# __EXHIBIT A__

**CCDA Lift Stay Hearing**
**Exhibit List**

# 1. CCDA Demonstrative



June 4, 2020

# Preliminary Hearing
# CCDA Lift Stay Motion

# CCDA – Relevant Statutes and Bond Documents

## CCDA Enabling Act, Act 351-2000

- Creates CCDA in order to develop and operate a convention center district in San Juan.
- The Commonwealth pledged and agreed with the CCDA bondholders "it shall not limit nor alter the rights hereby conferred" to CCDA until the CCDA bonds are "paid in full and said contracts are fully executed and honored" by CCDA. 23 L.P.R.A. § 6450.

## Hotel Occupancy Tax Act, Act 272-2003

- Authorizes the Tourism Company to levy taxes on the room rates charged to guests of hotels, motels, casinos, inns, and other lodgings (*i.e.*, the Hotel Taxes). 13 L.P.R.A. § 2271*o*; § 2271a(a).
- Authorizes CCDA to issue bonds backed by the Pledged Hotel Taxes in order to build the convention center and other facilities.  13 L.P.R.A. § 2271v.
- Transfers to CCDA bondholders all equitable ownership over the portion of Hotel Taxes pledged to the repayment of CCDA bonds. *Id.*
- Requires the Pledged Hotel Taxes to be transferred from the Tourism Company to GDB to the CCDA Bond Trustee, who receives and holds them for the benefit of the CCDA bondholders. *Id.*
- Prohibits the use of the Pledged Hotel Taxes, other than for payment to the CCDA bondholders.  *Id.*
- The Commonwealth covenanted with CCDA bondholders that it would never impair the CCDA bondholders' rights in the Pledged Hotel Taxes and would ensure that the Pledged Hotel Taxes were deposited by the Tourism Company into the Pledge Account.  *Id.*

## Assignment Agreement
(signed by the Tourism Company and GDB)

- Creates a specially segregated and restricted "Holding Fund," that is comprised of two accounts: the Transfer Account and the Surplus Account. §§ 1-2
- Requires that all Hotel Taxes be deposited "as collected" into the Holding Fund. *Id.*

## Pledge Agreement
(signed by GDB, CCDA, and the CCDA Bond Trustee)

- Creates a special and irrevocable "Pledge Account," held in trust by GDB on behalf of CCDA for the benefit of the Owners of the Bonds. § 2(a).
- Requires the Debt Service Amount to be transferred from the Holding Fund to the Pledge Account on a monthly basis..
- Grants Movants a lien on all funds that are "deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement." § 2(b).

## Trust Agreement
(signed by CCDA and the CCDA Bond Trustee)

- CCDA pledged and assigned the Pledged Hotel Taxes to the CCDA Bond Trustee.  *See* Granting Clauses.
- Creates a special "Bond Payment Fund", which shall be used to pay the bond payments on the CCDA bonds. § 5.02.
- Requires the CCDA Bond Trustee to distribute funds to the CCDA bondholders when funds are received from GDB. § 5.01.

## First Supplemental Trust Agreement
(signed by CCDA and the CCDA Bond Trustee)

Milbank

2

# The Pledge Agreement

Section 2.   (a)   In furtherance of the pledges set forth in the Assignment Agreement and the Occupancy Tax Act, GDB hereby creates and establishes a special and irrevocable account designated as the "Hotel Occupancy Tax Pledge Account" (the "Pledge Account") to be held in trust by GDB on behalf of the Authority for the benefit of the Owners of the Bonds, separate and apart from other funds of GDB.

(b)   Each of GDB and the Authority does hereby grant, bargain, convey, assign, mortgage and pledge a security interest to the Trustee, as trustee under the Trust Agreement and for the benefit of the Owners of the Bonds, free and clear of all prior or parity liens, pledges and security interests, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, to be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes, (i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

Milbank

(ECF No. 10104, Ex.4, Pledge Agreement § § 2(a), (b) (emphasis added).)

3

# Movants Have a Lien on the Pledged Hotel Taxes, Whether or Not They Are Deposited Into the Transfer Account.

Section 5.      The Tourism Company hereby acknowledges, and agrees to comply with, its obligations under the Occupancy Tax Act to transfer to GDB the monthly amounts required under Section 31(A) of the Occupancy Tax Act, pursuant to the instructions contained in the GDB Certificate.

(ECF No. 10104, Ex. 3, Assignment Agreement § 5 (emphasis added.)

(b)      GDB  will  diligently  enforce  its  rights  under  the  Assignment

Agreement  including its enforcement of the Hotel Occupancy Tax Funds transfer obligation of

the Company

(ECF No. 10104, Ex. 4, Pledge Agreement § 5(b) (emphasis added.)

Milbank

4

# Movants Have a Lien on the Pledged Hotel Taxes, Whether or Not They Are Deposited Into the Transfer Account.

(i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

(ECF No. 10104, Ex. 4, Pledge Agreement § 2(b)(iii) (emphasis added).)

Section 3.   (a) GDB hereby agrees that, so long as there are any Bonds Outstanding under the Trust Agreement, to deposit or cause to be deposited into the Pledge Account, all Hotel Occupancy Tax Funds received from the Tourism Company as received but in no event later than 12:00 noon, New York time, on the next Business Day immediately following the Business Day on which such Hotel Occupancy Tax Funds are received by GDB.

(ECF No. 10104, Ex. 4, Pledge Agreement § 3(a) (emphasis added).)

Milbank

5

## Movants' Lien on the Pledged Hotel Taxes Is Properly Perfected.

- CCDA Enabling Act Pledge:

23 L.P.R.A. § 6441

§ 6441 Authority; terms and conditions; execution and validity of bonds; uses of proceeds

(d) Pledge of the Authority. Any pledge of the Authority shall be binding from the moment that it was made, and any funds or property thus pledged shall be subject to the lien of the pledge without the need of its actual delivery. The lien on the pledge of the Authority shall be binding on any party that has a claim for damages, contracts or other claims against the Authority, regardless of the fact they have been duly served. No instrument that creates the pledge shall have to be recorded in a registry to be effective against third parties.

- P.R. UCC:

  - 19 L.P.R.A. § 2219(c)(2):  "This chapter does not apply to the extent that . . . another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state."

Milbank

6

# The Tourism Company Consented to the Terms of the Pledge Agreement.

Section 3.    The Company consents to and approves of the Preliminary Official Statement, the Pledge and Assigment Agreement, the Trust Agreement, the Supplemental Trust Agreement and the Bond Purchase Agreement, substantially in the form presented to the Board of Directors as Exhibits B, C, D, E and F, attached hereto and made part hereof.

Pedro A. Padilla Torres
Undersecretary

(ECF No. 13315, Ex. 49, Tourism Company Board of Directors Resolution 06-47 §§ 2-3 (excerpted).)

Section 10.    As required by Section 31 of the Occupancy Tax Act, the Tourism Company, pursuant to its Board of Directors' Resolution No. 06-47, hereby gives its prior written approval to (i) the form of Bonds as set forth in attachment 1 hereto (ii) the amortization schedule of the Bonds set forth as attachment 2 hereto, (iii) the Trust Agreement set forth as attachment 3 hereto and (iv) the Pledge Agreement set forth as attachment 4 hereto.

(ECF No. 10104, Ex. 3, Assignment Agreement § 10.)

Milbank

7

# The Tourism Company Consented to the Terms of the Pledge Agreement.

Section 7.    The Tourism Company hereby expressly acknowledges and consents to GDB entering into that certain Pledge Agreement with the Authority and the Trustee of even date herewith (the "Pledge Agreement") under which the Hotel Occupancy Tax Funds transferred to GDB hereunder will be further pledged by the Authority and transferred from GDB to the Trustee for the benefit of the Owners of the Bonds.

(ECF No. 10104, Ex. 3,  Assignment Agreement § 7 (emphasis added).)

Section 9.    The Tourism Company shall immediately upon receipt of a Deficiency Notice (as such term is defined in Section 4 of the Pledge Agreement), but in no event later than 12:00 noon, New York time, on the third Business Day immediately following receipt of such Deficiency Notice, deposit sufficient funds from amounts held as Hotel Occupancy Tax Funds, to satisfy the requirements set forth in Section 3(b)(2) of the Pledge Agreement.

(ECF No. 10104, Ex. 3 Assignment Agreement § 9 (emphasis added).)

(2)    GDB shall on each calendar month no later than 12:00 noon,

New York time on the third Business Day immediately following the Business Day on which

Hotel Occupancy Tax Funds are received by it, transfer or cause to be transferred to the Trustee,

all Hotel Occupancy Tax Funds then deposited to the Pledge Account.  The Trustee shall

(ECF No. 10104, Ex. 3, Pledge Agreement § 3(b)(2) (emphasis added).)

Milbank

8

# The Tourism Company's Rights to the Pledged Hotel Taxes Are Subject to the Commonwealth's Agreement to Be Bound by the Pledge Agreement.

The Hotel Occupancy Tax Act contains covenants of the Commonwealth to the CCDA bondholders that the Commonwealth:

- (i) will never eliminate or reduce the Hotel Taxes;

- (ii) will "make sure that the amounts that must be deposited in the [Pledge Account] as provided in this subsection are deposited in the [Pledge Account]";

- (iii) will "not alter or limit the rights acquired hereby by the Authority to encumber or pledge the collections from the tax required to be deposited in the [Pledge Account]"; and

- (iv) "**comply with the terms of any agreement entered into with, or for the benefit of the bondholders**."

13 L.P.R.A. § 2271v(a) (emphasis added).

The Enabling Act contains covenants of the Commonwealth to the CCDA bondholders that the Commonwealth:

- "The Government of the **Commonwealth of Puerto Rico pledges and agrees with the holders of any bonds issued under this chapter**, and with those persons or entities that enter into contracts with the Authority pursuant to the provisions of this chapter, **that it shall not limit nor alter the rights hereby conferred to the Authority until those bonds and the interest thereon are paid in full and said contracts are fully executed and honored by the Authority**; Provided, however, That nothing provided herein shall affect or alter said limitation if **adequate measures are provided by law** for the protection of said bondholders, or of those who have entered into contracts with the Authority. The Authority, as an agent of the Government of the Commonwealth of Puerto Rico, is authorized to include this pledge on behalf of the Government of the Commonwealth of Puerto Rico on said bonds or contracts."

23 L.P.R.A. § 6450 (emphasis added).

Milbank

9

**The Pledged Hotel Taxes have also been deposited into the Transfer Account (and thus became subject to Movants' lien), because the Scotiabank -5142 Account is the Transfer Account.**

Milbank

# January 2015 – November 2015



**Box Colors**
Blue: Tourism Company Account
Gray: Commonwealth Account
Yellow: Neither Commonwealth nor Tourism Company
Account

*See* ECF No. 13315, Ex. 44, Ahlberg Tr. 341:6-342:14,
502:17-503:9.

**Footnotes:**
Account contains comingled funds (room taxes and others).

(ECF No. 13315, Ex. 38, Letter from E. McKeen, Esq. to J. Hughes, Esq., et al., April 14, 2020, at 10.)   11

Milbank

# The GDB -9758 Account Is the Surplus Account



**DEBT SERVICE**
**CONVENTION CENTER DISTRICT AUTHORITY**

Dear Mr. Maestre:

We authorize debiting of the "Room Tax – Concentration Surplus" account number 250 – 9975 – 8, for the amount of **$3,033,841.10** for purposes of issuing the **payment for the month of February 2015**. This is to cover debt service of the bond issuance by the Convention Center District Authority, related to fiscal year 2014 – 2015.

**Please confirm with us, via email (sonia.rivera@tourism.pr.gov), after the transaction is completed.** If you have any additional questions, please contact me at extension 3043.

(*E.g.* ECF No. 13315, Ex. 37, CCDA_STAY0004297) (excerpted).)

Milbank

# February 2018 − Present



Box Colors
Blue: Tourism Company Account
Gray: Commonwealth Account
Yellow: Neither Commonwealth nor Tourism Company
Account

(*See* ECF No. 13315, Ex. 44, Ahlberg Tr. 341:6-342:14,
502:17-503:9.)
.

Account contains comingled funds (room taxes and others).

Denotes a discrete, one-time transfer

Milbank

(ECF No. 13315, Ex. 38, Letter from E. McKeen, Esq. to J. Hughes, Esq., et al., April 14, 2020, at 16.)   13

# The Government Parties' Only Evidence Is Inadmissible Hearsay.

| | | |
|---|---|---|
| 9 | BY MS. MILLER: | 06:31:26 |
| 10 | Q.     Okay.  And I don't think you | 06:31:39 |
| 11 | actually said it yet, so let me ask you to | 06:31:41 |
| 12 | identify which bank account do you believe on | 06:31:45 |
| 13 | this chart corresponds to the transfer account? | 06:31:50 |
| 14 | A.     GDB account 9758. | 06:31:59 |
| 15 | Q.     Okay.  And what is the basis for | 06:32:02 |
| 16 | that testimony? | 06:32:04 |
| 17 | A.     Conversations with Tourism. | 06:32:08 |

(ECF No. 13315, Ex. 44, Ahlberg
Tr. 489:9-17.)

| | | |
|---|---|---|
| 20 | BY MS. MILLER: | 07:03:30 |
| 21 | Q.     Mr. Ahlberg, you indicated that | 07:03:31 |
| 22 | you were confident that the GDB 9758 account | 07:03:33 |
| 23 | was the transfer account based on how -- the | 07:03:39 |
| 24 | moneys that flowed into it. | 07:03:42 |
| 25 | Can you explain to me what about | 07:03:45 |

| | | |
|---|---|---|
| 1 | the GDB 9758 account makes you confident that | 07:03:47 |
| 2 | it is the transfer account? | 07:03:52 |
| 3 | A.     After discussions with the Tourism | 07:04:02 |
| 4 | Company, I'm confident that that's the transfer | 07:04:04 |
| 5 | account. | 07:04:08 |
| 6 | Q.     So there is nothing specific about | 07:04:12 |
| 7 | the nature of the moneys that flowed into it, | 07:04:14 |
| 8 | how the account was used or any documents that | 07:04:19 |
| 9 | makes you confident that it's the transfer | 07:04:23 |
| 10 | account.  It's based exclusively on | 07:04:26 |
| 11 | conversations that you had with Gustavo? | 07:04:28 |

. . .

| | | |
|---|---|---|
| 2 | THE WITNESS:  Me, personally, it's | 07:05:24 |
| 3 | based on my conversations with Gustavo, but I | 07:05:25 |
| 4 | can't say that Gustavo didn't consider various | 07:05:29 |
| 5 | factors when determining that. | 07:05:35 |

(ECF No. 13315, Ex. 44, Ahlberg
Tr. 545:20-547:5.)

Milbank

14

# Hotel Occupancy Tax Act

- Requires that the Pledged Hotel Taxes be held "**for the benefit of the bondholders.**"

  13 L.P.R.A. § 2271v(a)(4) (emphasis added).

- Provides that the Pledged Hotel Taxes "shall be used **solely** for the payment of the principal and interest on the [CCDA] bonds."

  13 L.P.R.A. § 2271v(a)(4) (emphasis added).

- The Pledged Hotel Taxes "shall be deposited in a special account to be maintained by the Bank . . . [and] [t]he Bank shall transfer the amounts deposited in such special account to the trustees of the bondholders . . . ."

  13 L.P.R.A. § 2271v(a)(4) (emphasis added).

Milbank

# The Bond Documents

THIS ASSIGNMENT and COORDINATION AGREEMENT (the "Assignment Agreement"), dated March 24, 2006, is by and between the PUERTO RICO TOURISM COMPANY (the "Tourism Company"), and GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ("GDB"), acting herein for the benefit of the Owners of the Hotel Occupancy Tax Revenue Bonds (the "Bonds") issued by the Puerto Rico Convention Center District Authority (the "Authority") pursuant to the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") by and between the Authority and JPMORGAN CHASE BANK, N.A., as trustee under the Trust Agreement.

(ECF No. 10104, Ex. 3, Assignment Agreement, Introduction (emphasis added).)

**Section 2.** (a) In furtherance of the pledges set forth in the Assignment Agreement and the Occupancy Tax Act, GDB hereby creates and establishes a special and irrevocable account designated as the "Hotel Occupancy Tax Pledge Account" (the "Pledge Account") to be held in trust by GDB on behalf of the Authority for the benefit of the Owners of the Bonds, separate and apart from other funds of GDB.

(ECF No. 10104, Ex. 4, Pledge Agreement § 2(a) (emphasis added).)

Milbank

16

# CCDA Bondholders Have "Last Dollars" Protection

"In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."

Article VI, Section 8

"The Authority is hereby authorized, with the prior written consent of the Company, to pledge or otherwise encumber the revenues product of the fixed tax collected which is to be deposited in a special account as required by the first paragraph of this subsection, as security for the payment of the principal and interest on the bonds, notes or other obligations issued, assumed or incurred by the Authority, as described in the first paragraph of this subsection, or for the payment of its obligations under any bond related financing agreement, as described in said paragraph. Such a pledge or obligation shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico. The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, **but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes.**"

13 L.P.R.A. § 2271v(a)(4)

Milbank

17

# CCDA Bondholders Have "Last Dollars" Protection

**Section 2.** **(a)** In furtherance of the pledges set forth in the Assignment Agreement and the Occupancy Tax Act, GDB hereby creates and establishes a special and irrevocable account designated as the "Hotel Occupancy Tax Pledge Account" (the "Pledge Account") to be held in trust by GDB on behalf of the Authority for the benefit of the Owners of the Bonds, separate and apart from other funds of GDB.

**(b)** Each of GDB and the Authority does hereby grant, bargain, convey, assign, mortgage and pledge a security interest to the Trustee, as trustee under the Trust Agreement and for the benefit of the Owners of the Bonds, free and clear of all prior or parity liens, pledges and security interests, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, to be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes, (i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

**Section 3.** **(b)** Amounts deposited in the Pledge Account are to be held by GDB to provide for the following deposits (in order of priority):

**(1)** GDB will make payments to the Commonwealth of Puerto Rico as set forth in Section 2(b) above when required in accordance with Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico;

**(2)** GDB shall on each calendar month no later than 12:00 noon, New York time on the third Business Day immediately following the Business Day on which Hotel Occupancy Tax Funds are received by it, transfer or cause to be transferred to the Trustee, all Hotel Occupancy Tax Funds then deposited to the Pledge Account. The Trustee shall promptly deposit such funds into the Accounts established in Sections 5.02, 5.04, 5.05 and 5.06 of the Trust Agreement (in accordance with and in the order of priority set forth in Section 5.01 of the Trust Agreement) as set forth in the GDB Certificate authorized in Section 3(b)(3) hereof.

(ECF No. 10104, Ex.4, Pledge Agreement §§ 2, 3 (emphasis added).)

Milbank

# 2. Assignment Agreement (March 24, 2006), ECF No. 10104-3

## ASSIGNMENT AND COORDINATION AGREEMENT

THIS ASSIGNMENT and COORDINATION AGREEMENT (the "Assignment Agreement"), dated March 24, 2006, is by and between the PUERTO RICO TOURISM COMPANY (the "Tourism Company"), and GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ("GDB"), acting herein for the benefit of the Owners of the Hotel Occupancy Tax Revenue Bonds (the "Bonds") issued by the Puerto Rico Convention Center District Authority (the "Authority") pursuant to the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") by and between the Authority and JPMORGAN CHASE BANK, N.A., as trustee under the Trust Agreement.

All capitalized terms used herein, unless otherwise defined herein, shall have the meaning given such terms in the Trust Agreement.

In consideration of the foregoing and pursuant to the Occupancy Tax Act, which imposes the Hotel Occupancy Tax, the Tourism Company and GDB hereby agree as follows:

Section 1.    The Tourism Company hereby creates a special fund called the Assignment and Coordination Agreement Holding Fund (the "Holding Fund"). All Hotel Occupancy Tax Revenues will be deposited, as collected, into the Holding Fund.

Section 2.    The Holding Fund shall contain two accounts identified as the Transfer Account and the Surplus Account.

Section 3.    On or before May 30th of each Fiscal Year, GDB will determine and certify to the Authority, the Tourism Company and the Trustee in writing (the "GDB Certificate") the amount necessary for the Authority to make, during the upcoming fiscal year and the first day of the second succeeding fiscal year (collectively, the "Required Payments"):

(a) payments equal to the amount necessary (after taking into account any amounts then on deposit in the Bond Payment Fund and the Capitalized Interest Account of the Proceeds Fund available therefor) for the full and timely payment, or the amortization, of the principal and interest on the Bonds due on July 1st and January 1st of the immediately succeeding fiscal year and July 1st of the second succeeding fiscal year (including any amounts due in connection with prior payments for which there were insufficient funds);

(b) full and timely payment of the obligations of the Authority under any Credit Facilities or any Interest Rate Exchange Agreements, which in the future may be entered into by the Authority with the prior written authorization of the Tourism Company;

(c) the deposits required to replenish the Debt Service Reserve Fund established under the Trust Agreement; and

(d) any other expenses incurred in connection with (i) the issuance of the Bonds, or (ii) with any Credit Facilities or Interest Rate Exchange Agreements.

Section 4.    On a monthly basis, all Hotel Occupancy Tax Funds received by the Tourism Company shall be deposited into the Transfer Account until (i) 1/10 of the Required Payments has been met and (ii) any deficiencies in prior payment periods have been met, but in aggregate such amounts shall not exceed the total amount of Required Payments needed in any Fiscal Year.  Thereafter, and only when the Transfer Account contains all moneys necessary to pay the Bonds in accordance with the GDB Certificate, the Tourism Company shall deposit any excess funds into the Surplus Account, which account shall be available to be utilized in accordance with Section 31(B) of the Occupancy Tax Act.

Section 5.    The Tourism Company hereby acknowledges, and agrees to comply with, its obligations under the Occupancy Tax Act to transfer to GDB the monthly amounts required under Section 31(A) of the Occupancy Tax Act, pursuant to the instructions contained in the GDB Certificate.

Section 6.    The Tourism Company hereby irrevocably pledges, assigns, transfers, conveys, grants and sets over to GDB all rights it may legally have in amounts deposited in the Transfer Account collected by the Tourism Company as required under the provisions of Section 31 of the Occupancy Tax Act up to the amounts certified by GDB in the GDB Certificate (including any amounts as may be necessary to pay any previously unpaid amounts).

Section 7.    The Tourism Company hereby expressly acknowledges and consents to GDB entering into that certain Pledge Agreement with the Authority and the Trustee of even date herewith (the "Pledge Agreement") under which the Hotel Occupancy Tax Funds transferred to GDB hereunder will be further pledged by the Authority and transferred from GDB to the Trustee for the benefit of the Owners of the Bonds.

Section 8.    The Tourism Company further agrees that at any time and from time to time, upon the written request of GDB, the Authority or the Trustee, the Tourism Company will promptly and duly execute and deliver any and all such further instruments and documents as GDB, the Authority or the Trustee may deem desirable in order to obtain the full benefits of this Assignment Agreement and all rights and powers herein granted.  The above to the contrary notwithstanding, the Tourism Company shall not be obligated to execute such further instruments and documents which it is not legally permitted to execute under the Occupancy Tax Act.

Section 9.    The Tourism Company shall immediately upon receipt of a Deficiency Notice (as such term is defined in Section 4 of the Pledge Agreement), but in no event later than 12:00 noon, New York time, on the third Business Day immediately following receipt of such Deficiency Notice, deposit sufficient funds from amounts held as Hotel Occupancy Tax Funds, to satisfy the requirements set forth in Section 3(b)(2) of the Pledge Agreement.

Section 10.    As required by Section 31 of the Occupancy Tax Act, the Tourism Company, pursuant to its Board of Directors' Resolution No. 06-47, hereby gives its prior written approval to (i) the form of Bonds as set forth in attachment 1 hereto (ii) the amortization schedule of the Bonds set forth as attachment 2 hereto, (iii) the Trust Agreement set forth as attachment 3 hereto and (iv) the Pledge Agreement set forth as attachment 4 hereto.

2

DM3\337714.9

Section 11.    Notwithstanding anything herein to the contrary, the assignment, transfer and pledge of the Hotel Occupancy Tax Funds is made subject to the rights of the Commonwealth of Puerto Rico under Section 8 Article VI of the Constitution of the Commonwealth of Puerto Rico.

Section 12.    The Tourism Company acknowledges (and agrees to comply with) its obligations under the Occupancy Tax Act to:

(a)  enforce its right under the provisions of Section 33 of the Occupancy Tax Act to commence a distraint procedure, and/or to present an action against a bond or surety related to deficiencies with respect to taxes imposed by the Occupancy Tax Act;

(b)  enforce the provisions of Section 28 of the Occupancy Tax Act; and

(c)  submit to the Authority and to the Convention Center Bureau a monthly statement itemizing the collections on account of the Hotel Occupancy Tax

Section 13.    This Assignment Agreement shall be binding upon the Tourism Company and GDB and their successors and assigns and shall inure to the benefit of the Owners of the Bonds and parties to any Credit Facilities or Interest Rate Exchange Agreements.

Section 14.    This Assignment Agreement may not be modified, amended, or superseded, for as long as any Bonds remain outstanding under the Trust Agreement except in accordance with the provisions of Section 9.04 thereof.

Section 15.    The Owners of the Bonds, the parties to any Credit Facilities or Interest Rate Exchange Agreements, the Trustee and the Authority shall be deemed third party beneficiaries to this Assignment Agreement.  This Assignment and the right of the Tourism Company to pledge the Transfer Account shall be deemed an agreement made for the benefit of the Owners of the Bonds and the parties to any Credit Facilities or Interest Rate Exchange Agreements.

Section 16.    The laws of the Commonwealth shall be applied in the interpretation and enforcement of this Assignment Agreement.

Section 17.    Should any discrepancies between this Assignment Agreement and the Occupancy Tax Act arise, the provisions of the Occupancy Tax Act shall prevail.

DM3\037714.9

IN WITNESS WHEREOF, the Tourism Company and GDB have duly executed this Assignment Agreement on the date above stated at San Juan, Puerto Rico.

PUERTO RICO TOURISM COMPANY

By: _____

Terestella González Denton
Executive Director

GOVERNMENT DEVELOPMENT BANK OF PUERTO RICO

By: _____

Jorge Irizarry Herrans
Executive Vice President

Affidavit No. 490

Subscribed before me by Jorge Irizarry Herrans, of legal age, married, and resident of San Juan, Puerto Rico, in his capacity as Executive Vice President of Government Development Bank for Puerto Rico, personally known to me; and Terestella González Denton, of legal age, married, and resident of San Juan, Puerto Rico, in her capacity as Executive Director of the Puerto Rico Tourism Company, personally known to me. In San Juan, Puerto Rico, this 24th day of March 2006.

NOTARY PUBLIC

4

# 3. Pledge Agreement, (March 24, 2006), ECF No. 10104-4

# PLEDGE AND ASSIGNMENT AGREEMENT
by and among

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY,

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

and

## JPMORGAN CHASE BANK, N.A.

**Dated March 24, 2006**

relating to:

**Puerto Rico Convention Center District Authority
Hotel Occupancy Tax Revenue Bonds**

# PLEDGE AGREEMENT

**THIS PLEDGE AND ASSIGNMENT AGREEMENT** (this "Pledge Agreement"), dated March 24, 2006, by and among GOVERNMENT DEVELOPMENT BANK for PUERTO RICO ("GDB"), PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY (the "Authority"), and JPMORGAN CHASE BANK, N.A., as Trustee under the Trust Agreement (as hereinafter defined) (the "Trustee");

In consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

**Section 1.**    All capitalized terms used herein shall have the meanings set forth in the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") by and between Authority and the Trustee, unless otherwise indicated.

**Section 2.**    (a)    In furtherance of the pledges set forth in the Assignment Agreement and the Occupancy Tax Act, GDB hereby creates and establishes a special and irrevocable account designated as the "Hotel Occupancy Tax ·Pledge Account" (the "Pledge Account") to be held in trust by GDB on behalf of the Authority for the benefit of the Owners of the Bonds, separate and apart from other funds of GDB.

(b)    Each of GDB and the Authority does hereby grant, bargain, convey, assign, mortgage and pledge a security interest to the Trustee, as trustee under the Trust Agreement and for the benefit of the Owners of the Bonds, free and clear of all prior or parity liens, pledges and security interests, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, to be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other

DM3\321190.13

available resources to which reference is made in said Section are insufficient for such purposes,
(i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys
deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this
Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

    (c)  Each of GDB and the Authority hereby agrees that it will not grant,
assign, or pledge, nor allow, permit or suffer to exist any prior or parity lien on or security
interest in the items pledged pursuant to Section 2(b) above or any investments thereof or
earnings thereon in favor of any creditor of GDB, the Authority or any other Person other than
(1) the liens created by this Pledge Agreement and (2) the pledge set forth in Section 2(b) above.

    **Section 3.**  (a) GDB hereby agrees that, so long as there are any Bonds
Outstanding under the Trust Agreement, to deposit or cause to be deposited into the Pledge
Account, all Hotel Occupancy Tax Funds received from the Tourism Company as received but in
no event later than 12:00 noon, New York time, on the next Business Day immediately following
the Business Day on which such Hotel Occupancy Tax Funds are received by GDB.

    (b)  Amounts deposited in the Pledge Account are to be held by GDB to
provide for the following deposits (in order of priority):

    (1)  GDB will make payments to the Commonwealth of Puerto
Rico as set forth in Section 2(b) above when required in accordance with Section 8 of Article VI
of the Constitution of the Commonwealth of Puerto Rico;

    (2)  GDB shall on each calendar month no later than 12:00 noon,
New York time on the third Business Day immediately following the Business Day on which
Hotel Occupancy Tax Funds are received by it, transfer or cause to be transferred to the Trustee,
all Hotel Occupancy Tax Funds then deposited to the Pledge Account. The Trustee shall

3

promptly deposit such funds into the Accounts established in Sections 5.02, 5.04, 5.05 and 5.06 of the Trust Agreement (in accordance with and in the order of priority set forth in Section 5.01 of the Trust Agreement) as set forth in the GDB Certificate authorized in Section 3(b)(3) hereof.

(c)     The GDB Certificate, in the form attached hereto as Exhibit A, is hereby authorized.

Section 4. In the event that, as of the close of business on the last Business Day of any calendar month, the aggregate of the monthly amounts transferred by the Tourism Company to GDB during the related Fiscal Year is less than the aggregate of the monthly amounts required to be transferred under the GDB Certificate for such period, GDB and the Trustee shall promptly and in any event no later than the next Business Day send a written notice of such deficiency (the "Deficiency Notice") and the amount thereof to the Authority, the Tourism Company and the Trustee which notice shall be sent by telecopier and be promptly confirmed via first class mail.

Section 5.     (a)    GDB agrees with the Authority that it will comply with the direction to it set forth in Section 31 of the Occupancy Tax Act including without limitation the obligation to make the required certifications to the Company and the Authority as required by Subsection (a) of Section 31 of the Occupancy Tax Act.

(b)     GDB will diligently enforce its rights under the Assignment Agreement including its enforcement of the Hotel Occupancy Tax Funds transfer obligation of the Company

Section 6.     This Pledge Agreement, the Pledge Account and the security interest in the moneys in the items set forth in Section 2(b) hereof shall remain in full force and effect and shall not be terminated or revoked so long as there are any Bonds Outstanding under the terms of the Trust Agreement and any Supplemental Trust Agreement. Upon all Bonds having been paid

4

or deemed paid, in accordance with Section 10.01 of the Trust Agreement, this Agreement shall terminate and any moneys remaining in the Pledge Account at the time of such termination shall be released to the Authority.

**Section 7.** So long as GDB applies the moneys as provided herein, and complies fully with the terms of this Agreement, GDB shall not be liable for any deficiencies in the amounts necessary to pay the Bonds.

**Section 8.** If any one or more of the covenants or agreements provided in this Pledge Agreement by or on behalf of GDB, the Authority or the Trustee to be performed should be determined by a court of competent jurisdiction to be contrary to law, such covenant or agreement shall be deemed and construed to be severable from the remaining covenants and agreements herein contained and shall in no way affect the validity of the remaining provisions of this Agreement.

**Section 9.** If any section, paragraph, sentence, clause or provision of this Pledge Agreement shall for any reason be held to be invalid or unenforceable, the invalidity or unenforceability of such section, paragraph, sentence, clause or provision shall not affect any of the remaining provisions of this Pledge Agreement. GDB shall provide the Company, the Authority and the Trustee with written notice if any section, paragraph, sentence, clause or provision of the Pledge Agreement should be held to be invalid or unenforceable. Such written notices shall be mailed at the addresses set forth below:

**Section 10.** All the covenants, promises and agreements contained in this Agreement by or on behalf of GDB, the Authority or the Trustee shall bind and inure to the benefit of their respective successors and assigns, whether so expressed or not. Any successor trustee under the Trust Agreement and any Supplemental Trust Agreement without further act

5

shall be successor Trustee hereunder unless GDB or the Authority has otherwise appointed a successor Trustee. The predecessor Trustee shall pay over or transfer to the successor Trustee any moneys or Government Obligations at the time held by it or on its behalf.

Section 11.   Except insofar as the duties, powers and authority of the Authority and GDB, its officers and employees are governed by the laws of the Commonwealth of Puerto Rico, this Agreement shall be governed by the applicable law of New York; provided that the venue of any judicial action commenced by the parties other than the Trustees shall be in the Commonwealth of Puerto Rico.

Section 12.   This Agreement may be executed in several counterparts, all or any of which shall be regarded, for all purposes as one original, and shall constitute and be but one and the same instrument.

Section 13.   This Agreement may be amended, modified or supplemented only by written instrument executed by GDB, the Authority and the Trustee, and only in accordance with Section 9.04 of the Trust Agreement.

Section 14.   GDB and the Authority acknowledge and agree that the Agreement shall be part of the Trust Estate under the Trust Agreement, pledged to the Owners of the Bonds and any credit or liquidity provider or interest rate counter party secured under the Trust Agreement.

Section 15.   The laws of the Commonwealth shall be applied in the interpretation and enforcement of this Pledge Agreement.

Section 16.   Unless otherwise stated herein, any notice, demand, direction, request or other instrument authorized or required by this Pledge Agreement to be given to or filed with the Authority, GDB or Trustee shall be deemed to have been sufficiently given or filed for all

6

purposes of this Pledge Agreement if sent by registered mail, return receipt requested (i) to the respective addresses set forth in the Trust Agreement if such notice is being sent to the Trustee or the Authority; (ii) as follows if such notice is being sent to GDB: to Government Development Bank for Puerto Rico, Minillas Government Center, DeDiego Avenue, Stop 22, Santurce, Puerto Rico, 00940; or (iii) to such other address as may hereinafter be provided by written notice given by the Authority, GDB or the Trustee to the other parties.

7

**IN WITNESS WHEREOF,** the parties hereto have each caused the Pledge Agreement to be executed by their duly authorized officers or elected officials and GDB and the Authority have caused their respective seals to be hereunder affixed and attested as of the date first above written.

GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO

By: _____
Jorge Irizarry Herrans
Executive Vice President

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY

By: _____
Manuel Sánchez Biscombe
Executive Director

JPMORGAN CHASE BANK, N.A.,
as Trustee

By: _____
Joanne Adamis
Vice President

8

Affidavit No. 491

Subscribed before me by Jorge Irizarry Herrans, of legal age, married, and resident of San Juan, Puerto Rico, in his capacity as Executive Vice President of Government Development Bank for Puerto Rico, personally known to me; Manuel Sánchez Biscombe, of legal age, married, and resident of San Juan, Puerto Rico, in his capacity as Executive Director of the Puerto Rico Convention Center District Authority, personally known to me; and Joanne Adamis, of legal age, single, and resident of New York, New York, in her capacity as a Vice President of JPMorgan Chase Bank, N.A., personally known to me. In San Juan, Puerto Rico, this 24th day of March 2006.

NOTARY PUBLIC

Affidavit No. 4044 (copy)

Subscribed before me by Manuel Sánchez Biscombe, of legal age, married, and resident of San Juan, Puerto Rico, in his capacity as Executive Director of the Puerto Rico Convention Center District Authority, personally known to me. In San Juan, Puerto Rico, this 24th day of March 2006.



NOTARY PUBLIC

9

DM3\350062.1

EXHIBIT A

GDB CERTIFICATE

[Form of]
## Government Development Bank for Puerto Rico Certificate

The undersigned [Authorized Representative] of the Government Development Bank for Puerto Rico ("GDB"), a public corporation of the Commonwealth of Puerto Rico created by Act No. 17 of September 23, 1948, HEREBY CERTIFIES to the Puerto Rico Convention Center District Authority (the "Authority"), the Puerto Rico Tourism Company (the "Tourism Company") and JPMorgan Chase Bank, as Trustee (the "Trustee") under the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") between the Authority and the Trustee (all capitalized terms used but not defined herein shall have the respective meanings set forth in the Trust Agreement) the following.

This Certificate is issued in connection with the payments required for fiscal year ____- ____ and the first day of the succeeding fiscal year.

1. The following are the total sums necessary for the Authority to make the following payments, during the upcoming fiscal year and the first day of the second succeeding fiscal year:

I.          (a)     Payments equal to the amount set forth below (after taking into account any amounts then on deposit in the Bond Payment Fund and the Capitalized Interest Account of the Proceeds Fund available therefor) for the full and timely payment, or the amortization, of the principal and interest on the Bonds due on July 1st and January 1st of the immediately succeeding fiscal year and July 1st of the second succeeding fiscal year (including any amounts due in connection with prior payments for which there were insufficient funds):

        Amount necessary for Principal and Interest     $_____

        Offsets due to amounts held in the Earnings
        Account of the Proceeds Fund (-)

        Offsets due to amounts held in the Bond
        Payment Fund (-)

        Offsets due to Capitalized Interest in the
        Proceeds Fund[†] (-)

        Shortfalls due to Hotel Occupancy Tax
        Funds used pursuant to the provisions
        of Section 8 Article VI of the Constitution (+)

        Other shortfalls from prior years(+)     $_____

        Total Amount due (the "Total Amount")     $_____

---

[†] First year only

The Total Amount will be paid in monthly installments as set forth below:[*]

July                    $
August
September
October
November
December
January
February
March
April
May
June

    (b) Full and timely payment of the obligations of the Authority under any Credit Facilities or any Interest Rate Exchange Agreements, which in the future may be entered into by the Authority with the prior written authorization of the Tourism Company;[*]

July                    $
August
September
October
November
December
January
February
March
April
May
June

    (c) The deposits required to replenish the Debt Service Reserve Fund established under the Trust Agreement;[*] and

July                    $
August

---

[*] All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year. This may include payments in May and June of such Fiscal Year together with future Fiscal Years

2

September
October
November
December
January
February
March
April
May
June

   (d) Any other expenses incurred in connection with (i) the issuance of the Bonds, or (ii) with any Credit Facilities or Interest Rate Exchange Agreements.[*]

July
August
September
October
November
December
January
February
March
April
May
June

  2. The total amount due for all amounts set forth in paragraph 1 is $_____.

  3. Amounts set forth in paragraph 1 are in accordance with the provisions set forth in the Trust Agreement and the Assignment and Coordination Agreement, dated as of _____, 2006, by and between the Tourism Company and GDB.

  4. GDB will deposit all Hotel Occupancy Tax Funds as set forth in this Certificate in accordance with the Pledge Agreement.

  5. The Trustee will deposit into the Bond Payment Fund promptly upon receipt but in no event later than the third Business Day after receipt thereof, beginning on the first month of the next suceeding Fiscal Year, an amount sufficient, together (in the case of interest only) with any capitalized interest and accrued interest as set forth in the Proceeds Fund, to pay the amount of interest and principal payable for the year in the amounts set forth below (such annual deposit

---

[*] All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year. This may include payments in May and June of such Fiscal Year together with future Fiscal Years

3

being first satisfied with respect to interest on the Bonds and then with respect to principal on the Bonds):

|  | Principal | Interest |
|---|---|---|

July
August
September
October
November
December
January
February
March
April
May
June

**IN WITNESS WHEREOF**, the undersigned has hereunto set [his][her] official signature and the corporate seal of Government Development Bank for Puerto Rico this May __,
_____.

GOVERNMENT DEVELOPMENT
BANK FOR PUERTO RICO

By: ___        _____
   Name:
   Title:

4

# 4. Trust Agreement, (March 24, 2006), ECF No. 10104-5

# TRUST AGREEMENT

between

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

and

## JPMORGAN CHASE BANK, N.A., AS TRUSTEE

Dated as of March 24, 2006

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY
HOTEL OCCUPANCY TAX REVENUE BONDS

# TABLE OF CONTENTS

**Page**

### ARTICLE I.

### DEFINITIONS

Section 1.01    Definitions............................................................................................ 3

### ARTICLE II.

### SECURITY FOR BONDS

Section 2.01    Discharge of Trust Agreement................................................. 12
Section 2.02    Bonds Secured on a Parity Unless Otherwise Provided ...................... 13
Section 2.03    Limited Obligations .................................................................. 13

### ARTICLE III.

### AUTHORIZATION, ISSUANCE, DELIVERY OF AND FORM OF THE BONDS

Section 3.01    Authorization, Purpose, Name and Compliance with this Article......... 13
Section 3.02    Issuance of Bonds. ................................................................... 14
Section 3.03    Conditions to Issuance of Additional Bonds ........................................ 15
Section 3.04    Execution and Authentication of Bonds ............................................. 17
Section 3.05    Delivery of Bonds and Application of Proceeds.................................... 17
Section 3.06    Subordinated Loans .................................................................. 17

### ARTICLE IV.

### TERMS OF BONDS

Section 4.01    Applicability of this Article ................................................................ 18
Section 4.02    Registered Form, Denominations and Numbering of Bonds................. 18
Section 4.03    Negotiability ................................................................................. 18
Section 4.04    Registration of Bonds; Persons Treated as Owners; Transfer and
                Exchange of Bonds. ......................................................................... 18
Section 4.05    Mutilated, Lost, Stolen or Destroyed Bonds......................................... 19
Section 4.06    Payment of Bond Payments and Redemption Price. ........................... 19
Section 4.07    Book-Entry Registration ..................................................................... 20
Section 4.08    Notice of Redemption......................................................................... 20
Section 4.09    Optional Redemption Payments. ....................................................... 21
Section 4.10    Delivery of New Bonds Upon Partial Redemption of Bonds................. 21
Section 4.11    Nonpresentment of Bonds.................................................................. 21
Section 4.12    Cancellation of Bonds........................................................................ 22

## ARTICLE V.

### FUNDS AND ACCOUNTS

| | | |
|---|---|---|
| Section 5.01 | Application of Hotel Occupancy Tax Funds | 22 |
| Section 5.02 | Bond Payment Fund | 23 |
| Section 5.03 | Proceeds Fund | 24 |
| Section 5.04 | Financial Agreements Fund | 25 |
| Section 5.05 | Debt Service Reserve Fund | 25 |
| Section 5.06 | Rebate Fund | 26 |
| Section 5.07 | Moneys to be Held in Trust | 27 |
| Section 5.08 | Investment of Moneys | 27 |

## ARTICLE VI.

### COVENANTS OF THE AUTHORITY

| | | |
|---|---|---|
| Section 6.01 | Representations, Covenants and Warranties | 28 |
| Section 6.02 | Payment of Bond Payments | 30 |
| Section 6.03 | Rebate Payments | 30 |
| Section 6.04 | Other Payments by the Authority | 30 |
| Section 6.05 | Credit Facilities and Interest Rate Exchange Agreements | 30 |
| Section 6.06 | Tax Covenant | 31 |
| Section 6.07 | Defense of Trust Estate | 32 |

## ARTICLE VII.

### DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| Section 7.01 | Events of Default | 32 |
| Section 7.02 | Remedies Following an Event of Default | 32 |
| Section 7.03 | Use of Moneys Received From Exercise of Remedies | 33 |
| Section 7.04 | Owners of Majority in Aggregate Principal Amount of Bonds May Control Proceedings | 34 |
| Section 7.05 | Limitations on Rights of Owners Acting Individually | 34 |
| Section 7.06 | Trustee May Enforce Rights Without Bonds | 34 |
| Section 7.07 | Trustee to File Proofs of Claim in Receivership, Etc. | 35 |
| Section 7.08 | Delay or Omission No Waiver | 35 |
| Section 7.09 | Discontinuance of Proceedings on Event of Default; Position of Parties Restored | 35 |
| Section 7.10 | Waivers of Events of Default | 35 |

## ARTICLE VIII.

### CONCERNING THE TRUSTEE

| | | |
|---|---|---|
| Section 8.01 | Appointment of Trustee; Acceptance of Duties | 36 |

ii

Section 8.02    Limitations on Responsibilities of Trustee ............................................ 36
Section 8.03    Trustee Not Liable For Failure Of Authority To Act ............................ 36
Section 8.04    Quarterly Statements from Trustee ...................................................... 36
Section 8.05    Trustee Protected in Relying on Certain Documents............................ 37
Section 8.06    Qualification of Trustee ........................................................................ 37
Section 8.07    Resignation of Trustee .......................................................................... 38
Section 8.08    Removal of Trustee ............................................................................... 38
Section 8.09    Appointment of Successor Trustee ....................................................... 38
Section 8.10    Vesting of Rights in Successor Trustee ................................................ 39
Section 8.11    Compensation and Indemnification of Trustee..................................... 39
Section 8.12    Trustee Under No Duty to Investigate .................................................. 40
Section 8.13    Trustee May Employ Agents ................................................................ 40
Section 8.14    Trustee May Own Bonds ...................................................................... 40
Section 8.15    Rights of the Trustee ............................................................................. 40
Section 8.16    Trustee Notice to GDB ......................................................................... 41

## ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

Section 9.01    Supplemental Trust Agreements Not Requiring Consent of
               Owners ................................................................................................. 41
Section 9.02    Supplemental Trust Agreements Requiring Consent of Owners........... 42
Section 9.03    Conditions to Effectiveness of Supplemental Trust Agreements. ......... 43
Section 9.04    Amendment of Assignment Agreement or Pledge Agreement.............. 43

## ARTICLE X.

## DEFEASANCE

Section 10.01   Discharge of Trust Agreement................................................................ 44
Section 10.02   Defeasance of Bonds.............................................................................. 44
Section 10.03   Defeasance of Less than all Bonds of a Particular Series or
               Maturity................................................................................................. 45

## ARTICLE XI.

## MISCELLANEOUS

Section 11.01   Authority................................................................................................ 45
Section 11.02   Table of Contents, Titles and Headings................................................ 46
Section 11.03   Interpretation and Construction ............................................................ 46
Section 11.04   Further Assurances and Corrective Instruments.................................... 46
Section 11.05   Evidence of Signature of Owners and Ownership of Bonds. ................ 46
Section 11.06   Authorization of Officers and Employees ............................................ 47
Section 11.07   Parties Interested Herein ....................................................................... 47
Section 11.08   The Authority and Responsible Officers .............................................. 47

DM3_3395? 3.16

Section 11.09    Manner of Giving Notices ................................................................. 47
Section 11.10    Notices to Rating Agencies .............................................................. 48
Section 11.11    No Individual Liability ..................................................................... 48
Section 11.12    Events Occurring on Days that are not Business Days ...................... 48
Section 11.13    Severability ...................................................................................... 48
Section 11.14    Applicable Law ................................................................................ 48

DM3:339573.16

## TRUST AGREEMENT

**THIS TRUST AGREEMENT** is made and entered into as of the date set forth on the cover page hereof, by and between the Puerto Rico Convention Center District Authority (the "Authority"), a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") and JPMorgan Chase Bank, N.A., as trustee, a national banking association organized under the laws of the United States of America and authorized to accept and execute trusts of the character herein set out, and its permitted successors and assigns (the "Trustee").

**WHEREAS,** the Authority was created by Act No. 351 of the Legislature of Puerto Rico, approved September 2, 2000, as amended (hereinafter sometimes called the "Authority Act"), for the purpose of, among other things, possessing, financing, acquiring, developing, constructing, and operating the Puerto Rico Convention Center; and

**WHEREAS,** by virtue of the Authority Act, the Authority has, among others, the power to issue the Bonds (as defined herein).

**WHEREAS,** the Authority has determined that it is advisable to issue the Bonds, in one or more series, to finance or refinance a portion of the capital costs of certain projects and improvements constituting Construction Projects (defined herein);

**WHEREAS,** the Authority has further determined that it is appropriate to pledge the Hotel Occupancy Tax Funds (defined herein) pursuant to the Occupancy Tax Act (defined herein), to secure the Bonds; and

**WHEREAS,** the Authority deems it advisable to make provision for the issuance from time to time of revenue bonds on a parity with the Bonds issued initially under the provisions of this Trust Agreement for the purpose of financing and refinancing a portion of the capital costs of additional projects and improvements constituting Construction Projects; now, therefore,

## GRANTING CLAUSES

**NOW, THEREFORE,** The Authority, in consideration of the premises, the purchase of the Bonds by the Owners and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, in order to secure the payment of the Bond Payments on all Bonds at any time Outstanding hereunder, to secure the performance and observance of all the covenants and conditions set forth in the Bonds, this Trust Agreement and any Supplemental Trust Agreement, and to declare the terms and conditions upon and subject to which the Bonds are issued and secured, has entered into this Trust Agreement and has granted, assigned, pledged, bargained, sold, alienated, remised, released, conveyed, set over and confirmed, and by these presents does grant, assign, pledge, bargain, sell, alienate, remise, release, convey, set over and confirm unto the Trustee and to its successors and assigns forever, subject to the provisions of Section 8 of Article VI of the Constitution, all and singular the following described property, franchises and income, including any title or interest therein acquired after these presents (referred to herein as the "Trust Estate"):

I.

all Hotel Occupancy Tax Funds;

II.

All funds, accounts and all money from time to time held by the Trustee under this Trust Agreement or any Supplemental Trust Agreement and any fund or account other than (i) the Rebate Fund, (ii) any Defeasance Escrow Account and (iii) any fund or account created by a Supplemental Trust Agreement that is expressly excluded from the Trust Estate;

III.

all right, title and interest of the Authority acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Pledge Agreement, and any money from time to time held thereunder including the Pledge Account created thereunder;

IV.

all right, title and interest of GDB acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Assignment Agreement, including the Transfer Account created thereunder, and any money from time to time held therein;

V.

any and all other property, revenues or funds from time to time hereafter by delivery or by writing of any kind specially granted, assigned or pledged as and for additional security hereunder, by the Authority or anyone else, in favor of the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

THIS TRUST AGREEMENT FURTHER WITNESSETH that the proceeds from the issuance of Bonds that are pledged pursuant this Trust Agreement shall be used only for the purpose or purposes for which such funds are pledged;

THIS TRUST AGREEMENT FURTHER WITNESSETH that (i) the Hotel Occupancy Tax Funds pledged pursuant to Granting Clauses I, II, III, IV, and V of this Trust Agreement shall be valid and binding from the time such funds are transferred to GDB, (ii) any pledge of the proceeds of any Bonds that are pledged pursuant to Granting Clause II of this Trust Agreement shall be valid and binding from the date of the first issuance of the Bonds, and (iii) any pledge of the right, title, or interest in the Pledge Agreement and the Assignment Agreement that are pledged pursuant to Granting Clauses III and IV of this Trust Agreement shall be valid and binding from the date of the first issuance of the Bonds and of any pledge of the funds and accounts hereunder, under the Pledge Agreement, or under the Assignment Agreement shall be valid and binding from the date of the first issuance of the Bonds; and

THIS TRUST AGREEMENT FURTHER WITNESSETH that any Authority Representative is hereby authorized and directed, in the name and on behalf of the Authority, to execute and file with the appropriate office such financing statements as the person signing such

2

statements determines (with the advice of counsel) are necessary to preserve under applicable Commonwealth law, the lien on and pledge of Trust Estate for the benefit of the holders of the Bonds.

## ARTICLE I.

## DEFINITIONS

Section 1.01    Definitions.  Unless the context shall otherwise require, the terms defined in the recitals shall have such meanings throughout this Trust Agreement and the following terms shall have the following meanings in this Trust Agreement:

"*Accreted Value*" means any amount defined as such in a Supplemental Trust Agreement for purposes of determining the Redemption Price of, certain rights of the Owner of or certain other matters with respect to a Capital Appreciation Bond.

"*Accretion Date*" means any date defined as such in a Supplemental Trust Agreement for purposes of determining the Accreted Value or Maturity Value of a Capital Appreciation Bond.

"*Additional Bonds*" shall mean one or more series of Bonds of the Issuer issued pursuant to Section 3.02 or 3.03 hereof, other than the Series A Bonds issued on the date hereof pursuant to a first Supplemental Trust Agreement.

"*Assignment Agreement*" means the Assignment Agreement dated as of March 24, 2006, between the Tourism Company and GDB, pursuant to which the Tourism Company has irrevocably assigned to GDB its rights, duties and powers with respect to the receipt of Hotel Occupancy Tax Funds for the benefit of the bondholders.

"*Authority*" means the Puerto Rico Convention Center District Authority.

"*Authority Act*" means Act No. 351 of the Legislature of Puerto Rico, approved September 2, 2000, as the same shall be amended from time to time or any successor legislation by which the Authority shall be created and from which it shall derive its powers.

"*Authority Representative*" means the Executive Director or any other officer or employee of the Authority authorized by law to act as an Authority Representative under this Trust Agreement or any Supplemental Trust Agreement.

"*Authorized Denomination*" means the denomination or denominations defined as such in a Supplemental Trust Agreement for purposes of determining the denominations of a Series of Bonds.

"*Bond Counsel*" means (a) as of the date of issuance of the first Series of Bonds, Duane Morris LLP, and (b) as of any other date, Duane Morris LLP or other attorneys selected by the Authority who have nationally recognized expertise in the issuance of municipal securities, the interest on which is excluded from gross income for federal income tax purposes.

3

"*Bond Payment Date*" means each date on which Bond Payments are due and includes, but is not limited to, the maturity date of any Bond; each Interest Payment Date on each Current Interest Bond; and the mandatory sinking fund redemption dates of term Bonds that are subject to mandatory sinking fund redemption in accordance with a mandatory sinking fund redemption schedule set forth in a Supplemental Trust Agreement.

"*Bond Payment Fund*" means the special fund created by Section 5.02 hereof.

"*Bond Payments*" means (a) with respect to a Current Interest Bond, the interest due on such Bond on each Interest Payment Date and the principal and interest due on such Bond at maturity; (b) with respect to a Capital Appreciation Bond, the Maturity Value due on such Bond at maturity; and (c) with respect to term Bonds that are subject to mandatory sinking fund redemption in accordance with a schedule set forth in a Supplemental Trust Agreement, the principal and interest or the Accreted Value payable on such Bonds on the date on which they are subject to mandatory sinking fund redemption in accordance with such schedule. "Bond Payments" does not include the Redemption Price of any Bond.

For purposes of this definition:

(i)     Bond Payments due on any Interest Payment Date that are payable from accrued interest or capitalized interest held in the Bond Payment Fund pursuant to Section 5.02 hereof will be excluded in determining the amount of Bond Payments due in the Fiscal Year in which such Interest Payment Date occurs for purposes of determining the annual Bond Payments for the certificate required by Section 3.03(b).

(ii)     If any Bonds bear interest at an adjustable or variable interest rate such that the Bond Payments due in a Fiscal Year or on a Bond Payment Date cannot be determined with certainty on the date on which Hotel Occupancy Tax Funds are to be paid to the Trustee pursuant to the Pledge Agreement, or in determining the amount of Bond Payments becoming due during a Fiscal Year for purposes of preparing the certificate required by Section 3.03(b), the amount of interest included in the Bond Payments due on such Bonds in such Fiscal Year or on such Bond Payment Date shall be based on the interest rate estimated by the Authority, or as stated in any Supplemental Trust Agreement relating thereto.

(iii)     If the Authority purchases or arranges for a Credit Facility or an Interest Rate Exchange Agreement with respect to any Bonds pursuant to Section 6.05 hereof, (A) moneys paid or payable to the provider of the Credit Facility to reimburse the provider for moneys paid by the provider that are used to make Bond Payments (as defined in the first two sentences of this definition) and (B) moneys paid or payable to the provider of the Interest Rate Exchange Agreement for moneys paid by the provider that are used to make Bond Payments (as defined in the first two sentences of this definition) may, but in each case if and to the extent provided in a Supplemental Trust Agreement or in a separate agreement between the Authority and the Credit Facility or Interest Rate Exchange Agreement provider entered into pursuant to Section 6.05 hereof, be treated as Bond Payments on the Bonds to which the Credit Facility or Interest Rate Exchange Agreement relates.

4

"*Bonds*" means any bond or bonds, as the case may be, authenticated under, and issued pursuant to, the Trust Agreement.

"*Business Day*" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York, San Juan, Puerto Rico or any city identified in a Supplemental Trust Agreement are authorized by law to remain closed.

"*Capital Appreciation Bond*" means a Bond on which no payments are due until maturity or redemption prior to maturity.

"*Code*" means the Internal Revenue Code of 1986, as amended, and regulations thereunder.

"*Commonwealth*" means the Commonwealth of Puerto Rico.

"*Constitution*" means the Constitution of the Commonwealth.

"*Construction Account*" means the Construction Account within the Proceeds Fund created by Section 5.03 hereof.

"*Construction Costs*" means all costs and expenses paid or incurred or to be paid or incurred (including the reimbursement of the Authority for any of such costs and expenses originally paid or incurred by the Authority) in connection with:

      (a)    the design of, acquisition of the site for, construction of, and improvements made as part of, the Construction Projects;

      (b)    financing costs, including, but not limited to, costs and expenses that the Authority deems necessary or advantageous in connection with the sale of the Bonds and the administration of the Bonds, the Trust Estate, this Trust Agreement and any Supplemental Trust Agreement, including, but not limited to, costs and expenses relating to the engagement of consultants, financial advisors, underwriters, bond insurers, letter of credit banks, rating agencies, attorneys, trustees, paying agents, registrars, other agents and other Persons in connection with the issuance of the Bonds, the Trust Estate, this Trust Agreement or any Supplemental Trust Agreement;

      (c)    payment of interest on the Bonds during the construction of any Construction Projects;

      (d)    the funding of the Debt Service Reserve Fund; and

      (e)    working capital on or before the completion of any Construction Projects.

"*Construction Project*" means a project which may be financed, in whole or in part, with Hotel Occupancy Tax Funds in accordance with the Occupancy Tax Act, the Authority Act and the Tourism Company Administrative Determination No. 05-01, dated May 4, 2005.

5

"*Credit Facility*" means any letter of credit, insurance, stand-by credit or liquidity agreement or other forms of credit ensuring timely payment of any Bonds, including the Bond Payments on or the Redemption Price or purchase price of such Bonds, that is entered into in accordance with Section 6.05 hereof. References to "Credit Facility" with respect to any Series of Bonds shall be ineffective when such Bonds are not supported by a Credit Facility.

"*Current Interest Bond*" means a Bond on which interest is payable on Interest Payment Dates prior to maturity or redemption prior to maturity.

"*Debt Service Reserve Fund*" means the special fund created by Section 5.05 hereof.

"*Defeasance Escrow Account*" means any trust account into which money and/or Defeasance Securities are deposited for the purpose of defeasing any Bonds in accordance with Section 10.02 hereof.

"*Defeasance Security*" means Government Obligations that, at the time they are deposited into a Defeasance Escrow Account either (i) cannot be redeemed prior to maturity at the option of any Person other than the owner thereof or (ii) the redemption date of which has been irrevocably fixed by an irrevocable exercise of an option to redeem on such date or an irrevocable covenant to exercise an option to redeem on such date (in which case the fixed redemption date shall be treated as the maturity date for purposes of Article X hereon).

"*Earnings Account*" means the earnings account within the Proceeds Fund created by Section 5.03 hereof.

"*Event of Default*" means an event described in Section 7.01 hereof.

"*Executive Director*" means the Executive Director or any Assistant Executive Director of the Authority for the time being, or if there is no Executive Director or Assistant Executive Director, then any person designated by the Authority to perform the functions of the Authority.

"*Financial Agreements Fund*" means the special fund created by Section 5.04 hereof.

"*Fiscal Year*" means the period commencing on July 1st in each calendar year and ending on the last day of June of the next succeeding calendar year.

"*Government Obligations*" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government, (ii) bonds, debentures or notes issued by any of the following Federal Agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association or Federal Land Banks, (iii) obligations issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, (iv) municipal obligations, the payment of the principal of and interest and redemption premium, if any on which are irrevocably secured by obligations described in clause (i) of this definition and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the

DM3\339573.16

payment of the principal of and interest and redemption premium, if any, on such municipal obligations, and (v) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii), (iii) and (iv) of this definition held by a bank (including the Trustee) or trust company as custodian and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"*GDB*" means Government Development Bank for Puerto Rico, a public corporation of the Commonwealth created by Act No. 17 of the Legislature of Puerto Rico, approved September 23, 1948, as the same shall be amended from time to time or any successor legislation by which the shall be created and from which it shall derive its powers.

"*GDB Certificate*" means the annual certificate delivered on or before May 30 of each Fiscal Year by GDB to the Authority, the Tourism Company and the Trustee, setting forth the total monthly amounts to be delivered by GDB to the Trustee to pay principal and interest due on the Bonds for the upcoming Fiscal Year.

"*Hotel Occupancy Tax*" means the tax set forth in Section 24 of the Occupancy Tax Act.

"*Hotel Occupancy Tax Funds*" means all Hotel Occupancy Tax Revenues that are deposited in the Transfer Account on and after the date hereof.

"*Hotel Occupancy Tax Revenues*" means all revenues derived by the Tourism Company from the Hotel Occupancy Tax, including all penalties, surcharges and interest thereon.

"*Interest Payment Date*" means any date defined as such in a Supplemental Trust Agreement for purposes of paying the interest on a Series of Current Interest Bonds.

"*Interest Rate Exchange Agreement*" means any interest rate exchange agreement authorized by law and entered into with respect to the Bonds or any portion of the Trust Estate that is entered into in accordance with Section 6.05 hereof.

"*Letter of Representations*" means the Letter of Representations between the Authority and The Depository Trust Company, New York, New York or any successor depository with respect to the book-entry registration system for the Bonds.

"*Loan*" means any loan as set forth in the Supplemental Trust Agreement made by GDB or any other entity to the Authority.

"*Loan Payment Account*" means the Loan Payment Account within the Proceeds Fund created by Section 5.03 hereof.

"*Maturity Value*" means any amount defined as such in a Supplemental Trust Agreement for purposes of determining the amount payable to the Owner of a Capital Appreciation Bond at the maturity of such Capital Appreciation Bond.

"*Maximum Annual Debt Service Requirement*" means the greatest total amount of principal and interest due on the Bonds in any calendar year.

7

"*Moody's*" means Moody's Investor Service and its successors.

"*New Money Bonds*" means Bonds issued for the purpose of funding the Proceeds Fund.

"*Occupancy Tax Act*" means Act No. 272 of the Legislature of Puerto Rico, approved September 9, 2003, as amended and supplemented from time to time and any successor or replacement provision of law.

"*Operations Center*" means the operations center of the Trustee in Dallas, Texas or at such other location as the Trustee may designate from time to time by written notice to the Authority.

"*Original Principal Amount*" means any amount defined as such in a Supplemental Trust Agreement for purposes of determining certain rights of the Owner of, or certain other matters with respect to, a Capital Appreciation Bond.

"*Original Purchaser*" means the Person defined as such in a Supplemental Trust Agreement for purposes of purchasing a Series of Bonds from the Authority.

"*Outstanding*" means all Bonds that have been executed and delivered, except:

     (a)    any Bond on which all Bond Payments due or to become due have been paid at maturity;

     (b)    any Bond on which the Redemption Price due or to become due has been paid in accordance with the redemption provisions applicable to such Bond;

     (c)    Bonds in lieu of which other Bonds have been executed and delivered pursuant to the provisions of this Trust Agreement or any Supplemental Trust Agreement relating to the transfer and exchange of Bonds or the replacement of mutilated, lost, stolen or destroyed Bonds:

     (d)    Bonds that have been canceled by the Trustee or that have been surrendered to the Trustee for cancellation;

     (e)    Bonds on which all Bond Payments or the Redemption Price is due and for which the Trustee holds moneys sufficient to pay the Bond Payments or Redemption Price for the benefit of the Owner thereof pursuant to Section 4.11 hereof; and

     (f)    Bonds that have been defeased pursuant to Article X hereof.

"*Owner*" of a Bond means the registered owner of such Bond as shown in the registration records of the Trustee.

"*Permitted Investments*" means:

     (a)    Government Obligations;

8

(b)    direct and general obligations of any state or territory of the United States of America to the payment of the principal of and interest on which the full faith and credit of such state or territory is pledged, provided that such obligations are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any graduations, within any such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(c)    bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the Trustee), trust company or savings and loan association (including any investment in pools of such bankers' acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clauses (a) or (b) above and (i) below, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the Trustee has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

. (d)    any repurchase, reverse repurchase, forward purchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the Trustee), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clauses (a) and (b) above and (i) below, provided that the Trustee has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(e)    obligations, whether or not insured, issued by any state or territory of the United States, or any political subdivision, agency or, instrumentality thereof which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(f)    participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any graduations within any such category) by both Moody's or any successors thereto, and S&P or any successors thereto;

(g)    (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and S&P or any successors thereto (without regard to graduations within such category) that (A) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and, meets the requirements of Section 852(a) of said Code for the calendar year; (B) invests all of

9

its assets in obligations described in clauses (a) and (b) above; and (C) has at least 98% of (I) its gross income derived from interest on, or gain from the sale or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the Trustee or any state or federally chartered bank, banking associations, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and S&P or any successors thereto (without regard to any gradations within such category);

(h) any other obligations permitted under the laws of the Commonwealth which are rated, or which are issued by issuers which are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto, or which are collateralized by Permitted Investments;

(i) Commercial paper, rated "P-1" by Moody's or "A-1" by S&P, issued by a corporation or banking institution organized under the laws of the United States or any state or territory thereof; and

(j) money market accounts of any state, Commonwealth or federally chartered bank, banking association, trust company or subsidiary trust company, including the Trustee, that is rated or whose parent bank is rated in the highest short-term rating category or in the highest long-term rating category by Moody's Investors Service or Standard & Poor's (without regard to any gradations within such category) or money market funds registered under the Investment Company Act of 1940, as amended, whose shares are registered under the Securities Act of 1933, as amended, and having a rating by Standard & Poor's of "AAAm-G" or "AAAm".

"*Person*" means any natural person, firm, corporation, partnership, limited liability company, state (including the Commonwealth), political subdivision of any state, other public body or other organization or association.

"*Pledge Account*" means the Pledge Account established under the Pledge Agreement.

"*Pledge Agreement*" means the Pledge and Assignment Agreement dated as of March __, 2006, by and among GDB, the Trustee and the Authority, pursuant to which GDB will deposit Hotel Occupancy Tax Funds received from the Tourism Company into the Pledge Account, which Hotel Occupancy Tax Funds will be transferred by GDB to, and applied by, the Trustee in accordance with the terms of this Trust Agreement.

"*Principal Amount*" means (a) with respect to any Outstanding Current Interest Bond, the principal amount of such Bond; (b) with respect to any Outstanding Capital Appreciation Bond, the Accreted Value of such Bond as of the date on which the Bond is being determined; and (c) with respect to all the Outstanding Bonds together, the sum of the amounts determined pursuant to clauses (a) and (b).

"*Proceeds Fund*" means the special fund created by Section 5.03 hereof.

10

"*Program Costs*" means the costs and expenses set forth in items (b) and (c) included in the definition of Construction Costs.

"*Puerto Rico Convention Center*" means the Puerto Rico Convention Center which shall be developed and operated on the real property owned or leased by the Authority, or by the people or entities designated by the Authority, and which shall be suitable for the following purposes and events: congresses, conventions, conferences, trade shows, exhibitions, meetings and other business, entertainment, public assemblies, social, cultural, historic and scientific events.

"*Rating Agency*" means, with respect to the Bonds, each nationally recognized securities rating service that has, at the request of the Authority, a rating then in effect for the unenhanced Bonds.

"*Rating Confirmation*" means, with respect to the Bonds, written evidence from a Rating Agency that no underlying Bond rating then in effect from such Rating Agency will be withdrawn, reduced or suspended solely as a result of an action to be taken hereunder.

"*Rebate Fund*" means the special fund created by Section 5.06 hereof.

"*Record Date*" means (a) with respect to any Interest Payment Date that is the first day of a month, the fifteenth day of the month (whether or not a Business Day) preceding the month in which the Interest Payment Date occurs: (b) with respect to any Interest Payment Date that is the fifteenth day of a month, the first day of such month (whether or not a Business Day); and (c) with respect to any other Interest Payment Date, the date designated as the Record Date for such Interest Payment Date in a Supplemental Trust Agreement.

"*Redemption Price*" means the amount due on a Bond on the date on which it is redeemed prior to maturity pursuant to the redemption provisions applicable to such Bond. Such term does not include the principal and interest or Accreted Value due on term Bonds on the dates such Bonds are to be redeemed in accordance with a mandatory sinking fund redemption schedule set forth in a Supplemental Trust Agreement.

"*Refunding Bonds*" means Bonds issued for the purpose of refunding, and proceeds of which are used to refund, New Money Bonds or other Refunding Bonds.

"*Reserve Account Credit Facility*" means any letter of credit, surety bond or insurance policy meeting the criteria set forth in a Supplemental Trust Agreement authorizing the issuance of a Series of Bonds.

"*Responsible Officer*" means any officer in the corporate trust department of the Trustee and any other person authorized by a writing signed by an officer of the Trustee to act as a Responsible Officer under this Trust Agreement or any Supplemental Trust Agreement.

"*Series*" means the Bonds designated as a separate series in a Supplemental Trust Agreement and any Bonds authenticated and delivered in lieu of or in substitution for such Bonds pursuant to this Trust Agreement or any Supplemental Trust Agreement.

11

"*Series Debt Service Reserve Requirement*" means for each Series of Bonds, the Series Debt Service Reserve Requirement as prescribed in the Supplemental Trust Agreement authorizing such Series of Bonds.

"*Supplemental Trust Agreement*" means any trust agreement supplementing or amending this Trust Agreement entered into pursuant to Article IX hereof.

"*S&P*" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and its successors.

"*Special Record Date*" means a special date fixed to determine the names and addresses of Owners of Bonds for purposes of paying defaulted interest on Current Interest Bonds in accordance with Section 4.06 hereof.

"*Tax Certificate*" means with respect to each Series of Bonds on which the Authority intends the interest to be excluded from gross income for federal income tax purposes, (a) the arbitrage and use of proceeds certificate or other instrument that sets forth the Authority's expectations regarding the investment and use of proceeds of such Bonds and other matters relating to Bond Counsel's opinion regarding the federal income tax treatment of interest on such Bonds, including any instructions delivered by Bond Counsel in connection with such certificate, instrument or opinion; and (b) any amendment or modification of any such certificate, instrument or instructions that is accompanied by an opinion of Bond Counsel stating that the amendment or modification will not adversely affect the exclusion of interest on such Bonds from gross income for federal income tax purposes.

"*Tourism Company*" means the Puerto Rico Tourism Company, a public corporation of the Commonwealth.

"*Transfer Account*" means the Transfer Account established pursuant to the Assignment Agreement.

"*Trust Agreement*" means this Trust Agreement as amended or supplemented by any Supplemental Trust Agreements.

"*Trust Estate*" means the property granted to the Trustee the Granting Clauses hereof.

"*Trustee*" means JPMorgan Chase Bank, N.A., acting in its capacity as trustee hereunder, and in the event of a merger or an acquistion of the Trustee, such successor thereto, or any successor Trustee appointed hereunder.

## ARTICLE II.

## SECURITY FOR BONDS

**Section 2.01  Discharge of Trust Agreement.**  If this Trust Agreement is discharged in accordance with Section 10.01 hereof, the right, title and interest of the Trustee and the Owners in and to the Trust Estate shall terminate and be discharged; otherwise this Trust Agreement is to be and remain in full force and effect.

12

Section 2.02    **Bonds Secured on a Parity Unless Otherwise Provided**.  The Trust Estate shall be held by the Trustee for the equal and proportionate benefit of the Owners of all Outstanding Bonds, and any of them, without preference, priority or distinction as to lien or otherwise, except as expressly set forth in this Trust Agreement or any Supplemental Trust Agreement.

Section 2.03    **Limited Obligations**.  Notwithstanding any other provision of this Trust Agreement:

(a)    The Bond Payments shall be payable solely from Hotel Occupancy Tax Funds and earnings on the funds and accounts established under this Trust Agreement that are received by the Authority or the Trustee and moneys held in the Bond Payment Fund.  The Owners may not look to any other revenues of the Authority for the payment of the Bonds.

(b)    All financial obligations of the Authority under this Trust Agreement, every Supplemental Trust Agreement and the Bonds (i) are special, limited obligations of the Authority payable solely from the Trust Estate and shall not constitute nor give rise to a pecuniary liability or a charge against the general credit of the Authority or the Commonwealth and (ii) shall not be deemed or construed as creating a debt, liability or obligation of the Commonwealth, or any political subdivision of the Commonwealth, nor a pledge of the faith and credit of the Commonwealth or any political subdivision or municipality of the Commonwealth within the meaning of the Constitution or the laws of the Commonwealth concerning or limiting the creation of indebtedness by the Commonwealth or any political subdivision of the Commonwealth.

(c)    The provisions of this Section are hereby expressly incorporated into each Supplemental Trust Agreement.  The Bonds shall contain statements substantially to the effect of subsections (a) and (b) of this Section.

## ARTICLE III.

## AUTHORIZATION, ISSUANCE, DELIVERY OF AND FORM OF THE BONDS

Section 3.01    **Authorization, Purpose, Name and Compliance with this Article**.  The Authority hereby authorizes the issuance of the Bonds pursuant to the Authority Act for the purpose of financing any Loans, any Construction Projects or Refunding Bonds that were issued to finance any Loans or any Construction Projects.  The Bonds may be issued in one or more separate Series pursuant to one or more Supplemental Trust Agreements and shall be named "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds."  The Bonds of each Series may also include the name of, or other information identifying, the Series of which they are a part, together with such further or different designations as may be deemed appropriate, as provided by a Supplemental Trust Agreement. The aggregate principal amount of Bonds which may be issued shall not be limited except as provided herein or as may be limited by law provided that the aggregate principal amount of Bonds of each Series shall not exceed the amount specified in the Supplemental Trust Agreement

13

authorizing each such Series of Bonds. Bonds may only be issued in accordance with this Article and the Authority Act.

### Section 3.02    Issuance of Bonds.

(a)    The initial Series of Bonds may not be issued until (i) receipt by the Trustee of executed copies of each of the Pledge Agreement, the Assignment Agreement and resolutions of each of the Authority, the Tourism Company and GDB approving the transaction and (ii) the provisions set forth in 3.02(b) are satisfied.

(b)    No Series of Bonds may be issued until receipt by the Trustee of

(i)    Except with respect to the issuance of the first series of Bonds, reaffirmations of the Pledge Agreement and the Assignment Agreement from each of the Authority, the Tourism Company and GDB;

(ii)    A written opinion of Bond Counsel in form and substance satisfactory to the Trustee to the effect (which may be subject to customary assumptions and limitations) that (I) the Bonds have been duly authorized, executed and delivered by the Authority and are valid and binding special, limited obligations of the Authority, payable from the sources provided in this Trust Agreement together with the related Supplemental Trust Agreement and the applicable Supplemental Trust Agreement; (II) this Trust Agreement creates a valid pledge of and lien on the Trust Estate, subject to the terms hereof; (III) the Trust Agreement, the Supplemental Trust Agreement and the Pledge Agreement have been duly authorized executed and delivered by the Authority; and (IV) if the interest on the Bonds is intended by the Authority to be excluded from gross income for federal income tax purposes, interest on the Bonds is excluded from gross income for federal income tax purposes;

(iii)    The written order to the Trustee executed by an Authority Representative to authenticate and deliver the Bonds to the purchaser(s) therein identified upon payment to the Trustee for the account of the Authority of the purchase price therein specified, plus accrued interest, if any; and

(iv)    An original executed counterpart of all other documents required under the terms hereof, or any Supplemental Trust Agreement.

(c)    Before any series of Bonds is issued, the Authority and the Trustee shall enter into a Supplemental Trust Agreement authorizing the issuance of each Series of Bonds, which Supplemental Trust Agreement specifies the following:

(i)    The Series designation, the name, the aggregate principal amount, the Authorized Denominations, the dated date, the maturity date or dates and the form of the Bonds, as bonds or notes, and, if the Bonds are Capital Appreciation Bonds, the aggregate Original Principal Amount of each Series and of each Authorized Denomination of such Series.

14

(ii)  If the Bonds are Current Interest Bonds, the interest rate or rates, or the method for determining the interest rate or rates on the Bonds, which rates may be fixed, adjustable or variable or any combination thereof, and, if any such rate is adjustable or variable, the standard, index, method or formula to be used to determine the interest rate and the maximum interest rate applicable to the Bonds; and the Interest Payment Date or Dates for the payment of such interest.

(iii)  If the Bonds are Capital Appreciation Bonds, the Maturity Value, Accreted Value and Accretion Dates, or the manner of determining the same.

(iv)  The redemption provisions, if any, for the Bonds.

(v)  The form of the Bonds.

(vi)  The manner in which the proceeds of the Bonds are to be applied.

(vii)  Other provisions required hereunder to be set forth in the Supplemental Trust Agreement.

(viii)  Any variations from the terms set forth in this Trust Agreement with respect to the Bonds.

(ix)  Any other provisions deemed to be advisable or desirable to be included in such Supplemental Trust Agreement that do not violate and are not in conflict with this Trust Agreement or any previous Supplemental Trust Agreement.

**Section 3.03    Conditions to Issuance of Additional Bonds.**  Additional Bonds may be issued under a Supplemental Trust Agreement and delivered pursuant to this Section 3.03 to pay or provide for the payment of all or part of the Construction Costs of any Construction Project or the improvement, reconstruction or rehabilitation of one or more Construction Projects. No Series of Additional Bonds may be issued under a Supplemental Trust Agreement unless each of the following conditions applicable thereto has been satisfied:

(a)    Before any Additional Bonds are issued, all of the following conditions shall be satisfied:

(i)    There is no Event of Default under this Trust Agreement or in the event there is an Event of Default under this Trust Agreement, the Event of Default will be cured upon the issuance of the Bonds and the application of the proceeds of the Bonds in accordance with the Supplemental Trust Agreement authorizing the issuance of the Additional Bonds.

(ii)    All accumulations required to be made into the Bond Payment Fund or other similar account, and each account in the Debt Service Reserve Fund, for Outstanding Bonds, are current.

(iii)    All assignments or deposits required to be made in accordance with the terms the Authority Act and the Occupancy Tax Act are current.

15

(iv) A certificate has been delivered showing compliance with all applicable provisions of the Occupancy Tax Act.

(v) Bond Counsel has delivered a written opinion, satisfying the requirements of Section 3.02(a)(ii), in form and substance satisfactory to the Trustee with respect to the issuance of the Additional Bonds.

(vi) GDB shall have consented in writing to the issuance of such Additional Bonds.

(vii) The Tourism Company shall have consented in writing to the issuance of such Additional Bonds.

(b) Before any Additional Bonds constituting New Money Bonds are issued or incurred, it shall be determined that for the preceding Fiscal Year or any 12 consecutive months out of the preceding 24 months, the Hotel Occupancy Tax Funds for such period, will equal not less than 140% of the Maximum Annual Debt Service Requirement for all outstanding Bonds, after giving effect to the series of Additional Bonds to be issued, as certified by an Authority Representative or GDB; provided, that if there has been an increase in the amount of Hotel Occupancy Tax Funds available for transfer into the Transfer Account, the foregoing coverage calculation may be computed based upon the amount of the Hotel Occupancy Tax Funds that would have been realized had such an increase in Hotel Occupancy Tax Funds had been pledged during the period of such calculation.

(c) Before any Additional Bonds constituting Refunding Bonds are issued, all of the following additional conditions shall be satisfied:

(i) Either the requirements of Subsection (b) of this Section 3.03 shall have been met (as if such Refunding Bonds were New Money Bonds) or a certificate of an Authority Representative shall be provided stating that following the issuance of the Refunding Bonds (including Bond Payments with respect to the Refunding Bonds, but excluding Bond Payments with respect to the refunded Bonds), (i) the aggregate amount of Bond Payments due in any Fiscal Year, through and including the latest maturity of any Bonds then Outstanding, shall be no greater than immediately prior to the issuance of such Refunding Bonds and (ii) there will be no increase in the Maximum Annual Debt Service Requirement.

(ii) If any of the Bonds to be refunded are to be redeemed prior to their scheduled maturity date, an Authority Representative has directed the Trustee in writing to deliver redemption notices and to redeem the Bonds to be refunded in accordance with the provisions of this Trust Agreement and any applicable provisions of any Supplemental Trust Agreement.

(d) A written certification or opinion by or on behalf of an Authority Representative that the requirements of this Section have been satisfied shall be conclusively presumed to be accurate in determining the right to authorize, issue, sell and deliver the Series of Bonds proposed to be issued.

16

(e)     Until all Bond Payments and Program Costs are paid in full and while any Bonds are Outstanding, no bonds, notes, debentures or other obligations shall be issued or incurred having a lien on the Trust Estate prior and superior to the lien thereon of the Bonds.

**Section 3.04     Execution and Authentication of Bonds**.  The Bonds shall be signed by, or bear the facsimile signatures of the Executive Director, or any other Authority Representative designated in a Supplemental Trust Agreement, and a facsimile of the corporate seal of the Authority shall be imprinted on the Bonds.  In case any officer whose signature or facsimile shall appear on any Bonds shall cease to be such officer before the delivery of such Bonds, such signature or facsimile shall nevertheless be valid and sufficient for all purposes the same as if such officer had remained in office until such delivery, and also any Bond may be signed or bear the facsimile signature of such persons as at the actual time of the execution of such Bond shall be the proper officers to execute such Bond although at the date of such Bond such persons may not have been such officers.

Only such of the Bonds as shall have been endorsed thereon a certificate of authentication duly executed by the Trustee, shall be entitled to any benefit or security under this Trust Agreement.  No Bond shall be valid or become obligatory for any purpose unless and until such certificate of authentication shall have been duly executed by the Trustee, and such certificate of the Trustee upon any such Bond shall be conclusive evidence that such Bond has been duly authenticated and delivered under this Trust Agreement.  The Trustee's certificate of authentication on any Bond shall be deemed to have been duly executed if signed by a Responsible Officer, but it shall not be necessary that the same Responsible Officer sign the certificate of authentication on all of the Bonds that may be issued hereunder at any one time.

**Section 3.05     Delivery of Bonds and Application of Proceeds**.  Upon the execution and delivery by the Authority and the Trustee of the Trust Agreement prior to the issuance of the first Series of Bonds and execution and delivery by the Authority and the Trustee the Supplemental Trust Agreement relating to such Series of Bonds, the Trustee shall deliver the Bonds of the Series authorized by such Supplemental Trust Agreement to the Original Purchaser in exchange for the purchase price thereof and the purchase price shall be applied as provided in the Supplemental Trust Agreement relating to such Series of Bonds.

**Section 3.06     Subordinated Loans**.  Subordinated loans or other subordinated bonds, notes or other obligations may be incurred by, and the proceeds thereof be applied by, the Authority for Construction Projects permitted under the Authority Act and under this Trust Agreement, provided, however, that any items of the Trust Estate pledged to the payment of such subordinated loans or other subordinated bonds, notes or other obligations shall be subordinate in all respects to the pledge of revenues, moneys, securities and funds pledged under this Trust Agreement.

17

## ARTICLE IV.

## TERMS OF BONDS

**Section 4.01      Applicability of this Article**.  The terms set forth in this Article shall apply to all Bonds unless, and except to the extent, provided otherwise by the Supplemental Trust Agreement.

**Section 4.02      Registered Form, Denominations and Numbering of Bonds**. The Bonds shall be issued only as fully registered Bonds in Authorized Denominations (provided that no Bond may be in a denomination which exceeds the principal or Maturity Value coming due on any maturity date of the Series of which it is a part and no individual Bond may be issued for more than one maturity) and shall be numbered in such manner as shall be determined by the Trustee.

**Section 4.03      Negotiability**.  The Bonds are hereby declared to be negotiable instruments.  The Bonds shall, subject to the registration provisions hereof, be fully negotiable and shall have all the qualities of negotiable paper, and the Owners thereof shall possess all rights enjoyed by the holders or owners of negotiable instruments under the provisions of the Uniform Commercial Code-Investment Securities.  The Bond Payments on and Redemption Price of the Bonds shall be paid, and the Bonds shall be transferable, free from and without regard to any equities, set-offs or cross-claims between the Trustee and the original or any intermediate owner of any Bonds.

**Section 4.04      Registration of Bonds; Persons Treated as Owners; Transfer and Exchange of Bonds.**

(a)      Records for the registration and transfer of Bonds shall be kept by the Trustee which is hereby appointed the registrar for the Bonds.  The Bond Payments on and Redemption Price of any Bond shall be payable only to or upon the order of the Owner or his legal representative (except as otherwise herein provided with respect to Record Dates and Special Record Dates for the payment of interest).  Upon surrender for transfer of any Bond at the Operations Center of the Trustee, duly endorsed for transfer or accompanied by an assignment duly executed by the Owner or his attorney duly authorized in writing, the Trustee shall enter such transfer on the registration records and shall execute and deliver in the name of the transferee or transferees a new fully registered Bond or Bonds of a like Series, maturity, aggregate principal amount and interest rate or Maturity Value, bearing a number or numbers not previously assigned.

(b)      Fully registered Bonds may be exchanged at the Operations Center of the Trustee for an equal aggregate principal amount or Maturity Value of Bonds of the same Series, maturity and interest rate but of other Authorized Denominations.  The Trustee shall execute and deliver Bonds for which the Owner making the exchange is entitled to receive, bearing numbers not previously assigned.

(c)      The Trustee may require the payment, by the Owner of any Bond requesting exchange or transfer, of any reasonable charges as well as any taxes, transfer

18

fees or other governmental charges required to be paid with respect to such exchange or transfer.

(d)      The Trustee shall not be required to transfer or exchange (i) all or any portion of any Bond during the period beginning at the opening of business fifteen days before the day of the mailing by the Trustee of notice calling any of the Bonds of such Series for prior redemption and ending at the close of business on the day of such mailing, or (ii) all or any portion of a Bond after the mailing of notice calling such Bond or any portion thereof for prior redemption.

(e)      Except as otherwise herein provided with respect to Record Dates and Special Record Dates for the payment of interest, the person in whose name any Bond shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of or on account of the Bond Payments on or Redemption Price of any Bond shall be made only to or upon the written order of the Owner thereof or his legal representative, but such registration may be changed as herein provided.  All such payments shall be valid and effectual to satisfy and discharge such Bond to the extent of the sum or sums paid.

**Section 4.05      Mutilated, Lost, Stolen or Destroyed Bonds**.  In the event that any Bond is mutilated, lost, stolen or destroyed, a new Bond of like Series, date, maturity, interest rate and denomination as that mutilated, lost, stolen or destroyed shall be executed, authenticated and delivered to the Owner of such Bond upon receipt by the Trustee of such evidence, information or indemnity from the Owner of the Bond as the Trustee may reasonably require and, in case of any mutilated Bond, upon the surrender of the mutilated Bond to the Trustee.  If any such Bond shall have matured, instead of issuing a duplicate Bond, the Trustee may pay the same without surrender thereof.  The Trustee may charge the Owner of the Bond with its reasonable fees and expenses in this connection and require payment of such fees and expenses as a condition precedent to the delivery of a new Bond.

**Section 4.06      Payment of Bond Payments and Redemption Price.**

(a)      The principal or Maturity Value and Redemption Price, if any, of any Bond shall be payable to the Owner thereof as shown on the registration records of the Trustee upon maturity or prior redemption thereof and upon presentation and surrender at the Operations Center of the Trustee.

(b)      Payment of interest on the Bonds (other than interest paid as part of the Redemption Price of a Bond) shall be made by check or draft of the Trustee mailed, on or before each Interest Payment Date, to the Owner thereof at his address as it last appears on the registration records of the Trustee at the close of business on the Record Date.  Any such interest not so timely paid shall cease to be payable to the person who is the Owner thereof at the close of business on the Record Date and shall be payable to the person who is the Owner thereof at the close of business on a Special Record Date for the payment of such defaulted interest.  Such Special Record Date shall be fixed by the Trustee whenever moneys become available for payment of the defaulted interest, and notice of the Special Record Date shall be given by the Trustee to the Owners of the

19

Bonds, not less than ten days prior to the Special Record Date, by first-class mail to each such Owner as shown on the Trustee's registration records on a date selected by the Trustee, stating the date of the Special Record Date and the date fixed for the payment of such defaulted interest.   Alternative means of payment of interest may be used if mutually agreed to in writing between the Owner of any Bond and the Trustee.

Section 4.07    **Book-Entry Registration**.   Except as otherwise provided by Supplemental Trust Agreement, notwithstanding any other provision hereof the Bonds shall be delivered only in book-entry form registered in the name of Cede & Co as nominee of The Depository Trust Company ("DTC") New York, New York acting as securities depository of the Bonds and the Bond Payments on and Redemption Price of the Bonds shall be paid by wire transfer to DTC; provided, however, if at any time the Authority determines and notifies the Trustee of its determination that DTC is no longer able to act as, or is no longer satisfactorily performing its duties as, securities depository for the Bonds, the Authority may, at its discretion, either (a) designate a substitute securities depository for DTC and reregister the Bonds as directed by such substitute securities depository or (b) terminate the book-entry registration system and reregister the Bonds in the names of the beneficial owners thereof provided to it by DTC. Neither the Authority nor the Trustee shall have any liability to DTC, Cede & Co., any substitute securities depository, any Person in whose name the Bonds are reregistered at the direction of any substitute securities depository, any beneficial owner of the Bonds or any other Person for (i) any determination made by the Trustee pursuant to the proviso at the end of the immediately preceding sentence or (ii) any action taken to implement such determination and the procedures related thereto that is taken pursuant to any direction of or in reliance on any information provided by DTC, Cede & Co., any substitute securities depository or any Person in whose name the Bonds are reregistered.   DTC is solely responsible for disbursement of Bond Payments and transmission of notices to its participants, and DTC participants are solely responsible for making those payments and transmitting any notices to beneficial owners.

Section 4.08    **Notice of Redemption**.

(a)    When Bonds (or portion thereof) are to be redeemed at the option of the Authority and as authorized or provided for in any Supplemental Trust Agreement, the Authority shall give or shall cause to be given written notice of redemption of Bonds to the Trustee no later than 45 Days prior to the redemption date or such shorter time as may be acceptable to the Trustee.  Notice of the call for any redemption, identifying the Bonds or portions thereof to be redeemed and specifying the terms of such redemption, shall be given by the Trustee by mailing a copy of the redemption notice by United States first-class (pre-paid) mail, at least thirty days prior to the date fixed for redemption, to the Owner of each Bond to be redeemed at the address shown on the registration books; provided, however, that failure to give such notice by mailing, or any defect therein, shall not affect the validity of any proceedings of any Bonds as to which no such failure has occurred.

(b)    Any notice mailed as provided in this Section shall be conclusively presumed to have been duly given, whether or not the Owner receives the notice.

20

(c)     If at the time of mailing of notice of any redemption of Bonds at the option of the Authority there shall not have been deposited with the Trustee moneys sufficient to redeem all the Bonds called for redemption, which moneys are or will be available for redemption of Bonds, such notice may state that it is conditional upon the deposit of the redemption moneys with the Trustee not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited.

**Section 4.09     Optional Redemption Payments.**

(a)     On or prior to the Business Day immediately preceding the date fixed for redemption of any Bonds at the option of the Authority, the Authority shall pay or cause to be paid to either (i) the Trustee, moneys which, together with other moneys then on deposit in the Bond Payment Fund that are not required to pay Bond Payments due in such Fiscal Year on Bonds that are not being redeemed, are sufficient to pay the Redemption Price of the Bonds to be redeemed on the date fixed for redemption or (ii) to an escrow agent (for deposit into an escrow fund (including a Defeasance Escrow Account) created for such purpose in the name of the Trustee for the benefit of the Owners of the related Series of Bonds), moneys which are sufficient, together with other moneys then available, are sufficient to pay the Redemption Price of the Bonds to be redeemed on the date fixed for redemption. The Authority may make such payment from any legally available moneys.  The Trustee shall use the moneys paid to it for such purposes and such other available moneys in the Bond Payment Fund to pay the Redemption Price due on the Bonds to be redeemed on the date fixed for redemption. Upon the giving of notice and the deposit of such funds as may be available for redemption pursuant to this Trust Agreement or an escrow deposit agreement, interest and Accreted Value on the Bonds or portions thereof thus called for redemption shall no longer accrue or accrete after the date fixed for redemption.

(b)     The Trustee or escrow agent, as applicable, shall pay to the Owners of Bonds so redeemed, the amounts due on their respective Bonds, at the Operations Center of the Trustee upon presentation and surrender of the Bonds.

**Section 4.10     Delivery of New Bonds Upon Partial Redemption of Bonds**. Upon surrender and cancellation of a Bond for redemption in part only, a new Bond or Bonds of the same Series, maturity and interest rate and in an Authorized Denomination equal to the unredeemed portion thereof, shall be executed by the Authority and authenticated and delivered by the Trustee.

**Section 4.11     Nonpresentment of Bonds**.  If any Bond is not presented for payment when due, whether at maturity or on redemption prior to maturity, and if the Trustee holds moneys sufficient to pay the Bond Payments or Redemption Price due on such Bond for the benefit of the Owner thereof, the Trustee shall hold such moneys, without liability for interest thereon, for the benefit of the Owner of such Bond, who shall be restricted exclusively to such moneys for any claim of whatever nature on his part under this Trust Agreement or on or with respect to such Bond. The Trustee shall from time to time deliver such unclaimed funds to or as directed by pertinent escheat authority, as identified by the Trustee in its sole discretion, pursuant

21

to and in accordance with applicable unclaimed property laws, rules or regulations. Any such delivery shall be in accordance with the customary practices and procedures of the Trustee and the escheat authority. Any money held by the Trustee pursuant to this paragraph shall be held uninvested and without any liability for interest.

    **Section 4.12 Cancellation of Bonds**. Whenever any Outstanding Bonds have been paid or redeemed or are otherwise delivered to the Trustee for cancellation, upon payment or redemption thereof or for or after replacement, the new Bonds shall be promptly cancelled by the Trustee.

<div align="center">

**ARTICLE V.**

**FUNDS AND ACCOUNTS**

</div>

    **Section 5.01 Application of Hotel Occupancy Tax Funds**. The assignment and pledge of Hotel Occupancy Tax Funds to the Trustee for the benefit of the Owners under the Granting Clauses of this Trust Agreement are intended to and shall constitute a first priority lien on such Hotel Occupancy Tax Funds; provided, however, that such assignment and pledge of Hotel Occupancy Tax Funds is subject to the provisions of Section 8 of Article VI of the Constitution. All Hotel Occupancy Tax Funds received by the Trustee shall be subject to the assignment and lien hereof upon receipt thereof as set forth in the Granting Clauses hereof.

    Each Fiscal Year starting July 1, 2006, Hotel Occupancy Tax Funds and any earnings set forth in 5.07 received by the Trustee shall be deposited and used only in the manner and order of priority specified below:

    (a)  Deposits shall be made into the Bond Payment Fund promptly upon receipt of funds from and receipt of notice from GDB that such funds have been transferred to the Trustee, but in no event later than the third Business Day after receipt thereof, beginning on July 1, 2006, in an amount sufficient, together (in the case of interest only) with capitalized interest and accrued interest as set forth in Section 5.02(b)(i) and (b)(ii) hereof, to pay the amount of interest and principal payable as set forth in the GDB Certificate, all as more fully set forth in Section 5.02;

    (b)  Deposits shall be made into the Financial Agreements Fund, to be established under a Supplemental Trust Agreement, in the event the Authority purchases or arranges for a Credit Facility or an Interest Rate Exchange Agreement pursuant to Section 6.05 in an amount as set forth in, or as determined in accordance with, such Supplemental Trust Agreement;

    (c)  Deposits shall be made into the Debt Service Reserve Fund as required by Section 5.05 hereof;

    (d)  Deposits shall be made into the Rebate Fund as required by Section 6.03 hereof;

    (e)  Subject to the preceding paragraphs of this Section 5.01 and the Granting Clauses hereof, Hotel Occupancy Tax Funds received by the Trustee and any earnings set

<div align="center">22</div>

forth in 5.08(c) and (d) need not be deposited as set forth in (a), (b), (c) and (d) above and may be released to the Tourism Company free and clear of the lien of this Trust Agreement, if and to the extent (i) not required for payment of amounts set forth in the GDB Certificate and not expected to be needed for any subsequent Bond Payments and (ii) as provided in a certificate of the Authority Representative.

**Section 5.02    Bond Payment Fund.**

(a)    *Creation of Bond Payment Fund*.  A special fund is hereby created with the Trustee to be designated the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds Bond Payment Fund", which shall be used to pay the Bond Payments on and Redemption Price, if any, of the Bonds.  The Trustee shall create and maintain separate accounts identified by the appropriate Series designation within the Bond Payment Fund to account for the receipt of moneys to pay, and the payment of, the Bond Payments on and Redemption Price, if any, of each Series of Bonds, but such separate accounts shall not affect the rights of the Owners of the Bonds with respect to moneys in the Bond Payment Fund.

(b)    *Deposits into Bond Payment Fund*.  There shall be deposited into the appropriate account of the Bond Payment Fund (i) all accrued interest received at the time of the issuance of any Bonds; (ii) any capitalized interest from the proceeds of a Series of Bonds unless deposited in the Proceeds Fund pursuant to a Supplemental Trust Agreement; (iii) to the extent necessary and as more fully set forth in the GDB Certificate, amounts to make the next Bond Payment including amounts paid to the Trustee pursuant to Section 6.05 hereof from any Credit Facilities or Interest Rate Exchange Agreements; (iv) any moneys paid or caused to be paid by the Authority with respect to the Redemption Price of Bonds pursuant to Section 4.09 hereof: (v) any moneys transferred to the Bond Payment Fund from the Proceeds Fund pursuant to Section 5.03(c) hereof; (vi) moneys deposited into the Bond Payment Fund pursuant to Section 7.02 hereof following an Event of Default; and (vii) all other moneys received by the Trustee accompanied by written directions from the Authority that such moneys are to be deposited into the Bond Payment Fund.

(c)    *Use of Moneys in Bond Payment Fund*.  Moneys on deposit in the Bond Payment Fund shall be used solely for the payment of the Bond Payments on and Redemption Price of the Bonds.  Moneys on deposit in the Bond Payment Fund shall be used to make the following payments or for the following purposes:

(i)    Interest Component.  To pay interest due on the Bonds;

(ii)    Principal Payments.    To pay maturing principal payment or mandatory sinking fund redemption payments on the Bonds; and

(iii)    Redemption Price.  To pay the Redemption Price of the Bonds pursuant to redemption prior to maturity;

Moneys on deposit in the Bond Payment Fund shall be used solely for payments on a parity with Bond Payments; provided that (i) moneys representing accrued interest

23

received at the time of the issuance of any Series of Bonds shall be used to pay the first interest payment due on such Bonds; (ii) moneys paid by the Authority with respect to the Redemption Price of Bonds pursuant to Section 4.09 hereof shall be used to pay the Redemption Price of the Bonds to be redeemed; (iii) moneys held in the Bond Payment Fund following an Event of Default shall be used as provided in Section 7.03 hereof and (vi) moneys on deposit in the Bond Payment Fund may also be used to make payments for the purposes permitted by Section 6.03 hereof.

### Section 5.03      Proceeds Fund.

(a)      *Creation of Proceeds Fund*.  A special fund is hereby created with the Trustee to be designated the Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds Proceeds Fund.  The Trustee shall create and maintain separate accounts identified as the Capitalized Interest Account, the Earnings Account, the Construction Account and the Loan Payment Account within the Proceeds Fund.  The Trustee shall create and maintain separate sub-accounts identified by the appropriate Series designation within each account of the Proceeds Fund to account for the receipt and disbursement of proceeds of each Series of Bonds.

(b)      *Deposits into Proceeds Fund*.  There shall be deposited into the appropriate account of the Proceeds Fund, proceeds of each Series of Bonds as provided in the applicable Supplemental Trust Agreement.

(c)      *Use of Moneys in Proceeds Fund*.  Upon the written direction of an Authority Representative, any amounts on deposit in the Proceeds Fund shall be transferred to, or upon the order of, the Authority for the payment of, or reimbursement for, costs of issuance relating to any Bonds.  So long as no Event of Default described in Section 7.01(a) then exists, moneys held in the Proceeds Fund (including the Earnings Account, Construction Account and the Loan Payment Account) shall be disbursed to the Authority (or the payee indicated by the Authority) to pay Capitalized Interest, or Construction Costs, or to reimburse such costs, upon receipt of a requisition signed by the Authority Representative in substantially the form attached hereto as Appendix A. Moneys held in the Proceeds Fund following such an Event of Default may be transferred at the written direction of the Authority Representative to the Bond Payment Fund in accordance with Section 7.02 hereof.  In the event of a transfer pursuant to the preceding sentence followed by the transfer of sufficient amounts to the Trustee from Hotel Occupancy Tax Funds or other sources in excess of any amount necessary to make any Bond Payments then due, such excess amount up to the amount transferred from the Proceeds Fund to the Bond Payment Fund shall be transferred to the Proceeds Fund upon the direction of the Authority Representative.  Upon the receipt by the Trustee of a certificate from the Authority Representative stating that all the Construction Projects have been completed and all required amounts have been deposited into the Rebate Fund, the remaining moneys in the Proceeds Fund, minus any amount estimated by the Authority Representative necessary to pay Construction Costs that have not yet been paid, shall be transferred by the Trustee to the Authority.  The Authority may use any such remaining moneys in the Proceeds Fund to (i) redeem any outstanding Bonds or (ii),

subject to a tax opinion of Bond Counsel in form and substance satisfactory to the Trustee, pay any Construction Costs.

(d)    Capitalized Interest shall be transferred from the Proceeds Fund as set forth in the Supplemental Trust Agreement and the GDB Certificate.

(e)    Funds in the Loan Payment Account will be used to repay any Loans as more fully set forth in the Supplemental Trust Agreement.

**Section 5.04    Financial Agreements Fund.**

(a)    *Creation of Financial Agreements Fund*.  A special fund is hereby created with the Trustee to be designated the Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds Financial Agreements Fund.  The Trustee shall create and maintain separate accounts identified by the appropriate Series designation within the Financial Agreements Fund to account for the payment of any amounts due to the provider of any Credit Facility or any Interest Rate Exchange Agreement in accordance with Section 6.05 hereof and the Supplemental Trust Agreement authorizing the Credit Facility or the Interest Rate Exchange Agreement.

(b)    *Deposits into Financial Agreements Fund*.  There shall be deposited into the appropriate account of the Financial Agreements Fund, amounts due as provided in the applicable Supplemental Trust Agreement.

(c)    *Use of Moneys in Financial Agreements Fund*.  Upon the written direction of an Authority Representative, any amounts on deposit in the Financial Agreements Fund shall be transferred to, or upon the order of, the Authority for the payment of, or reimbursement for, costs incurred by any provider of a Credit Facility or an Interest Rate Exchange Agreement.

**Section 5.05    Debt Service Reserve Fund.**

(a)    *Creation of Debt Service Reserve Fund*.  A special fund is hereby created with the Trustee to be designated the Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds Debt Service Reserve Fund.  Any Supplemental Trust Agreement may establish an account in the Debt Service Reserve Fund related to the Series of Bonds authorized thereby, identified by the appropriate Series designation, which shall be funded pursuant to the terms of such Supplemental Trust Agreement.  The Series Debt Service Reserve Requirement shall be deposited in the account related to such Series of Bonds.  Amounts in each account in the Debt Service Reserve Fund shall be used to pay debt service on the related Series of Bonds on the date such debt service is due when insufficient funds for that purpose are available in the Bond Payment Fund; provided, however, that all amounts in an account in the Debt Service Reserve Fund shall be used, together with other amounts available for such purpose hereunder, to provide for payment of the related Series of Bonds when the aggregate of such amounts is sufficient for such purpose.  Amounts in each account of the Debt Service Reserve Fund shall be pledged to Owners of Bonds of the related Series.

25

(b)     *Reserve Account Credit Facilities*.  In lieu of or in substitution for any moneys on deposit in an account in the Debt Service Reserve Fund, the Authority may, in the manner provided, and in compliance with the conditions set forth in, the Supplemental Trust Agreement authorizing such Series of Bonds, deposit or cause to be deposited with the Trustee such Reserve Account Credit Facility meeting the criteria set forth in such Supplemental Trust Agreement.

(c)     *Restoration of the Debt Service Reserve Fund*.  If after the transfer of moneys on deposit in the Debt Service Reserve Fund to the Bond Payment Fund, the amount left on deposit in any account in the Debt Service Reserve Fund shall be less than the applicable Series Debt Service Reserve Requirement, or, if after a draw under any Reserve Account Credit Facility on deposit in an account in the Debt Service Reserve Fund, the amount available to be paid thereunder shall be less than the applicable Series Debt Service Reserve Requirement, the Authority shall cause to be deposited in the appropriate account in the Debt Service Reserve Fund, in accordance with Section 5.01, Hotel Occupancy Tax Funds in an amount necessary to cause the amount of moneys on deposit therein, or the amount available to be paid under any Reserve Account Credit Facility, to be equal to the applicable Series Debt Service Reserve Requirement. Amounts so deposited in the Debt Service Reserve Fund may be used to make payments to any provider of a Reserve Account Credit Facility in order to reinstate such Reserve Account Credit Facility to the applicable Series Debt Service Reserve Requirement.

### Section 5.06     Rebate Fund.

(a)     *Creation of Rebate Fund*.  A special fund is hereby created with the Trustee to be designated Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds Rebate Fund (the "Rebate Fund").  The Trustee shall create and maintain separate accounts identified by the appropriate Series designation within the Rebate Fund to account for rebate payments due on each Series of Bonds.

(b)     *Deposits into Rebate Fund*.  There shall be deposited into the appropriate account of the Rebate Fund moneys paid to the Trustee pursuant to Section 6.03 hereof.

(c)     *Use of Moneys in Rebate Fund*.  The Trustee at the written direction of and on behalf of the Authority shall use moneys in the Rebate Fund to make rebate payments to the United States in accordance with the Tax Certificates.  If the amount on deposit in the Rebate Fund at any time is greater than the amount required under the Tax Certificates, the excess shall be transferred to the Bond Payment Fund, to the Proceeds Fund, the Debt Service Reserve Fund or to the Authority, as directed by an Authority Representative to the Trustee, in writing, unless an Event of Default has occurred and is continuing, in which case the excess shall be transferred to the Bond Payment Fund.

(d)     *Administration of Rebate Fund*.  The Trustee at the written direction of an Authority Representative shall invest the Rebate Fund in accordance with the Tax Certificates and shall deposit earnings from the investment of moneys in the Rebate Fund into the Rebate Fund immediately upon receipt thereof.  Records with respect to the

26

deposits to, payments from and administration of the Rebate Fund shall be retained by the Authority and the Trustee until six years after the final retirement of the Bonds.

**Section 5.07** **Moneys to be Held in Trust.** The Bond Payment Fund, the Debt Service Reserve Fund and, except for the Proceeds Fund and the Rebate Fund, any other fund or account created hereunder that is not expressly excluded from the Trust Estate shall be held by the Trustee, for the benefit of the Owners as specified in this Trust Agreement, subject to the terms of this Trust Agreement and any Supplemental Trust Agreement. The Proceeds Fund shall be held for the purposes specified therefor, including payments, if any, to the Bond Payment Fund as directed by the Authority Representative and the Rebate Fund shall be held by the Trustee for the purpose of making payments to the United States pursuant to Section 5.06 hereof. Any Defeasance Escrow Account shall be held for the benefit of the Owners of the Bonds to be paid therefrom as provided in the agreement governing such Defeasance Escrow Account.

**Section 5.08** **Investment of Moneys.**

(a) The Authority and the Trustee agree that all moneys held as part of any fund or account created hereunder shall be deposited or invested and reinvested by the Trustee, at the written direction of an Authority Representative, in Permitted Investments.

(b) Earnings and losses from the investment of moneys held in the Proceeds Fund or any account thereof shall be deposited into or charged against the Proceeds Fund, with any earnings being deposited into the Earnings Account thereof.

(c) Earnings and losses from the investment of moneys held in any account in the Debt Service Reserve Fund shall be deposited into or charged against such account, with any earnings being transferred at the written direction of an Authority Representative in accordance with the provisions of Section 5.01 hereof.

(d) Earnings and losses from the investment of moneys held in the Bond Payment Fund or any account thereof shall, except as otherwise provided by a Supplemental Trust Agreement, be deposited into or charged against the fund or account in which realized in accordance with the provisions of Section 5.01 hereof.

(e) Earnings and losses from the investment of moneys held in any account of the Rebate Fund or any account thereof shall, except as otherwise provided in the Tax Certificate, be deposited into or shall be charged against the account in which realized.

(f) Earnings and losses from the investment of moneys held in any Defeasance Escrow Account shall be deposited or charged as provided in the escrow agreement governing such account.

(g) The Trustee shall, when and as directed in writing by an Authority Representative, sell and reduce to cash a sufficient amount of the investments held in any fund or account whenever the cash balance therein is insufficient to make any payment to be made therefrom.

27

(h)    In computing the amount in any fund or account for any purpose hereunder, investments shall be valued by the Trustee at cost (exclusive of accrued interest) or par, whichever is less.

## ARTICLE VI.

## COVENANTS OF THE AUTHORITY

**Section 6.01    Representations, Covenants and Warranties**.   The Authority represents, covenants and warrants that:

(a)    The execution of this Trust Agreement by the Authority and the performance of its obligations thereunder is authorized by the Authority Act and, upon the execution of this Trust Agreement by the Executive Director, this Trust Agreement will be enforceable against the Authority in accordance with its terms, limited only by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights generally, by equitable principles, whether considered at law or in equity, by the exercise by the Commonwealth and its governmental bodies of the police power inherent in the sovereignty of the Commonwealth and by the exercise by the United States of the powers delegated to it by the Constitution of the United States.

(b)    The Authority is duly authorized by Commonwealth law to enter into agreements with GDB with respect thereto and the Authority is duly authorized to enter into the Pledge Agreement.

(c)    The execution, delivery and performance of its obligations under this Trust Agreement by the Authority does not and will not conflict with or result in violation or a breach of any law or the terms, conditions or provisions of any restriction or any agreement or instrument to which the Authority is now a party or by which the Authority is bound, or constitute a default under any of the foregoing, or, except as specifically provided in this Trust Agreement, result in the creation or imposition of any lien or encumbrance whatsoever upon any of the property or assets of the Authority.

(d)    There is no litigation or proceeding pending or threatened against the Authority or any other Person affecting the right of the Authority to execute, deliver or perform their respective obligations under this Trust Agreement.

(e)    The amount of funds borrowed pursuant to each Supplemental Trust Agreement will not exceed the sum of (i) the Construction Costs of the Construction Projects to be financed, (ii) an amount necessary to pay any applicable Program Costs and (iii) the amount necessary to pay fund the Debt Service Reserve Fund.

(f)    The execution of this Trust Agreement, the fulfillment of or compliance with the terms and conditions in this Trust Agreement and the consummation of the transactions contemplated herein do not conflict with or result in a breach of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Authority is a party or by which the Authority is bound or any laws, ordinances,

28

governmental rules or regulations or court or other governmental orders to which the Authority or its properties are subject or constitute a default under any of the foregoing.

(g)     So long as Bonds are Outstanding, the pledge by the Authority of the Hotel Occupancy Tax Funds received by the Trustee for the payment of Bond Payments and Program Costs shall be irrevocable until all Bond Payments and Program Costs have been paid in full.

(h)     The Authority will reasonably cooperate with GDB in order to receive sufficient amounts of Hotel Occupancy Tax Revenues reasonably available to the Authority, including amounts sufficient for payment of the Bond Payments and Program Costs.

(i)     The deposit of Hotel Occupancy Tax Funds with the Trustee for the payment of Bond Payments is unconditional and the Authority is not entitled to offset any such payment as a result of the failure to perform by any contractor of any of its obligations relating to the Construction Projects or for any other reason; provided, however, that such payment of Hotel Occupancy Tax Funds is subject to the provisions of Section 8 of Article VI of the Constitution.

(j)     The Authority covenants, to the extent within its reasonable power and authority, to ensure that each Construction Project will be constructed expeditiously.

(k)     The Authority covenants that it will enforce all terms and conditions of the Pledge Agreement and adhere to all applicable provisions related hereto required under the Authority Act and the Occupancy Tax Act.

(l)     The Authority shall at all times comply with the Authority Act and the provisions of the Occupancy Tax Act, the regulations promulgated thereunder, all other laws and regulations, the Constitution and all other Commonwealth laws relating to the Bonds, the Construction Projects and the subject matter of this Trust Agreement and each Supplemental Trust Agreement.

(m)     The Authority covenants that, to the extent it is drawing funds in the Construction Account, it shall submit requisitions in substantially the form of **Appendix A** as such form may be revised from time to time by the Authority, that such requisitions shall be true, correct and complete in all material respects, and that the Authority shall not submit any requisition or otherwise apply proceeds of Bonds in a manner that would cause any limitation contained in this Trust Agreement to be exceeded.

(n)     The Authority, as an agent of the Commonwealth, is authorized to include the representation of the Commonwealth herein, that the Commonwealth will:

(i)     not reduce the Hotel Occupancy Tax and not decrease its rates, as fixed in the Occupancy Tax Act;

(ii)   not eliminate or reduce the Hotel Occupancy Tax to an amount lower than that established in the Occupancy Tax Act, or eliminate or reduce the rates of the tax fixed in the Hotel Occupancy Tax;

(iii)   make sure that the amounts that must be deposited in the Pledge Account are deposited in the accounts as provided in the Trust Agreement, and

(iv)   not alter or limit the rights acquired by the Authority under the Occupancy Tax Act to encumber or pledge the collections from the Hotel Occupancy Tax required to be deposited in the accounts set forth herein and under the Supplemental Trust Agreement and comply with the terms of any agreement entered into with, or for the benefit of the bondholders or holders of other obligations of the Authority or the other subscribing parties under any Credit Facility, Interest Rate Exchange Agreement, or bond insurance policy, until such time as such bonds, notes or other obligations issued, assumed or incurred at any time, including the interest thereon and any obligation under any Credit Facility, Interest Rate Exchange Agreement, or bond insurance policy have been paid in full.

(o)   The Authority, as an agent of the Commonwealth, is authorized to include the representation of the Commonwealth herein, that the Commonwealth pledges and agrees with the holders of the Bonds, and with those persons or entities that enter into contracts with the Authority pursuant to the Authority Act, that it shall not limit nor alter the rights conferred to the Authority under the Authority Act until the Bonds and the interest thereon are paid in full and said contracts are fully executed and honored by the Authority; provided, however, that nothing provided in the Authority Act shall affect or alter said limitation if adequate measures are provided by law for the protection of the holders of the Bonds, or of those who have entered into contracts with the Authority.

**Section 6.02     Payment of Bond Payments.**

The Authority covenants to pay, when due, solely from Hotel Occupancy Tax Funds or other funds available in the Trust Estate, the Bond Payments. Nothing in this Trust Agreement shall be construed as obligating the Authority to pay Bond Payments from any general or other funds of the Authority, the Commonwealth, GDB or the Tourism Company other than amounts pledged hereunder.

**Section 6.03     Rebate Payments**. The Authority shall deposit with the Trustee, to the extent permitted by law, from moneys requisitioned from the Proceeds Fund pursuant to Section 5.03 hereof, or paid pursuant to Section 5.01 hereof, at the times and in the amounts required to make rebate payments due to the United States in accordance with Section 5.06 hereof and the Tax Certificates.

**Section 6.04     Other Payments by the Authority**. Nothing herein shall be interpreted to restrict the Authority's right, to the extent permitted by law, to make any payment due to the Trustee under Section 6.03 or any other provision hereof or any provision of any Supplemental Trust Agreement from any other available moneys.

**Section 6.05     Credit Facilities and Interest Rate Exchange Agreements.**

30

(a)     The Authority may purchase or arrange for a Credit Facility with respect to any Bonds and may agree to reimburse the provider of such Credit Facility for moneys paid by the provider that are used to make Bond Payments on such Bonds, which reimbursement may be made from any moneys in the Trust Estate that are available for the payment of Bond Payments on such Bonds on a parity with or on a basis subordinate to the payment of such Bond Payments.

(b)     To the extent permitted by law, the Authority may purchase or arrange for an Interest Rate Exchange Agreement with respect to any Bonds and may agree to make payments to the provider of such Interest Rate Exchange Agreement, which may be made from any moneys in the Trust Estate that are available for payment of Bond Payments on such Bonds on a parity with or on a basis subordinate to the payment of such Bond Payments.

(c)     All or any portion of the agreement between the Authority and the provider of any Credit Facility or Interest Rate Exchange Agreement or provisions to put into effect such an arrangement, may be included in any Supplemental Trust Agreement or in a separate agreement between or among the Authority, the Credit Facility or Interest Rate Exchange Agreement provider and/or the Trustee, and the Trustee is hereby directed to agree to the provisions regarding such Credit Facility or Interest Rate Exchange Agreement contained in any Supplemental Trust Agreement or separate agreement agreed to by the Authority and the Credit Facility or Interest Rate Exchange Agreement provider. Notwithstanding anything to the contrary contained herein, the Trustee shall not be required to agree to or be bound by any provision that adversely affects its rights, duties, indemnities, privileges or obligations contained herein or under any Supplemental Trust Agreement.

**Section 6.06     Tax Covenant**. The Authority shall not take any action or omit to take any action with respect to the Bonds, the proceeds of the Bonds, the Trust Estate, the Construction Projects or any other funds or property of the Authority and, to the extent within its reasonable control, it will not permit any other Person to take any action or omit to take any action with respect to the Bonds, the Trust Estate, the Construction Projects or any other funds or property of the Authority if such action or omission would cause interest on any of the Bonds to be included in gross income for federal income tax purposes or to be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations (except, with respect to corporations, as such interest is required to be taken into account in determining "adjusted net book earnings" for the purpose of computing the alternative minimum tax imposed on such corporations). In furtherance of this covenant, the Authority agrees to comply with the procedures set forth in the Tax Certificate for each Series of Bonds. The covenants set forth in this Section shall remain in full force and effect notwithstanding the payment in full or defeasance of the Bonds until the date on which all of the Authority obligations in fulfilling such covenants have been met. The covenants set forth in this Section shall not, however, apply to any Series of Bonds if, at the time of issuance, the Authority intends the interest on such Series of Bonds to be subject to federal income tax or to the federal minimum tax.

31

**Section 6.07 Defense of Trust Estate.** The Authority shall at all times, to the extent permitted by law, defend, preserve and protect its title to the Trust Estate, the grant of the Trust Estate to the Trustee under this Trust Agreement and all the rights of the Owners under this Trust Agreement against all claims and demands of all Persons whomsoever; provided, however, that the pledge of Hotel Occupancy Tax Funds hereunder is subject to the provisions of Section 8 of Article VI of the Constitution.

## ARTICLE VII.

## DEFAULTS AND REMEDIES

**Section 7.01 Events of Default.** Any of the following shall constitute an "Event of Default" under this Trust Agreement:

(a)     Default in the payment of any portion of the Bond Payments on, or Redemption Price of, any Bond when due.

(b)     Failure by the Authority to observe and perform any covenant, condition or agreement on its part to be observed or performed under this Trust Agreement, other than as referred to in paragraph (a), for a period of sixty days after written notice specifying such failure and requesting that it be remedied is given to the Authority by the Trustee, unless the Trustee shall agree in writing to an extension of such time prior to its expiration; provided, however, if the failure stated in the notice can be wholly cured within a period of time not materially detrimental to the rights of the owners of Bonds but cannot be cured within the applicable sixty-day period, the Trustee will not unreasonably withhold its consent to an extension of such time if corrective action is instituted by the Authority within the applicable period and diligently pursued until the failure is corrected; and provided, further, that if by reason of force majeure the Authority is unable to carry out the agreements on its part herein contained, the Authority shall not be deemed in default under this paragraph (b) during the continuance of such inability (but force majeure shall not excuse any other Event of Default).

(c)     Any breach of covenants or requirements described in the Assignment Agreement or the Pledge Agreement.

(d)     Any breach of covenants described in the Continuing Disclosure Agreement to be delivered by the Authority and the Commonwealth in connection with the issuance of the Bonds.

**Section 7.02 Remedies Following an Event of Default.**

(a)     Upon the occurrence of any Event of Default described in Section 7.01(a) hereof, (i) the Trustee shall, if and to the extent directed in writing by the Authority Representative, transfer all or any moneys held in the Proceeds Fund to the Bond Payment Fund and (ii) any Owner of a Bond on which payment has not been paid when due shall have the right to institute any action permitted under Commonwealth law to enforce such payment as provided in the Trust Agreement, as supplemented.

32

(b)     Upon the occurrence of any Event of Default, the Trustee may, by mandamus or other action or proceeding or suit at law or in equity, enforce any of its rights hereunder against the Authority and compel the Authority to perform or carry out its duties under the law and the agreements and covenants required to be performed by it hereunder.

(c)     Upon the occurrence of any Event of Default, the Trustee may, by mandamus or other action or proceeding or suit at law or in equity, enforce any of its rights under the Pledge Agreement against the Authority or GDB and compel the Authority or GDB, as the case may be, to perform or carry out their respective duties under the law and the agreements and covenants required to be performed by either of them under the Pledge Agreement.

(d)     Upon the occurrence of any Event of Default, the Trustee may, by mandamus or other action or proceeding or suit at law or in equity, enforce any of its rights under the Assignment Agreement against the Tourism Company or GDB and compel the Tourism Company or GDB, as the case may be, to perform or carry out their respective duties under the law and the agreements and covenants required to be performed by either of them under the Assignment Agreement.

(e)     Upon the occurrence of any Event of Default, the Trustee may take whatever action at law or in equity may appear necessary or desirable to enforce the rights of the Owners and shall deposit any moneys received as a result of such action in the Bond Payment Fund.

(f)     No right or remedy is intended to be exclusive of any other right or remedy, but each and every such right or remedy shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute; provided, however, that neither the Trustee nor any Owners of Bonds shall have the right to declare all Bond Payments to be immediately due and payable.

(g)     A judgment requiring a payment of money entered against the Authority in connection with the Bonds and other obligations hereunder may be satisfied only from the Trust Estate.

**Section 7.03     Use of Moneys Received From Exercise of Remedies**.  Moneys received by the Trustee resulting from the exercise of remedies following an Event of Default shall be deposited in the Bond Payment Fund and shall, together with other moneys in the Bond Payment Fund and other moneys available for such purpose, be applied in the following order of priority:

(a)     *First*, to the payment of the reasonable and proper fees and expenses of the Trustee determined in accordance with Section 8.11 hereof.

(b)     *Second*, to the payment of interest due on the Bonds, including interest on past due interest on any Bond at the interest rate borne by such Bond, compounded on each Interest Payment Date.  If more than one installment of interest is due on the Bonds, such installments shall be paid in the order in which they were due, with the first

33

installment being paid first.  If the amount available is insufficient to pay all of any particular installment of interest due on the Bonds (including interest on the past due interest), the amount available shall be paid ratably, based on the ratio of the amount due on each such Bond to the amount due on all such Bonds.  For purposes of this Section, the difference between the Original Principal Amount and the Accreted Value of a Capital Appreciation Bond shall be treated as interest, the Accretion Date for a Capital Appreciation Bond shall be treated as an Interest Payment Date and the interest rate determined by straight-line interpolation between Accretion Dates shall be treated as the interest rate on a Capital Appreciation Bond.

(c)    *Third*, to the payment of principal due on the Bonds.  If principal is due that was to have been paid on more than one date, the amount due on the earliest dates shall be paid first.  If the amount available is insufficient to pay all the principal due on any particular date, the amount available shall be paid ratably, based on the ratio of the amount due on each such Bond to the amount due on all such Bonds.  For purposes of this Section, the Original Principal Amount of a Capital Appreciation Bond shall be treated as principal.

**Section 7.04     Owners of Majority in Aggregate Principal Amount of Bonds May Control Proceedings**.  Notwithstanding any other provision hereof, the Owners of a majority in aggregate principal amount of Bonds shall always have the right, at any time, to the extent permitted by law, by an instrument or instruments in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all proceedings to be taken in pursuit of remedies following an Event of Default or otherwise in connection with the enforcement of the terms of this Trust Agreement.  The Trustee is not liable for acts directed by a majority of bondholders or a credit provider.

**Section 7.05.     Limitations on Rights of Owners Acting Individually**.   No Owner shall have any right to institute any suit, action or proceeding at law or in equity for the enforcement of any remedy hereunder or for the enforcement of the terms of this Trust Agreement, unless an Event of Default under this Trust Agreement has occurred and the Owners of not less than a majority in aggregate principal amount of Bonds then Outstanding have made a written request to the Trustee, have offered the Trustee indemnity satisfactory to it against its costs, expenses and liabilities reasonably anticipated to be incurred, and have given the Trustee a reasonable opportunity, to take such action in its capacity as Trustee.  The purpose of the preceding sentence is to assure that no Owner or Owners shall have the right to affect, disturb or prejudice the lien of this Trust Agreement by his, her, its, or their action or to enforce any right hereunder except in the manner herein provided and that all proceedings at law or in equity shall be instituted and maintained in the manner herein provided and for the equal benefit of the Owners of all Outstanding Bonds.  Nothing contained herein shall, however, affect or impair the right of any Owner to enforce the payment of the Bond Payments on or Redemption Price of any Bond at and after the date of such payment is due.

**Section 7.06     Trustee May Enforce Rights Without Bonds**.   All rights of action and claims under this Trust Agreement or any of the Outstanding Bonds may be enforced by the Trustee without the possession of any of the Bonds or the production thereof in any trial or proceedings relative thereto; any suit or proceeding instituted by the Trustee shall be brought

34

in its name as Trustee, without the necessity of joining as plaintiffs or defendants any Owners; and any recovery of judgment shall be for the ratable benefit of the Owners, subject to the provisions hereof.

**Section 7.07    Trustee to File Proofs of Claim in Receivership, Etc.** In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceedings affecting the Trust Estate, the Trustee shall, to the extent permitted by law, be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have claims of the Trustee and of the Owners allowed in such proceedings for the entire amount due on the Bonds under this Trust Agreement, at the date of the institution of such proceedings and for any additional amounts which may become due by it after such date, without prejudice, however, to the right of any Owner to file a claim in its own behalf.

**Section 7.08    Delay or Omission; No Waiver.** No delay or omission of the Trustee or of any Owner to exercise any remedy, right or power accruing upon any Event of Default or otherwise shall exhaust or impair any such remedy, right or power or be construed to be a waiver of any such Event of Default, or acquiescence therein; and every remedy, right and power given by this Trust Agreement may be exercised from time to time and as often as may be deemed expedient.

**Section 7.09    Discontinuance of Proceedings on Event of Default; Position of Parties Restored.** In case the Trustee or any Owner shall have proceeded to enforce any right under this Trust Agreement and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Trustee or such Owner, then and in every such case the Authority, the Trustee and the Owners shall be restored to their former positions and rights, and all rights, remedies and powers of the Trustee and the Owner shall continue as if no such proceedings had been taken.

**Section 7.10    Waivers of Events of Default.** The Trustee may in its discretion waive any Event of Default and its consequences hereunder, and notwithstanding anything else to the contrary contained in this Trust Agreement, shall do so upon the written request of the Owners of a majority in aggregate principal amount of Bonds then Outstanding; provided, however, that there shall not be waived without the consent of the Owners of 100% of the Bonds any Event of Default in the payment of the Bond Payments and Redemption Price when due, unless, prior to such waiver, all such amounts (with interest on amounts past due on any Bond at the interest rate on such Bond or, in the case of a Capital Appreciation Bond, the interest rate determined by straight-line interpolation between Accretion Dates) and all expenses of the Trustee in connection with such Event of Default have been paid or provided for. In case of any such waiver, then and in every such case the Authority, the Trustee and the Owners shall be restored to their former positions and rights hereunder, but no such waiver shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE

35

**Section 8.01    Appointment of Trustee; Acceptance of Duties**.   JPMorgan Chase Bank, N.A., City of New York and State of New York, is the Trustee under this Trust Agreement.  The Trustee shall have only such duties and obligations as are expressly specified by this Trust Agreement, and no other duties or obligations of said bank shall be implied by, or read into, this Trust Agreement.

**Section 8.02    Limitations on Responsibilities of Trustee**.  The recitals of fact, statements and representations herein and in the Bonds are made by the Authority, and the Trustee assumes no responsibility in respect thereof.   The Trustee shall not have any responsibility and makes no representation in respect of the validity or sufficiency of this Trust Agreement or of the Bonds or the due execution or issuance thereof or in respect of the security afforded by this Trust Agreement and the Trustee shall not have any responsibility or duty and makes no representation with respect to the issuance of the Bonds for value.  The Trustee shall not have any responsibility or duty as to the amount of Bonds issued or outstanding at any time, and the Trustee shall have no responsibility and makes no representation as to whether the signatures or facsimile signatures on any Bond are genuine or as to whether any Bond is in the form authorized by the Authority or as to whether any Bond is within the amount the Authority is authorized to issue.  The Trustee shall not be under any obligation to see that any duties herein imposed upon the Authority or on any party other than itself, or any covenants herein contained on the part of any party other than itself to be performed shall be done or performed, and the Trustee shall not be under any obligation for failure to see that any such duties or covenants are so done or so performed.  The Trustee shall have no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to make or to advance any of its own monies, unless properly indemnified to its satisfaction.  The Trustee shall not be liable in connection with any action taken, suffered or omitted hereunder, except for its own negligence or willful misconduct.  The Trustee shall have no duty, obligation, responsibility or liability to independently examine the requisitions filed with it pursuant to Section 5.03(c) of this Trust Agreement or to take any action with respect to such requisitions or in any other respect whatsoever, except that the Trustee shall retain such requisitions in its possession pursuant to Section 11.09 of this Trust Agreement.  The Trustee is not liable for acts directed by a majority of bondholders or a credit provider.

**Section 8.03    Trustee Not Liable For Failure Of Authority To Act.**  The Trustee shall not be liable or responsible because of the failure of the Authority or any of its employees or agents to make collections or deposits or to perform any act herein required of them.  The Trustee shall not be responsible for the application of any of the proceeds of the Bonds or any other moneys deposited with it which are paid out, withdrawn or transferred in accordance with the provisions of this Trust Agreement.  The immunities and exemptions from liability of the Trustee hereunder shall extend to its directors, officers, employees and agents.

**Section 8.04    Quarterly Statements from Trustee**.  It shall be the duty of the Trustee on or before the 15th day of January, April, July and October of each year to file with the Authority and GDB a statement setting forth in respect of the preceding three (3) month period:

(a)    the amount deposited with it and the amount withdrawn or transferred by it on account of each fund and account held by it under the provisions of this Trust Agreement,

    (b)    the amount on deposit with it at the end of each such three (3) month period to the credit of each such fund and account,

    (c)    a brief description of all obligations held by it as an investment of moneys in each such fund and account,

    (d)    the amount, if any, applied to the purchase or redemption of Bonds under the Trust Agreement and a description of the Bonds so purchased or redeemed, and

    (e)    any other information which the Authority may reasonably request.

**Section 8.05    Trustee Protected in Relying on Certain Documents**. The Trustee shall be protected and shall incur no liability in acting or proceeding, or in not acting or not proceeding, in good faith, and in accordance with the terms of this Trust Agreement, upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other document which it shall in good faith believe to be genuine and to have been adopted or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Trust Agreement. The Trustee may consult with counsel, who may or may not be counsel to the Authority or the Trustee or any engineer, consultant or accountant and the written opinion of such counsel, engineer, consultant or accountant shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in accordance therewith. Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by an Authority Representative; but in its discretion the Trustee may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable. Except as otherwise expressly provided herein, any request, order, notice, consent or other direction required or permitted to be furnished pursuant to any provision hereof by the Authority to the Trustee shall be sufficient if executed by an Authority Representative.

**Section 8.06    Qualification of Trustee**. There shall be at all times a Trustee hereunder which shall be a corporation organized and doing business under the laws of the United States of America, the Commonwealth or any state, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $100,000,000 (or whose obligations hereunder are guaranteed by a bank or trust company duly authorized to exercise corporate trust powers and subject to examination by Commonwealth or state authority, of good standing, and having at the time of the appointment of such Trustee, a combined capital and surplus of at least such amount), subject to supervision or examination by Commonwealth or state authority, and having its principal corporate trust office in the Commonwealth or in one of the states of the United States of America. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section, the combined capital and surplus and the reported deposits of such corporation shall be deemed to be its combined capital and surplus and reported deposits, respectively, as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect specified in Section 8.07(b) hereof.

DM3 339573 16

**Section 8.07      Resignation of Trustee.** (a)  No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee under Section 8.09 hereof.

(b)      The Trustee may resign at any time by giving written notice thereof to the Authority.  If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within thirty days after the giving of such notice of resignation, the retiring Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

**Section 8.08      Removal of Trustee.**  The Trustee may be removed at any time by an instrument or concurrent instruments in writing, signed by the holders of not less than a majority in principal amount of the Bonds hereby secured and then Outstanding, signed in person by such holders or by their attorneys, legal representatives or agents and delivered to the Trustee, the Authority and GDB (such demand to be only when received by the Trustee in writing, the Authority and GDB).  The Trustee may also be removed at any time for any breach of trust or for acting or proceeding in violation of, or for failing to act or proceed in accordance with, any provision of this Trust Agreement with respect to the duties and obligations of the Trustee by any court of competent jurisdiction upon the application of the Authority or the holders of not less than five per centum in aggregate principal amount of the Bonds then outstanding hereunder.

**Section 8.09      Appointment of Successor Trustee.**

(a)  If at any time:

(i)      the Trustee shall cease to be eligible under Section 8.06 hereof and shall fail to resign after written request therefore by the Authority or by any bondholder who shall have been a bona fide bondholder for at least six months, or

(ii)      the Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then in any such case, (i) the Authority may remove the Trustee, or (ii) any bondholder who has been a bona fide bondholder for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(b)      If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any cause, the Authority shall promptly appoint a successor Trustee.

(c)      If, within one year after any resignation, removal or incapability, or the occurrence of any vacancy, a successor Trustee shall be appointed by the Authority, the holders of a majority in principal amount of the Bonds then Outstanding by an instrument or concurrent instruments in writing delivered to the Authority and GDB and the retiring Trustee, shall appoint a successor Trustee, the successor Trustee so appointed shall,

38

DM3\3339573.16

forthwith upon its acceptance of such appointment, become the successor Trustee and supersede the successor Trustee appointed by the Authority. If no successor Trustee shall have been so appointed by the Authority or the bondholders and accepted appointment in the manner hereinafter provided, any bondholder who has been a bona fide holder of a Bond for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(d)    The Authority shall give written notice by first-class mail, postage prepaid, of each resignation and each removal of the Trustee and each appointment of a successor Trustee to all bondholders. Each notice shall include the name and address of the principal corporate trust office of the successor Trustee.

**Section 8.10    Vesting of Rights in Successor Trustee**. Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor, and also to the Authority, an instrument in writing accepting such appointment hereunder, and thereupon such successor, without any further act, shall become fully vested with all the rights, immunities powers and trusts, and subject to all the duties and obligations, of its predecessors; but such predecessor shall, nevertheless, on the written request of its successor or of the Authority, and upon payment of the expenses, charges and other disbursements of such predecessor which are payable pursuant to the provisions of Section 8.11 hereof, execute and deliver an instrument transferring to such successor all the rights, immunities, powers and trusts of such predecessor hereunder; and every predecessor Trustee shall deliver all property and moneys held by it hereunder to its successor. Should any instrument in writing from the Authority be required by any successor Trustee for more fully and certainly vesting in such Trustee the rights, immunities, powers and trusts hereby vested or intended to be vested in its predecessor, and such instrument in writing shall and will, on request, be executed, acknowledged and delivered by an Authority Representative.

Notwithstanding any of the foregoing provisions of this Article, any bank or trust company having power to perform the duties and execute the trusts of this Trust Agreement and otherwise qualified to act as Trustee hereunder with or into which the bank or trust company acting as Trustee may be merged, consolidated or converted, or to which the corporate trust business assets as a whole or substantially as a whole of such bank or trust company may be sold, shall be deemed the successor of the Trustee.

**Section 8.11    Compensation and Indemnification of Trustee**. Subject to the provisions of any contract between the Authority and the Trustee, the Authority shall, from unencumbered moneys to the credit of the Proceeds Fund or any other moneys available therefore, pay to the Trustee reasonable compensation for all services rendered by it hereunder and also all its reasonable expenses, charges and other disbursements and those of its attorneys, agents and employees incurred in and about the administration and execution of the trusts hereby created, and the performance of its powers and duties hereunder. The Authority shall indemnify, defend and hold harmless the Trustee, its directors, employees, agents and affiliates (the "Indemnitees") from all loss, liability, claims, proceedings, suits, demands, penalties, costs and expenses, including without limitation the costs and expenses of outside and in house counsel and experts and their staffs and all expenses of document location, duplication and shipment and of preparation to defend any of the foregoing ("Losses"), that may be imposed on, incurred by or

asserted against any Indemnitee in respect of (a) the Trust Agreement, the Supplemental Trust Agreement and the Pledge Agreement, (b) the Trustee's execution, delivery and performance of the Trust Agreement, except in respect of any Indemnitee to the extent such Indemnitee's negligence or bad faith primarily caused the Loss, and (c) any instruction or other direction upon which the trustee may rely under the Trust Agreement. The obligation of the Authority under this Section shall survive payment of the bonds issued under this Trust Agreement and the resignation or removal of the Trustee.

Section 8.12    Trustee Under No Duty to Investigate. The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond or other paper or document.

Section 8.13    Trustee May Employ Agents. The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through affiliates, agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

Section 8.14    Trustee May Own Bonds. The Trustee and any officer, director or employee thereof may become the owner or pledgee of bonds issued under this Trust Agreement and may otherwise deal with the Authority with the same rights it would have were it not such Trustee.

Section 8.15    Rights of the Trustee. (a) The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed to in writing with the Authority and the Trustee shall not be liable for any gains or losses on investments (Permitted Investments or otherwise) made in connection with this Trust Agreement.

(b)    The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement.

(c)    The Trustee shall not be required to take notice and shall not be deemed to have notice of any Default or Event of Default unless written notice of such Default or Event of Default is received by the Responsible Officer at the Operation Center of the Trustee.

(d)    The Trustee may request that the Authority deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any person authorized to sign a certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(e)    Notwithstanding any other provision of this Trust Agreement, the Trustee shall not be obligated to perform any obligation hereunder and shall not incur any liability for any failure or delay in the performance of its obligations under this Trust Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood;

40

terrorism: wars; similar military disturbances; sabotage; epidemic; riots; interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; terrorist act; acts of civil or military authority or governmental action.

(f)     In no event shall the Trustee be liable for special, indirect or consequential loss or damages of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action.

**Section 8.16     Trustee Notice to GDB**. During the month of April of each Fiscal year, the Trustee shall inform GDB of the amounts on deposit in each fund or account held hereunder.

## ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01     Supplemental Trust Agreements Not Requiring Consent of Owners**. The Authority and the Trustee may, without the consent of, or notice to, the Owners, enter into a Supplemental Trust Agreement for any one or more or all of the following purposes:

(a)     to facilitate the receipt or use of Hotel Occupancy Tax Funds to pay Bond Payments;

(b)     to add additional covenants to the covenants and agreements of the Authority set forth herein or to add to the limitations and restrictions herein, and other limitations and restrictions to be observed by the Authority which are not contrary to or inconsistent with the Trust Agreement as theretofore in effect;

(c)     to add additional revenues, properties or collateral to the Trust Estate, subject to the Authority maintaining the prevailing rating of the Bonds by Moody's and S&P;

(d)     to cure any ambiguity, or to cure, correct or supplement any defect or omission or inconsistent provision contained herein, provided such action shall not adversely affect the interest of the Owners;

(e)     to amend any existing provision hereof or to add additional provisions which, in the opinion of Bond Counsel, are necessary or advisable (i) to qualify, or to preserve the qualification of, the interest on any Bonds for exclusion from gross income for federal income tax purposes or for exclusion from federal alternative minimum tax calculations; (ii) to qualify, or to preserve the qualification of, any Bonds for exemption from taxation and assessment in the Commonwealth; or (iii) to qualify, or preserve the qualification of, any Bonds for an exemption from registration or other limitations under the laws of any state or territory of the United States;

41

(f)     to amend any provision hereof relating to the Rebate Fund if in the opinion of Bond Counsel, such amendment does not adversely affect the exclusion of interest on any Bonds from gross income for federal income tax purposes;

(g)     to provide for or eliminate book-entry registration of any of the Bonds;

(h)     to obtain or maintain a rating of the Bonds by a nationally recognized securities rating agency;

(i)     to authorize the issuance of any Series of Bonds in accordance with Article III hereto;

(j)     to facilitate the provision of a Credit Facility or an Interest Rate Exchange Agreement in accordance with Section 6.05 hereof;

(k)     to establish additional funds, accounts or subaccounts necessary or useful in connection with any Supplemental Trust Agreement authorized by any other provision of this section;

(l)     to make any amendment with Rating Confirmation from each Rating Agency then maintaining an uninsured, underlying rating on the Bonds, that such amendment will not, in itself, result in such uninsured, underlying rating on the Bonds following such amendment being lower than such rating on the Bonds immediately prior to such amendment;

(m)     to modify any of the provisions in any other respect whatever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of each Series Outstanding at the date of the execution of such Supplemental Trust Agreement shall cease to be Outstanding and (ii) such Supplemental Trust Agreement shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the execution of such Supplemental Trust Agreement and of Bonds issued in exchange therefor or in place thereof; or

(n)     for any other purpose, provided that Bond Counsel has delivered a written opinion stating that the provisions of the Supplemental Trust Agreement do not materially adversely affect the rights of the Owners of any Bonds.

**Section 9.02     Supplemental Trust Agreements Requiring Consent of Owners**.  Except as expressly provided in Section 9.02 hereof, the Authority and Trustee may not enter into a Supplemental Trust Agreement without the written consent of the Owners of not less than a majority in aggregate principal amount of Bonds then Outstanding; provided, however, that no Supplemental Trust Agreement described below may be entered into without the written consent of the Owner of each Bond affected thereby for one or more of all of the following purposes:

(a)     a reduction of the interest rate, Bond Payments or Redemption Price payable on any Bond, a change in the maturity date of any Bond, a change in the Original Principal Amount of any Capital Appreciation Bond, a change in any Interest Payment

42

Date for any Current Interest Bond or any Accretion Date for any Capital Appreciation Bond or a change in the redemption provisions applicable to any Bond;

(b)     the deprivation of an Owner to the lien on the Trust Estate granted in this Trust Agreement;

(c)     the creation of a priority right in the Trust Estate of another Bond over the right of the affected Bond, except as permitted herein;

(d)     a reduction in the percentage of the aggregate principal amount of the Bonds required for consent to any Supplemental Trust Agreement;

**Section 9.03     Conditions     to     Effectiveness     of     Supplemental     Trust Agreements.**

(a)     No Supplemental Trust Agreement shall be effective until (i) the Authority and the Trustee have received the written consent of the Tourism Company and GDB to enter into such Supplemental Trust Agreement, (ii) it has been duly executed and delivered by the Authority and the Trustee, and (iii) Bond Counsel has delivered a written opinion to the effect that the Supplemental Trust Agreement complies with the provisions of this Article and will not adversely affect the exclusion from gross income for federal income tax purposes of interest on, or the exemption from taxation and assessment in the Commonwealth of the income from, any Outstanding Bonds.

(b)     No Supplemental Trust Agreement entered into pursuant to Section 9.02 hereof shall be effective until, in addition to the conditions set forth in subsection (a) of this Section, (i) a notice prepared by the Authority has been mailed to the Owners of the Outstanding Bonds, at the addresses last shown on the registration records of the Trustee, which notice describes the nature of the proposed Supplemental Trust Agreement and states that copies of it are on file at the office of the Trustee for inspection by the Owners of Outstanding Bonds and (ii) Owners of the required percentage in aggregate principal amount of the Bonds have consented to the Supplemental Trust Agreement. *Notwithstanding anything in this Section or the Trust Agreement to the contrary, the consent of the Owner of any Series of Additional Bonds to be issued hereunder, shall be deemed irrevocably given if the Original Purchaser thereof, whether or not for sale, consents in writing to any modification or amendment and, if such Series of Additional Bonds is expected to be resold, such modification or amendment, as well as such consent, is disclosed in the official statement or other offering document pursuant to which such Series of Additional Bonds is sold.*

**Section 9.04     Amendment of Assignment Agreement or Pledge Agreement**

No amendment, change or modification of the Pledge Agreement or the Assignment Agreement shall be effected without mailing of notice and written approval or consent of (i) the holders of not less than a majority in aggregate principal amount of the Bonds then Outstanding, (ii) GDB, and (iii) the Tourism Company and (iv) an opinion of counsel to the effect that amendment is authorized by governing documents and that all conditions precedent have been complied with.

## ARTICLE X.

## DEFEASANCE

**Section 10.01    Discharge of Trust Agreement.**  If 100% of the Bond Payments and Redemption Price due, or to become due, on all the Bonds and, all amounts payable to the United States pursuant to Section 5.06 hereof, have been paid, or provision shall have been made for the payment thereof in accordance with Section 10.02 hereof and the fees and expenses due to the Trustee and all other amounts payable hereunder have been paid, or provision for such payment shall have been made in a manner satisfactory to the Trustee, then (a) the right, title and interest of the Trustee in and to the Trust Estate shall terminate and be discharged (referred to herein as the "discharge" of this Trust Agreement); (b) the Trustee shall transfer and convey to or upon the written order of the Authority all property that was part of the Trust Estate, including but not limited to any moneys held in any fund or account hereunder, except any escrow account created pursuant to Section 10.02 hereof (which escrow account shall continue to be held in accordance with the agreement governing the administration thereof); and (c) the Trustee shall execute any instrument requested by the Authority to evidence such discharge, transfer and conveyance.

Outstanding Bonds or Bond Payments or Redemption Price or any portions thereof for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee shall at the respective maturity or redemption dates thereof be deemed to have been paid within the meaning and with the effect expressed in the first paragraph of this Section.

**Section 10.02    Defeasance of Bonds.**

(a)    All or any portion of the Outstanding Bonds or Bond Payments shall be deemed to have been paid (referred to herein as "defeased") prior to their maturity or redemption if:

(i)    the defeased Bonds are to be redeemed prior to their maturity, an Authority Representative has irrevocably instructed the Trustee to give notice of redemption of such Bonds in accordance with this Trust Agreement and any applicable Supplemental Trust Agreement;

(ii)    there has been deposited in trust in a Defeasance Escrow Account either moneys in an amount which shall be sufficient, or Defeasance Securities, the principal of and the interest on which when due, and without any reinvestment thereof will provide moneys which, together with the moneys, if any, deposited into or held in the Defeasance Escrow Account, shall be sufficient to pay when due the Bond Payments or Redemption Price, as applicable, due and to become due on the defeased Bonds on and prior to the redemption date or maturity date thereof, as the case may be;

(iii)    the Authority shall have given the Trustee in a form satisfactory to it irrevocable instructions to mail, as soon as practicable, a notice to the Owners of such Bonds that the deposit required by (ii) of this subsection has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with this

DM3\3395573.16

Article X and stating the date on which money is to be available for the payment of the principal or Redemption Price; and

(iv)  a certified public accountant or other nationally recognized expert respecting verification of escrows has delivered a verification report verifying the deposit described in clause (ii) of this subsection.

(b)  The Defeasance Securities and moneys deposited in a Defeasance Escrow Account pursuant to this Section and the principal and interest payments on such Defeasance Securities shall not be withdrawn or used for any purpose other than, and shall he held in trust solely for, the payment of the Bond Payments on and Redemption Price of the defeased Bonds; provided, however, that (i) any moneys received from principal and interest payments on such Defeasance Securities that are not required to pay the Bond Payments on or Redemption Price of the defeased Bonds on the date of receipt shall, to the extent practicable, be reinvested in Defeasance Securities maturing at the times and in amounts sufficient to pay when due the Bond Payments on and Redemption Price to become due on the defeased Bonds on or prior to the redemption date or maturity date thereof, as the case may be; and (ii) any moneys or Defeasance Securities may be withdrawn from a Defeasance Escrow Account if (A) the moneys and Defeasance Securities that are on deposit in the Defeasance Escrow Account, including any moneys or Defeasance Securities that are substituted for the moneys or Defeasance Securities that are withdrawn from the Defeasance Escrow Account, satisfy the conditions stated in subsection (a)(ii) of this Section, (B) a verification report is delivered that complies with subsection (a)(iii) of this Section and (C) an opinion of Bond Counsel is delivered to the effect that such withdrawal or substitution complies with this Section and will not of itself adversely affect the federal tax status of interest on either the related Refunding Bonds or the Bonds being refunded.

(c)  Any Bonds that are defeased as provided in this Section shall no longer be secured by or entitled to any right, title or interest in or to the Trust Estate, and the Bond Payments on and Redemption Price thereof shall be paid solely from the Defeasance Securities and money held in the Defeasance Escrow Account.

Section 10.03  Defeasance of Less than all Bonds of a Particular Series or Maturity.  If less than all the Bonds of any particular Series, any particular maturity of any Series or any particular interest rate within a maturity of a Series are defeased, the Trustee shall institute or cause to be instituted a system to preserve the identity of the individual Bonds or portions thereof that are defeased, regardless of changes in Bond numbers attributable to transfers and exchanges of Bonds.

## ARTICLE XI.

## MISCELLANEOUS

Section 11.01  Authority.  This Trust Agreement and the Bonds are authorized by the Authority Act.

45

**Section 11.02   Table of Contents, Titles and Headings**.  The table of contents, titles and headings of the Articles and Sections of this Trust Agreement have been inserted for convenience of reference only, are not to be considered a part hereof, shall not in any way modify or restrict any of the terms or provisions hereof and shall never be considered or given any effect in construing this Trust Agreement or any provision hereof or in ascertaining intent, if any question of intent should arise.

**Section 11.03   Interpretation and Construction**.  This Trust Agreement and all terms and provisions hereof shall be liberally construed to effectuate the purposes set forth herein to sustain the validity of this Trust Agreement.  For purposes of this Trust Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   All references in this Trust Agreement to designated "Articles," "Sections," "subsections," "paragraphs," "clauses" and other subdivisions are to the designated Articles, Sections, subsections, paragraphs, clauses and other subdivisions of this Trust Agreement.  The words "herein," "hereof," "hereto," "hereby," "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision.

(b)   The terms defined in Article I hereof have the meanings assigned to them in that Article.

(c).   Words of one gender shall be deemed and construed to include correlative words of any other gender.  Except where the context otherwise requires, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations and corporations.

(d)   All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as in effect from time to time.

(e)   The term "money" includes any cash, check, deposit, investment security or other form in which any of the foregoing are held hereunder.

(f)   In the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and each of the words "to" and "until" means "to but excluding."

**Section 11.04   Further Assurances and Corrective Instruments**.   The Authority and the Trustee agree that so long as this Trust Agreement is in full force and effect, the Authority and the Trustee shall have full power to carry out the acts and agreements provided herein and they will from time to time, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such supplements hereto and such further instruments as may be required for correcting any inadequate or incorrect description of the Trust Estate, or for otherwise carrying out the intention of or facilitating the performance of this Trust Agreement.

**Section 11.05   Evidence of Signature of Owners and Ownership of Bonds.**

46

(a)     Any request, consent or other instrument which this Trust Agreement may require or permit to be signed and executed by Owners may be in one or more instruments of similar tenor, and shall be signed or executed by such Owners in person or by their attorneys appointed in writing, and proof of the execution of any such instrument or of an instrument appointing any such attorney, or the ownership of Bonds, shall be sufficient (except as otherwise herein expressly provided) if made in the following manner, but the Trustee may, nevertheless, in its discretion require further or other proof in cases where it deems the same desirable:

(i)     The fact and date of the execution by any Owner or his attorney of such instrument may be proved by the certificate of any officer authorized to take acknowledgments in the jurisdiction in which he purports to act that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before a notary public; and

(ii)    The fact of the ownership by any person of Bonds and the amounts, numbers and date of ownership of such Bonds may be proved by the registration records of the Trustee.

(b)     Any request or consent of the Owner of any Bond shall bind all transferees of such Bond in respect of anything done or suffered to be done by the Authority or the Trustee in accordance therewith.

Section 11.06     Authorization of Officers and Employees.  The officers and employees of the Authority are hereby authorized and directed to take all actions that are necessary, convenient and in conformity with the Authority Act, the Constitution and other laws of the Commonwealth and this Trust Agreement, to carry out the provisions of this Trust Agreement.

Section 11.07     Parties Interested Herein.  This Trust Agreement shall be for the sole and exclusive benefit of the Authority, the Trustee and the Owners and their respective successors and assigns.  Nothing in this Trust Agreement expressed or implied is intended or shall be construed to confer upon, or to give to, any person other than the Authority, the Trustee and the Owners, any right, remedy or claim under or by reason of this Trust Agreement or any terms hereof.

Section 11.08     The Authority and Responsible Officers.  Whenever under the provisions hereof or of any Supplemental Trust Agreement the approval of the Authority or the Trustee is required, or the Authority or the Trustee is required to take some action at the request of the other, unless otherwise provided, such approval or such request shall be given for the Authority by an Authority Representative and for the Trustee by a Responsible Officer, and the Authority and the Trustee shall be authorized to act on any such approval or request.

Section 11.09     Manner of Giving Notices.  All notices, certificates or other communications hereunder or under any Supplemental Trust Agreement shall be in writing and shall be deemed sufficiently given when mailed by certified or registered mail, postage prepaid, or by any other independent delivery service providing written evidence of receipt, addressed as

DM3\339573.16

follows: if to the Authority, to Puerto Rico Convention Center District Authority, Antigua Base Naval, Edif. W-9, Avenida Isla Grande, Miramar, Puerto Rico, 00907, Attention: Executive Director; and if to the Trustee, to JPMorgan Chase Bank, N.A., 4 New York Plaza, 15th Floor, New York, New York 10004, Attention: Joanne Adamis. The entities listed above may, by written notice, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent. Notices to Trustee shall be deemed given when received by the Trustee.

  **Section 11.10 Notices to Rating Agencies**. If additional property, revenues or funds are granted, assigned or pledged as and for additional security hereunder pursuant to Section 2.0l(d) hereof, the Trustee shall notify Moody's and S&P in writing, of such grant, assignment or pledge and the nature of such additional security.

  **Section 11.11 No Individual Liability**. None of the members of the Authority or any person executing Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof. All covenants, stipulations, promises, agreements and obligations of the Authority or the Trustee, as the case may be, contained herein, in any Supplemental Trust Agreement or in the Bonds shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Authority or the Trustee, as the case may be, and not of any member, director, officer, employee, servant or other agent of the Authority or the Trustee in his or her individual capacity, and no recourse shall be had on account of any such covenant, stipulation, promise, agreement or obligation, or for any claim based thereon or hereunder, against any member, director, officer, employee, servant or other agent of the Authority or the Trustee or any natural person executing this Trust Agreement, any Supplemental Trust Agreement, the Bonds or any related document or instrument.

  **Section 11.12 Events Occurring on Days that are not Business Days**. If the date for making any payment or the last day for performance of any act or the exercising of any right under this Trust Agreement, any Supplemental Trust Agreement or the Bonds is a day that is not a Business Day, such payment may be made, such act may be performed or such right may be exercised on the next succeeding Business Day, with the same force and effect as if done on the date provided in such instrument.

  **Section 11.13 Severability**. In the event that any provision of this Trust Agreement, other than the grant of the Trust Estate to the Trustee, shall be held invalid or unenforceable by any court of such holding shall not invalidate or render unenforceable any other.

  **Section 11.14 Applicable Law**. The laws of the Commonwealth shall be applied in the interpretation, execution and enforcement of this Trust Agreement.

*[Remainder of page intentionally left blank]*

48

IN WITNESS WHEREOF, the Authority and the Trustee have caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above                                                                                                     written.

**PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY**

By: _____
      Manuel Sánchez Biscombe
      Executive Director

**JPMORGAN CHASE BANK, N.A.,**

By: _____
      Joanne Adamis
      Vice President

49

<div align="center">

**APPENDIX _**

**FORM OF PROCEEDS FUND REQUISITION**

**PROCEEDS FUND REQUISITION NO. _____**

</div>

JPMorgan Chase Bank, N.A., Trustee
4 New York Plaza, Floor 15
New York, New York 10004-2413
Attention:

Re:    Direction to Make Payments from the Proceeds Fund created under the Trust Agreement connection with the Puerto Rico Convention Center District Authority <u>$468,800,000 Hotel Occupancy Tax Revenue Bonds, Series A (the "Bonds")</u>

As Trustee under the Trust Agreement dated March 1, 2006 between the Puerto Rico Convention Center District Authority (the "Authority") and you, as Trustee (the "Trust Agreement"), you are hereby directed to pay the following from the identified account of the Proceeds Fund created by the Trust Agreement to the Payee indicated below, for the payment or reimbursement of the Construction Costs (as defined in the Trust Agreement) set forth in **Exhibit One** hereto.

The undersigned hereby certifies that (a) the items for which payment is sought are Construction Costs (as defined in the Trust Agreement) and are proper charges against the Proceeds Fund for which no prior payment or reimbursement has been sought from the proceeds of the Bonds or any other bonds of the Authority, (b) no Event of Default (as defined in the Trust Agreement) has occurred or is continuing or will occur as a result of payment pursuant to this Requisition, and (c) the undersigned is an Authority Representative (as defined in the Trust Agreement) and is authorized to execute and deliver this Requisition on behalf of the Authority.

Dated this ____ day of _____, 200_.

<div align="center">

**PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY**

</div>

By:    _____

Name:

Title:

[Additional signature, if applicable]

By:    _____

Name:

Title:

DM3\350002.1

# EXHIBIT ONE

| (a)<br>Account | (b)<br>Fund | (c)<br>Amount | (d)<br>Use/Payee | (e)<br>Sign off from<br>Bond Counsel |
|---|---|---|---|---|

DM3\350002.1

# 5. First Supplemental Trust Agreement, (March 24, 2006), ECF No. 10615-4

# FIRST SUPPLEMENTAL TRUST AGREEMENT

between

## PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY

and

## JPMORGAN CHASE BANK, N.A., AS TRUSTEE

Dated March 24, 2006

## $468,800,000

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY
HOTEL OCCUPANCY TAX
REVENUE BONDS, SERIES A

## FIRST SUPPLEMENTAL TRUST AGREEMENT

THIS FIRST SUPPLEMENTAL TRUST AGREEMENT ("First Supplemental Trust Agreement") is made and entered into as of on the date set forth on the cover page hereof, by and between the Puerto Rico Convention Center District Authority (the "Authority"), San Juan, Puerto Rico, a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") and JPMorgan Chase Bank, N.A., New York, New York, as trustee, a national banking association duly organized, existing and authorized to accept and execute trusts of the character herein set out, and it successors and assigns (the "Trustee")

WHEREAS, the Authority and the Trustee have entered into a Trust Agreement dated the date hereof (the "Master Trust Agreement" and together with the First Supplemental Trust Agreement, the "Trust Agreement"), which authorizes the issuance of Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds; and

WHEREAS, pursuant to the Master Trust Agreement, certain terms of and other matters relating to each series of Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds are to be specified in a Supplemental Trust Agreement (defined in the Master Trust Agreement); and

WHEREAS, this supplemental trust agreement and any amendment hereto is a Supplemental Trust Agreement that is being entered into to authorize and to set forth certain terms of and other matters relating to the Series A Bonds (defined herein); now, therefore,

Section 1.     Unless the context shall clearly indicate some other meaning, all words and terms used in this First Supplemental Trust Agreement which are defined in the Master Trust Agreement shall have for all purposes of this First Supplemental Trust Agreement the respective meanings given to them in the Master Trust Agreement.

Section 2.     For the purpose of providing funds to finance the costs of the Construction Projects listed in Schedule A attached hereto (the "Series A Projects") and to pay the Loans set forth in Schedule B attached hereto (the "Series A Loans"), Bonds of the Authority in the aggregate principal amount of Four Hundred and Sixty Eight Million, Eight Hundred Thousand Dollars ($468,800,000) are hereby authorized to be issued pursuant to the provisions of Section 3.01 of the Master Trust Agreement. Said Bonds shall be designated "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A)" (hereinafter called the "Series A Bonds"), shall be dated their date of delivery, shall be issuable as registered bonds without coupons in denominations of $5,000 and any multiple thereof (the "Authorized Denomination"), shall be numbered from RA-1 upwards, shall mature as set forth below and shall bear interest as set forth below from their date until their payment, payable semi-annually on January 1 and July 1 of each year, commencing July 1, 2006 (the "Interest Payment Dates").

The Series A Bonds shall be stated to mature in annual installments on July 1 in the years and amounts, to bear interest at the rates, to have the CUSIP numbers and be secured by the bond insurance as follows:

| Maturity (July 1) | Principal Amount | Interest Rate | CUSIP NO. |
|---|---|---|---|
| 2007 | $ 3,000,000 | 4.000% | 745266AA4 |
| 2008 | 4,000,000 | 4.000% | 745266AB2 |
| 2009 | 6,000,000 | 4.000% | 745266AC0 |
| 2010 | 3,130,000 | 4.000% | 745266AD8 |
| 2010 | 5,510,000 | 5.000% | 745266AE6 |
| 2011 | 2,390,000 | 4.000% | 745266AF3 |
| 2011 | 6,650,000 | 5.000% | 745266AG1 |
| 2012 | 9,470,000 ± | 4.000% | 745266AH9 |
| 2013 | 6,465,000 ± | 4.000% | 745266AJ5 |
| 2013 | 3,380,000 ± | 5.000% | 745266AK2 |
| 2014 | 10,275,000 ± | 5.000% | 745266AL0 |
| 2015 | 10,790,000 ± | 5.000% | 745266AM8 |
| 2016 | 11,325,000 ± | 4.000% | 745266AN6 |
| 2017 | 11,780,000 § | 5.000% | 745266AP1 |
| 2018 | 12,370,000 § | 5.000% | 745266AQ9 |
| 2019 | 12,985,000 § | 5.000% | 745266AR7 |
| 2020 | 13,635,000 § | 5.000% | 745266AS5 |
| 2021 | 3,330,000 † | 4.125% | 745266AT3 |
| 2021 | 10,990,000 † | 5.000% | 745266AU0 |
| 2022 | 15,005,000 † | 4.750% | 745266AV8 |
| 2023 | 15,720,000 † | 5.000% | 745266AW6 |
| 2024 | 16,505,000 † | 5.000% | 745266AX4 |
| 2025 | 17,330,000 † | 5.000% | 745266AY2 |
| 2026 | 4,255,000 † | 4.250% | 745266AZ9 |
| 2026 | 13,940,000 † | 5.000% | 745266BA3 |
| 2027 | 19,075,000 ± | 5.000% | 745266BB1 |
| 2031 | $86,320,000 §* | 5.000% | 745266BC9 |
| 2036 | $133,175,000 ±* | 4.500% | 745266BD7 |

§ Insured by Ambac Assurance Company.
± Insured by CDC IXIS Financial Guaranty North America, Inc.
† Insured by Financial Guaranty Insurance Company.
* Term Bond

DM3337931.6

Section 3.     The Bonds maturing after July 1, 2016, may be redeemed, at the option of the Authority, upon not less than 30 days' prior notice by mail to the Depository Trust Company, New York, New York or, if the book-entry system is discontinued, to the registered owners thereof from any available moneys (other than moneys deposited in the Bond Payment Fund under the Master Trust Agreement required to pay principal and interest due in such fiscal year on Bonds that are not being redeemed) either in whole or in part, as directed by the Authority, on any date not earlier than July 1, 2016, at a redemption price equal to 100% of the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

The Bonds maturing on July 1, 2031 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Master Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

| Year | Principal Amount |
|------|------------------|
| 2028 | $20,025,000 |
| 2029 | 21,030,000 |
| 2030 | 22,080,000 |
| 2031* | 23,185,000 |

*Maturity

The Bonds maturing on July 1, 2036 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Master Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

| Year | Principal Amount |
|------|------------------|
| 2032 | $24,345,000 |
| 2033 | 25,440,000 |
| 2034 | 26,585,000 |
| 2035 | 27,780,000 |
| 2036* | 29,025,000 |

*Maturity

Section 4.     The Series A Bonds shall bear the facsimile signature of the Executive Director of the Authority and a facsimile of the corporate seal of the Authority shall be imprinted on each Series A Bond. Said Series A Bonds and the certificate of authentication to be endorsed therein shall be, respectively, substantially in the following forms:

DM3\337331.6

[FORM OF SERIES A BOND]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

$

PUERTO RICO CONVENTION CENTER DISTRICT AUTHORITY HOTEL OCCUPANCY
TAX REVENUE BONDS (SERIES A)

| INTEREST RATE: | MATURITY DATE: | [ORIGINAL DATED DATE]: | CUSIP: |
|---|---|---|---|
| | July 1, 20 | _____, 2006 | |

REGISTERED OWNER: Cede & Co.

PRINCIPAL AMOUNT: DOLLARS

The Puerto Rico Convention Center District Authority (the "Authority"), a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), for value received, hereby promises to pay to the order of the registered owner named above, or registered assigns, the principal sum stated above on the maturity date stated above, with interest on such principal sum from the original dated date stated above at the interest rate per annum stated above (calculated based on a 360-day year of twelve 30-day months), payable on January 1 and July 1 of each year, commencing July 1, 2006. The principal and Redemption Price of this Hotel Occupancy Tax Revenue Bond, Series A (this "Bond") are payable to the registered owner hereof upon maturity or prior redemption hereof and upon presentation and surrender of this Bond at the operations center of JPMorgan Chase Bank, N.A., (the "Trustee"). Interest on this Bond (other than interest paid as part of the Redemption Price of this Bond) shall be paid by check or draft of the Trustee mailed, on or before each Interest Payment Date, to the registered owner hereof at such registered owner's address as it appears on the Trustee's registration records on the Record Date for such Interest Payment Date. Notwithstanding the foregoing, so long as Cede & Co is the registered owner of this Bond, the Bond Payments on and Redemption Price of this Bond shall be paid by wire transfer to Cede & Co. Any payment of Bond Payments on or Redemption Price of this Bond that is due on a day that is not a Business Day (as defined in the Master Trust Agreement, defined below) shall be made on the next succeeding day that is a Business Day with the same effect as if made on the day on which it was originally scheduled to be made and no interest shall accrue for the period after such originally scheduled day for payment.

This Bond is part of a series of revenue bonds of the Authority designated as "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A)," issued in the aggregate principal amount of Four Hundred and Sixty Eight Million, Eight Hundred Thousand Dollars ($468,800,000) (the "Bonds") for the purpose of financing the Series

4

Projects and Series A Loans. The Bonds have been issued pursuant to, under the authority of, and in full conformity with, the Constitution and the laws of the Commonwealth, including Act No. 351 of September 2, 2000 of the Legislature of Puerto Rico, creating the Authority, as the same shall be amended from time to time (the "Act"), and the Trust Agreement entered into by the Authority and the Trustee on March 24, 2006 (the "Master Trust Agreement"), as supplemented by the First Supplemental Trust Agreement entered into by the Authority and the Trustee on March 24, 2006 (the "First Supplemental Trust Agreement," and together with the Master Trust Agreement, the "Trust Agreement"). The Bonds are secured by funds received under the Commonwealth's Room Occupancy Rate Tax ("Hotel Occupancy Tax") as set forth in Article 31 of the Occupancy Tax Act (13 L.P.R.A. Section 2271(o)) (the "Occupancy Tax Act"). Capitalized terms used but not defined in this Bond have the meaning assigned to them in the Trust Agreement.

The Bonds maturing after July 1, 2016, may be redeemed, at the option of the Authority, upon not less than 30 days' prior notice by mail to the Depository Trust Company, New York, New York or, if the book-entry system is discontinued, to the registered owners thereof from any available moneys (other than moneys deposited in the Bond Payment Fund under the Trust Agreement required to pay principal and interest due in such fiscal year on Bonds that are not being redeemed) either in whole or in part, as directed by the Authority, on any date not earlier than July 1, 2016, at a redemption price equal to 100% of the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

The Bonds maturing on July 1, 2031 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

| Year | Principal Amount |
|------|------------------|
| 2028 | $20,025,000 |
| 2029 | 21,030,000 |
| 2030 | 22,080,000 |
| 2031* | 23,185,000 |

*Maturity

The Bonds maturing on July 1, 2036 are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such Bonds and otherwise subject to adjustment as described below), upon not less than 30 days' prior notice, from moneys in the Bond Payment Fund under the Trust Agreement, at a redemption price equal to the par amount of Bonds so redeemed plus accrued interest to the date fixed for redemption.

DM3/037331.6

| Year | Principal Amount |
|------|------------------|
| 2032 | $24,345,000 |
| 2033 | 25,440,000 |
| 2034 | 26,585,000 |
| 2035 | 27,780,000 |
| 2036* | 29,025,000 |

*Maturity

In connection with the issuance of the Bonds, the Commonwealth of Puerto Rico hereby agrees and makes a commitment with any person, firm or corporation or with any agency of the United States of America or of any state or the Commonwealth who subscribes or acquires Bonds or enters into bond related financing agreements for the payment of which the product of the Hotel Occupancy Tax is pledged, that it will:

(1)     not reduce the Hotel Occupancy Tax and not decrease its rates, as fixed in the Occupancy Tax Act;

(2)     not eliminate or reduce the Hotel Occupancy Tax to an amount lower than that established in the Occupancy Tax Act, or eliminate or reduce the rates of the tax fixed in the Hotel Occupancy Tax;

(3)     make sure that the amounts that must be deposited in the Pledge Account as set forth in the Trust Agreement, are deposited in the accounts as provided in the Trust Agreement, and

(4)     not alter or limit the rights acquired by the Authority under the Occupancy Tax Act to encumber or pledge the collections from the Hotel Occupancy Tax required to be deposited in the accounts set forth in the Trust Agreement and comply with the terms of any agreement entered into with, or for the benefit of the bondholders (including the holder of this Bond), noteholders or holders of other obligations of the Authority or the other subscribing parties under any bond related financing agreement, until such time as such bonds (including this Bond), notes or other obligations issued, assumed or incurred at any time, including the interest thereon and any obligation under any bond related financing agreement, have been paid in full. For purposes of this Bond, a "bond related financing agreement" means any interest rate exchange agreement or similar agreement, any bond insurance policy, letter of credit or other credit enhancement, liquidity agreement or similar agreements, arrangements or contracts.

The Commonwealth pledges and agrees with the holders of the Series A Bonds, and with those persons or entities that enter into contracts with the Authority pursuant to the Act, that it shall not limit nor alter the rights conferred to the Authority under the Act until the Series A Bonds and the interest thereon are paid in full and said contracts are fully executed and honored by the Authority; provided, however, that nothing provided in the Act shall affect or alter said limitation if adequate measures are provided by law for the protection of the holders of the Series A Bonds, or of those who have entered into contracts with the Authority.

6

DM3\337331.6

*THE TRUST AGREEMENT CONSTITUTES THE CONTRACT BETWEEN THE REGISTERED OWNER OF THIS BOND AND THE AUTHORITY. THIS BOND IS ONLY EVIDENCE OF SUCH CONTRACT AND, AS SUCH, IS SUBJECT IN ALL RESPECTS TO THE TERMS OF THE TRUST AGREEMENT, WHICH SUPERSEDES ANY INCONSISTENT STATEMENT IN THIS BOND.*

The Bond Payments shall be payable solely from the Trust Estate, including moneys held in the Bond Payment Fund, subject to Section 8 of Article VI of the Constitution of the Commonwealth. The registered owners and holders of the Bonds may not look to any other revenues of the Authority for the payment of the Bonds.

This Bond shall not be deemed to constitute a debt of the Commonwealth of Puerto Rico or of any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any such political subdivisions shall be liable thereon, nor shall this Bond or the interest thereon be payable out of any funds of the Authority other than those pledged for the payment thereof pursuant to the Trust Agreement.

All financial obligations of the Authority under the Trust Agreement, every Supplemental Trust Agreement, the Bonds and any other contract entered into pursuant to the Trust Agreement, any Supplemental Trust Agreement or the Bonds (i) are special, limited obligations of the Authority payable solely from the Trust Estate and shall not constitute nor give rise to a pecuniary liability or a charge against the general credit of the Authority or the Commonwealth and (ii) shall not be deemed or construed as creating a debt, liability or obligation of the Commonwealth, or any political subdivision of the Commonwealth, nor a pledge of the faith and credit of the Commonwealth or any political subdivision or municipality of the Commonwealth within the meaning of the Constitution of the Commonwealth or the laws of the Commonwealth concerning or limiting the creation of indebtedness by the Commonwealth or any political subdivision of the Commonwealth.

The Trustee shall keep, on behalf of the Authority, the records for the registration and transfer of the Bonds, and shall transfer the Bonds in authorized denominations of $5,000 in amount or any integral multiples thereof as provided in the Trust Agreement. The Trustee may require the payment, by the registered owner of any Bond requesting exchange or transfer, of any reasonable charges as well as any taxes, transfer fees or other governmental charges required to be paid with respect to such exchange or transfer. The Trustee shall not be required to transfer or exchange (i) all or any portion of any Bond during the period beginning at the opening of business 15 days before the day of the mailing by the Trustee of notice calling any the Bonds for prior redemption and ending at the close of business on the day of such mailing, or (ii) all or any portion of a Bond after the mailing of notice calling such Bond or any portion thereof for prior redemption.

Additional Hotel Occupancy Tax Revenue Bonds that are payable from the Trust Estate on a parity with the Bonds may be issued without the consent of the registered owners of the Bonds as provided in the Trust Agreement. Also, the Trust Agreement may be amended or supplemented from time-to-time with or without the consent of the registered owners of the Bonds as provided in the Trust Agreement.

7

DM3\337331.6

All acts and conditions required by the Constitution and laws of the Commonwealth of Puerto Rico, including the Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the issuance of this Bond and the adoption of the Trust Agreement have happened, exist and have been performed as so required.

This Bond is issued with the intent that the laws of the Commonwealth of Puerto Rico shall govern its construction.

This Bond shall not be valid or become obligatory for any purpose or be entitled to any lien, benefit or security under the Trust Agreement until the certificate of authentication endorsed hereon shall have been duly executed by the Trustee.

IN WITNESS WHEREOF, Puerto Rico Convention Center District Authority has caused this Bond to be signed by or bear the facsimile signature of its Executive Director and a facsimile of its corporate seal to be imprinted hereon, all as of the   day of March __, 2006.

<div align="right">

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY

</div>

By: _____

<div align="center">Executive Director</div>

(SEAL)

DM3\337391.6

[Form of Certificate of Authentication to be endorsed on all bonds]

## CERTIFICATE OF AUTHENTICATION

This Bond is one of the Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) described in the within-mentioned Trust Agreement.

JPMorgan Chase Bank, N.A., as Trustee

By: _____

Authorized Signatory

Date of authentication:

[Form of Assignment]

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned sells, assigns and transfers unto:

_____

(Please print or type name and address of assignee)

_____

(Insert social security number or tax identification number of assignee)

the   within   Bond   and   does   hereby   irrevocably   constitute   and   appoint
_____ Attorney, to transfer said Bond on the books kept for registration
thereof, with full power of substitution in the premises.

Dated:_____

Signature: _____

Notice:  This signature on this assignment
must correspond with the name as it appears
on the face of the within bond in every
particular, without alteration or enlargement
or any change whatever and such signature
must be guaranteed by a member firm of the
New York Stock Exchange or a commercial
bank or a trust company.

Social Security Number or Employer
Identification Number of Transferee:

_____

SIGNATURE GUARANTEED BY:

DM3037331.6

11

Section 5.    There is hereby created a separate sub-account in the Capitalized Interest Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Capitalized Interest Sub-Account" (the "Series A Capitalized Interest Sub-Account"). Amounts shall be deposited into the Series A Capitalized Interest Sub-Account in the amounts set forth on Schedule C attached hereto. Funds held in the Series A Capitalized Interest Sub-Account shall be transferred to the Bond Payment Fund established under the Master Trust Agreement in the amounts set forth, and on the dates set forth, in Schedule D attached hereto.

Section 6.    There is hereby created a separate sub-account in the Construction Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Construction Sub-Account" (the "Series A Construction Sub-Account"). Funds held in the Series A Construction Sub-Account will be used for the projects set forth in Exhibit A to the Master Trust Agreement. Amounts shall be deposited into the Series A Construction Sub-Account in the amounts set forth on Schedule C, attached hereto.

Section 7.    There is hereby created a separate sub-account in the Loan Payment Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Loan Payment Sub-Account" (the "Series A Loan Payment Sub-Account"). Amounts shall be deposited into the Series A Loan Payment Sub-Account to repay the Loans in the amounts as set forth in Schedule B.

Section 8.    There is hereby created a separate sub-account in the Earnings Account of the Proceeds Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Earnings Sub-Account" (the "Series A Earnings Account"). Funds held in the Series A Earnings Sub-Account shall be used as set forth in the Master Trust Agreement.

Section 9.    There is hereby created a separate account in the Debt Service Reserve Fund to be known as the "Puerto Rico Convention Center District Authority Hotel Occupancy Tax Revenue Bonds (Series A) Debt Service Reserve Account" (the "Series A Debt Service Reserve Account"). A portion of the proceeds from the sale of the Series A Bonds equal to the Series A Debt Service Reserve Requirement (as defined below) shall be deposited into the Series A Debt Service Reserve Account of the Debt Service Reserve Fund. The Series Debt Service Reserve Requirement for the Series A Bonds (the "Series A Debt Service Reserve Requirement") shall be the greatest total amount of principal and interest due on the Series A Bonds in any Fiscal Year. The amount of $30,338,962.50 shall be deposited into the Series A Debt Service Reserve Account to satisfy the Debt Service Reserve Requirement.

Section 10.    If the Series A Bonds are issued as other than book-entry only bonds through DTC or the book-entry-only system is terminated as to the Series A Bonds and definitive bonds are issued, there may be included on each of said definitive bonds the legal opinion of Duane Morris LLP respecting the validity of said bonds and, immediately following such legal

opinion, a certificate executed with the facsimile signature of the Executive Director of the Authority, said certificate to be in substantially the following form:

> "I HEREBY CERTIFY that the foregoing is true and correct copy of the legal opinion upon the bonds therein described which was manually signed by Duane Morris LLP, New York, New York, and was dated the date of delivery of and payment of the bonds therein described.

> [Facsimile Signature]
> _____
> Executive Director, Puerto Rico
> Convention Center District Authority"

Section 11.    The Authority hereby finds, determines and certifies that:

(a)    As of the date of issuance of the Series A Bonds, the Series A Bonds will be the only Bonds Outstanding.

(b)    This First Supplemental Trust Agreement contains all information required to be included in a Supplemental Trust Agreement authorizing a Series of Bonds under the Master Trust Agreement.

(c)    The Series A Bonds will not be issued until Bond Counsel has delivered a written opinion to the effect (which may be subject to customary assumptions and limitations) that (i) the Series A Bonds have been duly authorized, executed and delivered by the Authority and are valid and binding limited obligations of the Authority, payable from the sources provided in the Master Trust Agreement and this First Supplemental Trust Agreement; (ii) the Trust Agreement create a valid pledge of and lien on the Trust Estate, subject to the terms thereof, and subject to Section 8 of Article VI of the Constitution of Commonwealth; (iii) the interest on the Series A Bonds is excluded from gross income for federal income tax purposes; and (iv) the income from the Series A Bonds is exempt from all state, Commonwealth and local income taxation.

(d)    Except for actions to be taken pursuant to the terms hereof, all conditions to the execution and delivery of this First Supplemental Trust Agreement and the issuance of the Series A Bonds have been satisfied.

Section 12.    The Authority agrees that so long as this First Supplemental Trust Agreement is in full force and effect, the Authority shall have full power to carry out the acts and agreements provided herein, and will from time to time, execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such supplements hereto and such further instruments as may be required for correcting any inadequate or incorrect description of the Trust Estate, or for otherwise carrying out the intention of or facilitating the performance of this First Supplemental Trust Agreement.

Section 13.    The officers and employees of the Authority are hereby authorized and directed to take all actions that are necessary, convenient and in conformity with the Act, federal

DM3\037331.6

law, the Master Trust Agreement and this First Supplemental Trust Agreement, to carry out the provisions of this First Supplemental Trust Agreement, and all such action previously taken by them is hereby ratified and approved. Such actions include, but shall not be limited to (a) execution and delivery of the Series A Bonds; (b) execution, delivery and compliance with the terms of the Bond Purchase Agreement; (c) execution, delivery and compliance with the terms of the Tax Certificate for the Series A Bonds, (d) preparation and authorization of the use of a Preliminary Official Statement and preparation, authorization of the use and execution of an Official Statement relating to the Series A Bonds, and amendments and supplements thereto; and (e) execution, delivery and compliance with the terms of documents and instruments regarding the investment of proceeds of the Series A Bonds and other moneys relating to the Series A Bonds or the Construction Projects

Section 14.    This First Supplemental Trust Agreement is being entered into pursuant to and in accordance with Section 9.01 of the Master Trust Agreement for the purpose of authorizing the issuance of the Series A Bonds in accordance with Article III of the Master Trust Agreement and will, as provided in Section 9.03 of Master Trust Agreement, become effective when (i) the Authority and the Trustee have received the written consent of the Tourism Company and GDB to enter into this First Supplemental Trust Agreement; it has been executed and delivered by the Authority and the Trustee and (ii) Bond Counsel has delivered a written opinion to the effect that it complies with the provisions of Article IX of the Master Trust Agreement and will not adversely affect the exclusion from gross income for federal income tax purposes of interest on, or the exemption from state, Commonwealth and local income taxation of, any Outstanding Bonds.

Section 15.    Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company ("Ambac Assurance"), is providing insurance for the Series A Bonds maturing in 2017, 2018, 2019, 2020, and 2031 (the "Ambac Insured Bonds" ) pursuant to an insurance policy (the "Ambac Policy"). The following provisions are hereby made applicable with respect to the Ambac Insured Bonds:

(a)    Any provision of this First Supplemental Trust Agreement expressly recognizing or granting rights in or to Ambac Assurance may not be amended in any manner which affects the rights of Ambac Assurance hereunder without the prior written consent of Ambac Assurance. Ambac Assurance reserves the right to charge the Authority a fee for any consent or amendment to this First Supplemental Trust Agreement while the Ambac Policy is outstanding.

(b)    Unless otherwise provided in this Section, Ambac Assurance's consent shall be required in lieu of Owner consent of the registered owners of Ambac Insured Bonds ("Ambac Owners"), when required, for the following purposes: (i) execution and delivery of any additional Supplemental Trust Agreement or any amendment, supplement or change to or modification of the Master Trust Agreement (ii) removal of the Trustee and selection and appointment of any successor trustee required in those transactions in which the Financing Document provides for a trustee; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires Ambac Owner consent.

14

DM3\037331.6

(c)     Any reorganization or liquidation plan with respect to the Authority must be acceptable to Ambac Assurance. In the event of any reorganization or liquidation, Ambac Assurance shall have the right to vote on behalf of all Ambac Owners absent a default by Ambac Assurance under the applicable Ambac Policy insuring such Series A Bonds.

(d)     Anything in the Trust Agreement to the contrary notwithstanding, upon the occurrence and continuance of an Event of Default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Ambac Owners or the Trustee for the benefit of the Ambac Owners under this First Supplemental Trust Agreement.

(e)     Anything in the Trust Agreement to the contrary notwithstanding, upon the occurrence and continuance of an Event of Default, Ambac Assurance shall be entitled to control and direct the enforcement of all rights and remedies granted to the Ambac Owners or the Trustee for the benefit of the Ambac Owners under this First Supplemental Trust Agreement, including, without limitation: (i) the right to accelerate the principal of the Ambac Insured Bonds as described in this First Supplemental Trust Agreement, and (ii) the right to annul any declaration of acceleration, and Ambac Assurance shall also be entitled to approve all waivers of events of default.

(f)     Upon the occurrence of an Event of Default, the Trustee may, with the consent of Ambac Assurance, and shall, at the direction of Ambac Assurance, by written notice to the Authority and Ambac Assurance, declare the principal of the Ambac Insured Bonds to be immediately due and payable, whereupon that portion of the principal of the Ambac Insured Bonds thereby coming due and the interest thereon accrued to the date of payment shall, without further action, become and be immediately due and payable, anything in this First Supplemental Trust Agreement or in the Ambac Insured Bonds to the contrary notwithstanding.

(g)     While the Ambac Policy is in effect, the Authority shall furnish to Ambac Assurance, to the attention of the Ambac Assurance Surveillance Department, upon request, the following:

(1)     a copy of any financial statement, audit and/or annual report of the Authority.

(2)     such additional information it may reasonably request.

Upon request, such information shall be delivered at the Authority's expense to the attention of the Surveillance Department, unless otherwise indicated.

(h)     a copy of any notice to be given to Ambac Owners, including, without limitation, notice of any redemption of or defeasance of the Ambac Insured Bonds, and any certificate rendered pursuant to this First Supplemental Trust Agreement relating to the security for the Ambac Insured Bonds.

(i)     To the extent that the Authority has entered into a continuing disclosure agreement with respect to the Series A Bonds, Ambac Assurance shall be included as party to be notified.

15

DM3\3337331.6

(j)     The Authority shall notify the General Counsel Office of Ambac Assurance of any failure of the Authority to provide relevant notices, certificates, etc.

(k)     Notwithstanding any other provision of this First Supplemental Trust Agreement, the Authority shall immediately notify the General Counsel Office of Ambac Assurance if at any time there are insufficient moneys to make any payments of principal and/or interest as required and immediately upon the occurrence of any event of default hereunder.

(l)     The Authority will permit Ambac Assurance to discuss the affairs, finances and accounts of the Authority or any information Ambac Assurance may reasonably request regarding the security for the Series A Bonds with appropriate officers of the Authority. The Authority will permit Ambac Assurance to have access to the Puerto Rico Convention Center and have access to and to make copies of all books and records relating to the Series A Bonds at any reasonable time.

(m)     Ambac Assurance shall have the right to direct an accounting at the Authority's expense, and the Authority's failure to comply with such direction within thirty (30) days after receipt of written notice of the direction from Ambac Assurance shall be deemed a default hereunder; provided, however, that if compliance cannot occur within such period, then such period will be extended so long as compliance is begun within such period and diligently pursued, but only if such extension would not materially adversely affect the interests of any Ambac Owners.

(n)     Ambac Assurance will allow the following obligations to be used as Permitted Investments, with respect to the Ambac Insured Bonds, for all purposes, including defeasance investments in refunding escrow accounts.

(Ambac Assurance does not give a premium credit for the investment of accrued and/or capitalized interest).

(1) .   Cash (insured at all times by the Federal Deposit Insurance Corporation).

(2)     Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

a.     U.S. treasury obligations

b.     All direct or fully guaranteed obligations

c.     Farmers Home Administration

d.     General Services Administration

e.     Guaranteed Title XI financing

f.     Government National Mortgage Association (GNMA)

16

DM3\037331.6

g.      State and Local Government Series

Any security used for defeasance must provide for the timely payment of principal and interest and cannot be callable or prepayable prior to maturity or earlier redemption of the rated debt (excluding securities that do not have a fixed par value and/or whose terms do not promise a fixed dollar amount at maturity or call date).

(o)     Ambac will allow the following obligations to be used as Permitted Investments for all purposes other than defeasance investments in refunding escrow accounts, with respect to the Ambac Insured Bonds:

(1)    Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

a.      Export-Import Bank

b.      Rural Economic Community Development Administration

c.      U.S. Maritime Administration

d.      Small Business Administration

e.      U.S. Department of Housing & Urban Development (PHAs)

f.      Federal Housing Administration

g.      Federal Financing Bank

(2)    Direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

a.      Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).

b.      Obligations of the Resolution Funding Corporation (REFCORP)

c.      Senior debt obligations of the Federal Home Loan Bank System

17

d.  Senior debt obligations of other Government Sponsored Agencies approved by Ambac

(3)  U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the rating of the bank);

(4)  Commercial paper which is rated at the time of purchase in the single highest classification, "P-1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(5)  Investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P;

(6)  Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

a.  which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

b.  (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph A(2) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(7)  Municipal Obligations rated "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P.

18

(8)    Investment Agreements approved in writing by Ambac Assurance Corporation (supported by appropriate opinions of counsel); and

(9)    other forms of investments (including repurchase agreements) approved in writing by Ambac.

(10)    The value of the above investments in this Section 15(o) shall be determined as follows:

    a.    For the purpose of determining the amount in any fund, all Permitted Investments credited to such fund shall be valued at fair market value. The Trustee shall determine the fair market value based on accepted industry standards and from accepted industry providers. Accepted industry providers shall include but are not limited to pricing services provided by Financial Times Interactive Data Corporation, Merrill Lynch, Citigroup Global Markets Inc., Bear Stearns, or Lehman Brothers.

    b.    As to certificates of deposit and bankers' acceptances: the face amount thereof, plus accrued interest thereon; and

    c.    As to any investment not specified above: the value thereof established by prior agreement among the Authority, the Trustee, and Ambac.

(p)    The definition of "Outstanding" Obligations or obligations, with respect to the Ambac Insured Bonds, or any like concept, should specifically include Obligations or obligations which fall into the category described below.

(1)    Notwithstanding anything herein to the contrary, in the event that the principal and/or interest due on the Ambac Insured Bonds shall be paid by Ambac Assurance Corporation pursuant to the Ambac Policy, the Ambac Insured Bonds shall remain Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Authority, and the assignment and pledge of the Trust Estate and all covenants, agreements and other obligations of the Authority to the Ambac Owners shall continue to exist and shall run to the benefit of Ambac Assurance, and Ambac Assurance shall be subrogated to the rights of such Ambac Owners.

(q)    As long as the Ambac Insurance Policy shall be in full force and effect, the Authority and the Trustee agree to comply with the following provisions:

(1)    At least one (1) business day prior to all Interest Payment Dates the Trustee will determine whether there will be sufficient funds in the Funds and Accounts to pay the principal of or interest on the Ambac Insured

DM3\337331.6

Bonds on such Interest Payment Date. If the Trustee determines that there will be insufficient funds in such Funds or Accounts, the Trustee shall notify Ambac Assurance. Such notice shall specify the amount of the anticipated deficiency, the Ambac Insured Bonds to which such deficiency is applicable and whether such Ambac Insured Bonds will be deficient as to principal or interest, or both. If the Trustee has not so notified Ambac Assurance at least one (1) business day prior to an Interest Payment Date, Ambac Assurance will make payments of principal or interest due on the Ambac Insured Bonds on or before the first (1st) business day next following the date on which Ambac Assurance shall have received notice of nonpayment from the Trustee.

(2)   the Trustee shall, after giving notice to Ambac Assurance as provided in (a) above, make available to Ambac Assurance and, at Ambac Assurance's direction, to The Bank of New York, in New York, New York, as insurance trustee for Ambac Assurance or any successor insurance trustee (the "Insurance Trustee"), the registration books of the Authority maintained by the Trustee and all records relating to the Funds and Accounts maintained under this First Supplemental Trust Agreement and the Master Trust Agreement.

(3)   the Trustee shall provide Ambac Assurance and the Insurance Trustee with a list of Ambac Owners entitled to receive principal or interest payments from Ambac Assurance under the terms of the Ambac Policy, and shall make arrangements with the Insurance Trustee (i) to mail checks or drafts to the Ambac Owners entitled to receive full or partial interest payments from Ambac Assurance and (ii) to pay principal upon Ambac Insured Bonds surrendered to the Insurance Trustee by the Ambac Owners entitled to receive full or partial principal payments from Ambac Assurance.

(4)   the Trustee shall, at the time it provides notice to Ambac Assurance pursuant to (a) above, notify Ambac Owners entitled to receive the payment of principal or interest thereon from Ambac Assurance (i) as to the fact of such entitlement, (ii) that Ambac Assurance will remit to them all or a part of the interest payments next coming due upon proof of Ambac Owner entitlement to interest payments and delivery to the Insurance Trustee, in form satisfactory to the Insurance Trustee, of an appropriate assignment of the Ambac Owner's right to payment, (iii) that should they be entitled to receive full payment of principal from Ambac Assurance, they must surrender their Ambac Insured Bonds (along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac Assurance) for payment to the Insurance Trustee, and not the Trustee, and (iv) that should they be entitled to receive partial payment of principal from Ambac Assurance, they must surrender their Ambac Insured Bonds for payment thereon first to the

20

DM03337331.6

Trustee, who shall note on such Ambac Insured Bonds the portion of the principal paid by the Trustee and then, along with an appropriate instrument of assignment in form satisfactory to the Insurance Trustee, to the Insurance Trustee, which will then pay the unpaid portion of principal.

(5)    in the event that the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment and which is made to an Ambac Owner by or on behalf of the Authority has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time Ambac Assurance is notified pursuant to (a) above, notify all Ambac Owners that in the event that any Ambac Owner's payment is so recovered, such Ambac Owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available, and the Trustee shall furnish to Ambac Assurance its records evidencing the payments of principal of and interest on the Ambac Insured Bonds which have been made by the Trustee and subsequently recovered from Ambac Owners and the dates on which such payments were made.

(6)    in addition to those rights granted Ambac Assurance under this First Supplemental Trust Agreement, Ambac Assurance shall, to the extent it makes payment of principal of or interest on Ambac Insured Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Ambac Insurance Policy, and to evidence such subrogation (i) in the case of subrogation as to claims for past due interest, the Trustee shall note Ambac Assurance's rights as subrogee on the registration books of the Authority maintained by the Trustee, upon receipt from Ambac Assurance of proof of the payment of interest thereon to the Ambac Owners of the Ambac Insured Bonds, and (ii) in the case of subrogation as to claims for past due principal, the Trustee shall note Ambac Assurance's rights as subrogee on the registration books of the Authority maintained by the Trustee upon surrender of the Ambac Insured Bonds by the Ambac Owners thereof together with proof of the payment of principal thereof.

(r)    The following terms of the First Supplemental Trust Agreement are made with respect to the Trustee in connection with the Ambac Insured Bonds:

(1)    The Trustee may be removed at any time, at the request of Ambac Assurance, for any breach of the Trust Agreement.

(2)    Ambac Assurance shall receive prior written notice of any Trustee resignation.

21

OM3\337331.6

(3)    Every successor Trustee appointed pursuant to this Section shall be a trust company or bank in good standing located in or incorporated under the laws of the State, duly authorized to exercise trust powers and subject to examination by federal or state authority, having a reported capital and surplus of not less than $75,000,000 and acceptable to Ambac Assurance.

(4)    Notwithstanding any other provision of this First Supplemental Trust Agreement, in determining whether the rights of the Ambac Owners will be adversely affected by any action taken pursuant to the terms and provisions of this First Supplemental Trust Agreement, the Trustee shall consider the effect on the Ambac Owners as if there were no Ambac Policy.

(5)    Notwithstanding any other provision of this First Supplemental Trust Agreement, no removal, resignation or termination of the Trustee shall take effect until a successor, acceptable to Ambac, shall be appointed.

(s)    To the extent that this First Supplemental Trust Agreement confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this First Supplemental Trust Agreement, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.

(t)    Nothing in this First Supplemental Trust Agreement expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or entity, other than the Authority, the Trustee, Ambac Assurance, and the Ambac Owners, any right, remedy or claim under or by reason of this First Supplemental Trust Agreement or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this First Supplemental Trust Agreement contained by and on behalf of the Authority shall be for the sole and exclusive benefit of the Authority, the Trustee, Ambac Assurance and the Ambac Owners.

(u)    The following statement will be attached to the Ambac Insured Bonds:

Financial Guaranty Insurance Policy No. 25142BE (the "Policy") with respect to payments due for principal of and interest on this Bond has been issued by Ambac Assurance Corporation ("Ambac Assurance"). The Policy has been delivered to The Bank of New York, New York, New York, as the Insurance Trustee under said Policy and will be held by such Insurance Trustee or any successor insurance trustee. The Policy is on file and available for inspection at the principal office of the Insurance Trustee and a copy thereof may be secured from Ambac Assurance or the Insurance Trustee. All payments required to be made under the Policy shall be made in accordance with the provisions thereof. The owner of this Bond acknowledges and consents to the subrogation rights of Ambac Assurance as more fully set forth in the Policy.

22

DM3\037331.6

Section 16.    CDC IXIS Financial Guaranty North America, Inc. ("CIFG"), is providing insurance for the Series A Bonds maturing in 2012, 2013, 2014, 2015, 2016, 2027, and 2036 (the "CIFG Insured Bonds") pursuant to an insurance policy (the "CIFG Policy"). The following provisions are hereby made applicable with respect to the CIFG Insured Bonds:

(a)    Any notice that is required to be given to the registered owners of CIFG Insured Bonds ("CIFG Owners"), nationally recognized municipal securities information repositories or state information depositories pursuant to Rule 15c2-12(b)(5) adopted by the Securities and Exchange Commission or to the Trustee pursuant to the financing documents shall also be provided to CIFG. All notices required to be given to CIFG shall be in writing and shall be sent by registered or certified mail addressed to CDC IXIS Financial Guaranty North America, Inc., 825 Third Avenue, 6th Floor, New York, New York 10022, Attn: General Counsel; all electronic mail sent to CIFG shall be addressed both to surveillance@cifg.com and to general.counsel@cifg.com.

(b)    Within ninety (90) days of the end of the Authority's fiscal year, a copy of the audited financial statements of the Authority and a copy of the annual budget of the Authority and within forty-five (45) days after the close of each quarter of the Authority's fiscal year, a copy of the unaudited financial statements of the Authority shall be sent to CDC IXIS Financial Guaranty North America, Inc., 825 Third Avenue, 6th Floor, New York, New York 10022, Attn: Surveillance.

(c)    CIFG shall have the right to receive such additional information as it may reasonably request.

(d)    The Authority will permit CIFG to discuss the affairs, finances and accounts of the Authority or any information CIFG may reasonably request regarding the security for the Series A Bonds with appropriate officers of the Authority, and will grant CIFG access to the facilities, books and records of the Authority on any business day upon reasonable prior notice.

(e)    CIFG shall have the right to direct an accounting at the Authority's expense and the Authority's failure to comply with such direction within thirty (30) days after written notice of the direction from CIFG shall be deemed a default hereunder.

(f)    In the event that the principal and/or interest due on the CIFG Insured Bonds shall be paid by CIFG pursuant to the CIFG Policy, the CIFG Insured Bonds shall remain outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Authority, and the assignment and pledge of the trust estate and all covenants, agreements and other obligations of the Authority to the CIFG Owners shall continue to exist and shall run to the benefit of CIFG, and CIFG shall be subrogated to the rights of such CIFG Owners including, without limitation, any rights that such CIFG Owners may have in respect of securities law violations arising from the offer and sale of the CIFG Insured Bonds.

In addition, in the event of a defeasance CIFG shall be provided with the following items:

(1)     An opinion that refunding and defeasance will not adversely impact the exclusion from gross income for federal income tax purposes of interest on the CIFG Insured Bonds or refunded bonds.

(2)     The escrow agreement in connection with a defeasance which shall provide that:

a.       Any substitution of securities shall require a CPA verification and the prior written consent of CIFG.

b.       The Authority will not exercise any optional redemption of CIFG Insured Bonds secured by the escrow agreement or any other redemption other than mandatory sinking fund redemptions unless (i) the right to make any such redemption has been expressly reserved in the escrow agreement and such reservation has been disclosed in detail in the official statement for the refunding bonds, and (ii) as a condition of any such redemption there shall be provided to CIFG a CPA verification as to the sufficiency of escrow receipts without reinvestment to meet the escrow requirements remaining following such redemption.

c.       The Authority shall not amend the escrow agreement or enter into a forward purchase agreement or other agreement with respect to rights in the escrow without the prior written consent of CIFG.

In addition, all of the documents and requirements set forth in this Section 16(f) as a condition of future defeasance of the CIFG Insured Bonds.

(g)     CIFG shall receive prior written notice of any name change of the trustee (the "Trustee") for the CIFG Insured Bonds or the resignation or removal of the Trustee.

(h)     No removal, resignation or termination of the Trustee shall take effect until a successor, acceptable to CIFG, shall be appointed.

(i)      With respect to amendments or supplements to the financing documents which do not require the consent of the CIFG Owners, CIFG must be given notice of any such amendments or supplements. With respect to amendments or supplements to the financing documents which require the consent of the CIFG Owners, CIFG's prior written consent is required. All financing documents must contain a provision that requires copies of any amendments or supplements to such documents which are consented to by CIFG shall be sent to the rating agencies which have assigned a rating to the Series A Bonds. Notwithstanding any other provision of the financing documents, in determining whether the rights of the CIFG Owners, will be adversely affected by any action taken pursuant to the terms and provisions of any financing document, the Trustee shall consider the effect on the CIFG Owners, as if there were no CIFG Policy.

(j)      To the extent that this First Supplemental Trust Agreement confers upon or gives or grants to CIFG any right, remedy or claim, CIFG is explicitly recognized as being a

DM3\337331.6

third party beneficiary thereunder and may enforce any such right, remedy or claim conferred, given or granted thereunder.

(k)    Any provision set forth herein expressly recognizing or granting rights in or to CIFG may not be amended in any manner which affects the rights of CIFG thereunder without the prior written consent of CIFG.

(l)    Any provision of the Master Trust Agreement or the First Supplemental Trust Agreement requiring the consent of the Owners, shall also require CIFG's consent.

(m)    Any reorganization or liquidation plan with respect to the Authority must be acceptable to CIFG. In the event of any reorganization or liquidation, CIFG shall have the right to vote on behalf of all CIFG Owners absent a default by CIFG under the CIFG Policy.

(n)    Anything in a financing document to the contrary notwithstanding, upon the occurrence and continuance of an event of default as defined therein, CIFG shall be entitled to control and direct the enforcement of all rights and remedies granted to the CIFG Owners or the Trustee for the benefit of the CIFG Owners under any financing document.

(o)    With respect to the payment procedure under the CIFG Policy:

(1)    In the event that on the second (2nd) business day prior to the payment date on the CIFG Insured Bonds, the Trustee has not received sufficient moneys to pay all principal of and interest on the CIFG Insured Bonds due on the second (2nd) following business day, the Trustee shall immediately notify CIFG or its designee on the same business day by telephone or electronic mail, confirmed in writing by registered or certified mail, of the amount of the deficiency.

(2)    If any deficiency is made up in whole or in part prior to or on the payment date, the Trustee shall so notify CIFG or its designee.

(3)    In addition, if the Trustee has notice that any CIFG Owners has been required to disgorge payments of principal or interest on the CIFG Insured Bonds pursuant to a final non-appealable order by a court of competent jurisdiction that such payment constitutes an avoidable preference to such CIFG Owners within the meaning of any applicable bankruptcy laws, then the Trustee shall notify CIFG or its designee of such fact by telephone or electronic mail, confirmed in writing by registered or certified mail.

(4)    The Trustee shall irrevocably be designated, appointed, directed and authorized to act as attorney-in-fact for CIFG Owners, as follows:

a.    If there is a deficiency in amounts required to pay interest on the CIFG Insured Bonds, the Trustee shall (i) execute and deliver to CIFG, in form satisfactory to CIFG, an instrument appointing CIFG as agent for such CIFG Owners in any legal proceeding related to the payment of and an assignment to CIFG of the claims for interest on the

CIFG Insured Bonds, (ii) receive as designee of the respective CIFG Owners in accordance with the tenor of the CIFG Policy payment from CIFG with respect to the claims for interest so assigned, and (iii) disburse the same to such respective CIFG Owners; and

b.    If there is a deficiency in amounts required to pay principal of the CIFG Insured Bonds, the Trustee shall (i) execute and deliver to CIFG, in form satisfactory to CIFG, an instrument appointing CIFG as agent for such CIFG Owner in any legal proceeding related to the payment of such principal and an assignment to CIFG of the CIFG Insured Bond surrendered to CIFG (but such assignment shall be delivered only if payment from CIFG is received), (ii) receive as designee of the respective CIFG Owners in accordance with the tenor of the CIFG Policy payment therefor from CIFG, and (iii) disburse the same to such CIFG Owners.

(5)    Payments with respect to claims for interest on and principal of CIFG Insured Bonds disbursed by the Trustee from proceeds of the CIFG Policy shall not be considered to discharge the obligation of the Authority with respect to such CIFG Insured Bonds, and CIFG shall become the owner of such unpaid CIFG Insured Bond and claims for the interest in accordance with the tenor of the assignment made to it under the provisions of this subsection or otherwise.

(6)    Irrespective of whether any such assignment is executed and delivered, the Authority and the Trustee shall agree for the benefit of CIFG that:

a.    They recognize that to the extent CIFG makes payments directly or indirectly, on account of principal of or interest on the CIFG Insured Bonds, CIFG will be subrogated to the rights of such CIFG Owners to receive the amount of such principal and interest from the Authority, with interest thereon as provided and solely from the sources stated in the financing documents and the CIFG Insured Bonds; and

b.    They will accordingly pay to CIFG the amount of such principal and interest, with interest thereon as provided in the financing documents and the CIFG Insured Bonds, but only from the sources and in the manner provided herein for the payment of principal of and interest on the CIFG Insured Bonds to Owners thereof, and will otherwise treat CIFG as the owner of such rights to the amount of such principal and interest.

(7)    The Authority shall agree to pay or reimburse CIFG any and all charges, fees, costs and expenses which CIFG may reasonably pay or incur, including, but not limited to, fees and expenses of attorneys, accountants, consultants and auditors and reasonable costs of investigations, in connection with (i) any accounts established to facilitate payments under the CIFG Policy, (ii) the administration, enforcement, defense or preservation of any rights in respect of the Master Trust Agreement, this

DM3\337331.6

First Supplemental Trust Agreement or any other financing document including defending, monitoring or participating in any litigation or proceeding (including any bankruptcy proceeding in respect of the Authority or any affiliate thereof) relating to this First Supplemental Trust Agreement or any other financing document, any party to this agreement or any other financing document or the transaction contemplated by the financing documents (the "Transaction"), (iii) the foreclosure against, sale or other disposition of any collateral securing any obligations under this agreement or any other financing document, or the pursuit of any remedies under the trust agreement or any other financing document, to the extent such costs and expenses are not recovered from such foreclosure, sale or other disposition, or (iv) any amendment, waiver or other action with respect to, or related to, this agreement or any other financing document whether or not executed or completed; costs and expenses shall include a reasonable allocation of compensation and overhead attributable to the time of employees of CIFG spent in connection with the actions described in clauses (ii) - (iv) above; and CIFG shall reserve the right to charge a reasonable fee as a condition to executing any amendment, waiver or consent proposed in respect of this agreement or any other financing document.

(8)    In addition to any and all rights of reimbursement, subrogation and any other rights pursuant hereto or under law or in equity, the Authority shall agree to pay or reimburse CIFG any and all charges, fees, costs, claims, losses, liabilities (including penalties), judgments, demands, damages, and expenses which CIFG or its officers, directors, shareholders, employees, agents and each Person, if any, who controls CIFG within the meaning of either Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934 may reasonably pay or incur, including, but not limited to, fees and expenses of attorneys, accountants, consultants and auditors and reasonable costs of investigations, of any nature in connection with, in respect of or relating to the transactions contemplated by this agreement or any other financing document by reason of:

a.    any omission or action (other than of or by CIFG) in connection with the offering, issuance, sale, remarketing or delivery of the CIFG Insured Bonds;

b.    the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of the Authority in connection with any transaction arising from or relating to this agreement or any other financing document;

c.    the violation by the Authority of any law, rule or regulation, or any judgment, order or decree applicable to it;

27

d. the breach by the Authority of any representation, warranty or covenant under this agreement or any other financing document or the occurrence, in respect of the Authority, under this agreement or any other financing document of any "event of default" or any event which, with the giving of notice or lapse of time or both, would constitute any "event of default"; or

e. any untrue statement or alleged untrue statement of a material fact contained in any official statement or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such claims arise out of or are based upon any untrue statement or omission in information included in an official statement and furnished by CIFG in writing expressly for use therein.

(9) CIFG shall be entitled to pay any amount payable under the CIFG Policy in respect of Regular Payments (as defined in the CIFG Policy) on the CIFG Insured Bonds, including any amount payable upon its election on the CIFG Insured Bonds on an accelerated basis, whether or not any notice and certificate shall have been Received (as defined in the CIFG Policy) by CIFG as provided in the CIFG Policy.

(p) The following statement will be attached to the CIFG Insured Bonds:

CDC IXIS Financial Guaranty North America, Inc. ("CIFG NA"), New York, New York, has delivered its financial guaranty insurance policy (the "Policy") with respect to the scheduled payments of principal of and interest on this Bond as described hereinbelow to Trustee or its successor, as trustee (the "Trustee") for the Puerto Rico Convention District Authority. Said Policy is on file and available for inspection at the principal office of the Trustee and a copy thereof may be obtained from CIFG NA or the Trustee.

Section 17. The Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto ("FGIC"), is providing insurance for the Series A Bonds maturing in 2021, 2022, 2023, 2024, 2025 and 2026 (the "FGIC Insured Bonds") pursuant to the municipal bond new issue insurance policy issued by FGIC that guarantees payment of principal and interest on the FGIC Insured Bonds (the "FGIC Policy"). The following provisions are hereby made applicable with respect to the FGIC Insured Bonds:

(a) In determining whether a payment default has occurred or whether a payment on the FGIC Insured Bonds has been made under the Trust Agreement, no effect shall be given to payments made under the FGIC Policy.

DM3\837331.6

(b)     Any acceleration of the Bonds or any annulment thereof shall be subject to the prior written consent of FGIC (if it has not failed to comply with its payment obligations under the FGIC Policy).

(c)     FGIC shall receive immediate notice of any payment default and notice of any other default known to the Trustee or the Authority within 30 days of the Trustee's or the Authority's knowledge thereof.

(d)     For all purposes of the Trust Agreement provisions governing events of default and remedies, except the giving of notice of default to Owners of FGIC Insured Bonds, FGIC shall be deemed to be the sole holder of the FGIC Insured Bonds for so long as it has not failed to comply with its payment obligations under the FGIC Policy.

(e)     The provisions of the Trust Agreement permitting the Trustee to waive any event of default with respect to the FGIC Insured Bonds, shall be subject to the prior written consent of FGIC.

(f)     FGIC shall be included as a party in interest and as a party entitled to (i) notify the Authority, the Trustee, or any applicable receiver of the occurrence of an event of default and (ii) request the Trustee or receiver to intervene in judicial proceedings that affect the Bonds or the security therefor. The Trustee or receiver shall be required to accept notice of default from FGIC.

(g)     Any amendment or supplement to the Trust Agreement or any other principal financing documents shall be subject to the prior written consent of FGIC. Any rating agency rating the FGIC Insured Bonds must receive notice of each amendment and a copy thereof at least 15 days in advance of its execution or adoption. FGIC shall be provided with a full transcript of all proceedings relating to the execution of any such amendment or supplement.

(h)     No resignation or removal of the Trustee shall become effective until a successor has been appointed and has accepted the duties of Trustee. FGIC shall be furnished with written notice of the resignation or removal of the Trustee and the appointment of any successor thereto.

(i)     Only cash, direct non-callable obligations of the United States of America and securities fully and unconditionally guaranteed as to the timely payment of principal and interest by the United States of America, to which direct obligation or guarantee the full faith and credit of the United States of America has been pledged, Refcorp interest strips, CATS, TIGRS, STRPS, or defeased municipal bonds rated AAA by S&P or Aaa by Moody's (or any combination of the foregoing) shall be used to effect defeasance of the FGIC Insured Bonds unless FGIC otherwise approves. In the event of an advance refunding, the Authority shall cause to be delivered a verification report of an independent nationally recognized certified public accountant. If a forward supply contract is employed in connection with the refunding, (i) such verification report shall expressly state that the adequacy of the escrow to accomplish the funding relies solely on the initial escrowed investments and the maturing principal thereof and interest income thereon and does not assume performance under or compliance with the forward supply contract, and (ii) the applicable escrow agreement shall provide that in the event of any

29

pancy or difference between the terms of the forward supply contract and the escrow agreement (or the authorizing document, if no separate escrow agreement is utilized), the terms of the escrow agreement or authorizing document, if applicable, shall be controlling.

(j)     Any Swap provider with respect to the FGIC Insured Bonds must be rated at least A-/A3 or better by Standard & Poor's and Moody's (the "Initial Rating Requirement"). Assuming satisfaction of the Initial Rating Requirement, and thereafter as long as the long term indebtedness of the Swap provider or the claims paying ability of the Swap provider does not fall below Baa2 or BBB by either Standard & Poor's or Moody's (the "Minimum Rating Requirement"), all interest rate assumptions for purposes of establishing or demonstrating compliance with a financial covenant (e.g., rate covenant, reserve requirement, additional bonds test, asset transfer test, etc.) may be based upon the synthetic fixed interest rate under the Swap.

(k)     FGIC shall be provided with the following:

(1)     Notice of the redemption, other than mandatory sinking fund redemption, of any of the FGIC Insured Bonds, or of any advance refunding of the FGIC Insured Bonds, including the principal amount, maturities and CUSIP numbers thereof;

(2)     Notice of the downgrading by any rating agency of the Authority's underlying public rating, or the underlying rating on the Bonds or any parity obligations, to "noninvestment grade";

(3)     Notice of any drawing on any debt service reserve fund securing the FGIC Insured Bonds;

(4)     Notice of any material events pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934, as amended; and

(5)     Such additional information as FGIC may reasonably request from time to time.

(l)     The Authority shall pay or reimburse FGIC for any and all charges, fees, costs, and expenses that FGIC may reasonably pay or incur in connection with the following: (i) the administration, enforcement, defense, or preservation of any rights or security under the Trust Agreement or under any other transaction document; (ii) the pursuit of any remedies under the Trust Agreement, under any other transaction document, or otherwise afforded by law or equity; (iii) any amendment, waiver, or other action with respect to or related to this agreement or any other transaction document whether or not executed or completed; (iv) the violation by the Authority of any law, rule, or regulation or any judgment, order or decree applicable to it; (v) any advances or payments made by FGIC to cure defaults of the Authority under the transaction documents; or (vi) any litigation or other dispute in connection with this agreement, any other transaction document, or the transactions contemplated hereby or thereby, other than amounts resulting from the failure of FGIC to honor its payment obligations under the FGIC Policy. FGIC reserves the right to charge a reasonable fee as a condition to executing any amendment, waiver, or consent proposed in respect of this agreement or any other transaction document. The obligations of the Authority to FGIC shall survive discharge and termination of this agreement.

30

DM3/837331.6

(m)     The following claim procedures shall be followed with respect to the FGIC Insured Bonds:

(1)     If, on the third day preceding any interest payment date for the Bonds there is not on deposit with the Trustee sufficient moneys available to pay all principal of and interest on the Bonds due on such date, the Trustee shall immediately notify FGIC and U.S. Bank Trust National Association, New York, New York or its successor as its Fiscal Agent (the "Fiscal Agent") of the amount of such deficiency. If, by said interest payment date, the Issuer has not provided the amount of such deficiency, the Trustee shall simultaneously make available to FGIC and to the Fiscal Agent the registration books for the Bonds maintained by the Trustee. In addition:

a.      The Trustee shall provide FGIC with a list of the Bondholders entitled to receive principal or interest payments from FGIC under the terms of the FGIC Policy and shall make arrangements for FGIC and its Fiscal Agent (1) to mail checks or drafts to Bondholders entitled to receive full or partial interest payments from FGIC and (2) to pay principal of the Bonds surrendered to the Fiscal Agent by the Bondholders entitled to receive full or partial principal payments from FGIC; and

b.      The Trustee shall, at the time it makes the registration books available to FGIC pursuant to (i) above, notify Bondholders entitled to receive the payment of principal of or interest on the Bonds from FGIC (1) as to the fact of such entitlement, (2) that FGIC will remit to them all or part of the interest payments coming due subject to the terms of the FGIC Policy, (3) that, except as provided in paragraph (b) below, in the event that any Bondholder is entitled to receive full payment of principal from FGIC, such Bondholder must tender his Bond with the instrument of transfer in the form provided on the Bond executed in the name of FGIC, and (4) that, except as provided in paragraph (b) below, in the event that such Bondholder is entitled to receive partial payment of principal from FGIC, such Bondholder must tender his Bond for payment first to the Trustee, which shall note on such Bond the portion of principal paid by the Trustee, and then, with ail acceptable form of assignment executed in the name of FGIC, to the Fiscal Agent, which will then pay the unpaid portion of principal to the Bondholder subject to the terms of the FGIC Policy.

(2)     In the event that the Trustee has notice that any payment of principal of or interest on a Bond has been recovered from a Bondholder holding a FGIC Insured Bond pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time it provides notice to FGIC, notify all Bondholders holding FGIC Insured Bonds that in the event that any Bondholder's payment is so recovered, such Bondholder will be entitled to payment from FGIC to the extent of such

31

recovery, and the Trustee shall furnish to FGIC its records evidencing the payments of principal of and interest on the Bonds which have been made by the Trustee and subsequently recovered from Bondholders, and the dates on which such payments were made.

(3)     FGIC shall, to the extent it makes payment of principal of or interest on the Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the FGIC Policy and, to evidence such subrogation, (i) in the case of subrogation as to claims for past due interest, the Trustee shall note FGIC's rights as subrogee on the registration books maintained by the Trustee upon receipt from FGIC of proof of the payment of interest thereon to the Bondholders of such Bonds and (ii) in the case of subrogation as to claims for past due principal, the Trustee shall note FGIC's rights as subrogee on the registration books for the Bonds maintained by the Trustee upon receipt of proof of the payment of principal thereof to the Bondholders of such Bonds. Notwithstanding anything in this authorizing document or the Bonds to the contrary, the Trustee shall make payment of such past due interest and past due principal directly to FGIC to the extent that FGIC is a subrogee with respect thereto.

(n) .    The Authority may not purchase the FGIC Bonds, either outright or in lieu of redemption, for purposes other than retiring the FGIC Bonds. Notwithstanding any other provision in the Trust Agreement, this covenant shall survive the expiration of this commitment and shall be applicable so long as the FGIC Bonds remain Outstanding.

(o)     Any Credit Facility provided in lieu of a cash deposit into the Debt Service Reserve Fund, other than one provided by FGIC, shall conform to the provisions required by FGIC.

(p)     Notice of any redemption of FGIC Insured Bonds shall either (i) explicitly state that the proposed redemption is conditioned on there being on deposit in the applicable fund or account on the redemption date sufficient money to pay the full redemption price of the Bonds to be redeemed, or (ii) be sent only if sufficient money to pay the full redemption price of the FGIC Insured Bonds to be redeemed is on deposit in the applicable fund or account.

(q)     The notice addresses for FGIC are as follows: Financial Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Risk Management; and U.S. Bank Trust National Association, 100 Wall Street, 19th Floor, New York, New York 10005, Attention: Corporate Trust Department.

(r)     The following statement will be attached to the FGIC Insured Bonds:

Financial Guaranty Insurance Company ("Financial Guaranty") has issued a policy containing the following provisions with respect to the FGIC Insured Bonds maturing in the years 2021 to and including 2026 (the "FGIC Insured Bonds"), such policy being

on file at the principal office of Trustee, as Paying Agent (the "Trustee"):

Financial Guaranty hereby unconditionally and irrevocably agrees to pay for disbursement to the Bondholders that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which is then due for payment and which the issuer of the FGIC Insured Bonds (the "Issuer") shall have failed to provide. Due for payment means, with respect to principal or accreted value (if applicable), the stated maturity date thereof, or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which the payment of principal or accreted value (if applicable) of the FGIC Insured Bonds is due by reason of call for redemption (other than mandatory sinking fund redemption), acceleration or other advancement of maturity, and with respect to interest, the stated date for payment of such interest.

Upon receipt of telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or the Trustee to Financial Guaranty that the required payment of principal, accreted value (as applicable) has not been made by the Issuer to the Trustee, Financial Guaranty on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), sufficient to make the portion of such payment not paid by the Issuer. Upon presentation to the Fiscal Agent of evidence satisfactory to it of the Bondholder's right to receive such payment and any appropriate instruments of assignment required to vest all of such Bondholder's right to such payment in Financial Guaranty, the Fiscal Agent will disburse such amount to the Bondholder.

As used herein the term "Bondholder" means the person other than the Issuer or the borrower(s) of bond proceeds who at the time of nonpayment of an FGIC Insured Bond is entitled under the terms of such FGIC Insured Bond to payment thereof.

The policy is non-cancellable for any reason.

FINANCIAL GUARANTY INSURANCE COMPANY

IN WITNESS WHEREOF, the Authority and the Trustee have caused this First Supplemental Trust Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

PUERTO RICO CONVENTION CENTER
DISTRICT AUTHORITY

By: _____
Name: Manuel Sánchez Biscombe
Title: Executive Director

JPMORGAN CHASE BANK, N.A.

By: _____
Name: Joanne Adamis
Title: Vice President

[Signature Page to First Supplemental Trust Agreement]

34

DM3\037331.6

SCHEDULE A

LIST OF SERIES A PROJECTS

1.  Completion of the Puerto Rico Convention Center ($44,050,000). To finance the completion of the Puerto Rico Convention Center.

2.  Aquarium ($2,500,000). To finance the Authority's planning activities to study, to determine the feasibility of and, if justified, to promote the development of an aquarium within the District (as defined in the Authority Act).

3.  Land Acquisition ($5,600,000). To finance additional land acquisition cost for the Eyebrow (land area within Manuel Fernandez Juncos Avenue and Luis Munoz Rivera Expressway) ($4,200,000) and acquisition of Villa Verde Street from the Municipality of San Juan, in order to consolidate parcels within the District ($800,000).

4.  Construction of Authority's Administration Offices' ($1,000,000). To finance infrastructure improvements for administrative offices of the Authority next to the administration offices of the Puerto Rico Convention Center's Operator within the Puerto Rico Convention Center building.

5.  District Development Planning and Implementation Efforts ($2,500,000). To finance the Authority's RFP processes in order to complete the development and implementation process of the District's mixed uses parcels, including assessing (and updating) the District's Master Plan, develop/modify design guidelines, coordinate contract negotiation, implement a development program, and refine permits, studies, as well as conduct other development related efforts for Parcels D, E, F, G, I and J of the District.

6.  District Art Work ($200,000). To finance a portion of the placement of two (2) sculptures within the District.

7.  Former Juvenile Reformatory Center ($1,000,000). To finance the planning initiatives to investigate potential uses for the property identified as the Former Juvenile Reformatory Center and the possible demolition of existing facilities which are extremely deteriorated and constitute a safety hazard.

8.  District Operation/Maintenance during the next three years of the Development Period ($2,100,000). To finance a portion of the maintenance during the next three years, ending March 24, 2009, of the Urban Park and the other district common areas.

9.  Other District Enhancing Efforts ($1,500,000). To finance the study and evaluation of the feasibility and potential value to the District of other initiatives in the District such as, but not limited to,

- The development by private investors of a District cooling system.
- Construction of additional parking,
- Offsite signage

DM3\037331.6

## SCHEDULE B

### LOAN REPAYMENT SCHEDULE

| Loan | | Amount |
|------|------|------|
| GDB Taxable Loan | | $      191,540.72 |
| GDB Tax-Exempt Loan | | 371,458,984.85 |
| | Total | $371,650,525.57 |

36

## SCHEDULE C

## SERIES A ACCOUNT DEPOSITS

| | |
|---|---|
| Series A Capitalized Interest Sub-Account | $5,548,947.40 |
| Series A Construction Sub-Account | $58,021,047.67 |
| Series A Loan Payment Sub-Account | $371,650,525.57 |
| Series A Debt Service Reserve Account | $30,338,962.50 |

## SCHEDULE D

### CAPITALIZED INTEREST DEPOSITS

June 25, 2006                    $5,986,452.67

DMON37331.6

# 6. Tourism Company Board Resolution 06-47, ECF No. 13007-30

## PUERTO RICO TOURISM COMPANY

### CERTIFICATE AS TO RESOLUTION AND
### CERTIFICATE OF DETERMINATION

I, Pedro A. Padilla – Torres, Undersecretary of the Board of Directors of the Puerto Rico Tourism Company (the "Tourism Company"), DO HEREBY CERTIFY, that attached hereto as Exhibit A is a true, correct, and complete copy of Resolution No. 06-47 duly adopted by the Board of Directors of the Tourism Company on February 24, 2006 (the "Resolution"), at which meeting a quorum was present and acting throughout.

I FURTHER CERTIFY, that attached hereto as Exhibit B is a is a true, correct, and complete copy of the Certificate of Determination of the Tourism Company executed by Terestella González Denton, Executive Director of the Tourism Company, on March 15, 2006 (the "Certificate of Determination").

I FURTHER CERTIFY, that the attached Resolution is in full force and effect as of the date hereof and has not in any way been annulled, rescinded, revoked, modified or supplemented.

I FURTHER CERTIFY, that the attached Certificate of Determination is in full force and effect as of the date hereof and has not in any way been annulled, rescinded, revoked, modified or supplemented.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the official seal of the Tourism Company as of the 24th day of March, 2006.

Pedro A. Padilla - Torres
Undersecretary
Puerto Rico Tourism Company



EXHIBIT A

## CERTIFICATE AS TO RESOLUTION

I, PEDRO A. PADILLA TORRES, Undersecretary of the Board of Directors of the Puerto

Rico Tourism Company (the "Company"), DO HEREBY CERTIFY that attached hereto is a true,

correct, and complete copy of Resolution No. 06-47, duly adopted by the Board of Directors of the

Company at conference call meeting duly held on February 24, 2006, at which quorum was present

and acting throughout.

I FURTHER CERTIFY, that the attached Resolution is in full force and effect as of the date

hereof and has not in any way been annulled, rescinded, revoked, modified or supplemented.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the official seal of the

Company as of March 15, 2006.

Pedro A. Padilla Torres
Undersecretary

Resolution No. 06-47

RESOLUTION OF THE PUERTO RICO TOURISM COMPANY APPROVING
THE ISSUANCE OF THE $480,000,000.00 AGGREGATE PRINCIPAL
AMOUNT OF THE PUERTO RICO CONVENTION CENTER DISTRICT
AUTHORITY HOTEL OCCUPANCY TAX REVENUE BONDS, SERIES A

WHEREAS, the Puerto Rico Convention Center District Authority (the "Authority") has
requested the approval of the Puerto Rico Tourism Company (the "Company") for the issuance
of up to $480,000,000.00 aggregate principal amount of Authority's Hotel Occupancy Tax
Revenue Bonds, Series A (the "Bonds"), as required under Act. No. 351 of September 2, 2000 of
the Legislature of Puerto Rico, approved September 2, 2000, as amended (the "Occupancy Tax
Act");

WHEREAS, the Authority intends to issue the Bonds pursuant to its enabling act and the
Occupancy Tax Act, and to secure said Bonds with the revenues collected under the Occupancy
Tax Act pursuant to the terms and conditions as set forth in said Act and in the Trust Agreement
(the "Trust Agreement") to be entered into between the Authority and JPMorgan Chase Bank,
N.A., as trustee (the "Trustee");

WHEREAS, the proceeds of the Bonds will be used to: (i) repay an interim financing
used for the development and construction of the Puerto Rico Convention Center (as such term is
defined in the Trust Agreement); (ii) make deposits under the Trust Agreement to provide for the
completion of the Puerto Rico Convention Center and for the payment of capitalized interest;
(iii) fund the required debt service reserve; and (iv) pay the costs and expenses associated with
the issuance of the Bonds; and

WHEREAS, the Company has determined that the terms of the Bonds, including the
maturity schedules, the interest rates and yields to maturity (as applicable), the method of sale of
and the prices at which the Bonds are to be sold, the redemption provisions and premiums
therefor and all other essential factors of the Bonds, all as to be approved by the Authority and
described in the Preliminary Official Statement, the Trust Agreement and the Bond Resolution of
the Authority relating to the Bonds and attached hereto are consistent with the provisions of the
Occupancy Tax Act.

NOW, THEREFORE, IT IS HEREBY RESOLVED by the Company as follows:

Section 1.     The issuance of the Bonds as described in the Preliminary Official
Statement, is consistent with the provisions of the Occupancy Tax Act.

Section 2.     The Company consents to and approves of the issuance of the
Bonds and the Company's execution and delivery of the Assignment and Coordination
Agreement, substantially in the form presented to the Board of Directors as Exhibit A
attached hereto and made a part hereof.

Section 3.    The Company consents to and approves of the Preliminary Official Statement, the Pledge and Assigment Agreement, the Trust Agreement, the Supplemental Trust Agreement and the Bond Purchase Agreement, substantially in the form presented to the Board of Directors as Exhibits B, C, D, E and F, attached hereto and made part hereof.

Section 4.    The Company consents to and approves of (i) a principal amount of the Bonds as provided in the calculation set forth in Section 5 of this Resolution; (iii) a maturity schedule set forth as an attachment to the Supplemental Trust Agreement with such modifications as approved by the Executive Director of the Company, so long as the average life of the Bonds does not exceed 23 years; (iv) the interest rates on the Bonds as provided in the calculation set forth in Section 5 of this Resolution; (v) redemption premium for the Bonds as set forth in the form of Supplemental Trust Agreement, with such modifications as approved by the Executive Director of the Company, so long as the premium on or before the year beginning July 1, 2016 shall not exceed two and a half percent (2½%)%; and (vi) a purchase price of the Bonds as provided in the calculation set forth in Section 5 of this Resolution.

. Section 5.    The Company hereby consents to and approves of the sale of the Bonds to Lehman Brothers (the "Underwriters") at an aggregate purchase price at not less than ninety-eight and one-half percent (98½%) of the aggregate purchase price to the public of the Bonds, plus accrued interest and resulting in a true interest cost of not in excess of six percent (6%), upon the terms and conditions set forth in the Contract of Purchase between the Authority and the Underwriters.

Section 6.    The Company consents to and approves of any bond insurance for the Bonds if the Authority and the Government Development Bank deem such insurance advantageous.

Section 7.    The Company consents to and approves of any appropriate changes, insertions, and omissions to the Preliminary Official Statement as may be approved by the Authority with respect to making the Preliminary Official Statement an Official Statement to the extent such changes, insertions and omissions are consistent with the limitations set forth in Section 4 hereof.

Section 8.    Mrs. Terestella González Denton, Executive Director of the Company, is authorized and directed in the name and on behalf of the Company and under its seal, to execute and deliver, if necessary, a written consent or approval to the issuance of the Bonds and the related financing documents (the "Certificate of Determination"), with such changes therein, if any, that said Executive Director may approve, her execution thereof deemed to be conclusive evidence of such consent or approval.

Section 9.    Said Executive Director is authorized and directed, in the name and on behalf of the Company, to carry out, consummate, enforce and take any further action, and to execute any document that may be necessary and advisable in order to carry out

the purpose and intent of the foregoing resolutions. The Company recognizes that due to the unusual complexities of the financing it may become necessary that certain of the terms approved hereby may require modifications which will not affect the intent and substance of the authorizations and approvals by the Authority herein. The Authority hereby authorizes the Executive Director to approve modifications to the terms approved hereby which do not affect the intent and substance of this Resolution and all previously approved by the GDB. The approval of such modifications shall be evidenced by the execution of the documents, as modified by the Executive Director.

Section 10.    Previous actions of the Executive Director in connection to the issuance of the Bonds and the related financing documents be and they hereby are, affirmed, ratified and approved.

Section 11.    This Resolution shall take effect immediately upon its passage.

**7. Letter from E. McKeen, Esq. to J. Hughes, Esq., et al., April 14, 2020
(Flow of Funds Chart),
ECF No. 13315-19**

April 14, 2020

**VIA E-MAIL**

Gaspard Rappoport                                    John Hughes, III
Kelly DiBlasi                                        Atara Miller
Gabriel Morgan                                       Grant Mainland
Gregory Silbert                                      MILBANK LLP
Reed Collins                                         55 Hudson Yards
WEIL, GOTSHAL & MANGES LLP                           New York, New York 10001
767 Fifth Avenue
New York, New York 10153

Howard Hawkins                                       Jason Callen
Mark Ellenberg                                       Martin Sosland
William Natbony                                      BUTLER SNOW LLP
Casey Servais                                        5430 Lyndon B. Johnson Freeway, Suite 1200
CADWALADER, WICKERSHAM & TAFT LLP                    Dallas, Texas 75240
200 Liberty Street                                   1530 3rd Avenue South, Suite 1600
New York, New York 10281                             Nashville, Tennessee 37201

Re:   *In re Fin. Oversight & Mgmt. Bd., No. 17-BK-3283-LTS – Discovery on Lift Stay
       Motions – Movants' Letter Dated April 12, 2020*

Counsel:

We write in response to issues raised in your letters dated March 30, 2020 ("March 30, 2020
Letter") and April 12, 2020 ("April 12, 2020 Letter").  The Government Parties have complied
with their discovery obligations.  No further production is required.  Our responses to your
specific requests are set forth below.

I.      **General Ledger Requests**

On the evening of Sunday, April 12, 2020 Movants demanded for the first time that AAFAF
produce "any transaction, transfer, or transmittal records showing the internal financial reporting
of or controls over transactions on the Commonwealth's books and records, including the
relevant portions of the chart of accounts for the Commonwealth identifying and describing or
defining specific accounts and funds ("Chart of Accounts") (or the data on any internal accounts
or funds related to HTA pledged revenues or the Rum Taxes)." *See* April 12, 2020 Letter at 2
(defining these materials as "internal accounting records" or the "general ledger" documents).
This request is beyond the scope of permissible discovery, untimely, and entirely inconsistent
with the parties' discussions over the past two months.

While Movants suggest that they requested these materials from the beginning, this is
demonstrably untrue.  As your April 12, 2020 Letter notes, Movants' initial informal requests
sought "documents sufficient to show . . .all *transmittal information* associated with the transfer,
including, without limitation, all Fedwire or ACH transaction fields, memo lines, accompanying
memoranda, beneficiary information, addenda information, or other remittance or reference
information" (emphasis added). *See* Dkt. No. 11687-2 (Chart on Lift Stay Motions), CCDA

Request No. 1(g), PRIFA Request No. 1(g), HTA Requests Nos. 1(g) and 2(g))) (the "Transfer Information Requests.").  Movants' attempt to recast the Transfer Information Requests as calling for the production of the broad collection of materials Movants have defined as "internal accounting records" or "general ledger" documents does not change the fact that Movants' original requests did not call for the production of "documents describing or defining specific accounts and funds" or "internal financing reporting of or controls over transactions on the Commonwealth's books and records."

But even if the Transfer Information Requests called for the extensive internal accounting materials Movants now seek (and they do not), Judge Dein's March 5, 2020 Order does not compel their production.

As your letter acknowledges, AAFAF objected to producing the Transfer Information Requests from the beginning.  *See* April 12, 2020 Letter at 2-3.  The March 5, 2020 Order memorialized that the Government Parties "have agreed to produce," among other things, with respect to PRIFA and CCDA "transmittal information concerning transfers of pledged revenues" and "documents showing any sub-accounts or other designation used to track Rum Taxes in the Commonwealth Treasury Single Account," and with respect to HTA "transmittal information, such as payment vouchers and transfer activity reports for the period July 2016 to the present."

Movants' requests at the time did not refer to internal accounting materials or general ledger documents because no such request has been made.  The exhibit Movants attached to their motion to compel, which compiled all initial requests and follow up requests as of February 24, 2020, makes no mention of a "Chart of Accounts" or "internal financial reporting of or controls over"  the revenues at issue.  *See* Dkt. No. 11678-2.

Movants' statements at the March 5, 2020 hearing also show that Movants cannot shoehorn the internal accounting materials, including general ledger documents, into the phrase "transmittal information."  At the hearing, in response to a question from Judge Dein to explain the meaning of "transmittal information," Grant Mainland, counsel for Ambac explained:

> Transmittal information is really trying to deal with a situation where you look at an account statement and you see that money went from point A to point B, but often, these are accompanied by transmittal memoranda or what they've been referring to as disbursement detail.  That would provide more details as to the nature of the transfer that's occurring.

March 4, 2020 Hrg. Tr. at 244:8-14.  Remarks of Bill Natbony, counsel for Assured, also evidence the Movants used "transmittal information" to refer to vouchers and transmittal letters, which AAFAF has produced.  Responding to counsel for Ambac's suggestion that production of exemplar transmittal information may be appropriate, counsel for Assured stated "I don't really think it's appropriate to have them pick and choose which one of these transmittal slips they're going to send . . ." *Id.* at 247:17-19.  Rob Berezin, counsel for National interjected to explain that "AAFAF has already produced withdrawal vouchers and transfer activity reports for year 2015 and part of 2106 that were very helpful and informative.  And if they would just produce *the same types of documents* for the rest of 2016 through present, I think that would go a long way on this issue of transmittal information."  *Id.* at 248:7-14 (emphasis added).

Liz McKeen, counsel for AAFAF, explained that "AAFAF has agreed to produce direction letters, wiring instructions, and other similar content that exists in the files associated with the transfers.

The only thing we have refused to do is investigate the details of every single transfer reflected in five years' worth of statements. We're not going to go behind each transfer and accumulate more information. But to the extent we're finding documents like the ones Mr. Berezin just described, we're producing them." *Id.* 248:20-25. Counsel for AAFAF further noted "I want to make clear we're not doing what request number two asks of us" to investigate and compile additional information on a per-transaction basis. *Id.* 251:12-13.

Judge Dein's March 5, 2020 Order memorializing the Parties' agreement does not compel AAFAF to produce the broad collection of materials Movants requested for the first time on April 12, 2020. This is particularly evident given Judge Dein specifically warned at the hearing on Movants' motions that "I think you are entitled to discovery on understanding the flow in general, but that's not a specific -- you don't have time, nor do I think it's efficient, to be questioning each and every transaction over the last four years." *Id.* 245:6-10.

AAFAF has produced the direction letters, wiring instructions, and other similar content that exists in the files associated with the transfers at issue, just as it agreed to. It has also produced account opening materials and account statements that held the revenues at issue from 2015 onward for CCDA and HTA, and from 2014 onward for PRIFA. It has also prepared an analysis that illustrates the general flow of funds to aid the Monolines' understanding of those documents. These documents are more than sufficient given the scope of the issues for the May 13, 2020 hearing and in light of the discovery ordered by the Court, which was limited in nature.

## II. Other Document Requests

### A. Flow of Funds for Act 30 and Act 31 revenues

Movants have requested a flow of funds and accounting records for Act 30 and 31 revenues. This is beyond the scope of permissible discovery because revenues transferred to HTA under Act 30 and Act 31 were not allocated to pay debt service on the HTA Bonds. These revenues, allocated to HTA for the first time in 2013, post-date HTA's bond issuances and were never subsequently allocated to pay debt service on 1968 and 1998 Bonds. In fact, the Assignment and Security Agreement dated August 28, 2013 between the Puerto Rico Highways and Transportation Authority and the Government Development Bank for Puerto Rico states that HTA "absolutely, irrevocably and unconditionally assigns, conveys and transfers without recourse, to [GDB], and [GDB] hereby accepts and assumes without recourse all of [HTA's] rights, title, obligations and interest in the revenues allocated in favor of [HTA] by Acts No. 30-2013 & 31-2013 approved by the Legislature of the Commonwealth of Puerto Rico on June 25, 2013. *See* ECF No. 7643-23 ¶ 1.1.[1] Moreover, Act 30 and 31 revenues were not used for repayment of the HTA Bonds. *See* HTA_STAY0007983 (listing motor vehicle license fees, additional petroleum tax and cigarette taxes allocated under Act 30 and Act 31 as "Other Non Pledge Revenues", distinct from "1968 Resolution Revenues" and "1998 Resolution Revenues").

Accordingly, the flow of funds for these revenues is beyond the scope of permissible discovery

---

[1] Nothing in this letter should be construed as an admission with respect to the scope, validity, or perfection of the security interested granted to the GDB, if any.

in litigation concerning the 1968 and 1998 Bonds.  Notwithstanding, in the spirit of compromise, at Movants' request, AAFAF produced the account statements and opening materials for the accounts Movants identified as holding those revenues. That was not, however, a concession of relevance.

AAFAF has provided a flow of funds analysis for the revenues that were used for repayment of the 1968 and 1998 Bonds.  AAFAF will not undertake the task of preparing a flow of funds analysis for revenues that are beyond the scope of the issues before the Court.

### B.      PRIFA Disbursement Detail Memoranda

AAFAF produced all disbursement detail memoranda that were located in the Government's files following a reasonably diligent search.  AAFAF also requested that Citibank provide all of the following information regarding account no. **Redacted** 9028 (the "Lockbox Account"): (i) all account opening documents; (ii) all account statements from January 2014 to the present; (iii) all transfer memoranda, wiring instructions, disbursement detail, directional letters, or other documents from any government entity which includes any instruction or makes reference to transfers to or from the Citibank account; and (iv) any other document that may be related to the aforementioned.  AAFAF has produced all materials it received from Citibank in response to this request.

### C.      Additional TSA Cash Flow Reporting

As an accommodation to Movants, on February 25, 2020, AAFAF reproduced the historical TSA cash flow reports it had already produced to Movants in 2018 in response to Rule 2004 requests.  Prior to that production, we advised in a telephonic meet and confer that these reports did not date back to 2015.  (In connection with Rule 2004 discovery requests, we advised on November 30, 2018 that the weekly TSA cash flow reports only go back to March 31, 2017.  *See* Nov. 30, 2018 Letter at 4, at n. 15)  Movants' latest requests for additional cash flow documents that may exist in Treasury's files is untimely and beyond the scope of discovery, particularly given that AAFAF has produced account statements for the TSA operational account.

In the spirit of compromise, AAFAF will reproduce what was produced in connection with Rule 2004 requests — an excel workbook with the TSA year-to-date historic balances for fiscal years 2013 through 2018, which was produced on June 21, 2018 in connection with certain Monolines' Rule 2004 proceeding (*see* CW_RJM2004_0006665 - CW_RJM2004_0006765).

### D.      CCDA Request No. 1

Additional BNYM Statements

We have reviewed our transmittal records and confirmed that we produced all account statements that were provided to us by BNYM.

<u>Firstbank Account Number <sup>Redacted</sup>3039.</u>

As evidenced by the relevant account opening documents produced on March 16, 2020, the Puerto Rico Tourism Company opened its FirstBank account number <sup>Redacted</sup>3039 on December 30, 2015.  *See* CCDA_STAY0006787 - CCDA_STAY0006798, CCDA_STAY0006800 - CCDA_STAY0006805.

All account statements from January 2016 to February 2020 for FirstBank account number <sup>Redacted</sup>3039 were produced on March 15, 2020.  *See* CCDA_STAY0004045 - CCDA_STAY0004146.

<u>FirstBank Account number <sup>Redacted</sup>3961.</u>

The Government Parties' April 7 Letter identified only one account at FirstBank entitled "Debt Service Reserve," — account number <sup>Redacted</sup>3961.  Notwithstanding that FirstBank's records sometimes reflect 0* or 1* prior to the account number, it is the same account.  We urge you to review the relevant account statements (*see* CCDA_STAY0013926 - CCDA_STAY0014039), which demonstrate a month by month reconciliation of beginning and ending balances regardless of whether the statement contains a 0* or 1*.

<u>Additional Materials Relating to a Transfer from the GDB Room Tax Concentration Account</u>

Movants requested additional information as to the transfer details of a transaction involving the GDB Room Tax-Concentration (A/C No. <sup>Redacted</sup>9758) that was identified as ʻ<sup>Redacted</sup>2083 TRF FROM IBA."  After conducting a diligent search and consulting with the Puerto Rico Tourism Company, AAFAF has not located information pertaining to the transaction identified as ʻ<sup>Redacted</sup>2083 TRF FROM IBA."  AAFAF used reasonable efforts to locate information related to this transaction and it was not able to locate such information.

<u>Citibank Account Used for Transfers to US Bank</u>

In your March 30, 2020 Letter, you requested account opening materials and monthly statements "for the Citibank account that was used to transfer debt service payments between GDB Account No. <sup>Redacted</sup>1891 and U.S. Bank Account No. <sup>Redacted</sup>0-002."

As you are aware, the account statements for GDB -1891 show funds transferred directly to U.S. Bank.  Conversely, the U.S. Bank statements AAFAF produced show receipt of the corresponding funds on the same day.  Based on our investigation, the note in the U.S. Bank statements that the funds were "Rec'd From Citibank" does not reflect an additional deposit account in the flow of funds for the first $117 million of Rum Taxes.

In the ordinary course of its banking operations, GDB used third-party banks, including Citibank, to effectuate transfers directed by GDB's accountholders.  These transfers include, but are not limited to, the transfers reflected in the flow of funds summaries we provided.  It is our understanding that U.S. Bank made the determination to reflect the funds in its records as having been received from Citibank.

Discovery into the cash management procedures and operations of GDB and the private banks at which the accounts into which the relevant funds flowed were kept is beyond the scope of the Lift Stay Motions.

### III. CCDA Flow of Funds

Finally, we are providing a revised CCDA flow of funds presentation concurrently with this letter. This document is not intended to replace sworn deposition testimony and reflects our understanding of the documents our clients have produced in these proceedings; the documents themselves control.  This version adds a commingled designation to GDB account nos. -0006, -6048 on slide 2 and BPPR account no -9458 on slide 8, which is consistent with the PRIFA and HTA flow of funds presentations.  We reserve the right to modify or amend these documents to the extent necessary.

*        *        *

The Government Parties are available to meet and confer regarding the above matters.


Sincerely,

/s/ *Elizabeth L. McKeen*                               /s/ *Michael Mervis*

Elizabeth L. McKeen                               Michael Mervis

6

Attachment

# Puerto Rico Tourism Company ("Tourism")
*Room Taxes Flow of Funds*

This presentation is intended to illustrate the flow of room tax revenues from January 2015 to present. In doing so, the illustrations do not show all inflows and outflows from each account presented in cases where retained revenues are comingled with other funds in the same bank account.

4/14/2020

## January 2015 – November 2015



**Footnotes:**

Account contains comingled funds (room taxes and others).

## December 2015 – March 2016



**Footnotes:**

Account contains comingled funds (room taxes and others).

**1** Transfers from GDB -0006 to fund GO debt service payment in Jan. 2016 included comingled room tax receipts with proceeds from other retained revenues.

4/14/2020

**April 2016**



# May 2016 – July 2016



**Footnotes:**

Account contains comingled funds (room taxes and others).

## August 2016 – February 2017



**Footnotes:**

Account contains comingled funds (room taxes and others).

4/14/2020

# March 2017 – January 2018



**Footnotes:**

Account contains comingled funds (room taxes and others).

# February 2018 – Present



**Footnotes:**

⭐ Account contains comingled funds (room taxes and others).

▪▪▪▶ Denotes a discrete, one-time transfer

4/14/2020

# 8. Ahlberg Transcript CCDA Excerpt, ECF No. 13315-25

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                    April 23, 2020

225

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF PUERTO RICO


        -------------------------- X
        In re:                     :
                                   : PROMESA
        THE FINANCIAL OVERSIGHT    : TITLE III
        AND MANAGEMENT BOARD       :
        FOR PUERTO RICO,           : Case No.
                                   : 17 BK 3283-LTS
          as representative of     :
                                   : (Jointly
        THE COMMONWEALTH OF        :  Administered)
        PUERTO RICO,               :
                                   :
                Debtor.            :
        -------------------------- X
        In re:                     :
                                   : PROMESA
        THE FINANCIAL OVERSIGHT    : TITLE III
        AND MANAGEMENT BOARD       :
        FOR PUERTO RICO,           : Case No.
                                   : 17 BK 3567-LTS
          as representative of     :
                                   :
        THE COMMONWEALTH OF        : CONFIDENTIAL
        PUERTO RICO, et al.,       : PURSUANT TO
                                   : PROTECTIVE ORDER
                Debtor.            :
        -------------------------- X VOL. II OF II


            Videotaped deposition of TIMOTHY H.

    AHLBERG, conducted virtually, pursuant to

    continuance, reported stenographically by

    Cynthia J. Conforti, CSR, RPR, CRR, commencing

    at the hour of 9:46 a.m. CST, on the 23rd day

    of April, 2020.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

48 (Pages 410 to 413)

**410**

1  A.   Yes, I see that.
2  Q.   Okay.  During the April 2016 to
3  the present time period, that has replaced the
4  GDB 006 account as the main operational account
5  of the Commonwealth, correct?
6  A.   Correct.
7  Q.   Okay.  And then we see -- a
8  million dollars transferring to the PRIFA
9  BPPR 2882 account.  Do you see that?
10  A.   Yes.
11  Q.   And has that account replaced the
12  GDB 0704 account as the primary PRIFA operating
13  account?
14  A.   Would you mind giving me control
15  of the document, please?
16  Q.   Sure.
17  A.   Thank you.
18  That's correct.
19  Q.   Okay.  And the Flow of Funds
20  stopped here with the Banco Popular 9045
21  account and the Banco Popular 2882 account; is
22  that right?
23  A.   Correct.
24  Q.   Are there any outflows of rum
25  excise taxes out of the BPPR 9458 account?

**411**

1  A.   Besides the $1 million discrete
2  transfer, as documented on this presentation,
3  there would have been no transfers out of the
4  TSA operational account for which revenue
5  source was rum tax revenues.
6  Q.   Is that because the rum tax
7  revenues don't fit in the operational account?
8  A.   It's not possible to know that.
9  Q.   And why not?
10  A.   Because the TSA is a collection of
11  bank accounts that transfer between one
12  another.
13  Q.   Okay.  So you think the rum excise
14  taxes are sitting somewhere in the TSA but not
15  necessarily in the 9458 account.  Is that what
16  you're saying?
17  UNIDENTIFIED SPEAKER:  Objection.
18  THE WITNESS:  Once the cash is
19  in -- once the proceeds from rum revenue is
20  deposited to the TSA, those dollars -- that
21  cash is indistinguishable from other dollars
22  and cash within the TSA account.
23  BY MS. MILLER:
24  Q.   Okay.  I know that.  But on the
25  previous chart, we saw the rum tax revenues

**412**

1  being deposited in the 006 account, which is
2  the equivalent account to the current BPPR 9458
3  account, right?  And we were able to identify
4  outflows as a revenue source of rum excise
5  taxes.  Do you recall doing that exercise on
6  the prior two terms?
7  A.   Yes.
8  Q.   Okay.  So my question is:
9  Why could you not do that exercise
10  for the April '16 to present period?
11  A.   Maybe I'm not understanding the
12  exercise that you're referring to.  Could you
13  please repeat that?
14  Q.   I'm going to ask a different
15  question.
16  Is it your understanding that the
17  rum excise taxes collected between April 2016
18  and the present still remain in the TSA?
19  MS. McKEEN:  Objection.
20  THE WITNESS:  It's true that
21  revenue earned from rum taxes from April 2016
22  to present were transferred into the TSA
23  account.
24  BY MS. MILLER:
25  Q.   Have you seen any evidence of an

**413**

1  outflow from the TSA of rum tax revenue?
2  A.   Besides the $1 million discrete
3  transfer noted on the slide, I've seen no
4  transfers out of the TSA.  The fund source,
5  revenue source was rum taxes.
6  Q.   Okay.  And in the prior period
7  that we looked at, so the entire period from
8  January 2014 to March 2016, you were able to
9  identify outflows of rum tax revenues from the
10  General Fund, correct?
11  Sorry.  Let me restate that.
12  For the period January 2014
13  through March 2016, when rum taxes flowed out
14  of the Commonwealth's main operational account,
15  you were able to identify that, correct?
16  A.   No.  We were able to identify
17  transfers from the operational account whose
18  fund source was rum tax revenue.
19  Q.   Okay.  So for the period
20  January 2014 through March 2016, you were able
21  to identify transfers from the operational
22  account whose fund source was rum tax revenue;
23  is that correct?
24  A.   That is correct.
25  Q.   Okay.  And you were not able to

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

49 (Pages 414 to 417)

---

**414**

1  identify any outflow with the fund source of
2  rum tax revenues during the period April 2016
3  to the present; is that correct?
4      A.   It's not that we were unable to.
5  It's that we did not identify anything as such.
6      Q.   Okay. So to the best of your
7  knowledge, there were no outflows from the TSA
8  with a revenue source of rum excise taxes,
9  correct?
10         UNIDENTIFIED SPEAKER: Objection.
11  BY MS. MILLER:
12      Q.   Sorry. During this period, from
13  April -- let me just restate it so we have a
14  clean question.
15         To the best of your knowledge,
16  there were no outflows from April 2016 to the
17  present from the TSA with a revenue source of
18  the rum excise taxes, correct?
19      A.   With the exception of the
20  $1 million listed on this presentation
21  document, that is correct.
22      Q.   Thank you.
23         I'm going to switch to talking
24  about CCDA.
25         Now, I mentioned it earlier,

---

**415**

1  Mr. Ahlberg. Do you have an understanding that
2  when I say "CCDA" -- do you have an
3  understanding of what I mean when I say "CCDA"?
4      A.   Would you please clarify for me?
5      Q.   I think it's the Convention
6  Center Development Authority.
7      A.   Oh, okay.
8      Q.   And when I say "Tourism Company,"
9  do you know what I mean?
10      A.   Yes.
11      Q.   Okay. Do you have any -- have you
12  had any involvement in -- sorry. Let me
13  restate it.
14         So when I say "CCDA," I mean the
15  Convention Center District Authority. Do you
16  understand that?
17      A.   Yes.
18      Q.   When I say -- sorry, not when I
19  say.
20         Have you had any involvement with
21  CCDA in your -- the ordinary course of your
22  work for AAFAF?
23      A.   No.
24      Q.   What about the Tourism Company?
25      A.   Yes.

---

**416**

1      Q.   Okay. And what work did
2  you -- have you done with respect to the
3  Tourism Company?
4      A.   Generally cash flow reporting and
5  cash flow workout scenes.
6      Q.   How long have you been doing work
7  related to the Tourism Company?
8      A.   It's hard to say specifically.
9         My work with the Commonwealth
10  overlaps with various instrumentalities since I
11  began work at the Commonwealth.
12      Q.   Did you similarly put together the
13  Flow of Funds for CCDA?
14      A.   For tourism? Yes.
15      Q.   Okay. And who at CCDA did you
16  work with?
17         UNIDENTIFIED SPEAKER: Objection.
18  BY MS. MILLER:
19      Q.   All right. Who, if anybody, did
20  you speak to at CCDA?
21      A.   We worked with individuals
22  employed by the Tourism Company.
23      Q.   And why did you speak with people
24  employed by the Tourism Company rather than
25  CCDA?

---

**417**

1      A.   Because putting together the Flow
2  of Funds, the Tourism Company individuals and
3  management team were the ones with the
4  requisite knowledge to help develop an accurate
5  Flow of Funds.
6      Q.   Did you speak to anybody at
7  Treasury about putting together a CCDA Flow of
8  Funds?
9      A.   I spoke with Treasury about
10  putting together a Flow of Funds for the
11  Tourism Company.
12      Q.   And who did you speak to at
13  Treasury?
14      A.   Off the top of my head, I can
15  recall Jeira Belén and Hector Gomez.
16      Q.   And what did they tell you -- or
17  what did you talk to them about specifically
18  with respect to the Tourism Flow of Funds?
19      A.   I think it depends on the
20  conversation, that generally our conversations
21  were focused on aligning with the accuracy as
22  presented in the Flow of Funds presentation.
23      Q.   What do you mean by "aligning with
24  the accuracy as presented in the Flow of Funds
25  presentation"? I don't understand that.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

50 (Pages 418 to 421)

**418**

1  A.   I just mean collective review and
2  collaboration that the Flow of Funds
3  presentation is correct.
4  Q.   Did Treasury have any specific
5  information about the revenue stream or the
6  flow of the revenue?
7  A.   I can't recall specifically if I
8  obtained revenue information from Treasury.
9  MS. MILLER: Okay. Okay. So I'd
10  like to mark as the next exhibit tab 2001,
11  please.
12  (Monolines Exhibit 30 is
13  introduced for the record.)
14  BY MS. MILLER:
15  Q.   Mr. Ahlberg, in connection with
16  preparing the Flow of Funds, did you review the
17  assignment and coordination agreement between
18  the Tourism Company and the GDB?
19  A.   I personally did not review that
20  specific document.
21  Q.   Are you aware if such a document
22  exists?
23  A.   I have heard others refer to that
24  document.
25  Q.   Okay. And in what context have

**419**

1  you heard others refer to the document?
2  A.   I can't recall specifically. I
3  just know in general, I'm familiar with -- with
4  the term or the name of the document.
5  Q.   Okay. So you've heard of it, you
6  just don't remember specifically where.
7  A.   Correct.
8  Q.   Okay. So you have in front of you
9  a document that's been marked as Monolines
10  Exhibit 30. It is the Assignment and
11  Coordination Agreement between -- by and
12  between the Tourism Company and the GDB. Do
13  you see that?
14  A.   I see that.
15  Q.   Okay. And I'd like you to look
16  specifically at Section 1, which is right there
17  on the first page, and it says:
18  The Tourism Company hereby creates
19  a Special Fund called the Assignment and
20  Coordination Agreement ("Holding Fund"),
21  ("Holding Fund"). All hotel occupancy tax
22  revenues will be deposited, as collected, into
23  the Holding Fund.
24  Have you ever heard of the Holding
25  Fund?

**420**

1  A.   I'm not aware of a specific
2  Holding Fund.
3  Q.   Have you ever heard that term used
4  in connection with CCDA or the Tourism Company?
5  A.   I may have heard the term, but I
6  am not generally familiar with it.
7  Q.   Do you know whether there's an
8  accounting designation in the Commonwealth or
9  Tourism Company account that correspond to a
10  Holding Fund?
11  A.   I'm not positive about an
12  accounting designation of a specific Holding
13  Fund.
14  Q.   Okay. Are you thinking of a
15  different accounting designation that relates
16  to hotel occupancy taxes?
17  A.   I'm not certain, just not being
18  familiar with the Holding Fund terminology.
19  Q.   And my question was:
20  Are you aware of any accounting
21  designations that relate to the hotel occupancy
22  taxes?
23  A.   I'm not certain of accounting
24  designations.
25  Q.   And here it says that the moneys

**421**

1  will be deposited as collected into the Holding
2  Fund. Do you see that?
3  A.   I do see that.
4  Q.   And what does that mean to you?
5  A.   It means that all hotel occupancy
6  tax revenues will be deposited as collected
7  into the Holding Fund.
8  Q.   And what does it mean to be
9  deposited into a Fund?
10  A.   Generally it -- I mean, it depends
11  on how they're using the word "Fund" here, but,
12  generally, it would mean cash deposits into
13  whatever this concept of -- of Fund definitions
14  are used.
15  Q.   Does that make sense to you?
16  A.   Does what make sense to me?
17  Q.   The idea of a cash deposit into a
18  Fund.
19  A.   It makes sense that there would be
20  cash deposits into a bank account.
21  Q.   What about into the Fund?
22  A.   I don't know. It depends on
23  what's meant by "Fund."
24  Q.   Okay. Well, what do you think is
25  meant by "Fund" here?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

51 (Pages 422 to 425)

---

**422**

1     UNIDENTIFIED SPEAKER: Objection.
2  BY MS. MILLER:
3     Q.    Do you have an understanding of
4  how the Commonwealth uses the word "Fund"?
5     UNIDENTIFIED SPEAKER: Objection.
6     THE WITNESS: The Commonwealth
7  uses the word "Fund" in various ways, and often
8  very loosely, and the way that I think about
9  Fund is about Funds numbered specifically
10  within the PRIFA system.
11  BY MS. MILLER:
12     Q.    Okay.  Section 2 says that:
13     The holding Fund shall contain two
14  accounts identified as the Transfer Account and
15  the Surplus Account.  Do you see that?
16     A.    I see that.
17     Q.    Have you ever heard of the
18  transfer account before?
19     A.    Yes.
20     Q.    And have you ever heard of the
21  surplus account before?
22     A.    Yes.
23     Q.    Okay.  Do you have an
24  understanding of what revenues are assumed to
25  be deposited into the transfer account?

---

**423**

1     A.    Yes.
2     Q.    Okay.  And what moneys are those?
3     A.    In general, all hotel occupancy
4  taxes would eventually be transferred to the
5  transfer account.
6     Q.    Okay.  Your testimony – sorry, I
7  forgot to ask.
8     Are you also testifying as the
9  corporate representative for the Tourism
10  Company today?
11     A.    Yes.
12     Q.    And you've also been designated as
13  the corporate representative for CCDA; is that
14  correct?
15     A.    No.
16     Q.    Okay.  You're not the corporate
17  representative for CCDA?
18     A.    No.
19     MS. MILLER: Okay.  We don't get a
20  corporate representative for CCDA, Liz?
21     MS. McKEEN: You haven't noticed
22  one.
23     MS. MILLER: Okay.
24  BY MS. MILLER:
25     Q.    Okay.  So is the Tourism's

---

**424**

1  testimony that all hotel occupancy taxes have
2  to flow through the transfer account, is that
3  what I just heard you say?
4     A.    It is not my testimony that all
5  hotel occupancy taxes have to flow through the
6  transfer account.  It is my testimony that in
7  practice, in fact, depending on the time period
8  in question, that all – all hotel occupancy
9  taxes would pass through the transfer account.
10  BY MS. MILLER:
11     Q.    Okay.  So when I asked you if you
12  have an understanding of what revenues are
13  required to be deposited into the transfer
14  account, you weren't answering that question,
15  you were answering a different question when
16  you said all hotel occupancy taxes would
17  eventually be transferred to the transfer
18  account?  So it's just a statement not
19  responsive to my question?
20     UNIDENTIFIED SPEAKER: Objection.
21     THE WITNESS: I think I lost the
22  factual question that you're actually asking.
23  Would you mind --
24  BY MS. MILLER:
25     Q.    Okay.  Let me just ask -- let me

---

**425**

1  just ask you my same question again.
2     Do you have an understanding of
3  what revenues are required to be deposited into
4  the transfer account?
5     A.    I'm not an attorney.  I don't know
6  what revenues are required to be transferred
7  into that account, but I can tell you,
8  depending on the time period, what revenues did
9  or did not pass through that account.
10     Q.    Okay.  So are lawyers the only
11  people who have to take into account and
12  consider what moneys have to flow into what
13  account?
14     UNIDENTIFIED SPEAKER: Objection.
15     THE WITNESS: I don't know.  But
16  there – attorneys would certainly provide the
17  context for whether there was a requirement or
18  not a requirement to do so based on the law.
19  BY MS. MILLER:
20     Q.    Okay.  Well, what about
21  accountants, do they look at documents like
22  this to determine Flow of Funds and any
23  conditions or restrictions related to various
24  moneys?
25     A.    I can't speculate on what general

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

52 (Pages 426 to 429)

**426**

1  accountants might view or not view.
2      Q.    Okay.  Well, in any of your
3  five-plus accounting courses that you took in
4  college, did any of them consider the need in
5  reviewing accounting materials to consider
6  legal, contractual or other restrictions or
7  requirements associated with various funds?
8          UNIDENTIFIED SPEAKER:  Objection.
9          THE WITNESS:  I can't recall if
10 there's a specific section like that in one of
11 the classes I took in college.
12         BY MS. MILLER:
13     Q.    I'm not asking for a specific
14 section.  I'm just asking if that concept ever
15 came up.
16         MS. McKEEN:  Objection.
17         THE WITNESS:  I can't recall if
18 that context specifically came up in class or
19 not.
20         BY MS. MILLER:
21     Q.    Would operational people within
22 Treasury have to know what moneys are required
23 to flow into what account?
24         MS. McKEEN:  Objection.
25         THE WITNESS:  People at Treasury

**427**

1  would be knowledgeable about different bank
2  accounts and transfer between bank accounts.
3          BY MS. MILLER:
4      Q.    And the basis for those transfers,
5  correct?
6      A.    Potentially.  I can't say whether
7  one person at Treasury does or does not know
8  the basis for executing their operational job
9  functions.
10     Q.    Okay.  But they need to know what
11 the requirements are in order to execute and
12 direct money to appropriate people, right?
13         There are operational people in
14 whatever the relevant entity is, whether it's
15 the Commonwealth or whether it's Tourism
16 Company, correct?
17     A.    Certainly there are people who
18 review that information to know how to execute
19 transfers.
20     Q.    Okay.  And among those people are
21 the people who you've referred to multiple
22 times both today and on Tuesday as "we,"
23 referring to the Treasury, correct?
24     A.    Correct.
25

**428**

1          UNIDENTIFIED SPEAKER:  Objection.
2  BY MS. MILLER:
3      Q.    Okay.  So I'm asking you not as a
4  lawyer but from an operational perspective, do
5  you have an understanding of what moneys under
6  the assignment and coordination agreement are
7  supposed to flow through the transfer account?
8          MS. McKEEN:  Objection.
9          THE WITNESS:  I'm not certain what
10 this document would require or not require, but
11 I can't tell you or answer questions about in
12 practice and actuality what happened and where
13 funds would flow.
14         BY MS. MILLER:
15     Q.    Well, so let me ask you about that
16 in practice and then reality.
17         Have you seen any documents that
18 specifically identify any bank account that
19 you've included on your Flow of Funds as the
20 transfer account?
21     A.    Yes.
22     Q.    Okay.  What document?
23     A.    I believe I misunderstood your
24 question and answered -- answered a question
25 that you did not ask.

**429**

1      Q.    Okay.  So let me ask my question
2  again.
3          Have you seen any document in all
4  of the work that you've done in putting
5  together the Tourism Company Flow of Funds that
6  specifically identifies any bank account
7  reflected on your Flow of Funds as the transfer
8  account?
9      A.    I can't recall personally
10 reviewing a document that identified a specific
11 account as the transfer account, but through
12 the collaborative process and work with
13 Treasury and the team that was pulling
14 documents for discovery, I'm confident that I
15 can identify the transfer account on the Flow
16 of Funds presentation.
17     Q.    Okay.  I'd like to know if you or
18 anybody you've worked with has either seen or
19 told you that there exists a document that
20 identifies a particular bank account as the
21 transfer account.
22     A.    I can't recall a specific document
23 that somebody referenced, but I do know which
24 account is referred to as the transfer account.
25     Q.    Okay.  I don't want to know your

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

53 (Pages 430 to 433)

**430**

1  guesswork about what you've decided is the
2  transfer account.  I want to know if there's
3  any evidence that whatever account you're going
4  to tell me is the transfer account is actually
5  the transfer account.
6      MS. McKEEN:  Objection,
7  argumentative.
8      THE WITNESS:  I can't tell you a
9  specific document that I've personally reviewed
10  but that through our team's process and work,
11  I'm confident that I can identify the transfer
12  account in the Flow of Funds.
13  BY MS. MILLER:
14      Q.  Okay.  So I've looked through the
15  documents that you've produced, and I can tell
16  you that there is not a single document that
17  identifies any account on your Flow of Funds as
18  the transfer account.
19      Do you have any reason to believe
20  that that is not in fact the case?
21      MS. McKEEN:  Objection.
22  BY MS. MILLER:
23      Q.  So, actually, now I am asking you
24  about what I know.
25      So I'm going to make the

**432**

1      MS. MILLER:  Okay.  I'm going to
2  move to strike as nonresponsive.
3  BY MS. MILLER:
4      Q.  Has anyone on your team told you
5  that they have seen a document that identifies
6  a bank account as the transfer account?
7      A.  I don't recall a specific
8  conversation where somebody specifically
9  referenced a bank account as the reason that
10  they knew that that was the transfer account.
11      Q.  When you say "a bank account," do
12  you mean a document?
13      A.  I meant bank statement.  Thank
14  you.
15      Q.  Do you expect that if there was
16  such a document, it would have been produced?
17      A.  I can't speculate one way or the
18  other.
19      MS. MILLER:  Okay.  Well, I'm
20  going to call for the production of any such
21  documents that the Commonwealth intends to rely
22  on as evidence that the account that you're
23  going to tell me is the transfer account is in
24  fact the transfer account.
25

**431**

1  representation that I've reviewed it, and there
2  are no documents that were produced that
3  identify any account as the transfer account.
4      So my question to you is:
5      Do you believe that there is a
6  document to the contrary that specifically
7  identifies a bank account as the transfer
8  account?
9      MS. McKEEN:  Objection.
10  BY MS. MILLER:
11      Q.  Not that you can think of off the
12  top of your head, not that you've personally
13  seen that exists in the universe.
14      As the corporate representative of
15  the Tourism Company and of the Commonwealth, is
16  there a document that exists that identifies a
17  specific bank account as the transfer account?
18      MS. McKEEN:  Objection.
19      THE WITNESS:  I have not seen an
20  individual document that identifies the account
21  as the transfer account, but did enough work in
22  collaboration with the team to satisfy myself
23  that I can identify a transfer
24  account, bank account on the Flow of Funds
25  presentation.

**433**

1  BY MS. MILLER:
2      Q.  Okay.  Looking at Section 4, which
3  is on the next page of Monolines Exhibit 30,
4  this document provides what it seems like you
5  already know, which is that:
6      All hotel occupancy tax funds
7  received by the Tourism Company shall be
8  deposited into the transfer account until (i)
9  1/10 of the required payment has been met and
10  (ii) any deficiencies in prior payment periods
11  have been met, but in aggregate such amounts
12  shall not exceed the total amount of Required
13  Payment needed in any Fiscal Year.
14      Thereafter, and only when the
15  Transfer Account contains all moneys necessary
16  to pay the Bonds in accordance with the GDB
17  Certificate, the Tourism Company shall deposit
18  any excess funds into the surplus account.
19      Do you see that?
20      A.  Yes.
21      Q.  All right.  So you have an
22  understanding that under this agreement,
23  moneys -- the only moneys that are supposed to
24  flow into the transfer account are those that
25  are pledged to the bondholder, correct?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                       April 23, 2020

54 (Pages 434 to 437)

---

**434**

1     MS. McKEEN: Objection.
2     THE WITNESS: I think you
3 paraphrased this paragraph, and I'm not
4 positive whether I agree or disagree with that
5 paraphrasing.
6 BY MS. MILLER:
7     Q.   Okay. Well, I'll let you
8 paraphrase it.
9     What's your understanding, based
10 on the paragraph we just looked at, of what
11 moneys are supposed to flow into the transfer
12 account?
13     MS. McKEEN: Objection.
14     THE WITNESS: I'm happy to reread
15 the paragraph and sentences that you just read.
16 BY MS. MILLER:
17     Q.   Yeah. Take as long as you need.
18     A.   Okay. Thank you.
19     Would you now repeat your
20 question, please?
21     MS. MILLER: Could the court
22 reporter read it back, please?
23     (Record read as requested.)
24     THE WITNESS: The document says
25 that:

---

**435**

1     All Hotel Occupancy Tax Funds
2 shall be deposited into the transfer account
3 until 1/10 of the required payments are met.
4 BY MS. MILLER:
5     Q.   And any deficiencies, correct?
6     A.   Correct, that's what the document
7 says.
8     Q.   Okay. And do you have an
9 understanding of what required payments are?
10     A.   I have an understanding generally
11 of the term "required payments."
12     Q.   Okay. What's your understanding?
13     A.   I understand the term "required
14 payments" to mean payments that are required.
15     Q.   Okay. So let's go back one page
16 to Section 3, which defines the term "required
17 payment" as:
18     The amount necessary for the
19 Authority to make, during the upcoming fiscal
20 year and the first day of the second succeeding
21 fiscal -- succeeding fiscal year, (a), payments
22 equal to the amount necessary for the full and
23 timely payment or amortization of the principal
24 and interest on the bonds due on July 1 and
25 January 1.

---

**436**

1     And then it keeps going.
2     So you can take a look at that and
3 then tell me if you have an understanding of
4 what required payments are.
5     A.   Yeah, I have an understanding of
6 what required payments are as they're defined
7 within this document.
8     Q.   Okay. And so you have an
9 understanding that only the -- on a monthly
10 basis only 1/10 of the required payments are
11 supposed to be put into the transfer account
12 plus any deficiency, and thereafter any excess
13 moneys are supposed to flow to the surplus
14 account, correct?
15     UNIDENTIFIED SPEAKER: Objection.
16     THE WITNESS: That's what this
17 agreement says.
18 BY MS. MILLER:
19     Q.   Did you ever have any discussions
20 with anybody either at the Tourism Company or
21 Treasury about how the moneys are supposed to
22 flow under this agreement?
23     A.   I mean, we certainly talked to the
24 Tourism Company about Flow of Funds.
25     Q.   My question was specifically to

---

**437**

1 how the moneys were supposed to flow under this
2 agreement, specifically as between the transfer
3 account and the surplus account.
4     A.   My focus was on documenting the
5 actual Flow of Funds and how it actually
6 happened.
7     Q.   And is this how the moneys
8 actually flowed?
9     UNIDENTIFIED SPEAKER: Objection.
10     THE WITNESS: I have not done the
11 exercise to cross-reference every adjusted flow
12 from this document to the actual fund.
13 BY MS. MILLER:
14     Q.   Mr. Ahlberg, that's not what I'm
15 asking.
16     You've spent many weeks putting
17 together Flow of Funds documents, and I'm
18 asking you whether for the CCDA Flow of Funds
19 at any point in time the money flowed such that
20 the required payment -- 1/10 of the required
21 payment went into the transfer account on a
22 monthly basis, any deficiency, and the
23 remainder went into the surplus account.
24     You told me that you're confident
25 you can tell me which is the transfer account

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

55 (Pages 438 to 441)

**438**

1 and which is the surplus account. So now I'm
2 asking you did the money ever flow consistent
3 with the flow that we just looked at in
4 Monolines Exhibit 30?
5     UNIDENTIFIED SPEAKER: Same
6 objection.
7     THE WITNESS: I can't say whether
8 or not the Flow of Funds is consistent with how
9 the suggested Flow of Funds should be. I can
10 say that the Flow of Funds' presentation
11 document, the Flow of Funds they haven't.
12 BY MS. MILLER:
13     Q. Okay. And how did, based on your
14 recollection, and we'll look at them shortly,
15 what was the first step of the flow after being
16 received by the Commonwealth?
17     MS. McKEEN: Objection, vague as
18 to time.
19 BY MS. MILLER:
20     Q. At any time.
21     MS. McKEEN: Specify a time you'd
22 like. Objection.
23     THE WITNESS: I think you
24 characterized flows to the Commonwealth when I
25 think of hotel occupancy taxes flowing to the

**439**

1 Tourism Company.
2 BY MS. MILLER:
3     Q. Right. And that's a good point.
4     The hotel occupancy taxes never
5 actually flowed to the Commonwealth other than
6 during that clawback period where the
7 Commonwealth takes them back, right?
8     A. Without having the Flow of Funds
9 presentation in front of me, I believe that's
10 correct.
11     MS. MILLER. Okay. I'd like to
12 mark tab, document 102, as the next exhibit,
13 please.
14     And Exhibit 31, Monolines
15 Exhibit 31 is going to be the Pledge Assignment
16 Agreement by and among the Puerto Rico
17 Convention Center District Authority, the
18 Government Development Bank and JPMorgan Chase.
19     (Monolines Exhibit 31 is
20     introduced for the record.)
21 BY MS. MILLER:
22     Q. Is this the document or have you
23 seen such an assignment agreement before?
24     A. Are you pulling the document up
25 right now?

**440**

1     Q. Yeah, we are pulling it up, but
2 I'm just asking you generally, while it's
3 happening, whether you've ever seen the pledge
4 agreement related to this before.
5     A. I don't recall specifically
6 looking at this agreement previously.
7     Q. Okay. Are you familiar with any
8 accounts that are referred to in the Tourism
9 Company flow as the pledge account?
10     A. Yes.
11     Q. Okay. What's your understanding
12 of what the pledge account is?
13     A. In the Flow of Funds, the pledge
14 account is the account that receives an
15 approximately $3 million transfer every month.
16 During the certain period it is -- it is
17 ultimately passed on.
18     Q. Okay. Okay. And I just want to
19 look at -- okay.
20     And I just want to look at
21 Section 3(b) of the account -- of the pledge
22 agreement, so Section 3, which you went one
23 page too far, if you could go back. Thank you.
24     Section 3 provides that:
25     The GDB hereby agrees that, so

**441**

1 long as there are any Bonds Outstanding under
2 the Trust Agreement, to deposit or cause to be
3 deposited into the Pledge Account, all Hotel
4 Occupancy Taxes received from the Tourism
5 Company as received but in no event...than
6 12:00 noon, New York time, on the next Business
7 Day immediately following the Business Day on
8 which such Hotel Occupancy Tax Funds are
9 received by GDB," right?
10     And then (b) says:
11     Amounts deposited in the Pledge
12 Account are to be held by GDB to provide for
13 the following receipts (in order of priority).
14     Do you see that?
15     MS. McKEEN: Objection. It
16 doesn't say "receipt." It says "deposit."
17     MS. MILLER: Oh, sorry. Thank
18 you, but let me correct that.
19 BY MS. MILLER:
20     Q. 3(b) says:
21     Amounts deposited in the Pledge
22 Account are to be held by GDB to provide for
23 the following deposits (in order of priority).
24     Do you see that?
25     A. Yes, I see that.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

56 (Pages 442 to 445)

---

**442**

1  Q.   Okay.  And subsection 1 says:
2  GDB will make payments to the
3  Commonwealth of Puerto Rico as set forth in
4  Section 2(b) above when required in accordance
5  with Section 8 of Article VI of the
6  Constitution of the Commonwealth of
7  Puerto Rico.
8  Do you see that?
9  A.   Yes, I see that.
10  Q.   Okay.  And is it your
11  understanding that that is supposed to be a --
12  sorry.
13  Do you have an understanding of
14  what account that it's supposed to be
15  transferred from?
16  MS. McKEEN:  Objection.
17  THE WITNESS:  It's not clear to me
18  from the document section that we read.
19  BY MS. MILLER:
20  Q.   Okay.  Okay.  And then number 2 is
21  that the:
22  GDB shall on each calendar month
23  no later than 12:00 noon, on the third Business
24  Day immediately following the Business Day on
25  which the Hotel Occupancy Tax Funds are

---

**443**

1  received by it, transfer or caused to be
2  transferred to the Trustee all Hotel Occupancy
3  Tax Funds then deposited to the pledge account.
4  Do you see that?
5  A.   I see that.
6  Q.   Okay.  So you said it wasn't clear
7  to you when I asked you where the transfer to
8  the Commonwealth with respect to what was
9  colloquially referred to as "the clawback" were
10  made from, but if you look at Section 3(b), it
11  specifically says:
12  Amounts deposited in the Pledge
13  Account are to be held by the GDB pro-
14  -- sorry -- are to be held by GDB to provide
15  for the following deposits (in order of
16  priority).
17  So does that tell you that the
18  transfer of the money from the GDB to the
19  Commonwealth on account of any, quote,
20  "clawback" is supposed to come from the pledge
21  account?
22  MS. McKEEN:  Objection.
23  THE WITNESS:  I do understand that
24  that's what this document says.
25

---

**444**

1  BY MS. MILLER:
2  Q.   Okay.  All I want.  Okay.  Okay.
3  And then do you understand that
4  under Section 3(b)(2) moneys get transferred to
5  the trustee, correct?
6  MS. McKEEN:  Objection.  Are you
7  asking --
8  (Simultaneous speaking.)
9  BY MS. MILLER:
10  Q.   Are to be transferred to the
11  trustee?
12  MS. McKEEN:  Objection.
13  THE WITNESS:  Would you please
14  repeat the question?
15  BY MS. MILLER:
16  Q.   Yeah.  Do you have an
17  understanding that under Section 3(b)(2) the
18  GDB is then supposed to transfer the moneys
19  from the pledge account to the trust account,
20  right?
21  MS. McKEEN:  Objection.
22  THE WITNESS:  That is what
23  Section 3(b)(2) says.
24  BY MS. MILLER:
25  Q.   Okay.  And do you know who the

---

**445**

1  trustee is on the Fund?
2  A.   I can't recall off the top of my
3  head.
4  MS. MILLER:  I'd like to look at
5  the CCDA Flow of Funds.
6  So, Karen, if you could pull up
7  tab 2135 as Exhibit 32.
8  (Monolines Exhibit 32 is
9  introduced for the record.)
10  BY MS. MILLER:
11  Q.   Mr. Ahlberg, have you ever seen
12  any internal documents that specifically map
13  the various funds and accounts that we have
14  seen in the bond documents, the actual bank
15  account?
16  A.   I've not seen -- I personally have
17  not seen a file like that.
18  Q.   Do you believe any such file
19  exists?
20  A.   I can't recall off the top of my
21  head if that exercise was done.
22  Q.   Did you ask anybody in the course
23  of preparing for the Flow of Funds or for this
24  deposition whether or not such a document
25  existed?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

57 (Pages 446 to 449)

**446**

```
1        A.    I may have.  I just can't recall
2    right now.
3        Q.    But you know you've never seen
4    one?
5        A.    I know that I've chk first cited
6    docs in that document.
7        Q.    Do you know whether, based on
8    discussions with people on your team, anyone's
9    ever seen them?
10       A.    I can't recall.  It's certainly
11   something I could follow up on and get back to
12   you on.
13       Q.    How many people did you have on
14   your team working on this?
15       A.    Working on what specifically?
16       Q.    Working on putting together the
17   Flow of Funds chart.
18       A.    This Tourism Flow of Funds chart?
19       Q.    No.  All of the Tour- -- all of
20   the Flow of Funds charts, so the Tourism, the
21   rum taxes and the HTA.
22       A.    Okay.  I guess you asked who was
23   on the team that was doing that.  I prepared
24   these Flow of Funds documents --
25       Q.    I think I asked you how many --
```

**447**

```
1    how many people did you have on your team.
2        A.    Oh, how many people?
3             I can't recall specifically the
4    number of people on the team.  I'm happy to
5    list as many individuals that I can think of
6    off the top of my head.
7        Q.    Was there anybody senior to you
8    involved in this project?
9        A.    It depends on how you define
10   "senior."
11            For example, I would consider the
12   subsecretary of Treasury of the Commonwealth of
13   Puerto Rico to be senior to me but not
14   necessarily a -- you know, she doesn't work at
15   Conway MacKenzie in a position directly above
16   me.
17       Q.    So I would consider her to be in a
18   separate line entirely given that you're not
19   employed at the same place.  So I mean within
20   Conway MacKenzie, is there anybody senior to
21   you involved in this?
22       A.    Okay.  Thank you for clarifying.
23            No.
24       Q.    Okay.  I think we covered
25   yesterday that you've been at Conway MacKenzie
```

**448**

```
1    for how long?
2        A.    Since August 2017.
3        Q.    All right.  And your work has been
4    principally focused on Puerto Rico and mostly
5    limited to cash flows; is that right?
6        A.    That's correct, generally limited
7    to cash flow reporting, cash flow monitoring,
8    liquidity management.
9        Q.    Okay.  And I think you testified
10   yesterday that there are approximately five
11   people senior to you at Conway MacKenzie
12   involved generally in the Puerto Rico
13   engagement; is that right?
14       A.    Yes, I think I gave a range
15   between four and six.
16       Q.    Okay.  And none of them were
17   involved in this project; is that right?
18       A.    That's correct.
19       Q.    Did you speak to any of them about
20   the work you were doing?
21       A.    I wouldn't have spoken to anyone
22   on my team about the work we were doing.
23       Q.    Are any of the more senior people
24   at Conway MacKenzie involved in the Puerto Rico
25   engagement CPAs?
```

**449**

```
1        A.    Excuse me for a moment.  I do
2    recall that one member of Conway MacKenzie was
3    involved, and his name was Brett Howard.
4        Q.    What was his involvement?
5        A.    He specifically manages the cash
6    flow reporting for Tourism Company, and so I
7    consulted with him about the Flow of Funds
8    presentation in collaboration with Gustavo from
9    Tourism.  In all cases, counsel would have been
10   present.
11       Q.    And what is Mr. Howard's position
12   at Conway MacKenzie?
13       A.    Currently he is a senior associate
14   at Conway MacKenzie.
15       Q.    And is that senior to you?
16       A.    That is not.
17       Q.    Okay.  Well, I think I was asking
18   about people senior to you.
19       A.    Okay.  I apologize.
20       Q.    That's okay.  So let me ask again.
21            Of the people who are more senior
22   than you at Conway MacKenzie who were involved
23   in the Puerto Rico engagement, are any of them
24   CPAs?
25       A.    I think there are -- there's at
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

58 (Pages 450 to 453)

---

**450**

1    least -- there's at least one CPA on the Conway
2    MacKenzie team.  There could be more.
3        Q.    All right.  And who's the
4    one person who you can think of who's a CPA on
5    the Conway MacKenzie team?
6        A.    I believe that Rafael Di Napoli is
7    a CPA.
8        Q.    Okay.  And what is Mr. Di Napoli's
9    position at Conway MacKenzie?
10        A.    Currently he is a managing
11    director.
12        Q.    Okay.  And did you speak to
13    Mr. Di Napoli about Funds as used in the
14    Commonwealth?
15        A.    Would you repeat the question?
16        Q.    Yes.  Did you speak to Mr. Di
17    Napoli about how Funds are used within the
18    Commonwealth in this account?
19            UNIDENTIFIED SPEAKER:  Objection.
20            THE WITNESS:  I did not
21    specifically discuss Funds with Mr. Di Napoli
22    in preparation for this deposition.
23    BY MS. MILLER:
24        Q.    Did you speak to him about other
25    things in preparation for this deposition?

---

**451**

1        A.    Not specifically, but I can't say
2    unequivocally that we may never have ever
3    discussed Fund types together.
4        Q.    Did you speak to Mr. Di Napoli
5    about the significance of Funds or other
6    accounting designations in tracing money
7    through various Commonwealth accounts?
8        A.    No.
9        Q.    Did you speak to anyone else
10    senior to you at Conway MacKenzie about that?
11        A.    In preparation for this
12    deposition?  No.
13        Q.    Okay.  Okay.  So we have marked as
14    Exhibit 32 a document that is in front of you,
15    which is the Puerto Rico Tourism Company Room
16    Taxes Flow of Funds.  Do you see that?
17        A.    Yes.
18        Q.    Okay.  Do you recognize this
19    document?
20        A.    Yes.
21        Q.    And you prepared this,
22    right?
23        A.    I did.
24        Q.    Can you describe generally the
25    Flow of Funds -- sorry, the flow of hotel

---

**452**

1    occupancy taxes from the time that they're
2    collected by hoteliers?
3            MS. McKEEN:  Objection, vague.
4            THE WITNESS:  I don't know how to
5    answer that question.  Would you mind being
6    more specific, please?
7    BY MS. MILLER:
8        Q.    Okay.  Well, room tax revenues are
9    collected at a point of contact with the
10    customer, right?  And then they're transferred
11    to the Commonwealth; isn't that correct?
12        A.    Correct.
13        Q.    Okay.  So I want you to tell me
14    how a room tax revenue is collected and then
15    transferred to the Commonwealth.
16            MS. McKEEN:  Objection, vague.
17    BY MS. MILLER:
18        Q.    You can take it off -- you're
19    welcome to leave the Flow of Funds on, but I'm
20    asking for the step that's not reflected in the
21    Flow of Funds, right?
22            The room tax revenues are actually
23    collected by not a Commonwealth agent, right?
24    Is that consistent with your understanding,
25    Mr. Ahlberg?

---

**453**

1            Well, let me just ask:
2            Mr. Ahlberg, who collects room tax
3    revenue -- who collects room taxes?
4        A.    Hoteliers.
5        Q.    Okay.  So you would agree with me
6    that hoteliers collect room tax revenues,
7    correct?
8        A.    Correct.
9        Q.    And then the hoteliers then
10    transfer them to the Commonwealth, correct --
11    oh, sorry, sorry.
12        A.    The Tourism Company.
13        Q.    Yes.  Thank you.  Sorry.  Let me
14    restate my question.
15            Room tax revenues are collected by
16    hoteliers, right?
17        A.    Correct.
18        Q.    And the hoteliers then transfer
19    them to the Tourism Company, correct?
20        A.    Correct.
21        Q.    And how do they transfer them to
22    the Tourism Company?
23        A.    I think it depends on which
24    hotelier and their, you know, agreed-upon
25    schedule to transfer hotel revenue taxes.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

59 (Pages 454 to 457)

## 454

1    Q.    Okay.  Do you have an
2    understanding of the various ways in which
3    hoteliers can transfer the money to the Tourism
4    Company?
5    A.    I'm not positive of the ways that
6    the hoteliers designate their transfers to the
7    Tourism Company.
8    Q.    Okay.  Do you know whether they
9    can wire the money?
10    A.    I believe they can send
11    electronic -- electronic payments.
12    Q.    Do you know whether they can make
13    deposits at Scotiabank ATM machines in
14    Puerto Rico?
15    A.    I'm not positive whether they can
16    make ATM deposits or not.
17    Q.    Do you know whether they can
18    transfer the money by check?
19    A.    I believe that they can transfer
20    the money by check --
21    Q.    Okay.  And regardless --
22    A.    -- depending (indiscernible).
23    Q.    All right.
24        And regardless of the means used
25    by the hotelier to transfer the room tax

## 455

1    revenues that it collected, all of those
2    revenues are transferred to the Tourism Company
3    into the Scotiabank 5142 account, correct?
4    A.    Correct.
5    Q.    Okay.  And that was true for the
6    entire period that you looked at from
7    January 2015 through the present, correct?
8    A.    That's correct.
9    Q.    Okay.  So from January 2015 to the
10    present, all hotel room tax revenues collected
11    by hoteliers are transferred to the Tourism
12    Company through the Scotiabank 5142 account,
13    correct?
14    A.    Correct.
15    Q.    Okay.  And then looking at Flow of
16    Funds for January 2015 to November 2015 -- it's
17    up on the board or up on your screen -- the
18    Flow of Funds indicates that those revenues are
19    then transferred to the GDB 9758 account.  Do
20    you see that?
21    A.    Yes.
22    Q.    Okay.  Are there any moneys
23    deposited in the Scotiabank 5142 account that
24    are not transferred into the GDB 9758 account
25    during this period, January 2015 through

## 456

1    November 2015?
2    A.    No.
3    Q.    Okay.  So the GDB 9758 account has
4    exactly the same revenues that were transferred
5    into the Scotiabank 5142 account, correct?
6    A.    I believe the amount, the total
7    amount transferred into 5142 would be equal to
8    the total amount transferred into 9758 during
9    this time period.
10    Q.    Is that the long way of saying
11    yes, that the GDB 9758 account has exactly the
12    same revenues that were transferred into the
13    Scotiabank 5142 account by the hoteliers?
14    A.    It's -- I mean, the transfers for
15    the -- the transfers will total the exact
16    amount.  It will be -- the total transfers into
17    5142 will equal the total transfers into 9758.
18    Q.    So all the same moneys that are
19    going into 5142 are going into 9758, correct?
20    A.    During the time period, that's
21    correct.
22    Q.    Okay.  And then what moneys are
23    going from 9758 to 5144?
24    A.    Amounts that would be in excess of
25    the approximately $3 million per month that was

## 457

1    sent to the 9947 pledge account.
2    Q.    Okay.  And is the 9947 account the
3    pledge account as you understand it?
4    A.    Yes.
5    Q.    Okay.  Or as you've referred to
6    it.
7        And the 5144 account is designated
8    as a comingled account, do you see that?
9    A.    Yes, I see that.
10    Q.    What other moneys are deposited
11    into the 5144 account?
12    A.    An example I can think of off the
13    top of my head would be slot machine proceeds.
14    Q.    Okay.  Are any other moneys
15    deposited into the 9947 account?
16        MS. McKEEN:  Are you meaning the
17    moneys into the -- I just want to be clear.
18        MS. MILLER:  Yeah.  Now I'm asking
19    about the 9947 account.
20        THE WITNESS:  Would you please
21    repeat the question?
22    BY MS. MILLER:
23    Q.    Yeah.  Are any -- are any moneys
24    other than the moneys transferred from the 9758
25    account deposited into the 9947 account?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

60 (Pages 458 to 461)

---

**458**

1   A.   Not during this time period that
2   we're looking at.
3   Q.   Okay.  And then moneys from -- I'm
4   going back to the 5144 account.  Moneys from
5   the 5144 account, hotel occupancy tax revenues
6   in excess of the 3 million per month deposited
7   into the 5144 account are then indicated as
8   flowing to the 5138 account.  Do you see that?
9   A.   Yes.
10  Q.   And are all moneys during this
11  time period deposited in the 5144 account also
12  transferred to the 5138 account?
13  A.   No.
14  Q.   Okay.  So how do you know that it
15  is the hotel occupancy taxes that are moving
16  from the 5144 account to the 5138 account?
17  A.   You don't, because at the point of
18  transfer to 5144, those funds are comingled
19  with other funds.
20  Q.   Did you say "I don't" -- well,
21  then why is 5138 included in this Flow of
22  Funds?
23  A.   Because funds are
24  indistinguishable once they are transferred
25  into Account 5144, it is shown for exemplary

---

**459**

1   purposes that there still are outposts from
2   5144 used to fund operating disbursements and
3   transfers to that Account 5138, which is a zero
4   balance operating disbursement account.
5   Q.   Are you sure?
6   A.   Am I sure of what?
7   Q.   Are you -- so you just decided to
8   give me some example of some bank account that
9   moneys from 5144 flow to that may or may not be
10  the hotel occupancy taxes that we're talking
11  about?
12  A.   Sorry.
13       MS. McKEEN:  Objection, misstates
14  testimony, argumentative.
15       Atara, do you need to take a
16  break?
17       MS. MILLER:  No, I don't need to
18  take a break.  I definitely don't need a break.
19  I just need an answer to my question.
20       (Simultaneous speaking.)
21       MS. McKEEN:  I'd like you to take
22  a break.  I would like a break.  Thank you.
23       MS. MILLER:  All right.  I'm
24  not -- I'm not ready to take a break right now,
25  so I'm going to get an answer to the next

---

**460**

1   couple of questions, and then we can take a
2   break.
3   BY MS. MILLER:
4   Q.   Mr. Ahlberg, is it your testimony
5   that you don't know if hotels' occupancy taxes
6   in fact flowed from 5144 to 5138 and that the
7   5138 account is included in the Flow of Funds
8   just as an example of an account that moneys
9   may have or may not have flowed into from the
10  5144 account?
11       MS. McKEEN:  Objection, misstates
12  testimony.
13       MS. MILLER:  My question is, is it
14  his testimony.  So your witness can tell me
15  that it wasn't his testimony.
16       MS. McKEEN:  Objection.
17       THE WITNESS:  That was not my
18  testimony.
19  BY MS. MILLER:
20  Q.   Okay.  So, Mr. Ahlberg, do you
21  know that hotel occupancy taxes flowed from the
22  5144 account to the 5138 account?
23  A.   Due to the comingled nature of
24  funds within 5144, it's impossible to
25  say -- it's impossible to say one or the other,

---

**461**

1   which is why both are indicated with a
2   comingled star.
3   Q.   But you could have known that
4   money from one comingled account to another
5   comingled account would have come from hotel
6   occupancy taxes based on sources identifying
7   the revenue source, couldn't you?
8   A.   Could you repeat that question,
9   please?
10  Q.   Yeah, well, let me just ask it
11  this way:
12       Previously, when we saw comingled
13  account moneys being deposited in comingled
14  accounts flowing out, you indicated that you
15  were able to identify that the moneys were part
16  of the bucket of funds that you were tracing in
17  the Flow of Funds based on notations in outflow
18  documents, whether it was vouchers or
19  transmittal letters or the like.
20       Do you recall that?
21  A.   Yes.
22  Q.   Okay.  Is that different here?
23  A.   I don't think revenue source
24  is -- I don't think revenue source is
25  considered for disbursements from 5144 to 5138.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

61 (Pages 462 to 465)

**462**

1    Q.    Okay. I'm going to move on,
2 because, frankly, those aren't our moneys and
3 we know that. So I'm just going to move on,
4 but I'm not sure how that's consistent with how
5 you explain to put the charts together, so I
6 might come back to it just so I can understand
7 better what you did in the other Flow of Funds.
8           Can I ask you whether for all of
9 the Flow of Funds charts that you prepared for
10 HTA, PRIFA and CCDA if you were able to find
11 evidence that the revenues being traced were
12 transferred out of a particular account, if you
13 noted that transfer on the Flow of Funds chart?
14           UNIDENTIFIED SPEAKER: Objection.
15           THE WITNESS: Could you repeat
16 that question?
17 BY MS. MILLER:
18    Q.    Yeah. In putting together these
19 Flow of Funds charts, if you were able to
20 identify an outflow that corresponded to the
21 Fund that you were tracing, did you include
22 that outflow on the Flow of Funds chart?
23           UNIDENTIFIED SPEAKER: Objection.
24           THE WITNESS: Each Flow of Funds
25 chart is unique. It's hard for me to answer in

**463**

1 terms of all the Flow of Funds charts together.
2           MS. MILLER: Okay. Maybe let's
3 take a break. I need to think about why they
4 would be unique. Maybe I'll have an epiphany
5 over the break. Okay.
6           Do we want to take 5 minutes?
7           MS. McKEEN: I think 10 minutes, a
8 5-minute break we can't actually take a break.
9 Thanks.
10           MS. MILLER: Okay.
11           THE VIDEOGRAPHER: We are off the
12 record at 4:35 p.m.
13           (Recess taken.)
14           THE VIDEOGRAPHER: We are back on
15 the record at 4:56 p.m.
16 BY MS. MILLER:
17    Q.    Afternoon, Mr. Ahlberg.
18           Mr. Ahlberg, have you ever seen
19 any document specifically identifying a
20 particular bank account as the pledge account?
21    A.    I can't recall personally looking
22 at a document that's labeled a pledge account.
23    Q.    Do you know whether there are any
24 documents that specifically identify a
25 particular bank account as the hotel occupancy

**464**

1 tax pledge account?
2    A.    I believe that there is
3 justification for why there's an account that
4 is called the pledge account, but I just can't
5 recall off the top of my head the specific
6 document that we used to make that
7 determination.
8    Q.    But you believe there is a
9 document?
10           MS. McKEEN: Objection --
11           THE WITNESS: Yeah, I believe that
12 there's information out there.
13 BY MS. MILLER:
14    Q.    What do you mean when you say
15 "information out there"?
16    A.    Well, you characterized it as
17 potentially one document, and I'm just not
18 certain that there's one document or there may
19 be a collection of documents that say that.
20           MS. MILLER: Okay. I'd like to
21 mark as the next exhibit tab 2128, please.
22           (Monolines Exhibit 33 is
23           introduced for the record.)
24 BY MS. MILLER:
25    Q.    We have marked as Monolines

**465**

1 Exhibit 33 the document Bates-stamped
2 CCDA_STA0006780.
3           Do you see that?
4    A.    I don't see that. Could you
5 repeat that?
6    Q.    Yeah, we marked as Monolines
7 Exhibit 33 a document that's been Bates-stamped
8 CCDA STA006780.
9    A.    Yes, I see that, thank you.
10    Q.    Okay. And if those documents are
11 in Spanish, there is an English translation at
12 the back. And if you look at -- well, are you
13 going to want to look at the certified
14 translation or the Spanish version?
15    A.    I would prefer the certified
16 translation.
17    Q.    Okay. So looking at the certified
18 translation, do you see that -- well, do you
19 see what account these documents relate to?
20    A.    Yes, I see Account 9947.
21    Q.    Okay. So this is the GDB 9947
22 account. Do you agree with that?
23    A.    Yes.
24    Q.    And the account name is the Hotel
25 Occupancy Tax Pledge Account. Do you see that?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

62 (Pages 466 to 469)

---

**466**

1    A.   I see that here.

2    Q.   Okay. So let me ask my question

3 again.

4         Have you seen any documents that

5 identify a particular bank account as the

6 pledge account?

7    A.   Could we please flip back to the

8 PowerPoint presentation? I just want to

9 cross-reference this account number with the

10 account in the Flow of Funds that I know to be

11 the pledge account.

12   Q.   Sure. Well, sorry, before we do

13 that, how do you know that the account in the

14 Flow of Funds is a pledge account? You said,

15 "the account that I know to be the pledge

16 account." How do you know an account to be the

17 pledge account?

18   A.   We were working in preparation for

19 this deper- -- deposition (indiscernible) that

20 there is an account in the Flow of Funds that

21 is identifiable in the pledge account.

22   Q.   Okay. And what work did you do?

23   A.   It would have involved -- again,

24 as I mentioned, I personally did not review a

25 document that had that pledge account language

---

**467**

1 on that there, but it would have been in

2 conversation with the team in preparation for

3 this deposition.

4    Q.   Would you have asked them if they

5 saw a document that identified the account as

6 the pledge account?

7    A.   I admit I can't recall right now

8 asking about documents.

9    Q.   We spoke earlier today about the

10 PRIFA Flow of Funds. Do you recall that?

11   A.   I do recall speaking to you about

12 the PRIFA Flow of Funds.

13   Q.   And do you recall being pretty

14 adamant in connection with the testimony about

15 the bank account in the PRIFA Flow of Funds and

16 the various funds and accounts in the bond

17 documents, that you did not undertake an

18 exercise to map the accounts and Fund in PRIFA

19 to the actual bank accounts in the Flow of

20 Funds. Do you recall that?

21        MS. McKEEN: Objection.

22        THE WITNESS: I recall saying that

23 I did not personally do an exercise mapping

24 Flow of Funds to bond documents.

25

---

**468**

1 BY MS. MILLER:

2    Q.   Did anyone on your team do that

3 exercise?

4    A.   I'm not positive. It's something

5 that we can get back to you on.

6    Q.   Did you ask anybody to do it?

7    A.   I don't recall.

8    Q.   Did anybody tell you whether they

9 had done it?

10   A.   I can't recall just an exercise,

11 but -- I don't know.

12   Q.   Did you think it was an exercise

13 that was important to do in connection with

14 preparing the Flow of Funds?

15   A.   I think the Flow of Funds is

16 accurate as the method.

17   Q.   Okay. Did you think it was

18 important with respect to PRIFA to match the

19 Flow of Funds for the particular Funds and

20 accounts identified in the various bond

21 documents that we looked at earlier today?

22   A.   As I mentioned, I did not do that

23 in putting together the Flow of Funds, and I

24 believe the Flow of Funds is still an accurate

25 representation of the Flow of Funds during the

---

**469**

1 relevant time period.

2    Q.   Did you think it was important to

3 map the particular funds and accounts in the

4 PRIFA Flow of Fund to bank accounts identified

5 in your Flow of Funds chart in preparation for

6 your deposition today?

7    A.   Could you please repeat that

8 question?

9    Q.   Did you think it was important to

10 map the bank accounts identified in the PRIFA

11 Flow of Funds chart that you prepared to the

12 accounts and Funds identified in the PRIFA bond

13 document?

14   A.   I can't assign a degree of

15 importance or not there other than that I would

16 be able to put together an accurate Flow of

17 Funds without relying on an exercise like that.

18   Q.   Okay. So you did not do it for

19 PRIFA; is that right?

20   A.   I personally did not undertake an

21 exercise.

22   Q.   And you don't know if anybody on

23 your team did?

24   A.   I can't recall off the top of my

25 head.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

63 (Pages 470 to 473)

---

**470**

1  Q.   And it wasn't significant for you
2  to find that out and to remember that in
3  advance of your testimony today, right?
4  A.   I think the Flow of Funds are
5  accurate as they are.
6  Q.   I'm not challenging the Flow of
7  Funds. I believe that the Flow of Funds is
8  accurate. My question is that it wasn't
9  significant for you to find out from any other
10 team member in advance of your testimony today
11 whether they had put together a mapping of the
12 Funds and accounts in various PRIFA bond
13 documents to actual bank accounts, correct?
14     MS. McKEEN:  Objection.
15     THE WITNESS:  I don't think not
16 recalling whether this exercise was done or not
17 assigns a level of importance or not to the
18 exercise.
19 BY MS. MILLER:
20 Q.   Well, if you thought it was an
21 important part of your testimony today,
22 wouldn't you have asked and remembered the
23 answer?
24     MS. McKEEN:  Objection,
25 argumentative.

---

**471**

1      THE WITNESS:  In preparation for
2  testimony, I focused on developing an accurate
3  Flow of Funds.
4  BY MS. MILLER:
5  Q.   Okay. So you personally never did
6  a mapping exercise for PRIFA, and you don't
7  know if anybody on your team did, correct?
8      MS. McKEEN:  Objection, asked and
9  answered.
10     THE WITNESS:  I can't -- I did not
11 personally perform the exercise, and I can't
12 recall if someone on the team did or not.
13 BY MS. MILLER:
14 Q.   Okay.
15     THE REPORTER:  I'm sorry. Can you
16 repeat your answer, Mr. Ahlberg?
17     THE WITNESS:  I did not
18 personally, and I cannot recall if anyone on
19 the team did or did not.
20     THE REPORTER:  Thank you.
21 BY MS. MILLER:
22 Q.   Why did you do that exercise for
23 CCDA?
24     MS. McKEEN:  Objection.
25     THE WITNESS:  Which exercise?

---

**472**

1  BY MS. MILLER:
2  Q.   Of mapping the particular bank
3  accounts identified in the Flow of Funds to the
4  various funds and accounts identified in the
5  relevant bond document.
6  A.   I did not personally do that
7  mapping exercise either.
8  Q.   Okay. So how do you know that a
9  particular account in the Flow of Funds is the,
10 quote, "pledge account"?
11 A.   From our discussions with -- with
12 Tourism and our work together, we identified
13 the account as a pledge account.
14 Q.   Okay. Going back to PRIFA, did
15 you identify any of the particular accounts in
16 the PRIFA Flow of Funds to the designated
17 account names in the bond document?
18 A.   I can't recall off the top of my
19 head the names of the bond documents used.
20 Q.   Okay. But it was important enough
21 for you to remember it with respect to CCDA?
22     UNIDENTIFIED SPEAKER:  Objection.

---

**473**

1      THE WITNESS:  Again, I'm not
2  certain about defining importance or level or
3  not to that exercise.
4  BY MS. MILLER:
5  Q.   Can I ask you a question with
6  respect to CCDA?
7      Do you have a particular account
8  number that you would attach to each of the
9  accounts identified in the various CCDA bond
10 documents?
11 A.   Can you repeat that question?
12 Q.   Yeah. Sitting here today, do you
13 have a particular account number that's
14 reflected in your Flow of Funds chart that you
15 would attribute to the specific account names
16 included in the various CCDA bond documents?
17     UNIDENTIFIED SPEAKER:  Objection.
18     THE WITNESS:  Yeah. I'm not
19 positive off the top of my head.
20 BY MS. MILLER:
21 Q.   Okay. So I'm going to go through
22 them, and you'll tell me, just a yes or no, if
23 there is an account number identified in the
24 Flow of Funds that you would attach to that
25 account.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

64 (Pages 474 to 477)

**474**

1    And I don't need the notes -- the
2    names or numbers yet.  I'm going to give you
3    some names.  You're going to tell me what the
4    number -- you're going to tell me if there's a
5    specific bank account that relates to that
6    account designation in the document, okay,
7    so --
8        A.    Can somebody pull up the Flow of
9    Funds in question?
10       Q.    Yeah, sure.  Let's -- let's put --
11   yeah, let's put up Exhibit 32, please.
12             Okay.  So we are going to look at
13   this January 2015 to November 2015 flow.
14             Okay.  So looking at this, is
15   there a particular bank account that you
16   believe is the transfer account?
17       A.    Yes.
18       Q.    And is there a particular bank
19   account that you believe is the surplus
20   account?
21       A.    Yes.
22       Q.    And is there a particular bank
23   account that you believe is the pledge account?
24       A.    Yes.
25       Q.    And is there a particular bank

**475**

1    account that you believe is the trust account?
2        A.    Yes.
3        Q.    Okay.  So you can map in your
4    mind, sitting here with no documents in front
5    of you and no preparation, every single
6    relevant account identified in the CCDA -- CCDA
7    document to a specific bank account in this
8    chart, is that your testimony?
9             UNIDENTIFIED SPEAKER:  Objection.
10            UNIDENTIFIED SPEAKER:  Objection.
11            THE WITNESS:  I can identify on
12   this page accounts that I consider the pledge
13   account, transfer account, surplus account.
14   BY MS. MILLER:
15       Q.    Okay.  Can we just pull up the
16   PRIFA Flow of Funds for a minute because I just
17   want to ask you, sitting here off the top of
18   your head, if you did the same exercise with
19   respect to the PRIFA Flow of Funds.
20            While we are waiting for that,
21   Mr. Ahlberg, how many conversations that -- do
22   you -- have you had in preparation of these
23   Flow of Funds or in preparation for your
24   deposition today about which account is the
25   transfer account, the surplus account, and the

**476**

1    pledge account?
2        A.    Your question is how many times
3    did I have a conversation about which accounts
4    were considered by those names?
5        Q.    Yeah, about which accounts were
6    connected to which particular bank account,
7    exactly.
8        A.    Yeah.  I can't recall an exact
9    amount or number of conversations that we had
10   where we would have specifically talked about
11   this.
12       Q.    Do you recall any conversations
13   where you specifically spoke about it?
14       A.    Just to clarify, are we referring
15   to Tourism right now?
16       Q.    Yeah, I'm talking about Tourism
17   right now.
18       A.    Thank you for clarifying.
19             With that clarification, would you
20   please repeat the question?
21       Q.    How many conversations can you
22   recall having about which accounts
23   identified -- which bank accounts identified in
24   the Flow of Funds that you prepared related to
25   which account in the various bond documents?

**477**

1        A.    I can't recall an exact amount of
2    conversation.
3        Q.    Was it more than one?
4        A.    The identification of different
5    accounts came up on more than one occasion.
6        Q.    I mean, identification -- and
7    you only -- when you say the identification of
8    particular -- and I just want to make sure we
9    mean the same thing.
10             I mean the connecting or mapping
11   of a particular bank account to a particular
12   account name in a bond document.  Is that what
13   you're saying?
14       A.    That is not what I was saying.
15       Q.    Okay.  So that's my
16   question -- that's my question, so let me ask
17   my question again so we can just be clear.
18             How many conversations do you
19   recall about the linking of particular bank
20   account numbers to account names used or
21   designations used in the bond documents?
22       A.    I don't recall any specific
23   conversations where we discussed those things.
24       Q.    So how do you know, for example,
25   that the 9947 account is the pledge account?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

65 (Pages 478 to 481)

**478**

1    A.    Some discussions with -- with
2  Tourism Company and an understanding of
3  operationally how things work.
4    Q.    Okay.  I thought you just told me
5  that you didn't have any conversations about
6  that.
7    MS. McKEEN:  Objection.
8  BY MS. MILLER:
9    Q.    What conversations are you
10  recalling?
11    A.    It's hard to know since there were
12  several conversations with the different
13  management teams in preparation for this
14  deposition.
15    Q.    Who did you have conversations
16  with about the mapping of particular bank
17  accounts to account designations in the bond
18  documents?
19    MS. McKEEN:  Objection.
20    THE WITNESS:  I don't recall
21  specific conversations about mapping accounts
22  to the bond documents.
23  BY MS. MILLER:
24    Q.    Did you have any conversations
25  with counsel about mapping of bond documents --

**479**

1  just a yes or no -- mapping of accounts to bond
2  documents?
3    A.    I mean, I can't recall if we
4  specifically discussed this issue or not.
5    Q.    I'm trying to understand -- I
6  showed you a document that identified the
7  pledge account 9947 as the pledge account, and
8  you indicated to me that you weren't sure if
9  you had ever seen any document that identified
10  9947 specifically as the pledge account; is
11  that right?
12    A.    That's correct.
13    Q.    And yet you're confident that 9947
14  is the pledge account, right?
15    A.    Without having that diagram in
16  front of me, I can't recall the exact account
17  number.  I can remember it in the positioning
18  of the document.
19    Q.    Okay.  Where -- where is it
20  positioned in the document?
21    A.    If we could show the document, I
22  could identify the account.
23    Q.    Okay.  I'm not going to do that
24  right now because I have the PRIFA document up,
25  which is Exhibit 34 -- sorry -- 24.  It was

**480**

1  marked as Exhibit 24.
2    And could we go to the first Flow
3  of Funds chart in this document?
4    So we are going to look at the
5  January 2014 to June 2015 Flow of Funds.  Do
6  you see that?
7    A.    Yes.
8    Q.    Okay.  And in the PRIFA Flow of
9  Funds, the moneys are supposed to be deposited
10  to the credit of the Puerto Rico Infrastructure
11  Fund.  Can you identify a particular bank
12  account on this chart that relates to that?
13    A.    There is no bank account on this
14  chart that is identifiable as the Puerto Rico
15  Infrastructure Fund.
16    Q.    Okay.  And then the moneys that
17  flow from there into the Sinking Fund?
18    UNIDENTIFIED SPEAKER:  Objection.
19  BY MS. MILLER:
20    Q.    Are there any accounts on this --
21  on this Flow of Funds that you can identify as
22  the Sinking Fund?
23    A.    I am not positive of any of these
24  accounts being identified as the Sinking Fund.
25    Q.    Okay.  And do you know whether

**481**

1  that US Bank Account -0002 is the reserve
2  account?
3    A.    I'm not certain if that's the
4  colloquial name of this account or not.
5    Q.    I mean, there are reserve accounts
6  that are discussed in the relevant bond
7  documents.  Do you know if that US Bank 002
8  account is similar to the account discussed in
9  the bond document?
10    A.    Off the top of my head, I'm not
11  certain if that's the reserve account discussed
12  in the bond document.
13    Q.    Okay.  So, looking -- and you
14  don't know if it's the redemption account
15  either, do you?
16    A.    I'm not positive.
17    Q.    Okay.  So sitting here, off the
18  top of your head, looking at this PRIFA Flow of
19  Funds, is there any bank account that you can
20  attach a label from the bond document to?
21    A.    No.
22    MS. MILLER:  Okay.  So now we can
23  put up the CCDA Flow of Funds, which is
24  Exhibit 32.  We can put that back up.
25

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

66 (Pages 482 to 485)

**482**

BY MS. MILLER:

Q. Okay. But off the top of your head, you were able to attach labels corresponding or correlating particular bank accounts in the CCDA Flow of Funds to each of the three key accounts in the CCDA document; is that right?

A. In the Tourism document, yes.

Q. Okay. Okay. So the pledge account, which account is it your position is the pledge account?

A. The 9947.

Q. Okay. And you testified that you weren't sure if you've ever seen any document that specifically identified that, but I showed you a document that identified that, the pledge account, the name.

A. You did show me a document that named that account as the — a pledge account in the name.

Q. Okay. And who at the Tourism Company did you speak to about matching — sorry — mapping these various bank accounts to the account designations used in the bond documents?

**483**

MS. McKEEN: Objection.

THE WITNESS: Discussed with Gustavo and Brett which accounts operated as the transfer, pledge, surplus account.

BY MS. MILLER:

Q. Okay. And did Brett have independent knowledge of which account corresponded to each of those accounts — sorry — which bank accounts corresponded to each of those bond document accounts?

A. I can't say one way or the other if Brett had personal knowledge of the bond documents or not.

Q. Okay. And did you ask whether they knew which of these bank accounts correlated to particular accounts in the bond documents?

MS. McKEEN: Objection.

THE WITNESS: My question to them was not in the context of "match these accounts to the bond documents;" would have been in the context of in the actual Flow of Funds, which account functions as X account, which account functions as Y account.

**484**

BY MS. MILLER:

Q. Okay. So understanding that you focused on the Flow of Funds exclusively and the flow of cash, why is it that you committed to memory which of these accounts corresponds to particular named accounts in the bond document?

A. I can't give you an exact reason about why I committed those to memory, other than I know that's how the Tourism Company understands the account.

Q. Okay. And do you know what Gustavo's basis was for identifying particular accounts, bank accounts as those accounts in the bond document?

A. Not certain of the exact process that he used to determine.

Q. Did you ask him if he looked at any account opening statements or documents?

A. I don't recall specifically asking him that question or not.

Q. Did you ask him if he looked at any other document that might identify a particular account with a name used in the bond document?

**485**

A. I can't recall specifically asking him a question like that or not.

Q. Did you do anything to independently verify or confirm what Gustavo told you about which account was which?

A. No, other — no, but the actual Flow of Funds makes sense to me, given the assignments to those accounts that he provided.

Q. Well, we spoke earlier — well, what do you mean it made sense to you based on the assignments that he provided? Do you mean it made sense in terms of corresponding to moneys that were supposed to be transferred into the various accounts, and had the moneys actually flowed in relation to that?

MS. McKEEN: Objection.

THE WITNESS: What I mean generally, for example, is that I understand the Account 5144 being the surplus account, the surplus of the monthly average 3 million transfer from 9258, transfer to 9947, and thus the identification from the surplus account fits with my understanding of the Flow of Funds as presented here.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

67 (Pages 486 to 489)

**486**

BY MS. MILLER:

Q.   Okay.  Have you ever seen any document identifying the Scotiabank 5144 account as the surplus account?

A.   I can't recall a specific document that refers to it as the surplus account.

Q.   You think that you've seen it, though?

A.   I think I have seen some documents.

Q.   You think you have.  Okay.  I'm going to -- okay.

So I've looked through the production, and I have not seen any documents that identify the 5144 account as a surplus account.

MS. MILLER:  So I'm going to call on the record for the production of any such documents that you've seen that you're relying on for your testimony that the 5144 account is the surplus account or that the Commonwealth otherwise intends to rely on.

BY MS. MILLER:

Q.   Okay.  So you believe that you've seen a document identifying the 5144 account as

**487**

the surplus account; is that right?

A.   I feel confident to say that I believe the 5144 account is the surplus account.

Q.   That wasn't my question.

You believe that you've seen a document that identifies the 5144 account as the surplus account; is that correct?

A.   Yeah, and I'm not certain one way or the other as to whether I've seen a specific document that calls it that or not.

Q.   Okay.  Have you seen any documents that call any of these accounts the surplus account?

A.   I believe so.  I just -- I can't recall a specific document.

Q.   Okay.  And you believe that the document that you saw, called the Scotiabank 5144 account the surplus account; is that right?

A.   I -- yeah, I can't recall if it's a specific document, as I mentioned, or in conversations with Gustavo.

Q.   Okay.  Is the 5144 account a comingled operational account of the Tourism

**488**

Company?

A.   Did --

Q.   The moneys other than these excess moneys from the hotel occupancy taxes flow into the 5144 account?

A.   Could you repeat that, please?

Q.   The moneys other than the excess moneys from the hotel occupancy taxes, excuse me, flow into the 5144 account?

A.   Correct.

Q.   And you understand that the surplus account is one of the two accounts that's in the Special Fund called the Holding Fund under the assignment and coordination agreement that we looked at and previously marked as Exhibit 30, correct?

A.   I understand that that's what the document we looked at together said.

Q.   Okay.  And do you have an understanding of whether operating moneys would flow into a Special Fund as that term is used in government accounting?

A.   I'm not certain how to answer your question.  Could you be more specific?

Q.   Yes.  Do you know whether general

**489**

operating -- sorry.

Do you know whether general revenues used for operating expenses would flow into a Special Fund?

UNIDENTIFIED SPEAKER:  Objection.

THE WITNESS:  I don't think about dollars flowing into Funds, but I'm also not sure of the way that that would be classified.

BY MS. MILLER:

Q.   Okay.  And I don't think you actually said it yet, so let me ask you to identify which bank account do you believe on this chart corresponds to the transfer account?

A.   GDB account 9758.

Q.   Okay.  And what is the basis for that testimony?

A.   Conversations with Tourism.

Q.   And did you do anything to verify what Tourism told you about that?

A.   I did not personally pull documents to verify that, but the team, the entire document production had hundreds -- thousands -- thousands of documents that I personally could not review every single document.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

68 (Pages 490 to 493)

### 490

1    Q.    And you're confident that if
2    somebody told you that the 9758 account is the
3    transfer account that there is a document among
4    the thousands — I would say many tens of
5    thousands of documents -- that were produced
6    that identifies the 9758 account as the
7    transfer account, correct?
8         UNIDENTIFIED SPEAKER:  Objection.
9         THE WITNESS:  I can't recall if
10   there's specific documents (indiscernible).
11        THE REPORTER:  I'm sorry.  Can you
12   repeat that once more?
13        THE WITNESS:  I cannot recall if
14   there is a specific document that was used to
15   make that determination.
16   BY MS. MILLER:
17        Q.    And do you know if you've ever
18   seen any document referring to the 9758 account
19   as an account other than the transfer account?
20        A.    I'm not certain.
21        Q.    Okay.  Mr. Ahlberg, in putting
22   together your Flow of Funds, did you use
23   instruction letters to identify which moneys
24   deposited into the 9758 account flowed into the
25   9947 account?

### 491

1    A.    We looked at these transfer
2    letters.  I'm not sure if that's the same thing
3    as instruction letters that you're referring
4    to.
5         Q.    Okay.  So I'm going to pull one
6    up, and you can tell me.  Can I get tab 2132,
7    please, marked up as the next exhibit.
8         (Monolines Exhibit 34 is
9    introduced for the record.)
10   BY MS. MILLER:
11        Q.    Did you come to understand what
12   the relevant account names were under the
13   various bond documents?
14        A.    I'm sorry.  You broke up there in
15   the middle of your question.
16        Q.    How did you come to understand
17   what the relevant account names were under the
18   various bond documents and related agreements?
19        A.    It — it's hard to answer that
20   question because that assumes the — part of
21   the approach that I took to build the Flow of
22   Funds, which we start with the actual Flow of
23   Funds.
24        Q.    Yeah.  I'm saying how did you
25   figure out what -- well, when I asked -- I

### 492

1    showed you a number of bond documents earlier,
2    and you told me you hadn't looked at many of
3    them.  And my question is:
4         If you didn't even look at them,
5    how did you know what accounts were to even
6    know what labels to be putting on various bank
7    accounts?  That's my question.
8         UNIDENTIFIED SPEAKER:  Objection.
9    BY MS. MILLER:
10        Q.    So I'm assuming, consistent with
11   your testimony, that the process that you
12   underwent was entirely independent of the
13   various Fund or account designations under
14   statutes and bond documents and that there was
15   no reason or need for you to map them or
16   connect them.  That's consistent with your
17   testimony in HTA and PRIFA.
18        But suddenly, in CCDA, you have
19   very strong opinions about which account
20   corresponds to -- which bank account
21   corresponds to which account designation in the
22   bond documents, and that's what I'm trying to
23   understand here.
24        UNIDENTIFIED SPEAKER:  Objection.
25

### 493

1    BY MS. MILLER:
2         Q.    So my question was:
3         How did you come to know what the
4    account names were under the bond document that
5    you could attach to the various bank accounts?
6         A.    I'm not certain what the entire
7    process was to assign names to the accounts as
8    I understand them, plus my understanding came
9    about by a discussion with Tourism.
10        Q.    Okay.  So we have marked as
11   Monolines Exhibit 34 a document.  Do you see
12   it?
13        A.    I see a document.
14        Q.    And is this the document -- a form
15   of document that you recognize?
16        A.    Yes.
17        Q.    Okay.  And there are actually, if
18   you scroll through in this exhibit, a number of
19   sample transfer documents that we were given,
20   instruction letters that we were provided, and
21   you can flip through and look at all of them if
22   you would like.  There is also, I see — maybe
23   we don't have an English translation.
24        Do we have an English translation
25   of these?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                    April 23, 2020

69 (Pages 494 to 497)

**494**

1    MS. McKEEN: Atara, are they
2    consecutively paginated, or is this just --
3    MS. MILLER: Mine are
4    consecutively paginated, yes.
5    MS. McKEEN: Thank you.
6    MS. MILLER: No, I think this was
7    a collection of -- this was a collection of
8    instruction documents that were produced, and
9    there is an English translation. And this
10   is -- my understanding, Liz, is that this is
11   how the document was produced all together as a
12   single packet.
13   MS. McKEEN: Thank you. That was
14   just my question.
15   MS. MILLER: Yeah.
16   BY MS. MILLER:
17   Q.    Okay. So, Mr. Ahlberg, looking at
18   this, do you see that this is authorizing a
19   transfer from one account to another
20   account -- oh, we are pulling up the English
21   translation. Here we go.
22   Okay. And do you see that this
23   letter is authorizing the debiting of a
24   particular account of 3-million-plus dollars?
25   Do you see that?

**495**

1    A.    Yes, I see that.
2    Q.    Okay. And what account is that
3    debiting?
4    A.    The account number listed is
5    Redacted 9758.
6    Q.    Okay. And is that the same
7    account that is identified on your Flow of
8    Funds chart, Exhibit 32, as GDB 9758?
9    A.    Yes.
10   Q.    Okay. And how is that accounting
11   identified in this transfer letter?
12   A.    This transfer letter assigns a
13   name in quotes to that account of Room Tax -
14   Concentration Surplus.
15   Q.    And do you have an understanding
16   of what it means when an account name is put in
17   quotes in a transfer letter like this?
18   A.    I'm not entirely positive.
19   Q.    Okay. And who is this letter
20   from, can you tell?
21   And I don't know if it would be
22   easier to look at or if you would prefer to
23   look at the original Spanish letterhead, but
24   this is a letter from the Tourism Company to
25   the GDB, is it not?

**496**

1    A.    Could we go to the Spanish
2    translation just so I know for sure?
3    Q.    Sure.
4    A.    Yes, thanks.
5    Q.    Okay. And so -- and it's from a
6    Mr. Samuel Sierra Rivera. Do you see that?
7    A.    Yes.
8    Q.    And he's -- he identifies himself
9    as the chief financial officer. Do you see
10   that?
11   A.    I see that.
12   Q.    Okay. And so according to this
13   instruction letter, the chief financial officer
14   of the Tourism Company is identifying the
15   99 -- the 9758 account as, quote, the room tax
16   concentration surplus. Do you see that?
17   A.    I see that.
18   Q.    Okay. Do you have any
19   reason -- do you know who Mr. Sierra Rivera is?
20   A.    I do not.
21   Q.    Okay. Do you know whether Gustavo
22   is junior or senior to the chief financial
23   officer of the Tourism Company?
24   A.    I know Gustavo is not the CFO of
25   the company in his finance position. That

**497**

1    would make him subordinate to the CFO at the
2    Tourism Company.
3    Q.    All right. Do you have any reason
4    to dispute the at least then-CFO of the Tourism
5    company's characterization of the 9758 account
6    as the room tax concentration surplus?
7    A.    He calls the account what he calls
8    the account in this letter.
9    Q.    Okay. And you haven't seen any
10   documents that would indicate that the 9758
11   account is not the surplus account, have you?
12   A.    I can't recall specifically seeing
13   any documents like that.
14   Q.    Well, I can tell you that we
15   haven't. So I, again, call for the production
16   of any documents that would suggest that an
17   account other than the 9758 account is the
18   surplus account.
19   And you have not seen any
20   documents, have you, that identified the 9758
21   account as the transfer account?
22   A.    I can't recall seeing a specific
23   document that said that, but from my work with
24   Tourism, I understand that account to be the
25   transfer account.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

70 (Pages 498 to 501)

**498**

1    Q.    You haven't seen any documents
2  that say that.
3    A.    I can't recall if there were
4  documents, off the top of my head.
5    Q.    Okay.  And you've now seen at
6  least one collection of documents, and you can
7  flip through and see that the tourism company
8  in each of these letters identifies the 9758
9  account as the room tax concentration surplus.
10          You haven't seen any -- you've at
11 least not seen one collection of documents that
12 identified something other than the transfer
13 account, right?
14   A.    Again, I can't recall seeing it or
15 not seeing a document like that.
16   Q.    I'm asking you about the document
17 that's in front of you right now.  You are
18 currently looking at at least one document, one
19 document that is a collection of multiple
20 documents that identify the 9758 account as
21 something other than the transfer account;
22 isn't that right?
23   A.    These documents do call that
24 account number by name.  That is not the
25 transfer account.

**499**

1    Q.    Okay.  And the name is Room Tax
2  Concentration Surplus, isn't it?
3    A.    That's what it says.
4    Q.    Okay.  And I'd like to now mark as
5  Exhibit 35 tab 2507.
6          (Monolines Exhibit 35 is
7          introduced for the record.)
8  BY MS. MILLER:
9    Q.    Mr. Ahlberg, have you seen any
10 account-opening documents for the GDB 9758
11 account?
12   A.    I don't think I personally
13 reviewed an account opening statement for that
14 account.
15   Q.    Okay.  Do you know whether anybody
16 on your team did?
17   A.    I believe someone on the team
18 would have agreed that document.
19   Q.    Okay.  So I've marked as
20 Exhibit 35 a letter dated March 31, 2002, from
21 your counsel to me and many others, and I want
22 you to look at page 2 of that account on this
23 chart.  And do you see the GDB 9758 account
24 listed?
25   A.    Please give me a moment here.

**500**

1    Q.    Sure.
2    A.    Yes, I see that Account 9758
3  listed on this document.
4    Q.    Okay.  And what is the
5  representation from your counsel about the
6  account-opening documents for 9758?
7    A.    I was unable to locate an
8  account-opening document in GDB's file.
9    Q.    Okay.  And so do you now retract
10 your prior statement that you believe someone
11 on your team reviewed account-opening
12 statements for GDB 9758?
13   A.    I do.  I apologize.
14   Q.    Okay.  So to the best of your
15 knowledge and my knowledge, there simply are no
16 available account-opening documents for GDB
17 9758, correct?
18   A.    Correct.
19   Q.    Okay.  And what are -- is the
20 Scotiabank 5142 account?  Do you know if you've
21 looked at any account-opening documents for the
22 Scotiabank 5142 account?
23   A.    I didn't personally review the
24 account-opening statement for Scotiabank
25 Account 5142.

**501**

1    Q.    Do you know whether anyone on your
2  team received an account-opening statement --
3  sorry -- account-opening document for
4  Scotiabank 5142?
5    A.    Off the top of my head, I'm not
6  certain.
7    Q.    Okay.  Well, I'll tell you, and I
8  can mark it if you'd like, but your counsel
9  represented that it provided to us all of the
10 documents that it was able to get from
11 Oriental Bank and that that did not include
12 account-opening documents for 5142.
13          Do you have any reason to believe
14 that such account-opening documents are
15 available?
16   A.    No.
17   Q.    Okay.  So it's actually listed in
18 this chart as well right under what we were
19 looking at.  Okay.  I want to go back to
20 Exhibit 32, which is the Flow of Funds.
21          Okay.  In 5144, you indicated to
22 me that slot machine proceeds were also
23 deposited in that account, correct?
24   A.    I believe so, yes.
25   Q.    Do you know why slot machine

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

71 (Pages 502 to 505)

---

**502**

1  proceeds would be deposited into the surplus
2  account, which is an account in the Holding
3  Fund under the CCDA bond documents?
4      UNIDENTIFIED SPEAKER: Objection.
5      THE WITNESS: I don't know the
6  exact reasons why slot machine revenues would
7  be deposited into this account.
8  BY MS. MILLER:
9      Q.  All right.  Do you know
10  whether -- sorry.  I may have asked this again,
11  but I just want to make sure that I've covered
12  it.
13      Are any other moneys other than
14  hotel occupancy taxes deposited in the 9758
15  account?
16      A.  No.
17      Q.  Okay.  And looking at this chart,
18  I don't think I asked you this for CCDA yet,
19  but, again, we see various colors attached to
20  the boxes, right?
21      A.  Yes.
22      Q.  Okay.  So looking at the accounts
23  that are reflected in this January '15 to
24  November '15 Flow of Funds chart, just looking
25  by color designation, none of these is a

---

**503**

1  Commonwealth account; is that correct?
2      A.  That's correct.
3      Q.  Okay.  So during this time period,
4  none of the hotel occupancy taxes that were
5  collected by hoteliers transferred to the
6  tourism company ever touched a Commonwealth
7  account, correct?
8      A.  During this time period, that is
9  correct.
10      Q.  Okay.  I'm going to turn to the
11  next slide in the Flow of Funds, which is
12  December '15 to March 2016.
13      And during this period, the moneys
14  continue to be collected by hoteliers, correct?
15      A.  Correct.
16      Q.  And where did they transfer the
17  moneys to?
18      A.  The Scotiabank Account 5142.
19      Q.  Okay.  And then where did the
20  money flow after that?
21      A.  From there transfers were made at
22  that time.
23      Q.  Okay.  And the 9758 account, just
24  so that I have my story straight, the 9758
25  account is the account that you would call the

---

**504**

1  transfer account, right?
2      MS. McKEEN:  Objection,
3  argumentative.
4  BY MS. MILLER:
5      Q.  Sorry.  The GDB 9758 account is
6  the account that you would call the transfer
7  account, correct?
8      A.  Correct.
9      Q.  Okay.  And that's the same account
10  that we saw the document from the CFO of the
11  GDB -- of the Tourism Company, rather,
12  identifying the concentration surplus, correct?
13      A.  Correct.
14      Q.  Okay.  And the moneys still flow
15  into that GDB 9758 account, right?
16      A.  During this time period, money
17  still flows from 5042 to 9758.
18      Q.  Okay.  And then during this time
19  period, all the moneys still flow into the
20  Scotiabank 5144 account, correct?
21      A.  Correct.
22      Q.  And then what moneys during
23  this time period are flowing from the 5144
24  account into the 5138 account?
25      A.  Hotel occupancy taxes, among

---

**505**

1  others.
2      Q.  Okay.  And do all of the hotel
3  occupancy taxes flow from 5144 to 5138?
4      A.  Would you repeat the question?
5      Q.  Yeah.  During this period, do all
6  of the hotel occupancy taxes deposited in 5148
7  flow into -- sorry.  Let me start again.
8      During this time period, do all of the
9  hotel occupancy taxes deposited in 5144 flow
10  into 5138?
11      A.  Yes.
12      Q.  Okay.  And do all of the hotel
13  occupancy taxes during this period deposited in
14  5138 flow into the 006 account?
15      A.  No.
16      Q.  Okay.  What hotel occupancy taxes
17  do not flow into the 006 account from the 5138
18  account?
19      A.  Hotel occupancy taxes funding CCDA
20  operations would flow to that box called
21  Non-Debt Service Outflow.
22      Q.  And are those what are referred to
23  as the surplus amounts?
24      A.  I'm not certain if they're
25  referred to as surplus amounts or not.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

72 (Pages 506 to 509)

---

**506**

1   Q.   Okay.  Are all of the -- I'm just
2   trying to remember the exact term.
3       Are all of the amounts that are
4   required to be transferred into the transfer
5   account flowed into the 006 account?
6       Okay.  So let me restate that.
7   You don't remember -- do you recall that when
8   we looked at Exhibit 30, which is the
9   Assignment and Coordination Agreement, there
10  was a definition of required payments?
11  A.   I remember there was a definition
12  of required payments in that document.
13  Q.   Okay.  And do you remember that
14  that loosely was defined as the monthly 1/10 of
15  the amounts that had to be flowed into the
16  transfer account and any deficiency amount?
17  A.   I believe that's what that
18  document we looked at together said.
19  Q.   So if I refer to the
20  required payments, will you understand what I
21  mean?
22  A.   Yes.
23  Q.   Okay.  And just to make it simple,
24  because I want to make sure that we are talking
25  about things the same way, if we could just go

---

**507**

1   back one page in Exhibit 32.
2       When I'm talking about the
3   required payments, I'm talking about the
4   amounts that flowed from 9758 to 9947.  Is that
5   consistent with your understanding?
6   A.   Yes.
7   Q.   Okay.  So we'll call that the
8   required payments going forward.
9   MS. McKEEN:  Objection.
10  MS. MILLER:  What's the objection?
11  MS. McKEEN:  You mean the
12  agreement says what it says, and so to the
13  extent, you know, you're trying to get the
14  witness to give some form of legal conclusion,
15  that's the final objection.
16  MS. MILLER:  I'm trying to get the
17  witness to have a common understanding with a
18  noncontroversial term that refers to the moneys
19  that were pledged to the bondholders without
20  having him give the legal opinion that these
21  moneys are pledged to the policyholders, so I'm
22  going to go with required payments.  I think
23  the witness is comfortable with that and
24  understands what bucket of money I'm talking
25  about.

---

**508**

1   BY MS. MILLER:
2   Q.   Mr. Ahlberg, do you know the
3   bucket of moneys that I'm referring to?  So not
4   all hotel occupancy taxes, only that narrower,
5   what I think you've referred to as the 3-plus
6   million a month that's to be transferred?
7   A.   I understand that that's how
8   you're using the term "required payment."
9   Q.   Okay.  If you want to attach a
10  different term to it, I'm fine using whatever
11  term you're most comfortable with.
12  A.   We can say the monthly payment.
13  Q.   Monthly payment?  Okay.
14      Okay.  Are all of the monthly
15  payments, as you use that term -- defined it,
16  are all of the monthly payments flowed from the
17  5138 account to the GDB 006 account during the
18  December '15 to March '16 time period?
19      Now that I have this time period
20  presentation in front of me, can you reask the
21  question, please?
22  Q.   Now I forgot what you want to call
23  these.  Monthly payments?  Okay.
24      Are all of the monthly payments
25  transferred from the 5138 account to the 006

---

**509**

1   account?
2   A.   Yes.
3   Q.   Okay.  And how do you know that?
4   A.   Having reviewed these payments,
5   transfer details of those transfers.
6   Q.   Okay.  And based on that, you were
7   able to confirm that all of the monthly
8   payments were transferred from the 5138 account
9   to the 006 account, correct?
10  A.   Correct.
11  Q.   And are all of the hotel occupancy
12  tax monthly payments deposited in the 006
13  account transferred to the 6048 account during
14  this time period?
15  A.   Yes.
16  Q.   Okay.  And that 6048 account,
17  that's the account we were talking about
18  earlier, correct?
19  A.   That is an account that we talked
20  about earlier.
21  Q.   Okay.  And specifically, what
22  account was this?
23  A.   An account separate from the TSA,
24  account 1.
25  Q.   Okay.  What moneys were held in

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

73 (Pages 510 to 513)

**510**

1  this account during this time period?
2      A.   It held -- retained room tax
3  revenues and dollars -- well, not retained.
4      Q.   Okay. And then were all of the
5  hotel occupancy tax monthly payments that were
6  deposited into 6048 deposited into or back into
7  the 006 account?
8      A.   Yes.
9      Q.   Do you know whether when the
10 moneys flowed back into the 006 account they
11 were tagged with a different Fund or accounting
12 designation than when they were previously
13 transferred into the 006 account?
14     A.   I'm not positive to say it's
15 different funds or designations or not.
16     Q.   Okay. What would I do to find
17 that out?
18     A.   I would review a voucher prepared
19 for transfer.
20     Q.   Okay. And then were all of the
21 hotel occupancy tax monthly payments that were
22 retransferred into the 006 account during this
23 period transferred out for GO Debt Service?
24     A.   Yes.
25     Q.   Okay. And, again, do you know

**511**

1  whether that was actually -- sorry -- whether
2  that money was actually transferred to third
3  parties on account of GO Debt Service?
4      A.   I'm not certain.
5      Q.   Do you have an
6  understanding of how much of the -- do you know
7  how much of the hotel occupancy tax monthly
8  payments were transferred into the GDB 006
9  account during this time period?
10     A.   Off the top of my head, I don't
11 have that number.
12     Q.   Okay. And we spoke a little bit
13 about the time frames that were covered during
14 this -- for the time frames that were
15 identified at the top of each of these Flow of
16 Funds.
17       Is it your understanding that this
18 is referring to room tax revenues that were
19 generated and transferred into the Scotiabank
20 5142 account between December 2015 and
21 March 2016?
22     A.   Yes.
23     Q.   Okay. Footnote 1 to this Flow of
24 Funds indicates that transfers from the 006
25 account to Fund GO Debt Service payment in

**512**

1  January '16 included comingled room tax
2  receipts with proceeds from other retained
3  revenues. Do you see that?
4      A.   Yes, I see that.
5      Q.   Do you know whether moneys
6  transferred in January, February or March of
7  2016 were actually used to pay GO Debt Service?
8      A.   Could you repeat the question?
9      Q.   Do you know whether moneys
10 transferred in January, February or March of
11 2016 were actually used to pay GO Debt Service?
12     A.   Transfers from which account to
13 which account?
14     Q.   Hotel occupancy tax monthly
15 payments transferred into the GDB 006 account
16 in January, February and March 2016, do you
17 know if they were actually used to pay GO Debt
18 Service?
19     A.   We set the revenue from -- room
20 tax proceeds during this time period were
21 used -- sorry.
22       The revenue earned in this time
23 period was the source of funding for transfers
24 for GO Debt Service.
25     Q.   Okay. So the footnote indicates

**513**

1  that it was only for the GO Debt Service
2  payment in January of 2016. Do you believe
3  that there were additional GO debt service
4  payments that were funded from these moneys?
5      A.   Would you repeat the question,
6  please?
7      Q.   The footnote indicates that these
8  moneys were used for the January --
9  January 2016 GO Debt Service.
10       Do you believe that there were
11 additional GO Debt Service payments other than
12 January 2016 that were funded from the hotel
13 occupancy tax monthly payment reflected in this
14 Flow of Funds?
15     A.   I was thinking here. Would you
16 mind repeating the question again?
17       MS. MILLER: Would the court
18 reporter mind reading it back, please?
19       (Record read as requested.)
20       THE WITNESS: No.
21 BY MS. MILLER:
22     Q.   So do you believe that the hotel
23 occupancy tax monthly payments for January,
24 February and March of 2016 that are reflected
25 as flowing into the GDB 006 account and then to

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

74 (Pages 514 to 517)

---

**514**

1  the 6048 account and then to the 006 account
2  remain in the TSA today?
3      A.    I don't think of any one transfer
4  of any kind of funds ever remaining in the TSA
5  account. That's not really how I think about
6  it.
7      Q.    Have you seen any document --
8  sorry.
9          Have you seen any outflow document
10 after January 2016 indicating a tilt flow of
11 the hotel occupancy tax monthly payment from
12 the TSA?
13     A.    I've seen no other outflow from
14 the TSA that indicated hotel occupancy taxes as
15 a source of revenue of a transfer out of the
16 TSA.
17     Q.    Okay. And during this --
18         MS. MILLER: I don't have much
19 more. I am just going to quickly go through
20 the rest of the Flow of Funds.
21         MS. McKEEN: Okay. Thank you.
22         MS. MILLER: They do get very
23 complicated, though. I'm hoping to not have to
24 ask about every account. We have a simple one
25 coming up next.

---

**515**

1  BY MS. MILLER:
2      Q.    And just so that I understand, or
3  just can you confirm that all of the same hotel
4  occupancy tax revenues transferred from
5  hoteliers flow into the 5142 account and the
6  9758 account?
7      A.    To what time period?
8      Q.    In the December '15 to March 2016
9  period. The Scotiabank 5142 account and the
10 GDB 9758 account each have exactly the same
11 moneys; is that correct? Or let me say that
12 differently.
13         For the December '15 to March 2016
14 period, the exact same revenues flow through
15 the Scotiabank 5142 account and the GDB 9758
16 account, correct?
17     A.    Would have been the exact same
18 amount that was received into 5142 that was
19 transferred to 9758.
20     Q.    Okay. Is that different in any
21 way from what I said? I just want to know how
22 to ask the question precisely going forward.
23         So if you're drawing a distinction
24 that I'm not attuned to, I just would like to
25 hear what it is.

---

**516**

1      A.    Yeah, and I just answered that way
2  for my own benefit to make sure I answered
3  correctly.
4      Q.    Okay. All right. I might try to
5  ask you the same way.
6          Okay. So turning now to
7  April 2016, so this one appears pretty simple.
8          Can you just describe the flow
9  from the collection of room tax revenues by the
10 hoteliers?
11     A.    Yes. During April of 2016, room
12 tax revenues would have been collected by
13 hoteliers, remitted to Tourism Company, a/k/a
14 deposited into Scotiabank Account 5142, and
15 then transferred to GDB Account 9758.
16     Q.    Okay. And does the fact that the
17 Flow of Funds stop here mean that hotel
18 occupancy tax revenues collected in April 2016
19 remained in the GDB 9758 account?
20     A.    It means that during this time
21 period, there were no transfers out of the 9758
22 account.
23     Q.    Was there a transfer out of the
24 9758 account subsequent to this time period?
25     A.    No.

---

**517**

1      Q.    Okay. So what moneys were
2  deposited were then remaining in the GDB 9758
3  account presumably through the GDB's title fix;
4  is that right?
5      A.    I am not positive. I know that
6  account was dealt with in the GDB
7  restructuring.
8      Q.    Okay. Were you involved in the
9  GDB restructuring in any way?
10     A.    No.
11     Q.    Okay. And, again, during this
12 period, none of the accounts through which the
13 hotel occupancy taxes flowed were Commonwealth
14 accounts; is that correct?
15         THE REPORTER: I'm sorry. Were
16 what?
17         MS. MILLER: Commonwealth
18 accounts.
19         THE REPORTER: Thank you.
20         THE WITNESS: Correct.
21 BY MS. MILLER:
22     Q.    Okay. And again, as with the
23 prior period, exactly the same revenues flowed
24 through the 5142 account and the GDB 9758
25 account, correct?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

75 (Pages 518 to 521)

**518**

1    A.   It would have been the same amount
2    that — same revenue that was transferred by
3    hoteliers to 5142.  Transfers for the same
4    amount would be in total throughout April to
5    9758.
6    Q.   Okay.  So now let's go on to the
7    next one.  It's about to get a lot more
8    complicated.
9         Okay.  So here the hoteliers are
10   collecting taxes, and they're still
11   transferring them into the Scotiabank 5142
12   account; is that right?
13   A.   Right.
14   Q.   And then the money is being
15   transferred from the 5142 account into the 5144
16   account?
17   A.   Correct.
18   Q.   And is it your understanding that
19   during this period all of the hotel occupancy
20   taxes were transferred from the 5142 into the
21   5144 account?
22   A.   Yes.
23   Q.   Okay.  And have you seen
24   account-opening documents for the 5144 account?
25   A.   No, I have not personally seen

**519**

1    them.
2    Q.   Okay.  Do you know whether anybody
3    on your team has?
4    A.   I don't recall if anyone on the
5    team has or not.  I believe you could look at
6    the document we reviewed together earlier to
7    know for certain.
8    Q.   Okay.  Would you expect account
9    documents related to the 5144 account to
10   identify it as the surplus account?
11   A.   I'm not certain of what documents
12   would or would not be used to identify the
13   surplus account.
14   Q.   Well, I'm just asking if you -- we
15   saw the pledge account document.  It called the
16   account the pledge account.
17        Would you expect the account
18   documents related to this account to call it
19   the surplus account?
20   A.   I'm not certain what every
21   documented related to this account named the
22   account.
23   Q.   I'm asking you if you would expect
24   the account-opening documents to designate a
25   surplus account.

**520**

1    A.   I can't say one way or the other
2    whether an opening statement would say that or
3    not.
4    Q.   Would you expect any account, any
5    documents related to this account to identify
6    it as the surplus account?
7         MS. McKEEN:  Objection.
8         THE WITNESS:  I'm not positive of
9    documents that would or would not have been
10   used to make that determination.
11   BY MS. MILLER:
12   Q.   Okay.  Have you ever heard this
13   account referred to as the sweep concentration
14   account?
15   A.   You broke up there right at the
16   end.
17   Q.   Have you ever seen this account
18   referred to as the sweep concentration account?
19   A.   I can't recall if I've seen the
20   account referred to in that way or not.
21   Q.   What is a sweep concentration
22   account, as you understand it?
23   A.   I'm not certain of exactly what
24   that name — the name of an account like that
25   would indicate.

**521**

1    Q.   Are you aware of any other
2    accounts called sweep concentration accounts
3    within the Commonwealth or instrumentality?
4    A.   No.
5    Q.   No.  Have you ever heard that term
6    with respect to the Tourism Company?
7    A.   I just can't recall.  People use
8    the term "sweep" and "concentration" very
9    loosely when referring to different accounts.
10        MS. MILLER:  Okay.  I would like
11   to mark as the next exhibit tab 2134, please.
12        (Monolines Exhibit 36 is
13        introduced for the record.)
14        THE WITNESS:  Excuse me.  Could we
15   make a 2-minute break?  I just drank a bunch of
16   coffee with coffee grounds with it.
17        MS. MILLER:  Sure.  I'll let you
18   take it even though there's a question pending.
19        Let's go off the record.
20        THE VIDEOGRAPHER:  We are off the
21   record at 6:24 p.m.
22        (Recess taken.)
23        THE VIDEOGRAPHER:  We are back on
24   the record at 6:25 p.m.
25

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

76 (Pages 522 to 525)

**522**

BY MS. MILLER:
Q. Okay. So you have in front of you a document that was marked Monolines Exhibit 36.
Do you see that?
A. I see the document.
Q. Yeah. Is this a document that you've seen before?
A. Is there a certified English translation?
Q. I'm not sure. The answer is maybe. I don't think that what I'm going to have to do requires knowledge of Spanish. Other – okay. There is a certified English translation. Do we want to wait for it?
A. If you could.
Q. Sounds like your Spanish is a lot better than mine. If you need the English translation, just let me know, and I'll stop and wait for that to be found.
A. Fair enough.
Q. So do you recognize Exhibit 36 as a corporate resolution of the Tourism Company of Puerto Rico?
A. I see that's (indiscernible) --

**523**

THE REPORTER: I'm sorry. You broke up. The witness, your answer totally broke up for me. Sorry.
THE WITNESS: Sure. I said:
Yes, I see that's what the document says.
THE REPORTER: Thank you.
BY MS. MILLER:
Q. Okay. And you see that it lists a number of Tourism Company bank accounts in a chart starting about halfway through?
A. Yes, I see that.
Q. Could we magnify the exhibit a little bit? I think it's very hard to see the numbers. They're running together a little bit.
A. Does that help?
Q. If you have magnified it on your end. I have a hard copy that is slightly larger on my end. So if you can see it...
A. I can see it.
Q. Okay. Great. So do you see that the first account that's identified is the Scotiabank of Puerto Rico account [Redacted] 5144?

**524**

A. Yes, I see that on the document.
Q. Okay. And is that the account that is referred to in your Flow of Funds document as the Scotiabank 5144 account?
A. Yes.
Q. Okay. And do you see the next column over says:
Number de la cuenta?
A. Yes.
Q. And do you understand that to mean name of the account?
A. Yes.
Q. Okay. And the name of the account that's attributed to the 5144 account, can you just read what it's called in this document?
A. This document lists the name of that account as "sweep concentration."
Q. Okay. It doesn't list a surplus, does it?
A. The document says "sweep concentration."
Q. Okay. And looking at the May '16 to July '16 Flow of Funds, in fact, none of the accounts identified in this Flow of Funds is a Commonwealth account, is it?

**525**

A. Could we have the Flow of Funds presentation during the --
Q. Oh, sorry, yes. Yes. I'm sorry. We are not in hard copy. I forgot. Yes. Can we – that was not a memory test.
MS. MILLER: Can we pull up Exhibit 32 again, please.
Thank you. It wasn't a trick, I promise.
A. No problem.
BY MS. MILLER:
Q. I'm old school. My desk is filled with the exhibits. I kind of assumed yours was too.
MS. MILLER: Was there anyone else – did you want me to pull up the certified English translation? I'm happy to attach it to the exhibit that we marked just so we have it on a going forward basis, but unless anybody wants to see it right now, I was going to go back to the Flow of Funds document.
MS. McKEEN: I think we are okay.
MS. MILLER: Okay. Great, thank you.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

77 (Pages 526 to 529)

**526**

BY MS. MILLER:

Q.   Okay.  So let me just ask my question again.

Looking at the Flow of Funds from May '16 to July 2016, none of the accounts identified in this Flow of Funds is a Commonwealth account, correct?

A.   Correct.

Q.   And looking forward to the August '16 to February of 2017 account -- sorry -- Flow of Funds, here the room tax revenues collected by the hoteliers are still being transferred into the Scotiabank 5142 account; is that right?

A.   Correct.

Q.   And during this period, the money is now flowing next into the BPPR 2306 account; is that right?

A.   Correct.

Q.   Okay.  What's your understanding of what the BPPR 2306 account is?

A.   This account in this time period, this account is used to transfer monthly payments to BPPR 6545.

Q.   Okay.  So just looking back to the

**527**

January '15 to November 2015 period, that BPPR 2306 account is now taking the place of the GDB 9758 account; is that right?

UNIDENTIFIED SPEAKER:  Objection.

THE WITNESS:  It's not one -- one account -- accounts don't replace accounts in that way.  I don't think about it like that.

BY MS. MILLER:

Q.   Okay.  Well, when the GDB ceases to exist and you have to open an account in a new bank, wouldn't you think about it in that way?

MS. McKEEN:  Objection.

BY MS. MILLER:

Q.   Okay.  So let me just -- and I don't know, is there a way to split the screen on the exhibit so that you can look at both the January 2015 to November 2015 and August 2016 to February 2016 Flow of Funds side by side?

A.   I don't know.

Q.   The message from people who know say there is not.  That's the definitive answer.  Okay.  All right.

So the first one will be easy because we still start with room taxes being

**528**

collected by hoteliers, right?

And in those periods, the moneys are transferred by the hoteliers into the Scotiabank 5142 account, correct?

A.   Correct.

Q.   Okay.  And my question is going to be -- and I'm happy to go back and forth as much as you want, but my question is going to be are exactly the same moneys -- so I don't mean like actual dollars but the same revenue streams, hotel occupancy taxes, that flow into the GDB 9758 account in the January 2015 to November 2015 period -- sorry.  Let me just ask it more simply.

Are the hotel occupancy tax revenues that flow into the GDB 9758 account from January '15 to November '15 the same hotel occupancy tax revenues that flow into the BPPR 2306 account in the August '16 to February '17 period?

A.   They're inherently not the same revenues because they're revenues from different time periods, but from August 2016 to February 2017, there are approximately $3 million monthly amounts being transferred

**529**

from Account 2360 to BPPR 6545.

Q.   Okay.  Are all of the hotel occupancy taxes collected between August '16 and February '17 transferred from 5142 to BPPR 2306?

A.   Yes.

Q.   And that's the same as the Flow of Funds from 5142 to GDB 9758 in the January '15 to November '15 period, correct?

A.   Thank you for allowing me to flip back.  Would you mind repeating the question now that I've had a chance to look at this?

Q.   Yeah.  That flow of all of the hotel occupancy taxes from 5142 to BPPR 2306 is the same Flow of Funds, although in two different accounts that we saw in January '15 to November '15.

So all of the hotel occupancy taxes go from 5142 into the next account, and at that time period it was GDB 9758, correct?

A.   Correct.

Q.   Okay.  And then you indicated that it's about 3-plus million during the August 16th to February 17th period that goes from the BPPR 2306 down to the BPPR 6545,

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

78 (Pages 530 to 533)

### 530

1   correct?

2     A.   Correct.

3     Q.   Okay. And that is the same

4   proportional amount — or not proportional

5   amount but the same dollar amount flowed each

6   month that flowed during the January '15 to

7   November '15 time period from the GDB 9758

8   account to the GDB 9947 account, correct?

9     A.   The payments were approximately

10   the same amount.

11     Q.   Okay. And did the same

12   approximate amount flow from the 9758 account

13   to the Scotiabank 5144 account in both time

14   period, so in January '15 to November '15 and

15   in August '16 to February '17?

16     A.   Okay. Could you repeat that

17   question, please?

18     Q.   Yeah. Did the same amount of

19   hotel occupancy taxes or the same, yeah,

20   relative surplus amount of hotel occupancy

21   taxes flow from the 2306 account to the 5144

22   account and from the 9758 account to the 5144

23   account in the August '16 to February '17 and

24   January '15 to November '15 periods

25   respectively?

### 531

1     A.   Yes.

2     Q.   And, again, looking at the August

3   '15 to February '17 Flow of Funds, none of

4   these accounts is a Commonwealth account,

5   correct?

6     A.   Correct.

7     Q.   Okay. And is it your

8   understanding that the moneys transferred into

9   the BPPR 6545 account during this time period

10   remain in that account?

11     A.   During this time period, there

12   were no transfers out of the account.

13     Q.   Okay. In a couple of flows, we

14   are going to get to transfer out of that

15   account into a First Bank 3961 account, so I'm

16   happy to flip forward to the February 2018 to

17   the present Flow of Funds.

18     When the transfers were made

19   during this period, were all of the moneys that

20   were previously deposited into the BPPR 6545

21   account deposited into the First Bank account?

22     A.   Yes.

23     Q.   Okay. So we skipped over one. I

24   just want to go back to the March '17 to

25   January '18 Flow of Funds, and here there are

### 532

1   more errors further complicating things.

2     So let me start by asking:

3   Hoteliers still collect the taxes, correct?

4     A.   Yes.

5     Q.   In the March '17 to January '18

6   period. After collecting the taxes, they

7   continued to transfer those moneys to the

8   Scotiabank 5142 account, correct?

9     A.   Correct.

10     Q.   Okay. What moneys flowed from the

11   5142 account to the 6545 account during this

12   period?

13     A.   During this time period, the

14   approximately $3 million per month is

15   transferred from 5142 to 6545.

16     Q.   Okay. And what moneys are

17   transferred from 5142 to 2306?

18     A.   It depends. I think at this time

19   account 5142 had some maximum dollar threshold

20   limits, and so then amounts received from

21   hoteliers that exceed those limits, Scotiabank

22   5142 transferred those funds to 2306, assuming

23   they're in excess of the $3 million monthly

24   payments made to 6545.

25     Q.   Got it. And then — okay. And

### 533

1   then what moneys are transferred to the 5144

2   account from the -- sorry.

3     What moneys are transferred from

4   the 5142 account to the 5144 account?

5     A.   To the — the surplus of hotelier

6   room tax revenue is remitted to 5142. So

7   hoteliers remit room taxes to 5142, and the

8   monthly payment going to 6545. And in this

9   flow it's the same kinds of revenue that would

10   go from 5142 to 2306 or directly to 5144, just

11   depending on the cash management system and the

12   way this — the account maximum balance

13   threshold worked.

14     Q.   And do you have an understanding

15   of why approximately $3 million a month was

16   transferred from 5142 to 6545?

17     MS. McKEEN: Objection.

18     THE WITNESS: I don't know why the

19   exact amount was -- is that amount, it would

20   transfer.

21   BY MS. MILLER:

22     Q.   But do you know why the money was

23   being separated in this way and certain amounts

24   transferred to 6545 and other amounts to 5144?

25     MS. McKEEN: I'll articulate the

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

79 (Pages 534 to 537)

---

**534**

1   same objections as I did yesterday and made
2   clear that the witness wasn't supposed to be
3   giving testimony about why the Commonwealth
4   took certain actions.  So, like I did
5   yesterday, I'm going to instruct the witness
6   not to answer the question.
7   BY MS. MILLER:
8        Q.    Okay.  So let me ask you, then:
9              Is that a question that you could
10  answer but for the objection of your counsel?
11       A.    I'm not positive.
12       Q.    Okay.  Okay.  So looking at the
13  next sheet in the Flow of Funds, the next Flow
14  of Funds part, this is February 2018 to the
15  present.
16             And the first part corresponds to
17  the Flow of Funds that we saw previously from
18  March '17 to January '18.  I'm happy to go back
19  to that if it doesn't look visually the same to
20  you.  I'm going to limit my questions to the
21  bottom account.
22       A.    Okay.
23       Q.    Mr. Ahlberg, do you want to go
24  back, or are you sufficiently familiar with
25  these to understand that the top two lines are

---

**535**

1   the top two rows of transfer focusing?
2        A.    I understand they're the same.
3        Q.    Okay.  So just looking at the
4   bottom, the three accounts designated in the
5   bottom row here, so moneys go from -- let's
6   start at the beginning again.
7              The hoteliers collect the room
8   taxes, they then transfer them to Scotiabank
9   5142 account, and that's something that's
10  consistent throughout the time period covered
11  by all of these Flow of Funds, correct?
12       A.    Correct.
13       Q.    And then the 3-plus million is
14  then transferred from the 5142 account to the
15  BPPR 6545 account, correct?
16       A.    Correct.
17       Q.    Okay.  And then moneys flow to the
18  First Bank 3961 account, correct?
19       A.    During this time period, that's
20  correct.
21       Q.    Okay.  And what moneys flowed into
22  the First Bank 3961 account?
23       A.    The approximately 3 million
24  monthly payments would be transferred into the
25  First Bank 3691 account.

---

**536**

1        Q.    As well as any moneys that have
2   previously been transferred into the BPPR 6545
3   account, correct?
4        A.    Yes.
5        Q.    Okay.  And then moneys are
6   transferred into the First Bank 2984 account.
7   Do you see that?
8        A.    Yes.
9        Q.    What is the 2984 account?
10       A.    This is an account into which the
11  interest earned on deposits was transferred.
12       Q.    Okay.  So does that mean that the
13  principal amounts remained in the 3961 account
14  and only interest amounts earned flowed into
15  the 2984 account?
16       A.    Yes.
17       Q.    Okay.  So what is the First Bank
18  3961 account?
19       A.    An account at this time that's
20  being used to accumulate the approximately
21  $3 million monthly payment.
22       Q.    Okay.  And do you know if this
23  account has a name?
24       A.    I don't know off the top of my
25  head if this account has a name or not.

---

**537**

1        Q.    Do you know if this is a debt
2   service reserve account?
3        A.    Again, I'm just not certain of the
4   name of this account or not.
5        Q.    Okay.  So you know the name of a
6   whole lot of BPPR accounts, but you don't know
7   the name of this account?
8              UNIDENTIFIED SPEAKER:  Objection.
9              MS. McKEEN:  Objection,
10  argumentative.
11  BY MS. MILLER:
12       Q.    It's just a yes or no.
13       MS. McKEEN:  It would be nice if
14  you can ask questions.  It's been a very long
15  day for us.
16       MS. MILLER:  Can we pull up tab
17  2124, please.
18  BY MS. MILLER:
19       Q.    Have you ever seen any account
20  statements for this FirstBank 3961 account?
21       A.    I believe so, but I can't recall
22  looking at these specific ones off the top of
23  my head.
24       Q.    Okay.  So while we are pulling up
25  that exhibit, the last transfer that we haven't

---

Case:17-03283-LTS   Doc#:13338-1   Filed:06/02/20   Entered:06/02/20 14:20:16   Desc:
Exhibit A - Demonstrative and Key Exhibits   Page 195 of 287

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

80 (Pages 538 to 541)

**538**

1  spoken about on this Flow of Funds is a
2  $15 million, quote, discrete one-time transfer
3  to the BPPR 9458 account.  Do you see that?
4      A.    I don't see that on my screen, but
5  I do know the transfer you're referring to.
6      Q.    Sorry.  Okay.  I think it might be
7  sufficiently long — my headset's dying.  Okay.
8  What is that $15 million transfer?
9      A.    It's a transfer from the FirstBank
10  account to a Commonwealth account.
11      Q.    And what was that transfer for?
12      A.    The — I believe the transfers for
13  the Renew Your School program, I think it's
14  called.
15      Q.    Okay.  And do you know whether
16  that transfer of $15 million came from the
17  hotel occupancy tax monthly payment?
18      A.    Yes.
19      Q.    And did it?
20      A.    Yes.
21      Q.    Do you know when that payment was
22  made?
23      A.    When the $15 million transfer was
24  made?
25      Q.    Yeah.

**539**

1      A.    I can't recall if I had this
2  specific date.  We may have (indiscernible).
3          THE REPORTER:  I'm sorry.  I'm
4  sorry, Mr. Witness.  You just broke up in your
5  answer.  Can you repeat that, please?
6          THE WITNESS:  I don't remember
7  specifically what I said other than clarifying
8  that I'm not positive off the top of my head
9  the exact date of that $15 million transfer.
10  BY MS. MILLER:
11      Q.    Are there any moneys, Mr. Ahlberg,
12  in this FirstBank 3961 account that are not
13  from this 3-plus million monthly transfers of
14  hotel occupancy taxes?
15      A.    No.
16      Q.    Okay.  And what is the BPPR 9458
17  account?
18      A.    Can you clarify what you mean by
19  "What is that account?"
20      Q.    Yeah, you said it's a Commonwealth
21  account.  And it indicates that it has
22  comingled funds.
23          Were there funds held in this
24  account held for a particular purpose?
25      A.    Can we pull up that last Flow of

**540**

1  Funds presentation page?
2      Q.    Oh.  Yes, before we do that, let's
3  just do — I'll come back to that question.
4  While we have Monolines Exhibit 37 up.
5          (Monolines Exhibit 37 is
6          introduced for the record.)
7  BY MS. MILLER:
8      Q.    I've marked as Monolines
9  Exhibit 37 a statement of account from the
10  FirstBank account.
11          Do you see that?
12      A.    Yes.
13      Q.    And this is the — looking for the
14  account number.  Okay, so the account number is
15  3961.  This is from the FirstBank 3961 account.
16          Do you see that?  It's on the
17  left-hand side.  It starts with 0 star on the
18  upper — sorry — upper right-hand side starts
19  with 0 star, 03.
20      A.    Yes, I see that.  Thank you.
21      Q.    Okay.  So you see this is the 3961
22  bank account, correct?
23      A.    Yes.
24      Q.    And you see on the left-hand side
25  the statement of account is directed to the

**541**

1  Tourism Company?
2      A.    Yes.
3      Q.    And then it says Debt Service
4  Reserve.  Do you see that?
5      A.    I see that.
6      Q.    And do you understand that to be
7  the name of this account?
8      A.    That's what this statement says.
9      Q.    Okay.  So let's pull up Exhibit 32
10  again.  And let's just look at the last page.
11          Okay.  So while we are waiting for
12  the last page of Exhibit 32 to be pulled up,
13  I'm just going to check what my question was.
14          Okay.  So with Exhibit 32 back in
15  front of you, can you tell me what kind of
16  Commonwealth account this is or what kind of
17  account the BPPR 9458 account is?
18      A.    I believe that's the TSA
19  operational account at this time.
20      Q.    And how do you know that the
21  moneys were transferred in for the Renew Your
22  School program?
23      A.    I have reviewed documents
24  recording the $15 million transfer that
25  referenced the Renew Your School program.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

81 (Pages 542 to 545)

**542**

1  Q.    And do you know whether they were
2  identified when transferred into the 9458
3  account with any particular accounting or other
4  designation, Fund or account designation that
5  would specifically allocate them to the Renew
6  Your School program?
7  A.    I'm not certain of the exact
8  accounting treatment that was used to record
9  that transfer.
10  Q.    Okay. But you believe that there
11  is some indication in the transfer document
12  that specified that these moneys are for the
13  Renew Your School program?
14  A.    I believe so, yes.
15  Q.    Okay. And do you know whether
16  those moneys were ever transferred from the TSA
17  operational account to a third party or
18  another -- sorry, let me just ask simply:
19        Do you know whether those moneys
20  were ever transferred out of the TSA
21  operational account?
22  A.    I'm not certain if there was or
23  was not an outflow from the TSA account for the
24  Renew Your School program.
25  Q.    Okay. You did not see any

**543**

1  outflows indicating that these transfer hotel
2  occupancy taxes were moving out of the TSA, did
3  you?
4  A.    No, but as soon as the $15 million
5  is transferred to the TSA, it's comingled and
6  indistinguishable from other dollars.
7  Q.    Right. But as we saw previously,
8  there was an outflow identifying the revenue
9  source of the hotel occupancy tax. You would
10  be able to see that, correct?
11        UNIDENTIFIED SPEAKER: Objection.
12        THE WITNESS: I can't speculate
13  one way or the other.
14  BY MS. MILLER:
15  Q.    Well, we looked at a number of
16  documents where you identified the ability to
17  know that it was particular revenues from
18  comingled accounts because there were
19  accounting or other documents that so
20  designated them on the outflow side.
21        Do you recall that?
22        MS. McKEEN: Objection.
23        THE WITNESS: Yes.
24  BY MS. MILLER:
25  Q.    Okay. And if you had seen some

**544**

1  more outflow documents with respect to these
2  hotel occupancy taxes that were transferred
3  into the BPPR 9458 account during the February
4  '18 to the present time period, you would have
5  indicated that on this chart in the next step
6  of the Flow of Funds, wouldn't you?
7  A.    Would you mind repeating the
8  question?
9  Q.    Yeah, let me rephrase it.
10        Does the fact that there is no
11  subsequent transfer identified on the February
12  '18 to present Flow of Funds mean that you did
13  not see any outflow documents from the 9458
14  account that specifically identified the hotel
15  occupancy taxes as the revenue source?
16  A.    I have not certainly seen a
17  document that would indicate a transfer out of
18  the TSA indicating the revenue source was the
19  $15 million of hotel taxes.
20        MS. McKEEN: Atara, we have been
21  going for about two hours. It's been about an
22  hour since you said you were going to try to
23  wrap it up. So what's the plan here?
24        MS. MILLER: So I have over -- I
25  have 13 hours. Okay. So I have one more

**545**

1  question and then I was going to call a break
2  and caucus and hopefully just end.
3        MS. McKEEN: Okay. So let's have
4  one more question, then.
5  BY MS. MILLER:
6  Q.    Okay. So looking back at the
7  January '15 to November '15 Flow of Funds, back
8  a few pages in Exhibit 32, are there any
9  outflows from the 9758 account that are not
10  reflected on this chart?
11  A.    It is possible that there's a
12  one-off transaction that's not captured that's
13  intended as a summary document to show the
14  general Flow of Funds during this time period.
15        MS. MILLER: So, Liz, I lied. I
16  said I had one question. I had two. I've been
17  saving this one for a long time.
18        MS. McKEEN: I knew it wouldn't be
19  one.
20  BY MS. MILLER:
21  Q.    Mr. Ahlberg, you indicated that
22  you were confident that the GDB 9758 account
23  was the transfer account based on how -- the
24  moneys that flowed into it.
25        Can you explain to me what about

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

82 (Pages 546 to 549)

---

**546**

1  the GDB 9758 account makes you confident that
2  it is the transfer account?
3  A.     After discussions with the Tourism
4  Company, I'm confident that that's the transfer
5  account.
6  Q.     So there is nothing specific about
7  the nature of the moneys that flowed into it,
8  how the account was used or any documents that
9  makes you confident that it's the transfer
10  account. It's based exclusively on
11  conversations that you had with Gustavo?
12      MS. McKEEN:  Object to the form.
13      THE WITNESS:  Would you repeat
14  that question?
15      MS. MILLER:  Could the court
16  reporter read it back, please.
17      (Record read as requested.)
18      "So there is nothing specific
19      about the nature of the moneys
20      that flowed into it, how the
21      account was used or any
22      documents that makes you
23      confident that it's the
24      transfer account. It's based
25      exclusively on conversations

---

**547**

1  that you had with Gustavo?"
2      THE WITNESS:  Me, personally, it's
3  based on my conversations with Gustavo, but I
4  can't say that Gustavo didn't consider various
5  factors when determining that.
6  BY MS. MILLER:
7  Q.     Okay. And you, as the corporate
8  representative testifying today, have no idea
9  what Gustavo may have considered or been
10  relying on?
11      UNIDENTIFIED SPEAKER:  Objection.
12      THE WITNESS:  I just cannot recall
13  at this moment any documents he may or may not
14  have relied upon to make that determination.
15      MS. MILLER:  Okay. All right.
16  Can we take a 5-minute break? And I think
17  we'll conclude when we come back.
18      MS. McKEEN:  Atara, just to warn
19  you, I will have redirect, but I think it will
20  probably last 45 minutes.
21      MS. MILLER:  Okay. Thank you.
22  We'll come back.
23      THE VIDEOGRAPHER:  We are off the
24  record at 7:06 p.m.
25      (Recess taken.)

---

**548**

1      THE VIDEOGRAPHER:  We are back on
2  the record at 7:16 p.m.
3      MS. MILLER:  Mr. Ahlberg, we have
4  no further questions for you.
5      I want to thank you for your time
6  today and on Tuesday and the hard work you put
7  into preparing the Flow of Funds documents.
8      THE WITNESS:  Thank you, Madam.
9          EXAMINATION
10  BY MS. McKEEN:
11  Q.     Thank you, Mr. Ahlberg. I just
12  have a couple of questions for you, and I will
13  now also thank you for your time.
14      MS. McKEEN:  Atara, if your
15  colleague could please pull up Exhibit 11 to
16  Mr. Ahlberg's deposition, please.
17  BY MS. McKEEN:
18  Q.     Mr. Ahlberg, this is previously
19  marked as Exhibit 11 to your deposition, and I
20  believe you testified that is a voucher that
21  HTA submitted. Do you recall that testimony?
22  A.     Yes.
23  Q.     Did vouchers like this have to be
24  approved by the Puerto Rico Treasury
25  Department?

---

**549**

1  A.     Yes.
2  Q.     Does this document reflect that
3  approval anywhere?
4  A.     Yes.
5  Q.     And in your experience, would
6  payment in connection with a voucher like this
7  have been made without Treasury's approval?
8  A.     No.
9  Q.     Okay. Could I have Exhibit 14,
10  please.
11      Mr. Ahlberg, this was previously
12  marked as Exhibit 14 to your deposition. Was
13  this report prepared by HTA or by the
14  Puerto Rico Treasury Department?
15  A.     Document was prepared by HTA.
16  Q.     And if you look in the bottom
17  right-hand corner of the document, there's
18  reference to somebody name Hector Melendez.
19  Do you see that?
20  A.     Yes.
21  Q.     Was Hector Melendez an employee of
22  HTA?
23  A.     Yes.
24  Q.     And when it refers to Treasury
25  office underneath his name, is Treasury office

---

# 9. Account-Opening Documents for GDB -9758, ECF No. 13315-24

**BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO**
**DIVISION DE CUENTAS DE DEPOSITO**

**REGISTRO DE FIRMAS AUTORIZADAS**

B G F

Agencia : HOTEL OCCUPANCY TAX PLEDGE ACCOUNT

Cuenta* : [Redacted] 994-7     Fecha de efectividad: 5 / 26 /2006
(Pago de la deuda de la Emisión de Bonos)     **Mes Día Año**
(PRCCD, Series A, 2006)

| NOMBRE Y TITULO | FIRMA |
|---|---|
| Sr. Gabriel Rivera – Director Financ. Público | **Redacted** |
| Sr. Jesús M. García – Director Auxiliar | |
| Sr. Miguel Gutarra – Ejecutivo de Cuentas | **Redacted** |
| Sr. Arnaldo Maestre – Ejecutivo de Cuentas | |
| | |
| | |

cm.
*Nota: Favor de completar una tarjeta por cuenta.

Monolines 33
Defendant
Timothy H. Ahlberg
04/23/2020(CC)

CONFIDENTIAL

CCDA STAY0006780

*BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO*
*División de Cuentas de Depósito*
*San Juan, PR*

*30 de mayo de 2006*

*Sr. Arnaldo Maestre*

### *APERTURA DE CUENTA*

*Incluimos una copia firmada de la Solicitud de Apertura de Cuenta de:*

| Cuenta | Número |
|---|---|
| HOTEL OCCUPANCY TAX PLEDGE ACCOUNT *(Pago de la deuda de la emisión de bonos, PRCCD, Series A 2006)* | Redacted 1994-7 |

*De surgir alguna duda o necesitar información adicional, puede comunicarse con nuestra Sección de Servicio al Cliente con las Sras. Leslie Rivera y Brenda González o conmigo a las extensiones 6199, 6194 ó 6193, respectivamente.*

**Redacted**

*Ronald Meléndez*

*crm*

*Anexo*

```
001 BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO        DEMAND DEPOSITS
001 APARTADO 42001                              MAINTENANCE AND REJECT JOURNAL
                                                      REPORT- 01                           05/26/06 PAGE    1

        ACCOUNT CD CD 2        3        4        5        6        7        8     ***** ERROR MESSAGE (OR) ***** DATE  OF
        NUMBER CD SQ 123456789012345678901234567890123456789012345678901234567890  TYPE MAINT  FIELD CHANGED    LAST MNT SHORT NAME

      047-2       FROM= 5                     TO= 2                          DDA BAL MNT*ACCOUNT STATUS   01/13/06 MUN. NAGUA

      009-7       FROM= JORGE QUILES - DIRECTOR FINANZAS X 244               ALT N/A MNT*N/A LINE 1 2 3 4 5 02/03/06 ADJUNTA-LL
                        BRUNILDA ARROCHO- PAGADORA OFIC X 245            TO= JORGE QUILES - DIRECTOR FINANZAS X 244
                        CUADRO 829-2590                                     BRUNILDA ARROCHO- PAGADORA OFIC X 245
Redacted               FAX 829-4116                                        CUADRO 829-3310 X.245
                                                                           FAX 829-4116

      590-6                                                                 SNAPSHOT ST                 05/26/06 HOUSING

      001-5                                                                 SNAPSHOT ST                 05/26/06 BANCO DESA

      994-7       FROM= 0                     TO= 2                          DDA BAL MNT*ACCOUNT STATUS   05/26/06 HOTEL OCCU
                  FROM= (BLANK)               TO= 000                        DDA BAL MNT*OFFICER INITIALS
                                                                            NEW DDA ACT
             N/A 1= HOTEL OCCUPANCY TAX PLEDGE ACCOUNT     DATE OPEN  = 05/26/06  CLASS    = ES  SIG BAL CHG CD= 1
             N/A 2= AUTORIDAD DEL DISTRITO DEL CENTRO CONV. SOC SEC COD=       B  ST FORMAT= S  SIG PCT CHG   = 1
             N/A 3= PO BOX 42001 SAN JUAN PR 00940-2001    SOC SEC NBR=          ST TYPE  = C  OD LIMIT IND  = B
             N/A 4=                                        CIF NBR    =       0  ST CYCLE = 01  CLOSE OVERRIDE= Y
             N/A 5=                                        AFFIL ACCT =       0  ST DATE 1= OO  PKG POST CODE = N
             ZIP  =                                        SMSA CODE  =    0000  ST DATE 2= OO  SPEC INST CODE=
             SHORT                                         CENSUS TRCT=  0000.00  ST DATE 3= OO  OD/NSF CODE   = Y
             NAME= HOTEL OCCUPANCY                         SIC CODE   =    0000  ST DATE 4= OO  NBR STMT COPY = 1
             CREDIT                                        LOCATION   =     000  ST FULL  = N  STMT MAIL CODE= P
                 CARD=0000000000000000                    OFFICER    =     000  ST DAY DLY= N  OD/NSF MAIL CD= P
                                                          DOM BRANCH =     000  SC TYPE  = W  HOLD STMT CODE= N
                                                          IBA INT RAT=  00.000  SC DESC  =     STMT SEQUENCE = S
                                                          IBA IND    =       N  SC CYCLE = OO  ACCT HIST CODE= N
                                                          PHONE NUMBR=7877222525  SC METHOD = E  LRG MICR DEBIT= 1
                                                          FED WH FRQ=        A  SC DAY WTH=O1  LRG MICR CR   = 1
                                                          FED WH ELEC=       3  NSF CHG CD= N  BULK FILE FLAG= N
                                                          FED NBR DEP=     000  OD CHG CD = N  CHECK RECON   = Y
             ***** NEW ACCOUNT ACCEPTED *****             FED WH OPT=        X  STP CHG CD= N
             N/A 1= ARNALDO MAESTRE X.5961                FED STATUS =       S
             N/A 2= JESUS GARCIA X.6058                   NEW ALT N/A
             N/A 3=
             N/A 4=
             N/A 5=
             ZIP  =             EXPIRES= 12/31/49

      000-6                                                                 SNAPSHOT ST                 05/26/06 HAC-OPERAC
Redacted
      190-8 07 23 EC                                        0918091  NON-STANDARD CLASS CODE  21-22 *****************
                  FROM= IC                   TO= EC                          DDA BAL MNT*CLASS CODE       05/25/06 INES M. ME
```

Redacted

5/26/06

Apéndice MOB-130-01A



**BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO**
**SAN JUAN, PUERTO RICO**

**SOLICITUD Y CONVENIO DE APERTURA DE**
**CUENTA BANCARIA**

☐ **Marcar el cuadro si la cuenta es CORRIENTE PARA PAGADORES ESPECIALES DEL DEPARTAMENTO DE HACIENDA** - El Depositante deberá presentar y se hará formar parte de este convenio, los siguientes documentos autorizados por el Departamento de Hacienda: copia aprobada para la apertura de esta cuenta y el nombramiento del Oficial Pagador Especial o Auxiliar.

---

**Agencia:** <u>Hotel Occupancy Tax Pledge Account</u>
<u>PRCCDA, Series A, 2006</u>

**Dirección Postal:** <u>PO Box 42001</u>
<u>San Juan, PR 00940-2001</u>

**Teléfono:** <u>(787) 722-2525</u>   **Fax:** (787) <u>726-1440</u>

**Dirección Física:** <u>Avenida De Diego, Parada #22, San Juan</u>

**Fecha de Solicitud:** <u>22 de mayo de 2006.</u>

---

**Propósito de la Cuenta: Para el pago de la deuda de la Emisión de Bonos de PRCCD, Series A, 2006**

---

### El Depositante conviene y acuerda con el Banco los siguientes términos y condiciones:

1. El Depositante efectuará depósitos en la cuenta y éstos se acreditarán el mismo día laborable, si se realizan en o antes del horario establecido por el Banco Gubernamental de Fomento para Puerto Rico (Banco). La disponibilidad de los fondos estará sujeta a las disposiciones de la Regulación CC de la Junta de la Reserva Federal.

2. El Banco rehusará, sin incurrir en responsabilidad con el Depositante, cualquier orden de pago o libramiento que no esté expedido de conformidad con las prácticas usuales y corrientes con relación a la fecha, la cantidad, el endoso y la firma del libramiento u orden de pago. El rehusar por cualquiera de estos conceptos no constituirá renuncia por parte del Banco al derecho de pagar cualquier libramiento similar cuando así lo crea conveniente para los mejores intereses del Depositante y del Banco.

3. El Depositante renuncia al derecho de suspender el pago de cheques u otras órdenes de pago libradas contra su cuenta, excepto mediante los impresos que provea el Banco con sujeción a las condiciones que el Banco señale en éstos o mediante el uso del sistema en línea. El Banco queda relevado de toda obligación de aceptar órdenes de suspensión de pago contenidas en cualquier otro documento, o solicitadas verbalmente.

4. El Depositante notificará al Banco sobre cualquier suspensión de pago a través de los formatos provistos por el Banco. La suspensión será efectiva en la fecha en que la notificación sea recibida y aceptada por el Banco. Se procederá de igual forma con las derogaciones de suspensión de pago. Si la suspensión de pago no fuera aceptada por el Banco, el Banco deberá indicar la razón o razones en el documento presentado. El documento se devolverá al Depositante y se retendrá una copia para archivo.

5. El Banco está autorizado para enviar al Depositante, según los reglamentos, las costumbres y la práctica bancaria, por correo ordinario o por mensajero, a riesgo del Depositante, a la última dirección del Depositante conocida por el Banco, o a aquella dirección que éste señale por escrito, un estado de cuenta conjuntamente con la evidencia de las órdenes de pago y toda otra evidencia de cargos a la cuenta durante el período que cubre el estado de cuenta.

6. El Depositante tiene treinta (30) días calendario a partir de la fecha del estado para hacer reclamaciones relacionadas con cualesquiera de las transacciones allí registradas. Si el Banco no recibe estas reclamaciones por escrito dentro de

este término, se entenderá que el Depositante renuncia a las mismas para todos los efectos legales.
Las reclamaciones deberán ser enviadas a la siguiente dirección:

> Banco Gubernamental de Fomento para Puerto Rico
> Atención: Sección de Servicio al Cliente
> P.O. Box 42001
> San Juan, Puerto Rico 00940-2001

7. El Banco proveerá los primeros cien (100) cheques libre de costo, si aplica.

   _____ Aplica    **X** No Aplica

   El Depositante podrá solicitar al Banco la compra de los cheques adicionales y el Banco realizará un cargo a su cuenta por el costo de los cheques. El Depositante también tiene la alternativa de utilizar cualquier compañía para la adquisición de los cheques siempre y cuando esa compañía realice pruebas de los formularios con el Banco y cumplan con los requisitos de seguridad establecidos por el Banco.

8. Esta cuenta devengará intereses, si aplica, a base de una de las siguientes opciones a determinarse por el Banco y los intereses se acreditarán el primer día del siguiente mes:

   _____ Aplica    **X** No Aplica

   ☐ Tasa de interés variable computada diariamente

   ☐ Tasa de interés variable computada mensualmente

   ☐ Tasa de interés variable computada trimestralmente

   ☐ Otra: _____

   El cliente es responsable de cubrir cualquier balance negativo inmediatamente so pena de cancelar los servicios bancarios ofrecidos en este contrato.

   De la cuenta mantener un balance negativo, el Banco computará un cargo a base de la tasa Prime más el dos por ciento anual (2%) del balance en negativo.

Página 1 de 4

_22 de septiembre de 2004 / División Sistemas y Procedimientos_

Apéndice MOB-130-01A

**BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO**
**SAN JUAN, PUERTO RICO**

### SOLICITUD Y CONVENIO DE APERTURA DE
### CUENTA BANCARIA

9. El Banco no será responsable en forma alguna por falsificaciones o alteraciones en los nombres de los beneficiarios o en los endosos de los cheques expedidos por el Depositante.

En la eventualidad de que algún cheque expedido por el Depositante sea falsificado o alterado o que sea endosado fraudulentamente, el Banco, una vez notificado por el Depositante, iniciará los trámites para gestionar el cobro de su importe a través de la Cámara de Compensación de Cheques. El Depositante deberá hacer la reclamación al Banco en un período no mayor de seis (6) meses después de haber recibido el estado bancario. El Depositante llevará a cabo la investigación correspondiente con el propósito de determinar la validez de la reclamación para expedir un duplicado del efecto falsificado o endosado fraudulentamente, si procede.

10. Todos los valores y documentos relacionados, que no sean pagaderos en la oficina del Banco, se podrán enviar por correo u otros medios similares, directamente o en circuito a través de cualesquiera corresponsales sujeto a los reglamentos de éstos, o directamente al girado, librador o agente pagador para obtener su pago en efectivo, abono al banco remitente o giro o certificación del girado, librador, banco pagador, o cualquiera otro banco. La utilización de cualquiera de estos mecanismos será a riesgo del Depositante exclusivamente y sin responsabilidad para el Banco por cualquier acto, negligencia u omisión de cualquier corresponsal, agente o subagente.

Todo valor abonado se podría cargar nuevamente en cualquier momento antes de que se reciba en la oficina del Banco el pago total en efectivo. Los abonos que se hagan por efectos librados a cargo o pagaderos en la oficina del Banco serán de carácter provisional, sujetos a revocación de acuerdo con lo dispuesto en la Ley de Instrumentos Negociables en caso de que éstos no se pudieran pagar por cualquier razón. Cuando estos efectos se depositen después de cerrada al público, la oficina del Banco, el derecho de revocación se podrá ejercer durante el siguiente día laborable.

11. En consideración por los servicios prestados bajo este convenio, el Banco será compensado mensualmente, si aplica, y se utilizará la Estructura de Precios vigente en el Banco.

12. El total de los cargos se debitará de la cuenta que el depositante tiene con el Banco con efectividad del primer día del próximo mes, si aplica.

13. El Banco someterá un desglose mensual que incluirá el total de los cargos por concepto de servicios prestados.

14. Cualquiera de las partes podrá rescindir este convenio mediante notificación escrita con sesenta (60) días de anticipación a la fecha de la decisión.

15. Todos los términos y las condiciones de este convenio se podrán cambiar, alterar o modificar por parte del Banco, mediante notificación escrita al cliente con 60 días de anticipación a la fecha de efectividad de los cambios.

Número de Cuenta: Redacted 994-7

Fecha de Efectividad: 26 de mayo de 2006



---

Hotel Occupancy Tax Pledge Account-PRCCDA, Series A, 2006
**Agencia Depositante**

*Arnaldo Maestre Pujals*

**Nombre del Oficial Autorizado de la Agencia Depositante**

**Redacted**

**Firma del Oficial Autorizado de la Agencia Depositante**

*22 Mayo 06*

**Fecha**

**BANCO GUBERNAMENTAL DE FOMENTO**
**PARA PUERTO RICO**

**Redacted**

José Guillermo Dávila
**Nombre del Funcionario Autorizado**

**Firma del Funcionario Autorizado**

**Fecha**

# BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO
## Cuentas de Depósito

### INFORMACION PARA COMPLEMENTAR EL CONTRATO DE
### APERTURA DE CUENTA

FECHA SOLICITADO:  <u>22 de mayo de 2006.</u>

NOMBRE DE LA CUENTA: <u>Hotel Occupancy Tax Pledge Account-PRCCDA,Serie A, 2006</u>

PROPÓSITO DE LA CUENTA: <u>Para el pago de la deuda de la Emisión de Bonos de PRCCD,Series A,2006</u>

NUMERO DE CUENTA: [Redacted] 994-7          CLASE: <u>FS</u>

## INFORMACIÓN DE LA AGENCIA:

Nombre:        Autoridad del Distrito del Centro de Convenciones

Dirección Física Antigua Base Naval, Isla Grande, Miramar, San Juan, PR

Dirección Postal Po Box 42001 San Juan PR 00940-2001

Teléfonos:        787-722-3309

Fax:        787-722-3305

## PERSONAL DE CONTACTO:

Nombre:        Arnaldo Maestre
Posición:        Ejecutivo de Cuentas
Teléfono:        787-722-2525 x.5961
Dirección electrónica:  Arnaldo.Maestre@bgf.gobierno.pr

Nombre:        Jesús M. García
Posición:        Director Auxiliar
Teléfono:        [ Redacted ]
Dirección electrónica:  Jesús.M.Garcia@bgf.gobierno.pr

## DATOS:

☐ Cheques

    ☐ Adquiridos por el Banco    ☐ Adquiridos por el cliente
        (Entregar lista de requisitos de seguridad)

    Check Digit   ☐ Sí   ☐ No

☒ Transferencias   ☒ Sí   ☐ No

☐ Intereses   ☐ Sí   ☒ No

☐ OPE
  ☐ Carta nombramiento

☐ Factura por servicios mediante aviso a la cuenta número:

## TIPOS DE SERVICIOS QUE NECESITA:

☒ Depósitos
☒ Reconciliación bancaria
☐ Servicio de Imágenes
☐ Sistema de cheques devueltos
☐ Emisiones

☐ Suspensión de pago
☐ CMIA
☐ Transferencias cablegráficas
☐ ACH
☐ Acceso por Internet / Hyper Terminal

...nación entrada por: <u>Leslie Rivera Rodríguez</u>

**Redacted**   23/5/06

CONFIDENTIAL

## Rivera, Leslie (GDB)

| | |
|---|---|
| **From:** | Maestre Pujals, Arnaldo (GDB) |
| **Sent:** | Tuesday, May 30, 2006 10:44 AM |
| **To:** | Rivera, Leslie (GDB); González, Brenda (GDB) |
| **Cc:** | Pascual, Miriam (GDB) |
| **Subject:** | Solicitud para abrir cuenta |

Bueno días:

Por favor procedan con la apertura de la cuenta para el servicio a la deuda de la Autoridad del Distrito del Centro de Convenciones. De ser posible, necesitamos que se programe la cuenta para que se notifique a nuestra división sobre cada transacción que se efectúe en dicha cuenta. Esto es así por que los fondos que se depositen deben ser transferidos al fideicomisario de la emisión de bonos no más tarde de tres días de la fecha en que se recibiera el depósito.
Gracias.

*Arnaldo Maestre Pujals*

**From:** Pascual, Miriam (GDB)
**Sent:** Monday, May 22, 2006 2:13 PM
**To:** Rivera, Leslie (GDB); González, Brenda (GDB)
**Cc:** Maestre Pujals, Arnaldo (GDB)
**Subject:**

Buenas tardes. Les incluyo forma para abrir cuenta IBA de para el pago de la deuda de la emisión de bonos de la Autoridad del Distrito de Convenciones, Serie A, 2006. Muchas gracias.

5/30/2006

CONFIDENTIAL

CCDA_STAY0006786

# CERTIFIED TRANSLATION

CERTIFIED TRANSLATION

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
DEPOSIT ACCOUNTS DIVISION
REGISTRATION OF AUTHORIZED SIGNATURES

GDB

**Agency:** <u>HOTEL OCCUPANCY TAX PLEDGE ACCOUNT</u>

**Account:** [Redacted] <u>994-7</u>                    Effective Date: <u>5/ 26/2006</u>
(Debt service payment of PRCCD, Series A, 2006 Bond Issue)            **Month/Day/Year**

| NAME AND TITLE | SIGNATURE |
|---|---|
| Mr. Gabriel Rivera – Director Public Financing | *Illegible signature* |
| Mr. Jesús M. García – Assistant Director | |
| Mr. Miguel Gutarra – Account Executive | *Illegible signature* |
| Mr. Arnaldo Maestre – Account Executive | *Illegible signature* |
| | |
| | |
| | |

Note: Please complete one card per account.

CONFIDENTIAL                                    CCDA_STAY0006780

 I, **Juan E. Segarra**, USCCI #06-067**/**translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO*
*Deposit Accounts Division*
*San Juan, PR*

May 30, 2006

Mr. Arnaldo Maestre

ACCOUNT OPENING

We have attached a signed copy of the Account Application Form for:

| Account | Number |
|---|---|
| HOTEL OCCUPANCY TAX PLEDGE ACCOUNT *(Debt service payment of PRCCD, Series A, 2006 Bond Issue)* | Redacted 994-7 |

If you have any questions or need additional information, you may contact Mmes. Leslie Rivera and Brenda González or me at our Customer Service Section or me at extensions 6199, 6194, or 6193, respectively.

[*Illegible Signature*]
Ronald Meléndez

crm

Attachment

CONFIDENTIAL

CCDA_STAY0006781

 I, **Juan** E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

```
001 BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO        DEMAND DEPOSITS
001 APARTADO 42001                                   MAINTENANCE AND REJECT JOURNAL
                                                            REPORT-  01
                                                                                                05/26/06 PAGE     1

     ACCOUNT CD CD 2         3         4         5         6         7         8  ***** ERROR MESSAGE (OR) ***** DATE  OF
      NUMBER CD SQ 1234567890123456789012345678901234567890123456789012345678901234567890 TYPE MAINT  FIELD CHANGED  LAST MNT SHORT NAME

Redacted 047-2   FROM= 5                    TO= 2                DDA BAL MNT*ACCOUNT STATUS     01/13/06 MUN. NAGUA
         009-7                                                   ALT N/A MNT*N/A LINE 1 2 3 4 5 02/03/06 ADJUNTA-LL
                 FROM- JORGE QUILES - DIRECTOR FINANZAS X 244  TO= JORGE QUILES - DIRECTOR FINANZAS X 244
                       BRUNILDA ARROCHO- PAGADORA OFIC X 245       BRUNILDA ARROCHO- PAGADORA OFIC X 245
                       CUADRO 829-2590                             CUADRO 879-3310 X.245
                       FAX 829-4116                                FAX 829-4116
         590-6                                                   SNAPSHOT ST                    05/26/06 HOUSING
         001-5                                                   SNAPSHOT ST                    05/26/06 BANCO DESA
         004-7   FROM= 0                    TO= 2                DDA BAL MNT*ACCOUNT STATUS     05/26/06 HOTEL OCCU
                 FROM= (BLANK)              TO= 000              DDA BAL MNT*OFFICER INITIALS
                                                                 NEW DDA ACT
                 N/A 1= HOTEL OCCUPANCY TAX PLEDGE ACCOUNT   DATE OPEN  =  05/26/06  CLASS      = ES  SIG BAL CHG CD= 1
                 N/A 2= AUTORIDAD DEL DISTRITO DEL CENTRO CONV. SOC SEC COD=       8  ST FORMAT= S  SIG PCT CHG    = 1
                 N/A 3= PO BOX 42001 SAN JUAN PR 00940-2001  SOC SEC NBR=           ST TYPE    = C  OD LIMIT IND   = B
                 N/A 4=                                      CIF NBR    =        0  ST CYCLE   = 01 CLOSE OVERRIDE= Y
                 N/A 5=                                      AFFIL ACCT =        0  ST DATE 1= 00  PKG POST CODE = N
                 ZIP  =                                      SMSA CODE  =     0000  ST DATE 2= 00  SPEC INST CODE=
                 SHORT                                       CENSUS TRCT=  0000.00  ST DATE 3= 00  OD/NSF CODE    = Y
                  NAME= HOTEL OCCUPANCY                      SIC CODE   =     0000  ST DATE 4= 00  NBR STMT COPY  = 1
                 CREDIT                                      LOCATION   =      000  ST FULL    = N  STMT MAIL CODE= P
                   CARD=0000000000000000                     OFFICER    =      000  ST DAY DLY= N  OD/NSF MAIL CD= P
                                                             DOM BRANCH =      000  SC TYPE    = W  HOLD STMT CODE= N
Redacted                                                     IBA INT RAT=   00.000  SC DESC    =    STMT SEQUENCE = S
                                                             IBA IND    =        N  SC CYCLE   = 00 ACCT HIST CODE= N
                                                             PHONE NUMBR=7877222525 SC METHOD  = E  LRG MICR DEBIT= 1
                                                             FED WH FRQ=         A  SC DAY MTH=0    LRG MICR CR   = 1
                                                             FED WH ELEC=        3  NSF CHG CD= N  BULK FILE FLAG= N
                                                             FED NBR DEP=      000  OD CHG CD = N  CHECK RECON   = Y
                                                             FED WH OPT=         X  STP CHG CD= N
               *****NEW ACCOUNT ACCEPTED*****                FED STATUS =        S
                                                                 NEW ALT N/A
                 N/A 1= ARNALDO MAESTRE X 5061
                 N/A 2= JESUS GARCIA X.6058
                 N/A 3=
                 N/A 4=
                 N/A 5=
                 ZIP  =          EXPIRES= 12/31/49
Redacted 000-6                                                   SNAPSHOT ST                    05/26/06 HAC-OPERAC
         190-8 07 23 EC                                 0910091  NON-STANDARD CLASS CODE  21-22 ******************
                 FROM= EC                   TO= EC               DDA BAL MNT*CLASS CODE         05/25/06 INES M  ME
```

5/26/06

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[*Logo*: GDB]                                                                 Attachment MOB-130-01A

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
## SAN JUAN, PUERTO RICO

## BANK ACCOUNT APPLICATION
## AND AGREEMENT FORM

☐ Check the box if account is a CHECKING ACCOUNT FOR SPECIAL PAYERS OF THE DEPARTMENT OF THE TREASURY – Depositor will present and make part of this agreement, the following documents authorized by the Department of the Treasury: an approved copy for opening this account and the appointment of the Special or Assistant Payer.

**Agency:** **Hotel Occupancy Tax Pledge Account PRCCDA, Series A, 2006**                **Mailing Address: PO Box 42001 San Juan, PR 00940-2001**

**Telephone: (787) 722-2525        Fax: (787) 726-1440**

                                                                **Street Address: De Diego Avenue, Stop #22, San Juan**
**Application Date: May 22, 2006.**

**Purpose of the Account: For making debt service payments of PRCCD, Series A, 2006 Bond Issue.**

### Depositor covenants and agrees with the Bank the following terms and conditions:

1. Depositor will make deposits in the account and such deposits will be available on the same business day, if made on or before the cut-off hours established by the Government Development Bank for Puerto Rico (Bank). Availability of funds will be subject to the provisions of Regulation CC of the Federal Reserve Board.

2. The Bank will refuse, without incurring liability to Depositor, any order of payment that is not issued in accordance with usual and customary practices in relation to the date, amount, endorsement, and signature of the order of payment. Refusing payment on such account shall not constitute a waiver by the Bank of its right to pay any similar order of payment when it deems it convenient in the best interest of the Depositor and the Bank.

3. Depositor waives the right to dishonor any check or other order of payment, except through the forms provided by the Bank subject to the conditions set forth by the Bank therein or through the online system. The Bank is discharged from any obligation to accept orders to dishonor contained in any other document or requested orally.

4. Depositor will notify the Bank of any stop payment through the forms provided by the Bank. Stop payments will be effective on the date in which notice is received and accepted by the Bank. Cancellation of orders to dishonor will be processed in the same manner. If a stop payment is not accepted by the Bank, the Bank will state the reason or reasons in the form submittal. The form will be returned to the Depositor and a copy thereof will be kept in record.

5. The Bank is authorized to send the Depositor, in accordance with the regulations, usual and customary banking practices, by regular mail or messenger, at the Depositor's risk, to the Depositor's last known address by the Bank, or to such address stated by the Depositor in writing, an account statement showing the orders of payment and any other charges during the period covered in account statement.

6. The Depositor will have thirty (30) calendar days as of the date of the account statement to file any claim in connection with the transactions shown therein. If the Bank does not receive these claims in writing within said period, it shall be understood that the Depositor

waives the same for all legal purposes. Claims shall be mailed at the following address:
    Government Development Bank for Puerto Rico
    Attention Customer Service Section
    P. O. Box 42001
    San Juan, Puerto Rico 00940-2001

7. The Bank will provide the first one hundred (100) checks free of charge, if applicable.

_____ Applies   __X__ Does not Apply

The Depositor may purchase additional checks from the Bank and the Bank will debit the check charges from Depositor's account. Depositor also has the option to buy checks from any other company; provided that said company makes form verifications with the Bank and meets the security requirements established by the Bank.

8. This account will bear interest, if applicable, on the basis of any of the following options to be determined by the Bank and interest will be credited the first day of the following month.

_____ Applies   __X__ Does not Apply

☐ Variable interest rate compounded daily

☐ Variable interest rate compounded monthly

☐ Variable interest rate compounded quarterly

☐ Other

Client is responsible for covering any negative available balance immediately, under penalty of cancelling the banking services offered in this agreement.

If a negative available balance is maintained in the account, the Bank will compute a charge based on the Prime interest rate plus two (2%) percent per annum of the negative balance.

September 22, 2003 Systems and Procedures Division

CONFIDENTIAL                                                                 CCDA_STAY0006783

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Attachment MOB-130-01A

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
### SAN JUAN, PUERTO RICO

### BANK ACCOUNT APPLICATION
### AND AGREEMENT FORM

9. The Bank will assume no responsibility whatsoever for counterfeiting or alternations in beneficiaries' names or endorsement of checks issued by the Depositor.

In the event that a check issued by the Depositor is counterfeited or altered or fraudulently endorsed, the Bank, upon receipt of Depositor's notice, will begin the process to recover the amount through the Check Clearing House. The Depositor must file a claim with the Bank within a period not to exceed six (6) months after receiving the account statement. The Depositor will conduct the appropriate investigation for the purpose of determining the validity of the claim to issue a duplicate of the draft counterfeited or fraudulently endorsed, if appropriate.

10. All securities and related instruments that are not payable at the Bank's office, may be delivered by mail or other similar medium, directly or through any of the correspondent banks subject to the regulations thereof, or directly to the drawer, issuer or paying agent to obtain payment in cash, payment to the remitting bank, or draft or certification of the issuer, drawer, paying bank or any other bank. The use of any of these mechanisms will be solely at the Depositor's risk without liability to the Bank for any act, neglect, omission of any correspondent, agent, or sub-agent.

Any paid security may be charged once again at any time before full payment in cash is received at the Bank's office. Advances made for drafts issued chargeable to or payable in the Bank's office will be temporary, subject to revocation in accordance with the provisions of the Negotiable Instruments Act in the event these cannot be paid for any reason. When these drafts are deposited after the Bank's office is closed to the public, the right of revocation may be exercised the next business day.

11. In consideration of the services rendered under this Agreement, the Bank will charge a monthly fee, if applicable, using the Bank's Fee Schedule in effect.

12. The total fees will be debited from the depositor's account with the Bank the first day of the next month, if applicable.

13. The Bank will submit a monthly statement, which shall include the total service fees charged.

14. Any of the parties may cancel this agreement upon written notice within sixty (60) days prior to the decision date.

15. All the terms and conditions of these agreement may be changed, altered, or modified by the Bank upon written notice to the customer within sixty (60) days prior to the effective date of the changes.

Account Number: [Redacted]994-7

Effective Date: May 26, 2006

---

Hotel Occupancy Tax Pledge Account- PRCCDA, Series A, 2006

[Printed Name: Arnaldo Maestre Pujals]
Authorized Depositor Officer's Name

[Illegible Signature]
Authorized Depositor Officer's Signature
May 22, 2006
Date

GOVERNMENT DEVELOPMENT BANK
FOR PUERTO RICO

[Illegible Signature]
José Guillermo Dávila
Authorized Officer's name

Authorized Officer's signature

Date

CONFIDENTIAL
CCDA_STAY6784

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
Deposit Accounts

INFORMATION TO COMPLETE THE ACCOUNT APPLICATION
AND AGREEMENT FORM

DATE REQUESTED: May 22, 2006

ACCOUNT NAME: Hotel Occupancy Tax Pledge Account    PRCCDA, Series A, 2006

PURPOSE OF THE ACCOUNT: For making debt service payment of PRCCD, Series A, 2006 Bond Issue.

ACCOUNT NUMBER: [Redacted]994-7        CLASS: ES

AGENCY INFORMATION:

Name:    Convention Center District Authority

Street Address: Antigua Base Naval, Isla Grande, Miramar, San Juan, PR

Mailing Address: PO Box 42001 San Juan, PR 00940-2001

Telephone(s): 787-722-3309

Fax: 787-722-3305

CONTACT PERSON:

Name:    Arnaldo Maestre
Position:    Account Executive
Telephone:    787-722-2525 x. 5961
Email address:    Arnaldo.Maestre@bgf.gobierno.pr

Name:    Jesús M. García
Position:    Assistant Director
Telephone:    Redacted
Email address:    Jesus.M.Garcia@bgf.gobierno.pr

DATA:

☐ Checks

☐ Acquired by Bank        ☐ Acquired by Customer
                                            (Provide list of security requirements)

                              Check Digit ☐ Yes  ☐ No

☒ Transfers    ☒ Yes  ☐ No

☐ Interest   ☐ Yes  ☒ No

☐ OPE
     ☐ Letter of Appointment
☐ Service Invoice through notice to account number:

TYPES OF SERVICES NEEDED:

☐ Deposits                        ☐ Suspension of payment
☐ Bank Reconciliation        ☐ CMIA
☐ Image Service                ☐ Cable Transfers
☐ Returned Check System    ☐ ACH
☐ Issues                          ☐ Internet Access / Hyper Terminal

Data entered by: Leslie Rivera-Rodriguez        [Illegible Signature] 23/5/06

CONFIDENTIAL                                                                    CCDA_STAY0006785

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Rivera, Leslie (GDB)**

**From:** Maestre Pujals, Arnaldo (GDB)
**Sent:** Tuesday, May 30, 2006 10:44 AM
**To:** Rivera, Leslie (GDB); González, Brenda (GDB)
**Cc:** Pascual, Miriam (GDB)
**Subject:** Account Application

Good morning:
Please proceed to open account for the debt service of the Convention Center District Authority. If possible, we need that the account be programed to notify our division every transaction made in said account. This is because the funds deposited therein must be transferred to the bond issue trustee not later than three days after the date in which the deposit is received.
Thank you.

Arnaldo Maestre Pujals

---

**From:** Pascual, Miriam (GDB)
**Sent:** Monday, May 22, 2006 2:13 PM
**To:** Rivera, Leslie (GDB); González, Brenda (GDB)
**Cc:** Maestre Pujals, Arnaldo (GDB)
**Subject:**

Good afternoon. Attached is an IBA account application form to open an account for making debt service payments of PRCCD, Series A, 2006 Bond Issue.
Thank you very much.

[*illegible time stamp*]

5/30/2006

CONFIDENTIAL

CCDA_STAY0006786

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# 10. Transmittal Authorization Documents for GDB -9758, ECF No. 13315-18

ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**
DDEC-Compañía de Turismo de Puerto Rico

MCCP 4720

3 de febrero de 2015

Jesús M. García, Vicepresidente y Director
Dept. de Financ. de Obligaciones de Rentas
Banco Gubernamental de Fomento para PR
P.O. Box 42001
San Juan, PR 00940-2001

Vía E-mail: jesus.m.garcia@bgfpr.com

**SERVICIO DE DEUDA**
**AUTORIDAD DEL DISTRITO DE CENTRO DE CONVENCIONES**

Estimado señor Maestre:

Autorizamos debitar de la cuenta "Room Tax-Concentration Surplus" nú Redacted 975-8, la cantidad de **$3,033,841.10** a los fines de remitir el **pago correspondiente al mes de febrero de 2015**. Esto con el propósito de cubrir el servicio de deuda de la emisión de bonos de la Autoridad del Distrito del Centro de Convenciones, relacionado al año fiscal 2014-2015.

**Agradeceré nos confirmen, vía-email (sonia.rivera@tourism.pr.gov), una vez completada la transacción**. De tener alguna pregunta adicional, favor de comunicarse con el que suscribe a la extensión 3043.

Atentamente,

**Redacted**

Samuel Sierra Rivera, CPA
Principal Oficial Financiero

c   ingrid.rivera@tourism.pr.gov
    arnaldo.maestre@bgfpr.com
    miriam.t.pascual@bgfpr.com
    dafne.santiago@bgfpr.com

/w

PO Box 9023960, San Juan, P.R. 00902-3960

Tel: 787.721.2400


COMPAÑÍA DE
TURISMO
PUERTO RICO

CONFIDENTIAL                                                                                    CCDA_STAY0004297

**Pascual, Miriam (GDB)**

| | |
|---|---|
| **From:** | Sonia Rivera Ayala <sonia.rivera@tourism.pr.gov> |
| **Sent:** | Tuesday, February 03, 2015 12:00 PM |
| **To:** | Garcia, Jesus (GDB); Maestre Pujals, Arnaldo (GDB); Pascual, Miriam (GDB); dafne.santiago@bgfpr.com |
| **Cc:** | Ingrid I. Rivera; Samuel Sierra Rivera; Manuel Barreiro; Ileana Ortiz Reyes; Amilcar Torres Delgado; Elizabeth Torres Lopez; Johanna Miranda |
| **Subject:** | FW: Autoriz. Pago Bonos Centro Conv. due febrero 2015 |
| **Attachments:** | 20150203083735139.pdf |

Buenos Días. Se incluye carta autorizando transferencia para cubrir el pago de la deuda de emisión de bonos, de la Autoridad del Distrito de Centro de Convenciones de PR. El pago corresponde al mes de febrero de 2015.

Agradeceré, nos envien confirmación, una vez realizada la misma.

Gracias,

Sonia Ivette Rivera
Ayudante Especial - Finanzas
Co. de Turismo de Puerto Rico
Edif. Ochoa, 3er piso, Viejo San Juan
787-721-2400 ext. 3407
e-mail: sonia.rivera@tourism.pr.gov

-----Original Message-----
From: scanning@tourism.pr.gov [mailto:scanning@tourism.pr.gov]
Sent: Tuesday, February 03, 2015 9:38 AM
To: Sonia Rivera Ayala
Subject: Autoriz. Pago Bonos Centro Conv. due febrero 2015

This E-mail was sent from "RNPF225DA" (Aficio MP 5000).

Scan Date: 02.03.2015 08:37:34 (-0500)
Queries to: scanning@tourism.pr.gov

1

CONFIDENTIAL                                                                                      CCDA_STAY0004298



## BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO
DEPARTAMENTO DE MERCADOS DE CAPITAL-OBLIGACIONES DE RENTA

*ENVIADO POR CORREO ELECTRONICO*

3 de febrero de 2015

Tesorería

## DESEMBOLSO DE LA AUTORIDAD DEL DISTRITO DE CENTRO DE CONVENCIONES (ADCC)-( PR Convention Center Authority $468.8MM , Series A (2006) Bonds )

Se estará realizando un desembolso de la ADCC por **$3,033,841.10** que se le transfiera de la Redacted 994-7 para el pago de la deuda de la emisión de ADCC (PR Convention Center Authority $468.8MM , Series A (2006) Bonds ) a realizarse el **4 de febrero de 2015.** Este desembolso deberá ser transferido al:

**The Bank of New York Mellon**
**ABA 021000018**
**Credit** Redacted **1065**
**Further credit TAS 766334- PR Convention Center**
**PRCCDA Bond Payment Fund**
**Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541**

Miriam T. Pascual Escribano

"Favor notificarnos con tiempo suficiente cualquier situación que afecte el proceso para efectuar esta transferencia. De no recibir notificación alguna, se considerará que esta transferencia se realizó según solicitada."

CONFIDENTIAL



# BGF

## FUNDS TRANSFER ORDER

CONTROL NO. **T 103389**

| Originated by (Agency Name) | | | | Date |
|---|---|---|---|---|
| **Autoridad del Distrito del Centro de Convenciones de Puerto Rico** | | | | **03-Feb-15** |

| Transfer to: | Accounts to be Debited | Accounts to be Credited | ABA Number: | Amount |
|---|---|---|---|---|
| **Compañia de Turismo**<br>**Room Tax-Concetration Surplus** | Redacted 9975-8<br>(IBA-Turismo) | | | $ **3,033,841.10** |
| **PRCCDA Series A**<br>**Hotel Occupancy Tax**<br>**Pledge Account** | | Redacted 994-7<br>(IBA-ADCC) | | $ **3,033,841.10** |

BCO. GUB. DE FOMENTO
PARA PUERTO RICO
SAN JUAN P.R.
DIV. ESTADOS DE CUENTAS

15 FEB -3  PH 2:25

**Special Instructions:**

**Pago del mes de febrero del 2015 por $3,033,841.10 del service de la deuda de la emisión de bono por**
**$468,800,000 de la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, Series A.**

| Prepared by: Redacted | Approved by: Redacted |
|---|---|
| **Miriam T. Pascual Escribáno** | **Arnaldo Maestre Pujals** |

Government Development Bank for Puerto Rico is hereby authorized to make the funds transfer between the above
mentioned accounts. Approved by:

| Authorized Signature | Authorized Signature |
|---|---|

## FOR GOVERNMENT DEVELOPMENT BANK USE ONLY

| Order Received by: | Approved by: | Entered To DDA by: |
|---|---|---|
| Date: | Date: | Date: |

NN25-0068-0590                    GDB COPY

CONFIDENTIAL                                                                 CCDA_STAY0004300



ESTADO LIBRE ASOCIADO DE
PUERTO RICO

DDEC-Compañía de Turismo de Puerto Rico

*T103389*

3 de febrero de 2015

Jesús M. García, Vicepresidente y Director
Dept. de Financ. de Obligaciones de Rentas
Banco Gubernamental de Fomento para PR
P.O. Box 42001
San Juan, PR  00940-2001

Vía E-mail: jesus.m.garcia@bgfpr.com


**SERVICIO DE DEUDA**
**AUTORIDAD DEL DISTRITO DE CENTRO DE CONVENCIONES**

Estimado señor Maestre:

Autorizamos debitar de la cuenta "Room Tax-Concentration Surplus" número [Redacted]975-8, la
cantidad de **$3,033,841.10** a los fines de remitir el pago correspondiente al mes de <u>febrero de</u>
<u>2015</u>.  Esto con el propósito de cubrir el servicio de deuda de la emisión de bonos de la
Autoridad del Distrito del Centro de Convenciones, relacionado al año fiscal 2014-2015.

<u>Agradeceré nos confirmen, vía-email (sonia.rivera@tourism.pr.gov), una vez completada la</u>
<u>transacción.</u>  De tener alguna pregunta adicional, favor de comunicarse con el que suscribe a la
extensión 3043.

Atentamente,



Samuel Sierra Rivera, CPA
Principal Oficial Financiero


.c   ingrid.rivera@tourism.pr.gov
     arnaldo.maestre@bgfpr.com
     miriam.t.pascual@bgfpr.com
     dafne.santiago@bgfpr.com


/ab


PO Box 9023960, San Juan, P.R. 00902-3960

Tel: 787.721.2400



## Pascual, Miriam (GDB)

| | |
|---|---|
| **From:** | Sonia Rivera Ayala <sonia.rivera@tourism.pr.gov> |
| **Sent:** | Tuesday, February 03, 2015 12:00 PM |
| **To:** | Garcia, Jesus (GDB); Maestre Pujals, Arnaldo (GDB); Pascual, Miriam (GDB); dafne.santiago@bgfpr.com |
| **Cc:** | Ingrid I. Rivera; Samuel Sierra Rivera; Manuel Barreiro; Ileana Ortiz Reyes; Amilcar Torres Delgado; Elizabeth Torres Lopez; Johanna Miranda |
| **Subject:** | FW: Autoriz. Pago Bonos Centro Conv. due febrero 2015 |
| **Attachments:** | 20150203083735139.pdf |

Buenos Días. Se incluye carta autorizando transferencia para cubrir el pago de la deuda de emisión de bonos, de la Autoridad del Distrito de Centro de Convenciones de PR. El pago corresponde al mes de febrero de 2015.

Agradeceré, nos envíen confirmación, una vez realizada la misma.

Gracias,

Sonia Ivette Rivera
Ayudante Especial - Finanzas
Co. de Turismo de Puerto Rico
Edif. Ochoa, 3er piso, Viejo San Juan
787-721-2400 ext. 3407
e-mail: sonia.rivera@tourism.pr.gov

-----Original Message-----
From: scanning@tourism.pr.gov [mailto:scanning@tourism.pr.gov]
Sent: Tuesday, February 03, 2015 9:38 AM
To: Sonia Rivera Ayala
Subject: Autoriz. Pago Bonos Centro Conv. due febrero 2015

This E-mail was sent from "RNPF225DA" (Aficio MP 5000).

Scan Date: 02.03.2015 08:37:34 (-0500)
Queries to: scanning@tourism.pr.gov

1

CCDA_STAY0004302

ESTADO LIBRE ASOCIADO DE
# PUERTO RICO
Banco Gubernamental de Fomento
para Puerto Rico

28 de enero de 2015

CPA Samuel Sierra
Director de Finanzas
Compañía de Turismo
Paseo la Princesa 32
San Juan, Puerto Rico 00902

Estimado CPA Sierra:

De conformidad con la Certificación del Banco Gubernamental de Fomento para Puerto
Rico (BGF) del 16 de mayo de 2013, la cantidad necesaria para cubrir el servicio de los
bonos Serie A por $468.8 millones del Centro de Convenciones correspondiente al año
fiscal 2014-2015 asciende a $30,338,410.95. De esta cantidad, el pago correspondiente al
mes de febrero de 2015 asciende a $3,033,841.10.

Solicitamos remita el pago por $3,033,841.10 dentro de los próximos diez (10) días
laborables de manera que podamos transferir esos dineros al Fideicomisario según las
leyes y los acuerdos que rigen la transacción. Ese dinero será depositado en la cuenta
denominada "Hotel Occupancy Tax Pledge Account" que tiene el Banco para registrar
las transacciones de recibo y transferencia de dichos fondos.

Por favor envíe el pago mediante cheque o autorización de débito a su cuenta en el BGF,
con atención a los señores Arnaldo Maestre Pujals (e-mail: arnaldo.maestre@bgfpr.com)
y señoras Miriam Pascual (e-mail: miriam.t.pascual@bgfpr.com) y Dafne Santiago Vega
(e-mail: dafne.santiago@bgfpr.com), piso 2 del Banco. De tener alguna interrogante,
puede comunicarse con el que suscribe a los teléfonos, 722-2525, extensiones 5948, 5961 y
5924, respectivamente.

Atentamente,

**Redacted**

Jesús M. García
Vicepresidente y Director
Departamento de Financiamiento
de Obligaciones de Rentas

*Anejos*



BANCO
GUBERNAMENTAL
DE FOMENTO PARA
BGF   PUERTO RICO



COMMONWEALTH OF
PUERTO RICO
Government Development Bank
for Puerto Rico

May 21, 2014

Ms. Diana F. Torres, AT
The Bank of New York
101 Barclay Street - 7W
New York, NY 10286

Dear Ms. Torres:

Enclosed is the Government Development Bank for Puerto Rico (GDB) Certificate as required under the Trust Agreement dated March 24, 2006, and under Section 31A of the Occupancy Tax Act ("Tax Act"). The certificate states the amounts required to fulfill the Puerto Rico Convention Center District Authority debt service payments for the Hotel Occupancy Tax Revenue Bonds Series A, for the upcoming fiscal year and the first day of the second succeeding fiscal year.

As stated in the enclosed Certificate, and as required under the Tax Act, the Tourism Company shall transfer to GDB, on a monthly basis, an amount equal to one tenth (1/10) of the total amount necessary for payment to be deposited in a Hotel Occupancy Tax Pledge Account (account [Redacted] -994-7), which amounts to $3,033,841.10 for each of the first ten months of fiscal year 2014-2015.

The GDB Certificate is enclosed as required. These numbers were verified and confirmed by Bank of New York Mellon, Trustee.

Cordially,

**Redacted**

Jesus M. Garcia Rivera
Vice President and Director
Revenue Obligations Department

c    Mr. Christopher Byrnes
     Mr. José Pagán
     Mr. Jorge Clivillés
     Mr. Arnaldo Maestre
     Mrs. Miriam Pascual
     Mrs. Brenda González

Enclosure

PO Box 42001
San Juan, PR 00940-2001
Telephone (787) 722-2525

GDB   GOVERNMENT
      DEVELOPMENT
      BANK FOR
      PUERTO RICO

CCDA_STAY0004304

### Government Development Bank for Puerto Rico
PRCCDA Hotel Occupancy Tax Revenue Bonds Series A
Amount necessary to make the required debt service payments
For fiscal year 2015 and the first day of the succeeding fiscal year
Prepared on May 1, 2014

| | | | | |
|---|---|---|---|---|
| 1. Principal and Interest of the Bonds: | | | | |
| a. Payment of Principal and/or interest: | | | | |
| i. July 1, 2014 | $20,306,281.25 | | | |
| ii. January 1, 2015 | 9,774,406.25 | | | |
| iii. July 1, 2015 | 20,564,406.25 | $50,645,093.75 | | |
| b. Less amount on deposit in: | | | | |
| i. Bond Payment Fund | $20,306,682.80 | | | |
| ii. Capitalized Interest Account | 0.00 | 20,306,682.80 | $30,338,410.95 | |
| 2. Authority's Obligations: | | | | |
| a. Credit Facilities | | $0.00 | | |
| b. Interest Rate Exchange Agreements | | 0.00 | 0.00 | |
| 3. Replenish Debt Service Fund | | | 0.00 | |
| 4. Expenses related to : | | | | |
| a. The Issuance of the Bonds | | $0.00 | | |
| b. Credit Facilities | | 0.00 | | |
| c. Interest Rate Exchange Agreements | | 0.00 | 0.00 | |
| Total Amount Necessary | | | $30,338,410.95 | |

Amount to be received during each of the first 10 months of fiscal year    $3,033,841.10

Prepared by: **Redacted**
Brenda González

Revised by: **Redacted**
Arnaldo Maestre

Authorized by: **Redacted**
Jesús García

Date: May 21, 2014

CCDA_STAY0004305

### Government Development Bank for Puerto Rico Certificate

I, Jesús M. García Rivera, Vice President and Revenue Obligations Financing Director of the Government Development Bank for Rico ("GDB"), a public corporation of the Commonwealth of Puerto Rico created by Act No. 17 of September 23, 1948, HEREBY CERTIFIES to the Puerto Rico Convention Center District Authority (the "Authority"), the Puerto Rico Tourism Company (the "Tourism Company") and The Bank of New York, successor in interest to JPMorgan Chase Bank, as trustee (the "Trustee") under the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") between the Authority and the Trustee (all capitalized terms used but not defined herein shall have the respective meanings set forth in the Trust Agreement) the following.

This Certificate is issued in connection with the payments required for fiscal year 2014 - 2015 and the first day of the succeeding fiscal year.

1. The following are the total sums necessary for the Authority to make the following payments, during the upcoming fiscal year and the first day of the second succeeding fiscal year:

    (a)    Payments equal to the amount set forth below (after taking into account any amounts then on deposit in the Bond Payment Fund and the Capitalized Interest Account of the Proceeds Fund available therefor) for the full and timely payment, or the amortization, of the principal and interest on the Bonds due on July 1st and January 1st of the immediately succeeding fiscal year and July 1st of the second succeeding fiscal year (including any amounts due in connection with prior payments for which there were insufficient funds):

| | |
|---|---|
| Amount necessary for Principal and Interest | $50,645,093.75 |
| Offsets due to amounts held in the Earnings Account of the Proceeds Fund (-) | |
| Offsets due to amounts held in the Bond Payment Fund (-) | 20,306,682.80 |
| Offsets due to Capitalized Interest in the Proceeds Fund (-) | |
| Shortfalls due to Hotel Occupancy Tax Funds used pursuant to the provisions of Section 8 Article VI of the Constitution (+) | |
| Other shortfalls from prior years(+) | |
| Total Amount due (the "Total Amount") | $30,338,410.95 |

Redacted

CONFIDENTIAL

The Total Amount will be paid in monthly installments as set forth below:[*]

| | |
|---|---|
| July | $3,033,841.10 |
| August | $3,033,841.10 |
| September | $3,033,841.10 |
| October | $3,033,841.10 |
| November | $3,033,841.10 |
| December | $3,033,841.10 |
| January | $3,033,841.10 |
| February | $3,033,841.10 |
| March | $3,033,841.10 |
| April | $3,033,841.10 |
| May | N/A |
| June | N/A |

(b)  Full and timely payment of the obligations of the Authority under any Credit Facilities or any Interest Rate Exchange Agreements, which in the future may be entered into by the Authority with the prior written authorization of the Tourism Company;[*]

| | |
|---|---|
| July | N/A |
| August | N/A |
| September | N/A |
| October | N/A |

[*] All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year.  This may include payments in May and June of such Fiscal Year together with future Fiscal Years.

Redacted

2

CCDA_STAY0004307

| | |
|---|---|
| November | N/A |
| December | N/A |
| January | N/A |
| February | N/A |
| March | N/A |
| April | N/A |
| May | N/A |
| June | N/A |

(e)  The deposits required to replenish the Debt Service Reserve Fund established under the Trust Agreement;  and

| | |
|---|---|
| July | N/A |
| August | N/A |
| September | N/A |
| October | N/A |
| November | N/A |
| December | N/A |
| January | N/A |
| February | N/A |
| March | N/A |
| April | N/A |
| May | N/A |
| June | N/A |

Redacted

3

CCDA_STAY0004308

(d) Any other expenses incurred in connection with (i) the issuance of the Bonds, or (ii) with any Credit Facilities or Interest Rate Exchange Agreements.*

| | |
|---|---|
| July | N/A |
| August | N/A |
| September | N/A |
| October | N/A |
| November | N/A |
| December | N/A |
| January | N/A |
| February | N/A |
| March | N/A |
| April | N/A |
| May | N/A |
| June | N/A |

2. The total amount due for all amounts set forth in paragraph 1 is $30,338,410.95.

3. Amounts set forth in paragraph 1 are in accordance with the provisions set forth in the Trust Agreement and the Assignment and Coordination Agreement, dated as of March 24, 2006, by and between the Tourism Company and GDB.

4. GDB will deposit all Hotel Occupancy Tax Funds as set forth in this Certificate in accordance with the Pledge Agreement.

5. The Trustee will deposit into the Bond Payment Fund promptly upon receipt but in no event later than the third Business Day after receipt thereof, beginning on the first month of the next succeeding Fiscal Year, an amount sufficient, together (in the case of interest only) with any capitalized interest and accrued interest as set forth in the Proceeds Fund, to pay the amount of interest and principal

---

* All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year. This may include payments in May and June of such Fiscal Year together with future Fiscal Years

Redacted

DMEASTP#33.5

4

CONFIDENTIAL

CCDA_STAY0004309

payable for the year in the amounts set forth below (such annual deposit being first satisfied with respect to interest on the Bonds and then with respect to principal on the Bonds):

| | Principal | Interest |
|---|---|---|
| July | N/A | |
| August | N/A | |
| September | N/A | |
| October | N/A | |
| November | N/A | |
| December | N/A | |
| January | N/A | |
| February | N/A | |
| March | N/A | |
| April | N/A | |
| May | N/A | |
| June | N/A | |

IN WITNESS WHEREOF, the undersigned has hereunto set his official signature and the corporate seal of Government Development Bank for Puerto Rico this May 21, 2014.

GOVERNMENT DEVELOPMENT
BANK FOR PUERTO RICO

By: [ Redacted ]

Jesús M. García Rivera

DM3#3299773.3

5

## Pascual, Miriam (GDB)

| | |
|---|---|
| **From:** | Pascual, Miriam (GDB) |
| **Sent:** | Thursday, January 29, 2015 3:26 PM |
| **To:** | 'Sonia Rivera Ayala' |
| **Cc:** | Maestre Pujals, Arnaldo (GDB); Garcia, Jesus (GDB); Betancourt Nieves, Hector (GDB); 'Manuel Barreiro'; 'Delilah Diaz'; 'Ingrid I. Rivera'; 'Samuel Sierra Rivera'; Elizabeth Torres Lopez; Johanna Miranda; Santiago, Dafne (GDB); Gonzalez, Brenda (GDB) |
| **Subject:** | Solicitud de pago del servicio de los bonos de ADCC |
| **Attachments:** | DOC012915.pdf |

| Tracking: | Recipient | Delivery | Read |
|---|---|---|---|
| | 'Sonia Rivera Ayala' | | |
| | Maestre Pujals, Arnaldo (GDB) | Delivered: 1/29/2015 3:26 PM | |
| | Garcia, Jesus (GDB) | Delivered: 1/29/2015 3:26 PM | |
| | Betancourt Nieves, Hector (GDB) | Delivered: 1/29/2015 3:26 PM | Read: 1/29/2015 3:59 PM |
| | 'Manuel Barreiro' | | |
| | 'Delilah Diaz' | | |
| | 'Ingrid I. Rivera' | | |
| | 'Samuel Sierra Rivera' | | |
| | Elizabeth Torres Lopez | | |
| | Johanna Miranda | | |
| | Santiago, Dafne (GDB) | Delivered: 1/29/2015 3:26 PM | Read: 1/29/2015 3:26 PM |
| | Gonzalez, Brenda (GDB) | Delivered: 1/29/2015 3:26 PM | |

Buenos días:

Incluimos carta de solicitud de pago por $3,033,841.10 para cubrir el servicio de los bonos de la Serie A de la Autoridad del Distrito del Centro de Convenciones. Muchas gracias.

**Miriam Pascual**
Analista de Obligaciones de Renta
Financiamiento Público – Obligaciones de Rentas
Banco Gubernamental de Fomento para Puerto Rico
Teléfono: (787) 722-2525 Ext. 15252
Email: Miriam.T.Pascual@bgfpr.com
Web: www.bgfpr.com

 

CONFIDENTIALITY NOTE: This electronic transmission contains information belonging to the Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates, which is confidential and/or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail or telephone that this message has been inadvertently transmitted to you and delete this e-mail from your system. If you have received this transmission in error, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

1

CCDA_STAY0004311


**GDB**

**GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO**
**SAN JUAN, PUERTO RICO**
**ORDER TO TRANSFER**

RECEIVED
10. PREINTERVENCION

15 JAN 12 PM 4: 14

Control Number:  MCCP 4714

| | | | |
|---|---|---|---|
| Origination Unit | Area □ DDA | □ Operations | □ Treasury |
| □ Subsidiaries | □ Affiliates | | ☒ Other-Unit    Capital Markets |

**Redacted**

Verify by: Miriam T. Pascual Casillano  _____    Date: 01/12/2015
**Redacted**
Approved by: Arnaldo Marin Dihais/Jesus Pereira

| | |
|---|---|
| | Date of Transfer:   Amount: |
| | 01/14/2015       $3,033,841.10 |

Transfer to:
**The Bank of New York Mellon**

ABA or Chips Number:
021000018

For the Account of:
**P.R. Convention Center**
( Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541 )

Account Number:

Redacted   1065
Further credit Redacted 6334- PR Convention Center
PRCCDA Bond Payment Fund

| | | |
|---|---|---|
| For Further Credit to: | | Account Number: |
| Authorized by:      Date: | | Authorized by:       Date: |

Message or Special Instructions:
PR Convention Center Authory $468 8MM , Series A (2006) Bonds (Commonwealth Appropiation Bonds), corresponding to fiscal 2014-15.

| | | | |
|---|---|---|---|
| | | **For Investment Operations Division Purposes Only** | |
| Precode | Security ID | Entered by | Approved by |
| | | Date | Date |

**For Accounting Department Clearing Division Purposes Only**
□ GL / ☒ IBA Account Number to Be Debited       IBA Redacted 994-7

CONFIDENTIAL                                                                 CCDA_STAY0004312



**BANCO GUBERNAMENTAL DE FOMENTO PARA PUERTO RICO**
DEPARTAMENTO DE MERCADOS DE CAPITAL-OBLIGACIONES DE RENTA

*ENVIADO POR CORREO ELECTRONICO*

12 de enero de 2015

Tesorería

**DESEMBOLSO DE LA AUTORIDAD DEL DISTRITO DE CENTRO DE CONVENCIONES (ADCC)-( PR  Convention Center Authority $468.8MM , Series  A (2006)  Bonds )**

Se estará realizando un desembolso de la **ADCC** por **$3,033,841.10** que se le transfiera **de la IBA** Redacted **994-7** para el pago de la deuda de la emisión de ADCC (PR  Convention  Center  Authority $468.8MM , Series  A (2006)  Bonds ) a realizarse el **14 de enero de 2015.** Este desembolso  deberá ser transferido  al:

**The Bank of New York Mellon**
**ABA 021000018**
**Credit GLA** Redacted **1065**
**Further credit TAS** Redacted **5334- PR Convention Center**
**PRCCDA Bond Payment Fund**
**Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541**


**Miriam T. Pascual Escribano**


**"Favor notificarnos con tiempo suficiente cualquier situación que afecte el proceso para efectuar esta transferencia.  De no recibir notificación alguna, se considerará que esta transferencia se realizó según solicitada."**

**Pascual, Miriam (GDB)**

| | |
|---|---|
| **From:** | Maestre Pujals, Arnaldo (GDB) |
| **Sent:** | Monday, January 12, 2015 2:33 PM |
| **To:** | Pascual, Miriam (GDB) |
| **Subject:** | FW: PRCCDA debt service |



**Arnaldo Maestre**
Ejecutivo de Cuentas Senior
Financiamiento Público – Obligaciones de Rentas
Banco Gubernamental de Fomento para Puerto Rico
Teléfono: (787) 722-2525 Ext. 15294
Email: Arnaldo.Maestre@bgfpr.com
Web: www.bgfpr.com



ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**
Banco Gubernamental de Fomento
para Puerto Rico

**BGF**

CONFIDENTIALITY NOTE: This electronic transmission contains information belonging to the Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates, which is confidential and/or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail or telephone that this message has been inadvertently transmitted to you and delete this e-mail from your system. If you have received this transmission in error, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

> **From:** Torres, Diana F [mailto:diana.f.torres@bnymellon.com]
> **Sent:** Wednesday, July 02, 2014 4:16 PM
> **To:** Maestre Pujals, Arnaldo (GDB)
> **Subject:** RE: PRCCDA debt service
>
> Hi Arnaldo,
>
> Yes, the wire instructions are correct.
>
> Saludos,
> Diana
>
> **Diana F. Torres,** Client Service Manager · BNY Mellon
> 101 Barclay - 7 West, New York, NY 10286 · Tel 212.815.6955 · Fax 212.815.5595 · diana.f.torres@bnymellon.com

---

> **From:** Maestre Pujals, Arnaldo (GDB) [mailto:Arnaldo.Maestre@bgfpr.com]
> **Sent:** Wednesday, July 02, 2014 4:09 PM
> **To:** Torres, Diana F
> **Subject:** PRCCDA debt service
>
> Hola Diana:
> Please confirm that the wire instructions for the PRCCDA debt service funds are:

1

CONFIDENTIAL                                                                 CCDA_STAY0004314

The Bank of New York Mellon
ABA 021000018
Credit Redacted 1065
Further credit Redacted 5334 – PR Convention Center
PRCCDA Bond Payment Fund
Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541

Thank you.

**Arnaldo Maestre**
Ejecutivo de Cuentas Senior
Financiamiento Público – Obligaciones de Rentas
Banco Gubernamental de Fomento para Puerto Rico
Teléfono: (787) 722-2525 Ext. 15294
Email: Arnaldo.Maestre@bgfpr.com
Web: www.bgfpr.com

 

CONFIDENTIALITY NOTE: This electronic transmission contains information belonging to the Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates, which is confidential and/or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail or telephone that this message has been inadvertently transmitted to you and delete this e-mail from your system. If you have received this transmission in error, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

This email communication and any attachment thereto, contains information that belongs to Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates and which may be confidential, privileged and/or proprietary. It is solely for the use of its intended recipient. Access, retention, dissemination, distribution, copying and/or any other use of this email or any attachments thereto, or any information contained herein, by another person other than its intended recipient, is strictly prohibited. If you are not the intended recipient of this communication please immediately notify the sender of the error and delete it (including all of its attachments) from your computer. Unauthorized interception of this e-mail is a violation of federal criminal law. Although we attempt to sweep all e-mail communications and attachments for viruses, we do not guarantee that either are virus free and disclaim any liability for any damage sustained as a result of viruses.

This is for informational purposes only; from sources the Firm believes reliable; may not be accurate or complete; is subject to change; is not a recommendation or offer to buy/sell a financial instrument or adopt any investment strategy; is not legal, tax, credit or accounting advice. Do not use e-mail to submit any instructions acceptances are at your risk. The Firm or its affiliates lends to, borrows from and provides other products/services to issuers and others, receives compensation therefor, and periodically has a direct or indirect financial interest in the financial instruments/transactions indicated. Additional risks may exist that are not referenced. Past performance is not indicative of future returns. Other than CDs, financial instruments: are not FDIC insured; are not deposits or other obligations of and are not guaranteed by the Firm or any bank or non-bank affiliate; and involve investment risk including possible

2

loss of principal. The Firm is a wholly owned, indirect non-bank subsidiary of The Bank of New York Mellon Corporation, and a member of FINRA and SIPC, and is solely responsible for its obligations and commitments.

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Access, copying or re-use of the e-mail or any attachment, or any information contained therein, by any other person is not authorized. If you are not the intended recipient please return the e-mail to the sender and delete it from your computer. Although we attempt to sweep e-mail and attachments for viruses, we do not guarantee that either are virus-free and accept no liability for any damage sustained as a result of viruses.

Please refer to http://disclaimer.bnymellon.com/eu.htm for certain disclosures relating to European legal entities.

CONFIDENTIAL

CCDA_STAY0004316



ESTADO LIBRE ASOCIADO DE
# PUERTO RICO
Banco Gubernamental de Fomento
para Puerto Rico

30 de diciembre de 2014

CPA Samuel Sierra
Director de Finanzas
Compañía de Turismo
Paseo la Princesa 32
San Juan, PR 00902

Estimado CPA Sierra:

De conformidad con la Certificación del Banco Gubernamental de Fomento para Puerto Rico (BGF) del 21 de mayo de 2014, la cantidad necesaria para cubrir el servicio de los bonos Serie A por $468.8 millones del Centro de Convenciones correspondiente al año fiscal 2014-2015 asciende a $30,338,410.95. De esta cantidad, el pago correspondiente al mes de enero de 2015 asciende a $3,033,841.10.

Solicitamos remita el pago por $3,033,841.10 dentro de los próximos diez (10) días laborables, de manera que podamos transferir esos dineros al Fideicomisario según las leyes y los acuerdos que rigen la transacción. Ese dinero será depositado en la cuenta denominada "Hotel Occupancy Tax Pledge Account" que tiene el BGF para registrar las transacciones de recibo y transferencia de dichos fondos.

Por favor envíe el pago mediante cheque o autorización de débito a su cuenta en el BGF, a mi atención o a las señoras Brenda González (e-mail: brenda.gonzalez@bgfpr.com) y Dafne Santiago Vega (e-mail: dafne.santiago@bgfpr.com). De tener alguna duda, puede comunicarse con nosotros al 787-722-2525, extensiones 15253 ó 15295, respectivamente.

Atentamente,

**Redacted**

Arnaldo Maestre Pujals
Ejecutivo de Cuentas Senior
Financiamiento de Obligaciones de Rentas
Arnaldo.Maestre@bgfpr.com

c  Sra. Natalia Guzman
   Sr. Jesús M. García
   Sra. Brenda González

PO Box 42001
San Juan, PR 00940-2001
Teléfono (787) 722-2525



BANCO
GUBERNAMENTAL
DE FOMENTO PARA
PUERTO RICO

CCDA_STAY0004317

)                                                        )

## Government Development Bank for Puerto Rico Certificate

I, Jesús M. García Rivera, Vice President and Revenue Obligations Financing Director of the Government Development Bank for Rico ("GDB"), a public corporation of the Commonwealth of Puerto Rico created by Act No. 17 of September 23, 1948, HEREBY CERTIFIES to the Puerto Rico Convention Center District Authority (the "Authority"), the Puerto Rico Tourism Company (the "Tourism Company") and The Bank of New York, successor in interest to JPMorgan Chase Bank, as trustee (the "Trustee") under the Trust Agreement, dated March 24, 2006 (the "Trust Agreement") between the Authority and the Trustee (all capitalized terms used but not defined herein shall have the respective meanings set forth in the Trust Agreement) the following.

This Certificate is issued in connection with the payments required for fiscal year 2014 - 2015 and the first day of the succeeding fiscal year.

1. The following are the total sums necessary for the Authority to make the following payments, during the upcoming fiscal year and the first day of the second succeeding fiscal year:

(a)    Payments equal to the amount set forth below (after taking into account any amounts then on deposit in the Bond Payment Fund and the Capitalized Interest Account of the Proceeds Fund available therefor) for the full and timely payment, or the amortization, of the principal and interest on the Bonds due on July 1st and January 1st of the immediately succeeding fiscal year and July 1st of the second succeeding fiscal year (including any amounts due in connection with prior payments for which there were insufficient funds):

| | |
|---|---|
| Amount necessary for Principal and Interest | $50,645,093.75 |
| Offsets due to amounts held in the Earnings Account of the Proceeds Fund (-) | |
| Offsets due to amounts held in the Bond Payment Fund (-) | 20,306,682.80 |
| Offsets due to Capitalized Interest in the Proceeds Fund (-) | |
| Shortfalls due to Hotel Occupancy Tax Funds used pursuant to the provisions of Section 8 Article VI of the Constitution (+) | |
| Other shortfalls from prior years (+) | |
| Total Amount due (the "Total Amount") | $30,338,410.95 |

Redacted

UM #139976.5

The Total Amount will be paid in monthly installments as set forth below:[*]

| | |
|---|---|
| July | $3,033,841.10 |
| August | $3,033,841.10 |
| September | $3,033,841.10 |
| October | $3,033,841.10 |
| November | $3,033,841.10 |
| December | $3,033,841.10 |
| January | $3,033,841.10 |
| February | $3,033,841.10 |
| March | $3,033,841.10 |
| April | $3,033,841.10 |
| May | N/A |
| June | N/A |

(b) Full and timely payment of the obligations of the Authority under any Credit Facilities or any Interest Rate Exchange Agreements, which in the future may be entered into by the Authority with the prior written authorization of the Tourism Company;[*]

| | |
|---|---|
| July | N/A |
| August | N/A |
| September | N/A |
| October | N/A |

---

[*] All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year. This may include payments in May and June of such Fiscal Year together with future Fiscal Years

Redacted

DM3\039975.5

2

)                              )

| November | N/A |
| December | N/A |
| January | N/A |
| February | N/A |
| March | N/A |
| April | N/A |
| May | N/A |
| June | N/A |

(c)  The deposits required to replenish the Debt Service Reserve Fund established under the Trust Agreement; and

| July | N/A |
| August | N/A |
| September | N/A |
| October | N/A |
| November | N/A |
| December | N/A |
| January | N/A |
| February | N/A |
| March | N/A |
| April | N/A |
| May | N/A |
| June | N/A |

Redacted

DM3\559975.5

3

(d)  Any other expenses incurred in connection with (i) the issuance of the Bonds, or (ii) with any Credit Facilities or Interest Rate Exchange Agreements.[*]

| July | N/A |
| August | N/A |
| September | N/A |
| October | N/A |
| November | N/A |
| December | N/A |
| January | N/A |
| February | N/A |
| March | N/A |
| April | N/A |
| May | N/A |
| June | N/A |

2.  The total amount due for all amounts set forth in paragraph 1 is $30,338,410.98.

3.  Amounts set forth in paragraph 1 are in accordance with the provisions set forth in the Trust Agreement and the Assignment and Coordination Agreement, dated as of March 24, 2006, by and between the Tourism Company and GDB.

4.  GDB will deposit all Hotel Occupancy Tax Funds as set forth in this Certificate in accordance with the Pledge Agreement.

5.  The Trustee will deposit into the Bond Payment Fund promptly upon receipt but in no event later than the third Business Day after receipt thereof, beginning on the first month of the next succeeding Fiscal Year, an amount sufficient, together (in the case of interest only) with any capitalized interest and accrued interest as set forth in the Proceeds Fund, to pay the amount of interest and principal

---

[*] All amounts set forth in paragraph 1 will be adjusted upward to take into account any shortfalls occurring during the Fiscal Year. This may include payments in May and June of such Fiscal Year together with future Fiscal Years

Redacted

DM3339975.5

4

)                                                    )

payable for the year in the amounts set forth below (such annual deposit being first satisfied with respect
to interest on the Bonds and then with respect to principal on the Bonds):

|  | Principal | Interest |
|---|---|---|
| July | N/A | |
| August | N/A | |
| September | N/A | |
| October | N/A | |
| November | N/A | |
| December | N/A | |
| January | N/A | |
| February | N/A | |
| March | N/A | |
| April | N/A | |
| May | N/A | |
| June | N/A | |

IN WITNESS WHEREOF, the undersigned has hereunto set his official signature and the
corporate seal of Government Development Bank for Puerto Rico this May 21, 2014.

GOVERNMENT DEVELOPMENT
BANK FOR PUERTO RICO

By: _____
Jesús M. García Rivera

Redacted

DMS\339975.5

5

CONFIDENTIAL                                                                                    CCDA_STAY0004322



COMMONWEALTH OF
PUERTO RICO
Government Development Bank
for Puerto Rico

May 21, 2014

Ms. Diana F. Torres, AT
The Bank of New York
101 Barclay Street - 7W
New York, NY 10286

Dear Ms. Torres:

Enclosed is the Government Development Bank for Puerto Rico (GDB) Certificate as required under
the Trust Agreement dated March 24, 2006, and under Section 31A of the Occupancy Tax Act ("Tax
Act").   The certificate states the amounts required to fulfill the Puerto Rico Convention Center
District Authority debt service payments for the Hotel Occupancy Tax Revenue Bonds Series A, for
the upcoming fiscal year and the first day of the second succeeding fiscal year.

As stated in the enclosed Certificate, and as required under the Tax Act, the Tourism Company shall
transfer to GDB, on a monthly basis, an amount equal to one tenth (1/10) of the total amount
necessary for payment to be deposited in a Hotel Occupancy Tax Pledge Account (account #[Redacted]
—994-7), which amounts to $3,033,841.10 for each of the first ten months of fiscal year 2014-2015.

The GDB Certificate is enclosed as required. These numbers were verified and confirmed by Bank of
New York Mellon, Trustee.

Cordially,

Redacted

Jesús M. García Rivera
Vice President and Director
Revenue Obligations Department

c       Mr. Christopher Byrnes
        Mr. José Pagán
        Mr. Jorge Clivillés
        Mr. Arnaldo Maestre
        Mrs. Miriam Pascual
        Mrs. Brenda González

Enclosure

PO Box 42001
San Juan, PR 00940-2001
Telephone (787) 722-2525

GDB    GOVERNMENT
       DEVELOPMENT
       BANK FOR
       PUERTO RICO

### Government Development Bank for Puerto Rico
PRCCDA Hotel Occupancy Tax Revenue Bonds Series A
Amount necessary to make the required debt service payments
For fiscal year 2015 and the first day of the succeeding fiscal year
Prepared on May 1, 2014

1. Principal and Interest of the Bonds:
   a. Payment of Principal and/or Interest:

| | | | |
|---|---|---|---|
| i. July 1, 2014 | $20,306,281.25 | | |
| ii. January 1, 2015 | 9,774,406.25 | | |
| iii. July 1, 2015 | 20,564,406.25 | $50,645,093.75 | |
| b. Less amount on deposit in: | | | |
| i. Bond Payment Fund | $20,306,682.80 | | |
| ii. Capitalized Interest Account | 0.00 | 20,306,682.80 | $30,338,410.95 |
| 2. Authority's Obligations: | | | |
| a. Credit Facilities | | $0.00 | |
| b. Interest Rate Exchange Agreements | | 0.00 | 0.00 |
| 3. Replenish Debt Service Fund | | | 0.00 |
| 4. Expenses related to: | | | |
| a. The Issuance of the Bonds | | $0.00 | |
| b. Credit Facilities | | 0.00 | |
| c. Interest Rate Exchange Agreements | | 0.00 | 0.00 |
| Total Amount Necessary | | | $30,338,410.95 |

Amount to be received during each of the first 10 months of fiscal year     $3,033,841.10



Prepared by: ___ **Redacted** ___
   Brenda González

Revised by: ___ **Redacted** ___
   Arnaldo Messina

Authorized by: ___ Redacted ___
   Jesús García

Date: May 21, 2014



COMMONWEALTH OF
PUERTO RICO
Government Development Bank
for Puerto Rico

May 21, 2014

Mrs. Ingrid Rivera Rocafort
Executive Director
Tourism Company
La Princesa Bldg. #2
Paseo La Princesa
Old San Juan, P.R. 00902

Dear Mrs. Rivera Rocafort:

Enclosed is the Government Development Bank for Puerto Rico (GDB) Certificate as required under the Trust Agreement dated March 24, 2006, and under Section 31A of the Occupancy Tax Act ("Tax Act"). The certificate states the amounts required to fulfill the Puerto Rico Convention Center District Authority debt service payments for the Hotel Occupancy Tax Revenue Bonds Series A, for the upcoming fiscal year and the first day of the second succeeding fiscal year.

As stated in the enclosed Certificate, and as required under the Tax Act, the Tourism Company shall transfer to GDB, on a monthly basis, an amount equal to one tenth (1/10) of the total amount necessary for payment to be deposited in a Hotel Occupancy Tax Pledge Account (account #[Redacted]994-7), which amounts to $3,038,841.10 for each of the first ten months of fiscal year 2014-2015.

The GDB Certificate is enclosed as required. These numbers were verified and confirmed by Bank of New York Mellon, Trustee.

Cordially,

Redacted

Jesús M. García Rivera
Vice President and Director
Revenue Obligations Department

c  Mr. José Pagán
   Mr. Jorge Clivillés
   Samuel Sierra Rivera, CPA
   Mr. Arnaldo Maestre
   Mrs. Miriam Pascual
   Mrs. Brenda González

Enclosure

PO Box 42001
San Juan, PR 00940-2001
Telephone (787) 722-2525

GOVERNMENT
DEVELOPMENT
BANK FOR
PUERTO RICO

GDB

CCDA_STAY0004325



COMMONWEALTH OF

# PUERTO RICO

Government Development Bank
for Puerto Rico

May 21, 2014

Eng. Víctor A. Suárez Meléndez
Executive Director
Convention Center District Authority
Apartado 19269
San Juan, PR 00907

Dear Eng. Suárez Meléndez:

Enclosed is the Government Development Bank for Puerto Rico (GDB) Certificate as required under
the Trust Agreement dated March 24, 2006, and under Section 31A of the Occupancy Tax Act ("Tax
Act"). The certificate states the amounts required to fulfill the Puerto Rico Convention Center
District Authority debt service payments for the Hotel Occupancy Tax Revenue Bonds Series A, for
the upcoming fiscal year and the first day of the second succeeding fiscal year.

As stated in the enclosed Certificate, and as required under the Tax Act, the Tourism Company shall
transfer to GDB, on a monthly basis, an amount equal to one tenth (1/10) of the total amount
necessary for payment to be deposited in a Hotel Occupancy Tax Pledge Account (account [Redacted]
994-7), which amounts to $3,033,841.10 for each of the first ten months of fiscal year 2014-2015.

The GDB Certificate is enclosed as required. These numbers were verified and confirmed by Bank of
New York Mellon, Trustee.

Cordially,

**Redacted**

Jesús M. García Rivera
Vice President and Director
Revenue Obligations Department

c  Mr. José Pagán
   Mr. Santiago Rivera
   Mr. Jorge Clivillés
   Mr. Arnaldo Maestre
   Mrs. Miriam Pascual
   Mrs. Brenda González

Enclosure

PO Box 42001
San Juan, PR 00940-2001
Telephone (787) 722-2626

GOVERNMENT
DEVELOPMENT
BANK FOR
PUERTO RICO

GDB

CCDA_STAY0004326



ESTADO LIBRE ASOCIADO DE
PUERTO RICO

DDEC•Compañía de Turismo de Puerto Rico

12 de enero de 2015

Arnaldo Maestre Pujals
Banco Gubernamental de Fomento
Para Puerto Rico
P.O. Box 42001
San Juan, PR  00940-2001

Vía E-mail:  arnaldo.maestre@bgfpr.com

**SERVICIO DE DEUDA**
**AUTORIDAD DEL DISTRITO DE CENTRO DE CONVENCIONES**

Estimado señor Maestre:

Autorizamos debitar de la cuenta "Room Tax-Concentration Surplus" número [Redacted]975-8, la cantidad de **$3,033,841.10** a los fines de remitir el **pago correspondiente al mes de enero de 2015**. Esto con el propósito de cubrir el servicio de deuda de la emisión de bonos de la Autoridad del Distrito del Centro de Convenciones, relacionado al año fiscal 2014-2015.

Agradeceré nos confirmen, vía email (sonia.rivera@tourism.pr.gov), una vez completada la transacción. De tener alguna pregunta adicional, favor de comunicarse con el que suscribe a la extensión 3043.

Atentamente,

**Redacted**

Samuel Sierra Rivera, CPA
Principal Oficial Financiero

c   ingrid.rivera@tourism.pr.gov
    hector.betancourtnieves@bgfpr.com
    miriam.t.pascual@bgfpr.com
    brenda.gonzalez@bgfpr.com
    dafne.santiago@bgfpr.com

/hr

PO Box 9023960, San Juan, P.R. 00902-3960

Tel: 787.721.2400



COMPAÑÍA DE
TURISMO
PUERTO RICO

CONFIDENTIAL

CCDA_STAY0004327

**Pascual, Miriam (GDB)**

| | |
|---|---|
| **From:** | Sonia Rivera Ayala <sonia.rivera@tourism.pr.gov> |
| **Sent:** | Monday, January 12, 2015 2:13 PM |
| **To:** | Maestre Pujals, Arnaldo (GDB) |
| **Cc:** | Ingrid I. Rivera; Betancourt Nieves, Hector (GDB); Pascual, Miriam (GDB); Brenda Ruiz; dafne.santiago@bgfpr.com; Samuel Sierra Rivera; Manuel Barreiro; Ileana Ortiz Reyes; Elizabeth Torres Lopez; Johanna Miranda |
| **Subject:** | FW: Pago bonos Centro Conv. due enero 2015 |
| **Attachments:** | 20150112140309534.pdf |

Buenas Tardes. Se incluye carta autorizando transferencia para cubrir el pago de la deuda de emisión de bonos, de la Autoridad del Distrito del Centro de Convenciones de PR. El pago corresponde al mes de enero de 2015.

Agradeceré, nos envien confirmación, una vez realizada la misma.

Gracias,

Sonia Ivette Rivera
Ayudante Especial - Finanzas
Co. de Turismo de Puerto Rico
Edif. Ochoa, 3er piso, Viejo San Juan
787-721-2400 ext. 3407
e-mail: sonia.rivera@tourism.pr.gov

-----Original Message-----
From: scanning@tourism.pr.gov [mailto:scanning@tourism.pr.gov]
Sent: Monday, January 12, 2015 3:03 PM
To: Sonia Rivera Ayala
Subject: Pago bonos Centro Conv. due enero 2015

This E-mail was sent from "RNPF225DA" (Aficio MP 5000).

Scan Date: 01.12.2015 14:03:09 (-0500)
Queries to: scanning@tourism.pr.gov

1

CCDA_STAY0004328



# BGF

## FUNDS TRANSFER ORDER

CONTROL NO. **T 103376**

| Originated by (Agency Name) | | | | Date |
|---|---|---|---|---|
| Autoridad del Distrito del Centro de Convenciones de Puerto Rico | | | | **12-Jan-15** |

| Transfer to | Accounts to be Debited | Accounts to be Credited | ABA Number | Amount |
|---|---|---|---|---|
| **Compañia de Turismo** **Room Tax-Concetration Surplus** | **Redacted** (IBA-Turismo) | | | $ 3,033,841.10 |
| **PRCCDA Series A** **Hotel Occupancy Tax** **Pledge Account** | | Redacted 994-7 (IBA-ADCC) | | $ 3,033,841.10 |

Special Instructions:

**Pago del mes de enero del 2015 por $3,033,841.10 del service de la deuda de la emisión de bono por $468,800,000 de la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, Series A.**

Prepared by: **Redacted**
Miriam T. Pascual Escribano

Approved by: **Redacted**
**Arnaldo Maestre Pujars**

Government Development Bank for Puerto Rico is hereby authorized to make the funds transfer between the above mentioned accounts.  Approved by:

_____
Authorized Signature

_____
Authorized Signature

### FOR GOVERNMENT DEVELOPMENT BANK USE ONLY

| Order Received by: | Approved by: | Entered To DDA by: |
|---|---|---|
| Date: | Date: | Date: |

NN25-0068-0590

GDB COPY

CONFIDENTIAL

CCDA_STAY0004329



ESTADO LIBRE ASOCIADO DE
**PUERTO RICO**

DDEC-Compañía de Turismo de Puerto Rico

*T 103376*

12 de enero de 2015

Arnaldo Maestre Pujals
Banco Gubernamental de Fomento
Para Puerto Rico
P.O. Box 42001
San Juan, PR 00940-2001

Vía E-mail: arnaldo.maestre@bgfpr.com

**SERVICIO DE DEUDA**
**AUTORIDAD DEL DISTRITO DE CENTRO DE CONVENCIONES**

Estimado señor Maestre:

Autorizamos debitar de la cuenta "Room Tax-Concentration Surplus" número [Redacted] 975-B, la cantidad de **$3,033,841.10** a los fines de remitir el **pago correspondiente al mes de enero de 2015.** Esto con el propósito de cubrir el servicio de deuda de la emisión de bonos de la Autoridad del Distrito del Centro de Convenciones, relacionado al año fiscal 2014-2015.

**Agradeceré nos confirmen, vía-email (sonia.rivera@tourism.pr.gov), una vez completada la transacción.** De tener alguna pregunta adicional, favor de comunicarse con el que suscribe a la extensión 3043.

Atentamente,

**Redacted**

Samuel Sierra Rivera, CPA
Principal Oficial Financiero

c   ingrid.rivera@tourism.pr.gov
    hector.betancourtnieves@bgfpr.com
    miriam.t.pascual@bgfpr.com
    brenda.gonzalez@bgfpr.com
    dafne.santiago@bgfpr.com

/iv

PO Box 9023960, San Juan, P.R. 00902-3960

Tel: 787.721.2400



## Pascual, Miriam (GDB)

| | |
|---|---|
| **From:** | Sonia Rivera Ayala <sonia.rivera@tourism.pr.gov> |
| **Sent:** | Monday, January 12, 2015 2:13 PM |
| **To:** | Maestre Pujals, Arnaldo (GDB) |
| **Cc:** | Ingrid I. Rivera; Betancourt Nieves, Hector (GDB); Pascual, Miriam (GDB); Brenda Ruiz; dafne.santiago@bgfpr.com; Samuel Sierra Rivera; Manuel Barreiro; Ileana Ortiz Reyes; Elizabeth Torres Lopez; Johanna Miranda |
| **Subject:** | FW: Pago bonos Centro Conv. due enero 2015 |
| **Attachments:** | 20150112140309534.pdf |

Buenas Tardes. Se incluye carta autorizando transferencia para cubrir el pago de la deuda de emisión de bonos, de la Autoridad del Distrito del Centro de Convenciones de PR. El pago corresponde al mes de enero de 2015.

Agradeceré, nos envíen confirmación, una vez realizada la misma.

Gracias,

Sonia Ivette Rivera
Ayudante Especial - Finanzas
Co. de Turismo de Puerto Rico
Edif. Ochoa, 3er piso, Viejo San Juan
787-721-2400 ext. 3407
e-mail: sonia.rivera@tourism.pr.gov

-----Original Message-----
From: scanning@tourism.pr.gov [mailto:scanning@tourism.pr.gov]
Sent: Monday, January 12, 2015 3:03 PM
To: Sonia Rivera Ayala
Subject: Pago bonos Centro Conv. due enero 2015

This E-mail was sent from "RNPF225DA" (Aficio MP 5000).

Scan Date: 01.12.2015 14:03:09 (-0500)
Queries to: scanning@tourism.pr.gov

1

# CERTIFIED TRANSLATION

[Logo]
COMMONWEALTH OF PUERTO RICO
DDEC – Puerto Rico Tourism Company

MCCP 4720

February 3, 2015

Jesús M. García, Vice President and Director
Income Obligation Financing Department
Government Development Bank for Puerto Rico
PO Box 42001
San Juan, PR 00940 – 2001

Via Email: jesus.m.garcia@bgfpr.com

**DEBT SERVICE**
**CONVENTION CENTER DISTRICT AUTHORITY**

Dear Mr. Maestre:

We authorize debiting of the "Room Tax – Concentration Surplus" account number ⸂Redacted⸃975 – 8, for
the amount of **$3,033,841.10** for purposes of issuing the **payment for the month of February 2015**. This
is to cover debt service of the bond issuance by the Convention Center District Authority, related to
fiscal year 2014 – 2015.

**Please confirm with us, via email (sonia.rivera@tourism.pr.gov), after the transaction is completed**. If
you have any additional questions, please contact me at extension 3043.

Sincerely,

# Redacted

Samuel Sierra Rivera, CPA
Chief Financial Officer

Cc:      ingrid.rivera@tourism.pr.gov
         arnaldo.maestre@bgfpr.com
         miriam.t.pascual@bgfpr.com
         dafne.santiago@bgfpr.com

PO Box 9023960, San Juan, PR, 00902 – 3960
Tel. 787.721.2400                                    PUERTO RICO TOURISM COMPANY [logo]

CONFIDENTIAL                                         CCDA_STAY0004297

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

Pascual, Miriam (GDB)

| From: | Sonia Rivera Ayala <sonia.rivera@tourism.pr.gov> |
|---|---|
| Sent: | Tuesday, February 03, 2015 12:00 PM |
| To: | Garcia, Jesus (GDB); Maestre Pujals, Arnaldo (GDB); Pascual, Miriam (GDB); dafne.santiago@bg'pr.com |
| Cc: | Ingrid I. Rivera; Samuel Sierra Rivera; Manuel Barreiro; Ileana Ortiz Reyes; Amilcar Torres Delgado; Elizabeth Torres Lopez; Johanna Miranda |
| Subject: | FW: Conv. Center Auth. Bonds Payment due February 2015 |
| Attachments: | 20150203083735139.pdf |

Good morning. Included is a letter authorizing a transfer to cover the payment for the PR Convention Center District Authority's bond issuance debt. The payment is for the month of February 2015.

Please send us confirmation after the same has been completed.

Thank you

Sonia Ivette Rivera
Special Assistant – Finance
Puerto Rico Tourism Company
Ochoa Building, 3rd Floor, Old San Juan
787-721-2400 Ext. 3407
Email: sonia.rivera@tourism.pr.gov

-----Original Message-----
From: scanning@tourism.pr.gov [mailto:scanning@tourism.pr.gov]
Sent: Tuesday, February 03, 2015 9:38 AM
To: Sonia Rivera Ayala
Subject: Conv. Center Auth. Bonds Payment due February 2015

This E-mail was sent from "RNPF225DA" (Aficio MP 5000)

Scan Date: 02.03.2015 08:37:34 (-0500)
Queries to: scanning@tourism.pr.gov

1

CONFIDENTIAL                                              CCDA_STAY0004298

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
CAPITAL MARKETS – INCOME OBLIGATIONS DEPARTMENT

*SENT BY EMAIL*

February 3, 2015

Treasury

**DISBURSEMENT FROM THE CONVENTION CENTER DISTRICT AUTHORITY (ADCC by
its Spanish acronym) – (PR Convention Center Authority $468.8MM Series A (2006) Bonds)**

A payment from **ADCC** for **$3,033,841.10** will be made which will be transferred from IBA Redacted 994–7
for payment of the debt for the ADCC issuance (PR Convention Center Authority $468.8 MM, Series A
(2006) Bonds) to be made on **February 4, 2015**. This payment must be transferred to:

**The Bank of New York Mellon
ABA 021000018
Credit** Redacted **1065
Further credit** Redacted **6334- PR Convention Center
PRCCDA Bond Payment Fund
Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541**

Miriam T. Pascual Escribano

**"Please give us sufficient advance notice of any situation affecting the process of making this
transfer. If we do not receive notification, we will consider the transfer to have been completed as
requested."**

CONFIDENTIAL                                              CCDA_STAY0004299

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.



**BGF**          **FUNDS TRANSFER ORDER**     CONTROL NO.    **T 103389**

| Originated by (Agency Name) | | | | Date |
|---|---|---|---|---|
| Puerto Rico Convention Center District Authority | | | | **03-Feb-15** |

| Transfer to | Accounts to be Debited | Accounts to be Credited | ABA Number | Amount |
|---|---|---|---|---|
| Tourism Company<br>Room Tax-Concetration Surplus | Redacted 9975-8<br>(IBA- Tourism | | | $ 3,033,841.10 |
| PRCCDA Series A<br>Hotel Occupancy Tax<br>Pledge Account | | Redacted 993-7<br>(IBA-ADCC) | | $ 3,033,841.10 |

[vertical stamp text]: BLDG SUB DE TURISMO · PUBLIC HACIENDA · SAN JUAN P R · CITY ESTADOS DE CUENTAS · 15 FEB -3 PM 2:25

Special Instructions

Payment for the month of February 2015 for $3,033,841.10 for debt service of the $468,800,000
bond issuance by the Puerto Rico Convention Center District Authority, Series A.

| Prepared by: **Redacted** | Approved by: **Redacted** |
|---|---|
| Miriam T. Pascual Escribano | Arnaldo Maestre Pujals |

Government Development Bank for Puerto Rico is hereby authorized to make the funds transfer between the above
mentioned accounts. Approved by:

| Authorized Signature | Authorized Signature |
|---|---|

FOR GOVERNMENT DEVELOPMENT BANK USE ONLY

| Order Received by: | Approved by: | Entered To DDA by: |
|---|---|---|
| Date: | Date: | Date: |

NN25-0068-0590                     **GDB COPY**
CONFIDENTIAL                   CCDA_STAY0004300

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

[Logo]
COMMONWEALTH OF PUERTO RICO
DDEC – Puerto Rico Tourism Company

Redacted 3389

February 3, 2015

Jesús M. García, Vice President and Director
Income Obligation Financing Department
Government Development Bank for Puerto Rico
PO Box 42001
San Juan, PR 00940 – 2001

Via Email: jesus.m.garcia@bgfpr.com

DEBT SERVICE
CONVENTION CENTER DISTRICT AUTHORITY

Dear Mr. Maestre:

We authorize debiting of the "Room Tax – Concentration Surplus" account number [Redacted]975 – 8, for the amount of **$3,033,841.10** for purposes of issuing the **payment for the month of February 2015**. This is for purposes of covering the debt service of the bond issuance by the Convention Center District Authority, related to fiscal year 2014 – 2015.

**Please confirm with us, via email (sonia.rivera@tourism.pr.gov), after the transaction is completed**. If you have any additional questions, please contact me at extension 3043.

Sincerely,

# Redacted

Samuel Sierra Rivera, CPA
Chief Financial Officer

Cc:     ingrid.rivera@tourism.pr.gov
        arnaldo.maestre@bgfpr.com
        miriam.t.pascual@bgfpr.com
        dafne.santiago@bgfpr.com

PO Box 9023960, San Juan, PR, 00902 – 3960
Tel. 787.721.2400                                          PUERTO RICO TOURISM COMPANY [logo]

CONFIDENTIAL                                          CCDA_STAY0004301

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Translator note: This page is an exact duplicate of CCDA_STAY0004298.]

CONFIDENTIAL

CCDA_STAY0004302

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.



COMMONWEALTH OF PUERTO RICO
Government Development Bank for Puerto Rico

January 28, 2015

Samuel Sierra, CPA
Finance Director
Tourism Company
Paseo la Princesa 32
San Juan, PR 00902

Dear CPA Sierra:

In accordance with the Government Development Bank for Puerto Rico (GDB) Certificate of May 16, 2013, the amount needed to cover the service of Convention Center Series A bonds for $468.8 million amounts to $30,338,410.95 for fiscal year 2014 – 2015. Of this amount, the payment for the month of February 2015 is $3,033,841.10.

We request that you issue the payment for $3,033,841.10 within the next ten (10) business days so that we can transfer this money to the Trustee under the laws and agreements governing the transaction. This money must be deposited in the account titled "Hotel Occupancy Tax Pledge Amount" which the Bank uses to register the receipt transactions and transfer of said funds.

Please send the payment by check or authorization to debit your account at the GDB, attention: Arnaldo Maestre Pujals (email: arnaldo.maestre@bgfpr.com), Miriam Pascual (email: miriam.t.pascual@bgfpr.com) and Dafne Santiago Vega (email: dafne.santiago@bgfpr.com), floor 2 of the Bank. If you have any questions, you may contact me at telephone 722-2525, extensions 5948, 5961 and 5924, respectively.

Sincerely,

[Signature]
Jesús M. García
Vice President and Director
Income Obligations Financing Department

*Attachments*

[Logo]
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

CONFIDENTIAL                                                                 CCDA_STAY0004303

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Translator note: Pages CCDA_STAY0004303 through CCDA_STAY0004310 are in English in the Original; no translation required.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

## Pascual, Miriam (GDB)

| | |
|---|---|
| **From:** | Pascual, Miriam (GDB) |
| **Sent:** | Thursday, January 29, 2015 3:26 PM |
| **To:** | 'Sonia Rivera Ayala' |
| **Cc:** | Maestre Pujals, Arnaldo (GDB); Garcia, Jesus (GDB); Betancourt Nieves, Hector (GDB); 'Manuel Barreiro'; 'Delilah Diaz'; 'Ingrid I. Rivera'; 'Samuel Sierra Rivera'; Elizabeth Torres Lopez; Johanna Miranda; Santiago, Dafne (GDB); Gonzalez, Brenda (GDB) |
| **Subject:** | Request for payment of ADCC bond service |
| **Attachments:** | DOC012915.pdf |

**Tracking:**

| Recipient | Delivery | Read |
|---|---|---|
| 'Sonia Rivera Ayala' | | |
| Maestre Pujals, Arnaldo (GDB) | Delivered: 1/29/2015 3:26 PM | |
| Garcia, Jesus (GDB) | Delivered: 1/29/2015 3:26 PM | |
| Betancourt Nieves, Hector (GDB) | Delivered: 1/29/2015 3:26 PM | Read: 1/29/2015 3:59 PM |
| 'Manuel Barreiro' | | |
| 'Delilah Diaz' | | |
| 'Ingrid I. Rivera' | | |
| 'Samuel Sierra Rivera' | | |
| Elizabeth Torres Lopez | | |
| Johanna Miranda | | |
| Santiago, Dafne (GDB) | Delivered: 1/29/2015 3:26 PM | Read: 1/29/2015 3:26 PM |
| Gonzalez, Brenda (GDB) | Delivered: 1/29/2015 3:26 PM | |

Good morning:

Included is a letter requesting payment of $3,033,841.10 to cover service of Convention Center District Authority Series A bonds.

Miriam Pascual
Income Obligations Analyst
Public Financing – Income Obligations
Government Development Bank for Puerto Rico
Telephone: 787-722-2525 Extension 15252
Email: Miriam.T.Pascual@bgfpr.com
Web: www.bgfpr.com

[Logo]
COMMONWEALTH OF PUERTO RICO
Government Development Bank for Puerto Rico [Logo]

CONFIDENTIALITY NOTE: This electronic transmission contains information belonging to the Government Development Bank for Puerto Rico. Its subsidiaries and/or affiliates, which is confidential and/or legally privileged. If you are not the intended recipient, pease immediately advise the sender by reply e-mail or telephone that this message has been inadvertently transmitted to you and delete this e-mail from your system. If you have received this transmission in error, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

1

CONFIDENTIAL

CCDA_STAY0004311

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.



**GDB**

GOVERNMENT DEVELOPMENT BANK FOR PUERTO R.....   RECEIVED
SAN JUAN, PUERTO RICO   PRE-INTERVENTION DEPT.
ORDER TO TRANSFER

15 JAN 12 PM 4: 14

Control Number: MCCP #714

| Origination Unit: ☐ Pre-Aud ☒ Financing Area ☐ DDA ☐ Operation ☐ Treasury | | | |
|---|---|---|---|
| ☐ Subsidiaries **Redacted** ☐ Affiliates | | ☒ Other-San Juan | Capital Markets |

| | | Date of Transfer: | Amount: |
|---|---|---|---|
| Verify by: Miriam T. Pagan Carmona /788 **Redacted** Date: 01/12/2015 | | 01/14/2015 | $3,033,841.10 |

Approved by: Arnaldo M. **Redacted**

| Transfer to: **Redacted** | ABA or Chips Number: |
|---|---|
| The Bank of New York Mellon | 021000018 |

| For the Account of: | Account Number: |
|---|---|
| P.R. Convention Center | |
| ( Ref. Diana P Torres 212-815-6059 / Christopher Torres 212-815-6541 ) | Credit Redacted 1063 |
| | Further credit Redacted 6334- PR Convention Center |
| | PRCCDA Bond Payment Fund |

| For Further Credit to: | | Account Number: | |
|---|---|---|---|
| Authorized by: | Drawn: | Authorized by: | Date: |

Message or Special Instructions:
P9 / Convention Center Auditory $463 8MM , Series A (2005) Bonds (Commonwealth Appropriation Bonds), corresponding to fiscal 2014-15

sent ☐

| For Investment Operations Division Purposes Only | | | |
|---|---|---|---|
| Precode | Security ID | Entered by | Approved by |
| | | Date | Date |

| For Accounting Department Clearing Division Purposes Only | |
|---|---|
| ☐ GL / ☒ IBA Account Number to Be Debited | IBA 5984-7 |

CONFIDENTIAL                                                                                    CCDA_STAY0004312

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
CAPITAL MARKETS – INCOME OBLIGATIONS DEPARTMENT

*SENT BY EMAIL*

January 12, 2015

Treasury                                                                                          e

**DISBURSEMENT FROM THE CONVENTION CENTER DISTRICT AUTHORITY (ADCC by
its Spanish acronym) – (PR Convention Center Authority $468.8MM Series A (2006) Bonds)**

A payment from **ADCC** for **$3,033,841.10** will be made which will be transferred from IBA Redacted 994–7
for payment of the debt for the ADCC issuance (PR Convention Center Authority $468.8 MM, Series A
(2006) Bonds) to be made on **January 14, 2015**. This payment must be transferred to:

The Bank of New York Mellon
ABA 021000018
Credit Redacted 1065
Further credit Redacted 6334- PR Convention Center
PRCCDA Bond Payment Fund
Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541

Miriam T. Pascual Escribano

**"Please give us sufficient advance notice of any situation affecting the process of making this
transfer. If we do not receive notification, we will consider the transfer to have been completed as
requested."**

CONFIDENTIAL                                                    CCDA_STAY0004313

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

**Pascual, Miriam (GDB)**

From:      Maestre Pujals, Arnaldo (GDB)
Sent:      Monday, January 12, 2015 2:33 PM
To:      Pascual, Miriam (GDB)
Subject:      FW: PRCCDA debt service

MACOP 4714

**Arnaldo Maestre**

Senior Account Executive
Public Financing – Income Obligations
Government Development Bank for Puerto Rico
Telephone: 787-722-2525 Extension 15252
Email: Arnaldo.Maestre@bgfpr.com
Web: www.bgfpr.com

 

ESTADO LIBRE ASOCIADO DE
PUERTO RICO
Banco Gubernamental de Fomento
para Puerto Rico

BGF

CONFIDENTIALITY NOTE: This electronic transmission contains information belonging to the Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates, which is confidential and/or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail or telephone that this message has been inadvertently transmitted to you and delete the e-mail from your system. If you have received this transmission in error, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

From: Torres, Diana F [mailto:diana.f.torres@bnymellon.com]
Sent: Wednesday, July 02, 2014 4:16 PM
To: Maestre Pujals, Arnaldo (GDB)
Subject: RE: PRCCDA debt service

Hi Arnaldo,

Yes, the wire instructions are correct.

Saludos,
Diana

**Diana F. Torres,** Client Service Manager – BNY Mellon
101 Barclay · 7 West, New York, NY 10286 · Tel 212.815.6955 · Fax 212.815.5595 · diana.f.torres@bnymellon.com

From: Maestre Pujals, Arnaldo (GDB) [mailto:Arnaldo.Maestre@bgfpr.com]
Sent: Wednesday, July 02, 2014 4:09 PM
To: Torres, Diana F
Subject: PRCCDA debt service

Hola Diana:
Please confirm that the wire instructions for the PRCCDA debt service funds are:

CONFIDENTIAL             CCDA_STAY0004314

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

The Bank of New York Mellon
ABA 021000018
Credit [Redacted] 1065
Further credit [Redacted] 6334 - PR Convention Center
PRCCDA Bond Payment Fund
Ref: Diana F Torres 212-815-6955 / Christopher Byrnes 212-815-5541

Thank you.

**Arnaldo Maestre**

Senior Account Executive
Public Financing – Income Obligations
Government Development Bank for Puerto Rico
Telephone: 787-722-2525 Extension 15252
Email: Arnaldo.Maestre@bgfpr.com
Web: www.bgfpr.com

  

CONFIDENTIALITY NOTE: This electronic transmission contains information belonging to the Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates, which is confidential and/or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail or telephone that this message has been inadvertently transmitted to you and delete this e-mail from your system. If you have received this transmission in error, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful.

This email communication and any attachment thereto, contains information that belongs to Government Development Bank for Puerto Rico, its subsidiaries and/or affiliates and which may be confidential, privileged and/or proprietary. It is solely for the use of its intended recipient. Access, retention, dissemination, distribution, copying and/or any other use of this email or any attachments thereto, or any information contained herein, by another person other than its intended recipient, is strictly prohibited. If you are not the intended recipient of this communication please immediately notify the sender of the error and delete it (including all of its attachments) from your computer. Unauthorized interception of this e-mail is a violation of federal criminal law. Although we attempt to sweep all e-mail communications and attachments for viruses, we do not guarantee that either are virus free and disclaim any liability for any damage sustained as a result of viruses.

This is for informational purposes only; from sources the Firm believes reliable; may not be accurate or complete; is subject to change; is not a recommendation or offer to buy/sell a financial instrument or adopt any investment strategy; is not legal, tax, credit or accounting advice. Do not use e-mail to submit any instructions acceptances are at your risk. The Firm or its affiliates lends to, borrows from and provides other products/services to issuers and others, receives compensation therefor, and periodically has a direct or indirect financial interest in the financial instruments/transactions indicated. Additional risks may exist that are not referenced. Past performance is not indicative of future returns. Other than CDs, financial instruments: are not FDIC insured; are not deposits or other obligations of and are not guaranteed by the Firm or any bank or non-bank affiliate; and involve investment risk including possible

CONFIDENTIAL

CCDA_STAY0004315

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

loss of principal. The Firm is a wholly owned, indirect non-bank subsidiary of The Bank of New York Mellon Corporation, and a member of FINRA and SIPC, and is solely responsible for its obligations and commitments.

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Access, copying or re-use of the e-mail or any attachment, or any information contained therein, by any other person is not authorized. If you are not the intended recipient please return the e-mail to the sender and delete it from your computer. Although we attempt to sweep e-mail and attachments for viruses, we do not guarantee that either are virus-free and accept no liability for any damage sustained as a result of viruses.

Please refer to http://disclaimer.bnymellon.com/eu.htm for certain disclosures relating to European legal entities.

3

CONFIDENTIAL

CCDA_STAY0004316

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.



COMMONWEALTH OF PUERTO RICO
Government Development Bank for Puerto Rico

December 30, 2014

Samuel Sierra, CPA
Finance Director
Tourism Company
Paseo la Princesa 32
San Juan, PR 00902

Dear CPA Sierra:

In accordance with the Government Development Bank for Puerto Rico (GDB) Certificate of May 21, 2014, the amount needed to cover the service of Convention Center Series A bonds for $468.8 million amounts to $30,338,410.95 for fiscal year 2014 – 2015. Of this amount, the payment for the month of January 2015 is $3,033,841.10.

We request that you issue the payment for $3,033,841.10 within the next ten (10) business days so that we can transfer this money to the Trustee under the laws and agreements governing the transaction. This money must be deposited in the account titled "Hotel Occupancy Tax Pledge Amount" which the Bank uses to register the receipt transactions and transfer of said funds.

Please send the payment by check or authorization to debit your account at the GDB, to my attention or to the attention of Miriam Pascual (email: miriam.t.pascual@bgfpr.com) and Dafne Santiago Vega (email: dafne.santiago@bgfpr.com). If you have any questions, you may contact us at telephone 787-722-2525, extensions 15253 or 15295, respectively.

Sincerely,
[Signature]
Arnaldo Maestre Pujals
Senior Account Executive
Public Financing – Income Obligations
Government Development Bank for Puerto Rico
Arnaldo.Maestre@bgfpr.com

Cc:    Natalia Guzman
       Jesús M. García
       Brenda González

PO Box 42001
San Juan, PR 00940 - 2001
Telephone:  787-722-2525

[Logo]
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO
CCDA_STAY0004317

CONFIDENTIAL



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Translator note: Pages CCDA_STAY0004318 through CCDA_STAY0004326 are in English in the Original; no translation required.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Logo]
COMMONWEALTH OF PUERTO RICO
DDEC – Puerto Rico Tourism Company

T 103389

January 12, 2015

Jesús M. García, Vice President and Director
Income Obligation Financing Department
Government Development Bank for Puerto Rico
PO Box 42001
San Juan, PR 00940 – 2001

Via Email: arnaldo.maestre@bgfpr.com

**DEBT SERVICE**
**CONVENTION CENTER DISTRICT AUTHORITY**

Dear Mr. Maestre:

We authorize debiting of the "Room Tax – Concentration Surplus" account number Redacted 975 – 8, for
the amount of $3,033,841.10 for purposes of issuing the **payment for the month of January 2015**. This
is for purposes of covering the debt service of the bond issuance by the Convention Center District
Authority, related to fiscal year 2014 – 2015.

**Please confirm with us, via email (sonia.rivera@tourism.pr.gov), after the transaction is completed.** If
you have any additional questions, please contact me at extension 3043.

Sincerely,

[Signature]
Samuel Sierra Rivera, CPA
Chief Financial Officer

Cc:     ingrid.rivera@tourism.pr.gov
        arnaldo.maestre@bgfpr.com
        miriam.t.pascual@bgfpr.com
        dafne.santiago@bgfpr.com

PO Box 9023960, San Juan, PR, 00902 – 3960
Tel. 787.721.2400                                    PUERTO RICO TOURISM COMPANY [logo]

CONFIDENTIAL                                           CCDA_STAY0004327


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

Pascual, Miriam (GDB)

| | |
|---|---|
| From: | Sonia Rivera Ayala <sonia.rivera@tourism.pr.gov> |
| Sent: | Monday, January 12, 2015 2:13 PM |
| To: | Maestre Pujals, Arnaldo (GDB) |
| Cc: | Ingrid I. Rivera; Betancourt Nieves, Hector (GDB); Pascual, Miriam (GDB); Brenda Ruiz; dafne.santiago@bgfpr.com; Samuel Sierra Rivera; Manuel Barreiro; Ileana Ortiz Reyes; Elizabeth Torres Lopez; Johanna Miranda |
| Subject: | FW: Conv. Center Bonds Payment due January 2015 |
| Attachments: | 20150112140309534.pdf |

Good afternoon. Included is a letter authorizing transfer to cover the payment for the PR Convention Center District Authority's bond issuance debt. The payment is for the month of January 2015.

Please send us confirmation after the same has been completed.

Thank you

Sonia Ivette Rivera
Special Assistant – Finance
Puerto Rico Tourism Company
Ochoa Building, 3rd Floor, Old San Juan
787-721-2400, Ext. 3407
Email: sonia.rivera@tourism.pr.gov

——Original Message—
From: scanning@tourism.pr.gov [mailto:scanning@tourism.pr.gov]
Sent: Monday, January 12, 2015 3:03 PM
To: Sonia Rivera Ayala
Subject: Conv. Center Bonds Payment due January 2015

This E-mail was sent from "RNPF225DA" (Aficio MP 5000).

Scan Date: 01.12.2015 14:03:09 (-0500)
Queries to: scanning@tourism.pr.gov

1

CONFIDENTIAL

CCDA_STAY0004328

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.



**BGF**

**FUNDS TRANSFER ORDER**    CONTROL NO    **T 103378**

| Originated by (Agency Name) | | | | Date |
| Puerto Rico Convention Center District Authority | | | | **12-Jan-15** |

| Transfer to: | Accounts to be Debited | Accounts to be Credited | ABA Number | Amount |
|---|---|---|---|---|
| Tourism Company **Room Tax Concetration Surplus** | Redacted 975-8 (IBA-Tourism | | | $ 3,033,841.10 |
| **PRCCDA Series A Hotel Occupancy Tax Pledge Account** | | Redacted 994-7 (IBA-ADCC) | | $ 3,033,841.10 |

2015 JAN 12 PM 4:16
SAN JUAN-PUERTO RICO
OFICINAS DE DEPOSITO

Special Instructions:

Payment for the month of January 2015 for $3,033,841.10 for debt service of the $468,800,000 bond issuance by the Puerto Rico Convention Center District Authority, Series A.

**Redacted**

| Prepared by: **Redacted** | Approved by: **Redacted** |
| Miriam T. Pascual Escribano | Arnaldo Maestre Pujals |

Government Development Bank for Puerto Rico is hereby authorized to make the funds transfer between the above mentioned accounts. Approved by:

| Authorized Signature | Authorized Signature |

FOR GOVERNMENT DEVELOPMENT BANK USE ONLY

| Order Received by: | Approved by: | Entered To DDA by: |
|---|---|---|
| Date: | Date: | Date: |

NN25-0068-0590    GDB COPY

CONFIDENTIAL    CCDA_STAY0004329

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Logo]
COMMONWEALTH OF PUERTO RICO
DDEC – Puerto Rico Tourism Company

Redacted 3376

January 12, 2015

Jesús M. García, Vice President and Director
Income Obligation Financing Department
Government Development Bank for Puerto Rico
PO Box 42001
San Juan, PR 00940 – 2001

Via Email: arnaldo.maestre@bgfpr.com

**DEBT SERVICE
CONVENTION CENTER DISTRICT AUTHORITY**

Dear Mr. Maestre:

We authorize debiting of the "Room Tax – Concentration Surplus" account number Redacted 975 – 8, for the amount of **$3,033,841.10** for purposes of issuing the **payment for the month of January 2015**. This is for purposes of covering the debt service of the bond issuance by the Convention Center District Authority, related to fiscal year 2014 – 2015.

**Please confirm with us, via email (sonia.rivera@tourism.pr.gov), after the transaction is completed.** If you have any additional questions, please contact me at extension 3043.

Sincerely,

[Signature]
Samuel Sierra Rivera, CPA
Chief Financial Officer

Cc:     ingrid.rivera@tourism.pr.gov
        arnaldo.maestre@bgfpr.com
        miriam.t.pascual@bgfpr.com
        dafne.santiago@bgfpr.com

PO Box 9023960, San Juan, PR, 00902 – 3960
Tel. 787.721.2400                                    PUERTO RICO TOURISM COMPANY [logo]

CONFIDENTIAL                                                    CCDA_STAY0004327

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator note: This page is an exact duplicate of CCDA_STAY0004328.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# 11. Scotiabank -5142 January 2015 Statement, ECF No. 13315-28



## Your PUBLIC FUNDS ACCOUNT Account Summary

**PINERO-HATO REY BRANCH**
290 AVE. JESUS T. PINERO
SAN JUAN

TeleScotia(787) 766-4999
1 (877) 766-4999
www.scotiabankpr.com

### PUERTO RICO TOURISM COMPANY
OCHOA BUILDING
SAN JUAN PR 00936-

| | |
|---|---|
| **Account Number:** | Redacted 5142 |
| **Transit Number:** | 60715 |
| **Statement Period:** | 31DEC14 to 31JAN15 |

On March 1st Draco Rosa will be participating with us in the

World's Best 10k Scotiabank. For each person who signs up,

changes their name, and run for other, Scotiabank will donate

$2 for the fight against children's cancer.

Step by step races are won and this one, we will win together

See you at the race!

### Redacted 5142 - PUBLIC FUNDS ACCOUNT - USD

#### Account Summary

| | | | |
|---|---|---|---|
| **No. of Deposits** | 72 | **Service Charges** | $ 959.36 |
| **Deposits** | $ 7,639,971.57 | **Record Keeping Fees** | $ 0.00 |
| **No. of Withdrawals** | 29 | **Interest Paid** | $ 50.17 |
| **Withdrawals** | $ 7,635,329.04 | **Interest Rate** | 0.20% |
| **Enclosures** | 0 | **Annual Percentage Yield Earned (APY)** | 0.22% |
| **IVU TAX** | $ 0.00 | | |

*The interest earned and annual percentage yield earned are based on your average daily balance for the period 01JAN15 through 31JAN15.*

*Trademark of The Bank of Nova Scotia, used under license. Member FDIC. OCIF License 22.

Scotiabank

CONFIDENTIAL



## Your **PUBLIC FUNDS ACCOUNT Account Summary**

**PUERTO RICO TOURISM COMPANY**
Redacted 5142

TeleScotia(787) 766-4999
1 (877) 766-4999
www.scotiabankpr.com

### Transactions ( Withdrawals & Deposits ) - Redacted 5142

| Transaction Date | Description | Amount | Balance |
|---|---|---|---|
| | **OPENING BALANCE** | | **$ 198,226.64** |
| 02JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 15,987.64 - | |
| 02JAN | **ACH CREDIT** Redacted 9175, PR TOURISM TELECHECK | $ 2,114.00 + | |
| 02JAN | **ACH CREDIT** Redacted 7584, PR TOURISM TELECHECK | $ 15,647.00 + | |
| 02JAN | **DEPOSIT -** 5932 | $ 2,180.00 + | |
| 02JAN | **DEPOSIT -** 5934 | $ 782.00 + | $ 202,962.00 |
| 05JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 17,171.00 - | |
| 05JAN | **ACH CREDIT** Redacted 7736, PR TOURISM TELECHECK | $ 14,209.00 + | |
| 05JAN | **BILL PAYMENT CREDIT** | $ 211.92 + | |
| 05JAN | **DEPOSIT -** 5936 | $ 700.30 + | $ 200,912.22 |
| 06JAN | **ACH CREDIT** Redacted B006, PR TOURISM TELECHECK | $ 10,317.00 + | |
| 06JAN | **ACH CREDIT** Redacted 6722, PR TOURISM TELECHECK | $ 13,122.00 + | |
| 06JAN | **ACH CREDIT** Redacted 6398, PR TOURISM TELECHECK | $ 1,202,620.00 + | $ 1,426,971.22 |
| 07JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 1,327,149.22 - | |
| 07JAN | **ACH CREDIT** Redacted 8550, PR TOURISM TELECHECK | $ 100,178.00 + | |
| 07JAN | **BILL PAYMENT CREDIT** | $ 700.02 + | |
| 07JAN | **DEPOSIT -** 5958 | $ 1,530.25 + | |
| 07JAN | **DEPOSIT -** 6991 SBPR NORTE SHOPPING BRANCH | $ 2,875.49 + | $ 205,105.76 |
| 08JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 624,065.76 - | |
| 08JAN | **ACH CREDIT** Redacted 5694, PR TOURISM TELECHECK | $ 619,567.00 + | |
| 08JAN | **BILL PAYMENT CREDIT** | $ 1,063.51 + | |
| 08JAN | **DEPOSIT -** 1246 SBPR SAN PATRICIO BRANCH | $ 13,911.00 + | |
| 08JAN | **DEPOSIT -** 5965 | $ 1,512.20 + | $ 217,093.71 |
| 09JAN | **ACH DEBIT** Redacted 6436, PR TOURISM TELECHECK | $ 639.00 - | |
| 09JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 373,870.71 - | |
| 09JAN | **ACH CREDIT** Redacted 6434, PR TOURISM TELECHECK | $ 367,977.00 + | |
| 09JAN | **BILL PAYMENT CREDIT** | $ 4,251.00 + | |
| 09JAN | **CREDIT MEMO - 50699** CK PROC D/F 12/31/2014 | $ 907.32 + | |
| 09JAN | **DEPOSIT -** 5000 | $ 5,206.49 + | |
| 09JAN | **DEPOSIT -** 7193 SBPR NORTE SHOPPING BRANCH | $ 10,110.37 + | $ 231,036.18 |

*Trademark of The Bank of Nova Scotia, used under license. Member FDIC. OCIF License 22.

Scotiabank



**Page 3 of 6**

## Your **PUBLIC FUNDS ACCOUNT Account Summary**

**PUERTO RICO TOURISM COMPANY**
Redacted 5142

TeleScotia(787) 766-4999
1 (877) 766-4999
www.scotiabankpr.com

| Transaction Date | Description | Amount | Balance |
|---|---|---|---|
| 12JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 2,519,947.18 - | |
| 12JAN | **ACH CREDIT** Redacted D471, PR TOURISM TELECHECK | $ 2,498,821.00 + | |
| 12JAN | **BILL PAYMENT CREDIT** | $ 91,947.50 + | |
| 12JAN | **DEPOSIT -** 6037 | $ 13,857.70 + | $ 315,715.20 |
| 13JAN | **ACH DEBIT** Redacted 0827, PR TOURISM TELECHECK | $ 21.00 - | |
| 13JAN | **ACH DEBIT** Redacted 3097, PR TOURISM TELECHECK | $ 179.00 - | |
| 13JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 2,322,007.20 - | |
| 13JAN | **ACH CREDIT** Redacted D828, PR TOURISM TELECHECK | $ 333,946.00 + | |
| 13JAN | **ACH CREDIT** Redacted 3095, PR TOURISM TELECHECK | $ 1,854,575.00 + | |
| 13JAN | **ACH CREDIT** Redacted 1439, PR TOURISM TELECHECK | $ 17,971.00 + | |
| 13JAN | **BILL PAYMENT CREDIT** | $ 9,049.00 + | |
| 13JAN | **DEPOSIT -** 5039 | $ 9,842.20 + | |
| 13JAN | **DEPOSIT -** 7364 SBPR NORTE SHOPPING BRANCH | $ 48,929.75 + | |
| 13JAN | **DEPOSIT -** 7395 SBPR NORTE SHOPPING BRANCH | $ 22,850.00 + | |
| 13JAN | **DEPOSIT -** 7396 SBPR NORTE SHOPPING BRANCH | $ 2,746.00 + | $ 293,416.95 |
| 14JAN | **ACH DEBIT** Redacted 6346, PR TOURISM TELECHECK | $ 240.00 - | |
| 14JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 83,300.95 - | |
| 14JAN | **ACH CREDIT** Redacted 5723, PR TOURISM TELECHECK | $ 63,374.00 + | |
| 14JAN | **BILL PAYMENT CREDIT** | $ 145.00 + | |
| 14JAN | **DEPOSIT -** 6063 | $ 4,280.00 + | $ 277,675.00 |
| 15JAN | **ACH DEBIT** Redacted 7959, PR TOURISM TELECHECK | $ 120.00 - | |
| 15JAN | **WIRE TRANSFER** COMPANIA DE TURISMO DE PUERTO | $ 59,917.00 - | |
| 15JAN | **ACH CREDIT** Redacted 1342, PR TOURISM TELECHECK | $ 13,851.00 + | |
| 15JAN | **BILL PAYMENT CREDIT** | $ 596.00 + | |
| 15JAN | **DEPOSIT -** 1855 SBPR SAN PATRICIO BRANCH | $ 16,125.00 + | |
| 15JAN | **DEPOSIT -** 1856 SBPR SAN PATRICIO BRANCH | $ 7,263.00 + | |
| 15JAN | **DEPOSIT -** 1857 SBPR SAN PATRICIO BRANCH | $ 121.00 + | |
| 15JAN | **DEPOSIT -** 6109 | $ 18,304.80 + | $ 273,898.80 |

*Trademark of The Bank of Nova Scotia, used under license. Member FDIC. OCIF License 22.





## Your PUBLIC FUNDS ACCOUNT Account Summary

**PUERTO RICO TOURISM COMPANY**
Redacted 5142

TeleScotia(787) 766-4999
1 (877) 766-4999
www.scotiabankpr.com

### Transactions ( Withdrawals & Deposits ) - Redacted 5142

| Transaction Date | Description | Amount | Balance |
|---|---|---|---|
| 16JAN | **ACH DEBIT** <br> Redacted 1520, PR TOURISM TELECHECK | $ 7,255.00 - | |
| 16JAN | **WIRE TRANSFER** <br> COMPANIA DE TURISMO DE PUERTO | $ 86,282.80 - | |
| 16JAN | **ACH CREDIT** <br> Redacted 6603, PR TOURISM TELECHECK | $ 42,586.00 + | |
| 16JAN | **BILL PAYMENT CREDIT** | $ 2,975.00 + | |
| 16JAN | **DEPOSIT -** 6118 | $ 195.69 + | |
| 16JAN | **DEPOSIT -** 7613 <br> SBPR NORTE SHOPPING BRANCH | $ 12,354.89 + | $ 238,472.58 |
| 20JAN | **ACH DEBIT** <br> Redacted 1413, PR TOURISM TELECHECK | $ 123.00 - | |
| 20JAN | **WIRE TRANSFER** <br> COMPANIA DE TURISMO DE PUERTO | $ 31,574.58 - | |
| 20JAN | **RETURNED DEPOSITED CHECK** | $ 4,237.00 - | |
| 20JAN | **ACH CREDIT** <br> Redacted 5208, PR TOURISM TELECHECK | $ 1,213.00 + | |
| 20JAN | **ACH CREDIT** <br> Redacted 2316, PR TOURISM TELECHECK | $ 1,349.00 + | |
| 20JAN | **ACH CREDIT** <br> Redacted 0707, PR TOURISM TELECHECK | $ 3,914.00 + | |
| 20JAN | **DEPOSIT -** 6156 | $ 706.25 + | |
| 20JAN | **DEPOSIT -** 7791 <br> SBPR NORTE SHOPPING BRANCH | $ 131.00 + | $ 209,851.25 |
| 21JAN | **WIRE TRANSFER** <br> COMPANIA DE TURISMO DE PUERTO | $ 14,381.25 - | |
| 21JAN | **ACH CREDIT** <br> Redacted 8050, PR TOURISM TELECHECK | $ 4,530.00 + | |
| 21JAN | **DEPOSIT -** 6197 | $ 19,903.83 + | |
| 21JAN | **DEPOSIT -** 7844 <br> SBPR NORTE SHOPPING BRANCH | $ 16,870.00 + | $ 236,773.83 |
| 22JAN | **ACH DEBIT** <br> Redacted 3682, PR TOURISM TELECHECK | $ 1,504.00 - | |
| 22JAN | **WIRE TRANSFER** <br> COMPANIA DE TURISMO DE PUERTO | $ 53,835.83 - | |
| 22JAN | **SPECIAL SERVICE CHARGE** | $ 959.36 - | |
| 22JAN | **ACH CREDIT** <br> Redacted 3683, PR TOURISM TELECHECK | $ 35,236.00 + | $ 215,710.64 |
| 23JAN | **WIRE TRANSFER** <br> COMPANIA DE TURISMO DE PUERTO | $ 16,100.64 - | |
| 23JAN | **ACH CREDIT** <br> Redacted 1948, PR TOURISM TELECHECK | $ 413.00 + | |
| 23JAN | **DEPOSIT -** 6242 | $ 956.00 + | |
| 23JAN | **DEPOSIT -** 8008 <br> SBPR NORTE SHOPPING BRANCH | $ 7,439.00 + | $ 208,418.00 |
| 26JAN | **WIRE TRANSFER** <br> COMPANIA DE TURISMO DE PUERTO | $ 1,840.00 - | |
| 26JAN | **ACH CREDIT** <br> Redacted 4902, PR TOURISM TELECHECK | $ 577.00 + | |

*Trademark of The Bank of Nova Scotia, used under license. Member FDIC. OCIF License 22.





**Page 5 of 6**

## Your PUBLIC FUNDS ACCOUNT Account Summary

**PUERTO RICO TOURISM COMPANY**
Redacted 5142

TeleScotia(787) 766-4999
1 (877) 766-4999
www.scotiabankpr.com

### Transactions ( Withdrawals & Deposits ) - Redacted 5142

| Transaction Date | Description | Amount | Balance |
|---|---|---|---|
| 26JAN | **DEPOSIT - 8166**<br>SBPR NORTE SHOPPING BRANCH | $ 27,058.63 + | $ 234,213.63 |
| 27JAN | **WIRE TRANSFER**<br>COMPANIA DE TURISMO DE PUERTO | $ 7,890.63 - | |
| 27JAN | **ACH CREDIT**<br>Redacted 0578, PR TOURISM TELECHECK | $ 14.00 + | |
| 27JAN | **ACH CREDIT**<br>Redacted 3385, PR TOURISM TELECHECK | $ 521.00 + | |
| 27JAN | **DEPOSIT - 2783**<br>SBPR SAN PATRICIO BRANCH | $ 77.00 + | |
| 27JAN | **DEPOSIT - 5297** | $ 422.81 + | $ 227,357.81 |
| 28JAN | **WIRE TRANSFER**<br>COMPANIA DE TURISMO DE PUERTO | $ 33,507.81 - | |
| 28JAN | **ACH CREDIT**<br>Redacted 1573, PR TOURISM TELECHECK | $ 6,209.00 + | $ 200,059.00 |
| 29JAN | **WIRE TRANSFER**<br>COMPANIA DE TURISMO DE PUERTO | $ 344.00 - | |
| 29JAN | **ACH CREDIT**<br>Redacted 4374, PR TOURISM TELECHECK | $ 285.00 + | |
| 29JAN | **DEPOSIT - 3022**<br>SBPR SAN PATRICIO BRANCH | $ 5,435.68 + | |
| 29JAN | **DEPOSIT - 6366** | $ 24,313.80 + | $ 229,749.48 |
| 30JAN | **WIRE TRANSFER**<br>COMPANIA DE TURISMO DE PUERTO | $ 30,877.48 - | |
| 30JAN | **ACH CREDIT**<br>Redacted 0573, PR TOURISM TELECHECK | $ 3,504.00 + | |
| 30JAN | **CREDIT INTEREST** | $ 50.17 + | |
| 30JAN | **DEPOSIT - 5104**<br>SBPR SANTURCE BRANCH | $ 443.00 + | $ 202,869.17 |
| | **CLOSING BALANCE** | | **$ 202,869.17** |

| **Total Returned Item Fees This Period** | $ 0.00 | **Total Overdraft Fees This Period** | $ 0.00 |
|---|---|---|---|
| **Total Returned Item Fees Year to Date** | $ 0.00 | **Total Overdraft Fees Year to Date** | $ 0.00 |

*Trademark of The Bank of Nova Scotia, used under license. Member FDIC. OCIF License 22.



# Scotiabank

## Your PUBLIC FUNDS ACCOUNT Account Summary

**PUERTO RICO TOURISM COMPANY**
Redacted 5142



TeleScotia(787) 766-4999
1 (877) 766-4999

www.scotiabankpr.com

### RECONCILIACIÓN DEL ESTADO DE CUENTA
### RECONCILIATION STATEMENT

Para reconciliar este estado con sus registros :
To reconcile this statement with your records :

1 Marque en su registro las transacciones reflejadas en el estado de cuenta.
Check off all items in your checkbook register which are shown on this statement.

2. Detalle los cheques pendientes de pago
List outstanding checks.

EN CASO DE ERRORES O PREGUNTAS SOBRE ESTE ESTADO DE CUENTA RELACIONADOS A TRANSFERENCIAS ELECTRÓNICAS DE FONDOS Y/O TRANSACCIONES CON SU SCOTIACARD :

Debemos recibir su reclamación escrita dentro de un período de 60 días siguientes a la fecha del estado donde aparece el alegado error por primera vez.

Envíe su reclamación a .

Scotiabank de Puerto Rico
TeleScotia
PO Box 362230
San Juan, PR 00936-2230

En su carta, incluya la siguiente información :
1. Su nombre y número de cuenta
2. El detalle de la transacción, incluyendo la cantidad en dólares, la fecha y número de serie
3. La descripción del error o pregunta sobre la transacción en cuestión.

También nos puede llamar a TeleScotia al 787-766-4999 ó 1-877-766-7989, las 24 horas, 7 días a la semana, para preguntas sobre el estado y/o someter su reclamación.

Investigaremos su reclamación y corregiremos cualquier error rápidamente. Si tomamos más de 10 días laborables, acreditaremos su cuenta por la cantidad reclamada para que tenga disponible el dinero durante el tiempo que nos tome completar la investigación. Si determinamos que no se incurrió en el error, le enviaremos una explicación por escrito dentro de tres días laborables de haber concluido la investigación.

| CHEQUES PENDIENTES DE PAGO CHECKS OUTSTANDING | |
|---|---|
| NUMERO O BENEFICIARIO NUMBER OR PAYEE | CANTIDAD AMOUNT |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| Total | |

3. Añada en su registro cualquier cargo por servicio y/o algún otro cargo que aparezca en el estado de cuenta pero no en su registro.
Record in your register any service charge and/or other charges that appear on your statement but not in your records.

4. Añada el balance actual de su chequera.
Record checkbook balance.

5. Complete la reconciliación abajo.
Complete the reconciliation below.

| | | |
|---|---|---|
| BALANCE EN ESTE ESTADO DE CUENTA CLOSING BALANCE OF THIS STATEMENT | | |
| SUME DEPÓSITOS HECHOS DESPUÉS DE LA FECHA DE CIERRE DE ESTE ESTADO ADD DEPOSITS MADE AFTER STATEMENT CLOSING DATE | | |
| SUB TOTAL | | |
| DESCUENTE CHEQUES PENDIENTES DE PAGO LESS OUTSTANDING CHECKS | | |
| TOTAL | | |
| BALANCE CHEQUERA CHECKBOOK BALANCE | | |
| DIFERENCIA (SI ALGUNA) DIFFERENCE (IF ANY) | | |

SI EXISTE ALGUNA DIFERENCIA QUE NO PUEDA IDENTIFICAR, FAVOR DE COMUNICARSE CON TELESCOTIA AL 787-766-4999 Ó 1-877-766-4999

IF THERE IS A DIFFERENCE THAT YOU CANNOT IDENTIFY, PLEASE CALL TELESCOTIA AT 787-766-4999 OR 1-877-766-4999

IN CASE OF ERRORS OR QUESTIONS REGARDING ELECTRONIC FUNDS TRANSFERS AND/OR TRANSACTIONS WITH YOUR SCOTIACARD ON YOUR ACCOUNT STATEMENT:

We must receive your claim in writing, no later than 60 days after the statement date in which the transaction is reflected for the first time.

You may send your claim to:

Scotiabank de Puerto Rico
TeleScotia
P.O. Box 362230

San Juan PR 00936-2230

Please include the following information:
1. Your name and account number
2. The details of the transaction, including the dollar amount, date and serial number
3. A description of the error, or question regarding the transaction

You can also call us at TeleScotia at 787-766-4999 or 1-877-766-4999, 24 hours, 7 days a week, for questions about your statement and/or to submit your claim.

We will investigate your claim and correct any error promptly. If our investigation takes more than 10 business days to complete, we will credit your account for the amount claimed so you may have the funds available during the period of time it takes to complete our investigation. If after our investigation it is determined that no error has occurred, we will send you the results of our investigation in writing, within the following three business days.

*Trademark of The Bank of Nova Scotia, used under license. Member FDIC. OCIF License 22.



# 12. Excel file, titled "Bank Account Information,"
# ECF No. 13227-1



# Bank Account Information Request

| Agency # | Agency | Account Number | Banking institution / Bank name | Legal ownership | Type of account | Status |
|---|---|---|---|---|---|---|
| Insert agency number | Insert agency name | Insert account number | Insert Bank Name | Insert Employer Identification Number of the Entity who has legal ownership of the account | What type of account is this?<br>• Depository<br>• Checking<br>• Investment account<br><br>• Restricted v. Unrestricted? | 2. Is the account **open** or closed (Y/N)?<br><br>*If closed, request point of contact to provide bank verification.<br><br>3. If open, is the account **active** (Y/N)?<br><br>*If inactive, can the account be closed and if so request a timeline for closure from the point of contact. |
| 180 | Tourism Company | Redacted 6545 | Banco Popular de Puerto Rico | Redacted 8328 | Depository - Unrestricted | Open and Inactive - planning to close |
| 180 | Tourism Company | Redacted 5142 | Scotiabank | Redacted 8328 | Depository - Unrestricted | Open and Active |
| 180 | Tourism Company | Redacted 9039 | First Bank | Redacted 761 | Depository - Unrestricted | Open and Inactive - identified for future use. |

Recon Tax Accounts

| Agency # | Agency | Account Number | Banking institution / Bank name | Legal ownership | Type of account | Status |
|---|---|---|---|---|---|---|
| 180 | Tourism Company | [Redacted]3961 | First Bank | [Redacted]1761 | Depository - Restricted | Open and Active |
| 180 | Tourism Company | [Redacted]2306 | Banco Popular de Puerto Rico | [Redacted]5328 | Depository - Unrestricted | Open and Active |
| 180 | Tourism Company | Redacted 5138 | Scotiabank | TAX ID Not Matched Per Account Number to OCIF Report | Checking - Unrestricted | Open and Active |
| 180 | Tourism Company | [Redacted]975-8 | GDB | | | |

Room Tax Accounts

| Related services | Positive Pay | *If account is Zero Balance Account (ZBA) what account is it sweep to or from | Business purpose | Authorized Signatories? | Business contact | Secondary contact (Backup contact) |
|---|---|---|---|---|---|---|
| 3. What services are being provided through this account?<br>• ZBA<br>• Positive pay<br>• Lockbox<br>• Sweep<br>• ACH<br><br>4.Which of these services are crucial to the operations of the agencies? | 5. Is this a disbursement account (Y/N).<br><br>6. If yes, is Positive Pay (service that matches the account number, check number and dollar amount of each check presented for payment against a list of checks previously authorized and issued) being implemented? | 7. If account is set up as ZBA, what account are funds being pooled into?<br><br>If account is set up as ZBA, what account (account #, name of the Bank) are funds being pooled into?<br>8. Are there any other sweeps that happen with this account?<br><br>If there are sweeps, what account are these sweeps being channeled into? | Include brief description of the account: What is the source of funds (Hacienda, deposits, federal funds, etc), what are the funds are used for (operational expenses, payroll, program expenses reimbursement, etc), are the funds disbursed on a reimbursement or advance basis?<br><br>Purpose of Account? | 10. Who are the authorized signers on the account?<br>• Name<br>• Position<br>• Phone Number<br>• Email Address | 11. Who is the primary business contact?<br>• Name<br>• Position<br>• Phone Number<br>• Email Address | 12. Who is the secondary business contact?<br>• Name<br>• Position<br>• Phone Number<br>• Email Address |
| None - Inactive | No | No | Used to be used to deposit Debt Service Payments which were being held at the PRTC account Redacted 5142. This money was transferred to another financial institution which provided better interest. | Gustavo González Serrano - CFO: gustavo.gonzalez@tourism.pr.gov; (787)721-2400, Ext. 3043<br>Carla Campos - Executive Director<br>Carmen Fernandez - Chief Legal Counsel (Interim) | Carmen Lopez - BPPR: carmen.lopez@popular.com; (787)765-9800, Ext. 506717 | |
| No special services | No - Other Controls are implemented with similar purpose | Deposited Into the Sweep Account in Scotiabank Redacted 5144) | Pass through - Room Tax Deposits. Account identified for closure after FirstBank transfer. | Gustavo González Serrano - CFO: gustavo.gonzalez@tourism.pr.gov; (787)721-2400, Ext. 3043<br>Carla Campos - Executive Director<br>Carmen Fernandez - Chief Legal Counsel (Interim) | Evanthea Georas - Scotiabank: evanthea.georas@scotiabank.com; (787)766-7905 | |
| No special services | No - Other Controls are implemented with similar purpose | No | Room Tax Deposits | Gustavo González Serrano - CFO: gustavo.gonzalez@tourism.pr.gov; (787)721-2400, Ext. 3043<br>Carla Campos - Executive Director<br>Carmen Fernandez - Chief Legal Counsel (Interim) | Gustavo L. Calderón - First Bank: gustavo.calderon@firstbankpr.com | |

Case:17-03283-LTS   Doc#:13338-1   Filed:06/02/20   Entered:06/02/20 14:20:16   Desc:
Exhibit A - Demonstrative and Key Exhibits   Page 283 of 287

Room Tax Accounts

| Related services | Positive Pay | *If account is Zero Balance Account (ZBA) what account is it sweep to or from | Business purpose | Authorized Signatories? | Business contact | Secondary contact (Back-up contact) |
|---|---|---|---|---|---|---|
| No special services | No - Other Controls are implemented with similar purpose | No | This account is used to deposit the Debt Service payments for the Convention Center District Authority Debt payments. This was previously transferred to BGF for bondholder payments but it is now being deposited in this reserve account. | Gustavo González Serrano - CFO: gustavo.gonzalez@tourism.pr.gov; (787)721-2400, Ext. 3043 Carla Campos - Executive Director Carmen Fernandez - Chief Legal Counsel (Interim) | Gustavo L. Calderón - First Bank: gustavo.calderon@firstbankpr.com | |
| Savings | No - Other Controls are implemented with similar purpose | No | Savings Account for excess cash. Due to a Scotiabank deposit amount restriction, any excess over $25M was not secured by the entity, and therefore must be transferred from the bank.  For that reason, room tax collections were transferred from Scotiabank account [Redacted] 5142 to this account, including debt service amounts. From this account, transfers were made on monthly basis to  the FirstBank debt service reserve account [Redacted] 3961. | Gustavo González Serrano - CFO: gustavo.gonzalez@tourism.pr.gov; (787)721-2400, Ext. 3043 Carla Campos - Executive Director Carmen Fernandez - Chief Legal Counsel (Interim) | Carmen Lopez – BPPR: carmen.lopez@popular.com; (787)765-9800, Ext. 506717 | |
| ZBA | No - Other Controls are implemented with similar purpose | Sweep - Scotiabank Account [Redacted] 5144 | Pass through - Supplier Payments. Account identified for closure after FirstBank transfer. Previously used to pay room tax debt service amounts to Hacienda (Nov-15 - Apr-16). | Gustavo González Serrano - CFO: gustavo.gonzalez@tourism.pr.gov; (787)721-2400, Ext. 3043 Carla Campos - Executive Director Carmen Fernandez - Chief Legal Counsel (Interim) | Evanthea Georas - Scotiabank: evanthea.georas@scotiabank.com; (787)766-7905 | |
| | | | Utilized prior to November 2015 to deposit debt service/bondholder payments. | | | |

Case:17-03283-LTS   Doc#:13338-1   Filed:06/02/20   Entered:06/02/20 14:20:16   Desc:
Exhibit A - Demonstrative and Key Exhibits   Page 284 of 287

Room Tax Accounts

| Activity Type | Funds Type | What IT system are the transactions recorded in? | Separate Account Required? | Fund Flows | Is this an OPE/SDO Account? | *If account is for OPE/SDO what type of payment is made that can not be paid by PRIFAS or primary system2 | Last bank reconciliation date |
|---|---|---|---|---|---|---|---|
| 13. What is the primary business purpose of this account? What activities /transactions are being performed through this account?<br><br>14. What type of transactions flow through this account?<br>• Supplier Payment<br>• Payroll<br>• Expense Reimbursement<br>• Investment<br>• Interest Payments | 15. What fund is this account part of?<br>• State Fund<br>• General Fund<br>• Enterprise Fund<br>• Special Revenue Fund<br>• Federal Fund<br>• Agency Fund | 16. What IT system are the transactions being recorded in? (PRIFAS, PRTAS)<br>• PRIFAS<br>• PRTAS<br><br>17. Does the person managing the account have access to PRIFAS?<br><br>If not, does anyone in the agency have access to PRIFAS? | 18. Are separate accounts required? If so why?<br>• Grant<br>• Law<br>• Federal Agreement<br><br>If a separate account is not required, could the the transactions flow through another existing account? | 20. What are the fund flows across for this account?<br>• Inflows<br>• Outflows | 21. Is this an OPE/SDO Account? (Yes/No) | 22. If account is for OPE/SDO what type of payment is made that cannot be paid by PRIFAS or primary system? | 23. What is the date of the last bank reconciliation? |
| Reserve account to hold Debt Service payments. Not used for this purpose anymore. | Special Revenue Fund | Oracle Financial | Yes | Both | | | 12.31.19 |
| Collect Room Tax Deposits | Special Revenue Fund | Oracle Financial | LAW | Inflows | | | 12.31.19 |
| This account was set up in First Bank to replace the Scotiabank Room Tax account # Redacted 35142 for the same purpose. | Special Revenue Fund | Oracle Financial | Law | Inflows | | | 12.31.19 |

Room Tax Accounts

| Activity Type | Funds Type | What IT system are the transactions recorded in? | Separate Account Required? | Fund Flows | Is this an OPE/SDO Account? | *If account is for OPE/SDO what type of payment is made that can not be paid by PRIFAS or primary system? | Last bank reconciliation date |
|---|---|---|---|---|---|---|---|
| This account is used to deposit the debt service payments for the Convention Center District Authority Debt payments. This was previously transferred to BGF for bondholder payments but it is now being deposited in this reserve account. | Special Revenue Fund | Oracle Financial | LAW | Outflows | | | 12.31.19 |
| Savings account for excess cash | Enterprise Fund and Special Revenue Fund | Oracle Financial | No | Inflows | | | 12.31.19 |
| Supplier Payments and Expense Reimbursements | Enterprise Fund and Special Revenue Fund | Oracle Financial | No | Outflows | | | 12.31.19 |
| | | | | | | | |

| June 30, 2019<br>Balance |
|---|
| |
| - |
| 13,944,055 |
| - |

| June 30, 2019 Balance |
| --- |
| 72,973,659 |
| 24,392,186 |
| - |
| 6,224,493 |