# EXHIBIT A

PRIFA Lift Stay Hearing Exhibit List

# 1.  PRIFA Slide Deck

June 4, 2020

# Preliminary Hearing
# PRIFA Lift Stay Motion

# The Trust Agreement Grants the Trustee a Lien on "Pledged Revenues," which Includes Moneys in the Infrastructure Fund.

- Pledge:

> agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it

(Mot. Ex. 2, ECF 10602-2, Trust Agreement at 9.)

- Defined Terms:

> "Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

> "Special Tax Revenues" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

> "Offshore Excise Taxes" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

(Mot. Ex. 2, ECF 10602-2, Trust Agreement § 101.)

Milbank

2

## The Sinking Fund is a Trustee Account.

SECTION 401.        Sinking Fund and Accounts.  A special fund is hereby created and designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (herein sometimes called the "Sinking Fund") to be held by the Trustee. There are hereby created three separate accounts in the Sinking Fund designated "Bond Service Account", "Redemption Account" and "Reserve Account". Subject to the terms and conditions set forth in this Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund. As promptly as practicable upon the receipt of Special Tax Revenues or

(Mot. Ex. 2, ECF 10602-2, Trust Agreement § 401.)

Milbank

3

# The Oversight Board Contends the Lien Extends Only to Moneys Deposited in the Sinking Fund.

(emphasis added).  Pledged Revenues are defined as "…moneys that *have been deposited to the credit of the Sinking Fund*." Trust Agreement § 101 (emphasis added).

(Opposition, ECF 10611, ¶ 88.)

97.    The Trust Agreement is clear.  Yet Movants maintain that their security interest reaches beyond the Sinking Fund through self-serving definitional games that infect their entire brief.  They define "Pledged Rum Taxes" to encompass monies in the PRIFA Infrastructure Fund. M.Br. at 2, 9.  But it is the Trust Agreement's definition of "Pledged Revenues" – "moneys that have been deposited to the credit of the Sinking Fund" – and not Movants' convenient definition – that controls.  Trust Agreement § 101.  Even if the Trust Agreement could be interpreted as Movants desire, it cannot expand PRIFA's property rights under the Enabling Act, which only provides PRIFA a property interest in Rum Tax Remittances actually appropriated and deposited in the PRIFA Infrastructure Fund.

(Opposition, ECF 10611, ¶ 97.)

Milbank

4

Portions of the Bond Resolution Are Inconsistent with the Oversight Board's
Definition of "Pledged Revenues."

limitations and restrictions therein set forth. The Agreement also provides for the creation of a
special fund designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue
Bonds Sinking Fund" and for the deposit to the credit of said special fund of a sufficient amount
of the Pledged Revenues (as defined in the Agreement) to pay the principal of and interest on all
bonds issued under the Agreement as the same become due and payable and to provide a reserve

(Mot. Ex. 2, ECF 10602-2, Trust Agreement at 5-6 (Form of Bond).)

Milbank

5

# The Official Statement.

The Series 2005 Bonds, together with any outstanding bonds that the Authority has issued and may issue from time to time under said Trust Agreement, are payable solely from and secured by a pledge of the revenues of the Authority, consisting of a specified amount of the first proceeds received by the Commonwealth of Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth, and other moneys deposited in the Sinking Fund established under the Trust Agreement. If the federal excise taxes returned to the Commonwealth in any fiscal year fall below such specified amount, the deficiency shall be payable from appropriations which the Legislature of Puerto Rico may, but is not legally required to, make upon request by the Authority. Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.

(Mot. Ex. 17, ECF 10602-17, Puerto Rico Infrastructure Financing Authority Series 2005 Bonds Official Statement at i.)

Milbank

6

# Rum Producer Agreements.

4.6     **Payment Procedure and Timing**

4.6.1   Under current Act No. 119 of July 8, 2006 and existing contractual obligations, the first $117 million of Cover Over Revenues received by the Government in each Fiscal Year through fiscal 2057 are pledged and have to be transferred to the Puerto Rico Financing Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Pledged Cover Over Requirement). For Fiscal Year 2010-2011, upon completion of the Pledged Cover Over Requirement, the Government will pay to BIL on or before February 28, 2011, its corresponding percentage of the Cover Over Revenues attributable to Bacardi Rum Sales with respect to said $117 million in the form of Marketing and Production Support Payments from any available sources of revenue, in its sole discretion. Thereafter, including subsequent Fiscal Years, the Marketing and Production Support Payments will be paid on a monthly basis as the Government receives and identifies the Cover Over Revenues attributable to the Bacardi Rum Sales as further described below once the Pledged Cover Over Requirement is satisfied.

(Bacardí Br., Ex. B, ECF 10609-2, Bacardí Agreement § 4.6.)

3.3     **Pledged Cover Over Requirement**.  Any amount that would have been payable to BIL in any given month but for the Pledged Cover Over Requirement shall be deemed to be payable in the months immediately succeeding the month in which the Pledged Cover Over Requirement for the then current Fiscal Year has been satisfied in full. to the extent of funds available to the Paying Agent from its receipt of Cover Over Revenues.  Notwithstanding the immediately preceding sentence. this Section 3.3 shall not modify in any respect Sections 4.1.4 or 6.3.3 of the Existing Agreement.

(Bacardí Br., Ex. C, ECF 10609-3, Bacardí Supplement § 3.3.)

Milbank

7

# Rum Producer Agreements.

**4.6     Payment Procedure and Timing**

**4.6.1**  Under Act No. 119 of July 8, 2006 and existing contractual obligations, the first $117 million of Cover Over Revenues received by the Government in each fiscal year through fiscal 2057 are pledged and have to be transferred to the Puerto Rico Financing Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Pledged Cover Over Requirement"). Each Fiscal Year, after the Government complies with the Pledged Cover Over Requirement, the Refurbishment and Production Initiatives, the Marketing and Production Support Payments, the Strategic Third-Party Marketing Support Payments and the Molasses Subsidy Payments will be paid on a monthly basis as the Government receives and identifies the Cover Over Revenues attributable to the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales as further described below; provided, however, that (i) the Marketing and Production Support Payments relating to Cover Over Revenues for Fiscal Year 2010-2011, will be paid to Serrallés on seven equal annual installments due on July 1 of each year commencing with July 1, 2012 and (ii) the Marketing and Production Support Payments relating to Cover Over Revenues for Fiscal Year 2011-2012 that have already been received by the Government as of the Effective Date shall be payable to Serrallés within sixty (60) days from the Effective Date assuming that the Pledged Cover Over Requirement for that Fiscal Year has been satisfied.

(Sérralles Br., Ex. A, ECF 10612-1, Sérralles Agreement § 4.6.)

**2.8     Pledged Cover Over Requirement**. Any amount that would have been payable to Serrallés in any given month but for the Pledged Cover Over Requirement shall be deemed to be payable in the months immediately succeeding the month in which the Pledged Cover Over Requirement for the then current Fiscal Year has been satisfied in full, to the extent of funds available to the Paying Agent from its receipt of Cover Over Revenues. Notwithstanding the immediately preceding sentence, this provision shall not modify in any respect Sections 4.1.5 or 6.3.3 of the Existing Agreement.

(Sérralles Br., Ex. B, ECF 10612-2, Sérralles Supplement § 2.8.)

# The Lockbox Agreement.

Section 2.   **Account**.

(a)   The Secretary of Treasury has established at the Lockbox Bank, and the Lockbox Bank hereby confirms that the Lockbox Bank has established, an account at its Puerto Rico branch in the name of the Secretary of Treasury of Puerto Rico bearing account number 0400109028 (the "Account").

(b)   The Lockbox Bank shall not close the Account or change the name or account number of the Account without the prior written consent of the Secretary of Treasury and the Paying Agent. The Paying Agent shall not withhold its consent to such change provided that (i) any amendments or modifications to this Lockbox Agreement, the Security Agreement or the Deposit Account Control Agreement that may be necessary or convenient to preserve the validity, priority or perfection of the security interest granted under the Security Agreement shall be executed in form and substance satisfactory to the Paying Agent, and (ii) that the Government shall file (or shall provide such cooperation as may be required to enable the Paying Agent to file or to cause the Collateral Agent to file) such financing statements, continuation statements and other amendments describing all or part of the collateral subject to such security interest as may be requested by the Paying Agent to be filed in order to reflect such change.

(c)   The parties hereto acknowledge and agree that the Account is a "deposit account" within the meaning of Section 9-102(a)(29) of the PRCTA and that the Lockbox Bank's jurisdiction for purposes of the Account under the PRCTA shall be the Commonwealth of Puerto Rico.

(d)   Deposit Funds held in, or credited to, the Account shall not be invested.

(Mot. Ex. 10, ECF 10602-10, Lockbox Agreement § 2(d).)

Section 3.   **Lockbox Bank's Obligations with respect to the Account**.

(a)   The Account shall be used for the deposit by the U.S. Government of Cover Over Revenues payable to the Government on a periodic basis pursuant to Section 7652 of the Code. The Secretary of Treasury hereby grants to the Lockbox Bank exclusive and unrestricted access to and use of the Account for the purpose of administering such deposits in accordance with this Lockbox Agreement subject to the terms of the Deposit Account Control Agreement.

(b)   The Lockbox Bank shall maintain the Account as contemplated by this Lockbox Agreement and shall not commingle the Deposit Funds in or credited to, or designated for deposit in, the Account with any other Deposit Funds otherwise held on behalf of the Government, the Collateral Agent, the Trustee or any other Person. The Lockbox Bank acknowledges that the Account and any Deposit Funds in or credited to or designated for deposit in the Account are subject to security interests in favor of the Trustee and the Collateral Agent to the extent set forth in the Security Agreement. The Lockbox Bank shall not apply any Deposit Funds in the Account or make any disbursement from or debit to the Account other than in accordance with this Lockbox Agreement and, if applicable, the Deposit Account Control Agreement.

(Mot. Ex. 10, ECF 10602-10, Lockbox Agreement § 3(b).)

# The Lockbox Agreement.

**Section 5.   Disposition of Cover Over Payments in the Account.** The Lockbox Bank shall make disbursements of Cover Over Payments deposited by the U.S. Government in the Account during each Fiscal Year by making the following payments from the Account in the following order of priority, solely to the extent of funds available in the Account:

(a)   *First*, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of PRIFA, the first $117 million of aggregate Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(a) during such Fiscal Year;

(b)   *Second*, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of the S&T Trust, the next $5 million of Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(b) during such Fiscal Year;

(Mot. Ex. 10, ECF 10602-10, Lockbox Agreement § 5.)

Milbank

10

# The Commonwealth Created the Infrastructure Fund as a Special Revenue Fund for PRIFA's Benefit.

<hr>

### 3 L.P.R.A. § 1914

### § 1914 Special deposit

Beginning with fiscal year 1988-89, notwithstanding the provisions of Section 29A of Act No. 143 of June 30], 1969, as amended, the first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of thirty million dollars ($30,000,000), in the case of Fiscal Year 1988-89, for up to a maximum amount of forty million dollars ($40,000,000), in the case of Fiscal Years 1989-90 to 1996-97, for up to a maximum amount of sixty million dollars ($60,000,000), in the case of Fiscal Year 1997-98, for up to a maximum amount of seventy million dollars ($70,000,000), in the case of Fiscal Years 1998-1999 to 2005-2006, and up to a maximum amount of ninety million dollars ($90,000,000), in the case of Fiscal Years 2006-07 to 2008-09, and in subsequent years until Fiscal Year 2056-57, the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when received by the Department of the Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes, which shall include the development of the

Milbank

# The Commonwealth Covenanted with PRIFA Bondholders Not to Impair PRIFA's Rights in the Infrastructure Fund.

## 3 L.P.R.A. § 1913

### § 1913 Covenant of Commonwealth with bondholders

The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored on the part of the Authority; Provided, however, That nothing provided herein shall affect or alter such limitation if

Milbank

12

# The Commonwealth's 30(b)(6) Witness Confirmed the Infrastructure Fund is the First $117 Million of Rum Taxes Received by the Commonwealth.

| | | |
|---|---|---|
| 15 | Q. How was that term understood? | 12:24:54 |
| 16 | A. What term? | 12:24:57 |
| 17 | Q. The Puerto Rico Infrastructure | 12:24:58 |
| 18 | Fund. | 12:25:00 |
| 19 | A. It's understood to generally refer | 12:25:07 |
| 20 | to the first 117 million of rum Funds, rum | 12:25:10 |
| 21 | revenues. | 12:25:25 |
| 22 | Q. Held in the TSA? | 12:25:37 |
| 23 | A. Would you mind phrasing that as a | 12:25:39 |
| 24 | complete question? | 12:25:44 |
| 25 | Q. Is it understood to generally | 12:25:45 |

(Reply Br. Ex. 26, ECF 12995-26, Ahlberg Tr. 331:15-25.)

| | | |
|---|---|---|
| 1 | refer to the first $117 million of rum revenues | 12:25:46 |
| 2 | in the TSA? | 12:25:50 |
| 3 | A. No, I think it generally refers to | 12:25:59 |
| 4 | the first 117 million of rum revenues earned. | 12:26:01 |
| 5 | Q. Regardless of where they were? | 12:26:04 |
| 6 | A. I'm speaking generally about the | 12:26:14 |
| 7 | concepts of the Infrastructure Fund as | 12:26:16 |
| 8 | understood by relevant individuals. | 12:26:20 |
| 9 | Q. Okay. And so the common | 12:26:24 |
| 10 | understanding of that term is that the first | 12:26:26 |
| 11 | $117 million of rum excise taxes are in the | 12:26:30 |
| 12 | Puerto Rico Infrastructure Fund? | 12:26:36 |
| 13 | MS. McKEEN: Objection. | 12:26:44 |
| 14 | THE WITNESS: No. | 12:26:44 |
| 15 | BY MS. MILLER: | 12:26:44 |
| 16 | Q. Well, tell me again how you | 12:26:47 |
| 17 | understand it, how that term is generally | 12:26:48 |
| 18 | understood within the Commonwealth? | 12:26:50 |
| 19 | A. Generally understood as the first | 12:26:53 |
| 20 | 117 million of rum revenues in each fiscal | 12:26:56 |
| 21 | year. | 12:27:07 |

(Reply Br. Ex. 26, ECF 12995-26, Ahlberg Tr. 332:1-21.)

Milbank

13

# The Commonwealth's Treasury uses Account and Fund Numbers to Identify Specific Revenue Funds.

| | | |
|---|---|---|
| 9 | Q.    I'm asking within the | 12:12:42 |
| 10 | Commonwealth's internal accounting, does it use | 12:12:47 |
| 11 | account numbers to identify different moneys | 12:12:54 |
| 12 | within a particular Fund? | 12:12:57 |
| 13 | MS. McKEEN:  Objection. | 12:13:06 |
| 14 | THE WITNESS:  Revenue account | 12:13:19 |
| 15 | number -- revenue account number, which would | 12:13:22 |
| 16 | then be PRIFA systems referred to as a CFRA | 12:13:24 |
| 17 | code.  It is possible that one Fund number | 12:13:29 |
| 18 | could be attached to a string of data.  That | 12:13:33 |
| 19 | string of data would have a -- it could have | 12:13:36 |
| 20 | one Fund number, you could have more than one | 12:13:38 |
| 21 | different account number, but that's referring | 12:13:42 |
| 22 | to the CFRA account code, the revenue account | 12:13:44 |
| 23 | code within the PRIFA system. | 12:13:48 |

(Reply Br. Ex. 26, ECF 12995-26, Ahlberg Tr. 322:9-23.)

Milbank

14

# The Commonwealth's Treasury uses Account and Fund Numbers to Identify Specific Revenue Funds.

ESTADO LIBRE ASOCIADO DE PUERTO RICO
DEPARTAMENTO DE HACIENDA
Agencia

COMPROBANTE DE REMESA

URGENTE

MAY 1 1 2015

| CT | Agen | Número de Documento | Fecha de Contabilidad | Código de Banco | Cuenta de Banco | Fecha de Acreditación | Tipo de Depósito | Fecha de Notificación | Fecha de Requisición de Fondos | Número de |
|---|---|---|---|---|---|---|---|---|---|---|
| CR | 025 | 142915025684 | | GDB | 01 | 05/08/2015 | R | 05/08/2015 | 05/08/2015 | 050820 |

| LN | Cuenta | Fondo | Organización | Prog. | Asig. | Año Pres. | Aportación Federal | SE | Importe | Descripción |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 | R4220 | 111 | 0250000 | | | 2015 | | 62 | 17,362,112.59 | FONDO GENERAL |
| 02 | R4220 | 278 | 1660000 | | 780 | 2015 | | 62 | 9,860,296.59 | 46% PROMOCIONES DE RON |
| | | | | | | | | | | ARBITRIOS RON ABRIL 2015 |

APROBACION NIVEL I

COMMONWEALTH OF PUERTO RICO
DEPARTMENT OF THE TREASURY
Agency

PROOF OF REMITTANCE

URGENT

MAY 11 2015

| CT | Agen | Document Number | Accounting Date | Bank Code | Bank Account | Credited Date | Type of Deposit | Date of Notification | Date of Requisition of Funds | Credit Notice Number | Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CR | 025 | 142915025684 | | GDB | 01 | 05/08/2015 | R | 05/08/2015 | 05/08/20[illegible] | 0508201500[illegible] | 27,222,409.18 |

| LN | Account | Fund | Organization | Prog. | Alloc. | Pres. Year | Federal Contribution | SE | Amount | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 | R4220 | 111 | 0250000 | | | 2015 | | 62 | 17,362,112.59 | GENERAL FUND |
| 02 | R4220 | 278 | 1660000 | | 780 | 2015 | | 62 | 9,860,296.59 | 46% RUM PROMOTIONS |
| | | | | | | | | | | EXCISE TAX [illegible] APRIL 2015 |

APPROVAL LEVEL I

RECEIVED
DEPT OF THE TREASURY
AREA OF THE TREASURY
MAY 11 2015
REVENUE
ACCOUNTING DIVISION

TOTAL AMOUNT 27,222,409.18

(Sur-Reply Br. Ex. A, ECF 13161-1, PRIFA_STAY0001572.)

The Pre-Default Fund Flow Confirms that the Infrastructure Fund Exists on the Commonwealth's Books.



(Reply Br., ECF 12995 at 8.)

# The Commonwealth's Witness  Admits a Transfer Can be Effected by a Deposit in the TSA to the Credit of Another Entity.

transfer of $117 Million  Rum Tax Remittances to the GDB bank account and to PRIFA.  Pursuant to the Lockbox Agreement, the Commonwealth  opened the Lockbox Account at Citibank and, beginning  in July 2015, Rum Tax Remittances received from the United States Treasury were deposited in the Lockbox Account.  Under the terms of the Lockbox Agreement, (i) the first $117 million  in Rum Tax Remittances received each fiscal year is disbursed to a TSA account by Citibank,  N.A., as paying  agent, (ii) the next $5 million  is disbursed to the Puerto Rico Science and Technology  Trust, (iii)  under specified  conditions,  an amount  may be disbursed  to the Conservation  Trust, (iv) a portion of the rest of the Rum Tax Remittances received during that fiscal year are paid to certain rum producers under agreements with the Commonwealth,  and (v) subject to amounts disbursed to the Conservation  Trust under specified conditions,  any remainder is disbursed to a TSA account controlled  by the Commonwealth.

(Decl. of Timothy H. Ahlberg in Respect of Commonwealth Mot. for Partial S.J.,
Case No. 20-00003-LTS, ECF 49 ¶ 5.)

Milbank

17

# The Ahlberg Declaration Reveals that PRIFA's Ownership Interest in Rum Taxes Attaches the Moment Rum Taxes are Deposited into the TSA.

**Lockbox Disbursement Detail**

To: The parties listed on Schedule 1 hereto

Pusuant to section 3 (d) of the above referenced agreement please be advised that on the date indicated the following amounts were disbursed from the Account

| recipient | amount disbursed | date | remaining balances |
|---|---|---|---|
| Secretary of Treasury for deposit to the credit of PRIFA | $ 13,321,258.57 | 12/72/2017 | $ - |
| Secretary of Treasury for deposit to the credit of the S&T Trust | $ 5,000,000.00 | 12/72/2017 | $ - |

(Sur-Reply Resp. Br. Ex. 47, ECF 13229-47, PRIFA_STAY0001344.)

Milbank

18

The Ahlberg Declaration Reveals that PRIFA's Ownership Interest in Rum Taxes Attaches the Moment Rum Taxes are Deposited into the TSA.

| 12-22 | OUTGOING FUNDS TRANSFER DR REF 3173565268 IN FAVOR COMMONWEALTH OF PUERTO RICO-DEPARTMENT OF TREASURY ACCOUNT //FW021502011 BANCO POPULAR SAN JUAN PR PUERTO RUM PRODUCERS TRUST SECRETAR | 5,000,000.00 |
| 12-22 | OUTGOING FUNDS TRANSFER DR REF 3173565267 IN FAVOR COMMONWEALTH OF PUERTO RICO-DEPARTMENT OF TREASURY ACCOUNT //FW021502011 BANCO POPULAR SAN JUAN PR PUERTO RUM PRODUCERS TRUST SECRETAR | 13,321,258.57 |

(Sur-Reply Resp. Br. Ex. 48, ECF 13229-48, PRIFA_STAY0004793.)

Milbank

# PRIFA Bondholders Were Given Last Dollars Protection.

### 3 L.P.R.A. § 1914

### § 1914 Special deposit

The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes.

# Movants' Lien is Automatically Perfected under the Enabling Act.

3 L.P.R.A. § 1907

§ 1907 Bonds of the Authority

provided in the trust agreement or resolution under which the bonds are issued. Such pledge shall be valid and binding from the time it is made without the need for a public or notarized instrument. The revenues so pledged, including those subsequently received by the Authority, shall immediately be subject to said lien without the need of the physical delivery thereof or any other act, and said lien shall be valid and binding and shall prevail against any third party having any kind of claim against the Authority for damages, breach of contract or other reasons, regardless of whether such third party has been so notified. Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority. The resolution or resolutions authorizing

Milbank

21

# PRIFA Bonds Were Not Subject to the Risk of Non-Appropriation.

If the Federal Excise Taxes received in any fiscal year are insufficient to make the required deposit to the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget to include, upon the Authority's request, in the recommended budget for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make the necessary appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. For more information on the budgetary process of the Commonwealth, see *Additional Commonwealth Appropriations*.

Federal Excise Taxes have represented a stable source of revenues for the Commonwealth. The federal law requiring the transfer of Federal Excise Taxes to the Commonwealth has been in effect since 1917. In addition, since fiscal year 1988 Federal Excise Taxes have been no less than $166 million ($180 million if adjusted to take into account a change made by the Puerto Rico Department of the Treasury in June 1993 in the method used to report the collection of Federal Excise Taxes from an accrual to a cash basis). The level of Federal Excise Taxes transferred in the future may be affected by factors beyond the control of the Commonwealth, such as changes in federal legislation affecting the imposition or transfer of such taxes and conditions in the Puerto Rico rum industry.

(Mot. Ex. 17, ECF 10602-17, Puerto Rico Infrastructure Financing Authority Series 2005 Bonds Official Statement at 10.)

Milbank

22

# 2.  Trust Agreement (Oct. 1, 1988), ECF No. 10602-2

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

**TO**

**CITIBANK, N.A.,**

**TRUSTEE**

**TRUST AGREEMENT**

**Dated as of October 1, 1988,**
**as amended by a**
**First Supplemental Trust Agreement, dated as of February 1, 1989**
**and a**
**Second Supplemental Agreement, dated as of December 1, 1997**

# TABLE OF CONTENTS

(This Table of Contents is not a part of the
Trust Agreement but is for convenience of reference only)

PAGE

## ARTICLE I
DEFINITIONS

SECTION 101. Definitions..................................................................................................10
SECTION 102. Miscellaneous ............................................................................................18

## ARTICLE II
FORM, EXECUTION, AUTHENTICATION, DELIVERY AND REGISTRATION OF BONDS

SECTION 201. Limitation on Issuance of Bonds ................................................................19
SECTION 202. Form of Bonds ............................................................................................19
SECTION 203. Details of Bonds..........................................................................................19
SECTION 204. Authentication of Bonds .............................................................................20
SECTION 205. Exchange and Registration of Transfer......................................................21
SECTION 206. Ownership of Bonds ...................................................................................21
SECTION 207. The Series 1988 Bonds ...............................................................................22
SECTION 208. Additional Bonds ........................................................................................23
SECTION 209. Refunding Bonds ........................................................................................26
SECTION 210. Temporary Bonds........................................................................................29
SECTION 211. Mutilated, Destroyed, Stolen or Lost Bonds..............................................29
SECTION 212. Qualification for Depository Trust Company ..............................................30
SECTION 213. Capital Appreciation Bonds; Capital Appreciation and Income Bonds ..........30
SECTION 214. Debt Service Components............................................................................30

## ARTICLE III
REDEMPTION OF BONDS

SECTION 301. Redemption of Bonds ..................................................................................31
SECTION 302. Redemption Notice ......................................................................................31
SECTION 303. Effect of Calling for Redemption ...............................................................32
SECTION 304. Cancellation of Bonds .................................................................................32
SECTION 305. Bonds To Be Paid Not Outstanding............................................................32
SECTION 306. Partial Redemption.......................................................................................33

## ARTICLE IV
FUNDS AND ACCOUNTS

SECTION 401. Sinking Fund and Accounts.........................................................................34
SECTION 402. Withdrawals from Bond Service Account ...................................................35
SECTION 403. Withdrawals from Redemption Account .....................................................36
SECTION 404. Withdrawals from Reserve Account ...........................................................37

(i)

SECTION 405.    Moneys Set Aside Held in Trust..................................................................37
SECTION 406.    Establishment of Subaccounts in the Redemption Account ..........................38

## ARTICLE V
DEPOSITARIES OF MONEYS, SECURITY FOR DEPOSITS AND INVESTMENTS OF
FUNDS

SECTION 501.    Security for Deposits...............................................................................39
SECTION 502.    Investment of Moneys.............................................................................39
SECTION 503.    Valuation of Investments .......................................................................40
SECTION 504.    Tax Covenants .......................................................................................40

## ARTICLE VI
PARTICULAR COVENANTS

SECTION 601.    Payment of Principal, Interest and Premium; Pledge of Pledged
                Revenues................................................................................................42
SECTION 602.    No Impairment........................................................................................42
SECTION 603.    Inclusion of Shortfall in Budget.............................................................42

## ARTICLE VII
REMEDIES

SECTION 701.    Enforcement of Remedies.......................................................................43
SECTION 702.    Pro rata Application of Funds .................................................................43
SECTION 703.    Effect of Discontinuance of Proceedings................................................44
SECTION 704.    Bondholders May Control Proceedings...................................................44
SECTION 705.    Restrictions Upon Actions by Individual Bondholders ...........................45
SECTION 706.    No Remedy Exclusive.............................................................................45
SECTION 707.    No Delay or Omission Construed to be a Waiver.....................................45
SECTION 708.    Actions of Trustee..................................................................................45

## ARTICLE VIII
CONCERNING THE TRUSTEE

SECTION 801.    Acceptance of Trusts..............................................................................46
SECTION 802.    Trustee Entitled to Indemnity .................................................................46
SECTION 803.    Limitation on Trustee's Liabilities..........................................................46
SECTION 804.    Compensation and Indemnification of Trustee.........................................47
SECTION 805.    Trustee May Rely on Certificates ...........................................................47
SECTION 806.    Notice of Default....................................................................................47
SECTION 807.    Trustee May Be Bondholder...................................................................48
SECTION 808.    Trustee Not Responsible for Recitals ......................................................48
SECTION 809.    Trustee Protected in Relying on Papers ..................................................48
SECTION 810.    Resignation of Trustee............................................................................48
SECTION 811.    Removal of Trustee.................................................................................48
SECTION 812.    Appointment of Successor Trustee ..........................................................49
SECTION 813.    Vesting of Trust with Successor Trustee .................................................49

SECTION 814.   Reporting Requirements ...................................................................50

## ARTICLE IX
EXECUTION OF INSTRUMENTS BY BONDHOLDERS AND PROOF OF OWNERSHIP OF BONDS

SECTION 901.   Proof of Execution of Documents and Ownership. .......................................51

## ARTICLE X
SUPPLEMENTAL AGREEMENTS

SECTION 1001.  Supplemental Agreements Without Bondholders' Consent ...........................52
SECTION 1002.  Modification with Consent of Holders of Majority of Bonds.........................53
SECTION 1003.  Trustee Joining in Supplemental Agreements ................................................54
SECTION 1004.  Responsibilities of Trustee under this Article.................................................54
SECTION 1005.  Bond Resolution May Be Supplemented or Modified....................................55

ARTICLE XI
DEFEASANCE

SECTION 1101.  Defeasance .....................................................................................................56

## ARTICLE XII
MISCELLANEOUS PROVISIONS

SECTION 1201.  Mergers ...........................................................................................................58
SECTION 1202.  Any Notices ....................................................................................................58
SECTION 1203.  Substitute Publication and Mailing.................................................................58
SECTION 1204.  No Third Party Rights .....................................................................................59
SECTION 1205.  Effect of Partial Invalidity ..............................................................................59
SECTION 1206.  Effect of Covenants.........................................................................................59
SECTION 1207.  Governing Law ................................................................................................59
SECTION 1208.  Payments Due on Saturdays, Sundays and Holidays......................................59
SECTION 1209.  Multiple Counterparts .....................................................................................60
SECTION 1210.  Headings, etc. Not Part of Agreement ............................................................60

THIS AGREEMENT, dated for convenience of reference as of the first day of October, 1988, by and between

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY,

a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic (hereinafter sometimes called the "Authority"), exercising public and essential governmental functions and created by the Puerto Rico Infrastructure Financing Authority Act hereinafter mentioned, and

CITIBANK, N.A.,

a national banking association duly incorporated and existing under the laws of the United States of America and having its principal corporate trust office in the Borough of Manhattan, City and State of New York, which is authorized under such laws to exercise corporate trust powers (said banking association and any banking association, bank or trust company becoming successor trustee under this Agreement being hereinafter sometimes called the "Trustee");

W I T N E S S E T H:

WHEREAS, in order to provide financial, administrative and other assistance to public corporations and instrumentalities of the Commonwealth of Puerto Rico (the "Commonwealth") to enable them to fulfill their public purpose of providing, preserving, operating, maintaining, repairing, replacing and improving portions of the infrastructure, the Legislature of Puerto Rico duly adopted Act No. 44, approved June 21, 1988 (said Act, as amended and supplemented from time to time, the "Act") and by the Act created a public corporation and instrumentality of the Commonwealth to be known as the "Puerto Rico Infrastructure Financing Authority"; and

WHEREAS, by the Act, the Authority has the power to, among other things:

(a)    to provide assistance to any public corporation or governmental instrumentality authorized by law to provide infrastructure facilities related to water supply, treatment and distribution systems, waste water treatment and disposal systems and improvements;

(b) to enter into an assistance contract with such a benefited entity;

(c)    to borrow money and to issue its bonds for any of its corporate purposes, including, but not limited to, the payment of all or any portion of any indebtedness of such benefited entity;

(d)    to segregate a portion of the federal excise taxes deposited into the Puerto Rico Infrastructure Fund established pursuant to Section 15 of the Act into one or more accounts and to pledge moneys in said accounts, among other purposes, to the payment of principal of and interest on bonds and other obligations of the Authority; and

WHEREAS, the Authority has heretofore entered into an agreement with Puerto Rico Aqueduct and Sewer Authority ("PRASA") dated as of July 12, 1988, pursuant to which the

- 1 -

Authority has agreed, under certain conditions, to provide funds for the defeasance of PRASA's Puerto Rico Aqueduct and Sewer Authority Revenue and Refunding Bonds, Series 1985A (the "Outstanding PRASA Bonds") , thereby affording PRASA, among other things, additional capacity to finance its capital improvement program through the issuance of its revenue bonds; and

WHEREAS, the Authority has determined to provide for such defeasance of the Outstanding PRASA Bonds and for the payment of $15,500,000 PRASA General Obligation Notes due January 20, 1989 issued and outstanding under the terms of that certain Purchase Agreement dated January 19, 1983 by and between PRASA and Pfizer Pharmaceuticals, Inc. (the "Pfizer Debt") through the issuance of bonds payable from certain federal excise taxes deposited in a separate, segregated account of the Puerto Rico Infrastructure Fund exclusively for the purpose of paying principal of and interest on such bonds; and

WHEREAS, the proceeds of the first series of bonds to be issued hereunder will provide moneys, with other funds made available by PRASA, to defease the Outstanding PRASA Bonds, pay the Pfizer Debt, make a deposit to the Reserve Account and pay certain costs of issuance; and

WHEREAS, the Authority has determined that the bonds to be issued under this Agreement and, the certificate of authentication by the Trustee to be endorsed on all such bonds shall be, respectively, in substantially the following forms, with such variations, omissions and insertions as are required or permitted by this Agreement:

- 2 -

FORM OF BOND

[Front Side of Bond]

No. _____                                                                                    $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BOND, SERIES _____

Maturity Date          Interest Rate          Original Issue Date          Cusip


_____     _____     _____     _____

REGISTERED HOLDER:

PRINCIPAL AMOUNT:


  Puerto Rico Infrastructure Financing Authority (herein called the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic, is justly indebted and for value received hereby promises to pay to the Registered Holder shown above or registered assigns or legal representative on the Maturity Date specified above (or earlier as hereinafter described), from the special fund described herein, upon the presentation and surrender hereof, at the principal corporate trust office of Citibank, N.A. in the Borough of Manhattan, City and State of New York, the Principal Amount shown above, and to pay to the registered owner hereof, from the special fund described herein, by check mailed to the Registered Holder at his address as it appears on the bond registration books of the Authority, [or by wire transfer to the Registered Holder], interest on such principal amount from the date hereof or from the _____ or _____ next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a _____ or a _____ to which interest shall have been paid, in which case from such date, such interest to the maturity hereof being payable on _____ and _____ in each year, commencing _____, 19___, at the Interest Rate per annum specified above, until payment of such Principal Amount. The interest so payable and punctually paid, or duly provided for, on any interest payment date will be paid to the person in whose name this bond is registered at the close of business on the fifteenth (15th) day (whether or not a business day) of the calendar month next preceding such interest payment date. Any such interest not so punctually paid or duly provided for shall forthwith cease to be payable to the Registered Holder on such date, and may be paid to the person in whose name this bond is registered at the close of business on a special record date for the payment of such defaulted interest to be fixed by the Trustee, on a date established by the Trustee, notice thereof being given to the Holders not less than ten (10) days prior to such special record date, or may be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the bonds of this series may be listed and upon such notice as may be required by such exchange.

- 3 -

Such payment of interest shall be by check mailed to the Registered Holder at his address as it appears on the bond registration books of the Authority maintained by the Trustee [or by wire transfer to said holder]. All such payments shall be made in such coin or currency of _____.

This bond shall not be deemed to constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable therefor, and this bond shall be payable solely out of those funds pledged for the payment thereof.

ADDITIONAL PROVISIONS OF THIS BOND ARE SET FORTH ON THE REVERSE HEREIN AND SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH HERE.

This bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Agreement unless and until this bond shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

IN WITNESS WHEREOF, Puerto Rico Infrastructure Financing Authority has caused this bond to bear the facsimile signature of its Executive Director and a facsimile of the corporate seal to be imprinted hereon and attested to by its Secretary by facsimile signature, all as of the _____ day of _____ 19___.

[Facsimile of
  Corporate Seal]

PUERTO RICO INFRASTRUCTURE
FINANCING AUTHORITY

By:_____[Facsimile Signature]_____
              Executive Director

Attest:


____[Facsimile Signature]____
          Secretary

- 4 -

## CERTIFICATE OF AUTHENTICATION

This is one of the bonds of the series designated therein and issued under and secured by the provisions of the within mentioned Agreement.

CITIBANK, N.A.,
as Trustee


By:_____
        Authorized Signatory

Date of authentication: _____


[Reverse Side of Bond]

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BOND, SERIES _____

This bond is one of a duly authorized series of Bonds designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series _____" issued by the Authority in the aggregate principal amount of _____ Dollars ($_____) for the purpose of providing funds, with any other available funds, for the purpose of _____. This bond is issued under and secured by a trust agreement dated as of October 1, 1988 (said agreement, together with all supplemental agreements therein permitted, being herein called the "Agreement"), by and between the Authority and Citibank, N.A., trustee (said trustee and any successor trustee under the Agreement being herein called the "Trustee"). An executed counterpart of the Agreement is on file at the principal corporate trust office of the Trustee in the Borough of Manhattan, City and State of New York. By the acceptance of this bond, the Registered Holder hereof assents to all of the provisions of the Agreement.

This bond is issued and the Agreement was made and entered into under and pursuant to the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth of Puerto Rico, particularly the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, said Act being herein called the "Authority Act") and under and pursuant to resolutions duly adopted by the Executive Committee of the Board of Directors of the Authority. The Agreement provides for the issuance of additional series of bonds and for the incurrence of other indebtedness under the conditions, limitations and restrictions therein set forth. The Agreement also provides for the creation of a special fund designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue

Bonds Sinking Fund" and for the deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as defined in the Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable and to provide a reserve therefor, which special fund is pledged to and charged with the payment of such principal and interest.

The bonds of this series consist of bonds maturing on _____ of the years _____ to _____ , inclusive (the "Serial Bonds") and of bonds maturing on _____ 1, _____ (the "_____ Term Bonds"), on _____ 1, _____ (the "_____ Term Bonds") and on _____ 1, _____ (the "_____ Term Bonds").

[Applicable Terms of Redemption]

If less than all of the bonds of any one maturity shall be called for redemption, the particular bonds or portions of bonds to be redeemed shall be selected by the Trustee by such method as it shall deem fair and appropriate.

At least _____ (___) days before the redemption date of any bonds to be redeemed in whole or in part, the Trustee shall cause a notice of such redemption to be mailed, by first class mail, postage prepaid, to all registered owners of bonds to be redeemed at their addresses appearing upon the bond registration books of the Authority. The failure to mail such notice to any registered owner of bonds or any defect in any notice so mailed shall not affect the validity of the proceedings for the redemption of bonds of other registered owners. On the date fixed for redemption, notice having been given as aforesaid, the bonds or portions thereof so called for redemption shall be due and payable at the redemption price provided for the redemption of such Bonds or portions thereof on such date, and, if sufficient moneys or certain securities which may consist of (i) direct or guaranteed obligations of the United States of America (and evidences of ownership of proportionate interests in future interest or principal payments on such obligations), (ii) certain municipal obligations irrevocably secured by direct or guaranteed obligations of the United States of America (and evidences of ownership of proportionate interests in future interest or principal payments on such obligations), or (iii) obligations issued by Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Farm Credit System, Federal Home Loan Banks or Student Loan Marketing Association, the principal of and interest on which obligations when due will provide sufficient moneys for payment of the redemption price and the accrued interest on the bonds to be redeemed are held by the Trustee, as provided in the Agreement, interest on the bonds or the portions thereof so called for redemption shall cease to accrue, such bonds or portions thereof shall cease to be entitled to any benefit or security under the Agreement, and the Registered Holders thereof shall have no rights in respect of such bonds or portions thereof except to receive payment of the redemption price thereof and the accrued interest thereon. If a portion of this bond shall be called for redemption, a new bond or bonds of authorized denominations in an aggregate principal amount equal to the unredeemed portion hereof will be issued to the Registered Holder hereof, or his legal representative upon the surrender hereof.

The Registered Holder of this bond shall have no right to enforce the provisions of the Agreement, or to institute action to enforce the covenants therein, or to take any action with

respect to any default under the Agreement, or to institute, appear in or defend any suit or other proceeding with respect thereof, except as provided in the Agreement.

Modifications or alterations of the Agreement or of any agreement supplemental thereto may be made only to the extent and in the circumstances permitted by the Agreement.

The bonds of this series are issuable as fully registered bonds in the denomination of $_____ and any integral multiple thereof. At the principal corporate trust office of the Trustee, in the manner and subject to the conditions provided in the Agreement and without cost to the Registered Holders thereof except for any tax or other governmental charge, bonds may be exchanged for an equal aggregate principal amount of bonds of the same series and maturity, of authorized denominations and bearing interest at the same rate.

The Trustee is required to keep at its principal corporate trust office the books of the Authority for the registration of and for the registration of transfers of bonds. The transfer of this bond may be registered only upon such books and as otherwise provided in the Agreement upon the surrender hereof to the Trustee together with an assignment duly executed by the registered owner hereof or his attorney or legal representative in the form set forth on this bond or in such other form as shall be satisfactory to the Trustee. Upon any registration of transfer, the Trustee shall deliver in exchange for this bond, a new bond or bonds registered in the name of the transferee, of authorized denominations, in an aggregate principal amount equal to the principal amount of this bond, of the same series and maturity and bearing interest at the same rate.

The Trustee shall not be required to exchange or register any transfer of this bond during the fifteen (15) days immediately preceding the date of mailing of notice of any redemption of bonds of this series, or after this bond or any portion thereof has been selected for redemption.

This bond, notwithstanding the provisions for the registration of transfer contained in the Agreement, shall have all the qualities and incidents, including negotiability, of negotiable instruments under the laws of Puerto Rico.

All acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of Puerto Rico, including the Authority Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the issuance of this bond and the execution and delivery of the Agreement have happened, exist and have been performed as so required.

This bond is issued with the intent that the laws of the Commonwealth of Puerto Rico shall govern its construction.

**[Form of Assignment]**

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

_____

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within bond on the books kept for registration thereof with full power of substitution in the premises.

Dated: _____

_____

NOTICE:  The signature of this assignment must correspond with the name as it appears on the face of the within bond in every particular, without alteration or enlargement or any change whatever.

Social Security Number or
Employer Identification Number
or Transferee: _____

Signature Guaranteed:

_____

NOTICE:  Signatures must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank or a trust company.

NY1 5690864v.2 45967/59

WHEREAS, by virtue of the Act, the Authority is authorized to issue its bonds as hereinafter provided, to enter into this Agreement and to do or cause to be done all of the acts and things herein provided or required to be done as hereinafter covenanted; and

WHEREAS, the execution and delivery of this Agreement have been duly authorized by resolution of the Authority; and

WHEREAS, all acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of Puerto Rico, including the Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the execution and delivery of this Agreement have happened, exist and have been performed as so required, in order to make this Agreement a valid, binding and legal trust agreement for the security of the Bonds in accordance with its terms; and

WHEREAS, the Trustee has accepted the trusts created by this Agreement and in evidence thereof has joined in the execution hereof;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH, that in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the Bonds by the Holders thereof, and also for and in consideration of the sum of One Dollar to the Authority in hand paid by the Trustee at or before the execution and delivery of this Agreement, the receipt of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Bonds are to be issued, executed, authenticated, delivered, secured and accepted by all persons who shall from time to time be or become Holders thereof, and in order to secure the payment of the Bonds at any time issued and outstanding hereunder and the interest and premium, if any, thereon according to their tenor, purport and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such Bonds, and it is mutually agreed and covenanted by and among the parties hereto, for the equal and proportionate benefit and security of all and singular the present and future Holders of the Bonds, without preference, priority or distinction as to lien or otherwise, except as otherwise hereinafter provided, of any one Bond over any other Bond by reason of priority in the issue, sale or negotiation thereof or otherwise, as follows:

# ARTICLE I

# DEFINITIONS

SECTION 101.     <u>Definitions</u>.   As used in this Agreement, except as otherwise defined below, words and terms shall have the meanings ascribed to them in the recitals to this Agreement. In addition, the following words and terms shall have the following meanings, unless some other meaning is plainly intended:

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond (the principal amount on the date of original issuance) plus the interest accrued on such Capital Appreciation Bond from the date of original issuance to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the Term Bonds of any Series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of Term Bonds in such Fiscal Year or on the first day of the next succeeding Fiscal Year as provided herein.

If at the close of any Fiscal Year the total amount of Term Bonds of any Series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption under the provisions of Section 403 of this Agreement, shall be in excess of the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirements for the Term Bonds of such Series shall be reduced for such subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director in an order filed with the Trustee on or before the 10th day of the month following the close of such Fiscal Year.

If at the close of any Fiscal Year the total principal amount of Term Bonds of any Series retired by purchase or redemption, or called for redemption under the provisions of Section 403 of this Agreement, prior to the close of such Fiscal Year shall be less than the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirement for the term bonds of such Series for the next succeeding Fiscal Year shall be increased by the amount of such deficiency.

It shall be the duty of the Trustee, on or before the 15th day of each Fiscal Year, to compute the Amortization Requirement for the then current Fiscal Year for the Term Bonds of each Series then Outstanding. The Amortization Requirement for the then current Fiscal Year shall continue to be applicable during the balance of such current Fiscal Year and no adjustment shall be made therein by reason of Term Bonds purchased or redeemed or called for redemption during such current Fiscal Year.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond up to the Interest Commencement Date set forth in the resolution of the Board providing for the issuance of such Bond, an amount equal to the Accreted Value of such Bonds, and (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value on the Interest Commencement Date.

NY1 5690864v.2 45967/59

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any Series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund of funds are established and shall not be subject to a lien or charge in favor of the Holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Authority" shall mean Puerto Rico Infrastructure Financing Authority, a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic, created by the Act, and the successor or successors of the Authority.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Board" shall mean the Board of Directors of the Authority as constituted from time to time and defined by the Act, or, if said Board shall be abolished, the board or body succeeding to the principal functions thereof or to whom the powers of the Authority shall be given by law.

"Bond Service Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Bondholder", "Holder", "Holder of Bonds", or "Owner" or any similar term, shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

"Bonds" shall mean the Bonds of the Authority issued under Sections 207, 208 and 209 hereof.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded periodically on each of the dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either Serial Bonds or Term Bonds.

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date specified in the resolution authorizing such Bonds and the Appreciated Value for such Bonds is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either Serial Bonds or Term Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Credit Facility" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of, premium, if any, and interest on Bonds to which such Credit Facility relates.

"Debt Service Component" shall mean indebtedness incurred in accordance with the requirements of Section 214 hereof.

"Executive Director" shall mean the Executive Director or Deputy Executive Director of the Authority from time to time or if there is no Executive Director or Deputy Executive Director, then any person designated by the Board or by the bylaws of the Authority to perform the functions of the Executive Director.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended by and at the option of the Holders of the Bonds or the Authority.

"Fiscal Year" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Board.

"Government Obligations" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described in said clause (i), and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of such obligations are to be used and have been deposited in an escrow account that is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (iii) above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the underlying obligations described in said clause (iii), and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"Interest Commencement Date" shall mean, with respect to any Capital Appreciation and Income Bond, the date specified in the resolution providing for the issuance of such Bond after which interest accruing on such Bond shall be payable semiannually or otherwise on a periodic basis, with the first such payment date being the applicable Interest Payment Date immediately succeeding such Interest Commencement Date.

- 12 -

"Interest Payment Dates" shall mean the dates on which interest on a Series of Bonds or portion thereof is scheduled to be due and payable, as is provided by a resolution of the Board adopted prior to the issuance of such Series of Bonds.

"Interim Bonds" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth and which legality for investment shall be certified by the Authority upon the request of the Trustee:

    (i)    Government Obligations;

    (ii)    obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and evidences of ownership of proportionate interests in future interest or principal payments in obligations specified above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated;

    (iii)    bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities, as are described in clauses (i) or (ii) above, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured) provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

    (iv)    obligations issued by any state or territory of the United States of America, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

- 13 -

      (v)    municipal obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

      (vi)    any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee), trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in (i) or (ii) above, provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

      (vii)    commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

      (viii)    any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the Holders of Put Bonds.

"Offshore Excise Taxes" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

      (i)    Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

      (ii)    Bonds that are deemed paid and no longer Outstanding as provided herein;

      (iii)    Bonds in lieu of which other Bonds have been issued pursuant to the provisions hereof relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

(iv)    Bonds tendered or deemed tendered pursuant to any tender provisions, as further provided in the resolution adopted by the Board for any Series of Bonds; and

(v)    for purposes of any consent or other action to be taken hereunder by the Holders of a specified percentage of principal amount of Bonds, Bonds known by the Trustee to be held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

"PRASA" shall mean Puerto Rico Aqueduct and Sewer Authority, a public corporation and an autonomous governmental instrumentality of the Commonwealth and the successor or successors thereof.

"Principal Corporate Trust Office" or "principal corporate trust office" of the Trustee shall mean the principal corporate trust office of the Trustee, at which, at any particular time, its corporate trust business shall be administered, except that with respect to presentation of Bonds for payment or for registration of transfer or exchange and the location of the bond registration books, such term shall mean the office or agency of the Trustee, if different, at which, at any particular time, its corporate agency business shall be conducted.

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any Series, shall mean the sum of:

(i)    the amount required to pay the interest on all Bonds of such Series then Outstanding that is payable on each Interest Payment Date in such Fiscal Year;

(ii)    the amount required to pay the principal of all Serial Bonds of such Series then Outstanding that is payable upon the maturity of such Serial Bonds in such Fiscal Year; and

(iii)    the Amortization Requirement for the Outstanding Term Bonds of such Series for such Fiscal Year.

If an Interest Payment Date or a principal payment date for any Series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

(a)    The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (1) for purposes of determining the maximum Principal and Interest Requirements on Outstanding Bonds for any Fiscal Year under Section 208(c)(ii) and (d)(ii) , Section 209(f) and Section 401(c) of this Agreement, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation

- 15 -

or such shorter period that such Variable Rate Bonds shall have been outstanding, and (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation; provided that if a Series of Variable Rate Bonds had not been Outstanding prior to the date of calculation, the test set forth in clause (A) above shall be calculated as though said Variable Rate Bonds had been Outstanding for the twelve month period by using the average interest rate for comparable securities for such period as certified by an underwriting or investment banking firm experienced in marketing such securities;

(b) In the case of Put Bonds, the "put" date or dates shall be ignored if said "put" is payable from a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility (whether or not evidenced by provisions included in the Bonds, such as interest rate adjustments to apply if an unreimbursed drawing on the Credit Facility or Liquidity Facility shall occur) shall be ignored unless the issuer of the Credit Facility or a Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case Principal and Interest Requirements shall include the repayment obligation thereof in lieu of the stated terms of the Bonds, in accordance with the principal repayment schedule and interest rate or rates specified in the documents relating to such Credit Facility or Liquidity Facility, if the repayment obligation is secured on a parity with Bonds;

(c) In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(d) In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included in the year in which said principal and interest portions are due;

(e) In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value of Capital Appreciation and Income Bonds shall be included in the year in which said principal and interest portions are due;

(f) In the case of Balloon Bonds or Interim Bonds, the debt service requirements of the Balloon Bonds or Interim Bonds may be excluded and in lieu thereof the Balloon Bonds or Interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds, hypothetically maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years (as determined in the certificate described below) from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's Investors Services, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

NY1 5690864v.2 45967/59

(g)    If all or a portion of the principal of or interest on a Series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the Trustee shall have received on or prior to the date of calculation a verification from an independent certified public accountant demonstrating the sufficiency of such funds and projected earnings for such purpose.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and, to the extent applicable, shall be determined in accordance with the foregoing rules.

"Puerto Rico Infrastructure Fund" shall mean the Fund of that name designated by the Act.

"Put Bonds" shall mean Bonds that by their terms may be tendered by and at the option of the Holder thereof for payment prior to the stated maturity thereof.

"Qualified Depositary or Depositaries" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depositary for funds of agencies and instrumentalities of the Commonwealth of Puerto Rico, which have been designated as depositaries of the Authority by resolution of the Board remaining in full force and effect.

"Redemption Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Reserve Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Reserve Account Insurance Policy" shall mean the insurance policy, surety bond or other evidence of insurance deposited for the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer thereof shall be a municipal bond insurer whose senior debt obligations, ranking pari passu with its obligations under such policy, bond or other evidence of insurance, are rated, at the time of deposit for the credit of the Reserve Account, in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto.

"Reserve Account Letter of Credit" shall mean the irrevocable, transferable letter of credit deposited in the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer of such letter of credit shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking pari passu with its obligations under such letters of credit are rated at the time of deposit to the credit of the Reserve Account,

- 17 -

in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto.

"Secretary" shall mean the Secretary or Assistant Secretary of the Authority from time to time, or if there is no secretary or assistant secretary, then any person designated by the Board or by the by-laws of the Authority to perform the functions of the Secretary.

"Serial Bonds" shall mean the Bonds designated serial bonds in the resolutions authorizing such Bonds.

"Series" shall mean all of the Bonds authenticated and delivered at one time on original issuance and pursuant to any resolution authorizing such Bonds as a separate Series of Bonds, or any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article II hereof, regardless of variations in maturity, interest rate or other provisions.

"Series 1988 Bonds" shall mean the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A.

"Sinking Fund" shall mean the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund", a special fund created and designated by Section 401 hereof.

"Special Tax Revenues" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Term Bonds" shall mean the Bonds designated term bonds in the resolutions authorizing such Bonds.

"Trustee" shall mean the person named as the "Trustee" in the first paragraph of this Agreement until a successor Trustee shall have become such, and thereafter "Trustee" shall mean or include each person who is then a Trustee hereunder.

"Variable Rate Bonds" shall mean Bonds issued with a variable, adjustable, convertible or similar interest rate that is not fixed in percentage at the date of issue for the term thereof.

SECTION 102.     Miscellaneous.  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Words defined in Section 101 hereof that appear in this Agreement in lower case shall have the meanings ascribed to them in the definitions in Section 101 unless the context shall otherwise indicate. The words "Bond", "Owner", "Holder" and "person" shall include the plural as well as the singular number unless the context shall otherwise indicate. The word "person" shall include corporations, firms and associations, including public bodies, as well as natural persons, unless the context shall otherwise indicate. The word "Bond" or "Bonds" and the words "revenue bond" or "revenue bonds" shall mean any Bond or Bonds or all of the Bonds, as the case may be, issued under the provisions of this Agreement. The word "Agreement" shall include this Agreement and each agreement supplemental hereto.

## ARTICLE II

## FORM, EXECUTION, AUTHENTICATION, DELIVERY AND REGISTRATION OF BONDS

SECTION 201.     Limitation on Issuance of Bonds.  No Bonds may be issued under the provisions of this Agreement except in accordance with the provisions of this Article.

SECTION 202.     Form of Bonds.  The Bonds issued under the provisions of this Agreement shall be in substantially the form hereinabove set forth, with such appropriate variations, omissions and insertions as are permitted or required by this Agreement and with such additional changes as may be necessary or appropriate to conform to the provisions of the resolution or resolutions providing for the issuance of such Bonds, including changes required for the issuance of different types of Bonds which may reflect, without limitation, provisions for Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Balloon Bonds, Interim Bonds, Variable Rate Bonds, Extendible Maturity Bonds and Put Bonds. All such Bonds may have endorsed thereon such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority or any usage or requirement of law with respect thereto.

SECTION 203.     Details of Bonds.  The Bonds shall be issued in fully registered form and, if the Trustee issues notice of the availability of exchanging registered Bonds for coupon Bonds, in coupon form. If the Trustee receives a written request of the Authority for the delivery of coupon Bonds and an opinion of counsel of recognized standing in the field of law relating to municipal bonds to the effect that the issuance of any of the Bonds in coupon form will not adversely affect the exclusion from gross income of the interest on any of the Bonds for Federal income tax purposes, if such exclusion is otherwise applicable, the Trustee shall mail notice to the Holders of the Bonds of the availability of exchanging registered Bonds and coupon Bonds. Registered Bonds may then be exchanged for an equal aggregate principal amount of coupon Bonds of the same Series and maturity of any authorized denomination and bearing interest at the same rate as the exchanged Bonds and coupon Bonds may be exchanged for an equal aggregate principal amount of fully registered Bonds in the manner provided in this Agreement, as the Agreement may be supplemented to provide for coupon Bonds.

The Bonds of a Series shall be payable, with respect to interest, principal and premium, if any, in any coin or currency of the United States of America which at the time of payment is legal tender for public and private debts (or other coin or currency provided for in the resolution authorizing the issuance of the particular Series). The principal of Bonds shall be payable only to the Holder or his legal representative at the principal corporate trust office of the Trustee and at such other office or agency of any paying agent as the Board may designate from time to time upon the presentation and surrender of the Bonds (except as otherwise provided in Section 211 hereof). The Bonds of each Series shall be dated as provided in a resolution of the Board; shall bear interest, which may be fixed or variable, from the Interest Payment Date next preceding the date on which they are authenticated unless authenticated on an Interest Payment Date, in which event they shall bear interest from such Interest Payment Date, or are authenticated before the first Interest Payment Date in which event they shall bear interest from their date, provided, however, that if at the time of authentication of any Bond interest is in default, such Bond shall

- 19 -

bear interest from the date to which interest has been paid. Capital Appreciation Bonds shall bear interest as described under the defined term Accreted Value, payable on the amount due at maturity only upon redemption, acceleration or maturity thereof, and Capital Appreciation and Income Bonds shall bear interest as described under the defined term Appreciated Value, payable on the amount due at maturity but only from and after the Interest Commencement Date. The interest rate shall not exceed the applicable maximum legal rate per annum. Interest on the Bonds shall be payable by check mailed to the registered Holder thereof by the Trustee or any other paying agents appointed by the Authority at the address shown on the registration books of the Authority held by the Trustee at the close of business on the fifteenth (15th) day (whether or not a business day) of the calendar month preceding an Interest Payment Date or such other date as may be established by resolution for any Bonds; provided that to the extent provided in the resolution authorizing the issuance of Bonds interest shall be payable by wire transfer. The Bonds shall be lettered and numbered in such manner and shall be in the denominations provided in the resolutions of the Board authorizing their issuance. In the event that interest is not punctually paid or duly provided for, such interest shall forthwith cease to be payable to the Holder shown on the registration books held by the Trustee at the close of business on the fifteenth (15th) day of the calendar month preceding such Interest Payment Date and may be paid to the person in whose name Bonds are registered at the close of business on a special record date to be fixed by the Trustee, on a special payment date designated by the Trustee, notice having been given by the Trustee to the Holders not less than ten (10) days prior to such special record date or may be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which Bonds may be listed and upon such notice as may be required by such exchange, or as more fully provided for in the resolution of the Board authorizing the issuance of the Bonds. The above procedure for the payment of defaulted interest overdue may be varied in resolutions of the Board authorizing the issuance of particular Series of Bonds, which resolutions may also provide for the payment of such interest at defaulted interest rates.

The Bonds shall be signed in the name of the Authority by the Executive Director or with his facsimile signature and the corporate seal of the Authority shall be impressed or a facsimile of such seal shall be imprinted on the Bonds and attested by the Secretary or his facsimile signature. In case any officer whose signature or a facsimile of whose signature shall appear on any Bonds shall cease to be such officer before the delivery of such Bonds, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes as if he had remained in office until such delivery, and also any Bonds may bear the facsimile signature of or may be signed by such persons as at the actual time of the execution of such Bonds shall be the proper officers to sign such Bonds although on the date of such Bonds such persons may not have been such officers.

SECTION 204. <u>Authentication of Bonds</u>. Only such of the Bonds as shall have endorsed thereon a certificate of authentication substantially in the form hereinabove set forth, duly executed by the Trustee, shall be entitled to any benefit or security under this Agreement. No Bond shall be valid or become obligatory for any purpose or be entitled to any benefit or security under this Agreement unless and until such certificate of authentication shall have been duly executed by the Trustee, and such certificate of the Trustee upon any such Bond shall be conclusive evidence that such Bond has been duly authenticated and delivered under this Agreement. The Trustee's certificate of authentication on any Bond shall be deemed to have

been duly executed if signed by an authorized officer of the Trustee, but it shall not be necessary that the same officer sign the certificate of authentication on all of the Bonds that may be issued hereunder at any one time.

SECTION 205.    Exchange and Registration of Transfer.    Bonds upon surrender thereof at the principal corporate trust office of the Trustee, together with an assignment duly executed by the Holder or his attorney or legal representative in the form set forth on the Bonds or such other form as may be satisfactory to the Trustee, may, at the option of the Holder thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series and maturity, of any denomination or denominations authorized by this Agreement, and bearing interest at the same rate, in the same form as the Bonds surrendered for exchange.

The Trustee shall keep books for the registration of and for the registration of transfers of the Bonds as provided in this Agreement. The transfer of any Bond may be registered only upon the books kept for the registration of and registration of transfers of Bonds upon surrender thereof to the Trustee together with an assignment duly executed by the Holder or his attorney or legal representative in the form of the assignment set forth on the Bonds or such other form as may be satisfactory to the Trustee. Upon any such registration of transfer, the Authority shall execute and the Trustee shall authenticate and deliver in exchange for such Bond a new Bond or Bonds registered in the name of the transferee, of any denomination or denominations authorized by this Agreement, in an aggregate principal amount equal to the principal amount of such Bond of the same Series and maturity and bearing interest at the same rate. In all cases in which Bonds shall be exchanged or transferred hereunder, the Authority shall execute and the Trustee shall authenticate and deliver at the earliest practicable time Bonds in accordance with the provisions of this Agreement. The Authority or the Trustee may make a charge for every such exchange or registration of transfer of Bonds sufficient to reimburse it for any tax or other governmental charge required to be paid with respect to such exchange or registration of transfer, but no other charge shall be made to any Holder for exchanging or registering the transfer hereinabove granted. Any Bond surrendered in any such exchange or transfer shall be cancelled by the Trustee as provided in Section 304 hereof. Neither the Authority nor the Trustee shall be required to make any such exchange or registration of transfer of any Bond during the fifteen (15) days immediately preceding the date of mailing of notice of any redemption of such Bond, or after a Bond or any portion thereof has been selected for redemption.

SECTION 206.    Ownership of Bonds.    As to any Bond the person in whose name the same shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of or on account of the principal of and premium, if any and interest on any such Bond shall be made only to the Holder thereof or his legal representative. All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond, including the premium, if any, and interest thereon, to the extent of the sum or sums so paid.

Any Holder of any Bond is hereby granted power to transfer absolute title thereto by assignment thereof to a bona fide purchaser for value (present or antecedent) without notice of prior defenses or equities or claims of ownership enforceable against his assignor or any person in the chain of title and before the maturity of such Bond. Every prior Holder of any Bond shall be deemed to have waived and renounced all of his equities or rights therein in favor of every

- 21 -

such bona fide purchaser, and every such bona fide purchaser shall acquire absolute title thereto and to all rights represented thereby.

SECTION 207. <u>The Series 1988 Bonds</u>. The Series 1988 Bonds shall be issued under this Agreement in the aggregate principal amount of Three Hundred Twenty Seven Million Seven Hundred Forty Thousand Dollars ($327,740,000) for the purpose of providing funds to defease the Outstanding PRASA Bonds and to pay the Pfizer Debt. Such Bonds shall be designated Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A. The terms of such Bonds including, but not limited to, interest rates, Amortization Requirements, redemption provisions and maturity dates and the disposition of the proceeds of the Series 1988 Bonds and the disposition of moneys to be made available by PRASA, shall be provided for in a resolution of the Board. The disposition of proceeds may be supplemented or changed by a certificate of the Executive Director executed on the date of issuance of the Series 1988 Bonds if provided for in said resolution.

Each of the Series 1988 Bonds shall be executed substantially in the form and manner hereinabove set forth and deposited with the Trustee for authentication, but before the Series 1988 Bonds shall be authenticated and delivered by the Trustee, there shall be filed with the Trustee the following:

(i)      a copy, certified by the Secretary, of the resolution mentioned above;

(ii)     a copy, certified by the Secretary, of the resolution directing the authentication and delivery of the Series 1988 Bonds to or upon the order of the purchasers therein named upon payment of the purchase price for each Series therein set forth;

(iii)    a certificate of the Executive Director directing the disposition of the proceeds of the Series 1988 Bonds;

(iv)     the report of a firm of nationally recognized independent certified public accountants, of favorable reputation for skill and experience in verifying the mathematical computations of sufficiency of investments for defeasance and yield calculations in refunding transactions, stating their conclusions with respect to (A) the mathematical computations of the sufficiency of the maturing principal of and interest on the investments made with the proceeds of the Series 1988 Bonds to be applied to the refunding of the Outstanding PRASA Bonds and other moneys available for such purpose for the payment of the principal of, premium, if any, and interest on the Outstanding PRASA Bonds to be refunded and (B) the mathematical computations of the actuarial yield on the Series 1988 Bonds issued to refund the Outstanding PRASA Bonds and on investments made with the proceeds of such Bonds and other available moneys;

(v)      an opinion of counsel of recognized standing in the field of law relating to municipal bonds to the effect that upon the deposit of the United States government obligations and uninvested moneys in the Escrow Deposit Trust Fund

established for the refunding of the Outstanding PRASA Bonds and in reliance as to the sufficiency of such deposit upon the verification report addressing such sufficiency that has been delivered simultaneously herewith by Ernst & Whinney, Memphis, Tennessee, and the giving of notice of refunding required under the trust agreement under which the Outstanding PRASA Bonds were issued, the Outstanding PRASA Bonds shall no longer be deemed to be outstanding and shall cease to be entitled to any lien, benefit or security under said trust agreement; and

(vi)     an opinion of counsel for the Authority to the effect that (a) the issuance of such Bonds and the execution of this Agreement have been duly authorized and that all conditions precedent to the authentication and delivery of such Bonds have been fulfilled; (b) the form and terms of such Bonds have been established by or pursuant to one or more Board resolutions, in conformity with the provisions of this Agreement; (c) such Bonds, when authenticated and delivered by the Trustee and issued by the Authority in the manner and subject to any conditions specified in such opinion of counsel, will constitute valid and legally binding obligations of the Authority, enforceable in accordance with their terms, and will be entitled to the benefit of this Agreement; (d) the Authority has the corporate power to issue such Bonds, and has duly taken all necessary corporate action with respect to such issuance; (e) the issuance of such Bonds will not contravene the Act; and (f) that all requirements of this Agreement applicable to the Authority in respect of the execution and delivery by the Authority of such Bonds have been complied with and that, assuming due authentication and delivery of such Bonds by the Trustee, no authorization, approval or consent by any regulatory or statutory or other public authority which has not been obtained is required for the creation, issuance, authentication and delivery of such Bonds pursuant to this Agreement.

When the documents mentioned above in this Section shall have been filed with the Trustee and when said Series 1988 Bonds shall have been executed and authenticated as required by this Agreement, the Trustee shall deliver said Series 1988 Bonds to or upon the order of the purchasers named in the resolution mentioned in clause (ii) of this Section, but only upon payment to the Trustee of the purchase price of said Series 1988 Bonds.

SECTION 208.     <u>Additional Bonds</u>.  Bonds may be issued under and secured by this Agreement, subject to the conditions hereinafter provided in this Section, for any lawful purpose of the Authority and paying any costs of issuance of such Bonds.

Before any Bonds shall be issued under the provisions of this Section, the Board shall adopt a resolution authorizing the issuance of such Bonds, fixing the amount and the details thereof, specifying the amount of interest, if any, on such Bonds to be paid from the net proceeds of the Bonds, and describing in brief and general terms the purpose for which such Bonds are to be issued. The Bonds authorized by any such resolution shall be designated and dated, shall be in such denominations, shall be numbered, shall be issued in such form, shall bear interest until their payment at any rate or rates not exceeding the maximum rate permitted by applicable law, shall be stated to mature at such time or times, shall have such Amortization Requirements, and shall be made subject to redemption, either in whole or in part, at such times and prices (subject

- 23 -

to the provisions of Article III of this Agreement), as may be determined by resolution of the board adopted prior to the issuance of such Bonds. By said resolution, the Board may appoint one or more paying agents for such Bonds in addition to the Trustee. Prior to the issuance of Variable Rate Bonds, the Board shall adopt a resolution specifying, without limitation, the interest rate calculation methods and any conversion features and any Credit Facility or any Liquidity Facility which may be drawn upon to make principal and interest payments on the Variable Rate Bonds. The Variable Rate Bonds may provide that the owner of any such Bond may demand payment of principal and interest within a stated period after delivering notice to a designated agent for the Authority and providing a copy of the notice with the tender for the Variable Rate Bond to such agent. The designated agent for the Authority, in accordance with the terms of a remarketing agreement, may provide for the resale or redelivery of the Variable Rate Bonds on behalf of the Authority at a price provided for in the agreement. If the Variable Rate Bonds shall not be resold or redelivered within a stated period, the agent for the Authority may be authorized to draw upon a Credit Facility or Liquidity Facility for payment of interest on and principal of the Bonds. The particular form or forms of such demand provisions, the period or periods for payment of principal and interest after delivery of notice, the appointment of the agent for the Authority, the terms and provisions for the remarketing agreement, and the terms and provisions of the Credit Facility or the Liquidity Facility, shall be designated by a resolution of the Board. Prior to the issuance of Extendible Maturity Bonds, the Board shall specify by resolution the terms and conditions of the exercise by the Holders or the Authority of any option to extend the maturity of said Bonds. Prior to the issuance of Capital Appreciation Bonds and Capital Appreciation and Income Bonds, the Board shall specify by resolution the manner in which and the period during which principal and interest shall be deemed to accrue on such Bonds for purposes of the definition of "Principal and Interest Requirements". Additional Bonds shall be executed substantially in the form and manner hereinabove set forth and deposited with the Trustee for authentication, but before any of such Bonds shall be authenticated and delivered by the Trustee, there shall be filed with the Trustee the following:

      (a)    a copy, certified by the Secretary, of the resolution mentioned above;

      (b)    a copy, certified by the Secretary, of the resolution directing the authentication of such Bonds, specifying the interest rate of each such Bond, and directing the delivery of such Bonds to or upon the order of the purchasers therein named upon payment of the purchase price therein set forth;

      (c)    a certificate dated the date of original issuance of the such Bonds, signed by the Secretary of the Treasury of the Commonwealth, setting forth

           (i)    the amount of the average annual Offshore Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

           (ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then

Outstanding, the Debt Service Components then outstanding and the Bonds to be issued; and

(iii)    the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%;

(d)    a certificate dated the date of original issuance of the Bonds to be issued, signed by the Executive Director, setting forth

(i)    the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii)    the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%; and

(e)    an opinion of counsel for the Authority dated the date of original issuance of such Bonds to the effect that

(i)    the issuance of such Bonds has been duly authorized and that all conditions precedent to the authentication and delivery of such Bonds have been duly fulfilled;

(ii)    the form and terms of such Bonds have been established by or pursuant to one or more Board resolutions, in conformity with the provisions of this Agreement;

(iii)    such Bonds, when authenticated and delivered by the Trustee and issued by the Authority in the manner and subject to any conditions specified in such opinion of counsel, will constitute valid and legally binding obligations of the Authority, enforceable in accordance with their terms, and will be entitled to the benefits of this Agreement;

(iv)    the Authority has the corporate power to issue such Bonds, and has duly taken all necessary corporate action with respect to such issuance;

(v)    the issuance of the Bonds will not contravene the Act; and

- 25 -

(vi)     all requirements of this Agreement applicable to the Authority in respect of the execution and delivery by the Authority of such Bonds have been complied with and that, assuming due authentication and delivery of such Bonds by the Trustee, no authorization, approval or consent by any regulatory or statutory or other public authority which has not been obtained is required for the creation, issuance, authentication and delivery of such Bonds pursuant to this Agreement; and

When the documents mentioned above shall have been filed with the Trustee and when the Bonds described in the resolutions mentioned in clauses (a) and (b) of this Section shall have been executed and authenticated as required by this Agreement, the Trustee shall deliver such Bonds to or upon the order of the purchasers named in the resolution mentioned in said clause (b) upon payment to the Trustee of the purchase price of such Bonds.

Bonds may be issued under this Section as part of a Series of Bonds which contains Bonds issued under Section 209 hereof, in which event the conditions to authentication and delivery listed above shall pertain only to the portion of the Series of Bonds issued under this Section.

The proceeds of the Bonds issued under the provisions of this Section shall be applied by the Trustee as provided in a resolution of the Board adopted prior to the issuance of the Bonds, which may be supplemented or changed by a certificate of the Executive Director executed on the date of issuance of the Bonds, if provided for in said resolution.

SECTION 209.     Refunding Bonds.  Bonds may be issued, subject to the conditions hereinafter provided in this Section, at any time or times for the purpose of providing funds for refunding all or any part of the Outstanding Bonds of any one or more Series or all or any portion of Debt Service Components by payment at maturity or redemption at a selected redemption date or dates or combination of such payment at maturity and redemption, including the payment of any redemption premium thereon and paying any costs of issuance of such Bonds. Before any Bonds shall be issued under the provisions of this Section, the Board shall adopt a resolution authorizing the issuance of such Bonds, fixing the amount and the details of the Bonds, and describing the Bonds to be refunded. Such Bonds shall be designated and dated, shall be in such denominations, shall be numbered, shall be issued in such form, shall bear interest until their payment at any rate or rates not exceeding the maximum rate permitted by applicable law, shall be stated to mature at such time or times, shall have such Amortization Requirements and shall be made subject to redemption, in whole or in part, at such times and prices (subject to the provisions of Article III of this Agreement), as may be determined by resolution of the Board adopted prior to the issuance of such Bonds. By said resolution, the Board may appoint one or more paying agents for such Bonds in addition to the Trustee. Prior to the issuance of Variable Rate Bonds, the Board shall adopt a resolution specifying, without limitation, the interest rate calculation methods and any conversion features, and any Credit Facility or any Liquidity Facility which may be drawn upon to make principal and interest payments on the Variable Rate Bonds.  The Variable Rate Bonds may provide that the Holder of any such Bond may demand payment of principal and interest within a stated period after delivering notice to a designated agent for the Authority and providing a copy of the notice with the tender of the Variable Rate Bond to such agent. The designated agent for the Authority, in

NY1 5690864v.2 45967/59

accordance with the terms of a remarketing agreement, may provide for the resale or redelivery of the Variable Rate Bonds on behalf of the Authority at a price provided for in such agreement. If the Variable Rate Bonds shall not be resold or redelivered within a stated period, the agent for the Authority may be authorized to draw upon a previously executed Credit Facility or Liquidity Facility for payment of interest and principal for a particular series of Variable Rate Bonds to which such Credit Facility or Liquidity Facility shall pertain. The particular form or forms of such demand provisions, the period or periods for payment of principal and interest after delivery of notice, the appointment of the agent for the Authority, the terms and provisions for the remarketing agreement, and the terms and provisions of the Credit Facility or Liquidity Facility shall be as designated by a resolution of the Board pertaining to the Variable Rate Bonds to which such terms and provisions are applicable prior to the issuance thereof. Prior to the issuance of Put Bonds, the Board shall adopt a resolution which may provide for some of the above terms and provisions. Prior to the issuance of Extendible Maturity Bonds, the Board shall adopt a resolution which shall set forth the terms and conditions of the exercise by the Holder or the Authority of any option to extend the maturity of said Bonds. Prior to the issuance of Capital Appreciation Bonds and Capital Appreciation and Income Bonds, the Board shall specify by resolution, the manner in which and the period during which principal and interest shall be deemed to accrue on such Bonds for purposes of the definition of "Principal and Interest Requirements".

All Bonds issued under the provisions of this Section shall be executed substantially in the form and manner hereinabove set forth and deposited with the Trustee for authentication, but before such Bonds shall be authenticated and delivered by the Trustee, there shall be filed with the Trustee the following:

      (a)    a copy, certified by the Secretary, of the resolution mentioned above;

      (b)    a copy, certified by the Secretary, of the resolution directing the authentication of such Bonds, specifying the interest rate of each such Bond and directing the delivery of such Bonds to or upon the order of the purchasers therein named upon payment of the purchase price therein set forth;

      (c)    an opinion of counsel for the Authority dated the date of original issuance of such Bonds to the effect that

           (i)    the issuance of such Bonds has been duly authorized and that all conditions precedent to the authentication and delivery of such Bonds have been fulfilled;

           (ii)    the form and terms of such Bonds have been established by or pursuant to one or more Board resolutions, in conformity with the provisions of this Agreement;

           (iii)    such Bonds, when authenticated and delivered by the Trustee and issued by the Authority in the manner and subject to any conditions specified in such opinion of counsel, will constitute valid and legally binding obligations of

the Authority, enforceable in accordance with their terms, and will be entitled to the benefits of this Agreement;

(iv)    the Authority has the corporate power to issue such Bonds, and has duly taken all necessary corporate action with respect to such issuance;

(v)    the issuance of such Bonds will not contravene the Act; and

(vi)    all requirements of this Agreement applicable to the Authority in respect of the execution and delivery by the Authority of such Bonds, have been complied with and that, assuming due authentication and delivery of such Bonds by the Trustee, no authorization, approval or consent by any regulatory or statutory or other public authority which has not been obtained is required for the creation, issuance, authentication and delivery of such Bonds pursuant to this Agreement;

(d)    such documents as shall be required by counsel of recognized standing in the field of law relating to municipal bonds to show that provision has been made in accordance with the provisions of this Agreement for the payment or redemption or combination of such payment and redemption of all the Bonds or Debt Service Components to be refunded;

(e)    a certificate dated the date of original issuance of such Bonds, signed by the Executive Director, that the sum of the net proceeds (excluding accrued interest but including any premium) of such Bonds, together with investment earnings on said proceeds, other moneys to be deposited and investment earnings on said moneys, shall not be less than an amount sufficient to pay the principal of, the redemption premium, if any, and interest accrued to the payment dates on the Bonds or Debt Service Components to be refunded, and the expenses incident to such financing; and

(f)    the certificates required in Section 208(c) and (d); provided that said certificates shall not be required if the Executive Director delivers a certificate to the effect that (i) the aggregate Principal and Interest Requirements for each Fiscal Year thereafter on account of the Bonds Outstanding and Debt Service Components outstanding after the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of the Bonds Outstanding and Debt Service Components outstanding prior to such issuance of refunding Bonds or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds Outstanding and Debt Service Components outstanding after the issuance of such refunding Bonds are equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds Outstanding and Debt Service Components outstanding prior to the issuance of such refunding Bonds.

Bonds may be issued under this Section as a part of a Series of Bonds which contains Bonds issued under Section 208 hereof, in which event the conditions to execution and authentication listed above shall pertain only to Bonds issued under this Section.

The proceeds of the Bonds issued under the provisions of this Section shall be applied by the Trustee as provided in a resolution of the Board adopted prior to the issuance of the Bonds, which may be supplemented or changed by a certificate of the Executive Director executed on the date of issuance of the Bonds and delivered to the Trustee, if provided for in said resolution. Simultaneously with the delivery of the Bonds, the Trustee may withdraw from the Sinking Fund amounts which are Trustee to the Bonds to be refunded and shall transfer said amounts in accordance with the resolution of the Board authorizing the issuance of such Bonds.

The issuance of the Bonds to accomplish a cross-over refunding, economic defeasance or other similar refunding shall be within the purview of this Section 209.

SECTION 210.  <u>Temporary Bonds</u>.  Until definitive Bonds are ready for delivery, there may be executed, and upon request of the Executive Director the Trustee shall authenticate and deliver, in lieu of definitive Bonds and subject to the same imitations and conditions except as to identifying numbers, temporary printed, engraved, lithographed or typewritten Bonds in authorized denominations substantially of the tenor hereinabove recited, and with appropriate omissions, insertions and variations as may be required. The Authority shall cause the definitive Bonds to be prepared and to be executed and delivered to the Trustee, and the Trustee, upon presentation to it of any temporary Bond, shall cancel the same in the manner set forth in Series 304 hereof and authenticate and deliver in exchange therefor, at the place designated by the Holder, without expense to the Holder, a definitive Bond or Bonds of the same aggregate principal amount and having the same Series, maturity and interest rate as the temporary Bond surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefit and security of this Agreement as the definitive Bonds to be issued and authenticated hereunder.

SECTION 211.  <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>.  In case any Bond secured hereby shall become mutilated or be destroyed, stolen or lost, the Authority may execute, and the Trustee may authenticate and deliver, a new Bond of like date, maturity and tenor in exchange and substitution for such Bond destroyed, stolen, mutilated or lost, upon the Holder's paying the reasonable expenses and charges of the Authority and the Trustee in connection therewith. In the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Trustee and, in the case of a Bond destroyed, stolen or lost, there shall first be furnished to the Trustee evidence satisfactory to the Trustee and to the Authority that such Bond was destroyed, stolen or lost, and there shall be furnished to the Authority and the Trustee indemnity satisfactory to them.

In the event any such Bond shall be about to mature or have matured or have been called for redemption, instead of issuing a duplicate Bond, the Authority may direct the Trustee to pay the same without surrender thereof. Any Bond surrendered for replacement shall be cancelled in the same manner as provided in Section 304 hereof.

Any such new Bonds issued pursuant to this Section shall constitute additional contractual obligations on the part of the Authority, whether or not the mutilated, lost, stolen or destroyed Bonds be at any time enforceable by anyone, and shall be entitled to equal and proportionate benefits and rights as to lien on and source and security for payment from the Pledged Revenues with all other Bonds.

SECTION 212. <u>Qualification for Depository Trust Company</u>. The Trustee is hereby authorized to enter into agreements with the Depository Trust Company of New York and other depository trust companies, including but not limited to, agreements necessary for wire transfers of interest and principal payments with respect to the Bonds, utilization of electronic book entry data received from the Depository Trust Company of New York and other depository trust companies in place of actual delivery of Bonds and provision of notices with respect to Bonds registered by the Depository Trust Company of New York and other depository trust companies (or any of their designees identified to the Trustee) by overnight delivery, courier service, telegram, telecopy or other similar means of communication.

SECTION 213. <u>Capital Appreciation Bonds; Capital Appreciation and Income Bonds</u>. For purposes of determining the principal amount of a Capital Appreciation Bond or a Capital Appreciation and Income Bond, for redemption or computation of the amount of Bonds held by the Holder thereof in giving to the Authority any notice, covenant, request or demand pursuant to this Agreement for any purpose whatsoever, the principal amount of a Capital Appreciation Bond shall be deemed to be its Accreted Value and the principal amount of a Capital Appreciation and Income Bond shall be deemed to be its Appreciated Value. For purposes of determining the amount required to be deposited to the credit of the Reserve Account, reference herein to the original principal amount shall mean in the case of Capital Appreciation Bonds, Capital Appreciation and Income Bonds and other Bonds which are sold to the public at a discount, the value of such Bonds at maturity.

SECTION 214. <u>Debt Service Components</u>. The Authority may incur indebtedness payable from moneys withdrawn from the Puerto Rico Infrastructure Fund on a pro rata basis with the deposits required to be made to the credit of the Bond Service Account, the Redemption Account and the Reserve Account (in respect of Bonds issued before November 1, 1997) under Section 401 hereof, which indebtedness is referred to herein as Debt Service Components; provided that prior to the incurrence of such indebtedness, the Authority shall file with the Trustee the certificates required by Section 208(c) and (d) or Section 209(f), as applicable, in respect of such Debt Service Components.

- 30 -

## ARTICLE III

## REDEMPTION OF BONDS

SECTION 301.     Redemption of Bonds.  The Bonds of each Series issued under the provisions of this Agreement may be made subject to redemption, both in whole and in part and at such times and prices, as may be provided in the resolution authorizing the issuance of such Bonds. Term Bonds shall be made subject to redemption to the extent of any Amortization Requirements therefor.

If less than all of the Bonds of any one maturity of a Series shall be called for redemption; the particular Bonds or portions of Bonds to be redeemed shall be selected by the Trustee in such manner as it shall deem fair and appropriate; provided, however, that the portion of any Bond of any Series to be redeemed shall be in the principal amount equal to the lowest denomination authorized for such Series or some multiple thereof, and that, in selecting Bonds for redemption, the Trustee shall treat each Bond as representing that number of Bonds which is obtained by dividing the principal amount of such Bond by the amount of such lowest authorized denomination.

SECTION 302.     Redemption Notice.    At least thirty (30) days before the redemption date of any Bonds or as otherwise provided in the resolution authorizing the issuance of the particular Bonds, the Trustee shall cause a notice of any such redemption, either in whole or in part, on behalf of the Authority to be mailed, by first class mail, postage prepaid, to any other paying agents for the Bonds to be redeemed and to all Holders of Bonds to be redeemed at their addresses as they appear upon the books of registration hereinabove provided for; but failure so to mail any such notice to any Holder or any defect in any notice so mailed shall not affect the validity of the proceedings for the redemption of other Bonds. Each such notice shall set forth (1 ) the date fixed for redemption, (2) the redemption price to be paid, (3) that on the date fixed for redemption the redemption price will become due and payable upon each Bond called for redemption, (4) if moneys for the payment of the redemption price shall be on deposit on such date, that interest thereon shall cease to accrue on and after said redemption date, (5) the place where such Bonds are to be surrendered for payment of such redemption price, (6) if less than all of the Bonds of a Series then Outstanding shall be called for redemption, the numbers of such Bonds and (7) the complete designation of the Series, including the CUSIP numbers. Each notice of redemption shall also contain (a) the date of issue of the Bond as originally issued; (b) the rate of interest borne by each Bond being redeemed; (c) the maturity date of each Bond being redeemed; and (d) the name, address and telephone number of a contact person, if any, representing the Trustee. In case any Bond is to be redeemed in part only, the notice of redemption which relates to such Bond shall state also the amount of such Bond to be redeemed and that on or after the redemption date, upon surrender of such Bond, a new Bond or Bonds of the same Series and maturity, bearing interest at the same rate and in principal amount equal to the unredeemed portion of such Bond will be issued.

In addition to the foregoing notice, further notice shall be given by the Trustee as set out below, but no defect in said further notice nor any failure to give all or any portion of such further notice shall be the basis for any liability of the Trustee or in any manner defeat the effectiveness of a call for redemption if notice thereof is given as above prescribed.

NY1 5690864v.2 45967/59

(a)     Each further notice of redemption shall be sent by first class mail, postage prepaid, at least thirty (30) days before the redemption date to registered securities depositories and national information services whose names and addresses are included in the most recent list thereof furnished to the Trustee by the Authority; and

(b)     The Trustee shall cause a second notice of redemption to be mailed in the manner and in the form required above for the initial notice of redemption to Holders of Bonds or portions thereof to be redeemed who have not surrendered their Bonds within sixty (60) days after the redemption date.

SECTION 303.     <u>Effect of Calling for Redemption</u>.  On the date so designated for redemption, notice having been given in the manner and under the conditions hereinabove provided, the Bonds or portions of Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Bonds or portions of Bonds on such date, and, if sufficient moneys for payment of the redemption price and accrued interest or Sufficient Government Obligations as defined in Section 305 hereof are held by the Trustee in trust for the Holders of Bonds to be redeemed, as provided in this Agreement, interest on the Bonds or portions of Bonds so called for redemption shall cease to accrue, such Bonds or portions of Bonds shall cease to be entitled to any benefit or security hereunder and shall no longer be Outstanding hereunder and the Holders of such Bonds or portions of Bonds shall have no rights in respect thereof except to receive payment of the redemption price thereof and accrued interest, and, to the extent provided in Section 306 hereof, to receive Bonds for any unredeemed portions of Bonds.

SECTION 304.     <u>Cancellation of Bonds</u>.  All Bonds paid, redeemed or purchased by the Authority, either at or before maturity, shall be delivered to the Trustee when such payment, redemption or purchase is made and such Bonds shall thereupon be cancelled. The Trustee shall provide to the Authority the details of all Bonds so cancelled. All Bonds cancelled under any of the provisions of this Agreement either shall be delivered to the Authority or destroyed by the Trustee, as the Authority directs. Upon destruction of any Bonds, the Trustee shall execute a certificate in duplicate, describing the Bonds so destroyed, and one executed certificate shall be filed with the Authority and the other executed certificate shall be retained by the Trustee.

SECTION 305.     <u>Bonds To Be Paid Not Outstanding</u>.  If (a) Bonds shall have been duly called for redemption under the provisions of this Article or irrevocable instructions have been given the Authority to the Trustee to (i) call Bonds for redemption under the provisions of this Article or  (ii) pay Bonds at their maturity or maturities (the Bonds described in clause (a) are herein collectively called the "Bonds to be Paid"), and (b) sufficient moneys to provide for the payment of such Bonds or Sufficient Government Obligations (as defined below) are held in separate accounts by the Trustee or other appropriate fiduciary institution acting as escrow agent solely for the Holders of the Bonds to be Paid, then, notwithstanding any other provisions herein to the contrary, the Bonds to be Paid shall not be deemed to be Outstanding under the provisions of this Agreement and shall cease to be entitled to any benefit or security under this Agreement.

For purposes of this Agreement "Sufficient Government Obligations" shall mean Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, the Farm Credit System, Federal Home Loan Banks

or the Student Loan Marketing Association which are in such principal amounts, bear interest at such rate or rates and mature (without option of prior redemption) on such date or dates so that the proceeds to be received upon payment of such Government Obligations or obligations issued by Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Farm Credit System, Federal Home Loan Banks or Student Loan Marketing Association at their maturity and the interest to be received thereon, without any reinvestment thereof, will provide sufficient moneys on the dates required to pay the principal of and redemption premium, if any, and the interest on the Bonds to be Paid to the dates of their redemption or maturity.

SECTION 306.    Partial Redemption.  In case part but not all of an Outstanding Bond shall be selected for redemption, the Holder thereof or his attorney or legal representative shall present and surrender such Bond to the Trustee for payment of the principal amount thereof so called for redemption, and the Authority shall execute and the Trustee shall authenticate and deliver to or upon the order of such Holder or his attorney or legal representative, without charge to the Holder therefor, for the unredeemed portion of the principal amount of the Bond so surrendered, a new Bond or Bonds of the same Series and maturity, bearing interest at the same rate and of any denomination or denominations authorized by this Agreement.

**ARTICLE IV**

**FUNDS AND ACCOUNTS**

SECTION 401.    Sinking Fund and Accounts.  A special fund is hereby created and designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (herein sometimes called the "Sinking Fund") to be held by the Trustee. There are hereby created three separate accounts in the Sinking Fund designated "Bond Service Account", "Redemption Account" and "Reserve Account". Subject to the terms and conditions set forth in this Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund. As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys to make the following deposits in the following order:

(a)    to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each Series then Outstanding and (ii) the amount of principal of the Bonds of each Series then or to become within the current Fiscal Year due and payable;

(b)    to the credit of the Redemption Account, such amount as may be required to make the total amount then in the then current Fiscal Year to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the Term Bonds of each Series then Outstanding; and

(c)    in respect of Bonds issued before November 1, 1995 to the credit of the Reserve Account, such amount as may be required to make the amount then to the credit of the Reserve Account equal to the lesser of (i) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on the Bonds outstanding and (ii) ten percent (10%) of the original principal amount of each Series of Bonds Outstanding.

In lieu of any required deposit or in substitution of moneys on deposit to the credit of the Reserve Account, the Authority may cause to be deposited to the credit of the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any payment date for any Bonds issued before November 1, 1997 on which a withdrawal from the Reserve Account would be required under Section 404 hereof and which shall give the Trustee the right to draw on any Reserve Account Insurance Policy or Reserve Account Letter of Credit prior to the expiration thereof unless the Authority has furnished

a replacement Reserve Account Insurance Policy or Reserve Account Letter of Credit or sufficient moneys to make amounts on deposit to the credit of the Reserve Account equal to the amount required therefor. If a disbursement is made under a Reserve Account Insurance Policy or a Reserve Account Letter of Credit, the Authority shall either reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit or deposit to the credit of the Reserve Account moneys in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, or a combination of such alternatives.

If the Authority issues Variable Rate Bonds pursuant to the provisions of Section 208 or 209 of this Agreement, the assumptions for calculating interest for the current Fiscal Year and any adjustments necessary to ensure a sufficient deposit for the payment of said interest shall be provided for in the resolution authorizing the issuance of such Bonds. For purposes of clause (c) above, interest on Variable Rate Bonds shall be Calculated on the first day of the Fiscal Year for such Fiscal Year and on the date of issuance of any additional Series of Variable Rate Bonds.

If any interest payment date or a principal payment date for any Series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) through (c) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make (i) any payment necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component. After making the foregoing required applications, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund to any lawful purpose.

SECTION 402.    <u>Withdrawals from Bond Service Account</u>.  The Trustee shall on each Interest Payment Date or as otherwise provided in the resolution of the Board authorizing the issuance of Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each Holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due. If paying agents other than the Trustee have been designated by the Authority, the Trustee shall deposit in trust with such paying agents the amounts required to pay such principal and interest. Notwithstanding any provision herein to the contrary, if principal of and premium, if any, and interest on the Bonds that would have been paid from the Sinking Fund is paid instead by a Credit Facility or a Liquidity Facility, amounts held to the credit of the Bond Service Account and the Redemption Account, as applicable, for such purposes shall be paid, to the extent required under any agreement with the issuer of such Credit Facility or Liquidity Facility, to such issuer. The Trustee shall establish one or more subaccounts within the Bond Service Account and the Redemption Account, to the extent required by a resolution of the Board, to segregate

amounts to be paid to the issuer of a Credit Facility or a Liquidity Facility or amounts received from a Credit Facility or a Liquidity Facility.

SECTION 403. <u>Withdrawals from Redemption Account</u>. Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a) Subject to the provisions of paragraph (c) of this Section, the Trustee shall endeavor to purchase Bonds or portions of Bonds, whether or not such Bonds or portions shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds under the provisions of Article III of this Agreement if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. The Trustee shall pay the interest accrued on such Bonds or portions of Bonds to the date of settlement therefor from the Bond Service Account and the purchase price from the Redemption Account, but no such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part under the provisions of this Agreement except from moneys other than the moneys set aside or deposited for the redemption of Bonds.

(b) Subject to the provisions of paragraph (c) of this Section, the Trustee shall call for redemption on each date on which Bonds are subject to redemption from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then held for the credit of the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made pursuant to the provisions of Article III of this Agreement. Prior to calling Bonds or portions of Bonds for redemption the Trustee shall withdraw from the Bond Service Account and from the Redemption Account (including from moneys transferred from the Reserve Account to the credit of the Redemption Account) and set aside in separate accounts or deposit with the Paying Agents the respective amounts required for paying the interest on, and the principal and redemption premium of, the Bonds or portions of Bonds so called for redemption.

(c) Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each Series than Outstanding in the following order:

first, the Term Bonds of each such Series to the extent of the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, if any;

- 36 -

second, any balance then remaining shall be applied to the purchase of any Term Bonds secured hereby and then Outstanding whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) of this Section;

third, any balance then remaining shall be applied to the redemption of the Term Bonds of each such Series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, plus the applicable premium, if any; and

fourth, after the retirement of all Term Bonds, any balance still remaining shall be applied to the retirement of the Serial Bonds of each Series in proportion to the aggregate principal amount of the Serial Bonds of each such Series originally issued under the provisions of this Agreement.

SECTION 404.   Withdrawals from Reserve Account.  Moneys held for the credit of the Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of Bonds in each case in respect of Bonds initially issued before November 1, 1997 when moneys held to the credit of the Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Redemption Account in respect of Term Bonds issued before November 1, 1997 pursuant to the requirements of clause (b) of Section 401 of this Agreement when moneys in the Puerto Rico Infrastructure Fund are insufficient therefor; provided that if moneys then held to the credit of the Bond Service Account are sufficient to pay principal of and interest on the Bonds in the current Fiscal Year, moneys held to the credit of the Reserve Account shall be withdrawn forty-five (45) days prior to the redemption date of any Bonds from moneys in the Redemption Account to the extent necessary to make the deposits required by said clause (b) of Section 401 of this Agreement.

Any moneys held for the credit of the Reserve Account in excess of the lesser of the maximum aggregate Principal and Interest Requirements on the Bonds Outstanding for any Fiscal Year thereafter and ten percent (10%) of the original principal amount of each Series of Bonds Outstanding shall, upon the written request of the Authority, be transferred to the credit of the Bond Service Account or the Redemption Account provided that if the deposits required by clauses (a) and (b) of Section 401 hereof to the credit of the Bond Service Account and the Redemption Account shall have been made for the current Fiscal Year, such excess may be transferred, upon the written request of the Authority, to the Puerto Rico Infrastructure Fund.

SECTION 405.   Moneys Set Aside Held in Trust.  All moneys which the Trustee shall have withdrawn from the accounts of the Sinking Fund, or shall have received from any other source and set aside or deposited with any paying agent for the purpose of paying any of the Bonds hereby secured, either at the maturity thereof or upon call for redemption, shall be held in trust for the respective Holders of such Bonds. Any moneys which shall be so set aside or deposited by the Trustee or any paying agent and which shall remain unclaimed by the Holders of such Bonds for the period of two (2) years after the date on which such Bonds shall have become payable shall, upon request in writing, be paid to the Authority or to such officer, board or body as may then be entitled by law to receive the same, and thereafter the Holders of such Bonds, shall look only to the Authority or to such officer, board or body, as the case may be, for

- 37 -

payment and then only to the extent of the amounts so received without any interest thereon, and the Trustee and any other paying agents shall have responsibility for such moneys.

SECTION 406.  <u>Establishment of Subaccounts in the Redemption Account</u>.  The Trustee shall establish one or more subaccounts in the Redemption Account for deposits for extraordinary mandatory redemptions of one or more Series of Bonds and shall deposit and withdraw moneys from such subaccounts, if and as required by resolutions of the Board adopted prior to the issuance of such Series of Bonds.

## ARTICLE V

## DEPOSITARIES OF MONEYS, SECURITY FOR DEPOSITS
## AND INVESTMENTS OF FUNDS

SECTION 501.        Security for Deposits.  All moneys deposited under the provisions of this Agreement with the Trustee, other than moneys deposited to the credit of the Arbitrage Rebate Fund, shall be held in trust under the terms hereof, and shall not be subject to lien or attachment by any creditor of the Authority.

All moneys deposited with the Trustee hereunder in excess of the amount insured by the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation or other Federal agency shall be continuously secured for the benefit of the Trustee, the Holders of the Bonds and the issuer of any Credit Facility, either (a) by depositing with a bank or trust company approved by the Authority and by the Trustee, as custodian, or, if then permitted by law, by setting aside under control of the trust department of the bank holding such deposit, as collateral security, securities described in clause (i) of the definition of Government Obligations, or, with the approval of the Trustee, other marketable securities eligible as security for the deposit of trust funds under applicable regulations of the Comptroller of the Currency of the United States of America and applicable Commonwealth of Puerto Rico laws or regulations, having a market value (exclusive of accrued interest) not less than the amount of such deposit, or, (b) if the furnishing of security as provided in clause (a) of this Section is not permitted by applicable law, in such other manner as may then be required or permitted by applicable Commonwealth of Puerto Rico and Federal laws or regulations regarding the security for, or granting a preference in the case of, the deposit of trust funds; provided, however, that it shall not be necessary for the Trustee to give security for the deposits of any moneys for the payment of the principal of or the redemption premium or the interest on any Bonds issued hereunder, or for the Trustee or other Qualified Depositary or Qualified Depositaries to give security for any moneys which shall be represented by obligations purchased under the provisions of this Article as an investment of such moneys.

All moneys deposited with the Trustee shall be credited to the particular fund or account to which such moneys belong.

SECTION 502.        Investment of Moneys.  Moneys held for the credit of the Bond Service Account and the Redemption Account (except for any subaccounts established by one or more resolutions of the Board to segregate amounts received from a Credit Facility or a Liquidity Facility, which resolution or resolutions may provide for the investment of moneys deposited to the credit of any such subaccount) shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended. Moneys held for the credit of the Reserve Account shall as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations that shall mature no later than the final maturity of the Bonds in respect of Bonds initially issued before November 1, 1997.

Obligations so purchased as an investment of moneys in any such fund or account shall be deemed at all times to be a part of such fund or account, and any investment earnings and profit or loss realized on the sale or maturity thereof, shall be credited or debited to such fund or account; provided, however, that if the deposits to any account required by Section 401 hereof have been made for the current Fiscal Year, the investment earnings on moneys held to the credit of such account shall be deposited in the order set forth in said Section 401 to the credit of any account for which such required deposit has not been made, and if all such required deposits have been made, such earnings shall be paid to the Puerto Rico Infrastructure Fund. The Trustee, at the written direction of the Authority, shall sell any obligations so purchased as an investment whenever it shall be necessary to do so in order to provide moneys to meet any payments or transfers from such fund or account. Neither the Trustee nor the Authority shall be liable or responsible for any loss resulting from any such investment.

In the case of investments in the obligations described in clauses (iii)(B) and (vi) of the definition of Investment Obligations, the Authority shall deliver to the Trustee, if the Trustee so requests, an opinion of counsel acceptable to the Trustee as to the perfection and priority of the security interests in the collateral described therein.

SECTION 503.    Valuation of Investments.  In computing the amount in any fund or account created pursuant to the provisions of this Agreement, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such fund or account. The computation of the amount on deposit in or credited to any fund and account created under this Agreement and the valuation of the investments of such amount shall be performed by the Trustee for such fund and account held by the Trustee on the last day of each Fiscal Year, and such computation and valuation shall not be required to be performed at other times, except upon the written request of the Authority.

SECTION 504.    Tax Covenants.  The Authority covenants and agrees that so long as any Bonds remain Outstanding, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, it shall comply with the requirements of the Code, including any arbitrage rebate covenants contained in any agreement entered into by and between the Authority and the Trustee in connection with the issuance of any Series of Bonds, except to the extent failure so to comply would not, in the opinion of counsel of recognized standing in the field of law relating to municipal bonds, result in the interest payable on such Bonds being included in gross income for federal income tax purposes to the Holders thereof under the Code. Notwithstanding anything to the contrary contained herein or otherwise, the Authority shall not be required to comply with the covenants herein contained with respect to a specific Series of Bonds, to the extent that interest on such Series of Bonds shall be intended by the Authority, on

NYI 5690864v.2 45967/59

the date of issuance of such Bonds, to be included in gross income for federal income tax purposes to the Holders thereof under the Code.

## ARTICLE VI

## PARTICULAR COVENANTS

SECTION 601.        Payment of Principal, Interest and Premium; Pledge of Pledged Revenues.  The Authority covenants that it will promptly pay the principal of and the interest on every Bond issued hereunder and secured hereby at the places, on the dates and in the manner specified herein and in said Bonds and any premium required for the retirement of said Bonds by purchase or redemption, according to the true intent and meaning thereof. Except as in this Agreement otherwise provided, such principal, interest and premium, if any, are payable solely from the Pledged Revenues, which Pledged Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified. Nothing in the Bonds or in this Agreement shall be deemed to constitute the Bonds a debt or obligation of the Commonwealth of Puerto Rico or any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable for the payment of the principal of or the interest on the Bonds.

SECTION 602.        No Impairment.  The Authority covenants and agrees that, so long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in this Agreement, and that no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the Holders to such Pledged Revenues might be impaired or diminished. Any resolution adopted by the Board authorizing the issuance of a Series of Bonds shall, for all purposes, be deemed part of this Agreement and shall constitute a contract for the benefit of the Holders of said Series. The Agreement and any such resolution may be supplemented and amended only in accordance with Article X hereof, except for supplements and amendments adopted or entered into prior to the issuance of the applicable Series of Bonds which may be adopted or entered into without restriction.

SECTION 603.        Inclusion of Shortfall in Budget.  If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. For purposes of the foregoing sentence, the Authority shall project Special Tax Revenues in the next Fiscal Year of the Commonwealth at such time as shall enable the Authority to file a timely request with the Director of the Office of Budget and Management of the Commonwealth to ensure inclusion in the budget for the next Fiscal Year.  If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund shall be insufficient to permit the Authority to make the deposits into the Sinking Fund set forth in Section 401 hereof in the amounts therein required, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall in such notice request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary.  The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

# ARTICLE VII

# REMEDIES

SECTION 701.    <u>Enforcement of Remedies</u>.  At the request of the Holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed, subject to the provisions of Section 802 hereof, to protect and enforce its rights and the rights of the Holders under the laws of the Commonwealth or under this Agreement, including all rights with respect to funds and other moneys pledged hereunder, by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted or for the enforcement of any proper legal or equitable remedy, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights.

In the enforcement of any remedy under this Agreement the Trustee shall be entitled to sue for, enforce payment of and recover judgment for, in its own name and as trustee of an express trust, any and all amounts then or after any default becoming, and at any time remaining, due from the Authority for principal, premium, if any, interest or otherwise under any of the provisions of this Agreement or of the Bonds and unpaid, with interest on overdue payments of principal, premium, if any, and interest at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under the Bonds and maintain a suit, action or special proceeding in equity or at law against the Authority for any deficiency, all without prejudice to any other right or remedy of the Trustee or of the Holders, and to recover and enforce any judgment or decree against the Authority, but solely as provided herein and in the Bonds, for any portion of such amounts remaining unpaid and interest, costs and expenses as above provided, and to collect, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 702.    <u>Pro rata Application of Funds</u>.  Anything in this Agreement to the contrary notwithstanding, if at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the principal of the Bonds as the same shall become due and payable, such moneys (except for any moneys deposited in a separate subaccount from a drawing on a Credit Facility or Liquidity Facility which shall secure only specified Bonds), together with any moneys then available or thereafter becoming available for such purpose, whether through the exercise of the remedies provided for in this Article or otherwise, shall be applied as follows:

first:  to the payment to the persons entitled thereto of all installments of interest then due and payable, in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

second:  to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Agreement) in the

- 43 -

order of their due dates, with interest on such Bonds at the respective rates specified therein from the respective dates upon which such Bonds became due, and, if the amount available shall not be sufficient to pay in full the principal of such Bonds due on any particular date, together with such interest, then to the payment first of such interest, ratably, according to the amount of such interest due on such date, and then to the payment of such principal, ratably, according to the amount of such principal due on such date, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Bonds;

third: to the payment of the interest on and the principal of the Bonds, to the purchase and retirement of Bonds and to the redemption of Bonds, all in accordance with the provisions of Article IV of this Agreement; and

fourth: to the payment of any amounts then due and owing to a provider of a Credit Facility or a Liquidity Facility.

Whenever moneys are to be applied pursuant to the provisions of this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future; the setting aside of such moneys in trust for the proper purpose shall constitute proper application by the Trustee; and the Trustee shall incur no liability whatsoever to the Authority, to any Holder or to any other person for any delay in applying any such moneys, so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions of this Agreement as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such moneys, he shall fix the date (which shall be an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give notice as he may deem appropriate of the fixing of any such date, and shall not be required to make payment to the holder of any Bond until such Bond shall be surrendered to him for appropriate endorsement, or for cancellation if fully paid.

SECTION 703.    Effect of Discontinuance of Proceedings.  In case any proceeding taken by the Trustee shall have been discontinued or abandoned for any reason, then and in every such case the Authority, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been taken.

SECTION 704.    Bondholders May Control Proceedings.    Anything in this Agreement to the contrary notwithstanding, Holders of a majority in principal amount of the Bonds Outstanding shall have the right, subject to the provisions of Section 802 hereof, by an instrument in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law and the provisions of this Agreement. In the event that particular Bonds are secured by a Credit Facility or Liquidity Facility and the provider of the Credit Facility or Liquidity Facility has not defaulted on its

obligations under such Credit Facility or Liquidity Facility, the provider of such Credit Facility or Liquidity Facility shall have the right, in lieu of the Holders of the Bonds secured thereby, to direct the method and place of conducting such remedial proceedings and to give any consents or waivers to such remedial proceedings under this Article VII.

SECTION 705.    Restrictions Upon Actions by Individual Bondholders.  No Holder of any of the Bonds shall have any right to institute, appear in or defend any suit, action or proceeding in equity or at law on any Bond or for the execution of any trust hereunder or for any other remedy hereunder. It is understood and intended that no one or more Holders of the Bonds hereby secured shall have any right in any manner whatever by his or their action to affect, disturb, or prejudice the security of this Agreement, or to enforce any right hereunder, that all suits, actions and proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders of such outstanding Bonds, and that any individual right of action or other right given to one or more of such holders by law is restricted by this Agreement to the rights and remedies herein provided.

SECTION 706.    No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Holders of the Bonds is intended to be exclusive of any other remedy or remedies herein provided, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder.

SECTION 707.    No Delay or Omission Construed to be a Waiver.  No delay or omission of the Trustee, or any Holder of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein; and every power and remedy given by this Agreement to the Trustee and to the Holders may be exercised from time to time and as often as may be deemed expedient.

SECTION 708.    Actions of Trustee.  All rights of action under this Agreement or under any of the Bonds enforceable by the Trustee  may be enforced by it without the possession of any of the Bonds or the production thereof in the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Bonds, subject to the provisions of this Agreement.

# ARTICLE VIII

# CONCERNING THE TRUSTEE

SECTION 801.    <u>Acceptance of Trusts</u>.  The Trustee accepts and agrees to execute the trusts imposed upon it by this Agreement, but only upon the terms and conditions set forth in this Article and subject to the provisions of this Agreement, to all of which the parties hereto and the respective Holders of the Bonds agree.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

SECTION 802.    <u>Trustee Entitled to Indemnity</u>.  Any other provisions of this Agreement to the contrary notwithstanding, other than any steps required to draw upon a Credit Facility or a Liquidity Facility to make timely payments of interest on and principal or purchase price of Bonds secured by said Credit Facility or Liquidity Facility, as further provided by resolution of the Board authorizing the issuance of such Bonds, the Trustee shall be under no obligation to institute any suit, or to take any remedial proceeding under this Agreement, or to enter any appearance or in any way defend in any suit in which it may be made defendant, or to take any steps in the execution of the trusts hereby created or in the enforcement of any rights and powers hereunder, until it shall be indemnified to its satisfaction against any and all costs and expenses, outlays and counsel fees and other reasonable disbursements, and against all liability; the Trustee may, nevertheless, begin suit, or appear in and defend suit, or do anything else in its judgment proper to be done by it as such Trustee, without prior indemnity and in such case it shall be indemnified and reimbursed by the Authority for all liabilities, costs and expenses, outlays and counsel fees and other reasonable disbursements properly incurred in connection therewith.

SECTION 803.    <u>Limitation on Trustee's Liabilities</u>.  The Trustee shall have no responsibility in respect of the validity, sufficiency, due execution or acknowledgment of this Agreement or the validity or sufficiency of the security provided hereunder, or except as to the authentication thereof, in respect of the validity of the Bonds or the due execution or issuance thereof. The Trustee shall not be liable or responsible because of the loss of any deposit of moneys arising through the insolvency or the act or default or omission of any other bank or trust company in which such deposit shall have been made by the Trustee under the provisions of this Agreement or by the Authority. The Trustee shall not be responsible for the application of any of the proceeds of the Bonds, or the application of any other moneys deposited with it and paid out, withdrawn or transferred hereunder, if the application by the Trustee of such proceeds and such other moneys and such payment, withdrawal or transfer shall be made in accordance with the provisions of this Agreement. The Trustee shall not be liable in connection with the performance of its duties hereunder or for any error of judgment made in good faith by it, except for its own negligence or default. The Trustee may confer with competent legal counsel and shall not be liable for any action taken or suffered by it in good faith in accordance with an opinion of counsel. The immunities and exemptions from liability of the Trustee hereunder shall extend to its directors, officers, employees and agents.

- 46 -

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

SECTION 804.    Compensation and Indemnification of Trustee.    Subject to the provisions of any contract between the Authority and the Trustee and to Section 401 hereof, the Authority shall pay to the Trustee reasonable compensation for all services rendered by it hereunder and also all of its reasonable expenses, charges and other disbursements and those of its attorneys, agents and employees incurred in and about the administration and execution of the trusts hereby created, and the performance of its powers and duties hereunder, agrees to indemnify and save the Trustee harmless against any liabilities which it may incur in the exercise and performance of its powers and duties hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

SECTION 805.    Trustee May Rely on Certificates.    In case at any time it shall be necessary or desirable for the Trustee to make any investigation respecting any fact preparatory to taking or not taking any action or doing or not doing anything as such Trustee, and in any case in which this Agreement provides for permitting or taking any action, and whenever in the administration of this Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee may, in the absence of bad faith, rely conclusively upon any certificate, requisition, opinion or other instrument required or permitted to be filed with it under the provisions of this Agreement, and any such instrument shall be conclusive evidence of such fact to protect the Trustee in any action that it may or may not take or in respect of anything it may or may not do, in good faith, by reason of the supposed existence of such fact. Except as otherwise provided in this Agreement, any request, notice, certificate or other instrument from the Authority to the Trustee shall be deemed to have been signed by the proper party or parties if signed by the Executive Director or by any officer or employee of the Authority who shall be designated by the Authority by resolution for the purpose, and the Trustee may accept and rely upon a certificate signed by the Executive Director or any other officer or employee of the Authority as to any action taken by the Authority.

SECTION 806.    Notice of Default.    The Trustee shall mail to the Holders of the Bonds then Outstanding, at their addresses as they appear on the registration books, within thirty (30) days after the Trustee shall have knowledge of such default, and to any provider of a Credit Facility or a Liquidity Facility, at its address as it is known by the Trustee, within fifteen (15) days after the Trustee shall have knowledge of such default, written notice of any default in the payment of principal of and interest and premium on any Bond, and any other default known to the Trustee unless such default shall have been cured or waived. Except for such payment defaults, the Trustee shall not be deemed to have knowledge of any default hereunder unless specifically notified in writing by the Holders of not less than ten percent (10%) in principal amount of the Bonds Outstanding.

Notwithstanding the foregoing, except for any default in the payment of principal of and interest and premium on any Bond, the Trustee may withhold and shall be protected in

- 47 -

withholding any notice to the Holders if and so long as the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

SECTION 807.     Trustee May Be Bondholder.  The bank or trust company acting as Trustee under this Agreement, and its directors, officers, agents or employees in their respective individual or other capacities, may buy, sell, own, hold and deal in any of the Bonds issued under and secured by this Agreement, and may join in any action which any Holder of Bonds may be entitled to take with like effect and may otherwise deal with the Authority as if such bank or trust company were not the Trustee under this Agreement, may engage or be interested in any financial or other transaction with the Authority, and may maintain any and all of the general banking and business relations with the Authority with like effect and in the same manner as if the Trustee were not a party to this Agreement; and no implied covenant shall be read into this Agreement against the Trustee in respect of such matters.

SECTION 808.     Trustee Not Responsible for Recitals.  The recitals, statements and representations contained herein and in the Bonds (excluding the Trustee's certificate of authentication on the Bonds) shall be taken and construed as made by and on the part of the Authority and not by the Trustee, and the Trustee assumes and shall be under no responsibility for the correctness of the same. The Trustee makes no representation as to the validity or sufficiency of this Agreement or the Bonds.

SECTION 809.     Trustee Protected in Relying on Papers.  The Trustee shall be protected in acting or proceeding, or in not acting or not proceeding, in good faith, upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Agreement, or upon the written opinion or other written advice of any attorney believed by the Trustee to be qualified in relation to the subject matter, and the Trustee shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such instrument.

SECTION 810.     Resignation of Trustee.  The Trustee may resign and thereby become discharged from the trusts hereby created, by notice in writing to be given to the Authority and published in a daily newspaper of general circulation published in the Municipality of San Juan, Puerto Rico and in a daily newspaper or financial journal published in the Borough of Manhattan, City and State of New York, not less than sixty (60) days before such resignation is to take effect, but such resignation shall take effect immediately upon the appointment of a new Trustee hereunder, if such new Trustee shall be appointed before the time limited by such notice and shall then accept the trusts hereof.

No resignation by the Trustee under this Section, no removal of the Trustee under Section 811 hereof and no appointment of a successor Trustee under Section 812 hereof shall become effective until the acceptance of appointment by the successor Trustee under Section 813 hereof.

SECTION 811.     Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing, signed by the Holders of not less than a majority in principal amount of the Bonds hereby secured and then outstanding and filed with the

NY1 5690864v.2 45967/59

Authority. A photostatic copy of each such instrument shall be delivered promptly by the Authority to the Trustee. The Trustee may also be removed at any time for any breach of trust or for acting or proceeding in violation of, or for failing to act or proceed in accordance with, any provision of this Agreement with respect to the duties and obligations of the Trustee by any court of competent jurisdiction upon the application of the Authority pursuant to resolution of the Holders of not less than ten percent (10%) in aggregate principal amount of the Bonds then Outstanding under this Agreement.

SECTION 812.    Appointment of Successor Trustee.  If at any time hereafter the Trustee shall resign, be removed, be dissolved or otherwise become incapable of acting, or the bank or trust company acting as Trustee shall be taken over by any governmental official, agency, department or board, the position of Trustee shall thereupon become vacant. If the position of Trustee shall become vacant for any reason, the Authority shall appoint a Trustee to fill such vacancy. Within thirty (30) days after any such appointment, the Secretary of the Authority shall cause notice of such appointment to be published in a daily newspaper of general circulation published in the Municipality of San Juan, Puerto Rico, and in a daily newspaper or financial journal of general circulation in the Borough of Manhattan, City and State of New York.

At any time within one year after any such vacancy shall have occurred, the Holders of a majority in principal amount of the Bonds hereby secured and then Outstanding, by an instrument or concurrent instruments in writing, signed by such Bondholders or their attorneys in fact thereunto duly authorized and filed with the Authority, may appoint a successor Trustee, which shall supersede any Trustee theretofore appointed by the Board. Photostatic copies of each such instrument shall be delivered promptly by the Authority to the predecessor Trustee and to the Trustee so appointed by the Bondholders.

If no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within ten (10) days after the vacancy shall have occurred, the Holder of any Bond Outstanding hereunder or any retiring Trustee may apply to any court of competent jurisdiction to appoint a successor Trustee. Such court may thereupon, after such notice, if any, as such court may deem proper and prescribe, appoint a successor Trustee.

Any Trustee hereafter appointed shall be a corporation duly authorized to exercise corporate trust powers and subject to examination by Federal, state or Commonwealth authority and in good standing and having at the time of its appointment a combined capital and surplus aggregating at least One Hundred Million Dollars ($100,000,000).

SECTION 813.    Vesting of Trust with Successor Trustee.  Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor, and also to the Authority, an instrument in writing accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, shall become fully vested with all the rights, immunities, powers and trusts, and subject to all the duties and obligations, of its predecessor; but such predecessor shall, nevertheless, on the written request of its successor or of the Authority, execute and deliver an instrument transferring to such successor Trustee all the rights, immunities, powers and trusts of such predecessor hereunder; and every predecessor Trustee shall deliver all property and moneys held by it hereunder to its successor. Should any instrument

- 49 -

in writing from the Authority be required by any successor Trustee for more fully and certainly vesting in such Trustee the rights, immunities, power and trusts hereby vested or intended to be vested in the predecessor Trustee, any such instrument in writing shall and will, on request, be executed, acknowledged and delivered by the Authority.

SECTION 814.    Reporting Requirements.  The Trustee shall on a monthly basis, file with the Authority a statement setting forth in respect of the preceding calendar month:

(a)    the amount withdrawn or transferred by it and the amount deposited with it on account of each Fund and Account held by it under the provisions of this Agreement;

(b)    the amount on deposit with it at the end of such month to the credit of each such Fund and Account;

(c)    a brief description of all obligations held by it as an investment of moneys in each such Fund and Account and of any Reserve Account Letter of Credit or Reserve Account Insurance Policy in the Reserve Account;

(d)    the amount applied to the purchase or redemption of Bonds under Section 403 of this Agreement and a description of Bonds or portions of Bonds so purchased or redeemed; and

(e)    any other information which the Authority may reasonably request.

All records and files pertaining to the trusts hereunder in the custody of the Trustee shall be open at all reasonable times to the Authority and its agents and representatives.

# ARTICLE IX

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS
## AND PROOF OF OWNERSHIP OF BONDS

SECTION 901.        <u>Proof of Execution of Documents and Ownership</u>.

(a)        Any request, direction, consent or other instrument in writing required by this Agreement to be signed or executed by Bondholders may be in any number of concurrent instruments of similar tenor and may be signed or executed by such Bondholders in person or by their attorneys or legal representatives appointed by an instrument in writing. Proof of the execution of any such instrument and of the ownership of Bonds shall be sufficient for any purpose of this Agreement and shall be conclusive in favor of the Trustee with regard to any action taken by it under such instrument if made in the following manner:

(1)        The fact and date of the execution by any person of any such instrument may be proved by the verification of any officer in any jurisdiction who, by the laws thereof, has power to take affidavits within such jurisdiction, to the effect that such instrument was subscribed and sworn to before him, or by an affidavit of a witness to such execution. Where such execution is in behalf of a person other than an individual, such verification shall also constitute sufficient approval of the authority of the signor thereof.

(2)        The ownership of Bonds shall be proved by the registration books required to be maintained pursuant to the provisions of Article II of this Agreement.

Nothing contained in this Article shall be construed as limiting the Trustee to such proof, it being intended that the Trustee may accept any other evidence of the matters herein stated which it may deem sufficient.

(b)        If the Authority shall solicit from the Holders any request, direction, consent or other instrument in writing required or permitted by this Agreement to be signed or executed by the Holders, the Authority may, at its option, fix in advance a record date for determination of Holders entitled to give each request, direction, consent or other instrument, but the Authority shall have no obligation to do so. If such a record date is fixed, such request, direction, consent or other instrument may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Bonds have authorized or agreed or consented to such request, direction, consent or other instrument, and for that purpose the Bonds shall be computed as of such record date.

(c)        Any request or consent of the Holder of any Bond shall bind every future Holder of the same Bond in respect of anything done by the Trustee pursuant to such request or consent.

**ARTICLE X**

**SUPPLEMENTAL AGREEMENTS**

SECTION 1001.    Supplemental Agreements Without Bondholders' Consent.    The Authority and the Trustee may, from time to time and at any time, enter into such agreements supplemental hereto as shall not be inconsistent with the terms and provisions hereof (which supplemental agreements shall thereafter form a part hereof):

(a)    to cure any ambiguity or formal defect or omission in this Agreement or in any supplemental agreement or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provisions contained herein; or

(b)    to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

(c)    to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of this Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)    to add to the covenants and agreements of the Authority in this Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power herein reserved to or conferred upon the Authority; or

(e)    to permit the issuance of Bonds, the interest on which is intended to be excludible from gross income for federal income tax purposes under the Code to the Holders thereof, in coupon form, if the conditions precedent stated herein have been met; or

(f)    to permit the Authority to issue Bonds the interest on which is not excludible from gross income for federal income tax purposes under the Code to the Holders thereof; or

(g)    to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended; or

(h)    to qualify this Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(i)    to make such changes as may be necessary to adjust the terms hereof so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(j)  to make such changes as may be necessary to comply with the provisions of the Code relating to the exclusion of interest on the Bonds from gross income thereunder; or

(k)  to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds.

SECTION 1002.  Modification with Consent of Holders of Majority of Bonds. Subject to the terms and provisions contained in this Section, and not otherwise, the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several Series of Bonds then Outstanding are affected by the supplement hereto, the Holders of not less than a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time the consent is given) shall have the right, from time to time, anything contained in this Agreement to the contrary notwithstanding, to consent to and approve the execution by the Authority and the Trustee of such agreement or agreements supplemental hereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in this Agreement or in any supplemental agreement; provided, however, that nothing herein contained shall permit, or be construed as permitting, without the consent of the Holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the maturity of any Bond issued hereunder (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental Agreement. Nothing herein contained, however, shall be construed as making necessary the approval by Bondholders of the execution of any supplemental agreement authorized by Section 1001 of this Article. The provider of any Credit Facility or Liquidity Facility shall have the right, in lieu of the Holders of Bonds secured thereby, to give consent to any supplemental agreement for which consent of the Holders of such Bonds is required under this Article and all references to Bondholders for purposes of such consent shall mean instead the provider of said Credit Facility or Liquidity Facility; provided, however, that said provider of a Credit Facility or Liquidity Facility shall not be in default on its obligations in connection with said Credit Facility or Liquidity Facility.

If at any time the Authority shall request the Trustee to enter into any supplemental agreement for any of the purposes of this Section, the Trustee shall cause a notice to be mailed, postage prepaid, to all Holders of Bonds then Outstanding at their addresses as they appear on the registration books and to any provider of a Credit Facility or Liquidity Facility. Such notice shall briefly set forth the nature of the proposed supplemental agreement and shall state that a copy thereof is on file at the principal corporate trust office of the Trustee for inspection by all Bondholders. The Trustee shall not, however, be subject to any liability to any Bondholder by reason of its failure to mail the notice required by this Section, and any such failure shall not affect the validity of such supplemental agreement when consented to or approved as provided in this Section.

Whenever, at any time within a year after the date of the mailing of such notice, the Authority shall deliver to the Trustee an instrument or instruments purporting to be executed by

the Holders of at least a majority in aggregate principal amount of the Bonds then Outstanding, which instrument or instruments shall refer to the proposed supplemental agreement described in such notice and shall specifically consent to and approve the execution thereof the Trustee may execute such supplemental agreement without liability or responsibility to any Holder of any Bond, whether or not such Holder shall have consented thereto. It shall not be necessary for the consent of the Holders to approve the particular form of any proposed supplemental agreement, but it shall be sufficient if such consent shall approve the substance thereof.

If the Holders of not less than a majority in aggregate principal amount of the Bonds of each Series affected and Outstanding at the time of the execution of such supplemental agreement shall have consented to and approved the execution thereof as herein provided, no Holder shall have any right to object to the execution of such supplemental agreement, or to object to any of the terms and provisions therein contained, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or the Authority from executing the same or from taking any action pursuant to the provisions thereof.

The consent of the Holders of any additional Series of Bonds to be issued hereunder shall be deemed given if the underwriters or initial purchasers for resale consent in writing to such supplemental agreement and the nature of the amendment effected by such supplemental agreement is disclosed in the official statement or other offering document pursuant to which such additional Series of Bonds is offered and sold to the public.

Upon the execution of any supplemental agreement pursuant to the provisions of this Section, this Agreement shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under this Agreement of the Authority, the Trustee, and all Holders of Outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects, to such modifications and amendments.

SECTION 1003. <u>Trustee Joining in Supplemental Agreements</u>. The Trustee is authorized to join with the Authority in the execution of any such supplemental agreement and to make the further agreements and stipulations which may be contained therein, but the Trustee may, but shall not be obligated (except to the extent required in the case of a supplemental agreement entered into pursuant to Section 1001(h) hereof) to, enter into any such supplemental agreement which affects its rights, duties, or immunities under this Agreement. Any supplemental agreement executed in accordance with the provisions of this Article shall thereafter form a part of this Agreement; and all the terms and conditions contained in any such supplemental agreement as to any provision authorized to be contained therein shall be and be deemed to be part of the terms and conditions of this Agreement for any and all purposes. In case of the execution and delivery of any supplemental agreement, express reference may be made thereto in the text of any Bonds issued thereafter, if deemed necessary or desirable by the Trustee.

SECTION 1004. <u>Responsibilities of Trustee under this Article</u>. The Trustee shall not be under any responsibility or liability to the Authority or to any Bondholder or to anyone whomsoever for its refusal in good faith to enter into any such supplemental agreement if such agreement is deemed by the Trustee to be contrary to the provisions of this Article. The Trustee

shall be entitled to receive, and shall be fully protected in relying upon, the opinion of any counsel who may be counsel for the Authority, as conclusive evidence that any such supplemental agreement complies with the provisions of this Agreement, and that it is proper for the Trustee, under the provisions of this Article, to join in the execution of such supplemental agreement.

SECTION 1005.    Bond Resolution May Be Supplemented or Modified.  Resolutions of the Board authorizing the issuance of any Series of Bonds may be supplemented or modified by subsequent resolution of the Board; provided that the provisions of this Article shall apply, except as otherwise provided in Section 602 hereof .

NYI 5690864v.2 45967/59

# ARTICLE XI

# DEFEASANCE

SECTION 1101.    Defeasance.  If all the Outstanding Bonds shall have been paid as provided below, and the Trustee shall have received written notice for the provider of any Credit Facility or Liquidity Facility that all amounts then due and owing to any provider of a Credit Facility or Liquidity Facility have been paid, then and in that case the right, title and interest of the Trustee hereunder (except under Section 804 of this Agreement) shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under this Agreement except for Sections 205, 206 and 211 of this Agreement. In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in this Section 1101 when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the Holder of such Bond either moneys in an amount that shall be sufficient, or Sufficient Government Obligations, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the Holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or Sufficient Government Obligations mentioned in clause (a) of this paragraph has been made with the Trustee or another fiduciary institution  acting as escrow agent for the Holder of such Bond, and that such Bond is deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.  Neither the moneys nor Sufficient Government Obligations deposited with the Trustee or other fiduciary institution acting as escrow agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and premium, if any, and interest on such Bonds.

"Sufficient Government Obligations" for purposes of this Section 1101 shall have the same meaning as "Sufficient Government Obligations," as defined in Section 305 hereof, except that "Sufficient Government Obligations" shall not include obligations issued by the Farm Credit System or obligations included in clause (iv) of the definition of Government Obligations, without the prior written consent of Moody's Investors Service or any successor thereto and Standard & Poor's Corporation or any successor thereto, and any obligations included in clause (iii) of the definition of Government Obligations shall be rated at the time of investment, in the highest rating category by Moody's Investors Service or any successor thereto and Standard & Poor's Corporation or any successor thereto and any obligations otherwise included in the definition of "Sufficient Government Obligations" shall be direct obligations of the issuers permitted by such definition (except the Farm Credit System) which are not subject to redemption prior to the date on which the proceeds attributable to the principal of such

obligations are to be used. Prior to any defeasance of bonds secured by a Credit Facility or a Liquidity Facility, the Authority shall deliver to the Trustee an unqualified opinion of counsel recognized as an expert in bankruptcy matters that the payment of the money to accomplish such defeasance to the holders of such Bonds would not constitute an avoidable preference under the United States Bankruptcy Code or similar state, Commonwealth of Puerto Rico or federal laws (including federal, Commonwealth of Puerto Rico and state laws governing the insolvency of banks, insurance companies, savings and loan associations or other specific types of institutions) in the event of the filing of a petition for relief under the United State Bankruptcy Code or such similar state, Commonwealth of Puerto Rico or federal laws with avoidable preference provisions by or against the Authority.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the resolution of the Board authorizing the issuance of Variable Rate Bonds; provided, however, that if on any date the total amount of moneys and Sufficient Government Obligations on deposit for the payment of interest on such Variable Rate Bonds is in excess of the total amount which would have been required to be deposited on such date in respect of such Variable Rate Bonds in order fully to discharge and satisfy such Bonds pursuant to the provisions of this Section, the Authority may use amount of such excess, subject to Section 504 hereof, free and clear of any trust, lien, security interest, pledge or assignment securing said Variable Rate Bonds or otherwise existing under this Agreement.

Notwithstanding any of the provisions of this Agreement to the contrary, Put Bonds and Extendible Maturity Bonds may only be fully discharged and satisfied either by paying the principal of and interest on said Bonds as they become due and payable or by depositing moneys which shall be sufficient at the time of such deposit to pay when due the maximum amount of principal of and redemption premium, if any, and interest on such Put Bonds and Extendible Maturity Bonds which could become payable to the Holders of such Bonds upon the exercise of any options provided to the Holders of such Bonds and the Authority; provided, however, that if, at the time a deposit is made pursuant to this paragraph, the options originally exercisable are no longer exercisable, such Bonds shall not be considered Put Bonds or Extendible Maturity Bonds for these purposes.

If any portion of the moneys deposited for the payment of the principal of and redemption premium, if any, and interest on any Bond is not required for such purpose, the Authority may use the amount of such excess, subject to Section 504 hereof, free and clear of any trust, lien, security interest, pledge or assignment securing such Bond.

# ARTICLE XII

# MISCELLANEOUS PROVISIONS

SECTION 1201. <u>Mergers</u>. All the covenants, stipulations, obligations and agreements contained in this Agreement by or on behalf of or for the benefit of the Authority shall bind or inure to the benefit of the successor or successors of the Authority from time to time and any officer, board, body or commission to whom or to which any power or duty affecting such covenants, stipulations, obligations and agreements shall be transferred by or in accordance with law. Any bank or trust company having power to execute the trusts of this Agreement and otherwise qualified to act as Trustee hereunder with or into which the Trustee may be merged, converted or consolidated, or to which the assets and business of the Trustee may be sold, shall be deemed to be the successor of the Trustee. Any bank or trust company with or into which any of the paying agents may be merged, converted or consolidated, or to which the assets and business of such paying agents may be sold, shall be deemed the successor of such paying agents for the purposes of this Agreement.

SECTION 1202. <u>Any Notices</u>. Any notice, demand, direction, request or other instrument authorized or required by this Agreement to be given to or filed with the Authority or the Trustee shall be deemed to have been sufficiently given or filed for all purposes of this Agreement if and when sent by first class mail, postage prepaid:

to the Authority, if addressed to Executive Director, Puerto Rico Infrastructure Finance Authority, c/o Government Development Bank for Puerto Rico, Minillas Government Center Stop 22, Santurce, Puerto Rico 00907;

to the Trustee, if addressed to 5 Hanover Square, New York, New York 10043, Attention: Corporate Trust Office or at such other address as it may designate in writing, or to any successor Trustee, if addressed to its principal corporate trust office.

All documents received by the Trustee under the provisions of this Agreement shall be retained in its possession, subject at all reasonable times to the inspection of the Authority, any Bondholders, and the agents and representatives thereof.

SECTION 1203. <u>Substitute Publication and Mailing</u>. If, because of the temporary or permanent suspension of publication of any newspaper or financial journal or for any other reason, the Trustee or the Authority shall be unable to publish in a newspaper or financial journal any notice required to be published by the provisions of this Agreement, the Trustee or the Authority, as the case may be, shall give such notice in such other manner as in its judgment shall most effectively approximate such publication thereof, and the giving of such notice in such manner shall for all purposes of this Agreement be deemed to be compliance with the requirement for the publication thereof.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Bondholders when such notice is required to be given pursuant to any provision of this Agreement, any

manner of giving notice as shall be satisfactory to the Trustee and the Authority shall be deemed to be a sufficient giving of such notice.

SECTION 1204.     No Third Party Rights.   Except as herein otherwise expressly provided, nothing in this Agreement expressed or implied is intended or shall be construed to confer upon any person other than the parties hereto, the Holders of the Bonds issued under and secured by this Agreement and the provider of any Credit Facility or Liquidity Facility securing the Bonds, any right, remedy or claim, legal or equitable, under or by reason of this Agreement or any provision hereof, this Agreement and all its provisions intended to be and being for the sole and exclusive benefit of the parties hereto, the Holders from time to time of the Bonds issued hereunder and the provider of any Credit Facility or Liquidity Facility securing the Bonds.

SECTION 1205.     Effect of Partial Invalidity.   In case any one or more of the provisions of this Agreement or of the Bonds issued hereunder shall for any reason be held to be illegal or invalid, such illegality or invalidity shall not affect any other provision of this Agreement or of the Bonds, but this Agreement and said Bonds shall be construed and enforced as if such illegal or invalid provision had not been contained therein. In case any covenant, stipulation, obligation or agreement contained in the Bonds or in this Agreement shall for any reason be held to be in violation of law, then such covenant, stipulation, obligation or agreement shall be deemed to be the covenant, stipulation, obligation or agreement of the Authority to the full extent permitted by law.

SECTION 1206.     Effect of Covenants.   All covenants, stipulations, obligations and agreements of the Authority contained in this Agreement shall be deemed to be covenants, stipulations, obligations and agreements of the Authority and of the Board to the full extent authorized by the Act.

Except as otherwise provided in this Agreement, all rights, powers and privileges conferred and duties and  obligations imposed upon the Authority or upon the Board by the provisions of this Agreement shall be exercised or performed by the Authority, the Board or by such other officers, board, body or commission as may be required by law to exercise such rights, powers and privileges or to perform such duties and obligations.

No covenant, stipulation, obligation or agreement herein contained shall be deemed to be a covenant, stipulation, obligation or agreement of any member, agent or employee of the Authority in his individual capacity, and neither the members of the Authority nor any officer thereof executing the Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof.

SECTION 1207.     Governing Law.   The construction of this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico; provided that the provisions governing the Trustee's exercise of its obligations hereunder shall be governed by the laws of the State of New York.

SECTION 1208.     Payments Due on Saturdays, Sundays and Holidays.   In any case where the date of payment of interest on or principal of the Bonds or the date fixed for redemption of any Bonds shall be a Saturday, Sunday or other day on which banking institutions

- 59 -

in The City of New York, New York, or the Commonwealth of Puerto Rico, are authorized or required by law to close, then payment of interest or principal, and premium, if any, need not be made on such date but may be made on the next succeeding business day with the same force and effect as if made on said date of payment or the date fixed for redemption, and no interest on such payment shall accrue for the period after such date.

SECTION 1209.   <u>Multiple Counterparts</u>.   This Agreement may be executed in multiple counterparts, each of which shall be regarded for all purposes as an original, and such counterparts shall constitute but one and the same instruments.

SECTION 1210.   <u>Headings, etc. Not Part of Agreement</u>.   Any headings preceding the texts of the several articles hereof and any table of contents appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

IN WITNESS WHEREOF, Puerto Rico Infrastructure Financing Authority has caused this Agreement to be executed by its Executive Director and its corporate seal to be impressed hereon and attested by its Secretary and Citibank, N.A. has caused this Agreement to be executed in its behalf by one of its Vice Presidents, and its corporate seal to be impressed hereon and attested by a Trust Officer; all thereunto duly authorized, all as of the day and year first above written.

PUERTO RICO INFRASTRUCTURE
FINANCING AUTHORITY

(SEAL)

By:___ /s/ Jose R. Gonzalez _____
Executive Director

Attest:

___ /s/ Eugenio Prado _____
Secretary

CITIBANK, N.A.,
Trustee

(SEAL)

By:___ /s/ J.A. Olive _____
Vice President

Attest:

___ /s/ A.L. Peña _____
Trust Officer

- 61 -

THE STATE OF NEW YORK    )
                                        )   SS:

COUNTY OF NEW YORK      )

On the 2nd day of November, in the year 1988, before me personally came Jose R. Gonzalez, to me known, who, being by me duly sworn, did depose and say that he resides in the Municipality of San Juan, Puerto Rico; that he is the Executive Director of Puerto Rico Infrastructure Financing Authority, the body corporate described in and which executed the above instrument; that he knows the seal thereof; that the seal affixed to said instrument is the corporate seal of Puerto Rico Infrastructure Financing Authority; that it was so affixed by order of the Board of Directors of Puerto Rico Infrastructure Financing Authority; and that he signed his name thereto by like order.

<div align="right">
_____/s/ Christa M. Bowen_____

Notary Public, State of New York
</div>

My Commission Expires:

(NOTARIAL SEAL)

_____

Christa M. Bowen
Notary Public
No. 41-4723478
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 31, 1990

NY1 5690864v.2 45967/59

THE STATE OF NEW YORK          )
                               )   SS:
COUNTY OF NEW YORK             )

On the 2nd day of November, in the year 1988, before me personally came J.A. Olive, to me known, who, being by me duly sworn, did depose and say that he resides in New York; that he is a Vice President of Citibank, N.A., the national banking association described in and which executed the above instrument; that he knows the seal of said banking association; that the seal affixed to said instrument is the corporate seal of said banking association; that it was so affixed by authority of the Board of Directors of said corporation; and that he signed his name thereto by like authority.

_____/s/ Christa M. Bowen_____
Notary Public, State of New York

My Commission Expires:

(NOTARIAL SEAL)

_____
Christa M. Bowen
Notary Public, State of New York
No. 41-4723478
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 31, 1990

NY1 5690864v.2 45967/59

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY

TO

CITIBANK, N.A.,

TRUSTEE

TRUST AGREEMENT

Dated as of October 1, 1988

# TABLE OF CONTENTS

(This Table of Contents is not a part of the
Trust Agreement but is for convenience of reference only)

PAGE

ARTICLE I
DEFINITIONS

SECTION 101.    Definitions.............................. 11
SECTION 102.    Miscellaneous........................... 22

ARTICLE II
FORM, EXECUTION, AUTHENTICATION, DELIVERY
AND REGISTRATION OF BONDS

SECTION 201.    Limitation on Issuance of Bonds.......... 23
SECTION 202.    Form of Bonds........................... 23
SECTION 203.    Details of Bonds........................ 23
SECTION 204.    Authentication of Bonds................. 25
SECTION 205.    Exchange and Registration of Transfer.... 25
SECTION 206.    Ownership of Bonds...................... 26
SECTION 207.    The Series 1988 Bonds................... 27
SECTION 208.    Additional Bonds........................ 29
SECTION 209.    Refunding Bonds......................... 32
SECTION 210.    Temporary Bonds......................... 36
SECTION 211.    Mutilated, Destroyed, Stolen or
                Lost Bonds.............................. 36
SECTION 212.    Qualification for Depository
                Trust Company........................... 37
SECTION 213.    Capital Appreciation Bonds; Capital
                Appreciation and Income Bonds.......... 37
SECTION 214.    Debt Service Components................. 37

ARTICLE III
REDEMPTION OF BONDS

SECTION 301.    Redemption of Bonds..................... 39
SECTION 302.    Redemption Notice....................... 39
SECTION 303.    Effect of Calling for Redemption........ 40
SECTION 304.    Cancellation of Bonds................... 40
SECTION 305.    Bonds To Be Paid Not Outstanding........ 41
SECTION 306.    Partial Redemption...................... 41

ARTICLE IV
FUNDS AND ACCOUNTS

SECTION 401.   Sinking Fund and Accounts...............   43
SECTION 402.   Withdrawals from Bond Service Account....   45
SECTION 403.   Withdrawals from Redemption Account......   45
SECTION 404.   Withdrawals from Reserve Account.........   47
SECTION 405.   Moneys Set Aside Held in Trust...........   47
SECTION 406.   Establishment of Subaccounts in the
               Redemption Account....................   48

ARTICLE V
DEPOSITARIES OF MONEYS, SECURITY FOR
DEPOSITS AND INVESTMENTS OF FUNDS

SECTION 501.   Security for Deposits....................   49
SECTION 502.   Investment of Moneys.....................   49
SECTION 503.   Valuation of Investments.................   50
SECTION 504.   Tax Covenants............................   51

ARTICLE VI
PARTICULAR COVENANTS

SECTION 601.   Payment of Principal, Interest and
               Premium; Pledge of Pledged Revenues....   52
SECTION 602.   No Impairment............................   52
SECTION 603.   Inclusion of Shortfall in Budget.........   52

ARTICLE VII
REMEDIES

SECTION 701.   Enforcement of Remedies..................   53
SECTION 702.   Pro Rata Application of Funds............   53
SECTION 703.   Effect of Discontinuance of Proceedings..   55
SECTION 704.   Bondholders May Control Proceedings......   55
SECTION 705.   Restrictions Upon Actions by Individual
               Bondholders.............................   55
SECTION 706.   No Remedy Exclusive......................   56
SECTION 707.   No Delay or Omission Construed
               to be a Waiver..........................   56
SECTION 708.   Actions of Trustee.......................   56

(ii)

## ARTICLE VIII
### CONCERNING THE TRUSTEE

SECTION 801.    Acceptance of Trusts...................... 57
SECTION 802.    Trustee Entitled to Indemnity........... 57
SECTION 803.    Limitation on Trustee's Liabilities...... 57
SECTION 804.    Compensation and Indemnification
                of Trustee............................ 58
SECTION 805.    Trustee May Rely on Certificates......... 58
SECTION 806.    Notice of Default........................ 59
SECTION 807.    Trustee May Be Bondholder................ 59
SECTION 808.    Trustee Not Responsible for Recitals..... 59
SECTION 809.    Trustee Protected in Relying
                on Papers............................. 60
SECTION 810.    Resignation of Trustee................... 60
SECTION 811.    Removal of Trustee....................... 60
SECTION 812.    Appointment of Successor Trustee......... 61
SECTION 813.    Vesting of Trust with
                Successor Trustee..................... 61
SECTION 814     Reporting Requirements................... 62

## ARTICLE IX
### EXECUTION OF INSTRUMENTS BY BONDHOLDERS
### AND PROOF OF OWNERSHIP OF BONDS

SECTION 901.    Proof of Execution of Documents
                and Ownership......................... 63

## ARTICLE X
### SUPPLEMENTAL AGREEMENTS

SECTION 1001.    Supplemental Agreements Without
                 Bondholders' Consent.................... 65
SECTION 1002.    Modification with Consent of Holders
                 of Majority of Bonds................... 66
SECTION 1003.    Trustee Joining in Supplemental
                 Agreements............................ 68
SECTION 1004.    Responsibilities of Trustee under
                 this Article........................... 68
SECTION 1005.    Bond Resolution May Be Supplemented
                 or Modified........................... 68

ARTICLE XI
DEFEASANCE

SECTION 1101.   Defeasance.............................   70

ARTICLE XII
MISCELLANEOUS PROVISIONS

SECTION 1201.   Mergers...............................   72
SECTION 1202.   Any Notices...........................   72
SECTION 1203.   Substitute Publication and Mailing.......   72
SECTION 1204.   No Third Party Rights..................   73
SECTION 1205.   Effect of Partial Invalidity............   73
SECTION 1206.   Effect of Covenants....................   73
SECTION 1207.   Governing Law..........................   74
SECTION 1208.   Payments Due on Saturdays, Sundays
      and Holidays......................   74
SECTION 1209.   Multiple Counterparts..................   74
SECTION 1210.   Headings, etc. Not Part of
      Agreement.........................   74

(iv)

THIS AGREEMENT, dated for convenience of reference as of the first day of October, 1988, by and between

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY,

a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic (hereinafter sometimes called the "Authority"), exercising public and essential governmental functions and created by the Puerto Rico Infrastructure Financing Authority Act hereinafter mentioned, and

CITIBANK, N.A.,

a national banking association duly incorporated and existing under the laws of the United States of America and having its principal corporate trust office in the Borough of Manhattan, City and State of New York, which is authorized under such laws to exercise corporate trust powers (said banking association and any banking association, bank or trust company becoming successor trustee under this Agreement being hereinafter sometimes called the "Trustee");

## W I T N E S S E T H:

WHEREAS, in order to provide financial, administrative and other assistance to public corporations and instrumentalities of the Commonwealth of Puerto Rico (the "Commonwealth") to enable them to fulfill their public purpose of providing, preserving, operating, maintaining, repairing, replacing and improving portions of the infrastructure, the Legislature of Puerto Rico duly adopted Act No. 44, approved June 21, 1988 (said Act, as amended and supplemented from time to time, the "Act") and by the Act created a public corporation and instrumentality of the Commonwealth to be known as the "Puerto Rico Infrastructure Financing Authority"; and

WHEREAS, by the Act, the Authority has the power to, among other things:

(a)  to provide assistance to any public corporation or governmental instrumentality authorized by law to provide infrastructure facilities related to water supply, treatment and distribution systems, waste water treatment and disposal systems and improvements;

(b)  to enter into an assistance contract with such a benefited entity;

- 1 -

        (c)    to borrow money and to issue its bonds for any of its corporate purposes, including, but not limited to, the payment of all or any portion of any indebtedness of such benefited entity;

        (d)    to segregate a portion of the federal excise taxes deposited into the Puerto Rico Infrastructure Fund established pursuant to Section 15 of the Act into one or more accounts and to pledge moneys in said accounts, among other purposes, to the payment of principal of and interest on bonds and other obligations of the Authority; and

WHEREAS, the Authority has heretofore entered into an agreement with Puerto Rico Aqueduct and Sewer Authority ("PRASA") dated as of July 12, 1988, pursuant to which the Authority has agreed, under certain conditions, to provide funds for the defeasance of PRASA's Puerto Rico Aqueduct and Sewer Authority Revenue and Refunding Bonds, Series 1985A (the "Outstanding PRASA Bonds"), thereby affording PRASA, among other things, additional capacity to finance its capital improvement program through the issuance of its revenue bonds; and

WHEREAS, the Authority has determined to provide for such defeasance of the Outstanding PRASA Bonds and for the payment of $15,500,000 PRASA General Obligation Notes due January 20, 1989 issued and outstanding under the terms of that certain Purchase Agreement dated January 19, 1983 by and between PRASA and Pfizer Pharmaceuticals, Inc. (the "Pfizer Debt") through the issuance of bonds payable from certain federal excise taxes deposited in a separate, segregated account of the Puerto Rico Infrastructure Fund exclusively for the purpose of paying principal of and interest on such bonds; and

WHEREAS, the proceeds of the first series of bonds to be issued hereunder will provide moneys, with other funds made available by PRASA, to defease the Outstanding PRASA Bonds, pay the Pfizer Debt, make a deposit to the Reserve Account and pay certain costs of issuance; and

WHEREAS, the Authority has determined that the bonds to be issued under this Agreement and the certificate of authentication by the Trustee to be endorsed on all such bonds shall be, respectively, in substantially the following forms, with such variations, omissions and insertions as are required or permitted by this Agreement:

- 2 -

FORM OF BOND

[Front Side of Bond]

No. _____                                        $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BOND, SERIES _____

Maturity Date     Interest Rate    Original Issue Date     Cusip

_____      _____     _____       _____

REGISTERED HOLDER:

PRINCIPAL AMOUNT:


     Puerto Rico Infrastructure Financing Authority (herein
called the "Authority"), a public corporation and instrumentality
of the Commonwealth of Puerto Rico constituting an independent
body corporate and politic, is justly indebted and for value
received hereby promises to pay to the Registered Holder shown
above or registered assigns or legal representative on the
Maturity Date specified above (or earlier as hereinafter
described), from the special fund described herein, upon the
presentation and surrender hereof, at the principal corporate
trust office of Citibank, N.A. in the Borough of Manhattan, City
and State of New York, the Principal Amount shown above, and to
pay to the registered owner hereof, from the special fund
described herein, by check mailed to the Registered Holder at his
address as it appears on the bond registration books of the
Authority, [or by wire transfer to the Registered Holder],
interest on such principal amount from the date hereof or from
the _____ or _____ next preceding the date of
authentication to which interest shall have been paid, unless
such date of authentication is a _____ or a _____ to
which interest shall have been paid, in which case from such
date, such interest to the maturity hereof being payable on ____
and _____ in each year, commencing _____, 19__, at the
Interest Rate per annum specified above, until payment of such
Principal Amount.  The interest so payable and punctually paid,
or duly provided for, on any interest payment date will be paid
to the person in whose name this bond is registered at the close
of business on the fifteenth (15th) day (whether or not a busi-
ness day) of the calendar month next preceding such interest
payment date.  Any such interest not so punctually paid or duly
provided for shall forthwith cease to be payable to the Regis-

- 3 -

tered Holder on such date, and may be paid to the person in whose
name this bond is registered at the close of business on a
special record date for the payment of such defaulted interest to
be fixed by the Trustee, on a date established by the Trustee,
notice thereof being given to the Holders not less than ten (10)
days prior to such special record date, or may be paid at any
time in any other lawful manner not inconsistent with the
requirements of any securities exchange on which the bonds of
this series may be listed and upon such notice as may be required
by such exchange. Such payment of interest shall be by check
mailed to the Registered Holder at his address as it appears on
the bond registration books of the Authority maintained by the
Trustee [or by wire transfer to said holder]. All such payments
shall be made in such coin or currency of _____.

This bond shall not be deemed to constitute an indebtedness
of the Commonwealth of Puerto Rico or of any of its political
subdivisions, and neither the Commonwealth of Puerto Rico nor any
of its political subdivisions shall be liable therefor, and this
bond shall be payable solely out of those funds pledged for the
payment thereof.

ADDITIONAL PROVISIONS OF THIS BOND ARE SET FORTH ON THE
REVERSE HEREIN AND SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS
IF SET FORTH HERE.

This bond shall not be valid or become obligatory for any
purpose or be entitled to any benefit or security under the
Agreement unless and until this bond shall have been authenti-
cated by the execution by the Trustee of the certificate of
authentication endorsed hereon.

IN WITNESS WHEREOF, Puerto Rico Infrastructure Financing
Authority has caused this bond to bear the facsimile signature of
its Executive Director and a facsimile of the corporate seal to
be imprinted hereon and attested to by its Secretary by facsimile
signature, all as of the _____ day of _____, 19__.


[Facsimile of                    PUERTO RICO INFRASTRUCTURE
 Corporate Seal]                 FINANCING AUTHORITY


                                 By:_____[Facsimile Signature]_____
                                         Executive Director

Attest:


___[Facsimile Signature]___
      Secretary

CERTIFICATE OF AUTHENTICATION


    This is one of the bonds of the series designated therein
and issued under and secured by the provisions of the within men-
tioned Agreement.


                            CITIBANK, N.A.,
                            as Trustee


                    By:_____
                            Authorized Signatory

Date of authentication: _____


                    [Reverse Side of Bond]

                    UNITED STATES OF AMERICA
                    COMMONWEALTH OF PUERTO RICO

        PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
        SPECIAL TAX REVENUE BOND, SERIES _____


    This bond is one of a duly authorized series of Bonds desig-
nated "Puerto Rico Infrastructure Financing Authority Special Tax
Revenue Bonds, Series _____" issued by the Authority in the
aggregate principal amount of _____ Dollars
($_____) for the purpose of providing funds, with any
other available funds, for the purpose of _____. This
bond is issued under and secured by a trust agreement dated as of
October 1, 1988 (said agreement, together with all supplemental
agreements therein permitted, being herein called the "Agree-
ment"), by and between the Authority and Citibank, N.A., trustee
(said trustee and any successor trustee under the Agreement being
herein called the "Trustee"). An executed counterpart of the
Agreement is on file at the principal corporate trust office of
the Trustee in the Borough of Manhattan, City and State of New
York. By the acceptance of this bond, the Registered Holder
hereof assents to all of the provisions of the Agreement.

    This bond is issued and the Agreement was made and entered
into under and pursuant to the Puerto Rican Federal Relations Act
and the Constitution and laws of the Commonwealth of Puerto Rico,
particularly the Puerto Rico Infrastructure Financing Authority

                        - 5 -

Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, said Act being herein called the "Authority Act") and under and pursuant to resolutions duly adopted by the Executive Committee of the Board of Directors of the Authority. The Agreement provides for the issuance of additional series of bonds and for the incurrence of other indebtedness under the conditions, limitations and restrictions therein set forth. The Agreement also provides for the creation of a special fund designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" and for the deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as defined in the Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable and to provide a reserve therefor, which special fund is pledged to and charged with the payment of such principal and interest.

The bonds of this series consist of bonds maturing on ____ of the years ____ to ____, inclusive (the "Serial Bonds") and of bonds maturing on _____ 1, ____ (the "_____ Term Bonds"), on _____ 1, ____ (the "_____ Term Bonds") and on ____ 1, ____ (the "_____ Term Bonds").

[Applicable Terms of Redemption]

If less than all of the bonds of any one maturity shall be called for redemption, the particular bonds or portions of bonds to be redeemed shall be selected by the Trustee by such method as it shall deem fair and appropriate.

At least _____ (___) days before the redemption date of any bonds to be redeemed in whole or in part, the Trustee shall cause a notice of such redemption to be mailed, by first class mail, postage prepaid, to all registered owners of bonds to be redeemed at their addresses appearing upon the bond registration books of the Authority. The failure to mail such notice to any registered owner of bonds or any defect in any notice so mailed shall not affect the validity of the proceedings for the redemption of bonds of other registered owners. On the date fixed for redemption, notice having been given as aforesaid, the bonds or portions thereof so called for redemption shall be due and payable at the redemption price provided for the redemption of such Bonds or portions thereof on such date, and, if sufficient moneys or certain securities which may consist of (i) direct or guaranteed obligations of the United States of America (and evidences of ownership of proportionate interests in future interest or principal payments on such obligations), (ii) certain municipal obligations irrevocably secured by direct or guaranteed obligations of the United States of America (and evidences of ownership of proportionate interests in future interest or principal payments on such obligations), or (iii) obligations issued by Federal National Mortgage Association, Federal Home Loan Mortgage

- 6 -

Corporation, Farm Credit System, Federal Home Loan Banks or
Student Loan Marketing Association, the principal of and interest
on which obligations when due will provide sufficient moneys for
payment of the redemption price and the accrued interest on the
bonds to be redeemed are held by the Trustee, as provided in the
Agreement, interest on the bonds or the portions thereof so
called for redemption shall cease to accrue, such bonds or
portions thereof shall cease to be entitled to any benefit or
security under the Agreement, and the Registered Holders thereof
shall have no rights in respect of such bonds or portions thereof
except to receive payment of the redemption price thereof and the
accrued interest thereon.  If a portion of this bond shall be
called for redemption, a new bond or bonds of authorized denomi-
nations in an aggregate principal amount equal to the unredeemed
portion hereof will be issued to the Registered Holder hereof, or
his legal representative upon the surrender hereof.

The Registered Holder of this bond shall have no right to
enforce the provisions of the Agreement, or to institute action
to enforce the covenants therein, or to take any action with
respect to any default under the Agreement, or to institute,
appear in or defend any suit or other proceeding with respect
thereof, except as provided in the Agreement.

Modifications or alterations of the Agreement or of any
agreement supplemental thereto may be made only to the extent and
in the circumstances permitted by the Agreement.

The bonds of this series are issuable as fully registered
bonds in the denomination of $_____ and any integral multiple
thereof.  At the principal corporate trust office of the Trustee,
in the manner and subject to the conditions provided in the
Agreement and without cost to the Registered Holders thereof
except for any tax or other governmental charge, bonds may be
exchanged for an equal aggregate principal amount of bonds of the
same series and maturity, of authorized denominations and bearing
interest at the same rate.

The Trustee is required to keep at its principal corporate
trust office the books of the Authority for the registration of
and for the registration of transfers of bonds.  The transfer of
this bond may be registered only upon such books and as otherwise
provided in the Agreement upon the surrender hereof to the Trus-
tee together with an assignment duly executed by the registered
owner hereof or his attorney or legal representative in the form
set forth on this bond or in such other form as shall be satis-
factory to the Trustee.  Upon any registration of transfer, the
Trustee shall deliver in exchange for this bond, a new bond or
bonds registered in the name of the transferee, of authorized
denominations, in an aggregate principal amount equal to the
principal amount of this bond, of the same series and maturity
and bearing interest at the same rate.

- 7 -

The Trustee shall not be required to exchange or register any transfer of this bond during the fifteen (15) days immediately preceding the date of mailing of notice of any redemption of bonds of this series, or after this bond or any portion thereof has been selected for redemption.

This bond, notwithstanding the provisions for the registration of transfer contained in the Agreement, shall have all the qualities and incidents, including negotiability, of negotiable instruments under the laws of Puerto Rico.

All acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of Puerto Rico, including the Authority Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the issuance of this bond and the execution and delivery of the Agreement have happened, exist and have been performed as so required.

This bond is issued with the intent that the laws of the Commonwealth of Puerto Rico shall govern its construction.

[Form of Assignment]

　　　FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto _____

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within bond on the books kept for registration thereof with full power of substitution in the premises.

Dated: _____

|  | NOTICE: The signature of this assignment must correspond with the name as it appears on the face of the within bond in every particular, without alteration or enlargement or any change whatever. |
|---|---|

Social Security Number or
Employer Identification Number
of Transferee: _____

Signature Guaranteed:

|  | NOTICE: Signatures must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank or a trust company. |
|---|---|

- 9 -

WHEREAS, by virtue of the Act, the Authority is authorized to issue its bonds as hereinafter provided, to enter into this Agreement and to do or cause to be done all of the acts and things herein provided or required to be done as hereinafter covenanted; and

WHEREAS, the execution and delivery of this Agreement have been duly authorized by resolution of the Authority; and

WHEREAS, all acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of Puerto Rico, including the Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the execution and delivery of this Agreement have happened, exist and have been performed as so required, in order to make this Agreement a valid, binding and legal trust agreement for the security of the Bonds in accordance with its terms; and

WHEREAS, the Trustee has accepted the trusts created by this Agreement and in evidence thereof has joined in the execution hereof;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH, that in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the Bonds by the Holders thereof, and also for and in consideration of the sum of One Dollar to the Authority in hand paid by the Trustee at or before the execution and delivery of this Agreement, the receipt of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Bonds are to be issued, executed, authenticated, delivered, secured and accepted by all persons who shall from time to time be or become Holders thereof, and in order to secure the payment of the Bonds at any time issued and outstanding hereunder and the interest and premium, if any, thereon according to their tenor, purport and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such Bonds, and it is mutually agreed and covenanted by and among the parties hereto, for the equal and proportionate benefit and security of all and singular the present and future Holders of the Bonds, without preference, priority or distinction as to lien or otherwise, except as otherwise hereinafter provided, of any one Bond over any other Bond by reason of priority in the issue, sale or negotiation thereof or otherwise, as follows:

- 10 -

## ARTICLE I

## DEFINITIONS

SECTION 101. <u>Definitions</u>. As used in this Agreement, except as otherwise defined below, words and terms shall have the meanings ascribed to them in the recitals to this Agreement. In addition, the following words and terms shall have the following meanings, unless some other meaning is plainly intended:

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond (the principal amount on the date of original issuance) plus the interest accrued on such Capital Appreciation Bond from the date of original issuance to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the Term Bonds of any Series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of Term Bonds in such Fiscal Year or on the first day of the next succeeding Fiscal Year as provided herein.

If at the close of any Fiscal Year the total amount of Term Bonds of any Series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption under the provisions of Section 403 of this Agreement, shall be in excess of the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirements for the Term Bonds of such Series shall be reduced for such subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director in an order filed with the Trustee on or before the 10th day of the month following the close of such Fiscal Year.

If at the close of any Fiscal Year the total principal amount of Term Bonds of any Series retired by purchase or redemption, or called for redemption under the provisions of Section 403 of this Agreement, prior to the close of such Fiscal Year shall be less than the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirement for the term bonds of such Series for the next succeeding Fiscal Year shall be increased by the amount of such deficiency.

It shall be the duty of the Trustee, on or before the 15th day of each Fiscal Year, to compute the Amortization Requirement

- 11 -

for the then current Fiscal Year for the Term Bonds of each
Series then Outstanding. The Amortization Requirement for the
then current Fiscal Year shall continue to be applicable during
the balance of such current Fiscal Year and no adjustment shall
be made therein by reason of Term Bonds purchased or redeemed or
called for redemption during such current Fiscal Year.

"Appreciated Value" shall mean, (i) with respect to any
Capital Appreciation and Income Bond up to the Interest Commence-
ment Date set forth in the resolution of the Board providing for
the issuance of such Bond, an amount equal to the Accreted Value
of such Bonds, and (ii) as of any date of computation on and
after the Interest Commencement Date, an amount equal to the
Accreted Value on the Interest Commencement Date.

"Arbitrage Rebate Fund" shall mean a fund or funds estab-
lished by the Authority with a Qualified Depositary for the
deposit of moneys necessary for payments required to be made to
the United States of America in connection with any Series of
Bonds subject to arbitrage rebate requirements under the Code.
The moneys in such fund or funds shall be applied only for the
purposes for which such fund of funds are established and shall
not be subject to a lien or charge in favor of the Holders of any
Bonds and shall not be pledged as security for the payment of any
Bonds.

"Authority" shall mean Puerto Rico Infrastructure Financing
Authority, a public corporation and instrumentality of the
Commonwealth of Puerto Rico constituting an independent body
corporate and politic, created by the Act, and the successor or
successors of the Authority.

"Balloon Bonds" shall mean any Bonds, interest on which is
payable periodically and twenty five percent (25%) or more of the
original principal amount of which matures during any one Fiscal
Year and for which maturing principal amount Amortization
Requirements have not been designated.

"Board" shall mean the Board of Directors of the Authority
as constituted from time to time and defined by the Act, or, if
said Board shall be abolished, the board or body succeeding to
the principal functions thereof or to whom the powers of the
Authority shall be given by law.

"Bond Service Account" shall mean the account of that name
established in the Sinking Fund under Section 401 hereof.

"Bondholder", "Holder", "Holder of Bonds", or "Owner" or any
similar term, shall mean any person who shall be the registered
owner of any Outstanding Bond or Bonds.

- 12 -

"Bonds" shall mean the Bonds of the Authority issued under Sections 207, 208 and 209 hereof.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded periodically on each of the dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either Serial Bonds or Term Bonds.

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date specified in the resolution authorizing such Bonds and the Appreciated Value for such Bonds is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either Serial Bonds or Term Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Credit Facility" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of, premium, if any, and interest on Bonds to which such Credit Facility relates.

"Debt Service Component" shall mean indebtedness incurred in accordance with the requirements of Section 214 hereof.

"Executive Director" shall mean the Executive Director or Deputy Executive Director of the Authority from time to time or if there is no Executive Director or Deputy Executive Director, then any person designated by the Board or by the bylaws of the Authority to perform the functions of the Executive Director.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended by and at the option of the Holders of the Bonds or the Authority.

"Fiscal Year" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Board.

- 13 -

"Government Obligations" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligations described in said clause (i), and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of such obligations are to be used and have been deposited in an escrow account that is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (iii) above held by a bank (including the Trustee) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the underlying obligations described in said clause (iii), and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"Interest Commencement Date" shall mean, with respect to any Capital Appreciation and Income Bond, the date specified in the resolution providing for the issuance of such Bond after which interest accruing on such Bond shall be payable semiannually or otherwise on a periodic basis, with the first such payment date being the applicable Interest Payment Date immediately succeeding such Interest Commencement Date.

"Interest Payment Dates" shall mean the dates on which interest on a Series of Bonds or portion thereof is scheduled to be due and payable, as is provided by a resolution of the Board adopted prior to the issuance of such Series of Bonds.

"Interim Bonds" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" shall mean any of the following, to the extent that the same is legal for the investment of public

- 14 -

funds under the laws of the Commonwealth and which legality for
investment shall be certified by the Authority upon the request
of the Trustee:

     (i)    Government Obligations;

     (ii)   obligations issued or guaranteed by an agency of
the United States of America or person controlled by or
supervised by and acting as an instrumentality of the United
States of America pursuant to authority granted by Congress,
whether now existing or hereafter organized, including but
not limited to those of the Federal Home Loan Mortgage
Corporation, Federal Home Loan Banks, Farm Credit System,
Student Loan Marketing Association and Federal National
Mortgage Association and evidences of ownership of
proportionate interests in future interest or principal
payments in obligations specified above held by a bank
(including the Trustee) or trust company as custodian, under
which the owner of said interests is the real party in
interest and has the right to proceed directly and indiv-
idually against the obligor on the underlying obligations
described above, and which underlying obligations are not
available to satisfy any claim of the custodian or any per-
son claiming through the custodian or to whom the custodian
may be obligated;

     (iii)  bankers acceptances, certificates of deposit or
time deposits of any bank (including the Trustee), trust
company or savings and loan association (including any
investment in pools of such bankers acceptances, certifi-
cates of deposit or time deposits), which to the extent that
such obligations are not insured by the Federal Deposit
Insurance Corporation or the Federal Savings and Loan Insur-
ance Corporation, are either (A) issued by a bank, trust
company or savings and loan association having, on the date
of investment, a combined capital and surplus aggregating at
least $50,000,000 or (B) collateralized at all times by such
securities, as are described in clauses (i) or (ii) above,
having a market value at least equal to the principal amount
of such bankers acceptances, certificates of deposit or time
deposits (or portion thereof not so insured) provided that
the Trustee has a perfected first lien security interest in
the collateral and that such collateral is held free and
clear of claims by third parties;

     (iv)   obligations issued by any state or territory of
the United States of America, which are rated, on the date
of investment therein, in one of the three highest rating
categories (without regard to any gradation within such
category) by both Moody's Investors Service, Inc. or any

successors thereto and Standard & Poor's Corporation or any successors thereto;

(v)  municipal obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(vi)  any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee), trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in (i) or (ii) above, provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)  commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(viii)  any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the Holders of Put Bonds.

"Offshore Excise Taxes" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

- 16 -

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

(i)    Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)    Bonds that are deemed paid and no longer Outstanding as provided herein;

(iii)    Bonds in lieu of which other Bonds have been issued pursuant to the provisions hereof relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

(iv)    Bonds tendered or deemed tendered pursuant to any tender provisions, as further provided in the resolution adopted by the Board for any Series of Bonds; and

(v)    for purposes of any consent or other action to be taken hereunder by the Holders of a specified percentage of principal amount of Bonds, Bonds known by the Trustee to be held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

"PRASA" shall mean Puerto Rico Aqueduct and Sewer Authority, a public corporation and an autonomous governmental instrumentality of the Commonwealth and the successor or successors thereof.

"Principal Corporate Trust Office" or "principal corporate trust office" of the Trustee shall mean the principal corporate trust office of the Trustee, at which, at any particular time, its corporate trust business shall be administered, except that with respect to presentation of Bonds for payment or for registration of transfer or exchange and the location of the bond registration books, such term shall mean the office or agency of the Trustee, if different, at which, at any particular time, its corporate agency business shall be conducted.

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any Series, shall mean the sum of:

(i) the amount required to pay the interest on all Bonds of such Series then Outstanding that is payable on each Interest Payment Date in such Fiscal Year;

- 17 -

(ii) the amount required to pay the principal of all Serial Bonds of such Series then Outstanding that is payable upon the maturity of such Serial Bonds in such Fiscal Year; and

(iii) the Amortization Requirement for the Outstanding Term Bonds of such Series for such Fiscal Year.

If an Interest Payment Date or a principal payment date for any Series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

(a) The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (1) for purposes of determining the maximum Principal and Interest Requirements on Outstanding Bonds for any Fiscal Year under Section 208(c)(ii) and (d)(ii), Section 209(f) and Section 401(c) of this Agreement, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been Outstanding, and (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation; provided that if a Series of Variable Rate Bonds had not been Outstanding prior to the date of calculation, the test set forth in clause (A) above shall be calculated as though said Variable Rate Bonds had been Outstanding for the twelve month period by using the average interest rate for comparable securities for such period as certified by an underwriting or investment banking firm experienced in marketing such securities;

(b) In the case of Put Bonds, the "put" date or dates shall be ignored if said "put" is payable from a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility (whether or not evidenced by provisions included in the Bonds, such as interest rate adjustments to apply if an unreimbursed drawing on the Credit Facility or Liquidity

- 18 -

Facility shall occur) shall be ignored unless the issuer of
the Credit Facility or a Liquidity Facility has advanced
funds thereunder and such amount has not been repaid, in
which case Principal and Interest Requirements shall include
the repayment obligation thereof in lieu of the stated terms
of the Bonds, in accordance with the principal repayment
schedule and interest rate or rates specified in the
documents relating to such Credit Facility or Liquidity
Facility, if the repayment obligation is secured on a parity
with Bonds;

(c)   In the case of Extendible Maturity Bonds, the
Bonds shall be deemed to mature on the later of the stated
maturity date and the date to which such stated maturity
date has been extended;

(d)   In the case of Capital Appreciation Bonds, the
principal and interest portions of the Accreted Value of
Capital Appreciation Bonds becoming due at maturity or by
virtue of an Amortization Requirement shall be included in
the year in which said principal and interest portions are
due;

(e)   In the case of Capital Appreciation and Income
Bonds, the principal and interest portions of the Appreci-
ated Value of Capital Appreciation and Income Bonds shall be
included in the year in which said principal and interest
portions are due;

(f)   In the case of Balloon Bonds or Interim Bonds,
the debt service requirements of the Balloon Bonds or
Interim Bonds may be excluded and in lieu thereof the Bal-
loon Bonds or Interim Bonds shall be viewed as debt securi-
ties having a comparable federal tax status as such Balloon
Bonds or Interim Bonds, hypothetically maturing in substan-
tially equal annual payments of principal and interest over
a period of not more than 30 years (as determined in the
certificate described below) from the date of issuance
thereof, bearing interest at a fixed rate per annum equal to
the average interest rate per annum for such debt securities
on the date of issuance of the Balloon Bonds or Interim
Bonds and issued by issuers having a credit rating, issued
by Moody's Investors Services, Inc. or any successors
thereto or Standard & Poor's Corporation or any successors
thereto comparable to that of the Authority, as shown by a
certificate of an underwriting or investment banking firm
experienced in marketing such securities; and

(g)   If all or a portion of the principal of or
interest on a Series of Bonds is payable from funds irrevo-

cably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the Trustee shall have received on or prior to the date of calculation a verification from an independent certified public accountant demonstrating the sufficiency of such funds and projected earnings for such purpose.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and, to the extent applicable, shall be determined in accordance with the foregoing rules.

"Puerto Rico Infrastructure Fund" shall mean the Fund of that name designated by the Act.

"Put Bonds" shall mean Bonds that by their terms may be tendered by and at the option of the Holder thereof for payment prior to the stated maturity thereof.

"Qualified Depositary or Depositaries" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depositary for funds of agencies and instrumentalities of the Commonwealth of Puerto Rico, which have been designated as depositaries of the Authority by resolution of the Board remaining in full force and effect.

"Redemption Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Reserve Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Reserve Account Insurance Policy" shall mean the insurance policy, surety bond or other evidence of insurance deposited for the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer thereof shall be a municipal bond insurer whose senior debt obligations, ranking pari passu with its obligations under such policy, bond or other evidence of insurance, are rated, at the time of deposit for the credit of the Reserve Account, in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto.

- 20 -

"Reserve Account Letter of Credit" shall mean the irrevocable, transferable letter of credit deposited in the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer of such letter of credit shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking pari passu with its obligations under such letters of credit are rated at the time of deposit to the credit of the Reserve Account, in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto.

"Secretary" shall mean the Secretary or Assistant Secretary of the Authority from time to time, or if there is no secretary or assistant secretary, then any person designated by the Board or by the by-laws of the Authority to perform the functions of the Secretary.

"Serial Bonds" shall mean the Bonds designated serial bonds in the resolutions authorizing such Bonds.

"Series" shall mean all of the Bonds authenticated and delivered at one time on original issuance and pursuant to any resolution authorizing such Bonds as a separate Series of Bonds, or any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article II hereof, regardless of variations in maturity, interest rate or other provisions.

"Series 1988 Bonds" shall mean the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A.

"Sinking Fund" shall mean the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund", a special fund created and designated by Section 401 hereof.

"Special Tax Revenues" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Term Bonds" shall mean the Bonds designated term bonds in the resolutions authorizing such Bonds.

"Trustee" shall mean the person named as the "Trustee" in the first paragraph of this Agreement until a successor Trustee shall have become such, and thereafter "Trustee" shall mean or include each person who is then a Trustee hereunder.

- 21 -

"Variable Rate Bonds" shall mean Bonds issued with a variable, adjustable, convertible or similar interest rate that is not fixed in percentage at the date of issue for the term thereof.

SECTION 102. <u>Miscellaneous</u>. Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Words defined in Section 101 hereof that appear in this Agreement in lower case shall have the meanings ascribed to them in the definitions in Section 101 unless the context shall otherwise indicate. The words "Bond", "Owner", "Holder" and "person" shall include the plural as well as the singular number unless the context shall otherwise indicate. The word "person" shall include corporations, firms and associations, including public bodies, as well as natural persons, unless the context shall otherwise indicate. The word "Bond" or "Bonds" and the words "revenue bond" or "revenue bonds" shall mean any Bond or Bonds or all of the Bonds, as the case may be, issued under the provisions of this Agreement. The word "Agreement" shall include this Agreement and each agreement supplemental hereto.

ARTICLE II

## FORM, EXECUTION, AUTHENTICATION, DELIVERY AND
## REGISTRATION OF BONDS

SECTION 201. _Limitation on Issuance of Bonds_. No Bonds may be issued under the provisions of this Agreement except in accordance with the provisions of this Article.

SECTION 202. _Form of Bonds_. The Bonds issued under the provisions of this Agreement shall be in substantially the form hereinabove set forth, with such appropriate variations, omissions and insertions as are permitted or required by this Agreement and with such additional changes as may be necessary or appropriate to conform to the provisions of the resolution or resolutions providing for the issuance of such Bonds, including changes required for the issuance of different types of Bonds which may reflect, without limitation, provisions for Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Balloon Bonds, Interim Bonds, Variable Rate Bonds, Extendible Maturity Bonds and Put Bonds. All such Bonds may have endorsed thereon such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority or any usage or requirement of law with respect thereto.

SECTION 203. _Details of Bonds_. The Bonds shall be issued in fully registered form and, if the Trustee issues notice of the availability of exchanging registered Bonds for coupon Bonds, in coupon form. If the Trustee receives a written request of the Authority for the delivery of coupon Bonds and an opinion of counsel of recognized standing in the field of law relating to municipal bonds to the effect that the issuance of any of the Bonds in coupon form will not adversely affect the exclusion from gross income of the interest on any of the Bonds for Federal income tax purposes, if such exclusion is otherwise applicable, the Trustee shall mail notice to the Holders of the Bonds of the availability of exchanging registered Bonds and coupon Bonds. Registered Bonds may then be exchanged for an equal aggregate principal amount of coupon Bonds of the same Series and maturity of any authorized denomination and bearing interest at the same rate as the exchanged Bonds and coupon Bonds may be exchanged for an equal aggregate principal amount of fully registered Bonds in the manner provided in this Agreement, as the Agreement may be supplemented to provide for coupon Bonds.

The Bonds of a Series shall be payable, with respect to interest, principal and premium, if any, in any coin or currency of the United States of America which at the time of payment is legal tender for public and private debts (or other coin or

- 23 -

currency provided for in the resolution authorizing the issuance
of the particular Series). The principal of Bonds shall be
payable only to the Holder or his legal representative at the
principal corporate trust office of the Trustee and at such other
office or agency of any paying agent as the Board may designate
from time to time upon the presentation and surrender of the
Bonds (except as otherwise provided in Section 211 hereof). The
Bonds of each Series shall be dated as provided in a resolution
of the Board; shall bear interest, which may be fixed or
variable, from the Interest Payment Date next preceding the date
on which they are authenticated unless authenticated on an
Interest Payment Date, in which event they shall bear interest
from such Interest Payment Date, or are authenticated before the
first Interest Payment Date in which event they shall bear
interest from their date, provided, however, that if at the time
of authentication of any Bond interest is in default, such Bond
shall bear interest from the date to which interest has been
paid. Capital Appreciation Bonds shall bear interest as
described under the defined term Accreted Value, payable on the
amount due at maturity only upon redemption, acceleration or
maturity thereof, and Capital Appreciation and Income Bonds shall
bear interest as described under the defined term Appreciated
Value, payable on the amount due at maturity but only from and
after the Interest Commencement Date. The interest rate shall
not exceed the applicable maximum legal rate per annum. Interest
on the Bonds shall be payable by check mailed to the registered
Holder thereof by the Trustee or any other paying agents
appointed by the Authority at the address shown on the regis-
tration books of the Authority held by the Trustee at the close
of business on the fifteenth (15th) day (whether or not a busi-
ness day) of the calendar month preceding an Interest Payment
Date or such other date as may be established by resolution for
any Bonds; provided that to the extent provided in the resolution
authorizing the issuance of Bonds interest shall be payable by
wire transfer. The Bonds shall be lettered and numbered in such
manner and shall be in the denominations provided in the
resolutions of the Board authorizing their issuance. In the
event that interest is not punctually paid or duly provided for,
such interest shall forthwith cease to be payable to the Holder
shown on the registration books held by the Trustee at the close
of business on the fifteenth (15th) day of the calendar month
preceding such Interest Payment Date and may be paid to the
person in whose name Bonds are registered at the close of
business on a special record date to be fixed by the Trustee, on
a special payment date designated by the Trustee, notice having
been given by the Trustee to the Holders not less than ten (10)
days prior to such special record date or may be paid at any time
in any other lawful manner not inconsistent with the requirements
of any securities exchange on which Bonds may be listed and upon
such notice as may be required by such exchange, or as more fully

provided for in the resolution of the Board authorizing the issu-
ance of the Bonds. The above procedure for the payment of
defaulted interest overdue may be varied in resolutions of the
Board authorizing the issuance of particular Series of Bonds,
which resolutions may also provide for the payment of such inter-
est at defaulted interest rates.

The Bonds shall be signed in the name of the Authority by
the Executive Director or with his facsimile signature and the
corporate seal of the Authority shall be impressed or a facsimile
of such seal shall be imprinted on the Bonds and attested by the
Secretary or his facsimile signature. In case any officer whose
signature or a facsimile of whose signature shall appear on any
Bonds shall cease to be such officer before the delivery of such
Bonds, such signature or such facsimile shall nevertheless be
valid and sufficient for all purposes as if he had remained in
office until such delivery, and also any Bonds may bear the fac-
simile signature of or may be signed by such persons as at the
actual time of the execution of such Bonds shall be the proper
officers to sign such Bonds although on the date of such Bonds
such persons may not have been such officers.

SECTION 204. Authentication of Bonds. Only such of the
Bonds as shall have endorsed thereon a certificate of authentica-
tion substantially in the form hereinabove set forth, duly exe-
cuted by the Trustee, shall be entitled to any benefit or secu-
rity under this Agreement. No Bond shall be valid or become
obligatory for any purpose or be entitled to any benefit or secu-
rity under this Agreement unless and until such certificate of
authentication shall have been duly executed by the Trustee, and
such certificate of the Trustee upon any such Bond shall be con-
clusive evidence that such Bond has been duly authenticated and
delivered under this Agreement. The Trustee's certificate of
authentication on any Bond shall be deemed to have been duly
executed if signed by an authorized officer of the Trustee, but
it shall not be necessary that the same officer sign the certifi-
cate of authentication on all of the Bonds that may be issued
hereunder at any one time.

SECTION 205. Exchange and Registration of Transfer. Bonds
upon surrender thereof at the principal corporate trust office of
the Trustee, together with an assignment duly executed by the
Holder or his attorney or legal representative in the form set
forth on the Bonds or such other form as may be satisfactory to
the Trustee, may, at the option of the Holder thereof, be
exchanged for an equal aggregate principal amount of Bonds of the
same Series and maturity, of any denomination or denominations
authorized by this Agreement, and bearing interest at the same
rate, in the same form as the Bonds surrendered for exchange.

- 25 -

The Trustee shall keep books for the registration of and for the registration of transfers of the Bonds as provided in this Agreement. The transfer of any Bond may be registered only upon the books kept for the registration of and registration of transfers of Bonds upon surrender thereof to the Trustee together with an assignment duly executed by the Holder or his attorney or legal representative in the form of the assignment set forth on the Bonds or such other form as may be satisfactory to the Trustee. Upon any such registration of transfer, the Authority shall execute and the Trustee shall authenticate and deliver in exchange for such Bond a new Bond or Bonds registered in the name of the transferee, of any denomination or denominations authorized by this Agreement, in an aggregate principal amount equal to the principal amount of such Bond of the same Series and maturity and bearing interest at the same rate. In all cases in which Bonds shall be exchanged or transferred hereunder, the Authority shall execute and the Trustee shall authenticate and deliver at the earliest practicable time Bonds in accordance with the provisions of this Agreement. The Authority or the Trustee may make a charge for every such exchange or registration of transfer of Bonds sufficient to reimburse it for any tax or other governmental charge required to be paid with respect to such exchange or registration of transfer, but no other charge shall be made to any Holder for exchanging or registering the transfer hereinabove granted. Any Bond surrendered in any such exchange or transfer shall be cancelled by the Trustee as provided in Section 304 hereof. Neither the Authority nor the Trustee shall be required to make any such exchange or registration of transfer of any Bond during the fifteen (15) days immediately preceding the date of mailing of notice of any redemption of such Bond, or after a Bond or any portion thereof has been selected for redemption.

SECTION 206. <u>Ownership of Bonds</u>. As to any Bond the person in whose name the same shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of or on account of the principal of and premium, if any and interest on any such Bond shall be made only to the Holder thereof or his legal representative. All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond, including the premium, if any, and interest thereon, to the extent of the sum or sums so paid.

Any Holder of any Bond is hereby granted power to transfer absolute title thereto by assignment thereof to a bona fide purchaser for value (present or antecedent) without notice of prior defenses or equities or claims of ownership enforceable against his assignor or any person in the chain of title and before the maturity of such Bond. Every prior Holder of any Bond shall be deemed to have waived and renounced all of his equities or rights therein in favor of every such bona fide purchaser, and every

- 26 -

such bona fide purchaser shall acquire absolute title thereto and
to all rights represented thereby.

SECTION 207. The Series 1988 Bonds   The Series 1988 Bonds
shall be issued under this Agreement in the aggregate principal
amount of Three Hundred Twenty Seven Million Seven Hundred Forty
Thousand Dollars ($327,740,000) for the purpose of providing
funds to defease the Outstanding PRASA Bonds and to pay the
Pfizer Debt.   Such Bonds shall be designated Puerto Rico
Infrastructure Financing Authority Special Tax Revenue Bonds,
Series 1988A.   The terms of such Bonds including, but not limited
to, interest rates, Amortization Requirements, redemption provi-
sions and maturity dates and the disposition of the proceeds of
the Series 1988 Bonds and the disposition of moneys to be made
available by PRASA, shall be provided for in a resolution of the
Board.   The disposition of proceeds may be supplemented or
changed by a certificate of the Executive Director executed on
the date of issuance of the Series 1988 Bonds if provided for in
said resolution.

Each of the Series 1988 Bonds shall be executed sub-
stantially in the form and manner hereinabove set forth and de-
posited with the Trustee for authentication, but before the
Series 1988 Bonds shall be authenticated and delivered by the
Trustee, there shall be filed with the Trustee the following:

(i)   a copy, certified by the Secretary, of the reso-
lution mentioned above;

(ii)   a copy, certified by the Secretary, of the
resolution directing the authentication and delivery of the
Series 1988 Bonds to or upon the order of the purchasers
therein named upon payment of the purchase price for each
Series therein set forth;

(iii)   a certificate of the Executive Director
directing the disposition of the proceeds of the Series 1988
Bonds;

(iv)   the report of a firm of nationally recognized
independent certified public accountants, of favorable repu-
tation for skill and experience in verifying the mathemat-
ical computations of sufficiency of investments for defeas-
ance and yield calculations in refunding transactions, stat-
ing their conclusions with respect to (A) the mathematical
computations of the sufficiency of the maturing principal of
and interest on the investments made with the proceeds of
the Series 1988 Bonds to be applied to the refunding of the
Outstanding PRASA Bonds and other moneys available for such
purpose for the payment of the principal of, premium, if

- 27 -

any, and interest on the Outstanding PRASA Bonds to be
refunded and (B) the mathematical computations of the actua-
rial yield on the Series 1988 Bonds issued to refund the
Outstanding PRASA Bonds and on investments made with the
proceeds of such Bonds and other available moneys;

(v) an opinion of counsel of recognized standing in
the field of law relating to municipal bonds to the effect
that upon the deposit of the United States government obli-
gations and uninvested moneys in the Escrow Deposit Trust
Fund established for the refunding of the Outstanding PRASA
Bonds and in reliance as to the sufficiency of such deposit
upon the verification report addressing such sufficiency
that has been delivered simultaneously herewith by Ernst &
Whinney, Memphis, Tennessee, and the giving of notice of
refunding required under the trust agreement under which the
Outstanding PRASA Bonds were issued, the Outstanding PRASA
Bonds shall no longer be deemed to be outstanding and shall
cease to be entitled to any lien, benefit or security under
said trust agreement; and

(vi) an opinion of counsel for the Authority to the
effect that (a) the issuance of such Bonds and the execution
of this Agreement have been duly authorized and that all
conditions precedent to the authentication and delivery of
such Bonds have been fulfilled; (b) the form and terms of
such Bonds have been established by or pursuant to one or
more Board resolutions, in conformity with the provisions of
this Agreement; (c) such Bonds, when authenticated and
delivered by the Trustee and issued by the Authority in the
manner and subject to any conditions specified in such opin-
ion of counsel, will constitute valid and legally binding
obligations of the Authority, enforceable in accordance with
their terms, and will be entitled to the benefit of this
Agreement; (d) the Authority has the corporate power to
issue such Bonds, and has duly taken all necessary corporate
action with respect to such issuance; (e) the issuance of
such Bonds will not contravene the Act; and (f) that all
requirements of this Agreement applicable to the Authority
in respect of the execution and delivery by the Authority of
such Bonds have been complied with and that, assuming due
authentication and delivery of such Bonds by the Trustee, no
authorization, approval or consent by any regulatory or
statutory or other public authority which has not been
obtained is required for the creation, issuance, authentica-
tion and delivery of such Bonds pursuant to this Agreement.

When the documents mentioned above in this Section shall
have been filed with the Trustee and when said Series 1988 Bonds
shall have been executed and authenticated as required by this

- 28 -

Agreement, the Trustee shall deliver said Series 1988 Bonds to or upon the order of the purchasers named in the resolution mentioned in clause (ii) of this Section, but only upon payment to the Trustee of the purchase price of said Series 1988 Bonds.

SECTION 208. Additional Bonds. Bonds may be issued under and secured by this Agreement, subject to the conditions hereinafter provided in this Section, for any lawful purpose of the Authority, including making a deposit to the Reserve Account and paying any costs of issuance of such Bonds.

Before any Bonds shall be issued under the provisions of this Section, the Board shall adopt a resolution authorizing the issuance of such Bonds, fixing the amount and the details thereof, specifying the amount of interest, if any, on such Bonds to be paid from the net proceeds of the Bonds, and describing in brief and general terms the purpose for which such Bonds are to be issued. The Bonds authorized by any such resolution shall be designated and dated, shall be in such denominations, shall be numbered, shall be issued in such form, shall bear interest until their payment at any rate or rates not exceeding the maximum rate permitted by applicable law, shall be stated to mature at such time or times, shall have such Amortization Requirements, and shall be made subject to redemption, either in whole or in part, at such times and prices (subject to the provisions of Article III of this Agreement), as may be determined by resolution of the Board adopted prior to the issuance of such Bonds. By said resolution, the Board may appoint one or more paying agents for such Bonds in addition to the Trustee. Prior to the issuance of Variable Rate Bonds, the Board shall adopt a resolution specifying, without limitation, the interest rate calculation methods and any conversion features and any Credit Facility or any Liquidity Facility which may be drawn upon to make principal and interest payments on the Variable Rate Bonds. The Variable Rate Bonds may provide that the owner of any such Bond may demand payment of principal and interest within a stated period after delivering notice to a designated agent for the Authority and providing a copy of the notice with the tender for the Variable Rate Bond to such agent. The designated agent for the Authority, in accordance with the terms of a remarketing agreement, may provide for the resale or redelivery of the Variable Rate Bonds on behalf of the Authority at a price provided for in the agreement. If the Variable Rate Bonds shall not be resold or redelivered within a stated period, the agent for the Authority may be authorized to draw upon a Credit Facility or Liquidity Facility for payment of interest on and principal of the Bonds. The particular form or forms of such demand provisions, the period or periods for payment of principal and interest after delivery of notice, the appointment of the agent for the Authority, the terms and provisions for the remarketing agreement, and the terms and provisions of the Credit Facility or

the Liquidity Facility, shall be designated by a resolution of the Board. Prior to the issuance of Extendible Maturity Bonds, the Board shall specify by resolution the terms and conditions of the exercise by the Holders or the Authority of any option to extend the maturity of said Bonds. Prior to the issuance of Capital Appreciation Bonds and Capital Appreciation and Income Bonds, the Board shall specify by resolution the manner in which and the period during which principal and interest shall be deemed to accrue on such Bonds for purposes of the definition of "Principal and Interest Requirements". Additional Bonds shall be executed substantially in the form and manner hereinabove set forth and deposited with the Trustee for authentication, but before any of such Bonds shall be authenticated and delivered by the Trustee, there shall be filed with the Trustee the following:

(a) a copy, certified by the Secretary, of the resolution mentioned above;

(b) a copy, certified by the Secretary, of the resolution directing the authentication of such Bonds, specifying the interest rate of each such Bond, and directing the delivery of such Bonds to or upon the order of the purchasers therein named upon payment of the purchase price therein set forth;

(c) a certificate dated the date of original issuance of the such Bonds, signed by the Secretary of the Treasury of the Commonwealth, setting forth

(i) the amount of the average annual Offshore Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

(ii) the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%;

(d) a certificate dated the date of original issuance of the Bonds to be issued, signed by the Executive Director, setting forth

- 30 -

(i)     the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)     the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii)     the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%; and

(e)     an opinion of counsel for the Authority dated the date of original issuance of such Bonds to the effect that

(i)     the issuance of such Bonds has been duly authorized and that all conditions precedent to the authentication and delivery of such Bonds have been duly fulfilled;

(ii)     the form and terms of such Bonds have been established by or pursuant to one or more Board resolutions, in conformity with the provisions of this Agreement;

(iii)     such Bonds, when authenticated and delivered by the Trustee and issued by the Authority in the manner and subject to any conditions specified in such opinion of counsel, will constitute valid and legally binding obligations of the Authority, enforceable in accordance with their terms, and will be entitled to the benefits of this Agreement;

(iv)   the Authority has the corporate power to issue such Bonds, and has duly taken all necessary corporate action with respect to such issuance;

(v)   the issuance of the Bonds will not contravene the Act; and

(vi)   all requirements of this Agreement applicable to the Authority in respect of the execution and delivery by the Authority of such Bonds have been complied with and that, assuming due authentication and delivery of such Bonds by the Trustee, no authorization, approval or consent by any regulatory or statutory or other public authority which has not been obtained is required for the creation, issuance, authentication and delivery of such Bonds pursuant to this Agreement; and

When the documents mentioned above shall have been filed with the Trustee and when the Bonds described in the resolutions mentioned in clauses (a) and (b) of this Section shall have been executed and authenticated as required by this Agreement, the Trustee shall deliver such Bonds to or upon the order of the purchasers named in the resolution mentioned in said clause (b) upon payment to the Trustee of the purchase price of such Bonds.

Bonds may be issued under this Section as part of a Series of Bonds which contains Bonds issued under Section 209 hereof, in which event the conditions to authentication and delivery listed above shall pertain only to the portion of the Series of Bonds issued under this Section.

The proceeds of the Bonds issued under the provisions of this Section shall be applied by the Trustee as provided in a resolution of the Board adopted prior to the issuance of the Bonds, which may be supplemented or changed by a certificate of the Executive Director executed on the date of issuance of the Bonds, if provided for in said resolution.

SECTION 209.   Refunding Bonds.   Bonds may be issued, subject to the conditions hereinafter provided in this Section, at any time or times for the purpose of providing funds for refunding all or any part of the Outstanding Bonds of any one or more Series or all or any portion of Debt Service Components by payment at maturity or redemption at a selected redemption date or dates or combination of such payment at maturity and redemption, including the payment of any redemption premium thereon, making a deposit to the Reserve Account and paying any costs of issuance of such Bonds.   Before any Bonds shall be issued under the provisions of this Section, the Board shall

adopt a resolution authorizing the issuance of such Bonds, fixing the amount and the details of the Bonds, and describing the Bonds to be refunded.  Such Bonds shall be designated and dated, shall be in such denominations, shall be numbered, shall be issued in such form, shall bear interest until their payment at any rate or rates not exceeding the maximum rate permitted by applicable law, shall be stated to mature at such time or times, shall have such Amortization Requirements and shall be made subject to redemption, in whole or in part, at such times and prices (subject to the provisions of Article III of this Agreement), as may be determined prior to the issuance of such Bonds.  By said resolution, the Board may appoint one or more paying agents for such Bonds in addition to the Trustee.  Prior to the issuance of Variable Rate Bonds, the Board shall adopt a resolution specifying, without limitation, the interest rate calculation methods and any conversion features, and any Credit Facility or any Liquidity Facility which may be drawn upon to make principal and interest payments on the Variable Rate Bonds.  The Variable Rate Bonds may provide that the Holder of any such Bond may demand payment of principal and interest within a stated period after delivering notice to a designated agent for the Authority and providing a copy of the notice with the tender of the Variable Rate Bond to such agent.  The designated agent for the Authority, in accordance with the terms of a remarketing agreement, may provide for the resale or redelivery of the Variable Rate Bonds on behalf of the Authority at a price provided for in such agreement.  If the Variable Rate Bonds shall not be resold or redelivered within a stated period, the agent for the Authority may be authorized to draw upon a previously executed Credit Facility or Liquidity Facility for payment of interest and principal for a particular series of Variable Rate Bonds to which such Credit Facility or Liquidity Facility shall pertain.  The particular form or forms of such demand provisions, the period or periods for payment of principal and interest after delivery of notice, the appointment of the agent for the Authority, the terms and provisions for the remarketing agreement, and the terms and provisions of the Credit Facility or Liquidity Facility shall be as designated by a resolution of the Board pertaining to the Variable Rate Bonds to which such terms and provisions are applicable prior to the issuance thereof.  Prior to the issuance of Put Bonds, the Board shall adopt a resolution which may provide for some of the above terms and provisions.  Prior to the issuance of Extendible Maturity Bonds, the Board shall adopt a resolution which shall set forth the terms and conditions of the exercise by the Holder or the Authority of any option to extend the maturity of said Bonds.  Prior to the issuance of Capital Appreciation Bonds and Capital Appreciation and Income Bonds, the Board shall specify by resolution, the manner in which and the period during which principal and interest shall be deemed to accrue on such Bonds for purposes of the definition of "Principal and Interest Requirements".

- 33 -

All Bonds issued under the provisions of this Section shall be executed substantially in the form and manner hereinabove set forth and deposited with the Trustee for authentication, but before such Bonds shall be authenticated and delivered by the Trustee, there shall be filed with the Trustee the following:

(a) a copy, certified by the Secretary, of the resolution mentioned above;

(b) a copy, certified by the Secretary, of the resolution directing the authentication of such Bonds, specifying the interest rate of each such Bond and directing the delivery of such Bonds to or upon the order of the purchasers therein named upon payment of the purchase price therein set forth;

(c) an opinion of counsel for the Authority dated the date of original issuance of such Bonds to the effect that

(i) the issuance of such Bonds has been duly authorized and that all conditions precedent to the authentication and delivery of such Bonds have been fulfilled;

(ii) the form and terms of such Bonds have been established by or pursuant to one or more Board resolutions, in conformity with the provisions of this Agreement;

(iii) such Bonds, when authenticated and delivered by the Trustee and issued by the Authority in the manner and subject to any conditions specified in such opinion of counsel, will constitute valid and legally binding obligations of the Authority, enforceable in accordance with their terms, and will be entitled to the benefits of this Agreement;

(iv) the Authority has the corporate power to issue such Bonds, and has duly taken all necessary corporate action with respect to such issuance;

(v) the issuance of such Bonds will not contravene the Act; and

(vi) all requirements of this Agreement applicable to the Authority in respect of the execution and delivery by the Authority of such Bonds, have been complied with and that, assuming due authentication and delivery of such Bonds by the Trustee, no author-

- 34 -

ization, approval or consent by any regulatory or statutory or other public authority which has not been obtained is required for the creation, issuance, authentication and delivery of such Bonds pursuant to this Agreement;

(d) such documents as shall be required by counsel of recognized standing in the field of law relating to municipal bonds to show that provision has been made in accordance with the provisions of this Agreement for the payment or redemption or combination of such payment and redemption of all the Bonds or Debt Service Components to be refunded;

(e) a certificate dated the date of original issuance of such Bonds, signed by the Executive Director, that the sum of the net proceeds (excluding accrued interest but including any premium) of such Bonds, together with investment earnings on said proceeds, other moneys to be deposited and investment earnings on said moneys, shall not be less than an amount sufficient to pay the principal of, the redemption premium, if any, and interest accrued to the payment dates on the Bonds or Debt Service Components to be refunded, and the expenses incident to such financing; and

(f) the certificates required in Section 208(c) and (d); provided that said certificates shall not be required if the Executive Director delivers a certificate to the effect that (i) the aggregate Principal and Interest Requirements for each Fiscal Year thereafter on account of the Bonds Outstanding and Debt Service Components outstanding after the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of the Bonds Outstanding and Debt Service Components outstanding prior to such issuance of refunding Bonds or (ii) the *maximum* aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds Outstanding and Debt Service Components outstanding after the issuance of such refunding Bonds are equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds Outstanding and Debt Service Components outstanding prior to the issuance of such refunding Bonds.

Bonds may be issued under this Section as a part of a Series of Bonds which contains Bonds issued under Section 208 hereof, in which event the conditions to execution and authentication listed above shall pertain only to Bonds issued under this Section.

- 35 -

The proceeds of the Bonds issued under the provisions of this Section shall be applied by the Trustee as provided in a resolution of the Board adopted prior to the issuance of the Bonds, which may be supplemented or changed by a certificate of the Executive Director executed on the date of issuance of the Bonds and delivered to the Trustee, if provided for in said resolution. Simultaneously with the delivery of the Bonds, the Trustee may withdraw from the Sinking Fund amounts which are allocable to the Bonds to be refunded and shall transfer said amounts in accordance with the resolution of the Board authorizing the issuance of such Bonds.

The issuance of the Bonds to accomplish a cross-over refunding, economic defeasance or other similar refunding shall be within the purview of this Section 209.

SECTION 210. <u>Temporary Bonds</u>. Until definitive Bonds are ready for delivery, there may be executed, and upon request of the Executive Director the Trustee shall authenticate and deliver, in lieu of definitive Bonds and subject to the same limitations and conditions except as to identifying numbers, temporary printed, engraved, lithographed or typewritten Bonds in authorized denominations substantially of the tenor hereinabove recited, and with appropriate omissions, insertions and variations as may be required. The Authority shall cause the definitive Bonds to be prepared and to be executed and delivered to the Trustee, and the Trustee, upon presentation to it of any temporary Bond, shall cancel the same in the manner set forth in Series 304 hereof and authenticate and deliver in exchange therefor, at the place designated by the Holder, without expense to the Holder, a definitive Bond or Bonds of the same aggregate principal amount and having the same Series, maturity and interest rate as the temporary Bond surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefit and security of this Agreement as the definitive Bonds to be issued and authenticated hereunder.

SECTION 211. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. In case any Bond secured hereby shall become mutilated or be destroyed, stolen or lost, the Authority may execute, and the Trustee may authenticate and deliver, a new Bond of like date, maturity and tenor in exchange and substitution for such Bond destroyed, stolen, mutilated or lost, upon the Holder's paying the reasonable expenses and charges of the Authority and the Trustee in connection therewith. In the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Trustee and, in the case of a Bond destroyed, stolen or lost, there shall first be furnished to the Trustee evidence satisfactory to the Trustee and to the Authority that such Bond was destroyed, stolen or lost, and there shall be furnished to the Authority and the Trustee indemnity satisfactory to them.

- 36 -

In the event any such Bond shall be about to mature or have
matured or have been called for redemption, instead of issuing a
duplicate Bond, the Authority may direct the Trustee to pay the
same without surrender thereof. Any Bond surrendered for
replacement shall be cancelled in the same manner as provided in
Section 304 hereof.

Any such new Bonds issued pursuant to this Section shall
constitute additional contractual obligations on the part of the
Authority, whether or not the mutilated, lost, stolen or
destroyed Bonds be at any time enforceable by anyone, and shall
be entitled to equal and proportionate benefits and rights as to
lien on and source and security for payment from the Pledged
Revenues with all other Bonds.

Section 212. <u>Qualification for Depository Trust Company</u>.
The Trustee is hereby authorized to enter into agreements with
the Depository Trust Company of New York and other depository
trust companies, including but not limited to, agreements neces-
sary for wire transfers of interest and principal payments with
respect to the Bonds, utilization of electronic book entry data
received from the Depository Trust Company of New York and other
depository trust companies in place of actual delivery of Bonds
and provision of notices with respect to Bonds registered by the
Depository Trust Company of New York and other depository trust
companies (or any of their designees identified to the Trustee)
by overnight delivery, courier service, telegram, telecopy or
other similar means of communication.

Section 213. <u>Capital Appreciation Bonds; Capital Apprecia-</u>
<u>tion and Income Bonds</u>. For purposes of determining the principal
amount of a Capital Appreciation Bond or a Capital Appreciation
and Income Bond, for redemption or computation of the amount of
Bonds held by the Holder thereof in giving to the Authority any
notice, covenant, request or demand pursuant to this Agreement
for any purpose whatsoever, the principal amount of a Capital
Appreciation Bond shall be deemed to be its Accreted Value and
the principal amount of a Capital Appreciation and Income Bond
shall be deemed to be its Appreciated Value. For purposes of
determining the amount required to be deposited to the credit of
the Reserve Account, reference herein to the original principal
amount shall mean in the case of Capital Appreciation Bonds,
Capital Appreciation and Income Bonds and other Bonds which are
sold to the public at a discount, the value of such Bonds at
maturity.

Section 214. <u>Debt Service Components</u>. The Authority may
incur indebtedness payable from moneys withdrawn from the Puerto
Rico Infrastructure Fund on a pro rata basis with the deposits
required to be made to the credit of the Bond Service Account,
the Redemption Account and the Reserve Account under Section 401
hereof, which indebtedness is referred to herein as Debt Service

Components; provided that prior to the incurrence of such indebtedness, the Authority shall file with the Trustee the certificates required by Section 208(c) and (d) or Section 209(f), as applicable, in respect of such Debt Service Components.

## ARTICLE III

### REDEMPTION OF BONDS

SECTION 301. <u>Redemption of Bonds</u>. The Bonds of each Series issued under the provisions of this Agreement may be made subject to redemption, both in whole and in part and at such times and prices, as may be provided in the resolution authorizing the is-suance of such Bonds. Term Bonds shall be made subject to re-demption to the extent of any Amortization Requirements therefor.

If less than all of the Bonds of any one maturity of a Series shall be called for redemption, the particular Bonds or portions of Bonds to be redeemed shall be selected by the Trustee in such manner as it shall deem fair and appropriate; provided, however, that the portion of any Bond of any Series to be re-deemed shall be in the principal amount equal to the lowest de-nomination authorized for such Series or some multiple thereof, and that, in selecting Bonds for redemption, the Trustee shall treat each Bond as representing that number of Bonds which is obtained by dividing the principal amount of such Bond by the amount of such lowest authorized denomination.

SECTION 302. <u>Redemption Notice</u>. At least thirty (30) days before the redemption date of any Bonds or as otherwise provided in the resolution authorizing the issuance of the particular Bonds, the Trustee shall cause a notice of any such redemption, either in whole or in part, on behalf of the Authority to be mailed, by first class mail, postage prepaid, to any other paying agents for the Bonds to be redeemed and to all Holders of Bonds to be redeemed at their addresses as they appear upon the books of registration hereinabove provided for; but failure so to mail any such notice to any Holder or any defect in any notice so mailed shall not affect the validity of the proceedings for the redemption of other Bonds. Each such notice shall set forth (1) the date fixed for redemption, (2) the redemption price to be paid, (3) that on the date fixed for redemption the redemption price will become due and payable upon each Bond called for redemption, (4) if moneys for the payment of the redemption price shall be on deposit on such date, that interest thereon shall cease to accrue on and after said redemption date, (5) the place where such Bonds are to be surrendered for payment of such redemption price, (6) if less than all of the Bonds of a Series then Outstanding shall be called for redemption, the numbers of such Bonds and (7) the complete designation of the Series, inclu-ding the CUSIP numbers. Each notice of redemption shall also contain (a) the date of issue of the Bond as originally issued; (b) the rate of interest borne by each Bond being redeemed; (c) the maturity date of each Bond being redeemed; and (d) the name, address and telephone number of a contact person, if any,

- 39 -

representing the Trustee. In case any Bond is to be redeemed in part only, the notice of redemption which relates to such Bond shall state also the amount of such Bond to be redeemed and that on or after the redemption date, upon surrender of such Bond, a new Bond or Bonds of the same Series and maturity, bearing interest at the same rate and in principal amount equal to the unredeemed portion of such Bond will be issued.

In addition to the foregoing notice, further notice shall be given by the Trustee as set out below, but no defect in said further notice nor any failure to give all or any portion of such further notice shall be the basis for any liability of the Trustee or in any manner defeat the effectiveness of a call for redemption if notice thereof is given as above prescribed.

(a)    Each further notice of redemption shall be sent by first class mail, postage prepaid, at least thirty (30) days before the redemption date to registered securities depositories and national information services whose names and addresses are included in the most recent list thereof furnished to the Trustee by the Authority; and

(b)    The Trustee shall cause a second notice of redemption to be mailed in the manner and in the form required above for the initial notice of redemption to Holders of Bonds or portions thereof to be redeemed who have not surrendered their Bonds within sixty (60) days after the redemption date.

SECTION 303.  Effect of Calling for Redemption.  On the date so designated for redemption, notice having been given in the manner and under the conditions hereinabove provided, the Bonds or portions of Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Bonds or portions of Bonds on such date, and, if sufficient moneys for payment of the redemption price and accrued interest or Sufficient Government Obligations as defined in Section 305 hereof are held by the Trustee in trust for the Holders of Bonds to be redeemed, as provided in this Agreement, interest on the Bonds or portions of Bonds so called for redemption shall cease to accrue, such Bonds or portions of Bonds shall cease to be entitled to any benefit or security hereunder and shall no longer be Outstanding hereunder and the Holders of such Bonds or portions of Bonds shall have no rights in respect thereof except to receive payment of the redemption price thereof and accrued interest, and, to the extent provided in Section 306 hereof, to receive Bonds for any unredeemed portions of Bonds.

SECTION 304.  Cancellation of Bonds.  All Bonds paid, redeemed or purchased by the Authority, either at or before

maturity, shall be delivered to the Trustee when such payment, redemption or purchase is made and such Bonds shall thereupon be cancelled. The Trustee shall provide to the Authority the details of all Bonds so cancelled. All Bonds cancelled under any of the provisions of this Agreement either shall be delivered to the Authority or destroyed by the Trustee, as the Authority directs. Upon destruction of any Bonds, the Trustee shall execute a certificate in duplicate, describing the Bonds so destroyed, and one executed certificate shall be filed with the Authority and the other executed certificate shall be retained by the Trustee.

SECTION 305. <u>Bonds To Be Paid Not Outstanding</u>. If (a) Bonds shall have been duly called for redemption under the provisions of this Article or irrevocable instructions have been given by the Authority to the Trustee to (i) call Bonds for redemption under the provisions of this Article or (ii) pay Bonds at their maturity or maturities (the Bonds described in clause (a) are herein collectively called the "Bonds to be Paid"), and (b) sufficient moneys to provide for the payment of such Bonds or Sufficient Government Obligations (as defined below) are held in separate accounts by the Trustee or other appropriate fiduciary institution acting as escrow agent solely for the Holders of the Bonds to be Paid, then, notwithstanding any other provisions herein to the contrary, the Bonds to be Paid shall not be deemed to be Outstanding under the provisions of this Agreement and shall cease to be entitled to any benefit or security under this Agreement.

For purposes of this Agreement "Sufficient Government Obligations" shall mean Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, the Farm Credit System, Federal Home Loan Banks or the Student Loan Marketing Association which are in such principal amounts, bear interest at such rate or rates and mature (without option of prior redemption) on such date or dates so that the proceeds to be received upon payment of such Government Obligations or obligations issued by Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Farm Credit System, Federal Home Loan Banks or Student Loan Marketing Association at their maturity and the interest to be received thereon, without any reinvestment thereof, will provide sufficient moneys on the dates required to pay the principal of and redemption premium, if any, and the interest on the Bonds to be Paid to the dates of their redemption or maturity.

SECTION 306. <u>Partial Redemption</u>. In case part but not all of an Outstanding Bond shall be selected for redemption, the Holder thereof or his attorney or legal representative shall present and surrender such Bond to the Trustee for payment of the

principal amount thereof so called for redemption, and the Authority shall execute and the Trustee shall authenticate and deliver to or upon the order of such Holder or his attorney or legal representative, without charge to the Holder therefor, for the unredeemed portion of the principal amount of the Bond so surrendered, a new Bond or Bonds of the same Series and maturity, bearing interest at the same rate and of any denomination or denominations authorized by this Agreement.

## ARTICLE IV

### FUNDS AND ACCOUNTS

SECTION 401. <u>Sinking Fund and Accounts</u>. A special fund is hereby created and designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (herein sometimes called the "Sinking Fund") to be held by the Trustee. There are hereby created three separate accounts in the Sinking Fund designated "Bond Service Account", "Redemption Account" and "Reserve Account". Subject to the terms and conditions set forth in this Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infra-structure Fund. As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys to make the following deposits in the following order:

(a) to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each Series then Outstanding and (ii) the amount of principal of the Bonds of each Series then or to become within the current Fiscal Year due and payable;

(b) to the credit of the Redemption Account, such amount as may be required to make the total amount then in the then current Fiscal Year to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the Term Bonds of each Series then Out-standing; and

(c) to the credit of the Reserve Account, such amount as may be required to make the amount then to the credit of the Reserve Account equal to the lesser of (i) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on the Bonds Outstanding and (ii) ten percent (10%) of the original principal amount of each Series of Bonds Outstanding.

In lieu of any required deposit or in substitu-tion of moneys on deposit to the credit of the Reserve

- 43 -

Account, the Authority may cause to be deposited to the credit of the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any payment date for the Bonds on which a withdrawal from the Reserve Account would be required under Section 404 hereof and which shall give the Trustee the right to draw on any Reserve Account Insurance Policy or Reserve Account Letter of Credit prior to the expiration thereof unless the Authority has furnished a replacement Reserve Account Insurance Policy or Reserve Account Letter of Credit or sufficient moneys to make amounts on deposit to the credit of the Reserve Account equal to the amount required therefor. If a disbursement is made under a Reserve Account Insurance Policy or a Reserve Account Letter of Credit, the Authority shall either reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit or deposit to the credit of the Reserve Account moneys in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, or a combination of such alternatives.

If the Authority issues Variable Rate Bonds pursuant to the provisions of Section 208 or 209 of this Agreement, the assumptions for calculating interest for the current Fiscal Year and any adjustments necessary to ensure a sufficient deposit for the payment of said interest shall be provided for in the resolution authorizing the issuance of such Bonds. For purposes of clause (c) above, interest on Variable Rate Bonds shall be calculated on the first day of the Fiscal Year for such Fiscal Year and on the date of issuance of any additional Series of Variable Rate Bonds.

If any interest payment date or a principal payment date for any Series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) through (c) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make (i) any payment necessary to satisfy the then current arbitrage rebate requirements under the Code for

- 44 -

Bonds and Debt Service Components and (ii) any required deposit
into an Arbitrage Rebate Fund or comparable fund for a Debt
Service Component. After making the foregoing required
applications, the Authority may apply any balance remaining to
the credit of the Puerto Rico Infrastructure Fund to any lawful
purpose.

SECTION 402. Withdrawals from Bond Service Account. The
Trustee shall on each Interest Payment Date or as otherwise pro-
vided in the resolution of the Board authorizing the issuance of
Bonds, withdraw from the Bond Service Account and (1) remit by
mail (or by wire transfer if so provided by resolution of the
Board) to each Holder of Bonds the amounts required for paying
interest upon such Bonds as such interest becomes due and (2) set
aside sufficient moneys for paying the principal of Bonds as such
principal becomes due. If paying agents other than the Trustee
have been designated by the Authority, the Trustee shall deposit
in trust with such paying agents the amounts required to pay such
principal and interest. Notwithstanding any provision herein to
the contrary, if principal of and premium, if any, and interest
on the Bonds that would have been paid from the Sinking Fund is
paid instead by a Credit Facility or a Liquidity Facility,
amounts held to the credit of the Bond Service Account and the
Redemption Account, as applicable, for such purposes shall be
paid, to the extent required under any agreement with the issuer
of such Credit Facility or Liquidity Facility, to such issuer.
The Trustee shall establish one or more subaccounts within the
Bond Service Account and the Redemption Account, to the extent
required by a resolution of the Board, to segregate amounts to be
paid to the issuer of a Credit Facility or a Liquidity Facility
or amounts received from a Credit Facility or a Liquidity
Facility.

SECTION 403. Withdrawals from Redemption Account. Moneys
held for the credit of the Redemption Account shall be applied to
the retirement of Bonds as follows:

(a) Subject to the provisions of paragraph (c) of
this Section, the Trustee shall endeavor to purchase Bonds
or portions of Bonds, whether or not such Bonds or portions
shall then be subject to redemption, at the most advanta-
geous price obtainable with reasonable diligence, such price
not to exceed the principal of such Bonds plus the amount of
the premium, if any, that would be payable on the next
redemption date to the holders of such Bonds under the pro-
visions of Article III of this Agreement if such Bonds or
portions of Bonds should be called for redemption on such
date from the moneys in the Redemption Account. The Trustee
shall pay the interest accrued on such Bonds or portions of
Bonds to the date of settlement therefor from the Bond

- 45 -

Service Account and the purchase price from the Redemption
Account, but no such purchase shall be made by the Trustee
within the period of forty-five (45) days immediately
preceding the date on which such Bonds are subject to call
for redemption in part under the provisions of this Agree-
ment except from moneys other than the moneys set aside or
deposited for the redemption of Bonds.

(b)   Subject to the provisions of paragraph (c) of
this Section, the Trustee shall call for redemption on each
date on which Bonds are subject to redemption from moneys in
the Redemption Account such amount of Bonds or portions of
Bonds then subject to redemption as, with the redemption
premium, if any, will exhaust the moneys then held for the
credit of the Redemption Account as nearly as may be;
provided, however, that not less than One Hundred Thousand
Dollars ($100,000) principal amount of Bonds shall be called
for redemption at any one time.   Such redemption shall be
made pursuant to the provisions of Article III of this
Agreement.   Prior to calling Bonds or portions of Bonds for
redemption the Trustee shall withdraw from the Bond Service
Account and from the Redemption Account (including from
moneys transferred from the Reserve Account to the credit of
the Redemption Account) and set aside in separate accounts
or deposit with the Paying Agents the respective amounts
required for paying the interest on, and the principal and
redemption premium of, the Bonds or portions of Bonds so
called for redemption.

(c)   Moneys   in   the   Redemption   Account   shall   be
applied by the Trustee in each Fiscal Year to the retirement
of Bonds of each Series then Outstanding in the following
order:

first, the Term Bonds of each such Series to the
extent of the Amortization Requirement, if any, for
such Fiscal Year for the Term Bonds of each such
Series then Outstanding and, if the amount available
in such Fiscal Year shall not be equal thereto, then
in proportion to the Amortization Requirement, if any,
for such Fiscal Year for the Term Bonds of each such
Series then Outstanding, if any;

second, any balance then remaining shall be
applied to the purchase of any Term Bonds secured
hereby and then Outstanding whether or not such Bonds
shall then be subject to redemption, in accordance
with the provisions of paragraph (a) of this Section;

- 46 -

third, any balance then remaining shall be applied to the redemption of the Term Bonds of each such Series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, plus the applicable premium, if any; and

fourth, after the retirement of all Term Bonds, any balance still remaining shall be applied to the retirement of the Serial Bonds of each Series in proportion to the aggregate principal amount of the Serial Bonds of each such Series originally issued under the provisions of this Agreement.

SECTION 404. Withdrawals from Reserve Account. Moneys held for the credit of the Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of Bonds when moneys held to the credit of the Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Redemption Account pursuant to the requirements of clause (b) of Section 401 of this Agreement when moneys in the Puerto Rico Infrastructure Fund are insufficient therefor; provided that if moneys then held to the credit of the Bond Service Account are sufficient to pay principal of and interest on the Bonds in the current Fiscal Year, moneys held to the credit of the Reserve Account shall be withdrawn forty-five (45) days prior to the redemption date of any Bonds from moneys in the Redemption Account to the extent necessary to make the deposits required by said clause (b) of Section 401 of this Agreement.

Any moneys held for the credit of the Reserve Account in excess of the lesser of the maximum aggregate Principal and Interest Requirements on the Bonds Outstanding for any Fiscal Year thereafter and ten percent (10%) of the original principal amount of each Series of Bonds Outstanding shall, upon the written request of the Authority, be transferred to the credit of the Bond Service Account or the Redemption Account provided that if the deposits required by clauses (a) and (b) of Section 401 hereof to the credit of the Bond Service Account and the Redemption Account shall have been made for the current Fiscal Year, such excess may be transferred, upon the written request of the Authority, to the Puerto Rico Infrastructure Fund.

SECTION 405. Moneys Set Aside Held in Trust. All moneys which the Trustee shall have withdrawn from the accounts of the Sinking Fund, or shall have received from any other source and set aside or deposited with any paying agent for the purpose of paying any of the Bonds hereby secured, either at the maturity thereof or upon call for redemption, shall be held in trust for

- 47 -

the respective Holders of such Bonds. Any moneys which shall be
so set aside or deposited by the Trustee or any paying agent and
which shall remain unclaimed by the Holders of such Bonds for the
period of two (2) years after the date on which such Bonds shall
have become payable shall, upon request in writing, be paid to
the Authority or to such officer, board or body as may then be
entitled by law to receive the same, and thereafter the Holders
of such Bonds, shall look only to the Authority or to such offi-
cer, board or body, as the case may be, for payment and then only
to the extent of the amounts so received without any interest
thereon, and the Trustee and any other paying agents shall have
no responsibility for such moneys.

SECTION 406. Establishment of Subaccounts in the Redemption
Account. The Trustee shall establish one or more subaccounts in
the Redemption Account for deposits for extraordinary mandatory
redemptions of one or more Series of Bonds and shall deposit and
withdraw moneys from such subaccounts, if and as required by
resolutions of the Board adopted prior to the issuance of such
Series of Bonds.

ARTICLE V

DEPOSITARIES OF MONEYS, SECURITY FOR DEPOSITS AND
INVESTMENTS OF FUNDS

SECTION 501. <u>Security for Deposits</u>. All moneys deposited under the provisions of this Agreement with the Trustee, other than moneys deposited to the credit of the Arbitrage Rebate Fund, shall be held in trust under the terms hereof, and shall not be subject to lien or attachment by any creditor of the Authority.

All moneys deposited with the Trustee hereunder in excess of the amount insured by the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation or other Federal agency shall be continuously secured for the benefit of the Trustee, the Holders of the Bonds and the issuer of any Credit Facility, either (a) by depositing with a bank or trust company approved by the Authority and by the Trustee, as custodian, or, if then permitted by law, by setting aside under control of the trust department of the bank holding such deposit, as collateral security, securities described in clause (i) of the definition of Government Obligations, or, with the approval of the Trustee, other marketable securities eligible as security for the deposit of trust funds under applicable regulations of the Comptroller of the Currency of the United States of America and applicable Commonwealth of Puerto Rico laws or regulations, having a market value (exclusive of accrued interest) not less than the amount of such deposit, or, (b) if the furnishing of security as provided in clause (a) of this Section is not permitted by applicable law, in such other manner as may then be required or permitted by applicable Commonwealth of Puerto Rico and Federal laws or regulations regarding the security for, or granting a preference in the case of, the deposit of trust funds; provided, however, that it shall not be necessary for the Trustee to give security for the deposits of any moneys for the payment of the principal of or the redemption premium or the interest on any Bonds issued hereunder, or for the Trustee or other Qualified Depositary or Qualified Depositaries to give security for any moneys which shall be represented by obligations purchased under the provisions of this Article as an investment of such moneys.

All moneys deposited with the Trustee shall be credited to the particular fund or account to which such moneys belong.

SECTION 502. <u>Investment of Moneys</u>. Moneys held for the credit of the Bond Service Account and the Redemption Account (except for any subaccounts established by one or more resolutions of the Board to segregate amounts received from a Credit Facility or a Liquidity Facility, which resolution or resolutions may provide for the investment of moneys deposited to

the credit of any such subaccount) shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended. Moneys held for the credit of the Reserve Account shall as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations that shall mature no later than the final maturity of the Bonds.

Obligations so purchased as an investment of moneys in any such fund or account shall be deemed at all times to be a part of such fund or account, and any investment earnings and profit or loss realized on the sale or maturity thereof, shall be credited or debited to such fund or account; provided, however, that if the deposits to any account required by Section 401 hereof have been made for the current Fiscal Year, the investment earnings on moneys held to the credit of such account shall be deposited in the order set forth in said Section 401 to the credit of any account for which such required deposit has not been made, and if all such required deposits have been made, such earnings shall be paid to the Puerto Rico Infrastructure Fund. The Trustee, at the written direction of the Authority, shall sell any obligations so purchased as an investment whenever it shall be necessary to do so in order to provide moneys to meet any payments or transfers from such fund or account. Neither the Trustee nor the Authority shall be liable or responsible for any loss resulting from any such investment.

In the case of investments in the obligations described in clauses (iii)(B) and (vi) of the definition of Investment Obligations, the Authority shall deliver to the Trustee, if the Trustee so requests, an opinion of counsel acceptable to the Trustee as to the perfection and priority of the security interests in the collateral described therein.

SECTION 503. Valuation of Investments. In computing the amount in any fund or account created pursuant to the provisions of this Agreement, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such

- 50 -

purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such fund or account. The computation of the amount on deposit in or credited to any fund and account created under this Agreement and the valuation of the investments of such amount shall be performed by the Trustee for such fund and account held by the Trustee on the last day of each Fiscal Year, and such computation and valuation shall not be required to be performed at other times, except upon the written request of the Authority.

SECTION 504.  Tax Covenants.  The Authority covenants and agrees that so long as any Bonds remain Outstanding, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, it shall comply with the requirements of the Code, including any arbitrage rebate covenants contained in any agreement entered into by and between the Authority and the Trustee in connection with the issuance of any Series of Bonds, except to the extent failure so to comply would not, in the opinion of counsel of recognized standing in the field of law relating to municipal bonds, result in the interest payable on such Bonds being included in gross income for federal income tax purposes to the Holders thereof under the Code. Notwithstanding anything to the contrary contained herein or otherwise, the Authority shall not be required to comply with the covenants herein contained with respect to a specific Series of Bonds, to the extent that interest on such Series of Bonds shall be intended by the Authority, on the date of issuance of such Bonds, to be included in gross income for federal income tax purposes to the Holders thereof under the Code.

- 51 -

## ARTICLE VI

### PARTICULAR COVENANTS

SECTION 601. <u>Payment of Principal, Interest and Premium;
Pledge of Pledged Revenues</u>. The Authority covenants that it will
promptly pay the principal of and the interest on every Bond
issued hereunder and secured hereby at the places, on the dates
and in the manner specified herein and in said Bonds and any
premium required for the retirement of said Bonds by purchase or
redemption, according to the true intent and meaning thereof.
Except as in this Agreement otherwise provided, such principal,
interest and premium, if any, are payable solely from the Pledged
Revenues, which Pledged Revenues are hereby pledged to the pay-
ment thereof in the manner and to the extent hereinabove parti-
cularly specified. Nothing in the Bonds or in this Agreement
shall be deemed to constitute the Bonds a debt or obligation of
the Commonwealth of Puerto Rico or any of its political
subdivisions, and neither the Commonwealth of Puerto Rico nor any
of its political subdivisions shall be liable for the payment of
the principal of or the interest on the Bonds.

SECTION 602. <u>No Impairment</u>. The Authority covenants and
agrees that, so long as any of the Bonds shall be Outstanding,
none of the Pledged Revenues will be used for any purpose other
than as provided in this Agreement, and that no contract or con-
tracts will be entered into or any action taken by which the
rights of the Trustee or of the Holders to such Pledged Revenues
might be impaired or diminished. Any resolution adopted by the
Board authorizing the issuance of a Series of Bonds shall, for
all purposes, be deemed part of this Agreement and shall con-
stitute a contract for the benefit of the Holders of said
Series. The Agreement and any such resolution may be supple-
mented and amended only in accordance with Article X hereof,
except for supplements and amendments adopted or entered into
prior to the issuance of the applicable Series of Bonds, which
may be adopted or entered into without restriction.

SECTION 603. <u>Inclusion of Shortfall in Budget</u>. If the
amount of projected Special Tax Revenues in any fiscal year of
the Commonwealth is less than the maximum amount required to be
so deposited under the Act, the Authority shall request the
Director of the Office of Budget and Management of the
Commonwealth to include in the budget the necessary
appropriations to cover such deficiency. For purposes of the
foregoing sentence, the Authority shall project Special Tax
Revenues in the next Fiscal Year of the Commonwealth at such time
as shall enable the Authority to file a timely request with the
Director of the Office of Budget and Management of the
Commonwealth to ensure inclusion in the budget for the next
Fiscal Year.

## ARTICLE VII

### REMEDIES

SECTION 701. <u>Enforcement of Remedies</u>. At the request of the Holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed, subject to the provisions of Section 802 hereof, to protect and enforce its rights and the rights of the Holders under the laws of the Commonwealth or under this Agreement, including all rights with respect to funds and other moneys pledged hereunder, by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted or for the enforcement of any proper legal or equitable remedy, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights.

In the enforcement of any remedy under this Agreement the Trustee shall be entitled to sue for, enforce payment of and recover judgment for, in its own name and as trustee of an express trust, any and all amounts then or after any default becoming, and at any time remaining, due from the Authority for principal, premium, if any, interest or otherwise under any of the provisions of this Agreement or of the Bonds and unpaid, with interest on overdue payments of principal, premium, if any, and interest at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under the Bonds and maintain a suit, action or special proceeding in equity or at law against the Authority for any deficiency, all without prejudice to any other right or remedy of the Trustee or of the Holders, and to recover and enforce any judgment or decree against the Authority, but solely as provided herein and in the Bonds, for any portion of such amounts remaining unpaid and interest, costs and expenses as above provided, and to collect, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 702. <u>Pro rata Application of Funds</u>. Anything in this Agreement to the contrary notwithstanding, if at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the principal of the Bonds as the same shall become due and payable, such moneys (except for any moneys deposited in a separate subaccount from a drawing on a Credit Facility or Liquidity Facility which shall secure only specified Bonds), together with any moneys then available or thereafter becoming available for such purpose, whether through the exercise of the remedies provided for in this Article or otherwise, shall be applied as follows:

- 53 -

first: to the payment to the persons entitled thereto of all installments of interest then due and payable in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

second: to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Agreement) in the order of their due dates, with interest on such Bonds at the respective rates specified therein from the respective dates upon which such Bonds became due, and, if the amount available shall not be sufficient to pay in full the principal of such Bonds due on any particular date, together with such interest, then to the payment first of such interest, ratably, according to the amount of such interest due on such date, and then to the payment of such principal, ratably, according to the amount of such principal due on such date, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Bonds;

third: to the payment of the interest on and the principal of the Bonds, to the purchase and retirement of Bonds and to the redemption of Bonds, all in accordance with the provisions of Article IV of this Agreement; and

fourth: to the payment of any amounts then due and owing to a provider of a Credit Facility or a Liquidity Facility.

Whenever moneys are to be applied pursuant to the provisions of this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future; the setting aside of such moneys in trust for the proper purpose shall constitute proper application by the Trustee; and the Trustee shall incur no liability whatsoever to the Authority, to any Holder or to any other person for any delay in applying any such moneys, so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions of this

- 54 -

Agreement as may be applicable at the time of application by the
Trustee. Whenever the Trustee shall exercise such discretion in
applying such moneys, he shall fix the date (which shall be an
Interest Payment Date unless the Trustee shall deem another date
more suitable) upon which such application is to be made and upon
such date interest on the amounts of principal to be paid on such
date shall cease to accrue. The Trustee shall give notice as he
may deem appropriate of the fixing of any such date, and shall
not be required to make payment to the holder of any Bond until
such Bond shall be surrendered to him for appropriate endorse-
ment, or for cancellation if fully paid.

SECTION 703. Effect of Discontinuance of Proceedings. In
case any proceeding taken by the Trustee shall have been discon-
tinued or abandoned for any reason, then and in every such case
the Authority, the Trustee and the Holders shall be restored to
their former positions and rights hereunder, respectively, and
all rights, remedies, powers and duties of the Trustee shall
continue as though no such proceeding had been taken.

SECTION 704. Bondholders May Control Proceedings. Anything
in this Agreement to the contrary notwithstanding, Holders of a
majority in principal amount of the Bonds Outstanding shall have,
the right, subject to the provisions of Section 802 hereof, by an
instrument in writing executed and delivered to the Trustee, to
direct the time, method and place of conducting all remedial
proceedings to be taken by the Trustee hereunder, provided that
such direction shall not be otherwise than in accordance with law
and the provisions of this Agreement. In the event that particu-
lar Bonds are secured by a Credit Facility or Liquidity Facility
and the provider of the Credit Facility or Liquidity Facility has
not defaulted on its obligations under such Credit Facility or
Liquidity Facility, the provider of such Credit Facility or
Liquidity Facility shall have the right, in lieu of the Holders
of the Bonds secured thereby, to direct the method and place of
conducting such remedial proceedings and to give any consents or
waivers to such remedial proceedings under this Article VII.

SECTION 705. Restrictions Upon Actions by Individual Bond-
holders. No Holder of any of the Bonds shall have any right to
institute, appear in or defend any suit, action or proceeding in
equity or at law on any Bond or for the execution of any trust
hereunder or for any other remedy hereunder. It is understood
and intended that no one or more Holders of the Bonds hereby
secured shall have any right in any manner whatever by his or
their action to affect, disturb, or prejudice the security of
this Agreement, or to enforce any right hereunder, that all
suits, actions and proceedings at law or in equity shall be
instituted, had and maintained in the manner herein provided and
for the benefit of all holders of such outstanding Bonds, and

- 55 -

that any individual right of action or other right given to one
or more of such holders by law is restricted by this Agreement to
the rights and remedies herein provided.

SECTION 706.   No Remedy Exclusive.   No remedy herein con-
ferred upon or reserved to the Holders of the Bonds, is intended
to be exclusive of any other remedy or remedies herein provided,
and each and every such remedy shall be cumulative and shall be
in addition to every other remedy given hereunder.

SECTION 707.   No Delay or Omission Construed to be a
Waiver.   No delay or omission of the Trustee, or any Holder of
the Bonds to exercise any right or power accruing upon any
default shall impair any such right or power or shall be con-
strued to be a waiver of any such default or an acquiescence
therein; and every power and remedy given by this Agreement to
the Trustee and to the Holders may be exercised from time to time
and as often as may be deemed expedient.

SECTION 708.   Actions of Trustee.   All rights of action
under this Agreement or under any of the Bonds enforceable by the
Trustee, may be enforced by it without the possession of any of
the Bonds or the production thereof in the trial or other
proceeding relative thereto, and any such suit, action or
proceeding instituted by the Trustee shall be brought in its name
for the benefit of all the Holders of such Bonds, subject to the
provisions of this Agreement.

## ARTICLE VIII

### CONCERNING THE TRUSTEE

SECTION 801.  <u>Acceptance of Trusts</u>.  The Trustee accepts and agrees to execute the trusts imposed upon it by this Agreement, but only upon the terms and conditions set forth in this Article and subject to the provisions of this Agreement, to all of which the parties hereto and the respective Holders of the Bonds agree.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

SECTION 802.  <u>Trustee Entitled to Indemnity</u>.  Any other provisions of this Agreement to the contrary notwithstanding, the Trustee shall be under no obligation to institute any suit, or to take any remedial proceeding under this Agreement, or to enter any appearance or in any way defend in any suit in which it may be made defendant, or to take any steps in the execution of the trusts hereby created or in the enforcement of any rights and powers hereunder, until it shall be indemnified to its satisfaction against any and all costs and expenses, outlays and counsel fees and other reasonable disbursements, and against all liability; the Trustee may, nevertheless, begin suit, or appear in and defend suit, or do anything else in its judgment proper to be done by it as such Trustee, without prior indemnity and in such case it shall be indemnified and reimbursed by the Authority for all liabilities, costs and expenses, outlays and counsel fees and other reasonable disbursements properly incurred in connection therewith.

SECTION 803.  <u>Limitation on Trustee's Liabilities</u>.  The Trustee shall have no responsibility in respect of the validity, sufficiency, due execution or acknowledgment of this Agreement or the validity or sufficiency of the security provided hereunder, or except as to the authentication thereof, in respect of the validity of the Bonds or the due execution or issuance thereof. The Trustee shall not be liable or responsible because of the loss of any deposit of moneys arising through the insolvency or the act or default or omission of any other bank or trust company in which such deposit shall have been made by the Trustee under the provisions of this Agreement or by the Authority.  The Trustee shall not be responsible for the application of any of the proceeds of the Bonds, or the application of any other moneys deposited with it and paid out, withdrawn or transferred hereunder, if the application by the Trustee of such proceeds and such other moneys and such payment, withdrawal or transfer shall be made in accordance with the provisions of this Agreement.  The

– 57 –

Trustee shall not be liable in connection with the performance of its duties hereunder or for any error of judgment made in good faith by it, except for its own negligence or default.  The Trustee may confer with competent legal counsel and shall not be liable for any action taken or suffered by it in good faith in accordance with an opinion of counsel.  The immunities and exemptions from liability of the Trustee hereunder shall extend to its directors, officers, employees and agents.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

SECTION 804.  <u>Compensation and Indemnification of Trustee</u>. Subject to the provisions of any contract between the Authority and the Trustee and to Section 401 hereof, the Authority shall pay to the Trustee reasonable compensation for all services rendered by it hereunder and also all of its reasonable expenses, charges and other disbursements and those of its attorneys, agents and employees incurred in and about the administration and execution of the trusts hereby created, and the performance of its powers and duties hereunder, agrees to indemnify and save the Trustee harmless against any liabilities which it may incur in the exercise and performance of its powers and duties hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

SECTION 805.  <u>Trustee May Rely on Certificates</u>.  In case at any time it shall be necessary or desirable for the Trustee to make any investigation respecting any fact preparatory to taking or not taking any action or doing or not doing anything as such Trustee, and in any case in which this Agreement provides for permitting or taking any action, and whenever in the administration of this Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee may, in the absence of bad faith, rely conclusively upon any certificate, requisition, opinion or other instrument required or permitted to be filed with it under the provisions of this Agreement, and any such instrument shall be conclusive evidence of such fact to protect the Trustee in any action that it may or may not take or in respect of anything it may or may not do, in good faith, by reason of the supposed existence of such fact.  Except as otherwise provided in this Agreement, any request, notice, certificate or other instrument from the Authority to the Trustee shall be deemed to have been signed by the proper party or parties if signed by the Executive Director or by any officer or employee of

the Authority who shall be designated by the Authority by
resolution for the purpose, and the Trustee may accept and rely
upon a certificate signed by the Executive Director or any other
officer or employee of the Authority as to any action taken by
the Authority.

SECTION 806. Notice of Default. The Trustee shall mail to
the Holders of the Bonds then Outstanding, at their addresses as
they appear on the registration books, within thirty (30) days
after the Trustee shall have knowledge of such default, and to
any provider of a Credit Facility or a Liquidity Facility, at its
address as it is known by the Trustee, within fifteen (15) days
after the Trustee shall have knowledge of such default, written
notice of any default in the payment of principal of and interest
and premium on any Bond, and any other default known to the
Trustee unless such default shall have been cured or waived.
Except for such payment defaults, the Trustee shall not be deemed
to have knowledge of any default hereunder unless specifically
notified in writing by the Holders of not less than ten percent
(10%) in principal amount of the Bonds Outstanding.

Notwithstanding the foregoing, except for any default in the
payment of principal of and interest and premium on any Bond, the
Trustee may withhold and shall be protected in withholding any
notice to the Holders if and so long as the Trustee in good faith
determines that the withholding of such notice is in the inter-
ests of the Holders.

SECTION 807. Trustee May Be Bondholder. The bank or trust
company acting as Trustee under this Agreement, and its direc-
tors, officers, agents or employees in their respective individ-
ual or other capacities, may buy, sell, own, hold and deal in any
of the Bonds issued under and secured by this Agreement, and may
join in any action which any Holder of Bonds may be entitled to
take with like effect and may otherwise deal with the Authority
as if such bank or trust company were not the Trustee under this
Agreement, may engage or be interested in any financial or other
transaction with the Authority, and may maintain any and all of
the general banking and business relations with the Authority
with like effect and in the same manner as if the Trustee were
not a party to this Agreement; and no implied covenant shall be
read into this Agreement against the Trustee in respect of such
matters.

SECTION 808. Trustee Not Responsible for Recitals. The
recitals, statements and representations contained herein and in
the Bonds (excluding the Trustee's certificate of authentication
on the Bonds) shall be taken and construed as made by and on the
part of the Authority and not by the Trustee, and the Trustee
assumes and shall be under no responsibility for the correctness

- 59 -

of the same. The Trustee makes no representation as to the validity or sufficiency of this Agreement or the Bonds.

SECTION 809. _Trustee Protected in Relying on Papers_. The Trustee shall be protected in acting or proceeding, or in not acting or not proceeding, in good faith, upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Agreement, or upon the written opinion or other written advice of any attorney believed by the Trustee to be be qualified in relation to the subject matter, and the Trustee shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such instrument.

SECTION 810. _Resignation of Trustee_. The Trustee may resign and thereby become discharged from the trusts hereby created, by notice in writing to be given to the Authority and published in a daily newspaper of general circulation published in the Municipality of San Juan, Puerto Rico and in a daily newspaper or financial journal published in the Borough of Manhattan, City and State of New York, not less than sixty (60) days before such resignation is to take effect, but such resignation shall take effect immediately upon the appointment of a new Trustee hereunder, if such new Trustee shall be appointed before the time limited by such notice and shall then accept the trusts hereof.

No resignation by the Trustee under this Section, no removal of the Trustee under Section 811 hereof and no appointment of a successor Trustee under Section 812 hereof shall become effective until the acceptance of appointment by the successor Trustee under Section 813 hereof.

SECTION 811. _Removal of Trustee_. The Trustee may be removed at any time by an instrument or concurrent instruments in writing, signed by the Holders of not less than a majority in principal amount of the Bonds hereby secured and then outstanding and filed with the Authority. A photostatic copy of each such instrument shall be delivered promptly by the Authority to the Trustee. The Trustee may also be removed at any time for any breach of trust or for acting or proceeding in violation of, or for failing to act or proceed in accordance with, any provision of this Agreement with respect to the duties and obligations of the Trustee by any court of competent jurisdiction upon the application of the Authority pursuant to resolution of the Holders of not less than ten percent (10%) in aggregate principal amount of the Bonds then Outstanding under this Agreement.

SECTION 812.  Appointment of Successor Trustee.  If at any
time hereafter the Trustee shall resign, be removed, be dissolved
or otherwise become incapable of acting, or the bank or trust
company acting as Trustee shall be taken over by any governmental
official, agency, department or board, the position of Trustee
shall thereupon become vacant.  If the position of Trustee shall
become vacant for any reason, the Authority shall appoint a Trus-
tee to fill such vacancy.  Within thirty (30) days after any such
appointment, the Secretary of the Authority shall cause notice of
such appointment to be published in a daily newspaper of general
circulation published in the Municipality of San Juan, Puerto
Rico, and in a daily newspaper or financial journal of general
circulation in the Borough of Manhattan, City and State of New
York.

At any time within one year after any such vacancy shall
have occurred, the Holders of a majority in principal amount of
the Bonds hereby secured and then Outstanding, by an instrument
or concurrent instruments in writing, signed by such Bondholders
or their attorneys in fact thereunto duly authorized and filed
with the Authority, may appoint a successor Trustee, which shall
supersede any Trustee theretofore appointed by the Board.  Photo-
static copies of each such instrument shall be delivered promptly
by the Authority to the predecessor Trustee and to the Trustee so
appointed by the Bondholders.

If no appointment of a successor Trustee shall be made pur-
suant to the foregoing provisions of this Section within ten (10)
days after the vacancy shall have occurred, the Holder of any
Bond Outstanding hereunder or any retiring Trustee may apply to
any court of competent jurisdiction to appoint a successor Trus-
tee.  Such court may thereupon, after such notice, if any, as
such court may deem proper and prescribe, appoint a successor
Trustee.

Any Trustee hereafter appointed shall be a corporation duly
authorized to exercise corporate trust powers and subject to
examination by Federal, state or Commonwealth authority and in
good standing and having at the time of its appointment a com-
bined capital and surplus aggregating at least One Hundred Mil-
lion Dollars ($100,000,000).

SECTION 813.  Vesting of Trust with Successor Trustee.
Every  successor  Trustee  appointed  hereunder  shall  execute,
acknowledge and deliver to its predecessor, and also to the Auth-
ority, an instrument in writing accepting such appointment here-
under, and thereupon such successor Trustee, without any further
act, shall become fully vested with all the rights, immunities,
powers and trusts, and subject to all the duties and obligations,
of its predecessor; but such predecessor shall, nevertheless, on

- 61 -

the written request of its successor or of the Authority, execute
and deliver an instrument transferring to such successor Trustee
all the rights, immunities, powers and trusts of such predecessor
hereunder; and every predecessor Trustee shall deliver all prop-
erty and moneys held by it hereunder to its successor.  Should
any instrument in writing from the Authority be required by any
successor Trustee for more fully and certainly vesting in such
Trustee the rights, immunities, power and trusts hereby vested or
intended to be vested in the predecessor Trustee, any such
instrument in writing shall and will, on request, be executed,
acknowledged and delivered by the Authority.

SECTION 814.  Reporting Requirements.  The Trustee shall on
a monthly basis, file with the Authority a statement setting
forth in respect of the preceding calendar month:

(a)  the amount withdrawn or transferred by it and
the amount deposited with it on account of each Fund and
Account held by it under the provisions of this Agreement;

(b)  the amount on deposit with it at the end of such
month to the credit of each such Fund and Account;

(c)  a brief description of all obligations held by
it as an investment of moneys in each such Fund and Account
and of any Reserve Account Letter of Credit or Reserve
Account Insurance Policy in the Reserve Account;

(d)  the amount applied to the purchase or redemption
of Bonds under Section 403 of this Agreement and a descrip-
tion of Bonds or portions of Bonds so purchased or redeemed;
and

(e)  any other information which the Authority may
reasonably request.

All records and files pertaining to the trusts hereunder in
the custody of the Trustee shall be open at all reasonable times
to the Authority and its agents and representatives.

## ARTICLE IX

### EXECUTION OF INSTRUMENTS BY BONDHOLDERS
### AND PROOF OF OWNERSHIP OF BONDS

SECTION 901.  <u>Proof of Execution of Documents and Ownership</u>.

(a)  Any request, direction, consent or other instrument in writing required by this Agreement to be signed or executed by Bondholders may be in any number of concurrent instruments of similar tenor and may be signed or executed by such Bondholders in person or by their attorneys or legal representatives appointed by an instrument in writing.  Proof of the execution of any such instrument and of the ownership of Bonds shall be sufficient for any purpose of this Agreement and shall be conclusive in favor of the Trustee with regard to any action taken by it under such instrument if made in the following manner:

(1)  The fact and date of the execution by any person of any such instrument may be proved by the verification of any officer in any jurisdiction who, by the laws thereof, has power to take affidavits within such jurisdiction, to the effect that such instrument was subscribed and sworn to before him, or by an affidavit of a witness to such execution.  Where such execution is in behalf of a person other than an individual, such verification shall also constitute sufficient approval of the authority of the signor thereof.

(2)  The ownership of Bonds shall be proved by the registration books required to be maintained pursuant to the provisions of Article II of this Agreement.

Nothing contained in this Article shall be construed as limiting the Trustee to such proof, it being intended that the Trustee may accept any other evidence of the matters herein stated which it may deem sufficient.

(b)  If the Authority shall solicit from the Holders any request, direction, consent or other instrument in writing required or permitted by this Agreement to be signed or executed by the Holders, the Authority may, at its option, fix in advance a record date for determination of Holders entitled to give each request, direction, consent or other instrument, but the Authority shall have no obligation to do so.  If such a record date is fixed, such request, direction, consent or other instrument may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Bonds have authorized or agreed or consented to such request, direction, consent or other

- 63 -

instrument, and for that purpose the Bonds shall be computed as of such record date.

(c) Any request or consent of the Holder of any Bond shall bind every future Holder of the same Bond in respect of anything done by the Trustee pursuant to such request or consent.

- 64 -

## ARTICLE X

### SUPPLEMENTAL AGREEMENTS

SECTION 1001. Supplemental Agreements Without Bondholders' Consent. The Authority and the Trustee may, from time to time and at any time, enter into such agreements supplemental hereto as shall not be inconsistent with the terms and provisions hereof (which supplemental agreements shall thereafter form a part hereof):

(a) to cure any ambiguity or formal defect or omission in this Agreement or in any supplemental agreement or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provisions contained herein; or

(b) to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

(c) to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of this Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d) to add to the covenants and agreements of the Authority in this Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power herein reserved to or conferred upon the Authority; or

(e) to permit the issuance of Bonds, the interest on which is intended to be excludible from gross income for federal income tax purposes under the Code to the Holders thereof, in coupon form, if the conditions precedent stated herein have been met; or

(f) to permit the Authority to issue Bonds the interest on which is not excludible from gross income for federal income tax purposes under the Code to the Holders thereof; or

(g) to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended; or

(h) to qualify this Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

     (i)   to make such changes as may be necessary to adjust the terms hereof so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

     (j)   to make such changes as may be necessary to comply with the provisions of the Code relating to the exclusion of interest on the Bonds from gross income thereunder; or

     (k)   to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds.

SECTION 1002.  Modification with Consent of Holders of Majority of Bonds.  Subject to the terms and provisions contained in this Section, and not otherwise, the Holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several Series of Bonds then Outstanding are affected by the supplement hereto, the Holders of not less than a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time the consent is given) shall have the right, from time to time, anything contained in this Agreement to the contrary notwithstanding, to consent to and approve the execution by the Authority and the Trustee of such agreement or agreements supplemental hereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in this Agreement or in any supplemental agreement; provided, however, that nothing herein contained shall permit, or be construed as permitting, without the consent of the Holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the maturity of any Bond issued hereunder (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental Agreement.  Nothing herein contained, however, shall be construed as making necessary the approval by Bondholders of the execution of any supplemental agreement authorized by Section 1001 of this Article.  The provider of any Credit Facility or Liquidity Facility shall have the right, in lieu of the Holders of Bonds secured thereby, to give consent to any supplemental agreement for which consent of the Holders of such Bonds is required under this Article and all

- 66 -

references to Bondholders for purposes of such consent shall mean
instead the provider of said Credit Facility or Liquidity Facil-
ity; provided, however, that said provider of a Credit Facility
or Liquidity Facility shall not be in default on its obligations
in connection with said Credit Facility or Liquidity Facility.

If at any time the Authority shall request the Trustee to
enter into any supplemental agreement for any of the purposes of
this Section, the Trustee shall cause a notice to be mailed,
postage prepaid, to all Holders of Bonds then Outstanding at
their addresses as they appear on the registration books and to
any provider of a Credit Facility or Liquidity Facility. Such
notice shall briefly set forth the nature of the proposed supple-
mental agreement and shall state that a copy thereof is on file
at the principal corporate trust office of the Trustee for
inspection by all Bondholders. The Trustee shall not, however,
be subject to any liability to any Bondholder by reason of its
failure to mail the notice required by this Section, and any such
failure shall not affect the validity of such supplemental agree-
ment when consented to or approved as provided in this Section.

Whenever, at any time within a year after the date of the
mailing of such notice, the Authority shall deliver to the
Trustee an instrument or instruments purporting to be executed by
the Holders of at least a majority in aggregate principal amount
of the Bonds then Outstanding, which instrument or instruments
shall refer to the proposed supplemental agreement described in
such notice and shall specifically consent to and approve the
execution thereof the Trustee may execute such supplemental
agreement without liability or responsibility to any Holder of
any Bond, whether or not such Holder shall have consented
thereto. It shall not be necessary for the consent of the
Holders to approve the particular form of any proposed supplemen-
tal agreement, but it shall be sufficient if such consent shall
approve the substance thereof.

If the Holders of not less than a majority in aggregate
principal amount of the Bonds of each Series affected and Out-
standing at the time of the execution of such supplemental agree-
ment shall have consented to and approved the execution thereof
as herein provided, no Holder shall have any right to object to
the execution of such supplemental agreement, or to object to any
of the terms and provisions therein contained, or the operation
thereof, or in any manner to question the propriety of the execu-
tion thereof, or to enjoin or restrain the Trustee or the Auth-
ority from executing the same or from taking any action pursuant
to the provisions thereof.

The consent of the Holders of any additional Series of Bonds
to be issued hereunder shall be deemed given if the underwriters

or initial purchasers for resale consent in writing to such sup-
plemental agreement and the nature of the amendment effected by
such supplemental agreement is disclosed in the official state-
ment or other offering document pursuant to which such additional
Series of Bonds is offered and sold to the public.

Upon the execution of any supplemental agreement pursuant to
the provisions of this Section, this Agreement shall be and be
deemed to be modified and amended in accordance therewith, and
the respective rights, duties and obligations under this Agree-
ment of the Authority, the Trustee, and all Holders of Outstand-
ing Bonds shall thereafter be determined, exercised and enforced
hereunder, subject in all respects, to such modifications and
amendments.

SECTION 1003.  Trustee Joining in Supplemental Agreements.
The Trustee is authorized to join with the Authority in the exe-
cution of any such supplemental agreement and to make the further
agreements and stipulations which may be contained therein, but
the Trustee may, but shall not be obligated (except to the extent
required in the case of a supplemental agreement entered into
pursuant to Section 1001(h) hereof) to, enter into any such sup-
plemental agreement which affects its rights, duties, or immuni-
ties under this Agreement.  Any supplemental agreement executed
in accordance with the provisions of this Article shall thereaf-
ter form a part of this Agreement; and all the terms and condi-
tions contained in any such supplemental agreement as to any
provision authorized to be contained therein shall be and be
deemed to be part of the terms and conditions of this Agreement
for any and all purposes.  In case of the execution and delivery
of any supplemental agreement, express reference may be made
thereto in the text of any Bonds issued thereafter, if deemed
necessary or desirable by the Trustee.

SECTION 1004.  Responsibilities of Trustee under this Arti-
cle.  The Trustee shall not be under any responsibility or lia-
bility to the Authority or to any Bondholder or to anyone whom-
soever for its refusal in good faith to enter into any such
supplemental agreement if such agreement is deemed by the Trustee
to be contrary to the provisions of this Article.  The Trustee
shall be entitled to receive, and shall be fully protected in
relying upon, the opinion of any counsel who may be counsel for
the Authority, as conclusive evidence that any such supplemental
agreement complies with the provisions of this Agreement, and
that it is proper for the Trustee, under the provisions of this
Article, to join in the execution of such supplemental agreement.

SECTION 1005.  Bond Resolution May Be Supplemented or Mod-
ified.  Resolutions of the Board authorizing the issuance of any
Series of Bonds may be supplemented or modified by subsequent

- 68 -

resolution of the Board; provided that the provisions of this
Article shall apply, except as otherwise provided in Section 602
hereof.

## ARTICLE XI

### DEFEASANCE

SECTION 1101.  **Defeasance.**  If all the Outstanding Bonds shall have been paid as provided below, and the Trustee shall have received written notice from the provider of any Credit Facility or Liquidity Facility that all amounts then due and owing to any provider of a Credit Facility or Liquidity Facility have been paid, then and in that case the right, title and interest of the Trustee hereunder (except under Section 804 of this Agreement) shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under this Agreement except for Sections 205, 206 and 211 of this Agreement.  In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in this Section 1101 when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the Holder of such Bond either moneys in an amount that shall be sufficient, or Sufficient Government Obligations, as defined in Section 305 hereof, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the Holder of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or Sufficient Government Obligations mentioned in clause (a) of this paragraph has been made with the Trustee or another fiduciary institution acting as escrow agent for the Holder of such Bond, and that such Bond is deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.  Neither the moneys nor Sufficient Government Obligations deposited with the Trustee or other fiduciary institution acting as escrow agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and premium, if any, and interest on such Bonds.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the resolution of the Board authorizing the issuance of the Variable Rate Bonds; provided, however, that if on any date the total amount of moneys and Sufficient Government Obligations on deposit for the payment of interest on such Variable Rate Bonds is in excess of the total amount which would have been required to be deposited on such date in respect of such Variable Rate Bonds in order fully to discharge and satisfy such Bonds pursuant to the provisions of this Section, the Authority may use the amount of such excess, subject to Section 504 hereof, free and clear of any trust, lien, security interest, pledge or assignment securing said Variable Rate Bonds or otherwise existing under this Agreement.

Notwithstanding any of the provisions of this Agreement to the contrary, Put Bonds and Extendible Maturity Bonds may only be fully discharged and satisfied either by paying the principal of and interest on said Bonds as they become due and payable or by depositing moneys which shall be sufficient at the time of such deposit to pay when due the maximum amount of principal of and redemption premium, if any, and interest on such Put Bonds and Extendible Maturity Bonds which could become payable to the Holders of such Bonds upon the exercise of any options provided to the Holders of such Bonds and the Authority; provided, however, that if, at the time a deposit is made pursuant to this paragraph, the options originally exercisable are no longer exercisable, such Bonds shall not be considered Put Bonds or Extendible Maturity Bonds for these purposes.

If any portion of the moneys deposited for the payment of the principal of and redemption premium, if any, and interest on any Bond is not required for such purpose, the Authority may use the amount of such excess, subject to Section 504 hereof, free and clear of any trust, lien, security interest, pledge or assignment securing such Bond.

- 71 -

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

SECTION 1201. <u>Mergers</u>. All the covenants, stipulations, obligations and agreements contained in this Agreement by or on behalf of or for the benefit of the Authority shall bind or inure to the benefit of the successor or successors of the Authority from time to time and any officer, board, body or commission to whom or to which any power or duty affecting such covenants, stipulations, obligations and agreements shall be transferred by or in accordance with law. Any bank or trust company having power to execute the trusts of this Agreement and otherwise qualified to act as Trustee hereunder with or into which the Trustee may be merged, converted or consolidated, or to which the assets and business of the Trustee may be sold, shall be deemed to be the successor of the Trustee. Any bank or trust company with or into which any of the paying agents may be merged, converted or consolidated, or to which the assets and business of such paying agents may be sold, shall be deemed the successor of such paying agents for the purposes of this Agreement.

SECTION 1202. <u>Any Notices</u>. Any notice, demand, direction, request or other instrument authorized or required by this Agreement to be given to or filed with the Authority or the Trustee shall be deemed to have been sufficiently given or filed for all purposes of this Agreement if and when sent by first class mail, postage prepaid:

> to the Authority, if addressed to Executive Director, Puerto Rico Infrastructure Finance Authority, c/o Government Development Bank for Puerto Rico, Minillas Government Center Stop 22, Santurce, Puerto Rico 00907;

> to the Trustee, if addressed to 5 Hanover Square, New York, New York 10043, Attention: Corporate Trust Department or at such other address as it may designate in writing, or to any successor Trustee, if addressed to its principal corporate trust office.

All documents received by the Trustee under the provisions of this Agreement shall be retained in its possession, subject at all reasonable times to the inspection of the Authority, any Bondholders, and the agents and representatives thereof.

SECTION 1203. <u>Substitute Publication and Mailing</u>. If, because of the temporary or permanent suspension of publication of any newspaper or financial journal or for any other reason, the Trustee or the Authority shall be unable to publish in a newspaper or financial journal any notice required to be pub-

- 72 -

lished by the provisions of this Agreement, the Trustee or the
Authority, as the case may be, shall give such notice in such
other manner as in its judgment shall most effectively approxi-
mate such publication thereof, and the giving of such notice in
such manner shall for all purposes of this Agreement be deemed to
be compliance with the requirement for the publication thereof.

In case, by reason of the suspension of regular mail service
as a result of a strike, work stoppage or similar activity, it
shall be impractical to mail notice of any event to Bondholders
when such notice is required to be given pursuant to any pro-
vision of this Agreement, any manner of giving notice as shall be
satisfactory to the Trustee and the Authority shall be deemed to
be a sufficient giving of such notice.

SECTION 1204.  <u>No Third Party Rights</u>.  Except as herein
otherwise expressly provided, nothing in this Agreement expressed
or implied is intended or shall be construed to confer upon any
person other than the parties hereto, the Holders of the Bonds
issued under and secured by this Agreement and the provider of
any Credit Facility or Liquidity Facility securing the Bonds, any
right, remedy or claim, legal or equitable, under or by reason of
this Agreement or any provision hereof, this Agreement and all
its provisions intended to be and being for the sole and exclu-
sive benefit of the parties hereto, the Holders from time to time
of the Bonds issued hereunder and the provider of any Credit
Facility or Liquidity Facility securing the Bonds.

SECTION 1205.  <u>Effect of Partial Invalidity</u>.  In case any
one or more of the provisions of this Agreement or of the Bonds
issued hereunder shall for any reason be held to be illegal or
invalid, such illegality or invalidity shall not affect any other
provision of this Agreement or of the Bonds, but this Agreement
and said Bonds shall be construed and enforced as if such illegal
or invalid provision had not been contained therein.  In case any
covenant, stipulation, obligation or agreement contained in the
Bonds or in this Agreement shall for any reason be held to be in
violation of law, then such covenant, stipulation, obligation or
agreement shall be deemed to be the covenant, stipulation, obli-
gation or agreement of the Authority to the full extent permitted
by law.

SECTION 1206.  <u>Effect of Covenants</u>.  All covenants, stipu-
lations, obligations and agreements of the Authority contained in
this Agreement shall be deemed to be covenants, stipulations,
obligations and agreements of the Authority and of the Board to
the full extent authorized by the Act.

Except as otherwise provided in this Agreement, all rights,
powers and privileges conferred and duties and obligations

- 73 -

imposed upon the Authority or upon the Board by the provisions of
this Agreement shall be exercised or performed by the Authority,
the Board or by such other officers, board, body or commission as
may be required by law to exercise such rights, powers and pri-
vileges or to perform such duties and obligations.

No covenant, stipulation, obligation or agreement herein
contained shall be deemed to be a covenant, stipulation, obliga-
tion or agreement of any member, agent or employee of the Autho-
rity in his individual capacity, and neither the members of the
Authority nor any officer thereof executing the Bonds shall be
liable personally on the Bonds or be subject to any personal
liability or accountability by reason of the issuance thereof.

SECTION 1207.   Governing Law.   The construction of this
Agreement shall be governed by and construed in accordance with
the laws of the Commonwealth of Puerto Rico; provided that the
provisions governing the Trustee's exercise of its obligations
hereunder shall be governed by the laws of the State of New York.

SECTION 1208.   Payments Due on Saturdays, Sundays and Holi-
days.   In any case where the date of payment of interest on or
principal of the Bonds or the date fixed for redemption of any
Bonds shall be a Saturday, Sunday or other day on which banking
institutions in The City of New York, New York, or the Common-
wealth of Puerto Rico, are authorized or required by law to
close, then payment of interest or principal, and premium, if
any, need not be made on such date but may be made on the next
succeeding business day with the same force and effect as if made
on said date of payment or the date fixed for redemption, and no
interest on such payment shall accrue for the period after such
date.

SECTION 1209.   Multiple Counterparts.   This Agreement may be
executed in multiple counterparts, each of which shall be
regarded for all purposes as an original, and such counterparts
shall constitute but one and the same instruments.

SECTION 1210.   Headings, etc. Not Part of Agreement.   Any
headings preceding the texts of the several articles hereof and
any table of contents appended to copies hereof shall be solely
for convenience of reference and shall not constitute a part of
this Agreement, nor shall they affect its meaning, construction
or effect.

IN WITNESS WHEREOF, Puerto Rico Infrastructure Financing Authority has caused this Agreement to be executed by its Executive Director and its corporate seal to be impressed hereon and attested by its Secretary and Citibank, N.A. has caused this Agreement to be executed in its behalf by one of its Vice Presidents, and its corporate seal to be impressed hereon and attested by a Trust Officer; all thereunto duly authorized, all as of the day and year first above written.

PUERTO RICO INFRASTRUCTURE
FINANCING AUTHORITY

(SEAL)

By: _____
        Executive Director

Attest:

_____
        Secretary


CITIBANK, N.A.,
Trustee

(SEAL)

By: _____
        Vice President

Attest:

_____
    Trust Officer


- 75 -

THE STATE OF *New York* )
         ) SS:
COUNTY OF *New York* )

  On the *2nd* day of *November*, in the year 1988, before me personally came *Jose R Gonzalez*, to me known, who, being by me duly sworn, did depose and say that he resides in the Municipality of San Juan, Puerto Rico; that he is the Executive Director of Puerto Rico Infrastructure Financing Authority, the body corporate described in and which executed the above instrument; that he knows the seal thereof; that the seal affixed to said instrument is the corporate seal of Puerto Rico Infrastructure Financing Authority; that it was so affixed by order of the Board of Directors of Puerto Rico Infrastructure Financing Authority; and that he signed his name thereto by like order.

            *Christa M Bowen*
            Notary Public, State of _____

My Commission Expires:

       CHRISTA M. BOWEN
      Notary Public, State of New York
        No. 41-4723478
       Qualified in Queens County    (NOTARIAL SEAL)
_____   Certificate filed in New York County
      Commission Expires August 31, 1990

- 76 -

THE STATE OF New York )
                        )  SS:
COUNTY OF New York     )

On the 1st day of December, in the year 1988, before me personally came JA Olive, to me known, who, being by me duly sworn, did depose and say that he resides in New York; that he is a Vice President of Citibank, NA, the national banking association described in and which executed the above instrument; that he knows the seal of said banking association; that the seal affixed to said instrument is the corporate seal of said banking association; that it was so affixed by authority of the Board of Directors of said corporation; and that he signed his name thereto by like authority.

Notary Public, State of _____

My Commission Expires:

CHRISTA M. BOWEN
Notary Public, State of New York
No. 41-4723478
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 31, 1990

(NOTARIAL SEAL)

- 77 -

# 3.  Supplemental Opposition to Amended PRIFA Bondholder Motion to Lift Automatic Stay, ECF No. 10611

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AMBAC ASSURANCE CORPORATION, AND FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>    Movants,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>    Respondent. | Case No. 17-BK-3283-LTS<br><br>**Re: ECF Nos. 717, 8022, and 10602** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last  Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19- BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**SUPPLEMENTAL OPPOSITION OF
COMMONWEALTH OF PUERTO RICO
TO AMENDED PRIFA BONDHOLDER MOTION
TO LIFT AUTOMATIC STAY [ECF NO. 10602]**

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page(s)</u></div>

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 15

    A.   Rum Taxes are Collected by the Federal Government, Remitted to the Commonwealth Treasury, and Appropriated by the Commonwealth. .................................................... 15

    B.   The Commonwealth Historically Appropriated (Subject to Retention) a Portion of the Rum Tax Remittances to PRIFA and Authorized PRIFA to Issue Bonds and Pledge the Rum Tax Remittances it Received to Payment of the Bonds. .......................................... 17

    C.   PRIFA Issued Bonds Pursuant to a Trust Agreement That Limited the Pledged Collateral to Money Deposited in Its Sinking Fund. ............................................................... 20

    D.   As the Financial Crisis Hit, the Commonwealth Exercised its Retention Powers, and the Oversight Board Exercised Its Authority Under PROMESA Over the Rum Tax Remittances. 22

PROCEDURAL HISTORY ................................................................................................. 24

LEGAL STANDARDS ................................................................................................. 25

  **I.   THE STAY PROVIDES FUNDAMENTAL PROTECTIONS, AND LIFTING IT IS AN EXTRAORDINARY REMEDY.** ................................................................................. 25

  II.   THE "COLORABLE CLAIM" STANDARD DOES NOT APPLY. ................................. 26

ARGUMENT ................................................................................................. 29

  I.   NONE OF THE GOVERNING LEGAL DOCUMENTS PROVIDE MOVANTS AN INTEREST IN THE RUM TAX REMITTANCES. ......................................................... 29

    A.   The Enabling Act is an Appropriation Statute, Nothing More; It Does Not Pass Title or Turn the Commonwealth Into a "Mere Conduit." ................................................... 29

    B.   The Appropriations to PRIFA in the Enabling Act Are Preempted by PROMESA. ....... 34

    C.   The Commonwealth's Retention Powers Confirm Movants' Lack of Property Interest in the Rum Tax Remittances. ............................................................................ 39

    D.   The Trust Agreement Limits Movants' Lien to Monies Deposited in PRIFA's Sinking Fund. ................................................................................................. 41

    E.   The Enabling Act Does Not Create a Trust for PRIFA's Benefit. ............................ 47

    F.   Movants Have No Claim to a Constructive or Resulting Trust, or an Equitable Lien. .... 52

    G.   The Commonwealth's Retention of the Rum Tax Remittances Gives Rise to, at Most, a Dischargeable, Unsecured Claim in Favor of PRIFA. .......................................... 56

  II.   SECTION 362(d)(2) DOES NOT APPLY BECAUSE THE COMMONWEALTH HAS EQUITY IN THE RUM TAX REMITTANCES AND THEY ARE NECESSARY TO THE PLAN OF ADJUSTMENT. ................................................................................. 59

A. The Commonwealth Has Equity in the Rum Tax Remittances. ....................................... 59

III. **SECTION 362(d)(1) DOES NOT APPLY BECAUSE THE MOVANTS' INTERESTS, IF ANY, ARE "ADEQUATELY PROTECTED" AND THERE IS NO CAUSE TO LIFT THE STAY.** ...............................................................................................................59

A. Movants Do Not Have a Security Interest in the Retained Rum Tax Remittances. ......... 60

IV. MOVANTS, AS CREDITORS OF A CREDITOR, LACK STANDING TO SEEK STAY RELIEF. ..............................................................................................................................62

CONCLUSION ........................................................................................................................ 64

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arevalo v. Ashcroft*,
    344 F.3d 1 (1st Cir. 2003)................................................................................................31

*Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio
    v. Flores Galarza*,
    484 F.3d 1 (1st Cir. 2007)................................................................................................33

*Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*,
    682 F.2d 446 (3d Cir. 1982).............................................................................................26

*Bargas v. Rice (In re Rice)*,
    82 B.R. 623 (Bankr.S.D.Ga.1987)..................................................................................28

*Begier v. IRS*,
    496 U.S. 53 (1990).............................................................................................................6

*BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    301 F. Supp. 3d 312 (D.P.R. 2017).................................................................................13

*Den Norske Bank AS v. First National Bank of Boston*,
    75 F.3d 49 (1st Cir. 1996)................................................................................................32

*Drake v. Franklin Equip. Co. (In re Franklin Equipment Co.)*,
    416 B.R. 483 (Bankr. E.D. Va. 2009).............................................................................28

*Fazio v. Growth Dev. Corp. (In re Growth Dev. Corp.)*,
    168 B.R. 1009 (Bankr. N.D. Ga. 1994) ...........................................................................7

*First Nat'l Bank v. Turley*,
    705 F.2d 1024 (8th Cir. 1983) ........................................................................................27

*García-Rubiera v. Calderón*,
    570 F.3d 443 (1st Cir. 2009)............................................................................................33

*Garcia-Rubiera v. Fortuño*,
    665 F.3d 261 (1st Cir. 2011)............................................................................................33

*Gracia-Gracia v. Financial Oversight & Management Board for Puerto Rico (In re
    Fin. Oversight & Mgmt. Bd. for P.R.)*,
    939 F.3d 340 (1st Cir. 2019)..............................................................................7, 26, 27, 33

*Grant, Konvalinka & Harrison, P.C. v. Still (In re McKenzie)*,
    737 F.3d 1034 (6th Cir. 2013) ...................................................................................27

*Grella v. Salem Five Cent Sav. Bank*,
    42 F.3d 26 (1st Cir. 1994) ..................................................................................27, 28

*Howard Delivery Serv. v. Zurich Am. Ins. Co.*,
    547 U.S. 651 (2006) ...........................................................................................6

*In re 234-6 West 22nd St. Corp.*,
    214 B.R. 751 (Bankr. S.D.N.Y. 1997) .........................................................................26

*In re Breitburn Energy Partners LP*,
    No. 16-10992, 2017 WL 1379363 (Bankr.Apr. 14, S.D.N.Y. 2017)...........................................7

*In re Cabrillo*,
    101 B.R. 443 (Bankr. E.D. Pa. 1989) .........................................................................27

*In re Dahlquist*,
    34 B.R. 476 (Bankr. D.S.D. 1983)............................................................................27

*In re Irving A. Horns Farms Inc.*,
    42 B.R. 832 (Bankr. N.D. Iowa 1984) ........................................................................27

*In re Jefferson Cnty.*,
    491 B.R. 277 (Bankr. N.D. Ala. 2013) .......................................................................26

*In re Las Vegas Monorail Co.*,
    429 B.R. 317 (Bankr. D. Nev. 2010) ..........................................................................3

*In re Playa Dev. Corp.*,
    68 B.R. 549 (Bankr. W.D. Tex. 1986) ........................................................................27

*In re T. Brady Mech. Servs., Inc.*,
    129 B.R. 559 (Bankr. N.D. Ill. 1991) .........................................................................6

*In re Veal*,
    450 B.R. 897 (B.A.P. 9th Cir. 2011).........................................................................27

*In Vitreous Steel Products Co.*,
    911 F.2d 1233 (7th Cir. 1990) ...............................................................................28

*Jin Qing Li v. Rosen (In re Jin Qing Li)*,
    No. 3:12-BK-33630, 2018 WL 1354548 (B.A.P. 9th Cir. Mar. 12, 2018)..................................29

*Kane v. Coulson (In re Price)*,
    575 B.R. 461 (Bankr. D. Haw. 2017) .........................................................................5

*Katz v. Pershing, LLC,*
    672 F.3d 64 (1st Cir. 2002) .................................................................................13

*Kothe v. R.C. Taylor Trust,*
    280 U.S. 224 (1930) ...........................................................................................6

*Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old*
    *Cold, LLC),*
    602 B.R. 798 (B.A.P. 1st Cir. 2019) ..................................................................29

*Municipality of San Juan v. Commonwealth of P.R.,*
    919 F 3d. 565 (1st Cir. 2019) .............................................................................25

*Omega Envt'l. Inc. v. Valley Bank NA (In re Omega Envtl., Inc.),*
    219 F.3d 984 (9th Cir. 2000) (per curiam) .......................................................27

*P.R. v. Blumenthal,*
    642 F.2d 622 (D.C. Cir. 1980) ..........................................................................31

*Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re*
    *Fin. Oversight & Mgmt. Bd. for Puerto Rico),*
    899 F.3d 1 (1st Cir. 2018) ...........................................................................27, 30

*Peralta v. Gonzales,*
    441 F.3d 23 (1st Cir. 2006) ...............................................................................31

*Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.),*
    698 F.2d 571 (2d Cir. 1983) ..............................................................................13

*Ross v. Thousand Adventures,*
    675 N.W.2d 812 (Iowa 2004) ...........................................................................32

*Soares v. Brockton Credit Union (In re Soares),*
    107 F. 3d 969 (1st Cir. 1997) ............................................................................25

*Steslow v. Citicorp Mortgage, Inc. (In re Steslow),*
    225 B.R. 883 (Bankr E.D. Pa. 1998) ...................................................................5

*Tringali v. Hathaway Mach. Co.,*
    796 F.2d 553 (1st Cir. 1986) .............................................................................26

*Unisys Corp. v. Dataware Prods., Inc.,*
    848 F.2d 311 (1st Cir. 1988) .............................................................................25

*United Cos. Fin. Corp. v. Brantley,*
    6 B.R. 178 (Bankr. N.D. Fla. 1980) ..................................................................27

*United States v. Nason*,
   269 F.3d 10 (1st Cir. 2001) ...................................................................................31

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
   Mgmt. Bd. for P.R.)*,
   945 F.3d 3 (1st Cir. 2019) ...........................................................................1, 7, 35

*Yashouafar v. Elkwood Assocs., LLC*,
   No. 17-ap-01404-MT, 2019 Bankr. LEXIS 255 (Bankr. C.D. Cal. Jan. 25, 2019) ....................32

STATUTES

3 L.P.R.A. §§ 1901, 1902, 1903 .................................................................................17

3 L.P.R.A. § 1906(m) ..............................................................................................19

3 L.P.R.A. § 1907 ...........................................................................................19, 30

3 L.P.R.A. § 1910 .............................................................................................5, 20

3 L.P.R.A. § 1914 ........................................................................................ *passim*

3 L.P.R.A. § 1923 ................................................................................................11

13 L.P.R.A. § 10042(i)(3) ........................................................................................32

15 L.P.R.A. § 75 .................................................................................................32

31 L.P.R.A. § 13 .................................................................................................33

11 U.S.C. § 362 ......................................................................................... *passim*

11 U.S.C. § 502(a) ...............................................................................................26

26 U.S.C. § 7652 ...........................................................................................15, 30

48 U.S.C. §§ 2101-2241 ...........................................................................................1

PROMESA § 201 ..................................................................................................23

PROMESA § 202(e)(3)(C) ..........................................................................................23

PROMESA § 312 ..................................................................................................23

PROMESA § 315(b) .................................................................................................1

PROMESA § 4 ....................................................................................................23

PROMESA § 405 ..................................................................................................23

UCC § 9–101, Comment 1 ................................................................................3

UCC § 9–203, Comment 5 ................................................................................3

**OTHER AUTHORITIES**

H.R. REP. No. 64-77 (1916) ...........................................................................31

H.R. REP. No. 115-466 (2017) .......................................................................31

To the Honorable United States District Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "FOMB"), as sole representative of Debtor and Respondent the Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this supplemental opposition (the "Opposition") to the *Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank Trust National Association, Concerning Application of the Automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds* [ECF No. 10602] (the "Motion" or "Mtn.") of Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. ("AGC"), and Assured Guaranty Municipal Corp. (together with AGC, "Assured," and together with Ambac, FGIC, and AGC, the "Insurers"), and U.S. Bank Trust National Association, in its capacity as the successor trustee ("U.S. Bank" or the "Trustee," and together with Ambac, FGIC, and Assured, "Movants").  Because, as discussed below, Movants lack standing and have no property or security interest in the monies the federal government collects from federal excise taxes on rum produced in Puerto Rico and remits to the Commonwealth treasury—the Rum Tax Remittances—the Motion should be denied.

## PRELIMINARY STATEMENT

1.      For reasons explained in the following paragraphs, based on this Court's affirmed ruling that pre-PROMESA appropriations are preempted,[3] the instant Motion and its two

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3]   *See Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019).

companion motions must be denied because pre-PROMESA appropriations form the underpinnings of all the moving parties' alleged security interests and property interests in Commonwealth assets, for which they claim entitlement to adequate protection. Moreover, even without consideration of preemption, none of the moving parties has an interest in Commonwealth assets entitled to adequate protection. That is a second ground for denial of the motions, and many more are set forth below. But, those two grounds are each independently sufficient to resolve the motions, without more.

2. The Commonwealth owes tens of billions of dollars to retirees, general obligation bondholders, and others. It became obligated to pay in full its different unsecured debts based on written agreements, Commonwealth statutes, and/or the Puerto Rico Constitution. In each instance, the written agreement or law obligated the Commonwealth to pay the debtholders in full. In Title III, however, because all nonbankruptcy law requiring full payment of prepetition obligations is preempted by bankruptcy law, the debtholders are all sharing losses arising from the Commonwealth's fiscal emergency, consistent with the equality policy underlying all bankruptcy law that creditors of equal rank share the losses.

3. Prior to the instant Motion and its two companion motions, creditors did not generally challenge these bedrock principles of preemption and equality. Indeed, this Court and the First Circuit have each ruled Commonwealth appropriations by budget or statute are preempted by PROMESA, and the equality policy is routinely reaffirmed by the Supreme Court. Here, however, Movants deploy Commonwealth laws requiring debt payments or appropriations as the nonpreemptable foundations for their purported security interests or other property interests against the Commonwealth, and then request full payment of such amounts as if the Commonwealth laws are both nondischargeable and specifically enforceable. If they are right,

2

they receive full payment while all the Commonwealth's other creditors share all the losses. And, this occurs even though, pursuant to a statute, the Commonwealth owes Movants nothing in the first place.

4.      When viewed from the perspectives of public policy, PROMESA Titles II and III, and logic and common sense, it is apparent that Movants' requested relief is contrary to all of them. First, the proposition that the Commonwealth must pay PRIFA Bondholders[4] in full while the Commonwealth's own creditors absorb all the losses violates the equality policy. PRIFA Bondholders do not even hold claims against the Commonwealth, let alone secured claims. Second, the lynchpin of Movants' case, the Commonwealth statute requiring the Commonwealth to transfer money to PRIFA, is a pre-PROMESA appropriation. Both this Court and the First Circuit Court of Appeals have ruled all such appropriations are preempted by PROMESA section 202 because they are not certified by the Oversight Board. And, even without preemption, no appropriation of future years' revenues can bind future legislatures. Third, the appropriation is separately preempted by Title III because it requires payment of an obligation that Title III does not render a priority claim. The Commonwealth cannot insert priority claims into Title III. Fourth, Movants' kitchen sink of property law theories – equitable ownership, trust fund, and equitable lien – are each refuted by the Uniform Commercial Code which would be totally vitiated if it could be circumvented by such theories.[5]   Fifth, logic and common sense reinforce that PRIFA Bonds

---

[4]  Unless otherwise noted, capitalized terms are the same as defined in the Oversight Board's prior briefs, which are hereby incorporated by reference. [*E.g.*, ECF Nos. 7827, 8164].

[5]  The Uniform Commercial Code eliminates most equitable theories. *See* former UCC § 9–203, Comment 5 ("Since this Article reduces formal requisites to a minimum, the doctrine [of equitable mortgage] is no longer necessary or useful.") and current UCC § 9–101, Comment 1 (explaining comments to former UCC remain the rule of law); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 339 n.39 (Bankr. D. Nev. 2010) (stating trustee's equitable arguments to establish by operation of law what it failed to obtain by contract and practice failed because "[t]hese

sold on the basis of collateral consisting of funds in the Sinking Fund would not be further secured

by Commonwealth assets the Commonwealth nowhere pledged.

5.        No one disputes that where a debtor promises to pay a debt on an unsecured basis,

the promisee has nothing more than an unsecured claim.    Here, the Commonwealth has not

promised to pay PRIFA Bondholders.    It has done something less.    It has, by statute, obligated

itself to appropriate up to $117 million in rum taxes it receives in each fiscal year from the federal

government—the Rum Tax Remittances—to PRIFA, and not PRIFA's bondholders.    *See* 3

L.P.R.A. § 1914.[6]  An annotated diagram showing the flow of funds is attached hereto as **Exhibit**

**A**.    Once appropriated, the money historically was then "covered into" (*i.e.*, deposited in) the

PRIFA Infrastructure Fund by the Commonwealth for PRIFA's "corporate purposes," and *not* for

the benefit of the Bondholders.    *Id.*  Pursuant to the Trust Agreement, PRIFA then covenanted to

---

theories are . . . contrary to the general notion that Article 9 generally supplanted such theories in favor of one simple system.").

[6]  3 L.P.R.A. § 1914 provides, in relevant part:

"[T]he first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of thirty million dollars ($30,000,000),…in the case of Fiscal Years 2006-07 to 2008-09, and in subsequent years until Fiscal Year 2056-57, **the participation shall be for an amount of up to one hundred and seventeen million dollars** ($117,000,000), which **when received by the Department of the Treasury of Puerto Rico**, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', **and be used by the Authority for its corporate purposes**, which shall include the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games. In case the funds collected from said federal excise taxes are insufficient to cover **the amounts herein appropriated**, the Secretary of the Treasury is authorized to cover said deficiency with any funds available and the Director of the Office of Management and Budget, at the request of the Puerto Rico Infrastructure Financing Authority shall include for the budget recommended for the corresponding fiscal year the appropriations needed to cover said deficiencies.

The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, **subject to the provisions of** Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, **or for any other legal purpose of the Authority**. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes."

3 L.P.R.A. § 1914 (emphasis added).

transfer a certain amount of monies from the Infrastructure Fund to the Sinking Fund.  The Sinking

Fund is then pledged to Bondholders, and is the *sole* source of payment for the Bonds.  Trust

Agreement §§ 101, 601.

6.     Promises to appropriate money for general corporate purposes convey fewer

contract rights than an unsecured promise to pay, and they do not give rise to a security or property

interest.  *See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (holding a

promise to pay a debt from a particular fund does not create a contractual lien in the fund nor an

equitable lien);  *Steslow v. Citicorp Mortgage, Inc. (In re Steslow)*, 225 B.R. 883, 886 n.4 (Bankr

E.D. Pa. 1998) ("[a] covenant without a pledge granting additional security is simply a promise,

not a security interest)."  A promise by the Commonwealth to appropriate money into an account

for PRIFA's corporate purposes—and not even for Bondholders' benefit—cannot possibly make

PRIFA's bondholders better off than if they had an unsecured promise from the Commonwealth

to pay the Bonds.   And far from making any promise to pay PRIFA Bondholders, the

Commonwealth expressly disclaimed liability:  "The Bonds issued by [PRIFA] shall not constitute

an indebtedness of the Commonwealth nor any of its political subdivisions, and neither the

Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall

be payable solely out of those funds pledged for the payment thereof." 3 L.P.R.A. § 1910; *see also*

Trust Agreement § 601 ("Nothing in the Bonds or in this Agreement shall be deemed to constitute

… a debt or obligation of the Commonwealth … and neither the Commonwealth of Puerto Rico

nor any of its political subdivisions shall be liable for the payment of the principal of or the interest

on the Bonds.").

7.     Nevertheless, Movants attempt to convince the Court that somehow the

Commonwealth's promise to appropriate monies into a PRIFA account is not only superior to an

5

unsecured promise to pay, it is the equivalent of a nondischargable, specifically enforceable obligation to transfer money until the Bonds are paid in full. In doing so, Movants are attempting to undermine the fundamental bankruptcy policy of equality whereby creditors of equal rank share losses.[7] As one court aptly explained: "[i]n a bankruptcy case, there is nothing equitable about taking money away from unsecured creditors and giving it to a creditor that failed to protect its own interests when it had a chance to do so." *In re T. Brady Mech. Servs., Inc.*, 129 B.R. 559, 563 (Bankr. N.D. Ill. 1991) (citation omitted).

8. Dissatisfied that the Enabling Act does not provide PRIFA, and Trust Agreement does not provide Bondholders, with the rights they wish they had, Movants propound multiple theories designed to get them paid in full while other unsecured claimholders share the losses, even though Movants have no claims against the Commonwealth (and certainly not a secured claim). Their Motion consists of a number of "Hail Mary" passes that the Commonwealth's lesser obligation to appropriate money into an account somehow morphs into one or all of (i) a perfected security interest, (ii) equitable ownership, (iii) total ownership, (iv) an equitable lien, (v) a trust interest, or (vi) a constructive trust interest in the entire stream of Rum Tax Remittances. In their desperation, Movants even resort to making allegations about wiring instructions that contain "transmittal information" to try and convince the Court that the Commonwealth's cash management system can provide an ownership interest where the statutes and agreements fall short. But PRIFA's only "right" to the Rum Tax Remittances is the Commonwealth's conditional

---

[7] *See, e.g.*, *Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006) ("we are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed"); *Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive *pro rata* shares of the debtor's property."); *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930) ("The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate . . . .").

appropriation under the Enabling Act. And Bondholders' only security interest is to the monies that PRIFA actually receives from the Commonwealth and subsequently deposits in the Sinking Fund. No greater rights can be found..

9.      Movants ask the Court to lift the stay so they can prosecute two lawsuits: one against the United States so it can attempt to impose an equitable lien against the Rum Taxes before they are remitted to the Commonwealth on the theory the PRIFA bondholders or PRIFA, as opposed to the Commonwealth, is somehow entitled to them; and another against the Commonwealth to compel a turnover to PRIFA or to PRIFA bondholders of the Rum Tax Remittances. In the alternative, Movants seek adequate protection. For Movants to procure the desired relief, they must show (1) the PRIFA bondholders hold a lien against the Commonwealth's interest in the rum excise taxes in the hands of the Commonwealth and the United States, and (2) even if they do, the Commonwealth has no equity in the taxes.[8] Movants fail on both counts.

10.     **The Commonwealth Retains All Rights in the Rum Tax Remittances**. The Court need look no further than the First Circuit's recent decision, affirming this Court, to entirely dispose of this Motion. While Movants rewrote their entire motion based on their misunderstanding of *Gracia-Gracia v. Financial Oversight & Management Board for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340 (1st Cir. 2019) – which does not require any change to the Court's original June 13, 2019 Order providing for an initial hearing on Movants' standing and alleged property interests – Movants omit any mention of *Vázquez-Garced v.*

---

[8]   Under section 362(d)(2), Movants have the burden of proving the debtor lacks equity in the property and that they have a valid security interest in the property. *See Fazio v. Growth Dev. Corp. (In re Growth Dev. Corp.)*, 168 B.R. 1009, 1017 (Bankr. N.D. Ga. 1994) (an unsecured claimholder has "no interest in property to be protected, so relief provided for by § 362(d)(2) is not applicable"); *In re Breitburn Energy Partners LP*, No. 16-10992, 2017 WL 1379363, at *4 (Bankr.Apr. 14, S.D.N.Y. 2017) ("[T]he general rule is that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay….") (citation omitted).

*Financial Oversight & Management Board for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019). There the First Circuit confirmed,

> "that PROMESA subsection 202(e)(4)(C) itself precludes the territorial government from reprogramming funds from prior fiscal years except to the extent such reprogrammed expenditures are authorized in a subsequent budget approved by the Board, *and any Puerto Rico law to the contrary is preempted by virtue of PROMESA section 4*…. Simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, *regardless of what any territorial laws say*."

*Id.* at 8 (emphasis added).

11.     The consequence of *Vázquez-Garced* is clear: the purported requirements of 3 L.P.R.A. § 1914 that the Commonwealth transfer the Rum Tax Remittances to PRIFA's Infrastructure Fund once received[9] are preempted because it is inconsistent with PROMESA's requirement that appropriations can only be made pursuant to sections 201 and 202 of PROMESA, and the Oversight Board has not certified a budget that made such appropriations for PRIFA. The Rum Taxes, when received by the Commonwealth, are the Commonwealth's property to be used in accordance with its certified fiscal plan and budget.

12.     This is not just binding First Circuit law, it is logical. Outside of bankruptcy, debts are to be paid in full. But the whole purpose of bankruptcy, and PROMESA, is to preempt and restructure those obligations. If statutes purporting to appropriate moneys to instrumentalities are not preempted, they would make restructuring impossible and would preclude the Oversight Board from balancing the Commonwealth's budget. It would also create the absurd result of placing

---

9   The Enabling Act does not mandate any appropriation of Rum Tax Remittances. Instead it makes clear that the Rum Tax Remittances are at all times available resources of the Commonwealth, that the Commonwealth may "*appropriate*" in an amount up to $117 million in each fiscal year, and that, if any appropriation is made, it is always conditional and subject to the Commonwealth's Retention Powers pursuant to Puerto Rico Constitution, Article VI, § 8. *See* 3 L.P.R.A. § 1914.

creditors of an instrumentality—who can point to nothing more than the Commonwealth's promise to appropriate money to the instrumentality—ahead of creditors of the Commonwealth who actually hold the Commonwealth's direct promise to pay. Just as a prepetition promise to pay is preempted under PROMESA, so too is a prepetition appropriation.

13.     Moreover, any Commonwealth appropriation of Rum Tax Remittances to PRIFA under the Enabling Act is always subject to the Commonwealth's powers under "Section 8 of Article VI of the Constitution," which allow the Commonwealth to retain or claw back appropriations to pay public debt when its "available revenues" are insufficient (the "Retention Powers"). 3 L.P.R.A. § 1914; P.R. Const., art. VI, § 8. The Commonwealth's reversionary interest in any Rum Tax Remittances has priority over any pledge of the Rum Tax Remittances to Bondholders and is a standalone proof of equity. The Commonwealth also has equity by the simple fact the Puerto Rico Legislature can repeal or amend § 1914 at any time. If an appropriation were the eternal obligation Movants wish it were, or if the Commonwealth were just a mere conduit as Movants claim, it would be impossible for the Commonwealth to have asserted its Retention Powers over the Rum Tax Remittances in the first instance, and it would violate the principle that past legislatures cannot bind future legislatures.

14.     ***Movants' Have No Security Interest Beyond Monies in the Sinking Fund***. Even if 3 L.P.R.A. § 1914 were not preempted and Movants could show that PRIFA has a property right in the Rum Tax Remittances, Movants still have no property or security interest in the Rum Tax Remittances retained by the Commonwealth. The Trust Agreement is the only document pledging assets to secure PRIFA bonds. It pledges only the "Pledged Revenues," defined to mean monies deposited into the "Sinking Fund." Trust Agreement § 101. It further provides the "principal, interest and premium, if any, are payable ***solely*** from the Pledged Revenues." *Id.* § 601 (emphasis

9

added). These two simple, straight-forward provisions of the Trust Agreement delineate the entire scope of Movants' alleged security interest and are dispositive as to the lack of Movants' security interest in the Rum Tax Remittances.

15. No contractual or statutory authority extends Movants' interest beyond the Sinking Fund. *See Id.* Movants' interest simply does not reach the Commonwealth's accounts (and certainly not to Rum Taxes not in existence). Indeed, if the Trust Agreement intended to grant a security interest on monies sitting with the Commonwealth, the Commonwealth would have needed to be a party to the Trust Agreement (or to have entered into a separate security agreement for the benefit of the Bondholders). In addition, that security interest would have been disclosed in the Offering Statement, which are tellingly silent.[10]

16. Nor does their purported security interest extend to Rum Tax Remittances the Commonwealth may appropriate to PRIFA by transfer to the PRIFA Infrastructure Fund. The Trust Agreement is unequivocal that "[t]he Authority [PRIFA] shall not pledge or create *any* liens upon *any moneys* in the Puerto Rico Infrastructure Fund." *Id.* § 401 (emphasis added). "*Any*" means *any*. Thus, Movants' theory that their security interest somehow travels up from the Sinking Fund to the PRIFA Infrastructure Fund, and then to the Commonwealth TSA, suffers from breaks at every point in the chain. Their lack of a security interest in the Rum Tax Remittances conclusively resolves Movants' efforts to seek relief from the automatic stay irrespective of whether they are moving under Bankruptcy Code section 362(d)(1) or (d)(2). That was the case

---

[10] Available at https://emma.msrb.org/MD410020.pdf and https://emma.msrb.org/MD501151.pdf. (the "2005 Official Statement" and "2006 Official Statement," collectively "Offering Statements").

with the original PRIFA Lift Stay Motion [ECF No. 7176], and it is the case now.

17. ___*The Rum Tax Remittances are Not Held in Trust for the Benefit of PRIFA or its*___
___*Bondholders*___.  Unable to locate a lien or property interest to PRIFA in the Enabling Act, or a
security interest beyond that of the Sinking Fund in the Trust Agreement, Movants concoct from
whole cloth a theory that the Rum Tax Remittances are held in trust by the Commonwealth for the
benefit of PRIFA or its Bondholders (Movants do not make their mind up as to which).  Nothing
in the Enabling Act purports to create any trust relationship between the Commonwealth and
PRIFA or its Bondholders.  In fact, where the Enabling Act does endeavor to establish certain
trusts (*see, e.g.*, 3 L.P.R.A. § 1923) it clearly identifies a trustee, beneficiary, a segregated trust
*res*, and repeatedly uses language such as "to be held in trust" – all of which are glaringly absent
from descriptions of the TSA and the PRIFA Infrastructure Fund.[11]

18. Even if Movants could establish a property interest of PRIFA's in the Rum Tax
Remittances under the Enabling Act, PRIFA never pledged such interest to Bondholders in the
Trust Agreement.  The only monies "held in trust" under the Trust Agreement are those in the
Sinking Fund.  There, the characteristics of a trust are present: the powers, duties, and
responsibilities of the Trustee are clearly defined, the trust *res* is clearly identified, and the funds
are not commingled with other monies.  There is no equivalent language that PRIFA holds the
monies in the PRIFA Infrastructure Fund in trust for the Bondholders' benefit.  And the Trust
Agreement certainly cannot establish a trust relationship between the Commonwealth and PRIFA
Bondholders because no language even suggests that the Legislature was attempting to create a
trust, on the one hand, and "[n]othing in the Bonds or in this Agreement shall be deemed to

---

[11] Even in this example, it is not clear that under Puerto Rico law a trust was created.

constitute … a debt or obligation of the Commonwealth …" (Trust Agreement § 601), on the other hand.

19.     If Bondholders held a rational belief that the Rum Tax Remittances were held in trust by the Commonwealth or PRIFA for their benefit, one would expect this trust to be disclosed prominently in the Bond Offering Statements to help sell Bonds to the market.[12]  The only reference in the Offering Statements to any monies held in trust are those held by the Trustee in the Sinking Fund for the benefit of Bondholders.  Like the Enabling Act and Trust Agreement, the Offering Statements are completely silent as to any other trust relationship because no such relationship exists.

20.     ***Movants Cannot Resort to "Equity" to Expand Their Security Interest***.  Unhappy with the deal they bargained for, Movants ask the Court to exercise equitable remedies to plug up the myriad holes in their ownership theories.  Movants argue the unfairness of the law provides them an "equitable lien" on the Rum Taxes.  But equitable liens are not recognized under Puerto Rico law.  Even if they were, an equitable lien cannot remedy the effects of a statute.  As shown below, a statute, by definition, is never "unfair."  Manifestly, the law rejects such attempts to circumvent the Uniform Commercial Code requirements for perfected security interests with allegations of equitable liens and trusts.  Equitable constructs such as "equitable liens," "constructive trusts" and "resulting trusts" are disfavored and rarely granted in bankruptcy because, by definition, they override bankruptcy priorities and rules governing secured claims.

21.     ***Movants Are Not Parties-In-Interest and Lack Standing***.  Movants would have the Court believe the addition of the Trustee solves the issue of standing.  M.Br. at 18 n.15.  It may

---

[12]  *See* Offering Statements, *supra* note 10.

solve the problem under the Trust Agreement, but not the problem that the Trustee cannot assert

PRIFA's rights. Movants' actually clarify that this is precisely what they are trying to do.

22.     The Trust Agreement governs the relationship between PRIFA and its

Bondholders. The Enabling Act governs the relationship between PRIFA and the Commonwealth.

But there is no legal relationship, as it pertains to the Rum Tax Remittances, between PRIFA

Bondholders and the Commonwealth (other than the unsecured promise by the Commonwealth

under the Enabling Act that the Commonwealth will not limit or alter the rights conferred by the

Enabling Act to PRIFA). The Commonwealth is not a party to the Trust Agreement. None of this

is in dispute. M.Br. at 36 ("Movants' lien did not result from any security agreement entered into

by the Commonwealth. The lien arose [from] a contract between PRIFA and its Trustee…. PRIFA

is not a debtor."). Movants are thus creditors of a creditor and accordingly, lack standing to pursue

claims against the Commonwealth. *See Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach

Corp.)*, 698 F.2d 571, 574 (2d Cir. 1983) ("As a stranger to the proceeding [ ] [a] creditor [of a

creditor] did not qualify to seek modification of the stay which had been imposed when the debtor

filed for bankruptcy.").

23.     Movants admit they are attempting to step into PRIFA's shoes and assert PRIFA's

alleged rights. They repeatedly assert "PRIFA['s] ownership" rights. *E.g.*, M.Br. at 9. But without

a "direct claim to" the Rum Tax Remittances, Movants "lack[] the direct interest necessary to

establish prudential standing." *BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,

301 F. Supp. 3d 312 (D.P.R. 2017); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2002)

(to have standing, a party's claims generally must be "premised on [their] own legal rights (as

opposed to those of a third party)") (citation omitted).

24.     ***There is No Cause to Lift the Stay or Grant Adequate Protection***. Movants' lack

13

of a security interest in the Retained Rum Tax Remittances dooms Movants' requested relief. Without a security interest, they cannot seek stay relief under Bankruptcy Code sections 362(d)(2) or 362(d)(1). While the Motion addresses a host of other issues such as adequate protection and cause to lift the stay, the Opposition does not respond to these issues in light of the Court's *Amended Interim Case Management Order for Revenue Bonds* [ECF No. 10595] (the "Amended Case Management Order") limiting briefing to the issues of standing and secured status. If the Motion proceeds past the preliminary hearing, Movants reserve all rights to make all appropriate arguments. At that stage, the Commonwealth will show that Movants do not even attempt to make a *prima facie* case of diminution warranting adequate protection. Ironically, they do the exact opposite. Movants point to the Treasury's publicly available cash flow reports (*see* M.Br. at 42 n.28), which show the TSA's balance has been rising since well before Movants filed their motion, and, as of December 2019, contains over $8.7 billion.[13] This amount is well in excess of the aggregate amount payable on the PRIFA Bonds, and covers several multiples of the $117 million per year of Rum Tax Remittances retained in the TSA since the Commonwealth's Title III case commenced.

<p style="text-align:center">*    *    *    *</p>

25.    The forest should not get lost for the trees. Movants' claims boil down to a simple, straight-forward question: do they have a property interest in Rum Tax Remittances retained by the Commonwealth? The answer is equally straight-forward and simple. Any right Movants could have is derived from PRIFA. The Commonwealth's appropriation of Rum Tax Remittances to PRIFA was always conditional on its Retention Powers, and is now preempted by PROMESA.

---

[13] *See Publications & Reports*, AAFAF, http://www.aafaf.pr.gov/reports.html.

Even if PRIFA had a property interest in the Retained Rum Tax Remittances, Movants' security interest is determined by the Trust Agreement, which limits it "solely" to monies deposited in PRIFA's Sinking Fund. It is cut off from the PRIFA Infrastructure Fund, cannot reach preceding funds such as reach the Rum Tax Remittances in the TSA, and the Commonwealth's purported obligation to appropriate the Rum Tax Remittances to PRIFA is preempted by PROMESA. That is all this Court needs decide to resolve the Motion.

## **FACTUAL BACKGROUND**

26. The factual background concerning the Rum Taxes, PRIFA, and the PRIFA bonds has already been extensively briefed.[14] Accordingly, we briefly recount the facts relevant to the Motion using the same defined terms as in prior submissions. Per the Court's June 13, 2019 order [ECF No. 7420], these facts are limited to the statutes and contracts applicable to the Rum Taxes and the PRIFA bonds.

### *A. Rum Taxes are Collected by the Federal Government, Remitted to the Commonwealth Treasury, and Appropriated by the Commonwealth.*

27. Rum produced in Puerto Rico and sold on the mainland is subject to a federal excise tax collected by the United States Treasury – the Rum Taxes. The United States Treasury deposits the Rum Taxes into the "treasury of Puerto Rico" – the Rum Tax Remittances – without limitation on use. 26 U.S.C. § 7652.[15] The United States can amend that appropriation statute at any time.

28. <u>The Rum Producers Have a Deposit Account Control Agreement ("DACA"); the</u>

---

[14] *See, e.g.*, *Complaint Objecting to Defendants' Claims and Seeking Related Relief* [ECF No. 1; Case No. 20-003-LTS] (the "<u>PRIFA Revenue Bond Complaint</u>"); *Opposition of the Commonwealth of Puerto Rico to Ambac Assurance Corporation's Motion Concerning Application of the Automatic Stay* [ECF No. 7827] (the "<u>Lift Stay Opposition</u>")

[15] Section 7652(e)(1) provides, in full: "All taxes collected under section 5001(a)(1) on rum imported into the United States (less the estimated amount necessary for payment of refunds and drawbacks) shall be covered into the treasuries of Puerto Rico and the Virgin Islands." 26 U.S.C. § 7652(e)(1).

15

PRIFA Bond Trustee Does Not.  As shown in Exhibit A, the Rum Tax Remittances first flow to a Lockbox account pursuant to a Lockbox Agreement for the benefit of, among others, the rum producers, [16] not PRIFA bondholders.  The next to last WHEREAS clause in the Lockbox Agreement recites the parties are entering into a DACA to perfect a security interest in cash.  That is exactly what the PRIFA Bond Trustee did not do.  Section 24 of the agreement provides it shall not create any right on behalf of anyone other than its parties.  Neither PRIFA, the Bondholders, nor the PRIFA Bond Trustee under the Trust Agreement is a party to the Lockbox Agreement, and none of them have control of the Rum Tax Remittances.

29.  Pursuant to section 5(a) of the Lockbox Agreement, the first $117 million are disbursed by the Lockbox Bank to the TSA "for deposit to the credit of PRIFA,"[17] and commingled with other governmental public funds.[18]  Such disbursement is expressly subject to section 15 of the Lockbox Agreement which provides that if there is any change in federal or Commonwealth

---

[16] May 5, 2015 Lockbox Agreement between Government of Puerto Rico, Banco Popular (as trustee), and Citibank, N.A. (as paying agent).  The Lockbox Agreement is available at ECF No. 10109-12.

[17] Section 5(a) provides, in relevant part,

"**Disposition of Cover Over Payments in the Account.** The Lockbox Bank shall make disbursements of Cover Over Payments deposited by the U.S. Government in the Account during each Fiscal Year by making the following payments from the Account in the following order of priority, **solely to the extent of funds available in the Account**: (a) First, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of PRIFA, the first $117 million of aggregate Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(a) during such Fiscal Year…"

ECF No. 10109-12 (emphasis in original).

[18] After the first $117 million of Rum Taxes are deposited in the TSA, Citibank disburses additional designated amounts to (i) the Treasury Secretary "for deposit to the credit of" the Puerto Rico Science & Technology Trust, and (ii) the Puerto Rico Conservation Trust Fund.  Approximately 46% of the remaining Rum Tax Remittances are disbursed directly to a trustee (Banco Popular) on behalf of Puerto Rico rum producers in exchange for their agreement to continue production of large volumes of rum in Puerto Rico for a period of 20 years, to collaborate with the Commonwealth in the marketing and promotion of its rum and Puerto Rico rums generally in the U.S. market, and to use the Rum Tax Remittances returned to it to market and promote Puerto Rico rum products.

law that reduces the amounts appropriated to PRIFA, the corresponding amounts to be disbursed under section 5 will be reduced.[19] The disbursement is made with an accompanying "Disbursement Detail" (what Movants refer to as "transmittal information"), that describes the disbursements using the similar language from the Lockbox Agreement. Such "Disbursement Detail" is not an instruction, but is merely a description of how the disbursements were calculated, as the Lockbox Bank has no power to create any property interest in the monies or instruct how they are to be used.[20]

**B.** ***The Commonwealth Historically Appropriated (Subject to Retention) a Portion of the Rum Tax Remittances to PRIFA and Authorized PRIFA to Issue Bonds and Pledge the Rum Tax Remittances it Received to Payment of the Bonds.***

30.     PRIFA was created by the Enabling Act in June 1988 to provide assistance to public corporations, governmental instrumentalities, political subdivisions and municipalities with respect to the provision, preservation, operation, maintenance and development of infrastructure facilities. *See* 3 L.P.R.A. §§ 1901, 1902, 1903. PRIFA is not a Title III debtor.

31.     The Enabling Act allows or requires the Commonwealth to appropriate to PRIFA a portion of the Rum Tax Remittances in the TSA subject to its Retention Powers under the Commonwealth Constitution. *See* 3 L.P.R.A. § 1914. Since Fiscal Year 2006-07, the annual

---

[19] Section 15 provides, in relevant part,

"**Legal Adjustments; Change in Federal Law; Amounts Payable to PRIDCO**. (a) If, at any time after the date of this Lockbox Agreement, Act No. 119 of July 9, 2006 [i.e. 3 L.P.R.A. § 1914] of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to PRIFA from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(a) shall be adjusted accordingly to reflect such reduction or the elimination of such priorities. . . ."

ECF No. 10109-12.

[20] Section 14(c) of the Lockbox Agreement provides that only the Commonwealth and the Lockbox Trustee have any claims to the monies in the Lockbox Account. The Lockbox Bank, in section 14(b), disclaims its ability to enter into any agreement with any person relating to the Lockbox Account or any monies therein or credited thereto.

amount permitted to be appropriated to PRIFA has been capped at $117 million per fiscal year, all subject to the Commonwealth's Retention Powers.  *Id.*  The Enabling Act makes clear it is an appropriation statute by referring to the first proceeds up to $117 million as "amounts herein *appropriated*." *Id.* (emphasis added).  Regardless of the labeling, however, any statute requiring transfer or payment of money without Oversight Board certification would be inconsistent with PROMESA, even if not labelled an appropriation.

32.     The Offering Statements for bonds issued by PRIFA, similarly inform Bondholders "[t]he Federal Excise Taxes and other revenues received from the Commonwealth and deposited into the [PRIFA Infrastructure Fund] are subject to being applied first to the payment of general obligation debt or debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor."  *See* 2005 Official Statement at S-2; 2006 Official Statement at S-3.

33.     The Commonwealth deposits any appropriations to PRIFA in the PRIFA Infrastructure Fund to be used by PRIFA for its "corporate purposes" and not necessarily to repay Bondholders.  3 L.P.R.A. § 1914.  The Enabling Act merely authorizes,[21] but does not require, PRIFA to use the monies in the PRIFA Infrastructure Fund to pay the Bonds.[22]  Unlike other funds established by the Enabling Act, it contains no language that monies held in the PRIFA Infrastructure Fund are held in trust or segregated for the benefit of Bondholders.

34.     PRIFA, for its part, is authorized to issue bonds and is the only entity authorized to

---

[21] *Id.* ("The Authority is **hereby empowered** to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority…") (emphasis added).

[22] Indeed, section 1914 states that "corporate purposes…shall include the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games."  Section 1914 also states that monies in the PRIFA Infrastructure Fund may be used for the payment of "other obligations" of PRIFA.

pledge anything to secure the Bonds. We will explain what PRIFA pledged, but for present purposes, that is immaterial. The material fact is the Commonwealth pledged none of its assets to secure the Bonds. PRIFA is authorized to pledge PRIFA's funds, including tax proceeds it "may receive" from the Commonwealth, as payment for those bonds. 3 L.P.R.A. §§ 1906(m), 1907. Any pledge would be "as provided in the trust agreement … under which the bonds are issued." *Id.* The use of the word "may" and the appropriation of up to $117 million—at all times subject to the Retention Powers—indicate there may be situations where the Commonwealth does not make any appropriations to PRIFA.[23] The use of the word "receive" means that PRIFA only has the power to pledge Rum Tax Remittances that the Commonwealth actually appropriates and deposits so the PRIFA Infrastructure Fund receives them.[24] Section 1907 confirms this when it provides:

> The principal of, and interest on, the bonds issued by the Authority may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the ***proceeds*** of any tax or other funds ***which may be made available to the Authority by the Commonwealth***, all as provided in the trust agreement or resolution under which the bonds are issued.

3 L.P.R.A. §1907 (emphasis added). PRIFA, therefore, can only pledge the proceeds of Rum Tax Remittances the Commonwealth actually transfers to the PRIFA Infrastructure Fund. No language

---

[23] 3 L.P.R.A. § 1906(m) provides:

"The Authority shall have all the necessary and convenient powers to carry out and accomplish the purposes and provisions of this chapter, including but without being limited to the following … (m) Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority, or bonds issued by a benefited entity, **and pledge all or a portion of such revenues as the Authority *may receive*** including, but not limited to, and subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority."

[24] Under the Enabling Act, PRIFA has no property interest in the Rum Tax Remittances until they are appropriated by the Commonwealth and deposited in the PRIFA Infrastructure Fund. Therefore, even if PRIFA could pledge its "right to receive" (it cannot and did not), such power would be meaningless because appropriations are no longer being made by the Commonwealth to PRIFA.

19

mentions a pledge of PRIFA's "right to receive" future revenues. Notably, the above language also makes clear the Enabling Act did not pledge any interest, but rather it merely authorized the Authority to do so in a trust agreement. The bottom line is whatever PRIFA pledged or pledges has to be property of PRIFA, not the Commonwealth. For present purposes, that is all that matters.

35. Under section 1910, any bonds PRIFA issues "shall not constitute an indebtedness of the Commonwealth," and "such bonds shall be payable *solely* out of those funds pledged for the payment thereof." 3 L.P.R.A. § 1910 (emphasis added).

> *C.* **PRIFA Issued Bonds Pursuant to a Trust Agreement That Limited the Pledged Collateral to Money Deposited in Its Sinking Fund.**

36. In 1988, PRIFA entered into a Trust Agreement that governs the approximately $1.612 billion in bonds it has issued.

37. Section 601 of the Trust Agreement provides the principal, interest and premium on Bonds issued by PRIFA are to be paid "solely from Pledged Revenues." "Pledged Revenues" are "Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund." Trust Agreement § 101. "Special Tax Revenues," in turn, are "Offshore Excise Taxes deposited to the credit of" PRIFA. *Id.* And "Offshore Excise Taxes" are the Rum Tax Remittances. *Id.*

38. Through these definitional steps, the Trust Agreement traces the Rum Tax Remittances and identifies precisely when they are pledged to bondholders. First, the Rum Taxes are collected by the federal government. Second, they are remitted to the Puerto Rico Treasury pursuant to federal statute with no limitations as to use. At that stage, the Rum Tax Remittances are commingled in the Commonwealth's TSA, what the Trust Agreement defines as "Offshore Excise Taxes." Third, *if* the Rum Tax Remittances are deposited with PRIFA, they are called

"Special Tax Revenues" under the Trust Agreement. Fourth, *if* PRIFA deposits in the Sinking

Fund the Rum Tax Remittances it receives, they are called "Pledged Revenues," and deemed the

"sole[]" source of funds pledged to bondholders. In fact, the Trust Agreement *prohibits* PRIFA

from "pledg[ing] or creat[ing] any liens upon" money deposited in the Puerto Rico Infrastructure

Fund (Trust Agreement § 401), which is where the Commonwealth deposits any Rum Tax

Remittances pursuant to 3 L.P.R.A. § 1914 for PRIFA to use "for its corporate purposes" – not

necessarily to pay bondholders. Thus, the Trust Agreement limits the scope of any lien granted by

PRIFA to funds actually in the Sinking Fund. The diagram in Exhibit A illustrates this cash flow.

39.     Ample provisions of the Trust Agreement including, the forms of bond contained

therein) and the Offering Statements confirm that any pledge of the Pledged Revenues is limited

to monies in the Sinking Fund. The forms of bond included in the Trust Agreement make clear

that it is the Sinking Fund that is pledged to and charged with the payment of principal of and

interest on the Bonds:

> The Agreement also provides for the creation of a special fund designated "Puerto Rico
> Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" and for the
> deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as
> defined in the Agreement) to pay the principal of and interest on all bonds issued under the
> Agreement as the same become due and payable and to provide a reserve therefor, ***which
> special fund is pledged to and charged with the payment of such principal and interest***.

Trust Agreement at 6 (emphasis added).

40.     The Offering Statements remove any possible doubt as to the proper interpretation

of the definition of "Pledged Revenues" under the Trust Agreement. Under the heading

"SECURITY FOR THE BONDS" they provide the Bonds "are payable *solely* from, and secured

by a pledge of, the revenues and other moneys deposited in the [Sinking Fund] established under

the Trust Agreement (the 'Pledged Revenues')." Offering Statements at 9. The "Pledged

Revenues," in turn, are defined as:

21

(i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

*Id.* (emphasis added). Movants, therefore, certainly knew PRIFA's pledge was limited to monies actually received by PRIFA and actually deposited into the Sinking Fund. Arguments to the contrary defy reality.

41. Retained Rum Tax Remittances are "available resources"[25] of the Commonwealth. As noted in the Offering Statements, "*Prior to* their application to pay principal of and interest on the Bonds, the Special Tax Revenues *are available revenues* under the Constitution." 2005 Offering Statement at 10; 2006 Offering Statement at 10 (emphasis added).

**D.** *As the Financial Crisis Hit, the Commonwealth Exercised its Retention Powers, and the Oversight Board Exercised Its Authority Under PROMESA Over the Rum Tax Remittances.*

42. In 2015, the then-Governor exercised the Commonwealth's Retention Powers by issuing emergency orders that required "the Secretary of the Treasury … to withhold the revenue allocation to [PRIFA]," and authorized the use of Commonwealth funds to "safeguard" the public welfare and, to the extent any funds remain available, pay down public debt. Administrative Bulletin OE-2015-046; Administrative Bulletin OE-2015-49.

43. In 2016, the Commonwealth declared a state of emergency and prioritized the

---

[25] The official English version of the Puerto Rico Constitution uses the term "available revenues," not "available resources," which is used in other translations. Solely for purposes of this Opposition, and without waiver of or prejudice to any argument regarding which version of the Puerto Rico Constitution controls, we use the term "available resources" in accordance with the use of that term in Adversary Proceeding Nos. 19-291, 19-292, 19- 293, 19-294, 19-295, 19-296, and 19-297.

provision of essential services for the health, safety and welfare of the residents of the Commonwealth over debt service. To that end, the then-Governor ordered the retention of certain revenues from, among other entities, PRIFA. *See* OE-2016-18 at 5; *see also* EO-2016-30 at 2-3; *see also* EO-2016-31 at 2-3.

44.     On June 30, 2016, PROMESA became effective. Section 405 provides, among other things, there is a fiscal emergency in Puerto Rico and the Commonwealth is unable to provide its citizens with effective services. PROMESA § 405(m).

45.     PROMESA section 201 gives the Oversight Board the exclusive power to develop and certify fiscal plans for the Commonwealth and its instrumentalities. PROMESA §201. PROMESA section 202 gives the Oversight Board the exclusive power to certify budgets for the Commonwealth and its instrumentalities over all appropriations, which are deemed "in full force and effect" once certified. PROMESA §202(e)(3)(C). PROMESA "prevail[s] over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this chapter." PROMESA § 4. Thus, appropriations under pre-PROMESA statutes are preempted. Additionally, only the Oversight Board may propose a plan of adjustment of the debts of the Commonwealth. PROMESA § 312.

46.     Between March 13, 2017 and May 9, 2019, the Oversight Board certified eight fiscal plans for the Commonwealth. None provided for any appropriations or transfers of Retained Rum Tax Remittances to PRIFA.

47.     On September 27, 2019, the Oversight Board filed a proposed plan of adjustment. [ECF No. 8765]. The proposed plan would pay certain claims based on the Commonwealth's general obligation bonds at a level less than the full amount of their claims, even after taking into account the retention of the Retained Rum Tax Remittances.

23

48.     The Commonwealth has not appropriated or transferred any of the Retained Rum Tax Remittances to PRIFA since November 30, 2015; none have been deposited into the Sinking Fund; and none are subject to any bondholder lien.  To the extent Movants have claims against the Commonwealth arising out of moratorium or similar orders predating the Commonwealth Title III case, those claims are simply prepetition claims to be restructured in a plan of adjustment.

## PROCEDURAL HISTORY

49.     Ambac seeks to proceed "immediately" with two lawsuits.  The first is the "U.S. Treasury" action it filed against the U.S. Treasury in the United States District Court for the District of D.C., in which Ambac seeks to grab Rum Tax Remittances before they are deposited with the Commonwealth.  *Ambac Assurance Corp. v. U.S. Dep't of Treasury et al.*, 17-cv-00809 (D.D.C.). Before any responsive pleading was filed in the U.S. Treasury Action, it was stayed in May 2017 once the Commonwealth filed its Title III case.   Ambac's second action, the "PRIFA Clawback Action" was filed against the Commonwealth in the District of Puerto Rico in an attempt to grab the Rum Tax Remittances from the Commonwealth's Treasury.  *Ambac Assurance Corp. v. Commonwealth of Puerto Rico et al.*, 17-cv-01568 (D.P.R.).  That too was ruled stayed by the automatic stay in May 2017, and Ambac did not appeal the stay in both actions.

50.     Two years after its litigations were stayed, Ambac filed, on May 30, 2019, its PRIFA Lift Stay Motion [ECF No. 7176], seeking an order that the stay did not apply to Ambac's litigations, that the stay should be lifted if it did apply, and that it is entitled to adequate protection. FGIC joined the motion, as did Assured.  [ECF Nos. 7546, 8024].

51.     Following the filing of the Lift Stay Motion, the Court set a hearing for "oral argument on the legal issues of standing and secured status only," and limited "factual submissions … to legal documents."  [ECF No. 7420].  Any discovery, if needed, would await determination

of the threshold legal issues of standing and secured status.

52.     By July 19, 2019, the PRIFA Lift Stay Motion was fully briefed through the Commonwealth's sur-reply [ECF No. 8164], and oppositions filed by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") [ECF No. 7896].  Oral argument was set for July 24, 2019.

53.     On July 24, 2019, based upon the Court's pronouncement regarding its mediation stay order, Movants requested, and the Oversight Board consented, to the PRIFA Lift Stay Motion being stayed pending a period of mandatory mediation. [ECF Nos. 8244, 9016]. After the Mediation Team Leader filed an interim report, the Court set a schedule for the PRIFA Lift Stay Motion, allowing Movants to seek leave to amend their lift stay motion.  Movants filed the motion to amend on January 16, 2020.  The Oversight Board opposed the motion on January 22, 2020 [ECF No. 10274], and the Court granted the motion on January 31, 2020 [ECF No. 10591].

54.     Pursuant to the Amended Case Management Order, briefing is to be limited to "the issues of standing and secured status" and the Court will hold a preliminary hearing pursuant to 11 U.S.C. § 362(e)(1) on March 5, 2020 at 9:30 a.m. (AST) on the same issues.  [ECF No. 10595 at 4-5].

## LEGAL STANDARDS

### I.     THE STAY PROVIDES FUNDAMENTAL PROTECTIONS, AND LIFTING IT IS AN EXTRAORDINARY REMEDY.

55.     By preventing piecemeal adjudication of rights in the debtor's property, "[t]he automatic stay is among the most basic of debtor protections under bankruptcy law."[26] For this

---

[26] *Soares v. Brockton Credit Union (In re Soares)*, 107 F. 3d 969, 975 (1st Cir. 1997) (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503 (1986)); *see also, e.g.*, *Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311, 313 (1st Cir. 1988); *Municipality of San Juan v. Commonwealth of P.R.*, 919 F 3d. 565, 577 (1st Cir.

25

reason, the stay "is extremely broad in scope" and "applies to almost any type of formal or informal action taken against the debtor or the property of the estate. It is all the more so "in the PROMESA and municipal bankruptcy contexts…." *Gracia-Gracia*, 939 F.3d at 349.

56. Movants seek relief from the stay under both 11 U.S.C. § 362(d)(1), allowing relief "for cause," and under 11 U.S.C. § 362(d)(2), allowing relief from the stay if "the debtor does not have an equity in such property." Under both sections, Movants carry the burden to show among other things, that they have a valid security interest in the property.[27] Notably, Movants' claims against the Commonwealth have been objected to and, as such, they do not enjoy the presumption that their claim is allowed. *See* 11 U.S.C. § 502(a).

## II. THE "COLORABLE CLAIM" STANDARD DOES NOT APPLY.

57. Movants attempt to portray their burden as "not demanding." M.Br. at 17. To the contrary, the stay is such a fundamental protection that lifting it is an "extraordinary remedy." *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997). This is especially so when Movants' secured or ownership claims against Commonwealth assets do not arise out of contractual pledges, but are instead lawyers' creative imaginings. Doing so deprives debtors of "the time, opportunity, and] ability to confirm a plan." *In re Jefferson Cnty.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013). Thus, the stay should not be lifted if it would cause "interference with the orderly liquidation or rehabilitation of the debtor" and "detriment [to] other creditors." *Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982); *Tringali*

---

2019) (citing *Smith v. Me. Bureau of Revenue Servs. (In re Smith)*, 910 F.3d 576, 580 (1st Cir. 2018) ("the automatic stay [ ] is meant to offer the debtor 'breathing room during the period of financial reshuffling' and 'protect[ ] the debtor's assets from disorderly, piecemeal dismemberment outside the bankruptcy proceedings.'")).

[27] *See Gracia-Gracia*, 939 F.3d at 347; *supra* note 8.

*v. Hathaway Mach. Co.*, 796 F.2d 553, 562 (1st Cir. 1986). The opinions Movants cite do not diminish the burden they must carry to demonstrate they have valid and perfected liens for the court to lift the stay, a factor courts across the country consider before granting such relief. [28]

58.     Movant's seize on the word "colorable", analogizing their burden to a motion to dismiss standard under *Twombly*. M.Br. at 17. But the standard is a "preliminary injunction" standard, and Movants must show "a reasonable likelihood" of success. *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33 (1st Cir. 1994). Contrary to Movants' position, the First Circuit has made clear the Court must determine the existence and scope of any security interests before granting a lift stay motion predicated on movants' purported lien rights. [29]

59.     Indeed, particularly where a claimant faces party-in-interest standing issues, as Movants do here, the colorable claim standard has no application. *In re Veal*, 450 B.R. 897, 917–

---

[28] *See In re Cabrillo,* 101 B.R. 443, 450–51 (Bankr. E.D. Pa. 1989) (denying relief under 11 U.S.C. § 362(d)(2) because the creditor failed to prove that it held a valid security interest in the collateral); *In re Playa Dev. Corp.,* 68 B.R. 549, 553 (Bankr. W.D. Tex. 1986) ("In considering a motion for relief from the stay [brought pursuant to section 362(d)(2)], it is necessary to observe that the moving party has the burden of establishing the validity and perfection of its security interest...."); *In re Dahlquist,* 34 B.R. 476, 481 (Bankr. D.S.D. 1983) ("[A] creditor must establish the validity and perfection of its security interest ... and must carry the ultimate burden of proof with respect to equity [when bringing a motion to lift the stay pursuant to section 362(d)(2)]."); *United Cos. Fin. Corp. v. Brantley,* 6 B.R. 178, 184 (Bankr. N.D. Fla. 1980) (explaining that a creditor must "establish the validity and perfection of its security interest ... and ... must carry the ultimate burden of proof with respect to equity"); *In re Irving A. Horns Farms Inc.*, 42 B.R. 832, 836 (Bankr. N.D. Iowa 1984) ("In any litigation regarding a Motion to Lift the Automatic Stay the moving creditor must establish the validity and perfection of its security interests"); *see also Grant, Konvalinka & Harrison, P.C. v. Still (In re McKenzie)*, 737 F.3d 1034, 1039–40 (6th Cir. 2013) ("requiring a creditor to establish the validity of its security interest makes sense as a matter of sound judicial policy because the creditor will likely be in the best position to show that its interest is valid. . . . The bankruptcy court therefore properly required GKH to establish the validity of its security interest in the pledged collateral [when bringing a lift stay motion brought pursuant to Section 362(d)(2)].") (internal citations omitted); *Omega Envt'l. Inc. v. Valley Bank NA (In re Omega Envtl., Inc.)*, 219 F.3d 984, 986 n.1 (9th Cir. 2000) (per curiam) ("A creditor holding an unperfected security interest is not entitled to relief from an automatic stay imposed under Bankruptcy Code § 362."); *First Nat'l Bank v. Turley*, 705 F.2d 1024, 1027 (8th Cir. 1983) (same).

[29] *See, e.g., Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 899 F.3d 1, 13 (1st Cir. 2018) (Court's decision on future lift stay must include "the Title III court's view as to the precise nature and extent of [HTA Bondholder's] collateral"); *see also Gracia-Gracia*, 939 F.3d at 352-53 (remanding lift stay motion to Court to "make at least a preliminary determination of the parties' respective property interests in the segregated funds.").

18 (B.A.P. 9th Cir. 2011) ("the colorable claim standard … does not free [Movants] from the burden of establishing [their] status as a real party in interest").

60.     Where, as here, claim objections or other defenses are asserted that "strike at the heart of the … creditor's claim or the validity of his lien," those objections and defenses "directly affect the issue of equity and thus the issues of harm and adequate protection" and should be "give[n] consideration … in determining whether or not the stay should remain in effect." *Drake v. Franklin Equip. Co.* (*In re Franklin Equipment Co.*), 416 B.R. 483, 505 (Bankr. E.D. Va. 2009) (quoting *United Companies Fin. Corp. v.* Brantley, 6 B.R. 178 (Bankr. N.D. Fla. 1980)); *see also, e.g.*, *Bargas v. Rice (In re Rice),* 82 B.R. 623, 626 (Bankr.S.D.Ga.1987) (court denied lift stay motion when the evidence supported an inference the lien might be invalid).  For example, *Gracia-Gracia* quotes *Grella,* where the First Circuit made clear that a debtor's defenses should be considered during a stay relief hearing:

> This is not to say that bankruptcy courts can never consider counterclaims and defenses, including preference counterclaims, during a relief from stay hearing.  As several bankruptcy courts have discussed, there is a significant difference between mere consideration of claims and final adjudication on the merits.  **Certainly, a court may take into account any matter that bears directly on the debtor's equity, or that clearly refutes a creditor's claim to the property.  For example, if a trustee raises a defense to a creditor's claim at the relief from stay hearing, the court need not ignore this defense, but may consider it when deciding whether to lift the stay**.

*Grella*, 42 F.3d at 34 (emphasis added) (internal citations omitted).

61.     Notably, none of the cases cited by Movants involved situations where the debtor that opposed stay relief had a credible challenge to the validity of the security interest.[30]  Indeed,

---

[30] *In Vitreous Steel Products Co.*, 911 F.2d 1233 (7th Cir. 1990), relied upon by the Court in *Grella*, the Seventh Circuit noted how the record demonstrated the creditor held a perfected security interest in the collateral at issue. It was the preference and fraudulent transfer actions to eliminate the lien that the appellate court ruled was not part of the stay relief matter. *See id.* at 1234. Moreover, the bankruptcy trustee was not challenging the lien in *Vitreous Steel*. In fact,

application of a colorable claim standard defies common sense. Here, for example, the Commonwealth has far more than a colorable claim that Movants are wrong in their property interest arguments. That being the case, there is no way for the Court to make a determination without making findings about which party is likely to prevail (as a court would in the context of a preliminary injunction motion).

## ARGUMENT

**I.    *NONE OF THE GOVERNING LEGAL DOCUMENTS PROVIDE MOVANTS AN INTEREST IN THE RUM TAX REMITTANCES.***

**A.    *The Enabling Act is an Appropriation Statute, Nothing More; It Does Not Pass Title or Turn the Commonwealth Into a "Mere Conduit."***

62.    In their attempt to reach Rum Tax Remittances deposited in the TSA, Movants argue section 1914 of the Enabling Act morphs the Commonwealth into a "mere conduit" by requiring transfer of the Rum Tax Remittances to PRIFA "immediate[ly]" upon receipt. M.Br. at 7. The first step, however in determining what rights, if any, Movants have with respect to the Rum Tax Remittances is to determine PRIFA's own rights with respect to the Rum Tax Remittances. The plain language of the Enabling Act clearly and unequivocally does not grant PRIFA a property right in Rum Tax Remittances prior to their transfer. PRIFA, therefore, could

---

"[t]he bankruptcy court found that the evidence was undisputed that the Bank held a lien on all the realty and personalty" and the only issue properly before the court on the motion to lift the automatic stay was whether *Vitreous* had any equity in the real estate. *Id.* at 1229. *Mission Prod. Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC)*, 602 B.R. 798 (B.A.P. 1st Cir. 2019) does not lead to a different conclusion. While repeating language found in *Vitreous* that a hearing on lift stay motion is limited in scope, the court recognized that "the bankruptcy court is not precluded from considering defenses to a creditor's claim to property of the estate[.]" *Id.* at 826. *See also Jin Qing Li v. Rosen (In re Jin Qing Li)*, No. 3:12-BK-33630, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) ("Motions for relief from stay are 'summary proceedings' suitable only to ascertain whether the application of the automatic stay should be modified. As such, bankruptcy courts have the discretion to "consider" the defective nature of the creditor's interests within a motion for relief from stay") (internal citations omitted). In sum, courts have always recognized that defenses to alleged property interests can be considered by the bankruptcy court when determining if to lift the automatic stay.

not pledge under the Trust Agreement a property interest it does not have.

63.     The United States Treasury deposits the Rum Taxes into the Puerto Rican Treasury with no restrictions.  *See* 26 U.S.C. § 7652.  As with all Commonwealth property, the Commonwealth is free to appropriate its funds as it sees fit and to change its mind every minute if it chooses to do so.  In 1988, the Commonwealth authorized appropriation of certain portions of the Rum Tax Remittances – currently up to the first $117 million in each Fiscal Year – to PRIFA.  3 L.P.R.A. § 1914.    Any appropriation is, at all times, subject to its Retention Powers.  *Id.* Importantly, PRIFA's Enabling Act does not pledge any money to Bondholders or grant them any security interest whatsoever—it merely authorizes PRIFA to make certain pledges through a trust agreement.[31]  As such, it cannot afford Movants a statutory lien (as Movants have argued in the past).[32]

64.     Nor does the Enabling Act pass title or ownership of the Rum Tax Remittances to PRIFA.  It merely authorizes appropriations to PRIFA and sets a yearly ceiling for them.  *See* 3 L.P.R.A. § 1914.  It expressly refers to any of the "first proceeds….up to $117 million" as "amounts herein *appropriated*."  *Id.* (emphasis added).  Accordingly, there can be no question that 3 L.P.R.A. § 1914 is, at most, an appropriation statute.

---

[31] *See* 3 L.P.R.A. § 1907.

[32] Movants do not appear to argue the Enabling Act provides them with a statutory lien, instead arguing that, together with the Trust Agreement, they have a consensual lien. M.Br. at 33.  To the extent their convoluted arguments could be interpreted as arguing for a statutory lien, such arguments fail.  A statutory lien is a lien that "aris[es] solely by force of a statute on specified circumstances or conditions."  *Peaje Investments LLC v. The Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 1, 11 (1st Cir. 2018) (emphasis in original).  No statutory lien exists where the applicable statutory "provisions permit the Authority to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so."  *Id.*  "If the creation of the lien is dependent upon an agreement, it is a security interest even though there is a statute which may govern many aspects of the lien."  *Id.* at 10 (quoting 2 COLLIER ON BANKRUPTCY ¶ 101.53).  The Enabling Act permits, but does not require, PRIFA to issue any bonds or pledge any of its property to secure the bonds.

65.     Movants seize on the words "shall be covered into" to argue the first $117 million of Rum Tax Remittances in each Fiscal Year are never Commonwealth property but immediately belong to PRIFA.  M.Br. at 20.  Such a reading is wholly unrealistic.  First, Movants assume without basis that the length of time the Commonwealth holds the property impacts whether the Commonwealth owns it.  Second, Movants ignore the full picture, whereby the Commonwealth's transfer of the monies is subject to its Retention Powers, thereby showing the monies are considered available revenues of the Commonwealth.  Movants commit the cardinal error of reading the statute in pieces rather than as a whole (which, standing alone, would still not support their argument).[33]  The phrase "shall be covered into" merely identifies where any Rum Tax Remittances appropriated to PRIFA are to be deposited.  They go to the PRIFA Infrastructure Fund for PRIFA's general "corporate purposes."  3 L.P.R.A. § 1914.  The words do not confer any property interest or pass title as they simply mean "deposited into."[34]  Indeed, the Spanish version of the Enabling Act uses the verb "ingresar" or the noun "los ingresos," which respectively translate as "to deposit" or "deposits."

66.     The words "when received" in 3 L.P.R.A. § 1914 also do not render the

---

[33] *See, e.g.*, *Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003) (applying "the venerable rule" that "statutes should be interpreted, whenever possible, to give every word and phrase some operative effect"); *see also, e.g.*, *Peralta v. Gonzales*, 441 F.3d 23, 31 (1st Cir. 2006) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."); *United States v. Nason*, 269 F.3d 10, 16 (1st Cir. 2001) (applying the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

[34] *See P.R. v. Blumenthal*, 642 F.2d 622, 623 n.1 (D.C. Cir. 1980) ("The phrase 'covered into' means, literally, 'deposited into.' In practical terms, the provision requires the United States to rebate to the Puerto Rican treasury the same amount of funds as it collected through taxation of Puerto Rican articles [under section 7652(a)(3)].")  The definition of "covered into" being the same as "deposited into" is consistent with the Jones Act (enacted in 1917), and consistent with the prior usage of the relevant laws dealing with Puerto Rico, see H.R. REP. No. 64-77 (1916) (using "covered into" and "pay into" somewhat interchangeably).  Similarly, in a recent Congressional report dealing with the excise tax, the Conference Committee (for the recent tax reform bill) stated that "[a]mounts covered over to Puerto Rico and the U.S. Virgin Islands [which have a cover over provision for excise tax on rum that mirrors that of Puerto Rico] are deposited into the treasuries of the two possessions for use as those possessions determine." (H.R. REP. No. 115-466 (2017).

31

Commonwealth a mere conduit. "When received" does not mandate immediate transfer, as Movants argue, or transfer of any particular amount. It just means the Commonwealth is *not* obligated to send any appropriated funds to PRIFA *before* the Rum Taxes Remittances are received. Any appropriations to PRIFA must be Rum Tax Remittances actually received and sitting in the TSA.

67.     Movants also assert that somehow the use of the word "participation" in 3 L.P.R.A. § 1914 confers ownership of the Rum Tax Remittances to PRIFA. M.Br. at 25. Movants are wrong. They cite 15 L.P.R.A. § 75 and 13 L.P.R.A. § 10042(i)(3), but both concern shares of equity in corporations and/or partnerships, and have no relevance to Rum Tax Remittances or a similar construct to 3 L.P.R.A. § 1914. Movants also cite *Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 51 (1st Cir. 1996), but that case relates to a loan participation agreement (not a statute) under Massachusetts law—something far removed from Rum Tax Remittances—and does not make any statement equating participation with ownership. As a general matter, loan participations do not amount to assignments of ownership.[35] In actuality, the Spanish version of the Enabling Act controls. There, the word "participación" in this context translates to "portion" or "share." This interpretation makes sense because under the Enabling Act, the General Fund only receives a *portion* (e.g. $117 million) of all Rum Taxes (*e.g.*, ~ $430 million) remitted to the Commonwealth Treasury and placed in a lockbox account.[36]

---

[35] *See, e.g., Ross v. Thousand Adventures*, 675 N.W.2d 812, 817 (Iowa 2004) ("the participation agreement in this case, like loan participation agreements, is not an assignment"); *Yashouafar v. Elkwood Assocs., LLC*, No. 17-ap-01404-MT, 2019 Bankr. LEXIS 255, at *21 (Bankr. C.D. Cal. Jan. 25, 2019) (noting distinction between an assignment and a participation agreement).

[36] In addition, the Spanish text of the Enabling Act makes it clear that the word "participation" cannot be a noun characterizing PRIFA's purported "ownership" interest, but is one word in a phrase regarding the portion of Rum Tax Remittances the Commonwealth may allocate to PRIFA. In the Spanish text, the phrase "which shall be deposited" unquestionably refers to the tax remittances being deposited, not the "participation," because the text uses

68.     While Movants' cite *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007) and related cases, including the recent First Circuit decision in *Gracia-Gracia*,[37] for the proposition the Commonwealth is a "mere conduit," they are entirely inapposite. *Flores Galarza* and its progeny involved statutes mandating—without exception—that the Department of the Treasury either turn over insurance premiums to the insurers providing motorists auto insurance under the public program, or reimburse insured motorists that had been required to pay duplicate premiums to the government. In both situations, the government was holding either premiums intended for the insurers or duplicate premiums to be returned to motorists who had private insurance. Moreover, as noted by the First Circuit, these statutes made clear (i) that "[t]he Secretary of the Treasury shall retain these funds as *trustee*," *García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009) (quoting 26 L.P.R.A. § 8055(l)), and (ii) that the Treasury's collection of the funds constituted a "collection service performed in favor of the" plaintiffs. *Flores Galarza*, 484 F.3d at 29 (quoting 26 L.P.R.A. § 8055(c)). Thus, the applicable statute made the Secretary of the Treasury "merely the custodian of these funds" with "no entitlement" to them. *Id.*

69.     The statute governing the premium reimbursements in *Flores Galarza* is clearly distinguishable from the statutes at issue here. Here, the Commonwealth receives the Rum Taxes from the federal government with no strings attached, and deposits them into a treasury lockbox

---

the masculine plural form of the word "which." The Spanish refutes, rather than supports, Movants' position. *See* 31 L.P.R.A. § 13 (providing that to the extent a discrepancy exists between the English translation and original Spanish version of a statute, the Spanish text shall be preferred).

[37] *See also García-Rubiera v. Calderón*, 570 F.3d 443, 452 (1st Cir. 2009); *Garcia-Rubiera v. Fortuño*, 665 F.3d 261, 263 (1st Cir. 2011); *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight Mgmt. Bd. for P.R.)*, 939 F.3d 340, 345 (1st Cir. 2019). *See* M.Br. 20-21.

account, which then transfers a certain portion of them to the TSA.  The Commonwealth then specifies that it may appropriate—subject to certain conditions—those funds to PRIFA (and not Movants) for PRIFA's "corporate purposes."  3 L.P.R.A. § 1914.  In addition, no "trustee" or "fiduciary" language exists and the Commonwealth always reserved the right to retain those funds and use them for the Commonwealth's purposes.  *Id*.  This eliminates the argument the Commonwealth is a "mere custodian" of funds—it has authority to retain and use the funds as it sees fit.  Moreover, the funds are not required to be transferred to PRIFA bondholders, but to PRIFA for its "corporate purposes"—nothing even begins to support an argument that the funds are held for the Bondholders' benefits.  In addition, the Offering Statements never mention the existence of a trust relationship— a feature that would have been disclosed had it existed.

70.    Accordingly, the plain language of the 3 L.P.R.A § 1914 demonstrates it is a statute requiring an appropriation.  Indeed, if appropriation statutes transfer the amount appropriated, then upon passage of a budget effective July 1, all the Commonwealth's money for the year would be transferred and gone.  That easily qualifies as an absurd interpretation.  Thus, no provision of the Enabling Act transfers any title or ownership interest in the Rum Taxes Remittances to PRIFA or its Bondholders.

**B.  *The Appropriations to PRIFA in the Enabling Act Are Preempted by PROMESA.***

71.    To show entitlement to any of their requested relief, Movants must be able to demonstrate a property interest in the Retained Rum Tax Remittances—that is, they must demonstrate a property interest in the monies before they ever leave the Commonwealth and hit the Sinking Fund.  As explained, the Enabling Act does not provide any such interest.  But even if there were a Commonwealth statute that required transfer of monies to PRIFA and granted Movants a security interest beyond that in the Trust Agreement, such statute  would be preempted

by PROMESA.

72.     The Oversight Board argued preemption in its prior opposition [ECF No. 7827 at 47], but if there was any doubt as to preemption then, the First Circuit has definitively removed it. In December, the First Circuit held: "[I]f a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), ***there can be no spending*** from sources not listed in that budget**, *regardless of what any territorial laws say*.**" *Vázquez-Garced*, 945 F.3d at 8, *aff'g Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("a budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law … and inconsistent Commonwealth laws are preempted").[38]

73.     It is worth quoting, as the First Circuit did, this Court's "cogent explanation:"

> It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year. Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget. ***A prior year authorization for spending that is not covered by the budget is inconsistent with PROMESA's declaration that the Oversight Board-certified budget for the fiscal year is in full force and effect, and is therefore preempted by that statutory provision by force of Section 4 of PROMESA.*** Accordingly, the Fiscal Plan language regarding suspension of authority to approve off-budget reprogramming may well be superfluous, and in any event merely has the same effect as PROMESA's explicit provisions.

*Vázquez-Garced*, 945 F.3d at 8 (quoting *Rosselló Nevares*, 330 F. Supp. 3d 685, 704) (emphasis in original).

74.     This is just the latest in a series of decisions upholding the Oversight Board's

---

[38] Preemption does not effect a "taking" as Movants claim. M.Br. at 39-40.  There can only be a taking if it is Movants' property.  It is not – the Enabling Act is just a conditional appropriation to PRIFA and has nothing to do with Movants' property. Even if there were a "taking" claim, such claim would be owned by *PRIFA*, not Movants.

position on preemption. The First Circuit previously held, "[u]nder PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over *any* general or specific provisions of territory law' … that are 'inconsistent….'" *Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019) (emphasis added) (citation omitted). Similarly, this Court held in 2018 that "Congress' determination, in PROMESA, to empower the Oversight Board to accept, reject, develop and certify budgets, and to render certified budgets effective by operation of law, prevails over the general allocation of budgetary power to Puerto Rico's legislature." *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 365, 372 (D.P.R. 2018).

75. Any Commonwealth statute purporting to allocate funds to PRIFA or its Bondholders runs headlong into, and is thus preempted by, two core aspects of PROMESA. *First*, it is preempted by PROMESA Title II, because it purports to appropriate Commonwealth money outside the certified fiscal plan and budget, thus conflicting with the Oversight Board's exclusive appropriation powers. *See* PROMESA §§ 201, 202. *Second*, it is inconsistent with PROMESA Title III because it purports to distribute funds outside a Title III plan. PROMESA Title III recognizes no priority claims other than administrative claims provided by Bankruptcy Code section 507(a)(2). *See* PROMESA § 301(a). Movants would have the Court treat their claim like a nondischargeable, specifically enforceable claim to the Rum Tax Remittances.

76. The Oversight Board must determine whether Commonwealth revenues, including Rum Tax Remittances, should go to PRIFA or teachers or police or some other public need or expense. The Enabling Act is a forward-looking budgetary appropriation in conflict with the Oversight Board's powers under PROMESA sections 201 and 202 to certify fiscal plans and

36

provide for all budgetary allocations.  It appropriates a certain amount of the Rum Tax Remittances

from the Treasury to PRIFA for each fiscal year up to 2056-57.  Neither the currently certified

Commonwealth fiscal plan nor the current Commonwealth budget provide for payment of the

claimed revenues to PRIFA.

77.     Fiscal plans for the Commonwealth and Commonwealth budgets from April 2017

through 2019 certified by the Oversight Board all require continued retention of certain

Commonwealth revenues previously allocated to various instrumentalities (the "Allocable

Revenues"), including the Rum Tax Remittances.  For instance, the May 9, 2019 Fiscal Plan

requires the Commonwealth to retain Allocable Revenues to meet cash flow projections and fund

required expenditures.  *2019 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity* (May

9, 2019) at 27, 148.

78.     If the Enabling Act's appropriation of money to PRIFA remains enforceable, then

the Oversight Board's exclusive power to appropriate Commonwealth monies is meaningless.  It

would completely frustrate Congress's intent that the Oversight Board allocate funds, balance the

budget and "achieve fiscal responsibility and access to the capital markets".  PROMESA § 101(a).

Accordingly, the Enabling Act and any Puerto Rico law providing for such transfer is preempted.

If, as Movants would have it, a prior statutory appropriation of money to PRIFA is

nondischargeable, specifically enforceable, and immune to the Oversight Board's Title II and Title

III powers, then creditors of Commonwealth instrumentalities like PRIFA are given priority over

direct creditors of the Commonwealth.[39]  This clearly is not the result Congress intended in passing

---

[39] The caselaw on preemption is extensive and incontestable.  *See, e.g.*, *Perez v. Campbell*,  402 U.S. 637, 654 (1971)
(state law providing bankrupt had to pay an automobile tort claim was preempted because it had the "effect of
frustrating federal [bankruptcy] law"); *Ohio v. Kovacs*, 469 U.S. 274, 285-86 (1985) (O'Connor, concurring) (although
the nature of a creditor's claim is determined under state law, the Code establishes the priorities of claims); *Int'l Shoe*

PROMESA and explicitly providing it "prevail[s] over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." PROMESA § 4.

79.     Movants' position that any appropriation in the Enabling Act is an immutable forever promise is nonsensical for the additional reason that any Commonwealth Legislature since 3 L.P.R.A. § 1914 was enacted in 1988 was, and will continue to be, fully empowered to repeal or amend the statute.[40]  There is no such thing as unrepealable legislation.  *See Fletcher v. Peck*, 6 Cranch 87, 10 U.S. 87, 135 (1810) (Marshall, J.) ("[O]ne legislature cannot abridge the powers of a succeeding legislature….The correctness of this principle, so far as respects general legislation, can never be controverted.").    As the First Circuit recently made clear in the ERS context, "legislative appropriations are the method by which the Commonwealth allocates the Employers' Contributions to the System.  Although required by section 2-116(g), this directive could be disregarded by a subsequent legislature (to the Bondholders' detriment)." *See Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 2020 U.S. App. LEXIS 2954, at *17-18, Case No. 19-1699 (1st Cir. Jan. 30, 2020) (citing *Fletcher v. Peck,* at 135).

---

*Co. v. Pinkus*, 278 U.S. 261, 266-67 (1929) ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations…."); *In re City of Detroit*, 504 B.R. 97, 161 (Bankr. E.D. Mich. 2013) ("[S]tate law cannot reorder the distributional priorities of the bankruptcy code."); *In re Chambers*, 500 B.R. 221, 229 (Bankr. N.D. Ga. 2013); *In re Kitty Hawk, Inc.*, 255 B.R. 428, 439 (Bankr. N.D. Tex. 2000) ("Where a state statute would alter the priority of claims in a bankruptcy case, the state statute is pre-empted by the Code."); *In re Lull Corp.*, 162 B.R. 234, 240 (Bankr. D. Minn. 1993) ("A state statute cannot reset bankruptcy priorities."); *In re Webster*, 126 B.R. 4, 5-6 (Bankr. D. Me. 1991) ("Congress may, and has, determined the extent of the [claim's] wage priority. Having done so, its determination is exclusive, notwithstanding the content of state enactments with which it may collide.").

[40] The federal excise tax law, for example, has been frequently amended.  *E.g.*, Revenue Act of 1951, Pub. L. No. 82-183, 65 Stat. 452 (1951); Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (1984); Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993); Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106-170, 113 Stat. 1912 (1999).

80.    Thus, the Enabling Act either does not require any Rum Tax Remittances be deposited with PRIFA, or any such requirement is preempted.  This torpedoes Movants' case.

### C. The Commonwealth's Retention Powers Confirm Movants' Lack of Property Interest in the Rum Tax Remittances.

81.    Even when appropriated, Rum Tax Remittances remain subject to the Commonwealth's Retention Powers, which treat all monies in the TSA, including Rum Tax Remittances, as "available revenues" for the Commonwealth's use. 3 L.P.R.A. § 1914 (any appropriations "subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico").[41]  PRIFA has no authority to override the Retention Powers.  3 L.P.R.A. § 1907(a) (subjecting any pledge of Rum Tax Remittances "to the provisions of §  8 of Article VI of the Constitution of the Commonwealth of Puerto Rico"); *see also* 3 L.P.R.A. § 1906(m) (same).

82.    As "available revenues," the Commonwealth has equity in the Rum Tax Remittances.  They remain subject to the Commonwealth's continuing property interests even if appropriated to PRIFA in a given year.   This property interest is *superior* to the PRIFA Bondholders' interest because, when invoked, it entitles the Commonwealth to use the monies to pay the public debt before they may be applied to payment of the bonds.  *See* 3 L.P.R.A. § 1914. The Commonwealth is thus far from the "mere conduit" Movants claim.  If the Commonwealth were only a conduit, there would be no need for it to provide for appropriations of Rum Taxes

---

[41] Section 8 of Article VI provides that "[i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. Art. VI, § 8.  In this context, it allows the Commonwealth to retain the Rum Tax Remittances if other "available revenues" "are insufficient to meet the [Commonwealth's] appropriations" in any fiscal year.

each year.  Indeed, it would have no power over the Rum Tax Remittances whatsoever.  That is clearly untrue.

83.     While the foregoing facts establish the Commonwealth's ongoing ownership interest in the Rum Taxes, so does the absence of facts negating it.  Where the Commonwealth intended to transfer ownership of funds, it deployed language to accomplish it.  When it created COFINA, Puerto Rico enacted statutes providing the sales and use taxes transferred to COFINA would not be "available resources" of the Commonwealth.[42]  Puerto Rico did not do that for the Rum Tax Remittances.  It did the opposite.  When it created COFINA, it did not provide the sales and use taxes would be subject to clawback pursuant to the Puerto Rico Constitution.  And even with this clear language, there were still doubts as to whether the Commonwealth transferred its property rights under the applicable statutes.  The PRIFA Enabling Act has none of this language.

84.     Movants' only response is that the Retention Powers have not been triggered because the Commonwealth has had sufficient "available resources" to meet appropriations in a particular fiscal year's budget.  Yet again Movants miss the mark.  Whether clawback has been triggered is immaterial.  The material fact is that the monies are subject to clawback as available revenues of the Commonwealth.  Besides, the reason Congress stepped in and enacted PROMESA was because the Commonwealth was in a fiscal emergency and the "available revenues" of the Commonwealth were insufficient to cover the Commonwealth's appropriations.  Were available

_____

[42] 13 L.P.R.A. § 12 states a portion of the sales and use tax collected "shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico…" 13 L.P.R.A. § 12.  Section 12 further emphasizes the Dedicated Sales Tax Fund, all the funds deposited therein on the effective date of the Enabling Act, and all future funds that must be deposited therein, "are hereby transferred to, and shall be the property of COFINA."  *Id.*

40

resources sufficient, the Commonwealth would not have needed to institute a Title III case to adjust

its debt. And, indeed, the Commonwealth Plan does not provide for full payment of the GO debt.

85.     Finally, Movants argue even if the Retention Powers were triggered, the

Commonwealth is not using them to pay the public debt. M.Br. at 42. Movants' arguments assume

a pre-Title III world where the Commonwealth must pay its debts on a current basis. Simply

because the Retained Rum Tax Remittances are not being applied to the public debt *now* does not

mean they will not be needed to pay off the public debt under a plan (where GOs will not be paid

in full). In all likelihood, all the so-called diverted Allocable Revenues (and more) will be used to

pay the public debt under a plan over time. But, again, this is Movant's frolic and detour. The

key fact is the monies are, at the least, contingently subject to clawback as available revenues of

the Commonwealth.

### D.     *The Trust Agreement Limits Movants' Lien to Monies Deposited in PRIFA's Sinking Fund.*

86.     A security interest cannot be effective against the borrower in a bankruptcy case if

(1) the security interest does not cover the asserted collateral, or (2) the security interest was not

perfected. *See* Bankruptcy Code § 544(a)(1); 19 L.P.R.A. § 2267(a)(2). Here, neither the Enabling

Act nor any statute grants Movants a security interest in the Rum Tax Remittances, and the only

security interest Movants could have perfected is against the Sinking Fund.

87.     While the Enabling Act authorizes PRIFA to issue bonds and pledge PRIFA's

proceeds to payment of the bonds, the Enabling Act does not do so itself. It repeatedly makes

clear any lien or security interest that PRIFA might grant would be "as provided in the trust

agreement." 3 L.P.R.A. §§ 1906, 1907, 1911. Accordingly, while the Enabling Act provides the

outer scope of PRIFA's authority to pledge property, any security interest Movants may have exists

entirely by operation of the Trust Agreement, which sets the metes and bounds of any pledge. This is, of course, subject to the limitation that, PRIFA can only grant a security interest in property interests it owns (and, as shown above, it has no interest in the Retained Rum Tax Remittances).[43]

88.  The Trust Agreement provides that Bondholders' security interest, if any, is confined to Rum Tax Remittances deposited in PRIFA's Sinking Fund. Section 601 of the Trust Agreement – the clause granting a security interest – states: the "principal, interest and premium [on the Bonds], if any, are payable *solely* from the Pledged Revenues…." Trust Agreement § 601 (emphasis added). Pledged Revenues are defined as "…moneys that *have been deposited to the credit of the Sinking Fund*." Trust Agreement § 101 (emphasis added).

89.  Movants' argument that the definition of "Pledged Revenues" actually means *all* Rum Tax Remittances wherever held ignores the actual construction of the Trust Agreement. M.Br. at 8. It pledges "Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund." As written, "deposited to the credit of the Sinking Fund" modifies both "Special Tax Revenues" and "any other moneys," not just the latter.[44] This interpretation is unequivocally confirmed by the Offering Statements.[45] Any doubt as to the proper construction was resolved by the First Circuit, where, in affirming this Court, it observed:

> We start by rejecting the Bondholders' argument, as did the Title III court, that, in the Bond Resolution's definition of Employers' Contributions, the limiting clause "which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113" modifies only the

---

[43]  *See* Uniform Commerical Code ("UCC") § 9-203.

[44]  *See, e.g.*, *In re CRS Steam,* 217 B.R. 365, 373-74 (Bankr. D. Mass. 1998) (construing an antecedent clause to apply to both parts of a phrase because "[t]here are no commas or disjunctives separating the phrases here"); *Demko v. United States*, 44 Fed. Cl. 83, 89-90 (Fed. Cl. 1999) (same); *see also Thomas v. Comm'r of Soc. Sec.*, 294 F.3d 568, 572 (3d Cir. 2002), *rev'd sub nom., Barnhart v. Thomas,* 540 U.S. 20 (2003) ("When a sentence sets out one or more specific items followed by 'any other' and a description, the specific items must fall within the description.").

[45]  As mentioned above (*see* ¶ 38), the Offering Statements explain the extent of the "Pledged Revenues" and emphasize that its components are limited to amounts deposited to the Sinking Fund. It demonstrates that the phrase "deposited to the credit of the Sinking Fund" modifies both "Special Tax Revenues" and "any other moneys."

42

antecedent phrase "any assets in lieu thereof or derived thereunder" and not the other antecedent phrase "the contributions paid from and after the date hereof that are made by the Employers." The Supreme Court has held that "when several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)). That principle applies here, and the limiting clause here is applicable to both antecedent phrases. Such Employers' Contributions, and so the extent of the security interest granted by the Security Agreement, are limited to those contributions payable to the System pursuant to *Sections 2-116*, *3-105*, and *4113 of the Enabling Act*.

*Andalusian Glob.*, 2020 U.S. App. LEXIS 2954, at *14. Such construction is particularly relevant where, as here, the definition of Pledge Revenues uses the words "any other," which Miriam Webster defines as "in addition to the person or thing just mentioned,"[46] and which courts have defined to indicate that the former is a species of the latter.[47]

90.     Perhaps realizing their ill-conceived attempt to invoke the "last antecedent canon" only served to disprove their interpretation of "Pledged Revenues," Movants fall back on playing self-serving definitional games. They ascribe magical properties to the words "deposit" and "to the credit of" to argue that Rum Tax Remittances do not have to actually be *transferred* to PRIFA for their security interest to attach, it is sufficient that they are sitting in the TSA "to the credit of

---

[46] *Any other*, Merriam-Webster Online Dictionary (2019), https://www.merriam-webster.com/dictionary/any%20other (last visited February 2, 2020).

[47] In *Thomas v. Comm'r of Soc. Sec.,* the Third Circuit observed:

> When a sentence sets out one or more specific items followed by "any other" and a description, the specific items must fall within the description. For example, it makes sense to say: "I have not seen a tiger or any other large cat" or "I have not read *Oliver Twist* or any other novel which Charles Dickens wrote." But it would make no sense to say, "I have not seen a tiger or any other bird" or "I have not read *Oliver Twist* or any other novel which Leo Tolstoy wrote."

294 F.3d 568, 572 (3d Cir. 2002), *rev'd sub nom. Barnhart*, 540 U.S. 20 (2003).

While the Supreme Court in *Barnhart* would overturn the Third Circuit's ruling on the basis of the last antecedent canon, the provision at issue contained commas whereas no commas separate "Special Tax Revenues" from "any other monies deposited to the credit of the Sinking Fund" in the definition of Pledged Revenues. The Third Circuit's reasoning in the case thus applies.

43

the [PRIFA] Infrastructure Fund." M.Br. at 9-10. Movants' interpretation of the phrase "to the

credit of" is unfounded and inconsistent with the use of that term elsewhere in the Trust

Agreement.

91.     As a preliminary matter, Movants improperly attempt to graft the phrase "deposit

to the credit of the Puerto Rico Infrastructure Fund" from the Trust Agreement onto the Enabling

Act to expand PRIFA's rights beyond what was granted in the Enabling Act. M.Br. ¶¶ 49–50. The

phrase nowhere appears in any of the relevant sections of the Enabling Act, and Movants cannot

rely on what PRIFA pledged or granted to its bondholders under the Trust Agreement—a contract

between PRIFA and its bondholders—to expand PRIFA's rights against the Commonwealth.

92.     Second, because bank accounts are a debt, the phrase "to the credit of" the depositor

refers to the accounting entry that the bank makes to establish its debt to the depositor.[48] Trust

Agreement section 401 confirms this interpretation: "moneys held *to the credit of* the Sinking Fund

shall be held in trust and disbursed by the Trustee for the purposes set forth below." Trust

Agreement § 401 (emphasis added). The Trustee cannot hold in trust or disburse funds that reside

in an account that lies beyond the Trustee's control. Section 401 provides a waterfall in which

PRIFA is required to "withdraw an amount of such Special Tax Revenues and other moneys to

make the following *deposits* in the following order: (a) *to the credit of* the Bond Service

Account…(b) *to the credit of* the Redemption Account…and (c)…*to the credit of* the Reserve

Account." *Id.* No one could credibly argue that the withdrawals and deposits under this provision

---

[48] Movants claim the phrase "to the credit of" allows their interest to travel up the chain beyond the Sinking Fund. M.Br.
at 23-24. But "to the credit of" merely reflects the fact that bank accounts are a debt. When a person, Jane Smith,
opens a bank account at Chase and deposits money, the bank makes accounting entries to her credit to reflect the bank's
debt to her. The bank does not incur that debt unless and until Jane actually deposits funds into the account. The same
is true of the Sinking Fund. PRIFA's pledge does not attach unless and until funds are actually deposited into the
Sinking Fund (*i.e.*, "to the credit of" the Sinking Fund).

could be accomplished if PRIFA merely *intended* for such funds to be deposited as opposed to *actually* withdrawing and depositing the funds into the accounts. Moreover, section 502 requires the Trustee to invest "[m]oneys held *for the credit of* the Bond Service Account" (emphasis added); again, the Trustee cannot invest money that is not under its control and, as Movants argue, is in the General Fund. Movants' self-serving definition of "to the credit of" would lead to absurd results and must be rejected.

93.     Moreover, the use of the word "deposited" is critical and limits the pledge to the Sinking Fund. Movants do not contest that the funds must be "deposited" to be subject to the pledge. M.Br. at 22 ("Neither the Trust Agreement nor any other applicable legal principle requires more than that the funds be 'deposited.'"). As demonstrated above, the use of the word "deposit" in the Trust Agreement refers to funds actually sitting in an account. Hence, Rum Taxes deposited in the TSA are not "to the credit of the Sinking Fund," they are to the credit of the TSA (even under Movants' erroneous and distorted interpretation monies in the TSA would be to the credit of PRIFA and not the Sinking Fund). Likewise, Rum Tax Remittances deposited in the PRIFA Infrastructure Fund are not "to the credit of the Sinking Fund," they are to the credit of the PRIFA Infrastructure Fund. To be "deposited to the credit of the Sinking Fund," monies must be actually deposited in the Sinking Fund. And because the Bonds "are payable *solely* from the Pledged Revenues," (Trust Agreement § 601 (emphasis added)) the monies need to be actually deposited in the Sinking Fund and under the control of the Trustee for the Trustee to make payments to the Bondholders.

94.     Movants also attempt to argue that under 3 L.P.R.A. § 1907(a) their security interest automatically attaches to Rum Tax Remittances regardless of delivery to PRIFA. But Movants again misrepresent the statute's text. Section 1907(a) provides that whatever pledge PRIFA

45

makes, the lien will attach "without the need of the physical delivery" to PRIFA. Whether or not it had the authority, PRIFA did not make a pledge of monies outside the Sinking Fund. Nothing in the Trust Agreement purports to pledge any funds that have not been deposited in PRIFA's Sinking Fund. Section 1907(a) of the Enabling Act does not change the terms of the pledge itself. Nor could it, as the Commonwealth, through the Enabling Act, does not itself pledge anything or create a lien. Movants concede this, calling section 1907(a) a "statutory authorization." M.Br. at 33. As the First Circuit recently held, section 1906(m) is clear any lien "arises only when the Authority chooses to grant it." *Peaje Invs..*, 899 F.3d at 12. PRIFA's actual pledge, which controls, requires deposit in PRIFA's Sinking Fund before the pledge applies. Trust Agreement § 601.[49] For these same reasons, the automatic perfection provisions of 3 L.P.R.A. § 1907 are irrelevant because PRIFA cannot perfect an interest beyond what is pledged in the Trust Agreement.

95. Further emphasizing that the pledge to Bondholders, if any, is limited to the Sinking Fund and does not travel up to the PRIFA Infrastructure Fund, is the fact that section 401 prohibits PRIFA from granting a security interest to any party in the PRIFA Infrastructure Fund. Trust Agreement § 401 ("The Authority **shall not** pledge or create any liens upon any moneys in the [PRIFA] Infrastructure Fund.") (emphasis added).

96. The case of *In re Las Vegas Monorail Co.*, 429 B.R. 317 (Bankr. D. Nev. 2010)

---

[49] Movants refer to their claimed super lien that expands beyond its contractual limits as a "consensual lien." M.Br. at 33-34. There is no such thing, and Movants cite no authority for the concept. *Cf. Peaje Inves. LLC*, 899 F. 3d at 10 (holding liens are divided into *only* "three mutually exclusive categories: judicial liens, statutory liens, and security interests"). Whatever a "consensual lien" might be, if it even exists, it is neither a "security interest" nor a "statutory lien." Nor did the Commonwealth "consent" to any lien. *See* 3 L.P.R.A. § 1910 ("The bonds issued by the Authority shall not constitute an indebtedness of the Commonwealth nor of any of its political subdivisions, and neither the Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall be payable solely out of those funds pledged for the payment thereof.").

46

provides a notable parallel.  There, the debtor issued bonds secured by monies deposited in certain

accounts.  While the debtor had covenanted to transfer funds into the accounts, and the court held

the debtor's breach of the covenant may have been a default, but the default did not render the

lenders secured by the funds.  As the court explained:

> An adroit and hardnosed bank lawyer would have insisted on a security interest in all
> revenues whenever acquired that would attach as soon as the debtor acquired the revenues,
> with no guaranties of payment to any other creditor. And he or she would have insisted on
> procedures within its control to maintain perfection at all times. But the Indenture cannot be
> read to mean what the bondholders wish they could have or should have negotiated; this
> court can read it only as it is written. And that means that no security interest attaches in any
> of LVMC's revenues until the earlier of: (i) possession or control of the revenues by the
> Trustee; or (ii) after payment of Operation and Maintenance Costs, with a balance remaining.

*Id.* at 339.

97.     The Trust Agreement is clear.  Yet Movants maintain that their security interest

reaches beyond the Sinking Fund through self-serving definitional games that infect their entire

brief.  They define "Pledged Rum Taxes" to encompass monies in the PRIFA Infrastructure Fund.

M.Br. at 2, 9.  But it is the Trust Agreement's definition of "Pledged Revenues" – "moneys that

have been deposited to the credit of the Sinking Fund" – and not Movants' convenient definition

– that controls.  Trust Agreement § 101.  Even if the Trust Agreement could be interpreted as

Movants desire, it cannot expand PRIFA's property rights under the Enabling Act, which only

provides PRIFA a property interest in Rum Tax Remittances actually appropriated and deposited

in the PRIFA Infrastructure Fund.

### E.   The Enabling Act Does Not Create a Trust for PRIFA's Benefit.

98.     Unable to show a security interest flowing from the Enabling Act, Movants argue

the Enabling Act somehow "create[s] a series of trust relationships in which [the Commonwealth]

and PRIFA act as mere conduits for the transfer of the Pledged Rum Taxes."  M.Br. ¶ 58.  To

support their claim, Movants have to demonstrate the existence of a trust between (i) the Commonwealth as trustee and PRIFA as beneficiary, and (ii) between PRIFA as trustee and the Bondholders as beneficiaries. Movants cannot establish the existence of such trust relationships.

99. Under Puerto Rico law, for money to be held in valid trust, a public deed of trust is required to be executed. *See* Trust Act, Puerto Rico Act 219-2012.[50] This makes perfect sense, because otherwise, secret, springing trusts would render useless the Uniform Commercial Code by corralling property no one could know was in trust.[51] Movants make no allegation that there is a public deed of trust for either the TSA or the PRIFA Infrastructure Fund. To the contrary, Movants concede the Enabling Act does not use the word "trust" or any language indicative of a trust. Nonetheless, Movants insist the Enabling Act somehow creates a trust, relying on *Columbia Falls*[52] and *In re Bologna*.[53] Neither decision supports Movants' search for a trust.

100. *Columbia Falls* is inapposite. It was a pre-Uniform Commercial Code case and it involved a situation where the fund was created for a specific purpose and the collected monies were to be used solely for the payment of bonds. *Id.* at 761–62. It did not address whether a trust relationship exists where, as here, (i) the funds are not created for the specific purpose of repaying the bonds, or (ii) the monies in the fund are used for operations or general corporate purpose. It further does not address whether monies that may be, but have not yet been, deposited into a special

---

[50] Prior to the Trusts Act, the Puerto Rico Civil Code provided that trusts should be created by public deed. *See* 31 L.P.R.A. § 2543. Under the Trusts Act, trusts can be created *only* through public deed or a last will and testament, see 32 L.P.R.A. § 3352, and "[e]very trust constituted in Puerto Rico must be recorded in the Special Trust Registry under penalty of nullity," id. § 3351d.

[51] *See supra* note 5.

[52] *In re City of Columbia Falls, Montana, Special Improvement District Number 25*, 143 B.R. 750 (Bankr. D. Mont. 1992).

[53] *Stowe v. Bologna (In re Bologna)*, 206 B.R. 628 (Bankr. D. Mass. 1997).

fund are held in trust.[54]

101.    *In re Bologna* distinguishes express trusts from technical trusts.  An express trust "requires a declaration of trust and the intent to create a trust relationship with respect to a clearly defined res."  206 B.R. 628, 632.  Nothing in the Enabling Act purports to create a trust at the TSA or PRIFA Infrastructure Fund level.  Movants (whose entire argument regarding the existence of a trust is confined to paragraph 58) do not even attempt to make a *prima facie* showing of a "manifest written intent of the parties [] sufficient to find that a trust has been created."  M Br. ¶ 59.  Indeed, where the Commonwealth has attempted to create a trust relationship, it has done so explicitly.  Section 1923(b) of the Enabling Act itself, for example, creates a "special fund … **to be held in trust**."  3 L.P.R.A. § 1923(b) (emphasis added).[55]  No equivalent language is used regarding the TSA or the PRIFA Infrastructure Fund.[56]

102.    A "technical trust" can be imposed by statute where "the statute (1) defines the trust res, (2) spells out the trustee's fiduciary duties, and (3) imposes a trust prior to and without reference to the wrong that created the debt."  *In re Bologna,* 206 B.R. at 632.  Movants do not

---

[54] *Columbia Falls* may have been erroneously decided in any case, as the only citations it gave supporting the finding of a trust relationship were to opinions predating Article 9 of the Uniform Commercial Code with respect to perfection of interests in collateral.  *See Columbia Falls*, 143 B.R. at 762 (citing *State ex rel. Clark v. Bailey*, 99 Mont. 484, 44 P.2d 740 (1935), *State ex rel. Central Auxiliary Corp. v. Rorabeck*, 111 Mont. 320, 108 P.2d 601, 603 (1941), and *Blackford v. City of Libby*, 103 Mont. 272, 62 P.2d 216, 217–18 (1936) to support the finding of a trust relationship).

[55] 3 L.P.R.A. § 1923(b) provides in full : "A special fund is hereby created, which shall be a fund to be held in trust, denominated as the 'Infrastructure Financing Authority Special Economic Assistance Fund'.  The special fund may consist of one or more bank accounts held in trust.  The monies deposited in said Special Fund, including pledged revenues, shall be used by the Authority to (1) repay (A) the Transferred Debt, (B) Refinancing Bonds, (C) any Collateralized Debt Obligation, and (D) any other debt incurred by the Authority to refinance the Transferred Debt; and (2) any other purpose authorized by this chapter or § 31751a of Title 13."  Even this language, which is much stronger than what Movants rely on, is not free from doubt as to whether a trust was created.

[56] Arguably, and with no need to get into this issue in this pleading, even the mention of a trust in a statute is insufficient to create a trust under Commonwealth law.  As another example, when the Legislature created the Puerto Rico Children's Trust (the "Children's Trust"), the trust was constituted solely by force of its enabling act.  Article 4 of Act 173-1999 provides: "A public *trust fund* is hereby created, attached to the [Government Development Bank for Puerto Rico], which shall maintain said fund as fiduciary, apart from other public funds under its custody."

49

claim the Enabling Act satisfies these requirements, and there can be no argument that a "wrong created the debt." Significantly, the Enabling Act does not "spell out the trustee's fiduciary duties"—not as it relates to the Commonwealth and PRIFA, nor as it relates to PRIFA and the Bondholders. In fact, the Enabling Act does not even use the word "trust" or "fiduciary" in reference to the TSA or PRIFA Infrastructure Fund, and does not try to create such relationship. It also does not mandate the segregation of funds or identify the trust beneficiaries. This can be contrasted with the Trust Agreement's creation of a trust in the Sinking Fund, wherein the Trustee's duties and powers are expansively delineated.[57] Indeed, Trust Agreement section 801 provides "[t]he Trustee accepts and agrees to execute the trusts imposed upon it by this Agreement…. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement…." For its agreement to execute the trusts, the Trustee is provided an indemnity (§ 802) and limitation on liabilities (§ 803). The utter lack of any equivalent provisions for PRIFA shows the parties did not manifest any intent to create a trust.

103.     Based on their misinterpretation of the Enabling Act, Movants argue the mandated transfer of Rum Tax Remittances from the Commonwealth to the PRIFA Infrastructure Fund (and then, pursuant to the Trust Agreement, to the Sinking Fund) creates a series of trusts. But Movants neither cite nor quote any statutes to make this argument, and it is wrong. As demonstrated above, *see supra* ¶ 33, all the applicable statutes provide for the conditional prepetition promise to transfer funds to PRIFA for its "corporate purposes." Instead of creating property interests in the Rum Tax

---

[57] *See*, *e.g.,* Trust Agreement §§ 401 (noting the Trustee holds the monies in the Sinking Fund "in trust"); 403 (specifying how the Trustee shall apply monies in the Sinking Fund to payment of the Bonds); 405 (designating any monies the Trustee withdraws from the Sinking Fund as "held in trust for the respective Holders of such Bonds); 501 (directing Trustee to hold monies in trust as security for the Bonds); 701 (providing the Trustee shall proceed with enforcement of remedies).

Remittances, the statutes merely "**authorize**" PRIFA to grant security interests in them. *Supra* ¶

87. This does not create a trust: the First Circuit has specified that no trust can exist where no

"specific restriction [is] placed upon [the debtor's] use of the supposed trust funds," and "[the

debtor] was left free to use what it received for its own benefit rather than" hold it for the purported

trust beneficiary. *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) (holding that

contracts and International Air Transport Association resolutions that specified the debtor was "in

general terms" supposed to "hold whatever monies it collected in trust" for a creditor was

ineffective to create a trust where the debtor retained the right to use the monies as it saw fit and

was not required to keep the funds separate from others).[58] Accordingly, unappropriated Rum Tax

Remittances which sit in the TSA, not segregated, and commingled with other revenues are far

from a "clearly defined trust *res*." And, even if transferred to PRIFA (for its corporate purposes),

they are commingled in the PRIFA Infrastructure Fund with other funds as required by 3 L.P.R.A.

§ 1914.

104. To the extent Movants argue the Enabling Act can be interpreted to create a trust in

their favor, such interpretation is belied by 3 L.P.R.A § 1910, which expressly absolves the

Commonwealth from any liability for the Bonds. Movants effectively make the self-refuting

---

[58] *See also, e.g., LFD Operating, Inc. v Ames Dep't Stores Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 624 (Bankr. S.D.N.Y. 2002), *aff'd*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005) ("Therefore, the Court finds that Ames did not hold the Net Sales Proceeds in trust for LFD because Ames, at all relevant times, has commingled the Net Sales Proceeds and used the funds between settlement dates for purposes other than paying LFD, before making payment to LFD out of general funds provided by GECC."). Even the cases cited by Movants recognize the same and prohibit the finding of a trust here. *See, e.g., In re Tap, Inc.*, 52 B.R. 271, 276 (Bankr. D. Mass. 1985) (trust does not exist "where funds are collected from third parties and used at will by the defendant whose only responsibility is to pay when billed, or at some monthly or other non-immediate date, much the same as any other creditor"). *In re Bologna* at 632 does not help Movants' case (M.Br. ¶¶ 60): there, the statute involved monies (a security deposit) paid to the debtor by plaintiff, and specifically provided that "[a] security deposit shall continue to be the property of the tenant making such deposit, shall not be commingled with the assets of the lessor, and shall not be subject to the claims of any creditor of the lessor or of the lessor's successor in interest." *In re Bologna*, 206 B.R. at 632. None of the statutes at issue here provide the same as in *Bologna*.

argument that the Commonwealth enacted a statute broadcasting it was not liable for PRIFA bonds, while, with a wink and nod, rendering its assets liable for PRIFA bonds. This simply cannot be.

### F. Movants Have No Claim to a Constructive or Resulting Trust, or an Equitable Lien.

105.    In a last-ditch effort to show some kind of secured interest in the Retained Rum Tax Remittances, Movants resort to inapplicable equitable remedies – either an equitable lien or an equitable trust – arising from the Enabling Act. M.Br. at 27, 34-36.[59] Movants' attempt to invoke equitable remedies to expand their rights beyond what they bargained for and, to the detriment of other claimholders, turns equity upside down.

106.    As an initial matter, Puerto Rico law does not recognize the existence of equitable liens. In *Acevedo v. Solivellas & Co.,* 49 D.P.R. 633 (P.R. 1936), the Puerto Rico Supreme Court quoted the lower court's statement that "the doctrine of equitable liens invoked by the intervener is not in force in Puerto Rico. In Puerto Rico, just as in the State of Louisiana, no legal existence is recognized to implied liens, created by presumptions, such as equitable liens." *Id.* at 633 (citing, inter alia, *Estate of Romero v. Willoughby*, 10 D.P.R. 71 (P.R. 1906); *Ramis v. The Registrar*, 19 D.P.R. 747 (P.R. 1913)).[60] Moreover, even if Puerto Rico law recognized equitable liens, it would

---

[59] It should be noted Movants cannot simultaneously be equitable owners of the Rum Tax Remittances and have a lien on them. As this Court previously observed in granting the Oversight Board's motion to dismiss various bondholders' complaint (including PRIFA Bondholders): "[t]he existence of a trust is equally inconsistent with full, outright ownership because a trust divides ownership of property, placing legal title with trustee while the beneficiary enjoys an equitable interest." *Assured Guar. Corp. v. Commonwealth of P.R.* (*In re Fin. Oversight & Mgmt. Bd. For P.R.*), 582 B.R. 579, 597 (D.P.R. 2018) (citing *U.S. Fid. & Guar. Co. v. Guzman,* 2012 WL 4790314, at *5 (D.P.R. Sept. 20, 2012)). Put simply, "the assertion of a lien is inconsistent with the assertion of a title interest." *Id.* (citing *William W. Bierce, Ltd. v. Hutchins*, 205 U.S. 340 (1907)).

[60] Movants cite a more recent case from the District of Puerto Rico to argue that Puerto Rico law recognizes the existence of equitable liens. See *United States Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs., Inc.)*, 332 B.R. 495, 500 (Bankr. D.P.R. 2005) (recognizing in passing that party moving for adequate protection was a beneficiary of an express trust arrangement, and, as a result, had an "equitable lien" in the trust res and was entitled to adequate protection). In *In re Maxon*, however, no party sought to have the bankruptcy court grant an equitable lien. Rather, the decision merely recognized (in the context of a dispute regarding adequate protection) that, under Puerto Rico law, the beneficiary of an express trust arrangement is the equitable beneficiary of a trust res (and used "equitable lien" to

be displaced by Article 9 of the UCC.[61]  Finally, equitable constructs are disfavored and rarely

granted in bankruptcy because they invariably overturn the statutory priorities.[62]

107.    More fundamentally, all the grounds on which Movants seek a constructive trust

are inapplicable.  They assert a "constructive trust or, in the alternative, a resulting trust" because,

they say, the Commonwealth is "unjustly enriched" by the Retained Rum Tax Remittances.  M.Br.

at 27-28.[63]    The Commonwealth cannot be "unjustly enriched" by the Retained Rum Tax

Remittances because they are retained pursuant to statute: PROMESA and the Enabling Act.  The

effect of a *statute* cannot create any equitable right because an equitable lien is a remedy to address

unfair transactions.  A statute, by definition, is never "unfair" because it represents the judgment

---

describe this interest). The case did not address the question of whether a bankruptcy court could impose an equitable lien where a lien does not already exist from the express agreement of the parties.

[61] U.C.C. § 1-103, 19 L.P.R.A. § 402.  Puerto Rico adopted the Uniform Commercial Code in 1996.  The UCC does not recognize equitable liens when the lender could have created a security interest under Article 9.  Allowing equitable remedies between ordinary creditors and borrowers where the UCC provides a method of creating and perfecting a security interest would undermine the UCC's public notice requirement. *See Uniroyal, Inc. v. Universal Tire & Auto Supply Co.*, 557 F.2d at 22, 23 (1st Cir. 1977) (courts should not substitute an equitable rule where the UCC provides a statutory method of perfecting a security interest).

[62] *See Hunter v. Bank of N.Y. (In re Anderson)*, 266 B.R. 128, 134 (Bankr. N.D. Ohio 2001) ("[E]quitable liens are not favored in bankruptcy"); *Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*, 145 B.R. 719, 727 (Bankr. D. Mass. 1992) ("Business failures cause hardships that cannot and should not be rectified by the misapplication of equitable principles permitting the imposition of constructive trusts and the imposition of equitable liens. One of the fundamental precepts of our bankruptcy laws is the even-handed treatment of similarly situated unsecured creditors."); *see also Uniroyal*, 557 F.2d at 23 (1st Cir. 1997) ("Efforts by courts to fashion equitable solutions to mitigate the hardship on particular creditors of literal application of statutory filing requirements would have the deleterious effect of undermining the reliance which can be placed upon them. The harm would be more serious than the occasional harshness resulting from strict enforcement."); *In re T. Brady Mech. Servs., Inc.*, 129 B.R. at 563 ("[I]n a bankruptcy case, there is nothing equitable about taking money away from unsecured creditors and giving it to a creditor that failed to protect its own interests when it had a chance to do so.").

[63] Movants' resulting trust theory must be rejected.  As the very case Movants' cite specifies, a resulting trust can only apply where "a person **makes or causes to be made a disposition of property** under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein." *Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 263 (1st Cir. 2004) (emphasis added).  Here, there has been no disposition of property in which the transferor could intend to retain a beneficial interest—indeed, Movants' entire complaint is that the Commonwealth has decided *not* to dispose of the Rum Tax Remittances but has instead retained those funds.  No resulting trust can therefore exist.

of the legislative and executive branches of the state.[64]  Exercising rights and powers pursuant to

statute cannot create the "wrongdoing," "breach of fiduciary duties," or "unjust enrichment"

Movants must show for entitlement to an equitable trust.[65]  Indeed, Commonwealth law does not

recognize a cause of action for unjust enrichment against the Commonwealth,[66] or where there is

a contract that governs the dispute.  *See Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97

(1st Cir. 2011).

      108.    At its core, Movants' grounds for an equitable trust rely on their misreading of the

Enabling Act.  That misreading has already been addressed.  Nothing in the Enabling Act "raise[s]

an inference that [the Commonwealth] does not intend that [it] should have the beneficial interest"

in the Rum Tax Remittances.  *See* M.Br. at 28 (citing *Fleet Nat'l Bank v. Valente (In re Valente)*,

360 F.3d 256, 263 (1st Cir. 2004)).  As noted, the Enabling Act clearly allows for the

Commonwealth to retain the Rum Tax Remittances.  The Commonwealth's Retention Powers

make clear there was never any intent to deprive the Commonwealth of a beneficial interest in the

Rum Tax Remittances.  And, where the Retention Powers are invoked, that interest is superior to

any interest Movants' may have because the Enabling Act entitled the Commonwealth to use *all*

the Retained Rum Tax Remittances *before* they are applied to payment of the bonds.  *See* 3

---

[64] *See Restatement (Third) of Restitution & Unjust Enrichment,* Part II, Chapter 2, Topic 3, Introductory Note (transfers made under "legal compulsion" are not appropriate for an equitable remedy unless the statute is mistakenly applied); *Atl. Coast Line R. Co. v. Florida*, 295 U.S. 301, 315 (1935) (Cardozo, J) (transfer made under "color of legal right" generally not subject to equitable remedy).

[65] None of Movants' constructive trust cases addressed a situation where, as here, the debtor was retaining funds pursuant to statute. This renders all Movants' cases inapplicable.

[66] Puerto Rico law is clear that equitable remedies such as unjust enrichment are not available against the government when affording such a remedy would undermine an important public policy of the Commonwealth embodied in statutory or constitutional law.  *See, e.g.*, *Hatton v. Municipality de Ponce,* 134 D.P.R. 1001, 1010 (P.R. 1994) (holding that a medical equipment supplier could not recover as unjust enrichment the value of equipment delivered to a municipality where the purchase agreement violated a clear public policy embodied in rules governing municipal contracts).

L.P.R.A. § 1914 ("The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth…"). In addition to the Enabling Act, PROMESA allows for retention because it preempts any contrary statutory appropriation. Movants' contention that the Commonwealth "may not use or divert" (M.Br. at 29) the Rum Tax Remittances is wrong.[67]

109.    The same is true of Movants' arguments for an equitable lien. Movants assert they must show the funds at issue "are earmarked for the purpose of paying a particular debt." M.Br. at 34. The Enabling Act does not earmark any funds for PRIFA Bondholders; it only authorizes PRIFA to do so. PRIFA, for its part, earmarked "solely" those funds deposited in its Sinking Fund. Thus, Movants' lien, equitable or otherwise, cannot reach beyond the Sinking Fund. Movants cannot use equitable lien principles to expand what was bargained for in the Trust Agreement. *Am. Fid. Fire Ins. Co. v. Construcciones Werl, Inc.*, 407 F. Supp. 164, 203 (D.V.I. 1975) ("[E]quitable lien principles cannot create vested rights … which are contrary to express and implied contractual undertakings.").

110.    Finally, even if there were grounds to create an "equitable lien," it would be (i) disallowable under section 502(d) as a lien avoidable under section 544(a) and (ii) subordinate to the Commonwealth's interest in the Rum Tax Remittances under 19 L.P.R.A. § 2267(a)(2). Equitable liens, by nature, are subject to and avoidable by a 'lien creditor', which, pursuant to Bankruptcy Code section 544(a) and 19 L.P.R.A. § 2212(a)(52), includes a trustee in bankruptcy. *See, e.g., McRoberts v. Transouth Fin. (In re Bell)*, 194 B.R. 192, 196 (Bankr. S.D. Ill. 1996)

---

[67] Movants' argument that the Rum Tax Remittances are somehow "restricted funds" (M.Br. at 25-26) is thus incorrect. While the Commonwealth has set out forward-looking appropriations, it can adjust or remove those appropriations at any time. In any event, accounting earmarking, internal memos and transmittal information do not and cannot create property rights.

("equitable liens arising under state law are contrary to the letter and purpose of the Bankruptcy Code").[68]

111.    Nothing in the Enabling Act indicates to Bondholders that the Rum Tax Remittances will forever be available to them.  Even if it did, PROMESA preempts.  This was made clear in the Offering Statements, which note the Rum Tax Remittances are subject to the Commonwealth's Retention Powers, the Pledged Revenues were limited to the Sinking Fund, and are devoid of any reference to any Bondholder trust, constructive trust or equitable liens.

### G.   The Commonwealth's Retention of the Rum Tax Remittances Gives Rise to, at Most, a Dischargeable, Unsecured Claim in Favor of PRIFA.

112.    Even if the Enabling Act obligates the Commonwealth to transfer a portion of the Rum Tax Remittances to PRIFA, and if that purported obligation escapes PROMESA preemption – which, as explained, it cannot – the Commonwealth's alleged noncompliance would give PRIFA (and not its claimholders) at most a dischargeable unsecured claim.

113.    Here, the Commonwealth's appropriation of a portion of the Rum Tax Remittances to PRIFA is at most a conditional promise to pay PRIFA a certain sum of money.  *See Kane v. Coulson (In re Price)*, 575 B.R. 461, 466 (Bankr. D. Haw. 2017) (holding a promise to pay a debt from a particular fund does not create a contractual lien in the fund nor an equitable lien).

---

[68] *See also, e.g.,* W. Raushenbush, BROWN ON PERSONAL PROPERTY § 15.5 (3d ed. 1975) ("equitable pledges" are ineffective against lien creditors without knowledge of the interest).  Notably, any equitable lien Movants may hold would be unperfected as it was not granted by any of the statutes governing the Rum Taxes (which would have created a statutory lien, not an equitable lien) or granted by PRIFA (which would have granted a security interest, not equitable lien), and therefore would not be saved by the automatic perfection provision of 3 L.P.R.A. § 1907(a).  Such equitable liens would be unperfected and subject to avoidance under Bankruptcy Code section 544.

Noncompliance with a promise in a statute is tantamount to breach of contract, and would provide

PRIFA (and not Movants) an unsecured claim at best.[69]

114.    Movants admit that such statutory provisions are equivalent to "covenants" in a

"contract."  M.Br. at 36.  They point to 3 L.P.R.A. § 1913, which contains a covenant from the

Commonwealth to Bondholders that the Commonwealth will not "limit or alter" PRIFA's rights.[70]

Based on this language, Movants argue "[a]ny impairment or rescission of bondholders' rights to

the Pledged Rum Taxes, including contractual rights, would be an unconstitutional 'taking' of this

property right."  This argument fails on many levels.

115.    *First*, Movants ignore the most basic principle underlying all bankruptcy law – the

equity policy.  Assume a debtor owes each of ten people $1,000 apiece, and the debtor's assets are

$2,000.  If the debtor pays two people $1,000 apiece, they are paid in full while eight other people

get zero.  Thus, it is easy to see the most equitable outcome arises from the debtor's breach of all

ten debts so the debtor can pay each person $200.  Here, Movants insist they get paid in full, while

all the Commonwealth's other creditors simply take larger losses.  Nothing could be more

inequitable than Movants' position.

116.    *Second*, 3 L.P.R.A. § 1913 bars any action by the *Commonwealth* to limit or alter

*PRIFA's rights*.  That section is no more powerful than a contract or statute requiring the

---

[69] *See, e.g., Kovacs,* 469 U.S. at 279 (1985) (holding that breach of statute and court order gave rise to dischargeable unsecured claim, and rejecting argument that breach should be treated differently because it "was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim" that was dischargeable in bankruptcy); *FCC v. NextWave Pers. Commc'ns Inc.,* 537 U.S. 293, 302 (2003) (continuing right under statute to pay installment payments for FCC license is dischargeable unsecured claim); *Pennsylvania. Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552 (1990) (statutory criminal restitution obligation dischargeable as unsecured claim); *In re Berry Estates Inc.,* 49 B.R. 1002 (S.D.N.Y. 1985) (penalty for violating statute regarding rent limits dischargeable).

[70] 3 L.P.R.A. § 1913 provides, in relevant part, "The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter . . . that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full . . . .".

Commonwealth to pay a debt or transfer property. Pursuant to the equity policy, the Commonwealth must reject or breach that obligation to be able to treat the universe of creditors fairly. Moreover, it is not really the Commonwealth that is repealing or amending the Enabling Act. Instead, the appropriation was preempted by PROMESA, a statute enacted by Congress.

117. *Third*, Movants acknowledge this is a "covenant" yet shift in the same sentence to asserting that breach of a covenant gives rise to a "taking" of property. But, for the reasons above, Movants cannot point to any "property" that has been taken. Contract rights do not entitle Movants to adequate protection, as it strictly pertains to the diminution in the value of property. To the extent Movants assert the "value" of their contractual right has diminished, all they have is an unsecured claim for that value. Notably, in a chapter 11 case, no one would think twice about the need to reject contracts – precisely to carry out the equity policy. That the obligations breached here are contracts and statutes, does not change the calculus. Congress expressly preempted the statutes because otherwise, the equity policy and rehabilitation would be frustrated.

118. Fourth, non-impairment clauses are a kind of "negative covenant." Breaches of a negative covenant, such as non-impairment and negative pledge clauses, do not create property rights in favor of Movants and cannot convert an unsecured claim into a secured claim. *See Knott v. Shepherdstown Mfg. Co.*, 5 S.E. 266 (W.Va. 1888) ("Of course [the agreement's negative pledge covenant] creates no lien on or pledge of any property. It is simply negative; an agreement not to do a particular thing. The creation of a lien is an affirmative act, and the intention to do such act cannot be implied from an express negative."); *see also* 2 Gilmore, Security Interests in Personal Property, note 31, § 38.3.[71]

---

[71] 2 Gilmore at 1017: "Negative pledges should not, it is submitted, be allowed to operate as informal or inchoate security arrangements, even against third parties with notice. … The debtor's covenant not to encumber property…

## II. SECTION 362(d)(2) DOES NOT APPLY BECAUSE THE COMMONWEALTH HAS EQUITY IN THE RUM TAX REMITTANCES AND THEY ARE NECESSARY TO THE PLAN OF ADJUSTMENT.

### A. The Commonwealth Has Equity in the Rum Tax Remittances.

119.    Section 362(d)(2) allows relief from the stay if "the debtor does not have an equity in such property" *and* "such property is not necessary to an effective reorganization." The Court need not reach these issues, because, as explained, the Commonwealth has the equity in the Rum Tax Remittances (*supra* ¶¶ 13, 82). In any event, pursuant to the Court's January 31, 2020 Amended Case Management Order, [ECF No. 10595], we understand this topic is reserved for a second hearing if it becomes necessary. For now, we simply point to Movants' admission in paragraph 29 of the Motion that pursuant to its public reports the Commonwealth has over $8.7 billion cash and the total amount of all retained Allocable Revenues is considerably smaller.

## III. SECTION 362(d)(1) DOES NOT APPLY BECAUSE THE MOVANTS' INTERESTS, IF ANY, ARE "ADEQUATELY PROTECTED" AND THERE IS NO CAUSE TO LIFT THE STAY.

120.    To make a *prima facie* case for relief from the stay or adequate protection under Bankruptcy Code section 362(d)(1), Movants must show (1) a valid and perfected security interest; and (2) cause.[72] Putting aside cause for a follow-up hearing, if necessary, for all the reasons above, Movants do not have a valid and perfected security interest in Commonwealth assets.

---

should be treated, as on the whole the case law has done, as a covenant 'merely personal'-good enough to give rights against the covenantor for breach, to bring an acceleration clause into play, to constitute an 'event of default' under a loan agreement, but not good enough to give rights, whether they be called legal or equitable, in property."); *In re Friese*, 28 B.R. 953, 955 (Bankr.D.Conn. 1983) (referring to *Knott*, concluding that a negative pledge agreement "does not create a security interest.").

[72] *In re Jug End in Berkshires, Inc.*, 46 B.R. 892, 901 (Bankr. D. Mass. 1985) ("The moving creditor in a motion for relief from stay proceeding has the burden of establishing the validity and perfection of its security interests"); *Sonnax Indus., Inc. v. Tri Component Prod. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("Section 362(d)(1) requires an initial showing of cause by the movant").

### A. Movants Do Not Have a Security Interest in the Retained Rum Tax Remittances.

121.    Even if Movants' could show PRIFA has a right to the Retained Rum Tax Remittances, Movants' security interest, if any, is limited to monies deposited in PRIFA's Sinking Fund. *See supra* ¶¶ 86-96. Without a security interest, Movants cannot seek relief for lack of adequate protection under section 362(d)(1). *See e.g.*, *In re S. Ill. Railcar Co.*, 301 B.R. at 305 (denying motion for relief from stay on basis creditor failed to show it had a valid and perfected security interest).

122.    Movants argue Bankruptcy Code section 552(a) does not cut off their purported security interest because it arises only from a contract with PRIFA, not from the Commonwealth. M.Br. at 36. That is *precisely the point*: Movants' security interest does not reach Commonwealth funds because the Commonwealth never executed a single document creating a security interest in Movants' favor.[73]

123.    For section 552 to have any relevance, Movants would need to have a security interest in PRIFA's right to receive future revenues. As explained above (*supra* ¶¶ 33-34), the Enabling Act only authorizes PRIFA to pledge revenues it actually *receives*, all as provided for the in Trust Agreement, and the Trust Agreement only pledges monies deposited in the Sinking Fund. Moreover, PRIFA's "right to receive" Rum Tax Remittances was always conditional on the Commonwealth's appropriation, and such appropriation is now preempted by PROMESA.

---

[73] Under Article 9 a debtor can only grant security interests in its own property—not a third party's, such as the Commonwealth. 19 L.P.R.A. § 2233(b)(2) (debtor can only grant security interest in property the debtor "has rights in … or the power to transfer rights in"). The fact the Commonwealth never "entered into" a security agreement creating a lien in favor of Movants demonstrates no lien exists against the Commonwealth's property for section 552(a) to cut off.

124.     The fact Movants cannot have a security interest on an ongoing "stream" of future Revenues is also demonstrated by the recent First Circuit opinion relating to ERS bonds. *See Andalusian Glob.*, 2020 U.S. App. LEXIS 2954.  On January 30, 2020, the First Circuit issued an opinion addressing ERS bondholders' claimed property interest in employer contributions previously to be made to the retirement system following the commencement of these Title III proceedings by the Commonwealth and other public corporations and instrumentalities, including the retirement system.  Such employer contributions were to be calculated based on a percentage of payroll and only payable after the public employees performed work for their employers. Employer contributions were allocated to the retirement system by legislative appropriations.  The First Circuit held that the retirement system did not have a property interest in future employer contributions as it only had "merely an expectancy,", that such contributions would be made. *Id.* at *16. The court stated that any statutory requirement for the payment of employer contributions could be disregarded by a subsequent legislature.  Similarly, PRIFA (or Movants) had and have no property right in future Rum Tax Remittances, only an expectation.  The Rum Tax Remittances conditionally appropriated to PRIFA could be modified or eliminated by a subsequent legislature. *Id.* at *17-18.  Ironically, Movants themselves recognized that future Rum Taxes are a mere expectancy when they asserted there are a host of factors outside the Commonwealth's control, such as the level of production of rum on-island and repeal of the federal law remitting the monies to the Commonwealth, that could also impact future Rum Tax Remittances.  M.Br. ¶ 96.[74]  As a result, under no interpretation could Movants' have a security interest on any "stream" of future PRIFA revenues.

_____

[74] The First Circuit also observed "[i]t is also clear and our result is reinforced by the fact that language in the Bond Resolution and the Official Statement for the bonds explicitly contemplated that the payment of future Contributions

125.    To the extent Movants argue that they hold special revenue bonds, they are wrong. The Bonds are not secured by special revenues (as defined in Bankruptcy Code section 902) because the Rum Tax Remittances are not a special excise tax of the Commonwealth, but a mere appropriation from the United States.  Not only are the Rum Tax Remittances not derived from PRIFA's operations or the Commonwealth's operations, PRIFA is not even a Title III debtor and the Enabling Statute makes clear that any money the Commonwealth promised to send to PRIFA is dependent on appropriation from the United States.  As a result, section 928(a) of the Bankruptcy Code does not save Movants' security interest (if any) from being cut off by Bankruptcy Code section 552(a).

## IV.    MOVANTS, AS CREDITORS OF A CREDITOR, LACK STANDING TO SEEK STAY RELIEF.

126.    Movants are PRIFA Bondholders, insurers, and the Trustee.  M.Br. at 1.  They are in contractual privity with PRIFA, not the Commonwealth.  That appears to be common ground: "Movants' lien did not 'result from any security agreement entered into by the Commonwealth.' The lien arose based on the Trust Agreement, which is a contract between PRIFA and its Trustee on behalf of the bondholders…."  M.Br. at 36.  The Commonwealth is not a party to the Trust Agreement and the relevant statutes and documentation do not give rise to a debtor-creditor relationship between the Commonwealth and PRIFA Bondholders.  Whatever claims Movants might have against PRIFA, they do not have the right to seek stay relief vis-à-vis the Commonwealth.

---

was contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures." *Andalusian Glob.*, 2020 U.S. App. LEXIS 2954, at *16.  Here the Offering Statements notified Bondholders that the continued flow of Rum Taxes was contingent on future federal government allocations.  *See supra* ¶ 32, 41.

127.     Movants do not dispute they are seeking to press PRIFA's alleged rights.  They repeatedly assert "PRIFA['s] ownership" rights.  *E.g.*, M.Br. at 9.  Without a "direct claim to" the Rum Tax Remittances, however, Movants "lack[] the direct interest necessary to establish prudential standing."[75]

128.     Party-in-interest standing under Bankruptcy Code section 1109(b) is confined to parties whose interests are directly (not indirectly or derivatively) affected by a Title III case.[76] Party-in-interest status does not include a creditor of a creditor of a debtor.  This reasoning is obvious – the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor is trying to do.

129.     Movants are too far removed from the debtor (the Commonwealth) to have standing to seek relief from the stay.  They are at most creditors of a creditor of the Commonwealth with no standing to assert a security interest against the Commonwealth.  Even if they claim to be an unsecured claimholder of the Commonwealth, only a secured claimholder may seek stay relief or seek adequate protection from the debtor.[77]  The sections of the Bankruptcy Code relating to stay

---

[75] *Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306 (D.P.R. 2017); *see also Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2002) (to have standing, a party's claims generally must be "premised on [their] own legal rights (as opposed to those of a third party)").

[76] Party-in-interest status under Bankruptcy Code § 1109(b) is a necessary prerequisite to bankruptcy standing.  *In re Tower Park Props., LLC*, 803 F.3d 450, 452 (9th Cir. 2015) (citing *In re Thorpe Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012)).  "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

[77] Unsecured claimholders do not have the right to adequate protection payments.  *In re S. Biotech, Inc.*, 37 B.R.  318, 324 (Bankr. M.D. Fla. 1983); *see also In re Babcock & Wilcox Co.*, 250 F.3d 955, 961 n.12 (5th Cir. 2001); *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 90-91 (2d Cir. 2003) (concluding that an unsecured claimholder was ineligible to receive adequate protection under section 361 of the Bankruptcy Code; rather, the adequate protection provision of section 361 only protects secured claimholders; *see also*, *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 19 B.R. 231, 234 (Bankr. S.D.N.Y. 1982) (emphasis added) ("A noncreditor of a debtor, even though owed a debt by a creditor of the debtor, does not have standing *to seek relief from the automatic stay* for the purpose of recovering on its claim.").

63

relief and adequate protection (§§ 361-364) are intended to protect secured claimholders of a

debtor, not alleged secured claimholders of a creditor of a debtor. Movants are "not intended

beneficiaries" of these sections of the Bankruptcy Code and therefore lack prudential standing.[78]

## **CONCLUSION**

For the reasons set forth herein, the Commonwealth respectfully submits the Motion be

denied.

*[Remainder of page intentionally left blank.]*

---

[78] As articulated by the Second Circuit in *Comcoach*: "Support for this view is found in the Code's legislative history which suggests that, notwithstanding the use of the term 'party in interest', [sic] it is **only creditors** who may obtain relief from the automatic stay." *In re Comcoach Corp.*, 698 F.2d at 573–74 (citing H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 175, (1977)); *see also In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) (section 1109 was not "intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim.").

Dated: February 3, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer* _____
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel S. Desatnik (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com
Email: ebarak@proskauer.com
Email: ddesatnik@proskauer.com

Michael A. Firestein (*pro hac vice*)
Lary Alan Rappaport (*pro hac vice*)
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
lrappaport@proskauer.com

*Attorneys for the Financial Oversight and*
*Management Board for Puerto Rico, as*
*representative of the Commonwealth of*
*Puerto Rico*

65

**CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all

CM/ECF participants in this case.


*/s/ Hermann D. Bauer*
Hermann D. Bauer

## Exhibit A

Flow of Rum Taxes

Federal Government imposes Excise Tax. 26 U.S.C. § 5001(a)(1) ("**Rum Taxes**")

CW Lockbox (held by Citi)

Federal Government covers the Rum Taxes to the treasury of Puerto Rico with no strings attached. 26 U.S.C. § 7652 ("**Rum Tax Remittances**" or "**Offshore Excise Taxes**"). Treasury deposits the Rum Tax Remittances into Commonwealth Lockbox Account pursuant to Lockbox Agreement[2] for the benefit of, among others, rum producers.

Pursuant to the Trust Agreement[1] "Offshore Excise Taxes" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government *and* remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law. Trust Agreement §101

TSA (held by CW)

46% of Rum Tax Remittances to Rum Producers pursuant to Lockbox Agreement

Lockbox Trustee (Citibank) remits up to the first $117m of Rum Tax Remittances to the TSA where it is commingled with other funds

PRIFA Infra. Fund (held by PRIFA)

Enabling Act appropriation

Pursuant to Trust Agreement §401 "The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund"

Historically, the Commonwealth appropriated $117m and deposited such monies into the PRIFA Infrastructure Fund for its "corporate purposes" and subject to Section 8 Article IV of PR Constitution. 3 L.P.R.A. § 1914. ("**Special Tax Revenues**")

"Special Tax Revenues" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act. Trust Agreement §101

Sinking Fund (held by Trustee in trust)

PRIFA Bondholder security interest and recourse limited to Sinking Fund

Section 401 requires PRIFA, as promptly as practicable upon receipt of Special Tax Revenues, to withdraw Special Tax Revenues from the Infra. Fund and deposit them into one of three Sinking Fund sub-accounts. ("**Pledged Revenues**")

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund. Trust Agreement §101

Bonds "are payable solely from the Pledged Revenues, which Pledged Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified" Trust Agreement § 601

1. Oct. 1, 1988 Trust Agreement between PRIFA and Citibank, N.A. (as Trustee)
2. May 5, 2015 Lockbox Agreement between Government of Puerto Rico, Banco Popular (as trustee), and Citibank, N.A. (as paying agent)

# 4.  Official Statement, Puerto Rico Infrastructure Financing Authority Series 2005 Bonds, ECF No. 10602-17

**NEW ISSUE**
**Book-Entry Only**

<div align="center">

**$1,332,962,916.15**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**$309,102,577.35 Special Tax Revenue Bonds, Series 2005A**
**$324,625,000 Special Tax Revenue Bonds, Series 2005B**
**$699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C**

</div>

The $309,102,577.35 Special Tax Revenue Bonds, Series 2005A, the $324,625,000 Special Tax Revenue Bonds, Series 2005B, and the $699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C, are being issued by Puerto Rico Infrastructure Financing Authority pursuant to a Trust Agreement, dated as of October 1, 1988, as amended, with U.S. Bank Trust National Association, successor trustee.

The Series 2005 Bonds, together with any outstanding bonds that the Authority has issued and may issue from time to time under said Trust Agreement, are payable solely from and secured by a pledge of the revenues of the Authority, consisting of a specified amount of the first proceeds received by the Commonwealth of Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth, and other moneys deposited in the Sinking Fund established under the Trust Agreement. If the federal excise taxes returned to the Commonwealth in any fiscal year fall below such specified amount, the deficiency shall be payable from appropriations which the Legislature of Puerto Rico may, but is not legally required to, make upon request by the Authority. Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.

The Series 2005 Bonds will have the following characteristics:

• The Series 2005 Bonds will be dated their date of delivery.

• The Series 2005 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Series 2005 Bonds will not receive definitive Series 2005 Bonds.

• Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds identified on the inside cover page) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity or earlier redemption as part of the Bonds' Accreted Value.

• The Series 2005 Bonds are subject to redemption as described herein.

• The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Series 2005 Bonds.

• Payment of the principal of and interest on the Series 2005A Bonds, certain Series 2005B Bonds and the Series 2005C Bonds when due will be insured by bond insurance policies as indicated on the inside cover page and as described herein.

• The issuance of the Series 2005 Bonds and the purchase of the Series 2005 Bonds by the Underwriters are subject to approval and legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, and certain conditions.

• In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Matters*, beginning on page 27 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

• McConnell Valdés, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

• It is expected that settlement for the Series 2005 Bonds will occur on or about June 16, 2005.

| | | |
|---|---|---|
| **UBS FINANCIAL SERVICES INC.** | **BANC OF AMERICA SECURITIES LLC** | **MERRILL LYNCH & CO.** |
| Citigroup | Goldman, Sachs & Co. | JP Morgan |
| Lehman Brothers | Morgan Stanley | Raymond James & Associates, Inc. |
| Samuel A. Ramírez & Co. | | Wachovia Bank, National Association |

June 2, 2005

**$309,102,577.35**
**Special Tax Revenue Bonds, Series 2005A**

**$81,920,000 Serial Bonds***

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 2014 | $3,890,000 | 4.50% | 3.49% | 2022 | $5,525,000 | 5.50% | 3.93% |
| 2015 | 4,065,000 | 4.50% | 3.57% | 2023 | 5,835,000 | 5.50% | 3.94% |
| 2016 | 4,245,000 | 4.00% | 3.64% | 2024 | 6,155,000 | 5.50% | 3.96% |
| 2017 | 4,415,000 | 4.00% | 3.71% | 2025 | 6,495,000 | 5.50% | 3.98% |
| 2018 | 4,600,000 | 4.00% | 3.78% | 2026 | 6,850,000 | 5.50% | 4.01% |
| 2019 | 4,780,000 | 4.00% | 3.83% | 2027 | 7,230,000 | 5.50% | 4.02% |
| 2020 | 4,970,000 | 5.50% | 3.87% | 2028 | 7,625,000 | 5.50% | 4.03% |
| 2021 | 5,240,000 | 5.50% | 3.91% | | | | |

**Capital Appreciation Bonds**
**$227,182,577.35**

$23,779,963.20 Capital Appreciation Bonds due July 1, 2029 - Yield 4.56%†
$22,510,254.90 Capital Appreciation Bonds due July 1, 2030 - Yield 4.60%*
$21,400,138.95 Capital Appreciation Bonds due July 1, 2031 - Yield 4.62%*
$20,336,424.30 Capital Appreciation Bonds due July 1, 2032 - Yield 4.64%*
$19,318,407.90 Capital Appreciation Bonds due July 1, 2033 - Yield 4.66%*
$18,448,735.05 Capital Appreciation Bonds due July 1, 2034 - Yield 4.66%†
$17,566,407.30 Capital Appreciation Bonds due July 1, 2035 - Yield 4.67%†
$16,774,069.95 Capital Appreciation Bonds due July 1, 2036 - Yield 4.67%†
$11,460,988.15 Capital Appreciation Bonds due July 1, 2037 - Yield 4.67%†
$15,001,840.00 Capital Appreciation Bonds due July 1, 2042 - Yield 4.77%*
$14,311,260.00 Capital Appreciation Bonds due July 1, 2043 - Yield 4.77%†
$13,651,640.00 Capital Appreciation Bonds due July 1, 2044 - Yield 4.77%†
$12,622,447.65 Capital Appreciation Bonds due July 1, 2045 - Yield 4.77%*

**$324,625,000**
**Special Tax Revenue Bonds, Series 2005B**

**$10,780,000 Serial Bonds***

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2011 | $3,455,000 | 4.00% | 3.16% |
| 2012 | 3,590,000 | 4.00% | 3.28% |
| 2013 | 3,735,000 | 4.00% | 3.39% |

$20,000,000 - 5.00% Term Bonds due July 1, 2037 - Yield 4.50% (approx. price to call 104.001%)
$293,845,000 - 5.00% Term Bonds due July 1, 2041 - Yield 4.54% (approx. price to call 103.674%)

**$699,235,338.80**
**Special Tax Revenue Refunding Bonds, Series 2005C**

**$685,700,000 Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 2011 | $24,550,000† | 5.50% | 3.16% | 2020 | $39,745,000* | 5.50% | 3.87% |
| 2012 | 25,900,000† | 5.50% | 3.28% | 2021 | 41,930,000* | 5.50% | 3.91% |
| 2013 | 27,325,000† | 5.50% | 3.39% | 2022 | 44,240,000* | 5.50% | 3.93% |
| 2014 | 28,825,000† | 5.50% | 3.49% | 2023 | 46,670,000† | 5.50% | 3.94% |
| 2015 | 30,410,000† | 5.50% | 3.57% | 2024 | 49,235,000† | 5.50% | 3.96% |
| 2016 | 32,085,000† | 5.50% | 3.64% | 2025 | 51,945,000† | 5.50% | 3.98% |
| 2017 | 33,850,000† | 5.50% | 3.71% | 2026 | 54,800,000† | 5.50% | 4.01% |
| 2018 | 35,705,000† | 5.50% | 3.78% | 2027 | 57,815,000† | 5.50% | 4.02% |
| 2019 | 37,670,000* | 5.50% | 3.83% | 2028 | 23,000,000† | 5.50% | 4.03% |

$13,535,338.80 Capital Appreciation Bonds due July 1, 2028 - Yield 4.53%†

---

* Insured by Financial Guaranty Insurance Company
† Insured by Ambac Assurance Corporation

No dealer, broker, sales representative or other person has been authorized by the Authority, the Commonwealth or the Underwriters to give any information or to make any representations other than those contained or incorporated by reference herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority, the Commonwealth or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Series 2005 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth or incorporated by reference herein has been obtained from the Authority, the Commonwealth and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Series 2005 Bonds and may not be reproduced or used, in whole or in part, for any other purpose. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 2005 BONDS AND THE OTHER OUTSTANDING SPECIAL TAX REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

**Page**

SUMMARY STATEMENT . . . . . . . . . . . . . . . . . S-1
INTRODUCTORY STATEMENT . . . . . . . . . . . . 1
THE AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . 2
PLAN OF FINANCING . . . . . . . . . . . . . . . . . . . 4
THE SERIES 2005 BONDS . . . . . . . . . . . . . . . . 5
SECURITY FOR THE BONDS . . . . . . . . . . . . . 9
BOND INSURANCE . . . . . . . . . . . . . . . . . . . . . . 13
FEDERAL EXCISE TAXES . . . . . . . . . . . . . . . . 17
THE PUERTO RICO RUM INDUSTRY . . . . . . 20
ADDITIONAL COMMONWEALTH
  APPROPRIATIONS . . . . . . . . . . . . . . . . . . . . . 23
AUTHORITY DEBT . . . . . . . . . . . . . . . . . . . . . . 24
FINANCIAL ASSISTANCE TO BENEFITTED
  ENTITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
TAX MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . 27
VERIFICATION OF MATHEMATICAL
  COMPUTATIONS . . . . . . . . . . . . . . . . . . . . . . 28
ELIGIBILITY OF SERIES 2005 BONDS . . . . . . 29
UNDERWRITING . . . . . . . . . . . . . . . . . . . . . . . . 29
COMMONWEALTH COVENANT . . . . . . . . . . 29
GOVERNMENT DEVELOPMENT BANK
  FOR PUERTO RICO . . . . . . . . . . . . . . . . . . . . 29
LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . 30
RATINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Page**

CONTINUING DISCLOSURE . . . . . . . . . . . . . 30
MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . 32

Appendix  I  -  Summary of the Trust
                Agreement . . . . . . . . . . . . . . . . I-1
Appendix  II -  Audited Financial Statements
                of the Authority, dated
                June 30, 2004 . . . . . . . . . . . . . II-1
Appendix III -  Commonwealth of
                Puerto Rico Financial
                Information and Operating
                Data Report, May 1, 2005 . . . III-1
Appendix IV -  Proposed Form of Opinions
                of Bond Counsel . . . . . . . . . . IV-1
Appendix V  -  Table of Accreted Values
                for the Capital Appreciation
                Bonds . . . . . . . . . . . . . . . . . . . . V-1
Appendix VI -  Specimen Ambac Financial
                Guaranty Insurance Policy . . . VI-1
Appendix VII -  Specimen Financial Guaranty
                Insurance Company Municipal
                Bond New Issue Insurance
                Policy . . . . . . . . . . . . . . . . . . . . VII-1

[This page intentionally left blank]

## SUMMARY STATEMENT

*The following is subject in all respects to the additional information contained in this Official Statement including the Appendices attached hereto. Certain capitalized terms used in this Summary Statement and elsewhere in this Official Statement are defined in "Definitions of Certain Terms" in Summary of the Trust Agreement in Appendix I. Certain other capitalized terms are used in this Official Statement as defined in this Summary Statement.*

**The Authority** . . . . . . . . . . . . . . . Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), was created on June 21, 1988, for the purpose of providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth that develop and operate infrastructure facilities.

**Plan of Financing** . . . . . . . . . . . . The bonds offered hereby, when and if issued (collectively, the "Series 2005 Bonds"), will be issued to finance certain capital projects of Puerto Rico Aqueduct and Sewer Authority ("PRASA") and other instrumentalities and municipalities of the Commonwealth; provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities; repay certain advances made to the Authority by Government Development Bank for Puerto Rico; refund all of the Authority's outstanding Special Tax Revenue Bonds, Series 1997A; and pay capitalized interest and certain costs of issuance of the Series 2005 Bonds. See *Plan of Financing*.

**Security for the Bonds** . . . . . . . . The Authority's Special Tax Revenue Bonds, Series 1988A, Series 1997B, and Series 1998A, in the aggregate principal amount of $137,835,000, which will remain outstanding after the refunding described above (collectively, the "Remaining Bonds"), the Series 2005 Bonds, and any additional bonds that the Authority may from time to time issue under the Trust Agreement (collectively, the "Bonds") are payable solely from and secured by a pledge of Federal Excise Taxes (as defined below) and other moneys deposited to the credit of the Sinking Fund, as follows:

**Federal Excise Taxes** . . . . . . . . . Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), requires that in each fiscal year after fiscal 1998, through fiscal 2006, the first $70 million, and in each fiscal year thereafter through fiscal 2052, the first $90 million, of certain federal excise taxes received by the Commonwealth be deposited in the Authority's Infrastructure Fund. Such taxes consist of the Federal Excise Taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth (the "Federal Excise Taxes"). Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Commonwealth. The Trust Agreement requires the Authority to deposit in the Sinking Fund the Federal Excise Taxes and other moneys deposited in the Infrastructure Fund in such amounts as are required to meet the debt service requirement for all Bonds issued under the Trust Agreement.

Federal Excise Taxes have been transferred to the Commonwealth since 1917 in accordance with certain Acts of Congress. The amount of Federal Excise Taxes transferred to the Commonwealth is $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1,

2006, such amount will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed, unless a proposed one-year extension is approved by Congress. See "Pledged Revenues" under *Security for the Bonds* and "Imposition of Tax" under *Federal Excise Taxes*.

The table below shows the Federal Excise Taxes received by the Commonwealth in each of the last five fiscal years:

| Fiscal Year | Federal Excise Taxes |
|---|---|
| 2000 | $235,397,855 |
| 2001 | 296,472,248 |
| 2002 | 307,906,661 |
| 2003 | 299,045,613 |
| 2004 | 302,785,007 |

The maximum Principal and Interest Requirements (net of capitalized interest) on the Series 2005 Bonds and the Remaining Bonds in any fiscal year is $86 million. During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received at least $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year.

The Federal Excise Taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance by the United States of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Additional Commonwealth Appropriations** . . . . . . . . . . . . .

If the Federal Excise Taxes received by the Commonwealth in any fiscal year are insufficient to deposit $90 million ($70 million before fiscal 2007) in the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget, upon the Authority's request, to include in the recommended budget of the Commonwealth for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make any appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. See *Additional Commonwealth Appropriations*.

**Additional Bonds** . . . . . . . . . . . .

Additional Bonds secured on a parity with the Bonds may be issued for any purpose authorized by the Enabling Act, subject to compliance with certain financial tests provided in the Trust Agreement.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth** . . . . . . . .

The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor. The Commonwealth has never used Federal Excise Taxes for the payment of its

general obligation debt or its guaranteed debt. The incurrence by the Commonwealth of general obligation debt is subject to a constitutional debt limit described herein.

Maximum annual debt service for the Commonwealth's outstanding general obligation debt plus debt service for fiscal 2005 on bonds for which the Commonwealth is currently making payments under its guaranty equals $741,648,153. This amount is equal to 9.97% of $7,439,000,000, which is the average of the adjusted annual internal revenues of the Commonwealth (which excludes Federal Excise Taxes) for the two fiscal years ended June 30, 2003 and 2004. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security for the Bonds*.

**Interest** . . . . . . . . . . . . . . . . . . . . .   Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity as part of the Bonds' Accreted Value.

**Optional Redemption** . . . . . . . . .   The Series 2005B Bonds maturing July 1, 2037 and 2041, may be redeemed by the Authority prior to maturity, upon not less than 30 days' prior notice, either iu whole or in part, and if in part, as directed by the Authority. See "Optional Redemption" under *Redemption Provisions*.

**Trustee** . . . . . . . . . . . . . . . . . . . . . .   U.S. Bauk Trust National Association, successor trustee.

**Ratings** . . . . . . . . . . . . . . . . . . . . . .   Standard & Poor's: "BBB+;" Moody's: "Baa2." See *Ratings*.

**Bond Insurance** . . . . . . . . . . . . . .   The payment when due of principal of and interest on the Series 2005A Bonds, certain Series 2005B Bonds and the Series 2005C Bonds will be insured by bond insurance policies as indicated on the inside cover page and as described herein. See *Bond Insurance*.

**Tax Matters** . . . . . . . . . . . . . . . . .   In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from all state, Commonwealth and local income taxes. However, see *Tax Matters* beginning on page 27 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

[This page intentionally left blank]

**$1,332,962,916.15**
**Puerto Rico Infrastructure Financing Authority**
**$309,102,577.35 Special Tax Revenue Bonds, Series 2005A**
**$324,625,000 Special Tax Revenue Bonds, Series 2005B**
**$699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C**

### INTRODUCTORY STATEMENT

The purpose of this Official Statement is to provide certain information in connection with the issuance and sale by Puerto Rico Infrastructure Financing Authority (the "Authority") of its Special Tax Revenue Bonds, Series 2005A, in the aggregate principal amount of $309,102,577.35 (the "Series 2005A Bonds"), its Special Tax Revenue Bonds, Series 2005B, in the aggregate principal amount of $324,625,000 (the "Series 2005B Bonds"), and its Special Tax Revenue Refunding Bonds, Series 2005C, in the aggregate principal amount of $699,235,338.80 (the "Series 2005C Bonds" and together with the Series 2005A Bonds and the Series 2005B Bonds, the "Series 2005 Bonds"). A portion of the Series 2005A Bonds and Series 2005C Bonds (as shown on the inside cover) will be issued as Capital Appreciation Bonds (as defined in the Trust Agreement hereinafter mentioned).

The Series 2005 Bonds are being issued pursuant to Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), a Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and a resolution of the Board of Directors of the Authority adopted on June 2, 2005 (the "Bond Resolution"). The Series 2005 Bonds are expected to be delivered on or about June 16, 2005.

This Official Statement includes brief descriptions of the Enabling Act, the Series 2005 Bonds (and the other outstanding Bonds of the Authority secured on a parity with the Series 2005 Bonds), the Bond Resolution and the Trust Agreement. Such descriptions do not purport to be complete and are qualified in their entirety by reference to such documents. All references to the Series 2005 Bonds are qualified in their entirety by reference to the definitive forms thereof contained in the Bond Resolution. Copies of all such documents and agreements are available for inspection during regular business hours at the offices of Government Development Bank for Puerto Rico ("Government Development Bank"), located at 140 Broadway, 38th Floor, New York, New York 10005 and at the Government Development Bank for Puerto Rico Building, Minillas Government Center, San Juan, Puerto Rico 00940, or at the corporate trust office of the Trustee at 100 Wall Street, Suite 1600, New York, New York 10005.

This Official Statement, which includes the cover page and the Appendices hereto, incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2004, together with the independent auditor's report thereon, dated April 8, 2005, of KPMG LLP ("KPMG"), certified public accountants (collectively, the "CAFR"). The CAFR has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). KPMG did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. This Official Statement also includes the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated as of May 1, 2005 (the "Commonwealth Report"), attached hereto as Appendix III.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the CAFR that is filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB"), or any new or revised Commonwealth Report or CAFR, or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the CAFR that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Series 2005 Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the CAFR shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a

statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, New York 10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the CAFR may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The address of the MSRB is 1900 Duke Street, Suite 600, Alexandria, Virginia 22314, telephone number (703) 797-6600.

Certain capitalized terms used in this Official Statement are defined in "Definition of Certain Terms" in *Summary of Trust Agreement* in Appendix I. Certain other capitalized terms are defined in the Summary Statement.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Authority's and the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## THE AUTHORITY

### General

The Commonwealth recognizes the importance of developing, maintaining and improving its infrastructure to promote Puerto Rico's economic development. Accordingly, the Commonwealth has established the Authority as a public corporation and instrumentality with two principal functions: (i) providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth responsible for developing and operating infrastructure facilities, and (ii) providing an alternative means for directly financing those facilities.

The Enabling Act defines "infrastructure" to include public works and facilities of a substantial public interest, such as aqueduct and sewer systems including water supply systems, waste water treatment and disposal systems, improvements financed under the provisions of Title VI of the Federal Clean Water Act and Title I of the Federal Safe Drinking Water Act, solid and hazardous waste disposal systems, resource recovery systems, electric power systems, highways, roads, pedestrian walkways, parking facilities, airports, convention centers, bridges, maritime ports, tunnels, transportation systems including mass transportation, communication systems including telephones, industrial facilities, land and natural resources, public housing projects, and tourist, medical and agro-industrial infrastructure facilities.

The Authority has all the necessary and convenient powers to accomplish and effectuate the purposes and provisions of the Enabling Act, including the power to negotiate and enter into assistance agreements with political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth authorized to provide infrastructure for the purpose of carrying out necessary financing programs for the development of infrastructure and providing consulting, technical, administrative, advisory, and other assistance in all matters related to such facilities. Any such entity receiving assistance from the Authority (a "Benefitted Entity") may be required to comply with all

operational, administrative and budgetary requirements that the Authority considers pertinent to achieve the purposes of said assistance.

At its creation in 1988, the Authority's principal undertaking was to provide financial and other assistance to Puerto Rico Aqueduct and Sewer Authority ("PRASA") pursuant to the terms of an assistance agreement, as amended, between PRASA and the Authority. More recently, however, the Authority has signed assistance agreements with other Commonwealth instrumentalities and municipalities involved in infrastructure projects, including the Department of Education, the Department of Natural and Environmental Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation and the Special Communities Perpetual Trust. See *Plan of Financing* and *Financial Assistance to Benefitted Entities*.

The executive offices of the Authority are located at the Capital Center Building II, 235 Arterial Hostos Avenue, Suite 1601, San Juan, Puerto Rico 00918. The telephone number is (787) 763-5757.

## Powers

The Authority has broad powers under the Enabling Act, including, among others, the power to: sue and be sued; make contracts; acquire properties by eminent domain or otherwise; borrow money and issue bonds for any of its corporate purposes, including the financing of the construction, rehabilitation, acquisition, repair, preservation and replacement of portions of the infrastructure of Puerto Rico; mortgage or pledge any property and pledge all or a portion of the Authority's revenues, including Federal Excise Taxes (see "Pledged Revenues" under *Security for the Bonds*) or other funds transferred by the Commonwealth to the Authority for the payment of the principal of and interest on any bonds issued by the Authority or bonds issued by a Benefitted Entity; provide assistance to Benefitted Entities as permitted by and consistent with the purposes of the Enabling Act; and fix, impose and collect rents, fees, rates and other charges for the use of any of its properties.

## Management

The Enabling Act provides that the Board of Directors of the Authority (the "Board") shall be composed of the Board of Directors of Government Development Bank and the Secretary of the Treasury of Puerto Rico (in the event the Secretary of the Treasury is not a member of Government Development Bank's Board of Directors). Members of the boards or officers of any Benefitted Entity are specifically excluded from serving on the Board. The Secretary of the Treasury is the Chairman of the Board. The Board currently has one vacancy. The members of the Board are:

| Name | Term Ends | Occupation |
|------|-----------|------------|
| Juan C. Méndez | Indefinite | Secretary of the Treasury |
| Alfredo Salazar | September 22, 2008 | Chairman of the Board of Directors of Government Development Bank |
| Jorge P. Silva | September 22, 2006 | Secretary of Commerce and Economic Development |
| Ileana I. Fas | September 22, 2007 | Director of the Office of Management and Budget |
| José F. Rodríguez | September 20, 2008 | Businessman |
| Rafael Martínez | September 22, 2006 | Certified Public Accountant |

The Board appoints officers and employs agents and employees who are responsible for the general operation of the Authority. Set forth below is a brief biographical description of the Acting Executive Director of the Authority. The Authority currently does not have any other designated officers.

3

Magda L. Aguiar-Serrano, Esq. was appointed to the office of Acting Executive Director effective December 15, 2004. She is an attorney with over 22 years of experience working in several government entities, mainly in the areas of construction law, land acquisition and contracts. Ms. Aguiar-Serrano has been the Authority's Legal Director since February 2001. As such, she oversees all legal matters related to the Authority's construction projects on behalf of PRASA and other Benefitted Entities.

## PLAN OF FINANCING

### Series 2005A and 2005B Bonds

The Authority is issuing the Series 2005A and 2005B Bonds to (i) provide approximately $292 million in financial assistance to PRASA and other Commonwealth instrumentalities and municipalities in connection with certain capital projects, including the repayment of approximately $26 million for certain advances made to the Authority by Government Development Bank for the purpose of providing funds to pay certain capital improvements by the Authority or other Commonwealth instrumentalities, (ii) provide approximately $317 million in working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (iii) pay capitalized interest and costs of issuance of the Series 2005A and 2005B Bonds. The Bond proceeds earmarked for PRASA and non-PRASA projects will be deposited into a special construction fund administrated by the Authority on behalf of the applicable Benefitted Entities.

### Series 2005C Bonds

The Authority is issuing the Series 2005C Bonds to refund all of its Special Tax Revenue Bonds, Series 1997A, on January 1, 2008 in the amounts and maturities identified in the table below (the "Refunded Bonds") and pay capitalized interest and costs of issuance of the Series 2005C Bonds.

| Maturity Date July 1, | Principal Amount to be Refunded | Interest Rate | Redemption Price | CUSIP No. |
|---|---|---|---|---|
| 2011 | $ 27,425,000 | 5.00% | 101% | 745220 AB9 |
| 2012 | 28,795,000 | 5.00% | 101% | 745220 AC7 |
| 2013 | 30,235,000 | 5.00% | 101% | 745220 AD5 |
| 2014 | 31,745,000 | 5.00% | 101% | 745220 AE3 |
| 2015 | 33,335,000 | 5.00% | 101% | 745220 AF0 |
| 2016 | 35,000,000 | 5.00% | 101% | 745220 AG8 |
| 2017 | 36,750,000 | 5.00% | 101% | 745220 AH6 |
| 2021 | 166,315,000 | 5.00% | 101% | 745220 AM5 |
| 2028 | 381,885,000 | 5.00% | 101% | 745220 AU7 |
| Total ........ | $771,485,000 | | | |

This refunding will permit the Authority to realize present value savings on its debt service requirements on certain Bonds outstanding under the Trust Agreement. The Authority will deposit the net proceeds of the Series 2005C Bonds, together with certain other available moneys, with the Trustee, as escrow agent, in a special redemption fund under the terms of an Escrow Deposit Agreement. Such net proceeds, together with such other available moneys, will be invested in Government Obligations the principal of and interest on which when due, together with any moneys deposited with the Trustee remaining uninvested, will provide moneys sufficient to pay the principal of and redemption premium and interest on the Refunded Bonds on the date of redemption and the interest to accrue on such Bonds through the date of redemption.

Upon the deposit with the Trustee referred to above, in the opinion of Bond Counsel, the Refunded Bonds will no longer be outstanding under the provisions of the Trust Agreement. After such refunding, $137,835,000 aggregate

4

principal amount of the Authority's Special Tax Revenue Bonds, Series 1988A, Series 1997B, and Series 1998A, will remain outstanding (the "Remaining Bonds").

## Use of Proceeds

Sources:

| | |
|---|---|
| Principal Amount of Series 2005A Bonds | $ 309,102,577.35 |
| Principal Amount of Series 2005B Bonds | 324,625,000.00 |
| Principal Amount of Series 2005C Bonds | 699,235,338.80 |
| Deposit from Bond Service Account | 19,287,125.00 |
| Net Original Issue Premium | 152,015,081.80 |
| Total | $ 1,504,265,122.95 |

Uses:

| | |
|---|---|
| Deposit into escrow for Refunded Bonds | $ 820,034,071.30 |
| Deposit to Commonwealth's General Fund | 317,046,386.84 |
| Deposit to Special Construction Fund | 265,937,289.13 |
| Repayment of Government Development Bank Line of Credit | 26,331,792.00 |
| Deposit to Special Construction Fund (capitalized interest) | 22,695,250.00 |
| Bond Insurance | 41,724,970.87 |
| Underwriter's Discount, Legal, Priuting and Other Issuance Expenses | 10,495,362.73 |
| Total | $1,504,265,122.95 |

A portion ($22,695,250.00) of the proceeds of the Series 2005A, Series 2005B and Series 2005C Bonds, as set forth in the table above, will be allocated to capitalized interest. This amount of capitalized interest, which will be irrevocably set aside for this purpose, will have the effect, by virtue of the definitiou of Principal and Interest Requirements (see paragraph (g) of said definition in *Summary of the Trust Agreement* in Appendix I), of reducing total debt service requirements in fiscal 2006 to $58.8 million, which is lower than the annual amounts of Special Tax Revenues deposited in the Infrastructure Fund, as described in "Pledged Revenues" under *Security for the Bonds*, during the period ending June 30, 2006, thereby euabling the Authority to satisfy the coverage tests for the issuance of additional Bonds. See "Additional and Refunding Bonds" uuder *Security for the Bonds*.

## THE SERIES 2005 BONDS

### General

The Series 2005 Bonds (except for the Capital Appreciation Bonds) will bear interest at the rates, payable on January 1 and July 1 in cach year, beginning January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. The Series 2005A Bonds maturing on July 1 of years 2029 through 2037, inclusive, and 2042 through 2045, inclusive, and the Series 2005C Bonds maturing on July 1, 2028, are being issued as "capital appreciation bonds" (such capital appreciation bonds are referred to herein as "Capital Appreciation Bonds"). The Capital Appreciation Bonds will accrue interest payable at maturity as part of their "Accreted Value" based on the yields sct forth on the inside cover. The Accreted Value (per $5,000 maturity amount) of each maturity and series of the Capital Appreciation Bonds on each January 1 and July 1 is set forth in Appendix V hereof. The Accreted Value of the Capital Appreciation Bonds on any other date is calculated on the assumption that such Accreted Value increases in equal daily amounts, on the basis of a year of twelve 30-day months, up to thc Accreted Value on the next January 1 or July 1, as appropriate.

The Series 2005 Bonds mature on the dates and in the principal amounts set forth ou the inside cover. The Series 2005 Bonds will be dated the date of their delivery, which is expected to be on or about June 16, 2005. The Series 2005 Bonds will be issued in fully registered form, will be in denomiuations of $5,000 aud any multiple thereof

5

($5,000 maturity amount and any multiple thereof in the case of the Capital Appreciation Bonds), and when issued will initially be registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Series 2005 Bonds. The Series 2005 Bonds are subject to redemption at the times and in the manner set forth below in "Redemption Provisions."

Simultaneously with the delivery of the Series 2005 Bonds: (i) Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation ("Ambac Assurance"), has committed to issue a financial guaranty insurance policy in the form of Appendix VI insuring the payment when due of principal of and interest on the Series 2005A Bonds maturing July 1 of the years 2029, 2034 through 2037, inclusive, 2043 and 2044, and the Series 2005C Bonds maturing July 1 of the years 2011 through 2018, and 2023 through 2028, both inclusive, (the "Ambac Insured Bonds") as provided therein (the "Ambac Insurance Policy"); and (ii) Financial Guaranty Insurance Company, a New York stock insurance company ("Financial Guaranty"), has committed to issue a municipal bond new issue insurance policy in the form of Appendix VII insuring the payment when due of principal of and interest on the Series 2005A Bonds maturing July 1 of the years 2014 through 2028 and 2030 through 2033, both inclusive, 2042 and 2045; the Series 2005B Bonds maturing July 1 of years 2011 through 2013, inclusive; and the Series 2005C Bonds maturing July 1 of the years 2019 through 2022, inclusive (the "Financial Guaranty Insured Bonds"), as provided therein (the "Financial Guaranty Insurance Policy"). The Ambac Assurance Insured Bonds and the Financial Guaranty Insured Bonds are hereinafter sometimes collectively referred to as the "Insured Bonds."

As provided in the Bond Resolution, as long as Ambac Assurance and Financial Guaranty shall not then be in default on their respective Insurance Policies, they shall be deemed to be the owners of the respective Insured Bonds insured by them for purposes of, among other things, the giving of consents to the execution of any supplemental agreement to the Trust Agreement and for taking any remedial action under the Trust Agreement.

### Book-Entry Only System

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority and the Underwriters believe to be reliable, but the Authority and the Underwriters take no responsibility for the accuracy thereof.

DTC will act as securities depository for the Series 2005 Bonds. The Series 2005 Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully-registered Series 2005 Bond will be issued in the aggregate principal amount of each maturity and series, and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2 million issuers of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants (the "Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions, in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, GSCC, MBSCC, and EMCC are also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC

6

Rules applicable to its Participants are on file with the Securities and Exchange Commission (the "SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Series 2005 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2005 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2005 Bond (a "Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2005 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Series 2005 Bonds, except in the event that use of the book-entry system for the Series 2005 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2005 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Series 2005 Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2005 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (or such other DTC nominee) will consent or vote with respect to the Series 2005 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2005 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, interest and other principal payments on the Series 2005 Bonds will be made to Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Authority, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, interest and other principal payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Trustee or the Authority, disbursement of such payments to Direct Participants is the responsibility of DTC, and disbursement of such payments to the Beneficial Owners is the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Series 2005 Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Series 2005 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, also definitive Series 2005 Bonds will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued, the following provisions will apply: principal of and interest on the Series 2005 Bonds will be payable at maturity in lawful money of the United States of America upon presentation and surrender of Series 2005 Bonds at the principal office of the Trustee in New York, New York.

The Series 2005 Bonds will be issued only as registered bonds without coupons in denominations of $5,000 and any multiple thereof ($5,000 maturity amount and any multiple thereof in the case of the Capital Appreciation Bonds). The transfer of the Series 2005 Bonds will be registrable and they may be exchanged at the principal office of the Trustee in New York, New York, upon the payment of any taxes or other governmental charges required to be paid with respect to such registration of transfer or exchange.

## Redemption Provisions

The Series 2005A and 2005C Bonds are not subject to redemption prior to maturity.

*Optional Redemption.* The Series 2005B Bonds maturing July 1, 2037 and 2041 may be redeemed without premium at the option of the Authority prior to maturity, upon not less than thirty (30) days' prior notice, either in whole or in part, and if in part, as directed by the Authority, on any date not earlier than July 1, 2015, from any moneys available therefor (other than moneys held by the Trustee in respect of an Amortization Requirement), at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date.

*Amortization Requirements.* The Series 2005B Bonds maturing July 1, 2041 shall be redeemed in part on July 1, 2038, and each July 1 thereafter in the principal amounts equal to the Amortization Requirements (less the principal amount of any Series 2005B Bonds retired by purchase) from moneys in the Redemption Account at par plus accrued interest as follows:

| Fiscal Year ending June 30, | Amortization Requirements for Series 2005B Bonds due July 1, 2041 |
|---|---|
| 2038 | $67,845,000 |
| 2039 | 71,500,000 |
| 2040 | 75,500,000 |
| 2041 | 79,000,000* |
| Average life (years) | 34.6 |

* Final maturity.

*Notice of Redemption.* At least thirty (30) days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described above, by first class mail, postage prepaid to the registered owners of the Series 2005 Bonds to be redeemed and to the national information services whose names and addresses are included in the most recent list thereof furnished to the Trustee by the Authority, as set forth in the Trust Agreement. Each notice of redemption shall contain, among other things, the CUSIP identification number and the numbers of the Series 2005 Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which Series 2005 Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Series 2005 Bond will not affect the validity of the proceedings for the redemption of any other Series 2005 Bond. Any defect in such notice or the failure so to mail any such notice to any such national information service will not affect the effectiveness of a call for redemption.

*Selection of Series 2005 Bonds to be Redeemed.* If less than all of the Series 2005 Bonds of any one maturity and series are called for redemption, the particular Series 2005 Bonds or portions thereof to be redeemed will be selected by the Trustee by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Series 2005 Bonds and such Participants shall in turn select those Beneficial Owners

8

whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion deems fair and appropriate.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and redemption premium, if any, and accrued interest on the Series 2005 Bonds or portions thereof so called for redemption being held by the Trustee, interest on the Series 2005 Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the Trust Agreement, Series 2005 Bonds and portions of Series 2005 Bonds which have been duly called for redemption under the provisions of the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for the payment of the principal of and redemption premium, if any, and the accrued interest on which sufficient moneys or investments permitted by law shall be held in separate trust for the owners of the Series 2005 Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Trust Agreement, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the redemption premium, if any, and the accrued interest thereon from said separate trust.

## SECURITY FOR THE BONDS

The Bonds (including the Series 2005 Bonds) are payable solely from, and secured by a pledge of, the revenues and other moneys deposited in the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund (the "Sinking Fund") established under the Trust Agreement (the "Pledged Revenues"). The Sinking Fund includes the Bond Service Account, the Redemption Account and the Reserve Account. The last remaining outstanding Bonds secured by a pledge of the moneys on deposit in the Reserve Account will mature on July 1, 2005, at which time the Reserve Account will no longer apply to the Bonds. Consequently, no further reference will be made to the Reserve Account in this Official Statement.

### Pledged Revenues

Pledged Revenues consist of: (i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

Under the provisions of Section 9 of the Puerto Rican Federal Relations Act and Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended (the "Code"), any excise tax imposed and collected by the United States on articles produced in the Commonwealth and transported to the United States (less the estimated amount necessary for payments of refunds and drawbacks) is required to be transferred to the Commonwealth. Rum is the only article currently produced in Puerto Rico that is subject to the Federal Excise Tax. The United States Treasury is required by federal law to transfer to the Commonwealth the lesser of $10.50 per proof gallon ($13.25 per proof gallon during the period July 1, 1999 through December 31, 2005) or excise tax imposed on each proof gallon of rum produced in Puerto Rico and sold in the United States, currently set at the rate of $13.50 per proof gallon. For fiscal year 2004, the amount of Federal Excise Taxes transferred to the Commonwealth was $302,785,007. See *Federal Excise Taxes*.

The Enabling Act requires the Secretary of the Treasury of the Commonwealth to transfer to the Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Infrastructure Fund"), a special fund created by the Enabling Act to be maintained by or on behalf of the Authority, the first $70 million of Federal Excise Taxes received by the Commonwealth in each fiscal year after fiscal 1998 through fiscal 2006, and the first $90 million received in each fiscal year thereafter through fiscal 2052 (the Federal Excise Taxes deposited to the credit of the Infrastructure Fund are referred to as the "Special Tax Revenues"). During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received the first $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year. See "Federal Excise Tax Revenues" under *Federal Excise Taxes*.

9

If the Federal Excise Taxes received in any fiscal year are insufficient to make the required deposit to the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget to include, upon the Authority's request, in the recommended budget for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make the necessary appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. For more information on the budgetary process of the Commonwealth, see *Additional Commonwealth Appropriations*.

Federal Excise Taxes have represented a stable source of revenues for the Commonwealth. The federal law requiring the transfer of Federal Excise Taxes to the Commonwealth has been in effect since 1917. In addition, since fiscal year 1988 Federal Excise Taxes have been no less than $166 million ($180 million if adjusted to take into account a change made by the Puerto Rico Department of the Treasury in June 1993 in the method used to report the collection of Federal Excise Taxes from an accrual to a cash basis). The level of Federal Excise Taxes transferred in the future may be affected by factors beyond the control of the Commonwealth, such as changes in federal legislation affecting the imposition or transfer of such taxes and conditions in the Puerto Rico rum industry.

Pursuant to the proposed Highway Reauthorization and Excise Tax Simplification Act of 2005 pending before Congress (the "2005 Highway Reauthorization Act"), the amount of Federal Excise Taxes per proof gallon transferred to the Commonwealth would increase from $13.25 to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, the Federal Excise Taxes transferred to the Commonwealth would revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. If the 2005 Highway Reauthorization Act becomes law, it will require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Puerto Rico Conservation Trust Fund, a Puerto Rico charitable trust (the "Conservation Trust Fund"). Based on 2004 sales of rum, the amount that would be required to be transferred to the Conservation Trust Fund in 2006 is approximately $13.6 million. The Conservation Trust Fund was established pursuant to a Memorandum of Understanding, dated December 24, 1968, between the U.S. Department of the Interior and the Commonwealth to protect and enhance the natural resources and beauty of Puerto Rico through the acquisition and active management of lands possessing great ecological, aesthetic or historical value in Puerto Rico. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended, the Secretary of the Treasury is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by making prescribed monthly deposits into the Commonwealth Redemption Fund. As of April 30, 2005, the amount on deposit in the Redemption Fund was $299.5 million, which is the required amount for the payment of the July 1, 2005 period.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. The Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues (revenues raised under the provisions of Commonwealth legislation) consist principally of income taxes and excise taxes. Certain revenues, such as Federal Excise Taxes and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

As of December 31, 2004, $2.9 billion of Commonwealth guaranteed bonds of the Public Buildings Authority and $267 million of Commonwealth guaranteed obligations of Government Development Bank were outstanding. No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority or obligations of Government Development Bank.

As of December 31, 2004, the aggregate outstanding amount of the Series 1995 revenue bonds of PRASA guaranteed by the Commonwealth (the "PRASA Guaranteed Bonds") was $305.3 million. On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In April 2000, the Commonwealth extended its guaranty to all the outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of PRASA. The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005. In February 2004, this guaranty was extended through new legislation to cover PRASA's debt obligations issued until 2010. As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

Maximum annual debt service for the Commonwealth's general obligation debt outstanding as of December 31, 2004, is $600.6 million in fiscal 2020. This calculation does not take into account debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds are considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation. If such bonds are included therein, maximum annual debt service for the Commonwealth's general obligation debt outstanding would be $711.5 million in fiscal 2005. Debt service for the PRASA Guaranteed Bonds in fiscal 2005 (including for this purpose debt service payments due July 1, 2005) is $30.1 million. The sum of those amounts ($741.6 million) is equal to 9.97% of $7.439 billion, which is the average of the Commonwealth's adjusted internal revenues for the two fiscal years ended June 30, 2003 and 2004. See "Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt" under *Debt* in the Commonwealth Report.

## Flow of Funds

Under the Trust Agreement, the Authority must withdraw Special Tax Revenues and other moneys from the Infrastructure Fund and make the following deposits:

(a) first, to the credit of the Bond Service Account, such amount as may be required to make the total amount to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

11

(b)        second, to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Infrastructure Fund to make (i) any payment necessary to satisfy then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component. After making the foregoing applications, the Authority may apply any moneys to the credit of the Infrastructure Fund to any lawful purpose. See *Summary of the Trust Agreement* in Appendix I.

**Additional and Refunding Bonds**

Under the Trust Agreement, the Authority may issue additional Bonds for any lawful purpose of the Authority, provided that, among other things, the following coverage tests are met:

(a)        the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of issuance of such additional Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years, shall not be less than 200% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding, and the additional Bonds to be issued; and

(b)        the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that requires such increased amount, if received from the federal government, to be deposited to the credit of the Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding, shall not be less than 100% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the additional Bonds to be issued.

The average annual Federal Excise Taxes for the two Fiscal Years in the period ended June 30, 2004, computed on the basis of $13.25 per proof gallon, is equal to $303,539,000. That amount is more than 200% of $86 million, which is the maximum aggregate Principal and Interest Requirements for any Fiscal Year on all Bonds currently Outstanding and the Series 2005 Bonds, after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*. In addition, the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two Fiscal Years in the period ended June 30, 2004 is $90 million adjusted as permitted by the Trust Agreement to reflect the increase of Special Tax Revenues deposited to the Infrastructure Fund that will occur beginning in fiscal 2007. That amount is more than 100% of $86 million, which is the maximum aggregate Principal and Interest Requirements on the Remaining Bonds and the Series 2005 Bonds after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*.

Additional Bonds may also be issued for the purpose of refunding all or a portion of any series of Bonds then Outstanding by meeting the coverage tests described in paragraphs (a) and (b) above or if (i) the Principal and Interest

Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of such refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

## BOND INSURANCE

### Ambac Insured Bonds

The following information has been furnished by Ambac Assurance for use in this Official Statement. Reference is made to Appendix VI to this Official Statement for a specimen of the Ambac Insurance Policy. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payment Pursuant to Ambac Insurance Policy.* Ambac Assurance has made a commitment to issue the Ambac Insurance Policy relating to the Ambac Insured Bonds effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Insurance Policy, Ambac Assurance will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the Ambac Insured Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor (as such terms are defined in the Ambac Insurance Policy). Ambac Assurance will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which Ambac Assurance shall have received notice of Nonpayment from the Trustee. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac Assurance.

The Ambac Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac Assurance will remain obligated to pay principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does not insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Ambac Insurance Policy does not cover:

1.  payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

2.  payment of any redemption, prepayment or acceleration premium; or

3.  nonpayment of principal or interest caused by the insolvency or negligence of the Trustee.

If it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac Assurance to the extent of the payment under the Ambac Insurance Policy. Payment of interest pursuant to the Ambac Insurance Policy requires proof of Holder entitlement to interest payments and an appropriate assignment of the Holder's right to payment to Ambac Assurance.

Upon payment of the insurance benefits, Ambac Assurance will become the owner of the Ambac Insured Bond, appurtenant coupon, if any, or right to payment of principal or interest on such Ambac Insured Bond and will be fully subrogated to the surrendering Holder's rights to payment.

*Ambac Assurance Corporation.* Ambac Assurance is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth and the U.S. Virgin Islands, with admitted assets of approximately $8,585,000,000 (unaudited) and statutory capital of approximately $5,251,000,000 (unaudited) as of March 31, 2005. Statutory capital consists of Ambac Assurance's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit Markets Services, a Division of The McGraw-Hill Companies, Inc., Moody's Investors Service and Fitch Ratings have each assigned a triple-A financial strength rating to Ambac Assurance.

Ambac Assurance has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an Ambac Insured Bond by Ambac Assurance will not affect the treatment for federal income tax purposes of interest on such Ambac Insured Bond and that insurance proceeds representing maturing interest paid by Ambac Assurance under policy provisions substantially identical to those contained in its financial guaranty insurance policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor of the Ambac Insured Bonds.

Ambac Assurance makes no representation regarding the Ambac Insured Bonds or the advisability of investing in the Ambac Insured Bonds and makes no representation regarding, nor has it participated in the preparation of, this Official Statement other than the information supplied by Ambac Assurance and presented under the heading "Ambac Insured Bonds".

*Available Information.* The parent company of Ambac Assurance, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company . These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of Ambac Assurance's financial statements prepared in accordance with statutory accounting standards are available from Ambac Assurance. The address of Ambac Assurance's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

*Incorporation of Certain Documents by Reference.* The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

1.  The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2004 and filed on March 15, 2005;

2.  The Company's Current Report on Form 8-K dated April 5, 2005 and filed on April 11, 2005;

3.  The Company's Current Report on Form 8-K dated and filed on April 20, 2005;

4.  **The Company's Current Report on Form 8-K dated May 3, 2005 and filed on May 5, 2005; and**

5.  The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2005 and filed on May 10, 2005.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in *"Available Information"*.

## Financial Guaranty Insured Bonds

The following information has been provided by Financial Guaranty for use in this Official Statement. Reference is made to Appendix VII to this Official Statement for a specimen of the Financial Guaranty Insurance Policy. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payments Under the Policy.* Concurrently with the issuance of the Series 2005 Bonds, as indicated on the inside cover page of this Official Statement, Financial Guaranty will issue its Financial Guaranty Insurance Policy for the Financial Guaranty Insured Bonds. The Financial Guaranty Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the Financial Guaranty Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the issuer of the Financial Guaranty Insured Bonds (the "Issuer"). Financial Guaranty will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the Policy) from an owner of Bonds or the trustee or paying agent (if any) of the nonpayment of such amount by the Issuer. The Fiscal Agent will disburse such amount due on any Financial Guaranty Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in Financial Guaranty. The term "nonpayment" in respect of a Financial Guaranty Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a Financial Guaranty Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the Financial Guaranty Insurance Policy is non-cancellable by Financial Guaranty. The Financial Guaranty Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the Financial Guaranty Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the Financial Guaranty Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The Financial Guaranty Insurance Policy also covers the failure to pay interest on the stated date for its payment. In the event that payment of the Financial Guaranty Insured Bonds is accelerated, Financial Guaranty will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, Financial Guaranty will become the owner of the Financial Guaranty Insured Bond, appurtenant coupon or right to payment of principal or interest on each such Financial Guaranty Insured Bond and will be fully subrogated to all of the Bondholder's rights thereunder.

The Financial Guaranty Insurance Policy does not insure any risk other than Nonpayment by the Issuer, as defined in the Financial Guaranty Insurance Policy. Specifically, the Policy does not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the Trustee.

15

The Financial Guaranty Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

**Financial Guaranty Insurance Company**

Financial Guaranty, a New York stock insurance corporation, is a direct, wholly-owned subsidiary of FGIC Corporation, a Delaware corporation, and provides financial guaranty insurance for public finance and structured finance obligations. Financial Guaranty is licensed to engage in financial guaranty insurance in all 50 states, the District of Columbia and the Commonwealth and, through a branch, in the United Kingdom.

On December 18, 2003, an investor group consisting of The PMI Group, Inc. ("PMI"), affiliates of The Blackstone Group L.P. ("Blackstone"), affiliates of The Cypress Group L.L.C. ("Cypress") and affiliates of CIVC Partners L.P. ("CIVC") acquired FGIC Corporation (the "FGIC Acquisition") from a subsidiary of General Electric Capital Corporation ("GE Capital"). PMI, Blackstone, Cypress and CIVC acquired approximately 42%, 23%, 23% and 7%, respectively, of FGIC Corporation's common stock. FGIC Corporation paid GE Capital approximately $284.3 million in pre-closing dividends from the proceeds of dividends it, in turn, had received from Financial Guaranty, and GE Capital retained approximately $234.6 million in liquidation preference of FGIC Corporation's convertible participating preferred stock and approximately 5% of FGIC Corporation's common stock. Neither FGIC Corporation nor any of its shareholders is obligated to pay any debts of Financial Guaranty or any claims under any insurance policy, including the Financial Guaranty Insurance Policy, issued by Financial Guaranty.

Financial Guaranty is subject to the insurance laws and regulations of the State of New York, where it is domiciled, including Article 69 of the New York Insurance Law ("Article 69"), a comprehensive financial guaranty insurance statute. Financial Guaranty is also subject to the insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction, but generally require insurance companies to maintain minimum standards of business conduct and solvency, to meet certain financial tests, to comply with requirements concerning permitted investments and the use of policy forms and premium rates and to file quarterly and annual financial statements on the basis of statutory accounting principles ("SAP") and other reports. In addition, Article 69, among other things, limits the business of each financial guaranty insurer, including Financial Guaranty, to financial guaranty insurance and certain related lines.

For the three months ended March 31, 2005, and the years ended December 31, 2004, and December 31, 2003, Financial Guaranty had written directly or assumed through reinsurance, guaranties of approximately $14.8 billion, $59.5 billion and $42.4 billion par value of securities, respectively (of which approximately 71%, 56% and 79%, respectively, constituted guaranties of municipal bonds), for which it had collected gross premiums of approximately $84.4 million, $323.6 million and $260.3 million, respectively. For the three months ended March 31, 2005, Financial Guaranty had reinsured, through facultative and excess of loss arrangements, approximately 0.5% of the risks it had written.

As of March 31, 2005, Financial Guaranty had net admitted assets of approximately $3.215 billion, total liabilities of approximately $2.040 billion, and total capital and policyholders' surplus of approximately $1.175 billion, determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

The unaudited financial statements of Financial Guaranty as of March 31, 2005, the audited financial statements of Financial Guaranty as of December 31, 2004, and the audited financial statements of Financial Guaranty as of December 31, 2003, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading "*Financial Guaranty Insured Bonds,*" or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by Financial Guaranty with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of Financial Guaranty (if any) included in documents filed by Financial Guaranty with the NRMSIRs subsequent to the date of this Official Statement and prior to the

16

termination of the offering of the Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

Financial Guaranty also prepares quarterly and annual financial statements on the basis of generally accepted accounting principles. Copies of Financial Guaranty's most recent GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. Financial Guaranty's telephone number is (212) 312-3000.

## Financial Guaranty's Credit Ratings

The financial strength of Financial Guaranty is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of Financial Guaranty should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of Financial Guaranty. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the Financial Guaranty Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market prices of the Financial Guaranty Insured Bonds. Financial Guaranty does not guarantee the market prices or investment values of the Financial Guaranty Insured Bonds nor does it guarantee that the ratings on the Financial Guaranty Insured Bonds will not be revised or withdrawn.

**Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure that is provided to potential purchasers of the Series 2005 Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the Financial Guaranty Insurance Policy under the heading "*Financial Guaranty Insured Bonds*." In addition, Financial Guaranty makes no representation regarding the Series 2005 Bonds or the advisability of investing in the Series 2005 Bonds.**

## FEDERAL EXCISE TAXES

### Background

The imposition of excise taxes has a long history under United States law, as does the transfer of Federal Excise Taxes to Puerto Rico. Such transfer is required under certain Acts of Congress that establish the unique political and legal relationship between Puerto Rico and the United States.

Excise taxes were first imposed in the United States in 1790 and have remained in force since then except for a short period in the early part of the 19th century. The transfer of Federal Excise Taxes to Puerto Rico began with the Organic Act of 1917, popularly known as the Jones Act, passed by Congress on March 2, 1917. Section 9 of the Jones Act provided that "all taxes collected under the revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the Island shall be covered into the Treasury of Puerto Rico." This transfer was intended to provide revenues for Puerto Rico government expenditures.

In 1950, when Congress enacted legislation providing for the establishment of a constitutional government in Puerto Rico, Section 9 of the Jones Act was incorporated as Section 9 of the Puerto Rican Federal Relations Act. The Puerto Rican Federal Relations Act is one of the federal statutes in force that defines the nature of the political and legal relationship between Puerto Rico and the United States.

A provision similar to Section 9 of the Puerto Rican Federal Relations Act also appears in Section 7652(a)(3) of the Code and currently reads as follows: "[all] taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payment of refunds and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico."

Imposition of Tax

Section 7652(a)(1) of the Code provides that "articles of merchandise of Puerto Rican manufacture coming into the United States and withdrawn for consumption or sale shall be subject to a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture." Rum is the only article currently produced in Puerto Rico subject to federal excise tax.

Section 5001(a)(1) of the Code currently imposes a tax on all distilled spirits produced in or imported into the United States at the rate of $13.50 per proof gallon. A "proof gallon" is a liquid gallon consisting of 50% alcohol. Section 5001(a)(10) of the Code provides that, with certain exceptions, the tax upon any article containing distilled spirits brought from Puerto Rico into the United States for consumption or sale shall be at the same rate as the rate imposed on distilled spirits produced in the United States.

From 1951 until the enactment of the Deficit Reduction Act of 1984 (the "DRA"), the federal excise tax on distilled spirits produced in or imported into the United States was $10.50 per proof gallon. The DRA increased the tax to $12.50 per proof gallon, and amended Section 7652 of the Code to limit the amount of Federal Excise Taxes transferred to Puerto Rico to the lesser of $10.50 per proof gallon and the actual excise tax imposed under Section 5001 of the Code. Effective January 1, 1991, Section 5001(a)(1) was amended to increase the tax to $13.50 per proof gallon. The amount of Federal Excise Taxes transferred to Puerto Rico remained at $10.50 per proof gallon. In 1993, however, Section 7652 was amended to increase the amount of Federal Excise Taxes transferred to Puerto Rico to $11.30 per proof gallon during the five fiscal year period ended on September 30, 1998. In 1999 and 2004, Section 7652 was further amended to raise the amount of Federal Excise Taxes transferred to Puerto Rico to $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1, 2006, the amount of Federal Excise Taxes transferred to Puerto Rico will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed.

If it becomes law, the 2005 Highway Reauthorization Act will increase the amount of Federal Excise Taxes per proof gallon transferred to Puerto Rico to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, such amount will revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. The Act will also require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Conservation Trust Fund within 30 days of each such Federal Excise Tax transfer to Puerto Rico. See "Conservation Trust Fund" below. Each transfer payment is to be treated as principal for an endowment, the income from which is to be used by the Conservation Trust Fund for the purposes for which it was established. If Puerto Rico fails to make a timely payment to the Conservation Trust Fund, the U.S. Secretary of the Treasury will deduct and withhold such unpaid amount from the next Federal Excise Tax transfer payment, plus interest, and will transfer such amounts directly to the Conservation Trust Fund. Such deduction, withholding, and direct payment will not be made if the U.S. Secretary of the Interior, after consultation with the Governor of Puerto Rico, finds that the failure of the Commonwealth to make the transfer payment was for good cause.

The United States has never reduced the amount of Federal Excise Taxes transferred to Puerto Rico below $10.50 per proof gallon. For a five-month period in 1986, however, Federal Excise Taxes were subject to sequestration under the Gramm-Rudman-Hollings Act ("GRH"). This sequestration ended when Congress enacted a law requiring that, notwithstanding GRH or any other provision of law, amounts required to be transferred to Puerto Rico under the Puerto Rican Federal Relations Act be paid in full to Puerto Rico.

There can be no assurance that the excise tax rate on distilled spirits will not be reduced or that such taxes will not be eliminated in the future or that there will not be a reduction in the amounts transferred to the Commonwealth.

**Collection of Taxes**

In the case of rum shipped in bulk to the United States, Federal Excise Taxes are paid by distributors and importers on a semi-monthly basis, each payment representing the taxes on rum withdrawn from bonded warehouses during the immediately preceding two-week period for consumption in the United States. In the case of rum bottled in

18

Puerto Rico and shipped to the United States, Federal Excise Taxes are paid by producers in Puerto Rico when the rum is shipped to the United States.

The United States Department of the Treasury makes monthly transfers of Federal Excise Taxes to Government Development Bank for the account of the Puerto Rico Department of the Treasury consisting of: (i) excise taxes paid on rum bottled in Puerto Rico and shipped to the United States during the immediately preceding month, and (ii) excise taxes paid on rum shipped in bulk to the United States and retired for consumption two months prior to the date of such transfer.

The period elapsed between the time that a producer, distributor or importer pays the excise tax and the time that the United States Department of the Treasury remits such taxes to the Puerto Rico Department of the Treasury ranges between 30 and 90 days.

**Conservation Trust Fund**

Under a policy to protect and enhance the natural resources of Puerto Rico, the Commonwealth has transferred annually since 1999 to the Conservation Trust Fund an amount of Federal Excise Taxes equal to approximately 45 cents per proof gallon. During fiscal 2004, approximately $12.2 million was so transferred. Under the proposed 2005 Highway Reauthorization Act and based on 2004 rum sales, such transfer would increase to approximately $13.6 million in 2006. Given that the proposed federal mandate for such transfers to the Conservation Trust Fund would expire on December 31, 2006, the Authority believes that the deposit to the Infrastructure Fund has and will thereafter come ahead of any transfer to the Conservation Trust Fund in the event that the Federal Excise Taxes, net of such transfer, are insufficient to cover the required annual Infrastructure Fund deposit.

**Federal Excise Tax Revenues**

Throughout the 1950's and 1960's Federal Excise Taxes consisted principally of excise taxes on rum and tobacco. Since 1986, however, with the phasing out of the manufacture of tobacco products in Puerto Rico, all Federal Excise Taxes have consisted of taxes imposed on rum produced in Puerto Rico.

The table below shows the Federal Excise Taxes received with respect to rum during each of the five fiscal years ended June 30, 2004 and in the current fiscal year through May 2005. The figures shown represent the Federal Excise Taxes actually received by Government Development Bank for the account of the Puerto Rico Department of the Treasury in each month. In each case, the amounts shown are net of: (i) operational expenses incurred by the United States Department of the Treasury in processing and accounting for Federal Excise Taxes (approximately $8.9 million in fiscal 2004); (ii) amounts transferred by the Commonwealth Treasury to the Conservation Trust Fund (approximately $12.2 million in fiscal 2004); and (iii) federal excise taxes received in connection with rum produced in other countries (approximately $51.1 million in fiscal 2004), which are also transferred to the Commonwealth but are not deposited in the Infrastructure Fund pursuant to the terms of the Enabling Act and the Trust Agreement.

19

|  | Federal Excise Tax Revenues Per Fiscal Year (in thousands) | | | | | |
|---|---|---|---|---|---|---|
|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| July . . . . . . . . . . . | $ 15,935 | $ 21,532 | $ 36,178 | $ 22,220 | $ 26,853 | $ 20,822 |
| August . . . . . . . . | 21,682 | 25,018 | 23,583 | 27,167 | 21,896 | 18,545 |
| September . . . . . . . | 17,299 | 31,570 | 26,291 | 24,821 | 27,259 | 17,831 |
| October . . . . . . . . | 13,572 | 22,942 | 26,850 | 24,545 | 28,676 | 19,233 |
| November . . . . . . . | 19,767 | 24,460 | 23,632 | 26,408 | 23,219 | 39,610 |
| December . . . . . . . | 25,533 | 37,266 | 34,071 | 28,671 | 36,530 | 26,468 |
| January . . . . . . . . | 21,875 | 24,490 | 19,242 | 24,262 | 25,037 | 31,386 |
| February . . . . . . . . | 13,652 | 20,308 | 21,086 | 23,524 | 22,241 | 23,590 |
| March . . . . . . . . . | 16,364 | 20,728 | 24,265 | 15,258 | 19,555 | 9,889 |
| April . . . . . . . . . . | 16,372 | 22,394 | 25,883 | 26,337 | 20,537 | 31,760 |
| May . . . . . . . . . . | 20,618 | 16,521 | 23,834 | 32,417 | 23,344 | 63,739 |
| June . . . . . . . . . . | 32,729 | 29,244 | 22,990 | 23,415 | 27,638 | — |
| Total[(1)(2)] . . . . . | $235,398 | $296,473 | $307,907 | $299,046 | $302,785 | $302,873 |

(1) If the excise tax transfer rate had been $10.50 per proof gallon, it is estimated that the total Federal Excise Taxes (in thousands) received would have been $186,542, $234,941, $244,002, $236,980 and $239,943 for fiscals 2000, 2001, 2002, 2003 and 2004, respectively.

(2) Totals may not add due to rounding.

*Source: Puerto Rico Department of the Treasury, Office of Economic and Financial Affairs*

As a result of administrative delays in the monthly reporting and payment of Federal Excise Taxes to the United States Treasury by certain U.S. rum importers and distributors, which delays are beyond the Commonwealth's control, the Federal Excise Taxes transferred to the Commonwealth in recent months have fluctuated. This caused the March 2005 Federal Excise Tax transfer to the Commonwealth to be less than the transfers for the same month in each of the last five fiscal years. During April and May 2005, however, the amount transferred was substantially higher than the amounts transferred in the same months in each of such fiscal years. Consequently, Federal Excise Tax transfers to the Commonwealth in fiscal 2005 have already surpassed the transfers for fiscal 2004.

## THE PUERTO RICO RUM INDUSTRY

### United States Rum Market

Rums produced in Puerto Rico dominate the United States rum market according to data collected by the Distilled Spirits Council of the United States. In 2004, Puerto Rico rums accounted for over 70% of total rum shipments to the United States.

The following table shows the consumption of Puerto Rico rums in the United States relative to total consumption of rum in calendar 1995 and from calendar 2000 to 2004:

20

|  | United States Rum Consumption by Brands (in thousands of gallons) | | | | | |
|---|---|---|---|---|---|---|
|  | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Bacardí . . . . . . . . . . . . . . . | 15,097 | 17,594 | 18,212 | 18,545 | 19,353 | 20,090 |
| Castillo . . . . . . . . . . . . . . . | 2,164 | 2,639 | 2,734 | 2,775 | 2,841 | 2,853 |
| Captain Morgan . . . . . . . . | 2,496 | 7,751 | 8,500 | 9,351 | 10,021 | 11,400 |
| Ron Rico . . . . . . . . . . . . | 1,438 | 1,182 | 1,270 | 1,331 | 1,331 | 1,284 |
| Other P.R. Brands[1] . . . . . | 413 | 166 | — | — | — | — |
| Total P.R. Brands . . . . . . . | 21,610 | 29,332 | 30,716 | 32,002 | 33,546 | 35,627 |
| Percent . . . . . . . . | 75.2% | 72.6% | 72.3% | 72.5% | 72.3% | 72.0% |
| Other Brands . . . | 7,142 | 11,067 | 11,771 | 12,130 | 12,837 | 13,826 |
| Total Rum Consumption . | 28,752 | 40,399 | 42,487 | 44,132 | 46,384 | 49,453 |

(1) Includes Don Q, Palo Viejo and Matusalem rums.

*Source: Adams Media Liquor Handbook 1995 and 2000-2004.*

One of the factors that has contributed to the success of Puerto Rico rums in the United States market is the strong advertising effort carried out by the Government of Puerto Rico directed at promoting the high quality of Puerto Rico rums. Pursuant to legislation adopted in 1971 and incorporated into the Puerto Rico Internal Revenue Code of 1994, up to ten percent (10%) of the Federal Excise Taxes attributable to bulk shipments of rum is deposited in a special fund (after the deposit to the Infrastructure Fund required by the Enabling Act) and used to promote the sale and consumer recognition of Puerto Rico rums in the United States. Also, for three decades Commonwealth law has imposed strict standards on production and aging requirements as a means of assuring the high quality of Puerto Rico rums.

Most rums that compete with Puerto Rico rums in the United States are produced in the United States Virgin Islands and other Caribbean countries. Some of these rums enjoy duty-free access to the United States under the Caribbean Basin Trade Partnership Act. To date such duty-free access has not had a significant impact on the market share enjoyed by Puerto Rico rums.

According to information obtained from Adams Media Liquor Handbook 2004, during the period from 1990 to 2004, rum's share of the distilled spirits market in the United States increased from 8.5% to 12.6%. One factor that accounts for the increase in market share of rum is the overall shift in consumer preference from heavier brown spirits, such as whiskey and bourbon, to white spirits, such as gin, vodka and rum. The following table shows this shift in consumer preference on a calendar year basis:

21

|  | Distilled Spirits Market Share | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005[1] |
| Brown Spirits .......... | 34.6% | 29.6% | 28.9% | 28.4% | 27.5% | 27.0% | 26.3% |
| American Whiskies ... | 15.1 | 12.8 | 12.4 | 12.1 | 11.8 | 11.6 | 11.4 |
| Imported Whiskies .... | 19.5 | 16.9 | 16.5 | 16.2 | 15.7 | 15.4 | 14.9 |
| White Spirits ........... | 65.4 | 70.4 | 71.1 | 71.6 | 72.5 | 73.0 | 73.7 |
| Rums .............. | 8.8 | 11.4 | 11.9 | 12.1 | 12.3 | 12.6 | 12.7 |
| Tequila ............. | — | 4.9 | 4.4 | 4.7 | 4.8 | 5.0 | 5.2 |
| Vodka .............. | 23.4 | 24.2 | 25.1 | 25.7 | 26.2 | 26.6 | 26.9 |
| Gin ................ | 8.6 | 7.5 | 7.4 | 7.2 | 6.9 | 6.6 | 6.4 |
| Others[2] ............ | 24.6 | 22.2 | 22.4 | 21.9 | 22.4 | 22.2 | 22.4 |

(1) Estimated by Government Development Bank based on preliminary figures.

(2) Includes brandies, cordials, liqueurs, and prepared cocktails. Tequila is included only for 1995.

*Source: Adams Media Liquor Handbook 1995 and 2000-2004.*

Sales of distilled spirits in the United States have increased from 326.5 million gallons in 1995 to 394.0 million gallons in 2004. This increase is attributable to new brands and subsegments within the industry and increases in consumer spending and in the drinking age population. In 2004, the consumption of distilled spirits increased by 4.1%. This is the largest increment seen in the industry in more than 20 years. Also in 2004, rum consumption increased by 6.6%. The Commonwealth attributes this growth to new product flavors introduced into the United States market.

It is expected that Puerto Rico rums will continue to play a dominant role in the United States market. According to Adams Media Liquor Handbook 2004, it is expected that rum consumption in the United States will continue to increase in the period through 2008.

**Puerto Rico Rum Distillers**

The two Puerto Rico distillers that produce rum for sale in the United States are Bacardí Corporation ("Bacardí") and Destilería Serrallés, Inc. ("Serrallés"). Serrallés has been producing rum in Puerto Rico since the mid 1800's and Bacardí since the 1930's. Bacardí has the largest operation, accounting for more than 60% of the total Puerto Rico rums sold in the United States. During the last decade, Bacardí has been the top selling brand of distilled spirits in the United States.

The distilling operations of Bacardí and Serrallés in Puerto Rico are affected by various economic, regulatory and other factors that are beyond the control of the Commonwealth and that could influence their decision to maintain or expand these operations, which in turn could affect the level of Federal Excise Taxes transferred to Puerto Rico. For example, labor and environmental compliance costs are higher in Puerto Rico than in neighboring Caribbean countries. Distilling operations in Puerto Rico, however, enjoy federal and Puerto Rico income tax benefits and benefit from the goodwill associated with rum produced in Puerto Rico.

22

## ADDITIONAL COMMONWEALTH APPROPRIATIONS

Under the Enabling Act the Authority may request appropriations from the Commonwealth if Federal Excise Taxes in the amounts authorized by the Enabling Act are not received by the Commonwealth for deposit in the Infrastructure Fund, as described above, and the Director of the Office of Management and Budget is required, upon the Authority's request, to include such appropriations in the recommended budget for the corresponding fiscal year. The Commonwealth Legislature, however, is not legally obligated to make such appropriations. Since the enactment of the Enabling Act, the full amount of the Federal Excise Taxes required to be deposited in the Infrastructure Fund has been so deposited and no such appropriations have been requested by the Authority. Following is a brief description of the budgetary process of the Commonwealth.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by the Office of Management and Budget, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other sources for the ensuring fiscal year under (i) laws existing at the time the budget is estimated, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any item so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of a fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

### Financial Control and Adjustment Procedures

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by the Office of Management and Budget based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of the Office of Management and Budget, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, make recommendations to the Legislature for new taxes, authorize borrowings under provisions of existing legislation, or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and

guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund Act"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public services. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed six percent of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 90 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of any fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

## AUTHORITY DEBT

The following table sets forth the bond and note obligations of the Authority as of April 30, 2005, and as adjusted for the issuance of the Series 2005 Bonds and the refunding of the Refunded Bonds.

|  | Outstanding as of April 30, 2005[1] | As Adjusted |
| --- | --- | --- |
| Notes[2] .................... | $ 22,973,949 | $ 0 |
| Series 1988A Bonds ........... | 1,635,000 | 1,635,000 |
| Series 1997A and 1997B Bonds ... | 773,025,000 | 1,540,000 |
| Series 1998A Bonds ........... | 134,660,000 | 134,660,000 |
| Series 2005 Bonds ........... | 0 | 1,332,962,916 |
| Total ................ | $ 932,293,949 | $1,470,797,916 |

(1)   Excludes $1.058 billion of the Authority's Series 2000A and 2000B Bonds, which are payable solely from the investment income of funds on deposit in the Authority's Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(2)   Line of credit of Government Development Bank to the Authority.

**Debt Service Requirements**

The following table sets forth the Principal and Interest Requirements on the Bonds for each fiscal year. Principal and Interest Requirements for any fiscal year comprise the sum of principal, including Amortization Requirements, and interest that is payable on January 1 in such fiscal year and on July 1 in the next fiscal year.

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2005 Bonds | | | Total Debt Service Requirements |
| --- | --- | --- | --- | --- | --- |
| | | Principal | Interest[1] | Total Debt Service | |
| 2005 | $ 27,397,219 | $ — | $ 1,571,396 | $ 1,571,396 | $ 28,968,615 |
| 2006 | 27,397,759 | — | 58,837,354 | 58,837,354 | 86,235,113 |
| 2007 | 27,399,469 | — | 57,992,400 | 57,992,400 | 85,391,869 |
| 2008 | 27,399,619 | — | 57,992,400 | 57,992,400 | 85,392,019 |
| 2009 | 27,397,394 | — | 57,992,400 | 57,992,400 | 85,389,794 |
| 2010 | 26,907,163 | — | 57,992,400 | 57,992,400 | 84,899,563 |
| 2011 | — | 28,005,000 | 57,992,400 | 85,997,400 | 85,997,400 |
| 2012 | — | 29,490,000 | 56,503,950 | 85,993,950 | 85,993,950 |
| 2013 | — | 31,060,000 | 54,935,850 | 85,995,850 | 85,995,850 |
| 2014 | — | 32,715,000 | 53,283,575 | 85,998,575 | 85,998,575 |
| 2015 | — | 34,475,000 | 51,523,150 | 85,998,150 | 85,998,150 |
| 2016 | — | 36,330,000 | 49,667,675 | 85,997,675 | 85,997,675 |
| 2017 | — | 38,265,000 | 47,733,200 | 85,998,200 | 85,998,200 |
| 2018 | — | 40,305,000 | 45,694,850 | 85,999,850 | 85,999,850 |
| 2019 | — | 42,450,000 | 43,547,075 | 85,997,075 | 85,997,075 |
| 2020 | — | 44,715,000 | 41,284,025 | 85,999,025 | 85,999,025 |
| 2021 | — | 47,170,000 | 38,824,700 | 85,994,700 | 85,994,700 |
| 2022 | — | 49,765,000 | 36,230,350 | 85,995,350 | 85,995,350 |
| 2023 | — | 52,505,000 | 33,493,275 | 85,998,275 | 85,998,275 |
| 2024 | — | 55,390,000 | 30,605,500 | 85,995,500 | 85,995,500 |
| 2025 | — | 58,440,000 | 27,559,050 | 85,999,050 | 85,999,050 |
| 2026 | — | 61,650,000 | 24,334,850 | 85,994,850 | 85,994,850 |
| 2027 | — | 65,045,000 | 20,954,100 | 85,999,100 | 85,999,100 |
| 2028 | — | 44,160,339 | 41,836,286 | 85,996,625 | 85,996,625 |
| 2029 | — | 23,779,963 | 62,217,287 | 85,997,250 | 85,997,250 |
| 2030 | — | 22,510,255 | 63,486,995 | 85,997,250 | 85,997,250 |
| 2031 | — | 21,400,139 | 64,597,111 | 85,997,250 | 85,997,250 |
| 2032 | — | 20,336,424 | 65,660,826 | 85,997,250 | 85,997,250 |
| 2033 | — | 19,318,408 | 66,678,842 | 85,997,250 | 85,997,250 |
| 2034 | — | 18,448,735 | 67,548,515 | 85,997,250 | 85,997,250 |
| 2035 | — | 17,566,407 | 68,430,843 | 85,997,250 | 85,997,250 |

25

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2005 Bonds | | | Total Debt Service Requirements |
|---|---|---|---|---|---|
| | | Principal | Interest[1] | Total Debt Service | |
| 2036 | — | 16,774,070 | 69,223,180 | 85,997,250 | 85,997,250 |
| 2037 | — | 31,460,988 | 54,536,262 | 85,997,250 | 85,997,250 |
| 2038 | — | 67,845,000 | 14,692,250 | 82,537,250 | 82,537,250 |
| 2039 | — | 71,500,000 | 11,300,000 | 82,800,000 | 82,800,000 |
| 2040 | — | 75,500,000 | 7,725,000 | 83,225,000 | 83,225,000 |
| 2041 | — | 79,000,000 | 3,950,000 | 82,950,000 | 82,950,000 |
| 2042 | — | 15,001,840 | 70,998,160 | 86,000,000 | 86,000,000 |
| 2043 | — | 14,311,260 | 71,688,740 | 86,000,000 | 86,000,000 |
| 2044 | — | 13,651,640 | 72,348,360 | 86,000,000 | 86,000,000 |
| 2045 | — | 12,622,448 | 70,732,552 | 83,355,000 | 83,355,000 |
| Total[2] | $163,898,621 | $1,332,962,916 | $1,954,207,134 | $3,287,170,050 | $3,451,068,671 |

(1)  $22,695,250 of the interest shown in fiscal 2005 and 2006 will be paid from the portion of Series 2005 Bond proceeds deposited to the capitalized interest account, which amount is irrevocably set aside for the payment of interest on the Series 2005 Bonds (after taking into effect the refunding of the Refunded Bonds), plus earnings thereon. See " Use of Proceeds" under *Plan of Financing*.

(2)  Totals may not add due to rounding.

## FINANCIAL ASSISTANCE TO BENEFITTED ENTITIES

The Enabling Act empowers the Authority to provide financial, administrative, consulting, technical, advisory, and other assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth. In connection therewith, the Authority has executed assistance agreements with several Benefitted Entities, including PRASA, the Department of Education, the Department of Environmental and Natural Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation, and the Special Communities Perpetual Trust (collectively, the "Assistance Agreements"). The Authority has agreed to provide additional assistance to some of such Benefitted Entities by issuing the Series 2005 Bonds and utilizing the net proceeds as described under *Plan of Financing*.

The Assistance Agreements provide a contractual framework for the Authority to provide financial and other assistance to the Benefitted Entities in connection with their respective capital projects and working capital needs. In general, under the Assistance Agreements with Benefitted Entities other than PRASA, the Benefitted Entity assumes responsibility for the development of its capital project and agrees to indemnify and hold harmless the Authority in connection with the design, engineering and construction thereof. Under the PRASA Assistance Agreement, the Authority provides administrative support and assistance with respect to the undertaking and implementation of PRASA's on-going projects, and pending attainment of certain objectives, PRASA is subject to a "special period" during which the Authority is authorized to review and comment about any necessary changes to operating and capital budgets and capital improvement programs of PRASA. Pursuant to a proposed amendment to this agreement, the Authority will continue to provide financial, administrative, technical and other assistance to PRASA; however, PRASA will assume

primary responsibility for all new capital projects, including certain projects to be financed with proceeds of the Series 2005 Bonds.

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Commonwealth, the Authority, PRASA and certain other Benefitted Entities receiving proceeds of the Series 2005 Bonds must continue to meet after the issuance of the Series 2005 Bonds in order that interest on the Series 2005 Bonds is not included in gross income for federal income tax purposes. The failure of any of the foregoing entities to meet these requirements may cause interest on the Series 2005 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. Each of the Authority and the other entities mentioned above has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and the laws of the Commonwealth, so that interest on the Series 2005 Bonds will remain excluded from gross income for federal income tax purposes. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent any of the foregoing entities from complying with the requirements of the Code.

In the opinion of Sidley Austin Brown & Wood LLP, Bond Counsel, subject to continuing compliance by the Authority and the other entities mentioned above with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes. Interest on the Series 2005 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Series 2005 Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. No opinion is rendered by Sidley Austin Brown & Wood LLP on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is otherwise provided for in the documents pertaining to the Series 2005 Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the Series 2005 Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the Series 2005 Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the Series 2005 Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Series 2005 Bonds will not have an adverse effect on the tax-exempt status of the Series 2005 Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the Series 2005 Bonds.

### Discount Bonds

The excess, if any, of the amount payable at maturity of any maturity and series of the Series 2005 Bonds over the issue price corresponding thereto constitutes original issue discount. The amount of original issue discount that has

accrued and is properly allocable to an owner of any maturity and series of the Series 2005 Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2005 Bonds. In general, the issue price of a maturity and series of the Series 2005 Bonds is the first price at which a substantial amount of Series 2005 Bonds of that maturity and series was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed above. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bonds of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult with his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount relating to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Series 2005 Bond to a purchaser (other than a purchaser who holds such Bond as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases such Bond as part of the initial offering and at the applicable initial offering price as set forth on the inside cover page of this Official Statement over the amount payable at maturity of such Bond is "Bond Premium." Bond Premium is amortized over the term of such Bond for federal income tax purposes (or in the case of a Series 2005 Bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such Bond). No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Series 2005 Bonds. An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable Bond Premium attributable to each taxable year such Bond is held. An owner of such Bond should consult with his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Bond and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such Bond.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey, Demgen & Moore Inc. will verify from the information provided to them the mathematical accuracy, as of the date of the closing on the Series 2005C Bonds, of the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal of and interest, and redemption premium, if any, on the Refunded Bonds. Causey, Demgen & Moore Inc. will express no opinion on the assumptions provided to them, nor as to the exclusion from gross income the interest on the Series 2005 Bonds.

## ELIGIBILITY OF SERIES 2005 BONDS

The Series 2005 Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2005 Bonds from the Authority at an aggregate discount of $8,635,874.33 from the initial public offering prices for such Bonds, set forth (or derived from information set forth) on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent. The Underwriters will be obligated to purchase all Series 2005 Bonds if any such Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) and institutional purchasers at prices lower than the public offering prices which may be changed, from time to time, by the Underwriters.

Banc of America Securities LLC ("Banc of America Securities"), a co-senior underwriter, has entered into a written agreement with Oriental Financial Services Corp. ("Oriental Financial Services") pursuant to which Oriental Financial Services has agreed to act as a consultant to Banc of America Securities in connection with Banc of America Securities' provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a co-senior underwriter, has entered into a written agreement with BBVA Securities of Puerto Rico, Inc. ("BBVA Securities") pursuant to which BBVA Securities has agreed to act as a consultant to Merrill Lynch, in connection with Merrill Lynch's provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Pursuant to these agreements, the existence of which has been disclosed to the Authority and Government Development Bank, Oriental Financial Services and BBVA Securities will be entitled to receive, respectively, a portion of Banc of America Securities' and Merrill Lynch's actual net profits, if any, in connection with the underwriting of the Series 2005 Bonds. Other similar agreements with respect to the sharing of underwriting net profits have been entered into and disclosed to the Authority and Government Development Bank by: J.P. Morgan Securities, Inc. and R-G Investments Corporation. Goldman, Sachs & Co. and FirstBank Puerto Rico, Lehman Brothers, Inc. and Santander Securities Corporation, Morgan Stanley & Co. Incorporated and Popular Securities, Inc., and Wachovia Bank, National Association and Doral Securities, Inc.

The Authority has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the federal securities laws.

## COMMONWEALTH COVENANT

Pursuant to the Enabling Act, the Commonwealth has pledged to all holders of the Series 2005 Bonds that it will not limit or alter the rights or powers vested in the Authority by the Enabling Act so as to impair the rights of such holders until the Series 2005 Bonds and the interest thereon are fully met and discharged.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the offering of the Series 2005 Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2005 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, sale and delivery of the Series 2005 Bonds are subject to the unqualified approving legal opinion of Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel. The form of the proposed opinions of Bond Counsel is set forth in Appendix IV. Certain legal matters will be passed upon for the Underwriters by McConnell Valdés, San Juan, Puerto Rico.

## RATINGS

The Series 2005 Bonds have been assigned a rating of "Baa2," with a negative credit outlook, by Moody's Investors Service, and a rating of BBB+ by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. The "Baa2" rating was assigned by Moody's on May 19, 2005, and was lowered from the "Baa1" rating that the Authority's bonds had immediately prior to such date. This new Moody's rating is the same rating assigned to the Commonwealth's general obligations on such date, which was also revised downward from "Baa1" to "Baa2." Standard & Poor's "BBB+" rating was assigned on May 24, 2005, and was the same rating the Authority's bonds had immediately prior to such date. The aforementioned ratings do not reflect the Ambac Insurance Policy for the Ambac Insured Bonds nor the Financial Guaranty Insurance Policy for the Financial Guaranty Insured Bonds, Moody's and Standard & Poor's are expected to assign the Insured Bonds ratings of Aaa and AAA, respectively.

Any explanation regarding the reasons for and the significance of such ratings must be obtained only from the respective rating agency furnishing the same. The ratings reflect only the respective opinions of such rating agencies. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by either or both of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Series 2005 Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Commonwealth (the "Obligated Person") and the Authority, as specifically stated hereinbelow, have agreed to the following for the benefit of the Beneficial Owners (generally the tax owners of the Series 2005 Bonds):

(a) The Obligated Person has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2005, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) the Obligated Person's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Obligated Person (including such data concerning the Authority and any other entity to the extent it has a material impact on the Obligated Person) and revenues, expenditures, operations and indebtedness generally found in the Commonwealth Report;

(b) The Authority has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2005, with each NRMSIR and with any Commonwealth SID, the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time together with data of the type presented in this Official Statement under *Federal Excise Taxes, The Puerto Rico Rum Industry*, and *Authority Debt* for the preceding fiscal year; and

(c) The Authority has agreed to file in a timely manner, with each NRMSIR or with the MSRB, and with any Commonwealth SID, notice of failure of the Obligated Person to comply with clause (a) above and of the Authority to comply with clause (b) above and notice of any of the following events with respect to the Series 2005 Bonds, if material:

    (i)   principal and interest payment delinquencies;

30

    (ii)   non-payment related defaults;
    (iii)  unscheduled draws on debt service reserves reflecting financial difficulties;
    (iv)  unscheduled draws on credit enhancements reflecting financial difficulties;
    (v)   substitution of credit or liquidity providers, or their failure to perform;
    (vi)  adverse tax opinions or events affecting the tax-exempt status of Series 2005 Bonds;
    (vii) modifications to rights of security holders;
  (viii) Series 2005 Bond calls;
    (ix)  defeasances;
    (x)   release, substitution, or sale of property securing repayment of the Series 2005 Bonds; and
    (xi)  rating changes.

Event (iii) may not be applicable, since the terms of the Series 2005 Bonds do not provide for "debt service reserves." For a description of the Series 2005 Bonds, see *The Series 2005 Bonds*.

In addition, with respect to the following events:

Events (iv) and (v). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2005 Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (vi). For information on the tax status of the Series 2005 Bonds, see *Tax Matters*.

Event (viii). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under *The Series 2005 Bonds*, the only open issue is which Series 2005 Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Series 2005 Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

The Obligated Person expects to provide the information described in clause (a) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline.

As of the date of this Official Statement, there is no Commonwealth SID, and the name and address of each NRMSIR is: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn: NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Series 2005 Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Obligated Person and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Series 2005 Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Authority's or the Obligated Person's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants in paragraphs (a), (b) or (c) above (the "Covenants") or for any remedy for

breach thereof, unless such Beneficial Owner shall have filed with the Authority or the Obligated Person, as applicable, written notice of any request to cure such breach, and the Authority or the Obligated Person, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Series 2005 Bonds benefitted by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Notwithstanding the foregoing, no challenge to the adequacy of the information provided in accordance with the filings mentioned in paragraphs (a), (b) or (c) above may be prosecuted by any Beneficial Owner except in compliance with the remedial and enforcement provisions contained in Article VII of the Trust Agreement. See "Remedies of Bondholders" under *Summary of the Trust Agreement* in Appendix I. Moreover, proceedings filed by Beneficial Owners against the Obligated Person may be subject to the sovereign immunity provisions of Section 2 of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. § 3077 and § 3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Obligated Person, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Series 2005 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Obligated Person; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such resolution, ceases to be in effect for any reason, and the Authority or the Obligated Person, as applicable, elects that the Covenant shall be deemed amended accordingly.

The Authority and the Obligated Person have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters to comply with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the Trust Agreement, the Bond Resolution, the Escrow Deposit Agreement, the Assistance Agreements, the Enabling Act, the Constitution of Puerto Rico and the Series 2005 Bonds are subject to all the detailed provisions thereof. Such references and summaries do not purport to be complete and are qualified in their entirety by reference to such acts, laws, documents, agreements or decisions. Copies of the Trust Agreement, the Bond Resolution and the Escrow Deposit Agreement are available for inspection during regular business hours at the offices of Government Development Bank or at the principal corporate trust office of the Trustee.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

There is appended to this Official Statement a summary of the Trust Agreement (Appendix I), the audited financial statements of the Authority for the fiscal year ended June 30, 2004, together with the independent auditor's

report of KPMG (Appendix II), the Commonwealth Report (Appendix III), the proposed form of opinions of Sidley Austin Brown & Wood LLP, Bond Counsel (Appendix IV), the table of accreted values for the Capital Appreciation Bonds (Appendix V), and the financial guaranty insurance policy specimens of Ambac Assurance (Appendix VI) and Financial Guaranty (Appendix VII).

     The information set forth in this Official Statement, except the information appearing in *Underwriting* and *Bond Insurance* and the information pertaining to DTC, was supplied by the Acting Executive Director of the Authority in her official capacity as such and is included in this Official Statement on her authority. The information set forth in the Commonwealth Report was supplied by certain officials of the Commonwealth, in their respective official capacities, or was obtained from publications of the Commonwealth, and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC and the information pertaining to Ambac Assurance and Financial Guaranty was provided by Ambac Assurance and Financial Guaranty, respectively.

     This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

By:      /s/ Magda L. Aguiar-Serrano
          Acting Executive Director

33

[This page intentionally left blank]

## SUMMARY OF THE TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement. This summary does not purport to be complete and is qualified in its entirety by reference to the Trust Agreement. Inasmuch as the last remaining outstanding Bonds having the benefit of the Reserve Account mature on July 1, 2005, the summary below no longer makes reference to the Reserve Account in the Sinking Fund.

### Definitions of Certain Terms

The following words and terms shall have the following meanings, unless the context otherwise requires. Words importing the singular number shall include the plural number in each case and vice versa, and words importing persons shall include firms and corporations, including public bodies.

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond on its date of original issuance plus the interest accrued on such Capital Appreciation Bond from such original issue date to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the term Bonds of any series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of term Bonds in such Fiscal Year. If at or prior to the close of any Fiscal Year the total amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys exceeds the Amortization Requirement for such term Bonds for such Fiscal Year, then future Amortization Requirements for such term Bonds shall be reduced for subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director of the Authority in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys is less than the Amortization Requirement for such term Bonds for such Fiscal Year, then the Amortization Requirement for such term Bonds for the next Fiscal Year shall be increased by the amount of such deficiency.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond until the Interest Commencement Date, an amount equal to the Accreted Value of such Bond and, (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund or funds are established and shall not be subject to a lien or charge in favor of the holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded on each of the dates designated for compounding and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by the resolution authorizing said Bonds.

I-1

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date and the Appreciated Value for which is compounded periodically on the specified dates prior to the Interest Commencement Date for such Bonds, all as provided in the resolution authorizing such Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Credit Facility" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of and premium, if any and interest on Bonds to which such Credit Facility relates.

"Debt Service Component" shall mean indebtedness incurred by the Authority which complies with the tests for the issuance of additional series of Bonds in the Trust Agreement and which is payable from moneys withdrawn from the Puerto Rico Infrastructure Fund on a pro rata basis with the deposits required to be made to the credit of the Bond Service Account and Redemption Account of the Sinking Fund under the Trust Agreement.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended at the option of the holders of the Bonds or the Authority.

"Fiscal Year" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve consecutive month period designated by the Board.

"Government Obligations" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) qualifying evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above; (iii) municipal obligations whose payment is irrevocably secured by non-callable and non-prepayable obligations described in clause (i) or (ii) above deposited in an escrow account irrevocably pledged to the payment of such municipal obligations; and (iv) qualifying evidences of ownership of proportionate interests in fixture interest or principal payments on obligations specified in clause (in) above.

"Interest Commencement Date" shall mean, with respect to any Capital Appreciation and Income Bond, the specified date after which interest accruing on such Bond shall be payable periodically, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)      Government Obligations;

(ii)     obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and qualifying evidences of ownership of proportionate interests in future interest or principal payments in obligations specified in this clause (ii);

(iii)    bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association (including any investment in pools of such obligations), which

to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a depository institution having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by obligations described in clauses (i) or (ii) above held free and clear of claims by third parties, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured), provided that the Trustee has a perfected security interest in the collateral;

(iv)  obligations issued by any state or territory of the United States of America or any political subdivision or instrumentality thereof, which are rated on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(v)  any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee) or trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any of the obligations described in (i) or (ii) above, provided that the Trustee has a perfected security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vi)  commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(vii)  any other obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the holders of Put Bonds.

"Federal Excise Taxes" shall mean the federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds authenticated and delivered except:

(i)  Bonds cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)  Bonds that are deemed paid and no longer Outstanding under the Trust Agreement;

(iii)  Destroyed, mutilated, stolen or lost Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser, and

(iv)  for purposes of any consent or other action to be taken under the Trust Agreement by the holders of a specified percentage of principal amount of Bonds, Bonds held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

I-3

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any series, shall mean the sum of:

    (i)    the amount required to pay the interest on all Bonds of such series then Outstanding that is payable on each interest payment date in such Fiscal Year,

    (ii)   the amount required to pay the principal of all serial Bonds of such series then Outstanding that is payable upon the maturity of such serial Bonds in such Fiscal Year, and

    (iii)  the Amortization Requirement for the Outstanding term Bonds of such series for such Fiscal Year.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

    (a)   The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (I) for purposes of determining the maximum Principal and Interest Requirements under the projected tests for the issuance of additional series of Bonds, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been Outstanding, and (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and if a series of Variable Rate Bonds had not been Outstanding prior to the date of computation, the test set forth in clause (A) above shall be calculated as though said Variable Rate Bonds had been Outstanding for the twelve-month period by using the average interest rate for comparable securities for such period as certified by an underwriting or investment banking firm experienced in marketing such securities;

    (b)   In the case of Put Bonds, the "put" date shall be ignored if a source for payment of said "put" is a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility shall be ignored, unless the issuer of the Credit Facility or the Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case the repayment obligation shall be used rather than the stated terms of the Bonds, if the repayment obligation is secured on a parity with Bonds;

    (c)   In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

    (d)   In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value payable in any year shall be included in the year in which said payment is due;

    (e)   In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value shall be included in the year in which said principal and interest portions are due;

    (f)   In the case of Balloon Bonds or Interim Bonds, the debt service requirements may be excluded and instead such Bonds may be treated as debt securities having a comparable federal tax status as such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years (as determined in the certificate described below), bearing a fixed interest rate equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds rated by Moody's Investors Services, Inc. or any successors thereto or Standard

I-4

& Poor's Corporation or any successors thereto comparably to that of the Authority, all as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)   If all or a portion of a series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and to the extent applicable, shall be determined in accordance with the foregoing rules.

"Put Bonds" shall mean Bonds that by their terms may be tendered at the option of the holder thereof for payment prior to maturity.

"Qualified Depositary or Depositories" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depository for public funds, which institutions have been designated as depositories of the Authority by resolution.

"Special Tax Revenues" shall mean the Federal Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Variable Rate Bonds" shall mean Bonds issued with an interest rate that is not fixed in percentage at the date of issue for the term thereof.

**Puerto Rico Infrastructure Fund**

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any lieus upon any moneys in the Puerto Rico Infrastructure Fund. All moneys deposited to the credit of the Puerto Rico Infrastructure Fund will be applied for the purposes and in the order set forth in the Trust Agreement.

**Sinking Fund and Accounts**

A special fund is created under the Trust Agreement and designated the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (the "Sinking Fund") to be held by the Trustee. Two separate accounts are created in the Sinking Fund and designated "Bond Service Account" and "Redemption Account." Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys sufficient to make the following deposits in the following order:

(a)   to the Bond Service Account, the amount required to make the total amount then in the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)   to the Redemption Account, the amount required to make the total amount deposited in the then current Fiscal Year in the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding plus the premium, if any, payable on such Bonds if such Bonds were to be redeemed in such Fiscal Year from moneys held in the Sinking Fund.

I-5

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make any payment or deposit necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components.

After making the foregoing required applications and subject to the Authority's obligation to repay issuers of any Credit Facility any amounts owed to them, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund for any lawful purpose.

**Withdrawals from Bond Service Account**

The Trustee shall on each date for the payment of principal of or interest on Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)    subject to the provisions of paragraph (c) below, by purchase at a price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part except from moneys other than the moneys set aside or deposited for the redemption of Bonds; or

(b)    subject to the provisions of paragraph (C) below, by redemption pursuant to the redemption provisions of the Trust Agreement from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then in the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time.

(c)    Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each series then Outstanding in the following order:

*first*, the term Bonds of each such series to the extent of the related Amortization Requirement, if any, for such Fiscal Year, plus the applicable premium, if any, and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding plus the applicable premium, if any;

*second*, any balance then remaining shall be applied to the purchase in accordance with paragraph (a) above of any Outstanding term Bonds whether or not they are then subject to redemption;

I-6

*third*, any balance then remaining shall be applied to the redemption of the term Bonds of each such series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of each such series originally issued under the provisions of the Trust Agreement.

## Additional and Refunding Bonds

Bonds may be issued and secured by the Trust Agreement, subject to certain conditions, for any lawful purpose of the Authority, including paying any costs of issuance of such Bonds.

Among such conditions are the delivery to the Trustee of

(a)    a certificate of the Secretary of the Treasury of the Commonwealth setting forth:

(i)    the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the Bonds to be issued; and

(iii)    the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%; and

(b)    a certificate of the Executive Director of the Authority setting forth:

(i)    the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii)    the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%.

The above certificates need not be delivered for the issuance of refunding Bonds if the Executive Director of the Authority certifies that (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal

and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

### Investment of Moneys

Moneys in the Bond Service Account and the Redemption Account shall, to the extent possible, be continuously invested at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption at the option of the holder thereof, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended.

Any investment earnings and profit or loss realized on the sale or maturity of such Obligations shall be credited or debited to the holding fund or account. If the required deposit to any account in the Sinking Fund has been made for the current Fiscal Year, investment earnings on moneys in such account shall be deposited to any other account of the Sinking Fund for which a required deposit has not been made, in the order provided above (see "Sinking Fund and Accounts"), and thereafter shall be credited to the Puerto Rico Infrastructure Fund.

### No Impairment

So long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the holders to such Pledged Revenues might be impaired or diminished.

### Inclusion of Shortfall in Budget; Request for Advances

If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund are insufficient to permit the Authority to make the required deposits into the Sinking Fund, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary. The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

### Enforcement of Remedies

There are no events of default under the Trust Agreement and the principal of the Bonds Outstanding is not subject to acceleration. At the request of the holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed to protect and enforce its rights and the rights of the holders under the laws of the Commonwealth or under the Trust Agreement.

### Supplemental Agreements Without Bondholder's Consent

The Authority and the Trustee may from time to time and at any time, enter into agreements supplemental to the Trust Agreement, as shall not be inconsistent with the terms and provisions thereof, for the following purposes, among others:

(a)     to cure any ambiguity or formal defect or omission in the Trust Agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)     to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

I-8

(c)    to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)    to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power therein reserved to or conferred upon the Authority, or

(e)    to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(f)    to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(g)    to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

All other modifications to the Trust Agreement may be made only upon obtaining the consent and approval of the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each series so affected and Outstanding at the time the consent is given). Nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the maturity of any Bond issued under the Trust Agreement (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement. In lieu of the holders of Bonds secured by a Credit Facility or a Liquidity Facility, the provider thereof shall be viewed as the holder of such Bonds for purposes of consents to modifications.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Home Loan Banks or Student Loan Marketing Association, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the holder

I-9

of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

**APPENDIX II**

# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

(With Independent Auditors' Report Thereon)

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

### Table of Contents

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Management's Discussion and Analysis | 3 |
| Basic Financial Statements: |  |
| Statement of Net Assets – Governmental Activities | 10 |
| Statement of Activities | 11 |
| Balance Sheet – Governmental Funds | 12 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds | 13 |
| Reconciliation of the Statement of Revenues, Expenditures and Changes in Fund Balances of Governmental Funds to the Statement of Activities and Governmental Funds | 14 |
| Notes to Basic Financial Statements | 15 |
| **Schedule** |  |
| Schedule of Special Obligation Bonds 2000 Series A and B | 30 |

**Independent Auditors' Report**

The Board of Directors
Puerto Rico Infrastructure Financing Authority:

We have audited the accompanying financial statements of the governmental activities and each major fund of Puerto Rico Infrastructure Financing Authority (the Authority) (a component unit of the Commonwealth of Puerto Rico) as of and for the year ended June 30, 2004, which collectively comprise the Authority's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Authority's management. Our responsibility is to express opinions on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinions.

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities and each major fund of Puerto Rico Infrastructure Financing Authority as of June 30, 2004, and the respective changes in financial position thereof for the year then ended in conformity with accounting principles generally accepted in the United States of America.

The management's discussion and analysis on pages 3 through 9 is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Authority's basic financial statements. The supplementary information included in this Schedule of Special Obligation Bonds 2000 Series A and B is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

KPMG LLP

February 11, 2005

Stamp No. 1988685 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

This Management's Discussion and Analysis (MD&A) of Puerto Rico Infrastructure Financing Authority (the Authority) is designed to (a) assist the reader in focusing on significant financial issues, (b) provide an overview of the Authority's financial activity, (c) identify changes in the Authority's financial position, and (d) identify individual issues or concerns.

Since the MD&A is designed to focus on the current year's activities, resulting changes, and currently known facts, please read it in conjunction with the Authority's financial statements, which follow this section.

**Financial Highlights**

- The Authority's net assets decreased by $255 million or 34% to $504 million as of June 30, 2004.

- The Authority's net change from governmental activities decreased by $437 million, from an increase of $182 million in 2003 to a decrease of $(255) million in 2004, of which $340 million is related to the net decrease in fair value of investments in the Permanent Fund, from a $183 million increase in 2003 to $(157) million decrease in 2004.

- The General Fund (the primary operating fund) and the Capital Projects Fund reflected on a modified-accrual basis, report an increase in fund balance of $20 million and a decrease of $192 million, respectively.

**Overview of the Financial Statements**

The financial statements consist of two parts—management's discussion and analysis (this section) and the basic financial statements, including the notes to the basic financial statements. The basic financial statements include two kinds of statements that present different views of the Authority:

- The first two statements are government-wide financial statements that provide information about the Authority's overall financial position and results. These statements, which are presented on an accrual basis, consist of the statement of net assets and the statement of activities.

- The remaining statements are fund financial statements of the Authority's four major governmental funds (general, capital projects, debt service, and permanent), for which activities are funded primarily from Commonwealth of Puerto Rico appropriations and investment income for which the Authority follows a modified-accrual basis of accounting.

- The basic financial statements also include a section of notes to basic financial statements that explains some of the information in the government-wide and fund financial statements and provides more detailed data.

- The notes to the basic financial statements are followed by a supplementary Schedule of the Special Obligation Bonds 2000 Series A and B.

The remainder of this overview section of the management's discussion and analysis explains the structure and contents of each of these statements.

The government-wide financial statements report information about the Authority as a whole using accounting methods similar to those used by private sector companies. The statement of net assets includes all of the

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

Authority's assets and liabilities. All the current year's revenues and expenses are accounted for in the statement of activities regardless of when cash is received or paid.

The fund financial statements provide more detailed information about the Authority's major funds and not the Authority as a whole. All the Authority's funds are governmental funds. These funds' statements focus on how cash and other financial assets flowing into the funds have been used.

### Financial Analysis of the Authority as a Whole (Government-wide Financial Statements Analysis)

The government-wide financial statements were designed so that the user could determine if the Authority is in a better or worse financial condition from the prior year.

The following is a condensed summary of net assets for the Authority compared to the prior year:

|  | June 30 | | Increase |
|  | 2004 | 2003 | (decrease) |
|---|---|---|---|
| Current and other assets | $ 1,770,213,347 | 2,128,266,816 | (358,053,469) |
| Capital assets | 837,486,012 | 774,278,462 | 63,207,550 |
| Total assets | 2,607,699,359 | 2,902,545,278 | (294,845,919) |
| Other liabilities | 145,861,121 | 157,880,222 | (12,019,101) |
| Noncurrent liabilities | 1,957,974,402 | 1,985,317,765 | (27,343,363) |
| Total liabilities | 2,103,835,523 | 2,143,197,987 | (39,362,464) |
| Net assets: |  |  |  |
| Invested in capital assets, net of debt | 115,268,280 | 214,553,334 | (99,285,054) |
| Restricted | 1,289,418,616 | 1,457,344,891 | (167,926,275) |
| Unrestricted | (900,823,060) | (912,550,934) | 11,727,874 |
| Total net assets | $ 503,863,836 | 759,347,291 | (255,483,455) |

As can be seen from the table above, the Authority's total net assets as of June 30, 2004 decreased by $255 million or 34% when compared to total net assets as of June 30, 2003. The assets decreased by $295 million or 10.2% compared to the prior year. This decrease resulted mostly from the net decrease in fair value of investments of $157 million and capital project transfers to the Puerto Rico Aqueduct and Sewer Authority (PRASA), another component unit of the Commonwealth of Puerto Rico (the Commonwealth), of $97 million.

4                                                                                  (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

For the year ended June 30, 2004, the net increase of $63,207,550 in capital assets is mostly affected by a net change in construction in progress of $63,312,412, which was the result of the following construction works:

| | | |
|---|---|---:|
| Port of the Americas | $ | 5,412,720 |
| Education | | 238,037 |
| Water and Sewer Projects | | 160,170,262 |
| Less: | | |
| Projects transferred to PRASA | | (96,932,515) |
| Abandoned projects | | (5,576,092) |
| Change in construction work in progress | $ | 63,312,412 |

The total liabilities of the Authority decreased by $39 million or 2%. Such net decrease is mainly related to an increase in accounts payable and accrued expenses of $14 million, a decrease in due to PRASA of $22 million, and a decrease in long-term liabilities of $27 million, which is mainly related to the payment of maturing bonds and notes of $26 million.

The following schedule compares revenues and expenses of the Authority for the years ended June 30, 2004 and 2003.

| | | Year ended June 30 | | Increase |
|---|---|---:|---:|---:|
| | | **2004** | **2003** | **(decrease)** |
| Revenues: | | | | |
| Program revenues: | | | | |
| Operating grants and contributions, | | | | |
| and earnings (loss) on investments | $ | (887,519) | 363,929,203 | (364,816,722) |
| General revenue: | | | | |
| Contribution not restricted to specific | | | | |
| programs | | 4,000,000 | 4,000,000 | — |
| Investment income | | 10,202 | 20,332 | (10,130) |
| Total revenue | | 3,122,683 | 367,949,535 | (364,826,852) |
| Expenses: | | | | |
| Program activities: | | | | |
| General government | | 1,637,599 | 2,769,226 | (1,131,627) |
| Aqueduct and sewer | | 254,417,272 | 177,498,742 | 76,918,530 |
| Compliance, Section 301(h) | | 781,570 | 4,753,260 | (3,971,690) |
| Revolving fund | | 748,836 | 1,038,711 | (289,875) |
| Other | | 1,020,861 | — | 1,020,861 |
| Total expenses | | 258,606,138 | 186,059,939 | 72,546,199 |
| Change in net assets | $ | (255,483,455) | 181,889,596 | (437,373,051) |

5

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

Operating grants and contributions and earnings (loss) on investments from governmental activities decreased by $365 million resulting from a net decrease of $340 million in the net change in fair value of investments, a decrease of $12 million in interest income from investments and interest-bearing demand deposits, a decrease of $18 million in contributions from PRASA, and an increase of $6.5 million in contributions from the Commonwealth.

### *Expenses*

Net increase in expenses of $73 million includes a reduction of $1 million in the general government program mostly due to the termination of PRASA's contract administration, now becoming the responsibility of PRASA's executive office, and the termination of the tasks corresponding to the evaluation committee for the new PRASA administration contract. The increase of $77 million in the aqueduct and sewer program is mostly related to the transfers of water and sewer projects and contributions made to PRASA, as well as an increase in contributions made to the "Agua Para Todos" program. The reduction of $4 million in the environmental program [Compliance, Section 301 (h)] is due to the fact that PRASA absorbed most of these expenditures during fiscal year 2004.

During fiscal year 2003-2004, the Authority signed various assistance programs with other governmental entities including the Department of Transportation and Public Works, Department of Natural Resources, Puerto Rico Highway Authority, and Department of Education, among others. The Authority made contributions of $1,020,861 for the year ended June 30, 2004.

### Governmental Funds Financial Analysis

Governmental funds are comprised of the General, Capital Projects, Debt Service, and Permanent Funds. Governmental funds use the current financial resources measurement focus that concentrates on near-term inflows and outflows. The General Fund is the general operating fund that is used to account for all financial resources, except those required to be accounted for in another fund. The following are facts and changes from the prior year:

(a) *General Fund*

The General Fund expenditures decreased by $6 million from 2003 resulting from the termination of PRASA's contract administration and reduction in Section 301(h) expenses (environmental) and State Revolving Fund expenses due to the fact that PRASA and the Department of Health, respectively, absorbed most of these expenses during 2004. Also, a contribution from PRASA of $18 million was recorded as revenue in 2004 (presented as deferred revenue in 2003).

(b) *Capital Projects Fund*

The Capital Projects Fund expenditures increased by $32 million mostly from a result of an increase of $11 million in capital outlays for water and sewer projects, an increase of $1 million in capital outlays for the Port of the Americas, and an increase of $20 million in contributions made to PRASA including the "Agua Para Todos" program. Also, revenue decreased by $6 million as a result of a $6 million increase in contributions from the Commonwealth and a $12 million decrease in investment income.

6                                                                    (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

### (c)   Debt Service Fund

No major changes were observed in the Debt Service Fund during the fiscal year ended June 30, 2004.

### (d)   Permanent Fund

The Permanent Fund earnings on investments decreased by $340 million due to a decrease in the net change in fair value of investments.

## Capital Assets and Debt Administration

### Capital Assets

Nondepreciable capital assets include construction work in process. Depreciable assets include furniture and equipment, vehicles, and leasehold improvements.

The following is a schedule of the Authority's capital assets as of June 30, 2004 and 2003:

|  | June 30 | | Increase |
|  | 2004 | 2003 | (decrease) |
|---|---|---|---|
| Construction in progress | $ 837,296,416 | 773,984,004 | 63,312,412 |
| Vehicles, furniture, and equipment | 667,948 | 597,401 | 70,547 |
| Leasehold improvements | 620,847 | 620,847 | — |
| Total assets | 838,585,211 | 775,202,252 | 63,382,959 |
| Accumulated depreciation | (1,099,199) | (923,790) | (175,409) |
| Total | $ 837,486,012 | 774,278,462 | 63,207,550 |

The Authority was created, among other things, to provide financial, administrative, and other assistance to municipalities, political subdivisions, public corporations, and instrumentalities of the Commonwealth to enable them to fulfill their public purpose of providing, preserving, operating, maintaining, repairing, replacing, and improving portions of the infrastructure. Infrastructure includes, among other things, water supply systems, and waste water treatment and disposal systems.

7 (Continued)

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
### (A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

This year's major additions related to construction projects are as follows:

| Description | Location | Additions |
|---|---|---|
| Regional aqueduct | Fajardo | $ 30,136,676 |
| Regional aqueduct | North East | 18,823,557 |
| Cerrillos dam | Ponce | 11,621,812 |
| Transmission System | Juncos | 10,851,388 |
| Pump station and transmission line | Carolina | 10,599,084 |
| Regional aqueduct | Villalba | 8,643,886 |
| Interconnections | North Coast | 7,490,012 |
| Regional aqueduct | Fajardo | 7,431,275 |
| Rehabilitation of Incinerator (Puerto Nuevo) | San Juan | 5,793,594 |
| El Paraiso water distribution system | Ponce | 3,711,318 |
| Distribution System – Miramar | San Juan | 3,483,760 |
| Regional Sewer | Dorado | 3,426,472 |
| Rehabilitation Water Treatment Plant | Juncos | 2,547,540 |
| Sabana Eneas Sewer System | San Germán | 1,755,192 |
| | | $ 126,315,566 |

### *Debt Outstanding*

At June 30, 2004, the Authority had approximately $2 billion in debt (bonds and notes) outstanding. The following is a schedule of outstanding bonds and notes as of June 30, 2004 and 2003:

| | June 30 | | Increase |
|---|---|---|---|
| | 2004 | 2003 | (decrease) |
| Bonds payable | $ 1,994,355,000 | 2,018,935,000 | (24,580,000) |
| Less bond discount and premium | 33,677,211 | 34,043,650 | (366,439) |
| Total bonds payable | 1,960,677,789 | 1,984,891,350 | (24,213,561) |
| Notes payable | 19,298,697 | 20,130,816 | (832,119) |
| Total bonds and notes payable | $ 1,979,976,486 | 2,005,022,166 | (25,045,680) |

8                                                                    (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

The following is a schedule of ratings for obligation debt:

|  | Moody's | Standard & Poor's |
|---|---|---|
| Special Tax Revenue Bonds, Series 1988A | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1997A | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1997B | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1998A | Baa1 | BBB+ |
| Special Obligation Bonds Series 2000A | Aaa | AAA |
| Special Obligation Bonds Series 2000B | Aaa | AAA |

Additional information on the Authority's long-term obligations can be found in note 6 to the basic financial statements.

**Financial Contact**

The Authority's financial statements are designed to present users with a general overview of the Authority's finances and to demonstrate accountability. If you have questions about the report or need additional financial information, contact Puerto Rico Infrastructure Financing Authority, Capital Center (Tower 2), 235 Ave. Arterial Hostos, Suite 1601, San Juan, PR 00918-1433.

9

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Net Assets – Governmental Activities

June 30, 2004

| | |
|---|---:|
| Assets: | |
| Cash and cash equivalents and interest-bearing demand deposits | $ 133,244,048 |
| Investments and investment contracts | 324,958,500 |
| Accrued interest receivable, including $17,229,190 on nonexpendable restricted assets | 20,016,923 |
| Due from Puerto Rico Aqueduct and Sewer Authority | 370,492 |
| Prepaid expenses | 1,419,035 |
| Bond issue costs | 19,276,770 |
| Other assets | 650,572 |
| Assets held in trust | 1,270,277,007 |
| Capital assets: | |
| Nondepreciable – construction in progress | 837,296,416 |
| Depreciable, net | 189,596 |
| Total assets | 2,607,699,359 |
| | |
| Liabilities: | |
| Accounts payable and accrued expenses | 77,877,774 |
| Deferred revenue | 920,000 |
| Accrued interest payable | 38,799,697 |
| Long-term liabilities: | |
| Due in one year | 28,263,650 |
| Due in more than one year | 1,957,974,402 |
| Total liabilities | 2,103,835,523 |
| | |
| Net assets: | |
| Invested in depreciable capital assets, net of related debt | 115,268,280 |
| Restricted for: | |
| Capital projects | — |
| Debt service | 19,961,572 |
| Trust – nonexpendable | 1,287,506,196 |
| Other purposes | 13,181,416 |
| Unrestricted | (932,053,628) |
| Total net assets | $ 503,863,836 |

See accompanying notes to basic financial statements.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Activities

Year ended June 30, 2004

| | Expenses | Program revenues | | Net (expenses) revenues and change in net assets governmental activities |
| | | Operating grants and contributions | Net loss on investments | |
|---|---|---|---|---|
| Functions/programs: | | | | |
| Governmental activities: | | | | |
| General government | $ 1,637,599 | — | — | (1,637,599) |
| Aqueduct and sewer (including interest on long-term debt of $103,908,748) | 254,417,272 | 72,558,319 | (77,201,992) | (259,060,945) |
| Port | — | 3,700,000 | — | 3,700,000 |
| Compliance, Section 301(h) | 781,570 | — | — | (781,570) |
| Revolving Fund | 748,836 | — | 56,154 | (692,682) |
| Other | 1,020,861 | — | — | (1,020,861) |
| Total government activities | $ 258,606,138 | 76,258,319 | (77,145,838) | (259,493,657) |
| General revenues: | | | | |
| Contribution not restricted to specific programs | | | $ | 4,000,000 |
| Investment income | | | | 10,202 |
| Total general revenues | | | | 4,010,202 |
| Change in net assets | | | | (255,483,455) |
| Net assets, beginning of year | | | | 759,347,291 |
| Net assets, end of year | | | $ | 503,863,836 |

See accompanying notes to basic financial statements.

11

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheet – Governmental Funds

June 30, 2004

| Assets | | General | Capital projects | Debt service | Permanent | Total governmental funds |
|---|---|---|---|---|---|---|
| Cash and cash equivalents and interest-bearing demand deposits | $ | 13,855,857 | 60,652,188 | 58,736,003 | — | 133,244,048 |
| Investments and investment contracts | | — | 324,958,500 | — | 1,270,277,007 | 1,595,235,507 |
| Interest receivable | | 4,213 | 2,758,255 | 25,265 | 17,229,190 | 20,016,923 |
| Due from Puerto Rico Aqueduct and Sewer Authority | | 370,492 | — | — | — | 370,492 |
| Other assets | | 650,572 | — | — | — | 650,572 |
| Total assets | $ | 14,881,134 | 388,368,943 | 58,761,268 | 1,287,506,197 | 1,749,517,542 |
| **Liabilities and Fund Balances** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued expenses | $ | 2,081,829 | 75,795,945 | — | — | 77,877,774 |
| Deferred revenue | | 920,000 | — | — | — | 920,000 |
| Total liabilities | | 3,001,829 | 75,795,945 | — | — | 78,797,774 |
| Fund balances: | | | | | | |
| Reserved for: | | | | | | |
| Capital projects | | — | 312,572,998 | — | — | 312,572,998 |
| Debt service | | — | — | 58,761,268 | — | 58,761,268 |
| Trust | | — | — | — | 1,287,506,197 | 1,287,506,197 |
| Other purposes | | 13,181,416 | — | — | — | 13,181,416 |
| Unreserved – general fund | | (1,302,111) | — | — | — | (1,302,111) |
| Total fund balances | | 11,879,305 | 312,572,998 | 58,761,268 | 1,287,506,197 | 1,670,719,768 |
| Total liabilities and fund balances | $ | 14,881,134 | 388,368,943 | 58,761,268 | 1,287,506,197 | |

| Amounts reported for governmental activities in the statement of net assets are different because: | |
|---|---|
| Capital assets used in governmental activities are not financial resources and, therefore, are not reported in the funds | 837,486,012 |
| Prepaids and bonds issuance costs are not available to pay for current period expenditures and, therefore, are not deferred in the funds | 20,695,805 |
| Liabilities, including bonds payable and notes payable, accrued interest payable, and other liabilities are not due and payable in the current period and, therefore, are not reported in the funds | (2,025,037,749) |
| Net assets of governmental activities | $ 503,863,836 |

See accompanying notes to basic financial statements.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds

Year ended June 30, 2004

| | General | Capital projects | Debt service | Permanent | Total governmental funds |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Interest and investment income: | | | | | |
| Interest-bearing demand deposits | $ 66,355 | 295,329 | — | — | 361,684 |
| Investments and investment contracts, net | — | 10,528,125 | 226,910 | 68,966,012 | 79,721,047 |
| Net decrease in fair value of investments | — | — | — | (157,202,624) | (157,202,624) |
| Contribution from the Commonwealth of Puerto Rico | 70,000,000 | 10,258,319 | — | — | 80,258,319 |
| Contribution from the Puerto Rico Aqueduct and Sewer Authority | 18,000,000 | — | — | — | 18,000,000 |
| Total revenues | 88,066,355 | 21,081,773 | 226,910 | (88,236,612) | 21,138,426 |
| **Expenditures:** | | | | | |
| Current: | | | | | |
| General government | 302,924 | 928,579 | — | — | 1,231,503 |
| Aqueduct and sewer | 94,871 | 48,063,364 | — | — | 48,158,235 |
| Compliance, Section 301(h) | 781,570 | — | — | — | 781,570 |
| State Revolving Funds | 748,836 | — | — | — | 748,836 |
| Buildings | — | 43,304 | — | — | 43,304 |
| Arts and entertainment | — | 639,151 | — | — | 639,151 |
| Transportation | — | 338,406 | — | — | 338,406 |
| Capital outlays: | | | | | |
| Aqueduct and sewer | — | 160,170,262 | — | — | 160,170,262 |
| Ports | — | 5,412,720 | — | — | 5,412,720 |
| Education | — | 238,037 | — | — | 238,037 |
| Other | — | 70,547 | — | — | 70,547 |
| Debt service: | | | | | |
| Payment of maturing bonds | — | — | 24,580,000 | — | 24,580,000 |
| Repayment of notes payable to Government Development Bank for Puerto Rico | — | — | 1,152,209 | — | 1,152,209 |
| Interest | — | — | 103,162,480 | — | 103,162,480 |
| Debt issue costs | — | — | 320,090 | — | 320,090 |
| Total expenditures | 1,928,201 | 215,904,370 | 129,214,779 | — | 347,047,350 |
| Excess (deficiency) of revenues over (under) expenditures | 86,138,154 | (194,822,597) | (128,987,869) | (88,236,612) | (325,908,924) |
| **Other financing sources (uses):** | | | | | |
| Refunding bond issued | — | — | 4,678,509 | — | 4,678,509 |
| Payment to refunding bond escrow agent | — | — | (4,358,419) | — | (4,358,419) |
| Transfers in | 2,421,626 | 5,030,336 | 132,670,346 | — | 140,122,308 |
| Transfers out | (68,783,923) | (2,421,626) | — | (68,916,759) | (140,122,308) |
| Total other financing sources (uses) | (66,362,297) | 2,608,710 | 132,990,436 | (68,916,759) | 320,090 |
| Net changes in fund balances | 19,775,857 | (192,213,887) | 4,002,567 | (157,153,371) | (325,588,834) |
| Fund balances, beginning of year | (7,896,552) | 504,786,885 | 54,758,701 | 1,444,659,568 | 1,996,308,602 |
| Fund balances, end of year | $ 11,879,305 | 312,572,998 | 58,761,268 | 1,287,506,197 | 1,670,719,768 |

See accompanying notes to basic financial statements.

13

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances of
Governmental Funds to the Statement of Activities – Governmental Funds

Year ended June 30, 2004

Amounts reported for governmental activities in the statement of activities are different because:

| | |
|---|---:|
| Net changes in fund balances – total governmental funds | $  (325,588,834) |
| Governmental funds report capital outlays as expenditures. However, in statement of activities the cost of those assets is allocated over their estimated useful lives and reported as depreciation expense. This is the amount by which capital outlays exceeded transfers and depreciation in the current period | 63,207,550 |
| The issuance of long-term debt provides current financial resources to governmental funds, while the repayment of the principal of long-term debt consumes the current financial resources of governmental funds. Neither transaction, however, has any effect on net assets. Also governmental funds report the effect of issuance costs, premiums, discounts, and similar items when debt is first issued, whereas these amounts are deferred and amortized in the statement of activities. This amount is the net effect of these differences in the treatment of long-term debt and related items | 23,968,234 |
| Deferred revenue recorded in 2003 and revised against revenues in the governmental funds in 2004; however, reported as revenues in the 2003 statement of activities | (18,000,000) |
| Some expenses reported in the statement of activities do not require the use of current financial resources and, therefore, are not reported as expenditures in governmental funds | 929,595 |
| Changes in net assets of governmental activities | $  (255,483,455) |

See accompanying notes to basic financial statements.

14

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(1) **Summary of Significant Accounting Policies**

(a) *Reporting Entity*

Puerto Rico Infrastructure Financing Authority (the Authority) is a component unit of the Commonwealth of Puerto Rico (the Commonwealth) created by Act No. 44 (the Act) of the Legislature of the Commonwealth on June 21, 1988. The Authority was organized to provide financial, administrative, and other types of assistance to public corporations of the Commonwealth that develop and operate infrastructure facilities. The Authority is exempt from taxation in Puerto Rico.

The accompanying basic financial statements present the combined financial position and results of operations of the entity as a whole, by major fund, that are governed by the Authority.

(b) *Government-Wide and Fund Financial Statements*

*Government-Wide Financial Statements* – The statement of net assets and the statement of activities report information on all nonfiduciary activities of the Authority. The Authority has only governmental activities. The effect of interfund balances has been removed from the statement of net assets. Governmental activities generally are financed through intergovernmental revenues and other nonexchange revenues. Following is a description of the Authority's government-wide financial statements:

The statement of net assets presents the Authority's assets and liabilities, with the difference reported as net assets. Net assets are reported in three categories:

• Invested in capital assets consists of capital assets, net of accumulated depreciation and reduced by outstanding balances for bonds, notes, and other debt, if any, that are attributed to the acquisition, construction, or improvement of those assets.

• Restricted net assets result when constraints placed on net assets use are either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

• Unrestricted net assets consist of net assets which do not meet the definition of the two preceding categories. Unrestricted net assets often are designated to indicate that management does not consider them to be available for general operations. Unrestricted net assets often have constraints on resources which are imposed by management, but can be removed or modified.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment is offset by program revenues. Direct expenses are those that are clearly identifiable within a specific function. Program revenues include: (1) earnings (loss) on investments and changes in the fair value of investments and (2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function. Other items not meeting the definition of program revenue are instead reported as general revenue.

15 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

*Funds Financial Statements* – Separate financial statements are provided for governmental funds. Major individual governmental funds are reported as separate columns in the fund financial statements. All funds of the Authority are major funds.

**(c)    *Measurement Focus, Basis of Accounting, and Financial Statements Presentation***

*Government-Wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenues are recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Grants and similar items are recognized as revenue as soon as all eligibility requirements have been met.

*Governmental Funds' Financial Statements* – The governmental funds' financial statements are reported using the current financial resources measurement focus and the modified-accrual basis of accounting. Revenues are recognized as soon as it is both measurable and available. Revenues are considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the Authority considers revenues to be available if they are collected within 60 days at the end of the current fiscal year-end. Other revenues are considered to be measurable and available only when cash is received by the Authority. Expenditures generally are recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include:

- Interest on general long-term obligations is recognized when paid.

- Debt service expenditures and claims and judgments are recorded only when payment is due.

**(d)    *Fund Accounting***

The financial activities of the Authority are recorded in individual funds, each of which is deemed to be a separate accounting entity. Fund accounting is designed to demonstrate legal compliance and to aid financial management by segregating transactions related to certain government functions or activities. A fund is a separate accounting entity with a self-balancing set of accounts. The financial activities of the Authority that are reported in the accompanying basic financial statements have been classified into the following major governmental funds:

**(i)    General Fund**

The General Fund is the general operating fund of the Authority that is used to account for all financial resources, except those required to be accounted for in another fund.

**(ii)    Capital Projects**

The Capital Projects Fund accounts for resources used or contributed for the acquisition or construction of capital assets and capital improvements.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(iii) Debt Service**

The Debt Service Fund accounts for the accumulation of resources for payment of interest and principal on long-term obligations.

**(iv) Permanent Fund**

The Permanent Fund is used to account for assets held by the Authority in which the trust principal (corpus) may not be expended but must be kept intact, that is, the capital must be maintained.

When both restricted and unrestricted resources are available for use, it is the Authority's policy to use restricted resources first, and then unrestricted resources as they are needed.

**(e)  Budgetary Accounting**

The Authority is not required by the Act to submit a budget for approval by the Legislature of the Commonwealth; consequently, no formal budgetary accounting procedures are followed.

**(f)  Investments and Investment Contracts**

Investments and investment contracts are carried at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts, which are carried at cost. Fair value is determined based on quoted market prices whenever available. For securities without quoted price, fair value represents quoted market prices for comparable instruments. Realized gains and losses from the sale of investments and unrealized changes in fair value are recorded as investment income.

**(g)  Prepaid Expenses**

Certain payments to vendors represent costs applicable to future accounting periods and are recorded as prepaid items in the government-wide financial statements.

17 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(h) **Capital Assets**

Capital assets include construction in progress, furniture and equipment, vehicles, and leasehold improvements. Capital assets are reported in the government-wide financial statements. The threshold for capitalizing furniture and equipment, vehicles, and leasehold improvements is $750. Major capital outlays for capital assets and improvements are capitalized as projects are constructed. Capital assets are recorded at cost or estimated historical cost. Contributed assets are recorded at estimated fair market value at the time received. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets. The ranges of the useful lives are as follows:

| Assets | Years |
|---|---|
| Furniture and equipment | 3-5 |
| Vehicles | 3-5 |
| Leasehold improvements | Lesser of 5 years or lease term |

The costs of normal maintenance and repairs that do not add value to the asset or materially extend assets lives are not capitalized.

(i) **Compensated Absences**

The Authority maintains a policy that permits employees to accumulate earned but unused vacation and sick pay benefits that will be paid to employees upon separation from Authority service if certain criteria are met. These benefits plus their related tax and retirement costs are classified as compensated absences. The Authority policy permits employees to either bank unused sick pay benefits or receive a cash buyout on an annual basis. Both the current and long-term portion of compensated absences are accrued and reported in the government-wide financial statements.

A liability for these amounts is reported in the governmental funds only if these have matured, for example as a result of employee resignations and retirements.

(j) **Deferred Bond Issue Costs and Bond Discounts**

Discounts and issue costs related to long-term debt are amortized over the life of the debt principally by the effective-interest method. Notes payable, general obligation bonds payable, and revenue bonds payable in the government-wide financial statements are shown net of unamortized premium or discount. Bond issue costs are reported as deferred charges in the government-wide financial statements. Discount and issue costs related to general long-term debt in the governmental fund financial statements are recorded as expenditures when paid and, therefore, are not accounted for in subsequent periods. The net proceeds from bond issuances are presented as other financing sources in the governmental fund financial statements.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(k)  *Interfund Transactions***

The Authority has operating transfers which are legally required transfers that are reported when incurred as "Transfer-in" by the recipient fund and as "Transfer-out" by the disbursing fund. Interfund receivables and payables have been eliminated from the statement of net assets.

**(l)  *Reservations of Fund Balance***

Reservations of fund balance represent portions of fund balances that are limited for specific purpose, not appropriable, or not available for expenditure. The Authority has the following reservations of fund balance:

- ***Capital Projects*** – Represents net assets available to finance future capital outlays.

- ***Debt Service*** – Represents net assets available to finance future debt service payments.

- ***Trust – Nonexpendable*** – Represents net assets held in trust in which the principal (corpus) may not be expended. Investment earnings from the net assets held in Trust have been pledged for the debt service of long-term debt.

- ***Other Purposes*** – Represent cash reserved for future contributions to the Revolving Loan Funds (note 8).

**(m)  *Use of Estimates***

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenditures during the reporting period. Actual results could differ from those estimates.

**(n)  *Risk Management***

The Authority is responsible for assuring that the Authority's property is properly insured. Annually, the Authority compiles the information of all property owned and its respective market value and purchases the property and casualty insurance policies for the Authority. Insurance coverage for fiscal year 2004 remained similar to those of prior years. For the last three years, insurance settlements have not exceeded the amount of coverage.

**(o)  *Deferred Revenue***

Deferred revenue arises when potential revenue does not meet the available criterion for recognition in the current period. Available is defined as due at June 30 and collected within 60 days thereafter to pay obligations due at June 30. Deferred revenue at the government-wide level arises only when the Authority receives resources before it has a legal claim to them.

19 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(2)  Cash and Cash Equivalents**

The Authority's cash and cash equivalents are considered to be cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition. The table presented below discloses the level of custody credit risk assumed by the Authority based upon how its deposits were insured or secured with collateral at June 30, 2004:

- **Category 1** – Insured or collateralized with securities held by the Authority or by its agent in the Authority's name.

- **Category 2** – Collateralized with securities held by the pledging financing institution's trust department or its agent in the Authority's name.

- **Category 3** – Uninsured and uncollateralized.

The following table presents the reported amount and depository bank balances of deposits with financial institutions at June 30, 2004:

| | Category | | | Bank balance | Carrying amount |
|---|---|---|---|---|---|
| | **1** | **2** | **3** | | |
| Deposits with Government Development Bank for Puerto Rico (GDB) | $  — | — | 80,832,805 | 80,832,805 | 74,508,045 |
| Deposits with commercial banks | 58,736,003 | — | — | 58,736,003 | 58,736,003 |
| Total cash | $  58,736,003 | — | 80,832,805 | 139,568,808 | 133,244,048 |

The Commonwealth requires that public funds deposited in commercial banks operating in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth. GDB (a component unit of the Commonwealth) is exempt from the collateral requirements.

**(3)  Investments and Investment Contracts**

In accordance with investment guidelines promulgated by GDB for agencies and public corporations of the Commonwealth under the authority provided by Act No. 113 of August 3, 1995 and Executive Order 1995-50A (the investment guidelines), the Authority is authorized to purchase or enter into the following investment instruments:

- U.S. government and agencies obligations

- Certificates of deposit

- Bankers' acceptances

- Commercial paper

- Participations in the Puerto Rico Government Investment Trust Fund

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

- Obligations of the Commonwealth of Puerto Rico, its agencies, municipalities, public corporation obligations, and instrumentalities

- Obligations of state and local governments of the United States

- Mortgage and asset-backed securities

- Corporate debt, including investment contracts

The investment guidelines also establish limitations and others guidelines

The Authority's investments and investment contracts are categorized into three levels to provide an indication of custodial risk assumed. These categories are as follows:

- **Category 1** – Insured or registered in the name of the Authority, or securities held by the Authority or its agent in the Authority's name.

- **Category 2** – Uninsured and unregistered in the name of the Authority, with securities held by the counterparty's trust department or agent in the Authority's name.

- **Category 3** – Uninsured and unregistered in the name of the Authority, with securities held by the counterparty, or by its trust department or agent but not in the Authority's name.

The following table shows the category, carrying amount, and fair value as of June 30, 2004 of investments:

| | Category | | | Carrying | |
|---|---|---|---|---|---|
| Type | 1 | 2 | 3 | amount | Fair value |
| State and local government securities (SLGS) | $ 1,270,277,007 | — | — | 1,270,277,007 | 1,270,277,007 |
| Investment in the Puerto Rico Government Investment Trust Fund | — | 461,049 | — | 461,048 | 461,048 |
| Total categorized investments | $ 1,270,277,007 | 461,049 | — | 1,270,738,055 | 1,270,738,055 |
| Noncategorized investments: Guaranteed investment contracts | | | | 324,497,452 | · |
| Total investments (including assets held in trust) | | | | $ 1,595,235,507 | |

The Puerto Rico Government Investment Trust Fund (the Investment Fund) is a collective investment trust created by the Secretary of the Treasury of the Commonwealth, as setter, and GDB, as a trustee, pursuant to Act No. 176 of August 11, 1995 of the Commonwealth for the purpose of providing eligible investors a way to invest in a money market portfolio.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(4)  **Capital Assets**

Capital assets activity for the fiscal year ended at June 30, 2004, was as follows:

| Governmental activities | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Capital assets not depreciated: | | | | |
| Construction work in process | $ 773,984,004 | 165,821,019 | (102,508,607) | 837,296,416 |
| Capital assets being depreciated: | | | | |
| Furniture and equipment | 533,913 | 70,547 | — | 604,460 |
| Vehicles | 63,488 | — | — | 63,488 |
| Leasehold improvements | 620,847 | — | — | 620,847 |
| Total assets being depreciated | 1,218,248 | 70,547 | — | 1,288,795 |
| Less accumulated depreciation and amortization: | | | | |
| Furniture and equipment | (427,858) | (63,757) | — | (491,615) |
| Vehicles | (51,544) | (11,944) | — | (63,488) |
| Leasehold improvements | (444,388) | (99,708) | — | (544,096) |
| Total accumulated depreciation and amortization | (923,790) | (175,409) | — | (1,099,199) |
| Total capital assets being depreciated, net | 294,458 | (104,862) | — | 189,596 |
| Total governmental activities capital assets, net | $ 774,278,462 | 165,716,157 | (102,508,607) | 837,486,012 |

Total depreciation expense for the year ended June 30, 2004 amounted to $175,409 and was charged to general government activity.

(Continued)

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

*Construction Commitments*

The Authority has active construction projects as of June 30, 2004. Commitments (in millions) on significant contracts were as follows:

| Description | Commitments | Expended | Remaining commitments |
|---|---|---|---|
| Regional projects | $ 853 | 643 | 210 |
| Short-term projects | 248 | 236 | 12 |
| Supplementary projects | 82 | 82 | — |
| Capital expenditures | 155 | 150 | 5 |
| | $ 1,338 | 1,111 | 227 |

**(5) Interfund Transfers**

Interfund transfers for the year ended June 30, 2004, consist of the following:

| | Transfers in | | | |
|---|---|---|---|---|
| Transfers out | General Fund | Capital Projects | Debt Service | Total |
| General Fund | $ — | 5,030,336 | 63,753,587 | 68,783,923 |
| Capital Projects | 2,421,626 | — | — | 2,421,626 |
| Permanent | — | — | 68,916,759 | 68,916,759 |
| | $ 2,421,626 | 5,030,336 | 132,670,346 | 140,122,308 |

The majority of the interfund transfers were for recurring operating expenditures.

23 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(6)  **Long-Term Debt**

(a)  *Changes in Long-Term Liabilities*

Long-term liability activity in the governmental activities for the year ended June 30, 2004, was as follows:

| | Beginning balance | Additions | Reductions | Ending balance | Due within one year |
|---|---|---|---|---|---|
| Series 1988 A Bonds | $ 18,270,450 | — | (13,960,000) | 4,310,450 | 2,675,000 |
| Series 1997 A and B Bonds | 791,824,550 | — | (2,805,000) | 789,019,550 | 15,995,000 |
| Series 1998 A Bonds | 134,660,000 | — | — | 134,660,000 | — |
| Series 2000 A and B Bonds | 1,074,180,000 | — | (7,815,000) | 1,066,365,000 | 8,285,000 |
| | 2,018,935,000 | — | (24,580,000) | 1,994,355,000 | 26,955,000 |
| Less bond discounts | 34,043,650 | — | (366,439) | 33,677,211 | |
| Total bonds payable | 1,984,891,350 | — | (24,213,561) | 1,960,677,789 | 26,955,000 |
| Notes payable | 20,130,816 | 4,678,509 | (5,510,628) | 19,298,697 | 1,176,764 |
| Liabilities for claims and other contingencies | 6,000,000 | — | — | 6,000,000 | — |
| Accrued compensated absences | 238,169 | 23,397 | — | 261,566 | 131,886 |
| Long-term liabilities | $ 2,011,260,335 | 4,701,906 | (29,724,189) | 1,986,238,052 | 28,263,650 |

(b)  *Special Tax Revenue Bonds*

The Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A Bonds (the Series 1988A Bonds) were issued to provide financial assistance, in the form of a capital contribution, to the Puerto Rico Aqueduct and Sewer Authority (PRASA). The assistance provided was to facilitate PRASA's financing of its capital improvement program. The Series 1988A Bonds bear interest, payable semiannually in January 1 and July 1, at rates, which range between 7.60% and 7.90% and mature at various dates through July 1, 2005. These Bonds are entitled to the benefits of a $17,001,500 irrevocable direct pay letter of credit issued by a commercial bank, which expires on August 28, 2005.

On December 4, 1997, the Authority issued $771,485,000 Special Tax Revenue Bonds, Series 1997A and $30,275,000 Special Tax Revenue Bonds, Series 1997B (the Series 1997A and 1997B Bonds). The proceeds thereof were used to repay the outstanding principal and interest under various lines of credit provided by GDB to PRASA ($640,366,537) and to establish a special construction fund, to be administered by the Authority on behalf of PRASA, to finance additional projects of PRASA's capital improvement program ($121,235,185). The Series 1997A and 1997B Bonds bear interest, payable semiannually on January 1 and July 1 at rates which range between 5.00% and 6.30% and mature at various dates through July 1, 2028. The Series 1997A Bonds maturing on or after July 1, 2008 may be redeemed at the option of the Authority prior to maturity at 101% from January 1, 2008 to December 31, 2008, 100.5% from January 1, 2009 to December 31, 2009, and 100% thereafter.

24                                                                    (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

On April 2, 1998, the Authority issued $134,660,000 Special Tax Revenue Refunding Bonds, Series 1998A (the Series 1998A Bonds). The Series 1998A Bonds bear interest, payable semiannually on January 1 and July 1 at rates, which range between 4.30% and 5.50% and mature at various dates through July 1, 2010. The Series 1998A Bonds maturing on July 1, 2009 and 2010 may be redeemed at the option of the Authority prior to maturity at 101% from July 1, 2008 to June 30, 2009 and 100.5% from July 1, 2009 to June 30, 2010.

Payment of principal of and interest on the Series 1997A Bonds, and the Series 1998A Bonds is insured by separate municipal bond insurance policies issued by an unrelated, insurance company.

The Series 1988 A Bonds, Series 1997 A Bonds, Series 1997 B Bonds, and the Series 1998 A Bonds (collectively, the Bonds) are payable solely from and secured by a pledge of federal excise taxes and other moneys deposited to the credit of a sinking fund established pursuant to a trust agreement.

The Act, as amended, requires that the first $70 million, up to fiscal year 2028, of federal excise taxes received by the Commonwealth be transferred to the Authority. Federal excise taxes consist of taxes received by the Commonwealth from the United States in connection with rum and other articles produced in Puerto Rico and sold in the United States that are subject to federal excise tax. The trust agreement requires the Authority to deposit to the credit of the sinking fund the federal excise taxes and other moneys deposited as are required to meet debt service requirements with respect to the Bonds. Rum is the only article currently produced in Puerto Rico subject to federal excise tax, the proceeds of which are required to be transferred from the federal government to the Commonwealth.

The federal excise taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient, the Act requires that the Authority request and the Director of the Office of Management and Budget of the Commonwealth include in the budget of the Commonwealth for the corresponding fiscal year an appropriation necessary to cover such deficiency. The Commonwealth's Legislature, however, is not legally obligated to make the necessary appropriation to cover such deficiency.

The Authority is required under the trust agreement to establish a reserve account in the sinking fund to deposit and maintain therein an amount equal to the reserve requirement, as defined. Alternatively, the Authority may deposit to the credit of such reserve account an insurance policy or a letter of credit in lieu of any required deposit or in substitution of moneys on deposit in the reserve account. On the date of the issuance of the Series 1988A Bonds, the reserve account was fully funded in an amount equal to the reserve requirement from the proceeds of the Series 1988A Bonds and certain other moneys. In connection with the issuance of the 1997A and 1997B Bonds, the trust agreement was amended to eliminate the requirement that the Authority establish and maintain a reserve account in the sinking fund with respect to any bonds issued under the trust agreement, other than the Series 1988A bonds remaining outstanding after the advanced refunding described above.

25

(Continued)

### PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Additional bonds, secured on parity with the Bonds, may be issued for any purpose authorized by the Act, subject to compliance with certain financial tests in the trust agreement.

*(c)* *Special Obligation Bonds*

On September 28, 2000, the Authority issued $1,037,750,000 Special Obligation Bonds, 2000 Series A and $54,800,000 Special Obligation Bonds, 2000 Series B (collectively, the 2000 Series Bonds) for the purpose of repaying certain notes issued by the Authority to GDB and financing certain aqueduct and sewer infrastructure development projects. The 2000 Series Bonds are limited obligations of the Authority payable solely from, and secured by, a pledge of all interest received by the Authority from U.S. Treasury securities and other eligible obligations deposited in a special account of the Trust Fund held by a trustee under an irrevocable and permanent trust. The 2000 Series A bonds bear fixed interest rates ranging from 4.10% to 5.50% payable semiannually on each April 1 and October 1. The 2000 Series B bonds bear a variable interest rate during each index rate period, as defined, at a rate equal to the sum of (i) the average of the Bond Market Association Municipal Swap Index for each day during such period and (ii) 0.65% (the Index Rate). The Index Rate on the 2000 Series B bonds may not be less than 1% nor more than 7.5% per annum. The 2000 Series A Bonds are subject to redemption, at the option of the Authority, on or after October 1, 2010 through September 30, 2011 at a redemption price of 101% and 100% thereafter. The 2000 Series B Bonds are subject to redemption, at the option of the Authority, at a price equal to the principal balance plus accrued interest to the date of redemption, on any date not earlier than October 1, 2010.

Debt service requirements at June 30, 2004, for bonds outstanding are as follows:

| | Principal | Interest | Total |
|---|---|---|---|
| Fiscal year ending June 30: | | | |
| 2005 | $ 26,955,000 | 104,593,334 | 131,548,334 |
| 2006 | 29,165,000 | 103,117,316 | 132,282,316 |
| 2007 | 30,695,000 | 101,729,623 | 132,424,623 |
| 2008 | 32,225,000 | 100,198,390 | 132,423,390 |
| 2009 | 34,050,000 | 98,473,383 | 132,523,383 |
| 2010-2014 | 200,095,000 | 463,733,753 | 663,828,753 |
| 2015-2019 | 260,215,000 | 405,841,216 | 666,056,216 |
| 2020-2024 | 337,560,000 | 328,859,572 | 666,419,572 |
| 2025-2029 | 437,830,000 | 228,944,734 | 666,774,734 |
| 2030-2034 | 203,535,000 | 142,394,588 | 345,929,588 |
| 2035-2039 | 271,070,000 | 76,300,050 | 347,370,050 |
| 2040-2041 | 130,960,000 | 7,436,225 | 138,396,225 |
| | $ 1,994,355,000 | 2,161,622,184 | 4,155,977,184 |

*(d)* *Notes Payable*

On February 26, 2002, the Authority entered into a loan agreement with GDB where GDB lent the Authority the amount of $47,381,332 for the purpose of paying additional costs incurred or to be incurred by the Authority in the acquisition, construction, equipping, installation, and development

26 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

of certain aqueduct and sewer projects of PRASA. This loan matures on October 1, 2021 and bears an annual interest rate of 7.5%. Principal outstanding under this loan agreement amounted to $8,647,310 at June 30, 2004.

On January 16, 2002 (refinancing date), the Authority entered into a loan agreement (the Note). The note payable was originally a loan granted by GDB (the Old Note), but which, pursuant to Act No. 164 of December 17, 2001, the Puerto Rico Public Finance Corporation (PFC) acquired and restructured through the issuance of PFC Commonwealth Appropriation Bonds (PFC Bonds). The PFC Bonds were issued under trust indenture agreements where PFC pledged and sold the Note, along with other notes under the Act No. 164, to certain trustees and created a first lien on the pledged revenue (consisting of annual Commonwealth appropriations earmarked to repay the Note). In substance, the notes are payable to the corresponding trustees to which PFC pledged the notes.

During June 2004, PFC advance refunded a portion of certain of its outstanding Commonwealth appropriation bonds issued in 2001 under Act No. 164 of January 16, 2002. The Authority recognizes a mirror effect of this advance refunding by PFC in its own note payable in proportion to the portion of the Authority's note payable included in the PFC refunding. As a result, the Authority considered defeased and therefore removed from the balance sheet the portion refunded of $4,358,419. Refunding proceeds and bond issue costs of $4,678,509 and $320,090, respectively, were recognized and capitalized within the new refunding note and deferred through the note term. The aggregate debt service requirements of the refunding and unrefunded notes will be funded with annual appropriations from the Commonwealth.

As a result of this advance refunding, the Authority has decreased its aggregate debt service payments by approximately $2.5 million over the next 27 years and obtained an economic gain (the difference between the present values of the debt service payments of the refunded and refunding notes) of approximately $300,000. At June 30, 2004, approximately $4.4 million of the notes refunded during June 2004 remain outstanding and are considered defeased.

The amount outstanding of the Note at June 30, 2004 was $10,651,387 and matures in July 2031. Interest on the unpaid principal amount of the Note is equal to the applicable percentage of the aggregate interest payable on PFC Bonds. The applicable percentage is the percentage representing the proportion of the amount paid by PFC on the Note to the aggregate amount paid by PFC on all the notes acquired by PFC under Act No. 164.

27

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Debt service requirements at June 30, 2004, for notes payable outstanding are as follows:

|  | | Principal | Interest | Total |
|---|---|---|---|---|
| Fiscal year ending June 30: | | | | |
| 2005 | $ | 1,176,764 | 225,756 | 1,402,520 |
| 2006 | | 987,552 | 594,626 | 1,582,178 |
| 2007 | | 970,973 | 960,379 | 1,931,352 |
| 2008 | | 898,604 | 1,024,503 | 1,923,107 |
| 2009 | | 952,669 | 1,077,736 | 2,030,405 |
| 2010-2014 | | 3,588,157 | 5,464,110 | 9,052,267 |
| 2015-2019 | | 2,400,580 | 4,151,623 | 6,552,203 |
| 2020-2024 | | 2,015,530 | 2,326,908 | 4,342,438 |
| 2025-2029 | | 3,101,325 | 1,114,741 | 4,216,066 |
| 2030-2032 | | 3,206,543 | 191,323 | 3,397,866 |
|  | $ | 19,298,697 | 17,131,705 | 36,430,402 |

**(7)  Transactions with Related Parties**

For the fiscal year 2003-2004, the Commonwealth contributed to the Authority $70,000,000 that will be used for debt service payments of the Bonds (note 6) and operating expenses plus $10,258,319 for other purposes.

Interest income on interest-bearing demand deposits with GDB amounted to $361,684 for the year ended June 30, 2004. Also, the Bank provides payroll services to the Authority at no cost.

The Authority transferred to PRASA during 2004 aqueduct and sewer projects amounting to $96,932,515, included as expenses of aqueduct and sewer in the accompanying statement of activities.

**(8)  Revolving and Rotating Funds**

The Act, which created the Authority, as amended, provided for the establishment of the Puerto Rico Water Pollution Control Revolving Fund (the Revolving Fund), which is administered by the Puerto Rico Environmental Quality Board (EQB) and by the Authority in accordance with Title VI of the Water Pollution Control Act (Clean Water Act) of 1972. The EQB, as the designated instrumentality of the Commonwealth, is empowered to enter into capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), to accept capitalization grant awards made under Title VI of the Clean Water Act and, in conjunction with the Authority, to manage the Revolving Fund in accordance with the requirements of the Clean Water Act, the Act which created the Authority, as amended, and the Memorandum of Understanding entered into by and among EQB, PRASA, GDB, and the Authority.

On July 7, 1997, the Legislature of the Commonwealth enacted legislation, which, among other things, establishes the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (the Drinking Water Fund) with the purpose of receiving financial assistance under the Clean Water Act and provides for the participation of the Authority in the administration of said fund.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

The net assets, revenues, and expenses of these loan funds are not included in the accompanying basic financial statements since the Authority acts only as administrator of the Revolving Fund and Drinking Water Fund.

**(9) Permanent Fund**

Act No. 92 of June 24, 1998 of the Legislature of the Commonwealth provides, among other things, for the creation of the Permanent Fund to be administered by the Authority. The Permanent Fund consists of a corpus account funded with a portion of the proceeds from the sale of assets of Puerto Rico Telephone Authority (PRTA) and additional accounts created or to be created by the Authority. Act No. 92 provides that the principal of the corpus account may not be reduced for any reason and that income received from the investment of moneys in the corpus account and other moneys received may be deposited in any of the additional accounts. On March 2, 1999, the Authority received $1.2 billion in connection with the sale of certain assets of PRTA which were deposited in the corpus account. Moneys deposited in the additional accounts are to be used first to pay the principal, premium, and interest of any bonds outstanding or to be issued by the Authority and then for the expansion, development, and modernization of infrastructure related to the aqueduct and sewer systems of Puerto Rico.

The moneys deposited in the Permanent Fund shall be invested up to $1 billion in: (1) direct obligations of the U.S. government; (2) obligations, the payment of principal and interest of which are unconditionally guaranteed by the U.S. government; (3) certificates of deposit of any bank, national bank association, or trust company organized and existing under the laws of the Commonwealth, the United States of America, or any of its states, on which the excess over the federal deposit insurance is secured by investments of the types described in (1) and (2) above; or (4) tax-exempt obligations of any state, instrumentality, agency, or political subdivision of Puerto Rico or the United States, the payment of principal and interest of which is secured by investments of the types described in (1) and (2) above.

Moneys in excess of $1 billion shall be invested in any of the instruments mentioned above or in any other instruments, including publicly traded common and preferred stock, not prohibited by investment guidelines adopted by GDB.

**(10) Commitments**

***Operating Leases***

The Authority leases office space under noncancelable operating leases expiring in fiscal year 2005. Rent expense for the year ended June 30, 2004 amounted to $440,447.

At June 30, 2004, the minimum annual future rentals under noncancelable leases are $218,025 for fiscal year ending June 30, 2005.

29                                                                              (Continued)

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
### (A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(11) **Contingencies**

At June 30, 2004, the Authority is a defendant in various legal proceedings arising from its normal operations. Management, based on the advice of its legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings and legal actions in the aggregate will not have a material effect on the Authority's financial statements. However, management is of the opinion that they will reach some settlements in certain cases; therefore, management recorded in the accompanying statement of net assets a liability for claims and other contingencies amounting to $6 million.

(12) **Subsequent Event**

On August 26, 2004, the Authority entered into a loan agreement with GDB related to a nonrevolving line of credit in an amount not to exceed $125,000,000 for the acquisition, construction, equipping, installation, and development of various infrastructure projects for municipalities, public corporations, political subdivisions, and Commonwealth's instrumentalities included within the Authority's Capital Improvements Program for fiscal year 2004-2005. The principal amount of the loan is due and payable on June 30, 2005.

Case:17-03283-LTS Doc#:10602-17 Filed:01/31/20 Entered:01/31/20 18:34:34 Desc:
Exhibit Official Statement PRIFA Series 2005 Bonds Page 86 of 169

**Schedule**

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Special Obligation Bonds 2000 Series A and B – $1,092,550,000

Year ended June 30, 2004

1. Deposits to the credit of, and withdrawals from, each fund or account created under the provisions of the Trust Indenture:

| Account number<br>Account name | 125912-011<br>Special<br>corpus | 125912-099<br>Trust<br>agreement | 125912-002<br>Bond service<br>account | 125912-008<br>Rebate Fund<br>account | 125912-005<br>Construction<br>Fund |
|---|---|---|---|---|---|
| Deposits, beginning balance | $ 21,236,838 | 1,200,000,000 | 10,277,858 | 1,979,159 | 496,534,445 |
| Operating transfers in | 67,754,609 | — | 68,335,685 | 581,075 | — |
| Interest earned from July 1, 2003 to June 30, 2004 | 1,162,150 | 67,754,609 | 48,614 | 12,231 | 10,409,129 |
| Total deposits | 90,153,597 | 1,267,754,609 | 78,662,157 | 2,572,465 | 506,943,574 |
| Less: | | | | | |
| Operating transfers out | 68,916,759 | 67,754,609 | — | — | — |
| Trust management charges and fees | — | — | — | — | 3,475 |
| Payment of loan to Government Development Bank for Puerto Rico | — | — | 1,152,209 | — | — |
| Payment of interest to Government Development Bank for Puerto Rico | — | — | 143,791 | — | — |
| Interest payment to bondholders | — | — | 55,600,594 | — | — |
| Principal payment to bondholders | — | — | 7,815,000 | — | — |
| Total disbursements | 68,916,759 | 67,754,609 | 64,711,594 | — | 3,475 |
| Requisition amounts for projects, takedowns | — | — | — | — | 182,442,648 |
| Deposits as of June 30, 2004 | $ 21,236,838 | 1,200,000,000 | 13,950,563 | 2,572,465 | 324,497,451 |

2. Description of the bonds issued, paid, purchased, or redeemed during each fiscal year and the outstanding principal amount of the bonds:

(a) Issued $ —
(b) Paid:
   Series A 7,405,000
   Series B 410,000
(c) Purchased or redeemed —
(d) Outstanding principal amount at June 30, 2004:
   Series A 1,012,680,000
   Series B 53,685,000

See accompanying independent auditors' report.

31

[This page intentionally left blank]

APPENDIX III

COMMONWEALTH OF PUERTO RICO
Financial Information and Operating Data Report
May 1, 2005

### TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1
  Geographic Location and Demography .................................................................. 1
  Relationship with the United States ....................................................................... 1
  Governmental Structure ......................................................................................... 1
  Political Trends ...................................................................................................... 2
THE ECONOMY ............................................................................................................ 3
  General .................................................................................................................. 3
  Economic Development Program for the Private Sector ......................................... 6
  Employment and Unemployment ........................................................................... 9
  Economic Performance by Sector .......................................................................... 10
  Higher Education ................................................................................................... 19
  Tax Incentives ...................................................................................................... 20
DEBT ............................................................................................................................. 23
  Public Sector Debt ................................................................................................. 23
  Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ........ 24
  Commonwealth Guaranteed Debt .......................................................................... 26
  Trends of Public Sector Debt ................................................................................. 27
PUBLIC CORPORATIONS .......................................................................................... 29
  Government Development Bank for Puerto Rico .................................................... 31
  Other Public Corporations ..................................................................................... 32
INSURANCE MATTERS ............................................................................................... 37
RETIREMENT SYSTEMS ............................................................................................. 38
COMMONWEALTH FINANCIAL STATEMENTS ....................................................... 42
PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES ........................ 42
  Summary and Management's Discussion of General Fund Results .......................... 42
  Major Sources of General Fund Revenues .............................................................. 47
  Collections of Income and Excise Taxes ................................................................ 50
  Proposed Fiscal Reform ......................................................................................... 50
  Transfers to General Obligation Redemption Fund ................................................ 51
  Components of General Fund Expenditures ............................................................ 51
  Federal Grants ...................................................................................................... 52
BUDGET OF THE COMMONWEALTH OF PUERTO RICO ....................................... 53
  Office of Management and Budget ......................................................................... 53
  Budgetary Process ................................................................................................. 53
  Financial Control and Adjustment Procedures ....................................................... 53
  Appropriations ...................................................................................................... 54
  Fiscal Year 2005 Budget ....................................................................................... 55
  Fiscal Year 2006 Budget ....................................................................................... 57
  Differences between Budget and Basic Financial Statements .................................. 59
LITIGATION .................................................................................................................. 60

[This page intentionally left blank]

## COMMONWEALTH OF PUERTO RICO

### Financial Information and Operating Data Report
### May 1, 2005

### INTRODUCTION

#### Geographic Location and Demography

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000, compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

#### Relationship with the United States

Puerto Rico was discovered by Columbus in 1493, and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the fifty states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

#### Governmental Structure

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislature consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the Federal Judiciary and has its own United States District Court.

Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

Anibal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School. Since 1982, he has worked in the public sector as legislative advisor to the Governor of Puerto Rico, a member of the Puerto Rico House of Representatives and Resident Commissioner. From 1987 to 1989, he worked as a law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and later for Judge Levin Campbell of the First Circuit Court of Appeals.

Juan C. Méndez, Secretary of the Treasury, took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from the Georgetown University Law Center. During the second half of 2004 and prior to his appointment as Secretary of the Treasury, he worked as a senior tax manager for a Puerto Rico accounting firm. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a major Puerto Rico law firm.

Ileana F. Fas Pacheco, Director of the Office of Management and Budget ("OMB"), took office in January 2005. She is a graduate of the University of Puerto Rico, where she obtained a Bachelor's degree in Science with a major in Electrical Engineering. She obtained a Master's degree in Business Administration in International Management from Thunderbird, the American Graduate School of International Management. Since 2001, she has worked in the public sector as Special Assistant to the Puerto Rico Secretary of State, legislative assistant to the Resident Commissioner and Director of the Office of Federal Affairs of the Puerto Rico Department of Education. Prior to 2001, she worked as an electrical engineer at a major electronics company.

William Lockwood Benet was appointed President of Government Development Bank for Puerto Rico ("GDB") effective February 1, 2005. He is a graduate of Brown University and the Institute of Development Studies at the University of Sussex, where he became a development finance economist specialized in financing strategy, economic policy innovation, private equity, and life sciences. Prior to his appointment, he was managing director of Lockwood Financial Advisors and Generans Life Sciences and Chairman of the Board of Directors of Grupo Guayacán, a venture capital firm. From 1996 to 2000, he served as Director of the Center for the New Economy and Secretary of the PR Community Foundation. Prior to 1993, he served as Vice President and Assistant to three Presidents of the GDB.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total vote received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|                                | 1988  | 1992  | 1996  | 2000  | 2004  |
|--------------------------------|-------|-------|-------|-------|-------|
| Popular Democratic Party       | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party          | 45.8  | 49.9  | 51.1  | 45.7  | 48.2  |
| Puerto Rico Independence Party | 5.4   | 4.2   | 3.8   | 5.2   | 2.7   |
| Others                         | 0.1   | --    | 0.6   | 0.5   | 0.6   |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|                                | Senate | House |
|--------------------------------|--------|-------|
| Popular Democratic Party       | 9      | 18    |
| New Progressive Party          | 17     | 32    |
| Puerto Rico Independence Party | 1      | 1     |
|                                | 27     | 51    |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## THE ECONOMY

### General

The Commonwealth has established policies and programs directed principally at developing the manufacturing and services sectors of the economy and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico has enjoyed more than two decades of almost continuous economic expansion. Almost every sector of the economy has participated in this expansion, and record levels of employment have been achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, a significant expansion in construction investment driven by infrastructure projects and private investment, primarily in housing, the relatively low cost of borrowing, and low oil prices in many years during this period.

Personal income, both aggregate and per capita, has increased consistently each fiscal year from 1985 to 2004. In fiscal year 2004, aggregate personal income was $46.8 billion ($43.8 billion in 2000 prices) and personal income per capita was $12,031 ($11,260 in 2000 prices).[*] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Transfer payments to individuals in fiscal year 2004 were $9.7 billion, of which $7.5 billion, or 77%, represented entitlements to individuals who had previously performed services or made contributions under programs such as Social Security, Veterans' Benefits, Medicare and U.S. Civil Service retirement pensions.

---

[*] Different price deflators are used for gross product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

Total average monthly employment (as measured by the Department of Labor and Human Resources Household Employment Survey) has also increased. From fiscal year 2000 to fiscal year 2004, average monthly employment increased from 1,150,291 to 1,205,602.

The dominant sectors of the Puerto Rico economy are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, electronics, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second only to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross product for the five fiscal years ended June 30, 2004.

## Commonwealth of Puerto Rico
## Gross Product

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Gross product – $ millions[2] | $ 41,419 | $ 44,047 | $ 45,071 | $ 47,439 | $50,320 |
| Real gross product – $ millions (2000 prices) | 41,419 | 42,044 | 41,901 | 42,756 | 43,937 |
| Annual percentage increase in real gross product (2000 prices) | 3.0% | 1.5% | (0.3%) | 2.0% | 2.8% |
| U.S. annual percentage increase in real gross product (2000 prices) | 4.6% | 2.1% | 0.7% | 2.3% | 4.6% |

(1)    Preliminary.
(2)    In current dollars.

*Sources:* P.R. Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy.[*] Factors affecting the United States economy usually have a significant impact on the performance of the Puerto Rico economy. These include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the level of oil prices, the rate of inflation, and tourist expenditures. Consequently, the economic slowdown in the United States in 2001 and 2002, and the subsequent recovery in 2003 and 2004 (which continues in 2005) has also been reflected in the Puerto Rico economy.

The graph on the following page compares the growth rate of real gross product (or GNP) for the Puerto Rico and United States economies since fiscal 1990, and the forecast of the growth rate for fiscal years 2005 and 2006.

---

[*] During fiscal year 2004 (from July 2003 to June 2004) approximately 82% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 45% of Puerto Rico's imports.

# Real GNP Growth Rate



■ P.R.* □ U.S.**

* P.R. Planning Board
** Global Insight

Since the 1950s, the Puerto Rico Planning Board (the "Planning Board") has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce. In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes the economic accounts on an annual basis. Like the BEA, the Planning Board revises the macroeconomic numbers on a regular basis. The Planning Board has always classified the latest annual numbers as preliminary until they are revised and made final in conjunction with the release of new data each year. At present, all macroeconomic accounts for fiscal year 2004 are preliminary until the revised figures are released.

*Fiscal Year 2004*

The Planning Board's preliminary reports of the performance of the Puerto Rico economy during fiscal year 2004 indicate that the economy registered an increase of 2.8% in real gross product. Gross product was $50.3 billion in fiscal year 2004 ($43.9 billion in 2000 prices) compared to $47.4 billion in fiscal year 2003 ($42.8 billion in 2000 prices). This represents an increase in nominal gross product of 6.1%. Aggregate personal income increased from $44.7 billion in fiscal year 2003 ($42.4 billion in 2000 prices) to $46.8 billion in fiscal year 2004 ($43.8 billion in 2000 prices), and personal income per capita increased from $11,566 in fiscal year 2003 ($10,962 in 2000 prices) to $12,031 in fiscal year 2004 ($11,260 in 2000 prices). According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total monthly employment averaged 1,205,602 in fiscal year 2004 compared to 1,188,015 in fiscal year 2003, an increase of 1.5%. Concurrently, the unemployment rate decreased from 12.1% during fiscal year 2003 to 11.4% during fiscal year 2004.

*Fiscal Year 2005*

According to the Household Survey, total monthly seasonally adjusted employment for the first nine months of fiscal year 2005 averaged 1,233,100, an increase of 2.9% compared to 1,198,900 for the same period in fiscal year 2004. The seasonally adjusted unemployment rate for the first nine months of fiscal year 2005 was 10.8%, a decrease from 11.6% for the same period in fiscal year 2004. As in the past, the economy of Puerto Rico followed the performance of the United States economy.

The Planning Board's current real gross national product forecast for fiscal year 2005, released in February 2004, projected an increase of 2.3%. The Planning Board confirmed this projection in February 2005. The major short-term factors that could have an adverse effect on the economy of Puerto Rico include the persistent high level of oil prices, the upward turn of short-term interest rates, and the devaluation of the United States dollar, which affects the value of imports to Puerto Rico. Although interest rates began to increase slightly at the end of fiscal year 2004, they still remain at relatively low levels, which could stimulate economic activity in Puerto Rico for the short and medium-term.

*Fiscal Year 2006*

The Planning Board's current real gross national product forecast for fiscal year 2006, released in February 2005, projects an increase of 2.5%. The major short-term factors that could have an adverse effect on the economy include those presented for fiscal year 2005 and the possibility of a deceleration of public investment due to the Commonwealth's fiscal difficulties, which could reduce activity in the construction sector. The continued upward trend of interest rates may also contribute to a possible slowing of economic activity in the construction sector. Although the current administration is working to maintain public investment, no assurance can be given that the Commonwealth will succeed in these efforts. For a discussion of the Commonwealth's fiscal difficulties, see "Fiscal Year 2005 Budget" and "Fiscal Year 2006 Budget" under *Budget of the Commonwealth of Puerto Rico*.

**Economic Development Program for the Private Sector**

The Commonwealth's economic development program for the private sector is now focused on initiatives aimed at producing a more diversified and sustainable economic development. The three principal elements of these initiatives are: (i) the promotion of foreign investment focused on life sciences and computing and information technology; (ii) the promotion of local investment in order to facilitate the development of a local entrepreneurial culture that builds upon the Commonwealth's competitive advantages in, among others, life sciences, tourism, commerce and services; and (iii) investment in infrastructure and human capital to complement the promotion of foreign and local investment and focus on the current and future needs for human capital.

The Commonwealth has formulated a strategic plan to enhance its competitiveness in knowledge-based economic sectors, such as research and development of science and technology products. Four major components of this strategic plan are: (i) build on the strong presence in Puerto Rico of multinational companies in the science and technology sectors; (ii) build on Puerto Rico's skilled workforce to promote the expansion of research and development facilities by companies currently operating in Puerto Rico; (iii) attract new companies in such sectors; and (iv) provide incentives for companies and entrepreneurs to engage in the process of innovation and commercialization of new products, and establish research and development facilities in Puerto Rico. The latter initiative includes the creation of the Puerto Rico Science & Technology Trust, a government-sponsored trust that will provide grants and financing to companies, entrepreneurs, and universities that engage in these activities.

The Commonwealth is also providing incentives to promote the establishment of distribution and call centers, the acquisition and development of patents, and the development of a local entrepreneurial class. Distribution and call centers located in the Commonwealth will benefit from special incentives such as: (i) an excise tax exemption on machinery and equipment acquired by a call center; and (ii) a preferential tax rate of 4% for call centers located in Puerto Rico if they offer services to Latin America and a preferential tax rate of 2% if they offer hemisphere or worldwide services. The Commonwealth has decided to focus on this type of industry because it is labor intensive, presents no environmental concerns, and is generally able to start operations quickly.

The Commonwealth is also promoting and developing the acquisition and development of patents. According to newly enacted legislation, the Secretary of the Treasury may (i) negotiate the payment of taxes on patent royalties; and (ii) reduce the tax rate on patent royalties to a rate as low as 2%.

III-6

These incentives are in addition to those already enacted for research and development carried out in the Commonwealth.

The Commonwealth has also taken action to further develop a local entrepreneurial class. To this end, the Commonwealth has enacted legislation providing local entrepreneurs with the following benefits: (i) tax incentives to retailers that use their distribution channels to sell products made in Puerto Rico in other jurisdictions; (ii) require that at least 15% of products and services purchased by public agencies be locally manufactured or provided; and (iii) the use of government-sponsored financing, marketing and/or training to promote the production of economically feasible products or services for Puerto Rico markets.

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development in Puerto Rico. See "Tax Incentives" below.

In this regard, the Commonwealth has enacted legislation extending certain benefits of its most recent tax incentive law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct as a current expense investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally manufactured recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against the Puerto Rico tax liability of investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against the Puerto Rico tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical facilities and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The maximum amount of such credits that may be authorized by the Secretary of the Treasury for any fiscal year is $15,000,000.

The Commonwealth has also enacted legislation which (i) reduces the capital gains tax from 20% to 10% in the case of individuals and estates and trusts, and from 25% to 12.5% in the case of corporations and partnerships organized under the laws of the Commonwealth or engaged in trade or business in the Commonwealth, for gains from the sale of eligible Commonwealth investments; and (ii) allows income tax credits for extraordinary investment in housing infrastructure. In addition, legislation was enacted that reduces the tax payable on interest on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts and estates to 10% under certain circumstances.

For fiscal year 2005, the Commonwealth enacted a "sunset provision" that lowered all long-term capital gains tax rates by 50%. In particular, gains realized from July 1, 2004 to June 30, 2005 from the sale or exchange of a capital asset by resident individuals, if held for more than six months, will be taxed at a rate of 5% (6.25% in the case of corporate taxpayers) if located in Puerto Rico and at a rate of 10% (12.5% in the case of corporate taxpayers) if located outside Puerto Rico. However, as part of the package of legislative measures proposed to increase General Fund revenues for fiscal years 2006 and 2007, the preferential capital gains rates will be eliminated and all capital gains will be taxed at a rate of 20%. See "Summary and Management's Discussion of General Fund Results" under *Puerto Rico Taxes, Other Revenues and Expenditures*.

In addition, legislation has been enacted: (i) amending the 1998 Tax Incentives Act to provide special income tax rates ranging from 0% to 2% to companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) reducing to 7% the capital gains rate applicable to gains realized on the sale of the stock of Puerto Rico corporations sold in an initial public offering made prior to December 31, 2007, or acquired in public offerings made prior to December 31, 2007; (iv) granting income tax exemption to the fees and interest income received by financial institutions in connection with loans or guarantees of loans made to finance tourism development projects; (v) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations of areas designated as tourism enhancement districts; (vi) granting income tax exemption to financial institutions for charges collected on obligations issued for the financing of tourism projects; (vii) granting tax exemption for investments in infrastructure made by housing developers; (viii) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (ix) rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures and the development of undeveloped or under-developed sites.

## Reduction of the Costs of Doing Business

The Commonwealth believes that, to make Puerto Rico more competitive and foster investment, it needs to reduce the cost of doing business in Puerto Rico. In order to reduce the cost of doing business in Puerto Rico, the Commonwealth proposes to (i) promote the creation of more cogeneration power plants to diversify energy fuel sources and limit the dependence on oil imports for electric power generation; (ii) streamline the permitting process to accelerate and reduce the cost of investment in Puerto Rico; and (iii) create a multi-agency task force to expedite critical projects in the life sciences sector.

The Commonwealth is in the process of diversifying its energy fuel sources. Two cogeneration power plants, one of which is fueled by coal and the other by liquefied natural gas, have reduced Puerto Rico's dependence on oil imports for the generation of electricity by approximately 25%, from 99% to 74%. Currently, as part of the Electric Power Authority's capital improvement plan, the Authority is considering building an additional cogeneration power plant fueled by liquefied natural gas in the municipality of Mayagüez.

## Federal Tax Incentives

In order to enhance the attractiveness for United States companies of establishing operations in Puerto Rico, the Commonwealth is seeking to provide for a new tax regime applicable to U.S.-based businesses that have operations in the Commonwealth or other U.S. possessions. In connection with the phase-out of Sections 30A and 936 of the United States Internal Revenue Code of 1986, as amended (the "Code") (see "Tax Incentives – Incentives Under the Code" below), the United States Senate requested the Joint Commission on Taxation ("JCT") and the General Accounting Office ("GAO") study the economic impact of said phase-out and present recommendations on alternative tax incentives for U.S.-based companies operating in Puerto Rico. Due to the one-year delay in the release of the GAO/JCT report, the Commonwealth plans to seek a temporary, one-year extension of Sections 30A and 936 of the Code, until the United States Congress has had an opportunity to evaluate and act upon the report. In anticipation of the final phase-out of Sections 30A and 936 of the Code, most U.S.-based companies operating under Sections 30A and 936 of the Code have converted from United States corporations to either Puerto Rico or foreign corporations, thus lessening the impact of the phase-out of those sections.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2004 averaged 1,205,602, a 1.5% increase from 1,188,015 in fiscal year 2003. Unemployment, although at relatively low historical levels, remains above the United States average. The average unemployment rate increased from 11.0% in fiscal year 2000 to 11.4% in fiscal year 2004. This increase in the unemployment rate is a result of the sluggish labor market following the economic recession experienced during fiscal years 2002 and 2003. For the first nine months of fiscal year 2005, the average monthly unemployment rate (seasonally adjusted) was 10.8%.

The following table presents annual statistics of employment and unemployment for fiscal year 2000 through fiscal year 2004 and monthly statistics for fiscal year 2005. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

**Commonwealth of Puerto Rico**
**Employment and Unemployment [1]**

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate [2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2000 .................................................... | 1,292 | 1,150 | 142 | 11.0% |
| 2001 .................................................... | 1,277 | 1,144 | 134 | 10.5 |
| 2002 .................................................... | 1,309 | 1,152 | 158 | 12.1 |
| 2003 .................................................... | 1,352 | 1,188 | 164 | 12.1 |
| 2004 .................................................... | 1,360 | 1,206 | 155 | 11.4 |
| **Fiscal Year 2005** | | (Seasonally Adjusted) | | |
| July ..................................................... | 1,410 | 1,273 | 137 | 9.7% |
| August.................................................. | 1,423 | 1,271 | 152 | 10.7 |
| September.............................................. | 1,416 | 1,269 | 147 | 10.4 |
| October ................................................ | 1,391 | 1,238 | 153 | 11.0 |
| November ............................................. | 1,365 | 1,202 | 163 | 11.9 |
| December.............................................. | 1,387 | 1,235 | 152 | 11.0 |
| January................................................. | 1,381 | 1,227 | 154 | 11.2 |
| February............................................... | 1,354 | 1,223 | 131 | 9.7 |
| March .................................................. | 1,379 | 1,225 | 154 | 11.2 |

(1) Thousands of persons 16 years of age and over. Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources - Household Survey

III-9

## Economic Performance by Sector

During the period between fiscal year 2000 and 2004, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross product for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross Product**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Manufacturing | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 |
| Services[2] | 24,920 | 26,615 | 26,913 | 28,688 | 30,505 |
| Government[3] | 5,478 | 5,992 | 6,303 | 7,006 | 7,389 |
| Transportation, communication and public utilities | 4,237 | 4,698 | 4,948 | 5,205 | 5,350 |
| Agriculture, forestry and fisheries | 529 | 348 | 277 | 314 | 435 |
| Construction[4] | 1,875 | 1,802 | 1,648 | 1,614 | 1,741 |
| Statistical discrepancy | 585 | 717 | 292 | (493) | (654) |
| Total gross domestic product[5] | $61,702 | $69,208 | $71,624 | $74,834 | $78,842 |
| Less: net payment abroad | (20,283) | (25,162) | (26,552) | (27,396) | (28,522) |
| Total gross product[5] | $41,419 | $44,046 | $45,071 | $47,439 | $50,320 |

(1) Preliminary.

(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.

(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority.

(4) Includes mining.

(5) Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, is based on the Payroll Survey, which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004[2]** |
| Natural Resources and Mining | 1,425 | 1,455 | 1,292 | 1,173 | 1,182 |
| Construction | 73,492 | 73,729 | 69,208 | 68,701 | 68,355 |
| Manufacturing | | | | | |
| Durable Goods | 57,383 | 56,249 | 49,348 | 47,534 | 45,886 |
| Non-Durable Goods | 85,550 | 82,236 | 72,595 | 69,319 | 70,000 |
| Sub Total | 142,933 | 138,485 | 121,943 | 116,853 | 115,886 |
| Trade, Transportation, | | | | | |
| Warehouse & Utilities | | | | | |
| Wholesale Trade | 32,000 | 32,327 | 31,489 | 31,218 | 32,344 |
| Retail Trade | 131,817 | 133,821 | 127,716 | 128,189 | 131,873 |
| Transportation, | | | | | |
| Warehouse & Utilities | 19,458 | 19,285 | 17,603 | 17,124 | 16,926 |
| Sub Total | 183,275 | 185,433 | 176,808 | 176,531 | 181,144 |
| Information | 21,108 | 20,597 | 21,943 | 21,216 | 21,347 |
| Finance | 45,583 | 44,974 | 43,963 | 42,128 | 41,584 |
| Professional & Business | 96,750 | 97,164 | 95,223 | 96,938 | 95,006 |
| Educational & Health | 80,692 | 84,202 | 84,452 | 87,590 | 90,561 |
| Leisure & Hospitality | 65,942 | 66,435 | 64,273 | 66,200 | 68,263 |
| Other Services | 17,408 | 17,330 | 16,602 | 16,338 | 15,967 |
| Government | 286,133 | 287,723 | 288,679 | 298,751 | 303,914 |
| Total Non-Farm | 1,014,742 | 1,012,528 | 984,385 | 992,418 | 1,003,208 |

_____
(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey
(Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board estimates that in fiscal year 2004 manufacturing generated $34.1 billion, or 43.2%, of gross domestic product. During fiscal year 2004, payroll employment for the manufacturing sector was 115,886, a decrease of 0.8% compared with fiscal year 2003, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of July 2004, the average hourly manufacturing wage rate in Puerto Rico was 66.9% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by the large investment over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors assisting the

development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the Code, phases out the federal tax incentives during a ten-year period. See "Tax Incentives - Incentives Under the Code" under *The Economy*.

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years ended June 30, 2004.

<div align="center">

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

</div>

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Pharmaceuticals | $13,580 | $16,620 | $18,681 | $19,072 | $20,138 |
| Machinery and metal products: | | | | | |
|    Machinery, except electrical | 2,031 | 3,376 | 3,845 | 3,528 | 3,499 |
|    Electrical machinery | 1,525 | 1,874 | 1,757 | 1,915 | 1,821 |
|    Professional and scientific instruments | 1,758 | 2,100 | 2,191 | 3,026 | 3,325 |
|    Other machinery and metal products | 341 | 316 | 312 | 291 | 313 |
| Food products | 1,912 | 1,974 | 2,092 | 2,289 | 2,332 |
| Other chemical and allied products | 777 | 765 | 578 | 496 | 475 |
| Apparel | 610 | 569 | 530 | 466 | 620 |
| Other[2] | 1,543 | 1,444 | 1,258 | 1,418 | 1,555 |
| Total gross domestic product of manufacturing sector[3] | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 |

(1) Preliminary.

(2) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.

(3) Totals may not add due to rounding.

*Source:* Planning Board

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group[1]**
(persons age 16 years and over)

| Industry Group | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[2] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,833 | 4,726 | 4,447 | 4,255 | 4,312 |
| Cement and Concrete Products Manufacturing | 3,700 | 3,723 | 3,494 | 3,373 | 3,409 |
| Fabricated Metal Products | 7,267 | 7,218 | 6,403 | 6,054 | 5,780 |
| Computer and Electronic | 14,958 | 14,316 | 11,471 | 11,549 | 11,271 |
| Navigational, Measuring | 4,617 | 4,330 | 4,661 | 4,186 | 4,409 |
| Electrical Equipment | 8,917 | 8,225 | 7,064 | 6,927 | 6,606 |
| Electrical Equipment Manufacturing | 4,992 | 4,564 | 4,030 | 3,630 | 3,854 |
| Miscellaneous Manufacturing | 11,725 | 12,046 | 11,299 | 12,147 | 11,683 |
| Medical Equipment and Supplies Manufacturing | 10,300 | 10,784 | 10,110 | 11,187 | 10,781 |
| Other Durable Goods Manufacturing | 9,683 | 9,718 | 8,255 | 6,602 | 6,234 |
| Total – Durable Goods | 57,383 | 56,249 | 49,348 | 47,534 | 45,886 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 17,417 | 17,109 | 14,469 | 13,213 | 12,567 |
| Beverage and Tobacco Products Manufacturing | 3,425 | 3,571 | 3,423 | 3,352 | 3,757 |
| Apparel Manufacturing | 17,517 | 16,265 | 11,872 | 8,935 | 8,646 |
| Cut and Sew Apparel Manufacturing | 16,358 | 15,162 | 11,174 | 8,914 | 8,642 |
| Chemical Manufacturing | 29,450 | 29,124 | 30,265 | 31,621 | 31,868 |
| Pharmaceutical and Medicine Manufacturing | 24,300 | 24,275 | 25,707 | 27,337 | 28,157 |
| Plastics and Rubber Products | 4,108 | 3,820 | 3,399 | 3,154 | 3,007 |
| Plastics Product Manufacturing | 3,675 | 3,412 | 3,105 | 2,875 | 2,686 |
| Other Non-Durable Goods Manufacturing | 13,633 | 12,347 | 9,206 | 9,044 | 10,155 |
| Total – Non-Durable Goods | 85,550 | 82,236 | 72,595 | 69,319 | 70,000 |
| | | | | | |
| Total Manufacturing Employment | 142,933 | 138,485 | 121,943 | 116,853 | 115,886 |

(1) Totals may not add due to rounding.
(2) Preliminary.

*Sources:* Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 27,047 from fiscal year 2000 to fiscal year 2004. This reduction in manufacturing employment occurred during a period of significant expansion in real manufacturing output, as reflected in the growth of exports. This trend suggests a significant increase in manufacturing investment and productivity. Most of the decrease in employment has been concentrated in labor intensive industries, particularly apparel, textiles, tuna canning, and leather products.

## Leading United States and Foreign Companies with Manufacturing Operations in Puerto Rico [1]

| Employment 2,500 and over | Product | Employment 200 to 499 | Product |
|---|---|---|---|
| Baxter International, Inc. | Medical Devices | Alcan Finance (BDA) LTC | Plastics |
| Johnson and Johnson | Surgical Products | Atlantron Inc. | Computers |
| Pfizer Pharmaceuticals LLC | Pharmaceuticals | Bacardi Limited | Food |
| Wyeth | Pharmaceuticals | Biovail Corporation International | Pharmaceuticals |
| | | CEMEX | Cement |
| **Employment 1,000 to 2,499** | **Product** | Checkpoint Systems Inc. | Electronic Instruments |
| | | Coca Cola Company | Food |
| Abbot Laboratories | Pharmaceuticals | Colgate-Palmolive Company | Consumer Products |
| Altadis | Cigars | C.R. Bard | Surgical Instruments |
| Amgen, Inc. | Pharmaceuticals | Curtis Instruments Inc. | Electrical Instruments |
| Eaton Corporation | Electronic Instruments | Davis Creek Managing Partners | Metal Products |
| Edwards Lifesciences LLC | Surgical Instruments | E.I. DuPont de Nemours & Co. | Chemicals |
| Eli Lilly and Company | Pharmaceuticals | Eastern Canvas Products | Textile Products |
| General Electric Industrial Systems | Electronic Instruments | Espace Europeo de Lenterprise | Pharmaceuticals |
| Glaxo Smithkline | Pharmaceuticals | Essilor International | Ophthalmic Products |
| Hewlett-Packard Co. | Computers | Hershey Foods Corp. | Food |
| Medtronic Europe SA | Surgical Instruments | ICN Pharmaceuticals Inc. | Pharmaceuticals |
| Merck & Co., Inc. | Pharmaceuticals | Loctite Corporation | Chemicals |
| Propper International Company | Apparel | Lutron Electronics Co. Inc. | Electronic Instruments |
| Sara Lee Corp | Apparel | Millipore Corporation | Surgical Instruments |
| Schering Plough Corporation | Pharmaceuticals | Mylan Laboratories, Inc. | Chemicals |
| Solectron Corporation | Electronic Instruments | Northrop Grumman Corporation | Electrical Instruments |
| Zimmer Holdings, Inc. | Pharmaceuticals | Novartis Holding AG | Ophthalmic Products |
| | | Nypro International | Medical Devices |
| **Employment 500 to 999** | **Product** | Owens Illinois Inc. | Glass and Plastics |
| | | Packaging Coordinators Inc. | Packaging Products |
| Advanced Medical Optics, Inc. | Ophthalmic Products | PepsiCo, Inc. | Food |
| Astra Zeneca PLC | Pharmaceuticals | Pilgrim's Pride Corporation | Food |
| Becton-Dickinson & Co. | Surgical Instruments | Procter & Gamble Co. | Pharmaceuticals |
| Cardinal Health, Inc. | Pharmaceuticals | Rocky Shoes & Boots | Footwear |
| Connors Bros. | Food | Siemens AG | Electrical Instruments |
| Doan Foods Company | Food | Sinasuak Native Corporation | Apparel |
| Guidant Corp. | Medical Instruments | St. Jude Medical, Inc. | Surgical Instruments |
| Hamilton Sundstrand Corp. | Electrical Instruments | Standard Motor Products Inc. | Motor Vehicle Parts |
| Hubbel Incorporated | Electrical Instruments | Storage Technology Corp. | Electronics |
| Ingersoll-Rand Co. | Electrical Instruments | Symmetricom Inc. | Electronic Equipment |
| Ivax Pharmaceutical | Pharmaceuticals Ophthalmic | Thomas & Betts Corporation | Electrical Instruments |
| Pall Corporation | Filters | Timberland Company | Leather |
| Pharmacia Corporation | Pharmaceuticals | Watson Pharmaceutical, Inc. | Pharmaceuticals |
| Stryker Corp. | Surgical Instruments | | |
| Tyco, Int. | Security System | | |
| Tyco International | Surgical Products | | |
| Unilever PLC | Consumer Products | | |
| Warner-Lambor Company | Pharmaceuticals | | |
| Wellco Enterprise, Inc. | Leather | | |

[1] Based on the last employment figures reported by each company to PRIDCO.

*Source:* PRIDCO, Office of Economic Research

### Services

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2000 and 2004, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.2%, while payroll employment in this sector increased at an average annual rate of 1.1%. It should also be noted that in the Puerto Rico labor market self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, in fiscal year 2003, the number of self-employed individuals was 180,464, out of which 46.0% were in the service sector and 10.5% were in the construction sector. The development of the services sector has been positively

III-14

affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In fiscal year 2004, services generated $30.5 billion of gross domestic product, or 38.7%, of the total. Services employment grew from 510,758 in fiscal year 2000 to 513,872 in fiscal year 2004 (representing 51.2% of total employment). This represents a cumulative increase of 0.6%. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2000 to 2004, as measured by gross domestic product. From fiscal year 2000 to 2004, gross domestic product increased in wholesale and retail trade from $8.3 billion to $9.6 billion and in finance, insurance, and real estate from $10.0 billion to $13.0 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2004 were $94.3 billion. As of December 31, 2004, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $66.8 billion.

The following tables set forth gross domestic product and employment for the services sector for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Wholesale and retail trade | $ 8,340 | $ 8,338 | $ 8,623 | $ 9,005 | $ 9,582 |
| Finance, insurance and real estate | 9,977 | 11,294 | 11,212 | 12,425 | 13,024 |
| Other services[2] | 6,603 | 6,982 | 7,078 | 7,257 | 7,899 |
| Total[3] | $24,920 | $26,615 | $26,913 | $28,688 | $30,505 |

(1) Preliminary.
(2) Includes tourism.
(3) Totals may not add due to rounding.

*Source:* Planning Board

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector**
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004[1] |
| Wholesale Trade | 32,000 | 32,327 | 31,489 | 31,218 | 32,344 |
| Retail Trade | 131,817 | 133,821 | 127,716 | 128,189 | 131,873 |
| Transportation, Warehouse & Utilities | 19,458 | 19,285 | 17,603 | 17,124 | 16,926 |
| Trade, Transportation, Warehouse & Utilities | 183,275 | 185,433 | 176,808 | 176,531 | 181,144 |
| Information | 21,108 | 20,597 | 21,943 | 21,216 | 21,347 |
| Finance | 45,583 | 44,974 | 43,963 | 42,128 | 41,584 |
| Professional and Business | 96,750 | 97,164 | 95,223 | 96,938 | 95,006 |
| Educational & Health | 80,692 | 84,202 | 84,452 | 87,590 | 90,561 |
| Leisure & Hospitality | 65,942 | 66,435 | 64,273 | 66,200 | 68,263 |
| Other Services | 17,408 | 17,330 | 16,602 | 16,338 | 15,967 |
| Total | 510,758 | 516,135 | 503,264 | 506,941 | 513,872 |

(1) Preliminary

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services - Tourism*

During fiscal year 2004, the number of persons registered in tourist hotels was 1,788,800, an increase of 3.3% over the number of persons registered during fiscal year 2003. The average occupancy rate in tourist hotels during fiscal year 2004 was 72.3% compared to 68.0% in fiscal year 2003. The average number of rooms rented in tourist hotels increased 4.8% during fiscal year 2004 compared with fiscal year 2003. The average number of rooms available in tourist hotels decreased 1.4% during fiscal year 2004 compared with fiscal year 2003.

In the first eight months of fiscal year 2005, the number of persons registered in tourist hotels was 1,189,900, an increase of 3.9% over the number of persons registered during the same period in fiscal year 2004. The number of non-resident tourists registered in tourist hotels during the first eight months of fiscal year 2005 increased 3.7% in comparison with the same period of fiscal year 2004. The average number of rooms rented in tourist hotels increased 2.3% during the first eight months of fiscal year 2005 compared to the same period in fiscal year 2004. The average occupancy rate in tourist hotels during the first eight months of fiscal year 2005 was 69.4% compared to 70.8% for the same period in fiscal year 2004. The decrease in the occupancy rate in tourist hotels during fiscal year 2005 was due to the introduction of new hotel rooms into the market.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Tourism Data**

| | Number of Visitors | | | | |
|---|---|---|---|---|---|
| **Fiscal Years Ended June 30** | **Tourist Hotels**[1] | **Cruise Ship** | **Other**[2] | **Total** | **Total Visitors' Expenditures (in millions)** |
| 2000 | 1,050,100 | 1,224,600 | 2,291,300 | 4,566,000 | $2,387.9 |
| 2001 | 1,186,800 | 1,356,600 | 2,364,400 | 4,907,800 | 2,728.1 |
| 2002 | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | 2,486.4 |
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004[3] | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |

(1) Includes visitors in guesthouses.
(2) Includes visitors in homes of relatives, friends, and in hotel apartments.
(3) Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, is in the process of finishing the development of a convention center. The convention center, which will be the largest in the Caribbean, is the centerpiece of a 100-acre private development including hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to complement and improve Puerto Rico's competitive position in the convention and group travel segments. The convention center is expected to open by the end of calendar year 2005, and seventeen conventions have already been booked for the first year.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In fiscal year 2004, government accounted for $7.4 billion of Puerto Rico's gross domestic product, or 9.4%, of the total. The government is also a significant employer, providing jobs for 303,914 workers, or 30.3%, of total non-farm payroll employment in fiscal year 2004. The government's share of non-farm payroll employment (including the central government, the public corporations and the municipalities, but excluding the federal government), measured according to the payroll survey, had decreased from 34.9% in fiscal year 1980 to 26.4% in fiscal year 2000.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During fiscal year 2006, the Commonwealth and its instrumentalities will begin to negotiate the economic and non-economic terms of at least forty collective bargaining agreements, which could have a material impact on the General Fund.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations on the island including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marin International Airport is currently served by twenty-five United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Puerto Rico and other Caribbean islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system, which, as of December 31, 2004, totaled approximately 4,607 miles. The highway system comprises 379 miles of primary system highways, 230 miles of primary urban system highways, 954 miles of secondary system highways and 3,043 miles of tertiary highways and roads.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected to eventually serve the municipalities of Carolina and Caguas. Currently, Tren Urbano is operating free of charge until the first week of June 2005 as part of an education and familiarization program to introduce Tren Urbano to the population.

The Port of the Americas Authority, created by legislation, is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. In fiscal year 2004, the first phase of the Port of the Americas was completed. This initial phase included the improvement and expansion of the Port of Ponce at a cost of $40 million. During calendar year 2005, the Port of the Americas will begin its second phase relying on a $70 million line of credit provided by GDB. This second phase includes (i) dredging the entrance channel and adjacent areas of the Port of Ponce to a depth of 50 feet; (ii) reconstruction of container terminals at the Port of Ponce; (iii) commencement of certain required environmental mitigation procedures; and (iv) preparation of final construction schematics. Partial operation of the Port of the Americas could begin as early as calendar year 2006.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. However, during the period from fiscal year 2000 through fiscal year 2004, real construction investment decreased 3.3%. This decline is relatively small when compared to the relatively high levels of construction activity.

The total value of construction permits increased 21.2% for the same five-year period. Public investment has been an important component of construction investment. During fiscal year 2004, approximately 41% of the total investment in construction was related to public projects. During fiscal year 2004, the total value of construction permits increased 8.2% compared with fiscal year 2003. Average payroll employment in the construction sector during fiscal year 2004 was 68,355, a decrease of 0.5% from fiscal year 2003.

During fiscal year 2004, total sales of cement, including imports, decreased 1.9% compared with fiscal year 2003. This decrease in total sales of cement was attributable in part to heavy rains that affected the island in November 2003, causing a 31% decrease in sales as compared to November 2002. Excluding November 2003, total sales of cement for fiscal year 2004 increased 0.9%.

Total construction investment for fiscal year 2004 increased (in real terms) by 1.5%, which was the first increase in three years. For fiscal years 2005 and 2006, the Planning Board forecasts construction investment increases (in real terms) of 1.3% for each year. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. However, public investment in construction could be negatively affected by the Commonwealth's fiscal difficulties.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During fiscal year 2004, gross income from agriculture was $780.7 million, an increase of 2.8% compared with fiscal year 2003. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, and other products. During fiscal year 2004, traditional crops, livestock products, starchy vegetables, ornamental plants and other products contributed a higher percentage of the sector's income.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225, approved on December 1, 1995, increased the tax benefits available to bona fide farmers. Act No. 225 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s, college attendance and college attendance as a percentage of the college age population continued to increase.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| **Academic Year** | **Population 18-24 Years of Age** | **Higher Education Enrollment** | **Percent[1]** | **Population 18-24 Years of Age** | **Higher Education Enrollment** | **Percent[1]** |
| 1970 .................. | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 .................. | 397,839[2] | 130,105 | 32.7 | 30,022,000[2] | 12,096,895 | 40.3 |
| 1990 .................. | 417,636[2] | 156,147 | 37.4 | 26,961,000[2] | 13,621,000 | 50.5 |
| 2000 .................. | 428,892[2] | 176,015 | 41.0 | 27,143,455[2] | 15,312,000 | 56.4 |
| 2001 .................. | 425,519[3] | 185,015 | 43.5 | 27,831,000[3] | 15,873,000 | 57.0 |
| 2002 .................. | 422,549[3] | 190,776 | 45.1 | 28,342,000[3] | 15,608,000 | 55.1 |
| 2003 .................. | 418,390[3] | 199,842 | 47.8 | 28,899,571[3] | 15,756,000 | 54.5 |

(1)  Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2)  Based on census population as of April 1.
(3)  Estimated population (reference date July 1).

*Sources:*   United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2003-2004 was 68,627 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 43 public and private institutions of higher education located in Puerto Rico. Such institutions have a current enrollment in excess of 130,285 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

## Tax Incentives

One factor that has promoted and continues to promote the development of the manufacturing sector in Puerto Rico has been the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

### Industrial Incentives Program

Since 1948, Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these industrial incentives laws is the 1998 Tax Incentives Act, a law aimed at promoting investment in Puerto Rico.

The benefits provided by the 1998 Tax Incentives Act are available to new companies as well as companies currently conducting tax exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant. The activities eligible for tax exemption include manufacturing, certain designated services performed for markets outside Puerto Rico, the production of energy from local

renewable sources for consumption in Puerto Rico and laboratories for scientific and industrial research. For companies qualifying thereunder, the 1998 Tax Incentives Act imposes income tax rates ranging from 2% to 7% for periods ranging from 10 to 25 years. In addition, it grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and between 80% and 60% thereafter, and 100% exemption from excise taxes with respect to raw materials and certain machinery and equipment used in the exempt activities. The 1998 Tax Incentives Act also provides various special deductions designed to stimulate employment and productivity, research and development and capital investment in Puerto Rico.

Under the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth and other designated investments are fully exempt from income and municipal license taxes. Individual shareholders of an exempted business are allowed a credit against their Puerto Rico income taxes equal to 30% of their proportionate share of the exempted business's income tax liability. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period is subject to a 4% income tax rate.

*Tourism Incentives Program*

For many years, Puerto Rico has also had incentives laws designed to stimulate investment in hotel operations on the island. The most recent of these laws, the Tourism Incentives Act of 1993, provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of seventeen hotel projects representing over 3,800 new hotel rooms.

*Incentives under the Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income in Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the Code made in 1996 (the "1996 Amendments"), the tax credit is being phased out over a ten-year period for companies that were operating in Puerto Rico in 1995 and is no longer available for corporations that establish operations in Puerto Rico after October 13, 1995. The 1996 Amendments also eliminated the credit previously available for income derived from certain qualified investments in Puerto Rico.

*Section 30A*.  The 1996 Amendments added Section 30A to the Code.  Section 30A permits a "qualifying domestic corporation" ("QDC") that meets certain gross income tests to claim a credit (the "Section 30A Credit") against the federal income tax imposed on taxable income derived from sources outside the United States from the active conduct of a trade or business in Puerto Rico or from the sale of substantially all the assets used in such business ("possession income").  The Section 30A Credit will not be available for taxable years commencing on or after January 1, 2006.

The Section 30A Credit is limited to the sum of (i) 60% of qualified possession wages as defined in the Code, which includes wages up to 85% of the maximum earnings subject to the OASDI portion of Social Security taxes plus an allowance for fringe benefits of 15% of qualified possession wages; (ii) a specified percentage of depreciation deductions ranging between 15% and 65%, based on the class life of tangible property; and (iii) a portion of Puerto Rico income taxes paid by the QDC, up to a 9% effective tax rate (but only if the QDC does not elect the profit-split method for allocating income from intangible property).

In the case of taxable years beginning after December 31, 2001, the amount of possession income that qualifies for the Section 30A Credit is subject to a cap based on the QDC's possession income for an average adjusted base period ending before October 14, 1995 (the "income cap").

*Section 936*.  Under Section 936 of the Code, as amended by the 1996 Amendments, United States corporations that meet certain requirements and elect its application ("Section 936 Corporations") are entitled to credit against their United States corporate income tax the portion of such tax attributable to income derived from the active conduct of a trade or business within Puerto Rico ("active business income") and from the sale or exchange of substantially all assets used in the active conduct of such trade or business.

Under Section 936 of the Code, a Section 936 Corporation may elect to compute its active business income, eligible for the Section 936 credit, under one of three formulas: (i) a cost-sharing formula, whereby it is allowed to claim all profits attributable to manufacturing intangibles and other functions carried out in Puerto Rico provided it makes a cost sharing payment in the amount required under Section 936 of the Code; (ii) a profit-split formula, whereby it is allowed to claim 50% of the combined net income of its affiliated group from the sale of products manufactured in Puerto Rico; or (iii) a cost-plus formula, whereby it is allowed to claim a reasonable profit on the manufacturing costs incurred in Puerto Rico.

The Section 936 credit is now only available to companies that were operating in Puerto Rico on October 13, 1995, and had elected the percentage of income credit provided by Section 936 of the Code.  Such percentage of income credit is equal to 40% of the federal income tax otherwise imposable on the Puerto Rico active business income or derived from the sale or exchange of substantially all assets used in such business.

In the case of taxable years beginning on or after 1998, the possession income subject to the Section 936 credit is subject to a cap based on the Section 936 Corporation's possession income for an average adjusted base period ending on October 14, 1995.  The Section 936 credit is eliminated for taxable years commencing on or after January 1, 2006.

*Controlled Foreign Corporations*

Because of the credit limitations and impending phase out of Sections 30A and 936 of the Code, many corporations previously operating thereunder have reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs").  A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders.  In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United

States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from over 120 corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics companies manufacturing in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to corporations operating under Sections 30A and 936 of the Code. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a ten percent Puerto Rico withholding tax on royalty payments.

## DEBT

### Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below. The Constitution of Puerto Rico limits the amount of general obligation (full faith and credit) debt that can be issued or guaranteed by the Commonwealth. The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation. Direct debt of the Commonwealth is supported by Commonwealth taxes. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See *Public Corporations*. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to resolutions adopted by the respective municipal assemblies. Debt of public corporations is issued pursuant to resolutions adopted by the governing bodies of the public corporations in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2004. Excluded from the table is debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products. Also excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.237 billion of outstanding bonds issued by the Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.444 billion of obligations of GDB issued to purchase certain Commonwealth public sector debt and for other purposes, of which $267 million is guaranteed by the Commonwealth.

**Commonwealth of Puerto Rico**
**Public Sector Debt**
**(in thousands)**

|  | December 31, 2004 |
|---|---|
| Puerto Rico direct debt[1] | $ 9,734,936 |
| Municipal debt | 2,016,106 |
| Public corporations debt |  |
| Puerto Rico guaranteed debt[2] | 636,558 |
| Debt supported by Puerto Rico |  |
| appropriations or taxes[3] | 15,595,095 |
| Other non-guaranteed debt[4] | 7,966,971 |
| Total public corporations debt | 24,198,624 |
| Total public sector debt | $35,949,666 |

(1) Includes general obligation bonds, tax and revenues anticipation notes, and lines of credit provided by GDB. Excludes certain Commonwealth general obligation bonds that have been refunded with proceeds that were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance, even though such bonds will be considered outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.

(2) Consists of $485.7 million of bonds issued by the Aqueduct and Sewer Authority and $150.9 million of State Revolving Fund Loans, incurred under various federal water laws. Excludes Public Buildings Authority bonds in the principal amount of $2.920 billion as of December 31, 2004 and $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents, among others, bonds and notes issued by the Aqueduct and Sewer Authority, the Highway and Transportation Authority, the Housing Finance Authority, the Infrastructure Financing Authority, the Public Buildings Authority and the Public Finance Corporation.

(4) Excludes the following: $1.058 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.143 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $663 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities. If these amounts were included, total public corporation debt would be $27,667,431,000 and total public sector debt would be $39,419,727,000.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the above table for debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding as of December 31, 2004 and bonds of the Aqueduct and Sewer Authority for which debt service payments are being made under the Commonwealth guaranty.

The table excludes debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds will be considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation. Had such bonds been included in the table, maximum annual principal and interest on all outstanding general obligation bonds would have been $711,522,695 during the fiscal year ending June 30, 2005. With respect to other debt of the Aqueduct and Sewer Authority, see *Public Corporations*. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Puerto Rico**
**Debt Service Requirements\***
**(In thousands)**

| | | Outstanding Bonds | | | |
|---|---|---|---|---|---|
| Fiscal Year Ending June 30 | Principal | Interest | Total Debt Service | PRASA Bonds Debt Service | Grand Total |
| 2005 | 132,585 | 357,776 | 490,361 | 30,127 | 520,489 |
| 2006 | 174,484 | 387,535 | 562,019 | 30,121 | 592,140 |
| 2007 | 161,722 | 400,175 | 561,897 | 30,126 | 592,024 |
| 2008 | 200,027 | 371,611 | 571,638 | 30,131 | 601,769 |
| 2009 | 238,840 | 328,465 | 567,304 | 30,123 | 597,428 |
| 2010 | 252,795 | 314,693 | 567,488 | 29,984 | 597,472 |
| 2011 | 264,197 | 300,913 | 565,110 | 29,928 | 595,039 |
| 2012 | 283,795 | 281,166 | 564,961 | 30,127 | 595,088 |
| 2013 | 301,335 | 263,690 | 565,025 | 30,128 | 595,152 |
| 2014 | 299,023 | 268,096 | 567,119 | 30,125 | 597,244 |
| 2015 | 313,125 | 254,313 | 567,437 | 30,126 | 597,563 |
| 2016 | 328,230 | 239,472 | 567,702 | 30,121 | 597,823 |
| 2017 | 343,802 | 224,283 | 568,084 | 30,122 | 598,206 |
| 2018 | 361,120 | 208,346 | 569,466 | 30,126 | 599,591 |
| 2019 | 394,356 | 175,751 | 570,107 | 30,125 | 600,231 |
| 2020 | 452,165 | 148,395 | 600,560 | 0 | 600,560 |
| 2021 | 322,480 | 126,181 | 448,661 | 0 | 448,661 |
| 2022 | 247,400 | 111,409 | 358,809 | 0 | 358,809 |
| 2023 | 214,650 | 100,363 | 315,013 | 0 | 315,013 |
| 2024 | 200,845 | 90,886 | 291,731 | 0 | 291,731 |
| 2025 | 209,670 | 82,365 | 292,035 | 0 | 292,035 |
| 2026 | 209,880 | 73,792 | 283,672 | 0 | 283,672 |
| 2027 | 219,380 | 64,555 | 283,935 | 0 | 283,935 |
| 2028 | 229,265 | 54,947 | 284,212 | 0 | 284,212 |
| 2029 | 239,770 | 44,716 | 284,486 | 0 | 284,486 |
| 2030 | 251,355 | 33,301 | 284,656 | 0 | 284,656 |
| 2031 | 263,020 | 21,752 | 284,772 | 0 | 284,772 |
| 2032 | 96,645 | 9,518 | 106,163 | 0 | 106,163 |
| 2033 | 68,080 | 5,111 | 73,191 | 0 | 73,191 |
| 2034 | 33,105 | 1,655 | 34,760 | 0 | 34,760 |
| | $ 7,307,144 | $ 5,345,232 | $12,652,376 | $ 451,540 | $13,103,915 |

\*Totals may not add due to rounding.

*Sources:* GDB and Department of the Treasury

III-25

**Commonwealth Guaranteed Debt**

As of December 31, 2004, $2.920 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $219.5 million in fiscal year ending June 30, 2011, with their final maturity being July 1, 2036. No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority.

As of December 31, 2004, $267 million of Commonwealth guaranteed obligations of GDB were outstanding. No payments under the Commonwealth guaranty have been required for any obligations of GDB to date.

As of December 31, 2004, the aggregate outstanding principal amount of the Series 1995 revenue bonds of the Aqueduct and Sewer Authority guaranteed by the Commonwealth was $305.3 million. On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In addition, in April 2000, the Commonwealth extended its guaranty to all of the outstanding bonds issued by the Aqueduct and Sewer Authority to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of the Aqueduct and Sewer Authority. The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005. In February 2004, this guaranty was extended through new legislation to cover debt obligations issued until 2010. As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

III-26

**Trends of Public Sector Debt**

The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross product (in current dollars) for the five fiscal years ended June 30, 2004 and the first six months of fiscal year 2005. As of December 31, 2004, outstanding short-term debt, relative to total debt, was 8.7%.

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross Product**
**(dollars in millions)[*]**

| | Public Sector Debt | | | | | Gross Product[(1)] | |
| June 30 | Long Term | Short Term[(2)] | Short Term as % of Total | Total | Rate of Increase | Amount | Rate of Increase |
|---|---|---|---|---|---|---|---|
| 2000...................... | $21,620 | $2,202[(3)] | 9.2% | $23,822 | 5.0% | $41,419 | 8.2% |
| 2001[(4)].................... | 22,345 | 2,870[(5)] | 11.4 | 25,215 | 5.8 | 44,047 | 6.3 |
| 2002[(6)].................... | 26,737 | 1,250[(3)] | 4.5 | 27,987 | 11.0 | 45,071 | 2.3 |
| 2003[(7)]................... | 28,102 | 1,605[(3)] | 5.4 | 29,707 | 6.1 | 47,439 | 5.3 |
| 2004[(8)].................... | 31,767 | 2,175 | 6.4 | 33,942 | 14.3 | 50,320 | 6.1 |
| December 31, 2004[(9)]... | 32,823 | 3,126 | 8.7 | 35,949 | 5.9 | N/A | N/A |

---

[*]Totals may not add due to rounding.

(1) In current dollars.

(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

(3) Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

(4) Excludes $397.0 million of bonds of Children's Trust outstanding on this date. If these bonds had been included, the rate of growth of public sector debt for fiscal year 2001 would have been 12.1%. Excludes $1.093 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(5) Includes a $164 million line of credit from GDB to the Secretary of the Treasury the proceeds of which were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.

(6) Excludes $390.1 million of bonds of Children's Trust outstanding on this date. Excludes $1.082 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(7) Excludes $1.171 billion of bonds of Children's Trust outstanding on this date. Excludes $1.074 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(8) Excludes $1.155 billion of bonds of Children's Trust outstanding on this date. Excludes $1.066 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(9) Excludes the following: $1.058 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.143 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

III-27

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2004 and the first six months of fiscal year 2005.

**Commonwealth of Puerto Rico**
**Public Sector Debt by Major Category**
**(dollars in millions)**[*]

| June 30 | Commonwealth | | | Municipalities | | | Public Corporations[(1)] | | | Total | | Grand Total[(4)] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term[(4)] | Short Term[(2)] | Total | Long Term | Short Term[(2)] | Total | Long Term | Short Term[(2)] | Total | Long Term | Short Term[(2)] | |
| 2000 . . . . . . . . . | $5,349 | $ 0[(3)] | $5,349 | $1,396 | $ 68 | $1,464 | $14,875 | $2,134 | $17,008 | $21,620 | $2,202 | $23,822 |
| 2001 . . . . . . . . . . . . . . . | 5,674 | 164[(5)] | 5,838 | 1,469 | 163 | 1,632 | 15,201[(6)] | 2,543 | 17,744 | 22,345 | 2,870 | 25,215 |
| 2002 . . . . . . . . . . . | 6,025 | 91[(7)] | 6,116 | 1,618 | 177 | 1,795 | 19,094[(7)] | 982 | 20,076 | 26,737 | 1,250 | 27,987 |
| 2003 . . . . . . . . . . . . | 6,709 | 177[(8)] | 6,886 | 1,754 | 201 | 1,955 | 19,639[(8)] | 1,227 | 20,866 | 28,102 | 1,605 | 29,707 |
| 2004 . . . . . . . . . . . . | 7,758 | 761 | 8,519 | 1,820 | 226 | 2,046 | 22,190[(9)] | 1,187 | 23,377 | 31,768 | 2,174 | 33,942 |
| December 31, 2004 . . | 8,212 | 1,523 | 9,735 | 1,795 | 221 | 2,016 | 22,816[(10)] | 1,382 | 24,198 | 32,823 | 3,126 | 35,949 |

*Totals may not add due to rounding.

(1) Includes Commonwealth guaranteed debt.

(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

(3) Does not include the tax and revenue anticipation notes which were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

(4) Includes the Transferred CRUV Debt.

(5) Includes a $164 million line of credit from GDB to the Secretary of the Treasury the proceeds of which were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.

(6) Excludes the following: $397.0 million original principal amount of bonds issued by Children's Trust; and $1.093 billion original principal amount of bonds issued by Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(7) Excludes the following: $390.1 million of bonds of Children's Trust outstanding on this date; and $1.082 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(8) Excludes the following: $1.171 billion original principal amount of bonds of Children's Trust; and $1.074 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(9) Excludes the following: $1.155 billion original principal amount of bonds of Children's Trust; and $1.066 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(10) Excludes the following: $1.143 billion original principal amount of bonds of Children's Trust; $1.058 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental or quasi-governmental functions are performed by public corporations. These are governmental entities created by the Legislature with varying degrees of independence from the central government. Public corporations are generally created to perform a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards appointed by the Governor with the advice and consent of the Senate, but some public corporations are subsidiaries of departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds under trust agreements or bond resolutions or notes under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2004 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government or is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the following sections.

## Commonwealth of Puerto Rico
## Outstanding Debt of Public Corporations
## December 31, 2004
### (in thousands)

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 485,668 | $ 0 | $ 485,668 | $150,890 | $ 142,082[1] | $ 292,972 | $ 636,558 | $ 142,082[1] | $ 778,640 |
| Electric Power Authority | 0 | 4,878,508 | 4,878,508 | 0 | 330,459 | 330,459 | 0 | 5,208,967 | 5,208,967 |
| Highway and Transportation Authority | 0 | 5,770,009[1] | 5,770,009 | 0 | 110,037 | 110,037 | 0 | 5,880,046 | 5,880,046 |
| Housing Finance Authority[2] | 0 | 627,012 | 627,012 | 0 | 89,623 | 89,623 | 0 | 716,635 | 716,635 |
| Industrial Development Company | 0 | 295,449 | 295,449 | 0 | 35,242 | 35,242 | 0 | 330,691 | 330,691 |
| Infrastructure Financing Authority | 0 | 909,320[4] | 909,320 | 0 | 23,325 | 23,325 | 0 | 932,645 | 932,645 |
| Public Buildings Authority | 2,920,327 | 0 | 2,920,327 | 0 | 3,561 | 3,561 | 2,920,327 | 3,561 | 2,923,888 |
| Public Finance Corporation | 0 | 4,311,827[5] | 4,311,827 | | 0 | 0 | 0 | 4,311,827[4] | 4,311,827 |
| Ports Authority | 0 | 74,985[6] | 74,985 | 0 | 387,786 | 387,786 | 0 | 462,771 | 462,771 |
| University of Puerto Rico | 0 | 409,108[7] | 409,108 | 0 | 30,035 | 30,035 | 0 | 439,143 | 439,143 |
| Others | 0 | 0 | 0 | 0 | 2,213,371 | 2,213,371 | 0 | 2,213,371 | 2,213,371 |
| Total[8] | $3,405,995 | $17,276,218 | $20,682,213 | $150,890 | $3,365,521 | $3,516,411 | $3,556,885 | $20,641,739 | $24,198,624 |

(1) Principal of and interest on this debt is reimbursed from Commonwealth appropriations.

(2) Excludes $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

(3) Excludes the $663 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development.

(3) Excludes $1.058 billion of outstanding bonds of Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(4) Payable primarily from Commonwealth appropriations.

(5) Excludes $96 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education.

(6) Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement.

(7) Excludes $85 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico

(8) Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.155 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, issued on October 10, 2002, which will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Other Public Corporations" below.

Source: Government Development Bank for Puerto Rico.

III-30

**Government Development Bank for Puerto Rico**

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to make loans to private enterprises to aid in the economic development of Puerto Rico.

As of December 31, 2004, $1.4 billion of bonds and notes of GDB were outstanding. As of said date, GDB also had $4.7 billion in loans to the central government of the Commonwealth and its public corporations and municipalities. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2004.

Act No. 82 of June 16, 2002, authorizes GDB to transfer every year to the Commonwealth's General Fund up to 10% of its audited net income or $10,000,000, whichever is greater.

Act No. 271 of November 21, 2002, requires GDB to provide the Special Communities Perpetual Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million. As of April 18, 2005, GDB had disbursed to the Trust $320 million from two investment accounts held by GDB for the benefit of the Trust. GDB expects to replenish its equity capital with future net operating income. See "Other Public Corporations – Special Communities Perpetual Trust" below.

GDB has the following principal subsidiaries:

*Housing Finance Authority* (formerly known as Housing Finance Corporation) was originally created in November 1977 to provide needed rental-housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, the Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Authority. The Authority is engaged in insuring and servicing mortgages originated by the Urban Renewal and Housing Corporation. It also provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. Housing Finance Corporation had issued tax-exempt revenue bonds and notes to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units, which bonds and notes are now limited obligations of the Housing Finance Authority payable solely from revenues collected in respect of such housing units. The Federal Housing Administration has insured mortgages on certain of the housing units. As of December 31, 2004, $716.6 million of Housing Finance Authority bonds and notes were outstanding (excluding bonds payable solely from securities pledged to the payment of such bonds and bonds payable solely from federal funds).

As of December 31, 2004, the Authority also had outstanding $637.3 million of bonds issued to (i) pay obligations of the Commonwealth under law, (ii) fund certain payments of the Commonwealth under its mortgage subsidy program for low and moderate income families, (iii) guarantee certain insurance obligations of the Housing Bank and Finance Agency under certain programs.

*Tourism Development Fund* was created in November 1993 to promote Puerto Rico's hotel and tourism industry, primarily by making available direct loans and guarantees to secure the payment of private financing used for new hotel development projects. The Tourism Development Fund is also authorized to make capital investments and provide direct financing to tourism related projects. As of December 31, 2004, the Tourism Development Fund had outstanding direct loans and guarantees with

respect to the financing of fourteen hotel and tourism-related projects in an aggregate amount in excess of $572.6 million. See "Tax Incentives – Tourism Incentives Program" under *The Economy*.

The Tourism Development Fund has made payments under its guarantees and letters of credit in the aggregate amount of approximately $216.7 million with respect to several projects, including repayment in full of the bonds of three projects, which bonds had been declared due and payable at the direction of the Tourism Development Fund due to the failure of the borrowers of such projects to comply with their obligations under the related reimbursement agreements. After taking these payments and all related recoveries into consideration, the unrestricted net assets of the Tourism Development Fund as of December 31, 2004 were approximately $96.7 million (unaudited), and its allowance for loan losses on guarantees, loans, OREO and letters of credit was approximately $34.6 million (unaudited).

*Development Fund* was created in 1977 to provide an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund may also guarantee obligations of these enterprises and invest in their equity securities.

*Capital Fund* was created in November 1993 for trading in debt obligations and publicly traded shares of domestic and foreign corporations.

*Public Finance Corporation* was created in December 1984 to provide agencies and instrumentalities of Puerto Rico with alternate means of meeting their financing requirements. As of December 31, 2004, the Corporation had $4.264 billion aggregate principal amount of bonds outstanding, substantially all of which have been issued to purchase debt of agencies and instrumentalities of the Commonwealth, and are payable from Commonwealth appropriations.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority.* Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates a system of public water supply and sanitary sewer facilities.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the existing system and to finance its expansion for new users. Funds for this investment are expected to be provided through a combination of revenues from PRASA, bond issues, legislative appropriations, and federal grants. Debt service on revenue bonds is payable from net revenues of the system after payment of current expenses. Due to PRASA's financial difficulties (discussed below) and its inability to access the bond market, Act No. 45 was enacted in July 1994 to provide a Commonwealth guaranty of the principal and interest payments to the bondholders of all outstanding revenue bonds issued by PRASA. In addition, Act No. 45 was amended in 2000 to extend the Commonwealth payment guaranty to all outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and loans granted by the Clean Water and Drinking Water State Revolving Funds for the benefit of PRASA. The guaranty will cover additional debt obligations issued by PRASA prior to July 1, 2005. In February 2004, this guaranty was extended through new legislation to include debt obligations issued until 2010. The total debt of PRASA was $778.6 million as of December 31, 2004.

From May 1995 until March 2004, the operation, management, repair, and maintenance of PRASA's systems were in the hands of private companies. The most recent agreement for the private management of PRASA's systems was entered into in May 2002 with Ondeo Puerto Rico, Inc. ("Ondeo"). In January 2004, Ondeo and PRASA agreed to terminate their agreement and in April 2004, the operation, management, repair, and maintenance of the PRASA systems returned to PRASA.

As part of the plan for the return of the operation and management of the PRASA systems to PRASA, legislation was enacted in March 2004 to restructure PRASA and provide further powers to improve its operational and financial management. The main areas of this restructuring included (i) decentralizing the administration of PRASA by creating five regions to provide greater efficiency in, and financial control of, the day to day administration and operational decision making process and execution; (ii) creating the positions of five Executive Regional Directors and an Executive Director for Infrastructure, who will, respectively, manage each region and manage capital improvement projects; and (iii) providing for six-year appointments for each of the Executive Regional Directors, Executive Director for Infrastructure and Executive Director in order to provide continuity to top management and better implement, supervise and revise as needed the ten-year plan and goals identified for PRASA in 2002. Further powers granted include the authority to make certain determinations and take certain actions with respect to compliance of the water and sewer system with various federal environmental laws.

PRASA has reported operational losses of $76.6 million, $152.4 million, $281.3 million, $209.7 million and $282.5 million during fiscal years 2000, 2001, 2002, 2003 and 2004, respectively. For fiscal year 2005, it is expected that PRASA will incur another operational loss, which will be covered with financial assistance provided by the Commonwealth's General Fund.

Beginning in fiscal year 2006, the Commonwealth's General Fund will cease to provide financial assistance to PRASA in order to alleviate the financial demands on the General Fund. In order to achieve fiscal independence, PRASA will have to implement various changes, such as (i) aggressive cost savings programs; (ii) a new and aggressive enforcement policy to identify and process delinquent customers; and (iii) rate increases for industrial, commercial and residential customers. Although PRASA will require GDB financial assistance until these measures are fully implemented, these measures are intended to allow PRASA to become financially independent in the future.

*Children's Trust* is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.171 billion aggregate principal amount of Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. As of December 31, 2004, the outstanding principal amount of the bonds was $1.143 billion. These bonds and any other additional senior bonds issued by Children's Trust are secured by a statutory pledge of the payments made and to be made by participating manufacturers under the Master Settlement Agreement. To date, all payments required to be made under the Master Settlement Agreement have been made on a timely basis and Puerto Rico's share thereof has been received by Children's Trust.

*Convention Center District Authority* was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Convention Center and designated private parcels located within the Convention Center District in San Juan. The Authority currently has lines of credit with GDB totaling $415.7 million, of which $252.3 million was outstanding as of December 31, 2004.

The Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") financed the construction of a multi-purpose coliseum in San Juan, known as the Jose Miguel Agrelot Coliseum, with a line of credit provided by GDB. The Jose Miguel Agrelot Coliseum was recently completed and transferred to the Convention Center District Authority. Pursuant to Act No. 185 of August 3, 2004, AFICA also transferred the line of credit to the Convention Center District Authority. As of December 31, 2004, the line of credit had an outstanding balance of $136.2 million.

*Electric Power Authority* owns and operates the island's electric system. The capital improvement program for the five-year period ending June 30, 2009, is estimated to cost approximately $2.1 billion and will be financed primarily by borrowed funds, supplemented by internally generated funds. The Authority's bonded debt consists of Power Revenue Bonds, secured by a lien on net revenues of the electric system. As of December 31, 2004, the Authority's total debt was $5.209 billion, including $4.879 billion of bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As a means of reducing its dependency on oil, the Authority has entered into long-term power purchase contracts with the operators of two cogeneration plants that use fuels other than oil. These two cogeneration projects consist of EcoElectrica LP's 507 megawatts liquefied natural gas plant at Guayanilla and a 454 megawatts clean coal facility at Guayama operated by an affiliate of Applied Energy Systems ("AES"). EcoElectrica's and AES's plants started commercial operations in March 2000 and November 2002, respectively. Currently, these two cogeneration plants provide approximately 26% of the Authority's energy needs.

*Health Insurance Administration* was created in 1993 to implement the health reform by negotiating and contracting for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of several designated regions of the island and pays such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covers all of the municipalities, and approximately 1.5 million persons were covered by the system during fiscal year 2004.

The total cost of the health insurance program for fiscal year 2005 is estimated at $1.354 billion, compared to $1.234 billion for fiscal year 2004 and $1.248 billion for fiscal year 2003. For fiscal year 2005, the General Fund covered $984 million of the total cost of the health insurance program, while the remaining $370 million was expected to be paid from federal, municipal and other sources. The fiscal year 2006 budget estimates the cost of the health insurance program to be $1.418 billion, of which the General Fund is estimated to cover $994 million, while the remaining $424 million is expected to be paid from federal, municipal and other sources.

*Highway and Transportation Authority* is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of the Authority, and federal and Commonwealth grants. Debt service on the Authority's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the gasoline tax; one-half of the proceeds of the tax on gas oil or diesel oil; all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year; highway toll revenues; and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and payments required to be made by the Commonwealth under its guarantees of bonds and notes to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment. In April 2004, the Authority issued approximately $140 million of bonds secured solely by Federal Highway Aid grant revenues. As of December 31, 2004, the Authority's total debt was $5.880 billion, including $5.770 billion of bonds outstanding.

The Authority has completed the first phase of a new mass transit system, known as Tren Urbano, to serve a portion of metropolitan San Juan. The first phase of Tren Urbano was constructed under several design/build contracts, including a design/build/operate contract covering the design and construction of the system and the operation of Tren Urbano for five years with an additional five-year option at the Authority's election. The cost of the first phase was $2.25 billion, which cost was financed by Federal Transit Administration grants, other federal funding sources and the Authority's own resources, including bond financings. Currently, the Authority is conducting an education and familiarization program to introduce Tren Urbano to the population. As part of this program, Tren Urbano is operating free of charge until the first week of June 2005.

The Authority is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of the Authority, the outstanding principal balance of which was $153.2 million as of December 31, 2004, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances as described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require the Authority, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including low toll revenues, exist at this time, but the Authority does not currently anticipate that the operator will exercise its remedy against the Authority.

*Puerto Rico Industrial Development Company* participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. The Company was merged with the Economic Development Administration in January 1998. Rentals derived from the leasing of specified facilities of the Company are pledged to the payment of the Company's revenue bonds. As of December 31, 2004, the Company's total debt was $330.7 million.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority* was created in June 1977. The Authority has issued revenue bonds to finance industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to the Authority by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 2004, approximately $2.2 billion of the Authority's bonds were outstanding.

*Infrastructure Financing Authority* was created in June 1988 to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing infrastructure facilities. The Authority is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities. The Authority's enabling act also established the Puerto Rico Infrastructure Fund, funded with annual fixed amounts from the first proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States which are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. Currently, this amount is $70 million, and it will increase to $90 million for fiscal years 2007 to 2052. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury of Puerto Rico. The Authority is using these amounts to provide financial support for various infrastructure and other projects. As of April 30, 2005, the Authority's total debt was $1.990 billion.

The Authority is providing assistance to the Aqueduct and Sewer Authority, among other Benefited Entities, with regards to (i) the design and construction of various strategic regional water and sewer projects intended to provide improved services to targeted regions throughout the island; (ii) the implementation of an action plan to address a number of small water and sewer rehabilitation projects; (iii) the achievement of compliance with certain environmental laws; and (iv) the establishment of a prioritized capital program.

In June 1998, the Authority's enabling act was amended to establish the Infrastructure Development Fund, a permanent trust fund to be utilized by the Authority for the purpose of financing infrastructure projects. The Infrastructure Development Fund was initially funded in March 1999 with $1.2 billion of proceeds received by the Telephone Authority from the sale of a controlling interest in

Puerto Rico Telephone Company. This initial amount will remain permanently deposited in a segregated, perpetual account, denominated the "corpus account," and must be invested exclusively in U.S. government or U.S. government-backed obligations. The income from such investment may only be used to finance infrastructure projects related to the Commonwealth's water and sewer systems. Other moneys in the Infrastructure Development Fund not attributable to the corpus account or the investment income thereon may be used for other infrastructure projects. The Authority is the custodian and administrator of the Infrastructure Development Fund. In October 2000, the Authority issued $1.093 billion of bonds payable from and secured by a pledge of the interest received by the Authority from the investments of the Infrastructure Development Fund. The proceeds of this bond issue are being used to finance certain aqueduct and sewer infrastructure development projects.

*Maritime Shipping Authority* commenced operations in 1974 upon the acquisition of three shipping lines serving Puerto Rico and the United States mainland. In 1995, the assets and operations of the Maritime Shipping Authority were sold to a private investor group. The remaining debt of the Authority was refinanced through the issuance of bonds by Public Finance Corporation, a subsidiary of GDB. The aggregate principal amount of such bonds outstanding as of December 31, 2004, was $328.5 million (not including accreted values of capital appreciation bonds outstanding). The bonds are payable from funds to be appropriated annually by the Legislature of Puerto Rico.

*Municipal Finance Agency* was created in 1972 as a municipal "bond bank" for Puerto Rico. The Agency is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on the Agency's bonds is payable from debt service payments on municipal bonds held by the Agency and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislature, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of December 31, 2004, the Agency had $1.237 billion of bonds outstanding.

*Ports Authority* owns and operates the major airport and seaport facilities in Puerto Rico. The Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of seaport equipment and property. Act No. 1 of January 1, 2000, authorized the transfer of the Authority's maritime ferry operations to Puerto Rico Maritime Transportation Authority, a newly created government agency. As of December 31, 2004, the Authority had $462.8 million in debt, including $314.8 million under a line of credit with GDB.

*Public Buildings Authority* is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are further secured by the Commonwealth's guaranty. The Authority is authorized by law to have outstanding at any one time up to $3.325 billion of bonds guaranteed by the Commonwealth. As of December 31, 2004, $2.920 billion of such bonds of the Authority was outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds).

*Special Communities Perpetual Trust* is an irrevocable and permanent trust created in November 2002 as a public corporation. The Trust's principal purpose is to fund development projects which address the infrastructure and housing needs of underprivileged communities. Act No. 271 of November 21, 2002, requires GDB to provide the Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. In December 2004, GDB transferred to the Trust the $500 million capital contribution required by Joint Resolution No. 1027 of November 21, 2002 and $270.7 million, the amount remaining in the GDB $500 million line of credit. The amounts transferred to

III-36

the Trust were deposited in two investment accounts held by GDB for the benefit of the Trust, $320 million of which have been disbursed to the Trust as of April 18, 2005. As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million.

*Telephone Authority* was created in July 1974 when the Commonwealth purchased the Puerto Rico Telephone Company ("PRTC") from International Telephone and Telegraph Corporation. PRTC operates the principal telephone system in Puerto Rico.

In March 1999, the Telephone Authority sold a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated, which was acquired by Verizon Communications, Inc. The net proceeds of the sale received at closing were applied to defease outstanding bonds of the Authority in the principal amount of $756 million, to make a $1.2 billion deposit to the Infrastructure Development Fund held by the Infrastructure Financing Authority and to pay certain benefits to PRTC employees. In January 2002, Verizon exercised its option to purchase an additional 15% of PRTC stock for $172 million. The Commonwealth retains a 28% stock participation in PRTC. The proceeds from the Verizon stock option exercise and the remaining 28% ownership interest were transferred to the Employees Retirement System of the Commonwealth and its instrumentalities.

*University of Puerto Rico* (the "University"), with 68,627 students in academic year 2003-2004, is by far the largest institution of higher education on the island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements have been financed mainly by revenue bonds. As of December 31, 2004, the University's total debt was $439.1 million.

On December 21, 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project is being built and will be operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and will be leased to the University for a term equal to the term of the bonds with lease payments being in sufficient amounts to pay debt service on said bonds as they become due.

*Other public corporations* (not described above) have outstanding debt in the aggregate amount of $1.140 billion as of December 31, 2004. Debt service on $484.3 million of such outstanding debt is being paid from legislative appropriations. However, the Commonwealth is not obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by the Electric Power Authority and the Aqueduct and Sewer Authority, which is insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

Public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Commonwealth of Puerto Rico (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System"), and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System").

The University Retirement System and the Electric Power Authority Retirement System apply to employees of the University of Puerto Rico and Electric Power Authority, respectively. The Commonwealth is not required to contribute directly to those two systems, although a large portion of University revenues is derived from legislative appropriations.

The Teachers Retirement System covers public and private school teachers (primarily from the public sector) and employees, the Judiciary Retirement System covers judges, and the Employees Retirement System covers all other employees of the Commonwealth, its municipalities and instrumentalities. As of June 30, 2004, the total number of active members of the three systems was as follows: Employees Retirement System, 157,179; Teachers Retirement System, 78,500; and Judiciary Retirement System, 338. The three systems are financed by contributions made by employers (the Commonwealth, public corporations, and municipalities) and employees, and investment income. The central government is responsible for approximately 67% of total employer contributions to the Employees Retirement System, and the other 33% is the responsibility of public corporations and municipalities. The central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the systems and required contributions to the systems by employees are determined by law. Required employers' contributions to the systems are determined by law and are not actuarially determined. For the Employees Retirement System, required employer contributions consist of 9.275% of applicable payroll in the case of municipalities, central government and public corporations. Required employee contributions for the Employees Retirement System vary according to salary and how the individual employee's retirement benefits are coordinated with social security benefits. For the Judiciary Retirement System, required contributions consist of 20% of applicable payroll for the employer and 8% for the employees.

According to the most recent actuarial valuation of the Employees Retirement System and Judiciary Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2003, the total pension benefit obligation for the Employees Retirement System and Judiciary Retirement System was $11.2 billion and $166.7 million, respectively. The unfunded pension benefit obligation of the Employees Retirement System and Judiciary Retirement System for the same period was $9.2 billion and $105 million, respectively, representing a funding ratio of 17.4% and 37.1%, respectively. This actuarial valuation was completed in accordance with the "Projected Unit Credit" method and assumed an investment return of 8.5% per year and a salary increase of 5% per year.

In the case of the Employees Retirement System, Act No. 10 of May 21, 1992 provided for benefit increases of 3% every three years. The first 3% increase was granted to retirees who had been receiving their annuities for three or more years as of that date. The second 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1995. This increase is being financed by additional contributions from the employers. The third 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1998. This third increase is being partially funded with additional contributions from some of the employers. In June 2001, the Legislature approved a law providing a fourth 3% increase, effective as of January 1, 2001, in post-retirement annuity payments granted on or prior to January 1, 1998. This increase will be funded by the General Fund for retirees who were employees of the central government and by

municipalities and public corporations for retirees who were their employees.  In June 2003, the Legislature approved a law providing a fifth increase of 3% in post retirement benefits effective January 1, 2004.  This increase will also be funded by the General Fund for retirees who were employees of the central government and by municipalities and public corporations for retirees who were their employees.  Subsequent increases will depend upon the explicit approval of the System's Board of Trustees and the Legislature, and must provide a funding source.  In the case of the Judiciary Retirement System, Act No. 41 of June 13, 2001 provides a 3% increase in annuity payments, commencing on January 1, 2002 and every three years thereafter, to retirees who have been receiving their annuities for three or more years as of that date.  This increase will be funded by the General Fund.

In 1990, the organic act of the Employees Retirement System was amended to reduce the future pension liabilities of the Employees Retirement System.  Among other provisions, the legislation increased the level of contribution to the System and limited the retirement benefits for new employees by increasing the length of time for the vesting of certain benefits and reducing the level of benefits in the case of early retirement.  The legislation also reduced the level of occupational disability benefits and death benefits received by new employees.

In 1999, the organic act of the Employees Retirement System was further amended to change it, prospectively, from a defined benefit system to a defined contribution system.  This amendment provides for the establishment of an individual account for each employee hired by the Commonwealth after December 31, 1999 and for those current employees who elect to transfer from the existing defined benefit system.  The individual account of each current employee is credited initially with an amount equal to his aggregate contributions to the Employees Retirement System, plus interest.  Current employees who did not elect to transfer to the new defined contribution system will continue accruing benefits under the current defined benefit system.  The individual account of each participant of the new defined contribution system is credited monthly with the participant's contribution and is credited semiannually with a rate of return based on either of two notional investment returns.  Such accounts are not credited with any contribution by the employer.  Instead, employer contributions will now be used completely to reduce the accumulated unfunded pension liability of the Employees Retirement System.

The law approving the sale of a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated (subsequently acquired by Verizon Communications Inc.) provides that any future proceeds received by the government from the sale of its then remaining 43% stock ownership in PRTC will be transferred to the Employees Retirement System to reduce its accumulated unfunded pension benefit obligation.  In January 2002, Verizon exercised its option to purchase an additional 15% of the stock of PRTC for $172 million.  The proceeds of the sale were transferred to the Employees Retirement System.

The Employees Retirement System's disbursements of benefits during fiscal years 2002, 2003, and 2004 exceeded contributions and investment income for those years.  The cash shortfall for fiscal year 2002 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC.  The cash shortfall for fiscal year 2003 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC and an advance from the Department of the Treasury.  The cash shortfall for fiscal year 2004 was also covered with advances received from the Department of the Treasury.  A cash shortfall, which will be covered either by a sale of assets or advances from the Department of the Treasury, is also expected for fiscal year 2005.

The Employees Retirement System anticipates that its future cash flow needs for disbursement of benefits to participants may exceed the sum of the employer and employee contributions received and its investment and other recurring income.  The Employees Retirement System expects to cover this cash flow imbalance in the next few fiscal years with the proceeds from the sale of the remaining shares of PRTC stock.  The Employees Retirement System is also evaluating other measures to improve its cash flows and funding ratio.  Some of these measures include, but are not limited to, the establishment of a maximum salary to calculate pension benefits, aggressive collection efforts with respect to employer

contributions owed by the Commonwealth, the municipalities and public corporations, the transfer to the Employees Retirement System of any amounts remaining in the Children's Trust after payment of all the outstanding bonds, and the assignment to the Employees Retirement System of a percentage of General Fund revenues and/or excess proceeds derived from the proposed tax reform being considered by the Commonwealth. See "Proposed Fiscal Reform" under *Puerto Rico Taxes, Other Revenues and Expenditures.*

In addition, legislation has been submitted that if enacted will authorize the issuance of pension obligation bonds ("POBs"). The POBs will contribute approximately $2 billion in assets to the Employees Retirement System and will be payable solely from the Commonwealth's General Fund. While the POBs are outstanding and the Commonwealth is paying debt service, General Fund transfers to the Employees Retirement System in any fiscal year will be reduced by an amount equal to the lesser of $100 million and the debt service on the POBs payable in such fiscal year. The proposed legislation also includes a measure that would increase employee and employer contributions to the Employees Retirement System from 8.275% and 9.275%, respectively, to 10% each. The Employees Retirement System projects that current contributions, together with investment and other recurring income, earnings on the $2 billion raised by the issuance of the POBs, and the proposed increase in employee and employer contributions will allow it to improve its funding ratio.

According to the most recent actuarial valuation of the Teachers Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2004, the accrued actuarial liability of the system was $4.702 billion and the value of its assets amounted to $2.403 billion, representing a funding ratio of 51%, and the resulting unfunded accrued liability was $2.299 billion. This funding ratio takes into account the recent turn around in the equities market, which has provided an investment return of 16.5%, and the restructuring of the portfolio's asset composition. The actuarial valuation assumed an investment return of 8%, yearly salary increases of 5%, employee and employer contributions of 9% and 8.5%, respectively, and a remaining amortization period of 16 years for the unfunded accrued liability.

The following table presents, in summary form, the income and expenses of the retirement systems for fiscal years 2002, 2003, and 2004. The investment income figures presented in the table include unrealized gains and losses.

**Commonwealth of Puerto Rico**
**Retirement Systems**
**Income and Expenses**
**(in thousands)**

|  | Employees Retirement System | Judiciary Retirement System | Teachers Retirement System |
|---|---|---|---|
| **Fiscal Year Ending June 30, 2004** | | | |
| Income: | | | |
| Employers' contributions | $344,889 | $ 5,556 | $159,152 |
| Employee contributions | 294,013 | 2,578 | 110,548 |
| Investment income | 312,992 | 9,223 | 341,313 |
| Total | 951,894 | 17,357 | 611,013 |
| Expenses: | | | |
| Benefit payments | 718,219 | 9,927 | 324,611 |
| Administrative and other expenses | 39,635 | 1,360 | 26,069 |
| Total | 757,854 | 11,287 | 350,680 |
| Net Income | $194,040 | $ 6,070 | $260,333 |
| | | | |
| **Fiscal Year Ended June 30, 2003** | | | |
| Income: | | | |
| Employers' contributions | $330,404 | $ 5,536 | $ 140,264 |
| Employee contributions | 276,347 | 2,479 | 104,403 |
| Investment income | 57,132 | 4,131 | 51,998 |
| Total | 663,883 | 12,146 | 296,665 |
| Expenses: | | | |
| Benefit payments | 667,390 | 9,330 | 298,529 |
| Administrative and other expenses | 28,768 | 1,473 | 22,565 |
| Total | 696,158 | 10,803 | 321,094 |
| Net (Loss) Income | ($ 32,275) | $ 1,343 | ($ 24,429) |
| | | | |
| **Fiscal Year Ended June 30, 2002** | | | |
| Income: | | | |
| Employers' contributions | $308,228 | $ 5,412 | $124,152 |
| Employee contributions | 259,203 | 2,448 | 99,454 |
| Investment income | (306,008) | (7,791) | (41,068) |
| Total | 261,423 | 69 | 182,538 |
| Expenses: | | | |
| Benefit payments | 683,106 | 8,462 | 278,168 |
| Administrative and other expenses | 27,304 | 1,072 | 20,833 |
| Total | 710,410 | 9,534 | 299,001 |
| Net Loss | ($448,987) | ($ 9,465) | ($116,463) |

*Sources:* Employees Retirement System, Judiciary Retirement System, and Teachers Retirement System

III-41

## COMMONWEALTH FINANCIAL STATEMENTS

For fiscal year 2004, the financial statements of the Commonwealth were audited by KPMG LLP. KPMG LLP did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units identified separately in their report. Those financial statements were audited by other auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, was based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth for fiscal year 2004, which includes the basic financial statements of the Commonwealth for fiscal year 2004, was filed by the Commonwealth with each nationally recognized municipal securities information repository on May 17, 2005.

## PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income taxes and excise taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

### Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal year 2002 through fiscal year 2004, the estimated revenues and expenditures for fiscal years 2005, and the budgeted revenues and expenditures for fiscal year 2006. The information relating to fiscal year 2005 is based on the estimate of revenues and expenditures for that fiscal year. The information relating to fiscal year 2006 is based on the proposed budget of revenues and expenditures for that fiscal year, which is currently under review by the Legislature.

The amounts shown on the table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. For example, in fiscal years 2003 and 2004, there were approximately $150 million and $85 million, respectively, of such expenditures that are not reflected in the table. A discussion of the

budget for fiscal year 2005 and the proposed budget for fiscal year 2006 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislature has by resolution agreed to appropriate funds. "Transfers to Agencies" represents moneys appropriated for the operation of the Health Facilities and Services Administration or, after the dissolution of that Administration, the Department of Health. General Fund revenues, expenditures and transfers as presented in the table differ from the General Fund revenues, expenditures and transfers as presented in the financial statements of the Commonwealth, as the latter statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2002 | 2003 | 2004(p) | 2005(e) | 2006(b) |
|---|---|---|---|---|---|
| Beginning cash balance ............................................ | $ 125,154 | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 |
| **Revenues from internal sources:** | | | | | |
| Income Taxes: | | | | | |
| Individuals .............................................. | 2,449,982 | 2,767,678 | 2,720,920 | 2,868,000 | 3,127,000 |
| Corporations............................................ | 1,706,137 | 1,776,985 | 1,831,027 | 2,005,000 | 2,252,000 |
| Partnerships............................................ | 2,670 | 2,101 | 3,005 | 2,000 | 3,000 |
| Withheld from non-residents ...................... | 583,256 | 517,141 | 631,100 | 575,000 | 628,000 |
| Tollgate taxes.......................................... | 59,515 | 45,321 | 31,579 | 23,000 | 17,000 |
| Interest .................................................. | 14,310 | 11,278 | 10,108 | 10,000 | 11,000 |
| Dividends................................................ | 62,548 | 49,790 | 70,192 | 74,000 | 74,000 |
| Total income taxes ............................. | 4,878,418 | 5,170,299 | 5,297,931 | 5,557,000 | 6,112,000 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages.................................. | 249,705 | 299,582 | 296,302 | 302,000 | 316,000 |
| Cigarettes ............................................... | 116,055 | 149,487 | 144,733 | 146,000 | 152,000 |
| Motor vehicles ......................................... | 418,024 | 499,252 | 551,181 | 585,000 | 614,000 |
| Other excise taxes .................................... | 681,344 | 703,029 | 701,129 | 746,000 | 1,481,000 |
| Total Commonwealth excise taxes ......... | 1,465,128 | 1,651,350 | 1,693,345 | 1,779,000 | 2,563,000 |
| Property taxes........................................... | - | - | - | - | - |
| Inheritance and gift taxes............................ | 1,962 | 2,825 | 15,691 | 5,000 | 2,000 |
| Licenses.................................................. | 82,575 | 85,876 | 84,231 | 89,000 | 123,000 |
| Other: | | | | | |
| Lottery ................................................... | 61,358 | 67,621 | 65,387 | 70,000 | 63,000 |
| Electronic Lottery .................................... | 57,897 | 89,443 | 86,115 | 73,000 | 83,000 |
| Miscellaneous non-tax revenues.................. | 562,213[1] | 438,457 | 379,501 | 370,000 | 362,000 |
| Total Other ....................................... | 681,468 | 595,521 | 531,003 | 513,000 | 508,000 |
| Total revenues from internal sources.......... | 7,109,551 | 7,255,866 | 7,622,201 | 7,943,000 | 9,308,000 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[2] ............................... | 314,253 | 309,958 | 328,921 | 337,000 | 350,000 |
| Customs .................................................. | 30,595 | 25,918 | 34,266 | 24,000 | 26,000 |
| Total revenues from non-Commonwealth sources........ | 344,848 | 335,876 | 363,187 | 361,000 | 376,000 |
| Total net revenues...................................... | 7,454,399 | 7,841,742 | 7,985,388 | 8,304,000 | 9,684,000 |
| Other Income (refunds)[3] ........................... | 111,411 | (78,927) | 62,789 | (55,409) | - |
| Transfers to Redemption Fund[4] .................. | (274,773) | (331,925) | (341,538) | (369,985) | (435,000) |
| Proceeds of notes and other borrowings[5] ..... | 1,161,856 | 2,259,775 | 3,940,397 | 4,925,595 | - |
| Repayment of notes and other borrowings[6] ... | (1,201,084) | (2,021,832) | (3,713,634) | (3,909,434) | - |
| Adjusted revenues....................................... | 7,251,622 | 7,418,833 | 7,933,402 | 8,894,767 | 9,249,000 |
| **Expenditures:** | | | | | |
| Grants and subsidies.................................. | 2,862,288 | 3,773,579 | 3,468,531 | 3,617,386 | 2,809,310 |
| Personal services ...................................... | 2,884,636 | 3,119,476 | 3,951,387 | 4,783,567 | 5,667,093 |
| Other services .......................................... | 764,655 | 583,343 | 400,594 | 389,346 | 595,637 |
| Materials and supplies ............................... | 106,294 | 80,491 | 73,757 | 72,411 | 143,521 |
| Equipment purchases ................................. | 20,397 | 33,170 | 20,572 | 20,707 | 33,439 |
| Capital outlays and other debt service........... | 73,806 | - | 675 | 78,598 | - |
| Transfers to agencies ................................. | 314,416 | - | - | - | - |
| Prior year disbursements............................ | - | - | 88,432 | - | - |
| Total expenditures ............................. | 7,026,492 | 7,590,059 | 8,003,948 | 8,962,015 | 9,249,000 |
| Adjusted revenues less expenditures ............. | 225,130 | (171,226) | (70,546) | (67,248) | - |
| Ending cash balance.................................... | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 | $ 41,264 |

(p) Preliminary.
(e) Estimated; represents actual revenues as of April 2005 plus budgeted revenues for the months remaining in fiscal year 2005
(b) Budget, as proposed.
(1) Includes certain non-recurring revenues totaling $244.1 million.
(2) Excludes transfers by the Commonwealth to the Conservation Trust Fund and amounts deposited by the Secretary of the Treasury into a separate account for the promotion of Puerto Rico rums in foreign markets
(3) Consists of net revenue from General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(4) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly to the Redemption Fund from non-General Fund revenues
(5) Consists of proceeds of Commonwealth tax and revenue anticipation notes and borrowings from GDB .
(6) Consists of repayment of Commonwealth tax and revenue anticipation notes and borrowings from GDB

*Source*: Department of the Treasury

III-44

*Proposed Budget Fiscal Year 2006 Compared to Current Budget Fiscal Year 2005*

General Fund total revenues for fiscal year 2006 are projected to be $9.684 billion, representing an increase of $1.4 billion, or 16.6%, from budgeted fiscal year 2005 revenues. The major changes from fiscal year 2005 are expected to be: (i) projected increases in income taxes from individuals of $259 million and income taxes from corporations of $247 million; and (ii) projected increases in motor vehicle excise taxes of $29 million and Commonwealth excise taxes of $784 million.

The projection of General Fund revenues for fiscal year 2006 is based on a projected nominal and real growth in gross national product of 5.9% and 2.5%, respectively. The projection of General Fund revenues assumes additional revenues of $1.004 billion from the following new legislative and administrative measures: (i) the elimination of the exemption for food, medicine, and certain other goods from the 5% general excise tax ($639 million); (ii) an increase in license fees for luxury cars ($30 million); (iii) a temporary surtax on financial institutions ($180 million); (iv) the elimination of the preferential capital gains rates ($60 million); and (v) an intensification of efforts to detect excise tax evasion through the purchase of X-Ray machines to monitor ship containers at ports of entry, the implementation of a program to improve collections, and heightened scrutiny on the payment of excise taxes on crude oil and its derivatives ($95 million).

Proposed expenditures for fiscal year 2006 total $9.684 billion, which is $830 million, or 9.4%, higher than the $8.854 billion budgeted for fiscal year 2005. The principal reasons for the differences are (i) education related expenditures, which are proposed to be approximately $448.3 million higher; (ii) health related expenditures, which are proposed to be approximately $74.5 million higher; (iii) public safety and protection related expenditures, which are proposed to be approximately $164.6 million higher; and (iv) debt service which will be $54.8 million higher.

*Estimated Fiscal Year 2005 Compared to Preliminary Fiscal Year 2004*

The General Fund budget for fiscal year 2005, which commenced on July 1, 2004, provides for total net revenues of $8.304 billion, which represents an increase of $319 million, or 4%, over the budget for fiscal year 2004. Total budgeted net revenues and estimated net revenues of the General Fund for fiscal year 2004, which ended on June 30, 2004, were $7.925 billion and $7.985 billion, respectively.

The major changes in estimated revenues for fiscal year 2005 compared to preliminary revenues for fiscal year 2004 are: (i) projected increases in total income taxes of $259 million; (ii) projected increases in total excise taxes of $85 million; and (iii) projected decreases in non-tax revenues of $10 million. The revised budget of General Fund revenues for fiscal year 2005, which revised budgeted items but not the total budget amount, assumes a 6.0% nominal and 2.3% real growth in gross product, and additional revenues of $81 million from the legislative measures described below. The original budget of General Fund revenues for fiscal year 2005 assumed a 5.7% nominal and 2.9% real growth in gross product. Budgeted revenues also include the proceeds of a $550 million loan from GDB secured by tax receivables. Such loan has a maximum term of ten years.

As a means of increasing revenues for fiscal year 2005, the following laws were enacted: (i) a "sunset provision" which enables early retirement or "rollover" of certain individual retirement account funds without penalties under the Commonwealth's income tax law; (ii) a one-year "sunset provision" for variable annuities by insurance companies in the United States held by Puerto Rico citizens for "rollovers" to variable annuities by Puerto Rico insurance companies; (iii) a transfer to the General Fund of compulsory motor vehicle insurance premiums for which reimbursement has not been claimed; and (iv) a "sunset provision" to lower all long-term capital gains tax rates by 50%. In particular, gains realized on or prior to June 30, 2005 by resident individuals from the sale or exchange of a capital asset, if the asset is held for more than six months, will be taxed at a rate of 5% (6.25% in the case of corporate taxpayers) if the asset is located in Puerto Rico and at a rate of 10% (12.5% in the case of corporate

taxpayers) if located outside Puerto Rico. Similarly, lump sum distributions by resident individuals on income from pensions will be taxed at a rate of 10%.

As of April 30, 2005, General Fund estimated total revenues for fiscal year 2005 were within the amount originally budgeted. According to the rate of collections as of April 30, 2005, total income taxes, license fees and revenues from non-Commonwealth sources are expected to be under budget. However, such reduction is expected to be offset by collections in excess of budgeted amounts of Commonwealth excise taxes, inheritance and gift taxes and other revenues from internal sources.

*Preliminary Fiscal Year 2004 Compared to Fiscal Year 2003*

General Fund total net revenues for fiscal year 2004 were $7.985 billion, representing an increase of $143 million, or 1.8%, from fiscal year 2003 net revenues. This amount excludes proceeds of a loan of $233 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The loan has a term of ten years, and may be repaid sooner to the extent that sufficient revenues are available for such purpose. This amount also excludes $82 million of additional non-recurring revenues. The major changes in revenues from fiscal year 2003 were: (i) increases in total income taxes of $128 million, mainly resulting from decreases in income taxes from individuals of $203 million and in income taxes withheld from non-residents of $114 million; (ii) increases in total excise taxes of $42 million; and (iii) decreases in other revenues of $65 million, mainly as a result of a decrease in miscellaneous non-tax revenues of $59 million. Approximately $170 million of the increase in total income taxes for fiscal year 2004 relates to the collection of past taxes as a result of an incentives plan implemented by the Secretary of the Treasury.

Total cash expenditures for fiscal year 2004 were $8.004 billion, which amount excludes certain amounts related to fiscal year 2004 but to be disbursed in fiscal year 2005. This amount also excludes approximately $293 million of additional expenditures that were not originally budgeted and are expected to be covered with reserve funds ($50 million), the reimbursement of certain federal education funds ($141 million), and other sources. After considering (i) debt service payments (separately identified in the table as "Transfers to Redemption Fund"), (ii) $227 million in net borrowings from GDB and other sources, and (iii) $63 million in other income from the General Fund's non-budgetary funds, the ending cash balance of the General Fund decreased from $179 million at the end of fiscal year 2003 to $109 million at the end of fiscal year 2004.

*Fiscal Year 2003 Compared to Fiscal Year 2002*

General Fund total net revenues for fiscal year 2003 were $7.842 billion, representing an increase of $388 million, or 5.2%, from fiscal year 2002 revenues. This amount includes proceeds of a loan of $250 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The loan has a term of five years, and may be repaid sooner to the extent that sufficient revenues are available for such purpose. The major changes from fiscal year 2002 were: (i) increases in income taxes from individuals of $318 million and in corporate income taxes of $71 million; (ii) increases in excise taxes on alcoholic beverages and cigarettes of $83 million, and increases in motor vehicle excise taxes of $81 million; (iii) an increase in electronic lottery revenues of $32 million; and (iv) a decrease in miscellaneous non-tax revenues of $124 million and in income taxes withheld from non-residents of $66 million. The decrease in miscellaneous non-tax revenues relates to certain special administrative measures that had been implemented by the Secretary of the Treasury in fiscal year 2002 and that do not apply to fiscal year 2003.

Total cash expenditures for fiscal year 2003 were $7.590 billion, which amount excludes certain amounts related to fiscal year 2003 but disbursed in fiscal year 2004. This amount also excludes $150 million of additional expenditures that were not originally budgeted and were covered with reserve funds, federal fiscal relief funds and other sources. The principal reason for these higher expenditures was higher than anticipated education costs. After considering (i) $332 million in debt service payments

(separately identified on the table as "Transfers to Redemption Fund"), (ii) $238 million in net borrowings from GDB (which includes the $250 million loan mentioned above) and other sources, and (iii) $79 million in reserves for future tax refunds reduced by estimated tax refunds (separately identified on the table as "Other Income (refunds)"), the ending cash balance of the General Fund was reduced from $350 million at the end of fiscal year 2002 to $179 million at the end of fiscal year 2003.

## Major Sources of General Fund Revenues

### Income Taxes

The Commonwealth's income tax law, the Internal Revenue Code of 1994, as amended (the "PR Code"), imposes a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax is imposed on certain payments made to non-residents of Puerto Rico, which is collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code has five tax brackets for individuals with tax rates of 7%, 10%, 15%, 28%, and 33%. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at a rate of 10%.

Gain realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at a rate of 20%. It is taxed at a rate of 10% if the capital asset consists of certain property located or deemed located in Puerto Rico. Gains realized by Puerto Rico resident individuals, trusts and estates from the sale of stock of certain Puerto Rico corporations in an initial public offering made prior to January 1, 2008 are subject to a special capital gains rate of 7%.

On August 22, 2004, the Governor signed into law Act 226 to provide a temporary reduction in the long-term capital gains tax rate. Act 226 reduces the long-term capital gains tax rates by 50% for transactions that take place from July 1, 2004 through June 30, 2005, provided that the net long-term capital gain is reinvested in Puerto Rico.

Interest income in excess of $2,000 on deposits with Puerto Rico financial institutions is taxed at a rate of 17%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, and estates qualifies for a special 10% tax rate.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the industrial incentives program (see "Tax Incentives" under *The Economy* above), it is subject to tax at graduated rates.

The PR Code provides for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, are taxed at a maximum rate of 25% or 12.5% if the capital asset consists of certain property located or deemed located in Puerto Rico sold or exchanged after December 31, 2000. Act 226 reduces the long-term capital gains tax rates by 50% for transactions that take place from July 1, 2004 through June 30, 2005. Dividends received by Puerto Rico corporations and partnerships of foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received credit may be available. A

special tax rate of 17% is applicable to dividend distributions of REITs received by corporations. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident corporations and partnerships qualifies for a special tax rate.

Certain corporations and partnerships covered by the tax incentives acts continue to be subject to a maximum tax rate of 45% on their taxable income. Corporations and partnerships covered by the Puerto Rico Tourism Incentives Act of 1993, as amended, are subject to a maximum tax rate of 42% on their taxable income. The PR Code also provides for an alternative minimum tax of 22%. Corporations and partnerships operating under a new grant of tax exemption issued under the 1998 Tax Incentives Act are subject to a maximum income tax rate of 7% during their basic exemption period.

The PR Code imposes a branch profits tax on resident foreign corporations less than 80% of whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations (including Section 936 Corporations) operating under new grants of tax exemption issued under the 1998 Tax Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by such corporations to non-resident recipients are subject to a 10% withholding tax. The basic tax on dividends paid to foreign corporate shareholders of Section 936 Corporations operating under grants of tax exemption issued under prior incentives laws is 10% but is subject to reduction if a percentage of the profits are invested in certain eligible instruments for specified periods of time.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% withholding tax.

*Excise Taxes*

The PR Code imposes a tax on articles and commodities that are imported into or manufactured in Puerto Rico for consumption in Puerto Rico and a tax on certain transactions, such as hotel occupancy, public shows, and horse racing. The excise tax on certain articles and commodities, such as cigarettes, alcohol and petroleum products, is based upon the quantity of goods imported. The excise tax on motor vehicles is based on its suggested retail price. The PR Code imposes a tax at an effective rate of 6.6% of the F.O.B. factory price for imported goods and 3.6% of the sales price of goods manufactured in Puerto Rico, except sugar, cement, cigarettes, motor vehicles and certain petroleum products, which are taxed at different rates. Goods to be used by the government, except for motor vehicles and construction equipment, are not exempt. Exemptions apply to certain articles, such as food and medicines, and to articles designated for certain users.

The Department of the Treasury, in an effort to balance the fiscal year 2006 budget, is proposing the elimination of the excise tax exemptions that apply to certain articles, such as food and medicines. The Department of the Treasury expects to raise approximately $630 million through this legislative initiative less approximately $100 million which would be returned to certain low income segments of the population.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from the island to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is $13.50 per gallon. Of this amount, $13.25 per proof gallon has been or will be returned to the Treasury of Puerto Rico during the period from July 1, 1999 to December 31, 2005. Effective January 1, 2006, the amount returned will be reduced to the lesser of $10.50 per proof gallon and the actual excise tax imposed. Legislation is currently pending in both houses of the United States Congress, however, that would increase the amount of federal excise taxes per proof gallon transferred to the Commonwealth to $13.50 after December 31, 2005 and before January 1, 2007. This legislation would also allocate $0.50 of the total tax so returned to the Conservation Trust Fund, a charitable trust established in 1968 pursuant to a Memorandum of Understanding between the United States Department of the Interior and the Commonwealth whose mission is to protect natural resources in Puerto Rico.

*Property Taxes*

Personal property, which accounts for approximately 53% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, a special 1.03% tax on the assessed value of all property (other than exempted property) imposed by the Commonwealth for purposes of paying the Commonwealth's general obligation debt is deposited in the Commonwealth's Redemption Fund.

The following table presents the assessed valuations and real and personal property taxes collected for the fiscal years ending June 30, 2000 through 2004.

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

| Fiscal Years Ended June 30 | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections |
|---|---|---|---|---|---|
| 2000 | 20,514,014 | 704,568 | 594,151 | 64,812 | 658,963 |
| 2001 | 21,575,063 | 736,667 | 614,411 | 70,496 | 684,907 |
| 2002 | 22,743,568 | 792,799 | 645,117 | 60,677 | 705,794 |
| 2003 | 23,138,903 | 824,933 | 671,163 | 79,421 | 750,584 |
| 2004 | 23,540,237 | 836,734 | 706,677 | 79,772 | 786,449 |

(1) Valuation set as of July 1 of each fiscal year.

*Source:* Municipal Revenues Collection Center

III-49

**Collections of Income and Excise Taxes**

The Department of the Treasury has continued its program for improving tax collections, which began in fiscal year 1986. The program has consisted, in part, of taking the initiative in sponsoring and implementing tax reform, particularly in the areas of excise taxes and income taxes, in order to decrease the incidences of nonpayment of taxes and to expand the taxpayer base. The program has also included (i) improving the methods by which delinquent taxpayers are identified, primarily through the use of computer analyses, (ii) computerizing the processing of tax returns, and (iii) identifying and eliminating taxpayer evasion.

**Proposed Fiscal Reform**

The Department of the Treasury has completed its evaluation of a plan formulated by its outside consultants to reform the Commonwealth's tax system. The objective of this reform would be to reduce the income tax rates for individuals and corporations while expanding the tax base by taxing persons not currently participating in the income tax system and simplifying the tax system in order to make its administration more effective.

On April 30, 2005, the Fiscal Reform Evaluation Commission, a group appointed by the Governor to review the proposed fiscal reform proposals and comprised of various representatives from the private and public sectors, delivered to the Governor a comprehensive report containing its recommendations with respect to the proposed fiscal reform. The Governor is currently analyzing the Commission's recommendations in order to prepare and present fiscal reform legislation. Although the final form of the proposed fiscal reform is uncertain, the Department of the Treasury expects the fiscal reform will be implemented beginning on January 1, 2007. The Department of the Treasury expects that the fiscal reform will have a positive net effect on General Fund revenues.

In an attempt to completely restructure the current tax system, the Commission recommends the imposition of a 10% flat tax rate on income earned by individuals and corporations. As a result, individual taxpayers would see a reduction in available income tax deductions, an increase in income exempt from taxation, and the creation of tax credits for the benefit of retirees and certain salaried workers. Although income tax deductions available to corporations would also be reduced, the Commission proposes certain special incentives to corporate taxpayers and a 10% tollgate tax on the repatriation by foreign corporations of earning and royalties.

Another key element of the Commission's recommendations includes the implementation of a hybrid consumption-based tax. The hybrid system would be composed of a value-added tax and a sales tax. Initially, consumption would be taxed at a rate of 10%, with a subsequent reduction to 9% five years after implementation. During the first five years, 1% of collections would be transferred to the municipalities. This transfer would be eliminated upon the reduction of the consumption tax rate to 9%.

The Commission also provided recommendations for fiscal reform at the municipal level. Some of these recommendations include the elimination of taxes on personal property and the reappraisal of real property values, which are currently assessed on the basis of 1958 property values. Also, the Commission recommended the regional consolidation of municipalities in an effort to share expenses.

Finally, the Commission provided non-tax based recommendations. For example, the Commission recommends a reduction in the current size of the government and the development and implementation of advanced technological systems in order to make government more efficient and effective.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, *per diems*, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligations payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law.

**Federal Grants**

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government, including public corporations, are estimated to be $5.279 billion for fiscal year 2006, an increase of $83.5 million, or 1.6%, from fiscal year 2005. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Department of the Treasury. The figures for fiscal years 2002, 2003 and 2004 are actual figures. The estimated figures for fiscal years 2005 and 2006 are based on the information submitted by each agency to the Office of Management and Budget.

**Commonwealth of Puerto Rico**
**Federal Grants[1]**
**(in thousands)**

|  | 2002 | 2003 | 2004 | 2005[1] | 2006[1] |
|---|---|---|---|---|---|
| Education | $ 734,917 | $ 828,992 | $1,081,236 | $992,658 | $1,046,439 |
| Social Services | 1,711,360 | 1,848,910 | 1,792,203 | 1,884,298 | 1,878,945 |
| Health | 333,154 | 367,916 | 444,348 | 478,068 | 489,556 |
| Labor and Human Resources[2] | 376,119 | 334,350 | 204,679 | 214,679 | 208,973 |
| Crime | 15,689 | 32,479 | 37,988 | 29,313 | 29,593 |
| Housing[3] | 385,592 | 312,869 | 366,408 | 383,219 | 629,228 |
| Drug and Justice | 9,822 | 11,995 | 31,349 | 13,071 | 32,811 |
| Agriculture and Natural Resources | 13,119 | 7,883 | 10,378 | 8,183 | 10,115 |
| Contributions to Municipalities | 59,191 | 59,191 | 59,002 | 56,371 | 53,744 |
| Other | 13,538 | 25,874 | 39,879 | 33,168 | 40,721 |
| TOTAL | $3,652,501 | $3,830,459 | $4,067,470 | $4,093,028 | $4,420,125 |

(1)  Estimated.
(2)  Amounts include grants to the Right to Work Administration, the Occupational Development and Human Resources Council.
(3)  Amounts include grants to the Public Housing Administration.

*Source:* Office of Management and Budget

III-52

# BUDGET OF THE COMMONWEALTH OF PUERTO RICO

## Office of Management and Budget

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the Administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

## Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual balanced budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with the Governor's objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of the fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

## Financial Control and Adjustment Procedures

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditure in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's fiscal year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)     General Fund appropriations for recurring ordinary operating expenses of the central government and for contributions to public corporations, municipalities, and private organizations. Such appropriations are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)     General Fund appropriations for special operating expenses and for capital expenditures. Such appropriations are authorized by separate law for one or more years for special programs or activities, which may be permanent or transitory.

(iii)     Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)     Bond Fund appropriations for capital expenditures financed by bonds. Such expenditures occur in one or more years.

In Puerto Rico, the central government has many functions, which in the fifty states are the responsibility of local government, such as providing public education, police and fire protection. The central government provides significant annual grants to the University of Puerto Rico and to the municipalities, as well as to PRASA, although these grants are expected to diminish shortly. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations*.

In the summaries of the central government budgets presented below, grants to the University of Puerto Rico are included in current expenses for education and debt service on general obligation bonds is included in current expenses for debt service. Debt service on Sugar Corporation notes paid by the Commonwealth is included in current expenses for economic development, and debt service on Urban Renewal and Housing Corporation bonds and notes and on Housing Finance Authority mortgage subsidy bonds paid by the Commonwealth is included in current expenses for housing.

For fiscal year 2005, it is projected that approximately 57% and 9% of the General Fund is committed for payment of the central government payroll and debt service on the direct debt of the Commonwealth, respectively. For fiscal year 2006, it is proposed that approximately 56% and 7% of the General Fund be committed for payment of the central government payroll and debt service on the direct debt of the Commonwealth, respectively. In the case of the judiciary branch, legislation approved in December of 2002 provides that, commencing with fiscal year 2004, the Commonwealth will appropriate annually to the judiciary branch an amount initially equal to 3.3% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage will increase until it reaches 4% in fiscal year 2008, and may be further increased upon review, with scheduled reviews every five years.

**Fiscal Year 2005 Budget**

The consolidated budget for fiscal year 2005 totaled $24.842 billion. This amount includes General Fund total resources and appropriations of $8.854 billion, which represents an increase of $602 million, or 7.3%, over budgeted amounts for fiscal year 2004. These total resources include $8.304 billion of total revenues and $550 million of additional resources relating to a GDB loan secured by tax receivables. The budget for fiscal year 2005 was approved July 1, 2004.

<div align="center">

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2005**
**(in thousands)**

</div>

|  | General Fund[1] | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: |  |  |  |  |
| Property taxes | $          0 | - | $ 112,977 | $112,977 |
| Personal income taxes | 2,868,000 | - | - | 2,868,000 |
| Retained non-resident income tax | 575,000 | - | - | 575,000 |
| Corporate income taxes | 2,005,000 | - | - | 2,005,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 23,000 | - | - | 23,000 |
| 17% withholding tax on interest | 10,000 | - | - | 10,000 |
| 10% withholding tax on dividends | 74,000 | - | - | 74,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Excise taxes: |  |  |  |  |
| Alcoholic beverages | 302,000 | - | - | 302,000 |
| Motor vehicles and accessories | 585,000 | - | - | 585,000 |
| Cigarettes | 146,000 | - | - | 146,000 |
| Special excise tax on certain petroleum products | 0 | - | - | 0 |
| General 5% excise tax | 573,000 | - | - | 573,000 |
| Other | 173,000 | - | 47,100 | 220,100 |

<div align="center">

III-55

</div>

| | General Fund[1] | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Licenses | 89,000 | - | - | 89,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 70,000 | - | - | 70,000 |
| Electronic lottery | 73,000 | - | - | 73,000 |
| Registration and document certification fees | 218,000 | - | - | 218,000 |
| Other | 152,000 | - | 296,907 | 448,907 |
| Total revenues from internal sources | 7,943,000 | - | 456,984 | 8,399,984 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 337,000 | - | - | 337,000 |
| Federal grants | 0 | - | 4,093,028 [2] | 4,093,028 |
| Customs | 24,000 | - | - | 24,000 |
| Total revenues from non-Commonwealth sources | 361,000 | - | 4,093,028 | 4,454,028 |
| Total revenues | 8,304,000 | - | 4,550,012 | 12,854,012 |
| Other: | | | | |
| Other Income | 550,000 | - | - | 550,000 |
| Balance from previous year | 0 | - | 576,600 | 576,600 |
| Bonds authorized | 0 | 550,000 | - | 550,000 |
| Total other sources | 550,000 | 550,000 | 576,600 | 1,676,600 |
| Total resources | 8,854,000 | $ 550,000 | 5,126,612 | 14,530,612 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 824,929 | - | 51,224 | 876,153 |
| Education | 2,838,544 | - | 1,191,151 | 4,029,695 |
| Health | 1,431,130 | - | 542,622 | 1,973,752 |
| Welfare | 434,990 | - | 2,101,620 | 2,536,610 |
| Economic development | 198,925 | - | 66,478 | 265,403 |
| Public safety and protection | 1,558,232 | - | 89,497 | 1,647,729 |
| Transportation and communications | 92,636 | - | 51,342 | 143,978 |
| Housing | 26,539 | - | 206,341 | 232,880 |
| Contributions to municipalities | 369,835 | - | 2,031 | 371,866 |
| Special pension contributions | 239,684 | - | 0 | 239,684 |
| Debt service | 380,201 | - | 112,977 | 493,178 |
| Other debt service | 457,939 | - | 25,000 | 482,939 |
| Total appropriations-current expenses | 8,853,584 | - | 4,440,283 | 13,293,867 |
| Capital improvements | 0 | 550,000 | 242,632 | 792,632 |
| Total appropriations | 8,853,584 | 550,000 | 4,682,915 | 14,086,499 |
| Year-end balance | 416 | - | 443,697 | 444,113 |
| Total appropriations and year-end balance | $ 8,854,000 | $ 550,000 | $ 5,126,612 | $14,530,612 |

(1)  Law No. 93 of August 20, 1997 establishes that resources that do not represent revenues become part of the Budgetary Fund.

(2)  Does not include grants received by agencies whose accounting systems are not centralized in the Department of the Treasury.

*Sources:* Department of the Treasury and Office of Management and Budget.

In the fiscal year 2005 budget, revenues and other resources of all budgetary funds total $13.405 billion, excluding balances from the previous fiscal year and general obligation bonds authorized. The net increase in General Fund revenues in the fiscal year 2005 budget, as compared to fiscal year 2004 preliminary results, is accounted mainly by increases in personal income taxes (up $52 million), corporate income taxes (up $ 179 million), 10% withholding tax on dividends (up $27 million), excise taxes on motor vehicles and accessories (up $42 million), general 5% excise tax (up $30 million), registration and document certification fess (up $47 million) and other miscellaneous non-tax revenues (up $31 million) and decreases in excise taxes on alcoholic beverages (down $11 million), cigarettes (down $13 million), and certain petroleum products (down $22 million), and electronic lottery (down $15 million).

Current expenses and capital improvements of all budgetary funds total $14.086 billion, an increase of $911 million from fiscal year 2004. The major changes in General Fund expenditures by program in fiscal year 2005 are: education (up $286.1 million), public safety and protection (up $163.5

III-56

million), special pension contributions (up $52.5 million), debt service on Commonwealth's general obligation and guaranteed debt (up $37.7 million), welfare (up $31.0 million), health (up $27.4 million), economic development (up $16.0 million), transportation and communications (up $9.1 million), contributions to municipalities (up $7.0 million), housing (up $1.7 million), and a decrease in other debt service, consisting principally of Commonwealth appropriation debt (down $29.7 million), and general government (down $43.5 million).

Expenditures for fiscal year 2005 are projected at $9.332 billion, which exceeds the General Fund budget by $478 million. The higher expenditures are in the areas of education, public safety and protection and health. The government expects to cover this budget imbalance with several financing mechanisms that will generate approximately $402 million in funds. These mechanisms include the use of a portion of the proceeds of a bond issue by Infrastructure Financing Authority to replace a General Fund budgetary allocation to the University of Puerto Rico in the amount of $200 million, income generated through debt service deposit (forward delivery) agreements, the release of excess funds held in various Commonwealth reserve funds, and the transfer of excess moneys deposited in various government trust funds, such as the Children's Trust. The remaining imbalance, if any, will be covered by expenditure reductions in various agencies.

The general obligation bond authorization for the fiscal year 2005 budget was $550 million.

**Fiscal Year 2006 Proposed Budget**

The proposed consolidated budget for fiscal year 2006 totals $25.662 billion. This includes General Fund total resources and appropriations of $9.684 billion, which represents an increase of $830 million, or 9.4%, over budgeted amounts for fiscal year 2005. This consolidated budget also includes several revenue raising alternatives, some of which require legislative approval. These revenue raising measures consist of: (i) the elimination of the exemption for food, medicine, and certain other goods from the 5% general excise tax; (ii) an increase in license fees for luxury cars; (iii) a temporary surtax on financial institutions; (iv) the elimination of the preferential capital gains rates; and (v) strengthening efforts to detect excise tax evasion through the purchase of X-Ray machines to monitor ship containers at ports of entry, the implementation of a program to improve collections, and heightened scrutiny on the payment of excise taxes on crude oil and its derivatives.

The following table presents a summary of the Commonwealth's proposed central government budget for the fiscal year ending June 30, 2006.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2006**
**(in thousands)**

|  | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: |  |  |  |  |
| Property taxes | $ 0 | - | $ 113,825 | $ 113,825 |
| Personal income taxes | 3,127,000 | - | - | 3,127,000 |
| Retained non-resident income tax | 628,000 | - | - | 628,000 |
| Corporate income taxes | 2,252,000 | - | - | 2,252,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 17,000 | - | - | 17,000 |
| 17% withholding tax on interest | 11,000 | - | - | 11,000 |
| 10% withholding tax on dividends | 74,000 | - | - | 74,000 |
| Inheritance and gift taxes | 2,000 | - | - | 2,000 |
| Excise taxes: |  |  |  |  |
| Alcoholic beverages | 316,000 | - | - | 316,000 |
| Motor vehicles and accessories | 614,000 | - |  | 614,000 |

III-57

| | | | | |
|---|---|---|---|---|
| Cigarettes | 152,000 | - | - | 152,000 |
| Special excise tax on certain products | 30,000 | - | | 30,000 |
| General 5% excise tax | 1,273,000 | - | | 1,273,000 |
| Other | 178,000 | - | 47,100 | 225,100 |
| Licenses | 123,000 | - | - | 123,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 63,000 | - | - | 63,000 |
| Electronic lottery | 83,000 | - | - | 83,000 |
| Registration and document certification fees | 231,000 | - | - | 231,000 |
| Other | 131,000 | - | 309,200 | 440,200 |
| Total revenues from internal sources | 9,308,000 | - | 470,125 | 9,778,125 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 350,000 | - | 0 | 350,000 |
| Federal grants | 0 | - | 4,420,125 | 4,420,125 |
| Customs | 26,000 | - | 0 | 26,000 |
| Total revenues from non-Commonwealth sources | 376,000 | - | 4,420,125 | 4,796,125 |
| Total revenues | 9,684,000 | - | 4,890,250 | 14,574,250 |
| Other: | | | | |
| Balance from previous year | 416 | - | 443,697 | 444,113 |
| Bonds authorized | 0 | 575,000 | 0 | 575,000 |
| Total other sources | 416 | 575,000 | 443,697 | 1,019,113 |
| Total resources | 9,684,416 | 575,000 | 5,333,947 | 15,593,363 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 931,843 | - | 51,844 | 983,687 |
| Education | 3,206,842 | - | 1,315,482 | 4,522,324 |
| Health | 1,610,519 | - | 508,895 | 2,119,414 |
| Welfare | 414,314 | - | 2,190,033 | 2,604,347 |
| Economic development | 258,116 | - | 69,252 | 327,368 |
| Public safety and protection | 1,722,809 | - | 93,860 | 1,816,669 |
| Transportation and communications | 113,232 | - | 58,605 | 171,837 |
| Housing | 24,793 | - | 323,818 | 348,611 |
| Contributions to municipalities | 411,134 | - | 1,985 | 413,119 |
| Special pension contributions | 278,631 | - | 0 | 278,631 |
| Debt service | 435,000 | - | 113,825 | 548,825 |
| Other debt service | 229,967 | - | 19,000 | 248,967 |
| Total appropriations-current expenses | 9,637,200 | - | 4,746,599 | 14,383,799 |
| Capital improvements | 46,800 | 575,000 | 487,149 | 1,108,949 |
| Total appropriations | 9,684,000 | 575,000 | 5,233,748 | 15,492,748 |
| Year-end balance | 416 | - | 100,199 | 100,615 |
| Total appropriations and year-end balance | $ 9,684,416 | $ 575,000 | $ 5,333,947 | $15,593,363 |

(1) Does not include grants received by agencies whose accounting systems are not centralized in the Department of the Treasury.

*Sources:* Department of the Treasury and Office of Management and Budget.

In the fiscal year 2006 budget, revenues and other resources of all budgetary funds total $14.574 billion, excluding balances from the previous fiscal year and general obligation bonds authorized. The net increase in General Fund revenues in the fiscal year 2006 budget, as compared to fiscal year 2005 budget, is accounted mainly by increases in corporate income taxes (up $247 million), personal income taxes (up $259 million), general excise of 5% (up $700.0 million), licenses (up $34 million), excise taxes on motor vehicles and accessories (up $29 million), federal excise taxes on offshore shipments (up $13 million), excise taxes on alcoholic beverages (up $14 million), excise taxes on cigarettes (up $6 million) and decreases in tollgate taxes (down $6 million), contributions from lottery fund (down $7 million) and other miscellaneous non-tax revenues (down $21 million).

The approval of the proposed budget for fiscal year 2006, together with the different alternatives presented to address the Commonwealth's financial condition, is currently being debated at the Legislature. The president of the budget committee of the Legislature has indicated that he proposes to

approve a different budget that would include expenditure reductions totaling $1.3 billion, making it unnecessary to implement the tax measures being proposed to balance the budget. The Governor has indicated he would not approve a budget with such expenditure reductions. In light of the ongoing public debate over the budget, it is possible that a budget will not be approved by the Legislature by June 30, 2005, the end of the current fiscal year. In the event that the budget is not approved prior to the start of the new fiscal year, the Commonwealth's Constitution provides that the previous fiscal year's budget is automatically renewed until a new budget is developed and approved by the Legislature and signed by the Governor. In the event the budget is not approved and the prior fiscal year's budget is automatically renewed, OMB would have to implement new cost-cutting measures. OMB would likely recommend (i) cuts to all new projects or initiatives; (ii) the elimination of any incremental expenditures in existing projects; and (iii) the reduction of working hours for all non-essential employees. Such cost-cutting measures would be intended to achieve a reduction in expenditures of approximately $1.04 billion.

Current expenses and capital improvements of all budgetary funds total $15.493 billion, an increase of $1,406 million from fiscal year 2005. The major changes in General Fund expenditures by program in fiscal year 2006 are: education (up $368.3 million), health (up $179.4 million), public safety and protection (up $164.6 million), general government (up $106.9 million), economic development (up $59.2 million), debt service on Commonwealth's general obligation and guaranteed debt (up $54.8 million), contributions to municipalities (up $41.3 million), special pension contributions (up $38.9 million), transportation and communications (up $20.6 million), and a decrease in housing (down $1.7 million), welfare (down $20.7 million), and other debt service, consisting principally of Commonwealth appropriation debt (down $228.0 million).

The general obligation bond authorization for the proposed fiscal year 2006 budget is $575 million.

**Differences between Budget and Basic Financial Statements**

Revenue and expenditures, as reported by the Department of the Treasury in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Department of the Treasury include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)     Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

# LITIGATION

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of the Legislature of Puerto Rico, approved on June 25, 1955, as amended ("Act No. 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act No. 104 for damages up to a maximum amount of $75,000 or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of the Legislature of Puerto Rico, approved on November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under Act No. 9.

With respect to pending and threatened litigation, as of June 30, 2004, the Commonwealth has included in its financial statements reported liabilities of approximately $219 million for awarded and anticipated unfavorable judgments. This amount represented the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The Commonwealth believes that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

The Commonwealth is a defendant in a lawsuit filed by an association of primary care health centers seeking to recover from the Commonwealth $120 million of Medicaid funds retained by the Department of Health since 1997. In June 2004, the First Circuit Court of San Juan determined that the Commonwealth must return these funds. The Commonwealth appealed this decision. As of June 30, 2004, the Commonwealth has accrued $120 million for this legal contingency.

The Commonwealth is a defendant in two lawsuits filed in local and federal district court by an association of insurance companies seeking to recover from the Commonwealth approximately $74 million of compulsory motor vehicle insurance premiums allegedly belonging to the insurance companies or their policyholders, which were transferred by the Secretary of the Treasury to the General Fund. The Commonwealth believes that its ultimate liability, if any, would not be significant.

The Commonwealth is also a defendant in a lawsuit filed in local court by the Municipality of Ponce seeking to recover from the Commonwealth approximately $40 million for capital improvements promised to such municipality. The Commonwealth settled these claims out of court as follows: (i) a $5 million cash payment; and (ii) an increase of $20 million in the municipality's existing line of credit for capital improvements.

The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights and other damages. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $7.8 billion; however, the ultimate liability cannot be presently determined. It is the opinion of the Commonwealth that the claims are excessive and exaggerated. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability in excess of amounts provided, if any, would not be significant.

## SIDLEY AUSTIN BROWN & WOOD LLP

**APPENDIX IV**

| | | |
|---|---|---|
| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
| BRUSSELS | NEW YORK, NEW YORK 10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | June ___, 2005 | WASHINGTON, D.C. |

WRITER'S DIRECT NUMBER

WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Jnan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Anthority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), hy and hetween the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and salc of the following described bonds (the "Series 2005A Bonds"):

**$309,102,577.35**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE BONDS, SERIES 2005A**
**Dated: June , 2005.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amonnts, and subject to redemption prior to maturity, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005A Bonds.

We have also examined one of the Series 2005A Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.  The Puerto Rico Infrastructure Financing Authority Act is valid.

2.  Said proceedings have been validly and legally taken.

3.  The Series 2005A Bonds have been duly authorized and issued to provide funds to (i) provide financial assistance to PRASA and other Commonwealth instrumentalities or municipalities in connection with certain capital projects, (ii) repay certain advances made to the Authority by Government Development Bank, and (iii) pay capitalized interest and costs of issuance of the Series 2005A Bouds.

4.  As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005A Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005A Bonds) issued thereunder.

5.  The Trust Agreement provides for the issuance of additional Puerto Rico lnfrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

6.      The Series 2005A Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, as the same become due and payable.

7.      The bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including the Series 2005A Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005A Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005B and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005A Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005A Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005A Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005A Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005A Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005A Bonds and said Series 2005B and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005A Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005A Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
| BRUSSELS | NEW YORK, NEW YORK 10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | | WASHINGTON, D.C. |

June ___, 2005

WRITER'S DIRECT NUMBER

WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No.44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005B Bonds"):

**$324,625,000**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE BONDS, SERIES 2005B**
**Dated: June    , 2005.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005B Bonds.

We have also examined one of the Series 2005B Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.    The Puerto Rico Infrastructure Financing Authority Act is valid.

2.    Said proceedings have been validly and legally taken.

3.    The Series 2005B Bonds have been duly authorized and issued to provide funds to (i) provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (ii) pay capitalized interest and costs of issuance of the Series 2005B Bonds.

4.    As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005B Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005B Bonds) issued thereunder.

5.    The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

6.     The Series 2005B Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement). Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, as the same become due and payable.

7.     The bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005B Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.     Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005B Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005B Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005B Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005B Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005B Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005B Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005B Bonds and said Series 2005A and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005B Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005B Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

IV-4

## SIDLEY AUSTIN BROWN & WOOD LLP

| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
|---|---|---|
| BRUSSELS | NEW YORK, NEW YORK 10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | | WASHINGTON, D.C. |

June ___, 2005

WRITER'S DIRECT NUMBER                                                                    WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005C Bonds"):

<div align="center">

**$699,235,338.80**

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE REFUNDING BONDS, SERIES 2005C**
Dated: June    , 2005.

</div>

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005C Bonds.

We have also examined one of the Series 2005C Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      The Puerto Rico Infrastructure Financing Authority Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Series 2005C Bonds have been duly authorized and issued to (i) provide funds to refund all of the Authority's Special Tax Revenue Bonds, Series 1997A, and (ii) pay costs of issuance of the Series 2005C Bonds.

4.      As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005C Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005C Bonds) issued thereunder.

5.      The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

6.      The Series 2005C Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement). Under the Trust Agreement, the Authority has agreed to

<div align="center">

**IV-5**

</div>

deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued uuder the provisions of the Trust Agreement, including the Series 2005C Bonds, as the same become due and payable.

      7.     The bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005C Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

      8.     Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005C Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005B issued concurrently with the Series 2005C Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005C Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005C Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

      Interest on the Series 2005C Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005C Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

      Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005C Bonds and said Series 2005A and Series 2005B Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005C Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005C Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

<div align="center">Respectfully submitted,</div>

<div align="center">[To be signed "Sidley Austin Brown & Wood LLP"]</div>

| Date | Series 2005 A CABs 07/01/2029 | Series 2005 A CABs 07/01/2030 | Series 2005 A CABs 07/01/2031 | Series 2005 A CABs 07/01/2032 | Series 2005 A CABs 07/01/2033 | Series 2005 A CABs 07/01/2034 | Series 2005 A CABs 07/01/2035 | Series 2005 A CABs 07/01/2036 |
|---|---|---|---|---|---|---|---|---|
| 6/16/2005 | 1,691.20 | 1,600.90 | 1,521.95 | 1,446.30 | 1,373.90 | 1,312.05 | 1,249.30 | 1,192.95 |
| 7/1/2005 | 1,694.35 | 1,603.90 | 1,524.85 | 1,449.10 | 1,376.55 | 1,314.60 | 1,251.75 | 1,195.25 |
| 1/1/2006 | 1,733.00 | 1,640.80 | 1,560.05 | 1,482.70 | 1,408.65 | 1,345.20 | 1,280.95 | 1,223.15 |
| 7/1/2006 | 1,772.50 | 1,678.55 | 1,596.10 | 1,517.10 | 1,441.45 | 1,376.55 | 1,310.85 | 1,251.75 |
| 1/1/2007 | 1,812.95 | 1,717.15 | 1,632.95 | 1,552.30 | 1,475.05 | 1,408.65 | 1,341.50 | 1,280.95 |
| 7/1/2007 | 1,854.25 | 1,756.65 | 1,670.70 | 1,588.30 | 1,509.40 | 1,441.45 | 1,372.80 | 1,310.85 |
| 1/1/2008 | 1,896.55 | 1,797.05 | 1,709.30 | 1,625.15 | 1,544.60 | 1,475.05 | 1,404.85 | 1,341.50 |
| 7/1/2008 | 1,939.80 | 1,838.40 | 1,748.75 | 1,662.85 | 1,580.55 | 1,509.40 | 1,437.65 | 1,372.80 |
| 1/1/2009 | 1,984.00 | 1,880.65 | 1,789.15 | 1,701.45 | 1,617.40 | 1,544.60 | 1,471.25 | 1,404.85 |
| 7/1/2009 | 2,029.25 | 1,923.90 | 1,830.50 | 1,740.90 | 1,655.10 | 1,580.55 | 1,505.60 | 1,437.65 |
| 1/1/2010 | 2,075.50 | 1,968.15 | 1,872.80 | 1,781.30 | 1,693.65 | 1,617.40 | 1,540.75 | 1,471.25 |
| 7/1/2010 | 2,122.85 | 2,013.45 | 1,916.05 | 1,822.65 | 1,733.10 | 1,655.10 | 1,576.70 | 1,505.60 |
| 1/1/2011 | 2,171.25 | 2,059.75 | 1,960.30 | 1,864.90 | 1,773.50 | 1,693.65 | 1,613.55 | 1,540.75 |
| 7/1/2011 | 2,220.75 | 2,107.15 | 2,005.60 | 1,908.20 | 1,814.80 | 1,733.10 | 1,651.20 | 1,576.70 |
| 1/1/2012 | 2,271.40 | 2,155.60 | 2,051.90 | 1,952.45 | 1,857.10 | 1,773.50 | 1,609.75 | 1,613.55 |
| 7/1/2012 | 2,323.15 | 2,205.15 | 2,099.30 | 1,997.75 | 1,900.40 | 1,814.80 | 1,729.20 | 1,651.20 |
| 1/1/2013 | 2,376.15 | 2,255.90 | 2,147.80 | 2,044.10 | 1,944.65 | 1,857.10 | 1,769.60 | 1,689.75 |
| 7/1/2013 | 2,430.30 | 2,307.80 | 2,197.40 | 2,091.55 | 1,989.95 | 1,900.40 | 1,810.90 | 1,729.20 |
| 1/1/2014 | 2,485.75 | 2,360.85 | 2,248.20 | 2,140.05 | 2,036.35 | 1,944.65 | 1,853.20 | 1,769.60 |
| 7/1/2014 | 2,542.40 | 2,415.15 | 2,300.10 | 2,189.70 | 2,083.80 | 1,989.95 | 1,896.50 | 1,810.90 |
| 1/1/2015 | 2,600.35 | 2,470.70 | 2,353.25 | 2,240.50 | 2,132.35 | 2,036.35 | 1,940.75 | 1,853.20 |
| 7/1/2015 | 2,659.65 | 2,527.55 | 2,407.60 | 2,292.50 | 2,182.00 | 2,083.80 | 1,986.10 | 1,896.50 |
| 1/1/2016 | 2,720.30 | 2,585.65 | 2,463.25 | 2,345.65 | 2,232.85 | 2,132.35 | 2,032.45 | 1,940.75 |
| 7/1/2016 | 2,782.30 | 2,645.15 | 2,520.15 | 2,400.10 | 2,284.90 | 2,182.00 | 2,079.90 | 1,986.10 |
| 1/1/2017 | 2,845.75 | 2,706.00 | 2,578.35 | 2,455.80 | 2,338.10 | 2,232.85 | 2,128.50 | 2,032.45 |
| 7/1/2017 | 2,910.65 | 2,768.20 | 2,637.90 | 2,512.75 | 2,392.60 | 2,284.90 | 2,178.20 | 2,079.90 |
| 1/1/2018 | 2,977.00 | 2,831.90 | 2,698.85 | 2,571.05 | 2,448.35 | 2,338.10 | 2,229.05 | 2,128.50 |
| 7/1/2018 | 3,044.90 | 2,897.00 | 2,761.20 | 2,630.70 | 2,505.40 | 2,392.60 | 2,281.10 | 2,178.20 |
| 1/1/2019 | 3,114.30 | 2,963.65 | 2,824.95 | 2,691.75 | 2,563.75 | 2,448.35 | 2,334.35 | 2,229.05 |
| 7/1/2019 | 3,185.30 | 3,031.80 | 2,890.25 | 2,754.20 | 2,623.50 | 2,505.40 | 2,388.85 | 2,281.10 |
| 1/1/2020 | 3,257.95 | 3,101.55 | 2,957.00 | 2,818.10 | 2,684.65 | 2,563.75 | 2,444.65 | 2,334.35 |
| 7/1/2020 | 3,332.20 | 3,172.90 | 3,025.30 | 2,883.45 | 2,747.20 | 2,623.50 | 2,501.75 | 2,388.85 |
| 1/1/2021 | 3,408.20 | 3,245.85 | 3,095.20 | 2,950.35 | 2,811.20 | 2,684.65 | 2,560.15 | 2,444.65 |
| 7/1/2021 | 3,485.80 | 3,320.50 | 3,166.70 | 3,018.80 | 2,876.70 | 2,747.20 | 2,619.90 | 2,501.75 |
| 1/1/2022 | 3,565.40 | 3,396.90 | 3,239.85 | 3,088.85 | 2,943.75 | 2,811.20 | 2,681.10 | 2,560.15 |
| 7/1/2022 | 3,646.65 | 3,475.00 | 3,314.70 | 3,160.50 | 3,012.30 | 2,876.70 | 2,743.70 | 2,619.90 |

Case:17-03283-LTS   Doc#:10602-17   Filed:01/31/20   Entered:01/31/20 18:34:34   Desc:
Exhibit Official Statement   PRIFA Series 2005 Bonds   Page 156 of 169

APPENDIX V

| Date | Series 2005 A CABs 07/01/2029 | Series 2005 A CABs 07/01/2030 | Series 2005 A CABs 07/01/2031 | Series 2005 A CABs 07/01/2032 | Series 2005 A CABs 07/01/2033 | Series 2005 A CABs 07/01/2034 | Series 2005 A CABs 07/01/2035 | Series 2005 A CABs 07/01/2036 |
|---|---|---|---|---|---|---|---|---|
| 1/1/2023 | 3,729.80 | 3,554.95 | 3,391.25 | 3,233.85 | 3,082.50 | 2,943.75 | 2,807.75 | 2,681.10 |
| 7/1/2023 | 3,814.85 | 3,636.70 | 3,469.60 | 3,308.85 | 3,154.35 | 3,012.30 | 2,873.35 | 2,743.70 |
| 1/1/2024 | 3,901.85 | 3,720.35 | 3,549.75 | 3,385.60 | 3,227.85 | 3,082.50 | 2,940.40 | 2,807.75 |
| 7/1/2024 | 3,990.80 | 3,805.90 | 3,631.75 | 3,464.15 | 3,303.05 | 3,154.35 | 3,009.10 | 2,873.35 |
| 1/1/2025 | 4,081.80 | 3,893.45 | 3,715.65 | 3,544.55 | 3,380.00 | 3,227.85 | 3,079.35 | 2,940.40 |
| 7/1/2025 | 4,174.85 | 3,983.00 | 3,801.45 | 3,626.75 | 3,458.75 | 3,303.05 | 3,151.25 | 3,009.10 |
| 1/1/2026 | 4,270.05 | 4,074.60 | 3,889.25 | 3,710.90 | 3,539.35 | 3,380.00 | 3,224.85 | 3,079.35 |
| 7/1/2026 | 4,367.40 | 4,168.35 | 3,979.10 | 3,797.00 | 3,621.80 | 3,458.75 | 3,300.15 | 3,151.25 |
| 1/1/2027 | 4,467.00 | 4,264.20 | 4,071.05 | 3,885.10 | 3,706.20 | 3,539.35 | 3,377.20 | 3,224.85 |
| 7/1/2027 | 4,568.85 | 4,362.30 | 4,165.05 | 3,975.25 | 3,792.55 | 3,621.80 | 3,456.05 | 3,300.15 |
| 1/1/2028 | 4,673.00 | 4,462.60 | 4,261.30 | 4,067.45 | 3,880.90 | 3,706.20 | 3,536.75 | 3,377.20 |
| 7/1/2028 | 4,779.55 | 4,565.25 | 4,359.70 | 4,161.80 | 3,971.35 | 3,792.55 | 3,619.35 | 3,456.05 |
| 1/1/2029 | 4,888.50 | 4,670.25 | 4,460.45 | 4,258.35 | 4,063.90 | 3,880.90 | 3,703.85 | 3,536.75 |
| 7/1/2029 | 5,000.00 | 4,777.65 | 4,563.45 | 4,357.15 | 4,158.55 | 3,971.35 | 3,790.35 | 3,619.35 |
| 1/1/2030 | - | 4,887.55 | 4,668.90 | 4,458.25 | 4,255.45 | 4,063.90 | 3,878.85 | 3,703.85 |
| 7/1/2030 | - | 5,000.00 | 4,776.75 | 4,561.70 | 4,354.60 | 4,158.55 | 3,969.40 | 3,790.35 |
| 1/1/2031 | - | - | 4,887.10 | 4,667.50 | 4,456.10 | 4,255.45 | 4,062.10 | 3,878.85 |
| 7/1/2031 | - | - | 5,000.00 | 4,775.80 | 4,559.90 | 4,354.60 | 4,156.95 | 3,969.40 |
| 1/1/2032 | - | - | - | 4,886.60 | 4,666.15 | 4,456.10 | 4,254.00 | 4,062.10 |
| 7/1/2032 | - | - | - | 5,000.00 | 4,774.85 | 4,559.90 | 4,353.35 | 4,156.95 |
| 1/1/2033 | - | - | - | - | 4,886.15 | 4,666.15 | 4,455.00 | 4,254.00 |
| 7/1/2033 | - | - | - | - | 5,000.00 | 4,774.85 | 4,559.00 | 4,353.35 |
| 1/1/2034 | - | - | - | - | - | 4,886.15 | 4,665.45 | 4,455.00 |
| 7/1/2034 | - | - | - | - | - | 5,000.00 | 4,774.40 | 4,559.00 |
| 1/1/2035 | - | - | - | - | - | - | 4,885.90 | 4,665.45 |
| 7/1/2035 | - | - | - | - | - | - | 5,000.00 | 4,774.40 |
| 1/1/2036 | - | - | - | - | - | - | - | 4,885.90 |
| 7/1/2036 | - | - | - | - | - | - | - | 5,000.00 |
| 1/1/2037 | - | - | - | - | - | - | - | - |
| 7/1/2037 | - | - | - | - | - | - | - | - |
| 1/1/2038 | - | - | - | - | - | - | - | - |
| 7/1/2038 | - | - | - | - | - | - | - | - |
| 1/1/2039 | - | - | - | - | - | - | - | - |
| 7/1/2039 | - | - | - | - | - | - | - | - |
| 1/1/2040 | - | - | - | - | - | - | - | - |
| 7/1/2040 | - | - | - | - | - | - | - | - |

Case:17-03283-LTS   Doc#:10602-17   Filed:01/31/20   Entered:01/31/20 18:34:34   Desc:
Exhibit Official Statement   PRIFA Series 2005 Bonds   Page 158 of 169

| Date | Series 2005 A CABs 07/01/2029 | Series 2005 A CABs 07/01/2030 | Series 2005 A CABs 07/01/2031 | Series 2005 A CABs 07/01/2032 | Series 2005 A CABs 07/01/2033 | Series 2005 A CABs 07/01/2034 | Series 2005 A CABs 07/01/2035 | Series 2005 A CABs 07/01/2036 |
|---|---|---|---|---|---|---|---|---|
| 1/1/2041 | - | - | - | - | - | - | - | - |
| 7/1/2041 | - | - | - | - | - | - | - | - |
| 1/1/2042 | - | - | - | - | - | - | - | - |
| 7/1/2042 | - | - | - | - | - | - | - | - |
| 1/1/2043 | - | - | - | - | - | - | - | - |
| 7/1/2043 | - | - | - | - | - | - | - | - |
| 1/1/2044 | - | - | - | - | - | - | - | - |
| 7/1/2044 | - | - | - | - | - | - | - | - |
| 1/1/2045 | - | - | - | - | - | - | - | - |
| 7/1/2045 | - | - | - | - | - | - | - | - |

Case:17-03283-LTS   Doc#:10602-17   Filed:01/31/20   Entered:01/31/20 18:34:34   Desc:
Exhibit Official Statement   PRIFA Series 2005 Bonds   Page 159 of 169

| Series 2005 A CABs 07/01/2037 | Series 2005 A CABs 07/01/2042 | Series 2005 A CABs 07/01/2043 | Series 2005 A CABs 07/01/2044 | Series 2005 A CABs 07/01/2045 | Date | Series 2005 C CABs 07/01/2028 |
|---|---|---|---|---|---|---|
| 1,139.15 | 872.20 | 832.05 | 793.70 | 757.15 | 6/16/2005 | 1,781.20 |
| 1,141.35 | 873.90 | 833.65 | 795.30 | 758.65 | 7/1/2005 | 1,784.50 |
| 1,168.00 | 894.75 | 853.55 | 814.25 | 776.75 | 1/1/2006 | 1,824.95 |
| 1,195.25 | 916.10 | 873.90 | 833.65 | 795.30 | 7/1/2006 | 1,866.25 |
| 1,223.15 | 937.95 | 894.75 | 853.55 | 814.25 | 1/1/2007 | 1,908.55 |
| 1,251.75 | 960.30 | 916.10 | 873.90 | 833.65 | 7/1/2007 | 1,951.75 |
| 1,280.95 | 983.20 | 937.95 | 894.75 | 853.55 | 1/1/2008 | 1,996.00 |
| 1,310.85 | 1,006.65 | 960.30 | 916.10 | 873.90 | 7/1/2008 | 2,041.20 |
| 1,341.50 | 1,030.70 | 983.20 | 937.95 | 894.75 | 1/1/2009 | 2,087.45 |
| 1,372.80 | 1,055.25 | 1,006.65 | 960.30 | 916.10 | 7/1/2009 | 2,134.70 |
| 1,404.85 | 1,080.45 | 1,030.70 | 983.20 | 937.95 | 1/1/2010 | 2,183.05 |
| 1,437.65 | 1,106.20 | 1,055.25 | 1,006.65 | 960.30 | 7/1/2010 | 2,232.50 |
| 1,471.25 | 1,132.60 | 1,080.45 | 1,030.70 | 983.20 | 1/1/2011 | 2,283.05 |
| 1,505.60 | 1,159.60 | 1,106.20 | 1,055.25 | 1,006.65 | 7/1/2011 | 2,334.80 |
| 1,540.75 | 1,187.25 | 1,132.60 | 1,080.45 | 1,030.70 | 1/1/2012 | 2,387.65 |
| 1,576.70 | 1,215.55 | 1,159.60 | 1,106.20 | 1,055.25 | 7/1/2012 | 2,441.75 |
| 1,613.55 | 1,244.55 | 1,187.25 | 1,132.60 | 1,080.45 | 1/1/2013 | 2,497.05 |
| 1,651.20 | 1,274.25 | 1,215.55 | 1,159.60 | 1,106.20 | 7/1/2013 | 2,553.60 |
| 1,689.75 | 1,304.85 | 1,244.55 | 1,187.25 | 1,132.60 | 1/1/2014 | 2,611.45 |
| 1,729.20 | 1,335.75 | 1,274.25 | 1,215.55 | 1,159.60 | 7/1/2014 | 2,670.60 |
| 1,769.60 | 1,367.60 | 1,304.85 | 1,244.55 | 1,187.25 | 1/1/2015 | 2,731.10 |
| 1,810.90 | 1,400.25 | 1,335.75 | 1,274.25 | 1,215.55 | 7/1/2015 | 2,792.95 |
| 1,853.20 | 1,433.65 | 1,367.60 | 1,304.85 | 1,244.55 | 1/1/2016 | 2,856.20 |
| 1,896.50 | 1,467.80 | 1,400.25 | 1,335.75 | 1,274.25 | 7/1/2016 | 2,920.90 |
| 1,940.75 | 1,502.85 | 1,433.65 | 1,367.60 | 1,304.65 | 1/1/2017 | 2,987.05 |
| 1,986.10 | 1,538.65 | 1,467.80 | 1,400.25 | 1,335.75 | 7/1/2017 | 3,054.70 |
| 2,032.45 | 1,575.35 | 1,502.85 | 1,433.65 | 1,367.60 | 1/1/2018 | 3,123.90 |
| 2,079.90 | 1,612.95 | 1,538.65 | 1,467.80 | 1,400.25 | 7/1/2018 | 3,194.65 |
| 2,128.50 | 1,651.40 | 1,575.35 | 1,502.85 | 1,433.65 | 1/1/2019 | 3,267.05 |
| 2,178.20 | 1,690.80 | 1,612.95 | 1,538.65 | 1,467.80 | 7/1/2019 | 3,341.05 |
| 2,229.05 | 1,731.15 | 1,651.40 | 1,575.35 | 1,502.85 | 1/1/2020 | 3,416.70 |
| 2,281.10 | 1,772.40 | 1,690.80 | 1,612.95 | 1,538.65 | 7/1/2020 | 3,494.10 |
| 2,334.35 | 1,814.70 | 1,731.15 | 1,651.40 | 1,575.35 | 1/1/2021 | 3,573.25 |
| 2,388.55 | 1,857.95 | 1,772.40 | 1,690.80 | 1,612.95 | 7/1/2021 | 3,654.15 |
| 2,444.65 | 1,902.30 | 1,814.70 | 1,731.15 | 1,651.40 | 1/1/2022 | 3,736.95 |
| 2,501.75 | 1,947.65 | 1,857.95 | 1,772.40 | 1,690.80 | 7/1/2022 | 3,821.60 |

V-4

| Series 2005 A CABs 07/01/2037 | Series 2005 A CABs 07/01/2042 | Series 2005 A CABs 07/01/2043 | Series 2005 A CABs 07/01/2044 | Series 2005 A CABs 07/01/2045 | | Date | Series 2005 C CABs 07/01/2028 |
|---|---|---|---|---|---|---|---|
| 2,560.15 | 1,994.10 | 1,902.30 | 1,814.70 | 1,731.15 | | 1/1/2023 | 3,908.15 |
| 2,619.90 | 2,041.65 | 1,947.65 | 1,857.95 | 1,772.40 | | 7/1/2023 | 3,996.65 |
| 2,681.10 | 2,090.35 | 1,994.10 | 1,902.30 | 1,814.70 | | 1/1/2024 | 4,087.20 |
| 2,743.70 | 2,140.20 | 2,041.65 | 1,947.65 | 1,857.95 | | 7/1/2024 | 4,179.75 |
| 2,807.75 | 2,191.25 | 2,090.35 | 1,994.10 | 1,902.30 | | 1/1/2025 | 4,274.45 |
| 2,873.35 | 2,243.50 | 2,140.20 | 2,041.65 | 1,947.65 | | 7/1/2025 | 4,371.25 |
| 2,940.40 | 2,297.05 | 2,191.25 | 2,090.35 | 1,994.10 | | 1/1/2026 | 4,470.25 |
| 3,009.10 | 2,351.80 | 2,243.50 | 2,140.20 | 2,041.65 | | 7/1/2026 | 4,571.50 |
| 3,079.35 | 2,407.90 | 2,297.05 | 2,191.25 | 2,090.35 | | 1/1/2027 | 4,675.05 |
| 3,151.25 | 2,465.35 | 2,351.80 | 2,243.50 | 2,140.20 | | 7/1/2027 | 4,780.95 |
| 3,224.85 | 2,524.15 | 2,407.90 | 2,297.05 | 2,191.25 | | 1/1/2028 | 4,889.25 |
| 3,300.15 | 2,584.35 | 2,465.35 | 2,351.80 | 2,243.50 | | 7/1/2028 | 5,000.00 |
| 3,377.20 | 2,645.95 | 2,524.15 | 2,407.90 | 2,297.05 | | | |
| 3,456.05 | 2,709.10 | 2,584.35 | 2,465.35 | 2,351.80 | | | |
| 3,536.75 | 2,773.70 | 2,645.95 | 2,524.15 | 2,407.90 | | | |
| 3,619.35 | 2,839.85 | 2,709.10 | 2,584.35 | 2,465.35 | | | |
| 3,703.85 | 2,907.55 | 2,773.70 | 2,645.95 | 2,524.15 | | | |
| 3,790.35 | 2,976.90 | 2,839.85 | 2,709.10 | 2,584.35 | | | |
| 3,878.85 | 3,047.90 | 2,907.55 | 2,773.70 | 2,645.95 | | | |
| 3,969.40 | 3,120.60 | 2,976.90 | 2,839.85 | 2,709.10 | | | |
| 4,062.10 | 3,195.05 | 3,047.90 | 2,907.55 | 2,773.70 | | | |
| 4,156.95 | 3,271.25 | 3,120.60 | 2,976.90 | 2,839.85 | | | |
| 4,254.00 | 3,349.25 | 3,195.05 | 3,047.90 | 2,907.55 | | | |
| 4,353.35 | 3,429.15 | 3,271.25 | 3,120.60 | 2,976.90 | | | |
| 4,455.00 | 3,510.95 | 3,349.25 | 3,195.05 | 3,047.90 | | | |
| 4,559.00 | 3,594.65 | 3,429.15 | 3,271.25 | 3,120.60 | | | |
| 4,665.45 | 3,680.40 | 3,510.95 | 3,349.25 | 3,195.05 | | | |
| 4,774.40 | 3,768.20 | 3,594.65 | 3,429.15 | 3,271.25 | | | |
| 4,885.90 | 3,858.05 | 3,680.40 | 3,510.95 | 3,349.25 | | | |
| 5,000.00 | 3,950.05 | 3,768.20 | 3,594.65 | 3,429.15 | | | |
| - | 4,044.25 | 3,858.05 | 3,680.40 | 3,510.95 | | | |
| - | 4,140.75 | 3,950.05 | 3,768.20 | 3,594.65 | | | |
| - | 4,239.50 | 4,044.25 | 3,858.05 | 3,680.40 | | | |
| - | 4,340.60 | 4,140.75 | 3,950.05 | 3,768.20 | | | |
| - | 4,444.10 | 4,239.50 | 4,044.25 | 3,858.05 | | | |
| - | 4,550.10 | 4,340.60 | 4,140.75 | 3,950.05 | | | |

| Series 2005 A CABs 07/01/2037 | Series 2005 A CABs 07/01/2042 | Series 2005 A CABs 07/01/2043 | Series 2005 A CABs 07/01/2044 | Series 2005 A CABs 07/01/2045 | Date | Series 2005 C CABs 07/01/2028 |
|---|---|---|---|---|---|---|
| - | 4,658.65 | 4,444.10 | 4,239.50 | 4,044.25 | | |
| - | 4,769.75 | 4,550.10 | 4,340.60 | 4,140.75 | | |
| - | 4,883.50 | 4,658.65 | 4,444.10 | 4,239.50 | | |
| - | 5,000.00 | 4,769.75 | 4,550.10 | 4,340.60 | | |
| - | - | 4,883.50 | 4,658.65 | 4,444.10 | | |
| - | - | 5,000.00 | 4,769.75 | 4,550.10 | | |
| - | - | - | 4,883.50 | 4,658.65 | | |
| - | - | - | 5,000.00 | 4,769.75 | | |
| - | - | - | - | 4,883.50 | | |
| - | - | - | - | 5,000.00 | | |

V-6

**APPENDIX VI**

## Ambac

**Ambac Assurance Corporation**
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

### Financial Guaranty Insurance Policy

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

**SEAL**

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

VI-1

[This page intentionally left blank]



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212-312-3000
T 800-352-0001

## Municipal Bond
## New Issue Insurance Policy

| Issuer: | | Policy Number: | |
|---|---|---|---|
| | | Control Number: | 0010001 |
| Bonds: | | Premium: | |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of 'all

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                   **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                            Page 1 of 2

VII-2

[This page intentionally left blank]

[This page intentionally left blank]

.

Puerto Rico Infrastructure Financing Authority • Special Tax Revenue Bonds 2005A and 2005B • Special Tax Revenue Refunding Bonds, Series 2005C

Case:17-03283-LTS   Doc#:10602-17   Filed:01/31/20   Entered:01/31/20 18:34:34   Desc:
Exhibit Official Statement   PRIFA Series 2005 Bonds   Page 169 of 169



Recycled Paper • Printed by
IMAGEMASTER 800.452.5152

# 5.  Bacardi Agreement (Dec. 31, 2010), ECF No. 10609-2

EXECUTION VERSION

AGREEMENT

Between

BACARDI INTERNATIONAL LIMITED

BACARDI LIMITED

BACARDI CORPORATION

and

THE GOVERNMENT OF PUERTO RICO

Dated as of December 31, 2010

## AGREEMENT

**THIS AGREEMENT** (this "Agreement"), dated as of the 31ˢᵗ day of December, 2010, is made by and among Bacardi International Limited ("BIL"), Bacardi Corporation ("Corp"), and their parent company Bacardi Limited ("BL") and the Government of Puerto Rico (the "Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"), the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by Act No. 178 of December 1, 2010 (the "Enabling Act"). The Government, BIL, Corp and BL are collectively referred to as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, the Government is committed to promoting the growth, development and diversification of the economy of Puerto Rico ("Puerto Rico"); to promoting capital investment for the economic development of Puerto Rico; and to enhancing the business climate in Puerto Rico, all of which purposes and objectives are declared to be in the public interest; and

WHEREAS, since 1917, United States federal excise taxes on rum produced in Puerto Rico have been "covered-over" or transferred to Puerto Rico pursuant to Section 7652 of the U.S. Internal Revenue Code (the "Cover Over Revenues" as defined herein); and

WHEREAS, the Cover Over Revenues program was later extended to the United States Virgin Islands ("USVI"); and

WHEREAS, since 1999 the rate for the Cover Over Revenues has been set at $13.25 per proof gallon by periodic acts of Congress which have added $2.75 to the permanent cover over rate of $10.50 legislated in 1984; and

WHEREAS, in 2008 and 2009, the USVI entered into long-term agreements with two Bacardi competitors providing for significant incentives by using the Cover Over Revenues funds of the USVI (the "USVI Incentives"); and

WHEREAS, starting in 2012, this is expected to result in a significant competitive disadvantage for companies that produce their rum in Puerto Rico, including Bacardi, when compared to those USVI rum producers, as well as a significant decrease of over $135 million in Cover Over Revenues funds currently covered-over to Puerto Rico; and

WHEREAS, this reduction of over $135 million of the amount received of approximately $434 million in 2009 from all rum produced in Puerto Rico, represents a reduction of more than 30% in the annual Cover Over Revenues funds that Puerto Rico will lose permanently; and

WHEREAS, the BACARDI brand is the global leader among rum brands and the leading rum consumed in the United States and Corp has produced high quality rums in Puerto Rico since 1938; and

WHEREAS, Corp's rum production in Puerto Rico and ultimate sale by BIL and its designated Affiliates in the United States generates currently approximately $258 million in Cover Over Revenues to Puerto Rico; and

WHEREAS, Puerto Rico has used such revenues from the Cover Over Revenues to fund infrastructure and public works programs, support expenditures of the central government, preserve and improve the environment by protecting certain vital ecosystems, support the development of the science and technology industry and promote the Puerto Rican rum industry through its Rums of Puerto Rico program ("ROPR") which is administered by PRIDCO; and

WHEREAS, the Government recognizes that the protection and promotion of the rum production industry in Puerto Rico will have a significant positive impact on the welfare of the community, including the potential for the creation of jobs in Puerto Rico, the protection and increase of Cover Over Revenues to the Puerto Rico treasury, the creation of additional economic opportunities and revenues for other Puerto Rico industries that will support and otherwise do business with Bacardi, and therefore the Government is desirous of maintaining Bacardi's operations in Puerto Rico; and

WHEREAS, BL is the ultimate parent of the Bacardi entities and is a Party to this Agreement to guarantee the performance of its Affiliates of its obligations under the Agreement; and

WHEREAS, BIL as the economic owner of the BACARDI trademark and other trademarks utilized on other rum-based products, is the Bacardi Party of interest in this Agreement; and has contracted with Corp for the production of rum, which BIL sells into the U.S. as BACARDI rum, or other branded rum-based products; and

WHEREAS, other than BIL, Corp has no other prospective purchaser for the amount of Puerto Rican rum that it currently sells to BIL; and Corp is a Party to this Agreement as the producer of rum in Puerto Rico; and

WHEREAS, the Government is entering into this Agreement with Bacardi in reasonable reliance upon the United States Congress ("Congress") longstanding commitment to assist Puerto Rico in attracting and protecting rum production in Puerto Rico through the availability of the rum Cover Over Revenues program; and

WHEREAS, the Parties recognize that Bacardi can locate its current bulk rum manufacturing operation in other jurisdictions or source its bulk rum requirements from existing facilities in other jurisdictions but agree that it would be in the best interests of all Parties if Bacardi maintains significant operations in Puerto Rico; and

WHEREAS, the Government of Puerto Rico understands the importance of taking the steps necessary to maintain Puerto Rico as a competitive jurisdiction for the rum industry especially during the present difficult economic conditions; and

WHEREAS, it is in the best interest of the Government and the people of Puerto Rico that the Government of Puerto Rico enter into this Agreement with Bacardi to assure the continuance of the benefits generated by the Cover Over Revenues program to Puerto Rico.

WHEREAS, in order to maintain, promote and grow the production of BACARDI rum in Puerto Rico and to protect the corresponding Cover Over Revenues, the Parties desire to enter into this long-term Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## GENERAL PROVISIONS

### 1.1 Agreement Scope

Subject to the terms and conditions set forth herein, this Agreement shall become effective as of the date hereof, such date being herein after referred to as, the "Effective Date". This Agreement shall be recorded with the Office of the Comptroller of Puerto Rico, as required by Act No. 18 of October 30, 1975, as amended, within thirty (30) days after the full execution hereof. The Agreement includes this document and any exhibits, attachments, schedules or appendices attached hereto or referenced herein all of which are hereby incorporated by reference. This Agreement shall constitute the valid and binding obligation of the Parties, enforceable against any party in accordance with its terms.

### 1.2 Government Obligations

In consideration of Bacardi's long term commitment to produce rum in Puerto Rico as set forth in this Agreement, the Government agrees to fully perform its obligations as also set forth in this Agreement. The Government shall not support any federal, or Puerto Rico and/or municipal legislation, executive order, regulation, agreement, obligation, legal instrument, or other undertaking which materially impairs or limits the Government's ability to fully perform its obligations as set forth in this Agreement.

### 1.3 No Additional Cost to Bacardi

The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Bacardi be responsible for or be required to incur or pay or reimburse any cost, charge or expense under this Agreement relating to those obligations other than the direct expenses incurred by Bacardi in the negotiation and preparation of this Agreement and those expenses that this Agreement (or the agreement executed pursuant hereto) specifically identifies as a cost, charge or expense to be borne or paid by Bacardi.

### 1.4 Inducement

The Parties acknowledge that (a) the grants, tax, production and marketing incentives granted by the Government hereunder constitute the main inducement for Bacardi to commit to produce rum in Puerto Rico in the long term, (b) absent such grants, tax, production and marketing incentives, due to the USVI Incentives, among other reasons, Bacardi would have serious competitive disadvantages in maintaining its rum producing operations in Puerto Rico for sale in the United States, and (c) Bacardi's development and operation plans with respect to the production of rum in Puerto Rico for sale in the United States rely on the continued availability of such incentives throughout the Term of this Agreement. The Parties also acknowledge that Bacardi's commitment to produce bulk rum in accordance with the terms of this Agreement constitutes one of the main inducements for the Government to provide Bacardi with the grants, tax, production and marketing incentives set forth in this Agreement, which the Parties deem equivalent to the benefits provided by USVI to Bacardi's competitors.

1.5    **Bacardi Obligations**

In consideration of the Government granting the benefits and incentives to Bacardi under this Agreement, which consideration shall be acknowledged by Bacardi upon the full execution, adoption and filing of this Agreement by the Government, Bacardi agrees to obtain all necessary internal approvals prior to the execution of this Agreement and to fully perform its obligations as set forth in this Agreement. Bacardi shall not enter, and shall not cause or suffer its Affiliates to enter, into any contract, agreement, arrangement, undertaking or transaction that materially impairs or limits its ability to fully perform its obligations as set forth in this Agreement.

## ARTICLE II
## DEFINITIONS

2.1    **Defined Terms**

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Affiliate" shall mean with respect to Bacardi any entity which is controlled by or directly or indirectly owned in whole or in part by BL.

"Aggregate Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of all taxable rum sold in the United States during such Fiscal Year attributable to the bulk rum production in Puerto Rico, as reported in the Monthly Cover Over Reports for such Fiscal Year.

"Agreement" shall have the meaning specified in the preamble of this Agreement.

"Bacardi" shall mean BIL, and any affiliate of BIL (including BL or Corp) that is designated by BIL to perform "Bacardi" obligations under this Agreement.

"Bacardi Rum Sales" shall mean, with respect to any Fiscal Year, the number of proof gallons attributable to Bacardi's bulk rum manufacturing operations in Puerto Rico which is sold in the United States during such Fiscal Year, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U.S. Government) for such Fiscal Year under brand names owned or licensed by Bacardi and/or other third party brands including, but not limited to, other products ultimately to be sold to consumers in the United States and sold by Bacardi and/or for resale to Persons other than Bacardi, containing rum manufactured by Bacardi in Puerto Rico, which shall be counted cumulatively toward the incentives provided in this Agreement.

"Cover Over Rate" shall have the meaning specified in Section 4.7.1 hereof.

"Cover Over Revenues" shall mean the federal excise tax revenues payable to the Government by the U.S. Government pursuant to Section 7652(a) of the U.S. Internal Revenue Code or any other statute or regulation which may be substituted for such Section in the future. For purposes of this Agreement, Cover Over Revenues are deemed to be "payable to the Government" in respect of a Fiscal Year when all Monthly Cover Over Reports in respect of such Fiscal Year have been submitted by TTB to the U.S. Department of the Interior and a copy of each has been received by the Puerto Rico Department of the Treasury, and shall be determined without regard to the actual timing of such payment by the U.S. Government. The Cover Over Revenues attributable to any relevant rum sales during any Fiscal Year are determined by multiplying the number of proof gallons of relevant rum sales by a Dollar amount

calculated in accordance with Section 7652 of the U.S. Internal Revenue Code, as applicable to Puerto Rico, and the regulations thereunder for such Fiscal Year.

"Disbursement Agent" shall have the meaning specified in Section 3.4 hereof.

"Dispute" shall have the meaning specified in Section 8.3.1 hereof.

"Economic Development Incentives" shall mean those incentives provided by the Government to Bacardi in accordance with Sections 5.1 and 5.2 hereof.

"Effective Date" shall have the meaning specified in Section 1.1 hereof.

"EPA" shall have the meaning specified in Section 3.3.1 hereof

"Environmental Laws" shall mean any statute, ordinance, rule, regulation, code, policy, interpretation, Permit, license, authorization, order, judgment, injunction, decree or case law principle or doctrine relating to pollution, Hazardous Substances, land use, or protection of human health or the environment.

"Event of Force Majeure" shall mean any act that (a) materially and adversely affects the affected Party's ability to perform the relevant obligations under this Agreement or delays such affected Party's ability to do so, (b) is beyond the reasonable control of the affected Party, (c) is not due to the affected Party's fault or negligence and (d) could not be avoided, by the Party who suffers it, by the exercise of commercially reasonable efforts, including the expenditure of any reasonable sum of money and, subject to the satisfaction of the conditions set forth in (a) through (d) above, an "Event of Force Majeure" shall include: (i) natural phenomena, such as storms, floods, hurricanes and earthquakes; (ii) wars, civil disturbances, revolts, insurrections, terrorism, sabotage and threats of sabotage or terrorism; (iii) transportation disasters, whether by ocean, rail, land or air, (iv) strikes or other labor disputes that are not due to the breach of any labor agreement by the affected Party; (v) fires; and (vi) actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Governmental Rule; provided, however, that under no circumstances shall an Event of Force Majeure include any of the following events: (A) economic hardship; (B) changes in market conditions; (C) any strike or labor dispute involving the employees of Bacardi or any Affiliate of Bacardi, other than industry or nationwide strikes or labor disputes; (D) ordinary weather conditions which could reasonably be managed by experienced contractors operating in the relevant location; (E) the occurrence of any manpower, material or equipment shortages; or (F) any delay, default, or failure (financial or otherwise) of the affected Party that is not the result of an event that would otherwise be an Event of Force Majeure; provided further, that upon the occurrence of any Event of Force Majeure, the affected Party shall promptly notify the unaffected Party and shall use commercially reasonable efforts to mitigate the effects thereof.

"Fiscal Year" shall mean the Government's fiscal year of July 1 through June 30.

"GDB" shall have the meaning specified in the preamble of this Agreement.

"Government" shall mean the government of the Commonwealth of Puerto Rico.

"Governmental Authority" shall mean any federal, Puerto Rico, commonwealth, state, municipal or local governmental entity, authority or agency, department, instrumentality, court, tribunal, regulatory

commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) and any arbitrator to whom a dispute has been presented under Governmental Rule, pursuant to the terms of this Agreement or by agreement of the Parties.

"Governmental Function" means any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government or any of its instrumentalities is authorized or required to perform in its capacity as a Governmental Authority in accordance with Governmental Rules.

"Governmental Rule" shall mean any statute, law, treaty, rule, code, ordinance, regulation, permit, interpretation, certificate or order of any Governmental Authority, or any judgment, decision, decree, injunction, writ, order or like action of any court, arbitrator or other Governmental Authority.

"Hazardous Substances" shall mean any and all pollutants, contaminants, toxic, harmful or hazardous materials, substances or waste, or any other substances that: (a) might pose a hazard to health, safety or the environment, (b) the treatment, decontamination, containment or removal of which may be required; or (c) the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or migration of which is now or hereafter regulated, restricted, prohibited or penalized by any Environmental Law. Hazardous Substances include, without limitation, any substance, material or waste defined, listed or regulated by or in any statute, rule, regulation, Permit or order comprising Environmental Laws, and any other substance, material or waste that is regulated as hazardous, toxic, dangerous, harmful, a pollutant, a contaminant or words of similar meaning, or that because of the nature or characteristics of such substance, material or waste it requires special handling or care to prevent or mitigate a potential threat to human health or the environment.

"Historic Base Level" shall have the meaning specified in Section 4.7.1 hereof.

"Marketing Activities" shall have the meaning specified in Section 4.1.1 hereof.

"Marketing and Production Support Payment" shall have the meaning specified in Section 4.1.3 hereof.

"Material Default" shall mean (a) in the case of Bacardi (i) if Bacardi fails to meet the Minimum Rum Production Requirements by ten percent (10%) or more in any Fiscal Year during the first five Fiscal Years covered by this Agreement commencing on July 1, 2010 and by five percent (5%) or more in any Fiscal Year during the remaining term of this Agreement, in each case, after the expiration of the twelve (12) month cure period as provided in Section 4.7.2 hereof, or (ii) if Bacardi fails to rebuild its manufacturing plant and so re-commence production of bulk rum therein, as provided in Section 4.8.1 hereof, (iii) if any of BIL, BL and Corp provide a false lobbying certification under Section 8.21.1 hereof, (iv) if any of BIL, BL and Corp provide a certification and sworn statement which is found to be intentionally false, misleading, altered or forged under Section 8.21.5 hereof, and (v) if any of BIL, BL and Corp provide a criminal proceedings certification that is not correct in its entirety or in any of its parts under Section 8.21.8 hereof; (b) in the case of the Government (i) if the Refurbishment and Production Initiative payments are not made to Bacardi as provided in Section 3.1 hereof; (ii) the grant for the Treatment Plant is not paid by the Government as provided in Section 3.3 hereof, (iii) the Marketing and Production Support Payments are not paid by the Government as provided in Section 4.1.3 hereof, and (iv) if the Government fails to provide the obligations or other commitments agreed upon in Section 6.3.3 hereof; and (c) in the case of any Party, upon failure of the other Party to perform any other material obligation imposed upon that Party by the Agreement not listed in (a) and (b) above (including but not limited to failure to make a payment when due), if such failure or breach is not cured within ninety (90)

days following written notice, except for Bacardi's noncompliance with the applicable minimum production requirements, which remedies are specified in Section 7.2 hereof.

"Minimum Incentives" shall have the meaning specified in Section 4.1.3 (b) hereof.

"Minimum Rum Production Requirements" shall mean, for the first five (5) years of the Agreement commencing on July 1, 2010, the amount of proof gallons not less than those set forth in Exhibit F hereof, and thereafter, the minimum rum production requirements determined by Bacardi as provided in Section 4.7.1 hereof.

"Monthly Cover Over Reports" shall mean the report of actual monthly collections of federal excise tax revenues pursuant to Section 7652 of the U.S. Internal Revenue Code, which report is prepared immediately following the end of such month by TTB, a copy of which is delivered to the Puerto Rico Department of the Treasury approximately forty-five (45) days after the end of such month and/or any successor report providing the same information.

"Party" or "Parties" shall have the meaning specified in the introduction to this Agreement.

"Permit" or "Permits" means all consents, registrations, filings, licenses, permits, certificates, decrees, approvals, authorizations, qualifications, entitlements and orders of Governmental Authorities.

"Permitted Debt Service Reduction" shall mean for any Fiscal Year, the scheduled principal and interest paid or payable by the Government during such Fiscal Year in respect of any indebtedness issued by the Government on or after July 1, 2012 to finance the Refurbishment and Production Initiatives and, if applicable, the Treatment Plant, as may be reduced from time to time by the application of liquidated damage payments made by Bacardi under Section 7.2.1 hereof; provided, however, that in no event shall the Permitted Debt Service Reduction exceed (i) for the Fiscal Years beginning with the July 1, 2012 Fiscal Year, through the Fiscal Year beginning July 1, 2024, ten percent (10%) of the Cover Over Revenues generated by the Bacardi Rum Sales and (ii) for the Fiscal Year beginning July 1, 2025, and each Fiscal Year thereafter, twelve percent (12%) of the Cover Over Revenues generated by Bacardi Rum Sales.

"Person" means any individual or entity (including any corporation, limited partnership, joint venture, limited liability company, estate, trust or other body).

"PRIDCO" shall have the meaning specified in the preamble of this Agreement.

"Production Activities" shall have the meaning specified in Section 4.1.2 hereof.

"Project" shall mean the design, construction, ownership and operation of a sugar-cane agricultural/industrial project and rum production facility in Puerto Rico as further described in Section 3.2.2 hereof, for the potential benefit of rum producers in Puerto Rico, including Bacardi.

"Project Site" shall mean up to 28,000 acres of land, on a site or sites selected by the Government assembled, dedicated and suitable for the Project.

"Puerto Rico" shall mean the Commonwealth of Puerto Rico.

"Puerto Rico Tax Code" shall mean the Puerto Rico Internal Revenue Code of 1994, as from time to time amended.

"Recapture Amount" shall have the meaning specified in Section 7.2.1 hereof.

"Refurbishment and Production Initiatives" shall have the meaning specified in Section 3.1 hereof.

"ROPR" shall have the meaning specified in the Recitals hereof.

"Tax or Taxes" shall mean any form of tax including alternative minimum tax or any levy, impost, duty, surcharge, contribution or withholding in the nature of tax (including without limitation; income tax, capital tax, gross receipts tax, volume of business tax (patente), excise tax, franchise tax, sales and use tax, value added tax, land or, mortgage registration tax or fee, recording and filing fees, among others, and real estate and personal property tax imposed, collected or assessed by, or payable to a Tax Authority and all interest, surcharges and penalties included in or related to any Tax.

"Tax Authority" shall mean any governmental or municipality body of Puerto Rico competent to impose or collect or assess any tax in Puerto Rico.

"Tax Free" shall mean that the grants and incentives granted and paid to Bacardi by the Government as Refurbishment and Production Initiatives, Treatment Plant Grant, and Marketing and Production Support Payments under Articles III and IV of this Agreement shall be totally exempt from the payment of any Taxes imposed by a Tax Authority.

"Term" shall have the meaning set forth in Section 8.15 of this Agreement.

"Treatment Plant" shall have the meaning specified in Section 3.3.1 hereof.

"TTB" shall mean the U.S. Alcohol and Tobacco Tax and Trade Bureau.

"United States" shall mean the continental United States, Hawaii and Alaska.

"U.S. Government" shall mean the federal government of the United States of America.

"USVI Incentives" shall have the meaning specified in the Recitals.

# ARTICLE III
## INFRASTRUCTURE SUPPORT FOR REFURBISHMENT AND RUM PRODUCTION; THE PROJECT AND THE TREATMENT PLANT

### 3.1 **Infrastructure Support**

3.1.1 Following the Effective Date, the Government will make available to BIL (or an Affiliate designated by BIL) a Ninety Five Million Dollar ($95,000,000.00) grant to refurbish Bacardi's rum producing facilities in Cataño, Puerto Rico, and to increase Bacardi's aging warehouse capacity as described in Exhibit A hereto (the "Refurbishment and Production Initiatives"). Such funds will be disbursed on a Tax Free basis by the Government to BIL (or an Affiliate designated by BIL) as agreed by the parties in accordance with the improvement and construction schedule described in Schedule 3.1 of this Agreement subject to BIL submitting the necessary certifications and/or backup invoices to the Disbursement Agent as described in Section 3.4 hereof. The Refurbishment and Production Initiatives payments will constitute non-shareholder capital contributions by the Government to BIL or to its designated Affiliate(s), as the case may be.

3.1.2 The Government shall make all efforts and take such actions reasonably necessary, to the fullest extent permitted by law, to assist Bacardi (and, where applicable, its contractors and subcontractors), in Bacardi's expeditious filing of all applications for and obtaining, maintaining and renewing all Permits with respect to the Refurbishment and Production Initiatives. The Government shall take all feasible and lawful measures necessary to have all Permits under its jurisdiction issued in compliance with applicable law as soon as is practicable.

## 3.2   Development of the Project

3.2.1 Following the Effective Date, the Government will use its reasonable best efforts to develop the Project. In this respect, the Government's obligations to (x) acquire, through lease or purchase, the Project Site, (y) cause the Project to be designed, developed, constructed, and equipped, and (z) commence operations of the Project in a timely manner, are conditioned upon the following requirements:

(a) The economic, commercial and environmental feasibility of the Project itself to the Government, the EPA and Bacardi based upon a feasibility study which shall include, among other considerations, the items described in Schedule 3.2.1(a) of this Agreement and the following:

(i) the Project shall provide a long term solution for the disposition of distillery waste water (also known as vinasses), in accordance with EPA and EQB requirements;

(ii) the Project shall provide for the production of aguardiente and light cane distillate at a cost acceptable to the majority of the rum producers in Puerto Rico; and,

(iii) the Government will make its reasonable best efforts to develop a Project that shall be a financially viable independent business that can attract a professional third party_ to administer the same;

(b) The Government's ability to secure a Project Site in Puerto Rico on a commercially reasonable basis that is appropriate to develop the Project;

(c) The Government's ability to timely obtain such Permits as may be necessary to construct, equip and operate the Project; and

(d) The Government's ability to find a joint venture entity or third party to be selected by the Government and acceptable to the majority of the rum producers in Puerto Rico to operate the Project.

3.2.2 Subject to Section 3.2.1 above, the Government will use its reasonable best efforts to:

(a) identify among its own existing lands or acquire, through lease or purchase, an appropriate Project Site in Puerto Rico upon which the Project shall be developed to produce raw materials for the production of rum in Puerto Rico, including sugar, alcohol and energy, while integrating the disposal of by-products as described in Exhibit B hereto. The Government would own but not operate the Project. It is intended that the Government would enter into a long-term lease or concession agreement for the operation of the Project with a joint venture entity or third

party to be selected by the Government and acceptable to the majority of rum producers in Puerto Rico; and

(b) cause the Project to be designed, developed, constructed, equipped and operated in accordance with all applicable laws and regulations, including applicable Environmental Laws, as soon as reasonably practicable.

3.2.3 The Parties agree that it is in the Parties' best interests for the design, development, construction, equipping and operational start up of the Project to proceed on an expeditious basis. In this respect, the Project must be endorsed as a viable alternative to the Treatment Plant by the EPA on or before September 1, 2012 and shall be operational, as an acceptable alternative to the Treatment Plant, in accordance with a timetable agreeable to the Government, EPA and Bacardi.

3.2.4. Bacardi shall reasonably cooperate with the Government in the design, feasibility analysis and development of the Project providing internal technical assistance and other internal resources to be determined by Bacardi, at no additional cost to Bacardi or the Government, to assist in the areas of industrial rum production and waste treatment, as provided in Schedule 3.2.4 of this Agreement.

## 3.3 Treatment Plant

3.3.1 The Parties acknowledge that in order for Bacardi to continue its operations in Puerto Rico, it needs a long term alternative for the treatment of vinasses, either an environmentally desirable alternative as described in the Project or engage in the construction of a waste water treatment plant as described in Exhibit C hereto (the "Treatment Plant") to fully comply with current and future requirements of the Puerto Rico Environmental Quality Board ("EQB") and U.S. Environmental Protection Agency ("EPA"), at a currently estimated construction cost of approximately Fifty Million Dollars ($50,000,000.00). It is expected that Bacardi may not need to construct the Treatment Plant if the Project is completed on a timely basis. However, (a) if by September 1, 2012, there is not a final approval of the environmental impact review document of the Project by the Puerto Rico Permit Management Office, or, (b) if by September 1, 2012, after a complete review and assessment by the Government and Bacardi, the Project is deemed not to be feasible, from an economic perspective or otherwise, by the Government or Bacardi in their reasonable judgment, or (c) if after September 1, 2012, (i) the Project falls behind schedule to a degree that would preclude Bacardi from reasonably concluding that it will be in compliance with the applicable waste water treatment regulatory requirements of its operations in Cataño, Puerto Rico, (ii) despite Bacardi's and the Government's best efforts, Bacardi is unable to obtain the necessary extensions or permits from the environmental agencies to account for the delays in the development schedule of the Project and a Treatment Plant could be completed and operational before the environmentally desirable alternative described in the Project would be completed, and (iii) the Government has not incurred costs associated with the Project in excess of Twenty Million Dollars ($20,000,000), the Government will provide, at Bacardi's request, a Tax Free grant of Fifty Million Dollars ($50,000,000.00) (subject to U.S. inflationary cost adjustments) to BIL, or an Affiliate designated by BIL, for the construction of the Treatment Plant in accordance with Schedule 3.1 hereof and such grant (the "Treatment Plant Grant") will constitute a non-shareholder capital contribution by the Government; provided, however, that upon the occurrence of (a), (b) or (c), above, the Government, at its sole discretion, may choose to discontinue the Project. For purposes of (c)(iii), above, the Government and Bacardi shall establish an estimated budget of costs, which shall be updated quarterly to reflect actual costs. Once the costs incurred by the Government associated with the Project have reached Fifteen Million Dollars ($15,000,000), Bacardi will have the right to request a monthly update of actual costs for the Project but no more than one update per month.

3.3.2   The Government shall do all things and take such actions reasonably necessary, to the fullest extent permitted by law, to assist Bacardi (and, where applicable, its contractors and subcontractors), in Bacardi's expeditious filing of all applications for and obtaining, maintaining and renewing all Permits with respect to the Treatment Plant. The Government shall take all feasible and lawful measures necessary to have all Permits under its jurisdiction issued in compliance with applicable law as soon as it is practicable.

### 3.4   Disbursements of Incentives and Grant

The Refurbishment and Production Initiative payments  and the Treatment Plant Grant will be disbursed by PRIDCO (the "Disbursement Agent") following the Effective Date as Bacardi incurs the expenses described in Exhibit A and Exhibit C, and submits reasonable evidence and certifications to the Disbursement Agent of the equipment and materials ordered and /or the work performed. Payment will be made by the Disbursement Agent to Bacardi within thirty (30) days of the submission of such evidence.

## ARTICLE IV

## MARKETING AND PRODUCTION SUPPORT PAYMENTS

### 4.1   Marketing Activities; Production Activities; Marketing and Production Support Payments

#### 4.1.1   Marketing Activities.

(a)   Bacardi shall perform or shall cause its Affiliates to perform marketing activities, including, but not limited to, the marketing activities pre-approved by the Government which are specified in Exhibit D hereof (the "Marketing Activities").

(b)   Bacardi's Marketing Activities shall be in furtherance of its promotion of Bacardi's rum products (or any other third party products or brands in the United States utilizing the bulk rum produced by Bacardi in Puerto Rico for sale in the United States, and when advisable from a marketing standpoint, for the promotion of "Puerto Rican Rums".

(c)   Bacardi shall annually report to the Government on the content and effectiveness of the Marketing Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Bacardi to discuss the Marketing Activities and its progress in promoting Bacardi's rum products utilizing bulk rum produced in Puerto Rico for sale in the United States.

#### 4.1.2   Production Activities.

(a)   Bacardi shall perform or shall cause one of its designated Affiliates to perform production activities to support and promote the continued production of bulk rum by Bacardi in Puerto Rico (the "Production Activities").

(b)   Bacardi's Production Activities shall be in furtherance of its production of Bacardi's rum products (or any other third party products or brands) utilizing the bulk rum produced by Bacardi in Puerto Rico for sale in the United States.

(c) Bacardi shall annually report to the Government on the content and effectiveness of the Production Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Bacardi to discuss the Production Activities and its progress in producing Bacardi's rum products (or any other third party products) in Puerto Rico for sale in the United States.

### 4.1.3 **Marketing and Production Support Payments.**

(a) So long as the Cover Over Revenues are paid or transferred to Puerto Rico, from the Effective Date of the Agreement, the Government agrees to make marketing and production support payments (the "Marketing and Production Support Payments") to BIL, or an Affiliate designated by BIL, of ten percent (10%), or such other higher percentage agreed upon as provided for in this Agreement, of the Cover Over Revenues attributable to Bacardi Rum Sales for each Fiscal Year. The Marketing and Production Support Payments to BIL, or an Affiliate designated by BIL, will be for each Fiscal Year covered by this Agreement beginning with the Fiscal Year commencing on July 1, 2010.

(b) The Parties acknowledge that, notwithstanding the Refurbishment and Production Initiatives described in Section 3.1 and the Marketing and Production Support Payments described in Section 4.1.3 (a) above, the USVI Incentives are expected to result in a competitive disadvantage for Bacardi. As a result, Bacardi and the Government agree to support joint efforts to promote legislation at the United States federal level to limit the direct and indirect assistance provided to companies producing rum in Puerto Rico or USVI and selling it in the United States until December 31, 2011; provided that said support is reasonable and appropriate and such legal limits allow for the Government to provide Bacardi with, at least, 10% of the Cover Over Revenues attributable to Bacardi Rum Sales paid annually for Marketing and Production Support Payments (excluding any Permitted Debt Service Reduction) the Refurbishment and Production Initiatives and the Treatment Plant Grant, if any, to Bacardi (the "Minimum Incentives").

(c) Bacardi and the Government agree that, to the extent that, despite the Parties' efforts, the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to a particular competitor on December 31, 2011, the Government will take the necessary action as contemplated in the Enabling Act to provide Bacardi, commencing in the Fiscal Year starting on July 1, 2012, with additional Marketing and Production Support Payments equivalent to forty-six percent (46%) of the Cover Over Revenues attributable to Bacardi Rum Sales in respect of such Fiscal Year less any Permitted Debt Service Reduction, as provided in Section 4.1.3 (g) hereof. In this respect, the Government may provide such additional Marketing and Production Support Payments from any available sources of revenue, in its sole discretion. All such grants to provide financial support for Marketing and Production Support Payments will constitute non-shareholder capital contributions by the Government to BIL or to its designated Affiliates(s), as the case may be.

(d) [Intentionally left in blank]

(e) If following the Effective Date, other incentives are granted by the Government to any Bacardi competitor which result, in the aggregate, in a larger percentage of Cover Over Revenues or total economic incentives, provided to said competitor than the percentage of the Cover Over Revenues provided to Bacardi under this Agreement, then additional benefits will be also granted to Bacardi, as necessary, without any further amendment to the Agreement, unless such competitors sell in the United States less than five percent (5%) of Bacardi's proof gallons of rum produced in Puerto Rico for sale in the United States, in which case, the Government will

disclose to Bacardi the terms and conditions of any such incentives at the request of Bacardi, as permitted by law. If, following the Effective Date, incentives to Bacardi competitors in the USVI (including through a percentage of Cover Over Revenues and total economic incentives) are increased above forty seven point five percent (47.5%), the Parties agree to negotiate in good faith and, if necessary, amend the terms of this Agreement to provide additional Marketing and Production Support Payments to Bacardi. If, however, the Parties are not able to reach an agreement on the amount of such additional Marketing and Production Support Payments within ninety (90) days, Bacardi shall have the right to request a final thirty (30) day negotiation period with the Government. If the Parties cannot reach an agreement during this final 30-day negotiation period, Bacardi shall have the right to terminate the Agreement.

(f) If federal legislation is passed that places a limit on the direct or indirect assistance from Cover Over Revenues provided to companies producing rum in Puerto Rico and the USVI and selling it in the United States, the Parties agree to within sixty (60) days from the signing into law of the new legislation, to amend the Agreement accordingly, if necessary, to comply with such legislation and to provide Bacardi with grants, production and marketing incentives in such percentage of the Cover Over Revenues attributable to Bacardi Rum Sales which is equivalent to the benefits provided by USVI to Bacardi's largest competitor in that jurisdiction under such new limitations but which are, in no event, lower than the Minimum Incentives.

(g) The total amount of the Marketing and Production Support Payments due to be paid to BIL and its Affiliates in any Fiscal Year from July 1, 2010 to June 30, 2012, shall be ten percent (10%) of the Cover Over Revenues attributable to Bacardi Rum Sales in respect of such Fiscal Year, which amount shall be payable in full without any deduction, withholding or discount whatsoever. Beginning with the Fiscal Year commencing on July 1, 2012 and for each Fiscal Year thereafter, the total amount of Marketing and Production Support Payments due to be paid to BIL and its Affiliates in any Fiscal Year under this Agreement shall be forty six percent (46%) of the Cover Over Revenues attributable to the Bacardi Rum Sales in respect of such Fiscal Year, *less* the Permitted Debt Service Reduction, if any, for such Fiscal Year; provided, however, that the total amount of Marketing and Production Support Payments may be lowered to the extent permitted by Section 4.1.3 (f). If, in any Fiscal Year, the Permitted Debt Service Reduction exceeds the Marketing and Production Support Payment to which Bacardi is entitled, then the excess shall be rolled-over and applied as a reduction to the Marketing and Production Support Payment for the following Fiscal Year.

4.1.4. The foregoing provision shall not give BIL any rights with respect to the Cover Over Revenues of the Government but the Government covenants that it will provide the Marketing and Production Support Payments set forth in this Agreement from any available sources of revenue, in its sole discretion.

4.1.5 If the Marketing and Production Support Payments are timely and properly made to Bacardi by the Government, PRIDCO or any other designated agency, and economic conditions in the United States improve as expected by Bacardi, then Bacardi expects to achieve, for each fiscal year covered by the initial 20-year term of the Agreement, the range of projections of Bacardi Rum Sales (in numbers of proof gallons) set forth in Exhibit E hereto. The Parties understand and agree that the immediately preceding sentence shall be deemed to be an indication of the anticipated normal business trajectory of Bacardi under facts currently known or anticipated, and shall not be deemed to be a legal commitment, representation, warranty, or guarantee of results except for the Minimum Rum Production Requirements.

## 4.2 **Marketing and Production Activities**

4.2.1 Subject to the limitations in Sections 4.2.2 and 4.2.3, BIL shall be permitted to use any such Marketing and Production Support Payments to fund any and all Marketing Activities and Production Activities for its rum products produced in Puerto Rico for sale in the United States market in any manner that is reasonably expected to promote or benefit Bacardi Rums Sales in the United States.

4.2.2 With respect to the Marketing and Production Support Payments, (i) any and all Marketing Activities and Production Activities funded with Marketing and Production Support Payments will be disbursed through the Government, PRIDCO or any other designated agency, and (ii) BIL shall file with the Government through PRIDCO or any other designated agency, an annual plan for the Marketing Activities for each Fiscal Year.

4.2.3 All advertisement (print, broadcast or otherwise) placed using the Marketing and Production Support Payments will be so placed through a media agency designated by the Government through PRIDCO or any other designated agency, which shall provide its services at competitive fees, including matching any fee by BIL's own U.S. advertising agency in compliance with Section 4.2.4 hereof. Bacardi by itself or through an independent third party shall have the right, at its own cost, to make an annual audit of Bacardi's media campaign placed by the agency designated by the Government.

4.2.4 Both parties agree to the following mechanism to replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Bacardi's own U.S. advertising agency, if Bacardi is not satisfied with, among other criteria, the services, efficiency or fees offered by the media agency designated by the Government;

(a) Bacardi shall use, at its own cost, an outside media agency to audit the Government's designated media agency's performance based on its media purchasing power, measured by its costs per Total Gross Rating Points ("TGRP's");

(b) Bacardi shall compare the Government's agency media plan, as if said plan were to be executed by its US agency, and assess for efficiencies;

(c) Bacardi shall evaluate the Government's media agency turnaround performance and/or media placement to be within industry standards;

(d) Bacardi shall notify the Government of its media agency deficiencies and the Government's media agency shall have a thirty (30) day to cure said deficiencies; and

(e) If the Government's designated media agency fails to cure the deficiencies notified by Bacardi or continuously fails to comply with the considerations described in this Section 4.2.4, Bacardi shall notify the Government of its dissatisfaction with said media agency and the Government shall replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Bacardi's own U.S. advertising agency.

Bacardi and the Government will work together to maximize media buying efficiencies for both parties.

### 4.3    Use of Bacardi's Image

Use of Bacardi's intellectual property (including, without limitation, proprietary names, logos, bottle shapes, etc.) by ROPR will require Bacardi's prior written approval, which may be withheld, in its sole discretion. The Parties agree that the marketing and advertisement of the Bacardi brand products shall be under the exclusive control of Bacardi.

### 4.4    Promotion of Bacardi's Rum Brand

BIL's Marketing Activities shall be in furtherance of its promotion of the Bacardi rum brand in the United States (or any other products utilizing bulk rum produced by Bacardi in Puerto Rico for sale in the United States), and when advisable from a marketing viewpoint, it may also promote the "Rums of Puerto Rico" brand, in the United States.

### 4.5    Labeling

The Secretary of the Treasury and the Executive Director of PRIDCO hereby allow Bacardi to exclude from the labels of all its bottled rum products produced in Puerto Rico for sale in the United States the words "Rums of Puerto Rico" and/or "Puerto Rican Rum". Bacardi and the Government agree within one hundred and twenty (120) days from the signing of this Agreement to work together to develop a quality seal of approval, or other written reference to Puerto Rico that will be included on the back label of those rum products, which promotes Puerto Rico.

### 4.6    Payment Procedure and Timing

4.6.1    Under current Act No. 119 of July 8, 2006 and existing contractual obligations, the first $117 million of Cover Over Revenues received by the Government in each Fiscal Year through fiscal 2057 are pledged and have to be transferred to the Puerto Rico Financing Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Pledged Cover Over Requirement). For Fiscal Year 2010-2011, upon completion of the Pledged Cover Over Requirement, the Government will pay to BIL on or before February 28, 2011, its corresponding percentage of the Cover Over Revenues attributable to Bacardi Rum Sales with respect to said $117 million in the form of Marketing and Production Support Payments from any available sources of revenue, in its sole discretion. Thereafter, including subsequent Fiscal Years, the Marketing and Production Support Payments will be paid on a monthly basis as the Government receives and identifies the Cover Over Revenues attributable to the Bacardi Rum Sales as further described below once the Pledged Cover Over Requirement is satisfied.

4.6.2    The Cover Over Revenues received by the Government are transferred monthly to the Puerto Rico Treasury Department by the Alcohol and Tobacco Tax and Trade Bureau of the U.S. Department of Treasury, based on the net rum excise tax collected in the previous months. The Cover Over Revenues are transferred to the Government via the Automated Clearing House network with a two month lag. The Monthly Cover Over Reports often reflect adjustments to the Cover Over Revenues previously received by the Government in the current or prior Fiscal Years (the "Federal Adjustment").

4.6.3    Upon receipt of the Monthly Cover Over  Report and other reports  containing information on Bacardi Rum Sales from the U.S. Government or Bacardi, including reports filed by Bacardi with the U.S. Government,  the Government shall cause the Marketing and Production Support Payment due to BIL from the Bacardi Rum Sales to be deposited in a segregated account to be established for such purpose and to be distributed to BIL within thirty (30) days.

4.6.4    The Parties agree that:

    (a)    Bacardi will submit monthly reports to the Puerto Rico Treasury Department with copies to PRIDCO and the GDB of the Bacardi Rum Sales and the federal excise taxes paid to the U. S. Government to facilitate the review and processing of the Marketing and Production Support Payments by the Government.

    (b)    On September of each year, the Puerto Rico Treasury Department will prepare and submit to Bacardi a certified report on the Bacardi Rum Sales for the prior Fiscal Year based on the Monthly Cover Over Reports or such other reports from the U.S. Government that contain information on the Bacardi Rum Sales, in order to determine if, due to the Federal Adjustments, any true-up adjustments have to be made (upwards or downwards) on the Marketing and Production Support Payments paid during the immediately preceding Fiscal Year. If the adjustment is in favor of Bacardi and the adjustment does not exceed five percent (5%) of the total incentives paid by the Government to Bacardi under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid to Bacardi on or prior to October 30 of such year. If the adjustment is in favor of Bacardi and the adjustment exceeds five percent (5%) of the total incentives paid by the Government to Bacardi under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid in three (3) equal end of the month installments in October, November and December of such year.

## 4.7    Minimum Rum Production Requirements

4.7.1    Provided that (i) the Cover Over Revenue determined in accordance with Section 7652(a) of the U.S. Internal Revenue Code (the "Cover Over Rate") is not reduced below its historic base level of US $10.50 per proof gallon of Bacardi Rum Sales with respect to Aggregate Rum Sales (the "Historic Base Level") and (ii) the incentives granted by the Government to Bacardi under sections 3.1, 3.3,4.1 and 5.1, as applicable, of this Agreement have not been materially reduced or made unavailable to Bacardi, Bacardi shall produce bulk rum for sale in the United States in amounts not less than those set forth in Exhibit F to this Agreement for the first five (5) Fiscal Years commencing on July 1, 2010, unless the occurrence of an Event of Force Majeure prevents such production during the duration of such Event of Force Majeure. Thereafter, for subsequent Fiscal Years during the reminder of the initial 20-year term and any extension or renewal term, Bacardi shall determine its minimum production requirements every five (5) years based upon the average of the bulk Bacardi Rum Sales for the previous five (5) year period, subject to Bacardi's right to adjust the minimum production requirements by up to twenty five percent (25%) above or up to twenty percent (20%) below the average of the bulk Bacardi Rum Sales for the previous five (5) year period. Each five (5) year estimate shall be delivered by Bacardi to the Government within sixty (60) days after the beginning of each five (5) year period. For each such five (5) year period, Bacardi shall produce bulk rum in Puerto Rico for sale in the United States at least equal to the amounts so determined, unless the occurrence of an Event of Force Majeure prevents such production. Except as otherwise agreed in Section 4.7.3, any other changes in Minimum Rum Production Requirements shall require the mutual agreement of the parties.

4.7.2    If at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months or the Economic Development Incentives granted by the Government to Bacardi are materially reduced or unavailable to Bacardi (other than as a result of Bacardi's failure to comply with any contractual or legal requirements) for a period greater than twelve (12) months, Bacardi shall not be obligated to make Bacardi Rum Sales and may terminate this Agreement with thirty (30) day prior written notice to the Government.

4.7.3  If Bacardi cannot perform the applicable Minimum Rum Production Requirements by reason of any Event of Force Majeure, the Government will waive Bacardi's compliance with the minimum production requirements during the duration of the Event of Force Majeure. Upon the occurrence of a Event of Force Majeure, Bacardi shall promptly notify the Government and shall use commercially reasonable efforts to mitigate the effect thereof.

## 4.8    **Further Obligations**

4.8.1  After the completion of construction and commencement of commercial operation of the Refurbishment and Production Initiatives project or the Treatment Plant, as the case may be, and following the occurrence of fire or other damage to the Bacardi's manufacturing plant resulting in a commercially significant reduction in the output of rum that can be produced by Bacardi in Puerto Rico and that is caused by an event that is insurable at the time of the occurrence of the event at commercially reasonable rates, Bacardi agrees to rebuild its manufacturing plant in Cataño, Puerto Rico and re-commence production of bulk rum therein as soon as reasonably possible after the occurrence of such event of loss at the levels of production required by this Agreement. If Bacardi fails to so rebuild its manufacturing plant and so re-commence production of bulk rum therein, such failure shall be a Material Default and the Government may terminate this Agreement.

4.8.2  Bacardi agrees to maintain commercially reasonable insurance against the property damage risks described in Section 4.8.1 above either as part of the global insurance program for the portfolio of facilities operated by Bacardi or on a stand-alone basis, at the discretion of Bacardi. The proceeds from any claim made on such insurance shall be available to Bacardi toward the satisfaction of its obligations under this Agreement.

## ARTICLE V

## ECONOMIC DEVELOPMENT INCENTIVES AND OBLIGATIONS

### 5.1    **Economic Development Incentives; Tax Exemptions**

Bacardi currently enjoys certain tax exemptions pursuant to the Tax Grant No. 98-135- 1-45 (the "Tax Grant") issued under Act No. 135 of December 2, 1997, as amended ("Law 135"), and under Act No. 78 of September 10, 1993, as amended ("Law 78"). The Government agrees that nothing in this Agreement shall adversely affect the rights of Corp to retain, enjoy and obtain the tax incentives and benefits described in the Tax Grant or under Law 135 and Law 78.

### 5.2    **Tax Free Payments.**

All payments made by the Government to Bacardi as Refurbishment and Production Initiatives, Treatment Plant Grant and Marketing and Production Support Payments pursuant to Article III and Article IV hereof shall be in the nature of non-shareholder contributions and shall be disbursed Tax Free to Bacardi and not be subject to any tax, deduction or withholding on the part of the Government or its Tax Authorities. The Government hereby acknowledges that Bacardi will be entitled to receive such Tax Free treatment without the need for any formal application procedure by Bacardi. Other than the terms of this Article V, there shall be no additional conditions or requirements imposed upon Bacardi that could result in the suspension, revocation or reduction of such Tax Free treatment.

5.3 **No Adverse Actions.**

The Government hereby agrees and covenants with Bacardi that, except as otherwise provided in this Agreement and to the extent permitted by law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Bacardi to lose any applicable Tax, exemptions or benefits granted to Bacardi pursuant to this Agreement or any extension thereto.

5.4 **Effective Date**

The effective date of the benefits granted under Section 5.2 hereof shall be July 1, 2010.

## ARTICLE VI

## REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

### 6.1 Representations, Warranties and Acknowledgements

6.1.1 The Government hereby represents and warrants to Bacardi as of the Effective Date that:

(a) The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order or judgment;

(b) The Government has: (i) the legal power, due authority and necessary and adequate funding ability to execute and deliver this Agreement, to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; (ii) duly obtained such approvals, authorizations, or consents in accordance with applicable law and procedures to the extent that the approval, authorization, or consent of the federal or any other local government or agency or any third party to make the representations and perform its obligations contained herein is required; and (iii) with respect to the funding commitments made by the Government hereunder, such funding commitment has been, or on or prior to the date of issuance and disbursement of any proceeds thereof, and throughout the period that the same is outstanding, shall be properly budgeted and authorized pursuant to all applicable law;

(c) The Government knows of no material impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder; and

(d) There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out its obligations under this Agreement.

6.1.2    Each of BIL, BL and Corp hereby represents and warrants to the Government as of the Effective Date that:

(a)    BIL, BL and Corp are corporations duly organized and validly existing under the laws of their respective jurisdictions and have the corporate power and authority, and have taken all necessary action to authorize them, to execute and deliver this Agreement and to perform their obligations hereunder.

(b)    The execution, delivery and performance by BIL, BL and Corp of this Agreement do not violate or conflict with, or result in a default under, any material contract or agreement to which they are bound or any of their respective organizational documents.

(c)    Assuming due authorization, execution and delivery of this Agreement by the Government, this Agreement is the legal, valid and binding obligation of each BIL, BL and Corp, enforceable against each of them in accordance with its terms, subject to the effects of bankruptcy or insolvency or laws affecting creditors' rights generally.

(d)    There are no actions, suits or proceedings pending or, to the best of BIL, BL and Corp's knowledge, threatened against or affecting BIL, BL and Corp before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of BIL, BL and Corp to meet and carry out their obligations under this Agreement.

(e)    Neither BIL, nor BL nor Corp or their Affiliates is involved in any litigation, arbitration or claim against the Government.

## 6.2    Government Debt Financing

If the Government elects to use debt financing to fund the Refurbishment and Production Initiatives payments and the Treatment Plant Grant, if any, it will use its best efforts to obtain the best financing rate available to the Government, but shall be entitled, in its sole discretion, to determine the amortization period for the principal on such Government indebtedness.

## 6.3    Make-Whole Actions

6.3.1    The Government and Bacardi each assert that they enter into this Agreement based upon certain objectives and expectations, more specifically described below in this Section 6.3. The Government and Bacardi each further acknowledge and agree that it is not possible to predict, consider and provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, in order to preserve the basis upon which the Agreement is entered into by the Government and Bacardi, the Government and Bacardi each agree to the terms and conditions set forth in this Section 6.3.

6.3.2    Each of Bacardi and the Government acknowledges and agrees that each has entered into this Agreement in material reliance on each and all of the obligations and commitments of the other party under this Agreement, as a package and without exception, with the reasonable expectation that each of them will receive all of the benefits of such obligations and commitments, including, in the case of the Government, without limitation, the Minimum Production Requirements, and including, in the case of Bacardi, without limitation, receipt of benefits in the form of the Refurbishment and Production

Initiatives, or the Treatment Plant Grant, if applicable, and the Marketing and Production Support Payments described in Articles III and IV of this Agreement and the Tax Free treatment described in Section 5.2 hereof.

6.3.3 The Government and Bacardi each further agree and acknowledge that it is not possible to predict, consider or provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, the Government represents, warrants and covenants to Bacardi that in the event of a change in local law, the imposition of any special, additional or new levy or Tax on Bacardi or any other act, event or circumstance (except the enactment of federal legislation affecting the amount of the Cover Over Revenues received by the Government), the result of which would be to diminish, impede, impair or prevent the full performance after the Effective Date of any or all of the obligations and commitments made by the Government under this Agreement, the Government, shall exercise its best efforts to, and to the extent permitted by law shall, provide Bacardi with another obligation or commitment reasonably acceptable to Bacardi and having economic effect equivalent to the commitment so lessened or removed. If the Government fails to provide such obligation or other commitment, such failure shall be a Material Default. In furtherance of the foregoing, in the event that Cover Over Revenues attributable to the Bacardi Rum Sales are for any reason received by the Government but are not available to satisfy the Government's payment obligations to Bacardi hereunder, the Government agrees to fund such obligations from other sources of revenue, to the extent permitted by law.

6.3.4 The Government agrees to use reasonable efforts to strenuously oppose any proposed legislation, initiative, act, event, plan or proposal which would otherwise have the effect of voiding or reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally necessary steps to defend the obligations and commitments contained herein.

6.3.5 Bacardi acknowledges and agrees that the Government has entered into this Agreement in material reliance on each and all of the obligations and commitments of Bacardi under this Agreement, as a package and without exception, with the reasonable expectation that the Government will receive all the benefits contemplated to inure to it under the terms of this Agreement.

6.3.6 The Government and Bacardi each acknowledge and agree that: (a) the objectives and expectations set forth in this Section 6.3 are reasonable; (b) the commitments and obligations set forth in this Section 6.3 are intended to be continuous throughout the duration of this Agreement and (c) that the terms and conditions set forth in this Section 6.3 are material to this Agreement and intended to be enforced to the maximum extent possible.

### 6.4 Acknowledgements

The Government and Bacardi agree and acknowledge that:

6.4.1 Bacardi would face serious competitive disadvantages to continue to produce rum in Puerto Rico due to the USVI Incentives, among other reasons, without the obligations and commitments to be provided by the Government hereunder for the entire period for which such obligations and commitments are to be made available during the Term of this Agreement.

6.4.2 The Government would not have considered granting the benefits and exemptions to be provided to Bacardi under the terms of this Agreement without the obligations and commitments to be provided by Bacardi as set forth in this Agreement.

6.4.3 The Parties will exercise their best efforts and take all actions to fulfill and maintain the obligations and commitments that they have made for the specific period reference herein.

6.4.4 Bacardi has relied upon the continued performance of the Government's obligations and commitments for their specified duration in connection with its decision to remain in Puerto Rico.

6.4.5 This Agreement has been the subject of arm's length negotiations between Bacardi and the Government and it is the intent of the Parties that this Agreement constitutes an enforceable contract.

### 6.5 Negative Covenants

Without the prior written consent of Bacardi, the Government, to the extent permitted by law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to adversely affect, diminish or impair the beneficial use, operation, utility or the ability of Bacardi to beneficially use, occupy, obtain, receive or otherwise enjoy any of (i) the physical sites, facilities and improvements developed as a result of the Refurbishment and Production Initiatives, the Treatment Plant Grant, if applicable, and the Marketing and Production Support Payments, or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement.

### 6.6 Maintenance and Audit of Records.

6.6.1 During the term of this Agreement, Bacardi shall maintain accurate books, records and accounts of the Refurbishment and Production Initiatives, the Treatment Plant, if any, the Marketing Activities, the Production Activities, the Marketing and Production Support Payments and the Economic Development Incentives granted by this Agreement in order to assist the Government in auditing the use of such incentives by Bacardi. The Government and Bacardi shall cooperate to create a record keeping program reasonably acceptable to both Parties.

6.6.2 When so requested, Bacardi will provide the Government with information directly related to the incentives and activities described in Section 6.6.1 above and supporting documentation. The Government shall have the right, upon reasonable request during the term of this Agreement, to cause an audit of the books, records, and accounts specifically maintained by Bacardi pursuant to Section 6.1.1 above, to be performed by the Puerto Rico Department of the Treasury, or other agency designated by the Government upon prior written notice to Bacardi. The Government shall be responsible for the costs of such audits and the out-of-pocket expenses of Bacardi directly incurred in connection with such audit; provided, however, if the results of such audit demonstrate that Bacardi has materially failed to comply with the terms of this Section 6.6, Bacardi shall be responsible for the costs of such audit.

6.6.3 In the event of any discrepancy between the Government and Bacardi with respect to the result of any audit under this Section 6.6, any Party may seek to resolve such discrepancy as provided in Section 8.3 hereof.

## ARTICLE VII
## TERMINATION; REMEDIES

### 7.1 **Termination**

The Agreement may be terminated prior to term upon the occurrence of the following events:

7.1.1. By any Party, upon failure by the Government to file the Agreement with the Office of the Comptroller of Puerto Rico, as required by Act No.18 of October 30, 1975, as amended, within thirty (30) days after the full execution hereof.

7.1.2. By a non defaulting Party, upon failure of the other party to cure any Material Default under the Agreement within the time allowed for a cure under the Agreement, except for Bacardi's noncompliance with the applicable minimum production requirements, which remedies are specified in Section 7.2 hereof;

7.1.3. By Bacardi, upon failure by the Parties to reach an agreement on the amount of any additional Marketing and Production Support payments which could be granted by the Government to Bacardi under Section 4.1.3 (e) hereof.

7.1.4. By Bacardi, if following the Effective Date of the Agreement, (i) the Cover Over Revenues program is terminated; (ii) the Marketing and Production Support Payments to BIL are reduced below the amounts required to be paid by the Government at any given time under Section 4.1.3 of this Agreement; (iii) if at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months as provided in Section 4.7.2 hereof, or (iv) the Economic Development Incentives currently enjoyed by Bacardi under the Tax Grant, Law 135 and Law 78 as provided in Section 5.1 hereof, and the Tax Free treatment provided under Section 5.2 hereof, are materially reduced or unavailable to Bacardi (other than as a result of Bacardi's failure to comply with any contractual or legal requirements for a period greater than twelve (12) months as provided in Section 4.7.2). In any of the abovementioned events in this Section 7.1.4 in which the Government is responsible for the causes of termination, Bacardi will be entitled to retain any grants and incentives already paid by the Government, including the Refurbishment and Production Initiatives, the Treatment Plant Grant, if any, and Marketing and Production Support Payments without paying any Recapture Amount. If Bacardi terminates the Agreement because the Cover Over Revenues program has been terminated, it will have to pay the Recapture Amount, if any, as defined in Section 7.2.1 unless Bacardi continues to have in Puerto Rico sufficient economic activity thereafter (i.e. volume of business, employment and direct and indirect taxes, among other activities) to generate sufficient income for the Government to support the then outstanding debt obligations issued by the Government to fund the Refurbishment and Production Initiatives and the Treatment Plant Grant.

7.1.5. By Bacardi, if during the Term of this Agreement or any renewal thereof, the Tax Grant expires and Bacardi is unable to obtain tax incentives and benefits under Law 135, Law 78 or any successor law, equivalent to the ones currently enjoyed under the Tax Grant, Law 135 and Law 78, even though Bacardi is offering to make substantially the same contractual commitments to the Government as exist in the current Tax Grant (unless the Project is developed, in which case, Bacardi's contractual commitments to the Government may be different from the ones under the current Tax Grant to reasonably reflect that some operations currently carried out by

-22-

Bacardi will become part of the operations of the Project). This will not be considered an Event of Force Majeure but Bacardi shall have the right to terminate this Agreement, in which case it will be obligated to pay to the Government the Recapture Amount, if any, as defined in Section 7.2.

### 7.2    Remedies

The parties shall have the following remedies under the Agreement:

7.2.1. Upon a Material Default by Bacardi, the Government will be entitled to terminate the Agreement and/or to receive from Bacardi the payment of liquidated damages in the form of a recapture (by a straight line amortization over a 10 year period from each disbursement date until it reaches zero) of the unamortized balance of the subsidies granted by the Government for Refurbishment and Production Initiatives and the Treatment Plant Grant after deducting any principal amounts included in the Permitted Debt Service Reductions which have already occured (the "Recapture Amount"). Notwithstanding the above, if the Material Default consists of a reduction in the Minimum Production Requirement below the allowable percentage cushions included in the definition of "Material Default" herein, instead the following remedies shall apply after the expiration of the applicable twelve (12) month cure period, (i) if the reduction is of one percent (1%) to twenty percent (20%), the Government will be entitled to deduct from the Marketing and Production Support Payments payable to Bacardi, as liquidated damages, five percent (5%) of the Recapture Amount, if any, during the period of duration of said Material Default; (ii) if the reduction is of twenty percent (20%) or more but less than thirty percent (30%), the Government will be entitled to deduct from the Marketing and Production Support Payments payable to Bacardi, as liquidated damages, seven and one half percent (7.5%) of theRecapture Amount, if any, during the period of duration of said Material Default; (iii) if the reduction is of thirty percent (30%) or more but less than fifty percent (50%), the Government will be entitled to deduct from the Marketing and Production Support Payments payable to Bacardi, as liquidated damages, ten percent (10%) of the Recapture Amount, if any, during the period of duration of said Material Default; or (iv) if the reduction is of fifty percent (50%) or more, the Government will be entitled to terminate the Agreement and/or receive from Bacardi the payment, as liquidated damages, the Recapture Amount, if any,. Any reduction in the Marketing and Production Support Payments under the preceding sentence, shall be immediately applied by the Government (provided it does not terminate the Agreement pursuant to clause (iv) above) to reduce the principal amount of the obligations issued to provide Bacardi with the Refurbishment and Production Initiatives and the Treatment Plant Grant, if any, and such payment shall be taken into account in computing the amount of any future Permitted Debt Service Reductions, if any. The Parties recognize that the amount of the Marketing and Production Support Payments will be automatically reduced as a direct consequence of any reduction in the production of bulk rum in Puerto Rico for sale in the United States. The above remedies will be Bacardi's maximum exposure under the Agreement.

7.2.2. Upon a Material Default by the Government, Bacardi may seek specific performance or damages for failure to perform or breach of any representation or warranty, covenant or agreement, to the extent permitted by law and subject to the Government maximum exposure as stated in this Section, and/or termination of the Agreement. In case of said termination, Bacardi will be entitled to receive the full amount of any and all Marketing and Production Support Payments with respect to that fiscal year which remain unpaid as of the termination date and to keep as liquidated damages the subsidy payments already granted and paid by the Government as Refurbishment and Production Initiatives and the Treatment Plant Grant, if applicable. The above remedies will be the Government's maximum exposure under the Agreement. Bacardi may not terminate this Agreement for any default other than a Material Default.

7.2.3    The Parties expressly agree and recognize that, with respect to a breach on their part of certain of the covenants, agreements, representations, warranties or commitments contained herein, that

-23-

the non defaulting Party may not be fairly or adequately compensated by any legal remedy in an action for monetary damages. Therefore, the Parties agree that upon a breach of this Agreement by a Party, the non-defaulting Party, in accordance with the dispute resolution procedures set forth in Section 8.3 hereof, may seek the specific performance of any of the covenants, agreements, representations, warranties or commitments of the defaulting Party contained herein or may be awarded damages for failure of performance or breach of any representation or warranty, or both, on the part of the defaulting Party, to the extent permitted by this Agreement and applicable law. No action taken by such Party pursuant to the provisions of this Section 7.2.3 or pursuant to the provisions of any other Section of this Agreement shall be deemed to constitute an election of remedies, and all remedies set forth in this Agreement shall be cumulative and non-exclusive of any other remedy either set forth herein or available to a Party at law or in equity. Notwithstanding the foregoing, the sole remedies to Bacardi and the Government upon the occurrence of a Material Default of the other Party shall be the receipt of the liquidated damages and termination rights provided to each Party, respectively, under Sections 7.2.1 and 7.2.2 above.

7.2.4    No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

7.2.5    In the event that any Party breaches its obligations under this Agreement, and provided that the other Party has complied with its obligations under this Agreement, the Parties agree that the amount of the damages to be incurred by the non breaching Party may be difficult or impossible to determine and therefore the Parties agree that the payment of the liquidated damages specified in this Agreement by the breaching Party for such failure to perform its obligations hereunder is reasonable, adequate and practical under this Agreement.

## ARTICLE VIII
## MISCELLANEOUS

### 8.1    Counterparts

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

### 8.2    Governing Law

The governing law of this Agreement shall be the law of Puerto Rico. The Government hereby waives any right, forum, defense or limitation based upon it sovereign immunity for purposes of any action for breach of its obligations under this Agreement.

### 8.3    Dispute Resolution

8.3.1    Mutual Discussions. Except as otherwise provided in this Section 8.3, if a dispute or difference of any kind whatsoever shall arise among the Parties in connection with, relating to or arising out of this Agreement (each, a "Dispute"), one of such Parties shall notify the other of such Dispute. Such Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. Failing such resolution, the Governor of Puerto Rico and the

-24-

Chairman of BIL (or their duly appointed representatives) shall meet to resolve such Dispute and the joint decision of such individuals shall be binding upon the Parties hereto. If a settlement of any such Dispute or difference is not reached pursuant to this Section 8.3.1 within 60 days after such notice of Dispute is delivered, then the provisions of Section 8.3.2 hereof shall apply. The parties intend to cooperate in implementing Section 8.3.1; however, either Party may (i) decline to participate in negotiations pursuant to Section 8.3.1 or (ii) withdraw from negotiations at any time upon written notice to the other, and in either case, may institute mediation or arbitration proceedings pursuant to Section 8.3.2 or Section 8.3.3 respectively.

8.3.2    Mediation. If a settlement of any such Dispute or difference is not reached pursuant to Section 8.3.1, the Parties agree to submit the matter to mediation. Mediation shall take place at a time and place agreed by the Parties before a single neutral mediator approved by both Parties. Mediation shall be conducted in English. Following a proposal to mediate, either Party may initiate, at any time prior to or following the beginning of the mediation process, arbitration proceedings pursuant to Section 8.3.3 of this Agreement. If a Party intends to be accompanied by an attorney at a meeting in the context of negotiations or mediation, at least three (3) working days' notice of such intention shall be given and the other Party's may also be accompanied by an attorney. All discussions and exchanges of information pursuant to negotiation and mediation under Sections 8.3.1 and 8.3.2 are confidential and may not be used in the context of arbitration proceedings or in a court-of-law unless otherwise lawfully discoverable. The Parties intend to cooperate in implementing Sections 8.3.1 and 8.3.2; however, either Party may withdraw at any time upon written notice to the other from negotiations under Section 8.3.1 and may institute mediation or arbitration proceedings pursuant to Section 8.3.2 or 8.3.3 respectively; similarly, either Party may withdraw at any time upon written notice to the other from mediation under Section 8.3.2 and may institute arbitration proceedings pursuant to Section 8.3.3.

8.3.3    Arbitration. If a Dispute cannot be settled pursuant to Section 8.3.1 and 8.3.2 above, such Dispute shall be determined by arbitration administered by the American Arbitration Association ("AAA"). The number of arbitrators shall be three. Within thirty (30) days of delivery of the request for arbitration, each party shall appoint one (1) arbitrator. If the two party appointed arbitrators do not reach an agreement on the appointment of a third arbitrator who shall serve as the chairman of the tribunal within fifteen (15) days of their appointment, the AAA shall appoint the third arbitrator. The arbitration award shall be reasoned and in accordance with Puerto Rico law and shall be subject to the limitations provided in Section 7.2.3 of this Agreement. The language of the arbitration shall be English. Judgment upon any award(s) rendered by the arbitrators may be entered in any court having jurisdiction thereof. Nothing in this Agreement shall prevent Bacardi or the Government from seeking provisional measures from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

8.3.4    Continued Performance. The Parties shall continue to perform their respective obligations under this Agreement during the existence of any Dispute under this Agreement or the pendency of any mediation or arbitration.

8.3.5    Commercial Acts. The Parties each agree that the execution, delivery and performance of this Agreement constitute private and commercial acts rather than public or governmental acts.

## 8.4    Rules of interpretation

In this Agreement, unless the context otherwise requires, headings are for convenience only and do not affect the interpretation of this Agreement; a reference to an Exhibit, Article or Section is a reference to that Exhibit to, or Article or Section of, this Agreement; a reference to a document includes any amendment or supplement to, or replacement or novation of, that document; a reference to the

singular includes the plural and vice versa: the words "include," "includes," and "including" mean include, includes, and including "without limitation" and "without limitation by specification," and any list or series following any such term is: (a) not exhaustive and (b) not meant to be limited to elements or items of the same or similar kind; and the words "hereof", "herein" and "hereunder", or "thereof", "therein" and "thereunder" and words of similar import when used shall refer to this Agreement or any other agreement as a whole and not to any particular provision.

### 8.5 Construction

This Agreement shall not be construed more strictly against one Party than against any other Party merely by virtue of the fact that the Agreement may have been prepared by counsel for one of the Parties, it being recognized that all Parties have contributed substantially and materially to the preparation of this Agreement.

### 8.6 Conflicts

Subject to Section 8.2 hereof, all statutes, codes, ordinances, rules and regulations in effect in Puerto Rico as of the date hereof shall continue in effect in their current form during the entire Term of this Agreement, except as may otherwise be agreed to by Bacardi in writing and except to the extent of amendments mandated by Government or federal requirements. Notwithstanding the foregoing, if any statute, code, ordinance, rule or regulation is hereafter adopted, amended or interpreted so as to be less restrictive upon Bacardi than is currently the case, then at the option of Bacardi, such less restrictive amendment or interpretation shall control and become applicable without the requirement of an amendment to this Agreement.

### 8.7 Severability

In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect and for any reason whatsoever, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. In the event any such provision is held to be invalid, illegal or unenforceable, the Parties hereto shall make their best efforts to agree on a provision in substitution for such invalid, illegal or unenforceable provision that is as near in economic benefit as possible to the provision found to be invalid, illegal or unenforceable.

### 8.8 Notices

All communications and notices expressly provided for herein shall be sent, by registered first class mail, postage prepaid, by an internationally recognized overnight courier for delivery on the following business day or by telecopy (with such telecopy to be confirmed promptly in writing sent by mail or overnight courier as aforesaid), as follows:

GOVERNMENT OF
PUERTO RICO:

Secretary
Department of the Treasury
P. O. Box 9024140
San Juan, PR, 00902-4140
Intendente Ramírez Bldg.,
Stop 1 #10 Paseo Covadonga
San Juan, PR 00902-4140

-26-

Telephone: 787-722-2121, 787-723-4344
Telefax: 787-725-7303

Secretary
Department of Economic Development and
Commerce
P. O. Box 362350
San Juan, PR, 00936-2350
#355 F. D. Roosevelt Ave.
Fomento Industrial Bldg.,
Suite 401, San Juan, PR 00918
Telephone: 787-758-4747, 787-765-2900
Telefax: 787-753-4094; 787-753-6874

Secretary
Department of Agriculture
P. O. Box 10163
San Juan, PR, 00908-1163
1309 Fernandez Juncos Ave.,
San Juan, PR 00908
Telephone: 787-721-2120, 787-722-0871
Telefax: 787-723-8512

President
Government Development Bank of Puerto Rico
P. O. Box 42001
San Juan, PR, 00940-2001
José de Diego Ave., Stop 22
Centro Gubernamental R. Sánchez Vilella
Santurce, PR 00940-2001
Telephone: 787-722-2525
Telefax: 787-721-1443

Executive Director
Office of Management and Budget
PO Box 9023228
San Juan, P.R., 00902-3228
Calle Cruz 254
San Juan, Puerto Rico
Telephone: 787-725-9420
Telefax: 787-722-0299

Executive Director
Puerto Rico Industrial Development Company
P. O. Box 362350
SAN JUAN, PR, 00936-2350
355 Ave. F.D. Roosevelt
Fomento Industrial Bldg., Suite 404
Hato Rey, PR, 00940
Telephone: 787-758-4747, 787-754-9481
Telefax: 787-764-1415

-27-

WITH A COPY TO:

Attorney General
Puerto Rico Department of Justice
P. O. Box 909192
San Juan, PR, 00907
Olimpo St. and corner of Lindbergh, Stop11
San Juan, 00902-0192
Telephone: 787-721-2900
Telefax: 787-724-4770

O'Neill & Borges
American International Plaza
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Tel: 787-764-8181
Fax: 787-753-8944
Attention: Managing Partner

BACARDI:

Bacardi International Limited
65 Pitts Bay Road
Pembroke HM 08
Bermuda
Telephone: 441-295-4345
Telefax: 441-295-5364
Attention: Chairman

Bacardi Limited
65 Pitts Bay Road
Pembroke HM 08
Bermuda
Telephone: 441-295-4345
Telefax: 441-295-5364
Attention: President and Chief Executive Officer

Bacardi Corporation
P.O. Box 363549
San Juan, PR 00936-3549
#200 State Rd. 165, Km. 6.2
Cataño, PR 00962
Telephone: 787-788-1500
Telefax: 787-788-5075
Attention: President

WITH COPIES TO:

Bacardi North America/
Bacardi U.S.A., Inc.
2701 LeJeune Road
Coral Gables, FL 33134
Telephone: 786-264-8114
Telefax: 305-573-2730
Attention: General Counsel

-28-

Fiddler, Gonzalez & Rodriguez, PSC
P. O. Box 363507.
San Juan, Puerto Rico 00936-3507
254 Muñoz Rivera Ave., Sixth Floor
Hato Rey, Puerto Rico 00918
Telephone: 787-753-3113, 787-759-3183
Telefax: 787-759-3123
Attention: President

or to such other address as the receiving Party shall have most recently forwarded to the sending Party pursuant to the provisions of this Section 8.8.

### 8.9  Press Communications

The Parties shall agree on the form and forum on how to communicate the completion of this Agreement and the mutual long-term commitment to Puerto Rico. The Parties agree to cooperate fully with each other in connection with all communications-related activities (i.e., public relations, media relations, press releases, news conferences, media advisories, news organizations, etc.) concerning this Agreement and the transactions contemplated hereunder.

### 8.10  Assignment

This Agreement is not assignable by the Government in whole or in part except where Bacardi consents, in its sole discretion, to such assignment in writing. Bacardi shall have the right at any time to assign all its rights and obligations, or any part thereof, in and to this Agreement, or any part thereof, to any Affiliate of Bacardi that agrees to assume the assigned obligations of Bacardi in and to this Agreement or applicable portion thereof; provided, however, that proof of the ability of such Affiliate to fulfill any assigned obligations shall be provided to the Government as part of the advance notice by Bacardi. The Government may object to such assignment if it reasonably appears that the Affiliate of Bacardi lacks such ability. Bacardi shall provide the Government at least sixty (60) days advance written notice of its intention to assign this Agreement. The Government shall receive a copy of the written agreement of the Affiliate of Bacardi to agree to assume all assigned obligations and shall acknowledge to the Government its ability to fulfill such obligations.

### 8.11  No Third Party Beneficiary

This Agreement is for the sole and exclusive benefit of the Government and Bacardi and, if applicable, any permitted successors, transferees or assigns thereof. No other persons or entities are intended third party beneficiaries of this Agreement, including, without limitation, any third parties that may, from time to time, have ownership, security or other interests in any real or personal property associated with the Refurbishment and Production Initiatives and Treatment Plant project, nor shall such third parties have any rights to enforce any of the provisions of this Agreement.

### 8.12  Contractual Relationship

None of the commitments or other obligations, agreements or provisions contained in this Agreement shall or shall be deemed to give the Government the right or power to exercise control over the affairs or management of Bacardi or any of its Affiliates, the Refurbishment and Production Initiatives, the Treatment Plant, or any part thereof. The relationship between the Government and

Bacardi is, and at all times shall remain, contractual. No commitment or other obligation, agreement or provision of this Agreement, nor any agreement executed pursuant hereto, is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest between or among the Government and Bacardi or to create any equity interest in Bacardi for the Government. Notwithstanding any other provision of this Agreement or agreement executed pursuant hereto, the Government is not and shall not be construed as a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Bacardi, its stockholders, members, or partners.

### 8.13   **Further Assurances**

The Government and Bacardi agree to do all things and take all actions required, necessary or appropriate to carry out the terms of this Agreement and the implementation of the Parties' intent as reflected by the terms of this Agreement. Such things and actions include, but are not limited to, the obtaining, negotiation, execution and delivery of all necessary or desirable agreements, filings, consents, authorizations, approvals, licenses or deeds. Without limiting the generality of the foregoing, the Parties agree: (a) to take all actions, without exception, which are necessary and appropriate at any time to assure the binding effect, legality and enforceability of their respective obligations and commitments hereunder and (b) not to take any action which would affect adversely in any way whatsoever the binding effect, legality and enforceability of their respective obligations and commitments hereunder.

### 8.14   **Survival of Representations and Warranties**

The representations, warranties and covenants made by each of the Parties hereto and contained herein shall survive the performance of any obligations to which such representations, warranties and covenants relate.

### 8.15   **Term of Agreement**

The term of this Agreement (the "Term") shall commence on the Effective Date and continue in effect through the later to occur of the twentieth (20th) anniversary of the Effective Date which date for the term of this Agreement may be extended by Bacardi for a period of ten (10) additional years upon the delivery of written notice to the Government by Bacardi prior to the anticipated expiration of the Term. Except as otherwise provided in Sections 7.1 and 7.2, upon the expiration of the Term  Bacardi shall retain, at no additional cost, the full amount of all payments disbursed by the Government to Bacardi under this Agreement, including, but not limited to, the Refurbishment and Production Initiatives, Treatment Plant Grant and the Marketing and Production Support Payments.

### 8.16   **Binding Effect**

This Agreement and all terms, provisions and obligations set forth herein shall be binding upon and shall inure to the benefit of the Government and Bacardi and their respective successors and assigns.

### 8.17   **Waivers**

Waiver of any of the obligations of a Party set forth in this Agreement may only be effected, in writing, by the other Party hereto. No delay or omission to exercise any right or power by any Party shall be construed to be a waiver. In the event any provision is waived by a Party, such waiver shall not be deemed to waive any other provision.

### 8.18 Entire Agreement

This Agreement is the entire agreement and supersedes all prior and collateral communications and agreements of the Parties relating to the subject matter.

### 8.19 Amendments

This Agreement may be amended only by a written modification duly executed by the Parties' authorized representatives.

### 8.20 Compliance with Laws.

The Parties shall comply in a reasonable and substantial manner with all applicable provisions of the laws of the United States and Puerto Rico and all their applicable rules and regulations; provided, however, that in the event of a conflict between the specific terms of this Agreement and the laws of the United States or Puerto Rico or their applicable rules and regulations, the specific terms of this Agreement shall control.

### 8.21 Government Contract Clauses

8.21.1 Lobbying Certification. Each of BIL, BL and Corp certifies that none of the funds from this Agreement will be paid to any person for influencing or attempting to influence an official or employee of any Government agency and/or the Commonwealth Legislature in connection with this Agreement.

If any funds, other than funds provided by this Agreement, have been paid or will be paid to any person for lobbying before a member, an official or employee of the Commonwealth Legislature in connection with this Agreement, each of BIL, BL and Corp shall complete and submit to PRIDCO Standard Form LLL "Disclosure Form To Report Lobbying" in accordance with its instructions, and Standard Form LLL.

Each of BIL, BL and Corp shall require that this lobby certification clause be included in all sub-contracts entered into in the Commonwealth as a result of this Agreement. Each of BIL, BL and Corp acknowledges that a false certification by any of them constitutes a Material Default and may be grounds for termination of this Agreement.

8.21.2 No Payments or Gratuities. Neither BIL, BL or Corp nor their officers, directors or employees has made any payment, gift or anything of value to any Government employee or official to obtain a favorable evaluation or the execution of this Agreement. If there occurs a violation of this Section 8.21.2, in addition to any other remedies available to the Government, the Government shall be entitled to recover any payments made or gratuities given. No fee or gratuity will be paid to any such person in connection with this Agreement (except to attorneys and consultants engaged to advise Bacardi) to meet the requirements of the Agreement.

8.21.3 Conflicts of Interest. Each of BIL, BL and Corp hereby certifies that neither BIL, BL or Corp nor their directors, officers, members, partners or employees, has any interest nor shall they acquire any interest, directly or indirectly, in cases or issues which may conflict in any manner with its performance under this Agreement.

To the best knowledge of BIL, BL and Corp (i) no public official or employee of the Government has participated in any decision relating to this Agreement which affects such official's or

-31-

employee's personal interest or the interest of any entity or business in which such officer or employee or any member of his family has or has had an economic interest, directly or indirectly, and (ii) no official or employee of the Government has any interest, direct or indirect, in this Agreement or any proceeds thereof.

Each of BIL, BL and Corp agrees to request Government's consent or waiver to any agreement described in this Section 8.21.3 prior to its execution which consent or waiver will not be unreasonably denied.

8.21.4 Full Disclosure. To the best of its knowledge, each of BIL, BL and Corp has furnished to the Government all material facts necessary to make the statements contained herein. To the best of its knowledge, as of the Effective Date, there are no issues, facts or matters that materially adversely affect, or which could materially adversely affect, the properties, business, operations or condition (financial or otherwise) of any of them or that will hinder their ability to perform their obligations under this Agreement.

8.21.5 Compliance with Tax Laws. Each of BIL, BL and Corp shall be responsible for retention, proper filing and payment of all social security, income tax, worker's compensation, unemployment insurance, disability insurance, and all other labor requirements arising under this Agreement, if applicable. Each of BIL, BL and Corp agrees that it will comply with the Commonwealth tax laws, rules and regulations. Each of BIL, BL and Corp will be responsible for filing its income tax returns and for making any necessary payments to the Department of the Treasury and the Internal Revenue Service of the United States of America, if applicable.

Corp certifies that it has filed all of its Tax returns for the past five (5) years, owes no Taxes and/or is up to date in any payment plan for such Taxes. Prior to the execution of this Agreement, Corp has submitted to the Government the following certifications and documents, in each case, dated within thirty (30) days of the Effective Date:

      (a)    A certification of filing of income tax return for the past five (5) years, issued by the Department of the Treasury.

      (b)    A negative debt certificate, or payment plan and compliance therewith, issued by the Commonwealth's Department of the Treasury.

      (c)    A negative certificate of debt, or payment plan and compliance therewith, with respect to real and personal property taxes issued by the Municipal Revenue Collection Center ("CRIM" for its Spanish acronym).

      (d)    A negative certificate of debt, or payment plan and compliance therewith, for unemployment insurance, temporary disability insurance and chauffeur's social security issued by the Puerto Rico Department of Labor and Human Resources.

      (e)    A copy of the Workmen's Compensation Insurance policy issued by the State Insurance Fund.

      (f)    A negative certificate of debt, or payment plan and compliance therewith, issued by the State Insurance Fund.

      (g)    A good standing certificate from the Puerto Rico Department of State.

BIL and BL are not engaged in trade or business in Puerto Rico. Prior to the execution of this Agreement, BIL and BL submitted to PRIDCO a good standing certificate issued by the Department of State of their place of organization and a notarized sworn statement in which each of BIL and BL certifies that:

> (a) During the five (5) taxable years prior to the year of execution of this Agreement (the "Five Year Period"), it was not engaged in the conduct of trade or business in Puerto Rico, it did not derive any income effectively connected with a trade or business in Puerto Rico, it was not required to file, and did not file, any income tax returns in Puerto Rico and it does not owe income taxes to the Puerto Rico Department of the Treasury.

> (b) During the Five Year Period it did not have any personal property in Puerto Rico and it was not required to file, and did not file, any personal property tax returns in Puerto Rico and it does not owe the CRIM any taxes.

> (c) During the Five Year Period it did not have, and it currently does not have, any real property in Puerto Rico, it does not owe any real property taxes to the CRIM.

> (d) It does not have any employees in Puerto Rico. Therefore, it does not (1) owe any payments to the Puerto Rico Department of Labor and Human Resources in connection with unemployment, disability, or chauffeur's insurance; (2) have to obtain and maintain an insurance policy from the Puerto Rico State Insurance Fund; and (3) have the obligation as an employer to withhold and remit child support payments to the Puerto Rico Administration for the Sustenance of Minors (known as "ASUME" for its Spanish acronym).

> (e) It is not required to withhold or pay any other taxes to the Government of Puerto Rico.

It is acknowledged that the certifications and sworn statements above are essential conditions of this Agreement, and if found to be intentionally false, misleading, altered or forged, such finding shall constitute a Material Default and the Government shall have the right to terminate this Agreement.

8.21.6 Business Documents; Evidence of Authority. Prior to the execution of this Agreement each of BIL, BL and Corp shall provide copies of its articles of incorporation, by-laws, or partnership or joint venture agreement, as applicable. Each of BIL, BL and Corp shall deliver to the Government before the execution of this Agreement an original certificate of resolution evidencing the authorization to enter into this Agreement.

8.21.7 Registration of the Agreement. The Government shall remit a copy of this Agreement to the Office of the Comptroller within thirty (30) days following the date of the execution of this Agreement and any subsequent amendment of this Agreement. No provision or consideration of services under this Agreement may be demanded until the same has been filed for registration with the Office of the Comptroller pursuant to Act No. 18 of October 30, 1975, as amended.

8.21.8 Certification on Criminal Proceedings. Each of BL, BIL and Corp certifies that as of the date of this Agreement, it has not been convicted, or has no knowledge of being indicted in a criminal procedure for offenses against public integrity, embezzlement of public funds or for the felonies or misdemeanors mentioned in Act Number 458 of September 29, 2000, as amended, in the courts of the

Commonwealth, federal courts, or any other court with jurisdiction. It is acknowledged by the Parties that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute a Material Default and a cause for the Government to terminate this Agreement.

Each of BL, BIL and Corp shall immediately notify in writing the Government if it, or any of its officers and directors becomes indicted or convicted in a criminal procedure for any type of offense mentioned above. Failure to comply with this notice constitutes a Material Default and a cause for the Government to terminate this Agreement.

Corp will require compliance with the clauses described above to any consultant and/or subcontractor hired in the Commonwealth with the funds provided under this Agreement. If said certification is false, Corp will have just cause for terminating the agreement with the consultant or subcontractor, and the consultant or sub-contractor will have to reimburse the Government any and all amounts received for services performed under this Agreement.

If the circumstances of the consultant or sub-contractor related to child support payments changes at any time during this Agreement, the consultant or sub-contractor shall obtain the necessary certification, inform Corp, immediately obtain the certification from ASUME and provide a copy to Corp.

8.21.9 Ethics Representations. In addition to any of the foregoing warranties and representations, each of BL, BIL and Corp acknowledges, represents and warrants that no official or employee of the Government has a direct or indirect economic interest in Bacardi's rights under this Agreement in accordance with the provisions of Act Number 84 of June 18, 2002, as amended, also known as the Code of Ethics for Contractors. Each of BIL, BL and Corp certifies that it has received a copy of the Code, read, understood, has complied and will subsequently continue to comply with it in its entirety.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

### [SIGNATURE PAGES FOLLOW]

**WHEREFORE,** the Parties hereto have executed this Agreement as of the date first written above.

**BACARDI INTERNATIONAL LIMITED**

By: _Julie Hendrix_

Name: _Julie Hendrix_

Title: _Vice President_

By: _____

Name: _A. STEWART GURR_

Title: _UCE PRESIDENT_

**BACARDI LIMITED**

By: _____

Name: _SEAMUS M'BRIDE_

Title: _PRESIDENT * CEO_

By: _____

Name: _Michael MyAguire_

Title: _Assistant Vice President_

**BACARDI CORPORATION**

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

**WHEREFORE,** the Parties hereto have executed this Agreement as of the date first written above.

**BACARDI INTERNATIONAL LIMITED**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


**BACARDI LIMITED**

By: _____

Name: _____

Title: _____


By: _____

Name: _____

Title: _____


**BACARDI CORPORATION**

By: _____

Name: Joaquin E. Bacardi

Title: President - CEO

By: _____

Name: Jorge Marcano

Title: VP - Operations.

## THE GOVERNMENT OF PUERTO RICO

Department of the Treasury

By: _____

Name: Juan Carlos Puig
Title: Secretary

Department of Economic
Development and Commerce

By: _____

Name: José R. Pérez-Riera
Title: Secretary

Puerto Rico Industrial Development
Company

By: _____

Name: José R. Pérez-Riera
Title: Executive Director

Department of Agriculture

By: _____

Name: Javier A. Rivera Aquino
Title: Secretary

Office of Management and Budget

By: _____

Name: Maria Sánchez Bras
Title: Executive Director

Government Development Bank
for Puerto Rico

By: _____

Name: Carlos M. García
Title: President

Case:17-03283-LTS Doc#:10809-2 Filed:08/03/20 Entered:08/03/20 16:38:39 Desc:
Exhibit Exhibit B - Bacardi Opposition to Amended PR & Staff Motion Page 40 of 48

EXECUTION VERSION

## EXHIBIT A

## BASIC COMPONENTS OF THE REFURBISHMENT AND PRODUCTION INITIATIVES

Plant improvements include the following activities to replace the actual production areas and to increase the capacity to 40,000,000 PG/yr. between the Cataño facility and the Puerto Nuevo port storage tank facility.

1.  Blending Area Renovation
2.  Rum Processing Equipment
3.  Tank trucks loading and unloading area renovation
4.  Port tanks Instrumentation
5.  Environmental control equipment
6.  Electric substation renovation
7.  Electric underground system renovation
8.  Blending and boiler water rationalization
9.  Blending and Distillery compress air rationalization
10. Office building rationalization
11. Sprinklers system
12. Laboratory and Equipment
13. Demolition of obsolete equipment

Aging capacity includes the following investment to increase the capacity by 20%:

1.  Aging Warehouses
2.  Barrels
3.  Barrels filling and empting machine improvements
4.  Sprinklers
5.  Barrels visitor area
6.  Environment control equipment
7.  Demolition of obsolete equipment

## EXHIBIT B

### BASIC COMPONENTS OF THE PROJECT

The Project includes:

1.  The Project should be able to provide a solution to integrate, in the project, as a valuable by-product any discharge from the distillery and the sugar mill.

2.  The Main objective is to achieve zero discharge in the distillery and the Project.

3.  The use of fossil fuel should be minimized in the Project.

4.  Water usage and consumption in the Project should be as per the best technology available in the industry as described in the UNICA standards.

## EXHIBIT C

## BASIC COMPONENTS OF THE TREATMENT PLANT

A new waste treatment plant to treat 25 MM pg/yr which includes:

1.    Evaporation equipment to concentrate the vinasse to CMS or any other technology that    will result in converting the vinasse to a useful byproduct.

2.    Carbonic Gas recovery plant overhaul.

3.    Waste Holding Tanks.

4.    CMS holding Tanks.

5.    Demolition of obsolete equipment.

## EXHIBIT D

## MARKETING ACTIVITIES

**Potential Marketing Activities**

Media-Television

Media-Digital

Media-Other

Advertising Production

Creative Agency Fees

Relationship Marketing

Relationship Market Agency Fees

Consumer Public Relations

Trade Public Relations

Consumer Sponsorships

Innovation/Product Development

Brand Identification / Packaging Development

Consumer Planning and Research

Experimental Marketing / Sampling

Point of Sale

Consumer Promotions

Value Added Packaging

Commercial Advertising and Promotion

Discounts and consideration to customers

## EXHIBIT E

## PROJECTED BACARDI RUM SALES

| | Low | | Base | |
|---|---|---|---|---|
| | YoY Growth | Volume (m PG)* | YOY Growth | Volume (m PG)* |
| 2011 | 1.0% | 18.0 | 1.0% | 18.0 |
| 2012 | 1.0% | 18.2 | 3.0% | 18.5 |
| 2013 | 0.5% | 18.3 | 3.0% | 19.1 |
| 2014 | 0.0% | 18.3 | 3.0% | 19.7 |
| 2015 | 0.0% | 18.3 | 3.0% | 20.3 |
| 2016 | 0.0% | 18.3 | 2.0% | 20.7 |
| 2017 | 0.0% | 18.3 | 2.0% | 21.1 |
| 2018 | 0.0% | 18.3 | 2.0% | 21.5 |
| 2019 | 0.0% | 18.3 | 2.0% | 21.9 |
| 2020 | 0.0% | 18.3 | 2.0% | 22.3 |
| 2021 | 0.0% | 18.3 | 2.0% | 22.8 |
| 2022 | 0.0% | 18.3 | 1.0% | 23.0 |
| 2023 | 0.0% | 18.3 | 1.0% | 23.2 |
| 2024 | 0.0% | 18.3 | 1.0% | 23.4 |
| 2025 | 0.0% | 18.3 | 1.0% | 23.6 |
| 2026 | 0.0% | 18.3 | 1.0% | 23.8 |
| 2027 | 0.0% | 18.3 | 0.0% | 23.8 |
| 2028 | 0.0% | 18.3 | 0.0% | 23.8 |
| 2029 | 0.0% | 18.3 | 0.0% | 23.8 |
| 2030 | 0.0% | 18.3 | 0.0% | 23.8 |

\* Sales are stated in millions of proof gallons per year.

## EXHIBIT F

### MINIMUM RUM PRODUCTION REQUIREMENTS
### IN PROOF GALLONS (PG)

| Year | Minimum Production (PG)* |
|------|--------------------------|
| 2011 | 17,000,000 |
| 2012 | 17,136,000 |
| 2013 | 17,273,088 |
| 2014 | 17,411,272 |
| **2015 | 17,550,562 |

* Annual increase starting in fiscal year 2012 is based on a 0.8% annual U.S. population growth rate, as projected by the U.S. Census Bureau.

** From 2016 to the reminder of the initial 20-year term and any extension or renewal term, BIL shall determine the minimum production requirements every five (5) years based upon the average of the bulk Bacardi Rum Sales for the previous five (5) year period and BIL may further adjust up to twenty five percent (25%) above or up to twenty percent (20%) below the average of the bulk Bacardi Rum Sales for the previous five (5) year period. Any other changes in minimum production requirements shall be made by mutual agreement of the parties.

Schedule 3.1 to the Agreement

### Disbursement Schedule for the Refurbishment and Production Initiatives

|                        | FY 2011   | FY 2012   | FY 2013  | FY 2014  | Total     |
|------------------------|-----------|-----------|----------|----------|-----------|
| Waste Water Plant      |           | $ 7,000   | $ 25,000 | $ 18,000 | $ 50,000  |
| Refurbishing of Plant  | 8,000     | 25,000    | 35,000   | 2,000    | 70,000    |
| Ageing for Growth      | 2,000     | 11,000    | 8,000    | 4,000    | 25,000    |
| Total                  | $ 10,000  | $ 43,000  | $ 68,000 | $ 24,000 | $145,000  |

Schedule 3.2.1 (a) to this Agreement

**Feasibility Study for the Project**

The feasibility study shall include, but not be limited to, the following items:

1. A capital investment plan for the agricultural and industrial operation.
2. A vinasses disposition process and capability study and plan.
3. An environmental impact review document of the Project.
4. All regulatory requirements including, but not limited to, environmental permits and conditions, permitting time schedule, etc.
5. Land availability, location and acquisition method for up to 28,000 acres of contiguous or adjacent land.
6. A sugar cane yield per acre study for the land selected.
7. Economic, profitability and market condition analyses of the Project based on the outputs of sugar, molasses, cane distillate, energy, and potentially others.
8. Potential business model for Third Party Operator.

Schedule 3.2.4 to the Agreement

## Technical Assistance to the Project

Bacardi will be able to provide the following assistance to the Government with respect to the Project:

1. Technical assistance regarding alcohol production.
2. Evaluation of engineering drawings for the alcohol production.
3. Specification evaluation for the Project.
4. Environmental permits process and evaluation of documents.
5. Selection of experts and consultant in sugar and alcohol production.
6. Design of the governance structure of the Project and business operation.
7. Providing information from markets regarding alcohol and sugar.

# 6. Supplemental Bacardi Agreement No. 2 (May 5, 2015), ECF No. 10609-3

*Execution Version*

SUPPLEMENTAL AGREEMENT NO. 2

by and among

BACARDI INTERNATIONAL LIMITED,

BACARDI LIMITED,

BACARDI CORPORATION

and

THE GOVERNMENT OF PUERTO RICO

dated as of May 5, 2015

## Table of Contents

**ARTICLE I       DEFINITIONS; INTERPRETATION; EFFECTIVENESS** ...................... 3

1.1   Defined Terms ................................................................................ 3
1.2   Interpretation ................................................................................. 5
1.3   Effectiveness ................................................................................. 5
    1.3.1   Government Payment ......................................................... 5
    1.3.2   Designated Agreements ...................................................... 5
    1.3.4   Instruction ........................................................................ 5
1.4   Confirmation Date .......................................................................... 5

**ARTICLE II      EXISTING AGREEMENT** ................................................................ 6

2.1   Bulk and Bottled Rum ..................................................................... 6
2.2   Cover Over Revenues ...................................................................... 6
2.3   Marketing and Production Activities .................................................. 6
2.4   Permitted Debt Service Reduction ..................................................... 6
2.5   True-Up Adjustments ...................................................................... 6
2.6   Annual Reports .............................................................................. 6
3.4   No Further Obligations .................................................................... 6

**ARTICLE III     MARKETING AND PRODUCTION SUPPORT PAYMENTS** ................ 7

3.1   Past and Payable Amounts ............................................................... 7
3.2   Payment of Future Amounts ............................................................. 7
3.3   Pledged Cover Over Requirement ..................................................... 7

**ARTICLE IV     CAPEX PAYMENTS** ...................................................................... 7

4.1   Infrastructure Support ..................................................................... 7
4.2   Allocation ..................................................................................... 7
4.3   Tax Treatment ............................................................................... 7

**ARTICLE V      REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS** ............................................................................... 7

5.1   Representations, Warranties and Acknowledgements ........................... 7
    5.1.1   Government.................................................................... 8
    5.1.2   Bacardi ......................................................................... 9
    5.1.3   Joint Representation ......................................................... 9
5.2   Covenants ..................................................................................... 9
    5.2.1   Designated Agreements ..................................................... 9
    5.2.2   Cover Over Reports ......................................................... 10
    5.2.3   Reimbursement .............................................................. 10
5.3   Negative Covenants ....................................................................... 10
    5.3.1   No Adverse Actions ......................................................... 10

**ARTICLE VI     BREACH; FIRST SUPPLEMENTAL AGREEMENT** ............................ 10

6.1   Breach ......................................................................................... 10
6.2   First Supplemental ......................................................................... 11

**ARTICLE VII   MISCELLANEOUS**.................................................................................. 11

7.1    Counterparts. ........................................................................................... 11
7.2    Governing Law; Waiver of Sovereign Immunity. ................................. 11
7.3    Term of Agreement; Survival ................................................................ 11
7.4     Entire Agreement. .................................................................................. 11
7.5    Expenses. ................................................................................................ 11
7.6    No Waiver. .............................................................................................. 11
7.7    Government Contract Clauses ................................................................ 12
7.8    Other Existing Agreement Provisions. ................................................... 17

<u>**Supplemental Agreement No. 2**</u>

This **Supplemental Agreement No. 2** (this "*Agreement*"), entered into this fifth day of May, 2015, is made by and among Bacardi International Limited ("*BIL*"), Bacardi Corporation ("*Corp*") and their parent company Bacardi Limited ("*BL*") and the Government of Puerto Rico (the "*Government*"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico, the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto Rico Industrial Development Company ("*PRIDCO*") as authorized by Act No. 178 of December 1, 2010, as amended, Act No. 1 of January 31, 2011 and any successor legislation (the "*Enabling Act*"). BIL, and any affiliate of BIL (including BL or Corp) that is designated by BIL to perform obligations under the applicable agreement, are collectively referred to as "*Bacardi*". The Government, BIL, Corp and BL are collectively referred to as the "*Parties*" and each individually as a "*Party*".

**WHEREAS**, the Parties are party to that certain Agreement, dated as of December 31, 2010 (the "*2010 Agreement*");

**WHEREAS**, the 2010 Agreement has been modified by the Supplemental Agreement No. 1 dated as of June 27, 2014, as currently extended pursuant to the Sixth Extension of Supplemental Agreement and Amendment of Letter of Intent (the "*Sixth Extension*") dated as of April 9, 2015 (as so extended, and as amended and further extended pursuant to <u>Section 6.2</u>, the "*First Supplemental*", with such 2010 Agreement as so modified by the First Supplemental, the "*Existing Agreement*");

**WHEREAS**, the Parties share the objective of maintaining, promoting and growing the production of Bacardi rum in Puerto Rico;

**WHEREAS**, the Parties wish to supplement the Existing Agreement as set forth in this Agreement; and

**WHEREAS,** the Government has determined that the transactions described in this Agreement are in the best public interest;

**NOW THEREFORE**, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows, effective as set forth below:

### ARTICLE I

<u>**DEFINITIONS; INTERPRETATION; EFFECTIVENESS**</u>

**1.1** **Defined Terms**. For purposes of this Agreement, (i) capitalized terms not defined shall have the meanings set forth in the Existing Agreement and (ii) the following terms shall have the following meanings:

"*Bacardi Agreements*" shall mean this Agreement and the Existing Agreement.

3

"*Business Day*" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or San Juan, Puerto Rico are authorized or required by law to remain closed.

"*CapEx Payments*" shall mean Refurbishment and Production Initiatives payments and Treatment Plant Grant payments.

"*Code*" shall mean the United States Internal Revenue Code of 1986, as amended.

"*Collateral Agent*" shall mean Citibank, N.A., a national banking association, as collateral agent under the Trust Agreement.

"*Confirmation Date*" shall mean the date on which the Lockbox Bank has sent a written notice to the Government, the Trustee and the Paying Agent that it has received from the U.S. Government Cover Over Revenues for deposit into the Lockbox Account.

"*Deposit Account Control Agreement*" shall mean the Deposit Account Control Agreement of even date herewith among the Trustee, the Collateral Agent, the Lockbox Bank and the Government.

"*Designated Agreements*" shall mean the Trust Agreement, the Lockbox Agreement, the Security Agreement and the Deposit Account Control Agreement.

"*Effective Date*" shall mean the first date on which all of the conditions precedent set forth in <u>Section 1.3</u> have been satisfied.

"*Enforcement Expenses*" shall mean expenses incurred by the United States Department of Treasury in connection with the enforcement in Puerto Rico of the provisions of Subtitle E (Sections 5001 through 5891) and Section 7652(a) of the Code and reimbursed from Cover Over Revenues pursuant to Section 5314(a)(4) of the Code.

"*Lockbox Account*" shall mean the deposit account referred to as the "Account" in the Lockbox Agreement.

"*Lockbox Agreement*" shall mean the Lockbox Agreement of even date herewith among the Government, the Trustee, the Paying Agent and the Lockbox Bank.

"*Lockbox Bank*" shall mean Citibank, N.A., a national banking association, as lockbox bank under the Lockbox Agreement.

"*Paying Agent*" shall mean Citibank, N.A., a national banking association, as paying agent under the Trust Agreement.

"*P&I Agreement*" shall mean the Payment and Indemnification Agreement of even date herewith by and between BIL and Citibank, N.A. with respect to its role as Paying Agent, Collateral Agent and Lockbox Bank.

"*Reduction*" shall mean any offset or other reduction in the amount of Cover Over Revenues paid to the Government by the United States Department of Treasury, including as a result of amounts owed, or alleged to be owed, to any United States Governmental Authority by the Government or any Governmental Authority or affiliated entity thereof; provided, however, that a "Reduction" shall not include any reduction that is made by the TTB as an adjustment to the amount of Cover Over Revenues previously paid due to an error determined by an audit or other administrative review.

"*Security Agreement*" shall mean the Security Agreement of even date herewith between the Trustee and the Collateral Agent, as secured parties, and the Government, as pledgor.

"*Trust Agreement*" shall mean the Trust Agreement of even date herewith between the Government, the Trustee, the Paying Agent and the Collateral Agent.

"*Trustee*" shall mean Banco Popular de Puerto Rico, a Puerto Rico banking entity, as trustee under the Trust Agreement.

**1.2** **Interpretation**. It is not the intention of the Parties to this Agreement to effect a novation of the Existing Agreement but only to supplement and modify the Existing Agreement as herein specifically indicated. Except to the extent expressly modified by this Agreement, the terms of the Existing Agreement shall remain in full force and effect. To the extent that there are any conflicts or inconsistencies between the terms and conditions of the Existing Agreement and the terms and conditions of this Agreement, the terms and conditions of this Agreement shall prevail.

**1.3** **Effectiveness.** The effectiveness of this Agreement between the Parties shall be subject to the satisfaction of each of the following conditions:

**1.3.1** Government Payment. PRIDCO shall have paid to BIL, on the date hereof, the amount of $32,000,000, by wire transfer of immediately available funds, in full satisfaction of certain Marketing and Production Support Payments that were due and payable as of the date hereof, as more specifically described in Exhibit A .

**1.3.2** Designated Agreements. Each of the Designated Agreements shall have been executed by the applicable representatives of the Government and the other parties thereto pursuant to Section 5.2.1 and shall be in full force and effect.

**1.3.3** Instruction. The Government shall have delivered to the United States Department of Treasury an instruction to remit all Cover Over Revenues to the Lockbox Account.

**1.4** **Confirmation Date.** The effectiveness of Section 2.5 and Article III of this Agreement shall be subject, in addition to the satisfaction of the conditions listed in Section 1.3, to the condition that the Confirmation Date shall have occurred.

## ARTICLE II

## EXISTING AGREEMENT

**2.1    Bulk and Bottled Rum**.   The reference to "bulk rum" in the definition of "Bacardi Rum Sales" in the Existing Agreement shall instead refer to "bulk rum (and, after June 30, 2014, bottled rum)" for rum produced in Puerto Rico.

**2.2    Cover Over Revenues**.   The definition of "Cover Over Revenues" shall be determined without regard to any Reduction.

**2.3    Marketing and Production Activities**.   Sections 4.2.2(i), 4.2.3 and 4.2.4 of the Existing Agreement shall be of no further force and effect and the following text in Section 4.2.1 of the Existing Agreement shall be of no further force and effect:   "Subject to the limitations in Sections 4.2.2 and 4.2.3,".

**2.4    Permitted Debt Service Reduction**.    Marketing and Production Support Payments shall not be reduced by Permitted Debt Service Reductions.

**2.5    True-Up Adjustments**.   Section 4.6.4(b) of the Existing Agreement shall be of no further force and effect.   Adjustments relating to the amounts in respect of Cover Over Revenues paid, or to be paid, to Bacardi shall be determined in accordance with Section 4.5 of the Trust Agreement.   In order to permit PRIDCO to prepare the "True-Up Calculations" under Section 4.5 of the Trust Agreement, no later than September 30 of each year PRIDCO and Bacardi shall undertake a review and reconciliation of all the invoices for Marketing and Production Support Payments submitted by Bacardi during the prior Fiscal Year (including all federal tax forms and amendments thereto filed with the TTB evidencing Bacardi Rum Sales and Cover Over Revenues generated by such sales) and the actual Marketing and Production Support Payments made by the Government to Bacardi during such Fiscal Year.

**2.6    Annual Reports**.   The reports required to be delivered by Bacardi under Sections 4.1.1(c) and 4.1.2(c) of the Existing Agreement shall be delivered within ninety (90) days after the end of each Fiscal Year.   In addition to including the information contained in the reports Bacardi submitted pursuant to such Sections before the Effective Date, reports submitted after the Effective Date shall contain information as to the volume of rum sold during such Fiscal Year that generated Cover Over Revenues and Bacardi's use of the Marketing and Production Support Payments it received during such Fiscal Year.

**2.7    Application of Payments**.   Marketing and Production Support Payments shall be credited to invoices submitted by Bacardi in the order in which such invoices became due and payable.

**2.8    No Further Obligations**.   Bacardi shall have no further obligation under Section 4.8 of the Existing Agreement.

## ARTICLE III

## MARKETING AND PRODUCTION SUPPORT PAYMENTS

**3.1    Past and Payable Amounts**.  The Government shall have no further obligation to pay BIL (or any Affiliate of BIL) $30,000,000 of Marketing and Production Support Payments which were due and payable as of the date hereof, such amount to be applied as set forth on Exhibit A to this Agreement.

**3.2    Payment of Future Amounts**.  All Marketing and Production Support Payments shall be paid (i) to the Paying Agent by the Lockbox Bank and (ii) to BIL by the Paying Agent to the extent funds administered by the Paying Agent are sufficient to make such Marketing and Production Support Payments in accordance with the Trust Agreement.

**3.3    Pledged Cover Over Requirement**.  Any amount that would have been payable to BIL in any given month but for the Pledged Cover Over Requirement shall be deemed to be payable in the months immediately succeeding the month in which the Pledged Cover Over Requirement for the then current Fiscal Year has been satisfied in full, to the extent of funds available to the Paying Agent from its receipt of Cover Over Revenues.  Notwithstanding the immediately preceding sentence, this Section 3.3 shall not modify in any respect Sections 4.1.4 or 6.3.3 of the Existing Agreement.

**3.4    Enforcement Expenses**.  BIL shall pay a share of Enforcement Expenses pursuant to Section 4.7 of the Trust Agreement.

## ARTICLE IV

## CAPEX PAYMENTS

**4.1    Infrastructure Support.** The Government shall have no further obligation to make the CapEx Payments required under Sections 3.1, 3.3 and 3.4 of the Existing Agreement, whether such CapEx Payments accrued before, or would accrue after, the Effective Date.

**4.2    Allocation**.  Bacardi may apply any portion of the Marketing and Production Support Payments it receives after the Confirmation Date to fund Refurbishment and Production Initiatives and the construction and operation of the Treatment Plant.  Bacardi may determine in its sole discretion whether to make such application and the amount of any such application.

**4.3    Tax Treatment**.  Any allocation of Marketing and Production Support Payments pursuant to Section 4.2 shall be subject to Section 5.2 of the Existing Agreement.

## ARTICLE V

## REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

**5.1    Representations, Warranties and Acknowledgements**.

**5.1.1** <u>Government</u>. The Government hereby represents and warrants to Bacardi as of the date of this Agreement and as of the Effective Date that:

(A)     The Government is not prohibited from consummating the transactions contemplated in this Agreement or the Designated Agreements by any law, regulation, agreement, instrument, restriction, order or judgment.

(B)     The Government has: (i) the legal power and due authority to execute and deliver this Agreement and the Designated Agreements and to make the representations and perform its obligations set forth in this Agreement and the Designated Agreements; and (ii) duly obtained such approvals, authorizations or consents in accordance with applicable law and procedures to the extent that the approval, authorization or consent of any Governmental Authority or any third party to make the representations and perform its obligations contained in this Agreement and the Designated Agreements is required.

(C)     The execution and delivery by the Government of this Agreement and the Designated Agreements, and the performance by the Government of this Agreement and the Designated Agreements, does not violate or conflict with, or result in a default under, any material contract or agreement to which it is bound or any law, regulation, agreement, instrument, restriction, order or judgment.

(D)     Assuming due authorization, execution and delivery of this Agreement and the Designated Agreements by all other parties thereto, this Agreement and the Designated Agreements are the legal, valid and binding obligation of the Government, enforceable against the Government in accordance with its terms, subject to the effects of laws affecting creditors' rights generally, including such laws relating to insolvency or debt restructuring and, to the extent applicable, the laws affecting the payment priorities of the obligations of the Commonwealth of Puerto Rico.

(E)     There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out its obligations under this Agreement and the Designated Agreements, except for those actions, suits or proceedings pending, threatened or anticipated that have become public knowledge.

(F)     The Cover Over Revenues payable to the Government are not subject to any lien, mortgage, encumbrance, charge or other security interest other than the Pledged Cover Over Requirement and the security interest created under the Security Documents on the "Collateral" as defined therein. The Government has not received any notice stating that it is currently, or may in the future be, subject to the Treasury Offset Program administered by the United States Department of Treasury.

**5.1.2** <u>Bacardi</u>. Each of BIL, BL and Corp hereby represents and warrants to the Government as of the date of this Agreement and as of the Effective Date that:

(A) BIL, BL and Corp are corporations duly organized and validly existing under the laws of their respective jurisdictions and have the corporate power and authority, and have taken all necessary action to authorize them, to execute and deliver this Agreement and to perform their obligations under this Agreement and the Trust Agreement (to the extent such Bacardi entities are party thereto).

(B) The execution and delivery by BIL, BL and Corp of this Agreement, and the performance by BIL, BL and Corp of this Agreement and the Trust Agreement (to the extent such Bacardi entities are party thereto), does not violate or conflict with, or result in a default under, any material contract or agreement to which they are bound or any of their respective organizational documents or any law, regulation, agreement, instrument, restriction, order or judgment.

(C) Assuming due authorization, execution and delivery of this Agreement and the Trust Agreement by the other parties thereto, this Agreement and the Trust Agreement are the legal, valid and binding obligation of each of BIL, BL and Corp (to the extent such Bacardi entities are party thereto), enforceable against each of them in accordance with its terms, subject to the effects of bankruptcy or insolvency or laws affecting creditors' rights generally.

(D) There are no actions, suits or proceedings pending or, to the best of BIL, BL and Corp's knowledge, threatened against or affecting BIL, BL and Corp before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of BIL, BL and Corp to meet and carry out their obligations under this Agreement and the Trust Agreement (to the extent such Bacardi entities are party thereto).

(E) Each of BIL, BL and Corp know of no material impediment which would prevent, impede, diminish or delay its timely performance of its obligations under this Agreement and the Designated Agreements.

**5.1.3** <u>Joint Representation</u>. Bacardi hereby represents and warrants to the Government, and the Government hereby represents and warrants to Bacardi, in each case as of the date of this Agreement and as of the Effective Date, that <u>Exhibit A</u> to this Agreement accurately sets forth the Marketing and Production Support Payments that, based on the assumptions set forth in such Schedule, (i) were payable under the Existing Agreement immediately prior to the payment by the Government described in <u>Section 1.3.1</u>, (ii) remain unpaid as of the date of this Agreement after application of the payment by the Government described in <u>Section 1.3.1</u>, and (iii) that will remain unpaid as of the Effective Date, after giving effect to the agreement described in <u>Section 3.1</u>.

**5.2     Covenants**.

**5.2.1** <u>Designated Agreements</u>. Concurrently with the execution and delivery of this Agreement by the Parties and the execution and delivery of the Designated Agreements by each

of the other parties thereto, the Government shall execute and deliver the Designated Agreements and provide a copy of each such fully executed Designated Agreement to BIL.  The Government shall at all times comply in all material respects with its obligations under the Designated Agreements.

       **5.2.2**  <u>Cover Over Reports</u>.  As promptly as practicable, the Government shall use its best efforts following the Confirmation Date to obtain a waiver from the United States Department of Treasury that would permit the Government to deliver the Cover Over Reports (as such term is defined in the Lockbox Agreement) to the Lockbox Bank, the Paying Agent and PRIDCO.

       **5.2.3**  <u>Reimbursement</u>.  PRIDCO shall, within ten (10) Business Days of demand therefor, reimburse BIL for any amount that BIL has become obligated to pay to the Lockbox Bank, the Paying Agent or the Collateral Agent pursuant to the terms of the P&I Agreement.  For purposes of this <u>Section 5.2.3</u>, the terms of the P&I Agreement shall be those in effect on the date hereof unless PRIDCO has consented to any amendment, supplement or modification to the P&I Agreement that would have the effect of increasing the payment obligations of BIL thereunder.

       **5.3**    **Negative Covenants**.

       **5.3.1**  <u>No Adverse Actions</u>.  Without the prior written consent of the Government, Bacardi, to the extent permitted by law and unless otherwise required by law, shall not take or fail to take any action if such action or failure to act, as the case may be, is reasonably likely to adversely affect, diminish or impair the beneficial use, operation, utility of, or the ability of the Government to beneficially use, occupy, obtain, receive or otherwise enjoy, any of the obligations or other commitments of Bacardi contemplated by, or set forth in, this Agreement and the Designated Agreements.  Without the prior written consent of Bacardi, the Government, to the extent permitted by law and unless otherwise required by law, shall not take  or fail to take any action, if such action or failure to act, as the case may be, is reasonably likely to (i) adversely affect, diminish or impair the beneficial use, operation, utility of, or the ability of Bacardi to beneficially use, occupy, obtain, receive or otherwise enjoy, any of the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement and the Designated Agreements, (ii) result in the U.S. Department of Treasury not remitting all Cover Over Revenues to the Lockbox Account or (iii) result in a lien on the Collateral (as defined in the Security Agreement) or any portion thereof.

<div align="center">

**ARTICLE VI**

**<u>BREACH; FIRST SUPPLEMENTAL</u>**

</div>

       **6.1**    **Breach**.  Any breach by the Government of <u>Section 5.3.1</u> shall constitute a Material Default under the Existing Agreement and shall give rise to the same remedies and rights (including rights of termination) with respect to this Agreement as does a Material Default by the Government under the Existing Agreement.

<div align="center">10</div>

**6.2** **First Supplemental**. Pursuant to Section 3.6 of the First Supplemental, (i) the proviso in Section 3.6 of the First Supplemental is hereby amended to delete the phrase "in each case by no more than sixty (60) days", (ii) the date of May 8, 2015 set forth in Section 2.1 of the First Supplemental pursuant to the Sixth Extension, is hereby extended to the Confirmation Date and (iii) the date of April 24, 2015 set forth in Section 2.2 of the First Supplemental pursuant to the Sixth Extension, is hereby extended to June 26, 2015. If the Confirmation Date occurs at any time after Bacardi has commenced arbitration seeking to enforce obligations under the Existing Agreement that are extinguished by Section 3.1 hereof, Bacardi shall promptly after the Confirmation Date dismiss such arbitration.

## ARTICLE VII

## MISCELLANEOUS

**7.1** **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original.

**7.2** **Governing Law; Waiver of Sovereign Immunity**. The governing law of this Agreement shall be the law of the Commonwealth of Puerto Rico (the "Commonwealth"), without giving effect to applicable principles of conflicts of laws. The Government hereby waives any right, forum, defense or limitation based upon its sovereign immunity for purposes of any action for breach of its obligations under this Agreement.

**7.3** **Term of Agreement; Survival**. The term of this Agreement shall be the same as the Term. The provisions of this Agreement that have not become effective or that have not been fully performed (i) shall automatically terminate upon termination or expiration of the Existing Agreement (or, if the Existing Agreement is extended, upon the termination or expiration of such extension) and (ii) if the Confirmation Date has not occurred on or before June 26, 2015, may be terminated by BIL giving written notice to the Government, such termination to become effective upon the Government's receipt of such notice; provided, however, that Section 5.2.3 shall survive any such termination or expiration.

**7.4** **Entire Agreement.** The Bacardi Agreements, the Designated Agreements and the P&I Agreement constitute the entire agreement among the parties hereto with respect to the subject matter of this Agreement and supersede all prior or contemporaneous agreements, understandings, discussions or negotiations (written or oral) among the parties hereto with respect to the subject matter of this Agreement.

**7.5** **Expenses**. Except as otherwise expressly provided herein or in the Designated Agreements, each Party shall be responsible for all of the costs, fees and expenses incurred in performing its obligations under this Agreement and the Designated Agreements and shall pay the fees and expenses of its attorneys and other advisors and consultants and all other costs, fees and expenses incurred by such Party in connection with the negotiation, preparation, execution and delivery of this Agreement and the Designated Agreements.

**7.6** **No Waiver**. No provision of this Agreement may be interpreted to be a waiver of any provision of the laws (including the Constitution) of the Commonwealth that are not

waivable under such laws, including any applicable laws relating to the payment priorities of the obligations of the Commonwealth, including without limitation Section 8 of Article VI of the Constitution and Article 4(c) of Act 147 of June 18, 1980, as amended.

### 7.7 Government Contract Clauses.

**7.7.1** <u>Lobbying Certification</u>. Each of BIL, BL and Corp certifies that none of the funds from this Agreement will be paid to any person for lobbying before a member, an official or employee of any Government agency, the federal government and/or the Commonwealth Legislature in connection with this Agreement.

If any funds, other than funds provided by this Agreement, have been paid or will be paid to any person for lobbying before a member, an official or employee of the Commonwealth Legislature in connection with this Agreement, each of BIL, BL and Corp shall complete and submit to PRIDCO Standard Form LLL "Disclosure Form To Report Lobbying" in accordance with its instructions, and Standard Form LLL.

Each of BIL, BL and Corp shall require that this lobby certification clause be included in all contracts and sub-contracts entered into in the Commonwealth as a result of this Agreement. Each of BIL, BL and Corp acknowledges that a false certification by any of them constitutes a material default and may be grounds for termination of this Agreement.

**7.7.2** <u>No Payments or Gratuities</u>. Neither BIL, BL or Corp nor their officers, directors or employees has made any payment, gift or anything of value to any Government employee or official to obtain a favorable evaluation or the execution of this Agreement. If a violation of this <u>Section 7.7.2</u> occurs, in addition to the remedies available to the Government pursuant to applicable laws and regulations, the Government shall be entitled to recover any payments made or gratuities given. No fee or gratuity will be paid to any such person in connection with this Agreement (except to attorneys and consultants engaged to advise Bacardi) to meet the requirements of this Agreement and any violation of this prohibition may be grounds for termination of this Agreement.

**7.7.3** <u>Conflicts of Interest</u>. Each of BIL, BL and Corp hereby certifies that neither BIL, BL or Corp nor their directors, officers, members, partners or employees, has any interest nor shall they acquire any interest, directly or indirectly, in cases or issues which may conflict in any manner with its performance under this Agreement.

To the best knowledge of BIL, BL and Corp (i) no public official or employee of the Government or employee of the Legislative and Judicial branches of the Government has participated in any decision relating to this Agreement which affects such official's or employee's personal interest or the interest of any entity or business in which such officer or employee or any member of his family has or has had an economic interest, directly or indirectly, and (ii) no official or employee of the Government or of the Legislative and Judicial branches of the Government has any interest, direct or indirect, in this Agreement or any proceeds thereof.

Each of BIL, BL and Corp hereby certifies that neither it nor any of its shareholders, directors, executives, officers and employees receives a salary or any kind of compensation for

the delivery of regular services by appointment in any agency, instrumentality, public corporation, or municipality of the Commonwealth of Puerto Rico.

Each of BIL, BL and Corp agrees to request the Government's consent or waiver to any agreement described in this <u>Section 7.7.3</u> prior to its execution which consent or waiver will not be unreasonably denied.

It is acknowledged that the certifications as to the non-existence of a conflict of interest are essential conditions of this Agreement, and if found to be intentionally false, misleading, altered or forged, such finding may be grounds for termination of this Agreement.

**7.7.4** <u>Full Disclosure</u>. To the best of its knowledge, each of BIL, BL and Corp has furnished to the Government all material facts necessary to make the statements contained herein. To the best of its knowledge, as of the Effective Date, there are no issues, facts or matters that materially adversely affect, or which could materially adversely affect, the properties, business, operations or condition (financial or otherwise) of any of them or that will hinder their ability to perform their obligations under this Agreement.

**7.7.5** <u>Compliance with Tax Laws</u>. Each of BIL, BL and Corp shall be responsible for retention, proper filing and payment of all social security, income tax, worker's compensation, unemployment insurance, disability insurance, and all other labor requirements arising under this Agreement, if applicable. Each of BIL, BL and Corp agrees that it will comply with the Commonwealth tax laws, rules and regulations. Each of BIL, BL and Corp will be responsible for filing its income tax returns and any other tax or related filings for making any necessary payments to the Department of the Treasury and the Internal Revenue Service of the United States of America, if applicable.

Corp certifies that it has filed all of its Tax returns for the past five (5) years, owes no Taxes and/or is up to date in any payment plan for such Taxes. Corp also certifies that it does not have outstanding debts regarding its treatment of unemployment insurance premiums, workers' compensation payments, social security for chauffeurs in Puerto Rico or the Administration for the Sustenance of Minors (known by its Spanish acronym "ASUME"). Prior to the execution of this Agreement, Corp has submitted to the Government the following certifications and documents:

(a) A certification of filing of income tax returns for the past five (5) years, issued by the Department of the Treasury.

(b) A negative debt certificate, or payment plan and compliance therewith, issued by the Commonwealth's Department of the Treasury.

(c) A negative certificate of debt, or payment plan and compliance therewith, with respect to real and personal property taxes issued by the Municipal Revenue Collection Center (known by its Spanish acronym "CRIM").

(d) A negative certificate of debt, or payment plan and compliance therewith, for unemployment insurance, temporary disability insurance and chauffeur's social security issued by the Puerto Rico Department of Labor and Human Resources.

     (e)      A copy of the Workmen's Compensation Insurance policy issued by the State Insurance Fund.

     (f)      A negative certificate of debt, or payment plan and compliance therewith, issued by the State Insurance Fund.

     (g)      A good standing certificate from the Puerto Rico Department of State.

     (h)      A negative certificate of account or debt, or payment plan and compliance therewith, with respect to ASUME.

BIL and BL are not engaged in trade or business in Puerto Rico. Prior to the execution of this Agreement, BIL and BL submitted to PRIDCO a good standing certificate issued by the Department of State of their place of organization and a notarized sworn statement in which each of BIL and BL certifies that:

     (a)      During the five (5) taxable years prior to the year of execution of this Agreement (the "*Five Year Period*"), it was not engaged in the conduct of trade or business in Puerto Rico, it did not derive any income effectively connected with a trade or business in Puerto Rico, it was not required to file, and did not file, any income tax returns in Puerto Rico and it does not owe income taxes to the Puerto Rico Department of the Treasury.

     (b)      During the Five Year Period it did not have any personal property in Puerto Rico and it was not required to file, and did not file, any personal property tax returns in Puerto Rico and it does not owe the CRIM any taxes.

     (c)      During the Five Year Period it did not have, and it currently does not have any real property in Puerto Rico and it does not owe any real property taxes to the CRIM.

     (d)      It does not have any employees in Puerto Rico. Therefore, it does not (1) owe any payments to the Puerto Rico Department of Labor and Human Resources in connection with unemployment, disability, or chauffeur's insurance; (2) have to obtain and maintain an insurance policy from the Puerto Rico State Insurance Fund; and (3) have the obligation as an employer to withhold and remit child support payments to ASUME. Certificates issued by the Puerto Rico Department of Labor and Human Resources to the effect that BIL and BL are not registered as employers in Puerto Rico are attached hereto and made a part hereof.

     (e)      It is not required to withhold or pay any other taxes to the Government.

It is acknowledged that the certifications and sworn statements above are essential conditions of this Agreement, and if found to be intentionally false, misleading, altered or forged, such finding shall constitute a material default under this Agreement and the Government shall have the right to terminate this Agreement.

**7.7.6** <u>Business Documents; Evidence of Authority</u>. Prior to the execution of this Agreement, each of BIL, BL and Corp has provided to the Government copies of its articles of incorporation, by-laws, or partnership or joint venture agreement, as applicable. Each of BIL, BL and Corp has delivered to the Government an original certificate of resolution evidencing the authorization to enter into this Agreement.

**7.7.7** <u>Registration of this Agreement</u>. PRIDCO shall remit a copy of this Agreement to the Office of the Comptroller of Puerto Rico within thirty (30) days following the date of the execution of this Agreement and any subsequent amendment of this Agreement. No provision or consideration of services under this Agreement may be demanded until the same has been filed for registration with the Office of the Comptroller of Puerto Rico pursuant to Act No. 18 of October 30, 1975, as amended and Act No. 127 of May 31, 2004 (collectively, the "*Acts*"), as amended. The Government undertakes to register this Agreement pursuant to such Acts as soon as practicable after the execution of this Agreement.

**7.7.8** <u>Certification on Criminal Proceedings</u>. Each of BL, BIL and Corp certifies that as of the date of this Agreement and for the preceding ten (10) years, neither it nor any of its shareholders, directors, employees or agents, subsidiaries or parent companies have been convicted, entered a guilty plea or probable cause found for arrest, and that it has no knowledge that any of them is or are the subject of any investigation in either a civil or criminal procedure in a state or federal court for charges related to acts of corruption, the public treasury, the public trust, a public function, or a fault that involves public funds or property, or has no knowledge of being indicted in a criminal procedure for offenses against public integrity, embezzlement of public funds or for the felonies or misdemeanors mentioned in Act No. 458 of December 29, 2000, as amended, in the courts of the Commonwealth, federal courts, or any other court with jurisdiction. It is acknowledged by the Parties that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute a material default under this Agreement and a cause for the Government to terminate this Agreement without prior notice and to the extent required by Act No. 458 of December 29, 2000, if applicable with respect to this Agreement, each of BL, BIL and Corp will have to reimburse the Government any amount of money received under this Agreement. Each of BL, BIL and Corp have submitted to the Government a sworn statement as required by Act No. 428, approved on September 22, 2004.

If the status of each of BL, BIL and Corp with regards to the charges previously mentioned should change at any time during the term of this Agreement, each of BL, BIL and Corp shall immediately notify in writing the Government after acquiring knowledge thereof if it, or any of its shareholders, officers and directors becomes indicted, convicted or becomes the subject of an investigation in a criminal procedure for any type of offense mentioned above. Failure to comply with this notice constitutes a material default under this Agreement and a cause for the Government to terminate this Agreement and shall result in the remedies mentioned previously.

Corp will require compliance with the clauses described above to any consultant and/or subcontractor hired in the Commonwealth with the funds provided under this Agreement. If said certification is false, Corp will have just cause for terminating the agreement with the consultant or sub-contractor, and to the extent required by applicable law with respect to this Agreement,

the consultant or sub-contractor will have to reimburse the Government any and all amounts received for services performed under this Agreement.

If the circumstances of the consultant or sub-contractor related to child support payments change at any time during this Agreement, the consultant or sub-contractor shall obtain the necessary certification, inform Corp, immediately obtain the certification from ASUME and provide a copy to Corp.

**7.7.9** <u>Ethics Representations</u>. In addition to any of the foregoing warranties and representations, each of BL, BIL and Corp acknowledges, represents and warrants that no official or employee of the Government has a direct or indirect economic interest in Bacardi's rights under this Agreement, the Existing Agreement or the Designated Agreements as required by (a) Act No. 84 of June 18, 2002, as amended, also known as the Code of Ethics for Contractors (the "*Ethics Code*") and Act No. 68 of February 20, 2004, as amended, and (b) the Government's Ethics Law, Act No. 1, enacted on January 3, 2012, as amended from time to time, and its implementing regulations (the "Ethics Law and Regulations"). Each of BIL, BL and Corp certifies that it has received a copy of the Ethics Code and the Ethics Law and Regulations, read, understood, has complied and will subsequently continue to comply with them in their entirety. A violation of this <u>Section 7.7.9</u> shall constitute a material default under this Agreement and the Existing Agreement and a cause for the Government to terminate this Agreement and the Existing Agreement to the extent required by the Ethics Laws and Regulations, if applicable.

**7.7.10** <u>Invoice Certification</u>. All invoices under the Existing Agreement must include a written and signed certification stating that no officer or employee of the Government, and its respective subsidiaries or affiliates, will personally derive or obtain any benefit or profit of any kind from this Agreement, with the acknowledgement that invoices which do not include this certification will not be paid. This certification must read as follows:

"We certify under penalty of nullity that no public servant of the Government, its respective subsidiaries or affiliate, will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for services provided is the agreed upon price that has been negotiated with an authorized representative of the Government. The total amount shown on this invoice is true and correct. The services have been rendered, and no payment has been received."

**7.7.11** <u>Non Discrimination Clauses</u>. Each of BL, BIL and Corp agrees that it will not discriminate against any employees or applicant for employment on account of race, color, religion, sex, sexual orientation, disability or national origin in compliance with all applicable Commonwealth and federal laws and regulations regarding non-discrimination. The provisions of this <u>Section 7.7.11</u> shall be applicable to any sub-contractor or Person acting on behalf of each of BL, BIL and Corp and/or a sub-contractor.

Each of BL, BIL and Corp shall include the provisions of this <u>Section 7.7.11</u> in every subcontract so that such provisions will be binding upon each contractor.

**7.7.12** <u>Local Goods and Services</u>.  Pursuant to Article 10 of Act No. 14 of the Legislative Assembly of Puerto Rico, enacted on January 8, 2004, 3 P.R. Laws Ann. § 930 et seq., each of BL, BIL and Corp shall use, to the extent available and applicable hereunder, and to the extent permitted by applicable law, goods extracted, produced, assembled, packaged, bottled or distributed in the Commonwealth by businesses operating in the Commonwealth or distributed by agents established in the Commonwealth.

**7.7.13** <u>Enabling Act</u>.  This Agreement is entered into pursuant to the Enabling Act.

**7.8** **Other Existing Agreement Provisions**.  The following provisions of the Existing Agreement shall apply to this Agreement as fully as if set forth herein, and any references therein to the "Agreement" or any provision thereof shall instead refer to this Agreement or the applicable provision hereof for purposes of this <u>Section 7.8</u>:  Article V, Section 6.3, Sections 8.3 through 8.8, Sections 8.10 through 8.14, Section 8.16, Section 8.17, Section 8.19 and Section 8.20.

[*Signature Pages Follow*]

17

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date hereof.

**BACARDI INTERNATIONAL LIMITED**

By: _____
Name: D. Jane Hulse
Title: Finance Director

By: _____
Name: Michelle Hajek
Title: Assistant Secretary

**BACARDI LIMITED**

By: _____
Name: Douglas Mello
Title: Vice President – Corporate Secretary
& Shareholder Relations

By: _____
Name: Kevin McNamara
Title: Senior Vice President & Chief
Financial Officer

**BACARDI CORPORATION**

By: _____
Name: Joaquin E. Bacardí
Title: President

By: _____
Name: Carlos H. Dobal
Title: Vice President and Director

[Signature Page to Supplemental Agreement No. 2]

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date hereof.

BACARDI INTERNATIONAL LIMITED

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

BACARDI LIMITED

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

BACARDI CORPORATION

By: _____
      Name:  Joaquin E. Bacardí
      Title:   President

By: _____
      Name:  Carlos H. Dobal
      Title:   Vice President and Director

[Signature Page to Supplemental Agreement No. 2]

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date hereof.

**BACARDI INTERNATIONAL LIMITED**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**BACARDI LIMITED**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**BACARDI CORPORATION**

By: _____
     Name: Joaquin E. Bacardí
     Title: President

By: _____
     Name: Carlos H. Dobal
     Title: Vice President and Director

[Signature Page to Supplemental Agreement No. 2]

## THE GOVERNMENT OF PUERTO RICO

Department of the Treasury

By: _Juan Zaragoza Gómez_
     Name:  Juan Zaragoza Gómez
     Title:   Secretary

Department of Economic Development and Commerce

By: _____
     Name:  Alberto Bacó Bagué
     Title:   Secretary

Puerto Rico Industrial Development Company

By: _____
     Name:  Antonio L. Medina Comas
     Title:   Executive Director

Department of Agriculture

By: _____
     Name:  Myrna Comas Pagan
     Title:   Secretary

Office of Management and Budget

By: _____
     Name:  Luiz F. Cruz Batista
     Title:   Executive Director

Government Development Bank for Puerto Rico

By: _____
     Name:  Melba I. Acosta Febo
     Title:   President

[Signature Page to Supplemental Agreement No. 2]

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
        Name: Juan Zaragoza Gómez
        Title: Secretary

Department of Economic Development and
Commerce

By: _____
        Name: Alberto Bacó Bagué
        Title: Secretary

Puerto Rico Industrial Development Company

By: _____
        Name: Antonio L. Medina Comas
        Title: Executive Director

Department of Agriculture

By: _____
        Name: Myrna Comas Pagan
        Title: Secretary

Office of Management and Budget

By: _____
        Name: Luiz F. Cruz Batista
        Title: Executive Director

Government Development Bank for Puerto Rico

By: _____
        Name: Melba I. Acosta Febo
        Title: President

[Signature Page to Supplemental Agreement No. 2]

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____

      Name:  Juan Zaragoza Gómez
      Title:    Secretary


Department of Economic Development and
Commerce

By: _____

      Name:  Alberto Bacó Bagué
      Title:    Secretary


Puerto Rico Industrial Development Company

By: _____

      Name:  Antonio L. Medina Comas
      Title:    Executive Director


Department of Agriculture

By: _____

      Name:  Myrna Comas Pagan
      Title:    Secretary


Office of Management and Budget

By: _____

      Name:  Luiz F. Cruz Batista
      Title:    Executive Director


Government Development Bank for Puerto Rico

By: _____

      Name:  Melba I. Acosta Febo
      Title:    President


[Signature Page to Supplemental Agreement No. 2]

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
     Name: Juan Zaragoza Gómez
     Title: Secretary


Department of Economic Development and
Commerce

By: _____
     Name: Alberto Bacó Bagué
     Title: Secretary


Puerto Rico Industrial Development Company

By: _____
     Name: Antonio L. Medina Comas
     Title: Executive Director


Department of Agriculture

By: _Myrna Comas Pagán_____
     Name: Myrna Comas Pagan
     Title: Secretary


Office of Management and Budget

By: _____
     Name: Luiz F. Cruz Batista
     Title: Executive Director


Government Development Bank for Puerto Rico

By: _____
     Name: Melba I. Acosta Febo
     Title: President


[Signature Page to Supplemental Agreement No. 2]

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
      Name:  Juan Zaragoza Gómez
      Title:   Secretary

Department of Economic Development and
Commerce

By: _____
      Name:  Alberto Bacó Bagué
      Title:   Secretary

Puerto Rico Industrial Development Company

By: _____
      Name:  Antonio L. Medina Comas
      Title:   Executive Director

Department of Agriculture

By: _____
      Name:  Myrna Comas Pagan
      Title:   Secretary

Office of Management and Budget

By: _____
      Name:  Luiz F. Cruz Batista
      Title:   Executive Director

Government Development Bank for Puerto Rico

By: _____
      Name:  Melba I. Acosta Febo
      Title:   President

[Signature Page to Supplemental Agreement No. 2]

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
      Name:  Juan Zaragoza Gómez
      Title:   Secretary

Department of Economic Development and
Commerce

By: _____
      Name:  Alberto Bacó Bagué
      Title:   Secretary

Puerto Rico Industrial Development Company

By: _____
      Name:  Antonio L. Medina Comas
      Title:   Executive Director

Department of Agriculture

By: _____
      Name:  Myrna Comas Pagan
      Title:   Secretary

Office of Management and Budget

By: _____
      Name:  Luiz F. Cruz Batista
      Title:   Executive Director

Government Development Bank for Puerto Rico

By: _____
      Name:  Melba I. Acosta Febo
      Title:   President

[Signature Page to Supplemental Agreement No. 2]

# 7.  Destilería Sérralles Agreement (Dec. 31, 2011), ECF No. 10612-1

*File*



BANCO
GUBERNAMENTAL
DE FOMENTO PARA
PUERTO RICO

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**

PO Box 42001
San Juan, PR 00940-2001
Teléfono (787) 722-2525

3 de enero de 2012

**A LA MANO**

Lcdo. Juan Acosta Reboyras
Acosta & Ramírez CSP Law Offices
Po Box 195492
San Juan, Puerto Rico 00919-5492
151 Calle Tetuán, Esquina San José
Viejo San Juan, Puerto Rico 00901

Estimado licenciado Acosta:

**Re: Acuerdo entre Destilería Serrallés, Inc. y el Gobierno de Puerto Rico**

Adjunto incluyo un original del Acuerdo con Serrallés con fecha del 31 de diciembre de 2011, firmado por todas las partes con sus *exhibits*.

Atentamente,

Zulema E. Martínez Álvarez
Vicepresidenta *Senior* y
  Asesora Legal General

Anejo





28028

**EXECUTION VERSION**

**AGREEMENT**

Between

**DESTILERÍA SERRALLÉS, INC.**

and

**THE GOVERNMENT OF PUERTO RICO**

**Dated as of December 31, 2011**

EXECUTION VERSION

## AGREEMENT

**THIS AGREEMENT** (this "Agreement"), dated as of the 31st day of December, 2011, is made by and among Destilería Serrallés, Inc. ("Serrallés") and the Government of Puerto Rico (the "Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"), as fiscal agent for the Government, the Executive Director of the Office of Management and Budget, and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by the Puerto Rico Tax Code as defined herein. The Government and Serrallés are collectively referred to as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, the Government is committed to promoting the growth, development and diversification of the economy of Puerto Rico ("Puerto Rico"); to promoting capital investment for the economic development of Puerto Rico; and to enhancing the business climate in Puerto Rico, all of which purposes and objectives are declared to be in the public interest; and

WHEREAS, since 1917, United States federal excise taxes on rum produced in Puerto Rico have been "covered-over" or transferred to Puerto Rico pursuant to Section 7652 of the U.S. Internal Revenue Code of 1986, as amended (the "Cover Over Revenues" as defined herein); and

WHEREAS, the Cover Over Revenues program was later extended to the United States Virgin Islands ("USVI"); and

WHEREAS, since 1999 the rate for the Cover Over Revenues has been set at $13.25 per proof gallon by periodic acts of Congress which have added $2.75 to the permanent cover over rate of $10.50 legislated in 1984; and

WHEREAS, in 2008 and 2009, the USVI entered into long-term agreements with two Serrallés competitors providing for significant incentives by using the Cover Over Revenues funds of the USVI (the "USVI Incentives"); and



WHEREAS, starting in 2012, this is expected to result in a significant competitive disadvantage for companies that produce their rum in Puerto Rico, including Serrallés, when compared to those USVI rum producers, as well as a significant decrease of over $135 million in Cover Over Revenues funds currently covered-over to Puerto Rico; and

WHEREAS, the Don Q brand is the leading rum brand consumed in Puerto Rico and Serrallés has produced high quality rums in Puerto Rico since 1865; and

WHEREAS, Serrallés and its Affiliates are one of the largest employer of the southern region of Puerto Rico; and

WHEREAS, Serrallés in the past five years has invested from its own funds over $50 Million in capital expenditures to upgrade its rum production facilities; and

EXECUTION VERSION

WHEREAS, Serrallés' rum production in Puerto Rico and ultimate sale in the United States has generated over $1 billion in the last 10 years and will generate in calendar year 2011 approximately $140 million in Cover Over Revenues to Puerto Rico; and

WHEREAS, the termination by Diageo of its supply contract with Serrallés and the subsequent USVI Incentives granted to Diageo, shall cause a substantial reduction in Serrallés rum production levels after year 2011; and

WHEREAS, Serrallés desires to recover as quickly as possible the rum production lost to the USVI; and

WHEREAS, Puerto Rico has used the Cover Over Revenues to fund infrastructure and public works programs, support expenditures of the central government, preserve and improve the environment by protecting certain vital ecosystems, support the development of the science and technology industry and promote the Puerto Rican rum industry through its Rums of Puerto Rico program ("ROPR") which is administered by PRIDCO; and

WHEREAS, the Government recognizes that the protection and promotion of the rum production industry in Puerto Rico will have a significant positive impact on the welfare of the community, including the potential for the creation of jobs in Puerto Rico, the protection and increase of Cover Over Revenues to the Puerto Rico treasury, the creation of additional economic opportunities and revenues for other Puerto Rico industries that will support and otherwise do business with Puerto Rico rum producers and therefore, the Government is desirous of supporting Serrallés' rum production operations in Puerto Rico; and

WHEREAS, the Government is entering into this Agreement with Serrallés in reasonable reliance upon the United States Congress ("Congress") longstanding commitment to assist Puerto Rico in attracting and protecting rum production in Puerto Rico through the availability of the rum Cover Over Revenues program; and

WHEREAS, the Government of Puerto Rico understands the importance of taking the steps necessary to maintain Puerto Rico as a competitive jurisdiction for the rum industry especially during the present difficult global economic conditions; and

WHEREAS, it is in the best interest of the Government and the people of Puerto Rico that the Government of Puerto Rico enter into this Agreement with Serrallés to assure the continuance of the benefits generated by the Cover Over Revenues program to Puerto Rico; and

WHEREAS, in order to maintain, promote and grow the production of rum by Serrallés in Puerto Rico and to protect the corresponding Cover Over Revenues, the Parties desire to enter into this long-term Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

2

EXECUTION VERSION

# ARTICLE I

## GENERAL PROVISIONS

### 1.1 Agreement Scope

Subject to the terms and conditions set forth herein, this Agreement shall become effective as of the date hereof, such date being hereinafter referred to as, the "Effective Date". This Agreement shall be recorded by the Government with the Office of the Comptroller of Puerto Rico, as required by Act No. 18 of October 30, 1975, as amended, within fifteen (15) days after the full execution hereof. The Agreement includes this document and any exhibits, attachments, schedules or appendices attached hereto or referenced herein all of which are hereby incorporated by reference. This Agreement shall constitute the valid and binding obligation of the Parties, enforceable against any party in accordance with its terms.

### 1.2 Government Obligations

In consideration of Serrallés' long-term commitment to maintain and expand its Rum production in Puerto Rico as set forth in this Agreement, including a commitment by Serrallés to produce exclusively in Puerto Rico all Rum to be sold in the United States by Serrallés or its Affiliates in which Serrallés holds a controlling interest in excess of fifty percent (50%), the Government agrees to fully perform its obligations as also set forth in this Agreement. Except for Section 4.1.3 (b) the Government shall not support any federal, Puerto Rico and/or municipal legislation, executive order, resolution, regulation, agreement, obligation, legal instrument, or other undertaking which materially impairs or limits the Government's ability to fully perform its obligations as set forth in this Agreement.

### 1.3 No Additional Cost to Serrallés

The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Serrallés be responsible for or be required to incur or pay or reimburse any cost, charge or expense under this Agreement relating to those obligations other than the direct expenses incurred by Serrallés in the negotiation and preparation of this Agreement and those expenses that this Agreement specifically identifies as a cost, charge or expense to be borne or paid by Serrallés.

### 1.4 Inducement



The Parties acknowledge that (a) the molasses, refurbishment, tax, production and marketing incentives granted by the Government hereunder constitute an important inducement for Serrallés to commit to produce Rum in Puerto Rico in the long term, (b) absent such molasses, refurbishment, tax, production and marketing incentives, due to the USVI Incentives, among other reasons, Serrallés would have serious competitive disadvantages in maintaining its Rum producing operations in Puerto Rico for sale in the United States, and (c) Serrallés' development and operation plans with respect to the production of Rum in Puerto Rico for sale in the United States rely on the continued availability of such incentives throughout the Term of

3

EXECUTION VERSION

this Agreement. The Parties also acknowledge that Serrallés' commitment to produce Rum in Puerto Rico in accordance with the terms of this Agreement constitutes one of the main inducements for the Government to provide Serrallés with the molasses, refurbishment, tax, production and marketing incentives set forth in this Agreement.

**1.5    Serrallés Obligations**

In consideration of the Government granting the benefits and incentives to Serrallés under this Agreement, which consideration shall be acknowledged by Serrallés upon the full execution, adoption and filing of this Agreement by the Government, Serrallés agrees to obtain all necessary internal approvals prior to the execution of this Agreement and to fully perform its obligations as set forth in this Agreement. Serrallés shall not enter, and shall not cause or suffer its Affiliates to enter, into any contract, agreement, arrangement, undertaking or transaction that materially impairs or limits its ability to fully perform its obligations as set forth in this Agreement.

# ARTICLE II

# DEFINITIONS

**2.1 Defined Terms**

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Affiliate" shall mean with respect to Serrallés, (i) any entity which is controlled directly or indirectly by Serrallés, or which is under common control with Serrallés, or which controls Serrallés, or (ii) any entity on which Serrallés, directly or indirectly, owns at least thirty-three percent (33%) of the total common stock or voting equity interest of such entity, or (iii) any entity that owns, directly or indirectly, at least thirty-three percent (33%) of the total common stock or voting equity interest of Serrallés.

"Aggregate Minimum Rum Production Requirements" shall mean, with respect to any Fiscal Year, the sum of the Minimum Rum Branded Production Requirements and the Minimum Bulk Rum Production Requirements for that Fiscal Year.

"Aggregate Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of all taxable Rum sold in the United States during such Fiscal Year attributable to the total of Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales, as reported in the Monthly Cover Over Reports for such Fiscal Year.



"Agreement" shall have the meaning specified in the preamble of this Agreement.

"Branded Rum Products" shall mean all Rum produced at Serrallés' rum manufacturing operations in Puerto Rico for products ultimately to be sold to consumers in the United States under brand names owned or Licensed by Serrallés or its Affiliates, and shall be counted cumulatively toward the incentives provided in this Agreement for Serrallés Branded Rum Sales.

4

EXECUTION VERSION

"Bulk Rum" shall mean all Rum, other than Branded Rum Products, that is produced in Serrallés' rum manufacturing operations in Puerto Rico and sold by Serrallés for resale to Persons (including Affiliates) ultimately to be sold to consumers in the United States in products under brand names that are not owned or Licensed by Serrallés or its Affiliates, and shall be counted cumulatively toward the incentives provided in this Agreement for Serrallés Bulk Rum Sales.

"Cover Over Rate" shall mean the dollar amount per proof gallon of the Rum excise tax that is returned or covered over by the U.S. Government to the Government pursuant to Section 7652 of the United States Internal Revenue Code of 1986, as amended, or any other statute or regulation which may substitute such Section in the future. As of the date hereof, the Cover Over Rate is $13.25 per proof gallon.

"Cover Over Revenues" shall mean the federal excise tax revenues payable to the Government by the U.S. Government pursuant to Section 7652(a) of the U.S. Internal Revenue Code of 1986, as amended, or any other statute or regulation which may substitute such Section in the future. For purposes of this Agreement, Cover Over Revenues are deemed to be "payable to the Government" in respect of a Fiscal Year when all Monthly Cover Over Reports in respect of such Fiscal Year have been submitted by TTB to the United States Department of the Interior and a copy of each has been received by the Puerto Rico Department of the Treasury, and shall be determined without regard to the actual timing of such payment by the U.S. Government. The Cover Over Revenues attributable to any relevant Rum sales during any Fiscal Year are determined by multiplying the number of proof gallons of relevant Rum sales by the applicable Cover Over Rate.

"Disbursement Agent" shall have the meaning specified in Section 3.2 hereof.

"Dispute" shall have the meaning specified in Section 8.3.1 hereof.

"Economic Development Incentives" shall mean those incentives provided by the Government to Serrallés in accordance with Sections 5.1 and 5.2 hereof.

"Effective Date" shall have the meaning specified in Section 1.1 hereof.

"Event of Force Majeure" shall mean any act that (a) materially and adversely affects the affected Party's ability to perform the relevant obligations under this Agreement or delays such affected Party's ability to do so, (b) is beyond the reasonable control of the affected Party, (c) is not due to the affected Party's fault or negligence and (d) could not be avoided, by the Party who suffers it, by the exercise of commercially reasonable efforts, including the expenditure of any reasonable sum of money and, subject to the satisfaction of the conditions set forth in (a) through (d) above, an "Event of Force Majeure" shall include: (i) natural phenomena, such as storms, floods, hurricanes and earthquakes; (ii) wars, civil disturbances, revolts, insurrections, terrorism, sabotage and threats of sabotage or terrorism; (iii) transportation disasters, whether by ocean, rail, land or air, (iv) strikes or other labor disputes that are not due to the breach of any labor agreement by the affected Party; (v) fires; and (vi) actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions) that were not voluntarily induced or promoted

EXECUTION VERSION

by the affected Party, or brought about by the breach of its obligations under this Agreement or any Governmental Rule; provided, however, that under no circumstances shall an Event of Force Majeure include any of the following events: (A) economic hardship; (B) changes in market conditions; (C) any strike or labor dispute involving the employees of Serrallés or any Affiliate of Serrallés, other than industry or nationwide strikes or labor disputes; (D) ordinary weather conditions which could reasonably be managed by experienced contractors operating in the relevant location; (E) the occurrence of any manpower, material or equipment shortages; or (F) any delay, default, or failure (financial or otherwise) of the affected Party that is not the result of an event that would otherwise be an Event of Force Majeure; provided further, that upon the occurrence of any Event of Force Majeure, the affected Party shall promptly notify the unaffected Party and shall use commercially reasonable efforts to mitigate the effects thereof.

"Federal Adjustment" shall have the meaning specified in Section 4.6.2 hereof.

"Fiscal Year" shall mean the Government's fiscal year of July 1 through June 30.

"GDB" shall have the meaning specified in the preamble of this Agreement.

"Government" shall mean the government of the Commonwealth of Puerto Rico.

"Governmental Authority" shall mean any federal, Puerto Rico, commonwealth, state, municipal or local governmental entity, authority or agency, department, instrumentality, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) and any arbitrator to whom a dispute has been presented under Governmental Rule, pursuant to the terms of this Agreement or by agreement of the Parties.

"Governmental Function" means any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government or any of its instrumentalities is authorized or required to perform in its capacity as a Governmental Authority in accordance with Governmental Rules.

"Governmental Rule" shall mean any statute, law, treaty, rule, code, ordinance, regulation, permit, interpretation, certificate or order of any Governmental Authority, or any judgment, decision, decree, injunction, writ, order or like action of any court, arbitrator or other Governmental Authority.

"Historic Base Level" shall mean a Cover Over Rate of $10.50 per proof gallon.



"License" or "Licensed" shall mean or refer to the grant of permission by the brand owner (the "licensor) to a recipient (the "licensee") to use a brand of such licensor in the manufacture and distribution of Rum products under such licensor's brand. A "License" shall also include a sub-license granted by a duly licensed licensee but shall not include an agreement limited to the production of Rum.

"Marketing Activities" shall have the meaning specified in Section 4.1.1 hereof.

6

"Marketing and Production Support Payments" shall have the meaning specified in Section 4.1.3 hereof.

"Material Default" shall mean (a) in the case of Serrallés (i) if Serrallés fails to meet the Aggregate Minimum Rum Production Requirements by 10% or more in any Fiscal Year during the first five years of this Agreement and by five percent (5%) or more in any Fiscal Year during the remaining term of this Agreement, in each case, after the expiration of the twelve (12) month cure period as provided in Section 4.7.2 hereof, (ii) if Serrallés fails to rebuild its manufacturing plant and so re-commence production of rum therein, as provided in Section 4.8.1 hereof, (iii) if Serrallés provides a certification and sworn statement which is found to be intentionally false, misleading, altered or forged under Section 8.21.5 hereof, or (iv) if Serrallés provides a criminal proceedings certification that is not correct in its entirety or in any of its parts under Section 8.21.8 hereof; (b) in the case of the Government (i) if the Refurbishment and Production Initiative payments are not made to Serrallés as provided in Section 3.1 and 3.2 hereof; (ii) if the Marketing and Production Support Payments are not paid by the Government as provided in Section 4.1.3 hereof, (iii) if the Molasses Subsidy Payments are not paid by the Government as provided in Section 4.1.4 hereof, and (iv) if the Government fails to provide  for the obligations or other commitments agreed upon in Section 6.3.3 hereof; and (c) in the case of any Party, the failure of such Party to perform any other material obligation imposed upon that Party by the Agreement not listed in (a) and (b) above (including but not limited to failure to make a payment when due), if such failure or breach is not cured within ninety (90) days following written notice from the non-breaching Party.

"Minimum Incentives" shall have the meaning specified in Section 4.1.3 (b) hereof,

"Minimum Branded Rum Production Requirements" for the first five (5) Fiscal Years commencing on July 1, 2010 shall mean the amount of proof gallons not less than those set forth in Exhibit D hereof, and thereafter, the minimum rum production requirements determined by Serrallés as provided in Section 4.7.1 hereof.

"Minimum Bulk Rum Production Requirements" for the first five (5) Fiscal Years commencing on July 1, 2010 shall mean the amount of proof gallons not less than those set forth in Exhibit D hereof, and thereafter, the minimum rum production requirements determined by Serrallés as provided in Section 4.7.1 hereof

"Molasses Subsidy Payments" shall have the meaning specified in Section 4.1.4 hereof.

"Monthly Cover Over Reports" shall mean the report of actual monthly collections of federal excise tax revenues pursuant to Section 7652 of the U.S. Internal Revenue Code, which report is prepared immediately following the end of such month by TTB, a copy of which is delivered to the Puerto Rico Department of the Treasury approximately forty-five (45) days after the end of such month and/or any successor report providing the same information.

"Party" or "Parties" shall have the meaning specified in the introduction to this Agreement.

EXECUTION VERSION

"Permit" or "Permits" means all consents, registrations, filings, licenses, permits, certificates, decrees, approvals, authorizations, qualifications, entitlements and orders of Governmental Authorities.

"Person" means any individual or entity (including any corporation, limited partnership, joint venture, limited liability company, estate, trust or other body).

"Pledged Cover Over Requirement" shall have the meaning specified in Section 4.6.1 hereof.

"PRIDCO" shall have the meaning specified in the preamble of this Agreement.

"Production Activities" shall have the meaning specified in Section 4.1.2 hereof.

"Project" shall mean the design, construction, ownership and operation of a sugar cane agricultural/industrial project and rum production facility in Puerto Rico as further described in Section 3.3. hereof, for the potential benefit of rum producers in Puerto Rico, including Serrallés.

"Puerto Rico" shall mean the Commonwealth of Puerto Rico.

"Puerto Rico Tax Code" shall mean Act No. 1 of January 31, 2011 known as the Puerto Rico Internal Revenue Code of 2011, as amended from time to time.

"Refurbishment and Production Initiatives" shall have the meaning specified in Section 3.1 hereof.

"ROPR" shall have the meaning specified in the Recitals hereof.

"Rum" shall mean alcohol distillate produced from sugar cane molasses, sugar cane juice, or other derivatives of sugar cane which complies with the requirement of Section 7652 of the U.S. Internal Revenue Code of 1986, as amended.

"Serrallés" shall have the meaning specified in the preamble of this Agreement.

"Serrallés Branded Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of Branded Rum Products subject to federal excise tax sold in the United States during such Fiscal Year and attributable to Serrallés' Rum manufacturing operations in Puerto Rico, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U.S. Government) for such Fiscal Year. Notwithstanding anything to the contrary, with respect to Rum sales from Branded Rum bottled in Puerto Rico, only those sales occurring on and after January 1, 2011 shall be deemed included in this definition.

"Serrallés Bulk Rum Sales" shall mean, with respect to any Fiscal Year, the aggregate number of proof gallons of all Bulk Rum subject to federal excise tax sold in the United States during such Fiscal Year and attributable to Serrallés' Rum manufacturing operations in Puerto Rico, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U. S. Government) for such Fiscal Year. Notwithstanding anything



8

EXECUTION VERSION

to the contrary, with respect to Rum sales from Bulk Rum bottled in Puerto Rico, only those sales occurring on and after January 1, 2011 shall be deemed included in this definition.

"Serrallés Rum Affiliate" shall mean any Affiliate of Serrallés engaged in activities related or ancillary to the production or distribution of Rum produced by Serrallés.

"Strategic Third-Party Branded Products" shall mean Bulk Rum produced by Serrallés in Puerto Rico to be sold under brands not owned or licensed by Serrallés or its Affiliates, which third-party brands are to the extent permitted under Puerto Rico Tax Code identified on their respective labels with the seal mentioned in Section 4.5 hereof for Branded Rum Products, and notified in writing by Serrallés to the Government as a Strategic Third Party Branded Product, and shall be counted cumulatively toward the incentives provided in this Agreement. Notwithstanding the foregoing, the qualification of Bulk Rum sold after June 30, 2012 pursuant to supply agreements executed by Serrallés prior to the Effective Date as Strategic Third-Party Branded Products shall be exempted from compliance with the seal requirement of Section 4.5 hereof, if such supply contracts do not grant Serrallés the authority to require the use of such a seal. In addition, Bulk Rum sold after June 30, 2012 as Strategic Third-Party Branded Products will be exempted from complying with the seal requirement of Section 4.5 until one hundred twenty days have elapsed from the date on which the seal was submitted to Serrallés for reproduction.

"Strategic Third-Party Branded Rum Sales" shall mean with respect to any Fiscal Year commencing on or after July 1, 2012, the aggregate number of proof gallons of Strategic Third-Party Branded Products sold in the United States and subject to federal excise tax during such Fiscal Year and attributable to Serrallés facilities in Puerto Rico, as reported in the Monthly Cover Over Reports (or any other report containing such information prepared by the U. S. Government) for such Fiscal Year.

"Strategic Third-Party Marketing Support Payments" shall mean those payments set forth in Section 4.1.3 (e) of this Agreement.

"Tax or Taxes" shall mean any form of tax, levy, impost, duty, surcharge, contribution, assessment or withholding in the nature of tax (including without limitation, income tax, capital tax, gross receipts tax, municipal license tax or volume of business tax (patente), excise tax, franchise tax, sales and use tax, value added tax, alternative minimum tax, land or, mortgage registration tax or fee, recording and filing fees, and real estate and personal property tax) imposed, collected or assessed by, or payable to, a Tax Authority and all interest, surcharges and penalties included in or related to any Tax.

"Tax Authority" shall mean any governmental body of Puerto Rico (including municipalities) competent to impose or collect or assess any tax in Puerto Rico.

"Tax Free" shall mean that the grants and incentives granted and paid to Serrallés by the Government as Refurbishment and Production Initiatives, Marketing and Production Support Payments, Molasses Subsidy Payments and Strategic Third Party Support Payments under Articles III and IV of this Agreement shall be totally exempt from the payment of any Taxes imposed by a Tax Authority.

EXECUTION VERSION

"Term" shall have the meaning set forth in Section 8.15 of this Agreement.

"TTB" shall mean the U.S. Alcohol and Tobacco Tax and Trade Bureau of the U.S. Department of Treasury.

"United States" shall mean the continental United States, Hawaii and Alaska.

"U.S. Government" shall mean the federal government of the United States of America.

"USVI Incentives" shall have the meaning specified in the Recitals.

## ARTICLE III

## INFRASTRUCTURE SUPPORT FOR REFURBISHMENT AND RUM PRODUCTION

### 3.1    Infrastructure Support

**3.1.1**   So long as the Cover Over Revenues are paid or transferred to Puerto Rico, and with respect to the Fiscal Year commencing on July 1, 2011, the Government agrees, after the satisfaction of the Pledged Cover Over Requirement for that Fiscal Year, to make capital improvements support payments to Serrallés to refurbish Serrallés' Rum producing facilities in Puerto Rico, as described in Exhibit A hereto (the "Refurbishment and Production Initiatives"). Such funds will be disbursed on a Tax Free basis by the Government to Serrallés. The Refurbishment and Production Initiatives payments will constitute non-shareholder capital contributions by the Government to Serrallés.

**3.1.2**   The total amount of Refurbishment and Production Initiatives due to be paid to Serrallés with respect to the Fiscal Year commencing July 1, 2011 shall be ten percent (10%) of the Cover Over Revenues attributable to Aggregate Rum Sales in that Fiscal Year, which amount shall be payable in full without any deduction, withholding or discount whatsoever and payable with respect to expenditures described in Exhibit A placed in service on or after July 1, 2011 by Serrallés or a Serrallés Rum Affiliate.

### 3.2    Disbursements of Incentives

The Refurbishment and Production Initiative payments will be disbursed by PRIDCO (the "Disbursement Agent") following the Effective Date, according to Section 3.1 and after Serrallés and/or Serrallés Rum Affiliates have incurred the expenses described in Exhibit A, which shall include capitalizable operating expenses directly related to such capital expenditures, and submits reasonable evidence and certifications to the Disbursement Agent of the equipment and materials ordered, capitalizable operating expenses incurred and/or the work performed to cover such approved refurbishment. Payment will be made by the Disbursement Agent to Serrallés within thirty (30) days of the submission of such evidence assuming the Pledged Cover Over Requirement has been met. Serrallés will have until June 30, 2019 to obtain full disbursement of these Incentives. Any incentives for Refurbishment and Production Initiatives that remain unused as of June 30, 2019 shall be returned to the Government.

EXECUTION VERSION

### 3.3   Development of the Project

The parties hereto acknowledge their awareness of existing Government plans to develop the Project. The Government will use its reasonable best efforts to keep Serrallés informed of the development of the Project and may, at its sole discretion, request Serrallés' technical assistance with respect to the design, feability or development of the Project. It is hereby agreed that Serrallés will decide at its sole discretion the extent to which it may be able to respond to each such assistance request. Any assistance provided by Serrallés for the Project will be without any cost or expense to the Government. It is agreed that Serrallés' intervention will be solely in an advisory capacity and any and all advice rendered shall not in any manner be held to produce any risk or liability for Serrallés vis-à-vis the Government.

### ARTICLE IV

### MARKETING AND PRODUCTION SUPPORT PAYMENTS

#### 4.1   Marketing Activities; Production Activities; Marketing and Production Support Payments and Molasses Subsidy

##### 4.1.1   Marketing Activities

(a)    Serrallés shall use the Marketing and Production Support Payments to perform or cause its Affiliates to perform marketing activities, including, but not limited to, the marketing activities pre-approved by the Government which are specified in Exhibit B hereof (the "Marketing Activities").

(b)    Serrallés' Marketing Activities shall be in furtherance of its promotion of Serrallés' Rum products or any other third party Rum products or brands in the United States utilizing Bulk Rum produced by Serrallés in Puerto Rico for sale in the United States, and when advisable from a marketing standpoint, at Serrallés' sole discretion, for the promotion of "Puerto Rican Rums".

(c)    Serrallés shall annually report to the Government the content and effectiveness of the Marketing Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Serrallés to discuss the Marketing Activities and its progress in promoting Serrallés' Rum products or any other third party products or brands in the United States utilizing bulk Rum produced by Serrallés in Puerto Rico for sale in the United States.

##### 4.1.2   Production Activities



(a)    Serrallés shall use the Marketing and Production Support Payments and the Molasses Subsidy Payments to support and promote the continued production of Rum by Serrallés or any Serrallés Rum Affiliate in Puerto Rico (the "Production Activities").

EXECUTION VERSION

(b)     Serrallés' Production Activities shall be in furtherance of its production of Serrallés' Rum products or any other third party products or brands utilizing Rum produced by Serrallés in Puerto Rico for sale in the United States.

(c)     Serrallés shall annually report to the Government the content and effectiveness of the Production Activities performed hereunder. The Government shall have the right, at reasonable times and upon reasonable prior notice, to meet with the representatives of Serrallés to discuss the Production Activities and its progress in producing, supporting, and promoting Serrallés' Rum products or any other third party Rum products or brands utilizing Bulk Rum produced in Puerto Rico for sale in the United States.

### 4.1.3 Marketing and Production Support Payments

(a)     So long as the Cover Over Revenues are paid or transferred to the Government, from the Effective Date of this Agreement and during the Term of this Agreement, the Government agrees, to make marketing and production support payments (the "Marketing and Production Support Payments") to Serrallés, in the amounts obtained by multiplying the Cover Over Revenues attributable to Aggregate Rum Sales for each Fiscal Year by ten percent (10%), or such other higher percentage agreed upon as provided in this Agreement. The Marketing and Production Support Payments to be paid to Serrallés, will be for each Fiscal Year covered by this Agreement beginning with the Fiscal Year commencing on July 1, 2010; provided, however, that the Marketing and Production Support Payments attributable to Fiscal Year 2010-2011 shall be paid as described in Section 4.6.1 hereof.

(b)     The Parties acknowledge that, notwithstanding the Refurbishment and Production Initiatives described in Section 3.1 and the Marketing and Production Support Payments described in Section 4.1.3 (a) above, the USVI Incentives are expected to result in a competitive disadvantage for Serrallés. As a result, Serrallés and the Government agree to support joint efforts to promote legislation at the United States federal level to limit the direct and indirect assistance provided to companies producing Rum in Puerto Rico or USVI and selling it in the United States until June 30, 2012, provided that said support is reasonable and appropriate and such legal limits allow for the Government to provide Serrallés with, at least, 10% of the Cover Over Revenues attributable to Aggregate Rum Sales paid annually to be used for Marketing and Production Support Payments, and/or Refurbishment and Production Initiatives to Serrallés (the "Minimum Incentives").

(c)     Notwithstanding anything to the contrary set forth herein, if at any time during the term of this Agreement any Puerto Rico Rum producers or their affiliates (excluding Serrallés or the Serrallés Rum Affiliates) (i) are receiving Marketing and Production Support Payments or Strategic Third-Party Marketing Support Payments, or any similar type of incentives based on or paid out of Cover Over Revenues for bulk Rum sold under brand names not owned or licensed by such Puerto Rico Rum producers or their affiliates greater as a percentage of Cover Over Revenues than those being received by Serrallés for Serrallés Bulk Rum Sales or Strategic Third-Party Branded Rum Product Sales, and (ii) those same Puerto Rico rum producers or their affiliates sell or enter into agreements to sell in the United States in any given Fiscal Year, in the aggregate, at least 200,000 proof gallons of Rum produced in their facilities in Puerto Rico to third parties for resale under brand names not owned or licensed by such Puerto Rico rum producers or their affiliates, as applicable, the Parties agree that this Agreement shall be amended





12

EXECUTION VERSION

so that Serrallés shall receive additional incentives to ensure that the incentives provided by the Government to Serrallés are equal on a per proof gallon basis in all respects with the incentives provided to such other Puerto Rico Rum producers (the "Additional Incentives") for so long as such conditions persist and for an additional period of six months after such conditions cease (the "Adjustment Period"). In addition, if the above described sales of or agreements to sell Bulk Rum by such other Puerto Rico Rum producer or their affiliates exceed 500,000 proof gallons in any given Fiscal Year, any Additional Incentives granted to Serrallés for the sale of Bulk Rum in the United States will become permanent throughout the remaining Term of this Agreement with respect to any Bulk Rum customer (including its affiliates) that had a multiannual supply contract with Serrallés eligible for the Additional Incentives during the Adjustment Period. The Government shall use its best efforts to promptly notify Serrallés upon gaining knowledge of the occurrence of the above described sales of Bulk Rum by such other producer.

(d)     The Government agrees to provide Serrallés with Marketing and Production Support Payments in the amounts obtained by multiplying the Aggregate Rum Sales by ten percent (10%). However, the Government agrees that, to the extent that, despite the Government's efforts, the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI after June 30, 2012, the Government will take the necessary action as contemplated in the Puerto Rico Tax Code so that commencing in the Fiscal Year starting July 1, 2012 it will:

(i) increase the Marketing and Production Support Payments that Serrallés receives on account of its Serrallés Branded Rum Sales, so that the same are equal to thirty-six percent (36%) of the Cover Over Revenues attributable to Serrallés Branded Rum Sales,

(ii) increase the Marketing and Production Support Payments that Serrallés receives on account of its Serrallés Bulk Rum Sales so that the same are equal to twenty-five percent (25%) of the Cover Over Revenues attributable to Serrallés Bulk Sales,

(iii) provide Strategic Third-Party Marketing Support Payments as provided in Section 4.1.3 (e) equal to eleven percent (11%) of the Cover Over Revenues Attributable to Strategic Third-Party Branded Rum Sales, and

(iv) make Molasses Subsidy Payments to Serrallés as provided in Section 4.1.4 hereof in an amount equal to ten percent (10%) of the Cover Over Revenues attributable to Serrralles Branded Rum Sales for such Fiscal Year.

(e)     Assuming that the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI after June 30, 2012 and so long as the Cover Over Revenues are paid or transferred to the Government, for each Fiscal Year commencing July 1, 2012 and covered by this Agreement, Strategic Third-Party Support Payments shall be paid to Serrallés, in addition to the Marketing and Production Support Payments applicable to Bulk Rum, for the production of Strategic Third-Party Branded Products in an amount equal to 11% of the Cover Over Revenues attributable to Strategic Third-Party Branded Rum Product Sales for each Fiscal Year (the "Strategic Third-Party Marketing Support Payments"); provided, however, that 100% of such support payments shall be passed through Serrallés and/or its Affiliates to the owners of the respective third-party branded products (the "Pass-Through Requirement"). Compliance with the Pass-Through Requirement may be evidenced by any reasonable methodology that shows that the economic benefit of the incentive has been passed by Serrallés to the Bulk Rum client. This requirement shall not be interpreted as

EXECUTION VERSION

requiring that Serrallés pass to the Bulk Rum client any other incentives provided under this Agreement. Notwithstanding the foregoing, Serrallés shall be deemed to have passed-through the Strategic Third-Party Marketing Support Payments to a third party in accordance with this Agreement if the third party brand owner has contractually accepted that the eleven percent (11%) Strategic Third-Party Marketing Support Incentive granted under this Agreement has been passed through as part of the agreed to proof gallon unit price. Such Strategic Third Party Marketing Support Payments shall be in addition to, and shall not reduce, any incentives provided in this Article IV of this Agreement.

(f)     If federal legislation is passed that places a limit on the direct or indirect assistance from Cover Over Revenues provided to companies producing Rum in Puerto Rico and the USVI and selling it in the United States, and such limitation affects the incentives granted under this Agreement, the Parties agree to, within sixty (60) days from the signing into law of the new federal legislation, amend the Agreement accordingly, if necessary, to comply with such federal legislation to provide Serrallés with incentives which are consistent with such new limitations.

(g)     If following the Effective Date, other incentives are granted by the Government to any Serrallés competitor which result, in the aggregate, in a larger percentage of Cover Over Revenues or total economic incentives provided to said competitor than the percentage of the Cover Over Revenues provided to Serrallés under this Agreement with respect to Branded Rum Products , then additional benefits will be also granted to Serrallés, as necessary, without any further amendment to the Agreement, unless such competitors sell during each Fiscal Year in the United States less than ten percent (10%) of Serrallés proof gallons of rum produced in Puerto Rico for sale in the United States, in which case, the Government will disclose to Serrallés the terms and conditions of any such incentives at the request of Serrallés, as permitted by law. If, following the Effective Date, incentives to Serrallés competitors in the USVI (including through a percentage of Cover Over Revenues and total economic incentives) for Branded Rum Products are increased above forty seven point five percent (47.5%), the parties agree to negotiate in good faith and, if necessary, amend the terms of this Agreement to provide additional incentives to Serrallés for the production of Branded Rum Products. If, however, the Parties are not able to reach an agreement on the amount of such additional incentives within ninety (90) days, Serrallés shall have the right to request a final thirty (30) day negotiation period with the Government. If the Parties cannot reach an agreement during this final 30-day negotiation period, Serrallés shall have the right to terminate the Agreement.

### 4.1.4   Molasses Subsidy

Assuming that the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI after June 30, 2012 and so long as the Cover Over Revenues are paid or transferred to the Government, for Fiscal Years from July 1, 2012 and during the Term of this Agreement, the Government agrees to make molasses subsidy payments to Serrallés (the "Molasses Subsidy Payments") in the amounts obtained by multiplying the Cover Over Revenues attributable to Serrallés Branded Rum Sales for each Fiscal Year by ten percent (10%).  The Molasses Subsidy Payments shall be used by Serrallés in the purchase of molasses to be utilized in Puerto Rico in the production of Rum in Puerto Rico.

EXECUTION VERSION

**4.1.5** The foregoing provisions shall not give Serrallés any rights with respect to the Cover Over Revenues of the Government but the Government covenants that it will provide the Refurbishment and Production Initiative, Molasses Subsidy Payments, Marketing and Production Support Payments and Strategic Third-Party Marketing Support Payments set forth in this Agreement from any available sources of revenue, in its sole discretion.

**4.1.6** If the Refurbishment and Production Initiative, Molasses Subsidy Payments, Marketing and Production Support Payments and Strategic Third-Party Marketing Support Payments are timely and properly made to Serrallés by the Government, PRIDCO or any other designated agency, and economic conditions in the United States improve as expected by Serrallés, then Serrallés expects to achieve, for each fiscal year covered by the initial 20-year term of the Agreement, the range of projections of Aggregate Rum Sales (in numbers of proof gallons) set forth in Exhibit C hereto. The Parties understand and agree that the immediately preceding sentence shall be deemed to be an indication of the anticipated normal business trajectory of Serrallés under facts currently known or anticipated, and shall not be deemed to be a legal commitment, representation, warranty, or guarantee of results except for the Minimum Bulk Rum Production Requirements and Minimum Branded Rum Production Requirements.

**4.2** **Marketing and Production Activities**

**4.2.1** Subject to the limitations in Sections 4.2.2 and 4.2.3, Serrallés shall be permitted to use any such Marketing and Production Support Payments to fund any and all Marketing Activities and Production Activities for its Rum products produced in Puerto Rico for sale in the United States market in any manner that is reasonably expected to promote or benefit Aggregate Rum Sales in the United States.

**4.2.2** With respect to the Marketing and Production Support Payments, (i) any and all Marketing Activities and Production Activities funded with Marketing and Production Support Payments will be disbursed to Serrallés by the Government, PRIDCO or any other designated agency, and (ii) Serrallés shall file with the Government through PRIDCO or any other designated agency, an annual plan for the Marketing Activities for each Fiscal Year.

**4.2.3** All advertisement (print, broadcast or other advertising) placed using the Marketing and Production Support Payments will be so placed through a media agency designated by the Government through PRIDCO or any other designated agency, which shall provide its services at competitive fees, including matching any fee by Serrallés' own U.S. advertising agency in compliance with Section 4.2.4 hereof. Serrallés by itself or through an independent third party shall have the right, at its own cost, to make periodic audits, but no more than twice a year, of Serrallés' media campaign placed by the agency designated by the Government.

**4.2.4** Both parties agree to the following mechanism to replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Serrallés' own U.S. advertising agency or agencies, if Serrallés is not satisfied with, among other criteria, the services, efficiency or fees offered by the media agency designated by the Government:

15

Case:17-03283-LTS Doc#:13511-1 Filed:06/03/20 Entered:06/03/20 14:53:39 Desc:
Exhibit A Page 18 of 42

**EXECUTION VERSION**

(a)     Serrallés shall use, at its own cost, an outside media agency to audit the Government's designated media agency's performance based on its media purchasing power, measured by its costs per Total Gross Rating Points ("TGRP's");

(b)     Serrallés shall compare the Government's agency media plan, as if said plan were to be executed by its US agency, and assess for efficiencies;

(c)     Serrallés shall evaluate the Government's media agency turnaround performance and/or media placement to be within industry standards;

(d)     Serrallés shall notify the Government of its media agency deficiencies and the Government's media agency shall have thirty (30) days to cure said deficiencies; and

(e)     If the Government's designated media agency fails to cure the deficiencies notified by Serrallés or continuously fails to comply with the considerations described in this Section 4.2.4, Serrallés shall notify the Government of its dissatisfaction with said media agency and the Government shall replace, temporarily or permanently, the media agency designated by the Government for a different media agency designated by the Government, and/or Serrallés' own U.S. advertising agency or agencies. Serrallés and the Government will work together to maximize media buying efficiencies for both parties.

### 4.3    Use of Serrallés' Image

Use of Serrallés' intellectual property (including, without limitation, proprietary names, logos, bottle shapes, etc.) by ROPR will require Serrallés' prior written approval, which may be withheld, in its sole discretion. The Parties agree that the marketing and advertisement of the Serrallés brand products shall be under the exclusive control of Serrallés.

### 4.4    Promotion of Serrallés' Rum Brands

Serrallés' Marketing Activities shall be in furtherance of its promotion of the Serrallés Branded Rum Products in the United States (or any other Rum products utilizing Bulk Rum produced by Serrallés in Puerto Rico for sale in the United States), and when advisable from a marketing viewpoint, it may also promote the "Rums of Puerto Rico" brand in the United States.

### 4.5    Labeling



The Government will develop a quality seal of approval, or other written reference to Puerto Rico that complies with the Puerto Rico Tax Code and that will be included by Serrallés on the back labels of the Branded Rum Products bottled with a minimum volume of two hundred milliliters made in Puerto Rico to promote Puerto Rico. In addition, those bottled Branded Rum Products which qualify as "Puerto Rican Rum" under Puerto Rico law will be identified as such on their front labels. The Government and Serrallés shall cooperate with each other to develop a seal that meets, in terms of size and design, the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Notwithstanding the foregoing, if the Government and Serrallés cannot agree on a seal within 180 days from the Effective Date, either Party may request the intervention of a mutually acceptable third party which will make a final decision as to the appropriate seal to be used by Serrallés for its Branded Rum Products and its

16

EXECUTION VERSION

Strategic Third-Party Branded Products taking into consideration the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Any seal implemented under this Section must meet any requirements imposed by law or the TTB.

## 4.6 Payment Procedure and Timing

**4.6.1** Under Act No. 119 of July 8, 2006 and existing contractual obligations, the first $117 million of Cover Over Revenues received by the Government in each Fiscal Year through fiscal 2057 are pledged and have to be transferred to the Puerto Rico Financing Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Pledged Cover Over Requirement"). Each Fiscal Year, after the Government complies with the Pledged Cover Over Requirement, the Refurbishment and Production Initiatives, the Marketing and Production Support Payments, the Strategic Third-Party Marketing Support Payments and the Molasses Subsidy Payments will be paid on a monthly basis as the Government receives and identifies the Cover Over Revenues attributable to the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales as further described below; provided, however, that (i) the Marketing and Production Support Payments relating to Cover Over Revenues for Fiscal Year 2010-2011, will be paid to Serrallés on seven equal annual installments due on July 1 of each year commencing with July 1, 2012 and (ii) the Marketing and Production Support Payments relating to Cover Over Revenues for Fiscal Year 2011-2012 that have already been received by the Government as of the Effective Date shall be payable to Serrallés within sixty (60) days from the Effective Date assuming that the Pledged Cover Over Requirement for that Fiscal Year has been satisfied.

**4.6.2** The Cover Over Revenues received by the Government are transferred monthly to the Puerto Rico Treasury Department by the TTB, based on the net Rum excise tax collected by the U.S. Government in the previous months. The Cover Over Revenues are transferred to the Government via the Automated Clearing House network with a two month lag. The Monthly Cover Over Reports often reflect adjustments to the Cover Over Revenues previously received by the Government in the current or prior Fiscal Years (the "Federal Adjustment").

**4.6.3** Upon receipt of the Monthly Cover Over Report and other reports containing information on Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales from the U.S. Government or Serrallés, including reports filed by Serrallés with the U.S. Government and delivered to the Government by Serrallés, and receipt of the Cover Over Revenues, the Government shall cause the Refurbishment and Production Initiatives and the Marketing and Production Support Payments due to Serrallés from the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales to be disbursed to Serrallés within thirty (30) days of receipt of the Cover Over Revenues and the necessary corresponding reports described herein.

**4.6.4** The Parties agree that:

(a) Serrallés will submit monthly reports to the Puerto Rico Treasury Department with copies to PRIDCO and the GDB of the Serrallés Branded Rum Sales and the Serrallés Bulk Rum Sales and the federal excise taxes paid to the U. S. Government to facilitate the review and processing of the Refurbishment and Production Initiatives and the Marketing and Production Support Payments by the Government.

17

(b)     On September of each year, the Puerto Rico Treasury Department will prepare and submit to Serrallés a certified report on the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the prior Fiscal Year based on the Monthly Cover Over Reports or such other reports from the U.S. Government that contain information on such sales, in order to determine if, due to the Federal Adjustments, any true-up adjustments have to be made (upwards or downwards) on the Marketing and Production Support Payments, Strategic Third-Party Marketing Support Payments or Molasses Subsidy Payments, paid during the immediately preceding Fiscal Year. If the adjustment does not exceed five percent (5%) of the total incentives paid by the Government to Serrallés under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid by the Party which had received the excess funds on or prior to October 30 of such year. If the adjustment exceeds five percent (5%) of the total incentives paid by the Government to Serrallés under this Agreement during the immediately preceding Fiscal Year, the adjustment will be paid by the Party which had received the excess funds in three (3) equal end of the month installments in October, November and December of such year.

### 4.7     Minimum Rum Production Requirements

4.7.1     Provided that (i) the Cover Over Revenue determined in accordance with Section 7652(a) of the U.S. Internal Revenue Code (the "Cover Over Rate") is not reduced below its historic base level of US $10.50 per proof gallon with respect to Aggregate Rum Sales (the "Historic Base Level") or (ii) the incentives granted by the Government to Serrallés under Articles III, IV and V, as applicable, of this Agreement have not been materially reduced or made unavailable to Serrallés, Serrallés shall produce Branded Rum and Bulk Rum for sale in the United States in amounts not less than those set forth in Exhibit D to this Agreement for the first five (5) Fiscal Years commencing on July 1, 2010, unless the occurrence of an Event of Force Majeure prevents such production during the duration of such Event of Force Majeure. Thereafter, for each subsequent period of five (5) Fiscal Years, Serrallés shall determine its minimum production requirement for that period based upon the average of Branded Rum Sales and Bulk Rum Sales for the previous five (5) year period, subject to Serrallés' right to adjust the minimum production requirements by up to twenty five percent (25%) above or up to twenty percent (20%) below the average of Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the previous five (5) year period. The new five (5) year estimates shall be delivered by Serrallés to the Government within sixty (60) days after the beginning of such five (5) year period. For such five (5) year period, Serrallés shall produce Branded Rum and Bulk Rum in Puerto Rico for sale in the United States at least equal to the amounts so determined, unless the occurrence of an Event of Force Majeure prevents such production. Except as otherwise agreed in Section 4.7.3, any other changes in Minimum Branded Rum Production Requirements and Minimum Bulk Rum Production Requirements shall require the mutual agreement of the parties.

4.7.2     If at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months or the Economic Development Incentives granted under Article V by the Government to Serrallés are materially reduced or unavailable to Serrallés (other than as a result of Serrallés' failure to comply with any contractual or legal requirements) for a period greater than twelve (12) months, Serrallés shall not be obligated to make Aggregate Rum Sales and may terminate this Agreement with thirty (30) day prior written notice to the Government.

EXECUTION VERSION

**4.7.3** If Serrallés cannot perform the applicable Minimum Branded Rum Production Requirements or Minimum Bulk Rum Production Requirements by reason of any Event of Force Majeure, the Government will waive Serrallés' compliance with such minimum production requirements during the duration of the Event of Force Majeure. Upon the occurrence of a Event of Force Majeure, Serrallés shall promptly notify the Government and shall use commercially reasonable efforts to mitigate the effect thereof.

**4.7.4** Serrallés agrees that during the term of this Agreement, it will directly or indirectly through its Affiliates in which it holds a controlling interest in excess of fifty percent (50%), produce Rum for the United States market exclusively in Puerto Rico.

### 4.8    Further Obligations

**4.8.1** After the completion of construction and commencement of commercial operation of the Refurbishment and Production Initiatives, and following the occurrence of fire or other damage to the Serrallés' manufacturing plant resulting in a commercially significant reduction in the output of Rum that can be produced by Serrallés in Puerto Rico and that is caused by an event that is insurable at the time of the occurrence of the event at commercially reasonable rates, Serrallés agrees to rebuild its Rum manufacturing facilities in Puerto Rico and re-commence production of Rum therein as soon as reasonably possible after the occurrence of such event of loss at the levels of production required by this Agreement. If Serrallés fails to so rebuild its manufacturing plant and so re-commence production of Rum therein, such failure shall be a Material Default and the Government may terminate this Agreement subject to the termination remedies available to the Government under Section 7.2.1 hereof.

**4.8.2** Serrallés agrees to maintain commercially reasonable insurance against the property damage risks described in Section 4.8.1 above either as part of the global insurance program for the portfolio of facilities operated by Serrallés or on a stand-alone basis, at the discretion of Serrallés. The proceeds from any claim made on such insurance shall be available to Serrallés toward the satisfaction of its obligations under this Agreement.

### ARTICLE V

### ECONOMIC DEVELOPMENT INCENTIVES AND OBLIGATIONS

### 5.1    Economic Development Incentives; Tax Exemptions

Serrallés currently enjoys certain tax exemptions pursuant to the Tax Grant No. 07-135-I-31 (the "Tax Grant") issued under Act No. 135 of December 2, 1997, as amended ("Act 135"). Serrallés Environmental Technologies, Inc., a Serrallés Rum Affiliate, enjoys certain tax exemptions pursuant to the Tax Grant No. EI-09-(04-135-I-5)-B issued under Act No. 135 of December 2, 1997, as amended ("Act 135"). The Government agrees that nothing in this Agreement shall adversely affect the rights of Serrallés and Serrallés Environmental Technologies, Inc. to retain, enjoy and obtain the tax incentives and benefits described in these tax grants or under Law 135.

19

EXECUTION VERSION

### 5.2    Tax Free Payments

All payments made by the Government to Serrallés as Refurbishment and Production Initiatives, Marketing and Production Support Payments, Strategic Third-Party Marketing Support Payments and Molasses Subsidy Payments, pursuant to Article III and Article IV hereof shall be in the nature of non-shareholder contributions and shall be disbursed Tax Free to Serrallés and not be subject to any tax, deduction or withholding on the part of the Government or its Tax Authorities. The Government hereby acknowledges that Serrallés will be entitled to receive such Tax Free treatment without the need for any formal application procedure by Serrallés. Other than the terms of this Article V, there shall be no additional conditions or requirements imposed upon Serrallés that could result in the suspension, revocation or reduction of such Tax Free treatment.

### 5.3    No Adverse Actions

The Government hereby agrees and covenants with Serrallés that, except as otherwise provided in this Agreement and to the extent permitted by law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Serrallés to lose any applicable Tax, exemptions or benefits granted to Serrallés pursuant to this Agreement or any extension thereto.

### 5.4    Effective Date of Tax Benefits

The effective date of the benefits described under Section 5.2 hereof shall be July 1, 2010.



## ARTICLE VI

## REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

### 6.1    Representations, Warranties and Acknowledgements

**6.1.1**    The Government hereby represents and warrants to Serrallés as of the Effective Date that:

(a)    The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order or judgment;

(b)    The Government has: (i) the legal power, due authority and necessary and adequate funding ability to execute and deliver this Agreement, to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; and (ii) duly obtained such approvals, authorizations, or consents in accordance with applicable law and procedures to the extent that the approval, authorization, or consent of the federal or any other

local government or agency or any third party to make the representations and perform its obligations contained herein is required;

(c)     The Government knows of no material impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder; and

(d)     There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out its obligations under this Agreement.

**6.1.2**     Serrallés hereby represents and warrants to the Government as of the Effective Date that:

(a)     Serrallés is a corporation duly organized and validly existing under the laws of Puerto Rico and has the corporate power and authority, and has taken all necessary action to authorize the execution and delivery of this Agreement and to perform its obligations hereunder.

(b)     The execution, delivery and performance by Serrallés of this Agreement do not violate or conflict with, or result in a default under, any material contract or agreement to which Serrallés is bound or any of its organizational documents.

(c)     Assuming due authorization, execution and delivery of this Agreement by the Government, this Agreement is the legal, valid and binding obligation of Serrallés, enforceable against Serrallés in accordance with its terms, subject to the effects of bankruptcy or insolvency or laws affecting creditors' rights generally.

(d)     There are no actions, suits or proceedings pending or, to the best of Serrallés' knowledge, threatened against or affecting Serrallés before any court or administrative body or arbitral tribunal that could reasonably be expected to have a material adverse effect on the ability of Serrallés to meet and carry out its obligations under this Agreement.

(e)     Neither Serrallés nor its Affiliates is involved in any material litigation, arbitration or claim against the Government.

**6.2**     [Intentionally left in blank]

**6.3**     Make-Whole Actions

**6.3.1**     The Government and Serrallés each assert that they enter into this Agreement based upon certain objectives and expectations, more specifically described below in this Section 6.3. The Government and Serrallés each further acknowledge and agree that it is not possible to predict, consider and provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, in order to preserve the basis upon which the Agreement is entered into by the Government and Serrallés, the Government and Serrallés each agree to the terms and conditions set forth in this Section 6.3.

21

EXECUTION VERSION

**6.3.2** Each of Serrallés and the Government acknowledges and agrees that each has entered into this Agreement in material reliance on each and all of the obligations and commitments of the other party under this Agreement, as a package and without exception, with the reasonable expectation that each of them will receive all of the benefits of such obligations and commitments, including, in the case of the Government, without limitation, the Minimum Production Requirements, and including, in the case of Serrallés, without limitation, receipt of benefits in the form of the incentives described in Articles III, IV and V of this Agreement.

**6.3.3** The Government and Serrallés each further agree and acknowledge that it is not possible to predict, consider or provide for all future changes, circumstances or contingencies affecting the performance or implementation of this Agreement. Therefore, the Government represents, warrants and covenants to Serrallés that in the event of a change in local law, the imposition of any special, additional or new levy or Tax on Serrallés or any other act, event or circumstance (except the enactment of federal legislation affecting the amount of the Cover Over Revenues received by the Government), the result of which would be to diminish, impede, impair or prevent the full performance after the Effective Date of any or all of the obligations and commitments made by the Government under this Agreement, the Government, shall exercise its best efforts to, and to the extent permitted by law shall, provide Serrallés with another obligation or commitment reasonably acceptable to Serrallés and having economic effect equivalent to the commitment so lessened or removed. If the Government fails to provide such obligation or other commitment, such failure shall be a Material Default. In furtherance of the foregoing, in the event that Cover Over Revenues attributable to the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales are for any reason received by the Government but are not available to satisfy the Government's payment obligations to Serrallés hereunder, the Government agrees to fund such obligations from other sources of revenue, to the extent permitted by law.



**6.3.4** The Government agrees to use reasonable efforts to strenuously oppose any proposed legislation, initiative, act, event, plan or proposal which would otherwise have the effect of voiding or reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally necessary steps to defend the obligations and commitments contained herein.

**6.3.5** Serrallés acknowledges and agrees that the Government has entered into this Agreement in material reliance on each and all of the obligations and commitments of Serrallés under this Agreement, as a package and without exception, with the reasonable expectation that the Government will receive all the benefits contemplated to inure to it under the terms of this Agreement.

**6.3.6** The Government and Serrallés each acknowledge and agree that: (a) the objectives and expectations set forth in this Section 6.3 are reasonable; (b) the commitments and obligations set forth in this Section 6.3 are intended to be continuous throughout the duration of this Agreement and (c) that the terms and conditions set forth in this Section 6.3 are material to this Agreement and intended to be enforced to the maximum extent possible.

**6.4    Acknowledgements**

The Government and Serrallés agree and acknowledge that:

**6.4.1** Serrallés would face serious competitive disadvantages to produce Rum in Puerto Rico due to the USVI Incentives, without the obligations and commitments to be provided by the Government hereunder for the entire period for which such obligations and commitments are to be made available during the Term of this Agreement.

**6.4.2** The Government would not have considered granting the benefits and exemptions to be provided to Serrallés under the terms of this Agreement without the obligations and commitments to be provided by Serrallés as set forth in this Agreement.

**6.4.3** The Parties will exercise their best efforts and take all actions to fulfill and maintain the obligations and commitments that they have made for the specific period referenced herein.

**6.4.4** This Agreement has been the subject of arm's length negotiations between Serrallés and the Government and it is the intent of the Parties that this Agreement constitutes an enforceable contract.

## 6.5    Negative Covenants

Without the prior written consent of Serrallés, the Government, to the extent permitted by law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to adversely affect, diminish or impair the beneficial use, operation, utility or the ability of Serrallés to beneficially use, occupy, obtain, receive or otherwise enjoy any of (i) the physical sites, facilities and improvements developed as a result of the Refurbishment and Production Initiatives and the Marketing and Production Support Payments, or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement.



## 6.6    Maintenance and Audit of Records.

**6.6.1** During the term of this Agreement, Serrallés shall maintain accurate books, records and accounts of the Refurbishment and Production Initiatives, the Marketing Activities, the Production Activities, the Marketing and Production Support Payments, the Strategic Third-Party Marketing Support Payments and the Molasses Subsidy Payments granted by this Agreement in order to assist the Government in auditing the use of such incentives by Serrallés. The Government and Serrallés shall cooperate to create a record keeping program reasonably acceptable to both Parties.

**6.6.2** When so requested, Serrallés will provide the Government with information directly related to the incentives and activities described in Section 6.6.1 above and supporting documentation. The Government shall have the right, upon reasonable request during the term of this Agreement, to cause an audit of the books, records, and accounts specifically maintained by Serrallés pursuant to Section 6.6.1 above, to be performed by the Puerto Rico Department of the Treasury, or other agency designated by the Government upon prior written notice to Serrallés. The Government shall be responsible for the costs of such audits and the out-of-pocket expenses

EXECUTION VERSION

of Serrallés directly incurred in connection with such audit; provided, however, that if the results of such audit demonstrate that Serrallés has materially failed to comply with the terms of this Section 6.6, Serrallés shall be responsible for the costs of such audit.

**6.6.3** In the event of any discrepancy between the Government and Serrallés with respect to the result of any audit under this Section 6.6, any Party may seek to resolve such discrepancy as provided in Section 8.3 hereof.

## ARTICLE VII

## TERMINATION REMEDIES

### 7.1 Termination

The Agreement may be terminated prior to expiration of the Term upon the occurrence of any of the following events:

**7.1.1** By Serrallles, upon failure by the Government to file the Agreement with the Office of the Comptroller of Puerto Rico, as required by Act No.18 of October 30, 1975, as amended, within fifteen (15) days after the full execution hereof; or

**7.1.2** By the non defaulting Party, upon any Material Default by the other Party (beyond any applicable cure period set forth in the definition of Material Default); or

**7.1.3** By Serrallés, if following the Effective Date of the Agreement, (i) the Cover Over Revenues program is terminated; (ii) the incentives payments to Serrallés are reduced below the amounts required to be paid according to Articles III and IV of this Agreement; (iii) if at any time the Cover Over Rate is reduced below the Historic Base Level for a period greater than twelve (12) months as provided in Section 4.7.2 hereof, or (iv) the Economic Development Incentives currently enjoyed by Serrallés under the Tax Grant and Act 135 as provided in Section 5.1 hereof, and the Tax Free treatment provided under Section 5.2 hereof, are materially reduced or unavailable to Serrallés (other than as a result of Serrallés' failure to comply with any contractual or legal requirements) for a period greater than twelve (12) months as provided in Section 4.7.2. In any of the abovementioned events in this Section 7.1.3, Serrallés will be entitled to retain any incentives already paid by the Government under this Agreement.

### 7.2 Remedies

The parties shall have the following remedies under the Agreement:

**7.2.1** Upon a Material Default by Serrallés, the Government will be entitled to terminate the Agreement, and/or to reduce prospectively, at its sole option, the incentives granted under Articles III and IV of this Agreement. The foregoing remedies shall be the sole and exclusive remedies of the Government in the event of a Material Default by Serrallés. Notwithstanding the above, if the Material Default consists of a reduction in the Aggregate Minimum Production Requirement below the allowable percentage cushions included in the definition of "Material Default" herein, instead the following remedies shall apply after the expiration of the applicable, twelve (12) month cure period,

EXECUTION VERSION

(i) if the reduction is of one percent (1%) to twenty percent (20%) of the Aggregate Minimum Production Requirement, the Government will be entitled to deduct five percent (5%) of the total the incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default;

(ii) if the reduction is of twenty percent (20%) or more but less than thirty percent (30%) of the Aggregate Minimum Production Requirement, the Government will be entitled to deduct seven and one half percent (7.5%) of the total incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default;

(iii) if the reduction is of thirty percent (30%) or more but less than fifty percent (50%) of the Aggregate Minimum Production Requirement, the Government will be entitled to deduct ten percent (10%) of the total incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default; or

(iv) if the reduction is of fifty percent (50%) or more of the Aggregate Minimum Production Requirement, the Government will be entitled to terminate the Agreement and/or to deduct 15 percent (15%) of the total incentives payable to Serrallés under Article III and IV, as liquidated damages, during the period of duration of said Material Default. In case of termination, Serrallés will be entitled to keep all incentives received up to the date of termination and will also be entititled to receive the incentives accrued but unpaid up to the date of termination after application of the liquidated damages provided under this Section.



The Parties recognize that the incentives payable to Serrallés under Article III and IV will be automatically reduced as a direct consequence of any reduction in the production of rum in Puerto Rico for sale in the United States. The above remedies will be Serrallés maximum exposure under the Agreement.

**7.2.2** Upon a Material Default by the Government, Serrallés may seek specific performance of this Agreement to the extent permitted by law, and/or termination of the Agreement. In case of said termination, Serrallés will be entitled to keep all incentives received up to the date of termination and will also be entititled to receive the full amount of any such incentives with respect to that fiscal year which remain unpaid. Serrallés may not terminate this Agreement for any default other than a Material Default. The foregoing remedies shall be the sole and exclusive remedies of Serrallés in the event of a Material Default by the Government

**7.2.3** The Parties expressly agree and recognize that, with respect to a breach on their part of certain of the covenants, agreements, representations, warranties or commitments contained herein, that the non defaulting Party may not be fairly or adequately compensated by any legal remedy in an action for monetary damages. Therefore, the Parties agree that upon a breach of this Agreement by a Party, the non-defaulting Party, in accordance with the dispute resolution procedures set forth in Section 8.3 hereof, may seek the specific performance of any of the covenants, agreements, representations, warranties or commitments of the defaulting Party contained herein or may be awarded damages for failure of performance or breach of any representation or warranty, or both, on the part of the defaulting Party, to the extent permitted by this Agreement and applicable law and subject to the express remedy limitations of Section 7.2.1

25

EXECUTION VERSION

and Section 7.2.2 hereof. Except as set forth in Section 7.2.1 and Section 7.2.2, no action taken by such Party pursuant to the provisions of this Section 7.2.3 or pursuant to the provisions of any other Section of this Agreement shall be deemed to constitute an election of remedies, and all remedies set forth in this Agreement shall be cumulative and non-exclusive of any other remedy either set forth herein or available to a Party at law or in equity.

**7.2.4** No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

## ARTICLE VIII

## MISCELLANEOUS

### 8.1 Counterparts

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

### 8.2 Governing Law

The governing law of this Agreement shall be the law of Puerto Rico. The Government hereby waives any right, forum, defense or limitation based upon it sovereign immunity for purposes of any action for breach of its obligations under this Agreement.

### 8.3 Dispute Resolution

**8.3.1** Mutual Discussions. Except as otherwise provided in this Section 8.3, if a dispute or difference of any kind whatsoever shall arise among the Parties in connection with, relating to or arising out of this Agreement (each, a "Dispute"), one of such Parties shall notify the other of such Dispute. The Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. If a settlement of any such Dispute or difference is not reached pursuant to this Section 8.3.1 within 60 days after such notice of Dispute is delivered, then the provisions of Section 8.3.2 hereof shall apply. The parties intend to cooperate in implementing Section 8.3.1; however, either Party may (i) decline to participate in negotiations pursuant to Section 8.3.1 or (ii) withdraw from negotiations at any time upon written notice to the other, and in either case, may institute mediation proceedings pursuant to Section 8.3.2.

**8.3.2** Mediation. If a settlement of any such Dispute or difference is not reached pursuant to Section 8.3.1, the Parties agree to submit the matter to mediation. Mediation shall take place at a time and place agreed by the Parties before a single neutral mediator approved by both Parties. Following a proposal to mediate, either Party may initiate, at any time prior to or following the beginning of the mediation process, arbitration proceedings pursuant to Section 8.3.3 of this Agreement. If a Party intends to be accompanied by an attorney at a meeting in the



EXECUTION VERSION

context of negotiations or mediation, at least three (3) working days' notice of such intention shall be given to the other Party and the other Party may also be accompanied by an attorney. All discussions and exchanges of information pursuant to negotiation and mediation under Sections 8.3.1 and 8.3.2 are confidential and may not be used in the context of arbitration proceedings or in a court-of-law unless otherwise lawfully discoverable. The Parties intend to cooperate in implementing Sections 8.3.1 and 8.3.2; however, either Party may withdraw at any time upon written notice to the other from mediation under this Section 8.3.2 and may institute arbitration proceedings pursuant to Section 8.3.3.

**8.3.3** Arbitration. If a Dispute cannot be settled pursuant to Section 8.3.1 and 8.3.2 above, or if either Party has declined to participate in or has withdrawn from mediation, such Dispute shall be determined by arbitration administered by the American Arbitration Association ("AAA"). The number of arbitrators shall be three. Within thirty (30) days of delivery of the request for arbitration, each party shall appoint one (1) arbitrator, and the two arbitrators appointed by the parties shall mutually select a third arbitrator. If the two Party-appointed arbitrators do not reach an agreement on the appointment of a third arbitrator who shall serve as the chairman of the tribunal within fifteen (15) days of their appointment, the AAA shall appoint the third arbitrator. The arbitration award shall be reasoned and in accordance with Puerto Rico law and the terms of this Agreement including without limitation those provided in Section 7.2.1 and 7.2.2 hereof. Judgment upon any award(s) rendered by the arbitrators may be entered in any court having jurisdiction thereof. Nothing in this Agreement shall prevent Serrallés or the Government from seeking provisional measures from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. The fees of the mediator shall be shared 50/50 by the Parties. Each Party shall be responsible for the fees of the arbitrator it appointed, and the fees of the third arbitrator shall be shared 50/50 by the Parties.



**8.3.4** Continued Performance. The Parties shall continue to perform their respective obligations under this Agreement during the existence of any Dispute under this Agreement or the pendency of any mediation or arbitration.

**8.3.5** Commercial Acts. The Parties each agree that the execution, delivery and performance of this Agreement constitute private and commercial acts rather than public or governmental acts.

**8.4 Rules of interpretation**

In this Agreement, unless the context otherwise requires, headings are for convenience only and do not affect the interpretation of this Agreement; a reference to an Exhibit, Article or Section is a reference to that Exhibit to, or Article or Section of, this Agreement; a reference to a document includes any amendment or supplement to, or replacement or novation of, that document; a reference to the singular includes the plural and vice versa: the words "include," "includes," and "including" mean include, includes, and including "without limitation" and "without limitation by specification," and any list or series following any such term is: (a) not exhaustive and (b) not meant to be limited to elements or items of the same or similar kind; and the words "hereof", "herein" and "hereunder", or "thereof", "therein" and "thereunder" and words of similar import when used shall refer to this Agreement or any other agreement as a whole and not to any particular provision.



EXECUTION VERSION

### 8.5    Construction

This Agreement shall not be construed more strictly against one Party than against any other Party merely by virtue of the fact that the Agreement may have been prepared by counsel for one of the Parties, it being recognized that all Parties have contributed substantially and materially to the preparation of this Agreement.

### 8.6    Conflicts

For purposes of the interpretation, enforcement, and performance of this Agreement, all statutes, codes, ordinances, rules and regulations in effect in Puerto Rico as of the date hereof shall be deemed to continue in effect in their current form during the entire Term of this Agreement, except as may otherwise be agreed to by Serrallés in writing and except to the extent of amendments mandated by Government or federal requirements. Notwithstanding the foregoing, if any statute, code, ordinance, rule or regulation is hereafter adopted, amended or interpreted so as to he less restrictive upon Serrallés than is currently the case, then at the option of Serrallés, such less restrictive amendment or interpretation shall control and become applicable without the requirement of an amendment to this Agreement.

### 8.7    Severability

In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect and for any reason whatsoever, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. In the event any such provision is held to be invalid, illegal or unenforceable, the Parties hereto shall make their best efforts to agree on a provision in substitution for such invalid, illegal or unenforceable provision that is as near in economic benefit as possible to the provision found to he invalid, illegal or unenforceable.

### 8.8    Notices

All communications and notices expressly provided for herein shall be sent, by registered first class mail, postage prepaid, by an internationally recognized overnight courier for delivery on the following business day or by telecopy (with such telecopy to be confirmed promptly in writing sent by mail or overnight courier as aforesaid), as follows:

GOVERNMENT OF
PUERTO RICO:

> Secretary
> Department of the Treasury
> P. O. Box 90140
> San Juan, PR, 00902-4140
> Intendente Ramírez Bldg.,
> Stop 1 #10 Paseo Covadonga
> San Juan, PR 00902-4140
> Telephone: 787-722-2121, 787-723-4344
> Telefax: 787-725-7303

28

EXECUTION VERSION

Secretary
Department of Economic Development and
Commerce
P. O. Box 362350
San Juan, PR, 00936-2350
#355 F. D. Roosevelt Ave.
Fomento Industrial Bldg.,
Suite 401, San Juan, PR 00918
Telephone: 787-758-4747, 787-765-2900
Telefax: 787-753-4094; 787-753-6874

Secretary
Department of Agriculture
P. O. Box 10163 24 San Juan, PR, 00908-1163
1309 Fernandez Juncos Ave.,
San Juan, PR 00908
Telephone: 787-721-2120, 787-722-0871
Telefax: 787-723-8512

President
Government Development Bank of Puerto Rico
P. O. Box 42001
San Juan, PR, 00940-2001
José de Diego Ave., Stop 22
Centro Gubernamental R. Sánchez Vilella
Santurce, PR 00940-2001
Telephone: 787-722-2525
Telefax: 787-721-1443

Executive Director
Office of Management and Budget
PO Box 9023228
San Juan, P.R., 00902-3228
Calle Cruz 254
San Juan, Puerto Rico
Telephone: 787-725-9420
Telefax: 787-722-0299

Executive Director
Puerto Rico Industrial Development Company
P. O. Box 362350
SAN JUAN, PR, 00936-2350
355 Ave. F.D. Roosevelt
Fomento Industrial Bldg., Suite 404
Hato Rey, PR, 00940
Telephone: 787-758-4747, 787-754-9481
Telefax: 787-764-1415

29



WITH A COPY TO:                    Attorney General
                                   Puerto Rico Department of Justice
                                   P. O. Box 909192
                                   San Juan, PR, 00907
                                   Olimpo St. and corner of Lindbergh, Stop11
                                   San Juan, 00902-0192
                                   Telephone: 787-721-2900
                                   Telefax: 787-724-4770

                                   O'Neill & Borges
                                   American International Plaza
                                   250 Muñoz Rivera Avenue, Suite 800
                                   San Juan, Puerto Rico 00918-1813
                                   Tel: 787-764-8181 Fax: 787-753-8944
                                   Attention: Managing Partner

SERRALLÉS:                         Destilería Serrallés, Inc.
                                   P. O. Box 198
                                   Mercedita, Puerto Rico 00715
                                   Telephone: 787-840-1000
                                   Telefax: 787-651-8010
                                   Attention: President – Félix J. Serrallés, Jr.

WITH COPIES TO:                    Destilería Serrallés, Inc.
                                   P. O. Box 198
                                   Mercedita, Puerto Rico 00715
                                   Attention: Jorge A. Vázquez, Treasurer
                                   And
                                   Alberto J. Torruella, Executive Vice President

or to such other address as the receiving Party shall have most recently forwarded to the sending
Party pursuant to the provisions of this Section 8.8.

### 8.9    Press Communications

The Parties shall agree on the form and forum on how to communicate the execution of
this Agreement and the mutual long-term commitment to Puerto Rico. The Parties agree to
cooperate fully with each other in connection with all communications-related activities (i.e.,
public relations, media relations, press releases, news conferences, media advisories, news
organizations, etc.) concerning this Agreement and the transactions contemplated hereunder.

### 8.10   Assignments

This Agreement is not assignable by the Government in whole or in part except where
Serrallés consents, in its sole discretion, to such assignment in writing. Serrallés shall have the
right at any time to assign all its rights and obligations, or any part thereof, in and to this
Agreement, or any part thereof, to any Affiliate of Serrallés that agrees to assume the



30

EXECUTION VERSION

assigned obligations of Serrallés in and to this Agreement or applicable portion thereof; provided, however, that proof of the ability of such Affiliate to fulfill any assigned obligations shall be provided to the Government as part of the advance notice by Serrallés. The Government may object to such assignment if it reasonably appears that the Affiliate of Serrallés lacks such ability. Serrallés shall provide the Government at least sixty (60) days advance written notice of its intention to assign this Agreement. The Government shall receive a copy of the written agreement of the Affiliate of Serrallés to agree to assume all assigned obligations and shall acknowledge, to the Government its ability to fulfill such obligations.

### 8.11    No Third Party Beneficiary

This Agreement is for the sole and exclusive benefit of the Government and Serrallés and, if applicable, any permitted successors, transferees or assigns thereof. No other persons or entities are intended third party beneficiaries of this Agreement, including, without limitation, any third parties that may, from time to time, have ownership, security or other interests in any real or personal property associated with the Refurbishment and Production Initiatives, nor shall such third parties have any rights to enforce any of the provisions of this Agreement.

### 8.12    Contractual Relationship

None of the commitments or other obligations, agreements or provisions contained in this Agreement shall or shall be deemed to give the Government the right or power to exercise control over the affairs or management of Serrallés or any of its Affiliates, the Refurbishment and Production Initiatives, or any part thereof. The relationship between the Government and Serrallés is, and at all times shall remain, contractual. No commitment or other obligation, agreement or provision of this Agreement, nor any agreement executed pursuant hereto, is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest between or among the Government and Serrallés or to create any equity interest in Serrallés for the Government. Notwithstanding any other provision of this Agreement or agreement executed pursuant hereto, the Government is not and shall not be construed as a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Serrallés, its stockholders, members, or partners.

### 8.13    Further Assurances

The Government and Serrallés agree to do all things and take all actions required, necessary or appropriate to carry out the terms of this Agreement and the implementation of the Parties' intent as reflected by the terms of this Agreement. Such things and actions include, but are not limited to, the obtaining, negotiation, execution and delivery of all necessary or desirable agreements, filings, consents, authorizations, approvals, licenses or deeds. Without limiting the generality of the foregoing, the Parties agree: (a) to take all actions, without exception, which are necessary and appropriate at any time to assure the binding effect, legality and enforceability of their respective obligations and commitments hereunder and (b) not to take any action which would affect adversely in any way whatsoever the binding effect, legality and enforceability of their respective obligations and commitments hereunder.

EXECUTION VERSION

### 8.14    Survival of Representations and Warranties

The representations, warranties and covenants made by each of the Parties hereto and contained herein shall survive the performance of any obligations to which such representations, warranties and covenants relate.

### 8.15    Term of Agreement

The term of this Agreement (the "Term") shall commence on the Effective Date and continue in effect until the last day of the twentieth (20th) full Fiscal Year after the Effective Date unless earlier terminated pursuant to Sections 7.1 and 7.2. Upon expiration or termination of this Agreement, Serrallés shall retain, at no additional cost, the full amount of all payments disbursed by the Government to Serrallés under this Agreement for Refurbishment and Production Initiatives and for Marketing and Production Support Payments. Notwithstanding the foregoing, after the expiration or termination of this Agreement, the Parties will remain obligated to each other for the return of any excess funds received as a result of a Federal Adjustment. Payment of such funds will be due and payable immediately upon demand.

### 8.16    Binding Effect

This Agreement and all terms, provisions and obligations set forth herein shall be binding upon and shall inure to the benefit of the Government and Serrallés and their respective successors and assigns.

### 8.17    Waivers

Waiver of any of the obligations of a Party set forth in this Agreement may only he effected, in writing, by the other Party hereto. No delay or omission to exercise any right or power by any Party shall be construed to be a waiver. In the event any provision is waived by a Party, such waiver shall not be deemed to waive any other provision.

### 8.18    Entire Agreement

This Agreement is the entire agreement and supersedes all prior and collateral communications and agreements of the Parties relating to the subject matter.

### 8.19    Amendments

This Agreement may be amended only by a written modification duly executed by the Parties' authorized representatives.

### 8.20    Compliance with Laws

The Parties shall comply in a reasonable and substantial manner with all applicable provisions of the laws of the United States and Puerto Rico and all their applicable rules and regulations.

EXECUTION VERSION

### 8.21    Government Contract Clauses

#### 8.21.1 (Intentionally left blank)

**8.21.2 No Payments or Gratuities**. Neither Serrallés nor any of its officers, directors or employees have made any payment, gift or anything of value to any Government employee or official to obtain a favorable evaluation or the execution of this Agreement. If there occurs a violation of this Section 8.21.2, in addition to any other remedies available to the Government, the Government shall be entitled to recover any payments made or gratuities given. No fee or gratuity will be paid to any Government employee or official in connection with this Agreement (except to attorneys and consultants engaged to advise Serrallés) to meet the requirements of the Agreement.

**8.21.3 Conflicts of Interest**. Serrallés hereby certifies that neither Serrallés nor any of its directors, officers, members, partners or employees have any interest nor shall they acquire any interest, directly or indirectly, in cases or issues which may conflict in any manner with its performance under this Agreement. To the best knowledge of Serrallés (i) no public official or employee of the Government has participated in any decision relating to this Agreement which affects such official's or employee's personal interest or the interest of any entity or business in which such officer or employee or any member of his family has or has had an economic interest, directly or indirectly, and (ii) no official or employee of the Government has any interest, direct or indirect, in this Agreement or any proceeds thereof. Serrallés agrees to request Government's consent or waiver to any agreement described in this Section 8.21.3 prior to its execution which consent or waiver will not be unreasonably denied.



**8.21.4 Full Disclosure.** To the best of its knowledge, Serrallés has furnished to the Government all material facts necessary to make the statements contained herein true and correct as of the date hereof. To the best of its knowledge, as of the Effective Date, there are no issues, facts or matters that materially adversely affect, or which could materially adversely affect Serrallés' ability to perform its obligations under this Agreement.

**8.21.5 Compliance with Tax Laws.** Serrallés shall be responsible for retention, proper filing and payment of all social security, income tax, worker's compensation, unemployment insurance, disability insurance, and all other labor requirements arising under this Agreement, if applicable. Serrallés agrees that it will comply with Puerto Rico's tax laws, rules and regulations. Serrallés will be responsible for filing its income tax returns and for making any necessary payments to the Department of the Treasury and the Internal Revenue Service of the United States of America, if applicable. Serrallés certifies that it has filed all of its Tax returns that it has been required to file for the past five (5) years, owes no Taxes and/or is up to date in any payment plan for such Taxes. Prior to the execution of this Agreement, Serrallés has submitted to the Government the following certifications and documents, in each case, dated within thirty (30) days of the Effective Date:

(a)      A certification of filing of income tax return for the past five (5) years, issued by the Department of the Treasury.

(h)      A negative debt certificate, or payment plan and compliance therewith, issued by the Department of the Treasury of Puerto Rico.



33

EXECUTION VERSION

(c)      A negative certificate of debt, or payment plan and compliance therewith, with respect to real and personal property taxes issued by the Municipal Revenue Collection Center ("CRIM" for its Spanish acronym).

(d)      A negative certificate of debt, or payment plan and compliance therewith, for unemployment insurance, temporary disability insurance and chauffeur's social security issued by the Puerto Rico Department of Labor and Human Resources.

(e)      A copy of the Workmen's Compensation Insurance policy issued by the State Insurance Fund.

(f)      A negative certificate of debt, or payment plan and compliance therewith, issued by the State Insurance Fund.

(g)      A good standing certificate from the Puerto Rico Department of State.

It is acknowledged that the certifications and sworn statements above are essential conditions of this Agreement, and if found to be intentionally false, misleading, altered or forged, such finding shall constitute a Material Default and the Government shall have the right to terminate this Agreement.

**8.21.6 Business Documents; Evidence of Authority.** Prior to the execution of this Agreement Serrallés shall provide copies of its articles of incorporation, by-laws, or partnership or joint venture agreement, as applicable. Serrallés shall deliver to the Government before the execution of this Agreement an original certificate of resolution evidencing the authorization to enter into this Agreement.

**8.21.7 Registration of the Agreement.** The Government shall remit a copy of this Agreement to the Office of the Comptroller within fifteen (15) days following the date of the execution of this Agreement and any subsequent amendment of this Agreement. No provision or consideration of services under this Agreement may be demanded until the same has been filed for registration with the Office of the Comptroller pursuant to Act No. 18 of October 30, 1975, as amended.

**8.21.8 Certification on Criminal Proceedings.** Serrallés certifies that as of the date of this Agreement, it has not been convicted, or has no knowledge of being indicted in a criminal procedure for offenses against public integrity, embezzlement of public funds or for the felonies or misdemeanors mentioned in Act Number 458 of September 29, 2000, as amended, in Puerto Rico courts, federal courts, or any other court with jurisdiction. It is acknowledged by the Parties that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute a Material Default and a cause for the Government to terminate this Agreement.    Serrallés shall immediately notify in writing the Government if it, or any of its officers and directors becomes indicted or convicted in a criminal procedure for any type of offense mentioned above. Failure to comply with this notice constitutes a Material Default and a cause for the Government to terminate this Agreement.

34

EXECUTION VERSION

**8.21.9 Ethics Representations.** In addition to any of the foregoing warranties and representations, Serrallés acknowledges, represents and warrants that no official or employee of the Government has a direct or indirect economic interest in Serrallés' rights under this Agreement in accordance with the provisions of Act Number 84 of June 18, 2002, as amended, also known as the Code of Ethics for Contractors. Serrallés certifies that it has received a copy of the Code, read, understood, has complied and will subsequently continue to comply with it in its entirety.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE FOLLOWS]





35

**EXECUTION VERSION**

**WHEREFORE,** the Parties hereto have executed this Agreement as of the date first written above.

DESTILERÍA SERRALLÉS, INC.

By: _____
Name: Félix J. Serrallés, Jr.
Title:  President


THE GOVERNMENT OF
PUERTO RICO

By: _____
Name:  Jesús Méndez
Title:  Secretary
Department of Treasury

By: _____
Name:  José R. Pérez-Riera
Title:  Secretary
Department of Economic Development
and Commerce

By: _____
Name:  José R. Pérez-Riera
Title:  Executive Director
Puerto Rico Industrial Development
Company

By: _____
Name:  Javier A. Rivera Aquino
Title:  Secretary
Department of Agriculture

By: _____
Name:  Juan Carlos Pavía
Title:  Executive Director of  Office of
Management and Budget

By: _____
Name:  Juan Carlos Batlle
Title:  President of Government
Development Bank for Puerto Rico

## EXHIBIT A

### Refurbishment and Production Incentives

1. Blending Area expansion and renovation
2. Rum processing equipment and refurbishment
3. Tank instrumentation
4. Electric substation renovation
5. Boiler renovation
6. Boiler water renovation
7. Fire systems upgrades
8. Roads renovations
9. Laboratory equipment
10. Flavors coolers
11. New land parcels adjacent to distillery
12. Waste water treatment upgrade and refurbishment
13. Aging warehouse refurbishment
14. Central software upgrade
15. Aging warehouse insulation and cooling
16. Cost production incentives
17. Cost efficiencies warehouse modifications
18. Port tank facilities modifications
19. Bottling plant improvements and refurbishment
20. Bottling lines and improvements of existing line and refurbishment
21. New palletizers
22. Rectifying plant expansion and improvements
23. Distillation system and control upgrades and refurbishment
24. Fermnetation and Distilation refurbishment
25. Blending area expansion and renovation
26. Electric generation including renewable energy sources

A-1

**EXHIBIT B**

**MARKETING ACTIVITIES**

<u>**Potential Marketing Activities**</u>

Relationship Marketing

Relationship Market Agency Fees

Consumer Public Relations

Trade Public Relations

Consumer Sponsorships

Innovation and Product Development

Brand Identification l Packaging Development

Consumer Planning and Research

Experimental Marketing l Sampling

Point of Sale

Consumer Promotions

Value Added Packaging

Commercial Advertising and Promotion

Discounts and consideration to customers

<u>**Potential Advertising Activities**</u>

Media-Television

Media-Digital

Media-Other

Advertising Production

Creative Agency Fees

B-1

## EXHIBIT C

### AGREGATE RUM SALES*

| Fiscal Periods | YOY Growth | Volume (m PG) ** |
|---|---|---|
| 2010-2011 | 0% | 10.40 |
| 2011-2012 | -32% | 7.10 |
| 2012-2013 | -51% | 3.50 |
| 2013-2014 | 14% | 4.00 |
| 2014-2015 | 13% | 4.50 |
| 2015-2016 | 11% | 5.00 |
| 2016-2017 | 4% | 5.20 |
| 2017-2018 | 6% | 5.50 |
| 2018-2019 | 4% | 5.70 |
| 2019-2020 | 5% | 6.00 |
| 2020-2021 | 5% | 6.30 |
| 2021-2022 | 6% | 6.70 |
| 2022-2023 | 4% | 7.00 |
| 2023-2024 | 4% | 7.30 |
| 2024-2025 | 5% | 7.70 |
| 2025-2026 | 5% | 8.10 |
| 2026-2027 | 5% | 8.50 |
| 2027-2028 | 6% | 9.00 |
| 2028-2029 | 4% | 9.40 |
| 2029-2030 | 4% | 9.80 |



\* Assumes receipt of uniform incentive and obtaining contracts to supply additional bulk rum requirements for the U.S. market from 2012 on, in addition to maintaining the two contracts obtained to date.

\*\* Sales are stated in millions of U.S. proof gallons per year

C-1

# EXHIBIT D

## MINIMUM RUM PRODUCTION REQUIREMENTS IN PROOF GALLONS (PG)

| Year | Branded (PG) | Total |
|---|---|---|
| 2010/2011 and 2011/2012 | 500,000 | 3,000.000 |
| 2012/2013 through 2015/2016 | 600,000 | 3,000.000 |
| 2016/2017 and thereafter ** | | |



** From 2016-2017 to the reminder of the initial 20-year term, Serrallés shall determine the minimum production requirements every five (5) years based upon the average of the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the previous five (5) year period and Serrallés may further adjust up to twenty five percent (25%) above or up to twenty (20%) below the average of the Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for the previous five (5) year period. Any other changes in minimum production requirements shall be made by mutual agreement of the parties.

# 8.  Supplemental Destilería Sérralles Agreement No. 2 (June 30, 2015), ECF No. 10612-2

FIRST AMENDMENT TO THE DECEMBER 31, 2011 AGREEMENT BETWEEN THE
GOVERNMENT OF PUERTO RICO AND DESTILERIA SERRALLES

This First Amendment to the Agreement of December 31, 2011 (the "Amendment"), is made on this 20th day of July 2012, by and between Destilería Serrallés, Inc. ("Serrallés") and the Government of Puerto Rico ("the Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"), as fiscal agent for the Government, the Executive Director of the Office of Management and Budget, and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by the Puerto Rico Tax Code . The Government and Serrallés are collectively referred to as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, the Parties executed an Agreement on December 31, 2011 ("the Agreement") to ensure the continuance of the benefits generated by the Cover Over Revenues Program to Puerto Rico;

WHEREAS, the Parties now understand that it is necessary to make an amendment to the Agreement to clarify the powers of the Secretary of the Treasury with respect to the labeling requirements established in Article 4.5 of the Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, representations, warranties, and commitments agreed upon in the Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Article 4.5 of the Agreement, titled Labeling, is hereby amended and restated in its entirety and shall hereafter be and read as follows:

**4.5 Labeling**

The Government will develop a quality seal of approval, or other written reference to Puerto Rico that complies with the Puerto Rico Tax Code and that will be included by Serrallés on the back labels of the Branded Rum Products bottled with a minimum volume of two hundred milliliters made in Puerto Rico to promote Puerto Rico. In addition, those bottled Branded Rum Products which qualify as "Puerto Rican Rum" under Puerto Rico law will be identified as such on their front labels. The Government and Serrallés shall cooperate with each other to develop a seal that meets, in terms of size and design, the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Notwithstanding the foregoing, if the Government and Serrallés cannot agree on a seal within 180 days from the Effective Date, either Party

may request the intervention of a mutually acceptable third party which will make a final decision as to the appropriate seal to be used by Serrallés for its Branded Rum Products and its Strategic Third-Party Branded Products taking into consideration the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Any seal implemented under this Section must meet any requirements imposed by law or the TTB. In the case of Strategic Third-Party Branded Products, the Secretary of the Treasury and the Secretary of Economic Development and Commerce (the "Secretaries") will have the discretion and authority to waive upon request, either permanently or for a specific period of time, any requirement to include the quality seal of approval or other written reference to Puerto Rico described in this article on any particular brand or product if the Secretaries deem it to be to the benefit of the public interest. The request of any such waiver must be made in writing and hand delivered to the Secretaries. Any waiver granted must be in writing and its effects shall not be retroactive for any period prior to date of Serralles petition, or applicable to any other product not specifically included in such waiver. Notwithstanding the foregoing, any waiver requested pursuant to this section which has not been rejected by both Secretaries for fifteen (15) calendar days after such waiver request in writing has been hand delivered by Serralles to the Secretaries(the "Consideration Period"), shall be deemed approved by the Secretaries without the need of further action unless prior to the expiration of the Consideration Period a written notification signed by both Secretaries, is submitted to Serralles notifying that the Consideration Period shall be extended for an additional fifteen (15) calendar days, at their sole discretion.

2. Except as otherwise provided in this Amendment, all terms used in this Amendment that are not otherwise defined shall have the respective meanings ascribed to such terms in the Agreement.

3. This Amendment embodies the entire agreement between Serrallés and the Government with respect to the amendment of the Agreement. In the event of any conflict or inconsistency between the provisions of the Agreement and this Amendment, the provisions of this Amendment shall control and govern.

4. Except as specifically modified and amended herein, all of the terms, provisions, requirements and specifications contained in the Agreement remain in full force and effect. Except as otherwise expressly provided herein, the parties do not intend to, and the execution of this Amendment shall not, in any manner impair the Agreement, the purpose of this Amendment being simply to amend and ratify the Agreement, as hereby amended and ratified, and to confirm and carry forward the Agreement, as hereby amended, in full force and effect.

5. As required by Article 8.21.7 the Government shall remit a copy of this Amendment to the Office of the Comptroller within fifteen (15) days following the date of the execution of this Amendment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first written above.

**DESTILERÍA SERRALLÉS, INC.**

By: _____

Name: Félix J. Serrallés, Jr.

Title: President

**THE GOVERNMENT OF PUERTO RICO**

By: _____

Name: Jesús Méndez

Title: Secretary

Department of Treasury

By: _____

Name: José R. Pérez-Riera

Title: Secretary

Department of Economic Development and Commerce

By: _____

Name: José R. Pérez-Riera

Title: Executive Director

Puerto Rico Industrial Development Company

By: _____

Name: ~~Miguel Santiago Córdova~~ Neftali Soto Santiago

Title: ~~Acting~~ Secretary

Department of ~~Agriculture~~

By: _____

Name: Juan Carlos Pavía

Title: Executive Director of Office of Management and Budget

By: _____

Name: Juan Carlos Batlle   Jose Otero

Title: President of Government   EVP

Development Bank for Puerto Rico

# FIRST AMENDMENT TO THE DECEMBER 31, 2011 AGREEMENT BETWEEN THE GOVERNMENT OF PUERTO RICO AND DESTILERIA SERRALLES

This First Amendment to the Agreement of December 31, 2011 (the "Amendment"), is made on this ___ day of May 2012, by and between Destilería Serrallés, Inc. ("Serrallés") and the Government of Puerto Rico ("the Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"), as fiscal agent for the Government, the Executive Director of the Office of Management and Budget, and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by the Puerto Rico Tax Code . The Government and Serrallés are collectively referred to as the "Parties" and individually as a "Party".

## RECITALS

WHEREAS, the Parties executed an Agreement on December 31, 2011 ("the Agreement") to ensure the continuance of the benefits generated by the Cover Over Revenues Program to Puerto Rico;

WHEREAS, the Parties now understand that it is necessary to make an amendment to the Agreement to clarify the powers of the Secretary of the Treasury with respect to the labeling requirements established in Article 4.5 of the Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, representations, warranties, and commitments agreed upon in the Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:



1. Article 4.5 of the Agreement, titled Labeling, is hereby amended and restated in its entirety and shall hereafter be and read as follows:

### 4.5 Labeling

The Government will develop a quality seal of approval, or other written reference to Puerto Rico that complies with the Puerto Rico Tax Code and that will be included by Serrallés on the back labels of the Branded Rum Products bottled with a minimum volume of two hundred milliliters made in Puerto Rico to promote Puerto Rico. In addition, those bottled Branded Rum Products which qualify as "Puerto Rican Rum" under Puerto Rico law will be identified as such on their front labels. The Government and Serrallés shall cooperate with each other to develop a seal that meets, in terms of size and design, the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Notwithstanding the foregoing, if the Government and Serrallés cannot agree on a seal within 180 days from the Effective Date, either Party

may request the intervention of a mutually acceptable third party which will make a final decision as to the appropriate seal to be used by Serrallés for its Branded Rum Products and its Strategic Third-Party Branded Products taking into consideration the reasonable marketing needs of Serrallés and its Strategic Third-Party Branded Products customers. Any seal implemented under this Section must meet any requirements imposed by law or the TTB. In the case of Third-Party Branded Rum Products, the Secretary of the Treasury and the Secretary of Economic Development and Commerce (the "Secretaries") will have the discretion and authority to waive upon request, either permanently or for a specific period of time, any requirement to include the quality seal of approval or other written reference to Puerto Rico described in this article on any particular brand or product if the Secretaries deem it to be to the benefit of the public interest. The request of any such waiver must be made in writing and hand delivered to the Secretaries. Any waiver granted must be in writing and its effects shall not be retroactive for any period prior to date of Serralles petition, or applicable to any other product not specifically included in such waiver. Notwithstanding the foregoing, any waiver requested pursuant to this section which has not been rejected by both Secretaries for fifteen (15) calendar days after such waiver request in writing has been hand delivered by Serralles to the Secretaries(the "Consideration Period"), shall be deemed approved by the Secretaries without the need of further action unless prior to the expiration of the Consideration Period a written notification signed by both Secretaries, is submitted to Serralles notifying that the Consideration Period shall be extended for an additional fifteen (15) calendar days, at their sole discretion.

2. Except as otherwise provided in this Amendment, all terms used in this Amendment that are not otherwise defined shall have the respective meanings ascribed to such terms in the Agreement.

3. This Amendment embodies the entire agreement between Serrallés and the Government with respect to the amendment of the Agreement. In the event of any conflict or inconsistency between the provisions of the Agreement and this Amendment, the provisions of this Amendment shall control and govern.



4. Except as specifically modified and amended herein, all of the terms, provisions, requirements and specifications contained in the Agreement remain in full force and effect. Except as otherwise expressly provided herein, the parties do not intend to, and the execution of this Amendment shall not, in any manner impair the Agreement, the purpose of this Amendment being simply to amend and ratify the Agreement, as hereby amended and ratified, and to confirm and carry forward the Agreement, as hereby amended, in full force and effect.

5. As required by Article 8.21.7 the Government shall remit a copy of this Amendment to the Office of the Comptroller within fifteen (15) days following the date of the execution of this Amendment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date first written above.

**DESTILERÍA SERRALLÉS, INC.**

By: _____
Name: Félix J. Serrallés, Jr.
Title: President

**THE GOVERNMENT OF PUERTO RICO**

By: _____
Name: Jesús Méndez
Title: Secretary
Department of Treasury


By: _____
Name: José R. Pérez-Riera
Title: Secretary
Department of Economic Development
and Commerce


By: _____
Name: José R. Pérez-Riera
Title: Executive Director
Puerto Rico Industrial Development
Company


By: _____
Name: Miguel Santiago Córdova
Title: Acting Secretary
Department of Agriculture


By: _____
Name: Juan Carlos Pavía
Title: Executive Director of Office of
Management and Budget


By: _____
Name: Juan Carlos Batlle
Title: President of Government
Development Bank for Puerto Rico

## SECOND AMENDMENT TO AGREEMENT BETWEEN
## DESTILERIA SERRALLES AND THE GOVERNMENT OF PUERTO RICO

This Second Amendment to the Agreement of December 31, 2011 (the "Amendment"), is made on this _18_ day of February 2014, by and between Destilería Serrallés, Inc. ("Serrallés") and the Government of Puerto Rico ("the Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico ("GDB"), as fiscal agent for the Government, the Executive Director of the Office of Management and Budget, and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO") as authorized by the Puerto Rico Tax Code . The Government and Serrallés are collectively referred to as the "Parties" and individually as a "Party".

### RECITALS

WHEREAS, the Government and Serrallés entered into an Agreement on December 31, 2011 ("the Agreement") whereby the Government agreed to provide certain incentives to Serrallés from the Cover Over Revenues that the Government will receive that are attributable to Serrallés Aggregate Rum Sales;

WHEREAS, the Government and Serrallés entered into a First Amendment to the Agreement on July 20, 2012 (the "First Amendment");

WHEREAS, Serrallés expects to sell approximately 2,300,000 proof gallons of Bulk Rum during Fiscal Year 2013-2014 under supply contracts in existence on January 1, 2014;

WHEREAS, the Government desires to promote further the production of Bulk Rum in Puerto Rico.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Parties agree as follows:

1.    **Definitions.** All capitalized terms used herein shall have the meanings ascribed to them in the Agreement unless otherwise specifically set forth herein to the contrary.

2.    **Amendments to the Agreement.** The Agreement is hereby amended as follows:

a.    The following definition is added to Section 2.1 of the Agreement, in its corresponding alphabetical order, to read in its entirety as follows:

"Secretaries" shall mean the Secretary of the Treasury and the Secretary of Economic Development and Commerce."

Case:17-03283-LTS Doc#:19612-2 Filed:02/03/20 Entered:02/03/20 16:48:59 Desc:
Ex. A - Demonstrative Exhibits Page 549 of 832

2

Case:17-03283-LTS Doc#:13341-2 Filed:06/02/20 Entered:06/02/20 14:53:39 Desc:
Exhibit B Page 3 of 25

b.        Section 4.1.3 (d) (iv) of the Agreement is hereby amended to read in its entirety as follows:

"(iv) make Molasses Subsidy Payments to Serrallés as provided in Section 4.1.4 hereof an in amount equal to ten percent (10%) of the Cover Over Revenues attributable to Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for such Fiscal Year.

c.        Section 4.1.4 of the Agreement is hereby amended to read in its entirety as follows:

"Assuming that the USVI Incentives remain above ten percent (10%) of the Cover Over Revenues attributable to any rum producer in the USVI and so long as the Cover Over Revenues are paid or transferred to the Government, for Fiscal Years following June 30, 2013 and during the Term of this Agreement, the Government agrees to make molasses subsidy payments to Serrallés (the "Molasses Subsidy Payments") in the amounts obtained by multiplying the aggregate Cover Over Revenues attributable to Serrallés Branded Rum Sales and Serrallés Bulk Rum Sales for each Fiscal Year by ten percent (10%). The Molasses Subsidy Payments shall be used by Serrallés (i) to purchase molasses to be utilized in Puerto Rico in the production of Rum in Puerto Rico, or (ii) to grant sales discounts on Serrallés Bulk Rum Sales made with molasses fermented in Puerto Rico. Notwithstanding the foregoing, with respect to Serrallés Rum Bulk Sales made pursuant to Bulk Rum supply agreements in effect on January 1, 2014, Molasses Subsidy Payments for any given Fiscal Year relating to Serrallés Bulk Rum Sales shall be due and payable only upon Serrallés Rum Bulk Sales for such Fiscal Year exceeding the volume of 2,726,000 proof gallons; provided, however, that this volume requirement shall not apply to Serrallés Bulk Rum Sales made pursuant to Bulk Rum supply agreements entered after January 1, 2014.

d.        Section 4.1.2 (b) of the Agreement is hereby amended to read in its entirety as follows:

"(b) Serrallés' Production Activities shall be in furtherance of its production of Serrallés' Rum products or any other third party products or brands utilizing Rum produced by Serrallés in Puerto Rico for sale in the United States. Notwithstanding anything to the contrary set forth herein, Production Activities shall be deemed to include sales discounts granted by Serrallés with respect to sales of Bulk Rum.

e.        Section 4.2.2 of the Agreement is amended to read in its entirety as follows:

Case:17-03283-LTS Doc#:19612-2 Filed:06/03/20 Entered:06/03/20 16:48:59 Desc:
Ex. A - Demonstrative Exhibits Page 550 of 832

Exhibit B Page 9 of 25

3

"With respect to the Marketing and Production Support Payments, (i) any and all Marketing Activities and Production Activities funded with Marketing and Production Support Payments will be disbursed to Serrallés by the Government, PRIDCO or any other designated agency, and (ii) Serrallés shall file with the Government through PRIDCO or any other designated agency, an annual plan for the Marketing Activities for each Fiscal Year which shall include, without limitation, a description of the strategic marketing activities which are part of such plan.

f.     Sections 4.2.3 and 4.2.4 of the Agreement are repealed and left without effect.

3.  Except as otherwise provided in this Amendment, all terms used in this Amendment that are not otherwise defined shall have the respective meanings ascribed to such terms in the Agreement.

4.  This Amendment embodies the entire agreement between Serrallés and the Government with respect to the amendment of the Agreement and it shall be effective as of the date hereof. In the event of any conflict or inconsistency between the provisions of the Agreement and this Amendment, the provisions of this Amendment shall control and govern.

5.  Except as specifically modified and amended herein, all of the terms, provisions, requirements and specifications contained in the Agreement remain in full force and effect. Except as otherwise expressly provided herein, the parties do not intend to, and the execution of this Amendment shall not, in any manner impair the Agreement, the purpose of this Amendment being simply to amend and ratify the Agreement, as hereby amended and ratified, and to confirm and carry forward the Agreement, as hereby amended, in full force and effect.

6.  As required by Article 8.21.7 the Government shall remit a copy of this Amendment to the Office of the Comptroller within fifteen (15) days following the date of the execution of this Amendment.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGE FOLLOWS]**

Case:17-03283-LTS  Doc#:10612-2  Filed:02/03/20  Entered:02/03/20 16:48:59  Desc:
Ex. A - Demonstrative Exhibits  Page 551 of 832

4

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the date first written above.

DESTILERÍA SERRALLÉS, INC.

By: _____

Name: Félix J. Serrallés, Jr.

Title: President

THE GOVERNMENT OF
PUERTO RICO

By: _____

Name: Melba Acosta Febo

Title:   Secretary Department of Treasury

By: _____

Name: Alberto Bacó Bagué

Title:   Secretary Department of Economic Development
         and Commerce

By: _____

Name: Antonio L. Medina Comas

Title:   Executive Director Puerto Rico Industrial Development Company

By: _____

Name: Myrna Comas Pagán

Title: Secretary Department of Agriculture

By: _____

Name: Carlos D. Rivas Quiñones

Title: Executive Director of Office of Management and Budget

By: _____

Name: Jose Pagán Beauchamp

Title: Interim President of Government Development Bank for Puerto Rico

*(Execution Version)*

## Supplemental Agreement

This **Supplemental Agreement** (this "*Agreement*"), entered into as of the 30th day of June, 2015 (the "*Effective Date*"), is made by and among Destilería Serrallés, Inc. ("Serrallés") and the Government of Puerto Rico (the "*Government*"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico, the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto Rico Industrial Development Company ("PRIDCO"), as authorized by Act No. 178 of December 1, 2010, as amended, and the Puerto Rico Internal Revenue Code of 2011. The Government and Serrallés are collectively referred to as the "*Parties*" and each individually as a "*Party*".

**WHEREAS**, the Parties are party to that certain Agreement, dated as of December 31, 2011, as amended on July 20, 2012, and February 15, 2014 (the "*Existing Agreement*"), which provides for the payment of Incentives (as hereinafter defined) to Serrallés;

**WHEREAS**, the Parties wish to supplement the Existing Agreement to provide for the payment of certain amounts due as of the Effective Date from the Government to Serrallés under the Existing Agreement and to establish a method for future payments of Incentives under the Existing Agreement;

**WHEREAS**, the Parties share the objective of maintaining, promoting and growing the production of Serrallés Rum in Puerto Rico; and

**WHEREAS,** the Government has determined that the transactions contemplated in this Agreement are in the best interest of the Commonwealth of Puerto Rico.

**NOW THEREFORE**, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows, effective as of the Effective Date:

## ARTICLE I

## DEFINITIONS; INTERPRETATION

**Defined Terms.** For purposes of this Agreement, (i) capitalized terms not defined shall have the meanings set forth in the Existing Agreement and (ii) the following terms shall have the following meanings:

"*Business Day*" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or San Juan, Puerto Rico are authorized or required by law to remain closed.

"*Collateral Agent*" shall mean Citibank, N.A., a national banking association, as collateral agent under the Trust Agreement, or a duly appointed successor.

*Confirmation Date*" shall mean the date on which the Lockbox Bank has sent a written notice to the Government, the Trustee and the Paying Agent that it has received from the U.S. Government Cover Over Revenues for deposit into the Lockbox Account.

"*Deposit Account Control Agreement*" shall mean the Deposit Account Control Agreement dated May 5, 2015 among the Trustee, the Collateral Agent, the Lockbox Bank and the Government.

"*Designated Agreements*" shall mean the Trust Agreement, the Lockbox Agreement, the Security Agreement and the Deposit Account Control Agreement.

"*Enforcement Expenses*" shall mean expenses incurred by the United States Department of Treasury in connection with the enforcement in Puerto Rico of the provisions of Subtitle E (Sections 5001 through 5891) and Section 7652(a) of the Code and reimbursed from Cover Over Revenues pursuant to Section 5314(a)(4) of the Code.

"*Incentives*" shall mean the Refurbishment and Production Initiatives, Molasses Subsidy Payments, Marketing and Production Support Payments and Strategic Third-Party Marketing Support Payments under the Existing Agreement.

"*Lockbox Account*" shall mean the deposit account referred to as the "Account" in the Lockbox Agreement.

"*Lockbox Agreement*" shall mean the Lockbox Agreement dated May 5, 2015 among the Government, the Trustee, the Paying Agent and the Lockbox Bank.

"*Lockbox Bank*" shall mean Citibank, N.A., a national banking association, as lockbox bank under the Lockbox Agreement, or a duly appointed successor.

"*Paying Agent*" shall mean Citibank, N.A., a national banking association, as paying agent under the Trust Agreement, or a duly appointed successor.

"*Reduction*" shall mean any offset or other reduction in the amount of Cover Over Revenues paid to the Government by the United States Department of Treasury, including as a result of amounts owed, or alleged to be owed, to any United States Governmental Authority by the Government or any Governmental Authority or affiliated entity thereof; provided, however, that a "Reduction" shall not include any reduction that is made by the TTB as an adjustment to the amount of Cover Over Revenues previously paid due to an error determined by an audit or other administrative review.

"*Security Agreement*" shall mean the Security Agreement dated May 5, 2015 between the Trustee and the Collateral Agent, as secured parties, and the Government, as pledgor.

"*Serrallés Agreements*" shall mean this Agreement and the Existing Agreement.

"*Trust Agreement*" shall mean the Trust Agreement dated May 5, 2015 between the Government, the Trustee, the Paying Agent and the Collateral Agent.

"*Trustee*" shall mean Banco Popular de Puerto Rico, a Puerto Rico banking entity, as trustee under the Trust Agreement, or a duly appointed successor.

**1.1 Interpretation**. It is not the intention of the Parties to this Agreement to make a novation of the Existing Agreement, but only to agree on the terms and conditions of a one-time payment by PRIDCO of certain amounts due under the Existing Agreement as herein specifically indicated and to establish a method for future payments of Incentives under the Existing Agreement. Except to the extent expressly modified by this Agreement, the terms of the Existing Agreement shall remain in full force and effect. To the extent that there are any conflicts or inconsistencies between the terms and conditions of the Existing Agreement and the terms and conditions of this Agreement, the terms and conditions of this Agreement shall prevail.

**1.2 Confirmation Date**. The effectiveness of <u>Section 2.4</u>, <u>Section 2.7</u>, <u>Section 2.8</u>, and <u>Section 2.9</u>, shall be subject to the condition that the Confirmation Date has occurred.

## ARTICLE II

## EXISTING AGREEMENT

**2.1 Payment of Amounts Due**. Upon the execution of this Agreement by Serrallés and the Government, PRIDCO will pay Serrallés the amount of $10,000,000.00 by wire transfer of immediately available funds, in full satisfaction of certain Incentives that were due and payable as of the Effective Date, as more specifically described in <u>Exhibit A</u>, leaving a balance due also as specifically described in <u>Exhibit A</u>, as provided by Section 3.2(ii) hereof.

**2.2 Cover Over Revenues**. The definition of "Cover Over Revenues" shall be determined without regard to any Reduction.

**2.3 Marketing and Production Activities.** The following text in Section 4.2.1 of the Existing Agreement shall be of no further force and effect: "Subject to the limitations of Sections 4.2.2 and 4.2.3". Section 4.2.2 of the Existing Agreement is amended and restated to read in its entirety as follows:

> "With respect to the Marketing and Production Support Payments, Serrallés shall file with the Government through PRIDCO or any other designated agency an annual plan for the Marketing Activities for each Fiscal Year."

**2.4 True-Up Adjustments**. Section 4.6.4(b) of the Existing Agreement shall be of no further force and effect. Adjustments relating to the amounts in respect of Cover Over Revenues paid, or to be paid, to Serrallés shall be determined in accordance with Section 4.5 of the Trust Agreement. In order to permit PRIDCO to prepare the "True-Up Calculations" under Section 4.5 of the Trust Agreement, no later than September 30 of each year PRIDCO and Serrallés shall undertake a review and reconciliation of all the invoices for Incentives submitted by Serrallés during the prior Fiscal Year (including all federal tax forms and amendments thereto filed with the TTB evidencing Serrallés Rum Sales and Cover Over Revenues generated by such

sales) and the actual Incentives payments made by the Paying Agent and the Government to Serrallés during such Fiscal Year.

**2.5 Annual Reports.** Within ninety (90) days after the end of each Fiscal Year, Serrallés will provide to the Government the reports required to be delivered pursuant to Sections 4.1.1(c) and 4.1.2(c) of the Existing Agreement. In addition to including the information contained in the reports Serrallés submitted pursuant to such Sections before the Effective Date, reports submitted after the Effective Date shall contain information as to the volume of rum sold during such Fiscal Year that generated Cover Over Revenues from Forms TTB F 5000.25 and F 5110.51 for shipments of tax paid bottled rum to the USA and Forms TTB F 5110.28 and F 5110.31 for shipments of bulk rum to the USA and Serrallés' use of the Incentives payments made by the Paying Agent and the Government to Serrallés during such Fiscal Year. In the case of bulk rum sold to third parties, if Form 5110.28 which is filed by such third party with the TTB is or becomes unavailable, for reasons beyond the control of Serrallés, a certification under oath from Serrallés providing the information included in such Form may be substituted instead.

**2.6 Application of Payments.** All Incentives payments shall be credited to invoices submitted by Serrallés in the order in which such invoices became due and payable.

**2.7 Payment of Future Amounts.** All Incentives payments shall be paid (i) to the Paying Agent by the Lockbox Bank and (ii) to Serrallés by the Paying Agent to the extent funds administered by the Paying Agent are sufficient to make such Incentives payments in accordance with the Trust Agreement. Section 3.2 of the Existing Agreement shall be of no further force and effect, and all the Incentives that would become payable thereunder have been included and are reflected on Exhibit A as of the date provided therein.

**2.8 Pledged Cover Over Requirement.** Any amount that would have been payable to Serrallés in any given month but for the Pledged Cover Over Requirement shall be deemed to be payable in the months immediately succeeding the month in which the Pledged Cover Over Requirement for the then current Fiscal Year has been satisfied in full, to the extent of funds available to the Paying Agent from its receipt of Cover Over Revenues. Notwithstanding the immediately preceding sentence, this provision shall not modify in any respect Sections 4.1.5 or 6.3.3 of the Existing Agreement.

**2.9 Enforcement Expenses.** Serrallés shall pay a share of Enforcement Expenses pursuant to Section 4.7 of the Trust Agreement.

**2.10 Allocation.** Serrallés may apply any portion of the Marketing and Production Support Payments it receives after the Confirmation Date to fund Refurbishment and Production Initiatives. Serrallés will determine in its sole discretion whether to make such application and the amount of any such application.

**2.11 Tax Treatment.** Any allocation of Marketing and Production Support Payments pursuant to Section 2.10 shall be subject to Section 5.2 of the Existing Agreement.

**2.12 Invoices.** All invoices for Incentives submitted by Serrallés shall be substantially in the form of Exhibits C and D to the Lockbox Agreement, as appropriate. Such invoices shall be submitted to PRIDCO with a copy to the Lockbox Bank. Each monthly invoice for Incentives

submitted by Serrallés must include, as an offset for the amount of Incentives claimed by Serrallés for that month, the amounts of any permitted tax credits taken by Serrallés during such month.

## ARTICLE III

## REPRESENTATIONS, WARRANTIES, COVENANTS AND ACKNOWLEDGEMENTS

3.1     **Representations, Warranties and Acknowledgements**.

3.2     **Joint Representation**.    Serrallés hereby represents and warrants to the Government, and the Government hereby represents and warrants to Serrallés, in each case as of the Effective Date, that Exhibit A to this Agreement accurately sets forth the Incentives that, based on the assumptions set forth in such Exhibit, (i) were payable under the Existing Agreement immediately prior to the payment by the Government described in Section 2.1, and (ii) remain unpaid as of the Effective Date after application of the payment by the Government described in Section 2.1

3.3     **Designated Agreements**.  After the execution and delivery of this Agreement by the Parties, (i) PRIDCO covenants and agrees, upon the direction and at the request of Serrallés, to execute and deliver to the Trustee and the Paying Agent a "Government Certificate to Add Beneficiary" adding Serrallés as a Beneficiary under the Trust Agreement pursuant to section 14.2 thereof, and (ii) the Government shall provide a copy of each of the executed Designated Agreements to Serrallés.  The Government shall at all times comply in all material respects with its obligations under the Designated Agreements.

3.4     **Cover Over Reports**.  As promptly as practicable, the Government shall use its best efforts following the Confirmation Date to obtain a waiver from the United States Department of Treasury that would permit the Government to deliver the Cover Over Reports (as such term is defined in the Lockbox Agreement) to the Lockbox Bank, the Paying Agent and PRIDCO.

3.5     **No Adverse Actions**.  Without the prior written consent of the Government, Serrallés, to the extent permitted by law and unless otherwise required by law, shall not take or fail to take any action if such action or failure to act, as the case may be, is reasonably likely to adversely affect, diminish or impair the beneficial use, operation, utility of, or the ability of the Government to beneficially use, occupy, obtain, receive or otherwise enjoy, any of the obligations or other commitments of Serrallés contemplated by, or set forth in, this Agreement and the Designated Agreements.  Without the prior written consent of Serrallés, the Government, to the extent permitted by law and unless otherwise required by law, shall not take or fail to take any action, if such action or failure to act, as the case may be, is reasonably likely to (i) adversely affect, diminish or impair the beneficial use, operation, utility of, or the ability of Serrallés to beneficially use, occupy, obtain, receive or otherwise enjoy, any of the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement and the Designated Agreements, (ii) result in the U.S. Department of Treasury not remitting all Cover

Over Revenues to the Lockbox Account or (iii) result in a lien on the Collateral (as defined in the Security Agreement) or any portion thereof.

## ARTICLE IV

## BREACH

**4.1** **Breach**. Any breach by the Government of <u>Section 3.5</u> shall constitute a Material Default under the Existing Agreement and shall give rise to the same remedies and rights (including rights of termination) with respect to this Agreement as does a Material Default by the Government under the Existing Agreement.

## ARTICLE V

## MISCELLANEOUS

**5.1** **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original.

**5.2** **Governing Law; Waiver of Sovereign Immunity.** The governing law of this Agreement shall be the law of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") without giving effect to the applicable principles of conflicts of laws. The Commonwealth hereby waives any right, forum, defense or limitation based upon its sovereign immunity for purposes of any action for breach of its obligations under this Agreement.

**5.3** **Entire Agreement.** The Serrallés Agreements and the Designated Agreements constitute the entire agreement among the parties hereto with respect to the subject matter of this Agreement and supersede all prior or contemporaneous agreements, understandings, discussions or negotiations (written or oral) among the parties hereto with respect to the subject matters of this Agreement.

**5.4** **Binding Effect**. This Agreement and all terms, provisions and obligations set forth herein shall be binding upon and shall inure to the benefit of the Government and Serrallés and their respective successors and assigns.

**5.5** **No Waiver.** No provision of this Agreement may be interpreted to be a waiver of any provision of the laws (including the Constitution) of the Commonwealth that are not waivable under such laws, including any applicable laws relating to the payment priorities of the obligations of the Commonwealth, including without limitation Section 8 of Article VI of the Constitution and Article 4(c) of Act 147 of June 18, 1980, as amended.

**5.6** **Government Contract Clauses.** Serrallés hereby ratifies all its representations contained in Section 8.21 of the Existing Agreement, regarding Government Contract Clauses.

**5.7** **Business Documents; Evidence of Authority.** Prior to the execution of this Agreement, Serrallés has provided to the Government copies of its articles of incorporation and

by-laws, Serrallés has delivered to the Government an original certificate of resolution evidencing the authorization to enter into this Agreement.

**5.8     Registration of this Agreement**.  The Government shall remit a copy of this Agreement to the Office of the Comptroller within fifteen (15) days following the date of the execution of this Agreement and any subsequent amendment of this Agreement.  No provision or consideration of services under this Agreement may be demanded until the same has been filed for registration with the Office of the Comptroller pursuant to Act No. 18 of October 30, 1975, as amended and Act Number 127 of May 31, 2004, as amended.  The Government undertakes to register this Agreement pursuant to such Act as soon as practicable after the execution of this Agreement.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the Effective Date.

DESTILERIA SERRALLES, INC.

By: _____

Name: Felix Serrallés

Title: President and Chief Executive Officer

_____

_____

_____

*[Signature Page to Supplemental Agreement]*

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
     Name:  Juan Zaragoza Gómez
     Title:   Secretary

Department of Economic Development and Commerce

By: _____
     Name:  Alberto Bacó Bagué
     Title:   Secretary

Puerto Rico Industrial Development Company

By: _____
     Name:  Antonio L. Medina Comas
     Title:   Executive Director

Department of Agriculture

By: _____
     Name:  Myrna Comas Pagan
     Title:   Secretary

Office of Management and Budget

By: _____
     Name:  Luis F. Cruz Batista
     Title:   Director

Government Development Bank for Puerto Rico

By: _____
     Name:  Melba I. Acosta Febo
     Title:   President

00265129; 1

*[Signature Page to Supplemental Agreement]*

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
      Name:  Juan Zaragoza Gómez
      Title:   Secretary

Department of Economic Development and
Commerce

By: _____
      Name:  Alberto Bacó Bagué
      Title:   Secretary

Puerto Rico Industrial Development Company

By: _____
      Name:  Antonio L. Medina Comas
      Title:   Executive Director

Department of Agriculture

By: _____
      Name:  Myrna Comas Pagan
      Title:   Secretary

Office of Management and Budget

By: _____
      Name:  Luis F. Cruz Batista
      Title:   Director

Government Development Bank for Puerto Rico

By: _____
      Name:  Melba I. Acosta Febo
      Title:   President

*[Signature Page to Supplemental Agreement]*

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
      Name:  Juan Zaragoza Gómez
      Title:  Secretary

Department of Economic Development and Commerce

By: _____
      Name:  Alberto Bacó Bagué
      Title:  Secretary

Puerto Rico Industrial Development Company

By: _____
      Name:  Antonio L. Medina Comas
      Title:  Executive Director

Department of Agriculture

By: _____
      Name:  Myrna Comas Pagan
      Title:  Secretary

Office of Management and Budget

By: _____
      Name:  Luis F. Cruz Batista
      Title:  Director

Government Development Bank for Puerto Rico

By: _____
      Name:  Melba I. Acosta Febo
      Title:  President

*[Signature Page to Supplemental Agreement]*

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____

       Name:  Juan Zaragoza Gómez
       Title:   Secretary

Department of Economic Development and
Commerce

By: _____

       Name:  Alberto Bacó Bagué
       Title:   Secretary

Puerto Rico Industrial Development Company

By: _____

       Name:  Antonio L. Medina Comas
       Title:   Executive Director

Department of Agriculture

By: _Myrna Comas Pagán_

       Name:  Myrna Comas Pagan
       Title:   Secretary

Office of Management and Budget

By: _____

       Name:  Luis F. Cruz Batista
       Title:   Director

Government Development Bank for Puerto Rico

By: _____

       Name:  Melba I. Acosta Febo
       Title:   President

*[Signature Page to Supplemental Agreement]*

**THE GOVERNMENT OF PUERTO RICO**

Department of the Treasury

By: _____
      Name: Juan Zaragoza Gómez
      Title: Secretary

Department of Economic Development and Commerce

By: _____
      Name: Alberto Bacó Bagué
      Title: Secretary

Puerto Rico Industrial Development Company

By: _____
      Name: Antonio L. Medina Comas
      Title: Executive Director

Department of Agriculture

By: _____
      Name: Myrna Comas Pagan
      Title: Secretary

Office of Management and Budget

By: _____
      Name: Luis F. Cruz Batista
      Title: Director

Government Development Bank for Puerto Rico

By: _____
      Name: Melba I. Acosta Febo
      Title: President

### THE GOVERNMENT OF PUERTO RICO

Department of the Treasury

By: _____
Name: Juan Zaragoza Gómez
Title: Secretary

Department of Economic Development and
Commerce

By: _____
Name: Alberto Bacó Bagué
Title: Secretary

Puerto Rico Industrial Development Company

By: _____
Name: Antonio L. Medina Comas
Title: Executive Director

Department of Agriculture

By: _____
Name: Myrna Comas Pagan
Title: Secretary

Office of Management and Budget

By: _____
Name: Luis F. Cruz Batista
Title: Director

Government Development Bank for Puerto Rico

By: _____
Name: Melba I. Acosta Febo
Title: President

*[Signature Page to Supplemental Agreement]*

**EXHIBIT A**

**Application of Amounts**

Amounts due to Destilleria Serrallés for claims made for Marketing and Production Support payments and Refurbishment
and Production Initiative Payments as at April 30, 2015

| Month of production | Claim Number | Total Balance | Amounts payable pursuant to Section 1.3.1 | Balance outstanding at April 30, 2015 $10.50 after settlement |
|---|---|---|---|---|
| Nov-14 | MA0000168 | $ 646,209.41 | $ (646,209.41) | |
| Dec-14 | MA0000170 | $ 7,008,614.93 | $ (7,008,614.93) | |
| Nov-14 | MA0000172 | $ 7,576.09 | $ (7,576.09) | |
| Dec-14 | MA0000174 | $ 6,064.53 | $ (6,064.53) | |
| Capex | MA0000177 | $ 772,380.31 | $ (772,380.31) | |
| Capex | MA0000183 | $ 1,559,154.73 | $ (1,559,154.73) | |
| Jan-15 | MA0000173 | $ 1,561,871.35 | | $ 1,561,871.35 |
| Feb-15 | MA0000178 | $ 2,237,099.07 | | $ 2,237,099.07 |
| Mar-15 | MA0000180 | $ 3,114,447.61 | | $ 3,114,447.61 |
| Apr-15 | MA0000182 | $ 3,355,653.03 | | $ 3,355,653.03 |

| | | $ 20,269,071.06 | $ (10,000,000.00) | $ 10,269,071.07 |

# 9.  Lockbox Agreement (May 5, 2015), ECF No. 10602-10

*Execution Version*

## LOCKBOX AGREEMENT

This Lockbox Agreement (this "Lockbox Agreement") is dated as of May 5, 2015, and entered into by and among Citibank, N.A., a national banking association (the "Lockbox Bank"), Banco Popular de Puerto Rico, a Puerto Rico banking entity (not in its individual capacity but as trustee under the Trust Agreement (as defined below), the "Trustee"), Citibank, N.A., a national banking association (not in its individual capacity but as Paying Agent under the Trust Agreement (in each case as defined below)) and the Government of Puerto Rico (the "Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico, the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto Rico Industrial Development Company as authorized by Act No. 178 of December 1, 2010, as amended, Act No. 1 of January 31, 2011 and any successor legislation (the "Enabling Act").

## RECITALS

**WHEREAS**, pursuant to the Enabling Act, the Government has entered or may enter into agreements (as amended from time to time, the "Rum Producer Agreements") with various Puerto Rico rum producers (the "Rum Producers") to provide incentives with the objective of maintaining, promoting and growing the production of rum in Puerto Rico;

**WHEREAS**, under the Rum Producer Agreements, the Government is or will be obligated to make certain payments to the Rum Producers relating to the sale in the United States of proof gallons of rum attributable to the rum manufacturing operations of the Rum Producers in Puerto Rico;

**WHEREAS**, on the date hereof, the Government, the Trustee and Citibank N.A., as paying agent (the "Paying Agent") and collateral agent (the "Collateral Agent"), are entering into a Trust Agreement (the "Trust Agreement") to effect the Government's required payments to the Rum Producers (each Rum Producer that may become a beneficiary of the trust created by the Trust Agreement, a "Beneficiary");

**WHEREAS**, the Government has established a deposit account at the Puerto Rico branch of the Lockbox Bank to provide a source of payment from which the Paying Agent can effect such required payments to the Beneficiaries, and on the date hereof wishes to enter into this Lockbox Agreement with the Government, the Trustee and the Paying Agent with respect to such deposit account;

**WHEREAS**, on the date hereof, the Government, as pledgor, and the Trustee and the Collateral Agent (the "Secured Parties") are entering into a Security Agreement in order to grant the Secured Parties a security interest, on the terms set forth therein, in the collateral described therein (the "Security Agreement");

# 2015-000876
20-may-15 SRA

**WHEREAS**, on the date hereof, the Government, the Trustee, the Collateral Agent and the Lockbox Bank are entering into a Deposit Account Control Agreement (the "Deposit Account Control Agreement") in order to perfect the security interest granted under the Security Agreement; and

**WHEREAS,** the Government has determined that the above described transactions are in the best public interest and the terms of the above agreements are necessary and convenient to effect such transactions;

**NOW THEREFORE**, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Government, the Trustee, the Paying Agent and the Lockbox Bank agree as follows, effective as of the date of this Lockbox Agreement:

**Section 1.** **Certain Terms**. Capitalized terms when used in this Lockbox Agreement, including its preamble, recitals, annexes and schedules, shall have the meanings set forth in Annex A attached hereto.

**Section 2.** **Account**.

(a) The Secretary of Treasury has established at the Lockbox Bank, and the Lockbox Bank hereby confirms that the Lockbox Bank has established, an account at its Puerto Rico branch in the name of the Secretary of Treasury of Puerto Rico bearing account number 0400109028 (the "Account").

(b) The Lockbox Bank shall not close the Account or change the name or account number of the Account without the prior written consent of the Secretary of Treasury and the Paying Agent. The Paying Agent shall not withhold its consent to such change provided that (i) any amendments or modifications to this Lockbox Agreement, the Security Agreement or the Deposit Account Control Agreement that may be necessary or convenient to preserve the validity, priority or perfection of the security interest granted under the Security Agreement shall be executed in form and substance satisfactory to the Paying Agent, and (ii) that the Government shall file (or shall provide such cooperation as may be required to enable the Paying Agent to file or to cause the Collateral Agent to file) such financing statements, continuation statements and other amendments describing all or part of the collateral subject to such security interest as may be requested by the Paying Agent to be filed in order to reflect such change.

(c) The parties hereto acknowledge and agree that the Account is a "deposit account" within the meaning of Section 9-102(a)(29) of the PRCTA and that the Lockbox Bank's jurisdiction for purposes of the Account under the PRCTA shall be the Commonwealth of Puerto Rico.

(d) Deposit Funds held in, or credited to, the Account shall not be invested.

2

## Section 3. Lockbox Bank's Obligations with respect to the Account.

(a) The Account shall be used for the deposit by the U.S. Government of Cover Over Revenues payable to the Government on a periodic basis pursuant to Section 7652 of the Code. The Secretary of Treasury hereby grants to the Lockbox Bank exclusive and unrestricted access to and use of the Account for the purpose of administering such deposits in accordance with this Lockbox Agreement subject to the terms of the Deposit Account Control Agreement.

(h) The Lockbox Bank shall maintain the Account as contemplated by this Lockbox Agreement and shall not commingle the Deposit Funds in or credited to, or designated for deposit in, the Account with any other Deposit Funds otherwise held on behalf of the Government, the Collateral Agent, the Trustee or any other Person. The Lockbox Bank acknowledges that the Account and any Deposit Funds in or credited to or designated for deposit in the Account are subject to security interests in favor of the Trustee and the Collateral Agent to the extent set forth in the Security Agreement. The Lockbox Bank shall not apply any Deposit Funds in the Account or make any disbursement from or debit to the Account other than in accordance with this Lockbox Agreement and, if applicable, the Deposit Account Control Agreement.

(c) Not later than one (1) Business Day after the deposit by the U.S. Government of a Cover Over Payment in the Account, the Lockbox Bank shall notify the Secretary of Treasury, PRIDCO, the Trustee and the Paying Agent of the amount of such Cover Over Payment and the date of receipt.

(d) Not later than one (1) Business Day after disbursement of any funds from the Account, the Lockbox Bank shall notify the Secretary of Treasury, PRIDCO, the Trustee and the Paying Agent of the amount disbursed and the date and recipient of the disbursement. Such notification shall include a breakdown of amounts disbursed, if any, and remaining balances after giving effect to such disbursements, in respect of a Conservation Trust Tax Extender Amount, Unpaid Conservation Trust Amount, Unpaid Beneficiaries' Amount and Unpaid Other Rum Producers' Amount.

(e) Any transfer of funds from the Account shall be made by wire transfer or similar method of transfer of immediately available funds to the account set forth on Schedule 1 of the recipient designated by this Lockbox Agreement or such other account of a recipient set forth in a written instruction from such recipient to the Lockbox Bank.

## Section 4. Cover Over Report; Certification.

(a) From and after the Waiver Date, the Secretary of Treasury shall deliver to the Lockbox Bank a copy of each Cover Over Report not later than three (3) Business Days after the Government's receipt of such Cover Over Report. No later than one (1) Business Day after receipt of such Cover Over Report the Lockbox Bank shall deliver a copy of such Cover Over Report to the Paying Agent and PRIDCO.

(b) Not later than four (4) Business Days after the Government receives a Cover Over Report from the U.S. Government, the Secretary of Treasury shall deliver to the Lockbox

3

Bank, the Paying Agent and PRIDCO a Government Certification relating to such Cover Over Report and to the applicable Cover Over Payment to which such Cover Over Report relates.

(c) No later than one (1) Business Day after receipt of a Cover Over Report or Government Certification, the Lockbox Bank shall notify the Secretary of Treasury, PRIDCO, the Trustee and the Paying Agent of (i) any discrepancy between the amount of the corresponding Cover Over Payment and the amount that should have been received in the Account based on the applicable Cover Over Report or Government Certification and (ii) any Reduction set forth in such Government Certification.

**Section 5. Disposition of Cover Over Payments in the Account.** The Lockbox Bank shall make disbursements of Cover Over Payments deposited by the U.S. Government in the Account during each Fiscal Year by making the following payments from the Account in the following order of priority, **solely to the extent of funds available in the Account**:

(a) First, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of PRIFA, the first $117 million of aggregate Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(a) during such Fiscal Year;

(b) Second, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of the S&T Trust, the next $5 million of Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(b) during such Fiscal Year;

(c) Third, if the Lockbox Bank has received a Government Certification by the fourth (4th) Business Day following such deposit of the Cover Over Payment, not later than one (1) Business Day after receipt by the Lockbox Bank of such Government Certification, to the Secretary of Treasury, the remaining amount of Non-Rum COR included in such Cover Over Payment;

(d) Fourth, if the Lockbox Bank has received a Government Certification by the fourth (4th) Business Day following such deposit of the Cover Over Payment, not later than one (1) Business Day after receipt by the Lockbox Bank of such Government Certification, to the Secretary of Treasury, the remaining amount of Other Rum COR included in such Cover Over Payment;

(e) Fifth, subject to Section 15, if the Lockbox Bank has received a Government Certification by the fourth (4th) Business Day following such deposit of the Cover Over Payment, not later than one (1) Business Day after receipt by the Lockbox Bank of such Government Certification, to the Conservation Trust, an amount equal to the Unpaid Conservation Trust Amount;

4

(f) <u>Sixth</u>, no later than five (5) Business Days after such deposit of the Cover Over Payment, the following amounts on a Pro Rata Basis:

> (i) to the Paying Agent, an amount equal to the Unpaid Beneficiaries' Amount; and

> (ii) to PRIDCO, for credit to the Other Rum Producers, an amount equal to the Unpaid Other Rum Producers' Amount;

(g) <u>Seventh</u>, no later than one (1) Business Day following receipt by the Lockbox Bank of a Government Certification that is received after the fourth (4th) Business Day following such deposit of the Cover Over Payment, the following amounts in the following priority:

> (i) to the Secretary of Treasury, the remaining amount of Non-Rum COR included in such Cover Over Payment;

> (ii) to the Secretary of Treasury, the remaining amount of Other Rum COR included in such Cover Over Payment; and

> (iii) subject to <u>Section 15</u>, to the Conservation Trust, an amount equal to the Unpaid Conservation Trust Amount; and

(h) <u>Eighth</u>, no later than one (1) Business Day after the Lockbox Bank has made all payments required to be made pursuant to Sections 5(a) through 5(g), to the Secretary of Treasury, the remaining balance in the Account (exclusive of Cover Over Payments deposited in the Account on or after the Business Day referred to in Section 5(a)).

Amounts payable under Sections 5(a) and 5(b) shall in all cases be paid <u>first</u> out of Non-Rum COR, <u>second</u> out of Other Rum COR, and <u>third</u> out of Puerto Rico Rum COR, in each case to the extent of funds available in the Account.

**Section 6.** **Subordination of Lien; Waiver of Set-Off**. In the event that the Lockbox Bank has obtained or subsequently obtains by agreement, by operation of law or otherwise a security interest in, lien on, or encumbrance, claim or (except as provided in the next sentence) right of set-off against, the Account or any Deposit Funds therein or credited thereto, the Lockbox Bank hereby agrees that such security interest, lien, encumbrance, claim and right of set-off shall be subordinate to any interest of the Government or the Trustee, including the security interest created pursuant to the Security Agreement. The Lockbox Bank agrees not to exercise any present or future right of recoupment or set-off against the Account or to assert against the Account any present or future security interest, banker's lien or any other lien or claim (including claim for penalties) that the Lockbox Bank may at any time have against the Account or any Deposit Funds therein or credited thereto. The Lockbox Bank shall have no right

5

of set-off against, or other recourse to, the Account in respect of any fees payable for its services hereunder.

**Section 7.    Delegation of Duties.**  The Lockbox Bank may execute any of the powers of this Lockbox Agreement and perform any duty under this Lockbox Agreement either directly or by or through agents or attorneys-in-fact; provided that the Lockbox Bank shall be responsible for the gross negligence and willful misconduct of any agents or attorneys-in-fact selected by it. The Lockbox Bank shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties.

### Section 8.    Reliance by Lockbox Bank.

(a)    Whenever in the administration of the Account the Lockbox Bank shall deem it necessary or desirable that a factual matter be proved or established in connection with the Lockbox Bank taking, suffering or omitting any action under this Lockbox Agreement, such matter (unless other evidence in respect thereof is specifically prescribed in this Lockbox Agreement) may be deemed to be conclusively proved or established by a joint Account Instruction of the Government and the Paying Agent, and such Account Instruction shall be full warrant to the Lockbox Bank for any action taken, suffered or omitted in reliance thereon, subject, however, to the provisions of Section 9.

(b)    The Lockbox Bank may consult with counsel, and any opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by the Lockbox Bank under this Lockbox Agreement that is the subject of such opinion or advice.

(c)    The Lockbox Bank may rely, and shall be fully protected in acting, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document which it has no reason to believe to be other than genuine and to have been signed or presented (or, in the case of telecopies, to have been sent) by the proper party or parties. In the absence of its own gross negligence or willful misconduct, the Lockbox Bank may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates, authorizations or opinions furnished to the Lockbox Bank and conforming to the requirements of this Lockbox Agreement.

### Section 9.    Limitations on Duties of Lockbox Bank.

(a)    The Lockbox Bank shall be obligated to perform such duties and only such duties as are specifically set forth in this Lockbox Agreement (each of which is ministerial and shall not be considered fiduciary), and no implied covenants or obligations shall be read into this Lockbox Agreement against the Lockbox Bank.

(b)    The Lockbox Bank shall be under no obligation to take any action which is discretionary under the provisions of this Lockbox Agreement.

(c)    The Lockbox Bank shall not be liable for any special loss, or indirect, punitive or consequential damages, however caused or arising (including loss of business,

6

goodwill, opportunity or profit) even if advised of the possibility of such loss or damage and regardless of whether the claim for loss or damage is made in negligence, for breach of contract, for breach of trust or otherwise.

(d) The Lockbox Bank shall not be liable for any action it takes or omits to take in good faith hereunder that it believes to be authorized or within its rights or powers herein; provided that such conduct does not constitute gross negligence or willful misconduct (as finally adjudicated by an arbitral tribunal or court of competent jurisdiction).

(e) The Lockbox Bank shall not be required to incur any out-of-pocket expenses in the performance of its duties hereunder (other than any expenses for which the Lockbox Bank is being indemnified or reimbursed hereunder or under the applicable Fee Agreement).

(f) Notwithstanding anything contained in this Lockbox Agreement to the contrary, the Lockbox Bank shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any Governmental Authority, any act of god or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

**Section 10. Resignation and Removal of Lockbox Bank.** The Lockbox Bank may at any time, by giving written notice to the Government, the Trustee and the Paying Agent, resign and be discharged of the responsibilities hereby created, such resignation to become effective upon (a) the appointment of a successor lockbox bank by the Paying Agent, with the prior written consent of the Government (not to be unreasonably withheld, delayed or denied), and (b) the acceptance of such appointment by such successor lockbox bank. If no successor lockbox bank shall be appointed and shall have accepted such appointment within thirty (30) days after the Lockbox Bank gives the aforesaid notice of resignation, the Lockbox Bank, the Government or the Paying Agent may apply to any court of competent jurisdiction to appoint a successor lockbox bank to act until such time, if any, as a successor lockbox bank shall have been appointed as provided in this Section 10. The Paying Agent, with the prior written consent of the Government (not to be unreasonably withheld, delayed or denied), may remove the Lockbox Bank and appoint a successor lockbox bank, such removal to be effective upon the acceptance of such appointment by the successor lockbox bank.

**Section 11. Merger of Lockbox Bank.** Any corporation or entity into which the Lockbox Bank may be merged, or with which it may be consolidated, or any corporation or entity resulting from any merger or consolidation to which the Lockbox Bank shall be a party, shall be the Lockbox Bank under this Lockbox Agreement without the execution or filing of any paper or any further act on the part of the parties hereto unless such corporation does not meet the qualifications set forth in Section 13.

**Section 12. Books and Records.** The Lockbox Bank shall be responsible for the keeping of all appropriate books and records relating to the receipt and disbursement of all monies under this Lockbox Agreement, including all Cover Over Reports received by the Lockbox Bank and all calculations performed by the Lockbox Bank. The Lockbox Bank shall not be personally liable for any taxes due and payable in connection with this Lockbox

7

Agreement except for any such tax based on or measured by amounts paid to the Lockbox Bank as fees or compensation in connection with this Lockbox Agreement pursuant to the Fee Agreement.

**Section 13.   Qualifications.**   The Lockbox Bank under this Lockbox Agreement, including any successor lockbox bank, shall at all times (i) be a financial institution that is recognized in the industry as a leading provider of the types of services being provided under this Lockbox Agreement, (ii) have a net worth of at least $500,000,000, if there be such an institution willing, able and legally qualified to perform the duties of the lockbox bank under this Lockbox Agreement upon reasonable or customary terms and (iii) be able to comply with the provisions of Act 69 of August 14, 1991, as amended, with respect to the Account; provided, however, that such new Lockbox Bank shall resign in accordance with Section 10 if the Government certifies to the Lockbox Bank or the new Lockbox Bank, not later than 30 days after the succession of the new Lockbox Bank, that the new Lockbox Bank is a Person with whom the Commonwealth of Puerto Rico is at the time engaged in a material litigation or other significant legal controversy or dispute.

**Section 14.   Conflict with Other Agreements; Adverse Claims.**   The Lockbox Bank hereby confirms and agrees that:

(a)   there are no agreements entered into between the Lockbox Bank and any other Person with respect to the Account except for this Lockbox Agreement and the Deposit Account Control Agreement;

(b)   it has not entered into, and until the termination of this Lockbox Agreement shall not enter into, any agreement with any Person (other than the Government, the Paying Agent and the Trustee) relating to the Account and/or any Deposit Funds therein or credited thereto, other than the Deposit Account Control Agreement; and

(c)   except for the claims and interests of the Government and the Trustee in the Account and the Deposit Funds therein or credited thereto, the Lockbox Bank does not know of any security interest in, lien on, claim to, or interest in the Account or in any "financial asset" (as defined in Section 8-102(a)(9) of the PRCTA), funds, monies, checks or other items in or credited to the Account. If any Person asserts any security interest, lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Account or in any Deposit Funds therein or credited thereto, other than the security interest of the Trustee and the Collateral Agent therein, the Lockbox Bank shall promptly notify the Government, the Paying Agent and the Trustee thereof in writing.

**Section 15.   Legal Adjustments; Change in Federal Law; Amounts Payable to PRIDCO.**

(a)   If, at any time after the date of this Lockbox Agreement, Act No. 119 of July 9, 2006 of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to PRIFA from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(a) shall be adjusted accordingly to

8

reflect such reduction or the elimination of such priorities. If, at any time after the date of this Lockbox Agreement, Act No. 214 of August 19, 2004 of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to the S&T Trust from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(b) shall be adjusted accordingly to reflect such reduction or the elimination of such priorities. If, at any time after the date of this Lockbox Agreement, Act No. 108 of August 7, 2002 of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to the Conservation Trust from Cover Over Revenues, the payments from the Lockbox Account set forth in Section 5(e) and Section 5(g)(iii) shall be adjusted accordingly to reflect such reduction. Either the Paying Agent or the Government shall have the right to deliver a written notice to the other and to the Lockbox Bank identifying such amendment, modification, repeal or other change and setting forth the corresponding adjustment to be made to Section 5(a), (b), (e) or (g)(iii), as the case may be. Such adjustment shall become effective within ten (10) Business Days of receipt by the Lockbox Bank and either the Government or the Paying Agent, as the case may be, unless either the Government or the Paying Agent delivers a written notice to the other and to the Lockbox Bank prior to the end of such ten (10) Business Day period indicating that it is disputing such adjustment. In the event of any such dispute, no adjustment shall be made to Section 5 until such dispute is resolved pursuant to Section 27(b) or otherwise. Promptly upon resolution of any dispute, the Paying Agent and the Government shall deliver to the Lockbox Bank a joint Account Instruction setting forth the adjustments to be made to Section 5.

(b) If, at any time after the date of this Lockbox Agreement, any change in federal law, regulation or administrative practice would result in the payment of Cover Over Revenues into the Account with respect to any Applicable Month in excess of the Cover Over Revenues that would have been paid with respect to such Applicable Month if the payment had been determined by reference to the Cover Over Rate then in effect for such Applicable Month (an "Excess COR Payment"), the Paying Agent or the Government may deliver a written notice to the other and to the Lockbox Bank proposing an amendment or other modification to this Lockbox Agreement that will adjust the provisions hereof accordingly. Such adjustment shall assure that the Excess COR Payment is disbursed in accordance with the priority of payments set forth in Section 5, including disbursement of any portion of the Excess COR Payment to the Government only after all other Persons entitled to receive disbursements of the Excess COR Payment pursuant to Section 5, whether entitled to receive such disbursements at the time of the Excess COR Payment or with the passage of time, have received such disbursements. Pending the execution and delivery by all parties hereto of such amendment or other modification, the Lockbox Bank shall retain the Excess COR Payment. If the parties hereto cannot agree upon such amendment or other modification, the dispute regarding the adjustment may be submitted to arbitration pursuant to Section 27.

(c) Any amounts payable to PRIDCO from Cover Over Revenues pursuant to Act No. 108 of July 23, 2014 shall be paid to PRIDCO by the Government from amounts received pursuant to Section 5(h).

**Section 16. Notices; Authorized Representatives.**

9

(a)   All notices and other communications under this Lockbox Agreement shall be in writing and shall be sent by registered first class mail, postage prepaid, by an internationally recognized overnight courier for delivery on the following Business Day or by telecopy to the address set forth on Schedule 2, or to such other addresses as shall be designated from time to time by the applicable party hereto in accordance with this Section 16. All notices and other communications under this Lockbox Agreement shall be effective upon receipt.

(b)   Each individual designated as an authorized representative of the Government or the Paying Agent, respectively (an "Authorized Representative"), is authorized to give and receive notices, requests and instructions and to deliver certificates and documents in connection with this Lockbox Agreement on behalf of the Government or the Paying Agent, respectively. The specimen signature for each Authorized Representative of the Government initially authorized hereunder is set forth on Schedule 3. The specimen signature for each Authorized Representative of the Paying Agent initially authorized hereunder is set forth on Schedule 4. From time to time, the Government or the Paying Agent may, by delivering to each other and the Lockbox Bank a revised Schedule 3 or 4 (as applicable), change the information previously given pursuant to this Section 16, but each party hereto shall be entitled to rely conclusively on the then current Schedule until receipt of a superseding Schedule.

**Section 17.   Binding Effect**. This Lockbox Agreement shall be binding on the parties hereto and their successors and permitted assigns.

**Section 18.   Termination of this Lockbox Agreement**. This Lockbox Agreement shall terminate upon termination of the Trust Agreement. Upon termination of this Lockbox Agreement the Lockbox Bank shall disburse all payments then required to be paid from the Account in accordance with the terms of this Lockbox Agreement.

**Section 19.   Entire Agreement**. This Lockbox Agreement, the Security Agreement, the Deposit Account Control Agreement and the Fee Agreement constitute the entire agreement among the parties hereto with respect to the subject matter of this Lockbox Agreement and supersede all prior or contemporaneous agreements (other than the Rum Producer Agreements), understandings, discussions or negotiations (written or oral) among the parties hereto with respect to the subject matter of this Lockbox Agreement.

**Section 20.   Amendment**. This Lockbox Agreement may only be amended in writing signed by all of the parties hereto.

**Section 21.   Counterparts**. This Lockbox Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Lockbox Agreement by email (*e.g.*, with "PDF" attachment) or facsimile shall be effective as delivery of a manually executed counterpart of this Lockbox Agreement.

**Section 22.   Waiver**.

(a)   No failure of any party hereto to exercise, and no delay by it in exercising, any right, power or remedy in connection with this Lockbox Agreement (each a "Remedy") shall

10

operate as a waiver thereof, nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or the exercise of any other Remedy. The Remedies provided in this Lockbox Agreement are cumulative and not exclusive of any other Remedies (whether provided at law or in equity). Any express waiver of any breach of this Lockbox Agreement shall not be deemed to be a waiver of any subsequent breach.

(b)  No provision of this Lockbox Agreement may be interpreted to be a waiver of any provision of the laws (including the Constitution) of the Commonwealth of Puerto Rico that are not waivable under such laws, including any applicable laws relating to the payment priorities of the obligations of the Commonwealth, including without limitation Section 8 of Article VI of the Constitution and Article 4(c) of Act 147 of June 18, 1980, as amended.

**Section 23.  Severability**. Any provision of this Lockbox Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Lockbox Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 24.  Rights of Third Parties**. This Lockbox Agreement shall not create any right or cause of action in or on behalf of any Person other than the parties hereto.

**Section 25.  Assignment**. No party hereto may assign this Lockbox Agreement or any right, title or interest in or under this Lockbox Agreement, or delegate any duty or obligation under this Lockbox Agreement (other than pursuant to Sections 10 or 11), and any such attempted assignment or delegation shall be void, except with the prior written consent of the other parties hereto.

**Section 26.  Binding Effect**. This Lockbox Agreement shall be binding on the parties hereto and their successors and permitted assigns.

**Section 27.  Governing Law; Arbitration; Waiver of Sovereign Immunity**.

(a)  This Lockbox Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Puerto Rico (without giving effect to applicable principles of conflicts of laws), including, to the extent applicable, all laws of the Commonwealth of Puerto Rico (including the Constitution) relating to the payment priorities of the obligations of the Commonwealth of Puerto Rico, including without limitation, Section 8 of Article VI of the Constitution and Article 4(c) of Act No. 147 of June 18, 1980, as amended.

(b)  Any disputes arising out of or in connection with this Lockbox Agreement, including any questions regarding its existence, validity or termination, shall be determined by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as modified by this Section 27(b) and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. The number of arbitrators shall be three (3). Within thirty (30) days after the commencement of arbitration, all claimants shall jointly appoint one (1) arbitrator and all respondents shall jointly appoint one (1) arbitrator. The two (2) arbitrators thus appointed shall choose the third arbitrator, who shall act as chairman. If the two (2) appointed arbitrators

11

do not reach an agreement within fifteen (15) days of their appointment on the appointment of a third arbitrator, the AAA shall appoint the third arbitrator. If more than one arbitration is begun under any Transaction Document and any party contends that two or more arbitrations are substantially related and that the issues should be heard in one proceeding, the arbitrators selected in the first filed of such proceedings shall determine whether, in the interests of justice and efficiency, the proceedings should be consolidated before those arbitrators. The seat of the arbitration shall be San Juan, Puerto Rico. The language of the arbitration shall be English. The award shall be rendered within six (6) months of the commencement of the arbitration, unless otherwise agreed by the parties to the arbitration. A judgment upon any award(s) rendered by the arbitrators may be entered in any court having jurisdiction thereof, including any federal or state court of the United States or the Commonwealth of Puerto Rico. Nothing in this Lockbox Agreement shall prevent the parties hereto from seeking provisional measures from any court of competent jurisdiction, and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(c) The Government hereby waives any right, forum, defense or limitation based upon its sovereign immunity for purposes of any action for breach of its obligations under this Lockbox Agreement, it being recognized that pursuant to Section 27(b), the parties to this Lockbox Agreement have agreed to arbitration as the exclusive forum for dispute resolution.

**Section 28.   Construction; Interpretation; Application of Payments.**

(a)   References to a statutory provision include that provision as from time to time modified, amended, supplemented or replaced whether before or after the date of this Lockbox Agreement so far as such modification, amendment, supplement or replacement applies or is capable of applying to this Lockbox Agreement.

(b)   In this Lockbox Agreement, unless the context otherwise requires, a reference to a document includes any amendment or supplement to, or replacement or novation of, that document; a reference to the singular includes the plural and *vice versa*; and the words "include," "includes," and "including" mean include, includes, and including "without limitation" and "without limitation by specification," and any list or series following any such term is: (i) not exhaustive and (ii) not meant to be limited to elements or items of the same or similar kind.

(c)   In determining the effect of any payment or disbursement on any calculation required to be made pursuant to this Lockbox Agreement, such payment or disbursement shall be credited to the applicable obligation in the order in which such obligation became due and payable.

(d)   In the event of a conflict between this Lockbox Agreement and any other agreement between the Lockbox Bank and the Government relating to the Account, the terms of this Lockbox Agreement shall prevail.

**Section 29.   Rights of the Paying Agent**.  In acting or refraining from acting hereunder, the Paying Agent shall be afforded all of the rights, protections and immunities given to it under the Trust Agreement.

12

## Section 30.  Confidentiality.

(a)  The Lockbox Bank shall preserve the confidentiality of all information delivered to the Lockbox Bank by a counterparty hereunder, including all information contained in a Cover Over Report (all such information "Confidential Information"), and shall not disclose Confidential Information other than pursuant to the terms of this Lockbox Agreement; provided, however, that the Lockbox Bank may disclose Confidential Information to its directors, officers, employees, counsel, advisors, agents and attorneys-in-fact (including the agents and attorneys-in-fact referred to in Section 7) (together, "Representatives") as required in connection with the performance of the obligations of the Lockbox Bank under this Lockbox Agreement, provided that the Lockbox Bank shall notify its Representatives of the non-disclosure obligations of this Section 30 with respect to such Confidential Information and shall be liable for any breach by its Representatives of such non-disclosure obligations.

(b)  In addition to the disclosures permitted by Section 30(a), the Lockbox Bank shall be authorized to disclose Confidential Information where such disclosure is made (i) in connection with the exercise of the rights of the Lockbox Bank under the Lockbox Agreement or the Fee Agreement, (ii) with the consent of the applicable counterparty, (iii) in order to comply with any subpoena, order, regulation, ruling or request of any judicial, administrative or legislative body or committee or any self-regulatory body (including any securities or commodities exchange or the National Association of Securities Dealers, Inc.), or (iv) otherwise as required by applicable law or regulation.

(c)  In the event the Lockbox Bank receives a request to disclose Confidential Information by order from a court or other formal legal process pursuant to Section 30(h)(iii), it shall (i) exercise commercially reasonable efforts to notify the applicable counterparty of such request, to the extent not prohibited by law; (ii) if the applicable counterparty requests, cooperate with the counterparty at the counterparty's expense; and (iii) disclose only the portion of the counterparty's Confidential Information that is required to be disclosed under such law, regulation or order.

(d)  For purposes of this Section 30, Confidential Information shall not include information which (i) is or becomes part of the public domain other than as a result of breach of this Lockbox Agreement by the Lockbox Bank or its Representatives, (ii) was known or acquired by the Lockbox Bank prior to receipt from the applicable counterparty, (iii) is subsequently obtained by the Lockbox Bank from a third party not known by the Lockbox Bank to have an obligation to the applicable counterparty to maintain the confidentiality of the information, (iv) is developed independently by or for the Lockbox Bank, without reference to Confidential Information, or (v) is generally known by persons in the banking, technology, securities or financial services industries.

## Section 31.  Government Contract Clauses.

(a)  The Lockbox Bank undertakes to obey the laws, regulations, opinions, circulars, executive orders or any other norms promulgated by the Commonwealth of Puerto Rico which are applicable to it.

13

(b)  The Lockbox Bank certifies that no official or employee of the Government has a direct or indirect economic interest in its rights under this Lockbox Agreement, as mandated by the Law of Governmental Ethics, Act No. 1 of January 3, 2012.

(c)  The Lockbox Bank certifies that, as of the effective date of this Lockbox Agreement, it is not aware of any relationship which would constitute a conflict of interest with respect to this Lockbox Agreement.

(d)  PRIDCO shall remit a copy of this Lockbox Agreement to the Office of the Comptroller of Puerto Rico within fifteen (15) days following the date of execution of this Lockbox Agreement.  No provision or consideration under this Lockbox Agreement may be demanded until the same has been filed for registration in the Office of the Comptroller of Puerto Rico, in accordance with the mandate of Act No. 18 of October 30, 1975, as amended.

[SIGNATURE PAGES FOLLOW]

14

**IN WITNESS WHEREOF,** the parties hereto have caused this Lockbox Agreement to be duly executed as of the date first written above.

LOCKBOX BANK:

CITIBANK N A as Lockbox Bank

E *if*

By: _____

Name: **Marion O'Connor**
Title: Vice President

PAYING AGENT:

CITIBANK, N.A., as Paying Agent

*if*

By: _____

Name: **Marion O'Connor**
Title: Vice President

GOVERNMENT OF PUERTO RICO:

DEPARTMENT OF THE TREASURY

$E \, IN$

By: ⊹ Zaragoza 665

Name: Juan Zaragoza Gómez
Title: Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE

By: _____

Name: Alberto Bacó Bagué
Title: Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By: _____

Name: Antonio L. Medina Comas
Title: Executive Director

DEPARTMENT OF AGRICULTURE

By: _____

Name: Myrna Comas Pagan
Title: Secretary

OFFICE OF MANAGEMENT AND BUDGET

By: _____

Name: Luiz F. Cruz Batista
Title: Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

By: _____

Name: Melba I. Acosta Febo
Title: President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO RICO:

DEPARTMENT OF THE TREASURY

By:_____
Name: Juan Zaragoza Gómez
Title: Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE - EIN

By:_____
Name: Alberto Bacó Bagué
Title: Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____
Name: Antonio L. Medina Comas
Title: Executive Director

DEPARTMENT OF AGRICULTURE

By:_____
Name: Myrna Comas Pagan
Title: Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____
Name: Luiz F. Cruz Batista
Title: Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

By:_____
Name: Melba I. Acosta Febo
Title: President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO
RICO:

DEPARTMENT OF THE TREASURY

By:_____

Name: Juan Zaragoza Gómez

Title:  Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND
COMMERCE

By:_____

Name: Alberto Bacó Bagué

Title:  Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY
E.IN.

By:_____

Name: Antonio L. Medina Comas

Title:  Executive Director

DEPARTMENT OF AGRICULTURE

By:_____

Name: Myrna Comas Pagan

Title:  Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____

Name: Luiz F. Cruz Batista

Title:  Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO
RICO .

By:_____

Name: Melba I. Acosta Febo

Title:  President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO
RICO:
DEPARTMENT OF THE TREASURY

By:_____

Name: Juan Zaragoza Gómez

Title: Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE

By:_____

Name: Alberto Bacó Bagué

Title: Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____

Name: Antonio L. Medina Comas

Title: Executive Director

DEPARTMENT OF AGRICULTURE
$E I N$

By: _Myrra Comor Pagar_

Name: Myrna Comas Pagan

Title: Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____

Name: Luiz F. Cruz Batista

Title: Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

By:_____

Name: Melba I. Acosta Febo

Title: President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO RICO:

DEPARTMENT OF THE TREASURY

By:_____

Name: Juan Zaragoza Gómez

Title: Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE

By:_____

Name: Alberto Bacó Bagué

Title: Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____

Name: Antonio L. Medina Comas

Title: Executive Director

DEPARTMENT OF AGRICULTURE

By:_____

Name: Myrna Comas Pagan

Title: Secretary

OFFICE OF MANAGEMENT AND BUDGET
*E IN*

By:_____

Name: Luis F. Crúz Batísta

Title: Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

By:_____

Name: Melba I. Acosta Febo

Title: President

Exhibit Lockbox Agreement Page 588 of 832

GOVERNMENT OF PUERTO RICO:

DEPARTMENT OF THE TREASURY

By: _____
Name: Juan Zaragoza Gómez
Title: Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE

By: _____
Name: Alberto Bacó Bagué
Title: Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By: _____
Name: Antonio L. Medina Comas
Title: Executive Director

DEPARTMENT OF AGRICULTURE

By: _____
Name: Myrna Comas Pagan
Title: Secretary

OFFICE OF MANAGEMENT AND BUDGET

By: _____
Name: Luiz F. Cruz Batista
Title: Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO E/N

By: _____
Name: Melba I. Acosta Febo
Title: President

[Signature Page to Lockbox Agreement]

TRUSTEE:                    BANCO POPULAR DE PUERTO RICO, as Trustee
                           $E I N$

                           By:_____
                           Name: Héctor Rivera Rivera
                           Title: Vice President and Trust Officer

## ANNEX A
### to Lockbox Agreement

### **DEFINITIONS**

"AAA" shall have the meaning given to it in Section 27(b).

"Account" shall have the meaning given to it in Section 2(a).

"Account Instruction" shall mean, with respect to the Account, any order, direction or instruction concerning or directing the disposition, transfer, withdrawal, disbursement or redemption of any Deposit Funds in or credited to the Account, or otherwise relating to any matters pertaining to or concerning the Account or any Deposit Funds therein or credited thereto.

"Applicable Month" shall mean the month in which occurred the sale of rum produced in Puerto Rico, as reported in TTB Form 5110.28, or any substitute form providing substantially the same information, that produced excise tax revenue collected by the U.S. Government.

"Authorized Representative" shall have the meaning given to it in Section 16(b).

"Beneficiary" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Beneficiary Invoice" shall mean a Monthly Beneficiary Invoice or a Tax Extender Beneficiary Invoice.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or San Juan, Puerto Rico are authorized or required by law to remain closed.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended.

"Collateral Agent" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Confidential Information" shall have the meaning given to it in Section 30(a).

"Conservation Trust" shall mean the Puerto Rico Conservation Trust Fund.

"Conservation Trust Monthly Amount" shall mean, with respect to each Cover Over Payment that is not a Tax Extender Payment, a positive amount equal to one-sixth (1/6) of the difference of (x) the number of proof gallons used in calculating the Puerto Rico Rum COR included in such Cover Over Payment as set forth in the applicable Government Certification, *multiplied* by the lesser of (A) the Cover Over Rate then in effect as set forth in the applicable Government Certification and (B) $13.25, *minus* (y) such number of proof gallons *multiplied* by $10.50.

A-1

"Conservation Trust Tax Extender Amount" shall mean, with respect to any Tax
Extender Payment, a positive amount equal to one-sixth (1/6) of the Puerto Rico Rum COR
included in such Tax Extender Payment, as set forth in the applicable Government Certification.

"Cover Over Payment" shall mean the payment by the U.S. Government to the Account
of Cover Over Revenues, including any Tax Extender Payment, from and after March 1, 2015.

"Cover Over Rate" shall mean (i) with respect to any Cover Over Revenue attributable to
rum, the maximum rate at which such Cover Over Revenue is covered into the treasuries of
Puerto Rico and the U.S. Virgin Islands pursuant to Section 7652(f) of the Code, and (ii) with
respect to any Cover Over Revenue attributable to articles of merchandise other than rum, the
rate of tax imposed on the article of merchandise pursuant to Section 7652(a)(1) of the Code.

"Cover Over Report" shall mean the report of collections of federal excise tax revenues
pursuant to Section 7652 of the Code and the amount thereof remitted by the U.S. Government to
the Department of the Treasury of Puerto Rico, in substantially the form of Exhibit A hereto.
"Cover Over Report" shall also mean any written communication setting forth the amount of any
Tax Extender Payment if the amount of such Tax Extender Payment is not included in a Cover
Over Report in substantially the form of Exhibit A hereto.

"Cover Over Revenues" or "COR" shall mean the federal excise tax revenues payable to
the Government by the U.S. Government pursuant to Section 7652 of the Code or any other
statute or regulation which may be substituted for Section 7652 in the future.

"Deposit Account Control Agreement" shall have the meaning given to it in the recitals
of this Lockbox Agreement.

"Deposit Funds" shall mean cash or checks.

"Enabling Act" shall have the meaning given to it in the preamble to this Lockbox
Agreement.

"Enforcement Expenses" shall mean expenses incurred by the United States Department
of Treasury in connection with the enforcement in Puerto Rico of the provisions of Subtitle E
(Sections 5001 through 5891) and Section 7652(a) of the Code and reimbursed from Cover Over
Revenues pursuant to Section 5314(a)(4) of the Code.

"Excess COR Payment" shall have the meaning given to it in Section 15(b).

"Fee Agreement" shall mean the agreement between the Lockbox Bank and one or more
Rum Producers, dated the date hereof, with respect to the payment of fees for the Lockbox
Bank's services under this Lockbox Agreement.

"Fiscal Year" shall mean the Government's fiscal year of July 1 through June 30.

"Government" shall have the meaning given to it in the preamble to this Lockbox
Agreement.

"Government Certification" shall mean a certificate delivered by the Secretary of Treasury to the Lockbox Bank pursuant to Section 4(b) in substantially the form of Exhibit B.

"Government Other Rum Producers' Certification" shall mean a certificate in substantially the form of Exhibit E delivered by PRIDCO to the Lockbox Bank (i) in respect of an Other Rum Producer Invoice (or an amendment thereto) attached to such certificate, certifying, with respect to such Other Rum Producer Invoice or amendment, that the amounts set forth thereon have been calculated in a manner consistent with the Rum Producer Agreement between the Government and the applicable Other Rum Producer and are due and payable by the Government to such Other Rum Producer or (ii) certifying as to any adjustments that may have been made pursuant to "true up" or similar provisions contained in the applicable Rum Producer Agreement with an Other Rum Producer, including amounts that may have been paid by the Government to an Other Rum Producer in respect of an outstanding Other Rum Producer Invoice from funds not received in the Lockbox Account.

"Governmental Authority" shall mean any federal, Puerto Rico, commonwealth, state, municipal or local governmental entity, authority or agency, department, instrumentality, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof).

"Lockbox Agreement" shall have the meaning given to it in the preamble to this Lockbox Agreement.

"Lockbox Bank" shall have the meaning given to it in the preamhle to this Lockbox Agreement.

"Monthly Beneficiary Invoice" shall mean an invoice in substantially the form of Exhibit C delivered by a Beneficiary to PRIDCO and (following the date hereof) the Lockbox Bank with respect to rum sales reportable on TTB Form 5110.28, or any substitute form providing substantially the same information, for each Applicable Month beginning with the month of November 2014, calculated at the Cover Over Rate in effect during such Applicable Month, and including evidence of the payment of the applicable rum excise taxes by such Beneficiary for such Applicable Month, as such invoice may be amended from time to time.

"Monthly Other Rum Producer Invoice" shall mean an invoice delivered by an Other Rum Producer to PRIDCO and (following the date hereof) to the Lockbox Bank by PRIDCO together with a Government Other Rum Producers' Certification, with respect to rum sales reportable on TTB Form 5110.28, or any substitute form providing substantially the same information, for each Applicable Month beginning with the month of November 2014, calculated at the Cover Over Rate in effect during such Applicable Month, and including evidence of the payment of the applicable rum excise taxes by such Other Rum Producer for such Applicable Month, as such invoice may be amended from time to time.

"Non-Rum COR" shall mean, with respect to each Cover Over Payment, the portion of such Cover Over Payment that is not (i) Other Rum COR or (ii) Puerto Rico Rum COR.

A-3

"Other Rum COR" shall mean with respect to each Cover Over Payment, the portion of such Cover Over Payment comprised of Cover Over Revenue payable by the U.S. Government to the Government pursuant to Section 7652(e) of the Code.

"Other Rum Producer" shall mean any Rum Producer that is a party to a Rum Producer Agreement as of the date hereof but is not a Beneficiary as of the date hereof.

"Other Rum Producer Invoice" shall mean a Monthly Other Rum Producer Invoice or a Tax Extender Other Rum Producer Invoice.

"Parent" shall mean a corporation, company or other entity which owns, possesses or controls, directly or indirectly, now or hereafter, (a) all or substantially all of the assets of another corporation, company or other entity, (b) securities representing more than fifty percent (50%) of the voting power of another corporation, company or other entity, and (c) the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract, or otherwise) of another corporation, company or other entity.

"Paying Agent" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Person" shall mean any individual or entity (including any corporation, limited partnership, joint venture, limited liability company, estate, trust or other body).

"PRCTA" shall mean the Puerto Rico Commercial Transactions Act as in effect from time to time in the Commonwealth of Puerto Rico.

"PRIDCO" shall mean the Puerto Rico Industrial Development Company or any successor entity.

"PRIFA" shall mean the Puerto Rico Infrastructure Financing Authority.

"Pro Rata Basis" shall mean, with respect to a disbursement pursuant to Section 5(f), an amount with respect to each of the Paying Agent and the Government equal to (i) in the case of the Paying Agent, the Unpaid Beneficiaries' Amount and (ii) in the case of the Government, the Unpaid Other Rum Producers' Amount, in each such case *multiplied* by the Factor. For purposes of this definition, the "Factor" is equal to the lesser of (A) the quotient of (x) the total amount of funds available for disbursement pursuant to Section 5(f) *divided* by (y) the sum of the Unpaid Beneficiaries' Amount and the Unpaid Other Rum Producers' Amount and (B) 1.0.

"Puerto Rico" shall mean the Commonwealth of Puerto Rico.

"Puerto Rico Rum COR" shall mean, with respect to each Cover Over Payment, the portion of such Cover Over Payment comprised of Cover Over Revenue payable by the U.S. Government to the Government pursuant to Section 7652(a)(3) of the Code in respect of rum produced in Puerto Rico.

"Reduction" shall mean any offset or other reduction in the amount of Cover Over Revenues paid to the Government by the U.S. Government, including as a result of amounts owed, or alleged to be owed, to any United States Governmental Authority by the Government or any Governmental Authority or affiliated entity thereof; provided, however, that a "Reduction" shall not include any reduction that is made by the TTB as an adjustment to the amount of Cover Over Revenues previously paid due to a calculation error determined by an audit or other administrative review.

"Remedy" shall have the meaning given to it in Section 22(a).

"Representatives" shall have the meaning given to it in Section 30(a).

"Rum COR" shall mean Other Rum COR *plus* Puerto Rico Rum COR.

"Rum Producer Agreements" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Rum Producers" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"S&T Trust" means the Puerto Rico Science and Technology Trust.

"Secured Parties" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Security Agreement" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Tax Extender Beneficiary Invoice" shall mean an invoice in substantially the form of Exhibit D delivered by a Beneficiary to PRIDCO and the Lockbox Bank on or after the date hereof, with respect to rum sales reportable on TTB Form 5110.28 for each Applicable Month to be included in a Tax Extender Payment and calculated using the Cover Over Rate to be used in calculating such Tax Extender Payment, as such invoice may be amended from time to time.

"Tax Extender Other Rum Producer Invoice" shall mean an invoice delivered by an Other Rum Producer to PRIDCO on or after the date hereof, and forwarded by PRIDCO to the Lockbox Bank together with a Government Other Rum Producers' Certification, with respect to rum sales reportable on TTB Form 5110.28 for each Applicable Month to be included in a Tax Extender Payment and calculated using the Cover Over Rate to be used in calculating such Tax Extender Payment, as such invoice may be amended from time to time.

"Tax Extender Payment" shall mean the payment by the U.S. Government to the Account of Cover Over Revenues resulting from a retroactive increase in the Cover Over Rate above the Cover Over Rate specified in Section 7652(f) of the Code (such Cover Over Rate being $10.50 per proof gallon as of the date of this Lockbox Agreement) with respect to any Applicable Month from and after January 1, 2015.

"Trust Agreement" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Trustee" shall have the meaning given to it in the preamble to this Lockbox Agreement.

"TTB" shall mean the U.S. Alcohol and Tobacco Tax and Trade Bureau.

"Transaction Documents" means this Lockbox Agreement, the Trust Agreement, the Security Agreement and the Deposit Account Control Agreement.

"United States" shall mean the continental United States, Hawaii and Alaska.

"Unpaid Beneficiaries' Amount" shall mean, as of any date of determination, an amount equal to (i) the aggregate amount set forth as due to a Beneficiary pursuant to Beneficiary Invoices delivered by the Beneficiaries to PRIDCO and (following the date hereof) the Lockbox Bank as of the fifth (5th) Business Day immediately preceding the date of determination, *minus* (ii) the sum of (x) all amounts previously paid to the Paying Agent pursuant to Section 5(f)(i), *plus* (y) all amounts that the Government and the Paying Agent have certified in joint Account Instructions as of such Business Day as having been paid by the Government to a Beneficiary in respect of an outstanding Beneficiary Invoice, *plus* (iii) any amounts that the Government and the Paying Agent certify in a joint Account Instruction are to be added to the Unpaid Beneficiaries' Amount on account of a Rum Producer having entered into a new Rum Producer Agreement and become a Beneficiary or an Other Rum Producer having become a Beneficiary. The "Unpaid Beneficiaries' Amount" shall reflect (i) all amendments of Beneficiary Invoices delivered to PRIDCO and the Lockbox Bank not later than the fifth (5th) Business Day immediately preceding the date of determination and (ii) all adjustments that may be made pursuant to "true up" or similar provisions contained in the Rum Producer Agreements and the Trust Agreement (including Sections 4.3.2 and 4.5 thereof) jointly certified to the Lockbox Bank by PRIDCO and the applicable Beneficiary, including any amounts that have been paid by the Government to a Beneficiary in respect of an outstanding Beneficiary Invoice from funds not received in the Account. As of the date hereof, the Unpaid Beneficiaries' Amount is $26,030,156.

"Unpaid Conservation Trust Amount" shall mean, as of any date of determination, an amount equal to (i) the sum of, without duplication, (x) the aggregate Conservation Trust Monthly Amounts calculated with respect to Cover Over Payments beginning May 2015, *plus* (y) the aggregate Conservation Trust Tax Extender Amounts relating to Tax Extender Payments received by the Government after March 2015, *minus* (ii) the sum of all amounts previously paid to the Conservation Trust pursuant to Section 5(e) and Section 5(g)(iii).

"Unpaid Other Rum Producers' Amount" shall mean, as of any date of determination, an amount equal to (i) the aggregate amount set forth as due to an Other Rum Producer pursuant to Other Rum Producer Invoices delivered by the Other Rum Producers to PRIDCO and (following the date hereof) to the Lockbox Bank by PRIDCO together with a Government Other Rum Producers' Certification as of the fifth (5th) Business Day immediately preceding the date of determination *minus* (ii) the sum of (x) all amounts previously paid to the Paying Agent pursuant to Section 5(f)(ii) *plus* (y) all amounts that the Government has certified in Government Other

A-6

Rum Producers' Certifications as of such Business Day as having been paid by the Government to an Other Rum Producer in respect of an Other Rum Producer Invoice, *minus* (iii) any amounts that the Government and the Paying Agent have certified in joint Account Instructions as of such Business Day as having been added to the Unpaid Beneficiaries Amount as a result of an Other Rum Producer having become a Beneficiary. The "Unpaid Other Rum Producers' Amount" shall reflect (i) all amendments of Other Rum Producer Invoices set forth in a Government Other Rum Producers' Certification not later than the fifth (5th) Business Day immediately preceding the date of determination and (ii) all adjustments that may be made pursuant to "true up" or similar provisions contained in the Rum Producer Agreements with Other Rum Producers, including any amounts that have been paid by the Government to an Other Rum Producer in respect of an outstanding Other Rum Producer Invoice from funds not received in the Account, as certified to the Lockbox Bank by PRIDCO in a Government Other Rum Producers' Certification. As of the date hereof, the Unpaid Other Rum Producers' Amount is $4,499,415.10.

"U.S. Government" shall mean the federal government of the United States.

"Waiver Date" shall mean the date on which the Government obtains the waiver of the U.S. Government to allow disclosure of the information contained in the Cover Over Report to the Lockbox Bank.

A-7

SCHEDULE 1
to Lockbox Agreement

WIRE TRANSFER INSTRUCTIONS

(c) Wire instructions for each of the Secretary of Treasury, the Paying Agent and the Conservation Trust are as follows:

| Entity | Bank Name | ABA# | Account Name | Account Number | Reference |
|---|---|---|---|---|---|
| Secretary of Treasury | Government Development Bank of Puerto Rico | 0215-0211-8 | Department of Treasury | 32520006 | |
| Paying Agent | CITIBANK, NA. | 0210-0008-9 | Escrow Concentration Account | 36855852 | FFC Trust Account No. 11451000 |
| Conservation Trust | Merrill Lynch, Guaynabo, PR | 026-00959-3 | Puerto Rico Conservation Trust | 5PR-02298 | |
| PRIDCO | Citibank Puerto Rico | 0215-0204-0 | PRIDCO Puerto Rican Rums | 0/400017/212 | |

1-1

SCHEDULE 2
to Lockbox Agreement

## NOTICES

### Government

Notice Address:

Department of the Treasury
Intendente Ramírez Building
10 Paseo Covadonga, 8th Floor
San Juan, Puerto Rico 00902
Attention: Secretary
Fax: (787) 725-7303

With a copy to:

Department of the Treasury
Legal Department
Intendente Ramírez Building
10 Paseo Covadonga, Office 801
San Juan, Puerto Rico 00902
Attention: Assistant Secretary for Legal Affairs
Fax: (787) 721-0957

### Trustee

Notice Address:

Banco Popular de Puerto Rico
Fiduciary Service Division
209 Muñoz Rivera Avenue
North Building 4th Floor
San Juan, Puerto Rico 00918
Attention: Hector Rivera, Esq./Jorge Velez
Fax: (787) 281-4099

### Lockbox Bank

Notice Address:

Citibank, N.A.
480 Washington Boulevard, 18th Floor
Jersey City, NJ 07310
Attn: Marion O'Connor

2-1

Fax: (973) 461-7191 or (973) 461-7192

## SCHEDULE 3
### to Lockbox Agreement

### **Government**
### **Authorized Representatives and Telephone Number(s) for Call-Backs**

### **Solely with respect to the Department of the Treasury:**

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Ana García Noya | | |
| | | |

### **Solely with respect to the Puerto Rico Industrial Development Company:**

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Julio López | | 787-637-8448 |
| Julio Benitez | | 787-366-3105 |

## SCHEDULE 3
## to Lockbox Agreement

### **Government**
### **Authorized Representatives and Telephone Number(s) for Call-Backs**

## **Solely with respect to the Department of the Treasury:**

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Ana García Noya | | |
| | | |
| | | |
| | | |

## **Solely with respect to the Puerto Rico Industrial Development Company:**

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Julio C. López Iglesias | | 787-637-8448 |
| Julio R. Benítez Torres | | 787-366-3105 |
| | | |
| | | |

SCHEDULE 4
to Lockbox Agreement

**Paving Agent**
**Authorized Representatives and Telephone Number(s) for Call-Backs**

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Marion O'Connor | *Marion O'Connor* | (201) 763-3055 |
| Jenny Cheng | | (212) 816-5648 |
| Camille Tomao | | (212) 816-5859 |

4-1

# EXHIBIT A

## FORM OF COVER OVER REPORT

COVER OVER WORKSHEET
COVER OVER TO PUERTO RICO AND THE VIRGIN ISLANDS
[Month] [Year]

| COLLECTIONS: | PUERTO RICO | | VIRGIN ISLANDS | |
|---|---|---|---|---|
| (1) Bulk Rum | $_____ | | $_____ | |
| (2) Cased Rum | $_____ | | $_____ | |
| (3) Other Rum | $_____ | | $_____ | |
| (2) Beer | $_____ | | $_____ | |
| (2) Wine | $_____ | | $_____ | |
| (4) Customs | $_____ | | $_____ | |
| Adjustment: Customs | $_____ | | $_____ | Adjustment: Customs |
| Adjustment: Bulk | $_____ | | $_____ | Adjustment: Bulk (2/14") |
| Adjustment: Estimated Payment | $_____ | | $_____ | Dept of Interior Data Sent |
| Adjustment: Other Rum | $_____ | | $_____ | Adjustment: Other Rum |
| Adjustment: Estimated Payment | $_____ | | $_____ | Other Rum From TTB |

| TOTAL COLLECTIONS: | | $_____ | | $_____ |
|---|---|---|---|---|

| DEDUCTIONS: | | | TOTAL TO INTERIOR | $ |
|---|---|---|---|---|
| Enf. Exp (A7) | $___ | | TOTAL OTHER RUM | $_____ |
| Deduction | $___ | | | |
| Deduction | $___ | | | |
| TOTAL DEDUCTIONS: | | $ | | |
| TOTAL COVER OVER: | | $ | | $_____ |
| TOTAL COLLECTIONS: | | $ | | |

| (A1) BULK RUM IN PROOF GALLONS | | | |
|---|---|---|---|
| ATF F 5600.8 | Puerto Rico | Virgin Islands | Other Imp. Run |
| (5) Total Prf Gals | | | |

| (1) TOTAL @ $10.50 | $ | $ | $ |
|---|---|---|---|
| TOTAL @ $13.50 | $ | $ | $ |
| TOTAL @ $13.25 | $ | $ | $ |

| OTHER RUM DATA WITH PERCENTAGES FOR PUERTO RICO & THE VIRGIN ISLANDS | | | |
|---|---|---|---|
| [Month and Year] | | | |
| COLLECTIONS: | OTHER RUM (pg) | Puerto Rico | Virgin Islands |
| (5) Bulk @ 10.50 | $ | $ | $ |
| (A5) Census @ 10.50 | $ | $ | $ |
| Subtotal | $ | $ | $ |

A-1

| DEDUCTIONS | $ |
| --- | --- |

| | | | |
| --- | --- | --- | --- |
| TOTAL p.g. | $ | $ | $ |

| | | | |
| --- | --- | --- | --- |
| (3) TOTAL @ $10.50 | | $ | $ |
| TOTAL @ $13.50 | | $ | $ |
| TOTAL @ $13.25 | | $ | $ |

| (2) PR CASED GOODS: | Distilled Spirits | Wine | Beer |
| --- | --- | --- | --- |
| proof gallons @ 10.50 | $ | $ | $ |

| (4) CUSTOMS FIGURES | Puerto Rico | Virgin Islands |
| --- | --- | --- |
| Dollars | $ | $ |

A-2

## **EXHIBIT B**

## **FORM OF GOVERNMENT CERTIFICATION**

## [DATE]

## GOVERNMENT CERTIFICATION PURSUANT TO SECTION 4(b) OF THE LOCKBOX
AGREEMENT

I, [representative], being a duly authorized representative of the Secretary of
Treasury of Puerto Rico (the "Secretary"), hereby certify, pursuant to Section 4(b) of the
Lockbox Agreement, dated as of May 5, 2015 (the "Lockbox Agreement"), by and among
Citibank, N.A., a national banking association (the "Lockbox Bank"), Banco Popular de Puerto
Rico, a Puerto Rico banking entity (not in its individual capacity but as trustee under the Trust
Agreement (as defined in the Lockbox Agreement), the "Trustee"), Citibank, N.A., a national
banking association (not in its individual capacity but as paying agent under the Trust
Agreement, the "Paying Agent") and the Government of Puerto Rico (the "Government") as
follows:

## Part A[1]

The Cover Over Report for net excise tax collections due to the Government (the
"Report") for the month of [insert month and year on the cover letter accompanying the
Report], was received by the Secretary of Treasury on [date].

As set forth in the Report, (i) the amount of Other Rum COR due to the
Government and the number of proof gallons of rum used in determining such Other Rum
COR, (ii) the amount of Non-Rum COR included in the Cover Over Payment to which
such Report relates and the customs figures, Cover Over Revenues attributable to beer sales
and Cover Over Revenues attributable to wine sales that constitute such Non-Rum COR
and (iii) the amount of Puerto Rico Rum COR due to the Government and the number of
proof gallons of rum and the Cover Over Rate used in determining such Puerto Rico Rum
COR, is in each case, prior to any adjustments or deductions, as set forth in the table below:

---

[1] Part A to be included (i) in connection with a Cover Over Report that does not reflect a Tax
Extender Payment or (ii) in connection with a Cover Over Report that reflects a Tax
Extender Payment, but in such case only with respect to the portion of such Cover Over
Report that does not relate to such Tax Extender Payment.

| Product | Number of Proof Gallons | Cover Over Rate | COR |
|---|---|---|---|
| Other Rum | [●] pg | $[●] ppg | Other Rum COR: $[●] |
| Non-Rum | N/A | N/A | Non-Rum COR: $[●] |
| | | | Customs figures: $[●] : |
| | | | COR attributable to beer sales: $[●] |
| | | | COR attributable to wine sales: $[●] |
| Puerto Rico Rum | [●] pg | $[●] ppg | Puerto Rico Rum COR: $[●] |

As set forth in the Report, the total amount of Cover Over Revenues (after adjustments and deductions) due to the Government equals $[●].

[No Reduction is reflected in the total amount of Cover Over Revenues due to the Government as set forth in the Report.][A Reduction in the amount of $_____ is reflected in the total amount of Cover Over Revenues due to the Government as set forth in the Report.][2]]

### Part B[3]

As set forth in the Report, a Tax Extender Payment in the amount of $[●] has been or will be made.

(i) The amount of Other Rum COR included or to be included in such Tax Extender Payment and the Cover Over Rate for such Other Rum COR and (ii) the amount of Puerto Rico Rum COR included or to be included in such Tax Extender Payment and the Cover Over Rate for such Puerto Rico Rum COR are in each case as set forth in the table below:

---

[2] First sentence to be included unless the Cover Over Report reflects a Reduction. In that case the second sentence should be included, indicating the amount of the Reduction.

[3] Part B to be included solely in connection with the portion of any Cover Over Report that relates to a Tax Extender Payment.

| Product | Cover Over Rate | Amount of COR included in Tax Extender Payment |
|---------|-----------------|------------------------------------------------|
| Other Rum | $[●] ppg | Other Rum COR: $[●] |
| Puerto Rico Rum | $[●] ppg | Puerto Rico Rum COR: $[●] |

## Part C

As set forth in the Report, the Enforcement Expenses deducted from Cover Over Revenues as reimbursement to the United States Department of Treasury equals $[●].

All capitalized terms not defined herein shall have the meaning ascribed to them in the Lockbox Agreement.

IN WITNESS WHEREOF, the Secretary has caused this Government Certification to be executed by [representative] as of the date first written above.

DEPARTMENT OF THE TREASURY

By:_____

Name: [representative]
Title: [position]

## EXHIBIT C

## FORM OF MONTHLY BENEFICIARY INVOICE

[Rum Producer Letterhead]

### INVOICE

Executive Director
Puerto Rico Industrial Development Company
[address]

|  |  |
|---|---|
| DATE: | [date] |
| NUMBER: | [number] |

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico (the "Government") dated as of [date] (the "Agreement"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

| | | |
|---|---|---|
| (a) | Proof gallons of [Rum Producer] Rum Sales in month of [month][year] | [●] pg |
| (b) | Applicable Cover Over Rate | $[●] ppg[1] |
| (c) | Cover Over Revenues attributable to [Rum Producer] Rum Sales at applicable Cover Over Rate | $[●][2] |
| (d) | Applicable percentage of Cover Over | [●]%[3] |

---

[1] To be Cover Over Rate in effect for Applicable Month to which Monthly Beneficiary Invoice relates.

[2] To equal proof gallons in line item (a) multiplied by applicable Cover Over Rate in line item (b).

C-1

Revenues under Section [●] of the
Agreement

(e) Amount due and payable to [Rum
Producer]

$[●]⁴

I, being a duly authorized representative of [Rum Producer], hereby certify that the amount
requested above represents amounts due relating to Cover Over Revenues under the Agreement.

By: _____
[Name]
[Title]

cc:   Citibank, N.A.
[address]

(Cont'd from preceding page)

³ To equal applicable percentage to be applied to Cover Over Revenues attributable to rum sales
of the applicable Rum Producer under the applicable Rum Producer Agreement.

⁴ To equal dollar amount resulting from application of applicable percentage of Cover Over
Revenues in line item (d) to Cover Over Revenues in line item (c).

C-2

## REQUEST FOR DISBURSEMENT

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE:     [date]

_____

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico
(the "Government") dated as of [date] (the "Agreement"). All capitalized terms not defined
herein shall have the meaning ascribed to them in the Agreement.

|  | **Invoice Number** | **Invoice Date** | **Invoice Amount** |
|---|---|---|---|
| Amount due and payable to [Rum Producer], [●]% of Cover Over Revenues attributable to [Rum Producer] Rum Sales under Section [●] of the Agreement | [●] | [date] | $[●] |

I, being a duly authorized representative of [Rum Producer], hereby certify that the above is true
and correct.

By: _____
[Name]
[Title]

C-3

## CERTIFICATION UNDER PENALTY OF ABSOLUTE NULLITY

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE:       [date]

REFERENCE: Invoice [●]

[Agreement] between [Rum Producer] the ("Rum Producer") and the Government of Puerto Rico (the "Government") dated as of [date] (the "Agreement").

I, being a duly authorized representative of [Rum Producer], hereby certify under penalty of nullity that no public servant of the Government, its respective subsidiaries or affiliates, will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for services provided is the agreed upon price that has been negotiated with an authorized representative of the Government. The total amount shown on Invoice [●] is true and correct. The services have been rendered, and no payment has been received.

By: _____
[Name]
[Title]

Attachments:

- Copy of online confirmation of payments made by Rum Producer to the Internal Revenue Service in respect of excise taxes payable for the Applicable Month
- Copy of TTB Form 5110.28 filed with the U.S. Department of Treasury for the Applicable Month
- Copy of TTB Form 5110.31 for shipments received in the United States in the Applicable Month (unless provided to PRIDCO electronically)

C-4

## **EXHIBIT D**

## **FORM OF TAX EXTENDER BENEFICIARY INVOICE**

[Rum Producer Letterhead]

### INVOICE FOR TAX EXTENDER AMOUNTS FOR PERIOD FROM [MONTH], [YEAR] TO [MONTH], [YEAR][i]

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE: [date]
NUMBER: [number]

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico
(the "Government") dated as of [date] (the "Agreement"). All capitalized terms not defined
herein shall have the meaning ascribed to them in the Agreement.

| | | |
|---|---|---|
| (a) | Proof gallons of [Rum Producer] Rum Sales during period from [month] [year] to [month] [year] (the "Applicable Period") as detailed on Schedule A attached hereto | [•] pg |
| (b) | Cover Over Revenues for Applicable Period calculated at $[•][2] ppg | $[•][3] |
| (c) | Cover Over Revenues for Applicable Period calculated at $[•][4] ppg | $[•][5] |

---

[i] Period to reflect Applicable Months to which Tax Extender retroactively applies.

[2] To equal Cover Over Rate previously in effect during Applicable Period.

[3] To equal Cover Over Rate previously in effect during Applicable Period, multiplied by proof
gallons in line item (a).

D-1

| (d) | Difference in Cover Over Revenues (the "Tax Extender COR") | $[●]$[6] |
| (e) | Applicable percentage of Tax Extender COR under Section [●] of the Agreement | $[●]\%$[7] |
| (f) | Amount due and payable to [Rum Producer] | $[●]$[8] |

I, being a duly authorized representative of [Rum Producer], hereby certify that the amount requested above represents amounts due relating to Tax Extender COR to be retroactively paid for the Applicable Period under the Agreement based on an amendment to Section 7652(f) of the United States Internal Revenue Code of 1986, as amended, that became effective on [date].

By: _____
[Name ]
[Title]

cc:    Citibank, N.A.
       [address]

---

(Cont'd from preceding page)

[4] To equal Cover Over Rate retroactively in effect for Applicable Period following amendment to Section 7652(f) of the United States Internal Revenue Code of 1986, as amended.

[5] To equal Cover Over Rate retroactively in effect for Applicable Period, multiplied by proof gallons in line item (a).

[6] To equal Cover Over Revenues in line item (c) minus Cover Over Revenues in line item (b).

[7] To equal applicable percentage to be applied to Cover Over Revenues attributable to rum sales of the applicable Rum Producer under the applicable Rum Producer Agreement.

[8] To equal dollar amount resulting from application of applicable percentage of Cover Over Revenues in line item (e) to Tax Extender COR in line item (d).

## SCHEDULE A

### Schedule of Rum Producer Invoices for the Applicable Period

| Month / Year | Proof Gallons | Claim | Invoice |
|---|---|---|---|
| [Month] [Year] | [●] pg | $[●] | No. [●] |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Total for [●] to [●]⁹** | [Total] pg | $[Total] | N/A |

---

⁹ To be the Applicable Period.

D-3

## REQUEST FOR DISBURSEMENT

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE:     [date]

---

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico (the "Government") dated as of [date] (the "Agreement"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

|                                                                                                          | Invoice Number | Invoice Date | Invoice Amount |
|----------------------------------------------------------------------------------------------------------|----------------|--------------|----------------|
| Amount due and payable to [Rum Producer], [●]% of Tax Extender COR under Section [●] of the Agreement     | [●]            | [date]       | $[●]           |

I, being a duly authorized representative of [Rum Producer], hereby certify that the above is true and correct.

By: _____
[Name]
[Title]

D-4

## CERTIFICATION UNDER PENALTY OF ABSOLUTE NULLITY

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE:      [date]

REFERENCE: Invoice [●]

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico
(the "Government") dated as of [date] (the "Agreement")

I, being a duly authorized representative of [Rum Producer], hereby certify under penalty of
nullity that no public servant of the Government, its respective subsidiaries or affiliates, will
derive or obtain any benefit or profit of any kind from the contractual relationship which is the
basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior
to entering into the Agreement. The only consideration to be received in exchange for the
delivery of goods or for services provided is the agreed upon price that has been negotiated with
an authorized representative of the Government. The total amount shown on Invoice [●] is true
and correct. The services have been rendered, and no payment has been received.

By: _____
[Name ]
[Title]

Attachments:

- Copies of online confirmation of payments made by Rum Producer to the Internal
  Revenue Service in respect of excise taxes payable for the Applicable Period
- Copies of TTB Forms 5110.28 filed with the U.S. Department of Treasury for the
  Applicable Period

## **EXHIBIT E**

### **FORM OF GOVERNMENT OTHER RUM PRODUCERS' CERTIFICATION**

#### [DATE]

#### GOVERNMENT CERTIFICATION

I, [representative], being a duly authorized representative of the Puerto Rico Industrial Development Company ("PRIDCO"), hereby certify, pursuant to the Lockbox Agreement, dated as of May 5, 2015 (the "Lockbox Agreement"), by and among Citibank, N.A., a national banking association (the "Lockbox Bank"), Banco Popular de Puerto Rico, a Puerto Rico banking entity (not in its individual capacity but as trustee under the Trust Agreement (as defined in the Lockbox Agreement), the "Trustee"), Citibank, N.A., a national banking association (not in its individual capacity but as paying agent under the Trust Agreement, the "Paying Agent") and the Government of Puerto Rico (the "Government") as follows:

(1) with respect to each Other Rum Producer Invoice (or amendment thereto) attached hereto and set forth on Schedule 1 hereto, the amounts set forth thereon have been calculated in a manner consistent with the Rum Producer Agreement between the Government and the applicable Other Rum Producer and are due and payable by the Government to such Other Rum Producer; and

(2) the adjustments set forth on Schedule 2 hereto with respect to amounts payable to an Other Rum Producer have been made pursuant to "true up" or similar provisions contained in the Rum Producer Agreement with the applicable Other Rum Producer, as identified on Schedule 2, and are true and accurate calculations of such amounts.

All capitalized terms not defined herein shall have the meaning ascribed to them in the Lockbox Agreement.

IN WITNESS WHEREOF, PRIDCO has caused this Government Certification to be executed by [representative] as of the date first written above.

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____
Name: [representative]
Title: [position]

E-1

Schedule 1

to Government Certification

Schedule of Other Rum Producer Invoices

| Other Rum Producer | Invoice # | Date | Amount of Invoice |
|---|---|---|---|
|  |  |  | $[●] |

Schedule 2

to Government Certification

Schedule of Adjustments

| Other Rum Producer | Rum Producer Agreement | Date of Adjustment | Amount of Adjustment | Reason for Adjustment |
|---|---|---|---|---|
| [Name] | | | $\pm \$[\bullet]$ | |

## SCHEDULE 3
### to Lockbox Agreement

### Government
### Authorized Representatives and Telephone Number(s) for Call-Backs

### Solely with respect to the Department of the Treasury:

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Ana García Noya | | 787-731-8080 x 3760 |
| | | |

### Solely with respect to the Puerto Rico Industrial Development Company:

| Authorized Representative Name | Specimen Signature | Telephone Number |
|---|---|---|
| Julio López | | |
| Julio Benitez | | |

# 10. Ahlberg Deposition Transcript (Apr. 23, 2020), ECF No. 13311-2

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                              April 23, 2020

225

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF PUERTO RICO


        -------------------------- X
        In re:                     :
                                   : PROMESA
        THE FINANCIAL OVERSIGHT    : TITLE III
        AND MANAGEMENT BOARD       :
        FOR PUERTO RICO,           : Case No.
                                   : 17 BK 3283-LTS
           as representative of    :
                                   : (Jointly
        THE COMMONWEALTH OF        :  Administered)
        PUERTO RICO,               :
                                   :
                 Debtor.           :
        -------------------------- X
        In re:                     :
                                   : PROMESA
        THE FINANCIAL OVERSIGHT    : TITLE III
        AND MANAGEMENT BOARD       :
        FOR PUERTO RICO,           : Case No.
                                   : 17 BK 3567-LTS
           as representative of    :
                                   :
        THE COMMONWEALTH OF        : CONFIDENTIAL
        PUERTO RICO, et al.,       : PURSUANT TO
                                   : PROTECTIVE ORDER
                 Debtor.           :
        -------------------------- X VOL. II OF II


             Videotaped deposition of TIMOTHY H.
        AHLBERG, conducted virtually, pursuant to
        continuance, reported stenographically by
        Cynthia J. Conforti, CSR, RPR, CRR, commencing
        at the hour of 9:46 a.m. CST, on the 23rd day
        of April, 2020.
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

2 (Pages 226 to 229)

---

**226**

A P P E A R A N C E S :
FOR THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, as representative of the
COMMONWEALTH OF PUERTO RICO:
   PROSKAUER ROSE LLP
   Eleven Times Square
   (Eighth Avenue & 41st Street)
   New York, New York 10036-8299
   212.969.3000
   BY: DAVID A. MUNKITTRICK, ESQ.
   dmunkittrick@proskauer.com
   MICHAEL T. MERVIS, ESQ.
   mmervis@proskauer.com

   BY: ELLIOT STEVENS, ESQ.
   estevens@proskauer.com
   One International Place
   Boston, Massachusetts 02110-2600
   617.526.9600

FOR AMBAC ASSURANCE CORPORATION:
   MILBANK LLP
   55 Hudson Yards
   New York, New York 10001-2163
   212.530.5000
   BY: CAELAINN CARNEY, ESQ.
   ccarney@milbank.com
   WILL DENKER, ESQ.
   wdenker@milbank.com
   JOHN HUGHES, ESQ.
   jughes2@milbank.com
   KEVIN MAGGIO, ESQ.
   kmaggio@milbank.com
   GRANT MAINLAND, ESQ.
   gmainland@milbank.com
   DAVID MARCOU, ESQ.
   dmarcou@milbank.com
   ATARA MILLER, ESQ.
   amiller@milbank.com
   ALEXANDRA PASLAWSKY, ESQ.
   apaslawsky@milbank.com
   KEVIN WESTERMAN, ESQ.
   kwesterman@milbank.com

---

**227**

A P P E A R A N C E S : (Continued)

FOR NATIONAL PUBLIC FINANCE GUARANTEE CORP.:

   WEIL GOTSHAL & MANGES LLP

   767 Fifth Avenue
   New York, New York 10153-0119
   212.310.8000
   BY: ROBERT S. BEREZIN, ESQ.
   robert.berezin@weil.com
   CHRISTINE CALABRESE, ESQ.
   christine@calabrese@weil.com
   GASPARD RAPPOPORT, ESQ.
   gaspard.rappoport@weil.com

FOR THE PUERTO RICO FISCAL AGENCY AND FINANCIAL
ADVISORY AUTHORITY:

   O'MELVENY & MYERS LLP

   610 Newport Center Drive
   17th Floor
   Newport Beach, California 92660
   949.823.6900
   BY: ELIZABETH L. McKEEN, ESQ.
   emckeen@omm.com
   ASHLEY PAVEL, ESQ.
   apavel@omm.com
   610 Newport Center Drive
   17th Floor
   Newport Beach, California 92660
   949.823.6900
   - also -
   MARINI PIETRANTONI MUÑIZ LLC
   250 Avenue Ponce de Leon
   Suite 900
   San Juan, Puerto Rico 00918
   787.705.2171
   BY: IVÁN GARAU GONZÁLEZ, ESQ.
   lgarau@mpmlawpr.com

---

**228**

A P P E A R A N C E S : (Continued)

ON BEHALF OF ASSURED GUARANTY CORP. and ASSURED
GUARANTY MUNICIPAL CORP.:
   CADWALADER, WICKERSHAM & TAFT LLP
   200 Liberty Street
   New York, New York 10281
   212.504.6000
   BY: THOMAS J. CURTIN, ESQ.
   thomas.curtin@cwt.com
   BILL NATBONY, ESQ.
   bill.natbony@cwt.com
   CASEY JOHN SERVAIS, ESQ.
   casey.servais@cwt.com
   JACLYN A. HALL, ESQ.
   jaclyn.hall@cwt.com

FOR FINANCIAL GUARANTY INSURANCE COMPANY:

   BUTLER SNOW LLP
   The Pinnacle at Symphony Place
   Suite 1600
   150 3rd Avenue South
   Nashville, Tennessee 37201
   615.651.6700
   BY: JASON W. CALLEN, ESQ.
   jason.callen@butlersnow.com
   BY: ADAM M. LANGLEY, ESQ.
   adam.langley@butlersnow.com
   6075 Poplar Avenue
   Suite 500
   Memphis, Tennessee 38119
   901.680.7200

---

**229**

A P P E A R A N C E S : (Continued)

FOR CANTOR-KATZ COLLATERAL MONITOR LLC, as
Collateral Monitor for GDB DEBT RECOVERY
AUTHORITY:

   ORRICK, HERRINGTON & SUTCLIFFE LLP

   51 W 52nd Street
   New York, New York 10019
   212.506.5000
   BY: DAVID LITTERINE-KAUFMAN, ESQ.
   dlitterinekaufman@orrick.com

FOR THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS:

   PAUL HASTINGS LLP

   MetLife Building
   200 Park Avenue
   New York, New York 10166
   212.318.6000
   BY: ZACHARY S. ZWILLINGER, ESQ.
   zacharyzwillinger@paulhastings.com

FOR AMERINATIONAL COMMUNITY SERVICES, LLC, as
servicer for the GDB DEBT RECOVERY AUTHORITY:
   MCCONNELL VALDÉS LLC
   270 Muñoz Rivera Avenue
   Hato Rey, Puerto Rico 00918
   787.759.9292
   BY: NAYUAN ZOUAIRABANI TRINIDAD, ESQ.
   nzt@mcvpr.com
ALSO PRESENT:
   Hira Baig, Weil Gotshal & Manges LLP
   Lou Testani, Milbank LLP
   Alexander Whitelaw, Weil Gotshal & Manges LLP
   Anthony Micheletto, Videographer

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

3 (Pages 230 to 233)

---

**230**

                    INDEX
TESTIMONY OF TIMOTHY H. AHLBERG          PAGE

Examination by Ms. Miller:               236
Examination by Ms. McKeene:              548

          DEPOSITION EXHIBITS
NUMBER         DESCRIPTION              PAGE
MONOLINES

Exhibit 19A   June 30, 2016      247
              Basic Financial
              Statements and
              Required Supplementary
              Information
              CW_STAY0010168 -
              0010367

Exhibit 19B   6/30/16 Notes to the     247
              Basic Financial
              Statements 0010368 -
              0010543

Exhibit 20    FAFAA Treasury Single    274
              Account ("TSA") FY 2020
              Cash Flow As of April 10, 2020
              No Bates numbers

Exhibit 21    Laws of Puerto Rico      298
              Annotated Currentness
              Title 3, Executive
              Chapter 67, Puerto Rico
              Infrastructure Financing
              Authority Act
              No Bates numbers

Exhibit 22    Trust agreement related  217
              to the Puerto Rico
              Infrastructure Financing
              Authority to Citibank, N.A
              No Bates numbers

---

**231**

          DEPOSITION EXHIBITS (Continued)
NUMBER        DESCRIPTION              PAGE
MONOLINES
Exhibit 23    Exhibit A - Flow of      335
              Rum Taxes
              No Bates numbers
Exhibit 24    PRIFA Rum Excise Taxes   340
              Flow of Funds
              No Bates numbers
Exhibit 25    Application and          357
              Agreement for Opening
              Bank Account
              PRIFA_STAY0003747 -
              0004742
Exhibit 26    Statement of Account     368
              for Account 1891
              PRIFA_STAY0004151 -
              0004152

Exhibit 27    Commonwealth Department  371
              of the Treasury
              Remittance Receipt
              PRIFA_STAY0001065 -
              0001070 plus English
              translation not Bates
              numbered

Exhibit 28    Lockbox Agreement        377
              PRIFA_STAY0000472 -
              0000542

Exhibit 29    Lockbox Receipt Notice   389
              PRIFA_STAY0001319 -
              0001326

Exhibit 30    Assignment and           418
              Coordination Agreement
              No Bates numbers

---

**232**

          DEPOSITION EXHIBITS (Continued)
NUMBER        DESCRIPTION             PAGE
MONOLINES

Exhibit 31    Pledge Assignment       439
              Agreement by and among
              The Puerto Rico
              Convention Center
              District Authority, the
              Government Development
              Bank and JPMorgan Chase
              No Bates numbers

Exhibit 32    Puerto Rico Tourism     445
              Company Room Taxes Flow
              of Funds
              No Bates numbers
Exhibit 33    Government Development   464
              Bank For Puerto Rico
              Hotel Occupancy Tax
              Pledge Account
              CCDA_STA0006780 -
              0006787
              English Translation
              no Bates numbers

Exhibit 34    Instruction letters     491
              CCDA_STAY 0004927 -
              0004328
              English translation
              No Bates numbers

Exhibit 35    Discovery on Lift       499
              Stay Motions - Movants'
              Letters dated March
              23, 2020
              No Bates numbers

---

**233**

          DEPOSITION EXHIBITS (Continued)
NUMBER        DESCRIPTION             PAGE
MONOLINES

Exhibit 36    Document in Spanish     521
              CCDA_STAY0006916 -
              0006917
              Document in Spanish
              CCDA_STAY0006916 -
              0006917
              English translation
              No Bates numbers
              Document in Spanish
              CCDA_STAY0006916 -
              0006917

Exhibit 37    FirstBank               520
              Statement of Account
              CCDA_0000785

Exhibit 38    (Not referenced)
              10/14/18 letter,
              Ana Garcia Noya,
              Deputy Treasury
              Secretary to Arnaldo
              Maestry, Government
              Development Bank
              For Puerto Rico
              PRIFA_STAY0001079 -
              0001093

PREVIOUSLY MARKED EXHIBITS REFERRED TO (NOT
TENDERED FOR INCLUSION INTO TRANSCRIPT)

Exhibit 11                            548

Exhibit 14                            549

---

Case:17-03283-LTS Doc#:13341-2 Filed:06/02/20 Entered:06/02/20 22:33:02 Desc:
Exhibit 25 – Deposition Transcript Exhibit of Timothy Ahlberg Page 5 of 85
Exhibit 25 Deposition Transcript of Timothy Ahlberg Page 5 of 85

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

4 (Pages 234 to 237)

---

**234**

PRODUCTION REQUESTS

Page 432, Line 19:

"MS. MILLER: Okay. Well, I'm going to
call for the production of any such documents
that the Commonwealth intends to rely on as
evidence that the account that you're going to
tell me is the transfer account is in fact the
transfer account."

Page 486, Line 17:

MS. MILLER: "So I'm going to call on the
record for the production of any such documents
that you've seen that you're relying on for
your testimony that the 5144 account is the
surplus account or that the Commonwealth
otherwise intends to rely on."

---

**236**

(Witness previously sworn.) 09:46:14
TIMOTHY H. AHLBERG, 09:46:14
having been duly sworn, was examined and 09:46:14
testified further as follows: 09:46:14
EXAMINATION 09:46:16
BY MS. MILLER: 09:46:16
Q. Good morning, Mr. Ahlberg. I am 09:46:18
Atara Miller, and I'm from Milbank, and I'm 09:46:21
counsel for Ambac Assurance Corporation in this 09:46:24
matter. I'll be asking questions today 09:46:27
relating to PRIFAS and CCDA Flow of Funds, and 09:46:30
I'm asking questions on behalf of all of the 09:46:36
defendants here. I guess I'll open with that 09:46:38
here, I should say. 09:46:42
So as the videographer indicated, 09:46:43
Mr. Ahlberg, do you understand that you're 09:46:45
still under oath today? 09:46:47
A. Yes. 09:46:50
Q. And you understand that the 09:46:51
testimony that you're giving has the same 09:46:53
weight and effect as if you were giving it in a 09:46:55
court of law, correct? 09:46:58
A. Yes. 09:47:00
Q. And the instructions that 09:47:06
Mr. Natbony gave you yesterday will continue, 09:47:07

---

**235**

THE VIDEOGRAPHER: We are now on 09:45:19
the record. Welcome to the continuing 09:45:20
deposition of Timothy Ahlberg. My name is 09:45:23
Anthony Micheletto. I am the videographer and 09:45:25
conference call host for Henderson Legal 09:45:27
Services. 09:45:29
Today's date is April 23, 2020. 09:45:29
The time is 9:46 a.m., Central time. 09:45:33
It is my understanding that there 09:45:39
are approximately 44 attorneys attending 09:45:40
telephonically. To keep instructions at a 09:45:42
minimum, I will be muting all telephones except 09:45:45
the witness, taking attorney, and opposing 09:45:48
counsel whom will dial *6 so they can be heard. 09:45:51
In addition, if you are not 09:45:54
speaking, please make sure you turn off your 09:45:55
camera on LiveLitigation. You should receive 09:45:57
the video stream through your computer and 09:46:03
audio through your phone. Periodically, during 09:46:06
the break, I will communicate to everyone how 09:46:08
long we have been on the record. Our court 09:46:10
reporter today is Cynthia Conforti. 09:46:10
Mr. Ahlberg, you are still under 09:46:12
oath. 09:46:12
Counsel, you may proceed. 09:46:14

---

**237**

but I'm just going to remind you of two 09:47:11
critical ones, particularly as we are taking 09:47:13
this by video. 09:47:17
The first one is to be sure not to 09:47:17
talk over each other. The court reporter, 09:47:20
especially on video, is going to have a hard 09:47:22
time recording what you're saying. So I'm 09:47:24
going to wait for you to finish answering the 09:47:30
question before I ask the next question. I'm 09:47:32
going to ask you to wait for me to finish 09:47:34
asking the question before you start answering. 09:47:37
Is that okay? 09:47:39
A. Okay. 09:47:39
MS. McKEEN: I'm having a 09:47:46
little -- I'm having a little trouble hearing 09:47:47
you. Can you maybe position your phone closer 09:47:48
or turn up the volume on your -- your phone? 09:47:50
I can hear Atara just fine. 09:48:04
THE WITNESS: Is that any better? 09:48:04
MS. McKEEN: It is. Thank you. 09:48:05
BY MS. MILLER: 09:48:07
Q. At any time today, if you'd like 09:48:08
to take a break, just feel free to take one, but I 09:48:11
am going to ask you to answer any question 09:48:13
that's pending before we take a break. But 09:48:15

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

5 (Pages 238 to 241)

---

**238**

```
 1   otherwise, if you want a break, I'll take one          09:48:18
 2   at the next convenient point.  Is that okay?           09:48:20
 3       A.   Okay.                                         09:48:23
 4       Q.   You testified multiple times on              09:48:25
 5   Tuesday that in your mind, Funds don't have            09:48:28
 6   balances.  Do you recall that?                         09:48:33
 7           MS. McKEEN:  Object to the form.               09:48:37
 8           THE WITNESS:  I do recall saying               09:48:40
 9   that I don't think about Fund numbers in that          09:48:41
10   way.                                                   09:48:46
11   BY MS. MILLER:                                         09:48:46
12       Q.   Okay.  When you say "Fund                     09:48:49
13   numbers," what do you mean?"                           09:48:53
14       A.   Numbers that correspond with                  09:48:56
15   different Funds within the PRIFAS system.              09:48:59
16       Q.   Okay.  So let me ask you so the               09:49:02
17   record's clear.                                        09:49:06
18           Mr. Ahlberg, in your opinion, do               09:49:07
19   Funds have balances?                                   09:49:11
20           MS. McKEEN:  Objection to the form             09:49:13
21   of the question.                                       09:49:14
22           UNIDENTIFIED SPEAKER:  Objection.              09:49:19
23           THE WITNESS:  I don't typically                09:49:21
24   think about Funds as having balances.                  09:49:22
25                                                          
```

**240**

```
 1   BY MS. MILLER:                                         09:50:24
 2       Q.   Okay.  So to the best of your                 09:50:26
 3   knowledge, do other people within Treasury in         09:50:30
 4   Puerto Rico think about Funds as having                09:50:30
 5   balances?                                              09:50:32
 6           MS. McKEEN:  Objection.                        09:50:34
 7           THE WITNESS:  Again, I can't                   09:50:42
 8   speculate what every person may or may not             09:50:45
 9   believe about that concept.                            09:50:48
10   BY MS. MILLER:                                         09:50:49
11       Q.   I didn't ask you to speculate.  I            09:50:49
12   asked you whether to the best of your personal        09:50:51
13   knowledge, other people within Treasury in            09:50:53
14   Puerto Rico think about Funds as having                09:50:57
15   balances.                                              09:50:58
16           MS. McKEEN:  Objection.                        09:50:59
17           THE WITNESS:  It's not typically               09:51:05
18   how me or others think about Funds.                    09:51:06
19   BY MS. MILLER:                                         09:51:06
20       Q.   Okay.  And when you say "others,"            09:51:09
21   who are you referring to?                              09:51:12
22       A.   Just generally others within the             09:51:20
23   Department of Treasury.                                09:51:21
24       Q.   And when you say "typically," do             09:51:22
25   you sometimes think about Funds as having              09:51:24
```

---

**239**

```
 1   BY MS. MILLER:                                         09:49:22
 2       Q.   Is it your testimony that Funds              09:49:26
 3   within the Commonwealth accounting system do          09:49:29
 4   not have balances?                                     09:49:31
 5           MS. McKEEN:  Objection.                        09:49:37
 6           THE WITNESS:  I don't think about             09:49:37
 7   Funds having balances within the TSA account.         09:49:40
 8   BY MS. MILLER:                                         09:49:40
 9       Q.   Okay.  So it's a yes-or-no                    09:49:45
10   question.  I'm not asking you about how you           09:49:48
11   think about it.  I'm asking you whether it is         09:49:48
12   your testimony that Funds within the                   09:49:52
13   Commonwealth accounting system do not have            09:49:54
14   balances.                                              09:49:56
15           MS. McKEEN:  Objection.                        09:50:02
16           THE WITNESS:  It is my testimony              09:50:02
17   that I don't think about Funds having balances        09:50:03
18   within bank accounts.                                  09:50:07
19   BY MS. MILLER:                                         09:50:07
20       Q.   Does that mean that they don't              09:50:11
21   have balances?                                         09:50:14
22           MS. McKEEN:  Objection.                        09:50:17
23           THE WITNESS:  It means that that's            09:50:22
24   not the way that I think about them.                   09:50:24
25                                                          
```

**241**

```
 1   balances?                                              09:51:26
 2       A.   I don't think about Funds having            09:51:33
 3   balances.                                              09:51:34
 4       Q.   Okay.  So it's your testimony that          09:51:35
 5   Funds do not have balances, right?                     09:51:36
 6           MS. McKEEN:  Objection.                        09:51:40
 7           UNIDENTIFIED SPEAKER:  Objection.              09:51:43
 8           THE WITNESS:  I don't think about             09:51:46
 9   Funds having balances within bank accounts.           09:51:48
10   BY MS. MILLER:                                         09:51:48
11       Q.   Okay.  But you're not willing to            09:51:51
12   say that they don't have balances, are you?           09:51:52
13           MS. McKEEN:  Objection.                        09:51:54
14           THE WITNESS:  That's not how I                09:52:01
15   think about Funds having balances within bank         09:52:03
16   accounts.                                              09:52:06
17   BY MS. MILLER:                                         09:52:06
18       Q.   I got it.  That's not how you                09:52:07
19   think about it.                                        09:52:08
20           But my question to you is that you            09:52:09
21   are not willing to say unequivocally that Funds       09:52:11
22   do not have balances, right?  You cannot say          09:52:14
23   that.                                                  09:52:17
24                                                          
25                                                          
```

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

6 (Pages 242 to 245)

---

**242**

1        MS. McKEEN: Objection to the form   09:52:18
2 of the question.   09:52:19
3 BY MS. MILLER:   09:52:19
4    Q.   Okay. Let me ask another   09:52:22
5 question.   09:52:23
6    Mr. Ahlberg, can you testify   09:52:24
7 unequivocally that Funds within the TSA do not   09:52:26
8 have balances?   09:52:28
9    A.   I don't think about Funds having   09:52:39
10 balances within bank accounts.   09:52:41
11    Q.   I'm going to ask you for a   09:52:45
12 yes-or-no answer to my question. It's a simple   09:52:47
13 yes-or-no question. I'm going to ask it again.   09:52:49
14 I want a yes or a no. If you need to just   09:52:51
15 explain after, I'd be happy to ask you for an   09:52:55
16 explanation, but I'd like a yes or no, okay?   09:52:57
17 Do you understand that?   09:52:59
18    MS. McKEEN: Objection. What   09:53:01
19 you're demanding doesn't dictate what his   09:53:04
20 response needs to be. He may not think of it   09:53:08
21 as a yes-or-no question no matter how many   09:53:10
22 times you ask it that way.   09:53:13
23 BY MS. MILLER:   09:53:15
24    Q.   Mr. Ahlberg, can you testify   09:53:15
25 unequivocally that Funds within the TSA do not   09:53:17

---

**244**

1 audited financial statements did you review in   09:54:58
2 connection with your testimony today?   09:55:00
3    A.   Having reviewed hundreds of   09:55:04
4 documents in preparation for this deposition, I   09:55:07
5 can't recall the exact sections of audited   09:55:09
6 financial statements I may have reviewed.   09:55:12
7    Q.   What sections generally did you   09:55:15
8 review?   09:55:18
9    A.   I can't recall any specific   09:55:24
10 sections other than general review of the   09:55:26
11 document.   09:55:28
12    Q.   How did you look at the audited   09:55:30
13 financials?   09:55:34
14    A.   It would not be out of the   09:55:39
15 ordinary course of my daily job function to   09:55:40
16 occasionally look at audited financials.   09:55:44
17    Q.   I know. You told me that you   09:55:47
18 looked at them in connection with your   09:55:49
19 preparation for your deposition today, so I'm   09:55:50
20 asking do you -- why, in preparing for your   09:55:53
21 deposition today, did you look at the audited   09:55:55
22 financials for the Commonwealth?   09:55:57
23    A.   In order to prepare for the   09:56:15
24 deposition --   09:56:15
25    Q.   Okay.   09:56:15

---

**243**

1 have balances?   09:53:19
2    MS. McKEEN: Objection.   09:53:20
3    THE WITNESS: I do not think about   09:53:26
4 Funds as having balances within the TSA.   09:53:27
5 BY MS. MILLER:   09:53:27
6    Q.   Can you tell me why you can't give   09:53:32
7 me a yes-or-no answer to that question?   09:53:34
8    A.   I cannot give you a yes-or-no   09:53:50
9 answer to that question because that's not how   09:53:52
10 I think about Funds.   09:53:56
11    Q.   Mr. Ahlberg, have you ever looked   09:54:07
12 at the audited financial statements for the   09:54:08
13 Commonwealth?   09:54:10
14    A.   I have seen financial statements   09:54:19
15 of the Commonwealth.   09:54:20
16    Q.   Have you ever seen the audited   09:54:24
17 financial statements for the Commonwealth?   09:54:37
18    A.   I have seen audited financial   09:54:37
19 statements of the Commonwealth.   09:54:39
20    Q.   Did you review audited financial   09:54:40
21 statements of the Commonwealth in preparation   09:54:42
22 for your testimony today?   09:54:44
23    A.   I did review certain portions of   09:54:50
24 audited financial statements.   09:54:53
25    Q.   Okay. So what portions of the   09:54:56

---

**245**

1    A.   -- (indiscernible.)   09:56:17
2    Q.   Okay. And so in preparing for the   09:56:22
3 deposition, what did you think was going to be   09:56:23
4 relevant in the audited financial statement?   09:56:25
5    MS. McKEEN: I'll object to the   09:56:31
6 extent that, Mr. Ahlberg, you can -- you can   09:56:31
7 answer the question unless it would require you   09:56:36
8 to divulge communications that you had with   09:56:39
9 counsel. You can answer the question as long   09:56:42
10 as you're not revealing attorney-client   09:56:47
11 (indiscernible).   09:56:47
12    THE REPORTER: I'm sorry, "as long   09:56:47
13 as you're not"?   09:56:47
14    THE WITNESS: That said, would you   09:56:56
15 mind repeating the question?   09:56:56
16 BY MS. MILLER:   09:56:59
17    Q.   Sure. My question was:   09:56:59
18    And so in preparing for the   09:57:05
19 deposition, what did you think was going to be   09:57:06
20 relevant in the audited financial statement?   09:57:09
21    MS. McKEEN: Objection to the form   09:57:14
22 of the question.   09:57:14
23    THE WITNESS: I don't think I can   09:57:27
24 answer without revealing privileged   09:57:30
25 conversations.   09:57:32

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

7 (Pages 246 to 249)

---

**246**

1    BY MS. MILLER:
2        Q.    Okay.  So your testimony is that
3    you only looked at the audited financial
4    statement because your lawyers told you to; is
5    that right?
6            MS. McKEEN:  Objection.
7            THE WITNESS:  That's not what I
8    said.
9    BY MS. MILLER:
10       Q.    Okay.  Well, that's the only basis
11   to not answer the question.
12           So if you have other -- another
13   answer, I'm happy to take it now and ask the
14   question again.
15           MS. McKEEN:  Objection.
16           Atara, he's given you an answer.
17   It's argumentative.
18           MS. MILLER:  He really hasn't.
19   Actually, I don't think he's answered a single
20   question that I've asked him yet today, so I'm
21   doing to continue making my record,, and I'm
22   going to go to Judge Dein if I can't start
23   getting answers.  So if you think this is how
24   we're going and you think that's an answer, we
25   will have to fight it out with the judge.  No,

---

**247**

1    he has not given me an answer to my question.
2            MS. McKEEN:  Atara, I --
3    BY MS. MILLER:
4        Q.    My -- my question is,
5    Mr. Ahlberg --
6            MS. McKEEN:  Atara, I was talking.
7    If you could not cut me off, that would be
8    great.  I disagree with your characterization
9    of the record and the witness's testimony thus
10   far today.
11   BY MS. MILLER:
12       Q.    Mr. Ahlberg, did you have any
13   independent reason other than your lawyers
14   telling you to look at the financial statements
15   to review the audited financial statements in
16   preparation for your deposition today?
17       A.    No.  But as I mentioned, I
18   occasionally review financial statements in the
19   ordinary course of my business.
20       Q.    You reviewed them in connection
21   with your -- the preparation for your
22   deposition today, right?
23       A.    Yes.
24           (Monolines Exhibit 19A and
25           Exhibit 19B are introduced for

---

**248**

1    the record.)
2    BY MS. MILLER:
3        Q.    Okay.  I want to -- can we mark
4    the Commonwealth of Puerto Rico basic financial
5    statements that are required supplementary
6    information dated June 30, 2016, with
7    independent auditor's report thereon, which was
8    Bates-stamped COMMONWEALTH_STA 0010186.
9            And it's a large document, so
10   we're going to mark it as Monolines Exhibit 19A
11   and Exhibit 19B so that we can avoid some of
12   the system delay issues we had yesterday.
13           So it's just the document split.
14   19A is up right now, or was up, and we'll have
15   19B if you want to flip through more of it.
16           MS. MILLER:  Kevin, can you put
17   19A back up on the screen, please?
18   BY MS. MILLER:
19       Q.    Mr. Ahlberg, while we are waiting
20   for the exhibit to get back up on the screen,
21   Funds refer to specific portions of cash in the
22   TSA; isn't that right?
23           MS. McKEEN:  Objection.

---

**249**

1            THE WITNESS:  Can you repeat the
2    question?
3    BY MS. MILLER:
4        Q.    Do Funds refer to specific
5    portions of cash in the TSA?
6        A.    Depends on how you use the word
7    "Funds."
8        Q.    Okay.  Has the word "Fund," as
9    used in the Commonwealth accounting, does it
10   refer to specific portions of moneys in the
11   TSA?
12           MS. McKEEN:  Objection.
13           THE WITNESS:  Funds do not
14   identify cash balances within the TSA.
15   BY MS. MILLER:
16       Q.    Okay.  That wasn't my question.
17   My question is:
18           Are Funds associated with specific
19   amounts of money in the TSA?
20           MS. McKEEN:  Objection.
21           That wasn't your question.  If you
22   want to rephrase it, you can.
23   BY MS. MILLER:
24       Q.    Can you answer that question?
25       A.    Could you repeat it?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                   April 23, 2020

8 (Pages 250 to 253)

|  | 250 |
|---|---|
| 1 | Q. Are Funds associated with | 10:02:22 |
| 2 | particular amounts of money in the TSA? | 10:02:25 |
| 3 | **A. Funds are not associated with cash** | 10:02:25 |
| 4 | **balances within the TSA.** | 10:02:37 |
| 5 | Q. What are Funds associated with in | 10:02:41 |
| 6 | the TSA? | 10:02:42 |
| 7 | **A. Funds are used to record revenue.** | 10:02:59 |
| 8 | Q. Revenues in the TSA, right? | 10:03:07 |
| 9 | **A. Revenues that results in cash** | 10:03:12 |
| 10 | **receipts deposited into the TSA.** | 10:03:15 |
| 11 | Q. How is that different from what I | 10:03:19 |
| 12 | said? | 10:03:21 |
| 13 | MS. McKEEN: Object to the form. | 10:03:25 |
| 14 | THE WITNESS: An inherent | 10:03:29 |
| 15 | difference between earned revenue and cash | 10:03:31 |
| 16 | receipts. | 10:03:33 |
| 17 | BY MS. MILLER: | 10:03:33 |
| 18 | Q. All right. So can there be cash | 10:03:40 |
| 19 | that's not also revenue? | 10:03:42 |
| 20 | **A. The...** | 10:03:58 |
| 21 | **Are you asking in the Commonwealth** | 10:04:10 |
| 22 | **if there exists noncash revenue streams?** | 10:04:12 |
| 23 | Q. No. My question was the opposite. | 10:04:17 |
| 24 | My question is: | 10:04:19 |
| 25 | Is all cash also revenue? | 10:04:19 |

|  | 252 |
|---|---|
| 1 | THE WITNESS: I said what I said. | 10:05:39 |
| 2 | BY MS. MILLER: | 10:05:44 |
| 3 | Q. So Funds and Fund numbers do | 10:05:45 |
| 4 | represent specific revenues into the TSA, | 10:05:48 |
| 5 | right? | 10:05:53 |
| 6 | **A. Fund numbers can be used to track** | 10:05:54 |
| 7 | **earned revenues.** | 10:05:56 |
| 8 | Q. Okay. And can earned revenues | 10:05:59 |
| 9 | also result in cash in the TSA? | 10:06:03 |
| 10 | **A. Earned revenues -- earned revenues** | 10:06:13 |
| 11 | **that turn into cash receipts may -- may be** | 10:06:20 |
| 12 | **deposited into the TSA.** | 10:06:26 |
| 13 | Q. And may be allocated to the same | 10:06:26 |
| 14 | Fund numbers, correct? | 10:06:30 |
| 15 | MS. McKEEN: Objection. | 10:06:31 |
| 16 | THE WITNESS: I don't think about | 10:06:38 |
| 17 | allocations of Fund numbers. That doesn't make | 10:06:38 |
| 18 | sense to me. | 10:06:41 |
| 19 | BY MS. MILLER: | 10:06:41 |
| 20 | Q. Okay. It may be tagged with the | 10:06:41 |
| 21 | same Fund numbers, right? | 10:06:43 |
| 22 | MS. McKEEN: Objection. | 10:06:46 |
| 23 | THE WITNESS: Would you specify | 10:06:48 |
| 24 | when? | 10:06:49 |
| 25 |  |  |

|  | 251 |
|---|---|
| 1 | **A. Not being a CPA, I'm not -- I** | 10:04:27 |
| 2 | **don't know.** | 10:04:31 |
| 3 | Q. Okay. So you're prepared to be | 10:04:31 |
| 4 | really specific about the difference between | 10:04:33 |
| 5 | cash and revenue, because you're not a CPA, so | 10:04:34 |
| 6 | you can't tell me whether there's cash that's | 10:04:42 |
| 7 | not also revenue, right? | 10:04:44 |
| 8 | UNIDENTIFIED SPEAKER: Objection. | 10:04:50 |
| 9 | THE WITNESS: I answered your | 10:05:01 |
| 10 | previous question. | 10:05:04 |
| 11 | Is there another question? | 10:05:04 |
| 12 | BY MS. MILLER: | 10:05:05 |
| 13 | Q. Yeah, that was my question. | 10:05:06 |
| 14 | My question was that you're | 10:05:06 |
| 15 | prepared to be very specific about the | 10:05:09 |
| 16 | difference between cash and revenue, but | 10:05:09 |
| 17 | because you're not a CPA, you can't tell me | 10:05:10 |
| 18 | whether there's cash that's not also revenue; | 10:05:18 |
| 19 | is that right? | 10:05:18 |
| 20 | UNIDENTIFIED SPEAKER: Objection. | 10:05:18 |
| 21 | THE WITNESS: I said what I said | 10:05:28 |
| 22 | in the previous answer. | 10:05:29 |
| 23 | BY MS. MILLER: | 10:05:29 |
| 24 | Q. So that's a yes? | 10:05:33 |
| 25 | MS. McKEEN: Objection. | 10:05:35 |

|  | 253 |
|---|---|
| 1 | BY MS. MILLER: | 10:06:49 |
| 2 | Q. No. | 10:06:52 |
| 3 | Okay. So the exhibit now, which | 10:06:52 |
| 4 | is Monolines Exhibit 19A. As I mentioned, 19B, | 10:06:57 |
| 5 | Mr. Ahlberg, if you need to look at the second | 10:07:03 |
| 6 | half in order to refer to any of my questions, | 10:07:05 |
| 7 | it's available to you. I believe it's | 10:07:08 |
| 8 | submitted -- a submitted exhibit, although it's | 10:07:10 |
| 9 | not currently part of what's being exhibited, | 10:07:12 |
| 10 | so you should have access to that as well. | 10:07:14 |
| 11 | Do you recognize this document? | 10:07:26 |
| 12 | **A. I recognize the cover page of this** | 10:07:28 |
| 13 | **document.** | 10:07:30 |
| 14 | Q. Okay. And did you speak to anyone | 10:07:33 |
| 15 | at Treasury about this document in connection | 10:07:35 |
| 16 | with your deposition today? | 10:07:38 |
| 17 | **A. No.** | 10:07:44 |
| 18 | Q. Okay. I'd like to turn to the | 10:07:45 |
| 19 | next page of the exhibit, please. And do you | 10:07:50 |
| 20 | see this document identifies that it was | 10:08:17 |
| 21 | prepared by the Puerto Rico Department of the | 10:08:17 |
| 22 | Treasury? Do you see that? | 10:08:23 |
| 23 | **A. I see that on the document.** | 10:08:26 |
| 24 | Q. You have no reason to dispute | 10:08:29 |
| 25 | that, do you? | 10:08:32 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

9 (Pages 254 to 257)

| 254 | |
|---|---|
| 1       **A.**    **The document says what it says.** | 10:08:39 |
| 2       **Q.**    Is that a no, you have no reason | 10:08:46 |
| 3 to dispute that? | 10:08:46 |
| 4       MS. McKEEN: Objection. | 10:08:47 |
| 5       THE WITNESS: The document says it | 10:08:48 |
| 6 was prepared by Puerto Rico Department of | 10:08:50 |
| 7 Treasury. | 10:08:50 |
| 8    BY MS. MILLER: | 10:08:52 |
| 9       **Q.**    And you have no basis to think | 10:08:52 |
| 10 that that's not true, right? | 10:08:54 |
| 11       **A.**    **The document says what it says.** | 10:09:01 |
| 12       **Q.**    Okay. But I'm asking you whether | 10:09:03 |
| 13 you had any conversations with anybody at | 10:09:05 |
| 14 Treasury about this document and they said, | 10:09:07 |
| 15 "Oh, my God, have you seen the 2016 audited | 10:09:10 |
| 16 financials? Crazy that that went out. We had | 10:09:11 |
| 17 nothing to do with it. I can't believe our | 10:09:14 |
| 18 name's on it." | 10:09:15 |
| 19       That's my question. | 10:09:16 |
| 20       So when I ask you do you have any | 10:09:17 |
| 21 basis to believe that that's not accurate, | 10:09:19 |
| 22 that's what I'm asking. Do you understand? | 10:09:21 |
| 23       MS. McKEEN: Objection to the form | 10:09:24 |
| 24 of the question. | 10:09:25 |
| 25 | |

| 255 | |
|---|---|
| 1    BY MS. MILLER: | 10:09:30 |
| 2       **Q.**    So I'm going to ask my question | 10:09:30 |
| 3 again. | 10:09:32 |
| 4       Do you have any basis to believe | 10:09:33 |
| 5 that this document was not prepared by the | 10:09:35 |
| 6 Puerto Rico Department of Treasury? | 10:09:37 |
| 7       **A.**    **The document says it was prepared** | 10:09:39 |
| 8 **by the Puerto Rico Department of Treasury.** | 10:09:41 |
| 9       **Q.**    And you have no independent basis | 10:09:42 |
| 10 to believe that that is not true, right? | 10:09:45 |
| 11       **A.**    **The document says what it says.** | 10:09:51 |
| 12       **Q.**    Okay. You won't say that you | 10:09:53 |
| 13 don't have an independent basis to say that | 10:09:54 |
| 14 this was not prepared by the -- by the | 10:09:57 |
| 15 Puerto Rico Department of Treasury? | 10:10:00 |
| 16       MS. McKEEN: Objection to the form | 10:10:05 |
| 17 of the question. | 10:10:06 |
| 18    BY MS. MILLER: | 10:10:08 |
| 19       **Q.**    Mr. Ahlberg, I don't need you to | 10:10:09 |
| 20 testify to what the document says. The | 10:10:11 |
| 21 document speaks for itself. | 10:10:13 |
| 22       I'm asking you for your testimony, | 10:10:15 |
| 23 whether you have any reason to believe that | 10:10:17 |
| 24 this document was not prepared by the | 10:10:22 |
| 25 Puerto Rico Department of Treasury. That's my | 10:10:24 |

| 256 | |
|---|---|
| 1 question. | 10:10:26 |
| 2       Do you have any reason to believe | 10:10:27 |
| 3 that this document was not prepared by the | 10:10:28 |
| 4 Puerto Rico Department of Treasury? | 10:10:31 |
| 5       **A.**    **They're basic financial statements** | 10:10:37 |
| 6 **and required supplementary information. The** | 10:10:40 |
| 7 **document shows it was prepared by the** | 10:10:44 |
| 8 **Puerto Rico Department of Treasury.** | 10:10:46 |
| 9       **Q.**    And you have no reason to believe | 10:10:47 |
| 10 that that's not true, right? | 10:10:49 |
| 11       **A.**    **That's what the document says.** | 10:10:53 |
| 12       **Q.**    So you're going to refuse to | 10:10:55 |
| 13 answer that question? | 10:10:58 |
| 14       MS. McKEEN: Objection. | 10:11:00 |
| 15    BY MS. MILLER: | 10:11:09 |
| 16       **Q.**    That was a question, Mr. Ahlberg. | 10:11:09 |
| 17 I'm asking you if you're refusing to testify | 10:11:11 |
| 18 about whether you have any reason to believe | 10:11:14 |
| 19 that this document was not prepared by the | 10:11:15 |
| 20 Department of Treasury. | 10:11:17 |
| 21       **A.**    **The document says it was prepared** | 10:11:22 |
| 22 **by the Department of Treasury.** | 10:11:26 |
| 23       **Q.**    Have you had any conversations | 10:11:27 |
| 24 with anybody that would indicate that this | 10:11:29 |
| 25 document was not in fact prepared by the | 10:11:30 |

| 257 | |
|---|---|
| 1 Department of Treasury? | 10:11:32 |
| 2       **A.**    **No.** | 10:11:40 |
| 3       **Q.**    Have you seen any document that | 10:11:40 |
| 4 would indicate that this document was not in | 10:11:42 |
| 5 fact prepared by the Puerto Rico Department of | 10:11:45 |
| 6 Treasury? | 10:11:52 |
| 7       **A.**    **No.** | 10:11:52 |
| 8       **Q.**    So you have no independent reason | 10:11:52 |
| 9 to believe that this document was not prepared | 10:11:54 |
| 10 by the Department of Treasury, correct? | 10:11:55 |
| 11       **A.**    **Document says it was prepared by** | 10:12:00 |
| 12 **Puerto Rico Department of Treasury.** | 10:12:02 |
| 13       **Q.**    I don't think you need a graduate | 10:12:09 |
| 14 degree to understand my questions, so I'd | 10:12:11 |
| 15 appreciate going forward, if you could just | 10:12:14 |
| 16 answer them. Thank you. | 10:12:16 |
| 17       MS. McKEEN: Objection. | 10:12:20 |
| 18    BY MS. MILLER: | 10:12:21 |
| 19       **Q.**    I'd like you to look at the next | 10:12:21 |
| 20 page of the exhibit. This is the table of | 10:12:22 |
| 21 contents. Have you seen the table of contents | 10:12:25 |
| 22 to the audited financial statements? | 10:12:29 |
| 23       **A.**    **I don't recall typically viewing** | 10:12:35 |
| 24 **the table of contents of these financial** | 10:12:38 |
| 25 **statements previously.** | 10:12:41 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

10 (Pages 258 to 261)

---

**258**

|   |   |   |
|---|---|---|
| 1 | Q. Okay. Looking at the financial | 10:12:41 |
| 2 | statements for the Commonwealth, do you see a | 10:12:45 |
| 3 | section called Basic Financial Statements? | 10:12:47 |
| 4 | It's the third line down listed in the | 10:12:55 |
| 5 | contents. | 10:12:57 |
| 6 | A. I see where it says Basic | 10:12:58 |
| 7 | **Financial Statements.** | 10:13:03 |
| 8 | Q. And three lines under that, it | 10:13:03 |
| 9 | says Fund Financial Statements. | 10:13:05 |
| 10 | Do you see that? | 10:13:08 |
| 11 | A. I see that. | 10:13:08 |
| 12 | Q. What's your understanding of what | 10:13:09 |
| 13 | Fund Financial Statements are? | 10:13:12 |
| 14 | A. Not being a CPA, I don't know the | 10:13:25 |
| 15 | **exact definition of Fund Financial Statements.** | 10:13:27 |
| 16 | Q. I'm just asking for your | 10:13:29 |
| 17 | understanding. | 10:13:30 |
| 18 | You mentioned that these | 10:13:31 |
| 19 | are -- this is a document you looked at in | 10:13:33 |
| 20 | connection with your preparation and also a | 10:13:35 |
| 21 | document that you looked at periodically in the | 10:13:38 |
| 22 | ordinary course of business. | 10:13:38 |
| 23 | So what is your understanding -- | 10:13:40 |
| 24 | understanding that you're not a CPA, what is | 10:13:42 |
| 25 | your understanding of what Fund Financial | 10:13:44 |

**259**

|   |   |   |
|---|---|---|
| 1 | Statements are? | 10:13:46 |
| 2 | A. My understanding of Fund Financial | 10:14:00 |
| 3 | **Statements is that there will be financial** | 10:14:03 |
| 4 | **statements for Funds.** | 10:14:05 |
| 5 | Q. And when you say "for Funds," what | 10:14:07 |
| 6 | Funds are we talking about? | 10:14:10 |
| 7 | A. Not being a CPA, I don't know the | 10:14:21 |
| 8 | **exact Funds.** | 10:14:21 |
| 9 | Q. Okay. Well, why does that require | 10:14:28 |
| 10 | being a CPA to answer? | 10:14:30 |
| 11 | A. Not being a CPA, I think that | 10:14:47 |
| 12 | **there are specific definitions for those terms** | 10:14:50 |
| 13 | **that I do not want to mischaracterize, not** | 10:14:55 |
| 14 | **being a CPA.** | 10:14:57 |
| 15 | Q. Okay. So I understand that you're | 10:14:59 |
| 16 | not a CPA, and that's pretty clear on the | 10:15:01 |
| 17 | record so far. So when I ask you questions, | 10:15:04 |
| 18 | it's all going to be based on your | 10:15:06 |
| 19 | understanding, which is recognizing that you | 10:15:08 |
| 20 | are not a CPA, okay? | 10:15:10 |
| 21 | So what's your understanding of | 10:15:12 |
| 22 | what Funds are included? | 10:15:14 |
| 23 | MS. McKEEN: Objection to the form | 10:15:22 |
| 24 | of the question. | 10:15:23 |
| 25 | THE WITNESS: Having reviewed | 10:15:31 |

**260**

|   |   |   |
|---|---|---|
| 1 | hundreds of documents in preparation for this | 10:15:34 |
| 2 | deposition, I don't have the Funds memorized. | 10:15:36 |
| 3 | BY MS. MILLER: | 10:15:41 |
| 4 | Q. Do you know -- can you think of | 10:15:41 |
| 5 | any Fund? | 10:15:45 |
| 6 | A. It depends on how you're using the | 10:15:52 |
| 7 | **term "Funds."** | 10:15:56 |
| 8 | Q. Well, I'm asking how you | 10:15:57 |
| 9 | understand this term was used in these | 10:15:59 |
| 10 | financial statements. Can you think of any | 10:16:01 |
| 11 | Fund? | 10:16:07 |
| 12 | A. I can't think of any off the top | 10:16:08 |
| 13 | **of my head, but I'm happy to flip to the Fund** | 10:16:10 |
| 14 | **section of this document with you.** | 10:16:13 |
| 15 | Q. Okay. So going down a few lines | 10:16:14 |
| 16 | from Fund Financial Statements in the table of | 10:16:20 |
| 17 | contents, do you see about one, two, | 10:16:23 |
| 18 | three -- well, the next line talks about | 10:16:26 |
| 19 | Government Fund, and it goes through a number | 10:16:29 |
| 20 | of Funds that have Fund Financial Statements | 10:16:31 |
| 21 | contained within these audited financials. | 10:16:34 |
| 22 | Do you see that in the table of | 10:16:37 |
| 23 | contents? | 10:16:38 |
| 24 | A. I see that. | 10:16:38 |
| 25 | Q. Okay. And so the -- I want you to | 10:16:39 |

**261**

|   |   |   |
|---|---|---|
| 1 | just look at the third entry. It says: | 10:16:43 |
| 2 | Statement of revenue, expenditures | 10:16:46 |
| 3 | and changes in Fund balance. | 10:16:48 |
| 4 | Do you see that? | 10:16:52 |
| 5 | A. Yes, I see it. | 10:16:52 |
| 6 | Q. Do you have an understanding of | 10:16:54 |
| 7 | what "changes in Fund balance" means? | 10:16:55 |
| 8 | A. Without reviewing page 40 of this | 10:17:04 |
| 9 | **document, I can't say for certain.** | 10:17:08 |
| 10 | Q. Okay. Do you have some basic | 10:17:11 |
| 11 | accounting knowledge? | 10:17:13 |
| 12 | A. I do have some basic accounting | 10:17:20 |
| 13 | **knowledge.** | 10:17:22 |
| 14 | Q. How many accounting classes have | 10:17:23 |
| 15 | you taken? | 10:17:25 |
| 16 | A. I can't recall the exact amount of | 10:17:29 |
| 17 | **accounting classes I've taken.** | 10:17:31 |
| 18 | Q. More than one? | 10:17:33 |
| 19 | A. Yes. | 10:17:33 |
| 20 | Q. More than two? | 10:17:37 |
| 21 | A. Yes. | 10:17:39 |
| 22 | Q. More than three? | 10:17:41 |
| 23 | A. Yes. | 10:17:46 |
| 24 | Q. More than four? | 10:17:46 |
| 25 | A. Yes. | 10:17:48 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

11 (Pages 262 to 265)

---

**262**

Q.    More than five?

A.    I think so, but I'm not positive. As I mentioned, I can't recall the exact amount.

Q.    Okay. And so you've taken at least five accounting courses; is that right?

A.    Yes.

Q.    And were all of those at post high school level?

A.    Yes.

Q.    And were some of those part of the MBA coursework that you did?

A.    No.

Q.    So you took at least five accounting courses in college; is that right?

A.    Yes.

Q.    And does your job require you to apply any basic accounting principles or have familiarity with accounting principles?

A.    It is not a requirement to occupy the position that I have.

Q.    I'm not asking if that's the job description. I'm asking about whether what you do from day-to-day requires you to have general

---

**263**

familiarity with accounting. How's that?

A.    And I have general familiarity with accounting concepts. I'm not certain that my job requires that.

Q.    Did any of the courses that you took on accounting touch on government accounting?

A.    I did not take a specific government accounting class.

Q.    Okay. But you know that wasn't my question. So I'm going to ask you to answer my question, which was:

Did any of the courses that you took on accounting touch on government accounting?

UNIDENTIFIED SPEAKER:  Objection.

THE WITNESS:  I can't recall a specific context of every accounting class I took.

BY MS. MILLER:

Q.    I didn't ask for a recitation of the context of every course.

I'm asking you if you recall whether any of the accounting courses that you took covered government accounting as well.

---

**264**

MS. McKEEN:  Objection.

THE WITNESS:  I can't recall.

BY MS. MILLER:

Q.    Okay. Have you taken any courses while employed at Conway MacKenzie?

A.    Could you clarify what you mean by "courses"?

Q.    Any classes, any continuing education presentations, any formal college or graduate degree classes; as broad a definition of "courses" as you could apply.

A.    I took a course in preparation for passing Part 1 of the ERA certification, but no college courses while I have been employed by Conway MacKenzie.

Q.    Okay. Did you participate in any presentations related to government accounting?

A.    Not to my recollection.

Q.    Have you read any books that touched on government accounting specifically for the purpose of understanding it?

A.    No.

Q.    Okay. So looking back at Exhibit 19A, which is still up on the screen, did you speak to anybody within the Treasury

---

**265**

Department about what "changes in Fund balances" mean?

MS. McKEEN:  Objection.

THE WITNESS:  No.

BY MS. MILLER:

Q.    Are you surprised to see statement of revenue expenditures and changes in Fund balances as an entry in the table of contents of the Commonwealth financial statement?

A.    I'm not surprised one way or the other.

Q.    Okay. Even though you don't think of Funds as having balances, you're not surprised to see that in the Commonwealth audited financials?

A.    I'm not surprised one way or the other.

Q.    Okay. Having seen this, do you stand by your testimony that Funds don't have balances?

UNIDENTIFIED SPEAKER:  Objection.

UNIDENTIFIED SPEAKER:  Object to the form.

THE WITNESS:  I believe my testimony is that I don't think about Funds

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II      April 23, 2020

12 (Pages 266 to 269)

---

266

1   having balances within the TSA.    10:23:11
2   BY MS. MILLER:    10:23:11
3      Q.   Okay. Mr. Ahlberg, does this tell    10:23:13
4   you that others within the Puerto Rico    10:23:17
5   Department of Treasury do think of Funds as    10:23:22
6   having balances?    10:23:25
7      MS. McKEEN: Objection.    10:23:25
8      THE WITNESS: Would you repeat the    10:23:43
9   question?    10:23:44
10      MS. MILLER: Could the court    10:23:49
11   reporter read it back, please?    10:23:49
12      (Record read as requested.)    10:24:27
13      THE WITNESS: It's unclear to me    10:24:27
14   what others may or may not think about Fund    10:24:28
15   balances based on this line of the table of    10:24:30
16   contents here.    10:24:32
17   BY MS. MILLER:    10:24:32
18      Q.   Okay. Mr. Ahlberg, financial    10:24:33
19   statements are prepared to serve the public; is    10:24:37
20   that right? Audited financial statements are    10:24:39
21   prepared for the public; is that right?    10:24:41
22      **A.**   **Audited financial statements are**    10:24:50
23   **typically published and acceptable to the**    10:24:52
24   **public.**    10:24:58
25      Q.   And these financial statements    10:24:59

---

267

1   that we're looking at, do you know who they    10:25:00
2   were audited by?    10:25:03
3      **A.**   **Off the top of my head, I do not**    10:25:05
4   **recall who audited these financial statements.**    10:25:07
5      Q.   Okay. Well, could we move    10:25:10
6   two pages forward to the Bates ending 173?    10:25:12
7   Does this refresh your recollection about who    10:25:22
8   audited these financial statements?    10:25:25
9      MS. McKEEN: Object to the form.    10:25:27
10      THE WITNESS: I see that this is    10:25:31
11   an independent auditor's report with the KPMG    10:25:38
12   header on it.    10:25:44
13   BY MS. MILLER:    10:25:44
14      Q.   Mr. Ahlberg, did KPMG audit the    10:25:47
15   Commonwealth's 2016 financial statements?    10:25:49
16      **A.**   **Yes.**    10:25:54
17      Q.   In response to a question that I    10:26:30
18   asked previously, you said that your testimony    10:26:32
19   is that you don't think about Funds as having    10:26:36
20   balances within the TSA. Do you recall that?    10:26:39
21      **A.**   **Yes.**    10:26:45
22      Q.   Do you think of Funds as having    10:26:46
23   balances other than within the TSA?    10:26:49
24      THE WITNESS: Could the court    10:27:14
25   reporter read back that question, please?    10:27:15

---

268

1      (Record read as requested.)    10:27:41
2      THE WITNESS: Okay. Well, as I    10:27:41
3   mentioned, I don't think about Funds as having    10:27:43
4   balances within the TSA.    10:27:47
5   BY MS. MILLER:    10:27:47
6      Q.   All right. So my question is do    10:27:55
7   you think of Funds as having balances other    10:27:57
8   than balances within the TSA?    10:27:59
9      MS. McKEEN: Objection to the    10:27:59
10   form.    10:28:03
11      THE WITNESS: Right. And as I    10:28:03
12   said, I don't think about Funds having balances    10:28:05
13   within the TSA.    10:28:08
14   BY MS. MILLER:    10:28:08
15      Q.   Do you think of Funds as having    10:28:14
16   any other balances -- all right. Okay. Strike    10:28:18
17   that. Let me rephrase.    10:28:20
18      Do you think of Funds as having a    10:28:22
19   balance other than a balance in the TSA?    10:28:24
20      MS. McKEEN: Object to the form.    10:28:29
21   BY MS. MILLER:    10:28:32
22      Q.   Okay. Let me rephrase it one more    10:28:32
23   time.    10:28:34
24      Do you think about Funds as having    10:28:34
25   a balance that is not a balance in the TSA?    10:28:36

---

269

1      **A.**   **No.**    10:28:45
2      Q.   Do you have an understanding at    10:28:54
3   all of what the Fund balances reflected in the    10:28:56
4   audited financial statements are?    10:29:00
5      **A.**   **I do not know exactly what the**    10:29:14
6   **Fund balances shown in these financial**    10:29:16
7   **statements are.**    10:29:19
8      Q.   All right. And the very concept    10:29:19
9   of Fund balances is just disconsonant entirely    10:29:22
10   with your understanding of Funds; is that    10:29:27
11   right?    10:29:30
12      MS. McKEEN: Object to the form.    10:29:30
13      THE WITNESS: I don't think I    10:29:42
14   understood the question.    10:29:43
15   BY MS. MILLER:    10:29:43
16      Q.   My question is:    10:29:45
17      The very concept of Fund balances    10:29:47
18   is fundamentally inconsistent with your    10:29:49
19   understanding of Funds; is that right?    10:29:52
20      **A.**   **That is right, in the**    10:30:00
21   **context that -- in my work that I do for the**    10:30:11
22   **Department of Treasury on a regular basis.**    10:30:13
23      Q.   What about outside of the context    10:30:13
24   of the work that you do for the Department of    10:30:17
25   Treasury on a regular basis?    10:30:19

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

13 (Pages 270 to 273)

270

1    A.    No.                                        10:30:24
2    Q.    Okay.  Do you have any                     10:30:26
3  understanding of the term "valid" as it relates    10:30:33
4  to a Fund?                                         10:30:35
5    A.    I don't know the exact definition          10:30:45
6  there.                                             10:30:46
7    Q.    I'm asking you if you have an              10:30:52
8  understanding of the term "balance" as it          10:30:54
9  relates to a Fund.  I don't understand your        10:30:58
10  answer, so let me ask my question again.           10:31:00
11    Did you, Mr. Ahlberg, have a                     10:31:05
12  personal understanding of the term "balances,"     10:31:05
13  as it relates to a Fund?                           10:31:09
14    A.    I just -- I don't think about             10:31:19
15  Funds having balances.                             10:31:21
16    Q.    So you're -- so in your mind              10:31:23
17  there's no place where the term "Fund" and the     10:31:27
18  term "balance" come together; is that right?       10:31:31
19    MS. McKEEN:  Objection.                          10:31:35
20    THE WITNESS:  Is there an                         10:31:58
21  outstanding question?                              10:32:00
22  BY MS. MILLER:                                     10:32:00
23    Q.    Yes, the outstanding question is:         10:32:02
24    In your mind there's no place                    10:32:05
25  where the term "Fund" and the term "balance"       10:32:06

271

1  come together, right?                              10:32:12
2    MS. McKEEN:  Same objection.                      10:32:12
3    THE WITNESS:  Not in the context                  10:32:20
4  of the Flow of Funds which we have put together    10:32:23
5  and presented to you guys.                         10:32:27
6  BY MS. MILLER:                                     10:32:30
7    Q.    What about in any other context?           10:32:31
8    A.    I don't know.                               10:32:37
9    Q.    You don't know what you think?            10:32:44
10    MS. McKEEN:  Objection.                          10:32:46
11    Atara, did you want to rephrase                  10:32:54
12  the question?                                      10:32:56
13  BY MS. MILLER:                                     10:32:56
14    Q.    Mr. Ahlberg, is there any place in        10:32:58
15  your mind where the term "Fund" and the term       10:33:03
16  "balance" come together?                           10:33:03
17    MS. McKEEN:  Objection.                          10:33:04
18    THE WITNESS:  I don't know.                       10:33:26
19  BY MS. MILLER:                                     10:33:45
20    Q.    Mr. Ahlberg, you're here                   10:33:45
21  testifying on behalf of the Commonwealth; isn't    10:33:47
22  that right?                                         10:33:51
23    A.    Yes.                                        10:33:51
24    Q.    And this the official testimony           10:33:55
25  of the Commonwealth that Funds don't have          10:33:57

272

1  balances?                                          10:34:02
2    MS. McKEEN:  I'm going to object.                 10:34:04
3  Mr. Ahlberg is here to testify on behalf of the     10:34:09
4  Commonwealth with respect to specifically          10:34:09
5  articulated topics, and I believe Mr. -- that,     10:34:10
6  along with all the questions you've asked today     10:34:15
7  are well outside the scope of those topics.  So    10:34:18
8  Mr. Ahlberg can answer your questions if he         10:34:22
9  knows the answer, but I don't believe the          10:34:24
10  question you just articulated is within the         10:34:26
11  scope of the topics that you identified or as      10:34:28
12  to which Mr. Ahlberg has been designated.          10:34:30
13  BY MS. MILLER:                                     10:34:30
14    Q.    You can answer if you know.               10:34:33
15    MS. MILLER:  Liz, I honestly                      10:34:37
16  cannot even think of a line of questioning that    10:34:39
17  is more directly relevant to the 30(b)(6)          10:34:40
18  deposition.  So I don't even understand the        10:34:43
19  basis for your commentary, but that's not an       10:34:45
20  issue for right now.                               10:34:47
21  BY MS. MILLER:                                     10:34:47
22    Q.    My question to Mr. Ahlberg is:            10:34:49
23    Mr. Ahlberg, do you believe that                 10:34:51
24  it is the Commonwealth's official position that    10:34:53
25  Funds do not have balances?                        10:34:55

273

1    MS. McKEEN:  Same objection.  I                   10:34:58
2  appreciate your disagreement, but I'm going to     10:34:59
3  continue to make whatever objections I think       10:35:01
4  are appropriate.                                   10:35:03
5  BY MS. MILLER:                                     10:35:03
6    Q.    You can answer.                            10:35:11
7    A.    I don't know.                               10:35:21
8    Q.    Did you speak to anybody within           10:35:32
9  Treasury in preparation for your deposition        10:35:36
10  today about Fund balances?                         10:35:38
11    A.    No.                                        10:35:45
12    MS. MILLER:  I'd like to pull up                 10:35:59
13  the next exhibit, please.                          10:36:00
14  BY MS. MILLER:                                     10:36:00
15    Q.    Mr. Ahlberg, you testified               10:36:02
16  yesterday that for the last year plus, you've      10:36:03
17  been involved in preparing -- in assisting with    10:36:06
18  preparing the weekly cash flow reports.  Do you    10:36:06
19  recall that?                                        10:36:11
20    A.    Yes.                                        10:36:16
21    Q.    So if we could pull up an example         10:36:16
22  of the weekly cash flow report and mark it as      10:36:22
23  Exhibit 20, please.                                10:36:25
24
25

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

14 (Pages 274 to 277)

---

**274**

|   | | |
|---|---|---|
| 1 | (Monolines Exhibit 20 is | 10:36:25 |
| 2 | introduced for the record.) | 10:36:43 |
| 3 | BY MS. MILLER: | 10:36:43 |
| 4 | Q.   Do you know, Mr. Ahlberg, before | 10:36:44 |
| 5 | we look at this, whether it is the official | 10:36:45 |
| 6 | position of the Highway Transportation | 10:36:48 |
| 7 | Authority that there are no Fund balances? | 10:36:51 |
| 8 | MS. McKEEN:  Same objection as | 10:36:59 |
| 9 | before. | 10:37:01 |
| 10 | THE WITNESS:  I don't know. | 10:37:06 |
| 11 | BY MS. MILLER: | 10:37:06 |
| 12 | Q.   Okay.  Great.  So you have in | 10:37:08 |
| 13 | front of you a document that's been marked as | 10:37:13 |
| 14 | Monolines Exhibit 20.  Do you see that? | 10:37:13 |
| 15 | A.   I see the document. | 10:37:16 |
| 16 | Q.   Is this a document that you | 10:37:18 |
| 17 | recognize? | 10:37:25 |
| 18 | A.   Yes. | 10:37:25 |
| 19 | Q.   Is this a document that you | 10:37:26 |
| 20 | assisted in preparing? | 10:37:27 |
| 21 | A.   Me personally, no. | 10:37:35 |
| 22 | Q.   Okay.  Well, can you give me an | 10:37:37 |
| 23 | example, because I'd like to put in front of | 10:37:38 |
| 24 | you a document that you did personally prepare. | 10:37:40 |
| 25 | So can you give me an example of a | 10:37:43 |

**275**

|   | | |
|---|---|---|
| 1 | weekly cash flow report that you assisted in | 10:37:47 |
| 2 | preparing that you testified about on Tuesday | 10:37:51 |
| 3 | that I can pull up as an exhibit for you? | 10:37:54 |
| 4 | A.   I did provide the review of this | 10:38:11 |
| 5 | document.  I did not -- I did not prepare the | 10:38:13 |
| 6 | document. | 10:38:16 |
| 7 | Q.   Okay.  So people who report to you | 10:38:17 |
| 8 | prepared this document? | 10:38:21 |
| 9 | A.   Correct. | 10:38:22 |
| 10 | Q.   And did you have responsibility | 10:38:25 |
| 11 | for reviewing the contents? | 10:38:27 |
| 12 | A.   Yes, I had certain review | 10:38:36 |
| 13 | responsibilities with respect to this report. | 10:38:39 |
| 14 | Q.   Okay.  What are your -- | 10:38:40 |
| 15 | (Simultaneous speaking.) | 10:38:43 |
| 16 | UNIDENTIFIED SPEAKER: | 10:38:43 |
| 17 | (Indiscernible) is not appearing on my screen. | 10:38:51 |
| 18 | BY MS. MILLER: | 10:38:51 |
| 19 | Q.   Okay.  Does any -- Mr. Ahlberg, | 10:38:53 |
| 20 | can you see the document? | 10:38:55 |
| 21 | A.   Yes. | 10:38:56 |
| 22 | Q.   Okay. | 10:38:57 |
| 23 | MS. MILLER:  And Ms. McKeen, can | 10:38:58 |
| 24 | you see it? | 10:39:00 |
| 25 | MS. McKEEN:  I can.  Thank you. | 10:39:01 |

**276**

|   | | |
|---|---|---|
| 1 | MS. MILLER:  Okay.  So I'll put on | 10:39:06 |
| 2 | the record, and maybe you can pull it up online | 10:39:07 |
| 3 | for those who can't see it.  It's publicly | 10:39:09 |
| 4 | available on the AAFAF website.  It is the | 10:39:13 |
| 5 | Treasury Single Account Fiscal Year 2020 Cash | 10:39:18 |
| 6 | Flow as of April 10, 2020. | 10:39:25 |
| 7 | It's for ease for people pulling | 10:39:27 |
| 8 | it up, it's the most recent cash flow that was | 10:39:29 |
| 9 | published, so it should be the first link. | 10:39:31 |
| 10 | BY MS. MILLER: | 10:39:31 |
| 11 | Q.   Mr. Ahlberg, I think the question | 10:39:33 |
| 12 | that was pending was what are your review | 10:39:35 |
| 13 | responsibilities in connection with this | 10:39:38 |
| 14 | document? | 10:39:39 |
| 15 | A.   My review responsibilities with | 10:39:49 |
| 16 | respect to this document generally involve | 10:39:53 |
| 17 | making sure that the numbers in this document | 10:39:57 |
| 18 | agree to the numbers of the Department of | 10:40:02 |
| 19 | Treasury. | 10:40:11 |
| 20 | Q.   Okay.  And are there any numbers | 10:40:11 |
| 21 | in this document, specifically, when you say | 10:40:13 |
| 22 | "the numbers in this document," or generally | 10:40:16 |
| 23 | all of them? | 10:40:18 |
| 24 | A.   Generally all of them. | 10:40:19 |
| 25 | Q.   Okay.  And what documents do you | 10:40:22 |

**277**

|   | | |
|---|---|---|
| 1 | look at to confirm that they align with numbers | 10:40:24 |
| 2 | in the Department of Treasury? | 10:40:32 |
| 3 | A.   There's several -- several | 10:40:39 |
| 4 | documents that go into this report.  Treasury | 10:40:44 |
| 5 | has maintained an internal cash flow, internal | 10:40:50 |
| 6 | daily cash flow.  That would be my main source | 10:40:56 |
| 7 | of review with this report, ensuring that this | 10:40:59 |
| 8 | report tied to the internal daily cash flow | 10:41:03 |
| 9 | utilized by the Treasury team. | 10:41:08 |
| 10 | Q.   Does the internal daily cash flow | 10:41:09 |
| 11 | include Fund designation? | 10:41:12 |
| 12 | A.   No. | 10:41:13 |
| 13 | Q.   Okay.  Let me take a step back. | 10:41:17 |
| 14 | Can you generally describe what | 10:41:19 |
| 15 | this document is for me? | 10:41:21 |
| 16 | A.   Generally this document will show | 10:41:25 |
| 17 | cash inflows and outflow from the TSA. | 10:41:28 |
| 18 | Q.   Okay.  And so this is explicitly | 10:41:36 |
| 19 | focused on moneys within the TSA; is that | 10:41:47 |
| 20 | right? | 10:41:50 |
| 21 | A.   Correct.  Moneys that flow in or | 10:41:50 |
| 22 | out of the TSA. | 10:41:55 |
| 23 | Q.   And if you look at page 8 | 10:42:02 |
| 24 | of the document, if we could turn that so we | 10:42:02 |
| 25 | don't have to turn our heads.  There we go.  Is | 10:42:16 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

15 (Pages 278 to 281)

---

**278**

1  this a page from within the report that you    10:42:19
2  recognize?                                      10:42:21
3      A.    Yes.                                   10:42:23
4      Q.    And what is this page?                 10:42:23
5      A.    The TSA cash flow actual results       10:42:30
6  for the week ended April 10, 2020.              10:42:33
7      Q.    Okay.  And do you see that             10:42:39
8  within -- under State Collections, it was       10:42:47
9  General Fund Collections.  Do you see that?     10:42:56
10     A.    Yes.                                   10:43:00
11     Q.    And then it also lists non-General     10:43:01
12 Fund passthrough collections.  Do you see that? 10:43:04
13     A.    Yes, I see that.                        10:43:11
14     Q.    How are non-General Fund               10:43:12
15 pass-through collections identified in the TSA? 10:43:15
16     A.    Could we please flip to page 10?       10:43:33
17 I just want to be sure that I have the right    10:43:38
18 line item.                                       10:43:40
19     A.    I think you could actually control    10:43:46
20 the document if you want to.                     10:43:48
21     A.    I cannot right now.  I think           10:43:50
22 somebody needs to give me that control.         10:43:52
23     Q.    We're on page 10.  We're going to      10:43:55
24 rotate it and then give you that control so     10:43:56
25 that you can look at whatever.                   10:43:58

---

**280**

1      Q.    As it's used on page 11 of this        10:47:35
2  document.                                        10:47:37
3      A.    As it's used on this page of the       10:47:43
4  document, first to non-General Fund collections 10:47:47
5  that either historically or currently pass      10:47:53
6  through the list.                                10:48:02
7      Q.    And so you used the word               10:48:02
8  "pass-through" in your definition when I asked  10:48:05
9  you if there was another way to describe it.    10:48:07
10     And is that because "pass-through"          10:48:09
11 is sort of a self-explanatory, clear phrase in  10:48:11
12 your mind?                                        10:48:19
13     UNIDENTIFIED SPEAKER:  Objection.           10:48:19
14     THE WITNESS:  No.                            10:48:23
15 BY MS. MILLER:                                    10:48:23
16     Q.    Okay.  So is there another way         10:48:28
17 that you can explain pass-through other than by 10:48:27
18 using the word "pass-through"?                   10:48:31
19     A.    If you're just asking for the         10:48:38
20 general way for first pass-through without      10:48:48
21 saying "pass-through," that's a different       10:48:51
22 question than -- is -- is that your question?   10:48:53
23     Q.    That's my question, yes.              10:48:56
24     A.    Minimally, pass-through means what    10:49:13
25 it means.                                        10:49:15

---

**279**

1      A.    Okay.  Just the (indiscernible).       10:44:01
2  That's right.                                    10:44:01
3      Could you repeat your question?              10:44:08
4      Q.    My question is:                        10:44:50
5      How are non-General Fund                     10:44:53
6  pass-through collections identified within the  10:44:53
7  TSA?                                             10:44:56
8      A.    Non-General Fund pass-through          10:45:23
9  collections are understood by concept at the    10:45:23
10 sweep account level and the detail by concept.  10:45:31
11 And by "concept," I mean by the lines that you  10:45:31
12 see under non-GF pass-throughs on this page.     10:45:39
13 That information by concept detail is obtained   10:45:45
14 from data from the sweep accounts.               10:45:50
15     Q.    Why is it broken out in a              10:46:00
16 reporting of cash within the TSA?                10:46:02
17     A.    This separates cash inflows.  It      10:46:16
18 does not opine on cash within the TSA.           10:46:21
19     Q.    Do you have an understanding of        10:46:31
20 what the term "pass-through" means?              10:46:35
21     A.    Pass-through means pass-through.       10:46:45
22     Q.    Is there any other way you could       10:46:57
23 describe it?                                      10:46:59
24     A.    Another way to describe the            10:47:29
25 general phrase "pass-through"?                    10:47:31

---

**281**

1      Q.    Okay.  And then going back to          10:49:16
2  page 8, the next line is Other Special Revenue  10:49:27
3  Fund Collection.  Do you see that?               10:49:43
4      A.    Yes.                                   10:49:45
5      Q.    What are Other Special Revenue         10:49:53
6  Funds?                                           10:50:05
7      A.    Other Special Revenue Funds            10:50:05
8  Collections on this document refers to what is  10:50:06
9  referred to in Treasury as agency collections.  10:50:10
10     Q.    Okay.  And then going down, the        10:50:18
11 next section is Federal Fund Receipts.  Do you  10:50:23
12 see that?                                         10:50:31
13     A.    Yes, I see that.                        10:50:31
14     Q.    And do you have an understanding       10:50:32
15 of what Federal Fund receipts are?              10:50:33
16     A.    Yes.                                   10:50:38
17     Q.    And what are they?                      10:50:38
18     A.    In general, it is cash received       10:50:42
19 from federal government entities.               10:50:44
20     Q.    And are -- are federal funds so        10:50:51
21 designated within the TSA?                       10:50:56
22     UNIDENTIFIED SPEAKER:  Objection.           10:50:56
23     THE WITNESS:  I'm -- I'm not sure
24 I understood the question.  Would you repeat
25 it?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

16 (Pages 282 to 285)

---

282

BY MS. MILLER:

Q.   Let me ask this:

Can the Commonwealth send funds, federal funds that it receives from Medicaid on anything other than Medicaid?

MS. McKEEN:  Objection, outside the scope.

You can answer if you know.

THE WITNESS:  Yeah.  I'm not an attorney.  I don't -- I don't know all the uses for Medicaid receipts.

BY MS. MILLER:

Q.   Okay.  So do you think it requires an attorney to know all the uses?

MS. McKEEN:  Objection, Atara. You could use a better example.

BY MS. MILLER:

Q.   How do you -- how are federal funds identified to be listed in these separate buckets within this TSA cash flow report?

MS. MILLER:  Oh, I think we have to pause for a minute.  Oh, no --

THE REPORTER:  No, this is the court reporter.

MS. MILLER:  Are you -- is the

---

283

court reporter okay for us to proceed?  I believe the answer is yes.

THE REPORTER:  Yes, it's okay -- it's okay to proceed.  I'm back in.  Thank you.

MS. MILLER:  Thank you.

MR. NATBONY:  Just to let you know, this is Bill Natbony.  There is a large delay that at least I'm experiencing, something like five or six minutes in both the chat room and in the -- hearing the testimony.

MS. MILLER:  I wonder if now might be -- yeah, I also have a few seconds.  I'm wondering if now might be a good time to take a quick break and maybe let everybody log out and get back in.  Let's see if that helps.

THE REPORTER:  This is the court reporter -- this is the court reporter.  I know Henderson said that Live Litigation is monitoring, so I'll give them a quick call, if we want to take a break, and make -- have Live Litigation get involved immediately and see if they can straighten this out.

UNIDENTIFIED SPEAKER:  Yeah, I did log in and log out.  It did not help.

MS. MILLER:  Did not help.  Okay.

---

284

MS. McKEEN:  We're fine to go off the record as far as a break.  It's as good a time as any.

MS. MILLER:  Okay.  So let's go off the record.  Let's take a 5-minute break, back at 11 Central.

MS. McKEEN:  Atara --

THE VIDEOGRAPHER:  We are off the record at 10:54 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record at 11:13a.m.

BY MS. MILLER:

Q.   So we were looking at Exhibit 20 before the break, and I was asking you about the federal funds receipt.  Do you recall that?

A.   Yes.

Q.   And my question is:

How are federal funds designated within the TSA?

A.   It requires a manual exercise performed by Treasury team daily to review the TSA operational account bank statements and identify transfers from known federal government entities and identifying those

---

285

transfers as such in their internal daily cash flow workbook that I referenced before.

Q.   Okay.  And is a particular Federal Fund identified within that internal daily workbook?

A.   No.

Q.   Okay.  So how are the Funds tracked once inside the TSA?

A.   The receipt of this cash is tracked, as I mentioned.

Q.   Is the outflow of those federal funds also tracked?

A.   Outflows of federal funds are tracked.

Q.   How are they tracked?

A.   Depends on the nature of the outflow.

Q.   Can you give me an example?

A.   For example, in outflow, for example, in line 18 on this report, where it says "Federal Fund," under Payroll and Related Costs, that would require synthesis of the biweekly payroll registers that we review in which there would be a Fund designation, a Fund-type designation.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

17 (Pages 286 to 289)

---

286

1    Q.    Are there other outflows that have          11:15:53
2    Fund-type designations?                            11:15:55
3         MS. McKEEN:  Objection.                       11:16:02
4         THE WITNESS:  Yes.                            11:16:06
5    BY MS. MILLER:                                     11:16:06
6    Q.    What other outflows have Fund-type           11:16:08
7    designations?                                      11:16:12
8    A.    Cash outflows to suppliers, which            11:16:19
9    in this report would be captured in line 22        11:16:27
10   under Vendor Disbursements, Federal fund.          11:16:30
11   Q.    And are the outflows designated              11:16:46
12   with the same Fund identifier as the inflows?      11:16:50
13   A.    I don't know.  We have never done            11:17:18
14   that exercise.                                     11:17:19
15   Q.    When you say "we," who do you                11:17:21
16   mean?"                                             11:17:28
17   A.    Treasury.                                    11:17:28
18   Q.    What exercise are you referring to           11:17:29
19   that you've never -- that Treasury has never       11:17:30
20   done?                                              11:17:34
21   A.    I believe that was any kind of               11:17:53
22   matching federal fund inflows by Fund number on    11:17:55
23   Type 2 with their corresponding outflows, which    11:18:06
24   may appear throughout this document in various     11:18:10
25   line items.                                        11:18:13

---

287

1    Q.    My question is whether the                   11:18:14
2    outflows are designated on the Commonwealth's      11:18:15
3    internal accounting documents with the same        11:18:17
4    Fund number as the corresponding inflow.           11:18:20
5    A.    And, again, matching specific                11:18:36
6    Fund, Fund ID numbers would not be an exercise     11:18:42
7    that would be required to put together this        11:18:45
8    report here.                                       11:18:47
9    Q.    I didn't ask about mapping, so I'm           11:18:48
10   going to ask my question for a third time, and     11:18:51
11   I'm going to ask you to listen to it carefully,    11:18:53
12   okay?  The question is quite narrow:               11:18:56
13        Are the outflows designated on the            11:19:00
14   Commonwealth's internal accounting documents       11:19:04
15   with the same Fund number as the corresponding     11:19:06
16   inflows for the federal fund example that you      11:19:09
17   provided?                                          11:19:15
18        MS. McKEEN:  Asked and answered,              11:19:16
19   objection.                                         11:19:17
20        THE WITNESS:  We were speaking                11:19:26
21   generally about line items.                        11:19:27
22   BY MS. MILLER:                                     11:19:36
23   Q.    Was that an answer to my question?           11:19:36
24   A.    Yes.                                         11:19:41
25   Q.    I don't understand it.                       11:19:44

---

288

1         So can you explain how that's               11:19:45
2    responsive to the question that I asked about      11:19:46
3    whether federal fund inflows and corresponding     11:19:48
4    outflows are designated on Commonwealth            11:19:52
5    accounting documents with the same Fund number?    11:19:54
6         MS. McKEEN:  Objection.                       11:20:01
7         THE WITNESS:  Outflows on the TSA             11:20:32
8    that are identified as federal fund outflows       11:20:35
9    would be tagged with a Fund number that would      11:20:40
10   be the same universe of Fund numbers that would    11:20:45
11   be used within the accounting system to record     11:20:50
12   federal fund revenue.                              11:20:54
13   BY MS. MILLER:                                     11:20:54
14   Q.    What do you mean by "the same               11:20:57
15   universe"?                                         11:21:00
16   A.    Same list of Fund numbers.                   11:21:03
17   Q.    Do you know whether that's true             11:21:08
18   for Fund 278 revenues?                             11:21:10
19   A.    Do I know whether what is true for           11:21:19
20   Fund 278 revenues?                                 11:21:23
21   Q.    Whether outflows of                          11:21:25
22   Fund 278 revenues are similarly tagged with        11:21:28
23   Fund 278.                                          11:21:32
24        UNIDENTIFIED SPEAKER:  Objection.             11:21:33
25        THE WITNESS:  I believe we looked             11:21:50

---

289

1    at vouchers together on Tuesday of transfers       11:21:50
2    from the TSA to HTA in which Fund Number 278       11:21:56
3    was included on those vouchers.                    11:22:02
4    BY MS. MILLER:                                     11:22:02
5    Q.    So Fund 278 is designated on both           11:22:10
6    inflows and outflows from the TSA with respect     11:22:12
7    to revenues therein, correct?                      11:22:15
8         MS. McKEEN:  Objection.                       11:22:20
9         THE WITNESS:  No, the outflows               11:22:29
10   would show Fund 278 as being the source of         11:22:32
11   those -- source revenues for a transfer or         11:22:37
12   outflow.                                           11:22:40
13   BY MS. MILLER:                                     11:22:40
14   Q.    So outflows of Fund 278 revenues            11:22:48
15   would identify Fund 278 as the source of the       11:22:50
16   revenue for that outflow; is that correct?         11:22:54
17   A.    I don't know if that's correct the           11:23:03
18   way you phrased the question, but outflows to      11:23:05
19   HTA that were -- that the funding source was       11:23:08
20   revenue earned under 278, that transfer would      11:23:11
21   show that the revenue source for that transfer     11:23:15
22   was Fund 278 revenue.                              11:23:17
23   Q.    Okay.  I think we can put this              11:23:20
24   exhibit to the side.                               11:23:30
25        I'm going to turn now,                        11:23:47

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

18 (Pages 290 to 293)

---

**290**

```
 1    Mr. Ahlberg, to asking you some questions about      11:23:49
 2    PRIFA, okay?                                         11:23:52
 3        A.    Okay.                                      11:23:53
 4        Q.    Just before I do that, one last            11:23:56
 5    question.                                            11:23:58
 6              What about outflows of revenues            11:23:59
 7    from Fund 278 to a source other than HTA, would      11:24:04
 8    they also be tagged with Fund 278 as                 11:24:15
 9    the -- sorry -- would they also identify             11:24:19
10    Fund 278 as the source of the revenue?               11:24:22
11        A.    Could you repeat the question all          11:24:27
12    together, not broken up?                             11:24:29
13        Q.    Sure.  If there were outflows to           11:24:32
14    an entity other than HTA that the funding            11:24:41
15    source was revenue earned under 278, would that      11:24:46
16    transfer also show the revenue source for the        11:24:51
17    transfer of Fund 278?                                11:24:54
18        A.    I'm not certain how to answer that         11:25:10
19    hypothetical question, but I've seen no              11:25:12
20    outflows to other entities other than HTA that       11:25:14
21    identified the revenue source of Fund 278.           11:25:19
22        Q.    Okay.  So you're not certain               11:25:26
23    whether they exist or not?                           11:25:29
24        A.    Whether what exists or not?                11:25:32
25        Q.    Whether there are, in fact,                11:25:35
```

**291**

```
 1    transfers to entities other than HTA that            11:25:37
 2    identify a revenue source for Fund 278.              11:25:40
 3        A.    I've seen no evidence of any               11:25:49
 4    transfers to entities that would have used Fund      11:25:53
 5    source 278 as the revenue source for that            11:25:57
 6    transfer.                                            11:26:02
 7        Q.    When I say "PRIFA," you understand         11:26:17
 8    that I'm referring to the Puerto Rico                11:26:19
 9    Infrastructure Financing Authority, correct?         11:26:28
10        A.    Yeah.                                      11:26:29
11        Q.    And you're here testifying as a            11:26:29
12    representative of PRIFA, correct?                     11:26:35
13        A.    Yes.                                       11:26:36
14        Q.    Okay.  And I think you -- let me           11:26:37
15    ask:                                                 11:26:40
16              In connection with the work that           11:26:40
17    you do, other than this deposition for the           11:26:42
18    Commonwealth, do you have any responsibilities       11:26:46
19    that relate to PRIFA?                                11:26:49
20        A.    No.                                        11:26:56
21        Q.    You mentioned yesterday that you           11:27:02
22    spoke to someone named Sylvia in connection          11:27:04
23    with preparing for your deposition today             11:27:07
24    related to PRIFA; is that correct?                   11:27:09
25        A.    Yes.                                       11:27:13
```

**292**

```
 1        Q.    And were you referring to Sylvia           11:27:13
 2    Lopez Jorge?                                         11:27:25
 3        A.    I think that's her full name.              11:27:28
 4        Q.    Do you know what her position is?          11:27:30
 5    Let me ask.  Is she employed at PRIFA?               11:27:32
 6        A.    Yes.                                       11:27:34
 7        Q.    Do you know what her position is           11:27:38
 8    at PRIFA?                                            11:27:39
 9        A.    I don't know what her exact title          11:27:41
10    is, but I know that she's a manager over a lot       11:27:42
11    of PRIFA.                                            11:27:47
12        Q.    Okay.  Do you know whether she's           11:27:47
13    an accountant?                                       11:27:49
14        A.    I know that generally she's a              11:27:52
15    manager in the finance and accounting               11:27:54
16    department.  I don't know her exact title or         11:27:57
17    the way that she exactly considers her               11:27:59
18    professional occupation.                             11:28:02
19        Q.    Okay.  She's in the finance and            11:28:02
20    accounting department; is that right?                11:28:04
21        A.    Yes.                                       11:28:10
22        Q.    Okay.  Do you know if she's a CPA?         11:28:10
23        A.    I'm not -- I don't know if she's a         11:28:14
24    CPA or not.                                          11:28:16
25        Q.    Okay.  And have you spoken to her          11:28:17
```

**293**

```
 1    other than in preparation -- have you ever           11:28:21
 2    spoken to her other than in preparation for          11:28:23
 3    your deposition?                                     11:28:26
 4        A.    No.                                        11:28:27
 5        Q.    And what did you talk to her               11:28:27
 6    about?                                               11:28:30
 7        A.    I would -- we talked about                 11:28:42
 8    anything that would help put together the Flow       11:28:47
 9    of Funds presentation that was provided to you       11:28:50
10    guys in order to understand Flow of Funds            11:28:54
11    during the relevant time period.                     11:28:56
12        Q.    And did you call her with specific         11:28:59
13    questions?                                           11:29:02
14        A.    When we spoke, sometimes I would           11:29:14
15    have questions to ask her.                           11:29:16
16        Q.    How many times did you speak to            11:29:19
17    her?                                                 11:29:21
18        A.    I can't recall the exact amount of         11:29:24
19    times that I spoke with her.  I would estimate       11:29:27
20    about two to three times per week for two to         11:29:31
21    three weeks.                                         11:29:35
22        Q.    Okay.  Did she provide you with            11:29:43
23    documents that helped you in preparing the Flow      11:29:50
24    of Funds?                                            11:29:54
25        A.    Yes.                                       11:29:54
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                        April 23, 2020

19 (Pages 294 to 297)

|  | 294 |
|---|---|
| 1 | Q.    And did you prepare the initial |
| 2 | Flow of Funds or did somebody else do it? |
| 3 | A.    It was a collaborative effort. |
| 4 | Q.    And who were you collaborating |
| 5 | with? |
| 6 | A.    Me, Sylvia, I mentioned, and then |
| 7 | Treasury Department, Jeira Belén plus Hector |
| 8 | Gomez. |
| 9 | Q.    Anybody else? |
| 10 | A.    Not that I can recall |
| 11 | specifically. |
| 12 | Q.    Were there any lawyers involved in |
| 13 | that? |
| 14 | A.    Yes. |
| 15 | Q.    And which lawyers? |
| 16 | A.    Attorneys representing O'Melveny & |
| 17 | Myers, Marini, AAFAF or Proskauer. |
| 18 | Q.    Okay.  I missed what you said |
| 19 | before Proskauer. |
| 20 | A.    Marini I think is the name of the |
| 21 | law firm. |
| 22 | Q.    So you mentioned O'Melveny, Marini |
| 23 | and Proskauer; is that right? |
| 24 | A.    Yes. |
| 25 | Q.    Okay.  Have you reviewed any of |

|  | 295 |
|---|---|
| 1 | the legal briefs that were submitted to the |
| 2 | Court in connection with this litigation? |
| 3 | A.    I have seen some of that |
| 4 | information. |
| 5 | Q.    Okay.  And what do you recall |
| 6 | seeing? |
| 7 | A.    I don't recall specific -- |
| 8 | specific documents. |
| 9 | Q.    Do you remember seeing any |
| 10 | oversight for briefs in opposition to the |
| 11 | motion? |
| 12 | A.    I think so, but without the |
| 13 | document in front of me, it's hard to recall. |
| 14 | Q.    Okay.  Do you know if you read it? |
| 15 | A.    Without the document in front of |
| 16 | me, it's hard to recall. |
| 17 | Q.    Did you read any legal briefs that |
| 18 | were submitted to the Court in connection with |
| 19 | this litigation? |
| 20 | A.    I've seen hundreds of documents. |
| 21 | I just can't recall the specific documents that |
| 22 | I reviewed. |
| 23 | Q.    Could that be if you've read any |
| 24 | legal briefs -- you don't remember one way or |
| 25 | another if you've read any legal briefs that |

|  | 296 |
|---|---|
| 1 | identified what the key issues in this |
| 2 | litigation are? |
| 3 | MS. McKEEN:  Asked and answered. |
| 4 | MS. MILLER:  Well, I got the stock |
| 5 | answer that "I reviewed hundreds of documents." |
| 6 | That's not an answer.  The answer is yes or no |
| 7 | to "Did you review it?" |
| 8 | MS. McKEEN:  Let's be clear.  He |
| 9 | told you he didn't remember.  If you want to |
| 10 | ask him ten different ways, I don't know why |
| 11 | you're expecting a different answer.  If you |
| 12 | want to keep going, you can, but it's a waste |
| 13 | of time.  He told you he did not remember. |
| 14 | It's not a stock answer if he does not remember |
| 15 | something, Atara. |
| 16 | MS. MILLER:  I have a feeling |
| 17 | somebody suggested to him that anytime someone |
| 18 | asks about a document he testifies that he's |
| 19 | reviewed hundreds of documents and can't |
| 20 | possibly remember the single document I'm |
| 21 | asking about. |
| 22 | BY MS. MILLER: |
| 23 | Q.    Mr. Ahlberg, did you review legal |
| 24 | briefs submitted in this litigation? |
| 25 | MS. McKEEN:  Stop.  I'm going -- |

|  | 297 |
|---|---|
| 1 | MS. MILLER:  You're not |
| 2 | interrupting me.  There's a question pending. |
| 3 | The witness is going to answer the question. |
| 4 | If you have an objection, you can state |
| 5 | "objection" without speaking. |
| 6 | MS. McKEEN:  Atara, respectfully, |
| 7 | I'm going to say what I am going to say, and |
| 8 | you can't stop me.  I don't -- |
| 9 | MS. MILLER:  No.  There are rules |
| 10 | that govern it.  You can't just put speaking |
| 11 | objections on the record.  This is my |
| 12 | deposition, not yours.  You can defend, you can |
| 13 | say "objection."  I'm not letting you put a |
| 14 | speech on the record right now. |
| 15 | MS. McKEEN:  I'm responding to |
| 16 | your suggestion that the witness was coached to |
| 17 | say that I don't appreciate it, and I would |
| 18 | appreciate it if you would conduct yourself in |
| 19 | a more courteous and professional manner, both |
| 20 | to me and to the witness, who's given you a lot |
| 21 | of his time. |
| 22 | So if you would like to ask him |
| 23 | yet a fourth time if he recalls reading briefs, |
| 24 | you can.  I object to that.  Go ahead. |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                 April 23, 2020

20 (Pages 298 to 301)

---

**298**

BY MS. MILLER:

Q.     Mr. Ahlberg, do you recall reading any of the legal briefs in connection with this matter?

A.     I have read various legal briefs. I can't recall specifically which ones without having the documents in front of me.

Q.     Okay. Thank you.

MS. MILLER: I'd like to mark as an exhibit tab 1102.

(Monolines Exhibit 21 is introduced for the record.)

BY MS. MILLER:

Q.     Mr. Ahlberg, did you review the PRIFA Enabling Act in connection with your testimony today?

A.     I did not review the PRIFA Enabling Act.

Q.     All right. Do you have a general understanding of the requirements under the PRIFA Enabling Act to deposit certain moneys into particular accounts?

MS. McKEEN: Objection.

THE WITNESS: I am aware that the PRIFA Enabling Act has certain information

---

**299**

about moneys in accounts, as you mentioned.

BY MS. MILLER:

Q.     Okay. I'd like to turn to Section 1914, if we could.

Let me ask you while we are getting to it, because it's about 25 pages in, so it might take a while. We're going page by page here.

Do you have an understanding of what a special deposit is as used by the Commonwealth?

A.     As used by the Commonwealth in what context?

Q.     Well, now you have Section 1914 up in front of you, and it's titled Special Deposit, and my question is if you have an understanding within the Commonwealth, accounting or otherwise, what a special deposit means.

A.     I'm not familiar with the term "special deposit."

Q.     Okay. Have you ever heard it?

A.     I may have heard the term before.

Q.     Okay. Okay. So this provision requires that -- I'm reading about the second

---

**300**

line.

...the first proceeds of the federal excise taxes remitted to the Department of Treasury on Puerto Rico in each fiscal year...

Do you see that?

A.     Yes, I see that.

Q.     Okay. And then if you go down to about halfway through the paragraph, as it goes through various years which are well behind us, so I'm going to skip them.

So in the case of fiscal year 2006 to '7 to 2008 and '9, and at subsequent years until fiscal year 2056 to '57, the participation shall be for an amount of up to $117 million, which when received by the Department of Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the authority designated as the Puerto Rico Infrastructure Fund.

Do you see that?

A.     Yes, I see that.

Q.     Okay. Do you have an understanding of what Special Fund, capital S, capital F, means in the Commonwealth?

---

**301**

MS. McKEEN: Objection.

THE WITNESS: I'm not certain what Special Fund means in the context of this page here. It looks like a definition that we can refer to within the document.

BY MS. MILLER:

Q.     Not elsewhere defined in the document, but let me ask you, have you ever heard of that term, Special Fund, being used anywhere in Commonwealth accounting?

A.     I have heard people use the term "Special Fund," but depending on the context, people could have been referring to different things.

Q.     Okay. And what have you -- what are some of the things that you think it could have been referring to?

A.     That's -- I'm not sure I have a clear understanding from the document.

Q.     Okay. Do you know whether special -- I'm sorry.

Going back to special deposit, do you know whether special deposit is defined in the Commonwealth financial statement of the Special Fund?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

21 (Pages 302 to 305)

---

**302**

1        A.    I do not know off the top of my
2 head if that's how the financial statements
3 define that term.
4        Q.    Okay. What does "Fund" mean
5 within the Commonwealth financial statement?
6        MS. McKEEN: Objection.
7        THE WITNESS: Not being a CPA, I
8 am not certain. Depends on where in the
9 financial statements...
10 BY MS. MILLER:
11        Q.    Okay. Can you give me one example
12 of what it might mean?
13        MS. McKEEN: Objection.
14        THE WITNESS: One example of what
15 might mean?
16 BY MS. MILLER:
17        Q.    Of what "Fund" means in the
18 financial statement. You said it depends on
19 where -- where it is in the financial
20 statements.
21        I'm asking you for one option
22 based on anything you can think of, and I think
23 you should go back to the financial statements,
24 if you want to pull them up and go through
25 them.

---

**303**

1        MS. McKEEN: Objection.
2        THE WITNESS: I believe page 40 of
3 the financial statements has the word "Fund" on
4 it.
5 BY MS. MILLER:
6        Q.    Okay. And my question is:
7 What does it mean when it's used
8 in the financial statements?
9        MS. McKEEN: Can you please click
10 the exhibit button so we can all see what
11 you're looking at?
12        THE WITNESS: I'm looking at
13 what's been put in front of me.
14        MS. McKEEN: Atara, if you'd like
15 the witness to look at page 40 of the financial
16 statements, you can put it in front of him.
17 BY MS. MILLER:
18        Q.    Are you saying that you just think
19 page 40 off the top of your head? You happen
20 to remember that page 40 of the financial
21 statements refers to Fund?
22        A.    If I recall that from the top of
23 my head, having used the table of contents of
24 that document together, and seeing page 40 next
25 to the line that we discussed together.

---

**304**

1        Q.    Got it. Okay.
2        So we'll pull up Monolines
3 Exhibit 19A and look at page 40.
4        Okay. So you now have page 40 of
5 this Monolines Exhibit 19A in front of you.
6        Looking at this document, can you
7 tell me what "Fund" means as used within the
8 Commonwealth accounting?
9        MS. McKEEN: Objection.
10        THE WITNESS: Not being a CPA, I'm
11 uncertain exactly how "Funds" is used within
12 the Commonwealth accounting (indiscernible)
13 operate chk give you an example of use of the
14 term "Fund," which was the goal of pointing me
15 to this page.
16 BY MS. MILLER:
17        Q.    Okay. And you don't know what it
18 means when on this page it uses the term
19 "Fund." You were just saying it's your -- it
20 makes sense where the Commonwealth uses the
21 word "Fund" in its accounting statements?
22        UNIDENTIFIED SPEAKER: Objection.
23 Yes, since that was in direct response to the
24 question that you asked.
25

---

**305**

1 BY MS. MILLER:
2        Q.    And because you are not a CPA, you
3 can't tell me what the word "Fund" as used on
4 this page or anywhere else in the audited
5 financials means; is that right?
6        MS. McKEEN: Objection.
7        THE WITNESS: I don't know one way
8 or the other how the authors of this document
9 are using the term "Fund."
10 BY MS. MILLER:
11        Q.    Well, this isn't meant to be a
12 super secret document, right? It's meant for
13 public consumption, isn't it?
14        MS. McKEEN: Objection.
15        THE WITNESS: The audited
16 financial statements are made public.
17 BY MS. MILLER:
18        Q.    Do you have an understanding of
19 how the public would expect -- as a member of
20 the public, how the public would expect the
21 word "Fund" to be used in the context of
22 Puerto Rico government financial statements?
23        UNIDENTIFIED SPEAKER: Objection.
24        THE WITNESS: I can't speculate on
25 how the public would interpret the use of the

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

22 (Pages 306 to 309)

---

**306**

1  word "Fund."    11:45:57
2  BY MS. MILLER:    11:45:57
3      Q.    What about how you would interpret    11:45:57
4  the use of the word "Fund"?    11:45:59
5          MS. McKEEN:  Objection.    11:46:03
6          THE WITNESS:  The way that I think    11:46:11
7  about the use of the word "Fund" are Fund    11:46:13
8  numbers within the PRIFA system.    11:46:16
9  BY MS. MILLER:    11:46:16
10      Q.    Looking -- while we have this    11:46:20
11  document up, I know I asked you about it.  Once    11:46:23
12  we have it, if we can turn to page 161, 162 of    11:46:25
13  the PDF.  It's not the page that I wanted.  So    11:46:27
14  I'll have to come back to it.  Okay.  I'll come    11:46:58
15  back to it with a question if I need to.    11:47:01
16          MS. McKEEN:  Atara, I think you    11:47:11
17  have page 151 up.    11:47:12
18          THE REPORTER:  Ms. McKeen, this is    11:47:12
19  the court reporter -- I'm sorry.  This is the    11:47:12
20  court reporter.  Can you just move your phone a    11:47:12
21  little bit closer to you?    11:47:12
22          MS. McKEEN:  Is that better?    11:47:12
23          THE REPORTER:  Yes.  Thank you.    11:47:51
24  BY MS. MILLER:    11:47:51
25      Q.    Okay.  I want to turn back to tab    11:47:52

---

**307**

1  1102.  Okay.    11:47:59
2          Okay.  So, sorry, the page that    11:48:11
3  I'm looking for is actually the second half, so    11:48:15
4  we're going to just have to load 19B.  So give    11:48:21
5  me one second.    11:48:21
6          MS. MILLER:  Kevin, could you go    11:49:38
7  to 357, please, back a couple pages?  Thank    11:49:40
8  you.  Okay.  Here we go.    11:49:44
9  BY MS. MILLER:    11:49:44
10      Q.    And do you see -- so we are still    11:49:48
11  in the audited financials for the year ended    11:49:50
12  June 30, 2016.    11:49:54
13          Do you see that?    11:49:55
14      A.    Yes, I see it.    11:49:55
15      Q.    And there's a section designated    11:50:01
16  Special Deposits.    11:50:03
17          Do you see that?    11:50:05
18      A.    I see that.    11:50:09
19      Q.    And you can just read how the    11:50:10
20  Commonwealth defines Special Deposits in its    11:50:12
21  financial reports?    11:50:18
22      A.    Sure.  Special Deposits:  This    11:50:20
23  Fund acts as a fiduciary -- sorry.    11:50:24
24          This Fund acts in a fiduciary    11:50:28
25  capacity in order to account for moneys    11:50:31

---

**308**

1  received for the specified purposes for which    11:50:32
2  the law does not specify its recording in any    11:50:35
3  other Fund.  It mainly includes -- it mainly    11:50:39
4  includes deposits under the custody of the    11:50:42
5  Courts of Justice for alimony payments,    11:50:44
6  escrows, revenue collections and agency    11:50:47
7  accounts for which the Commonwealth act in an    11:50:50
8  agent's capacity.    11:50:54
9      Q.    Okay.  Have you spoken to anybody    11:50:57
10  at Treasury about Special Deposits?    11:51:05
11      A.    No.    11:51:11
12      Q.    Have you had any conversations    11:51:14
13  with anyone at PRIFA about the Special Deposits    11:51:17
14  established under the Enabling Act?    11:51:27
15      A.    We did not have particular    11:51:31
16  conversations about Special Deposits.    11:51:34
17          MS. MILLER:  Okay.  Can we turn    11:51:37
18  back to tab 1102, Kevin, please?    11:51:42
19  BY MS. MILLER:    11:51:42
20      Q.    So we have back in front of us    11:51:45
21  Exhibit -- Monolines Exhibit 21, and we are    11:52:07
22  looking, again, at Section 1914.  And I just    11:52:10
23  want to draw your attention to the bottom of    11:52:18
24  the middle portion of that paragraph where it    11:52:20
25  says the -- shall be covered into -- that the    11:52:25

---

**309**

1  moneys shall be covered into a Special Fund to    11:52:27
2  be maintained by or on behalf of the authority    11:52:30
3  designated as the Puerto Rico Infrastructure    11:52:33
4  Fund.    11:52:37
5          Do you see that?    11:52:37
6      A.    Yes, I see that.    11:52:40
7      Q.    And is the Puerto Rico    11:52:42
8  Infrastructure Fund something that you have    11:52:47
9  ever come across in the accounting material of    11:52:49
10  the Commonwealth?    11:52:58
11      A.    The concept of the Puerto Rico    11:53:03
12  Infrastructure Fund is something I discussed    11:53:06
13  with PRIFA.  Is that the question?    11:53:18
14      Q.    That was the question.    11:53:20
15          And what did you speak to PRIFA    11:53:22
16  about?    11:53:24
17      A.    We specifically inquired as to the    11:53:34
18  existence of an Infrastructure Fund account.    11:53:41
19      Q.    And what did PRIFA tell you?    11:53:49
20      A.    That there's no specific bank    11:53:51
21  account that is designated or known as the    11:53:57
22  Infrastructure Fund.    11:54:00
23      Q.    Okay.  Did you ask whether --    11:54:03
24  other than a specific bank account whether    11:54:05
25  there is a Fund, as that term is used in the    11:54:07

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

23 (Pages 310 to 313)

---

**310**

1      Commonwealth accounting, designated the    11:54:09
2      Puerto Rico Infrastructure Fund?    11:54:11
3      **A.     Yes.**    11:54:15
4      Q.     And what was the answer?    11:54:19
5      **A.     That, again, there's no -- there's**    11:54:24
6      **no Fund that is the Puerto Rico Infrastructure**    11:54:35
7      **Fund.**    11:54:35
8      THE REPORTER: I'm sorry. Can you    11:54:35
9      repeat the back half of the answer, please?    11:54:36
10      THE WITNESS: There is no account    11:54:38
11      number or Fund identified as the Puerto Rico    11:54:40
12      Infrastructure Fund.    11:54:44
13      BY MS. MILLER:    11:54:44
14      Q.     When you say "account number," you    11:54:51
15      mean bank account number?    11:54:54
16      A.     Correct.    11:54:55
17      Q.     Did you speak to anybody at the    11:54:59
18      Puerto Rico Department of Treasury regarding    11:55:01
19      whether or not there was a Puerto Rico    11:55:03
20      Infrastructure Fund?    11:55:04
21      A.     Yes.    11:55:09
22      Q.     And who did you speak to?    11:55:09
23      **A.     I can recall discussions with**    11:55:15
24      **Jeira Belén and Hector Gomez.**    11:55:21
25      Q.     And what did they tell you about    11:55:23

---

**311**

1      that?    11:55:29
2      **A.     That they did not understand the**    11:55:29
3      **Puerto Rico Infrastructure Fund as being a**    11:55:32
4      **specific or -- a specific bank account or Fund.**    11:55:36
5      Q.     Well, do you have an understanding    11:55:41
6      under the statute, based on what we just read    11:55:43
7      in Monolines Exhibit 21, about what the    11:55:47
8      Puerto Rico Infrastructure Fund -- what moneys    11:55:50
9      were supposed to be deposited into the    11:55:52
10      Puerto Rico Infrastructure Fund?    11:55:55
11      MS. McKEEN: I'll object to the    11:56:00
12      extent it calls for any legal testimony, but if    11:56:02
13      the witness has a lay understanding, he can    11:56:04
14      answer.    11:56:09
15      THE WITNESS: Could you repeat the    11:56:16
16      question?    11:56:17
17      BY MS. MILLER:    11:56:17
18      Q.     Do you have an understanding of    11:56:19
19      what moneys under Section 1914 of Exhibit 21    11:56:19
20      were supposed to flow into the Puerto Rico    11:56:24
21      Infrastructure Fund?    11:56:29
22      MS. McKEEN: Same objections.    11:56:29
23      THE WITNESS: I understand that    11:56:36
24      this document specifies up to $117 million.    11:56:36
25

---

**312**

1      BY MS. MILLER:    11:56:36
2      Q.     Of what?    11:56:47
3      **A.     Of rum taxes.**    11:57:00
4      Q.     And you testified, I think, that    11:57:03
5      over a matter -- course of a few weeks, you put    11:57:06
6      together a Flow of Funds for PRIFA among other    11:57:09
7      instrumentalities, right?    11:57:13
8      **A.     Yes.**    11:57:14
9      Q.     And were these the Funds that you    11:57:15
10      were tracking in the Flow of Funds?    11:57:18
11      UNIDENTIFIED SPEAKER: Note my    11:57:29
12      objection, please.    11:57:30
13      THE WITNESS: The Flow of Funds,    11:57:35
14      those are the Flow of Funds for $117 million in    11:57:39
15      each fiscal year.    11:57:48
16      BY MS. MILLER:    11:57:48
17      Q.     Not just any $117 million, right?    11:57:50
18      **A.     Not just any $117 million;**    11:58:04
19      **correct.**    11:58:11
20      Q.     Mr. Ahlberg, what moneys are the    11:58:11
21      PRIFA Flow of Funds that you prepared tracking?    11:58:13
22      **A.     We generally track the first**    11:58:22
23      **$117 million of rum tax proceeds.**    11:58:24
24      Q.     Okay. And those are the moneys    11:58:33
25      that Section 1914 indicated were to be    11:58:34

---

**313**

1      deposited in a Special Fund called the    11:58:39
2      Puerto Rico Infrastructure Fund, right?    11:58:43
3      MS. McKEEN: Objection.    11:58:45
4      THE WITNESS: That is what this    11:58:45
5      Section 1914 says.    11:58:47
6      BY MS. MILLER:    11:58:47
7      Q.     Okay. And that's why you included    11:58:49
8      them in the Flow of Funds because that's the    11:58:50
9      money that's in dispute in this litigation,    11:58:53
10      right?    11:58:55
11      **A.     I don't know if that's the**    11:59:04
12      **specific reason why we entered the Flow of**    11:59:05
13      **Funds as 117 million.**    11:59:12
14      Q.     And not just any 117 million of    11:59:13
15      rum taxes, the first 117 million of rum taxes,    11:59:16
16      right, that you were tracking?    11:59:20
17      **A.     The first $117 million of rum**    11:59:22
18      **taxes in a given fiscal year, yes.**    11:59:27
19      Q.     Mr. Ahlberg, did you review any of    11:59:34
20      the Commonwealth financial documents to see if    11:59:41
21      there was any discussion of a Puerto Rico    11:59:41
22      Infrastructure Fund?    11:59:43
23      **A.     I did not specifically review any**    11:59:49
24      **one particular document in search for the**    12:00:00
25      **phrase "Puerto Rico Infrastructure Fund."**    12:00:03

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

24 (Pages 314 to 317)

---

**314**

```
 1        Q.    Did you look at whether the          12:00:10
 2   Puerto Rico Infrastructure Fund was identified   12:00:12
 3   as a Fund in the Commonwealth's audited          12:00:17
 4   financial statements?                            12:00:20
 5        A.    I can't recall off the top of my      12:00:32
 6   head if that's something that's included in the  12:00:35
 7   financial statements or not.                     12:00:37
 8        Q.    I'm asking you if you looked.         12:00:37
 9        A.    I did not look through the            12:00:45
10   financial statements for that specific phrase.   12:00:47
11        Q.    Okay.  Did you look through the       12:00:50
12   financial statements generally for the concept   12:00:55
13   of a Fund established to hold the first          12:00:57
14   $117 million of rum excise taxes?                12:01:01
15        A.    No.                                   12:01:10
16        Q.    All right.  Other than speaking to    12:01:11
17   Sylvia and two people at Treasury, did you do    12:01:17
18   anything else to determine whether or not the    12:01:23
19   Commonwealth in fact has a Fund called the       12:01:25
20   Puerto Rico Infrastructure Fund or another Fund  12:01:27
21   designated for the deposit of the first          12:01:30
22   $117 million of rum excise tax?                  12:01:32
23        A.    Outside of the conversations with     12:01:44
24   the individuals that I mentioned and -- no.      12:01:46
25        Q.    Okay.  So you did not look at any     12:01:52
```

**315**

```
 1   documents to independently verify that, did     12:01:55
 2   you?                                            12:01:58
 3        MS. McKEEN:  Objection.                    12:01:58
 4        THE WITNESS:  No, but I did look           12:02:04
 5   at enough documents to satisfy myself that the  12:02:06
 6   Flow of Funds presentation put together was     12:02:11
 7   accurate.                                       12:02:16
 8   BY MS. MILLER:                                  12:02:16
 9        Q.    Okay.  And counsel represented to    12:02:17
10   us that at least since 2014, there has been no  12:02:19
11   Fund identified as the Puerto Rico              12:02:22
12   Infrastructure Funds.  Do you understand that?  12:02:23
13        Sorry.  Do you agree with that            12:02:25
14   representation?                                 12:02:27
15        A.    Yes.                                 12:02:27
16        Q.    Okay.  And you believe that to be    12:02:29
17   true, don't you?                                12:02:31
18        A.    I guess.                             12:02:32
19        Q.    So that's a yes?                     12:02:39
20        A.    Yes.                                 12:02:41
21        Q.    Okay.                                12:02:44
22
23
24
25
```

**316**

```
 1        MS. MILLER:  Kevin, I hate to do           12:02:46
 2   this to you, but I'd like to go back to the     12:02:48
 3   audited financial statements, please, and I'd   12:02:49
 4   like to go to page 347.  So it will be at 19B.  12:02:51
 5   BY MS. MILLER:                                  12:02:51
 6        Q.    Okay.  So here we are.  Look at      12:03:20
 7   number 2.                                       12:03:22
 8        Do you see that it's called              12:03:25
 9   Puerto Rico Infrastructure Financing            12:03:26
10   Authority's Special Revenue Fund?  Do you see   12:03:28
11   that?                                           12:03:33
12        A.    I see that, yes.                     12:03:33
13        Q.    Okay.  And can you just read the     12:03:36
14   first sentence to me?                           12:03:37
15        A.    The Special Revenue Fund of the      12:03:43
16   Puerto Rico Infrastructure Financing Authority, 12:03:46
17   a blended component unit, is used to account    12:03:50
18   principally for the moneys received by the      12:03:55
19   Commonwealth up to $117 million of certain      12:03:57
20   federal excise taxes levied on rum and other    12:04:01
21   articles produced in Puerto Rico and sold in    12:04:05
22   the United States which are collected by the    12:04:07
23   U.S. Treasury and returned to the Commonwealth. 12:04:18
24        Q.    Did you have any discussions with    12:04:18
25   anybody at Treasury about what this Special     12:04:20
```

**317**

```
 1   Revenue Fund is?                                12:04:25
 2        A.    No.                                  12:04:32
 3        Q.    Would you have liked to have known   12:04:36
 4   about that representation in the financial      12:04:36
 5   statements when you were having discussions     12:04:42
 6   about the Puerto Rico Infrastructure Fund?      12:04:44
 7        UNIDENTIFIED SPEAKER:  Objection.          12:04:48
 8        THE WITNESS:  I can't say whether          12:04:54
 9   it would have impacted our conversations one    12:04:54
10   way or the other.                               12:04:57
11   BY MS. MILLER:                                  12:04:57
12        Q.    Okay.  But would you have liked to   12:04:58
13   have at least known about it so you could ask?  12:05:00
14        MS. McKEEN:  Objection.                    12:05:04
15        THE WITNESS:  I can't say one way          12:05:09
16   or the other.                                   12:05:11
17        MS. MILLER:  I'd like to mark as           12:05:49
18   an exhibit tab 1107, Monolines Exhibit 22.      12:05:50
19        (Monolines Exhibit 22 is                  12:05:50
20        introduced for the record.)               12:06:40
21                                                   12:06:40
22        Q.    Okay.  Mr. Ahlberg, you have in      12:06:40
23   front of you a document that was marked         12:06:41
24   Exhibit 22.  If we go to the second page of the 12:06:43
25   exhibit, you'll see that it is the trust        12:06:46
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

25 (Pages 318 to 321)

---

**318**

```
 1  agreement related to the Puerto Rico          12:06:54
 2  Infrastructure Financing Authority to Citibank, 12:06:55
 3  N.A?                                           12:07:01
 4        Do you see that?                         12:07:01
 5     A.   I see that.                            12:07:01
 6     Q.   Is this a document that you've         12:07:03
 7  seen before?                                   12:07:05
 8     A.   I don't recall specifically           12:07:18
 9  reviewing this particular document.            12:07:19
10     Q.   Are you generally familiar with       12:07:28
11  the various accounts that were supposed to be  12:07:29
12  set up under both the Enabling Act and the     12:07:31
13  trust agreement for -- sorry -- through which  12:07:34
14  the first $117 million of rum taxes were       12:07:41
15  supposed to flow?                              12:07:44
16        MS. McKEEN:  Objection.                  12:07:47
17        THE WITNESS:  I'm not an attorney.       12:07:48
18  I'm not specific of what those -- our trust    12:07:50
19  agreement requires in terms of bank accounts or 12:07:52
20  not.                                           12:07:56
21  BY MS. MILLER:                                 12:07:56
22     Q.   I'm not asking what was required.      12:07:56
23  I am just asking do you structurally understand 12:07:58
24  the Funds or account that the first            12:08:01
25  $117 million of Puerto Rico -- sorry -- of rum 12:08:04
```

**319**

```
 1  excise taxes were supposed to flow through?    12:08:10
 2     A.   I understand how the Funds did         12:08:17
 3  flow.  I'm happy to answer any questions about 12:08:17
 4  factual information that actually did happen   12:08:24
 5  with respect to the Flow of Funds.             12:08:27
 6     Q.   Okay.  Are you familiar with a         12:08:28
 7  Fund called the Sinking Fund?                  12:08:31
 8     A.   Can you be more specific?              12:08:43
 9     Q.   Yeah, we can turn to page 34 of        12:08:45
10  the document, which is Article IV, Section 401 12:08:54
11  of the trust agreement.                        12:09:00
12        Actually, let me ask you one other       12:09:05
13  thing before we get there.  We spoke yesterday 12:09:09
14  or Tuesday and then this morning about how the 12:09:10
15  TSA or the operational account of the          12:09:12
16  Commonwealth has within it revenues from       12:09:15
17  multiple Funds, correct?                       12:09:19
18     A.   It has within it cash receipts         12:09:25
19  from revenue recorded.                         12:09:31
20     Q.   From multiple Funds, right?            12:09:32
21     A.   What?                                  12:09:37
22     Q.   Obviously had cash receipts from       12:09:42
23  revenue recorded.  My point was did it have    12:09:46
24  cash receipts from revenue recorded in multiple 12:09:48
25  different Funds?                               12:09:53
```

**320**

```
 1        MS. McKEEN:  Objection.                  12:09:55
 2        THE WITNESS:  Cash is comingled in       12:09:56
 3  the TSA account, if that's your question.      12:09:59
 4  BY MS. MILLER:                                 12:09:59
 5     Q.   No.  My question is that you can       12:10:02
 6  have General Fund money in an account and you  12:10:05
 7  can have Fund 278 money in the account and you 12:10:08
 8  can have federal fund money in the account, but 12:10:11
 9  there is cash within a single account but the  12:10:14
10  cash is coming from various different Funds,    12:10:17
11  correct?                                       12:10:24
12        MS. McKEEN:  Objection.                  12:10:24
13        THE WITNESS:  The source of the          12:10:26
14  cash that ends up in the TSA are               12:10:28
15  different -- different revenue types, different 12:10:32
16  Fund types.                                    12:10:33
17  BY MS. MILLER:                                 12:10:33
18     Q.   They're allocated on the               12:10:35
19  Commonwealth's internal accounting document to 12:10:37
20  different Funds, right?                        12:10:39
21     A.   The revenues are tagged with Fund      12:10:43
22  number identifiers when revenue is recorded.   12:10:46
23     Q.   Okay.  And a single Fund can also      12:10:53
24  have multiple bank accounts associated with it, 12:11:01
25  right?                                         12:11:05
```

**321**

```
 1        MS. McKEEN:  Objection.                  12:11:08
 2        UNIDENTIFIED SPEAKER: Objection.         12:11:11
 3        THE WITNESS:  I'm not certain what       12:11:15
 4  you mean.                                      12:11:16
 5        MS. MILLER:  I don't understand          12:11:17
 6  the objection.                                 12:11:18
 7  BY MS. MILLER:                                 12:11:19
 8     Q.   The General Fund -- does the           12:11:19
 9  General Fund have multiple bank accounts?      12:11:22
10     A.   I don't think about Funds having       12:11:26
11  bank accounts.                                 12:11:28
12     Q.   Why not?                               12:11:30
13     A.   Because Fund numbers are used to       12:11:31
14  record earned revenue and -- and don't -- don't 12:11:46
15  have anything to do with a cash balance, a     12:11:52
16  discrete cash balance in the TSA.              12:11:54
17     Q.   Okay.  Well, can the General Fund      12:11:56
18  have separate accounting accounts, not bank    12:11:59
19  accounts, but just accounts that are used for  12:12:01
20  accounting purposes, internal Commonwealth     12:12:04
21  account numbers?                               12:12:06
22        MS. McKEEN:  Object to the form.         12:12:08
23        THE WITNESS:  What do you mean by        12:12:16
24  "account numbers"?                             12:12:17
25                                                 12:12:17
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

26 (Pages 322 to 325)

---

**322**

BY MS. MILLER:

Q.    Does the Commonwealth have any internal account numbers that it uses when moneys are received?

MS. McKEEN:  Objection.

THE WITNESS:  The way you're using "account" is pretty broad.

BY MS. MILLER:

Q.    I'm asking within the Commonwealth's internal accounting, does it use account numbers to identify different moneys within a particular Fund?

MS. McKEEN:  Objection.

THE WITNESS:  Revenue account number -- revenue account number, which would then be PRIFA systems referred to as a CFRA code.  It is possible that one Fund number could be attached to a string of data.  That string of data would have a -- it could have one Fund number, you could have more than one different account number, but that's referring to the CFRA account code, the revenue account code within the PRIFA system.

BY MS. MILLER:

Q.    Okay.  And does the General Fund

---

**323**

have a balance?

A.    I don't think of a General Fund as having a balance in terms of cash.

Q.    Hmm.  What about in terms -- what about not in terms of cash?

A.    I don't think about the General Fund having balance.

Q.    Does the General Fund have a balance for accounting purposes?

A.    Not BCB, no note if they have balance for accounting purposes or not, but I don't think about Funds in terms of cash balances.

Q.    You've taken five postsecondary accounting classes.  So I understand you're not a Certified Public Accountant, but I think you can still answer my question.  And your answer was no, is that right, the General Fund does not have a balance -- it is your testimony that the General Fund does not have a balance for accounting purposes?

MS. McKEEN:  Objection.

THE WITNESS:  That's not what I said.

BY MS. MILLER:

---

**324**

Q.    What did you say?

A.    That I don't think about the General Fund as having a balance.

Q.    So how does that differ from what I said you said?

MS. McKEEN:  Objection.

BY MS. MILLER:

Q.    I'm just looking for an answer?

A.    If the court reporter wants to repeat back what is said, sure.

Q.    Okay.  I don't want the court reporter to repeat back what I said.  I'd like you to look at Section 401 on Monolines Exhibit 22.  So I understand that you said that bank accounts within Funds made no sense.  I'd like you to look at the section Funds and Accounts.

Do you see that?

MS. McKEEN:  Object.

BY MS. MILLER:

Q.    Do you see that, Article IV titled Funds and Accounts?

A.    I see Article IV where it says Funds and Accounts.

Q.    Okay.  And do you have an

---

**325**

understanding of what the difference is between a Fund and an account?

A.    It depends on the context --

Q.    Okay.  What about in this context?

A.    Without reviewing this entire section, I'm not sure I could summarize --

(Simultaneous speaking.)

A.    -- conjecture.

Q.    Okay.  So let's look at Section 401.  Section 401 is titled Banking Funds and Accounts.

Do you see that?

A.    Yes.

Q.    And it says:

A Special Fund is hereby created and designated Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bond Sinking Fund, hereinafter -- herein sometimes called the Sinking Fund, to be held by the trustee.

Do you see that?

A.    Yes.

Q.    And then it says:

There are hereby created three separate accounts in the Sinking Fund

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

27 (Pages 326 to 329)

**326**

1　designated Bond Service Account, Redemption
2　Account, and Reserve Account.
3　　　Do you see that?
4　**A.　Yes.**
5　　　Q.　So now let me ask again. Do you
6　understand that a Fund can have multiple bank
7　accounts associated with it?
8　　　MS. McKEEN: Objections.
9　　　THE WITNESS: I understand that in
10　the context of this document, that the Sinking
11　Fund that it mentions does appear to have
12　multiple accounts.
13　BY MS. MILLER:
14　　　Q.　And you had never heard of that
15　concept before, a Fund having multiple bank
16　accounts associated with it; is that right?
17　　　MS. McKEEN: Objection,
18　mischaracterizes testimony.
19　　　THE WITNESS: That's not what I
20　said.
21　BY MS. MILLER:
22　　　Q.　Okay. Have you ever encountered
23　this concept of a Fund having multiple bank
24　accounts associated with it previously?
25　**A.　No, because the nature of my work**

**327**

1　**with -- with Funds is a little different than**
2　**what they're calling a Fund in this document.**
3　　　Q.　Okay. In what way?
4　**A.　Because when I think of Funds, I**
5　**think of the Fund number identifiers within the**
6　**PRIFA system.**
7　　　Q.　Okay. That's the only time you've
8　ever encountered the concept of a Fund with
9　respect to Puerto Rico and -- with respect to
10　Puerto Rico and the instrumentalities which are
11　designated as the 30(b)(6) to testify today?
12　　　MS. McKEEN: Objection.
13　　　THE WITNESS: I don't know. What
14　was the question there?
15　BY MS. MILLER:
16　　　Q.　The question was that the Fund
17　designation within the PRIFA system is the only
18　time that you've encountered the concept of a
19　Fund with respect to Puerto Rico and the
20　instrumentalities with which you were
21　designated to teach as the 30(b)(6) to testify
22　today?
23　　　MS. McKEEN: Objection.
24　　　THE WITNESS: The concept of Funds
25　is very broad, so that's not the only context

**328**

1　in which I would have encountered the word or
2　concept of Fund.
3　BY MS. MILLER:
4　　　Q.　So what other contexts have you
5　encountered it in?
6　**A.　It's hard to say because people**
7　**use the term "Fund" very loosely.**
8　　　Q.　Okay. In preparing the Flow of
9　Funds, did you ask for any documents that
10　mapped particular bank account numbers to
11　accounts or Funds identified in the relevant
12　bond documents for the trust agreement in the
13　Enabling Act that we just looked at?
14　　　MS. McKEEN: Objection to the form
15　of the question.
16　　　THE WITNESS: Would you repeat the
17　question?
18　BY MS. MILLER:
19　　　Q.　Yes. In preparing the Flow of
20　Funds, did you ask whether there were any
21　documents that mapped particular bank account
22　numbers to accounts or Funds identified in the
23　relevant bond document within the trust
24　agreement and the Enabling Act that we just
25　looked at?

**329**

1　　　MS. McKEEN: Objection.
2　　　THE WITNESS: No.
3　BY MS. MILLER:
4　　　Q.　Why not?
5　**A.　I felt comfortable with the work**
6　**that I did to satisfy myself that the Flow of**
7　**Funds presentations that we submitted were**
8　**correct and accurate.**
9　BY MS. MILLER:
10　　　Q.　Do you know whether there are any
11　internal Commonwealth documents that map
12　specific bank accounts to the Funds and
13　accounts identified in the bond documents?
14　**A.　Is that a question?**
15　　　Q.　Yeah.
16　**A.　It didn't sound like it. Would**
17　**you repeat it in a way that sounds like a**
18　**question?**
19　　　Q.　Okay. Do you know whether there
20　are any internal Commonwealth documents that
21　map specific bank accounts to the Funds and
22　accounts identified in the bond documents?
23　**A.　I've seen no evidence of that.**
24　　　Q.　Where did you look for
25　that, or let me ask before that.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

28 (Pages 330 to 333)

---

**330**

```
 1              You didn't ask anybody for it.  So      12:22:30
 2   did you independently look for such a document?     12:22:33
 3       A.   No.                                        12:22:40
 4       Q.   What's the basis for your                  12:22:43
 5   testimony that you don't believe there is any?      12:22:45
 6       MS. McKEEN:  Objection, misstates              12:22:48
 7   testimony.                                          12:22:50
 8       THE WITNESS:  After discussions                12:22:52
 9   with Treasury and PRIFA, I saw no evidence of       12:22:58
10   that.                                               12:23:04
11   BY MS. MILLER:                                      12:23:04
12       Q.   What were the nature of those              12:23:09
13   discussions?                                        12:23:12
14       A.   The nature of those discussions            12:23:15
15   were preparation for this deposition.               12:23:23
16       Q.   Okay.  So you're assuming that if          12:23:27
17   they had a document mapping particular Funds or     12:23:32
18   accounts, they would have mentioned it in the       12:23:32
19   course of the conversations even though you         12:23:35
20   didn't ask for it?                                  12:23:37
21       MS. McKEEN:  Objection.                        12:23:39
22       THE WITNESS:  That would have                  12:23:50
23   been -- I believe I would have been aware           12:23:52
24   of -- of any evidence to the contrary.              12:23:59
25                                                       
```

**331**

```
 1   BY MS. MILLER:                                      12:23:59
 2       Q.   How would you have been aware of           12:24:03
 3   it?                                                 12:24:05
 4       A.   Again, through discussions with            12:24:05
 5   the team mentioned.                                 12:24:15
 6       Q.   Okay.  And your counsel                    12:24:17
 7   represented that the term "Puerto Rico              12:24:21
 8   Infrastructure Fund" is not understood to refer     12:24:27
 9   to a specific bank account or accounts or           12:24:27
10   accounting designations.  Are you aware of that     12:24:30
11   representation?                                      12:24:37
12       A.   Yes.                                       12:24:37
13       Q.   And do you believe it to be true?          12:24:37
14       A.   Yes.                                       12:24:44
15       Q.   How was that term understood?              12:24:54
16       A.   What term?                                 12:24:57
17       Q.   The Puerto Rico Infrastructure            12:24:58
18   Fund.                                               12:25:00
19       A.   It's understood to generally refer         12:25:07
20   to the first 117 million of rum Funds, rum          12:25:10
21   revenues.                                           12:25:25
22       Q.   Held in the TSA?                           12:25:37
23       A.   Would you mind phrasing that as a          12:25:39
24   complete question?                                  12:25:44
25       Q.   Is it understood to generally              12:25:45
```

**332**

```
 1   refer to the first $117 million of rum revenues     12:25:46
 2   in the TSA?                                         12:25:50
 3       A.   No, I think it generally refers to         12:25:59
 4   the first 117 million of rum revenues earned.       12:26:01
 5       Q.   Regardless of where they were?             12:26:04
 6       A.   I'm speaking generally about the           12:26:14
 7   concepts of the Infrastructure Fund as             12:26:16
 8   understood by relevant individuals.                 12:26:20
 9       Q.   Okay.  And so the common                   12:26:24
10   understanding of that term is that the first        12:26:26
11   $117 million of rum excise taxes are in the         12:26:31
12   Puerto Rico Infrastructure Fund?                    12:26:36
13       MS. McKEEN:  Objection.                        12:26:44
14       THE WITNESS:  No.                              12:26:44
15   BY MS. MILLER:                                      12:26:44
16       Q.   Well, tell me again how you                12:26:47
17   understand it, how that term is generally           12:26:48
18   understood within the Commonwealth?                 12:26:51
19       A.   Generally understood as the first          12:26:53
20   117 million of rum revenues in each fiscal          12:26:58
21   year.                                               12:27:07
22       Q.   Okay.                                      12:27:07
23       THE WITNESS:  How does anybody               12:27:07
24   feel about a break here, maybe breaking for         12:27:16
25   lunch?                                              12:27:18
```

**333**

```
 1       MS. McKEEN:  I think it's fine for             12:27:23
 2   us to take a break if Atara is close to a           12:27:24
 3   stopping place.                                     12:27:28
 4       MS. MILLER:  Okay.  I'm okay                    12:27:34
 5   taking a break.  Can we keep it short, like can     12:27:35
 6   we come back at 2 o'clock, 1 o'clock Central,       12:27:38
 7   does that work?  33 minutes, 32 minutes?            12:27:42
 8       MS. McKEEN:  Tim, is that okay                 12:27:47
 9   with you?                                           12:27:47
10       THE WITNESS:  Okay.                           12:27:48
11       MS. MILLER:  Okay.                              12:27:49
12       MS. McKEEN:  Fine for us, Atara.              12:27:50
13       MS. MILLER:  All right.  Great,               12:27:53
14   thank you.                                          12:27:53
15       THE VIDEOGRAPHER:  We are off the             12:27:53
16   record at 12:28 p.m.                                12:27:54
17       (Recess taken.)                                 12:27:56
18   A F T E R N O O N  S E S S I O N                    12:59:27
19       THE VIDEOGRAPHER:  We are back on             01:03:44
20   the record at 1:04 p.m.                             01:04:23
21   BY MS. MILLER:                                      01:04:23
22       Q.   Good afternoon, Mr. Ahlberg,              01:04:29
23   welcome back.                                       01:04:31
24       Do you understand moneys as being              01:04:32
25   deposited into the Infrastructure Fund?             01:04:36
```

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                April 23, 2020

29 (Pages 334 to 337)

| | 334 | |
|---|---|---|
| 1 | THE VIDEOGRAPHER: Counsel, excuse | 01:04:47 |
| 2 | me, I'm sorry. Before he answers, can we just | 01:04:50 |
| 3 | pause real slightly? I need to resize the | 01:04:53 |
| 4 | screen here and then we can reask the question. | 01:04:53 |
| 5 | I am so sorry. | 01:04:56 |
| 6 | MS. MILLER: That's okay. Okay. | 01:04:58 |
| 7 | BY MS. MILLER: | 01:04:58 |
| 8 | Q. Do you understand moneys as being | 01:05:13 |
| 9 | deposited into the Infrastructure Fund? | 01:05:21 |
| 10 | A. Yes. | 01:05:23 |
| 11 | Q. Do you understand the | 01:05:24 |
| 12 | Infrastructure Fund as being a Fund held by | 01:05:25 |
| 13 | PRIFA? | 01:05:29 |
| 14 | MS. McKEEN: Objection. | 01:05:33 |
| 15 | THE WITNESS: I don't think the | 01:05:38 |
| 16 | Infrastructure Funds as being something held by | 01:05:39 |
| 17 | anyone at all. | 01:05:57 |
| 18 | THE REPORTER: I'm sorry, | 01:05:57 |
| 19 | Mr. Witness, can you repeat your answer and | 01:05:58 |
| 20 | move your phone a little bit closer? Thanks. | 01:06:03 |
| 21 | THE WITNESS: Is this better? | 01:06:05 |
| 22 | THE REPORTER: It is. Thank you. | 01:06:08 |
| 23 | THE WITNESS: Okay. I don't | 01:06:10 |
| 24 | remember the specific answer that I just gave. | 01:06:12 |
| 25 | MS. MILLER: I think for the court | 01:06:14 |

| | 336 | |
|---|---|---|
| 1 | documented rotated? | 01:07:45 |
| 2 | MS. MILLER: Sorry. Say that | 01:07:45 |
| 3 | again, Liz. | 01:07:47 |
| 4 | MS. McKEEN: I was just asking to | 01:07:48 |
| 5 | have the document rotated, and it has been. So | 01:07:49 |
| 6 | I appreciate that. | 01:07:51 |
| 7 | THE WITNESS: Okay. Now that we | 01:08:08 |
| 8 | have the document right side up, would you | 01:08:09 |
| 9 | please repeat the question? | 01:08:12 |
| 10 | BY MS. MILLER: | 01:08:12 |
| 11 | Q. Sure. My question was just | 01:08:13 |
| 12 | whether this is a document that you've seen | 01:08:16 |
| 13 | before. | 01:08:18 |
| 14 | A. Yes. | 01:08:22 |
| 15 | Q. Is this a document that you saw in | 01:08:23 |
| 16 | connection with preparation for your testimony | 01:08:28 |
| 17 | today? | 01:08:29 |
| 18 | A. Yes. | 01:08:35 |
| 19 | Q. Is this a document that you had | 01:08:36 |
| 20 | seen before your testimony? | 01:08:37 |
| 21 | A. No. | 01:08:42 |
| 22 | UNIDENTIFIED SPEAKER: Objection. | 01:08:43 |
| 23 | BY MS. MILLER: | 01:08:43 |
| 24 | Q. So you weren't involved in | 01:08:45 |
| 25 | preparing the Flow of Funds, were you? | 01:08:49 |

| | 335 | |
|---|---|---|
| 1 | reporter the answer was: | 01:06:16 |
| 2 | I don't think about the | 01:06:18 |
| 3 | Infrastructure Fund as being held by anybody. | 01:06:21 |
| 4 | Is that correct, Mr. Ahlberg? | 01:06:21 |
| 5 | THE WITNESS: That is correct. | 01:06:24 |
| 6 | Thank you. | 01:06:25 |
| 7 | MS. MILLER: I'm going to mark a | 01:06:30 |
| 8 | document as Exhibit -- Monolines Exhibit 23, | 01:06:32 |
| 9 | tab 1510, please. | 01:06:36 |
| 10 | (Monolines Exhibit 23 is | 01:06:36 |
| 11 | introduced for the record.) | 01:06:54 |
| 12 | BY MS. MILLER: | 01:06:54 |
| 13 | Q. And while it's loading, I will | 01:06:54 |
| 14 | describe the document that you'll see on your | 01:06:57 |
| 15 | screen in a minute as Exhibit A to the | 01:07:00 |
| 16 | Supplemental Opposition of the Commonwealth of | 01:07:02 |
| 17 | Puerto Rico to Amended PRIFA Bondholder Motion | 01:07:05 |
| 18 | to Lift the Automatic Stay. And it's titled | 01:07:09 |
| 19 | Flow of Rum Taxes. Do you see that? | 01:07:14 |
| 20 | A. I see that. | 01:07:17 |
| 21 | Q. Okay. And if we could just look | 01:07:19 |
| 22 | at the next page. Is this a document that you | 01:07:22 |
| 23 | recognize? | 01:07:31 |
| 24 | A. Please allow me to rotate it. | 01:07:37 |
| 25 | MS. McKEEN: Could we have the | 01:07:42 |

| | 337 | |
|---|---|---|
| 1 | A. I was not involved in preparing | 01:08:52 |
| 2 | this document. | 01:08:53 |
| 3 | Q. Okay. And so I just want to | 01:08:57 |
| 4 | direct your attention to the bottom half of the | 01:09:01 |
| 5 | page on the right-hand side. It identifies the | 01:09:03 |
| 6 | PRIFA Infrastructure Fund. Do you see that? | 01:09:10 |
| 7 | A. Where specifically? | 01:09:20 |
| 8 | Q. There's a red box between two | 01:09:21 |
| 9 | green boxes on the right-hand side. Do you see | 01:09:23 |
| 10 | that? | 01:09:31 |
| 11 | A. Yes, I see that, thank you. | 01:09:31 |
| 12 | Q. Okay. And in the red box, the | 01:09:33 |
| 13 | Flow of Funds is indicating money flowing from | 01:09:36 |
| 14 | the TSA to the Puerto Rico Infrastructure Fund. | 01:09:38 |
| 15 | Do you see that? Do you see that, | 01:09:50 |
| 16 | Mr. Ahlberg? | 01:09:51 |
| 17 | A. I see the green box there, where | 01:09:51 |
| 18 | it says: | 01:09:53 |
| 19 | The lockbox trustee (Citibank) | 01:09:54 |
| 20 | remits up to the first $117 million of rum tax | 01:09:57 |
| 21 | remittances to the TSA where it is comingled | 01:09:58 |
| 22 | with other funds. | 01:10:01 |
| 23 | Q. Yes. So on top of that, there | 01:10:03 |
| 24 | seems to be blue writing that's identifying the | 01:10:06 |
| 25 | account, and that says TSA (held by | 01:10:09 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

30 (Pages 338 to 341)

---

338

1  Commonwealth).                                          01:10:12
2          Do you see that?                                01:10:12
3      A.    I see that.                                   01:10:12
4      Q.    Okay.  And then the flow is                   01:10:19
5  indicating that moneys are moving from the TSA          01:10:20
6  down into the PRIFA Infrastructure Fund which           01:10:21
7  is identified on this Flow of Funds as held by          01:10:27
8  PRIFA.  Do you see that?                                01:10:33
9      A.    I see the arrows that you are                 01:10:41
10 referring to.                                           01:10:43
11     Q.    Okay.  And in that red box                    01:10:47
12 describing the PRIFA Infrastructure Fund, the           01:10:49
13 Flow of Funds indicates that historically, the          01:10:53
14 Commonwealth appropriated 117 million and               01:10:57
15 deposited such moneys into the PRIFA                    01:10:59
16 Infrastructure Fund for its "corporate                  01:11:01
17 purposes" and subject to Section 8, Article IV          01:11:03
18 of the Puerto Rico Constitution.                        01:11:06
19         Do you see that?                                01:11:08
20     A.    I see where it says that on this              01:11:08
21 document.                                               01:11:11
22     Q.    Okay.  And based on all of the                01:11:11
23 work that you've done in connection with                01:11:14
24 putting together Flow of Funds documents, is            01:11:16
25 that consistent with your understanding of the          01:11:20

---

339

1  PRIFA Flow of Funds?                                    01:11:23
2          MS. McKEEN:  Object to form.                    01:11:31
3          THE WITNESS:  I don't know.  It's               01:11:32
4  not an exercise that we did to map this                 01:11:34
5  document to the Flow of Funds that I prepared.          01:11:37
6  BY MS. MILLER:                                          01:11:37
7      Q.    I'm not asking you to map, though.            01:11:42
8  I'm just asking you whether it is consistent            01:11:45
9  with your -- everything that you know and all           01:11:47
10 of the analysis that you did -- have done that          01:11:51
11 the moneys flowed from the TSA into a bank              01:11:56
12 account held by PRIFA called the Puerto Rico            01:12:01
13 Infrastructure Fund.                                    01:12:04
14     A.    Would you please repeat the                   01:12:17
15 question?                                               01:12:18
16     Q.    Is it consistent, based on all of             01:12:22
17 the work and analysis that you did putting              01:12:24
18 together the PRIFA Flow of Funds in this                01:12:27
19 matter, is it your understanding --                     01:12:29
20     A.    I don't know.  I did not analyze              01:12:39
21 this document for consistency with the Flow of          01:12:42
22 Funds documents that I prepared.                        01:12:45
23     Q.    Okay.  Is it your understanding,              01:12:46
24 based on all of the work that you've done, that         01:12:49
25 money flowed historically from the TSA account          01:12:52

---

340

1  into a PRIFA bank account called the                    01:12:56
2  Infrastructure Fund?                                    01:12:58
3      A.    No.                                           01:13:03
4          MS. MILLER:  Okay.  So now I'd                  01:13:13
5  like to mark as Monolines Exhibit 24 a letter           01:13:15
6  from counsel dated March 21, 2020, which                01:13:33
7  attaches a Flow of Funds that I believe you did         01:13:33
8  prepare for PRIFA.                                      01:13:40
9          (Monolines Exhibit 24 is                        01:13:40
10         introduced for the record.)                     01:14:22
11         MS. MILLER:  Would you go back to               01:14:22
12 the first page of the exhibit and rotate the            01:14:24
13 exhibit, please?                                        01:14:26
14 BY MS. MILLER:                                          01:14:26
15     Q.    Okay.  Do you recognize this                  01:14:28
16 document?                                               01:14:30
17     A.    Yes.                                          01:14:30
18     Q.    And did you prepare this document?           01:14:30
19     A.    Will you allow me to briefly look            01:14:38
20 through the other pages?                                01:14:45
21     Q.    Yes.  Do you have the controls               01:14:47
22 that you need?                                          01:14:49
23     A.    Yes, thank you.                               01:14:51
24         The answer to your question is                  01:14:53
25 yes.                                                    01:14:54

---

341

1      Q.    Okay.  And what documents did you             01:14:55
2  review in preparing these Flow of Funds?                01:15:00
3      A.    Generally, we reviewed bank                   01:15:07
4  statements and transfer letters or voucher             01:15:10
5  information.                                            01:15:13
6      Q.    Okay.  And I want to look at the             01:15:19
7  first slide on this, which is the rum taxes            01:15:23
8  June '14 to June 2015.  And I know yesterday --        01:15:31
9  or Tuesday, you had a discussion with                  01:15:31
10 Mr. Natbony about the various colors used in           01:15:34
11 the chart and what they mean, and I just want          01:15:37
12 to confirm with you that they have the same            01:15:39
13 meaning in the PRIFA Flow of Funds as they did         01:15:42
14 in the HTA Flow of Funds you were asked               01:15:45
15 about on Tuesday.                                       01:15:47
16     A.    Yes.                                          01:15:48
17     Q.    Okay.  And so to review, the gray            01:15:58
18 box indicates a Commonwealth account; is that          01:15:58
19 right?                                                  01:16:06
20     A.    Yes.                                          01:16:06
21     Q.    And what does the blue box                    01:16:07
22 indicate?                                               01:16:09
23     A.    In this -- in these cases, the               01:16:10
24 blue boxes would indicate that PRIFA's name           01:16:14
25 would be on the bank statements of those              01:16:19

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

31 (Pages 342 to 345)

---

342

```
 1   accounts.                                         01:16:21
 2       Q.  Okay.  And when you say PRIFA's           01:16:23
 3   name would be on it, do you mean as account       01:16:26
 4   holder?                                           01:16:28
 5       A.  Yes.                                       01:16:34
 6       Q.  Okay.  And what does the yellow           01:16:36
 7   box indicate?                                     01:16:39
 8       A.  Yellow box indicates an account          01:16:41
 9   that is not a Commonwealth or PRIFA account.       01:16:44
10       Q.  Okay.  And I know it all starts          01:16:49
11   with a curved edge with an orange box or peach     01:16:55
12   box.  I don't know what color that's supposed      01:16:58
13   to be.  What does that indicate?                   01:17:01
14       A.  That indicates the rum taxes.            01:17:06
15       Q.  And it's just the taxes                   01:17:13
16   themselves?                                        01:17:15
17       A.  Yeah, yes.                                01:17:18
18       Q.  And when generated before they            01:17:23
19   flow into a Commonwealth -- any Commonwealth or    01:17:26
20   Commonwealth instrumentality account; is that     01:17:29
21   right?                                             01:17:33
22       A.  Correct, as in when funds are            01:17:33
23   collected in bonded warehouses.                   01:17:35
24       Q.  All right.  I missed the end,             01:17:38
25   "collected in bonded warehouses"?                 01:17:40
```

---

343

```
 1       A.  I think that's the -- the term           01:17:46
 2   that's used by U.S. Treasury.  Maybe I don't      01:17:47
 3   recall that term specifically.                    01:17:51
 4       Q.  Okay.  Can you just -- it's not a         01:17:53
 5   term I'm familiar with.  Can you just tell me      01:17:55
 6   what that means?                                   01:17:58
 7       A.  Just in general, meaning that U.S.       01:18:00
 8   Treasury or U.S. Treasury collects these taxes    01:18:03
 9   at different -- at different points of             01:18:07
10   collection.                                        01:18:13
11       Q.  All right.  And then they all flow        01:18:14
12   into, at this time, January '14 to June '15,       01:18:18
13   into the 006 account; is that right?              01:18:22
14       A.  Correct.                                  01:18:26
15       Q.  Okay.  And then certain                   01:18:29
16   accounts -- of these accounts have yellow stars   01:18:31
17   on them.  And is that, as you testified on        01:18:35
18   Tuesday, to denote accounts that have comingled   01:18:41
19   funds?                                             01:18:49
20       A.  Correct.                                  01:18:49
21       Q.  And what do you mean by "comingled        01:18:50
22   funds"?                                            01:18:55
23       A.  On this specific slide, the              01:18:55
24   comingling designation would represent that       01:18:57
25   revenues besides rum taxes are received into an   01:19:05
```

---

344

```
 1   account.                                           01:19:12
 2       Q.  And what money specifically is            01:19:17
 3   this Flow of Funds tracking?                      01:19:24
 4       A.  This Flow of Funds is tracking the       01:19:26
 5   first 117 million of rum revenues in this time    01:19:32
 6   period, within this time period.                   01:19:39
 7       Q.  Okay.  I'm going to ask a basic          01:19:41
 8   question.  I hope you can help me with it.        01:19:45
 9       How were you able to determine               01:19:49
10   when the moneys flowed from the 006 account to    01:19:52
11   the GDB 1891 account if those were part of this   01:19:55
12   $117 million of rum taxes?                        01:20:05
13       A.  By reviewing either transfer            01:20:01
14   letter or voucher information that would have     01:20:14
15   indicated a source of funds for that transfer.    01:20:17
16       Q.  Can you explain to me a little bit       01:20:24
17   more what you mean?                               01:20:28
18       A.  In review of transfer letters or        01:20:31
19   vouchers that correspond with a transfer from    01:20:37
20   GDB account 0006 to GDB account 1891, there       01:20:42
21   would be an indication that the source of        01:20:48
22   revenue for that cash transfer was in fact       01:20:51
23   rum -- rum proceeds.                              01:20:57
24       Q.  So meaning if there was a letter         01:21:02
25   from Treasury saying send 35 million -- or        01:21:04
```

---

345

```
 1   $23 million from the 006 account to the 1891      01:21:09
 2   account as the first transfer of rum excise       01:21:12
 3   taxes, that was evidence to you that if you saw   01:21:15
 4   that $23 million transfer into 1891, that that    01:21:19
 5   was in fact from the rum excise taxes.  Is that   01:21:25
 6   your testimony?                                    01:21:30
 7       A.  Right.  That hypothetical                01:21:34
 8   $23 million transfer would have accompanying      01:21:34
 9   transfer letter or voucher detail that would     01:21:41
10   indicate the source of funds for that transfer   01:21:43
11   being rum revenues.                               01:21:46
12       Q.  Okay.  And are the transfer              01:21:47
13   letters and vouchers maintained as part of the   01:21:51
14   Commonwealth accounting documents?               01:21:56
15       MS. McKEEN:  Object.                          01:21:59
16       THE WITNESS:  The Commonwealth               01:22:05
17   maintains and -- maintains historical records     01:22:07
18   of vouchers or transfers, if that's what you     01:22:11
19   meant.                                            01:22:14
20   BY MS. MILLER:                                    01:22:14
21       Q.  Okay.  And can you tell me               01:22:15
22   specifically what in a voucher would identify    01:22:16
23   the source of funds?                             01:22:19
24       A.  I don't recall specifically            01:22:34
25   without looking at an individual voucher.        01:22:34
```

---

Henderson Legal Services, Inc.

Case:17-03283-LTS Doc#:13341-2 Filed:06/02/20 Entered:06/02/20 22:33:02 Desc:
Exhibit 26 Deposition Transcript of Timothy Ahlberg Page 33 of 85

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                  April 23, 2020

32 (Pages 346 to 349)

|  | 346 |
|---|---|
| 1 | Q. Okay. And so you don't recall |
| 2 | specifically any particular notation account |
| 3 | number or other designation on a transfer |
| 4 | voucher that would indicate that revenues are |
| 5 | from the first $117 million of rum excise |
| 6 | taxes; is that right? |
| 7 | MS. McKEEN: Objection. |
| 8 | BY MS. MILLER: |
| 9 | Q. Let me just ask it straight up: |
| 10 | Do you recall any specific |
| 11 | notation or account number on the transfer |
| 12 | voucher that would indicate that the revenues |
| 13 | are from the first $117 million of rum excise |
| 14 | taxes? |
| 15 | MS. McKEEN: Objection. |
| 16 | THE WITNESS: There is a -- excuse |
| 17 | me. There is a revenue code, revenue SFRA |
| 18 | account code that is used when recording the |
| 19 | revenues from rum proceeds. |
| 20 | BY MS. MILLER: |
| 21 | Q. And what is that revenue code? |
| 22 | A. I can't recall specifically off |
| 23 | the top of my head. I think it's R2220, but I |
| 24 | would be able to know it if we looked at a |
| 25 | voucher together to verify. |

|  | 348 |
|---|---|
| 1 | query, I don't think of that query as spitting |
| 2 | out the voucher, factual voucher that |
| 3 | corresponds with each of those transactions. |
| 4 | Vouchers are recorded within the system, and |
| 5 | you can go in and pull vouchers. |
| 6 | Q. Well, would it -- what would the |
| 7 | output be of that query in the PRIFA system? |
| 8 | A. You could run a report within the |
| 9 | PRIFA system that would show all revenue earned |
| 10 | during a discrete time period of your choosing |
| 11 | under any revenue account code, but specific to |
| 12 | this case for Revenue Code 4220, I believe it |
| 13 | wasn't. |
| 14 | Q. And how long would it take to run |
| 15 | such a query and get the report? |
| 16 | A. I am not certain exactly how long |
| 17 | it takes to process a query like that, but I |
| 18 | would imagine that would be something that |
| 19 | could be accomplished in a day. |
| 20 | Q. Do you know whether queries can be |
| 21 | run in the PRIFA system remotely or whether you |
| 22 | need to specifically be within the Treasury |
| 23 | offices to run them? |
| 24 | A. I'm not positive. I think there |
| 25 | are DCMs that exist for people to run queries |

|  | 347 |
|---|---|
| 1 | Q. Okay. Well, that's -- does R4220 |
| 2 | sound familiar? |
| 3 | A. It sounds familiar, but without |
| 4 | looking at the voucher to confirm, I am not |
| 5 | 100 percent positive. |
| 6 | Q. Okay. Would the voucher tell you |
| 7 | specifically that it's rum taxes, or would it |
| 8 | just have that account code on it? |
| 9 | A. It will have the -- a voucher |
| 10 | would have that account code, and the voucher |
| 11 | may or may not reference rum on the voucher |
| 12 | apart from just a revenue code. |
| 13 | Q. And would you be able to go into |
| 14 | the PRIFA system and pull all vouchers within |
| 15 | R4220 revenue there? |
| 16 | A. I'm not positive. We would have |
| 17 | to follow up on that and get back to you. |
| 18 | Q. So you don't know if the revenue |
| 19 | code is a query that you can run within the |
| 20 | system? |
| 21 | A. I know for a fact that you can run |
| 22 | a query within the PRIFA system and the |
| 23 | parameters of which Revenue Code 4220 could be |
| 24 | one of those parameters. But when I think |
| 25 | about programming that query and running that |

|  | 349 |
|---|---|
| 1 | if they're not physically there, but I would |
| 2 | have to double-check on that and let you know |
| 3 | for certain. |
| 4 | Q. Have you personally ever accessed |
| 5 | the PRIFA system and run a query on anything |
| 6 | remotely? |
| 7 | A. No. |
| 8 | Q. Okay. Do you know whether the |
| 9 | R4220 revenue code continues to attach to rum |
| 10 | taxes that are collected today? |
| 11 | A. I believe that that revenue |
| 12 | account code is still used to record rum |
| 13 | revenues that are earned. |
| 14 | Q. Okay. And this chart, which is |
| 15 | part of Monolines Exhibit 24, indicates four |
| 16 | dotted arrow lines going from the 006 account |
| 17 | to a GDB 0704 account. Do you see that? |
| 18 | A. Yes. |
| 19 | Q. Do you know what the GDB 0704 |
| 20 | account is? |
| 21 | A. An operational account at PRIFA. |
| 22 | Q. And the dotted arrow is footnoted |
| 23 | to mean that it's a discrete one-time transfer. |
| 24 | Do you see that? |
| 25 | A. I do see that. |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

33 (Pages 350 to 353)

| | 350 |
|---|---|
| 1 | Q. Is that a designation that you put |
| 2 | on that? |
| 3 | A. Yes. |
| 4 | Q. Sorry. Is that a designation that |
| 5 | you attributed to those transfers? |
| 6 | A. Yes. |
| 7 | Q. What do you mean by a discrete |
| 8 | one-time transfer? |
| 9 | A. I mean a one-time transfer. In |
| 10 | this case, there were four one-time transfers |
| 11 | for the exact same amount. |
| 12 | Q. How does that differ from the |
| 13 | transfers between, for example, the 006 account |
| 14 | and the 1891 account? |
| 15 | A. I believe there are just more |
| 16 | than -- more -- more transfers and then in |
| 17 | differing amounts. |
| 18 | Q. Do you know how many transfers of |
| 19 | rum taxes there were annually from the 006 |
| 20 | account to the 1891 account? |
| 21 | A. I don't know off the top of my |
| 22 | head how many transfers there were from 0006 to |
| 23 | 1891. |
| 24 | Q. And if there had only been four, |
| 25 | you would have designated them by dotted arrow |

| | 351 |
|---|---|
| 1 | line? |
| 2 | I'm trying to understand. Is the |
| 3 | number of transfers the only thing that is |
| 4 | different between the dotted arrow transfers |
| 5 | and the solid arrow transfer? |
| 6 | A. Okay. Would you mind repeating |
| 7 | the question, please? |
| 8 | Q. If there had been only four |
| 9 | transfers of rum taxes from the 006 account to |
| 10 | the 1891 account, would you have designated |
| 11 | them on this Flow of Funds with dotted arrows? |
| 12 | A. No. The dotted arrows and the use |
| 13 | of those four -- the four $1 million transfers |
| 14 | from GDB 0006 to 0704 was done with the reader |
| 15 | of this presentation in mind just to make |
| 16 | things as understandable as possible. |
| 17 | Q. Okay. Given that it's confusing |
| 18 | me, I'm asking for a little bit of |
| 19 | clarification. |
| 20 | So the -- I'm trying to |
| 21 | understand. Does the dotted line distinguish |
| 22 | between the nature of the transfer from box to |
| 23 | box? |
| 24 | A. The transfers from 0006 to 0704 do |
| 25 | represent discrete transfers for operational |

| | 352 |
|---|---|
| 1 | purposes of PRIFA, which is different than the |
| 2 | transfers to GDB 1891, which end up flowing to |
| 3 | a US Bank. |
| 4 | Q. And what's the difference? |
| 5 | A. Those four million dollar -- those |
| 6 | four $1 million transfers were transferred to |
| 7 | PRIFA for operational purposes. |
| 8 | Q. Okay. And is the flow from 006 to |
| 9 | 1891 not indicated by a broken arrow because |
| 10 | those transfers were subject to legislation or |
| 11 | some other obligation to transfer those moneys? |
| 12 | MS. McKEEN: Objection. |
| 13 | THE WITNESS: I did not consider |
| 14 | legislation or allegations when determining |
| 15 | whether to use a dotted line or a bold, |
| 16 | nonbold line. |
| 17 | BY MS. MILLER: |
| 18 | Q. Did you consider whether there was |
| 19 | a standing direction to transfer the money? |
| 20 | A. That would not have been something |
| 21 | I considered when determining whether to use a |
| 22 | dotted line or not. |
| 23 | Q. Okay. So what did you consider in |
| 24 | determining whether to use a dotted line or |
| 25 | not? |

| | 353 |
|---|---|
| 1 | A. As mentioned, those dotted lines |
| 2 | represent $1 million transfers to PRIFA's |
| 3 | operational account for operation purposes, |
| 4 | which is different than the transfers to |
| 5 | Account 1891, which are not used for |
| 6 | operational purposes during this time period |
| 7 | into a US Bank. |
| 8 | Q. Do the dotted lines mean used for |
| 9 | operational purposes and in light of the fact |
| 10 | they're footnoted? |
| 11 | A. The dotted lines are a discrete |
| 12 | one-time transfer, and then just for added |
| 13 | clarification, I've explained to you that those |
| 14 | represent operational transfers. |
| 15 | Q. How does a discrete one-time |
| 16 | transfer differ from the transfers from 006 to |
| 17 | 1891? |
| 18 | A. Discrete one-time transfers were |
| 19 | transferred for operational purposes to PRIFA's |
| 20 | operational account. |
| 21 | Q. Okay. I'm going to just move on |
| 22 | because I'm not getting an answer, but I still |
| 23 | don't understand it. So we may follow up with |
| 24 | a letter to get a more comprehensive answer and |
| 25 | explanation for what "discrete one-time |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

34 (Pages 354 to 357)

---

**354**

1  transfer" means.

2      Do you know whether those moneys
3  that were transferred into the 0704 account
4  were transferred out of that account?

5      A.    I do not know because once those
6  transfers are within the PRIFA operational
7  account, they are comingled and
8  indistinguishable from other sources of
9  revenue.

10      Q.    Okay.  So if you had been able to
11  distinguish and identify the $4 million from
12  the 0704 account based on transfer vouchers,
13  transfer orders or other documents, you would
14  have indicated the next step in the Flow of
15  Funds for those moneys; is that right?

16      MS. McKEEN:  Objection.

17  BY MS. MILLER:

18      Q.    Let me just ask it.

19      If you had been able to
20  distinguish and identify those $4 million on
21  the outflow side as coming from the rum tax
22  revenues, would you have shown the next step in
23  the Flow of Funds from the 0704 account?

24      A.    I'm assuming that those funds are
25  comingled into Account 0704 and that you'd be

---

**356**

1      A.    Correct.

2      Q.    Okay.  So my question is on GDB
3  0704, if you similarly had evidence like what
4  you had with respect to the transfer from 006
5  to 1891 that indicated that the next step in
6  the Flow of Funds related directly to the rum
7  tax revenues, would it have been so indicated
8  on this chart?

9      A.    Would you repeat the question
10  again?

11      Q.    Okay.  I'm just going to ask
12  another question, then move on.

13      Did you do anything -- sorry,
14  scratch that.

15      Did you look at the outflows from
16  the 0704 account to indicate whether you could
17  identify rum tax revenues as a source of the
18  revenue for any of those outflows?

19      A.    No.  It was my understanding that
20  they are comingled in Account 0704 and
21  indistinguishable from one another.

22      MS. MILLER:  Okay.  I want to
23  look -- I'm going to mark as Exhibit 25
24  tab 1202, please.

25

---

**355**

1  unable to distinguish transfers whose source of
2  revenue is these transfers in or were not -- or
3  other transfers into Account 0704.

4      Q.    Okay.  But the rum tax revenues
5  are comingled into the 006 account, right?  And
6  you just explained, I think quite well, how you
7  were able to identify and distinguish them from
8  all the other money in the 006 account as being
9  transferred into the 1891 account, right?

10      A.    Would you mind repeating that?

11      Q.    Yeah.  The rum taxes flowed into
12  the 006 account, which itself is a comingled
13  account, correct?

14      A.    Correct.

15      Q.    But you were able to distinguish
16  the rum tax revenues that flowed from the
17  comingled account into the GDB 1891 account,
18  right?

19      A.    We were able to determine that the
20  source of funds of that transfer from 0006 to
21  1891 was rum tax revenues.

22      Q.    Okay.  So the fact that the moneys
23  were in a comingled account didn't preclude you
24  from identifying, as they flowed out, what the
25  source of those revenues were, correct?

---

**357**

1      (Monolines Exhibit 25 is
2      introduced for the record.)

3  BY MS. MILLER:

4      Q.    Okay.  Mr. Ahlberg, you have in
5  front of you a document that was marked
6  Monolines Exhibit 25.  Do you see that?

7      A.    I see the document, yes.

8      Q.    Is this a document that you've
9  seen before?

10      A.    Do you have a certified
11  translation of this document?

12      Q.    I do.  Do you need an English
13  translation to tell me whether you've seen it
14  before?  You probably haven't seen the English
15  translation before.

16      MS. MILLER:  I think -- Kevin, I
17  think the English translation is 1202A, if you
18  want to load that, and maybe we can merge them
19  into a combined exhibit.

20      Does anyone have an objection if
21  we mark this as 1202A and then we merge it into
22  a combined exhibit at the end of the deposition
23  so we don't have two exhibits?

24      MS. McKEEN:  I don't have an
25  objection to that.  I think for Exhibit 25, it

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                    April 23, 2020

35 (Pages 358 to 361)

---

**358**

1    would certainly be helpful for the record if
2    that exhibit, plus the original certified
3    translation is one exhibit. I think that's how
4    we did prior deposition exhibits.
5         MS. MILLER: Okay. Perfect.
6    BY MS. MILLER:
7         Q.    Okay. So, Mr. Ahlberg, you now
8    have in front of you Exhibit 25, what's now
9    being marked as 25A, but I'm just going to
10   refer to it as Exhibit 25 because we are going
11   to merge them after the deposition, and this is
12   the certified English translation of the
13   account opening document.
14        A.    Okay. Thanks.
15        MS. MILLER: Okay. All right. My
16   team is telling me that my binder has some
17   stuff earlier, that they're already merged in
18   the system, so it's all Exhibit 25, and the
19   back pages are the certified English
20   translation. So you can go back and forth as
21   necessary.
22   BY MS. MILLER:
23        Q.    So, Mr. Ahlberg, now that you have
24   the English in front of you, can you tell me
25   whether this is a document that you've seen

---

**359**

1    before?
2         A.    I have not reviewed this specific
3    document before.
4         Q.    Okay. Have you seen other
5    documents like this before?
6         A.    I have seen other agreements for
7    opening of bank accounts.
8         Q.    Okay. Hold on a second. Hold on
9    a second. I lost it. I'll see if it comes
10   back up again.
11        Okay. So I want you just to look
12   at the document. Do you see at the top it
13   indicates -- excuse me -- it indicates the
14   agency?
15        A.    I see that under Agency it says:
16   Banco Gubernamental de Fomento para PR.
17        Q.    Okay. And do you see the name of
18   this bank account, that the purpose of the
19   account is AFI bond debt service? Do you see
20   that?
21        A.    I see that.
22        Q.    And you understand AFI to be the
23   Spanish acronym for PRIFA?
24        A.    Yes.
25        Q.    Okay. And this account -- and

---

**360**

1    then if you turn to the third page of
2    Exhibit 25. Okay. So it has the information
3    and it identifies an account number. Do you
4    see that?
5         A.    Yes.
6         Q.    And you see the account is the
7    1891 account; is that right?
8         A.    Yes.
9         Q.    And if we could just go back one
10   page, it indicates there's a depositor agency
11   listed. Do you see that?
12        A.    Yes, I see that.
13        Q.    And what deposit -- what is the
14   depositor agency?
15        A.    It says on this document that the
16   depositor agency is the Banco Gubernamental de
17   Fomento para PR.
18        Q.    Okay. And if you go to the next
19   page in the exhibit, it identifies the customer
20   name. Do you see that?
21        A.    Under Customer Name I see Banco
22   Gubernamental de Fomento para PR.
23        Q.    Okay. And then if we could just
24   look at the next -- or sorry -- two pages out,
25   the 4741, this is an e-mail chain dated -- I

---

**361**

1    guess it runs from November 18, 2009, through
2    November 20th, 2009. Do you see that?
3         A.    Yes.
4         Q.    And are you familiar with any of
5    the people who are involved in this e-mail
6    chain?
7         A.    I'm not familiar with any of the
8    individuals whose names are on this e-mail
9    chain.
10        Q.    Okay. But you see they're all
11   identified as being at the GDB?
12        A.    That's what it says here.
13        Q.    Okay. And if you look at the top
14   e-mail in the chain as the most recent -- or
15   sorry -- the second e-mail down on the page,
16   the one with the time stamp November 19, 2009,
17   at 9:10 a.m., do you see that?
18        A.    Yes.
19        Q.    And there's a question that says:
20        Hi, Arnaldo, can you please
21   provide me with the title of Mr. Rivera and
22   Mr. Garcia? I would also like to know if the
23   account is in the name of ASI or of the bank.
24        Do you see that?
25        A.    Yes, I see that.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

36 (Pages 362 to 365)

---

**362**

1   Q.   And do you see the response?                01:49:12
2   A.   Yes, I see the response.                    01:49:20
3   Q.   Okay.  And can you just read the            01:49:21
4   second line of the response?                     01:49:24
5   A.   Is it okay if I read the whole              01:49:28
6   response?                                        01:49:37
7   Q.   Yeah, you can read the whole                01:49:39
8   thing.  I just meant aloud.                      01:49:39
9   A.   Gabriel Rivera is the director of           01:49:43
10  public financing and Jesus Garcia is the         01:49:46
11  Assistant Director of Public Financing.  In the  01:49:51
12  name of the bank, But referencing the AFI Debt   01:49:53
13  Service.                                         01:49:56
14  Q.   Okay.  And just looking back at             01:49:57
15  the Flow of Funds which is Exhibit 24, from      01:49:59
16  January 2014 to January 2015 -- sorry -- to      01:50:09
17  June 2015, do you see the 1891 account on this   01:50:09
18  exhibit?                                         01:50:28
19  A.   Yes, I see the account 1891.                01:50:28
20  Q.   Okay.  And you testified                    01:50:30
21  previously that blue meant that it was in        01:50:31
22  PRIFA's name; is that right?                     01:50:34
23  A.   Yeah, I referenced that PRIFA's             01:50:40
24  name would be on the bank statement.             01:50:44
25  Q.   Okay.  And what's the basis for             01:50:46

---

**363**

1   your position that the 1891 account was held in  01:50:52
2   PRIFA's name?                                    01:50:55
3   A.   I didn't say it was held in                 01:50:55
4   PRIFA's name.  I just mentioned that PRIFA's --  01:51:01
5   PRIFA's name would be on the bank statements.    01:51:04
6   Q.   Okay.  So I think you said that,            01:51:08
7   and then I specifically asked you -- and we can  01:51:11
8   go back if you need to, but I specifically       01:51:14
9   asked if by that you meant that PRIFA was the    01:51:16
10  account holder.  Do you recall that?             01:51:20
11  A.   I do recall you asking me that              01:51:30
12  question.                                        01:51:31
13  Q.   Okay.  And you said yes.  Do you            01:51:33
14  recall giving me that answer?                    01:51:35
15  A.   Yes, I do remember giving that              01:51:35
16  answer.  I meant to answer in the context of     01:51:43
17  meaning that PRIFA's name would be on their      01:51:49
18  bank statement.                                  01:51:51
19  Q.   Well, I said:                               01:51:55
20  What does the blue box indicate?                 01:51:58
21  And you said:                                    01:52:00
22  In the case of the blue box, it                  01:52:02
23  would indicate that PRIFA's name would be on     01:52:05
24  the bank account statement of those accounts.    01:52:05
25  And I said:                                      01:52:07

---

**364**

1   Okay.  And when you said PRIFA's                 01:52:08
2   name would be on it, do you mean as an account   01:52:10
3   holder?                                          01:52:12
4   And you said:                                    01:52:13
5   Yes.                                             01:52:13
6   Do you recall me asking those                    01:52:14
7   questions and you giving those answers?          01:52:16
8   A.   Yes.                                        01:52:19
9   Q.   I'm asking you what the basis is            01:52:23
10  for your testimony that PRIFA is an account      01:52:26
11  holder of the 1891 account.                      01:52:31
12  A.   I remember answering your                   01:52:38
13  question, original question in that way, and     01:52:40
14  what I meant is that I knew that PRIFA's name     01:52:42
15  was on the bank statements.  I'm just -- I'm     01:52:44
16  not an attorney.  I'm not certain if account     01:52:49
17  holder or not holder is a legal term that has    01:52:52
18  an implication I'm not aware of.                 01:52:55
19  Q.   I'm not talking about a legal               01:52:57
20  term.  I'm just asking you whether it is a       01:52:59
21  PRIFA account or not a PRIFA account.            01:53:02
22  A.   And my answer would be that                 01:53:09
23  PRIFA's name is on the bank statement.           01:53:12
24  Q.   So you don't know if it's a PRIFA           01:53:15
25  account or not?                                  01:53:17

---

**365**

1   MS. McKEEN:  Objection.                          01:53:18
2   THE WITNESS:  I know PRIFA's name                01:53:23
3   is on the bank statement.                        01:53:24
4   MS. MILLER:  Can I ask someone                   01:53:36
5   from my team to pull up a bank statement for     01:53:39
6   the 1891 account so Mr. Ahlberg can show us      01:53:42
7   where PRIFA's name is on the account statement,  01:53:46
8   please?                                          01:53:52
9   BY MS. MILLER:                                   01:53:52
10  Q.   This might take a minute,                   01:53:55
11  Mr. Ahlberg.  I apologize.                       01:53:56
12  A.   No problem.                                 01:54:00
13  Q.   While you're waiting or while               01:54:27
14  we're waiting, based on Exhibit 25 that we just  01:54:30
15  looked at, would you agree with me that the GDB  01:54:32
16  is the account holder of the 1891 account?       01:54:35
17  A.   You asked me to confirm if GDB is           01:54:58
18  the account holder of this account?              01:55:01
19  Q.   I'm asking you whether, based on            01:55:04
20  Monolines Exhibit 25, which we could put that    01:55:08
21  one back up, you would agree with me that the    01:55:13
22  GDB is actually the account holder of the 1891   01:55:16
23  account?                                         01:55:19
24  A.   I don't know if there's a specific          01:55:30
25  way you're using "account holder."  I'm just --  01:55:32

---

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

37 (Pages 366 to 369)

366

1    not being an attorney, I'm uncertain of the          01:55:36
2    implications of that phrase "account holder."        01:55:39
3        Q.    Do you own a bank account,                 01:55:42
4    Mr. Ahlberg?                                          01:55:44
5        A.    I do have bank accounts.                    01:55:45
6        Q.    Okay. Do you understand what it             01:55:46
7    means when someone asks you if you're the            01:55:49
8    account holder of a certain account?                 01:55:55
9        A.    Generally, I would understand if           01:56:01
10   someone asked me that question.                       01:56:03
11       Q.    Okay. Do you have any joint bank            01:56:07
12   accounts?                                             01:56:14
13       A.    No.                                         01:56:14
14       Q.    How do you understand that                 01:56:19
15   generally when someone -- if someone were to         01:56:21
16   ask you that?                                         01:56:26
17           UNIDENTIFIED SPEAKER: Object to              01:56:26
18   form.                                                 01:56:26
19           THE WITNESS: If someone were to             01:56:26
20   ask me what? Would you mind repeating the            01:56:29
21   question?                                             01:56:29
22   BY MS. MILLER:                                        01:56:31
23       Q.    If someone were to ask you if you          01:56:31
24   were the account holder of a particular bank         01:56:33
25   account.                                              01:56:36

367

1        A.    In the context of my own personal         01:56:41
2    finances, I would think that would mean that         01:56:44
3    it's an account that -- that I have the ability      01:56:46
4    to withdraw funds from or deposit funds into.        01:56:51
5           THE REPORTER: I'm sorry. Excuse              01:57:11
6    me one moment. I'm sorry.                            01:57:11
7           I just wanted to ask, Ms. McKeen,            01:57:11
8    would you mind moving the phone closer to you?       01:57:15
9    You're very faint with your objections. Sorry.       01:57:15
10   Go ahead.                                            01:57:17
11          MS. McKEEN: (Indiscernible) I                01:57:17
12   haven't objected in several questions. So I'm         01:57:18
13   not sure if you heard any. That wasn't me. I         01:57:21
14   didn't hear an opposing objection. Can you           01:57:25
15   hear me now?                                          01:57:31
16          THE REPORTER: I can. Thank you.              01:57:32
17          MS. McKEEN: Thank you.                       01:57:33
18   BY MS. MILLER:                                        01:57:33
19       Q.    Is that the same understanding            01:57:44
20   that you used in determining whether or not to       01:57:46
21   designate a box blue or not?                         01:57:49
22       A.    Did not apply the same -- same            01:57:59
23   exact criteria that I just referenced in my own      01:58:04
24   personal finances to the Flow of Funds              01:58:07
25   presentation.                                         01:58:09

368

1        Q.    Okay. So what criteria did you            01:58:09
2    apply to the GDB 1891 account that resulted in       01:58:11
3    you designating it as a blue box?                    01:58:14
4        A.    In color coding as a general              01:58:25
5    association and to help the reader interpret         01:58:29
6    this presentation, but understanding that           01:58:31
7    PRIFA's name was on the bank statement, I            01:58:34
8    thought it was appropriate to make that box         01:58:38
9    blue.                                                 01:58:41
10          (Monolines Exhibit 26 is                     01:58:41
11   introduced for the record.)                          01:58:41
12   BY MS. MILLER:                                        01:58:42
13       Q.    Okay. So now we are looking at a          01:58:42
14   bank statement that's been marked Monolines          01:58:45
15   Exhibit 26, and when you say that PRIFA's name       01:58:48
16   was on the bank statement, do you mean that         01:58:51
17   PRIFA's name is indicated in the account name?       01:58:55
18       A.    PRIFA in this exact bank statement        01:59:01
19   example that we're looking at, that is correct,      01:59:08
20   that PRIFA's listed in the account name under        01:59:11
21   the Spanish acronym AFI.                             01:59:16
22       Q.    You don't see PRIFA's name                01:59:18
23   anywhere else, do you?                               01:59:20
24          Well, sorry. You don't see                   01:59:21
25   PRIFA's name as an account holder, right?            01:59:23

369

1        A.    I don't see the phrase "account           01:59:39
2    holder" listed anywhere on this page.               01:59:43
3        Q.    Okay. And you do see that the             01:59:46
4    account statements are being directed to            01:59:48
5    Mr. Gabriel Rivera, the director of public          01:59:50
6    finance at the GDB, right?                           01:59:52
7        A.    I do see that.                             02:00:04
8        Q.    Okay. And did you do anything             02:00:05
9    other than noting that PRIFA's name was             02:00:06
10   mentioned somewhere on that account statement       02:00:12
11   to identify whether or not the account was          02:00:13
12   actually a PRIFA account?                            02:00:16
13       A.    Can you repeat the question,              02:00:29
14   please?                                              02:00:31
15       Q.    Yeah. Did you do anything other           02:00:32
16   than noting that PRIFA's name was mentioned         02:00:33
17   somewhere on the account statement to identify      02:00:36
18   whether or not the account was actually a PRIFA     02:00:39
19   account?                                             02:00:41
20       A.    No, no.                                   02:00:54
21       Q.    Okay. I want to go back to                02:00:55
22   Exhibit 24, please.                                  02:00:58
23          Am I understanding this chart              02:01:16
24   correctly that between the January 2014 and        02:01:18
25   June 2015 period, the only account that had the     02:01:23

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

38 (Pages 370 to 373)

---

**370**

1  full 117 million of rum excise taxes was the
2  GDB 006 account?
3      A.    I missed the last part of your
4  question, sorry.  Could you repeat it?
5      Q.    Okay.  Am I correct that according
6  to this chart, from the January '14 to
7  June 2015 period, the only bank account that
8  held the full $117 million rum excise taxes was
9  the GDB 006 account?
10         Sorry, let me -- let me restate
11  that because I misspoke in the question.  Let
12  me ask it again.
13         Am I correct that according to
14  this chart, from January '14 to June 2015, the
15  only bank account that held the first
16  $117 million in full was the GDB 006 account?
17      A.    I can't say that there was any one
18  given time where the 117 million was
19  identifiable as a separate cash balance within
20  the operating account 0006.
21      Q.    Okay.  That's a fair point.  Let
22  me restate it.
23         Is it true that in the
24  January 2014 to June 2015 period, the only
25  account that the full first $117 million of rum

---

**371**

1  excise taxes flowed through was the GDB 006
2  account?
3      A.    Yes.
4      Q.    Thank you for that clarification.
5         Okay.  So I'd like to now mark as
6  Exhibit 26 tab 1301.
7         MS. MILLER:  Actually, Kevin,
8  before we go there, can I just -- can we mark
9  quickly tab 1203?
10         (Monolines Exhibit 27 is
11  introduced for the record.)
12  BY MS. MILLER:
13      Q.    Okay.  So we have marked as
14  Monolines Exhibit 27 -- we'll come back to
15  26 -- a document.  Is this a document that you
16  recognize?
17      A.    Yes.
18      Q.    Okay.  And what is this document?
19      A.    I would like to clarify that I
20  recognize this type of document.  I can't
21  recall specifically reviewing this exact
22  document.
23      Q.    Fair enough.
24         And what is this type of document?
25      A.    This document is a Comprobante de

---

**372**

1  Remesa for rum taxes during this time, which is
2  stamped August 2014.  This is probably fiscal
3  year 2014.
4      Q.    Okay.
5      A.    Or fiscal year 2015.
6      Q.    And are these among the documents
7  or the type of documents that you reviewed in
8  preparing the Flow of Funds that we discussed
9  earlier?
10      A.    Yes, this type of document would
11  be included in that review.
12      Q.    Okay.  And you see here there's a
13  designation Fondo, and it says 111.  Do you see
14  that?
15      A.    Yes.
16      Q.    And do you know what Fund 111 is?
17      A.    Fund 111 is one of the fund
18  numbers used to identify General Fund.
19      Q.    Okay.  And then to the left of
20  that it says Cuenta R4220.  Do you see that?
21      A.    Yes.
22      Q.    And is that the revenue account
23  within the General Fund that's used for rum
24  excise taxes that we discussed earlier?
25      A.    That's the revenue account used

---

**373**

1  within the PRIFA system to record the revenues
2  of rum taxes.
3      Q.    Okay.  Do you know whether that's
4  used to record all of the revenues of rum taxes
5  or just the first 117 million of rum taxes?
6         Let me break it out.
7         Is that revenue account number
8  used to record all of the revenues of rum
9  taxes?
10      A.    I'm not positive.  I would have to
11  double-check on that and get back to you.
12      Q.    Okay.  How would you go about
13  double-checking?
14      A.    I would just have to look at the
15  voucher maybe similar to this one that -- whose
16  amount, which, you know, ended up meaning
17  specifically your total exceeded 117 million
18  and they were still using account code 4220,
19  that would indicate to me that they were using
20  Account 4220 for rum proceed revenues, the
21  first 117, as well as the excise.
22      Q.    And if you ran the report that we
23  discussed earlier from the PRIFA system on
24  Revenue Account 4220, you would be able to tell
25  that based on the report, correct?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

39 (Pages 374 to 377)

374

| | |
|---|---|
| 1 | **A.    Correct.** |
| 2 | Q.    You didn't run that report, right? |
| 3 | **A.    No, I have not run that report.** |
| 4 | Q.    Okay.  And how long do you think |
| 5 | it would take to run that report for a single |
| 6 | fiscal year? |
| 7 | **A.    I don't know specifically how long** |
| 8 | **the system would take to process that, but I** |
| 9 | **imagine it would be accomplishable within** |
| 10 | **one day.** |
| 11 | Q.    And when you say "accomplishable |
| 12 | within one day," you just mean processing time? |
| 13 | **A.    Right.  I can't speculate on time** |
| 14 | **to quality control review data that the system** |
| 15 | **would potentially output.** |
| 16 | Q.    How long would it take to come up |
| 17 | with a query? |
| 18 | **A.    Query -- query -- I mean, I guess** |
| 19 | **I could tell you what the query is now.  You** |
| 20 | **would need time to determine what the** |
| 21 | **parameters of the query would be.** |
| 22 | Q.    Do you know whether moneys other |
| 23 | than the first 117 million of rum -- sorry, |
| 24 | strike that.  Let me start over. |
| 25 | Do you know whether rum excise |

375

| | |
|---|---|
| 1 | taxes beyond the first 117 million of rum |
| 2 | excise taxes are deposited into the General |
| 3 | Fund? |
| 4 | UNIDENTIFIED SPEAKER:  Objection. |
| 5 | THE REPORTER:  I'm sorry, did |
| 6 | somebody -- I'm sorry? |
| 7 | THE WITNESS:  (Indiscernible) |
| 8 | deposited into the General Fund. |
| 9 | BY MS. MILLER: |
| 10 | Q.    Okay.  Do you know whether the |
| 11 | R4220 account is used in connection with other |
| 12 | Funds as well? |
| 13 | Sorry, just -- just to be clear, |
| 14 | when I said Funds, I meant capital F Fund, the |
| 15 | Fund of the Special Fund other than the |
| 16 | general. |
| 17 | UNIDENTIFIED SPEAKER:  Objection. |
| 18 | THE WITNESS:  I know the first |
| 19 | 117 million would use the General Fund |
| 20 | identifier there.  We -- we did not look at |
| 21 | the, you know, the revenues outside the first |
| 22 | 117 for purposes of the Flow of Funds |
| 23 | accreditation. |
| 24 | BY MS. MILLER: |
| 25 | Q.    So you don't know whether they |

376

| | |
|---|---|
| 1 | flow into a Fund other than the General Fund? |
| 2 | UNIDENTIFIED SPEAKER:  Objection. |
| 3 | THE WITNESS:  I disagree with the |
| 4 | characterization of funds flowing into any |
| 5 | Fund. |
| 6 | BY MS. MILLER: |
| 7 | Q.    Okay.  So you disagree with the |
| 8 | funds being allocated.  All right. |
| 9 | So you don't know whether they're |
| 10 | allocated to a Fund other than the General |
| 11 | Fund? |
| 12 | **A.    The first 117 million are recorded** |
| 13 | **with the General Fund fund number.** |
| 14 | Q.    Do you know whether moneys beyond |
| 15 | the first 117 million are recorded with a Fund |
| 16 | number that is not the General Fund? |
| 17 | **A.    I don't know for certain since we** |
| 18 | **didn't look at the funds outside the 117 for** |
| 19 | **purposes of the Flow of Funds presentation.** |
| 20 | **That would certainly be something we could** |
| 21 | **follow up on and get back to you.** |
| 22 | Q.    Okay.  Do you think they might be? |
| 23 | MS. McKEEN:  Objection. |
| 24 | THE WITNESS:  I can't speculate |
| 25 | one way or the other. |

377

| | |
|---|---|
| 1 | (Monolines Exhibit 28 is |
| 2 | introduced for the record.) |
| 3 | MS. MILLER:  Okay.  I want to go |
| 4 | to Exhibit 26 now, please, Kevin. |
| 5 | BY MS. MILLER: |
| 6 | Q.    Mr. Ahlberg, did you review the |
| 7 | lockbox agreement in connection with your |
| 8 | preparation for your deposition today? |
| 9 | **A.    I did not review the lockbox** |
| 10 | **agreement in preparation for this deposition,** |
| 11 | **but I am familiar with the lockbox agreement** |
| 12 | **based on my ordinary business and work with the** |
| 13 | **Commonwealth.** |
| 14 | Q.    Okay.  And in what context have |
| 15 | you encountered the lockbox agreement in the |
| 16 | course of your ordinary work? |
| 17 | **A.    Beyond the first 117 million that** |
| 18 | **we have been discussing together, there's a rum** |
| 19 | **tax waterfall that proceeds after that, and I** |
| 20 | **have reviewed actual cash flows with -- actual** |
| 21 | **cash flows in the rum tax waterfall after the** |
| 22 | **first 117 million in my normal course of** |
| 23 | **business with the Commonwealth.** |
| 24 | Q.    And in the course of that, have |
| 25 | you looked at the actual document? |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                        April 23, 2020

40 (Pages 378 to 381)

**378**

1  A.    Somewhere along the lines in the
2  past two and a half years, I have seen the
3  actual lockbox agreement.
4  Q.    Okay.  Do you understand that
5  under the lockbox agreement -- which,
6  apologies, is being pulled off, I created
7  confusion, apparently.  We already used
8  Exhibit 26.  So this will be Exhibit 27 -- that
9  there are multiple transfers that -- let me
10  ask.
11         Here's the lockbox agreement.  Is
12  this the agreement that we were just talking
13  about?
14  A.    Yes.
15  Q.    Okay.  So the record is clear,
16  because we have now said it wrong three times,
17  Monolines Exhibit 28 is the lockbox agreement
18  dated May 5, 2015.  Who's the lockbox trustee?
19  Sorry, what does the lockbox say?
20  A.    Citibank.
21  Q.    And do you understand that under
22  this agreement Citibank has to make a number of
23  transfers to various entities, right?
24  A.    Not being an attorney, I'm not
25  certain what the lockbox agreement mandates or

**379**

1  does not mandate.
2  Q.    Okay.  Well, I thought you told me
3  that in the ordinary course of your business,
4  you have seen the lockbox agreement and
5  considered it in connection with the Flow of
6  Funds that it mandates.  No?  Did I get that
7  wrong?
8         UNIDENTIFIED SPEAKER:  Objection.
9         THE WITNESS:  I'm generally
10  familiar with the lockbox agreement, and in the
11  context in which I would have been familiar
12  with it was in monitoring cash flow activity
13  with respect to rum tax.
14  BY MS. MILLER:
15  Q.    Okay.  And so you understand that
16  the lockbox agreement outlines period cash
17  flows or the flow of various revenues, right?
18         MS. McKEEN:  Objection.
19         THE WITNESS:  I understand it's --
20  the Flow of Funds is different before and after
21  the lockbox agreement is operational.
22  BY MS. MILLER:
23  Q.    Okay.  I have not asked anything
24  about that.
25         I'm just asking you whether you

**380**

1  understand that the lockbox agreement sets
2  forth a Flow of Funds for the rum tax revenue.
3  A.    Not being an attorney, I'm not
4  positive that this lockbox agreement says that.
5  Q.    Why did you look at it in
6  connection with the Flow of Funds of the rum
7  taxes in the ordinary course of your business?
8  A.    In my ordinary course of business,
9  and understanding the historical Flow of Funds
10  for rum taxes, for us it meant understanding
11  that transfers were -- after the lockbox
12  agreements were coming directly from the
13  Citibank account as opposed to being
14  transferred directly from the U.S. Government.
15  Q.    Okay.  And is that
16  something -- when you said in the ordinary
17  course of your business, did you mean in
18  connection with preparing these Flow of Funds
19  documents?
20  A.    No.
21  Q.    Okay.  So in connection with your
22  ordinary course of business, you have to
23  understand that historical Flow of Funds
24  differed from the Flow of Funds under the
25  lockbox agreement?  Did I understand that

**381**

1  right?
2         MS. McKEEN:  Objection.
3         THE WITNESS:  From a normal course
4  of business, I understood the lockbox agreement
5  changed the Flow of Funds.
6  BY MS. MILLER:
7  Q.    Okay.  Do you understand how it
8  changed the Flow of Funds?
9  A.    Yes.  The funds are -- rum taxes
10  are -- first went to Citibank prior to transfer
11  to the TSA, as opposed to coming directly from
12  the U.S. Government.
13  Q.    And then, after the first
14  117 -- well, look at page 4 of the lockbox
15  agreement.
16         And is this specifically a page
17  that you've seen before?  And I'm going to
18  direct you to Section 5, which is the
19  Disposition of Cover Over Payments in the
20  account.  Do you see that?
21  A.    I see that fifth section there.
22  Q.    Okay.  And did you look at this
23  fifth section in the ordinary course of
24  business before preparing the PRIFA Flow of
25  Funds for this deposition?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

41 (Pages 382 to 385)

---

**382**

1    A.   I don't recall specifically    02:22:33
2  reviewing this exact section of the document.    02:22:34
3    Q.   Okay.  Do you have an    02:22:40
4  understanding of how the moneys beyond the    02:22:40
5  first 117 million flow?    02:22:43
6    A.   I have a general understanding.    02:22:52
7    Q.   Okay.  What's your general    02:22:57
8  understanding?
9    A.   My general understanding is that    02:23:01
10  after the first 117 million, that there    02:23:06
11  are -- there's a waterfall for the remaining --    02:23:12
12  remaining distribution of funds.    02:23:19
13    Q.   Okay.  And do you know who gets    02:23:21
14  the second payment in the waterfall?    02:23:22
15    A.   I can't recall off the top of my    02:23:26
16  head who gets the second payment in the    02:23:29
17  waterfall.    02:23:32
18    Q.   Well, good news.  You don't have    02:23:32
19  to recall off the top of your head.  If you    02:23:34
20  look at Section 5(b), it says "Second."    02:23:36
21    So you can just read it and then    02:23:36
22  tell me if that refreshes your recollection of    02:23:39
23  who gets the second flow in the waterfall.    02:23:42
24    A.   Counsel, could you point me to the    02:23:51
25  section of the document you're referring to?    02:23:53

---

**383**

1    Q.   Section 5(b), as in boy.    02:24:01
2  Actually -- sorry.  Yeah, that's right.    02:24:03
3  Section 5(b).    02:24:05
4    MS. McKEEN:  Atara, when you get    02:24:11
5  to a convenient stopping place, if we could    02:24:14
6  have a short break, I would appreciate it.    02:24:16
7    MS. MILLER:  Sure.  Actually,    02:24:22
8  almost done with this.  I want to go a few    02:24:24
9  minutes longer, and hopefully I can wrap this    02:24:26
10  up.    02:24:29
11    MS. McKEEN:  That's great.  Thank    02:24:29
12  you.  Just a quick one.    02:24:30
13    MS. MILLER:  Okay.    02:24:31
14  BY MS. MILLER:    02:24:38
15    Q.   Mr. Ahlberg, does Section 5(b)    02:24:38
16  refresh your recollection as to who gets the    02:24:41
17  second distribution of rum taxes after the    02:24:43
18  first 117 million?    02:24:46
19    A.   That refreshes my recollection of    02:24:53
20  what this lockbox agreement says.  I can't say    02:24:55
21  for certain that -- off the top of my head that    02:24:59
22  this is how the cash flow on activity follows.    02:25:03
23    Q.   Okay.  Who's supposed to get the    02:25:06
24  next 5 million --    02:25:09
25

---

**384**

1    MS. McKEEN:  Objection.    02:25:11
2  BY MS. MILLER:    02:25:11
3    Q.   -- under the lockbox agreement?    02:25:13
4    MS. McKEEN:  Objection.    02:25:13
5    THE WITNESS:  I believe that it    02:25:28
6  says:    02:25:28
7    Second, to the Secretary of    02:25:29
8  Treasury for deposit to the credit of the S&T    02:25:32
9  Trust, which I understand is the Science and    02:25:36
10  Technology Trust.    02:25:36
11  BY MS. MILLER:    02:25:39
12    Q.   Okay.  And what about third?    02:25:39
13    A.   The document says:    02:25:44
14    Third, to the Secretary of    02:25:46
15  Treasury, the remaining amount of Non-Rum COR    02:26:00
16  included in such Cover Over Payment.    02:26:06
17    Q.   Okay.  And then what about 4?    02:26:11
18    A.   The document says:    02:26:14
19    Fourth, to the Secretary of    02:26:14
20  Treasury, the remaining amount of other rum    02:26:22
21  Cover Over or COR included in such Cover Over    02:26:25
22  Payment.    02:26:28
23    Q.   Okay.  Do you know whether the    02:26:30
24  Commonwealth accounts for each of these buckets    02:26:32
25  of rum tax revenues differently when it    02:26:36

---

**385**

1  receives them from Citi?    02:26:39
2    A.   I'm not certain if there's    02:26:52
3  different accounting treatment for the rum    02:26:54
4  revenues in excess of the first 117 million.    02:26:59
5    Q.   Do you know if the 5 million to    02:27:03
6  the credit of the S&T Trust if -- sorry -- is    02:27:06
7  credited to the General Fund?    02:27:11
8    A.   I'm not positive off the top of my    02:27:20
9  head if that is the case.    02:27:23
10    Q.   What would you do to find out    02:27:26
11  whether the transfers in (a), (b), (c) and (d)    02:27:28
12  of Section 5 of Exhibit 28 are accounted for    02:27:34
13  differently on the internal accounting records    02:27:39
14  of the Commonwealth?    02:27:41
15    A.   Apologies, I'm just thinking here.    02:28:07
16  Would you mind repeating the question?    02:28:10
17    Q.   Yeah.  My question is:    02:28:11
18    What would you do to determine    02:28:13
19  whether the transfers in Section 5(a), (b), (c)    02:28:14
20  and (d) of Exhibit 28 are accounted for    02:28:18
21  differently on the internal accounting records    02:28:22
22  of the Commonwealth?    02:28:24
23    A.   I would -- first, I would discuss    02:28:43
24  with -- with Treasury and review the transfers    02:28:45
25  into -- review the, you know, transfers letters    02:28:53

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

42 (Pages 386 to 389)

---

### Page 386

1  or vouchers that show transfer into the TSA.                02:28:58
2      Q.    Do you know whether when Citi                     02:29:03
3  makes transfers under this lockbox agreement it             02:29:09
4  specifically identifies whether the                          02:29:10
5  transfer -- sorry -- which bucket the                        02:29:16
6  transfer -- let me start over.                               02:29:19
7          Do you know whether Citi, when it                    02:29:21
8  makes transfers under the lockbox agreement,                 02:29:23
9  specifically identifies which bucket the moneys             02:29:26
10 fall under?                                                  02:29:29
11      A.    Would you repeat that question,                  02:29:48
12 please?                                                      02:29:49
13      Q.    Yeah.  Do you know whether Citi,                 02:29:51
14 when it makes transfers under the lockbox                    02:29:53
15 agreement, specifically identifies which bucket             02:29:56
16 the moneys fall under?                                       02:29:58
17      A.    I'm not positive.  I would have to              02:30:21
18 double-check on that.                                        02:30:24
19      Q.    Okay.  Do you know what it means                02:30:26
20 for a deposit to be to the credit of the S&T                 02:30:38
21 Trust?                                                       02:30:48
22      A.    I'm not sure what is intended by                02:30:48
23 that exact phrasing there.                                   02:30:51
24      Q.    Do you know whether there is a                  02:30:54
25 Fund that corresponds to the S&T Trust?                      02:30:55

---

### Page 387

1      A.    I do not know whether there is a                 02:31:05
2  separate Fund number within the PRIFA system                 02:31:07
3  that identifies S&T Trust money.                             02:31:16
4      Q.    Would you expect the Commonwealth                02:31:18
5  to account differently for moneys deposited to               02:31:21
6  the credit of the S&T Trust from moneys                      02:31:26
7  deposited to the credit of PRIFA?                            02:31:30
8          UNIDENTIFIED SPEAKER:  Objection.                   02:31:40
9          THE WITNESS:  I mean, nothing --                    02:31:41
10 I'm not sure how S&T would account for those                 02:31:44
11 differently from one another.                                02:31:49
12 BY MS. MILLER:                                               02:31:50
13      Q.    Okay.  Do you know why the                       02:31:51
14 Commonwealth asks Citi to separately break out               02:31:52
15 amounts that were going to the Treasury for                  02:31:55
16 deposit of the credit into different entities?               02:32:02
17          MS. McKEEN:  Objection.                            02:32:08
18          THE WITNESS:  I do not know why                    02:32:09
19 Citibank does that.                                          02:32:11
20 BY MS. MILLER:                                               02:32:13
21      Q.    My question was why does the                     02:32:13
22 Commonwealth ask them to do it.                              02:32:15
23          MS. McKEEN:  Objection.                            02:32:18
24          THE WITNESS:  I don't know why the                 02:32:22
25 Commonwealth would have asked them to do that.               02:32:24

---

### Page 388

1  BY MS. MILLER:                                               02:32:28
2      Q.    Okay.  Just, for example, (a) and                02:32:28
3  (b), it would have been more simple to just                  02:32:33
4  make a single transfer to the Secretary of the              02:32:36
5  Treasury for 122 million, wouldn't it?                       02:32:39
6          MS. McKEEN:  Objection.                             02:32:41
7          THE WITNESS:  I can't say what                      02:32:50
8  would have been easier or not.                               02:32:52
9  BY MS. MILLER:                                               02:32:54
10      Q.    Is there any reason you can think               02:32:54
11 of why in a Flow of Funds the first 117 million             02:32:57
12 being transferred to the Secretary -- to the                 02:33:01
13 Secretary of the Treasury for the credit of                  02:33:05
14 PRIFA was broken out from the next $5 million               02:33:05
15 that were being transferred to the Secretary of             02:33:09
16 the Treasury for deposit to the credit of the               02:33:12
17 S&T Trust?                                                   02:33:18
18          MS. McKEEN:  Objection.                            02:33:18
19          THE WITNESS:  Would you please                     02:33:26
20 repeat the question?                                         02:33:27
21 BY MS. MILLER:                                               02:33:31
22      Q.    Is there any reason you can think               02:33:31
23 of for why in the Flow of Funds the first                    02:33:33
24 117 million being transferred to the Secretary              02:33:37
25 of Treasury for the credit of PRIFA was broken              02:33:40

---

### Page 389

1  out from the next 5 million that were being                 02:33:45
2  transferred to the Secretary of Treasury for                 02:33:48
3  deposit to the credit of the S&T Trust?                      02:33:53
4          MS. McKEEN:  Objection.                             02:33:57
5          THE WITNESS:  I can't speculate as                  02:33:59
6  to why.                                                      02:34:04
7  BY MS. MILLER:                                               02:34:11
8      Q.    Okay.  All right.  Let's -- I'm                   02:34:11
9  going to do one more quick exhibit, Liz, and                 02:34:18
10 then I'll take a break.  It shouldn't take more              02:34:22
11 than a minute.                                               02:34:24
12          MS. MILLER:  Can we mark tab 1302                  02:34:26
13 as Exhibit 29?                                               02:34:28
14          (Monolines Exhibit 29 is                           02:34:28
15          introduced for the record.)                        02:35:03
16 BY MS. MILLER:                                               02:35:03
17      Q.    Okay.  Mr. Ahlberg, is this a                    02:35:04
18 document that you've seen before or a form of               02:35:05
19 document that you've seen before?                            02:35:07
20      A.    Yes.                                              02:35:22
21      Q.    Okay.  And what is it?                           02:35:23
22      A.    It is a lockbox receipt notice.                  02:35:29
23      Q.    And can we just look at the second              02:35:35
24 page of this document?                                       02:35:37
25          Okay.  Mr. Ahlberg, does this                      02:35:41

---

Case:17-03283-LTS   Doc#:13341-2   Filed:06/02/20   Entered:06/02/20 22:33:09   Desc:
Exhibit 26 - Deposition Transcript of Timothy Ahlberg   Page 44 of 85
Exhibit 26 - Deposition Transcript of Timothy Ahlberg   Page 44 of 85

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

43 (Pages 390 to 393)

---

**390**

1  refresh your recollection about whether Citi in
2  fact breaks out into each category the amount
3  of the disbursement?
4      A.   Yes.
5      Q.   Okay.  And so Citi would transfer
6  in the first 117 million of rum excise taxes,
7  specifically identifies the recipient as the
8  Secretary of Treasury for deposit to the credit
9  of PRIFA, correct?
10         UNIDENTIFIED SPEAKER:  Note my
11 objection.
12         MS. MILLER:  What's your
13 objection?
14         UNIDENTIFIED SPEAKER:  You've used
15 the word "identifies" in the present tense, and
16 I think it's unclear as to whether you're
17 asking about this specific example or a course
18 of conduct across all Citi transfers.  That's
19 my objection.
20         MS. MILLER:  Okay.  I appreciate
21 that clarification.
22 BY MS. MILLER:
23      Q.   Mr. Ahlberg, does this refresh
24 your recollection that on August 25, 2017, Citi
25 identifies the recipient of the first

---

**391**

1  117 million as Secretary of Treasury for
2  deposit to the credit of PRIFA?
3      A.   Yes, it does refresh my
4  recollection that Citibank produces a document
5  with this information.
6      Q.   And does it still produce that
7  document today?
8      A.   I believe so.
9      Q.   And it specifically identifies the
10 recipient for the first 117 million as
11 Secretary of Treasury for deposit to the credit
12 of PRIFA, correct?
13      A.   On this document, that is correct.
14      Q.   Do you believe that's changed in
15 any subsequent documents?
16         MS. McKEEN:  Objection.
17         THE WITNESS:  Do not think so.
18 BY MS. MILLER:
19      Q.   And that's distinct from the
20 Secretary of Treasury for deposit to the credit
21 of the S&T Trust, correct?
22      A.   Different in that it is shown
23 separately on the Citibank-produced document,
24 yes.
25         MS. MILLER:  Okay.  This is a good

---

**392**

1  time for a break.
2         Liz, how long do you want to take?
3         MS. McKEEN:  10.
4         MS. MILLER:  Okay.  Great.
5         MS. McKEEN:  Thank you.
6         MS. MILLER:  Thank you.
7         THE VIDEOGRAPHER:  We are off the
8  record at 2:39 p.m.
9         (Recess taken.)
10         THE VIDEOGRAPHER:  We are back on
11 the record at 2:54 p.m.
12 BY MS. MILLER:
13      Q.   Okay.  I want to go back to
14 Exhibit 24, and I want to look at the next
15 page, which is the Flow of Funds from July 2015
16 to March 2016.  Do you see that?
17      A.   No.
18      Q.   Me neither.  There we go.
19         Now do you see it?
20      A.   Yes.
21      Q.   Okay.  And just looking at this
22 chart, based on what you've already said, you
23 were able to identify -- well, let me ask the
24 first question.
25         The first $117 million of rum

---

**393**

1  excise taxes flowed, according to this chart,
2  from this U.S. Treasury to the Citibank
3  account.  And is that the lockbox account?
4      A.   Yes.
5      Q.   Okay.  And is it your
6  understanding that that is an account of the
7  Secretary of the Treasury?
8      A.   The Citibank account?
9      Q.   The Citibank account, yeah.
10      A.   I'm not -- I'm not certain there.
11      Q.   Okay.  Well, it's denoted in dark
12 gray.  What does dark gray mean?
13      A.   In this case, it indicates that
14 it's not a Commonwealth account.
15      Q.   So your testimony, as the
16 corporate representative of the Commonwealth,
17 is that the Citibank 9028 account is not a
18 Commonwealth account?
19      A.   I'm not certain whether that's
20 called a Commonwealth account or not a
21 Commonwealth account.  The dark gray is meant
22 to distinguish it from the TSA operational
23 accounts as well as the other Commonwealth
24 account 6048.
25      Q.   Okay.  Why were you distinguishing

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

44 (Pages 394 to 397)

---

**394**

```
1    this account?                                    02:57:15
2        A.   I mean, it's a separate bank            02:57:27
3    account.  The dark gray is done to -- to help    02:57:29
4    the reader know that that account is separate    02:57:32
5    from the TSA 0006 or Account 6048.               02:57:36
6        Q.   What is Account 6048?                   02:57:44
7        A.   It's a separate account at              02:57:48
8    Treasury.                                        02:57:52
9        Q.   And what's it used for?                 02:57:54
10       A.   It's -- I believe it's an account       02:58:00
11   that's actually no longer used.                  02:58:07
12       Q.   During the period July 2015 to          02:58:10
13   March 2016, what was that account used for?      02:58:13
14       A.   In this case, it received a             02:58:17
15   transfer of -- from 0006 and a -- more than one  02:58:19
16   transfer, potentially many transfers.            02:58:29
17       Q.   Okay.  And the 6048 account is          02:58:31
18   designated as a comingled account.  Do you see   02:58:34
19   that?                                            02:58:38
20       A.   Yes.                                    02:58:38
21       Q.   What other moneys are deposited         02:58:38
22   into the 6048 account or what other              02:58:40
23   deposit -- what other moneys were deposited      02:58:45
24   into the 6048 account during the period          02:58:47
25   July 2015 to March 2016?                         02:58:51
```

**395**

```
1        A.   I can't recall off the top of my        02:58:55
2    head what other moneys were included in that     02:58:57
3    transfer or those transfers.                     02:59:00
4        Q.   Do you know whether HTA taxes were      02:59:01
5    loaded to the 6048 account?                      02:59:05
6        A.   I can't recall off the top of my        02:59:09
7    head without looking at the HTA Flow of Funds    02:59:11
8    presentation document.                           02:59:14
9        Q.   Okay.  Do you know whether CCDA         02:59:16
10   moneys were flowed into the 6048 account during  02:59:20
11   this period?                                     02:59:24
12       A.   I can't recall which moneys             02:59:30
13   besides rum taxes off the top of my head were    02:59:32
14   transferred to this account.                     02:59:37
15       Q.   Do you have an understanding of         02:59:39
16   why the money was flowed from the 006 account    02:59:40
17   into the 6048 account and then back into the     02:59:43
18   006 account?                                     02:59:47
19       A.   It's a function of internal cash        02:59:53
20   management at the time of the Department of      03:00:00
21   Treasury.                                        03:00:02
22       Q.   Okay.  Do you know whether              03:00:02
23   60 -- the 6048 account was designated a          03:00:04
24   clawback revenue account?                        03:00:10
25       A.   I'm not part of the -- the name or      03:00:11
```

**396**

```
1    colloquial name of that account.                 03:00:17
2        Q.   Does that ring a bell, that the         03:00:18
3    6048 account was used during this period to      03:00:20
4    hold clawback moneys from HTA, CCDA, and PRIFA?  03:00:25
5        A.   It certainly received transfers of      03:00:32
6    funds that either previously or ultimately were  03:00:34
7    used for those purposes.                         03:00:38
8        Q.   What purposes do you mean when you      03:00:40
9    say "those purposes"?                            03:00:43
10       A.   In this -- in this specific case,       03:00:46
11   being an accountant, the Flow of Funds during    03:00:51
12   the time in which -- that service payments were  03:00:54
13   being made.                                      03:01:03
14       THE REPORTER:  I'm sorry.  During            03:01:03
15   the time in which?                               03:01:05
16   BY MS. MILLER:                                   03:01:05
17       Q.   I didn't get any of that, so...         03:01:08
18       A.   I heard a couple people there.          03:01:15
19       Q.   I think the court reporter asked        03:01:18
20   you to finish your answer.  She didn't catch     03:01:19
21   the end of it.                                   03:01:21
22       A.   Okay, sorry.  Would you mind            03:01:25
23   repeating the question?                          03:01:27
24       Q.   I've lost track of it.                  03:01:33
25       MS. MILLER:  Madam Court Reporter,           03:01:34
```

**397**

```
1    would you mind reading back the last question?   03:01:35
2        (Record read as requested.)                 03:01:39
3        "What do you mean when you say               03:01:39
4        'those purposes'?"                           03:01:39
5        MS. MILLER:  We need to go back              03:01:39
6    one more question.                               03:01:39
7        (Record read as requested.)                 03:01:39
8        Question:  "Does that ring a                 03:01:39
9        bell, that the 6048 account                  03:01:39
10       was used during this period to               03:01:39
11       hold clawback moneys from HTA,               03:01:39
12       CCDA, and PRIFA?                             03:01:39
13       Answer:  It certainly received               03:01:39
14       transfers of funds that either               03:01:39
15       previously or ultimately were                03:01:39
16       used for those purposes.                     03:01:39
17       Question:  What purposes do                  03:01:39
18       you mean when you say "those                 03:01:39
19       purposes"?                                   03:01:39
20       THE WITNESS:  Those purposes,                03:02:55
21   meaning to receive bank flows of revenues, you   03:02:56
22   know, that could be rum tax revenues or the      03:03:03
23   other revenues that you referenced.             03:03:08
24   BY MS. MILLER:                                   03:03:08
25       Q.   Did the 6048 account receive any        03:03:12
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

45 (Pages 398 to 401)

---

**398**

1  moneys other than clawback money during this     03:03:13
2  period?     03:03:19
3      A.    I'm not certain what you're     03:03:25
4  referring to as clawback money.     03:03:26
5      Q.    Okay.  Have you ever heard the     03:03:29
6  term "clawback money"?     03:03:31
7      A.    I have heard the term "clawback     03:03:32
8  money."     03:03:35
9      Q.    And what do you understand it to     03:03:35
10 mean?     03:03:36
11     A.    Meaning funds that either were or     03:03:43
12 are retained at the Commonwealth -- by the     03:03:46
13 Commonwealth.     03:03:55
14     Q.    And when you say money, do you     03:03:55
15 specifically mean moneys that are allocated to     03:03:57
16 either PRIFA, HTA or CCDA that are currently     03:04:00
17 being retained by the Commonwealth, correct?     03:04:05
18     MS. McKEEN:  Objection.     03:04:08
19     THE WITNESS:  Well, I disagree     03:04:09
20 with the characterization that they're     03:04:11
21 allocated to those entities.     03:04:14
22 BY MS. MILLER:     03:04:14
23     Q.    Well, you don't mean all moneys     03:04:14
24 that are held by the Commonwealth, do you?  So     03:04:16
25 define what you mean, please.     03:04:18

---

**399**

1      A.    Moneys that either previously or     03:04:26
2  continue to flow for debt service.     03:04:31
3      Q.    Well, not all debt service money     03:04:35
4  went to the 6048 account, did it?  So I don't     03:04:40
5  think that's what you mean by defining clawback     03:04:44
6  money.  Can you tell me what you actually mean     03:04:46
7  when you use the term "clawback money"?     03:04:50
8      MS. McKEEN:  Objection.     03:04:53
9  BY MS. MILLER:     03:04:53
10     Q.    Mr. Ahlberg, what do you     03:04:53
11 understand the term "clawback money" to mean?     03:04:56
12     A.    I understand the term to refer to     03:05:05
13 revenues that either were or are retained by     03:05:06
14 the Commonwealth.     03:05:11
15     Q.    Any money or a specific set of     03:05:18
16 money?     03:05:19
17     A.    When I think about -- yeah,     03:05:27
18 there's specific -- yes, specific moneys.     03:05:36
19     Q.    And what specific money?     03:05:39
20     A.    I mean, again, I can't recall off     03:05:45
21 the top of my head all other, other than the     03:05:49
22 context of rum in the context of looking at     03:05:50
23 this account in the account 6048.     03:05:55
24     Q.    I'm not even asking about Account     03:05:57
25 6048 right now.  I'm just asking about your     03:05:58

---

**400**

1  understanding of what "clawback revenues"     03:06:01
2  means.     03:06:04
3      A.    My understanding of "clawback     03:06:06
4  revenues" is revenues that either were or are     03:06:09
5  retained by the Commonwealth.     03:06:13
6      Q.    Can you give me an example of     03:06:21
7  a -- okay.  So let me give you an example.     03:06:23
8      We looked previously at the     03:06:26
9  financial statements and the cash flows, and     03:06:28
10 one category of moneys was federal funds for     03:06:30
11 Medicaid.  Do you recall that?     03:06:41
12     A.    I do recall.     03:06:42
13     Q.    Okay.  And the Commonwealth     03:06:43
14 received those moneys, correct, in its TSA     03:06:44
15 account?     03:06:47
16     A.    Correct.     03:06:53
17     Q.    During the time that the     03:06:54
18 Commonwealth holds those revenues, are they     03:06:55
19 considered clawback moneys under your     03:06:59
20 definition?     03:07:02
21     A.    I would not consider those     03:07:03
22 clawback moneys.     03:07:05
23     Q.    Okay.  So can you suggest or     03:07:07
24 provide me with -- can you provide me with a     03:07:10
25 definition of clawback moneys that would     03:07:13

---

**401**

1  appropriately distinguish what you mean by     03:07:16
2  clawback moneys from, for example, the federal     03:07:19
3  funds?     03:07:24
4      MS. McKEEN:  Objection.     03:07:24
5      THE WITNESS:  Could you repeat the     03:07:44
6  question?     03:07:45
7  BY MS. MILLER:     03:07:45
8      Q.    Can you give me a definition of     03:07:56
9  clawback moneys that would appropriately     03:07:58
10 distinguish what you mean by clawback moneys     03:08:00
11 for, for example, those federal funds?     03:08:04
12     A.    Okay.  So the way I understand     03:08:12
13 the -- generally understand the definition of     03:08:15
14 "clawback revenues" as you've used it is that     03:08:19
15 this refers to moneys that either were or are     03:08:22
16 retained by the Commonwealth.  Specifically as     03:08:25
17 it relates to this deposition, I'm referring to     03:08:28
18 rum taxes or HTA allocable revenues, et cetera.     03:08:31
19     And when you say "et cetera," do     03:08:39
20 you mean CCDA or (indiscernible)?     03:08:43
21     A.    Those would be generally included     03:08:48
22 in the general term of clawback revenues as I     03:08:50
23 understand it.     03:08:53
24     Q.    Okay.  And was the 6048 account an     03:08:55
25 account that was specifically used during the     03:08:59

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

46 (Pages 402 to 405)

---

**402**

```
1    July '15 to March 2016 period to hold clawback       03:09:01
2    moneys from those particular entities?              03:09:06
3        A.   I believe so, yes.                          03:09:15
4        Q.   Do you know whether there are any          03:09:16
5    other moneys that were deposited into the 6048?     03:09:17
6        A.   I don't believe that there were,           03:09:29
7    but I can't recall off the top of my head.          03:09:31
8        Q.   Okay.  Do you know approximately           03:09:33
9    how much money was deposited into Account 6048      03:09:34
10   during this period?                                 03:09:40
11       A.   Off the top of my head, I do not,          03:09:45
12   but that's certainly something that we could        03:09:49
13   review and get back to you on.                      03:09:51
14       Q.   And how would you determine that?          03:09:53
15       A.   I would review the internal daily          03:09:55
16   cash flow that I mentioned earlier that             03:10:00
17   Treasury maintains, and in there I would look       03:10:05
18   at transfers from the TSA operational account       03:10:08
19   through this account.                               03:10:14
20       Q.   Okay.  And how were you able to            03:10:16
21   identify the money from the 006 account into        03:10:20
22   the 6048 account -- sorry.                          03:10:29
23            How were you able to identify HTA          03:10:32
24   revenues, for example, flowing from the 006         03:10:35
25   account to the 6048 account?                        03:10:39
```

**403**

```
1        A.   If the question is in the context          03:10:49
2    of HTA, would you mind putting the HTA              03:10:51
3    presentation for this time period up on the         03:10:54
4    screen?                                             03:10:56
5        Q.   I'm not going to do that.  I'm             03:11:03
6    just going to ask you about the HTA later.          03:11:05
7            I thought you just told me that             03:11:12
8    6048 was used during this time for HTA, PRIFA       03:11:13
9    and CCDA.  Didn't you just tell me that?            03:11:17
10       A.   I believe so, but to answer a              03:11:22
11   specific question about HTA, I thought it would     03:11:25
12   be helpful to have that slide in front of me.       03:11:27
13       Q.   Okay.  Well, how do you know that          03:11:33
14   the moneys were rum taxes when they flowed from     03:11:36
15   the 006 account to the 6048 account?               03:11:40
16       A.   By reviewing the transfer details         03:11:43
17   that corresponded with that transfer.              03:11:47
18       Q.   And what specifically in the              03:11:49
19   transfer details allowed you to identify the       03:11:51
20   moneys as being for the rum taxes or the           03:11:54
21   117 million for the rum taxes?                      03:12:00
22       A.   Without looking at the exact              03:12:04
23   transfer details, I can't -- I can't recall the    03:12:04
24   exact data point on those transfer details that    03:12:07
25   would have indicated who was the transferor of     03:12:11
```

**404**

```
1    rum funds.                                          03:12:15
2        Q.   Okay.  But you know that there was         03:12:15
3    something specific in the internal accounting       03:12:15
4    documents of the Commonwealth that identified      03:12:17
5    the revenues as from among the first               03:12:20
6    117 million of rum excise taxes, correct?          03:12:27
7        A.   That's correct.                            03:12:35
8        Q.   And is the same true with respect         03:12:36
9    to the transfer from the 006 account to the GO     03:12:38
10   Debt Service?                                       03:12:48
11       A.   That's correct.                            03:12:48
12       Q.   Do you know whether all of the            03:12:48
13   money in the 6048 account was transferred into     03:12:51
14   the 006 account during this period?                03:12:54
15       A.   I believe the entirety of the             03:13:03
16   balances was actually transferred over.  I         03:13:05
17   can't recall if it occurs within the parameters    03:13:08
18   of the time period suggested on the slide or       03:13:10
19   not.                                                03:13:13
20       Q.   So is the time parameter indicated        03:13:17
21   on the slide talking about the starting point      03:13:21
22   of the flow, meaning if the flow of dollars        03:13:24
23   started between July '15 to March 2016, this is    03:13:35
24   how it flowed, that some of these flows may        03:13:35
25   have occurred outside of that period?              03:13:40
```

**405**

```
1            UNIDENTIFIED SPEAKER:  Objection.          03:13:42
2        THE WITNESS:  None of the flows               03:13:43
3    presented on this page would have occurred        03:13:45
4    outside the period.                                03:13:49
5    BY MS. MILLER:                                     03:13:55
6        Q.   I thought you just told me that          03:13:55
7    some of the money from 6048 may have              03:13:57
8    transferred to 006 outside of this time period.   03:13:59
9        A.   You asked if the entire balance of       03:14:05
10   6048 was transferred to 0006.  Given the nature   03:14:11
11   that it's comingled, I just -- I can't say for    03:14:11
12   certain, looking at this particular diagram,      03:14:16
13   that every single dollar in Account 6048 was      03:14:18
14   transferred to Account 0006 in this time period   03:14:24
15   without reviewing --                               03:14:27
16       Q.   Okay.                                     03:14:27
17       A.   -- internal cash flows, as I             03:14:28
18   mentioned.                                         03:14:30
19       Q.   Okay.  And the moneys flowed from        03:14:30
20   the 006 account to GO Debt Service.  Do you see   03:14:36
21   that?                                              03:14:42
22       A.   I see that.                               03:14:42
23       Q.   Was that an actual GO Debt Service       03:14:44
24   payment out to bondholder?                        03:14:46
25       A.   I'm sorry, what was the question?        03:15:01
```

---

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

47 (Pages 406 to 409)

|  | 406 |  |
|---|---|---|
| 1 | Q.     Does that reflect an actual | 03:15:06 |
| 2 | payment of GO Debt Service to bondholder? | 03:15:08 |
| 3 | A.     Those transfers were made toward | 03:15:26 |
| 4 | the GO Debt Service.  I'm uncertain to -- to | 03:15:29 |
| 5 | the exact accounts, all of the accounts there. | 03:15:34 |
| 6 | Q.     Was it made to third parties? | 03:15:40 |
| 7 | A.     I'm not positive. | 03:15:49 |
| 8 | Q.     So you don't know if it was | 03:15:52 |
| 9 | transferred into a Commonwealth GO Debt Service | 03:15:57 |
| 10 | account but never transferred subsequently to | 03:16:02 |
| 11 | third parties? | 03:16:04 |
| 12 | A.     I can't recall off the top of my | 03:16:09 |
| 13 | head, but I think we provided documents of that | 03:16:11 |
| 14 | transfer. | 03:16:14 |
| 15 | Q.     And what kind of documents do you | 03:16:18 |
| 16 | believe you provided reflecting that transfer | 03:16:24 |
| 17 | or those transfers? | 03:16:24 |
| 18 | A.     I believe we provided transfer -- | 03:16:28 |
| 19 | transfer details showing the transfer out of | 03:16:30 |
| 20 | GDB Account 0006 for GO Debt Service. | 03:16:32 |
| 21 | Q.     And you can't recall whether it | 03:16:35 |
| 22 | was to another internal Commonwealth account or | 03:16:37 |
| 23 | to a third party? | 03:16:40 |
| 24 | A.     I can't recall. | 03:16:47 |
| 25 | Q.     Okay.  Do you know approximately | 03:16:48 |

|  | 407 |  |
|---|---|---|
| 1 | how much money was transferred from the 006 | 03:16:50 |
| 2 | account to GO Debt Service during this time | 03:16:54 |
| 3 | period? | 03:16:57 |
| 4 | A.     I can't recall exactly how much | 03:17:01 |
| 5 | that transfer was or those transfers were given | 03:17:02 |
| 6 | the transfer that's comingled with other | 03:17:07 |
| 7 | retained revenues. | 03:17:10 |
| 8 | Q.     Okay.  Do you know whether there | 03:17:12 |
| 9 | were any other moneys remaining in the 006 | 03:17:18 |
| 10 | account when that transfer was made? | 03:17:21 |
| 11 | A.     Being the operational account of | 03:17:33 |
| 12 | the Commonwealth and TSA, there would | 03:17:39 |
| 13 | definitely be a balance in that account even | 03:17:41 |
| 14 | after it transferred. | 03:17:45 |
| 15 | Q.     Okay.  And the 006 account, does | 03:17:48 |
| 16 | that refer to a single bank account within the | 03:17:50 |
| 17 | TSA? | 03:17:53 |
| 18 | A.     Yes. | 03:17:58 |
| 19 | Q.     Okay.  And are there other bank | 03:17:59 |
| 20 | accounts within the TSA? | 03:18:01 |
| 21 | A.     Yes. | 03:18:02 |
| 22 | Q.     Do you know whether the other bank | 03:18:04 |
| 23 | accounts in the TSA had any money at the time | 03:18:05 |
| 24 | that the transfers of these retained revenues | 03:18:09 |
| 25 | were made, as reflected in this July '15 to | 03:18:12 |

|  | 408 |  |
|---|---|---|
| 1 | March '16 period, were made from the 006 | 03:18:17 |
| 2 | account, the GO Debt Service account? | 03:18:20 |
| 3 | A.     Without seeing a single account | 03:18:26 |
| 4 | during this time period, I believe that the | 03:18:31 |
| 5 | other TSA account would have had balances | 03:18:33 |
| 6 | during this time period. | 03:18:35 |
| 7 | Q.     Okay.  I'm going to ask you the | 03:18:36 |
| 8 | same question I asked you previously with | 03:18:46 |
| 9 | respect to the prior Flow of Funds. | 03:18:47 |
| 10 | Just looking at this document for | 03:18:49 |
| 11 | the period July '15 to March 2016, it's | 03:18:54 |
| 12 | correct, is it not, that the only account | 03:18:59 |
| 13 | through which the full 117 million of the first | 03:19:01 |
| 14 | rum excise tax revenue flow are the Citibank | 03:19:07 |
| 15 | 9028 account and the GDB 006 account, correct? | 03:19:11 |
| 16 | MS. McKEEN:  Object to form. | 03:19:16 |
| 17 | THE WITNESS:  The first | 03:19:24 |
| 18 | 117 million would be received into the Citibank | 03:19:28 |
| 19 | lockbox as well as transferred into GDB Account | 03:19:30 |
| 20 | 0006. | 03:19:35 |
| 21 | BY MS. MILLER: | 03:19:35 |
| 22 | Q.     Okay.  And then no other account | 03:19:38 |
| 23 | reflected on this chart -- sorry. | 03:19:40 |
| 24 | The full first 117 million of rum | 03:19:46 |
| 25 | excise taxes do not flow through any other | 03:19:49 |

|  | 409 |  |
|---|---|---|
| 1 | account reflected on this Flow of Funds, | 03:19:51 |
| 2 | correct? | 03:20:00 |
| 3 | A.     There's no other transfer of | 03:20:00 |
| 4 | 117 million or -- on this -- on this Flow of | 03:20:04 |
| 5 | Funds. | 03:20:12 |
| 6 | Q.     Okay.  So that's a yes, right? | 03:20:12 |
| 7 | MS. McKEEN:  Objection. | 03:20:15 |
| 8 | THE WITNESS:  The first | 03:20:18 |
| 9 | 117 million flows to the Citibank account, and | 03:20:22 |
| 10 | then that 117 million will flow to the GDB | 03:20:26 |
| 11 | account 0006. | 03:20:29 |
| 12 | It is true then that a total of | 03:20:34 |
| 13 | 117 million would not flow from GDB Account | 03:20:37 |
| 14 | 0006 to 6048 with respect to rum taxes. | 03:20:39 |
| 15 | BY MS. MILLER: | 03:20:39 |
| 16 | Q.     Okay.  I just want to look quickly | 03:20:45 |
| 17 | at the last page in the Flow of Funds, and this | 03:20:52 |
| 18 | reflects the Flow of Funds from April of 2016 | 03:20:58 |
| 19 | to the present.  Do you see that? | 03:21:03 |
| 20 | A.     Yes. | 03:21:07 |
| 21 | Q.     Okay.  And here there's a change | 03:21:07 |
| 22 | in the Flow of Funds where the moneys go from | 03:21:15 |
| 23 | the U.S. Treasury to the Commonwealth, | 03:21:21 |
| 24 | correct?  And then they go into the Banco | 03:21:26 |
| 25 | Popular 9458 account.  Do you see that? | 03:21:31 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

48 (Pages 410 to 413)

### Page 410

1 A. Yes, I see that. 03:21:37
2 Q. Okay. During the April 2016 to 03:21:38
3 the present time period, that has replaced the 03:21:40
4 GDB 006 account as the main operational account 03:21:42
5 of the Commonwealth, correct? 03:21:46
6 A. Correct. 03:21:52
7 Q. Okay. And then we see -- a 03:21:52
8 million dollars transferring to the PRIFA 03:21:55
9 BPPR 2882 account. Do you see that? 03:21:59
10 A. Yes. 03:22:05
11 Q. And has that account replaced the 03:22:05
12 GDB 0704 account as the primary PRIFA operating 03:22:08
13 account? 03:22:14
14 A. Would you mind giving me control 03:22:16
15 of the document, please? 03:22:18
16 Q. Sure. 03:22:20
17 A. Thank you. 03:22:39
18 That's correct. 03:22:44
19 Q. Okay. And the Flow of Funds 03:22:51
20 stopped here with the Banco Popular 9045 03:22:54
21 account and the Banco Popular 2882 account; is 03:23:02
22 that right? 03:23:02
23 A. Correct. 03:23:12
24 Q. Are there any outflows of rum 03:23:12
25 excise taxes out of the BPPR 9458 account? 03:23:14

### Page 411

1 A. Besides the $1 million discrete 03:23:31
2 transfer, as documented on this presentation, 03:23:34
3 there would have been no transfers out of the 03:23:47
4 TSA operational account for which revenue 03:23:49
5 source was rum tax revenues. 03:23:54
6 Q. Is that because the rum tax 03:24:00
7 revenues don't fit in the operational account? 03:24:02
8 A. It's not possible to know that. 03:24:21
9 Q. And why not? 03:24:24
10 A. Because the TSA is a collection of 03:24:25
11 bank accounts that transfer between one 03:24:35
12 another. 03:24:37
13 Q. Okay. So you think the rum excise 03:24:41
14 taxes are sitting somewhere in the TSA but not 03:24:44
15 necessarily in the 9458 account. Is that what 03:24:44
16 you're saying? 03:24:48
17 UNIDENTIFIED SPEAKER: Objection. 03:24:52
18 THE WITNESS: Once the cash is 03:24:55
19 in -- once the proceeds from rum revenue is 03:24:57
20 deposited to the TSA, those dollars -- that 03:25:02
21 cash is indistinguishable from other dollars 03:25:05
22 and cash within the TSA account. 03:25:07
23 BY MS. MILLER: 03:25:07
24 Q. Okay. I know that. But on the 03:25:10
25 previous chart, we saw the rum tax revenues 03:25:11

### Page 412

1 being deposited in the 006 account, which is 03:25:15
2 the equivalent account to the current BPPR 9458 03:25:18
3 account, right? And we were able to identify 03:25:22
4 outflows as a revenue source of rum excise 03:25:28
5 taxes. Do you recall doing that exercise on 03:25:30
6 the prior two terms? 03:25:33
7 A. Yes. 03:25:35
8 Q. Okay. So my question is: 03:25:36
9 Why could you not do that exercise 03:25:39
10 for the April '16 to present period? 03:25:42
11 A. Maybe I'm not understanding the 03:25:52
12 exercise that you're referring to. Could you 03:25:58
13 please repeat that? 03:26:00
14 Q. I'm going to ask a different 03:26:01
15 question. 03:26:02
16 Is it your understanding that the 03:26:02
17 rum excise taxes collected between April 2016 03:26:04
18 and the present still remain in the TSA? 03:26:08
19 MS. McKEEN: Objection. 03:26:17
20 THE WITNESS: It's true that 03:26:19
21 revenue earned from rum taxes from April 2016 03:26:22
22 to present were transferred into the TSA 03:26:24
23 account. 03:26:28
24 BY MS. MILLER: 03:26:29
25 Q. Have you seen any evidence of an 03:26:29

### Page 413

1 outflow from the TSA of rum tax revenue? 03:26:31
2 A. Besides the $1 million discrete 03:26:42
3 transfer noted on the slide, I've seen no 03:26:46
4 transfers out of the TSA. The fund source, 03:26:51
5 revenue source was rum tax revenues. 03:26:54
6 Q. Okay. And in the prior period 03:26:55
7 that we looked at, so the entire period from 03:26:57
8 January 2014 to March 2016, you were able to 03:27:01
9 identify outflows of rum tax revenues from the 03:27:07
10 General Fund, correct? 03:27:11
11 Sorry. Let me restate that. 03:27:13
12 For the period January 2014 03:27:17
13 through March 2016, when rum taxes flowed out 03:27:21
14 of the Commonwealth's main operational account, 03:27:25
15 you were able to identify that, correct? 03:27:27
16 A. No. We were able to identify 03:27:32
17 transfers from the operational account whose 03:27:34
18 fund source was rum tax revenue. 03:27:39
19 Q. Okay. So for the period 03:27:46
20 January 2014 through March 2016, you were able 03:27:49
21 to identify transfers from the operational 03:27:52
22 account whose fund source was rum tax revenue; 03:27:54
23 is that correct? 03:27:54
24 A. That is correct. 03:28:04
25 Q. Okay. And you were not able to 03:28:04

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

49 (Pages 414 to 417)

**414**

1    identify any outflow with the fund source of          03:28:09
2    rum tax revenues during the period April 2016         03:28:12
3    to the present; is that correct?                      03:28:16
4        A.    It's not that we were unable to.            03:28:29
5    It's that we did not identify anything as such.       03:28:33
6        Q.    Okay. So to the best of your                03:28:29
7    knowledge, there were no outflows from the TSA        03:28:45
8    with a revenue source of rum excise taxes,            03:28:51
9    correct?                                              03:28:51
10           UNIDENTIFIED SPEAKER: Objection.             03:28:58
11   BY MS. MILLER:                                        03:28:58
12       Q.    Sorry. During this period, from             03:28:58
13   April -- let me just restate it so we have a          03:29:00
14   clean question.                                       03:29:02
15           To the best of your knowledge,               03:29:03
16   there were no outflows from April 2016 to the         03:29:05
17   present from the TSA with a revenue source of         03:29:09
18   the rum excise taxes, correct?                        03:29:14
19       A.    With the exception of the                   03:29:22
20   $1 million listed on this presentation               03:29:23
21   document, that is correct.                            03:29:26
22       Q.    Thank you.                                  03:29:31
23           I'm going to switch to talking               03:29:31
24   about CCDA.                                           03:29:46
25           Now, I mentioned it earlier,                 03:29:48

**415**

1    Mr. Ahlberg. Do you have an understanding that        03:29:50
2    when I say "CCDA" -- do you have an                    03:29:53
3    understanding of what I mean when I say "CCDA"?       03:29:55
4        A.    Would you please clarify for me?            03:30:03
5        Q.    Sure. I think it's the Convention           03:30:06
6    Center Development Authority.                          03:30:11
7        A.    Oh, okay.                                    03:30:15
8        Q.    And when I say "Tourism Company,"           03:30:15
9    do you know what I mean?                               03:30:19
10       A.    Yes.                                         03:30:21
11       Q.    Okay. Do you have any -- have you            03:30:21
12   had any involvement in -- sorry. Let me               03:30:24
13   restate it.                                            03:30:31
14           So when I say "CCDA," I mean the              03:30:32
15   Convention Center District Authority. Do you          03:30:35
16   understand that?                                       03:30:37
17       A.    Yes.                                         03:30:38
18       Q.    When I say -- sorry, not when I              03:30:38
19   say.                                                   03:30:43
20           Have you had any involvement with            03:30:43
21   CCDA in your -- the ordinary course of your          03:30:45
22   work for AAFAF?                                        03:30:49
23       A.    No.                                          03:30:53
24       Q.    What about the Tourism Company?             03:30:54
25       A.    Yes.                                         03:30:59

**416**

1        Q.    Okay. And what work did                     03:30:59
2    you -- have you done with respect to the              03:31:03
3    Tourism Company?                                       03:31:05
4        A.    Generally cash flow reporting and           03:31:11
5    cash flow workout scenes.                              03:31:15
6        Q.    How long have you been doing work           03:31:31
7    related to the Tourism Company?                        03:31:31
8        A.    It's hard to say specifically.              03:31:40
9           My work with the Commonwealth                  03:31:41
10   overlaps with various instrumentalities since I      03:31:43
11   began work at the Commonwealth.                        03:31:46
12       Q.    Did you similarly put together the          03:32:04
13   Flow of Funds for CCDA?                                03:32:10
14       A.    For tourism? Yes.                            03:32:17
15       Q.    Okay. And who at CCDA did you               03:32:20
16   work with?                                             03:32:22
17           UNIDENTIFIED SPEAKER: Objection.             03:32:27
18   BY MS. MILLER:                                        03:32:27
19       Q.    All right. Who, if anybody, did             03:32:30
20   you speak to at CCDA?                                  03:32:33
21       A.    We worked with individuals                  03:32:35
22   employed by the Tourism Company.                       03:32:37
23       Q.    And why did you speak with people           03:32:43
24   employed by the Tourism Company rather than          03:32:44
25   CCDA?                                                  03:32:47

**417**

1        A.    Because putting together the Flow           03:32:50
2    of Funds, the Tourism Company individuals and        03:32:53
3    management team were the ones with the               03:32:57
4    requisite knowledge to help develop an accurate     03:32:59
5    Flow of Funds.                                        03:33:03
6        Q.    Did you speak to anybody at                 03:33:04
7    Treasury about putting together a CCDA Flow of       03:33:05
8    Funds?                                                 03:33:12
9        A.    I spoke with Treasury about                 03:33:12
10   putting together a Flow of Funds for the             03:33:17
11   Tourism Company.                                       03:33:19
12       Q.    And who did you speak to at                 03:33:19
13   Treasury?                                              03:33:22
14       A.    Off the top of my head, I can              03:33:26
15   recall Jeira Belén and Hector Gomez.                  03:33:28
16       Q.    And what did they tell you -- or            03:33:34
17   what did you talk to them about specifically         03:33:35
18   with respect to the Tourism Flow of Funds?           03:33:39
19       A.    I think it depends on the                   03:33:46
20   conversation, that generally our conversations      03:33:47
21   were focused on aligning with the accuracy as       03:33:49
22   presented in the Flow of Funds presentation.        03:33:53
23       Q.    What do you mean by "aligning with         03:34:01
24   the accuracy as presented in the Flow of Funds      03:34:03
25   presentation"? I don't understand that.             03:34:06

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

50 (Pages 418 to 421)

---

**418**

1    A.    I just mean collective review and
2    collaboration that the Flow of Funds
3    presentation is correct.
4    Q.    Did Treasury have any specific
5    information about the revenue stream or the
6    flow of the revenue?
7    A.    I can't recall specifically if I
8    obtained revenue information from Treasury.
9    MS. MILLER:  Okay.  Okay.  So I'd
10   like to mark as the next exhibit tab 2001,
11   please.
12          (Monolines Exhibit 30 is
13          introduced for the record.)
14   BY MS. MILLER:
15   Q.    Mr. Ahlberg, in connection with
16   preparing the Flow of Funds, did you review the
17   assignment and coordination agreement between
18   the Tourism Company and the GDB?
19   A.    I personally did not review that
20   specific document.
21   Q.    Are you aware if such a document
22   exists?
23   A.    I have heard others refer to that
24   document.
25   Q.    Okay.  And in what context have

---

**419**

1    you heard others refer to the document?
2    A.    I can't recall specifically.  I
3    just know in general, I'm familiar with -- with
4    the term or the name of the document.
5    Q.    So you've heard of it, you
6    just don't remember specifically where.
7    A.    Correct.
8    Q.    Okay.  So you have in front of you
9    a document that's been marked as Monolines
10   Exhibit 30.  It is the Assignment and
11   Coordination Agreement between -- by and
12   between the Tourism Company and the GDB.  Do
13   you see that?
14   A.    I see that.
15   Q.    Okay.  And I'd like you to look
16   specifically at Section 1, which is right there
17   on the first page, and it says:
18          The Tourism Company hereby creates
19   a Special Fund called the Assignment and
20   Coordination Agreement ("Holding Fund"),
21   ("Holding Fund").  All hotel occupancy tax
22   revenues will be deposited, as collected, into
23   the Holding Fund.
24          Have you ever heard of the Holding
25   Fund?

---

**420**

1    A.    I'm not aware of a specific
2    Holding Fund.
3    Q.    Have you ever heard that term used
4    in connection with CCDA or the Tourism Company?
5    A.    I may have heard the term, but I
6    am not generally familiar with it.
7    Q.    Do you know whether there's an
8    accounting designation in the Commonwealth or
9    Tourism Company account that correspond to a
10   Holding Fund?
11   A.    I'm not positive about an
12   accounting designation of a specific Holding
13   Fund.
14   Q.    Okay.  Are you thinking of a
15   different accounting designation that relates
16   to hotel occupancy taxes?
17   A.    I'm not certain, just not being
18   familiar with the Holding Fund terminology.
19   Q.    And my question was:
20          Are you aware of any accounting
21   designations that relate to the hotel occupancy
22   taxes?
23   A.    I'm not certain of accounting
24   designations.
25   Q.    And here it says that the moneys

---

**421**

1    will be deposited as collected into the Holding
2    Fund.  Do you see that?
3    A.    I do see that.
4    Q.    And what does that mean to you?
5    A.    It means that all hotel occupancy
6    tax revenues will be deposited as collected
7    into the Holding Fund.
8    Q.    And what does it mean to be
9    deposited into a Fund?
10   A.    Generally it -- I mean, it depends
11   on how they're using the word "Fund" here, but,
12   generally, it would mean cash deposits into
13   whatever this concept of -- of Fund definitions
14   are used.
15   Q.    Does that make sense to you?
16   A.    Does what make sense to me?
17   Q.    The idea of a cash deposit into a
18   Fund.
19   A.    It makes sense that there would be
20   cash deposits into a bank account.
21   Q.    What about into the Fund?
22   A.    I don't know.  It depends on
23   what's meant by "Fund."
24   Q.    Okay.  Well, what do you think is
25   meant by "Fund" here?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

51 (Pages 422 to 425)

---

**422**

1    UNIDENTIFIED SPEAKER: Objection.  03:39:44
2  BY MS. MILLER:  03:39:46
3    Q.   Do you have an understanding of  03:39:46
4  how the Commonwealth uses the word "Fund"?  03:39:48
5    UNIDENTIFIED SPEAKER: Objection.  03:39:52
6    THE WITNESS: The Commonwealth  03:39:53
7  uses the word "Fund" in various ways, and often  03:39:54
8  very loosely, and the way that I think about  03:39:57
9  Fund is about Funds numbered specifically  03:40:00
10  within the PRIFA system.  03:40:02
11  BY MS. MILLER:  03:40:02
12    Q.   Okay. Section 2 says that:  03:40:08
13    The holding Fund shall contain two  03:40:10
14  accounts identified as the Transfer Account and  03:40:13
15  the Surplus Account. Do you see that?  03:40:16
16    A.   I see that.  03:40:18
17    Q.   Have you ever heard of the  03:40:19
18  transfer account before?  03:40:21
19    A.   Yes.  03:40:26
20    Q.   And have you ever heard of the  03:40:26
21  surplus account before?  03:40:28
22    A.   Yes.  03:40:30
23    Q.   Okay. Do you have an  03:40:30
24  understanding of what revenues are assumed to  03:40:32
25  be deposited into the transfer account?  03:40:36

**423**

1    A.   Yes.  03:40:40
2    Q.   Okay. And what moneys are those?  03:40:40
3    A.   In general, all hotel occupancy  03:40:46
4  taxes would eventually be transferred to the  03:40:52
5  transfer account.  03:40:52
6    Q.   Okay. Your testimony -- sorry, I  03:41:11
7  forgot to ask.  03:41:15
8    Are you also testifying as the  03:41:16
9  corporate representative for the Tourism  03:41:20
10  Company today?  03:41:22
11    A.   Yes.  03:41:22
12    Q.   And you've also been designated as  03:41:22
13  the corporate representative for CCDA; is that  03:41:25
14  correct?  03:41:28
15    A.   No.  03:41:28
16    Q.   Okay. You're not the corporate  03:41:30
17  representative for CCDA?  03:41:32
18    A.   No.  03:41:35
19    MS. MILLER: Okay. We don't get a  03:41:37
20  corporate representative for CCDA, Liz?  03:41:38
21    MS. McKEEN: You haven't noticed  03:41:43
22  one.  03:41:45
23    MS. MILLER: Okay.  03:41:47
24  BY MS. MILLER:  03:41:47
25    Q.   Okay. So is the Tourism's  03:41:50

**424**

1  testimony that all hotel occupancy taxes have  03:41:51
2  to flow through the transfer account is that  03:41:56
3  what I just heard you say?  03:41:59
4    A.   It is not my testimony that all  03:42:06
5  hotel occupancy taxes have to flow through the  03:42:07
6  transfer account. It is my testimony that in  03:42:11
7  practice, in fact, depending on the time period  03:42:18
8  in question, that all -- all hotel occupancy  03:42:20
9  taxes would pass through the transfer account.  03:42:22
10  BY MS. MILLER:  03:42:24
11    Q.   Okay. So when I asked you if you  03:42:28
12  have an understanding of what revenues are  03:42:31
13  required to be deposited into the transfer  03:42:33
14  account, you weren't answering that question,  03:42:35
15  you were answering a different question when  03:42:36
16  you said all hotel occupancy taxes would  03:42:39
17  eventually be transferred to the transfer  03:42:42
18  account? So it's just a statement not  03:42:45
19  responsive to my question?  03:42:47
20    UNIDENTIFIED SPEAKER: Objection.  03:42:49
21    THE WITNESS: I think I lost the  03:42:57
22  factual question that you're actually asking.  03:42:59
23  Would you mind --  03:43:01
24  BY MS. MILLER:  03:43:01
25    Q.   Okay. Let me just ask -- let me  03:43:02

**425**

1  just ask you my same question again.  03:43:04
2    Do you have an understanding of  03:43:06
3  what revenues are required to be deposited into  03:43:08
4  the transfer account?  03:43:10
5    A.   I'm not an attorney. I don't know  03:43:17
6  what revenues are required to be transferred  03:43:19
7  into that account, but I can tell you,  03:43:23
8  depending on the time period, what revenues did  03:43:24
9  or did not pass through that account.  03:43:26
10    Q.   Okay. So are lawyers the only  03:43:28
11  people who have to take into account and  03:43:30
12  consider what moneys have to flow into what  03:43:33
13  account?  03:43:35
14    UNIDENTIFIED SPEAKER: Objection.  03:43:40
15    THE WITNESS: I don't know. But  03:43:52
16  there -- attorneys would certainly provide the  03:43:55
17  context for whether there was a requirement or  03:43:59
18  not a requirement to do so based on the law.  03:44:00
19  BY MS. MILLER:  03:44:00
20    Q.   Okay. Well, what about  03:44:06
21  accountants, do they look at documents like  03:44:07
22  this to determine Flow of Funds and any  03:44:09
23  conditions or restrictions related to various  03:44:11
24  moneys?  03:44:15
25    A.   I can't speculate on what general  03:44:20

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

52 (Pages 426 to 429)

---

426

accountants might view or not view.                                    03:44:23

Q.    Okay.  Well, in any of your                                      03:44:26
five-plus accounting courses that you took in                          03:44:32
college, did any of them consider the need in                          03:44:32
reviewing accounting materials to consider                             03:44:34
legal, contractual or other restrictions or                            03:44:38
requirements associated with various funds?                            03:44:42
        UNIDENTIFIED SPEAKER:  Objection.                               03:44:48
        THE WITNESS:  I can't recall if                                03:44:51
there's a specific section like that in one of                         03:44:52
the classes I took in college.                                         03:44:54
BY MS. MILLER:                                                         03:44:54
Q.    I'm not asking for a specific                                    03:44:58
section.  I'm just asking if that concept ever                         03:45:01
came up.                                                               03:45:04
        MS. McKEEN:  Objection.                                        03:45:04
        THE WITNESS:  I can't recall if                                03:45:12
that context specifically came up in class or                          03:45:13
not.                                                                   03:45:13
BY MS. MILLER:                                                         03:45:15
Q.    Would operational people within                                  03:45:15
Treasury have to know what moneys are required                         03:45:17
to flow into what account?                                             03:45:18
        MS. McKEEN:  Objection.                                        03:45:27
        THE WITNESS:  People at Treasury                               03:45:31

---

427

would be knowledgeable about different bank                            03:45:32
accounts and transfer between bank accounts.                           03:45:36
BY MS. MILLER:                                                         03:45:36
Q.    And the basis for those transfers,                               03:45:42
correct?                                                               03:45:50
A.    Potentially.  I can't say whether                                03:45:50
one person at Treasury does or does not know                           03:45:52
the basis for executing their operational job                          03:45:56
functions.                                                             03:46:00
Q.    Okay.  But they need to know what                                03:46:03
the requirements are in order to execute and                           03:46:03
direct money to appropriate people, right?                             03:46:06
        There are operational people in                                03:46:09
whatever the relevant entity is, whether it's                          03:46:11
the Commonwealth or whether it's Tourism                               03:46:15
Company, correct?                                                      03:46:15
A.    Certainly there are people who                                   03:46:21
review that information to know how to execute                         03:46:23
transfers.                                                             03:46:27
Q.    Okay.  And among those people are                                03:46:28
the people who you've referred to multiple                             03:46:29
times both today and on Tuesday as "we,"                               03:46:32
referring to the Treasury, correct?                                    03:46:36
A.    Correct.                                                         03:46:42

---

428

        UNIDENTIFIED SPEAKER:  Objection.                              03:46:43
BY MS. MILLER:                                                         03:46:43
Q.    Okay.  So I'm asking you not as a                                03:46:44
lawyer but from an operational perspective, do                         03:46:46
you have an understanding of what moneys under                         03:46:49
the assignment and coordination agreement are                          03:46:51
supposed to flow through the transfer account?                         03:46:53
        MS. McKEEN:  Objection.                                        03:46:58
        THE WITNESS:  I'm not certain what                             03:47:06
this document would require or not require, but                        03:47:08
I can't tell you or answer questions about in                          03:47:12
practice and actuality what happened and where                        03:47:15
funds would flow.                                                     03:47:17
BY MS. MILLER:                                                         03:47:17
Q.    Well, so let me ask you about that                               03:47:18
in practice and then reality.                                          03:47:20
        Have you seen any documents that                               03:47:23
specifically identify any bank account that                            03:47:24
you've included on your Flow of Funds as the                           03:47:28
transfer account?                                                     03:47:30
A.    Yes.                                                             03:47:33
Q.    Okay.  What document?                                            03:47:34
A.    I believe I misunderstood your                                   03:47:44
question and answered -- answered a question                           03:47:47
that you did not ask.                                                 03:47:51

---

429

Q.    Okay.  So let me ask my question                                 03:47:52
again.                                                                 03:47:55
        Have you seen any document in all                              03:47:55
of the work that you've done in putting                                03:48:01
together the Tourism Company Flow of Funds that                        03:48:03
specifically identifies any bank account                               03:48:07
reflected on your Flow of Funds as the transfer                        03:48:11
account?                                                               03:48:16
A.    I can't recall personally                                        03:48:19
reviewing a document that identified a specific                        03:48:23
account as the transfer account, but through                           03:48:23
the collaborative process and work with                                03:48:28
Treasury and the team that was pulling                                 03:48:31
documents for discovery, I'm confident that I                          03:48:36
can identify the transfer account on the Flow                          03:48:41
of Funds presentation.                                                03:48:44
Q.    Okay.  I'd like to know if you or                                03:48:46
anybody you've worked with has either seen or                          03:48:49
told you that there exists a document that                             03:48:53
identifies a particular bank account as the                            03:48:57
transfer account.                                                     03:49:03
A.    I can't recall a specific document                               03:49:06
that somebody referenced, but I do know which                          03:49:11
account is referred to as the transfer account.                       03:49:13
Q.    Okay.  I don't want to know your                                 03:49:16

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                        April 23, 2020

53 (Pages 430 to 433)

---

**430**

1   guesswork about what you've decided is the          03:49:18
2   transfer account.  I want to know if there's        03:49:21
3   any evidence that whatever account you're going     03:49:22
4   to tell me is the transfer account is actually      03:49:26
5   the transfer account.                               03:49:29
6          MS. McKEEN:  Objection,                       03:49:30
7   argumentative.                                      03:49:31
8          THE WITNESS:  I can't tell you a              03:49:41
9   specific document that I've personally reviewed     03:49:42
10  but that through our team's process and work,        03:49:44
11  I'm confident that I can identify the transfer       03:49:48
12  account in the Flow of Funds.                        03:49:50
13  BY MS. MILLER:                                       03:49:51
14      Q.    Okay.  So I've looked through the          03:49:52
15  documents that you've produced, and I can tell       03:49:53
16  you that there is not a single document that         03:49:55
17  identifies any account on your Flow of Funds as      03:49:57
18  the transfer account.                               03:50:01
19          Do you have any reason to believe           03:50:04
20  that that is not in fact the case?                   03:50:06
21          MS. McKEEN:  Objection.                      03:50:13
22  BY MS. MILLER:                                       03:50:13
23      Q.    So, actually, now I am asking you          03:50:14
24  about what I know.                                  03:50:16
25          So I'm going to make the                     03:50:17

---

**431**

1   representation that I've reviewed it, and there      03:50:18
2   are no documents that were produced that            03:50:19
3   identify any account as the transfer account.       03:50:20
4          So my question to you is:                     03:50:25
5          Do you believe that there is a               03:50:29
6   document to the contrary that specifically           03:50:30
7   identifies a bank account as the transfer            03:50:32
8   account?                                            03:50:35
9          MS. McKEEN:  Objection.                       03:50:36
10  BY MS. MILLER:                                       03:50:36
11      Q.    Not that you can think of off the         03:50:38
12  top of your head, not that you've personally        03:50:41
13  seen that exists in the universe.                    03:50:43
14          As the corporate representative of          03:50:45
15  the Tourism Company and of the Commonwealth, is     03:50:48
16  there a document that exists that identifies a       03:50:51
17  specific bank account as the transfer account?       03:50:54
18          MS. McKEEN:  Objection.                      03:50:58
19          THE WITNESS:  I have not seen an             03:51:03
20  individual document that identifies the account     03:51:05
21  as the transfer account, but did enough work in     03:51:07
22  collaboration with the team to satisfy myself       03:51:10
23  that I can accurately identify a transfer           03:51:13
24  account, bank account on the Flow of Funds           03:51:17
25  presentation.                                       03:51:19

---

**432**

1          MS. MILLER:  Okay.  I'm going to              03:51:21
2   move to strike as nonresponsive.                     03:51:23
3   BY MS. MILLER:                                       03:51:23
4      Q.    Has anyone on your team told you           03:51:26
5   that they have seen a document that identifies      03:51:35
6   a bank account as the transfer account?              03:51:35
7      A.    I don't recall a specific                   03:51:41
8   conversation where somebody specifically            03:51:42
9   referenced a bank account as the reason that        03:51:44
10  they knew that that was the transfer account.        03:51:45
11      Q.    When you say "a bank account," do         03:51:50
12  you mean a document?                                03:51:52
13      A.    I meant bank statement.  Thank            03:51:57
14  you.                                                03:51:59
15      Q.    Do you expect that if there was           03:51:59
16  such a document, it would have been produced?       03:52:01
17      A.    I can't speculate one way or the          03:52:05
18  other.                                              03:52:10
19          MS. MILLER:  Okay.  Well, I'm               03:52:10
20  going to call for the production of any such        03:52:11
21  documents that the Commonwealth intends to rely     03:52:12
22  on as evidence that the account that you're         03:52:15
23  going to tell me is the transfer account is in      03:52:18
24  fact the transfer account.                          03:52:21
25                                                      

---

**433**

1   BY MS. MILLER:                                       03:52:21
2      Q.    Okay.  Looking at Section 4, which         03:52:22
3   is on the next page of Monolines Exhibit 30,        03:52:32
4   this document provides what it seems like you       03:52:32
5   already know, which is that:                         03:52:37
6          All hotel occupancy tax funds                03:52:37
7   received by the Tourism Company shall be            03:52:41
8   deposited into the transfer account until (i)       03:52:42
9   1/10 of the required payment has been met and       03:52:44
10  (ii) any deficiencies in prior payment periods      03:52:48
11  have been met, but in aggregate such amounts        03:52:52
12  shall not exceed the total amount of Required       03:52:54
13  Payment needed in any Fiscal Year.                   03:52:56
14          Thereafter, and only when the               03:52:59
15  Transfer Account contains all moneys necessary     03:53:01
16  to pay the Bonds in accordance with the GDB         03:53:01
17  Certificate, the Tourism Company shall deposit     03:53:07
18  any excess funds into the surplus account.          03:53:09
19          Do you see that?                             03:53:11
20      A.    Yes.                                       03:53:14
21      Q.    All right.  So you have an                 03:53:14
22  understanding that under this agreement,            03:53:17
23  moneys -- the only moneys that are supposed to     03:53:19
24  flow into the transfer account are those that      03:53:22
25  are pledged to the bondholder, correct?             03:53:29

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

54 (Pages 434 to 437)

---

**434**

1    MS. McKEEN:  Objection.                          03:53:33
2    THE WITNESS:  I think you                        03:53:52
3 paraphrased this paragraph, and I'm not            03:53:54
4 positive whether I agree or disagree with that     03:53:56
5 paraphrasing.                                       03:53:59
6 BY MS. MILLER:                                      03:53:59
7    Q.    Okay.  Well, I'll let you                  03:54:00
8 paraphrase it.                                      03:54:03
9        What's your understanding, based            03:54:03
10 on the paragraph we just looked at, of what        03:54:05
11 moneys are supposed to flow into the transfer      03:54:07
12 account?                                           03:54:09
13    MS. McKEEN:  Objection.                         03:54:10
14    THE WITNESS:  I'm happy to reread              03:54:15
15 the paragraph and sentences that you just read.    03:54:17
16 BY MS. MILLER:                                     03:54:17
17    Q.    Yeah.  Take as long as you need.          03:54:25
18    **A.    Okay.  Thank you.**                     03:54:36
19        **Would you now repeat your**               03:54:40
20 **question, please?**                              03:54:41
21    MS. MILLER:  Could the court                    03:55:15
22 reporter read it back, please?                     03:55:15
23        (Record read as requested.)                 03:55:18
24    THE WITNESS:  The document says                 03:55:18
25 that:                                              03:55:20

---

**435**

1        All Hotel Occupancy Tax Funds                03:55:20
2 shall be deposited into the transfer account        03:55:20
3 until 1/10 of the required payments are met.        03:55:28
4 BY MS. MILLER:                                      03:55:28
5    Q.    And any deficiencies, correct?             03:55:28
6    **A.    Correct, that's what the document**      03:55:30
7 **says.**                                           03:55:32
8    Q.    Okay.  And do you have an                  03:55:36
9 understanding of what required payments are?        03:55:37
10    **A.    I have an understanding generally**     03:55:37
11 **of the term "required payments."**               03:55:46
12    Q.    Okay.  What's your understanding?         03:55:47
13    **A.    I understand the term "required**       03:55:47
14 **payments" to mean payments that are required.**  03:55:52
15    Q.    Okay.  So let's go back one page          03:55:52
16 to Section 3, which defines the term "required     03:55:59
17 payment" as:                                       03:56:03
18        The amount necessary for the                03:56:03
19 Authority to make, during the upcoming fiscal      03:56:15
20 year and the first day of the second succeeding    03:56:15
21 fiscal -- succeeding fiscal year, (a), payments    03:56:21
22 equal to the amount necessary for the full and     03:56:21
23 timely payment or amortization of the principal    03:56:24
24 and interest on the bonds due on July 1 and        03:56:27
25 January 1.                                         03:56:31

---

**436**

1        And then it keeps going.                     03:56:31
2        So you can take a look at that and           03:56:33
3 then tell me if you have an understanding of        03:56:35
4 what required payments are.                         03:56:36
5    **A.    Yeah, I have an understanding of**       03:56:47
6 **what required payments are as they're defined**   03:56:50
7 **within this document.**                           03:56:50
8    Q.    Okay.  And so you have an                  03:56:51
9 understanding that only the -- on a monthly         03:56:55
10 basis only 1/10 of the required payments are        03:56:58
11 supposed to be put into the transfer account       03:57:01
12 plus any deficiency, and thereafter any excess     03:57:06
13 moneys are supposed to flow to the surplus         03:57:10
14 account, correct?                                  03:57:12
15    UNIDENTIFIED SPEAKER:  Objection.              03:57:17
16    THE WITNESS:  That's what this                 03:57:19
17 agreement says.                                     03:57:19
18 BY MS. MILLER:                                     03:57:19
19    Q.    Did you ever have any discussions         03:57:25
20 with anybody either at the Tourism Company or      03:57:26
21 Treasury about how the moneys are supposed to      03:57:29
22 flow under this agreement?                          03:57:31
23    **A.    I mean, we certainly talked to the**    03:57:45
24 **Tourism Company about Flow of Funds.**           03:57:47
25    Q.    My question was specifically to          03:57:59

---

**437**

1 how the moneys were supposed to flow under this     03:58:01
2 agreement, specifically as between the transfer     03:58:04
3 account and the surplus account.                    03:58:07
4    **A.    My focus was on documenting the**        03:58:16
5 **actual Flow of Funds and how it actually**        03:58:19
6 **happened.**                                       03:58:22
7    Q.    And is this how the moneys                 03:58:24
8 actually flowed?                                    03:58:24
9    UNIDENTIFIED SPEAKER:  Objection.              03:58:35
10    THE WITNESS:  I have not done the              03:58:37
11 exercise to cross-reference every adjusted flow    03:58:42
12 from this document to the actual fund.             03:58:46
13 BY MS. MILLER:                                     03:58:48
14    Q.    Mr. Ahlberg, that's not what I'm          03:58:48
15 asking.                                            03:58:50
16        You've spent many weeks putting             03:58:50
17 together Flow of Funds documents, and I'm          03:58:52
18 asking you whether for the CCDA Flow of Funds      03:58:55
19 at any point in time the money flowed such that    03:58:59
20 the required payment -- 1/10 of the required       03:59:04
21 payment went into the transfer account on a        03:59:08
22 monthly basis, any deficiency, and the            03:59:11
23 remainder went into the surplus account.           03:59:19
24        You told me that you're confident           03:59:24
25 you can tell me which is the transfer account      03:59:27

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

55 (Pages 438 to 441)

### 438

| | | |
|---|---|---|
| 1 | and which is the surplus account. So now I'm | 03:59:29 |
| 2 | asking you did the money ever flow consistent | 03:59:31 |
| 3 | with the flow that we just looked at in | 03:59:34 |
| 4 | Monolines Exhibit 30? | 03:59:35 |
| 5 | UNIDENTIFIED SPEAKER: Same | 03:59:39 |
| 6 | objection. | 03:59:40 |
| 7 | THE WITNESS: I can't say whether | 03:59:42 |
| 8 | or not the Flow of Funds is consistent with how | 03:59:43 |
| 9 | the suggested Flow of Funds should be. I can | 03:59:45 |
| 10 | say that the Flow of Funds' presentation | 03:59:48 |
| 11 | document, the Flow of Funds they haven't. | 03:59:50 |
| 12 | BY MS. MILLER: | 03:59:50 |
| 13 | Q. Okay. And how did, based on your | 03:59:53 |
| 14 | recollection, and we'll look at them shortly, | 03:59:57 |
| 15 | what was the first step of the flow after being | 04:00:01 |
| 16 | received by the Commonwealth? | 04:00:05 |
| 17 | MS. McKEEN: Objection, vague as | 04:00:08 |
| 18 | to time. | 04:00:09 |
| 19 | BY MS. MILLER: | 04:00:09 |
| 20 | Q. At any time. | 04:00:13 |
| 21 | MS. McKEEN: Specify a time you'd | 04:00:15 |
| 22 | like. Objection. | 04:00:20 |
| 23 | THE WITNESS: I think you | 04:00:24 |
| 24 | characterized flows to the Commonwealth when I | 04:00:25 |
| 25 | think of hotel occupancy taxes flowing to the | 04:00:31 |

### 440

| | | |
|---|---|---|
| 1 | Q. Yeah, we are pulling it up, but | 04:01:37 |
| 2 | I'm just asking you generally, while it's | 04:01:39 |
| 3 | happening, whether you've ever seen the pledge | 04:01:42 |
| 4 | agreement related to this before. | 04:01:46 |
| 5 | **A. I don't recall specifically** | 04:01:48 |
| 6 | **looking at this agreement previously.** | 04:01:48 |
| 7 | Q. Okay. Are you familiar with any | 04:01:55 |
| 8 | accounts that are referred to in the Tourism | 04:01:56 |
| 9 | Company flow as the pledge account? | 04:01:59 |
| 10 | **A. Yes.** | 04:02:01 |
| 11 | Q. Okay. What's your understanding | 04:02:04 |
| 12 | of what the pledge account is? | 04:02:04 |
| 13 | **A. In the Flow of Funds, the pledge** | 04:02:10 |
| 14 | **account is the account that receives an** | 04:02:13 |
| 15 | **approximately $3 million transfer every month.** | 04:02:16 |
| 16 | **During the certain period it is -- it is** | 04:02:20 |
| 17 | **ultimately passed on.** | 04:02:23 |
| 18 | Q. Okay. Okay. And I just want to | 04:02:27 |
| 19 | look at -- okay. | 04:02:41 |
| 20 | And I just want to look at | 04:03:33 |
| 21 | Section 3(b) of the account -- of the pledge | 04:03:35 |
| 22 | agreement, so Section 3, which you went one | 04:03:39 |
| 23 | page too far, if you could go back. Thank you. | 04:03:50 |
| 24 | Section 3 provides that: | 04:03:54 |
| 25 | The GDB hereby agrees that, so | 04:03:55 |

### 439

| | | |
|---|---|---|
| 1 | Tourism Company. | 04:00:34 |
| 2 | BY MS. MILLER: | 04:00:34 |
| 3 | Q. Right. And that's a good point. | 04:00:36 |
| 4 | The hotel occupancy taxes never | 04:00:38 |
| 5 | actually flowed to the Commonwealth other than | 04:00:40 |
| 6 | during that clawback period where the | 04:00:42 |
| 7 | Commonwealth takes them back, right? | 04:00:45 |
| 8 | **A. Without having the Flow of Funds** | 04:00:50 |
| 9 | **presentation in front of me, I believe that's** | 04:00:52 |
| 10 | **correct.** | 04:01:01 |
| 11 | MS. MILLER: Okay. I'd like to | 04:01:01 |
| 12 | mark tab, document 102, as the next exhibit, | 04:01:03 |
| 13 | please. | 04:01:11 |
| 14 | And Exhibit 31, Monolines | 04:01:11 |
| 15 | Exhibit 31 is going to be the Pledge Assignment | 04:01:15 |
| 16 | Agreement by and among the Puerto Rico | 04:01:19 |
| 17 | Convention Center District Authority, the | 04:01:20 |
| 18 | Government Development Bank and JPMorgan Chase. | 04:01:20 |
| 19 | (Monolines Exhibit 31 is | 04:01:23 |
| 20 | introduced for the record.) | 04:01:29 |
| 21 | BY MS. MILLER: | 04:01:29 |
| 22 | Q. Is this the document or have you | 04:01:30 |
| 23 | seen such an assignment agreement before? | 04:01:31 |
| 24 | **A. Are you pulling the document up** | 04:01:34 |
| 25 | **right now?** | 04:01:36 |

### 441

| | | |
|---|---|---|
| 1 | long as there are any Bonds Outstanding under | 04:03:57 |
| 2 | the Trust Agreement, to deposit or cause to be | 04:04:00 |
| 3 | deposited into the Pledge Account, all Hotel | 04:04:03 |
| 4 | Occupancy Taxes received from the Tourism | 04:04:06 |
| 5 | Company as received but in no event...than | 04:04:09 |
| 6 | 12:00 noon, New York time, on the next Business | 04:04:12 |
| 7 | Day immediately following the Business Day on | 04:04:13 |
| 8 | which such Hotel Occupancy Tax Funds are | 04:04:15 |
| 9 | received by GDB," right? | 04:04:17 |
| 10 | And then (b) says: | 04:04:19 |
| 11 | Amounts deposited in the Pledge | 04:04:21 |
| 12 | Account are to be held by GDB to provide for | 04:04:23 |
| 13 | the following receipts (in order of priority). | 04:04:26 |
| 14 | Do you see that? | 04:04:29 |
| 15 | MS. McKEEN: Objection. It | 04:04:29 |
| 16 | doesn't say "receipt." It says "deposit." | 04:04:30 |
| 17 | MS. MILLER: Oh, sorry. Thank | 04:04:32 |
| 18 | you, but let me correct that. | 04:04:34 |
| 19 | BY MS. MILLER: | 04:04:34 |
| 20 | Q. 3(b) says: | 04:04:37 |
| 21 | Amounts deposited in the Pledge | 04:04:38 |
| 22 | Account are to be held by GDB to provide for | 04:04:40 |
| 23 | the following deposits (in order of priority). | 04:04:43 |
| 24 | Do you see that? | 04:04:45 |
| 25 | **A. Yes, I see that.** | 04:04:46 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

56 (Pages 442 to 445)

---

442

1     Q.   Okay.  And subsection 1 says:
2     GDB will make payments to the
3  Commonwealth of Puerto Rico as set forth in
4  Section 2(b) above when required in accordance
5  with Section 8 of Article VI of the
6  Constitution of the Commonwealth of
7  Puerto Rico.
8     Do you see that?
9     A.   Yes, I see that.
10     Q.   Okay.  And is it your
11  understanding that that is supposed to be a --
12  sorry.
13     Do you have an understanding of
14  what account that it's supposed to be
15  transferred from?
16     MS. McKEEN:  Objection.
17     THE WITNESS:  It's not clear to me
18  from the document section that we read.
19  BY MS. MILLER:
20     Q.   Okay.  Okay.  And then number 2 is
21  that the:
22     GDB shall on each calendar month
23  no later than 12:00 noon, on the third Business
24  Day immediately following the Business Day on
25  which the Hotel Occupancy Tax Funds are

---

443

1  received by it, transfer or caused to be
2  transferred to the Trustee all Hotel Occupancy
3  Tax Funds then deposited to the pledge account.
4     Do you see that?
5     A.   I see that.
6     Q.   Okay.  So you said it wasn't clear
7  to you when I asked you where the transfer to
8  the Commonwealth with respect to what was
9  colloquially referred to as "the clawback" were
10  made from, but if you look at Section 3(b), it
11  specifically says:
12     Amounts deposited in the Pledge
13  Account are to be held by the GDB pro-
14  -- sorry -- are to be held by GDB to provide
15  for the following deposits (in order of
16  priority).
17     So does that tell you that the
18  transfer of the money from the GDB to the
19  Commonwealth on account of any, quote,
20  "clawback" is supposed to come from the pledge
21  account?
22     MS. McKEEN:  Objection.
23     THE WITNESS:  I do understand that
24  that's what this document says.
25

---

444

1  BY MS. MILLER:
2     Q.   Okay.  All I want.  Okay.  Okay.
3     And then do you understand that
4  under Section 3(b)(2) moneys get transferred to
5  the trustee, correct?
6     MS. McKEEN:  Objection.  Are you
7  asking --
8     (Simultaneous speaking.)
9  BY MS. MILLER:
10     Q.   Are to be transferred to the
11  trustee?
12     MS. McKEEN:  Objection.
13     THE WITNESS:  Would you please
14  repeat the question?
15  BY MS. MILLER:
16     Q.   Yeah.  Do you have an
17  understanding that under Section 3(b)(2) the
18  GDB is then supposed to transfer the moneys
19  from the pledge account to the trust account,
20  right?
21     MS. McKEEN:  Objection.
22     THE WITNESS:  That is what
23  Section 3(b)(2) says.
24  BY MS. MILLER:
25     Q.   Okay.  And do you know who the

---

445

1  trustee is on the Fund?
2     A.   I can't recall off the top of my
3  head.
4     MS. MILLER:  I'd like to look at
5  the CCDA Flow of Funds.
6     So, Karen, if you could pull up
7  tab 2135 as Exhibit 32.
8     (Monolines Exhibit 32 is
9  introduced for the record.)
10  BY MS. MILLER:
11     Q.   Mr. Ahlberg, have you ever seen
12  any internal documents that specifically map
13  the various funds and accounts that we have
14  seen in the bond documents, the actual bank
15  account?
16     A.   I've not seen -- I personally have
17  not seen a file like that.
18     Q.   Do you believe any such file
19  exists?
20     A.   I can't recall off the top of my
21  head if that exercise was done.
22     Q.   Did you ask anybody in the course
23  of preparing for the Flow of Funds or for this
24  deposition whether or not such a document
25  existed?

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

57 (Pages 446 to 449)

---

**446**

1    A.   I may have. I just can't recall                    04:10:14
2    right now.                                              04:10:17
3    Q.   But you know you've never seen                     04:10:23
4    one?                                                    04:10:25
5    A.   I know that I've chk first cited                   04:10:25
6    docs in that document.                                 04:10:28
7    Q.   Do you know whether, based on                      04:10:28
8    discussions with people on your team, anyone's          04:10:30
9    ever seen them?                                         04:10:32
10   A.   I can't recall. It's certainly                    04:10:36
11   something I could follow up on and get back to          04:10:39
12   you on.                                                 04:10:44
13   Q.   How many people did you have on                    04:10:44
14   your team working on this?                              04:10:46
15   A.   Working on what specifically?                     04:10:49
16   Q.   Working on putting together the                    04:10:51
17   Flow of Funds chart.                                    04:10:54
18   A.   This Tourism Flow of Funds chart?                 04:11:00
19   Q.   No. All of the Tour-- all of                       04:11:03
20   the Flow of Funds charts, so the Tourism, the           04:11:04
21   rum taxes and the HTA.                                  04:11:09
22   A.   Okay. I guess you asked who was                    04:11:13
23   on the team that was doing that. I prepared             04:11:17
24   these Flow of Funds documents --                        04:11:19
25   Q.   I think I asked you how many --                    04:11:22

---

**447**

1    how many people did you have on your team.              04:11:23
2    A.   Oh, how many people?                              04:11:25
3    Q.   I can't recall specifically the                    04:11:29
4    number of people on the team. I'm happy to              04:11:32
5    list as many individuals that I can think of            04:11:36
6    off the top of my head.                                 04:11:39
7    Q.   Was there anybody senior to you                    04:11:42
8    involved in this project?                               04:11:43
9    A.   It depends on how you define                      04:11:51
10   "senior."                                               04:11:54
11   For example, I would consider the                       04:11:54
12   subsecretary of Treasury of the Commonwealth of         04:11:56
13   Puerto Rico to be senior to me but not                  04:11:58
14   necessarily -- you know, she doesn't work at            04:12:01
15   Conway MacKenzie in a position directly above           04:12:05
16   me.                                                     04:12:07
17   Q.   So I would consider her to be in a                 04:12:08
18   separate line entirely given that you're not            04:12:12
19   employed at the same place. So I mean within            04:12:14
20   Conway MacKenzie, is there anybody senior to            04:12:20
21   you involved in this?                                   04:12:20
22   A.   Okay. Thank you for clarifying.                   04:12:22
23   No.                                                     04:12:25
24   Q.   Okay. I think we covered                           04:12:26
25   yesterday that you've been at Conway MacKenzie          04:12:29

---

**448**

1    for how long?                                           04:12:33
2    A.   Since August 2017.                                04:12:37
3    Q.   All right. And your work has been                  04:12:41
4    principally focused on Puerto Rico and mostly           04:12:43
5    limited to cash flows; is that right?                   04:12:48
6    A.   That's correct, generally limited                 04:12:54
7    to cash flow reporting, cash flow monitoring,           04:12:56
8    liquidity management.                                   04:13:06
9    Q.   Okay. And I think you testified                    04:13:06
10   yesterday that there are approximately five             04:13:07
11   people senior to you at Conway MacKenzie                04:13:09
12   involved generally in the Puerto Rico                   04:13:11
13   engagement; is that right?                              04:13:13
14   A.   Yes, I think I gave a range                       04:13:16
15   between four and six.                                   04:13:19
16   Q.   Okay. And none of them were                        04:13:21
17   involved in this project; is that right?                04:13:24
18   A.   That's correct.                                   04:13:26
19   Q.   Did you speak to any of them about                 04:13:27
20   the work you were doing?                                04:13:32
21   A.   I wouldn't have spoken to anyone                  04:13:35
22   on my team about the work we were doing.               04:13:37
23   Q.   Are any of the more senior people                 04:13:42
24   at Conway MacKenzie involved in the Puerto Rico         04:13:45
25   engagement CPAs?                                        04:13:47

---

**449**

1    A.   Excuse me for a moment. I do                      04:13:54
2    recall that one member of Conway MacKenzie was          04:13:56
3    involved, and his name was Brett Howard.                04:13:58
4    Q.   What was his involvement?                          04:14:02
5    A.   He specifically manages the cash                  04:14:09
6    flow reporting for Tourism Company, and so I            04:14:11
7    consulted with him about the Flow of Funds              04:14:17
8    presentation in collaboration with Gustavo from         04:14:21
9    Tourism. In all cases, counsel would have been          04:14:24
10   present.                                                04:14:27
11   Q.   And what is Mr. Howard's position                 04:14:29
12   at Conway MacKenzie?                                    04:14:31
13   A.   Currently he is a senior associate                04:14:34
14   at Conway MacKenzie.                                    04:14:38
15   Q.   And is that senior to you?                         04:14:40
16   A.   That is not.                                      04:14:42
17   Q.   Okay. Well, I think I was asking                   04:14:43
18   about people senior to you.                             04:14:46
19   A.   Okay. I apologize.                                04:14:50
20   Q.   That's okay. So let me ask again.                  04:14:51
21   Of the people who are more senior                       04:14:55
22   than you at Conway MacKenzie who were involved          04:14:58
23   in the Puerto Rico engagement, are any of them          04:15:01
24   CPAs?                                                   04:15:04
25   A.   I think there are -- there's at                   04:15:08

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

58 (Pages 450 to 453)

---

450

1   least -- there's at least one CPA on the Conway        04:15:13
2   MacKenzie team. There could be more.                   04:15:16
3       Q.    All right. And who's the                     04:15:18
4   one person who you can think of who's a CPA on         04:15:21
5   the Conway MacKenzie team?                             04:15:23
6       A.    I believe that Rafael Di Napoli is           04:15:36
7   a CPA.                                                 04:15:36
8       Q.    Okay. And what is Mr. Di Napoli's            04:15:40
9   position at Conway MacKenzie?                          04:15:47
10      A.    Currently he is a managing                   04:15:47
11  director.                                              04:15:53
12      Q.    Okay. And did you speak to                   04:15:53
13  Mr. Di Napoli about Funds as used in the               04:15:55
14  Commonwealth?                                          04:16:01
15      A.    Would you repeat the question?               04:16:04
16      Q.    Yes. Did you speak to Mr. Di                 04:16:06
17  Napoli about how Funds are used within the             04:16:10
18  Commonwealth in this account?                          04:16:16
19            UNIDENTIFIED SPEAKER: Objection.             04:16:16
20            THE WITNESS: I did not                       04:16:21
21  specifically discuss Funds with Mr. Di Napoli          04:16:21
22  in preparation for this deposition.                    04:16:24
23  BY MS. MILLER:                                         04:16:28
24      Q.    Did you speak to him about other             04:16:28
25  things in preparation for this deposition?             04:16:32

---

451

1       A.    Not specifically, but I can't say           04:16:36
2   unequivocally that we may never have ever              04:16:38
3   discussed Fund types together.                         04:16:44
4       Q.    Did you speak to Mr. Di Napoli               04:16:45
5   about the significance of Funds or other               04:16:48
6   accounting designations in tracing money               04:16:50
7   through various Commonwealth accounts?                 04:16:52
8       A.    No.                                          04:17:00
9       Q.    Did you speak to anyone else                 04:17:00
10  senior to you at Conway MacKenzie about that?          04:17:01
11      A.    In preparation for this                      04:17:06
12  deposition? No.                                        04:17:07
13      Q.    Okay. Okay. So we have marked as             04:17:07
14  Exhibit 32 a document that is in front of you,         04:17:15
15  which is the Puerto Rico Tourism Company Room          04:17:21
16  Taxes Flow of Funds. Do you see that?                  04:17:25
17      A.    Yes.                                         04:17:28
18      Q.    Okay. Do you recognize this                  04:17:31
19  document?                                              04:17:35
20      A.    Yes.                                         04:17:35
21      Q.    Okay. And you prepared this,                 04:17:36
22  right?                                                 04:17:38
23      A.    I did.                                       04:17:40
24      Q.    Can you describe generally the               04:17:41
25  Flow of Funds -- sorry, the flow of hotel             04:18:00

---

452

1   occupancy taxes from the time that they're             04:18:04
2   collected by hoteliers?                                04:18:08
3            MS. McKEEN: Objection, vague.                 04:18:19
4            THE WITNESS: I don't know how to              04:18:26
5   answer that question. Would you mind being             04:18:30
6   more specific, please?                                 04:18:33
7   BY MS. MILLER:                                         04:18:33
8       Q.    Okay. Well, room tax revenues are            04:18:36
9   collected at a point of contact with the               04:18:39
10  customer, right? And then they're transferred          04:18:44
11  to the Commonwealth; isn't that correct?               04:18:48
12      A.    Correct.                                     04:18:50
13      Q.    Okay. So I want you to tell me               04:18:50
14  how a room tax revenue is collected and then           04:18:56
15  transferred to the Commonwealth.                       04:19:03
16            MS. McKEEN: Objection, vague.                04:19:09
17  BY MS. MILLER:                                         04:19:09
18      Q.    You can take it off -- you're                04:19:11
19  welcome to leave the Flow of Funds on, but I'm         04:19:12
20  asking for the step that's not reflected in the        04:19:15
21  Flow of Funds, right?                                  04:19:17
22            The room tax revenues are actually           04:19:18
23  collected by not a Commonwealth agent, right?          04:19:23
24  Is that consistent with your understanding,            04:19:26
25  Mr. Ahlberg?                                           04:19:28

---

453

1            Well, let me just ask:                        04:19:29
2            Mr. Ahlberg, who collects room tax            04:19:31
3   revenue -- who collects room taxes?                    04:19:34
4       A.    Hoteliers.                                   04:19:36
5       Q.    Okay. So you would agree with me             04:19:36
6   that hoteliers collect room tax revenues,              04:19:40
7   correct?                                               04:19:46
8       A.    Correct.                                     04:19:46
9       Q.    And then the hoteliers then                  04:19:47
10  transfer them to the Commonwealth, correct --          04:19:49
11  oh, sorry, sorry.                                      04:19:52
12      A.    The Tourism Company.                         04:19:54
13      Q.    Yes. Thank you. Sorry. Let me                04:19:55
14  restate my question.                                   04:19:58
15            Room tax revenues are collected by           04:19:58
16  hoteliers, right?                                      04:20:02
17      A.    Correct.                                     04:20:04
18      Q.    And the hoteliers then transfer              04:20:06
19  them to the Tourism Company, correct?                  04:20:11
20      A.    Correct.                                     04:20:12
21      Q.    And how do they transfer them to             04:20:13
22  the Tourism Company?                                   04:20:16
23      A.    I think it depends on which                  04:20:26
24  hotelier and their, you know, agreed-upon              04:20:29
25  schedule to transfer hotel revenue taxes.              04:20:34

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

59 (Pages 454 to 457)

| | 454 | |
|---|---|---|
| 1 | Q. Okay. Do you have an | 04:20:42 |
| 2 | understanding of the various ways in which | 04:20:45 |
| 3 | hoteliers can transfer the money to the Tourism | 04:20:49 |
| 4 | Company? | 04:20:56 |
| 5 | A. I'm not positive of the ways that | 04:20:56 |
| 6 | the hoteliers designate their transfers to the | 04:20:57 |
| 7 | Tourism Company. | 04:21:04 |
| 8 | Q. Okay. Do you know whether they | 04:21:05 |
| 9 | can wire the money? | 04:21:07 |
| 10 | A. I believe they can send | 04:21:08 |
| 11 | electronic -- electronic payments. | 04:21:14 |
| 12 | Q. Do you know whether they can make | 04:21:14 |
| 13 | deposits at Scotiabank ATM machines in | 04:21:16 |
| 14 | Puerto Rico? | 04:21:25 |
| 15 | A. I'm not positive whether they can | 04:21:26 |
| 16 | make ATM deposits or not. | 04:21:28 |
| 17 | Q. Do you know whether they can | 04:21:30 |
| 18 | transfer the money by check? | 04:21:31 |
| 19 | A. I believe that they can transfer | 04:21:37 |
| 20 | the money by check -- | 04:21:39 |
| 21 | Q. Okay. And regardless -- | 04:21:40 |
| 22 | A. -- depending (indiscernible). | 04:21:40 |
| 23 | Q. All right. | 04:21:40 |
| 24 | And regardless of the means used | 04:21:47 |
| 25 | by the hotelier to transfer the room tax | 04:21:48 |

| | 456 | |
|---|---|---|
| 1 | November 2015? | 04:23:24 |
| 2 | A. No. | 04:23:26 |
| 3 | Q. Okay. So the GDB 9758 account has | 04:23:28 |
| 4 | exactly the same revenues that were transferred | 04:23:33 |
| 5 | into the Scotiabank 5142 account, correct? | 04:23:36 |
| 6 | A. I believe the amount, the total | 04:23:46 |
| 7 | amount transferred into 5142 would be equal to | 04:23:48 |
| 8 | the total amount transferred into 9758 during | 04:23:52 |
| 9 | this time period. | 04:23:55 |
| 10 | Q. Is that the long way of saying | 04:23:59 |
| 11 | yes, that the GDB 9758 account has exactly the | 04:24:01 |
| 12 | same revenues that were transferred into the | 04:24:04 |
| 13 | Scotiabank 5142 account by the hoteliers? | 04:24:09 |
| 14 | A. It's -- I mean, the transfers for | 04:24:16 |
| 15 | the -- the transfers will total the exact | 04:24:19 |
| 16 | amount. It will be -- the total transfers into | 04:24:23 |
| 17 | 5142 will equal the total transfers into 9758. | 04:24:28 |
| 18 | Q. So all the same moneys that are | 04:24:32 |
| 19 | going into 5142 are going into 9758, correct? | 04:24:34 |
| 20 | A. During the time period, that's | 04:24:40 |
| 21 | correct. | 04:24:42 |
| 22 | Q. Okay. And then what moneys are | 04:24:42 |
| 23 | going from 9758 to 5144? | 04:24:45 |
| 24 | A. Amounts that would be in excess of | 04:24:51 |
| 25 | the approximately $3 million per month that was | 04:24:55 |

| | 455 | |
|---|---|---|
| 1 | revenues that it collected, all of those | 04:21:52 |
| 2 | revenues are transferred to the Tourism Company | 04:21:55 |
| 3 | into the Scotiabank 5142 account, correct? | 04:22:00 |
| 4 | A. Correct. | 04:22:04 |
| 5 | Q. Okay. And that was true for the | 04:22:04 |
| 6 | entire period that you looked at from | 04:22:07 |
| 7 | January 2015 through the present, correct? | 04:22:10 |
| 8 | A. That's correct. | 04:22:25 |
| 9 | Q. Okay. So from January 2015 to the | 04:22:25 |
| 10 | present, all hotel room tax revenues collected | 04:22:30 |
| 11 | by hoteliers are transferred to the Tourism | 04:22:32 |
| 12 | Company through the Scotiabank 5142 account, | 04:22:35 |
| 13 | correct? | 04:22:43 |
| 14 | A. Correct. | 04:22:43 |
| 15 | Q. Okay. And then looking at Flow of | 04:22:44 |
| 16 | Funds for January 2015 to November 2015 -- it's | 04:22:49 |
| 17 | up on the board or up on your screen -- the | 04:22:53 |
| 18 | Flow of Funds indicates that those revenues are | 04:23:00 |
| 19 | then transferred to the GDB 9758 account. Do | 04:23:05 |
| 20 | you see that? | 04:23:12 |
| 21 | A. Yes. | 04:23:12 |
| 22 | Q. Okay. Are there any moneys | 04:23:13 |
| 23 | deposited in the Scotiabank 5142 account that | 04:23:14 |
| 24 | are not transferred into the GDB 9758 account | 04:23:19 |
| 25 | during this period, January 2015 through | 04:23:22 |

| | 457 | |
|---|---|---|
| 1 | sent to the 9947 pledge account. | 04:24:56 |
| 2 | Q. Okay. And is the 9947 account the | 04:25:07 |
| 3 | pledge account as you understand it? | 04:25:15 |
| 4 | A. Yes. | 04:25:17 |
| 5 | Q. Okay. Or as you've referred to | 04:25:18 |
| 6 | it. | 04:25:25 |
| 7 | And the 5144 account is designated | 04:25:26 |
| 8 | as a comingled account, do you see that? | 04:25:46 |
| 9 | A. Yes, I see that. | 04:25:49 |
| 10 | Q. What other moneys are deposited | 04:25:50 |
| 11 | into the 5144 account? | 04:25:52 |
| 12 | A. An example I can think of off the | 04:25:55 |
| 13 | top of my head would be slot machine proceeds. | 04:25:58 |
| 14 | Q. Okay. Are any other moneys | 04:26:11 |
| 15 | deposited into the 9947 account? | 04:26:13 |
| 16 | MS. McKEEN: Are you meaning the | 04:26:25 |
| 17 | moneys into the -- I just want to be clear. | 04:26:30 |
| 18 | MS. MILLER: Yeah. Now I'm asking | 04:26:31 |
| 19 | about the 9947 account. | 04:26:32 |
| 20 | THE WITNESS: Would you please | 04:26:39 |
| 21 | repeat the question? | 04:26:40 |
| 22 | BY MS. MILLER: | 04:26:40 |
| 23 | Q. Yeah. Are any -- are any moneys | 04:26:41 |
| 24 | other than the moneys transferred from the 9758 | 04:26:44 |
| 25 | account deposited into the 9947 account? | 04:26:47 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

60 (Pages 458 to 461)

---

458

| | |
|---|---|
| 1 | **A.** Not during this time period that | 04:26:53 |
| 2 | we're looking at. | 04:26:56 |
| 3 | **Q.** Okay. And then moneys from -- I'm | 04:26:56 |
| 4 | going back to the 5144 account. Moneys from | 04:27:01 |
| 5 | the 5144 account, hotel occupancy tax revenues | 04:27:04 |
| 6 | in excess of the 3 million per month deposited | 04:27:08 |
| 7 | into the 5144 account are then indicated as | 04:27:11 |
| 8 | flowing to the 5138 account. Do you see that? | 04:27:15 |
| 9 | **A.** Yes. | 04:27:18 |
| 10 | **Q.** And are all moneys during this | 04:27:19 |
| 11 | time period deposited in the 5144 account also | 04:27:23 |
| 12 | transferred to the 5138 account? | 04:27:27 |
| 13 | **A.** No. | 04:27:29 |
| 14 | **Q.** Okay. So how do you know that it | 04:27:32 |
| 15 | is the hotel occupancy taxes that are moving | 04:27:34 |
| 16 | from the 5144 account to the 5138 account? | 04:27:39 |
| 17 | **A.** You don't, because at the point of | 04:28:03 |
| 18 | transfer to 5144, those funds are comingled | 04:28:06 |
| 19 | with other funds. | 04:28:11 |
| 20 | **Q.** Did you say "I don't" -- well, | 04:28:12 |
| 21 | then why is 5138 included in this Flow of | 04:28:15 |
| 22 | Funds? | 04:28:24 |
| 23 | **A.** Because funds are | 04:28:24 |
| 24 | indistinguishable once they are transferred | 04:28:27 |
| 25 | into Account 5144, it is shown for exemplary | 04:28:30 |

459

| | |
|---|---|
| 1 | purposes that there still are outposts from | 04:28:37 |
| 2 | 5144 used to fund operating disbursements and | 04:28:40 |
| 3 | transfers to that Account 5138, which is a zero | 04:28:45 |
| 4 | balance operating disbursement account. | 04:28:52 |
| 5 | **Q.** Are you sure? | 04:28:54 |
| 6 | **A.** Am I sure of what? | 04:28:55 |
| 7 | **Q.** Are you -- so you just decided to | 04:28:57 |
| 8 | give me some example of some bank account that | 04:28:59 |
| 9 | moneys from 5144 flow to that may or may not be | 04:29:02 |
| 10 | the hotel occupancy taxes that we're talking | 04:29:08 |
| 11 | about? | 04:29:10 |
| 12 | **A.** Sorry. | 04:29:11 |
| 13 | MS. McKEEN: Objection, misstates | 04:29:11 |
| 14 | testimony, argumentative. | 04:29:13 |
| 15 | Atara, do you need to take a | 04:29:14 |
| 16 | break? | 04:29:16 |
| 17 | MS. MILLER: No, I don't need to | 04:29:17 |
| 18 | take a break. I definitely don't need a break. | 04:29:19 |
| 19 | I just need an answer to my question. | 04:29:22 |
| 20 | (Simultaneous speaking.) | 04:29:24 |
| 21 | MS. McKEEN: I'd like you to take | 04:29:27 |
| 22 | a break. I would like a break. Thank you. | 04:29:28 |
| 23 | MS. MILLER: All right. I'm | 04:29:30 |
| 24 | not -- I'm not ready to take a break right now, | 04:29:31 |
| 25 | so I'm going to get an answer to the next | 04:29:33 |

---

460

| | |
|---|---|
| 1 | couple of questions, and then we can take a | 04:29:35 |
| 2 | break. | 04:29:37 |
| 3 | BY MS. MILLER: | 04:29:37 |
| 4 | **Q.** Mr. Ahlberg, is it your testimony | 04:29:38 |
| 5 | that you don't know if hotels' occupancy taxes | 04:29:39 |
| 6 | in fact flowed from 5144 to 5138 and that the | 04:29:44 |
| 7 | 5138 account is included in the Flow of Funds | 04:29:49 |
| 8 | just as an example of an account that moneys | 04:29:52 |
| 9 | may have or may not have flowed into from the | 04:29:54 |
| 10 | 5144 account? | 04:29:58 |
| 11 | MS. McKEEN: Objection, misstates | 04:30:01 |
| 12 | testimony. | 04:30:02 |
| 13 | MS. MILLER: My question is, is it | 04:30:05 |
| 14 | his testimony. So your witness can tell me | 04:30:06 |
| 15 | that it wasn't his testimony. | 04:30:09 |
| 16 | MS. McKEEN: Objection. | 04:30:12 |
| 17 | THE WITNESS: That was not my | 04:30:12 |
| 18 | testimony. | 04:30:13 |
| 19 | BY MS. MILLER: | 04:30:13 |
| 20 | **Q.** Okay. So, Mr. Ahlberg, do you | 04:30:18 |
| 21 | know that hotel occupancy taxes flowed from the | 04:30:19 |
| 22 | 5144 account to the 5138 account? | 04:30:24 |
| 23 | **A.** Due to the comingled nature of | 04:30:32 |
| 24 | funds within 5144, it's impossible to | 04:30:34 |
| 25 | say -- it's impossible to say one or the other, | 04:30:40 |

461

| | |
|---|---|
| 1 | which is why both are indicated with a | 04:30:43 |
| 2 | comingled star. | 04:30:46 |
| 3 | **Q.** But you could have known that | 04:30:47 |
| 4 | money from one comingled account to another | 04:30:49 |
| 5 | comingled account would have come from hotel | 04:30:51 |
| 6 | occupancy taxes based on sources identifying | 04:30:55 |
| 7 | the revenue source, couldn't you? | 04:30:58 |
| 8 | **A.** Could you repeat that question, | 04:31:06 |
| 9 | please? | 04:31:07 |
| 10 | **Q.** Yeah, well, let me just ask it | 04:31:08 |
| 11 | this way: | 04:31:11 |
| 12 | Previously, when we saw comingled | 04:31:12 |
| 13 | account moneys being deposited in comingled | 04:31:14 |
| 14 | accounts flowing out, you indicated that you | 04:31:17 |
| 15 | were able to identify that the moneys were part | 04:31:25 |
| 16 | of the bucket of funds that you were tracing in | 04:31:29 |
| 17 | the Flow of Funds based on notations in outflow | 04:31:34 |
| 18 | documents, whether it was vouchers or | 04:31:38 |
| 19 | transmittal letters or the like. | 04:31:43 |
| 20 | Do you recall that? | 04:31:44 |
| 21 | **A.** Yes. | 04:31:51 |
| 22 | **Q.** Okay. Is that different here? | 04:31:51 |
| 23 | **A.** I don't think revenue source | 04:32:11 |
| 24 | is -- I don't think revenue source is | 04:32:16 |
| 25 | considered for disbursements from 5144 to 5138. | 04:32:17 |

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

61 (Pages 462 to 465)

---

462

```
 1      Q.    Okay.  I'm going to move on,              04:32:30
 2   because, frankly, those aren't our moneys and      04:32:33
 3   we know that.  So I'm just going to move on,       04:32:37
 4   but I'm not sure how that's consistent with how    04:32:40
 5   you explain to put the charts together, so I       04:32:43
 6   might come back to it just so I can understand     04:32:47
 7   better what you did in the other Flow of Funds.    04:32:50
 8      Can I ask you whether for all of                04:32:55
 9   the Flow of Funds charts that you prepared for     04:33:00
10   HTA, PRIFA and CCDA if you were able to find       04:33:03
11   evidence that the revenues being traced were       04:33:09
12   transferred out of a particular account, if you    04:33:12
13   noted that transfer on the Flow of Funds chart?    04:33:15
14      UNIDENTIFIED SPEAKER:  Objection.               04:33:23
15      THE WITNESS:  Could you repeat                  04:33:25
16   that question?                                     04:33:26
17   BY MS. MILLER:                                     04:33:26
18      Q.    Yeah.  In putting together these          04:33:29
19   Flow of Funds charts, if you were able to          04:33:31
20   identify an outflow that corresponded to the       04:33:34
21   Fund that you were tracing, did you include        04:33:34
22   that outflow on the Flow of Funds chart?           04:33:41
23      UNIDENTIFIED SPEAKER:  Objection.               04:33:48
24      THE WITNESS:  Each Flow of Funds                04:33:55
25   chart is unique.  It's hard for me to answer in    04:33:56
```

464

```
 1   tax pledge account?                                04:56:55
 2      A.    I believe that there is                   04:56:58
 3   justification for why there's an account that      04:57:02
 4   is called the pledge account, but I just can't     04:57:05
 5   recall off the top of my head the specific         04:57:08
 6   document that we used to make that                 04:57:10
 7   determination.                                     04:57:12
 8      Q.    But you believe there is a                04:57:15
 9   document?                                          04:57:17
10      MS. McKEEN:  Objection --                       04:57:18
11      THE WITNESS:  Yeah, I believe that              04:57:19
12   there's information out there.                     04:57:21
13   BY MS. MILLER:                                     04:57:23
14      Q.    What do you mean when you say             04:57:23
15   "information out there"?                           04:57:26
16      A.    Well, you characterized it as             04:57:29
17   potentially one document, and I'm just not         04:57:31
18   certain that there's one document or there may     04:57:34
19   be a collection of documents that say that.        04:57:36
20      MS. MILLER:  Okay.  I'd like to                 04:57:39
21   mark as the next exhibit tab 2128, please.         04:57:42
22      (Monolines Exhibit 33 is                        04:57:42
23      introduced for the record.)                     04:57:42
24   BY MS. MILLER:                                     04:57:42
25      Q.    We have marked as Monolines               04:57:58
```

463

```
 1   terms of all the Flow of Funds charts together.    04:34:01
 2      MS. MILLER:  Okay.  Maybe let's                 04:34:16
 3   take a break.  I need to think about why they      04:34:16
 4   would be unique.  Maybe I'll have an epiphany       04:34:20
 5   over the break.  Okay.                             04:34:25
 6      Do we want to take 5 minutes?                   04:34:31
 7      MS. McKEEN:  I think 10 minutes, a              04:34:32
 8   5-minute break we can't actually take a break.     04:34:32
 9   Thanks.                                            04:34:39
10      MS. MILLER:  Okay.                              04:34:39
11      THE VIDEOGRAPHER:  We are off the               04:34:41
12   record at 4:35 p.m.                                04:34:41
13      (Recess taken.)                                 04:34:44
14      THE VIDEOGRAPHER:  We are back on               04:56:04
15   the record at 4:56 p.m.                            04:56:12
16   BY MS. MILLER:                                     04:56:12
17      Q.    Afternoon, Mr. Ahlberg.                   04:56:18
18      Mr. Ahlberg, have you ever seen                 04:56:20
19   any document specifically identifying a            04:56:21
20   particular bank account as the pledge account?     04:56:32
21      A.    I can't recall personally looking         04:56:35
22   at a document that's labeled a pledge account.     04:56:37
23      Q.    Do you know whether there are any         04:56:43
24   documents that specifically identify a             04:56:45
25   particular bank account as the hotel occupancy     04:56:48
```

465

```
 1   Exhibit 33 the document Bates-stamped              04:57:59
 2   CCDA_STA0006780.                                   04:58:10
 3      Do you see that?                                04:58:14
 4      A.    I don't see that.  Could you              04:58:21
 5   repeat that?                                       04:58:24
 6      Q.    Yeah, we marked as Monolines              04:58:28
 7   Exhibit 33 a document that's been Bates-stamped    04:58:30
 8   CCDA STA006780.                                    04:58:32
 9      A.    Yes, I see that, thank you.               04:58:39
10      Q.    Okay.  And if those documents are         04:58:42
11   in Spanish, there is an English translation at     04:58:44
12   the back.  And if you look at -- well, are you     04:58:50
13   going to want to look at the certified             04:59:03
14   translation or the Spanish version?                04:59:05
15      A.    I would prefer the certified              04:59:07
16   translation.                                       04:59:09
17      Q.    Okay.  So looking at the certified        04:59:10
18   translation, do you see that -- well, do you       04:59:13
19   see what account these documents relate to?        04:59:37
20      A.    Yes, I see Account    9947.               04:59:39
21      Q.    Okay.  So this is the GDB 9947            04:59:49
22   account.  Do you agree with that?                  04:59:52
23      A.    Yes.                                      04:59:56
24      Q.    And the account name is the Hotel         04:59:57
25   Occupancy Tax Pledge Account.  Do you see that?    05:00:00
```

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

62 (Pages 466 to 469)

---

466

1      A.   I see that here.

2      Q.   Okay. So let me ask my question

3 again.

4      Have you seen any documents that

5 identify a particular bank account as the

6 pledge account?

7      A.   Could we please flip back to the

8 PowerPoint presentation? I just want to

9 cross-reference this account number with the

10 account in the Flow of Funds that I know to be

11 the pledge account.

12      Q.   Sure. Well, sorry, before we do

13 that, how do you know that the account in the

14 Flow of Funds is a pledge account? You said,

15 "the account that I know to be the pledge

16 account." How do you know an account to be the

17 pledge account?

18      A.   We were working in preparation for

19 this deper- -- deposition (indiscernible) that

20 there is an account in the Flow of Funds that

21 is identifiable in either pledge account.

22      Q.   Okay. And what work did you do?

23      A.   It would have involved -- again,

24 as I mentioned, I personally did not review a

25 document that had that pledge account language

---

467

1 on that there, but it would have been in

2 conversation with the team in preparation for

3 this deposition.

4      Q.   Would you have asked them if they

5 saw a document that identified the account as

6 the pledge account?

7      A.   I admit I can't recall right now

8 asking about documents.

9      Q.   We spoke earlier today about the

10 PRIFA Flow of Funds. Do you recall that?

11      A.   I do recall speaking to you about

12 the PRIFA Flow of Funds.

13      Q.   And do you recall being pretty

14 adamant in connection with the testimony about

15 the bank account in the PRIFA Flow of Funds and

16 the various funds and accounts in the bond

17 documents, that you did not undertake an

18 exercise to map the accounts and Fund in PRIFA

19 to the actual bank accounts in the Flow of

20 Funds. Do you recall that?

21      MS. McKEEN: Objection.

22      THE WITNESS: I recall saying that

23 I did not personally do an exercise mapping

24 Flow of Funds to bond documents.

25

---

468

1 BY MS. MILLER:

2      Q.   Did anyone on your team do that

3 exercise?

4      A.   I'm not positive. It's something

5 that we can get back to you on.

6      Q.   Did you ask anybody to do it?

7      A.   I don't recall.

8      Q.   Did anybody tell you whether they

9 had done it?

10      A.   I can't recall just an exercise,

11 but -- I don't know.

12      Q.   Did you think it was an exercise

13 that was important to do in connection with

14 preparing the Flow of Funds?

15      A.   I think the Flow of Funds is

16 accurate as the method.

17      Q.   Okay. Did you think it was

18 important with respect to PRIFA to match the

19 Flow of Funds for the particular Funds and

20 accounts identified in the various bond

21 documents that we looked at earlier today?

22      A.   As I mentioned, I did not do that

23 in putting together the Flow of Funds, and I

24 believe the Flow of Funds is still an accurate

25 representation of the Flow of Funds during the

---

469

1 relevant time period.

2      Q.   Did you think it was important to

3 map the particular funds and accounts in the

4 PRIFA Flow of Fund to bank accounts identified

5 in your Flow of Funds chart in preparation for

6 your deposition today?

7      A.   Could you please repeat that

8 question?

9      Q.   Did you think it was important to

10 map the bank accounts identified in the PRIFA

11 Flow of Funds chart that you prepared to the

12 accounts and Funds identified in the PRIFA bond

13 document?

14      A.   I can't assign a degree of

15 importance or not there other than that I would

16 be able to put together an accurate Flow of

17 Funds without relying on an exercise like that.

18      Q.   Okay. So you did not do it for

19 PRIFA; is that right?

20      A.   I personally did not undertake an

21 exercise.

22      Q.   And you don't know if anybody on

23 your team did?

24      A.   I can't recall off the top of my

25 head.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

63 (Pages 470 to 473)

---

470

1  Q.  And it wasn't significant for you
2  to find that out and to remember that in
3  advance of your testimony today, right?
4  **A.  I think the Flow of Funds are**
5  **accurate as they are.**
6  Q.  I'm not challenging the Flow of
7  Funds.  I believe that the Flow of Funds is
8  accurate.  My question is that it wasn't
9  significant for you to find out from any other
10 team member in advance of your testimony today
11 whether they had put together a mapping of the
12 Funds and accounts in various PRIFA bond
13 documents to actual bank accounts, correct?
14 MS. McKEEN:  Objection.
15 THE WITNESS:  I don't think not
16 recalling whether this exercise was done or not
17 assigns a level of importance or not to the
18 exercise.
19 BY MS. MILLER:
20 Q.  Well, if you thought it was an
21 important part of your testimony today,
22 wouldn't you have asked and remembered the
23 answer?
24 MS. McKEEN:  Objection,
25 argumentative.

---

471

1  THE WITNESS:  In preparation for
2  testimony, I focused on developing an accurate
3  Flow of Funds.
4  BY MS. MILLER:
5  Q.  Okay.  So you personally never did
6  a mapping exercise for PRIFA, and you don't
7  know if anybody on your team did, correct?
8  MS. McKEEN:  Objection, asked and
9  answered.
10 THE WITNESS:  I can't -- I did not
11 personally perform the exercise, and I can't
12 recall if someone on the team did or not.
13 BY MS. MILLER:
14 Q.  Okay.
15 THE REPORTER:  I'm sorry.  Can you
16 repeat your answer, Mr. Ahlberg?
17 THE WITNESS:  I did not
18 personally, and I cannot recall if anyone on
19 the team did or did not.
20 THE REPORTER:  Thank you.
21 BY MS. MILLER:
22 Q.  Why did you do that exercise for
23 CCDA?
24 MS. McKEEN:  Objection.
25 THE WITNESS:  Which exercise?

---

472

1  BY MS. MILLER:
2  Q.  Of mapping the particular bank
3  accounts identified in the Flow of Funds to the
4  various funds and accounts identified in the
5  relevant bond document.
6  **A.  I did not personally do that**
7  **mapping exercise either.**
8  Q.  Okay.  So how do you know that a
9  particular account in the Flow of Funds is the,
10 quote, "pledge account"?
11 **A.  From our discussions with -- with**
12 **Tourism and our work together, we identified**
13 **the account as a pledge account.**
14 Q.  Okay.  Going back to PRIFA, did
15 you identify any of the particular accounts in
16 the PRIFA Flow of Funds to the designated
17 account names in the bond document?
18 **A.  I can't recall off the top of my**
19 **head the names of the bond documents used.**
20 Q.  Okay.  But it was important enough
21 for you to remember it with respect to CCDA?
22 UNIDENTIFIED SPEAKER:  Objection.

---

473

1  THE WITNESS:  Again, I'm not
2  certain about defining importance or level or
3  not to that exercise.
4  BY MS. MILLER:
5  Q.  Can I ask you a question with
6  respect to CCDA?
7  Do you have a particular account
8  number that you would attach to each of the
9  accounts identified in the various CCDA bond
10 documents?
11 **A.  Can you repeat that question?**
12 Q.  Yeah.  Sitting here today, do you
13 have a particular account number that's
14 reflected in your Flow of Funds chart that you
15 would attribute to the specific account names
16 included in the various CCDA bond documents?
17 UNIDENTIFIED SPEAKER:  Objection.
18 THE WITNESS:  Yeah, I'm not
19 positive off the top of my head.
20 BY MS. MILLER:
21 Q.  Okay.  So I'm going to go through
22 them, and you'll tell me, just a yes or no, if
23 there is an account number identified in the
24 Flow of Funds that you would attach to that
25 account.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

64 (Pages 474 to 477)

474

1   And I don't need the notes -- the                05:10:17
2   names or numbers yet. I'm going to give you      05:10:18
3   some names. You're going to tell me what the     05:10:22
4   number -- you're going to tell me if there's a   05:10:24
5   specific bank account that relates to that       05:10:25
6   account designation in the document, okay,       05:10:28
7   so --                                            05:10:32
8       A.   Can somebody pull up the Flow of        05:10:32
9   Funds in question?                               05:10:36
10      Q.   Yeah, sure. Let's -- let's put --       05:10:37
11  yeah, let's put up Exhibit 32, please.           05:10:38
12          Okay. So we are going to look at         05:10:43
13  this January 2015 to November 2015 flow.         05:10:45
14          Okay. So looking at this, is            05:10:50
15  there a particular bank account that you         05:10:52
16  believe is the transfer account?                05:10:54
17      A.   Yes.                                    05:10:58
18      Q.   And is there a particular bank          05:10:59
19  account that you believe is the surplus         05:11:01
20  account?                                         05:11:03
21      A.   Yes.                                    05:11:05
22      Q.   And is there a particular bank          05:11:06
23  account that you believe is the pledge account? 05:11:09
24      A.   Yes.                                    05:11:13
25      Q.   And is there a particular bank          05:11:14

475

1   account that you believe is the trust account?   05:11:17
2       A.   Yes.                                    05:11:24
3       Q.   Okay. So you can map in your            05:11:26
4   mind, sitting here with no documents in front    05:11:30
5   of you and no preparation, every single          05:11:32
6   relevant account identified in the CCDA -- CCDA  05:11:36
7   document to a specific bank account in this      05:11:40
8   chart, is that your testimony?                   05:11:43
9          UNIDENTIFIED SPEAKER: Objection.          05:11:46
10         UNIDENTIFIED SPEAKER: Objection.          05:11:48
11         THE WITNESS: I can identify on            05:11:51
12  this page accounts that I consider the pledge    05:11:52
13  account, transfer account, surplus account.      05:11:57
14  BY MS. MILLER:                                   05:11:57
15      Q.   Okay. Can we just pull up the           05:11:57
16  PRIFA Flow of Funds for a minute because I just  05:12:19
17  want to ask you, sitting here off the top of     05:12:22
18  your head, if you did the same exercise with     05:12:26
19  respect to the PRIFA Flow of Funds.              05:12:29
20         While we are waiting for that,            05:12:48
21  Mr. Ahlberg, how many conversations that -- do   05:12:50
22  you -- have you had in preparation of these      05:12:54
23  Flow of Funds or in preparation for your         05:12:58
24  deposition today about which account is the      05:13:00
25  transfer account, the surplus account, and the   05:13:09

476

1   pledge account?                                  05:13:11
2       A.   Your question is how many times         05:13:18
3   did I have a conversation about which accounts   05:13:23
4   were considered by those names?                  05:13:26
5       Q.   Yeah, about which accounts were         05:13:32
6   connected to which particular bank account,      05:13:35
7   exactly.                                         05:13:37
8       A.   Yeah. I can't recall an exact           05:13:37
9   amount or number of conversations that we had    05:13:42
10  where we would have specifically talked about    05:13:46
11  this.                                            05:13:51
12      Q.   Do you recall any conversations         05:13:51
13  where you specifically spoke about it?           05:13:52
14      A.   Just to clarify, are we referring       05:14:01
15  to Tourism right now?                            05:14:04
16      Q.   Yeah, I'm talking about Tourism         05:14:05
17  right now.                                       05:14:07
18      A.   Thank you for clarifying.               05:14:09
19          With that clarification, would you      05:14:11
20  please repeat the question?                      05:14:16
21      Q.   How many conversations do you           05:14:18
22  recall having about which accounts              05:14:20
23  identified -- which bank accounts identified in 05:14:24
24  the Flow of Funds that you prepared related to   05:14:24
25  which account in the various bond documents?     05:14:28

477

1       A.   I can't recall an exact amount of       05:14:33
2   conversation.                                    05:14:36
3       Q.   Was it more than one?                   05:14:37
4       A.   The identification of different         05:14:38
5   accounts came up on more than one occasion.      05:14:40
6       Q.   I mean, identification -- and           05:14:54
7   you only -- when you say the identification of   05:14:55
8   particular -- and I just want to make sure we    05:14:57
9   mean the same thing.                             05:15:00
10         I mean the connecting or mapping          05:15:01
11  of a particular bank account to a particular     05:15:03
12  account name in a bond document. Is that what    05:15:06
13  you're saying?                                   05:15:09
14      A.   That is not what I was saying.          05:15:10
15      Q.   Okay. So that's my               05:15:12
16  question -- that's my question, so let me ask     05:15:15
17  my question again so we can just be clear.        05:15:16
18         How many conversations do you             05:15:18
19  recall about the linking of particular bank      05:15:21
20  account numbers to account names used or         05:15:25
21  designations used in the bond documents?         05:15:30
22      A.   I don't recall any specific             05:15:34
23  conversations where we discussed those things.   05:15:37
24      Q.   So how do you know, for example,        05:15:41
25  that the 9947 account is the pledge account?     05:15:43

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

65 (Pages 478 to 481)

478

```
1      A.    Some discussions with -- with          05:15:52
2   Tourism Company and an understanding of          05:15:54
3   operationally how things work.                   05:15:59
4      Q.    Okay. I thought you just told me        05:16:01
5   that you didn't have any conversations about     05:16:02
6   that.                                            05:16:05
7         MS. McKEEN: Objection.                     05:16:07
8   BY MS. MILLER:                                   05:16:07
9      Q.    What conversations are you              05:16:10
10  recalling?                                       05:16:12
11     A.    It's hard to know since there were      05:16:32
12  several conversations with the different         05:16:36
13  management teams in preparation for this         05:16:40
14  deposition.                                      05:16:42
15     Q.    Who did you have conversations          05:16:53
16  with about the mapping of particular bank        05:16:54
17  accounts to account designations in the bond     05:16:57
18  documents?                                       05:17:08
19        MS. McKEEN: Objection.                     05:17:08
20        THE WITNESS: I don't recall                05:17:09
21  specific conversations about mapping accounts    05:17:09
22  to the bond documents.                           05:17:11
23  BY MS. MILLER:                                   05:17:17
24     Q.    Did you have any conversations          05:17:17
25  with counsel about mapping of bond documents --  05:17:18
```

479

```
1   just a yes or no -- mapping of accounts to bond  05:17:21
2   documents?                                       05:17:25
3      A.    I mean, I can't recall if we            05:17:28
4   specifically discussed this issue or not.        05:17:30
5      Q.    I'm trying to understand -- I           05:17:44
6   showed you a document that identified the        05:17:46
7   pledge account 9947 as the pledge account, and   05:17:50
8   you indicated to me that you weren't sure if     05:17:53
9   you had ever seen any document that identified   05:17:56
10  9947 specifically as the pledge account; is      05:18:01
11  that right?                                      05:18:07
12     A.    That's correct.                         05:18:07
13     Q.    And yet you're confident that 9947      05:18:07
14  is the pledge account, right?                    05:18:12
15     A.    Without having that diagram in          05:18:18
16  front of me, I can't recall the exact account    05:18:21
17  number. I can remember it in the positioning     05:18:23
18  of the document.                                 05:18:25
19     Q.    Okay. Where -- where is it              05:18:27
20  positioned in the document?                      05:18:28
21     A.    If we could show the document, I        05:18:34
22  could identify the account.                      05:18:37
23     Q.    Okay. I'm not going to do that          05:18:39
24  right now because I have the PRIFA document up,   05:18:41
25  which is Exhibit 34 -- sorry -- 24. It was       05:18:48
```

480

```
1   marked as Exhibit 24.                            05:18:52
2         And could we go to the first Flow          05:18:56
3   of Funds chart in this document?                 05:19:00
4         So we are going to look at the             05:19:02
5   January 2014 to June 2015 Flow of Funds. Do      05:19:04
6   you see that?                                     05:19:08
7      A.    Yes.                                     05:19:08
8      Q.    Okay. And in the PRIFA Flow of          05:19:08
9   Funds, the moneys are supposed to be deposited   05:19:12
10  to the credit of the Puerto Rico Infrastructure  05:19:17
11  Fund. Can you identify a particular bank         05:19:21
12  account on this chart that relates to that?      05:19:23
13     A.    There is no bank account on this        05:19:30
14  chart that is identifiable as the Puerto Rico    05:19:33
15  Infrastructure Fund.                             05:19:37
16     Q.    Okay. And then the moneys that          05:19:37
17  flow from there into the Sinking Fund?           05:19:39
18        UNIDENTIFIED SPEAKER: Objection.           05:19:49
19  BY MS. MILLER:                                   05:19:49
20     Q.    Are there any accounts on this --       05:19:52
21  on this Flow of Funds that you can identify as   05:19:57
22  the Sinking Fund?                                05:19:59
23     A.    I am not positive of any of these       05:20:06
24  accounts being identified as the Sinking Fund.   05:20:08
25     Q.    Okay. And do you know whether           05:20:10
```

481

```
1   that US Bank Account -0002 is the reserve        05:20:12
2   account?                                         05:20:16
3      A.    I'm not certain if that's the           05:20:24
4   colloquial name of this account or not.          05:20:28
5      Q.    I mean, there are reserve accounts      05:20:33
6   that are discussed in the relevant bond          05:20:36
7   documents. Do you know if that US Bank 002       05:20:38
8   account is similar to the account discussed in   05:20:42
9   the bond document?                               05:20:45
10     A.    Off the top of my head, I'm not         05:20:49
11  certain if that's the reserve account discussed  05:20:53
12  in the bond document.                            05:20:54
13     Q.    Okay. So, looking -- and you            05:20:55
14  don't know if it's the redemption account        05:20:57
15  either, do you?                                  05:21:00
16     A.    I'm not positive.                       05:21:01
17     Q.    Okay. So sitting here, off the          05:21:02
18  top of your head, looking at this PRIFA Flow of  05:21:05
19  Funds, is there any bank account that you can    05:21:08
20  attach a label from the bond document to?        05:21:10
21     A.    No.                                     05:21:25
22        MS. MILLER: Okay. So now we can            05:21:26
23  put up the CCDA Flow of Funds, which is          05:21:28
24  Exhibit 32. We can put that back up.             05:21:31
25                                                   05:21:31
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

66 (Pages 482 to 485)

482

BY MS. MILLER:

Q.   Okay.  But off the top of your
head, you were able to attach labels
corresponding or correlating particular bank
accounts in the CCDA Flow of Funds to each of
the three key accounts in the CCDA document; is
that right?

A.   In the Tourism document, yes.

Q.   Okay.  Okay.  So the pledge
account, which account is it your position is
the pledge account?

A.   The 9947.

Q.   Okay.  And you testified that you
weren't sure if you've ever seen any document
that specifically identified that, but I showed
you a document that identified that, the pledge
account, the name.

A.   You did show me a document that
named that account as the -- a pledge account
in the name.

Q.   Okay.  And who at the Tourism
Company did you speak to about matching --
sorry -- mapping these various bank accounts to
the account designations used in the bond
documents?

483

MS. McKEEN:  Objection.

THE WITNESS:  Discussed with
Gustavo and Brett which accounts operated as
the transfer, pledge, surplus account.

BY MS. MILLER:

Q.   Okay.  And did Brett have
independent knowledge of which account
corresponded to each of those accounts --
sorry -- which bank accounts corresponded to
each of those bond document accounts?

A.   I can't say one way or the other
if Brett had personal knowledge of the bond
documents or not.

Q.   Okay.  And did you ask whether
they knew which of these bank accounts
correlated to particular accounts in the bond
documents?

MS. McKEEN:  Objection.

THE WITNESS:  My question to them
was not in the context of "match these accounts
to the bond documents;" would have been in the
context of in the actual Flow of Funds, which
account functions as X account, which account
functions as Y account.

484

BY MS. MILLER:

Q.   Okay.  So understanding that you
focused on the Flow of Funds exclusively and
the flow of cash, why is it that you committed
to memory which of these accounts corresponds
to particular named accounts in the bond
document?

A.   I can't give you an exact reason
about why I committed those to memory, other
than I know that's how the Tourism Company
understands the account.

Q.   Okay.  And do you know what
Gustavo's basis was for identifying particular
accounts, bank accounts as those accounts in
the bond document?

A.   Not certain of the exact process
that he used to determine.

Q.   Did you ask him if he looked at
any account opening statements or documents?

A.   I don't recall specifically asking
him that question or not.

Q.   Did you ask him if he looked at
any other document that might identify a
particular account with a name used in the bond
document?

485

A.   I can't recall specifically asking
him a question like that or not.

Q.   Did you do anything to
independently verify or confirm what Gustavo
told you about which account was which?

A.   No, other -- no, but the actual
Flow of Funds makes sense to me, given the
assignments to those accounts that he provided.

Q.   Well, we spoke earlier -- well,
what do you mean it made sense to you based on
the assignments that he provided?  Do you mean
it made sense in terms of corresponding to
moneys that were supposed to be transferred
into the various accounts, and had the moneys
actually flowed in relation to that?

MS. McKEEN:  Objection.

THE WITNESS:  What I mean
generally, for example, is that I understand
the Account 5144 being the surplus account, the
surplus of the monthly average 3 million
transfer from 9258, transfer to 9947, and thus
the identification from the surplus account
fits with my understanding of the Flow of Funds
as presented here.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                         April 23, 2020

67 (Pages 486 to 489)

**486**

```
1   BY MS. MILLER:                                      05:27:15
2       Q.    Okay.  Have you ever seen any            05:27:17
3   document identifying the Scotiabank 5144           05:27:20
4   account as the surplus account?                    05:27:23
5       A.    I can't recall a specific document        05:27:29
6   that refers to it as the surplus account.          05:27:31
7       Q.    You think that you've seen it,           05:27:35
8   though?                                            05:27:38
9       A.    I think I have seen some                  05:27:39
10  documents.                                         05:27:44
11      Q.    You think you have.  Okay.  I'm          05:27:44
12  going to -- okay.                                  05:27:47
13          So I've looked through the                 05:27:47
14  production, and I have not seen any documents       05:27:50
15  that identify the 5144 account as a surplus        05:27:53
16  account.                                           05:27:57
17          MS. MILLER:  So I'm going to call          05:27:57
18  on the record for the production of any such       05:27:57
19  documents that you've seen that you're relying     05:28:00
20  on for your testimony that the 5144 account is     05:28:02
21  the surplus account or that the Commonwealth       05:28:05
22  otherwise intends to rely on.                      05:28:08
23  BY MS. MILLER:                                     05:28:08
24      Q.    Okay.  So you believe that you've        05:28:14
25  seen a document identifying the 5144 account as    05:28:15
```

**487**

```
1   the surplus account; is that right?               05:28:19
2       A.    I feel confident to say that I           05:28:24
3   believe the 5144 account is the surplus           05:28:26
4   account.                                           05:28:29
5       Q.    That wasn't my question.                 05:28:29
6           You believe that you've seen a            05:28:33
7   document that identifies the 5144 account as       05:28:33
8   the surplus account; is that correct?             05:28:36
9       A.    Yeah, and I'm not certain one way        05:28:44
10  or the other as to whether I've seen a specific    05:28:45
11  document that calls it that or not.                05:28:48
12      Q.    Okay.  Have you seen any documents       05:28:49
13  that call any of these accounts the surplus       05:28:53
14  account?                                           05:28:55
15      A.    I believe so.  I just -- I can't         05:29:06
16  recall a specific document.                        05:29:12
17      Q.    Okay.  And you believe that the          05:29:13
18  document that you saw, called the Scotiabank       05:29:14
19  5144 account the surplus account; is that          05:29:17
20  right?                                             05:29:24
21      A.    I -- yeah, I can't recall if it's        05:29:24
22  a specific document, as I mentioned, or in         05:29:26
23  conversations with Gustavo.                        05:29:30
24      Q.    Okay.  Is the 5144 account a             05:29:32
25  comingled operational account of the Tourism      05:29:36
```

**488**

```
1   Company?                                           05:29:43
2       A.    Did --                                   05:29:43
3       Q.    The moneys other than these excess       05:29:43
4   moneys from the hotel occupancy taxes flow into    05:29:45
5   the 5144 account?                                  05:29:48
6       A.    Could you repeat that, please?           05:29:52
7       Q.    The moneys other than the excess         05:29:54
8   moneys from the hotel occupancy taxes, excuse      05:29:55
9   me, flow into the 5144 account?                    05:30:04
10      A.    Correct.                                 05:30:07
11      Q.    And you understand that the              05:30:12
12  surplus account is one of the two accounts         05:30:14
13  that's in the Special Fund called the Holding      05:30:17
14  Fund under the assignment and coordination         05:30:20
15  agreement that we looked at and previously         05:30:22
16  marked as Exhibit 30, correct?                     05:30:24
17      A.    I understand that that's what the        05:30:27
18  document we looked at together said.               05:30:30
19      Q.    Okay.  And do you have an                05:30:31
20  understanding of whether operating moneys would    05:30:33
21  flow into a Special Fund as that term is used      05:30:39
22  in government accounting?                          05:30:42
23      A.    I'm not certain how to answer your       05:30:54
24  question.  Could you be more specific?             05:30:56
25      Q.    Yes.  Do you know whether general        05:30:59
```

**489**

```
1   operating -- sorry.                               05:31:01
2           Do you know whether general               05:31:02
3   revenues used for operating expenses would flow    05:31:04
4   into a Special Fund?                               05:31:07
5           UNIDENTIFIED SPEAKER:  Objection.         05:31:16
6           THE WITNESS:  I don't think about         05:31:21
7   dollars flowing into Funds, but I'm also not       05:31:22
8   sure of the way that that would be classified.     05:31:26
9   BY MS. MILLER:                                     05:31:26
10      Q.    Okay.  And I don't think you             05:31:39
11  actually said it yet, so let me ask you to         05:31:41
12  identify which bank account do you believe on      05:31:45
13  this chart corresponds to the transfer account?    05:31:50
14      A.    GDB account 9758.                        05:31:59
15      Q.    Okay.  And what is the basis for         05:32:02
16  that testimony?                                    05:32:04
17      A.    Conversations with Tourism.             05:32:08
18      Q.    And did you do anything to verify        05:32:12
19  what Tourism told you about that?                  05:32:16
20      A.    I did not personally pull                05:32:22
21  documents to verify that, but the team, the       05:32:25
22  entire document production had hundreds --         05:32:30
23  thousands -- thousands of documents that I         05:32:33
24  personally could not review every single          05:32:36
25  document.                                          05:32:38
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

68 (Pages 490 to 493)

---

**490**

```
 1      Q.    And you're confident that if          05:32:38
 2   somebody told you that the 9758 account is the  05:32:40
 3   transfer account that there is a document among 05:32:43
 4   the thousands -- I would say many tens of       05:32:46
 5   thousands of documents -- that were produced    05:32:49
 6   that identifies the 9758 account as the         05:32:51
 7   transfer account, correct?                      05:32:55
 8          UNIDENTIFIED SPEAKER:  Objection.        05:32:58
 9          THE WITNESS:  I can't recall if          05:33:07
10   there's specific documents (indiscernible).     05:33:09
11          THE REPORTER:  I'm sorry.  Can you        05:33:16
12   repeat that once more?                          05:33:16
13          THE WITNESS:  I cannot recall if          05:33:17
14   there is a specific document that was used to   05:33:18
15   make that determination.                        05:33:20
16   BY MS. MILLER:                                  05:33:20
17      Q.    And do you know if you've ever          05:33:26
18   seen any document referring to the 9758 account 05:33:30
19   as an account other than the transfer account?  05:33:30
20      A.    I'm not certain.                        05:33:38
21      Q.    Okay.  Mr. Ahlberg, in putting          05:33:40
22   together your Flow of Funds, did you use         05:33:42
23   instruction letters to identify which moneys    05:33:50
24   deposited into the 9758 account flowed into the 05:33:53
25   9947 account?                                   05:33:58
```

**491**

```
 1      A.    We looked at these transfer            05:34:09
 2   letters.  I'm not sure if that's the same thing 05:34:14
 3   as instruction letters that you're referring    05:34:15
 4   to.                                             05:34:17
 5      Q.    Okay.  So I'm going to pull one         05:34:17
 6   up, and you can tell me.  Can I get tab 2132,    05:34:24
 7   please, marked up as the next exhibit.          05:34:31
 8          (Monolines Exhibit 34 is                 05:34:31
 9   introduced for the record.)                     05:35:16
10   BY MS. MILLER:                                  05:35:16
11      Q.    Did you come to understand what        05:35:17
12   the relevant account names were under the       05:35:18
13   various bond documents?                         05:35:24
14      A.    I'm sorry.  You broke up there in       05:35:29
15   the middle of your question.                    05:35:31
16      Q.    How did you come to understand          05:35:32
17   what the relevant account names were under the  05:35:33
18   various bond documents and related agreements?  05:35:51
19      A.    It -- it's hard to answer that          05:35:54
20   question because that assumes the -- part of    05:35:57
21   the approach that I took to build the Flow of   05:35:59
22   Funds, which we start with the actual Flow of   05:36:02
23   Funds.                                          05:36:05
24      Q.    Yeah.  I'm saying how did you           05:36:05
25   figure out what -- well, when I asked -- I       05:36:08
```

**492**

```
 1   showed you a number of bond documents earlier,  05:36:11
 2   and you told me you hadn't looked at many of    05:36:13
 3   them.  And my question is:                      05:36:16
 4          If you didn't even look at them,          05:36:17
 5   how did you know what accounts were to even     05:36:18
 6   know what labels to be putting on various bank  05:36:20
 7   accounts?  That's my question.                  05:36:23
 8          UNIDENTIFIED SPEAKER:  Objection.        05:36:25
 9   BY MS. MILLER:                                  05:36:29
10      Q.    So I'm assuming, consistent with       05:36:29
11   your testimony, that the process that you       05:36:32
12   underwent was entirely independent of the      05:36:33
13   various Fund or account designations under      05:36:36
14   statutes and bond documents and that there was 05:36:39
15   no reason or need for you to map them or        05:36:41
16   connect them.  That's consistent with your     05:36:45
17   testimony in HTA and PRIFA.                     05:36:51
18          But suddenly, in CCDA, you have          05:36:53
19   very strong opinions about which account       05:36:55
20   corresponds to -- which bank account           05:36:58
21   corresponds to which account designation in the 05:36:59
22   bond documents, and that's what I'm trying to  05:37:01
23   understand here.                                05:37:03
24          UNIDENTIFIED SPEAKER:  Objection.        05:37:06
25
```

**493**

```
 1   BY MS. MILLER:                                  05:37:06
 2      Q.    So my question was:                     05:37:28
 3          How did you come to know what the         05:37:30
 4   account names were under the bond document that 05:37:32
 5   you could attach to the various bank accounts?  05:37:34
 6      A.    I'm not certain what the entire         05:37:50
 7   process was to assign names to the accounts as  05:37:52
 8   I understand them, plus my understanding came   05:37:57
 9   about by a discussion with Tourism.             05:37:59
10      Q.    Okay.  So we have marked as             05:38:10
11   Monolines Exhibit 34 a document.  Do you see    05:38:12
12   it?                                             05:38:16
13      A.    I see a document.                        05:38:16
14      Q.    And is this the document -- a form      05:38:17
15   of document that you recognize?                 05:38:19
16      A.    Yes.                                    05:38:45
17      Q.    Okay.  And there are actually, if      05:38:46
18   you scroll through in this exhibit, a number of 05:38:49
19   sample transfer documents that we were given,   05:38:52
20   instruction letters that we provided, and if    05:38:58
21   you can flip through and look at all of them if 05:39:01
22   you would like.  There is also, I see -- maybe  05:39:04
23   we don't have an English translation.           05:39:06
24          Do we have an English translation        05:39:10
25   of these?                                       05:39:12
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

69 (Pages 494 to 497)

---

494

1  MS. McKEEN: Atara, are they
2  consecutively paginated, or is this just --
3  MS. MILLER: Mine are
4  consecutively paginated, yes.
5  MS. McKEEN: Thank you.
6  MS. MILLER: No, I think this was
7  a collection of -- this was a collection of
8  instruction documents that were produced, and
9  there is an English translation. And this
10  is -- my understanding, Liz, is that this is
11  how the document was produced all together as a
12  single packet.
13  MS. McKEEN: Thank you. That was
14  just my question.
15  MS. MILLER: Yeah.
16  BY MS. MILLER:
17  Q. Okay. So, Mr. Ahlberg, looking at
18  this, do you see that this is authorizing a
19  transfer from one account to another
20  account -- oh, we are pulling up the English
21  translation. Here we go.
22  Okay. And do you see that this
23  letter is authorizing the debiting of a
24  particular account of 3-million-plus dollars?
25  Do you see that?

---

495

1  A. Yes, I see that.
2  Q. Okay. And what account is that
3  debiting?
4  A. The account number listed is
5  9758.
6  Q. Okay. And is that the same
7  account that is identified on your Flow of
8  Funds chart, Exhibit 32, as GDB 9758?
9  A. Yes.
10  Q. Okay. And how is that accounting
11  identified in this transfer letter?
12  A. This transfer letter assigns a
13  name in quotes to that account of Room Tax -
14  Concentration Surplus.
15  Q. And do you have an understanding
16  of what it means when an account name is put in
17  quotes in a transfer letter like this?
18  A. I'm not entirely positive.
19  Q. Okay. And who is this letter
20  from, can you tell?
21  A. And I don't know if it would be
22  easier to look at or if you would prefer to
23  look at the original Spanish letterhead, but
24  this is a letter from the Tourism Company to
25  the GDB, is it not?

---

496

1  A. Could we go to the Spanish
2  translation just so I know for sure?
3  Q. Sure.
4  A. Yes, thanks.
5  Q. Okay. And so -- and it's from a
6  Mr. Samuel Sierra Rivera. Do you see that?
7  A. Yes.
8  Q. And he's -- he identifies himself
9  as the chief financial officer. Do you see
10  that?
11  A. I see that.
12  Q. Okay. And so according to this
13  instruction letter, the chief financial officer
14  of the Tourism Company is identifying the
15  99 -- the 9758 account as, quote, the room tax
16  concentration surplus. Do you see that?
17  A. I see that.
18  Q. Okay. Do you have any
19  reason -- do you know who Mr. Sierra Rivera is?
20  A. I do not.
21  Q. Okay. Do you know whether Gustavo
22  is junior or senior to the chief financial
23  officer of the Tourism Company?
24  A. I know Gustavo is not the CFO of
25  the company in his finance position. That

---

497

1  would make him subordinate to the CFO at the
2  Tourism Company.
3  Q. All right. Do you have any reason
4  to dispute the at least then-CFO of the Tourism
5  company's characterization of the 9758 account
6  as the room tax concentration surplus?
7  A. He calls the account what he calls
8  the account in this letter.
9  Q. Okay. And you haven't seen any
10  documents that would indicate that the 9758
11  account is not the surplus account, have you?
12  A. I can't recall specifically seeing
13  any documents like that.
14  Q. Well, I can tell you that we
15  haven't. So I, again, call for the production
16  of any documents that would suggest that an
17  account other than the 9758 account is the
18  surplus account.
19  And you have not seen any
20  documents, have you, that identified the 9758
21  account as the transfer account, have you?
22  A. I can't recall seeing a specific
23  document that said that, but from my work with
24  Tourism, I understand that account to be the
25  transfer account.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

70 (Pages 498 to 501)

---

498

```
1        Q.      You haven't seen any documents        05:45:14
2   that say that.                                      05:45:16
3        A.      I can't recall if there were          05:45:19
4   documents, off the top of my head.                 05:45:23
5        Q.      Okay.  And you've now seen at          05:45:24
6   least one collection of documents, and you can     05:45:28
7   flip through and see that the tourism company      05:45:28
8   in each of these letters identifies the 9758       05:45:34
9   account as the room tax concentration surplus.     05:45:34
10           You haven't seen any -- you've at         05:45:37
11  least not seen one collection of documents that    05:45:39
12  identified something other than the transfer       05:45:43
13  account, right?                                     05:45:44
14       A.      Again, I can't recall seeing it or    05:45:49
15  not seeing a document like that.                   05:45:51
16       Q.      I'm asking you about the document     05:45:55
17  that's in front of you right now.  You are         05:45:57
18  currently looking at least one document, one       05:45:59
19  document that is a collection of multiple          05:46:01
20  documents that identify the 9758 account as        05:46:03
21  something other than the transfer account;         05:46:09
22  isn't that right?                                  05:46:11
23       A.      These documents do call that          05:46:16
24  account number by name.  That is not the           05:46:21
25  transfer account.                                  05:46:24
```

---

499

```
1        Q.      Okay.  And the name is Room Tax        05:46:24
2   Concentration Surplus, isn't it?                   05:46:26
3        A.      That's what it says.                   05:46:28
4        Q.      Okay.  And I'd like to now mark as     05:46:30
5   Exhibit 35 tab 2507.                               05:46:40
6           (Monolines Exhibit 35 is                    05:46:40
7           introduced for the record.)                 05:47:12
8   BY MS. MILLER:                                      05:47:12
9        Mr. Ahlberg, have you seen any                 05:47:12
10  account-opening documents for the GDB 9758         05:47:14
11  account?                                           05:47:18
12       A.      I don't think I personally            05:47:22
13  reviewed an account opening statement for that     05:47:23
14  account.                                           05:47:23
15       Q.      Okay.  Do you know whether anybody    05:47:28
16  on your team did?                                  05:47:31
17       A.      I believe someone on the team         05:47:32
18  would have agreed that document.                   05:47:38
19       Q.      Okay.  So I've marked as              05:47:41
20  Exhibit 35 a letter dated March 31, 2002, from     05:47:50
21  your counsel to me and many others, and I want     05:47:54
22  you to look at page 2 of that account on this      05:47:59
23  chart.  And do you see the GDB 9758 account        05:48:02
24  listed?                                            05:48:06
25       A.      Please give me a moment here.         05:48:11
```

---

500

```
1        Q.      Sure.                                  05:48:17
2        A.      Yes, I see that Account 9758          05:48:29
3   listed on this document.                           05:48:33
4        Q.      Okay.  And what is the                05:48:34
5   representation from your counsel about the         05:48:36
6   account-opening documents for 9758?               05:48:38
7        A.      I was unable to locate an             05:48:45
8   account-opening document in GDB's file.           05:48:49
9        Q.      Okay.  And so do you now retract      05:48:51
10  your prior statement that you believe someone     05:48:54
11  on your team reviewed account-opening             05:48:56
12  statements for GDB 9758?                          05:48:59
13       A.      I do.  I apologize.                   05:49:02
14       Q.      Okay.  So to the best of your        05:49:04
15  knowledge and my knowledge, there simply are no   05:49:09
16  available account-opening documents for GDB       05:49:11
17  9758, correct?                                     05:49:15
18       A.      Correct.                              05:49:20
19       Q.      Okay.  And what are -- is the        05:49:21
20  Scotiabank 5142 account?  Do you know if you've   05:49:24
21  looked at any account-opening documents for the  05:49:29
22  Scotiabank 5142 account?                          05:49:31
23       A.      I didn't personally review the       05:49:40
24  account-opening statement for Scotiabank         05:49:43
25  Account 5142.                                      05:49:45
```

---

501

```
1        Q.      Do you know whether anyone on your    05:49:47
2   team received an account-opening statement --     05:49:50
3   sorry -- account-opening document for            05:49:53
4   Scotiabank 5142?                                  05:49:56
5        A.      Off the top of my head, I'm not      05:49:59
6   certain.                                          05:50:01
7        Q.      Okay.  Well, I'll tell you, and I    05:50:05
8   can mark it if you'd like, but your counsel       05:50:07
9   represented that it provided to us all of the    05:50:11
10  documents that it was able to get from            05:50:14
11  Oriental Bank and that that did not include      05:50:18
12  account-opening documents for 5142.              05:50:21
13       Q.      Do you have any reason to believe    05:50:23
14  that such account-opening documents are          05:50:24
15  available?                                        05:50:26
16       A.      No.                                  05:50:37
17       Q.      Okay.  So it's actually listed in    05:50:38
18  this chart as well right under what we were       05:50:41
19  looking at.  Okay.  I want to go back to          05:50:43
20  Exhibit 32, which is the Flow of Funds.           05:51:02
21           Okay.  In 5144, you indicated to         05:51:30
22  me that slot machine proceeds were also           05:51:34
23  deposited in that account, correct?               05:51:35
24       A.      I believe so, yes.                   05:51:43
25       Q.      Do you know why slot machine         05:51:44
```

---

Henderson Legal Services, Inc.

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                    April 23, 2020

71 (Pages 502 to 505)

---

**502**

1    proceeds would be deposited into the surplus
2    account, which is an account in the Holding
3    Fund under the CCDA bond documents?
4         UNIDENTIFIED SPEAKER: Objection.
5         THE WITNESS: I don't know the
6    exact reasons why slot machine revenues would
7    be deposited into this account.
8    BY MS. MILLER:
9         Q.   All right. Do you know
10   whether -- sorry. I may have asked this again,
11   but I just want to make sure that I've covered
12   it.
13        Are any other moneys other than
14   hotel occupancy taxes deposited in the 9758
15   account?
16        A.   No.
17        Q.   Okay. And looking at this chart,
18   I don't think I asked you this for CCDA yet,
19   but, again, we see various colors attached to
20   the boxes, right?
21        A.   Yes.
22        Q.   Okay. So looking at the accounts
23   that are reflected in this January '15 to
24   November '15 Flow of Funds chart, just looking
25   by color designation, none of these is a

---

**503**

1    Commonwealth account; is that correct?
2         A.   That's correct.
3         Q.   Okay. So during this time period,
4    none of the hotel occupancy taxes that were
5    collected by hoteliers transferred to the
6    tourism company ever touched a Commonwealth
7    account, correct?
8         A.   During this time period, that is
9    correct.
10        Q.   Okay. I'm going to turn to the
11   next slide in the Flow of Funds, which is
12   December '15 to March 2016.
13        And during this period, the moneys
14   continue to be collected by hoteliers, correct?
15        A.   Correct.
16        Q.   And where did they transfer the
17   moneys to?
18        A.   The Scotiabank Account 5142.
19        Q.   Okay. And then where did the
20   money flow after that?
21        A.   From there transfers were made at
22   that time.
23        Q.   Okay. And the 9758 account, just
24   so that I have my story straight, the 9758
25   account is the account that you would call the

---

**504**

1    transfer account, right?
2         MS. McKEEN: Objection,
3    argumentative.
4    BY MS. MILLER:
5         Q.   Sorry. The GDB 9758 account is
6    the account that you would call the transfer
7    account, correct?
8         A.   Correct.
9         Q.   Okay. And that's the same account
10   that we saw the document from the CFO of the
11   GDB -- of the Tourism Company, rather,
12   identifying the concentration surplus, correct?
13        A.   Correct.
14        Q.   Okay. And the moneys still flow
15   into that GDB 9758 account, right?
16        A.   During this time period, money
17   still flows from 5042 to 9758.
18        Q.   Okay. And then during this time
19   period, all the moneys still flow into the
20   Scotiabank 5144 account, correct?
21        A.   Correct.
22        Q.   Okay. And then what moneys during
23   this time period are flowing from the 5144
24   account into the 5138 account?
25        A.   Hotel occupancy taxes, among

---

**505**

1    others.
2         Q.   Okay. And do all of the hotel
3    occupancy taxes flow from 5144 to 5138?
4         A.   Would you repeat the question?
5         Q.   Yeah. During this period, do all
6    of the hotel occupancy taxes deposited in 5148
7    flow into -- sorry. Let me start again.
8         During this period, do all of the
9    hotel occupancy taxes deposited in 5144 flow
10   into 5138?
11        A.   Yes.
12        Q.   Okay. And do all of the hotel
13   occupancy taxes during this period deposited in
14   5138 flow into the 006 account?
15        A.   No.
16        Q.   Okay. What hotel occupancy taxes
17   do not flow into the 006 account from the 5138
18   account?
19        A.   Hotel occupancy taxes funding CCDA
20   operations would flow to that box called
21   Non-Debt Service Outflow.
22        Q.   And are those what are referred to
23   as the surplus amounts?
24        A.   I'm not certain if they're
25   referred to as surplus amounts or not.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

72 (Pages 506 to 509)

---

**506**

1    Q.    Okay.  Are all of the -- I'm just
2    trying to remember the exact term.
3         Are all of the amounts that are
4    required to be transferred into the transfer
5    account flowed into the 006 account?
6         Okay.  So let me restate that.
7    You don't remember -- do you recall that when
8    we looked at Exhibit 30, which is the
9    Assignment and Coordination Agreement, there
10   was a definition of required payments?
11        A.    I remember there was a definition
12   of required payments in that document.
13        Q.    Okay.  And do you remember that
14   that loosely was defined as the monthly 1/10 of
15   the amounts that had to be flowed into the
16   transfer account and any deficiency amount?
17        A.    I believe that's what that
18   document we looked at together said.
19        Q.    Okay.  So if I refer to the
20   required payments, will you understand what I
21   mean?
22        A.    Yes.
23        Q.    Okay.  And just to make it simple,
24   because I want to make sure that we are talking
25   about things the same way, if we could just go

---

**507**

1    back one page in Exhibit 32.
2         When I'm talking about the
3    required payments, I'm talking about the
4    amounts that flowed from 9758 to 9947.  Is that
5    consistent with your understanding?
6         A.    Yes.
7         Q.    Okay.  So we'll call that the
8    required payments going forward.
9         MS. McKEEN:  Objection.
10        MS. MILLER:  What's the objection?
11        MS. McKEEN:  You mean the
12   agreement says what it says, and so to the
13   extent, you know, you're trying to get the
14   witness to give some form of legal conclusion,
15   that's the final objection.
16        MS. MILLER:  I'm trying to get the
17   witness to have a common understanding with a
18   noncontroversial term that refers to the moneys
19   that were pledged to the bondholders without
20   having him give the legal opinion that these
21   moneys are pledged to the policyholders, so I'm
22   going to go with required payments.  I think
23   the witness is comfortable with that and
24   understands what bucket of money I'm talking
25   about.

---

**508**

1    BY MS. MILLER:
2         Q.    Mr. Ahlberg, do you know the
3    bucket of moneys that I'm referring to?  So not
4    all hotel occupancy taxes, only that narrower,
5    what I think you've referred to as the 3-plus
6    million a month that's to be transferred?
7         A.    I understand that that's how
8    you're using the term "required payment."
9         Q.    Okay.  If you want to attach a
10   different term to it, I'm fine using whatever
11   term you're most comfortable with.
12        A.    We can say the monthly payment.
13        Q.    Monthly payment?  Okay.
14        Okay.  Are all of the monthly
15   payments, as you use that term -- defined it,
16   all of the monthly payments flowed from the
17   5138 account to the GDB 006 account during the
18   December '15 to March '16 time period?
19        A.    Now that I have this time period
20   presentation in front of me, can you reask the
21   question, please?
22        Q.    Now I forgot what you want to call
23   these.  Monthly payments?  Okay.
24        Are all of the monthly payments
25   transferred from the 5138 account to the 006

---

**509**

1    account?
2         A.    Yes.
3         Q.    Okay.  And how do you know that?
4         A.    Having reviewed these payments,
5    transfer details of those transfers.
6         Q.    Okay.  And based on that, you were
7    able to confirm that all of the monthly
8    payments were transferred from the 5138 account
9    to the 006 account, correct?
10        A.    Correct.
11        Q.    And are all of the hotel occupancy
12   tax monthly payments deposited in the 006
13   account transferred to the 6048 account during
14   this time period?
15        A.    Yes.
16        Q.    Okay.  And that 6048 account,
17   that's the account we were talking about
18   earlier, correct?
19        A.    That is an account that we talked
20   about earlier.
21        Q.    Okay.  And specifically, what
22   account was this?
23        A.    An account separate from the TSA,
24   account 1.
25        Q.    Okay.  What moneys were held in

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

73 (Pages 510 to 513)

---

510

1 this account during this time period?
2     A.     It held -- retained room tax
3 revenues and dollars -- well, not retained.
4     Q.     Okay. And then were all of the
5 hotel occupancy tax monthly payments that were
6 deposited into 6048 deposited into or back into
7 the 006 account?
8     A.     Yes.
9     Q.     Do you know whether when the
10 moneys flowed back into the 006 account they
11 were tagged with a different Fund or accounting
12 designation than when they were previously
13 transferred into the 006 account?
14     A.     I'm not positive to say it's
15 different funds or designations or not.
16     Q.     Okay. What would I do to find
17 that out?
18     A.     I would review a voucher prepared
19 for transfer.
20     Q.     Okay. And then were all of the
21 hotel occupancy tax monthly payments that were
22 retransferred into the 006 account during this
23 period transferred out for GO Debt Service?
24     A.     Yes.
25     Q.     Okay. And, again, do you know

---

511

1 whether that was actually -- sorry -- whether
2 that money was actually transferred to third
3 parties on account of GO Debt Service?
4     A.     I'm not certain.
5     Q.     Do you have an
6 understanding of how much of the -- do you know
7 how much of the hotel occupancy tax monthly
8 payments were transferred into the GDB 006
9 account during this time period?
10     A.     Off the top of my head, I don't
11 have that number.
12     Q.     Okay. And we spoke a little bit
13 about the time frames that were covered during
14 this -- for the time frames that were
15 identified at the top of each of these Flow of
16 Funds.
17         Is it your understanding that this
18 is referring to room tax revenues that were
19 generated and transferred into the Scotiabank
20 5142 account between December 2015 and
21 March 2016?
22     A.     Yes.
23     Q.     Okay. Footnote 1 to this Flow of
24 Funds indicates that transfers from the 006
25 account to Fund GO Debt Service payment in

---

512

1 January '16 included comingled room tax
2 receipts with proceeds from other retained
3 revenues. Do you see that?
4     A.     Yes, I see that.
5     Q.     Do you know whether moneys
6 transferred in January, February or March of
7 2016 were actually used to pay GO Debt Service?
8     A.     Could you repeat the question?
9     Q.     Do you know whether moneys
10 transferred in January, February or March of
11 2016 were actually used to pay GO Debt Service?
12     A.     Transfers from which account to
13 which account?
14     Q.     Hotel occupancy tax monthly
15 payments transferred into the GDB 006 account
16 in January, February and March 2016, do you
17 know if they were actually used to pay GO Debt
18 Service?
19     A.     We set the revenue from -- room
20 tax proceeds during this time period used --
21 used -- sorry.
22         The revenue earned in this time
23 period was the source of funding for transfers
24 for GO Debt Service. So the footnote indicates

---

513

1 that it was only for the GO Debt Service
2 payment in January of 2016. Do you believe
3 that there were additional GO debt service
4 payments that were funded from these moneys?
5     A.     Would you repeat the question,
6 please?
7     Q.     The footnote indicates that these
8 moneys were used for the January --
9 January 2016 GO Debt Service.
10         Do you believe that there were
11 additional GO Debt Service payments other than
12 January 2016 that were funded from the hotel
13 occupancy tax monthly payment reflected in this
14 Flow of Funds?
15     A.     I was thinking here. Would you
16 mind repeating the question again?
17     MS. MILLER: Would the court
18 reporter mind reading it back, please?
19     (Record read as requested.)
20     THE WITNESS: No.
21 BY MS. MILLER:
22     Q.     So do you believe that the hotel
23 occupancy tax monthly payments for January,
24 February and March of 2016 that are reflected
25 as flowing into the GDB 006 account and then to

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

74 (Pages 514 to 517)

514

1 the 6048 account and then to the 006 account
2 remain in the TSA today?
3     A.    I don't think of any one transfer
4 of any kind of funds ever remaining in the TSA
5 account. That's not really how I think about
6 it.
7     Q.    Have you seen any document --
8 sorry.
9     Have you seen any outflow document
10 after January 2016 indicating a tilt flow of
11 the hotel occupancy tax monthly payment from
12 the TSA?
13     A.    I've seen no other outflow from
14 the TSA that indicated hotel occupancy taxes as
15 a source of revenue of a transfer out of the
16 TSA.
17     Q.    Okay. And during this --
18     MS. MILLER: I don't have much
19 more. I am just going to quickly go through
20 the rest of the Flow of Funds.
21     MS. McKEEN: Okay. Thank you.
22     MS. MILLER: They do get very
23 complicated, though. I'm hoping to not have to
24 ask about every account. We have a simple one
25 coming up next.

515

1 BY MS. MILLER:
2     Q.    And just so that I understand, or
3 just can you confirm that all of the same hotel
4 occupancy tax revenues transferred from
5 hoteliers flow into the 5142 account and the
6 9758 account?
7     A.    To what time period?
8     Q.    In the December '15 to March 2016
9 period. The Scotiabank 5142 account and the
10 GDB 9758 account each have exactly the same
11 moneys; is that correct? Or let me say that
12 differently.
13     For the December '15 to March 2016
14 period, the exact same revenues flow through
15 the Scotiabank 5142 account and the GDB 9758
16 account, correct?
17     A.    Would have been the exact same
18 amount that was received into 5142 that was
19 transferred to 9758.
20     Q.    Okay. Is that different in any
21 way from what I said? I just want to know how
22 to ask the question precisely going forward.
23     So if you're drawing a distinction
24 that I'm not attuned to, I just would like to
25 hear what it is.

516

1     A.    Yeah, and I just answered that way
2 for my own benefit to make sure I answered
3 correctly.
4     Q.    Okay. All right. I might try to
5 ask you the same way.
6     Okay. So turning now to
7 April 2016, so this one appears pretty simple.
8     Can you just describe the flow
9 from the collection of room tax revenues by the
10 hoteliers?
11     A.    Yes. During April of 2016, room
12 tax revenues would have been collected by
13 hoteliers, remitted to Tourism Company, a/k/a
14 deposited into Scotiabank Account 5142, and
15 then transferred to GDB Account 9758.
16     Q.    Okay. And does the fact that the
17 Flow of Funds stop here mean that hotel
18 occupancy tax revenues collected in April 2016
19 remained in the GDB 9758 account?
20     A.    It means that during this time
21 period, there were no transfers out of the 9758
22 account.
23     Q.    Was there a transfer out of the
24 9758 account subsequent to this time period?
25     A.    No.

517

1     Q.    Okay. So what moneys were
2 deposited were then remaining in the GDB 9758
3 account presumably through the GDB's title fix;
4 is that right?
5     A.    I am not positive. I know that
6 account was dealt with in the GDB
7 restructuring.
8     Q.    Okay. Were you involved in the
9 GDB restructuring in any way?
10     A.    No.
11     Q.    And, again, during this
12 period, none of the accounts through which the
13 hotel occupancy taxes flowed were Commonwealth
14 accounts; is that correct?
15     THE REPORTER: I'm sorry. Were
16 what?
17     MS. MILLER: Commonwealth
18 accounts.
19     THE REPORTER: Thank you.
20     THE WITNESS: Correct.
21 BY MS. MILLER:
22     Q.    Okay. And again, as with the
23 prior period, exactly the same revenues flowed
24 through the 5142 account and the GDB 9758
25 account, correct?

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

75 (Pages 518 to 521)

---

**518**

1      A.   It would have been the same amount   06:18:41
2  that -- same revenue that was transferred by   06:18:43
3  hoteliers to 5142.  Transfers for the same   06:18:45
4  amount would be in total throughout April to   06:18:50
5  9758.   06:18:56
6      Q.   Okay.  So now let's go on to the   06:18:56
7  next one.  It's about to get a lot more   06:18:59
8  complicated.   06:19:09
9      Okay.  So here the hoteliers are   06:19:09
10 collecting taxes, and they're still   06:19:15
11 transferring them into the Scotiabank 5142   06:19:15
12 account; is that right?   06:19:20
13     A.   Right.   06:19:21
14     Q.   And then the money is being   06:19:22
15 transferred from the 5142 account into the 5144   06:19:24
16 account?   06:19:26
17     A.   Correct.   06:19:28
18     Q.   And is it your understanding that   06:19:30
19 during this period all of the hotel occupancy   06:19:31
20 taxes were transferred from the 5142 into the   06:19:34
21 5144 account?   06:19:40
22     A.   Yes.   06:19:40
23     Q.   Okay.  And have you seen   06:19:44
24 account-opening documents for the 5144 account?   06:19:45
25     A.   No, I have not personally seen   06:19:53

---

**519**

1  them.   06:19:55
2      Q.   Okay.  Do you know whether anybody   06:19:55
3  on your team has?   06:19:56
4      A.   I don't recall if anyone on the   06:20:00
5  team has or not.  I believe you could look at   06:20:02
6  the document we reviewed together earlier to   06:20:05
7  know for certain.   06:20:08
8      Q.   Okay.  Would you expect account   06:20:08
9  documents related to the 5144 account to   06:20:14
10 identify it as the surplus account?   06:20:16
11     A.   I'm not certain of what documents   06:20:22
12 would or would not be used to identify the   06:20:26
13 surplus account.   06:20:31
14     Q.   Well, I'm just asking if you -- we   06:20:37
15 saw the pledge account document.  It called the   06:20:39
16 account the pledge account.   06:20:41
17     Would you expect the account   06:20:43
18 documents related to this account to call it   06:20:45
19 the surplus account?   06:20:47
20     A.   I'm not certain what every   06:20:52
21 documented related to this account named the   06:20:54
22 account.   06:20:59
23     Q.   I'm asking you if you would expect   06:20:59
24 the account-opening documents to designate a   06:21:00
25 surplus account.   06:21:08

---

**520**

1      A.   I can't say one way or the other   06:21:09
2  whether an opening statement would say that or   06:21:12
3  not.   06:21:15
4      Q.   Would you expect any account, any   06:21:15
5  documents related to this account to identify   06:21:17
6  it as the surplus account?   06:21:21
7      MS. McKEEN:  Objection.   06:21:24
8      THE WITNESS:  I'm not positive of   06:21:31
9  documents that would or would not have been   06:21:33
10 used to make that determination.   06:21:35
11 BY MS. MILLER:   06:21:35
12     Q.   Okay.  Have you ever heard this   06:21:46
13 account referred to as the sweep concentration   06:21:57
14 account?   06:22:00
15     A.   You broke up there right at the   06:22:01
16 end.   06:22:02
17     Have you ever seen this account   06:22:04
18 referred to as the sweep concentration account?   06:22:08
19     A.   I can't recall if I've seen the   06:22:12
20 account referred to in that way or not.   06:22:16
21     Q.   What is a sweep concentration   06:22:23
22 account, as you understand it?   06:22:25
23     A.   I'm not certain of exactly what   06:22:26
24 that name -- the name of an account like that   06:22:46
25 would indicate.   06:22:47

---

**521**

1      Q.   Are you aware of any other   06:22:52
2  accounts called sweep concentration accounts   06:22:54
3  within the Commonwealth or instrumentality?   06:22:56
4      A.   No.   06:23:02
5      Q.   No.  Have you ever heard that term   06:23:02
6  with respect to the Tourism Company?   06:23:07
7      A.   I just can't recall.  People use   06:23:14
8  the term "sweep" and "concentration" very   06:23:16
9  loosely when referring to different accounts.   06:23:20
10     MS. MILLER:  Okay.  I would like   06:23:26
11 to mark as the next exhibit tab 2134, please.   06:23:30
12     (Monolines Exhibit 36 is   06:23:30
13 introduced for the record.)   06:23:30
14     THE WITNESS:  Excuse me.  Could we   06:23:55
15 make a 2-minute break?  I just drank a bunch of   06:23:56
16 coffee with coffee grounds with it.   06:24:00
17     MS. MILLER:  Sure.  I'll let you   06:24:03
18 take it even though there's a question pending.   06:24:04
19 Let's go off the record.   06:24:07
20     THE VIDEOGRAPHER:  We are off the   06:24:09
21 record at 6:24 p.m.   06:24:09
22     (Recess taken.)   06:24:14
23     THE VIDEOGRAPHER:  We are back on   06:24:43
24 the record at 6:25 p.m.   06:24:45

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                        April 23, 2020

76 (Pages 522 to 525)

---

522

BY MS. MILLER:
Q.    Okay.  So you have in front of you
a document that was marked Monolines
Exhibit 36.
         Do you see that?
A.    I see the document.
Q.    Yeah.  Is this a document that
you've seen before?
A.    Is there a certified English
translation?
Q.    I'm not sure.  The answer is
maybe.  I don't think that what I'm going to
have to do requires knowledge of Spanish.
Other -- okay.  There is a certified English
translation.  Do we want to wait for it?
A.    If you could.
Q.    Sounds like your Spanish is a lot
better than mine.  If you need the English
translation, just let me know, and I'll stop
and wait for that to be found.
A.    Fair enough.
Q.    So do you recognize Exhibit 36 as
a corporate resolution of the Tourism Company
of Puerto Rico?
A.    I see that's (indiscernible) --

---

523

         THE REPORTER:  I'm sorry.  You
broke up.  The witness, your answer totally
broke up for me.  Sorry.
         THE WITNESS:  Sure.  I said:
         Yes, I see that's what the
document says.
         THE REPORTER:  Thank you.
BY MS. MILLER:
Q.    Okay.  And you see that it lists a
number of Tourism Company bank accounts in a
chart starting about halfway through?
A.    Yes, I see that.
Q.    Could we magnify the exhibit a
little bit?  I think it's very hard to see the
numbers.  They're running together a little
bit.
A.    Does that help?
Q.    If you have magnified it on your
end.  I have a hard copy that is slightly
larger on my end.  So if you can see it...
A.    I can see it.
Q.    Okay.  Great.  So do you see that
the first account that's identified is the
Scotiabank of Puerto Rico account
██████████ 5144?

---

524

A.    Yes, I see that on the document.
Q.    Okay.  And is that the account
that is referred to in your Flow of Funds
document as the Scotiabank 5144 account?
A.    Yes.
Q.    Okay.  And do you see the next
column over says:
         Number de la cuenta?
A.    Yes.
Q.    And do you understand that to mean
name of the account?
A.    Yes.
Q.    Okay.  And the name of the account
that's attributed to the 5144 account, can you
just read what it's called in this document?
A.    This document lists the name of
that account as "sweep concentration."
Q.    Okay.  It doesn't list a surplus,
does it?
A.    The document says "sweep
concentration."
Q.    Okay.  And looking at the May '16
to July '16 Flow of Funds, in fact, none of the
accounts identified in this Flow of Funds is a
Commonwealth account, is it?

---

525

A.    Could we have the Flow of Funds
presentation during the --
Q.    Oh, sorry, yes.  Yes.  I'm sorry.
We are not in hard copy.  I forgot.  Yes.  Can
we -- that was not a memory test.
         MS. MILLER:  Can we pull up
Exhibit 32 again, please.
         Thank you.  It wasn't a trick, I
promise.
A.    No problem.
BY MS. MILLER:
Q.    I'm old school.  My desk is filled
with the exhibits.  I kind of assumed yours was
too.
         MS. MILLER:  Was there anyone
else -- did you want me to pull up the
certified English translation?  I'm happy to
attach it to the exhibit that we marked just so
we have it on a going forward basis, but unless
anybody wants to see it right now, I was going
to go back to the Flow of Funds document.
         MS. McKEEN:  I think we are okay.
         MS. MILLER:  Okay.  Great, thank
you.

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

77 (Pages 526 to 529)

---

**526**

BY MS. MILLER:

Q.   Okay.  So let me just ask my question again.

Looking at the Flow of Funds from May '16 to July 2016, none of the accounts identified in this Flow of Funds is a Commonwealth account, correct?

A.   Correct.

Q.   And looking forward to the August '16 to February of 2017 account -- sorry -- Flow of Funds, here the room tax revenues collected by the hoteliers are still being transferred into the Scotiabank 5142 account; is that right?

A.   Correct.

Q.   And during this period, the money is now flowing next into the BPPR 2306 account; is that right?

A.   Correct.

Q.   Okay.  What's your understanding of what the BPPR 2306 account is?

A.   **This account in this time period, this account is used to transfer monthly payments to BPPR 6545.**

Q.   Okay.  So just looking back to the

---

**527**

January '15 to November 2015 period, that BPPR 2306 account is now taking the place of the GDB 9758 account; is that right?

UNIDENTIFIED SPEAKER:  Objection.

THE WITNESS:  It's not one -- one account -- accounts don't replace accounts in that way.  I don't think about it like that.

BY MS. MILLER:

Q.   Okay.  Well, when the GDB ceases to exist and you have to open an account in a new bank, wouldn't you think about it in that way?

MS. McKEEN:  Objection.

BY MS. MILLER:

Q.   Okay.  So let me just -- and I don't know, is there a way to split the screen on the exhibit so that you can look at both the January 2015 to November 2015 and August 2016 to February 2016 Flow of Funds side by side?

A.   **I don't know.**

Q.   The message from people who know say there is not.  That's the definitive answer.  So okay.  All right.

So the first one will be easy because we still start with room taxes being

---

**528**

collected by hoteliers, right?

And in those periods, the moneys are transferred by the hoteliers into the Scotiabank 5142 account, correct?

A.   Correct.

Q.   Okay.  And my question is going to be -- and I'm happy to go back and forth as much as you want, but my question is going to be are exactly the same moneys -- so I don't mean like actual dollars but the same revenue streams, hotel occupancy taxes, that flow into the GDB 9758 account in the January 2015 to November 2015 period -- sorry.  Let me just ask it more simply.

Are the hotel occupancy tax revenues that flow into the GDB 9758 account from January '15 to November '15 the same hotel occupancy tax revenues that flow into the BPPR 2306 account in the August '16 to February '17 period?

A.   **They're inherently not the same revenues because they're revenues from different time periods, but from August 2016 to February 2017, there are approximately $3 million monthly amounts being transferred**

---

**529**

**from Account 2360 to BPPR 6545.**

Q.   Okay.  Are all of the hotel occupancy taxes collected between August '16 and February '17 transferred from 5142 to BPPR 2306?

A.   **Yes.**

Q.   And that's the same as the Flow of Funds from 5142 to GDB 9758 in the January '15 to November '15 period, correct?

A.   **Thank you for allowing me to flip back.  Would you mind repeating the question now that I've had a chance to look at this?**

Q.   Yeah.  That flow of all of the hotel occupancy taxes from 5142 to BPPR 2306 is the same Flow of Funds, although in two different accounts that we saw in January '15 to November '15.

So all of the hotel occupancy taxes go from 5142 into the next account, and at that time period it was GDB 9758, correct?

A.   **Correct.**

Q.   Okay.  And then you indicated that it's about 3-plus million during the August 16th to February 17th period that goes from the BPPR 2306 down to the BPPR 6545,

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

78 (Pages 530 to 533)

---

530

1    correct?                                             06:37:05
2        A.    Correct.                                   06:37:05
3        Q.    Okay.  And that is the same                06:37:07
4    proportional amount -- or not proportional           06:37:09
5    amount but the same dollar amount flowed each        06:37:13
6    month that flowed during the January '15 to          06:37:16
7    November '15 time period from the GDB 9758           06:37:19
8    account to the GDB 9947 account, correct?            06:37:25
9        A.    The payments were approximately            06:37:29
10   the same amount.                                     06:37:30
11       Q.    Okay.  And did the same                    06:37:32
12   approximate amount flow from the 9758 account        06:37:38
13   to the Scotiabank 5144 account in both time          06:37:41
14   period, so in January '15 to November '15 and        06:37:44
15   in August '16 to February '17?                       06:37:48
16       A.    Okay.  Could you repeat that               06:38:00
17   question, please?                                    06:38:02
18       Q.    Yeah.  Did the same amount of              06:38:02
19   hotel occupancy taxes or the same, yeah,             06:38:04
20   relative surplus amount of hotel occupancy           06:38:06
21   taxes flow from the 2306 account to the 5144         06:38:09
22   account and from the 9758 account to the 5144        06:38:15
23   account in the August '16 to February '17 and        06:38:20
24   January '15 to November '15 periods                  06:38:25
25   respectively?                                        06:38:29

---

531

1        A.    Yes.                                       06:38:30
2        Q.    And, again, looking at the August         06:38:34
3    '15 to February '17 Flow of Funds, none of           06:38:37
4    these accounts is a Commonwealth account,            06:38:40
5    correct?                                             06:38:47
6        A.    Correct.                                   06:38:47
7        Q.    Okay.  And is it your                      06:38:48
8    understanding that the moneys transferred into       06:38:50
9    the BPPR 6545 account during this time period        06:38:53
10   remain in that account?                              06:38:58
11       A.    During this time period, there            06:39:05
12   were no transfers out of the account.               06:39:07
13       Q.    Okay.  In a couple of flows, we            06:39:15
14   are going to get to transfer out of that             06:39:20
15   account into a First Bank 3961 account, so I'm       06:39:24
16   happy to flip forward to the February 2018 to        06:39:29
17   the present Flow of Funds.                            06:39:32
18           When the transfers were made                 06:39:45
19   during this period, were all of the moneys that      06:39:46
20   were previously deposited into the BPPR 6545         06:39:48
21   account deposited into the First Bank account?       06:39:52
22       A.    Yes.                                       06:40:03
23       Q.    Okay.  So we skipped over one.  I          06:40:04
24   just want to go back to the March '17 to             06:40:08
25   January '18 Flow of Funds, and here there are        06:40:11

---

532

1    more errors further complicating things.             06:40:18
2           So let me start by asking:                     06:40:20
3    Hoteliers still collect the taxes, correct?          06:40:22
4        A.    Yes.                                        06:40:26
5        Q.    In the March '17 to January '18            06:40:27
6    period.  After collecting the taxes, they            06:40:30
7    continued to transfer those moneys to the            06:40:33
8    Scotiabank 5142 account, correct?                    06:40:36
9        A.    Correct.                                   06:40:39
10       Q.    Okay.  What moneys flowed from the         06:40:40
11   5142 account to the 6545 account during this         06:40:49
12   period?                                              06:40:53
13       A.    During this time period, the              06:40:58
14   approximately $3 million per month is                06:41:01
15   transferred from 5142 to 6545.                       06:41:03
16       Q.    And what moneys are                        06:41:08
17   transferred from 5142 to 2306?                       06:41:10
18       A.    It depends.  I think at this time          06:41:21
19   account 5142 had some maximum dollar threshold       06:41:25
20   limits, and so then amounts received from           06:41:29
21   hoteliers that exceed those limits, Scotiabank       06:41:34
22   5142 transferred those funds to 2306, assuming       06:41:42
23   they're in excess of the $3 million monthly          06:41:45
24   payments made to 6545.                               06:41:50
25       Q.    Got it.  And then -- okay.  And            06:41:54

---

533

1    then what moneys are transferred to the 5144         06:41:58
2    account from the -- sorry.                           06:42:00
3           What moneys are transferred from              06:42:05
4    the 5142 account to the 5144 account?                06:42:07
5        A.    To the -- the surplus of hotelier         06:42:12
6    room tax revenue is remitted to 5142.  So            06:42:19
7    hoteliers remit room taxes to 5142, and the         06:42:22
8    monthly payment going to 6545.  And in this          06:42:27
9    flow it's the same kinds of revenue that would      06:42:31
10   go from 5142 to 2306 or directly to 5144, just      06:42:36
11   depending on the cash management system and the     06:42:39
12   way this -- the account maximum balance             06:42:45
13   threshold worked.                                    06:42:47
14       Q.    And do you have an understanding          06:42:51
15   of why approximately $3 million a month was          06:42:58
16   transferred from 5142 to 6545?                       06:42:59
17           MS. McKEEN:  Objection.                       06:43:02
18           THE WITNESS:  I don't know why the          06:43:08
19   exact amount was -- is that amount, it would         06:43:15
20   transfer.                                            06:43:17
21   BY MS. MILLER:                                        06:43:21
22       Q.    But do you know why the money was         06:43:21
23   being separated in this way and certain amounts      06:43:24
24   transferred to 6545 and other amounts to 5144?      06:43:28
25           MS. McKEEN:  I'll articulate the            06:43:47

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

79 (Pages 534 to 537)

534

```
1   same objections as I did yesterday and made        06:43:49
2   clear that the witness wasn't supposed to be       06:43:51
3   giving testimony about why the Commonwealth        06:43:53
4   took certain actions.  So, like I did              06:43:56
5   yesterday, I'm going to instruct the witness       06:43:58
6   not to answer the question.                        06:43:59
7   BY MS. MILLER:                                     06:43:59
8        Q.   Okay.  So let me ask you, then:          06:44:01
9             Is that a question that you could        06:44:03
10  answer but for the objection of your counsel?      06:44:05
11       A.   I'm not positive.                        06:44:14
12       Q.   Okay.  Okay.  So looking at the          06:44:21
13  next sheet in the Flow of Funds, the next Flow     06:44:24
14  of Funds part, this is February 2018 to the        06:44:31
15  present.                                           06:44:39
16            And the first part corresponds to        06:44:44
17  the Flow of Funds that we saw previously from      06:44:49
18  March '17 to January '18.  I'm happy to go back    06:44:51
19  to that if it doesn't look visually the same to    06:44:57
20  you.  I'm going to limit my questions to the       06:45:02
21  bottom account.                                    06:45:04
22       A.   Okay.                                    06:45:08
23       Q.   Mr. Ahlberg, do you want to go           06:45:09
24  back, or are you sufficiently familiar with        06:45:13
25  these to understand that the top two lines are     06:45:16
```

535

```
1   the top two rows of transfer focusing?             06:45:18
2        A.   I understand they're the same.           06:45:24
3        Q.   Okay.  So just looking at the            06:45:24
4   bottom, the three accounts designated in the       06:45:29
5   bottom row here, so moneys go from -- let's        06:45:32
6   start at the beginning again.                      06:45:38
7             The hoteliers collect the room           06:45:39
8   taxes, they then transfer them to Scotiabank      06:45:41
9   5142 account, and that's something that's          06:45:46
10  consistent throughout the time period covered      06:45:49
11  by all of these Flow of Funds, correct?            06:45:52
12       A.   Correct.                                 06:45:55
13       Q.   And then the 3-plus million is           06:45:55
14  then transferred from the 5142 account to the      06:45:56
15  BPPR 6545 account, correct?                        06:45:59
16       A.   Correct.                                 06:46:03
17       Q.   Okay.  And then moneys flow to the       06:46:04
18  First Bank 3961 account, correct?                  06:46:08
19       A.   During this time period, that's          06:46:11
20  correct.                                           06:46:15
21       Q.   Okay.  And what moneys flowed into       06:46:15
22  the First Bank 3961 account?                       06:46:18
23       A.   The approximately 3 million              06:46:28
24  monthly payments would be transferred into the     06:46:29
25  First Bank 3691 account.                           06:46:31
```

536

```
1        Q.   As well as any moneys that have          06:46:34
2   previously been transferred into the BPPR 6545     06:46:36
3   account, correct?                                  06:46:40
4        A.   Yes.                                     06:46:41
5        Q.   Okay.  And then moneys are               06:46:43
6   transferred into the First Bank 2984 account.      06:46:49
7   Do you see that?                                   06:46:51
8        A.   Yes.                                     06:46:53
9        Q.   What is the 2984 account?                06:46:54
10       A.   This is an account into which the        06:47:00
11  interest earned on deposits was transferred.       06:47:09
12       Q.   Okay.  So does that mean that the        06:47:13
13  principal amounts remained in the 3961 account     06:47:17
14  and only interest amounts earned flowed into       06:47:21
15  the 2984 account?                                  06:47:26
16       A.   Yes.                                     06:47:29
17       Q.   Okay.  So what is the First Bank         06:47:29
18  3961 account?                                      06:47:36
19       A.   An account at this time that's           06:47:39
20  being used to accumulate the approximately         06:47:41
21  $3 million monthly payment.                        06:47:44
22       Q.   Okay.  And do you know if this           06:47:46
23  account has a name?                                06:47:49
24       A.   I don't know off the top of my           06:47:52
25  head if this account has a name or not.            06:47:55
```

537

```
1        Q.   Do you know if this is a debt            06:47:57
2   service reserve account?                           06:47:58
3        A.   Again, I'm just not certain of the       06:48:06
4   name of this account or not.                       06:48:09
5        Q.   Okay.  So you know the name of a         06:48:13
6   whole lot of BPPR accounts, but you don't know     06:48:16
7   the name of this account?                          06:48:19
8             UNIDENTIFIED SPEAKER:  Objection.        06:48:20
9             MS. McKEEN:  Objection,                  06:48:21
10  argumentative.                                     06:48:21
11  BY MS. MILLER:                                     06:48:21
12       Q.   It's just a yes or no.                   06:48:23
13            MS. McKEEN:  It would be nice if         06:48:26
14  you can ask questions.  It's been a very long      06:48:28
15  day for us.                                        06:48:32
16            MS. MILLER:  Can we pull up tab          06:48:32
17  2124, please.                                      06:48:34
18  BY MS. MILLER:                                     06:48:36
19       Q.   Have you ever seen any account           06:48:36
20  statements for this FirstBank 3961 account?        06:48:37
21       A.   I believe so, but I can't recall         06:48:45
22  looking at these specific ones off the top of      06:48:46
23  my head.                                           06:48:50
24       Q.   Okay.  So while we are pulling up        06:48:50
25  that exhibit, the last transfer that we haven't    06:48:57
```

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                April 23, 2020

80 (Pages 538 to 541)

---

538

```
1    spoken about on this Flow of Funds is a          06:49:02
2    $15 million, quote, discrete one-time transfer   06:49:06
3    to the BPPR 9458 account.  Do you see that?      06:49:11
4        A.    I don't see that on my screen, but     06:49:15
5    I do know the transfer you're referring to.      06:49:20
6        Q.    Sorry.  Okay.  I think it might be     06:49:27
7    sufficiently long -- my headset's dying.  Okay.  06:49:30
8    What is that $15 million transfer?               06:49:34
9        A.    It's a transfer from the FirstBank     06:49:39
10   account to a Commonwealth account.               06:49:42
11       Q.    And what was that transfer for?        06:49:46
12       A.    The -- I believe the transfers for     06:49:52
13   the Renew Your School program, I think it's      06:49:57
14   called.                                          06:50:03
15       Q.    Okay.  And do you know whether         06:50:10
16   that transfer of $15 million came from the       06:50:12
17   hotel occupancy tax monthly payment?             06:50:20
18       A.    Yes.                                   06:50:33
19       Q.    And did it?                            06:50:34
20       A.    Yes.                                   06:50:37
21       Q.    Do you know when that payment was      06:50:40
22   made?                                            06:50:45
23       A.    When the $15 million transfer was      06:50:47
24   made?                                            06:50:49
25       Q.    Yeah.                                  06:50:50
```

---

540

```
1    Funds presentation page?                         06:52:28
2        Q.    Oh.  Yes, before we do that, let's     06:52:33
3    just do -- I'll come back to that question.      06:52:37
4    While we have Monolines Exhibit 37 up.           06:52:40
5            (Monolines Exhibit 37 is                 06:52:40
6            introduced for the record.)              06:52:40
7    BY MS. MILLER:                                   06:52:40
8        Q.    I've marked as Monolines               06:52:45
9    Exhibit 37 a statement of account from the       06:52:47
10   FirstBank account.                               06:52:49
11           Do you see that?                         06:52:57
12       A.    Yes.                                   06:52:57
13       Q.    And this is the -- looking for the     06:52:58
14   account number.  Okay, so the account number is 06:53:04
15   3961.  This is from the FirstBank 3961 account.  06:53:07
16           Do you see that?  It's on the            06:53:18
17   left-hand side.  It starts with 0 star on the    06:53:19
18   upper -- sorry -- upper right-hand side starts   06:53:22
19   with 0 star, 03.                                 06:53:27
20       A.    Yes, I see that.  Thank you.           06:53:32
21       Q.    Okay.  So you see this is the 3961     06:53:34
22   bank account, correct?                           06:53:37
23       A.    Yes.                                   06:53:38
24       Q.    And you see on the left-hand side      06:53:38
25   the statement of account is directed to the      06:53:40
```

---

539

```
1        A.    I can't recall if I had this          06:50:51
2    specific date.  We may have (indiscernible).     06:51:10
3            THE REPORTER:  I'm sorry.  I'm           06:51:10
4    sorry, Mr. Witness.  You just broke up in your   06:51:12
5    answer.  Can you repeat that, please?            06:51:13
6            THE WITNESS:  I don't remember           06:51:21
7    specifically what I said other than clarifying   06:51:21
8    that I'm not positive off the top of my head     06:51:28
9    the exact date of that $15 million transfer.     06:51:28
10   BY MS. MILLER:                                   06:51:28
11       Q.    Are there any moneys, Mr. Ahlberg,     06:51:32
12   in this FirstBank 3961 account that are not      06:51:34
13   from this 3-plus million monthly transfers of    06:51:38
14   hotel occupancy taxes?                           06:51:41
15       A.    No.                                    06:51:46
16       Q.    Okay.  And what is the BPPR 9458       06:51:52
17   account?                                         06:51:59
18       A.    Can you clarify what you mean by       06:52:08
19   "What is that account?"                          06:52:11
20       Q.    Yeah, you said it's a Commonwealth     06:52:12
21   account.  And it indicates that it has           06:52:14
22   comingled funds.                                 06:52:14
23           Were there funds held in this           06:52:20
24   account held for a particular purpose?           06:52:22
25       A.    Can we pull up that last Flow of       06:52:25
```

---

541

```
1    Tourism Company?                                 06:53:42
2        A.    Yes.                                   06:53:48
3        Q.    And then it says Debt Service          06:53:49
4    Reserve.  Do you see that?                       06:53:51
5        A.    I see that.                            06:53:53
6        Q.    And do you understand that to be       06:53:53
7    the name of this account?                        06:53:55
8        A.    That's what this statement says.       06:54:01
9        Q.    Okay.  So let's pull up Exhibit 32     06:54:04
10   again.  And let's just look at the last page.    06:54:08
11           Okay.  So while we are waiting for      06:55:16
12   the last page of Exhibit 32 to be pulled up,     06:55:17
13   I'm just going to check what my question was.    06:55:20
14           Okay.  So with Exhibit 32 back in       06:55:44
15   front of you, can you tell me what kind of       06:55:47
16   Commonwealth account this is or what kind of     06:55:50
17   account the BPPR 9458 account is?                06:55:52
18       A.    I believe that's the TSA              06:56:03
19   operational account at this time.               06:56:05
20       Q.    And how do you know that the           06:56:12
21   moneys were transferred in for the Renew Your    06:56:16
22   School program?                                  06:56:19
23       A.    I have reviewed documents             06:56:27
24   recording the $15 million transfer that         06:56:41
25   referenced the Renew Your School program.       06:56:45
```

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

81 (Pages 542 to 545)

542

```
1       Q.    And do you know whether they were          06:56:48
2   identified when transferred into the 9458             06:56:51
3   account with any particular accounting or other       06:56:57
4   designation, Fund or account designation that         06:57:01
5   would specifically allocate them to the Renew          06:57:04
6   Your School program?                                   06:57:08
7       A.    I'm not certain of the exact                06:57:12
8   accounting treatment that was used to record          06:57:15
9   that transfer.                                         06:57:16
10      Q.    Okay.  But you believe that there           06:57:18
11  is some indication in the transfer document            06:57:20
12  that specified that these moneys are for the           06:57:25
13  Renew Your School program?                             06:57:27
14      A.    I believe so, yes.                          06:57:32
15      Q.    Okay.  And do you know whether              06:57:35
16  those moneys were ever transferred from the TSA        06:57:36
17  operational account to a third party or                06:57:42
18  another -- sorry, let me just ask simply:              06:57:47
19          Do you know whether those moneys              06:57:50
20  were ever transferred out of the TSA                   06:57:51
21  operational account?                                   06:57:54
22      A.    I'm not certain if there was or             06:58:25
23  was not an outflow from the TSA account for the        06:58:27
24  Renew Your School program.                             06:58:32
25      Q.    Okay.  You did not see any                  06:58:35
```

543

```
1   outflows indicating that these transfer hotel         06:58:38
2   occupancy taxes were moving out of the TSA, did       06:58:44
3   you?                                                   06:58:54
4       A.    No, but as soon as the $15 million          06:58:54
5   is transferred to the TSA, it's comingled and          06:58:54
6   indistinguishable from other dollars.                  06:59:01
7       Q.    Right.  But as we saw previously,           06:59:04
8   there was an outflow identifying the revenue           06:59:10
9   source of the hotel occupancy tax.  You would          06:59:10
10  be able to see that, correct?                           06:59:14
11          UNIDENTIFIED SPEAKER:  Objection.              06:59:16
12          THE WITNESS:  I can't speculate                06:59:22
13  one way or the other.                                   06:59:23
14  BY MS. MILLER:                                          06:59:23
15      Q.    Well, we looked at a number of              06:59:33
16  documents where you identified the ability to          06:59:36
17  know that it was particular revenues from              06:59:38
18  comingled accounts because there were                   06:59:40
19  accounting or other documents that so                   06:59:42
20  designated them on the outflow side.                    06:59:45
21          Do you recall that?                            06:59:48
22          MS. McKEEN:  Objection.                        06:59:50
23          THE WITNESS:  Yes.                             06:59:51
24  BY MS. MILLER:                                          06:59:51
25      Q.    Okay.  And if you had seen some             06:59:52
```

544

```
1   more outflow documents with respect to these          06:59:55
2   hotel occupancy taxes that were transferred            06:59:58
3   into the BPPR 9458 account during the February         07:00:00
4   '18 to the present time period, you would have         07:00:05
5   indicated that on this chart in the next step          07:00:08
6   of the Flow of Funds, wouldn't you?                     07:00:11
7       A.    Would you mind repeating the                07:00:43
8   question?                                               07:00:45
9       Q.    Yeah, let me rephrase it.                   07:00:46
10          Does the fact that there is no                07:00:50
11  subsequent transfer identified on the February        07:00:51
12  '18 to present Flow of Funds mean that you did         07:00:55
13  not see any outflow documents from the 9458            07:00:59
14  account that specifically identified the hotel         07:01:04
15  occupancy taxes as the revenue source?                 07:01:07
16      A.    I have not certainly seen a                 07:01:31
17  document that would indicate a transfer out of         07:01:33
18  the TSA indicating the revenue source was the          07:01:36
19  $15 million of hotel taxes.                             07:01:44
20          MS. McKEEN:  Atara, we have been              07:01:53
21  going for about two hours.  It's been about an         07:01:54
22  hour since you said you were going to try to           07:01:59
23  wrap it up.  So what's the plan here?                   07:02:02
24          MS. MILLER:  So I have over -- I              07:02:05
25  have 13 hours.  Okay.  So I have one more              07:02:08
```

545

```
1   question and then I was going to call a break         07:02:11
2   and caucus and hopefully just end.                     07:02:13
3           MS. McKEEN:  Okay.  So let's have             07:02:17
4   one more question, then.                                07:02:19
5   BY MS. MILLER:                                          07:02:19
6       Q.    Okay.  So looking back at the              07:02:20
7   January '15 to November '15 Flow of Funds, back        07:02:23
8   a few pages in Exhibit 32, are there any               07:02:32
9   outflows from the 9758 account that are not           07:02:38
10  reflected on this chart?                                07:02:47
11      A.    It is possible that there's a              07:03:00
12  one-off transaction that's not captured that's         07:03:03
13  intended as a summary document to show the            07:03:05
14  general Flow of Funds during this time period.         07:03:11
15          MS. MILLER:  So, Liz, I lied.  I              07:03:18
16  said I had one question.  I had two.  I've been        07:03:20
17  saving this one for a long time.                        07:03:22
18          MS. McKEEN:  I knew it wouldn't be            07:03:25
19  one.                                                    07:03:30
20  BY MS. MILLER:                                          07:03:30
21      Q.    Mr. Ahlberg, you indicated that            07:03:31
22  you were confident that the GDB 9758 account          07:03:33
23  was the transfer account based on how -- the          07:03:39
24  moneys that flowed into it.                             07:03:42
25          Can you explain to me what about             07:03:45
```

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                      April 23, 2020

82 (Pages 546 to 549)

---

**546**

```
 1   the GDB 9758 account makes you confident that       07:03:47
 2   it is the transfer account?                          07:03:52
 3        A.    After discussions with the Tourism        07:04:02
 4   Company, I'm confident that that's the transfer      07:04:04
 5   account.                                             07:04:08
 6        Q.    So there is nothing specific about        07:04:12
 7   the nature of the moneys that flowed into it,        07:04:14
 8   how the account was used or any documents that       07:04:23
 9   makes you confident that it's the transfer          07:04:23
10   account.  It's based exclusively on                  07:04:26
11   conversations that you had with Gustavo?             07:04:28
12        MS. McKEEN:  Object to the form.                07:04:33
13        THE WITNESS:  Would you repeat                   07:04:49
14   that question?                                       07:04:50
15        MS. MILLER:  Could the court                    07:04:53
16   reporter read it back, please.                       07:04:54
17        (Record read as requested.)
18        "So there is nothing specific
19        about the nature of the moneys
20        that flowed into it, how the
21        account was used or any
22        documents that makes you
23        confident that it's the
24        transfer account.  It's based
25        exclusively on conversations
```

**547**

```
 1   that you had with Gustavo?"                          07:05:24
 2        THE WITNESS:  Me, personally, it's             07:05:24
 3   based on my conversations with Gustavo, but I       07:05:29
 4   can't say that Gustavo didn't consider various      07:05:33
 5   factors when determining that.                       07:05:35
 6   BY MS. MILLER:                                       07:05:35
 7        Q.    Okay.  And you, as the corporate         07:05:41
 8   representative testifying today, have no idea        07:05:44
 9   what Gustavo may have considered or been            07:05:46
10   relying on?                                          07:05:49
11        UNIDENTIFIED SPEAKER:  Objection.               07:05:50
12        THE WITNESS:  I just cannot recall             07:05:51
13   at this moment any documents he may or may not      07:05:53
14   have relied upon to make that determination.        07:05:56
15        MS. McKEEN:  Okay.  All right.                  07:05:58
16   Can we take a 5-minute break?  And I think         07:06:00
17   we'll conclude when we come back.                    07:06:06
18        MS. McKEEN:  Atara, just to warn               07:06:11
19   you, I will have redirect, but I think it will      07:06:15
20   probably last 45 minutes.                            07:06:18
21        MS. MILLER:  Okay.  Thank you.                  07:06:22
22   We'll come back.                                     07:06:22
23        THE VIDEOGRAPHER:  We are off the              07:06:24
24   record at 7:06 p.m.                                  07:06:24
25        (Recess taken.)                                 07:06:27
```

**548**

```
 1        THE VIDEOGRAPHER:  We are back on               07:14:54
 2   the record at 7:16 p.m.                              07:15:40
 3        MS. MILLER:  Mr. Ahlberg, we have              07:15:44
 4   no further questions for you.                        07:15:45
 5        I want to thank you for your time              07:15:46
 6   today and on Tuesday and the hard work you put      07:15:49
 7   into preparing the Flow of Funds documents.         07:15:51
 8        THE WITNESS:  Thank you, Madam.                07:15:55
 9        EXAMINATION                                     07:15:57
10   BY MS. McKEEN:                                       07:15:57
11        Q.    Thank you, Mr. Ahlberg.  I just          07:16:00
12   have a couple of questions for you, and I will      07:16:02
13   now also thank you for your time.                    07:16:05
14        MS. McKEEN:  Atara, if your                    07:16:08
15   colleague could please pull up Exhibit 11 to        07:16:11
16   Mr. Ahlberg's deposition, please.                    07:16:14
17   BY MS. McKEEN:                                       07:16:14
18        Q.    Mr. Ahlberg, this is previously          07:16:39
19   marked as Exhibit 11 to your deposition, and I      07:16:40
20   believe you testified that is a voucher that        07:16:42
21   HTA submitted.  Do you recall that testimony?       07:16:46
22        A.    Yes.                                      07:16:48
23        Q.    Did vouchers like this have to be        07:16:51
24   approved by the Puerto Rico Treasury                 07:16:53
25   Department?                                          07:16:59
```

**549**

```
 1        A.    Yes.                                      07:16:59
 2        Q.    Does this document reflect that          07:17:01
 3   approval anywhere?                                   07:17:07
 4        A.    Yes.                                      07:17:07
 5        Q.    And in your experience, would            07:17:10
 6   payment in connection with a voucher like this      07:17:13
 7   have been made without Treasury's approval?         07:17:16
 8        A.    No.                                       07:17:22
 9        Q.    Okay.  Could I have Exhibit 14,          07:17:23
10   please.                                             07:17:26
11        Mr. Ahlberg, this was previously               07:17:27
12   marked as Exhibit 14 to your deposition.  Was       07:17:54
13   this report prepared by HTA or by the              07:18:03
14   Puerto Rico Treasury Department?                     07:18:06
15        A.    Document was prepared by HTA.            07:18:10
16        Q.    And if you look in the bottom            07:18:14
17   right-hand corner of the document, there's          07:18:14
18   reference to somebody named Hector Melendez.        07:18:20
19        Do you see that?                                07:18:23
20        A.    Yes.                                      07:18:23
21        Q.    Was Hector Melendez an employee of       07:18:24
22   HTA?                                                07:18:28
23        A.    Yes.                                      07:18:28
24        Q.    And when it refers to Treasury           07:18:30
25   office underneath his name, is Treasury office      07:18:36
```

---

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II                                    April 23, 2020

83 (Pages 550 to 553)

|  | 550 | |
|---|---|---|
| 1 | a part of HTA? | 07:18:39 |
| 2 | A.  Yes, that refers to the Treasury | 07:18:44 |
| 3 | office within HTA. | 07:18:46 |
| 4 | Q.  And is that Treasury office part | 07:18:53 |
| 5 | of Hacienda? | 07:18:59 |
| 6 | A.  No. | 07:18:59 |
| 7 | MS. McKEEN:  Thank you.  I don't | 07:19:00 |
| 8 | have any more questions for you.  I appreciate | 07:19:01 |
| 9 | your time both today and Tuesday, Mr. Ahlberg. | 07:19:04 |
| 10 | Pass the witness. | 07:19:08 |
| 11 | MS. MILLER:  So I object to those | 07:19:08 |
| 12 | questions as leading, I guess too late. | 07:19:09 |
| 13 | But I have, Liz, based on your | 07:19:15 |
| 14 | questions, a couple of additional documents and | 07:19:19 |
| 15 | some additional questions that I'd like to ask | 07:19:21 |
| 16 | the witness, but it's going to take me a minute | 07:19:23 |
| 17 | to find them. | 07:19:26 |
| 18 | So if we can go off the record | 07:19:26 |
| 19 | just for a minute, I shouldn't have more than | 07:19:30 |
| 20 | 5 minutes of questioning when we come back. | 07:19:32 |
| 21 | MS. McKEEN:  Sounds good.  How | 07:19:36 |
| 22 | long do you want to stay off?  Break for 5 and | 07:19:39 |
| 23 | then come back for 5? | 07:19:43 |
| 24 | MS. MILLER:  Let's break for 5, | 07:19:44 |
| 25 | yeah. | 07:19:46 |

|  | 551 | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  We are off the | 07:19:47 |
| 2 | record at 7:20 p.m. | 07:19:47 |
| 3 | (Recess taken.) | 07:19:55 |
| 4 | THE VIDEOGRAPHER:  We are back on | 07:28:22 |
| 5 | the record at 7:30 p.m. | 07:29:41 |
| 6 | BY MS. MILLER: | 07:29:41 |
| 7 | Q.  Mr. Ahlberg, what is your | 07:29:45 |
| 8 | involvement in the voucher approval process? | 07:29:51 |
| 9 | A.  I am not personally involved in | 07:29:54 |
| 10 | voucher approval processes. | 07:29:56 |
| 11 | Q.  Who did you speak to about the | 07:29:59 |
| 12 | voucher approval process between your | 07:30:02 |
| 13 | deposition yesterday -- on Tuesday and today? | 07:30:07 |
| 14 | A.  I apologize.  Could you repeat the | 07:30:14 |
| 15 | question? | 07:30:16 |
| 16 | Q.  Who did you speak to about the | 07:30:17 |
| 17 | voucher approval process between your | 07:30:19 |
| 18 | deposition on Tuesday and today? | 07:30:27 |
| 19 | A.  I haven't spoken with anybody else | 07:30:29 |
| 20 | other than counsel between Tuesday and today. | 07:30:33 |
| 21 | Q.  And did you -- I forgot to ask you | 07:30:35 |
| 22 | at the beginning. | 07:30:37 |
| 23 | Did you meet with counsel between | 07:30:38 |
| 24 | your deposition yesterday -- sorry, your | 07:30:39 |
| 25 | deposition on Tuesday and today? | 07:30:42 |

|  | 552 | |
|---|---|---|
| 1 | A.  We had a phone call yesterday. | 07:30:47 |
| 2 | Q.  And how long was that phone call? | 07:30:52 |
| 3 | A.  I think it was less than 30 | 07:30:54 |
| 4 | minutes. | 07:30:54 |
| 5 | MS. MILLER:  I'm going to put on | 07:31:04 |
| 6 | the record that that conversation was while you | 07:31:04 |
| 7 | were under oath and during open testimony.  I'm | 07:31:10 |
| 8 | going to refrain from asking about it as a | 07:31:12 |
| 9 | courtesy to opposing counsel. | 07:31:13 |
| 10 | BY MS. MILLER: | 07:31:15 |
| 11 | Q.  Did you speak to anybody at | 07:31:21 |
| 12 | Treasury about the voucher approval process? | 07:31:23 |
| 13 | A.  In between Tuesday and today? | 07:31:29 |
| 14 | Q.  No, in general. | 07:31:34 |
| 15 | A.  I didn't have to ask anyone about | 07:31:38 |
| 16 | the voucher approval process.  Just due to the | 07:31:41 |
| 17 | nature of my work with the Commonwealth, I'm | 07:31:44 |
| 18 | familiar with the voucher approval process. | 07:31:47 |
| 19 | Q.  Okay.  So you're not involved in | 07:31:49 |
| 20 | it in any way? | 07:31:52 |
| 21 | A.  I'm not involved in the voucher | 07:31:53 |
| 22 | approval process. | 07:31:55 |
| 23 | Q.  Okay.  And so you don't know | 07:31:57 |
| 24 | whether there are any vouchers that relate to | 07:31:58 |
| 25 | certain entities that may or may not be | 07:32:02 |

|  | 553 | |
|---|---|---|
| 1 | Treasury approval based? | 07:32:09 |
| 2 | MS. McKEEN:  Objection. | 07:32:11 |
| 3 | THE WITNESS:  I can't speculate on | 07:32:14 |
| 4 | the hypothetical vouchers. | 07:32:18 |
| 5 | MS. MILLER:  Okay.  Okay.  I have | 07:32:22 |
| 6 | no further questions. | 07:32:26 |
| 7 | MS. McKEEN:  I have no further | 07:32:28 |
| 8 | questions for you either, Mr. Ahlberg. | 07:32:29 |
| 9 | Thank you very much for your time | 07:32:31 |
| 10 | over these two days. | 07:32:33 |
| 11 | THE WITNESS:  Thank you, everyone. | 07:32:37 |
| 12 | MR. ZOUAIRABANI:  This is Nayuan. | 07:32:39 |
| 13 | I would like to make a reservation of rights | 07:32:?? |
| 14 | for the DRA parties on the record before we | 07:32:?? |
| 15 | call it a night. | 07:32:?? |
| 16 | THE REPORTER:  I'm sorry.  Who is | 07:32:?? |
| 17 | this? | 07:32:?? |
| 18 | MR. ZOUAIRABANI:  This is Nayuan | 07:32:?? |
| 19 | Zouairabani on behalf of AmeriNational | 07:32:52 |
| 20 | Community Services, LLC.  I can spell my last | 07:32:52 |
| 21 | name and my first name if you want. | 07:32:54 |
| 22 | THE REPORTER:  No, that's okay.  I | 07:32:54 |
| 23 | got it.  Thank you. | 07:32:59 |
| 24 | MR. ZOUAIRABANI:  Okay.  The DRA | 07:32:59 |
| 25 | parties have not made any questions or not made | 07:33:03 |

CONFIDENTIAL

Ahlberg, Timothy H. - Vol. II

April 23, 2020

84 (Pages 554 to 557)

554

```
1    any active participation during Tuesday and        07:33:06
2    today's deposition in compliance with             07:33:09
3    Judge Dein's March 3, 2020 order.                 07:33:15
4            Such action or inaction does not          07:33:15
5    constitute, and should not be interpreted as a    07:33:18
6    waiver of any sort of the DRA parties to seek      07:33:23
7    and obtain discovery as part of their DRA          07:33:23
8    lift-stay motion, which rights are preserved in    07:33:29
9    the March 3, 2020 order.                          07:33:29
10           That is the intent of the                  07:33:34
11   reservation of rights that I want to make.         07:33:36
12           MS. McKEEN:  Thank you, Counsel.           07:33:36
13   We reserve all rights with respect to             07:33:38
14   everything you just said on the record.           07:33:40
15           I don't have anything further.             07:33:45
16   Thank you, Mr. Ahlberg.                           07:33:49
17           THE WITNESS:  Thank you.                   07:33:49
18           THE VIDEOGRAPHER:  We are going            07:33:51
19   off the record at 7:34 p.m.  This concludes the   07:33:51
20   video deposition of Timothy Ahlberg.              07:33:54
21           (Ending time noted 7:34 p.m.)
22
23
24
25
```

556

```
1    aforesaid.
2            I further certify that the signature to
3    the foregoing deposition was not waived by
4    counsel for the respective parties.
5            I further certify that I am not counsel
6    for nor in any way related to the parties
7    to this suit, nor am I in any way interested in
8    the outcome thereof.
9            IN TESTIMONY WHEREOF:  I have hereunto
10   set my hand and affixed my notarial seal this
11   24th day of April, 2020.
12
13
14
15
16           Cynthia J. Conforti, CSR, CRR
17           CSR License No. 084-003064
18
19
20
21
22
23
24
25
```

555

```
1    STATE OF ILLINOIS   )
2                        ) SS:
3    COUNTY OF C O O K   )
4
5            I, Cynthia J. Conforti, a notary public
6    within and for the County of Cook and State of
7    Illinois, do hereby certify that heretofore,
8    to-wit, on the 23rd day of April, 2020,
9    virtually appeared TIMOTHY H. AHLBERG, in a
10   cause now pending and undetermined in the
11   United States District Court for the District
12   of Puerto Rico, IN RE: THE FINANCIAL OVERSIGHT
13   AND MANAGEMENT BOARD FOR PUERTO RICO, AS
14   REPRESENTATIVE OF THE COMMONWEALTH OF PUERTO
15   RICO, et al., DEBTORS.
16           I further certify that the said witness
17   was first duly sworn to testify the truth, the
18   whole truth and nothing but the truth in the
19   cause aforesaid; that the testimony then given
20   by said witness was reported stenographically
21   by me in the presence of the said witness, and
22   afterwards reduced to typewriting by
23   Computer-Aided Transcription, and the foregoing
24   is a true and correct transcript of the
25   testimony so given by said witness as
```

557

```
1            ACKNOWLEDGMENT OF DEPONENT
2
3            I, _____, do hereby
4    acknowledge that I have read and examined the
5    foregoing testimony, and the same is a true, correct
6    and complete transcription of the testimony given by
7    me, and any corrections appear on the attached Errata
8    Sheet signed by me.
9
10
11   _____     _____
12   (DATE)           (SIGNATURE)
13
14           NOTARIZATION  (If Required)
15
16   State of _____
17   County of _____
18   Subscribed and sworn to (or affirmed) before me on
19   this _____ day of _____, 20____, by
20   _____, proved to me on the
21   basis of satisfactory evidence to be the person who
22   appeared before me.
23
24   Signature: _____
25              (Seal)
```

# 11. Proof of Remittance, ECF No. 13161-1

PRIFA_STAY0001572

CONFIDENTIAL

Modelo SC 745
31-Jan-01

Original – ACC
1ª Copia – Funcionario
2ª Copia – Agencia
PRIFAS

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**DEPARTAMENTO DE HACIENDA**
Agencia

**COMPROBANTE DE REMESA**

Núm. Recibo _____ al _____

MAY 1 1 2015



| Día | TOTAL COBRADO (DIARIO) | | TOTAL DEPOSITADO (DIARIO) | |
|---|---|---|---|---|
| | FECHA | IMPORTE | FECHA | IMPORTE |
| LUN | | | | |
| MAR | | | | |
| MIER | | | | |
| JUE | | | | |
| VIER | | | | |
| SAB | | | | |
| DOM | | | | |
| TOTAL | | 0.00 | TOTAL | 0.00 |

**Identificación del Documento**

| CT | Agen | Número de Documento | Fecha de Contabilidad | Código de Banco | Cuenta de Banco | Fecha de Acreditación | Tipo de Depósito | Fecha de Notificación | Fecha de Requisición de Fondos | Número de Aviso de Crédito | Importe Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CR | 025 | 142915025684 | | GDB | 01 | 05/08/2015 | R | 05/08/2015 | 05/08/2015 | 05082015000088 | 27,222,409.18 |

| LN | Cuenta | Fondo | Organización | Prog. | Asig. | Año Pres. | Aportación Federal | SE | Importe | Descripción | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | R4220 | 111 | 0250000 | | | 2015 | | 62 | 17,362,112.59 | FONDO GENERAL | | |
| 02 | R4220 | 278 | 1660000 | | 780 | 2015 | | 62 | 9,860,296.59 | 46% PROMOCIONES DE RON | | |

ARBITRIOS RON ABRIL 2015

APROBACION NIVEL I

RECIBIDO
DEPTO. DE HACIENDA
AREA DEL TESORO
MAY 11 2015
DIVISION CONTABILIDAD
DE INGRESOS

IMPORTE TOTAL | 27,222,409.18

| Para uso de las Agencias que no tienen Recaudador Oficial | Para uso del Recaudador Oficial u Oficial Pagador Especial o Secretario del Tribunal | Para uso del Departamento de Hacienda |
|---|---|---|
| Certifico que los valores que se acompañan son los que realmente se recibieron en esta Agencia, que los mismos deben acreditarse a las asignaciones y fondos indicados y que toda la demás información es correcta. | Certifico que los importes arriba detallados son los que realmente recaudé y deposité en la semana del ____ al ____ de ____ de ____; que los mismos deben acreditarse _____ s indicados y que toda la información es correcta. | Aprobado por: Nombre y Firma  Título |

| Fecha | Nombre y Firma Jefe Agencia o Su Rep.Aut. | Teléfono | Fecha | Nombre y Firma Recaudador Oficial u OPE o Secretario del Tribunal | Teléfono | Fecha | Teléfono |

En caso de Liquidación de Anticipo de Viajes, deberá enviar una copia al Negociado de Intervenciones.
Conservación: Seis años o una intervención del Contralor, lo que ocurra primero.

# CERTIFIED TRANSLATION

PRIFA_STAY0001572

Model SC 745
31-Jan-01

Original - ACC
1st Copy - Official
2nd Copy - Agency
PR FAS

**COMMONWEALTH OF PUERTO RICO**
**DEPARTAMENT OF THE TREASURY**
Agency

**PROOF OF REMITTANCE** URGENT

MAY 11 2015

Receipt No. _____ to _____

| Day | TOTAL COLLECTED (DAILY) | | TOTAL DEPOSITED (DAILY) | |
|-----|------|--------|------|--------|
| | DATE | AMOUNT | DATE | AMOUNT |
| MON | | | | |
| TUE | | | | |
| WED | | | | |
| THUR | | | | |
| FRI | | | | |
| SAT | | | | |
| SUN | | | | |
| | TOTAL | 0.00 | TOTAL | 0.00 |

### Identification of the Document

| CT | Agen | Document Number | Accounting Date | Bank Code | Bank Account | Credited Date | Type of Deposit | Date of Notification | Date of Requisition of Funds | Credit Notice Number | Total Amount |
|----|------|-----------------|-----------------|-----------|--------------|---------------|-----------------|----------------------|------------------------------|----------------------|--------------|
| CR | 025 | 142915025684 | | GDB | 01 | 05/08/2015 | R | 05/08/2015 | 05/08/2015 | 0508201500088 | 27,222,409.18 |

| LN | Account | Fund | Organization | Prog. | Alloc. | Pres. Year | Federal Contribution | SE | Amount | Description | |
|----|---------|------|--------------|-------|--------|-----------|----------------------|-----|--------|-------------|--|
| 01 | R4220 | 111 | 0250000 | | | 2015 | | 62 | 17,362,112.59 | GENERAL FUND | |
| 02 | R4220 | 278 | 1660000 | | 780 | 2015 | | 62 | 9,860,296.59 | 46% RUM PROMOTIONS | |
| | | | | | | | | | | EXCISE TAX ON RUM APRIL 2015 | |
| | | | | | | | | | | | |
| | | | | | | | | | | RECEIVED | |
| | | | | APPROVAL LEVEL I | | | | | | DEPT. OF THE TREASURY | |
| | | | | | | | | | | AREA OF THE TREASURY | |
| | | | | | | | | | | MAY 11 2015 | |
| | | | | | | | | | | | |
| | | | | | | | | | | REVENUE | |
| | | | | | | | | | | ACCOUNTING DIVISION | |
| | | | | TOTAL AMOUNT | | | | | 27,222,409.18 | | |

| For use by Agencies that do not have an Official Collector | For use by the Official Collector or Special Paying Officer or Clerk of the Court | For use of the Department of the Treasury |
|---|---|---|
| I certify that the values listed are those actually received by this Agency, that they should be credited to the indicated allocations and funds and that all other information is correct | I certify that the amounts listed above are those actually collected and deposited in the week of the ____ to ____ of ____; that they are to be credited to the allocations and funds indicated and that all information is correct. | Approved by: _____ Name and Signature |
| | | Title |
| Date — Name and Signature Head of Agency or Auth. Rep. — Telephone | Date — [illegible signature] VILMA OCASIO NIEVES — Telephone Name and Signature Official Collector or OPE or Court Clerk | Date — Telephone |

In the case of Advance Travel Payments, a copy must be sent to the Auditing Department.
Archival: Six years or an audit by the Comptroller, whichever comes first.

*Certified to be a correct and true translation from the source text in Spanish to the target language English.*
*15/MAY/2020 - Andreea I. Boscor ATA-certified Spanish-English #525556*
*By Targem Translations Inc.*

CONFIDENTIAL



T  718.384.8040
W  TargemTranslations.com
E  projects@targemtranslations.com
A  185 Clymer St. Brooklyn, NY 11211

**TRANSLATOR'S CERTIFICATE OF TRANSLATION**

Translation from: Spanish (Puerto Rico) into English (US)
TARGEM Translations Inc.

I, Andreea I. Boscor, ATA-certified Spanish-English #525556, acting as translator at TARGEM Translations Inc., a NEW YORK City corporation, with its principal office at 185 Clymer Street, Brooklyn, NY, 11211, USA, certify that:

the English translated document is a true and accurate translation of the original Spanish and has been translated to the best of my knowledge.

Original Document Name: PRIFA_STAY0001572

Signed this 15th day of May 2020



_____
Andreea I. Boscor



# 12. Reply of Ambac Assurance Corp., et. al in Support of Their Amended Motion Concerning Application of the automatic Stay to the Revenues Securing PRIFA Rum Tax Bonds, ECF No. 13110

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## REPLY OF AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND U.S. BANK TRUST NATIONAL ASSOCIATION, IN SUPPORT OF THEIR AMENDED MOTION CONCERNING APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING PRIFA RUM TAX BONDS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ......................................................................... 1

**SUPPLEMENTAL BACKGROUND** ................................................................ 4

    I.    The Commonwealth's Pre-Default Implementation of the Enabling Act
Shows That the Pledged Rum Taxes are Property of PRIFA and Its
Bondholders, Not the Commonwealth.................................................... 4

    II.    Post-Default, the Commonwealth Continues to Receive Moneys Deposited
"to the Credit of PRIFA." ...................................................................... 10

**ARGUMENT** ................................................................................................... 12

    I.    The Court Should Lift the Automatic Stay Under Bankruptcy Code Section
362(d)(2) Because the Commonwealth Has No Equity in the Pledged Rum
taxes and They Are NOT necessary to an Effective Reorganization.................. 13

        A.    Movants Are Entitled to Relief Under 11 U.S.C. § 362(d)(2) Because
the Commonwealth Lacks Equity in the Pledged Rum Taxes................. 13

            1.    The Enabling Act and the Trust Agreement Confirm that the
Commonwealth Is a Mere Conduit for the Pledged Rum
Taxes. ..................................................................................... 17

                a.    The Oversight Board's Tortured, Made-for-Litigation
Interpretation of the Enabling Act Is Belied By the
Statute's Plain Text. ............................................................... 17

                b.    The Oversight Board's Reinterpretation of the Trust
Agreement Renders Its Terms Superfluous and
Circular. ............................................................................... 20

            2.    The Oversight Board Fails to Rebut that the Commonwealth,
at Most, Holds the Pledged Rum Taxes in Trust or Custody for
PRIFA (and Its Bondholders). ...................................................... 29

            3.    The Pledged Rum Taxes are "Restricted Funds" that the
Commonwealth Must Transfer to PRIFA...................................... 32

        B.    The Puerto Rico Constitution Does Not Give the Commonwealth
Equity In the Pledged Rum Taxes. .......................................................... 33

i

C. Because the Commonwealth Lacks Equity in the Pledged Rum Taxes, the Oversight Board Cannot Show They Are Necessary for an Effective Reorganization. ........................................................... 38

II. Alternatively, the Court Should Lift the Stay for "Cause" Pursuant to Bankruptcy Code Section 362(d)(1). ................................................ 38

A. "Cause" Exists to Lift the Automatic Stay Because Movants' Lien on the Pledged Rum Taxes Is Not Adequately Protected. ........................... 39

1. Contrary to the Oversight Board's Assertions, Movants Have a Valid Lien. ................................................................................. 39

2. Movants' Liens Were Properly Perfected. ............................... 42

3. Section 552(a) Does Not Apply to Movants' Lien. ................. 44

III. Neither PROMESA's Title III Provisions Nor the Oversight Board's Budgetary Powers Preempt Bondholders' Pre-Existing Legal Rights. ............... 46

A. The Plain Text of PROMESA Limits the Scope of Preemption to Cases of Actual Conflict, Which Does Not Exist Here. ............................ 46

B. Neither of the Oversight Board's Asserted Bases for "Preemption" Withstands Scrutiny. ..................................................................... 48

1. The Oversight Board's Title II Budgetary Powers Under PROMESA Have No Preemptive Effect on Movants' Rights ...... 48

a. The Commonwealth's Transfer of the Pledged Rum Taxes to PRIFA Is Valid and Legally Binding, Not a Mere "Appropriation" Subject to Repeal Without Consequence. .................................................... 48

b. There Is No Inconsistency Between the Oversight Board's Budget Powers and Movants' Legal Rights Because, Under Settled Law, the Legislative Power over the "Budget" or "Appropriations" Does Not Include Any Power to Rescind, Repudiate, or Alter Pre-Existing Property or Contract Rights. ........................ 51

c. The Oversight Board's Claimed Preemption Powers Is Inconsistent with the Structure and Purpose of PROMESA. ............................................................. 53

2. There is no Inconsistency Between the Enabling Act and PROMESA Title III or Bankruptcy Policy. ............................... 56

a. Far from Preempting Them, PROMESA Title III Expressly Protects the Legal Rights of Revenue Bondholders. ................................................. 56

b. There Is No "Inconsistency" Between the Concept of a Restructuring and Protecting Property Rights. ................. 56

C. The Oversight Board's Interpretation Must Be Rejected Because It Would Be Unconstitutional. ......................................................... 60

1. The Oversight Board's Claimed Preemption Power Would Violate the Due Process Clause. ................................................. 60

2. Any Repeal or Preemption of the Enabling Act Under PROMESA Would Effect a Fifth Amendment Taking Without Just Compensation. ........................................................ 61

a. Preempting Property Rights Under a Lien or Trust Violates the Fifth Amendment. ......................................... 61

b. Preempting a Statutory Covenant Pledging Specific Special Revenues to Bondholders Violates the Fifth Amendment. ................................................................. 62

c. Just Compensation Requires that Bondholders Be Made Whole. .................................................................. 64

IV. Movants Have Standing to Bring this Motion. .................................................... 64

**CONCLUSION** ........................................................................... 67

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acevedo v. Solivellas & Co.,*
   49 D.P.R. 633, 1936 PR Sup. LEXIS 51 (P.R. 1936) ........................................................... 40

*Acosta v. Local Union 26, Unite Here,*
   895 F.3d 141 (1st Cir. 2018) ............................................................................................... 25

*Albany Sav. Bank, F.S.B. v. Novak,*
   151 Misc. 2d 956 (N.Y. Sup. Ct. 1991) ............................................................................. 41

*Altair Global Credit Opportunities Fund (A), LLC v. U.S.,*
   138 Fed. Cl. 742 (Fed. Cl. 2018) ....................................................................................... 59

*Ambac Assurance Corp. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
   927 F.3d 597 (1st Cir. 2019) ............................................................................................... 45

*American Fidelity Fire Insurance Co. v. Contrucciones Werl, Inc.,*
   407 F. Supp. 164 (D.V.I. 1975) ......................................................................................... 40

*Armstrong v. United States,*
   364 U.S. 40 (1960) ............................................................................................................. 61

*Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio
v. Flores Galarza,*
   484 F.3d 1 (1st Cir. 2007) ....................................................................................... 14, 15, 17

*Barnhart v. Thomas,*
   540 U.S. 20 (2003) ..................................................................................................... 24, 25

*Bd. of Regents v. Roth,*
   408 U.S. 564 (1972) ........................................................................................................... 61

*Brown Transp. Truckload v. Humbolt Express (In re Brown Transp. Truckload,
Inc.),*
   118 B.R. 889 (Bankr. N.D. Ga. 1990) ............................................................................... 66

*Brown v. United Airlines, Inc.,*
   720 F.3d 60 (1st Cir. 2013) ............................................................................................... 46

*Chemical Bank N.Y. Tr. Co. v. Kheel,*
   369 F.2d 845 (2d Cir. 1966) (concurring opinion) ............................................................ 57

*Citibank, N.A. v. Allied Mgmt. Grp.,*
   491 F. Supp. 2d 232 (D.P.R. 2007) ................................................................................... 19

*City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.)*,
  281 B.R. 782 (Bankr. D. Mass. 2002), *aff'd*, 329 F.3d 204 (1st Cir. 2003) .........................32

*Claudio-De Leòn v. Sistema Universitario Ana G. Mèndez*,
  775 F.3d 41 (1st Cir. 2013) .................................................................................................18

*Clay v. United Parcel Serv., Inc.*,
  501 F.3d 695 (6th Cir. 2007) ..............................................................................................12

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985).............................................................................................................61

*Coffin v. Bowater, Inc.*,
  501 F.3d 80 (1st Cir. 2007)..................................................................................................24

*Cohen v. Wasserman*,
  238 F.2d 683 (1st Cir. 1956)................................................................................................41

*Columbia Falls, García-Rubiera v. Calderón*,
  570 F.3d 443 (1st Cir. 2009)................................................................................................32

*Demko v. United States*,
  44 Fed. Cl. 83 (Fed. Cl. 1999), *aff'd*, 216 F.3d 1049 (Fed. Cir. 2000)...............................25

*Diaz v. Dep't of Educ.*,
  823 F. Supp. 2d 68 (D.P.R. 2011).......................................................................................44

*Dimino v. Sec'y of Commonwealth*,
  695 N.E.2d 659 (Mass. 1998) .......................................................................................45, 63

*Enrique Lopez Delgado v. South Porto Rico Sugar Co. of P.R.*,
  62 D.P.R. 238, 242-43 (P.R. 1943) .....................................................................................31

*Estate of Romero v. Willoughby*,
  10 D.P.R. 71, 1906 PR Sup. LEXIS 152 (P.R. 1906).........................................................40

*Ferris v. United States*,
  27 Ct. Cl. 542 (1892) ...........................................................................................................52

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*,
  948 F.3d 457 (1st Cir. 2020).......................................................................25, 43, 44, 50

*First National Bank of Boston v. Maine Turnpike Authority*,
  136 A.2d 699 (Me. 1957).....................................................................................................63

*First Union Nat'l Bank v. Diamond (In re Diamond)*,
  196 B.R. 635 (Bankr. S.D. Fla. 1996) .................................................................................42

*Fletcher v. Peck*,
    10 U.S. 87 (1810) ........................................................................................51

*Flores Rodriguez v. Flores Toledo*,
    101 D.P.R. 61, 68-69 (P.R. 1973) ...............................................................24

*Foster v. Mfrs.' Fin. Co.*,
    22 F.2d 609 (1st Cir. 1927) ........................................................................41

*Francisco Levy, Jr., Inc. v. Caribe Gen. Elec., Inc.*,
    2003 WL 21047205 (P.R. Cir. Feb. 28, 2003) ...........................................17

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
    85 F. Supp. 3d 577 (D.P.R. 2015), *judgment entered*, 2015 WL 574008
    (D.P.R. Feb. 10, 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct.
    1938 (2016) ................................................................................................62

*Gen. Ins. Co. of Am. v. Lowry*,
    570 F.2d 120 (6th Cir. 1978) ......................................................................41

*Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.)*,
    939 F.3d 340 (1st Cir. 2019) ............................................................. *passim*

*Grella v. Salem Five Cent Sav. Bank*,
    42 F.3d 26 (1st Cir. 1994) .....................................................................12, 13

*Haesloop v. United States*,
    2000 WL 1607316 (Bankr. E.D.N.Y. Aug. 30, 2000) .................................57

*Hatton v. Municipality de Ponce*,
    134 D.P.R. 1001, 1010 (P.R. 1994) ...........................................................32

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ....................................................................................19

*Hoseman v. Weinschneider*,
    322 F.3d 468 (7th Cir. 2003) ......................................................................58

*Hunter v. Bank of N.Y. (In re Anderson)*,
    266 B.R. 128 (Bankr. N.D. Ohio 2001) ......................................................41

*In re Airadigm Commc'ns, Inc.*,
    519 F.3d 640 (7th Cir. 2008) ......................................................................44

*In re City of Columbia Falls, Mont., Special Imp. Dist. No. 25*,
    143 B.R. 750 (Bankr. D. Mont. 1992) ........................................................31

*In re Comcoach Corp.*,
　698 F.2d 571 (2d Cir. 1983)........................................................................66, 67

*In re CRS Steam*,
　217 B.R. 365 (Bankr. D. Mass. 1998) ..................................................................25

*In re Czebotar*,
　5 B.R. 379 (Bankr. E.D. Wash. 1980) ..................................................................40

*In re DeCora*,
　396 B.R. 222 (W.D. Wisc. 2008)..........................................................................44

*In re El Comandante Management Co., LLC*,
　359 B.R. 410 (Bankr. D.P.R. 2006) ................................................................65, 66

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
　2019 WL 4735362 (D.P.R. June 28, 2019)...........................................................12

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
　931 F.3d 111 (1st Cir. 2019) .................................................................................45

*In re Fluge*,
　57 B.R. 451 (Bankr. D.N.D. 1985) .......................................................................44

*In re Garcia*,
　484 B.R. 1 (Bankr. D.P.R. 2012) ..........................................................................19

*In re Heffernan Mem'l Hosp. Dist.*,
　202 B.R. 147 (Bankr. S.D. Cal. 1996) ..................................................................45

*In re Hernandez*,
　244 B.R. 549 (Bankr. D.P.R. 2000) ......................................................................12

*In re Horton*,
　595 B.R. 1 (Bankr. D.D.C. 2019) .........................................................................66

*In re Irving Tanning Co.*,
　496 B.R. 644 (B.A.P. 1st Cir. 2013) .....................................................................53

*In re Jones*,
　No. 02-17125-SR, 2002 WL 34560880 (Bankr. E.D. Pa. Sept. 27, 2002) ...........65

*In re Kang Jin Hwang*,
　396 B.R. 757 (Bankr. C.D. Cal. 2008), *rev'd and remanded on other grounds*,
　438 B.R. 661 (C.D. Cal. 2010) .............................................................................65

*In re Las Vegas Monorail Co.*,
　429 B.R. 317 (Bankr. D. Nev. 2010) .....................................................................29

*In re Las Vegas Monorail Co.*,
   429 B.R. 770 (Bankr. D. Nev. 2010) ....................................59

*In re Mefford*,
   18 B.R. 853 (Bankr. S.D. Ind. 1982) ....................................42

*In re Morales Travel Agency*,
   667 F.2d 1069 (1st Cir. 1981)....................................32

*In re Overview Equities*,
   240 B.R. 683 (Bankr. E.D.N.Y. 1999)....................................65

*In re Palmas del Mar Country Club, Inc.*,
   443 B.R. 569 (Bankr. D.P.R. 2010) ....................................27

*In re S. Biotech, Inc.*,
   37 B.R. 318 (Bankr. M.D. Fla. 1983)....................................39

*In re Sanchez*,
   429 B.R. 393 (Bankr. D.P.R. 2010) ....................................18

*In re Sweports, Ltd.*,
   476 B.R. 540 (Bankr. N.D. Ill. 2012) ....................................66

*In re T. Brady Mech. Servs., Inc.*,
   129 B.R. 559 (Bankr. N.D. Ill. 1991) ....................................41

*In re Tap, Inc.*,
   52 B.R. 271 (Banrk. D. Mass. 1985) ....................................30, 32

*In re Trask*,
   462 B.R. 268 (B.A.P. 1st Cir. 2011) ....................................44

*In re Vieland*,
   41 B.R. 134 (Bankr. N.D. Oh. 1984) ....................................65

*In re Weisband*,
   427 B.R. 13 (Bankr. D. Az. 2010) ....................................65

*In re Zhejiang Topoint Photovoltaic Co.*,
   2015 WL 2260647 (Bankr. D.N.J. May 12, 2015) ....................................67

*Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*,
   728 F.2d 572 (1st Cir. 1984)....................................11

*Kokoszka v. Belford*,
   417 U.S. 642 (1974), *reh'g denied*, 419 U.S. 886 (1974)....................................58

viii

*Kungys v. United States*,
    485 U.S. 759 (1988)............................................................................................54

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)............................................................................................28

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)............................................................................................61

*Local Initiative Health Auth. for L.A. Cty. v. United States*,
    142 Fed. Cl. 1 (Fed. Cl. 2019)............................................................................52

*Lockhart v. United States*,
    136 S. Ct. 958 (2016)...................................................................................24, 26

*Louisiana ex rel. Hubert v. City of New Orleans*,
    215 U.S. 170 (1909).....................................................................................21, 63

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)............................................................................................61

*Lopez del Valle v. Gobierno de la Capital*,
    855 F. Supp. 34 (D.P.R. 1994)...........................................................................19

*LPP Mortg., Ltd. v. Sugarman*,
    565 F.3d 28 (1st Cir. 2009).................................................................................17

*Maine Cmty. Health Options v. United States*,
    2020 WL 1978706 (U.S. Apr. 27, 2020) ........................................................4, 52

*Martin v. United States*,
    130 Fed. Cl. 578 (Fed. Cl. 2017) .......................................................................52

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995)..............................................................................................23

*McGraw v. Hansbarger*,
    301 S.E.2d 848 (W. Va. 1983)............................................................................18

*McRoberts v. Transouth Fin. (In re Bell)*,
    194 B.R. 192 (Bankr. S.D. Ill. 1996) .................................................................42

*Mèndez-Nùñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.)*,
    916 F.3d 98 (1st Cir. 2019).................................................................................46

*Missouri v. Jenkins*,
    495 U.S. 33 (1990)..............................................................................................21

*Murphy v. Smith,*
   138 S. Ct. 784 (2018) ...................................................................................................18

*Murray v. City of Charleston,*
   96 U.S. 432 (1877) .......................................................................................................63

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy*
   *Mart Convenience Stores, Inc.),*
   351 F.3d 86 (2d Cir. 2003) ..........................................................................................39

*P.R. Tel. Co. v. Advanced Cellular Sys. (In re Advanced Cellular Sys., Inc.),*
   483 F.3d 7 (1st Cir. 2007) ............................................................................................19

*Pare v. Natale (In re Natale),*
   174 B.R. 362 (Bankr. D.R.I. 1994) ..............................................................................41

*Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.,*
   173 F.3d 46 (1st Cir. 1999) .....................................................................................62, 63

*Paroline v. United States,*
   572 U.S. 434 (2014) ................................................................................................25, 26

*Peaje Investments LLC v. Financial Oversight & Management Board for Puerto*
   *Rico,*
   899 F.3d 1 (1st Cir. 2018) ............................................................................................13

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta,*
   91 F. Supp. 3d 267 (D.P.R. 2015) ...............................................................................18

*Porto Rico Tel. Co. v. Tax Court,*
   1960 PR Sup. LEXIS 72 (P.R. June 30, 1960) ...........................................................49

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
   136 S. Ct. 1938 (2016) ...........................................................................................46, 48

*Quasar Energy Group, LLC v. VGBLADS, LLC,*
   No. 2:16-CV-00402-NT, 2017 WL 3206940 (D. Me. July 28, 2017) .......................17

*Ramis v. The Registrar,*
   19 D.P.R. 747, 1913 PR Sup. LEXIS 140 (P.R. 1913) ..............................................40

*Reed & Reed, Inc. v. Weeks Marine, Inc.,*
   431 F.3d 384 (1st Cir. 2005) ........................................................................................17

*Rice v. City of Milwaukee,*
   100 Wis. 516 (1898) .....................................................................................................51

*Riley v. Joint Fiscal Comm. of Ala. Legislature,*
   26 So. 3d 1150 (Ala. 2009) ........................................................15

*Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.),*
   19 B.R. 231 (Bankr. S.D.N.Y. 1982) ...................................66, 67

*Rotman Elec. Co. v. Cullen (In re Vappi & Co.),*
   145 B.R. 719 (Bankr. D. Mass. 1992) .......................................41

*Salazar v. Ramah Navajo Chapter,*
   567 U.S. 182 (2012).............................................................52, 54

*Semaphore Entm't Grp. Sports Corp. v. Gonzalez,*
   919 F. Supp. 543 (D.P.R. 1996) ................................................61

*Slodov v. United States,*
   436 U.S. 238 (1978).................................................................28

*Sovran Bank v. United States (In re Aumiller),*
   168 B.R. 811 (Bankr. D.D.C. 1994) ..........................................42

*State ex rel. Hunter v. Lippold,*
   142 S.W.3d 241 (Mo. Ct. App. 2004) ........................................18

*State v. Sherman,*
   46 Iowa 415 (1877)..................................................................15

*Stowe v. Bologna (In re Bologna),*
   206 B.R. 628 (Bankr. D. Mass. 1997) .......................................32

*Systemized of New England, Inc. v. SCM, Inc.,*
   732 F.2d 1030 (1st Cir. 1984)..................................................23

*Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. of Educ.,*
   763 S.E.2d 288 (N.C. Ct. App. 2014) ........................................33

*Thomas v. Commissioner of Social Security,*
   294 F.3d 568 (3d Cir. 2002).....................................................25

*Ticonic Nat'l Bank v. Sprague,*
   303 U.S. 406 (1938).................................................................57

*U.S. Bank N.A. v. Vertullo (In re Vertullo),*
   610 B.R. 399 (B.A.P. 1st Cir. 2020) ..........................................12

*U.S. Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs. Inc.),*
   332 B.R. 495 (Bankr. D.P.R. 2005) ...........................................41

*U.S. Tr. Co. of N.Y. v. New Jersey,*
 431 U.S. 1 (1977) .................................................................................................62

*UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.,*
 929 F.3d 11 (1st Cir. 2019) ...................................................................................26

*Union Tr. Co. of Maryland v. Townshend,*
 101 F.2d 903 (4th Cir. 1939) .................................................................................42

*Uniroyal, Inc. v. Universal Tire & Auto Supply Co.,*
 557 F.2d 22 (1st Cir. 1977) ...................................................................................41

*United States v. Friedman,*
 143 F.3d 18 (1st Cir. 1998) ...................................................................................41

*United States v. Kerley,*
 416 F.3d 176 (2d Cir. 2005) ..................................................................................25

*United States v. Santoro,*
 359 F. Supp. 3d 122 (D. Me. 2019) .......................................................................26

*United States v. Sec. Indus. Bank,*
 459 U.S. 70 (1982) ................................................................................................64

*United States v. Ven-Fuel, Inc.,*
 758 F.2d 741 (1st Cir. 1985) .................................................................................26

*United States v. Winstar Corp.,*
 518 U.S. 839 (1996) (Souter, J., plurality) ...........................................................51

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
 *Mgmt. Bd. for P.R.),*
 945 F.3d 3 (1st Cir. 2019) .....................................................................................53

*Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.,*
 2016 WL 183653 (D.P.R. Jan. 14, 2016) ..............................................................63

*Von Hoffman v. City of Quincy,*
 71 U.S. 535 (1867) ...............................................................................21, 30, 51, 63

*W. Auto Supply Co. v. Savage Arms (In re Savage Indus., Inc.),*
 43 F.3d 714 (1st Cir. 1994) ...................................................................................66

*Warren Tool Co. v. Stephenson,*
 161 N.W.2d 133 (Mich. 1968) ...............................................................................40

*Wertheim, LLC v. Currency Corp.,*
 2017 WL 3668985 (Cal. Ct. App. Aug. 25, 2017) .................................................27

*Whitfield v. Municipality of Fajardo*,
    2007 WL 6894782 (D.P.R. May 29, 2007)..............................................................44

**Statutes**

3 L.P.R.A. § 1906(m)..............................................................................................20

3 L.P.R.A. § 1907(a)....................................................................................41, 43, 49

3 L.P.R.A. § 1911....................................................................................................31

3 L.P.R.A. § 1913.................................................................................14, 49, 51, 62

3 L.P.R.A. § 1914............................................................................................*passim*

13 L.P.R.A. § 12.....................................................................................................37

19 L.P.R.A. § 402....................................................................................................40

19 L.P.R.A. § 2212(29)...........................................................................................43

19 L.P.R.A. § 2212(61)...........................................................................................43

19 L.P.R.A. § 2219(c)(2)...................................................................................42, 43

19 L.P.R.A. § 2260..................................................................................................43

19 L.P.R.A. § 2262(b)(1).........................................................................................43

19 L.P.R.A. § 2265(d)(2).........................................................................................43

31 L.P.R.A. § 3.......................................................................................................31

11 U.S.C. § 101(5)(A).............................................................................................65

11 U.S.C. § 101(10)(A)...........................................................................................65

11 U.S.C. § 361.................................................................................................39, 47

11 U.S.C. § 362(d).........................................................................................*passim*

11 U.S.C. § 362(d)(1)....................................................................................*passim*

11 U.S.C. § 362(d)(2)........................................................................................14, 38

11 U.S.C. § 362(e)..................................................................................................38

11 U.S.C. § 502(d)..................................................................................................41

11 U.S.C. § 544.......................................................................................................44

11 U.S.C. § 544(a) ..................................................................................44

11 U.S.C. § 544(a)(1) ............................................................................44

11 U.S.C. § 552 .................................................................................44, 45

11 U.S.C. § 552(a) .................................................................................44

11 U.S.C. § 922(d) .................................................................................45

11 U.S.C. § 928 .........................................................................28, 43, 59

11 U.S.C. § 928(a) .................................................................................59

11 U.S.C. § 1109(b) ...............................................................................66

11 U.S.C. § 1123 ...................................................................................48

11 U.S.C. § 1129(b)(2)(B) .....................................................................58

48 U.S.C. § 2103 ...................................................................................47

48 U.S.C. § 2141 ...................................................................................56

48 U.S.C. § 2141(b)(1)(N) .....................................................................47

48 U.S.C. § 2149 ...............................................................................53, 55

48 U.S.C. § 2161 ...................................................................................47

48 U.S.C. § 2161(a) ...........................................................................35, 56

48 U.S.C. § 2195 ...................................................................................55

48 U.S.C. § 2195(a) ...............................................................................65

P.R. CONST. art. VI, § 8...................................................................*passim*

P.R. Laws Ann. tit. 22 § 215 ..................................................................62

U.S. CONST. amend. V ............................................................................64

**Other Authorities**

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS
144 (2012)..................................................................................24, 25, 26

BLACK'S LAW DICTIONARY (11th ed. 2019) ...........................................24

David A. Skeel, *The Education of Detroit's Pension and Bond Creditors*, 24 U.
    Pᴀ. Pᴜʙ. Pᴏʟ'ʏ Iɴɪᴛɪᴀᴛɪᴠᴇ 1, 3 (2014) ..................................................................58

Elizabeth Bauer, *Is Chicago the Next Detroit?*, Fᴏʀʙᴇs (Jan. 16, 2019) ....................................60

*Rating Methodology:  Lease, Appropriation, Moral Obligation and Comparable
    Debt of US State and Local Governments*, Mᴏᴏᴅʏ's Iɴᴠ. Sᴇʀᴠ. (July 26,
    2016) ...........................................................................................................................................49

Restatement (Second) of Contracts § 202 (1981) ................................................................ *passim*

Richard Porter, *Commentary: Bankruptcy Looms for Chicago If There's No
    Pension Fix*, Cʜɪ. Tʀɪʙ. (Sept. 26, 2019) ...............................................................60

Statement of Motives, No. 44. July 7, 1997, No. 32 (June 21, 1988)............................................49

Wigmore on Evidence § 291.............................................................................................................11

Movants respectfully submit this reply (the "Reply") in further support of their Motion[2] and to respond to: (i) the Supplemental Opposition filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") (ECF No. 10611, the "Opposition" or "Opp."); (ii) the Limited Joinder to the Opposition filed by AAFAF (ECF No. 10641); and (iii) the Partial Joinder filed by the Official Committee of Unsecured Creditors in Support of the Opposition (ECF No. 10635). In support of their Reply, Movants state as follows:

## PRELIMINARY STATEMENT

1.　　The Motion established multiple independent bases for lifting the stay. Each boils down to the simple fact that the Commonwealth is interfering with Movants' property, and Movants should not be deprived of the ability to enforce their rights. The Oversight Board's arguments in opposition are legally meritless, and, as discovery has now revealed, based on false factual premises.

2.　　The Enabling Act mandates that the Pledged Rum Taxes "*shall be covered into*" the Puerto Rico Infrastructure Fund (the "Infrastructure Fund") for PRIFA's benefit, "when received." And the Commonwealth contracted by legislation with PRIFA bondholders not to limit or impair PRIFA's rights to the Pledged Rum Taxes. Those actions alone, under *Flores Galarza*, make the Pledged Rum Taxes PRIFA's money and subject to bondholders' liens the moment the Commonwealth receives them.

---

[2] Unless otherwise specified, defined terms have the same meaning given to them in the Motion. Unless otherwise indicated, all ECF numbers referenced in this Reply refer to the docket in Case No. 17-3283-LTS. All references to Exhibits in this Reply, other than Exhibit A attached to the Motion, refer to the Exhibits attached to the Motion and to the *Declaration of Atara Miller* (the "Miller Decl."), as appropriate. Also submitted with Movants' Reply is the accompanying declaration of William H. Holder, dated April 30, 2020, along with the expert report of Mr. Holder attached thereto (the "Holder Report"). The Holder Report is submitted in response to arguments made in the Opposition, issues raised by documents produced since that time, and arguments raised through the deposition testimony of the Rule 30(b)(6) representative for PRIFA and the Commonwealth. All arguments in the Motion are reincorporated herein by reference and not waived.

3.  To avoid the parallels between *Flores Galarza* and this case, the Oversight Board invents convenient—but wildly illogical—constructions of the governing documents and, now, PROMESA.  It claims that the Enabling Act does not mandate anything, as if "shall transfer" means "may transfer," and "when received" means "whenever (or never)."  But the First Circuit has already held that such mandatory language effects a transfer of property rights.  And the Oversight Board's main argument—that the Trust Agreement grants a lien to the PRIFA Trustee only on moneys deposited into the Sinking Fund (*i.e.*, the trust account held by the Trustee)— would render the basic pledge underlying the PRIFA Trust Agreement meaningless.  Basic numerous canons of construction require, this Court to read the Trust Agreement to give effect to the intent of the parties and its terms— and avoid constructions, like the Oversight Board's, that would render the agreement nugatory or ineffective.

4.  Recognizing the infirmities in its legal arguments, the Oversight Board tries to rewrite the facts.  It claims that the Infrastructure Fund (which it acknowledges is owned by PRIFA) is not a special revenue fund held on the Commonwealth's books—as reported in the Commonwealth's audited financial statements—but was instead a specific bank account held by PRIFA into which the Pledged Rum Taxes were, but no longer are, transferred.

5.  Discovery has disproved this contention.  The Commonwealth's corporate representative admitted that the Infrastructure Fund is not (and never has been) a physical bank account in PRIFA's name.  (Ex. 26, Ahlberg Tr. 339:23-340:3.)  The Infrastructure Fund is, rather, understood to refer to "the first $117 million of rum revenues" received by the Commonwealth each fiscal year. (Ex. 26, Ahlberg Tr. 331:15-332:21.)  And, *to this day*, "the first $117 million of rum revenues" are recorded and tracked in a special revenue account when received by the Commonwealth.  (Ex. 26, Ahlberg Tr. 349:8-13.)  This testimony is consistent with the disclosures

2

and description of the PRIFA special revenue fund in the Commonwealth's audited financial statements.

6.     As Movants' accounting expert, Professor William Holder, explains, this structure is standard in governmental "fund accounting," which allows governments to centrally manage cash for operational purposes (such as to maximize the rate of return on available cash, and ensure proper accountability), while also tracking "funds" that are restricted to particular purposes.  (*See* Holder Report ¶¶ 22-25.)  This segregation and tracking of restricted or committed moneys is effectuated through unique fund designations, account numbers within the General Fund, and other designations.  As the Commonwealth continues to record the Pledged Rum Taxes was a unique internal revenue account number, the Infrastructure Fund continues to exist on the Commonwealth's internal books and records in precisely the same manner that it has since at least 2014.  Moneys in the Infrastructure Fund are equitably owned by PRIFA, not the Commonwealth, and are subject to Movants' lien.

7.     Recognizing that neither law nor fact could excuse the Commonwealth's unlawful seizure of the Pledged Rum Taxes, the Oversight Board ultimately resorts to brazen declarations that its power to limit budgetary appropriations under Title II of PROMESA has given it free rein to preempt statutes, repudiate contracts, and seize property—to disregard "any prepetition obligation to pay" the Commonwealth might have had (or will have).  This claim is meritless.  While Title II grants the Oversight Board the power to certify Commonwealth budgets and thereby impose restrictions on the Commonwealth's appropriations, that does not create a power to destroy pre-existing legal obligations.  More than a century of case law, reaffirmed by the Supreme Court just days ago, makes that clear.  *See Maine Cmty. Health Options*, 2020 WL 1978706, at *9-10 (U.S. Apr. 27, 2020) (affirming that the failure to make a budget appropriations has no effect on

the Government's legal obligations to third parties or the third parties' ability to enforce that obligation in court). The failure of a government to appropriate funds to pay a legal obligation does not discharge the obligation or constitute a cognizable defense in a court proceeding.

8.  Movants are now entitled to enforce their property interests in, and liens on, the pledged special revenue stream—those Pledged Rum Taxes that the Commonwealth unlawfully took without ever satisfying the conditions of Article VI, Section 8, and, under Section 928(a) of the Bankruptcy Code, those that the Commonwealth receives in the future. The notion that Movants, who are asserting direct claims against the Commonwealth, lack "party-in-interest" standing under any analysis, fails on its own weight.

9.  For the reasons set forth in the Motion and below, Movants are entitled to stay relief under Sections 362(d)(2) and (d)(1).

## SUPPLEMENTAL BACKGROUND

10.  On February 14, 2020, after Movants had filed their Motion and the Oversight Board its Opposition, the Court ordered the Oversight Board and AAFAF to provide "limited discovery" into the factual representations the Oversight Board made in paragraphs 29, 38, 69, 103, and 124-25 of the Opposition. (*See* ECF No. 11057 at 2.) The limited discovery to date proves that the Commonwealth lacks equity in the Pledged Rum Taxes.

**I.  The Commonwealth's Pre-Default Implementation of the Enabling Act Shows That the Pledged Rum Taxes are Property of PRIFA and Its Bondholders, Not the Commonwealth.**

11.  In its Opposition, the Oversight Board contends that PRIFA bondholders have no rights to any "Retained Rum Taxes" held by the Commonwealth because, historically, PRIFA only received those moneys the Commonwealth "appropriated" to it on an annual basis. According to the Oversight Board, the appropriated money, after being deposited in the Treasury's Single Account ("TSA"), was then transferred to and "deposited in" the "PRIFA Infrastructure Fund"—

which the Oversight Board describes as a bank account "held by PRIFA." (Opp. ¶ 5 & Ex. A.)

The Oversight Board argues that neither PRIFA nor its bondholders have any rights to the Pledged

Rum Taxes until the Commonwealth transfers them to a PRIFA-held bank account called the

Infrastructure Fund—at which point PRIFA owned the money and was obligated to transfer it to

the Sinking Fund. (*Id.* ¶ 5.)

12.     Discovery has disproved the Oversight Board's assertions. (Ex. 26, Ahlberg Tr.

339:23-340:3.) The Commonwealth's Rule 30(b)(6) witness testified that the Infrastructure Fund

never referred to a specific bank account held by PRIFA. (Ex. 26, Ahlberg Tr. 339:23-340:3.)

Instead, he testified that the Infrastructure Fund refers to the first $117 million in Rum Taxes

received by the Commonwealth. (Ex. 26, Ahlberg Tr. 331:15-332:21; Ex. 27, *Commonwealth of*

*Puerto Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2014*,

at 323.) [3]

13.     Indeed, consistent with principles of governmental fund accounting, the

Infrastructure Fund is an accounting entity that, by operation of law, holds the first $117 million

annually of Rum Taxes. It is accounted for on the Commonwealth's books and records as a special

revenue fund. The Commonwealth's audited financial statements publicly disclosed the

---

[3] In obvious recognition of how devastating this admission was to their case, the Oversight Board has
already tried to run away from it—claiming that Mr. Ahlberg, the Commonwealth's designated corporate
representative, merely testified "to his layperson understanding" of what the Infrastructure Fund *used*
to mean. (*See Memorandum of the Commonwealth of Puerto Rico, by and through the Financial Oversight
and Management Board, in Support of Motion Pursuant to Bankruptcy Rule 7056 for Partial Summary
Judgment Disallowing Claims* ¶ 34, No. 20-00003 (ECF No. 44).) Mr. Ahlberg, however, explicitly
testified, without objection, that he was describing the Commonwealth's present understanding of the
Infrastructure Fund, as shared by "relevant individuals":

> [The Puerto Rico Infrastructure Fund] is understood to *generally* refer to the first 117
> million of rum Funds, rum revenues. . . . I'm speaking generally about the concepts of the
> Infrastructure Fund as understood by relevant individuals.

(Ex. 26, Ahlberg Tr. 331:19-332:8 (emphasis added); *see also id.* at 271:20-23 ("Q: Mr. Ahlberg, you're
here testifying on behalf of the Commonwealth; isn't that right? A: Yes.").)

Infrastructure Fund's separate existence as a special fund and accounting entity. For instance, the

audited financial statement for fiscal year 2014 describes the Infrastructure Fund as follows:

> ***Puerto Rico Infrastructure Financing Authority's Special Revenue Fund*** – The
> ***special revenue fund*** of the Puerto Rico Infrastructure Financing Authority, a
> blended component unit, ***is used to account*** principally for the moneys received by
> the Commonwealth, up to \$117 million, of certain federal excise taxes levied on
> rum and other articles produced in Puerto Rico and sold in the United States, which
> are collected by the U.S. Treasury and returned to the Commonwealth. Under Act
> No. 44 of June 21, 1988, as amended, ***the Commonwealth transfers to this fund
> the first \$117 million*** of these federal excise taxes reimbursed, ***which are
> subsequently transferred to the Puerto Rico Infrastructure Financing
> Authority's Debt Service Fund*** to provide for the debt service of its special tax
> revenue bonds. . . .

(Ex. 27, at 323; *see also* Ex. 28, *Commonwealth of Puerto Rico, Basic Financial Statements and*

*Required Supplementary Information, June 30, 2013*, at 256; and Ex. 29, CW_STAY0009784, at

357) (emphasis added).)[4]

    14.    The Commonwealth has consistently defined "Special Revenue Funds" as:

> Commonwealth governmental funds *separate from the General Fund* that are
> created by law, *are not subject to annual appropriation* and have specific uses
> established by their respective enabling legislation. Special Revenue Funds are
> funded from, among other things, revenues from federal programs, tax revenues
> assigned by law to public corporations and other third parties, fees and charges for
> services by agencies, dividends from public corporations and financing proceeds.

---

[4] In its audited financial statements for the fiscal year ending June 30, 2015—issued on June 29, 2018—the
Commonwealth, for the first time, stated that it "*conditionally allocates*" to [the Special Revenue Fund] the
first \$117 million of [] federal excises taxes reimbursed, which are subsequently transferred to [PRIFA's]
Debt Service Fund to provide for the debt service of it special tax revenue bonds." (Ex. 29,
CW_STAY00009784 at 357 (emphasis added).) This *ex post facto* addition to the Commonwealth's
financial statements—added after PROMESA was passed and related litigation had been initiated—is
belied by the Commonwealth's pre-litigation financial statements, in which the phrase "conditionally
allocated" appeared nowhere. (*See, e.g.*, Ex. 27, at 323; Ex. 30, *Comprehensive Annual Financial Report:
Fiscal Year Ended June 30, 2011* at 140 ("Act No. 44, as amended, *requires* that in each fiscal year through
fiscal year 2057, the first \$117 million, of certain federal excise taxes received by the Commonwealth be
transferred to [PRIFA]. . . *The Commonwealth has pledged these taxes for the repayment of PRIFA's Special
Tax Revenue Bonds*.") (emphasis added).)

(*See* Ex. 31, CW_STAY0000229 at 3 (emphasis added); Ex. 32, CW_STAY0000914 at 3 (emphasis added); Ex. 33, TSA Cash Flow as of March 8, 2019 at 3 (emphasis added); *see also* Ex. 29, CW_STAY0009784 at 367; Ex. 34, CW_STAY0010168 at 357 (defining Special Revenue Funds as funds that "are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units."); (Holder Report ¶¶ 45-46.)

15.    The manner in which the Commonwealth described the Infrastructure Fund in its audited financials is consistent with fundamental principles of "governmental fund accounting." Accounting expert Bill Holder explains in his report that government accounting systems "are organized and operated on a fund basis. Fund accounting calls for the financial resources of a government to be accounted for and reported in appropriate funds." (Holder Report ¶ 2.) Moreover, he explains, "Moneys received and restricted to use for specific activities can be, and in practice often are, pooled in a single bank account along with unrestricted moneys or moneys to be used for other purposes," such as the Commonwealth TSA. (*Id.* ¶ 25.) Doing so "does not extinguish or affect restrictions on those resources" imposed by enabling legislation. (*Id.* ¶ 26.) Governmental funds are simply the manner in which the Commonwealth tracks restrictions on particular funds, even while cash is held in a pooled account like the TSA.

16.    The Commonwealth's pre-default implementation of the Enabling Act and Trust Agreement and internal accounting of the Rum Taxes as they flowed through Treasury accounts demonstrates that the Pledged Rum Taxes were at all times treated as for the benefit of PRIFA and its bondholders, even though they never flowed through any PRIFA-controlled account. The following chart reflects the pre-default flow-of-funds by bank account for the period January 2014

to June 2015 (the earliest period for which Movants have obtained flow-of-funds discovery).  As

shown below, the Pledged Rum Taxes never passed through a PRIFA bank account.



**Rum Taxes – January 2014 to June 2015**

**Footnotes:**

⭐ Account contains pooled funds, but rum taxes remain traceable
on the Commonwealth's books and records.

---▶ Denotes transfers of rum taxes made to PRIFA for its operational expenses.

🔶 The Government Parties' flow chart identifies this account as "PRIFA GDB -1891"

17.     During this period, when the U.S. Treasury transferred Rum Taxes to the

Commonwealth, the funds were deposited into one of the bank accounts that comprised the TSA,

specifically GDB Account Number ▮▮▮ 000-6 (the "GDB -0006 Account").  (*See* Ex. 26, Ahlberg

Tr. 355:4-14).  This is the only bank account through which the entirety of the first $117 million

of Rum Taxes flowed, making clear that the Infrastructure Fund existed as a fund on the

Commonwealth's books and records (with the corresponding cash held in the TSA).  (Ex. 26,

Ahlberg Tr. 370:21-371:2; *see also* Ex. 36, Government Parties' Flow of Funds Charts at 3.)

18.     After the $117 million was deposited into the GDB-0006 Account, $4 million of

the Rum Taxes was transferred to the PRIFA operational account (GDB Account No. ▮▮▮0704).

(*See, e.g.*, Ex. 26, Ahlberg Tr. 353:15-20.)  The remaining $113 million was transferred to a GDB-held PRIFA debt service account (GDB Account No. ███189-1 (the "GDB -1891 Account)), before being transferred to the bond trustee's account at U.S. Bank (Account Number ███0-002).  (*See* Ex. 36, Government Parties' Flow of Funds Charts at 3; *see also* Ex. 26, Ahlberg Tr. 344:7-23; Ex. 27, at 323 ("the Commonwealth transfers to [PRIFA's Special Revenue Fund] the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds.").)

19.     The Oversight Board's and AAFAF's (collectively, the "Government Parties") representation of the pre-default flow of funds, (*see* Ex. 36, Government Parties' Flow of Funds Charts at 3), is wrong in at least one respect:  The account labeled "PRIFA GDB-1891" was not a PRIFA bank account.  It was in the name of the Government Development Bank for Puerto Rico ("GDB").  (*See* Ex. 37, PRIFA_STAY0004737 at PRIFA_STAY0004737, PRIFA_STAY0004741-42; Ex. 26, Ahlberg Tr. 362:19-363:5, 368:13-369:2 (confirming that, while the account is named "AFI DEBT SERVICE" for internal reference, that does not mean that PRIFA was the actual accountholder).)  In other words, the moneys used to pay the PRIFA bonds never flowed through any PRIFA-controlled bank account.[5]  When asked about Exhibit A to the Opposition that the Oversight Board submitted to this Court, representing that the Infrastructure Fund is "held by PRIFA" (ECF No. 10611-1), the Commonwealth's corporate representative testified that the exhibit was not consistent with the Commonwealth's understanding of the Infrastructure Fund. (Ex. 26, Ahlberg Tr. 339:23-340:2.)  The Treasury Department maintains the Infrastructure Fund

---

[5] This is consistent with the PRIFA Enabling Act, which requires only that that the Fund "be maintained by *or on behalf of* [PRIFA]."  3 L.P.R.A. § 1914.

on PRIFA's behalf. The Commonwealth holds, at most, legal title, and PRIFA enjoys equitable ownership (but with PRIFA's equitable ownership of the Infrastructure Fund subject to the Trustee's lien for the benefit of all bondholders).

20. Here, Treasury recorded incoming Rum Taxes using a specific account designation (R4220) in its internal fiscal and accounting system (coincidentally known by the abbreviation PRIFAS). (*See* Ex. 38, PRIFA_STAY00001065-66; Ex. 39, AAFAF Mar. 13, Ltr. at 4 ("Account value R4220 refers to the account used for the Rum Cover Over received from the Alcohol and Tobacco Tax and Trade Bureau for rum exported to the United States"); Ex. 26, Ahlberg Tr. 349:8-13, 372:19-373:2.)

## II. Post-Default, the Commonwealth Continues to Receive Moneys Deposited "to the Credit of PRIFA."

21. The current manner in which the Pledged Rum Taxes are being accounted for as they are deposited into the TSA makes clear that they are owned by PRIFA. The Lockbox Agreement, dated May 5, 2015, between the Commonwealth and Rum Producers,[6] provides that the first $117 million in Rum Taxes received each year should be sent to Treasury, with a direction that the moneys are "**for deposit to the credit of PRIFA**."[7] (Opp. ¶ 29 (emphasis added); *see*

---

[6] Two rum producers—Bacardí International Limited and Bacardí Corporation and Destileria Sérralles, Inc. (together, the "Rum Producers")—filed joinders to the Opposition. (ECF No. 10616, "Bacardi Br."); (ECF No. 10612, "Sérralles Br."). The Rum Producers' joinders should be disregarded because the Rum Producers lack standing. The Rum Producers have no claim to the Pledged Rum Taxes. Their joinder motions do nothing more than make assertions about the putative merits of claims that are not before this Court. This is something the Rum Producers freely admit in their joinder motions. (*See, e.g.*, Bacardi Br. at 4-5 (stating that because the Oversight Board has "thoroughly" addressed the issues of standing and property interests, they only address in their filing whether the facts alleged "give rise to claims against the Commonwealth and Rum Producers").) One thing Movants and the Rum Producers do agree on, however, is that the first $117 million of Rum Taxes are Movants' property.

[7] The Oversight Board tries to trivialize the "Disbursement Details" as "merely a description of how the disbursements were calculated," rather than "an instruction," because "the Lockbox Bank has no power to create any property interest in the monies . . . ." (Opp. ¶ 29.) There is no merit to this argument. The Lockbox Agreement expressly recognizes PRIFA's entitlement to the first $117 million, and thus, it is the Lockbox Agreement (not the purported power of the Lockbox Bank) that requires the moneys to be

*also* Ex. 40, PRIFA_STAY0001515; Sérralles Br. ¶ 6; Bacardí Br., Ex. D, ECF 10609-4 (Lockbox

Agreement), § 5(a); Ex. 26, Ahlberg Tr. 391:9-17; Miller Decl. ¶ 18.)  This is consistent with the

statutory requirement that the Pledged Rum Taxes "shall be covered into a Special Fund

maintained by *or on behalf of* the Authority."  3 L.P.R.A. § 1914 (emphasis added).

22.    Treasury accepts the deposits and records the incoming Pledged Rum Tax proceeds

in the General Fund, with the same fund and account designations that allow separate tracing of

the Rum Taxes, the first $117 million of which constitute the Infrastructure Fund as used prior to

the implementation of the Lockbox Agreement.  (Ex. 26, Ahlberg Tr. 349:8-13.)  And it does so

at the express direction of the Commonwealth.[8]  (Lockbox Agreement § 5(a).)  The funds can be

identified from these accounting designations.  (Ex. 26, Ahlberg Tr. 344:7-16.)  In other words, as

in *Gracia-Gracia*, Pledged Rum Taxes are "segregated into a separate account in the general fund

for accounting purposes."  *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin.*

*Oversight & Mgmt. Bd. for P.R.)*, 939 F.3d 340, 351 (1st Cir. 2019).

---

delivered "to the credit of" PRIFA.  While the Oversight Board argues that, under Section 15 of the Lockbox
Agreement, the disbursements are subject to change if the amount "appropriated" to PRIFA is changed
(Opp. ¶ 29 and n.19), the Oversight Board does not dispute that this provision has never been invoked and
the Lockbox Bank is continuing to deposit the first $117 million with the Treasury Department "to the
credit of PRIFA." (Ex. 26, Ahlberg Tr. 390:23-391:8.)

[8] Any effort by the Government Parties to dispute these facts cannot be entertained in the context of this
Motion.  The Court must assume the facts alleged in favor of the Movants on this record because the
Government Parties did not comply with the Court's discovery orders.  Following motion to compel
briefing, Judge Dein ordered the Government Parties to produce internal accounting records, specifically
"transmittal information . . . including, without limitation . . . documents showing any sub-accounts or other
designations used to track Rum Taxes in the [TSA]."  (ECF No. 12080 at 4.)  The Government Parties
refused to provide a complete set of such records.  Where, as here, a party fails to comply with a discovery
order, the Court must presume that the unproduced discovery would be unfavorable to the party that failed
to produce it.  (*See* 2 Wigmore on Evidence § 291, at 228 ("The failure or refusal to produce a relevant
document. . . . is evidence from which alone its contents may be inferred to be unfavorable to the possessor
. . . ."); *Knightsbridge Mktg. Servs., Inc. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572, 575 (1st Cir.
1984) ("The district court was entitled, as are we, to draw an adverse inference against the defendant for its
failure to produce . . . ."); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 716 (6th Cir. 2007) (concluding
that "the district court should have drawn an adverse inference against [defendant] for its failure to turn
over" critical documents).)  This alone confirms that Movants have a "colorable claim."

## ARGUMENT

23.     The Oversight Board's attempt to heighten Movants' burden or to suggest that Movants must prove secured status (Opp. ¶¶ 56, 58) is baseless.  "Adjudication of a motion for relief from the automatic stay 'is not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims.'"  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 2019 WL 4735362, at \*4 (D.P.R. June 28, 2019) (quoting *In re Bos. Language Inst., Inc.*, 593 B.R. 381, 395 (Bankr. D. Mass. 2018)).  Rather, *Grella*'s "colorable claim" standard applies.  *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32-33 (1st Cir. 1994); *see also Gracia-Gracia*, 939 F.3d at 352 (quoting *Grella*, 42 F.3d at 33); *U.S. Bank N.A. v. Vertullo (In re Vertullo)*, 610 B.R. 399, 403-04 (B.A.P. 1st Cir. 2020).

24.     Likewise, "[a] hearing on relief from the automatic stay is typically not the proper forum for the assertion of defenses and counterclaims against the party seeking relief.  In an automatic stay proceeding, the Court should limit itself to a narrow frame of inquiry."  *In re Hernandez*, 244 B.R. 549, 553-54 (Bankr. D.P.R. 2000) (finding that the movant had a colorable claim to the property, notwithstanding "Debtor's defenses and counterclaims [that] attack the validity of the Movant's claim . . .  In view of the First Circuit Court of Appeals' opinion in *Grella v. Salem, supra*, we hold that the appropriate forum for the Debtor's affirmative defenses and counterclaims is the trial court in the foreclosure action.").  Although "a more expansive approach to what may be asserted in opposition to a relief from stay motion has evolved, the First Circuit Court of Appeals has adopted the more restrictive approach."  *Id.* at 554 (citations omitted).  The Court need not—and should not—adjudicate the merits of the underlying claims at this stage.

25.     While *Grella* drew a loose analogy between a lift-stay and a preliminary injunction hearing, it did not suggest that the same burden of proof applies to each.  Quite the contrary, *Grella* explicitly stated that a lift-stay movant need only show a "***reasonable likelihood*** that a creditor

has a legitimate claim or lien," and the Court must make "only a determination that the creditor's

claim is **_sufficiently plausible_** to allow its prosecution elsewhere." *Grella*, 42 F.2d at 33-34

(emphasis added). Contrary to the Oversight Board's suggestion (Opp. ¶ 60), a lift-stay hearing

does "not involve a full adjudication on the merits of claims, defenses, or counterclaims." *Grella*,

42 F.2d at 32.

26. *Peaje Investments LLC v. Financial Oversight & Management Board for Puerto

Rico*, 899 F.3d 1 (1st Cir. 2018), is not to the contrary. While the First Circuit concluded that it

could not evaluate the Title III court's finding of lack of "cause" without the court's "view as to

the precise nature and extent of [movant's] collateral," it did not require lift-stay movants to

"establish[]" the nature and extent of the collateral to prevail. *Id.* at 13. To the contrary, the First

Circuit has emphasized that the Court makes only a "preliminary determination" of a movant's

claim to the debtor's property. *Gracia-Gracia.*, 939 F.3d at 352.

## I.    THE COURT SHOULD LIFT THE AUTOMATIC STAY UNDER BANKRUPTCY CODE SECTION 362(D)(2) BECAUSE THE COMMONWEALTH HAS NO EQUITY IN THE PLEDGED RUM TAXES AND THEY ARE NOT NECESSARY TO AN EFFECTIVE REORGANIZATION.

### A.    Movants Are Entitled to Relief Under 11 U.S.C. § 362(d)(2) Because the Commonwealth Lacks Equity in the Pledged Rum Taxes.[9]

27. As Movants have previously shown (Mot. § III.A), the Enabling Act statutorily

requires the Commonwealth to assign any rights to the Pledged Rum Taxes to PRIFA and

mandates that the Pledged Rum Taxes "**_when received_** by the Department of the Treasury of Puerto

Rico, **_shall be covered_** into" the Infrastructure Fund by operation of law. 3 L.P.R.A. § 1914

---

[9] Contrary to the Oversight Board's argument (Opp. ¶¶ 56, 58), relief under 11 U.S.C. § 362(d)(2) does not require Movants to show secured status. None of the cases the Oversight Board cites suggests otherwise. (Opp. ¶¶ 57-58, nn.28-29.) These cases—all outside the First Circuit—simply did not address the distinction between § 362(d)(1) and 362(d)(2). In *Gracia Gracia*, the First Circuit squarely held that these two prongs are very different and the court's analysis under Section 362(d)(2) is less "arduous" than the "cause" standard under Section 362(d)(1). 939 F.3d at 347.

(emphasis added).[10]  The Commonwealth further covenanted with PRIFA bondholders not to impair the flow of funds or PRIFA's rights under the Enabling Act.  3 L.P.R.A. §§ 1913, 1914. This statute granted PRIFA and its bondholders a property interest in the special restricted fund, and rendered Treasury a mere conduit.  (Mot. ¶¶ 45-49.)  These facts put this case on all fours with *Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, (referred to herein as the "JUA Cases").  484 F.3d 1, 29 (1st Cir. 2007) ("Law 253 . . . provides that the JUA 'shall receive' premiums from the Secretary of Treasury and that the Secretary '***shall transfer***' these premiums to the JUA . . . ***The JUA has successfully alleged an entitlement to the Earned Premiums under Law 253, and therefore a property interest in those funds***") (emphasis added).

28.    The Oversight Board tries to distinguish the JUA Cases by misstating the flow of funds mandated by the Enabling Act and by injecting the words "conditional" or "contingent" into the Enabling Act.[11]  From that false premise, the Oversight Board argues that, unlike the insurance premiums at issue in the JUA Cases, the Commonwealth "has authority to retain and use the funds as it sees fit."  (Opp. ¶ 69.)  There is nothing conditional about the provisions of the Enabling Act, which, in Section 1914, uses the term "shall."  3 L.P.R.A. § 1914.[12]  Indeed, the title of that

---

[10] Movants' interpretation of the Enabling Act is confirmed by the Commonwealth's pre-PROMESA publicly disclosed audited financial statements, in which the Commonwealth wrote that it "has pledged [the first $117,000,000 of Rum Taxes] for the repayment of PRIFA's Special Tax Revenue Bonds."  *See, e.g.*, Ex. 30, at 140.

[11] The Oversight Board uses "contingent" or "contingently" twice in its brief (Opp. ¶¶ 85, 124 n.74) and "conditional" or "conditionally" eight times (Opp. ¶¶ 11 n.9, 25, 72 n.38, 103, 113, 123, 124).  By contrast, those words are not found once in the Enabling Act.

[12] Article VI, Section 8 of the Enabling Act does not change the result in that any limitation contained therein does not render the statute subject to the legislature's whim.  In other words, unless the specific clawback conditions have been met (which they have not), Article VI, Section 8 does not provide the Commonwealth with blanket authority to disregard fiscal mandates in its existing statutes.  Indeed, fiscal mandates cannot be ignored even when they are subject to provisions calling for hypothetical reductions in the event of a budgetary shortfall.  *See Riley v. Joint Fiscal Comm. of Ala. Legislature*, 26 So. 3d 1150, 1156-57 (Ala. 2009) (fiscal mandate was absolute even in face of constitutional provision that called for

section—"Special Deposit"—makes plain that the Commonwealth transferred ownership of the

Pledged Rum Taxes, and intended only to hold them in a fiduciary capacity for PRIFA and its

bondholders.  (*See* Ex. 34, CW_STAY0010168 at 357 (defining a "special deposit" fund as one

that "acts in a fiduciary capacity in order to account for moneys received with specified purposes

for which the law does not specify its recording in any other fund.  It mainly includes . . . agency

accounts for which the Commonwealth act in an agent's capacity.").)  This is also consistent with

the Commonwealth's discussion of the transfer of the Pledged Rum Taxes to PRIFA as one of the

Commonwealth's "***Pledges*** of Receivables and Future Revenues" (Ex. 28, at 122 (emphasis

added)), and its representation to rum producers.[13]  What mattered in *Flores Galarza* was that Law

253 obligated Treasury to transfer the premiums, once received, to the legal owner.  So too here.

The Enabling Act obligates Treasury to transfer the Pledged Rum Taxes to PRIFA when received.

The Commonwealth thus possesses no equitable interest in those funds.[14]

29.     That the Enabling Act unequivocally mandates Treasury to remit the Pledged Rum

Taxes to PRIFA is further proved by the fact that the Enabling Act separately gives Treasury the

authority (but does not require it) to appropriate funds to PRIFA in any year that the Rum Tax

Remittances fall short of the pledged $117 million.  *See* 3 L.P.R.A. § 1914.  If the full $117 million

---

blanket reductions in appropriations in the event of hypothetical budgetary shortfalls); *State v. Sherman*, 46 Iowa 415, 420 (1877) (requirement that specified sums be paid to the state university if there was "any money in the State treasury, not otherwise appropriated," was "[b]y its language . . . absolute and not conditional").  *See infra* Argument § I.B.

[13] (*See, e.g.*, Bacardí Br., Ex. B, ECF 10609-2 (Bacardí Agreement), § 4.6 ("***the first $117 million*** of Cover Over Revenues ***received by the Government*** . . . ***are pledged and have to be transferred to [PRIFA]***" (emphasis added)); Sérralles Br., Ex. A, ECF No. 10612-1 (Sérralles Agreement), § 4.6 ("***the first $117 million*** of Cover Over Revenues ***received by the Government*** . . . ***are pledged and have to be transferred to [PRIFA]***" (emphasis added)).)

[14] The Oversight Board also emphasizes that, unlike with Law 253, the Enabling Act does not contain "trustee" or "fiduciary" language, and thus does not render Treasury a "mere custodian" of the funds.  (Opp. ¶ 69.)  But, as detailed in the Motion, the statute need not contain certain magic words to create a custodial or trust relationship.  (Mot. ¶ 58 n.18.)

were a conditional appropriation subject to the whim of the legislature, there would be no need to specify that the Commonwealth legislature is *not* obligated to cover any deficit amount. The plain implication is that such legislative discretion does not exist with respect to the first $117 million of annual Rum Taxes.

30. Discovery to date, albeit incomplete, confirms that the Commonwealth implemented the Enabling Act in a manner that reflects PRIFA's equitable ownership of the Infrastructure Fund. Pre-default, the Commonwealth (a) accounted for the first $117 million in Rum Taxes in the Infrastructure Fund, *i.e.*, "the first $117 million of rum revenues" that the Commonwealth receives "in each fiscal year," (Ex. 26, Ahlberg Tr. 332:9-21); (b) "segregated [the moneys] in a separate account in the General Fund for accounting purposes," *Gracia-Gracia*, 939 F.3d 340, 351 (1st Cir. 2019)—as is commonplace in governmental accounting—to ensure they are traceable while in the custody of Treasury and delivered to their rightful owner, PRIFA; and (c) transferred the moneys through its own accounts and to trust accounts for the PRIFA bondholders without the moneys ever touching a PRIFA-held account. And, through the Lockbox Agreement, the Commonwealth expressly acknowledged that the first $117 million in Rum Taxes were to be transferred "to the credit of" PRIFA, *and consistently records them as such to this day*. (*See* Ex. 26, Ahlberg Depo. Tr. 349:8-13.)

31. Under settled law, the Commonwealth cannot argue for a different interpretation of the Enabling Act given its "course of performance," which courts treat as powerful evidence of the parties' agreement.[15] *See Reed & Reed, Inc. v. Weeks Marine, Inc.*, 431 F.3d 384, 388 (1st Cir.

---

[15] "Course of performance" evidence is admissible even if there is no ambiguity in the Trust Agreement or other governing documents. *See Quasar Energy Group, LLC v. VGBLADS, LLC*, 2017 WL 3206940, at *7 (D. Me. July 28, 2017), *report and recommendation adopted sub nom. Quasar Energy Grp. v. Vgblads LLC*, 2017 WL 4274159 (D. Me. Sept. 26, 2017); *see also Francisco Levy, Jr., Inc. v. Caribe Gen. Elec., Inc.*, 2003 WL 21047205, at *8 (P.R. Cir. Feb. 28, 2003) (applying the Restatement (Second) of Contracts to a contract dispute that arose under the Commonwealth law). And more generally, applying the law of

2005) ("'The parties to an agreement know best what they meant,' and thus the parties' subsequent

course of performance may be instructive in contract interpretation.") (quoting Restatement

(Second) of Contracts § 202 cmt. g (1981)). This evidence further confirms the Commonwealth's

understanding that, like the insurance premiums in *Flores Galarza*, the Pledged Rum Taxes were

PRIFA's (subject to bondholders' liens) upon receipt by the Commonwealth.

      **1.**    **The Enabling Act and the Trust Agreement Confirm that the Commonwealth Is a Mere Conduit for the Pledged Rum Taxes.**

          **a.**    **The Oversight Board's Tortured, Made-for-Litigation Interpretation of the Enabling Act Is Belied By the Statute's Plain Text.**

32.      Unable to avoid the compelling similarities between the Enabling Act and Law 253,

the Oversight Board twists the PRIFA statute beyond its plain meaning.

33.      *First*, the Oversight Board "commit[s] the cardinal error of reading the statute in

pieces rather than as a whole," (something the Oversight Board wrongly accuses Movants of doing

(Opp. ¶ 65)). The Oversight Board breaks apart the phrases "shall be covered into" and "when

received" in an attempt to strip them of their plain meaning. (*See* Opp. ¶ 65 (addressing "shall be

covered into") and ¶ 66 (addressing "when received").) The Oversight Board claims that, read in

isolation, the language "shall be covered into" simply "identifies where any Rum Tax Remittances

appropriated to PRIFA are to be deposited." (Opp. ¶ 65.) The Oversight Board then disavows the

plain import of the words "when received," asserting: "'When received' does not mandate

immediate transfer, as Movants argue, or transfer of any particular amount. It just means the

Commonwealth is *not* obligated to send any appropriated funds to PRIFA *before* the Rum Tax

Remittances are received." (Opp. ¶ 66.)

_____

other jurisdictions, the First Circuit has noted the trend has been to relax the traditional "four corners" rule and to allow extrinsic evidence, even in the absence of ambiguity. *LPP Mortg., Ltd. v. Sugarman*, 565 F.3d 28, 31 (1st Cir. 2009).

34. "[I]t is axiomatic that the word 'shall' has a mandatory connotation." *Claudio-De Leòn v. Sistema Universitario Ana G. Mèndez*, 775 F.3d 41, 46 (1st Cir. 2013); *see also Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty.").[16] Use of the word "when" indicates a temporal requirement—it operates as a directive regarding timing of moneys entering the fund. Thus, the directive that the moneys "when received . . . shall be covered into" the Infrastructure Fund requires that the moneys enter the fund at the moment they are received. The Oversight Board's construction of the statute effectively would render nugatory the language "when received."[17] The Commonwealth obviously could not be obligated to send the Rum Taxes to PRIFA "*before* the Rum Tax Remittances are received"; it would be impossible to do so. "When received" must mean more than simply eliminating the impossible.

35. *Second*, the Oversight Board tries to escape the Act's description of PRIFA's right as a "participation"—which Movants explained means "ownership" (Mot. ¶ 56)—by arguing that, "in this context," it "translates to a 'portion' or 'share.'" (Opp. ¶ 67); *but see In re Garcia*, 484

---

[16] *See also In re Sanchez*, 429 B.R. 393, 399 (Bankr. D.P.R. 2010) ("[T]he inclusion of the term 'shall' is considered mandatory and imperative, hence inconsistent with the idea of discretion."); *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267, 285-86 (D.P.R. 2015) ("Certainly, the Puerto Rico Code's use of the word 'shall' in Section 6189(b) is meant to impose restrictions on how the municipalities can spend and use the IVUM funds collected. Contrary to Plaintiff's contention, the court finds that Section 6189 does not *suggest* certain uses for the monies collected.") (emphasis in original); *State ex rel. Hunter v. Lippold*, 142 S.W.3d 241, 243-46 (Mo. Ct. App. 2004) (statutory language mandating an appropriation was not permissive; it said the commission "shall" include this line item in the specified amount in its budget); *McGraw v. Hansbarger*, 301 S.E.2d 848, 857-60 (W. Va. 1983) (statute mandating use of funds "for the purpose of providing revenue for care, treatment, and rehabilitation of alcoholics" created trust fund held by the legislature for the benefit of those who seek treatment).

[17] It is well-settled that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotations omitted); *see also P.R. Tel. Co. v. Advanced Cellular Sys. (In re Advanced Cellular Sys., Inc.)*, 483 F.3d 7, 12 (1st Cir. 2007) (rejecting an interpretation that would render certain contractual provisions surplusage); *Citibank, N.A. v. Allied Mgmt. Grp.*, 491 F. Supp. 2d 232, 237 (D.P.R. 2007) (same).

18

B.R. 1, 3 (Bankr. D.P.R. 2012) (with respect to the funds derived from an asset sale, the debtor's "participation" was its ownership interest of those funds). The argument is a non-sequitur, but even the Oversight Board's preferred definition supports Movants. The term "share" connotes ownership—consider, for example, shares of a stock corporation (which represent the *portion* of the corporation owned by particular investors). *See Lopez del Valle v. Gobierno de la Capital*, 855 F. Supp. 34, 35 (D.P.R. 1994) (equating "shares" with "ownership interest"). At a minimum, the words "share" or "portion" can refer to ownership interests—and thus the Oversight Board's preferred definitions do nothing to undermine Movants' ownership rights. The Enabling Act transfers ownership of a portion of the Rum Taxes to PRIFA—specifically, the first $117 million, which constitutes PRIFA's "participation" (or the "share" or "portion" that PRIFA owns).

36.     *Third*, the Oversight Board contends that PRIFA does not own the Pledged Rum Taxes because Section 1096(m) of the Enabling Act states that "PRIFA 'may receive' federal excise taxes." (Opp. ¶ 34.) The Oversight Board misconstrues that provision—which states that PRIFA has the power to "pledge all or a portion of such revenues as [PRIFA] may receive, ***including, but not limited to,*** . . . all or any portion of the federal excise taxes ***or other funds which should have been transferred by the Commonwealth to the Authority***." 3 L.P.R.A. § 1906(m) (emphasis added). This section authorizes PRIFA to pledge any revenues it ***might*** receive—specifically including (but not limited to) the Pledged Rum Taxes, which it ***will*** or is legally entitled to receive.[18]

37.     Indeed, if anything, Section 1906(m) reflects the Commonwealth's recognition that the Pledged Rum Taxes are held in a special fund for PRIFA when the Commonwealth receives

---

[18] Moreover, while PRIFA owns the Pledged Rum Taxes, it is nevertheless accurate to state that PRIFA merely "may receive" such taxes: As the Oversight Board acknowledges, there is no guarantee that the federal government will transfer Rum Taxes to the Commonwealth in every fiscal year. (*E.g.*, Opp. ¶ 125.)

them (whether or not they are transferred to any particular account).  Section 1906(m) states that

any Rum Taxes "which should have been transferred" are included among the revenues PRIFA

"receive[s]."  *See id.* (the "revenues" PRIFA "may receive include[es], [are] not limited to, . . .

federal excise taxes . . . which should have been transferred").

> **b.    The Oversight Board's Reinterpretation of the Trust
> Agreement Renders Its Terms Superfluous and Circular.**

38.    As Movants have shown (Mot. ¶ 50-51), the Trust Agreement makes clear that the

first proceeds of the Rum Taxes are PRIFA's property, and subject to the Trustee's liens on behalf

of bondholders, once covered into the Infrastructure Fund by Treasury.  "Pledged Revenues" are

defined to include "Special Tax Revenues and any other moneys deposited to the credit of the

Sinking Fund."  In turn, "Special Tax Revenues" are defined as "the Offshore Excise Taxes

deposited to the credit of the Puerto Rico Infrastructure Fund *pursuant to the Act*."  (Mot. Ex. 2,

ECF 10602-2, at 18 (emphasis added).)  The Oversight Board does not contest that "the Act" refers

to, *inter alia*, 3 L.P.R.A. § 1914, which created the Puerto Rico Infrastructure Fund, and requires

that the first proceeds of the Rum Taxes, "when received" by Treasury, "shall be covered into the

[Infrastructure Fund]."   3 L.P.R.A.  § 1914;[19]  (Mot. Ex. 3, ECF 10602-3, at 42, 17 (Trust

Agreement §§ 601, 101).)

---

[19] Statutes like this one create a mandatory and binding continuing duty.  *See Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1867) ("where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied."); *see also Louisiana ex rel. Hubert v. City of New Orleans*, 215 U.S. 170, 177-78 (1909) ("The contract creditors of the Police Board were entitled to rely upon the benefit of the laws imposing taxation to make their obligations effectual. They could not, constitutionally, be deprived of such benefit."); *Missouri v. Jenkins*, 495 U.S. 33, 55-56 (1990) (reaffirming *Von Hoffman* and *Hubert* as "a long and venerable line of cases in which this Court held that federal courts could issue the writ of mandamus to compel local governmental bodies to levy taxes adequate to satisfy their debt obligations.").

39.     The Oversight Board nevertheless assumes that only "Special Tax Revenues" that have been "deposited to the credit of the Sinking Fund" constitute "Pledged Revenues."  (Opp. ¶ 89.)  This reading violates several basic principles of contractual interpretation—including by rendering critical portions of the Trust Agreement nugatory and others nonsensical.

40.     ***First*, the pledge of revenues under the Trust Agreement would become a nullity—rendering the entire Trust Agreement nonsensical and defeating its evident purpose.**  The absurdity of the Oversight Board's position is highlighted by the fact that the PRIFA bondholder trustee is the legal owner of the Sinking Fund.  The trustee holds the Sinking Fund in trust for the benefit of bondholders.  (*See* Mot. Ex. 3, ECF 10602-3, at 42, 17 (Trust Agreement § 401) (Sinking Fund "to be held by the Trustee . . . in trust")).  PRIFA's pledge of revenues—which created the security interest—is likewise made to the trustee.  Under the Oversight Board's interpretation, PRIFA "pledge[d] to the Trustee . .  as security for the payment of the Bonds," moneys deposited to the credit of the Sinking Fund—which is the account that the trustee itself owns.  *Id.* at 9.  This reading is analogous to suggesting that a customer of a bank borrowed money from the bank, and pledged as "security," in case the debt was not repaid, the bank's own money sitting in the vault.

41.     Such an interpretation must be rejected, because the debtor cannot grant a security interest in an account the debtor does not own—and construing the Trust Agreement in this manner plainly would defeat its basic objective:  to provide a security interest in a revenue stream from which bondholders would be paid.  Both the Trust Agreement itself and the offering documents are replete with references to the "pledge" and provisions intended to protect the "Pledged Revenues."  (*See* Mot. Ex. 3, ECF 10602-3, at 42, 17 (Trust Agreement §§ 601, 602; *id.* at 9); Mot. Ex. 17, ECF 10602-17, at 9-10 (Official Statement, Puerto Rico Infrastructure Financing Authority

Series 2005 Bonds).) All of these provisions would be inoperative and nonsensical if the agreement is construed as merely giving the trustee a security interest in an account owned by the trustee, not the debtor.

42. *Second,* **"Special Tax Revenues" would become nugatory.** Specific definitions in the text also become nugatory under the Oversight Board's reading. As argued in the Motion, and not addressed in the Opposition, the Oversight Board's interpretation would negate the reference to "Special Tax Revenues" in the definition of "Pledged Revenues."[20] (*See* Mot. ¶ 52.) Under the Oversight Board's reading, Pledged Revenues could have been defined simply as "moneys that have been deposited to the credit of the Sinking Fund." There would be no need to mention "Special Tax Revenues," which would become mere surplusage. (*See* Mot. ¶¶ 51-55.) Courts, however, "must favor interpretation[s] which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage." *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1034 (1st Cir. 1984); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995).

43. Unlike the Oversight Board's proposed construction, Movants' reading appropriately gives effect to all the Trust Agreement's terms. Pledged Revenues are (i) "Special Tax Revenues" (a kind of "moneys") *plus* (ii) any "other moneys" that "have been deposited to the credit of the Sinking Fund." By way of example, "other moneys" might be deposited to the credit of the Sinking Fund if less than $117 million is received from the U.S. Treasury in a given

---

[20] The Oversight Board emphasizes that Section 601 of the Trust Agreement states that the bonds are payable only from Pledged Revenues. We agree. But the Oversight Board then reads out of the definition of Pledged Revenues the language it does not like. (*See* Opp. ¶ 88 ("Pledged Revenues are defined as ' . . . moneys that *have been deposited to the credit of the Sinking Fund.*'") (omitting "Special Tax Revenues and any other . . .").)

fiscal year.  In that instance, "the Secretary of the Treasury is authorized to cover said deficiency with any funds available," even funds that are not Special Tax Revenues.  3 L.P.R.A. § 1914.

44. **_Third_, other portions of the Bond Resolution would become absurd.**  The governing bond resolution provides:  "The [Trust] Agreement also provides for the creation of a special fund designated 'Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund' (the '_Sinking Fund_') and for the _deposit to the credit of said special fund_ of a sufficient amount of the Pledged Revenues (as defined in the Trust Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable . . . ."  (Mot. Ex. 2, ECF 10602-2, at 5-6 (emphasis added).)  The Oversight Board's interpretation would render this sentence nonsensical and circular:  Because the Oversight Board defines "Pledged Revenues" as money deposited into an account entitled "Sinking Fund," under the Oversight Board's interpretation, this sentence would require PRIFA to deposit **_into an account designated the Sinking Fund_** "a sufficient amount of" funds **_that have been deposited to the credit of the Sinking Fund_**—an absurdity.  _See Flores Rodriguez v. Flores Toledo_, 101 D.P.R. 61, 68-69 (P.R. 1973) (contractual interpretations that result in an absurdity should be rejected).

45. **_Fourth_, the Oversight Board's reading violates the last-antecedent canon.**  The Oversight Board's interpretation—that Special Tax Revenues are moneys deposited "to the credit of the Sinking Fund"—violates the last-antecedent canon.  "[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows[.]" _Barnhart v. Thomas_, 540 U.S. 20, 26 (2003); _see also Lockhart v. United States_, 136 S. Ct. 958, 960 (2016); _Rule of the Last Antecedent_, BLACK'S LAW DICTIONARY (11th ed. 2019); A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 144 (2012) (hereinafter READING LAW).  Under the canon, the limiting phrase—"that have been deposited to the credit of

23

the Sinking Fund"—modifies only the phrase that it immediately follows—"any other moneys"—

and *not* "Special Tax Revenues." *See Barnhart*, 540 U.S. at 27-28. In other words, the Pledged

Revenues include (a) Special Tax Revenues *and* (b) "any other moneys that have been deposited

to the credit of the Sinking Fund."

46. The Oversight Board invents a "commas" exception to the last-antecedent canon:

that the canon applies only to clauses offset by commas. (Opp. ¶ 89, n.44.) No such exception

exists. While *Barnhart* and *Lockhart* happened to involve lists of three or more items, the *Barnhart*

court explicitly noted that the canon applies to a list of two items not offset by commas. *See* 540

U.S. at 27 (illustrating the last-antecedent canon with a clause containing two items not separated

by a comma: "'You will be punished if you throw a party or engage in any other activity that

damages the house.' If [you] nevertheless throw[] a party and [are] caught, [you] should hardly

be able to avoid punishment by arguing that the house was not damaged."). Numerous courts have

applied the canon to lists of just two items not offset by a comma. *See, e.g.*, *Coffin v. Bowater,

Inc.*, 501 F.3d 80, 93-96 (1st Cir. 2007) (finding that application of the canon to such a list

produced a "significantly more persuasive" interpretation); *Acosta v. Local Union 26, Unite Here*,

895 F.3d 141, 143 n.2 (1st Cir. 2018); *United States v. Kerley*, 416 F.3d 176, 179-80 (2d Cir.

2005).

47. In arguing to the contrary, the Oversight Board relies on *Thomas v. Commissioner

of Social Security*, 294 F.3d 568, 572 (3d Cir. 2002), for the exact proposition that the Supreme

Court overruled in *Barnhart* (the appeal of *Thomas* under a different name). *Barnhart*, 540 U.S.

at 26 ("'When,' [the Third Circuit] said, 'a sentence sets out one or more specific items followed

by 'any other' and a description, the specific items must fall within the description.' **We disagree.**" (citation omitted) (emphasis added)).[21]

48. The Oversight Board also incorrectly claims that the recent First Circuit decision in the *ERS* case, which applied the "series-qualifier" canon, confirms its reading. (Opp. ¶ 89 (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*, 948 F.3d 457, 467-68) ("ERS").) Not so. The "series-qualifier" canon instructs: "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (citation and internal quotation marks omitted). That canon, however, "perhaps more than most of the other canons," is "highly sensitive to context . . . and subject to defeasance by other canons." READING LAW at 150. Here, unlike in *ERS*, applying the series-qualifier canon would defeat the objective of the Trust Agreement (as evident from its plain text) to confer a security interest, would render the first part of the Pledged Revenues definition entirely nugatory, and also would render the definition elsewhere in the document nonsensical. Movants' reading harmonizes all provisions and thus avoids both problems, and therefore, the context here plainly favors application of the last-antecedent canon. *Cf. Lockhart*, 136 S. Ct. at 968 ("Lockhart contends that if we applied . . . his 'series-qualifier principle[,]' we would arrive at an alternative construction of [the statute]. *But . . . [h]ere, the rule of the last antecedent is well supported by context and Lockhart's alternative is not. We will not apply the*

---

[21] The other cases cited by the Oversight Board (*see* Opp. ¶ 89, n.44) are inapposite because, in each, unlike here, application of the last-antecedent rule would have rendered the statute at issue nonsensical. *See In re CRS Steam* 217 B.R. 365, 374 (Bankr. D. Mass. 1998) ("I am faced with a statute made nonsensical by application of the [last-antecedent] rule."); *Demko v. United States* 44 Fed. Cl. 83, 89-90 (Fed. Cl. 1999) (declining to apply last-antecedent rule, not because the list of two was not separate by commas, but because doing so would "impair the meaning of the sentence"), *aff'd,* 216 F.3d 1049 (Fed. Cir. 2000).

*rule of lenity to override a sensible grammatical principle buttressed by the statute's text and structure*." (emphasis added)).[22]

49.     ***Fifth*, the Oversight Board misconstrues Section 401.**  The Oversight Board argues that Section 401 "prohibits PRIFA from granting a security interest to any party in the PRIFA Infrastructure Fund." (Opp. ¶ 95.)  That distorts the meaning of the provision, which is merely a forward-looking bondholder protection mechanism intended to prevent PRIFA from encumbering bondholders' collateral with an *additional* or secondary lien, beyond the pledge created under the Trust Agreement itself.  It also violates several canons of interpretation.  For one, Section 401 is a general provision, which cannot trump the specific provision defining Pledged Revenues.  *See UBS Fin. Servs., Inc. of P.R. v. XL Specialty Ins. Co.*, 929 F.3d 11, 24 (1st Cir. 2019) ("Nevertheless, it is a well-known precept of contract interpretation in Puerto Rico law that *specific provisions in a contract trump general provisions*." (emphasis added)); READING LAW at 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails.").  At best, the Oversight Board points to two conflicting provisions, and the *contra proferentum* canon obliges the Court to construe any such conflict against the drafter, here, the Commonwealth.  (*See* Mot. ¶ 51, n.16 (collecting authorities).)

50.     ***Sixth*, the Oversight Board too narrowly construes "to the credit of" and ignores the nature of "special funds."**  The Oversight Board invents false tension between Movants' interpretation of the language—"to the credit of" in Section 601 and the usage of that

---

[22] *See also United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 751-52 (1st Cir. 1985) (applying the last-antecedent canon and rejecting an alternative interpretation where such interpretation would "render nugatory [an] entire phrase" and where "[t]he modifying phrase *cannot be rationally construed* to refer distributively to the more remote antecedent words or phrases." (emphasis added)); *United States v. Santoro*, 359 F. Supp. 3d 122, 124-25 (D. Me. 2019) (declining to apply the series-qualifier canon over the last-antecedent canon where "the limitation phrase cannot be applicable to the second category in the list," and following *Lockhart* over *Paroline*).

phrase in Section 401 and elsewhere in the Trust Agreement. (Opp. ¶ 92.) Section 401 mandates

that "moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the

Trustee." The Oversight Board argues that "[t]he Trustee cannot hold in trust or disburse funds

that reside in an account that lies beyond the Trustee's control," so funds cannot be "to the credit

of" an entity unless they are in a bank account controlled by that entity. (Opp. ¶ 92.) In fact, there

is no inconsistency: While it is true that money held in Jane Doe's account is held "to the credit

of" Jane Doe, that is not, as the Oversight Board suggests, the *only* situation in which property can

be held "to the credit of" Jane Doe. The formulation "deposited to the credit of" by its plain terms

can reach tangible property or cash held to the credit of a particular entity—or moneys held by a

third party for the benefit of another. *See In re Palmas del Mar Country Club, Inc.*, 443 B.R. 569,

574 (Bankr. D.P.R. 2010) ("'Deposit' has been defined as 'money given as a pledge or down

payment', 'anything laid away or entrusted to another for safekeeping', 'anything given as security

or in part payment', and 'the act of giving money or property to another who promises to preserve

it or to use it and return it in kind.'"); *Wertheim, LLC v. Currency Corp.*, 2017 WL 3668985, at *7

(Cal. Ct. App. Aug. 25, 2017) (deeming a check to pay a judgment "deposited" when it was

delivered, and therefore entrusted, to the trial court).[23]

51.     The Oversight Board has no response to numerous examples under Puerto Rico law

of "special funds" created by Commonwealth statute that are simply held *at the Puerto Rico

Treasury Department* "to the credit of" a particular identified special fund. (*See* Mot. ¶ 53 n.17

(citing 18 L.P.R.A. § 1026; 13 L.P.R.A. § 4(b)).) In such instances, the property held by the

---

[23] The Oversight Board's interpretation is also contradicted by the express terms of other agreements to
which the Commonwealth is a party. (*See, e.g.*, Lockbox Agreement, Mot. Ex. 10 (ECF No. 10602-10) at
Section 2(d) (providing that "Deposited Funds held in, or credited to, the Account shall not be invested");
Section 3(b) ("The Lockbox Bank . . . shall not commingle the Deposit Funds in or credited to, or designated
for deposit in, the Account . . . .").)

Treasury Department is "to the credit of" the special fund—whether held in the TSA or in a segregated bank account bearing the fund's name. *See, e.g.*, *Slodov v. United States*, 436 U.S. 238, 243 (1978) (noting that an employer's tax withholdings are "deemed to be a special fund in trust for the United States" notwithstanding that "[t]here is no general requirement that the withheld sums be segregated from the employer's general funds" or "deposited in a separate bank account" (internal quotations omitted)); Trust Agreement § 401 (providing that moneys held in the Sinking Fund be "to the credit of" multiple accounts); (Holder Report ¶¶ 23-25); *see also La. Pub. Serv. Comm'n. v. FCC*, 476 U.S. 355, 372 (1986) (applying the "rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply").

52. ***Finally*, the *Las Vegas Monorail* decision on which the Oversight Board principally relies supports Movants' position.** The Oversight Board attempts to support its argument by citing the *Las Vegas Monorail* decision and then claiming that, "the debtor issued bonds secured by monies deposited in certain accounts." (Opp. ¶ 96.) But the court in that case reached the same conclusion that Movants urge here, finding that the creditor's security interest in monorail revenues attached when the revenues were collected (even before being transferred to the bond trustee). *See In re Las Vegas Monorail Co.*, 429 B.R. 317, 339 (Bankr. D. Nev. 2010). And even though the bonds at issue were not Section 928 special revenue bonds—and, thus, not entitled to heightened protection as in the present case—the court nevertheless ordered the debtor to follow "the procedures and obligations for handling and applying cash contained in the Indenture." *Id.* at 345-46. Thus, the court required the debtor to continue transferring funds into the segregated accounts, as required under the indenture. The ruling in *Las Vegas Monorail* is entirely consistent with the relief Movants seek here.

\* \* \*

28

53.    For these reasons, the Oversight Board's attempt to equate "Pledged Revenues" with moneys deposited to the Sinking Fund must be rejected.  Movants submit that the Enabling Act and Trust Agreement unambiguously support their position.  The only possible reading of the Trust Agreement is that "Special Tax Revenues," whether deposited to the credit of the Sinking Fund or not, are "Pledged Revenues," and that "other moneys" deposited to the credit of the Sinking Fund (such as Commonwealth appropriations to make up a shortfall) also become Pledged Revenues.[24]  The failure by the Treasury Department to assign physical control of the funds to PRIFA does not alter PRIFA's beneficial ownership of the funds, nor does it prevent those funds from becoming part of the Infrastructure Fund and PRIFA's property.  But even were the Court to find ambiguity, the Oversight Board does not dispute that, as argued in the Motion, such ambiguity must be construed against PRIFA and the Commonwealth, which drafted them.  (*See* Mot. ¶ 51, n.16 (collecting authorities stating the rule of *contra proferentum*, which requires courts to construe ambiguity against the drafter).)

### 2.    The Oversight Board Fails to Rebut that the Commonwealth, at Most, Holds the Pledged Rum Taxes in Trust or Custody for PRIFA (and Its Bondholders).

54.    As detailed in the Motion, the Enabling Act "manifests a legislative intent to impose a trust relationship that equally binds the Commonwealth and PRIFA."  (*See* Mot. ¶¶ 58-67.); *see also Von Hoffman v. City of Quincy*, 71 U.S. 535, 555 (1866) ("The State and the corporation, in such cases, are equally bound. The power given becomes a trust which the donor cannot annul,

---

[24] The Oversight Board's reliance on the form of bonds (Opp. ¶ 39) and offering statements (*id.* ¶ 40) is a red herring; those are mere summaries.  (*See* Offering Statement at 1 (noting that descriptions therein "do not purport to be complete and qualified in their entirety by reference to such documents").)

and which the donee is bound to execute[.]").  The Oversight Board's arguments to the contrary fail.[25]

55.     As an initial matter, discovery has confirmed that the Commonwealth "segregated [the Pledged Rum Taxes] into a separate account in the General Fund for accounting purposes"— which is more than sufficient to make "a *prima facie* showing of traceability."  *See Gracia-Gracia*, 939 F.3d at 351.  And even if the moneys were indistinguishably commingled with other moneys in the TSA (which it is not), it would still give rise to a trust *res* traceable under the lowest intermediate balance test.[26]  (Holder Report ¶¶ 50-54.)

56.     The Oversight Board is wrong to suggest (Opp. ¶ 99) that the Puerto Rico Trust Act, 32 L.P.R.A. §§ 3351-3355a (the "Trust Act"), has any bearing here.  The Trust Act applies only to *inter vivos* and testamentary trusts, 32 L.P.R.A. §§ 3352, 3355, not to statutory or constructive trusts.  Indeed, the Enabling Act expressly states that the trust agreement securing the PRIFA Bonds "need not be constituted pursuant to a public deed in order to be a valid trust under the laws of the Commonwealth."  3 L.P.R.A. § 1911.  The First Circuit expressed skepticism of the Oversight Board's "public deed" argument on precisely this ground:  "Why [the public deed] requirement would apply equally to a trust relationship created by statute, the Commonwealth does not say."  *Gracia Gracia*, 939 F.3d at 351-52.

---

[25] The Oversight Board seeks to confuse the issue of PRIFA's trust ownership of the Pledged Rum Taxes with Movants' security interest.  Movants' position is clear:  PRIFA is the owner of the Pledged Rum Taxes as a result of the Enabling Act, and Movants have a lien on the Pledged Rum Taxes owned by PRIFA.

[26] The Oversight Board suggests that "commingling" of funds may present an obstacle to establishing a trust for the benefit of PRIFA.  (Opp. ¶ 103 n.58.)  Commingling is not the death knell to a trust argument; rather, it is "a factor [that] a Court . . . must weigh[, but] its presence does not dictate the finding of an absence of a trust relationship."  *In re Tap, Inc.*, 52 B.R. at 276.  Regardless, discovery confirms that there is no commingling.  What the Oversight Board calls "commingling" is instead a pooled bank account that is nonetheless segregated by internal funds and general ledger accounts maintained by Treasury.  These fund and account designations allow moneys to be traced in Treasury's fiscal and accounting systems.

57.     In any event, the Trust Act imposed a public reporting requirement in 2012—*years*

after the PRIFA trust relationship formed—and its requirements do not apply retroactively.  *See*

31 L.P.R.A. § 3 ("Laws shall not have a retroactive effect unless they expressly so decree.  In no

case shall the retroactive effect of a law operate to prejudice rights acquired under previously

legislative action."); *Enrique Lopez Delgado v. South Porto Rico Sugar Co. of P.R.*, 62 D.P.R.

238, 242-43 (P.R. 1943).  The Office of the Director of Notary Inspections ("ODIN") has issued a

General Instruction pursuant to Article 5 of the Trust Act, informing all notaries that "[t]he

effectiveness of the Registry [created in 2012] is prospective."  (Ex. 41, Office of the Director of

Notary Inspections, *General Instructions for the Notaries* (Oct. 1, 2012).)

58.     Contrary to the Oversight Board's contention (Opp. ¶ 100), *Columbia Falls* is

directly on point.  There, the court precluded the debtors from diverting funds designated for the

repayment of bonds to pay delinquent property taxes, despite a statute that generally allowed

municipalities to use excess funds to pay delinquent property taxes.  *In re City of Columbia Falls,*

*Mont., Special Imp. Dist. No. 25*, 143 B.R. 750, 762 (Bankr. D. Mont. 1992).  Because the

specifically identifiable funds were to be used for a specific purpose—debt repayment—the

municipal officers held them in trust as "mere[] custodians" for the benefit of the bondholders.  *Id.*

at 762-63.  The same rationale applies here.  Treasury is the "mere custodian" of an identifiable

revenue stream designated for a specific purpose—PRIFA's operating expenses and debt service.

3 L.P.R.A. § 1914.[27]

---

[27] *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir. 1981), is inapposite.  (*See* Opp. ¶ 103, and n.58.)
In that case, a resolution that specified that travel agencies hold funds for payment of airline tickets "in
trust" for the benefit of the airlines was insufficient to give rise to a trust relationship because the resolution
did not put restrictions on how the agencies could use the funds.  667 F.2d. at 1070.  The Enabling Act
expressly mandates, however, that the transfer of the Pledged Rum Taxes and designates them to be used
for PRIFA's corporate purposes—namely, securing debt.  *In re Tap, Inc.*, 52 B.R. 271, 276-77 (Bankr. D.
Mass. 1985) (distinguishing *Morales* where debtor was "not free to use the money for its own benefit").

59.     The fact that the Enabling Act does not use the word "trust" with respect to PRIFA's

ownership of the Pledged Rum Taxes is immaterial: A statute that manifests the requisite elements

of a trust need not use the word "trust" to create a trust relationship. *See Stowe v. Bologna (In re*

*Bologna)*, 206 B.R. 628, 632 (Bankr. D. Mass. 1997).[28]

### 3.     The Pledged Rum Taxes are "Restricted Funds" that the Commonwealth Must Transfer to PRIFA.

60.     The Oversight Board does not meaningfully respond to Movants' argument that the

Pledged Rum Taxes are "restricted funds" (Mot. at 25-26), except to claim, as they do repeatedly,

that moneys are mere appropriations subject to repeal (Opp. ¶ 108 n.67). But the Commonwealth's

disclosure in its own audited financial statements that the Infrastructure Fund is a special revenue

fund comprised of "restricted funds" (*see* Holder Report ¶ 42-44) refutes the Oversight Board's

assertions to the contrary.   The Pledged Rum Taxes are "restricted funds" because the

Commonwealth cannot lawfully use or dispose of any Pledged Rum Taxes, except by transferring

them to PRIFA.   *See, e.g.*, *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd.*

*of Educ.*, 763 S.E.2d 288, 293 (N.C. Ct. App. 2014) ("restricted funds" are those with "a limited

use and specific purpose, such as to fund a special program").   Indeed, fund accounting is the

---

The Oversight Board misleadingly cites *Hatton v. Municipality de Ponce,* 134 D.P.R. 1001, 1010 (P.R. 1994), for the proposition that equitable remedies are not available against the government when such a remedy would undermine public policy. (Opp. ¶ 107 n.66.)  *Hatton* merely held, however, that a plaintiff cannot recover on a theory of unjust enrichment where he conferred a benefit under an illegal contract that he knew was formed illegally.  134 D.P.R. at 1007.  And the Oversight Board's argument that unjust enrichment does not apply when a contract governs the dispute, without any further explanation, is inapplicable to the case at hand.  (Opp. ¶ 107.)

[28] The Oversight Board attacks Movants' reliance on *In re Bologna*, but mistakes why Movants cited it. Movants do not seek to use the Enabling Act to bring fiduciary breach claims against the Commonwealth; but the general concept that statutory obligations can give rise to trusts is supported by *Bologna* (as well as *Columbia Falls*, *García-Rubiera v. Calderón*, 570 F.3d 443 (1st Cir. 2009), *City of Springfield v. LAN Tamers, Inc. (In re LAN Tamers, Inc.)*, 281 B.R. 782 (Bankr. D. Mass. 2002), *aff'd*, 329 F.3d 204 (1st Cir. 2003), and the numerous other cases cited in the Movants' Motion, *see* Mot. ¶¶ 58, 63 (collecting cases)). The Oversight Board also argues at length that the Enabling Act does not give rise to a "technical trust," (Opp. ¶¶ 101-02), which Movants never argued.  (Mot. ¶¶ 58-67; *Gracia-Gracia*, 939 F.3d at 350-51.)

framework governmental entities use to track resources, and the Commonwealth can hold funds in the TSA that are restricted to or owned by instrumentalities such as PRIFA. (*See* Holder Report ¶ 22-26.) The Commonwealth has no discretion over how such restricted funds are used.

**B.     The Puerto Rico Constitution Does Not Give the Commonwealth Equity In the Pledged Rum Taxes.**

61.     The Oversight Board's argument that the Pledged Rum Taxes belong to the Commonwealth, not PRIFA, pursuant to the Commonwealth's purported "retention powers" under Article VI, Section 8 of the Puerto Rico Constitution plainly misconstrues the limited scope of that provision.[29] The PRIFA bondholders' lien is subject to Article VI, Section 8, but Commonwealth law does not give the Commonwealth carte blanche to withhold Pledged Rum Taxes.

62.     Pledged Rum Taxes subject to the PRIFA bondholders' lien may be used for payment of general obligation ("GO") debt only if (i) the conditions of Article VI, Section 8 have been triggered; (ii) there are no other available resources (as that term is used in Article VI, Section 8 to include all resources of the Commonwealth) other than the Pledge Rum Taxes; and (iii) the money is used to pay public debt in a manner consistent with Article VI, Section 8.

63.     This scheme does not give the Commonwealth equity in the Pledged Rum Taxes. (Opp. ¶ 82.) If Article VI, Section 8 creates any interest in the Pledged Rum Taxes at all, it is an interest in favor of the *GO bondholders*. Any Pledged Rum Taxes transferred to the Commonwealth can only be for the limited and specific purpose of paying GO debt. The moneys would therefore be restricted funds, and the Commonwealth itself would not have a beneficial

---

[29] The provision provides: "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. CONST., art. VI, § 8.

interest in those funds and could not use them for any purpose except applying them to GO debt. P.R. CONST., art. VI, § 8.

64.     Notably, the Oversight Board makes no factual showing that the conditions necessary for triggering Article VI, Section 8 have been satisfied.  (*See* Mot. ¶ 92 n.28.)  Nor could it.  As the Commonwealth has not paid any GO debt since 2016, it cannot credibly claim that revenues were needed in prior fiscal years to pay GO bondholders.  (Mot. ¶ 26.)  Article VI, Section 8 is part of a suite of constitutional provisions addressing budgeting and payments in a fiscal year. By its terms, it applies only to resources and payment obligations within a particular fiscal year. Nothing in Article VI, Section 8 would allow moneys to be retained in one fiscal year to make payment, even on public debt, in another fiscal year.  The analysis is required to be done on an annualized basis.  The Oversight Board offers no response to this point.

65.     Instead, the Oversight Board argues that the fact that "the Retained Rum Tax Remittances are not being applied to the public debt *now* does not mean they will not be needed to pay off the public debt under a plan (where GOs will not be paid in full)."  (Opp. ¶ 85 (emphasis in original)); Ex. 26, Ahlberg Tr. 407:8-21.)  This confuses the operation of PROMESA with the Commonwealth's state law rights under Article VI, Section 8.  That provision is a limitation on the scope of bondholders' lien that provides for an additional permitted use of the funds in certain limited circumstances.  Nothing about Article VI, Section 8 modifies the obligation for the money to continue to be deposited to the credit of PRIFA.  PROMESA incorporates 11 U.S.C. § 362(d), which requires the court to determine whether the Commonwealth had equity in the Pledged Rum Taxes under pre-PROMESA state law.  PROMESA § 301(a), 48 U.S.C. § 2161(a).  Because Article VI, Section 8 is in no way tied to the treatment of claims in a bankruptcy, the proposed

plan is irrelevant to whether that constitutional provision gives the Commonwealth equity.[30]  As Movants have explained, the prerequisites for Article VI, Section 8 were not satisfied in this or any prior fiscal year, so Movants are entitled to at least Pledged Rum Taxes held by the Commonwealth that were not validly retained in compliance with Article VI, Section 8.  And Article VI, Section 8 does not give the Commonwealth equity in the Pledged Rum Taxes going forward, because (i) the Commonwealth has made no showing that its conditions were or will be triggered, and (ii) any purported triggering would, at most, give rise to an interest in favor of the GO bondholders, not the Commonwealth.  (Mot. ¶ 93.)

66.    In any event, the Enforcement Actions that Movants seek to bring will not affect or impair whatever purported reversionary right the Commonwealth claims to have in future moneys. If the Commonwealth has rights under Article VI, Section 8, those rights will remain intact and unimpaired, and the Commonwealth will be able to assert them in any year when the conditions for those rights are satisfied.  The PRIFA Enforcement Actions are thus not an "act to obtain possession of property of the" Commonwealth "or to exercise control over property of the" Commonwealth.  11 U.S.C. § 362(a)(3).

67.    Ultimately, though, this Court need not decide here whether the conditions for applying Pledged Rum Taxes to payment of public debt have been satisfied, nor whether the retained moneys have been used for such a purpose.  That question, to the extent implicated by the PRIFA Enforcement Actions, is a substantive factual question that should be presented and decided in that case.  It is clear that Movants have shown at least a colorable claim that (i) the

---

[30] There is also no authority in the Puerto Rico Constitution or otherwise for the proposition that moneys clawed back in one fiscal year can be retained and used to pay public debt in *another* fiscal year.  Such a position would be contrary to the very structure and annual budgeting requirements of the Puerto Rico Constitution.

conditions of Article VI, Section 8 have not been satisfied in one or more years, and (ii) that there are other available resources of the Commonwealth from which public debt can be paid. The Opposition offers nothing more than bald assertions, devoid of factual support, on these points.

68.     The Oversight Board's arguments to the contrary turn the entire Puerto Rico constitutional scheme, and the statutory and contractual protections embodied in the property interests granted to PRIFA bondholders, on their head. According to the Oversight Board, the proposed Amended Plan of Adjustment (which does not provide for payment in full of public debt) proves that the Commonwealth is without sufficient available resources to meet all appropriations and thus has an interest in the Pledged Rum Taxes. This is the exact inverse of the required inquiry under Puerto Rico law.

69.     Puerto Rico law allows the Commonwealth to use Pledged Rum Taxes for the payment of public debt only if there are no other "available resources." The Amended Plan of Adjustment is based on a Fiscal Plan that provides for payment of all Commonwealth appropriations and expenses (in fact, according to the Oversight Board, it defines the precise parameters of permitted appropriations). The proposed Plan of Adjustment addresses only the allocation and distribution of the excess remaining value. It does not account for all of the "available resources" of the Commonwealth, as that term is used in Article VI, Section 8, and certainly does not prove that there are no available resources other than the Pledged Rum Taxes that can be used for payment of public debt. That the Oversight Board is proposing to impair GO debt under the proposed Plan of Adjustment does not prove that the Pledged Rum Taxes are the only available resources that could be used to pay that debt.[31] The question is not, as the Oversight

---

[31] To the extent the full amount of GO debt payments is not included in the annual budget, any shortfall would not even factor into the Article VI, Section 8 analysis, which considers only whether available resources in a particular fiscal year are insufficient to meet appropriations for that year. Section

Board suggests, whether available resources are sufficient to meet all appropriations; rather, it is whether there are any available resources other than the Pledged Rum Taxes that could be used (before considering other appropriations) for payment of public debt.

70.     Lastly, the Oversight Board's separate argument that ownership of the Pledged Rum Taxes was not transferred to PRIFA because the Enabling Act lacks certain provisions found in the COFINA Enabling Act (Opp. ¶¶ 83 and n.42) ignores material differences between PRIFA and COFINA.  The COFINA structure transferred ownership of the taxes to COFINA, *and* it rendered those taxes beyond the reach of Article VI, Section 8.  Here, the PRIFA structure merely transferred ownership of the Pledged Rum Taxes, without exempting them from the Article VI, Section 8.  *Compare* 13 L.P.R.A. § 12 ("FIA shall be funded each fiscal year from the following sources, the proceeds of which shall be directly deposited in FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico"), *with* 3 L.P.R.A. § 1914 ("The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority.").  The Oversight Board's argument in this regard fails in light of these differences.[32]

---

201(b)(1)(D) of PROMESA, by requiring that the Fiscal Plan (with which any budget must be consistent) to eliminate structural deficits, prevents Article VI, Section 8 from being triggered in this manner.

[32] Notably, the Commonwealth publicly disclosed the pledge and transfer of revenues to COFINA and to PRIFA in the same manner and in the same section of its annual audited financial statements.  (*See, e.g.*, Ex. 28, at 122 (notes to 2013 audited financial statements).)

    **C.**     **Because the Commonwealth Lacks Equity in the Pledged Rum Taxes, the Oversight Board Cannot Show They Are Necessary for an Effective Reorganization.**

71.     As explained in the Motion, if this Court were to determine that the Commonwealth lacks equity in the Pledged Rum Taxes, then it must conclude they are not necessary to an effective reorganization; they are PRIFA's property, not to be used to pay the Commonwealth's debts. (Mot. ¶ 68.) The Oversight Board fails to address this point, arguing that this topic is reserved for a subsequent hearing, but then points to Movants' purported "admission" that "pursuant to its public reports the Commonwealth has over $8.7 billion cash and the total amount of all retained Allocable Revenues is considerably smaller." (Opp. ¶ 119.) But that misses the point regarding the Pledged Rum Taxes' necessity for the reorganization. To the extent the Oversight Board is asserting that Movants are adequately protected, that is irrelevant to the equity inquiry and, in any event, wrong. (Mot. § III.A.) Thus, the stay should be lifted under Section 362(d)(2).[33]

**II.**     **ALTERNATIVELY, THE COURT SHOULD LIFT THE STAY FOR "CAUSE" PURSUANT TO BANKRUPTCY CODE SECTION 362(d)(1).**

72.     Even if the Court were to find that the Commonwealth has equity in the Pledged Rum Taxes, "cause" exists to lift the stay under Section 362(d)(1). (Mot. § III.) The Oversight Board has not meaningfully responded to any of Movants' "cause" arguments under Section 362(d)(1), claiming that that issue is relevant only if the motion proceeds to a final hearing. (Opp.

---

[33] Movants reiterate their position that the stay terminated by operation of law thirty days after November 30, 2019, for the reasons set forth in the Motion (Mot. ¶ 120 n.33), and on the record at the January 29, 2020, omnibus hearing. Movants additionally assert that, for the reasons set forth herein and in the Motion, the Oversight Board has failed to establish a likelihood of success under Section 362(d)(2) or (d)(1), and this Court is thus precluded from extending the time to hear and decide the lift-stay motion under Section 362(e) of the Bankruptcy Code.

¶ 120.)  That said, Movants will reply to certain of the Oversight Board's arguments, as applicable

to Section 362(d)(1).[34]

> **A.     "Cause" Exists to Lift the Automatic Stay Because Movants' Lien on the Pledged Rum Taxes Is Not Adequately Protected.**

73.     Movants have a lien on the Pledged Rum Taxes that either must be enforced

pursuant to its terms, or adequately protected, during the restructuring proceedings.  The Oversight

Board's arguments to the contrary each fail.

> **1.     Contrary to the Oversight Board's Assertions, Movants Have a Valid Lien.**

74.     *First*, **PRIFA bondholders, through their Trustee, have an equitable lien on**

**the Pledged Rum Taxes.**  As explained in the Motion, the Enabling Act "shows an intention" that

"specific funds," *i.e.*, the Pledged Rum Taxes, will be transferred to PRIFA in order for PRIFA to

pay debt service on the PRIFA bonds—enough to create an equitable lien.  (Mot. ¶ 78 (collecting

cases).)  The Oversight Board claims that equitable principles cannot expand bondholders' rights

under the Trust Agreement.  (Opp. ¶ 109.)  But even the case the Oversight Board cites for that

proposition shows otherwise.  *See American Fidelity Fire Insurance Co. v. Contrucciones Werl,*

*Inc.*, 407 F. Supp. 164, 203 (D.V.I. 1975).  In *American Fidelity*, the court accepted an equitable

lien theory, noting that "[t]he legal obligations [found in the contract] are not set aside; they are

surmounted and transcended by equitable considerations."  *Id.* at 184.

---

[34] Movants seek stay relief for "cause" under 11 U.S.C. § 362(d)(1) on multiple independent grounds. Contrary to the Oversight Board's argument (Opp. ¶¶ 120, 129 n.77), only Movants' "adequate protection" ground would require a showing of secured status.  Even the Oversight Board's own cases cited for this proposition tie the requirement of showing "secured status" specifically to entitlement to *adequate protection*, rather than addressing the additional question of "secured status" as a prerequisite to stay relief more generally.  (*Id.* at  ¶ 129 n.77.)  *See, e.g.*, *In re  S. Biotech, Inc.*, 37 B.R. 318, 323-24 (Bankr. M.D. Fla. 1983) ("[T]here is no express statutory requirement that holders of unsecured claims be provided *adequate protection* . . . ." (emphasis added)); *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 90 (2d Cir. 2003) ("The *adequate protection provision* of 11 U.S.C. § 361 protects only secured creditors." (emphasis added)).

75.   ***Second*, Puerto Rico recognizes equitable liens.**   Contrary to the Oversight

Board's argument (Opp. ¶ 106), Puerto Rico law does not reject the equitable lien doctrine.  The

Oversight Board's misquotes *Acevedo v. Solivellas & Co.*, 49 D.P.R. 633, 1936 PR Sup. LEXIS

51 (P.R. 1936).  The Oversight Board, the Oversight Board cited to a lower court decision that was

overturned; the Supreme Court expressly declined to foreclose the application of the equitable lien

doctrine in Puerto Rico.  (Opp. ¶ 106 (citing *id.* at *1 ("We[shall]not follow the parties in their full

and interesting argument[s] about the existence or non-existence in this island of the so called

equitable liens.")).)  The other cases cited by the Oversight Board (Opp. ¶ 106) do not address

equitable liens.  *See Estate of Romero v. Willoughby*, 10 D.P.R. 71, 1906 PR Sup. LEXIS 152, *1

(P.R. 1906) (statute did not create lien on taxpayers' personal property); *Ramis v. The Registrar*,

19 D.P.R. 747, 1913 PR Sup. LEXIS 140, *1 (P.R. 1913) (noting presumption in favor of free use

of property).

76.   And, contrary to the Oversight Board's argument, (*see* Opp. ¶ 106 and n.61.), even

were Article 9 of the UCC applicable (which it is not), courts have consistently concluded that

equitable liens are independent of, and not foreclosed by, that provision.[35]  *See* 19 L.P.R.A. § 402

("Unless displaced by the particular provisions of §§ 401 et seq. of this title, the general principles

of law of our jurisdiction shall supplement its provisions."); *Gen. Ins. Co. of Am. v. Lowry*, 570

F.2d 120, 122 (6th Cir. 1978) (evaluating equivalent non-displacement provision and concluding

that UCC Article 9 did not supplant equitable liens).[36]

---

[35] *See, e.g.*, *U.S. Fid. & Guar. Co. v. Maxon Eng'g Servs. (In re Maxon Eng'g Servs. Inc.)*, 332 B.R. 495,
500 (Bankr. D.P.R. 2005) (recognizing equitable lien under Puerto Rico law *after* Article 9 of the UCC was
adopted); *In re Czebotar*, 5 B.R. 379, 381 (Bankr. E.D. Wash. 1980) (noting survival of equitable lien
doctrine after enactment of Article 9 of the UCC); *Warren Tool Co. v. Stephenson*, 161 N.W.2d 133, 148-
49 (Mich. 1968) (same); *Albany Sav. Bank, F.S.B. v. Novak*, 151 Misc. 2d 956, 957 (N.Y. Sup. Ct. 1991)
("[E]quitable liens are independent of the Uniform Commercial Code").

[36] The Oversight Board's reliance on *Uniroyal, Inc. v. Universal Tire & Auto Supply Co.*, 557 F.2d 22, 23
(1st Cir. 1977), is similarly misplaced.  (*See* Opp. ¶ 106 n.61.)  That case stands for the unremarkable

77.    ***Third*, equitable liens are routinely recognized in bankruptcy.**  The Oversight

Board's argument that equitable liens are not recognized in bankruptcy is undercut by *Maxon*, in

which the court was tasked with determining whether equitable lienholders were entitled to

adequate protection.  332 B.R. at 500.  Numerous other cases recognize that "valid equitable liens

. . . are enforceable in bankruptcy."  *Foster v. Mfrs.' Fin. Co.*, 22 F.2d 609, 610 (1st Cir. 1927);

*see also United States v. Friedman*, 143 F.3d 18, 23-24 (1st Cir. 1998) (equitable lienholder was

"no ordinary unsecured trade creditor"); *Cohen v. Wasserman*, 238 F.2d 683, 688 (1st Cir. 1956)

(equitable lien arising pre-petition recognized after debtor filed bankruptcy); *Pare v. Natale (In re

Natale)*, 174 B.R. 362, 364-65 (Bankr. D.R.I. 1994) (same).[37]

78.    ***Last*, Movants' lien is not disallowable.**  The Oversight Board argues that, even if

Movants proved an equitable lien (which at a minimum they do), it would be disallowable under

section 502(d) and subordinate to the Commonwealth's clawback powers.  However, *In re Bell*,

cited by the Oversight Board in support of this argument (Opp. ¶ 110), held that the trustee could

avoid the security interests at issue because they were not perfected.  *McRoberts v. Transouth Fin.

(In re Bell)*, 194 B.R. 192, 196 (Bankr. S.D. Ill. 1996).  Numerous other cases demonstrate that an

equitable lien is not automatically disallowable in bankruptcy.  *See Union Tr. Co. of Maryland v.

Townshend*, 101 F.2d 903, 914 (4th Cir. 1939) (regarding an equitable lien, the Court found that

statutes requiring registration of liens did not avoid unregistered conveyances); *First Union Nat'l*

---

proposition that if a lien must be perfected by filing a UCC financing statement, failure to follow filing
instructions renders the lien unperfected and unenforceable.  *Id.*  Here, the bondholders' equitable lien is
automatically perfected by virtue of the Enabling Act.  3 L.P.R.A. § 1907(a).

[37] The Oversight Board also contends, more generally, that equitable constructs are disfavored in
bankruptcy.  (Opp. ¶ 106 n.62.)  The cases the Oversight Board cites do not say that.  In *Hunter v. Bank of
N.Y. (In re Anderson)*, 266 B.R. 128, 135 (Bankr. N.D. Ohio 2001), the court never reached the issue of
whether an equitable lien existed.  And both *Rotman Elec. Co. v. Cullen (In re Vappi & Co.)*, 145 B.R. 719
(Bankr. D. Mass. 1992), and *In re T. Brady Mech. Servs., Inc.*, 129 B.R. 559 (Bankr. N.D. Ill. 1991), dealt
with contract, not lien, disputes and are plainly inapplicable here.

*Bank v. Diamond (In re Diamond)*, 196 B.R. 635, 641 (Bankr. S.D. Fla. 1996) (finding Chapter 7 debtors could not avoid mortgagee's equitable lien on homestead property based on unrecorded mortgage); *Sovran Bank v. United States (In re Aumiller)*, 168 B.R. 811, 822 (Bankr. D.D.C. 1994) (reserving on determination on whether equitable lien was avoidable); *In re Mefford*, 18 B.R. 853, 855 (Bankr. S.D. Ind. 1982) (noting that the creditor's lien was an equitable lien arising out of conduct of debtor and concluding that, if debtor should become sole, separate and exclusive owner of the real estate, mortgage lien might attach to her interest in property, and, therefore, lien was not avoidable).

### 2. Movants' Liens Were Properly Perfected.

79.     The Oversight Board's arguments that the bondholders' liens were not "perfected" (Opp. ¶¶ 20, 86, 120), or that the liens did not comply with the Uniform Commercial Code ("P.R. UCC") (Opp. ¶¶ 4 n.5, 106 n.61), fail for three separate reasons:

80.     *First*, the P.R. UCC by its express terms "does not apply to the extent that . . . another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state[.]"  19 L.P.R.A. § 2219(c)(2).  Here, the Enabling Act "expressly governs" the perfection of Movants' security interest, providing that, when PRIFA makes a pledge of its property, that property "shall immediately be subject to said lien without the need of the physical delivery thereof or any other act."  3 L.P.R.A. § 1907(a).  Because another statute expressly governs perfection of the PRIFA security interest, the UCC is inapplicable according to its plain text.[38]  19 L.P.R.A. § 2219(c)(2).

---

[38] For this reason, this case is nothing like *ERS*, where, unlike here, there was no separate statute governing perfection.  *See Op. & Order Granting & Denying in Part Cross Mots. for Summ. J.*, No. 17-00213-LTS, ECF No. 215 at 11 (under Commonwealth law, security interests of this kind "must be perfected by filing financing statements pursuant to the Uniform Commercial Code (as adopted by Puerto Rico) on the secured transactions registry maintained by the Department of State").

81. *Second*, even if the P.R. UCC were applicable, Movants properly perfected their security interests. Movants' collateral—the Pledged Rum Taxes—is a payment intangible, a monetary obligation of PRIFA. 19 L.P.R.A. § 2212(61). Under the P.R. UCC, a security interest in a payment intangible is enforceable against a debtor and third parties if an authenticated financing statement is filed with the Commonwealth Department of State. *See* 19 L.P.R.A. § 2260. Movants filed financing statements with the Department of State on September 18, 2015, (*see* UCC-1 Statement, ECF No. 10602-16), perfecting their interest as against PRIFA and third parties in accordance with the P.R. UCC.[39]

82. *Third*, even if Movants' lien had not been perfected, the Oversight Board could not avoid the lien under 11 U.S.C. § 544 because a hypothetical creditor of the Commonwealth could not have obtained "a judicial lien on" the Pledged Rum Taxes (or any other property of the Commonwealth) as of the commencement of the case. 11 U.S.C. § 544(a)(1). The Pledged Rum Taxes are not property of the Commonwealth at all, *see supra* Argument § I.A, and even if they

---

[39] To the extent the Oversight Board argues that Movants' collateral includes a deposit account (Opp. ¶ 28)—a convenient argument, as a deposit account generally requires the secured party to have control of the collateral in order to perfect its interest (19 L.P.R.A. § 2262(b)(1))—the Oversight Board is incorrect. A deposit account is "a demand, time, savings, passbook, or similar account maintained with a bank." 19 L.P.R.A. § 2212(29). Movants' collateral is not mere accounts with a bank but the Pledged Revenues themselves, and the rules governing perfection of security interests in deposit accounts do not apply.

Even if Movants' collateral was deemed to include a deposit account, however, the funds in those deposit accounts would be proceeds of Movants' perfected interest in the Pledged Revenues themselves. As discussed *infra* ¶ 112, the Pledged Revenues acquired by the debtor after the commencement of the case are pledged special revenues that remain subject to the Movants' lien under 11 U.S.C. § 928. Thus, there is a perfected security interest in Pledged Revenues received by the debtor both before and after commencement of the case. Where this collateral generates "identifiable cash proceeds," a secured creditor's lien continues to attach to such proceeds. 19 L.P.R.A. § 2265(d)(2). The Oversight Board has admitted that the Pledged Revenues may be traced from account to account. (Opp. ¶ 29 (the Pledged Revenues are identified by a "Disbursement Detail"); *see also* Ex. 42, CCDA_STAY0000001 (Bank Account Information Request demonstrating detailed tracing of funds by bank account).) So the Pledged Rum Taxes are easily identifiable when they arrive at any deposit account. Accordingly, Movants' lien continues to attach to the identifiable cash proceeds of the Pledged Rum Taxes when such revenues arrive in any deposit accounts at issue.

were, Commonwealth property cannot be attached through a judicial lien.[40]  Section 544(a) "does

not give the Trustee any greater rights than he, or any person, would have as a . . . judicial lien

creditor under applicable state law."  *In re Trask*, 462 B.R. 268, 273 (B.A.P. 1st Cir. 2011).

Therefore, the lien cannot be avoided.[41]

**3.    Section 552(a) Does Not Apply to Movants' Lien.**

83.    The Oversight Board's argument that Section 552 cuts off Movants' lien (Opp. ¶¶

122-23) is wrong.  The PRIFA bonds do not create "merely an expectancy," (Opp. ¶ 124), and

numerous provisions make clear that—unlike the bonds at issue in *ERS*—PRIFA bondholders had

legally enforceable rights.

84.    *ERS* was premised on the fact that the ERS Enabling Act "***does not include any***

***covenant by the Legislature of the Commonwealth not to amend the act in a way adverse to***

***Bondholders***."  (Ex. 46, ERS Bond Offering Statements (emphasis added).)  PRIFA bonds are the

opposite:  backed by specific revenue streams and a covenant of the Commonwealth not to

interfere with the flow of revenues, subject only to limited clawback rights under Article VI,

Section 8.[42]

---

[40] *See, e.g.*, *Diaz v. Dep't of Educ.*, 823 F. Supp. 2d 68, 77 (D.P.R. 2011) ("[T]he Puerto Rico Supreme
Court has held that as a matter of public policy governmental entities ought not be subject to the
inconveniencies of attachment, which interfere with the execution of public functions."); *Whitfield v.
Municipality of Fajardo*, 2007 WL 6894782, at *3 (D.P.R. May 29, 2007) ("[G]overnmental entities are
exempt from attachment procedures, because as a matter of public policy, governmental activities ought
not to be subject to the inconveniencies of such procedures, which interfere with the execution of public
functions, in the detriment of the common good.") (quoting *Stump Corp. v. Tribunal Superior*, 99 D.P.R.
179, 181 (P.R. 1970)).

[41] *See, e.g.*, *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 652 (7th Cir. 2008) (holding that avoidance of
Federal Communications Commission's lien on debtor's licenses was not permitted under Section 544
because, under applicable non-bankruptcy law, no judgment creditor could obtain superior lien against the
debtor's property); *In re DeCora*, 396 B.R. 222 (W.D. Wisc. 2008); *In re Fluge*, 57 B.R. 451, 456 (Bankr.
D.N.D. 1985) ("A trustee as a hypothetical holder of a judicial lien under Section 544(a)(1) can avoid a
superior interest ***only if an actual creditor could have obtained a judicial lien against the property***.").

[42] The Oversight Board's argument that the "continued flow of Rum Taxes was contingent on future federal
government allocations" (Opp. ¶ 124 n.74) is beside the point.  Revenue bonds are frequently contingent

85.     Pledged Rum Taxes are "pledged special revenues" under Section 922(d) in any

event, and thus not subject to Section 552.  The Oversight Board argues that the Pledged Rum

Taxes "are not a special excise tax of the Commonwealth, but a mere appropriation from the United

States," and they are "not derived from PRIFA's operations or the Commonwealth's operations."

(Opp. ¶ 125.)  The Oversight Board has no answer to case law holding that there is no requirement

that the party that imposes and collects the tax be the same as the party that pledges the tax for the

payment of bonds, in order for the tax revenues to be considered "special revenues."  *In re*

*Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147, 148 (Bankr. S.D. Cal. 1996) (*cited in* Mot. ¶ 86 n.24).

                                *        *        *

86.     As noted above, the Oversight Board addresses, albeit superficially, Movants'

argument for "cause" based on adequate protection, but fails to address Movants' other two bases

for cause under Section 362(d)(1).  The Motion established that (a) Movants have due process

rights that require a forum for litigating their constitutional claims, (Mot. ¶¶ 99-103); *see Ambac*

*Assurance Corp. v. P.R.*, *(In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 927 F.3d 597, 605 (1st Cir.

2019); and (b) all applicable *Sonnax* factors favor lifting the stay, (Mot. ¶¶ 122-32); *see Gracia-*

*Gracia*, 939 F.3d at 347.  Movants reiterate those independent bases for stay relief.

---

on future revenues derived from third parties; special revenue bonds for toll roads (quintessential revenue
bonds, *see In re Fin. Oversight & Mgmt. Bd. for P.R.*, 931 F.3d 111, 122 (1st Cir. 2019) ("[r]evenue bonds
are bonds issued to finance projects or programs [] such as toll roads . . . .") (internal quotations omitted)),
are dependent on motorists continuing to drive on the roads and paying tolls.  To the extent such revenues
are received—as they indisputably are here—they must be used to repay bondholders.  *See Dimino v. Sec'y*
*of Commonwealth*, 695 N.E.2d 659, 708-09 (Mass. 1998) (bondholders of revenue bonds secured by toll
revenues had a "right to the authority's [toll] revenues").

III.   NEITHER PROMESA'S TITLE III PROVISIONS NOR THE OVERSIGHT
       BOARD'S BUDGETARY POWERS PREEMPT BONDHOLDERS' PRE-
       EXISTING LEGAL RIGHTS.[43]

   A.   The Plain Text of PROMESA Limits the Scope of Preemption to Cases of
        Actual Conflict, Which Does Not Exist Here.

   87.   The Oversight Board's arguments that PROMESA gives it unrestrained powers to

preempt statutes and destroy pre-existing legal rights based on its budgetary appropriation powers

are meritless.  (Opp. ¶¶ 73-75, 80.)  Where, as here, a "statute contains an express pre-emption

clause," courts "focus on the plain wording of the clause, which necessarily contains the best

evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct.

1938, 1946 (2016).  "Congressional intent is the principal resource to be used in defining the scope

and extent of an express preemption clause." *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st

Cir. 2013) (internal quotation marks omitted).

   88.   PROMESA § 4, entitled "Supremacy," is such an express clause.  It states: "The

provisions of this Act shall prevail over any general or specific provisions of territory law, State

law, or regulation that is *inconsistent with* this Act." *Id.*  The effect of this language is to limit the

scope of preemption under PROMESA to cases of conflict, as the First Circuit has previously

found.  *See Mèndez-Nùñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*

*Bd. for P.R.)*, 916 F.3d 98, 104 (1st Cir. 2019) (addressing preemption under PROMESA § 4)

(quoting *United States v. Acosta-Martinez*, 252 U.S. 13, 18 (1st Cir. 2001) ("[A] provision of the

Puerto Rico Constitution cannot prevail where it conflicts with applicable federal law.")).

---

[43] Movants' arguments in this section are substantially similar to those made in the contemporaneously-filed reply briefs filed in further support of the *Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and The Bank Of New York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds*, (ECF No. 10104).  Movants include the arguments in each brief to ensure the record on each motion is complete.

46

89.     Nothing in PROMESA is "inconsistent with" Movants' property and contractual rights, which predate PROMESA.  Far from rescinding or repudiating property or contract rights (or authorizing the Oversight Board to do so), PROMESA expressly commands that existing property and contractual rights are to be respected:  Section 201, which the Oversight Board suggests is somehow inconsistent with Movants' contractual rights, expressly required the Oversight Board to "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act" when formulating fiscal plans and budgets.  PROMESA § 201(b)(1)(N); 48 U.S.C. § 2141(b)(1)(N).  Moreover, PROMESA's supremacy clause provides only that "the provisions of this Act" shall prevail over inconsistent Commonwealth law.  PROMESA § 4, 48 U.S.C. § 2103.  The Oversight Board's fiscal plan or budget is not a "*provision of this Act*," and nothing in PROMESA suggests that Congress intended to grant the Oversight Board the power to issue preemptive edicts in its sole and absolute discretion through its budgetary or fiscal plan certification powers.

90.     There is likewise no inconsistency between Movants' property and contractual rights and the Title III restructuring process.  (*See* Opp. ¶ 75.)  The Bankruptcy Code provisions made applicable here under Title III expressly protect the rights of secured creditors.  *See* PROMESA § 301, 48 U.S.C. § 2161 (making the adequate protection provisions of 11 U.S.C. § 361 and other creditor protection provisions applicable in PROMESA).  And as in any bankruptcy, both secured and unsecured creditors' rights remain intact unless and until they are addressed as part of a confirmed plan of adjustment that complies with the requirements of PROMESA.  *Id.* (making provisions of 11 U.S.C. §§ 362, 1123 and other provisions applicable in PROMESA).

There is thus no inconsistency between Movants' property and contractual rights and either the

Title II budgetary process or the Title III restructuring.

91.  Because there is no conflict between the Enabling Act and PROMESA, there is no

statutory basis for this Court to find that the Enabling Act has been preempted.  "[T]he plain

wording" of PROMESA's supremacy clause, "which necessarily contains the best evidence of

Congress' pre-emptive intent[,]" precludes any such finding.  *See Puerto Rico v. Franklin Cal.*

*Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (internal quotation marks omitted).

**B.  Neither of the Oversight Board's Asserted Bases for "Preemption" Withstands Scrutiny.**

92.  The Oversight Board premises its argument to the contrary on its budgetary

appropriation powers under Title II of PROMESA (Opp. ¶¶ 73-75, 80) and the Title III

restructuring process (Opp. ¶ 75).  Neither Title of PROMESA preempts Movants' legal rights.

**1.  The Oversight Board's Title II Budgetary Powers Under PROMESA Have No Preemptive Effect on Movants' Rights.**

**a.  The Commonwealth's Transfer of the Pledged Rum Taxes to PRIFA Is Valid and Legally Binding, Not a Mere "Appropriation" Subject to Repeal Without Consequence.**

93.  As a threshold matter, the Oversight Board cavalierly and erroneously asserts that

the Enabling Act merely "authorized appropriation of certain portions of the Rum Tax Remittances

. . . to PRIFA," which appropriations "the Commonwealth is free to . . . change . . . if it chooses to

do so."  (Opp. ¶ 63; *see also id.* ¶¶ 62-70.)  The PRIFA bonds are legally enforceable special

revenue bonds, not mere "appropriation" bonds as the Oversight Board claims.

94.  "Appropriation" bonds are bonds backed by nothing more than discretionary

governmental appropriations; bondholders expect that municipal debtors will pay such bonds in

order to maintain access to capital markets,[44] but in the event that a municipality experiences financial distress, bondholders have no legally enforceable right to payment. Such appropriation bonds *explicitly* state at issuance that the legal remedies for nonpayment are limited. The Commonwealth indeed issued some appropriation bonds with warnings of these kinds.[45] These bonds are classified separately in the Oversight Board's proposed Plan of Adjustment, and receive a recovery of 0.0% by virtue of the fact that they are not legally enforceable. (*See Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico*, et al., Case No. 17-03283, ECF No. 11946, Article 50.1.)

95.    The PRIFA bonds share none of these characteristics. Far from warning that payment is limited to discretionary appropriations, the PRIFA bonds were (and are) secured by an express pledge of a specific revenue stream (the Pledged Rum Taxes), which the Enabling Act makes subject to a "valid and binding" lien in favor of bondholders. 3 L.P.R.A. § 1907(a). The stated purpose of the Act was to "endow[] the Authority with the needed resources to *ensure* the payment of the principal and interest on bonds." The Enabling Act, Statement of Motives, No. 44. July 7, 1997, No. 32 (June 21, 1988) (emphasis added). The Commonwealth also covenanted with PRIFA bondholders that it would not limit or alter the rights or powers vested in PRIFA until the PRIFA bonds are fully repaid. 3 L.P.R.A. § 1913; *Porto Rico Tel. Co. v. Tax Court*, 1960 PR Sup.

---

[44] *See Rating Methodology: Lease, Appropriation, Moral Obligation and Comparable Debt of US State and Local Governments*, MOODY'S INV. SERV. (July 26, 2016), https://www.ncsl.org/Portals/1/Documents/fiscal/LAMethodologyfiscal2016.pdf ("[T]he failure of a government to appropriate for debt service on a[n] . . . appropriation obligation is often an indicator of severe stress and typically leads to a default on the obligation shortly thereafter. A non-appropriation decision would likely result in negative rating action on the government's GO rating since it would call into question the government's willingness to honor commitments made to investors.").

[45] *See, e.g.*, Ex. 44, Puerto Rico Public Finance Corporation 2003 Series A Bonds Official Statement, at 15 ("The Legislature of Puerto Rico is not legally bound to appropriate sufficient amount to timely pay the principal of, redemption premium, if any, and any interest due on the Act 164 Bonds. There is no assurance that sufficient funds will be appropriated or otherwise made available to make such payments on the Act 164 Bonds.").

LEXIS 72 (P.R. June 30, 1960) (assignment of special revenues to a special fund of a public authority is "perfectly valid" under Puerto Rico law). These features make clear that PRIFA bonds are not appropriation bonds, but enforceable special revenue bonds, as even the Oversight Board has recognized in previously distinguishing the PRIFA bonds from appropriation bonds. (*See* Ex. 34, CW_STAY0010168 at 53 ("PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt is payable from federal excise taxes levied on the rum . . . **PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is payable from Commonwealth legislative appropriations**.") (emphasis added).)

96.     The Oversight Board's comparison of the PRIFA bonds with the ERS bonds (Opp. ¶ 79) only highlights the hollowness of Oversight Board's argument. The Official Statements for the ERS bonds expressly provide:  "The Bonds are being issued pursuant to general authority contained in the Act, *which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders*." (See Ex. 46, (ERS Bond Offering Statements for Series A at 37, Series B at 38; and Series C at 40.))  The ERS Bond Resolution also "explicitly states that *the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so 'adversely affect[]' the Bondholders*." *ERS*, at 468-69 (emphasis added); (*see* Ex. 43, ERS Bond Resolution at VI-16.)  That language convinced the First Circuit that ERS bondholders were "on notice that the Employers' Contributions stem from *appropriations that the Commonwealth legislature could, and likely would, reduce if it could not fully fund its planned appropriations.*" (*Id.* (emphasis added).)  The PRIFA bonds are the exact opposite, because they are backed by an express pledge of revenues and a statutory non-impairment covenant that assures PRIFA bondholders' legal rights to payment

from the Pledged Rum Taxes so long as any are received by the Commonwealth.  (*See* 3 L.P.R.A. § 1913.) [46]

> **b.    There Is No Inconsistency Between the Oversight Board's Budget Powers and Movants' Legal Rights Because, Under Settled Law, the Legislative Power over the "Budget" or "Appropriations" Does Not Include Any Power to Rescind, Repudiate, or Alter Pre-Existing Property or Contract Rights.**

97.    The Oversight Board's argument that its budgetary powers under PROMESA § 202, 11 U.S.C. § 2142, would allow it to preempt even legally binding bonds and pledges of revenues (Opp. ¶ 4) is based on basic conceptual confusion about the relationship between budgetary appropriations and the government's legal obligations to third parties.  As the Oversight Board itself repeatedly acknowledges, its "budgetary" power under PROMESA § 202 is nothing more than the power to make (or not make) appropriations.  (*See, e.g.*, Opp. ¶ 45 ("PROMESA section 202 gives the Oversight Board the exclusive power to certify budgets for the Commonwealth and its instrumentalities over all appropriations . . . .").)

98.    Under more than a century of well-settled precedent—which no doubt was well-known to the congressional drafters of PROMESA—a budgetary appropriation (or its absence)

---

[46] In arguing that legislatures are free simply to repudiate secured debt at will, the Oversight Board misconstrues *Fletcher v. Peck*, 10 U.S. 87 (1810) (cited in Opp. ¶ 79).  That case held explicitly that "if an act be done under a law, a succeeding legislature cannot undo it.  The past cannot be recalled by the most absolute power. . . . When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights." *Id.* at 135; *see United States v. Winstar Corp.*, 518 U.S. 839, 873-76 (1996) (Souter, J., plurality) (analyzing *Fletcher*) ("[T]he National Government has some capacity to make agreements binding future Congresses by creating vested rights."); *see also Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1866) ("It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.  The State and the corporation, in such cases, are equally bound."); *Rice v. City of Milwaukee*, 100 Wis. 516 (1898) ("It would seem to be very clear that when money is raised for a special purpose, under an express limitation to a particular use, it cannot lawfully be used for any other purpose . . . Any other holding would commit us to the palpable absurdity of saying that a person may pay his debts by taking money from one pocket, and putting it in the other.").

cannot change the legal rights of third parties against the government. "An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted [sic] to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties." *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892); *see Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012) ("Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's 'valid obligations will remain enforceable in the courts.'").

99.     In fact, the Supreme Court has recently reaffirmed, in *Maine Community Health Options*, that the lack of a budget appropriation has no effect on the Government's obligations to third parties (or a third party's capacity to enforce that obligation). 2020 WL 1978706, at *9-10. The Court held that where the government has incurred an obligation the "failure or refusal by Congress to make the necessary appropriation would not defeat the obligation[.]" *Id.* at *7 (quoting 2 GAO, Principles of Federal Appropriations Law, p. 2-4 to -5 (4th ed. 2016), *available at* https://www.gao.gov/legal/appropriations-law-decisions/red-book (hereinafter "Redbook") (Ex. 45). Similarly, the Supreme Court reaffirmed that where a government "create[s] an obligation directly by statute . . . [a] subsequent failure to appropriate enough funds neither abrogated nor suspended the Government's pre-existing commitment to pay." *Id.* As the Court's analysis makes clear, appropriations or a lack of appropriations do not change the property or contract rights of third parties. *See also Local Initiative Health Auth. for L.A. Cty. v. United States*, 142 Fed. Cl. 1, 19 (Fed. Cl. 2019) ("Congress' mere refusal to pay has not modified its contractual obligation in any way."); *Martin v. United States*, 130 Fed. Cl. 578, 585-86 (Fed. Cl. 2017) (lack of appropriations not a viable legal defense to the government's legal obligations to pay third parties).

100.    Nothing in this Court's decisions regarding the Oversight Board's budgetary powers, or those of the First Circuit, are in any way inconsistent with these principles.  The Commonwealth government cannot reprogram funds in contravention of the Commonwealth budget.  *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019).  But that does not change the fact that governmental budgets and appropriations are mere internal instructions to Treasury that have no effect on the legal rights of third parties.[47]

### c.    The Oversight Board's Claimed Preemption Powers Is Inconsistent with the Structure and Purpose of PROMESA.

101.    The Oversight Board's claimed preemption power under Title II also must be rejected as inconsistent with the structure and purpose of PROMESA for several reasons:

102.    *First*, the Oversight Board's budgetary powers under PROMESA § 202, 48 U.S.C. § 2142, are distinct from the restructuring provisions of Title III.  Indeed, the budgetary powers will remain in effect—potentially for many years—even after the Commonwealth emerges from Title III, confirming that those powers were not intended to be a means for discharging the Commonwealth's debts.  *See* PROMESA § 209, 48 U.S.C. § 2149.  Under the Oversight Board's theory that its certification decisions have preemptive effect, there is no principled reason it would not be able to preempt any and all legal rights to payment, even post-Title III, as long as an Oversight Board remains in existence.  Obviously, post-Title III, Congress envisioned that the Oversight Board would continue to control the Commonwealth's budget until it regains access to financial markets—but like any government, the Commonwealth would be obligated to uphold

---

[47] Indeed, the First Circuit has made clear that in the context of a restructuring it will find the power to preempt property rights only where Congress gives a "clear and specific indication of [its] intent" to grant "power to appropriate the property of third parties." *In re Irving Tanning Co.*, 496 B.R. 644, 664-65 (B.A.P. 1st Cir. 2013).  There is no such statement here.

approved contracts it makes. The Oversight Board cannot approve a long-term contract one year, and then the next decide to "preempt" it under PROMESA § 202 with the next year's certified fiscal plan and budget. If that were possible, particularly given that the Oversight Board's composition can change every few years, it would be impossible for the Commonwealth to regain access to credit markets. *See Salazar*, 567 U.S. at 191 (explaining that being a reliable contract partner protects "the long-term fiscal interests of the United States").

103.   *Second*, the Oversight Board's arguments would render the Title III process essentially irrelevant. Under the Oversight Board's theory, "***Any prepetition obligations to pay*** are inconsistent with . . . PROMESA's grant to the Oversight Board of power over uses of the Debtor's revenues in Title II."[48] But if that were true, most of the provisions in Title III would be superfluous. According to the Oversight Board, the mere enactment of PROMESA, the beginning of the covered period for Puerto Rico and its instrumentalities, and the appointment of the Oversight Board, gave the Oversight Board free rein to decide which debts would be paid and which would not be paid, which decisions are not subject to review even by this Court. The restructuring and elimination of all revenue bond debt, according to the Oversight Board, has already been effectuated through the certification of fiscal plans. If true, there would be no need for this Court to consider and approve a plan of adjustment. The elaborate procedures for both a consensual (Title VI) and a non-consensual (Title III) restructuring make clear that the Commonwealth's debt obligations can only be accomplished through a proceeding under one of those provisions, not surreptitiously through fiscal plans. *See Kungys v. United States*, 485 U.S.

---

[48] Opposition of the to the Financial Oversight Management Board to the *Urgent Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public Finance Guarantee Corporation, and Financial Guaranty Insurance Company to Adjourn Hearing on Motions for Relief from the Automatic Stay and Extend Deadline for Replies in Support of Motions for Relief from the Automatic Stay*, ECF No. 10958 ¶ 20.

759, 778 (1988) (noting that it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant").

104.     *Third,* the Oversight Board's claimed "preemption" power would render PROMESA § 407 nugatory and ineffective.  The Oversight Board contends that there is no "applicable law" pursuant to which creditors could bring claims under PROMESA § 407, 48 U.S.C. § 2195, because PROMESA itself preempted applicable law.  *See* Docket No. 20-00003, ECF No. 44, ¶ 151 ("[T]here can be no violation of applicable law because the Enabling Act was preempted by PROMESA, which *is* the applicable law.  Thus, the Commonwealth is not violating 'applicable law' by retaining Rum Tax Remittances.") (emphasis in original).   In other words, the Oversight Board would have the Court conclude that Congress expressly included a statutory provision to give creditors the ability to sue for violations of applicable law—but simultaneously preempted any "applicable law," such that PROMESA § 407 was nullified by the same legislation that created it.

105.     *Fourth*, the fact that the Oversight Board's budgets cover only individual fiscal years while the Oversight Board remains in effect further undermines any suggestion that those powers could be used to destroy existing contract or property rights.  Movants' rights to payments extend to the year 2044.  PROMESA expressly contemplates that the Oversight Board will terminate when the Commonwealth regains access to capital markets, at which point the Oversight Board's powers over the Commonwealth government will be extinguished entirely.  *See* PROMESA § 209; 48 U.S.C. § 2149.  The Oversight Board offers no textual basis for extending the preemptive effect of its budgetary powers beyond the specific fiscal years that the Oversight Board remains in effect.

## 2. There is no Inconsistency Between the Enabling Act and PROMESA Title III or Bankruptcy Policy.

### a. Far from Preempting Them, PROMESA Title III Expressly Protects the Legal Rights of Revenue Bondholders.

106.    The Oversight Board's argument that Title III preempts Movants' legal rights (Opp. ¶ 75) is equally meritless.  PROMESA incorporates specific provisions of the Bankruptcy Code that protect the rights of special revenue bondholders and those of secured claimants generally. *See* PROMESA § 301, 48 U.S.C. § 2161(a).

107.    While the Oversight Board claims that PROMESA recognizes "no priority claims other than administrative claims provided by Bankruptcy Code section 507(a)(2)" (Opp. ¶ 75), it simply ignores the express provisions confirming that contractual and property rights would be part of (and not disposed of prior to) the Title III process.  *See* PROMESA § 301, 48 U.S.C. § 216 (incorporating secured and unsecured creditor protection provisions); PROMESA § 201(b)(1)(N), 48 U.S.C. § 2141 (requiring a fiscal plan to respect "lawful priorities and lawful liens . . . effect prior to the date of enactment of this Act.") and §314(b)(7) (requiring a Title III plan of adjustment comply with existing fiscal plans).

### b. There Is No "Inconsistency" Between the Concept of a Restructuring and Protecting Property Rights.

108.    The Oversight Board argues that Movants' property rights would violate the "equality" principle and render the Commonwealth's entire restructuring regime futile.  (Opp. ¶¶ 2, 4, 7.)  The Oversight Board has it backwards:  Finding that Movants have *no* property rights in their pledged collateral will upend decades of municipal financing and market expectations, with consequences that will reverberate far beyond the Commonwealth.

109.    The "equality" principle regarding unsecured creditors has no application here, as the treatment Movants request is entirely ordinary and commonplace for *any* secured creditor.  *See*

*Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938) ("[T]o the extent that one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors, which cannot be affected by the principle of equality of distribution."); *Chemical Bank N.Y. Tr. Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (concurring opinion) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite[.]").

110.    It is axiomatic that secured creditors and unsecured creditors are not of equal priority and therefore should not share equally in a *pro rata* division of a debtor's property.  *See Haesloop v. United States*, 2000 WL 1607316, at *3 (Bankr. E.D.N.Y. Aug. 30, 2000) (secured claims are scheduled separately from unsecured claims when a debtor files bankruptcy).  Nearly every complex restructuring involves some secured claims and some unsecured claims, where payouts to each differ based on the value of the secured claimants' collateral.

111.    The secured nature of revenue bonds is the primary reason investors purchase such bonds.  And perhaps the key feature of revenue bonds' security is the protection it provides in bankruptcy—a feature generally absent from most GO bonds.  As Professor David Skeel, a member of the Oversight Board, explains:

> [T]he belief that GO bonds are protected and revenue bonds are vulnerable is upside-down from a bankruptcy perspective: ***in bankruptcy, revenue bonds are protected and GO bonds aren't***.  With revenue bonds, the bankruptcy laws treat the specified revenue source as truly belonging to the bondholders, and as securing their repayment.  Unlike most other creditors, revenue bondholders are explicitly permitted to continue collecting the payments even during the bankruptcy case, thanks to a 1988 reform that sought to make sure that bankruptcy does not interfere with the payment of revenue bonds.  GO bonds are not entitled to any such protection.  The "full faith and credit" protection is not treated as giving GO bondholders a right to any particular source of revenue.  They are simply general creditors, and [a debtor's] obligations to them can be restructured just as its obligations to other creditors can be.

*See* David A. Skeel, *The Education of Detroit's Pension and Bond Creditors*, 24 U. PA. PUB. POL'Y INITIATIVE 3 (2014) (emphasis added).[49] The Oversight Board's claim that granting revenue bonds their due protections in bankruptcy would violate equality among creditors is false, but the converse is true: Proper classification among creditors is preserved only by respecting the protections unique to revenue bonds.

112. Moreover, the notion that respecting property rights undermines the goals of a restructuring regime is nonsensical in light of the decades of precedent in which the current U.S. bankruptcy regime has operated. The Bankruptcy Code strikes a balance between respect for the rights of secured creditors in their collateral and affording the debtor the opportunity to restructure its affairs and reduce its debt load to a sustainable level—these "twin goals" are of equal importance. *See Hoseman v. Weinschneider*, 322 F.3d 468, 475 (7th Cir. 2003) ("The administration of bankruptcy estates has twin goals of maximization of realization on creditors' claims and of prompt and efficient administration of the estate") (internal quotation marks omitted); *see also Kokoszka v. Belford*, 417 U.S. 642, 645–46 (1974) ("It is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched."), *reh'g denied*, 419 U.S. 886 (1974) (internal quotation marks omitted).

---

[49] Notwithstanding the fact that GO bonds are unsecured obligations in many jurisdictions, Assured takes the position that the Commonwealth's GO bonds are secured by a special property tax under Act 83 of 1991. (*See Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp. to Dismiss Adversary Complaint*, Adv. Proc. No. 19-291-LTS, ECF No. 53 ¶¶ 27-30.) In addition, Assured takes the view that the Commonwealth's GO bonds enjoy a first-priority status under Article VI, Section 8 of the Puerto Rico Constitution, which first-priority status is incorporated into PROMESA, among other things, through PROMESA § 201(b)(1)(N) and Section 1129(b)(2)(B) of the Bankruptcy Code (as incorporated by PROMESA § 301(a)).

113.    And these twin aims inherent in our bankruptcy regime have far-reaching effects. In today's global economy, where capital can move freely around the world in search of the greatest risk-adjusted returns, U.S. municipalities historically have enjoyed some of the lowest borrowing costs in the world—precisely because the U.S. has strong respect for the rule of law and property rights. The special protections for revenue bond creditors built into the Bankruptcy Code (§ 928) are a classic example of this respect for property rights, ensuring that even in a restructuring, the rights of revenue bond creditors in their collateral will be respected. *See* 6 Collier on Bankruptcy ¶ 928.02 (16th ed. 2020) (observing that, in general, § 928(a) prevents special revenues that secure revenue bonds from being made available for the municipality's general expenses or obligations); *Altair Global Credit Opportunities Fund (A), LLC v. U.S.*, 138 Fed. Cl. 742, 779 (Fed. Cl. 2018) (noting that § 928 requires that "postpetition special revenues remain subject to any lien created before the commencement of the municipal bankruptcy proceeding"); *In re Las Vegas Monorail Co.*, 429 B.R. 770, 782 (Bankr. D. Nev. 2010) (holding that § 928 was enacted to prevent special revenues from being diverted for the municipality's general expenses or obligations).

114.    But in this case, the biggest municipal restructuring in U.S. history, the Oversight Board asks the Court to abandon the federal courts' traditional respect for property rights and the rule of law, resorting to tortured readings of the bond documents in an effort to argue that revenue bond creditors in fact have no legal rights. It is impossible to overstate the consequences of this Court adopting such an approach. Such a decision would meaningfully impair investor confidence in the enforceability of municipal debt in the United States and increase borrowing costs for financially troubled municipalities across the country. Investors require legal predictability and

the ability to enforce their rights; without these, municipalities will be unable to raise funds at anything but astronomical rates.

115.    While this Court has been confronted with certain novel municipal financing structures in these Title III cases that investors understood would carry some risk, like ERS, revenue bonds like those at issue here have always been understood to enjoy increased protections, even—and especially—in bankruptcy.  A decision eviscerating this principle, in contravention of congressional intent, would increase borrowing costs for struggling municipalities.  And some of these struggling municipalities, at the margin, that otherwise might have avoided a bankruptcy filing will find it all the more difficult to do so—ultimately forcing untold numbers of additional citizens to endure the hardships that the citizens of Puerto Rico have unfortunately already had to face.[50]

116.    Thus, any consideration of "policy" rationales leads inexorably to one conclusion:  This Court must uphold property rights and the rule of law.

### C.    The Oversight Board's Interpretation Must Be Rejected Because It Would Be Unconstitutional.

117.    Construing PROMESA to allow the Oversight Board to rescind and repudiate contract or property rights, at its whim, would violate the U.S. Constitution.

### 1.    The Oversight Board's Claimed Preemption Power Would Violate the Due Process Clause.

118.    The Oversight Board's reading of PROMESA § 202 would violate the Due Process Clause.  In the Oversight Board's view, if it decides not to appropriate funds in a budget, that

---

[50] *See, e.g.*, Richard Porter, *Commentary:  Bankruptcy Looms for Chicago If There's No Pension Fix*, CHI. TRIB. (Sept. 26, 2019), https://www.chicagotribune.com/opinion/commentary/ct-opinion-bankruptcy-chicago-pensions-crisis-20190926-4iwzdnfcjzh2tac7pw6i5fbgea-story.html (discussing how Chicago is teetering on the brink of bankruptcy); Elizabeth Bauer, *Is Chicago the Next Detroit?*, FORBES (Jan. 16, 2019), https://www.forbes.com/sites/ebauer/2019/01/16/is-chicago-the-next-detroit/#1bc755ee6894 (noting that, without reform, Chicago could be headed for bankruptcy)).

decision deprives any individuals whose debts were not funded of any property or contract rights they previously had. *See generally Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Due process requires that a deprivation of a protected property interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation and internal quotation marks omitted). As contract rights are "property" under the Due Process Clause, *Semaphore Entm't Grp. Sports Corp. v. Gonzalez*, 919 F. Supp. 543, 549 (D.P.R. 1996), any Oversight Board rescission of property rights *or* contractual rights would constitute a deprivation, which requires pre-deprivation notice and an opportunity to be heard.[51]

### 2. Any Repeal or Preemption of the Enabling Act Under PROMESA Would Effect a Fifth Amendment Taking Without Just Compensation.

#### a. Preempting Property Rights Under a Lien or Trust Violates the Fifth Amendment.

119. The Oversight Board's seizure of Pledged Rum Taxes on which Movants have a lien is a direct appropriation of Movants' property and constitutes a "paradigmatic" taking requiring just compensation. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) ("We hold that there was a taking of these liens for which just compensation is due under the Fifth Amendment."); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (holding that a "paradigmatic taking . . . is a direct government appropriation or physical invasion of private property.").

---

[51] An after-the-fact judicial proceeding does not cure a Due Process Clause violation caused by a governmental agency decision that deprived someone of their property or contract rights without due process. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (noting that a post-deprivation hearing is "constitutionally inadequate" "absent necessity of quick action . . . or impracticality of providing any pre-deprivation process") (internal quotation marks omitted).

### b. Preempting a Statutory Covenant Pledging Specific Special Revenues to Bondholders Violates the Fifth Amendment.

120.     Even if Movants did not have a security interest in the Pledged Rum Taxes (which they plainly do, *see supra* Argument § II.A.), any preemption of the Enabling Act and the Trust Agreement would constitute a Fifth Amendment violation.  A statutory covenant that makes a pledge of specific special revenues to bondholders creates a protected property interest under the Fifth Amendment, whether or not the covenant is properly characterized as a "security interest" or a "contract" under the Bankruptcy Code.

121.     The statutory covenant at issue here is plainly not merely legislative, but is at least a binding contractual commitment of the Commonwealth, pledging to make available to bondholders a specific set of revenues.  "[A] statute is itself treated as a contract when the ***language*** and ***circumstances*** evince a legislative intent to create private rights of a contractual nature enforceable against the State."  *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977) (emphasis added).  In the Enabling Act, "[t]he Commonwealth ***pledges*** and ***agrees*** with the holders of any bonds issued under this chapter . . . that it ***shall not*** limit or alter the rights hereby conferred to [PRIFA]" (3 L.P.R.A. § 1913)—a "clear indication" that the Commonwealth legislature "intend[ed] to bind itself contractually" to bondholders.  *See Parella v. Ret. Bd. of R.I. Emps' Ret. Sys.*, 173 F.3d 46, 60 (1st Cir. 1999).  This court has found similar statutory language evidenced an unmistakable intent to form a contract.  *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 604 (D.P.R. 2015), *judgment entered*, 2015 WL 574008 (D.P.R. Feb. 10, 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016) (P.R. Laws Ann. tit. 22 § 215 evidenced a "clear intent" to form a contract where it provided, "The Commonwealth Government does hereby pledge to, and agree with, any person, firm or corporation . . . subscribing to or acquiring bonds of [PREPA] . . . ."); *see also U.S. Trust*, 431 U.S. at 18 (holding that the "intent

to make a contract is clear from the statutory language," where two states had "covenant[ed] and agree[d] with each other and with the holders of any affected bonds.") (internal quotation marks omitted).  That the Commonwealth committed not to alter PRIFA's rights until the bonds are repaid "also evince[s] an unmistakable intent to contract."  *Parella*, 173 F.3d at 60.  The surrounding "circumstances"—that the Commonwealth's instrumentalities were offering bonds, a quintessential contractual instrument—further confirms "a clear and unequivocal intent to contract."  *Id.* at 61.

122.    This statutory contract, pledging specific revenues to bondholders, gives rise to a constitutionally protected property interest—whether or not it also creates a "security interest" within the meaning of the Bankruptcy Code.  The statutory covenant creates a legitimate claim of entitlement to specifically identifiable property (the Pledged Rum Taxes)—which is the touchstone of a protected property interest.  *Vázquez-Velázquez v. Puerto Rico Highway & Transp. Auth.*, 2016 WL 183653, at *3 (D.P.R. Jan. 14, 2016) ("plaintiffs [must] have a '***legitimate claim of entitlement***.'") (emphasis added) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)); *see also Louisiana ex rel. Hubert v. City of New Orleans*, 215 U.S. 170, 177-78 (1909); *Murray v. City of Charleston*, 96 U.S. 432, 445 (1877); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 554-55 (1866) ("[W]here a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied.").

123.    Moreover, revenue bonds that, like PRIFA's bonds, are backed by *specific* pledged revenues create property rights.  *See Dimino v. Sec'y of Commonwealth*, 695 N.E.2d 659, 705 (Mass. 1998) (proposed elimination of toll revenues "constitutes an appropriation of the bondholders' private property"); *First National Bank of Boston v. Maine Turnpike Authority*, 136

63

A.2d 699, 722 (Me. 1957) (impairing a rate covenant would unconstitutionally "transfer a vested

property right from one person to another by the pure fiat of the Legislature").

<div align="center">

**c.      Just Compensation Requires that Bondholders Be Made Whole.**

</div>

124.     The Oversight Board does not contest that any taking of private property, including

contractual property rights, requires just compensation.  *See* U.S. CONST. amend. V.  Nor does it

dispute that a requirement to provide "just compensation" cannot be impaired by the operation of

the Bankruptcy Code but instead requires payment for the full value of the property taken.  *See*

*United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) ("The bankruptcy power is **subject to**

the Fifth Amendment's prohibition against taking private property without compensation.")

(emphasis added).  Absent the payment of just compensation, Movants' property rights cannot be

impaired in this proceeding.

## IV.     MOVANTS HAVE STANDING TO BRING THIS MOTION.

125.     As the Court is aware, Movants have, by joinder of the Trustee, mooted the heart

of the Oversight Board's arguments against their standing to bring this Motion.  (Opp. ¶¶ 126-9.)

Recognizing the weakness of its last-remaining argument—that Movants are "creditors of a

creditor"—the Oversight Board relegates it to a few thinly supported paragraphs that attempt to

rehash their merits arguments.  (Opp. ¶¶ 126-9.)

126.     Contrary to the Oversight Board's half-hearted argument, Movants are not seeking

to bring PRIFA's claims.  They are requesting stay relief to safeguard their own constitutionally-

protected interest in the Pledged Rum Taxes.  Movants have shown a colorable claim to the

Pledged Rum Taxes in the hands of the Commonwealth.  (*Supra* Argument § II.)  In any event,

Movants have direct standing under Section 407 of PROMESA, which grants creditors standing

to sue over transfers "which deprive[] any . . . territorial instrumentality [of Puerto Rico] of

property in violation of applicable law assuring the transfer of such property to such territorial

<div align="center">64</div>

instrumentality for the benefit of its creditors[.]"  PROMESA § 407(A); 48 U.S.C. § 2195(a).  And, contrary to the Oversight Board's argument that Movants lack contractual privity with the Commonwealth (Opp. ¶ 126), Movants seek to enforce the non-impairment covenant between the Commonwealth and PRIFA's bondholders—which the Oversight Board simply ignores.

127.    These are, each and together, more than sufficient to establish Movants' "party in interest" standing to move to lift the stay.  Section 362(d) of the Bankruptcy Code grants standing to a "party in interest" to "request . . . relief from the stay."  11 U.S.C. § 362(d).  "Party in interest" is a broad concept that encompasses *all* parties affected by the automatic stay, including but not limited to "a creditor."[52]   "Creditor" in turn is broadly defined as *any* "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" *Id.* § 101(10)(A).  And "claim" is similarly expansive:  "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" *Id.* § 101(5)(A).  Movants each qualify as a "creditor" of the Commonwealth in their own right, since they hold claims to enforce

---

[52] *See, e.g.*, *In re Weisband*, 427 B.R. 13, 17 (Bankr. D. Az. 2010) ("Any party affected by the stay should be entitled to seek relief"); *In re Jones*, No. 02-17125-SR, 2002 WL 34560880, at *2 (Bankr. E.D. Pa. Sept. 27, 2002) ("the better approach is to recognize that any party affected by the stay should be entitled to relief. This avoids the anomalous situation in which a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance" (citation omitted)); *In re Vieland*, 41 B.R. 134, 138 (Bankr. N.D. Oh. 1984) (holding that a party in interest under Section 362(d) is determined on a case-by-case basis "with reference to the interest asserted and how said interest is affected by the automatic stay"); *see also*, *e.g.*, *In re Kang Jin Hwang*, 396 B.R. 757, 768 (Bankr. C.D. Cal. 2008), *rev'd and remanded on other grounds*, 438 B.R. 661 (C.D. Cal. 2010) ("In general, a party in interest, in the bankruptcy context, is anyone who is entitled to express a view with respect to a matter before the court"); *In re El Comandante Management Co., LLC*, 359 B.R. 410, 416-18 (Bankr. D.P.R. 2006) ("party in interest" generally refers to any person or entity that "holds a financial stake in the outcome of the debtor's estate . . ."); *In re Overview Equities*, 240 B.R. 683, 686-87 (Bankr. E.D.N.Y. 1999) (holding that a party with a legal interest in property, rather than a claim, was a party in interest).

their constitutional, statutory, and contractual rights against the Commonwealth; even their "disputed" claims suffice.[53]

128.   The Oversight Board nevertheless relies on the out-of-circuit, widely criticized decision, *Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 19 B.R. 231 (Bankr. S.D.N.Y. 1982), for the proposition that "[a] noncreditor of a debtor, even though owed a debt by a creditor of the debtor, does not have standing to seek relief from the automatic stay for the purpose of recovering on its claim."  (Opp. ¶ 129 n.77 (quoting *Comcoach*, 19 B.R. at 234).) There, the Second Circuit held that the mortgagee bank was not a party-in-interest for purposes of seeking stay relief, because the debtor was just a tenant of the mortgagor landlord, and had no obligation to the mortgagee.  *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983).

129.   *Comcoach* has been widely criticized as being (i) too restrictive and (ii) incompatible with Section 362(d)'s use of the term "party in interest" rather than "creditor."[54]  And

---

[53] Movants need not even qualify as "creditors," though they do, since courts consistently construe "party-in-interest" to include not only those parties listed within Section 1109(b), but also, more generally, "*any* person or entity[] who *holds a financial stake* in the outcome of the debtor's estate . . . ."  *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 416-17 (citations omitted) (emphasis added); *see also W. Auto Supply Co. v. Savage Arms (In re Savage Indus., Inc.)*, 43 F.3d 714, 720-21 (1st Cir. 1994) ("The term 'parties in interest' encompasses not only entities holding 'claims' against the debtor, but *any* entity *whose pecuniary interests might be directly and adversely affected* by the proposed action." (emphasis added) (citations omitted)).  Movants obviously have a direct financial stake in the resolution of issues related to the Commonwealth's bankruptcy, which is enough for Section 1109(b).  *See In re El Comandante Mgmt. Co.*, 359 B.R. at 416-17.  They insure (or, in the case of the Trustee, represent the interests of) holders of hundreds of millions of dollars in PRIFA bonds secured by collateral sitting in Treasury accounts or wrongfully diverted to Rum Companies.

[54] *See, e.g.*, *In re Horton*, 595 B.R. 1, 4 (Bankr. D.D.C. 2019) (referring to *Comcoach*'s "misguided discussion"); *In re Sweports, Ltd.*, 476 B.R. 540, 543 (Bankr. N.D. Ill. 2012) (stating that "[a]s an exercise in statutory interpretation, *Comcoach* leaves something to be desired" and noting "[h]ad Congress wanted to limit standing under section 362(d) to creditors, it could have used the term 'creditor'"); *Brown Transp. Truckload v. Humbolt Express (In re Brown Transp. Truckload, Inc.)*, 118 B.R. 889, 893 (Bankr. N.D. Ga. 1990) ("In many instances the mechanical application of the *Comcoach* rule would leave a party without . . . recourse, creating 'an anomalous situation where a party is subject to the automatic stay but is unable to seek relief even if damage may result from its continuance[.]'"); *see also* Collier on Bankruptcy ¶ 362.07[2] (noting that "the better approach is to recognize that any party affected by the stay should be entitled to move for relief").

were this Court to follow its logic, it would create "an anomalous situation in which a party is subject to the automatic stay but is unable to seek relief even when damage may result from its continuance." 2 Collier on Bankruptcy (16th ed.) ¶ 362.07. That is why courts have declined to follow *Comcoach* where doing so would, as here, leave the lift-stay movant without a remedy. *See In re Zhejiang Topoint Photovoltaic Co.*, 2015 WL 2260647, at *4 (Bankr. D.N.J. May 12, 2015) (noting that "[t]here are distinguishing characteristics between ['creditor of a creditor' cases] and the instant case," because "in *Comcoach* . . . the non-party mortgagee . . . was *not left without a remedy* because it could appoint a receiver in its *state court action*, and the receiver would subsequently have rights as a party in interest" (emphasis added)). Hence, "the better approach," reflected in 362(d), "is to recognize that any party affected by the stay should be entitled to move for relief." *Id.* Movants easily meet the test.

## CONCLUSION

130. For the foregoing reasons, the Court should (i) overrule the Oversight Board's standing challenge, (ii) find that Movants have stated "colorable claims," and (iii) grant the Motion.

## CERTIFICATION

In accordance with paragraph 9 of the *Final Case Management Order for Revenue Bonds* (ECF No. 12186), Movants certify that (i) they have taken reasonable efforts to avoid duplication and submit a brief that is no longer than necessary, and (ii) they have used reasonable efforts to draft a single brief and coordinate to minimize duplicative briefs.

Dated: April 30, 2020
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By:    */s/ Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com
      scolon@ferraiuoli.com

**MILBANK LLP**

By:    */s/ Atara Miller*
Dennis F. Dunne (admitted *pro hac vice*)
Atara Miller (admitted *pro hac vice*)
Grant R. Mainland (admitted *pro hac vice*)
John J. Hughes, III (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddunne@milbank.com
      amiller@milbank.com
      gmainland@milbank.com
      jhughes2@milbank.com

**ARENT FOX LLP**

By:    */s/ David L. Dubrow*
David L. Dubrow (admitted *pro hac vice*)
Mark A. Angelov (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 484-3900
Facsimile:  (212) 484-3990
Email: david.dubrow@arentfox.com
      mark.angelov@arentfox.com
Randall A. Brater (admitted *pro hac vice*)
1717 K Street, NW
Washington, DC  20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
Email: randall.brater@arentfox.com

***Attorneys for Ambac Assurance Corporation***

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
    María E. Picó
    (USDC-PR No. 123214)
    802 Ave. Fernández Juncos
    San Juan, PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    Email: mpico@rexachpico.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    (USDC-PR No. 204809)
    Ricardo F. Casellas-Sánchez
    (USDC-PR No. 203114)
    Diana Pérez-Seda
    (USDC-PR No. 232014)
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone: (787) 756-1400
    Facsimile: (787) 756-1401
    Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
    Martin A. Sosland (admitted *pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    Email: martin.sosland@butlersnow.com
    Jason W. Callen (admitted *pro hac vice*)
    150 3rd Ave., S., Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    Email: jason.callen@butlersnow.com

***Attorneys for Financial Guaranty
Insurance Company***

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Mark C. Ellenberg*
    Howard R. Hawkins, Jr. (admitted *pro hac vice*)
    Mark C. Ellenberg (admitted *pro hac vice*)
    William J. Natbony (admitted *pro hac vice*)
    Ellen M. Halstead (admitted *pro hac vice*)
    Thomas J. Curtin (admitted *pro hac vice*)
    Casey J. Servais (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666
    Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        ellen.halstead@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.***

COR

RIVERA, TULLA AND FERRER, LLC

By: /s/ Eric A. Tulla
Eric A. Tulla
(USDC-DPR No. 118313)
Email: etulla@ riveratulla.com
Iris J. Cabrera-Gómez
(USDC-DPR No. 221101)
Email: icabrera@ riveratulla.com
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212
Telephone: (787) 753-0438
Facsimile: (787) 767-5784

HOGAN LOVELLS US LLP

By: /s/ Robin E. Keller
Robin E. Keller, Esq.
Ronald Silverman, Esq.
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
robin.keller@hoganlovells.com
ronald.silverman@hoganlovells.com

*Attorneys for U.S. Bank National Association, in its Capacity as Trustee*

[*Remainder of Page Intentionally Omitted*]

71

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this same date a true and exact copy of this notice was filed with

the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com

# 13. Declaration of Timothy H. Ahlberg in Respect of Commonwealth Motion for Partial Summary Judgment, ECF No. 49 in Case No. 20-00003-LTS

THE COMMONWEALTH OF PUERTO RICO, by
and through THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     Movant,

         v.

AMBAC ASSURANCE CORPORATION,
ASSURED GUARANTY CORP., FINANCIAL
GUARANTY INSURANCE COMPANY, and U.S.
BANK TRUST NATIONAL ASSOCIATION, as
Trustee,

     Respondents.

Adv. Proc. No. 20-00003-LTS

# DECLARATION OF TIMOTHY H. AHLBERG
# IN RESPECT OF COMMONWEALTH MOTION
# FOR PARTIAL SUMMARY JUDGMENT

I, Timothy H. Ahlberg, declare that:

1.     I am a Director of Conway Mackenzie, Inc. ("CM") and have been employed by CM since 2017. I submit this Declaration based upon personal knowledge, except as otherwise indicated, in respect of the Commonwealth of Puerto Rico's ("Commonwealth") *Motion Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment Disallowing Claims* (the "Motion for Partial Summary Judgment") filed concurrently herewith. If called as a witness, I could and would testify competently thereto.[2]

2.     CM is an internationally recognized consulting firm whose services include, among others, financial reporting regarding distressed municipalities. Since 2015, CM has served as financial advisor to the Commonwealth and, in that capacity, CM supports the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") across several functions, many of which relate to financial reporting concerning the Commonwealth (the "CM Engagement"). By way of example, CM publishes a weekly cash flow report regarding a collection of accounts controlled by the Commonwealth, and commonly referred to as the Commonwealth's Treasury Single Account (the "TSA"), which includes the TSA operational account (the "TSA Operational Account"), the Commonwealth's main operational bank account into which a majority of receipts, including tax collections, from Governmental functions are deposited and used for Commonwealth purposes. To develop these reports, CM worked closely with the Puerto Rico Department of Treasury ("DTPR"), Office of Management and Budget, and multiple central government agencies and public corporations, including the Puerto Rico Infrastructure Financing Authority ("PRIFA").

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Motion for Partial Summary Judgment.

3.    In my capacity as a Director of CM, I have devoted substantial time to the CM

Engagement and am familiar with the relevant business and financial records and record keeping

of the Commonwealth and AAFAF.  For instance, I worked extensively on the development of the

TSA Liquidity Plans for Fiscal Years 2019 and 2020.  The Liquidity Plans are a translation of the

Commonwealth's Certified Budget into a cash management forecast. Developing these Liquidity

Plans required deep knowledge of the Budget, Fiscal Plan, the operations of the DTPR and intra-

governmental cash flows.  As such, I have become familiar with, among other things, financial

records regarding the TSA accounts and cash flows related thereto.  I also am familiar with the

Commonwealth's financial records regarding (i) the TSA cash flows of the Rum Taxes collected

by the United States Treasury and then "covered into" (i.e. deposited into) the DTPR (once

remitted to the Commonwealth by the United States Treasury, the "Rum Tax Remittances"), (ii)

the Commonwealth's Lockbox Account in the name of the Secretary of the Treasury of Puerto

Rico maintained by Citibank, N.A. in its Puerto Rico branch pursuant to the Lockbox Agreement

among the Commonwealth, Citibank, N.A. and Banco Popular de Puerto Rico ("BPPR") (as

trustee) dated as of May 5, 2015, and (iii) "Retained Rum Tax Remittances" (i.e. Rum Tax

Remittances not transferred to PRIFA by the Commonwealth).

4.    I have reviewed account opening documents pertaining to the TSA Operational

Account (including those pertaining to the current TSA Operational Account held at BPPR) that

were provided at the request of DTPR and AAFAF, true and correct copies of which are attached

hereto as Exhibit A.  Those account opening documents confirm my understanding the

Commonwealth has the authority to sign checks, direct money transfers, and otherwise exercise

control over the TSA Operational Account for Commonwealth purposes.  I have seen no

documents reflecting that PRIFA has signing authority over the TSA Operational Account, nor do

2

the account opening documents for the TSA Operational Account include any notation or other document authorizing PRIFA to access funds in such accounts or to control the disbursement of funds in the TSA Operational Account.

5.     During the period January 1, 2014 until approximately July 1, 2015, Rum Tax Remittances received from the United States Treasury were deposited in the TSA Operational Account.  DTPR transferred the first $117 million in Rum Tax Remittances received by the Commonwealth during the fiscal year as follows: (i) $113 million of appropriations to a Government Development Bank for Puerto Rico ("GDB") bank account to pay PRIFA Bonds; and (ii) $4 million to PRIFA for PRIFA's operational purposes.  The Commonwealth, and none of PRIFA, the Trustee for the PRIFA Bonds, the PRIFA Bondholders or their insurers, controlled the transfer of $117 Million Rum Tax Remittances to the GDB bank account and to PRIFA.  Pursuant to the Lockbox Agreement, the Commonwealth opened the Lockbox Account at Citibank and, beginning in July 2015, Rum Tax Remittances received from the United States Treasury were deposited in the Lockbox Account.  Under the terms of the Lockbox Agreement, (i) the first $117 million in Rum Tax Remittances received each fiscal year is disbursed to a TSA account by Citibank, N.A., as paying agent, (ii) the next $5 million is disbursed to the Puerto Rico Science and Technology Trust, (iii) under specified conditions, an amount may be disbursed to the Conservation Trust, (iv) a portion of the rest of the Rum Tax Remittances received during that fiscal year are paid to certain rum producers under agreements with the Commonwealth, and (v) subject to amounts disbursed to the Conservation Trust under specified conditions, any remainder is disbursed to a TSA account controlled by the Commonwealth.

6.     DTPR's records reflect that no Rum Tax Remittances have been transferred to PRIFA or to any account maintained on behalf of PRIFA at any point after July 2015, except for

$4 million of Rum Tax Remittances transferred to PRIFA for operational purposes between August 2015 and May 2016. Other than that $4 million, the first $117 million in Rum Tax Remittances received by the Commonwealth each fiscal year since July 2015 has been retained by the Commonwealth, under the Commonwealth's control, held for Commonwealth purposes, and not transferred to PRIFA. Indeed, the account opening materials I reviewed for the TSA Operational Account, along with documents concerning the other Commonwealth bank accounts in which the Retained Rum Tax Remittances have been deposited since July 2015 (the "Relevant Accounts"), all confirm my understanding that the Commonwealth has the exclusive authority to sign checks, direct money transfers, and otherwise control outflows. I have not seen any documents reflecting PRIFA has signing authority over the Relevant Accounts or authorization to access or direct the disbursement of funds in such accounts, nor have I seen any document vesting PRIFA with such authority. More specifically, over the course of my work on the CM Engagement, I have seen no indication of the existence of a deposit account control agreement or any other arrangement that would confer control over funds in any of the Relevant Accounts in favor of (i) the Trustee under the Trust Agreement, (ii) any PRIFA Bondholder or (iii) any insurer of the PRIFA Bonds, nor to my knowledge has any PRIFA Bondholder or insurer or the Trustee alleged that any such agreement exists.

7.     In the course of my work on PRIFA matters, my understanding as a layperson of the "Puerto Rico Infrastructure Fund" is that it is a label used to refer to the first $117 million of Rum Tax Remittances made available during the period the Commonwealth was paying its obligations timely and appropriating Rum Tax Remittances to PRIFA to carry out legal requirements then in effect.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 27th day of April, 2020 at Chicago, Illinois.

Timothy H. Ahlberg

# 14. Transmittal Information Associated with a Transfer of Rum Tax Remittances from the Lockbox Account to Treasury, ECF No. 13229-1

Citibank, NA -- Agency & Trust
480 Washington Blvd., 18th Floor
Jersey City, NJ 07310



December 13, 2017

RE: Lockbox Agreement dated as of May 5, 2015, among Citibank, N.A., (the "Lockbox Bank"), Banco Popular de Puerto Rico, (the
"Trustee"), Citibank, N.A., as Paying Agent under the Trust Agreement and the Government of Puerto Rico (the "Government"),
acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture,
the President of the Government Development Bank for Puerto Rico, the Executive Director of the Office of Management and
Budget and the Executive Director of the Puerto Rico Industrial Development Company as authorized by Act No. 178 of December
1, 2010, as amended, Act No. 1 of January 31, 2011 and any successor legislation (the "Enabling Act").

## Lockbox Receipt Notice

To: The parties listed on Schedule 1 hereto

Pursuant to Section 3 (c) of the above referenced agreement please be advised the Lockbox Account received the below Cover
Over Payment from the U.S. Government.

| Amount of Cover Over Payment | Date of Receipt* |
| --- | --- |
| $26,395,318.57 | 12/13/2017 |

*Please note the payment from the US Government was received via ACH (Automated Clearing House) and is subject to reversal
for 5 business days. The funds will be considred available on December 20, 2017.

Kind Regards,
Citibank, N.A. as Lockbox Bank

Citibank, NA – Agency & Trust
480 Washington Blvd., 18th Floor
Jersey City, NJ 07310



January 3, 2018

RE: Trust Agreement dated as of May 5, 2015, among Citibank, N.A., (the "Paying Agent and Collateral
Agent"), Banco Popular de Puerto Rico, (the "Trustee"), and the Government of Puerto Rico (the
"Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and
Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto
Rico, the Executive Director of the Office of Management and Budget and the Executive Director of the
Puerto Rico Industrial Development Company as authorized by Act No. 178 of December 1, 2010, as
amended, Act No. 1 of January 31, 2011 and any successor legislation (the "Enabling Act").

Trust Account Disbursement Notice

To: The parties listed on Schedule 1 hereto

Pursuant to section 4.1.2 of the above referenced agreement please be advised that on the date of this
notice the following amounts were disbursed from the Trust Account.

| recipient | amount disbursed | date |
|---|---|---|
| Beneficiaries | 4,269,388.30 | 1/3/2018 |
| Secretary of Treasury | 551,347.21 | 1/3/2018 |

Kind Regards,
Citibank, N.A. as Paying Agent

Citibank, NA – Agency & Trust
480 Washington Blvd., 18th Floor
Jersey City, NJ 07310



December 27, 2017

RE: Lockbox Agreement dated as of May 5, 2015, among Citibank, N.A., (the "Lockbox Bank"), Banco Popular de Puerto Rico, (the "Trustee"),
Citibank, N.A., as Paying Agent under the Trust Agreement and the Government of Puerto Rico (the "Government"), acting through the
Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government
Development Bank for Puerto Rico, the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto
Rico Industrial Development Company as authorized by Act No. 178 of December 1, 2010, as amended, Act No. 1 of January 31, 2011 and any
successor legislation (the "Enabling Act").

Lockbox Disbursement Detail

To: The parties listed on Schedule 1 hereto

Pusuant to section 3 (d) of the above referenced agreement please be advised that on the date indicated the following amounts were
disbursed from the Account.

| recipient | amount disbursed | date | remaining balances |
|---|---|---|---|
| Secretary of Treasury for deposit to the credit of PRIFA | $ 13,321,258.57 | 12/22/2017 | $ - |
| Secretary of Treasury for deposit to the credit of the S&T Trust | $ 5,000,000.00 | 12/22/2017 | $ - |
| Secretary of Treasury, the remaining amount of Non-Rum COR included in such Cover Over Payment | $ - | N/A | N/A |
| Secretary of Treasury, the remaining amount of Other Rum COR included in such Cover Over Payment | $ 3,156,100.56 | 12/22/2017 | N/A |
| Conservation Trust - the Unpaid Conservation Trust Amount | $ 4,776.15 | 12/22/2017 | $ - |
| Paying Agent - the Unpaid Beneficiaries Amount | $ 4,820,735.51 | 12/22/2017 | $ 51,228,960.54 |
| PRIDCO for credit to the Other Rum Producers, Unpaid Other Rum Producers Amount | $ 92,447.78 | 12/22/2017 | $ 982,423.47 |
| Secretary of Treasury, the remaining balance in the Account | $ - | N/A | N/A |

Kind Regards,
Lockbox Bank

PRIFA_STAY0001346

EXHIBIT B

FORM OF GOVERNMENT CERTIFICATION

NOVEMBER 2017

GOVERNMENT CERTIFICATION PURSUANT TO SECTION 4(b) OF THE LOCKBOX
AGREEMENT

       I, Francisco Peña Montañez, being a duly authorized representative of the
Secretary of Treasury of Puerto Rico (the "Secretary"), hereby certify, pursuant to Section 4(b) of
the Lockbox Agreement, dated as of May 5, 2015 (the "Lockbox Agreement"), by and among
Citibank, N.A., a national banking association (the "Lockbox Bank"), Banco Popular de Puerto
Rico, a Puerto Rico banking entity (not in its individual capacity but as trustee under the Trust
Agreement (as defined in the Lockbox Agreement), the "Trustee"), Citibank, N.A., a national
banking association (not in its individual capacity but as paying agent under the Trust Agreement,
the "Paying Agent") and the Government of Puerto Rico (the "Government") as follows:

Part A[1]

       The Cover Over Report for net excise tax collections due to the Government (the
"Report") for the month of November 2017, was received by the Secretary of Treasury on
December 18, 2017.

       As set forth in the Report, (i) the amount of Other Rum COR due to the Government
and the number of proof gallons of rum used in determining such Other Rum COR, (ii) the
amount of Non-Rum COR included in the Cover Over Payment to which such Report relates
and the customs figures, Cover Over Revenues attributable to beer sales and Cover Over
Revenues attributable to wine sales that constitute such Non-Rum COR and (iii) the amount
of Puerto Rico Rum COR due to the Government and the number of proof gallons of rum
and the Cover Over Rate used in determining such Puerto Rico Rum COR, is in each case,
prior to any adjustments or deductions, as set forth in the table below:

---

[1] Part A to be included (i) in connection with a Cover Over Report that does not reflect a
  Tax Extender Payment or (ii) in connection with a Cover Over Report that reflects a
  Tax Extender Payment, but in such case only with respect to the portion of such
  Cover Over Report that does not relate to such Tax Extender Payment.

00266550; 1

CONFIDENTIAL

| Product | Number of Proof Gallons | | Cover Over Rate | COR | COR | |
|---|---|---|---|---|---|---|
| Other Rum | 300,581.01 | pg. | $ 10.50 | Prior Periods | Other Rum COR: $ | 3,156,100.56 |
| | Total Other Rums | | | | $ | 3,156,100.56 |
| Non-Rum | N/A | | | N/A | Non-Rum COR: | |
| | | | | Customs: $ | | – |
| | | | | COR attributable to beer sales: $ | | – |
| | | | | COR attributable to wine sales: $ | | – |
| | Totals Non Rum COR | | | | $ | – |
| Puerto Rico Rum | 2,225,545.82 | pg. | $ 10.50 | Prior Periods | Puerto Rico Rum COR $ | 23,368,231.11 |
| | Adjustments | | | | $ | – |
| | Total Puerto Rico Rum | | | | $ | 23,368,231.11 |

As set forth in the Report, the total amount of Cover Over Revenues (after adjustments and deductions) due to the Government equals $26,395,318.57.

No Reduction is reflected in the total amount of Cover Over Revenues due to the Government as set forth in the Report.[2]

### Part B

As set forth in the Report, the Enforcement Expenses deducted from Cover Over Revenues as reimbursement to the United States Department of Treasury equals $129,013.10.

All capitalized terms not defined herein shall have the meaning ascribed to them in the Lockbox Agreement.

IN WITNESS WHEREOF, the Secretary has caused this Government Certification to be executed by [representative] as of the date first written above.

DEPARTMENT OF THE TREASURY

By: 
Name: Francisco Peña Montañez CPA
Title: Assistant Secretary of Treasury

---

[2] First sentence to be included unless the Cover Over Report reflects a Reduction. In that case the second sentence should be included, indicating the amount of the Reduction.

CONFIDENTIAL



**DEPARTMENT OF THE TREASURY**
ALCOHOL AND TOBACCO TAX AND TRADE BUREAU
8002 FEDERAL OFFICE BUILDING
550 MAIN STREET
CINCINNATI, OHIO 45202
December 7, 2017

502010100:PGS
5600

Mr. Edwin Rivera
Assistant Secretary
Department of the Treasury
Commonwealth of Puerto Rico
P.O. Box 9024140
San Juan, Puerto Rico 00902-4140

Dear Mr. Rivera:

Enclosed is the detailed activity report of net excise tax
collections due to the Government of Puerto Rico for the month
of November 2017. Payment in the amount of **$26,395,318.57** for
these collections has been scheduled via the Automated Clearing
House (ACH) network.

Please check with your financial institution two weeks after
receipt of this letter to verify the ACH deposit. If no deposit
has been received, please contact Stacy Neal at (513)684-2300.

Should you have any questions regarding the enclosed report,
please feel free to contact Terri K. Maher at (513)684-2258.

Sincerely,

for Thurla F. Skora
Director, National Revenue Center

Digitally signed by Todd B. Moon
DN: c=US, o=U.S. Government,
ou=Department of the Treasury,
ou=Alcohol and Tobacco Tax and Trade
Bureau, ou=People,
serialNumber=102020, cn=Todd B.
Moon
Date: 2017.12.07 14:59:55 -05'00'

Thurla F. Skora
Director, National Revenue Center

Enclosures

CONFIDENTIAL

PRIFA_STAY0001349

November 2017

| COLLECTIONS: | PUERTO RICO | | VIRGIN ISLANDS | |
|---|---|---|---|---|
| (1) Bulk Rum | $23,049,659.85 | | $5,685,120.00 | |
| (2) Cased Rum | $318,571.26 | | $0.00 | |
| (3) Other Rum | $3,156,100.56 | | $445,648.40 | |
| (2) Beer | $0.00 | | $0.00 | |
| (2) Wine | $0.00 | | $0.00 | |
| (4) Customs | $0.00 | | $0.00 | |
| ADJUSTMENTS | | | | ADJUSTMENTS |
| Customs | $0.00 | | $0.00 | Customs |
| Bulk | $0.00 | | $3,869,207.53 | Bulk (Dec-16, Dec-14, Feb-17,Jul-17, Nov-14,May-15) |
| Other Rum | $0.00 | | $0.00 | Other Rum |
| Estimated Payment | $0.00 | | $0.00 | Dept of Int. Data Sent |
| Estimated Payment | $0.00 | | $0.00 | Other Rum From TTB |
| TOTAL COLLECTIONS: | | $26,524,331.67 | | $9,999,975.93 |
| DEDUCTIONS: | | | TOTAL TO INTERIOR: | $9,554,327.53 |
| Enf.Exp. (A7) | $129,013.10 | | TOTAL OTHER RUM: | $445,648.40 |
| Deduction | $0.00 | | | |
| TOTAL DEDUCTIONS: | | $129,013.10 | | |
| TOTAL COVER OVER: | | $26,395,318.57 | | $9,999,975.93 |
| TOTAL COLLECTIONS: | | $27,024,790.76 | | |

| (A1) BULK RUM IN PROOF GALLONS | | | |
|---|---|---|---|
| ATF F 5600.8 | Puerto Rico | Virgin Islands | Other Imp. Rum |
| (5) Total Prf Gals | 2,195,205.7 | 541,440.0 | 111,941.1 |
| | | | |
| (1) TOTAL @ $10.50 | $23,049,659.85 | $5,685,120.00 | $1,175,381.55 |
| TOTAL @ $13.50 | $29,635,276.95 | $7,309,440.00 | $1,511,204.85 |
| TOTAL @ $13.25 | $29,086,475.53 | $7,174,080.00 | $1,483,219.58 |

| OTHER RUM DATA WITH PERCENTAGES FOR PUERTO RICO & THE VIRGIN ISLANDS | | | |
|---|---|---|---|
| November 2016 | | | |
| COLLECTIONS: | OTHER RUM (pg) | Puerto Rico | Virgin Islands |
| | | 87.626889% of pg | 12.373111% of pg |
| (5) Bulk | 111,941.10 | 98,090.50 | 13,850.60 |
| (A5) Census | 231,082.61 | 202,490.50 | 28,592.11 |
| Subtotal | 343,023.71 | 300,581.01 | 42,442.70 |
| DEDUCTIONS | 0.00 | | |
| TOTAL p.g. | 343,023.71 | 300,581.01 | 42,442.70 |
| | | | |
| (3) TOTAL @ $10.50 | | $3,156,100.56 | $445,648.40 |
| TOTAL @ $13.50 | | $4,057,843.58 | $572,976.51 |
| TOTAL @ $13.25 | | $3,982,698.32 | $562,365.83 |

| (2) PR CASED GOODS: | Distilled Spirits | Wine | Beer |
|---|---|---|---|
| proof gallons | 30,340.12 | 0.00 | 0.0000 |

| (4) CUSTOMS FIGURES | Puerto Rico | Virgin Islands | |
|---|---|---|---|
| Dollars | $0.00 | $0.00 | |

| COLLECTIONS: | | |
|---|---|---|
| Bulk Rum | $23,049,659.85 | |
| Cased Rum | $318,571.26 | |
| Other Rum | $3,156,100.56 | |
| Beer | $0.00 | |
| Wine | $0.00 | |
| Customs | $0.00 | |
| ADJUSTMENTS | | |
| Customs | $0.00 | |
| Bulk Rum | $0.00 | |
| Other Rum | $0.00 | |
| Estimated Payment | $0.00 | |
| TOTAL COLLECTIONS: | | $26,524,331.67 |
| DEDUCTIONS: | | |
| Enforcement Expenses | $129,013.10 | |
| Deduction | $0.00 | |
| TOTAL DEDUCTIONS: | | $129,013.10 |
| TOTAL COVER OVER: | | $26,395,318.57 |

| PUERTO RICAN COVER OVER CUMULATIVE THROUGH: | | |
|---|---|---|
| November 2017 | | |
| COLLECTIONS: | | |
| Bulk Rum | $46,636,179.45 | |
| Cased Rum | $673,054.94 | |
| Other Rum | $6,998,039.23 | |
| Beer | $0.00 | |
| Wine | $0.00 | |
| Customs | $0.00 | |
| ADJUSTMENTS | | |
| Customs | $0.00 | |
| Bulk Rum | $0.00 | |
| Other Rum | $560.33 | |
| Estimated Payment | $0.00 | |
| TOTAL COLLECTIONS: | | $54,307,833.95 |
| DEDUCTIONS: | | |
| Enforcement Expenses | $575,702.63 | |
| Deduction | $0.00 | |
| TOTAL DEDUCTIONS: | | $575,702.63 |
| TOTAL COVER OVER: | | $53,732,131.32 |

# 15. December 2017 Account Statement for the Lockbox Account, ECF No. 13229-2



Citibank, N.A. - Puerto Rico
Member FDIC

Page    1 of 2

DEPARTAMENTO DE HACIENDA
DEPARTAMENTO DE HACIENDA
PO BOX 9024140
SAN JUAN PR, 00902

Account Number: ▮▮▮▮9/028
Statement Period
Dec 1, 2017 - Dec 29, 2017

CORPORATE ACCOUNT AS OF December 29, 2017          2017 REGULAR STATEMENT

## ACCOUNT SUMMARY

| OPENING BALANCE | | 0.00 |
|---|---|---|
| 6 | DEBITS | 26,395,318.57 |
| | 0 CHECKS | 0.00 |
| | 6 NON-CHECKS | 26,395,318.57 |
| 1 | CREDITS | 26,395,318.57 |
| | 0 DEPOSITS | 0.00 |
| | 1 NON-DEPOSITS | 26,395,318.57 |
| CLOSING LEDGER | | 0.00 |

Citi Corporate Service Centers provide the following services:
Cashing Checks, Account Deposits, Night Depository.
Manager Check Issuance. E-Statement options is available.
Business hours are from 8:30 to 4:00PM - Monday thru Friday

Service Center is located in:
Parque Las Américas
235 Federico Costas, 3rd Floor
Hato Rey P.R. 00918
Tel. 787-282-2201

## DESCRIPTIVE ITEMS

| Date | Description | Serial No | Debits | Credits | Balance |
|---|---|---|---|---|---|
| 12-01 | OPENING BALANCE | | | | 0.00 |
| 12-13 | NAME: NRC  TREAS 310 | | | 26,395,318.57 | 26,395,318.57 |
| | ENTRY DESC:  MISC PAY | | | | |
| | INDIVIDUAL ID: 660433481201000 | | | | |
| | RMR IV PR122017 AI 26395318.57 2639 | | | | |
| 12-22 | OUTGOING FUNDS TRANSFER DR | | 4,776.15 | | |
| | REF 3173565271 IN FAVOR | | | | |
| | PUERTO RICO CONSERVATION TRUST | | | | |
| | ACCOUNT | | | | |
| | /6550113516 | | | | |
| | MERRILL LYNCH | | | | |
| | PUERTO RICO RUM PRODUCERS TRUST PUE | | | | |
| | RTO RICO CONSERVATION TRUST | | | | |
| | ▮▮▮▮9028 | | | | |
| | SAN JUAN PR          00902 | | | | |
| 12-22 | OUTGOING FUNDS TRANSFER DR | | 3,156,100.56 | | |
| | REF 3173565272 IN FAVOR | | | | |
| | COMMONWEALTH OF PUERTO | | | | |
| | RICO-DEPARTMENT OF TREASURY | | | | |
| | ACCOUNT | | | | |
| | //FW021502011 | | | | |
| | BANCO POPULAR | | | | |
| | SAN JUAN | | | | |
| | PR | | | | |
| | PUERTO RUM PRODUCERS TRUST SECRETAR | | | | |

ANY ERROR OR OMISSION ON THIS STATEMENT MUST BE NOTIFIED IN WRITING WITHIN THIRTY (30) DAYS
FROM MAILING DATE TO THE ATTENTION OF CITISERVICE UNIT TO THE FOLLOWING ADDRESS: PO BOX 70301,
SAN JUAN, P.R. 00936-8301. YOU CAN ALSO SEND A WRITTEN MESSAGE SENDING AN E-MAIL TO THE FOLLOWING
ADDRESS: citiservice.pr@citi.com. IF SUCH WRITTEN NOTICE IS NOT RECEIVED BY CITI WITHIN THE THIRTY (30) DAYS,
IT WILL BE ASSUMED THAT THE STATEMENT IS CORRECT AND CITI WILL BE RELEASED FROM ANY LIABILITY THEREOF.
FOR ANY QUESTIONS,YOU MAY CONTACT CITISERVICE AT 1-855-207-9325.



Citibank, N.A. - Puerto Rico
Member FDIC

DEPARTAMENTO DE HACIENDA
DEPARTAMENTO DE HACIENDA

Page     2 of 2

Account Number: ████9/028
Statement Period
Dec 1, 2017 - Dec 29, 2017

## DESCRIPTIVE ITEMS

| Date | Description | Serial No | Debits | Credits | Balance |
|------|-------------|-----------|--------|---------|---------|
| 12-22 | OUTGOING FUNDS TRANSFER DR REF 3173565269 IN FAVOR ESCROW CEONCENTRATION ACCOUNT ACCOUNT //FW021000089 CITIBANK NA NEW YORK NY PR RUM FFC TRUST ACCOUNT NO. 114510 UNPAID BENEFICIARIES AMOUNT | | 4,820,735.51 | | |
| 12-22 | OUTGOING FUNDS TRANSFER DR REF 3173565268 IN FAVOR COMMONWEALTH OF PUERTO RICO-DEPARTMENT OF TREASURY ACCOUNT //FW021502011 BANCO POPULAR SAN JUAN PR PUERTO RUM PRODUCERS TRUST SECRETAR | | 5,000,000.00 | | |
| 12-22 | OUTGOING FUNDS TRANSFER DR REF 3173565267 IN FAVOR COMMONWEALTH OF PUERTO RICO-DEPARTMENT OF TREASURY ACCOUNT //FW021502011 BANCO POPULAR SAN JUAN PR PUERTO RUM PRODUCERS TRUST SECRETAR | | 13,321,258.57 | | |
| 12-22 | BOOK TRANSFER DR OUR REF.: 3173565270 TRANSFER IN FAVOR OF: DEPARTAMENTO DE HACIENDA PUERTO RICO RUM PRODUCERS TRUST PRI DCO PUERTO RICAN RUMS UNPAID OTHER RUM PRODUCERS' AMOUNT ORDER:DEPARTAMENTO DE HACIENDA ████9028 SAN JUAN PR          00902 | | 92,447.78 | | |
| 12-29 | CLOSING BALANCE | | | | 0.00 |
| Total Debits/Credits | | | 26,395,318.57 | 26,395,318.57 | |

CONFIDENTIAL

# 16. Commonwealth Audited Financial Statement (June 30, 2014), ECF No. 13311-3

# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements
and Required Supplementary Information

June 30, 2014

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

| | Page(s) |
|---|---|
| **Independent Auditors' Report** | 1–7 |
| **Management's Discussion and Analysis (Unaudited)** | 8–35 |
| **Basic Financial Statements:** | |
| Government-Wide Financial Statements: | |
| Statement of Net Position | 36–37 |
| Statement of Activities | 38–39 |
| Fund Financial Statements: | |
| Governmental Funds: | |
| Balance Sheet | 40 |
| Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 41 |
| Statement of Revenue, Expenditures, and Changes in Fund Balances | 42 |
| Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances of Governmental Funds to the Statement of Activities | 43 |
| Proprietary Funds: | |
| Statement of Net Position | 44 |
| Statement of Revenue, Expenses, and Changes in Fund Net Position | 45 |
| Statement of Cash Flows | 46–47 |
| Fiduciary Funds: | |
| Statement of Fiduciary Net Position | 48 |
| Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds | 49 |
| Major Discretely Presented Component Units: | |
| Combining Statement of Net Position | 50–51 |
| Combining Statement of Activities | 52 |
| Notes to Basic Financial Statements | 53–308 |

# COMMONWEALTH OF PUERTO RICO

### Table of Contents

| | Page(s) |
|---|---|
| **Required Supplementary Information (Unaudited)** | |
| Schedule of Funding Progress – Defined-Benefit Pension Plans | 310 |
| Schedule of Funding Progress – Postemployment Healthcare Plans | 311 |
| Schedule of Employers' Contributions | 312 |
| Schedule of Revenue and Expenditures – Budget and Actual – Budgetary Basis – General Fund | 313 |
| Notes to Required Supplementary Information | 314–317 |
| **Combining and Individual Fund Financial Statements and Schedules** | |
| General Fund: | |
| General Fund | 319 |
| Supplemental Schedule of Expenditures by Agency – Budget and Actual – Budgetary Basis | 320–322 |
| Nonmajor Governmental Funds: | |
| Nonmajor Governmental Funds | 323–324 |
| Combining Balance Sheet | 325 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances | 326 |
| Nonmajor Proprietary Funds: | |
| Nonmajor Proprietary Funds | 327 |
| Combining Statement of Net Position | 328 |
| Combining Statement of Revenue, Expenses, and Changes in Fund Net Position | 329 |
| Combining Statement of Cash Flows | 330 |
| Fiduciary Funds: | |
| Fiduciary Funds | 331–332 |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 333 |
| Combining Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds | 334 |

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

|  | Page(s) |
|---|---|
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 335 |
| Nonmajor Discretely Presented Component Units: | |
| Nonmajor Discretely Presented Component Units | 336 |
| Combining Statement of Net Position | 337–343 |
| Combining Statement of Activities | 344 |

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2014

**Special Revenue Funds**

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

*Public Buildings Authority Special Revenue Fund* – The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's Primary Government agencies.

*The Children's Trust Special Revenue Fund* – The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

*Puerto Rico Infrastructure Financing Authority's Special Revenue Fund* – The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. Under Act No. 44 of June 21, 1988, as amended, the Commonwealth transfers to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds. This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

*Special Communities Perpetual Trust's Special Revenue Fund* – The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain under privileged communities.

**Debt Service Funds**

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

*The Children's Trust Debt Service Fund* – The debt service fund of The Children's Trust accounts for the financial resources that are restricted, committed, or assigned to expenditure for the payment of interest and principal on long-term obligations financed with moneys to be received by the Commonwealth from the global settlement agreement signed by certain tobacco companies.

(Continued)

# 17. Commonwealth Audited Financial Statement (June 30, 2015), ECF No. 13311-5

# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements
and Required Supplementary Information

June 30, 2015

(With Independent Auditors' Report Thereon)

CONFIDENTIAL

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

|  | Page(s) |
|---|---|
| Independent Auditors' Report | 1–13 |
| Management's Discussion and Analysis (Unaudited) | 14–38 |
| Basic Financial Statements: |  |
| Government-Wide Financial Statements: |  |
| Statement of Net Position | 39–40 |
| Statement of Activities | 41–42 |
| Fund Financial Statements: |  |
| Governmental Funds: |  |
| Balance Sheet | 43 |
| Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 44 |
| Statement of Revenue, Expenditures, and Changes in Fund Balances | 45 |
| Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances – Governmental Funds to the Statement of Activities | 46 |
| Proprietary Funds: |  |
| Statement of Net Position | 47 |
| Statement of Revenues, Expenses, and Changes in Fund Net Position | 48 |
| Statement of Cash Flows | 49–50 |
| Fiduciary Funds: |  |
| Statement of Fiduciary Net Position | 51 |
| Statement of Changes in Fiduciary Net Position – Pension (and Other Employee Benefit) Trust Funds | 52 |
| Discretely Presented Component Units: |  |
| Combining Statement of Net Position | 53–54 |

CW_STAY0009786

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

|  | Page(s) |
|---|---|
| Combining Statement of Activities | 55 |
| Notes to Basic Financial Statements | 56–340 |
| **Required Supplementary Information:** | |
| Schedule of Changes in the Commonwealth's Net Pension Liability for Single-Employer Pension Plans | 342 |
| Schedule of the Commonwealth's Proportionate Share of the Net Pension Liability of the Cost-Sharing Multiple-Employer Pension Plan | 342 |
| Schedule of Employers' Contributions - All Pension Plans | 343 |
| Schedule of Actuarial Methods and Assumptions - All Pension Plans | 344 |
| Schedule of Funding Progress for the Postemployment Healthcare Plans | 345 |
| Schedule of Employers' Contributions for the Postemployment Healthcare Plans | 346 |
| Schedule of Revenue and Expenditures – Budget and Actual – Budgetary Basis – General Fund | 347 |
| Notes to Required Supplementary Information | 348–351 |
| **Combining and Individual Fund financial Statements and Schedules** | |
| General Fund: | |
| General Fund | 353 |
| Schedule of Expenditures by Agency – Budget and Actual – Budgetary Basis – General Fund | 354–356 |
| Nonmajor Governmental Funds: | |
| Nonmajor Governmental Funds | 357–359 |
| Combining Balance Sheet | 360 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances | 361 |
| Nonmajor Proprietary Funds: | |
| Nonmajor Proprietary Funds | 362 |

CW_STAY0009787

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

|  | Page(s) |
|---|---|
| Combining Statement of Net Position | 363 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Net Position | 364 |
| Combining Statement of Cash Flows | 365 |
| Fiduciary Funds: |  |
| Fiduciary Funds | 366–367 |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 368 |
| Combining Statement of Changes in Fiduciary Net Position – (and Other Employee Benefit) Trust Funds | 369 |
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 370 |
| Nonmajor Discretely Presented Component Units: |  |
| Nonmajor Discretely Presented Component Units | 371 |
| Combining Statement of Net Position | 372–378 |
| Combining Statement of Activities | 379 |

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2015

### Special Revenue Funds

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

#### *Public Buildings Authority Special Revenue Fund*

The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's Primary Government agencies.

#### Puerto Rico Infrastructure Financing Authority's Special Revenue Fund

The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. Under Act No. 44 of June 21, 1988, as amended, the Commonwealth conditionally allocates to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds. This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

#### *Port of the Americas Authority's Special Revenue Fund*

The special revenue fund of Port of the Americas Authority, a blended component unit, is used to account for its remaining legal and certain other administrative requirements resulting after the transfer of all rights and duties to PPA. The main purpose of the PAA was the planning, development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico.

#### *Special Communities Perpetual Trust's Special Revenue Fund*

The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain under privileged communities.

#### *The Children's Trust Special Revenue Fund*

The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

357 (Continued)

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2015

### *University of Puerto Rico Comprehensive Cancer Canter's Special Revenue Fund*

The special revenue fund of the UPRCCC, a blended component unit, is used to account for the moneys received from the Commonwealth and certain other grants from both the private sector and the Federal government, to execute public policy related to the prevention, orientation, investigation and treatment of cancer in Puerto Rico. The medical and hospital operations of the UPRCCC, for which fees will be charged to patients, has not commenced at June 30, 2015.

### Debt Service Funds

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

### *Public Buildings Authority Debt Service Fund*

A blended component unit engaged in the construction and/or acquisition of building facilities for lease mainly to the Commonwealth's Primary Government agencies. Its debt service fund is used to account for the financial resources that are restricted, committed, or assigned to expenditure for the payment of revenue bonds and other liabilities incurred to finance the construction of the buildings and facilities.

### *Puerto Rico Infrastructure Financing Authority's Debt Service Fund*

The debt service fund of the Puerto Rico Infrastructure Financing Authority accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its special tax revenue bonds. These resources are received from operating transfers from the Puerto Rico Infrastructure Financing Authority Special Revenue Fund.

### *Port of the Americas Authority's Debt Service Fund*

The debt service fund of of Port of the Americas Authority is used to account for the financial resources that are restricted for the payment of the long-term debt that remained at PAA after the transfer of its operations to PPA. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

### *Puerto Rico Maritime Shipping Authority Debt Service Fund*

This is the remainder of a former shipping company owned by the Commonwealth. Its debt service fund is used to account for the financial resources that are restricted for the payment of the long-term liability that resulted from the sale of its marine operations. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

(Continued)

CONFIDENTIAL

CW_STAY0010146

**COMMONWEALTH OF PUERTO RICO**

Fiduciary Funds

Year ended June 30, 2015

single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

**Agency Fund**

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits**

This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections, and agency accounts for which the Commonwealth act in an agent's capacity.

367