# **Volume I**

## Government Parties' PRIFA Demonstrative No. 1

**PRIFA – Flow of Funds**

Federal Government imposes and collects rum excise taxes. 26 U.S.C. § 5001(a)(1) ("**Rum Taxes**")

CW Lockbox (held by Citi)

Federal Government covers the Rum Taxes to the treasury of Puerto Rico with no strings attached (26 U.S.C. § 7652) ("**Rum Tax Remittances**" or "**Offshore Excise Taxes**") and Treasury deposits the Rum Tax Remittances into Commonwealth Lockbox Account pursuant to Lockbox Agreement[2]

Pursuant to the Trust Agreement[1]
"**Offshore Excise Taxes**" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government **and** remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law. Trust Agreement §101

TSA (held by CW).
PRIFA has no control or access[3]

Other amounts of Rum Tax Remittances are remitted by Lockbox Paying Agent (Citibank) in accordance with Lockbox Agreement

Lockbox Paying Agent (Citibank) remits the first $117m of Rum Tax Remittances to the TSA where it is commingled with other funds, including other Rum Tax Remittances, and recorded with revenue account code "**R4220**" and the General Fund fund code

Commonwealth appropriation to Infrastructure Fund (3 LPRA 1914) preempted by PROMESA and not made since 2016.[4]

Infrastructure Fund
(maintained by or on behalf of PRIFA)

Pursuant to Trust Agreement §401 "[PRIFA] shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund"

Historically, the Commonwealth appropriated $117m and deposited such monies into the Infrastructure Fund for PRIFA's "corporate purposes" and subject to Section 8 Article IV of PR Constitution. 3 L.P.R.A. § 1914. ("**Special Tax Revenues**")

"**Special Tax Revenues**" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act. Trust Agrmnt §101

Sinking Fund (held by Trustee in trust)

PRIFA Bondholder security interest and recourse limited to Sinking Fund (Trust Agrmnt § 601)

Section 401 requires PRIFA, as promptly as practicable upon receipt of Special Tax Revenues, to withdraw Special Tax Revenues from the Infra. Fund and deposit them into one of three Sinking Fund sub-accounts. ("**Pledged Revenues**")

"**Pledged Revenues**" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund. Trust Agrmnt §101

1. Oct. 1, 1988 Trust Agreement between PRIFA and Citibank, N.A. (as Trustee)
2. May 5, 2015 Lockbox Agreement between Government of Puerto Rico, Banco Popular (as trustee), and Citibank, N.A. (as paying agent)
3. Declaration of Timothy H.Ahlberg, dated April 27, 2020 ¶ 4 [Adv. Pro. 20-0003-LTS; ECF No. 53].
4. Declaration of Michael Mervis [Case No. 17-3283-LTS; ECF No. 13161] Ex. J (2016 Commonwealth Budget Resolution) (CW_STAY0001141 at 24).

**<u>Government Parties' PRIFA Demonstrative No. 2</u>**

Case:17-03283-LTS    Doc#:13343-1    Filed:06/02/20    Entered:06/02/20 15:06:51    Desc:
Volume(s) I    Page 5 of 222

Laws of Puerto Rico Annotated Currentness
  Title 3. Executive
    Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1901

§ 1901 Purpose

The construction, rehabilitation, acquisition, repair, preservation and replacement of the infrastructure of the Commonwealth, or any part thereof, is essential to the general welfare. It is a fact that it is occasionally necessary for the Commonwealth to give financial, administrative, or other assistance to public corporations and instrumentalities of the Commonwealth, to allow them to fulfill their public purpose to provide, preserve, operate, maintain, repair, replace, and improve parts of the infrastructure of Puerto Rico. It is hereby stated that the people of Puerto Rico shall benefit by providing an alternate method of financing our infrastructure needs. It is necessary to immediately establish a Water Pollution Control Revolving Fund and a Commonwealth Potable Water Revolving Fund, and the special standards and provisions that are essential for their administration, so that the Commonwealth may benefit from the Federal Capital Grants program established under Title VI of the Federal Clean Water Act, as amended, and Title I of the Federal Clean Water Act, as amended, or any otter similar or related federal legislation or regulations. It is the firm intent of the Legislature of Puerto Rico to adopt whatever measures are necessary and convenient to fulfill the abovementioned needs and purposes, and to do so, it hereby creates the Puerto Rico Infrastructure Financing Authority, as a public corporation and instrumentality of the Commonwealth, which is an independent body corporate and politic, and establishes the Water Pollution Control Revolving Fund and the Commonwealth Potable Water Revolving Fund.

Credits
June 21, 1988, No. 44, § 2; July 7, 1997, No. 32, § 1.

**History**

**Transfer. Section 1 of Act Aug. 18, 1994, No. 88, ascribed the Puerto Rico Infrastructure Financing Authority, created by Act June 21, 1988, No. 44, §§ 1901 1920 of this title, to the Government Development Bank, that was creat ed by Act Sept. 23, 1948, No. 17, as amended, codified under §§ 551 606 of Title 7.**

**Text references. Title VI of the Federal Clean Water Act, as amended, referred to in the text, is Act Feb. 4, 1987, P.L. No. 100-4, T. II, 101 Stat. 22, §§ 1381 et seq. of Title 33, U.S.C. The Federal Safe Drinking Water Act mentioned in the text is to the Act December 16, 1974, P.l. 93-523, 88 stat. 1660, codified under 42 U.S.C §§ 300f et s eq., known as the 'Safe Drinking Water Act'.**

**Amendments  1997.Act 1997 added references to the Commonwealth Potable Water Revo lving Fund and 'Title I of the Federal Clean Water Act'.**

**Statement of motives. June 21, 1988, No. 44. July 7, 1997, No. 32.**

**Title. Section 1 of Act June 21, 1988, No. 44, provides: 'This Act thi s chapter shall be known as the Puerto Rico Infrastructure Financing Authority Act.'**

**Repealing clause. Section 7 of Act July 7, 1997, No. 32, provides: 'Any provision
or portion of any act that contravenes what is provided herein, is repealed.'**

3 L.P.R.A. § 1901, PR ST T. 3 § 1901

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto
Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

Laws of Puerto Rico Annotated Currentness
  Title 3. Executive
    Chapter 67. Puerto Rico Infrastructure Financing Authority Act

---

3 L.P.R.A. § 1902

§ 1902 Definitions

The following words and terms when used or referred to in this chapter, shall have the meaning indicated unless it is otherwise clearly construed from the context:

(a) Authority. Shall mean the Puerto Rico Infrastructure Financing A uthority established by this chapter, or if said Authority should be abolished or otherwise divested of its functions under this chapter, the public body or entity which succeeds it in its main functions or in which the rights, powers and duties conferred by this chapter to the Authority, are vested.

(b) Benefited entity. Shall mean every municipality, public corporat ion, political subdivisions or instrumentality of the Commonwealth to which financial, administrative, consulting, technical, advisory or other assistance is provided, pursuant to the provisions of this chapter.

(c) Board. Shall mean the Board of Directors of the Authority create d hereby and if said Board is abolished, whatever Board or entity that succeeds it in the performance of its main functions.

(d) Bonds. Shall mean bonds, temporary bonds, refunding bonds, oblig ations, notes, bond anticipation notes, interim receipts or provisional bonds, certificates, or any other evidences of indebtedness of the Authority issued under the provisions of this chapter.

(e) Clean Water Act. Shall mean the 1972 Water Pollution Control Act , P.L. 92-500 as amended and the regulations promulgated thereunder.

(f) Commmonwealth. Shall mean the Commonwealth of Puerto Rico.

(g) Revolving Fund. Shall mean collectively, the Puerto Rico Water P ollution Control Fund and the Commonwealth Potable Water Revolving Fund, each of which shall be constituted independent and separate from any other Commonwealth fund, and in accordance with the provisions and purposes of Title VI of the Clean Water Act and Title I of the Federal Clean Water Act, respectively, or any other similar or related federal legislation or regulations.

(h) Government Development Bank. Shall mean the Government Developme nt Bank for Puerto Rico, created by §§ 551 et seq. of Title 7.

(i) Infrastructure. Shall mean those capital works and facilities of substantial public interest, such as aqueduct and sewer systems, including all water supply, treatment and distribution systems, and waste water treatment and disposal systems, improvements financed under the provisions of the Federal Clean Water Act and the Federal Drinking Water Act, or any other similar or related federal legislation or regulations, solid and hazardous waste disposal systems, resource recovery systems, electric power systems, expressways, highways, pedestrian walkways, parking facilities, airports, convention centers, bridges, maritime ports, tunnels, transportation

---

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                1

systems including mass transit systems, communication systems including telephones, industrial facilities, land and natural resources, public housing projects and all other tourist, medical and agro-industrial infrastructure facilities.

(j) Development Fund. Shall mean the Infrastructure Development Fund created under § 1914a of this title, pursuant to the provisions of §§ 43 1 et seq. of Title 27.

(k) Assistance contract. Shall mean any contract, including a lease, sublease, or other type of agreement, contract or written instrument, executed between the Authority and a benefited agency, whereby the Authority agrees to provide to said entity financial, administrative, consulting, technical, advisory or any other type of assistance, pursuant to the provisions of this chapter.

(l) Person. Shall mean any individual, corporation, partnership, joi nt venture, association, stock company, trust or unincorporated organization, or any agency, department, instrumentality, or political subdivision of the Government of the Commonwealth of Puerto Rico, or any other entity created, organized or existing under the laws of the latter or of the United States or any of its statesor of any foreign country or any combination of the above.

(m) Clean Water Act. Shall mean the 1944 Clean Water Act, as amended , and regulations promulgated thereunder.

(n) Fees for benefits. Shall mean the fees imposed on the real prope rty of a special improvements district which is exclusively and substantially benefited by the improvement, construction or repair of infrastructure carried out or being carried out in said district, to defray the cost and maintenance of said improvement, construction or repair. The amount to be imposed on each property shall be based solely on the profit or utility said particular property receives. The fees for benefits shall constitute a tacit legal lien security for the payment of the fees for benefits described in the resolution issued by the Authority pursuant to the provisions of this chapter.

(o) Special improvements district, district(s). Shall mean that geog raphical area established pursuant to the procedures provided by this chapter, which benefits particularly and substantially by the improvement, construction or repair of infrastructure carried out or being carried out in said district pursuant to the provisions of this chapter.

(p) Planning Board. Shall mean the Puerto Rico Planning Board create d by virtue of §§ 62 et seq. of Title 23.

(q) United States. Shall mean the United States of America.

(r) Corpus Account. Shall mean the account of the corpus of the Deve lopment Fund as established in subsection (a) of § 1914a of this title. The c apital yield generated by this account must be used as established in § 1914a of this title.

(s) Additional accounts. Shall mean accounts created within the Deve lopment Fund, in addition to the Corpus Account, that are needed to carry out the purposes of this chapter, as established in subsection (a) of § 1914a of th is title.

**Credits**

June 21, 1988, No. 44, § 3; July 7, 1997, No. 32, § 2; June 24, 1 998, No. 92, § 1; Jan. 14, 2009, No. 3, § 1.

## History

**Text references. The Clean Water Act, 1972 Water Pollution Control Act, P.L. No. 92-500, as amended, mentioned in subsection (e), is Act Oct. 18, 1972, 86 Stat. 816, 33 U.S.C. §§ 1251 et seq. Title VI of the Federal Clean Water Act mentioned in subsections (g) and (i) as amended is Act Feb. 4, 1987, P.L. No. 100-4, T. II, 101 Stat. 22, 33 U.S.C. § § 1381 et seq. The Federal Safe Drinking Water Act mentioned in subsections (g) and (i) is to the Act December 16, 1974, P.L. 93-253, 88 stat. 1660, codified under 42 U.S.C §§ 300f et seq., known as the 'Safe Drinking Water Act'. Amendments 2009.Subsection (r): Act 2009 substituted 'exclusively to provide i nfrastructure facilities related to aqueduct and sewer systems, including all water supply, treatment and distribution systems and waste water treatment and disposal systems and improvements financed under the provisions of the Federal Clean Water Act and the Federal Drinking Water Act, or any similar or related federal legislation or regulations' with 'as established in § 1914a of this tit le' at the end of this subsection. 1998.Subsection (b): Act 1998 substituted 'public corporation' wi th 'municipality, public corporation, political subdivision'. Subsection (i): Act 1998 amended this section generally. Subsection (j): Act 1998 added this subsection. Subsections (k) and (l): Act 1998 former subsections (j) and (k) as (k) and (l) and amended them generally. Subsection (m): Act 1998 redesignated former subsection (l) as (m). Subsections (n) (s): Act 1998 added these subsections. 1997.Subsection (g): Act 1997 amended this subsection generally. Subsection (i): Act 1997 inserted the reference to the Federal Clean Water Act. Subsection (l): Act 1997 added this subsection.**

**Effectiveness. Section 23 of Act June 24, 1998, No. 92, provides: 'This act this chapter shall take effect immediately after its approval, with the exception of §§ 6 7, 8, 9, 10, 11, 12, 13 and 14 §§ 1906b 1906j of thi s title], which shall take effect ninety (90) days after the approval of this act this chapter].'**

**Statement of motives. July 7, 1997, No. 32. June 24, 1998, No. 92. Jan. 14, 2009, No. 3.**

**Separability. Section 3 of Act Jan. 14, 2009, No. 3, provides: 'Should any provision of this Act which amended §§ 1902 and 1914a of this title or the application thereof be declared invalid, said ruling shall not affect the remaining provisions nor the application of this Act that could be in effect without the need for the provisions that were declared invalid, and to this end, the provisions of this Act are separable.'**

**Repealing clause. Section 22 of Act June 24, 1998, No. 92, provides: 'A ny provision of law or portion thereof which contravenes what is provided herein is hereby repealed. Likewise, should any part, paragraph or section of this act this chapter be declared null and void by a Court of competent jurisdiction, the judgment issued to that effect shall only affect that part, paragraph or Section which has been declared null and void.' See note under § 1901 of this title.**

3 L.P.R.A. § 1902, PR ST T. 3 § 1902

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

End of Document
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Laws of Puerto Rico Annotated Currentness
Title 3. Executive
Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1906

§ 1906 General powers

The Authority shall have all the necessary and convenient powers to carry out and accomplish the purposes and provisions of this chapter, including but without being limited to the following:

(a) Adopt bylaws for the administration of its corporate affairs and business and adopt the regulations and standards needed to exercise its functions and duties.

(b) Adopt an official seal and alter it at will.

(c) Maintain one or more offices in the municipality of San Juan or in any other place within or without Puerto Rico as it may deem necessary.

(d) Sue and be sued in its own name, to implead and be impleaded.

(e) Receive and administer any gift, grant, loan or donation of any property or money, including but without being limited to those made by the Commonwealth and the federal government or any agency or instrumentality thereof, and lend or expend the proceeds thereof for any of its corporate purposes and comply with all such conditions and requirements with respect thereto, including those for the administration of the Revolving Fund, under the Federal Clean Water Act, created by § 1915 of this title, and under the Federal Drinking Water Act, cr eated by § 1915a of this title, and to take all steps to meet those condition s and otherwise exercise such powers as may be needed to obtain the benefits of the programs established pursuant to the Federal Clean Water Act and the Federal Drinking Water Act, or any other similar or related federal legislation or regulations, for the Commonwealth.

(f) Provide any type of assistance to a benefited entity which is consistent with the purposes of this chapter, such as (but without being limited to):

(1) Provide funds in the form of loans, grants or assignments, interest subsidies, credit backing, reserves for losses or transfer of financial resources.

(2) Pay or provide for the payment (all at once or from time to time) of any debt of the benefited entity, in full or in part.

(3) Assume all or part of the obligations of the benefited entity.

(4) Guarantee the payment of any debt of the benefited entity.

(5) Execute lease, sublease, loan or financing contracts with a benefited entity.

(6) Provide the assistance deemed necessary to obtain financial backing or letters of credit or similar credit backing.

(g) Make and execute, with any person, contracts, leases, subleases and all such other necessary or convenient instruments and agreements to exercise the powers and functions conferred on the Authority by this chapter and negotiate and execute assistance contracts with benefited entities.

(h) Acquire in any lawful manner, including but not limited to, by purchase, eminent domain, lease, donation, or other legal means, real or personal property, improved or unimproved, encumbered or unencumbered, and property rights of land, as necessary or convenient, to exercise the powers and functions conferred on the Authority under this chapter.

(i) Sell, lease, assign, transfer, convey, exchange, mortgage, or otherwise dispose of or encumber any property. The Authority may also lease, reacquire or otherwise obtain title to, or hold any property which it has previously sold, leased or otherwise conveyed, transferred or disposed of.

(j) Grant options for the purchase of any property or the renewal of any lease granted by it in connection with any of its properties, under such terms and conditions as it may deem advisable.

(k) Pledge or assign any moneys, income, fees or any other revenues, as well as the proceeds from the sale of properties, and compensation under the provisions of insurance policies or condemnation awards.

(l) Borrow money and issue bonds of the Authority for any of its corporate purposes, including, but not limited to, financing the construction, rehabilitation, purchase, repair, conservation and replacement of portions of the infrastructure of the Commonwealth, and for lending or otherwise providing funds to any benefited entity, including, without it being a limitation, for the payment of all or any part of any indebtedness of such benefited entity or for any other purposes authorized by this chapter.

(m) Mortgage or pledge any property for the payment of the principal of and interest on any bonds issued by the Authority, or bonds issued by a benefited entity, and pledge all or a portion of such revenues as the Authority may receive including, but not limited to, and subject to the provisions of § 8 of Ar ticle VI of the Constitution of the Commonwealth of Puerto Rico, all or any portion of the federal excise taxes or other funds which should have been transferred by the Commonwealth to the Authority.

(n) Commence any legal action, including, but not limited to, proceedings for writs of mandamus and injunctions, to protect or enforce any right conferred upon it by any law, contract or other agreement and, notwithstanding any provision of law to the contrary, exercise any remedy provided for breach under any contract or other agreement, as provided by such contract or agreement.

(o) Appoint officers and hire agents and employees and fix their powers and duties as the Authority may determine and, without being a limitation, contract consulting engineers, architects, superintendents, general contractors, managers, attorneys, accountants and other consultants and contractors as determined by the Authority and delegate such functions and powers to such persons as the Authority may designate, and fix and pay the corresponding remuneration from funds available to the Authority therefor. The directors, officers and employees of the Authority shall be subject to the provisions of §§ 1801 et seq. of this title, known as the 'Ethics in Government Act of the Commonwealth of Puerto R ico'.

(p) Purchase insurance against loss in such amounts and from such insurers which it deems desirable which may include, without being limited to, civil liability insurance for directors, officers, agents and employees.

(q) Invest its funds as authorized by a resolution of the Board, subject to any restrictions in trust agreements or resolutions authorizing bond issues.

(r) Purchase bonds issued by the Authority, subject to the provisions of any contract with the holders of such bonds; and purchase any bonds or other obligations issued by municipalities, political subdivisions, public corporations and instrumentalities of the Commonwealth, and to sell without relation to cost such bonds or other obligations at such prices and in such manner as the Authority shall deem advisable.

(s) Construct, rehabilitate, repair, preserve, replace, extend, improve, renovate, furnish, equip, maintain and operate portions of the infrastructure and other property that are used or may be useful to provide portions of the infrastructure, or to cause them to be constructed, rehabilitated, repaired, preserved, replaced, extended, improved, renovated, furnished, equipped, maintained and operated and to pay all or any part of the costs thereof from the funds of the Authority available therefor, including those it may receive from any benefited entity.

The Authority shall be exempt from complying with any public auction and bidding requirement for the adjudication of construction, purchase, or any other types of contracts when it is deemed necessary and convenient to comply with the public purposes of this chapter and is so authorized by the Board in each particular case, by a resolution to such effect. Said resolution shall state the circumstances which justify that the Authority may be exempted from the public bidding requirements. A copy of said resolution shall be submitted to the Office of the Secretary of each Legislative Body within five (5) working days after the Board adopts said resolution.

(t) Fix, impose and collect rentals, fees, rates and other charges for the use of any of its properties, including portions of the infrastructure, and for its services, without being subject to any limitations that would be applicable if such property were owned or operated or such services were provided by any other persons. The Authority shall not bind any benefited entity to increase any rent, charge or fee for its services, without complying with the provisions of §§ 261 et seq. of Title 27, which provides a uniform procedure for the esta blishment of rates.

(u) Provide advisory, consulting, technical and administrative assistance to the municipalities, public corporations, political subdivisions and instrumentalities of the Commonwealth to enable them to provide, operate, maintain and improve the infrastructure.

(v) Propose to the Legislature the creation of companies, partnerships or subsidiary, affiliated or associated corporations, and acquire, hold, dispose of securities and shares, contracts, bonds, or other interests in other companies, entities or corporations and exercise each and every one of the powers and rights that such interest grants it, provided that in the judgment of the Board of Directors, said measure is necessary, proper or convenient to attain the purposes of the Authority or to exercise its powers, and sell, lease, cede, or otherwise transfer any property of the Authority, or to delegate or transfer any of its rights, powers, functions, or duties, except the power of eminent domain to any company, entity or corporation that may be under its entire or partial control; Provided, That the powers granted herein do not extend to the sale, lease, cession, or other form of transfer of the affiliates or subsidiaries to be created by this subsection but rather exclusively extend to the assets thereof. The affiliated or subsidiary corporations herein created shall render an annual report to the Legislature no later than February 28 of each year.

However, the Industrial Development Company and its Executive Director shall be responsible for evaluating, acquiring with title deed, selecting and developing the Transshipment Port Industrial Park and the added value industries and activities to be established in said area.

(w) Indemnify any of its directors, officers, agents or employees for any liability incurred in the performance of their duties and responsibilities as provided in § 1903 of this title.

(x) Exercise any additional powers and rights that have been granted or shall be legally bestowed on the benefited entities in the future.

(y) Exercise all the powers inherent to the functions, prerogatives and responsibilities conferred to it by this chapter and perform any act or activity which is necessary or convenient to carry out its purposes.

**Credits**

June 21, 1988, No. 44, § 7; July 7, 1997, No. 32, § 4; June 24, 1 998, No. 92, § 4; Oct. 17, 2000, No. 421, § 1.

**History**

**Text references.** The Federal Safe Drinking Water Act mentioned in the text is to the Act December 16, 1974, **P.L. 93-523,** 88 stat. 1660, codified under **42 U.S.C §§ 300f et seq.,** known as the 'Safe Drinking Water Act'. Title VI of the Federal Clean Water Act as amended is Act Feb. 4, 1987, **Public Law No. 100-4,** T. II, 101 Stat. 22, **33 U.S.C. §§ 1381 et seq.** Amendments 2000.Act 2000 added subsection (v) and redesignated former subsection s (v) (x) as (w) (y), respectively. 1998.Subsection (e): Act 1998 added the references to the Federal Cle an Water Act and the Federal Drinking Water Act. Subsection (f): Act 1998 amended this subsection generally. Subsection (u): Act 1998 added 'to the municipalities' and 'political sub divisions' in this subsection. 1997.Subsection (e): Act 1997 amended this subsection generally.

**Effectiveness.** See the effectiveness note under § 1902 of this title.

**Statement of motives.** July 7, 1997, No. 32. June 24, 1998, No. 92. Oct. 17, 2000, No. 421.

**Repealing clause.** See the notes under §§ 1901 and 1902 of this title.

**Constitutional provisions.** Section 8, Article VI, see Constitution of the Commonwealth, preceding Title 1.

**Temporary provisions.** Section 3 of Act Oct. 17, 2000, No. 421, provides: 'Requirements to be included in counseling and advisory contracts: '(1) Any work, counseling or advisory contract for the development of the faci lities of the Transshipment Port and of any companies, partnerships or subsidiaries, affiliated or associated corporations, intervening in the development thereof, shall contain a clause expressly providing that any natural or juridical person who has intervened in the evaluation process of the Transshipment Port or this legislation, by advising any agency, instrumentality or public corporation of the Government of Puerto Rico, may not, within the four years following approval of this Act, hold a position or have a pecuniary interest in the natural or juridical persons created or selected to develop, operate or otherwise participate in the Transshipment Port project established under this Act which amended this section]. Failure to comply with this contractual clause shall result in the restitution of all fees received from the execution of said contract. '(2) Any invitation made through bidding or proposal process for the developme nt of the transshipment port as well as for the development of its facilities, shall be notified in the media outside Puerto Rico, specifically the Internet, and any natural or juridical person who gives Puerto Rico a treatment different than that usually granted to the states of the United States shall be disqualified from participating in said process. '(3) In order to provide more access roads to the Transshipment Port, the Secr etary of Transportation and Public Works shall include in the five-year Development Plan the construction of the PR-10 expressway, between the municipalities of Utuado and Adjuntas, as well as the conversion into expressway of the stretch between Ponce to Aguadilla of PR-2, within a period not greater than one (1) year as of the approval of this Act Oct. 17, 2000].'

**Special provisions.** Section 2 of Act Oct. 17, 2000, No. 421, provides: 'All provisions of Act No. 135 of December 2, 1997, as amended §§ 10101 et seq. of Title 13], known as the 'Tax Incentives Act of 1998'

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**are hereby exte nded to any eligible business related to port or maritime development or operations and to enterprises or business of added value to be established therein to provide support to the transshipment port.'**

**Cross references.**

Uniform Administrative Procedure Act, see §§ 2101 2201 of this title .

3 L.P.R.A. § 1906, PR ST T. 3 § 1906

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

---

**End of Document**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  5

Laws of Puerto Rico Annotated Currentness
  Title 3. Executive
    Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1907

§ 1907 Bonds of the Authority

The Authority is hereby authorized to issue bonds from time to time for such principal amounts which, in the opinion of the Authority, are necessary to provide sufficient funds to finance infrastructure including, but not limited to, all costs of developing and designing infrastructure projects, for the repayment of obligations of, or provide financial assistance to public corporations, municipalities, political subdivisions and instrumentalities of the Commonwealth which provide infrastructure, to pay interest on its bonds for such a period as the Authority may determine, and to pay such other expenses of the Authority or such other benefited entities, including, but not limited to, working capital, which are incidental, necessary or convenient to execute its or their corporate purposes and powers, and to pay any costs for their issue and to establish reserves to secure such bonds. The Authority may also issue bonds to acquire or refinance obligations of any benefited entity.

(a) The bonds issued by the Authority may be payable from all or any part of the gross or net revenues and other income derived by the Authority which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth as provided in the trust agreement or resolution whereby the bonds are issued. The principal of, and interest on, the bonds issued by the Authority may be secured by a pledge of all or part of any of its revenues which, subject to the provisions of § 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, may include the proceeds of any tax or other funds which may be made available to the Authority by the Commonwealth, all as provided in the trust agreement or resolution under which the bonds are issued. Such pledge shall be valid and binding from the time it is made without the need for a public or notarized instrument. The revenues so pledged, including those subsequently received by the Authority, shall immediately be subject to said lien without the need of the physical delivery thereof or any other act, and said lien shall be valid and binding and shall prevail against any third party having any kind of claim against the Authority for damages, breach of contract or other reasons, regardless of whether such third party has been so notified. Neither the trust agreement, nor the bond resolution, nor any collateral agreement by which the Authority's rights on any revenues are pledged or assigned shall have to be presented or recorded in order to perfect the lien thereon against any third party except in the records of the Authority. The resolution or resolutions authorizing the bond issue or the trust agreement securing the bonds may contain provisions which shall be part of the contract with the holders of the bonds issued under such resolution or resolutions or under such trust agreement regarding the pledge and creation of liens on the Authority's revenues and assets, the creation and maintenance of redemption and reserv e funds, limitations concerning the purposes to which bond proceeds may be applied, limitations concerning the issuance of additional bonds, limitations concerning the introduction of amendments or supplements to such resolution or resolutions, or to the trust agreement, the granting of rights, powers and privileges and the imposition of obligations and responsibilities upon the trustee under any trust agreement or resolution, the rights, powers, obligations and liabilities that shall arise in the event of a default of any obligation under such resolution or resolutions or under such trust agreement, or in connection with any rights, powers or privileges conferred on the bondholders as security for the bonds in order to enhance their marketability.

(b) The bonds may be authorized by a resolution or resolutions of the Board. They may be serial bonds, bear such date or dates, mature at such a term or terms not to exceed fifty (50) years from the respective dates of

issue and may accrue interest, if any, at such interest rate or rates (which may be fixed or variable) that do not exceed the maximum allowable legal rate at the time. The bonds may be payable in such place or places, whether within or outside the Commonwealth, may be of such a denomination or denominations, and in such a form, as coupon bonds or registered bonds, may have such registration or conversion privileges, may be issued in book-entry form, may be executed in such a manner, may be payable by such means of payment, may be subject to such redemption terms, with or without premiums, may provide for the replacement of mutilated, destroyed, stolen or lost bonds, may be authenticated in such a manner and upon compliance with such conditions, and contain such terms and conditions, and be issued in temporary form, pending the execution and delivery of final bonds as may be provided in the resolution or resolutions or the terms provided in the trust agreement. The bonds may be exchanged for obligations of the benefited entity or may be sold at public or private sales at the price or prices the Authority may determine; Provided, however, That refinancing bonds may be sold or exchanged for outstanding bonds of the Authority or the benefited entity on such terms as the Authority may deem are in its best interest.

(c) The proceeds from the sale of each bond issue shall be disbursed in such manner and under such restrictions, if any, as the Authority may provide in the resolution or resolutions authorizing the bond issue or in the trust agreement securing such bonds.

(d) The bonds of the Authority bearing the signatures of the officers thereof who were in office on the date said bonds were signed shall be valid and binding obligations, even though any or all the officers whose signatures or facsimile signatures appear thereon have ceased as such officers of the Authority before the delivery and payment of said bonds. Any trust agreement or resolution securing the bonds shall provide that any such bonds may contain a statement to the effect that they were issued pursuant to the provisions of this chapter, and any bond containing such statement under the authority of any such trust agreement or resolution shall be conclusively deemed to be valid and to have been issued pursuant to the provisions of this chapter. Neither the members of the Board of the Authority nor any person executing the bonds shall be personally liable, nor shall they be subject to any civil liability for the issuance of said bonds.

**Credits**
June 21, 1988, No. 44, § 8, renumbered as § 18 and amended on June 24, 1998, No. 92, §§ 5, 15.

<p style="text-align:center"><strong>History</strong></p>

<p style="text-align:center"><strong>Codification. Subsection (b) of this section is assigned as it appears in the original act of June 21, 1988, No. 44, p. 192, whose § 8 constitutes this section.</strong></p>

<p style="text-align:center"><strong>Amendments  1998.Act 1998 amended this section generally.</strong></p>

<p style="text-align:center"><strong>Effectiveness. See note under § 1902 of this title.</strong></p>

<p style="text-align:center"><strong>Statement of motives. June 24, 1998, No. 92.</strong></p>

<p style="text-align:center"><strong>Repealing clause. See the note under § 1902 of this title.</strong></p>

<p style="text-align:center"><strong>Constitutional provisions. Section 8, Article VI, see the Constitution of the Commonwealth, preceding Title 1.</strong></p>

3 L.P.R.A. § 1907, PR ST T. 3 § 1907

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

Case:17-03283-LTS   Doc#:13343-1   Filed:06/02/20   Entered:06/02/20 15:06:51   Desc:
Volume(s) I   Page 17 of 222

Laws of Puerto Rico Annotated Currentness
  Title 3. Executive
    Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1910

§ 1910 Immunity from liability

The bonds issued by the Authority shall not constitute an indebtedness of the Commonwealth nor of any of its political subdivisions, and neither the Commonwealth nor any of its political subdivisions shall be liable therefor, and such bonds shall be payable solely out of those funds pledged for the payment thereof.

The Authority shall not be deemed to be acting on behalf of or to have incurred any obligation to the holders of any indebtedness of the Commonwealth or any benefited entity or to third parties, even when the Authority has taken any action under this chapter which affects such benefited entity.

**Credits**
June 21, 1988, No. 44, § 11, renumbered as § 21 on June 24, 1998, No. 92, § 16.

3 L.P.R.A. § 1910, PR ST T. 3 § 1910

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Laws of Puerto Rico Annotated Currentness
  Title 3. Executive
    Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1911

§ 1911 Trust agreement

In the discretion of the Authority, any bonds issued under the provisions of this chapter shall be secured by a trust agreement by and between the Authority and any bank or trust company described in the following paragraph, which may be a bank or trust company within or without the Commonwealth. Notwithstanding any provision of law to the contrary, said trust agreement need not be constituted pursuant to a public deed in order to be a valid trust under the laws of the Commonwealth.

It shall be lawful for any bank or trust company incorporated under the laws of the Commonwealth, the United States of America or any state of the United States of America which may act as depository of the proceeds of the bonds, revenues or other moneys, to provide such indemnity bonds or to pledge such securities as may be required by the Authority. In addition to the above, the trust agreement shall contain all such provisions as the Authority may deem reasonable and proper for the protection of the bondholders.

**Credits**
June 21, 1988, No. 44, § 12, renumbered as § 22 on June 24, 1998, No. 92, § 16.

3 L.P.R.A. § 1911, PR ST T. 3 § 1911

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

---

End of Document                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Laws of Puerto Rico Annotated Currentness
Title 3. Executive
Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1913

§ 1913 Covenant of Commonwealth with bondholders

The Commonwealth pledges and agrees with the holders of any bonds issued under this chapter and with those persons or entities that enter into contracts with the Authority, pursuant to the provisions hereof, that it shall not limit or alter the rights hereby conferred to the Authority until such bonds and the interest thereon are paid in full and such contracts are fully performed and honored on the part of the Authority; Provided, however, That nothing provided herein shall affect or alter such limitation if adequate measures are provided by law for the protection of said holders of the Authority's bonds or of those who hav e entered into such contracts with the Authority. The Authority, as an agent of the Commonwealth, is hereby authorized to include this pledge on behalf of the Commonwealth on such bonds or contracts.

**Credits**
June 21, 1988, No. 44, § 14, renumbered as § 24 on June 24, 1998, No. 92, § 16.

3 L.P.R.A. § 1913, PR ST T. 3 § 1913

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

Laws of Puerto Rico Annotated Currentness
   Title 3. Executive
      Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1914

§ 1914 Special deposit

Beginning with fiscal year 1988-89, notwithstanding the provisions of Section 29A of Act No. 143 of June 30], 1969, as amended, the first proceeds of the federal excise taxes remitted to the Department of the Treasury of Puerto Rico on each fiscal year, pursuant to Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended, for up to a maximum amount of thirty million dollars ($30,000,000), in the case of Fiscal Year 1988-89, for up to a maximum amount of forty million dollars ($40,000,000), in the case of Fiscal Years 1989-90 to 1996-97, for up to a maximum amount of sixty million dollars ($60,000,000), in the case of Fiscal Year 1997-98, for up to a maximum amount of seventy million dollars ($70,000,000), in the case of Fiscal Years 1998-1999 to 2005-2006, and up to a maximum amount of ninety million dollars ($90,000,000), in the case of Fiscal Years 2006-07 to 2008-09, and in subsequent years until Fiscal Year 2056-57, the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when received by the Department of the Treasury of Puerto Rico, shall be covered into a Special Fund to be maintained by or on behalf of the Authority, designated as the 'Puerto Rico Infrastructure Fund', and be used by the Authority for its corporate purposes, which shall i clude the development of the infrastructure necessary and convenient for holding the Mayaguez 2010 Central American and Caribbean Games. In case the funds collected from said federal excise taxes are insufficient to cover the amounts herein appropriated, the Secretary of the Treasury is authorized to cover said deficiency with any funds available and the Director of the Office of Management and Budget, at the request of the Puerto Rico Infrastructure Financing Authority shall include for the budget recommended for the corresponding fiscal year the appropriations needed to cover said deficiencies.

The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes.

Credits
June 21, 1988, No. 44, § 15; July 7, 1997, No. 32, § 5; renumbere d as § 25 on June 24, 1998, No. 92, § 16; Aug. 7, 2002, No. 111, § 1; J uly 9, 2006, No. 119, § 1.

History

Text references. The reference to § 29A of Act 1969 in the opening par agraph is to former § 6029a of Title 13, repealed by Act September 4, 1998, N o. 265, § 14. Section 7652(a)(3) of the United States Internal Revenue Code of 1986, as amended, appears at 26 U.S.C. § 7652(a)(3). Amendments 2006.First paragraph: Act 2006, in the first sentence, substituted 'in the case of subsequent fiscal years up to the 2051-52 fiscal year' with 'in the case of Fiscal Years 2006-07 to 2008-09, and in subsequent years until Fiscal Year 2056-57, the participation shall be for an amount of up to one hundred and seventeen million dollars ($117,000,000), which when received by the Department of the Treasury of Puerto Rico', added 'which shall include the develo pment of the infrastructure necessary and convenient for holding the Mayaguez

**2010 Central American and Caribbean Games' after 'corporate purposes', and made minor lexical and syntactical changes.  2002.Act 2002 amended the first paragraph generally. Act 1997 amended the first paragraph generally.**

**Statement of motives. July 7, 1997, No. 32. Aug. 7, 2002, No. 111. July 9, 2006, No. 119.**

**Repealing clause. See note under § 1901 of this title.**

**Constitutional provisions. Section 8, Article VI, see Constitution of the Commonwealth, preceding Title 1.**

**Cross references.**

Treasury, Department of, see §§ 231a et seq. of this title.

3 L.P.R.A. § 1914, PR ST T. 3 § 1914

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

---

**End of Document**　　　　　　　　　　　　　　　　　© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Laws of Puerto Rico Annotated Currentness
Title 3. Executive
Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1914a

§ 1914a Infrastructure Development Fund

(a) A special, irrevocable and permanent public trust fund is hereby created within and under the control of the Authority, for the continued benefit of the people of Puerto Rico, to be known as the Infrastructure Development Fund. The Authority shall be empowered to make disbursements from said Development Fund according to the purposes of this chapter and the provisions of §§ 431 et seq. of Title 27 and of this section. The Authority may grant assistance according to the provisions of this section to any public corporation, government instrumentality, political subdivision or municipality authorized by law to provide infrastructure facilities related to the aqueduct and sewer systems, including all water supply, treatment and distribution systems and waste water treatment and disposal systems and improvements financed under the provisions of the Federal Clean Water Act and the Federal Drinking Water Act, or any other similar or related federal legislation or regulations.

The Authority shall create within the Development Fund, an account to be known as the Corpus Account, whose principal may be used as provided in subsections (j) and (k) of this section; Provided, That the proceeds (including interest income) from the investment of the money deposited in said account may be covered into any of the additional accounts, as defined in this chapter.

The Authority is also empowered to:

(1) Create within the Development Fund any other accounts needed to carry out the purposes of this chapter, henceforth to be known as the 'Additional Accounts', and segregate a portion of the moneys deposited to the credit of th e Development Fund in said accounts.

(2) Grant loans or concessions or provide any other financial assistance, as provided in subsections (c) (f) of this section.

(3) Issue, for the purpose of providing funds to cover all or part of the cost of any necessary infrastructure development project, bonds or other obligations of the Authority, under the same terms and conditions and with the same rights and benefits provided in other provisions of this chapter and with regard to the above.

(4) Pledge, with the same effect as provided in other sections of this chapter, all or part of the moneys segregated in any of the additional accounts thus created for the payment of the principal of and interest on such bonds or other obligations.

(5) Pledge, with the same effect as provided in other sections of this chapter, all or part of the moneys segregated in any of the additional accounts thus created for the payment (including the provision for payment until the expiration or resolution) or the refinancing of bonds or other obligations of the Authority or any other public corporation, municipality, political subdivision or government instrumentality, or

(6) use said moneys thus segregated in any of the additional accounts thus created, for any other legal purpose of the Authority.

Pending its use for the purposes of, and subject to, the conditions specified in this chapter, any amount of money deposited to the credit of the Development Fund up to one billion dollars, shall be invested in:

(1) Direct obligations of the United States, or

(2) obligations whose principal and interest are unconditionally secured by the United States, or

(3) certificates of deposit of any bank, national bang association or trust company organized and existing under the laws of Puerto Rico, the United States or any of its states and which are totally secured up to the amount not secured by federal deposit insurance for direct obligations of, or obligations whose principal and interest are unconditionally secured by the United States, or

(4) tax-exempt obligations of any state, instrumentality, agency or political subdivision of Puerto Rico or the United States, or

(5) investment contracts or agreements with the Government Development Bank for Puerto Rico or with any institution approved thereby. The moneys of the Development Fund may be invested in any obligation or instrument approved by the Government Development Bank pursuant to §§ 1261 et seq. of Title 7. Any amo unt of money deposited to the credit of the Development Fund in excess of one billion dollars shall be invested in the abovementioned financial instruments or in any other financial instruments (including, but not limited to, common or preferred stock quoted in the national or international stock markets); Provided, That the money deposited to the credit of the Development Fund may not be invested in any stock or transaction expressly prohibited by any investment guidelines applicable to the Authority, promulgated by the Government Development Bank pursuant to §§ 1261 et seq. of Title 7.

(b)

(1) The following shall be deposited to the credit of the Development Fund:

(A) The portion of the net product of the sale of the assets of the Puerto Rico Telephone Authority, which the Legislature of Puerto Rico authorizes for deposit to secure the permanent capital base of the Development Fund, which shall be deposited in the Corpus Account.

(B) All receipts, including principal and interest payments, of any loan agreement related to any loan made by the Authority with money deposited to the credit of the Development Fund, not belonging to the Corpus Account.

(C) The total product of the assets of any nature received by the Authority as a result of noncompliance or delinquency with regard to loan agreements related to loans made with moneys deposited to the credit of the Development Fund, including the product of the sale, disposal or lease of real estate or chattels which the Authority may receive as a result of said noncompliance or delinquency.

(D) Any appropriations of the Legislature of Puerto Rico or other appropriations, assignments, donations or contributions made by any person to the Development Fund.

(E) Any income (including income from interest) received from the investment of moneys covered into the Development Fund. However, any income of the Development Fund shall be used in the first place, to pay the principal, the premiums and the interest on any bonds issued or to be issued, as provided in subsection (a) of

this section and that any surplus income which is not needed to cover the total amount of said payments be deposited in the Corpus Account up to the amount needed to preserve intact the capital base of the Corpus Account at its present value to the year 1999.

(2) Except for the provisions of clause (1)(A) of this subsection, the Authority, subject to any legal or contractual obligation in effect at the time, shall determine into which accounts of the Development Fund shall all or part of said deposits be made.

(c) The Authority is hereby authorized to grant loans or concessions to, or on behalf of any public corporation, municipality, political subdivision or government instrumentality for the purpose of financing or facilitating the financing of infrastructure development projects, including loans and concessions to, or on behalf of infrastructure development projects with the purpose of providing access to or reducing the financing costs of other sources of financing whether by borrowing money from diverse sources, obtaining credit backing, shares or subsidies to cover financing costs.

(d) The Authority is hereby authorized to grant interest subsidies to any public corporation, municipality, political subdivision or government instrumentality which has successfully requested the financing of loans for infrastructure development projects from other federal and Puerto Rican financing intermediaries and programs. The Authority shall only grant interest subsidies to, or on behalf of an infrastructure development project when it has been determined that the interest subsidy is justified to permit the total financing of the project.

(e) The Authority is hereby authorized to grant loans and credit backing concessions to any public corporation, municipality, political subdivision or government instrumentality. Loans and credit backing concessions may be granted to public intermediaries of infrastructure financing in order to acquire letters of credit and other forms of credit backing to allow the recipient to expand the financing resources or reduce the cost of financing, available to any public corporation, municipality, political subdivision or government instrumentality to finance the necessary infrastructure development projects.

(f) The Authority is hereby empowered to grant reserves of funds in order to facilitate the access to, and the financing of costs through funds available by means of other public intermediaries of infrastructure financing. Said concessions may be granted only to public intermediaries of infrastructure financing authorized to provide financing to any public corporation, municipality, political subdivision or government instrumentality for the necessary infrastructure development projects. The product of said concessions may only be used by public intermediaries of infrastructure financing to establish reserves of funds for losses whose intention is to diversify the access and financing of infrastructure costs. The reserves of funds for losses shall be established according to a trust agreement granted for such a purpose by the grantee financing intermediary. The trust agreement shall limit the uses of the reserve of funds to pay for the losses which occur in the infrastructure financing program of the public intermediary of infrastructure financing, as specified in the concession agreement and to pay the fees and other administrative costs of the reserve funds for losses trust.

(g) The application for funds shall be done in the form and manner prescribed by the Authority. The Authority is hereby authorized to promulgate the necessary regulations in the opinion of the Authority that are not inconsistent with any of the provisions of this chapter, to govern the application process and establish the criteria that the Authority deems necessary for each application to meet.

(h) The infrastructure loans and concessions granted by the Authority are subject to the following conditions:

(1) The financial assistance provided through loans and concessions must be used for the purposes specified in subsections (c) (f) of this section.

(2) For infrastructure loans the Authority must determine the interest rates, if any, including interest rates below those of the loan market. The Authority shall fix the terms and conditions for paying the loans.

(3) The payment of the principal and interest on the loans made and any funds received by the Authority as a result of noncompliance of the terms and conditions of a loan shall be covered into the Development Fund.

(i) The Authority is hereby authorized to take any action that is necessary or appropriate to protect the interests of the Development Fund in case of default, execution, or noncompliance with the terms and conditions of the loans or concessions granted under this chapter, including the power to sell, dispose of or lease real property or chattels that the Authority may receive in said cases, under the terms and conditions the Authority deems appropriate.

(j) During the period comprising from the date of approval of this act to June 30, 2009, the Authority may make use of the assets deposited in the Corpus Account if the market value of said assets is higher than their par value. The net product of said sale, after the payment of the bonds backed by said assets, the expenses related to the sale and any other payment required by the Internal Revenue Service of the United States of America, shall be applied in the following manner: (i) $300 million dollars shall be deposited in the Corpus Account; (ii) two-thirds (2/3 ) of the remainder shall be transferred to the Secretary of the Treasury to be used to defray operating expenses of the Commonwealth of Puerto Rico related to the budget for Fiscal Year 2008-09; the balance, which represents one-third (2/3) of the remainder, shall be transferred to the Government D evelopment Bank for Puerto Rico as a contribution of capital. When making use of the assets of the Corpus Account, the Authority shall be under the obligation to satisfy all obligations assumed with the holders of Authority bonds secured with the assets of the Corpus Account.

(k) During the period included between the date of approval of this act and December 31, 2012, the Authority shall dispose of the assets deposited in the Corpus Account as follows: (1) transfer the sum of $162.5 million from the funds currently deposited in the Corpus Account of the Infrastructure Development Fund created by virtue of §§ 1902 et seq. of this title, to the Retirement Syst em, to be invested only in capital appreciation bonds issued by the Puerto Rico Sales Tax Financing Corporation (COFINA, Spanish acronym) with a maturity date of not less than thirty (30) years, but not more than forty (40) years at an interest rate of not less than seven percent (7% ); and (2) the surplus shall remain in the Corpus Account and shall be used to purchase a capital appreciation bond issued by the Puerto Rico Sales Tax Financing Corporation with a maturity date of not less than thirty (30) years, but not more than forty (40) years at an interest rate of not less than seven percent (7% ). The Retirement System of the Employees of the Commonwealth of Puerto Rico and the Puerto Rico Infrastructure Financing Authority may not voluntarily dispose of the bond of the Puerto Rico Sales Tax Financing Corporation, unless such disposal is authorized by the Government Development Bank for Puerto Rico, and in the case of the bond deposited in the Corpus account, unless it is approved by Joint Resolution of the Legislative Assembly.

**Credits**
June 21, 1988, No. 44, added as § 25-A on June 24, 1998, No. 92, § 17; Jan. 14, 2009, No. 3, § 2; June 16, 2011, No. 96, § 1.

**History**

**Text references. The reference to 'this act' in subsection (j) is to Act Jan. 14, 2009, No. 3, which amended this section.**

**Codification. Clauses (i) (z) of subsection (a) were redesignated as (1 ) (6) and paragraphs (i) (v) of subsection (b) (1) were redesignated as (A) (E) to conform with L.P.R.A. style. Amendments 2011. Subsection (a): Act 2011 substituted 'subsection (j)' with 'subsections (j) and (k)' before 'of this section'. Subsection (k): Act 2011 added this subsection. 2009.Subsection (a): Act 2009 substituted 'shall never be reduced f or any reason' with 'may be used as provided in subsection (j) of this secti on' after 'Corpus Account, whose principal' in the second paragraph of thi s**

Case:17-03283-LTS   Doc#:13343-1   Filed:06/02/20   Entered:06/02/20 15:06:51   Desc:
Volume(s) I   Page 26 of 222

subsection. Subsection (a)(4): Act 2009 deleted 'whose corresponding principal and interes t payments are totally secured by obligations such as those described in clauses (1) and (2) of this paragraph' from the end of this clause. Subsection (a)(5): Act 2009 added this clause. Subsection (b)(1)(A): Act 2009 deleted 'and maintained intact' after 'dep osited' in this paragraph. Subsection (j): Act 2009 substituted 'The Authority may use the revenues from the investment of the funds proceeding from the sale of the Puerto Rico Telephone Authority solely for aqueduct and sewer infrastructure projects' with 'Du ring the period assets of the Corpus Account' at the beginning o f this subsection.

Effectiveness. See note under § 1902 of this title.

Statement of motives. June 24, 1998, No. 92. Jan. 14, 2009, No. 3. June 16, 2011, No. 96.

Separability. See note under § 1902 of this title. Section 2 of Act June 16, 2011, No. 96, provides: 'If any provision of this Act which amended this section or the applicability thereof were held to be invalid, such holding shall not affect the remaining provisions of this Act or the applicability thereof, which shall remain in effect without the provisions held to be invalid, and to such purposes the provisions of this Act are separable. '

Repealing clause. See note under § 1902 of this title.

3 L.P.R.A. § 1914a, PR ST T. 3 § 1914a

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Laws of Puerto Rico Annotated Currentness
Title 3. Executive
Chapter 67. Puerto Rico Infrastructure Financing Authority Act

3 L.P.R.A. § 1918

§ 1918 Funds and accounts

All moneys of the Authority shall be deposited in depositories qualified to receive funds of the Commonwealth, but they shall be kept in a separate account or accounts in the name of the Authority. The disbursements shall be made by it pursuant to regulations and budgets approved by the Authority.

The Authority shall establish, pursuant to generally accepted accounting principles, the accounting system required for the proper statistical control and recording of all expenses and income belonging to, managed, or controlled by the Authority. The Authority's accounting records appropriately shall be kept in such manner so as to identify the accounts and maintain them separate, insofar as advisable, with regard to the different kinds of undertakings and activities of the Authority.

**Credits**
June 21, 1988, No. 44, § 19, renumbered as § 29 on June 24, 1998, No. 92, § 18.

3 L.P.R.A. § 1918, PR ST T. 3 § 1918

The Constitution, statutes, and court rules are current through all acts translated by the Translation Office of the Puerto Rico Government through the 2010 Legislative Session and various acts from 2011 to April 2017.

---

End of Document    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

## Government Parties' PRIFA Exhibit No. 1

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

**TO**

**CITIBANK, N.A.,**

**TRUSTEE**

---

**TRUST AGREEMENT**

---

**Dated as of October 1, 1988,**
**as amended by a**
**First Supplemental Trust Agreement, dated as of February 1, 1989**
**and a**
**Second Supplemental Agreement, dated as of December 1, 1997**

NY1 5690864v.2 45967/59

## TABLE OF CONTENTS

(This Table of Contents is not a part of the
Trust Agreement but is for convenience of reference only)

PAGE

**ARTICLE I**
DEFINITIONS

SECTION 101.   Definitions......................................................................................................10
SECTION 102.   Miscellaneous ................................................................................................18

**ARTICLE II**
FORM, EXECUTION, AUTHENTICATION, DELIVERY AND REGISTRATION OF BONDS

SECTION 201.   Limitation on Issuance of Bonds ....................................................................19
SECTION 202.   Form of Bonds ...............................................................................................19
SECTION 203.   Details of Bonds.............................................................................................19
SECTION 204.   Authentication of Bonds ................................................................................20
SECTION 205.   Exchange and Registration of Transfer...........................................................21
SECTION 206.   Ownership of Bonds .......................................................................................21
SECTION 207.   The Series 1988 Bonds ...................................................................................22
SECTION 208.   Additional Bonds............................................................................................23
SECTION 209.   Refunding Bonds ............................................................................................26
SECTION 210.   Temporary Bonds...........................................................................................29
SECTION 211.   Mutilated, Destroyed, Stolen or Lost Bonds...................................................29
SECTION 212.   Qualification for Depository Trust Company ...................................................30
SECTION 213.   Capital Appreciation Bonds; Capital Appreciation and Income Bonds ..........30
SECTION 214.   Debt Service Components................................................................................30

**ARTICLE III**
REDEMPTION OF BONDS

SECTION 301.   Redemption of Bonds .....................................................................................31
SECTION 302.   Redemption Notice.........................................................................................31
SECTION 303.   Effect of Calling for Redemption ...................................................................32
SECTION 304.   Cancellation of Bonds.....................................................................................32
SECTION 305.   Bonds To Be Paid Not Outstanding................................................................32
SECTION 306.   Partial Redemption.........................................................................................33

**ARTICLE IV**
FUNDS AND ACCOUNTS

SECTION 401.   Sinking Fund and Accounts.............................................................................34
SECTION 402.   Withdrawals from Bond Service Account .......................................................35
SECTION 403.   Withdrawals from Redemption Account .........................................................36
SECTION 404.   Withdrawals from Reserve Account ................................................................37

NY1 5690864v.2 45967/59

SECTION 405.  Moneys Set Aside Held in Trust.................................................................37
SECTION 406.  Establishment of Subaccounts in the Redemption Account ...........................38

**ARTICLE V**
DEPOSITARIES OF MONEYS, SECURITY FOR DEPOSITS AND INVESTMENTS OF
FUNDS

SECTION 501.  Security for Deposits...................................................................................39
SECTION 502.  Investment of Moneys................................................................................39
SECTION 503.  Valuation of Investments ...........................................................................40
SECTION 504.  Tax Covenants ..........................................................................................40

**ARTICLE VI**
PARTICULAR COVENANTS

SECTION 601.  Payment of Principal, Interest and Premium; Pledge of Pledged
Revenues.................................................................................................42
SECTION 602.  No Impairment ..........................................................................................42
SECTION 603.  Inclusion of Shortfall in Budget.................................................................42

ARTICLE VII
REMEDIES

SECTION 701.  Enforcement of Remedies...........................................................................43
SECTION 702.  Pro rata Application of Funds .....................................................................43
SECTION 703.  Effect of Discontinuance of Proceedings.....................................................44
SECTION 704.  Bondholders May Control Proceedings .......................................................44
SECTION 705.  Restrictions Upon Actions by Individual Bondholders .................................45
SECTION 706.  No Remedy Exclusive.................................................................................45
SECTION 707.  No Delay or Omission Construed to be a Waiver..........................................45
SECTION 708.  Actions of Trustee .....................................................................................45

**ARTICLE VIII**
CONCERNING THE TRUSTEE

SECTION 801.  Acceptance of Trusts...................................................................................46
SECTION 802.  Trustee Entitled to Indemnity .....................................................................46
SECTION 803.  Limitation on Trustee's Liabilities...............................................................46
SECTION 804.  Compensation and Indemnification of Trustee..............................................47
SECTION 805.  Trustee May Rely on Certificates.................................................................47
SECTION 806.  Notice of Default........................................................................................47
SECTION 807.  Trustee May Be Bondholder........................................................................48
SECTION 808.  Trustee Not Responsible for Recitals ..........................................................48
SECTION 809.  Trustee Protected in Relying on Papers .......................................................48
SECTION 810.  Resignation of Trustee ...............................................................................48
SECTION 811.  Removal of Trustee ....................................................................................48
SECTION 812.  Appointment of Successor Trustee ..............................................................49
SECTION 813.  Vesting of Trust with Successor Trustee ......................................................49

SECTION 814.    Reporting Requirements ............................................................50

## ARTICLE IX
EXECUTION OF INSTRUMENTS BY BONDHOLDERS AND PROOF OF OWNERSHIP OF
BONDS

SECTION 901.    Proof of Execution of Documents and Ownership. .........................................51

## ARTICLE X
SUPPLEMENTAL AGREEMENTS

SECTION 1001.   Supplemental Agreements Without Bondholders' Consent ............................52
SECTION 1002.   Modification with Consent of Holders of Majority of Bonds.........................53
SECTION 1003.   Trustee Joining in Supplemental Agreements ..................................................54
SECTION 1004.   Responsibilities of Trustee under this Article...................................................54
SECTION 1005.   Bond Resolution May Be Supplemented or Modified......................................55

## ARTICLE XI
DEFEASANCE

SECTION 1101.   Defeasance ..........................................................................................................56

## ARTICLE XII
MISCELLANEOUS PROVISIONS

SECTION 1201.   Mergers ................................................................................................................58
SECTION 1202.   Any Notices ..........................................................................................................58
SECTION 1203.   Substitute Publication and Mailing....................................................................58
SECTION 1204.   No Third Party Rights...........................................................................................59
SECTION 1205.   Effect of Partial Invalidity ..................................................................................59
SECTION 1206.   Effect of Covenants..............................................................................................59
SECTION 1207.   Governing Law......................................................................................................59
SECTION 1208.   Payments Due on Saturdays, Sundays and Holidays......................................59
SECTION 1209.   Multiple Counterparts .........................................................................................60
SECTION 1210.   Headings, etc. Not Part of Agreement ...............................................................60

NY1 5690864v.2 45967/59

THIS AGREEMENT, dated for convenience of reference as of the first day of October, 1988, by and between

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY,

a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic (hereinafter sometimes called the "Authority"), exercising public and essential governmental functions and created by the Puerto Rico Infrastructure Financing Authority Act hereinafter mentioned, and

CITIBANK, N.A.,

a national banking association duly incorporated and existing under the laws of the United States of America and having its principal corporate trust office in the Borough of Manhattan, City and State of New York, which is authorized under such laws to exercise corporate trust powers (said banking association and any banking association, bank or trust company becoming successor trustee under this Agreement being hereinafter sometimes called the "Trustee");

W I T N E S S E T H:

WHEREAS, in order to provide financial, administrative and other assistance to public corporations and instrumentalities of the Commonwealth of Puerto Rico (the "Commonwealth") to enable them to fulfill their public purpose of providing, preserving, operating, maintaining, repairing, replacing and improving portions of the infrastructure, the Legislature of Puerto Rico duly adopted Act No. 44, approved June 21, 1988 (said Act, as amended and supplemented from time to time, the "Act") and by the Act created a public corporation and instrumentality of the Commonwealth to be known as the "Puerto Rico Infrastructure Financing Authority"; and

WHEREAS, by the Act, the Authority has the power to, among other things:

(a)     to provide assistance to any public corporation or governmental instrumentality authorized by law to provide infrastructure facilities related to water supply, treatment and distribution systems, waste water treatment and disposal systems and improvements;

(b) to enter into an assistance contract with such a benefited entity;

(c)     to borrow money and to issue its bonds for any of its corporate purposes, including, but not limited to, the payment of all or any portion of any indebtedness of such benefited entity;

(d)     to segregate a portion of the federal excise taxes deposited into the Puerto Rico Infrastructure Fund established pursuant to Section 15 of the Act into one or more accounts and to pledge moneys in said accounts, among other purposes, to the payment of principal of and interest on bonds and other obligations of the Authority; and

WHEREAS, the Authority has heretofore entered into an agreement with Puerto Rico Aqueduct and Sewer Authority ("PRASA") dated as of July 12, 1988, pursuant to which the

- 1 -

Authority has agreed, under certain conditions, to provide funds for the defeasance of PRASA's Puerto Rico Aqueduct and Sewer Authority Revenue and Refunding Bonds, Series 1985A (the "Outstanding PRASA Bonds") , thereby affording PRASA, among other things, additional capacity to finance its capital improvement program through the issuance of its revenue bonds; and

WHEREAS, the Authority has determined to provide for such defeasance of the Outstanding PRASA Bonds and for the payment of $15,500,000 PRASA General Obligation Notes due January 20, 1989 issued and outstanding under the terms of that certain Purchase Agreement dated January 19, 1983 by and between PRASA and Pfizer Pharmaceuticals, Inc. (the "Pfizer Debt") through the issuance of bonds payable from certain federal excise taxes deposited in a separate, segregated account of the Puerto Rico Infrastructure Fund exclusively for the purpose of paying principal of and interest on such bonds; and

WHEREAS, the proceeds of the first series of bonds to be issued hereunder will provide moneys, with other funds made available by PRASA, to defease the Outstanding PRASA Bonds, pay the Pfizer Debt, make a deposit to the Reserve Account and pay certain costs of issuance; and

WHEREAS, the Authority has determined that the bonds to be issued under this Agreement and, the certificate of authentication by the Trustee to be endorsed on all such bonds shall be, respectively, in substantially the following forms, with such variations, omissions and insertions as are required or permitted by this Agreement:

NY1 5690864v.2 45967/59

FORM OF BOND

[Front Side of Bond]

No. _____                                                                                    $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BOND, SERIES _____

| Maturity Date | Interest Rate | Original Issue Date | Cusip |
|---|---|---|---|
| _____ | _____ | _____ | _____ |

REGISTERED HOLDER:

PRINCIPAL AMOUNT:


  Puerto Rico Infrastructure Financing Authority (herein called the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic, is justly indebted and for value received hereby promises to pay to the Registered Holder shown above or registered assigns or legal representative on the Maturity Date specified above (or earlier as hereinafter described), from the special fund described herein, upon the presentation and surrender hereof, at the principal corporate trust office of Citibank, N.A. in the Borough of Manhattan, City and State of New York, the Principal Amount shown above, and to pay to the registered owner hereof, from the special fund described herein, by check mailed to the Registered Holder at his address as it appears on the bond registration books of the Authority, [or by wire transfer to the Registered Holder], interest on such principal amount from the date hereof or from the _____ or _____ next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a _____ or a _____ to which interest shall have been paid, in which case from such date, such interest to the maturity hereof being payable on _____ and _____ in each year, commencing _____, 19___, at the Interest Rate per annum specified above, until payment of such Principal Amount. The interest so payable and punctually paid, or duly provided for, on any interest payment date will be paid to the person in whose name this bond is registered at the close of business on the fifteenth (15th) day (whether or not a business day) of the calendar month next preceding such interest payment date. Any such interest not so punctually paid or duly provided for shall forthwith cease to be payable to the Registered Holder on such date, and may be paid to the person in whose name this bond is registered at the close of business on a special record date for the payment of such defaulted interest to be fixed by the Trustee, on a date established by the Trustee, notice thereof being given to the Holders not less than ten (10) days prior to such special record date, or may be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which the bonds of this series may be listed and upon such notice as may be required by such exchange.

- 3 -

Such payment of interest shall be by check mailed to the Registered Holder at his address as it appears on the bond registration books of the Authority maintained by the Trustee [or by wire transfer to said holder]. All such payments shall be made in such coin or currency of _____.

This bond shall not be deemed to constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable therefor, and this bond shall be payable solely out of those funds pledged for the payment thereof.

ADDITIONAL PROVISIONS OF THIS BOND ARE SET FORTH ON THE REVERSE HEREIN AND SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS IF SET FORTH HERE.

This bond shall not be valid or become obligatory for any purpose or be entitled to any benefit or security under the Agreement unless and until this bond shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

IN WITNESS WHEREOF, Puerto Rico Infrastructure Financing Authority has caused this bond to bear the facsimile signature of its Executive Director and a facsimile of the corporate seal to be imprinted hereon and attested to by its Secretary by facsimile signature, all as of the _____ day of _____ 19__.

[Facsimile of                          PUERTO RICO INFRASTRUCTURE
  Corporate Seal]                      FINANCING AUTHORITY


                                       By:_____    [Facsimile Signature]_____
                                                     Executive Director

Attest:


____[Facsimile Signature]____
            Secretary

NY1 5690864v.2 45967/59

**CERTIFICATE OF AUTHENTICATION**

This is one of the bonds of the series designated therein and issued under and secured by the provisions of the within mentioned Agreement.

CITIBANK, N.A.,
as Trustee

By:_____
Authorized Signatory

Date of authentication: _____

[Reverse Side of Bond]

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BOND, SERIES _____

This bond is one of a duly authorized series of Bonds designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series _____" issued by the Authority in the aggregate principal amount of _____ Dollars ($_____) for the purpose of providing funds, with any other available funds, for the purpose of _____. This bond is issued under and secured by a trust agreement dated as of October 1, 1988 (said agreement, together with all supplemental agreements therein permitted, being herein called the "Agreement"), by and between the Authority and Citibank, N.A., trustee (said trustee and any successor trustee under the Agreement being herein called the "Trustee"). An executed counterpart of the Agreement is on file at the principal corporate trust office of the Trustee in the Borough of Manhattan, City and State of New York. By the acceptance of this bond, the Registered Holder hereof assents to all of the provisions of the Agreement.

This bond is issued and the Agreement was made and entered into under and pursuant to the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth of Puerto Rico, particularly the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, said Act being herein called the "Authority Act") and under and pursuant to resolutions duly adopted by the Executive Committee of the Board of Directors of the Authority. The Agreement provides for the issuance of additional series of bonds and for the incurrence of other indebtedness under the conditions, limitations and restrictions therein set forth. The Agreement also provides for the creation of a special fund designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue

Bonds Sinking Fund" and for the deposit to the credit of said special fund of a sufficient amount of the Pledged Revenues (as defined in the Agreement) to pay the principal of and interest on all bonds issued under the Agreement as the same become due and payable and to provide a reserve therefor, which special fund is pledged to and charged with the payment of such principal and interest.

The bonds of this series consist of bonds maturing on _____ of the years _____ to _____ , inclusive (the "Serial Bonds") and of bonds maturing on _____ 1, _____ (the "_____ Term Bonds"), on _____ 1, _____ (the "_____ Term Bonds") and on _____ 1, _____ (the "_____ Term Bonds").

[Applicable Terms of Redemption]

If less than all of the bonds of any one maturity shall be called for redemption, the particular bonds or portions of bonds to be redeemed shall be selected by the Trustee by such method as it shall deem fair and appropriate.

At least _____ (___) days before the redemption date of any bonds to be redeemed in whole or in part, the Trustee shall cause a notice of such redemption to be mailed, by first class mail, postage prepaid, to all registered owners of bonds to be redeemed at their addresses appearing upon the bond registration books of the Authority. The failure to mail such notice to any registered owner of bonds or any defect in any notice so mailed shall not affect the validity of the proceedings for the redemption of bonds of other registered owners. On the date fixed for redemption, notice having been given as aforesaid, the bonds or portions thereof so called for redemption shall be due and payable at the redemption price provided for the redemption of such Bonds or portions thereof on such date, and, if sufficient moneys or certain securities which may consist of (i) direct or guaranteed obligations of the United States of America (and evidences of ownership of proportionate interests in future interest or principal payments on such obligations), (ii) certain municipal obligations irrevocably secured by direct or guaranteed obligations of the United States of America (and evidences of ownership of proportionate interests in future interest or principal payments on such obligations), or (iii) obligations issued by Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Farm Credit System, Federal Home Loan Banks or Student Loan Marketing Association, the principal of and interest on which obligations when due will provide sufficient moneys for payment of the redemption price and the accrued interest on the bonds to be redeemed are held by the Trustee, as provided in the Agreement, interest on the bonds or the portions thereof so called for redemption shall cease to accrue, such bonds or portions thereof shall cease to be entitled to any benefit or security under the Agreement, and the Registered Holders thereof shall have no rights in respect of such bonds or portions thereof except to receive payment of the redemption price thereof and the accrued interest thereon. If a portion of this bond shall be called for redemption, a new bond or bonds of authorized denominations in an aggregate principal amount equal to the unredeemed portion hereof will be issued to the Registered Holder hereof, or his legal representative upon the surrender hereof.

The Registered Holder of this bond shall have no right to enforce the provisions of the Agreement, or to institute action to enforce the covenants therein, or to take any action with

respect to any default under the Agreement, or to institute, appear in or defend any suit or other proceeding with respect thereof, except as provided in the Agreement.

Modifications or alterations of the Agreement or of any agreement supplemental thereto may be made only to the extent and in the circumstances permitted by the Agreement.

The bonds of this series are issuable as fully registered bonds in the denomination of $_____ and any integral multiple thereof.  At the principal corporate trust office of the Trustee, in the manner and subject to the conditions provided in the Agreement and without cost to the Registered Holders thereof except for any tax or other governmental charge, bonds may be exchanged for an equal aggregate principal amount of bonds of the same series and maturity, of authorized denominations and bearing interest at the same rate.

The Trustee is required to keep at its principal corporate trust office the books of the Authority for the registration of and for the registration of transfers of bonds. The transfer of this bond may be registered only upon such books and as otherwise provided in the Agreement upon the surrender hereof to the Trustee together with an assignment duly executed by the registered owner hereof or his attorney or legal representative in the form set forth on this bond or in such other form as shall be satisfactory to the Trustee. Upon any registration of transfer, the Trustee shall deliver in exchange for this bond, a new bond or bonds registered in the name of the transferee, of authorized denominations, in an aggregate principal amount equal to the principal amount of this bond, of the same series and maturity and bearing interest at the same rate.

The Trustee shall not be required to exchange or register any transfer of this bond during the fifteen (15) days immediately preceding the date of mailing of notice of any redemption of bonds of this series, or after this bond or any portion thereof has been selected for redemption.

This bond, notwithstanding the provisions for the registration of transfer contained in the Agreement, shall have all the qualities and incidents, including negotiability, of negotiable instruments under the laws of Puerto Rico.

All acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of Puerto Rico, including the Authority Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the issuance of this bond and the execution and delivery of the Agreement have happened, exist and have been performed as so required.

This bond is issued with the intent that the laws of the Commonwealth of Puerto Rico shall govern its construction.

NY1 5690864v.2 45967/59

WHEREAS, by virtue of the Act, the Authority is authorized to issue its bonds as hereinafter provided, to enter into this Agreement and to do or cause to be done all of the acts and things herein provided or required to be done as hereinafter covenanted; and

WHEREAS, the execution and delivery of this Agreement have been duly authorized by resolution of the Authority; and

WHEREAS, all acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of Puerto Rico, including the Act, and the rules and regulations of the Authority to happen, exist and be performed precedent to and in the execution and delivery of this Agreement have happened, exist and have been performed as so required, in order to make this Agreement a valid, binding and legal trust agreement for the security of the Bonds in accordance with its terms; and

WHEREAS, the Trustee has accepted the trusts created by this Agreement and in evidence thereof has joined in the execution hereof;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH, that in consideration of the premises, of the acceptance by the Trustee of the trusts hereby created, and of the purchase and acceptance of the Bonds by the Holders thereof, and also for and in consideration of the sum of One Dollar to the Authority in hand paid by the Trustee at or before the execution and delivery of this Agreement, the receipt of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Bonds are to be issued, executed, authenticated, delivered, secured and accepted by all persons who shall from time to time be or become Holders thereof, and in order to secure the payment of the Bonds at any time issued and outstanding hereunder and the interest and premium, if any, thereon according to their tenor, purport and effect, and in order to secure the performance and observance of all the covenants, agreements and conditions therein and herein contained, the Authority has executed and delivered this Agreement and has pledged and does hereby pledge to the Trustee the Pledged Revenues (as defined herein) and as security for the payment of the Bonds and the interest and premium, if any, thereon and as security for the satisfaction of any other obligation assumed by it in connection with such Bonds, and it is mutually agreed and covenanted by and among the parties hereto, for the equal and proportionate benefit and security of all and singular the present and future Holders of the Bonds, without preference, priority or distinction as to lien or otherwise, except as otherwise hereinafter provided, of any one Bond over any other Bond by reason of priority in the issue, sale or negotiation thereof or otherwise, as follows:

NY1 5690864v.2 45967/59

# ARTICLE I

## DEFINITIONS

SECTION 101.     Definitions.   As used in this Agreement, except as otherwise defined below, words and terms shall have the meanings ascribed to them in the recitals to this Agreement. In addition, the following words and terms shall have the following meanings, unless some other meaning is plainly intended:

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond (the principal amount on the date of original issuance) plus the interest accrued on such Capital Appreciation Bond from the date of original issuance to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the Term Bonds of any Series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of Term Bonds in such Fiscal Year or on the first day of the next succeeding Fiscal Year as provided herein.

If at the close of any Fiscal Year the total amount of Term Bonds of any Series retired by purchase or redemption, or prior to the close of such Fiscal Year called for redemption under the provisions of Section 403 of this Agreement, shall be in excess of the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirements for the Term Bonds of such Series shall be reduced for such subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director in an order filed with the Trustee on or before the 10th day of the month following the close of such Fiscal Year.

If at the close of any Fiscal Year the total principal amount of Term Bonds of any Series retired by purchase or redemption, or called for redemption under the provisions of Section 403 of this Agreement, prior to the close of such Fiscal Year shall be less than the amount of the Amortization Requirement for the Term Bonds of such Series for such Fiscal Year, then the amount of the Amortization Requirement for the term bonds of such Series for the next succeeding Fiscal Year shall be increased by the amount of such deficiency.

It shall be the duty of the Trustee, on or before the 15th day of each Fiscal Year, to compute the Amortization Requirement for the then current Fiscal Year for the Term Bonds of each Series then Outstanding. The Amortization Requirement for the then current Fiscal Year shall continue to be applicable during the balance of such current Fiscal Year and no adjustment shall be made therein by reason of Term Bonds purchased or redeemed or called for redemption during such current Fiscal Year.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond up to the Interest Commencement Date set forth in the resolution of the Board providing for the issuance of such Bond, an amount equal to the Accreted Value of such Bonds, and (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value on the Interest Commencement Date.

- 10 -

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any Series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund of funds are established and shall not be subject to a lien or charge in favor of the Holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Authority" shall mean Puerto Rico Infrastructure Financing Authority, a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic, created by the Act, and the successor or successors of the Authority.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Board" shall mean the Board of Directors of the Authority as constituted from time to time and defined by the Act, or, if said Board shall be abolished, the board or body succeeding to the principal functions thereof or to whom the powers of the Authority shall be given by law.

"Bond Service Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Bondholder", "Holder", "Holder of Bonds", or "Owner" or any similar term, shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

"Bonds" shall mean the Bonds of the Authority issued under Sections 207, 208 and 209 hereof.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded periodically on each of the dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either Serial Bonds or Term Bonds.

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date specified in the resolution authorizing such Bonds and the Appreciated Value for such Bonds is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either Serial Bonds or Term Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

(v)     municipal obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(vi)     any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee), trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in (i) or (ii) above, provided that the Trustee has a perfected first lien security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)     commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(viii)     any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the Holders of Put Bonds.

"Offshore Excise Taxes" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

(i)     Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)     Bonds that are deemed paid and no longer Outstanding as provided herein;

(iii)     Bonds in lieu of which other Bonds have been issued pursuant to the provisions hereof relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

NY1 5690864v.2 45967/59

(iv)     Bonds tendered or deemed tendered pursuant to any tender provisions, as further provided in the resolution adopted by the Board for any Series of Bonds; and

(v)     for purposes of any consent or other action to be taken hereunder by the Holders of a specified percentage of principal amount of Bonds, Bonds known by the Trustee to be held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

"PRASA" shall mean Puerto Rico Aqueduct and Sewer Authority, a public corporation and an autonomous governmental instrumentality of the Commonwealth and the successor or successors thereof.

"Principal Corporate Trust Office" or "principal corporate trust office" of the Trustee shall mean the principal corporate trust office of the Trustee, at which, at any particular time, its corporate trust business shall be administered, except that with respect to presentation of Bonds for payment or for registration of transfer or exchange and the location of the bond registration books, such term shall mean the office or agency of the Trustee, if different, at which, at any particular time, its corporate agency business shall be conducted.

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any Series, shall mean the sum of:

(i)     the amount required to pay the interest on all Bonds of such Series then Outstanding that is payable on each Interest Payment Date in such Fiscal Year;

(ii)     the amount required to pay the principal of all Serial Bonds of such Series then Outstanding that is payable upon the maturity of such Serial Bonds in such Fiscal Year; and

(iii)    the Amortization Requirement for the Outstanding Term Bonds of such Series for such Fiscal Year.

If an Interest Payment Date or a principal payment date for any Series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

(a)     The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (1) for purposes of determining the maximum Principal and Interest Requirements on Outstanding Bonds for any Fiscal Year under Section 208(c)(ii) and (d)(ii) , Section 209(f) and Section 401(c) of this Agreement, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation

- 15 -

(g)    If all or a portion of the principal of or interest on a Series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the Trustee shall have received on or prior to the date of calculation a verification from an independent certified public accountant demonstrating the sufficiency of such funds and projected earnings for such purpose.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and, to the extent applicable, shall be determined in accordance with the foregoing rules.

"Puerto Rico Infrastructure Fund" shall mean the Fund of that name designated by the Act.

"Put Bonds" shall mean Bonds that by their terms may be tendered by and at the option of the Holder thereof for payment prior to the stated maturity thereof.

"Qualified Depositary or Depositaries" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depositary for funds of agencies and instrumentalities of the Commonwealth of Puerto Rico, which have been designated as depositaries of the Authority by resolution of the Board remaining in full force and effect.

"Redemption Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Reserve Account" shall mean the account of that name established in the Sinking Fund under Section 401 hereof.

"Reserve Account Insurance Policy" shall mean the insurance policy, surety bond or other evidence of insurance deposited for the credit of the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer thereof shall be a municipal bond insurer whose senior debt obligations, ranking pari passu with its obligations under such policy, bond or other evidence of insurance, are rated, at the time of deposit for the credit of the Reserve Account, in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto.

"Reserve Account Letter of Credit" shall mean the irrevocable, transferable letter of credit deposited in the Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer of such letter of credit shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking pari passu with its obligations under such letters of credit are rated at the time of deposit to the credit of the Reserve Account,

- 17 -

in any of the three highest rating categories of either Moody's Investors Service, Inc. or any successors thereto or Standard & Poor's Corporation or any successors thereto.

"Secretary" shall mean the Secretary or Assistant Secretary of the Authority from time to time, or if there is no secretary or assistant secretary, then any person designated by the Board or by the by-laws of the Authority to perform the functions of the Secretary.

"Serial Bonds" shall mean the Bonds designated serial bonds in the resolutions authorizing such Bonds.

"Series" shall mean all of the Bonds authenticated and delivered at one time on original issuance and pursuant to any resolution authorizing such Bonds as a separate Series of Bonds, or any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article II hereof, regardless of variations in maturity, interest rate or other provisions.

"Series 1988 Bonds" shall mean the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A.

"Sinking Fund" shall mean the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund", a special fund created and designated by Section 401 hereof.

"Special Tax Revenues" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Term Bonds" shall mean the Bonds designated term bonds in the resolutions authorizing such Bonds.

"Trustee" shall mean the person named as the "Trustee" in the first paragraph of this Agreement until a successor Trustee shall have become such, and thereafter "Trustee" shall mean or include each person who is then a Trustee hereunder.

"Variable Rate Bonds" shall mean Bonds issued with a variable, adjustable, convertible or similar interest rate that is not fixed in percentage at the date of issue for the term thereof.

SECTION 102.    <u>Miscellaneous</u>.   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Words defined in Section 101 hereof that appear in this Agreement in lower case shall have the meanings ascribed to them in the definitions in Section 101 unless the context shall otherwise indicate. The words "Bond", "Owner", "Holder" and "person" shall include the plural as well as the singular number unless the context shall otherwise indicate. The word "person" shall include corporations, firms and associations, including public bodies, as well as natural persons, unless the context shall otherwise indicate. The word "Bond" or "Bonds" and the words "revenue bond" or "revenue bonds" shall mean any Bond or Bonds or all of the Bonds, as the case may be, issued under the provisions of this Agreement. The word "Agreement" shall include this Agreement and each agreement supplemental hereto.

NY1 5690864v.2 45967/59

## ARTICLE II

## FORM, EXECUTION, AUTHENTICATION, DELIVERY AND REGISTRATION OF BONDS

SECTION 201.        Limitation on Issuance of Bonds.  No Bonds may be issued under the provisions of this Agreement except in accordance with the provisions of this Article.

SECTION 202.        Form of Bonds.  The Bonds issued under the provisions of this Agreement shall be in substantially the form hereinabove set forth, with such appropriate variations, omissions and insertions as are permitted or required by this Agreement and with such additional changes as may be necessary or appropriate to conform to the provisions of the resolution or resolutions providing for the issuance of such Bonds, including changes required for the issuance of different types of Bonds which may reflect, without limitation, provisions for Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Balloon Bonds, Interim Bonds, Variable Rate Bonds, Extendible Maturity Bonds and Put Bonds. All such Bonds may have endorsed thereon such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority or any usage or requirement of law with respect thereto.

SECTION 203.        Details of Bonds.  The Bonds shall be issued in fully registered form and, if the Trustee issues notice of the availability of exchanging registered Bonds for coupon Bonds, in coupon form. If the Trustee receives a written request of the Authority for the delivery of coupon Bonds and an opinion of counsel of recognized standing in the field of law relating to municipal bonds to the effect that the issuance of any of the Bonds in coupon form will not adversely affect the exclusion from gross income of the interest on any of the Bonds for Federal income tax purposes, if such exclusion is otherwise applicable, the Trustee shall mail notice to the Holders of the Bonds of the availability of exchanging registered Bonds and coupon Bonds. Registered Bonds may then be exchanged for an equal aggregate principal amount of coupon Bonds of the same Series and maturity of any authorized denomination and bearing interest at the same rate as the exchanged Bonds and coupon Bonds may be exchanged for an equal aggregate principal amount of fully registered Bonds in the manner provided in this Agreement, as the Agreement may be supplemented to provide for coupon Bonds.

The Bonds of a Series shall be payable, with respect to interest, principal and premium, if any, in any coin or currency of the United States of America which at the time of payment is legal tender for public and private debts (or other coin or currency provided for in the resolution authorizing the issuance of the particular Series). The principal of Bonds shall be payable only to the Holder or his legal representative at the principal corporate trust office of the Trustee and at such other office or agency of any paying agent as the Board may designate from time to time upon the presentation and surrender of the Bonds (except as otherwise provided in Section 211 hereof). The Bonds of each Series shall be dated as provided in a resolution of the Board; shall bear interest, which may be fixed or variable, from the Interest Payment Date next preceding the date on which they are authenticated unless authenticated on an Interest Payment Date, in which event they shall bear interest from such Interest Payment Date, or are authenticated before the first Interest Payment Date in which event they shall bear interest from their date, provided, however, that if at the time of authentication of any Bond interest is in default, such Bond shall

- 19 -

bear interest from the date to which interest has been paid. Capital Appreciation Bonds shall bear interest as described under the defined term Accreted Value, payable on the amount due at maturity only upon redemption, acceleration or maturity thereof, and Capital Appreciation and Income Bonds shall bear interest as described under the defined term Appreciated Value, payable on the amount due at maturity but only from and after the Interest Commencement Date. The interest rate shall not exceed the applicable maximum legal rate per annum. Interest on the Bonds shall be payable by check mailed to the registered Holder thereof by the Trustee or any other paying agents appointed by the Authority at the address shown on the registration books of the Authority held by the Trustee at the close of business on the fifteenth (15th) day (whether or not a business day) of the calendar month preceding an Interest Payment Date or such other date as may be established by resolution for any Bonds; provided that to the extent provided in the resolution authorizing the issuance of Bonds interest shall be payable by wire transfer. The Bonds shall be lettered and numbered in such manner and shall be in the denominations provided in the resolutions of the Board authorizing their issuance. In the event that interest is not punctually paid or duly provided for, such interest shall forthwith cease to be payable to the Holder shown on the registration books held by the Trustee at the close of business on the fifteenth (15th) day of the calendar month preceding such Interest Payment Date and may be paid to the person in whose name Bonds are registered at the close of business on a special record date to be fixed by the Trustee, on a special payment date designated by the Trustee, notice having been given by the Trustee to the Holders not less than ten (10) days prior to such special record date or may be paid at any time in any other lawful manner not inconsistent with the requirements of any securities exchange on which Bonds may be listed and upon such notice as may be required by such exchange, or as more fully provided for in the resolution of the Board authorizing the issuance of the Bonds. The above procedure for the payment of defaulted interest overdue may be varied in resolutions of the Board authorizing the issuance of particular Series of Bonds, which resolutions may also provide for the payment of such interest at defaulted interest rates.

The Bonds shall be signed in the name of the Authority by the Executive Director or with his facsimile signature and the corporate seal of the Authority shall be impressed or a facsimile of such seal shall be imprinted on the Bonds and attested by the Secretary or his facsimile signature. In case any officer whose signature or a facsimile of whose signature shall appear on any Bonds shall cease to be such officer before the delivery of such Bonds, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes as if he had remained in office until such delivery, and also any Bonds may bear the facsimile signature of or may be signed by such persons as at the actual time of the execution of such Bonds shall be the proper officers to sign such Bonds although on the date of such Bonds such persons may not have been such officers.

SECTION 204.     Authentication of Bonds.  Only such of the Bonds as shall have endorsed thereon a certificate of authentication substantially in the form hereinabove set forth, duly executed by the Trustee, shall be entitled to any benefit or security under this Agreement. No Bond shall be valid or become obligatory for any purpose or be entitled to any benefit or security under this Agreement unless and until such certificate of authentication shall have been duly executed by the Trustee, and such certificate of the Trustee upon any such Bond shall be conclusive evidence that such Bond has been duly authenticated and delivered under this Agreement. The Trustee's certificate of authentication on any Bond shall be deemed to have

- 20 -

SECTION 212.        Qualification for Depository Trust Company.  The Trustee is hereby authorized to enter into agreements with the Depository Trust Company of New York and other depository trust companies, including but not limited to, agreements necessary for wire transfers of interest and principal payments with respect to the Bonds, utilization of electronic book entry data received from the Depository Trust Company of New York and other depository trust companies in place of actual delivery of Bonds and provision of notices with respect to Bonds registered by the Depository Trust Company of New York and other depository trust companies (or any of their designees identified to the Trustee) by overnight delivery, courier service, telegram, telecopy or other similar means of communication.

SECTION 213.        Capital Appreciation Bonds; Capital Appreciation and Income Bonds.  For purposes of determining the principal amount of a Capital Appreciation Bond or a Capital Appreciation and Income Bond, for redemption or computation of the amount of Bonds held by the Holder thereof in giving to the Authority any notice, covenant, request or demand pursuant to this Agreement for any purpose whatsoever, the principal amount of a Capital Appreciation Bond shall be deemed to be its Accreted Value and the principal amount of a Capital Appreciation and Income Bond shall be deemed to be its Appreciated Value. For purposes of determining the amount required to be deposited to the credit of the Reserve Account, reference herein to the original principal amount shall mean in the case of Capital Appreciation Bonds, Capital Appreciation and Income Bonds and other Bonds which are sold to the public at a discount, the value of such Bonds at maturity.

SECTION 214.        Debt Service Components.  The Authority may incur indebtedness payable from moneys withdrawn from the Puerto Rico Infrastructure Fund on a pro rata basis with the deposits required to be made to the credit of the Bond Service Account, the Redemption Account and the Reserve Account (in respect of Bonds issued before November 1, 1997) under Section 401 hereof, which indebtedness is referred to herein as Debt Service Components; provided that prior to the incurrence of such indebtedness, the Authority shall file with the Trustee the certificates required by Section 208(c) and (d) or Section 209(f), as applicable, in respect of such Debt Service Components.

NY1 5690864v.2 45967/59

## ARTICLE IV

## FUNDS AND ACCOUNTS

SECTION 401.        <u>Sinking Fund and Accounts</u>.  A special fund is hereby created and designated "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (herein sometimes called the "Sinking Fund") to be held by the Trustee. There are hereby created three separate accounts in the Sinking Fund designated "Bond Service Account", "Redemption Account" and "Reserve Account". Subject to the terms and conditions set forth in this Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund. As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys to make the following deposits in the following order:

(a)       to the credit of the Bond Service Account, such amount as may be required to make the total amount then to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each Series then Outstanding and (ii) the amount of principal of the Bonds of each Series then or to become within the current Fiscal Year due and payable;

(b)       to the credit of the Redemption Account, such amount as may be required to make the total amount then in the then current Fiscal Year to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the Term Bonds of each Series then Outstanding; and

(c)       in respect of Bonds issued before November 1, 1995 to the credit of the Reserve Account, such amount as may be required to make the amount then to the credit of the Reserve Account equal to the lesser of (i) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on the Bonds outstanding and (ii) ten percent (10%) of the original principal amount of each Series of Bonds Outstanding.

In lieu of any required deposit or in substitution of moneys on deposit to the credit of the Reserve Account, the Authority may cause to be deposited to the credit of the Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to such required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any payment date for any Bonds issued before November 1, 1997 on which a withdrawal from the Reserve Account would be required under Section 404 hereof and which shall give the Trustee the right to draw on any Reserve Account Insurance Policy or Reserve Account Letter of Credit prior to the expiration thereof unless the Authority has furnished

a replacement Reserve Account Insurance Policy or Reserve Account Letter of Credit or sufficient moneys to make amounts on deposit to the credit of the Reserve Account equal to the amount required therefor. If a disbursement is made under a Reserve Account Insurance Policy or a Reserve Account Letter of Credit, the Authority shall either reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit or deposit to the credit of the Reserve Account moneys in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, or a combination of such alternatives.

If the Authority issues Variable Rate Bonds pursuant to the provisions of Section 208 or 209 of this Agreement, the assumptions for calculating interest for the current Fiscal Year and any adjustments necessary to ensure a sufficient deposit for the payment of said interest shall be provided for in the resolution authorizing the issuance of such Bonds. For purposes of clause (c) above, interest on Variable Rate Bonds shall be Calculated on the first day of the Fiscal Year for such Fiscal Year and on the date of issuance of any additional Series of Variable Rate Bonds.

If any interest payment date or a principal payment date for any Series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) through (c) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make (i) any payment necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component. After making the foregoing required applications, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund to any lawful purpose.

SECTION 402.        Withdrawals from Bond Service Account.  The Trustee shall on each Interest Payment Date or as otherwise provided in the resolution of the Board authorizing the issuance of Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each Holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due. If paying agents other than the Trustee have been designated by the Authority, the Trustee shall deposit in trust with such paying agents the amounts required to pay such principal and interest. Notwithstanding any provision herein to the contrary, if principal of and premium, if any, and interest on the Bonds that would have been paid from the Sinking Fund is paid instead by a Credit Facility or a Liquidity Facility, amounts held to the credit of the Bond Service Account and the Redemption Account, as applicable, for such purposes shall be paid, to the extent required under any agreement with the issuer of such Credit Facility or Liquidity Facility, to such issuer. The Trustee shall establish one or more subaccounts within the Bond Service Account and the Redemption Account, to the extent required by a resolution of the Board, to segregate

amounts to be paid to the issuer of a Credit Facility or a Liquidity Facility or amounts received from a Credit Facility or a Liquidity Facility.

SECTION 403. <u>Withdrawals from Redemption Account</u>. Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) of this Section, the Trustee shall endeavor to purchase Bonds or portions of Bonds, whether or not such Bonds or portions shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds under the provisions of Article III of this Agreement if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. The Trustee shall pay the interest accrued on such Bonds or portions of Bonds to the date of settlement therefor from the Bond Service Account and the purchase price from the Redemption Account, but no such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part under the provisions of this Agreement except from moneys other than the moneys set aside or deposited for the redemption of Bonds.

(b)     Subject to the provisions of paragraph (c) of this Section, the Trustee shall call for redemption on each date on which Bonds are subject to redemption from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then held for the credit of the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made pursuant to the provisions of Article III of this Agreement. Prior to calling Bonds or portions of Bonds for redemption the Trustee shall withdraw from the Bond Service Account and from the Redemption Account (including from moneys transferred from the Reserve Account to the credit of the Redemption Account) and set aside in separate accounts or deposit with the Paying Agents the respective amounts required for paying the interest on, and the principal and redemption premium of, the Bonds or portions of Bonds so called for redemption.

(c)     Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each Series than Outstanding in the following order:

first, the Term Bonds of each such Series to the extent of the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, if any;

- 36 -

second, any balance then remaining shall be applied to the purchase of any Term Bonds secured hereby and then Outstanding whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) of this Section;

third, any balance then remaining shall be applied to the redemption of the Term Bonds of each such Series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the Term Bonds of each such Series then Outstanding, plus the applicable premium, if any; and

fourth, after the retirement of all Term Bonds, any balance still remaining shall be applied to the retirement of the Serial Bonds of each Series in proportion to the aggregate principal amount of the Serial Bonds of each such Series originally issued under the provisions of this Agreement.

SECTION 404.     Withdrawals from Reserve Account.  Moneys held for the credit of the Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of Bonds in each case in respect of Bonds initially issued before November 1, 1997 when moneys held to the credit of the Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Redemption Account in respect of Term Bonds issued before November 1, 1997 pursuant to the requirements of clause (b) of Section 401 of this Agreement when moneys in the Puerto Rico Infrastructure Fund are insufficient therefor; provided that if moneys then held to the credit of the Bond Service Account are sufficient to pay principal of and interest on the Bonds in the current Fiscal Year, moneys held to the credit of the Reserve Account shall be withdrawn forty-five (45) days prior to the redemption date of any Bonds from moneys in the Redemption Account to the extent necessary to make the deposits required by said clause (b) of Section 401 of this Agreement.

Any moneys held for the credit of the Reserve Account in excess of the lesser of the maximum aggregate Principal and Interest Requirements on the Bonds Outstanding for any Fiscal Year thereafter and ten percent (10%) of the original principal amount of each Series of Bonds Outstanding shall, upon the written request of the Authority, be transferred to the credit of the Bond Service Account or the Redemption Account provided that if the deposits required by clauses (a) and (b) of Section 401 hereof to the credit of the Bond Service Account and the Redemption Account shall have been made for the current Fiscal Year, such excess may be transferred, upon the written request of the Authority, to the Puerto Rico Infrastructure Fund.

SECTION 405.     Moneys Set Aside Held in Trust.  All moneys which the Trustee shall have withdrawn from the accounts of the Sinking Fund, or shall have received from any other source and set aside or deposited with any paying agent for the purpose of paying any of the Bonds hereby secured, either at the maturity thereof or upon call for redemption, shall be held in trust for the respective Holders of such Bonds. Any moneys which shall be so set aside or deposited by the Trustee or any paying agent and which shall remain unclaimed by the Holders of such Bonds for the period of two (2) years after the date on which such Bonds shall have become payable shall, upon request in writing, be paid to the Authority or to such officer, board or body as may then be entitled by law to receive the same, and thereafter the Holders of such Bonds, shall look only to the Authority or to such officer, board or body, as the case may be, for

payment and then only to the extent of the amounts so received without any interest thereon, and the Trustee and any other paying agents shall have responsibility for such moneys.

      SECTION 406.      <u>Establishment of Subaccounts in the Redemption Account</u>.  The Trustee shall establish one or more subaccounts in the Redemption Account for deposits for extraordinary mandatory redemptions of one or more Series of Bonds and shall deposit and withdraw moneys from such subaccounts, if and as required by resolutions of the Board adopted prior to the issuance of such Series of Bonds.

NY1 5690864v.2 45967/59

## ARTICLE V

### DEPOSITARIES OF MONEYS, SECURITY FOR DEPOSITS
### AND INVESTMENTS OF FUNDS

SECTION 501.        Security for Deposits.  All moneys deposited under the provisions of this Agreement with the Trustee, other than moneys deposited to the credit of the Arbitrage Rebate Fund, shall be held in trust under the terms hereof, and shall not be subject to lien or attachment by any creditor of the Authority.

All moneys deposited with the Trustee hereunder in excess of the amount insured by the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation or other Federal agency shall be continuously secured for the benefit of the Trustee, the Holders of the Bonds and the issuer of any Credit Facility, either (a) by depositing with a bank or trust company approved by the Authority and by the Trustee, as custodian, or, if then permitted by law, by setting aside under control of the trust department of the bank holding such deposit, as collateral security, securities described in clause (i) of the definition of Government Obligations, or, with the approval of the Trustee, other marketable securities eligible as security for the deposit of trust funds under applicable regulations of the Comptroller of the Currency of the United States of America and applicable Commonwealth of Puerto Rico laws or regulations, having a market value (exclusive of accrued interest) not less than the amount of such deposit, or, (b) if the furnishing of security as provided in clause (a) of this Section is not permitted by applicable law, in such other manner as may then be required or permitted by applicable Commonwealth of Puerto Rico and Federal laws or regulations regarding the security for, or granting a preference in the case of, the deposit of trust funds; provided, however, that it shall not be necessary for the Trustee to give security for the deposits of any moneys for the payment of the principal of or the redemption premium or the interest on any Bonds issued hereunder, or for the Trustee or other Qualified Depositary or Qualified Depositaries to give security for any moneys which shall be represented by obligations purchased under the provisions of this Article as an investment of such moneys.

All moneys deposited with the Trustee shall be credited to the particular fund or account to which such moneys belong.

SECTION 502.        Investment of Moneys.  Moneys held for the credit of the Bond Service Account and the Redemption Account (except for any subaccounts established by one or more resolutions of the Board to segregate amounts received from a Credit Facility or a Liquidity Facility, which resolution or resolutions may provide for the investment of moneys deposited to the credit of any such subaccount) shall, as nearly as may be practicable, be continuously invested and reinvested, at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended. Moneys held for the credit of the Reserve Account shall as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations that shall mature no later than the final maturity of the Bonds in respect of Bonds initially issued before November 1, 1997.

Obligations so purchased as an investment of moneys in any such fund or account shall be deemed at all times to be a part of such fund or account, and any investment earnings and profit or loss realized on the sale or maturity thereof, shall be credited or debited to such fund or account; provided, however, that if the deposits to any account required by Section 401 hereof have been made for the current Fiscal Year, the investment earnings on moneys held to the credit of such account shall be deposited in the order set forth in said Section 401 to the credit of any account for which such required deposit has not been made, and if all such required deposits have been made, such earnings shall be paid to the Puerto Rico Infrastructure Fund. The Trustee, at the written direction of the Authority, shall sell any obligations so purchased as an investment whenever it shall be necessary to do so in order to provide moneys to meet any payments or transfers from such fund or account. Neither the Trustee nor the Authority shall be liable or responsible for any loss resulting from any such investment.

In the case of investments in the obligations described in clauses (iii)(B) and (vi) of the definition of Investment Obligations, the Authority shall deliver to the Trustee, if the Trustee so requests, an opinion of counsel acceptable to the Trustee as to the perfection and priority of the security interests in the collateral described therein.

SECTION 503.      Valuation of Investments.  In computing the amount in any fund or account created pursuant to the provisions of this Agreement, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such fund or account. The computation of the amount on deposit in or credited to any fund and account created under this Agreement and the valuation of the investments of such amount shall be performed by the Trustee for such fund and account held by the Trustee on the last day of each Fiscal Year, and such computation and valuation shall not be required to be performed at other times, except upon the written request of the Authority.

SECTION 504.      Tax Covenants.  The Authority covenants and agrees that so long as any Bonds remain Outstanding, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, it shall comply with the requirements of the Code, including any arbitrage rebate covenants contained in any agreement entered into by and between the Authority and the Trustee in connection with the issuance of any Series of Bonds, except to the extent failure so to comply would not, in the opinion of counsel of recognized standing in the field of law relating to municipal bonds, result in the interest payable on such Bonds being included in gross income for federal income tax purposes to the Holders thereof under the Code. Notwithstanding anything to the contrary contained herein or otherwise, the Authority shall not be required to comply with the covenants herein contained with respect to a specific Series of Bonds, to the extent that interest on such Series of Bonds shall be intended by the Authority, on

the date of issuance of such Bonds, to be included in gross income for federal income tax purposes to the Holders thereof under the Code.

NY1 5690864v.2 45967/59

## ARTICLE VI

## PARTICULAR COVENANTS

SECTION 601.        Payment of Principal, Interest and Premium; Pledge of Pledged Revenues.  The Authority covenants that it will promptly pay the principal of and the interest on every Bond issued hereunder and secured hereby at the places, on the dates and in the manner specified herein and in said Bonds and any premium required for the retirement of said Bonds by purchase or redemption, according to the true intent and meaning thereof. Except as in this Agreement otherwise provided, such principal, interest and premium, if any, are payable solely from the Pledged Revenues, which Pledged Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified. Nothing in the Bonds or in this Agreement shall be deemed to constitute the Bonds a debt or obligation of the Commonwealth of Puerto Rico or any of its political subdivisions, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions shall be liable for the payment of the principal of or the interest on the Bonds.

SECTION 602.        No Impairment.  The Authority covenants and agrees that, so long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in this Agreement, and that no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the Holders to such Pledged Revenues might be impaired or diminished. Any resolution adopted by the Board authorizing the issuance of a Series of Bonds shall, for all purposes, be deemed part of this Agreement and shall constitute a contract for the benefit of the Holders of said Series. The Agreement and any such resolution may be supplemented and amended only in accordance with Article X hereof, except for supplements and amendments adopted or entered into prior to the issuance of the applicable Series of Bonds which may be adopted or entered into without restriction.

SECTION 603.        Inclusion of Shortfall in Budget.  If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. For purposes of the foregoing sentence, the Authority shall project Special Tax Revenues in the next Fiscal Year of the Commonwealth at such time as shall enable the Authority to file a timely request with the Director of the Office of Budget and Management of the Commonwealth to ensure inclusion in the budget for the next Fiscal Year.  If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund shall be insufficient to permit the Authority to make the deposits into the Sinking Fund set forth in Section 401 hereof in the amounts therein required, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall in such notice request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary.  The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

# ARTICLE VII

# REMEDIES

SECTION 701.        Enforcement of Remedies.  At the request of the Holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed, subject to the provisions of Section 802 hereof, to protect and enforce its rights and the rights of the Holders under the laws of the Commonwealth or under this Agreement, including all rights with respect to funds and other moneys pledged hereunder, by such suits, actions or special proceedings in equity or at law, or by proceedings in the office of any board or officer having jurisdiction, either for the specific performance of any covenant or agreement contained herein or in aid or execution of any power herein granted or for the enforcement of any proper legal or equitable remedy, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights.

In the enforcement of any remedy under this Agreement the Trustee shall be entitled to sue for, enforce payment of and recover judgment for, in its own name and as trustee of an express trust, any and all amounts then or after any default becoming, and at any time remaining, due from the Authority for principal, premium, if any, interest or otherwise under any of the provisions of this Agreement or of the Bonds and unpaid, with interest on overdue payments of principal, premium, if any, and interest at the rate or rates of interest specified in the Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under the Bonds and maintain a suit, action or special proceeding in equity or at law against the Authority for any deficiency, all without prejudice to any other right or remedy of the Trustee or of the Holders, and to recover and enforce any judgment or decree against the Authority, but solely as provided herein and in the Bonds, for any portion of such amounts remaining unpaid and interest, costs and expenses as above provided, and to collect, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 702.        Pro rata Application of Funds.  Anything in this Agreement to the contrary notwithstanding, if at any time the moneys in the Sinking Fund shall not be sufficient to pay the interest on or the principal of the Bonds as the same shall become due and payable, such moneys (except for any moneys deposited in a separate subaccount from a drawing on a Credit Facility or Liquidity Facility which shall secure only specified Bonds), together with any moneys then available or thereafter becoming available for such purpose, whether through the exercise of the remedies provided for in this Article or otherwise, shall be applied as follows:

first:  to the payment to the persons entitled thereto of all installments of interest then due and payable, in the order in which such installments became due and payable and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment, ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in such Bonds;

second:  to the payment to the persons entitled thereto of the unpaid principal of any of the Bonds which shall have become due (other than Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Agreement) in the

- 43 -

order of their due dates, with interest on such Bonds at the respective rates specified therein from the respective dates upon which such Bonds became due, and, if the amount available shall not be sufficient to pay in full the principal of such Bonds due on any particular date, together with such interest, then to the payment first of such interest, ratably, according to the amount of such interest due on such date, and then to the payment of such principal, ratably, according to the amount of such principal due on such date, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Bonds;

third:  to the payment of the interest on and the principal of the Bonds, to the purchase and retirement of Bonds and to the redemption of Bonds, all in accordance with the provisions of Article IV of this Agreement; and

fourth:  to the payment of any amounts then due and owing to a provider of a Credit Facility or a Liquidity Facility.

Whenever moneys are to be applied pursuant to the provisions of this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future; the setting aside of such moneys in trust for the proper purpose shall constitute proper application by the Trustee; and the Trustee shall incur no liability whatsoever to the Authority, to any Holder or to any other person for any delay in applying any such moneys, so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions of this Agreement as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such moneys, he shall fix the date (which shall be an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give notice as he may deem appropriate of the fixing of any such date, and shall not be required to make payment to the holder of any Bond until such Bond shall be surrendered to him for appropriate endorsement, or for cancellation if fully paid.

SECTION 703.    Effect of Discontinuance of Proceedings.  In case any proceeding taken by the Trustee shall have been discontinued or abandoned for any reason, then and in every such case the Authority, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been taken.

SECTION 704.    Bondholders May Control Proceedings.    Anything in this Agreement to the contrary notwithstanding, Holders of a majority in principal amount of the Bonds Outstanding shall have the right, subject to the provisions of Section 802 hereof, by an instrument in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law and the provisions of this Agreement. In the event that particular Bonds are secured by a Credit Facility or Liquidity Facility and the provider of the Credit Facility or Liquidity Facility has not defaulted on its

- 44 -

obligations under such Credit Facility or Liquidity Facility, the provider of such Credit Facility or Liquidity Facility shall have the right, in lieu of the Holders of the Bonds secured thereby, to direct the method and place of conducting such remedial proceedings and to give any consents or waivers to such remedial proceedings under this Article VII.

SECTION 705.    Restrictions Upon Actions by Individual Bondholders.  No Holder of any of the Bonds shall have any right to institute, appear in or defend any suit, action or proceeding in equity or at law on any Bond or for the execution of any trust hereunder or for any other remedy hereunder. It is understood and intended that no one or more Holders of the Bonds hereby secured shall have any right in any manner whatever by his or their action to affect, disturb, or prejudice the security of this Agreement, or to enforce any right hereunder, that all suits, actions and proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders of such outstanding Bonds, and that any individual right of action or other right given to one or more of such holders by law is restricted by this Agreement to the rights and remedies herein provided.

SECTION 706.    No Remedy Exclusive.  No remedy herein conferred upon or reserved to the Holders of the Bonds is intended to be exclusive of any other remedy or remedies herein provided, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder.

SECTION 707.    No Delay or Omission Construed to be a Waiver.  No delay or omission of the Trustee, or any Holder of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein; and every power and remedy given by this Agreement to the Trustee and to the Holders may be exercised from time to time and as often as may be deemed expedient.

SECTION 708.    Actions of Trustee.  All rights of action under this Agreement or under any of the Bonds enforceable by the Trustee  may be enforced by it without the possession of any of the Bonds or the production thereof in the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Bonds, subject to the provisions of this Agreement.

NY1 5690864v.2 45967/59

# ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801.    <u>Acceptance of Trusts</u>.  The Trustee accepts and agrees to execute the trusts imposed upon it by this Agreement, but only upon the terms and conditions set forth in this Article and subject to the provisions of this Agreement, to all of which the parties hereto and the respective Holders of the Bonds agree.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

SECTION 802.    <u>Trustee Entitled to Indemnity</u>.   Any other provisions of this Agreement to the contrary notwithstanding, other than any steps required to draw upon a Credit Facility or a Liquidity Facility to make timely payments of interest on and principal or purchase price of Bonds secured by said Credit Facility or Liquidity Facility, as further provided by resolution of the Board authorizing the issuance of such Bonds, the Trustee shall be under no obligation to institute any suit, or to take any remedial proceeding under this Agreement, or to enter any appearance or in any way defend in any suit in which it may be made defendant, or to take any steps in the execution of the trusts hereby created or in the enforcement of any rights and powers hereunder, until it shall be indemnified to its satisfaction against any and all costs and expenses, outlays and counsel fees and other reasonable disbursements, and against all liability; the Trustee may, nevertheless, begin suit, or appear in and defend suit, or do anything else in its judgment proper to be done by it as such Trustee, without prior indemnity and in such case it shall be indemnified and reimbursed by the Authority for all liabilities, costs and expenses, outlays and counsel fees and other reasonable disbursements properly incurred in connection therewith.

SECTION 803.    <u>Limitation on Trustee's Liabilities</u>.  The Trustee shall have no responsibility in respect of the validity, sufficiency, due execution or acknowledgment of this Agreement or the validity or sufficiency of the security provided hereunder, or except as to the authentication thereof, in respect of the validity of the Bonds or the due execution or issuance thereof. The Trustee shall not be liable or responsible because of the loss of any deposit of moneys arising through the insolvency or the act or default or omission of any other bank or trust company in which such deposit shall have been made by the Trustee under the provisions of this Agreement or by the Authority. The Trustee shall not be responsible for the application of any of the proceeds of the Bonds, or the application of any other moneys deposited with it and paid out, withdrawn or transferred hereunder, if the application by the Trustee of such proceeds and such other moneys and such payment, withdrawal or transfer shall be made in accordance with the provisions of this Agreement. The Trustee shall not be liable in connection with the performance of its duties hereunder or for any error of judgment made in good faith by it, except for its own negligence or default. The Trustee may confer with competent legal counsel and shall not be liable for any action taken or suffered by it in good faith in accordance with an opinion of counsel. The immunities and exemptions from liability of the Trustee hereunder shall extend to its directors, officers, employees and agents.

- 46 -

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

SECTION 804.    Compensation and Indemnification of Trustee.    Subject to the provisions of any contract between the Authority and the Trustee and to Section 401 hereof, the Authority shall pay to the Trustee reasonable compensation for all services rendered by it hereunder and also all of its reasonable expenses, charges and other disbursements and those of its attorneys, agents and employees incurred in and about the administration and execution of the trusts hereby created, and the performance of its powers and duties hereunder, agrees to indemnify and save the Trustee harmless against any liabilities which it may incur in the exercise and performance of its powers and duties hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

SECTION 805.    Trustee May Rely on Certificates.    In case at any time it shall be necessary or desirable for the Trustee to make any investigation respecting any fact preparatory to taking or not taking any action or doing or not doing anything as such Trustee, and in any case in which this Agreement provides for permitting or taking any action, and whenever in the administration of this Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee may, in the absence of bad faith, rely conclusively upon any certificate, requisition, opinion or other instrument required or permitted to be filed with it under the provisions of this Agreement, and any such instrument shall be conclusive evidence of such fact to protect the Trustee in any action that it may or may not take or in respect of anything it may or may not do, in good faith, by reason of the supposed existence of such fact. Except as otherwise provided in this Agreement, any request, notice, certificate or other instrument from the Authority to the Trustee shall be deemed to have been signed by the proper party or parties if signed by the Executive Director or by any officer or employee of the Authority who shall be designated by the Authority by resolution for the purpose, and the Trustee may accept and rely upon a certificate signed by the Executive Director or any other officer or employee of the Authority as to any action taken by the Authority.

SECTION 806.    Notice of Default.    The Trustee shall mail to the Holders of the Bonds then Outstanding, at their addresses as they appear on the registration books, within thirty (30) days after the Trustee shall have knowledge of such default, and to any provider of a Credit Facility or a Liquidity Facility, at its address as it is known by the Trustee, within fifteen (15) days after the Trustee shall have knowledge of such default, written notice of any default in the payment of principal of and interest and premium on any Bond, and any other default known to the Trustee unless such default shall have been cured or waived. Except for such payment defaults, the Trustee shall not be deemed to have knowledge of any default hereunder unless specifically notified in writing by the Holders of not less than ten percent (10%) in principal amount of the Bonds Outstanding.

Notwithstanding the foregoing, except for any default in the payment of principal of and interest and premium on any Bond, the Trustee may withhold and shall be protected in

withholding any notice to the Holders if and so long as the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

SECTION 807.        Trustee May Be Bondholder.  The bank or trust company acting as Trustee under this Agreement, and its directors, officers, agents or employees in their respective individual or other capacities, may buy, sell, own, hold and deal in any of the Bonds issued under and secured by this Agreement, and may join in any action which any Holder of Bonds may be entitled to take with like effect and may otherwise deal with the Authority as if such bank or trust company were not the Trustee under this Agreement, may engage or be interested in any financial or other transaction with the Authority, and may maintain any and all of the general banking and business relations with the Authority with like effect and in the same manner as if the Trustee were not a party to this Agreement; and no implied covenant shall be read into this Agreement against the Trustee in respect of such matters.

SECTION 808.        Trustee Not Responsible for Recitals.  The recitals, statements and representations contained herein and in the Bonds (excluding the Trustee's certificate of authentication on the Bonds) shall be taken and construed as made by and on the part of the Authority and not by the Trustee, and the Trustee assumes and shall be under no responsibility for the correctness of the same. The Trustee makes no representation as to the validity or sufficiency of this Agreement or the Bonds.

SECTION 809.        Trustee Protected in Relying on Papers.  The Trustee shall be protected in acting or proceeding, or in not acting or not proceeding, in good faith, upon any resolution, order, notice, request, consent, waiver, certificate, statement, affidavit, requisition, bond or other paper or document which it shall in good faith believe to be genuine and to have been passed or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Agreement, or upon the written opinion or other written advice of any attorney believed by the Trustee to be qualified in relation to the subject matter, and the Trustee shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such instrument.

SECTION 810.        Resignation of Trustee.  The Trustee may resign and thereby become discharged from the trusts hereby created, by notice in writing to be given to the Authority and published in a daily newspaper of general circulation published in the Municipality of San Juan, Puerto Rico and in a daily newspaper or financial journal published in the Borough of Manhattan, City and State of New York, not less than sixty (60) days before such resignation is to take effect, but such resignation shall take effect immediately upon the appointment of a new Trustee hereunder, if such new Trustee shall be appointed before the time limited by such notice and shall then accept the trusts hereof.

No resignation by the Trustee under this Section, no removal of the Trustee under Section 811 hereof and no appointment of a successor Trustee under Section 812 hereof shall become effective until the acceptance of appointment by the successor Trustee under Section 813 hereof.

SECTION 811.        Removal of Trustee.  The Trustee may be removed at any time by an instrument or concurrent instruments in writing, signed by the Holders of not less than a majority in principal amount of the Bonds hereby secured and then outstanding and filed with the

- 48 -

Authority. A photostatic copy of each such instrument shall be delivered promptly by the Authority to the Trustee. The Trustee may also be removed at any time for any breach of trust or for acting or proceeding in violation of, or for failing to act or proceed in accordance with, any provision of this Agreement with respect to the duties and obligations of the Trustee by any court of competent jurisdiction upon the application of the Authority pursuant to resolution of the Holders of not less than ten percent (10%) in aggregate principal amount of the Bonds then Outstanding under this Agreement.

SECTION 812.    Appointment of Successor Trustee.  If at any time hereafter the Trustee shall resign, be removed, be dissolved or otherwise become incapable of acting, or the bank or trust company acting as Trustee shall be taken over by any governmental official, agency, department or board, the position of Trustee shall thereupon become vacant. If the position of Trustee shall become vacant for any reason, the Authority shall appoint a Trustee to fill such vacancy. Within thirty (30) days after any such appointment, the Secretary of the Authority shall cause notice of such appointment to be published in a daily newspaper of general circulation published in the Municipality of San Juan, Puerto Rico, and in a daily newspaper or financial journal of general circulation in the Borough of Manhattan, City and State of New York.

At any time within one year after any such vacancy shall have occurred, the Holders of a majority in principal amount of the Bonds hereby secured and then Outstanding, by an instrument or concurrent instruments in writing, signed by such Bondholders or their attorneys in fact thereunto duly authorized and filed with the Authority, may appoint a successor Trustee, which shall supersede any Trustee theretofore appointed by the Board. Photostatic copies of each such instrument shall be delivered promptly by the Authority to the predecessor Trustee and to the Trustee so appointed by the Bondholders.

If no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within ten (10) days after the vacancy shall have occurred, the Holder of any Bond Outstanding hereunder or any retiring Trustee may apply to any court of competent jurisdiction to appoint a successor Trustee. Such court may thereupon, after such notice, if any, as such court may deem proper and prescribe, appoint a successor Trustee.

Any Trustee hereafter appointed shall be a corporation duly authorized to exercise corporate trust powers and subject to examination by Federal, state or Commonwealth authority and in good standing and having at the time of its appointment a combined capital and surplus aggregating at least One Hundred Million Dollars ($100,000,000).

SECTION 813.    Vesting of Trust with Successor Trustee.  Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor, and also to the Authority, an instrument in writing accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, shall become fully vested with all the rights, immunities, powers and trusts, and subject to all the duties and obligations, of its predecessor; but such predecessor shall, nevertheless, on the written request of its successor or of the Authority, execute and deliver an instrument transferring to such successor Trustee all the rights, immunities, powers and trusts of such predecessor hereunder; and every predecessor Trustee shall deliver all property and moneys held by it hereunder to its successor. Should any instrument

- 49 -

in writing from the Authority be required by any successor Trustee for more fully and certainly vesting in such Trustee the rights, immunities, power and trusts hereby vested or intended to be vested in the predecessor Trustee, any such instrument in writing shall and will, on request, be executed, acknowledged and delivered by the Authority.

SECTION 814.        Reporting Requirements.  The Trustee shall on a monthly basis, file with the Authority a statement setting forth in respect of the preceding calendar month:

(a)        the amount withdrawn or transferred by it and the amount deposited with it on account of each Fund and Account held by it under the provisions of this Agreement;

(b)        the amount on deposit with it at the end of such month to the credit of each such Fund and Account;

(c)        a brief description of all obligations held by it as an investment of moneys in each such Fund and Account and of any Reserve Account Letter of Credit or Reserve Account Insurance Policy in the Reserve Account;

(d)        the amount applied to the purchase or redemption of Bonds under Section 403 of this Agreement and a description of Bonds or portions of Bonds so purchased or redeemed; and

(e)        any other information which the Authority may reasonably request.

All records and files pertaining to the trusts hereunder in the custody of the Trustee shall be open at all reasonable times to the Authority and its agents and representatives.

NY1 5690864v.2 45967/59

IN WITNESS WHEREOF, Puerto Rico Infrastructure Financing Authority has caused this Agreement to be executed by its Executive Director and its corporate seal to be impressed hereon and attested by its Secretary and Citibank, N.A. has caused this Agreement to be executed in its behalf by one of its Vice Presidents, and its corporate seal to be impressed hereon and attested by a Trust Officer; all thereunto duly authorized, all as of the day and year first above written.

<div style="margin-left:50%;">

PUERTO RICO INFRASTRUCTURE
FINANCING AUTHORITY

(SEAL)

By:___/s/ Jose R. Gonzalez_____
        Executive Director

</div>

Attest:

___/s/ Eugenio Prado_____
        Secretary

<div style="margin-left:50%;">

CITIBANK, N.A.,
Trustee

(SEAL)

By:___/s/ J.A. Olive_____
        Vice President

</div>

Attest:

___/s/ A.L. Peña_____
        Trust Officer

NY1 5690864v.2 45967/59

THE STATE OF NEW YORK     )

                             )   SS:

COUNTY OF NEW YORK     )

On the 2nd day of November, in the year 1988, before me personally came Jose R. Gonzalez, to me known, who, being by me duly sworn, did depose and say that he resides in the Municipality of San Juan, Puerto Rico; that he is the Executive Director of Puerto Rico Infrastructure Financing Authority, the body corporate described in and which executed the above instrument; that he knows the seal thereof; that the seal affixed to said instrument is the corporate seal of Puerto Rico Infrastructure Financing Authority; that it was so affixed by order of the Board of Directors of Puerto Rico Infrastructure Financing Authority; and that he signed his name thereto by like order.

                                                   /s/ Christa M. Bowen
                                 Notary Public, State of New York

My Commission Expires:

_____

Christa M. Bowen
Notary Public
No. 41-4723478
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 31, 1990

                                       (NOTARIAL SEAL)

NY1 5690864v.2 45967/59

THE STATE OF NEW YORK        )
                            )   SS:
COUNTY OF NEW YORK           )

     On the 2nd day of November, in the year 1988, before me personally came J.A. Olive, to me known, who, being by me duly sworn, did depose and say that he resides in New York; that he is a Vice President of Citibank, N.A., the national banking association described in and which executed the above instrument; that he knows the seal of said banking association; that the seal affixed to said instrument is the corporate seal of said banking association; that it was so affixed by authority of the Board of Directors of said corporation; and that he signed his name thereto by like authority.

                              /s/ Christa M. Bowen
                           Notary Public, State of New York

My Commission Expires:

                                  (NOTARIAL SEAL)

Christa M. Bowen
Notary Public, State of New York
No. 41-4723478
Qualified in Queens County
Certificate filed in New York County
Commission Expires August 31, 1990

NY1 5690864v.2 45967/59

**Government Parties' PRIFA Exhibit No. 2**

**NEW ISSUE**
**Book-Entry Only**

# $1,332,962,916.15
# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
### $309,102,577.35 Special Tax Revenue Bonds, Series 2005A
### $324,625,000 Special Tax Revenue Bonds, Series 2005B
### $699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C

The $309,102,577.35 Special Tax Revenue Bonds, Series 2005A, the $324,625,000 Special Tax Revenue Bonds, Series 2005B, and the $699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C, are being issued by Puerto Rico Infrastructure Financing Authority pursuant to a Trust Agreement, dated as of October 1, 1988, as amended, with U.S. Bank Trust National Association, successor trustee.

The Series 2005 Bonds, together with any outstanding bonds that the Authority has issued and may issue from time to time under said Trust Agreement, are payable solely from and secured by a pledge of the revenues of the Authority, consisting of a specified amount of the first proceeds received by the Commonwealth of Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth, and other moneys deposited in the Sinking Fund established under the Trust Agreement. If the federal excise taxes returned to the Commonwealth in any fiscal year fall below such specified amount, the deficiency shall be payable from appropriations which the Legislature of Puerto Rico may, but is not legally required to, make upon request by the Authority. Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.

The Series 2005 Bonds will have the following characteristics:

- The Series 2005 Bonds will be dated their date of delivery.

- The Series 2005 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Series 2005 Bonds will not receive definitive Series 2005 Bonds.

- Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds identified on the inside cover page) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity or earlier redemption as part of the Bonds' Accreted Value.

- The Series 2005 Bonds are subject to redemption as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Series 2005 Bonds.

- Payment of the principal of and interest on the Series 2005A Bonds, certain Series 2005B Bonds and the Series 2005C Bonds when due will be insured by bond insurance policies as indicated on the inside cover page and as described herein.

- The issuance of the Series 2005 Bonds and the purchase of the Series 2005 Bonds by the Underwriters are subject to approval and legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, and certain conditions.

- In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Matters*, beginning on page 27 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

- McConnell Valdés, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Series 2005 Bonds will occur on or about June 16, 2005.

**UBS FINANCIAL SERVICES INC.   BANC OF AMERICA SECURITIES LLC**                     **MERRILL LYNCH & CO.**

| | | |
|---|---|---|
| **Citigroup** | **Goldman, Sachs & Co.** | **JP Morgan** |
| **Lehman Brothers** | **Morgan Stanley** | **Raymond James & Associates, Inc.** |
| **Samuel A. Ramírez & Co.** | | **Wachovia Bank, National Association** |

June 2, 2005

No dealer, broker, sales representative or other person has been authorized by the Authority, the Commonwealth or the Underwriters to give any information or to make any representations other than those contained or incorporated by reference herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority, the Commonwealth or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Series 2005 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth or incorporated by reference herein has been obtained from the Authority, the Commonwealth and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Series 2005 Bonds and may not be reproduced or used, in whole or in part, for any other purpose. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 2005 BONDS AND THE OTHER OUTSTANDING SPECIAL TAX REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

**Page**

SUMMARY STATEMENT . . . . . . . . . . . . . . . . S-1
INTRODUCTORY STATEMENT . . . . . . . . . . . 1
THE AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . 2
PLAN OF FINANCING . . . . . . . . . . . . . . . . . . . 4
THE SERIES 2005 BONDS . . . . . . . . . . . . . . . 5
SECURITY FOR THE BONDS . . . . . . . . . . . . . 9
BOND INSURANCE . . . . . . . . . . . . . . . . . . . . . 13
FEDERAL EXCISE TAXES . . . . . . . . . . . . . . . 17
THE PUERTO RICO RUM INDUSTRY . . . . . . 20
ADDITIONAL COMMONWEALTH
    APPROPRIATIONS . . . . . . . . . . . . . . . . . . . 23
AUTHORITY DEBT . . . . . . . . . . . . . . . . . . . . . 24
FINANCIAL ASSISTANCE TO BENEFITTED
    ENTITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
TAX MATTERS . . . . . . . . . . . . . . . . . . . . . . . . 27
VERIFICATION OF MATHEMATICAL
    COMPUTATIONS . . . . . . . . . . . . . . . . . . . . . 28
ELIGIBILITY OF SERIES 2005 BONDS . . . . . . 29
UNDERWRITING . . . . . . . . . . . . . . . . . . . . . . . 29
COMMONWEALTH COVENANT . . . . . . . . . . 29
GOVERNMENT DEVELOPMENT BANK
    FOR PUERTO RICO . . . . . . . . . . . . . . . . . . . 29
LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . 30
RATINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Page**

CONTINUING DISCLOSURE . . . . . . . . . . . . . 30
MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . 32

Appendix  I  -   Summary of the Trust
                Agreement . . . . . . . . . . . . . . . . I-1
Appendix  II -   Audited Financial Statements
                of the Authority, dated
                June 30, 2004 . . . . . . . . . . . . II-1
Appendix III -   Commonwealth of
                Puerto Rico Financial
                Information and Operating
                Data Report, May 1, 2005 . . . III-1
Appendix IV -    Proposed Form of Opinions
                of Bond Counsel . . . . . . . . . . IV-1
Appendix  V  -   Table of Accreted Values
                for the Capital Appreciation
                Bonds . . . . . . . . . . . . . . . . . . . V-1
Appendix VI -    Specimen Ambac Financial
                Guaranty Insurance Policy . . . VI-1
Appendix VII -   Specimen Financial Guaranty
                Insurance Company Municipal
                Bond New Issue Insurance
                Policy . . . . . . . . . . . . . . . . . . . VII-1

# SUMMARY STATEMENT

*The following is subject in all respects to the additional information contained in this Official Statement including the Appendices attached hereto. Certain capitalized terms used in this Summary Statement and elsewhere in this Official Statement are defined in "Definitions of Certain Terms" in Summary of the Trust Agreement in Appendix I. Certain other capitalized terms are used in this Official Statement as defined in this Summary Statement.*

**The Authority** . . . . . . . . . . . . . . .
Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), was created on June 21, 1988, for the purpose of providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth that develop and operate infrastructure facilities.

**Plan of Financing** . . . . . . . . . . . . .
The bonds offered hereby, when and if issued (collectively, the "Series 2005 Bonds"), will be issued to finance certain capital projects of Puerto Rico Aqueduct and Sewer Authority ("PRASA") and other instrumentalities and municipalities of the Commonwealth; provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities; repay certain advances made to the Authority by Government Development Bank for Puerto Rico; refund all of the Authority's outstanding Special Tax Revenue Bonds, Series 1997A; and pay capitalized interest and certain costs of issuance of the Series 2005 Bonds. See *Plan of Financing*.

**Security for the Bonds** . . . . . . . .
The Authority's Special Tax Revenue Bonds, Series 1988A, Series 1997B, and Series 1998A, in the aggregate principal amount of $137,835,000, which will remain outstanding after the refunding described above (collectively, the "Remaining Bonds"), the Series 2005 Bonds, and any additional bonds that the Authority may from time to time issue under the Trust Agreement (collectively, the "Bonds") are payable solely from and secured by a pledge of Federal Excise Taxes (as defined below) and other moneys deposited to the credit of the Sinking Fund, as follows:

**Federal Excise Taxes** . . . . . . . . .
Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), requires that in each fiscal year after fiscal 1998, through fiscal 2006, the first $70 million, and in each fiscal year thereafter through fiscal 2052, the first $90 million, of certain federal excise taxes received by the Commonwealth be deposited in the Authority's Infrastructure Fund. Such taxes consist of the Federal Excise Taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth (the "Federal Excise Taxes"). Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Commonwealth. The Trust Agreement requires the Authority to deposit in the Sinking Fund the Federal Excise Taxes and other moneys deposited in the Infrastructure Fund in such amounts as are required to meet the debt service requirement for all Bonds issued under the Trust Agreement.

Federal Excise Taxes have been transferred to the Commonwealth since 1917 in accordance with certain Acts of Congress. The amount of Federal Excise Taxes transferred to the Commonwealth is $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1,

2006, such amount will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed, unless a proposed one-year extension is approved by Congress.   See "Pledged Revenues" under *Security for the Bonds* and "Imposition of Tax" under *Federal Excise Taxes*.

The table below shows the Federal Excise Taxes received by the Commonwealth in each of the last five fiscal years:

| Fiscal Year | Federal Excise Taxes |
|:-----------:|:--------------------:|
| 2000 | $235,397,855 |
| 2001 | 296,472,248 |
| 2002 | 307,906,661 |
| 2003 | 299,045,613 |
| 2004 | 302,785,007 |

The maximum Principal and Interest Requirements (net of capitalized interest) on the Series 2005 Bonds and the Remaining Bonds in any fiscal year is $86 million.  During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received at least $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year.

The Federal Excise Taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance by the United States of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry.  See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Additional Commonwealth Appropriations** . . . . . . . . . . . . . .    If the Federal Excise Taxes received by the Commonwealth in any fiscal year are insufficient to deposit $90 million ($70 million before fiscal 2007) in the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget, upon the Authority's request, to include in the recommended budget of the Commonwealth for the corresponding fiscal year the appropriation needed to cover such insufficiency.  The Commonwealth Legislature, however, is not legally obligated to make any appropriation to cover such insufficiency.  There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature.   See *Additional Commonwealth Appropriations*.

**Additional Bonds** . . . . . . . . . . . .    Additional Bonds secured on a parity with the Bonds may be issued for any purpose authorized by the Enabling Act, subject to compliance with certain financial tests provided in the Trust Agreement.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth** . . . . . . . .    The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.  The Commonwealth has never used Federal Excise Taxes for the payment of its

general obligation debt or its guaranteed debt. The incurrence by the Commonwealth of general obligation debt is subject to a constitutional debt limit described herein.

Maximum annual debt service for the Commonwealth's outstanding general obligation debt plus debt service for fiscal 2005 on bonds for which the Commonwealth is currently making payments under its guaranty equals $741,648,153. This amount is equal to 9.97% of $7,439,000,000, which is the average of the adjusted annual internal revenues of the Commonwealth (which excludes Federal Excise Taxes) for the two fiscal years ended June 30, 2003 and 2004. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security for the Bonds*.

**Interest** . . . . . . . . . . . . . . . . . . . . . Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity as part of the Bonds' Accreted Value.

**Optional Redemption** . . . . . . . . . The Series 2005B Bonds maturing July 1, 2037 and 2041, may be redeemed by the Authority prior to maturity, upon not less than 30 days' prior notice, either in whole or in part, and if in part, as directed by the Authority. See "Optional Redemption" under *Redemption Provisions*.

**Trustee** . . . . . . . . . . . . . . . . . . . . . U.S. Bank Trust National Association, successor trustee.

**Ratings** . . . . . . . . . . . . . . . . . . . . Standard & Poor's: "BBB+;" Moody's: "Baa2." See *Ratings*.

**Bond Insurance** . . . . . . . . . . . . . . The payment when due of principal of and interest on the Series 2005A Bonds, certain Series 2005B Bonds and the Series 2005C Bonds will be insured by bond insurance policies as indicated on the inside cover page and as described herein. See *Bond Insurance*.

**Tax Matters** . . . . . . . . . . . . . . . . . In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from all state, Commonwealth and local income taxes. However, see *Tax Matters* beginning on page 27 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

**$1,332,962,916.15**
**Puerto Rico Infrastructure Financing Authority**
**$309,102,577.35 Special Tax Revenue Bonds, Series 2005A**
**$324,625,000 Special Tax Revenue Bonds, Series 2005B**
**$699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C**

### INTRODUCTORY STATEMENT

The purpose of this Official Statement is to provide certain information in connection with the issuance and sale by Puerto Rico Infrastructure Financing Authority (the "Authority") of its Special Tax Revenue Bonds, Series 2005A, in the aggregate principal amount of $309,102,577.35 (the "Series 2005A Bonds"), its Special Tax Revenue Bonds, Series 2005B, in the aggregate principal amount of $324,625,000 (the "Series 2005B Bonds"), and its Special Tax Revenue Refunding Bonds, Series 2005C, in the aggregate principal amount of $699,235,338.80 (the "Series 2005C Bonds" and together with the Series 2005A Bonds and the Series 2005B Bonds, the "Series 2005 Bonds"). A portion of the Series 2005A Bonds and Series 2005C Bonds (as shown on the inside cover) will be issued as Capital Appreciation Bonds (as defined in the Trust Agreement hereinafter mentioned).

The Series 2005 Bonds are being issued pursuant to Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), a Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and a resolution of the Board of Directors of the Authority adopted on June 2, 2005 (the "Bond Resolution"). The Series 2005 Bonds are expected to be delivered on or about June 16, 2005.

This Official Statement includes brief descriptions of the Enabling Act, the Series 2005 Bonds (and the other outstanding Bonds of the Authority secured on a parity with the Series 2005 Bonds), the Bond Resolution and the Trust Agreement. Such descriptions do not purport to be complete and are qualified in their entirety by reference to such documents. All references to the Series 2005 Bonds are qualified in their entirety by reference to the definitive forms thereof contained in the Bond Resolution. Copies of all such documents and agreements are available for inspection during regular business hours at the offices of Government Development Bank for Puerto Rico ("Government Development Bank"), located at 140 Broadway, 38th Floor, New York, New York 10005 and at the Government Development Bank for Puerto Rico Building, Minillas Government Center, San Juan, Puerto Rico 00940, or at the corporate trust office of the Trustee at 100 Wall Street, Suite 1600, New York, New York 10005.

This Official Statement, which includes the cover page and the Appendices hereto, incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2004, together with the independent auditor's report thereon, dated April 8, 2005, of KPMG LLP ("KPMG"), certified public accountants (collectively, the "CAFR"). The CAFR has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). KPMG did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. This Official Statement also includes the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated as of May 1, 2005 (the "Commonwealth Report"), attached hereto as Appendix III.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the CAFR that is filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB"), or any new or revised Commonwealth Report or CAFR, or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the CAFR that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Series 2005 Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the CAFR shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a

statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, New York 10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the CAFR may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The address of the MSRB is 1900 Duke Street, Suite 600, Alexandria, Virginia 22314, telephone number (703) 797-6600.

Certain capitalized terms used in this Official Statement are defined in "Definition of Certain Terms" in *Summary of Trust Agreement* in Appendix I. Certain other capitalized terms are defined in the Summary Statement.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Authority's and the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## THE AUTHORITY

**General**

The Commonwealth recognizes the importance of developing, maintaining and improving its infrastructure to promote Puerto Rico's economic development. Accordingly, the Commonwealth has established the Authority as a public corporation and instrumentality with two principal functions: (i) providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth responsible for developing and operating infrastructure facilities, and (ii) providing an alternative means for directly financing those facilities.

The Enabling Act defines "infrastructure" to include public works and facilities of a substantial public interest, such as aqueduct and sewer systems including water supply systems, waste water treatment and disposal systems, improvements financed under the provisions of Title VI of the Federal Clean Water Act and Title I of the Federal Safe Drinking Water Act, solid and hazardous waste disposal systems, resource recovery systems, electric power systems, highways, roads, pedestrian walkways, parking facilities, airports, convention centers, bridges, maritime ports, tunnels, transportation systems including mass transportation, communication systems including telephones, industrial facilities, land and natural resources, public housing projects, and tourist, medical and agro-industrial infrastructure facilities.

The Authority has all the necessary and convenient powers to accomplish and effectuate the purposes and provisions of the Enabling Act, including the power to negotiate and enter into assistance agreements with political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth authorized to provide infrastructure for the purpose of carrying out necessary financing programs for the development of infrastructure and providing consulting, technical, administrative, advisory, and other assistance in all matters related to such facilities. Any such entity receiving assistance from the Authority (a "Benefitted Entity") may be required to comply with all

operational, administrative and budgetary requirements that the Authority considers pertinent to achieve the purposes of said assistance.

At its creation in 1988, the Authority's principal undertaking was to provide financial and other assistance to Puerto Rico Aqueduct and Sewer Authority ("PRASA") pursuant to the terms of an assistance agreement, as amended, between PRASA and the Authority. More recently, however, the Authority has signed assistance agreements with other Commonwealth instrumentalities and municipalities involved in infrastructure projects, including the Department of Education, the Department of Natural and Environmental Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation and the Special Communities Perpetual Trust. See *Plan of Financing* and *Financial Assistance to Benefitted Entities*.

The executive offices of the Authority are located at the Capital Center Building II, 235 Arterial Hostos Avenue, Suite 1601, San Juan, Puerto Rico 00918. The telephone number is (787) 763-5757.

**Powers**

The Authority has broad powers under the Enabling Act, including, among others, the power to: sue and be sued; make contracts; acquire properties by eminent domain or otherwise; borrow money and issue bonds for any of its corporate purposes, including the financing of the construction, rehabilitation, acquisition, repair, preservation and replacement of portions of the infrastructure of Puerto Rico; mortgage or pledge any property and pledge all or a portion of the Authority's revenues, including Federal Excise Taxes (see "Pledged Revenues" under *Security for the Bonds*) or other funds transferred by the Commonwealth to the Authority for the payment of the principal of and interest on any bonds issued by the Authority or bonds issued by a Benefitted Entity; provide assistance to Benefitted Entities as permitted by and consistent with the purposes of the Enabling Act; and fix, impose and collect rents, fees, rates and other charges for the use of any of its properties.

**Management**

The Enabling Act provides that the Board of Directors of the Authority (the "Board") shall be composed of the Board of Directors of Government Development Bank and the Secretary of the Treasury of Puerto Rico (in the event the Secretary of the Treasury is not a member of Government Development Bank's Board of Directors). Members of the boards or officers of any Benefitted Entity are specifically excluded from serving on the Board. The Secretary of the Treasury is the Chairman of the Board. The Board currently has one vacancy. The members of the Board are:

| Name | Term Ends | Occupation |
|------|-----------|------------|
| Juan C. Méndez | Indefinite | Secretary of the Treasury |
| Alfredo Salazar | September 22, 2008 | Chairman of the Board of Directors of Government Development Bank |
| Jorge P. Silva | September 22, 2006 | Secretary of Commerce and Economic Development |
| Ileana I. Fas | September 22, 2007 | Director of the Office of Management and Budget |
| José F. Rodríguez | September 20, 2008 | Businessman |
| Rafael Martínez | September 22, 2006 | Certified Public Accountant |

The Board appoints officers and employs agents and employees who are responsible for the general operation of the Authority. Set forth below is a brief biographical description of the Acting Executive Director of the Authority. The Authority currently does not have any other designated officers.

3

whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion deems fair and appropriate.

*Effect of Redemption*.  On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and redemption premium, if any, and accrued interest on the Series 2005 Bonds or portions thereof so called for redemption being held by the Trustee, interest on the Series 2005 Bonds or portions thereof so called for redemption shall cease to accrue.  Subject to certain provisions of the Trust Agreement, Series 2005 Bonds and portions of Series 2005 Bonds which have been duly called for redemption under the provisions of the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for the payment of the principal of and redemption premium, if any, and the accrued interest on which sufficient moneys or investments permitted by law shall be held in separate trust for the owners of the Series 2005 Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Trust Agreement, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the redemption premium, if any, and the accrued interest thereon from said separate trust.

## SECURITY FOR THE BONDS

The Bonds (including the Series 2005 Bonds) are payable solely from, and secured by a pledge of, the revenues and other moneys deposited in the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund (the "Sinking Fund") established under the Trust Agreement (the "Pledged Revenues").  The Sinking Fund includes the Bond Service Account, the Redemption Account and the Reserve Account.  The last remaining outstanding Bonds secured by a pledge of the moneys on deposit in the Reserve Account will mature on July 1, 2005, at which time the Reserve Account will no longer apply to the Bonds.  Consequently, no further reference will be made to the Reserve Account in this Official Statement.

**Pledged Revenues**

Pledged Revenues consist of:  (i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

Under the provisions of Section 9 of the Puerto Rican Federal Relations Act and Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended (the "Code"), any excise tax imposed and collected by the United States on articles produced in the Commonwealth and transported to the United States (less the estimated amount necessary for payments of refunds and drawbacks) is required to be transferred to the Commonwealth.  Rum is the only article currently produced in Puerto Rico that is subject to the Federal Excise Tax.  The United States Treasury is required by federal law to transfer to the Commonwealth the lesser of $10.50 per proof gallon ($13.25 per proof gallon during the period July 1, 1999 through December 31, 2005) or excise tax imposed on each proof gallon of rum produced in Puerto Rico and sold in the United States, currently set at the rate of $13.50 per proof gallon. For fiscal year 2004, the amount of Federal Excise Taxes transferred to the Commonwealth was $302,785,007. See *Federal Excise Taxes*.

The Enabling Act requires the Secretary of the Treasury of the Commonwealth to transfer to the Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Infrastructure Fund"), a special fund created by the Enabling Act to be maintained by or on behalf of the Authority, the first $70 million of Federal Excise Taxes received by the Commonwealth in each fiscal year after fiscal 1998 through fiscal 2006, and the first $90 million received in each fiscal year thereafter through fiscal 2052 (the Federal Excise Taxes deposited to the credit of the Infrastructure Fund are referred to as the "Special Tax Revenues").  During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received the first $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year.  See "Federal Excise Tax Revenues" under *Federal Excise Taxes*.

If the Federal Excise Taxes received in any fiscal year are insufficient to make the required deposit to the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget to include, upon the Authority's request, in the recommended budget for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make the necessary appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. For more information on the budgetary process of the Commonwealth, see *Additional Commonwealth Appropriations*.

Federal Excise Taxes have represented a stable source of revenues for the Commonwealth. The federal law requiring the transfer of Federal Excise Taxes to the Commonwealth has been in effect since 1917. In addition, since fiscal year 1988 Federal Excise Taxes have been no less than $166 million ($180 million if adjusted to take into account a change made by the Puerto Rico Department of the Treasury in June 1993 in the method used to report the collection of Federal Excise Taxes from an accrual to a cash basis). The level of Federal Excise Taxes transferred in the future may be affected by factors beyond the control of the Commonwealth, such as changes in federal legislation affecting the imposition or transfer of such taxes and conditions in the Puerto Rico rum industry.

Pursuant to the proposed Highway Reauthorization and Excise Tax Simplification Act of 2005 pending before Congress (the "2005 Highway Reauthorization Act"), the amount of Federal Excise Taxes per proof gallon transferred to the Commonwealth would increase from $13.25 to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, the Federal Excise Taxes transferred to the Commonwealth would revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. If the 2005 Highway Reauthorization Act becomes law, it will require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Puerto Rico Conservation Trust Fund, a Puerto Rico charitable trust (the "Conservation Trust Fund"). Based on 2004 sales of rum, the amount that would be required to be transferred to the Conservation Trust Fund in 2006 is approximately $13.6 million. The Conservation Trust Fund was established pursuant to a Memorandum of Understanding, dated December 24, 1968, between the U.S. Department of the Interior and the Commonwealth to protect and enhance the natural resources and beauty of Puerto Rico through the acquisition and active management of lands possessing great ecological, aesthetic or historical value in Puerto Rico. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment*. The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended, the Secretary of the Treasury is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by making prescribed monthly deposits into the Commonwealth Redemption Fund. As of April 30, 2005, the amount on deposit in the Redemption Fund was $299.5 million, which is the required amount for the payment of the July 1, 2005 period.

*Debt Limitation*.  Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years.  The Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.  Internal revenues (revenues raised under the provisions of Commonwealth legislation) consist principally of income taxes and excise taxes.  Certain revenues, such as Federal Excise Taxes and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

As of December 31, 2004, $2.9 billion of Commonwealth guaranteed bonds of the Public Buildings Authority and $267 million of Commonwealth guaranteed obligations of Government Development Bank were outstanding.  No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority or obligations of Government Development Bank.

As of December 31, 2004, the aggregate outstanding amount of the Series 1995 revenue bonds of PRASA guaranteed by the Commonwealth (the "PRASA Guaranteed Bonds") was $305.3 million.  On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In April 2000, the Commonwealth extended its guaranty to all the outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of PRASA.  The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005.  In February 2004, this guaranty was extended through new legislation to cover PRASA's debt obligations issued until 2010.  As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

Maximum annual debt service for the Commonwealth's general obligation debt outstanding as of December 31, 2004, is $600.6 million in fiscal 2020.  This calculation does not take into account debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance.  Such refunded bonds are considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.  If such bonds are included therein, maximum annual debt service for the Commonwealth's general obligation debt outstanding would be $711.5 million in fiscal 2005.  Debt service for the PRASA Guaranteed Bonds in fiscal 2005 (including for this purpose debt service payments due July 1, 2005) is $30.1 million.  The sum of those amounts ($741.6 million) is equal to 9.97% of $7.439 billion, which is the average of the Commonwealth's adjusted internal revenues for the two fiscal years ended June 30, 2003 and 2004.  See "Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt" under *Debt* in the Commonwealth Report.

**Flow of Funds**

Under the Trust Agreement, the Authority must withdraw Special Tax Revenues and other moneys from the Infrastructure Fund and make the following deposits:

(a)       first, to the credit of the Bond Service Account, such amount as may be required to make the total amount to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)        second, to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Infrastructure Fund to make (i) any payment necessary to satisfy then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component.  After making the foregoing applications, the Authority may apply any moneys to the credit of the Infrastructure Fund to any lawful purpose.  See *Summary of the Trust Agreement* in Appendix I.

## Additional and Refunding Bonds

Under the Trust Agreement, the Authority may issue additional Bonds for any lawful purpose of the Authority, provided that, among other things, the following coverage tests are met:

(a)        the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of issuance of such additional Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years, shall not be less than 200% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding, and the additional Bonds to be issued; and

(b)        the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that requires such increased amount, if received from the federal government, to be deposited to the credit of the Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding, shall not be less than 100% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the additional Bonds to be issued.

The average annual Federal Excise Taxes for the two Fiscal Years in the period ended June 30, 2004, computed on the basis of $13.25 per proof gallon,  is equal to $303,539,000. That amount is more than 200% of $86 million, which is the maximum aggregate Principal and Interest Requirements for any Fiscal Year on all Bonds currently Outstanding and the Series 2005 Bonds, after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*.  In addition, the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two Fiscal Years in the period ended June 30, 2004 is $90 million adjusted as permitted by the Trust Agreement to reflect the increase of Special Tax Revenues deposited to the Infrastructure Fund that will occur beginning in fiscal 2007.  That amount is more than 100% of $86 million, which is the maximum aggregate Principal and Interest Requirements on the Remaining Bonds and the Series 2005 Bonds after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*.

Additional Bonds may also be issued for the purpose of refunding all or a portion of any series of Bonds then Outstanding by meeting the coverage tests described in paragraphs (a) and (b) above or if (i) the Principal and Interest

termination of the offering of the Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

Financial Guaranty also prepares quarterly and annual financial statements on the basis of generally accepted accounting principles. Copies of Financial Guaranty's most recent GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. Financial Guaranty's telephone number is (212) 312-3000.

## Financial Guaranty's Credit Ratings

The financial strength of Financial Guaranty is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of Financial Guaranty should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of Financial Guaranty. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the Financial Guaranty Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market prices of the Financial Guaranty Insured Bonds. Financial Guaranty does not guarantee the market prices or investment values of the Financial Guaranty Insured Bonds nor does it guarantee that the ratings on the Financial Guaranty Insured Bonds will not be revised or withdrawn.

**Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure that is provided to potential purchasers of the Series 2005 Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the Financial Guaranty Insurance Policy under the heading "*Financial Guaranty Insured Bonds*." In addition, Financial Guaranty makes no representation regarding the Series 2005 Bonds or the advisability of investing in the Series 2005 Bonds.**

## FEDERAL EXCISE TAXES

### Background

The imposition of excise taxes has a long history under United States law, as does the transfer of Federal Excise Taxes to Puerto Rico. Such transfer is required under certain Acts of Congress that establish the unique political and legal relationship between Puerto Rico and the United States.

Excise taxes were first imposed in the United States in 1790 and have remained in force since then except for a short period in the early part of the 19th century. The transfer of Federal Excise Taxes to Puerto Rico began with the Organic Act of 1917, popularly known as the Jones Act, passed by Congress on March 2, 1917. Section 9 of the Jones Act provided that "all taxes collected under the revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the Island shall be covered into the Treasury of Puerto Rico." This transfer was intended to provide revenues for Puerto Rico government expenditures.

In 1950, when Congress enacted legislation providing for the establishment of a constitutional government in Puerto Rico, Section 9 of the Jones Act was incorporated as Section 9 of the Puerto Rican Federal Relations Act. The Puerto Rican Federal Relations Act is one of the federal statutes in force that defines the nature of the political and legal relationship between Puerto Rico and the United States.

A provision similar to Section 9 of the Puerto Rican Federal Relations Act also appears in Section 7652(a)(3) of the Code and currently reads as follows: "[all] taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payment of refunds and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico."

17

**Imposition of Tax**

Section 7652(a)(l) of the Code provides that "articles of merchandise of Puerto Rican manufacture coming into the United States and withdrawn for consumption or sale shall be subject to a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture." Rum is the only article currently produced in Puerto Rico subject to federal excise tax.

Section 5001(a)(1) of the Code currently imposes a tax on all distilled spirits produced in or imported into the United States at the rate of $13.50 per proof gallon. A "proof gallon" is a liquid gallon consisting of 50% alcohol. Section 5001(a)(10) of the Code provides that, with certain exceptions, the tax upon any article containing distilled spirits brought from Puerto Rico into the United States for consumption or sale shall be at the same rate as the rate imposed on distilled spirits produced in the United States.

From 1951 until the enactment of the Deficit Reduction Act of 1984 (the "DRA"), the federal excise tax on distilled spirits produced in or imported into the United States was $10.50 per proof gallon. The DRA increased the tax to $12.50 per proof gallon, and amended Section 7652 of the Code to limit the amount of Federal Excise Taxes transferred to Puerto Rico to the lesser of $10.50 per proof gallon and the actual excise tax imposed under Section 5001 of the Code. Effective January 1,1991, Section 5001(a)(l) was amended to increase the tax to $13.50 per proof gallon. The amount of Federal Excise Taxes transferred to Puerto Rico remained at $10.50 per proof gallon. In 1993, however, Section 7652 was amended to increase the amount of Federal Excise Taxes transferred to Puerto Rico to $11.30 per proof gallon during the five fiscal year period ended on September 30,1998. In 1999 and 2004, Section 7652 was further amended to raise the amount of Federal Excise Taxes transferred to Puerto Rico to $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1, 2006, the amount of Federal Excise Taxes transferred to Puerto Rico will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed.

If it becomes law, the 2005 Highway Reauthorization Act will increase the amount of Federal Excise Taxes per proof gallon transferred to Puerto Rico to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, such amount will revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. The Act will also require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Conservation Trust Fund within 30 days of each such Federal Excise Tax transfer to Puerto Rico. See "Conservation Trust Fund" below. Each transfer payment is to be treated as principal for an endowment, the income from which is to be used by the Conservation Trust Fund for the purposes for which it was established. If Puerto Rico fails to make a timely payment to the Conservation Trust Fund, the U.S. Secretary of the Treasury will deduct and withhold such unpaid amount from the next Federal Excise Tax transfer payment, plus interest, and will transfer such amounts directly to the Conservation Trust Fund. Such deduction, withholding, and direct payment will not be made if the U.S. Secretary of the Interior, after consultation with the Governor of Puerto Rico, finds that the failure of the Commonwealth to make the transfer payment was for good cause.

The United States has never reduced the amount of Federal Excise Taxes transferred to Puerto Rico below $10.50 per proof gallon. For a five-month period in 1986, however, Federal Excise Taxes were subject to sequestration under the Gramm-Rudman-Hollings Act ("GRH"). This sequestration ended when Congress enacted a law requiring that, notwithstanding GRH or any other provision of law, amounts required to be transferred to Puerto Rico under the Puerto Rican Federal Relations Act be paid in full to Puerto Rico.

There can be no assurance that the excise tax rate on distilled spirits will not be reduced or that such taxes will not be eliminated in the future or that there will not be a reduction in the amounts transferred to the Commonwealth.

**Collection of Taxes**

In the case of rum shipped in bulk to the United States, Federal Excise Taxes are paid by distributors and importers on a semi-monthly basis, each payment representing the taxes on rum withdrawn from bonded warehouses during the immediately preceding two-week period for consumption in the United States. In the case of rum bottled in

Puerto Rico and shipped to the United States, Federal Excise Taxes are paid by producers in Puerto Rico when the rum is shipped to the United States.

The United States Department of the Treasury makes monthly transfers of Federal Excise Taxes to Government Development Bank for the account of the Puerto Rico Department of the Treasury consisting of: (i) excise taxes paid on rum bottled in Puerto Rico and shipped to the United States during the immediately preceding month, and (ii) excise taxes paid on rum shipped in bulk to the United States and retired for consumption two months prior to the date of such transfer.

The period elapsed between the time that a producer, distributor or importer pays the excise tax and the time that the United States Department of the Treasury remits such taxes to the Puerto Rico Department of the Treasury ranges between 30 and 90 days.

**Conservation Trust Fund**

Under a policy to protect and enhance the natural resources of Puerto Rico, the Commonwealth has transferred annually since 1999 to the Conservation Trust Fund an amount of Federal Excise Taxes equal to approximately 45 cents per proof gallon. During fiscal 2004, approximately $12.2 million was so transferred. Under the proposed 2005 Highway Reauthorization Act and based on 2004 rum sales, such transfer would increase to approximately $13.6 million in 2006. Given that the proposed federal mandate for such transfers to the Conservation Trust Fund would expire on December 31, 2006, the Authority believes that the deposit to the Infrastructure Fund has and will thereafter come ahead of any transfer to the Conservation Trust Fund in the event that the Federal Excise Taxes, net of such transfer, are insufficient to cover the required annual Infrastructure Fund deposit.

**Federal Excise Tax Revenues**

Throughout the 1950's and 1960's Federal Excise Taxes consisted principally of excise taxes on rum and tobacco. Since 1986, however, with the phasing out of the manufacture of tobacco products in Puerto Rico, all Federal Excise Taxes have consisted of taxes imposed on rum produced in Puerto Rico.

The table below shows the Federal Excise Taxes received with respect to rum during each of the five fiscal years ended June 30, 2004 and in the current fiscal year through May 2005. The figures shown represent the Federal Excise Taxes actually received by Government Development Bank for the account of the Puerto Rico Department of the Treasury in each month. In each case, the amounts shown are net of: (i) operational expenses incurred by the United States Department of the Treasury in processing and accounting for Federal Excise Taxes (approximately $8.9 million in fiscal 2004); (ii) amounts transferred by the Commonwealth Treasury to the Conservation Trust Fund (approximately $12.2 million in fiscal 2004); and (iii) federal excise taxes received in connection with rum produced in other countries (approximately $51.1 million in fiscal 2004), which are also transferred to the Commonwealth but are not deposited in the Infrastructure Fund pursuant to the terms of the Enabling Act and the Trust Agreement.

19

## ADDITIONAL COMMONWEALTH APPROPRIATIONS

Under the Enabling Act the Authority may request appropriations from the Commonwealth if Federal Excise Taxes in the amounts authorized by the Enabling Act are not received by the Commonwealth for deposit in the Infrastructure Fund, as described above, and the Director of the Office of Management and Budget is required, upon the Authority's request, to include such appropriations in the recommended budget for the corresponding fiscal year. The Commonwealth Legislature, however, is not legally obligated to make such appropriations. Since the enactment of the Enabling Act, the full amount of the Federal Excise Taxes required to be deposited in the Infrastructure Fund has been so deposited and no such appropriations have been requested by the Authority. Following is a brief description of the budgetary process of the Commonwealth.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by the Office of Management and Budget, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other sources for the ensuring fiscal year under (i) laws existing at the time the budget is estimated, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any item so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of a fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by the Office of Management and Budget based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of the Office of Management and Budget, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, make recommendations to the Legislature for new taxes, authorize borrowings under provisions of existing legislation, or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and

23

guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund Act"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public services. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed six percent of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 90 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of any fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

## AUTHORITY DEBT

The following table sets forth the bond and note obligations of the Authority as of April 30, 2005, and as adjusted for the issuance of the Series 2005 Bonds and the refunding of the Refunded Bonds.

| | Outstanding as of April 30, 2005[1] | As Adjusted |
|---|---|---|
| Notes[2] . . . . . . . . . . . . . . . . . . . . . | $    22,973,949 | $          0 |
| Series 1988A Bonds . . . . . . . . . . . . | 1,635,000 | 1,635,000 |
| Series 1997A and 1997B Bonds . . . | 773,025,000 | 1,540,000 |
| Series 1998A Bonds . . . . . . . . . . . . | 134,660,000 | 134,660,000 |
| Series 2005 Bonds . . . . . . . . . . . . . | 0 | 1,332,962,916 |
| Total . . . . . . . . . . . . . . . . | $  932,293,949 | $1,470,797,916 |

_____

(1) Excludes $1.058 billion of the Authority's Series 2000A and 2000B Bonds, which are payable solely from the investment income of funds on deposit in the Authority's Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(2) Line of credit of Government Development Bank to the Authority.

## ELIGIBILITY OF SERIES 2005 BONDS

The Series 2005 Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2005 Bonds from the Authority at an aggregate discount of $8,635,874.33 from the initial public offering prices for such Bonds, set forth (or derived from information set forth) on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent. The Underwriters will be obligated to purchase all Series 2005 Bonds if any such Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) and institutional purchasers at prices lower than the public offering prices which may be changed, from time to time, by the Underwriters.

Banc of America Securities LLC ("Banc of America Securities"), a co-senior underwriter, has entered into a written agreement with Oriental Financial Services Corp. ("Oriental Financial Services") pursuant to which Oriental Financial Services has agreed to act as a consultant to Banc of America Securities in connection with Banc of America Securities' provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a co-senior underwriter, has entered into a written agreement with BBVA Securities of Puerto Rico, Inc. ("BBVA Securities") pursuant to which BBVA Securities has agreed to act as a consultant to Merrill Lynch, in connection with Merrill Lynch's provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Pursuant to these agreements, the existence of which has been disclosed to the Authority and Government Development Bank, Oriental Financial Services and BBVA Securities will be entitled to receive, respectively, a portion of Banc of America Securities' and Merrill Lynch's actual net profits, if any, in connection with the underwriting of the Series 2005 Bonds. Other similar agreements with respect to the sharing of underwriting net profits have been entered into and disclosed to the Authority and Government Development Bank by: J.P. Morgan Securities, Inc. and R-G Investments Corporation, Goldman, Sachs & Co. and FirstBank Puerto Rico, Lehman Brothers, Inc. and Santander Securities Corporation, Morgan Stanley & Co. Incorporated and Popular Securities, Inc., and Wachovia Bank, National Association and Doral Securities, Inc.

The Authority has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the federal securities laws.

## COMMONWEALTH COVENANT

Pursuant to the Enabling Act, the Commonwealth has pledged to all holders of the Series 2005 Bonds that it will not limit or alter the rights or powers vested in the Authority by the Enabling Act so as to impair the rights of such holders until the Series 2005 Bonds and the interest thereon are fully met and discharged.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the offering of the Series 2005 Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2005 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

APPENDIX I

## SUMMARY OF THE TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement. This summary does not purport to be complete and is qualified in its entirety by reference to the Trust Agreement. Inasmuch as the last remaining outstanding Bonds having the benefit of the Reserve Account mature on July 1, 2005, the summary below no longer makes reference to the Reserve Account in the Sinking Fund.

**Definitions of Certain Terms**

The following words and terms shall have the following meanings, unless the context otherwise requires. Words importing the singular number shall include the plural number in each case and vice versa, and words importing persons shall include firms and corporations, including public bodies.

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond on its date of original issuance plus the interest accrued on such Capital Appreciation Bond from such original issue date to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the term Bonds of any series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of term Bonds in such Fiscal Year. If at or prior to the close of any Fiscal Year the total amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys exceeds the Amortization Requirement for such term Bonds for such Fiscal Year, then future Amortization Requirements for such term Bonds shall be reduced for subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director of the Authority in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys is less than the Amortization Requirement for such term Bonds for such Fiscal Year, then the Amortization Requirement for such term Bonds for the next Fiscal Year shall be increased by the amount of such deficiency.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond until the Interest Commencement Date, an amount equal to the Accreted Value of such Bond and, (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund or funds are established and shall not be subject to a lien or charge in favor of the holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded on each of the dates designated for compounding and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by the resolution authorizing said Bonds.

to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a depository institution having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by obligations described in clauses (i) or (ii) above held free and clear of claims by third parties, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured), provided that the Trustee has a perfected security interest in the collateral;

(iv)     obligations issued by any state or territory of the United States of America or any political subdivision or instrumentality thereof, which are rated on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(v)      any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee) or trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any of the obligations described in (i) or (ii) above, provided that the Trustee has a perfected security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vi)     commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(vii)    any other obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the holders of Put Bonds.

"Federal Excise Taxes" shall mean the federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds authenticated and delivered except:

(i)      Bonds cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)     Bonds that are deemed paid and no longer Outstanding under the Trust Agreement;

(iii)    Destroyed, mutilated, stolen or lost Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser; and

(iv)     for purposes of any consent or other action to be taken under the Trust Agreement by the holders of a specified percentage of principal amount of Bonds, Bonds held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

& Poor's Corporation or any successors thereto comparably to that of the Authority, all as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)     If all or a portion of a series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and to the extent applicable, shall be determined in accordance with the foregoing rules.

"Put Bonds" shall mean Bonds that by their terms may be tendered at the option of the holder thereof for payment prior to maturity.

"Qualified Depositary or Depositories" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depository for public funds, which institutions have been designated as depositories of the Authority by resolution.

"Special Tax Revenues" shall mean the Federal Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Variable Rate Bonds" shall mean Bonds issued with an interest rate that is not fixed in percentage at the date of issue for the term thereof.

## Puerto Rico Infrastructure Fund

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund.  The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund.  All moneys deposited to the credit of the Puerto Rico Infrastructure Fund will be applied for the purposes and in the order set forth in the Trust Agreement.

## Sinking Fund and Accounts

A special fund is created under the Trust Agreement and designated the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (the "Sinking Fund") to be held by the Trustee.  Two separate accounts are created in the Sinking Fund and designated "Bond Service Account" and "Redemption Account."  Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys sufficient to make the following deposits in the following order:

(a)     to the Bond Service Account, the amount required to make the total amount then in the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)     to the Redemption Account, the amount required to make the total amount deposited in the then current Fiscal Year in the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding plus the premium, if any, payable on such Bonds if such Bonds were to be redeemed in such Fiscal Year from moneys held in the Sinking Fund.

I-5

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make any payment or deposit necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components.

After making the foregoing required applications and subject to the Authority's obligation to repay issuers of any Credit Facility any amounts owed to them, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund for any lawful purpose.

**Withdrawals from Bond Service Account**

The Trustee shall on each date for the payment of principal of or interest on Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due.

**Withdrawals from Redemption Account**

Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     subject to the provisions of paragraph (c) below, by purchase at a price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account. No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part except from moneys other than the moneys set aside or deposited for the redemption of Bonds; or

(b)     subject to the provisions of paragraph (C) below, by redemption pursuant to the redemption provisions of the Trust Agreement from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then in the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time.

(c)     Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each series then Outstanding in the following order:

*first,* the term Bonds of each such series to the extent of the related Amortization Requirement, if any, for such Fiscal Year, plus the applicable premium, if any, and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding plus the applicable premium, if any;

*second*, any balance then remaining shall be applied to the purchase in accordance with paragraph (a) above of any Outstanding term Bonds whether or not they are then subject to redemption;

*third*, any balance then remaining shall be applied to the redemption of the term Bonds of each such series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of each such series originally issued under the provisions of the Trust Agreement.

## Additional and Refunding Bonds

Bonds may be issued and secured by the Trust Agreement, subject to certain conditions, for any lawful purpose of the Authority, including paying any costs of issuance of such Bonds.

Among such conditions are the delivery to the Trustee of

(a)    a certificate of the Secretary of the Treasury of the Commonwealth setting forth:

(i)    the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%; and

(b)    a certificate of the Executive Director of the Authority setting forth:

(i)    the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)    the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%.

The above certificates need not be delivered for the issuance of refunding Bonds if the Executive Director of the Authority certifies that (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal

and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

**Investment of Moneys**

Moneys in the Bond Service Account and the Redemption Account shall, to the extent possible, be continuously invested at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption at the option of the holder thereof, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended.

Any investment earnings and profit or loss realized on the sale or maturity of such Obligations shall be credited or debited to the holding fund or account. If the required deposit to any account in the Sinking Fund has been made for the current Fiscal Year, investment earnings on moneys in such account shall be deposited to any other account of the Sinking Fund for which a required deposit has not been made, in the order provided above (see "Sinking Fund and Accounts"), and thereafter shall be credited to the Puerto Rico Infrastructure Fund.

**No Impairment**

So long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the holders to such Pledged Revenues might be impaired or diminished.

**Inclusion of Shortfall in Budget; Request for Advances**

If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund are insufficient to permit the Authority to make the required deposits into the Sinking Fund, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary. The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

**Enforcement of Remedies**

There are no events of default under the Trust Agreement and the principal of the Bonds Outstanding is not subject to acceleration. At the request of the holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed to protect and enforce its rights and the rights of the holders under the laws of the Commonwealth or under the Trust Agreement.

**Supplemental Agreements Without Bondholder's Consent**

The Authority and the Trustee may from time to time and at any time, enter into agreements supplemental to the Trust Agreement, as shall not be inconsistent with the terms and provisions thereof, for the following purposes, among others:

(a)     to cure any ambiguity or formal defect or omission in the Trust Agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)     to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

(c)      to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d)      to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power therein reserved to or conferred upon the Authority, or

(e)      to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(f)      to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(g)      to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

All other modifications to the Trust Agreement may be made only upon obtaining the consent and approval of the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each series so affected and Outstanding at the time the consent is given). Nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the maturity of any Bond issued under the Trust Agreement (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement. In lieu of the holders of Bonds secured by a Credit Facility or a Liquidity Facility, the provider thereof shall be viewed as the holder of such Bonds for purposes of consents to modifications.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Home Loan Banks or Student Loan Marketing Association, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the holder

of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

**APPENDIX II**

# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

(With Independent Auditors' Report Thereon)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

## Table of Contents

| | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Management's Discussion and Analysis | 3 |
| Basic Financial Statements: | |
| Statement of Net Assets – Governmental Activities | 10 |
| Statement of Activities | 11 |
| Balance Sheet – Governmental Funds | 12 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds | 13 |
| Reconciliation of the Statement of Revenues, Expenditures and Changes in Fund Balances of Governmental Funds to the Statement of Activities and Governmental Funds | 14 |
| Notes to Basic Financial Statements | 15 |
| **Schedule** | |
| Schedule of Special Obligation Bonds 2000 Series A and B | 30 |

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(6)  Long-Term Debt**

**(a)  *Changes in Long-Term Liabilities***

Long-term liability activity in the governmental activities for the year ended June 30, 2004, was as follows:

| | Beginning balance | Additions | Reductions | Ending balance | Due within one year |
|---|---|---|---|---|---|
| Series 1988 A Bonds | $  18,270,450 | — | (13,960,000) | 4,310,450 | 2,675,000 |
| Series 1997 A and B Bonds | 791,824,550 | — | (2,805,000) | 789,019,550 | 15,995,000 |
| Series 1998 A Bonds | 134,660,000 | — | — | 134,660,000 | — |
| Series 2000 A and B Bonds | 1,074,180,000 | — | (7,815,000) | 1,066,365,000 | 8,285,000 |
| | 2,018,935,000 | — | (24,580,000) | 1,994,355,000 | 26,955,000 |
| Less bond discounts | 34,043,650 | — | (366,439) | 33,677,211 | — |
| Total bonds payable | 1,984,891,350 | — | (24,213,561) | 1,960,677,789 | 26,955,000 |
| Notes payable | 20,130,816 | 4,678,509 | (5,510,628) | 19,298,697 | 1,176,764 |
| Liabilities for claims and other contingencies | 6,000,000 | — | — | 6,000,000 | — |
| Accrued compensated absences | 238,169 | 23,397 | — | 261,566 | 131,886 |
| Long-term liabilities | $ 2,011,260,335 | 4,701,906 | (29,724,189) | 1,986,238,052 | 28,263,650 |

**(b)  *Special Tax Revenue Bonds***

The Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A Bonds (the Series 1988A Bonds) were issued to provide financial assistance, in the form of a capital contribution, to the Puerto Rico Aqueduct and Sewer Authority (PRASA). The assistance provided was to facilitate PRASA's financing of its capital improvement program. The Series 1988A Bonds bear interest, payable semiannually in January 1 and July 1, at rates, which range between 7.60% and 7.90% and mature at various dates through July 1, 2005. These Bonds are entitled to the benefits of a $17,001,500 irrevocable direct pay letter of credit issued by a commercial bank, which expires on August 28, 2005.

On December 4, 1997, the Authority issued $771,485,000 Special Tax Revenue Bonds, Series 1997A and $30,275,000 Special Tax Revenue Bonds, Series 1997B (the Series 1997A and 1997B Bonds). The proceeds thereof were used to repay the outstanding principal and interest under various lines of credit provided by GDB to PRASA ($640,366,537) and to establish a special construction fund, to be administered by the Authority on behalf of PRASA, to finance additional projects of PRASA's capital improvement program ($121,235,185). The Series 1997A and 1997B Bonds bear interest, payable semiannually on January 1 and July 1 at rates which range between 5.00% and 6.30% and mature at various dates through July 1, 2028. The Series 1997A Bonds maturing on or after July 1, 2008 may be redeemed at the option of the Authority prior to maturity at 101% from January 1, 2008 to December 31, 2008, 100.5% from January 1, 2009 to December 31, 2009, and 100% thereafter.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

On April 2, 1998, the Authority issued $134,660,000 Special Tax Revenue Refunding Bonds, Series 1998A (the Series 1998A Bonds). The Series 1998A Bonds bear interest, payable semiannually on January 1 and July 1 at rates, which range between 4.30% and 5.50% and mature at various dates through July 1, 2010. The Series 1998A Bonds maturing on July 1, 2009 and 2010 may be redeemed at the option of the Authority prior to maturity at 101% from July 1, 2008 to June 30, 2009 and 100.5% from July 1, 2009 to June 30, 2010.

Payment of principal of and interest on the Series 1997A Bonds, and the Series 1998A Bonds is insured by separate municipal bond insurance policies issued by an unrelated, insurance company.

The Series 1988 A Bonds, Series 1997 A Bonds, Series 1997 B Bonds, and the Series 1998 A Bonds (collectively, the Bonds) are payable solely from and secured by a pledge of federal excise taxes and other moneys deposited to the credit of a sinking fund established pursuant to a trust agreement.

The Act, as amended, requires that the first $70 million, up to fiscal year 2028, of federal excise taxes received by the Commonwealth be transferred to the Authority. Federal excise taxes consist of taxes received by the Commonwealth from the United States in connection with rum and other articles produced in Puerto Rico and sold in the United States that are subject to federal excise tax. The trust agreement requires the Authority to deposit to the credit of the sinking fund the federal excise taxes and other moneys deposited as are required to meet debt service requirements with respect to the Bonds. Rum is the only article currently produced in Puerto Rico subject to federal excise tax, the proceeds of which are required to be transferred from the federal government to the Commonwealth.

The federal excise taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient, the Act requires that the Authority request and the Director of the Office of Management and Budget of the Commonwealth include in the budget of the Commonwealth for the corresponding fiscal year an appropriation necessary to cover such deficiency. The Commonwealth's Legislature, however, is not legally obligated to make the necessary appropriation to cover such deficiency.

The Authority is required under the trust agreement to establish a reserve account in the sinking fund to deposit and maintain therein an amount equal to the reserve requirement, as defined. Alternatively, the Authority may deposit to the credit of such reserve account an insurance policy or a letter of credit in lieu of any required deposit or in substitution of moneys on deposit in the reserve account. On the date of the issuance of the Series 1988A Bonds, the reserve account was fully funded in an amount equal to the reserve requirement from the proceeds of the Series 1988A Bonds and certain other moneys. In connection with the issuance of the 1997A and 1997B Bonds, the trust agreement was amended to eliminate the requirement that the Authority establish and maintain a reserve account in the sinking fund with respect to any bonds issued under the trust agreement, other than the Series 1988A bonds remaining outstanding after the advanced refunding described above.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Additional bonds, secured on parity with the Bonds, may be issued for any purpose authorized by the Act, subject to compliance with certain financial tests in the trust agreement.

*(c)*   *Special Obligation Bonds*

On September 28, 2000, the Authority issued $1,037,750,000 Special Obligation Bonds, 2000 Series A and $54,800,000 Special Obligation Bonds, 2000 Series B (collectively, the 2000 Series Bonds) for the purpose of repaying certain notes issued by the Authority to GDB and financing certain aqueduct and sewer infrastructure development projects. The 2000 Series Bonds are limited obligations of the Authority payable solely from, and secured by, a pledge of all interest received by the Authority from U.S. Treasury securities and other eligible obligations deposited in a special account of the Trust Fund held by a trustee under an irrevocable and permanent trust. The 2000 Series A bonds bear fixed interest rates ranging from 4.10% to 5.50% payable semiannually on each April 1 and October 1. The 2000 Series B bonds bear a variable interest rate during each index rate period, as defined, at a rate equal to the sum of (i) the average of the Bond Market Association Municipal Swap Index for each day during such period and (ii) 0.65% (the Index Rate). The Index Rate on the 2000 Series B bonds may not be less than 1% nor more than 7.5% per annum. The 2000 Series A Bonds are subject to redemption, at the option of the Authority, on or after October 1, 2010 through September 30, 2011 at a redemption price of 101% and 100% thereafter. The 2000 Series B Bonds are subject to redemption, at the option of the Authority, at a price equal to the principal balance plus accrued interest to the date of redemption, on any date not earlier than October 1, 2010.

Debt service requirements at June 30, 2004, for bonds outstanding are as follows:

|  | Principal | Interest | Total |
|---|---|---|---|
| Fiscal year ending June 30: |  |  |  |
| 2005 | $         26,955,000 | 104,593,334 | 131,548,334 |
| 2006 | 29,165,000 | 103,117,316 | 132,282,316 |
| 2007 | 30,695,000 | 101,729,623 | 132,424,623 |
| 2008 | 32,225,000 | 100,198,390 | 132,423,390 |
| 2009 | 34,050,000 | 98,473,383 | 132,523,383 |
| 2010-2014 | 200,095,000 | 463,733,753 | 663,828,753 |
| 2015-2019 | 260,215,000 | 405,841,216 | 666,056,216 |
| 2020-2024 | 337,560,000 | 328,859,572 | 666,419,572 |
| 2025-2029 | 437,830,000 | 228,944,734 | 666,774,734 |
| 2030-2034 | 203,535,000 | 142,394,588 | 345,929,588 |
| 2035-2039 | 271,070,000 | 76,300,050 | 347,370,050 |
| 2040-2041 | 130,960,000 | 7,436,225 | 138,396,225 |
|  | $   1,994,355,000 | 2,161,622,184 | 4,155,977,184 |

*(d)*   *Notes Payable*

On February 26, 2002, the Authority entered into a loan agreement with GDB where GDB lent the Authority the amount of $47,381,332 for the purpose of paying additional costs incurred or to be incurred by the Authority in the acquisition, construction, equipping, installation, and development

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Debt service requirements at June 30, 2004, for notes payable outstanding are as follows:

| Fiscal year ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2005 | $ 1,176,764 | 225,756 | 1,402,520 |
| 2006 | 987,552 | 594,626 | 1,582,178 |
| 2007 | 970,973 | 960,379 | 1,931,352 |
| 2008 | 898,604 | 1,024,503 | 1,923,107 |
| 2009 | 952,669 | 1,077,736 | 2,030,405 |
| 2010-2014 | 3,588,157 | 5,464,110 | 9,052,267 |
| 2015-2019 | 2,400,580 | 4,151,623 | 6,552,203 |
| 2020-2024 | 2,015,530 | 2,326,908 | 4,342,438 |
| 2025-2029 | 3,101,325 | 1,114,741 | 4,216,066 |
| 2030-2032 | 3,206,543 | 191,323 | 3,397,866 |
| | $ 19,298,697 | 17,131,705 | 36,430,402 |

**(7) Transactions with Related Parties**

For the fiscal year 2003-2004, the Commonwealth contributed to the Authority $70,000,000 that will be used for debt service payments of the Bonds (note 6) and operating expenses plus $10,258,319 for other purposes.

Interest income on interest-bearing demand deposits with GDB amounted to $361,684 for the year ended June 30, 2004. Also, the Bank provides payroll services to the Authority at no cost.

The Authority transferred to PRASA during 2004 aqueduct and sewer projects amounting to $96,932,515, included as expenses of aqueduct and sewer in the accompanying statement of activities.

**(8) Revolving and Rotating Funds**

The Act, which created the Authority, as amended, provided for the establishment of the Puerto Rico Water Pollution Control Revolving Fund (the Revolving Fund), which is administered by the Puerto Rico Environmental Quality Board (EQB) and by the Authority in accordance with Title VI of the Water Pollution Control Act (Clean Water Act) of 1972. The EQB, as the designated instrumentality of the Commonwealth, is empowered to enter into capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), to accept capitalization grant awards made under Title VI of the Clean Water Act and, in conjunction with the Authority, to manage the Revolving Fund in accordance with the requirements of the Clean Water Act, the Act which created the Authority, as amended, and the Memorandum of Understanding entered into by and among EQB, PRASA, GDB, and the Authority.

On July 7, 1997, the Legislature of the Commonwealth enacted legislation, which, among other things, establishes the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (the Drinking Water Fund) with the purpose of receiving financial assistance under the Clean Water Act and provides for the participation of the Authority in the administration of said fund.

(Continued)

APPENDIX III

COMMONWEALTH OF PUERTO RICO
Financial Information and Operating Data Report
May 1, 2005

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1
 Geographic Location and Demography ........................................................................... 1
 Relationship with the United States ................................................................................ 1
 Governmental Structure .................................................................................................. 1
 Political Trends ............................................................................................................... 2
THE ECONOMY ................................................................................................................ 3
 General ........................................................................................................................... 3
 Economic Development Program for the Private Sector ................................................. 6
 Employment and Unemployment .................................................................................... 9
 Economic Performance by Sector ................................................................................. 10
 Higher Education .......................................................................................................... 19
 Tax Incentives .............................................................................................................. 20
DEBT ................................................................................................................................ 23
 Public Sector Debt ........................................................................................................ 23
 Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt .......... 24
 Commonwealth Guaranteed Debt ................................................................................. 26
 Trends of Public Sector Debt ........................................................................................ 27
PUBLIC CORPORATIONS .............................................................................................. 29
 Government Development Bank for Puerto Rico ........................................................... 31
 Other Public Corporations ............................................................................................ 32
INSURANCE MATTERS .................................................................................................. 37
RETIREMENT SYSTEMS ................................................................................................ 38
COMMONWEALTH FINANCIAL STATEMENTS ............................................................ 42
PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES ........................... 42
 Summary and Management's Discussion of General Fund Results ............................... 42
 Major Sources of General Fund Revenues ................................................................... 47
 Collections of Income and Excise Taxes ...................................................................... 50
 Proposed Fiscal Reform ............................................................................................... 50
 Transfers to General Obligation Redemption Fund ...................................................... 51
 Components of General Fund Expenditures .................................................................. 51
 Federal Grants ............................................................................................................. 52
BUDGET OF THE COMMONWEALTH OF PUERTO RICO ........................................... 53
 Office of Management and Budget ................................................................................ 53
 Budgetary Process ....................................................................................................... 53
 Financial Control and Adjustment Procedures .............................................................. 53
 Appropriations .............................................................................................................. 54
 Fiscal Year 2005 Budget .............................................................................................. 55
 Fiscal Year 2006 Budget .............................................................................................. 57
 Differences between Budget and Basic Financial Statements ...................................... 59
LITIGATION ..................................................................................................................... 60

States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from over 120 corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics companies manufacturing in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to corporations operating under Sections 30A and 936 of the Code. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a ten percent Puerto Rico withholding tax on royalty payments.

## DEBT

### Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below. The Constitution of Puerto Rico limits the amount of general obligation (full faith and credit) debt that can be issued or guaranteed by the Commonwealth. The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation. Direct debt of the Commonwealth is supported by Commonwealth taxes. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See *Public Corporations*. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to resolutions adopted by the respective municipal assemblies. Debt of public corporations is issued pursuant to resolutions adopted by the governing bodies of the public corporations in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2004. Excluded from the table is debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products. Also excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.237 billion of outstanding bonds issued by the Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.444 billion of obligations of GDB issued to purchase certain Commonwealth public sector debt and for other purposes, of which $267 million is guaranteed by the Commonwealth.

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental or quasi-governmental functions are performed by public corporations.   These are governmental entities created by the Legislature with varying degrees of independence from the central government.  Public corporations are generally created to perform a single function or a limited number of related functions.  Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government.  Most public corporations are governed by boards appointed by the Governor with the advice and consent of the Senate, but some public corporations are subsidiaries of departments of the central government.  Capital improvements of most of the larger public corporations are financed by revenue bonds under trust agreements or bond resolutions or notes under loan agreements.   The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2004 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity).  Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government or is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds.  Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting.   No deductions have been made in the table for debt service funds and debt service reserve funds.  More detailed information about the major public corporations is presented in the following sections.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**December 31, 2004**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 485,668 | $         0 | $ 485,668 | $150,890 | $ 142,082[(1)] | $ 292,972 | $ 636,558 | $    142,082 [(1)] | $ 778,640 |
| Electric Power Authority | 0 | 4,878,508 | 4,878,508 | 0 | 330,459 | 330,459 | 0 | 5,208,967 | 5,208,967 |
| Highway and Transportation Authority | 0 | 5,770,009[(2)] | 5,770,009 | 0 | 110,037 | 110,037 | 0 | 5,880,046 | 5,880,046 |
| Housing Finance Authority[(3)] | 0 | 627,012 | 627,012 | 0 | 89,623 | 89,623 | 0 | 716,635 | 716,635 |
| Industrial Development Company | 0 | 295,449 | 295,449 | 0 | 35,242 | 35,242 | 0 | 330,691 | 330,691 |
| Infrastructure Financing Authority | 0 | 909,320[(4)] | 909,320 | 0 | 23,325 | 23,325 | 0 | 932,645 | 932,645 |
| Public Buildings Authority | 2,920,327 | 0 | 2,920,327 | 0 | 3,561 | 3,561 | 2,920,327 | 3,561 | 2,923,888 |
| Public Finance Corporation | 0 | 4,311,827[(5)] | 4,311,827 | | 0 | 0 | 0 | 4,311,827[(4)] | 4,311,827 |
| Ports Authority | 0 | 74,985[(6)] | 74,985 | 0 | 387,786 | 387,786 | 0 | 462,771 | 462,771 |
| University of Puerto Rico | 0 | 409,108[(7)] | 409,108 | 0 | 30,035 | 30,035 | 0 | 439,143 | 439,143 |
| Others | 0 | 0 | 0 | 0 | 2,213,371 | 2,213,371 | 0 | 2,213,371 | 2,213,371 |
| Total[(8)] | $3,405,995 | $17,276,218 | $20,682,213 | $150,890 | $3,365,521 | $3,516,411 | $3,556,885 | $20,641,739 | $24,198,624 |

(1) Principal of and interest on this debt is reimbursed from Commonwealth appropriations.
(2) Excludes $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.
(3) Excludes the $663 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development.
(3) Excludes $1.058 billion of outstanding bonds of Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(4) Payable primarily from Commonwealth appropriations.
(5) Excludes $96 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education.
(6) Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement.
(7) Excludes $85 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico
(8) Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.155 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, issued on October 10, 2002, which will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico.

**Government Development Bank for Puerto Rico**

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to make loans to private enterprises to aid in the economic development of Puerto Rico.

As of December 31, 2004, $1.4 billion of bonds and notes of GDB were outstanding.  As of said date, GDB also had $4.7 billion in loans to the central government of the Commonwealth and its public corporations and municipalities.  Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2004.

Act No. 82 of June 16, 2002, authorizes GDB to transfer every year to the Commonwealth's General Fund up to 10% of its audited net income or $10,000,000, whichever is greater.

Act No. 271 of November 21, 2002, requires GDB to provide the Special Communities Perpetual Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million. As of April 18, 2005, GDB had disbursed to the Trust $320 million from two investment accounts held by GDB for the benefit of the Trust.  GDB expects to replenish its equity capital with future net operating income.  See "Other Public Corporations – Special Communities Perpetual Trust" below.

GDB has the following principal subsidiaries:

*Housing Finance Authority* (formerly known as Housing Finance Corporation) was originally created in November 1977 to provide needed rental-housing units and stimulate the construction industry under federally subsidized programs.  Effective February 8, 2002, the Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Authority.  The Authority is engaged in insuring and servicing mortgages originated by the Urban Renewal and Housing Corporation.  It also provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs.  Housing Finance Corporation had issued tax-exempt revenue bonds and notes to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units, which bonds and notes are now limited obligations of the Housing Finance Authority payable solely from revenues collected in respect of such housing units.  The Federal Housing Administration has insured mortgages on certain of the housing units.  As of December 31, 2004, $716.6 million of Housing Finance Authority bonds and notes were outstanding (excluding bonds payable solely from securities pledged to the payment of such bonds and bonds payable solely from federal funds).

As of December 31, 2004, the Authority also had outstanding $637.3 million of bonds issued to (i) pay obligations of the Commonwealth under law, (ii) fund certain payments of the Commonwealth under its mortgage subsidy program for low and moderate income families, (iii) guarantee certain insurance obligations of the Housing Bank and Finance Agency under certain programs.

*Tourism Development Fund* was created in November 1993 to promote Puerto Rico's hotel and tourism industry, primarily by making available direct loans and guarantees to secure the payment of private financing used for new hotel development projects.  The Tourism Development Fund is also authorized to make capital investments and provide direct financing to tourism related projects.  As of December 31, 2004, the Tourism Development Fund had outstanding direct loans and guarantees with

respect to the financing of fourteen hotel and tourism-related projects in an aggregate amount in excess of $572.6 million.  See "Tax Incentives – Tourism Incentives Program" under *The Economy*.

The Tourism Development Fund has made payments under its guarantees and letters of credit in the aggregate amount of approximately $216.7 million with respect to several projects, including repayment in full of the bonds of three projects, which bonds had been declared due and payable at the direction of the Tourism Development Fund due to the failure of the borrowers of such projects to comply with their obligations under the related reimbursement agreements.  After taking these payments and all related recoveries into consideration, the unrestricted net assets of the Tourism Development Fund as of December 31, 2004 were approximately $96.7 million (unaudited), and its allowance for loan losses on guarantees, loans, OREO and letters of credit was approximately $34.6 million (unaudited).

*Development Fund* was created in 1977 to provide an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources.  The Development Fund may also guarantee obligations of these enterprises and invest in their equity securities.

*Capital Fund* was created in November 1993 for trading in debt obligations and publicly traded shares of domestic and foreign corporations.

*Public Finance Corporation* was created in December 1984 to provide agencies and instrumentalities of Puerto Rico with alternate means of meeting their financing requirements.  As of December 31, 2004, the Corporation had $4.264 billion aggregate principal amount of bonds outstanding, substantially all of which have been issued to purchase debt of agencies and instrumentalities of the Commonwealth, and are payable from Commonwealth appropriations.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority*.  Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates a system of public water supply and sanitary sewer facilities.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the existing system and to finance its expansion for new users. Funds for this investment are expected to be provided through a combination of revenues from PRASA, bond issues, legislative appropriations, and federal grants.  Debt service on revenue bonds is payable from net revenues of the system after payment of current expenses.  Due to PRASA's financial difficulties (discussed below) and its inability to access the bond market, Act No. 45 was enacted in July 1994 to provide a Commonwealth guaranty of the principal and interest payments to the bondholders of all outstanding revenue bonds issued by PRASA.  In addition, Act No. 45 was amended in 2000 to extend the Commonwealth payment guaranty to all outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and loans granted by the Clean Water and Drinking Water State Revolving Funds for the benefit of PRASA.  The guaranty will cover additional debt obligations issued by PRASA prior to July 1, 2005.  In February 2004, this guaranty was extended through new legislation to include debt obligations issued until 2010.  The total debt of PRASA was $778.6 million as of December 31, 2004.

From May 1995 until March 2004, the operation, management, repair, and maintenance of PRASA's systems were in the hands of private companies. The most recent agreement for the private management of PRASA's systems was entered into in May 2002 with Ondeo Puerto Rico, Inc. ("Ondeo").  In January 2004, Ondeo and PRASA agreed to terminate their agreement and in April 2004, the operation, management, repair, and maintenance of the PRASA systems returned to PRASA.

As part of the plan for the return of the operation and management of the PRASA systems to PRASA, legislation was enacted in March 2004 to restructure PRASA and provide further powers to improve its operational and financial management. The main areas of this restructuring included (i) decentralizing the administration of PRASA by creating five regions to provide greater efficiency in, and financial control of, the day to day administration and operational decision making process and execution; (ii) creating the positions of five Executive Regional Directors and an Executive Director for Infrastructure, who will, respectively, manage each region and manage capital improvement projects; and (iii) providing for six-year appointments for each of the Executive Regional Directors, Executive Director for Infrastructure and Executive Director in order to provide continuity to top management and better implement, supervise and revise as needed the ten-year plan and goals identified for PRASA in 2002. Further powers granted include the authority to make certain determinations and take certain actions with respect to compliance of the water and sewer system with various federal environmental laws.

PRASA has reported operational losses of $76.6 million, $152.4 million, $281.3 million, $209.7 million and $282.5 million during fiscal years 2000, 2001, 2002, 2003 and 2004, respectively. For fiscal year 2005, it is expected that PRASA will incur another operational loss, which will be covered with financial assistance provided by the Commonwealth's General Fund.

Beginning in fiscal year 2006, the Commonwealth's General Fund will cease to provide financial assistance to PRASA in order to alleviate the financial demands on the General Fund. In order to achieve fiscal independence, PRASA will have to implement various changes, such as (i) aggressive cost savings programs; (ii) a new and aggressive enforcement policy to identify and process delinquent customers; and (iii) rate increases for industrial, commercial and residential customers. Although PRASA will require GDB financial assistance until these measures are fully implemented, these measures are intended to allow PRASA to become financially independent in the future.

*Children's Trust* is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.171 billion aggregate principal amount of Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. As of December 31, 2004, the outstanding principal amount of the bonds was $1.143 billion. These bonds and any other additional senior bonds issued by Children's Trust are secured by a statutory pledge of the payments made and to be made by participating manufacturers under the Master Settlement Agreement. To date, all payments required to be made under the Master Settlement Agreement have been made on a timely basis and Puerto Rico's share thereof has been received by Children's Trust.

*Convention Center District Authority* was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Convention Center and designated private parcels located within the Convention Center District in San Juan. The Authority currently has lines of credit with GDB totaling $415.7 million, of which $252.3 million was outstanding as of December 31, 2004.

The Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") financed the construction of a multi-purpose coliseum in San Juan, known as the Jose Miguel Agrelot Coliseum, with a line of credit provided by GDB. The Jose Miguel Agrelot Coliseum was recently completed and transferred to the Convention Center District Authority. Pursuant to Act No. 185 of August 3, 2004, AFICA also transferred the line of credit to the Convention Center District Authority. As of December 31, 2004, the line of credit had an outstanding balance of $136.2 million.

The Authority is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of the Authority, the outstanding principal balance of which was $153.2 million as of December 31, 2004, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances as described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require the Authority, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including low toll revenues, exist at this time, but the Authority does not currently anticipate that the operator will exercise its remedy against the Authority.

*Puerto Rico Industrial Development Company* participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. The Company was merged with the Economic Development Administration in January 1998. Rentals derived from the leasing of specified facilities of the Company are pledged to the payment of the Company's revenue bonds. As of December 31, 2004, the Company's total debt was $330.7 million.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority* was created in June 1977. The Authority has issued revenue bonds to finance industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to the Authority by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 2004, approximately $2.2 billion of the Authority's bonds were outstanding.

*Infrastructure Financing Authority* was created in June 1988 to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing infrastructure facilities. The Authority is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities. The Authority's enabling act also established the Puerto Rico Infrastructure Fund, funded with annual fixed amounts from the first proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States which are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. Currently, this amount is $70 million, and it will increase to $90 million for fiscal years 2007 to 2052. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury of Puerto Rico. The Authority is using these amounts to provide financial support for various infrastructure and other projects. As of April 30, 2005, the Authority's total debt was $1.990 billion.

The Authority is providing assistance to the Aqueduct and Sewer Authority, among other Benefited Entities, with regards to (i) the design and construction of various strategic regional water and sewer projects intended to provide improved services to targeted regions throughout the island; (ii) the implementation of an action plan to address a number of small water and sewer rehabilitation projects; (iii) the achievement of compliance with certain environmental laws; and (iv) the establishment of a prioritized capital program.

In June 1998, the Authority's enabling act was amended to establish the Infrastructure Development Fund, a permanent trust fund to be utilized by the Authority for the purpose of financing infrastructure projects. The Infrastructure Development Fund was initially funded in March 1999 with $1.2 billion of proceeds received by the Telephone Authority from the sale of a controlling interest in

Puerto Rico Telephone Company.  This initial amount will remain permanently deposited in a segregated, perpetual account, denominated the "corpus account," and must be invested exclusively in U.S. government or U.S. government-backed obligations.  The income from such investment may only be used to finance infrastructure projects related to the Commonwealth's water and sewer systems.  Other moneys in the Infrastructure Development Fund not attributable to the corpus account or the investment income thereon may be used for other infrastructure projects.  The Authority is the custodian and administrator of the Infrastructure Development Fund.  In October 2000, the Authority issued $1.093 billion of bonds payable from and secured by a pledge of the interest received by the Authority from the investments of the Infrastructure Development Fund.  The proceeds of this bond issue are being used to finance certain aqueduct and sewer infrastructure development projects.

*Maritime Shipping Authority* commenced operations in 1974 upon the acquisition of three shipping lines serving Puerto Rico and the United States mainland.  In 1995, the assets and operations of the Maritime Shipping Authority were sold to a private investor group.  The remaining debt of the Authority was refinanced through the issuance of bonds by Public Finance Corporation, a subsidiary of GDB.  The aggregate principal amount of such bonds outstanding as of December 31, 2004, was $328.5 million (not including accreted values of capital appreciation bonds outstanding).  The bonds are payable from funds to be appropriated annually by the Legislature of Puerto Rico.

*Municipal Finance Agency* was created in 1972 as a municipal "bond bank" for Puerto Rico.  The Agency is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve.  Debt service on the Agency's bonds is payable from debt service payments on municipal bonds held by the Agency and from the debt service reserve, including investment income thereon.  The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislature, which appropriation is authorized but not legally required to be made.  To date no such payments have been required.  As of December 31, 2004, the Agency had $1.237 billion of bonds outstanding.

*Ports Authority* owns and operates the major airport and seaport facilities in Puerto Rico.  The Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of seaport equipment and property.  Act No. 1 of January 1, 2000, authorized the transfer of the Authority's maritime ferry operations to Puerto Rico Maritime Transportation Authority, a newly created government agency.  As of December 31, 2004, the Authority had $462.8 million in debt, including $314.8 million under a line of credit with GDB.

*Public Buildings Authority* is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth.  Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are further secured by the Commonwealth's guaranty.  The Authority is authorized by law to have outstanding at any one time up to $3.325 billion of bonds guaranteed by the Commonwealth.  As of December 31, 2004, $2.920 billion of such bonds of the Authority was outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds).

*Special Communities Perpetual Trust* is an irrevocable and permanent trust created in November 2002 as a public corporation.  The Trust's principal purpose is to fund development projects which address the infrastructure and housing needs of underprivileged communities.  Act No. 271 of November 21, 2002, requires GDB to provide the Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million.  In December 2004, GDB transferred to the Trust the $500 million capital contribution required by Joint Resolution No. 1027 of November 21, 2002 and $270.7 million, the amount remaining in the GDB $500 million line of credit.  The amounts transferred to

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2002 | 2003 | 2004(p) | 2005(e) | 2006(b) |
|---|---|---|---|---|---|
| Beginning cash balance | $ 125,154 | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 |
| Revenues from internal sources: | | | | | |
| Income Taxes: | | | | | |
| Individuals | 2,449,982 | 2,767,678 | 2,720,920 | 2,868,000 | 3,127,000 |
| Corporations | 1,706,137 | 1,776,985 | 1,831,027 | 2,005,000 | 2,252,000 |
| Partnerships | 2,670 | 2,101 | 3,005 | 2,000 | 3,000 |
| Withheld from non-residents | 583,256 | 517,141 | 631,100 | 575,000 | 628,000 |
| Tollgate taxes | 59,515 | 45,321 | 31,579 | 23,000 | 17,000 |
| Interest | 14,310 | 11,278 | 10,108 | 10,000 | 11,000 |
| Dividends | 62,548 | 49,790 | 70,192 | 74,000 | 74,000 |
| Total income taxes | 4,878,418 | 5,170,299 | 5,297,931 | 5,557,000 | 6,112,000 |
| Commonwealth excise taxes: | | | | | |
| Alcoholic beverages | 249,705 | 299,582 | 296,302 | 302,000 | 316,000 |
| Cigarettes | 116,055 | 149,487 | 144,733 | 146,000 | 152,000 |
| Motor vehicles | 418,024 | 499,252 | 551,181 | 585,000 | 614,000 |
| Other excise taxes | 681,344 | 703,029 | 701,129 | 746,000 | 1,481,000 |
| Total Commonwealth excise taxes | 1,465,128 | 1,651,350 | 1,693,345 | 1,779,000 | 2,563,000 |
| Property taxes | - | - | - | - | - |
| Inheritance and gift taxes | 1,962 | 2,825 | 15,691 | 5,000 | 2,000 |
| Licenses | 82,575 | 85,876 | 84,231 | 89,000 | 123,000 |
| Other: | | | | | |
| Lottery | 61,358 | 67,621 | 65,387 | 70,000 | 63,000 |
| Electronic Lottery | 57,897 | 89,443 | 86,115 | 73,000 | 83,000 |
| Miscellaneous non-tax revenues | 562,213[1] | 438,457 | 379,501 | 370,000 | 362,000 |
| Total Other | 681,468 | 595,521 | 531,003 | 513,000 | 508,000 |
| Total revenues from internal sources | 7,109,551 | 7,255,866 | 7,622,201 | 7,943,000 | 9,308,000 |
| Revenues from non-Commonwealth sources: | | | | | |
| Federal excise taxes[2] | 314,253 | 309,958 | 328,921 | 337,000 | 350,000 |
| Customs | 30,595 | 25,918 | 34,266 | 24,000 | 26,000 |
| Total revenues from non-Commonwealth sources | 344,848 | 335,876 | 363,187 | 361,000 | 376,000 |
| Total net revenues | 7,454,399 | 7,841,742 | 7,985,388 | 8,304,000 | 9,684,000 |
| Other Income (refunds)[3] | 111,411 | (78,927) | 62,789 | (55,409) | - |
| Transfers to Redemption Fund[4] | (274,773) | (331,925) | (341,538) | (369,985) | (435,000) |
| Proceeds of notes and other borrowings[5] | 1,161,856 | 2,259,775 | 3,940,397 | 4,925,595 | - |
| Repayment of notes and other borrowings[6] | (1,201,084) | (2,021,832) | (3,713,634) | (3,909,434) | - |
| Adjusted revenues | 7,251,622 | 7,418,833 | 7,933,402 | 8,894,767 | 9,249,000 |
| Expenditures: | | | | | |
| Grants and subsidies | 2,862,288 | 3,773,579 | 3,468,531 | 3,617,386 | 2,809,310 |
| Personal services | 2,884,636 | 3,119,476 | 3,951,387 | 4,783,567 | 5,667,093 |
| Other services | 764,655 | 583,343 | 400,594 | 389,346 | 595,637 |
| Materials and supplies | 106,294 | 80,491 | 73,757 | 72,411 | 143,521 |
| Equipment purchases | 20,397 | 33,170 | 20,572 | 20,707 | 33,439 |
| Capital outlays and other debt service | 73,806 | - | 675 | 78,598 | - |
| Transfers to agencies | 314,416 | - | - | - | - |
| Prior year disbursements | - | - | 88,432 | - | - |
| Total expenditures | 7,026,492 | 7,590,059 | 8,003,948 | 8,962,015 | 9,249,000 |
| Adjusted revenues less expenditures | 225,130 | (171,226) | (70,546) | (67,248) | - |
| Ending cash balance | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 | $ 41,264 |

_____
(p)  Preliminary.
(e)  Estimated; represents actual revenues as of April 2005 plus budgeted revenues for the months remaining in fiscal year 2005.
(b)  Budget, as proposed.
(1)  Includes certain non-recurring revenues totaling $244.1 million.
(2)  Excludes transfers by the Commonwealth to the Conservation Trust Fund and amounts deposited by the Secretary of the Treasury into a separate account for the promotion of Puerto Rico rums in foreign markets.
(3)  Consists of net revenue from General Fund's non budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(4)  Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited directly to the Redemption Fund from non-General Fund revenues.
(5)  Consists of proceeds of Commonwealth tax and revenue anticipation notes and borrowings from GDB .
(6)  Consists of repayment of Commonwealth tax and revenue anticipation notes and borrowings from GDB .

*Source*:  Department of the Treasury

**BUDGET OF THE COMMONWEALTH OF PUERTO RICO**

**Office of Management and Budget**

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the Administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual balanced budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with the Governor's objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of the fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditure in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's fiscal year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)      General Fund appropriations for recurring ordinary operating expenses of the central government and for contributions to public corporations, municipalities, and private organizations. Such appropriations are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)     General Fund appropriations for special operating expenses and for capital expenditures. Such appropriations are authorized by separate law for one or more years for special programs or activities, which may be permanent or transitory.

(iii)    Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)     Bond Fund appropriations for capital expenditures financed by bonds. Such expenditures occur in one or more years.

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
| BRUSSELS | NEW YORK, NEW YORK  10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | June ___, 2005 | WASHINGTON, D.C. |

WRITER'S DIRECT NUMBER                                                                                    WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005A Bonds"):

<div align="center">

**$309,102,577.35**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE BONDS, SERIES 2005A**
**Dated: June     , 2005.**

</div>

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005A Bonds.

We have also examined one of the Series 2005A Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.     The Puerto Rico Infrastructure Financing Authority Act is valid.

2.     Said proceedings have been validly and legally taken.

3.     The Series 2005A Bonds have been duly authorized and issued to provide funds to (i) provide financial assistance to PRASA and other Commonwealth instrumentalities or municipalities in connection with certain capital projects, (ii) repay certain advances made to the Authority by Government Development Bank, and (iii) pay capitalized interest and costs of issuance of the Series 2005A Bonds.

4.     As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005A Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005A Bonds) issued thereunder.

5.     The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

6.      The Series 2005A Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, as the same become due and payable.

7.      The bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including the Series 2005A Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005A Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005B and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005A Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005A Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005A Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005A Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005A Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005A Bonds and said Series 2005B and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005A Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005A Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,


[To be signed "Sidley Austin Brown & Wood LLP"]

# SIDLEY AUSTIN BROWN & WOOD LLP

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

787 SEVENTH AVENUE
NEW YORK, NEW YORK  10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com

FOUNDED 1866

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

June ___, 2005

WRITER'S DIRECT NUMBER                                                    WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No.44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005B Bonds"):

<div align="center">

**$324,625,000**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE BONDS, SERIES 2005B**
**Dated: June      , 2005.**

</div>

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005B Bonds.

We have also examined one of the Series 2005B Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      The Puerto Rico Infrastructure Financing Authority Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Series 2005B Bonds have been duly authorized and issued to provide funds to (i) provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (ii) pay capitalized interest and costs of issuance of the Series 2005B Bonds.

4.      As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005B Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005B Bonds) issued thereunder.

5.      The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

<div align="center">IV-3</div>

6.      The Series 2005B Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, as the same become due and payable.

7.      The bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005B Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005B Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005B Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005B Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005B Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005B Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005B Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005B Bonds and said Series 2005A and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005B Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005B Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,


[To be signed "Sidley Austin Brown & Wood LLP"]

<div align="center">

SIDLEY AUSTIN BROWN & WOOD LLP

</div>

| | | |
|---|---|---|
| BEIJING | 787 SEVENTH AVENUE | LOS ANGELES |
| BRUSSELS | NEW YORK, NEW YORK  10019 | NEW YORK |
| CHICAGO | TELEPHONE 212 839 5300 | SAN FRANCISCO |
| DALLAS | FACSIMILE 212 839 5599 | SHANGHAI |
| GENEVA | www.sidley.com | SINGAPORE |
| HONG KONG | FOUNDED 1866 | TOKYO |
| LONDON | | WASHINGTON, D.C. |

<div align="center">

June ___, 2005

</div>

WRITER'S DIRECT NUMBER                                                                        WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

        We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005C Bonds"):

<div align="center">

**$699,235,338.80**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE REFUNDING BONDS, SERIES 2005C**
**Dated: June     , 2005.**

</div>

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005C Bonds.

        We have also examined one of the Series 2005C Bonds as executed and authenticated.

        From such examination we are of the opinion that:

        1.        The Puerto Rico Infrastructure Financing Authority Act is valid.

        2.        Said proceedings have been validly and legally taken.

        3.        The Series 2005C Bonds have been duly authorized and issued to (i) provide funds to refund all of the Authority's Special Tax Revenue Bonds, Series 1997A, and (ii) pay costs of issuance of the Series 2005C Bonds.

        4.        As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005C Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005C Bonds) issued thereunder.

        5.        The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

        6.        The Series 2005C Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to

<div align="center">

IV-5

</div>

deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, as the same become due and payable.

7.      The bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005C Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005C Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005B issued concurrently with the Series 2005C Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005C Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005C Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005C Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005C Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005C Bonds and said Series 2005A and Series 2005B Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005C Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005C Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,


[To be signed "Sidley Austin Brown & Wood LLP"]

**Government Parties' PRIFA Exhibit No. 3**



ESTADO LIBRE ASOCIADO DE

# PUERTO RICO

DEPARTAMENTO D
Registro de Transa    **2015005887**

DEPTO. DE ESTADO
SECRETARIA AUX. DE SERVICIOS
RECIBIDO

2015 SEP 18  PM 4:47

## DECLARACIÓN DE FINANCIAMIENTO / *FINANCING STATEMENT*
SIGA INSTRUCCIONES/ *FOLLOW INSTRUCTIONS*

A. NOMBRE Y NÚMERO DE CONTACTO (opcional) / *NAME & PHONE OF CONTACT AT FILER (optional)*
**Timothy Sandell**

B. CORREO ELECTRÓNICO DE CONTACTO (opcional) / *E-MAIL CONTACT AT FILER (optional)*
timothy.sandell@usbank.com

C. ENVIAR CONFIRMACIÓN A (Nombre y Dirección): / *SEND ACKNOWLEDGMENT TO:  (Name and Address)*

U.S. Bank

Corporate Trust Services

60 Livingston Ave.

St. Paul, MN 55107

EL ESPACIO ARRIBA ES PARA USO DEL OFICIAL DE REGISTRO
*THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY*

1. NOMBRE DEL DEUDOR / *DEBTOR'S NAME:* Provea sólo un nombre de Deudor (1a o 1b) (use el nombre completo y exacto, no omita, modifique o abrevie ningún componente del nombre); si algún aparte del nombre del Deudor no cabe en la línea 1b, déjela en blanco, marque aquí ☐ y provea la información del Deudor individual en el renglón 10 del Anejo a la Declaración de Financiamiento (Forma UCC1AdPR) / *Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here* ☐ *and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1AdPR)*

| 1a. NOMBRE DE LA ENTIDAD / *ORGANIZATION'S NAME* | | | |
|---|---|---|---|
| Puerto Rico Infrastructure Finance Authority | | | |
| OR 1b. APELLIDO / *INDIVIDUAL'S SURNAME* | NOMBRE / *FIRST PERSONAL NAME* | SEGUNDO NOMBRE / *ADDITIONAL NAME* | SUFIJO / *SUFFIX* |
| 1c. DIRECCIÓN POSTAL / *MAILING ADDRESS* P1) Minillas Government Center Stop 22 2) P.O. Box 41207 Minillas Station | CIUDAD / *CITY* Santurce San Juan | ESTADO / *STATE* CÓDIGO POSTAL / *POSTAL CODE* 00907 00940-1207 | PAÍS / *COUNTRY* |

2. NOMBRE DEL DEUDOR/ *DEBTOR'S NAME:* Provea sólo un Deudor adicional (2a o 2b) (Use el nombre completo y exacto; no omita, modifique o abrevie ninguna parte del nombre). Si cualquier parte de un nombre no cupiera en el espacio provisto en la 2b, deje toda la sección 2 en blanco, marque aquí ☐ y provea el nombre completo en el renglón 10 en el Anejo de la Declaración de Financiamiento (Forma UCC1AdPR) / *Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here* ☐ *and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1AdPR)*

| 2a. NOMBRE DE LA ENTIDAD / *ORGANIZATION'S NAME* | | | |
|---|---|---|---|
| OR 2b. APELLIDO / *INDIVIDUAL'S SURNAME* | NOMBRE / *FIRST PERSONAL NAME* | SEGUNDO NOMBRE / *ADDITIONAL NAME* | SUFIJO / *SUFFIX* |
| 2c. DIRECCIÓN / *MAILING ADDRESS* | CIUDAD / *CITY* | ESTADO / *STATE* CÓDIGO POSTAL / *POSTAL CODE* | PAÍS / *COUNTRY* |

3. NOMBRE DEL ACREEDOR GARANTIZADO (o NOMBRE DE CESIONARIO): Provea sólo un nombre de Acreedor Garantizado (3a o 3b)
*SECURED PARTY'S NAME (or NAME of ASSIGNEE): Provide only one Secured Party name (3a or 3b)*

| 3a. NOMBRE DE LA ENTIDAD / *ORGANIZATION'S NAME* | | | |
|---|---|---|---|
| U.S. Bank Trust National Association, as successor trustee under Trust Agreement dated October 1, 1988, as supplemented | | | |
| OR 3b. APELLIDO / *INDIVIDUAL'S SURNAME* | NOMBRE / *FIRST PERSONAL NAME* | SEGUNDO NOMBRE / *ADDITIONAL NAME* | SUFIJO / *SUFFIX* |
| 3c. DIRECCIÓN POSTAL / *MAILING ADDRESS* 100 Wall Street | CIUDAD / *CITY* New York | ESTADO / *STATE* NY CÓDIGO POSTAL / *POSTAL CODE* 10005 | PAÍS / *COUNTRY* USA |

4. COLATERAL: Esta declaración de financiamiento cubre la siguiente colateral: / *COLLATERAL: This financing statement covers the following collateral:*

All of the Debtor's present and future right, title and interest in and to the Pledged Revenues as defined in the Trust Agreement dated October 1, 1988, as more fully described in Exhibit A attached hereto and incorporated herein.

| 5. Marque sólo si aplica y sólo una opción: Colateral está ☐ en posesión de un Fideicomiso (véase UCC1AdPR, renglón 7 e instrucciones) ☐ administrado por Representante de un difunto | *Check only if applicable and check only one box: Collateral is* ☐ *held in a Trust (See UCC1AdPR, Item 17 and instructions)* ☐ *being administered by a Decedent's Personal Representative* |
|---|---|
| 6a. Marque sólo si aplica y una sola alternativa / *Check only if applicable and check only one box:* ☑ Transacción de Financiamiento Público / *Public-Finance Transaction* ☐ Transacción de Casa Prefabricada / *Manufactured-Home Transaction* ☐ Un Deudor es una entidad transmisora / A Debtor is a *Transmitting Utility* | 6b. Marque sólo si aplica y una sola alternativa / *Check only if applicable and check only one box:* ☐ Gravamen Agrícola *Agricultural Lien* ☐ Inscripción extra-registral *Non-UCC Filing* |
| 7. DESIGNACIÓN ALTERNA (si aplica) ALTERNATIVE DESIGNATION (if applicable): | ☐ Arrendador/Arrendatario *Lessee/Lessor* ☐ Consignatario/Consignador *Consignee/Consignor* ☐ Vendedor/ Comprador *Seller/Buyer* ☐ Depositario/ Fiador *Bailee/Bailor* ☐ Concesionario/Concedente *Licensee/Licensor* |
| 8. DATOS OPCIONALES DE REFERENCIA PARA EL SOLICITANTE / OPTIONAL FILER REFERENCE DATA: | |

COPIA OFICINA DE REGISTRO—DECLARACIÓN DE FINANCIAMIENTO (Forms UCC1PR) (Rev. 05/09/14)

DEPTO DE ESTADO
SECRETARIA AUX. DE SERVICIOS
RECIBIDO

**EXHIBIT A TO**            2015 SEP 18   PM 4:47
**FINANCING STATEMENT**

**DEBTOR:**                                              **SECURED PARTY:**

| | |
|---|---|
| Puerto Rico Infrastructure Finance Authority<br>P.O. Box 41207 Minillas Station<br>San Juan, Puerto Rico 00940 | U.S. Bank Trust National Association, as<br>Trustee<br>100 Wall Street<br>New York, New York 10005 |

## Description of Collateral

The collateral described in this financing statement is all of the Debtor's present and future right, title and interest in and to the Pledged Revenues, as defined below.

## Definitions

The following terms have the following meaning in the Trust Agreement:

"**Act**" shall mean Act No. 44, approved June 21, 1988, as amended and supplemented from time to time.

"**Authority**" or "**Debtor**" shall mean Puerto Rico Infrastructure Financing Authority, a public corporation and instrumentality of the Commonwealth of Puerto Rico constituting an independent body corporate and politic, created by the Act, and the successor or successors of the Authority.

"**Bondholder**", "**Holder**", "**Holder of Bonds**", or "**Owner**" or any similar term, shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

"**Bonds**" shall mean the Bonds of the Authority issued under the Trust Agreement.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"**Offshore Excise Taxes**" shall mean the federal excise taxes on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"**Outstanding**" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds theretofore authenticated and delivered except:

1

\NY - 021918/000024 - 4335580 v4



(i) Bonds theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii) Bonds that are deemed paid and no longer Outstanding as provided in the Trust Agreement;

(iii) Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement relating to Bonds destroyed, mutilated, stolen or lost, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser;

(iv) Bonds tendered or deemed tendered pursuant to any tender provisions, as further provided in the resolution adopted by the Board for any Series of Bonds; and

(v) for purposes of any consent or other action to be taken under the Trust Agreement by the Holders of a specified percentage of principal amount of Bonds, Bonds known by the Trustee to be held by or for the account of the Authority.

"**Pledged Revenues**" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

"**Puerto Rico Infrastructure Fund**" shall mean the Fund of that name designated by the Act.

"**Series**" shall mean all of the Bonds authenticated and delivered at one time on original issuance and pursuant to any resolution authorizing such Bonds as a separate Series of Bonds, or any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds, regardless of variations in maturity, interest rate or other provisions.

"**Sinking Fund**" shall mean the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund", a special fund created and designated by the Trust Agreement.

"**Special Tax Revenues**" shall mean the Offshore Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to Act No. 44.

"**Trust Agreement**" shall mean the Trust Agreement between the Puerto Rico Infrastructure Financing Authority and Citibank, N.A. dated October 1, 1988, as amended, restated, supplemented and otherwise modified and in effect from time to time.

"**Trustee**" shall mean Citibank, N.A. until a successor Trustee shall have become such, and thereafter "Trustee" shall mean or include each person who is then a Trustee under the Trust Agreement.

2

**Government Parties' PRIFA Exhibit No. 4**

*Execution Version*

# LOCKBOX AGREEMENT

This Lockbox Agreement (this "Lockbox Agreement") is dated as of May 5, 2015, and entered into by and among Citibank, N.A., a national banking association (the "Lockbox Bank"), Banco Popular de Puerto Rico, a Puerto Rico banking entity (not in its individual capacity but as trustee under the Trust Agreement (as defined below), the "Trustee"), Citibank, N.A., a national banking association (not in its individual capacity but as Paying Agent under the Trust Agreement (in each case as defined below)) and the Government of Puerto Rico (the "Government"), acting through the Secretary of Treasury, the Secretary of Economic Development and Commerce, the Secretary of Agriculture, the President of the Government Development Bank for Puerto Rico, the Executive Director of the Office of Management and Budget and the Executive Director of the Puerto Rico Industrial Development Company as authorized by Act No. 178 of December 1, 2010, as amended, Act No. 1 of January 31, 2011 and any successor legislation (the "Enabling Act").

## RECITALS

**WHEREAS**, pursuant to the Enabling Act, the Government has entered or may enter into agreements (as amended from time to time, the "Rum Producer Agreements") with various Puerto Rico rum producers (the "Rum Producers") to provide incentives with the objective of maintaining, promoting and growing the production of rum in Puerto Rico;

**WHEREAS**, under the Rum Producer Agreements, the Government is or will be obligated to make certain payments to the Rum Producers relating to the sale in the United States of proof gallons of rum attributable to the rum manufacturing operations of the Rum Producers in Puerto Rico;

**WHEREAS**, on the date hereof, the Government, the Trustee and Citibank N.A., as paying agent (the "Paying Agent") and collateral agent (the "Collateral Agent"), are entering into a Trust Agreement (the "Trust Agreement") to effect the Government's required payments to the Rum Producers (each Rum Producer that may become a beneficiary of the trust created by the Trust Agreement, a "Beneficiary");

**WHEREAS**, the Government has established a deposit account at the Puerto Rico branch of the Lockbox Bank to provide a source of payment from which the Paying Agent can effect such required payments to the Beneficiaries, and on the date hereof wishes to enter into this Lockbox Agreement with the Government, the Trustee and the Paying Agent with respect to such deposit account;

**WHEREAS**, on the date hereof, the Government, as pledgor, and the Trustee and the Collateral Agent (the "Secured Parties") are entering into a Security Agreement in order to grant the Secured Parties a security interest, on the terms set forth therein, in the collateral described therein (the "Security Agreement");

*# 2015-000876*
*20- may -15  SRA*

NY: 886646

**WHEREAS**, on the date hereof, the Government, the Trustee, the Collateral Agent and the Lockbox Bank are entering into a Deposit Account Control Agreement (the "Deposit Account Control Agreement") in order to perfect the security interest granted under the Security Agreement; and

**WHEREAS,** the Government has determined that the above described transactions are in the best public interest and the terms of the above agreements are necessary and convenient to effect such transactions;

**NOW THEREFORE**, in consideration of the foregoing recitals, the covenants, representations, warranties, commitments and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Government, the Trustee, the Paying Agent and the Lockbox Bank agree as follows, effective as of the date of this Lockbox Agreement:

**Section 1.    Certain Terms**.  Capitalized terms when used in this Lockbox Agreement, including its preamble, recitals, annexes and schedules, shall have the meanings set forth in Annex A attached hereto.

**Section 2.    Account**.

(a)    The Secretary of Treasury has established at the Lockbox Bank, and the Lockbox Bank hereby confirms that the Lockbox Bank has established, an account at its Puerto Rico branch in the name of the Secretary of Treasury of Puerto Rico bearing account number 0400109028 (the "Account").

(b)    The Lockbox Bank shall not close the Account or change the name or account number of the Account without the prior written consent of the Secretary of Treasury and the Paying Agent.  The Paying Agent shall not withhold its consent to such change provided that (i) any amendments or modifications to this Lockbox Agreement, the Security Agreement or the Deposit Account Control Agreement that may be necessary or convenient to preserve the validity, priority or perfection of the security interest granted under the Security Agreement shall be executed in form and substance satisfactory to the Paying Agent, and (ii) that the Government shall file (or shall provide such cooperation as may be required to enable the Paying Agent to file or to cause the Collateral Agent to file) such financing statements, continuation statements and other amendments describing all or part of the collateral subject to such security interest as may be requested by the Paying Agent to be filed in order to reflect such change.

(c)    The parties hereto acknowledge and agree that the Account is a "deposit account" within the meaning of Section 9-102(a)(29) of the PRCTA and that the Lockbox Bank's jurisdiction for purposes of the Account under the PRCTA shall be the Commonwealth of Puerto Rico.

(d)    Deposit Funds held in, or credited to, the Account shall not be invested.

2

**Section 3.    Lockbox Bank's Obligations with respect to the Account**.

(a)    The Account shall be used for the deposit by the U.S. Government of Cover Over Revenues payable to the Government on a periodic basis pursuant to Section 7652 of the Code.  The Secretary of Treasury hereby grants to the Lockbox Bank exclusive and unrestricted access to and use of the Account for the purpose of administering such deposits in accordance with this Lockbox Agreement subject to the terms of the Deposit Account Control Agreement.

(b)    The Lockbox Bank shall maintain the Account as contemplated by this Lockbox Agreement and shall not commingle the Deposit Funds in or credited to, or designated for deposit in, the Account with any other Deposit Funds otherwise held on behalf of the Government, the Collateral Agent, the Trustee or any other Person.  The Lockbox Bank acknowledges that the Account and any Deposit Funds in or credited to or designated for deposit in the Account are subject to security interests in favor of the Trustee and the Collateral Agent to the extent set forth in the Security Agreement.  The Lockbox Bank shall not apply any Deposit Funds in the Account or make any disbursement from or debit to the Account other than in accordance with this Lockbox Agreement and, if applicable, the Deposit Account Control Agreement.

(c)    Not later than one (1) Business Day after the deposit by the U.S. Government of a Cover Over Payment in the Account, the Lockbox Bank shall notify the Secretary of Treasury, PRIDCO, the Trustee and the Paying Agent of the amount of such Cover Over Payment and the date of receipt.

(d)    Not later than one (1) Business Day after disbursement of any funds from the Account, the Lockbox Bank shall notify the Secretary of Treasury, PRIDCO, the Trustee and the Paying Agent of the amount disbursed and the date and recipient of the disbursement.  Such notification shall include a breakdown of amounts disbursed, if any, and remaining balances after giving effect to such disbursements, in respect of a Conservation Trust Tax Extender Amount, Unpaid Conservation Trust Amount, Unpaid Beneficiaries' Amount and Unpaid Other Rum Producers' Amount.

(e)    Any transfer of funds from the Account shall be made by wire transfer or similar method of transfer of immediately available funds to the account set forth on Schedule 1 of the recipient designated by this Lockbox Agreement or such other account of a recipient set forth in a written instruction from such recipient to the Lockbox Bank.

**Section 4.    Cover Over Report; Certification**.

(a)    From and after the Waiver Date, the Secretary of Treasury shall deliver to the Lockbox Bank a copy of each Cover Over Report not later than three (3) Business Days after the Government's receipt of such Cover Over Report.  No later than one (1) Business Day after receipt of such Cover Over Report the Lockbox Bank shall deliver a copy of such Cover Over Report  to the Paying Agent and PRIDCO.

(b)    Not later than four (4) Business Days after the Government receives a Cover Over Report from the U.S. Government, the Secretary of Treasury shall deliver to the Lockbox

3

Bank, the Paying Agent and PRIDCO a Government Certification relating to such Cover Over Report and to the applicable Cover Over Payment to which such Cover Over Report relates.

(c)   No later than one (1) Business Day after receipt of a Cover Over Report or Government Certification, the Lockbox Bank shall notify the Secretary of Treasury, PRIDCO, the Trustee and the Paying Agent of (i) any discrepancy between the amount of the corresponding Cover Over Payment and the amount that should have been received in the Account based on the applicable Cover Over Report or Government Certification and (ii) any Reduction set forth in such Government Certification.

**Section 5.**   **Disposition of Cover Over Payments in the Account.**  The Lockbox Bank shall make disbursements of Cover Over Payments deposited by the U.S. Government in the Account during each Fiscal Year by making the following payments from the Account in the following order of priority, **solely to the extent of funds available in the Account**:

(a)   First, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of PRIFA, the first $117 million of aggregate Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(a) during such Fiscal Year;

(b)   Second, subject to Section 15, no later than one (1) Business Day after such deposit of the Cover Over Payment, to the Secretary of Treasury for deposit to the credit of the S&T Trust, the next $5 million of Cover Over Payments received for credit to the Account during each Fiscal Year commencing with the Fiscal Year beginning July 1, 2015, *minus* the aggregate disbursements previously made pursuant to this Section 5(b) during such Fiscal Year;

(c)   Third, if the Lockbox Bank has received a Government Certification by the fourth (4th) Business Day following such deposit of the Cover Over Payment, not later than one (1) Business Day after receipt by the Lockbox Bank of such Government Certification, to the Secretary of Treasury, the remaining amount of Non-Rum COR included in such Cover Over Payment;

(d)   Fourth, if the Lockbox Bank has received a Government Certification by the fourth (4th) Business Day following such deposit of the Cover Over Payment, not later than one (1) Business Day after receipt by the Lockbox Bank of such Government Certification, to the Secretary of Treasury, the remaining amount of Other Rum COR included in such Cover Over Payment;

(e)   Fifth, subject to Section 15, if the Lockbox Bank has received a Government Certification by the fourth (4th) Business Day following such deposit of the Cover Over Payment, not later than one (1) Business Day after receipt by the Lockbox Bank of such Government Certification, to the Conservation Trust, an amount equal to the Unpaid Conservation Trust Amount;

4

(f)  Sixth, no later than five (5) Business Days after such deposit of the Cover Over Payment, the following amounts on a Pro Rata Basis:

(i)  to the Paying Agent, an amount equal to the Unpaid Beneficiaries' Amount; and

(ii)  to PRIDCO, for credit to the Other Rum Producers, an amount equal to the Unpaid Other Rum Producers' Amount;

(g)  Seventh, no later than one (1) Business Day following receipt by the Lockbox Bank of a Government Certification that is received after the fourth (4th) Business Day following such deposit of the Cover Over Payment, the following amounts in the following priority:

(i)  to the Secretary of Treasury, the remaining amount of Non-Rum COR included in such Cover Over Payment;

(ii)  to the Secretary of Treasury, the remaining amount of Other Rum COR included in such Cover Over Payment; and

(iii)  subject to Section 15, to the Conservation Trust, an amount equal to the Unpaid Conservation Trust Amount; and

(h)  Eighth, no later than one (1) Business Day after the Lockbox Bank has made all payments required to be made pursuant to Sections 5(a) through 5(g), to the Secretary of Treasury, the remaining balance in the Account (exclusive of  Cover Over Payments deposited in the Account on or after the Business Day referred to in Section 5(a)).

Amounts payable under Sections 5(a) and 5(b) shall in all cases be paid first out of Non-Rum COR, second out of Other Rum COR, and third out of Puerto Rico Rum COR, in each case to the extent of funds available in the Account.

**Section 6.   Subordination of Lien; Waiver of Set-Off**.  In the event that the Lockbox Bank has obtained or subsequently obtains by agreement, by operation of law or otherwise a security interest in, lien on, or encumbrance, claim or (except as provided in the next sentence) right of set-off against, the Account or any Deposit Funds therein or credited thereto, the Lockbox Bank hereby agrees that such security interest, lien, encumbrance, claim and right of set-off shall be subordinate to any interest of the Government or  the Trustee, including the security interest created pursuant to the Security Agreement.  The Lockbox Bank agrees not to exercise any present or future right of recoupment or set-off against the Account or to assert against the Account any present or future security interest, banker's lien or any other lien or claim (including claim for penalties) that the Lockbox Bank may at any time have against the Account or any Deposit Funds therein or credited thereto.  The Lockbox Bank shall have no right

5

Agreement except for any such tax based on or measured by amounts paid to the Lockbox Bank as fees or compensation in connection with this Lockbox Agreement pursuant to the Fee Agreement.

Section 13.   **Qualifications**.   The Lockbox Bank under this Lockbox Agreement, including any successor lockbox bank, shall at all times (i) be a financial institution that is recognized in the industry as a leading provider of the types of services being provided under this Lockbox Agreement, (ii) have a net worth of at least $500,000,000, if there be such an institution willing, able and legally qualified to perform the duties of the lockbox bank under this Lockbox Agreement upon reasonable or customary terms and (iii) be able to comply with the provisions of Act 69 of August 14, 1991, as amended, with respect to the Account; provided, however, that such new Lockbox Bank shall resign in accordance with Section 10 if the Government certifies to the Lockbox Bank or the new Lockbox Bank, not later than 30 days after the succession of the new Lockbox Bank, that the new Lockbox Bank is a Person with whom the Commonwealth of Puerto Rico is at the time engaged in a material litigation or other significant legal controversy or dispute.

Section 14.   **Conflict with Other Agreements; Adverse Claims**.   The Lockbox Bank hereby confirms and agrees that:

(a)   there are no agreements entered into between the Lockbox Bank and any other Person with respect to the Account except for this Lockbox Agreement and the Deposit Account Control Agreement;

(b)   it has not entered into, and until the termination of this Lockbox Agreement shall not enter into, any agreement with any Person (other than the Government, the Paying Agent and the Trustee) relating to the Account and/or any Deposit Funds therein or credited thereto, other than the Deposit Account Control Agreement; and

(c)   except for the claims and interests of the Government and the Trustee in the Account and the Deposit Funds therein or credited thereto, the Lockbox Bank does not know of any security interest in, lien on, claim to, or interest in the Account or in any "financial asset" (as defined in Section 8-102(a)(9) of the PRCTA), funds, monies, checks or other items in or credited to the Account.  If any Person asserts any security interest, lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Account or in any Deposit Funds therein or credited thereto, other than the security interest of the Trustee and the Collateral Agent therein, the Lockbox Bank shall promptly notify the Government, the Paying Agent and the Trustee thereof in writing.

Section 15.   **Legal Adjustments; Change in Federal Law; Amounts Payable to PRIDCO**.

(a)   If, at any time after the date of this Lockbox Agreement, Act No. 119 of July 9, 2006 of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to PRIFA from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(a) shall be adjusted accordingly to

8

reflect such reduction or the elimination of such priorities. If, at any time after the date of this Lockbox Agreement, Act No. 214 of August 19, 2004 of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to the S&T Trust from Cover Over Revenues or to eliminate any priority that PRIFA may have with respect to such amounts, the payments from the Lockbox Account set forth in Section 5(b) shall be adjusted accordingly to reflect such reduction or the elimination of such priorities. If, at any time after the date of this Lockbox Agreement, Act No. 108 of August 7, 2002 of the Commonwealth of Puerto Rico or any successor legislation is amended, modified, repealed or otherwise changed to reduce the amount payable to the Conservation Trust from Cover Over Revenues, the payments from the Lockbox Account set forth in Section 5(e) and Section 5(g)(iii) shall be adjusted accordingly to reflect such reduction. Either the Paying Agent or the Government shall have the right to deliver a written notice to the other and to the Lockbox Bank identifying such amendment, modification, repeal or other change and setting forth the corresponding adjustment to be made to Section 5(a), (b), (e) or (g)(iii), as the case may be. Such adjustment shall become effective within ten (10) Business Days of receipt by the Lockbox Bank and either the Government or the Paying Agent, as the case may be, unless either the Government or the Paying Agent delivers a written notice to the other and to the Lockbox Bank prior to the end of such ten (10) Business Day period indicating that it is disputing such adjustment. In the event of any such dispute, no adjustment shall be made to Section 5 until such dispute is resolved pursuant to Section 27(b) or otherwise. Promptly upon resolution of any dispute, the Paying Agent and the Government shall deliver to the Lockbox Bank a joint Account Instruction setting forth the adjustments to be made to Section 5.

(b)    If, at any time after the date of this Lockbox Agreement, any change in federal law, regulation or administrative practice would result in the payment of Cover Over Revenues into the Account with respect to any Applicable Month in excess of the Cover Over Revenues that would have been paid with respect to such Applicable Month if the payment had been determined by reference to the Cover Over Rate then in effect for such Applicable Month (an "Excess COR Payment"), the Paying Agent or the Government may deliver a written notice to the other and to the Lockbox Bank proposing an amendment or other modification to this Lockbox Agreement that will adjust the provisions hereof accordingly. Such adjustment shall assure that the Excess COR Payment is disbursed in accordance with the priority of payments set forth in Section 5, including disbursement of any portion of the Excess COR Payment to the Government only after all other Persons entitled to receive disbursements of the Excess COR Payment pursuant to Section 5, whether entitled to receive such disbursements at the time of the Excess COR Payment or with the passage of time, have received such disbursements. Pending the execution and delivery by all parties hereto of such amendment or other modification, the Lockbox Bank shall retain the Excess COR Payment. If the parties hereto cannot agree upon such amendment or other modification, the dispute regarding the adjustment may be submitted to arbitration pursuant to Section 27.

(c)    Any amounts payable to PRIDCO from Cover Over Revenues pursuant to Act No. 108 of July 23, 2014 shall be paid to PRIDCO by the Government from amounts received pursuant to Section 5(h).

**Section 16.    Notices; Authorized Representatives.**

9

**IN WITNESS WHEREOF**, the parties hereto have caused this Lockbox Agreement to be duly executed as of the date first written above.

LOCKBOX BANK:                    CITIBANK. N.A.. as Lockbox Bank

                                 *E IN*

                                 By: _____

                                 Name:   **Marion O'Connor**
                                 Title:    Vice President


PAYING AGENT:                    CITIBANK. N.A.. as Paying Agent

                                 *E IN*

                                 By: _____

                                 Name:   **Marion O'Connor**
                                 Title:    Vice President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO RICO:

DEPARTMENT OF THE TREASURY

*EIN:*

By: _Juan Zaragoza Gómez_ _____

Name: Juan Zaragoza Gómez

Title:   Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE

By: _____

Name: Alberto Bacó Bagué

Title:   Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By: _____

Name: Antonio L. Medina Comas

Title:   Executive Director

DEPARTMENT OF AGRICULTURE

By: _____

Name: Myrna Comas Pagan

Title:   Secretary

OFFICE OF MANAGEMENT AND BUDGET

By: _____

Name: Luiz F. Cruz Batista

Title:   Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

By: _____

Name: Melba I. Acosta Febo

Title:   President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO
RICO:

DEPARTMENT OF THE TREASURY

By:_____
Name: Juan Zaragoza Gómez
Title:   Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND
COMMERCE *- EIN:*

By:_____
Name: Alberto Bacó Bagué
Title:   Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____
Name: Antonio L. Medina Comas
Title:   Executive Director

DEPARTMENT OF AGRICULTURE

By:_____
Name: Myrna Comas Pagan
Title:   Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____
Name: Luiz F. Cruz Batista
Title:   Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO
RICO

By:_____
Name: Melba I. Acosta Febo
Title:   President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO RICO:

DEPARTMENT OF THE TREASURY

By:_____
Name: Juan Zaragoza Gómez
Title:  Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE

By:_____
Name: Alberto Bacó Bagué
Title:  Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____
Name: Antonio L. Medina Comas
Title:  Executive Director

DEPARTMENT OF AGRICULTURE

By:_____
Name: Myrna Comas Pagan
Title:  Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____
Name: Luiz F. Cruz Batista
Title:  Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

By:_____
Name: Melba I. Acosta Febo
Title:  President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO
RICO:

DEPARTMENT OF THE TREASURY

By: _____
Name: Juan Zaragoza Gómez
Title:   Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND
COMMERCE

By: _____
Name: Alberto Bacó Bagué
Title:   Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By: _____
Name: Antonio L. Medina Comas
Title:   Executive Director

DEPARTMENT OF AGRICULTURE
*EIN:*
By: *Myrna Comas Pagan* _____
Name: Myrna Comas Pagan
Title:   Secretary

OFFICE OF MANAGEMENT AND BUDGET

By: _____
Name: Luiz F. Cruz Batista
Title:   Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO
RICO

By: _____
Name: Melba I. Acosta Febo
Title:   President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO
RICO:

DEPARTMENT OF THE TREASURY

By:_____
Name: Juan Zaragoza Gómez
Title:   Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND
COMMERCE

By:_____
Name: Alberto Bacó Bagué
Title:   Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____
Name: Antonio L. Medina Comas
Title:   Executive Director

DEPARTMENT OF AGRICULTURE

By:_____
Name: Myrna Comas Pagan
Title:   Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____
Name:   Luis F. Cruz Batista
Title:   Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO
RICO

By:_____
Name: Melba I. Acosta Febo
Title:   President

[Signature Page to Lockbox Agreement]

GOVERNMENT OF PUERTO
RICO:

DEPARTMENT OF THE TREASURY

By:_____
Name: Juan Zaragoza Gómez
Title:   Secretary

DEPARTMENT OF ECONOMIC DEVELOPMENT AND
COMMERCE

By:_____
Name: Alberto Bacó Bagué
Title:   Secretary

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY

By:_____
Name: Antonio L. Medina Comas
Title:   Executive Director

DEPARTMENT OF AGRICULTURE

By:_____
Name: Myrna Comas Pagan
Title:   Secretary

OFFICE OF MANAGEMENT AND BUDGET

By:_____
Name: Luiz F. Cruz Batista
Title:   Executive Director

GOVERNMENT DEVELOPMENT BANK FOR PUERTO
RICO   *EIN:*

By:_____
Name: Melba I. Acosta Febo
Title:   President

[Signature Page to Lockbox Agreement]

TRUSTEE:                    BANCO POPULAR DE PUERTO RICO, as Trustee

*EIN:*

By: _____
Name: Héctor Rivera Rivera
Title: Vice President and Trust Officer

[Signature Page to Lockbox Agreement]

ANNEX A
to Lockbox Agreement

**DEFINITIONS**

"AAA" shall have the meaning given to it in Section 27(b).

"Account" shall have the meaning given to it in Section 2(a).

"Account Instruction" shall mean, with respect to the Account, any order, direction or instruction concerning or directing the disposition, transfer, withdrawal, disbursement or redemption of any Deposit Funds in or credited to the Account, or otherwise relating to any matters pertaining to or concerning the Account or any Deposit Funds therein or credited thereto.

"Applicable Month" shall mean the month in which occurred the sale of rum produced in Puerto Rico, as reported in TTB Form 5110.28, or any substitute form providing substantially the same information, that produced excise tax revenue collected by the U.S. Government.

"Authorized Representative" shall have the meaning given to it in Section 16(b).

"Beneficiary" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Beneficiary Invoice" shall mean a Monthly Beneficiary Invoice or a Tax Extender Beneficiary Invoice.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or San Juan, Puerto Rico are authorized or required by law to remain closed.

"Code" shall mean the United States Internal Revenue Code of 1986, as amended.

"Collateral Agent" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Confidential Information" shall have the meaning given to it in Section 30(a).

"Conservation Trust" shall mean the Puerto Rico Conservation Trust Fund.

"Conservation Trust Monthly Amount" shall mean, with respect to each Cover Over Payment that is not a Tax Extender Payment, a positive amount equal to one-sixth (1/6) of the difference of (x) the number of proof gallons used in calculating the Puerto Rico Rum COR included in such Cover Over Payment as set forth in the applicable Government Certification, *multiplied* by the lesser of (A) the Cover Over Rate then in effect as set forth in the applicable Government Certification and (B) $13.25, *minus* (y) such number of proof gallons *multiplied* by $10.50.

"Conservation Trust Tax Extender Amount" shall mean, with respect to any Tax Extender Payment, a positive amount equal to one-sixth (1/6) of the Puerto Rico Rum COR included in such Tax Extender Payment, as set forth in the applicable Government Certification.

"Cover Over Payment" shall mean the payment by the U.S. Government to the Account of Cover Over Revenues, including any Tax Extender Payment, from and after March 1, 2015.

"Cover Over Rate" shall mean (i) with respect to any Cover Over Revenue attributable to rum, the maximum rate at which such Cover Over Revenue is covered into the treasuries of Puerto Rico and the U.S. Virgin Islands pursuant to Section 7652(f) of the Code, and (ii) with respect to any Cover Over Revenue attributable to articles of merchandise other than rum, the rate of tax imposed on the article of merchandise pursuant to Section 7652(a)(1) of the Code.

"Cover Over Report" shall mean the report of collections of federal excise tax revenues pursuant to Section 7652 of the Code and the amount thereof remitted by the U.S. Government to the Department of the Treasury of Puerto Rico, in substantially the form of Exhibit A hereto. "Cover Over Report" shall also mean any written communication setting forth the amount of any Tax Extender Payment if the amount of such Tax Extender Payment is not included in a Cover Over Report in substantially the form of Exhibit A hereto.

"Cover Over Revenues" or "COR" shall mean the federal excise tax revenues payable to the Government by the U.S. Government pursuant to Section 7652 of the Code or any other statute or regulation which may be substituted for Section 7652 in the future.

"Deposit Account Control Agreement" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Deposit Funds" shall mean cash or checks.

"Enabling Act" shall have the meaning given to it in the preamble to this Lockbox Agreement.

"Enforcement Expenses" shall mean expenses incurred by the United States Department of Treasury in connection with the enforcement in Puerto Rico of the provisions of Subtitle E (Sections 5001 through 5891) and Section 7652(a) of the Code and reimbursed from Cover Over Revenues pursuant to Section 5314(a)(4) of the Code.

"Excess COR Payment" shall have the meaning given to it in Section 15(b).

"Fee Agreement" shall mean the agreement between the Lockbox Bank and one or more Rum Producers, dated the date hereof, with respect to the payment of fees for the Lockbox Bank's services under this Lockbox Agreement.

"Fiscal Year" shall mean the Government's fiscal year of July 1 through June 30.

"Government" shall have the meaning given to it in the preamble to this Lockbox Agreement.

A-2

"Government Certification" shall mean a certificate delivered by the Secretary of Treasury to the Lockbox Bank pursuant to Section 4(b) in substantially the form of Exhibit B.

"Government Other Rum Producers' Certification" shall mean a certificate in substantially the form of Exhibit E delivered by PRIDCO to the Lockbox Bank (i) in respect of an Other Rum Producer Invoice (or an amendment thereto) attached to such certificate, certifying, with respect to such Other Rum Producer Invoice or amendment, that the amounts set forth thereon have been calculated in a manner consistent with the Rum Producer Agreement between the Government and the applicable Other Rum Producer and are due and payable by the Government to such Other Rum Producer or (ii) certifying as to any adjustments that may have been made pursuant to "true up" or similar provisions contained in the applicable Rum Producer Agreement with an Other Rum Producer, including amounts that may have been paid by the Government to an Other Rum Producer in respect of an outstanding Other Rum Producer Invoice from funds not received in the Lockbox Account.

"Governmental Authority" shall mean any federal, Puerto Rico, commonwealth, state, municipal or local governmental entity, authority or agency, department, instrumentality, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof).

"Lockbox Agreement" shall have the meaning given to it in the preamble to this Lockbox Agreement.

"Lockbox Bank" shall have the meaning given to it in the preamble to this Lockbox Agreement.

"Monthly Beneficiary Invoice" shall mean an invoice in substantially the form of Exhibit C delivered by a Beneficiary to PRIDCO and (following the date hereof) the Lockbox Bank with respect to rum sales reportable on TTB Form 5110.28, or any substitute form providing substantially the same information, for each Applicable Month beginning with the month of November 2014, calculated at the Cover Over Rate in effect during such Applicable Month, and including evidence of the payment of the applicable rum excise taxes by such Beneficiary for such Applicable Month, as such invoice may be amended from time to time.

"Monthly Other Rum Producer Invoice" shall mean an invoice delivered by an Other Rum Producer to PRIDCO and (following the date hereof) to the Lockbox Bank by PRIDCO together with a Government Other Rum Producers' Certification, with respect to rum sales reportable on TTB Form 5110.28, or any substitute form providing substantially the same information, for each Applicable Month beginning with the month of November 2014, calculated at the Cover Over Rate in effect during such Applicable Month, and including evidence of the payment of the applicable rum excise taxes by such Other Rum Producer for such Applicable Month, as such invoice may be amended from time to time.

"Non-Rum COR" shall mean, with respect to each Cover Over Payment, the portion of such Cover Over Payment that is not (i) Other Rum COR or (ii) Puerto Rico Rum COR.

A-3

"<u>Other Rum COR</u>" shall mean with respect to each Cover Over Payment, the portion of such Cover Over Payment comprised of Cover Over Revenue payable by the U.S. Government to the Government pursuant to Section 7652(e) of the Code.

"<u>Other Rum Producer</u>" shall mean any Rum Producer that is a party to a Rum Producer Agreement as of the date hereof but is not a Beneficiary as of the date hereof.

"<u>Other Rum Producer Invoice</u>" shall mean a Monthly Other Rum Producer Invoice or a Tax Extender Other Rum Producer Invoice.

"<u>Parent</u>" shall mean a corporation, company or other entity which owns, possesses or controls, directly or indirectly, now or hereafter, (a) all or substantially all of the assets of another corporation, company or other entity, (b) securities representing more than fifty percent (50%) of the voting power of another corporation, company or other entity, and (c) the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract, or otherwise) of another corporation, company or other entity.

"<u>Paying Agent</u>" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"<u>Person</u>" shall mean any individual or entity (including any corporation, limited partnership, joint venture, limited liability company, estate, trust or other body).

"<u>PRCTA</u>" shall mean the Puerto Rico Commercial Transactions Act as in effect from time to time in the Commonwealth of Puerto Rico.

"<u>PRIDCO</u>" shall mean the Puerto Rico Industrial Development Company or any successor entity.

"<u>PRIFA</u>" shall mean the Puerto Rico Infrastructure Financing Authority.

"<u>Pro Rata Basis</u>" shall mean, with respect to a disbursement pursuant to <u>Section 5(f)</u>, an amount with respect to each of the Paying Agent and the Government equal to (i) in the case of the Paying Agent, the Unpaid Beneficiaries' Amount and (ii) in the case of the Government, the Unpaid Other Rum Producers' Amount, in each such case *multiplied* by the Factor.  For purposes of this definition, the "<u>Factor</u>" is equal to the lesser of (A) the quotient of (x) the total amount of funds available for disbursement pursuant to <u>Section 5(f)</u> *divided* by (y) the sum of the Unpaid Beneficiaries' Amount and the Unpaid Other Rum Producers' Amount and (B) 1.0.

"<u>Puerto Rico</u>" shall mean the Commonwealth of Puerto Rico.

"<u>Puerto Rico Rum COR</u>" shall mean, with respect to each Cover Over Payment, the portion of such Cover Over Payment comprised of Cover Over Revenue payable by the U.S. Government to the Government pursuant to Section 7652(a)(3) of the Code in respect of rum produced in Puerto Rico.

A-4

"Reduction" shall mean any offset or other reduction in the amount of Cover Over Revenues paid to the Government by the U.S. Government, including as a result of amounts owed, or alleged to be owed, to any United States Governmental Authority by the Government or any Governmental Authority or affiliated entity thereof; provided, however, that a "Reduction" shall not include any reduction that is made by the TTB as an adjustment to the amount of Cover Over Revenues previously paid due to a calculation error determined by an audit or other administrative review.

"Remedy" shall have the meaning given to it in Section 22(a).

"Representatives" shall have the meaning given to it in Section 30(a).

"Rum COR" shall mean Other Rum COR *plus* Puerto Rico Rum COR.

"Rum Producer Agreements" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Rum Producers" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"S&T Trust" means the Puerto Rico Science and Technology Trust.

"Secured Parties" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Security Agreement" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Tax Extender Beneficiary Invoice" shall mean an invoice in substantially the form of Exhibit D delivered by a Beneficiary to PRIDCO and the Lockbox Bank on or after the date hereof, with respect to rum sales reportable on TTB Form 5110.28 for each Applicable Month to be included in a Tax Extender Payment and calculated using the Cover Over Rate to be used in calculating such Tax Extender Payment, as such invoice may be amended from time to time.

"Tax Extender Other Rum Producer Invoice" shall mean an invoice delivered by an Other Rum Producer to PRIDCO on or after the date hereof, and forwarded by PRIDCO to the Lockbox Bank together with a Government Other Rum Producers' Certification, with respect to rum sales reportable on TTB Form 5110.28 for each Applicable Month to be included in a Tax Extender Payment and calculated using the Cover Over Rate to be used in calculating such Tax Extender Payment, as such invoice may be amended from time to time.

"Tax Extender Payment" shall mean the payment by the U.S. Government to the Account of Cover Over Revenues resulting from a retroactive increase in the Cover Over Rate above the Cover Over Rate specified in Section 7652(f) of the Code (such Cover Over Rate being $10.50 per proof gallon as of the date of this Lockbox Agreement) with respect to any Applicable Month from and after January 1, 2015.

"Trust Agreement" shall have the meaning given to it in the recitals of this Lockbox Agreement.

"Trustee" shall have the meaning given to it in the preamble to this Lockbox Agreement.

"TTB" shall mean the U.S. Alcohol and Tobacco Tax and Trade Bureau.

"Transaction Documents" means this Lockbox Agreement, the Trust Agreement, the Security Agreement and the Deposit Account Control Agreement.

"United States" shall mean the continental United States, Hawaii and Alaska.

"Unpaid Beneficiaries' Amount" shall mean, as of any date of determination, an amount equal to (i) the aggregate amount set forth as due to a Beneficiary pursuant to Beneficiary Invoices delivered by the Beneficiaries to PRIDCO and (following the date hereof) the Lockbox Bank as of the fifth (5th) Business Day immediately preceding the date of determination, *minus* (ii) the sum of (x) all amounts previously paid to the Paying Agent pursuant to Section 5(f)(i), *plus* (y) all amounts that the Government and the Paying Agent have certified in joint Account Instructions as of such Business Day as having been paid by the Government to a Beneficiary in respect of an outstanding Beneficiary Invoice, *plus* (iii) any amounts that the Government and the Paying Agent certify in a joint Account Instruction are to be added to the Unpaid Beneficiaries' Amount on account of a Rum Producer having entered into a new Rum Producer Agreement and become a Beneficiary or an Other Rum Producer having become a Beneficiary. The "Unpaid Beneficiaries' Amount" shall reflect (i) all amendments of Beneficiary Invoices delivered to PRIDCO and the Lockbox Bank not later than the fifth (5th) Business Day immediately preceding the date of determination and (ii) all adjustments that may be made pursuant to "true up" or similar provisions contained in the Rum Producer Agreements and the Trust Agreement (including Sections 4.3.2 and 4.5 thereof) jointly certified to the Lockbox Bank by PRIDCO and the applicable Beneficiary, including any amounts that have been paid by the Government to a Beneficiary in respect of an outstanding Beneficiary Invoice from funds not received in the Account. As of the date hereof, the Unpaid Beneficiaries' Amount is $26,030,156.

"Unpaid Conservation Trust Amount" shall mean, as of any date of determination, an amount equal to (i) the sum of, without duplication, (x) the aggregate Conservation Trust Monthly Amounts calculated with respect to Cover Over Payments beginning May 2015, *plus* (y) the aggregate Conservation Trust Tax Extender Amounts relating to Tax Extender Payments received by the Government after March 2015, *minus* (ii) the sum of all amounts previously paid to the Conservation Trust pursuant to Section 5(e) and Section 5(g)(iii).

"Unpaid Other Rum Producers' Amount" shall mean, as of any date of determination, an amount equal to (i) the aggregate amount set forth as due to an Other Rum Producer pursuant to Other Rum Producer Invoices delivered by the Other Rum Producers to PRIDCO and (following the date hereof) to the Lockbox Bank by PRIDCO together with a Government Other Rum Producers' Certification as of the fifth (5th) Business Day immediately preceding the date of determination *minus* (ii) the sum of (x) all amounts previously paid to the Paying Agent pursuant to Section 5(f)(ii) *plus* (y) all amounts that the Government has certified in Government Other

Rum Producers' Certifications as of such Business Day as having been paid by the Government to an Other Rum Producer in respect of an Other Rum Producer Invoice, *minus* (iii) any amounts that the Government and the Paying Agent have certified in joint Account Instructions as of such Business Day as having been added to the Unpaid Beneficiaries Amount as a result of an Other Rum Producer having become a Beneficiary.  The "Unpaid Other Rum Producers' Amount" shall reflect (i) all amendments of Other Rum Producer Invoices set forth in a Government Other Rum Producers' Certification not later than the fifth (5th) Business Day immediately preceding the date of determination and (ii) all adjustments that may be made pursuant to "true up" or similar provisions contained in the Rum Producer Agreements with Other Rum Producers, including any amounts that have been paid by the Government to an Other Rum Producer in respect of an outstanding Other Rum Producer Invoice from funds not received in the Account, as certified to the Lockbox Bank by PRIDCO in a Government Other Rum Producers' Certification.  As of the date hereof, the Unpaid Other Rum Producers' Amount is $4,499,415.10.

"U.S. Government" shall mean the federal government of the United States.

"Waiver Date" shall mean the date on which the Government obtains the waiver of the U.S. Government to allow disclosure of the information contained in the Cover Over Report to the Lockbox Bank.

## EXHIBIT A

## FORM OF COVER OVER REPORT

COVER OVER WORKSHEET
COVER OVER TO PUERTO RICO AND THE VIRGIN ISLANDS
[Month] [Year]

| COLLECTIONS: | PUERTO RICO | | VIRGIN ISLANDS | |
|---|---|---|---|---|
| (1) Bulk Rum | $ | | $ | |
| (2) Cased Rum | $ | | $ | |
| (3) Other Rum | $ | | $ | |
| (2) Beer | $ | | $ | |
| (2) Wine | $ | | $ | |
| (4) Customs | $ | | $ | |
| Adjustment: Customs | $ | | $ | Adjustment: Customs |
| Adjustment: Bulk | $ | | $ | Adjustment: Bulk (2/14") |
| Adjustment: Estimated Payment | $ | | $ | Dept of Interior Data Sent |
| Adjustment: Other Rum | $ | | $ | Adjustment: Other Rum |
| Adjustment: Estimated Payment | $ | | $ | Other Rum From TTB |

| TOTAL COLLECTIONS: | $ | |
|---|---|---|

| DEDUCTIONS: | | TOTAL TO INTERIOR | $ |
|---|---|---|---|
| Enf. Exp (A7) | $ | TOTAL OTHER RUM | $ |
| Deduction | $ | | |
| Deduction | $ | | |

| TOTAL DEDUCTIONS: | $ | |
|---|---|---|
| TOTAL COVER OVER: | $ | $ |
| TOTAL COLLECTIONS: | $ | |

| (A1) BULK RUM IN PROOF GALLONS | | | |
|---|---|---|---|
| ATF F 5600.8 | Puerto Rico | Virgin Islands | Other Imp. Run |
| (5) Total Prf Gals | | | |

| | Puerto Rico | Virgin Islands | Other Imp. Run |
|---|---|---|---|
| (1) TOTAL @ $10.50 | $ | $ | $ |
| TOTAL @ $13.50 | $ | $ | $ |
| TOTAL @ $13.25 | $ | $ | $ |

| OTHER RUM DATA WITH PERCENTAGES FOR PUERTO RICO & THE VIRGIN ISLANDS | | | |
|---|---|---|---|
| [Month and Year] | | | |
| COLLECTIONS: | OTHER RUM (pg) | Puerto Rico | Virgin Islands |
| | | $ | $ |
| (5) Bulk @ 10.50 | $ | $ | $ |
| (A5) Census @ 10.50 | $ | $ | $ |
| Subtotal | $ | $ | $ |

A-1

| DEDUCTIONS | $ |
|---|---|

| | | | |
|---|---|---|---|
| TOTAL p.g. | $ | $ | $ |

| | | | |
|---|---|---|---|
| (3) TOTAL @ $10.50 | | $ | $ |
| TOTAL @ $13.50 | | $ | $ |
| TOTAL @ $13.25 | | $ | $ |

| (2) PR CASED GOODS: | Distilled Spirits | Wine | Beer |
|---|---|---|---|
| proof gallons @ 10.50 | $ | $ | $ |

| (4) CUSTOMS FIGURES | Puerto Rico | Virgin Islands |
|---|---|---|
| Dollars | $ | $ |

A-2

**EXHIBIT B**

**FORM OF GOVERNMENT CERTIFICATION**

[DATE]

GOVERNMENT CERTIFICATION PURSUANT TO SECTION 4(b) OF THE LOCKBOX
AGREEMENT

I, [representative], being a duly authorized representative of the Secretary of
Treasury of Puerto Rico (the "Secretary"), hereby certify, pursuant to Section 4(b) of the
Lockbox Agreement, dated as of May 5, 2015 (the "Lockbox Agreement"), by and among
Citibank, N.A., a national banking association (the "Lockbox Bank"), Banco Popular de Puerto
Rico, a Puerto Rico banking entity (not in its individual capacity but as trustee under the Trust
Agreement (as defined in the Lockbox Agreement), the "Trustee"), Citibank, N.A., a national
banking association (not in its individual capacity but as paying agent under the Trust
Agreement, the "Paying Agent") and the Government of Puerto Rico (the "Government") as
follows:

Part A[1]

The Cover Over Report for net excise tax collections due to the Government (the
"Report") for the month of [insert month and year on the cover letter accompanying the
Report], was received by the Secretary of Treasury on [date].

As set forth in the Report, (i) the amount of Other Rum COR due to the
Government and the number of proof gallons of rum used in determining such Other Rum
COR, (ii) the amount of Non-Rum COR included in the Cover Over Payment to which
such Report relates and the customs figures, Cover Over Revenues attributable to beer sales
and Cover Over Revenues attributable to wine sales that constitute such Non-Rum COR
and (iii) the amount of Puerto Rico Rum COR due to the Government and the number of
proof gallons of rum and the Cover Over Rate used in determining such Puerto Rico Rum
COR, is in each case, prior to any adjustments or deductions, as set forth in the table below:

---

[1] Part A to be included (i) in connection with a Cover Over Report that does not reflect a Tax
Extender Payment or (ii) in connection with a Cover Over Report that reflects a Tax
Extender Payment, but in such case only with respect to the portion of such Cover Over
Report that does not relate to such Tax Extender Payment.

| Product | Number of Proof Gallons | Cover Over Rate | COR |
|---|---|---|---|
| Other Rum | [●] pg | $[●] ppg | Other Rum COR: $[●] |
| Non-Rum | N/A | N/A | Non-Rum COR: $[●] |
| | | | Customs figures: $[●] : |
| | | | COR attributable to beer sales: $[●] |
| | | | COR attributable to wine sales: $[●] |
| Puerto Rico Rum | [●] pg | $[●] ppg | Puerto Rico Rum COR: $[●] |

As set forth in the Report, the total amount of Cover Over Revenues (after adjustments and deductions) due to the Government equals $[●].

[No Reduction is reflected in the total amount of Cover Over Revenues due to the Government as set forth in the Report.][A Reduction in the amount of $_____ is reflected in the total amount of Cover Over Revenues due to the Government as set forth in the Report.][2]

<u>Part B</u>[3]

As set forth in the Report, a Tax Extender Payment in the amount of $[●] has been or will be made.

(i) The amount of Other Rum COR included or to be included in such Tax Extender Payment and the Cover Over Rate for such Other Rum COR and (ii) the amount of Puerto Rico Rum COR included or to be included in such Tax Extender Payment and the Cover Over Rate for such Puerto Rico Rum COR are in each case as set forth in the table below:

---

[2] First sentence to be included unless the Cover Over Report reflects a Reduction.  In that case the second sentence should be included, indicating the amount of the Reduction.

[3] Part B to be included solely in connection with the portion of any Cover Over Report that relates to a Tax Extender Payment.

B-2

| Product | Cover Over Rate | Amount of COR included in Tax Extender Payment |
|---|---|---|
| Other Rum | $[●] ppg | Other Rum COR:  $[●] |
| Puerto Rico Rum | $[●] ppg | Puerto Rico Rum COR: $[●] |

### Part C

As set forth in the Report, the Enforcement Expenses deducted from Cover Over Revenues as reimbursement to the United States Department of Treasury equals **$[●].**

All capitalized terms not defined herein shall have the meaning ascribed to them in the Lockbox Agreement.

IN WITNESS WHEREOF, the Secretary has caused this Government Certification to be executed by [representative] as of the date first written above.

DEPARTMENT OF THE TREASURY

By:_____
Name: [representative]
Title:   [position]

B-3

**EXHIBIT C**

**FORM OF MONTHLY BENEFICIARY INVOICE**

[Rum Producer Letterhead]

INVOICE

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE:      [date]
NUMBER:   [number]

_____

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico (the "Government") dated as of [date] (the "Agreement").  All capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

(a)   Proof gallons of [Rum Producer] Rum                [●] pg
      Sales in month of [month][year]

(b)   Applicable Cover Over Rate                          $[●] ppg[1]

(c)   Cover Over Revenues attributable to [Rum           $[●][2]
      Producer] Rum Sales at applicable Cover
      Over Rate

(d)   Applicable percentage of Cover Over                [●]%[3]

_____

[1] To be Cover Over Rate in effect for Applicable Month to which Monthly Beneficiary Invoice relates.

[2] To equal proof gallons in line item (a) multiplied by applicable Cover Over Rate in line item (b).

Revenues under Section [●] of the
Agreement

(e)   Amount due and payable to [Rum        $[●][4]
      Producer]


I, being a duly authorized representative of [Rum Producer], hereby certify that the amount
requested above represents amounts due relating to Cover Over Revenues under the Agreement.

By:  _____
[Name]
[Title]

cc:    Citibank, N.A.
       [address]


_____

(Cont'd from preceding page)

[3] To equal applicable percentage to be applied to Cover Over Revenues attributable to rum sales
    of the applicable Rum Producer under the applicable Rum Producer Agreement.

[4] To equal dollar amount resulting from application of applicable percentage of Cover Over
    Revenues in line item (d) to Cover Over Revenues in line item (c).

# REQUEST FOR DISBURSEMENT

Executive Director
Puerto Rico Industrial Development Company
[address]

DATE:        [date]

_____

[Agreement] between [Rum Producer] (the "Rum Producer") and the Government of Puerto Rico
(the "Government") dated as of [date] (the "Agreement").  All capitalized terms not defined
herein shall have the meaning ascribed to them in the Agreement.

| | **Invoice Number** | **Invoice Date** | **Invoice Amount** |
|---|---|---|---|
| Amount due and payable to [Rum Producer], [●]% of Cover Over Revenues attributable to [Rum Producer] Rum Sales under Section [●] of the Agreement | [●] | [date] | $[●] |

I, being a duly authorized representative of [Rum Producer], hereby certify that the above is true
and correct.

By: _____
[Name]
[Title]

**Government Parties' PRIFA Exhibit No. 5**



# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements

and Required Supplementary Information

June 30, 2013

(With Independent Auditors' Report Thereon)

# *BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION*

### *Fiscal Year Ended June 30, 2013*



## *Commonwealth of Puerto Rico*

### *Honorable Alejandro García Padilla*
### *Governor*

*Prepared by:*

### *Puerto Rico Department of the Treasury*

### *Melba Acosta Febo, CPA, Esq.*
*Secretary of the Treasury*

### *Karolee García Figueroa, CPA, Esq.*

*Under Secretary of the Treasury*

This document is available on the Puerto Rico Department of the Treasury homepage
On the World Wide Web: http://www.hacienda.gobierno.pr

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

| | Page |
|---|---|
| **Independent Auditors' Report** | 1 – 5 |
| **Management's Discussion and Analysis (Unaudited)** | 6-20 |
| **Basic Financial Statements:** | |
| Government-Wide Financial Statements: | |
| Statement of Net Position | 21-22 |
| Statement of Activities | 23-24 |
| Fund Financial Statements: | |
| Governmental Funds: | |
| Balance Sheet | 25 |
| Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 26 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances (Deficit) | 27 |
| Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances (Deficit) of Governmental Funds to the Statement of Activities | 28 |
| Proprietary Funds: | |
| Statement of Net Position | 29 |
| Statement of Revenues, Expenses, and Changes in Fund Net Position (Deficit) | 30 |
| Statement of Cash Flows | 31-32 |
| Fiduciary Funds: | |
| Statement of Fiduciary Net Position | 33 |
| Statement of Changes in Fiduciary Net Position – Pension Trust Funds | 34 |
| Major Discretely Presented Component Units: | |
| Combining Statement of Net Position | 35-36 |
| Combining Statement of Activities | 37 |
| Notes to Basic Financial Statements | 38-241 |

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

| | Page |
|---|---|
| **Required Supplementary Information (Unaudited)** | |
| Schedule of Funding Progress – Defined Benefit Pension Plans | 243 |
| Schedule of Funding Progress – Defined Benefit Postemployment Healthcare Plans | 244 |
| Schedule of Employer's Contributions | 245 |
| Schedule of Revenues and Expenditures – Budget and Actual – Budgetary Basis –General Fund | 246 |
| Notes to Required Supplementary Information | 247-250 |
| **Combining and Individual Fund Financial Statements and Schedules** | |
| General Fund: | |
| Supplemental Schedule of Expenditures by Agency – Budget and Actual – Budgetary Basis | 253-255 |
| Nonmajor Governmental Funds: | |
| Combining Balance Sheet | 258 |
| Combining Statement of Revenues, Expenditures, and Changes in Fund Balances | 259 |
| Nonmajor Proprietary Funds: | |
| Combining Statement of Net Position | 261 |
| Combining Statement of Revenues, Expenses, and Changes in Net Position | 262 |
| Combining Statement of Cash Flows | 263 |
| Fiduciary Funds: | |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 266 |
| Combining Statement of Changes in Fiduciary Net Position – Pension (and other employee benefit) Trust Funds | 267 |
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 268 |
| Nonmajor Discretely Presented Component Units: | |
| Combining Statement of Net Position | 270-276 |
| Combining Statement of Activities | 277 |

# COMMONWEALTH OF PUERTO RICO

Management's Discussion and Analysis (Unaudited)

June 30, 2013

## Net Position (Deficit)

Net position may serve over time as a useful indicator of a government's financial position. Total assets plus deferred outflows of resources and total liabilities plus deferred inflows of resources of the governmental activities at June 30, 2013 amounted to approximately $14.5 billion and $61.7 billion, respectively, for a net deficit of approximately $47.2 billion, compared to a net deficit of $41.8 billion at the beginning of the current year.

The deficit in unrestricted net position in governmental activities, which increased by approximately $3.9 billion, exists primarily because the Commonwealth has issued debt for short-term purposes while retaining the long-term obligations, including the net pension obligation. The statement of net position presents outstanding bonds amounting to approximately $35.8 billion and net pension obligation amounting to approximately $13.1 billion. This deficit in unrestricted net position of governmental activities can be expected to continue for as long as the Commonwealth continues to have obligations outstanding for purposes other than the acquisition of governmental capital assets. The deficit also shows the accumulation of years of excessive operating expenses in disparity with actual revenues.

A portion of the Commonwealth's net position reflects its investment in capital assets such as land, buildings, and equipment, less any related debt used to acquire those assets. The Commonwealth uses these capital assets to provide services to its residents.

An additional portion of the Commonwealth's net position represents resources that are subject to external restrictions on how they may be used. Internally imposed designations of resources are not presented as restricted net assets.

During fiscal year 2013, the Commonwealth adopted the provisions of GASB Statement No. 61, *The Financial Reporting Entity: Omnibus*. Pursuant to the adoption of GASB Statement No. 61, certain discretely presented component units were blended with the corresponding fund. The Puerto Rico Infrastructure Financing Authority and Special Communities Perpetual Trust became blended component units within other governmental funds. Blending the aforementioned entities increased net deficit of governmental activities by approximately $1.8 billion (see note 3 for further detail).

The net position in business-type activities increased by approximately $15.9 million (2%) from $776.3 million in 2012 to $792.2 million in 2013. The increase in net position for business-type activities was caused primarily by the unemployment insurance fund, lotteries fund and Puerto Rico Water Pollution Control Revolving Fund revenues and U.S. Government Grants exceeding expenses by approximately $12.8 million, $21.1 million, and $29.1 million, respectively. This was partially offset by decreases in net position reported by the Puerto Rico Medical Services Administration (PRMeSA) fund and other nonmajor proprietary funds. Puerto Rico Medical Services Administration fund expenses exceeded revenues by $41.3 million primarily because the administration derives a substantial portion of its revenues from services rendered to member institutions and provides services to medical indigent population, some of them uninsured, which do not have formal means of repayment. Other nonmajor funds expenses exceeded revenues by $5.8 million.

With the adoption of GASB Statement No. 61, the PRMeSA became a blended component unit within business-type activities, while the presentation of the Governing Board of 9-1-1 Services was corrected and is now presented as a business type activity as opposed to a discretely presented component unit. This change had a

10

## COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2013

**Blended Component Units**

The following entities, while legally separate from the Commonwealth, meet the blending criteria to be reported as part of the primary government as follows:

*Public Buildings Authority (PBA)* – PBA is governed by a seven member board comprised of the Secretary of the Department of Transportation and Public Works (DTPW), the Secretary of the Department of Education of the Commonwealth, the President of the Government Development Bank for Puerto Rico (GDB), and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. It is a legally separate entity, whose activities are blended within the primary government because it exists to construct, purchase, or lease office, school, health, correctional, social welfare, and other facilities for lease to the Commonwealth's departments, component units, and instrumentalities. Bonds issued by the PBA to finance such facilities are payable from lease collections, which are largely derived from Commonwealth appropriations and are further secured by the Commonwealth's guaranty. Therefore the financial statements of the PBA are blended in the Commonwealth's fund financial statements as a special revenue, debt service and capital project fund.

*Puerto Rico Infrastructure Financing Authority (PRIFA)* – PRIFA is governed by a seven member board comprised of five members appointed by the board of the directors of the GDB, the Secretary of the Treasury of the Commonwealth and one member appointed by the Governor. The members of PRIFA's board of directors are executives on trustworthy positions, named and supervised by the Governor. The President is appointed by the Governor from among its members. PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternate means for financing them. PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt, is expected to be repaid entirely or almost entirely from resources of the Commonwealth, consisting of federal excise taxes levied on the rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth. PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is currently being repaid with Commonwealth's legislative appropriations. Therefore, PRIFA's financial statements are blended in the Commonwealth's fund financial statements as a special revenue, debt service and capital project fund.

*Puerto Rico Maritime Shipping Authority (PRMSA)* – PRMSA is governed by the President of the GDB. The operations of PRMSA have been limited to processing the remaining legal requirements resulting from the sale of certain maritime operations formerly owned and operated by PRMSA. Such legal requirements consist solely of servicing the long-term debt that remained in PRMSA after the sale. The Commonwealth is required to annually appropriate funds in its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding. Therefore, PRMSA's financial statements are blended in the Commonwealth's fund financial statements as a debt service fund.

*Puerto Rico Medical Services Administration (PRMeSA)* — PRMeSA is governed by a ten member board comprising the Secretary of the Department of Health of the Commonwealth, who is the Chairman, the Dean of the Medical Sciences Faculty of the University of Puerto Rico (UPR), the

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2013

(c) *Component Units Audited Separately*

The basic financial statements of the Commonwealth include the financial statements of the following component units that were audited by other auditors:

**Blended component units**

Public Buildings Authority
Puerto Rico Infrastructure Financing Authority
Puerto Rico Maritime Shipping Authority
Puerto Rico Medical Services Administration
Special Communities Perpetual Trust
The Children's Trust

**Discretely presented component units**

Agricultural Enterprises Development Administration
Automobile Accidents Compensation Administration
Cardiovascular Center Corporation of Puerto Rico and the Caribbean
Company for the Integral Development of the "Península de Cantera"
Corporation for the "Caño Martín Peña" ENLACE Project
Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico
Corporation of Industries for the Blind and Mentally Retarded and Incapacitated Persons of Puerto Rico
Culebra Conservation and Development Authority
Employment and Training Enterprises Corporation
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Institute of Puerto Rican Culture
Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Local Redevelopment Authority for Roosevelt Roads Puerto Rico
Musical Arts Corporation
National Parks Company of Puerto Rico
Port of the Americas Authority
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives
Puerto Rico Aqueduct and Sewer Authority
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Education
Puerto Rico Electric Power Authority
Puerto Rico Health Insurance Administration
Puerto Rico Highways and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities
    Financing Authority
Puerto Rico Land Administration

　　　　　　　　　　　　　　　　(Continued)

# COMMONWEALTH OF PUERTO RICO

Notes to Basic Financial Statements

June 30, 2013

*Unrestricted Net Position* – This component of net position is the net amount of the assets, deferred outflows of resources, liabilities, and deferred inflows of resources that are not included in the determination of net investment in capital assets or the restricted component of net position.

When both restricted and unrestricted resources are available for use, generally, it is the Commonwealth's policy to use restricted resources first, then the unrestricted resources as they are needed.

The statement of activities demonstrates the degree to which the direct expenses of a given function, segment, or component unit are offset by program revenue. Direct expenses are those that are clearly identifiable with a specific function, segment, or component unit. The Commonwealth does not allocate general government (indirect) expenses to other functions. Program revenue includes charges to customers who purchase, use, or directly benefit from goods or services provided by a given function, segment, or component unit. Program revenue also includes grants and contributions that are restricted to meeting the operational or capital requirements of a particular function, segment, or component unit. Revenues that are not classified as program revenues, including all taxes, are presented as general revenue. Resources that are dedicated internally are reported as general revenue rather than as program revenue.

## Fund Financial Statements

The Commonwealth reports its financial position and results of operations in funds, which are considered separate accounting entities, including those component units which are required to be blended. The operations of each fund are accounted for within a set of self-balancing accounts. Fund accounting segregates funds according to their intended purpose and is used to aid management in demonstrating compliance with legal, financial, and contractual provisions. Major funds are determined using a predefined percentage of the assets, liabilities, revenue, or expenditures/expenses of either the fund category or the governmental and enterprise funds combined. The nonmajor funds are combined in a single column in the fund financial statements.

### *Governmental Funds*

Governmental funds focus on the sources and uses of funds and provide information on near-term inflows, outflows and balances of available resources. The Commonwealth reports the following governmental funds:

o   *General Fund* – The General Fund is the primary operating fund of the Commonwealth. It is used to account for and report all financial resources received and used for those services traditionally provided by a government, except those required to be accounted for and reported in another fund. Included are transactions for services such as general government, public safety, health, public housing and welfare, and education.

•   *Debt Service Fund* – The debt service fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2013

of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

- *COFINA Special Revenue Fund* – The special revenue fund of the Puerto Rico Sales Tax Financing Corporation (COFINA) is used to account for and report all financial resources of COFINA, except those required to be accounted for and reported in the COFINA Debt Service fund.

- *COFINA Debt Service Fund* – The debt service fund of the Puerto Rico Sales Tax Financing Corporation is used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

- *Other Governmental Funds* – The Commonwealth reports the following blended component units within the nonmajor governmental funds: Public Buildings Authority, The Children's Trust, Puerto Rico Infrastructure Financing Authority, Special Communities Perpetual Trust and the Puerto Rico Maritime Shipping Authority. If a component unit is blended, the governmental fund types of the component unit should be blended with those of the primary government by including them in the appropriate combining statements of the primary government. Although the primary government's General Fund is usually the main operating fund of the reporting entity, the General Fund of a blended component unit should be reported as a special revenue fund. Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the primary government directly or for discrete component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities. Capital projects funds exclude those types of capital-related outflows financed by proprietary funds or for assets that will be held in trust for individuals, private organizations, or other governments.

In accordance with GASB Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions*, the classification of fund balance is based on the extent to which the Commonwealth is bound to observe constraints imposed upon the use of resources in the governmental funds. The classifications are as follows:

- *Nonspendable* – Amounts that are not in a spendable form or are legally or contractually required to be maintained intact.

- *Restricted* – Amounts that are legally restricted by outside parties, constitutional provisions or enabling legislation for a specific purpose.

- *Committed* – Amounts that are constrained for specific purposes that are internally imposed by the government's formal action at the highest level of decision-making authority and do not lapse at year-end. The highest level of decision authority for the Commonwealth is the

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2013

and TSAs for estimated shipments from January 1 to their respective fiscal year ends, since the annual payments are based on a calendar year. However, under the modified accrual basis of accounting at the fund level, revenue should be recognized only to the extent that resources are available.

**(bb)** *Use of Estimates*

The preparation of the basic financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the basic financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

**(cc)** *New Accounting Standards Adopted*

The following new accounting standards were adopted by the Commonwealth effective July 1, 2012:

- GASB Statement No. 60, *Accounting and Financial Reporting for Service Concession Arrangements*. This Statement improves financial reporting by addressing issues related to service concession arrangements (SCAs), which are a type of public-private or public-public partnership. As used in this Statement, an SCA is an arrangement between a transferor (a government) and an operator (governmental or nongovernmental entity) in which: (i) the transferor conveys to an operator the right and related obligation to provide services through the use of infrastructure or another public asset (a facility) in exchange for significant consideration; and (ii) the operator collects and is compensated by fees from third parties. Within the Commonwealth's reporting entity, SCAs are normally entered into at the component unit level rather than by the primary government. The most significant SCAs within the Commonwealth reside at the Puerto Rico Highways and Transportation Authority and Puerto Rico Ports Authority.  Refer to note 16 for further information on these SCAs.

- GASB Statement No. 61, *The Financial Reporting Entity: Omnibus*. The requirements of Statement No. 14, *The Financial Reporting Entity*, and the related financial reporting requirements of Statement No. 34, *Basic Financial Statements and Management's Discussion and Analysis for State and Local Governments*, were amended to better meet user needs and to address reporting entity issues that have arisen since the issuance of those Statements. The most significant effects of the amendments are to: 1) increase the emphasis on financial relationships by raising the bar for inclusion; 2) refocus and clarify the requirements to blend certain component units, and 3) improve the recognition of ownership interests (joint ventures, component units, investments). Pursuant to the adoption of this Statement, component units previously presented as discrete are now required to be blended. These component units are: Puerto Rico Infrastructure Financing Authority, Puerto Rico Medical Services Administration and the Special Communities Perpetual Trust.

- GASB Statement No. 62, *Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements*. This Statement incorporates into the GASB's authoritative literature certain accounting and financial reporting guidance that is included in the following pronouncements issued on or before November 30,

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2013

**(8)    Pledges of Receivables and Future Revenues**

The Commonwealth has pledged the first two point seventy-five (2.75%) percent of the sales and use tax for the repayment of certain outstanding obligations of the Commonwealth. During 2013, COFINA, a blended component unit of the Commonwealth, responsible for the financing, payments and retirement of certain debt obligations of the Commonwealth, has issued bond anticipation notes for approximately $333.3 million payable on September 30, 2014. The Commonwealth has committed to appropriate each year, from the sales and use tax, amounts sufficient to cover the principal and interest requirements on the debt issued by COFINA. COFINA has pledged as the sole security for the bonds, the annual appropriations from the Commonwealth. Total principal and interest remaining on the secured debt is $35.5 billion and $17.7 billion, respectively. The pledged sale and use tax base amount for the fiscal year ended June 30, 2013 amounted to approximately $619 million. For fiscal year 2013, interest paid by COFINA amounted approximately to $643 million and issuance costs of approximately $600 thousands on the aforementioned bond anticipation notes issued. Sales and use tax revenue recognized by the Commonwealth was approximately $543 million.

Rum manufactured in Puerto Rico is subject to federal excise taxes; however, these are returned by the U.S. Internal Revenue Service (IRS) to the Commonwealth. Act No. 44, as amended, requires that in each fiscal year through fiscal year 2057, the first $117 million, of certain federal excise taxes received by the Commonwealth be transferred to the Puerto Rico Infrastructure Financing Authority (PRIFA), a blended component unit of the Commonwealth. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the U.S. Treasury and returned to the Commonwealth. The Commonwealth has pledged these taxes for the repayment of PRIFA's Special Tax Revenue Bonds (the Bonds). The Commonwealth has committed to appropriate each year, from the excise taxes, amounts sufficient to cover the principal and interest requirements on the debt issued by PRIFA. PRIFA has pledged as the sole security for the bonds, the annual appropriations from the Commonwealth. The federal excise taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. The level of federal excise taxes to be received by the Commonwealth is currently expected to decrease, although the exact amount cannot be determined. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient, Act No. 44 requires that PRIFA request and the Director of the Office of Management and Budget of the Commonwealth include in the budget of the Commonwealth for the corresponding fiscal year, an appropriation necessary to cover such deficiency. The Commonwealth's Legislature, however, is not obligated to make the necessary appropriation to cover such deficiency. Total principal and interest remaining on the secured debt is $2.5 billion and $1.3 billion, respectively. For the year ended June 30, 2013, of the total of $117 million received by PRIFA from the Commonwealth, a total of $113 million was pledged for the debt service of the Special Tax Revenue Bonds. For fiscal year 2013, principal and interest paid on Special Tax Revenue Bonds by PRIFA amounted to $112.1 million.

Also, the Commonwealth has pledged part of the gross receipts of the gasoline excise taxes and one half of the diesel oil excise taxes (up to $11 million monthly but no more than $120 million annually) derived from excise taxes over crude oil and its derivatives and $15 per vehicle per year from motor vehicle license fees for the repayment of the PRHTA Revenue Bonds. On June 25, 2013, as described in note 7, the Commonwealth enacted Act No. 31, amending the aforementioned gasoline excise tax rates and distributions, and eliminating the $120 million ceiling; therefore providing additional sources for the

**COMMONWEALTH OF PUERTO RICO**

Notes to Basic Financial Statements

June 30, 2013

debt in proportion to the portion of the Commonwealth's notes included in such PFC refundings. Also, during more recent years, COFINA, through the issuance of bonds, has been used to repay certain other loans and existing appropriation bonds. COFINA is a blended component unit of the Commonwealth created in 2007 with the capacity to issue bonds to repay or refund advances from the GDB, the appropriation bonds referred to above, and other debt obligations, collectively referred as the extra constitutional debt.  There were no new activities of Commonwealth appropriation bonds during fiscal year 2013, other than the annual amortization of corresponding premiums and deferred refunding losses.

At June 30, 2013, the outstanding balance of the Commonwealth appropriation bonds pertaining to the primary government (i.e. excluding the balance pertaining to discretely presented component units), consists of the following obligations (expressed in thousands):

| | | |
|---|---|---:|
| Act. No. 164 restructuring | $ | 420,405 |
| Puerto Rico Maritime Shipping Authority (PRMSA) | | 118,168 |
| Total Commonwealth appropriation bonds | $ | 538,573 |

**Act No. 164 Restructuring** – On December 17, 2001, Act No. 164 was approved, which authorized certain government agencies and discretely presented component units to refund approximately $2.4 billion of their outstanding obligations with the GDB, for which no repayment source existed, over a period not exceeding 30 years, and to be repaid with annual Commonwealth appropriations not to exceed $225 million. This refunding was originally executed with Commonwealth appropriation bonds through several Series issued by PFC during the period between December 2001 and June 2002. Subsequently, additional refundings (current and advance) and/or redemptions of Act No. 164 restructuring have been executed through PFC and COFINA bond issuances.

Approximately $420.4 million of the Commonwealth Appropriation bonds outstanding at June 30, 2013, belong to the primary government under Act No. 164, consisting of the Department of Health of the Commonwealth (health reform financing and other costs), the Department of the Treasury of the Commonwealth (originally the fiscal year 2001 deficit financing and the obligation assumed for defective tax liens), and the one attributed to PRIFA, which effective July 1, 2012 became a blended component unit of the Commonwealth pursuant the adoption of GASB No. 61, as previously described in note 1(b).  The outstanding balance of Commonwealth Appropriation bonds related to Act No. 164, bears interest at rates ranging from 3.10% to 6.50%. Debt service requirements in future years are as follows (expressed in thousands):

(Continued)

**COMBINING AND INDIVIDUAL FUND
FINANCIAL STATEMENTS AND SCHEDULES**

# COMMONWEALTH OF PUERTO RICO

General Fund

Year ended June 30, 2013

## Special Revenue Funds

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

*Public Buildings Authority Special Revenue Fund* – The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's primary government agencies.

*The Children's Trust Special Revenue Fund* – The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

*Puerto Rico Infrastructure Financing Authority's Special Revenue Fund* – The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the Unites States, which are collected by the US Treasury and returned to the Commonwealth.  Under Act No. 44 of June 21, 1988, as amended, the Commonwealth transfers to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds.  This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

*Special Communities Perpetual Trust's Special Revenue Fund* – The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain underpriviledged communities.

## Debt Service Funds

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

*The Children's Trust Debt Service Fund* – The debt service fund of The Children's Trust accounts for the financial resources that are restricted, committed, or assigned to expenditure for the payment of interest and principal on long-term obligations financed with moneys to be received by the Commonwealth from the global settlement agreement signed by certain tobacco companies.

(Continued)

**COMMONWEALTH OF PUERTO RICO**

General Fund

Year ended June 30, 2013

*Public Buildings Authority Debt Service Fund* – A blended component unit engaged in the construction and/or acquisition of building facilities for lease mainly to the Commonwealth's primary government agencies. Its debt service fund is used to account for the financial resources that are restricted, committed, or assigned to expenditure for the payment of revenue bonds and other liabilities incurred to finance the construction of the buildings and facilities.

*Puerto Rico Maritime Shipping Authority Debt Service Fund* – This is the remainder of a former shipping company owned by the Commonwealth. Its debt service fund is used to account for the financial resources that are restricted for the payment of the long-term liability that resulted from the sale of its marine operations. This fund is mainly subsidized from appropriations and operating transfers from the General Fund

*Puerto Rico Infrastructure Financing Authority's Debt Service Fund* – The debt service fund of the Puerto Rico Infrastructure Financing Authority accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its special tax revenue bonds.  These resources are received from operating transfers from the Puerto Rico Infrastructure Financing Authority Special Revenue Fund.

*Special Communities Perpetual Trust's Debt Service Fund* –The debt service fund of the Special Communities Perpetual Trust accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its line of credit with the GDB, financed with moneys to be received by the Commonwealth from general legislative appropriations.

**Capital Projects Funds**

Capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not being financed by the Public Buildings Authority's Capital Projects Fund, the Puerto Rico Infrastructure Financing Authority's Capital Project Fund, proprietary fund types, pension trust funds, and discretely presented component units.

*Commonwealth Public Improvements Funds and Other Funds* – These funds present the activities of the capital improvements program of the Commonwealth, financed with the proceeds of the general obligation bonds.

*Public Buildings Authority's Capital Projects Fund* – The Public Buildings Authority's capital projects fund is used to account for and report financial resources that are restricted, committed or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not financed by proprietary fund types, pension trust funds, and discretely presented component units.

*Puerto Rico Infrastructure Financing Authority's Capital Projects Fund* – The Puerto Rico Infrastructure Financing Authority's capital projects fund is used to account for and report financial resources that are restricted, committed or assigned for the acquisition or construction of capital assets and capital improvements, not financed by proprietary fund types, pension trust funds, and discretely presented component units.

## COMMONWEALTH OF PUERTO RICO

Nonmajor Proprietary Funds

Year ended June 30, 2013

Fiduciary funds are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units.  Following are the Commonwealth's fiduciary funds:

**Pension Trust Funds**

The pension trust funds are used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees of the Commonwealth.

***Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)*** – ERS is a cost-sharing multiple-employer defined benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 447 on May 15, 1951. The ERS is sponsored by the Commonwealth, public corporations, and municipalities of Puerto Rico. Substantially all full-time employees of the Commonwealth and its instrumentalities are covered by the ERS. All regular appointed and temporary employees of the Commonwealth become plan members at the date of employment. The ERS is administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) that also administers the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). The ERS MIPC is an unfunded, cost-sharing, multi-employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

***Puerto Rico System of Annuities and Pensions for Teachers (TRS)*** – TRS is a cost-sharing multiple-employer defined benefit pension plan administered by the Puerto Rico Teachers Retirement System and was created by Act No. 91 of March 29, 2004, that superseded Act No. 218 of May 6, 1951. The TRS is sponsored by the Commonwealth. All active teachers of the Commonwealth's Department of Education are covered by the TRS. Licensed teachers working in private schools or other educational organizations have the option to become members of TRS at their own choice as long as the required employer and employee contributions are satisfied. The employees of the TRS are also plan members. The TRS is administered by the Puerto Rico Teachers Retirement System (the TRS Administration) that also administers the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC), an unfunded, cost-sharing, multi-employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of the TRS Administration.

***Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)*** – JRS is a single-employer defined benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 12 on October 19, 1954. The JRS is sponsored by the Commonwealth. All judges of the judiciary branch of the Commonwealth are plan members. The JRS provides retirement benefits to the employees of the judiciary branch of the Commonwealth, through the office of the Administration of Court Facilities. The JRS is administered by the ERS and JRS Administration that also administers the Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC), an unfunded, single-employer defined benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

(Continued)

# COMMONWEALTH OF PUERTO RICO

Nonmajor Proprietary Funds

Year ended June 30, 2013

**Agency Fund**

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits** – This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections and agency accounts for which the Commonwealth act in an agent's capacity.

## Government Parties' PRIFA Exhibit No. 6

RSM Puerto Rico



# Puerto Rico Infrastructure Financing Authority
*(A Component Unit of the Commonwealth of Puerto Rico)*

Basic Financial Statements
and Required Supplementary Information
For the Fiscal Year Ended June 30, 2015

THE POWER OF BEING UNDERSTOOD
AUDIT | TAX | CONSULTING



**RSM**

PRIFA_STAY0000928

 

# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
## (A Component Unit of the Commonwealth of Puerto Rico)

*Basic Financial Statements, and Required Supplementary Information*
*For the Fiscal Year Ended June 30, 2015*

| Table of Contents | Pages |
|---|---|
| Independent Auditors' Report | 1-2 |
| Management's Discussion and Analysis (Unaudited) | 3-10 |
| Basic Financial Statements: | |
| Government-Wide Financial Statements- | |
| Statement of Net Position (Deficit) | 11 |
| Statement of Activities | 12 |
| Fund Financial Statements- | |
| Governmental Funds: | |
| Balance Sheet | 13-14 |
| Reconciliation of the Balance Sheet to the Statement of Net Position (Deficit) | 15 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances | 16-17 |
| Reconciliation of the Statement of Revenues, Expenditures and Changes in Fund Balances to the Statement of Activities | 18 |
| Proprietary Fund: | |
| Statement of Net Position (Deficit) | 19 |
| Statement of Revenues, Expenses, and Changes in Fund Net Position (Deficit) | 20 |
| Statement of Cash Flows | 21 |
| Notes to Basic Financial Statements | 22-54 |

PRIFA_STAY0000929



RSM Fees to Rico

P(I Box 10528
San Juan, PR 00922-0528

t (787) 751-6164
F (787) 759-7470

www.rsm.pr

## INDEPENDENT AUDITORS' REPORT

To:  The Board of Directors of the
     Puerto Rico Infrastructure Financing Authority:

We have audited the accompanying financial statements of the governmental activities, the business-type activities, and each major fund of the Puerto Rico Infrastructure Financing Authority, a Component Unit of the Commonwealth of Puerto Rico, as of and for the fiscal year ended June 30, 2015, and the related notes to the financial statements which collectively comprise the Puerto Rico Infrastructure Financing Authority's basic financial statements as listed in the table of contents.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatements, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express opinions on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risk of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence that we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

RSM Puerto Rico is a member of the RSM network, a network of independent audit, tax and consulting firms. The member firms of RSM network operate as separate legal entities and are members of RSM International Limited, a UK company. RSM International Limited does not provide any services to clients.

PRIFA_STAY0000930



**Basis for Qualified Opinions**

The Puerto Rico Infrastructure Financing Authority's full time employees participate in a cost-sharing defined benefit program, which is administered by the Employee Retirement System, a Statutory Trust and Component Unit of the Commonwealth of Puerto Rico. The Puerto Rico Infrastructure Financing Authority was required to implement GASB Statement No. 68, Accounting and Financial Reporting for Pensions – an Amendment to GASB Statement No. 27, effective June 30, 2015. However, the information necessary to adopt GASB Statement No. 68, including the proportionate share of the collective net pension liability, pension expense, and the corresponding deferred inflows and deferred outflows of resources as of June 30, 2015 are still being evaluated by the Employee Retirement System and the Commonwealth of Puerto Rico. Consequently, the accompanying financial statements do not contain any adjustments that may be necessary, neither the disclosures and supplementary information required by GASB Statement No. 68.

**Opinions**

In our opinion, except for the possible effects of the matter described in the Basis for Qualified Opinions paragraph, the financial statements referred to above present fairly, in all material respects, the financial position of each major fund of the Puerto Rico Infrastructure Financing Authority as of June 30, 2015 and the respective changes in financial position thereof for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Other Matters**

*Emphasis of Matters*

As of June 30, 2015, the Authority's government-wide statement of net position (deficit) reflect a net deficit of approximately $1.9 billion in its governmental activities. Such deficit is mostly attributed to the recognition of certain liabilities, including bonds payable aggregating approximately $2.2 billion, that are not payable with current expendable resources. As described in Note 4, this situation occurs because the Authority's normal operations is to acquire and/or construct capital assets that will be transferred to the Commonwealth's agencies or other Component Units. The acquisition is mainly conducted through the issuance of long term obligations that will be funded by the Commonwealth with future appropriations. Accordingly, the Authority is completely dependent from the Commonwealth to effectively reverse its deficit position. However, as described in Note 24, on December 1, 2015, the Governor of the Commonwealth of Puerto Rico signed Executive Order No. OE-2015-46 (the "Executive Order"), which provides that the Commonwealth will redirect certain revenues in light of recently revised revenues estimates and its deteriorating liquidity situation. Pursuant to the Executive Order, certain available revenue that have been budgeted to pay debt service on the debt of the Authority were redirected, pursuant to the constitutional requirements (the clawback provision), to pay debt issued or guaranteed by the Commonwealth. The Secretary of the Treasury has retained, for the application to payments due on the Commonwealth's public debt, approximately $113 million assigned to pay debt of the Authority, which by law, constitute "available resources" subject to the Commonwealth's priority provision set forth in the Constitution. As a result, the Authority did not transfer sufficient funds to the Trustee to make the $35.9 million in interest payment in full in respect of the January 1, 2016 payment date for its outstanding Series 2005A-C and Series 2006 Special Tax Revenue Bonds. The provision of the Executive Order creates a high level of uncertainty as to the ability of the Authority to satisfy future obligations as they become due. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

PRIFA_STAY0000931



In addition, as described in Note 24, the annual budget submitted by the Legislature of Puerto Rico for fiscal year 2016 did not appropriate funds for the payment the PFC bonds. Due to the non-appropriation of funds for the payment of the Bonds in the annual budget for fiscal year 2016, none of the payments on the Notes, nor the corresponding payment on the PFC Bonds, that have come due and payable this fiscal year have been made in full. As publically disclosed by GDB and PFC following the approval of the annual budget for fiscal year 2016, the non-appropriation of the necessary funds to make the payments on PFC Bonds reflects the reality of the Commonwealth's current liquidity situation and fiscal challenges, in combination with the balance of the Commonwealth's obligations to its creditors and the equally important obligations to the citizens of Puerto Rico to ensure the provisions of essential services. GDB is unaware of any claims being asserted by holders of the PFC Bonds or the PFC Bonds trustee under the governing agreement and/or the Notes in connection with the missed payments on the PFC Bonds. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

*Required Supplementary Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis on pages 3 to 10 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquires of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

San Juan, Puerto Rico
April 15, 2016

Stamp No. E217647 was affixed
to the original of this report.

PRIFA_STAY0000932

**RSM**

*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Management's Discussion and Analysis
As of and for the Fiscal Year Ended June 30, 2015

This section presents a narrative overview and analysis of the financial performance of the Puerto Rico Infrastructure Financing Authority (the Authority) and is designed to assist the reader in focusing on significant financial issues, provide an overview of the Authority's financial activity, identify changes in the Authority's financial position, and identify individual issues or concerns. The information presented here should be read in conjunction with the basic financial statements, including the notes thereto.

1. **FINANCIAL HIGHLIGHTS**

   - During the year ended June 30, 2015, the restricted investment in bonds of Puerto Rico Sales Tax Financing Corporation (COFINA, for its acronym in Spanish) reported a net decrease in market value of approximately $84 million.

   - World Plaza Building Fund, which in prior year was presented within the general fund, at the beginning of fiscal year 2015, began to be reported as a proprietary fund. (See note 3, in the accompanying financial statements for further details and impact of change in reporting entity).

   - Capital assets increased approximately $22.4 million primarily due to construction projects executed through the "Paseo Puerta de Tierra" and "Malecones y Poblados" infrastructure programs, which are financed with legislative appropriations from the Commonwealth of Puerto Rico.

   - Liabilities net increase of approximately $177.8 million was primarily due to the issuance of Dedicated Tax Fund Revenue Anticipation Notes, Series 2015 A, in the aggregated principal amount of approximately $246 million during the fiscal year ended June 30, 2015.

2. **OVERVIEW OF THE FINANCIAL STATEMENTS**

   This discussion and analysis is required supplementary information to the basic financial statements and is intended to serve as an introduction to the basic financial statements of the Authority. The basic financial statements comprise three components: (1) government-wide financial statements, (2) fund financial statements and, (3) notes to the basic financial statements.

   *Government-wide Financial Statements* - The government-wide financial statements provide readers with a broad overview of the Authority's finances, in a manner similar to a private-sector business. The statements provide both short and long-term information about the Authority's financial position, which assists in assessing the Authority's economic condition at the end of the fiscal year. These are prepared using the economic resources measurement focus and the accrual basis of accounting. This basically means they follow methods that are similar to those used by private nongovernmental organizations. They take into account all revenue and expenses connected with the fiscal year even if cash involved has not been received or paid.

PRIFA_STAY0000933

*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Management's Discussion and Analysis
As of and for the Fiscal Year Ended June 30, 2015



The government-wide financial statements include two statements:

- *Statement of Net Position (Deficit)* - This statement presents all of the government's assets, liabilities and deferred outflows and inflows of resources. Net position (deficit) is the difference between (a) assets and deferred outflows of resources, and (b) liabilities and deferred inflows of resources. Over time, increases or decreases in the Authority's net position (deficit) may serve as a useful indicator of whether the financial position of the Authority is improving or deteriorating.

- *Statement of Activities* - This statement presents information showing how the Authority's net position (deficit) changed during the most recent fiscal year. All changes in net position (deficit) are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenue and expenses are reported in this statement for some items that will not result in cash flows until future fiscal periods.

These financial statements present the following columns segregated by activities:

- *Governmental Activities* - These activities are mostly supported by intergovernmental revenue (Contributions from the Commonwealth of Puerto Rico). Most services normally associated with the Authority fall into general government, economic development, education, aqueduct and sewers, transportation, recreation and sports, and arts and entertainment.

- *Business Type Activities* - These activities are normally intended to recover all or a significant portion of their costs through user fees and charges to external users of goods and services. The business type activities of the Authority include the operations of the World Plaza Building.

The government-wide financial statements can be found immediately following this Management's Discussion and Analysis.

*Fund Financial Statements* - A fund is a grouping of related accounts that is used to maintain control over resources that have been segregated for specific activities or objectives. The Authority has two types of funds: Governmental Funds and Proprietary Funds. Governmental fund financial statements focus on near-term inflows and outflows of spendable resources, as well as on balances of spendable resources available at the end of the fiscal year. Such information may be useful in evaluating the Authority's near-term financing requirements. Because the focus of governmental funds is narrower than that of the government-wide financial statements, it is useful to compare the information presented for governmental funds with similar information presented for governmental activities in the government-wide financial statements.

PRIFA_STAY0000934



*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
*Management's Discussion and Analysis*
*As of and for the Fiscal Year Ended June 30, 2015*

By doing so, readers may better understand the long-term impact of financial decisions related to the Authority's governmental activities. Both, the governmental funds balance sheet and the governmental funds statement of revenues, expenditures, and changes in fund balances, provide a reconciliation to facilitate this comparison between governmental funds and governmental activities.

***Governmental Funds Financial Statements*** - The Authority has four major governmental funds. That is, each major fund is presented in a separate column in the governmental funds balance sheet and in the governmental funds statement of revenues, expenditures, and changes in fund balances (deficit). The Authority's four major governmental funds are:

- General Fund
- ARRA Fund
- Capital Projects Fund
- Debt Service Fund

***Proprietary Funds Financial Statements*** - These funds are used to show activities that operate more like those of commercial enterprises. Because these funds charge fees for services provided to outside customers, including local governments, they are known as enterprise funds. Proprietary funds provide the same type of information as the government-wide financial statements, only in more detail. Like the government-wide financial statements, proprietary fund financial statements use the accrual basis of accounting. There is no reconciliation needed between the government-wide financial statements for business-type activities and the proprietary fund financial statements. The basic proprietary funds financial statements can be found immediately following the governmental fund financial statements.

***Notes to the Basic Financial Statements*** - The notes provide additional information that is essential to a full understanding of the data provided in the government-wide financial statements and the fund financial statements.

3.   **GOVERNMENT-WIDE FINANCIAL ANALYSIS**

Governmental entities are required by accounting principles generally accepted in the United States of America (GAAP), as prescribed by the Governmental Accounting Standard Board (GASB), to report on their net position (deficit).  The Statement of Net Position (Deficit) presents the value of all of the Authority's assets and deferred outflow of resources, and liabilities and deferred inflow of resources, with the difference between them reported as net position (deficit).

6

*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Management's Discussion and Analysis
As of and for the Fiscal Year Ended June 30, 2015

**RSM**

4. **GOVERNMENTAL FUNDS RESULTS**

**General Fund** - Total assets in the general fund decreased approximately $92 million as a direct result of the negative investment yield of the restricted nonspendable investments that had a market value of approximately $135 million in 2014, to approximately $51 million in 2015. This reduction results from the effect of the overall municipal market negative valuation of COFINA Bonds. Other assets and the liabilities remained similar in 2015 when compared to 2014. The fund balance decreased from approximately $139 million to approximately $56 million, or 40%, specifically due to the decrease in the valuation of the investment.

Revenues in the general fund increased from approximately $29.4 million to approximately $33.5 million directly by the effect of the valuation of the nonspendable investment. Investment loss during 2014 was approximately $90.3 million, while in 2015, there was a net investment loss of approximately $84 million, for a total net decrease of approximately $6.3 million. General government expenditures decreased from approximately $6.3 million in 2014 to approximately $3.5 million in 2015, or 45%, due to cost control measures implemented for the administrative and operating expenses of the Authority. Also, in this fiscal year, the Authority contributed approximately $227.7 million to the PRHTA as explained in more detail in the expenses section of the Government-wide financial analysis included in this Management's Discussion and Analysis.

**ARRA Fund** - The ARRA federal program reached its sunset date during 2012. During recent years its activities were very limited. During the year ended June 30, 2015, the operations were limited to oversight and monitoring works as established by Act No. 8 of 2009.

**Capital Projects Fund** - Total assets decreased from approximately $116 in 2014 million to approximately $84.6 million in 2015, or 27%. This reduction is in line with the reduction of accounts receivable of approximately $10.5 million. This reduction relates to the amounts that are receivable from the different Commonwealth agencies for which the Authority carries out construction of facilities that are later transferred to these entities. In line with this reduction, total liabilities also decreased from approximately $77 million in 2014 to approximately $54.1 million in 2015, for a net decrease of approximately $22.8 million, or 30%. Total revenue increased from approximately $5 million in 2014 to approximately $19 million in 2015, for an increase of approximately $14 million, or 278%, mainly driven by an increase in contribution from the Commonwealth of Puerto Rico from approximately $4.8 million in 2014 to approximately $18.8 million in 2015. This increase resulted because some infrastructure programs funded by the Commonwealth of Puerto Rico started or were in progress during the fiscal year.

**Debt Service Fund** - Total assets increased from approximately $78.8 million in 2014 to approximately $119.8 million in 2015, resulting in an increase of approximately $41 million, or 52%. The increase is directly related to funds received, or to be received, from the Commonwealth of Puerto Rico as contributions to be used to repay principal of and interest on the Dedicated Tax Fund Revenue Anticipation Note, Series 2015A, when due.

PRIFA_STAY0000938



**Puerto Rico Infrastructure Financing Authority**
**(A Component Unit of the Commonwealth of Puerto Rico)**
*Notes to Basic Financial Statements*
*June 30, 2015*

1.   **REPORTING ENTITY**

Puerto Rico Infrastructure Financing Authority (the Authority) is a Component Unit of the Commonwealth of Puerto Rico (the Commonwealth) created by Act No. 44 of June 21, 1988, as amended (the Act No. 44) and an affiliate of Government Development Bank for Puerto Rico (GDB), another Component Unit of the Commonwealth. The Authority was organized to provide financial, administrative, and other types of assistance to public corporations, municipalities, and other governmental instrumentalities or political subdivisions of the Commonwealth that develop and operate infrastructure facilities. The accompanying financial statements present the net position and results of operations of the entity as a whole and by major funds that are governed by the Authority.

2.   **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accounting and reporting policies of the Authority conform to accounting principles generally accepted in the United States of America (US GAAP) for governments as prescribed by the Governmental Accounting Standard Board (GASB). As further explained in Note 23, the Employees Retirement System of the Commonwealth of Puerto Rico did not provide the Authority the information needed to adopt GASB Statement No. 68, *Accounting and Financial Reporting for Pensions – an amendment of GASB Statement No. 27* (GASB 68). Accordingly, these financial statements do not contain any adjustments, disclosures or required supplementary information required by GASB 68.

The preparation of financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses/expenditures during the reporting period. Actual results could differ from those estimates.

Following is a description of the Authority's most significant accounting policies:

***Government-Wide Financial Statements*** — The statement of net position (deficit) and the statement of activities report information on all activities of the Authority. The effect of interfund balances has been removed from the statement of net position (deficit). Governmental activities are financed through intergovernmental revenues and other revenues.

Following is a description of the Authority's government - wide financial statements:

The statement of net position (deficit) presents the Authority's assets, deferred outflows of resources and liabilities, and deferred inflow of resources, with the difference reported as net position (deficit), which in turn is reported in three categories:

Net investment in capital assets — consists of capital assets, net of accumulated depreciation and amortization, and reduced by the outstanding balances of related debt, when such debt is attributed to the acquisition, construction, or improvement of such assets.

PRIFA_STAY0000952

**RSM**

*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Notes to Basic Financial Statements
June 30, 2015

- Restricted net position (deficit) — result when constraints placed on certain asset's use are either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation. When both restricted and unrestricted resources are available for use, generally it is the Authority's policy to us restricted resources first, and the unrestricted resources when they are needed.

- Unrestricted net position (deficit) — consist of amounts that do not meet the definition of the two preceding categories. Unrestricted position (deficit) often is designated to indicate that management does not consider them available for general operations. Unrestricted net position often have constraints on resources that are imposed by management, but may be removed or modified.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment is offset by program revenues. Direct expenses are those that are clearly identifiable with a specific function. Program revenues include: (1) interest and investment income, including the changes in the fair value of investments and (2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function (3) and certain charges for services to customers that purchase, use or directly benefit from services given by a particular function. Other items not meeting the definition of program revenue are instead reported as general revenue.

*Governmental Funds Financial Statements* — Separate financial statements are provided for governmental funds. Major individual governmental funds are reported as separate columns in the fund financial statements. All funds of the Authority are considered major funds.

**Governmental Funds**

Governmental funds focus on the sources and uses of funds and provide information on near-term inflows, outflows and balances of available resources. The Authority reports the following governmental funds:

- *General Fund* — The General Fund is the general operating fund of the Authority that is used to account for all financial resources, except those required to be accounted for in another fund.

- *ARRA Fund* — The ARRA fund accounts for resources used or contributed to meet the specific purposes established by this specific federal financial assistance program.

- *Capital Projects Fund* — The Capital Projects Fund accounts for resources used or contributed for the acquisition or construction of capital assets and capital improvements.

- *Debt Service Fund* — The Debt Service Fund accounts for the accumulation of resources for payment of interest and principal on long-term obligations.

PRIFA_STAY0000953

**Puerto Rico Infrastructure Financing Authority**
**(A Component Unit of the Commonwealth of Puerto Rico)**
Notes to Basic Financial Statements
June 30, 2015

**RSM**

The Authority issued certain bonds and notes and received legislative appropriations to finance the construction of certain capital projects for the benefit of Puerto Rico Aqueduct and Sewer Authority (PRASA), various municipalities of Puerto Rico, and other agencies and instrumentalities of the Commonwealth.  The capital projects include the construction of infrastructure and buildings to be used in the operations of, and managed by, PRASA, municipalities of Puerto Rico, and other agencies and instrumentalities of the Commonwealth in their respective operations.  These capital projects, including land acquired, are included as part of the Authority's capital assets until construction is completed and the conditions for transfers to the ultimate beneficiaries are met, at which time they are recorded as an expense in the statement of activities.

During the year ended June 30, 2015, the Authority incurred construction costs for the benefit of other instrumentalities, which are presented as current expenditures in the accompanying statement of revenues, expenditures, and changes in fund balances — governmental funds as follows:

| Function/Programs | | Amount |
|---|---|---|
| Economic development program | $ | 3,131,014 |
| Education, aqueduct and sewers and transportation | | 734,234 |
| Recreation and sports | | 495,806 |
| Arts and entertainment | | 155,756 |
| | $ | 4,516,810 |

During the year ended June 30, 2015, depreciation expense of approximately $41 thousand and $609 thousand were charged to the general government function and Business-type activities respectively in the accompanying statement of activities.

9.   **INTERFUND BALANCES AND TRANSFERS**

The summary of the amounts due from/to other funds as of June 30, 2015, is as follows:

| Receivable By | Payable By | Purpose | | Amount |
|---|---|---|---|---|
| General Fund | Capital Projects Fund | Reimbursement of administrative costs | $ | 2,241,959 |
| ARRA Fund | General Fund | To finance program expenditures | | 236,022 |
| Capital Projects Fund | ARRA Fund | Reimbursement of administrative costs | | 117,031 |
| General Fund | ARRA Fund | Reimbursement of administrative costs | | 108,158 |
| General Fund | World Plaza Building Fund | Reimbursement of administrative costs | | 91,333 |
| Capital Projects Fund | General Fund | Reimbursement of administrative costs | | 52,428 |
| World Plaza Building Fund | General Fund | Reimbursement of administrative costs | | 6,860 |
| ARRA Fund | Capital Projects Fund | Reimbursement of administrative costs | | 30 |
| | | | $ | 2,853,821 |

38

PRIFA_STAY0000967

**RSM**

*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Notes to Basic Financial Statements
June 30, 2015

Interfund transfers for the year ended June 30, 2015, consist of the following:

| Transfer Out | Transfer In | Purpose | Amount |
|---|---|---|---|
| Debt Service Fund | General Fund | Transfer of proceeds for contribution to PRHTA | $ 227,670,000 |
| General Fund | Debt Service Fund | Debt service payments | 112,982,883 |
| Capital Projects Funds | Debt Service Fund | Debt service payments | 144,131 |
| Capital Projects Fund | World Plaza Building Fund | To finance capital related activities | 473,377 |
| ARRA Fund | General Fund | To settle interfund transaction | 85,476 |
| | | | $ 341,355,867 |

10. **RESTRICTED NET POSITION / FUND BALANCES**

Restricted assets of the Authority included in the statement of net position / fund balances at June 30, 2015 consist of cash and cash equivalents, receivables, investments, and other assets, net of its related liabilities payable from those restricted assets, to be used for the following purposes:

| Description | Amount |
|---|---|
| Restricted for investment in capital appreciation bonds of COFINA, whereby the Authority is not allowed to use the interest earned in this investment. In the governmental funds financial statements this amount is presented as non-spendable fund balance. | $ 50,827,736 |
| Restricted for debt service payments for the outstanding debt of capital projects | 110,226,641 |
| Restricted for debt payments of dedicated revenue tax bonds anticipation notes | 40,092,663 |
| | $ 201,147,040 |

11. **BONDS PAYABLE**

**Special Tax Revenue Bonds** — On June 16, 2005, the Authority issued $309,102,577 Special Tax Revenue Bonds, Series 2005 A (the Series 2005 A Bonds), $324,625,000 Special Tax Revenue Bonds, Series 2005 B (the Series 2005 B Bonds), and $699,235,339 Special Tax Revenue Refunding Bonds, Series 2005 C (the Series 2005 C Bonds). The Series 2005 A Bonds mature at various dates from July 1, 2029 through 2045, inclusive, the Series 2005 B Bonds maturing on July 1, 2037 and 2041, and the Series 2005 C Bonds maturing on July 1, 2028. The Series 2005 B Bonds may be redeemed by the Authority prior to maturity upon not less than 30 days' prior notice, either in whole or in part, and if in part, as directed by the Authority. The Series 2005 A and C are not subject to redemption prior to maturity, were issued as Capital Appreciation Bonds.

39

PRIFA_STAY0000968

**RSM**

*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Notes to Basic Financial Statements
June 30, 2015

The Series 2005 A, B, and C Bonds bear interest, payable semiannually on January 1 and July 1 at rates ranging from 4% to 5.5%. Accrued interest on the Capital Appreciation Bonds will be paid at maturity as part of the bonds accreted value.

The Series 2005 A and B Bonds were issued primarily for the purpose of providing approximately $292 million in financial assistance to PRASA and other Commonwealth instrumentalities and municipalities in connection with certain capital projects. This includes the repayment of approximately $26 million for certain advances made to the Authority by GDB for the purpose of providing funds to pay certain capital improvements of the Authority or other Commonwealth's instrumentalities. The Series 2005 A and B Bonds were also issued to provide approximately $317 million in working capital assistance to the Commonwealth and to cover interest and costs of issuance of the Series 2005 A and Series 2005 B Bonds. The bond proceeds earmarked for PRASA and non-PRASA projects were deposited in the Authority's Capital Projects Fund.

The Series 2005 C Bonds were issued for the purpose of refunding all of the Authority's Special Tax Revenue Bonds, Series 1997 A Bonds, including capitalized interest and to cover costs of issuance of the Series 2005 C Bonds. This refunding permitted the Authority to realize present value savings on its debt service requirements. Such transaction resulted in a deferred loss on refunding of $76,267,097.

The Authority deposited the net proceeds of the Series 2005 C Bonds, together with certain other available moneys, with the Trustee, as escrow agent, in a special redemption fund under the terms of an escrow deposit agreement. Such net proceeds, together with such other available moneys, were invested in government obligations, whose principal and interest when due, together with any moneys deposited with the Trustee remaining uninvested, will provide moneys sufficient to pay the principal redemption of premium and interest on the refunded bonds through the date of redemption.

On September 28, 2006, the Authority issued $469,770,000 Special Tax Revenue Bonds, Series 2006 (the Series 2006 Bonds), for the purpose of developing the infrastructure necessary for the XXI Central American and Caribbean Games (the Games). The proceeds of this issuance provided for: (1) the acquisition, improvements and construction of sports and other facilities necessary for the Games; (2) the construction of capital projects of certain Commonwealth's instrumentalities and municipalities; and (3) the payment of capitalized interest and cost of issuance of the Series 2006 Bonds. The proceeds of the Series 2006 Bonds were deposited into a Special Construction Fund administered by the Authority on behalf of the applicable benefited entities. The Series 2006 Bonds bear interest, payable on July 1 and January 1 of each year, at various rates ranging from 4.50% to 5.00%, and mature on various dates from July 1, 2010 to July 1, 2046.

The Special Tax Revenue Bonds are payable solely from and secured by a pledge of federal excise taxes and other moneys deposited to the credit of a sinking fund established pursuant to a trust agreement. Payment of principal and interest is insured by separate municipal bond insurance policies issued by an unrelated insurance company.

PRIFA_STAY0000969



*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Notes to Basic Financial Statements
June 30, 2015

Act No. 44, as amended, requires that in each fiscal year through fiscal year 2057, the first $117 million of certain federal excise taxes received by the Commonwealth be transferred to the Authority. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the U.S. Treasury and returned to the Commonwealth. For the year ended June 30, 2015, principal and interest paid on Special Tax Revenue Bonds amounted to approximately $112 million.

Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Commonwealth. The trust agreement requires the Authority to deposit in the sinking fund the federal excise taxes and other moneys deposited as are required to meet the debt service requirements with respect to the Bonds.

The federal excise taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. The level of federal excise taxes to be received by the Commonwealth is currently expected to fall, although the exact amount cannot be determined. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient, Act No. 44 requires that the Authority request and the Director of the Office of Management and Budget of the Commonwealth include in the budget of the Commonwealth for the corresponding fiscal year, an appropriation necessary to cover such deficiency. The Legislature of the Commonwealth, however, is not obligated to make the necessary appropriation to cover such deficiency.

The Authority was required under the trust agreement to establish a reserve account in the sinking fund to deposit and maintain therein an amount equal to the reserve requirements, as defined. Alternatively, the Authority may deposit to the credit of such reserve account an insurance policy or a letter of credit in lieu of any required deposit or in substitution of moneys on deposit in the reserve account.

Additional bonds, secured on parity with the Bonds, may be issued for any purpose authorized by Act No. 44, subject to compliance with certain financial tests in the trust agreement.

On March 16, 2015 the Authority issued the Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015 under and pursuant to Act No. 1 of 2015, as amended by Act No. 2 of 2015 of the Legislature of Puerto Rico approved January 15, 2015, as amended, in the aggregate principal amount of $245,955,000 with a maturity date of May 1, 2017, with an interest rate of 8.25% payable monthly on the first Business Day of each month, commencing on April 1, 2015.

The Series 2015A Notes are subject to redemption in whole or in part in Authorized Denominations at any time, at the option of the Authority upon not less than 20 days' prior written notice.

The Series 2015A Notes are subject to mandatory sinking fund redemption prior to maturity, and to redemption from funds in the redemption fund.

PRIFA_STAY0000970

**Puerto Rico Infrastructure Financing Authority**
**(A Component Unit of the Commonwealth of Puerto Rico)**
Notes to Basic Financial Statements
June 30, 2015

**RSM**

The net position, revenues, and expenses of these loan funds are not included in the accompanying basic financial statements since the Authority acts only as administrator of the Revolving Fund and the Drinking Water Fund. As of June 30, 2015, the Authority holds cash in a custodian capacity for approximately $9.6 million which is presented as part of restricted cash and cash equivalents with a corresponding liability for the same amount, which is included as part of liabilities payable from restricted assets — accounts payable and accrued expenses in the accompanying statement of net position (deficit).

17.   **CONDUIT DEBT OBLIGATION**

In December 2011, the Authority issued $669,215,000 Special Revenue Bonds, pursuant to a Loan and a Trust Agreement dated December 1, 2011, between the Authority and the Puerto Rico Ports Authority (PRPA), another component unit of the Commonwealth. The proceeds from the bonds were lent to PRPA to refinance certain obligations, acquire real estate for airport and seaport facilities, provide working capital, finance certain operating and capital costs, and finance the cost of issuing the bonds. These bonds are limited obligations of the Authority and are payable solely from and secured by the revenues to be received under the Loan and Trust Agreement. The PRPA shall make loan payments sufficient to cover the payment of principal and interest due on the Bonds. The bonds are also secured by two irrevocable, transferable direct pay letters of credit issued by GDB. Upon repayment of the bonds, ownership of the acquired facilities is retained by the PRPA. The Authority is not obligated in any manner for the repayment of the bonds. Accordingly, the bonds are not reported as liabilities in the basic financial statements of the issuing entity. As of June 30, 2015, the remaining outstanding balance amounts to $192.8 million.

18.   **RELATED-PARTY TRANSACTIONS AND OTHER INTERGOVERNMENTAL TRANSACTIONS**

During the year ended June 30, 2015, the Authority entered into the following related party transactions:

- Legislative appropriations from the Commonwealth of $117 million were used for debt service payments of the bonds and operating expenses.

- Interest income on interest-bearing demand and time deposits with GDB amounted to approximately $91 thousand.

- GDB provided payroll services to the Authority at fixed amount of $50 thousand.

49

PRIFA_STAY0000978



*Puerto Rico Infrastructure Financing Authority*
*(A Component Unit of the Commonwealth of Puerto Rico)*
Notes to Basic Financial Statements
June 30, 2015

**Executive Order**

On December 1, 2015, the Governor signed Executive Order No. OE-2015-46 (the "Executive Order"), which provides that the Commonwealth will begin to redirect certain revenues in light of recently revised revenues estimates and its deteriorating liquidity situation. Pursuant to the Executive Order, certain available revenue that have been budgeted to pay debt service on the debt of the Authority will be redirected, pursuant to the constitutional requirements (the clawback provision), to pay debt issues or guaranteed by the Commonwealth. The Secretary of the Treasury will retain, for the application to payments due on the Commonwealth's public debt, approximately $113 million assigned to pay debt of the Authority which by law, constitute "available resources" subject to the Commonwealth's priority provision set forth in the Constitution.

**Default**

Due to the implementation of the Executive Order No. OE-2015-46 described above, the Authority did not transfer sufficient funds to the Trustee to make the $35.9 million in interest payment in full in respect of the January 1, 2016 payment date for its outstanding Series 2005A-C and Series 2006 Special Tax Revenue Bonds, issued pursuant to the Trust Agreement, between the Authority and U.S. Bank Trust National Association, as successor trustee (the "Trustee"), dated as of October 1, 1998, as amended. The Trustee has applied funds already on deposit in the Bond Service Account pro-rata to the January 1, 2016 interest payment under the Bonds.

**Downgrade**

On January 5, 2016, Standard & Poor's Rating Services (S&P) lowered its rating on the Authority bonds secured by federal rum taxes to D from CC due to the Authority's default on scheduled interest payments due in January 1, 2016

PRIFA_STAY0000984

**Government Parties' PRIFA Exhibit No. 7**

# Commonwealth of Puerto Rico

Comprehensive Annual Financial Report
Year Ended June 30, 2011

# *COMPREHENSIVE ANNUAL FINANCIAL REPORT*

## *Fiscal Year Ended June 30, 2011*



## *Commonwealth of Puerto Rico*

### *Honorable Luis G. Fortuño Burset*
### *Governor*

*Prepared by:*

### *Puerto Rico Department of the Treasury*

### *Jesús F. Méndez Rodríguez, CPA*
*Secretary of the Treasury*

### *Jaysel D. Chevres Santiago, CPA*
*Assistant Secretary of Central Accounting*

This document is available on the Puerto Rico Department of the Treasury homepage
On the World Wide Web: http://www.hacienda.gobierno.pr

# COMMONWEALTH OF PUERTO RICO

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| **Part I: Introductory Section (Unaudited)** | |
| LETTER OF TRANSMITTAL | 1–11 |
| PRINCIPAL OFFICIALS | 12 |
| ORGANIZATIONAL CHART | 13 |
| **Part II: Financial Section** | |
| INDEPENDENT AUDITORS' REPORT | 15–17 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS (UNAUDITED) | 18–47 |
| BASIC FINANCIAL STATEMENTS: | |
|   Government-Wide Financial Statements: | |
|     Statement of Net Assets (Deficit) | 48–49 |
|     Statement of Activities | 50–51 |
|     Fund Financial Statements: | |
|       Balance Sheet — Governmental Funds | 52–53 |
|       Reconciliation of the Balance Sheet to the Statement of Net Assets (Deficit) — Governmental Funds | 54 |
|       Statement of Revenues, Expenditures, and Changes in Fund Balances (Deficit) — Governmental Funds | 55–56 |
|       Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances (Deficit) to the Statement of Activities — Governmental Funds | 57 |
|       Statement of Revenues and Expenditures – Budget and Actual — Budget Basis — General Fund | 58 |
|       Statement of Net Assets (Deficit) — Proprietary Funds | 59 |
|       Statement of Revenues, Expenses, and Changes in Fund Net Assets (Deficit) — Proprietary Funds | 60 |
|       Statement of Cash Flows — Proprietary Funds | 61–62 |

Statement of Fiduciary Net Assets — Fiduciary Funds | 63

Statement of Changes in Fiduciary Net Assets — Pension Trust Funds | 64

Combining Statement of Net Assets (Deficit) — Major Component Units | 65–68

Combining Statement of Activities — Major Component Units | 69

Notes to Basic Financial Statements | 70–252

**Required Supplementary Information (Unaudited):**

SCHEDULE OF FUNDING PROGRESS — RETIREMENT SYSTEMS | 254

SCHEDULE OF FUNDING PROGRESS — POSTEMPLOYMENT HEALTHCARE BENEFITS | 255

**Supplementary Information:**

**Combining and Individual Fund Financial Statements and Schedules:**

GENERAL FUND:

Supplemental Schedule of Expenditures by Agency — Budget and Actual — Budget Basis | 258–260

NONMAJOR GOVERNMENTAL FUNDS:

Combining Balance Sheet | 263–264

Combining Statement of Revenues, Expenditures, and Changes in Fund Balances | 265

NONMAJOR PROPRIETARY FUNDS:

Combining Statement of Net Assets | 267

Combining Statement of Revenues, Expenses, and Changes in Net Assets | 268

Combining Statement of Cash Flows | 269

FIDUCIARY FUNDS:

Combining Statement of Fiduciary Net Assets — Pension Trust Funds | 271

Combining Statement of Changes in Fiduciary Net Assets — Pension Trust Funds | 272

Combining Statement of Changes in Assets and Liabilities — Agency Funds | 273

NONMAJOR DISCRETELY PRESENTED COMPONENT UNITS:

    Combining Statement of Net Assets (Deficit) ........................................ 275–286

    Combining Statement of Activities ........................................ 287

**Part III: Statistical Section (Unaudited):**

SCHEDULES OF FINANCIAL TREND INFORMATION:

    Changes in Net Assets (Deficit) for the Last Eight Fiscal Years ........................................ 291–292

    Net Assets (Deficit) by Component for the Last Eight Fiscal Years ........................................ 293

    Changes in Fund Balances (Deficit) of Governmental Funds all
      Governmental Fund Types for the Last Ten Fiscal Years ........................................ 294

    Fund Balances (Deficit) of Governmental Funds for the
      Last Eight Fiscal Years ........................................ 295

SCHEDULE OF REVENUE CAPACITY INFORMATION —

    General Fund Net Revenues for the Last Ten Fiscal Years ........................................ 297–298

SCHEDULES OF DEBT CAPACITY INFORMATION:

    Legal Debt Margin Information for the Last Ten Fiscal Years ........................................ 300

    Ratio of Annual Debt Service for General Bonded
      Debt to Total General Expenditures for the Last Ten Fiscal Years ........................................ 301

SCHEDULES OF DEMOGRAPHIC AND ECONOMIC INFORMATION:

    Demographic and Economic Statistics for the Last Ten Fiscal Years ........................................ 303

    Average Employment by Sector for the Last Ten Fiscal Years ........................................ 304

    Tourism Indicators for the Last Ten Fiscal Years ........................................ 305

SCHEDULE OF OPERATING INFORMATION —

    Operating Indicators by Function for the Last Ten Fiscal Years ........................................ 307

The annual budget, which is developed using elements of program budgeting, includes an estimate of revenue and other resources for the ensuing fiscal year under laws existing at the time the budget is submitted and legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Puerto Rico Planning Board.

The Legislature may amend the budget submitted by the Governor, but may not increase items that would cause a deficit without imposing additional taxes to cover such deficit. Once approved by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item, but may not increase or insert new items in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the end of the fiscal year, as originally approved by the Legislature and the Governor, it is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This allows the Commonwealth to continue to pay operating and other expenses until a new budget is approved.

**Governmental Activities**

General governmental activities of the Commonwealth are accounted for in five major governmental funds. These funds are: general, pledged sales and use tax, debt service, COFINA special revenue, and COFINA debt service. Nonmajor governmental funds are combined in a single column in the governmental fund financial statements, and individually identified in the supplementary combining nonmajor governmental funds' financial statements of this report.

**Business-type Activities**

Proprietary funds are used to account for operations that are financed and operated in a manner similar to private business enterprises, where the intent of the government is that the costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges or where the government has decided that periodic determination of net income is appropriate for accountability purposes.

The Commonwealth's major proprietary operations comprise the following activities: the Unemployment Insurance Fund and the Lotteries Fund (which includes the Lottery of Puerto Rico and the Additional Lottery System). The Disability Insurance Fund, the Drivers' Insurance Fund, the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund are all nonmajor proprietary funds combined in a single column in the proprietary fund financial statements, and individually identified in the supplementary combining nonmajor proprietary funds' financial statements of this report.

**Fiduciary Operations**

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity or as an agent for individuals, private organizations, and other governmental units. These include the pension and agency funds. Pension trust funds are established through trust agreements specifying how the fund will operate. Agency funds are custodial in nature and do not report fund balances.

The pension funds include the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico and its Instrumentalities, the Puerto Rico Judiciary Retirement System, and the Puerto Rico System of Annuities and Pensions for Teachers.



SECRETARY OF THE TREASURY

Agency funds consist of the Special Deposits Fund. This agency fund includes deposits under the custody of the Courts of Justice, Minors Support Administration for child support payments, deposits under the custody of the Commissioner of Insurance of the Commonwealth for escheated property, and for insurance companies under liquidation and an allocated share of the sales and use tax corresponding to the municipalities.

**Cash Management Policies and Practices**

The Commonwealth maintains a cash pool for its cash and cash equivalents. The balance in the pooled cash accounts is available to meet current operating requirements and any excess is invested in various interest-bearing accounts in the Government Development Bank for Puerto Rico, a discretely presented component unit. In addition, the Puerto Rico Government Investment Trust Fund (PRGITF) was created by the Commonwealth pursuant to Act No. 176 of August 11, 1995, as a no-load diversified collective investment trust that for the purpose of providing eligible governmental investors of Puerto Rico with a convenient and economical way to invest in a professionally managed money market portfolio. The deposits on hand and the investments purchased are not collateralized, secured, or guaranteed by the Commonwealth or any of its agencies, instrumentalities, or political subdivisions.

The Commonwealth's investment policy is to minimize credit and market risk while maintaining a competitive yield on its portfolio. The cash temporarily idle during this year was invested mainly in U.S. government securities, stocks, corporate bonds, repurchase agreements, Commonwealth securities other trading securities, and short-term investments. These are primary government investments that are restricted and unrestricted.

**Capital Assets**

These basic financial statements include the capital assets of the Commonwealth. A discussion of capital assets accounting is included in the MD&A that is part of the basic financial statements. More detailed information about capital assets can be found in the notes to the basic financial statements.

**Debt Administration**

The Commonwealth had a number of debt issues outstanding. The Commonwealth's general obligation and appropriation debt is currently rated "Baa1" by Moody's Investors Service, "BBB" by Standard & Poor's Ratings Services, and "BBB+" by Fitch, Inc.

Section 2, Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes are backed by the full faith, credit and taxing power of the Commonwealth shall not be issued if the amount of the principal and interest on such bonds and notes and on all such bonds and notes issued thereafter, which are payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of the Commonwealth Legislation and deposited into the Treasury of Puerto Rico in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2, Article VI of the Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the commonwealth on such guaranteed debt. At June 30, 2011, the Commonwealth is in compliance with the debt limitation requirement. See the computation of the legal debt margin in the statistical section of this report. More detailed information about the long-term debt can be found in the notes to the basis financial statements.



SECRETARY OF THE TREASURY

## FIDUCIARY FUNDS

Fiduciary funds are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units. Following are the Commonwealth's fiduciary funds:

### Pension Trust Funds

The pension trust funds are used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees of the Commonwealth.

**Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)** — ERS is a defined benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 447 on May 15, 1951. ERS is sponsored by the Commonwealth, public corporations, and municipalities of Puerto Rico. Substantially all full-time employees of the Commonwealth and its instrumentalities are covered by ERS.

**Puerto Rico System of Annuities and Pensions for Teachers (TRS)** — TRS is a defined benefit pension plan administered by the Puerto Rico Teachers Retirement System and was created by Act No. 91 of March 29, 2004, that superseded Act No. 218 of May 6, 1951. TRS is sponsored by the Commonwealth. Substantially, all active teachers of the Commonwealth's Department of Education are covered by TRS. Licensed teachers working in private schools or other educational organizations can be members of TRS at their own choice as long as the required employer and employee contributions are satisfied.

**Commonwealth of Puerto Rico Judiciary Retirement System (JRS)** — JRS is a defined benefit pension plan administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 12 on October 19, 1954. JRS provides retirement benefits to the employees of the judiciary branch of the Commonwealth, through the office of the Administration of Court Facilities.

### Agency Fund

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits** — This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections and agency accounts for which the Commonwealth act in an agent's capacity.

**Government Parties' PRIFA Exhibit No. 8**

# COMMONWEALTH OF PUERTO RICO

Basic Financial Statements
and Required Supplementary Information

June 30, 2016

(With Independent Auditors' Report Thereon)

CONFIDENTIAL

# BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION

### Fiscal Year Ended June 30, 2016



### Commonwealth of Puerto Rico

### Honorable Ricardo Rosselló Nevares
### Governor

*Prepared by:*

### Puerto Rico Department of the Treasury

### Raúl Maldonado Gautier, CPA, Esq.
*Secretary of the Treasury*

### Francisco Peña Montañez
*Under Secretary of the Treasury*

### Omar E. Rodríguez Pérez
*Assistant Secretary of Central Accounting*

CONFIDENTIAL

# COMMONWEALTH OF PUERTO RICO

## Table of Contents

| | Page(s) |
|---|---|
| Independent Auditors' Report | 1–10 |
| Management's Discussion and Analysis (Unaudited) | 11–33 |
| Basic Financial Statements: | |
| Government-wide- Financial Statements: | |
| Statement of Net Position | 34–35 |
| Statement of Activities | 36–37 |
| Fund Financial Statements: | |
| Governmental Funds: | |
| Balance Sheet | 38 |
| Reconciliation of the Balance Sheet of Governmental Funds to the Statement of Net Position | 39 |
| Statement of Revenue, Expenditures, and Changes in Fund Balances | 40 |
| Reconciliation of the Statement of Revenue, Expenditures, and Changes in Fund Balances of Governmental Funds to the Statement of Activities | 41 |
| Proprietary Funds: | |
| Statement of Net Position | 42 |
| Statement of Revenues, Expenses, and Changes in Fund Net Position | 43 |
| Statement of Cash Flows | 44 |
| Fiduciary Funds: | |
| Statement of Fiduciary Net Position | 45 |
| Statement of Changes in Fiduciary Net Position -- Pension (and Other Employee Benefit) Trust Funds | 46 |
| Discretely Presented Component Units: | |
| Combining Statement of Net Position | 47–48 |

CONFIDENTIAL

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

| | Page(s) |
|---|---|
| Combining Statement of Activities | 49 |
| Notes to Basic Financial Statements | 50–330 |
| Required Supplementary Information (Unaudited): | |
| Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans - TRS | 331 |
| Schedule of Changes in Net Pension Liability for Single-Employer Pension Plans - JRS | 332 |
| Schedule of Proportionate Share of the Net Pension Liability of a Cost-Sharing Multiple-Employer Pension Plan - ERS | 333 |
| Schedule of Employers' Contributions - All Pension Plans | 334 |
| Schedule of Funding Progress for the Postemployment Healthcare Plans | 335 |
| Schedule of Employers' Contributions for the Postemployment Healthcare Plans | 336 |
| Schedule of Revenue and Expenditures – Budget and Actual – Budgetary Basis – General Fund | 337 |
| Notes to Required Supplementary Information | 338–342 |
| Combining and Individual Fund financial Statements and Schedules | |
| General Fund: | |
| General Fund | 343 |
| Schedule of Expenditures by Agency – Budget and Actual– Budgetary Basis – General Fund | 344–346 |
| Nonmajor Governmental Funds: | |
| Nonmajor Governmental Funds | 347–349 |
| Combining Balance Sheet | 350 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Balances | 351 |
| Nonmajor Proprietary Funds: | |
| Nonmajor Proprietary Funds | 352 |

**COMMONWEALTH OF PUERTO RICO**

**Table of Contents**

|  | Page(s) |
|---|---|
| Combining Statement of Net Position | 353 |
| Combining Statement of Revenue, Expenditures, and Changes in Fund Net Position | 354 |
| Combining Statement of Cash Flows | 355 |
| Fiduciary Funds: |  |
| Fiduciary Funds | 356–357 |
| Combining Statement of Fiduciary Net Position – Pension Trust Funds | 358 |
| Combining Statement of Changes in Fiduciary Net Position – (and Other Employee Benefit) Trust Funds | 359 |
| Combining Statement of Changes in Assets and Liabilities – Agency Funds | 360 |
| Nonmajor Discretely Presented Component Units: |  |
| Nonmajor Discretely Presented Component Units | 361 |
| Combining Statement of Net Position | 362–368 |
| Combining Statement of Activities | 369 |

CW_STAY0010172

**COMMONWEALTH OF PUERTO RICO**

Management's Discussion and Analysis (Unaudited)

June 30, 2016

governmental funds financial statements can be found immediately following the government-wide financial statements.

x   ***Proprietary Funds*** -- These funds are used to show activities that operate more like those of commercial enterprises. Because these funds charge fees for services provided to outside customers, including local governments, they are also known as enterprise funds. Proprietary funds provide the same type of information as the Business-Type Activities in the government-wide financial statements, but in more detail. As with government-wide financial statements, proprietary funds financial statements use the full accrual basis of accounting. There is no reconciliation needed between the government-wide financial statements for Business-Type Activities and the proprietary funds financial statements.

The Commonwealth has five major proprietary funds:

x   Unemployment Insurance Fund

x   Lotteries Fund, which includes the Lottery of Puerto Rico and the Additional Lottery System

x   Puerto Rico Health Insurance Administration (PRHIA)

x   Puerto Rico Medical Service Administration (PRMeSA)

x   Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF)

Other nonmajor proprietary funds consist of the Disability Insurance Fund, Drivers' Insurance Fund, Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (PRSDWRLF), Ponce Ports Authority (PPA), and the Governing Board of 9-1-1 Services which are grouped and presented in a separate column in the proprietary funds' financial statements. The basic proprietary funds financial statements can be found immediately following the governmental funds financial statements.

**Fiduciary Funds**

The Commonwealth is a trustee, or fiduciary, for its employees' pension plans. It is also responsible for other assets on an agent capacity for individuals, private organizations, and other governmental entities. All the Commonwealth fiduciary activities are reported in a separate statement of fiduciary net position and of changes in fiduciary net position. The Commonwealth excluded these activities from its government-wide financial statements because the Commonwealth cannot use these assets to finance its operations. The Commonwealth is responsible for ensuring that the assets reported in these funds are used for their intended purposes.

*New Plan for Defined Contributions for Public Servants*

On August 23, 2017, Act No. 106 of 2017 (Act No.106 of 2017) was signed into law to guarantee the payment to pensioners and establish a new plan for defined contributions for public servants, reformed the Commonwealth's pensions by replacing the governing boards of the Retirement Systems with a single Retirement Board of the Commonwealth of Puerto Rico (Retirement Board) and established a separate "account for the payment of accrued pensions" to implement a "pay-as-you-go" (PayGo) method for the Retirement Systems. Act No. 106 of 2017 created the legal framework so that the Commonwealth can guarantee payments to pensioners through the PayGo system. For additional information regarding the PayGo system, refer to Notes 2, 3 and 23.

16

CW_STAY0010188

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

**(1) Summary of Significant Accounting Policies**

The Commonwealth of Puerto Rico (the Commonwealth) was constituted on July 25, 1952, under the provisions of the Commonwealth's Constitution as approved by the people of Puerto Rico and the U.S. Congress. The Commonwealth's Constitution provides for the separation of powers of the executive, legislative, and judicial branches of the government. The Commonwealth assumes responsibility for general government, public safety, health, public housing and welfare, education, and economic development. Recently, however, as a result of the current fiscal crisis that affects the Commonwealth (as further described below in Note 2 and Note 3), the U.S. Congress enacted a law establishing an Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs, and review and approval over certain governmental responsibilities. This law is known as the "Puerto Rico Oversight, Management and Economic Stability Act" (PROMESA).

The accompanying basic financial statements of the Commonwealth are presented in conformity with U.S. Generally Accepted Accounting Principles (U.S. GAAP) for governments as prescribed by the Governmental Accounting Standards Board (GASB).

The accompanying basic financial statements present the financial position of the Commonwealth and its various funds and component units, the results of operations of the Commonwealth and its various funds and component units, and the cash flows of the proprietary funds.

**(a) Financial Reporting Entity**

As required by U.S. GAAP, the financial reporting entity of the Commonwealth includes all departments, agencies, funds, functions, and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The Commonwealth has considered all potential component units for which it is financially accountable and other organizations for which the nature and significance of their relationship with the Commonwealth are such that exclusion would cause the Commonwealth's basic financial statements to be misleading or incomplete. The GASB has set forth criteria to be considered in determining financial accountability. These criteria include when the Commonwealth appoints a voting majority of an organization's governing body and it has (i) the ability to impose its will on that organization or (ii) the potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth. In situations where the Commonwealth has not appointed the voting majority of an organization's governing body, the GASB has then provided as criteria for financial accountability the fiscal dependency of such organizations on the Commonwealth and when there is a potential for the organization to provide specific financial benefits to, or impose specific financial burdens on, the Commonwealth.

**(b) Component Units**

The financial statements of the component units discussed below have been included in the financial reporting entity either as blended component units or as discretely presented component units in accordance with GASB Statements No. 14, *The Financial Reporting Entity*, as amended by GASB Statements No. 39, *Determining Whether Certain Organizations Are Component Units—an*

50

CW_STAY0010222

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

*amendment of GASB Statement No. 14* and No. 61, *The Financial Reporting Entity: Omnibus—an amendment of GASB Statements No. 14 and No. 34.*

(i)   *Blended Component Units*

The following entities, while legally separate from the Commonwealth, meet the blending criteria to be reported as part of the Primary Government as follows:

*Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA)* – On April 6, 2016, Act No. 21 (Act No. 21) was approved creating the FAFAA as an independent public corporation and government instrumentality with separate legal existence, fiscal and administrative autonomy, and independence from the Commonwealth. FAFAA was created for the purpose of acting as fiscal agent, financial advisor and reporting agent of the Government of Puerto Rico, its agencies, instrumentalities, subdivisions, public corporations and/or municipalities, and to assist such entities in confronting the fiscal and economic emergency that Puerto Rico is experiencing. The FAFAA assumed the fiscal agency and financial advisory responsibilities that were previously held by the Government Development Bank (GDB). On January 18, 2017, the Governor signed into law the Enabling Act of the Fiscal Agency and Financial Advisory Authority, Act No. 2 of 2017. This new law amended and replaced sections of the prior law that established FAFAA. Act No. 2 of 2017 expanded FAFAA's powers to include, among other things, sole responsibility to renegotiate, to restructure and/or to reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity. In addition, FAFAA is the entity in charge of the collaboration, communication and cooperation efforts between the Government of Puerto Rico and the Oversight Board, created under the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187 (PROMESA).

The Board of Directors of FAFAA was initially composed of only one member appointed by the Governor but upon the enactment of Act No. 2 of 2017 the Board is now composed of five members: (1) FAFAA's Executive Director appointed by the Governor, (2) a representative of the Senate of Puerto Rico, and (3) a representative of the House of Representatives of Puerto Rico which will be appointed by the President of each Legislative Body, and (4) two members appointed by the Governor. The members can only be replaced and/or removed by the entity who appointed them. The members of the Board of Directors will select a President, Vice-President and Secretary among them. FAFAA does not have legal authority to issue bonds, notes or any other debt instrument; however, will be the principal financial advisor in future debt issuances of any instrumentality of the Commonwealth. FAFAA's budget will be assigned by the Legislative Assembly and will originate from the General Fund, special assignments or any other revenue identified.

*Ponce Ports Authority (PPA)* – On December 12, 2011, Act No. 240 (Act No. 240) was approved creating the PPA, a component unit of the Commonwealth, with a seven-member board required to be comprised of the Secretary of Economic Development and Commerce, the director of the Ponce port, three members to be appointed by the Governor with the consent of the Senate and two members to be appointed by the Mayor of Ponce with the consent of the Ponce legislative assembly. PPA was created to continue the development of the container terminal formerly undertaken by Port of the Americas Authority (PAA) and handle such facilities' future operations; therefore, all of the assets, rights and duties of PAA (with the exception of its existing debt) would be transferred to PPA. Effective fiscal year 2015, the board of PPA was formed and operations started; although the assets

51

CW_STAY0010223

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

of PAA have not been transferred at June 30, 2016. On December 19, 2013, Act No. 156 was approved amending Act No. 240 by, among other things, authorizing PPA to request a line of credit of up to $60 million from the GDB to start funding the operations for which it was created and to establish that effective fiscal year 2015 the debt service of such debt be satisfied with annual Commonwealth's legislative appropriations. As the total debt outstanding of PPA at June 30, 2015 is payable from Commonwealth's legislative appropriations, PPA's financial statements became blended in the Commonwealth's fund financial statements as an enterprise fund effective July 1, 2015.

*Port of the Americas Authority (PAA)* – PAA is governed by an eleven-member board comprising the Secretary of the Department of Transportation and Public Works (DTPW), the Secretary of Economic Development and Commerce, the Executive Director of PRIDCO, the Mayors of the Municipalities of Ponce, Peñuelas, and Guayanilla and five private citizens appointed by the Governor with the consent of the Senate. The main purpose of the PAA was the planning, development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico. The Commonwealth generally provided financial support to the PAA through legislative appropriations and its current existing debt is guaranteed by the Commonwealth pursuant to the provisions of Act No. 409 of September 22, 2004 (Act No. 409 of 2004). With the commencement of the operations of PPA in fiscal year 2015, as described in the previous paragraph above, the operations of PAA have been limited to processing the remaining legal requirements resulting after the transfer of all rights and duties to PPA. Such legal requirements consist principally of servicing the long-term debt that remained in PAA. Act No. 49 of 2004 also provides for the Commonwealth to appropriate funds in its general operating budget annually for the payment of principal and interest on such debt, which is the total debt outstanding. Therefore, PAA's financial statements became blended in the Commonwealth's fund financial statements as a special revenue fund and a debt service fund effective July 1, 2015.

*Public Buildings Authority (PBA)* – PBA is governed by a seven-member board comprised of the Secretary of the DTPW, the Secretary of the Department of Education of the Commonwealth, the President of the GDB, and four members appointed by the Governor of Puerto Rico with the advice and consent of the Senate. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. PBA is a legally separate entity, whose activities are blended within the Primary Government because it exists to construct, purchase, or lease office, school, health, correctional, social welfare, and other facilities for lease to the Commonwealth's departments, component units, and instrumentalities. Bonds issued by the PBA to finance such facilities are payable from the payments of rentals of certain government facilities leased by PBA and are further supported by a guarantee of the Commonwealth. Therefore, the financial statements of the PBA are blended in the Commonwealth's fund financial statements as a special revenue, debt service, and capital project fund.

*Puerto Rico Health Insurance Administration (PRHIA)* – PRHIA is governed by a board of directors, which, by law, is composed of eleven members (six compulsory members and five discretionary members). The compulsory members are the Secretary of Health of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the Director of the Office of Management and Budget of the Commonwealth (OMB), the President of the GDB, the Insurance Commissioner of

52

CW_STAY0010224

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

Puerto Rico, and the Administrator of the Administration of Services of Mental Health and Addiction. The five discretionary members are appointed by the Governor, with the advice and consent of the Senate. The board of directors' president is designated by the Governor and all discretionary board members are executives in a trustworthy position. As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. PRHIA was created for implementing, administering, and negotiating a health insurance system through contracts with insurance underwriters to provide quality medical and hospital care to low income individuals (via the Medicaid program administered and funded by the Centers for Medicare and Medicaid Services through a memorandum of understanding with the Department of Health); and also to employees of the Commonwealth, Municipalities and policemen who voluntarily subscribe to the Puerto Rico health insurance medical plan in exchange for a fee paid by them through payroll deductions. PRHIA also recovers its operating costs through charges made to Municipalities and a rebate program with pharmacies where PRHIA retains 100% of the income derived from this program. Since 2015, the Commonwealth should annually appropriate funds from its general operating budget to provide for the payment of principal and interest on the PRHIA line of credit obligation, which is the total debt outstanding of PRHIA. Therefore, PRHIA's financial statements are blended in the Commonwealth's fund financial statements as an enterprise fund effective July 1, 2015.

*Puerto Rico Infrastructure Financing Authority (PRIFA)* – PRIFA is governed by a seven-member board comprised of five members appointed by the board of the directors of the GDB, the Secretary of the Treasury of the Commonwealth and one member appointed by the Governor. . As provided under Act No. 2 of 2017, the board member position previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The members of PRIFA's board of directors are executives in trustworthy positions, named and supervised by the Governor. The President is appointed by the Governor from among its members. PRIFA is a financing authority whose responsibilities are to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other component units and governmental instrumentalities of the Commonwealth, which are authorized to develop infrastructure facilities and to establish alternate means for financing them. PRIFA's total debt outstanding, mostly Special Tax Revenue Bonds comprising over 95% of its total debt is payable from federal excise taxes levied on the rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the US Treasury and returned to the Commonwealth. PRIFA's remaining debt, other than the Special Tax Revenue Bonds, is payable from Commonwealth legislative appropriations. Therefore, PRIFA's financial statements are blended in the Commonwealth's fund financial statements as a special revenue, debt service and capital project fund.

*Puerto Rico Maritime Shipping Authority (PRMSA)* – PRMSA is governed by the President of the GDB. As provided under Act No. 2 of 2017, the board member positon previously occupied by the President of the GDB is currently held by the Executive Director of FAFAA as of January 18, 2017. The operations of PRMSA have been limited to processing the remaining legal requirements resulting from the sale of certain maritime operations formerly owned and operated by PRMSA. Such legal requirements consist solely of servicing the long-term debt that remained in PRMSA after the sale. The Commonwealth should appropriate annually funds in its general operating budget to provide for the payment of principal and interest on such debt, which is the total debt outstanding.

CONFIDENTIAL

CW_STAY0010225

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

**(c)** *Component Units Audited Separately*

The basic financial statements of the Commonwealth include the financial statements of the following component units that were audited by other auditors:

*(i)* *Blended Component Units*

Ponce Ports Authority
Port of the Americas Authority
Public Buildings Authority
Puerto Rico Health Insurance Administration
Puerto Rico Infrastructure Financing Authority
Puerto Rico Maritime Shipping Authority
Puerto Rico Medical Services Administration
Special Communities Perpetual Trust
The Children's Trust
University of Puerto Rico Comprehensive Cancer Center

*(ii)* *Discretely Presented Component Units*

Agricultural Enterprises Development Administration
Automobile Accidents Compensation Administration
Cardiovascular Center Corporation of Puerto Rico and the Caribbean
Company for the Integral Development of the "Península de Cantera"
Corporation for the "Caño Martín Peña" ENLACE Project
Culebra Conservation and Development Authority
Economic Development Bank for Puerto Rico
Farm Insurance Corporation of Puerto Rico
Fine Arts Center Corporation
Independent Consumer Protection Office
Institute of Puerto Rican Culture
Institutional Trust of the National Guard of Puerto Rico
Land Authority of Puerto Rico
Local Redevelopment Authority of the Lands and Facilities of Naval Station Roosevelt Roads
Musical Arts Corporation
Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives
Puerto Rico Aqueduct and Sewer Authority
Puerto Rico Conservatory of Music Corporation
Puerto Rico Convention Center District Authority
Puerto Rico Council on Education
Puerto Rico Electric Power Authority
Puerto Rico Energy Commission
Puerto Rico Government Investment Trust Fund
Puerto Rico Highways and Transportation Authority
Puerto Rico Industrial Development Company
Puerto Rico Industrial, Tourist, Educational, Medical and Environmental, Control Facilities Financing Authority
Puerto Rico Integrated Transit Authority

72

CW_STAY0010244

COMMONWEALTH OF PUERTO RICO

Notes to the Basic Financial Statements

June 30, 2016

fund. The General Fund includes transactions for services such as general government, public safety, health, public housing and welfare, education, and economic development. The financial resources received and used in the General Fund mostly include: budgeted resources (such as taxes and charges for services), as approved by the Legislature and as adjusted for timing and basis of accounting differences, and other financial resources outside the General Fund budget such as: federal funds, pledged funds, other special revenue and general type funds, and agencies with independent treasuries.

x   *Debt Service Fund* – The debt service fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and component units, either blended or discretely presented. Long-term debt and interest due on July 1 of the following fiscal year are accounted for as a fund liability if resources are available as of June 30 for its payment.

x   *COFINA Special Revenue Fund* – The special revenue fund of the Puerto Rico Sales Tax Financing Corporation (COFINA) was used to account for and report all financial resources of COFINA, except those required to be accounted for and reported in the COFINA Debt Service fund.

x   *COFINA Debt Service Fund* – The debt service fund of COFINA was used to account for the Commonwealth sales tax revenue being deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

x   *Nonmajor Governmental Funds* – The Commonwealth reports the following blended component units within the nonmajor governmental funds: PBA, The Children's Trust, PRIFA, PRMSA, PAA, SCPT and the UPRCCC. The nonmajor governmental funds also includes the Commonwealth's capital project fund.

If a component unit is blended, it should be blended with those funds of the Primary Government by including them in the appropriate fund category of the Primary Government. Although the Primary Government's General Fund is usually the main operating fund of the reporting entity, the General Fund of a blended component unit should be reported as a special revenue fund. Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the Primary Government directly or for discretely presented component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities. Capital project funds exclude those types of capital related outflows financed by proprietary funds or for assets that will be held in trust for individuals, private organizations, or other governments.

In accordance with GASB Statement No. 54, *Fund Balance Reporting and Governmental Fund Type Definitions*, the classification of fund balance is based on the extent to which the Commonwealth is

75

CW_STAY0010247

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

bound to observe constraints imposed upon the use of resources in the governmental funds. The classifications are as follows:

x   *Nonspendable* – Amounts that are not in a spendable form or are legally or contractually required to be maintained intact.

x   *Restricted* – Amounts that are legally restricted by outside parties, constitutional provisions, or enabling legislation for a specific purpose.

x   *Committed* – Amounts that are constrained for specific purposes that are internally imposed by the government's formal action at the highest level of decision making authority and do not lapse at year end. The highest level of decision authority for the Commonwealth is the Legislature and the Governor, and the formal action is the passage of a law specifying the purposes for which amounts can be used.

x   *Assigned* – includes fund balance amounts that are constrained by the Commonwealth and are intended to be used for specific purposes that are neither considered restricted or committed. The Director of the Commonwealth OMB is authorized to assign an amount for a specific purpose through the approval of budget certificates as required by statute.

x   *Unassigned* – is the residual classification for the General Fund. In a governmental fund other than the General Fund, a negative amount indicates that the expenditures incurred for a specific purpose exceeded the amounts in the fund that are restricted, committed, and assigned to that purpose.

The Commonwealth uses restricted amounts first when both restricted and unrestricted fund balances are available, unless there are legal documents/contracts that prohibit doing this, such as a grant agreement requiring dollar for dollar spending. Additionally, unless required by law or agreement, the Commonwealth would first use committed, then assigned, and lastly unassigned amounts of unrestricted fund balance when expenditures are made.

The Commonwealth does not have a formal minimum fund balance policy.

*(iv)   Proprietary Funds*

These funds account for those activities, which are financed and operated in a manner similar to private business enterprises. Management intends to recover, primarily through user charges, the cost of providing goods or services to the general public.

The Commonwealth reports the following major proprietary funds:

x   *Unemployment Insurance Fund* – This fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund held by the U.S. Treasury for payment of unemployment benefits and charges made to individual employers.

x   *Lotteries Fund* – This fund accounts for the assets and operations of two lottery systems administered by the Commonwealth.

x   *Puerto Rico Health Insurance Administration* –This fund, a blended component unit, accounts for a health insurance system operated through contracts with insurance underwriters to provide

76

CW_STAY0010248

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

quality medical and hospital care to low income individuals, employees of the Commonwealth and policemen who voluntarily subscribe to the Puerto Rico health insurance medical plan.

x   *Puerto Rico Medical Services Administration* – This fund, a blended component unit, accounts for the operations of the centralized health services, provided in support of hospitals and other functions offered by the member institutions and consumers of the complex known as Puerto Rico Medical Center.

x   *Puerto Rico Water Pollution Control Revolving Fund (PRWPCRF)* – This fund, administered by the Puerto Rico Environmental Quality Board (EQB), is authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), mostly for water infrastructure projects, under a joint cooperation agreement between the EQB, PRIFA, PRASA, and the GDB, where each entity has agreed to assume their corresponding responsibilities.

The Commonwealth reports the following nonmajor proprietary funds: Disability Insurance Fund, Drivers' Insurance Fund, the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (PRSDWTRLF), Ponce Ports Authority and the 9-1-1 Service Governing Board.

*(v)   Fiduciary Funds*

Fiduciary funds are used to account for assets held by the Commonwealth in a trustee capacity, or as an agent for individuals, private organizations, and other governmental units. The following are the Commonwealth's fiduciary funds:

x   *Pension (and Other Employee Benefit) Trust Funds* – These are used to account for the assets, liabilities, and net position held in trust for pension benefits and postemployment healthcare benefits held in trust for the public employees' retirement systems.

x   *Agency Funds* – These are custodial in nature (assets equal liabilities) and do not involve measurement of the results of operations.

**(e)  *Measurement Focus and Basis of Accounting***

*Government-Wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows.

*Governmental Fund Financial Statements* – The governmental fund financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenue is recognized as soon as it is both measurable and available, and net of estimated overpayments (as applicable) and amounts considered not collectible. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period (see Note 1(j) for further description about the period of availability for the principal sources of revenue in the Governmental Activities).

Principal revenue sources considered susceptible to accrual include personal and corporate income taxes (recognized as taxpayers earn the underlying income), sales and uses taxes (recognized as the underlying sales are made), excise taxes (as the underlying import or related activity takes place),

77

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

the economic and tourism development of Puerto Rico. Loans to the private sector also include the outstanding principal balance of mortgage loans granted to low and moderate-income families for the acquisition of single-family housing units and to developers of low- and moderate-income multifamily housing units in Puerto Rico. These credit facilities, net of allowance for loan losses, amounted to approximately $241 million at June 30, 2016, of which approximately $206 million are mortgage loans for low and moderate-income housing units, approximately $34 million are for tourism projects and approximately $1 million are manufacturing loans. Private sector loans classified as nonaccrual amounted to approximately $164 million at June 30, 2016 and had a corresponding allowance for loan losses of $135 million as of June 30, 2016. Interest income that would have been recorded if these loans had been performing in accordance with their original terms was approximately $12.6 million in 2016.

**(9) Conditionally Allocated Receivables and Future Revenue**

**(a) COFINA Revenue**

Prior to the enactment of Act No. 241 of 2018 and confirmation of COFINA's Third Amended Plan of Adjustment in February 2019, Act No. 91 of 2006 established the Dedicated Sales Tax Fund, a special revenue fund held by COFINA. Act No. 91 required that the greater of the following amounts be deposited in the Dedicated Sales Tax Fund each fiscal year for the payment of COFINA bonds: (i) a minimum fixed amount, referred to as the Pledged Sales Tax Base Amount and (ii) the revenue generated by up to 2.75% of the Commonwealth's sales and use tax.

On October 9, 2013, an amendment to Act No. 91 of 2006 was signed into law which increased from 2.75% to 3.50% the portion of the Pledged Sales Tax deposited in the Dedicated Sales Tax Fund.

The Pledged Sales Tax Base Amount in fiscal year ended June 30, 2016 amounted to approximately $696.3 million. For fiscal year 2016, debt service paid by COFINA amounted to approximately to $655.2 million.

**(b) PRIFA Assigned Revenue**

The following revenue (collectively, the PRIFA Allocated Revenue) has been conditionally allocated by the Commonwealth to PRIFA, subject to the provisions of Article VI, Section 8, of the Commonwealth's Constitution. As further discussed in Note 2 and Note 23, the PRIFA Allocated Revenues are currently being retained by the Commonwealth.

*(i) Federal Excise Taxes*

Rum manufactured in Puerto Rico is subject to federal excise taxes once exported to the United States; however, the revenue generated by such excise taxes is returned by the IRS to the Commonwealth. Act No. 44 of June 21, 1988, as amended (the PRIFA Act), requires that the first $117 million of certain federal excise taxes received by the Commonwealth be transferred to PRIFA, a blended component unit of the Commonwealth, each fiscal year. Such taxes consist of the federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States. PRIFA applies these taxes to the repayment of PRIFA's Special Tax Revenue Bonds. Receipt of the federal excise taxes securing the bonds is subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. The amount of federal excise taxes to be received by the Commonwealth is currently expected to decrease, although the exact amount cannot be determined. If the federal

160

CW_STAY0010332

**COMMONWEALTH OF PUERTO RICO**

Notes to the Basic Financial Statements

June 30, 2016

excise taxes received by the Commonwealth in any fiscal year are less than $117 million, the PRIFA Act requires that PRIFA request, and the Director of the Commonwealth OMB include in the budget of the Commonwealth for the corresponding fiscal year, an appropriation sufficient to cover such deficiency. The Legislature, however, is not required to make such appropriation. For the year ended June 30, 2016, the Legislature originally appropriated the $117 million required by Act No. 44-1988 but it was subsequently amended to decrease such appropriation to a total amount of $4 million.

*(ii)   Petroleum Products Tax*

The PRIFA Act and the Puerto Rico Internal Revenue Code of 2011, as amended (the Puerto Rico Code) were amended by Act No. 1 of 2015, as amended, in order to impose a new petroleum products tax on nondiesel products ($6.25 initially) and to assign the revenue therefrom to PRIFA to secure the payment of certain of its bonds and notes, in particular, the Dedicated Tax Fund Revenue Bond Anticipation Notes issued on March 16, 2015 to redeem certain PRHTA Special Revenue Bonds 2013A Bond Anticipation Notes. For fiscal year 2016, debt service paid on the Dedicated Tax Fund Revenue Bond Anticipation Notes issued by PRIFA amounted to $169 million, composed of $155 million in principal and $14 million in interest.

**(c)   PRHTA Allocated Revenue**

The following revenues (collectively, the PRHTA Allocated Revenues) have been conditionally allocated by the Commonwealth to PRHTA, subject to the provisions of Article VI, Section 8 of the Commonwealth's Constitution. As further discussed in Note 2 and Note 23, prior to May 3, 2017, the PRHTA Allocated Revenues were retained by the Commonwealth pursuant to Article VI, Section 8 of the Commonwealth's Constitution. Subsequent to the filing of the Commonwealth's Title III case on May 3, 2017, the PRHTA Allocated Revenues have been retained by the Commonwealth due to the automatic stay under Title III of PROMESA.

*(i)   Gasoline and Gas Oil Taxes*

The Puerto Rico currently imposes a $0.16 per gallon tax on gasoline and a $0.04 per gallon tax on gas oil and diesel oil. By law, the Commonwealth has conditionally allocated the entire $0.16 tax on gasoline and $0.04 tax on gas oil and diesel oil to PRHTA as a source of revenue.

*(ii)   License Fees*

Under Act No. 22 of 2000, as amended, known as the "Vehicle and Traffic Law," the Commonwealth imposes annual license fees on various classes of motor vehicles. Fifteen dollars ($15) of each such annual license fee were conditionally allocated to PRHTA to be used as a source of revenue. Act No. 30 of 2013 conditionally assigned the remaining twenty-five dollars ($25) of each such annual license fee to PRHTA.

*(iii)   Petroleum Products Tax*

The Puerto Rico Code also allocates to PRHTA $9.50 per barrel or fraction thereof of petroleum products excise tax (which include crude oil, unfinished oil, and derivative products). The tax is imposed on any petroleum product introduced, consumed, sold, or transferred in the Commonwealth.

161

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2016

**Special Revenue Funds**

Special revenue funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects. Other resources (investment earnings and transfers from other funds, for example) also may be reported in the fund if those resources are restricted, committed, or assigned to the specified purpose of the fund.

*(1) Public Buildings Authority Special Revenue Fund*

The operating fund of the Public Buildings Authority, a blended component unit, used to account for the operation, maintenance, equipment replacement, and other extraordinary operation and maintenance costs of the buildings and facilities that, when constructed, are leased to the Commonwealth's Primary Government agencies.

*(2) Puerto Rico Infrastructure Financing Authority's Special Revenue Fund*

The special revenue fund of the Puerto Rico Infrastructure Financing Authority, a blended component unit, is used to account principally for the moneys received by the Commonwealth, up to $117 million, of certain federal excise taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which are collected by the U.S. Treasury and returned to the Commonwealth. Under Act No. 44 of June 21, 1988, as amended, the Commonwealth conditionally allocates to this fund the first $117 million of these federal excise taxes reimbursed, which are subsequently transferred to the Puerto Rico Infrastructure Financing Authority's Debt Service Fund to provide for the debt service of its special tax revenue bonds. This special revenue fund also receives ARRA funds for the weatherization program aimed at converting certain government buildings into eco-friendly locations.

*(3) Port of the Americas Authority's Special Revenue Fund*

The special revenue fund of Port of the Americas Authority, a blended component unit, is used to account for its remaining legal and certain other administrative requirements resulting after the transfer of all rights and duties to PPA. The main purpose of the PAA was the planning development and construction of a large-scale container terminal in the city of Ponce, Puerto Rico.

*(4) Special Communities Perpetual Trust's Special Revenue Fund*

The special revenue fund of the Special Communities Perpetual Trust, a blended component unit, is used to account for the moneys received from the Governmental Development Bank, through a line of credit financing and cash contributions, upon inception of the Special Communities Perpetual Trust. The financial resources received by this fund are used to carry out development projects that address the infrastructure and housing needs of certain under privileged communities.

*(5) The Children's Trust Special Revenue Fund*

The special revenue fund of the Children's Trust, a blended component unit, is used to account for the money received by the Commonwealth from a global settlement agreement dated November 23, 1998 between certain tobacco companies and certain states, territories, and other jurisdictions of the United State of America, including the Commonwealth. The financial resources received by this fund are used to carry out projects aimed at promoting the well-being of children and youth of Puerto Rico.

347

CW_STAY0010521

COMMONWEALTH OF PUERTO RICO

Nonmajor Governmental Funds

Year ended June 30, 2016

**(6) *University of Puerto Rico Comprehensive Cancer Canter's Special Revenue Fund***

The special revenue fund of the UPRCCC, a blended component unt, is used to account for the moneys received from the Commonwealth and certain other grants from both the private sector and the Federal government, to execute public policy related to the prevention, orientation, investigation and treatment of cancer in Puerto Rico.

**Debt Service Funds**

The debt service funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for principal and interest, and related costs other than bonds payable from operations of proprietary fund types, pension trust funds, and discretely presented component units. Long-term debt and interest due on July 1 of the following year are accounted for as a fund liability if resources are available as of June 30 for its payment.

**(1) *Public Buildings Authority Debt Service Fund***

A blended component unit engaged in the construction and/or acquisition of building facilities for lease mainly to the Commonwealth's Primary Government agencies. Its debt service fund is used to account for the financial resources that are restricted, committed, or assigned to expenditure for the payment of revenue bonds and other liabilities incurred to finance the construction of the buildings and facilities.

**(2) *Puerto Rico Infrastructure Financing Authority's Debt Service Fund***

The debt service fund of the Puerto Rico Infrastructure Financing Authority accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its special tax revenue bonds. These resources are received from operating transfers from the Puerto Rico Infrastructure Financing Authority Special Revenue Fund.

**(3) *Port of the Americas Authority's Debt Service Fund***

The debt service fund of Port of the Americas Authority is used to account for the financial resources that are restricted for the payment of the long-term debt that remained at PAA after the transfer of its operations to PPA. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

**(4) *Puerto Rico Maritime Shipping Authority Debt Service Fund***

This is the remainder of a former shipping company owned by the Commonwealth. Its debt service fund is used to account for the financial resources that are restricted for the payment of the long-term liability that resulted from the sale of its marine operations. This fund is mainly subsidized by appropriations and operating transfers from the General Fund.

**(5) *Special Communities Perpetual Trust's Debt Service Fund***

The debt service fund of the Special Communities Perpetual Trust accounts for the financial resources that are restricted to expenditure for the payment of interest and principal on its line of credit with the GDB, financed with moneys to be received by the Commonwealth from general legislative appropriations.

348

CW_STAY0010522

**COMMONWEALTH OF PUERTO RICO**

Nonmajor Governmental Funds

Year ended June 30, 2016

**(6)  *The Children's Trust Debt Service Fund***

The debt service fund of The Children's Trust accounts for the financial resources that are restricted, committed, or assigned to expenditure for the payment of interest and principal on long-term obligations financed with moneys to be received by the Commonwealth from the global settlement agreement signed by certain tobacco companies.

**Capital Projects Funds**

Capital project funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not being financed by the Public Buildings Authority's Capital Projects Fund, the Puerto Rico Infrastructure Financing Authority's Capital Project Fund, proprietary fund types, pension trust funds, and discretely presented component units.

**(1)  *Commonwealth of Puerto Rico Capital Project Fund***

These funds present the activities of the capital improvements program of the Commonwealth, financed with the proceeds of the general obligation bonds.

**(2)  *Public Buildings Authority's Capital Projects Fund***

The Public Buildings Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned to expenditure for capital outlays, including the acquisition or construction of capital facilities and other capital assets not financed by proprietary fund types, pension trust funds, and discretely presented component units.

**(3)  *Puerto Rico Infrastructure Financing Authority's Capital Projects Fund***

The Puerto Rico Infrastructure Financing Authority's capital projects fund is used to account for and report financial resources that are restricted, committed, or assigned for the acquisition or construction of capital assets and capital improvements, not financed by proprietary fund types, pension trust funds, and discretely presented component units.

349

CONFIDENTIAL

COMMONWEALTH OF PUERTO RICO

Fiduciary Funds

Year ended June 30, 2016

Fiduciary funds are used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for individuals, organizations, and other governmental units. Following are the Commonwealth's fiduciary funds:

**Pension Trust Funds**

Prior to the enactment of Act No.106 of 2017 on August 23, 2017, the pension trust funds were used to account for the assets, liabilities, and net assets available for pension benefits held in trust for the public employees of the Commonwealth. After August 23, 2017, all pension benefits will be paid from the Primary Government's General Fund (as discussed in Note 23).

**(1) Employees' Retirement System of the Government of the Commonwealth of Puerto Rico (ERS)**

ERS is a cost-sharing multiple-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 447 on May 15, 1951. ERS is sponsored by the Commonwealth, public corporations, and municipalities of Puerto Rico. Substantially all full-time employees of the Commonwealth and its instrumentalities are covered by the ERS. All regular appointed and temporary employees of the Commonwealth become plan members at the date of employment. Prior to August 23, 2017, ERS was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration (the ERS and JRS Administration) that also administered the Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities Medical Insurance Plan Contribution (ERS MIPC). The ERS MIPC is an unfunded, cost-sharing, multi-employer, defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired plan members.

**(2) Puerto Rico System of Annuities and Pensions for Teachers (TRS)**

TRS is a cost-sharing multiple-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Teachers Retirement System and was created by Act No. 91 of March 29, 2004, that superseded Act No. 218 of May 6, 1951. TRS is sponsored by the Commonwealth. All active teachers of the Commonwealth's Department of Education are covered by the TRS. Licensed teachers working in private schools or other educational organizations have the option to become members of TRS as long as the required employer and employee contributions are satisfied. The employees of the TRS are also plan members. Prior to August 23, 2017, TRS was administered by the Puerto Rico Teachers Retirement System (the TRS Administration) that also administered the Puerto Rico System of Annuities and Pensions for Teachers Medical Insurance Plan Contribution (TRS MIPC), an unfunded, cost-sharing, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired teachers of the Department of Education of the Commonwealth and retired employees of the TRS Administration.

356

CW_STAY0010530

COMMONWEALTH OF PUERTO RICO

Fiduciary Funds

Year ended June 30, 2016

**(3) Retirement System for the Judiciary of the Commonwealth of Puerto Rico (JRS)**

JRS is a single-employer defined-benefit pension plan that, prior to August 23, 2017, was administered by the Puerto Rico Government Employees and Judiciary Retirement Systems Administration and was created by Act No. 12 on October 19, 1954. The JRS is sponsored by the Commonwealth. All judges of the judiciary branch of the Commonwealth are plan members. The JRS provides retirement benefits to the employees of the judiciary branch of the Commonwealth through the office of the Administration of Court Facilities. Prior to August 23, 2017, JRS was administered by the ERS and JRS Administration that also administered the Retirement System for the Judiciary of the Commonwealth of Puerto Rico Medical Insurance Plan Contribution (JRS MIPC), an unfunded, single-employer defined-benefit other postemployment healthcare benefit plan provided by the Commonwealth to retired judges of the Judiciary Branch of the Commonwealth.

**Agency Fund**

Agency fund is used to account for assets held by the Commonwealth as an agent for individuals, private organizations, and other governments. This fund is custodial in nature (assets equal liabilities) and does not involve measurement of the results of operations.

**Special Deposits**

This fund acts in a fiduciary capacity in order to account for moneys received with specified purposes for which the law does not specify its recording in any other fund. It mainly includes deposits under the custody of the courts of justice for alimony payments, escrows, revenue collections, and agency accounts for which the Commonwealth act in an agent's capacity.

357

CW_STAY0010531