```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF PUERTO RICO

 3
     In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,               )      (Jointly Administered)
                               )
 7   as representative of       )
                               )
 8   The Commonwealth of        )
     Puerto Rico and the        )
 9   Puerto Rico Electric       )
     Power Authority,           )      June 3, 2020
10                             )
              Debtors,         )
11
     _____
12
13   In Re:                    )      Docket No. 3:17-BK-4780(LTS)
                               )
14                             )      PROMESA Title III
     The Financial Oversight and )
15   Management Board for       )
     Puerto Rico,               )      (Jointly Administered)
16                             )
     as representative of       )
17                             )
     The Puerto Rico Electric   )
18   Power Authority,           )
                               )
19            Debtor,          )

20   _____

21

22

23

24

25
```

```
 1  _____

 2  In Re:                    )         Docket No. 3:17-BK-3567(LTS)
                              )
 3                            )         PROMESA Title III
    The Financial Oversight and )
 4  Management Board for       )
    Puerto Rico,               )         (Jointly Administered)
 5                            )
    as representative of       )
 6                            )
    The Puerto Rico Highways   )
 7  and Transportation         )
    Authority,                 )
 8                            )
              Debtor,         )
 9
10  _____

11                      OMNIBUS HEARING

12    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13              UNITED STATES DISTRICT COURT JUDGE

14    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

15              UNITED STATES DISTRICT COURT JUDGE

16  _____

17  APPEARANCES:

18  ALL PARTIES APPEARING TELEPHONICALLY

19  For The Commonwealth
    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
20                           Mr. Brian S. Rosen, PHV
                             Ms. Hadassa R. Waxman, PHV
21                           Mr. Michael A. Firestein, PHV
                             Mr. Paul Possinger, PHV
22
    For the Official
23  Committee of Unsecured
    Creditors:               Mr. Luc A. Despins, PHV
24

25
```

```
 1    APPEARANCES, Continued:

 2    For the Puerto Rico
      Fiscal Agency and
 3    Financial Advisory
      Authority:              Mr. Peter Friedman, PHV
 4                            Mr. Luis C. Marini Biaggi, Esq.
                              Mr. John J. Rapisardi, PHV
 5
      For Union de
 6    Trabajadores de la
      Industria Electrica
 7    y Riego, Inc.:          Ms. Jessica E. Mendez Colberg, Esq.

 8    For Puerto Rico
      Electric Power
 9    Authority:              Mr. Joseph P. Davis, III, PHV
                              Mr. Kelly Malone, PHV
10
      For Cobra Acquisition,
11    LLC:                    Mr. Abid Qureshi, PHV

12    For Ambac Assurance
      Corporation:            Mr. Andrew K. Glenn, PHV
13
      For Windmar Renewable
14    Energy, Inc.:           Mr. Fernando E. Agrait, Esq.

15    For Autopistas
      Metropolitanas de
16    Puerto Rico:            Mr. Keith Martorana, PHV

17    For EcoElectrica, L.P.: Mr. Frederic Sosnick, PHV

18    For Environmental
      Advocacy Group:         Mr. William Santiago Sastre, Esq.
19

20

21

22

23

24
      Proceedings recorded by stenography.  Transcript produced by
25    CAT.
```

```
 1                          I N D E X

 2   WITNESSES:                                        PAGE

 3        None offered.

 4

 5   EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    June 3, 2020

 3                                    At or about 9:36 AM

 4                          *     *     *

 5          THE COURT:  Buenos dias.  Judge Swain here.

 6          Ms. Tacoronte, would you please call the case?

 7          COURTROOM DEPUTY:  Absolutely, Your Honor.  Good

 8   morning.

 9          Bankruptcy case 2017-3283, *In Re:  The Financial*

10   *Oversight and Management Board for Puerto Rico as*

11   *representative of the Commonwealth of Puerto Rico, et. al.*

12          THE COURT:  Again, good morning.  This is Judge Swain

13   presiding, and Magistrate Judge Dein is also present.

14          Welcome counsel, parties in interest and members of

15   the public and press.  Today's telephonic Omnibus Hearing is

16   once again occurring against a backdrop of circumstances that

17   have been extremely challenging for all participants.  Our

18   thoughts remain with all of the people on the island and on

19   the mainland who have been affected directly and indirectly by

20   the coronavirus pandemic, and are also with those in cities

21   where issues of speech, human dignity and public order are the

22   focus of tension.

23          We hope for success in resolving the public crises

24   and safety as the ongoing lockdown restrictions are eventually

25   lifted.  We look forward to the time when we will be able to
```

1   travel safely to Puerto Rico again, and eventually to a

2   successful conclusion of these Title III proceedings.

3           To ensure the orderly operation of today's telephonic

4   hearing, all parties on the line must mute their phones when

5   they are not speaking.  Please be sure to select mute on the

6   Court Solutions dashboard if you are accessing these

7   proceedings on a computer.

8           I remind everyone that consistent with court and

9   judicial conference policies and the Orders that have been

10  issued, no recording -- I think there's someone who's not

11  muted.  So if you're not sure, mute yourself, please.  Thank

12  you.

13          No recording or retransmission of the hearing is

14  permitted by any person, including but not limited to the

15  parties, members of the public, or the press.  Violations of

16  this rule may be punished with sanctions.

17          I will be calling on each speaker during these

18  proceedings.  When I do, please identify yourself by name for

19  clarity of the record.  After the speakers listed on today's

20  Agenda for each of today's matters has spoken, I may provide

21  an opportunity for other parties in interest to address

22  briefly any issues raised during the course of the discussion

23  that require further remarks.  If you wish to be heard under

24  these circumstances, please state your name clearly at the

25  appropriate time.  I will call on the speakers if more than

1    one person wishes to be heard.

2          Please do not interrupt each other or me during this

3    hearing.  If we interrupt each other, it is difficult to

4    create an accurate transcript of the proceedings.  Having said

5    that, I apologize in advance for breaking this rule, as I may

6    interrupt if I have questions, or if you go beyond your

7    allotted time.  However, if anyone has difficulty hearing me

8    or another participant, please say something immediately.

9          The time allotments for each matter, and the time

10   allocations for each speaker, are set forth in the Agenda that

11   was filed by the Oversight Board on Monday, June 1st.  The

12   Agenda, which was filed as docket entry 13305 in case 17-3283,

13   is available to the public at no cost on Prime Clerk for those

14   interested.

15         I encourage each speaker to keep track of his or her

16   own time.  The Court will also be keeping track of the time

17   and will alert each speaker when there are two minutes

18   remaining with one buzz, and when time is up, with two buzzes.

19   Here is an example of the buzz sound that you will hear.

20         (Sound played.)

21         THE COURT:  If your allocation is two minutes or

22   less, you will just hear the final double buzz.

23         If we need to take a break, I will direct everyone to

24   disconnect and dial back in at a specified time.  This

25   morning, our timing is from 9:30 to noon, and we'll pick up

1    again from 1:00 to 5:00 if that is necessary.

2         The first Agenda item is, as usual, status reports

3    from the Oversight Board and AAFAF.  As I requested in the

4    Procedures Order, these reports have been made in writing in

5    advance of this telephonic hearing and are available on the

6    public docket at docket entries 13337 and 13353 in case number

7    17-3283.

8         I thank the Oversight Board and AAFAF for the care

9    and detail reflected in the reports.  I find them quite

10   comprehensive.  I do have one additional question for counsel

11   to the Oversight Board, which I will pose after the Oversight

12   Board's counsel introduces himself and makes any further

13   remarks that he wishes to make.

14        Mr. Bienenstock or Mr. Rosen?

15        MR. BIENENSTOCK:  Good morning, Your Honor.  This is

16   Martin Bienenstock.

17        We didn't have any additional comments, so, happy to

18   take whatever questions the Court has.

19        MR. ROSEN:  Yes.  Your Honor, this is Brian Rosen.

20        Subsequent to the filing of the status report, we

21   heard from chambers that you were interested in additional

22   information regarding the ACR, ADR processes, as well as the

23   claims.  If you'd like, I can address those points.

24        THE COURT:  Yes.  That is the additional question.

25        MR. ROSEN:  If you don't mind, Your Honor, I'll go

1    back over some older territory just to bring it up to speed

2    with respect to the claims process.

3              THE COURT:  Yes.

4              MR. ROSEN:  Your Honor, as you know, there were

5    approximately 177,000 claims filed in the approximate amount

6    of 43.6 trillion dollars of asserted liabilities.  So far,

7    claims expunged are approximately 35,000, relating to

8    approximately 43 trillion of those liabilities.  There have

9    been additionally 9,000 claims withdrawn, representing 174

10   billion dollars.

11             And there are claims on omnibus objections that are

12   pending before the Court of approximately 56,000, for an

13   additional four and a half billion dollars of liabilities.

14   Those are either subject to objections that have not been

15   heard yet by the Court, or orders that have not been entered,

16   or, as the Court is well aware, we did push some off several

17   times due to people claiming that they needed additional

18   notice.  Those are all slated to be heard at the July 29th

19   Omnibus Hearing, and we are intending to file additional

20   omnibus objections between now and that time so that they will

21   also be on the calendar for that date.

22             So that leads, Your Honor, to claims for -- I'm

23   sorry.

24             THE COURT:  Mr. Rosen, may I just say one thing?  In

25   scheduling and in adjourning certain of these omnibus

1  objections, you are paying close attention to the degree to

2  which government offices that may be relevant to someone's

3  ability to respond properly to the claim are still in shutdown

4  or reduced mode on the island?

5       MR. ROSEN:  We are, Your Honor.  And that actually

6  impacts the next thing I'm about to talk about, which is the

7  ACR and the ADR processes.  We're very cognizant of that, and

8  we've been working very closely with the Department of

9  Justice, AAFAF, and other agencies in trying to compile

10  information, as well as being responsive to some of the

11  concerns or questions that individual claimants or creditors

12  might have.

13       Your Honor, we, at this point, believe that there are

14  approximately 11,000 claims that will be slated for the ADR

15  process, the alternative dispute resolution, and approximately

16  49,000 which will go to the ACR process.  I say 49,000, Your

17  Honor, but that may actually come down as we continue to look

18  at some of those claims.  Many of them, we're now finding out,

19  are actually claims that have already been satisfied, paid by

20  the government.  So they will come out of the ACR process, and

21  they will be the subject of an omnibus objection as already

22  deemed satisfied.

23       On the ADR process itself, Your Honor, and in taking

24  the cue from the Court for both the ACR and the ADR, we are

25  anticipating that, of those 11,000 slated for ADR, very few

1    will be done initially.  We have a current obligation to file

2    a notice with the Court on July 10, which will list the first

3    claims which will go into the ADR process.

4         Because the government has been on shutdown, Your

5    Honor, and is not scheduled to open at this point until June

6    15, we've been somewhat hamstrung in collecting all the

7    necessary information to put together a big slate of claims to

8    go into that ADR process.  So we're going to test it, as you

9    suggested.  We'll do a test run, and we will have just a few

10   claims put into the ADR at the outset.

11        We have also been -- Ms. Stafford and I have been

12   taking bids -- excuse me.  I shouldn't say just us.  The

13   Oversight Board has been taking bids from arbitration

14   providers.  We've been collecting those and doing an analysis

15   to determine which of those or which of that provider should

16   be the arbitration servicer here for this process.

17        We will bring in, as we collect that information, we

18   will discuss those proposals with interested parties,

19   including the Unsecured Creditors Committee.  And we

20   anticipate and hope to file an informative motion with the

21   Court regarding that selection as soon as possible.  We think

22   it will probably be, Your Honor, by the end of the month of

23   June.

24        With respect to the ACR process, Your Honor, again,

25   that is -- a first slate is due to be filed with the court on

 1   July 10th.  We are working closely with AAFAF, ERS, and the

 2   other Commonwealth agencies to review and reconcile those

 3   which are suitable for the ACR process.  And in that regard,

 4   letters have been going out to the various agencies to collect

 5   the information, and we're doing our best to set up that

 6   mechanism that is in the ACR Approval Order, so that there

 7   will be claims done on a relatively short time frame and we

 8   will know exactly which claims have been resolved.  And we can

 9   report those back to the Court as expeditiously as possible

10   after that in accordance with the procedures.

11            Your Honor, unless you have any additional questions,

12   I think that would be it for the claims and the ACR and the

13   ADR.

14            THE COURT:  Thank you very much.  I do appreciate

15   that comprehensive and concise update.  And I'm also glad to

16   hear that the first tranche going into ADR will be a

17   relatively small test run, as we are still in the process of

18   setting up the evaluative mediation mechanism, and it will be

19   helpful to be able to see how a small group makes its way

20   through the process in the first instance.

21            MR. ROSEN:  Your Honor, if I could add just one other

22   thing to bring to the Court's attention.  As you know, we have

23   periodically asked the Court to extend the period or the bar

24   date for the PBA claims, as well as the submission of benefit

25   information with respect to ERS.  While lobbies or business

1   lobbies are now open in Puerto Rico, the collection centers

2   have not truly been up and running, and we have not been

3   collecting what we thought would be the universe of claims

4   that we expected.

5        So we are going to file an informative motion with

6   the court, Your Honor, seeking to extend both the bar date and

7   that ERS submission date, just to allow an additional time

8   period.  As I said, June 15 is the current date when the

9   Governor is hopeful -- going to open it up or reduce the

10  lockdown in Puerto Rico.  We'll know much more.  So we're

11  going to hold off on filing that informative motion until we

12  hear from the Governor, Your Honor, but we will be asking for

13  an extension of those periods.

14       THE COURT:  Very well.  And so since that's a motion

15  that will be requesting Court action, you'll do it as an

16  urgent motion rather than an informative motion?

17       MR. ROSEN:  Probably so, Your Honor.  That's correct.

18  Sorry for that misstatement.

19       THE COURT:  Yes.  We try to keep track and act on

20  things that are clearly labeled as requesting action and do

21  that most quickly.  And of course we read the informative

22  motions as well, but it is very helpful when everyone complies

23  with the CMO and the local rule and labels something that is

24  requesting Court action as a motion or, if necessary, an

25  urgent motion rather than an informative motion.

1          So thank you for your patience with my housekeeping

2    note there.

3          MR. ROSEN:  No problem.  Thank you very much, Your

4    Honor.

5          THE COURT:  Thank you, Mr. Rosen.

6          I also would note that last night, San Juan filed an

7    informative motion asking to be involved in the Law 29

8    discussions.  So I ask the parties to those discussions to be

9    mindful of San Juan's request for direct contact as the

10   discussions continue.

11         I understand from an informative filing last night

12   that Mr. Despins wished to be heard in connection with the

13   Oversight Board's report.  Mr. Despin, would you like to make

14   your remarks now?

15         MR. DESPINS:  Yes.  Good morning, Your Honor.  Thank

16   you.

17         THE COURT:  Good morning.

18         MR. DESPINS:  This will be brief.  Your Honor, the

19   Committee is concerned about the lack of clarity with respect

20   to the status of the PSA in the Commonwealth case.  And I want

21   to be clear, this is not about the Committee being critical,

22   because we are not critical of the Board on that point, of the

23   Board taking its time to review the effects of COVID-19 on the

24   Puerto Rico economy.  That's perfectly appropriate.

25         But it is clear, I think, at this time that there is

1   no PSA settlement.  Just to take the remarks of Professor

2   Skeel at the last public conference of the Board, he said that

3   the PSA provides a good framework to start a discussion

4   regarding a plan.  So -- and despite the Board's efforts to

5   not go there, and I understand why they want to -- want to go

6   there -- and by the way, I would do the same if I were in

7   their shoes -- I think we have to be clear that there is no

8   such settlement.

9        And in that context, Your Honor, we're not asking for

10  any relief today, but clearly your March 10th Order was based

11  on -- the March 10th Order imposing a stay regarding the

12  objection that we had filed on February 3rd, on the priority

13  of the GO bonds, that Stay Order was based entirely on the

14  existence of a plan settlement and the fact that these issues

15  would be resolved through a plan.

16       And that one day may be the case, but today, and for

17  the foreseeable future, that is not the case.  And the

18  Committee believes that this issue, which is a very narrow

19  issue of law, the issue being the priority of the GO bonds,

20  needs to go forward.  And again, as I said, we're not asking

21  for a ruling from the Court today.  That would not be the

22  proper procedural vehicle to do so.  But we believe that there

23  should be clarity on the issue of, is there a settlement at

24  this point or not.  And I think it's like the elephant in the

25  room.  I think it's clear to everyone, but the issue needs to

1   be addressed.

2          And, Your Honor, I also have a procedural question

3   relating to that, relating to the hearing tomorrow.  Last

4   night there was an informative -- and you'll tell me if you

5   want to take that in that order or not.  But last night there

6   was an informative motion filed by the -- by a group of -- I

7   think it's called the LCDC, saying that the Court -- that they

8   had reached an agreement with the Board that tomorrow the

9   Board would not be seeking -- I'm quoting now -- any rulings

10  regarding preemption of the constitutional priority for

11  constitutional debt currently proposed to be compromised

12  pursuant to the Plan of Adjustment.

13         So literally those words are, okay, meaning that the

14  Board is still arguing preemption, but -- and that's the

15  clarification we're seeking -- but not with respect to GO

16  bonds, because the instruments we're dealing with tomorrow are

17  not GO bonds.  If that's the case, then we have nothing to

18  say.  We're okay with that, and the hearing should proceed as

19  planned.  But if the Board is saying, and I don't think that's

20  what they're saying, if the Board is saying that they're not

21  pursuing preemption at all, we need to know that, because the

22  hearing -- we would need more time to pick up the mantle on

23  that point.

24         We've had an exchange of e-mails just before this

25  call, and I believe that what I stated is accurate, meaning

1    that the Board is not abandoning the preemption argument.

2    It's just the Board is just clarifying that it's not seeking a

3    preemption argument with respect to GO bonds, but I think we

4    should clarify that today so that there's no confusion as to

5    what happens tomorrow.

6            So these are the two points I want to make.  Sorry

7    that it took longer than I thought.  Thank you, Your Honor.

8            THE COURT:  Thank you, Mr. Despins.

9            Mr. Bienenstock, would you like to respond?

10           MR. BIENENSTOCK:  Yes.  Thank you, Your Honor.  And

11   good morning again.

12           THE COURT:  Good morning.

13           MR. BIENENSTOCK:  Mr. Despins and I spoke yesterday,

14   so what I'm saying is probably not news to him, but I think

15   it's important for the record.  We do not believe, the Board

16   does not believe that COVID-19 is a legally cognizable ground

17   to provide the Committee control over a claim objection.

18           Additionally, as is evident from the Proposed Plan of

19   Adjustment on file, the settlement of the GO priority claim is

20   a central --

21           MS. SELDEN:  Excuse me.

22           THE COURT:  Just one moment.

23           MS. SELDEN:  Judge, I'm sorry to interrupt, but the

24   AT&T line dropped.

25           THE COURT:  All right.  Thank you.

1              So we will have to wait until the AT&T line is

2   restored.  So let's be quiet.

3              MS. NG:  Hi.  Can anybody hear me?

4              THE COURT:  I can hear you.

5              MS. NG:  Judge, are you there?  I don't know what

6   happened.  Everything just -- I don't know.  I got

7   disconnected from everything.

8              THE COURT:  All right.  Ms. Ng, you're back.

9              MS. NG:  I'm back.

10             THE COURT:  Is the AT&T line back?

11             MS. NG:  It is, Your Honor.  The AT&T line is fine.

12             THE COURT:  So we can proceed?  The press and public

13  line --

14             MS. NG:  Yes.  If you could give it a second so

15  everyone can log back in.

16             THE COURT:  Is that what all the beeping is?

17             MS. NG:  Yes.  That's all the beeping.

18             THE COURT:  Okay.  That was only like four or five

19  beeps.  So tell us when you see enough log-ins where you think

20  we can go forward.

21             MS. NG:  Okay.  I just want to make sure.  Can Carmen

22  or Amy hear me?

23             COURTROOM DEPUTY:  Yes, Lisa.  Thank you.

24             MS. NG:  Okay.  Okay.  Can any of the attorneys just

25  let me know that you can hear me?

1          UNIDENTIFIED PERSON:  We can hear you.

2          MS. NG:  Okay.  Let me just check with somebody who's

3     on the AT&T line.  I just want to make sure everything is

4     okay.

5          Okay.  Judge?

6          THE COURT:  Yes, Ms. Ng.

7          MS. NG:  I think we are all good.  The AT&T line can

8     hear us and the attorneys can hear us.  Okay.

9          THE COURT:  Very good.

10         Welcome back, everyone.  We had a technical

11    difficulty, but I understand that both the attorney lines and

12    the public lines are functioning again now.

13         And so, Mr. Bienenstock, would you resume with

14    explaining your response to Mr. Despins' remarks?

15         MR. BIENENSTOCK:  Yes, Your Honor.  And thank you.

16         As I stated, the short answer is that we do not

17    believe that COVID-19 is a legally cognizable ground to

18    provide the statutory committee control of the dispute over

19    the priority of the GO claims.  Mr. Despins referred to

20    Professor Skeel's statement at the last public hearing.

21    Professor Skeel also reaffirmed the Board's wanting to go

22    forward with a debt restructuring.  And to accomplish that,

23    we -- as I think the Court may recall, the Board had to

24    certify a new fiscal plan when it did, because by July 1, it

25    needs a new budget for the coming fiscal year that starts

1   July 1.

2         And so to provide the Commonwealth enough time to

3   propose a budget under the timetables and schedules in

4   PROMESA, the fiscal plan had to be certified when it was last

5   week.  That, in turn, was a certification without the Board or

6   anyone, for that matter, having enough data to know the crux

7   of the ultimate impact of COVID-19 on the economy of Puerto

8   Rico.  And as the Board has always said, it changes its fiscal

9   plan either when it finds it made an error, or when there's

10  new evidence on a material issue, new information, it adjusts

11  it.

12        So as evident from the Proposed Plan of Adjustment on

13  file, settlement of the GO priority claim is a very important

14  component of the settlement.  And there's no reason to believe

15  that even if the settlement is changed in light of the impact

16  of COVID-19, that that would not remain a primary focal point

17  or component of the settlement.  So the last thing the Board

18  would want is for such an important issue in the settlement to

19  be highjacked and litigated when it may never have to be

20  litigated.

21        So, you know, right now, as Mr. Despins said, there's

22  nothing on file.  We are not about to declare the PSA over,

23  even if the likelihood is that it has to be adjusted.  All --

24  virtually every proposed plan in a Chapter 11 or a Chapter 9

25  or now in a Title III case, prior to the disclosure statement,

1    and sometimes after the disclosure statement and before

2    confirmation gets amended.  That's not a reason, in our view,

3    to take away from the Oversight Board and the main parties to

4    the settlement the power over resolving the GO priority issue.

5         As to Mr. Despins' question about tomorrow, we -- to

6    my knowledge, I've been pretty intimately involved with the

7    stay relief pleadings, we've never requested, as part of that

8    relief, a ruling on the preemption of the GO priority claim,

9    and we're not going to change that position now.  As the Court

10   knows, and all the litigants know, preemption is a very

11   important component of that hearing.  But it's not preemption

12   of the GO priority claim.  It's preemption of prePROMESA

13   appropriations and things of that nature.

14        So I don't think, at least in our --

15        THE COURT:  I'm sorry, Mr. Bienenstock.  You're not

16   planning to press the -- what has been referred to as the

17   Title III preemption aspect of your preemption argument in

18   this Lift Stay Motion practice, only the Title II budget

19   appropriation oriented aspect of the preemption argument?

20        MR. BIENENSTOCK:  Well, I'll -- let me state what we

21   will urge.  We're definitely urging the Title II preemption.

22   In terms of what Your Honor just referred to as the Title III

23   preemption, I'll -- we did make the argument, and I'll --

24   we'll continue with it, that to the extent the obligation of

25   the Commonwealth, if it is a legal obligation, and I don't

 1   want to argue tomorrow today, but to the extent there is,

 2   if --

 3          THE COURT:  Those are --

 4          MR. BIENENSTOCK:   But to the extent there is an

 5   obligation of the Commonwealth to transfer or appropriate

 6   money to instrumentalities, such as PRIFA and the like, what

 7   are known as the clawback entities, we would -- we have argued

 8   and we will continue to argue that that obligation is not a

 9   priority claim.  And to the extent someone argues that under

10   Puerto Rico law it is a priority claim, we would say that that

11   is preempted by Title III.

12          I don't think that really is what Mr. Despins was

13   getting at, but I'm grateful for the Court for raising that

14   nuance, and hopefully I clarified what we are saying and what

15   we are not saying for tomorrow.

16          THE COURT:  So that argument is focused on clawback

17   entities as opposed to the GOs?

18          MR. BIENENSTOCK:  That's correct, Your Honor.

19          THE COURT:  Thank you for that clarification.

20          MR. DESPINS:  But to be clear, Your Honor -- this is

21   Luc Despins -- I was not -- I've never argued that they were,

22   in that proceeding, arguing the preemption against the GO

23   bonds.  I just want to make sure that the Title III preemption

24   argument would still be made, and I think we just got that

25   confirmation, so that issue is resolved.

1          THE COURT:  Thank you.

2          MR. ROSEN:  Your Honor, it's Brian Rosen.  If I could

3  just add one thing to what Mr. Bienenstock said.

4          The PSA has certain milestones in it.  None of those

5  milestones have been passed at this point.  We continue to

6  work with the PSA creditors and with Judge Houser as the Court

7  appointed mediator to address any issues associated with

8  timing and any further discussions that we're going to have on

9  the PSA.

10          As Mr. Bienenstock said, we have not -- no one has

11  taken any action to terminate the PSA, and we're continuing to

12  talk with all parties in light of what has occurred on the

13  island.

14          THE COURT:  And you do have a date for a further

15  status report set by Court Order, correct?

16          MR. ROSEN:  That is correct, Your Honor.  July 15.

17          THE COURT:  Thank you.  Thank you.

18          I will now turn to the status report, or any further

19  comments of AAFAF.  Mr. Rapisardi?

20          MR. FRIEDMAN:  Your Honor, it's Peter Friedman.

21  AAFAF has no further comment with respect to the status

22  report.  And we appreciate your recognizing that detail.  If

23  there are any specific questions, I think Mr. Marini may also

24  be able to answer them on the operations of the Puerto Rico

25  Government.

 1              THE COURT:  Thank you, Mr. Friedman.  As I noted, I

 2     found your report quite clear and comprehensive, and so I have

 3     no further questions of you.

 4              Do any other counsel who are on speaking lines have

 5     questions or comments that they wish to make in connection

 6     with the status report?  Just state your name if you want to

 7     be called on.

 8              (No response.)

 9              THE COURT:  All right then.  It appears that there

10     are no other questions.

11              Again, my thanks for the status reports and for the

12     conversation between the Oversight Board's representative and

13     the UCC's representative that helped to clarify further the

14     status of certain matters.

15              And so we will now turn to Item II on the Agenda,

16     which is contested matters.  The first of which is the Status

17     Conference on Cobra Acquisition's Motion for Allowance and

18     Payment of Administrative Expense Claims.  And I have a time

19     allocation of five minutes for Mr. Qureshi, representing

20     Cobra, to start.  Mr. Qureshi.

21              MR. QURESHI:  Thank you, Your Honor.  Good morning.

22     For the record, Abid Qureshi, along with my partner, Tom

23     McLish, from Akin, Gump, Strauss, Hauer & Feld, on behalf of

24     Cobra.

25              Your Honor, my plea to the Court this morning is

1    grounded in what we view to be basic considerations of

2    fairness and of equity.  As Your Honor knows, Cobra believes

3    that it is owed in excess of 250 million dollars, a little

4    more than 60 million of which is on account of taxes that

5    Cobra paid to Puerto Rico and that we believe PREPA is

6    contractually obligated to reimburse us for.

7         The delay in these proceedings, Your Honor, is

8    extremely harmful to Cobra and to Cobra's employees, but we

9    submit also to all of PREPA's creditors.  And, Your Honor,

10   that is because each month that Cobra's claim remains

11   outstanding puts the PREPA estate at risk for additional

12   interest liability in the approximate amount of two million

13   dollars per month, which of course we think greatly exceeds

14   the cost of litigating the dispute.

15        Your Honor, we have been waiting for many months to

16   have the opportunity to move this dispute forward and at least

17   to get closer to final resolution by this Court.  And the two

18   events that the debtors have continued to use to justify the

19   continued delay are the pending criminal proceedings that

20   involve Cobra's former president and former FEMA officials, as

21   well as FEMA's ongoing analysis of Cobra's contract.  And,

22   Your Honor, those two events simply have no end in site.

23        As we now know, the criminal trial has been delayed

24   until January of 2021.  And of course nobody will be able to

25   say now whether that will, in fact, proceed on that date or

1   might be further delayed.

2         And as to the FEMA review process, which to be clear,

3   we don't believe there's any relevance here, but in any event,

4   Your Honor, the last guidance that Cobra is aware of is that

5   FEMA was to complete that process by May 29.  May 29 has come

6   and gone, and as far as Cobra is aware, that process is

7   neither complete, nor has FEMA provided any further guidance

8   as to how much longer it will be outstanding.  And, therefore,

9   Your Honor, we think that certain steps could be taken now to

10  at least start to get this dispute ready for trial.

11        One, we could begin the discovery process with

12  respect to the factual issues that have been raised by both

13  parties.  Clearly it will take some time to get the matter

14  ready for trial.  We don't see any prejudice to any parties in

15  getting that process going now.

16        And the second thing, Your Honor, that we could do in

17  addition to or as an alternative to the first is brief what we

18  think is a legal issue with respect to whether the services

19  that were provided by Cobra are actually and necessary costs

20  and expenses of preserving the PREPA estate.  While we

21  understand there will be factual disputes that require

22  discovery with respect to the precise amount of those

23  invoices, we certainly think that legal issue could be

24  advanced now.

25        So in conclusion, Your Honor, we believe that basic

1    principles of fairness and equity require that we be permitted

2    to at least make some progress towards our day in court and to

3    get the process going.  We don't think that continued delay at

4    this point serves any purpose of the PREPA estate.  To the

5    contrary, it just exposes PREPA to needless potential

6    additional expense.

7            I'm happy, of course, to answer any questions the

8    Court may have.  Thank you, Your Honor.

9            THE COURT:  Thank you.  I have no questions for you

10   at this point.  And so I will turn to the Oversight Board's

11   representative.

12           MS. WAXMAN:  Good morning, Your Honor.  Hadassa

13   Waxman --

14           MR. DAVIS:  Good morning.

15           THE COURT:  So who is going to speak?

16           MR. DAVIS:  Hadassa will.

17           MS. WAXMAN:  Good morning, Your Honor.  I just wanted

18   to introduce myself and to say good morning to Your Honor.

19   Hadassa Waxman on behalf of the Oversight Board.  My colleague

20   is going to address the issue, if that's okay.

21           THE COURT:  That's fine.  So good morning, Ms.

22   Waxman.  And is it Mr. Davis?

23           MR. DAVIS:  Yes, Your Honor.  Good morning.  How are

24   you?

25           THE COURT:  Very well.  Could you state your full

1    name for the record, please?

2        MR. DAVIS:  Joseph Davis of Greenberg Traurig for

3    PREPA, and in this capacity, the government parties.

4        Your Honor, thank you for giving us some time this

5    morning to address this.  As Your Honor put in the recent

6    order denying the most recent motion from Cobra, the issues

7    involved in this dispute are intertwined with the proceedings

8    that will be addressed in the criminal trial in January, and

9    also have a bearing on the reasonable cost analysis that FEMA

10   is in the process of completing or is -- that's our

11   understanding.

12       The original date -- let me start with that latter

13   point.  As Mr. Qureshi is absolutely correct, we have not

14   heard yet from FEMA as to the status of that reasonable cost

15   analysis.  It had an estimated completion date of May 29.  We

16   have been assured that they were going to meet that deadline,

17   but for reasons unknown to us, it was not met, and we are

18   still awaiting FEMA's determination as to the reasonable cost

19   analysis of the Cobra contracts.

20       I would expect that to be happening soon, but we

21   don't control that process.  FEMA does.  In light of the

22   criminal trial date, though, I don't believe that the May 29

23   deadline is as important as it might otherwise be.  The real

24   driving force here, of course, is the deadline or the

25   commencement date of the criminal proceedings in January.

1            In terms of the issues here, Mr. Qureshi made a

2   couple suggestions.  One is to start discovery now.  Given the

3   costs that are going to be associated with starting discovery

4   and the issues that are ultimately going to be tried --

5            THE COURT:  Please.  Hold on just one minute, please,

6   Mr. Davis.

7            Ms. Ng, I think I heard another, like a drop tone.

8   Is everything all right with the AT&T line?

9            MS. NG:  Judge, yes.  Everything's fine so far.  Just

10  give me one second and let me check with one of the people

11  that are on.  Hold on.

12           Judge, can you hear me?

13           THE COURT:  Yes, I can hear you.

14           MS. NG:  Yes.  The AT&T line is good so far.

15           THE COURT:  Okay.  That's fine.  I thought I was

16  hearing a couple of lines, a couple of noises.  So we'll

17  continue.

18           Sorry for the interruption, Mr. Davis.  Please

19  proceed.

20           MR. DAVIS:  Oh, not a problem, Your Honor.  We're all

21  learning on the fly here as to how the new world of virtual

22  courts operate.

23           As in terms of the discovery process, Your Honor,

24  discovery is obviously going to be expensive.  This is a

25  detailed analysis of some 200 invoices.  It's not going to be

1    done -- there is no broad, sweeping mechanism for addressing

2    issues.  This is, in essence, a form of construction

3    litigation, which by its nature gets somewhat granular, and

4    that's what would happen here.

5         To conduct that discovery, we would have to be

6    dealing with government parties that are currently, as you

7    know, on lockdown, to track down documents and witnesses that

8    are currently largely not working at their offices and are

9    focused on other issues having to do with overall power

10   restoration and power provision under these circumstances.

11   Given the importance of the upcoming criminal trial in

12   January, many of these issues will be dealt with in that, and

13   a more appropriate time to do this is after that point.

14        As for his other comment, which is we should be

15   briefing something now, again, since the briefing is going to

16   be tied into a factual inquiry, and the factual inquiry is not

17   being conducted right now, we don't really see any benefit to

18   having further briefing in advance of discovery.

19        We hear their concern that somehow they're entitled

20   to interest, but they have to first prove they first have a

21   claim before they get to their concerns of interest, and the

22   interest concerns are, frankly, those of the estate, which is

23   to say the government parties, as opposed to a creditor.

24        So, Your Honor, I'm happy to answer any questions

25   that you have, but those are really the key points that I

1 | wanted to address.

2 | THE COURT:  So I think I heard implicitly in your

3 | last statement that the government parties are aware of the

4 | theoretical exposure, financial exposure point that Mr. Davis

5 | has made, and have taken the judgment that that is a risk that

6 | is appropriate for PREPA to take at this stage?

7 | MR. DAVIS:  Yes, Your Honor.

8 | THE COURT:  All right.  Mr. Qureshi, anything

9 | further?

10 | MR. QURESHI:  Your Honor, the only thing I would add

11 | is that to the extent the Court does not allow us to proceed

12 | now, and to the extent that ruling is on account of the

13 | COVID-19 situation and lockdown with respect to the various

14 | government parties and others, we would just ask for another

15 | early status conference in the very near future so we can

16 | address again whether at that point it would be appropriate

17 | for discovery to proceed, again to the extent Your Honor is

18 | not inclined to allow us to proceed today.

19 | Thank you, Your Honor.

20 | THE COURT:  Thank you.

21 | For the reasons that I stated in my recent Order, and

22 | because of the practical considerations relating to COVID-19,

23 | and the still outstanding outcomes of the FEMA investigation

24 | and the criminal prosecution, I am going to maintain the stay

25 | in place.

1          I know that it is very problematic for Cobra.  I have

2    been told today that PREPA has done its risk assessment as

3    well and has made its judgment that it is still not in the

4    interests of PREPA to proceed with discovery or further

5    litigation at this time given the issues that PREPA

6    anticipates raising with respect to underlying liability and,

7    to the extent there is liability, with respect to the

8    propriety of administrative expense priority.  But PREPA has

9    acknowledged that after the criminal charges have been

10   resolved, it may be in a position productively to pursue

11   discovery.

12         And so the stay will remain in effect.  I will enter

13   an order to that effect, and also directing the Oversight

14   Board to file an informative motion as to the status of the

15   FEMA investigation and the status of the criminal case one

16   week before the December 2020 Omni.

17         So, Mr. Davis, you'll be getting your marching orders

18   in that regard in writing, but do you understand that

19   obligation?

20              MR. DAVIS:  Yes, Your Honor.  Thank you.

21              THE COURT:  Thank you very much.  And thank you

22   both.

23         We now turn to Item Two of the contested matters,

24   which is the Oversight Board's motion to direct Ambac to

25   withdraw its complaint against Metropistas, which is pending

1    in the District Court.  That is docket entry number 12569 in

2    case 17-3283 and docket entry 756 in case 17-3567.

3            I have as the first speaker, for 14 minutes,

4    Mr. Firestein for the Oversight Board.

5            MR. FIRESTEIN:  Good morning, Your Honor.  It's

6    Michael Firestein.  I will be -- I'm not Mr. Barack.  Can you

7    hear me?

8            THE COURT:  Yes, I can.  Good morning, Mr. Firestein.

9    Do you want to reserve time for rebuttal?

10           MR. FIRESTEIN:  I did, Your Honor.  I think in the

11   Agenda, we had reserved five minutes for me to close it out

12   after potential Metropistas observations before that.

13           THE COURT:  Actually, I'm not sure whether I have

14   this right.  I actually have you down for 14 minutes to start,

15   and then 14 minutes to come back with rebuttal after three and

16   a half minutes from Metropistas.

17           MR. FIRESTEIN:  I think that would be too many

18   minutes.  I think the way it works, Your Honor, is we had

19   split it, 22 and a half between the sides.  So 14 on the

20   opening remarks.  Then Mr. Glenn is going to speak for his

21   portion.  And then Metropistas' counsel will speak for three

22   and a half, if it wishes to.  And I'll take the remaining five

23   on the back end.

24           THE COURT:  Thank you very much for helping me to

25   correct my tally sheet here.  All right.  Then we will start

1    your time for argument now.

2         MR. FIRESTEIN:  Thank you.

3         This motion concerns Ambac's myriad violations of the

4    automatic stay in connection with its pursuit of its recently

5    filed Complaint and the debtor's effort to seek this Court's

6    assistance in directing Ambac to withdraw.  Anything less than

7    an order directing withdrawal of the Complaint would allow

8    Ambac to flout the automatic stay, and without having sought

9    Court permission, seek to rescind or avoid a contract between

10   HTA and Metropistas in violation of 362(a)(3), seek a

11   declaration enforcing a security interest in HTA's property in

12   violation of 362(a)(4), and recover on a claim against the

13   debtor in violation of 362(a)(1) and (6).

14        Ambac offered a lot of excuses for its conduct,

15   including trying to run away from its own allegations in the

16   Complaint, but those efforts fall flat.  The truth is that

17   Ambac, again without seeking relief, a procedure that Ambac

18   knows well, tried to end run the automatic stay, but got

19   caught at it.  They violated the stay, and under any analysis,

20   are without standing or legal basis to pursue the claims.

21        I know the Court has reviewed the briefing, but I

22   want to take a moment to lay out a couple of important

23   background facts.  In 2011, HTA and Metropistas entered into a

24   toll road concession agreement, and pursuant to that

25   agreement, HTA granted Metropistas a multi-year concession to

1   operate toll roads and then assign Metropistas certain of the

2   toll road revenues in exchange for a fee in excess of a

3   billion dollars.

4         Five years later, HTA and Metropistas entered an

5   extension agreement that the Court has read about, which

6   extended the concession rights for an additional ten years,

7   increased the share of certain toll revenues to Metropistas in

8   exchange for an additional payment of 150 million dollars to

9   HTA, and an agreement by Metropistas to make investments in

10  the tolling gantries, and some other terms as well.

11        Importantly, in May of 2016, Ambac filed suit

12  against, among others, HTA to seek the appointment of a

13  receiver and a TRO to prevent the then Governor from using the

14  additional money received from Metropistas for purposes other

15  than paying the bonds that Ambac insured.  Even more

16  importantly in that litigation, Ambac did not challenge the

17  terms of the extension agreement or seek to rescind it.  Ambac

18  expressly admitted it was not seeking any relief that would

19  have the effect of unwinding the agreement.

20        The Court denied Ambac's request for temporary relief

21  on the grounds that Ambac wasn't likely to prevail on the

22  merits; and thereafter, the case languished, and once these

23  Title III cases were filed, was stayed by the automatic stay.

24        Fast forwarding several years, Ambac filed this

25  Complaint only against Metropistas, and alleged three causes

1    of action:  One for recission, one for unjust enrichment, and

2    one for declaratory relief.  Again, Ambac didn't seek relief

3    from stay.  So why does Ambac violate the stay here and why do

4    its excuses provide it with no cover?

5         The most straight forward violation is as follows:

6    Count I of the Complaint is for recission.  Paragraph 80 flat

7    out states, "Ambac seeks an order rescinding the extension

8    agreement."  Under Puerto Rico law, that means recission in

9    total.  The contract in question stands or falls altogether,

10   with all of its provisions.  If there's recission, the parties

11   must be put in the position they were in before the contract.

12        There's no partial or limited recission under Puerto

13   Rico law.  Naturally, that would require return of the money

14   received by HTA, a relinquishment of potential future sharing

15   of revenues, perhaps a removal of the tolling gantries that

16   are now operating on the highways, and likely a secession

17   of -- by Metropistas of its ongoing maintenance.  That's a

18   textbook case of violating 362(a)(3).

19        Ambac attempts to escape that conclusion by arguing

20   the return of that consideration is rank speculation.  It

21   isn't.  That is what recission requires.  Ambac argues that it

22   only seeks recission to the extent necessary to satisfy its

23   claims, but that concept has no basis in the law.  There is no

24   limited recission where one side gives up what it has and the

25   other side gets to keep theirs.

1        Ambac endeavors to run away from its Complaint by

2   arguing it seeks only money damages and only from Metropistas,

3   but that concept has no foundation in the law.  Ambac's

4   tortured interpretation derives from its read of a provision

5   in the Puerto Rico Code, Section 3499, but as we've pointed

6   out, that statute appears in the section of the Code regarding

7   recission, and is only triggered when recission is possible.

8   Ambac presents nothing to suggest that a return of money or

9   the other consideration is impossible, and we can all think of

10  examples where that might be the case.

11       It also doesn't matter, as Ambac suggested, that the

12  party -- excuse me, that the action was brought against a

13  third party, in this case Metropistas, as opposed to the

14  debtor.  As noted by the Court in the *Kaiser* case, "The

15  protection of the automatic stay extends to any action or

16  proceeding against an interest in the debtor.  The scope of

17  this protection is not determined solely by who the party

18  chose to name in the proceeding, but rather by who is the

19  party with a real interest in the litigation."

20       There is no question that's HTA here.  Ambac sued for

21  recission.  It's stuck with the Complaint that it filed and

22  the relief that flows from it, not the Complaint it wished it

23  filed or attempted to rewrite in its opposition.

24       But there are more violations.  The Complaint seeks a

25  declaration that it has a security interest in HTA's property

1    which violates 362(a)(4).  The Complaint alleges it has a lien

2    on various elements of HTA property, including taxes and

3    vehicle fees that this Court has heard so much about, in

4    addition to the toll revenues, even future toll revenues,

5    which the Court has also heard much about.  But the existence

6    or lack thereof of such a lien on future toll revenues of HTA

7    is one of the centerpieces of the revenue bond adversary

8    proceedings.

9         And yet, without seeking relief from the stay, Ambac

10   unilaterally filed this Complaint.  Putting aside the forum

11   shopping attributes, or the risk of obtaining differing or

12   conflicting judicial outcomes, that is exactly what 362(a)(4)

13   is intended to protect against.

14        Ambac again seeks to skirt that conclusion by arguing

15   it merely seeks to affirm its lien on revenues collected by

16   Metropistas for its own account, because the lien supposedly

17   continued to when Metropistas was transferred whatever toll

18   revenues it gets, but that exalts form over substance.  The

19   escrow agreement confirms that the money collected from tolls

20   by Metropistas are jointly owned by HTA and Metropistas.  HTA

21   continues to have an ownership in those funds, and it doesn't

22   magically get transferred to Metropistas.

23        But in any event, Ambac's argument is really too cute

24   by half.  A lien is a claim against property.  Ambac admits

25   its lien was granted by HTA, not Metropistas.  So any effort

1    to make a claim against Metropistas necessarily involves a

2    matter regarding a lien vis-a-vis HTA, and just because HTA

3    isn't named doesn't mean that HTA isn't involved to address

4    that lien in question.

5         But Ambac's violations go even beyond this.  Ambac

6    unabashedly seeks to recover payment on a claim against the

7    debtor, in this case, HTA.  Paragraph seven of the Complaint

8    makes this clear.  Ambac alleges that it seeks, quote, to

9    reclaim hundreds of millions of dollars in value that was

10   fraudulently transferred to Metropistas to secure payment of

11   obligations HTA owes to Ambac.  That violates 362(a)(1) and

12   (a)(6).  And obviously we cite a number of cases throughout

13   the papers, across Circuits, to support that argument.

14        The reason for that violation is simple, and merely

15   suing Metropistas doesn't cure the issue.  Any recovery by

16   Ambac against Metropistas could easily lead to a claim by

17   Metropistas against HTA, and in the absence of stay relief,

18   that burden should not be imposed on the debtor.

19        Now, Ambac places great reliance --

20        THE COURT:  Just a question --

21        MR. FIRESTEIN:  Do you have a question, Your Honor?

22        THE COURT:  Yes, I do.  Wouldn't relief for Ambac

23   against Metropistas necessarily involve a determination that

24   there is -- there was wrongful conduct by HTA, that the

25   contract is not legitimate?  And HTA, of course, has contract

1 rights, and so would that not be an effort to undermine or

2 eliminate HTA's contract rights as well?

3 MR. FIRESTEIN: Most assuredly. Ambac tries to run

4 away from that piece by focusing only on the so-called bad

5 faith that it believes it needs to prove against Metropistas,

6 but the Court is exactly right. In connection with whatever

7 evidence would come forward, Ambac is going to have to delve

8 into the origins of this contract, how it was negotiated; and

9 to that extent, it clearly is going to impact contract rights

10 of HTA.

11 So in connection with this (a)(1) and (a)(6)

12 violation, Ambac, of course, places reliance on the *Unisys*

13 case to avoid the stay violation, but *Unisys* is unavailing as

14 the facts there are wholly different for two reasons: One,

15 there was an express abandonment by the trustee of the claim

16 in question. Not so here. And more importantly, and as the

17 Court in *Unisys* made clear to point out, there was only one

18 creditor, so that -- only one creditor who could be impacted

19 if the stay was not applicable. That's clearly not the case

20 here. So once, twice, three times over, Ambac has violated

21 the stay.

22 But beyond that, Ambac spends a lot of time arguing

23 that it has standing to pursue its claims, as if the stay

24 violations were less relevant or don't apply. But in any

25 event, standing is not a panacea. It doesn't absolve or

1  excuse Ambac's violations.  And in any event, Ambac doesn't

2  have standing to assert the claims.

3          Centrally, Ambac argues the claims that it alleges,

4  or at least some of them, were abandoned by the Oversight

5  Board by not having brought them within the two-year

6  limitation period set forth in Section 546.  This failure --

7  and that somehow that magically or automatically confers

8  standing, allowing Ambac to file them without seeking relief.

9  But the Bankruptcy Code and PROMESA doesn't allow for such

10 automatic reversion, and the arguments here are straight

11 forward.

12          There isn't anything in 546 to suggest a two-year

13 limitation to file an avoidance claim applies only to the

14 trustee.  Ambac doesn't cite a case to the contrary.  If they

15 wanted to pursue such a claim, they should have brought a

16 motion under 926 like this Court has seen.  Any other result

17 would wrongly afford no discretion to the debtor's decision

18 not to bring a particular claim.  And regardless, the

19 underpinning of Ambac's theory of abandonment, be it express

20 or constructive, is without merit.  Section 554 is not

21 incorporated into PROMESA, and there's no other source of

22 abandonment authority that Ambac presents.  They talk about

23 it, but cite nothing.

24          And there has to be a judicial determination of

25 abandonment, and there's no notion of constructive abandonment

1  in the law applicable here.  Reversion doesn't happen

2  magically, and the cases that Ambac cites to this effect don't

3  control.

4       In fact, the *Tribune* case from the end of last year

5  speaks to the notion that it has no basis in the Code at all.

6  And further, the approach makes sense.  It gives appropriate

7  and relevant discretion to the debtor's decisions about how

8  and what claims to pursue, which is rooted in 305 and utilizes

9  the holistic approach this Court has found necessary for the

10  continuation of government function.

11       Lastly, Your Honor, abandonment or the so-called

12  reversion aside, Ambac's asserted unjust enrichment claim

13  doesn't belong to Ambac.  It belongs to HTA, as the Court

14  noted.  It's HTA's contract.  If anyone is damaged by an

15  unjust enrichment, it would be HTA and all of its creditors,

16  not just Ambac.

17       Ambac's purported injury is derivative to an injury

18  to HTA creditors as a whole.  And as the *Artesanias* Court

19  noted, a trustee cannot relinquish claims belonging to the

20  estate for the benefit of a single creditor, which is what

21  Ambac is trying to do.

22       In any event, the unjust enrichment claim is not

23  subject to the two-year limitations period under 546.  The

24  right to bring that action hasn't expired and remains with

25  HTA, if it ever wanted to bring it, and it certainly hasn't

1    been -- hasn't reverted or been abandoned.

2          Your Honor, the motion should be granted.  Unless the

3    Court has questions, I'll reserve for rebuttal.

4          THE COURT:  Thank you, Mr. Firestein.

5          I'll turn now to Mr. Glenn for Ambac.

6          MR. GLENN:  Good morning, Your Honor.  Can you hear

7    me?

8          THE COURT:  Good morning.

9          MR. GLENN:  Thank you.  Andrew Glenn, Kasowitz,

10   Benson, Torres, LLP, on behalf of Ambac Assurance Corporation.

11         The debtors have asked the Court to force Ambac to

12   withdraw its Complaint solely against Metropistas based on a

13   purported violation of the automatic stay.  As I will explain,

14   because the 546(a) deadline had elapsed for bringing these

15   claims on behalf of the debtors, the claims automatically

16   reverted to Ambac and, indeed, any other creditor that has the

17   right to bring them under state law.  And there is nothing in

18   PROMESA that bars or preempts them.

19         The debtors are not --

20         THE COURT:  Mr. Glenn, Mr. Firestein has just argued

21   that whether -- well, he certainly argues against your

22   reversion theory, but says that even if you did have the right

23   to bring this sort of action on your own behalf, because of

24   the effect that the relief you're seeking would have on the

25   contract rights and other determinations of -- rights that are

 1 | ultimately at HTA, it would still be violative of the

 2 | automatic stay.

 3 | And so I'll hear what you want to say on this

 4 | reversion argument, but I am principally interested in what

 5 | you want to say about how it is that an action that seeks

 6 | recission of a contract to which HTA is a party, that seeks a

 7 | determination of a lien that is rooted in a grant originally

 8 | allegedly by HTA, and that seeks to declare that a contract

 9 | entered into by HTA is one that provided for unjust enrichment

10 | doesn't violate the automatic stay.

11 | MR. GLENN:  Yes, Your Honor.

12 | So we're all familiar with the Bankruptcy Code's

13 | avoidance actions, and what those actually prolong -- the

14 | Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance

15 | Act, all those statutory regimes use the word "avoid" or

16 | "annul" in connection with a transfer.  The Puerto Rico

17 | statute --

18 | THE COURT:  May I stop you for one more second?

19 | MR. GLENN:  Yes.

20 | THE COURT:  There's a bit of a sort of percussive

21 | feedback sound when you speak.  Are you using the computer

22 | microphone or are you using a headset?

23 | MR. GLENN:  I'm using a headset.  Is that better now,

24 | Your Honor?

25 | THE COURT:  Say testing, one, two, three.

1          MR. GLENN:  Testing, one, two, three.

2          THE COURT:  A little better.  Go on, please.

3          MR. GLENN:  Thank you.  I'll try to improve that.

4          Anyway, those statutory regimes use words like

5  "avoid" or "annul" a transfer.  The Puerto Rico Fraudulent

6  Conveyance Statute uses the word "recission."  We don't

7  dispute that.  And what the complaint says is that, we seek

8  recission under that statute only to the extent necessary to

9  pay our claims.  That's all we seek.

10          THE COURT:  And how is that a legal concept?  What is

11  the cite for that concept?

12          MR. GLENN:  If you look at the statutory provision

13  that we've cited, which the Oversight Board has only

14  selectively quoted, there's two relevant provisions.  Where,

15  as here, property has been transferred, but recission is

16  impossible for any reason, for any reason whatsoever, the

17  statute says, Your Honor, the transferee is obligated to

18  indemnify the plaintiff in that case for the losses and

19  damages for the fraudulent transfer.

20          And this is completely --

21          THE COURT:  What makes transfer impossible here?  I

22  understand it would be complicated, painful, and have far

23  reaching implications, but why does that make it impossible?

24          MR. GLENN:  Because it's barred by the automatic

25  stay.  And that's actually -- we agree with the debtors --

1          THE COURT:  The impossibility argument is rooted in

2     the existence of the automatic stay?

3          MR. GLENN:  Correct.  It's impossible for any reason

4     whatsoever.  And in fact, Section 3495 of the same provision

5     of the recission statute in Puerto Rico states, "When an

6     action for recission is a subsidiary one, it may be enforced

7     only when the person injured has no other legal remedy to

8     obtain reparation for the injury."

9          So what this --

10          THE COURT:  Section (b)(2) provides for an

11     application for relief from the automatic stay.

12          MR. GLENN:  It does.

13          THE COURT:  So where's your impossibility?  The stay

14     is there.  There's a mechanism in PROMESA, which is adopted

15     from the Code, to ask for relief from the automatic stay.

16          MR. GLENN:  It does, Your Honor.  But if you read

17     Section 3495, it says that that is the course of last resort.

18     And no case has ever held, under these circumstances, that

19     there is no action for recission, fraudulent conveyance,

20     where, as here, there is a money damages remedy for a

21     fraudulent conveyance plaintiff.

22          In fact, as I've indicated, under the Bankruptcy

23     Code, this same issue applies.  And under state law, all the

24     fraudulent conveyance statutes offer two alternatives to

25     plaintiffs.  One is to rescind, annul, avoid the transaction

1   in their entirety.  And secondarily, it's to get money

2   damages.  And so that's all we seek.  And if we're wrong about

3   that, we will not prevail against Metropistas.

4        And I think that's the point.  They want you to make

5   a determination as a matter of law on these points.  And

6   there's no reason to protect Metropistas, who we believe

7   committed a fraudulent conveyance in a no-bid auction while

8   the Commonwealth and HTA were in distress.  That -- our client

9   should be allowed to recover its damages for that.

10       And it's a traditional fraudulent conveyance claim.

11   Someone paid less than what they should have for the rights

12   they obtained.  And by virtue --

13       THE COURT:  And given that -- Mr. Glenn, given that

14   the underlying contract that you say resulted, or was a

15   fraudulent conveyance, is one that is executory, is one that

16   HTA and Metropistas are expected to be bound together under

17   for a number of years, how can a determination that the

18   contract itself was a fraudulent conveyance not affect the

19   rights of HTA in that contract and, therefore, be implicated

20   by the automatic stay?

21       MR. GLENN:  When a party obtains fraudulently

22   transferred property, that party can keep the property if they

23   pay the damages that represent the value they should have paid

24   in the first instance.  So there's nothing -- and in fact,

25   Mr. Firestein talks about consequences that might involve the

1    Oversight Board down the road, but they've cited none.

2    They've cited none.

3         And every fraudulent conveyance action which seeks

4    this monetary recovery does not require the third party to

5    divest itself from the assets it obtained.  All that it seeks

6    is that they pay more than what they should have paid.  So

7    there's not going to be a disturbance in any contractual

8    relationship between the debtor and Metropistas, and they've

9    cited that.

10        They've said a lot of things about potential

11   consequences down the road, but they're all conclusory.

12   There's no facts.  There's no explanation for what they've

13   done.  And so at the end of the day, the debtor in any

14   fraudulent conveyance action is going to be party to the

15   transaction that gave rise to that fraudulent conveyance.

16        So the debtor is always going to have some

17   relationship to the fraudulent conveyance claim, but that

18   doesn't mean that the debtor's rights are going to be

19   divested, offset, or even affected by that fraudulent

20   conveyance claim.  And in fact, if we prevail, all that will

21   happen is that Metropistas will have to pay us additional

22   consideration, which we believe it should have in the first

23   instance.

24        That's the bedrock of every fraudulent conveyance

25   claim.  And if there were some consequence that occurred as a

```
 1    matter of law when this happened in other circumstances, I
 2    would have expected them to say that.  So --
 3             THE COURT:  Thank you.
 4             MR. GLENN:  Thank you.  So we think that the
 5    provisions of the statute, although different in the
 6    terminology from Section 548 of the Bankruptcy Code, operative
 7    provisions of governing state law are essentially
 8    substantively the same.  The foundation of fraudulent
 9    conveyance law is that there's an annulment, a recission, and
10    avoidance of the obligation; but the remedy in an action for
11    recission here would be payment of monetary damages.
12             I also would venture to say that if we ever did file
13    a motion to lift the automatic stay, that that would be
14    strenuously opposed by the Oversight Board to bring this
15    claim, it would be strenuously opposed by Metropistas, so we'd
16    be right back where we are today indicating that rescinding
17    the contract, which is not the object of our action, would be
18    an impossibility and those provisions of the Code of recission
19    in Puerto Rico apply to us as well.
20             Now, in terms of standing and reversion, I will touch
21    on those briefly.
22             THE COURT:  I would just like to ask my timekeeper
23    what her count is of the time now?
24             MS. SELDEN:  Twelve minutes remaining, Judge.
25             THE COURT:  Thank you.
```

1             Please go on, Mr. Glenn.

2             MR. GLENN:  Thank you.

3             We've cited, contrary to Mr. Firestein's suggestion,

4 a -- what they concede in their papers as a litany of cases

5 standing for the proposition that when the 546(a) deadline for

6 the debtor to bring 544(b) claims which belonged to the debtor

7 before the bankruptcy, that those revert automatically to the

8 operative creditors after the deadline passes.  And that's

9 obvious, because those claims never belonged to the debtor

10 before the bankruptcy.

11             It gives the debtor a two-year exclusive period to

12 bring those claims if it chooses to, as Mr. Firestein says, in

13 its discretion.  Why?  Because it's bringing the claims in a

14 representative capacity on behalf of all the creditors.

15             That doesn't mean that the claims don't revert after

16 the two-year period, as Mr. Firestein suggests.  All the cases

17 we cited --

18             THE COURT:  Mr. Glenn, are you still there?

19             MR. GLENN:  Yes.  I'm going to switch to my headset.

20 I'm sorry.  Is that better?

21             THE COURT:  Ms. Ng, can you hear me?

22             MR. GLENN:  Hello?  Hello?

23             THE COURT:  Can anyone hear me?

24             MR. GLENN:  I cannot hear --

25             MR. FIRESTEIN:  Yes, Your Honor.

```
 1              UNIDENTIFIED PERSON:  Yes, we can.

 2              UNIDENTIFIED PERSON:  Yes, Your Honor.

 3              UNIDENTIFIED PERSON:  Yes, Your Honor.

 4              THE COURT:  It appears that my line has dropped.

 5              MS. NG:  Judge, we can hear you.

 6              MR. FIRESTEIN:  We can hear you.

 7              MS. SELDEN:  We can hear you, Judge.

 8              MR. GLENN:  Can you hear me, Your Honor?

 9              MS. NG:  No, I think she -- can you guys hear me?

10   This is Lisa.

11              MR. GLENN:  We can.

12              MR. FIRESTEIN:  We can.

13              MS. NG:  She may not have been able to hear you.

14   That's why she's probably logging off and logging back in.  So

15   just give her a few minutes.  I'm sorry about that.

16              THE COURT:  This is Judge Swain.  Can anybody hear

17   me?

18              MR. GLENN:  I can.

19              MR. FIRESTEIN:  We can.

20              MR. GLENN:  Yes, Your Honor.

21              THE COURT:  All right.  I don't know what happened.

22   For some reason, I ceased to hear anyone.

23              So, Mr. Glenn, you can hear me?

24              MR. GLENN:  I can hear you fine.

25              THE COURT:  Ms. Ng, can you hear me?
```

1          MS. NG:  Yes, Judge.  We could hear you before, but I

2     guess you weren't able to hear us.  We heard you perfectly.

3          THE COURT:  All right, then.  Sorry about that.

4     So --

5          MR. GLENN:  Where was I, Judge?

6          THE COURT:  We all are back again.

7          You were talking about how the claims that revert are

8     brought in a representative capacity.

9          MR. GLENN:  Yes.

10         THE COURT:  And so if you would go on with that.

11         MR. GLENN:  Sure.

12         So we've cited a bunch of cases for the proposition

13    of this automatic reversion.  And the reason why we don't have

14    to seek relief from the Court is that that two-year period has

15    elapsed.  And we're not seeking to bring the claim in any

16    representative capacity.  We're bringing it solely on our own

17    behalf.

18         And there's no cases that stand for the proposition,

19    none, that we ever had to seek approval to bring these claims

20    on our own behalf.  We agree that in a non-Chapter Nine,

21    non-Title XI -- non-Title III case, that if we wanted to bring

22    them on behalf of the bankruptcy estate, we would have had to

23    file a motion.  But there's no case that says that after the

24    546(a) deadline expires and the claims are no longer viable by

25    the bankrupt entity, that a creditor has to seek leave of the

1   Court.

2           In -- the *Unisys* case, which Mr. Firestein tries to

3   distinguish, is well on point.  There, there was an

4   abandonment of the claim under Section 554.  Now, that was

5   because the claim was still within the two-year 546(a) period,

6   and so abandonment was necessary for the claim to go to the

7   individual creditor.  There's nothing in that case, a First

8   Circuit case, that says that stay relief is needed.  Nothing.

9   It says very clearly that once there's an abandonment, or in

10  our case, a reversion, the claim is free of any need to

11  address the automatic stay.

12          Mr. Firestein argues that because there was no --

13  only one creditor in that case, that that's somehow an issue,

14  but it wasn't an issue.  The Court held, as a matter of law,

15  that the application of the automatic stay did not apply at

16  that point in time based on abandonment.

17          I think the only distinction here is that because

18  there is no Section 554 abandonment in PROMESA, that we

19  couldn't have sought abandonment of the claim within that

20  two-year period.  But the automatic reversion, which Circuit

21  Courts have held applies under 546(a), still applies, and

22  there's no reason why it shouldn't apply here.

23          Now, moving on to the issues of our lien and unjust

24  enrichment.  The toll revenues of HTA that are subject to the

25  concession extension were pledged to Ambac and other

1   bondholders.  So as a matter of law, it's our position that we

2   did have a lien on these tolls.

3           Now, the difference between what happened with the

4   concession in 2011 was that the proceeds of the concession

5   agreement were paid to the bondholders.  That did not happen

6   with respect to the concession extension.  So it's our

7   position that the lien was never discharged.  And much like a

8   party who owns a house, you can't sell the house free and

9   clear of the lien unless you satisfy the mortgage, or state

10  law allows you to sell free and clear of the lien.  So we're

11  not asserting any claims against HTA property, even though we

12  once had a lien against those tolls while they were property

13  of HTA.

14          Now, they've cited in their Reply for the first time

15  the escrow agreement.  The escrow agreement does not provide

16  a, quote, ownership interest in all the tolls for all reasons.

17  It's a ministerial contract that allows for the splitting of

18  those tolls as required under the concession agreement.  So an

19  escrow agreement does not provide a broader beneficial legal

20  interest in the tolls themselves.  It's merely a mechanic so

21  that the tolls, once they are paid, are split as required

22  under the contract.

23          And our Complaint says very clearly that all we are

24  seeking are the tolls that go to Metropistas, again for its

25  own account, and, therefore, there's no lien, no assertion of

1    a lien in our Complaint against any debtor property.  And it's

2    very clear.  And, therefore, there is no stay violation at

3    all.

4          We have to file a proof of claim asserting liens

5    against the company.  Just because we once had liens against

6    the company doesn't mean that, by asserting those liens

7    against a third party, that we're asserting a claim against a

8    debtor.  Otherwise, actions against insurers, guarantors,

9    other third parties would automatically be deemed against the

10   debtor, and that's not the law.

11         Finally --

12         THE COURT:  But in relation to -- Mr. Glenn, I just

13   want to make sure that I understand your argument and

14   understand the debtor's argument.

15         Here I understand the debtor to be saying that for

16   you to be found to have a valid lien on the property that has

17   gone into the hands of Metropistas, the toll piece that goes

18   to Metropistas, there will have to be a determination that you

19   had a lien on that property when it was in the hands of HTA.

20   And that is something that is being litigated even now.

21   That's not, you know, a question that's been determined.

22         And so by seeking to litigate that, you are seeking

23   to put yourself in a legal position that does affect HTA.

24         MR. GLENN:  I disagree with that strenuously.  Just

25   because, as a matter of proof, you know, in our action against

1   Metropistas, we have to prove that we once had a lien, that

2   doesn't have any effect on the company.  That only has an

3   effect on Metropistas.  And that means that if we're right,

4   then Metropistas has to hand over the money to us in 2051

5   through 2061, when it collects those tolls.

6        I think you have to distinguish between, on the

7   automatic stay point, evidentiary proof with the actual remedy

8   that we're seeking.  And the remedy is really the determinant

9   of whether we're violating the automatic stay or not.

10        And I don't mean to undermine or characterize other

11   aspects of the litigation that are being handled by the

12   Milbank firm, so I'm not going to comment beyond that.  And

13   I'm not conversant in the interplay between what's going on

14   with that Lift Stay litigation and this Complaint, but looking

15   at the face of the Complaint, which is the relevant inquiry

16   for the automatic stay, all that will be determined is whether

17   Metropistas -- when those tolls are collected by it, put in

18   its bank account, would have to be paid to us.  That's it.

19        It's not an action against the debtor.  It's an

20   action against the third party, and it does not violate the

21   stay.  Same goes for our unjust enrichment claim.

22        Our position is that we had a property right in those

23   tolls subject to our lien.  If we are correct about that, and

24   those funds were supposed to be paid or are supposed to be

25   paid to us, then we've been deprived of those tolls.  And

1   conversely, Metropistas has been unjustly enriched, because it

2   knew of our lien and it understood its obligation based on the

3   payment of our lien from the first concession agreement, that

4   it should have paid those concession proceeds to us.  And

5   because it didn't, it must pay them in the future as we go

6   forward.

7          So I would urge the Court to look at the plain

8   language of the statute, which the Oversight Board has

9   conspicuously omitted in its papers.  Impossibility, for any

10  reason; the *Unisys* case, which says that the claims are free

11  of the stay, full stop; and the fact that reversion is

12  automatic under the litany of cases.  All the major concepts,

13  all the major arguments they're putting forward today, Your

14  Honor, have no support in case law or the statute.

15         And if you look at the cases they've cited, the ones

16  they do cite, like *Tribune*, which involved the application of

17  the safe harbor defense in 546(e), had nothing to do with

18  whether claims revert as a matter of law to creditors, as the

19  cases we've cited actually hold.

20         So unless Your Honor has any further questions, that

21  concludes my presentation.

22         THE COURT:  Thank you, Mr. Glenn.

23         And so now I call on Mr. Martorana from Metropistas.

24         MR. MARTORANA:  Good morning, Your Honor.  Keith

25  Martorana from Gibson, Dunn & Crutcher on behalf of

1  Metropistas.  Can you hear me okay?

2          THE COURT:  Yes, I can.  Thank you.

3          MR. MARTORANA:  Great.  Thank you.

4          As Your Honor is aware, Metropistas filed a joinder

5  to the FOMB's motion, and I think it goes without saying that

6  we fully endorse all the arguments of the FOMB's counsel, both

7  in those briefs and at the hearing today.

8          Your Honor, we had asked for a small amount of time,

9  I think 3.5 minutes, to address this Court really for the

10  purposes of addressing any factual issues that might need to

11  be corrected or to answer any questions that Your Honor might

12  have.  While I don't have any factual concerns that would need

13  to be addressed, I did want to speak very briefly on one point

14  that was raised just now by counsel for Ambac.

15          Your Honor, one of the cornerstones of Mr. Glenn's

16  arguments is that indemnification is appropriate because the

17  automatic stay makes recission impossible, but I'm personally

18  not aware of any cases stating that the automatic stay can be

19  used as a basis for impossibility under Puerto Rico law.  And

20  Ambac hasn't cited any cases in that respect either.

21          Indeed, my understanding of the impossibility cases

22  under Puerto Rico law is that they speak to true physical

23  impossibility, i.e., situations where the subject property is

24  actually destroyed.  And as Your Honor has noted, the remedy

25  here would be for Ambac to at least try to lift the automatic

1  stay.

2          At this point, Your Honor, I don't have anything else

3  to add.  However, we're at your disposal to the extent that

4  you have any questions.  At this point, unless Your Honor has

5  questions, I think I would cede the rest of my small amount of

6  time to the FOMB's counsel for the rebuttal.

7          THE COURT:  Thank you.  I have no further questions

8  for you, Mr. Martorana.

9          And so, Mr. Firestein, I think you're conceded about

10 two minutes.

11         MR. FIRESTEIN:  All right.  With any luck, I won't

12 use it all, but let's see.

13         Can you hear me, Your Honor?

14         THE COURT:  Yes, I can.

15         MR. FIRESTEIN:  Perfect.  Again, Michael Firestein of

16 Proskauer on behalf of the debtor.

17         Let me start at basic principles.  I really don't

18 think that Mr. Glenn said anything that contradicts the

19 position that we've articulated.  And I want to focus

20 principally on the issue that was emphasized by the Court,

21 which is the stay violation issues, and the simple fact that

22 they didn't seek relief from it.

23         There is no excuse for that, and I want to make a few

24 basic points about it.  They don't dispute that they sued for

25 recission.  They're trying to dress it up as something

1  different, but in fact, they are seeking recission.  And under

2  Puerto Rico law, that means that recission has the effect of

3  voiding a contract from its inception, i.e., as if it never

4  existed, which is the *Peer International Corporation* case that

5  we cited in our Response.  They focus on the issue of

6  impossibility, but I agree with Mr. Martorana, and I was

7  surprised by Mr. Glenn's comment that his understanding of

8  impossibility is the existence of the automatic stay.

9       As the Court properly pointed out, that is what the

10  statutory provision allows for relief for.  If you have a

11  basis to seek relief, you should go and do it.  It is not the

12  basis of impossibility.  Impossibility, as described in our

13  papers and as is well understood, is where it's just not

14  physically possible.

15       I mean, one can think of the -- if the consideration

16  was a steak, a piece of meat that is considered -- available

17  for return, then you have the notion of impossibility.  But

18  the existence of the automatic stay doesn't create that type

19  of impossibility, and it doesn't help them if they are seeking

20  only, as they claim, to recover against Metropistas.

21       I think it is not a far reach to suggest that if

22  Metropistas is called upon to return money somehow based on

23  some notion of the contract -- guess who they're going to turn

24  around and level a claim against?  And guess what it's going

25  to be about?  It's going to be about the issue of the lien

1  that these folks are claiming that they have.

2        They don't debate the fact that the lien is -- that

3  they claim is on future toll revenues, but as this Court

4  pointed out, that is precisely one of the issues that's being

5  litigated in this Title III -- in this Title III court.

6        I think that the notion of their stay violation is

7  pretty apparent.  They are seeking to enforce or validate a

8  lien.  They are trying to impact rights that HTA has in a

9  contract.  They are basically doing everything that the

10  sections of 362 that we cite to are designed to prevent.  And

11  the cases are all over the place.  I mean, there are many

12  cases that say it doesn't matter that you're just suing

13  Metropistas.  You have to look at the gravamen of the issue.

14        I do want to, if I can, Your Honor, just to state for

15  a moment this issue of reversion, and I want to read a quote

16  from the *Tribune Company* case, which I think is square on

17  point, which was at the end of 2019 in the Second Circuit.

18  The Court states, a critical step in the logic of appellant's

19  theory finds no support in the language of the Code.  In

20  particular, the inference that fraudulent conveyance actions

21  revert to creditors if either of the two-year statute of

22  limitations passes without an exercise of the trustee's powers

23  under Section 544 or the 362 stay is lifted by the Bankruptcy

24  Court, has no basis in the Code's language.

25        It doesn't happen by magic.  And the legend of -- or

1    the legion of cases that Mr. Glenn reports that they've cited

2    to, and I believe it's in paragraph 43 of their Opposition,

3    each one of them is sort of a clever quotation and use of

4    ellipses as to exactly what the cases are saying.  And I could

5    go through each one of them, but let me just highlight a

6    couple.

7         In the -- and I'll probably mispronounce it -- the

8    *Gronczewski* case, the central element of that is the trustee

9    claims he didn't have, or she didn't have any interest in the

10   property.

11        In the *Klingman* case, the cases that the *Klingman*

12   Court cite to, in most instances, the bankruptcy itself was

13   closed.  And it says -- and it says nothing about the

14   requirement to seek stay relief in any -- in any event -- in

15   any event.  Excuse me, Your Honor.

16        All of these cases don't speak to reversion.  They

17   only speak to the general proposition that the trustee has two

18   years.  And perhaps a creditor could have standing, but there

19   needs to be certain determinations.  And those determinations

20   require that there is an abandonment of the property and some

21   other items that we've identified in our papers.

22        But in any event, unjust enrichment is not a claim

23   that would revert under 546 or 544, even if it did exist.

24   That claim has always been HTA's.  But this Court doesn't

25   really even need to address that standing issue, if it doesn't

1   wish to, because the stay violations are still relevant,

2   applicable and obvious.

3           And unless the Court has any further questions on

4   that score, I'll submit.

5           THE COURT:  Thank you, Mr. Firestein.  And thank you

6   all for these arguments, which are very helpful.

7           I take this motion under submission, and will issue a

8   written decision in due time.  Thank you.

9           And so now the third matter on the contested calendar

10  is PREPA's Motion to Assume Certain Contracts, which is docket

11  entry number 12579 in case 17-3283 and docket entry 1951 in

12  case 17-4780.

13          I have the counsel for the Oversight Board and PREPA

14  up for initial remarks of 18 minutes, and then ultimately

15  coming back for rebuttal of five minutes.  And so would

16  counsel for the Oversight Board please introduce himself and

17  begin?

18          MR. POSSINGER:  Yes, Your Honor.  Thank you.  Paul

19  Possinger, Proskauer Rose, on behalf of the Oversight Board in

20  its capacity as representative of PREPA in the Title III case.

21  Also on the line is Mr. Kelly Malone of King & Spalding,

22  counsel to PREPA, who participated in the negotiation of the

23  amendments of the contracts that are the subject of this

24  motion.  Additionally, we have Fred Sosnick of Shearman &

25  Sterling, counsel to ECO, who will address the Court when I

1    conclude my opening remarks.

2          Your Honor, this is PREPA's motion to assume two

3    major prepetition executory contracts, a power purchase

4    agreement with EcoElectrica, LP, and a natural gas supply

5    agreement with Gas Natural Aprovisionamientos, which I'll call

6    Naturgy.  These contracts have been in place for years or

7    decades prior to the filing of PREPA's petition and have been

8    amended post petition through months of negotiation and

9    several layers of approval, including by the Puerto Rico

10   Energy Bureau and the Oversight Board.

11         I'll briefly describe the contracts and the relevant

12   facts, which are all set forth in the contracts themselves

13   attached to the motion and the supporting declaration of

14   Fernando Padilla of PREPA.

15         Pursuant to the EcoElectrica power purchase

16   agreement, PREPA purchases power from a private natural gas

17   generation facility that sits adjacent to the Costa Sur

18   generation plant on the south coast of Puerto Rico, which is

19   fueled by natural gas supplied by Naturgy.  Under the Naturgy

20   contract, PREPA purchases the liquid natural gas that supplies

21   the Costa Sur units five and six, as well as -- and also

22   supplies liquid natural gas to fuel the ECO plant.

23         Both contracts rely on liquid natural gas imported by

24   Naturgy to the LNG terminal that is owned and operated by ECO

25   at Penuelas, which is in the region, and is, in fact, the only

1    liquid natural gas terminal in the region.  The ECO contract

2    has been in place since 1995, and is set to expire in March of

3    2022.  The Naturgy contract has been in place since 2012, and

4    is set to expire in December of this year.  Together, these

5    contracts source up to 40 percent of the power generation in

6    Puerto Rico.

7         PREPA's Certified Fiscal Plan from May of 2019

8    recognizes how critical these contracts are to PREPA, but

9    contemplated renegotiating certain of their terms to achieve

10   fiscal savings targets.  PREPA entered into these negotiations

11   in July of 2019, and those negotiations concluded in October

12   of 2019.

13        The result -- the resulting amendments to the

14   contract in so much -- both contracts were extended until

15   September of 2032.  The fuel supply was restructured so that

16   PREPA buys liquid natural gas from Naturgy through the ECO

17   terminal, for both the ECO facility and Costa Sur units five

18   and six.  And ECO, in turn, supplies power at an increased

19   capacity at a lower cost.

20        There are also changes in the liquid natural gas

21   price structure under the Naturgy contract.  As described in

22   Fernando Padilla's declaration, PREPA estimates savings of

23   over 100 million dollars a year as a result of these

24   amendments, which will be passed through onto rate payers.

25   There's also an increase in capacity from the ECO facility,

1   which provides PREPA flexibility to use less power from its

2   more expensive and potentially less reliable plants that are

3   operated by PREPA using a different fuel mix.

4          I would say, most importantly, the contracts will now

5   remain in place for another 12 years, which secures a major

6   power source on the island where there is no viable

7   replacement that currently exists.  And this period will allow

8   for a period of time for the retirement or replacement of the

9   Costa Sur facility.

10         These amendments meet the savings targets of the

11  Certified Fiscal Plan.  They're compliant with Puerto Rico

12  Energy policy and PREPA's -- also compliant with PREPA's

13  current Integrated Resource Plan.  The amendments went through

14  an extensive series of reviews.  And first, after the three

15  months of negotiations for the amendments, definitive

16  documents were presented to and approved by PREPA's governing

17  board in October of 2019.

18         The amendments were then submitted to the Oversight

19  Board, which conducted a thorough review and analysis to

20  ensure that savings targets were met.  The Oversight Board

21  approved both amendments in December of 2019.  Concurrently,

22  the amendments were submitted to the Puerto Rico Energy Board

23  in November of 2019, which conducted a thorough process that

24  concluded in March of this year, with an order approving both

25  amendments.  So all in, Your Honor, this has been an

1  eight-month process, extensive negotiation, and several layers

2  of independent and regulatory review on approval.

3  So those are the relevant facts here.  I'll turn to

4  the standard for assumption under Section 365(a).  Simply put,

5  the standard is whether the amendments here are a sound

6  exercise -- I'm sorry.  The assumption of the amended contract

7  is a sound exercise of PREPA's business judgment, meaning that

8  the decision to assume the contracts will provide some benefit

9  to the debtor, and are not based on whim, caprice, bad faith,

10  or gross negligence.

11  As a general matter, this is a highly deferential

12  standard based on the bulk of the case law that we cite.  In

13  PREPA's case, and as the Court has recognized in Your Honor's

14  Order in January of this year denying the appointment of the

15  Section 922 trustee in the ERS case, the discretion of the

16  Oversight Board as PREPA'S representative is entitled to even

17  greater deference.

18  The Oversight Board is tasked not only with assuring

19  some recovery to creditors, but also strategic decision making

20  to arrive at holistic solutions for Puerto Rico, and in this

21  case, PREPA and its customers.  The assumption of these

22  contracts easily satisfies this standard.

23  As I described, it was an extensive and thorough

24  review process to ensure savings targets are met, capacity

25  levels are increased, or greater flexibility away from other

1    less reliable or more expensive plants.  And the contracts

2    assure a major source of power generation for the next 12

3    years.

4              THE COURT:  May I?

5              MR. POSSINGER:  It was designed to -- I'm sorry.

6              THE COURT:  I wanted to -- I guess finish your

7    remarks about the process.  I would then like to focus on

8    whether this amended contract is the prepetition agreement.

9    That is an issue that has been raised and one about which I

10   have true concern, about whether this comes within 365 so --

11   but first, finish your process comments.

12             MR. POSSINGER:  Certainly.  I would just conclude on

13   that point that the process was designed to achieve the goals

14   that I mentioned, and the process succeeded.  These amendments

15   achieved these goals.  They're good for PREPA.  They're good

16   for Puerto Rico.  And the assumption of the contracts more

17   than satisfies the business judgment standard.

18             With respect to the arguments that the objectors have

19   asserted regarding novation, all units are -- both of them

20   assert that the contracts can't be assumed because they're not

21   amendments but they're brand new contracts under Puerto Rico

22   law principle of passive novation.

23             For starters, Your Honor, I would note that this

24   argument is self-defeating.  If these are, in fact, new post

25   petition contracts, we really don't need to be here, because

1    PREPA can simply execute the contracts and implement them

2    subject only to review and approval by the Oversight Board and

3    PREB, which have already been obtained.

4         THE COURT:   I understand that is your position, and

5    there's no Section 363, so it's a logical position, but if I'm

6    being asked to exercise authority, I need to be comfortable

7    that what I'm being asked to do is within my authority.

8         MR. POSSINGER:   That's understood.

9         THE COURT:   And I have here amended contracts that

10   use superseder language, and the ordinary meaning of

11   superseding means something that leaves the previous thing

12   behind, that nullifies and replaces the previous thing.   And

13   there seems to be Puerto Rico Supreme Court authority that

14   says that such a clause extinguishes the prior contract.   So

15   I'm wrestling with that a bit.

16        MR. POSSINGER:   I understood, Your Honor.   And we're

17   here because we concluded that that's not the case, that these

18   are the same prepetition executory contracts that had been

19   amended through the renegotiation process.

20        Under Puerto Rico law, a novation would happen either

21   by the express intent of the parties, or where the contracts

22   are so thoroughly amended that they have little or nothing to

23   do with the original contract.   Neither happened here.   Both

24   contracts state clearly the parties intend to amend and

25   restate the original contracts.   That statement of intent is

1   entitled to substantial deference under Puerto Rico law.

2           Neither amendment altered the fundamental nature of

3   the original contract here.  Under the ECO contract, PREPA

4   still buys power from the ECO plant.  It buys more capacity,

5   it has a lower price, but it's simply an amendment from the

6   prior arrangement.

7           Under the Naturgy contract, PREPA still buys liquid

8   natural gas.  It now buys it for both plants and under a

9   different cost structure, but the fundamental nature of both

10  contracts remains unchanged.

11          Under Puerto Rico law, a passive novation has not

12  occurred here.  These contracts are simply amendments to the

13  contracts that existed prepetition.

14          With that, Your Honor, I'll return to address the

15  standard that you --

16          THE COURT:  So I should -- I'm sorry.  I was just

17  trying to find the precise language, but I'll just ask the

18  question more generally.  And so I should -- in determining

19  what the contract by its terms expresses -- I should accept

20  and focus on the word "amendment", and ignore the provisions

21  in the merger clauses that say that the contract supersedes

22  prior agreements?

23          MR. POSSINGER:  Under Puerto Rico law, the contracts

24  are only novated if they are completely -- if they address a

25  completely different subject matter essentially.

1          THE COURT:  Well, that's one of the prongs, but the

2    other prong is whether there is an expression of an intention

3    to extinguish the old contract.  And here I have a contract

4    term that says this supersedes all prior agreements.

5          MR. POSSINGER:  In effect, Your Honor, by amending

6    and restating the contract, rather than taking the original

7    contract and do an amendment that goes through, you know, term

8    by term, a very complex contract, and do a separate amendment

9    document, for the sake of convenience, these contracts were

10   amended and restated.

11         They are amendments.  They are amendments to the

12   original contracts that, again, under the ECO contract,

13   provide for a supply of power, under the Naturgy contract,

14   provide for a supply of natural gas.  The original nature of

15   the contracts remains in place, and they've simply been

16   amended by these amendments.

17         THE COURT:  Thank you.

18         MR. POSSINGER:  Returning to the standard, UTIER has

19   argued that the Court should adopt a more strident standard of

20   balance of the equities; in turn, it should be a summary

21   proceeding on the narrow business judgment inquiry that I

22   described, into a full-blown trial under public policy

23   provisions, to replace the conclusions of the Oversight Board,

24   and an independent regulator, with their own.

25         To push this, they cite three cases:  *Bildisco*,

1   Supreme Court decision in *Bildisco*; Fifth Circuit decision in

2   *Mirant*; and the Sixth Circuit decision in *FirstEnergy*.   All of

3   these cases involve the debtor seeking to unilaterally reject

4   contracts in contravention of federal labor or federal energy

5   policy.

6        Here, not only is there no applicable federal policy,

7   there's no contract rejection and there's no dispute with the

8   independent regulator.   Certainly no dispute with the

9   Oversight Board.

10        As I indicated, PREPA has approved these amendments

11  and certainly haven't opposed assumption.   There's no basis

12  whatsoever to apply the heightened standard that they

13  described.   The correct standard here is the business judgment

14  standard.

15        I will address a few other points raised by the

16  objectors.   The first related to ripeness.   All argue -- both

17  objections argue the motion isn't ripe for adjudication,

18  because the PREB regulatory process isn't complete.   That's

19  wrong for two reasons.   First of all, PREB presented a final

20  order approving the amendments.   We understand the objectors

21  filed motions to intervene in the PREB process and reconsider

22  this Order, as -- motions were filed a month and a half after

23  the Order was entered, and almost a month after this motion

24  was filed.

25        Regardless, the PREB process is essentially ex parte.

1    It's between PREPA and PREB.  There's no right to a third

2    party to intervene.  They do have rights of appeal.

3         So the second reason, if they succeed in reversing

4    the PREB Order, we believe that's unlikely, but if they do,

5    the assumption order is not intended to undo that result.

6    We're not seeking to override PREB or preempt PREB.  Although

7    the assumption of the contract is a necessary part of the

8    process to effect these amendments, assumption is no more or

9    less necessary than PREB approval or Oversight Board approval,

10   and there's no required order of events here.

11        So, but the Oversight Board approval has been

12   obtained.  PREB approval has been obtained.  And the motion to

13   assume is certainly ripe, as one of the final steps to get

14   these amendments into effect.

15        THE COURT:  Now, if I were to find that this -- if I

16   were to find a novation here and, therefore, find that it is

17   improper for me to approve an assumption of this contract

18   under 365, what, if any, practical effect would that have,

19   given that PREPA can enter into contracts under PROMESA?

20        MR. POSSINGER:  That may be more a question for

21   Mr. Sosnick.  The practical and immediate effect would be that

22   there would be no assumption.  Assumption of the contracts is

23   a condition precedent to the effectiveness of both.  So to the

24   extent assumption is not obtained, I think the contracts would

25   have to be further amended to remove that condition so that

1  they could take effect.

2          THE COURT:  Thank you.

3          MR. POSSINGER:  Returning to a few points that the

4  objectors raise, UTIER argues PREPA could not have exercised

5  business judgment, because it had no alternatives due to ECO's

6  sole control over the only liquid natural gas terminal in the

7  region.  That argument is also self-defeating.  If PREPA has

8  no alternative for the supply of 40 percent of the power in

9  Puerto Rico, how can assumption be anything but the sound

10  exercise of business judgment?

11          They argue that PREPA was strong-armed, but there's

12  no factual support for this.  Although ECO and Naturgy may be

13  the only option for liquid natural gas supply in this region,

14  PREPA, in turn, is their only possible customer.  This is a

15  balanced negotiation between mutually dependent parties, and

16  the result is a significant savings to PREPA and its

17  customers.

18          Finally, Your Honor, I'll address briefly the point

19  on standing.  Neither of these objectors have shown that they

20  have standing to oppose this motion.  They all make the simple

21  argument that they're parties in interest under Section 1109,

22  that should be enough.  But none of their arguments address

23  their interest as alleged creditors of PREPA.  All they point

24  to are aspects of the contracts they don't like from a

25  politics standpoint.

1             They've alleged vague impacts on employees, on

2    environment, on rates charged to customers, but no impacts on

3    their alleged interests as creditors of PREPA.  In fact, there

4    is no impact on their rights as creditors, to the extent they

5    are creditors.   The cost of the Power Purchase Agreement and

6    the liquid natural gas supply as passed on to rate payers,

7    there's no effect on PREPA's assets or cash flow.

8             With respect to Environmental and Windmar, the only

9    injuries they argue relate to energy and environmental policy,

10   matters this Court has already ruled don't give rise to

11   standing in the context of their attempting opposition to the

12   9019 motion.

13            With respect to Windmar, it asserts its own business

14   interests in promoting renewable energy generation, again, not

15   its interest as a purported creditor of PREPA.  The Court

16   similarly denied standing to oppose the 9019 motion on this

17   basis as well.

18            And finally, UTIER vaguely alleges prospective harm

19   to its members as PREPA employers and as rate payers.  Again,

20   at bottom, this is a challenge to energy policy.  It is not an

21   assertion of rights as creditors or interests as creditors in

22   this case.  None of the objectors here have shown that they

23   have standing, and so the objection should be overruled on

24   that basis as well.  And I ask that the motion be granted.

25            With that, unless the Court has any further

1   questions, I would yield to Mr. Sosnick.

2           THE COURT:  Thank you, Mr. Possinger.

3           Mr. Sosnick.

4           MR. SOSNICK:  Good morning, Your Honor.  Fred Sosnick

5   from Shearman Sterling on behalf of EcoElectrica.

6           Just to pick up on a couple of those items in the

7   brief time I have, I would point out to Your Honor that from

8   our perspective, this is very much the type of contract that

9   would be assumed as an amended contract under Section 365 of

10  the Bankruptcy Code.

11          I take the point that 363 does not apply, but in a

12  normal proceeding -- or in a Chapter 11 proceeding, not

13  normal, but in a Chapter 11 proceeding, these would normally

14  be handled as 365 amendments, not 363 new contracts anyhow.

15  And the reason for that, Your Honor, is that this is a

16  continuing contract to supply power to Puerto Rico.

17          I understand the Court's focus on the superseding

18  language, but I agree with PREPA's counsel that the purpose of

19  that language in this contract is these contracts, by

20  definition -- they've been amended over time at other

21  points -- can be -- unless you have a single document that

22  you're working off of, would be very difficult in the scope

23  of, you know, a document that covers almost 80 or 70 pages

24  without exhibits.  It would just be very difficult to

25  understand and comprehend.

1          From our perspective, Your Honor, the way this --

2    what we were asked to do is to address two concerns in a

3    contract that ran through to 2022 for the EcoElectrica

4    contract.  And those were to try to make the contract more

5    flexible so that PREPA could have the ability over time to

6    call more or less power, depending on what happens, and their

7    IRP, and how they bring on new renewables, and also to bring

8    about cost reductions today.

9          If we, on EcoElectrica's side, said we're not

10   interested in talking to you, that would have left PREPA with

11   two choices:  It could have assumed the contract as-is, and

12   then come back to us in 2022 and had a discussion, or it could

13   have rejected the contract.  And which is --

14        THE COURT:  So just finish your point.

15        MR. SOSNICK:  Yes.  In which case, we would have been

16   without this contract providing baseload.  And that's why, to

17   us, it was a renegotiation around terms to fit within the

18   continuation of a contract that provided this key source of

19   power to PREPA.

20        THE COURT:  Thank you, Mr. Sosnick.

21        And now I will turn to UTIER's counsel, Ms. Mendez

22   Colberg.

23        MS. MENDEZ COLBERG:  Yes, Your Honor.

24        THE COURT:  I have you down for 15 minutes.

25        MS. MENDEZ COLBERG:  Yes, Your Honor.

1          This is Jessica Mendez on behalf of UTIER.  Can you

2     hear me okay?

3          THE COURT:  Yes.  Yes, I can.  Thank you.

4          MS. MENDEZ COLBERG:  Thank you.  Well, good morning,

5     Your Honor.

6          THE COURT:  Good morning.

7          MS. MENDEZ COLBERG:  As I said, this is Jessica

8     Mendez on behalf of UTIER.

9          First, we want to submit to the Court that these

10    contracts, as Mr. Possinger stated, are major power purchase

11    and operation agreements.  These are critical contracts that

12    have -- that have public interest concerns, as opposed to the

13    cases that PREPA has been citing in its documents.

14         So what we are asking the Court is a determination on

15    lack of jurisdiction and to find that assumption isn't proper

16    under the proper standard of review.  So what we are asking

17    the Court is within the confines of this contested matter.

18         So with respect to the standing of UTIER, PREPA has

19    questioned whether UTIER has standing to object to the

20    extension of the contracts.  But UTIER is a creditor and a

21    party in interest; and it has a right to appear and be heard

22    on any matter in this case, but especially when that matter

23    has a direct effect on UTIER's claim.

24         By assuming the contract, PREPA is not just assuming

25    the obligations that it had prepetition with EcoElectrica and

1    Naturgy, which were set to expire in 2022 and 2020. PREPA is

2    assuming ten to 12 years worth of new liabilities that will be

3    granted an automatic administrative expense priority in this

4    case. So evidently, it is not the same to grant priority to

5    liabilities of a few months or a couple of years as a decade

6    or more. This obviously affects UTIER's claims as an

7    unsecured creditor.

8         Now, PREPA has argued that being a party in interest

9    is not enough, and it has cited cases that address formality

10   issues. But with respect to -- but those are with respect to

11   Section 365(d)(4). Now, UTIER is not objecting on the basis

12   of a formality. It's objecting under constitutional and

13   prudential principles and under Section 365(a), which is

14   subject to the Court's review and requires benefit to the

15   estate.

16        Now, the benefit to the estate is benefit to the

17   unsecured creditors, as much as anything else. If unsecured

18   creditors do not have standing to object to assumption when it

19   would be prejudicial to the estate, then the Court would rely

20   only on the word of the debtor who wants to assume the

21   contract and the nondebtor who wants the administrative

22   expense priority for its claim. So obviously, Section 365(a)

23   benefits the parties to the contract, but it also benefits the

24   bankruptcy estate, and, by inevitable consequence, the

25   unsecured creditors as well.

1          Now, with respect to the aspect of the ripeness for

2     adjudication, Mr. Possinger stated that the proceedings before

3     the Energy Bureau were final, but they are not.  The Court --

4     if the Court does not deny the Motion to Assume, at least it

5     should hold this matter in abeyance until the process before

6     the Puerto Rico Energy Bureau is completed and the Order is

7     actually final.

8          Ripeness is a jurisdictional issue, as well as a

9     prudential one, and the Court should not waste its judicial

10    resources in matters that are not ripe.  Actually, this

11    Court's own procedures for the assumption of power purchase

12    and operating agreements at docket 1199 require the Energy

13    Bureau's prior approval to assume a power purchase and

14    operating agreement.

15         And the Energy Bureau, as I mentioned, the Energy

16    Bureau's approval is not final.  Yes, the Energy Bureau

17    approved the contracts on March 11, but due to the COVID-19

18    pandemic, all deadlines in the Energy Bureau were extended.

19    Therefore, four different motions, including our own, have

20    been filed before the Energy Bureau, none of which have been

21    ruled on yet.

22         Even if the Energy Bureau rules on these motions,

23    regardless of who it favors, judicial review in the state

24    court is available to the unfavored party.  And actually, to

25    this day, other parties can still seek to -- timely

1   reconsideration on those proceedings, because the deadlines

2   have been extended to June 15.  So -- and even if the Energy

3   Bureau denies a reconsideration, it may grant any other of

4   these motions, and regardless of the Energy Bureau's decision,

5   the judicial review is available even for PREPA.

6           PREPA contends that it has taken care of this problem

7   by amending its Proposed Order to say that it will not

8   override any decision by the Energy Bureau, but that doesn't

9   solve the issue that the Court does not have jurisdiction to

10  cede this contested matter if it's not ripe.  To rule on this

11  matter would be, as I mentioned, a waste of the Court's

12  limited resources and would also create a burden on the Energy

13  Bureau.

14          Now, and also I would like to stress that PREPA

15  admitted that it is not seeking Court approval for the

16  assumption unless the PREB's Order remains final.

17          Now, with respect to the issue of these contracts

18  being new contracts, the Court should deny PREPA's motion,

19  because PREPA is trying to assume new contracts by calling

20  them amended contracts.  Section 365 is only -- it's only for

21  assuming executory contracts, which must be pending

22  prepetition.

23          Now, PREPA contends that the contracts are not new,

24  because they are amended, restated agreements.  However,

25  PREPA'S own discovery in these proceedings show that this is

1   not the case.  Under Puerto Rico law, an amendment constitutes

2   a new obligation when novation takes place.  Now, novation can

3   be express or tacit, and if it is tacit, what the Court looks

4   for is the change in the nature on the contract.

5          Now, if Your Honor would look at the form -- the form

6   marked in our informative motion submitting the exhibits,

7   referring to Exhibit Four, when PREPA needed authorization for

8   the funds of the Naturgy contract, it marked the contract as a

9   new contract.  And this document was submitted by Mr. Padilla

10  himself.  So that's an admission of this contract being a new

11  contract.

12         Also, PREPA'S executive director has admitted that

13  the Naturgy contract can be considered a new contractual

14  obligation because Naturgy is the new supplier of natural gas

15  to PREPA for the EcoElectrica facility.  So PREPA's own

16  discovery shows that this is a new contract by tacit novation.

17         Also, with respect to the EcoElectrica agreement, we

18  submit that it is also a new contract as well, because PREPA

19  itself has admitted that there are substantial changes to the

20  nature of the contract.  The -- PREPA's executive director

21  said that the EcoElectrica contract has been substantially

22  amended so that it now takes the form of a tolling agreement,

23  which is a totally different structure for the contract

24  through PREPA, which will supply the natural gas to be

25  converted to electric energy in the EcoElectrica facilities.

1          Now, in the way that the contracts are now, PREPA

2    does not have that obligation to supply the natural gas to

3    EcoElectrica, so it is a substantial, a radical change of the

4    nature of the contract, including new obligations to the

5    parties.  This is not just something that is extending

6    deadlines or due dates of the contracts.

7          THE COURT:  If I were --

8          MS. MENDEZ COLBERG:  Now, to be sure --

9          THE COURT:  Ms. Mendez, if I were to agree with you

10   that this is a new contract, so that I don't have authority to

11   examine it under 365, there appears to be nothing in PROMESA

12   to stop PREPA from going ahead and amending the contract to

13   take away the condition precedent, but PREPA has the authority

14   to just enter into this contract without asking for my

15   approval.  So to what benefit to UTIER would it be for me to

16   deny approval of assumption on the grounds of this being a new

17   contract?

18         MS. MENDEZ COLBERG:  Yes, Your Honor.  This is the

19   question that you asked about the practical effect to

20   Mr. Possinger.  And with respect to the bankruptcy

21   proceedings, and UTIER, if the contract is assumed under 365,

22   it would entitle them to administrative expenses priority,

23   which is what we say injures UTIER as an unsecured creditor.

24   So that would be the effect of assuming the contract in the

25   bankruptcy proceedings.

1          And also, we would submit that the agency that has

2    the expertise to address the technical issues of these

3    contracts are within the Energy -- the Energy Bureau.  So yes,

4    if the contract is a new contract, it doesn't require the

5    authorization of the -- the approval of this Court.  It would

6    be in the hands of the PREB, who has the expertise, and we

7    would also intervene in those proceedings as well.  But with

8    respect to the bankruptcy proceeding, it's about the

9    administrative expenses priority.

10          THE COURT:  Thank you.

11          MS. MENDEZ COLBERG:  So I wanted to address the

12   language of the contract, because, to be sure, just because

13   the parties include the language "amend and restate," that

14   does not negate the "will not" to novate the contracts.  Under

15   Puerto Rico law, this kind of language does not indicate the

16   "will not" to novate, and with that respect, we've cited in

17   our motion various cases, including the *Ballester Hermanos*

18   case from the District Court.

19          And also, Your Honor was mentioning that the contract

20   explicitly says that this contract supersedes previous

21   agreements, so that goes to the express content of the

22   contract itself.

23          Now, with respect to the standard of review, the

24   appropriate standard here is the balance of equities.  Now,

25   the contracts that PREPA wants to assume are special and

1  unique contracts which will have significant impact on a

2  myriad of interests.

3       Now, we'd obviously disagree with PREPA'S

4  interpretation of the cases, the *Bildisco*, the *Mirant* cases,

5  as limiting the scope of the Bankruptcy Court's equity powers.

6  The focus of those cases is not on rejection nor on

7  regulation, it's on the interests that are effected due to the

8  nature of the contracts.

9       We are not aware of any case law that defines the

10  standard of review for assumption as different from that of

11  rejection.  The general test for both is the business judgment

12  standard.  But it stands to reason that if a contract should

13  be seen under the balance of equity standard, or rejection, it

14  can be seen under the same standard for assumption as well.

15       These cases took unique situations and considered

16  that the importance of the interests at stake warranted a

17  stricter standard.  So there, as here, the business judgment

18  standard doesn't cut it.  It's a highly differential standard

19  for such important contracts.

20       And with respect to that, we mentioned the two

21  interests involved that the business judgment standard does

22  not address, which are the effect on rate payers and the

23  effect on environmental management as well.  So rate payers

24  are adversely affected by the negotiated terms of the

25  contracts, because they are charged for those payments that

1   PREPA has to make.  And with respect to environmental effects,

2   Puerto Rico law mandates that PREPA transition towards

3   renewable energy, and here PREPA is committing to natural gas,

4   which is not a renewable energy source, for the next ten

5   years.

6        Now, with respect to the business judgment standard

7   itself, even if we considered that standard, PREPA has the

8   burden to show that the contracts benefited -- as a debtor.

9   Now, the EcoElectrica contract that PREPA wants to assume

10  imposes new burdens on PREPA.  PREPA has not explained the

11  reasonability of the new payments on the contracts, and PREPA

12  is not fully protected under either contract from paying

13  EcoElectrica the capacity payment if, for example, Naturgy

14  fails to deliver the fuel.

15       And with respect to that, in PREPA'S Response to our

16  Interrogatories, it said that -- it has been saying that it is

17  fully protected, but yet in its Reply, in the Omnibus Reply,

18  it says that PREPA has mechanisms to mitigate.  So those two

19  are not the same.

20       We already mentioned the effect on the creditors,

21  especially UTIER, with respect to the administrative expense

22  priority, and the negotiations with respect to these contracts

23  with PREPA establishes that -- are reasonable, but it actually

24  had no choice to give it in -- to give in to Naturgy's

25  request, with those that say that -- with respect to being a

1    business -- sound business judgment.

2         Naturgy's actions fit the description of a

3    monopolistic violation, such as the type of arrangement in

4    violation of the essential facility doctrine, because Naturgy

5    has used its control over the EcoElectrica terminals, which it

6    got through a tolling agreement with EcoElectrica, to make

7    itself the only available option if PREPA intended to use the

8    terminal, which it had to do.

9         So this made PREPA agree to a contract for natural

10   gas for EcoElectrica, which made it change the nature of the

11   EcoElectrica contract, skipping obviously the competitive

12   bidding process and agreeing to assume both contracts and the

13   Title III.

14        Now, lastly, PREPA excuses entering into these

15   contracts without competitive bidding under the sole source

16   exception, but this exception does not apply --

17        THE COURT:  Please finish up concisely.

18        MS. MENDEZ COLBERG:  Yes.  To conclude, Your Honor,

19   we reiterate that the process before the Energy Bureau is not

20   final, so the Court should hold in abeyance these proceedings

21   or deny the Motion to Assume for the reasons that I already

22   stated and for the reasons stated in our motion.

23        Thank you, Your Honor.

24        THE COURT:  Thank you, Ms. Mendez.

25        And now, Mr. Agrait for Windmar.

1          MR. AGRAIT:  Good morning, Judge.

2          THE COURT:  Good morning.

3          MR. AGRAIT:  Can you hear me well?

4          THE COURT:  Yes, I can.

5          MR. AGRAIT:  Okay.  I'll be very short, because

6    Attorney Mendez has covered most of the issues, but I would

7    like to go directly to the question you asked concerning the

8    new contracts.

9          PREPA itself submitted this to the PREB as a new

10   contract.  And it was Mr. Jose Ortiz, executive director

11   himself, who said so.  That's one.

12         Two, this contract, these new contracts, as opposed

13   to the first contract, provide for the possibility of bringing

14   to Puerto Rico natural gas from the United States, which would

15   make this interstate, which would require FERC intervention.

16   The first contract provides only for outside of U.S. sources

17   for gas, so it didn't have any component of interstate

18   transfer of NG.  That in itself makes this contract a totally

19   different one than the first one.

20         Third, the risks in these contracts are altered

21   significantly.  The commercial entity or the entity that would

22   buy the gas in the open market would be PREPA.  It would

23   become either -- Naturgy gas by the tolling agreement, but the

24   person who would go out to buy the gas would be PREPA with --

25   when we don't know really what the expertise of PREPA is in

1   that field.  But certainly it adds, adds a big risk to PREPA's

2   future, because it is -- in practical terms, if this is a new

3   contract, as we think, and the Court has no bearing on

4   approving this new contract, because PREPA can go into it

5   itself, it can go into it itself if it gets prior PREB final

6   approval.

7           And if it's a new contract, then it is subject to

8   Rule 8415 of PREB, which specifically requires competitive

9   procedures, which were not present here, among other reasons,

10  because it supposedly was just an assumption of an existing

11  contract.  If this Court recognizes, as PREPA has admitted

12  now, not in its first motion, but at the other motions, that

13  this has to have PREB's prior final approval before the Court

14  decides, then what -- in a way, why are we here?

15          Why don't we go back to PREB, where the substantive

16  decision of whether these contracts comply or not with the

17  public policy of Puerto Rico, which is respected under PROMESA

18  law, which, as a matter of fact, mentions specifically the

19  PREB as an important entity in the further development of

20  Puerto Rico?

21          Why don't we go to PREB to have a final decision that

22  PREPA has admitted is needed, look at it as a new contract,

23  have it subject to the applicable regulation, which is

24  regulation 8415, and then the Court wouldn't have to be

25  involved in these issues?  As a matter of fact, PREB would

1   give the balance of equity analysis that the parties -- the

2   opposing parties are requesting.

3        It is important, Your Honor, that the public policy

4   in Puerto Rico, on this field, which -- Law 17 of 2019 is not

5   only a substantive law, but it is also a procedural law on the

6   processes, transparency and participation of consumers in the

7   decisions of PREPA.  If that participation is not granted,

8   it's not through PREB, which is the regulator, then the whole

9   process would be contrary to Puerto Rico public policy, Law 17

10  of 2019.

11       That would be my statement, Your Honor.

12       THE COURT:  Thank you, Mr. Agrait.

13       And now, for five minutes, Mr. Santiago Sastre for

14  the Environmental Advocacy Group.

15       MR. SANTIAGO SASTRE:  Good morning, Your Honor.

16  William Santiago Sastre on behalf of the Environmental

17  Advocacy Group.  And am I speaking clearly?

18       THE COURT:  Yes, you are.

19       MR. SANTIAGO SASTRE:  Okay.  First of all, I have to

20  state that my clients join all the arguments presented by the

21  UTIER and Windmar parties in their opposition to PREPA's

22  urgent motion for entry of an order to authorize the

23  assumption of the contracts in question, especially as to the

24  ripeness discussion that has been held today and also in the

25  pleadings.

1        Secondly, I want to clarify, for the benefit of the

2   Oversight lawyers, who exactly I represent and who composes

3   these groups.  We are not creditors in the sense that PREPA

4   doesn't necessarily owe us money, but of the groups that I

5   represent, there are people that live adjacent to these

6   plants.  They live right next to them, in Penuelas and

7   Guayanilla, two very small towns in the south side of the

8   island.  And they have been struggling with the issues of

9   contamination in their area for years.

10       So, you know, I hope no one takes that lightly, you

11  know.  We're not creditors.  That's right.  But we are

12  citizens, and the environment is being affected greatly by the

13  use of fossil fuels, and these contracts contemplate 12 more

14  years of fossil fuel use.

15       And in the case law that we cited in our Sur-reply

16  that was Ordered by the Court, which is at docket 2003 in the

17  PREPA proceedings, we cite cases which state that when an

18  energy company is the debtor, then issues of the environment

19  are relevant in regard to the standing of a party to appear

20  before the Court.

21       So I have to say that we definitely should have --

22  and your prior ruling, Judge, which they are relying on to try

23  to again exclude citizens from these proceedings, it was very

24  clear that when the 9019 motion was filed last year, it was

25  later narrowed down.  It was narrowed.  And so the public

1   policy questions that we want to address as to the environment

2   and the economic impact of the RSA, were no longer before the

3   Court.

4        So it was very reasonable, and I accepted that

5   decision at that time, because, yeah, well, you know, they

6   narrowed their RSA.  So we didn't necessarily have to

7   intervene at that time, but certainly now these contracts are

8   the implementation of measures of the RSA or the

9   reorganization plan.  And certainly it is appropriate at this

10  time for this Court to hear the citizens that are being

11  affected in their lives, you know, theirselves, because of

12  these contracts.

13       I really don't have much else to say, because I'm

14  adopting basically the positions of UTIER and Windmar, but I

15  am concerned that because, you know, the Oversight Board has

16  very capable lawyers, and so does AAFAF, and you know, we have

17  very limited resources.  And a decision by this Court allowing

18  the assumption of these contracts would, I believe -- even

19  though they are saying, oh, it would override a revocation of

20  the approval of the contracts by the agency, they're going to

21  use an assumption of the contract possibly as collateral

22  estoppel as to the sound business judgment or the benefit of

23  the debtor.  So it would impact the motions that are pending

24  before the regulatory agency.

25       You know, we have a motion to intervene and a motion

1   for reconsideration that was presented in April, the end of

2   April, pending before the agency.  And I fear that or I

3   suspect they are going to use an assumption of the contract in

4   some fashion to say, well, that was already adjudicated, and

5   then take it away from the agency to decide these issues about

6   whether pricing is good and what is the environmental impact

7   in these type of issues that this -- the agency has expertise

8   in.

9        And so, basically, that would be our oral argument

10  today, Your Honor.  Thank you for your time.

11       THE COURT:  Thank you very much, Mr. Santiago Sastre.

12       And now Mr. Possinger for five minutes of rebuttal.

13       MR. POSSINGER:  Yes, Your Honor.  Thank you.

14       And I'll start with the ripeness argument and I think

15  the related policy argument.  I want to make clear what we are

16  seeking to do here is assume contracts pursuant to Section

17  365, period.  We're not seeking to use this process to

18  override the authority of PREB or to preempt the process at

19  PREB, whatever, to the extent that that process is still

20  ongoing.

21       I understand that there are motions to reconsider.  I

22  also understand that there really is no standing for parties

23  to intervene in a PREB proceeding.  There may be appellate

24  rights.  And I believe there is a tolling now because of the

25  COVID crisis, and the appellate rights may still exist.  If

1    that process, you know, goes forward, the parties will have

2    whatever rights they have under Puerto Rico law to present

3    their policy positions.

4         And, you know, I'm certainly sympathetic to the

5    statement of the Environmental Group regarding contamination.

6    Nobody wants to hear about that or know that that's happening,

7    but that's a matter of energy policy in Puerto Rico.  That's a

8    matter for PREB.  PREB has spoken.  PREB has entered an Order

9    approving these amendments.  If there's an appeal, it can be

10   heard.  If the appeal is successful, then, you know, I would

11   say PREPA is assuming these contracts as is, subject to Puerto

12   Rico law.  And if PREB, the ultimate conclusion of the PREB

13   process is that the contracts are not approved by PREB, then

14   they're not approved.

15        However, under the contracts as we have there

16   written, assumption is a requirement for their effectiveness.

17   Approval by PREB and the Oversight Board, also requirements.

18   And again, there's no required order of events here.  They can

19   occur independently, and, you know, the PREB approval has

20   already been obtained.

21        Regarding Your Honor's question as to, you know, what

22   is the harm to the opponents here if PREPA simply just has to

23   sign the new contracts and not get an assumption order, we've

24   heard that there's a concern that, well, then they'll be

25   administrative priority claims.  And that begs the question:

1    What do they view as the alternative here.

2         For the next 12 years, these contracts provide that

3    PREPA will be able to access 40 percent of its power

4    generation stemming from the south coast of the island.  If

5    the contracts are rejected, which seems to be the desire of

6    the opponents, what is the alternative, first of all?  They

7    haven't identified any.

8         And second of all, they suggest that the alternative

9    will come free, and that -- or that the cost of providing

10   those alternatives will somehow be subject to discharge in

11   this Title III case.  They wouldn't be.  PREPA has to pay for

12   power and provide it to its customers.  Under these contracts,

13   it has a source of doing that, a secure source of doing that

14   for the next 12 years.

15        With respect to the balance of the equities, Your

16   Honor, I would say again, that's -- the standard that they put

17   forward kicks in only when a debtor seeks to assume -- if

18   it -- I say it rejects a contract.  If they want to argue that

19   assumption is the same, has the same standard, fine, but that

20   the standard would kick in only if either step is taken in

21   contravention of a federal policy.  Here there's not even

22   contravention with a local policy.

23        But this isn't the forum to litigate policy.  If they

24   say the PREB process is still open, that's where they should

25   take these arguments.  Here the standard is business judgment,

 1   and business judgment has been satisfied.

 2          Finally, on the issue of novation, again, they put

 3   forth their arguments on radical changes to these agreements.

 4   These radical changes really boil down to amendments.  That's

 5   all they are.  The fundamental nature of these contracts

 6   remains intact.  There's a supply of power.  There's a supply

 7   of liquid natural gas.

 8          The statement in the contract that says it supercedes

 9   all prior agreements is for clarity only.  It is not a

10   substantive statement that renders these, you know, new

11   contracts, novated contracts pursuant to Puerto Rico law.

12   They are the original contracts as amended, substantively

13   amended, but amended nonetheless, and they're still subject to

14   assumption pursuant to 365.

15          Thank you, Your Honor.

16          THE COURT:  Thank you, Mr. Possinger.

17          I will take this matter under --

18          MR. MALONE:  Your Honor.

19          THE COURT:  Yes.

20          MR. MALONE:  This is Michael Kelly Malone.  May I

21   take a few minutes?  I'm acting on behalf of PREPA.  May I

22   take the remaining time, if possible?

23          THE COURT:  Yes.  I don't -- how much remaining time

24   was there, Ms. Selden?

25          MS. SELDEN:  About a minute, Judge.

1              THE COURT:  All right.  So, briefly, Mr. Malone.

2    Yes.

3              MR. MALONE:  Thank you, very much.

4              If I could just go quickly to the point of the reason

5    why the Assumption Order was part of the two contracts, and

6    that was a position required from the very beginning by the

7    two counterparties, Naturgy and EcoElectrica, because of the

8    very, very high value of payments that were going to happen

9    under both of those contracts over 12 years and the fact that

10   they were contracting with an insolvent party.

11             I'm -- a ruling that would find a novation and sort

12   of take this process outside of the Assumption Order would

13   deny the counterparties the administrative expense priority

14   and would likely have a big setback on these transactions.

15   And as Mr. Possinger already said, there are really no other

16   alternatives.  It could be a significant setback to PREPA'S

17   program to roll out power, particularly in southern Puerto

18   Rico, as a result of that ruling.

19             I'll stop there, Your Honor.

20             THE COURT:  Thank you, Mr. Malone.

21             And I thank all counsel for these arguments, which I

22   will continue to consider carefully.  I will take the motion

23   under advisement, and I will issue a written opinion in due

24   course.

25             That concludes the set Agenda for today's

1  proceedings.  Are there any other matters that need to be

2  addressed today?

3          (No response.)

4          THE COURT:  We will reconvene telephonically tomorrow

5  morning at 9:30 for the preliminary hearing on the Revenue

6  Bond Lift Stay Motions.  Please note that due to an unforeseen

7  conflict in the Court's schedule, the timing for tomorrow's

8  hearing will be in the morning from 9:30 to 12:45, and if

9  necessary, resuming at 2:15 and continuing until five o'clock.

10 And I thank everyone in advance for the accommodation of the

11 Court's schedule.

12          Stay safe and keep well, everyone.  I look forward to

13 reconvening tomorrow morning.  We are adjourned.

14          (At 12:09 PM, proceedings concluded.)

15                  *     *     *

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 99 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   June 3, 2020.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
December 2020 32:16
February 3rd 15:12
July 1 19:24, 20:1
July 10 11:2
July 15 23:16
July 29th 9:18
June 15 11:5, 13:8,
  81:2
June 1st 7:11
June 3, 2020 1:18,
  5:2, 99:9
March 11 80:17
May 29 26:5, 28:15,
  28:22
(6). 34:13


< 1 >
100 65:23
10th 12:1, 15:10,
  15:11
11 20:24, 76:12,
  76:13
11,000 10:14, 10:25
1109 74:21
1199 80:12
12 66:5, 68:2, 79:2,
  91:13, 95:2,
  95:14, 97:9
12569 33:1
12579 63:11
12:09 98:14
12:45 98:8
13305 7:12
13337 8:6
13353 8:6
14 33:3, 33:14,
  33:15, 33:19
15 77:24
150 35:8
17 90:4, 90:9
17-3283 7:12, 33:2,
  63:11
17-3283. 8:7
17-3567. 33:2
17-4780. 63:12
17-BK-3283(LTS 1:6
17-BK-3567(LTS 2:4
17-BK-4780(LTS 1:25

174 9:9
177,000 9:5
18 63:14
1951 63:11
1995 65:2
1:00 8:1


< 2 >
200 29:25
2003 91:16
2011 34:23, 54:4
2012 65:3
2016 35:11
2017-3283 5:9
2019 61:17, 65:7,
  65:11, 66:23, 90:4
2019. 65:12, 66:17,
  66:21, 90:10
2020. 79:1
2021. 25:24
2022 77:3, 77:12,
  79:1
2022. 65:3
2032. 65:15
2051 56:4
2061 56:5
22 33:19
250 25:3
29 14:7
2:15 98:9


< 3 >
3.5 58:9
305 42:8
3495 46:4, 46:17
3499 37:5
35,000 9:7
362 61:10, 61:23
362(a)(1 34:13,
  39:11
362(a)(3 34:10,
  36:18
362(a)(4 34:12,
  38:1, 38:12
363 69:5, 76:11,
  76:14
365 68:10, 73:18,
  76:9, 76:14,

81:20, 83:11,
  83:21, 93:17
365(a 67:4, 79:13,
  79:22
365(d)(4 79:11
365. 96:14
3799 99:14
3: 1:6, 1:25, 2:4


< 4 >
40 65:5, 74:8, 95:3
43 9:8, 62:2
43.6 9:6
49,000 10:16


< 5 >
544 61:23, 62:23
544(b 50:6
546 41:12, 62:23
546(a 43:14, 50:5,
  52:24, 53:5, 53:21
546(e 57:17
546. 41:6, 42:23
548 49:6
554 41:20, 53:18
554. 53:4
56,000 9:12
5:00 8:1


< 6 >
60 25:4


< 7 >
70 76:23
756 33:2


< 8 >
80 36:6, 76:23
8415 89:8, 89:24


< 9 >
9 20:24
9,000 9:9
9019 75:12, 75:16,

91:24
922 67:15
926 41:16
99 99:4
9:30 7:25, 98:5,
   98:8
9:36 5:3

< A >
a)(1 40:11
a)(6 39:12, 40:11
A. 2:35, 2:40
AAFAF 8:3, 8:8,
   10:9, 12:1, 23:19,
   23:21, 92:16
abandoned 41:4, 43:1
abandoning 17:1
abandonment 40:15,
   41:19, 41:22,
   41:25, 42:11,
   53:4, 53:6, 53:9,
   53:16, 53:18,
   53:19, 62:20
abeyance 80:5, 87:20
Abid 3:21, 24:22
ability 10:3, 77:5,
   99:5
able 5:25, 12:19,
   23:24, 25:24,
   51:13, 52:2, 95:3
absence 39:17
Absolutely 5:7,
   28:13
absolve 40:25
accept 70:19
accepted 92:4
access 95:3
accessing 6:6
accommodation 98:10
accomplish 19:22
accordance 12:10
account 25:4, 31:12,
   38:16, 54:25,
   56:18
accurate 7:4, 16:25,
   99:5
achieve 65:9, 68:13
achieved 68:15
acknowledged 32:9

Acquisition 3:20,
   24:17
ACR 8:22, 10:7,
   10:16, 10:20,
   10:24, 11:24,
   12:3, 12:6, 12:12
across 39:13
Act 13:19, 44:14,
   44:15
acting 96:21
action 13:15, 13:20,
   13:24, 23:11,
   36:1, 37:12,
   37:15, 42:24,
   43:23, 44:5, 46:6,
   46:19, 48:3,
   48:14, 49:10,
   49:17, 55:25,
   56:19, 56:20
actions 44:13, 55:8,
   61:20, 87:2
actual 56:7
Actually 10:5,
   10:17, 10:19,
   26:19, 33:13,
   33:14, 44:13,
   45:25, 57:19,
   58:24, 80:7,
   80:10, 80:24,
   86:23
add 12:21, 23:3,
   31:10, 59:3
addition 26:17, 38:4
additional 8:10,
   8:17, 8:21, 8:24,
   9:13, 9:17, 9:19,
   12:11, 13:7,
   25:11, 27:6, 35:6,
   35:8, 35:14, 48:21
Additionally 9:9,
   17:18, 63:24
address 6:21, 8:23,
   23:7, 27:20, 28:5,
   31:1, 31:16, 39:3,
   53:11, 58:9,
   62:25, 63:25,
   70:14, 70:24,
   72:15, 74:18,
   74:22, 77:2, 79:9,
   84:2, 84:11,

85:22, 92:1
addressed 16:1,
   28:8, 58:13, 98:2
addressing 30:1,
   58:10
adds 89:1
adjacent 64:17, 91:5
adjourned 98:13
adjourning 9:25
adjudicated 93:4
adjudication 72:17,
   80:2
adjusted 20:23
Adjustment 16:12,
   17:19, 20:12
adjusts 20:10
Administered 1:11,
   1:30, 2:9
Administrative
   24:18, 32:8, 79:3,
   79:21, 83:22,
   84:9, 86:21,
   94:25, 97:13
admission 82:10
admits 38:24
admitted 35:18,
   81:15, 82:12,
   82:19, 89:11,
   89:22
adopt 71:19
adopted 46:14
adopting 92:14
ADR 8:22, 10:7,
   10:14, 10:23,
   10:24, 10:25,
   11:3, 11:8, 11:10,
   12:13, 12:16
advance 7:5, 8:5,
   30:18, 98:10
advanced 26:24
adversary 38:7
adversely 85:24
advisement 97:23
Advisory 3:5
Advocacy 3:36,
   90:14, 90:17
affect 47:18, 55:23
affected 5:19,
   48:19, 85:24,
   91:12, 92:11

affects 79:6
affirm 38:15
afford 41:17
agencies 10:9, 12:2,
    12:4
Agency 3:4, 84:1,
    92:20, 92:24,
    93:2, 93:5, 93:7
Agenda 6:20, 7:10,
    7:12, 8:2, 24:15,
    33:11, 97:25
Agrait 3:27, 87:25,
    88:1, 88:3, 88:5,
    90:12
agree 45:25, 52:20,
    60:6, 76:18, 83:9,
    87:9
agreeing 87:12
Agreement 16:8,
    34:24, 34:25,
    35:5, 35:9, 35:17,
    35:19, 38:19,
    54:5, 54:15,
    54:18, 54:19,
    57:3, 64:4, 64:5,
    64:16, 68:8, 75:5,
    80:14, 82:17,
    82:22, 87:6, 88:23
agreement. 36:8
agreements 70:22,
    71:4, 78:11,
    80:12, 81:24,
    84:21, 96:3, 96:9
ahead 83:12
Akin 24:23
al 2:32, 5:11
alert 7:17
allegations 34:15
alleged 35:25,
    74:23, 75:1, 75:3
allegedly 44:8
alleges 38:1, 39:8,
    41:3, 75:18
allocation 7:21,
    24:19
allocations 7:10
allotments 7:9
allotted 7:7
allow 13:7, 31:11,
    31:18, 34:7, 41:9,

    66:7
Allowance 24:17
allowed 47:9
allowing 41:8, 92:17
allows 54:10, 54:17,
    60:10
almost 72:23, 76:23
already 10:19,
    10:21, 69:3,
    75:10, 86:20,
    87:21, 93:4,
    94:20, 97:15
altered 70:2, 88:20
alternative 10:15,
    26:17, 74:8, 95:1,
    95:6, 95:8
alternatives 46:24,
    74:5, 95:10, 97:16
Although 49:5, 73:6,
    74:12
altogether 36:9
amend 69:24, 84:13
amended 21:2, 64:8,
    67:6, 68:8, 69:9,
    69:19, 69:22,
    71:10, 71:16,
    73:25, 76:9,
    76:20, 81:20,
    81:24, 82:22,
    96:12, 96:13
amending 71:5, 81:7,
    83:12
amendment 70:2,
    70:5, 70:20, 71:7,
    71:8, 82:1
amendments 63:23,
    65:13, 65:24,
    66:10, 66:13,
    66:15, 66:18,
    66:21, 66:22,
    66:25, 67:5,
    68:14, 68:21,
    70:12, 71:11,
    71:16, 72:10,
    72:20, 73:8,
    73:14, 76:14,
    94:9, 96:4
among 35:12, 89:9
amount 9:5, 25:12,
    26:22, 58:8, 59:5

Amy 18:22, 99:13,
    99:14
an injury 42:17
analysis 11:14,
    25:21, 28:9,
    28:15, 28:19,
    29:25, 34:19,
    66:19, 90:1
Andrew 3:24, 43:9
annul 44:16, 45:5,
    46:25
annulment 49:9
answer 19:16, 23:24,
    27:7, 30:24, 58:11
anticipate 11:20
anticipates 32:6
anticipating 10:25
anybody 18:3, 51:16
anyhow 76:14
Anyway 45:4
apologize 7:5
apparent 61:7
appeal 73:2, 94:9,
    94:10
appear 78:21, 91:19
APPEARANCES 2:27,
    3:1
APPEARING 2:29
appears 24:9, 37:6,
    51:4, 83:11
appellant 61:18
appellate 93:23,
    93:25
applicable 40:19,
    42:1, 63:2, 72:6,
    89:23
application 46:11,
    53:15, 57:16
applies 41:13,
    46:23, 53:21
apply 40:24, 49:19,
    53:15, 53:22,
    72:12, 76:11,
    87:16
appointed 23:7
appointment 35:12,
    67:14
appreciate 12:14,
    23:22
approach 42:6, 42:9

appropriate 6:25,
    14:24, 22:5,
    30:13, 31:6,
    31:16, 42:6,
    58:16, 84:24, 92:9
appropriation 21:19
appropriations 21:13
Approval 12:6,
    52:19, 64:9, 67:2,
    69:2, 73:9, 73:11,
    73:12, 80:13,
    80:16, 81:15,
    83:15, 83:16,
    84:5, 89:6, 89:13,
    92:20, 94:17,
    94:19
approve 73:17
approved 66:16,
    66:21, 72:10,
    80:17, 94:13,
    94:14
approving 66:24,
    72:20, 89:4, 94:9
approximate 9:5,
    25:12
approximately 9:5,
    9:7, 9:8, 9:12,
    10:14, 10:15
April 93:1, 93:2
Aprovisionamientos
    64:5
arbitration 11:13,
    11:16
area 91:9
argue 22:1, 22:8,
    72:16, 72:17,
    74:11, 75:9, 95:18
argued 22:7, 22:21,
    43:20, 71:19, 79:8
argues 22:9, 36:21,
    41:3, 43:21,
    53:12, 74:4
arguing 16:14,
    22:22, 36:19,
    37:2, 38:14, 40:22
argument 17:1, 17:3,
    21:17, 21:19,
    21:23, 22:16,
    22:24, 34:1,
    38:23, 39:13,

44:4, 46:1, 55:13,
    55:14, 68:24,
    74:7, 74:21, 93:9,
    93:14, 93:15
arguments 41:10,
    57:13, 58:6,
    58:16, 63:6,
    68:18, 74:22,
    90:20, 95:25,
    96:3, 97:21
around 60:24, 77:17
arrangement 70:6,
    87:3
arrive 67:20
Artesanias 42:18
articulated 59:19
as-is 77:11
aside 38:10, 42:12
aspect 21:17, 21:19,
    80:1
aspects 56:11, 74:24
assert 41:2, 68:20
asserted 9:6, 42:12,
    68:19
asserting 54:11,
    55:4, 55:6, 55:7
assertion 54:25,
    75:21
asserts 75:13
assessment 32:2
assets 48:5, 75:7
assign 35:1
assistance 34:6
associated 23:7,
    29:3
Assume 63:10, 64:2,
    67:8, 73:13,
    79:20, 80:4,
    80:13, 81:19,
    84:25, 86:9,
    87:12, 87:21,
    93:16, 95:17
assumed 68:20, 76:9,
    77:11, 83:21
assuming 78:24,
    79:2, 81:21,
    83:24, 94:11
Assumption 67:4,
    67:6, 67:21,
    68:16, 72:11,

73:5, 73:7, 73:8,
    73:17, 73:22,
    73:24, 74:9,
    78:15, 79:18,
    80:11, 81:16,
    83:16, 85:10,
    85:14, 89:10,
    90:23, 92:18,
    92:21, 93:3,
    94:16, 94:23,
    95:19, 96:14,
    97:5, 97:12
Assurance 3:23,
    43:10
assure 68:2
assured 28:16
assuredly 40:3
assuring 67:18
AT&T 17:24, 18:1,
    18:10, 18:11,
    19:3, 19:7, 29:8,
    29:14
attached 64:13
attempted 37:23
attempting 75:11
attempts 36:19
attention 10:1,
    12:22
Attorney 19:11, 88:6
attorneys 18:24,
    19:8
attributes 38:11
auction 47:7
Authority 1:18,
    1:35, 2:15, 3:6,
    3:17, 41:22, 69:6,
    69:7, 69:13,
    83:10, 83:13,
    93:18
authorization 82:7,
    84:5
authorize 90:22
automatic 34:4,
    34:8, 34:18,
    35:23, 37:15,
    41:10, 43:13,
    44:2, 44:10,
    45:24, 46:2,
    46:11, 46:15,
    47:20, 49:13,

52:13, 53:11,
53:15, 53:20,
56:7, 56:9, 56:16,
57:12, 58:17,
58:18, 58:25,
60:8, 60:18, 79:3
automatically 41:7,
43:15, 50:7, 55:9
Autopistas 3:29
available 7:13, 8:5,
60:16, 80:24,
81:5, 87:7
avoid 34:9, 40:13,
44:15, 45:5, 46:25
avoidance 41:13,
44:13, 49:10
awaiting 28:18
aware 9:16, 26:4,
26:6, 31:3, 58:4,
58:18, 85:9
away 21:3, 34:15,
37:1, 40:4, 67:25,
83:13, 93:5


< B >
b) (2 46:10
back 7:24, 9:1,
12:9, 18:8, 18:9,
18:10, 18:15,
19:10, 33:15,
33:23, 49:16,
51:14, 52:6,
63:15, 77:12,
89:15
backdrop 5:16
background 34:23
bad 40:4, 67:9
balance 71:20,
84:24, 85:13,
90:1, 95:15
balanced 74:15
Ballester 84:17
bank 56:18
bankrupt 52:25
Bankruptcy 5:9,
41:9, 44:12,
46:22, 49:6, 50:7,
50:10, 52:22,
61:23, 62:12,

76:10, 79:24,
83:20, 83:25,
84:8, 85:5
bar 12:23, 13:6
Barack 33:6
barred 45:24
bars 43:18
based 15:10, 15:13,
43:12, 53:16,
57:2, 60:22, 67:9,
67:12
baseload 77:16
basic 25:1, 26:25,
59:17, 59:24
basically 61:9,
92:14, 93:9
basis 34:20, 36:23,
42:5, 58:19,
60:11, 60:12,
61:24, 72:11,
75:17, 75:24,
79:11
bearing 28:9, 89:3
become 88:23
bedrock 48:24
beeping 18:16, 18:17
beeps 18:19
begin 26:11, 63:17
beginning 97:6
begs 94:25
behalf 24:23, 27:19,
43:10, 43:15,
43:23, 50:14,
52:17, 52:20,
52:22, 57:25,
59:16, 63:19,
76:5, 78:1, 78:8,
90:16, 96:21
behind 69:12
believe 10:13,
15:22, 16:25,
17:15, 17:16,
19:17, 20:14,
25:5, 26:3, 26:25,
28:22, 47:6,
48:22, 62:2, 73:4,
92:18, 93:24
believes 15:18,
25:2, 40:5
belong 42:13

belonged 50:6, 50:9
belonging 42:19
belongs 42:13
beneficial 54:19
benefit 12:24,
30:17, 42:20,
67:8, 79:14,
79:16, 83:15,
91:1, 92:22
benefited 86:8
benefits 79:23
Benson 43:10
best 12:5, 99:5
better 44:23, 45:2,
50:20
beyond 7:6, 39:5,
40:22, 56:12
Biaggi 3:7
bidding 87:12, 87:15
bids 11:12, 11:13
Bienenstock 2:32,
8:14, 8:15, 8:16,
17:9, 17:10,
17:13, 19:13,
19:15, 21:15,
21:20, 22:4,
22:18, 23:3, 23:10
big 11:7, 89:1,
97:14
Bildisco 71:25,
72:1, 85:4
billion 9:10, 9:13,
35:3
bit 44:20, 69:15
boil 96:4
Bond 38:7, 98:6
bondholders 54:1,
54:5
bonds 15:13, 15:19,
16:16, 16:17,
17:3, 22:23, 35:15
bottom 75:20
bound 47:16
brand 68:21
break 7:23
breaking 7:5
Brian 2:33, 8:19,
23:2
brief 14:18, 26:17,
76:7

briefing 30:15,
    30:18, 34:21
briefly 6:22, 49:21,
    58:13, 64:11,
    74:18, 97:1
briefs 58:7
bring 9:1, 11:17,
    12:22, 41:18,
    42:24, 42:25,
    43:17, 43:23,
    49:14, 50:6,
    50:12, 52:15,
    52:19, 52:21, 77:7
bringing 43:14,
    50:13, 52:16,
    88:13
broad 30:1
broader 54:19
brought 37:12, 41:5,
    41:15, 52:8
budget 19:25, 20:3,
    21:18
Buenos 5:5
bulk 67:12
bunch 52:12
burden 39:18, 81:12,
    86:8
burdens 86:10
Bureau 64:10, 80:3,
    80:6, 80:13,
    80:15, 80:16,
    80:18, 80:20,
    80:22, 81:3, 81:4,
    81:8, 81:13, 84:3,
    87:19
business 12:25,
    67:7, 68:17,
    71:21, 72:13,
    74:5, 74:10,
    75:13, 85:11,
    85:17, 85:21,
    86:6, 87:1, 92:22,
    95:25, 96:1
buy 88:22, 88:24
buys 65:16, 70:4,
    70:7, 70:8
buzz 7:18, 7:19,
    7:22
buzzes 7:18

< C >
C. 3:7
calendar 9:21, 63:9
call 5:6, 6:25,
    16:25, 57:23,
    64:5, 77:6
called 16:7, 24:7,
    60:22
calling 6:17, 81:19
capable 92:16
capacity 28:3,
    50:14, 52:8,
    52:16, 63:20,
    65:19, 65:25,
    67:24, 70:4, 86:13
caprice 67:9
care 8:8, 81:6
carefully 97:22
Carmen 18:21
cases 35:23, 39:12,
    42:2, 50:4, 50:16,
    52:12, 52:18,
    57:12, 57:15,
    57:19, 58:18,
    58:20, 58:21,
    61:11, 61:12,
    62:1, 62:4, 62:11,
    62:16, 71:25,
    72:3, 78:13, 79:9,
    84:17, 85:4, 85:6,
    85:15, 91:17
cash 75:7
CAT 3:49
caught 34:19
causes 35:25
ceased 51:22
cede 59:5, 81:10
centerpieces 38:7
centers 13:1
central 17:20, 62:8
Centrally 41:3
Certain 9:25, 23:4,
    24:14, 26:9, 35:1,
    35:7, 62:19,
    63:10, 65:9
Certainly 26:23,
    42:25, 43:21,
    68:12, 72:8,
    72:11, 73:13,

89:1, 92:7, 92:9,
    94:4
certification 20:5
Certified 20:4,
    65:7, 66:11
certify 19:24, 99:4
challenge 35:16,
    75:20
challenging 5:17
chambers 8:21
change 21:9, 82:4,
    83:3, 87:10
changed 20:15
changes 20:8, 65:20,
    82:19, 96:3, 96:4
Chapter 20:24,
    76:12, 76:13
characterize 56:10
charged 75:2, 85:25
charges 32:9
check 19:2, 29:10
choice 86:24
choices 77:11
chooses 50:12
chose 37:18
Circuit 53:8, 53:20,
    61:17, 72:1, 72:2
Circuits 39:13
circumstances 5:16,
    6:24, 30:10,
    46:18, 49:1
cite 39:12, 41:14,
    41:23, 45:11,
    57:16, 61:10,
    62:12, 67:12,
    71:25, 91:17
cited 45:13, 48:1,
    48:2, 48:9, 50:3,
    50:17, 52:12,
    54:14, 57:15,
    57:19, 58:20,
    60:5, 62:1, 79:9,
    84:16, 91:15
cites 42:2
cities 5:20
citing 78:13
citizens 91:12,
    91:23, 92:10
claimants 10:11
claiming 9:17, 61:1

clarification 16:15,
  22:19
clarified 22:14
clarify 17:4, 24:13,
  91:1
clarifying 17:2
clarity 6:19, 14:19,
  15:23, 96:9
clause 69:14
clauses 70:21
clawback 22:7, 22:16
clear 14:21, 14:25,
  15:7, 15:25,
  22:20, 24:2, 26:2,
  39:8, 40:17, 54:9,
  54:10, 55:2,
  91:24, 93:15
Clearly 6:24, 13:20,
  15:10, 26:13,
  40:9, 40:19, 53:9,
  54:23, 69:24,
  90:17
Clerk 7:13
clever 62:3
client 47:8
clients 90:20
close 10:1, 33:11
closed 62:13
closely 10:8, 12:1
closer 25:17
CMO 13:23
coast 64:18, 95:4
Cobra 3:20, 24:17,
  24:20, 24:24,
  25:2, 25:5, 25:8,
  25:10, 25:20,
  25:21, 26:4, 26:6,
  26:19, 28:6,
  28:19, 32:1
Code 37:5, 37:6,
  41:9, 42:5, 44:12,
  46:15, 46:23,
  49:6, 49:18,
  61:19, 61:24,
  76:10
cognizable 17:16,
  19:17
cognizant 10:7
COLBERG 3:13, 77:22,
  77:23, 77:25,

78:4, 78:7, 83:8,
  83:18, 84:11,
  87:18
collateral 92:21
colleague 27:19
collect 11:17, 12:4
collected 38:15,
  38:19, 56:17
collecting 11:6,
  11:14, 13:3
collection 13:1
collects 56:5
comes 68:10
comfortable 69:6
coming 19:25, 63:15
commencement 28:25
comment 23:21,
  30:14, 56:12, 60:7
comments 8:17,
  23:19, 24:5, 68:11
commercial 88:21
committed 47:7
Committee 2:39,
  11:19, 14:19,
  14:21, 15:18,
  17:17, 19:18
committing 86:3
Commonwealth 1:15,
  2:31, 5:11, 12:2,
  14:20, 20:2,
  21:25, 22:5, 47:8
Company 55:5, 55:6,
  56:2, 61:16, 91:18
competitive 87:11,
  87:15, 89:8
compile 10:9
Complaint 32:25,
  34:5, 34:7, 34:16,
  35:25, 36:6, 37:1,
  37:21, 37:22,
  37:24, 38:1,
  38:10, 39:7,
  43:12, 45:7,
  54:23, 55:1,
  56:14, 56:15
complete 26:5, 26:7,
  72:18
completed 80:6
completely 45:20,
  70:24, 70:25

completing 28:10
completion 28:15
complex 71:8
compliant 66:11,
  66:12
complicated 45:22
complies 13:22
comply 89:16
component 20:14,
  20:17, 21:11,
  88:17
composes 91:2
comprehend 76:25
comprehensive 8:10,
  12:15, 24:2
compromised 16:11
computer 6:7, 44:21
concede 50:4
conceded 59:9
concept 36:23, 37:3,
  45:10, 45:11
concepts 57:12
concern 30:19,
  68:10, 94:24
concerned 14:19,
  92:15
concerning 88:7
concerns 10:11,
  30:21, 30:22,
  34:3, 58:12, 77:2,
  78:12
concession 34:24,
  34:25, 35:6,
  53:25, 54:4, 54:6,
  54:18, 57:3, 57:4
concise 12:15
concisely 87:17
conclude 64:1,
  68:12, 87:18
concluded 65:11,
  66:24, 69:17
concluded. 98:14
concludes 57:21,
  97:25
conclusion 6:2,
  26:25, 36:19,
  38:14, 94:12
conclusions 71:23
conclusory 48:11
Concurrently 66:21

condition 73:23,
    73:25, 83:13
conduct 30:5, 34:14,
    39:24
conducted 30:17,
    66:19, 66:23
Conference 6:9,
    15:2, 24:17, 31:15
confers 41:7
confines 78:17
confirmation 21:2,
    22:25
confirms 38:19
conflict 98:7
conflicting 38:12
confusion 17:4
connection 14:12,
    24:5, 34:4, 40:6,
    40:11, 44:16
consequence 48:25,
    79:24
consequences 47:25,
    48:11
consider 97:22
consideration 36:20,
    37:9, 48:22, 60:15
considerations 25:1,
    31:22
considered 60:16,
    82:13, 85:15, 86:7
consistent 6:8
consisting 99:4
conspicuously 57:9
constitutes 82:1
constitutional
    16:10, 16:11,
    79:12
construction 30:2
constructive 41:20,
    41:25
consumers 90:6
contact 14:9
contamination 91:9,
    94:5
contemplate 91:13
contemplated 65:9
contends 81:6, 81:23
content 84:21
contested 24:16,
    32:23, 63:9,

78:17, 81:10
context 15:9, 75:11
continuation 42:10,
    77:18
continue 10:17,
    14:10, 21:24,
    22:8, 23:5, 29:17,
    97:22
Continued 3:1,
    25:18, 25:19,
    27:3, 38:17
continues 38:21
continuing 23:11,
    76:16, 98:9
contracting 97:10
contractual 48:7,
    82:13
contractually 25:6
contradicts 59:18
contrary 27:5,
    41:14, 50:3, 90:9
contravention 72:4,
    95:21, 95:22
control 17:17,
    19:18, 28:21,
    42:3, 74:6, 87:5
convenience 71:9
conversant 56:13
conversation 24:12
conversely 57:1
converted 82:25
Conveyance 44:14,
    45:6, 46:19,
    46:21, 46:24,
    47:7, 47:10,
    47:15, 47:18,
    48:3, 48:14,
    48:15, 48:17,
    48:20, 48:24,
    49:9, 61:20
cornerstones 58:15
coronavirus 5:20
Corporation 3:24,
    43:10, 60:4
Correct 13:17,
    22:18, 23:15,
    23:16, 28:13,
    33:25, 46:3,
    56:23, 72:13
corrected 58:11

cost 7:13, 25:14,
    28:9, 28:14,
    28:18, 65:19,
    70:9, 75:5, 77:8,
    95:9
Costa 64:17, 64:21,
    65:17, 66:9
costs 26:19, 29:3
counsel 5:14, 8:10,
    8:12, 24:4, 33:21,
    58:6, 58:14, 59:6,
    63:13, 63:16,
    63:22, 63:25,
    76:18, 77:21,
    97:21
Count 36:6, 49:23
counterparties 97:7,
    97:13
couple 29:2, 29:16,
    34:22, 62:6, 76:6,
    79:5
course 6:22, 13:21,
    25:13, 25:24,
    27:7, 28:24,
    39:25, 40:12,
    46:17, 97:24
COURTROOM 5:7, 18:23
Courts 29:22, 53:21
cover 36:4
covered 88:6
covers 76:23
COVID 93:25
COVID-19 14:23,
    17:16, 19:17,
    20:7, 20:16,
    31:13, 31:22,
    80:17
create 7:4, 60:18,
    81:12
creditor 30:23,
    40:18, 42:20,
    43:16, 52:25,
    53:7, 53:13,
    62:18, 75:15,
    78:20, 79:7, 83:23
Creditors 2:40,
    10:11, 11:19,
    23:6, 25:9, 42:15,
    42:18, 50:8,
    50:14, 57:18,

61:21, 67:19,
74:23, 75:3, 75:4,
75:5, 75:21,
79:17, 79:18,
79:25, 86:20,
91:3, 91:11
criminal 25:19,
25:23, 28:8,
28:22, 28:25,
30:11, 31:24,
32:9, 32:15
crises 5:23
crisis 93:2
critical 14:21,
14:22, 61:18,
65:8, 78:11
Crutcher 57:25
crux 20:6
CSR 99:14
cue 10:24
cure 39:15
current 11:1, 13:8,
66:13
currently 16:11,
30:6, 30:8, 66:7
customer 74:14
customers 67:21,
74:17, 75:2, 95:12
cut 85:18
cute 38:23

< D >
damaged 42:14
damages 37:2, 45:19,
46:20, 47:2, 47:9,
47:23, 49:11
dashboard 6:6
data 20:6
date 9:21, 12:24,
13:6, 13:7, 13:8,
23:14, 25:25,
28:12, 28:15,
28:22, 28:25
dates 83:6
DAVIS 3:17, 27:14,
27:16, 27:22,
27:23, 28:2, 29:6,
29:18, 29:20,
31:4, 31:7, 32:17,

32:20
day 15:16, 27:2,
48:13, 80:25
de 3:10, 3:11, 3:30
deadline 28:16,
28:23, 28:24,
43:14, 50:5, 50:8,
52:24
deadlines 80:18,
81:1, 83:6
dealing 16:16, 30:6
dealt 30:12
debate 61:2
debt 16:11, 19:22
Debtors 1:20, 25:18,
43:11, 43:15,
43:19, 45:25
decade 79:5
decades 64:7
December 65:4, 66:21
decide 93:5
decides 89:14
decision 41:17,
63:8, 67:8, 67:19,
72:1, 72:2, 81:4,
81:8, 89:16,
89:21, 92:5, 92:17
decisions 42:7, 90:7
declaration 34:11,
37:25, 64:13,
65:22
declaratory 36:2
declare 20:22, 44:8
deemed 10:22, 55:9
defense 57:17
deference 67:17,
70:1
deferential 67:11
defines 85:9
definitely 21:21,
91:21
definition 76:20
definitive 66:15
degree 10:1
Dein 2:24, 5:13,
99:8
delay 25:7, 25:19,
27:3
delayed 25:23, 26:1
deliver 86:14

delve 40:7
denied 35:20, 75:16
denies 81:3
deny 80:4, 81:18,
83:16, 87:21,
97:13
denying 28:6, 67:14
Department 10:8
dependent 74:15
depending 77:6
deprived 56:25
DEPUTY 5:7, 18:23
derivative 42:17
derives 37:4
describe 64:11
described 60:12,
65:21, 67:23,
71:22, 72:13
description 87:2
designed 61:10,
68:5, 68:13
desire 95:5
Despin 14:13
Despins 2:40, 14:12,
14:15, 14:18,
17:8, 17:13,
19:14, 19:19,
20:21, 21:5,
22:12, 22:20,
22:21
despite 15:4
destroyed 58:24
detail 8:9, 23:22
detailed 29:25
determinant 56:8
determination 28:18,
39:23, 41:24,
44:7, 47:5, 47:17,
55:18, 78:14
determinations
43:25, 62:19
determine 11:15
determined 37:17,
55:21, 56:16
determining 70:18
development 89:19
dial 7:24
dias 5:5
difference 54:3
different 40:14,

49:5, 60:1, 66:3,
  70:9, 70:25,
  80:19, 82:23,
  85:10, 88:19
differential 85:18
differing 38:11
difficult 7:3,
  76:22, 76:24
difficulty 7:7,
  19:11
dignity 5:21
direct 7:23, 14:9,
  32:24, 78:23
directing 32:13,
  34:6, 34:7
directly 5:19, 88:7
director 82:12,
  82:20, 88:10
disagree 55:24, 85:3
discharge 95:10
discharged 54:7
disclosure 20:25,
  21:1
disconnect 7:24
disconnected 18:7
discovery 26:11,
  26:22, 29:2, 29:3,
  29:23, 29:24,
  30:5, 30:18,
  31:17, 32:4,
  32:11, 81:25,
  82:16
discretion 41:17,
  42:7, 50:13, 67:15
discuss 11:18
discussion 6:22,
  15:3, 77:12, 90:24
discussions 14:8,
  14:10, 23:8
disposal 59:3
dispute 10:15,
  19:18, 25:14,
  25:16, 26:10,
  28:7, 45:7, 59:24,
  72:7, 72:8
disputes 26:21
distinction 53:17
distinguish 53:3,
  56:6
distress 47:8

District 1:1, 1:3,
  2:22, 2:23, 2:25,
  33:1, 84:18, 99:1,
  99:2, 99:7
disturbance 48:7
divest 48:5
divested 48:19
Docket 1:6, 1:25,
  2:4, 7:12, 8:6,
  33:1, 33:2, 63:10,
  63:11, 80:12,
  91:16
doctrine 87:4
document 71:9,
  76:21, 76:23, 82:9
documents 30:7,
  66:16, 78:13
doing 11:14, 12:5,
  61:9, 95:13
dollars 9:6, 9:10,
  9:13, 25:3, 25:13,
  35:3, 35:8, 39:9,
  65:23
done 11:1, 12:7,
  30:1, 32:2, 48:13
double 7:22
down 10:17, 30:7,
  33:14, 48:1,
  48:11, 77:24,
  91:25, 96:4
dress 59:25
driving 28:24
drop 29:7
dropped 17:24, 51:4
due 9:17, 11:25,
  63:8, 74:5, 80:17,
  83:6, 85:7, 97:23,
  98:6
Dunn 57:25
during 6:17, 6:22,
  7:2


< E >
e-mails 16:24
E. 3:13, 3:27
early 31:15
easily 39:16, 67:22
ECO 63:25, 64:22,
  64:24, 65:1,

65:16, 65:17,
  65:18, 65:25,
  70:3, 70:4, 71:12,
  74:5, 74:12
Ecoelectrica 3:33,
  64:4, 64:15, 76:5,
  77:3, 77:9, 78:25,
  82:15, 82:17,
  82:21, 82:25,
  83:3, 86:9, 86:13,
  87:5, 87:6, 87:10,
  87:11, 97:7
economic 92:2
economy 14:24, 20:7
effect 32:12, 32:13,
  35:19, 42:2,
  43:24, 56:2, 56:3,
  60:2, 71:5, 73:8,
  73:14, 73:18,
  73:21, 74:1, 75:7,
  78:23, 83:19,
  83:24, 85:22,
  85:23, 86:20
effected 85:7
effectiveness 73:23,
  94:16
effects 14:23, 86:1
effort 34:5, 38:25,
  40:1
efforts 15:4, 34:16
eight-month 67:1
either 9:14, 20:9,
  58:20, 61:21,
  69:20, 86:12,
  88:23, 95:20
elapsed 43:14, 52:15
Electric 1:17, 1:34,
  3:16, 82:25
Electrica 3:12
element 62:8
elements 38:2
elephant 15:24
eliminate 40:2
ellipses 62:4
emphasized 59:20
employees 25:8, 75:1
employers 75:19
encourage 7:15
end 11:22, 25:22,
  33:23, 34:18,

42:4, 48:13,
61:17, 93:1
endeavors 37:1
endorse 58:6
Energy 3:27, 64:10,
66:12, 66:22,
72:4, 75:9, 75:14,
75:20, 80:3, 80:6,
80:12, 80:15,
80:16, 80:18,
80:20, 80:22,
81:2, 81:4, 81:8,
81:12, 82:25,
84:3, 86:3, 86:4,
87:19, 91:18, 94:7
enforce 61:7
enforced 46:6
enforcing 34:11
enough 18:19, 20:2,
20:6, 74:22, 79:9
enriched 57:1
enrichment 36:1,
42:12, 42:15,
42:22, 44:9,
53:24, 56:21,
62:22
ensure 6:3, 66:20,
67:24
enter 32:12, 73:19,
83:14
entered 9:15, 34:23,
35:4, 44:9, 65:10,
72:23, 94:8
entering 87:14
entirely 15:13
entirety 47:1
entities 22:7, 22:17
entitle 83:22
entitled 30:19,
67:16, 70:1
entity 52:25, 88:21,
89:19
entries 8:6
entry 7:12, 33:1,
33:2, 63:11, 90:22
environment 75:2,
91:12, 91:18, 92:1
Environmental 3:35,
75:8, 75:9, 85:23,
86:1, 90:14,

90:16, 93:6, 94:5
equities 71:20,
84:24, 95:15
equity 25:2, 27:1,
85:5, 85:13, 90:1
error 20:9
ERS 12:1, 12:25,
13:7, 67:15
escape 36:19
escrow 38:19, 54:15,
54:19
especially 78:22,
86:21, 90:23
Esq 3:7, 3:13, 3:27,
3:36
essence 30:2
essential 87:4
essentially 49:7,
70:25, 72:25
establishes 86:23
estate 25:11, 26:20,
27:4, 30:22,
42:20, 52:22,
79:15, 79:16,
79:19, 79:24
estimated 28:15
estimates 65:22
estoppel 92:22
et 2:32, 5:11
evaluative 12:18
event 26:3, 38:23,
40:25, 41:1,
42:22, 62:14,
62:15, 62:22
events 25:18, 25:22,
73:10, 94:18
eventually 5:24, 6:1
everyone 6:8, 7:23,
13:22, 15:25,
18:15, 19:10,
98:10, 98:12
Everything 18:6,
18:7, 19:3, 29:8,
29:9, 61:9
evidence 20:10, 40:7
evident 17:18, 20:12
evidentiary 56:7
evidently 79:4
ex 72:25
exactly 12:8, 38:12,

40:6, 62:4, 91:2
exalts 38:18
examine 83:11
example 7:19, 86:13
examples 37:10
exceeds 25:13
exception 87:16
excess 25:3, 35:2
exchange 16:24,
35:2, 35:8
exclude 91:23
exclusive 50:11
Excuse 11:12, 17:21,
37:12, 41:1,
59:23, 62:15
excuses 34:14, 36:4,
87:14
execute 69:1
executive 82:12,
82:20, 88:10
executory 47:15,
64:3, 69:18, 81:21
exercise 61:22,
67:6, 67:7, 69:6,
74:10
exercised 74:4
Exhibit 82:7
EXHIBITS 4:9, 76:24,
82:6
exist 62:23, 93:25
existed 60:4, 70:13
existence 15:14,
38:5, 46:2, 60:8,
60:18
existing 89:10
exists 66:7
expect 28:20
expected 13:4,
47:16, 49:2
expeditiously 12:9
Expense 24:18, 27:6,
32:8, 79:3, 79:22,
86:21, 97:13
expenses 26:20,
83:22, 84:9
expensive 29:24,
66:2, 68:1
expertise 84:2,
84:6, 88:25, 93:7
expire 65:2, 65:4,

79:1
expired 42:24
expires 52:24
explain 43:13
explained 86:10
explaining 19:14
explanation 48:12
explicitly 84:20
exposes 27:5
exposure 31:4
express 40:15,
   41:19, 69:21,
   82:3, 84:21
expresses 70:19
expression 71:2
expressly 35:18
expunged 9:7
extend 12:23, 13:6
extended 35:6,
   65:14, 80:18, 81:2
extending 83:5
extends 37:15
extension 13:13,
   35:5, 35:17, 36:7,
   53:25, 54:6, 78:20
extensive 66:14,
   67:1, 67:23
extent 21:24, 22:1,
   22:4, 22:9, 31:11,
   31:12, 31:17,
   32:7, 36:22, 40:9,
   45:8, 59:3, 73:24,
   75:4, 93:19
extinguish 71:3
extinguishes 69:14
extremely 5:17, 25:8


< F >
face 56:15
facilities 82:25
facility 64:17,
   65:17, 65:25,
   66:9, 82:15, 87:4
fact 15:14, 25:25,
   42:4, 46:4, 46:22,
   47:24, 48:20,
   57:11, 59:21,
   60:1, 61:2, 64:25,
   68:24, 75:3,

89:18, 89:25, 97:9
facts 34:23, 40:14,
   48:12, 64:12, 67:3
factual 26:12,
   26:21, 30:16,
   58:10, 58:12,
   74:12
fails 86:14
failure 41:6
fairness 25:2, 27:1
faith 40:5, 67:9
fall 34:16
falls 36:9
familiar 44:12
far 9:6, 26:6, 29:9,
   29:14, 45:22,
   60:21
fashion 93:4
Fast 35:24
favors 80:23
fear 93:2
federal 72:4, 72:6,
   95:21
fee 35:2
feedback 44:21
fees 38:3
Feld 24:23
FEMA 25:20, 25:21,
   26:2, 26:5, 26:7,
   28:9, 28:14,
   28:18, 28:21,
   31:23, 32:15
FERC 88:15
Fernando 3:27,
   64:14, 65:22
few 10:25, 11:9,
   51:15, 59:23,
   72:15, 74:3, 79:5,
   96:21
field 89:1, 90:4
Fifth 72:1
file 9:19, 11:1,
   11:20, 13:5,
   17:19, 20:13,
   20:22, 32:14,
   41:8, 41:13,
   49:12, 52:23, 55:4
filed 7:11, 7:12,
   9:5, 11:25, 14:6,
   15:12, 16:6, 34:5,

35:11, 35:23,
   35:24, 37:21,
   37:23, 38:10,
   58:4, 72:21,
   72:22, 72:24,
   80:20, 91:24
filing 8:20, 13:11,
   14:11, 64:7
final 7:22, 25:17,
   72:19, 73:13,
   80:3, 80:7, 80:16,
   81:16, 87:20,
   89:5, 89:13, 89:21
Finally 55:11,
   74:18, 75:18, 96:2
Financial 1:9, 1:28,
   2:7, 3:5, 5:9,
   31:4
find 8:9, 70:17,
   73:15, 73:16,
   78:15, 97:11
finding 10:18
finds 20:9, 61:19
fine 18:11, 27:21,
   29:9, 29:15,
   51:24, 95:19
finish 68:6, 68:11,
   77:14, 87:17
Firestein 2:35,
   33:4, 33:5, 33:6,
   33:8, 33:10,
   33:17, 34:2,
   39:21, 40:3, 43:4,
   43:20, 47:25,
   50:3, 50:12,
   50:16, 50:25,
   51:6, 51:12,
   51:19, 53:2,
   53:12, 59:9,
   59:11, 59:15, 63:5
firm 56:12
First 8:2, 11:2,
   11:25, 12:16,
   12:20, 24:16,
   26:17, 30:20,
   33:3, 47:24,
   48:22, 53:7,
   54:14, 57:3,
   66:14, 68:11,
   72:16, 72:19,

78:9, 88:13,
88:16, 88:19,
89:12, 90:19, 95:6
Firstenergy 72:2
Fiscal 3:4, 19:24,
19:25, 20:4, 20:8,
65:7, 65:10, 66:11
fit 77:17, 87:2
Five 18:18, 24:19,
33:11, 33:22,
35:4, 63:15,
64:21, 65:17,
90:13, 93:12, 98:9
flat 34:16, 36:6
flexibility 66:1,
67:25
flexible 77:5
flout 34:8
flow 75:7
flows 37:22
fly 29:21
focal 20:16
focus 5:22, 59:19,
60:5, 68:7, 70:20,
76:17, 85:6
focused 22:16, 30:9
focusing 40:4
folks 61:1
follows 36:5
FOMB 58:5, 58:6,
59:6
force 28:24, 43:11
foreseeable 15:17
form 30:2, 38:18,
82:5, 82:22
formality 79:9,
79:12
former 25:20
forth 7:10, 41:6,
64:12, 96:3
forum 38:10, 95:23
forward 5:25, 15:20,
18:20, 19:22,
25:16, 36:5, 40:7,
41:11, 57:6,
57:13, 94:1,
95:17, 98:12
forwarding 35:24
fossil 91:13, 91:14
found 24:2, 42:9,

55:16
foundation 37:3,
49:8
Four 9:13, 18:18,
80:19, 82:7
frame 12:7
framework 15:3
frankly 30:22
Fraudulent 44:14,
45:5, 45:19,
46:19, 46:21,
46:24, 47:7,
47:10, 47:15,
47:18, 48:3,
48:14, 48:15,
48:17, 48:19,
48:24, 49:8, 61:20
fraudulently 39:10,
47:21
Fred 63:24, 76:4
Frederic 3:33
free 53:10, 54:8,
54:10, 57:10, 95:9
Friedman 3:6, 23:20,
24:1
fuel 64:22, 65:15,
66:3, 86:14, 91:14
fueled 64:19
fuels 91:13
full 27:25, 57:11
full-blown 71:22
fully 58:6, 86:12,
86:17
function 42:10
functioning 19:12
fundamental 70:2,
70:9, 96:5
funds 38:21, 56:24,
82:8
future 15:17, 31:15,
36:14, 38:4, 38:6,
57:5, 61:3, 89:2


< G >
Gail 2:24, 99:8
gantries 35:10,
36:15
Gas 64:4, 64:5,
64:16, 64:19,

64:20, 64:22,
64:23, 65:1,
65:16, 65:20,
70:8, 71:14, 74:6,
74:13, 75:6,
82:14, 82:24,
83:2, 86:3, 87:10,
88:14, 88:17,
88:22, 88:23,
88:24, 96:7
gave 48:15
general 62:17,
67:11, 85:11
generally 70:18
generation 64:17,
64:18, 65:5, 68:2,
75:14, 95:4
gets 21:2, 30:3,
36:25, 38:18, 89:5
getting 22:13,
26:15, 32:17
Gibson 57:25
give 18:14, 29:10,
51:15, 75:10,
86:24, 90:1
Given 29:2, 30:11,
32:5, 47:13, 73:19
gives 36:24, 42:6,
50:11
giving 28:4
glad 12:15
goals 68:13, 68:15
Gos 22:17
governing 49:7,
66:16
Government 10:2,
10:20, 11:4,
23:25, 28:3, 30:6,
30:23, 31:3,
31:14, 42:10
Governor 13:9,
13:12, 35:13
grant 44:7, 79:4,
81:3
granted 34:25,
38:25, 43:2,
75:24, 79:3, 90:7
granular 30:3
grateful 22:13
gravamen 61:13

Great 39:19, 58:3
greater 67:17, 67:25
greatly 25:13, 91:12
Greenberg 28:2
Gronczewski 62:8
gross 67:10
ground 17:16, 19:17
grounded 25:1
grounds 35:21, 83:16
Group 3:36, 12:19,
  16:6, 90:14,
  90:17, 94:5
groups 91:3, 91:4
guarantors 55:8
Guayanilla 91:7
guess 52:2, 60:23,
  60:24, 68:6
guidance 26:4, 26:7
Gump 24:23
guys 51:9

< H >
Hadassa 2:34, 27:12,
  27:16, 27:19
half 9:13, 33:16,
  33:19, 33:22,
  38:24, 72:22
hamstrung 11:6
hand 56:4
handled 56:11, 76:14
hands 55:17, 55:19,
  84:6
happen 30:4, 42:1,
  48:21, 54:5,
  61:25, 69:20, 97:8
happened 18:6, 49:1,
  51:21, 54:3, 69:23
happening 28:20,
  94:6
happens 17:5, 77:6
happy 8:17, 27:7,
  30:24
harbor 57:17
harm 75:18, 94:22
harmful 25:8
Hauer 24:23
headset 44:22,
  44:23, 50:19
heard 6:23, 7:1,

8:21, 9:15, 9:18,
  14:12, 28:14,
  29:7, 31:2, 38:3,
  38:5, 52:2, 78:21,
  94:10, 94:24
Hearing 2:21, 5:15,
  6:4, 6:13, 7:3,
  7:7, 8:5, 9:19,
  16:3, 16:18,
  16:22, 19:20,
  21:11, 29:16,
  58:7, 98:5, 98:8
heightened 72:12
held 46:18, 53:14,
  53:21, 90:24
Hello 50:22
help 60:19
helped 24:13
helpful 12:19,
  13:22, 63:6
helping 33:24
Hermanos 84:17
high 97:8
highjacked 20:19
highlight 62:5
highly 67:11, 85:18
Highways 2:13, 36:16
Hold 13:11, 29:5,
  29:11, 57:19,
  80:5, 87:20
holistic 42:9, 67:20
Honorable 2:22,
  2:24, 99:6, 99:8
hope 5:23, 11:20,
  91:10
hopeful 13:9
hopefully 22:14
house 54:8
housekeeping 14:1
Houser 23:6
human 5:21
hundreds 39:9

< I >
identified 62:21,
  95:7
identify 6:18
ignore 70:20
II 21:18, 21:21,

24:15
III 1:8, 1:27, 2:6,
  3:17, 6:2, 20:25,
  21:17, 21:22,
  22:11, 22:23,
  35:23, 52:21,
  61:5, 63:20,
  87:13, 95:11
immediate 73:21
immediately 7:8
impact 20:7, 20:15,
  40:9, 61:8, 75:4,
  85:1, 92:2, 92:23,
  93:6
impacted 40:18
impacts 10:6, 75:1,
  75:2
implement 69:1
implementation 92:8
implicated 47:19
implications 45:23
implicitly 31:2
importance 30:11,
  85:16
important 17:15,
  20:13, 20:18,
  21:11, 28:23,
  34:22, 85:19,
  89:19, 90:3
Importantly 35:11,
  35:16, 40:16, 66:4
imported 64:23
imposed 39:18
imposes 86:10
imposing 15:11
Impossibility 46:1,
  46:13, 49:18,
  57:9, 58:19,
  58:21, 58:23,
  60:6, 60:8, 60:12,
  60:17, 60:19
impossible 37:9,
  45:16, 45:21,
  45:23, 46:3, 58:17
improper 73:17
improve 45:3
in. 51:14, 93:8
Inc. 3:13, 3:27
inception 60:3
inclined 31:18

include 84:13
including 6:14,
  11:19, 34:15,
  38:2, 64:9, 80:19,
  83:4, 84:17
incorporated 41:21
increase 65:25
increased 35:7,
  65:18, 67:25
indemnification
  58:16
indemnify 45:18
independent 67:2,
  71:24, 72:8
independently 94:19
indicate 84:15
indicated 46:22,
  72:10
indicating 49:16
indirectly 5:19
individual 10:11,
  53:7
Industria 3:12
inevitable 79:24
inference 61:20
information 8:22,
  10:10, 11:7,
  11:17, 12:5,
  12:25, 20:10
informative 11:20,
  13:5, 13:11,
  13:16, 13:21,
  13:25, 14:7,
  14:11, 16:4, 16:6,
  32:14, 82:6
initial 63:14
initially 11:1
injured 46:7
injures 83:23
injuries 75:9
injury 42:17
injury. 46:8
inquiry 30:16,
  56:15, 71:21
insolvent 97:10
instance 12:20,
  47:24, 48:23
instances 62:12
instrumentalities
  22:6

instruments 16:16
insured 35:15
insurers 55:8
intact 96:6
Integrated 66:13
intend 69:24
intended 38:13,
  73:5, 87:7
intending 9:19
intent 69:21, 69:25
intention 71:2
interest 5:14, 6:21,
  25:12, 30:20,
  30:21, 30:22,
  34:11, 37:16,
  37:19, 37:25,
  54:16, 54:20,
  62:9, 74:21,
  74:23, 75:15,
  78:12, 78:21, 79:8
interested 7:14,
  8:21, 11:18, 44:4,
  77:10
interests 32:4,
  75:3, 75:14,
  75:21, 85:2, 85:7,
  85:16, 85:21
International 60:4
interplay 56:13
interpretation 37:4,
  85:4
Interrogatories
  86:16
interrupt 7:2, 7:3,
  7:6, 17:23
interruption 29:18
interstate 88:15,
  88:17
intertwined 28:7
intervene 72:21,
  73:2, 84:7, 92:7,
  92:25, 93:23
intervention 88:15
intimately 21:6
introduce 27:18,
  63:16
introduces 8:12
investigation 31:23,
  32:15
investments 35:9

invoices 26:23,
  29:25
involve 25:20,
  39:23, 47:25, 72:3
involved 14:7, 21:6,
  28:7, 39:3, 57:16,
  85:21, 89:25
involves 39:1
IRP 77:7
island 5:18, 10:4,
  23:13, 66:6, 91:8,
  95:4
issue 15:18, 15:19,
  15:23, 15:25,
  20:10, 20:18,
  21:4, 22:25,
  26:18, 26:23,
  27:20, 39:15,
  46:23, 53:13,
  53:14, 59:20,
  60:5, 60:25,
  61:13, 61:15,
  62:25, 63:7, 68:9,
  80:8, 81:9, 81:17,
  96:2, 97:23
issued 6:10
issues 5:21, 6:22,
  15:14, 23:7,
  26:12, 28:6, 29:1,
  29:4, 30:2, 30:9,
  30:12, 32:5,
  53:23, 58:10,
  59:21, 61:4,
  79:10, 84:2, 88:6,
  89:25, 91:8,
  91:18, 93:5, 93:7
Item 8:2, 24:15,
  32:23
items 62:21, 76:6
itself 10:23, 47:18,
  48:5, 62:12,
  82:19, 84:22,
  86:7, 87:7, 88:9,
  88:18, 89:5

< J >
J. 2:32, 3:8
January 25:24, 28:8,
  28:25, 30:12,

67:14
Jessica 3:13, 78:1, 78:7
John 3:8
join 90:20
joinder 58:4
Jointly 1:11, 1:30, 2:9, 38:20
Jose 88:10
Joseph 3:17, 28:2
Juan 5:1, 14:6, 14:9
Judge 2:22, 2:23, 2:24, 2:25, 5:5, 5:12, 5:13, 17:23, 18:5, 19:5, 23:6, 29:9, 29:12, 49:24, 51:5, 51:7, 51:16, 52:1, 52:5, 88:1, 91:22, 96:25, 99:7, 99:8
judgment 31:5, 32:3, 67:7, 68:17, 71:21, 72:13, 74:5, 74:10, 85:11, 85:17, 85:21, 86:6, 87:1, 92:22, 95:25, 96:1
judicial 6:9, 38:12, 41:24, 80:9, 80:23, 81:5
Judith 2:24, 99:8
July 12:1, 65:11
June 11:23
jurisdiction 78:15, 81:9
jurisdictional 80:8
Justice 10:9
justify 25:18

< K >
K. 3:24
Kaiser 37:14
Kasowitz 43:9
keep 7:15, 13:19, 36:25, 47:22, 98:12
keeping 7:16
Keith 3:31, 57:24
Kelly 3:18, 63:21,

96:20
key 30:25, 77:18
kick 95:20
kicks 95:17
kind 84:15
King 63:21
Klingman 62:11
knowledge 21:6
known 22:7
knows 21:10, 25:2, 34:18

< L >
la 3:11
labeled 13:20
labels 13:23
labor 72:4
lack 14:19, 38:6, 78:15
language 57:8, 61:19, 61:24, 69:10, 70:17, 76:18, 76:19, 84:12, 84:13, 84:15
languished 35:22
largely 30:8
Last 14:6, 14:11, 15:2, 16:3, 16:5, 19:20, 20:4, 20:17, 26:4, 31:3, 42:4, 46:17, 91:24
Lastly 42:11, 87:14
later 35:4, 91:25
latter 28:12
Laura 2:22, 99:7
lawyers 91:2, 92:16
lay 34:22
layers 64:9, 67:1
LCDC 16:7
lead 39:16
leads 9:22
learning 29:21
least 21:14, 25:16, 26:10, 27:2, 41:4, 58:25, 80:4
leave 52:25
leaves 69:11
left 77:10

legal 21:25, 26:18, 26:23, 34:20, 45:10, 46:7, 54:19, 55:23
legally 17:16, 19:17
legend 61:25
legion 62:1
legitimate 39:25
less 7:22, 34:6, 40:24, 47:11, 66:1, 66:2, 68:1, 73:9, 77:6
letters 12:4
level 60:24
levels 67:25
liabilities 9:6, 9:8, 9:13, 79:2, 79:5
liability 25:12, 32:6, 32:7
lien 38:1, 38:6, 38:15, 38:16, 38:24, 38:25, 39:2, 39:4, 44:7, 53:23, 54:2, 54:7, 54:9, 54:10, 54:12, 54:25, 55:1, 55:16, 55:19, 56:1, 56:23, 57:2, 57:3, 60:25, 61:2, 61:8
liens 55:4, 55:5, 55:6
Lift 21:18, 49:13, 56:14, 58:25, 98:6
lifted 5:25, 61:23
light 20:15, 23:12, 28:21
lightly 91:10
likelihood 20:23
likely 35:21, 36:16, 97:14
limitation 41:6, 41:13
limitations 42:23, 61:22
limited 6:14, 36:12, 36:24, 81:12, 92:17
limiting 85:5

line 6:4, 17:24,
    18:1, 18:10,
    18:11, 18:13,
    19:3, 19:7, 29:8,
    29:14, 51:4, 63:21
lines 19:11, 19:12,
    24:4, 29:16
liquid 64:20, 64:22,
    64:23, 65:1,
    65:16, 65:20,
    70:7, 74:6, 74:13,
    75:6, 96:7
Lisa 18:23, 51:10
list 11:2
listed 6:19
litany 50:4, 57:12
literally 16:13
litigants 21:10
litigate 55:22,
    95:23
litigated 20:19,
    20:20, 55:20, 61:5
litigating 25:14
litigation 30:3,
    32:5, 35:16,
    56:11, 56:14
litigation. 37:19
little 25:3, 45:2,
    69:22
live 91:5, 91:6
lives 92:11
LLC 3:21
LLP 43:10
LNG 64:24
lobbies 12:25, 13:1
local 13:23, 95:22
lockdown 5:24,
    13:10, 30:7, 31:13
log 18:15
log-ins 18:19
logging 51:14
logic 61:18
logical 69:5
longer 17:7, 26:8,
    52:24, 92:2
look 5:25, 10:17,
    45:12, 57:7,
    57:15, 61:13,
    82:5, 89:22, 98:12
looking 56:14

looks 82:3
losses 45:18
lot 34:14, 40:22,
    48:10
lower 65:19, 70:5
LP 64:4
Luc 2:40, 22:21
luck 59:11
Luis 3:7


< M >
magic 61:25
magically 38:22,
    41:7, 42:2
Magistrate 2:24,
    5:13, 99:8
main 21:3
mainland 5:19
maintain 31:24
maintenance 36:17
major 57:12, 57:13,
    64:3, 66:5, 68:2,
    78:10
Malone 3:18, 63:21,
    96:18, 96:20,
    97:1, 97:3, 97:20
Management 1:10,
    1:29, 2:8, 5:10,
    85:23
mandates 86:2
mantle 16:22
March 15:10, 15:11,
    65:2, 66:24
marching 32:17
Marini 3:7, 23:23
marked 82:6, 82:8
market 88:22
Martin 2:32, 8:16
Martorana 3:31,
    57:23, 57:24,
    57:25, 58:3, 59:8,
    60:6
material 20:10
matter 7:9, 20:6,
    26:13, 37:11,
    39:2, 47:5, 49:1,
    53:14, 54:1,
    55:25, 57:18,
    61:12, 63:9,

67:11, 70:25,
    78:17, 78:22,
    80:5, 81:10,
    81:11, 89:18,
    89:25, 94:7, 94:8,
    96:17
matters 6:20, 24:14,
    24:16, 32:23,
    75:10, 80:10, 98:1
Mclish 24:23
mean 39:3, 48:18,
    50:15, 55:6,
    56:10, 60:15,
    61:11
meaning 16:13,
    16:25, 67:7, 69:10
means 36:8, 56:3,
    60:2, 69:11
measures 92:8
meat 60:16
mechanic 54:20
mechanism 12:6,
    12:18, 30:1, 46:14
mechanisms 86:18
mediation 12:18
mediator 23:7
meet 28:16, 66:10
members 5:14, 6:15,
    75:19
Mendez 3:13, 77:21,
    77:23, 77:25,
    78:1, 78:4, 78:7,
    78:8, 83:8, 83:9,
    83:18, 84:11,
    87:18, 87:24, 88:6
mentioned 68:14,
    80:15, 81:11,
    85:20, 86:20
mentioning 84:19
mentions 89:18
merely 38:15, 39:14,
    54:20
merger 70:21
merit 41:20
merits 35:22
met 28:17, 66:20,
    67:24
Metropolitanas 3:30
Michael 2:35, 33:6,
    59:15, 96:20

microphone 44:22
Milbank 56:12
milestones 23:4,
    23:5
million 25:3, 25:4,
    25:12, 35:8, 65:23
millions 39:9
mind 8:25
mindful 14:9
ministerial 54:17
minute 29:5, 96:25
minutes 7:17, 7:21,
    24:19, 33:3,
    33:11, 33:14,
    33:15, 33:16,
    33:18, 49:24,
    51:15, 58:9,
    59:10, 63:14,
    63:15, 77:24,
    90:13, 93:12,
    96:21
Mirant 72:2, 85:4
mispronounce 62:7
misstatement 13:18
mitigate 86:18
mix 66:3
mode 10:4
moment 17:22, 34:22,
    61:15
Monday 7:11
monetary 48:4, 49:11
money 22:6, 35:14,
    36:13, 37:2, 37:8,
    38:19, 46:20,
    47:1, 56:4, 60:22,
    91:4
monopolistic 87:3
month 11:22, 25:10,
    25:13, 72:22,
    72:23
months 25:15, 64:8,
    66:15, 79:5
mortgage 54:9
Motions 13:22,
    72:21, 72:22,
    80:19, 80:22,
    81:4, 89:12,
    92:23, 93:21, 98:6
move 25:16
moving 53:23

multi-year 34:25
mute 6:4, 6:5, 6:11
muted 6:11
mutually 74:15
myriad 34:3, 85:2
myself 27:18


< N >
name 6:18, 6:24,
    24:6, 28:1, 37:18
named 39:3
narrow 15:18, 71:21
narrowed 91:25, 92:6
Natural 64:4, 64:5,
    64:16, 64:19,
    64:20, 64:22,
    64:23, 65:1,
    65:16, 65:20,
    70:8, 71:14, 74:6,
    74:13, 75:6,
    82:14, 82:24,
    83:2, 86:3, 87:9,
    88:14, 96:7
Naturally 36:13
nature 21:13, 30:3,
    70:2, 70:9, 71:14,
    82:4, 82:20, 83:4,
    85:8, 87:10, 96:5
Naturgy 64:6, 64:19,
    64:24, 65:3,
    65:16, 65:21,
    70:7, 71:13,
    74:12, 79:1, 82:8,
    82:13, 82:14,
    86:13, 86:24,
    87:2, 87:4, 88:23,
    97:7
near 31:15
necessarily 39:1,
    39:23, 91:4, 92:6
necessary 8:1, 11:7,
    13:24, 26:19,
    36:22, 42:9, 45:8,
    53:6, 73:7, 73:9,
    98:9
need 7:23, 16:21,
    16:22, 53:10,
    58:10, 58:12,
    62:25, 68:25,

69:6, 98:1
needed 9:17, 53:8,
    82:7, 89:22
needless 27:5
needs 15:20, 15:25,
    19:25, 40:5, 62:19
negate 84:14
negligence 67:10
negotiated 40:8,
    85:24
negotiation 63:22,
    64:8, 67:1, 74:15
negotiations 65:10,
    65:11, 66:15,
    86:22
Neither 26:7, 69:23,
    70:2, 74:19
news 17:14
next 10:6, 68:2,
    86:4, 91:6, 95:2,
    95:14
NG 18:3, 18:5, 18:8,
    18:9, 18:11,
    18:14, 18:17,
    18:21, 18:24,
    19:2, 19:6, 19:7,
    29:7, 29:9, 29:14,
    50:21, 51:5, 51:9,
    51:13, 51:25,
    52:1, 88:18
night 14:6, 14:11,
    16:4, 16:5
Nine 52:20
no-bid 47:7
No. 1:6, 1:25, 2:4
Nobody 25:24, 94:6
noises 29:16
non-chapter 52:20
non-title 52:21
nondebtor 79:21
None 4:5, 4:11,
    23:4, 48:1, 48:2,
    52:19, 74:22,
    75:22, 80:20
nonetheless 96:13
noon 7:25
nor 26:7, 85:6
normal 76:12, 76:13
normally 76:13
note 14:2, 14:6,

68:23, 98:6
noted 24:1, 37:14,
   42:14, 42:19,
   58:24
Nothing 16:17,
   20:22, 37:8,
   41:23, 43:17,
   47:24, 53:7, 53:8,
   57:17, 62:13,
   69:22, 83:11
notice 9:18, 11:2
notion 41:25, 42:5,
   60:17, 60:23, 61:6
novate 84:14, 84:16
novated 70:24, 96:11
novation 68:19,
   68:22, 69:20,
   70:11, 73:16,
   82:2, 82:16, 96:2,
   97:11
November 66:23
nuance 22:14
nullifies 69:12
number 8:6, 33:1,
   39:12, 47:17,
   63:11


< O >
o'clock 98:9
object 49:17, 78:19,
   79:18
objecting 79:11,
   79:12
objection 10:21,
   15:12, 17:17,
   75:23
objections 9:11,
   9:14, 9:20, 10:1,
   72:17
objectors 68:18,
   72:16, 72:20,
   74:4, 74:19, 75:22
obligated 25:6,
   45:17
obligation 11:1,
   21:24, 21:25,
   22:5, 22:8, 32:19,
   49:10, 57:2, 82:2,
   82:14, 83:2

obligations 39:11,
   78:25, 83:4
observations 33:12
obtain 46:8
obtained 47:12,
   48:5, 69:3, 73:12,
   73:24, 94:20
obtaining 38:11
obtains 47:21
obvious 50:9, 63:2
obviously 29:24,
   39:12, 79:6,
   79:22, 85:3, 87:11
occur 94:19
occurred 23:12,
   48:25, 70:12
occurring 5:16
October 65:11, 66:17
offer 46:24
offered 4:5, 4:11,
   34:14
offices 10:2, 30:8
Official 2:38, 99:15
officials 25:20
offset 48:19
Okay 16:13, 16:18,
   18:18, 18:21,
   18:24, 19:2, 19:4,
   19:5, 19:8, 27:20,
   29:15, 58:1, 78:2,
   88:5, 90:19
old 71:3
older 9:1
omitted 57:9
Omni 32:16
Omnibus 2:21, 5:15,
   9:11, 9:19, 9:20,
   9:25, 10:21, 86:17
once 5:16, 35:22,
   40:20, 53:9,
   54:12, 54:21,
   55:5, 56:1
one. 88:11
ones 57:15
ongoing 5:24, 25:21,
   36:17, 93:20
open 11:5, 13:1,
   13:9, 88:22, 95:24
opening 33:20, 64:1
operate 29:22, 35:1

operated 64:24, 66:3
operating 36:16,
   80:12, 80:14
operation 6:3, 78:11
operations 23:24
operative 49:6, 50:8
opinion 97:23
opponents 94:22,
   95:6
opportunity 6:21,
   25:16
oppose 74:20, 75:16
opposed 22:17,
   30:23, 37:13,
   49:14, 49:15,
   72:11, 78:12,
   88:12
opposing 90:2
Opposition 37:23,
   62:2, 75:11, 90:21
option 74:13, 87:7
oral 93:9
Order 5:21, 8:4,
   12:6, 15:10,
   15:11, 15:13,
   16:5, 23:15, 28:6,
   31:21, 32:13,
   34:7, 36:7, 66:24,
   67:14, 72:20,
   72:22, 72:23,
   73:4, 73:5, 73:10,
   80:6, 81:7, 81:16,
   90:22, 94:8,
   94:18, 94:23,
   97:5, 97:12
Ordered 91:16
orderly 6:3
Orders 6:9, 9:15,
   32:17
ordinary 69:10
oriented 21:19
original 28:12,
   69:23, 69:25,
   70:3, 71:6, 71:12,
   71:14, 96:12
originally 44:7
origins 40:8
Ortiz 88:10
others 31:14, 35:12
Otherwise 28:23,

55:8
outcomes 31:23,
  38:12
outset 11:10
outside 88:16, 97:12
outstanding 25:11,
  26:8, 31:23
overall 30:9
override 73:6, 81:8,
  92:19, 93:18
overruled 75:23
owe 91:4
owed 25:3
owes 39:11
own 7:16, 34:15,
  38:16, 43:23,
  52:16, 52:20,
  54:25, 71:24,
  75:13, 80:11,
  80:19, 81:25,
  82:15
owned 38:20, 64:24
ownership 38:21,
  54:16
owns 54:8

< P >
P. 3:17
Padilla 64:14,
  65:22, 82:9
PAGE 4:3
pages 76:23, 99:4
paid 10:19, 25:5,
  47:11, 47:23,
  48:6, 54:5, 54:21,
  56:18, 56:24,
  56:25, 57:4
painful 45:22
panacea 40:25
pandemic 5:20, 80:18
papers 39:13, 50:4,
  57:9, 60:13, 62:21
Paragraph 36:6,
  39:7, 62:2
part 21:7, 73:7,
  97:5
parte 72:25
partial 36:12
participant 7:8

participants 5:17
participated 63:22
participation 90:6,
  90:7
particular 41:18,
  61:20
particularly 97:17
partner 24:22
party 37:12, 37:13,
  37:17, 37:19,
  44:6, 47:21,
  47:22, 48:4,
  48:14, 54:8, 55:7,
  56:20, 73:2,
  78:21, 79:8,
  80:24, 91:19,
  97:10
passed 23:5, 65:24,
  75:6
passes 50:8, 61:22
passive 68:22, 70:11
patience 14:1
Paul 2:36, 63:18
pay 45:9, 47:23,
  48:6, 48:21, 57:5,
  95:11
payers 65:24, 75:6,
  75:19, 85:22,
  85:23
paying 10:1, 35:15,
  86:12
Payment 24:18, 35:8,
  39:6, 39:10,
  49:11, 57:3, 86:13
payments 85:25,
  86:11, 97:8
PBA 12:24
Peer 60:4
pending 9:12, 25:19,
  32:25, 81:21,
  92:23, 93:2
Penuelas 64:25, 91:6
people 5:18, 9:17,
  29:10, 91:5
per 25:13
percent 65:5, 74:8,
  95:3
percussive 44:20
Perfect 59:15
perfectly 14:24,

52:2
perhaps 36:15, 62:18
period 12:23, 13:8,
  41:6, 42:23,
  50:11, 50:16,
  52:14, 53:5,
  53:20, 66:7, 66:8,
  93:17
periodically 12:23
periods 13:13
permission 34:9
permitted 6:14, 27:1
PERSON 6:14, 7:1,
  19:1, 46:7, 51:1,
  51:2, 51:3, 88:24
personally 58:17
perspective 76:8,
  77:1
Peter 3:6, 23:20
petition 64:7, 64:8,
  68:25
phones 6:4
PHV 2:32, 2:33,
  2:34, 2:35, 2:36,
  2:40, 3:6, 3:8,
  3:17, 3:18, 3:21,
  3:24, 3:31, 3:33
physical 58:22
physically 60:14
pick 7:25, 16:22,
  76:6
piece 40:4, 55:17,
  60:16
place 31:25, 61:11,
  64:6, 65:2, 65:3,
  66:5, 71:15, 82:2
places 39:19, 40:12
plain 57:7
plaintiff 45:18,
  46:21
plaintiffs 46:25
Plan 15:4, 15:14,
  15:15, 16:12,
  17:18, 19:24,
  20:4, 20:9, 20:12,
  20:24, 65:7,
  66:11, 66:13, 92:9
planned 16:19
planning 21:16
plant 64:18, 64:22,

70:4
plants 66:2, 68:1,
    70:8, 91:6
played. 7:20
plea 24:25
pleadings 21:7,
    90:25
Please 5:6, 6:5,
    6:11, 6:18, 6:24,
    7:2, 7:8, 28:1,
    29:5, 29:18, 45:2,
    50:1, 63:16,
    87:17, 98:6
pledged 53:25
PM 98:14
point 10:13, 11:5,
    14:22, 15:24,
    20:16, 27:4, 31:4,
    31:16, 40:17,
    53:16, 56:7,
    58:13, 59:2, 59:4,
    61:17, 68:13,
    74:18, 74:23,
    76:7, 76:11, 97:4
point. 16:23, 23:5,
    27:10, 28:13,
    30:13, 47:4, 53:3,
    77:14
pointed 37:5, 60:9,
    61:4
points 8:23, 17:6,
    30:25, 47:5,
    59:24, 72:15,
    74:3, 76:21
policies 6:9
policy 66:12, 71:22,
    72:5, 72:6, 75:9,
    75:20, 89:17,
    90:3, 90:9, 92:1,
    93:15, 94:3, 94:7,
    95:21, 95:22,
    95:23
politics 74:25
portion 33:21
pose 8:11
position 21:9,
    32:10, 36:11,
    54:1, 54:7, 55:23,
    56:22, 59:19,
    69:4, 69:5, 97:6

positions 92:14,
    94:3
possibility 88:13
possible 11:21,
    12:9, 37:7, 60:14,
    74:14, 96:22
possibly 92:21
Possinger 2:36,
    63:18, 63:19,
    68:5, 68:12, 69:8,
    69:16, 70:23,
    71:5, 71:18,
    73:20, 74:3, 76:2,
    78:10, 80:2,
    83:20, 93:12,
    93:13, 96:16,
    97:15
post 64:8, 68:24
potential 27:5,
    33:12, 36:14,
    48:10
potentially 66:2
Power 1:18, 1:35,
    3:16, 21:4, 30:9,
    30:10, 64:3,
    64:15, 64:16,
    65:5, 65:18, 66:1,
    66:6, 68:2, 70:4,
    71:13, 74:8, 75:5,
    76:16, 77:6,
    77:19, 78:10,
    80:11, 80:13,
    95:3, 95:12, 96:6,
    97:17
powers 61:22, 85:5
practical 31:22,
    73:18, 73:21,
    83:19, 89:2
practice 21:18
PREB 69:3, 72:18,
    72:19, 72:21,
    72:25, 73:1, 73:4,
    73:6, 73:9, 73:12,
    81:16, 84:6, 88:9,
    89:5, 89:8, 89:13,
    89:15, 89:19,
    89:21, 89:25,
    90:8, 93:18,
    93:19, 93:23,
    94:8, 94:12,

94:13, 94:17,
    94:19, 95:24
precedent 73:23,
    83:13
precise 26:22, 70:17
precisely 61:4
preempt 73:6, 93:18
preempted 22:11
preemption 16:10,
    16:14, 16:21,
    17:1, 17:3, 21:8,
    21:10, 21:11,
    21:12, 21:17,
    21:19, 21:21,
    21:23, 22:22,
    22:23
preempts 43:18
prejudice 26:14
prejudicial 79:19
preliminary 98:5
PREPA'S 67:16,
    81:25, 82:12,
    85:3, 86:15, 97:16
prepetition 64:3,
    68:8, 69:18,
    70:13, 78:25,
    81:22
prepromesa 21:12
present 5:13, 89:9,
    94:2
presentation 57:21
presented 66:16,
    72:19, 90:20, 93:1
presents 37:8, 41:22
preserving 26:20
president 25:20
presiding 5:13
press 5:15, 6:15,
    18:12, 21:16
pretty 21:6, 61:7
prevail 35:21, 47:3,
    48:20
prevent 35:13, 61:10
previous 69:11,
    69:12, 84:20
price 65:21, 70:5
pricing 93:6
PRIFA 22:6
primary 20:16
Prime 7:13

principally 44:4,
  59:20
principle 68:22
principles 27:1,
  59:17, 79:13
prior 20:25, 64:7,
  69:14, 70:6,
  70:22, 71:4,
  80:13, 89:5,
  89:13, 91:22, 96:9
priority 15:12,
  15:19, 16:10,
  17:19, 19:19,
  20:13, 21:4, 21:8,
  21:12, 22:9,
  22:10, 32:8, 79:3,
  79:4, 79:22,
  83:22, 84:9,
  86:22, 94:25,
  97:13
private 64:16
Probably 11:22,
  13:17, 17:14,
  51:14, 62:7
problem 14:3, 29:20,
  81:6
problematic 32:1
procedural 15:22,
  16:2, 90:5
procedure 34:17
Procedures 8:4,
  12:10, 80:11, 89:9
proceed 16:18,
  18:12, 25:25,
  29:19, 31:11,
  31:17, 31:18, 32:4
proceeding 22:22,
  37:16, 37:18,
  71:21, 76:12,
  76:13, 84:8, 93:23
Proceedings 3:48,
  6:2, 6:7, 6:18,
  7:4, 25:7, 25:19,
  28:7, 28:25, 38:8,
  80:2, 81:1, 81:25,
  83:21, 83:25,
  84:7, 87:20,
  91:17, 91:23,
  98:1, 98:14, 99:6
proceeds 54:4, 57:4

processes 8:22,
  10:7, 90:6
produced 3:48
productively 32:10
Professor 15:1,
  19:20, 19:21
program 97:17
progress 27:2
prolong 44:13
PROMESA 1:8, 1:27,
  2:6, 20:4, 41:9,
  41:21, 43:18,
  46:14, 53:18,
  73:19, 83:11,
  89:17
promoting 75:14
prong 71:2
prongs 71:1
proof 55:4, 55:25,
  56:7
proper 15:22, 78:15,
  78:16
properly 10:3, 60:9
property 34:11,
  37:25, 38:2,
  38:24, 45:15,
  47:22, 54:11,
  54:12, 55:1,
  55:16, 55:19,
  56:22, 58:23,
  62:10, 62:20
proposals 11:18
propose 20:3
Proposed 16:11,
  17:18, 20:12,
  20:24, 81:7
proposition 50:5,
  52:12, 52:18,
  62:17
propriety 32:8
prosecution 31:24
Proskauer 59:16,
  63:19
prospective 75:18
protect 38:13, 47:6
protected 86:12,
  86:17
protection 37:15,
  37:17
prove 30:20, 40:5,

  56:1
provide 6:20, 17:17,
  19:18, 20:2, 36:4,
  54:15, 54:19,
  67:8, 71:13,
  71:14, 88:13,
  95:2, 95:12
provided 26:7,
  26:19, 44:9, 77:18
provider 11:15
providers 11:14
provides 15:3,
  46:10, 66:1, 88:16
providing 77:16,
  95:9
provision 30:10,
  37:4, 45:12, 46:4,
  60:10
provisions 36:10,
  45:14, 49:5, 49:7,
  49:18, 70:20,
  71:23
prudential 79:13,
  80:9
PSA 14:20, 15:1,
  15:3, 20:22, 23:4,
  23:6, 23:9, 23:11
public 5:15, 5:21,
  5:23, 6:15, 7:13,
  8:6, 15:2, 18:12,
  19:12, 19:20,
  71:22, 78:12,
  89:17, 90:3, 90:9,
  91:25
punished 6:16
Purchase 64:3,
  64:15, 75:5,
  78:10, 80:11,
  80:13
purchases 64:16,
  64:20
purported 42:17,
  43:13, 75:15
purpose 27:4, 76:18
purposes 35:14,
  58:10
Pursuant 16:12,
  34:24, 64:15,
  93:16, 96:11,
  96:14

pursue 32:10, 34:20,
   40:23, 41:15, 42:8
pursuing 16:21
pursuit 34:4
push 9:16, 71:25
put 11:7, 11:10,
   28:5, 36:11,
   55:23, 56:17,
   67:4, 95:16, 96:2
puts 25:11
Putting 38:10, 57:13


< Q >
question 8:10, 8:24,
   16:2, 21:5, 36:9,
   37:20, 39:4,
   39:20, 39:21,
   40:16, 55:21,
   70:18, 73:20,
   83:19, 88:7,
   90:23, 94:21,
   94:25
questioned 78:19
questions 7:6, 8:18,
   10:11, 12:11,
   23:23, 24:3, 24:5,
   24:10, 27:7, 27:9,
   30:24, 43:3,
   57:20, 58:11,
   59:4, 59:5, 59:7,
   63:3, 76:1, 92:1
quickly 13:21, 97:4
quiet 18:2
quite 8:9, 24:2
quotation 62:3
quote 39:8, 54:16,
   61:15
quoted 45:14
quoting 16:9
QURESHI 3:21, 24:19,
   24:20, 24:21,
   24:22, 28:13,
   29:1, 31:8, 31:10


< R >
R. 2:34
radical 83:3, 96:3,
   96:4

raise 74:4
raised 6:22, 26:12,
   58:14, 68:9, 72:15
raising 22:13, 32:6
ran 77:3
rank 36:20
Rapisardi 3:8, 23:19
rate 65:24, 75:6,
   75:19, 85:22,
   85:23
rates 75:2
rather 13:16, 13:25,
   37:18, 71:6
Re 1:6, 1:25, 2:4,
   5:9
reach 60:21
reached 16:8
reaching 45:23
read 13:21, 35:5,
   37:4, 46:16, 61:15
ready 26:10, 26:14
reaffirmed 19:21
real 28:23, 37:19
really 22:12, 30:17,
   30:25, 38:23,
   56:8, 58:9, 59:17,
   62:25, 68:25,
   88:25, 92:13,
   93:22, 96:4, 97:15
reason 20:14, 21:2,
   39:14, 45:16,
   46:3, 47:6, 51:22,
   52:13, 53:22,
   57:10, 73:3,
   76:15, 85:12, 97:4
reasonability 86:11
reasonable 28:9,
   28:14, 28:18,
   86:23, 92:4
reasons 28:17,
   31:21, 40:14,
   54:16, 72:19,
   87:21, 87:22, 89:9
rebuttal 33:9,
   33:15, 43:3, 59:6,
   63:15, 93:12
recall 19:23
received 35:14,
   36:14
receiver 35:13

recent 28:5, 28:6,
   31:21
recently 34:4
recission 36:1,
   36:6, 36:8, 36:10,
   36:12, 36:21,
   36:22, 36:24,
   37:7, 37:21, 44:6,
   45:8, 45:15, 46:5,
   46:6, 46:19, 49:9,
   49:11, 49:18,
   58:17, 59:25,
   60:1, 60:2
recission. 45:6
reclaim 39:9
recognized 67:13
recognizes 65:8,
   89:11
recognizing 23:22
reconcile 12:2
reconsider 72:21,
   93:21
reconsideration
   81:1, 81:3, 93:1
reconvene 98:4
reconvening 98:13
record 6:19, 17:15,
   24:22, 28:1
recorded 3:48
recording 6:10, 6:13
recover 34:12, 39:6,
   47:9, 60:20
recovery 39:15,
   48:4, 67:19
reduce 13:9
reduced 10:4
reductions 77:8
referred 19:19,
   21:16, 21:22
referring 82:7
reflected 8:9
regard 12:3, 32:18,
   91:19
Regarding 8:22,
   11:21, 15:4,
   15:11, 16:10,
   37:6, 39:2, 68:19,
   94:5, 94:21
Regardless 41:18,
   72:25, 80:23, 81:4

regimes 44:15, 45:4
region 64:25, 65:1,
    74:7, 74:13
regulation 85:7,
    89:23, 89:24
regulator 71:24,
    72:8, 90:8
regulatory 67:2,
    72:18, 92:24
reimburse 25:6
reiterate 87:19
reject 72:3
rejected 77:13, 95:5
rejection 72:7,
    85:6, 85:11, 85:13
rejects 95:18
relate 75:9
related 72:16, 93:15
relating 9:7, 16:3,
    31:22
relation 55:12
relationship 48:8,
    48:17
relatively 12:7,
    12:17
relevance 26:3
relevant 10:2,
    40:24, 42:7,
    45:14, 56:15,
    63:1, 64:11, 67:3,
    91:19
reliable 66:2, 68:1
reliance 39:19,
    40:12
relief 15:10, 21:7,
    21:8, 34:17,
    35:18, 35:20,
    36:2, 37:22, 38:9,
    39:17, 39:22,
    41:8, 43:24,
    46:11, 46:15,
    52:14, 53:8,
    59:22, 60:10,
    60:11, 62:14
relinquish 42:19
relinquishment 36:14
rely 64:23, 79:19
relying 91:22
remain 5:18, 20:16,
    32:12, 66:5

remaining 7:18,
    33:22, 49:24,
    96:22, 96:23
remains 25:10,
    42:24, 70:10,
    71:15, 81:16, 96:6
remarks 6:23, 8:13,
    14:14, 15:1,
    19:14, 33:20,
    63:14, 64:1, 68:7
remedy 46:7, 46:20,
    49:10, 56:7, 56:8,
    58:24
remind 6:8
removal 36:15
remove 73:25
renders 96:10
renegotiating 65:9
renegotiation 69:19,
    77:17
Renewable 3:26,
    75:14, 86:3, 86:4
renewables 77:7
reorganization 92:9
reparation 46:8
replace 71:23
replacement 66:7,
    66:8
replaces 69:12
Reply 54:14, 86:17
report 8:20, 12:9,
    14:13, 23:15,
    23:18, 23:22,
    24:2, 24:6
Reporter 99:15
reports 8:2, 8:4,
    8:9, 24:11, 62:1
represent 47:23,
    91:2, 91:5
representative 1:13,
    1:32, 2:11, 5:11,
    24:12, 24:13,
    27:11, 50:14,
    52:8, 52:16,
    63:20, 67:16
representing 9:9,
    24:19
request 14:9, 35:20,
    86:25
requested 8:3, 21:7

requesting 13:15,
    13:20, 13:24, 90:2
require 6:23, 26:21,
    27:1, 36:13, 48:4,
    62:20, 80:12,
    84:4, 88:15
required 54:18,
    54:21, 73:10,
    94:18, 97:6
requirement 62:14,
    94:16
requirements 94:17
requires 36:21,
    79:14, 89:8
rescind 34:9, 35:17,
    46:25
rescinding 36:7,
    49:16
reserve 33:9, 43:3
reserved 33:11
resolution 10:15,
    25:17
resolved 12:8,
    15:15, 22:25,
    32:10
resolving 5:23, 21:4
resort 46:17
Resource 66:13
resources 80:10,
    81:12, 92:17
respected 89:17
respond 10:3, 17:9
Response 19:14,
    60:5, 86:15
response. 24:8, 98:3
responsive 10:10
rest 59:5
restate 69:25, 84:13
restated 71:10,
    81:24
restating 71:6
restoration 30:10
restored 18:2
restrictions 5:24
restructured 65:15
restructuring 19:22
result 41:16, 65:13,
    65:23, 73:5,
    74:16, 97:18
resulted 47:14

resulting 65:13
resume 19:13
resuming 98:9
retirement 66:8
retransmission 6:13
return 36:13, 36:20,
  37:8, 60:17,
  60:22, 70:14
Returning 71:18,
  74:3
Revenue 38:7, 98:5
revenues 35:2, 35:7,
  36:15, 38:4, 38:6,
  38:15, 38:18,
  53:24, 61:3
reversing 73:3
Reversion 41:10,
  42:1, 42:12,
  43:22, 44:4,
  49:20, 52:13,
  53:10, 53:20,
  57:11, 61:15,
  62:16
revert 50:7, 50:15,
  52:7, 57:18,
  61:21, 62:23
reverted 43:1, 43:16
review 12:2, 14:23,
  26:2, 66:19, 67:2,
  67:24, 69:2,
  78:16, 79:14,
  80:23, 81:5,
  84:23, 85:10
reviewed 34:21
reviews 66:14
revocation 92:19
rewrite 37:23
Riego 3:13
rights 35:6, 40:1,
  40:2, 40:9, 43:25,
  47:11, 47:19,
  48:18, 61:8, 73:2,
  75:4, 75:21,
  93:24, 93:25, 94:2
ripe 72:17, 73:13,
  80:10, 81:10
Ripeness 72:16,
  80:1, 80:8, 90:24,
  93:14
rise 48:15, 75:10

risk 25:11, 31:5,
  32:2, 38:11, 89:1
risks 88:20
road 34:24, 35:2,
  48:1, 48:11
roads 35:1
roll 97:17
room 15:25
rooted 42:8, 44:7,
  46:1
Rose 63:19
ROSEN 2:33, 8:14,
  8:19, 8:25, 9:4,
  9:24, 10:5, 12:21,
  13:17, 14:3, 14:5,
  23:2, 23:16
RSA 92:2, 92:6, 92:8
Rule 6:16, 7:5,
  13:23, 81:10, 89:8
ruled 75:10, 80:21
rules 80:22
ruling 15:21, 21:8,
  31:12, 91:22,
  97:11, 97:18
rulings 16:9
run 11:9, 12:17,
  34:15, 34:18,
  37:1, 40:3
running 13:2


< S >
S. 2:33
S/ 99:13
safe 57:17, 98:12
safely 6:1
safety 5:24
sake 71:9
San 5:1, 14:6, 14:9
sanctions 6:16
Santiago 3:36,
  90:13, 90:15,
  90:16, 90:19,
  93:11
Sastre 3:36, 90:13,
  90:15, 90:16,
  90:19, 93:11
satisfied 10:19,
  10:22, 96:1
satisfies 67:22,

68:17
satisfy 36:22, 54:9
savings 65:10,
  65:22, 66:10,
  66:20, 67:24,
  74:16
saying 16:7, 16:19,
  16:20, 17:14,
  22:14, 22:15,
  55:15, 58:5, 62:4,
  86:16, 92:19
says 43:22, 45:7,
  45:17, 46:17,
  50:12, 52:23,
  53:8, 53:9, 54:23,
  57:10, 62:13,
  69:14, 71:4,
  84:20, 86:18, 96:8
schedule 98:7, 98:11
scheduled 11:5
schedules 20:3
scheduling 9:25
scope 37:16, 76:22,
  85:5
score 63:4
secession 36:16
Second 18:14, 26:16,
  29:10, 44:18,
  61:17, 73:3, 95:8
secondarily 47:1
Secondly 91:1
Section 37:5, 37:6,
  41:6, 41:20, 46:4,
  46:10, 46:17,
  49:6, 53:4, 53:18,
  61:23, 67:4,
  67:15, 69:5,
  74:21, 76:9,
  79:11, 79:13,
  79:22, 81:20,
  93:16
sections 61:10
secure 39:10, 95:13
secures 66:5
security 34:11,
  37:25
seek 34:5, 34:9,
  34:10, 35:12,
  35:17, 36:2, 45:7,
  45:9, 47:2, 52:14,

52:19, 52:25,
  59:22, 60:11,
  62:14, 80:25
seeking 13:6, 16:9,
  16:15, 17:2,
  34:17, 35:18,
  38:9, 41:8, 43:24,
  52:15, 54:24,
  55:22, 56:8, 60:1,
  60:19, 61:7, 72:3,
  73:6, 81:15,
  93:16, 93:17
seeks 36:7, 36:22,
  37:2, 37:24,
  38:14, 38:15,
  39:6, 39:8, 44:5,
  44:6, 44:8, 48:3,
  48:5, 95:17
seems 69:13, 95:5
seen 41:16, 85:13,
  85:14
SELDEN 17:21, 17:23,
  49:24, 51:7,
  96:24, 96:25
select 6:5
selection 11:21
selectively 45:14
self-defeating
  68:24, 74:7
sell 54:8, 54:10
sense 42:6, 91:3
separate 71:8
September 65:15
series 66:14
serves 27:4
servicer 11:16
services 26:18
set 7:10, 12:5,
  23:15, 41:6,
  64:12, 65:2, 65:4,
  79:1, 97:25
setback 97:14, 97:16
setting 12:18
settlement 15:1,
  15:8, 15:14,
  15:23, 17:19,
  20:13, 20:14,
  20:15, 20:17,
  20:18, 21:4
seven 39:7

several 9:16, 35:24,
  64:9, 67:1
share 35:7
sharing 36:14
Shearman 63:24, 76:5
sheet 33:25
shoes 15:7
shopping 38:11
short 12:7, 19:16,
  88:5
shouldn't 11:12,
  53:22
show 81:25, 86:8
shown 74:19, 75:22
shows 82:16
shutdown 10:3, 11:4
side 36:24, 36:25,
  77:9, 91:7
sides 33:19
sign 94:23
significant 74:16,
  85:1, 97:16
significantly 88:21
similarly 75:16
simple 39:14, 59:21,
  74:20
Simply 25:22, 67:4,
  69:1, 70:5, 70:12,
  71:15, 94:22
single 42:20, 76:21
site 25:22
sits 64:17
situation 31:13
situations 58:23,
  85:15
six 64:21
six. 65:18
Sixth 72:2
Skeel 15:2, 19:20,
  19:21
skipping 87:11
skirt 38:14
slate 11:7, 11:25
slated 9:18, 10:14,
  10:25
small 12:17, 12:19,
  58:8, 59:5, 91:7
so-called 40:4,
  42:11
sole 74:6, 87:15

solely 37:17, 43:12,
  52:16
Solutions 6:6, 67:20
solve 81:9
somebody 19:2
somehow 30:19, 41:7,
  53:13, 60:22,
  95:10
Someone 6:10, 10:2,
  22:9, 47:11
sometimes 21:1
somewhat 11:6, 30:3
soon 11:21, 28:20
Sorry 9:23, 13:18,
  17:6, 17:23,
  21:15, 29:18,
  50:20, 51:15,
  52:3, 67:6, 68:5,
  70:16
sort 43:23, 44:20,
  62:3, 97:11
Sosnick 3:33, 63:24,
  73:21, 76:1, 76:3,
  76:4, 77:15, 77:20
sought 34:8, 53:19
Sound 7:19, 7:20,
  44:21, 67:5, 67:7,
  74:9, 87:1, 92:22
source 41:21, 65:5,
  66:6, 68:2, 77:18,
  86:4, 87:15, 95:13
sources 88:16
south 64:18, 91:7,
  95:4
southern 97:17
Spalding 63:21
speaker 6:17, 7:10,
  7:15, 7:17, 33:3
speakers 6:19, 6:25
speaking 6:5, 24:4,
  90:17
speaks 42:5
special 84:25
specific 23:23
specifically 89:8,
  89:18
specified 7:24
speculation 36:20
speech 5:21
speed 9:1

spends 40:22
split 33:19, 54:21
splitting 54:17
spoke 17:13
spoken 6:20, 94:8
square 61:16
Stafford 11:11
stage 31:6
stake 85:16
stand 52:18
standard 67:4, 67:5,
   67:12, 67:22,
   68:17, 70:15,
   71:18, 71:19,
   72:12, 72:13,
   72:14, 78:16,
   84:23, 84:24,
   85:10, 85:12,
   85:13, 85:14,
   85:17, 85:18,
   85:21, 86:6, 86:7,
   95:16, 95:19,
   95:20, 95:25
standing 34:20,
   40:23, 40:25,
   41:2, 41:8, 49:20,
   50:5, 62:18,
   62:25, 74:19,
   74:20, 75:11,
   75:16, 75:23,
   78:18, 78:19,
   79:18, 91:19,
   93:22
standpoint 74:25
stands 36:9, 85:12
start 15:3, 24:20,
   26:10, 28:12,
   29:2, 33:14,
   33:25, 59:17,
   93:14
starters 68:23
starting 29:3
starts 19:25
state 6:24, 21:20,
   24:6, 27:25,
   43:17, 46:23,
   49:7, 54:9, 61:14,
   69:24, 80:23,
   90:20, 91:17
stated 16:25, 19:16,

   31:21, 78:10,
   80:2, 87:22
statement 19:20,
   20:25, 21:1, 31:3,
   69:25, 90:11,
   94:5, 96:8, 96:10
States 1:1, 2:23,
   2:25, 36:7, 46:5,
   61:18, 88:14,
   99:7, 99:8
stating 58:18
Status 8:2, 8:20,
   14:20, 23:15,
   23:18, 23:21,
   24:6, 24:11,
   24:14, 24:16,
   28:14, 31:15,
   32:14, 32:15
Statute 37:6, 44:17,
   45:6, 45:8, 45:17,
   46:5, 49:5, 57:8,
   57:14, 61:21
statutes 46:24
statutory 19:18,
   44:15, 45:4,
   45:12, 60:10
stayed 35:23
steak 60:16
stemming 95:4
stenography 3:48
step 61:18, 95:20
steps 26:9, 73:13
Sterling 63:25, 76:5
stop 44:18, 57:11,
   83:12, 97:19
straight 36:5, 41:10
strategic 67:19
Strauss 24:23
strenuously 49:14,
   49:15, 55:24
stress 81:14
stricter 85:17
strident 71:19
strong-armed 74:11
structure 65:21,
   70:9, 82:23
struggling 91:8
stuck 37:21
subject 9:14, 10:21,
   42:23, 53:24,

   56:23, 58:23,
   63:23, 69:2,
   70:25, 79:14,
   89:7, 89:23,
   94:11, 95:10,
   96:13
submission 12:24,
   13:7, 63:7
submit 25:9, 63:4,
   78:9, 82:18, 84:1
submitted 66:18,
   66:22, 82:9, 88:9
submitting 82:6
Subsequent 8:20
subsidiary 46:6
substance 38:18
substantial 70:1,
   82:19, 83:3
substantially 82:21
substantive 89:15,
   90:5, 96:10
substantively 49:8,
   96:12
succeed 73:3
succeeded 68:14
success 5:23
successful 6:2,
   94:10
sued 37:20, 59:24
suggest 37:8, 41:12,
   60:21, 95:8
suggested 11:9,
   37:11
suggestion 50:3
suggestions 29:2
suggests 50:16
suing 39:15, 61:12
suit 35:11
suitable 12:3
summary 71:20
supercedes 96:8
superseder 69:10
supersedes 70:21,
   71:4, 84:20
superseding 69:11,
   76:17
supplied 64:19
supplier 82:14
supplies 64:20,
   64:22, 65:18

supply 64:4, 65:15, 71:13, 71:14, 74:8, 74:13, 75:6, 76:16, 82:24, 83:2, 96:6
support 39:13, 57:14, 61:19, 74:12
supporting 64:13
supposed 56:24
supposedly 38:16, 89:10
Supreme 69:13, 72:1
Sur 64:17, 64:21, 65:17, 66:9
Sur-reply 91:15
surprised 60:7
suspect 93:3
Swain 2:22, 5:5, 5:12, 51:16, 99:7
sweeping 30:1
switch 50:19
sympathetic 94:4

< T >
tacit 82:3, 82:16
Tacoronte 5:6
talks 47:25
tally 33:25
targets 65:10, 66:10, 66:20, 67:24
tasked 67:18
taxes 25:4, 38:2
Taylor 2:22, 99:7
technical 19:10, 84:2
telephonic 5:15, 6:3, 8:5
TELEPHONICALLY 2:29, 98:4
temporary 35:20
ten 35:6, 79:2, 86:4
tension 5:22
term 71:4, 71:7, 71:8
terminal 64:24, 65:1, 65:17, 74:6, 87:8

terminals 87:5
terminate 23:11
terminology 49:6
terms 21:22, 29:1, 29:23, 35:10, 35:17, 49:20, 65:9, 70:19, 77:17, 85:24, 89:2
territory 9:1
test 11:8, 11:9, 12:17, 85:11
Testing 44:25, 45:1
textbook 36:18
thanks 24:11
theirs 36:25
theirselves 92:11
themselves 54:20, 64:12
theoretical 31:4
theory 41:19, 43:22, 61:19
thereafter 35:22
thereof 38:6
they'll 94:24
They've 48:1, 48:2, 48:8, 48:10, 48:12, 54:14, 57:15, 62:1, 71:15, 75:1, 76:20
Third 37:13, 48:4, 55:7, 55:9, 56:20, 63:9, 73:1, 88:20
thorough 66:19, 66:23, 67:23
thoroughly 69:22
though 28:22, 54:11, 92:19
thoughts 5:18
three 33:15, 33:21, 35:25, 40:20, 44:25, 45:1, 66:14, 71:25
throughout 39:12
tied 30:16
timekeeper 49:22
timely 80:25
timetables 20:3
timing 7:25, 23:8, 98:7
Title 1:8, 1:27,

2:6, 6:2, 20:25, 21:17, 21:18, 21:21, 21:22, 22:11, 22:23, 35:23, 61:5, 63:20, 87:13, 95:11
Today 5:15, 6:3, 6:19, 6:20, 15:10, 15:16, 15:21, 17:4, 22:1, 31:18, 32:2, 49:16, 57:13, 58:7, 77:8, 90:24, 93:10, 97:25, 98:2
Together 11:7, 47:16, 65:4
toll 34:24, 35:1, 35:2, 35:7, 38:4, 38:6, 38:17, 53:24, 55:17, 61:3
tolling 35:10, 36:15, 82:22, 87:6, 88:23, 93:24
tolls 38:19, 54:2, 54:12, 54:16, 54:18, 54:20, 54:21, 54:24, 56:5, 56:17, 56:23, 56:25
Tom 24:22
tomorrow 16:3, 16:8, 16:16, 17:5, 21:5, 22:1, 22:15, 98:4, 98:7, 98:13
tone 29:7
took 17:7, 85:15
Torres 43:10
tortured 37:4
total 36:9
totally 82:23, 88:18
touch 49:20
towards 27:2, 86:2
towns 91:7
Trabajadores 3:11
track 7:15, 7:16, 13:19, 30:7
traditional 47:10
tranche 12:16
transaction 46:25,

48:15
transactions 97:14
Transcript 3:48,
  7:4, 99:4
transcription 99:5
Transfer 22:5,
  44:14, 44:16,
  45:5, 45:19,
  45:21, 88:18
transferee 45:17
transferred 38:17,
  38:22, 39:10,
  45:15, 47:22
transition 86:2
transparency 90:6
Transportation 2:14
Traurig 28:2
travel 6:1
trial 25:23, 26:10,
  26:14, 28:8,
  28:22, 30:11,
  71:22
Tribune 42:4, 57:16,
  61:16
tried 29:4, 34:18
tries 40:3, 53:2
triggered 37:7
trillion 9:6, 9:8
TRO 35:13
true 58:22, 68:10,
  99:5
truly 13:2
trustee 40:15,
  41:14, 42:19,
  61:22, 62:8,
  62:17, 67:15
truth 34:16
try 13:19, 45:3,
  58:25, 77:4, 91:22
trying 10:9, 34:15,
  42:21, 59:25,
  61:8, 70:17, 81:19
turn 20:5, 23:18,
  24:15, 27:10,
  32:23, 43:5,
  60:23, 65:18,
  67:3, 71:20,
  74:14, 77:21
Twelve 49:24
twice 40:20

Two 7:17, 7:18,
  7:21, 17:6, 25:12,
  25:17, 25:22,
  32:23, 40:14,
  44:25, 45:1,
  45:14, 46:24,
  59:10, 62:17,
  64:2, 72:19, 77:2,
  77:11, 85:20,
  86:18, 88:12,
  91:7, 97:5, 97:7
two-year 41:5,
  41:12, 42:23,
  50:11, 50:16,
  52:14, 53:5,
  53:20, 61:21
type 60:18, 76:8,
  87:3, 93:7


< U >
UCC 24:13
ultimate 20:7, 94:12
ultimately 29:4,
  44:1, 63:14
unabashedly 39:6
unavailing 40:13
unchanged 70:10
underlying 32:6,
  47:14
undermine 40:1,
  56:10
underpinning 41:19
understand 14:11,
  15:5, 19:11,
  26:21, 32:18,
  45:22, 55:13,
  55:14, 55:15,
  69:4, 72:20,
  76:17, 76:25,
  93:21, 93:22
understanding 28:11,
  58:21, 60:7
understood 57:2,
  60:13, 69:8, 69:16
undo 73:5
unfavored 80:24
unforeseen 98:6
UNIDENTIFIED 19:1,
  51:1, 51:2, 51:3

Uniform 44:14
unilaterally 38:10,
  72:3
Union 3:10
unique 85:1, 85:15
Unisys 40:12, 40:13,
  40:17, 53:2, 57:10
United 1:1, 2:23,
  2:25, 88:14, 99:6,
  99:8
units 64:21, 65:17,
  68:19
universe 13:3
unjust 36:1, 42:12,
  42:15, 42:22,
  44:9, 53:23,
  56:21, 62:22
unjustly 57:1
unknown 28:17
Unless 12:11, 43:2,
  54:9, 57:20, 59:4,
  63:3, 75:25,
  76:21, 81:16
unlikely 73:4
Unsecured 2:39,
  11:19, 79:7,
  79:17, 79:25,
  83:23
until 11:5, 13:11,
  18:1, 25:24,
  65:14, 80:5, 98:9
unwinding 35:19
upcoming 30:11
update 12:15
urge 21:21, 57:7
urgent 13:16, 13:25,
  90:22
urging 21:21
uses 45:6
using 35:13, 44:21,
  44:22, 44:23, 66:3
usual 8:2
UTIER 71:18, 74:4,
  75:18, 77:21,
  78:1, 78:8, 78:18,
  78:19, 78:20,
  78:23, 79:6,
  79:11, 83:15,
  83:21, 83:23,
  86:21, 90:21,

92:14
utilizes 42:8

< V >
vague 75:1
vaguely 75:18
valid 55:16
validate 61:7
value 39:9, 47:23,
   97:8
various 12:4, 31:13,
   38:2, 84:17
vehicle 15:22, 38:3
venture 49:12
viable 52:24, 66:6
view 21:2, 25:1,
   95:1
violate 36:3, 44:10,
   56:20
violated 34:19,
   40:20
violates 38:1, 39:11
violating 36:18,
   56:9
violation 34:10,
   34:12, 34:13,
   36:5, 39:14,
   40:12, 40:13,
   43:13, 55:2,
   59:21, 61:6, 87:3,
   87:4
Violations 6:15,
   34:3, 37:24, 39:5,
   40:24, 41:1, 63:1
violative 44:1
virtual 29:21
virtually 20:24
virtue 47:12
vis-a-vis 39:2
voiding 60:3

< W >
wait 18:1
waiting 25:15
Walker 99:13, 99:14
wanted 27:17, 31:1,
   41:15, 42:25,
   52:21, 68:6, 84:11

wanting 19:21
wants 79:20, 79:21,
   84:25, 86:9, 94:6
warranted 85:16
waste 80:9, 81:11
Waxman 2:34, 27:12,
   27:13, 27:17,
   27:19, 27:22
week 20:5, 32:16
Welcome 5:14, 19:10
whatever 8:18,
   38:17, 40:6,
   93:19, 94:2
whatsoever 45:16,
   46:4, 72:12
whether 25:25,
   26:18, 31:16,
   33:13, 43:21,
   56:9, 56:16,
   57:18, 67:5, 68:8,
   68:10, 71:2,
   78:19, 89:16, 93:6
whim 67:9
whole 42:18, 90:8
wholly 40:14
William 3:36, 90:16
Windmar 3:26, 75:8,
   75:13, 87:25,
   90:21, 92:14
wish 6:23, 24:5,
   63:1
wished 14:12, 37:22
wishes 7:1, 8:13,
   33:22
withdraw 32:25,
   34:6, 43:12
withdrawal 34:7
withdrawn 9:9
within 41:5, 53:5,
   53:19, 68:10,
   69:7, 77:17,
   78:17, 84:3
without 20:5, 34:8,
   34:17, 34:20,
   38:9, 41:8, 41:20,
   58:5, 61:22,
   76:24, 77:16,
   83:14, 87:15
WITNESSES 4:3, 30:7
word 44:15, 45:6,

70:20, 79:20
words 16:13, 45:4
work 23:6
working 10:8, 12:1,
   30:8, 76:22
works 33:18
world 29:21
worth 79:2
wrestling 69:15
writing 8:4, 32:18
written 63:8, 94:16,
   97:23
wrongful 39:24
wrongly 41:17

< X >
XI 52:21

< Y >
year 19:25, 42:4,
   65:4, 65:23,
   66:24, 67:14,
   91:24
years 35:4, 35:6,
   35:24, 47:17,
   62:18, 64:6, 66:5,
   68:3, 79:2, 79:5,
   86:5, 91:9, 91:14,
   95:2, 95:14, 97:9
yesterday 17:13
yield 76:1
yourself 6:11, 6:18,
   55:23