```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF PUERTO RICO

 3
      In Re:                      )      Docket No. 3:17-BK-3283(LTS)
 4                                )
                                  )      PROMESA Title III
 5    The Financial Oversight and )
      Management Board for        )
 6    Puerto Rico,                )      (Jointly Administered)
                                  )
 7    as representative of        )
                                  )
 8    The Commonwealth of         )
      Puerto Rico and the         )
 9    Puerto Rico Electric        )
      Power Authority,            )      June 4, 2020
10                                )
                    Debtors,      )
11
      _____
12
13    In Re:                      )      Docket No. 3:17-BK-3567(LTS)
                                  )
14                                )      PROMESA Title III
      The Financial Oversight and )
15    Management Board for        )
      Puerto Rico,                )      (Jointly Administered)
16                                )
      as representative of        )
17                                )
      The Puerto Rico Highways    )
18    and Transportation          )
      Authority,                  )
19                                )
                    Debtor.       )
20
      _____
21
22
23
24
25
```

```
 1  _____

 2                         OMNIBUS HEARING

 3    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

 4                 UNITED STATES DISTRICT COURT JUDGE

 5     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

 6                 UNITED STATES DISTRICT COURT JUDGE

 7  _____

 8  APPEARANCES:

 9  ALL PARTIES APPEARING TELEPHONICALLY

10  For The Commonwealth
    of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
11
    For the Official
12  Committee of Unsecured
    Creditors:               Mr. Luc A. Despins, PHV
13                           Mr. Zachary S. Zwillinger, PHV

14  For Ambac Assurance
    Corporation:             Ms. Atara Miller, PHV
15
    For Assured Guaranty
16  Corporation and
    Assured Guaranty
17  Municipal Corporation:   Mr. Mark C. Ellenberg, PHV

18  For Puerto Rico Fiscal
    Agency and Financial
19  Advisory Authority:      Ms. Elizabeth L. McKeen, PHV

20  For Bacardi
    International Limited
21  and Bacardi
    Corporation:             Ms. Dianne Coffino, PHV
22

23

24

25
```

```
 1   APPEARANCES, Continued:

 2
     For AmeriNational
 3   Community Services,
     LLC, and
 4   Cantor-Katz Collateral
     Monitor, LLC:           Mr. Douglas S. Mintz, PHV
 5                           Mr. Nayuan Zouairabani Trinidad, PHV

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                          I N D E X

 2   WITNESSES:                                              PAGE

 3         None.

 4

 5   EXHIBITS:

 6         None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    June 4, 2020

 3                                    At or about 9:37 AM

 4                           *      *      *

 5         THE COURT:  All right.  Then we will begin.  I'd ask

 6   Ms. Tacoronte to call the case.

 7         MS. TACORONTE:  Good morning, Your Honor.

 8         Bankruptcy case 17-3283, In Re:  The Financial

 9   Oversight and Management Board for Puerto Rico, as

10   representative of the Commonwealth of Puerto Rico.  The

11   Honorable Judge Laura Taylor Swain presiding.  Also sitting,

12   Honorable Magistrate Judge Judith Gail Dein.

13         THE COURT:  Thank you.

14         Buenos dias.  This is Judge Swain speaking.  Welcome

15   back counsel, parties in interest, and members of the public

16   and the press.  Today's telephonic hearing is a continuation

17   of the Omnibus Hearing that began yesterday.  For clarity, and

18   for those who are joining us for the first time today, I will

19   repeat my usual instructions regarding the hearing.

20         To ensure the orderly operation of today's telephonic

21   hearing, all parties on the line must mute their phones when

22   they are not speaking.  If you are not accessing these

23   proceedings on a computer, please be sure to select mute on

24   both the Court Solutions dashboard and your telephone.

25         I remind everyone that, consistent with Court and
```

1   Judicial Conference policies and the Orders that have been

2   issued, no recording or retransmission of the hearing is

3   permitted by any person, including but not limited to the

4   parties, members of the public, and the press.  Violations of

5   this rule may be punished with sanctions.

6        I will be calling on each speaker during these

7   proceedings.  When you speak, please start by identifying

8   yourself by name for clarity of the record.  Please do not

9   interrupt each other or me during this hearing.  If we

10  interrupt each other, it is difficult to create an accurate

11  transcript of the proceedings.  Having said that, I apologize

12  in advance for breaking this rule, as I may interrupt if I

13  have questions or if you go beyond your allotted time.

14  However, if anyone has any difficulty hearing me or another

15  participant, please say something immediately.

16       The time allotments for each matter and the time

17  allotments for each speaker are set forth in Section III of

18  the Agenda that was filed by the Oversight Board on Monday,

19  June 1st.  That Agenda was filed at docket entry 13305 in case

20  17-3283 and is available to the public at no cost on Prime

21  Clerk for those interested.

22       I encourage each speaker to keep track of his or her

23  own time.  The Court will also be keeping track of the time

24  and will alert each speaker when there are two minutes

25  remaining with one buzz, and when time is up, with two buzzes.

 1  And here is an example of the buzz sound.

 2          (Sound played.)

 3          THE COURT:  If your allocation is two minutes or

 4  less, you will just hear the final buzzes.

 5          When we need to take a break, I will direct everyone

 6  to disconnect and then dial back in at a specified time.  Our

 7  timing for this morning is from 9:30 to 12:45.  We will take a

 8  ten minute break around 11:15, and then we will resume in the

 9  afternoon at 2:15 and go until 5:00, if necessary.  The longer

10  mid-day break is necessitated by a conflict in the Court's

11  schedule, and so I am thankful for your patience and your

12  understanding.

13          Today we are having the preliminary hearing on three

14  motions for relief from stay relating to revenue bonds:  The

15  monoline insurers' Lift Stay Motion with respect to HTA bonds,

16  which is docket entry 10102 in case 17-3283; the monolines'

17  Lift Stay Motion with respect to PRIFA bonds, which is docket

18  entry 10602 in case 17-3283; and the monolines' Lift Stay

19  Motion with respect to CCDA bonds, which is docket entry

20  number 10104 in case 17-3283.

21          We will begin with the argument relating to HTA

22  bonds.  I have 40 minutes allocated to Ms. Miller and/or

23  Mr. Ellenberg.  So which of you will be speaking first?

24          MR. ELLENBERG:  Your Honor, this is Mark Ellenberg.

25  I was going to start, but, as I understood your Court's

1    subsequent Order, all of the arguments were going to be made

2    on behalf of movants, and then all of the arguments are going

3    to be made on behalf of opponents.  And then we were going to

4    end with a rebuttal.

5            THE COURT:  Yes.

6            MR. ELLENBERG:  And so we've -- we view that as a

7    90-minute block, which we would allocate as follows:  I would

8    start with 30 minutes devoted to the lien and standing

9    issues -- well, the lien issues as they relate to HTA, and the

10   standing issues in general.  Ms. Miller would then spend 45

11   minutes addressing preemption across all three motions and the

12   lien issues relating to PRIFA and CCDA.  And then we would

13   reserve 15 minutes for rebuttal that we will share.

14           THE COURT:  Very well then.

15           MR. ELLENBERG:  So then I would start with 30

16   minutes, Your Honor.

17           THE COURT:  Yes.  Understood.  All right then.  Thank

18   you very much for those clarifications, and we will adjust our

19   timing mechanisms accordingly.

20           So, Mr. Ellenberg.

21           MR. ELLENBERG:  Thank you, Your Honor.  And if the

22   Court please, Mark Ellenberg, counsel to Assured and speaking

23   on behalf of all movants with respect to the lien issues in

24   HTA and standing.

25           Your Honor, the excise tax statutes transfer

1    ownership of the pledged taxes to HTA for the benefit of the

2    bondholders.   The statutes were enacted or amended

3    contemporaneously with each of the 1968 and 1998 bond issues,

4    and they were enacted for the express purpose of funding the

5    bonds.

6         The legislature's intent is clear:   It was to enable

7    the construction of highways for the Commonwealth for the use

8    of the residents of the island through the pledge of tolls and

9    excise taxes, without exposing the general credit of the

10   Commonwealth.   The pledge was the essence of the transaction.

11   The language in the statutes themselves makes that quite

12   clear.

13        And I'd ask, Your Honor, if you have handy the

14   demonstrative package that we submitted to you?

15        THE COURT:   I do.   That is Docket Entry 13339.

16        MR. ELLENBERG:   Yes, Your Honor.

17        And so pages four, five, and six of the demonstrative

18   package have a chart which sets forth salient provisions of

19   the tax statutes.   And I will focus on the oil and gasoline

20   tax in the far left-hand column, but -- the other statutes are

21   not identical but to the same effect.

22        So if we start with 3175 --

23        THE COURT:   That would be D-4?

24        MR. ELLENBERG:   Yes, D-4, Your Honor.

25        THE COURT:   D --

1          MR. ELLENBERG:  D, as in dog.

2          THE COURT:  Four?

3          MR. ELLENBERG:  Yes.  Excise tax statutes.

4          THE COURT:  Yes.

5          MR. ELLENBERG:  There should be a chart, Your

6    Honor.

7          THE COURT:  Yes.  I have it here.  It's page 14 of

8    the PDF, the consolidated PDF.

9          MR. ELLENBERG:  Okay.  I'm --

10         THE COURT:  There are many ways, but it's page D-4.

11   It's headed, Excise Tax Statutes Provide that Revenues are

12   Held --

13         MR. ELLENBERG:  Yes.  Exactly.

14         THE COURT:  So I'm there.

15         MR. ELLENBERG:  Okay.  So let's start with subsection

16   (A), which creates a four cent tax, which is to be covered

17   into a special deposit in favor of the Highways and

18   Transportation Authority for its corporate purposes, although

19   we will see later that "for its corporate purposes" is then

20   qualified by later positions.  (A)(1)(a) tells us that the

21   secretary shall transfer every month the amounts covered into

22   the special deposit.

23         So we now know that a tax was enacted specifically to

24   fund the repayment of these bonds, and that it was to be kept

25   separate from the General Fund, which is the assets of the

1    Commonwealth, for the benefit of the Highways and

2    Transportation Authority.  And that it was to be transferred

3    to them on a regular basis.

4        If we then turn to the next page, Your Honor, D-5, we

5    see that the Highways and Transportation Authority is given

6    the authority to commit or pledge the proceeds of the

7    collections on the taxes.  And then down at the bottom it

8    says, unless clawback applies, the proceeds of said

9    collection, in the amount that they be necessary, shall be

10   used solely, shall be used solely for the payment of the

11   principal and interest on bonds and other obligations of the

12   Authority.  So that while -- and so that while these taxes

13   were given to HTA for its general purposes, in the event that

14   they issue bonds, then the bondholders will have a first lien

15   on these assets.

16       And how this works, Your Honor, is that there's a

17   waterfall in the bond resolutions.  And --

18       THE COURT:  I know that -- pardon me.  I just have a

19   question before you go on.  And I know that you will be

20   talking about liens, but your position is that word -- shall

21   be used solely is not merely a statutory direction, but is

22   actually the imposition of a lien that would give somebody the

23   power to enforce it as against these specific assets, even

24   though the word "lien" isn't used here, even though the word

25   "pledge" isn't used here?

1           MR. ELLENBERG:  Yes, Your Honor.  We believe it means

2      two things:  First, we believe that the statute as a whole,

3      and that provision is certainly a key part of it, actually

4      transfers the beneficial ownership of the excise taxes to HTA,

5      and that HTA has then pledged them on through a consensual

6      lien to the bondholders.

7           But in addition to that, we believe that that

8      language is also sufficient to create a charge against the

9      property, and that that charge satisfies the requirements for

10     a statutory lien, which applies against the taxes in anyone's

11     hands, including the Commonwealth.

12          THE COURT:  Thank you.

13          MR. ELLENBERG:  Okay.  So Your Honor, I apologize for

14     that phone ringing in the background.

15          Your Honor, if we then turn to page D-6, we see now

16     that the government of Puerto Rico itself is making agreements

17     and commitments.  And it makes two of them, each one of which

18     is very important.

19          So first, it agrees and commits -- agreement wasn't

20     enough.  It had to also commit not to reduce the tax that was

21     just enacted to fund the bonds.  And then it says that it will

22     ensure that the taxes are covered into the special deposit in

23     the name and for the benefit of HTA.  In the name and for the

24     benefit of HTA, until such bonds, issued at any time,

25     including their interest, have been paid in full.

1          So, Your Honor, this language, which is critical,

2   establishes a number of things.  First, as I said, taken as a

3   whole, the statute establishes that HTA is the beneficial

4   owner of the designated excise taxes, which makes perfect

5   sense, because the taxes were what was going to repay the

6   bondholders.  In fact, the bondholders only have recourse to

7   the collateral that is pledged to them.  They don't have

8   recourse against the general credit of the Commonwealth.  They

9   don't even have recourse against the general credit of HTA.

10  Their sole recourse is to the pledge.  That was the essence of

11  the deal.  And so HTA, as the party issuing the bonds, became

12  the beneficial owner.

13          Second, the statute establishes that HTA had the

14  authority to issue bonds and to pledge the taxes.

15          Third, there's the requirement that the taxes be kept

16  separate from the General Fund, not commingled with the

17  Commonwealth assets.

18          Fourth, there's a requirement that they be

19  transmitted by the Treasury to HTA on a regular basis.  And

20  then we have the two direct commitments by the Commonwealth

21  itself.

22          Now, Your Honor, these are not mere contractual

23  covenants.  They're not just unsecured promises.  This is the

24  law of Puerto Rico.  It was enacted by the legislature, and it

25  was signed into law by the Governor.

1           This is the law.  They have to obey it.  It is not a

2    mere contract.  Anyone can breach a contract, whether or not

3    they're a debtor, but you can't breach a law.  For example,

4    the Government of Puerto Rico is subject to procurement laws

5    and regulations.  Can they breach those just because they're a

6    debtor?

7           You heard yesterday, with respect to PREPA, that PREB

8    approval was necessary with respect to the contracts they

9    wanted to assume.  They're a debtor.  Can they just ignore

10   PREB?  No, of course they can't.  This is the law of Puerto

11   Rico.  It cannot just be ignored.  And their status as a

12   debtor gives them no greater right to ignore it than they had

13   before.  They have to follow the law.

14          And again, Your Honor, we have to step back and look

15   at the entire question of what was the legislature trying to

16   accomplish here?  They are trying to accomplish the funding of

17   highways for the Commonwealth without impacting their general

18   credit.  And the way to do that was to create streams of

19   revenues that would secure the bonds and limit the

20   bondholders' recourse to those revenues.  That's the deal.  We

21   accept that deal.  We don't want more than we were entitled

22   to.  But what we do want is the collateral that was clearly

23   pledged to us.

24          Now, Your Honor, this language directly refutes a

25   number of the arguments made by the government parties.  And

1  let me try to go through them.

2         The first argument is that because the Commonwealth

3  is not liable for the bonds, the excise taxes cannot be taken

4  to pay for the bonds.  Well, what this legislation shows is

5  that the Commonwealth clearly understood that the excise taxes

6  would be used to pay for the bonds.  Indeed, the Commonwealth

7  expressly commits by law that it will not diminish the taxes

8  until the bonds are paid in full.

9         This means that either, one, the excise taxes are not

10  the property of the Commonwealth, which is we believe the

11  right answer; or two, at a minimum, that the Commonwealth

12  agreed to guarantee the bonds to the extent of the pledged

13  excise taxes.  One of those two things must be true.  Either

14  way, the bondholders are secured by the taxes.

15         Now, the next argument, Your Honor, is that the

16  statutes merely make the excise taxes available to HTA for its

17  general corporate purposes.  But as we noted, that statement

18  was qualified by subsequent clauses.  The first authorizes HTA

19  to issue debts secured by the excise taxes, and the second is

20  that once that debt is issued, the bondholders shall have a

21  first lien on the excise taxes.

22         Now, what happens, Your Honor, is that the taxes

23  are -- and the tolls are poured into the waterfall set up in

24  the bond resolutions.  And the first priority is to top up the

25  various reserve funds created by those resolutions, and it is

1    out of those funds that principal and interest on the bonds

2    are paid. But once all those funds are topped up, whatever

3    falls out at the bottom of the waterfall is available to HTA

4    for its general corporate purposes.  Historically, Your Honor,

5    about 400 million dollars a year has fallen through the bottom

6    of the waterfall and been available to HTA for its use,

7    including maintenance of the toll roads.

8           Now, Your Honor, we're seeking relief from the stay

9    to enforce our rights under the bond resolutions.  So that is

10   our right.  Our right is to have the excise taxes and the

11   tolls poured into the waterfall to have our funds, our reserve

12   funds topped up.  And then when there's money left over, yes,

13   HTA can have it.

14          We're not here to say that we are seizing the funds.

15   We're not going to take all of them.  All we want is to have

16   the bond resolutions enforced.  That's the deal we signed up

17   for.  We're happy to live with it.

18          The next argument, Your Honor, is that the grant of

19   the taxes to HTA is merely conditional, and that's based on

20   the clawback.  But that's wrong.  The language obligating the

21   taxes to a special deposit for the benefit of HTA is in no way

22   conditional.  It's mandatory.  There's a "shall".

23          Similarly, the transfer obligation isn't mandatory --

24   there's a "shall" there, and there's no qualification in any

25   way whatsoever.  The qualification doesn't appear until we get

1   down to -- until we get down to Section (A)(1)(c).  And the

2   qualification appears there only in reference to the priority

3   lien given to the bondholders.

4           So effectively, the constitutional clawback is a

5   carve-out from our lien.  It is not a carve out from the

6   transfer of ownership to HTA.  And in that sense, Your Honor,

7   it's just like the carve-out of a DIP loan.  DIP lenders get

8   liens on the assets of the debtor, but they allow a carve-out

9   for attorneys' fees.  It's standard operating procedure.

10          That doesn't mean they don't have a lien.  It just

11  means the lien is subject to a carve-out.  Well, it's exactly

12  the same here.  Our lien is subject --

13          THE COURT:  Okay.

14          MR. ELLENBERG  -- to a carve-out -- I'm sorry, Your

15  Honor.  You were going to speak?

16          THE COURT:  Yes.  And so you're saying that Article

17  VI, Section Eight does not affect, qualify, or limit in any

18  way,  what you believe the statute does, and that it is only a

19  limitation on the consensual lien that is created by the

20  resolutions?

21          MR. ELLENBERG:  Well, it's a carve-out from both the

22  consensual lien and the statutory lien.  I mean, we agree that

23  our liens are subject to clawback, be they consensual or

24  statutory.  And it is part of the statute.  But what we're

25  saying is that it does not undercut our lien.  It simply is a

1  carve-out from our lien.  It's a limitation on our lien.  And

2  it's a very conditional one.

3       The conditionality is not in our lien or in the

4  transfer to HTA, the transfer of ownership to HTA.  The

5  conditionality is on the clawback.  And there's zero evidence

6  in the record that the conditions for clawback have ever been

7  met, much less that they will be met in the future.  And the

8  only permitted use of clawback funds is to pay the GO bonds.

9  They are not generally available to the Commonwealth for

10  whatever use it wants to make of them.

11       In sum, Your Honor, you know, as we learned in our

12  first year property courses, ownership is a bundle of sticks.

13  It's not an all or nothing proposition.  And so in this case,

14  the Commonwealth has retained one stick, a very slender,

15  conditional stick, which is clawback.  But all the other

16  sticks have been transferred to HTA, which has pledged them to

17  the bondholders.

18       So the next argument, Your Honor, is that the

19  Commonwealth has no privity with the bondholders, thus

20  depriving the bondholders of recourse to the funds, and also

21  depriving us of standing.  Well, I don't know how they can say

22  that.  The statute itself has the Commonwealth making direct

23  agreements with and commitments to the bondholders.  And there

24  are two of them.  And we just looked at them.  So that not

25  only blows up their standing argument, but it severely

1   undercuts the whole theme of their opposition, which is that

2   the Commonwealth is something of an innocent bystander here,

3   who maybe made some unsecured promises but is not otherwise

4   involved in this transaction.

5          The Commonwealth is at the heart of this transaction.

6   They were the architect of it, and they absolutely understood

7   that they were alienating the tax proceeds to fund these

8   bonds.

9          So that leads us to the next argument, Your Honor,

10  which is that the taxing power belongs to the Commonwealth and

11  cannot be alienated.  Well, Your Honor, the taxing power is

12  not being alienated.  It is the taxes collected pursuant to

13  that taxing power that are being alienated.  That happens all

14  the time, and indeed, it happened in COFINA, in the COFINA

15  Plan that you confirmed, and which was supported by the FOMB

16  and the Commonwealth.

17         Certain of the sales and use taxes are alienated to

18  the COFINA structure, permanently and forever.  So that can

19  happen, and it's not an alien -- an improper alienation of the

20  taxing authority.

21         THE COURT:  Mr. Ellen --

22         MR. ELLENBERG:  So indeed, Your Honor --

23         THE COURT:  Mr. Ellenberg?

24         MR. ELLENBERG:  Yes.

25         THE COURT:  In the statutory provisions in COFINA,

1   there was very explicit, express language of transfer, and

2   also language addressing the available resources clawback

3   issue.  And no language of transfer at that level of

4   specificity is in the Excise Tax Statute, is it?

5           MR. ELLENBERG:  Yes, Your Honor.  Well, the language

6   is what we have.  And what I'd say, Your Honor, is that the

7   fact that over the course of 50 years, someone figured out how

8   to make a better mousetrap, doesn't mean that the original

9   mousetrap didn't catch mice.

10          Could the language of these statutes have been even

11  stronger?  Yes.  But that doesn't mean that the language here

12  is inadequate.  And again, we have to view this in the context

13  of the entire transaction.

14          What was the legislature intending to do?  They were

15  intending to fund the construction of highways based on the

16  security of the tolls and the excise taxes.  That's the only

17  way the transaction worked.  And so the intention to pledge

18  them is overwhelmingly obvious.  And yes, of course I agree

19  the language could have been better.

20          The Commonwealth and government parties also point to

21  subsection (G) of the statute, which never became effective,

22  but which also contained better language.  But frankly, Your

23  Honor, that later drafted provision just confirms what the

24  intent was all along, that the -- that the clear legislative

25  intent here was to transfer the benefit of the taxes to HTA so

1   that they could be pledged to the bondholders.  And that's how

2   the bondholders were going to be repaid.

3           And again, I'd go back to the language of (A)(1)(d),

4   which says that the taxes shall be covered into a special

5   deposit in the name of and for the benefit of HTA.  So I think

6   that's pretty good language, Your Honor, and I think it makes

7   the point pretty clearly.

8           So Your Honor, we not only have the plain language of

9   the statutes to rely on, but we have a First Circuit precedent

10  that's directly on point, which is the *Flores Galarza* case

11  which we discuss throughout our briefs, but initially at pages

12  20 through 24 of our Brief in Support of the Motion.  And

13  *Flores Galarza* involved a statute that had the Commonwealth

14  collect insurance premiums from motorists renewing their

15  vehicle licenses in the event that they couldn't provide proof

16  that they had private insurance.  And it is, in that sense,

17  very much like an excise tax.

18          And the Commonwealth was then obligated to transfer

19  the premiums to a consortium of insurers to insurer those

20  unable to get the private insurance.  In 2000, however, the

21  Treasury decided that it was simply going to keep the premiums

22  to ease its own cash flow problems.  Again, very reminiscent

23  of our current situation.  The Court, however, concluded that

24  the insurance consortium had an entitlement to and a property

25  interest in the premiums.  And by contrast, the Court

1    concluded that the Commonwealth had no property interest in

2    the premiums, but merely collected and held them as a

3    custodian, trustee or agent.

4         Now, Your Honor, the words "custodian, trustee or

5    agent" didn't appear in the statute.  The word "transfer"

6    didn't appear in the statute.  The word "lien" didn't appear

7    in the statute.  But it was clear to the Court that the

8    government was simply acting as a collection agent.  And

9    that's exactly what's going on here.

10        The government is a collection agent for the taxes,

11   much in the way that a mortgage lender is a collection agent

12   after it sells the mortgage to Freddie Mac or Fannie Mae.

13   They no longer have a beneficial ownership interest in the

14   funds.  They're just collecting them on behalf of HTA and the

15   bondholders.

16        THE COURT:  Now, the money in *Flores Galarza* was paid

17   by private individuals as premiums for a particular purpose

18   under a statutory scheme that said that the insurance was to

19   be provided by the entity that I think was in the plaintiff

20   position in *Flores Galarza*, or given back, and so there was --

21   it seems to me at least factually different in the sense that

22   it is not a revenue premised on something else that the

23   government is collecting and then you're asserting dedicating

24   to a particular purpose.

25        So coming in, there was no general Commonwealth

1    purpose for these premiums in *Flores Galarza*, and there was

2    another entity that was set up as being entitled to them in

3    the first place.  And that's a factual distinction.  Does it

4    make a legal difference from your point of view?

5          MR. ELLENBERG:  Absolutely not, Your Honor.  And,

6    well, what's going on here?  Private individuals pay the

7    excise taxes, and they do it when they renew their automobile

8    license or when they consume certain petroleum products.  And

9    those taxes, paid by private people in connection with an

10   activity, are then collected by the government, which has

11   committed to transfer them to HTA, another entity, which

12   earned them when it issued five billion dollars worth of bonds

13   secured by those revenues.  And the bondholders certainly

14   earned them when they forked over five billion dollars on the

15   expectation that those pledged revenue streams would be used

16   to repay them.

17         So I think the fact that one was a payment made in

18   connection with renewing your license for insurance, and the

19   others are payments made in connection with consumption of

20   various products, you know, is a distinction absolutely

21   without a difference.  And the parallels are overwhelming.

22         THE COURT:  To your knowledge, are there any excise

23   taxes that are presently at HTA?

24         MR. ELLENBERG:  Well, Your Honor, a hundred million

25   dollars a year is -- has been transferred since 2017 from the

1    Treasury single account to HTA.  And we believe at a minimum,

2    we certainly have received those taxes.

3           THE COURT:  Thank you.

4           MR. ELLENBERG:  And that's exactly where I was going

5    next, Your Honor, because we not only have the taxes in *Flores*

6    *Galarza* -- we have not only the statutes in *Flores Galarza* to

7    rely on, but we have the way in which the excise taxes were

8    treated by the government historically.

9           So first and foremost, those taxes were never put

10   into the Commonwealth General Fund budget.  They were never in

11   that budget.  There was never an appropriation as to them.

12   They've always been kept separate from that budget and

13   appeared instead in the HTA budget, where they are labeled as

14   HTA's own funds.

15          Moreover, Your Honor, in the government's official

16   accounting system, they created a fund called Fund 278, which

17   has specific subaccounts that are dedicated to HTA.  And every

18   dollar of these excise taxes is tracked into those subaccounts

19   and it's tracked out of those subaccounts.  And this is

20   precisely the type of special deposit that the excise tax

21   statutes required and with -- how the Commonwealth

22   historically complied with its obligations under these

23   statutes.

24          Moreover, HTA had the authority to remove the funds

25   from the subaccount.  And in Demonstrative 15, we have an

1    example of an SC-735 voucher, where HTA's signature was

2    adequate to withdraw the funds. Now, the government parties

3    make much of the fact that there's also a Treasury signature

4    on that document, but that Treasury signature is simply

5    ministerial. And so, Your Honor, if the -- if HTA didn't

6    receive the taxes ab initio when the tax statutes were enacted

7    and transferred ownership to them, they certainly received

8    them when the Commonwealth collected them as its agent. And

9    if they didn't receive them when the Commonwealth collected

10   them as an agent, then they certainly received them when they

11   were covered in two -- Fund 278.

12           And finally, as I mentioned, Your Honor, a hundred

13   million dollars a year has been transferred to HTA from the

14   Treasury single account, and certainly that should be subject

15   to our liens. And those -- those funds were received.

16           Now, Your Honor, the official statements are also

17   completely consistent with everything I've been saying.

18   Another data point in how we should read these statutes. And

19   I'm surprised that the government parties dispute this and

20   even suggest otherwise. But the official statements make

21   clear that the excise taxes are pledged to the bondholders.

22   They make clear that the Treasury is obligated to keep the

23   excise taxes separate from the general funds. They make clear

24   that the pledged taxes are subject to clawback, but only if no

25   other resources are available. And they further state that

1   clawback has never occurred in the history of the

2   Constitution.

3           On the other hand, and unlike the *ERS* case, the

4   official statements do not warn of appropriation risk, nor do

5   they warn of bankruptcy or insolvency risk.  The only risk

6   factor contained in the official statements is that the excise

7   taxes and tolls themselves may not be sufficient to service

8   the bonds.  That is the risk we signed up for.  It is a risk

9   that has never occurred.  As I said, at least four hundred

10  million a year in excise taxes and tolls are collected.  But

11  that is the risk we took.  We did not take the risk that the

12  government would just decide to keep the funds.

13          So, Your Honor, I think when you put all those pieces

14  of evidence together, our reading of the statute is clearly

15  corroborated.  But to the extent Your Honor doesn't conclude

16  there's ownership, then there is clearly a statutory lien, as

17  I've discussed.

18          THE COURT:  If you could just wind up.

19          MR. ELLENBERG:  Yes, Your Honor.

20          And so finally, I would just say that we haven't

21  talked about the HTA level yet, but we did have consensual

22  liens granted to us there under the bond resolutions, that

23  clearly 601 is the operative provision, not 401.  And we go

24  through that at length in our briefs.

25          And thus, at the HTA level, we have valid and

1    perfected consensual liens on both the tolls, toll receivables

2    and on the excise taxes.  And that's -- Your Honor, when you

3    put the entire package together, we clearly have liens on the

4    taxes and the tolls, and that should ultimately entitle us to

5    relief from the stay to enforce those rights.

6              THE COURT:  Thank you, Mr. Ellenberg.

7         And so now we'll turn to Ms. Miller.  And we'll set

8    the clock at 45 minutes again.  And the timekeeper, I'm sure,

9    has made a note of what little overage we had with

10   Mr. Ellenberg.  And we'll circle back to that when we compute

11   what's left for with rebuttal.

12             MS. MILLER:  Thank you, Your Honor.  Good morning.

13   Atara Miller for Milbank on behalf of Ambac, and speaking

14   today for all of the other movants as well.

15        As Mr. Ellenberg indicated, I'm going to start by

16   speaking about preemption, but before I do, I just want to

17   respond or add to Mr. Ellenberg's response to Your Honor's

18   question about the *Flores Galarza* case and whether the idea of

19   initial ownership matters.  And I just would refer the Court

20   to *In re City of Columbia Falls*.  And in that case, the

21   question before the court was whether a special assessment

22   that was collected by the municipality for a specific purpose

23   was held in trust by the municipality.

24        And it was held there that it was being held in a

25   trust capacity; that the municipality acts in a pure

1    ministerial role as a custodian.  And in that case, those were

2    tax assessments, special assessment taxes, which just like HTA

3    and all of the other taxes, originated in ownership with the

4    municipality there and the Commonwealth here.

5        The Oversight Board's only response to this case is

6    that ultimately, in that case, the Court held that Chapter 9

7    modified that obligation.  But Chapter 9 modified the

8    obligation because the obligation to transfer this special

9    assessment was only to pay the deficiency, and if the bonds

10   were retired, there was no deficiency.  So it didn't address

11   at all this fundamental question of whether or not, when a

12   statute sets up a sum like this with similar language, it

13   results in a trust for the benefit of the entities for which

14   purpose it was intended to be used.

15       So with that, I'd like to address the Oversight

16   Board's preemption arguments.  And I'll note at the outset

17   that AAFAF does not join in them, which we think is

18   significant.  And as this Court is aware, AAFAF actually

19   vehemently disagrees with the arguments being advanced by the

20   Oversight Board here.

21       And the Oversight Board clarified in its sur-reply

22   briefs that it's not suggesting that PROMESA preempt any

23   unsecured claim or property interest, but simply that, as

24   they explained in the CCDA sur-reply, "Territorial law cannot

25   force the Commonwealth to use retained revenues for debt

1    service."

2         Given that this preliminary hearing is limited to

3    secured status and standing, and the Oversight Board's

4    acknowledgment that its preemption argument does not impact

5    whatever security interest or -- even an unsecured claim

6    movant may have here, this issue is simply not ripe today, and

7    the Court doesn't need to reach preemption at all.

8         I'm going to, nonetheless, briefly address the

9    substance of their arguments.  And the Oversight Board has

10   really articulated three separate series of preemption, and

11   Your Honor noted two at the Omnibus Hearing yesterday.  The

12   first is that the Commonwealth is always free to disregard the

13   law, because one legislature can't bind another.  The second,

14   that the Oversight Board's Title II budgetary powers preempt

15   bondholders' rights.  And third, that the Title III

16   restructuring process preempts certain rights.

17        I'm going to address the first, which is what I call

18   the nonentrenchment, or is known as the nonentrenchment

19   principle.  And the Oversight Board's argument that the

20   government statutes are mere appropriations and that the

21   Commonwealth can -- and I'm going to quote their language --

22   change its mind every minute if it chooses to do so, was

23   unequivocally rejected by the Supreme Court over 150 years

24   ago, and has consistently been reaffirmed since, as noted in

25   the Supreme Court case, *Missouri versus Jenkins* in 1990.

 1          In the *Von Hoffman* case from 1886, the Supreme Court

 2   expressly considered and rejected the argument that laws, and

 3   in particular taxing laws, passed by one legislature cannot

 4   bind a subsequent legislature.  It held, and I'm going to

 5   quote the language from the case, "It is clear that where a

 6   statute has authorized a municipal corporation to contract and

 7   to exercise the power of local taxation to the extent

 8   necessary to meet its engagements, the power thus given cannot

 9   be withdrawn until the contract is satisfied.  The state and

10   the corporation in such cases are equally bound.  The power

11   given becomes the trust which the donor cannot annul and which

12   the donee is bound to execute."

13          The structure issue in that case is exactly the same

14   as the one that we have here.  These are from appropriation

15   statutes.

16          THE COURT:  Ms. Miller.

17          MS. MILLER:  Yes, Your Honor.

18          THE COURT:  I just have a question.  *Von Hoffman*

19   seems to me to reach its result via a finding of the violation

20   of the Contract Clause of the Constitution and the remedy of

21   the mandamus and specific performance.  *Von Hoffman* doesn't

22   deal with the issues of reasonableness and necessity that are

23   elements of current Contract Clause jurisprudence, and so --

24   and those issues obviously weren't raised in that case.

25          Do those issues complicate or have implications for

1    the nonentrenchment principle in the current legal

2    jurisprudential structure, if you will?

3            MS. MILLER:  So I would say, you know, at a

4    theoretical level, I think the answer is no.  But at a

5    minimum, it would require a determination and a -- you know,

6    evidence and a finding that there were, in fact, such

7    circumstances that warranted that.  And that certainly, first

8    of all, hasn't been briefed, but it is also something that

9    would have to be briefed in a substantive action, not on a

10   Lift Stay.

11           THE COURT:  Yes.  Thank you.

12           MS. MILLER:  You're welcome.

13           And just because Your Honor raised the Contract

14   Clause issue in the -- or the Contract Clause element of the

15   holding of *Von Hoffman*, I want to also highlight the fact that

16   this is -- really becomes an issue, I think, to the extent

17   that the Oversight Board's argument is that either the budgets

18   themselves are changing the law, and so you don't even need

19   preemption, or as support for the reasonableness of Title II

20   preemption.

21           The appropriation status of these statutes doesn't

22   feed into Title III preemption.  And so to the extent that

23   there's a Contracts Clause issue, we would say that the fiscal

24   plan and the budgets violate the Contracts Clause.  And as

25   Your Honor has previously held now twice, to the extent that

1    we want to challenge the fiscal plan and budget on the grounds

2    that it's violating the Contracts Clause, or the Constitution,

3    such challenges would not be barred by 106(e).

4            So I'm going to turn now to discuss the Title II

5    preemption argument where the Oversight Board essentially says

6    that Title II preempted any Commonwealth law that provides for

7    the distribution of money, other than as provided for in the

8    certified fiscal plan or budget.

9            This week's Supreme Court decision in the *Aurelius*

10   case makes claim the fiscal plan and budgets themselves can't

11   preempt anything.  The Oversight Board's members are merely

12   local officials.  They don't exercise federal law-making

13   power, and their budgets are acts of the Commonwealth, not

14   federal law.  The preemption, if it exists at all, has to be

15   based specifically on a conflict with the provisions of

16   PROMESA under Section Four.

17           The Oversight Board seems to argue that all

18   Commonwealth laws obligating the payment or transfer of money

19   were immediately preempted the moment PROMESA was enacted.

20   The plain text of PROMESA indicates that this is not what

21   Congress intended.  PROMESA was enacted against the backdrop

22   of the clawback of revenues from HTA, CCDA, and PRIFA.

23   Congress included numerous provisions to roll back

24   Commonwealth laws purporting to direct the clawback of

25   revenues from those entities, including expressly preempting

1    certain Commonwealth laws and executive orders directing

2    particular use of the funds.

3            The Section 303(3), which I know we have discussed at

4    length in other cases, is a bespoke edition to the Chapter 9

5    corollary in PROMESA, and it expressly preempts unlawful

6    executive orders that diverted funds from territorial

7    instrumentalities, i.e., changed the way monies were to be

8    spent.

9            Well, every law and executive order, whether lawful

10   or not, directing the use of funds was immediately preempted

11   upon enactment of PROMESA by Section Four.  This provision

12   would have been unnecessary.  And if their argument is that

13   the preemption doesn't come into effect until there's a

14   conflicting budget, we would posit that that's not federal

15   preemption because the budget isn't federal.

16           But we would also say that you wouldn't have needed

17   to expressly preempt anything.  You could have just given the

18   Oversight Board carte blanche to rewrite the spending as they

19   wanted to.  And there's no suggestion that's in PROMESA, that

20   all spending, regardless of Commonwealth law, is at the

21   discretion of the Oversight Board.

22           Section 201(b)(1)(N) we think further supports this,

23   which requires the fiscal plan to respect the relative lawful

24   priorities, lawful liens that are in laws in effect prior to

25   the date of the enactment.  So clearly, there's no intention

1  to just undermine all of the laws that the Oversight Board is

2  suggesting are simply preempted.

3        So the Oversight Board relies, of course, very

4  heavily on this argument and the First Circuit's decision in

5  *Vazquez Garced*. The decision there merely held that the

6  Governor can't override the Board's budgeting process to

7  approve future spending commitments after the enactment of

8  PROMESA. It nowhere addressed the question of whether the

9  fiscal plan could or did preempt pre-existing legal

10  obligations that were created before PROMESA.

11        And if you think about it, you know, also, *Vazquez*

12  *Garced* was really focusing on a procedural aspect, right? So

13  it was saying, does the Puerto Rico law which sets the process

14  and allows the Governor to reprogram funds that were not spent

15  in a prior fiscal year, does that process still stand or is it

16  preempted by the complex budgeting and fiscal planning process

17  that was set out in PROMESA?

18        And there it seems that there's a clear conflict with

19  the act itself, which is what Section Four preempts. It

20  doesn't preempt anything that's inconsistent with the act or

21  any actions taken hereunder.

22        Okay. So I'm going to turn now to their Title III

23  preemption argument, where the Oversight Board argues that

24  Title III of PROMESA doesn't recognize any priority other than

25  an administrative priority, and thereby preempts movants'

1    claims.  So despite Mr. Bienenstock's statements yesterday,

2    this theory would apply equally to the GO bondholders.  If the

3    obligation to transfer money under the revenue bond statutes

4    is a preempted priority, then the GO priority is as well.

5    There is simply no such thing as selective preemption.

6           The Oversight Board's efforts to avoid the

7    application of any rulings by this Court to the GO bonds

8    simply highlights that the Proposed Plan is nothing more than

9    the Board picking winners and losers.  That issue is not

10   before the Court today, but the fact that the Board is

11   pressing this aspect of preemption and multiple fora against

12   the revenue bondholders, while at the same time desperately

13   trying to avoid adjudication of the very same legal questions

14   against the GO bondholders, is both telling and an indication

15   of the strength of this argument.

16          With respect to the revenue bondholders, this

17   argument fails on the merits.  Title III addresses only the

18   treatment of claims in a Plan of Adjustment.  It does not

19   abstractly preempt rights or reprioritize claims.  There's no

20   plan here and, therefore, the Court need not rule on any

21   question regarding priorities in connection with this Lift

22   Stay Motion.  Moreover, administrative priority relates only

23   to unsecured claims, not the secured claims asserted by

24   movants here, which PROMESA expressly recognizes and

25   preserves.

1      In any event, it would be inappropriate for this

2  Court to rule on the issue today under the First Circuit's

3  decision in *Grella* and the District of Puerto Rico's decision

4  in *In re Henderson*.  The question of priority is expressly not

5  before the Court on a lift stay motion, and the Oversight

6  Board's Title III preemption argument addresses only the

7  preemption of priorities.

8      So unless Your Honor has any questions on priority,

9  I'd like to turn now to PRIFA.

10      THE COURT:  You may go on to the next point.  Thank

11  you.

12      MS. MILLER:  Thank you.

13      So, Your Honor, there are hundreds of pages of

14  briefings, and mounds and mounds of spaghetti that have fallen

15  off the wall.

16      THE COURT:  And the --

17      MS. MILLER:  And if you cut through all of that, the

18  Oversight Board's -- which I'm going to try to do, and keep it

19  simple this morning.  The Oversight Board's argument boils

20  down to two basic points:  First, that the rum taxes belong to

21  the Commonwealth, which is free to transfer them or not at its

22  whim.  And second, the bondholders have no interest in the

23  revenues until they are physically deposited into the trust

24  account.  They're wrong on both points.

25      The Oversight Board's first argument requires one to

1   accept that sophisticated commercial lenders and insurers

2   extended billions of dollars of credit to PRIFA for the

3   benefit of the Commonwealth based on nothing more than a

4   promise by the Commonwealth that it would transfer money to

5   PRIFA, and an illusory one at that.

6           According to the Oversight Board, the Commonwealth,

7   at all times, retained full ownership and control over the rum

8   taxes until it chose to send them to PRIFA, and was free at

9   any time to change the law and nullify even that apparent

10  promise to transfer the money.  Thankfully, the trillion

11  dollar domestic revenue bond market -- the law is not in

12  accord.

13          As we already discussed, the Supreme Court long ago

14  held that statutes authorizing an instrumentality to issue

15  bonds and pledge tax revenues to support those bonds cannot

16  simply be repealed or amended.  These are not mere

17  appropriation statutes.  And here, as added security, the

18  Commonwealth directly pledged to PRIFA bondholders that it

19  would not interfere with any of the rights granted to PRIFA

20  under the statute.

21          I now want to address the second argument.  It's

22  clear that PRIFA's bondholder liens extend to revenues in the

23  infrastructure fund.  The Oversight Board's restrictive

24  definition of our lien defies logic and is contrary to the

25  plain language of the Trust Agreement.  Limiting the liens to

1    monies in the Sinking Fund means that PRIFA bondholders are

2    not secured by any PRIFA account, or any money at all until

3    PRIFA actually pays the Trustee what it owes on the bond.

4         Of course the entire point of a lien is to have

5    security in the event that the debtor does not pay.  So it's

6    commonplace, it's belt and suspenders to include trust

7    accounts within the scope of the lien.  But here, the Board

8    would have you believe that the bondholders only got those

9    belts and suspenders.  No pants.

10        The Oversight Board nowhere explains why the trust

11   agreement 24 times references pledge or pledge to bondholders,

12   including defining the collateral as pledged revenues, when

13   the pledge didn't grant the Trustee any more rights than it

14   got under the Trust Agreement without it.  According to the

15   Oversight Board, PRIFA didn't grant the Trustee a security

16   interest in any PRIFA property or account.  This irrational

17   position, which the Oversight Board has contended for well

18   over a year now, resolves this motion as a matter of law, is

19   based on a plain misreading of the definition of pledged

20   revenues.

21        So, Your Honor, if you have the demonstratives that

22   we submitted in connection with the PRIFA Lift Stay, which are

23   ECF1334-1 --

24        THE COURT:  Yes.  Let me just turn to that.  Yes.

25   Which page?

1            MS. MILLER:  Page two of the deck indicated on the

2    bottom right.

3            THE COURT:  If you can just give me a chance to

4    scroll up to that.  If you will give me a moment.

5            So just -- we'll stop the time on the clock maybe.

6            MS. MILLER:  Thank you, Your Honor.

7            THE COURT:  Does it say -- okay.  Slide deck.  I've

8    reviewed the cover sheet and now I am --

9            MS. MILLER:  It's actually the first page of the

10   document.  Exactly.

11           THE COURT:  Yes.  The Trust Agreement grants the

12   Trustee a lien?

13           MS. MILLER:  Exactly.  And it incorporates the

14   relevant definition, put together in one place.

15           THE COURT:  All right.  I'm there.  Thank you.

16           MS. MILLER:  You're welcome.

17           So we tried on this flag to just put all of the

18   relevant definitions that are incorporated into the pledge, so

19   that we don't have to flip pages back and forth.  So the

20   pledge is included in page nine of the Trust Agreement, and it

21   provides that PRIFA has pledged and does hereby pledge to the

22   Trustee the pledged revenues as defined herein.  And the

23   Oversight Board -- and then the definition of pledged revenues

24   is, in turn, defined as, "shall mean the special tax revenues,

25   defined term, and any other monies that have been deposited to

1    the credit of the Sinking Fund."

2           The Oversight Board's entire theory rests on its

3    reading of this provision, to have deposited to the credit of

4    the Sinking Fund, qualified -- both special tax revenues and

5    any other monies that have been deposited.  This has the

6    effect of making a portion of the definition entirely

7    superfluous.  And this is evidenced by actually the Over --

8    the way the Oversight Board uses the term multiple times in

9    its own brief.

10          So I included a couple of examples on slide four

11   where the Oversight Board says things like, pledged revenues

12   are defined as, "Monies that have been deposited to the credit

13   of the Sinking Fund."  Well, slide two has the definition, and

14   it has me saying, but what about the special tax revenues?

15   And their brief is right.  If you re-deposited to the credit

16   of the Sinking Fund, you don't need special tax revenues at

17   all.  In fact, you probably don't even need the defined term

18   included in the Trust Agreement at all.

19          So this reading is contrary to the well-accepted,

20   last antecedent canon principle.  And the Supreme Court in

21   *Barnhart v. Thomas,* from 2003, discussed this provision, and

22   specifically in connection with a provision from the Social

23   Security Act that included the same language, "any other,"

24   right?

25          So to the extent that you would say, well, "other"

1    tells me that it has to modify back, they specifically said

2    any other.  And what the Supreme Court explained in that case,

3    and kind of a memorable example of a teenage house party and

4    parents absent, which makes me, as a parent, a little bit

5    frightened, it makes the simple point which applies exactly

6    here, which is that you would expect that when you have a list

7    of two things, and the first thing is something that is quite

8    specific that everybody knows, but the second is a very broad,

9    general term, you would be qualifying the very broad, general

10   term.

11         So, for example, here pledged revenues could never

12   mean special tax revenues and any other monies.  That would

13   not be the scope of the lien.  You had to qualify any other

14   monies, but the first very specific provision didn't need to

15   be qualified.  And so it's not -- it would be improper to read

16   the qualifying language as qualifying anything other than the

17   last provision.

18         The Oversight Board actually cited to the Circuit

19   Court decision, which was -- held to the contrary and was

20   expressly overturned on this point by the Supreme Court.  So

21   not only is it precluded, it would make -- render a portion

22   meaningless and would be contrary to basic grammatical

23   principles.  But under the Oversight Board's arguments that

24   they've raised, PRIFA actually couldn't even grant a lien on

25   the Sinking Fund because PRIFA doesn't own it.

1          The Sinking Fund is a trust account that's legally

2     owned by the Trustee for the benefit of the bondholders.  So

3     yet another reason why it would be irrational to limit the

4     lien to something that PRIFA -- that the Oversight Board at

5     least argues PRIFA could not grant the lien in.

6          But the Oversight Board's counter to our position is

7     that the lien -- to our position that the lien extends to the

8     Infrastructure Fund is that Section 401 of the Trust Agreement

9     precludes PRIFA from granting any liens on the infrastructure

10    fund.  Section 401 was plainly added as -- to protect

11    bondholders, and we believe it was intended to mean only that

12    PRIFA couldn't grant any additional liens on the property that

13    was already being pledged.

14         But most fundamentally, the pledge is the pledge.

15    Section 401 is a restriction on PRIFA's activities.  It's a

16    covenant.  It doesn't -- it cannot redefine the pledge.  And

17    so at most what we have here is a breach of a covenant, which

18    maybe is the right result since it seems very clearly to have

19    been unartfully worded.

20         There were also numerous other provisions of that

21    paragraph in particular, Section 401, which were not complied

22    with, including the -- PRIFA withdrawing amounts and making

23    deposits itself into the Sinking Fund.  I think there's no

24    dispute now that these monies, even when they were flowing,

25    were not ever held in a PRIFA bank account, and PRIFA was

1   never actually withdrawing the money or making deposits.  So

2   at most, this means that some portion of Section 401 was

3   breached.

4        The Commonwealth agreements with the rum producers

5   also demonstrate that, prior to this litigation, the

6   Commonwealth didn't believe that its lien was so limited.  And

7   so on slides seven and eight of the slide deck, I've included

8   brief excerpts from the Bacardi and Serralles agreements.

9        And you'll see that in Section 4.6.1 of the Bacardi

10  Agreement, on slide seven, the Oversight Board said that, "The

11  first 117 million dollars of cover over revenues received by

12  the government in each fiscal year through fiscal 2057 are

13  pledged and have to be transferred to PRIFA for deposit to the

14  credit of the Infrastructure Fund."

15       That's exactly what we contend the Enabling Act and

16  the bond documents accomplished.  And the Lockbox Agreement

17  itself preserves the structure and continues to have the first

18  117 million dollars in each fiscal year deposited to the

19  credit of PRIFA.  And that's reflected on slide nine of the

20  deck.

21       So this shows that, as a pure matter of law, the

22  bondholders lien is not limited to money in the Sinking Fund.

23  And we would contend that -- and that it extends to monies in

24  the Infrastructure Fund.  We would contend that the monies are

25  currently being covered into the Infrastructure Fund.

1          Under the Lockbox Agreement, Citibank transfers and

2    deposits the first 117 million dollars each year to the

3    Secretary of the Treasury for deposit to the credit of PRIFA.

4    And that -- a sample of that distribution detail that goes

5    with the transfer is included on slide 18.

6          The transfers continue in this manner to this day.

7    And once deposited with the Commonwealth, the monies are

8    deposited to the credit of the Infrastructure Fund.

9    "Deposited to the credit of" does not require it to be

10   deposited into a specific bank account.

11         The Lockbox Agreement itself makes clear that the

12   Commonwealth knows well the difference between monies being in

13   -- credited to, or designated for deposit in a bank account.

14   And the language from that is on slide nine of the deck.

15         The government parties have a lot to say about what

16   the Infrastructure Fund is not, but they never actually

17   affirmatively say what it is.  Our position, however, is

18   clear.  As required by the Enabling Act and as disclosed in

19   the audited financial statements, the Infrastructure Fund is a

20   special fund, meaning an accounting designation rather than a

21   bank account, used to record the first 117 million dollars of

22   annual excise tax revenues.

23         The actual dollars are held in a TSA bank account,

24   but are specifically designated and tracked PRIFA monies.  At

25   no time was there any other account in which the 117 million

1    dollars required by the Enabling Act to be deposited to the

2    credit of the Infrastructure Fund held.  And that's even prior

3    to the withholding.

4         The Oversight Board disputes our contention that the

5    monies are currently being deposited to the credit of the

6    Infrastructure Fund.  This is a purely factual dispute, which

7    is not ripe or appropriate for resolution at this juncture,

8    particularly on a limited record.

9         Movants have presented at least three pieces of

10   evidence to support their colorable claim that the

11   Infrastructure Fund is a fund maintained for accounting

12   purposes with monies corresponding to the revenues therein

13   currently held in the TSA account.  First, the corporate --

14   Commonwealth corporate representative testified that the

15   Infrastructure Fund isn't a single bank account or fund, but

16   generally refers to the first 117 million dollars of rum taxes

17   earned each year.

18        Two, the disbursement detail from the Lockbox

19   account, and evidence showing that the first 117 million are,

20   in fact, being credited to account R4220 and Fund 111 to this

21   day.  Three, the Commonwealth audited financials, which

22   publicly disclose the PRIFA fund as a special revenue fund

23   used to account for monies received by the Commonwealth up to

24   117 million of certain federal excise taxes levied on rum and

25   other articles.  And I note that the Commonwealth cites to the

1   most recent Commonwealth audited financials, and those deviate

2   significantly in the language from the prior financial

3   statements and were only issued years after this litigation

4   began.  And they clearly reflect the Commonwealth litigation

5   position and don't say anything about what is, in fact,

6   happening.

7          The fact that the 117 million dollars required to be

8   deposited in the Infrastructure Fund was only ever held in the

9   TSA account further supports our position.  And the Oversight

10  Board's argument to the contrary rests on its assertion

11  without any evidence that the Infrastructure Fund may have

12  been a combination of bank accounts.  And I can get into

13  detail on that, but I'm going to spare the Court for now.  I

14  think it's set out in our brief.

15         THE COURT:  I understand your overall point that

16  their position on what the infrastructure is, is unclear and

17  speculative.

18         MS. MILLER:  Right.  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         MS. MILLER:  So one more thing.  The Oversight Board

21  included in its excerpt of the statute for this hearing,

22  Section 1918 of the Enabling Act, and it was nowhere cited

23  previously.  And we would contend, for good reason, we think

24  it's entirely irrelevant to this inquiry.

25         Section 1918 addresses only the money that's actually

1   being held by PRIFA.  They already mentioned, there's no

2   dispute that the Infrastructure Fund is an accounting

3   designation.  And as the Commonwealth corporate representative

4   testified many, many times, monies are not deposited in funds.

5   They are accounting designations.  And there's a difference

6   between accounting and cash.  And as the -- it's also clear

7   that it doesn't apply because Section 1918 requires PRIFA to

8   hold the cash in its possession in bank accounts in its name,

9   and Section 1914, which is on slide 11.  But it's the

10  provision that obligates the transfer, confirms that the

11  Infrastructure Fund can be maintained by or on behalf of

12  PRIFA.  And so, clearly, 1914 and the transfers of the

13  Infrastructure Fund are not subject to 1918.

14          So I'm going to turn -- because I'm running out of

15  time, I'm going to turn now to CCDA, and then I'll circle back

16  to additional open questions -- open issues, unless Your Honor

17  has specific questions on PRIFA.

18          THE COURT:  That's fine.  Please proceed.

19          MS. MILLER:  Okay.  So, Your Honor, CCDA is

20  different, and that's why I left it for last.  And, for

21  purposes of this motion, simpler than the other revenue bonds,

22  because the hotel taxes never actually touch a Commonwealth

23  account.  And that's why we're not seeking to bring a suit

24  against the Commonwealth at all with respect to these

25  revenues.

1           The CCDA bonds are governed by a suite of statutes

2    and agreements, which are described briefly on slide two of

3    the deck.  And the CCDA demonstrative deck is ECF 133 --

4    13338-1.

5           THE COURT:  I have that demonstrative, and I am now

6    turning to the section of it that says, CCDA demonstrative.

7    And I have found your cover sheet for the demonstrative.

8           MS. MILLER:  Okay.  Great.  Thank you.

9           Okay.  So we included, just because I know that I,

10   over the past many months, have found myself sort of having

11   trouble to keep all of the agreements that govern and

12   structure this deal clear in my mind, we put them together.

13   So there are two statutes, the CCDA Enabling Act, the hotel

14   occupancy taxes, and then four, but really three, interrelated

15   agreements:  The Assignment and Coordination Agreement, the

16   Pledge Agreement, and then the two Trust Agreements.

17          The Tourism Company -- so the Hotel Tax Occupancy Act

18   gave the Tourism Company the power to impose, collect, and use

19   hotel occupancy taxes.  The Tourism Company keeps all of the

20   taxes collected, and spends them for its own corporate

21   purposes.  The Oversight Board misleadingly cites to the

22   statement of motives to suggest that the Tourism Company is

23   acting in a "ministerial capacity" as a collection agent for

24   the Commonwealth.

25          So the statement of motives, what the statement of

1   motives actually says -- and I'm going to read the whole

2   sentence for you.  In order to continue with the development

3   of the tourism industry in our island, it is essential that

4   the Tourism Company exercise a more prominent role in the

5   collection and supervision of what represents one of its

6   principal sources of revenue so that it may continue with its

7   ministerial role to promote Puerto Rico as the premier tourism

8   destination in the Caribbean.  Clearly, the other kind of

9   ministerial role.

10       It is undisputed that the Tourism Company does not

11   round trip the revenues back to the Commonwealth, as confirmed

12   by the various flow of funds documents prepared by the

13   government parties in this litigation, and the Oversight

14   Board's Sur-reply, at page one, stating that the Tourism

15   Company, "Retains them in its own accounts."  Only the Tourism

16   Company must approve the pledge of the hotel taxes, and the

17   Commonwealth has no corresponding right.  Neither the Tourism

18   Company nor CCDA is a Title III debtor.

19       This motion highlights the extreme behavior being

20   endorsed or imposed by the Oversight Board under the guise of

21   fairness.  It is the ultimate gotcha scenario in which even

22   nondebtors can avoid obligations and benefit from the

23   automatic stay of -- simply ignoring our obligations and just

24   not transferring money into trust accounts.

25       If they don't -- just don't transfer the money, then

50

1   they can avoid their debt obligation, leaving bondholders with

2   rights only against an empty box, or so the Commonwealth says.

3   The Commonwealth argues that it has an interest in the hotel

4   taxes sufficient to preclude bondholders from exercising their

5   rights against CCDA and the Tourism Company, either because of

6   its inherent taxing power or by virtue of its residual

7   interest arising from the clawback right.

8           We disagree with these arguments, as explained in our

9   brief.  And I'm happy to address them further if you have

10  specific questions, but I want to hold them to the end because

11  we submit that this motion should be granted, even if the

12  funds are, in fact, subject to the automatic stay.

13          So first, bondholders have -- are the beneficial

14  owners of the monies from the time they're collected, because

15  they're restricted and can only be used as required under the

16  statutes and bond documents for the ultimate distribution to

17  bondholders.  Notable here is the detailed Commonwealth

18  covenants, which include the affirmative obligation to make

19  sure that the amounts that must be deposited are deposited, in

20  addition to the pledge not to also eliminate the taxes or

21  parties' rights.

22          We think that, generally, the cases that the

23  Commonwealth cites with respect to negative covenants are

24  inapplicable here, frankly.  They deal with promises not to --

25  when a bank lends you money and you own a home, issue a

1    mortgage on another -- another mortgage senior to their debt.

2    On that, we just think that those have nothing to do with what

3    we're talking about here, where the Commonwealth is giving you

4    an asset and then promises that it won't not give you that

5    asset.  So essentially, even the negative covenants are double

6    negative covenants, so they are affirmative covenants.

7         But the Commonwealth here just cites the same string

8    cite of cases, and doesn't even address the fact that there is

9    a clear, affirmative and direct obligation of the Commonwealth

10   itself.  And the Commonwealth also agrees to be bound and to

11   comply with all of the applicable bond documents.  But even if

12   Your Honor doesn't agree that the bondholders are the

13   beneficial owner of the property, such that the Commonwealth

14   lacks any equity in the funds and makes them definitionally

15   unnecessary for a restructuring, there's no dispute that the

16   bondholders have a lien on the revenues deposited in the

17   transfer account, which we contend is still happening.

18        The arguments here center on a factual dispute about

19   which bank account is the transfer account.  The factual

20   dispute, as in PRIFA, should be decided in the underlying

21   action and not on this motion.  The Court is not charged with

22   definitively resolving the issues, particularly not on the

23   limited record, but instead has to determine whether movants

24   have demonstrated a plausible claim to the property, or said

25   in the converse, whether the Oversight Board has demonstrated,

1   based on the evidence, that we have no plausible basis to

2   suggest that we have a claim.

3        The Oversight Board's arguments for why Scotiabank --

4   the Scotiabank's 5142 account -- and I'm going to refer to

5   some of the bank accounts, so let me just find this slide so I

6   don't lose you.

7        So if you look at slide 11 in the deck, this is the

8   flow of funds, a slightly modified version of the flow of

9   funds, only by adding the red writing that was produced to us

10  in litigation.

11       The COURT:  Yes.  So this is the one that is headed

12  January 2015 to November 2015?

13       MS. MILLER:  Exactly.

14       THE COURT:  One of the things that I have in --

15  unfortunately to do, working with two screens here, is to

16  click the wrong screen and put something back.  But I'm back

17  there.  I'm good.  Thanks for your patience.

18       MS. MILLER:  Okay.  You're welcome.  So we're all

19  set?

20       THE COURT:  Yes.

21       MS. MILLER:  Okay.  Thank you, Your Honor.

22       The Oversight Board's argument -- so you see that on

23  this, if you look at slide 11, there's -- the monies are

24  collected by the hoteliers, and then they're transferred into

25  the Scotiabank 5412 account, which is the Tourism Company

1    account.  And that's the account that we contend is the

2    transfer account.  It then, during this period, got moved into

3    the GDB 9758 account, which is the account that the Oversight

4    Board contends is the transfer account.  So just so you have

5    that sort of clear in your mind.

6         THE COURT:  I do understand those positions.  Thank

7    you.

8         MS. MILLER:  Thank you.  They do -- potentially in

9    material ways, but potentially not.

10        So the Oversight Board's arguments for why the

11   Scotiabank 5142 account is not the transfer account are based

12   on pure speculation, or arguments that would also defeat their

13   arguments about which bank account corresponds to which

14   account identified in the relevant documents.

15        For example, if the Oversight Board is correct that

16   the Scotiabank 5142 cannot be the transfer account because it

17   was opened in 2011, which is a fact not supported by the

18   evidence, including the documents that they cite in their

19   Sur-reply, then the Scotiabank 5144 account, which is the one

20   designated with the yellow star to the right, which is the

21   account that the Oversight Board contends is the surplus

22   account, also can't be the surplus account, because that

23   account was also opened, as the Oversight Board admits, years

24   after the agreement.

25        It's more logical to assume that both Scotiabank

1   accounts are successor accounts to accounts that were

2   previously established.  And nothing in the bond documents or

3   otherwise restricts the transfer account to being a single

4   bank account that can never change.  That's particularly, I

5   mean, relevant here where you're talking about deals that

6   stand, you know, 50 years.

7        There is no affirmative evidence identifying any

8   account as the transfer account.  The Oversight Board's

9   assertion about which one is based purely -- is the transfer

10  account is based purely on inadmissible hearsay.  Their

11  witness testified that he spoke to someone else who said that

12  it was the transfer account, but he has no idea and hasn't

13  seen any documents that support that.

14       The Oversight Board's theory also requires the Court

15  to ignore the affirmative evidence we do have regarding the

16  GDB 9758 account, describing it as the rum tax concentration

17  surplus account, and the lack of any evidence at all

18  identifying the Scotiabank 5144 account as the surplus

19  account.

20       The Oversight Board argues that the Court should

21  ignore the labels attached to the accounts and consider

22  instead how the accounts were used to conclude which account

23  is the transfer account.  Again, the Court should not be

24  making factual conclusions on the Lift Stay motion.  But

25  second, the flow of funds doesn't support the Oversight

1   Board's theory any more than it does ours.

2          Key facts are omitted in their demonstrative, which

3   are reflected on slide 11, that defeat their assertion.

4   First, there are outflows.  Their witness testified that there

5   are outflows from the GDB 9758 account, which would be

6   consistent with it being the surplus account but not

7   consistent with it being the transfer account.

8          And they also don't identify the fact that the

9   Scotiabank 5144 account is a commingled account that holds

10  monies that are entirely unrelated to the tax revenues.

11  There's no -- they give no explanation for why you would have

12  a commingled account that is part of the Special Holding Fund,

13  which has particular accounting requirements attached to it,

14  why you would want to subject other monies, or why it would

15  even be appropriate to subject other monies to that.

16         The Enabling Act contemplates that the Tourism

17  Company will transfer the money to the GDB for deposit into

18  the pledge account every month, not that the money is already

19  being held in a GDB account.  And to the extent the Oversight

20  Board wants to argue, well, that just means in a GDB held

21  account, and the GDB 9758 account is a Tourism Company

22  account, the evidence would show that -- and this is Hughes'

23  Declaration, Exhibit 43, which I apologize is not in the

24  demonstrative at CCDA_stay0006785, just so the cite is on the

25  record, that the agency, the depository agency and the agency

1  listed on that account is actually CCDA, not the GDB.  The

2  Oversight Board, as -- its third account into the flow, that's

3  nowhere described or mentioned, is the GDB 9758 account.  It's

4  the surplus account, as stated in the official Tourism Company

5  and GDB records.

6      Then predefault, the monies flowed through only

7  accounts identified in the relevant documents.  The transfer

8  account, the surplus account, the pledge account, and the bond

9  payment fund.  AAFAF did not provide any flow of funds

10  information predating January 2015, so honestly, we just don't

11  know whether the flow of monies into the GDB 9758 account

12  always happened from the time these bonds were issued or

13  whether it was a later change to help ameliorate the GDB's

14  dire liquidity position in later years.

15      Sending all of the monies to the GDB surplus account

16  daily, rather than directly to the pledge account monthly,

17  would have allowed the GDB to benefit from the float on the

18  funds.  We don't have affirmative evidence, but it's just as

19  likely as any of the Oversight Board's theories.

20      The Oversight Board argues that the GDB 9758 account

21  can't be the surplus account because the monies flow in and

22  out of the account subject to movants' lien, causing the lien

23  to attach and detach.  This just misunderstands our lien,

24  which is not a lien on a deposit account.  That's why I don't

25  need a deposit control agreement.  But it's a lien on the flow

1    of funds, and once it attaches, it doesn't matter what bank

2    account or what you do with it, the lien, they're always

3    subject to the lien.

4         Even -- I just want to, in my last minute, say that

5    even if the Oversight Board were right about which account is

6    the transfer account, movants still have a lien on the monies

7    in the Scotiabank 5142 account.  And this is because, at slide

8    three, there is the grant, and the Tourism Company expressly

9    agreed to be bound by all of the agreements, and passed a

10   corporate resolution, so they're equally bound by the Pledge

11   Agreement.

12        And it includes in the collateral, one, the hotel

13   occupancy tax revenues, which mean the monies deposited in the

14   transfer account; two, the monies deposited in, or required to

15   be deposited in the pledge account pursuant to the provisions

16   of the pledge agreement.

17        Now, they say, well, that doesn't extend -- that

18   doesn't give you anything other than monies in the transfer

19   account.  And so the Oversight Board's argument is that 2-B,

20   the pledge in 2-B gave me a security interest in, one, money

21   in the transfer account, and then two, money in the pledge

22   account or money in the transfer account.

23        Well, that doesn't seem to be a logical reading of

24   the provision, and nothing indicates that the words "or

25   obligated to be transferred into" means -- refers only to the

1    directly preceding transfer.  And, in fact, you know, the

2    nature of this agreement, and the deal, and the fact that

3    they're all interrelated agreements makes pretty clear that it

4    logically refers to the monies that had to be transferred in

5    from the beginning of the flow.  If at any time they had to

6    get to the pledge account, then they're included in the

7    pledge.

8         And this is -- this is clear when you look at the

9    pledge agreement on slide four.  For example, Section 5-B

10   requires the GDB -- do you want me to just finish the

11   sentence -- to put -- to diligently enforce its rights under

12   the assignment agreement, including enforcement of the Tourism

13   Company's obligation to transfer the hotel occupancy taxes

14   into the transfer fund.

15        THE COURT:  And I had promised that -- I had taken a

16   minute or so to fiddle around, so if you have something else

17   you want to state quickly, you may.

18        MS. MILLER:  Okay.  So I just wanted to touch briefly

19   on the delegation of taxing authority and Your Honor's

20   question with respect to PRIFA -- sorry, with respect to

21   COFINA, and isn't the language there more clear.  You know,

22   again, like Mr. Ellenberg said, delegation is a proper

23   exercise.  And the reliance, as I noted on the statement of

24   motives, is not to the contrary.  Actually, I think it

25   supports our facts by indicating that they are Tourism Company

59

1    revenues.  But also, this case is entirely distinguishable

2    from COFINA.

3         In COFINA, you had taxes, sales and use taxes, which

4    were being collected by the Commonwealth.  And it was only a

5    fraction, a small slice of that revenue stream.  You know, one

6    slice goes to the municipalities, one slice goes to COFINA,

7    the rest of it goes to the Commonwealth.  You had to make

8    clear in that -- because COFINA lacked all of the indicia of

9    ownership.

10        The same isn't true here.  Once you gave the Tourism

11   Company the authority to impose the tax and collect it, and to

12   use it as it sees fit, and to pledge it where the Commonwealth

13   doesn't need to and consent to that, you don't need to

14   expressly say, and I'm giving you ownership.  Nobody would

15   ever think -- and that is why these monies in the cash

16   restriction analysis are actually being held by the Tourism

17   Company in a debt service reserve fund to this day.

18        And the Oversight Board indicated that those --

19   designated those funds, as restricted in its class restriction

20   analysis, and ones that the Oversight Board doesn't have

21   access to, because it can't reduce appropriations to CC -- to

22   the Tourism Company to basically, you know, make CCDA spend --

23   part of the Tourism Company, spend its money on hand rather

24   than through appropriations.

25        So I just wanted to respond to Your Honor's question

60

1   on that as well.

2          THE COURT:  Thank you very much.

3          MS. MILLER:  Thank you, Your Honor.

4          THE COURT:  And so this concludes the movants'

5   opening arguments, and I think that this is an appropriate

6   time for our ten-minute break.  After the break, we'll come

7   back and hear from the DRA parties, and then the objecting

8   parties, and then rebuttal.

9          So I'm going to -- we are starting a ten-minute break

10  now.  Please everybody hang up and then dial back in in ten

11  minutes.  Thank you.

12         MS. MILLER:  Your Honor, I was reminded just before

13  we take a break, as a housekeeping matter, we would like to

14  move into evidence the exhibits that were submitted in ECF

15  13339-2, 13338-2 and 13341-2.

16         THE COURT:  Is there any objection?

17         (No response.)

18         THE COURT:  Hearing none -- I'm sorry.  Is that an

19  objection?

20         (No response.)

21         THE COURT:  No.  Okay.  So hearing none, the exhibits

22  in the enumerated docket entries are received into evidence.

23         So the ten minutes starts from now.

24         MR. BIENENSTOCK:  Your Honor, this is Martin

25  Bienenstock.  I apologize.  I was trying to get off mute.  I

1   forgot I was asked to mute my phone on the dashboard.

2              THE COURT:  All right.

3              MR. BIENENSTOCK:  So I unmuted my phone but --

4              THE COURT:  All right.

5              MR. BIENENSTOCK:  We absolutely object.  This was

6   oral argument.  We'd want to go through -- we have all kinds

7   of problems with their exhibits, their deposition questions,

8   et cetera.  This was supposed to be oral argument, not an

9   evidentiary hearing, and we do object to admitting what

10  Ms. Miller asked to be put into evidence.

11             And offhand, I mean, it was so quick, I don't even

12  know what exhibits she's talking about, but we definitely

13  object.

14             THE COURT:  Well, Mr. Bienenstock does make a good

15  point that we have oral argument, and the things that were

16  submitted with the various original submissions and that have

17  been highlighted here are part of the record on this Lift Stay

18  proceeding at this point.  So I'm not sure that it is

19  necessary for me to receive into evidence matters that have

20  been put up for my consideration in connection with this

21  preliminary hearing.

22             Ms. Miller.

23             MS. MILLER:  Your Honor, we actually spent days

24  exchanging lists of the exhibits that we wanted included as

25  part of the record.  They are the exhibits that were attached

1   to the various briefs, plus just a couple of supplemental

2   documents.

3         The Oversight Board actually gave us their

4   objections, including a number which were based on hearsay.

5   We agreed, as reflected in the submitted materials.  We

6   addressed all of their objections to their satisfaction,

7   including making clear that we weren't relying on certain

8   documents for the truth of the matter.  I'm just not sure --

9   the idea that I'm springing this on them is false.

10         We, for a long time, went back and forth.  And

11  frankly, if the Oversight Board had a fundamental objection to

12  this, they should have and could have articulated it earlier.

13  I mean, I'm not sure what the practical difference is other

14  than from our perspective, having a clean record of, you know,

15  what are the factual documents that are being considered by

16  the Court in connection with these motions.

17         THE COURT:  Well, lest we take another hour here

18  trying to look independently through PDFs, I will take

19  Ms. Miller's request under advisement.  The materials that

20  have been filed are part of the court record at this point.

21         And I would ask that you meet and confer, and as

22  promptly as possible, give me a joint letter on your positions

23  as to whether it's necessary to receive things in evidence.

24  And to the extent one side or the other believes that things

25  should be received, and the other believes there are preserved

1    objections to that, lay that position out.  And let's say that

2    joint report must be filed by a week from now.  But it should

3    also apply to anything that the Oversight Board would be

4    trying to introduce that the movants would object to.

5         So that is by June 11th, you will file a joint status

6    report, all right?

7         MR. BIENENSTOCK:  Thank you, Judge.

8         MS. MILLER:  Thank you, Your Honor.

9         THE COURT:  Okay.  Thank you.

10        Now, talk to you in ten minutes.  11:20, by my clock.

11        (At 11:11 AM, recess taken.)

12        (At 11:20 AM, proceedings reconvened.)

13        MS. NG:  Okay, Judge.

14        THE COURT:  Yes.

15        MS. NG:  Things are pretty much okay.  I think

16    everyone's on who's supposed to be on.  Let me just check.  I

17    think mostly counsel are on.

18        THE COURT:  Do you have there Ms. Miller,

19    Mr. Ellenberg, Mr. Mintz, Mr. Zouairabani, Mr. Bienenstock,

20    Ms. McKeen?

21        MR. BIENENSTOCK:  Yes, Judge.  This is Martin

22    Bienenstock.

23        MS. NG:  Yes.  I don't see Ms. Miller yet.  I do see

24    Mr. Ellenberg on.

25        MR. ELLENBERG:  Yes, I'm on.  Can you hear me?

```
 1              MS. NG:  Yes, I can hear you.
 2              MR. ELLENBERG:  Great.  Thank you.
 3              MS. MILLER:  I'm on as well.  It's Ms. Miller.
 4              THE COURT:  Ms. Miller is on.  Okay.  Very good.
 5   We're just trying to check.  Ms. Ng has the screen that shows
 6   who's on.
 7              So I want to make sure that everyone who is arguing
 8   is on.  So actually, I'll also do this just by asking you to
 9   respond "present" or not.
10              Mr. Mintz, are you present?
11              MR. MINTZ:  Yes.  Good morning, Your Honor.  This is
12   Doug Mintz.
13              THE COURT:  Good morning.
14              Mr. Zouairabani.
15              MR. ZOUAIRABANI:  Yes, Your Honor.  Present.  Good
16   morning.
17              THE COURT:  Good morning.
18              Mr. Bienenstock, you said you're here?
19              MR. BIENENSTOCK:  Yes, Your Honor.
20              THE COURT:  Good morning again.
21              Ms. McKeen?
22              MS. MCKEEN:  Yes, Your Honor.  I'm here.
23              THE COURT:  Good morning.
24              Mr. Despins?
25              MS. NG:  He's on.
```

1          MR. DESPINS:  Yes, Your Honor.  Good morning.   I was

2  muted.  Sorry.

3          THE COURT:  Good morning.  I'm sorry.  I know the

4  muting is complicated, and so I will wait for you to unmute

5  yourselves a little longer than I did with Mr. Bienenstock

6  earlier.  And thank you for doing that double muting thing.

7          And Mr. Zwillinger, are you on?

8          MR. ZWILLINGER:  Yes.  Good morning.

9          THE COURT:  Good morning.

10          Ms. Coffino, are you on?

11          MS. COFFINO:  Yes, Your Honor.  Good morning.

12          THE COURT:  Good morning.

13          All right.  I think all are present and accounted

14  for.  And so we will now --

15          MS. NG:  Judge?

16          THE COURT:  Yes.

17          MS. NG:  I'm sorry to bother you one more time.  I

18  need to remind everybody to please, when you're not speaking,

19  to mute your phone and your computer, because I still see

20  people are not muted.  Okay.

21          Sorry, Judge.

22          THE COURT:  Thank you, Ms. Ng.

23          And Counsel, please do comply so we don't have random

24  noises from people's houses.

25          So with that, I will turn now to the argument for the

1   DRA parties in connection with the HTA Lift Stay Motion.  I

2   have a ten-minute time allocation.  Who will be speaking?

3           MR. MINTZ:  Good morning, Your Honor.  It's Doug

4   Mintz of -- excuse me.  Good morning.  It's Doug Mintz of

5   Orrick on behalf of Cantor-Katz.  I will be speaking for five

6   minutes, and then Mr. Zouairabani will be speaking for five

7   minutes.

8           THE COURT:  Very well, then.  So Mr. Mintz, please

9   proceed.

10          MR. MINTZ:  Thank you, Your Honor.

11          In accordance with Judge Dein's March 3rd Order, the

12  DRA parties were prohibited from taking discovery, and we

13  reserve all our rights with respect to our Lift Stay Motion

14  and lien until we've had a full opportunity to address them.

15  But as I said a moment ago, this is Doug Mintz.  I'm here for

16  Cantor-Katz on behalf of the DRA parties.  And Mr. Zouairabani

17  is here from McConnell Valdes for AmeriNat as well.

18          We've briefed a handful of issues, and today we want

19  to focus on just two.  I'll address the preemption, whether

20  PROMESA can preempt our lien, and Mr. Zouairabani will address

21  whether the excise tax statutes, Act 31 and 30, create

22  appropriations.

23          With respect to preemption, PROMESA cannot and does

24  not extinguish the DRA's liens on and rights to the Act 30 and

25  31 revenues, whether through preemption or otherwise.  The

1    Oversight Board argues they aren't preempting the liens, but

2    rather just the revenue streams, by drawing away the

3    collateral itself.  The impact is the same under the law.

4    Doing so would be inconsistent with the Constitution, policy

5    and applicable statutes and case law.

6          The Oversight Board has taken the view that PROMESA,

7    largely through the budgeting and fiscal plan process,

8    preempts significant chunks of Commonwealth law.  This Court

9    has already rejected the Oversight Board's view, stating that

10   the Oversight Board has not been given the power to

11   affirmatively legislate.

12         Thus, with respect to policy measures that would

13   require appeal or modification of existing Commonwealth law,

14   the Oversight Board has only budgetary tools and negotiations.

15   Nevertheless, the Oversight Board pushes ahead again here,

16   placing its faith in Section Four of PROMESA, which states

17   that the provisions of PROMESA preempt specific provisions of

18   territory law that are inconsistent with PROMESA.  But the

19   plain language of Section Four makes clear that Congress

20   intended PROMESA to supplement, not supplant, territorial law.

21         The Oversight Board asserts that Congress expressly

22   preempted Acts 30 and 31 through the budget and fiscal plan

23   processes delineated in Sections 201 and 202 of PROMESA.  They

24   state that because the Oversight Board never certified fiscal

25   plans and budgets providing for the appropriations required

1    under Acts 30 and 31, and because enforcing those statutes

2    would, "make it impossible for the Oversight Board to

3    restructure the Commonwealth debt and fulfill its mandate, the

4    excise tax statutes, therefore, are preempted."

5          This argument is unavailing.  Their argument would

6    create significant policy concerns about PROMESA.  Property

7    rights are expressly protected under both the Fifth Amendment

8    of the U.S. Constitution and the Puerto Rico Constitution.

9    The Supreme Court has held repeatedly that, "However great the

10   Nation's need, private property shall not be thus taken, even

11   for a wholly public use, without just compensation."  That's

12   Justice Brandeis in *Radford*, 295 U.S., at 602.

13         The fact that enforcements of Acts 30 and 31 are

14   inconvenient to our restructuring does not give the Oversight

15   Board or Congress the ability to write property rights out of

16   existence when it suits them.  That would create an array of

17   problems that are not before the Court today.

18         But if the law was intended to supercede the Fifth

19   Amendment, is PROMESA even valid?  While the Oversight Board

20   wonders about the ability to confirm the Plan under the

21   current statute, the Court should also consider a world where

22   Congress permits determination of valid liens without just

23   compensation.  The Court would fair better to follow the

24   Supreme Court's lead and assume that Congress did not

25   expressly violate the Fifth Amendment in the absence of an

1    express statement of Congress, citing to *U.S. v. Security*

2    *Industrial Bank,* 459 U.S. 70.

3              The Oversight Board further suggests that Congress

4    may somehow extinguish the revenue source of the

5    appropriations behind the lien, but preserve the property

6    rights in the lien.  They argue that this Court and the First

7    Circuit have found that all appropriations not expressly

8    included in the Oversight Board's budget are preempted, but

9    that's a wildly overbroad reading of this Court and

10   Judge Kayatta's prior opinions, which talk about whether a

11   governor can spend outside the budget.  It also turns on the

12   meaning of appropriations, which Mr. Zouairabani will address

13   shortly.

14             In any event, extinguishing the funding source of

15   those revenues without providing adequate replacement value

16   nullifies the value of the DRA's interest in the excise tax

17   statutes -- the excise tax statute revenues and amounts to a

18   taking just the same.  See *Armstrong v. U.S.,* 364 U.S. 40, at

19   48.

20             And finally, a close look at the statute, as

21   Ms. Miller noted, reveals that Congress did not intend to

22   preempt applicable Commonwealth law here.  For instance,

23   Section 201(b)(1)(N) provides that any fiscal plan must

24   respect the priorities, and also the liens, of the

25   Commonwealth.  Therefore, it's clear Congress intended, as

1  you'd expect, to preserve the DRA's property rights and

2  revenue streams behind them.

3        So with that, I will turn things over to

4  Mr. Zouairabani to discuss the meaning of appropriations.

5        THE COURT:  Thank you very much.

6        Mr. Zouairabani.

7        MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

8  Good morning.  Attorney Nayuan Zouairabani from McConnell

9  Valdes on behalf of AmeriNat.

10       Before we delve into the appropriations discussion,

11 we'd like to clarify two points regarding the lien issues in

12 the HTA motion.  First, the various positions as to the extent

13 and validity of the monolines' lien have already been outlined

14 in our papers, and I will not repeat them.

15       Second, it is important to distinguish that the liens

16 in controversy at this juncture are the monolines', and the

17 controversy on whether HTA presented a lien over the excise

18 tax statutes has not been raised in these proceedings and are

19 not among the issues before the Court for adjudication.  With

20 these two clarifications, we move on to the topic of

21 appropriations.

22       Your Honor, the FOMB is relying on the presumption

23 that the excise tax statutes, including Acts 30 and 31, are

24 both belonging to the Commonwealth, which the Commonwealth

25 "appropriate" to HTA.  However, the FOMB has never supported

1   this presumption, other than implying that it is common sense,

2   and that any other interpretation would make it impossible for

3   them to restructure the Commonwealth debts and fulfill its

4   mandates.

5          As explained in our briefs, appropriations with

6   legitimate authorization to address that, from the state

7   treasury, to dispense for a specific purpose or project, only

8   funds that are available in the state treasury and under the

9   legislature's control for purposes of annual budgeting may be

10   subject to appropriations.  This concept has not only been

11   adopted in the United States.  It has been expressly

12   incorporated as part of the federal budgeting scheme.

13          Now, while the Puerto Rico Constitution does not

14   define appropriation, Sections Six and Seven of Article VI

15   provide us with a guideline on how they work.  That is,

16   appropriations are set in the Commonwealth budget in a fiscal

17   year by fiscal year basis.

18          With this framework in mind, we turn to the structure

19   of Acts 30 and 31.  These provide that, number one, revenues

20   shall be covered into a special deposit for the benefit of

21   HTA.  Two, they were created for the specific purpose of

22   particular creditors of HTA.  And three, the Commonwealth does

23   not have the authority to divert them to the General Fund.

24          As Mr. Ellenberg explained, the only extraordinary

25   exception is when there's a valid clawback.  To date, no court

1   has addressed whether a clawback has been properly activated

2   by the Commonwealth.  And in any event, the only use of the

3   clawback funds is for payment of GO bonds.  It is not for the

4   Commonwealth General Fund and use.  And two, solely for a

5   particular period of time.  It is not perpetual.

6         Acts 30 and 31 revenues are, thus, not

7   appropriations, because, by the statute's own terms, they do

8   not flow into the Commonwealth's General Fund and are not

9   subject to annual budgetary allocations in the Commonwealth's

10   budget.  To this, the FOMB relies on the First Circuit's

11   decisions in *Vazquez Garced* and *Andalusian*.  However, the

12   facts that they state are wholly inapplicable to Acts 30 and

13   31.

14         *Vazquez Garced* involves the reprogramming of budget

15   extensions from prior fiscal years, while *Andalusian* involves

16   a statute that specifically required annual funding of

17   mandatory contributions to the retirement system.  Both of

18   these decisions revolve around controversies over particular

19   items and the annual Commonwealth budget that requires

20   specific budgetary allocations, whereas Acts 30 and 31 do not

21   contain any such requirement.

22         The FOMB's reliance on a 2005 opinion of the Puerto

23   Rico Secretary of Justice to the effect that the Excise Tax

24   Statute creates a "standing appropriation" also falls flat,

25   because, as explained by the Puerto Rico Supreme Court in *In*

1   *Re:  Secretary of Justice,* AGR opinions 955, the opinions of

2   the Secretary of Justice do not in any way bind the Court.

3          In conclusion, the FOMB has failed to show why Acts

4   30 and 31 should be treated as appropriations.  Therefore, the

5   Act 30 and 31 revenues cannot be modified through the

6   budgetary certification process, because they are not

7   Commonwealth funds and are not subject to annual budgetary

8   appropriations.

9          The Puerto Rico legislature knows how to create

10  appropriation statutes.  In fact, we have listed a number of

11  such statutes in our briefs.  If the legislature wanted to

12  subject Act 30 and 31 revenues to annual budgetary

13  appropriations, it could have categorically stated so, but

14  they did not.  By now reclaiming these revenues as

15  "appropriations" and diverting them to certified budgets, the

16  FOMB is effectively repealing Acts 30 and 31, which authority

17  the FOMB does not possess, as specifically dictated by this

18  Court and affirmed by the First Circuit.

19         And with that, Your Honor, I'll leave it at that

20  unless the Court has any questions.

21         THE COURT:  Thank you very much.  I have no questions

22  for you.

23         MR. ZOUAIRABANI TRINIDAD:  Thank you, Your Honor.

24         THE COURT:  So now we will turn to the objecting

25  parties, beginning with the Oversight Board, to which I have

1  an allocation of 60 minutes and Mr. Bienenstock identified as

2  the speaker.

3         Mr. Bienenstock?

4         MR. BIENENSTOCK:  Yes, Your Honor.  Good morning.

5         THE COURT:  Good morning.

6         MR. BIENENSTOCK:  And we have separate allocations

7  for AAFAF, I believe.

8         THE COURT:  Yes.  What I have is 60 minutes for the

9  Oversight Board, 15 minutes for AAFAF, ten minutes for the

10  UCC, and five minutes for Bacardi.

11         MR. BIENENSTOCK:  Okay.  Thank you.  Thank you.

12  Well, good morning.  Martin Bienenstock with Proskauer Rose,

13  LLP, for the Oversight Board, as Title III representative of

14  the Commonwealth.  And once again, Your Honor, the Board and

15  myself would like to wish everyone good health and hope that

16  we're all back together soon, and in San Juan.

17         My argument intends to start with principles

18  applicable to all of HTA, PRIFA and CCDA, and then to address

19  certain unique aspects of each entity's transactions with the

20  bondholders.  In explaining some of the general principles,

21  however, I have to use some specific examples from the three

22  entities.

23         Before addressing the substance, I want to make clear

24  what the Oversight Board believes is the standard of proof

25  today.  The Court has directed the litigants to address

1   standing and property interests.  The Oversight Board submits

2   the monolines must prove a reasonable likelihood of prevailing

3   on the issue that the Commonwealth does not have a property

4   interest in a revenue stream before the Court can rule no stay

5   relief is required in the Commonwealth's Title III case.

6        Monolines have proffered two contrary positions to

7   that burden of proof.  First, they contend they only need to

8   establish a colorable claim.  As Ms. Miller said a few moments

9   ago, a plausible claim.  The monolines adopt the colorable

10  claim standard from the First Circuit's *Grella* opinion, but in

11  what I will show is a recurring theme in their legal and

12  factual assertions, they omit the First Circuit's explanation

13  of what it means by colorable.

14       What the First Circuit ruled at 42 F.3d, page 34, is,

15  "Put another way, in employing the preliminary injunction

16  analogy discussed above, a creditor must show a reasonable

17  likelihood that it has a meritorious claim, and the court may

18  consider any defenses or counterclaims that bear on whether

19  this reasonable likelihood exists."

20       Just parenthetically, Your Honor, I would say among

21  those defenses and counterclaims is preemption.  We disagree

22  with the movants that preemption is not an issue today.

23       Second, the monolines' PRIFA sur-sur-reply argues in

24  paragraph one, "That the Oversight Board found it necessary to

25  respond at length in sur-reply briefing to movants' legal and

1   factual arguments is proof positive that movants have

2   demonstrated a colorable claim to the pledged rum tax."

3         I will not waste time repeating the proposition that

4   a litigant's reply to lengthy briefs based on new accounting

5   arguments means the moving party must have a colorable claim.

6   It refutes itself.

7         Now to the substance.  Your Honor, the old proverb

8   that a chain is as strong as its weakest link sums up the key

9   issue in each of the three bond transactions.  In a nutshell,

10  the Oversight Board contends that the Commonwealth's

11  pre-PROMESA statutory obligation to appropriate or transfer

12  certain revenue streams from itself, by or through the Tourism

13  Company, to HTA, PRIFA and CCDA, is at most a prepetition

14  unsecured obligation that can and must be breached in the

15  Commonwealth's Title III case.

16        Two venerable legal principles supported by common

17  sense and logic compel that result.  First, every state and

18  territory in the United States has laws requiring entities to

19  honor their contracts and their statutory obligations,

20  including obligations to pay debt.  Until now, no one would

21  even question that these contracts and laws are subject to

22  rejection or breach in bankruptcy where contractual

23  obligations are impaired, debt is discharged, and the debtor

24  pays the amounts required by the bankruptcy law.  The

25  supremacy of the bankruptcy law over local law through

1   preemption mandates that result.  Otherwise, there can be no

2   bankruptcy.

3        The monolines have provided no reason why the Puerto

4   Rico statutes requiring the Commonwealth to transfer or

5   appropriate revenue streams to its instrumentalities can and

6   must be specifically enforceable and nondischargeable, while

7   the Commonwealth's promises to pay its own debt are not.  An

8   unsecured obligation is an unsecured obligation, whether it is

9   an obligation -- whether it is an obligation to pay or an

10  obligation to transfer.

11       Now, in *Ohio v. Kovacs*, 469 U.S. 274, at page 279,

12  the United States Supreme Court ruled that bankruptcy

13  discharges claims regardless of their origin in contract or

14  statute.  It said, "It makes little sense to assert that

15  because the cleanup order was entered to remedy a statutory

16  violation, it cannot likewise constitute a claim for

17  bankruptcy purposes.  Furthermore, it is apparent that

18  Congress desired a broad definition of a 'claim' and knew how

19  to limit the application of a provision to contracts when it

20  desired to do so."

21       Your Honor, I just want to mention hypo -- or

22  parenthetically, that contrary to some of the arguments

23  earlier, if you look at many of the movants' briefs, including

24  their latest PRIFA Sur-sur-reply Brief just a week ago, they

25  say at paragraph 23, "And under settled law, statutory

1   contracts, such as the statutory covenant between the

2   Commonwealth and PRIFA bondholders in the PRIFA Enabling Act

3   are no different."  And in the context, it's no different than

4   claims, non-statutory claims.

5           Second, the Commonwealth --

6           THE COURT:  Mr. Bienenstock.

7           MR. BIENENSTOCK:   Yes.

8           THE COURT:  It seems to me that these arguments on

9   your side and the arguments on the monoline side just proceed

10  from very different fundamental assumptions.  The monolines'

11  arguments say that these -- what you characterize as unsecured

12  contracts should and are actually transfers of property

13  rights.  And you say that they're not.

14          If they're not, your argument that they're an

15  unsecured claim that can be affected by bankruptcy makes

16  perfect sense.  If they are security arrangements, you have

17  the problem that debtors have with secured claims in

18  bankruptcy.

19          And so I'll hear this as your, you know, introduction

20  to a deeper dive on why they're wrong on reading the statutes

21  and the agreements the way they do.  It seems to me that would

22  be wise for me --

23          MR. BIENENSTOCK:  Sure.  Your Honor, I -- although I

24  think I get to that in a little more depth a little later on

25  in my argument, I'd like to offer the following just right now

 1    in response while it's fresh in mind.

 2          I think Your Honor's questions early in the morning

 3    to Mr. Ellenberg really provided the answer, which is in the

 4    statutes he's referring to, there's no words of pledging or

 5    granting a lien.  So whereas I totally agree that if something

 6    is preempted that is a secured property interest somehow,

 7    there has to be adequate compensation under the Fifth

 8    Amendment.

 9          But if there's a statute that creates an undertaking

10    to transfer, and let's -- as I just said earlier, in this

11    case, we have obligations of the Commonwealth to transfer

12    money to instrumentalities.  We have promises of the

13    Commonwealth to pay the, for instance, General Obligation

14    bondholders.

15          Both are obligations to transfer money.  Neither one

16    is secured.  Just as clearly as the obligation, the promise to

17    pay the bondholders is unsecured and it's preempted and it's

18    breached, the obligation to transfer money to

19    instrumentalities is unsecured.

20          And here, it would lead to a completely absurd result

21    if it were not, but we don't have to go that far because I

22    think it's clear.  But the absurd result that would occur is

23    the -- I'm going to get to this in a minute.  The

24    instrumentality bondholders would be paid in full.

25          The obligations to transfer money to

1   instrumentalities would be treated as nondischargeable,

2   specifically enforceable obligations, notwithstanding that

3   Title III doesn't have any nondischargeable claims and doesn't

4   provide for any specific performance.

5          And that would leave virtually nothing for the

6   creditors the Commonwealth promised to pay, the GO creditors

7   and all the other creditors.  So, I mean, that's the essence

8   of our answer.

9          If there is -- if there are words that create a

10  security interest, that's one thing, a Fifth Amendment rights

11  to the adequate compensation.  But if there are promises to

12  move money, that's just an unsecured claim, and the Fifth

13  Amendment is not invoked.

14         THE COURT:  Thank you.

15         MR. BIENENSTOCK:  The Commonwealth obligation would

16  be if it's treated -- or the Commonwealth's appropriation

17  obligations would be treated contrary to the equality policy

18  under which creditors of the same rank share losses equally.

19         Instead, the Commonwealth obligation would be treated

20  as a nondischargeable, specifically enforceable obligation to

21  transfer billions to HTA, PRIFA and CCDA, pay their

22  bondholders in full, while the Commonwealth's own creditors,

23  including the GO bondholders, would absorb all the losses and

24  possibly be paid nothing.

25         It is very important to recognize the obvious here.

1    Namely, it is outside bankruptcy that the law generally

2    requires every entity to keep all its promises, and equitable

3    remedies, such as equitable ownership and trust, are sometimes

4    ordered to compel entities to honor their obligations.

5         Indeed, Article I, Section 10, of the U.S.

6    Constitution bars states from enacting legislation impairing

7    contractual obligations.  Article II, Section Seven, of the

8    Puerto Rico Constitution does the same.  That's because the

9    U.S. Constitution reserved to federal law the power to

10   authorize impairment of contractual obligations.

11        So inside federal bankruptcy, the worst thing a

12   debtor can do is to keep one promise, such as the promise to

13   transfer revenues to the three entities here, while breaking

14   all other promises.  In bankruptcy, the equality policy

15   requires a debtor to break all its unsecured promises so

16   everyone shares the losses equally.

17        In opposition, the monolines' claim is best typified

18   at paragraph two of their PRIFA motion dated January 31, 2020.

19   And I won't read the whole thing, but in that paragraph they

20   claim that, in exchange for buying the bonds, and the

21   Commonwealth promising not to impair PRIFA's rights, and, you

22   know, the Commonwealth's promise to maintain the

23   appropriations, that they claim the Commonwealth alienated all

24   of its ownership rights over those revenues, while at the same

25   time disclaiming any liability for PRIFA's debt.

1          As the quid pro quo for the nonrecourse nature of the
2   debt, PRIFA bondholders were granted an immediate protected
3   lien on the tax revenue stream until the bonds were paid in
4   full.  In other words, they say PRIFA is the equitable owner
5   of the rum taxes, and its bondholders have a perfected lien
6   against them.  What they say is the facts and the legal
7   outcome, we say is simply their desire, but nothing more than
8   their desire, completely refuted by what the documents say.
9          There are several reasons why the monolines' claims
10  that the Commonwealth alienated all its ownership rights, that
11  PRIFA, HTA and CCDA are the equitable owners, and that the
12  bondholders have a perfected lien on the revenues are wrong.
13  First, each of the three deals expressly renders the revenue
14  stream subject to the Commonwealth's retention or clawback
15  rights.  Monolines do not deny that fact.  Rather, they now
16  contend in paragraph three of the CCDA sur-sur-reply that the
17  clawback rights do not provide the Commonwealth a property
18  interest, because they are solely for the benefit of the GO
19  debtholders and not the Commonwealth.
20         The Puerto Rico Constitution refutes the monolines'
21  contention.  It only allows clawback and retention in respect
22  of available revenues of the Commonwealth.  Article VI,
23  Section Two, paragraph three of the Puerto Rico Constitution
24  provides the Secretary of the Treasury may be required to
25  apply the available revenues, including surplus, to payment of

1    interests on public debt.  Section Eight provides when

2    available revenues, including surplus, are insufficient, the

3    public debt and amortization thereof shall first be paid.

4    This is paid from available resources of the Commonwealth, and

5    each of these three deals expressly provides a carve-out for

6    that.

7         So it's almost impossible to dispute that the monies

8    they're talking about are not, at least on a contingent

9    reversionary basis, available resources of the Commonwealth.

10   That's the property interest.  And here, this is more than

11   speculative or hypothetical.  The currently proposed Plan of

12   Adjustment takes that money and uses it to pay the GO

13   debtholders, none of whom are paid in full under the Proposed

14   Plan.

15        Moreover, the revenue -- the revenues come

16   unencumbered, thereby providing the Commonwealth equity in

17   them for purposes of Bankruptcy Code Section 362(d)(2)(A).

18   That's very significant, because there are many arguments here

19   where the movants say, well, even if you have a right, you're

20   under water for purposes of (d)(2)(A).  But we have the

21   revenues back lien free, so we have to have equity in them and

22   (d)(2)(A) can't be satisfied.

23        Second, this Court already determined, in the context

24   of the monolines' request and HTA revenues and the reserve

25   account, that HTA had a minimum -- had at a minimum, a

1  contingent reversionary beneficial interest. That was at 582

2  B.L.R., at pages 598 and 599. The Commonwealth's clawback

3  rights provided a reversionary interest as well that was not

4  so contingent given that none of the GO debt would be paid in

5  full under the Proposed Plan of Adjustment.

6  The monolines' claims are also wrong because of the

7  following undisputed facts. The Commonwealth is not party to

8  any security agreement with bondholders. The Commonwealth has

9  disclaimed liability on all the bonds. There is no financing

10  statement filed naming the Commonwealth as a debtor by any of

11  the movants or their bond trustees. There is no agreement

12  under which the Commonwealth transfers equitable ownership or

13  any ownership of the revenue streams to its instrumentalities

14  or to any bondholders or trustees. Bondholders do not have

15  control over any of the Commonwealth's deposit accounts.

16  None of the official statements suggested that the

17  Commonwealth was liable on the bonds, that any of the

18  Commonwealth's funds were pledged to bondholders, that any

19  statutory liens existed, or that any trust in favor of the

20  bondholders had been created. None of the attorneys' opinions

21  mention these rights either. I will address the monolines'

22  reasons why none of the foregoing matters in a few minutes.

23  Third, as we spelled out in our briefs, all

24  pre-PROMESA appropriations are preempted by PROMESA, as we

25  believe this Court and the First Circuit have already held.

1   Additionally, one legislature cannot bind a future legislature

2   to make a particular appropriation or not to repeal any tax,

3   thus, this applies to all three situations.

4         I will address now the monolines' arguments.  First,

5   in at least their PRIFA and HTA Sur-sur-replies, and now today

6   in their argument, the monolines cite *Von Hoffman v. Quincy*

7   and *Missouri v. Jenkins* for the proposition that once a legal

8   obligation is incurred pursuant to legislative authorization,

9   the government cannot avoid it by simply failing to

10  appropriate a disbursement of funds to pay the obligation.

11        Under well-settled law, reaffirmed by the Supreme

12  Court they say, if the government says it's a tax and incurs a

13  debt obligation, but does not perform the ministerial

14  appropriation, the aggrieved party can sue to mandate the tax

15  proceeds to be used in accordance with the pledge.

16        And they describe *Von Hoffman* as follows:  "The power

17  given becomes a trust which the debtor cannot annul and which

18  the donee is bound to execute."  That's -- when I said that

19  this is their description, it's their quotation from *Von*

20  *Hoffman*, which ends with a semicolon.

21        The rest of the sentence that they didn't include has

22  what Your Honor raised, that the reason for that ruling was

23  because it would impair contractual obligations.  And, Your

24  Honor, I was a little worried that you stole my thunder, and

25  you stole part of it.  In hindsight, I wish you stole all of

1    it.  But I want to go further than the prior colloquy went.

2          One would never expect a litigant to write in its

3    brief that it should lose and its adversary should win, but by

4    citing *Von Hoffman* and cutting off its quotation mid sentence,

5    that is exactly what the monolines have done, albeit

6    unintentional.  The portion of the sentence the monolines cut

7    off says that neither the state nor the corporation can any

8    more impair the obligation of the contract in this way than

9    any other.

10         When the Contract Clause has arisen in these Title

11   III cases, it's been creditors asserting that the

12   Commonwealth's moratorium acts and similar acts impaired their

13   contractual obligations.  It was never a matter of claiming

14   Title III impaired their contractual obligations.

15         *Von Hoffman* was a case outside bankruptcy, when there

16   was no permanent bankruptcy law, where the Supreme Court was

17   barring the state from impairing a contractual obligation.  It

18   was a Contract Clause case having no application in Title III,

19   where the Contract Clause does not apply, or we wouldn't be

20   here.

21         The bottom line is that the monolines haven't cited

22   *Von Hoffman* as their legal authority -- that the monolines

23   haven't cited *Von Hoffman* as their legal authority means they

24   have no authority that is applicable.  But the monoline

25   citation of *Von Hoffman* also shows they acknowledge the

1    Commonwealth has the power not to appropriate the rum tax to

2    PRIFA.  They cite *Von Hoffman* to say the Commonwealth is

3    barred from exercising that power.  *Von Hoffman* would have no

4    application in the monolines' brief if the Commonwealth had no

5    ownership and control of the rum taxes in the first place,

6    because then it wouldn't be able to retain them.

7         The monolines' request for the Court to apply *Von*

8    *Hoffman* and stop the Commonwealth from refusing to appropriate

9    rum taxes to PRIFA is the crux of this dispute and has a clear

10   answer.  No one, including the monolines, have asserted the

11   Commonwealth or any debtor cannot breach its promises to pay.

12   Not paying is the essence of bankruptcy.

13        Here the monolines are contending that while the

14   Commonwealth can breach its promises to pay its GO debt and

15   other debt, it cannot breach its promise to appropriate rum

16   taxes to PRIFA.  There is no statutory or logical basis for

17   such a distinction.

18        The monolines' HTA Sur-sur-reply Brief also cites

19   *Missouri v. Jenkins*, but that gets them nowhere, simply

20   collects cases consistent with *Von Hoffman*, such as *Louisiana*

21   *v. City of New Orleans*, which the monolines cite, but again,

22   do not disclose as a Contracts Clause case.  That Court opined

23   at 215 U.S. 175-6, "a number of decisions in this Court have

24   settled the law to be that where a municipal corporation is

25   authorized to contract and to exercise the power of local

1    taxation to meet its contractual engagements, this power must

2    continue until the contract is satisfied."  And that, it is an

3    impairment of an obligation in contract to destroy or lessen

4    the means by which it can be enforced.

5         Second, they assert the statutes at issue are not

6    appropriations.  There are many reasons why it doesn't matter,

7    and in any event, they are wrong.  First, as I already

8    explained above, any obligation to pay money or transfer money

9    is preempted in bankruptcy.  It doesn't have to be an

10   appropriation obligation.

11        Bankruptcy impairs all obligations, not just

12   obligations arising from appropriations.  Specifically, Title

13   III does not make any prepetition obligation nondischargeable,

14   and that includes appropriation obligations and

15   nonappropriation obligations.

16        Second, movants claim the use of the word asignacion,

17   and I'm sorry if I mispronounced it, and the HTA -- for

18   revenue statutes is different from an appropriation, but the

19   English definition of that word is appropriation.  Moreover,

20   their contention that funds and appropriations are not

21   synonymous is substantively wrong.

22        They cite to definitions in LPRA -- 3 LPRA 283(b) and

23   (a), which are not applicable here, but the distinctions there

24   are distinctions without a difference.  Additionally, there is

25   preemption under Title III, and contrary to what movants

1    argued earlier, there is a big difference between the GO debt

2    and the obligations to appropriate funds to instrumentalities,

3    and the difference is clear and obvious.

4            The difference is that the obligation to transfer

5    money to the instrumentalities is just an obligation, whereas

6    the Puerto Rico Constitution says that the promise to pay the

7    GO debt gets paid first from available resources before anyone

8    else.  One is a priority.  The other is a garden variety

9    obligation, unsecured obligation.  So we don't submit that

10   preemption as to one means preemption as to the other.

11           THE COURT:  And you are not pressing your priorities

12   aspect of the preemption arguments in this Lift Stay

13   litigation?

14           MR. BIENENSTOCK:  No, I -- well, I'm not addressing

15   all how it would --

16           THE COURT:  How it would be --

17           MR. BIENENSTOCK:  Right, but what I am saying as to

18   Title III preemption is that the Commonwealth's obligation to

19   transfer money to the three instrumentalities has no greater

20   priority than any other prepetition -- prepetition general

21   unsecured claim.  And to say that it does, under some concept

22   of Puerto Rico law that is unidentified, to my knowledge,

23   would be subject to preemption.

24           But the movants haven't even identified any Puerto

25   Rico law that says, hey, look, you have to make these

1    appropriations before you pay your other debts.  You know, the

2    GOs have obviously made that argument, because it jumps out of

3    the Puerto Rico Constitution.

4              THE COURT:  Thank you.

5              MR. BIENENSTOCK:  Now I'm going to turn to PRIFA,

6    although certain principles will be applicable to HTA and

7    CCDA.  First, the Board asked the Court not to rely on the

8    monolines' characterizations of what the Board relies on or no

9    longer relies on.  The Board rejects the monolines'

10   characterizations of the Board's position.

11             Because Trust Agreement Section 601 provides the

12   PRIFA bonds can only be paid from pledged revenues, two

13   dispositive issues arise immediately:  What are they and who

14   owns them?  The pledged revenues are defined as the special

15   tax revenues and any other monies that have been deposited to

16   the credit of the Sinking Fund.  Movants contend, "Deposited

17   to the credit of the Sinking Fund," only modifies other

18   monies, not the special tax revenues.  They are wrong.

19             For now, I'll provide just two reasons.  First, that

20   the last clause, "deposited to the credit of the Sinking

21   Fund," modifies both of the prior clauses, which are not

22   separated by a comma, was the First Circuit's ruling in its

23   *ERS* decision at 948 F3d 457.  At page 467, the First Circuit

24   wrote, "We start by rejecting the Bondholders' argument, as

25   did the Title III court, that, in the Bond Resolution's

1    definition of Employers' Contributions, the limiting clause

2    'which are payable to the System pursuant to Sections 2-116,

3    3-105, 4-113' modifies only the antecedent phrase 'any assets

4    in lieu thereof or derived thereunder' and not the other

5    antecedent phrase 'the contributions paid from and after the

6    date hereof that are made by the Employers.' The Supreme Court

7    has held that 'when several words are followed by a clause

8    which is applicable as much to the first and other words as to

9    the last, the natural construction of the language demands

10   that the clause be read as applicable to all.'"

11            On the monolines' demonstrative page six, they quote

12   from page i, Roman numeral i, the first page of the official

13   statement that crams a summary of the whole deal into one

14   page.  On that page, it separates by a comma the two clauses,

15   so it looks like the rum taxes may not have to be deposited

16   into the Sinking Fund.  Nowhere do the monolines mention that

17   page nine of the official statement, which is Exhibit 17 to

18   the movants' PRIFA Stay Motion, provides a detailed disclosure

19   under the bolded heading, security for the bonds.

20            It provides, "Pledged revenues consist of, one, such

21   proceeds of the federal excise tax imposed on the rum and

22   other articles produced in Puerto Rico and sold in the United

23   States that are transferred to the Commonwealth, the federal

24   excise taxes, and deposited to the credit of the Sinking Fund

25   as required by the Enabling Act and the Trust Agreement."

1          Finally, the monolines claim the phrase "deposited in

2     the sinking fund" cannot modify special tax revenues, because

3     the Trust Agreement refers to the deposit to the credit of the

4     Sinking Fund of pledged revenues.  So how can deposited funds

5     be deposited again?

6          There are two answers to the monolines' claim.

7     First, the language they found is not operative language in

8     the Trust Agreement.  It is language from the back of a form

9     of bond included in the Trust Agreement at pages five and six,

10    which language attempts to summarize the collateral security.

11         Second, the monolines did not solve the problem, what

12    they call their circularity problem, by claiming the deposit

13    language did not apply to special tax revenues.  The form of

14    bond does not refer to special tax revenues.  It just refers

15    to pledge revenues deposited into the Sinking Fund.

16         So under the monolines' argument, if the deposit

17    requirement only refers to any other monies, the language on

18    the back of the form of bond still creates the issue of

19    depositing pledged revenues, the other monies that are already

20    deposited.

21         Now, who does the Sinking Fund account belong to --

22         The COURT:  Mr. Bienenstock, I'm sorry.  I'm

23    interrupting you for a moment.

24         MR. BIENENSTOCK:  Sure.

25         THE COURT:  Before you go on to that next point, what

1    do you do with the argument that if any other monies deposited

2    doesn't modify -- sorry.  If it applies to special tax

3    revenues, why mention special tax revenues specifically at

4    all?  Why not simply say the pledged revenues are whatever is

5    deposited in that account?  It seems to make special tax

6    revenue reference superfluous.

7            MR. BIENENSTOCK:  Well, I don't think it's

8    superfluous in the context of the document.  The entire

9    document, starting with the Enabling Act, which allocates the

10   special tax revenues to PRIFA, is all about the special tax

11   revenues.

12           So it's totally understandable that someone drafting

13   a document would want to be expressly clear that the

14   collateral includes the special tax revenues, which are the

15   117 million dollars.  A little extra clarity doesn't hurt.  I

16   know if I were sitting at the drafting section for those bonds

17   that are counting on the 117 million, I would want explicit

18   reference to them and wouldn't be happy if someone said, well,

19   I'll just say any monies we happen to put there.

20           There is an obligation to put the 117 million there,

21   and I want to make that crystal clear and not let anyone

22   argue, well, that 117 million didn't really have to be put

23   there.

24           THE COURT:  Thank you.

25           MR. BIENENSTOCK:  Now, who does the Sinking Fund

1    account belong to?  In their Sur-sur-reply, the monolines mock

2    the concept that they could have a lien and only have a lien

3    against an account owned by the bond trustee.  But bear in

4    mind, this is the only pledge in the entire Trust Agreement.

5    That's exactly what they got.

6          The notion that the bond trustee owns the Sinking

7    Fund is a completely false invention, as proven by the Trust

8    Agreement itself.  First, movants point to the language in the

9    Trust Agreement, Section 401, providing that the Sinking Fund

10   shall be held by the trustee.  Given that a protected security

11   interest in an account requires control, the trustee is

12   holding the account as one of the accepted methods of

13   perfection.

14         Second, movants simply ignore the other language in

15   Trust Agreement Sections 401, 401(a), 401(c), 402, 404 and

16   502.  401 names the Sinking Fund, but -- Puerto Rico

17   Infrastructure Financing Authority Special Tax Revenue Bonds

18   Sinking Fund.  It certainly sounds like it belongs to the

19   Authority, not the trustee.

20         401(a) requires PRIFA to withdraw money from the

21   Infrastructure Fund and deposit it into the bond service

22   account, which is one of the subaccounts for the Sinking Fund,

23   in the amount of principal and interest to become due during

24   the year.  If the Trustee owns it, you wouldn't deposit the

25   money early.

1          401(c), PRIFA can deposit it into the reserve account

2     in substitution of monies, a letter of credit or insurance

3     policy.  This cannot possibly belong to the trustee as it is a

4     reserve account that may never be needed.

5          402 instructs the trustee when he can withdraw money

6     and what he can withdraw from the bond service account.  If

7     the trustee owned it, he would not need permission or

8     instructions on when to access it.

9          404 requires the trustee to allow PRIFA to withdraw

10    money from the reserve account when there is excess funding.

11    It can't belong to the trustee if PRIFA is entitled to it.

12         And 502 requires that investment earnings of the

13    Sinking Fund be paid to the Puerto Rico Infrastructure Fund

14    when there is excess money.  If the trustee owned it, he would

15    get the earnings.

16         Third, UCC Section 9-607(a)(4) provides, funds

17    credited to a deposit account that is collateral do not become

18    property of the secured party until applied.  9-617(a)(2)

19    provides, a deposit account or -- applies to secured debt only

20    on collection.

21         Now, the Lockbox Agreement.  Just a few facts to show

22    it does not help movants.  Neither PRIFA, nor the bondholders,

23    nor the PRIFA bond trustee are parties.  It protects the rum

24    producers like the party.  The existence of the Lockbox

25    Agreement shows exactly how the bondholders should have

1   protected themselves if they wanted a security interest in the

2   excise taxes at the Commonwealth level.  Section 24 provides

3   for no third-party beneficiaries.

4          The next to last whereas clause recites, the parties

5   are entering into a deposit account control agreement to

6   perfect a security interest in cash.  That is exactly what the

7   PRIFA bond trustee did not do at the Commonwealth level.

8          I just have a few arguments in the context of PRIFA

9   about movants used of their expert report and financial

10  statements.  There are basically three reasons why we submit

11  they have no materiality or relevance.

12         First, let's take a look at the government parties'

13  PREPA demonstrative.  There's just one, Your Honor.  There are

14  two, but one is the statute, so I'm referring to the first,

15  which is the one-page diagram.

16         THE COURT:  Okay.  329 --

17         MR. BIENENSTOCK:  The flow of funds -- yeah.

18         THE COURT:  Okay.  And it's in Exhibit A of that?

19         MR. BIENENSTOCK:  Right.

20         THE COURT:  Okay.

21         MR. BIENENSTOCK:  The flow of funds shows the money

22  starting with the federal government, and then going to the

23  Commonwealth, which then deposits it in the lockbox.  And then

24  the lockbox, Bank City, transfers 117 million to the

25  Commonwealth TSA account.  And then it goes into the

1    Infrastructure Fund, which according to movants' expert, may

2    be located in one or more bank accounts.  For present

3    purposes, it won't matter.

4         Movants' expert report doesn't help resolve the

5    issues here.  As we explained in the government's Sur-reply,

6    the expert defined "fund" as a concept to keep track of

7    certain revenues, regardless of whether they were in one or

8    more accounts.  And he defined "restricted" as meaning a debt

9    covenant to governmental purpose that would require use of the

10   money for a particular objective.

11        No one here, including the Court, needs to see the

12   word "restricted" to know what the PRIFA documents say the

13   money should be used for.  That's not the question.  That's

14   not even disputed.  The issue is whether, under Title III, the

15   documents and statutory obligations can or must be breached --

16   or the contractual and statutory obligations can or must be

17   breached or specifically enforced.  Accounting doesn't answer

18   that question.

19        Finally, movants' expert looked at balance sheets for

20   the Commonwealth for the dates, how much it was paying its

21   debts, and made various observations.  The point I want to

22   make is that the balance sheets can only be based on account

23   balances either at the lockbox, the TSA, the Infrastructure

24   Fund or the Sinking Fund.

25        Let's look at the top of the exhibit of the

1    demonstrative.  The balance sheet doesn't request cash the

2    Federal Government is about to send the Commonwealth, nor does

3    it reflect a check from the Federal Government being held by a

4    Commonwealth employee deciding where to deposit it.  Or if

5    they use wires, the balance sheet doesn't reflect instructions

6    Commonwealth employees could give the Federal Government, the

7    lockbox bank, or the TSA, as to where to send the money.

8         The expert only sees where they sent it.  That's the

9    only thing the balance sheet reflects, and whether they marked

10   it restricted.  That doesn't help solve the legal issues here,

11   namely, whether the Commonwealth could instruct each bank not

12   to transfer the money to the Infrastructure Fund accounts,

13   which is what has been happening or not happening the last

14   three years.

15        Put differently, the balance sheets only show what

16   restrictions the Commonwealth wanted to impose or comply with.

17   And the ones looked at were during the good times when they

18   were paying all their debts.  They don't show what the

19   Commonwealth's options were.

20        Now, on the Infrastructure Funds --

21        THE COURT:  Before you go on, may I just explain that

22   I gave the wrong document reference.  I was looking at 13343,

23   the government's demonstrative on those funds.  Please go

24   ahead.

25        MR. BIENENSTOCK:  Thank you, Your Honor.

```
 1                    The Infrastructure Funds.  First, it's important not

 2      to overlook the obvious, namely, that the Enabling Act

 3      authorizes and the Trust Agreement determines which

 4      authorizations to use.  So while 3 LPRA 1914 provides, the

 5      Puerto Rico Infrastructure Fund shall be maintained by

 6      quote -- shall be "maintained by or on behalf of the

 7      Authorities," the Trust Agreement Section 401 provides, "The

 8      Authority shall maintain, with a qualified depository, the

 9      Puerto Rico Infrastructure Fund."  Movants' contention that

10      the Infrastructure Fund is at the Commonwealth is simply

11      contrary to Section 401.

12                    Additionally, and as a response to some of this

13      morning's argument, all of this discovery, and looking for

14      where the accounts are and what they need in them, you'll

15      either find that the Commonwealth complied with the document

16      or did not comply with the document.  But who cares?  They --

17      the document gives the parties their rights.  And if they

18      didn't comply, then someone might have a claim for not

19      complying.  But it has nothing to do with whether -- with what

20      property interest the moving parties have.

21                    3 LPRA 1914 also provides that the excise taxes

22      covered into the Infrastructure Fund "shall be used by the

23      Authority for its corporate purposes."  Thus, the monolines'

24      whole story about the Infrastructure Fund being at the

25      Commonwealth and subject to their lien or equitable ownership
```

1   makes no sense.  It is totally at odds with the open-ended

2   corporate purposes that the Authority can use the money for.

3          Additionally, movants claim that rum excise taxes

4   belong to PRIFA, and are held in the TSA, and they have a lien

5   against them.  This is additionally disproved by 3 LPRA 1918,

6   which requires that, "all moneys of the Authority shall be

7   deposited in depositories qualified to receive funds of the

8   Commonwealth, but they shall be kept in a separate account or

9   accounts in the name of the Authority."  Thus, PRIFA's money

10  cannot be held in the TSA.

11         The word "participation" in 3 LPRA 1914 logically

12  refers to the share of Rum Taxes to be covered into the

13  Infrastructure Fund.  There's no reason it means "ownership".

14         3 LPRA 1913 shows the Commonwealth can terminate its

15  annual appropriations to PRIFA, otherwise, it would not have

16  needed to covenant not to terminate the appropriations.

17         Mr. Ahlberg's testimony that he understood the

18  Infrastructure Fund to refer to the first 117 million of rum

19  revenues earned is both understandable and totally irrelevant

20  and immaterial.  It's understandable, because in the years

21  Puerto Rico was paying all its debts, it was expected that

22  Puerto Rico would comply with the Trust Agreement and transfer

23  the rum tax proceeds to the Infrastructure Fund as required by

24  3 LPRA 1914.  It's immaterial, because it does not address any

25  of the legal issues, such as whether the rum taxes became

1    subject to a security interest before being deposited in the

2    Sinking Fund.

3         This testimony is only being hyped by movants because

4    they created a fallacious theory that somehow the rum taxes

5    became subject to the bondholders' lien immediately on the

6    Commonwealth's receipt of them, and to shore that up, the

7    monolines claim PRIFA becomes their equitable owner

8    immediately because they say the Commonwealth holds the

9    Infrastructure Funds.  And since the taxes do not have to be

10   deposited in the Sinking Fund, according to them, the security

11   interest arises as soon as PRIFA gets them.

12        None of that story is borne out by the deal

13   documents, the Trust Agreement.  When we pointed out that the

14   Trust Agreement, Section 401, provides, "The Authority shall

15   not pledge or create any liens upon any monies in the Puerto

16   Rico Infrastructure Fund," movants responded, it must mean no

17   liens except for that lien.  Suffice it to say, that's not

18   what Section 401 says.  That's something they just made up.

19        Finally, no language in the Enabling Act or Trust

20   Agreement creates a trust in the Infrastructure Fund.

21   Moreover, because that fund is for PRIFA's corporate purposes,

22   movants lack standing to assert the Infrastructure Fund money

23   is in trust.  Only PRIFA would have that standing.

24        For a moment, I just want to review the legal

25   determinations movants are asking for, or the hoops they are

1    hoping the Court will jump through.  First, that the
2    Commonwealth statutory agreement not to alter PRIFA's rights
3    somehow transferred equitable ownership of the rum revenues to
4    PRIFA.  Second, that the Infrastructure Fund the Trust
5    Agreement requires to be maintained by PRIFA is actually
6    maintained by the Commonwealth.  That the Trust Agreement's
7    bar against liens against the Infrastructure Funds does not
8    bar PRIFA from granting movants a lien, or from movants having
9    a lien.  And the definition of Pledged Revenues restricting
10   them to Special Tax Revenues deposited in the Sinking Fund
11   doesn't really mean that.
12          Now to HTA.  Ms. McKeen will cover most all the
13   issues relating to the disputes over the accounts, but as
14   shown by the government parties' HTA demonstrative, other than
15   the tolls collected by HTA, all the taxes and other revenues
16   movants want originate at the Commonwealth and flow down to
17   HTA when the Commonwealth appropriates them to HTA.
18          To be sure, they argue that in prior pre-PROMESA
19   years, the appropriation was done by HTA.  And that's
20   perfectly logical since when the Commonwealth was paying all
21   its debts, what is sometimes referred to as a standing
22   appropriation in the statutes to send down the license fees
23   and guest taxes, it's taken for granted that it will happen
24   each year to pay the debts.
25          And it was totally within the Commonwealth and HTA's

1   powers to put it into HTA's budget.  It doesn't mean that we

2   should use that voluntary decision as evidence to change what

3   the documents say.  But the main issues are preemption of

4   pre-PROMESA appropriation, whether one legislature can bind

5   today's legislature, which is deemed to approve Oversight

6   Board budgets, both of which are covered.

7         And the last issue, whether movants have succeeded in

8   proving a security interest in HTA's purported rights to

9   appropriations, if the appropriations are not preempted and

10   given rise to a claim, as I will show, movants only have

11   security interest in the Sinking Fund.  First, Section 601 of

12   the 1968 and '98 resolutions provides the revenues and funds

13   are pledged to the extent herein above particularly specified.

14   Movants omit that qualification from their Reply in paragraphs

15   33 to 39.

16         Section 401 is the only grant of a security interest

17   in the resolutions, and it grants security interest only to

18   the extent funds are deposited in the Sinking Fund that is

19   herein above specified.

20         Movants claim to have a perfected security interest

21   in HTA's rights to monies from the Commonwealth.  In fact,

22   they only have security interest in monies received by HTA,

23   but they are not perfected for many reasons.

24         Your Honor, may I ask how long I have?

25         THE COURT:  Ms. Selden.

1          MS. SELDEN:  About 12 minutes.

2          MR. BIENENSTOCK:  Okay.  Thank you.  Thank you.

3          THE COURT:  Mr. Bienenstock, would you make sure to

4     touch on the position as to ownership or security interest in

5     excise tax monies that have reached HTA?

6          MR. BIENENSTOCK:  Yes.  To the extent whatever --

7     whatever taxes or other revenues are in the Sinking Fund are

8     subject to their security interest.

9          THE COURT:  But only what is actually in the Sinking

10    Fund?

11         MR. BIENENSTOCK:   Right.  Now, that doesn't --

12    right.  That's right.

13         THE COURT:  Thank you.

14         MR. BIENENSTOCK:  In regards to perfection, no

15    section of either the 1998 resolution or the 2002 Security

16    Agreement grants a security interest in HTA's receivables or

17    any right of HTA to receive revenues.  The security interests

18    are limited to monies already received by HTA.

19         Even on the expansive view of the security interest

20    granted by the 1998 resolution, it grants only security

21    interest in revenues "received" by HTA.  That's a 1998

22    resolution, Sections 101, 401, and 601.

23         Similarly, the 2002 Security Agreement grants a

24    security interest in the '98 resolution funds, which are

25    deposit accounts, and amounts that are required to be on

1    deposit in them by the terms of the 1998 resolution.  The only

2    monies the 1998 resolution requires to be on deposit are the

3    1998 resolution funds or revenues that have been received by

4    HTA.  Received funds are, of course, put into and held in a

5    deposit account.

6         As a result and as discussed, or as I will discuss,

7    movants' security interests are best characterized as security

8    interests in deposit accounts under Article Nine of the

9    Uniform Commercial Code.  Movants claim a security interest in

10   deposit accounts are perfected because when the security

11   interests were granted, Article Nine of the UCC did not cover

12   deposit accounts, and when revised, Article Nine came into

13   force, it provided continuing validity.

14        Movants are wrong.  I'm going to abbreviate what I

15   plan to say for lack of time, but suffice it to say, movants

16   have cited the wrong statute.  They cite the transition rules

17   in Article Nine for the attachment of the security interest.

18   They cite 19 LPRA 2402(b), but the correct citations is 19

19   LPRA 2403(b).

20        And the bottom line to that is whatever happened pre

21   the revision of Article Nine, it would have to be fixed within

22   three years.  Three years long ago expired, in about 2015, and

23   it wasn't fixed.

24        To avoid this conclusion, movants try to assert their

25   security interest is in accounts, which are not to be confused

1   with deposit accounts, for payment intangibles.  This is

2   wrong.  Article Nine defines accounts as a right to payments

3   of a monetary obligation, and a payment intangible is a

4   general intangible under which the account debtor's principal

5   obligation is a monetary obligation.

6          A security interest in amounts or monies in deposit

7   accounts is a security interest in a deposit account.

8   Movants' security interests are in the 1998 resolution funds,

9   and at the most, on all amounts received by HTA.  To qualify

10  as security interests in payment intangibles or accounts,

11  movants' security interest must extend to HTA's right to

12  payment.  But even on movants' expansive view, none of the HTA

13  bond resolutions grant movants a security interest to any

14  rights to payment of revenues.  They only grant a security

15  interest in monies actually received by HTA into HTA's

16  accounts.  Movants have not seemingly alleged otherwise.

17         As a result, it is a security interest on deposit

18  accounts that can only be perfected by control, which does not

19  exist.  Which does not exist.

20         Your Honor, as much as I would like to cover the HTA

21  slides and --

22         COURT REPORTER:  I'm sorry.  Could the person

23  speaking identify themselves?

24         THE COURT:  Yes.  Who is speaking now?

25  Mr. Bienenstock was speaking.  Who just spoke?  Hello?  Would

1  someone who can hear me say that they can hear me?

2          MS. NG:  Judge, can you hear me?

3          THE COURT:  Yes, I hear Lisa.

4          MS. NG:  Okay.

5          THE COURT:  Okay.  Mr. Bienenstock, can you hear me?

6          MR. BIENENSTOCK:   Yes, I can, Your Honor.

7          THE COURT:  Okay.  Was that a different person

8  speaking or was that -- he said, as much as I would like to

9  something.  Was that you?

10          MR. BIENENSTOCK:  No, that was not me.

11          THE COURT:  Okay.

12          MR. BIENENSTOCK:  I said, as much as I would like to

13  go on with HTA, I wanted -- and the slides, I was going to say

14  I want to get some of the comments made earlier in the

15  argument.  And Ms. McKeen is going to cover the dispute over

16  the CCDA transfer account.

17          THE COURT:  Okay.  Was that Mr. Bienenstock?

18          MR. BIENENSTOCK:  Pardon me?

19          THE COURT:  Is that Mr. Bienenstock who just said

20  that?

21          MR. BIENENSTOCK:  Yes.

22          THE COURT:  For some reason, voices are sounding

23  different to me.

24          MR. BIENENSTOCK:  Yes.  This is Martin Bienenstock.

25          THE COURT:  Okay.  I'm so sorry.  For some reason,

1     the sound quality changed, so I was confused.

2              So we'll put you another minute and a half on the

3     clock to cover my confusion.

4              MR. BIENENSTOCK:   Thanks, Judge.

5              I want to go back to cover a few comments made

6     earlier, but I will say, as far as CCDA, and again, HTA, we

7     believe the preemption issues and the inquiries here, they --

8     there is no obligation, other than an unsecured prepetition

9     obligation to transfer any of these monies to any of these

10    three entities, and as a result -- and that none of the

11    documents give them a security interest at the Commonwealth

12    level.  So we think that ends the matter.

13             And whether CCDA's transfer account is one number or

14    the other has no materiality or relevance to the Stay Motion.

15    I think that's clear, but I just wanted to put it on the

16    record as our position.

17             Contrary to the argument that there's some type of

18    trust in HTA, based on the *Flores Galarza* case, we think it

19    was totally different.  It was motorists sending their own

20    money into the government, which was duplicative of insurance

21    premiums they had paid for private insurance, with their own

22    money being returned to them.  And so the government was

23    holding their money for them.  And the statute contemplated

24    that people would pay duplicative premiums, and the duplicates

25    would have to be returned.

1           The notion that preemption is not ripe -- we think

2     that preemption is key, key to this for the reasons that I've

3     already mentioned.

4           THE COURT:  Mr. Bienenstock, are you still there?

5           MR. BIENENSTOCK:  Yes.  I'm sorry.  I was looking at

6     my notes.  It wasn't that you lost the sound.

7           THE COURT:  Yesterday I got cut off, so I'm just

8     checking.

9           MR. BIENENSTOCK:  I wanted to address some of the DRA

10    issues.  As I explained earlier, whether the obligation to

11    transfer taxes that the DRAs are concerned about fit within

12    the definition of appropriations or not, as I explained

13    earlier, has no consequence here.  Any obligation to transfer

14    is preempted by PROMESA.

15          Otherwise, as I said at the very outset, these claims

16    would become equivalent to specifically enforceable

17    nondischargeable claims.  And to make them that way, I

18    think -- none of the moving parties would dare say to Your

19    Honor, I'd like Your Honor to determine that my claim is

20    specifically enforceable and nondischargeable, because the

21    statute doesn't come close to doing that.

22          So instead, they have said, well, tell me I've got

23    equitable ownership.  Tell me I've got a trust.  Tell me I've

24    got something that takes it outside of the property of the

25    Commonwealth.

1          And Your Honor, this is reminiscent of equitable

2     remedies outside of bankruptcy.  When you don't have

3     bankruptcy and debts can be paid in full, courts frequently

4     come up with equitable remedies.  But those equitable remedies

5     are frowned on and virtually banned and preempted in

6     bankruptcy because their only effect is to spring one

7     unsecured claimholder ahead of another.

8          It's true that the Commonwealth has breached its

9     obligations to its creditors.  It's not a good thing.  It's a

10    bad thing.  But for one group of creditors to say, well, give

11    me a special remedy, I have a transfer obligation, you only

12    have a promise to pay, makes no logical sense.

13         And I think on that, Your Honor, I'll stop, subject

14    to Your Honor's questions.

15         THE COURT:  Thank you, Mr. Bienenstock.  Let me just

16    take a minute to -- so as to standing, do you dispute that

17    movants have standing to bring their motion with respect to

18    toll revenues and any other monies that have hit HTA but are

19    not necessarily in the Sinking Fund?

20         I'm asking about standing, not about whether you

21    think there's a security interest, whether you think they'll

22    win on the security interest.

23         MR. BIENENSTOCK:  Right.  Your Honor, we're not --

24    we're not attacking standing for purposes of making the stay

25    relief motions.  That's actually where this started

1    approximately a year ago, with the PRIFA rum tax stay relief

2    motion.

3            THE COURT:  Yes.

4            MR. BIENENSTOCK:  We're not making that type of

5    attack on standing.  Our standing objections today are to the

6    extent that movants have claimed that they have a trust, a

7    beneficial trust interest in monies that, outside of

8    bankruptcy, were supposed to be transferred to the three

9    entities, we're saying that it's those three entities.

10           Now, we do acknowledge that the -- in each of these

11   three instances, there's a statute on the books where the

12   Commonwealth committed that it would not alter or impair the

13   rights of these three entities while the relevant bonds were

14   outstanding.  So I think for purposes of making claims based

15   on that statute, the bondholders would be included as having

16   standing, because the statute was addressed to them as much as

17   to the three instrumentalities.

18           But for purposes of stay relief, based on having a

19   secured interest or some other property interest, whether a

20   trust or whatever, we don't think they have standing for that

21   based on the statutes.

22           THE COURT:  So whereas to matters in which you might

23   concede, there's a more -- I'm not even going to get into the

24   word "colorable", so -- and I'm not going to try to summarize

25   because the hour is late, but I do think I follow what you

1    said.  So I thank you for that.

2        And let me just take one more minute to look at my

3    notes.  Let's see.  You said that as to the cash flow, that

4    includes the transfer account and the surplus account, so I

5    think that that is CCDA, that it doesn't matter which account

6    is the transfer account.  If that is what you said, I'd be

7    grateful if you'd explain that a bit further, because my

8    impressions have been that the identity of the transfer

9    account was a material issue, because the Oversight Board is

10   contending that it's an account that is not funded and the

11   movants are contending that it is an account through which all

12   money goes.

13       MR. BIENENSTOCK:  Right.  I think -- I hope I said it

14   in the context -- in the context of it doesn't -- it doesn't

15   matter in terms of whether preemption allows the Commonwealth

16   to cease all transfers of these taxes.  And I didn't say it

17   earlier, but I should have, that, you know, we don't believe

18   that the taxes belong to the Tourism Company.  They were made

19   effectively a collection agent.  In fact, you might even say

20   that the Commonwealth hadn't been doing a good job at it, so

21   they became the collection agent.

22       The taxes still are Commonwealth taxes, but as to

23   which account they're in, we know the moving party's looking

24   for the account into which money is being -- money is being

25   deposited, because they have a lien on the transfer account.

1    If it's -- well, they have a lien on the actual transfer

2    account, not the one they've designated as the transfer

3    account.

4         We can -- you know, we can reroute the money.  It's

5    in that sense I said it doesn't matter.  But I suppose for

6    purposes of determining the amount of their lien at any given

7    time, it would matter which one it is, because they have a --

8    they don't have a lien on all the accounts.  They only have it

9    on the transfer account.

10        THE COURT:  Thank you for that clarification.

11        And so it is now 12:42.  We will break for lunch and

12   resume at 2:15 with Ms. McKeen's argument.  And then we will

13   continue through the remaining arguments.

14        Thank you very much for the arguments thus far this

15   morning, and for all of the thousands of pages of submissions

16   in advance of the hearing.  And you can see that I have spent

17   a great deal of time on them.

18        So have a good lunch, and dial back in at 2:15,

19   please.  Thank you.  Be well, everyone.

20        MR. BIENENSTOCK:  Thank you.

21        (At 12:43 PM, recess taken.)

22        (At 2:19 PM, proceedings reconvened.)

23        THE COURT:  Good afternoon.  This is Judge Swain.

24        MS. NG:  Hi, Judge.

25        THE COURT:  Ms. Ng, are you there?

 1              MS. NG:  Yes, Judge.  I'm here.

 2              THE COURT:  Hi there.  Are we all ready to proceed?

 3              MS. NG:  Yes, we are.

 4              THE COURT:  Very well.  Again, good afternoon.

 5  Buenas tardes to everyone.

 6              I believe the next person up to speak is Ms. McKeen

 7  for AAFAF for 15 minutes.

 8              MS. MCKEEN:  Thank you, Your Honor.  Good afternoon.

 9  Elizabeth McKeen of O'Melveny & Myers for AAFAF.

10              Before I begin, I want to quickly address what

11  Ms. Miller said about AAFAF's preemption position.  Ms. Miller

12  said we -- that AAFAF vehemently disagrees with the Board's

13  preemption argument, and that's just not right.  We agree

14  Title III has preemptive parts.  We did not join the other

15  preemption argument made by the Board because, as the Court

16  knows, we've had historical disagreements with the Board

17  regarding the breadth of its powers under PROMESA, and we

18  simply don't think the Court needs to reach these issues to

19  deny these motions in their entirety.  I think calling it

20  vehement disagreement is unfounded.

21              There are two distinct issues here that have to be

22  disaggregated, even though the monolines repeatedly conflate

23  them in their brief and in their argument.  Those issues are

24  who owns the revenue, on the one hand, and then on the other

25  hand, what liens exist in favor of the bondholders.

1            As for the latter, putting aside perfection issues,

2    the bondholders clearly have liens on specific accounts at

3    each entity.  Those are very specific.  They can be discerned

4    plainly from the face of the docket.  But as the briefs and as

5    Mr. Bienenstock explained, that's all they have.  And the

6    clarity of those liens stands in sharp contrast with

7    everything else they claim from a sort of muddled set of

8    doctrines and incorrect factual contention.

9            As for who owns the revenues, we think the touchstone

10   of that analysis has to be statutes themselves.  Those

11   statutes gave an expectancy interest, but they did not

12   transfer the Commonwealth's ownership interest to the

13   bondholders.

14           First, the bondholders' liens from the

15   instrumentalities are themselves fundamentally inconsistent

16   with the idea that the bondholders also own the Commonwealth's

17   revenues, as they tried to argue.  This Court's recognized

18   that already.  It's recognized the contention that funds that

19   are subject to a lien are spatially incompatible with full

20   ownership of the funds.  That was in the *Assured-HTA* case, 582

21   B.R. 579, at 598.

22           Second, contrary to what Mr. Ellenberg argued, when

23   the Commonwealth legislature intends to transfer ownership of

24   public funds, the language of the statute is unmistakable on

25   that point.  And I think COFINA is instructive, as this Court

1    recognized in its colloquy with Mr. Ellenberg.

2         The post restructuring COFINA statute contains a

3    provision entitled, ownership of the COFINA revenues.  It

4    states that transfer of the COFINA revenues was, quote, An

5    absolute transfer of all legal and equitable right, title and

6    interest, and not a pledge or other financing.  And it goes on

7    to say that COFINA, quote, Is and will be the sole and

8    exclusive owner of the COFINA revenues.  And that those

9    revenues don't constitute available resources under Section

10   Eight, or Article VI of the Constitution.

11        Now, that's not a new --

12        THE COURT:  I'm sorry.  What I want to say is that

13   the new COFINA statute was drafted in the light of Title III

14   and substantial litigation of all these issues.  Is there any

15   statutory language or means, short of that sort of very

16   specific lengthy language that's in the new COFINA statute,

17   that you would recognize as dedicating a stream of tax

18   revenues securing repayment of bonds in a way that couldn't be

19   undone by subsequent legislation or a certified budget?

20        MS. MCKEEN:  That's a good question, and I think the

21   prior COFINA statute that the Board cited in its papers also

22   goes a lot farther than the statutes that we have here.  I

23   think what's clear is that the statutes here don't even come

24   close to where they would need to be to get the monolines to

25   the promised land.

```
1             They use language like, shall pay, shall transfer,
2    shall be covered into, shall be deposited; and that kind of
3    language creates nothing more than an expectancy.  It doesn't
4    create property rights, much less in favor of the bondholders.
5    And that's why I think you heard Mr. Ellenberg and Ms. Miller
6    speak a lot about intent, and that's because the statutes just
7    don't say what they want them to say.
8             And Mr. Ellenberg also argued --
9             THE COURT:  You --
10            MS. MCKEEN:  Go ahead.  I'm sorry.
11            THE COURT:  I'm sorry.  The first COFINA statute I
12   think also postdated these other statutes, and so, you know,
13   to get into a little bit of mind reading, but I'd like to know
14   what your position is, would your position be that the COFINA
15   provision for transfer was a decision by the Commonwealth to
16   change its practice, or is there some way short of the
17   specific use of the word "transfer" that the Commonwealth
18   could alienate its interest in the stream of revenue if it
19   intended to do that?
20            MS. MCKEEN:  I think there certainly could be, but we
21   don't need to guess at that here, because the language of the
22   statutes that we have in front of us don't even come close.  I
23   think it's a good question, and it's hard for me to speculate
24   about where that line gets crossed, but it's not crossed here.
25   They don't even come close to it here.
```

118

```
 1              THE COURT:  Thank you.

 2              MS. MCKEEN:  With respect to the statutory language,

 3   Mr. Ellenberg argues that it's the law, but as Mr. Bienenstock

 4   explained, that argument is entirely inconsistent with Chapter

 5   Nine, which relieves the debtor of all manner of financial

 6   obligations, including those that arise by statute.

 7              The Commonwealth itself made no pledge to the

 8   bondholders at all, and because the language of the statutes

 9   don't -- it doesn't give the movants the right they claim,

10   they ask this Court to go on and infer property rights that

11   don't otherwise exist based on a host of different things.

12   One of the things they think gets them to where they need to

13   be is this characterizing what they call a course of

14   performance, that they say confirms their reading of the law.

15   But course of performance isn't relevant to statutory

16   interpretation for a good reason.

17              Whatever accountants say or whatever Treasury

18   employees do to facilitate the Commonwealth's state of their

19   cash management can't create property rights that don't

20   otherwise exist against public funds.  That's kind of a

21   fundamental point.  If the movants didn't get the rights to

22   hundreds of millions of dollars pursuant to these statutes, it

23   doesn't make sense to think that they somehow got those rights

24   because of how the Commonwealth engaged in accounting.

25              But the monolines also ignore facts that either
```

1   undercut or downright disprove their argument.  For example,

2   with respect to the Commonwealth collection of excise taxes

3   and rum taxes, there's no question that in the first instance,

4   the Commonwealth takes its funds and puts them into its own

5   account.

6          The movants rely on language about special deposit

7   funds in a Commonwealth financial statement to argue that

8   maybe the Commonwealth holds these funds only as a trustee or

9   as a collection agent, but when the Commonwealth holds funds

10  as a custodian for another entity, the financial statements

11  make that very clear with disclosures.  And as the Oversight

12  Board explained in its Sur-reply brief, nothing in the

13  financial statement suggested that the excise taxes were the

14  wrong taxes, were in a special deposit fund.  There's no

15  mention of HTA or PRIFA funds whatsoever in that context.

16         So that tells you what you need to know on the point

17  about course of dealing.  The Commonwealth wasn't or didn't

18  consider itself a fiduciary or a collection agent for any

19  funds at issue in this case.

20         And I think *Flores Galarza* sort of makes the point

21  all the more clear, because in that case, you had a statute

22  that was very clear about the Commonwealth being a collection

23  agent.  And in fact, you had a situation where the

24  Commonwealth was given a fee for conducting collections.  And

25  so the combination of the financial statement and the

1   monolines' characterization of *Flores Galarza* show you that

2   they're asking the Court to make these huge inferences, when

3   the reality is the Commonwealth knows very well how to express

4   all these points when it wants to.

5          Now, to conclude, I'd like to address some of the

6   instrumentality specific arguments that the monolines make,

7   because I think they are based on either misinterpretation or

8   sometimes just plain mischaracterization of the facts.  And I

9   think it's important to talk about some of these with some

10  specificity.

11         With respect to HTA, contrary to their arguments, the

12  existence of Fund 278 doesn't show that these excise taxes are

13  held in trust.  Some codes do not define or relate to property

14  rights.  They are a mechanism within Treasury's accounting

15  system used to classify funds upon receipts.

16         Putting aside that a fund code isn't a bank account

17  and it's not used to segregate money, the fund code 278 isn't

18  even exclusive to HTA.  There are revenues tagged from 278

19  that were never allocated to HTA.  As one example, before the

20  Lockbox Agreement was executed, rum tax proceeds paid to rum

21  producers were classified with the Fund 278 code, which you

22  can see right on page 15 of the demonstrative that Ms. Miller

23  referred to with respect to PRIFA.

24         There is highlighted text there referring to Fund

25  278, even though it's with respect to a payment being made to

1    rum purchasers.  So it can't be that designated money -- the

2    fund code 278 makes that money HTA, or makes that money

3    bondholder property, when there's clearly fund code 278

4    designated monies that are not HTA's property.

5              The monolines' expert, Mr. Holder, claims that

6    classifying excise taxes with that fund code conveyed that the

7    revenue is restricted, but he cites no evidence whatsoever to

8    support that assumption.  And in fact, right after saying that

9    Treasury use of code fund 278 must convey a debt service

10   restriction with respect to HTA, he turns around and draws the

11   exact opposite conclusion in his discussion of PRIFA, saying

12   that the accounts used in systems like PRIFA are, quote,

13   Helpful for tracking funds subject to particular restrictions,

14   but are not in and of themselves ultimately determinative of

15   which money they're held with special funds or otherwise

16   subject to restriction.

17             The monolines --

18             THE COURT:  I'm sorry.  Since we're on PRIFA for a

19   moment, can you tell me what the PRIFA Infrastructure Fund is

20   and where it's located?  Who maintains it?

21             MS. MCKEEN:  Yes, Your Honor.  So the PRIFA

22   Infrastructure Fund -- and if you'll allow me to just check my

23   notes, I want to make sure that I get this right.  Under the

24   terms of the Enabling Act, the Infrastructure Fund is a

25   special fund to be maintained by or on behalf of PRIFA, and to

1    be used by PRIFA for its corporate purposes.

2         The Enabling Act also allowed PRIFA to segregate the

3    funds into one or more subaccounts.  As the Commonwealth and

4    PRIFA's 30(b)(6) witness testified, there was no bank account

5    or accounting designation that was understood to be the

6    Infrastructure Fund.  It was the understanding of Commonwealth

7    personnel that the Infrastructure Fund referred to the first

8    117 million dollars of rum tax revenue.

9         So when you read the statute and compare it to the

10   predefault funds, the most logical conclusion is that the

11   Infrastructure Fund existed across two accounts into which the

12   Commonwealth transferred the first 117 million dollars of rum

13   taxes; the 113 million dollars of PRIFA debt service that was

14   in an account that GDB administered; and the four million

15   dollars that went to a PRIFA general account for PRIFA's

16   operational purposes.

17        What I would also say about that, as long as we're

18   talking about PRIFA, is that while movants argue that the

19   Infrastructure Fund is part of the TSA, and it attempts to

20   kind of expand their rights to reach Commonwealth accounts,

21   they -- in doing so, I think they ignore Section 1914 of the

22   Enabling Act, which expressly contemplates the Infrastructure

23   Fund can be segregated into one or more subaccounts, because

24   that's precisely what was done here.

25        THE COURT:  And is it your position that those

1    accounts have not been funded since the cessation of payments

2    on the bonds?

3            MS. MCKEEN:  That's correct, Your Honor.

4            THE COURT:  Thank you.

5            MS. MCKEEN:  The last thing I want to address is

6    quickly, with respect to CCDA, the transfer account is empty.

7    The movants are struggling to define a different account to be

8    the transfer account.  And their argument, which is entirely

9    made up, is not only inconsistent with the flow of funds that

10   the documents dictate, it's also inconsistent with what

11   actually happened.

12           When they start from the premise that the initial

13   collection account, the Scotiabank 5142 account is the

14   transfer account, it means they're forced to argue that the

15   actual transfer account, which is GDB-9758, must be the

16   surplus account; and they double-down on that argument,

17   because some account materials associated with the transfer

18   account use the word "surplus" in the account name.  But

19   there's no question that that account functioned as the

20   transfer account.

21           GDB-9758 is the only account in the flow of funds

22   that ever funded the pledge account, which channeled funds for

23   that service.  That's how you know it's the transfer account.

24   And similarly, you know that Scotiabank 5144 is a surplus

25   account, because it received the surplus funds.  And that's

 1   not what happened with GDB-9758, which received all of the

 2   funds.

 3            So, to conclude, we believe that -- yes, Your Honor.

 4            THE COURT:  Give me your conclusion, and then I'll

 5   ask you my follow-up question.

 6            MS. MCKEEN:  Okay.  We think the inconsistencies and

 7   the movants' submissions in support of the HTA and PRIFA

 8   motions make the shortcomings of their argument clear.  With

 9   respect to HTA, they argue that the lack of an annual budget

10   appropriation means they have an ownership interest, but when

11   the rum taxes are subject to a budget appropriation, they say

12   it doesn't matter.

13            With HTA, they say fund codes show an ownership

14   interest.  With respect to PRIFA, they say it doesn't matter.

15   And that's because their argument really boils down to no

16   matter what the facts are, we should win.  Their positions

17   aren't based on any consistent or coherent set of principles,

18   because they're hunting and pecking for something to hang

19   their hats on, because the statutes didn't say what they want.

20            Mr. Ellenberg's mouse trap is empty.  The

21   Commonwealth knows how to grant property interest when it

22   wants to, and that's not what it did here.

23            Thank you, Your Honor.

24            THE COURT:  Thank you.

25            Now, going back to CCDA, are the movants wrong when

1    they argue that factual disputes over which account is the

2    transfer account should be determined in the context of their

3    proposed CCDA enforcement action as opposed to the Lift Stay

4    litigation?

5          MS. MCKEEN:  I think they are, Your Honor.  I think

6    that this is something that should be done in the context of

7    this proceeding.

8          THE COURT:  In aid of --

9          MS. MCKEEN:  I --

10         THE COURT:  -- what determination?  I mean, in aid of

11   a determination of a likelihood of success in showing a

12   security interest in -- because it certainly seems to me that

13   I can't do anything that would be preclusive of the argument.

14         MS. MCKEEN:  I think this goes to the likelihood of

15   success issue, yes, Your Honor.  I think that's right.

16         THE COURT:  And so you think that I should be

17   resolving factual material, factual disputes for purposes of

18   determining a likelihood of success?

19         MS. MCKEEN:  I think you can conclude that they

20   haven't made their case; that there's a likelihood of success

21   here; and that a definitive determination could always be made

22   in connection with the summary judgment proceeding.  But for

23   purposes of these proceedings, they haven't met their burden.

24         THE COURT:  Should this be -- if the factual issue is

25   material to a question of whether they've made a prima facie

1   case, is it something that I should consider further evidence

2   on in connection with a final hearing, or is it something you

3   think I can resolve on this record?

4        MS. MCKEEN:  I think you can resolve it now, because

5   they haven't created a dispute sufficient to entitle them to

6   stay relief.  The argument that they're advancing is precluded

7   by the plain text of the relevant agreement, because the

8   Assignment Agreement requires that the surplus account only

9   receive tax revenues that are in excess of the amount

10  certified by GDB as required for debt service.  So they have

11  no lien over the surplus account.

12       And their proposed mapping would have their debt

13  service payments being made from the surplus account.  That's

14  how you know it can't be.  And because their argument is not

15  credible, there's, frankly, no need to continue to consume the

16  parties' resources and judicial resources to have a full

17  evidentiary hearing to dispense with this argument.

18       THE COURT:  Thank you.

19       MS. MCKEEN:  Thank you, Your Honor.

20       THE COURT:  The next person up to speak is -- well,

21  for the UCC, I have Mr. Despins and Mr. Zwillinger listed as

22  speakers.  And so how do you propose to allocate your time?

23       MR. DESPINS:  Your Honor, good afternoon.  This is

24  Luc Despins with Paul Hastings.  I will cover the presentation

25  for the Committee.  It's ten minutes, but I expect to be

1   shorter than that and to cede, with the Court's permission, my

2   time back to Mr. Bienenstock.

3          THE COURT:  All right, then.  Thank you.  Please

4   begin.

5          MR. DESPINS:  Okay.  Thank you, Your Honor.

6          So, at the end of the day, the monolines' argument is

7   really that intent should govern here.  And that's really the

8   argument that was made by Mr. Ellenberg.  So they cobble

9   together some statutory provisions, a few documents here and

10  there, and say, voila, we have a security interest.  But we

11  know how to grant a security interest.  People know how to do

12  that.  And maybe they failed to do that here because they

13  never thought that the Commonwealth would be insolvent, but

14  they just didn't.

15         And the best evidence of that are the 2015 failed

16  amendments to the statute, which are referred to in our

17  pleading at docket number 10634, where we take the Court

18  through the fact that there was a proposal to amend these

19  statutes.  It would provide for a lien on gross revenues.  It

20  provided for a payment mechanism directly to the trustee.

21  And, of course, that's not the landscape we have now.  So they

22  really have no security interest.

23         The second point I want to address briefly, Your

24  Honor, is the *Galarza* case.  It was key in that case, this is

25  on page 24 of the Court's decision, that the Secretary or the

1   Commonwealth was not in the business, in the insurance

2   business.  And that was the crux of the argument, is that the

3   Commonwealth is not in the business of collecting premiums.

4   And of course, therefore, it acts merely as a custodian.

5        But here in our case, the Commonwealth is in the

6   business of collecting taxes.  That's what they do for a

7   living.  And therefore, the *Galarza* case really doesn't work

8   from their point of view.  And also, very importantly, *Galarza*

9   is not a bankruptcy case.  And that's very important.  I'll

10  tie that in in a second.

11       They cite the *Howard's Appliance* case, 1989, Second

12  Circuit case.  That's a case, Your Honor, that's been

13  distinguished every time it's been cited, which tells you a

14  lot.

15       And the Second Circuit itself in the *First Central*

16  *Financial* case in 2004, 377 F.3d 209, went out of its way to

17  say, well, we're not overruling *Howard's Appliance*, but,

18  quote, We need to act very cautiously to minimize conflicts

19  with the goals of the Bankruptcy Code when we're dealing with

20  constructive trusts.  And also said that, we carefully note

21  the difference between constructive trust claims arising in

22  bankruptcy, as opposed to those arriving before bankruptcy.

23       And that's the tie-in to *Galarza*.  That's why the

24  *Galarza* case is of very limited application, given that it's

25  not a bankruptcy case.

1          And here what we have, Your Honor, are unsecured

2   promises to do certain things.  The Commonwealth obviously did

3   promise to do certain things, but that's no different than

4   what it promised to do with our constituents who built

5   buildings for the Commonwealth.  They were promised to be

6   paid, paid by a date certain, et cetera, et cetera, and that

7   never happened.  That's why I always refer to this bankruptcy

8   as the land of broken promises.  This is one more broken

9   promise.

10          The next point I want to address, Your Honor, that's

11   very important, is that the Committee is not bound by any

12   Commonwealth pre-Title III waiver.  They're not saying there

13   was a waiver, by the way, and the Board has addressed that

14   carefully in their papers.  But to the extent Your Honor would

15   be inclined to find that there was a waiver, it's not binding

16   on the Committee.

17          The monolines are saying, well, of course it's

18   binding on the Committee.  The Committee only has its claims

19   again, you know, through the Commonwealth, and that's true

20   when we're dealing with affirmative claims.  So, for example,

21   if we want to sue a counterparty that did business with the

22   Commonwealth, we only have claims that we can assert

23   derivatively, if the Court were authorized -- were to

24   authorize such a claim.

25          But when we're dealing with defenses to a motion to

1    lift the stay, that's not the case. Any party in interest can

2    object to a motion to lift the stay. We cited the *Cheeks* case

3    for that proposition. And in that case, the Court said, well,

4    the debtor is silenced because the debtor has signed a

5    forbearance agreement leaving all their rights pre-bankruptcy,

6    but any party at interest can object. And that's why we're

7    not bound by any waiver. And we're not saying it was a

8    waiver.

9         And finally, Your Honor, the issue of Title III

10   preemption. Your Honor, they're relying on a statute that

11   says the funds shall, quote, shall be used solely for a

12   certain purpose. That statute either created a security

13   interest -- that's the argument you were making. We don't

14   think it did -- or it has to be preempted to the extent

15   they're relying on it to get some other better treatment,

16   because otherwise, they are getting a priority that's not

17   enforceable in Title III.

18        And the argument by Mr. Ellenberg that this is the

19   law, the law must be abided by, and then referring to

20   yesterday's hearing regarding PREPA, you know, I want to make

21   sure we focus on that for one second. Just -- the reason why

22   PREPA is bound to follow regulatory law is because there's a

23   section of 28 U.S.C., it's Section 959(b), that says a debtor

24   or trustee must operate their business in accordance to local

25   laws. That section doesn't mean, and therefore, you must pay

1   all the creditors you've promised to pay pursuant to statute.

2   And therefore, that's really a non sequitur.

3          And for all these reasons, Your Honor, we believe

4   that the motion should be denied.

5          So as I said, I cede the rest of my time to

6   Mr. Bienenstock.  Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Despins.

8          So Mr. Bienenstock, it looks like a little over four

9   minutes.

10         Ms. Selden, will you tell us what Mr. Bienenstock

11   has?

12         MS. SELDEN:  About four and a half minutes, Judge.

13         THE COURT:  Thank you.

14         Mr. Bienenstock.

15         MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

16   Bienenstock of Proskauer Rose, LLP, for the Oversight Board as

17   Title III representative of the Commonwealth.

18         I'll try not to even use the full four and a half

19   minutes.  I wanted to address just one issue.  Your Honor

20   asked me a question as to why the term "special tax revenues"

21   is used in the definition of pledge revenues.  And I gave an

22   answer, I think it was right, may be, may not be, but it was

23   en route to trying to figure out whether the final clause in

24   the definition of pledge revenues, that clause being "that

25   have been deposited to the credit of the Sinking Fund," should

1    modify only "any other monies" or should also modify "special

2    tax revenues".

3            And the reason Mr. Despins ceded me some time is

4    because I discovered over the lunch break that the Trust

5    Agreement makes it crystal clear that the final modifying

6    clause that had been deposited to the credit of the Sinking

7    Fund, has to, must, absolutely must modify special tax

8    revenues for the following reason.  Special tax revenues, Your

9    Honor, are defined in the Trust Agreement to mean the offshore

10   excise taxes deposited to the credit of the Puerto Rico

11   Infrastructure Fund pursuant to the Act.

12           In turn, Section 401 of the Trust Agreement provides,

13   the Authority shall not pledge or create any liens upon any

14   monies in the Puerto Rico Infrastructure Fund.  Therefore, if

15   pledged revenue is defined to mean special tax revenues,

16   without the qualifier "that have been deposited in the Sinking

17   Fund," the definition of pledged revenues would be in

18   violation of Section 401, because it would create a lien on

19   special tax revenues that are defined as deposited to the

20   credit of the Infrastructure Fund.

21           So, in order to prevent one provision of the Trust

22   Agreement from violating and being inconsistent with the

23   other, the only way to reconcile them is to say the special

24   tax revenues, as part of pledge revenues, have to have been

25   deposited to the credit of the Sinking Fund.  They are no

1      longer in the Infrastructure Fund.

2           And if Your Honor interprets it that way, the Trust

3      Agreement will not violate itself, the Court will be

4      consistent with the First Circuit, and the First Circuit

5      decided that same interpretation issue consistent with the

6      Supreme Court.  And that's all I wanted to say.

7           THE COURT:  Thank you, Mr. Bienenstock.

8           MR. BIENENSTOCK:  Thank you.

9           THE COURT:  And now I will turn to Ms. Coffino for

10     Bacardi.

11          MS. COFFINO:  Good afternoon, Your Honor.  For the

12     record, I'm Dianne Coffino from Covington & Burling.  We're

13     counsel to Bacardi International Limited and Bacardi

14     Corporation, one of the Commonwealth's rum producers.

15          I'm not going to duplicate arguments made by the

16     Oversight Board with respect to the first 117 million dollars

17     of rum excise taxes that they receive every year.  I do want

18     to clarify for the record, however, that Bacardi did not

19     agree, as movants claim in their Reply Brief, that that first

20     117 million really belongs to PRIFA.  All we did was defer to

21     the Oversight Board to address that issue, and we refrained

22     from duplicating those arguments.

23          I also want to respond to movants' contention, which

24     they relegate to a footnote, that the rum producers have no

25     standing to be heard.  There's no question that Bacardi is a

1    party in interest in this case.  It's a counterparty to

2    operative transaction agreements with the Commonwealth, and

3    it's a secured creditor that holds a perfected lien on certain

4    rum excise taxes deposited in the lockbox held by the

5    Commonwealth Treasury.

6         I'm sure we'll hear, because we've heard it before,

7    that movants don't need to lift the stay to file an action

8    against Bacardi, and in theory that's true.  Bacardi's not a

9    debtor.  But what they seek to do here is exercise control,

10   particularly at the Federal Treasury level, over a revenue

11   stream that belongs to the Commonwealth, and to interfere with

12   the Commonwealth contractual relationships with rum producers.

13   That requires lifting the stay or we wouldn't be here.  It

14   also would interfere with our contractual rights and our

15   rights as secured creditors with perfected liens.

16        So I think we can say that safely gives the rum

17   producers standing to be heard.  I'll limit the rest of my

18   argument or my comments on the arguments made by movants in

19   support of their request to lift the stay to bring claims

20   against both the Commonwealth and the rum producers for

21   allegedly conspiring to divert rum excise taxes from PRIFA to

22   the rum producers.

23        Movants make fleeting references to claims such as

24   conversion, unjust enrichment, subordination rights, but they

25   don't support these allegations in any way.  In fact, to the

1    contrary, movants repeatedly admit in their amended motion

2    that any rum excise taxes received by the Commonwealth in

3    excess of the first 117 million belong unequivocally to the

4    Commonwealth, and that neither PRIFA nor PRIFA bondholders

5    have any claim to them.

6         The Lockbox Agreement, that document itself, which

7    really only memorialized the parties' prior practice, makes

8    clear that no funds flow to the rum producers until after the

9    first 117 million is transferred from the Treasury's lockbox

10   account to the TSA and certain other payments due other

11   parties are made under the waterfall.  These admissions alone

12   make it impossible for movants to demonstrate a likelihood of

13   success on the merit.

14        Nevertheless, they argue that Section 4.6.1 of the

15   Bacardi Agreement, which only contains an acknowledgement of

16   the Commonwealth's retention of the first 117 million in rum

17   taxes, creates some sort of subordination relationship with

18   PRIFA.  But this provision and the waterfall really only

19   reflects an agreement between, again, the Commonwealth and the

20   rum producers as to a sequence of payments.

21        Neither PRIFA nor the trustee are parties to the

22   Lockbox Agreement, or any other transactional documents

23   between the rum producers and the Commonwealth.  Moreover, the

24   Lockbox Agreement makes clear in Section 24 that there are no

25   third-party rights here; that the agreement itself doesn't

1    create any right or cause of action in or on behalf of any

2    person that is not a party to an agreement -- to the

3    agreement, and they are not, and -- as we are not parties to

4    their agreements.

5           You perfect an interest in cash by control, and that

6    is what we did to protect our interest.  But neither PRIFA nor

7    PRIFA bondholders had control.  They never had control.  So

8    this notion of a subordination right just has no basis in fact

9    or law.

10          Finally, I just want to end by saying that the rum

11   industry is one of Puerto Rico's success stories.  Even in the

12   midst of what has been a staggering series of events that have

13   created great hardship for the Commonwealth and its people,

14   the production of rum, if you just look at the Commonwealth's

15   own financials, shows that it continues to grow, generating

16   tax based revenues, increasing tax based revenues in the

17   hundreds of millions of dollars to the Commonwealth.  And the

18   payments that are made to us, to the rum producers, are used

19   to promote and market that industry and the rum products.

20   Movants should not be allowed to disrupt that industry or that

21   revenue stream.

22          And unless you have questions, Your Honor, I'm done.

23          THE COURT:  Thank you so much, Ms. Coffino.

24          MS. COFFINO:  You're welcome.

25          THE COURT:  And now we will return to movants for

1   rebuttal argument.  You have 14 minutes.  So who was up first

2   for movants on rebuttal?

3        MR. ELLENBERG:  Sorry, Your Honor.  This is Mark

4   Ellenberg.  I had to get unmuted, which is a bit cumbersome.

5   Your Honor, I will take five minutes of our rebuttal time, and

6   Ms. Miller will take the balance.

7        So Your Honor, the Court identified the obvious

8   weakness in the government parties' position on excise taxes

9   in its very first question, and their position is entirely

10  circular.  It assumes a question in the case, which is whether

11  we are secured, or whether HTA is the true beneficial owner of

12  the excise taxes.  If HTA is the owner of the excise taxes, or

13  if we have a statutory lien against the excise taxes, then all

14  of their arguments fall apart, because they just assume that

15  we're unsecured creditors and they can do whatever they want

16  to us.  That's at issue before the Court.

17       Now, you asked Mr. Bienenstock what support he had

18  for his position, and he never went to the statutes.  All he

19  said was there are no words of pledging or granting of liens

20  in any of the statutes.  I dispute that, but it's the wrong

21  test.

22       Bankruptcy Code Section 101(37) says that a lien is a

23  charge against or an interest in property to secure payment of

24  a debt or performance of an obligation.  There are no magic

25  words specified there, and case after case have held that none

1   are required.  In fact, the UCC says that anything intending

2   to be a security agreement will be deemed one.  The HTA

3   Statute, we've gone through it.  There's clear language there

4   suggesting that there's a charge against the property, not the

5   least of which is the phrase "covered into a special deposit

6   in the name of and for the benefit of HTA."  That's pretty

7   clear.

8         And to Mr. Despins' point, as I mentioned in my

9   opening argument, the 2015 amendments actually help us,

10  because they clarify that the intent was always to transfer

11  the beneficial interest in this property to HTA.  And just to

12  be clear, the transfer mandated by the statute, and it's

13  mandated, isn't what creates the property interest.  It

14  reflects the fact that HTA is the proper owner from the

15  get-go; that from the moment these taxes were created to be

16  levied, they were created for the sole purpose of funding

17  these bonds.  That was the essence of the deal.

18        Now, Your Honor --

19        THE COURT:  May I just ask you a question?

20        MR. ELLENBERG:  Sure.

21        THE COURT:  As to HTA and your position that future

22  excise tax revenues, and excise tax revenues not delivered are

23  within the scope of the lien, how do you reconcile that with 9

24  LPRA section 2015, which specifically precludes recourse to

25  funds other than those pledged for the payments of such bonds

1   and interest thereon pursuant to the provisions of section

2   2004(L), which in turn provides for pledges of the proceeds of

3   any tax or other funds which may be made available to the

4   Authority by the Commonwealth?

5        MR. ELLENBERG:  Your Honor, we start out with the

6   proposition that all of the excise taxes to be collected are

7   to be covered into a special account, separate from the

8   General Fund, a special deposit separate from the General

9   Fund, for the benefit of HTA.  And so it's inherently a

10  forward-looking commitment.

11       And these are special revenues.  This is a classic

12  municipal revenue bond deal where the bondholders look to the

13  security of a future stream of revenues pledged by the

14  municipality.  And as Your Honor recognized in the last visit

15  we had before you on the subject, 928(a) is in the Code to

16  prevent 552(a) from cutting off the liens.  And so, clearly,

17  we have a lien on future revenues.

18       Now, Your Honor, I'd like to speak for a minute about

19  the standard of proof.

20       THE COURT:  So the "made available" language either

21  doesn't mean anything or it's made available when it's covered

22  into the special deposit?

23       MR. ELLENBERG:  Yes.  Exactly.  But the other

24  language in the statute clearly talks prospectively about

25  future collections.

1            So, Your Honor, if I could talk for a moment about

2    standard of proof.  Mr. Bienenstock greatly misrepresented the

3    standards set forth in *Grella*.  And you of course can reach

4    your own conclusions on that by reading the case.  We don't

5    really need to quibble much on that, because I think we meet

6    whatever standard should be imposed subject to two principles.

7            One is that the Court is ultimately not ruling on the

8    merits, but just seeing whether we have met some kind of

9    standard of viability.  And second, I don't believe the Court

10   should be resolving disputed issues of fact in a plenary -- in

11   a summary proceeding like this.  We need a plenary proceeding

12   with full discovery and full evidentiary rules if we're going

13   to be deciding disputed issues of fact.

14           More importantly, Your Honor, I think Mr. Bienenstock

15   also misstated what had to be proven.  He said the question is

16   we have to disprove that the Commonwealth has even a

17   contingent residual interest in the assets.  No.  That's

18   wrong.  They do, but that's just one stick from the bundle.

19   The rest of the bundle is transferred to HTA.

20           What we have to show is that we have a property

21   interest in or a charge on the rest of the bundle.  Clawback,

22   again, is merely a contingent carve-out from our rights.  It

23   doesn't negate the existence of the rights.

24           THE COURT:  Is he correct with respect to 362(d)(2),

25   that you would have to show that the Commonwealth has no

1  equity?  You would have to show a likelihood of disproving

2  even that contingent, right?

3      MR. ELLENBERG:  No, not at all, Your Honor.  I don't

4  think that's what that test means.

5      Obviously that's beyond the scope of this hearing.

6  That will be addressed at the final hearing.  But no, I

7  completely disagree with that.  And we are not trying to take

8  that contingent right away from them.  We fully recognize that

9  if the circumstances permitting clawback ever occurred, and I

10  need to stress there's no evidence that they ever have or ever

11  will, but we don't deny that if they exist, clawback can be

12  invoked.

13      Again, that's the deal we signed up to.  We're not

14  trying to get better rights than we signed up to.  They're

15  trying to take away the rights they agreed to give us in order

16  to get us to give them five billion dollars.

17      Your Honor, if I could speak briefly about the

18  pledges at the HTA level?  Well, before I get to that, Your

19  Honor, I would just like to stress that money at HTA not only

20  includes the cash they've sent down there, but that it also

21  includes Fund 278, which Ms. McKeen failed to mention includes

22  unique subaccounts that are only for HTA funds and only these

23  revenues ever went in there.  And --

24      THE COURT:  Mr. Ellenberg, that was your second beep,

25  so do you intend to go on?

1          MR. ELLENBERG:  Yes.

2          THE COURT:  Okay.

3          MR. ELLENBERG:  If I could, just for a minute or two,

4    Your Honor.

5          So there are over two billion dollars credited to

6    that account right now, and those monies have been received by

7    HTA in all senses of the word.

8          Your Honor with respect to 601 and 401,

9    Mr. Bienenstock said there's no pledge in 601.  Well, on its

10   face it says the funds are hereby pledged to the payment of

11   the bonds.  And Section 401 says, it is only for additional

12   security.  And Mr. Bienenstock is effectively reading the word

13   "additional" out of Section 401 and making Section 601

14   surplusage.

15         Finally, Your Honor, we are perfected by UCC-1

16   filings, because the receivables are pledged to us, and those

17   can be perfected by UCC-1.  Moreover, the right to the

18   receivables has been pledged to us, which Mr. Bienenstock says

19   is what we need.  And what he fails to look at is the

20   Supplemental Security Agreement and the Supplemental

21   Resolution 9808, both of which were adopted in connection with

22   the 1998 bonds, which make clear that the lien extends to all

23   funds required to be deposited in the Sinking Fund, not just

24   the funds that actually are deposited in the Sinking Fund.

25         Thank you, Your Honor.

```
1            THE COURT:  I have a couple of questions for you.

2            MR. ELLENBERG:  Sure, Your Honor.

3            THE COURT:  Do you have evidence that there was a

4    resolution adopted with respect to the 2002 Security

5    Agreement, which I think is what you just referred to?

6            MR. ELLENBERG:  Yes, Your Honor.  But the -- there is

7    not a resolution, but it's also not necessary.  The Board --

8    the management of HTA had authority to enter into that

9    agreement without a bond -- without a Board resolution.  9808

10   is a properly adopted Board resolution.

11           THE COURT:  And turning to CCDA, you argue in your

12   papers that the grant of the relief you propose to seek in the

13   enforcement action by way of mandamus would not infringe even

14   on the Commonwealth's future contingent clawback rights.  How

15   can that be, since you are looking for a mandate to push

16   through a cash flow ultimately ending at the bondholders and

17   potentially within subportions of fiscal years?

18           MR. ELLENBERG:  Your Honor, if you're asking about

19   CCDA, with your permission, I'd defer that to Ms. Miller.

20           THE COURT:  Okay.

21           MR. ELLENBERG:  And I would just emphasize again

22   that, as to HTA, we are only seeking our right to have the

23   funds applied through the waterfall, and whatever falls out of

24   the bottom, HTA gets to use.

25           THE COURT:  Thank you.
```

1          MR. ELLENBERG:  And historically, they've had over

2   400 million dollars available to them, per year.

3          Any other questions, Your Honor?

4          THE COURT:  No.  That's it.  Thank you.

5          MR. ELLENBERG:  Thank you very much.

6          MS. MILLER:  Good afternoon, Your Honor.  Atara

7   Miller from Milbank on behalf of Ambac and movants.

8          Just one note, and I don't have the cite handy, but I

9   believe that there actually is a resolution approving the 2002

10  closing documents.  And we'd be happy to submit that to the

11  Court, if the Court would accept it after the hearing.

12         THE COURT:  Well, I would ask you to file it with an

13  informative motion, and my consideration of it will be subject

14  to any objection that the opponents may want to file in

15  response to your informative motion.

16         MS. MILLER:  Understood.

17         So I'm going to jump around.  And I apologize for not

18  having sort of an organized flow, but I'm going to try to

19  respond quickly to the points that were raised.

20         The first point that I would like to discuss is

21  Mr. Bienenstock stated we've never asserted a priority, so

22  that we contend, as we did earlier, that that is irrelevant

23  for now.  But I want to make clear that we both have and the

24  Puerto Rico District Court has found that we do have a

25  priority, and that our priority is second only to the public

1  debt under the Puerto Rico Constitution and Puerto Rico law.

2  And that's in the *Assured versus Garcia Padilla* case, 214

3  F.Supp. 3d 117.

4        With respect to clawback, I know Mr. Ellenberg

5  touched on it briefly and noted that the Oversight Board

6  argues that we don't have -- that they have a future

7  contingent interest and therefore, it defeats our arguments.

8  That's irrelevant to the question of whether or not we have a

9  property interest.

10       The CCDA Pledge Agreement makes it most clear,

11 because it requires the money expressly in the pledge account,

12 which the Oversight Board concedes is subject to our lein, to

13 be distributed first in the circumstance when clawback is

14 triggered for the payment of the public debt.  So there's no

15 question that it's a condition of our lien, but that it

16 doesn't actually affect our ownership.

17       We have ownership even though there's some

18 reversionary interest potentially.  And we think that that

19 future contingent interest has not, as a matter of fact, been

20 triggered with respect to historic funds, and is unlikely,

21 particularly given our last dollars protection, to ever be

22 triggered on a go-forward basis.  And, you know, to the extent

23 that the Commonwealth is contending otherwise, that would be a

24 defense to the enforcement action which the Commonwealth would

25 have to prove and which should be adjudicated there and not on

1    this motion.

2         The Oversight Board points to the impairment of the

3    GO debt in the Plan.  And we heard Mr. Bienenstock refer to

4    that today as a justification for perpetual clawback, but

5    impairment of the GO debt is irrelevant to the clawback

6    analysis.  Once the Proposed Plan becomes effective, and new

7    bonds are issued, and they're being paid as required on a

8    fiscal year by fiscal year basis the conditions of clawback

9    will not be triggered.

10        The Plan itself also inverts Puerto Rico law and the

11   express priority thereunder, because it assumes the payment of

12   expenses first and then the amount payable for debt service,

13   which is contrary to the order of priority set in Puerto Rico,

14   both in the Constitution and the OMB Act, which is

15   incorporated into that provision of the Constitution.

16        So the suggestion that monies will be paid to GO

17   bondholders under the Plan, already clawback money doesn't

18   save any clawback, which requires the analysis to be done on

19   an annual basis and would permit clawback only of monies

20   required in that year, which there's no proof that that's ever

21   happened.

22        I want to talk for a minute about the language in the

23   *Andalusian* decision which Mr. Bienenstock mentioned as support

24   for the applica -- or for the nonapplication of the last

25   antecedent clause principle.  And I just want to -- you know,

1   the language there actually proves why it makes good sense to

2   not apply it there, and it's similarly irrational to apply or

3   to not apply the last antecedent canon in our case.

4         The definition there that was at issue was the

5   contribution paid from and after the date hereof, and that are

6   made by employers, and any assets in lieu thereof or derived

7   thereunder which are payable to the system pursuant to various

8   sections of the Enabling Act.

9         The first clause is the contributions paid from and

10  after the date hereof that are made by the employers.  That

11  clause lacks specificity to the extent that if you don't have

12  the further qualifying provision, there's a certain degree of

13  vagueness and ambiguity about what that's referring to.

14         THE COURT:  Ms. Miller.

15         MS. MILLER:  Yes.

16         THE COURT:  I'm sorry.  I don't have the language

17  right in front of me, but as I recall it, it said

18  contributions made by the employers pursuant to specific

19  sections of the Act, and it was only after that that the final

20  sort of more comprehensive clause came in.

21         MS. MILLER:  No.  The language is cited in the

22  decision at page 464.  And the full language, which I'll just

23  read it so you have the reference, it says, the resolution

24  defines employer contributions as the contributions paid from

25  and after the date hereof that are made by the employers, and

1    any assets in lieu thereof or derived thereunder which are
2    payable to the system pursuant to Sections 2-116, 3-105 and
3    4-113 of the Enabling Act.
4            THE COURT:  I'm sorry.  I think I was thinking of a
5    different clause.  So --
6            MS. MILLER:  And the question -- and the question
7    there was whether it referred to both portions of that.
8            So then we heard for the first time from
9    Mr. Bienenstock an argument that, frankly, we think is created
10   from whole cloth and we've never heard before, that PRIFA is
11   the owner of the Sinking Fund, which is just not right.  I
12   mean, as this Court held in the *Assured* special revenues
13   decision at 582 B.R. 579, "a trust divides ownership of
14   property, placing legal title with the trustee while the
15   beneficiary enjoys an equitable interest."
16           And Section 405 of the Trust Agreement states that
17   the Sinking Fund "shall be held in trust for the respective
18   holders of such bonds."  The suggestion, also, that it was
19   required to be held or controlled by the trustee, because
20   that's how you get perfection, is just belied by the fact that
21   Section 1907, which is on slide 21 of the PRIFA deck, provides
22   that all of the liens and pledges are automatically perfected.
23   So there would have been no reason to run through contortions
24   to get to perfection.
25           The flow of funds also clearly demonstrates it as a

1    U.S. bank account.  It's reflected on slide 16, but also the

2    original flow of funds as produced to us by the government

3    parties are attached as Exhibit 36 to the Miller Declaration.

4    And when I asked Mr. Ahlberg about what it means, what the

5    yellow on the flow of funds means -- I said, and this is at

6    Exhibit 26, 342, line six, I said, okay, and what does the

7    yellow box indicate.  And Mr. Ahlberg said, yellow box

8    indicates an account that is not a Commonwealth or PRIFA

9    account.  There is no question that the Sinking Fund is not a

10   PRIFA account.

11          The Infrastructure Fund, I mean, Ms. McKeen just

12   totally made up what those accounts are.  There's absolutely

13   no evidence.  In fact, she started out by saying, well, all

14   the testimony is we have no idea what it is.  It's an

15   accounting principle.  And yes, so yes, the accounting matters

16   here.  And that's what the infrastructure is, was, and always

17   is.

18          And the notion that Mr. Ahlberg -- of course he said

19   that it's the first -- just the first 117 million as earned,

20   because that's what everybody always thought about in the good

21   times.  Well, that ignores the fact that Mr. Ahlberg had

22   nothing to do with the Commonwealth until about a year ago,

23   and that was certainly not good times when the money was just

24   flowing.

25          With respect to the Lockbox Agreement, Bacardi's

1    counsel indicated that the Lockbox Agreement only shows prior

2    practice.  You know, when things were good, what were they

3    doing.  And that's just wrong.  The Lockbox Agreement itself,

4    as the Oversight Board points out in its brief, provides for

5    the ability to change it and to modify the flow.  And they

6    just never have done that.  So I think it's more than that.  I

7    think it's a clear acknowledgment that certainly, at the time

8    before everything went sour, the Commonwealth fully recognized

9    its obligations here.

10          With respect to CCDA and the question about, you

11   know, what is the transfer account, and where is it, and

12   Ms. McKeen made some comments about, you know, the logical

13   inferences that we should be making, we obviously disagree

14   with the logical inferences and think that the weight of the

15   evidence supports us.  In particular, this single fact that we

16   have identifying an account and tying a bank account

17   directly -- if I could just have 30 seconds to finish?

18          THE COURT:  Yes.

19          MS. MILLER:  Thank you.  Identifies the account that

20   they say is the transfer account as the surplus account.  At a

21   very, very minimum, we should get flow of funds information

22   going back to 2006, when the initial bonds were issued, and

23   then also in 2011, when they say that the Scotiabank account

24   was established, because looking at the flow of funds from

25   2015 doesn't tell me a whole lot about anything.

1    So with that, unless Your Honor has any additional

2    questions --

3    THE COURT:  Let me just look at my notes for one

4    moment.

5    MS. MILLER:  Actually, I had one other quick point if

6    the Court would indulge?

7    THE COURT:  Yes.

8    MS. MILLER:  So Your Honor asked Mr. Ellenberg about

9    the "made available" language in the HTA statute, and in my

10   mind, it's sort of corollary -- in the PRIFA statute, is

11   1906(m), which provides or defines what revenues PRIFA can

12   mortgage or pledge.  And there they don't use "made available"

13   but they say "may receive".

14   And I think both of them mean the same thing, that

15   may be made available by statute, or that they may receive by

16   statute.  And that has to be clear, because otherwise the very

17   last -- the very end of that, which is, "which should have

18   been transferred by Commonwealth to the Authority," doesn't

19   make sense.

20   So it's clear that the "may receive" or "made

21   available" doesn't mean actually transferred to them.  It

22   means that they got through the statutory grant.

23   THE COURT:  Thank you.

24   Let's see.  So the Oversight Board argues that a

25   dispute over what the infrastructure is or any lien on the

1    Infrastructure Fund is ultimately irrelevant because without

2    appropriation, no money goes into the Infrastructure Fund; and

3    PRIFA wouldn't have a secured claim if the Infrastructure Fund

4    is empty.

5         Do you have a response to that, other than that it is

6    the Infrastructure Fund as soon as it hits the Commonwealth

7    essentially?

8         MS. MILLER:  Well, one of my basic responses to that

9    is that the government precluded us from getting any discovery

10   into their fund accounting, and so at this point in

11   particular, I don't even know if that's a true or false

12   assertion.

13        So all I know is that the monies, based on their

14   testimony, continue to be recorded in exactly the same fund

15   and account that they were previously; and that Mr. Ahlberg

16   said that the funds are traceable through this combination of

17   fund and account numbers; that they use the same fund and

18   account numbers that they have always used; and that they

19   previously publicly disclosed those monies as being in the

20   Puerto Rico Infrastructure Fund.

21        THE COURT:  Thank you, Ms. Miller.

22        I thank all of you for your arguments and for all of

23   the work that you have put into putting me in a position to

24   make a decision after this preliminary hearing that will then

25   guide us in defining whether and to what extent further

1    proceedings on the Lift Stay Motions are necessary.

2           I take these motions under submission, and will issue

3    written decisions as promptly as possible.

4           This concludes the hearing Agenda for the two-day

5    Omnibus Hearing, which included this Lift Stay Motion hearing.

6    The next scheduled hearing date is the July Omnibus Hearing

7    scheduled for July 29th to 30th of this year.  I expect that

8    that hearing will occur telephonically as well, but I will

9    issue a procedures order providing appropriate logistical

10   details closer to that time, and we'll know more about how the

11   world is operating closer to that time.

12          As always, I would like to thank the Court staff in

13   Puerto Rico, in Boston, and in New York for their work in

14   preparing for and conducting this hearing, and their superb

15   ongoing support of the administration of these complex cases

16   under very challenging circumstances, including challenging

17   technological circumstances.  So thank you to all of the court

18   staff.

19          Counsel, is there anything else that we need to

20   address together before we adjourn?

21          MS. MILLER:  Nothing from us, Your Honor.  Thank you.

22          THE COURT:  Okay.  I think I've waited long enough

23   for unmuting.  There's two more seconds there.

24          MS. NG:  Judge, are you looking for me?  I'm sorry.

25          THE COURT:  No.  No.  I'm just waiting for any

```
 1    counsel --

 2              MS. NG:  Okay.

 3              THE COURT:  -- who might have been unmuting

 4    themselves.  But I think I have waited --

 5              MR. BIENENSTOCK:  Nothing from us either, Your

 6    Honor.

 7              THE COURT:  Okay.  Thank you, Mr. Bienenstock.

 8              All right.  Stay safe and keep well everyone, and

 9    again, thank you.  Good-bye.

10              MS. MILLER:  Thank you, Your Honor.

11              MR. BIENENSTOCK:  Thank you.

12              (At 3:24 PM, proceedings concluded.)

13                         *     *     *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 155 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   June 4, 2020.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
"may 151:13, 151:20
January 2015 52:12,
   56:10
January 31, 2020
   81:18
July 29th 153:7
June 1st 6:19
June 4, 2020 1:18,
   5:2, 155:9
March 3rd 66:11
November 2015 52:12
'98 103:12, 104:24


< 1 >
10 81:5
101 104:22
101(37) 137:22
10102 7:16
10104 7:20
106(e 32:3
10602 7:18
10634 127:17
11 52:7, 52:23, 55:3
11. 47:9
111 45:20
113 122:13
117 43:11, 43:18,
   44:2, 44:21,
   44:25, 45:16,
   45:19, 45:24,
   46:7, 93:15,
   93:17, 93:20,
   93:22, 96:24,
   100:18, 122:8,
   122:12, 133:16,
   133:20, 135:3,
   135:9, 135:16,
   149:19
117. 145:3
11:11 63:11
11:15 7:8
11:20 63:10, 63:12
11th 63:5
12 104:1
12:42. 113:11
12:43 113:21
12:45. 7:7
133 48:3

13305 6:19
13338-1. 48:4
13338-2 60:15
13339-2 60:15
13339. 9:15
13341-2. 60:15
13343 98:22
14 10:7, 137:1
15 8:13, 24:25,
   74:9, 114:7,
   120:22
150 29:23
155 155:4
16 149:1
17 91:17
17-3283 5:8, 6:20,
   7:16, 7:18, 7:20
17-BK-3283(LTS 1:6
17-BK-3567(LTS 1:25
175-6 87:23
18. 44:5
1886 30:1
19 105:18
1906(m 151:11
1907 148:21
1913 100:14
1914 47:9, 47:12,
   99:4, 99:21,
   100:11, 122:21
1914. 100:24
1918 46:22, 46:25,
   47:7, 100:5
1918. 47:13
1968 9:3, 103:12
1989 128:11
1990. 29:25
1998 9:3, 104:15,
   104:20, 104:21,
   105:1, 105:2,
   105:3, 106:8,
   142:22


< 2 >
2-116 91:2, 148:2
2-B 57:19, 57:20
20 21:12
2000 21:20
2002 104:15, 104:23,
   143:4, 144:9

2003 40:21
2004 128:16
2004(L 139:2
2005 72:22
2006 150:22
201 67:23
201(b)(1)(n 33:22,
   69:23
2011 53:17, 150:23
2015 105:22, 127:15,
   138:9, 138:24,
   150:25
2017 23:25
202 67:23
2057 43:12
209 128:16
21 148:21
214 145:2
215 87:23
23 77:25
24 21:12, 38:11,
   96:2, 127:25,
   135:24
2402(b 105:18
2403(b 105:19
26 149:6
274 77:11
278 24:16, 120:12,
   120:17, 120:18,
   120:21, 120:25,
   121:2, 121:3,
   121:9, 141:21
278. 25:11
279 77:11
28 130:23
283(b 88:22
295 68:12
2:15 7:9, 113:12,
   113:18
2:19 113:22


< 3 >
3 88:22, 99:4,
   99:21, 100:5,
   100:11, 100:14,
   100:24
3-105 91:3, 148:2
30 8:8, 8:15, 66:21,
   66:24, 67:22,

68:1, 68:13,
70:23, 71:19,
72:6, 72:12,
72:20, 73:4, 73:5,
73:12, 73:16,
150:17
30(b)(6 122:4
303(3) 33:3
30th 153:7
31 66:21, 66:25,
67:22, 68:1,
68:13, 70:23,
72:6, 72:20, 73:4,
73:5, 73:12, 73:16
31. 71:19, 72:13
3175 9:22
329 96:16
33 103:15
34 75:14
342 149:6
36 149:3
362(d)(2 140:24
362(d)(2)(a 83:17
364 69:18
377 128:16
3799 155:14
39. 103:15
3: 1:6, 1:25
3:24 154:12
3d 145:3

< 4 >
4-113 148:3
4-113' 91:3
4.6.1 43:9, 135:14
40 7:22, 69:18
400 16:5, 144:2
401 42:8, 42:10,
42:15, 42:21,
43:2, 94:9, 94:15,
94:16, 99:7,
101:14, 101:18,
103:16, 104:22,
132:12, 132:18,
142:8, 142:11,
142:13
401(a 94:15, 94:20
401(c 94:15, 95:1
401. 26:23, 99:11

402 94:15, 95:5
404 94:15, 95:9
405 148:16
42 75:14
43 55:23
45 8:10, 27:8
457. 90:23
459 69:2
464. 147:22
467 90:23
469 77:11
48. 69:19

< 5 >
5-B 58:9
50 20:7, 54:6
502 95:12
502. 94:16
5142 52:4, 53:11,
53:16, 57:7,
123:13
5144 53:19, 54:18,
55:9, 123:24
5412 52:25
552(a 139:16
579 115:21, 148:13
582 84:1, 115:20,
148:13
598 84:2
598. 115:21
599. 84:2
5:00 7:9

< 6 >
60 74:1, 74:8
601 26:23, 90:11,
103:11, 142:8,
142:13
601. 104:22, 142:9
602. 68:12

< 7 >
70. 69:2

< 9 >
9 28:6, 28:7, 33:4,

138:23
9-607(a)(4 95:16
9-617(a)(2 95:18
90-minute 8:7
928(a 139:15
948 90:23
955 73:1
959(b 130:23
9758 53:3, 54:16,
55:5, 55:21, 56:3,
56:11, 56:20
9808 142:21, 143:9
9:30 7:7
9:37 5:3

< A >
A)(1)(a 10:20
A)(1)(c 17:1
A)(1)(d 21:3
A. 2:17
AAFAF 28:17, 28:18,
56:9, 74:7, 74:9,
114:7, 114:9,
114:11, 114:12
ab 25:6
abbreviate 105:14
abided 130:19
ability 68:15,
68:20, 150:5,
155:5
able 87:6
above 75:16, 88:8,
103:13, 103:19
absence 68:25
absent 41:4
absolute 116:5
Absolutely 19:6,
23:5, 23:20, 61:5,
132:7, 149:12
absorb 80:23
abstractly 35:19
absurd 79:20, 79:22
accept 14:21, 37:1,
144:11
accepted 94:12
access 59:21, 95:8
accessing 5:22
accomplish 14:16
accomplished 43:16

accord 37:12
accordance 66:11,
  85:15, 130:24
According 37:6,
  38:14, 97:1,
  101:10
accordingly 8:19
accountants 118:17
accounted 65:13
Accounting 24:16,
  44:20, 45:11,
  47:2, 47:5, 47:6,
  55:13, 76:4,
  97:17, 118:24,
  120:14, 122:5,
  149:15, 152:10
accounts. 49:15
accurate 6:10, 155:5
acknowledge 86:25,
  111:10
acknowledgement
  135:15
acknowledgment 29:4,
  150:7
across 8:11, 122:11
Act 34:19, 34:20,
  40:23, 43:15,
  44:18, 45:1,
  46:22, 48:13,
  48:17, 55:16,
  66:21, 66:24,
  73:5, 73:12, 78:2,
  91:25, 93:9, 99:2,
  101:19, 121:24,
  122:2, 122:22,
  128:18, 132:11,
  146:14, 147:8,
  147:19, 148:3
acting 22:8, 48:23
action 31:9, 51:21,
  125:3, 134:7,
  136:1, 143:13,
  145:24
actions 34:21
activated 72:1
activities 42:15
activity 23:10
Acts 27:25, 32:13,
  67:22, 68:1,
  68:13, 70:23,

71:19, 72:6,
  72:12, 72:20,
  73:3, 73:16,
  86:12, 128:4
actual 44:23, 113:1,
  123:15
add 27:17
added 37:17, 42:10
adding 52:9
addition 12:7, 50:20
additional 42:12,
  47:16, 142:11,
  142:13, 151:1
Additionally 85:1,
  88:24, 99:12,
  100:3, 100:5
address 28:10,
  28:15, 29:8,
  29:17, 37:21,
  50:9, 51:8, 66:14,
  66:19, 66:20,
  69:12, 71:6,
  74:18, 74:25,
  84:21, 85:4,
  100:24, 109:9,
  114:10, 120:5,
  123:5, 127:23,
  129:10, 131:19,
  133:21, 153:20
addressed 34:8,
  62:6, 72:1,
  111:16, 129:13,
  141:6
addresses 35:17,
  36:6, 46:25
addressing 8:11,
  20:2, 74:23, 89:14
adequate 25:2,
  69:15, 79:7, 80:11
adjourn 153:20
adjudicated 145:25
adjudication 35:13,
  70:19
adjust 8:18
Adjustment 35:18,
  83:12, 84:5
Administered 1:11,
  1:30, 122:14
administration
  153:15

administrative
  34:25, 35:22
admissions 135:11
admit 135:1
admits 53:23
admitting 61:9
adopt 75:9
adopted 71:11,
  142:21, 143:4,
  143:10
advance 6:12, 113:16
advanced 28:19
advancing 126:6
adversary 86:3
advisement 62:19
Advisory 2:30
affect 17:17, 145:16
affected 78:15
affirmative 50:18,
  51:6, 51:9, 54:7,
  54:15, 56:18,
  129:20
affirmatively 44:17,
  67:11
affirmed 73:18
afternoon 7:9,
  113:23, 114:4,
  114:8, 126:23,
  133:11, 144:6
Agency 2:29, 55:25
Agenda 6:18, 6:19,
  153:4
agent 22:3, 22:5,
  22:8, 22:10,
  22:11, 25:8,
  25:10, 48:23,
  112:19, 112:21,
  119:9, 119:18,
  119:23
aggrieved 85:14
ago 29:24, 37:13,
  66:15, 75:9,
  77:24, 105:22,
  111:1, 149:22
AGR 73:1
agree 17:22, 20:18,
  51:12, 79:5,
  114:13, 133:19
agreed 15:12, 57:9,
  62:5, 141:15

Agreement. 91:25
Agreements 12:16,
    18:23, 43:4, 43:8,
    48:2, 48:11,
    48:15, 48:16,
    57:9, 58:3, 78:21,
    134:2, 136:4
agrees 12:19, 51:10
ahead 67:15, 98:24,
    110:7, 117:10
Ahlberg 100:17,
    149:4, 149:7,
    149:18, 149:21,
    152:15
aid 125:8, 125:10
al 2:13
albeit 86:5
alert 6:24
alien 19:19
alienate 117:18
alienated 19:11,
    19:12, 19:13,
    19:17, 81:23,
    82:10
alienating 19:7
alienation 19:19
all.' 91:10
allegations 134:25
alleged 106:16
allegedly 134:21
allocate 8:7, 126:22
allocated 7:22,
    120:19
allocates 93:9
allocation 7:3,
    66:2, 74:1
allocations 72:9,
    72:20, 74:6
allotments 6:16,
    6:17
allotted 6:13
allow 17:8, 95:9,
    121:22
allowed 56:17,
    122:2, 136:20
allows 34:14, 82:21,
    112:15
almost 83:7
alone 135:11
already 37:13,

42:13, 47:1,
    55:18, 67:9,
    70:13, 83:23,
    84:25, 88:7,
    92:19, 104:18,
    109:3, 115:18,
    146:17
alter 102:2, 111:12
although 10:18,
    78:23, 90:6
Ambac 2:20, 27:13,
    144:7
ambiguity 147:13
ameliorate 56:13
amend 127:18
amended 9:2, 37:16,
    135:1
Amendment 68:7,
    68:19, 68:25,
    79:8, 80:10, 80:13
amendments 127:16,
    138:9
Amerinat 66:17, 70:9
Amerinational 3:4
among 70:19, 75:20
amortization 83:3
amount 11:9, 94:23,
    113:6, 126:9,
    146:12
amounts 10:21,
    42:22, 50:19,
    69:17, 76:24,
    104:25, 106:6,
    106:9
Amy 155:13, 155:14
analogy 75:16
analysis 59:16,
    59:20, 115:10,
    146:6, 146:18
and/or 7:22
Andalusian 72:11,
    72:15, 146:23
annual 44:22, 71:9,
    72:9, 72:16,
    72:19, 73:7,
    73:12, 100:15,
    124:9, 146:19
annul 30:11, 85:17
answer 15:11, 31:4,
    79:3, 80:8, 87:10,

97:17, 131:22
answers 92:6
antecedent 40:20,
    91:3, 91:5,
    146:25, 147:3
apart 137:14
apologize 6:11,
    12:13, 55:23,
    60:25, 144:17
apparent 37:9, 77:17
appeal 67:13
appear 16:25, 22:5,
    22:6
APPEARANCES 2:8, 3:2
appeared 24:13
APPEARING 2:10
appears 17:2
Appliance 128:11,
    128:17
applica 146:24
applicable 51:11,
    67:5, 69:22,
    74:18, 86:24,
    88:23, 90:6, 91:8,
    91:10
application 35:7,
    77:19, 86:18,
    87:4, 128:24
applied 95:18,
    143:23
applies 11:8, 12:10,
    41:5, 85:3, 93:2,
    95:19
apply 35:2, 47:7,
    63:3, 82:25,
    86:19, 87:7,
    92:13, 147:2,
    147:3
appropriate 45:7,
    55:15, 60:5,
    70:25, 76:11,
    77:5, 85:10, 87:1,
    87:8, 87:15, 89:2,
    153:9
appropriates 102:17
appropriation 24:11,
    26:4, 30:14,
    31:21, 37:17,
    71:14, 72:24,
    73:10, 80:16,

85:2, 85:14,
88:10, 88:14,
88:18, 88:19,
102:19, 102:22,
103:4, 124:10,
124:11, 152:2
appropriations
29:20, 59:21,
59:24, 66:22,
67:25, 69:5, 69:7,
69:12, 70:4,
70:10, 70:21,
71:5, 71:10,
71:16, 72:7, 73:4,
73:8, 73:13,
73:15, 81:23,
84:24, 88:6,
88:12, 88:20,
90:1, 100:15,
100:16, 103:9,
109:12
approval 14:8
approve 34:7, 49:16,
103:5
approving 144:9
approximately 111:1
architect 19:6
argue 32:17, 55:20,
69:6, 93:22,
102:18, 115:17,
119:7, 122:18,
123:14, 124:9,
125:1, 135:14,
143:11
argued 89:1, 115:22,
117:8
argues 34:23, 42:5,
50:3, 54:20,
56:20, 67:1,
75:23, 118:3,
145:6, 151:24
arguing 64:7
arise 90:13, 118:6
arisen 86:10
arises 101:11
arising 50:7, 88:12,
128:21
Armstrong 69:18
around 7:8, 58:16,
72:18, 121:10,

144:17
arrangements 78:16
array 68:16
arriving 128:22
Article 17:16,
71:14, 81:5, 81:7,
82:22, 105:8,
105:11, 105:12,
105:17, 105:21,
106:2, 116:10
articles 45:25,
91:22
articulated 29:10,
62:12
aside 115:1, 120:16
asignacion 88:16
aspect 34:12, 35:11,
89:12
aspects 74:19
assert 77:14, 88:5,
101:22, 105:24,
129:22
asserted 35:23,
87:10, 144:21
asserting 22:23,
86:11
assertion 46:10,
54:9, 55:3, 152:12
assertions 75:12
asserts 67:21
assessment 27:21,
28:2, 28:9
assessments 28:2
asset 51:4, 51:5
assets 10:25, 11:15,
11:23, 13:17,
17:8, 91:3,
140:17, 147:6,
148:1
Assignment 48:15,
58:12, 126:8
associated 123:17
assume 14:9, 53:25,
68:24, 137:14
assumes 137:10,
146:11
assumption 121:8
assumptions 78:10
Assurance 2:20
Assured 2:23, 2:25,

8:22, 145:2,
148:12
Assured-hta 115:20
Atara 2:21, 27:13,
144:6
attach 56:23
attached 54:21,
55:13, 61:25,
149:3
attaches 57:1
attachment 105:17
attack 111:5
attacking 110:24
attempts 92:10,
122:19
Attorney 70:8
attorneys 17:9,
84:20
audited 44:19,
45:21, 46:1
Aurelius 32:9
Authorities 99:7
Authority 1:18,
1:36, 2:30, 10:18,
11:2, 11:5, 11:6,
11:12, 13:14,
19:20, 24:24,
58:19, 59:11,
71:23, 73:16,
86:22, 86:23,
86:24, 94:17,
94:19, 99:8,
99:23, 100:2,
100:6, 101:14,
132:13, 139:4,
143:8, 151:18
Authority. 100:9
authorization 71:6,
85:8
authorizations 99:4
authorize 81:10,
129:24
authorized 30:6,
87:25, 129:23
authorizes 15:18,
99:3
authorizing 37:14
automatic 49:23,
50:12
automatically 148:22

automobile 23:7
available 6:20,
   15:16, 16:3, 16:6,
   18:9, 20:2, 25:25,
   71:8, 82:22,
   82:25, 83:2, 83:4,
   83:9, 89:7, 116:9,
   139:3, 139:20,
   139:21, 144:2,
   151:9, 151:12,
   151:15, 151:21
avoid 35:6, 35:13,
   49:22, 50:1, 85:9,
   105:24
aware 28:18
away 67:2, 141:8,
   141:15


< B >
Bacardi 2:32, 2:34,
   43:8, 43:9, 74:10,
   133:10, 133:13,
   133:18, 133:25,
   134:8, 135:15,
   149:25
back 5:15, 7:6,
   14:14, 21:3,
   22:20, 27:10,
   32:23, 39:19,
   41:1, 47:15,
   49:11, 52:16,
   60:7, 60:10,
   62:10, 74:16,
   83:21, 92:8,
   92:18, 108:5,
   113:18, 124:25,
   127:2, 150:22
backdrop 32:21
background 12:14
bad 110:10
balance 97:19,
   97:22, 98:1, 98:5,
   98:9, 98:15, 137:6
balances 97:23
Bank 42:25, 44:10,
   44:13, 44:21,
   44:23, 45:15,
   46:12, 47:8,
   50:25, 51:19,

52:5, 53:13, 54:4,
   57:1, 69:2, 96:24,
   97:2, 98:7, 98:11,
   120:16, 122:4,
   149:1, 150:16
Bankruptcy 5:8,
   26:5, 76:22,
   76:24, 76:25,
   77:2, 77:12,
   77:17, 78:15,
   78:18, 81:1,
   81:11, 81:14,
   83:17, 86:15,
   86:16, 87:12,
   88:9, 88:11,
   110:2, 110:3,
   110:6, 111:8,
   128:9, 128:19,
   128:22, 128:25,
   129:7, 137:22
banned 110:5
bar 102:7, 102:8
Barnhart 40:21
barred 32:3, 87:3
barring 86:17
bars 81:6
based 16:19, 20:15,
   32:15, 37:3,
   38:19, 52:1,
   53:11, 54:9,
   54:10, 62:4, 76:4,
   97:22, 108:18,
   111:14, 111:18,
   111:21, 118:11,
   120:7, 124:17,
   136:16, 152:13
basic 36:20, 41:22,
   152:8
basically 59:22,
   96:10
basis 11:3, 13:19,
   52:1, 71:17, 83:9,
   87:16, 136:8,
   145:22, 146:8,
   146:19
bear 75:18, 94:3
became 13:11, 20:21,
   100:25, 101:5,
   112:21
become 94:23, 95:17,

109:16
becomes 30:11,
   31:16, 85:17,
   101:7, 146:6
beep 141:24
began 5:17, 46:4
begin 5:5, 7:21,
   114:10, 127:4
beginning 58:5,
   73:25
behalf 8:2, 8:3,
   8:23, 22:14,
   27:13, 47:11,
   66:5, 66:16, 70:9,
   99:6, 121:25,
   136:1, 144:7
behavior 49:19
behind 69:5, 70:2
belied 148:20
believe 12:1, 12:2,
   12:7, 15:10,
   17:18, 24:1, 38:8,
   42:11, 43:6, 74:7,
   84:25, 108:7,
   112:17, 114:6,
   124:3, 131:3,
   140:9, 144:9
believes 62:24,
   62:25, 74:24
belong 36:20, 92:21,
   94:1, 95:3, 95:11,
   100:4, 112:18,
   135:3
belonging 70:24
belongs 19:10,
   94:18, 133:20,
   134:11
belt 38:6
belts 38:9
beneficial 12:4,
   13:3, 13:12,
   22:13, 50:13,
   51:13, 84:1,
   111:7, 137:11,
   138:11
beneficiaries 96:3
beneficiary 148:15
benefit 9:1, 11:1,
   12:23, 12:24,
   16:21, 20:25,

21:5, 28:13, 37:3,
  42:2, 49:22,
  56:17, 71:20,
  82:18, 138:6,
  139:9
bespoke 33:4
best 81:17, 105:7,
  127:15, 155:5
better 20:8, 20:19,
  20:22, 68:23,
  130:15, 141:14
beyond 6:13, 141:5
big 89:1
billion 23:12,
  23:14, 141:16,
  142:5
billions 37:2, 80:21
bind 29:13, 30:4,
  73:2, 85:1, 103:4
binding 129:15,
  129:18
bit 41:4, 112:7,
  117:13, 137:4
blanche 33:18
block 8:7
blows 18:25
boils 36:19, 124:15
bolded 91:19
Bond 9:3, 11:17,
  15:24, 16:9,
  16:16, 26:22,
  35:3, 37:11, 38:3,
  43:16, 50:16,
  51:11, 54:2, 56:8,
  76:9, 84:11,
  90:25, 92:9,
  92:14, 92:18,
  94:3, 94:6, 94:21,
  95:6, 95:23, 96:7,
  106:13, 139:12,
  143:9
bondholder 37:22,
  121:3
bonds. 148:18
books 111:11
borne 101:12
Boston 153:13
bother 65:17
bottom 11:7, 16:3,
  16:5, 39:2, 86:21,

105:20, 143:24
bound 30:10, 30:12,
  51:10, 57:9,
  57:10, 85:18,
  129:11, 130:7,
  130:22
box 50:2, 149:7
Brandeis 68:12
breach 14:2, 14:3,
  14:5, 42:17,
  76:22, 87:11,
  87:14, 87:15
breached 43:3,
  76:14, 79:18,
  97:15, 97:17,
  110:8
breadth 114:17
break 7:5, 7:8,
  7:10, 60:6, 60:9,
  60:13, 81:15,
  113:11, 132:4
breaking 6:12, 81:13
Brief 21:12, 40:9,
  40:15, 43:8,
  46:14, 50:9,
  77:24, 86:3, 87:4,
  87:18, 114:23,
  119:12, 133:19,
  150:4
briefed 31:8, 31:9,
  66:18
briefing 75:25
briefings 36:14
briefly 29:8, 48:2,
  58:18, 127:23,
  141:17, 145:5
briefs 21:11, 26:24,
  28:22, 62:1, 71:5,
  73:11, 76:4,
  77:23, 84:23,
  115:4
bring 47:23, 110:17,
  134:19
broad 41:8, 41:9,
  77:18
broken 129:8
budget 24:10, 24:11,
  24:12, 24:13,
  32:1, 32:8, 33:14,
  33:15, 67:22,

69:8, 69:11,
  71:16, 72:10,
  72:14, 72:19,
  103:1, 116:19,
  124:9, 124:11
budgetary 29:14,
  67:14, 72:9,
  72:20, 73:6, 73:7,
  73:12
budgeting 34:6,
  34:16, 67:7, 71:9,
  71:12
budgets 31:17,
  31:24, 32:10,
  32:13, 67:25,
  73:15, 103:6
Buenas 114:5
Buenos 5:14
buildings 129:5
built 129:4
bundle 18:12,
  140:18, 140:19,
  140:21
burden 75:7, 125:23
Burling 133:12
business 128:1,
  128:2, 128:3,
  128:6, 129:21,
  130:24
buying 81:20
buzz 6:25, 7:1
buzzes 6:25, 7:4
bystander 19:2


< C >
C. 2:26
call 5:6, 29:17,
  92:12, 118:13
called 24:16
calling 6:6, 114:19
canon 40:20, 147:3
Cantor-katz 3:7,
  66:5, 66:16
capacity 27:25,
  48:23
carefully 128:20,
  129:14
cares 99:16
Caribbean 49:8

carte 33:18
carve 17:5
carve-out 17:5,
    17:7, 17:8, 17:11,
    17:14, 17:21,
    18:1, 83:5, 140:22
cases 30:10, 33:4,
    50:22, 51:8,
    86:11, 87:20,
    153:15
cash 21:22, 47:6,
    47:8, 59:15, 96:6,
    98:1, 112:3,
    118:19, 136:5,
    141:20, 143:16
CAT 3:49
catch 20:9
categorically 73:13
cause 136:1
causing 56:22
cautiously 128:18
CC 59:21
Ccda_stay0006785
    55:24
cease 112:16
cede 127:1, 131:5
ceded 132:3
cent 10:16
center 51:18
Central 128:15
Certain 19:17, 23:8,
    29:16, 33:1,
    45:24, 62:7,
    74:19, 76:12,
    90:6, 97:7, 129:2,
    129:3, 129:6,
    130:12, 134:3,
    135:10, 147:12
certainly 12:3,
    23:13, 24:2, 25:7,
    25:10, 25:14,
    31:7, 94:18,
    117:20, 125:12,
    149:23, 150:7
certification 73:6
certified 32:8,
    67:24, 73:15,
    116:19, 126:10
certify 155:4
cessation 123:1

cetera 61:8, 129:6
chain 76:8
challenge 32:1
challenges 32:3
challenging 153:16
chance 39:3
change 29:22, 37:9,
    54:4, 56:13,
    103:2, 117:16,
    150:5
changed 33:7, 108:1
changing 31:18
channeled 123:22
Chapter 28:6, 28:7,
    33:4, 118:4
characterization
    120:1
characterizations
    90:8, 90:10
characterize 78:11
characterized 105:7
characterizing
    118:13
charge 12:8, 12:9,
    137:23, 138:4,
    140:21
charged 51:21
chart 9:18, 10:5
check 63:16, 64:5,
    98:3, 121:22
checking 109:8
Cheeks 130:2
chooses 29:22
chose 37:8
chunks 67:8
circle 27:10, 47:15
Circuit 21:9, 34:4,
    36:2, 41:18, 69:7,
    72:10, 73:18,
    75:10, 75:12,
    75:14, 84:25,
    90:22, 90:23,
    128:12, 128:15,
    133:4
circular 137:10
circularity 92:12
circumstance 145:13
circumstances 31:7,
    141:9, 153:16,
    153:17

citation 86:25
citations 105:18
cite 51:8, 53:18,
    55:24, 85:6, 87:2,
    87:21, 88:22,
    105:16, 105:18,
    128:11, 144:8
cited 41:18, 46:22,
    86:21, 86:23,
    105:16, 116:21,
    128:13, 130:2,
    147:21
cites 45:25, 48:21,
    50:23, 51:7,
    87:18, 121:7
Citibank 44:1
citing 69:1, 86:4
City 27:20, 87:21,
    96:24
claimed 111:6
claimholder 110:7
claiming 86:13,
    92:12
claims 35:1, 35:18,
    35:19, 35:23,
    77:13, 78:4,
    78:17, 80:3, 82:9,
    84:6, 109:15,
    109:17, 111:14,
    121:5, 128:21,
    129:18, 129:20,
    129:22, 134:19,
    134:23
clarification 113:10
clarifications 8:18,
    70:20
clarified 28:21
clarify 70:11,
    133:18, 138:10
clarity 5:17, 6:8,
    93:15, 115:6
class 59:19
classic 139:11
classified 120:21
classify 120:15
classifying 121:6
Clause 30:20, 30:23,
    31:14, 31:23,
    31:24, 32:2,
    86:10, 86:18,

86:19, 87:22,
90:20, 91:1, 91:7,
91:10, 96:4,
131:23, 131:24,
132:6, 146:25,
147:9, 147:11,
147:20, 148:5
clauses 15:18,
90:21, 91:14
clean 62:14
cleanup 77:15
Clearly 14:22, 15:5,
21:7, 26:14,
26:16, 26:23,
27:3, 33:25,
42:18, 46:4,
47:12, 49:8,
79:16, 115:2,
121:3, 139:16,
139:24, 148:25
Clerk 6:21
click 52:16
clock 27:8, 39:5,
63:10, 108:3
close 69:20, 109:21,
116:24, 117:22,
117:25
closer 153:10,
153:11
closing 144:10
cloth 148:10
cobble 127:8
Code 83:17, 105:9,
120:16, 120:17,
120:21, 121:2,
121:3, 121:6,
121:9, 128:19,
137:22, 139:15
codes 120:13, 124:13
COFFINO 2:35, 65:10,
65:11, 133:9,
133:11, 133:12,
136:23, 136:24
COFINA 19:14, 19:18,
19:25, 58:21,
59:2, 59:3, 59:6,
59:8, 115:25,
116:2, 116:3,
116:4, 116:7,
116:8, 116:13,

116:16, 116:21,
117:11, 117:14
coherent 124:17
Collateral 3:7,
13:7, 14:22,
38:12, 57:12,
67:3, 92:10,
93:14, 95:17
collect 21:14,
48:18, 59:11
collected 19:12,
22:2, 23:10, 25:8,
25:9, 26:10,
27:22, 48:20,
50:14, 52:24,
59:4, 102:15,
139:6
collecting 22:14,
22:23, 128:3,
128:6
collection 11:9,
22:8, 22:10,
22:11, 48:23,
49:5, 95:20,
112:19, 112:21,
119:2, 119:9,
119:18, 119:22,
123:13
collections 11:7,
119:24, 139:25
collects 87:20
colloquy 86:1, 116:1
colorable 45:10,
75:8, 75:9, 75:13,
76:2, 76:5, 111:24
Columbia 27:20
column 9:20
combination 46:12,
119:25, 152:16
coming 22:25
comma 90:22, 91:14
comments 107:14,
108:5, 134:18,
150:12
Commercial 37:1,
105:9
commingled 13:16,
55:9, 55:12
commit 11:6, 12:20
commitment 139:10

commitments 12:17,
13:20, 18:23, 34:7
commits 12:19, 15:7
committed 23:11,
111:12
Committee 2:16,
126:25, 129:11,
129:16, 129:18
common 71:1, 76:16
commonplace 38:6
Community 3:5
Company 48:17,
48:18, 48:19,
48:22, 49:4,
49:10, 49:15,
49:16, 49:18,
50:5, 52:25,
55:17, 55:21,
56:4, 57:8, 58:13,
58:25, 59:11,
59:17, 59:22,
59:23, 76:13,
112:18
compare 122:9
compel 76:17, 81:4
compensation 68:23,
79:7, 80:11
compensation. 68:11
completely 25:17,
79:20, 82:8, 94:7,
141:7
complex 34:16,
153:15
complicate 30:25
complicated 65:4
complied 24:22,
42:21, 99:15
comply 51:11, 65:23,
98:16, 99:16,
99:18, 100:22
complying 99:19
comprehensive 147:20
compute 27:10
computer 5:23, 65:19
concede 111:23
concedes 145:12
concentration 54:16
concept 71:10,
89:21, 94:2, 97:6
concerned 109:11

concerns 68:6
conclude 26:15,
    54:22, 120:5,
    124:3, 125:19
concluded 21:23,
    22:1
concluded. 154:12
concludes 60:4,
    153:4
conclusion 73:3,
    105:24, 121:11,
    122:10, 124:4
conclusions 54:24,
    140:4
condition 145:15
conditional 16:19,
    16:22, 18:2, 18:15
conditionality 18:3,
    18:5
conditions 18:6,
    146:8
conducting 119:24,
    153:14
confer 62:21
Conference 6:1
confirm 68:20
confirmed 19:15,
    49:11
confirms 20:23,
    47:10, 118:14
conflate 114:22
conflict 7:10,
    32:15, 34:18
conflicting 33:14
conflicts 128:18
confused 105:25,
    108:1
confusion 108:3
Congress 32:21,
    32:23, 67:19,
    67:21, 68:15,
    68:22, 68:24,
    69:1, 69:3, 69:21,
    69:25, 77:18
connection 23:9,
    23:18, 23:19,
    35:21, 38:22,
    40:22, 61:20,
    62:16, 66:1,
    125:22, 126:2,

142:21
consensual 12:5,
    17:19, 17:22,
    17:23, 26:21, 27:1
consent 59:13
consequence 109:13
consider 54:21,
    68:21, 75:18,
    119:18, 126:1
consideration 61:20,
    144:13
considered 30:2,
    62:15
consist 91:20
consistent 5:25,
    25:17, 55:6, 55:7,
    87:20, 124:17,
    133:4, 133:5
consistently 29:24
consisting 155:4
consolidated 10:8
consortium 21:19,
    21:24
conspiring 134:21
constituents 129:4
constitute 77:16,
    116:9
Constitution 26:2,
    30:20, 32:2, 67:4,
    68:8, 71:13, 81:6,
    81:8, 81:9, 82:20,
    82:23, 89:6, 90:3,
    116:10, 145:1,
    146:14, 146:15
constitutional 17:4
construction 9:7,
    20:15, 91:9
constructive 128:20,
    128:21
consume 23:8, 126:15
consumption 23:19
contain 72:21
contained 20:22,
    26:6
contains 116:2,
    135:15
contemplated 108:23
contemplates 55:16,
    122:22
contemporaneously

9:3
contend 43:15,
    43:23, 43:24,
    46:23, 51:17,
    53:1, 75:7, 82:16,
    90:16, 144:22
contended 38:17
contending 87:13,
    112:10, 112:11,
    145:23
contends 53:4,
    53:21, 76:10
contention 45:4,
    82:21, 88:20,
    99:9, 115:8,
    115:18, 133:23
context 20:12, 78:3,
    83:23, 93:8, 96:8,
    112:14, 119:15,
    125:2, 125:6
contingent 83:8,
    84:1, 84:4,
    140:17, 140:22,
    141:2, 141:8,
    143:14, 145:7,
    145:19
continuation 5:16
continue 44:6, 49:2,
    49:6, 88:2,
    113:13, 126:15,
    152:14
Continued 3:2
continues 43:17,
    136:15
continuing 105:13
contortions 148:23
Contract 14:2, 30:6,
    30:9, 30:20,
    30:23, 31:13,
    31:14, 77:13,
    86:8, 86:10,
    86:18, 86:19,
    87:25, 88:2, 88:3
Contracts 14:8,
    31:23, 31:24,
    32:2, 76:19,
    76:21, 77:19,
    78:1, 78:12, 87:22
contractual 13:22,
    76:22, 81:7,

81:10, 85:23,
86:13, 86:14,
86:17, 88:1,
97:16, 134:12,
134:14
Contrary 37:24,
40:19, 41:19,
41:22, 46:10,
58:24, 75:6,
77:22, 80:17,
88:25, 99:11,
108:17, 115:22,
120:11, 135:1,
146:13
contrast 21:25,
115:6
contribution 147:5
Contributions 72:17,
91:1, 91:5, 147:9,
147:18, 147:24
control 37:7, 56:25,
71:9, 84:15, 87:5,
94:11, 96:5,
106:18, 134:9,
136:5, 136:7
controlled 148:19
controversies 72:18
controversy 70:16,
70:17
converse 51:25
conversion 134:24
convey 121:9
conveyed 121:6
Coordination 48:15
corollary 33:5,
151:10
corporate 10:18,
10:19, 15:17,
16:4, 45:13,
45:14, 47:3,
48:20, 57:10,
99:23, 100:2,
101:21, 122:1
Corporation 2:21,
2:24, 2:26, 2:35,
30:6, 30:10, 86:7,
87:24, 133:14
correct 53:15,
105:18, 123:3,
140:24

corresponding 45:12,
49:17
corresponds 53:13
corroborated 26:15
cost 6:20
Counsel 5:15, 8:22,
63:17, 65:23,
133:13, 150:1,
153:19, 154:1
counter 42:6
counterclaims 75:18,
75:21
counterparty 129:21,
134:1
counting 93:17
couple 40:10, 62:1,
143:1
course 14:10, 20:7,
20:18, 34:3, 38:4,
105:4, 118:13,
118:15, 119:17,
127:21, 128:4,
129:17, 140:3,
149:18
courses 18:12
courts 110:3
covenant 42:16,
42:17, 78:1, 97:9,
100:16
covenants 13:23,
50:18, 50:23,
51:5, 51:6
cover 39:8, 43:11,
48:7, 102:12,
105:11, 106:20,
107:15, 108:3,
108:5, 126:24
covered 10:16,
10:21, 12:22,
21:4, 25:11,
43:25, 71:20,
99:22, 100:12,
103:6, 117:2,
138:5, 139:7,
139:21
Covington 133:12
crams 91:13
create 6:10, 12:8,
14:18, 66:21,
68:6, 68:16, 73:9,

80:9, 101:15,
117:4, 118:19,
132:13, 132:18,
136:1
created 15:25,
17:19, 24:16,
34:10, 71:21,
84:20, 101:4,
126:5, 130:12,
136:13, 138:15,
138:16, 148:9
creates 10:16,
72:24, 79:9,
92:18, 101:20,
117:3, 135:17,
138:13
credible 126:15
credit 9:9, 13:8,
13:9, 14:18, 37:2,
40:1, 40:3, 40:12,
40:15, 43:14,
43:19, 44:3, 44:8,
44:9, 45:2, 45:5,
90:16, 90:17,
90:20, 91:24,
92:3, 95:2,
131:25, 132:6,
132:10, 132:20,
132:25
credited 44:13,
45:20, 95:17,
142:5
creditor 75:16,
134:3
Creditors 2:17,
71:22, 80:6, 80:7,
80:18, 80:22,
86:11, 110:9,
110:10, 131:1,
134:15, 137:15
critical 13:1
crossed 117:24
crux 87:9, 128:2
crystal 93:21, 132:5
CSR 155:14
cumbersome 137:4
current 21:23,
30:23, 31:1, 68:21
currently 43:25,
45:5, 45:13, 83:11

custodian 22:3,
   22:4, 28:1,
   119:10, 128:4
cut 36:17, 86:6,
   109:7
cutting 86:4, 139:16


< D >
d)(2)(a 83:20, 83:22
D-4 9:23, 9:24,
   10:10
D-5 11:4
D-6 12:15
daily 56:16
dare 109:18
dashboard 5:24, 61:1
data 25:18
date 33:25, 71:25,
   91:6, 129:6,
   147:5, 147:10,
   147:25, 153:6
dated 81:18
dates 97:20
day 44:6, 45:21,
   59:17, 127:6
days 61:23
deal 13:11, 14:20,
   14:21, 16:16,
   30:22, 48:12,
   50:24, 58:2,
   91:13, 101:12,
   113:17, 138:17,
   139:12, 141:13
dealing 119:17,
   128:19, 129:20,
   129:25
deals 54:5, 82:13,
   83:5
debtholders 82:19,
   83:13
Debtor 1:38, 14:3,
   14:6, 14:9, 14:12,
   17:8, 38:5, 49:18,
   76:23, 81:12,
   81:15, 84:10,
   85:17, 87:11,
   106:4, 118:5,
   130:4, 130:23,
   134:9

Debtors 1:20, 78:17
debts 15:19, 71:3,
   90:1, 97:21,
   98:18, 100:21,
   102:21, 102:24,
   110:3
decide 26:12
decided 21:21,
   51:20, 133:5
deciding 98:4,
   140:13
decision 32:9, 34:4,
   34:5, 36:3, 41:19,
   90:23, 103:2,
   117:15, 127:25,
   146:23, 147:22,
   148:13, 152:24
decisions 72:11,
   72:18, 87:23,
   153:3
deck 39:1, 39:7,
   43:7, 43:20,
   44:14, 48:3, 52:7,
   148:21
Declaration 55:23,
   149:3
dedicated 24:17
dedicating 22:23,
   116:17
deemed 103:5, 138:2
deeper 78:20
defeat 53:12, 55:3
defeats 145:7
defense 145:24
defenses 75:18,
   75:21, 129:25
defer 133:20, 143:19
deficiency 28:9,
   28:10
defies 37:24
define 71:14,
   120:13, 123:7
defined 39:22,
   39:24, 39:25,
   40:12, 40:17,
   90:14, 97:6, 97:8,
   132:9, 132:15,
   132:19
defines 106:2,
   147:24, 151:11

defining 38:12,
   152:25
definitely 61:12
definition 37:24,
   38:19, 39:14,
   39:23, 40:6,
   40:13, 77:18,
   88:19, 91:1,
   102:9, 109:12,
   131:21, 131:24,
   132:17, 147:4
definitionally 51:14
definitions 39:18,
   88:22
definitive 125:21
definitively 51:22
degree 147:12
Dein 2:5, 5:12,
   66:11, 155:8
delegation 58:19,
   58:22
delineated 67:23
delivered 138:22
delve 70:10
demands 91:9
demonstrate 43:5,
   135:12
demonstrated 51:24,
   51:25, 76:2
demonstrates 148:25
Demonstrative 9:14,
   9:17, 24:25, 48:3,
   48:5, 48:6, 48:7,
   55:2, 55:24,
   91:11, 96:13,
   98:1, 98:23,
   102:14, 120:22
demonstratives 38:21
denied 131:4
deny 82:15, 114:19,
   141:11
depositing 92:19
deposition 61:7
depositories 100:7
depository 55:25,
   99:8
deposits 42:23,
   43:1, 44:2, 96:23
depriving 18:20,
   18:21

depth 78:24
derivatively 129:23
derived 91:4, 147:6,
 148:1
describe 85:16
described 48:2, 56:3
describing 54:16
description 85:19
designated 13:4,
 44:13, 44:24,
 53:20, 59:19,
 113:2, 121:1,
 121:4
designation 44:20,
 47:3, 122:5
designations 47:5
desire 82:7, 82:8
desired 77:18, 77:20
desperately 35:12
Despins 2:17, 64:24,
 65:1, 126:21,
 126:23, 126:24,
 127:5, 131:7,
 132:3, 138:8
despite 35:1
destination 49:8
destroy 88:3
detach 56:23
detail 44:4, 45:18,
 46:13
detailed 50:17,
 91:18
details 153:10
determination 31:5,
 68:22, 125:10,
 125:11, 125:21
determinations
 101:25
determinative 121:14
determine 51:23,
 109:19
determined 83:23,
 125:2
determines 99:3
determining 113:6,
 125:18
development 49:2
deviate 46:1
devoted 8:8
diagram 96:15

dial 7:6, 60:10,
 113:18
Dianne 2:35, 133:12
dias 5:14
dictate 123:10
dictated 73:17
difference 23:4,
 23:21, 44:12,
 47:5, 62:13,
 88:24, 89:1, 89:3,
 89:4, 128:21
different 22:21,
 47:20, 78:3,
 78:10, 88:18,
 107:7, 107:23,
 108:19, 118:11,
 123:7, 129:3,
 148:5
different. 78:3
differently 98:15
difficult 6:10
difficulty 6:14
diligently 58:11
diminish 15:7
DIP 17:7
dire 56:14
direct 7:5, 13:20,
 18:22, 32:24, 51:9
directed 74:25
directing 33:1,
 33:10
direction 11:21
directly 14:24,
 21:10, 37:18,
 56:16, 58:1,
 127:20, 150:17
disaggregated 114:22
disagree 50:8,
 75:21, 141:7,
 150:13
disagreement 114:20
disagreements 114:16
disagrees 28:19,
 114:12
disbursement 45:18,
 85:10
discerned 115:3
discharged 76:23
discharges 77:13
disclaimed 84:9

disclaiming 81:25
disclose 45:22,
 87:22
disclosed 44:18,
 152:19
disclosure 91:18
disclosures 119:11
disconnect 7:6
discovered 132:4
discovery 66:12,
 99:13, 140:12,
 152:9
discretion 33:21
discuss 21:11, 32:4,
 70:4, 105:6,
 144:20
discussed 26:17,
 33:3, 37:13,
 40:21, 75:16,
 105:6
discussion 70:10,
 121:11
dispense 71:7,
 126:17
dispositive 90:13
disprove 119:1,
 140:16
disproved 100:5
disproving 141:1
dispute 25:19,
 42:24, 45:6, 47:2,
 51:15, 51:18,
 51:20, 83:7, 87:9,
 107:15, 110:16,
 126:5, 137:20,
 151:25
disputed 97:14,
 140:10, 140:13
disputes 45:4,
 102:13, 125:1,
 125:17
disregard 29:12
disrupt 136:20
distinct 114:21
distinction 23:3,
 23:20, 87:17
distinctions 88:23,
 88:24
distinguish 70:15
distinguishable 59:1

distinguished 128:13
distributed 145:13
distribution 32:7,
   44:4, 50:16
District 1:1, 1:3,
   2:3, 2:4, 2:6,
   36:3, 144:24,
   155:1, 155:2,
   155:7
dive 78:20
divert 71:23, 134:21
diverted 33:6
diverting 73:15
divides 148:13
Docket 1:6, 1:25,
   6:19, 7:16, 7:17,
   7:19, 9:15, 60:22,
   115:4, 127:17
doctrines 115:8
document 25:4,
   39:10, 93:8, 93:9,
   93:13, 98:22,
   99:15, 99:16,
   99:17, 135:6
documents 43:16,
   49:12, 50:16,
   51:11, 53:14,
   53:18, 54:2,
   54:13, 56:7, 62:2,
   62:8, 62:15, 82:8,
   97:12, 97:15,
   101:13, 103:3,
   108:11, 123:10,
   127:9, 135:22,
   144:10
dog 10:1
Doing 65:6, 67:4,
   109:21, 112:20,
   122:21, 150:3
dollar 24:18, 37:11
dollars 16:5, 23:12,
   23:14, 23:25,
   25:13, 37:2,
   43:11, 43:18,
   44:2, 44:21,
   44:23, 45:1,
   45:16, 46:7,
   93:15, 118:22,
   122:8, 122:12,
   122:13, 122:15,

133:16, 136:17,
   141:16, 142:5,
   144:2, 145:21
domestic 37:11
done 86:5, 102:19,
   122:24, 125:6,
   136:22, 146:18,
   150:6
donee 30:12, 85:18
donor 30:11
double 51:5, 65:6
double-down 123:16
Doug 64:12, 66:3,
   66:4, 66:15
Douglas 3:8
down 11:7, 17:1,
   36:20, 102:16,
   102:22, 124:15,
   141:20
downright 119:1
DRA 60:7, 66:1,
   66:12, 66:16,
   66:24, 69:16,
   70:1, 109:9
drafted 20:23,
   116:13
drafting 93:12,
   93:16
Dras 109:11
drawing 67:2
draws 121:10
due 94:23, 135:10
duplicate 133:15
duplicates 108:24
duplicating 133:22
duplicative 108:20,
   108:24
during 6:6, 6:9,
   53:2, 94:23, 98:17


< E >
earlier 62:12, 65:6,
   77:23, 79:10,
   89:1, 107:14,
   108:6, 109:10,
   109:13, 112:17,
   144:22
early 79:2, 94:25
earned 23:12, 23:14,

45:17, 100:19,
   149:19
earnings 95:12,
   95:15
ease 21:22
ECF 48:3, 60:14
ECF1334-1 38:23
edition 33:4
effect 9:21, 33:13,
   33:24, 40:6,
   72:23, 110:6
effective 20:21,
   146:6
effectively 17:4,
   73:16, 112:19,
   142:12
efforts 35:6
Eight 17:17, 43:7,
   83:1, 116:10
Either 15:9, 15:13,
   31:17, 50:5,
   84:21, 97:23,
   99:15, 104:15,
   118:25, 120:7,
   130:12, 139:20,
   154:5
Electric 1:17
element 31:14
elements 30:23
eliminate 50:20
Elizabeth 2:30,
   114:9
Ellen 19:21
emphasize 143:21
employee 98:4
employees 98:6,
   118:18
employer 147:24
Employers 91:1,
   147:6, 147:10,
   147:18, 147:25
Employers. 91:6
employing 75:15
empty 50:2, 123:6,
   124:20, 152:4
en 131:23
enable 9:6
Enabling 43:15,
   44:18, 45:1,
   46:22, 48:13,

55:16, 78:2,
91:25, 93:9, 99:2,
101:19, 121:24,
122:2, 122:22,
147:8, 148:3
enacted 9:2, 9:4,
10:23, 12:21,
13:24, 25:6,
32:19, 32:21
enacting 81:6
enactment 33:11,
33:25, 34:7
encourage 6:22
end 8:4, 50:10,
127:6, 136:10,
151:17
ending 143:16
endorsed 49:20
ends 85:20, 108:12
enforce 11:23, 16:9,
27:5, 58:11
enforceable 77:6,
80:2, 80:20,
109:16, 109:20,
130:17
enforced 16:16,
88:4, 97:17
enforcement 58:12,
125:3, 143:13,
145:24
enforcements 68:13
enforcing 68:1
engaged 118:24
engagements 30:8,
88:1
English 88:19
enjoys 148:15
enough 12:20, 153:22
enrichment 134:24
ensure 5:20, 12:22
enter 143:8
entered 77:15
entering 96:5
entire 14:15, 20:13,
27:3, 38:4, 40:2,
93:8, 94:4
entirely 40:6,
46:24, 55:10,
59:1, 118:4,
123:8, 137:9

entirety 114:19
entities 28:13,
32:25, 74:22,
76:18, 81:4,
81:13, 108:10,
111:9, 111:13
entitle 27:4, 126:5
entitled 14:21,
23:2, 95:11, 116:3
entitlement 21:24
entity 22:19, 23:2,
23:11, 74:19,
81:2, 115:3,
119:10
entries 60:22
Entry 6:19, 7:16,
7:18, 7:19, 9:15
enumerated 60:22
equality 80:17,
81:14
equally 30:10, 35:2,
57:10, 80:18,
81:16
equitable 81:2,
81:3, 82:4, 82:11,
84:12, 99:25,
101:7, 102:3,
109:23, 110:1,
110:4, 116:5,
148:15
equity 51:14, 83:16,
83:21, 141:1
equivalent 109:16
ERS 26:3, 90:23
essence 9:10, 13:10,
80:7, 87:12,
138:17
essential 49:3
essentially 32:5,
51:5, 152:7
establish 75:8
established 54:2,
150:24
establishes 13:2,
13:3, 13:13
et 2:13, 61:8, 129:6
event 11:13, 21:15,
36:1, 38:5, 69:14,
72:2, 88:7
events 136:12

everybody 41:8,
60:10, 65:18,
149:20
everyone 5:25, 7:5,
63:16, 64:7,
74:15, 81:16,
113:19, 114:5,
154:8
everything 25:17,
115:7, 150:8
evidence 18:5,
26:14, 31:6,
45:10, 45:19,
46:11, 52:1,
53:18, 54:7,
54:15, 54:17,
55:22, 56:18,
60:14, 60:22,
61:10, 61:19,
62:23, 103:2,
121:7, 126:1,
127:15, 141:10,
143:3, 149:13,
150:15
evidenced 40:7
evidentiary 61:9,
126:17, 140:12
exact 121:11
Exactly 10:13,
17:11, 22:9, 24:4,
30:13, 39:10,
39:13, 41:5,
43:15, 52:13,
86:5, 94:5, 95:25,
96:6, 139:23,
152:14
example 7:1, 14:3,
25:1, 41:3, 41:11,
53:15, 58:9,
119:1, 120:19,
129:20
examples 40:10,
74:21
except 101:17
exception 71:25
excerpt 46:21
excerpts 43:8
excess 95:10, 95:14,
126:9, 135:3
exchange 81:20

exchanging 61:24
exclusive 116:8,
  120:18
excuse 66:4
execute. 30:12,
  85:18
executed 120:20
executive 33:1,
  33:6, 33:9
exercise 30:7,
  32:12, 49:4,
  58:23, 87:25,
  134:9
exercising 50:4,
  87:3
Exhibit 55:23,
  91:17, 96:18,
  97:25, 149:3,
  149:6
EXHIBITS 4:9, 60:14,
  60:21, 61:7,
  61:12, 61:24,
  61:25
exist 106:19,
  114:25, 118:11,
  118:20, 141:11
existed 84:19,
  122:11
existence 68:16,
  95:24, 120:12,
  140:23
existing 67:13
exists 32:14
exists. 75:19
expand 122:20
expansive 104:19,
  106:12
expect 41:6, 70:1,
  86:2, 126:25,
  153:7
expectancy 115:11,
  117:3
expectation 23:15
expected 100:21
expenses 146:12
expert 96:9, 97:1,
  97:4, 97:6, 97:19,
  98:8, 121:5
expired 105:22
explain 98:21, 112:7

explained 28:24,
  41:2, 50:8, 71:5,
  71:24, 72:25,
  88:8, 97:5,
  109:10, 109:12,
  115:5, 118:4,
  119:12
explaining 74:20
explains 38:10
explanation 55:11,
  75:12
explicit 20:1, 93:17
exposing 9:9
express 9:4, 20:1,
  69:1, 120:3,
  146:11
expressly 15:7,
  30:2, 32:25, 33:5,
  33:17, 35:24,
  36:4, 41:20, 57:8,
  59:14, 67:21,
  68:7, 68:25, 69:7,
  71:11, 82:13,
  83:5, 93:13,
  122:22, 145:11
extend 37:22, 57:17,
  106:11
extended 37:2
extends 42:7, 43:23,
  142:22
extensions 72:15
extent 15:12, 26:15,
  30:7, 31:16,
  31:22, 31:25,
  40:25, 55:19,
  62:24, 70:12,
  103:13, 103:18,
  104:6, 111:6,
  129:14, 130:14,
  145:22, 147:11,
  152:25
extinguish 66:24,
  69:4
extinguishing 69:14
extra 93:15
extraordinary 71:24
extreme 49:19


< F >

F.3d 75:14, 128:16
F3d 90:23
face 115:4, 142:10
facie 125:25
facilitate 118:18
factor 26:6
facts 55:2, 58:25,
  72:12, 82:6, 84:7,
  95:21, 118:25,
  120:8, 124:16
factual 23:3, 45:6,
  51:18, 51:19,
  54:24, 62:15,
  75:12, 76:1,
  115:8, 125:1,
  125:17, 125:24
factually 22:21
failed 73:3, 127:12,
  127:15, 141:21
failing 85:9
fails 35:17, 142:19
fair 68:23
fairness 49:21
faith 67:16
fall 137:14
fallacious 101:4
fallen 16:5, 36:14
Falls 16:3, 27:20,
  72:24, 143:23
false 62:9, 94:7,
  152:11
Fannie 22:12
far 9:20, 79:21,
  108:6, 113:14
farther 116:22
favor 10:17, 84:19,
  114:25, 117:4
Federal 32:12,
  32:14, 33:14,
  33:15, 45:24,
  71:12, 81:9,
  81:11, 91:21,
  91:23, 96:22,
  98:2, 98:3, 98:6,
  134:10
fee 119:24
feed 31:22
fees 17:9, 102:22
few 75:8, 84:22,
  95:21, 96:8,

108:5, 127:9
fiddle 58:16
fiduciary 119:18
Fifth 68:7, 68:18,
   68:25, 79:7,
   80:10, 80:12
figure 131:23
figured 20:7
file 63:5, 134:7,
   144:12, 144:14
filed 6:18, 6:19,
   62:20, 63:2, 84:10
filings 142:16
final 7:4, 126:2,
   131:23, 132:5,
   141:6, 147:19
Finally 25:12,
   26:20, 69:20,
   92:1, 97:19,
   101:19, 130:9,
   136:10, 142:15
Financial 1:9, 1:28,
   2:29, 5:8, 44:19,
   46:2, 96:9, 118:5,
   119:7, 119:10,
   119:13, 119:25,
   128:16
financials 45:21,
   46:1, 136:15
Financing 84:9,
   94:17, 116:6
find 52:5, 99:15,
   129:15
finding 30:19, 31:6
fine 47:18
finish 58:10, 150:17
Fiscal 2:28, 31:23,
   32:1, 32:8, 32:10,
   33:23, 34:9,
   34:15, 34:16,
   43:12, 43:18,
   67:7, 67:22,
   67:24, 69:23,
   71:16, 71:17,
   72:15, 143:17,
   146:8
fit 59:12, 109:11
five 9:17, 23:12,
   23:14, 66:5, 66:6,
   74:10, 92:9,

137:5, 141:16
fixed 105:21, 105:23
flag 39:17
flat 72:24
fleeting 134:23
flip 39:19
float 56:17
Flores 21:10, 21:13,
   22:16, 22:20,
   23:1, 24:5, 24:6,
   27:18, 108:18,
   119:20, 120:1
flow 21:22, 49:12,
   52:8, 54:25, 56:2,
   56:9, 56:11,
   56:21, 56:25,
   58:5, 72:8, 96:17,
   96:21, 102:16,
   112:3, 123:9,
   123:21, 135:8,
   143:16, 144:18,
   148:25, 149:2,
   149:5, 150:5,
   150:21, 150:24
flowed 56:6
flowing 42:24,
   149:24
focus 9:19, 66:19,
   130:21
focusing 34:12
follow 14:13, 68:23,
   111:25, 130:22
follow-up 124:5
followed 91:7
following 78:25,
   84:7, 132:8
follows 8:7, 85:16
FOMB 19:15, 70:22,
   70:25, 72:10,
   72:22, 73:3,
   73:16, 73:17
footnote 133:24
fora 35:11
forbearance 130:5
force 28:25, 105:13
forced 123:14
foregoing 84:22
foremost 24:9
forever 19:18
forgot 61:1

forked 23:14
form 92:8, 92:13,
   92:18
forth 6:17, 9:18,
   39:19, 62:10,
   140:3
forward-looking
   139:10
found 48:7, 48:10,
   69:7, 75:24, 92:7,
   144:24
Four 9:17, 10:2,
   10:16, 26:9,
   34:19, 40:10,
   48:14, 67:16,
   67:19, 122:14,
   131:8, 131:12,
   131:18
Four. 32:16, 33:11,
   58:9
Fourth 13:18
fraction 59:5
framework 71:18
frankly 20:22,
   50:24, 62:11,
   126:15, 148:9
Freddie 22:12
free 29:12, 36:21,
   37:8, 83:21
frequently 110:3
fresh 79:1
frightened 41:5
front 117:22, 147:17
frowned 110:5
fulfill 68:3, 71:3
full 12:25, 15:8,
   37:7, 66:14,
   79:24, 80:22,
   82:4, 83:13, 84:5,
   110:3, 115:19,
   126:16, 131:18,
   140:12, 147:22
fully 141:8, 150:8
functioned 123:19
Fund. 40:1, 40:13,
   43:14, 99:9
fundamental 28:11,
   62:11, 78:10,
   118:21
fundamentally 42:14,

115:15
funded 112:10,
  123:1, 123:22
funding 9:4, 14:16,
  69:14, 72:16,
  95:10, 138:16
future 18:7, 34:7,
  85:1, 138:21,
  139:13, 139:17,
  139:25, 143:14,
  145:6, 145:19


< G >
Gail 2:5, 5:12,
  155:8
Galarza 21:10,
  21:13, 22:16,
  22:20, 23:1, 24:6,
  27:18, 108:18,
  119:20, 120:1,
  127:24, 128:7,
  128:8, 128:23,
  128:24
Garced 34:5, 34:12,
  72:11, 72:14
Garcia 145:2
garden 89:8
gasoline 9:19
gave 48:18, 57:20,
  59:10, 62:3,
  98:22, 115:11,
  131:21
GDB 53:3, 54:16,
  55:5, 55:17,
  55:19, 55:20,
  55:21, 56:1, 56:3,
  56:5, 56:11,
  56:13, 56:15,
  56:17, 56:20,
  58:10, 122:14,
  126:10
GDB-9758 123:15,
  123:21, 124:1
General 8:10, 9:9,
  10:25, 11:13,
  13:8, 13:9, 13:16,
  14:17, 15:17,
  16:4, 22:25,
  24:10, 25:23,

41:9, 71:23, 72:4,
  72:8, 74:20,
  79:13, 89:20,
  106:4, 122:15,
  139:8
generally 18:9,
  45:16, 50:22, 81:1
generating 136:15
get-go 138:15
gets 87:19, 89:7,
  101:11, 117:24,
  118:12, 143:24
getting 130:16,
  152:9
Give 11:22, 39:3,
  39:4, 51:4, 55:11,
  57:18, 62:22,
  68:14, 98:6,
  108:11, 110:10,
  118:9, 124:4,
  141:15, 141:16
Given 11:5, 11:13,
  17:3, 22:20, 29:2,
  30:8, 30:11,
  33:17, 67:10,
  84:4, 85:17,
  94:10, 103:10,
  113:6, 119:24,
  128:24, 145:21
gives 14:12, 99:17,
  134:16
giving 51:3, 59:14
go-forward 145:22
goals 128:19
Good-bye 154:9
Gos 90:2
gotcha 49:21
govern 48:11, 127:7
governed 48:1
governmental 97:9
Governor 13:25,
  34:6, 34:14, 69:11
grammatical 41:22
grant 16:18, 38:13,
  38:15, 41:24,
  42:5, 42:12, 57:8,
  103:16, 106:13,
  106:14, 124:21,
  127:11, 143:12,
  151:22

granted 26:22,
  37:19, 50:11,
  82:2, 102:23,
  104:20, 105:11
granting 42:9, 79:5,
  102:8, 137:19
grants 39:11,
  103:17, 104:16,
  104:20, 104:23
grateful 112:7
Great 48:8, 64:2,
  68:9, 113:17,
  136:13
greater 14:12, 89:19
greatly 140:2
Grella 36:3, 75:10,
  140:3
gross 127:19
grounds 32:1
group 110:10
grow 136:15
guarantee 15:12
Guaranty 2:23, 2:25
guess 117:21
guest 102:23
guide 152:25
guideline 71:15
guise 49:20


< H >
half 108:2, 131:12,
  131:18
hand 26:3, 59:23,
  114:24, 114:25
handful 66:18
hands 12:11
handy 9:13, 144:8
hang 60:10, 124:18
happen 19:19, 93:19,
  102:23
happened 19:14,
  56:12, 105:20,
  123:11, 124:1,
  129:7, 146:21
happening 46:6,
  51:17, 98:13
happens 15:22, 19:13
happy 16:17, 50:9,
  93:18, 144:10

hard 117:23
hardship 136:13
Hastings 126:24
hats 124:19
headed 10:11, 52:11
heading 91:19
health 74:15
hear 7:4, 60:7,
    63:25, 64:1,
    78:19, 107:1,
    107:2, 107:3,
    107:5, 134:6
heard 14:7, 117:5,
    133:25, 134:6,
    134:17, 146:3,
    148:8, 148:10
Hearing 2:2, 5:16,
    5:17, 5:19, 5:21,
    6:2, 6:9, 6:14,
    7:13, 29:2, 29:11,
    46:21, 60:18,
    60:21, 61:9,
    61:21, 113:16,
    126:2, 126:17,
    130:20, 141:5,
    141:6, 144:11,
    152:24, 153:4,
    153:5, 153:6,
    153:8, 153:14
hearsay 54:10, 62:4
heart 19:5
heavily 34:4
Hello 106:25
help 56:13, 95:22,
    97:4, 98:10, 138:9
Helpful 121:13
Henderson 36:4
hereby 39:21, 142:10
herein 39:22,
    103:13, 103:19
hereof 91:6, 147:5,
    147:10, 147:25
hereunder 34:21
highlight 31:15
highlighted 61:17,
    120:24
highlights 35:8,
    49:19
Highways 1:34, 9:7,
    10:17, 11:1, 11:5,

14:17, 20:15
hindsight 85:25
historic 145:20
historical 114:16
Historically 16:4,
    24:8, 24:22, 144:1
history 26:1
hit 110:18
hits 152:6
Hoffman 30:1, 30:18,
    30:21, 31:15,
    85:6, 85:16,
    85:20, 86:4,
    86:15, 86:22,
    86:23, 86:25,
    87:2, 87:3, 87:8,
    87:20
hold 47:8, 50:10
Holder 121:5
holders 148:18
Holding 31:15,
    55:12, 94:12,
    108:23
holds 55:9, 101:8,
    119:8, 119:9,
    134:3
home 50:25
honestly 56:10
Honorable 2:3, 2:5,
    5:11, 5:12, 155:6,
    155:8
hoops 101:25
hope 74:15, 112:13
hoping 102:1
host 118:11
Hotel 47:22, 48:13,
    48:17, 48:19,
    49:16, 50:3,
    57:12, 58:13
hoteliers 52:24
hour 62:17, 111:25
house 41:3
housekeeping 60:13
houses 65:24
Howard 128:11,
    128:17
HTA. 138:6
huge 120:2
Hughes 55:22
hundred 23:24,

25:12, 26:9
hundreds 36:13,
    118:22, 136:17
hunting 124:18
hurt 93:15
hyped 101:3
hypo 77:21
hypothetical 83:11


< I >
idea 27:18, 54:12,
    62:9, 115:16,
    149:14
identical 9:21
identified 53:14,
    56:7, 74:1, 89:24,
    137:7
Identifies 150:19
identify 55:8,
    106:23
identifying 6:7,
    54:7, 54:18,
    150:16
identity 112:8
ignore 14:9, 14:12,
    54:15, 54:21,
    94:14, 118:25,
    122:21
ignored 14:11
ignores 149:21
ignoring 49:23
II 29:14, 31:19,
    32:4, 32:6, 81:7
III 1:8, 1:27, 6:17,
    29:15, 31:22,
    34:22, 34:24,
    35:17, 36:6,
    49:18, 74:13,
    75:5, 76:15, 80:3,
    86:11, 86:14,
    86:18, 88:13,
    88:25, 89:18,
    90:25, 97:14,
    114:14, 116:13,
    129:12, 130:9,
    130:17, 131:17
illusory 37:5
immaterial 100:20,
    100:24

immediate 82:2
immediately 6:15,
   32:19, 33:10,
   90:13, 101:5,
   101:8
impact 29:4, 67:3
impacting 14:17
impair 81:21, 85:23,
   86:8, 111:12
impaired 76:23,
   86:12, 86:14
impairing 81:6,
   86:17
impairment 81:10,
   88:3, 146:2, 146:5
impairs 88:11
implications 30:25
implying 71:1
important 12:18,
   70:15, 80:25,
   99:1, 120:9,
   128:9, 129:11
importantly 128:8,
   140:14
impose 48:18, 59:11,
   98:16
imposed 49:20,
   91:21, 140:6
imposition 11:22
impossible 68:2,
   71:2, 83:7, 135:12
impressions 112:8
improper 19:19,
   41:15
in. 42:5, 147:20
inadequate 20:12
inadmissible 54:10
inapplicable 50:24,
   72:12
inappropriate 36:1
inclined 129:15
include 38:6, 50:18,
   85:21
included 32:23,
   39:20, 40:10,
   40:18, 40:23,
   43:7, 44:5, 46:21,
   48:9, 58:6, 61:24,
   69:8, 92:9,
   111:15, 153:5

includes 57:12,
   88:14, 93:14,
   112:4, 141:20,
   141:21
including 6:3,
   12:11, 12:25,
   16:7, 32:25,
   38:12, 42:22,
   53:18, 58:12,
   62:4, 62:7, 70:23,
   76:20, 77:23,
   80:23, 82:25,
   83:2, 87:10,
   97:11, 118:6,
   153:16
incompatible 115:19
inconsistencies
   124:6
inconsistent 34:20,
   67:4, 67:18,
   115:15, 118:4,
   123:9, 123:10,
   132:22
inconvenient 68:14
incorporated 39:18,
   71:12, 146:15
incorporates 39:13
incorrect 115:8
increasing 136:16
incurred 85:8
incurs 85:12
independently 62:18
indicate 149:7
indicated 27:15,
   39:1, 59:18, 150:1
indicates 32:20,
   57:24, 149:8
indicating 58:25
indication 35:14
indicia 59:8
individuals 22:17,
   23:6
indulge 151:6
Industrial 69:2
industry 49:3,
   136:11, 136:19,
   136:20
infer 118:10
inferences 120:2,
   150:13, 150:14

information 56:10,
   150:21
informative 144:13,
   144:15
infringe 143:13
inherent 50:6
inherently 139:9
initial 27:19,
   123:12, 150:22
initially 21:11
initio 25:6
injunction 75:15
innocent 19:2
inquiries 108:7
inquiry 46:24
inside 81:11
insolvency 26:5
insolvent 127:13
instance 69:22,
   79:13, 119:3
instances 111:11
Instead 24:13,
   51:23, 54:22,
   80:19, 109:22
instruct 98:11
instructions 5:19,
   95:8, 98:5
instructive 115:25
instructs 95:5
instrumentalities
   33:7, 77:5, 79:12,
   79:19, 80:1,
   84:13, 89:2, 89:5,
   89:19, 111:17,
   115:15
instrumentality
   37:14, 79:24,
   120:6
insufficient 83:2
insurance 21:14,
   21:16, 21:20,
   21:24, 22:18,
   23:18, 95:2,
   108:20, 108:21,
   128:1
insurer 21:19
insurers 7:15,
   21:19, 37:1
intangible 106:3,
   106:4

intangibles 106:1,
    106:10
intend 69:21, 141:25
intended 28:14,
    32:21, 42:11,
    67:20, 68:18,
    69:25, 117:19
intending 20:14,
    20:15, 138:1
intends 74:17,
    115:23
intent 9:6, 20:24,
    20:25, 117:6,
    127:7, 138:10
intention 20:17,
    33:25
interest. 148:15
interested 6:21
interests 75:1,
    83:1, 104:17,
    105:7, 105:8,
    105:11, 106:8,
    106:10
interfere 37:19,
    134:11, 134:14
International 2:33,
    133:13
interpretation 71:2,
    118:16, 133:5
interprets 133:2
interrelated 48:14,
    58:3
interrupt 6:9, 6:10,
    6:12
interrupting 92:23
introduce 63:4
introduction 78:19
invention 94:7
inverts 146:10
investment 95:12
invoked 80:13,
    141:12
involved 19:4, 21:13
involves 72:14,
    72:15
irrational 38:16,
    42:3, 147:2
irrelevant 46:24,
    100:19, 144:22,
    145:8, 146:5,

152:1
island 9:8, 49:3
issued 6:2, 12:24,
    15:20, 23:12,
    46:3, 56:12,
    146:7, 150:22
issues 8:9, 8:10,
    8:12, 8:23, 9:3,
    30:22, 30:24,
    30:25, 47:16,
    51:22, 66:18,
    70:11, 70:19,
    90:13, 97:5,
    98:10, 100:25,
    102:13, 103:3,
    108:7, 109:10,
    114:18, 114:21,
    114:23, 115:1,
    116:14, 140:10,
    140:13
issuing 13:11
items 72:19
itself 12:16, 13:21,
    18:22, 34:19,
    42:23, 43:17,
    44:11, 51:10,
    67:3, 76:6, 76:12,
    94:8, 118:7,
    119:18, 128:15,
    133:3, 135:6,
    135:25, 146:10,
    150:3


< J >
J. 2:13
Jenkins 29:25, 85:7,
    87:19
job 112:20
join 28:17, 114:14
joining 5:18
joint 62:22, 63:2,
    63:5
Jointly 1:11, 1:30
Juan 5:1, 74:16
Judge 2:3, 2:4, 2:5,
    2:6, 5:11, 5:12,
    5:14, 63:7, 63:13,
    63:21, 65:15,
    65:21, 66:11,

69:10, 107:2,
    108:4, 113:23,
    113:24, 114:1,
    131:12, 153:24,
    155:7, 155:8
judgment 125:22
Judicial 6:1, 126:16
Judith 2:5, 5:12,
    155:8
July 153:6
jump 102:1, 144:17
jumps 90:2
juncture 45:7, 70:16
June 63:5
jurisprudence 30:23
jurisprudential 31:2
Justice 68:12,
    72:23, 73:1, 73:2
justification 146:4


< K >
Kayatta 69:10
keep 6:22, 21:21,
    25:22, 26:12,
    36:18, 48:11,
    81:2, 81:12, 97:6,
    154:8
keeping 6:23
keeps 48:19
kept 10:24, 13:15,
    24:12, 100:8
Key 12:3, 55:2,
    76:8, 109:2,
    127:24
kind 41:3, 49:8,
    117:2, 118:20,
    122:20, 140:8
kinds 61:6
knowledge 23:22,
    89:22
known 29:18
knows 41:8, 44:12,
    73:9, 114:16,
    120:3, 124:21
Kovacs 77:11


< L >
L. 2:30

labeled 24:13
labels 54:21
lack 54:17, 101:22,
  105:15, 124:9
lacked 59:8
lacks 51:14, 147:11
land 116:25, 129:8
landscape 127:21
largely 67:7
last 40:20, 41:17,
  47:20, 57:4,
  90:20, 91:9, 96:4,
  98:13, 103:7,
  123:5, 139:14,
  145:21, 146:24,
  147:3, 151:17
late 111:25
later 10:19, 10:20,
  20:23, 56:13,
  56:14, 78:24
latest 77:24
latter 115:1
Laura 2:3, 5:11,
  155:7
law-making 32:12
lawful 33:9, 33:23,
  33:24
laws 14:4, 30:2,
  30:3, 32:18,
  32:24, 33:1,
  33:24, 34:1,
  76:18, 76:21,
  130:25
lay 63:1
lead 68:24, 79:20
leads 19:9
learned 18:11
least 22:21, 26:9,
  42:5, 45:9, 83:8,
  85:5, 138:5
leave 73:19, 80:5
leaving 50:1, 130:5
left 16:12, 27:11,
  47:20
left-hand 9:20
legal 23:4, 31:1,
  34:9, 35:13,
  75:11, 75:25,
  76:16, 82:6, 85:7,
  86:22, 86:23,

98:10, 100:25,
  101:24, 116:5,
  148:14
legally 42:1
legislate 67:11
legislation 15:4,
  81:6, 116:19
legislative 20:24,
  85:8
legislature 9:6,
  13:24, 14:15,
  20:14, 29:13,
  30:3, 30:4, 71:9,
  73:9, 73:11, 85:1,
  103:4, 103:5,
  115:23
legitimate 71:6
lein 145:12
lender 22:11
lenders 17:7, 37:1
lends 50:25
length 26:24, 33:4,
  75:25
lengthy 76:4, 116:16
less 7:4, 18:7,
  117:4
lessen 88:3
lest 62:17
letter 62:22, 95:2
level 20:3, 26:21,
  26:25, 31:4, 96:2,
  96:7, 108:12,
  134:10, 141:18
levied 45:24, 138:16
liability 81:25,
  84:9
liable 15:3, 84:17
license 23:8, 23:18,
  102:22
licenses 21:15
liens 11:20, 17:8,
  17:23, 25:15,
  26:22, 27:1, 27:3,
  33:24, 37:22,
  37:25, 42:9,
  42:12, 66:24,
  67:1, 68:22,
  69:24, 70:15,
  84:19, 101:15,
  101:17, 102:7,

114:25, 115:2,
  115:6, 115:14,
  132:13, 134:15,
  137:19, 139:16,
  148:22
lieu 91:4, 147:6,
  148:1
Lift 7:15, 7:17,
  7:18, 31:10,
  35:21, 36:5,
  38:22, 54:24,
  61:17, 66:1,
  66:13, 89:12,
  125:3, 130:1,
  130:2, 134:7,
  134:19, 153:1,
  153:5
lifting 134:13
light 116:13
likelihood 75:2,
  75:17, 75:19,
  125:11, 125:14,
  125:18, 125:20,
  135:12, 141:1
likely 56:19
likewise 77:16
limit 14:19, 17:17,
  42:3, 77:19,
  134:17
limitation 17:19,
  18:1
Limited 2:33, 6:3,
  29:2, 43:6, 43:22,
  45:8, 51:23,
  104:18, 128:24,
  133:13
Limiting 37:25, 91:1
line 5:21, 86:21,
  105:20, 117:24,
  149:6
link 76:8
liquidity 56:14
Lisa 107:3
list 41:6
listed 56:1, 73:10,
  126:21
lists 61:24
litigant 76:4, 86:2
litigants 74:25
litigation 43:5,

46:3, 46:4, 49:13,
  52:10, 89:13,
  116:14, 125:4
little 27:9, 41:4,
  65:5, 77:14,
  78:24, 85:24,
  93:15, 117:13,
  131:8
live 16:17
living 128:7
LLC 3:6, 3:8
LLP 74:13, 131:16
loan 17:7
local 30:7, 32:12,
  76:25, 87:25,
  130:24
located 97:2, 121:20
Lockbox 43:16, 44:1,
  44:11, 45:18,
  95:21, 95:24,
  96:23, 96:24,
  97:23, 98:7,
  120:20, 134:4,
  135:6, 135:9,
  135:22, 135:24,
  149:25, 150:1,
  150:3
logic 37:24, 76:17
logical 53:25,
  57:23, 87:16,
  102:20, 110:12,
  122:10, 150:12,
  150:14
logically 58:4,
  100:11
logistical 153:9
long 37:13, 62:10,
  103:24, 105:22,
  122:17, 153:22
longer 7:9, 22:13,
  65:5, 90:9, 133:1
look 14:14, 52:7,
  52:23, 58:8,
  62:18, 69:20,
  77:23, 89:25,
  96:12, 97:25,
  112:2, 136:14,
  139:12, 142:19,
  151:3
looked 18:24, 97:19,

98:17
looking 98:22,
  99:13, 109:5,
  112:23, 143:15,
  150:24, 153:24
looks 91:15, 131:8
lose 52:6, 86:3
losers 35:9
losses 80:18, 80:23,
  81:16
lost 109:6
lot 44:15, 116:22,
  117:6, 128:14,
  150:25
Louisiana 87:20
LPRA 88:22, 99:4,
  99:21, 100:5,
  100:11, 100:14,
  100:24, 105:18,
  105:19, 138:24
Luc 2:17, 126:24
lunch 113:11,
  113:18, 132:4


< M >
Mac 22:12
Mae 22:12
magic 137:24
Magistrate 2:5,
  5:12, 155:8
main 103:3
maintain 81:22, 99:8
maintained 45:11,
  47:11, 99:5, 99:6,
  102:5, 102:6,
  121:25
maintains 121:20
maintenance 16:7
Management 1:10,
  1:29, 5:9, 118:19,
  143:8
mandamus 30:21,
  143:13
mandate 68:3, 85:14,
  143:15
mandated 138:12,
  138:13
mandates 71:4, 77:1
mandatory 16:22,

16:23, 72:17
manner 44:6, 118:5
mapping 126:12
Mark 2:26, 7:24,
  8:22, 137:3
marked 98:9
market 37:11, 136:19
Martin 2:13, 60:24,
  63:21, 74:12,
  107:24, 131:15
material 53:9,
  112:9, 125:17,
  125:25
materiality 96:11,
  108:14
materials 62:5,
  62:19, 123:17
matter 6:16, 38:18,
  43:21, 57:1,
  60:13, 62:8,
  86:13, 88:6, 97:3,
  108:12, 112:5,
  112:15, 113:5,
  113:7, 124:12,
  124:14, 124:16,
  145:19
matters 27:19,
  61:19, 84:22,
  111:22, 149:15
Mcconnell 66:17,
  70:8
Mckeen 2:30, 63:20,
  64:21, 64:22,
  102:12, 107:15,
  113:12, 114:6,
  114:8, 114:9,
  116:20, 117:10,
  117:20, 118:2,
  121:21, 123:3,
  123:5, 124:6,
  125:5, 125:9,
  125:14, 125:19,
  126:4, 126:19,
  141:21, 149:11,
  150:12
mean 17:10, 17:22,
  20:8, 20:11,
  39:24, 41:12,
  42:11, 54:5,
  57:13, 61:11,

62:13, 80:7,
101:16, 102:11,
103:1, 125:10,
130:25, 132:9,
132:15, 139:21,
148:12, 149:11,
151:14, 151:21
meaning 44:20,
69:12, 70:4, 97:8
meaningless 41:22
means 12:1, 15:9,
17:11, 38:1, 43:2,
55:20, 57:25,
75:13, 76:5,
86:23, 88:4,
89:10, 100:13,
116:15, 123:14,
124:10, 141:4,
149:4, 149:5,
151:22
measures 67:12
mechanism 120:14,
127:20
mechanisms 8:19
meet 30:8, 62:21,
88:1, 140:5
members 5:15, 6:4,
32:11
memorable 41:3
memorialized 135:7
mention 77:21,
84:21, 91:16,
93:3, 119:15,
141:21
mentioned 25:12,
47:1, 56:3, 109:3,
138:8, 146:23
mere 13:22, 14:2,
29:20, 37:16
merely 11:21, 15:16,
16:19, 22:2,
32:11, 34:5,
128:4, 140:22
merit 135:13
meritorious 75:17
merits 35:17, 140:8
met 18:7, 125:23,
140:8
methods 94:12
mice 20:9

mid 86:4
mid-day 7:10
midst 136:12
Milbank 27:13, 144:7
million 16:5, 23:24,
25:13, 26:10,
43:11, 43:18,
44:2, 44:21,
44:25, 45:16,
45:19, 45:24,
46:7, 93:15,
93:17, 93:20,
93:22, 96:24,
100:18, 122:8,
122:12, 122:13,
122:14, 133:16,
133:20, 135:3,
135:9, 135:16,
144:2, 149:19
millions 118:22,
136:17
mind 29:22, 48:12,
53:5, 71:18, 79:1,
94:4, 117:13,
151:10
minimize 128:18
minimum 15:11, 24:1,
31:5, 83:25,
150:21
ministerial 25:5,
28:1, 48:23, 49:7,
49:9, 85:13
Mintz 3:8, 63:19,
64:10, 64:11,
64:12, 66:3, 66:4,
66:8, 66:10, 66:15
minute 7:8, 29:22,
57:4, 58:16,
79:23, 108:2,
110:16, 112:2,
139:18, 142:3,
146:22
minutes 6:24, 7:3,
7:22, 8:8, 8:11,
8:13, 8:16, 27:8,
60:11, 60:23,
63:10, 66:6, 66:7,
74:1, 74:8, 74:9,
74:10, 84:22,
104:1, 114:7,

126:25, 131:9,
131:12, 131:19,
137:1, 137:5
mischaracterization
120:8
misinterpretation
120:7
misleadingly 48:21
mispronounced 88:17
misreading 38:19
misrepresented 140:2
Missouri 29:25,
85:7, 87:19
misstated 140:15
misunderstands 56:23
mock 94:1
modification 67:13
modified 28:7, 52:8,
73:5
modifies 90:17,
90:21, 91:3
modify 41:1, 92:2,
93:2, 132:1,
132:7, 150:5
modifying 132:5
moment 32:19, 39:4,
66:15, 92:23,
101:24, 121:19,
138:15, 140:1,
151:4
moments 75:8
Monday 6:18
monetary 106:3,
106:5
moneys 100:6
Monitor 3:8
monoline 7:15, 78:9,
86:24
month 10:21, 55:18
monthly 56:16
months 48:10
moratorium 86:12
morning 5:7, 7:7,
27:12, 36:19,
64:11, 64:13,
64:16, 64:17,
64:20, 64:23,
65:1, 65:3, 65:8,
65:9, 65:11,
65:12, 66:3, 66:4,

70:8, 74:4, 74:5,
  74:12, 79:2,
  99:13, 113:15
mortgage 22:11,
  22:12, 51:1,
  151:12
mostly 63:17
Motion 7:15, 7:17,
  7:19, 21:12,
  35:22, 36:5,
  38:18, 47:21,
  49:19, 50:11,
  51:21, 54:24,
  66:1, 66:13,
  70:12, 81:18,
  91:18, 108:14,
  110:17, 111:2,
  129:25, 130:2,
  131:4, 135:1,
  144:13, 144:15,
  146:1, 153:5
Motions 7:14, 8:11,
  62:16, 110:25,
  114:19, 124:8,
  153:1, 153:2
motives 48:22,
  48:25, 49:1, 58:24
motorists 21:14,
  108:19
mounds 36:14
mouse 124:20
mousetrap 20:8, 20:9
movant 29:6
move 60:14, 70:20,
  80:12
moved 53:2
moving 76:5, 99:20,
  109:18, 112:23
muddled 115:7
multiple 35:11, 40:8
Municipal 2:26,
  30:6, 87:24,
  139:12
municipalities 59:6
municipality 27:22,
  27:23, 27:25,
  28:4, 139:14
mute 5:21, 5:23,
  60:25, 61:1, 65:19
muted 65:2, 65:20

muting 65:4, 65:6
Myers 114:9
myself 48:10, 74:15


< N >
name 6:8, 12:23,
  21:5, 47:8, 100:9,
  123:18, 138:6
Namely 81:1, 98:11,
  99:2
names 94:16
naming 84:10
Nation 68:10
natural 91:9
nature 58:2, 82:1
Nayuan 3:9, 70:8
necessarily 110:19
necessary 7:9, 11:9,
  14:8, 30:8, 61:19,
  62:23, 75:24,
  143:7, 153:1
necessitated 7:10
necessity 30:22
need 7:5, 29:7,
  31:18, 35:20,
  40:16, 40:17,
  41:14, 56:25,
  59:13, 65:18,
  68:10, 75:7, 95:7,
  99:14, 116:24,
  117:21, 118:12,
  119:16, 126:15,
  128:18, 134:7,
  140:5, 140:11,
  141:10, 142:19,
  153:19
needed 33:16, 95:4,
  100:16
needs 97:11, 114:18
negate 140:23
negative 50:23,
  51:5, 51:6
negotiations 67:14
Neither 49:17,
  79:15, 86:7,
  95:22, 135:4,
  135:21, 136:6
Nevertheless 67:15,
  135:14

New 76:4, 87:21,
  116:11, 116:13,
  116:16, 146:6,
  153:13
next 11:4, 15:15,
  16:18, 18:18,
  19:9, 24:5, 36:10,
  92:25, 96:4,
  114:6, 126:20,
  129:10, 153:6
NG 63:13, 63:15,
  63:23, 64:1, 64:5,
  64:25, 65:15,
  65:17, 65:22,
  107:2, 107:4,
  113:24, 113:25,
  114:1, 114:3,
  153:24, 154:2
Nine 39:20, 43:19,
  44:14, 91:17,
  105:8, 105:11,
  105:12, 105:17,
  105:21, 106:2,
  118:5
No. 1:6, 1:25, 31:4,
  60:21, 140:17,
  144:4, 147:21,
  153:25
Nobody 59:14
noises 65:24
non 131:2
non-statutory 78:4
nonapplication
  146:24
nonappropriation
  88:15
nondebtors 49:22
nondischargeable
  77:6, 80:1, 80:3,
  80:20, 88:13,
  109:17, 109:20
None 4:5, 4:11,
  60:18, 60:21,
  83:13, 84:4,
  84:16, 84:20,
  84:22, 101:12,
  106:12, 108:10,
  109:18, 137:25
nonentrenchment
  29:18, 31:1

nonetheless 29:8
nonrecourse 82:1
nor 26:4, 49:18,
  86:7, 95:22,
  95:23, 98:2,
  135:4, 135:21,
  136:6
Notable 50:17
note 27:9, 28:16,
  45:25, 128:20,
  144:8
noted 15:17, 29:11,
  29:24, 58:23,
  69:21, 145:5
notes 109:6, 112:3,
  121:23, 151:3
Nothing 18:13, 35:8,
  37:3, 51:2, 54:2,
  57:24, 80:5,
  80:24, 82:7,
  99:19, 117:3,
  119:12, 149:22,
  153:21, 154:5
notion 94:6, 109:1,
  136:8, 149:18
notwithstanding 80:2
Nowhere 34:8, 38:10,
  46:22, 56:3,
  87:19, 91:16
nullifies 69:16
nullify 37:9
number 7:20, 13:2,
  14:25, 62:4,
  71:19, 73:10,
  87:23, 108:13,
  127:17
numbers 152:17,
  152:18
numeral 91:12
numerous 32:23,
  42:20
nutshell 76:9


< O >
O'melveny 114:9
obey 14:1
object 61:5, 61:9,
  61:13, 63:4,
  130:2, 130:6

objecting 60:7,
  73:24
objection 60:16,
  60:19, 62:11,
  144:14
objections 62:4,
  62:6, 63:1, 111:5
objective 97:10
obligated 21:18,
  25:22, 57:25
obligates 47:10
obligating 16:20,
  32:18
obligations 11:11,
  24:22, 34:10,
  49:22, 49:23,
  76:19, 76:20,
  76:23, 79:11,
  79:15, 79:25,
  80:2, 80:17, 81:4,
  81:7, 81:10,
  85:23, 86:13,
  86:14, 88:11,
  88:12, 88:14,
  88:15, 89:2,
  97:15, 97:16,
  110:9, 118:6,
  150:9
observations 97:21
obvious 20:18,
  80:25, 89:3, 99:2,
  137:7
Obviously 30:24,
  90:2, 129:2,
  141:5, 150:13
Occupancy 48:14,
  48:17, 48:19,
  57:13, 58:13
occur 79:22, 153:8
occurred 26:1, 26:9,
  141:9
odds 100:1
offer 78:25
offhand 61:11
Official 2:15,
  24:15, 25:16,
  25:20, 26:4, 26:6,
  56:4, 84:16,
  91:12, 91:17,
  155:15

officials 32:12
offshore 132:9
Ohio 77:11
oil 9:19
old 76:7
OMB 146:14
omit 75:12, 103:14
omitted 55:2
Omnibus 2:2, 5:17,
  29:11, 153:5,
  153:6
Once 15:20, 16:2,
  44:7, 57:1, 59:10,
  74:14, 85:7, 146:6
one-page 96:15
one. 18:2, 138:2
ones 59:20, 98:17
ongoing 153:15
open 47:16
open-ended 100:1
opened 53:17, 53:23
opening 60:5, 138:9
operate 130:24
operating 17:9,
  153:11
operation 5:20
operational 122:16
operative 26:23,
  92:7, 134:2
opined 87:22
opinion 72:22, 75:10
opinions 69:10,
  73:1, 84:20
opponents 8:3,
  144:14
opportunity 66:14
opposed 125:3,
  128:22
opposite 121:11
opposition 19:1,
  81:17
options 98:19
oral 61:6, 61:8,
  61:15
Order 8:1, 33:9,
  49:2, 66:11,
  77:15, 132:21,
  141:15, 146:13,
  153:9
ordered 81:4

orderly 5:20
Orders 6:1, 33:1,
    33:6
organized 144:18
origin 77:13
original 20:8,
    61:16, 149:2
originate 102:16
originated 28:3
Orleans 87:21
Orrick 66:5
others 23:19
Otherwise 19:3,
    25:20, 54:3,
    66:25, 77:1,
    100:15, 106:16,
    109:15, 118:11,
    118:20, 121:15,
    130:16, 145:23,
    151:16
outcome 82:7
outflows 55:4, 55:5
outlined 70:13
outset 28:16, 109:15
outside 69:11, 81:1,
    86:15, 109:24,
    110:2, 111:7
outstanding 111:14
overage 27:9
overall 46:15
overbroad 69:9
overlook 99:2
override 34:6
overruling 128:17
overturned 41:20
overwhelming 23:21
overwhelmingly 20:18
owes 38:3
own 6:23, 21:22,
    24:14, 40:9,
    41:25, 48:20,
    49:15, 50:25,
    72:7, 77:7, 80:22,
    108:19, 108:21,
    115:16, 119:4,
    136:15, 140:4
owned 42:2, 94:3,
    95:7, 95:14
owner 13:4, 13:12,
    51:13, 82:4,

101:7, 116:8,
    137:11, 137:12,
    138:14, 148:11
owners 50:14, 82:11
owns 90:14, 94:6,
    94:24, 114:24,
    115:9


< P >
package 9:14, 9:18,
    27:3
Padilla 145:2
Page 4:3, 10:7,
    10:10, 11:4,
    12:15, 38:25,
    39:1, 39:9, 39:20,
    49:14, 75:14,
    77:11, 90:23,
    91:11, 91:12,
    91:14, 91:17,
    120:22, 127:25,
    147:22
pages 9:17, 21:11,
    36:13, 39:19,
    84:2, 92:9,
    113:15, 155:4
paid 12:25, 15:8,
    16:2, 22:16, 23:9,
    79:24, 80:24,
    82:3, 83:3, 83:4,
    83:13, 84:4, 89:7,
    90:12, 91:5,
    95:13, 108:21,
    110:3, 120:20,
    129:6, 146:7,
    146:16, 147:5,
    147:9, 147:24
pants 38:9
papers 70:14,
    116:21, 129:14,
    143:12
paragraph 42:21,
    75:24, 77:25,
    81:18, 81:19,
    82:16, 82:23
paragraphs 103:14
parallels 23:21
Pardon 11:18, 107:18
parent 41:4

parenthetically
    75:20, 77:22
parents 41:4
part 12:3, 17:24,
    55:12, 59:23,
    61:17, 61:25,
    62:20, 71:12,
    85:25, 122:19,
    132:24
participant 6:15
participation 100:11
particular 22:17,
    22:24, 30:3, 33:2,
    42:21, 55:13,
    71:22, 72:5,
    72:18, 85:2,
    97:10, 121:13,
    150:15, 152:11
particularly 45:8,
    51:22, 54:4,
    103:13, 134:10,
    145:21
parts 114:14
party 13:11, 41:3,
    76:5, 84:7, 85:14,
    95:18, 95:24,
    112:23, 130:1,
    130:6, 134:1,
    136:2
passed 30:3, 57:9
past 48:10
patience 7:11, 52:17
Paul 126:24
pay 15:4, 15:6,
    18:8, 23:6, 28:9,
    38:5, 76:20, 77:7,
    77:9, 79:13,
    79:17, 80:6,
    80:21, 83:12,
    85:10, 87:11,
    87:14, 88:8, 89:6,
    90:1, 102:24,
    108:24, 110:12,
    117:1, 130:25,
    131:1
payable 91:2,
    146:12, 147:7,
    148:2
paying 87:12, 97:20,
    98:18, 100:21,

102:20
payment 11:10,
  23:17, 32:18,
  56:9, 72:3, 82:25,
  106:1, 106:3,
  106:10, 106:12,
  106:14, 120:25,
  127:20, 137:23,
  142:10, 145:14,
  146:11
payments 23:19,
  106:2, 123:1,
  126:13, 135:10,
  135:20, 136:18,
  138:25
pays 38:3, 76:24
PDF 10:8
Pdfs 62:18
pecking 124:18
People 23:9, 65:20,
  65:24, 108:24,
  127:11, 136:13
per 144:2
perfect 13:4, 78:16,
  96:6, 136:5
perfected 27:1,
  82:5, 82:12,
  103:20, 103:23,
  105:10, 106:18,
  134:3, 134:15,
  142:15, 142:17,
  148:22
perfection 94:13,
  104:14, 115:1,
  148:20, 148:24
perfectly 102:20
perform 85:13
performance 30:21,
  80:4, 118:14,
  118:15, 137:24
period 53:2, 72:5
permanent 86:16
permanently 19:18
permission 95:7,
  127:1, 143:19
permit 146:19
permits 68:22
permitted 6:3, 18:8
permitting 141:9
perpetual 72:5,

146:4
person 6:3, 106:22,
  107:7, 114:6,
  126:20, 136:2
personnel 122:7
perspective 62:14
petroleum 23:8
phone 12:14, 61:1,
  61:3, 65:19
phones 5:21
phrase 91:3, 91:5,
  92:1, 138:5
PHV 2:13, 2:17,
  2:18, 2:21, 2:26,
  2:30, 2:35, 3:8,
  3:9
physically 36:23
picking 35:9
pieces 26:13, 45:9
place 23:3, 39:14,
  87:5
placing 67:16,
  148:14
plain 21:8, 32:20,
  37:25, 38:19,
  67:19, 120:8,
  126:7
plainly 42:10, 115:4
plaintiff 22:19
Plan 19:15, 31:24,
  32:1, 32:8, 32:10,
  33:23, 34:9, 35:8,
  35:18, 35:20,
  67:7, 67:22,
  68:20, 69:23,
  83:11, 83:14,
  84:5, 105:15,
  146:3, 146:6,
  146:10, 146:17
planning 34:16
plans 67:25
plausible 51:24,
  52:1, 75:9
played. 7:2
pleading 127:17
Please 5:23, 6:7,
  6:8, 6:15, 8:22,
  47:18, 60:10,
  65:18, 65:23,
  66:8, 98:23,

113:19, 127:3
pledges 139:2,
  141:18, 148:22
pledging 79:4,
  137:19
plenary 140:10,
  140:11
plus 62:1
PM 113:21, 113:22,
  154:12
point 20:20, 21:7,
  21:10, 23:4,
  25:18, 38:4, 41:5,
  41:20, 46:15,
  61:15, 92:25,
  94:8, 97:21,
  119:16, 119:20,
  127:23, 128:8,
  129:10, 138:8,
  144:20, 151:5,
  152:10
point. 36:10, 61:18,
  62:20, 115:25,
  118:21
pointed 101:13
points 36:20, 36:24,
  70:11, 120:4,
  144:19, 146:2,
  150:4
policies 6:1
policy 67:4, 67:12,
  68:6, 80:17,
  81:14, 95:3
portion 40:6, 41:21,
  43:2, 86:6
portions 148:7
posit 33:14
position 11:20,
  22:20, 38:17,
  42:6, 42:7, 44:17,
  46:5, 46:9, 46:16,
  56:14, 63:1,
  90:10, 104:4,
  108:16, 114:11,
  117:14, 122:25,
  137:8, 137:9,
  137:18, 138:21,
  152:23
positions 10:20,
  53:6, 62:22,

70:12, 75:6,
  124:16
positive 76:1
possess 73:17
possession 47:8
possible 62:22,
  153:3
possibly 80:24, 95:3
post 116:2
postdated 117:12
potentially 53:8,
  53:9, 143:17,
  145:18
poured 15:23, 16:11
Power 1:18, 11:23,
  19:10, 19:11,
  19:13, 30:7, 30:8,
  30:10, 32:13,
  48:18, 50:6,
  67:10, 81:9,
  85:16, 87:1, 87:3,
  87:25, 88:1
powers 29:14, 103:1,
  114:17
practical 62:13
practice 117:16,
  135:7, 150:2
pre 105:20
pre-bankruptcy 130:5
pre-existing 34:9
pre-promesa 76:11,
  84:24, 102:18,
  103:4
pre-title 129:12
PREB 14:7, 14:10
precedent 21:9
preceding 58:1
precisely 24:20,
  122:24
preclude 50:4
precluded 41:21,
  126:6, 152:9
precludes 42:9,
  138:24
preclusive 125:13
predating 56:10
predefault 56:6,
  122:10
preempt 28:22,
  29:14, 32:11,

33:17, 34:9,
  34:20, 35:19,
  66:20, 67:17,
  69:22
preempted 32:6,
  32:19, 33:10,
  34:2, 34:16, 35:4,
  67:22, 69:8, 79:6,
  79:17, 84:24,
  88:9, 103:9,
  109:14, 110:5,
  130:14
preempted. 68:4
preempting 32:25,
  67:1
preemptive 114:14
preempts 29:16,
  33:5, 34:19,
  34:25, 67:8
preliminary 7:13,
  29:2, 61:21,
  75:15, 152:24
premier 49:7
premise 123:12
premised 22:22
premiums 21:14,
  21:19, 21:21,
  21:25, 22:2,
  22:17, 23:1,
  108:21, 108:24,
  128:3
PREPA 14:7, 96:13,
  130:20, 130:22
prepared 49:12
preparing 153:14
prepetition 76:13,
  88:13, 89:20,
  108:8
Present 64:9, 64:10,
  64:15, 65:13, 97:2
presentation 126:24
presented 45:9,
  70:17
presently 23:23
preserve 69:5, 70:1
preserved 62:25
preserves 35:25,
  43:17
presiding 5:11
press 5:16, 6:4

pressing 35:11,
  89:11
presumption 70:22,
  71:1
pretty 21:6, 21:7,
  58:3, 63:15, 138:6
prevailing 75:2
prevent 132:21,
  139:16
previously 31:25,
  46:23, 54:2,
  152:15, 152:19
prima 125:25
Prime 6:20
principal 11:11,
  16:1, 49:6, 94:23,
  106:4
principle 29:19,
  31:1, 40:20,
  146:25, 149:15
principles 41:23,
  74:17, 74:20,
  76:16, 90:6,
  124:17, 140:6
prior 33:24, 34:15,
  43:5, 45:2, 46:2,
  69:10, 72:15,
  86:1, 90:21,
  102:18, 116:21,
  135:7, 150:1
priorities 33:24,
  35:21, 36:7,
  69:24, 89:11
priority 15:24,
  17:2, 34:24,
  34:25, 35:4,
  35:22, 36:4, 36:8,
  89:8, 89:20,
  130:16, 144:21,
  144:25, 146:11,
  146:13
Private 21:16,
  21:20, 22:17,
  23:6, 23:9, 68:10,
  108:21
privity 18:19
pro 82:1
probably 40:17
problem 78:17,
  92:11, 92:12

problems 21:22,
  61:7, 68:17
procedural 34:12
procedure 17:9
procedures 153:9
proceed 47:18, 66:9,
  78:9, 114:2
proceeding 61:18,
  125:7, 125:22,
  140:11
Proceedings 3:48,
  5:23, 6:7, 6:11,
  63:12, 70:18,
  113:22, 125:23,
  153:1, 154:12,
  155:6
proceeds 11:6, 11:8,
  19:7, 85:15,
  91:21, 100:23,
  120:20, 139:2
process 29:16, 34:6,
  34:13, 34:15,
  34:16, 67:7, 73:6
processes 67:23
procurement 14:4
produced 3:48, 52:9,
  91:22, 149:2
producers 43:4,
  95:24, 120:21,
  133:14, 133:24,
  134:12, 134:17,
  134:20, 134:22,
  135:8, 135:20,
  135:23, 136:18
production 136:14
products 23:8,
  23:20, 136:19
proffered 75:6
prohibited 66:12
project 71:7
PROMESA 1:8, 1:27,
  28:22, 32:16,
  32:19, 32:20,
  32:21, 33:5,
  33:11, 33:19,
  34:8, 34:10,
  34:17, 34:24,
  35:24, 66:20,
  66:23, 67:6,
  67:16, 67:17,

67:18, 67:20,
  67:23, 68:6,
  68:19, 84:24,
  109:14, 114:17
prominent 49:4
promise 37:4, 37:10,
  79:16, 81:12,
  81:22, 87:15,
  89:6, 110:12,
  129:3, 129:9
promised 58:15,
  80:6, 116:25,
  129:4, 129:5,
  131:1
promises 13:23,
  19:3, 50:24, 51:4,
  77:7, 79:12,
  80:11, 81:2,
  81:14, 81:15,
  87:11, 87:14,
  129:2, 129:8
promising 81:21
promote 49:7, 136:19
promptly 62:22,
  153:3
proof 21:15, 74:24,
  75:7, 76:1,
  139:19, 140:2,
  146:20
proper 58:22, 138:14
properly 72:1,
  143:10
proposal 127:18
propose 126:22,
  143:12
Proposed 35:8,
  83:11, 83:13,
  84:5, 125:3,
  126:12, 146:6
proposition 18:13,
  76:3, 85:7, 130:3,
  139:6
Proskauer 74:12,
  131:16
prospectively 139:24
protect 42:10, 136:6
protected 68:7,
  82:2, 94:10, 96:1
protection 145:21
protects 95:23

prove 75:2, 145:25
proven 94:7, 140:15
proverb 76:7
proves 147:1
Provide 10:11,
  21:15, 56:9,
  71:15, 71:19,
  80:4, 82:17,
  90:19, 127:19
provided 22:19,
  32:7, 77:3, 79:3,
  84:3, 105:13,
  127:20
provides 32:6,
  39:21, 69:23,
  82:24, 83:1, 83:5,
  90:11, 91:18,
  91:20, 95:16,
  95:19, 96:2, 99:4,
  99:7, 99:21,
  101:14, 103:12,
  132:12, 139:2,
  148:21, 150:4,
  151:11
providing 67:25,
  69:15, 83:16,
  94:9, 153:9
proving 103:8
provision 12:3,
  20:23, 26:23,
  33:11, 40:3,
  40:21, 40:22,
  41:14, 41:17,
  47:10, 57:24,
  77:19, 116:3,
  117:15, 132:21,
  135:18, 146:15,
  147:12
provisions 9:18,
  19:25, 32:15,
  32:23, 42:20,
  57:15, 67:17,
  127:9, 139:1
public 5:15, 6:4,
  6:20, 68:11, 83:1,
  83:3, 115:24,
  118:20, 144:25,
  145:14
publicly 45:22,
  152:19

punished 6:5
purchasers 121:1
pure 27:25, 43:21,
  53:12
purely 45:6, 54:9,
  54:10
purported 103:8
purporting 32:24
purpose 9:4, 22:17,
  22:24, 23:1,
  27:22, 28:14,
  71:7, 71:21, 97:9,
  130:12, 138:16
purposes 10:18,
  10:19, 11:13,
  15:17, 16:4,
  45:12, 47:21,
  48:21, 71:9,
  77:17, 83:17,
  83:20, 97:3,
  100:2, 101:21,
  110:24, 111:14,
  111:18, 113:6,
  122:1, 122:16,
  125:17, 125:23
purposes. 99:23
pursuant 19:12,
  57:15, 85:8, 91:2,
  118:22, 131:1,
  132:11, 139:1,
  147:7, 147:18,
  148:2
push 143:15
pushes 67:15
Put 24:9, 26:13,
  27:3, 39:14,
  39:17, 48:12,
  52:16, 58:11,
  61:10, 61:20,
  75:15, 93:19,
  93:20, 93:22,
  98:15, 103:1,
  105:4, 108:2,
  108:15, 152:23
puts 119:4
Putting 115:1,
  120:16, 152:23


< Q >

qualification 16:24,
  16:25, 17:2,
  103:14
qualified 10:20,
  15:18, 40:4,
  41:15, 99:8, 100:7
qualifier 132:16
qualify 17:17,
  41:13, 106:9
qualifying 41:9,
  41:16, 147:12
quality 108:1
questions 6:13,
  35:13, 36:8,
  47:16, 47:17,
  50:10, 61:7,
  73:20, 73:21,
  79:2, 110:14,
  136:22, 143:1,
  144:3, 151:2
quibble 140:5
quick 61:11, 151:5
quickly 58:17,
  114:10, 123:6,
  144:19
quid 82:1
Quincy 85:6
quite 9:11, 41:7
quo 82:1
quotation 85:19,
  86:4
quote 29:21, 30:5,
  91:11, 99:6,
  116:4, 116:7,
  121:12, 128:18,
  130:11


< R >

R4220 45:20
Radford 68:12
raised 30:24, 31:13,
  41:24, 70:18,
  85:22, 144:19
random 65:23
rank 80:18
Rather 44:20, 56:16,
  59:23, 67:2, 82:15
Re 1:6, 1:25, 5:8,
  27:20, 36:4, 73:1

re-deposited 40:15
reach 29:7, 30:19,
  114:18, 122:20,
  140:3
reached 104:5
read 25:18, 41:15,
  49:1, 81:19,
  91:10, 122:9,
  147:23
reading 26:14, 40:3,
  40:19, 57:23,
  69:9, 78:20,
  117:13, 118:14,
  140:4, 142:12
ready 114:2
reaffirmed 29:24,
  85:11
reality 120:3
really 29:10, 31:16,
  34:12, 48:14,
  79:3, 93:22,
  102:11, 124:15,
  127:7, 127:22,
  128:7, 131:2,
  133:20, 135:7,
  135:18, 140:5
reason 42:3, 46:23,
  77:3, 85:22,
  100:13, 107:22,
  107:25, 118:16,
  130:21, 132:3,
  132:8, 148:23
reasonable 75:2,
  75:16, 75:19
reasonableness
  30:22, 31:19
reasons 82:9, 84:22,
  88:6, 90:19,
  96:10, 103:23,
  109:2, 131:3
rebuttal 8:4, 8:13,
  27:11, 60:8,
  137:1, 137:2,
  137:5
recall 147:17
receipt 101:6
receipts 120:15
receivables 27:1,
  104:16, 142:16,
  142:18

receive 25:6, 25:9,
  61:19, 62:23,
  100:7, 104:17,
  126:9, 133:17,
  151:13, 151:15,
  151:20
Received 24:2, 25:7,
  25:10, 25:15,
  43:11, 45:23,
  60:22, 62:25,
  103:22, 104:18,
  104:21, 105:3,
  105:4, 106:9,
  106:15, 123:25,
  124:1, 135:2,
  142:6
recent 46:1
recess 63:11, 113:21
recites 96:4
reclaiming 73:14
recognize 34:24,
  80:25, 116:17,
  141:8
recognized 115:17,
  115:18, 116:1,
  139:14, 150:8
recognizes 35:24
reconcile 132:23,
  138:23
reconvened. 63:12,
  113:22
record 6:8, 18:6,
  44:21, 45:8,
  51:23, 55:25,
  61:17, 61:25,
  62:14, 62:20,
  108:16, 126:3,
  133:12, 133:18
recorded 3:48,
  152:14
recording 6:2
records 56:5
recourse 13:6, 13:8,
  13:9, 13:10,
  14:20, 18:20,
  138:24
recurring 75:11
red 52:9
redefine 42:16
reduce 12:20, 59:21

refer 27:19, 52:4,
  92:14, 100:18,
  129:7, 146:3
reference 17:2,
  93:6, 93:18,
  98:22, 147:23
references 38:11,
  134:23
referred 102:21,
  120:23, 122:7,
  127:16, 143:5,
  148:7
referring 79:4,
  96:14, 120:24,
  130:19, 147:13
refers 45:16, 57:25,
  58:4, 92:3, 92:14,
  92:17, 100:12
reflect 46:4, 98:3,
  98:5
reflected 43:19,
  55:3, 62:5, 149:1
reflects 98:9,
  135:19, 138:14
refrained 133:21
refusing 87:8
refuted 82:8
refutes 14:24, 76:6,
  82:20
regarding 5:19,
  35:21, 54:15,
  70:11, 114:17,
  130:20
regardless 33:20,
  77:13, 97:7
regards 104:14
regular 11:3, 13:19
regulations 14:5
regulatory 130:22
rejected 29:23,
  30:2, 67:9
rejecting 90:24
rejection 76:22
rejects 90:9
relate 8:9, 120:13
relates 35:22
relating 7:14, 7:21,
  8:12, 102:13
relationship 135:17
relationships 134:12

relative 33:23
relegate 133:24
relevance 96:11,
  108:14
relevant 39:14,
  39:18, 53:14,
  54:5, 56:7,
  111:13, 118:15,
  126:7
reliance 58:23,
  72:22
relief 7:14, 16:8,
  27:5, 75:5,
  110:25, 111:1,
  111:18, 126:6,
  143:12
relies 34:3, 72:10,
  90:8, 90:9
relieves 118:5
rely 21:9, 24:7,
  90:7, 119:6
relying 62:7, 70:22,
  130:10, 130:15
remaining 6:25,
  113:13
remedies 81:3,
  110:2, 110:4
remedy 30:20, 77:15,
  110:11
remind 5:25, 65:18
reminded 60:12
reminiscent 21:22,
  110:1
remove 24:24
render 41:21
renders 82:13
renew 23:7
renewing 21:14,
  23:18
repaid 21:2
repay 13:5, 23:16
repayment 10:24,
  116:18
repeal 85:2
repealed 37:16
repealing 73:16
repeat 5:19, 70:14
repeatedly 68:9,
  114:22, 135:1
repeating 76:3

replacement 69:15
Reply 76:4, 103:14,
    133:19
report 63:2, 63:6,
    96:9, 97:4
Reporter 106:22,
    155:15
representative 1:13,
    1:32, 5:10, 45:14,
    47:3, 74:13,
    131:17
represents 49:5
reprioritize 35:19
reprogram 34:14
reprogramming 72:14
request 62:19,
    83:24, 87:7, 98:1,
    134:19
require 31:5, 44:9,
    67:13, 97:9
required 24:21,
    44:18, 45:1, 46:7,
    50:15, 57:14,
    67:25, 72:16,
    75:5, 76:24,
    82:24, 91:25,
    100:23, 104:25,
    126:10, 138:1,
    142:23, 146:7,
    146:20, 148:19
requirement 13:15,
    13:18, 72:21,
    92:17
requirements 12:9,
    55:13
requires 33:23,
    36:25, 47:7,
    54:14, 58:10,
    72:19, 81:2,
    81:15, 94:11,
    94:20, 95:9,
    95:12, 100:6,
    102:5, 105:2,
    126:8, 134:13,
    145:11, 146:18
requiring 76:18,
    77:4
reroute 113:4
reserve 8:13, 15:25,
    16:11, 59:17,

    66:13, 83:24,
    95:1, 95:4, 95:10
reserved 81:9
residents 9:8
residual 50:6,
    140:17
Resolution 45:7,
    57:10, 90:25,
    104:15, 104:20,
    104:22, 104:24,
    105:1, 105:2,
    105:3, 106:8,
    142:21, 143:4,
    143:7, 143:9,
    143:10, 144:9,
    147:23
resolutions 11:17,
    15:24, 15:25,
    16:9, 16:16,
    17:20, 26:22,
    103:12, 103:17,
    106:13
resolve 97:4, 126:3,
    126:4
resolves 38:18
resolving 51:22,
    125:17, 140:10
resources 20:2,
    25:25, 83:4, 83:9,
    89:7, 116:9,
    126:16
respective 148:17
respond 27:17,
    59:25, 64:9,
    75:25, 133:23,
    144:19
responded 101:16
response 27:17,
    28:5, 79:1, 99:12,
    144:15, 152:5
response. 60:17,
    60:20
responses 152:8
rest 59:7, 85:21,
    131:5, 134:17,
    140:19, 140:21
restricted 50:15,
    59:19, 97:8,
    97:12, 98:10,
    121:7

restricting 102:9
restriction 42:15,
    59:16, 59:19,
    121:10, 121:16
restrictions 98:16,
    121:13
restrictive 37:23
restricts 54:3
restructure 68:3,
    71:3
restructuring 29:16,
    51:15, 68:14,
    116:2
rests 40:2, 46:10
result 30:19, 42:18,
    76:17, 77:1,
    79:20, 79:22,
    105:6, 106:17,
    108:10
results 28:13
resume 7:8, 113:12
retain 87:6
retained 18:14,
    28:25, 37:7
Retains 49:15
retention 82:14,
    82:21, 135:16
retired 28:10
retirement 72:17
retransmission 6:2
return 136:25
returned 108:22,
    108:25
reveals 69:21
reversionary 83:9,
    84:1, 84:3, 145:18
review 101:24
reviewed 39:8
revised 105:12
revision 105:21
revolve 72:18
rewrite 33:18
ringing 12:14
ripe 29:6, 45:7,
    109:1
rise 103:10
risk 26:4, 26:5,
    26:8, 26:11
roads 16:7
role 28:1, 49:4,

49:7, 49:9
roll 32:23
Roman 91:12
Rose 74:12, 131:16
round 49:11
route 131:23
rule 6:5, 6:12,
  35:20, 36:2, 75:4
ruled 75:14, 77:12
rules 105:16, 140:12
ruling 85:22, 90:22,
  140:7
rulings 35:7
run 148:23
running 47:14

< S >
S. 2:18, 3:8
S/ 155:13
safe 154:8
safely 134:16
sales 19:17, 59:3
salient 9:18
sample 44:4
San 5:1, 74:16
sanctions 6:5
satisfaction 62:6
satisfied 30:9,
  83:22
satisfied. 88:2
satisfies 12:9
save 146:18
saying 17:16, 17:25,
  25:17, 34:13,
  40:14, 89:17,
  111:9, 121:8,
  121:11, 129:12,
  129:17, 130:7,
  136:10, 149:13
says 11:8, 12:21,
  21:4, 32:5, 40:11,
  48:6, 49:1, 50:2,
  85:12, 86:7, 89:6,
  89:25, 101:18,
  130:11, 130:23,
  137:22, 138:1,
  142:10, 142:11,
  142:18, 147:23
SC-735 25:1

scenario 49:21
schedule 7:11
scheduled 153:6,
  153:7
scheme 22:18, 71:12
scope 38:7, 41:13,
  138:23, 141:5
Scotiabank 52:3,
  52:4, 52:25,
  53:11, 53:16,
  53:19, 53:25,
  54:18, 55:9, 57:7,
  123:13, 123:24,
  150:23
screen 52:16, 64:5
screens 52:15
scroll 39:4
Second 13:13, 15:19,
  29:13, 36:22,
  37:21, 41:8,
  54:25, 70:15,
  75:23, 78:5,
  83:23, 88:5,
  88:16, 92:11,
  94:14, 102:4,
  115:22, 127:23,
  128:10, 128:11,
  128:15, 130:21,
  140:9, 141:24,
  144:25
seconds 150:17,
  153:23
Secretary 10:21,
  44:3, 72:23, 73:1,
  73:2, 82:24,
  127:25
Sections 67:23,
  71:14, 91:2,
  94:15, 104:22,
  147:8, 147:19,
  148:2
secure 14:19, 137:23
secured 15:14,
  15:19, 23:13,
  29:3, 35:23, 38:2,
  78:17, 79:6,
  79:16, 95:18,
  95:19, 111:19,
  134:3, 134:15,
  137:11, 152:3

securing 116:18
seeing 140:8
seek 134:9, 143:12
seeking 16:8, 47:23,
  143:22
seem 57:23
seemingly 106:16
seems 22:21, 30:19,
  32:17, 34:18,
  42:18, 78:8,
  78:21, 93:5,
  125:12
seen 54:13
sees 59:12, 98:8
segregate 120:17,
  122:2
segregated 122:23
seizing 16:14
SELDEN 103:25,
  104:1, 131:10,
  131:12
select 5:23
selective 35:5
sells 22:12
semicolon 85:20
send 37:8, 98:2,
  98:7, 102:22
Sending 56:15,
  108:19
senior 51:1
sense 13:5, 17:6,
  21:16, 22:21,
  71:1, 76:17,
  77:14, 78:16,
  100:1, 110:12,
  113:5, 118:23,
  147:1, 151:19
senses 142:7
sent 98:8, 141:20
sentence 49:2,
  58:11, 85:21,
  86:4, 86:6
separate 10:25,
  13:16, 24:12,
  25:23, 29:10,
  74:6, 100:8,
  139:7, 139:8
separated 90:22
separates 91:14
sequence 135:20

sequitur 131:2
series 29:10, 136:12
Serralles 43:8
service 26:7, 59:17,
  94:21, 95:6,
  121:9, 122:13,
  123:23, 126:10,
  126:13, 146:12
service. 29:1
Services 3:5
set 6:17, 15:23,
  23:2, 27:7, 34:17,
  46:14, 52:19,
  71:16, 115:7,
  124:17, 140:3,
  146:13
sets 9:18, 28:12,
  34:13
settled 77:25, 87:24
Seven 43:7, 43:10,
  71:14, 81:7
several 82:9, 91:7
severely 18:25
shall 10:21, 11:9,
  11:10, 11:20,
  15:20, 16:22,
  16:24, 21:4,
  39:24, 68:10,
  71:20, 83:3,
  94:10, 99:5, 99:6,
  99:8, 99:22,
  100:6, 100:8,
  101:14, 117:1,
  117:2, 130:11,
  132:13, 148:17
share 8:13, 80:18,
  100:12
shares 81:16
sharp 115:6
sheet 39:8, 48:7,
  98:1, 98:5, 98:9
sheets 97:19, 97:22,
  98:15
shore 101:6
short 116:15, 117:16
shortcomings 124:8
shorter 127:1
shortly 69:13
show 55:22, 73:3,
  75:11, 75:16,

95:21, 98:15,
  98:18, 103:10,
  120:1, 120:12,
  124:13, 140:20,
  140:25, 141:1
showing 45:19,
  125:11
shown 102:14
shows 15:4, 43:21,
  64:5, 86:25,
  95:25, 96:21,
  100:14, 136:15,
  150:1
side 62:24, 78:9
signature 25:1,
  25:3, 25:4
signed 13:25, 16:16,
  26:8, 130:4,
  141:13, 141:14
significant 28:18,
  67:8, 68:6, 83:18
significantly 46:2
silenced 130:4
similar 28:12, 86:12
Similarly 16:23,
  104:23, 123:24,
  147:2
simple 36:19, 41:5
simpler 47:21
simply 17:25, 21:21,
  22:8, 25:4, 28:23,
  29:6, 34:2, 35:5,
  35:8, 37:16,
  49:23, 82:7, 85:9,
  87:19, 93:4,
  94:14, 99:10,
  114:18
single 24:1, 25:14,
  45:15, 54:3,
  150:15
sitting 5:11, 93:16
situation 21:23,
  119:23
situations 85:3
Six 9:17, 71:14,
  91:11, 92:9, 149:6
slender 18:14
slice 59:5, 59:6
Slide 39:7, 40:10,
  40:13, 43:7,

43:10, 43:19,
  44:5, 44:14, 47:9,
  48:2, 52:5, 52:7,
  52:23, 55:3, 57:7,
  58:9, 148:21,
  149:1
slides 43:7, 106:21,
  107:13
slightly 52:8
small 59:5
so. 77:20
Social 40:22
sold 91:22
sole 13:10, 116:7,
  138:16
solely 11:10, 11:21,
  72:4, 82:18,
  130:11
Solutions 5:24
solve 92:11, 98:10
somebody 11:22
somehow 69:4, 79:6,
  101:4, 102:3,
  118:23
someone 20:7, 54:11,
  93:12, 93:18,
  99:18, 107:1
sometimes 81:3,
  102:21, 120:8
soon 74:16, 101:11,
  152:6
sophisticated 37:1
Sorry 17:14, 58:20,
  60:18, 65:2, 65:3,
  65:17, 65:21,
  88:17, 92:22,
  93:2, 106:22,
  107:25, 109:5,
  116:12, 117:10,
  117:11, 121:18,
  137:3, 147:16,
  148:4, 153:24
sort 48:10, 53:5,
  115:7, 116:15,
  119:20, 135:17,
  144:18, 147:20,
  151:10
Sound 7:1, 7:2,
  108:1, 109:6
sounding 107:22

sounds 94:18
sour 150:8
source 69:4, 69:14
sources 49:6
spaghetti 36:14
spare 46:13
spatially 115:19
speaker 6:6, 6:17,
  6:22, 6:24, 74:2
speakers 126:22
speaking 5:14, 5:22,
  7:23, 8:22, 27:13,
  27:16, 65:18,
  66:2, 66:5, 66:6,
  106:23, 106:24,
  106:25, 107:8
specific 11:23,
  24:17, 27:22,
  30:21, 41:8,
  41:14, 44:10,
  47:17, 50:10,
  67:17, 71:7,
  71:21, 72:20,
  74:21, 80:4,
  115:2, 115:3,
  116:16, 117:17,
  120:6, 147:18
Specifically 10:23,
  32:15, 40:22,
  41:1, 44:24,
  72:16, 73:17,
  77:6, 80:2, 80:20,
  88:12, 93:3,
  97:17, 109:16,
  109:20, 138:24
specificity 20:4,
  120:10, 147:11
specified 7:6,
  103:13, 103:19,
  137:25
speculate 117:23
speculation 53:12
speculative 46:17,
  83:11
spelled 84:23
spend 8:10, 59:22,
  59:23, 69:11
spending 33:18,
  33:20, 34:7
spends 48:20

spent 33:8, 34:14,
  61:23, 113:16
spoke 54:11, 106:25
spring 110:6
springing 62:9
staff 153:12, 153:18
staggering 136:12
stand 34:15, 54:6
standard 17:9,
  74:24, 75:10,
  139:19, 140:2,
  140:6, 140:9
standards 140:3
standing 8:8, 8:10,
  8:24, 18:21,
  18:25, 29:3,
  72:24, 75:1,
  101:22, 101:23,
  102:21, 110:16,
  110:17, 110:20,
  110:24, 111:5,
  111:16, 111:20,
  133:25, 134:17
stands 115:6
star 53:20
start 6:7, 7:25,
  8:8, 8:15, 9:22,
  10:15, 27:15,
  74:17, 90:24,
  123:12, 139:5
started 110:25,
  149:13
starting 60:9, 93:9,
  96:22
starts 60:23
state 25:25, 30:9,
  58:17, 67:24,
  71:6, 71:8, 72:12,
  76:17, 86:7,
  86:17, 118:18
stated 56:4, 73:13,
  144:21
statement 15:17,
  48:22, 48:25,
  58:23, 69:1,
  84:10, 91:13,
  91:17, 119:7,
  119:13, 119:25
statements 25:16,
  25:20, 26:4, 26:6,

35:1, 44:19, 46:3,
  84:16, 96:10,
  119:10
States 1:1, 2:4,
  2:6, 67:16, 71:11,
  76:18, 77:12,
  81:6, 91:23,
  116:4, 148:16,
  155:7, 155:8
stating 49:14, 67:9
status 14:11, 29:3,
  31:21, 63:5
statutory 11:21,
  12:10, 17:22,
  17:24, 19:25,
  22:18, 26:16,
  76:11, 76:19,
  77:15, 77:25,
  78:1, 84:19,
  87:16, 97:15,
  97:16, 102:2,
  116:15, 118:2,
  118:15, 127:9,
  137:13, 151:22
stenography 3:48
step 14:14
stick 18:14, 18:15,
  140:18
sticks 18:12, 18:16
stole 85:24, 85:25
stop 39:5, 87:8,
  110:13
stories 136:11
story 99:24, 101:12
stream 59:5, 75:4,
  82:3, 82:14,
  116:17, 117:18,
  134:11, 136:21,
  139:13
streams 14:18,
  23:15, 67:2, 70:2,
  76:12, 77:5, 84:13
strength 35:15
stress 141:10,
  141:19
string 51:7
strong 76:8
stronger 20:11
structure 19:18,
  30:13, 31:2,

43:17, 48:12,
71:18
struggling 123:7
subaccount 24:25
subaccounts 24:17,
 24:18, 24:19,
 94:22, 122:3,
 122:23, 141:22
submission 153:2
submissions 61:16,
 113:15, 124:7
submit 50:11, 89:9,
 96:10, 144:10
submits 75:1
submitted 9:14,
 38:22, 60:14,
 61:16, 62:5
subordination
 134:24, 135:17,
 136:8
subportions 143:17
subsection 10:15,
 20:21
subsequent 8:1,
 15:18, 30:4,
 116:19
substance 29:9,
 74:23, 76:7
substantial 116:14
substantive 31:9
substantively 88:21
substitution 95:2
succeeded 103:7
success 125:11,
 125:15, 125:18,
 125:20, 135:13,
 136:11
successor 54:1
sue 85:14, 129:21
Suffice 101:17,
 105:15
sufficient 12:8,
 26:7, 50:4, 126:5
suggest 25:20,
 48:22, 52:2
suggested 84:16,
 119:13
suggesting 28:22,
 34:2, 138:4
suggestion 33:19,

146:16, 148:18
suggests 69:3
suit 47:23
suite 48:1
suits 68:16
sum 18:11, 28:12
summarize 92:10,
 111:24
summary 91:13,
 125:22, 140:11
sums 76:8
superb 153:14
supercede 68:18
superfluous 40:7,
 93:6, 93:8
supervision 49:5
Supp 145:3
supplant 67:20
supplement 67:20
Supplemental 62:1,
 142:20
Support 21:12,
 31:19, 37:15,
 45:10, 54:13,
 54:25, 121:8,
 124:7, 134:19,
 134:25, 137:17,
 146:23, 153:15
supported 19:15,
 53:17, 70:25,
 76:16
supports 33:22,
 46:9, 58:25,
 150:15
suppose 113:5
supposed 61:8,
 63:16, 111:8
supremacy 76:25
Supreme 29:23,
 29:25, 30:1, 32:9,
 37:13, 40:20,
 41:2, 41:20, 68:9,
 68:24, 72:25,
 77:12, 85:11,
 86:16, 91:6, 133:6
Sur-reply 28:21,
 28:24, 49:14,
 53:19, 75:25,
 97:5, 119:12
Sur-sur-replies 85:5

Sur-sur-reply 75:23,
 77:24, 82:16,
 87:18, 94:1
surplus 53:21,
 53:22, 54:17,
 54:18, 55:6, 56:4,
 56:8, 56:15,
 56:21, 82:25,
 83:2, 112:4,
 123:16, 123:18,
 123:24, 123:25,
 126:8, 126:11,
 126:13, 150:20
surplusage 142:14
surprised 25:19
suspenders 38:6,
 38:9
Swain 2:3, 5:11,
 5:14, 113:23,
 155:7
synonymous 88:21
System 24:16, 72:17,
 91:2, 120:15,
 147:7, 148:2
systems 121:12


< T >
TACORONTE 5:6, 5:7
tagged 120:18
taken. 63:11, 113:21
talked 26:21
talks 139:24
tardes 114:5
tax. 76:2
taxation 30:7, 88:1
taxing 19:10, 19:11,
 19:13, 19:20,
 30:3, 50:6, 58:19
Taylor 2:3, 5:11,
 155:7
technological 153:17
teenage 41:3
telephone 5:24
telephonic 5:16,
 5:20
TELEPHONICALLY 2:10,
 153:8
tells 10:20, 41:1,
 119:16, 128:13

ten 7:8, 60:10,
   60:23, 63:10,
   74:9, 126:25
ten-minute 60:6,
   60:9, 66:2
term 39:25, 40:8,
   40:17, 41:9,
   41:10, 131:20
terminate 100:14,
   100:16
terms 72:7, 105:1,
   112:15, 121:24
Territorial 28:24,
   33:6, 67:20
territory 67:18,
   76:18
test 137:21, 141:4
testified 45:14,
   47:4, 54:11, 55:4,
   122:4
testimony 100:17,
   101:3, 149:14,
   152:14
text 32:20, 120:24,
   126:7
thankful 7:11
Thankfully 37:10
Thanks 52:17, 108:4
theme 19:1, 75:11
themselves 9:11,
   26:7, 31:18,
   32:10, 96:1,
   106:23, 115:10,
   115:15, 121:14,
   154:4
theoretical 31:4
theories 56:19
theory 35:2, 40:2,
   54:14, 55:1,
   101:4, 134:8
thereby 34:25, 83:16
therein 45:12
thereof 83:3, 91:4,
   147:6, 148:1
thereon 139:1
thereunder 91:4,
   146:11, 147:7,
   148:1
they'll 110:21
They've 24:12,

41:24, 113:2,
   125:25, 141:20,
   144:1
thinking 148:4
Third 13:15, 29:15,
   56:2, 84:23, 95:16
third-party 96:3,
   135:25
Thomas 40:21
though 11:24,
   114:22, 120:25,
   145:17
thousands 113:15
Three 7:13, 8:11,
   29:10, 45:9,
   45:21, 48:14,
   57:8, 71:22,
   74:21, 76:9,
   81:13, 82:13,
   82:16, 82:23,
   83:5, 85:3, 89:19,
   96:10, 98:14,
   105:22, 108:10,
   111:8, 111:9,
   111:11, 111:13,
   111:17
throughout 21:11
thunder 85:24
tie 128:10
tie-in 128:23
timekeeper 27:8
timing 7:7, 8:19
Today 5:16, 5:18,
   5:20, 7:13, 27:14,
   29:6, 35:10, 36:2,
   66:18, 68:17,
   74:25, 75:22,
   85:5, 103:5,
   111:5, 146:4
together 26:14,
   27:3, 39:14,
   48:12, 74:16,
   127:9, 153:20
toll 16:7, 27:1,
   110:18
tolls 9:8, 15:23,
   16:11, 20:16,
   26:7, 26:10, 27:1,
   27:4, 102:15
took 26:11

tools 67:14
top 15:24, 97:25
topic 70:20
topped 16:2, 16:12
totally 79:5, 93:12,
   100:1, 100:19,
   102:25, 108:19,
   149:12
touch 47:22, 58:18,
   104:4
touched 145:5
touchstone 115:9
Tourism 48:17,
   48:18, 48:19,
   48:22, 49:3, 49:4,
   49:7, 49:10,
   49:14, 49:15,
   49:17, 50:5,
   52:25, 55:16,
   55:21, 56:4, 57:8,
   58:12, 58:25,
   59:10, 59:16,
   59:22, 59:23,
   76:12, 112:18
traceable 152:16
track 6:22, 6:23,
   97:6
tracked 24:18,
   24:19, 44:24
tracking 121:13
transaction 9:10,
   19:4, 19:5, 20:13,
   20:17, 134:2
transactional 135:22
transactions 74:19,
   76:9
Transcript 3:48,
   6:11, 155:4
transcription 155:5
transferred 11:2,
   18:16, 23:25,
   25:7, 25:13,
   43:13, 52:24,
   57:25, 58:4,
   91:23, 102:3,
   111:8, 122:12,
   135:9, 140:19,
   151:18, 151:21
transferring 49:24
transfers 12:4,

44:1, 44:6, 47:12,
78:12, 84:12,
96:24, 112:16
transition 105:16
transmitted 13:19
Transportation 1:35,
10:18, 11:2, 11:5
trap 124:20
Treasury 13:19,
21:21, 24:1, 25:3,
25:4, 25:14,
25:22, 44:3, 71:7,
71:8, 82:24,
118:17, 120:14,
121:9, 134:5,
134:10, 135:9
treated 24:8, 73:4,
80:1, 80:16,
80:17, 80:19
treatment 35:18,
130:15
tried 39:17, 115:17
triggered 145:14,
145:20, 145:22,
146:9
trillion 37:10
TRINIDAD 3:9, 70:7,
73:23
trip 49:11
trouble 48:11
true 15:13, 59:10,
110:8, 129:19,
134:8, 137:11,
152:11, 155:5
Trustee 22:3, 22:4,
38:3, 38:13,
38:15, 39:12,
39:22, 42:2, 94:3,
94:6, 94:10,
94:11, 94:19,
94:24, 95:3, 95:5,
95:7, 95:9, 95:11,
95:14, 95:23,
96:7, 119:8,
127:20, 130:24,
135:21, 148:14,
148:19
trustees 84:11,
84:14
trusts 128:20

truth 62:8
try 15:1, 36:18,
105:24, 111:24,
131:18, 144:18
trying 14:15, 14:16,
35:13, 60:25,
62:18, 63:4, 64:5,
131:23, 141:7,
141:14, 141:15
TSA 44:23, 45:13,
46:9, 96:25,
97:23, 98:7,
100:4, 100:10,
122:19, 135:10
turn 11:4, 12:15,
27:7, 32:4, 34:22,
36:9, 38:24,
39:24, 47:14,
47:15, 65:25,
70:3, 71:18,
73:24, 90:5,
132:12, 133:9,
139:2
turning 48:6, 143:11
turns 69:11, 121:10
twice 31:25
two-day 153:4
two. 66:19
tying 150:16
type 24:20, 108:17,
111:4
typified 81:17


< U >
UCC 74:10, 95:16,
105:11, 126:21,
138:1
UCC-1 142:15, 142:17
ultimate 49:21,
50:16
ultimately 27:4,
28:6, 121:14,
140:7, 143:16,
152:1
unable 21:20
unartfully 42:19
unavailing 68:5
unclear 46:16
undercut 17:25,

119:1
undercuts 19:1
underlying 51:20
undermine 34:1
understand 46:15,
53:6
understandable
93:12, 100:19,
100:20
understanding 7:12,
122:6
Understood 7:25,
8:17, 15:5, 19:6,
100:17, 122:5,
144:16
undertaking 79:9
undisputed 49:10,
84:7
undone 116:19
unencumbered 83:16
unequivocally 29:23,
135:3
unfortunately 52:15
unfounded 114:20
unidentified 89:22
Uniform 105:9
unintentional 86:6
unique 74:19, 141:22
United 1:1, 2:4,
2:6, 71:11, 76:18,
77:12, 91:22,
155:6, 155:8
unjust 134:24
unlawful 33:5
unless 11:8, 36:8,
47:16, 73:20,
136:22, 151:1
unlike 26:3
unlikely 145:20
unmistakable 115:24
unmute 65:4
unmuted 61:3, 137:4
unmuting 153:23,
154:3
unnecessary 33:12,
51:15
unrelated 55:10
Unsecured 2:16,
13:23, 19:3,
28:23, 29:5,

35:23, 76:14,
77:8, 78:11,
78:15, 79:17,
79:19, 80:12,
81:15, 89:9,
89:21, 108:8,
110:7, 129:1,
137:15
Until 7:9, 12:24,
15:8, 16:25, 17:1,
30:9, 33:13,
36:23, 37:8, 38:2,
66:14, 76:20,
82:3, 88:2, 95:18,
135:8, 149:22
uses 40:8, 83:12
usual 5:19


< V >
v. 40:21, 69:1,
69:18, 77:11,
85:6, 85:7, 87:19,
87:21
vagueness 147:13
Valdes 66:17, 70:9
valid 26:25, 68:19,
68:22, 71:25
validity 70:13,
105:13
value 69:15, 69:16
variety 89:8
various 15:25,
23:20, 49:12,
61:16, 62:1,
70:12, 97:21,
147:7
Vazquez 34:5, 34:11,
72:11, 72:14
vehement 114:20
vehemently 28:19,
114:12
vehicle 21:15
venerable 76:16
version 52:8
versus 29:25, 145:2
VI 17:17, 71:14,
82:22, 116:10
via 30:19
viability 140:9

view 8:6, 20:12,
23:4, 67:6, 67:9,
104:19, 106:12,
128:8
violate 31:24,
68:25, 133:3
violating 32:2,
132:22
violation 30:19,
77:16, 132:18
Violations 6:4
virtually 80:5,
110:5
virtue 50:6
visit 139:14
voices 107:22
voila 127:10
voluntary 103:2
Von 30:1, 30:18,
30:21, 31:15,
85:6, 85:16,
85:19, 86:4,
86:15, 86:22,
86:23, 86:25,
87:2, 87:3, 87:7,
87:20
voucher 25:1


< W >
wait 65:4
waited 153:22, 154:4
waiting 153:25
waiver 129:12,
129:13, 129:15,
130:7, 130:8
Walker 155:13,
155:14
wall 36:15
wanted 14:9, 33:19,
58:18, 59:25,
61:24, 73:11,
96:1, 98:16,
107:13, 108:15,
109:9, 131:19,
133:6
wants 18:10, 55:20,
120:4, 124:22
warn 26:4, 26:5
warranted 31:7

waste 76:3
water 83:20
waterfall 11:17,
15:23, 16:3, 16:6,
16:11, 135:11,
135:18, 143:23
ways 10:10, 53:9
weakest 76:8
weakness 137:8
week 32:9, 63:2,
77:24
weight 150:14
Welcome 5:14, 31:12,
39:16, 52:18,
136:24
well-accepted 40:19
well-settled 85:11
Whatever 16:2,
18:10, 29:5, 93:4,
104:6, 104:7,
105:20, 111:20,
118:17, 137:15,
140:6, 143:23
whatsoever 16:25,
119:15, 121:7
whereas 72:20, 79:5,
89:5, 96:4, 111:22
whim 36:22
whole 12:2, 13:3,
19:1, 49:1, 81:19,
91:13, 99:24,
148:10, 150:25
wholly 68:11, 72:12
whom 83:13
wildly 69:9
win 86:3, 110:22,
124:16
wind 26:18
winners 35:9
wires 98:5
wise 78:22
wish 74:15, 85:25
withdraw 25:2,
94:20, 95:5, 95:6,
95:9
withdrawing 42:22,
43:1
withdrawn 30:9
withholding 45:3
within 38:7, 102:25,

105:21, 109:11,
120:14, 138:23,
143:17
without 9:9, 14:17,
23:21, 38:14,
46:11, 68:11,
68:22, 69:15,
88:24, 132:16,
143:9, 152:1
witness 54:11, 55:4,
122:4
WITNESSES 4:3
wonders 68:20
word 11:20, 11:24,
22:5, 22:6, 88:16,
88:19, 97:12,
100:11, 111:24,
117:17, 123:18,
142:7, 142:12
worded 42:19
words 22:4, 57:24,
79:4, 80:9, 82:4,
91:7, 91:8,
137:19, 137:25
work 71:15, 128:7,
152:23, 153:13
worked 20:17
working 52:15
works 11:16
world 68:21, 153:11
worried 85:24
worst 81:11
worth 23:12
write 68:15, 86:2
writing 52:9
written 153:3
wrote 90:24

< Y >
year 16:5, 18:12,
23:25, 25:13,
26:10, 34:15,
38:18, 43:12,
43:18, 44:2,
45:17, 71:17,
94:24, 102:24,
111:1, 133:17,
144:2, 146:8,
146:20, 149:22,

153:7
years 20:7, 29:23,
46:3, 53:23, 54:6,
56:14, 72:15,
98:14, 100:20,
102:19, 105:22,
143:17
yellow 53:20, 149:5,
149:7
Yesterday 5:17,
14:7, 29:11, 35:1,
109:7, 130:20
York 153:13
yourself 6:8
yourselves 65:5

< Z >
Zachary 2:18
zero 18:5
ZOUAIRABANI 3:9,
63:19, 64:14,
64:15, 66:6,
66:16, 66:20,
69:12, 70:4, 70:6,
70:7, 70:8, 73:23
Zwillinger 2:18,
65:7, 65:8, 126:21