Opposition Deadline:  July 8, 2020
Hearing Date and Time:  TBD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------------------- X

| | |
|---|---|
| In re: | ) |
| | ) |
| THE FINANCIAL OVERSIGHT AND | ) PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) Title III |
| | ) |
| as representative of | ) Case No. 17-BK-03283 (LTS) |
| | ) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.,* | ) (Jointly Administered) |
| | ) |
| Debtors.[1] | ) |

--------------------------------------------------------------------- X

| | |
|---|---|
| In re: | ) |
| | ) |
| THE FINANCIAL OVERSIGHT AND | ) PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) Title III |
| | ) |
| as representative of | ) Case No. 17-BK-03566 (LTS) |
| | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF THE COMMONWEALTH OF | ) |
| PUERTO RICO, | ) |
| | ) |
| Debtor. | ) |

--------------------------------------------------------------------- X

## CLAIMANTS' MOTION FOR JUDGMENT
## ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-03283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-03284- LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-03567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-03566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-04780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-05233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 2

    A.    ERS ................................................................................................ 2

    B.    Pension Funding Bonds Issued by ERS ................................................ 3

    C.    PROMESA and the Post-Petition Legislation ........................................ 4

    D.    Procedural Background ....................................................................... 5

ARGUMENT ...................................................................................................... 7

    I.    Claimants May Assert Recourse Claims Against ERS ................................ 7

        A.    The Bankruptcy Code Provides Claimants with Recourse Claims ............ 7

            1.    Claimants Hold Recourse Claims Against ERS Pursuant to
Section 1111(b)(1)(A) ........................................................... 7

            2.    The Objectors Forfeited Any Objection to Application of
Section 1111(b) ................................................................... 8

            3.    The Plan-Sale Exception Does Not Apply ................................... 9

                a.    The Pledged Property Has Already Been Disposed
of by the Post-Petition Legislation .................................. 11

                b.    Even If ERS Could Sell Its Assets, the Purported
"Sale" Would Not Satisfy the Plan-Sale Exception ......... 12

                c.    The Plan-Sale Exception Does Not Apply Because
the Plan Does Not Purport to Sell All Claimants'
Collateral .................................................................... 15

        B.    Claimants Are Entitled to a Recourse Claim Against ERS for
Breaches of the Bond Resolution ...................................................... 16

        C.    Claimants Are Entitled to a Recourse Claim Against ERS Based
Upon ERS's Unconstitutional, Tortious, and Illegal Conduct ................ 21

        D.    Even if Claimants Are Not Allowed Recourse Claims Beyond the
Pledged Property, Their Unsecured Claims Remain Significant ............. 24

    II.    Claimants' Post-Petition Claims Are Entitled to Administrative Expense
Priority Under Bankruptcy Code Section 503(b)(1) And are
Nondischargeable ............................................................................... 24

        A.    Claimants' Post-Petition Claims Should Be Treated as
Administrative Expenses ................................................................. 25

1.    The Post-Petition Claims Meet the Requirements of Section
      503(b)(1)(A) ................................................................................. 25

2.    The Objections Should Be Rejected .......................................... 26

      a.    Administrative Expense Claims Are Allowable in
            Title III Cases ................................................................. 26

      b.    Claims Based Upon the Post-Petition Legislation
            Did Not Arise Pre-Petition ............................................. 30

            i.    All Claimants' Claims Against the
                  Commonwealth Arose Post-Petition ................... 30

            ii.   Claimants' Non-Contractual Claims Against
                  ERS Arose Post-Petition ...................................... 32

      c.    The Objectors' Other Arguments Are Not
            Persuasive ....................................................................... 33

B.    Even If the Claims Are Not Entitled to Administrative Expense
      Treatment, They Are Nondischargeable in this Proceeding. ................... 33

CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

CASES

*APG, Inc. v. MCI Telecomms. Corp.*,
   436 F.3d 294 (1st Cir. 2006)..................................................................31

*Baum-Holland v. El Conquistador P'ship L.P., S.E.*,
   336 F. Supp. 3d 6 (D.P.R. 2018)............................................................23

*Blackie v. State of Me.*,
   75 F.3d 716 (1st Cir. 1996)....................................................................20

*Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*,
   961 F. Supp. 353 (D.P.R. 1997).............................................................23

*Cen-Pen Corp. v. Hanson*,
   58 F.3d 89 (4th Cir. 1995) .......................................................................8

*Delphi Indus., Inc. v. Stroh Brewery Co.*,
   945 F.2d 215 (7th Cir. 1991) .................................................................22

*Dewsnup v. Timm*,
   502 U.S. 410 (1992)..................................................................................8

*Duluth Lighthouse For The Blind v. C.G. Bretting Mfg. Co.*,
   No. 99-1601 JRT/RLE, 2001 WL 1640079 (D. Minn. Sept. 25, 2001) ............................18, 21

*FDIC v. W.R. Grace & Co.*,
   877 F.2d 614 (7th Cir. 1989) .................................................................22

*First Indep. Bank of Nevada v. Mohave State Bank*,
   No. CV-09-8195-PCT-PGR, 2010 WL 1408890 (D. Ariz. Apr. 7, 2010)................17, 18, 20

*Henson v. Santander Consumer USA Inc.*,
   137 S. Ct. 1718 (2017)...........................................................................34

*In re 680 Fifth Ave. Assoc.*,
   29 F.3d 95 (2d Cir. 1994) .......................................................7, 8, 15, 16

*In re Abercrombie*,
   139 F.3d 755 (9th Cir. 1998) ............................................................31, 32

*In re Advanced Cellular Sys., Inc.*,
   483 F.3d 7 (1st Cir. 2007) ........................................................................21

*In re Arch Wireless*,
   332 B.R. 241 (D. Mass. 2005) ................................................................34

*In re B.R. Brookfield Commons No. 1 LLC*,
   735 F. 3d 596 (7th Cir. 2013) ..............................................................8, 15

*In re Charlesbank Laundry, Inc.*,
   755 F.2d 200 (1st Cir. 1985).................................................................2, 25

*In re City of Detroit, Mich.*,
   548 B.R. 748 (E.D. Mich. 2016)...............................................................35

*In re City of San Bernardino*,
   558 B.R. 321 (C.D. Cal. 2016) ...............................................................26

*In re Constitution Plaza Associates Ltd. P'ship*,
   161 B.R. 563 (D. Conn. 1993)..................................................................15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   914 F.3d 694 (1st Cir. 2019).............................................................2, 3, 8

*In re GT Advanced Techs., Inc.*,
   547 B.R. 3 (D.N.H. 2016).......................................................................31

*In re Hemingway Transp., Inc.*,
   954 F.2d 1 (1st Cir. 1992)........................................................31, 32, 33

*In re Kent Terminal Corp.*,
   166 B.R. 555 (Bankr. S.D.N.Y. 1994)......................................................13

*In re Mammoth Mart, Inc.*,
   536 F.2d 950 (1st Cir. 1975).......................................................25, 31, 32

*In re Matrix Dev. Corp.*,
   No. 08-32798-TMB11, 2009 WL 2169717 (Bankr. D. Or. July 16, 2009)...........12, 13, 14, 16

*In re Midway Investments, Ltd.*,
   187 B.R. 382 (Bankr. S.D. Fla. 1995) ......................................................13

*In re Montgomery Ward, LLC*,
   634 F. 3d 732 (3d Cir. 2011)....................................................................13

-iv-

*In re New York Off-Track Betting, Corp.*,
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) .........................................................................26, 29, 30

*In re Stanley*,
    185 B.R. 417 (Bankr. D. Conn. 1995) ....................................................................................9

*In re Tampa Bay Assocs., Ltd.*,
    864 F.2d 47 (5th Cir. 1989) ..................................................................................................13

*In re Western Real Estate Fund, Inc.*,
    75 B.R. 580 (Bankr. W.D. Okla. 1987) ....................................................................13, 14, 16

*Jaffe-Spindler Co. v. Genesco, Inc.*,
    747 F.2d 253 (4th Cir. 1984) ................................................................................................22

*Kiefer v. Woolley*,
    210 F.3d 383 (Table), 2000 WL 59912 (9th Cir. 2000) ........................................................22

*Matter of DRW Prop. Co. 82*,
    57 B.R. 987 (Bankr. N.D. Tex. 1986)....................................................................................16

*People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*,
    814 F. Supp. 159 (D. Me. 1993) ...........................................................................................17

*Puerto Rico Tel. Co. v. SprintCom, Inc.*,
    662 F.3d 74 (1st Cir. 2011)...................................................................................................23

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..............................................................................................................13

*Reading Co. v. Brown*,
    391 U.S. 471 (1968)....................................................................................................... *passim*

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019) ............................................................................................................27

*Travelers Ins. Co. v. 633 Third Assocs.*,
    973 F.2d 82 (2d Cir. 1992)....................................................................................................22

*USX Corp. v. Prime Leasing Inc.*,
    988 F.2d 433 (3d Cir. 1993)...........................................................................................18, 21

**STATUTES**

3 L.P.R.A. § 763 ..................................................................................................2

3 L.P.R.A. § 779 ..................................................................................................3

3 L.P.R.A. § 781 ............................................................................................2, 3, 5

3 L.P.R.A. § 782 ..................................................................................................2

3 L.P.R.A. § 787 ..................................................................................................2

31 L.P.R.A. § 3019 ............................................................................................23

11 U.S.C. § 362 ..................................................................................................4

11 U.S.C. § 365 ................................................................................................29

11 U.S.C. § 503 ..........................................................................................25, 29

11 U.S.C. § 510 ................................................................................................29

11 U.S.C. § 550 ................................................................................................29

11 U.S.C. § 552 ................................................................................................29

11 U.S.C. § 727 ................................................................................................34

11 U.S.C. § 901 ................................................................................................27

11 U.S.C. § 902 ................................................................................................27

11 U.S.C. § 943 ................................................................................................12

11 U.S.C. § 944 ................................................................................................34

11 U.S.C. § 1111 .......................................................................................... *passim*

11 U.S.C. § 1129 ..............................................................................................29

11 U.S.C. § 1141 ..............................................................................................34

48 U.S.C. § 2161 ......................................................................................4, 10, 27

48 U.S.C. § 2175 ................................................................................................4

Act 106 ................................................................................................................. *passim*

Joint Resolution 188 ............................................................................................ *passim*

**OTHER AUTHORITIES**

Andrew Minear, *Unfortunate Consequences of A Patchwork Chapter* ............................ 28, 29, 30

COLLIER ON BANKRUPTCY ¶ 1111.03 (16th ed. rev. 2020) .................................................. *passim*

COLLIER ON BANKRUPTCY ¶ 901.04 (16th ed. rev. 2020) .................................................. 34, 35

Vazquez & Dauchter, *Restructuring a Municipality Under Chapter 9*,
    29 Aug. AMBKRIJ 50, 60-61 (2010) .................................................................................. 22

Williston on Contracts § 19:24 (4th ed.) .......................................................................... 23

## PRELIMINARY STATEMENT

Claimants[2] seek judgment as a matter of law on two issues central to the objections[3] lodged against their proofs of claim and motions for allowance of administrative expense claims:  First, whether Claimants' recovery is limited solely to their collateral.  And second, whether Claimants' post-petition claims are allowable as administrative expenses or are nondischargeable.  These issues are ripe for resolution as a matter of law, and should be resolved in Claimants' favor.

First, Claimants are not limited to recovery solely from their collateral.  Although the Bond Resolution provides that the ERS Bonds are limited recourse bonds, section 1111(b) of the Bankruptcy Code expressly overrides such provisions in prepetition contracts.  Moreover, courts have repeatedly recognized that limited recourse provisions such as those found in the Bond Resolution apply only to the claim for repayment of principal and interest on the underlying bonds, not to claims for damages for violation of other contractual rights.  Similarly, courts have also repeatedly held that limited recourse provisions in contracts do not bar recovery on non-contractual claims.  In any event, even if Claimants cannot assert recourse claims, they still possess significant unsecured claims based upon their contractual right to be paid from the Pledged Property.

Second, Claimants' post-petition claims are entitled to administrative expense treatment and are nondischargeable.  Claimants' claims meet the standards of 11 U.S.C. § 503 under *Reading*

---

[2] This motion is brought pursuant to Fed. R. Civ. P. 12(c) by certain beneficial owners of bonds issued by ERS represented by Jones Day, certain beneficial owners of bonds issued by ERS represented by White & Case, LLP, and The Bank of New York Mellon as fiscal agent for the bonds issued by ERS (collectively, "Claimants").  Fed. R. Civ. P. 12 is made applicable to this contested matter by PROMESA § 310, Fed. R. Bankr. P. 7012, and this Court's initial procedures order, Ex. 2, § 1 [ECF No. 8818 in Case No. 17-3283].  Capitalized terms used but not defined in this Motion have the meanings given in the ERS Bondholders' Supplement to Proofs of Claim and Motions for Allowance of Administrative Expense Claims [ECF No. 12536 in Case No. 17-3283] (the "Supplement").

[3] Objections were filed by the Financial Oversight and Management Board for Puerto Rico ("Oversight Board"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Official Committee of Retired Employees of the Commonwealth of Puerto Rico ("Retiree Committee"), and the Official Committee of Unsecured Creditors ("Creditors Committee," and, together with the Oversight Board, AAFAF, and the Retiree Committee, the "Objectors").

*Co. v. Brown*, 391 U.S. 471 (1968), and *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir. 1985). Moreover, even if Claimants' post-petition claims were held not to meet the requirements of section 503, they are nonetheless nondischargeable and can be pursued by Claimants after confirmation of the debtors' Title III plans.

## **BACKGROUND**

### A. ERS

The Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") "is a trust and government agency created in 1951 by an Act of the Commonwealth," and it "is structured to provide pensions and other retirement benefits to employees and officers of the Commonwealth government, members and employees of the Commonwealth's Legislative Assembly, and officers and employees of the Commonwealth's municipalities and public corporations." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d 694, 704 (1st Cir. 2019). ERS "is designated as 'independent and separate' from other Commonwealth agencies." *Id.*

Until legislation enacted on July 1, 2017, ERS was funded by employer contributions, employee contributions, and its investment earnings. *See, e.g.*, 3 L.P.R.A. §§ 763(42), 787f, 787q (2008). Employers were required to pay monthly contributions to ERS, and to cover any shortfalls between those contributions and the cost of accrued benefits. *See id.* §§ 781(d)-(e), 787, 782(d). ERS's "statutory right to receive [e]mployer[] [c]ontributions" was described in the operative contract as "an obligation of the [e]mployers and a legal asset of [ERS]." *See* Pension Funding Bond Resolution, at p. VI-1 (Jan. 24, 2008) ("Bond Resolution"), attached hereto as Exhibit 1.

The Commonwealth was ERS's largest participating employer. Historically, the Commonwealth was responsible for approximately 59 percent of employer contributions, while Puerto Rico municipalities and public corporations were responsible for the remainder. *See, e.g.*, Commonwealth of Puerto Rico, *Financial Information and Operating Data Report* 88 n.6, 130

(Oct. 30, 2014); Commonwealth of Puerto Rico, *Financial Information and Operating Data Report* 228 (Dec. 18, 2016).[4]  ERS had the statutory authority to compel the payment of unpaid employer contributions, and any contributions in arrears for more than 30 days had priority over any other outstanding debt of a public employer.  3 L.P.R.A. § 781a(h).  ERS also had the power to intercept or garnish a delinquent municipality's property tax revenues, and to obtain a certificate of indebtedness from the Puerto Rico Treasury Department for delinquent public corporation or agency contributions.  *Id.*  Puerto Rico law also provided for interest on delinquent contributions, which it called "debts," and imposed criminal penalties for the failure to remit employer contributions to ERS in a timely manner.  *Id.* § 781a(f).

### B.  Pension Funding Bonds Issued by ERS

Despite ERS's dependence on employer contributions, the Commonwealth has never paid ERS enough to satisfy its statutory contribution requirements.  By the time ERS filed its Title III petition, the Commonwealth owed ERS more than $411 million.  ERS, *Annual Financial Information Fiscal Year 2016*, at 13 n.1.[5]

Consequently, ERS was forced to find outside funding to continue paying pension benefits.  ERS had the statutory right to issue debt, "securing said debt with the assets of the [ERS]."  3 L.P.R.A. § 779(d) (2008).  In 2008, "[s]eeking to decrease an unfunded liability of approximately $9.9 billion," *Fin. Oversight & Mgmt. Bd. for P.R.*, 914 F.3d at 704, ERS authorized the issuance of pension funding bonds pursuant to the Bond Resolution.  The majority of ERS Bonds were sold to individual Puerto Rico residents and local businesses, who still hold many of them.

---

[4] Available at http://www.hacienda.gobierno.pr/sites/default/files/commonwealthreport-october302014.pdf; http://www.promesacodex.com/uploads/9/0/9/7/90977614/commonwealth__financial_information_and_operating_data_report_-_december_18_2016.pdf.

[5] Available at https://emma.msrb.org/ER1050099-ER822796-ER1223828.pdf.

3

An integral part of ERS's bond issuance was an extensive security package designed to protect Bondholders' investment.  ERS granted Bondholders, through a Fiscal Agent, a security interest in and lien on certain ERS property, including, *inter alia*, all employer contributions received by ERS, all "right, title, and interest of [ERS] in and to" those contributions, and "all rights to receive [those contributions]."  Bond Resolution § 501 & p. VI-36.  That property was to remain "free and clear of any pledge, lien, charge or encumbrance," *id.* § 705, and was to be used to make timely principal and interest payments on ERS Bonds, *id.* § 501.  Notably, ERS also pledged its statutory right to collect employer contributions to secure the bonds, and that right was exercisable upon default.  *Id.* §§ 501, 1102.  ERS further promised Bondholders that it would "oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in . . . relevant legislation that would have a material adverse effect on Bondholders."  *Id.* § 709.

### C.  PROMESA and the Post-Petition Legislation

On June 30, 2016, Congress enacted PROMESA.  Under the financial restructuring authority provided by Title III of PROMESA, 48 U.S.C. §§ 2162, 2175, the Oversight Board filed petitions on behalf of the Commonwealth and ERS on May 3 and 21, 2017, respectively.

The filing of ERS's Title III petition on May 21, 2017, triggered the operation of an automatic stay to protect ERS's property.  11 U.S.C. § 362; 48 U.S.C. § 2161(a) (incorporating § 362 into PROMESA).  But on June 25, 2017, in total disregard of the ERS automatic stay, the Puerto Rico Legislative Assembly passed Joint Resolution for Other Allocations for Fiscal Year 2017-2018 ("Joint Resolution 188" or "J.R. 188," attached hereto as Exhibit 2), pursuant to the Fiscal Plan the Oversight Board had approved and certified for the Commonwealth.  Joint Resolution 188 required ERS to sell all of its assets and transfer the proceeds, plus any other available funds, into the Commonwealth's General Fund.  J.R. 188 §§ 1-3.  The Resolution also

required employers to make future employer contributions towards pension costs directly to the Commonwealth's General Fund, rather than to ERS. *Id.* §§ 1-4. On June 30, 2017, the Oversight Board adopted the resolution on behalf of the Governor, who subsequently signed it.

On August 23, 2017, with the automatic stay still in effect, the Governor signed a Law to Guarantee Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants ("Act 106," attached hereto as Exhibit 3, and, collectively with J.R. 188, the "Post-Petition Legislation"). Act 106 further implemented Joint Resolution 188. The law stated that Joint Resolution 188 "eliminated" "the employer contributions being made until now," and purported to set up a new "'Pay-Go' Fee" that employers must pay directly into the Commonwealth's General Fund. Act 106, § 1.4. The "'Pay-Go' Fee" is nothing new, however, because the employers required to pay it are the same government entities (including the Commonwealth, public corporations, and municipalities) that were previously obligated to make contributions to ERS; indeed, even the "contributions" are the same obligations. *See id.* § 1.6(g); *compare id.* § 2.1(b), *with* 3 L.P.R.A. § 781(a) (2008).

### D. Procedural Background

Claimants, holders of secured bonds issued by ERS in 2008 and the Fiscal Agent, filed timely proofs of claim against ERS and the Commonwealth.[6] This Court subsequently entered an order approving the procedures for objections to claims by holders of bonds issued by ERS. ECF 8818 in Case No. 17-3283 (the "Initial Procedures Order"). Among other things, the Initial Procedures Order established a January 6, 2020, deadline for the filing of objections to claims and

---

[6] The Fiscal Agent filed master bond proofs of claim to assert rights to payment from ERS and the Commonwealth on behalf of itself and all beneficial owners of the ERS Bonds as their respective interests appear in the Bond Resolution and the ERS Bonds. The Fiscal Agent has joined this Motion to ensure that the allowance of any claims against ERS and the Commonwealth arising from or relating to the ERS Bonds inures to the benefit of all Bondholders consistent with the Bond Resolution and the ERS Bonds.

set a deadline for the assertion of any post-petition claim (including a request for an administrative

expense) against ERS on account of or related to the Bonds.  On November 21, 2019, the ERS

Bondholder Groups timely filed motions for the allowance of post-petition and administrative

expense claims, which the Fiscal Agent joined ("Administrative Expense Motions").  *See* ECF

9285, 9286, 9294, 9295, and 9298 in Case No. 17-3283.  On January 6, 2020, the Creditors

Committee, the Retiree Committee, and the Oversight Board each filed objections to the proofs of

claim.  *See* ECF 9700, 9701, 9702, 9703, 9704, 9705, 9708 & 9710 in Case No. 17-3283.

This Court stayed the majority of proceedings related to Claimants' claims while the First

Circuit decided the impact of 11 U.S.C. § 552 on Claimants' liens.[7]  After the First Circuit issued

its Section 552 Decision, however, this Court set a schedule providing for (i) Claimants to file the

Supplement, (ii) any objecting parties to file a motion to dismiss the Claimants' proofs of claim

and Administrative Expense Motions, and (iii) Claimants to file a motion for judgment on the

pleadings.  ECF 12446 in Case No. 17-3283 (as subsequently amended by ECF 12901 in Case No.

17-3283) (the "Scheduling Order").  In accordance with the Scheduling Order, Claimants filed the

Supplement on March 25, 2020.  ECF 12536 in Case No. 17-3283.  On May 6, 2020, the Oversight

Board and the Retiree Committee filed motions to dismiss the proofs of claim and Administrative

Expense Motions, AAFAF filed a statement in support of the Board's motion, and the Creditors

Committee filed a limited joinder.  *See* ECF 13504, 13506, 13507 & 13508 in Case No. 17-3283.

Pursuant to the Scheduling Order, these filings are considered part of the pleadings for purposes

of this Rule 12(c) motion.  *See* Scheduling Order ¶ 7.

---

[7] Claimants continue to dispute application of section 552 to their collateral, and the ERS Bondholder Groups intend to seek further review in the Supreme Court.  Nonetheless, the legal issues raised in this motion do not turn on whether or not section 552 applies.  For one, whether Claimants may assert recourse claims is wholly independent of the Section 552 Decision.  Moreover, as Claimants will explain at length in their opposition to the Objectors' motions to dismiss, the Section 552 Decision does not eliminate any claims related to the Post-Petition Legislation because Claimants' collateral includes more than simply the post-petition employer contributions affected by that decision.

## ARGUMENT

### I.  CLAIMANTS MAY ASSERT RECOURSE CLAIMS AGAINST ERS

Claimants are entitled to assert recourse claims against ERS for three independent reasons:

First, although the Bond Resolution makes the ERS Bonds limited recourse, section 1111(b) of the

Bankruptcy Code expressly overrides that limitation and allows Claimants to recover as recourse

creditors on their claims for principal and interest on the ERS Bonds themselves.  Second, even if

section 1111(b) does not apply, Claimants' claims for breach of obligations under the ERS Bond

Resolution are not constrained by the limited recourse provisions of the ERS Bonds.  And third,

similarly, Claimants' constitutional, tort, statutory, and equitable claims against ERS, which are

not based on the Bond Resolution at all, are also not constrained by the limited recourse provisions.

In any event, even if Claimants cannot assert recourse claims, they still retain significant unsecured

claims based upon their contractual right to payment from the Pledged Property.

### A.  The Bankruptcy Code Provides Claimants with Recourse Claims

#### 1.  Claimants Hold Recourse Claims Against ERS Pursuant to Section 1111(b)(1)(A)

Claimants have a recourse claim under the plain text of section 1111(b)(1)(A), which

provides:  "A claim secured by a lien on property of the estate shall be allowed or disallowed under

section 502 of this title the same as if the holder of such claim had recourse against the debtor on

account of such claim, whether or not such holder has such recourse."  11 U.S.C. § 1111(b)(1)(A).

This section "implements a general rule that a claim secured by a lien on property of the estate is

to be treated as giving the lienholder recourse against the debtor, whether or not recourse exists

under applicable non-bankruptcy law."  *In re 680 Fifth Ave. Assoc.*, 29 F.3d 95, 97 (2d Cir. 1994).

"Section 1111(b)(1)(A) is an exception to the general rule that bankruptcy law respects

nonbankruptcy entitlements" and "essentially instructs courts to ignore nonbankruptcy law on

nonrecourse agreements."  7 COLLIER ON BANKRUPTCY ¶ 1111.03 (16th ed. rev. 2020).

"The impetus behind Congress's enactment of § 1111(b) was to protect the rights of nonrecourse lienholders in Chapter 11 reorganizations."  *In re 680 Fifth Ave. Assoc.*, 29 F.3d at 97.  "By giving the lienholder recourse against the debtor personally for the amount of any deficiency, § 1111(b) provides the lienholder the benefit it would otherwise obtain from its nonrecourse loan bargain—i.e., either full payment (or at least a claim against the estate for the full amount of the debt and the ability to vote on the plan to the extent of its claim), or the right to foreclose and bid on the property at public auction."  *Id.* at 97-98.  Thus, "[S]ection 1111(b) protects the legitimate expectation of secured lenders that the bankruptcy laws will be used only as a shield to protect debtors and not as a sword to enrich debtors at the expense of secured creditors."  COLLIER ON BANKRUPTCY at ¶ 1111.03.

"[T]he existence of a valid and enforceable lien is the only prerequisite for § 1111(b)(1)(A) to apply."  *In re B.R. Brookfield Commons No. 1 LLC*, 735 F. 3d 596, 601 (7th Cir. 2013); *see also In re 680 Fifth Ave. Assoc.*, 29 F.3d at 98 ("The only precondition to the statute's application is a claim secured by a lien on property of the estate.").  Here, Claimants are perfected, secured creditors as a result of their interests in the ERS Bonds and, prior to the petition date, held valid, enforceable liens on all of the Pledged Property.  *See Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 914 F.3d at 721.[8]  Thus, pursuant to section 1111(b)(1)(A), Claimants should be treated as recourse creditors of ERS for purposes of allowance and distribution.

### 2.  The Objectors Forfeited Any Objection to Application of Section 1111(b)

The Objectors have waived any argument that Claimants are not entitled to assert recourse

---

[8] The Objectors have asserted that Claimants' liens are avoidable because the ERS Bonds are *ultra vires*. This is the subject of litigation in ongoing adversary proceedings.  *See* Adv. Proc. Nos. 19-356, 19-357, 19-359 & 19-361 (D.P.R.).  Unless and until such liens are avoided, however, they exist and are regarded as valid and enforceable. *See Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir. 1995); *Dewsnup v. Timm*, 502 U.S. 410, 417-20 (1992).

claims against ERS pursuant to section 1111(b)(1)(A). This Court's Initial Procedures Order set a
deadline of January 6, 2020, at the latest, for the filing of objections to Claimants' claims.  ECF
8818, at ¶ 5, in Case No. 17-3283.  Although the Objectors each filed objections by the January 6
deadline, these filings did not assert an objection to application of section 1111(b)(1)(A) to
Claimants' claims.  In fact, even now, although the Objectors repeatedly suggest in their motions
to dismiss that Claimants' recovery is limited to their collateral, they provide no explanation for
why section 1111(b) would not give Claimants recourse claims against ERS.  Indeed, the Objectors
somehow do not even *cite* Section 1111(b) in any of their objections or their motions to dismiss.

This is significant because "[p]ursuant to § 1111(b)(1) of the Code, a nonrecourse secured
loan is converted, *automatically*, into a recourse loan thereby entitling the creditor to an unsecured
deficiency claim if the value of the collateral is less than the debt."  Advisory Committee Note to
Fed. R. Bankr. P. 3014 (emphasis added).  That is, unless and until the class elects treatment under
section 1111(b)(2) or a timely objection is sustained as to the allowance of a recourse claim under
section 1111(b)(1)(A), the Bankruptcy Code automatically treats a nonrecourse debt as a recourse
claim.  No affirmative action is required on the part of the creditor to obtain such treatment.  *See,*
*e.g.*, *In re Stanley*, 185 B.R. 417, 428 (Bankr. D. Conn. 1995) (noting that section 1111(b)(1)(A)
operates "automatically").  Consequently, the Objectors should have known when they filed their
Objections (and, indeed, their motions to dismiss) that, by operation of law, Claimants'
nonrecourse claims had been converted to recourse claims.  That the Objectors have never sought
to lodge an objection to this treatment is not excusable and precludes them from doing so now.

### 3. The Plan-Sale Exception Does Not Apply

In any event, even if the Court were to consider an untimely objection to the application of
section 1111(b)(1)(A), it would fail.

The Bankruptcy Code provides only three circumstances under which section

1111(b)(1)(A) does not apply:  (1) if the class of which the claim is a part elects to have its claims treated as a secured claim to the extent such claim is allowed; (2) if the property subject to the claimant's lien is "sold under section 363" of the Bankruptcy Code; or (3) if the property is "to be sold under the plan."   11 U.S.C. §§ 1111(b)(1)(A)(i) – (ii).   Here, the first two of these circumstances clearly do not apply:  The Claimants' class has not yet elected treatment under section 1111(b)(2), and because PROMESA does not incorporate section 363 into Title III cases, *see* 48 U.S.C. § 2161(a), Claimants' collateral cannot be sold pursuant to that section.

Moreover, the so-called "plan-sale exception" of section 1111(b)(1)(A)(ii) also does not apply.  Although the proposed *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF No. 11946 in Case No. 17-3283) (the "Plan") purports to provide for the "sale" of all ERS's assets to the Commonwealth, including those assets to which Claimants' lien may attach, that purported "sale" does not satisfy the exception for three reasons.[9]  First, and most basically, the proposed "sale" of ERS's assets to the Commonwealth cannot be "under the plan" because the Post-Petition Legislation has *already* ordered the liquidation and transfer of ERS's assets to the Commonwealth; ERS cannot sell through a plan that which it has already transferred.  Second, even if the collateral were somehow able to be sold under the Plan, the type of sale contemplated by the Oversight Board's proposed plan would not satisfy the plan-sale exception, because it does not make the collateral available for sale at a public auction, contemporaneous with the plan effective date, at which Claimants have the opportunity to credit

---

[9] The Plan provides: "On the Effective Date, the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey, all of ERS's right, title and interest in ERS's assets, including, without limitation, such assets subject to a valid and perfected lien or security interest, for an aggregate purchase price equal to the sum of (a) one hundred percent (100%) of the Cash in ERS accounts as of the Effective Date, (b) ninety-five percent (95%) of the face amount of performing ERS employee loans as of the Effective Date, (c) one hundred percent (100%) of the market price of the COFINA bonds held by ERS, as of the Effective Date, and (d) fifty percent (50%) of the book value of the ERS portfolio of private equity interests held by ERS as of the Effective Date, with such amount being approved by the Title III Court at the Confirmation Hearing and incorporated into the findings of fact set forth in the Confirmation Order."  Plan, § 2.4.

bid.  And third, because the Plan does not even purport to sell all of the collateral Claimants

possessed on the ERS petition date, the plan-sale exception cannot override section 1111(b)(1)(A).

### a.  The Pledged Property Has Already Been Disposed of by the Post-Petition Legislation

First, the Post-Petition Legislation on its face purported to order the immediate transfer

and release of ERS's assets on July 1, 2017.  *See* Ex. 2 (J.R. 188), at 3 ("The [ERS] and Judiciary

Retirement System and the Teachers' Retirement System are ordered to sell their assets and to

transfer the net cash proceeds, in addition to any available fund, into the Treasury Secretary's

account."); Ex. 3 (Act 106), at § 5.1(c) ("Retirement System Administrators shall take all necessary

steps to liquidate their assets and transfer the proceeds to the General Fund and/or the Accumulated

Pensions Payment Account, as applicable . . . ."); *id.* § 2.1 (requiring the Commonwealth to make

pension payments from an account funded by "[t]he net proceeds from the liquidation of

Retirement Systems' assets, . . . as provided in House Joint Resolution 188-2017, approved

pursuant to PROMESA").  These laws unconditionally require the liquidation of ERS's assets and

the transfer of the proceeds to the Commonwealth.  They do not provide (or allow) for the

Commonwealth to pay any consideration in exchange for the assets.

The purported "[p]urchase and sale" of ERS's assets proposed in the Plan is fundamentally

incompatible with the legislative requirements of Joint Resolution 188 and Act 106.  Nothing in

the Plan purports to (or could) unwind the legislative directive from the Commonwealth to ERS to

liquidate its assets and transfer the proceeds to the Commonwealth.  The Oversight Board has

never objected to this legislation (as it did with other Commonwealth legislation); indeed, the

Board demanded and encouraged its enactment.  Now, however, the Plan simply pretends as if

these legislative directives do not exist.  The Plan purports to have the Commonwealth "purchase,"

and ERS to "sell, assign, transfer, and convey," "all of ERS's right, title and interest in ERS's

11

Assets" for a "purchase price" equal to certain percentages of ERS's cash, outstanding loan portfolio, COFINA bonds, and private equity investments. Plan § 2.4. This is nonsensical. The Post-Petition Legislation already, on its face, ordered ERS to liquidate and transfer all of its assets to the Commonwealth for no consideration whatever. As the Objectors frequently observe in their motions to dismiss, ERS is not able simply to ignore this command. In fact, because the legislation already compels ERS to transfer its assets to the Commonwealth for no consideration, any consideration provided under the plan is a gratuity. Moreover, unless ERS were to immediately return any funds paid by the Commonwealth for ERS's assets, the plan will not be confirmable under 11 U.S.C. § 943(b)(4) because ERS is prohibited by J.R. 188 and Act 106 from retaining the proceeds of any sales of its assets. *See* 11 U.S.C. § 943(b)(4) (precluding confirmation where the debtor is "prohibited by law from taking any action necessary to carry out the plan"). Put simply, the Commonwealth cannot now offer to pay for something that the Legislature has already ordered ERS to transfer to the Commonwealth. That is not a "purchase"; it is a gift.

### b. Even if ERS Could Sell Its Assets, the Purported "Sale" Would Not Satisfy the Plan-Sale Exception

Second, even if the Post-Petition Legislation had not already ordered the transfer of ERS's assets to the Commonwealth, the plan-sale exception still would not apply because the "sale" contemplated here is not sufficient to meet the requirements for a sale "under the plan."

Courts have been clear that not every purported "sale" of property pursuant to a plan is a sale "under the plan" within the meaning of section 1111(b)(1)(A)(ii). Rather, courts have developed several criteria for identifying whether a sale is "under the plan."

First, courts have been virtually unanimous that a sale of collateral cannot meet the plan-sale exception unless the secured creditor is permitted to credit bid the full face amount of its debt for the collateral. *See, e.g.*, *In re Matrix Dev. Corp.*, No. 08-32798-TMB11, 2009 WL 2169717,

12

at *4 (Bankr. D. Or. July 16, 2009) (compiling cases requiring secured creditor's right to credit

bid at a sale in order for the exception to apply); *In re Midway Investments, Ltd.*, 187 B.R. 382,

390-91 (Bankr. S.D. Fla. 1995) ("The right to credit bid the full amount of a secured claim is

essential to the protection of a non-recourse secured creditor."); *In re Kent Terminal Corp.*, 166

B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) (holding that "[i]f a plan proposes the sale of a creditor's

collateral free and clear of liens, the lienholder has the unconditional right to bid in its lien"); *In re*

*Tampa Bay Assocs., Ltd.*, 864 F.2d 47, 50 (5th Cir. 1989) ("Through these exceptions it appears

that Congress intended to protect the nonrecourse undersecured creditor only if such a creditor is

not permitted to purchase the collateral at a sale or if the debtor intends to retain the collateral after

bankruptcy and not repay the debt in full."); *In re Montgomery Ward, LLC*, 634 F. 3d 732, 740 (3d

Cir. 2011) ("If the debtor elects to sell the collateral in the Chapter 11 proceeding, the creditor can

bid on it."); *cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012)

(holding that confirmation involving a sale under section 1129(b) requires a secured creditor to

have the right to credit bid its debt); COLLIER ON BANKRUPTCY at ¶ 1111.03.

Second, courts have held that the collateral must be offered to the market at a public

auction, or, "if the sale is to be a private sale, disclose[ ] the specifics of the sale, including the

name of the purchaser, the sale price, the proposed closing date, other terms of the sale, and where

the proposed sale will occur substantially contemporaneously with plan confirmation." *Matrix*

*Dev. Corp.*, 2009 WL 2169717 at *5; *see also In re Western Real Estate Fund, Inc.*, 75 B.R. 580,

589 (Bankr. W.D. Okla. 1987) ("Debtors should not be permitted to deprive objecting non-

recourse undersecured creditors of the valuable rights which would be conferred upon them under

§ 1111(b)(1) by simply providing for the sale of the property at some unspecified future time, to

some unspecified purchaser, at an unspecified price and on unspecified terms.").

13

Third, courts have made clear that the sale must occur in close temporal proximity to confirmation in order to qualify as a sale "under the plan." *See Matrix Dev. Corp.*, 2009 WL 2169717, at *5 ("Case law also supports the [creditors'] contention that the § 1111(b) sale 'under the plan' exception only applies . . . where the proposed sale will occur substantially contemporaneously with plan confirmation."); *Western Real Estate Fund*, 75 B.R. at 589 (holding that plan must specify time of sale to satisfy plan-sale exception).

Together, these three criteria seek to accomplish "Congress's goal [of] ensuring that each individual secured creditor retain[s] the benefit of its bargain." *Matrix Dev. Corp.*, 2009 WL 2169717, at *8. The cases recognize that subjecting property to the market through a public auction at which the secured creditor is allowed to credit bid is the only way to protect the secured creditor's interest and to justify the removal of the creditor's recourse treatment under section 1111(b)(1)(A). If, by contrast, the sale happens in secret, is not exposed to a public market, is not contemporaneous with the plan, or the creditor is not allowed to credit-bid the full amount of its claim, the policies underlying the plan sale exception have not been satisfied. This is why courts have routinely recognized that, without these protections, the plan-sale exception does not apply.

Here, the proposed Plan contains none of these features. ERS's assets are not being exposed to the market at a public sale. Instead, they are being forcibly sold to the Commonwealth for a price that provides no assurance that it accurately reflects market sentiment. Moreover, the purported "sale" to the Commonwealth (apart from being wholly gratuitous) can in no way be described as arms-length, given that ERS is bound by the Post-Petition Legislation to transfer its assets to the Commonwealth and the entity presumably deciding appropriate compensation—the Oversight Board—sits on both sides of the transaction. And, although the Plan purports to have the sale occur "on the Effective Date," *see* Plan § 2.4, the reality is that the liquidation and transfer

14

of ERS's assets was ordered back in July 2017 pursuant to the Post-Petition Legislation, before any proposed plan of adjustment was even filed, let alone confirmed.  Last, and most importantly, the Plan nowhere provides Claimants with the ability to credit bid for the collateral, which courts have repeatedly held is required to satisfy the plan-sale exception of section 1111(b)(1)(A)(ii).

### c. The Plan-Sale Exception Does Not Apply Because the Plan Does Not Purport to Sell All Claimants' Collateral

Finally, even if ERS somehow could still "sell" Claimants' collateral under the plan notwithstanding the Post-Petition Legislation and the defects in the sale process, that is not what is happening here.  While some of Claimants' collateral may be a part of the "sale" of all ERS's assets pursuant to the plan, much of the collateral Claimants owned as of the ERS petition date has already been eliminated by actions taken by ERS.  That is, ERS has already used section 552 of the Bankruptcy Code to significantly narrow the extent of Claimants' lien, has participated in the Commonwealth's efforts to eliminate and depress the value of Claimants' collateral, and has used the automatic stay to block Claimants from protecting their rights.

As explained above, however, section 1111(b) was designed to provide a nonrecourse creditor with "the benefit it would otherwise obtain from its nonrecourse loan bargain" outside of bankruptcy.  *In re 680 Fifth Ave. Assoc.*, 29 F.3d at 97; *see also In re Constitution Plaza Associates Ltd. P'ship*, 161 B.R. 563, 565 (D. Conn. 1993) (same); *B.R. Brookfield Commons No. 1 LLC*, 735 F.3d at 600 (same).  While the prior Bankruptcy Act heavily favored debtors, through section 1111(b), the Bankruptcy Code "attempt[ed] . . . to create a balance between the debtor's need for protection and a creditor's right to receive equitable treatment."  COLLIER ON BANKRUPTCY ¶ 1111.03.  "By giving the lienholder recourse against the debtor personally for the amount of any deficiency, § 1111(b) provides the lienholder the benefit it would otherwise obtain from its nonrecourse loan bargain—i.e., either full payment (or at least a claim against the estate for the

full amount of the debt and the ability to vote on the plan to the extent of its claim), or the right to foreclose and bid on the property at public auction." *In re 680 Fifth Ave. Assoc.*, 29 F.3d at 97-98; *see also Matter of DRW Prop. Co. 82*, 57 B.R. 987, 992 (Bankr. N.D. Tex. 1986) (same); *Matrix Dev. Corp.*, 2009 WL 2169717, at *8 (same).

Here, however, the sale proposed by the plan in no way reflects the Claimants' bargain outside of the bankruptcy context. Because ERS has already used section 552 of the Bankruptcy Code to severely curtail the scope of Claimants' lien, has participated in the Commonwealth's efforts to reduce or eliminate large portions of Claimants' collateral (such as ERS's pre-petition accounts receivable), and has used the automatic stay and other Bankruptcy Code provisions to prevent Claimants from protecting their rights, the amount of collateral purportedly being "sold" pursuant to the plan in no way resembles the collateral possessed by Claimants on the ERS petition date. This "result is wholly lacking in fairness." *Western Real Estate Fund*, 75 B.R. at 589. ERS "should not be permitted to deprive objecting non-recourse undersecured creditors of the valuable rights which would be conferred upon them under § 1111(b)(1)" by using the Bankruptcy Code to severely curtail the value of their collateral package, and then orchestrating a sale of the dramatically reduced collateral for a meager price. *Id.* Section 1111(b) exists precisely to prevent debtors from using bankruptcy laws "as a sword to enrich debtors at the expense of secured creditors." COLLIER ON BANKRUPTCY ¶ 1111.03.

Thus, because ERS is not "selling" all collateral Claimants possessed on the petition date, and for the other reasons above, the plan-sale exception does not apply and cannot override the important protections conferred on nonrecourse lenders by section 1111(b)(1)(A).

### B. Claimants Are Entitled to a Recourse Claim Against ERS for Breaches of the Bond Resolution

Even if Claimants are not able to assert recourse claims by virtue of section 1111(b)(1)(A)

of the Bankruptcy Code, they nonetheless have allowable claims against ERS's property based upon ERS's breaches of the Bond Resolution.

As a general matter, courts have recognized that the term "nonrecourse" is "implicitly limited in its formal legal definition to disallowing recourse on the underlying instrument." *People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*, 814 F. Supp. 159, 163 (D. Me. 1993). Thus, "[c]ourts generally understand the word 'nonrecourse' to denote that the purchaser or holder cannot pursue the seller on the *underlying obligation*"—here, the ERS Bonds themselves. *Id.* (emphasis added). However, "nonrecourse does not mean that the purchaser cannot pursue the seller in the event that the seller has *other contractual or common law obligations which have been breached*." *Id.* (emphasis added); *see also First Indep. Bank of Nevada v. Mohave State Bank*, No. CV-09-8195-PCT-PGR, 2010 WL 1408890, at *2 (D. Ariz. Apr. 7, 2010) ("Non-recourse provisions are included in contracts to limit the liability to specified collateral identified in advance, but such terms do not limit the underlying obligation of the agreement.").

In *First Independent Bank of Nevada v. Mohave State Bank*, for example, the court considered whether nonrecourse provisions in a loan participation agreement barred claims for breach of contract and tort. 2010 WL 1408890, at *2-3. Plaintiff First Independent Bank of Nevada ("FIBN") had purchased an interest in a loan made by Mohave State Bank ("Mohave"), which entitled FIBN to a portion of the interest payments received by Mohave and required Mohave to protect FIBN's rights against the borrower. The purchase agreement specifically provided that "[t]he sale is made by [Mohave] without recourse and shall in no way be construed as an extension of credit by [FIBN] to [Mohave]." *Id.* at *2. After a missed payment, FIBN inquired and discovered that Mohave had failed to inform FIBN that the third party had defaulted on the loan and had failed to protect FIBN's rights. FIBN sued Mohave alleging, among other

17

things, failure to notify FIBN of adverse changes in the financial condition of the borrower, failure
to properly administer the loan, and gross negligence by failing to pursue available remedies.  In
response, Mohave asserted that because the loan participation agreement was nonrecourse, FIBN's
claims should be dismissed.  The court rejected this argument.  It explained that "[c]ontractual and
common law claims are not barred by a non-recourse loan participation agreement if they have
any basis in assertion of breach other than the obligation to pay the underlying loan of the
borrower."  *Id.*  Because "FIBN's claims were not based on the default of [the borrower], but rather
on Mohave's response to that default which FIBN alleges is contrary to the [loan participation
agreement]," the court concluded that "FIBN's claims ha[d] their assertion in breach of the
agreement between the parties, irrespective and wholly independent to the obligation to pay the
underlying loan of the borrower."  *Id.* at *3.

Courts have also repeatedly declined to extend nonrecourse provisions in one contract to
other, related contracts within the same transaction.  *See also*, *e.g.*, *USX Corp. v. Prime Leasing
Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (declining to extend nonrecourse limitation in a note to
preclude damages for violation of notice requirement of a related contract); *Duluth Lighthouse For
The Blind v. C.G. Bretting Mfg. Co.*, No. 99-1601 JRT/RLE, 2001 WL 1640079, at *3 (D. Minn.
Sept. 25, 2001) (limiting non-recourse provision in financing and security agreement to payment
obligations under that agreement and refusing to limit liability for breach of ancillary purchase
agreement for wrongful rejection or wrongful revocation).

Here the limited recourse provisions of the Bond Resolution similarly do not limit
Claimants' ability to pursue contract breach claims against ERS.  As noted above, nonrecourse
provisions generally are not viewed as precluding remedies for contract breach, and nothing about
the Bond Resolution suggests it should be treated differently.  To the contrary, the clear intent of

18

the Bond Resolution was to provide Claimants with recourse to ERS for breaches of its covenants.

For one, the plain text of the limited recourse provision in the Bond Resolution confines its application to the ERS Bonds themselves.  Section 201 of the Bond Resolution provides that "[t]he *Bonds* shall be special obligations of [ERS] payable solely from the Pledged Property without recourse against other assets of the System," and that "nor shall any *Bond* or *Ancillary Bond Facility* be payable out of any funds or assets other than the Pledged Property, and the *Bonds* and each *Ancillary Bond Facility* shall contain a statement to the foregoing effect."  Bond Resolution § 201 (emphasis added).  These specific references to the "Bonds" and "Ancillary Bond Facility" do not encompass the Bond Resolution.  Indeed, when section 201 intends to refer to rights or obligations created by the Bond Resolution, as opposed to the Bonds themselves, it refers to the "Resolution" or the "Supplemental Resolution."  *See, e.g.*, Bond Resolution § 201 ("There is hereby further created by this Resolution, in the manner and to the extent provided herein, a security interest and lien on the Pledged Property to secure the full and timely payment of the principal of and interest on, all of the Bonds issued pursuant to this Resolution or any Supplemental Resolution.").  This is consistent with the definitions in the Bond Resolution, which defines "Resolution" to "mean th[e] Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions," and defines "Bonds" separately to mean "the initial Series of Bonds and any additional Bonds authorized to be issued on a party therewith pursuant to Section 202 or 708."  Bond Resolution at VI-32, VI-37.[10]

Moreover, although section 201 of the Bond Resolution restricts recovery on payment defaults under the Bonds to the Pledged Property, other provisions of the Bond Resolution

---

[10] The Bond Resolution defines "Ancillary Bond Facility" to mean "each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement." Bond Resolution at VI-31. "Credit Facility," "Liquidity Facility," "Qualified Hedge," and "Standby Purchase Agreement" are in turn defined to include financial arrangements ERS might in the future enter into with third parties, such as bond insurance or swap agreements.

contemplate independent remedies to enforce covenant breaches under the Bond Resolution. For example, section 1102(1)(i) gives Claimants the right to bring suit to compel collection of employer contributions sufficient to fulfill ERS's obligations under the Bond Resolution and the Enabling Act. That this right is "irrespective and wholly independent to the obligation to pay" the underlying Bonds, *Mohave State Bank*, 2010 WL 1408890, at *3, is made clear by the fact that the next subsection (section 1102(1)(ii)) separately gives Claimants the power to bring "suit *upon the Bonds* limited, upon recovery *thereunder*, to the Pledged Property pledged and assigned under this Resolution." Bond Resolution § 1102(1)(ii) (emphasis added); *see also id.* at §§ 1102(1)(iii)-(iv) (providing rights to demand accounting and sue to enjoin acts in violation Bondholders' rights).

Similarly, Article VII of the Bond Resolution contains a series of "particular covenants of [ERS]." Section 701, for example, covenants that ERS will maintain and further perfect the Pledged Property, enforce all its powers under the Enabling Act to collect and remit employer contributions, and ensure employers are current in their payments to ERS. Bond Resolution § 701. Section 709(1) additionally includes a covenant that ERS will "do and perform or cause to be done and performed all acts and things required to be done by or on behalf of [ERS] under the provisions of this Act and this Resolution," particularly "with regards to the collection of the Employers' Contributions as provided in the [Enabling] Act." *Id.* § 709(1). And section 709(2) includes a covenant that ERS will oppose attempts by the Commonwealth Legislature to reduce employer contributions or to make other changes that will adversely affect ERS's ability to comply with its obligations. *Id.* § 709(2). Reading the Bond Resolution to bar any recourse other than with respect to the Pledged Property would render these provisions meaningless. *See, e.g.*, *Blackie v. State of Me.*, 75 F.3d 716, 722 (1st Cir. 1996) ("It is hornbook law that an interpretation which gives effect to all the terms of a contract is preferable to one that harps on isolated provisions, heedless of

20

context"); *In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) ("It is well-established that courts should avoid interpretations that render a provision of an agreement surplusage.")

Finally, as a structural matter, the Bond Resolution is a separate contract from the ERS Bonds themselves.   As explained above, courts have been reluctant to extend nonrecourse provisions in one agreement to cover promises made in a separate, but related, agreement. *See USX Corp.*, 988 F.2d at 438; *Duluth Lighthouse for the Blind*, 2001 WL 1640079, at *3.

Because section 201 limits recourse only with respect to the Bonds themselves, Claimants may assert recourse claims against ERS for breaches of the Bond Resolution that are independent of ERS's obligation under the Bonds to pay principal and interest.  Claimants have asserted several such bases, including, for example, claims that ERS breached covenants related to its ability to grant liens on the Pledged Property and that it had authority to issue the ERS Bonds, that ERS breached its obligation to promptly collect and remit employer contributions, that ERS breached its obligation to transfer employer contributions to collateral accounts, that ERS breached its obligation to oppose the enactment of the Post-Petition Legislation, and that ERS failed to defend, preserve, and protect the assignment of the pledged property and Claimants' rights.  *See, e.g.*, Administrative Expense Motions ¶¶ 29, 31-33; Supplement ¶¶ 21, 22.  Each of these breaches arises under the Bond Resolution, not the ERS Bonds.  As a result, if successful, Claimants will not be constrained by the limited recourse nature of the ERS Bonds but may recover against ERS for any damages suffered as a result of its breaches.[11]

### C.  Claimants Are Entitled to a Recourse Claim Against ERS Based Upon ERS's Unconstitutional, Tortious, and Illegal Conduct

In addition, Claimants are entitled to recourse damages based on the non-contractual claims

---

[11] Although Claimants assert multiple bases for their claims against both the Commonwealth and ERS, Claimants are entitled to, and seek, only a single recovery for the principal and interest due under the ERS Bonds.

asserted against ERS—including constitutional, statutory, tort, and equitable claims—which, under the case law, must give rise to a general unsecured claim.

In instances where contractual counterparties have committed independent violations of law, courts have routinely held that nonrecourse provisions limiting *contractual* remedies do not apply. Such a conclusion makes sense: A victim should not be precluded from seeking recovery for non-contractual claims merely because he may have a contractual relationship with the tortfeasor. *See, e.g.*, *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 256 (4th Cir. 1984) ("Because waste is a tort, the [nonrecourse] provision in the agreement is inapplicable."); *Kiefer v. Woolley*, 210 F.3d 383 (Table), 2000 WL 59912, at *2 (9th Cir. 2000) (holding that claims based upon the covenant of good faith and fair dealing were not barred by nonrecourse provision); *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 85 (2d Cir. 1992) (holding that nonrecourse provision barring contractual and legal claims did not bar equitable claims); *Delphi Indus., Inc. v. Stroh Brewery Co.*, 945 F.2d 215, 218 (7th Cir. 1991) (nonrecourse provision in contract did not bar tortious interference claim against third party); *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 622-24 (7th Cir. 1989) (holding nonrecourse borrower that committed fraud personally liable for compensatory and punitive damages).

Here, the language of the Bond Resolution does not even arguably preclude liability for non-contractual claims. In providing that "[t]he Bonds shall be special obligations of the System payable solely from the Pledged Property without recourse against other assets of the System," section 201 of the Bond Resolution does not mention tort or other non-contractual liability, let alone expressly preclude it. Bond Resolution § 201. To the contrary, the Bond Resolution states expressly that it does *not* preclude other non-contractual rights or remedies: "[E]ach and every . . . remedy [under the Bond Resolution] shall be cumulative and shall be in addition to any other

22

remedy given hereunder or now or hereafter existing at law or in equity or by statute." *Id.* § 1108.

Nor would such a waiver even be enforceable against many of the non-contractual claims asserted against ERS, such as claims premised upon constitutional violations, intentional torts, or "dolo." *See, e.g.*, *Baum-Holland v. El Conquistador P'ship L.P., S.E.*, 336 F. Supp. 3d 6, 26 (D.P.R. 2018) (waiver of constitutional claims not allowed unless it is "clear, unambiguous, and explicit"); 31 L.P.R.A. § 3019 ("Liability arising from [dolo] is demandable in all obligations. The renunciation of the action to enforce it is void."); *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 961 F. Supp. 353, 358 (D.P.R. 1997) ("Article 1055 is aimed . . . at prohibiting the parties to include in a contract an 'exclusionary clause' to release beforehand the future intentional and dolus breach of their obligations under said contract."); *Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 100 (1st Cir. 2011) (discussing Article 1055); Williston on Contracts § 19:24 (4th ed.) ("An attempted exemption from liability for a future intentional tort or crime or for a future willful or grossly negligent act is generally held void . . . .").

Claimants are therefore entitled to assert recourse claims based upon ERS's illegal, unconstitutional, tortious, and fraudulent conduct. Such claims will not be constrained by the limited recourse nature of the ERS Bonds themselves. And, indeed, Claimants have asserted several such bases for their claims, including that ERS committed fraudulent transfers in connection with the Post-Petition Legislation, that ERS committed "dolo" or "deceit" in the performance of its contractual obligations, that ERS breached its obligation to perform the Bond Resolution in good faith, that ERS converted Claimants' property, and that ERS negligently or intentionally harmed Claimants in various ways. *See* Supplement ¶¶ 3-10, 19-27.

*         *         *

In sum, whether by virtue of section 1111(b)(1)(A)'s automatic conversion of nonrecourse

claims into recourse claims, by virtue of ERS's breaches of the Bond Resolution, or on account of

the torts committed by ERS, Claimants are entitled to a recourse claim against ERS.

### D. Even If Claimants Are Not Allowed Recourse Claims Beyond the Pledged Property, Their Unsecured Claims Remain Significant

In any event, even if section 1111(b) somehow does not apply, *and* the limited recourse

provisions of the Bond Resolution are held to preclude Claimants' contract breach, constitutional,

tort, and other claims, Claimants would still possess significant unsecured deficiency claims,

which may be pursued against ERS and the Commonwealth.  This is because Section 201 of the

Bond Resolution, which provides that the Bonds are "payable solely from Pledged Property,"

expressly does not say that the Bonds are payable from the Pledged Property *only if the lien on*

*Pledged Property is valid and enforceable*.  Thus, even after the Section 552 Decision, Claimants

retain their contractual right to be paid from post-petition employer contributions, and that right

remains enforceable regardless of whether the post-petition employer contributions have been

diverted to the Commonwealth.  In other words, even if the Bonds themselves are payable only

from the Pledged Property, the Pledged Property remains an enormous sum of money from which

Claimants' unsecured deficiency claims must be paid.  Consequently, even if Claimants do not

have recourse beyond the Pledged Property, they are entitled to assert valuable unsecured claims

against ERS and the Commonwealth for any deficiency between the value of their collateral and

the principal and interest due under the Bonds.

## II. CLAIMANTS' POST-PETITION CLAIMS ARE ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY UNDER BANKRUPTCY CODE SECTION 503(b)(1) AND ARE NONDISCHARGEABLE

The Court should additionally grant judgment as a matter of law on the Objectors'

objection to the allowance of Claimants' post-petition claims as administrative expenses or

nondischargeable debts.  First, because each claim based upon the Post-Petition Legislation arises

from the Commonwealth's post-petition tortious and unconstitutional conduct, they are allowable as an administrative expense.  Second, even if the claims are not entitled to administrative expense treatment, they nevertheless are non-dischargeable because they arose post-petition.

### A.  Claimants' Post-Petition Claims Should Be Treated as Administrative Expenses

The Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including—(1)(A) the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b).  Section 301 of PROMESA expressly incorporates section 503(b) of the Bankruptcy Code.  The post-petition claims are allowable as administrative expenses under this section, and the arguments to the contrary are not persuasive.

### 1.  The Post-Petition Claims Meet the Requirements of Section 503(b)(1)(A)

It is well-established that "the actual, necessary costs and expenses of preserving the estate" include post-petition claims against a debtor.  In *Reading Co. v. Brown*, the Supreme Court held that post-petition negligence claims against the receiver conducting the debtor's business qualified as administrative expenses.  391 U.S. 471, 477-82 (1968).  The Court relied heavily on the "decisive, statutory objective: fairness to all persons having claims against an insolvent."  *Id.* at 477.  Simply put, it seemed "more natural and just" to allow those injured by operation of a business during bankruptcy proceedings to "recover ahead of . . . those for whose benefit the business is carried on."  *Id.* at 482.

The First Circuit extended *Reading* in *In re Charlesbank Laundry, Inc.* to apply to intentional acts in addition to negligent torts.  755 F.2d 200, 203 (1st Cir. 1985).  "If fairness dictates that a tort claim based on negligence should be paid ahead of pre-organization claims, then, *a fortiori*, an intentional act which violates the law and damages others should be so treated." *Id.*; *see also In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1975) (*Reading* principle applies "whe[n] the debtor-in-possession commits a tort").  Other decisions have likewise

25

acknowledged the broad scope of *Reading*'s fairness rationale. In *Yorke v. NLRB*, the Seventh Circuit parenthetically referred to *Reading*'s holding simply as "those injured during administration of [the] estate by [the] Trustee [are] entitled to a priority claim as administrative expense." 709 F.2d 1138, 1143 (7th Cir. 1983). Unsurprisingly, district courts have straightforwardly followed these cases to apply *Reading* to post-petition constitutional violations as well. *See, e.g.*, *In re City of San Bernardino*, 558 B.R. 321, 329-30 (C.D. Cal. 2016).

Each of Claimants' claims against the Commonwealth based on the Post-Petition Legislation arises post-petition and thus, if successful, is allowable as an administrative expense under 11 U.S.C. § 503(b)(1)(A). As Claimants alleged in their Administrative Expense Motions, the Commonwealth's actions in enacting the Post-Petition Legislation violated the automatic stay, the Contracts Clause, the Takings Clause, PROMESA, and constituted a tort and unjust enrichment under Commonwealth law. To the extent Claimants are able to prove any of these claims, they will accordingly be allowable as administrative expenses under 11 U.S.C. § 503(b)(1)(A).

## 2.   The Objections Should Be Rejected

Against this, the Retiree Committee and Oversight Board assert two primary arguments, but each fails. First, the Retiree Committee (alone) argues that because administrative expense status applies only to "the actual, necessary costs and expense of preserving the estate," no such claims can exist in a Title III proceeding because under PROMESA, like chapter 9, there is no "estate." RC Br. 6-7. Second, the Objectors argue that claims based on the Post-Petition Legislation cannot be allowed as administrative expenses because they all have a "pre-petition genesis" based upon the ERS Bonds. FOMB Br. 25-26. Neither argument is persuasive.

### a.   Administrative Expense Claims Are Allowable in Title III Cases

Relying on *In re New York Off-Track Betting Corp.*, the Retiree Committee contends that because there is no "estate" created in cases under chapter 9 or PROMESA, "[t]his means that

26

'there can be no administrative expenses for the actual and necessary costs of preserving the estate,' *i.e.*, 'no operating expenses are permitted in a chapter 9 bankruptcy case.'"  RC Br. 6-7 (quoting *In re New York Off-Track Betting, Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010)). Notably, the Oversight Board and the other Objectors do not make this argument.  And for good reason:  the Retiree Committee's interpretation of section 503(b)(1) is inconsistent with the text, and would do violence to the Title III process under PROMESA.

First, the Retiree Committee's interpretation is inconsistent with the text of the Bankruptcy Code and PROMESA.  It is true that PROMESA, like chapter 9, does not incorporate section 541 of the Bankruptcy Code, and so no "estate" is formed in a Title III case.  However, both PROMESA and chapter 9 expressly address this situation by providing that "'property of the estate', when used in a section of [the Bankruptcy Code] made applicable in a case under [Title III] by subsection (a), means property of the debtor."  48 U.S.C. § 2161(c)(5); *cf.* 11 U.S.C. § 902. And  PROMESA  §  301(a),  in  turn,  expressly  provides  that  "Section[ ] . . . 503 . . . of [the Bankruptcy Code] appl[ies] in a case under [Title III]."  48 U.S.C. § 2161(a); *cf.* 11 U.S.C. § 901.

Importantly, PROMESA § 301(a) incorporates the *entirety* of section 503.  This is in contrast to its approach to other sections of the Bankruptcy Code, where only *specific subsections* were incorporated, for example, "364(f)," "507(a)(2)," and "524(a)(2)."  48 U.S.C. § 2161(a); *cf.* 11 U.S.C. § 901 (same).  The Retiree Committee's interpretation, however, would make section 503(b)(1)(A) completely inapplicable in any chapter 9 or PROMESA case, a result inconsistent with the wholesale incorporation of section 503.  Courts must "presume that Congress 'says in a statute what it means and means in a statute what it says there,'" and "[a]textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."  *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019)

27

(quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)). PROMESA § 301(a) makes clear that Congress knew how to make only particular subsections of the Bankruptcy Code applicable when it intended to. That Congress did not exclude section 503(b)(1)(A) can only be regarded as expressing an intent to allow operating administrative expenses in Title III cases.

This straightforward textual interpretation is supported by the broader statutory structure. For example, section 301(a) of PROMESA also specifically incorporates section 507(a)(2)—but not the rest of section 507—into Title III cases. While section 507 generally provides the priority scheme for claims for Chapters 7, 11, and 13, section 507(a)(2) in particular provides the priority of administrative expenses described in section 503(b). Andrew Minear, *Unfortunate Consequences of A Patchwork Chapter*, 32 Am. Bankr. Inst. J. 38, 39 (Dec. 2013). Again, it is unlikely Congress would have incorporated section 507(a)(2) if section 503(b)(1)(A) categorically did not apply in PROMESA or chapter 9 cases. *See id.* at 39. Indeed, many other portions of section 507 apply in precisely this more targeted way, for example, specifically referring to "paragraphs (1)(A), (2), and (6) of section 503(b)" in section 507(a)(1)(C).

Perhaps most significantly, the Retiree Committee's interpretation threatens to do violence to the Title III process under PROMESA. That is, if sections referring to the "estate" categorically do not apply in PROMESA cases because no estate exists, many provisions of the Bankruptcy Code on which the debtors have relied (and plan to rely) will not apply.

To take just a few examples, if "estate" does not mean "property of the debtor" in PROMESA or chapter 9, then the Bankruptcy Code "does not limit the secured portion of a secured creditor's claim in chapter 9." Minear, *supra*, at 90. Section 506(a) provides: "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." If

"estate" "has no meaning in Chapter 9, [then] a secured creditor's claim is not limited by 'the *estate's* interest in such property.'" Minear, *supra*, at 90 (emphasis added).  In that case, "a secured creditor's claim would thus not be limited to the value of the security interest but [would be] secured beyond such value to the full amount of the creditor's claim." *Id.*  The consequences of such a ruling are significant:  In the ERS case alone, Claimants would have a secured claim for the full principal and interest due under the ERS Bonds, regardless of the value of their collateral.

Similarly, the lack of an estate in PROMESA cases would also render the avoidance provisions useless.  This is because section 550, which provides the remedy for an avoided transfer, states that when a transfer or lien has been avoided under sections 544 through 549, the debtor may "recover, for the benefit of *the estate*, the property transferred."  11 U.S.C. § 550 (emphasis added); *see also* Minear, *supra*, at 90.  If "estate" does not mean "property of the debtor," then the debtor lacks a cause of action to recover a preferential or fraudulent transfer under section 550.  *Id.*

These issues arise throughout the Bankruptcy Code.  *See, e.g.*, 11 U.S.C. §§ 365(k), 503(b)(1)(B)(i), 510(c)(2), 552, and 1129(b)(2)(A)(ii).  Of course, these problems can be avoided if, as Congress appears to have intended, the replacement of the term "property of the estate" with "property of the debtor" also applies when the term "estate" is used in sections incorporated into chapter 9 and PROMESA.  This interpretation is most consistent with the text of the statute and avoids the anomalous results under the Retiree Committee's interpretation.

The Retiree Committee's reliance on *Off-Track Betting* does not change the analysis.  For one, that case never considered the textual analysis above; if it had, it likely would have reached a different conclusion. Instead, *Off-Track Betting* "essentially redrafted § 901 to exclude § 503(b)(1)(A), even though § 901 incorporates all of § 503 into chapter 9," and missed the other structural clues pointing toward permitting administrative expenses to be recovered in a chapter 9

29

case.   Minear, *supra*, at 39.  In any event, *Off-Track Betting*—which is the only case to have considered this issue directly—involved a small public benefit corporation that is not comparable to the Commonwealth or ERS.  *See* 434 B.R. at 135.  And beyond *Off-Track Betting*, the typical practice in large municipal bankruptcies has been to allow and pay administrative expense claims under section 503(b)(1)(A), just as the debtors' current plan proposes to do here.[12]

### b.  Claims Based Upon the Post-Petition Legislation Did Not Arise Pre-Petition

The Retirement Committee and Oversight Board's second primary argument is that Claimants' claims have a pre-petition genesis because the ERS Bonds were issued prior to the filing of the bankruptcy petitions.  *See* FOMB Br. 26-27; RC Br. 7-8.  And, they point out, the *Reading* exception applies only to post-petition claims.  This argument also fails.

### i.  All Claimants' Claims Against the Commonwealth Arose Post-Petition

For one, Claimants' claims against the *Commonwealth* could not have arisen pre-petition because the Bondholders did not have a pre-petition contractual relationship with the Commonwealth.  The Commonwealth was not a party to the Bond Resolution, and the Bond Resolution makes expressly clear that the Commonwealth is "not liable" for the ERS Bonds.  *See* Bond Resolution § 201 ("Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth . . . ."); *id.* § 1305 (stating that the Bond Resolution did not create rights or

---

[12] *See* ECF 11946 in Case No. 17-3283, at § 1.50 & Art. III.  *See also, e.g.*, *In re City of Detroit, Mich.*, Case No. 13-53846, ECF No. 8272, at 30 & App. I, pp. 2-3, 30-31 ("The Plan expressly provides for the cash payment, in full, of Allowed Administrative Claims, including administrative expenses allowed under section 503(b) of the Bankruptcy Code . . . ."); *In re Jefferson County, Ala.*, Case No. 11-05736, ECF No. 2248, at 43 ("Section 2.2(b)(i) of the Plan provides that unless the Person holding an Allowed Administrative Claim agrees to different treatment, or already has been paid the full amount of such Allowed Administrative Claim, the County shall pay to that Person Cash in an amount equal to the Allowed amount of such Administrative Claim . . . ."); *id.*, ECF No. 1911, at 1, 39 (Jefferson County confirmed plan defining "Administrative Claim" as "a Claim for administrative costs or expenses that is entitled to priority in payment under Bankruptcy Code sections 503(b), 507(a)(2), and 901").

obligations for anyone except the parties thereto, which did not include the Commonwealth). Without a pre-petition contractual relationship, there is no basis for stating that claims against the Commonwealth have a pre-petition genesis. *See In re Hemingway Transp., Inc.*, 954 F.2d 1, 7 (1st Cir. 1992) (*Reading* does not apply to claims arising from a "prepetition contract *with the debtor*" (emphasis added)); *In re GT Advanced Techs., Inc.*, 547 B.R. 3, 13 (D.N.H. 2016) (same).

In addition, Claimants' claims against the Commonwealth have a post-petition genesis because the *source of the obligation to pay* is the Commonwealth's post-petition illegal, tortious, and unconstitutional conduct. As the First Circuit has made clear, a claim is post-petition when "[t]he source of the claimant's right to payment . . . originated during the *postpetition* period." *Hemingway*, 954 F.2d at 7 n.7; *see also In re Abercrombie*, 139 F.3d 755, 759 (9th Cir. 1998) (explaining that the claim in *Hemingway* arose pre-petition because "*the source of the estate's obligation* remain[ed] [a] prepetition fee provision" (emphasis added)). Both the Supreme Court and the First Circuit have made clear that the source of the obligation to pay on a post-petition tort claim is the tort itself. *See, e.g.*, *Reading*, 391 U.S. at 482 ("[I]t is theoretically sounder . . . to treat tort claims arising" post-petition as administrative claims); *Mammoth Mart*, 536 F.2d at 955 (recognizing that "[w]hen the debtor-in-possession commits a tort," the claim has a post-petition genesis). While the contract between Claimants and ERS might supply the measure of damages for the Commonwealth's wrongful conduct, Claimants' claims against the Commonwealth nonetheless have their source in statutory, tort, or constitutional law—not contract. *Cf. APG, Inc. v. MCI Telecomms. Corp.*, 436 F.3d 294, 303 (1st Cir. 2006) (discussing the tort of tortious interference with contractual relations). And the obligation to pay with respect to these claims did not arise until the Commonwealth enacted the Post-Petition Legislation.

For these two reasons, the authority the Oversight Board and Retiree Committee rely upon

is inapposite.  In *Mammoth Mart*, for example, the claims arose out of former employees' pre-petition employment relationship with the debtor that entitled the employees to severance pay based on the length of their pre-petition employment.  536 F.2d at 952.  The First Circuit explained that "[t]he claims for additional severance pay are based entirely upon services performed by appellants to the debtor" before the petition date.  *Id.* at 955.  The Court therefore concluded that because "no portion of appellants' claims can be apportioned to their employment after the [petition date], no portion of the severance pay claims can be entitled to [administrative expense] priority."  *Id.* at 953, 955.  Here, by contrast, the claims against the Commonwealth do not arise out of a pre-petition contract with the Commonwealth but are instead all based upon unconstitutional and tortious actions taken after the petition date.  Indeed, as *Mammoth Mart* itself explained, a claim is post-petition "when the debtor-in-possession's actions themselves[,] that is, considered apart from any obligation of the debtor[,] give rise to a legal liability"—for example, "[w]hen the debtor-in-possession commits a tort."  *Id.* at 955.

Similarly, the claims in both *Hemingway* and *Abercrombie* stemmed from attorneys' fees provisions contained in a pre-petition contract with the debtor, which the claimant invoked as the basis for recovering fees incurred in defending against a trustee's post-petition litigation.  954 F.2d at 4.  Like *Mammoth Mart*, and unlike the claims against the Commonwealth here, these cases involved "a right to payment *originating in a prepetition contract with the debtor*."  *Hemingway*, 954 F.2d at 3, 7 (emphasis added); *see also Abercrombie*, 139 F.3d at 756 (holding "that the claim [wa]s not an administrative expense, because it arises not out of the efforts to preserve the estate, but out of litigation over a contract entered into before the bankruptcy petition was filed").

### ii.   Claimants' Non-Contractual Claims Against ERS Arose Post-Petition

As for ERS, the same analysis applies with respect to the non-contractual claims asserted

by Claimants.  To be sure, both the Bond Resolution and the ERS Bonds are pre-petition contracts between Claimants and ERS.  As a result, claims for failure to pay principal and interest due under the Bonds and for breaches of the Bond Resolution have a pre-petition genesis under *Hemingway* and cannot give rise to administrative expense claims.

These, however, are not the only types of claims asserted by Claimants.  Claimants have also asserted constitutional, tort, automatic stay, fraudulent transfer, and equitable claims against ERS based upon ERS's post-petition actions with respect to the Post-Petition Legislation.  *See, e.g.*, Administrative Expense Motions ¶¶ 27, 34, 41, 42; Supplement ¶¶ 3, 4, 7-10.  Because these claims do not involve "a right to payment originating in a prepetition contract with the debtor," they do not give rise to pre-petition claims.  *Hemingway*, 954 F.2d at 3.  Consequently, if Claimants prove these claims, they will be entitled to administrative expense treatment for any damages.

### c.  The Objectors' Other Arguments Are Not Persuasive

In addition to their two primary arguments, the Objectors also reiterate arguments aimed at establishing that Claimants' claims should be dismissed under Rule 12(b)(6), such as that the Section 552 Decision eliminates any post-petition claims and that the Post-Petition Legislation was not illegal.  FOMB Br. 23-24, 27; RC Br. 9.  As these arguments concern the merits of Claimants' claims, rather than Claimants' entitlement to administrative expense treatment if their claims are successful, Claimants' full response to these arguments will be made in connection with their opposition to the Objectors' motions to dismiss, which will be filed on June 17, 2020.  Claimants incorporate the arguments stated therein by reference.

### B.  Even If the Claims Are Not Entitled to Administrative Expense Treatment, They Are Nondischargeable in this Proceeding.

Claimants' claims based upon the Post-Petition Legislation are non-dischargeable because they arose post-petition.  Section 944(b), made applicable to the Commonwealth and ERS cases

by PROMESA § 301, provides that upon confirmation of a plan of adjustment, the debtor is discharged from all debts. 11 U.S.C. § 944(b).[13]  Unlike the discharge provisions in chapters 7 and 11, however, section 944(b) does not expressly specify whether debts that arise after the petition date but before plan confirmation are discharged. *Cf.* 11 U.S.C. § 727(b) ("Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter . . . ."); 11 U.S.C. § 1141(d)(1)(A) ("Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . .").  For several reasons, however, the best interpretation of section 944(b) is that if Claimants' post-petition claims are not allowed as administrative expenses, they cannot be discharged by a plan of adjustment.

First, section 944(b) stands in stark contrast to section 1141(d)(1)(A), which specifies the scope of the discharge in chapter 11 cases and provides that "the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1)(a).  Many bankruptcy cases have held that this provision means what it says: debts arising between the filing of the petition and confirmation are discharged in chapter 11.  *See, e.g.*, *In re Arch Wireless*, 332 B.R. 241, 250 (D. Mass. 2005).  Congress thus knew how to provide that pre-confirmation debts were discharged, and it did not choose to include a similar provision in chapter 9.  That distinction should be honored, not rewritten.  *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) ("[W]hen we're engaged in the business of interpreting statutes

---

[13] Section 944(b) provides:  "Except as provided in subsection (c) of this section, the debtor is discharged from all debts as of the time when—(1) the plan is confirmed; (2) the debtor deposits any consideration to be distributed under the plan with a disbursing agent appointed by the court; and (3) the court has determined—(A) that any security so deposited will constitute, after distribution, a valid legal obligation of the debtor; and (B) that any provision made to pay or secure payment of such obligation is valid."  These provisions specify the time at which the discharge becomes effective, not the scope of the discharge.  *See* COLLIER ON BANKRUPTCY at ¶ 901.04, n.110.

34

we presume differences in language like this convey differences in meaning.").

Moreover, although there are few cases on this question, the available authority has concluded that post-petition claims are not discharged by plan confirmation in a chapter 9 case. In *In re City of Detroit, Michigan*, for example, the court noted that "[t]he only unresolved question in each motion is whether certain claims arose, for bankruptcy purposes, before the City filed for protection under Chapter 9 . . . because the City's liability on pre-petition claims was discharged when the Plan was confirmed." 548 B.R. 748, 751 (E.D. Mich. 2016). "Claimants holding post-petition claims," by contrast, "may be entitled to pursue other remedies." *Id.* The court ultimately held that one of the claims arose post-petition and thus was not discharged by confirmation of the plan. *Id.* at 767-70; *see also* COLLIER ON BANKRUPTCY at ¶ 901.04[13][b] ("[C]laims incurred by the municipality during the case will not be discharged, and will remain liabilities of the municipality after confirmation of a plan or dismissal of the case."); Vazquez & Dauchter, *Restructuring a Municipality Under Chapter 9*, 29 Aug. AMBKRIJ 50, 60-61 (2010) ("The discharge is likely limited to pre-petition debts and does not include debts arising during the chapter 9 case, but the Bankruptcy Code is ambiguous.").

Neither the Oversight Board nor the Retiree Committee seriously contends that post-petition claims not treated as administrative expenses are dischargeable in a municipal bankruptcy. The Oversight Board appears only to repeat its pre-petition genesis argument (p. 22) but, as explained above, that argument has no bearing on Claimants' claims against the Commonwealth or the non-contractual claims against ERS. *Supra*, at 30-33.

## **CONCLUSION**

For the reasons above, Claimants respectfully request that the Court enter judgment as a matter of law that Claimants may assert recourse claims against ERS and that any post-petition claims are entitled to administrative expense treatment and are nondischargeable.

In San Juan, Puerto Rico, today June 10, 2020.

/s/ Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3435
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

*Counsel for Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd., and SV Credit, L.P.*

/s/ Alicia I. Lavergne-Ramírez
José C. Sánchez-Castro
USDC-PR 213312
jsanchez@lsplawpr.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@lsplawpr.com

SÁNCHEZ & PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

/s/ Jason N. Zakia
John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax- Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*

/s/ Albéniz Couret-Fuentes
Albéniz Couret-Fuentes
USDC-PR Bar No. 222207
SEPULVADO, MALDONADO &
COURET
304 Ponce de León Ave. – Suite 990
San Juan, PR 00918
Telephone: (787) 765-5656
Facsimile: (787) 294-0073
Email: acouret@smclawpr.com

/s/ Luke A. Sizemore
Eric A. Schaffer (*pro hac vice*)
Luke A. Sizemore (*pro hac vice*)
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Email: eschaffer@reedsmith.com
Email: lsizemore@reedsmith.com

C. Neil Gray (*pro hac vice*)
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
Email: cgray@reedsmith.com

*Counsel for The Bank of New York Mellon, as fiscal agent*