# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| as representative of | ) | Case No. 3:17-bk-03283 (LTS) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| Debtors.[1] | ) | |
| | X | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| as representative of | ) | Case No. 3:17-bk-03566 (LTS) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| Debtor. | ) | |
| | X | |

# CLAIMANTS' BRIEF IN OPPOSITION TO
# MOTIONS TO DISMISS CLAIMANTS' PROOFS OF CLAIM
# AND MOTIONS FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-03283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-03284- LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-03567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-03566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-04780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-05233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. v

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................. 4

      A.     ERS ...................................................................................................... 4

      B.     Pension Funding Bonds Issued by ERS ............................................. 5

      C.     The Commonwealth's Failure to Make Required Contributions .......... 6

      D.     Enactment of PROMESA ................................................................... 7

      E.     The Post-Petition Legislation ............................................................ 8

      F.     Procedural Background ...................................................................... 10

STANDARD OF REVIEW ................................................................................................. 11

ARGUMENT ...................................................................................................................... 12

I.     CLAIMANTS HAVE SUFFICIENTLY ASSERTED ADMINISTRATIVE
     EXPENSE CLAIMS BASED UPON THE POST-PETITION LEGISLATION ........... 12

      A.     The 552 Decision Does Not Bar Claimants' Post-Petition Claims ..... 13

           1.   Claimants Are Secured Creditors With Respect to All
               Identifiable Collateral as of the Petition Date ............................. 13

           2.   Claimants Are Unsecured Creditors of ERS With Respect to
               Any Deficiency Claim .................................................................. 18

           3.   Claimants May Assert Claims Against the Commonwealth for
               Actions that Harmed Their Interests as Secured or Unsecured
               Creditors of ERS ......................................................................... 20

      B.     The Debtors' Post-Petition Acts Give Rise to Administrative Expense
           Claims and Are Non-Dischargeable ................................................... 23

      C.     The Debtors Have Waived Any Claim that PROMESA Preempts
           Employer Contributions, Which, In Any Event, It Does Not .............. 25

      D.     The Post-Petition Legislation Is Not Categorically Immune from
           Challenge ........................................................................................... 28

      E.     *Ultra Vires* Arguments Do Not Support Dismissal ............................ 30

      F.     Movants' Other Arguments Also Fail .................................................. 30

II.    THE CLAIMS ASSERTED AGAINST THE COMMONWEALTH SHOULD
     NOT BE DISMISSED ................................................................................................. 32

      A.     The Commonwealth Is Liable for Claims Based on the Post-Petition
           Legislation ......................................................................................... 33

# TABLE OF CONTENTS

(continued)

**Page**

1. The Commonwealth Violated the Automatic Stay ........................................ 33

    a.   Claimants Have Standing to Assert a Violation of § 362 ............ 33

    b.   The Post-Petition Legislation Is Not Exempt from the Automatic Stay Under PROMESA §§ 303 and 305 .................... 34

    c.   The Post-Petition Legislation Is Not Exempt from the Automatic Stay Under 11 U.S.C. § 362(b)(4) ............................. 39

2. The Commonwealth Violated the Contracts Clauses of the U.S. and Puerto Rico Constitutions ........................................................ 44

    a.   The Post-Petition Legislation Substantially Impaired Claimants' Contract with ERS ...................................................... 44

    b.   The Post-Petition Legislation Was Neither Reasonable Nor Necessary to Serve an Important Public Purpose ................ 52

3. The Post-Petition Legislation Violated the Takings Clauses of the U.S. and Puerto Rico Constitutions ............................................... 57

    a.   Claimants Have Asserted Recognized Property Interests ........... 58

    b.   Claimants Have Sufficiently Alleged A Taking ........................ 63

    c.   Movants' Remaining Arguments Likewise Lack Merit ............. 69

    d.   The Post-Petition Legislation Lacks a Public Purpose ............... 72

4. The Commonwealth Was Unjustly Enriched ................................. 74

5. The Commonwealth Is Liable Under PROMESA § 407 ............................. 79

6. The Commonwealth Fraudulently Acquired ERS Assets ............................. 83

7. The Commonwealth Tortiously Interfered with the Contract Between ERS and Claimants ................................................ 87

8. The Commonwealth Aided and Abetted ERS's Breach of Duties ................ 89

9. The Commonwealth Is Liable for Conversion ................................................. 90

10. The Commonwealth Is Liable for General Fault and Negligence ................ 90

11. The Pledged Property Remains Subject to Movants' Liens Under the UCC ................................................................. 91

12. The Commonwealth Is Liable for Harm from the Stay ............................. 91

B.   The Commonwealth Is Liable for Claims Based On Its Other Wrongful Conduct .......................................................... 93

    1.   The Commonwealth Violated the January Stipulation ................................. 93

## TABLE OF CONTENTS
### (continued)

Page

2. Collateral Transferred to the Commonwealth from ERS Pursuant to the Moratorium Act Was Taken in Violation of the Takings Clauses ........... 94

3. Any Revisions to the Enabling Act that Converted, Deferred, or Cancelled Owed But Unpaid Employer Contributions Was a Taking ........................................................................................... 96

4. The Commonwealth Unlawfully Failed to Pay Prepetition Contributions ..................................................................................... 98

III. THE CLAIMS ASSERTED AGAINST ERS SHOULD NOT BE DISMISSED ........... 99

A. Section 506(b) of the Bankruptcy Code Does Not Provide a Basis for Dismissing the Fiscal Agent's Claims for Fees, Expenses, and Indemnification ............................................................................. 99

B. Claimants' Request for a Determination of Secured Status in the ERS Title III Case Is Not Duplicative of Claims in the Lien Scope Adversary Proceeding ........................................................................ 101

C. ERS Is Liable for Claims Based On the Post-Petition Legislation ................... 102

1. ERS Breached the Bond Resolution .............................................. 102

2. ERS Was Unjustly Enriched .......................................................... 102

3. ERS Caused the Commonwealth's Unjust Enrichment ............................. 103

4. ERS Committed a Fraudulent Transfer ............................................ 103

5. ERS Committed Dolo in the Evasion of Contractual Duties ...................... 104

6. ERS Violated the Covenant of Good Faith ...................................... 105

7. ERS Committed Negligent Performance ........................................ 106

8. ERS Is Subject to Promissory Estoppel .......................................... 107

9. ERS Committed Conversion .......................................................... 108

10. ERS Is Liable for General Fault and Negligence ........................................ 108

D. ERS Is Liable for Claims Based on the Issuance of the ERS Bonds ................ 109

1. ERS Breached Representations and Covenants on Ability to Provide Liens ............................................................................ 109

2. ERS Breached Representations and Covenants on Ability to Issue Bonds ................................................................................ 111

3. ERS Committed Dolo in the Bond Issuance ................................ 111

4. ERS Committed Negligent Misrepresentation ............................ 112

5. ERS and Claimants Made a Mutual Mistake of Law ................... 113

## <u>TABLE OF CONTENTS</u>
(continued)

|  |  | **Page** |
|---|---|---|
| 6. | ERS Committed Breach of Warranty | 114 |
| CONCLUSION | | 115 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adames Mendez v. United States,*
 652 F. Supp. 356 (D.P.R. 1987)...........................................................................91

*Adria Int'l Grp., Inc. v. Ferre Dev., Inc.,*
 241 F.3d 103 (1st Cir. 2001).............................................................................106

*Aguilar v. ICE,*
 510 F.3d 1 (1st Cir. 2007)...................................................................................38

*Allied Structural Steel Co. v. Spannaus,*
 438 U.S. 234 (1978)....................................................................................44, 53

*AMPR v. Sist. Retiro Maestros IV,*
 190 D.P.R. 854, 868 (P.R. 2014) ........................................................................53

*AMPR v. Sist. Retiro Maestros IV,*
 190 D.P.R. 854 (P.R. 2014) ................................................................................49

*Armstrong v. United States,*
 364 U.S. 40 (1960)....................................................................................59, 65

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)...........................................................................................95

*Atl. Cleaners & Dyers, Inc. v. United States,*
 286 U.S. 427 (1932)...........................................................................................41

*Banco Commercial De P.R. v. Royal Exch. Assur. Corp.,*
 71 F.2d 933 (1st Cir. 1934)..............................................................................113

*Bank of N.Y. v. Treco* (*In re Treco*),
 240 F.3d 148 (2d Cir. 2001)...............................................................................60

*Baum-Holland v. El Conquistador P'ship L.P., S.E.,*
 336 F. Supp. 3d 6 (D.P.R. 2018)........................................................................22

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)...........................................................................................12

*Brown v. Legal Found. of Wash.,*
 538 U.S. 216 (2003)...........................................................................................64

*Buffalo Teachers Fed'n v. Tobe,*
 464 F.3d 362 (2d Cir. 2006)....................................................................... *passim*

*Casanova v. P.R.-Amer. Ins. Co.,*
 No. O-77-287, 1978 WL 48889 (P.R. Jan. 31, 1978).......................................113

*Cent. Int'l Co. v. Kemper Nat. Ins. Cos.,*
 202 F.3d 372 (1st Cir. 2000).............................................................................110

### <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*Chang v. United States*,
    859 F.2d 893 (Fed. Cir. 1988)..................................................................59

*Cherokee Nation of Okla. v. Leavitt*,
    543 U.S. 631 (2005)..............................................................................27

*Chrysler Corp. v. Kolosso Auto Sales, Inc.*,
    148 F.3d 892 (7th Cir. 1998) ............................................................45, 50

*Colon v. Promo Motor Imports, Inc.*,
    No. CC-96-443, 144 D.P.R. 659, 658 (P.R. 1997) .................................32

*Colon-Diaz v. Dep't of Educ.*,
    No. CV 09-1564, 2010 WL 11679378 (D.P.R. June 8, 2010)................90

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
    __ F. Supp. 3d __, No. 16CV4569, 2020 WL 2036723
    (S.D.N.Y. Apr. 28, 2020).............................................................62, 115

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993)..............................................................................68

*Connolly v. Pension Ben. Guar. Corp.*,
    475 U.S. 211 (1986)..........................................................................60, 65

*Constable v. Nat'l S.S. Co.*,
    154 U.S. 51 (1894)................................................................................23

*Cortes-Ramos v. Martin-Morales*,
    894 F.3d 55 (1st Cir. 2018)....................................................................21

*De Jesus Diaz v. Carrero*,
    12 P.R. Offic. Trans. 786 (P.R. 1982)......................................32, 83, 86

*Diaz-Ramos v. Hyndai Motor Co.*,
    501 F.3d 12 (1st Cir. 2007)....................................................................29

*Dorr v. United States*,
    195 U.S. 138 (1904)..............................................................................58

*Elena v. Municipality of San Juan*,
    677 F.3d 1 (1st Cir. 2012).....................................................................58

*Energy Reserves Grp. Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983)....................................................................44, 53, 54

*Ex parte Young*,
    209 U.S. 123 (1908)..............................................................................28

*Falcone v. Pierce*,
    864 F.2d 226 (1st Cir. 1988)...............................................................114

vi

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*Fershtman v. Schectman*,
  450 F.2d 1357 (2d Cir. 1971)..................................................................32

*Fideicomiso de la Tierra del Caño Martin Peña v. Fortuño*,
  604 F.3d 7 (1st Cir. 2010)................................................................58, 73

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
  85 F. Supp. 3d 577 (D.P.R. 2015)..........................................................59

*Garbincius v. Boston Edison Co.*,
  621 F.2d 1171 (1st Cir. 1980)..............................................................110

*Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*,
  863 F.3d 718 (7th Cir. 2017) ................................................................51

*Gen. Office Prod. Corp. v. A.M. Capen's Sons, Inc.*,
  780 F.2d 1077 (1st Cir. 1986)................................................................88

*Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.*,
  15 P.R. Offic. Trans. 727 (1984)............................................................88

*Gencarelli v. UPS Capital Bus. Credit*,
  501 F.3d 1 (1st Cir. 2007)....................................................................101

*Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp.*,
  92 F. Supp. 2d 8 (D.P.R. 2000)............................................104, 105, 111

*General Motors Corp. v. Romein*,
  503 U.S. 181 (1992)..............................................................................45

*Gilbert v. City of Cambridge*,
  932 F.2d 51 (1st Cir. 1991)....................................................................68

*Gomez v. Toledo*,
  446 U.S. 635 (1980)..............................................................................62

*González-Álvarez v. Rivero-Cubano*,
  426 F.3d 422 (1st Cir. 2005)..................................................................71

*Granada Wines, Inc. v. New Eng. Teamsters & Trucking Indus. Pension Fund*,
  748 F.2d 42 (1st Cir. 1984)....................................................................20

*Gray v. Evercore Restructuring L.L.C.*,
  544 F.3d 320 (1st Cir. 2008)............................................................12, 62

*Gutierrez de Martinez v. Lamagno*,
  515 U.S. 417 (1995)..............................................................................38

*Hadacheck v. Sebastian*,
  239 U.S. 394 (1915)..............................................................................68

*Hawaii Housing Authority v. Midkiff*,
  467 U.S. 229 (1984)..............................................................................73

# **TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Henson v. Santander Consumer USA Inc.*,
137 S. Ct. 1718 (2017)..................................................................................................40

*Hodel v. Irving*,
481 U.S. 704 (1987)......................................................................................................96

*Home Bldg. & Loan Ass'n v. Blaisdell*,
290 U.S. 398 (1934)......................................................................................................53

*Houlton Citizens' Coal. v. Town of Houlton*,
175 F.3d 178 (1st Cir. 1999)........................................................................................44

*Hutt v. Dean Witter Reynolds, Inc.*,
737 F. Supp. 128 (D. Mass. 1990) ..............................................................................32

*In re Adler, Coleman Clearing Corp.*,
263 B.R. 406 (S.D.N.Y. 2001)....................................................................................86

*In re Albion Disposal, Inc.*,
217 B.R. 394 (W.D.N.Y. 1997)........................................................................29, 33, 40

*In re Bernadin*,
610 B.R. 787 (Bankr. E.D. Pa. 2019) .........................................................................75

*In re Beverages Int'l Ltd.*,
50 B.R. 273 (Bankr. D. Mass. 1985) ...........................................................................11

*In re Charlesbank Laundry, Inc.*,
755 F.2d 200 (1st Cir. 1985)................................................................................2, 23, 24

*In re City of Detroit*,
504 B.R. 191 (Bankr. E.D. Mich. 2013)................................................................37, 82

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014)......................................................................71

*In re City of Detroit, Mich.*,
548 B.R. 748 (Bankr. E.D. Mich. 2016)......................................................................24

*In re City of Stockton (Stockton II)*,
526 B.R. 35 (Bankr. E.D. Cal.)............................................................................35, 37, 82

*In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*,
805 F.2d 440 (1st Cir. 1986)........................................................................................43

*In re FOMB for P.R.*,
297 F. Supp. 3d 269 (D.P.R. 2018)....................................................................52, 56, 57

*In re FOMB for P.R.*,
301 F. Supp. 3d 278 (D.P.R. 2017)..............................................................................39

*In re FOMB for P.R.*,
590 B.R. 577 (D.P.R. 2018).........................................................................................93

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re FOMB for P.R.*,
914 F.3d 694 (1st Cir. 2019) .......................................................................4, 5, 14, 57

*In re FOMB for P.R.*,
919 F.3d 638 (1st Cir. 2019) ........................................................................................72

*In re FOMB for P.R.*,
945 F.3d 3 (1st Cir. 2019) ............................................................................................27

*In re FOMB for P.R.*,
948 F.3d 457 (1st Cir. 2020) ......................................................................14, 15, 34, 97

*In re Gutierrez*,
526 B.R. 449 (Bankr. D.P.R. 2015) .............................................................................22

*In re Harford Sands Inc.*,
372 F.3d 637 (4th Cir. 2004) .......................................................................................12

*In re Hemingway Transp., Inc.*,
954 F.2d 1 (1st Cir. 1992) ............................................................................................24

*In re Hemingway Transp., Inc.*,
993 F.2d 915 (1st Cir. 1993) ................................................................................. *passim*

*In re Integrated Agri, Inc.*,
313 B.R. 419 (Bankr. C.D. Ill. 2004) ..........................................................................83

*In re Killmer*,
501 B.R. 208 (Bankr. S.D.N.Y. 2013) ........................................................................34

*In re Lacoquille Investment Co., Inc.*,
44 B.R. 731 (Bankr. S.D. Fla. 1984) ...........................................................................42

*In re Lopez-Soto*,
764 F.2d 23 (1st Cir. 1985) ..........................................................................................39

*In re McMullen*,
386 F.3d 320 (1st Cir. 2004) ................................................................................. *passim*

*In re Nortel Networks, Inc.*,
669 F.3d 128 (3d Cir. 2011) ............................................................................41, 42, 43

*In re Pension Reform Litig.*,
2015 IL 118585, 32 N.E.3d 1 .................................................................................55, 67

*In re Racing Servs., Inc.*,
540 F.3d 892 (8th Cir. 2008) .......................................................................................75

*In re Radcliffe*,
390 B.R. 881 (N.D. Ind. 2008) ....................................................................................34

*In re Reza Farzan, Debtor.*,
No. 19-29256 (CMG), 2020 WL 2769046 (Bankr. D.N.J. May 27, 2020) ...........................12

## TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Roco Corp.*,
701 F.2d 978 (1st Cir. 1983) ............................................................................86

*In re Sepulveda Figueras*,
193 B.R. 118 (Bankr. D.P.R. 1996) ..................................................................86

*In re Skorich*,
482 F.3d 21 (1st Cir. 2007) ..............................................................................80

*In re Soares*,
107 F.3d 969 (1st Cir. 1997) ............................................................................38

*In re Teligent, Inc.*,
325 B.R. 81 (Bankr. S.D.N.Y. 2005) ...............................................................85

*In re Thompson*,
965 F.2d 1136 (1st Cir. 1992) ..........................................................................21

*In re Wheeler*,
12 B.R. 908 (Bankr. D. Mass. 1981) ...............................................................92

*Kelo v. City of New London*,
545 U.S. 469 (2005) ...........................................................................20, 73, 74

*Klingman v. Levinson*,
158 B.R. 109 (N.D. Ill. 1993) ..........................................................................84

*Knick v. Twp. of Scott*,
139 S. Ct. 2162 (2019) ...............................................................................17, 72

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ....................................................................................58, 59

*Lass v. Bank of Am., N.A.*,
695 F.3d 129 (1st Cir. 2012) ............................................................................79

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .............................................................................63, 64, 66

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) ................................................................................ *passim*

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........................................................................................64

*Lynch v. United States*,
292 U.S. 571 (1934) ....................................................................................59, 60

*Maine Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) ...............................................................................26, 27

*Mann v. Chase Manhattan Mortg. Corp.*,
316 F.3d 1 (1st Cir. 2003) ................................................................................38

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*Marrero-Rodriguez v. Municipality of San Juan*,
677 F.3d 497 (1st Cir. 2012) ................................................................54

*McAndrews v. Fleet Bank of Mass., N.A.*,
989 F.2d 13 (1st Cir. 1993) ..................................................................68

*Morton Arboretum v. Thompson*,
605 F. Supp. 486 (N.D. Ill. 1984) .......................................................47

*Moushigian v. Marderosian*,
764 F.3d 123 (1st Cir. 2014) ...............................................................71

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017) ...........................................................20, 64, 67

*Nat'l Educ. Ass'n-R.I. ex rel. Scigulinsky v. Ret. Bd. of R.I. Emps.' Ret. Sys.*,
172 F.3d 22 (1st Cir. 1999) ..................................................................59

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
287 F.3d 1 (1st Cir. 2002) ..................................................................106

*New Ponce Shopping Ctr., S.E. v. Integrand Assur. Co.*,
86 F.3d 265 (1st Cir. 1996) ..........................................................62, 115

*Ogle v. Fid. & Deposit Co. of Md.*,
586 F.3d 143 (2d Cir. 2009) ..............................................................100

*Ortiz Andújar v. Commonwealth*,
22 P.R. Offic. Trans. 774 (1988) ......................................74, 75, 77, 78

*P.R. Tel. Co. v. SprintCom, Inc.*,
662 F.3d 74 (1st Cir. 2011) ..................................................................78

*Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.*,
173 F.3d 46 (1st Cir. 1999) ..................................................................55

*Parkview Adventist Med. Ctr. v. United States*,
842 F.3d 757 (1st Cir. 2016) ...............................................................42

*Peaje Invs. LLC v. García-Padilla*,
845 F.3d 505 (1st Cir. 2017) .........................................................66, 71

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......................................................................64, 66

*Penn. Coal Co. v. Mahon*,
260 U.S. 393 (1922) .............................................................................64

*People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*,
814 F. Supp. 159 (D. Me. 1993) ..........................................................22

*Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands*,
247 U.S. 385 (1918) ...........................................................................114

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Plan Bienestar Salud v. Alcalde Cabo Rojo,*
14 P.R. Offic. Trans. 896 (1983) ...................................................................75, 78

*Pro-Eco, Inc. v. Board of Commissioners of Jay County,*
57 F.3d 505 (7th Cir. 1995) .................................................................................60

*Punta Lima, LLC v. Punta Lima Dev. Co., LLC,*
No. 19-cv-1673 (FAB), 2020 WL 710770 (D.P.R. Feb. 11, 2020) .......................78

*Reading Co. v. Brown,*
391 U.S. 471 (1968) ..................................................................................2, 23, 24

*Redondo Constr. Corp. v. Izquierdo,*
662 F.3d 42 (1st Cir. 2011) ................................................................................51

*Ropico, Inc. v. City of New York,*
425 F. Supp. 970 (S.D.N.Y. 1976) ......................................................................70

*Rosario Rivera v. Ramos,*
5 P.R. Offic. Trans. 152 (1976) .........................................................................74

*Russello v. United States,*
464 U.S. 16 (1983) .............................................................................................40

*Salazar v. Ramah Navajo Chapter,*
567 U.S. 182 (2012) ...........................................................................................27

*Santiago Nieves v. A.C.A.A.,*
No. RE-86-266, 1987 WL 448258 (P.R. Nov. 25, 1987) ...................................107

*Satellite Broad. Cable, Inc. v. Telefonica de Espana, S.A.,*
807 F. Supp. 218 (D.P.R. 1992) .........................................................................32

*SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.),*
571 F.3d 826 (9th Cir. 2009) ...........................................................................100

*Solarchick ex rel. Solarchick v. Metro. Life Ins. Co.,*
430 F. Supp. 2d 511 (W.D. Pa. 2006) ................................................................32

*SummitBridge Nat'l Invs. III, LLC v. Faison,*
915 F.3d 288 (4th Cir. 2019) ...........................................................................100

*Thames Shipyard & Repair Co. v. United States,*
350 F.3d 247 (1st Cir. 2003) .............................................................................28

*Town of Chester v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017) .......................................................................................72

*Trinidad Hernández v. ELA,*
188 D.P.R. 828, 834 (P.R. 2013) ...................................................................44, 57

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.,*
817 F. Supp. 2d 934 (N.D. Tex. 2011) ...............................................................86

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*U.S. Fid. & Guar. Co. v. Guzmán,*
2012 WL 4790314 (D.P.R. Sept. 20, 2012)........................................................................86, 87

*U.S. Tr. Co. of N.Y. v. New Jersey,*
431 U.S. 1 (1977)................................................................................................................ *passim*

*UAW v. Fortuño,*
633 F.3d 37 (1st Cir. 2011).................................................................................53, 54, 56, 57

*Unisys Corp. v. Dataware Prods., Inc.,*
848 F.2d 311 (1st Cir. 1988).............................................................................................83

*United States v. Castleman,*
572 U.S. 157 (2014).............................................................................................................41

*United States v. Michigan,*
518 F. Supp. 966 (E.D. Mich. 1981)..................................................................................47

*United States v. Sec. Indus. Bank,*
459 U.S. 70 (1982)...............................................................................................................65

*United States v. Va. Elec. & Power Co.,*
365 U.S. 624 (1961).............................................................................................................61

*United States v. Williams,*
553 U.S. 285 (2008).............................................................................................................40

*Von Hoffman v. City of Quincy,*
71 U.S. 535 (1866)..........................................................................................................45, 46

*W.B. Worthen Co. ex rel. Bd. of Comm'rs v. Kavanaugh,*
295 U.S. 56 (1935)..........................................................................................................46, 47

*Wash. Legal Found. v. Mass. Bar Found.,*
993 F.2d 962 (1st Cir. 1993)..............................................................................................58

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,*
449 U.S. 155 (1980).............................................................................................................64

*Westernbank P.R. v. Kachkar,*
No. 07-cv-1606, 2009 WL 6337949 (D.P.R. Dec. 10, 2009) ............................................78

*Westernbank P.R. v. Kachkar,*
No. CV 07-1606, 2008 WL 11357939 (D.P.R. Sept. 5, 2008) ...............................108, 109

*Wilmington Tr. Co. v. Tribune Media Co. (In re Tribune Media Co.),*
No. 15-01116-RGA, 2008 WL 6167504 (D. Del. Nov. 26, 2018) .......................................100

*Wolff v. City of New Orleans,*
103 U.S. 358 (1880).............................................................................................................46

*Wright v. Union Cent. Life Ins. Co.,*
311 U.S. 273 (1940).............................................................................................................60

# TABLE OF AUTHORITIES
(continued)

Page(s)

CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const., Amendment V .................................................................................57

U.S. Const., Article I ...........................................................................................44

U.S. Const., Article VI ........................................................................................29

P.R. Const. Article II .........................................................................44, 57, 58, 78

11 U.S.C. § 101 .................................................................................31, 80, 108

11 U.S.C. § 102 ...................................................................................................19

11 U.S.C. § 106 ...................................................................................................37

11 U.S.C. § 325 ...................................................................................................41

11 U.S.C. § 361 ...................................................................................................92

11 U.S.C. § 362 .............................................................................................passim

11 U.S.C. § 501 ...........................................................................................79, 110

11 U.S.C. § 503 .........................................................................................2, 23, 24

11 U.S.C. § 506 ...................................................................................................91

11 U.S.C. § 546 ...................................................................................................41

11 U.S.C. § 549 ...................................................................................................41

11 U.S.C. § 550 ...........................................................................................41, 104

11 U.S.C. § 903 ...................................................................................................35

11 U.S.C. § 904 ...................................................................................................35

11 U.S.C. § 922 ...........................................................................................41, 91, 115

11 U.S.C. § 944 ...................................................................................................71

11 U.S.C. § 1519 .................................................................................................41

11 U.S.C. § 1520 .................................................................................................41

11 U.S.C. § 1521 .................................................................................................41

28 U.S.C. § 1410 .................................................................................................41

31 U.S.C. § 3727 .................................................................................................62

48 U.S.C. § 2141 .......................................................................8, 28, 81, 82

48 U.S.C. § 2161 .............................................................................................passim

48 U.S.C. § 2162 ...................................................................................................7

48 U.S.C. § 2164 ...................................................................................................7

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

48 U.S.C. § 2165 ........................................................................................................... 38

48 U.S.C. § 2175 ............................................................................................................. 7

48 U.S.C. § 2194 ........................................................................................................... 41

48 U.S.C. § 2195 .................................................................................................... *passim*

3 L.P.R.A. § 763 (2008) .................................................................................................. 4

3 L.P.R.A. § 779 (2008) ............................................................................................. 5, 51

3 L.P.R.A. § 781 (2008) .................................................................................... 4, 6, 9, 36

3 L.P.R.A. § 781 ....................................................................................................... 26, 36

3 L.P.R.A. § 781a ...................................................................................................... 5, 49

3 L.P.R.A. § 782 (2008) .................................................................................................. 4

3 L.P.R.A. § 782 .............................................................................................................. 49

3 L.P.R.A. § 787 (2008) .................................................................................................. 4

3 L.P.R.A. § 787 .................................................................................................. 26, 36, 49

3 L.P.R.A. § 787f (2008) ................................................................................................. 4

3 L.P.R.A. § 787q (2008) ................................................................................................ 4

3 L.P.R.A. § 787q .......................................................................................................... 49

31 L.P.R.A. § 4 .............................................................................................................. 22

31 L.P.R.A. § 3018 ............................................................................................... 104, 107

31 L.P.R.A. § 3028 ........................................................................................... 83, 87, 104

31 L.P.R.A. § 3375 ...................................................................................................... 105

31 L.P.R.A. § 3408 ....................................................................................................... 111

31 L.P.R.A. § 3492 .................................................................................................. 83, 87

31 L.P.R.A. § 3499 .................................................................................................. 83, 87

31 L.P.R.A. § 5141 ................................................................................................ 90, 112

N.Y. Gen. Oblig. Law § 13-107 (McKinney) ...................................................... 62, 115

## OTHER AUTHORITIES

11 Williston on Contracts § 32:7 (4th ed.) .................................................................... 50

27 Williston on Contracts § 70:15 (4th ed.) ................................................................. 113

Martin J. Bienenstock, *et al.*, *Are Triangular Setoff Agreements Enforceable in
Bankruptcy?*, 83 Am. Bankr. L.J. 325 (2009) .............................................................. 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Black's Law Dictionary* (10th ed. 2014)................................................................33

COLLIER ON BANKRUPTCY ....................................................................................24

Dan B. Dobbs et al., *The Law of Torts* (2d ed. 2011) ............................................32

ERS, *Annual Financial Information Fiscal Year 2016* ............................................5

E. Allan Farnsworth, *Farnsworth on Contracts* Vol. II........................................110

Fed. R. Bankr. P. 3001 ...............................................................................11, 31, 63

Fed. R. Bankr. P. 4007.............................................................................................70

Fed. R. Civ. P. 8 ...........................................................................................12, 79, 103

*Financial Information and Operating Data Report* (Oct. 30, 2014) .......................5

*Financial Information and Operating Data Report* (Dec. 18, 2016) .......................5

H.R. Rep. No. 114–602 (2016).........................................................................28, 82

Mediation: Summary of Cash Restriction Analysis (Oct. 2, 2019) ........................92

Restatement (Second) of Contracts § 90 (1981) ...................................................107

Restatement (Second) of Torts § 549....................................................................32

S. Rep. No. 95-989 (1978)......................................................................................41

Stuart M. Speiser et al., *American Law of Torts* § 24:13.......................................32

UCC Article 8 .........................................................................................................30

## <u>PRELIMINARY STATEMENT</u>

Shortly after filing for protection under Title III of PROMESA and becoming subject to the jurisdiction of this Court, the Commonwealth and ERS, at the direction of the Oversight Board, drafted and secured passage of two laws—Joint Resolution 188 and Act 106—designed to dismantle ERS, require ERS to liquidate its remaining assets, and mandate transfer of the proceeds to the Commonwealth along with all future payments that ERS was slated to receive. The two statutes directed the Commonwealth to make the pension payments ERS formerly made—and gave the Commonwealth the revenues ERS formerly used to make those payments—but left ERS's $3 billion of bond debt stranded at a debtor that was stripped of all its assets and that—by design—would have no revenues. Obviously, this was illegal, and Claimants have advanced a series of legal bases for their claims against the Commonwealth and ERS. As explained in Claimants' proofs of claim, motions for allowance of administrative claims, and the related supplement, the actions taken by the Commonwealth and ERS violate the U.S. and Puerto Rico Constitutions, are void under the automatic stay, and are contrary to other applicable law.[2]

Movants now seek dismissal of Claimants' proofs of claim and Administrative Expense Motions, but none of their arguments is convincing, and their motions should be denied.

First, Movants place great weight on the First Circuit's recent decision about the effect of Bankruptcy Code § 552 on post-petition employer contributions (the "<u>552 Decision</u>"), arguing that the 552 Decision requires the Court to dismiss all claims based upon the Post-Petition Legislation. This is not correct. The 552 Decision does not justify the dismissal of any—much less all—of

---

[2] Claimants include certain beneficial owners of bonds issued by ERS represented by Jones Day, certain beneficial owners of bonds issued by ERS represented by White & Case, LLP, and The Bank of New York Mellon as fiscal agent for the ERS Bonds, reflected in the signature blocks at the end of this Opposition. Capitalized terms used but not defined herein have the meanings given in the ERS Bondholders' Supplement to Proofs of Claim and Motions for Allowance of Administrative Expense Claims. No. 17-3283, Dkt. No. 12536 (the "<u>Supplement</u>" or "<u>Supp.</u>"). Case citations throughout this brief have been cleaned up to omit internal citations and quotation marks.

Claimants' claims. For one, Claimants have liens on assets other than post-petition employer contributions. Additionally, Claimants have rights as unsecured creditors on any portion of their claims not covered by the value of their liens. Accordingly, the 552 Decision does not justify wholesale dismissal of the claims raised in Claimants' Administrative Expense Motions.

The Commonwealth's limited promise to return certain transferred assets following the Lien Scope AP does not change the outcome. The Lien Scope AP is not designed to—and will not—result in a valuation of the amount of Claimants' secured claim. Rather, it will resolve only whether certain categories of assets are or are not collateral. And the Lien Scope AP does not even purport to resolve existing disputes about the value of certain categories of assets that the parties agree are collateral but dispute in amount, including employer contributions where the amounts due were owed and calculated, but unpaid, as of the petition date. As explained below, although the Board unrealistically asserts that these accounts receivable were worth only $105.5 million, the true amount is measured in billions of dollars. *See infra* at 6-7, 13-16. Thus, even after the Lien Scope AP is resolved, there will still likely be a dispute over the value of Claimants' secured claim that can only be resolved here. In any event, an adverse party's promise to return some of the confiscated collateral is not a reason to dismiss litigation to recover the wrongfully taken property. Until the property is returned, the claims remain very much alive.[3]

Second, contrary to Movants' suggestion, Claimants are entitled to assert administrative expense claims against the Commonwealth and ERS for their post-petition acts under 11 U.S.C. § 503(b)(1)(A). *See Reading Co. v. Brown*, 391 U.S. 471, 477-82 (1968); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 203 (1st Cir. 1985). In any case, even if claims based upon the Post-

---

[3] Movants also speak out of both sides of their mouths on this issue—promising that the Commonwealth will return Claimants' collateral in one sentence, while vigorously resisting any administrative expense claim for return of that same collateral in another.

Petition Legislation do not qualify as administrative expenses, all such claims are non-dischargeable in a Title III case because the wrongful conduct occurred after the Commonwealth and ERS petition dates. Simply put, there is no scenario in which Claimants' post-petition claims can be resolved through the Title III process unless treated as administrative expenses.

Third, Movants' additional theories for dismissing the administrative expense claims based on the Post-Petition Legislation similarly fail: Their newfound argument that PROMESA somehow preempted the ERS Enabling Act's requirement to make employer contributions (after almost four years of litigation over those contributions) is untimely and, in any event, incorrect. Their suggestion that the Post-Petition Legislation is categorically immune from challenge misunderstands the law. And their attempt to import *ultra vires* issues into this litigation is contrary to this Court's orders and, in any event, seeks an impermissible advisory opinion.

Additionally, Movants' specific reasons for the dismissal of particular claims against the Commonwealth are not persuasive. Contrary to Movants' suggestion, Claimants properly base several claims on the Commonwealth's enactment of the Post-Petition Legislation, which is void under the automatic stay, in violation of the Contracts Clauses and Takings Clauses of the U.S. and Puerto Rico Constitutions, and violates PROMESA § 407. The Commonwealth is also liable under Puerto Rico law for its unjust enrichment, fraudulent acquisition of ERS assets, aiding and abetting ERS's breach of its contract with Claimants, tortious interference with that contract, conversion, general fault or negligence, and failure to make statutorily required prepetition employer contribution payments to ERS. Finally, the Commonwealth is also liable for its wrongful conduct other than with respect to the Post-Petition Legislation, including takings effected through the Moratorium Act and revisions to the ERS Enabling Act.

Movants' specific reasons for dismissal of particular claims against ERS similarly fail.

Claimants have properly pled claims against ERS under Puerto Rico law for breach of contract, unjust enrichment, causing the Commonwealth's unjust enrichment, fraudulent transfer, dolo in the evasion of contractual duties and bond issuance, violation of the covenant of good faith, negligent performance, promissory estoppel, conversion, general fault or negligence, breaches of representations and covenants regarding its ability to provide liens and issue bonds, negligent misrepresentation, mutual mistake of law, and breach of warranty.

Accordingly, this Court should deny the motions to dismiss in their entirety.

## **BACKGROUND**

### A.   ERS

The Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") "is a trust and government agency created in 1951 by an Act of the Commonwealth," and it "is structured to provide pensions and other retirement benefits to employees and officers of the Commonwealth government, members and employees of the Commonwealth's Legislative Assembly, and officers and employees of the Commonwealth's municipalities and public corporations." *In re FOMB for P.R.*, 914 F.3d 694, 704 (1st Cir. 2019). ERS "is designated as 'independent and separate' from other Commonwealth agencies." *Id.*

Until legislation that took effect on July 1, 2017, *see infra* at 8-10, ERS was funded by employer contributions, employee contributions, and investment earnings. *E.g.*, 3 L.P.R.A. §§ 763(42), 787f, 787q (2008). Employers were required to pay monthly contributions to ERS, and to cover any shortfalls between those contributions and the cost of accrued benefits. 3 L.P.R.A. §§ 781(d)-(e), 787, 782(d) (2008). ERS's "statutory right to receive [e]mployer[] [c]ontributions [was] an obligation of the [e]mployers and a legal asset of [ERS]." No. 17-3283, Dkt. No. 13400-1 at VI-1 (the "Bond Resolution").

The Commonwealth was ERS's largest participating employer. Historically, the

4

Commonwealth was responsible for about 59 percent of employer contributions made to ERS, while Puerto Rico municipalities and public corporations were responsible for the rest. *See, e.g.*, Commonwealth of Puerto Rico, *Financial Information and Operating Data Report* 88 n.6, 130 (Oct. 30, 2014); Commonwealth of Puerto Rico, *Financial Information and Operating Data Report* 228 (Dec. 18, 2016).[4] ERS had statutory authority to compel payment of unpaid employer contributions, and any contributions in arrears for more than 30 days had priority over any other outstanding debt of a public employer. 3 L.P.R.A. § 781a(h). ERS also had power to intercept or garnish a delinquent municipality's property tax revenues, and obtain a certificate of indebtedness from the Treasury Department for delinquent public corporation or agency contributions. *Id.* Puerto Rico law also provided for interest on delinquent contributions, which it called "debts," and imposed criminal penalties for failure to timely remit employer contributions to ERS. *Id.* § 781a(f).

### B.    Pension Funding Bonds Issued by ERS

Despite ERS's dependence on employer contributions, the Commonwealth has never paid ERS enough to satisfy its statutory contribution requirements. By the time ERS filed its Title III petition, the Commonwealth owed ERS more than $411 million. ERS, *Annual Financial Information Fiscal Year 2016*, 13 n.1.[5]

Consequently, ERS was forced to find outside funding to pay pension benefits. ERS had the statutory right to issue debt, "securing said debt with the assets of the [ERS]." 3 L.P.R.A. § 779(d) (2008). In 2008, "[s]eeking to decrease an unfunded liability of approximately $9.9 billion," *In re FOMB for P.R.*, 914 F.3d at 704, ERS authorized the issuance of pension funding bonds pursuant to the Bond Resolution, *see* Bond Resolution Cover Page. The majority of ERS Bonds were sold to, and are still held by, individual Puerto Rico residents and local businesses.

---

[4] *Available at* http://hacienda.gobierno.pr/sites/default/files/CommonwealthReport-October302014.pdf.
[5] *Available at* https://emma.msrb.org/ER1050099-ER822796-ER1223828.pdf.

An integral part of ERS's bond issuance was an extensive security package to protect Bondholders' investment. ERS granted Bondholders, through a Fiscal Agent, a security interest in and lien on certain ERS property, including, *inter alia*, all employer contributions received by ERS, all "right, title, and interest of [ERS] in and to" those contributions, and "all rights to receive [those contributions]," (as defined in the Bond Resolution, the "Pledged Property"). Bond Resolution at VI-8, VI-36. That property was to remain "free and clear of any pledge, lien, charge or encumbrance," *id.* at VI-15, and was to be used to make timely principal and interest payments on ERS Bonds, *id.* at VI-8. Notably, ERS also pledged its statutory right to collect employer contributions, and that right was exercisable upon default. *Id.* at VI-8, VI-22. ERS further promised Bondholders that it would "oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in … relevant legislation that would have a material adverse effect on Bondholders." *Id.* at VI-16.

## C.     The Commonwealth's Failure to Make Required Contributions

In the years following the bond issuance, the Commonwealth and many of its agencies continued to fail to make the required contributions. Indeed, when the Enabling Act was amended in 2011, the Legislature noted that "the Central Government has contributed to the Actuarial Deficit and the Cash Flow Deficit of [ERS] because its employer contributions have been less than what the law itself requires," for example, due to a "[f]ailure to implement Section 2-116 of the [ERS Enabling Act]." Statement of Motives, Act 116-2011 ("Act 116"), attached hereto as Exhibit 1; 3 L.R.P.A. § 781 (2008) ("Enabling Act § 2-116"). The Central Government was not the only delinquent employer. For example, Act 116 noted that two public corporations—the State Insurance Fund and the Aqueduct and Sewer Authority—each owed ERS *almost a billion dollars* in unpaid, but owed and calculated, employer contributions. *See id.* Act 116 noted that "undoubtedly, a payment plan [was] necessary to collect this accrued debt," and suggested a ten-

year payment plan would be appropriate. *Id.* ERS's financial statements show these contributions—and the other owed and calculated contributions—were never fully paid. Ultimately, upon information and belief, these amounts remained unpaid as of the petition date or, alternatively, were converted into other obligations, deferred, or otherwise taken by the Commonwealth. Indeed, the Board unrealistically contends that, as of the ERS petition date, ERS's accounts receivable for owed, but unpaid employer contributions was a mere $105.5 million. No. 17-3566, Dkt. No. 516 at ¶ 2 (the "Lien Scope Adv. Compl."). Needless to say, this is impossible to reconcile with the history summarized here, and Claimants vigorously dispute this amount.

### D.    Enactment of PROMESA

On June 30, 2016, Congress enacted PROMESA. Under the financial restructuring authority provided by Title III of PROMESA, 48 U.S.C. §§ 2162, 2175, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Board") filed petitions on behalf of the Commonwealth and ERS on May 3 and 21, 2017, respectively. Under PROMESA, the Board simultaneously serves as each Debtor's representative, *see* 48 U.S.C. § 2175(b), despite ERS and the Commonwealth having directly conflicting interests—including that the Commonwealth owes ERS vast sums of money. Indeed, the same lawyers represent both Debtors.

Notwithstanding the Board's simultaneous representation of ERS and the Commonwealth, PROMESA demands that each Debtor be treated as a distinct entity. Territories and covered territorial instrumentalities are considered separate entities, *id.* § 2162(1), and each entity decides for itself whether it "desires to effect a plan to adjust its debts," *id.* § 2162(3). And although the Board is the representative of each Debtor, *id.* § 2175(b), PROMESA states that "nothing in [Title III] shall be construed as authorizing substantive consolidation of the cases of affiliated debtors," *id.* § 2164(f), even if the cases are administered jointly, *id.* § 2164(g). To the contrary, PROMESA requires that Debtors' separateness be respected. Among other things, it requires that fiscal plans

7

not transfer funds between different territorial instrumentalities, *id.* § 2141(b)(1)(M), and it provides creditors with a cause of action to challenge inter-debtor transfers, *id.* § 2195.

### E.     The Post-Petition Legislation

The filing of ERS's Title III petition on May 21, 2017, triggered an automatic stay to protect ERS's property. 11 U.S.C. § 362; 48 U.S.C. § 2161(a) (incorporating § 362 into PROMESA). But on June 25, 2017, in total disregard of that stay, the Puerto Rico Legislative Assembly passed Joint Resolution for Other Allocations for Fiscal Year 2017-2018 ("Joint Resolution 188" or "J.R. 188"), attached hereto as Exhibit 2, pursuant to the Fiscal Plan the Board had approved and certified for the Commonwealth. Joint Resolution 188 required ERS to sell all of its assets and transfer the proceeds, plus any other available funds, to the Commonwealth's General Fund. J.R. 188, §§ 1-3. It also required employers to make future contributions directly to the Commonwealth's General Fund, rather than to ERS. *Id.* §§ 1-4. On June 30, 2017, the Board adopted the resolution on behalf of the Governor, who then signed it.

On August 23, 2017, with the automatic stay still in effect, the Governor signed the Law to Guarantee Payment to Our Pensioners and Establish a New Plan for Defined Contributions for Public Servants ("Act 106"), attached hereto as Exhibit 3. Act 106 further implemented Joint Resolution 188. Act 106 required ERS's Board of Trustees to dissolve by December 31, 2017. Act 106, §§ 4.2, 5.1-5.3. It stated that Joint Resolution 188 "eliminated" "the employer contributions being made until now," and purported to set up a new "'Pay-Go' Fee" for employers to make to the General Fund. Act 106, § 1.4.

The "'Pay-Go' Fee," however, is nothing new. Rather, the employers required to pay it are the same government entities (including the Commonwealth, public corporations, and municipalities) that were already obligated to make contributions to ERS. *See id.* § 1.6(g) (requiring payments from "entities deemed as employers under the [ERS]"); *compare id.* § 2.1(b),

*with* 3 L.P.R.A. § 781(a) (2008). Indeed, Act 106 made no significant change to the relative contributions made by the Commonwealth, public corporations, and municipalities:



**Notes and Sources:**
- Data for 2013 - 2016 are from the Schedules of Employer Allocations for the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico, the June 30, 2018 PayGo and Individual Contribution Debt by Entity report, and ERS_LS0009366.

In reality, the only difference under Act 106 is that the contributions from employers have now been funneled off to circumvent ERS's obligations to its Bondholders:



9

Act 106, moreover, did not require the Commonwealth to give ERS any real consideration for taking assets. Even if the Commonwealth took on certain administrative responsibilities from ERS (*e.g.*, collecting contributions and making pension payments), the Commonwealth did not take on any new liabilities to pensioners. To the contrary, the Commonwealth always had (and continues to have) the ultimate liability to its pensioners, and it has acquired the right to receive payments from participating employers to cover pension payments to those employers' pensioners.

Act 106 and Joint Resolution 188 (together, the "Post-Petition Legislation") amount to a seizure by the Commonwealth of ERS's assets and property.

### F.    Procedural Background

Claimants, holders of secured bonds issued by ERS in 2008 and the Fiscal Agent, filed timely proofs of claim against ERS and the Commonwealth.[6] This Court subsequently entered an order approving the procedures for objections to claims by holders of bonds issued by ERS. No. 17-3283, Dkt. No. 8818 (the "Initial Procedures Order"). Among other things, the Initial Procedures Order established a January 6, 2020, deadline for the filing of objections to claims and set a deadline for the assertion of any post-petition claim (including a request for an administrative expense) against ERS on account of or related to the Bonds. On November 21, 2019, the ERS Bondholder Groups timely filed motions for the allowance of post-petition and administrative expense claims, which the Fiscal Agent joined ("Administrative Expense Motions"). No. 17-3283, Dkt. Nos. 9285, 9294, 9298. On January 6, 2020, the Creditors Committee, the Retiree Committee, and the Board each filed objections to the proofs of claim. *See* No. 17-3283, Dkt. Nos. 9700, 9701,

---

[6] The Fiscal Agent filed master bond proofs of claim to assert rights to payment from ERS and the Commonwealth on behalf of itself and all beneficial owners of the ERS Bonds as their respective interests appear in the Bond Resolution and the ERS Bonds. *See* Claim Nos. 16775, 16777. The Fiscal Agent has joined this Opposition to ensure that the allowance of any claims against ERS and the Commonwealth arising from or relating to the ERS Bonds inures to the benefit of all Bondholders consistent with the Bond Resolution and the ERS Bonds.

9702, 9703, 9704, 9705, 9708, 9710.

This Court stayed the majority of proceedings related to Claimants' claims while the First Circuit decided the impact of 11 U.S.C. § 552 on Claimants' liens. After the First Circuit issued its 552 Decision, however, this Court set a schedule providing for (i) Claimants to file the Supplement, (ii) any objecting parties to file a motion to dismiss the Claimants' proofs of claim and Administrative Expense Motions, and (iii) Claimants to file a motion for judgment on the pleadings. *See* No. 17-3283, Dkt. No. 12446 (as subsequently amended No. 17-3283, Dkt. No. 12901) (the "Scheduling Order").[7] In accordance with the Scheduling Order, Claimants filed the Supplement on March 25, 2020, No. 17-3283, Dkt. No. 12536. On May 6, 2020, the Board and the Retiree Committee filed motions to dismiss the proofs of claim and Administrative Expense Motions, AAFAF filed a statement in support of the Board's motion, and the Creditors Committee filed a limited joinder. *See* No. 17-3283, Dkt. No. 13054, 13056, 13058, 13059. On June 10, 2020, Claimants filed a Rule 12(c) motion for partial judgment on the pleadings. No. 17-3283, Dkt. No. 13400 (the "Rule 12(c) Motion").

## STANDARD OF REVIEW

"A proof of claim executed and filed in accordance" with the relevant rules "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *In re Hemingway Transp., Inc.*, 993 F.2d 915, 925 (1st Cir. 1993). "A party objecting to [that] claim has the initial burden of presenting a substantial factual basis to overcome [its] prima facie validity." *In re Beverages Int'l Ltd.*, 50 B.R. 273, 280 (Bankr. D. Mass. 1985) (citing *In re Multiponics, Inc.*,

---

[7] The claim numbers for the proofs of claim filed by Claimants are listed in Appendix 2 to the Scheduling Order. No. 17-3283, Dkt. No. 12901. For purposes of this opposition brief, Claimants use the term "Claim Addenda" to refer to the addenda to proofs of claim filed by Bondholders represented by Jones Day as reflected in the Scheduling Order; the term "W&C Claim Addenda" to refer to the addenda to proofs of claim filed by Bondholders represented by White & Case as reflected in the Scheduling Order; and the term "FA Claim Addenda" to refer to the addenda to proofs of claim filed by the Fiscal Agent as reflected in the Scheduling Order.

622 F.2d 709, 714 (5th Cir. 1980)); *see also In re Hemingway Transp., Inc.*, 993 F.2d at 925 ("The

interposition of an objection does not deprive the proof of claim of presumptive validity unless the

objection is supported by *substantial evidence*."). "It is often said that the objector must produce

evidence equal in force to the prima facie case." *In re Reza Farzan, Debtor.*, No. 19-29256 (CMG),

2020 WL 2769046, at *4 (Bankr. D.N.J. May 27, 2020). Only then does the burden "revert[] to

the claimant to prove the validity of the claim by a preponderance of the evidence." *Id.*; *see also*

*In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004).

To prevail, Movants therefore must either (1) show that the claims fail as a matter of law,

accepting Claimants' allegations as true, *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320,

324 (1st Cir. 2008), or (2) present "a substantial factual basis to overcome" the prima facie validity

of those allegations and thereby shift the burden back to Claimants to prove their claim at trial by

a preponderance of the evidence, *In re Hemingway Transp., Inc.*, 993 F.2d at 925.[8]

## ARGUMENT

### I. CLAIMANTS HAVE SUFFICIENTLY ASSERTED ADMINISTRATIVE EXPENSE CLAIMS BASED UPON THE POST-PETITION LEGISLATION

Claimants are entitled to assert administrative expense claims against the Commonwealth

and ERS based on the Post-Petition Legislation. These claims were not eliminated by the 552

Decision, because Claimants' collateral extends beyond the post-petition employer contributions

affected by the Decision and because the Post-Petition Legislation interfered with Claimants'

contractual rights and their ability to recover on their unsecured claims against ERS. Moreover,

---

[8] Even if the traditional standard for a Rule 12(b)(6) motion were to apply here, the motions to dismiss should be denied because all of Claimants' claims are plausible. Under Rule 8, Claimants would need to offer only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]"). Claimants' allegations are, at a minimum, "plausible," and must be accepted as true at this stage of the litigation. *See id.*

because these claims arise from post-petition acts, they are entitled to administrative expense treatment. In any event, they are nondischargeable. Movants' argument that PROMESA preempted employer contributions under the ERS Enabling Act is untimely and, in any event, unpersuasive, as is their argument that legislation like the Post-Petition Legislation is categorically immune from challenge. Consequently, Claimants have the right to pursue post-petition, administrative expense and nondischargeable claims against the Commonwealth and ERS.

### A.    The 552 Decision Does Not Bar Claimants' Post-Petition Claims

The central argument underlying the motions to dismiss is Movants' claim that the 552 Decision alone requires dismissal of "all Claims in the Administrative Expense Motions (including those supplemented in the Supplement)." No. 17-3566, Dkt. No. 891 at 20 (the "FOMB Br."). According to the Board, by limiting Claimants' lien on future employer contributions to amounts that were "calculated and owed" as of the ERS petition date, the 552 Decision "render[ed] totally irrelevant the Commonwealth's enactment of the Post-Petition Legislation." *Id.* at 3. This, however, is wrong for at least two reasons: First, Claimants have liens on assets other than the post-petition employer contributions addressed in the 552 Decision, and the Post-Petition Legislation affected those liens. Second and relatedly, Claimants have rights as unsecured creditors for any portion of their claims not covered by these liens, and the Post-Petition Legislation severely harmed Claimants' ability to be repaid on these claims. Dismissal of Claimants' administrative expense claims is thus unwarranted.

### 1.    Claimants Are Secured Creditors With Respect to All Identifiable Collateral as of the Petition Date

The 552 Decision could not justify dismissal of all the administrative expense claims because the post-petition employer contributions—the collateral implicated by the 552 Decision— is not Claimants' only collateral. To the contrary, Claimants have asserted valid, perfected liens

on a variety of other, prepetition property.[9]

a.      Pursuant to the Bond Resolution, Claimants possess valid and perfected liens on all "Pledged Property." "Pledged Property" is defined to include, among other things, "[a]ll Revenues" of ERS and "[a]ll right, title, and interest of [ERS] in and to Revenues, and all rights to receive the same." Bond Resolution at VI-36. This includes, for example: contributions due to ERS before the petition date (the "Accounts Receivable"); Additional Uniform Contributions and related receivables; employee loans and loan payments; funds remitted to ERS by the fiscal agent; and traceable funds in deposit accounts, whether or not controlled by the fiscal agent. Claim Addenda ¶¶ 12, 21-25, 36; No. 17-3283, Dkt. No. 9285 at ¶¶ 35, 37-39 (the "Admin. Expense Claims"); Supp. ¶¶ 3, 11, 26-27, 30-31; *see also* Answer and Counterclaims, Dkt. No. 41, *In re FOMB for P.R.*, Adv. Proc. No. 19-00366 (LTS). As the 552 Decision itself recognizes, "[t]he [Oversight] Board [has] concede[d] that the Bondholders have a security interest in" at least some of this outstanding collateral, namely "the [accounts] receivable[]." *In re FOMB for P.R.*, 948 F.3d 457, 472 n.13 (1st Cir. 2020).

Of course, Claimants were deprived of this collateral when the Post-Petition Legislation commanded ERS to transfer *all* of its assets—including those promised to Claimants as collateral—to the Commonwealth. Claim Addenda ¶ 23; Admin. Expense Claims ¶ 37; No. 17-3283, Dkt. No. 9286, Ex. A at ¶¶ 137-163 (the "Adversary Compl. Claims"). As the Board itself explains, pursuant to the Post-Petition Legislation, "ERS was required to sell its assets and transfer the proceeds, in addition to any existing available funds, to the Puerto Rico Department of

---

[9] The ERS Bondholder Groups also plan to seek review of the 552 Decision. For purposes of this motion, Claimants accept the 552 Decision as authoritative. However, if the Supreme Court reverses the 552 Decision, the post-petition employer contributions would, of course, also be available as collateral to satisfy the Claimants' claims, and Claimants reserve the right to argue, as they have, that Debtors cannot evade their obligations (or freely violate Claimants' rights) simply by giving such contributions a new name. This is yet another reason it would be premature to dismiss Claimants' claims.

Treasury's general fund to offset a portion of the Commonwealth's assumed pension liabilities." FOMB Br. 9; *see also* No. 17-3566, Dkt. No. 892 at 27 (the "RC Br.") (tacitly acknowledging that the Post-Petition Legislation caused the physical removal of "$190.48 million that ERS transferred to the Commonwealth"). And, in fact, Claimants allege that far more than just $190.4 million has been transferred pursuant to the Post-Petition Legislation, and those allegations must be regarded as true at this stage.

For example, the Board concedes that, under the 552 Decision, Claimants have a lien on all owed and calculated, but unpaid, employer contributions. Although the Board contends that these Accounts Receivable were a mere $105.5 million as of the ERS petition date, substantial evidence suggests that the true amount is much higher, that is, in the billions of dollars. *See* Enabling Act § 2-116; Statement of Motives, Act 116 (noting that, as of 2011, two agencies each owed ERS almost a billion dollars in unpaid employer contributions); *supra* at 6-7; *infra* at 96-98. Act 106, however, on its face, purports to cancel all past due employer contributions owed to ERS and to make those amounts satisfied by payment of Pay-Go Fees. The Post-Petition Legislation has therefore already transferred Accounts Receivable to the Commonwealth—potentially billions of dollars of Claimants' collateral—despite Claimants' acknowledged lien on those funds.

Similarly, Claimants have asserted that their lien extends to the Additional Uniform Contributions established in Act 3-2013 to require participating employers to catch up on their unfunded obligations to ERS. In the 552 Decision, the First Circuit made expressly clear that it was "not faced with and do[es] not decide the issues pending before the Title III court concerning liens on prepetition Additional Uniform Contributions." *In re FOMB*, 948 F.3d at 467 n.7. While Bondholders assert these amounts are substantially higher, the Commonwealth concedes that Additional Uniform Contributions owing on the petition date equaled at least $715 million. Adv.

15

Proc. 19-367, Dkt. No. 1, at ¶ 2. Because Act 106 purported to convert this obligation into a component of the Pay-Go Fee as of July 1, 2017, substantial amounts of collateral have been taken.

The 552 Decision thus did not "render[] totally irrelevant the Commonwealth's enactment of the Post-Petition Legislation," as the Board argues. FOMB Br. 3. Precisely to the contrary, as Claimants have repeatedly alleged—*see, e.g.*, Claim Addenda ¶ 23; Admin. Expense Claims ¶ 37; Adversary Compl. Claims ¶¶ 137-163—this legislation resulted in the confiscation of both Claimants' collateral and contractual rights, ERS financial insolvency and functional irrelevance, and the elimination of any traditional remedy Claimants might otherwise have had. It likewise prevented ERS from using Claimants' surviving collateral to satisfy the outstanding debts owed under the Bond Resolution. *See, e.g.*, Supp. ¶ 17.

b.     It is no answer to say, as Movants do, that the post-petition claims should be dismissed because the Commonwealth promised to return any funds determined to be Claimants' collateral in the Lien Scope adversary proceeding ("Lien Scope AP"). *See* FOMB Br. 32-33.

For one, the parties dispute the value of the various collateral categories—issues that the Lien Scope AP will not resolve. The counts asserted in the Lien Scope AP seek declaratory judgments only about whether Claimants' liens *attached* to certain disputed categories of assets (*e.g.*, additional uniform contributions, employee loans, etc.) and related lien-avoidance issues. The counts do not ask for a determination of the *amount* of collateral in these categories—which the parties, of course, dispute. And the Lien Scope AP does not even purport to address certain categories of collateral—such as Accounts Receivable—that the parties agree are collateral but dispute the amount outstanding. *See supra* at 16-17. As noted above, Claimants allege that the true amount of Accounts Receivable is in the billions of dollars, and that to the extent these amounts were transferred by Act 106 (or previously converted to other obligations, deferred, or cancelled),

Claimants can recover their value. The Lien Scope AP will not resolve any of these disputes.

Unless the parties agreed as to the amount of the collateral categories (which they do not), any promise to return their value is illusory. And while the Lien Scope AP will decide some issues relevant to the scope of Claimants' lien, it will not resolve all disputed issues regarding the extent of Claimants' collateral or the amount of their secured claim. Those issues are pending for decision solely in connection with Claimants' proofs of claim and Administrative Expense Motions. Additional discovery in this preceding is therefore necessary to determine the precise value of the collateral categories, which Claimants have alleged is substantial—an allegation that is, of course, prima facie valid in the absence of "substantial evidence" to the contrary, *In re Hemingway Transp., Inc.*, 993 F.2d at 925, of which Movants offer none.

Moreover, even if the full extent and amount of Claimants' secured claim were determined in the Lien Scope AP and even if the Commonwealth's offer were genuine, a third party's decision to take and hold another's collateral for the purported "benefit" of that secured creditor is never a valid reason to dismiss that creditor's bankruptcy claims. Until the Commonwealth returns Claimants' collateral, with interest, these claims remain very much alive. *E.g.*, *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019) ("[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it.").

In any case, the Commonwealth's promise is more limited than Movants make it seem. It extends only to collateral that the Commonwealth agrees was transferred from ERS to the Commonwealth—that is, the $190.4 million the Board refers to as the "Transferred Assets." *See* FOMB Br. 32 ("[O]nly the Transferred Assets were transferred from ERS to the Commonwealth, and the Debtors have represented Claimants will receive the value of such assets if their security interest attaches thereto."). But Claimants allege that the value of transferred collateral far exceeds

17

$190.4 million. Moreover, ERS had over $2 billion in assets as of the petition date, according to the Government Parties' own Lien Scope complaint, which Claimants contend has also been transferred (or ordered transferred) pursuant to the Post-Petition Legislation. No. 17-3566, Dkt. No. 516 at ¶ 2. These amounts include Additional Uniform Contributions that Movants assert have been transferred or eliminated after the petition date. Movants offer no similar "promise" to transfer back this collateral, which is not currently being "held" for Claimants' benefit. An offer to transfer only a portion of Claimants' collateral back to them at some unspecified future date cannot eliminate Claimants' claims.

At a minimum, it would be premature to dismiss Claimants' administrative expense claims before any court has had the chance to determine whether Claimants hold or held valid liens on the transferred property or even what property was actually transferred from ERS pursuant to the Post-Petition Legislation. Significant legal and factual questions regarding the scope and extent of Claimants' lien, and the amount of their secured claim, remain to be decided after discovery in this contested matter. Absent an answer to these questions, Claimants' well-pled allegations that the value of their liens extends to significant collateral notwithstanding the 552 Decision must be accepted as true. Those allegations encompass a claim to collateral well beyond the post-petition employer contributions at issue in the 552 Decision. *See* Adversary Compl. Claims ¶ 67-70.

## 2.  Claimants Are Unsecured Creditors of ERS With Respect to Any Deficiency Claim

Second, beyond seizing Claimants' collateral, the Post-Petition Legislation also sharply diminished, if not eliminated, Claimants' ability to be repaid on unsecured claims against ERS.

As explained in Claimants' Rule 12(c) Motion, incorporated here, Claimants' recovery is not limited solely to their collateral. No. 17-3283, Dkt. No. 13400, at 7-24. Rather, pursuant to § 1111(b) of the Bankruptcy Code, Claimants have recourse claims against ERS for any losses

18

suffered after collection of their collateral. Movants have articulated no reason why § 1111(b) would not apply, and have waived any objection on that basis. *See id.* at 8-16. In any event, even if § 1111(b) somehow does not apply to claims under the Bonds themselves, Claimants' constitutional, contract, and tort claims are not subject to the limited recourse provisions of the Bond Resolution and are an independent basis for unsecured claims against ERS. *Id.* at 16-24.

Indeed, as explained in the Rule 12(c) Motion, even if Claimants' recovery *were* limited to the Pledged Property, they would still possess significant unsecured deficiency claims against ERS and the Commonwealth. *Id.* at 24. This is because Section 201 of the Bond Resolution, which provides that the Bonds are "payable solely from Pledged Property," expressly does not say that the Bonds are payable from the Pledged Property *only if the lien on Pledged Property is valid and enforceable*. Thus, even after the Section 552 Decision, Claimants retain their contractual right to be paid from post-petition employer contributions, and that right remains enforceable regardless of whether the post-petition employer contributions have been diverted to the Commonwealth. *See* 11 U.S.C. § 102(2) ("'claim against the debtor' includes claim against property of a debtor"); Martin J. Bienenstock, *et al.*, *Are Triangular Setoff Agreements Enforceable in Bankruptcy?*, 83 Am. Bankr. L.J. 325, 328-31, 341 (2009) ("Because Bankruptcy Code § 102(2) provides a claim includes a claim against property, and does not require a secured claim against property, the Bankruptcy Code clearly does not require that [a] right be considered a perfected or unperfected secured claim as a condition of qualifying as a claim."). Put simply, even if the Bonds are payable only from Pledged Property, the Pledged Property remains an enormous sum of money from which Claimants' unsecured deficiency claims must be paid.

Thus, for the reasons explained in the Rule 12(c) Motion, Claimants are entitled to assert unsecured claims for any deficiency between the value of their secured claims and the face value

19

of their debt. Because of this, any illegal post-petition acts that deprived ERS of the ability to repay

Claimants as unsecured creditors can give rise to claims. The Commonwealth, of course, had no

right to raid ERS's coffers to benefit one group of unsecured creditors (*i.e.*, pensioners) at the

expense of another. *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) ("[I]t has long been

accepted that the sovereign may not take the property of A for the sole purpose of transferring it

to another private party B."); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (describing the

"purpose of the Takings Clause" as "prevent[ing] the government from forcing some people alone

to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

In fact, even the Board recognizes that "treating similarly situated creditors similarly" is "a

foundational principle of bankruptcy law." FOMB Br. 4; *see also Granada Wines, Inc. v. New*

*Eng. Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46-47 (1st Cir. 1984) (rejecting

disparate treatment of pension plan withdrawal liability versus other unsecured claims).

And because Claimants have rights extending beyond their liens, the Commonwealth's

limited offer to return certain property is not only an invalid basis to dismiss the claims, *supra* at

16-18, it is not even the cure-all Movants make it out to be. Indeed, if this Court were to dismiss

Claimants' claims solely because the Commonwealth offered to return secured collateral,

Claimants would be left wholly without a remedy for their unsecured claims, including claims

entitled to priority or which may not be discharged.

### 3. Claimants May Assert Claims Against the Commonwealth for Actions that Harmed Their Interests as Secured or Unsecured Creditors of ERS

The 552 Decision likewise does not eliminate Claimants' claims against the

Commonwealth. Rather, Claimants may assert claims against the Commonwealth for damages

caused by the Commonwealth's wrongful conduct. Indeed, even if recourse claims under the ERS

Bonds are limited (they are not), that would not affect Claimants' ability to recover from the

Commonwealth, because the Commonwealth is neither a party to, nor a third-party beneficiary of, the Bond Resolution. *See* Bond Resolution §§ 102, 1305. The Commonwealth cannot avoid responsibility for its own torts and breaches of state and federal law by invoking provisions of a contract that the Commonwealth did not sign, is not a party to, and cannot itself enforce. *Cortes-Ramos v. Martin-Morales*, 894 F.3d 55, 58 (1st Cir. 2018) (noting general rule that contracts do not protect a non-signatory unless shown "with special clarity" that it is a third-party beneficiary).

The Retiree Committee nonetheless argues that the Bond Resolution waives Claimants' ability to pursue claims against the Commonwealth, pointing to language that "[t]he Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility." RC Br. 18-21 (citing Bond Resolution § 201); *see also* FOMB Br. 4 (similar). This is wrong for several reasons.

For one, the Retiree Committee does not have standing to interpose its own claim objection where the debtor is already pursuing an objection. The First Circuit has explained: "the needs of orderly and expeditious administration do not permit the full and unfettered exercise of [a creditor's] right to object to the allowance of another creditor's claim. The most important qualification attached to the right of a creditor to object is that it is the trustee who acts as the spokesman for all the creditors in discharge of the trustee's duty unless the trustee refuses to take action." *In re Thompson*, 965 F.2d 1136, 1147 (1st Cir. 1992). Here, the Board has not refused to take action. On the contrary, the debtor has filed voluminous objections. Under *Thompson*, because a representative of the debtor is already litigating the issues, the Retiree Committee does not have standing to interpose its own objections.

In any event, Claimants are not seeking to hold the Commonwealth liable for the ERS Bonds. Rather, Claimants' claims against the Commonwealth are based upon its independent violations of the U.S. and Puerto Rico Constitutions, the Bankruptcy Code, PROMESA, and

Puerto Rico tort and fraudulent transfer law. While the damages Bondholders suffered relate to their investments in the ERS Bonds (in that the Commonwealth deprived Bondholders of their ability to be repaid the principal and interest owed to them under the ERS Bonds), Claimants are not seeking to hold the Commonwealth "liable for the Bonds or any Ancillary Bond Facility." Bond Resolution § 201. Thus, the plain language of the Bond Resolution does not apply to Claimants' claims against the Commonwealth. *Cf. People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*, 814 F. Supp. 159, 163 (D. Me. 1993) (limited recourse provisions typically limit only underlying obligation to make payments due under instrument).

Moreover, Section 201 of the Bond Resolution clearly does not amount to a "clear, unambiguous, and explicit" waiver of all claims against the Commonwealth that are in any way related to the ERS Bonds. *See Baum-Holland v. El Conquistador P'ship L.P., S.E.*, 336 F. Supp. 3d 6, 26 (D.P.R. 2018). Section 201 is much more focused, providing only that "[t]he Commonwealth shall not be liable *for the Bonds* or any *Ancillary Bond Facility*" and that "[n]either any *Bond* nor any *Ancillary Bond Facility* shall constitute a debt of the Commonwealth … and the Commonwealth shall not be liable to make any payments thereon …."[10] Bond Resolution § 201 (emphases added). The fact that the Commonwealth is not liable for payments of principal and interest on the ERS Bonds says nothing about whether Claimants can pursue claims against the Commonwealth for the Commonwealth's own acts that damaged Bondholders.[11]

---

[10] The Bond Resolution defines "Ancillary Bond Facility" to mean "each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement." Bond Resolution at VI-31. "Credit Facility," "Liquidity Facility," "Qualified Hedge," and "Standby Purchase Agreement" are in turn defined to include financial arrangements ERS might enter into with third parties for bond insurance, liquidity to redeem the bonds, swap agreements, etc. The Bond Resolution is thus simply making clear that the Commonwealth will not be liable for these additional sorts of transactions, just as it is not liable to pay principal and interest on the ERS Bonds.

[11] A broad, preemptive waiver of all unlawful conduct against the government would also be "inconsistent with public policy." *See* 31 L.P.R.A. § 4 ("Rights granted by the laws may be renounced, *provided such renunciation be not contrary to law, to public interest or public order,* or prejudicial to the interest of a third person."); *In re Gutierrez*, 526 B.R. 449, 462 (Bankr. D.P.R. 2015) (describing "public interest" as "a series of norms and ideals in a

Finally, as noted above, even if Claimants somehow contractually waived their ability to assert claims against the Commonwealth for the Commonwealth's own, independent acts, the Commonwealth could not invoke that waiver here because it is not a third-party beneficiary of the Bond Resolution. The Bond Resolution expressly provides that "[n]othing in this Resolution expressed or implied is intended or shall be construed to confer upon, or give to, any Person, other than the System, the Fiscal Agent, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of this Resolution …." Bond Resolution § 1305.[12] Because the Commonwealth is neither a party to, nor a third party beneficiary of, the Bond Resolution, it would lack standing to assert any waiver, if one existed. *See Constable v. Nat'l S.S. Co.*, 154 U.S. 51, 98 (1894) ("[I]t is undoubtedly the general rule that a person who is not a party to a simple contract cannot enforce such contract at law" unless a third-party beneficiary).

### B.     The Debtors' Post-Petition Acts Give Rise to Administrative Expense Claims and Are Non-Dischargeable

Movants next argue that Claimants' administrative expense claims should be dismissed because they do not qualify for administrative expense treatment under the Bankruptcy Code. These arguments are addressed in Claimants' Rule 12(c) Motion, which Claimants incorporate herein. No. 17-3283, Dkt No. 13400 at 24-35. As explained in the Rule 12(c) Motion, claims based upon the Post-Petition Legislation satisfy 11 U.S.C. § 503(b)(1)(A) because it is well-established that "the actual, necessary costs and expenses of preserving the estate" include post-petition claims against a debtor. *See Reading*, 391 U.S. at 477-82; *Charlesbank Laundry, Inc.*, 755 F.2d at 203.

---

society that are not always codified in the law and fill the gaps between what has been made law and what has not been expressly made into law but would otherwise harm, if tolerated, the general interest").

[12] "Person" is defined to include the government. "Beneficiaries" is defined as "(i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding." Bond Resolution at VI-32. Thus, the Commonwealth is not a "Beneficiary" of the Bond Resolution.

Movants assert two principal responses, but each fails. First, the Retiree Committee (alone) argues that because administrative expense status applies only to "the actual, necessary costs and expense of preserving the estate," no such claims can exist in a Title III proceeding because under PROMESA, like chapter 9, there is no "estate." RC Br. 6-7. However, as explained in the Rule 12(c) Motion, the Retiree Committee's interpretation is inconsistent with the Bankruptcy Code and would do violence to the Title III process under PROMESA, rendering many Bankruptcy Code provisions (such as the avoidance powers of §§ 544-549) inapplicable in a Title III case. It is therefore no wonder that the Board and other objectors do not join in this argument.

Second, the Objectors argue that claims based on the Post-Petition Legislation cannot be allowed as administrative expenses because they all have a "pre-petition genesis" based upon the ERS Bonds. FOMB Br. 25-26. However, there is no basis at all for saying that the claims against the *Commonwealth* have a pre-petition genesis in the ERS Bonds or the Bond Resolution, because the Commonwealth was not a party to the Bond Resolution and was not liable for the ERS Bonds. *See In re Hemingway Transp., Inc.*, 954 F.2d 1, 7 (1st Cir. 1992) (holding that *Reading* does not apply to claims arising from a "prepetition contract *with the debtor*" (emphasis added)). And while the claims against ERS based upon the Bonds or breaches of the Bond Resolution may have a pre-petition genesis, the non-contractual claims based upon ERS's independent wrongful conduct do not. These claims, like all claims against the Commonwealth, fall squarely under *Reading* and *Charlesbank Laundry* and are allowable as administrative expenses under § 503(b)(1)(A).

In any event, even if claims based on the Post-Petition Legislation are not administrative expenses, they are still nondischargeable because they arose post-petition. *In re City of Detroit, Mich.*, 548 B.R. 748, 751, 767-70 (Bankr. E.D. Mich. 2016) (holding that Detroit's plan of adjustment discharged only prepetition claims); COLLIER ON BANKRUPTCY at ¶ 901.04[13][b]

("[C]laims incurred by the municipality during the case will not be discharged, and will remain liabilities of the municipality after confirmation of a plan or dismissal of the case."). Movants do not seriously contend that post-petition claims not treated as administrative expenses are dischargeable in a municipal bankruptcy. Thus, if Claimants' post-petition claims are not treated as administrative expenses in the debtors' plan, Claimants can pursue them post-confirmation.[13]

### C. The Debtors Have Waived Any Claim that PROMESA Preempts Employer Contributions, Which, In Any Event, It Does Not

Movants also argue that the claims in the Administrative Expense Motions should be dismissed because the provisions of the ERS Enabling Act requiring the Commonwealth to pay and appropriate employer contributions were preempted by PROMESA. Movants are wrong.

As an initial matter, because Movants did not include this objection in their January 6, 2020, objection to Claimants' proofs of claim (or, indeed, in any of their voluminous filings over the past four years of litigation), Movants' objection is untimely and cannot now be asserted. As explained above, *see supra* at 10, this Court set a January 6, 2020, deadline for objections to Claimants' proofs of claim. Yet even though the proofs of claim relied fundamentally on the ERS Enabling Act's requirement that employer contributions be paid, Movants made no mention whatsoever of an argument that such requirements were somehow preempted by PROMESA. In fact, Movants have never asserted this argument in the course of four years of litigation (including four trips to the First Circuit), all of which was premised on the existence and enforceability of the ERS Enabling Act's employer contributions. Consequently, this Court's Initial Procedures Order and fundamental fairness dictate any such objection is untimely and has been forfeited.

---

[13] Movants also reiterate their arguments that the post-petition claims should be dismissed because the 552 Decision eliminates any post-petition claims, that the Post-Petition Legislation was not illegal, and that only ERS has standing to challenge the legality of the Post-Petition Legislation. FOMB Br. 23-24, 27; RC Br. 9. These arguments fail for the reasons explained elsewhere. *See supra* at 13-23; *infra* at 28-29, 32-34, 75-76, 83-85, 96-97.

In any event, Movants are also wrong. For one, even if PROMESA somehow preempted *the Commonwealth's* obligation to pay employer contributions, this would not have affected the requirement that non-Commonwealth employers pay employer contributions. *See* 3 L.P.R.A. §§ 781, 787. Those employers are not subject to the Commonwealth's appropriations process and are not affected by PROMESA. As Claimants have alleged, the Post-Petition Legislation diverted those contributions in addition to eliminating the Commonwealth's required contributions.[14]

Moreover, the gist of Movants' argument simply is that PROMESA and the Board-certified budgets preempted any Commonwealth budget that might have sought to appropriate employer contributions. But that is beside the point. Whatever impact PROMESA had on the Commonwealth's ability to enact a budget that actually appropriated employer contributions, it did not eliminate the Commonwealth's statutory obligation to pay employer contributions, 3 L.P.R.A. § 787, or its statutory obligation to appropriate those contributions, *id.* § 781(g) ("The contributions of each employer *shall* be included in the budget and *shall* be appropriated annually together with appropriations for salaries or compensation of employees." (emphases added)).[15] "Incurring an obligation … is different from paying one." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020). A government may incur an obligation by contract or by statute. *Id.* Here, the Commonwealth incurred a statutory obligation to make and appropriate employer contributions. 3 L.P.R.A. §§ 781, 787. Whatever the reason, failure to actually appropriate those funds "neither abrogate[s] nor suspend[s] the Government's pre-existing

---

[14] Indeed, if PROMESA does in fact preempt the Commonwealth's statutory obligation to appropriate employer contributions or otherwise preempt appropriation of employer contributions in a given year, then Claimants have a claim against the federal government for taking their rights in specific property (employer contributions), as well as Claimants' property in the form of their contractual right to payment from employer contributions, without just compensation in violation of the Fifth Amendment.

[15] The Board asserts that the "expectation that future Employers' Contributions will be contributed to ERS is nothing more than a forward-looking projection based on a budget preempted by PROMESA." FOMB Br. 27-28. But the Enabling Act makes clear that appropriating employer contributions each year was a statutory requirement.

commitment to pay."[16] 140 S. Ct. at 1320. And that obligation remains enforceable in the courts.
*Cf. Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012).

For the same reason, the Commonwealth's failure to appropriate funds needed by ERS to pay Bondholders does not abrogate ERS's obligations to its Bondholders. *See Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 636-38 (2005) (rejecting the Government's argument that it was legally bound by its contractual promise to pay "if, and only if, Congress appropriated sufficient funds"); *Salazar*, 567 U.S. at 191 ("Although the agency itself cannot disburse funds beyond those appropriated to it, the Government's valid obligations will remain enforceable in the courts."). Even without appropriation, Bondholders could enforce their contractual right to payment in court and their lien would attach to the accumulating accounts receivable of employer contributions. *See, e.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1321-23 (2020) (holding that government remained obligated for statutory liability even without an appropriation).

Finally, to the extent Movants argue it was PROMESA alone and not the Post-Petition Legislation that harmed Claimants, they are wrong. PROMESA may require Board approval of territorial budgets while in effect. *See In re FOMB for P.R.*, 945 F.3d 3, 8 (1st Cir. 2019). But of course the Board is the Commonwealth's representative, and Board supervision does not, in any event, absolve the Commonwealth of responsibility for its legislative acts and their consequences. Moreover, the Post-Petition Legislation did far more harm to Claimants than a mere failure to appropriate funds would have. Far from failing to appropriate funds for employer contributions to ERS (which, in any event, would have generated an accounts receivable on which Claimants would have a lien), the Post-Petition Legislation dismantled ERS, confiscated Claimants' collateral, and

---

[16] Moreover, nothing in the Enabling Act suggests that the Commonwealth's obligation was subject to the availability of appropriations. *See Maine Cmty. Health Options*, 140 S. Ct. at 1322.

diverted the non-Commonwealth contributions to the Commonwealth.

In fact, absent the Post-Petition Legislation, PROMESA's requirement that pension systems like ERS be adequately funded would have protected Claimants' collateral by ensuring sufficient employer contributions to fund pensions were made. 48 U.S.C. § 2141(b)(1)(C); *see also infra* at 46-51. Similarly, PROMESA's requirement that any fiscal plan should "respect the relative lawful priorities" found in "agreements of a … covered territorial instrumentality in effect prior to June 30, 2016," would have prevented the Commonwealth from giving pensioners special priority. 48 U.S.C. § 2141(b)(1)(N); *see also* H.R. Rep. No. 114-602, at 45 (2016) (PROMESA's requirement of adequate funding for pension systems "does not allow for pensions to be unduly favored over other indebtedness in a restructuring."). And PROMESA's prohibition on inter-debtor transfers would have ensured that ERS's property remained at ERS, where it would have been used to pay Claimants. 48 U.S.C. § 2195.

### D.    The Post-Petition Legislation Is Not Categorically Immune from Challenge

Movants' suggestion that the Commonwealth's unlawful acts—in the Post-Petition Legislation and otherwise—are sanitized because they were performed through legislation is a gross overgeneralization. *See* FOMB Br. 25; RC 9, 15-16.

For one, as the Board admits (FOMB Br. 25, 67), legislation is void if it is unconstitutional or otherwise invalid. Deprived of legislative status, such action offers no inherent defense to liability. *See Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254–55 (1st Cir. 2003) (government actions that "are unconstitutional, proscribed by statute, or exceed the scope of an official's authority" may result in tort liability); *cf. Ex parte Young*, 209 U.S. 123, 159 (1908) ("The act to be enforced is alleged to be unconstitutional; and if it be so, … [i]t is simply an illegal act … void because unconstitutional."). As argued, *infra* at 44-74, the Post-Petition Legislation violated the Contracts Clauses and Takings Clauses of the U.S. and Puerto Rico Constitutions.

28

The Post-Petition Legislation is also void because it violated federal statutory commands such as the automatic stay and PROMESA § 407. *See infra* at 33-44, 79-83; 11 U.S.C. § 362; 48 U.S.C. § 2161(a) (incorporating § 362 into PROMESA); 48 U.S.C. § 2195. In total disregard of the automatic stay and PROMESA's prohibition of inter-debtor transfers, the Commonwealth seized possession of ERS's property by enacting the Post-Petition Legislation. Of course, state legislation that violates applicable federal law is unenforceable under the Supremacy Clause. U.S. Const., Art. VI. And nothing in the Bankruptcy Code exempts legislation from the scope of the automatic stay. *See infra* at 34-44; *In re McMullen*, 386 F.3d 320, 324 (1st Cir. 2004) (noting that the Bankruptcy Code "accords broad scope to the automatic stay"); *In re Albion Disposal, Inc.*, 217 B.R. 394, 407-08 (W.D.N.Y. 1997) (plaintiffs stated a claim that enactment of local ordinances violated § 362(a)(3)). Indeed, Movants make no attempt to argue otherwise.

Moreover, the Post-Petition Legislation did not purport to repeal the Puerto Rico statutory provisions on which Claimants base their claims, and Puerto Rico law "do[es] not favor implied repeals." *Diaz-Ramos v. Hyndai Motor Co.*, 501 F.3d 12, 16 (1st Cir. 2007) (quoting *McCrillis v. Auto. Navieras de P.R.*, 23 P.R. Offic. Trans. 109 (P.R. 1989)). Instead, where the Puerto Rico legislature has wanted to insulate legislatively mandated acts from challenge under the Civil Code, it has expressly done so. *See, e.g.*, Act 1-2015 § 2.02(f) ("Notwithstanding any other provision of law, including Articles 1242 through 1251 of the Civil Code of Puerto Rico, the allocation of Pledged Revenues to the Authority may not be revoked or rescinded until the Refinancing Bonds … have been paid in full, and no person may bring an action claiming said revocation or rescindment."). There is no comparable provision in the Post-Petition Legislation. Because the Post-Petition Legislation both failed to repeal and violates the statutory provisions on which Claimants base their claims, the Post-Petition Legislation is invalid.

29

### E.   *Ultra Vires* Arguments Do Not Support Dismissal

The Retiree Committee spends a significant portion of its motion to dismiss arguing that all of Claimants' claims should be dismissed on the ground that the Bonds were *ultra vires*. *See* RC Br. 11-13. While the Retiree Committee acknowledges that these *ultra vires* issues "are pending in another contested proceeding," it nonetheless argues that "the Court can and should decide now the legal ramifications of an *ultra vires* finding." RC Br. 11.

This is improper. This Court's October 24, 2019, Order specifically required *ultra vires* issues to be decided in separate litigation, and the parties have spent considerable time and effort in that litigation, including discovery. *See* No. 17-3283, Dkt. No. 8962. The Board obviously recognizes this, but the Retiree Committee inappropriately seeks to use the motion to dismiss to make its arguments regarding *ultra vires* issues. The Retiree Committee's suggestion that the Court should "decide the legal ramifications of an *ultra vires* finding," at best, improperly seeks an advisory opinion on something that may never happen—namely, a finding that the bonds are *ultra vires*—and, at worst, urges the Court to disregard its order and rule on *ultra vires* issues without the benefit of discovery. The Court should disregard the Retiree Committee's invitation.[17]

### F.   Movants' Other Arguments Also Fail

Finally, the remaining arguments in support of dismissal are unpersuasive. First, Movants are wrong that ongoing adversary proceedings justify dismissal of Claimants' claims. *See* FOMB Br. 31-32, 60, 81. These cases are not duplicative, and even if they were, it makes little sense to dismiss valid claims before any court has had an opportunity to decide the merits. Certainly, for example, Claimants agree that the *ultra vires* issues should be decided by the *ultra vires* litigation.

---

[17] Of course, Claimants disagree entirely with the Retiree Committee's arguments regarding the validity of the ERS Bonds. This is not the appropriate context in which to air these arguments, but, at a minimum these issues cannot be decided without considering Claimants' interpretation and translation of the Enabling Act, their status as bona fide purchasers, and the requirements of UCC Article 8.

FOMB Br. 81. But the existence of that adversary proceeding does not require dismissal of those claims here, and judicial economy and the avoidance of potential prejudice dictate otherwise.

Second, contrary to Movants' suggestion, none of the bases asserted in the Supplement are untimely. *See* FOMB Br. 77; RC Br. 22. A "claim" is the asserted right to payment from ERS. *See* 11 U.S.C. § 101(5) (defining "claim"). That "claim" is supported by numerous "bases," but each basis is not itself a new claim. *See* Claim Addenda ¶ 12 (describing bases for Claimants' claim). None of the arguments raised in Claimants' supplemental brief asserts a new right to payment unrelated to the ERS Bonds or Post-Petition Legislation. As such, they are not barred from inclusion in the Supplement. In any case, none of the bases supporting Claimants' claims are actually new. As directed in the Scheduling Order, the Supplement expands on theories first referenced in the "Additional Claims" paragraphs of Claimants' proofs of claim and Administrative Expense Motions, which identified the various legal theories expanded upon in the Supplement. *See, e.g.*, Admin. Expense Claims ¶ 43; Claim Addenda ¶ 12 (Jones Day); W&C Claim Addenda ¶ 5(b). Each basis in the supplement has an origin in the proofs of claim. *Compare* Suppl. ¶¶ 4-6, 10-11, 15, 17, 21-26, *with* Claim Addenda ¶ 12 (Jones Day); W&C Claim Addenda ¶ 5(b)(iii), *and* Admin. Expense Claims ¶ 43; *compare* Suppl. ¶ 29, *with* Claim Addenda ¶¶ 12, 20, 22, *and* Admin. Expense Claims ¶¶ 34, 36, 43.[18] Moreover, as noted, a proof of claim is prima facie valid if executed and filed under the specified rules. *See supra* at 11-12; Fed. R. Bankr. P. 3001(f); *In re Hemingway Transp., Inc.*, 993 F.2d at 925.

---

[18] Relatedly, the Retiree Committee's argument that Claimants have failed to support several of the bases for their claims with sufficient factual allegations is off the mark. *See* RC Br. 21-22. The Retiree Committee is referring to the "Additional Claims" listed in the catchall paragraphs at the end of the ERS Bondholder Groups' claim addenda and Administrative Expense Motions. Admin. Expense Claims ¶ 43; *see also* Claim Addenda ¶ 12 (same as to bases for claims). But those are the bases that the Supplement was expressly designed to expand upon, and the Retiree Committee does not suggest that the allegations in the Supplement are insufficient. In any event, although Claimants expressly reserved their right to assert additional claims or bases in their proofs of claim, Administrative Expense Motions, and Supplement, these filings contain all the bases Claimants currently intend to assert.

Finally, the Retiree Committee is wrong that the allowable amount for any tort-based claim is no more than what Bondholders paid for their Bonds. *See* RC Br. 35. Most importantly, this is a damages issue inappropriate for resolution at the motion to dismiss stage.[19] In any event, the Retiree Committee is patently wrong to argue that no tort-based claim can result in damages greater than the price of the bond. To the contrary, "[m]ost courts … permit the plaintiff to recover the loss of bargain" for the types of torts asserted here. Dan B. Dobbs et al., *The Law of Torts* § 690 (2d ed. 2011); *see also* Restatement (Second) of Torts § 549(2); Stuart M. Speiser et al., *American Law of Torts* § 24:13; *Colon v. Promo Motor Imports, Inc.*, No. CC-96-443, 144 D.P.R. 659, 658 (P.R. 1997).[20] Moreover, in fashioning remedies, Puerto Rico courts see their "principal function" as "afford[ing] an adequate legal remedy for repairing any injury that may have been unlawfully caused" and have noted that "[g]reater still must be the zeal and care of the courts … when it is sought to prosecute or to prevent fraud." *De Jesus Diaz v. Carrero*, 12 P.R. Offic. Trans. 786, 798 (P.R. 1982) (quoting *Castellón v. Padín*, 60 P.R. 369, 375 (P.R. 1942)).

## II.   THE CLAIMS ASSERTED AGAINST THE COMMONWEALTH SHOULD NOT BE DISMISSED

Beyond their general arguments regarding the ability of Claimants to assert administrative expense claims based on the Post-Petition Legislation, Movants also offer a range of arguments to dismiss specific claims against the Commonwealth. None is valid.

---

[19] Claimants retain their right to object to any claim-specific offsets during the remedy phase.

[20] In arguing otherwise, the Retiree Committee cites cases that reflect minority positions, *see Solarchick ex rel. Solarchick v. Metro. Life Ins. Co.*, 430 F. Supp. 2d 511, 513-14 (W.D. Pa. 2006), or are inapposite, *see Satellite Broad. Cable, Inc. v. Telefonica de Espana, S.A.*, 807 F. Supp. 218, 222 (D.P.R. 1992) (involving "willful termination or withdrawal from precontractual negotiations"); *Hutt v. Dean Witter Reynolds, Inc.*, 737 F. Supp. 128, 131 (D. Mass. 1990) (involving federal securities law where defendant was not enriched by the fraud); *Fershtman v. Schectman*, 450 F.2d 1357, 1361 (2d Cir. 1971) (same). Here, Claimants' tort claims do not involve withdrawal from precontractual negotiations, nor do they involve federal securities law or situations where the alleged fraud did not cause enrichment.

### A.   The Commonwealth Is Liable for Claims Based on the Post-Petition Legislation

#### 1.   The Commonwealth Violated the Automatic Stay

The filing of ERS's Title III petition on May 21, 2017, triggered an automatic stay against all efforts by any entity (including the Commonwealth) to obtain or exercise control over ERS's property. 11 U.S.C. § 362; 48 U.S.C. § 2161(a) (incorporating § 362 into PROMESA). Barely a month later, despite that automatic stay, the Commonwealth seized possession of ERS's property by enacting the Post-Petition Legislation. Clearly, the Post-Petition Legislation violates the automatic stay unless it falls within an applicable exception. Indeed, Movants make no attempt to argue otherwise.[21] *See* Adversary Compl. Claims ¶¶ 99-110. Instead, Movants' sole arguments are that Bondholders did not suffer any damages, and that the Post-Petition Legislation was exempt from the automatic stay under PROMESA §§ 303 or 305, or 11 U.S.C. § 362(b)(4).

##### a.   Claimants Have Standing to Assert a Violation of § 362

To begin, Bondholders plainly suffered damages from the Commonwealth's violation of the automatic stay. Movants argue that the First Circuit's 552 Decision prevents Claimants from showing damages because they lack a property interest in post-petition employer contributions. FOMB Br. 30; RC Br. 23. But the Post-Petition Legislation damaged Bondholders in ways having nothing to do with their lien on post-petition employer contributions. *See supra* at 8-10, 13-23.

For one, as the First Circuit recognized, post-petition employer contributions are not Claimants' only source of collateral, and the Post-Petition Legislation purported to order the

---

[21] Nor could they. The Post-Petition Legislation is plainly an "act to obtain possession of [ERS's] property … or to exercise control over [ERS's] property." 11 U.S.C. § 362(a)(3). The Bankruptcy Code "accords broad scope to the automatic stay," *In re McMullen*, 386 F.3d at 324, and the term "act" naturally describes legislation, *Black's Law Dictionary* (10th ed. 2014) (defining "act" as "[s]omething done or performed," and containing an entry for "legislative act"); *see also Albion Disposal*, 217 B.R. at 407-08 (plaintiffs stated a claim that enactment of local ordinances violated § 362(a)(3)).

transfer of *all* of ERS's property. Second, as Claimants have alleged, the Post-Petition Legislation caused other harm to Claimants, such as the conversion or cancelling of Accounts Receivable on which the Board concedes Claimants had a lien. *See* Act 106 §§ 2.4(e), 2.5; *In re FOMB for P.R.*, 948 F.3d at 472 n.13. Third, regardless of whether their lien attached to post-petition employer contributions, Claimants clearly had a contractual right under the Bond Resolution to payment from that particular stream of income. As explained, even if Claimants do not have recourse beyond that stream of income under the Bond Resolution, the enormous size of that stream of income would have ensured Claimants payment in full. *See supra* at 18-19. But by diverting that stream away from ERS, the Post-Petition Legislation harmed Claimants and interfered with their ability to be repaid. Finally, Claimants do have recourse claims against ERS both under § 1111(b) and in connection with their contract breach and other claims against ERS. *See supra* at 18-20.

Each of these harms is sufficient to establish that Bondholders suffered damages from the Commonwealth's violation of the automatic stay. Claimants thus have standing to enforce the automatic stay. *See In re Radcliffe*, 390 B.R. 881, 888 (N.D. Ind. 2008) (a party with a pecuniary interest in the estate has standing to enforce automatic stay) (citing *In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607-08 (7th Cir. 1998)), *aff'd*, 563 F.3d 627 (7th Cir. 2009); *In re Killmer*, 501 B.R. 208, 212 (Bankr. S.D.N.Y. 2013) ("Since the automatic stay is meant to prevent creditors from racing to the courthouse to the detriment of other creditors, the Court sees no reason why a creditor who has been harmed by a stay violation should not be able to seek redress for its injury.").

### b.    The Post-Petition Legislation Is Not Exempt from the Automatic Stay Under PROMESA §§ 303 and 305

Movants next argue that the Commonwealth's and ERS's "political or governmental powers" under PROMESA §§ 303 and 305 exempt the Post-Petition Legislation from the automatic stay. This is wrong. PROMESA's exceptions do not include creditor-debtor relations or

the Commonwealth's financial relations with its instrumentalities.

"[P]olitical or governmental powers" under §§ 303 and 305 encompass only "basic matters of the organization and operation of government that are incidents of sovereignty" and "do not extend to financial relations between the state and its municipalities." *In re City of Stockton (Stockton II)*, 526 B.R. 35, 54 (Bankr. E.D. Cal.) (interpreting 11 U.S.C. §§ 903 and 904, the Chapter 9 models for PROMESA §§ 303, 305), *aff'd in part, dismissed in part*, 542 B.R. 261 (B.A.P. 9th Cir. 2015).[22] Congress, in using the phrase "political or governmental powers," indicated "the existence of a broader array of municipal powers that are not 'political or governmental.'" *Id.* at 52. Indeed, if "political or governmental powers" included control over "property or revenues," Congress would not have "need[ed] to be specific in § 904(2) [or PROMESA § 305(2)] about 'property or revenues'" or "in § 904(3) [or PROMESA § 305(3)] about 'use or enjoyment' of income-producing property." *Id.* Accordingly, as the Board itself has argued, "Congress clearly sees the political and governmental powers … as separate from powers over the property or revenues of the debtor. … [P]ower over the property and the revenues and the income-producing property … is different from the powers that were safeguarded to the Commonwealth …." Tr. of Nov. 13, 2017, Hrg. at 12-13, *In re Puerto Rico Electric Power Authority*, No. 17-bk-4780.

Accordingly, "political or government powers" do *not* include the Commonwealth's acts here. Even if pension reform legislation could sometimes be an exercise of "political or governmental powers," *but see Stockton II*, 526 B.R. at 54, 58-59, that is not what happened here and, in any event, such powers do not include legislation with the purpose and effect of relieving

---

[22] The concept of "political or governmental powers" appears in PROMESA §§ 303 and 305 and their chapter 9 models, 11 U.S.C. §§ 903 and 904, and thus draws its meaning from both pairs of provisions. *See Stockton II*, 526 B.R. at 53 (interpreting §§ 903 and 904).

the Commonwealth of payment obligations to its instrumentality, acquiring that instrumentality's assets, and cutting off that instrumentality's obligations to its bondholders. In reality, the Post-Petition Legislation did not merely *adjust* the Commonwealth's financial relationship with ERS; it *destroyed* that relationship to eliminate bankruptcy claims against itself and ERS.

Indeed, aside from eliminating the Commonwealth's past due employer contributions, confiscating ERS's assets, and evading ERS's obligations to Claimants, ERS and the PayGo system are exactly the same in every meaningful respect: They fund the same benefits to the same pensioners and are funded by the same employers. Act 106, § 1.6(g), (q), (r), (s). They are for amounts that, even before Act 106, employers were already liable to cover as employer contributions. 3 L.P.R.A. §§ 781, 787.[23] And, critically, because ERS's assets were close to total depletion when the Puerto Rico Legislature passed Act 106, *see* Act 106, at 15-16, ERS was *already* functioning as a pay-as-you-go system, which is simply a system in which contributions are deferred until payments are actually due. *See* No. 17-3283, Dkt. No. 7556-3, at ¶¶ 8(c), 21.[24]

In fact, at least from the Commonwealth's perspective, the Post-Petition Legislation's most significant change was to eliminate the $411 million-plus claim that ERS had against the Commonwealth for failure to make mandatory employer contributions (and future contributions it would fail to pay). But it cannot be that, following the filing of a Title III petition, the

---

[23] *See* 3 L.P.R.A. § 787 (Act 447, § 4-113, providing that "the contributions required from the employer, as well as all annuities, benefits, reimbursements, and administration expenses, shall constitute obligations of the employer."); 3 L.P.R.A. § 781 (2008) ("any difference between" the minimum percentage of payroll that employers in fact paid ERS and the much higher actuarially required level "shall constitute a deficiency in the employer contribution" that "shall constitute an actuarial deficit of the System and an obligation of the employer").

[24] Under the Enabling Act, employers were required to make contributions sufficient to meet the cost of accrued benefits. *See* 3 L.P.R.A. § 781(e) (2008). However, once ERS depleted its assets, employers would be obligated to make contributions sufficient to pay pension benefits as they became due, thus turning ERS into a pay-as-you-go system. *See* No. 17-3283, Dkt. No. 7556-3, at ¶ 8(c) (declaration and expert report of Andrew A. Samwick). As the ERS Bondholder Groups have previously shown by expert testimony, by the time of the Post-Petition Legislation, ERS was already operating on a pay-as-you-go basis because it was using current contributions to pay current benefits. *See id.* Claimants will again prove this fact at the appropriate time in this litigation.

Commonwealth can legislatively annul bankruptcy claims against itself and then call upon § 303 to immunize its behavior. This is contrary to, and preempted by, § 502 of the Bankruptcy Code. Moreover, doing so goes against the fundamental precept that a state may not prefer itself or its favored constituencies in bankruptcy. *See Stockton II*, 526 B.R. at 57 ("[S]pecial insulation of a state actor in a municipal insolvency is contrary to chapter 9 precedent." (*citing Mission Indep. Sch. Dist. v. Texas*, 116 F.2d 175, 176-78 (5th Cir. 1940) (Texas cannot immunize bonds held by state from impairment in a chapter 9 proceeding))); *In re City of Detroit*, 504 B.R. 191, 255 (Bankr. E.D. Mich. 2013) (a state "cannot reorder the distributional priorities of the bankruptcy code"). As discovery will establish—to the extent it is not already clear—the Commonwealth's actions were not an exercise of the "political or governmental powers" protected by §§ 303 and 305.[25]

In fact, Congress made clear that it did not intend for § 303 to prevent a debtor or creditor from pursuing relief against the Commonwealth if it violated an instrumentality's automatic stay, because Congress expressly abrogated the Commonwealth's sovereign immunity with respect to § 362. 11 U.S.C. § 106(a)(1); 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 106 into PROMESA); *see also Stockton II*, 526 B.R. at 53 ("It is beyond cavil that [11 U.S.C.] § 106 applies in chapter 9 cases."). In the context of PROMESA, the only reason for Congress to expressly

---

[25] This Court's prior order on Sept. 18, 2018, has no bearing on whether PROMESA §§ 303 or 305 permitted the Commonwealth to seize ERS's assets in violation of the automatic stay. *In re FOMB for P.R.*, No. 17-3283, Dkt. No. 3941 (D.P.R. Sept. 18, 2018) ("Order Denying Stay"). That order addressed a restructuring that was initiated by the debtor, and in concluding that the automatic stay did not prevent debtor-initiated transfers, the court relied primarily on the fact that the Bankruptcy Code's automatic stay provision, § 362, did not "expressly prohibit a Title 11 debtor from itself taking actions to affect or dispose of property of the estate," and that PROMESA failed to incorporate Bankruptcy Code § 363, which does set restrictions on such actions. The Court invoked PROMESA §§ 303 and 305 only to support a reading already apparent from PROMESA's text. *See* Order Denying Stay 6 (noting that its interpretation of debtor-initiated transfers was "consistent with the nature of the cases and the sovereign character of the Title III Debtors" as expressed through PROMESA §§ 303 and 305). While PROMESA provides textual support for a debtor-initiated transfer, it provides the opposite for a creditor-initiated transfer of a debtor's assets, which § 362 strictly prohibits, unless an exception applies. And while the court invoked §§ 303 and 305 generally, it never interpreted the specific meaning of "political or governmental powers," which, as *Stockton II* made clear, do not extend to the adjustment of financial relations between the state and its municipalities. 526 B.R. at 54.

abrogate the Commonwealth's sovereign immunity for violations of § 362 would be to enable a party to seek relief against the Commonwealth if it violated an instrumentality's automatic stay. That abrogation would have no meaning if any time it was accused of violating an automatic stay, the Commonwealth could deploy § 303 as an absolute defense to its actions.

Finally, the Post-Petition Legislation is not exempt from the automatic stay under § 305 on the ground that a bankruptcy court may not interfere with a municipal debtor's "property or revenues." 48 U.S.C. § 2165(2). *See* RC Br. 23. An order declaring that the Post-Petition Legislation violated the automatic stay would not interfere with property of the Commonwealth; it would instead restore property to ERS that was taken from it. The Board and the Commonwealth are the ones that seized ERS's property and transferred it to the Commonwealth. Any "interfere[nce]" was the result of that seizure of ERS's property in the first instance. Declaring the Post-Petition Legislation void *ab initio* as a violation of the automatic stay would remove that interference and vindicate ERS's property interests. *See In re Soares*, 107 F.3d 969, 976 (1st Cir. 1997) (noting that violations of the automatic stay are void *ab initio*).

If merely undoing an unlawful transfer of debtor property "interfere[d] with" that property, the automatic stay, 11 U.S.C. § 362(a), would be unenforceable and judicial review effectively prohibited despite the strong presumption in favor of its availability. *See, e.g.*, *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424 (1995) ("[J]udicial review of executive action will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."); *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) (requiring "clear and convincing evidence of legislative intent before restricting access to judicial review"). The stay protects debtor property—as well as creditors—"against the disorderly, piecemeal dismemberment of the debtor's estate outside the bankruptcy proceedings." *Mann v. Chase Manhattan Mortg. Corp.*, 316 F.3d 1, 3 (1st

Cir. 2003); *see In re Lopez-Soto*, 764 F.2d 23, 27 (1st Cir. 1985). If § 305 prohibited this Court

from remedying a violation of the automatic stay, a third party could raid the coffers of a

government debtor with impunity, effectively transferring control of a government debtor's

property during Title III proceedings. This is not only clearly prohibited by the automatic stay, it

is also contrary to what this Court has itself said is the purpose of § 305. *In re FOMB for P.R.*, 301

F. Supp. 3d 278, 285 (D.P.R. 2017), *vacated and remanded by*, 899 F.3d 13 (1st Cir. 2018).

Recognizing that § 305 permits the Court to undo one debtor's interference with another's

property also avoids any unnecessary tension between §§ 305 and 407 of PROMESA. Section 407,

entitled "Protection from Inter-Debtor Transfers," prohibits transfers of the "property of any

territorial instrumentality … in violation of applicable law under which any creditor has a valid

pledge of, security interest in, or lien on such property, or which deprives any such territorial

instrumentality of property in violation of applicable law assuring the transfer of such property to

such territorial instrumentality for the benefit of its creditors." 48 U.S.C. § 2195(a). Section 407(b)

gives creditors a cause of action to enforce their rights, so long as no Title III stay "is in effect."

*Id.* §2195(b). Reading § 305 to cut off any remedies with respect to a debtor's property, even when

that property is no longer in the debtor's possession, would render § 407(b) an empty promise.

### c. The Post-Petition Legislation Is Not Exempt from the Automatic Stay Under 11 U.S.C. § 362(b)(4)

Section 362(b)(4) exempts from the automatic stay "the commencement or continuation of

an action or proceeding by a governmental unit … to enforce such governmental unit's or

organization's police and regulatory power." Movants argue that the Post-Petition Legislation fits

this exception because it "advances the public safety and welfare by guaranteeing pensions for

retirees and public servants." No. 17-3566, Dkt. No. 893 at 4-5 (the "AAFAF Br."); RC Br. 24-

25; FOMB Br. 31 n.17. But § 362(b)(4) is irrelevant, since it does not apply to legislative acts at

all. *See Albion Disposal*, 217 B.R. at 410. In any case, § 362(b)(4) does not apply to governmental action with a primarily pecuniary purpose.

i.      *First*, the plain text of § 362(b)(4) does not encompass legislation. The exception applies only to an "action or proceeding," *id.*, which, courts have held, refers only to judicial or administrative proceedings. *See Albion Disposal*, 217 B.R. at 410 (enactment of local ordinances did not satisfy § 362(b)(4), which requires "some type of action or proceeding, such as a lawsuit or administrative proceeding, that had been, or was about to be, brought by a governmental unit").

Movants attempt to rewrite § 362(b)(4) to cover "acts" rather than "action[s]" that protect public welfare. FOMB Br. 31 n.17; *see also* AAFAF Br. 4.[26] But it is "never [a court's] job to rewrite a constitutionally valid statutory text." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017). Congress chose to use the broad word "act" when defining the scope of the stay in § 362(a)(3), but the narrow phrase "action or proceeding" when defining the scope of the exception in § 362(b)(4). This Court must presume that Congress "act[ed] intentionally and purposely" when "includ[ing] particular language in one section of a statute but omit[ting] it in another." *Russello v. United States*, 464 U.S. 16, 23 (1983).

Moreover, even if the word "action" could sometimes mean "act" in context, here, the surrounding language "or proceeding" makes clear that "action" refers unambiguously to judicial or administrative matters. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* … counsels that a word is given more precise content by the neighboring words with which it is associated."). Indeed, Congress's other uses of the phrase "action or proceeding" elsewhere in the Bankruptcy Code and PROMESA also do not refer to

---

[26] In particular, AAFAF suggests that the First Circuit described § 362(b)(4) as pertaining to "*acts* 'designed primarily to protect the public safety and welfare.'" In fact, the court described § 362(b)(4) with reference to a regulatory proceeding. *See* AAFAF Br. 4 (citing *In re McMullen*, 386 F.3d at 325).

legislation.[27] Movants' awkward reading of § 362(b)(4) must be rejected. *See Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) (The "natural presumption [is] that identical words used in different parts of the same act are intended to have the same meaning"); *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring in part) (discussing "presumption of consistent usage").

Nor is there merit to the Board's claim that § 362(b)(4) applies to any "generally applicable regulatory laws." FOMB Br. 31 n.17. For one, the First Circuit has recognized that, "given the expansiveness of subsection 362(a), the exception contained in subsection 362(b)(4) is to be narrowly construed." *In re McMullen*, 386 F.3d at 325. And the Senate report makes clear that the exclusion applies only "where a governmental unit is *suing* a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law." S. Rep. No. 95-989, at 52 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5838 (emphasis added); *see also In re Nortel Networks, Inc.*, 669 F.3d 128, 140-41 (3d Cir. 2011). The enactment the Post-Petition Legislation was neither a suit to prevent or stop a violation of a regulatory law, nor is pension reform the type of regulation contemplated by § 362(b)(4).

This conclusion—that § 362(b)(4) does not apply to legislation—is consistent with all of Movants' cited authority. *See* AAFAF Br. 4. Two of these cases involve an administrative decision

---

[27] *See* 11 U.S.C. § 325 ("any pending action or proceeding"); *id.* § 362(a)(1) ("judicial, administrative, or other action or proceeding"); *id.* § 362(b)(1) ("criminal action or proceeding"); *id.* § 362(b)(2)(A) ("civil action or proceeding"); *id.* § 546(a) (statute of limitations for "[a]n action or proceeding under section 544, 545, 547, 548, or 553 of this title"); *id.* § 549(d) (statute of limitations for "[a]n action or proceeding under this section"); *id.* § 550(f) (statute of limitations for "[a]n action or proceeding under this section"); *id.* § 922(a)(1) ("judicial, administrative, or other action or proceeding … that seeks to enforce a claim against the debtor"); *id.* § 1519(d) ("a criminal action or proceeding"); *id.* § 1520(b) ("an individual action or proceeding in a foreign country"); *id.* § 1521(a)(1) ("an individual action or proceeding concerning the debtor's assets"); *id.* § 1521(d) ("a criminal action or proceeding"); 48 U.S.C. § 2194(b)(1) ("a judicial, administrative, or other action or proceeding against the Government of Puerto Rico"). *See also* 28 U.S.C. § 1410(2) (venue for chapter 15 bankruptcy proceedings may be proper where "there is pending against the debtor an action or proceeding in a Federal or State court").

and a regulatory proceeding, not legislation. *See Parkview Adventist Med. Ctr. v. United States*, 842 F.3d 757, 764 (1st Cir. 2016) (administrative decision); *In re McMullen*, 386 F. 3d at 325 (regulatory proceeding). And their final case actually held that an amendment to a municipal zoning ordinance was *not* an "action or proceeding against the debtor" enjoined by 11 U.S.C. § 362(a)(1). *In re Lacoquille Investment Co., Inc.*, 44 B.R. 731, 733 (Bankr. S.D. Fla. 1984) (holding that the automatic stay did not apply). While the court noted in dicta that if the ordinance *were* ruled to be an "action or proceeding against the debtor" it would nonetheless be covered by § 362(b)(4), the court did not purport to rule that legislation falls within the exception. *Id.*

ii.       *Second*, even if § 362(b)(4) somehow applied to legislation, the exception still would not apply here. Section 362(b)(4) applies only to actions or proceedings to enforce "police and regulatory power," but the Post-Petition Legislation does neither, because it was primarily enacted for a pecuniary purpose.

The governing test is clear: "[C]ourts have devised two interrelated, fact-dominated inquiries—the so-called 'public policy' and 'pecuniary purpose' tests—for assessing whether a particular governmental proceeding comes within the subsection 362(b)(4) exception." *McMullen*, 386 F.3d at 325. Under this analysis, "the bankruptcy court, after assessing the totality of the circumstances, [must] determine whether the particular regulatory proceeding at issue is designed primarily to protect the public safety and welfare, *or* represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties." *Id.*; *see also Nortel Networks*, 669 F.3d at 139-40. "[I]f the action is an attempt by the government to recover property from the estate, it has a pecuniary purpose and so remains subject to the stay." *Parkview Adventist*, 842 F.3d at 763.

Movants fail to satisfy this test. As an initial matter, it is not enough for Movants simply

to assert that the Post-Petition Legislation "advances the public safety and welfare by guaranteeing pensions for retirees and public servants." AAFAF Br. 4. Instead, the First Circuit made clear in *McMullen* that the test is "fact-dominated," making resolution at a motion to dismiss stage impossible given Claimants' allegation that the Post-Petition Legislation was motivated by a pecuniary purpose. 386 F.3d at 325; *see also* Adversary Compl. Claims ¶ 96 ("[T]he Commonwealth and the Oversight Board appear to have enacted the Post-Petition Legislation for the purpose of providing the Commonwealth with additional funds to use for purposes specified in the Fiscal Plan for Puerto Rico."); *see also id.* ¶¶ 3, 93-98. Dismissal is thus improper.

In any case, even the existing record shows that § 362(b)(4) does not apply. Courts have held that § 362(b)(4) is normally triggered when the government's "action or proceeding" is "predicated upon an allegation of wrongdoing," *Nortel Networks*, 669 F.3d at 141, or seeks to "enforce[e] generally applicable regulatory laws," *In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 445 (1st Cir. 1986). But the Post-Petition Legislation fits neither category: The Post-Petition Legislation obviously does not involve any allegation of wrongdoing. And rather than enforcing existing regulations, it introduces new rules to limit Claimants' rights. Indeed, in a similar circumstance, the Third Circuit held that § 362(b)(4) did not apply to a government agency's action to determine liability for a financial shortfall in a private pension plan. *See Nortel Networks*, 669 F.3d at 141-42. The court reasoned that the proceeding "d[id] not protect the public safety and health as those terms have been applied in the context of the police power exception" even though it "clearly reflect[ed] public policy decisions," because the proceeding was "focused on the pecuniary interests of the [government agency] and the members of [the] pension scheme," not the public at large. *Id.* So too here. Regardless of its stated motivations, the Commonwealth's efforts to address the pension funding shortfall for the

pecuniary benefit of the Commonwealth and retirees would not fall within § 362(b)(4).

### 2. The Commonwealth Violated the Contracts Clauses of the U.S. and Puerto Rico Constitutions

Claimants have sufficiently alleged that the Post-Petition Legislation violates the Contracts Clauses of the U.S. and Puerto Rico Constitutions by substantially impairing the contractual relationship between Claimants and ERS. The federal Contracts Clause prohibits "any … Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Similarly, the Puerto Rico Constitution provides that "[n]o laws impairing the obligation of contracts shall be enacted." P.R. Const. art. II, § 7. The same standard applies to both constitutional provisions. *See Trinidad Hernández v. ELA*, 188 D.P.R. 828, 834 (P.R. 2013). A law violates either Contracts Clause if: (1) it "has … operated as a substantial impairment of a contractual relationship," *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978), and (2) that impairment was not "reasonable and necessary to serve an important public purpose," *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977). As explained below, the Post-Petition Legislation satisfies this test: It substantially impaired Claimants' rights under the Bond Resolution and is neither reasonable nor necessary to an important governmental purpose.

### a. The Post-Petition Legislation Substantially Impaired Claimants' Contract with ERS.

By eliminating employer contributions to ERS, the Commonwealth subverted the reasonable expectations of the contracting parties, the cornerstone of a Contracts Clause violation.

"In order to weigh the substantiality of a contractual impairment, courts look long and hard at the reasonable expectations of the parties." *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999). Crucially, the question is not whether the parties should have foreseen that *some* future law might affect their contract, but whether the *particular* impairment was "foreseeable as the type of law that would alter contract obligations." *Energy Reserves Grp.*

*Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 416 (1983). Thus, for instance, "[t]he fact that some incidents of a commercial activity are heavily regulated does not put the regulated firm on notice that an entirely different scheme of regulation will be imposed." *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 895 (7th Cir. 1998). A law substantially impairs a contract if it impairs a promise that was "not only the primary inducement for" the contract, "but also the central provision upon which [a party] reasonably rel[ied]." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006). Here, the impairment was substantial and Bondholders could not reasonably have expected what took place: the dismantling of ERS, evasion of ERS's obligations to Bondholders, and elimination of Claimants' collateral and contractual right to be repaid.

i.      The Post-Petition Legislation substantially impaired Claimants' rights under the Bond Resolution. In particular, under the Bond Resolution, Claimants' had a contractual right to be paid from a particular stream of funds—employer contributions. Bond Resolution § 201; *see also supra* at 18-20. Absent the Post-Petition Legislation, that stream of funds would have been more than sufficient to pay Claimants in full. Yet the Post-Petition Legislation impaired that right by redirecting the stream of funds to the Commonwealth, effectively ensuring that Claimants' contractual rights to payment would be rendered unenforceable.

Contracts Clause cases recognize that "changes in the laws that make a contract legally enforceable may trigger Contract Clause scrutiny if they impair the obligation of pre-existing contracts, even if they do not alter any of the contracts' bargained-for terms." *General Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992). Moreover, "[a] number of cases have held that a State may not authorize a municipality to borrow money and then restrict its taxing power so that the debt cannot be repaid." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 24 n. 22 (1977). In particular, in *Von Hoffman v. City of Quincy*, 71 U.S. 535 (1866) the Court held that a state statute

restricting municipal taxing authority to such a low level that the city would be unable to pay outstanding bonds violated the Contracts Clause by impairing the city's contractual obligations to pay its bonds: "To the extent of the deficiency [in collections due to the new statute] the obligation of the contract will be impaired, and if there be nothing applicable, it may be regarded as annulled." *Id.* at 554. Thus, the Court ruled that "where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is satisfied." *Id.* Thus, the state could not "any more impair the obligation of the contract in this way"—*i.e.*, by cutting off all funds to pay it—"than in any other." *Id.*; *see also Wolff v. City of New Orleans*, 103 U.S. 358 (1880) (similar); *W.B. Worthen Co. ex rel. Bd. of Comm'rs v. Kavanaugh*, 295 U.S. 56 (1935) (similar).

That is just what happened here: While the Post-Petition Legislation did not eliminate ERS's obligation to pay the bonds, it rendered that obligation unenforceable by taking away the funds (and all other assets) with which ERS would make the required payments. Importantly, the 552 Decision does not pose a barrier to this argument. To be sure, if the 552 Decision stands, Claimants will have had no lien on employer contributions ERS received post-petition, which the Post-Petition Legislation redirected to the Commonwealth. But Claimants still had a contractual right to be repaid out of that stream of funds, and a valid contractual right for purposes of the Contract Clause does not depend on the existence of a security interest in the funds at issue— nothing in the reasoning of *Van Hoffman* depended on the bondholders having had a lien on future tax revenues; rather, the elimination of those revenues was deemed an impairment of their contractual rights to payment because it ensured that the payments would not be made. So too here.

ii.     The Board contends (FOMB Br. 53) that Bondholders must have expected that the Commonwealth could eliminate employer contributions, because the Bonds' Official Statement

warned "[t]he Legislature … could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions." *Id.* This is wrong.

As an initial matter, the Board errs in relying on the Official Statement, because the operative contract was the Bond Resolution. That document alone determines the parties' contractual expectations. *See* Bond Resolution § 102 (declaring Bond Resolution a contract); *id.* § 1310 (repealing acts of ERS conflicting with Bond Resolution); *Morton Arboretum v. Thompson*, 605 F. Supp. 486, 489 (N.D. Ill. 1984) (expressly rejecting argument that the Official Statement, rather than the Resolution, controls); *United States v. Michigan*, 518 F. Supp. 966, 970 (E.D. Mich. 1981) (relying on contract and disregarding conflicting provision in offering statement); Adversary Compl. Claims ¶ 60. And the only pertinent statement in the Bond Resolution was a provision setting the Employers' Contribution Rate "initially" at 9.275% of the Covered Payroll. That is a far cry from saying that employer contributions to ERS could be entirely eliminated.

Moreover, Movants' fact-based arguments do not justify dismissal of Claimants' claims at this stage. Bondholders' expectations are an issue of fact and cannot be determined prior to discovery. At the least, Claimants have properly pled that Bondholders could not have expected employer contributions to be diverted wholesale in order to circumvent Bondholders' claims.

As Claimants have alleged, nothing in the Official Statement or Bond Resolution reasonably gave notice that employer contributions could be wholly diverted or eliminated. At most, Bondholders were on notice that the Commonwealth might reduce the contribution rate in a way that would adversely affect employer contributions (which were, nevertheless, scheduled to increase annually from the "initial" rate of 9.275%). Adversary Compl. Claims ¶ 53; ECF 892-3 in Case No. 17-3566, at 37 (the "Official Statement"). But neither Bondholders nor anyone else could have foreseen that the Puerto Rico Legislature would restructure the pension system to

47

wholly bypass one set of ERS creditors—Bondholders—in favor of another set of creditors—

pensioners—whose claims were subordinated by the Bond Resolution and ERS Enabling Act.[28]

As discovery and other documents will show, ratings agencies were assured of a dynamic

in which the Commonwealth's maintenance of a system of employer contributions for its

pensioners protected Bondholders' interest in those contributions. Thus, as long as pensions were

paid, there would be employer contributions to fund them. Indeed, the Official Statement noted

that the Puerto Rico Supreme Court had ruled that government employees had "a contractual

vested right to their pension benefits" and that Bondholders could "benefit indirectly" from the

actions of government employees who challenged any proposed reduction to their pension

benefits. Official Statement 38. Nothing in either the Official Statement or Bond Resolution alerted

Bondholders that that dynamic could be fundamentally transformed.

The ERS Enabling Act underscores this point. The rate of contribution is distinct from

employers' overarching obligation under the ERS Enabling Act to "maintain the System fully

funded on an actuarial basis." Official Statement 3; see *id.* at 37 (The ERS Enabling Act "requires

that Employer Contributions cover the difference between (i) the benefits provided by the System

to its beneficiaries, plus administrative costs, and (ii) the contributions that employees are required

to make to the System."). While the Official Statement suggested *rates* could fall, it also repeatedly

explained that employers were still obligated under the Enabling Act to cover the total accrued

actuarial liability. Thus, as long as an actuarial liability remained, employer contributions would

continue—and, along with them, repayments on the ERS Bonds. *See id.* at 26 (suggesting that the

contribution rate will be lowered if "the System's unfunded accrued liability has been reduced or

---

[28] And, in fact, employer contributions have not been reduced or eliminated; they have instead been funneled
off to circumvent ERS's obligations to its Bondholders. *See supra* at 9 (graphic depicting diversion of employer
contributions). The relative contributions made by the Commonwealth, public corporations, and municipalities have
not even significantly changed. *See supra* at 9 (graphic depicting relative contributions).

eliminated").[29] Such an expectation was particularly strong given that the Enabling Act imposes

penalties for non-compliance: an employer's failure to pay its contributions to ERS on time may

be punishable as a misdemeanor, and ERS may take various actions if contributions are in arrears.

*See* 3 L.P.R.A. § 781a; *see also* 3 L.P.R.A. § 782(d) (actuarial liabilities), § 787q (maintaining

solvency of ERS), and § 787 (identifying obligations of employers with respect to contributions,

annuities, benefits, reimbursements, and administration expenses); Adversary Compl. Claims ¶ 54.

The Official Statement made these protections clear to investors. It pointed out that (i)

existing Puerto Rico Supreme Court precedent protected pension benefits for government

employees and so Bondholders would "benefit indirectly" from government employees

challenging any reduction to benefits; (ii) ERS had a contractual obligation "to uphold, enforce

and defend its rights to receive the current statutorily required Employer Contributions," including

by challenging in court any legislation reducing employer contributions as unlawful under the

Constitution or Puerto Rico Supreme Court precedent, *e.g.*, *AMPR v. Sist. Retiro Maestros IV*, 190

D.P.R. 854 (P.R. 2014);  (iii) "the Legislature ha[d] never taken any action that had the effect of

impairing the ability of a Puerto Rico government instrumentality to pay its debt, and ha[d] always

appropriated funds required to pay debt service, even if not legally obligated to do so;" (iv) the

"Legislature ha[d] not reduced the Employer Contribution rate since 1960;" (v) the "[Enabling]

Act provide[d] [ERS] with special powers to compel employers to make required contributions"

and the failure to do so was chargeable as "a felony punishable by imprisonment;" and (vi) public

corporations and municipalities were prohibited from obtaining government funding if they had

---

[29] Presumably the unfunded accrued liability could be reduced or eliminated based on ERS's investment earnings or a decision by the Commonwealth to cut pension benefits drastically. The Official Statement, however, provided assurances that the Commonwealth could not make unreasonable alterations to pension rights that would impact the solvency of the retirement system (which would have resulted in a failure to repay bonds altogether, such as what occurred here). *See* Official Statement 38.

not made the required contributions. *See* RC Br. Ex. C, Bond Official Statement, Series A at 38.

Finally, it belies common sense to think that Bondholders would have expended hundreds of millions of dollars to purchase interests in the ERS Bonds and would have gone to the trouble of obtaining liens if they had expected their collateral and contractual right to repayment to be seized by the Commonwealth, without any hope of recovery, as cover for the government's own failure to fund its employees' pension plans. *See* 11 Williston on Contracts § 32:7 (4th ed.) (noting that the commercial setting in which the contract was negotiated is relevant to interpreting its meaning). Additionally, if the current situation had been entirely foreseeable, as Movants argue, it is odd indeed that the Board, ERS, and the Commonwealth all previously represented to this court and the First Circuit, shortly before the ERS Title III filing, that the ERS Bonds were *over*secured.[30] Assuming these representations were made in good faith, it seems even Movants themselves lacked actual notice that Claimants had no secure right to repayment.[31]

In sum, Bondholders could not have reasonably foreseen what happened here: the complete destruction of ERS's ability to repay its Bondholders, notwithstanding the continued funding of pensions for the very same pensioners from the very same employers. *See Chrysler Corp.*, 148

---

[30] *See, e.g.*, Brief of Amicus Curiae FOMB for Puerto Rico in Support of Respondents-Appellees Urging Affirmance of the District Court Order in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-2433, ECF No. 65, at 18 (1st Cir. Dec. 23, 2016) ("The [ERS Bondholders] have a substantial equity cushion as a result of the reserve accounts and the perpetual revenue streams."); Respondent Employees Retirement System of the Government of the Commonwealth of Puerto Rico's Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro Garcia Padilla, et al.*, No. 16-cv-2696, ECF No. 52, at 10-11 (Oct. 26, 2016) ("[T]he security interests held by the ERS Bondholders provide them with future protection more than sufficient to address any concern, real or imagined."); Respondents' Brief in Opposition to Motion for Relief from the PROMESA Automatic Stay in *Altair Global Credit Opportunities Fund (A), L.L.C., et al. v. Governor Alejandro García Padilla, et al.*, No. 16-cv-2696, ECF No. 53, at 18 ("Given its size and indefinite duration, the security interest provides Movants with the adequate protection they purport is required to ensure payment on their bonds, certainly through the expiration of the PROMESA stay and, indeed, for as long as the bonds remain outstanding.").

[31] In a tacit acknowledgment of the reality of what happened here, the Board also argues that the Puerto Rico Constitution warned Bondholders that their constitutional rights were subject to the Commonwealth's police power. FOMB Br. 45. But of course the Commonwealth may not violate the U.S. Constitution or limit Claimants' rights thereunder. Any warning to the contrary lacks the force of law and logic.

F.3d at 895 ("The form and particularly the consequences of such a scheme would be so difficult to foresee that it would be unrealistic to think that the firm had been compensated for the risk of bearing those consequences when it negotiated the original contract."). Indeed, neither the underlying documents nor the parties' interactions gave any warning that such legislation was possible. Much the opposite: Not only did the law *require* ERS's debt to be secured, 3 L.P.R.A. § 779(d) (2008); Adversary Compl. Claims ¶ 50, but statutes gave ERS a right to employer contributions, *id.* ¶ 51; required those contributions to cover the difference between benefits and employee contributions, *id.* ¶ 53; and authorized ERS to enforce these rights, *see id.* ¶ 54.[32]

iii.     Movants also argue (FOMB Br. 54; RC Br. 29) that there is no substantial impairment because the Commonwealth has not impaired Claimants' ability to "obtain a remedy for a demonstrated breach." *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 48 (1st Cir. 2011). But the Post-Petition Legislation plainly "destroys *both* the obligation to perform on the contract *and* the obligation to pay damages for nonperformance," *Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*, 863 F.3d 718, 722 (7th Cir. 2017), by dismantling Claimants' very counterparty, ERS, and diverting all its assets, *cf. U.S. Tr. Co.*, 431 U.S. at 19 ("Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the States' contract."). Movants' argument—that Claimants have a remedy for the Commonwealth's substantial impairment of their contract with ERS—also contradicts their contention that Claimants have no recourse to ERS beyond their prepetition collateral. *See, e.g.*, FOMB Br. 79-80.

---

[32] Those same understandings were also evident in the Bond Resolution. For instance, § 709(2) of the Bond Resolution provides that ERS "shall oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in the Act or any other relevant legislation that would have a material adverse effect on Claimants." (emphases added). Notably, the provision uses the terms "change" or "reduc[tion]," neither of which implies the complete destruction of Claimants' collateral.

iv.      Finally, the Board argues (FOMB Br. 40-50 & n.20) that any impairment to the Bond Resolution arose not from any act of the Commonwealth but instead from PROMESA's preemption of the Enabling Act's appropriations, making the Contracts Clause inapplicable. As explained more fully above, *see supra* at 25-28, this is incorrect for several reasons. For one, this argument, which appeared for the first time in the Board's motion to dismiss, has been waived because it was not included in the Board's objection to the Claimants' proofs of claim. *See supra* at 25. Second, the Bond Resolution was impaired by the redirection of employer contributions and all other ERS assets from ERS to the Commonwealth. These acts caused greater harm than a mere failure to appropriate, and are attributable to the Post-Petition Legislation, not PROMESA's preemption of the Enabling Act's appropriations. *See supra* at 25-28. The Contracts Clause is implicated so long as the impairment involved "some exercise of legislative power" by Puerto Rico. *In re FOMB for P.R.*, 297 F. Supp. 3d 269, 285 (D.P.R. 2018) (quoting *Arriaga v. Members of Bd. of Regents*, 825 F.Supp. 1, 4 (D. Mass. 1992)), *aff'd*, 927 F.3d 597 (1st Cir. 2019). Claimants' claims more than meet that standard.

### b.      The Post-Petition Legislation Was Neither Reasonable Nor Necessary to Serve an Important Public Purpose

Movants next argue that even if the Post-Petition Legislation substantially impaired Claimants' contract rights, that impairment served an important public purpose: namely, to ensure that benefits would be paid to retirees and to address the Commonwealth's fiscal crisis. FOMB Br. 55; RC Br. 30. Movants also argue that the impairment was reasonable and necessary to that public purpose because the legislature represented that the Commonwealth was in need of money, previous attempts to reform ERS were unsuccessful, and the impairment was part of a broader suite of reforms. FOMB Br. 56-59. These arguments likewise fail.

i.      As an initial matter, it is important to note that "[w]here the state is alleged to have

impaired a public contract to which it is a party, 'less deference to a legislative determination of

reasonableness and necessity is required, because the State's self-interest is at stake.'" *UAW v.*

*Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011); *see also AMPR v. Sist. Retiro Maestros IV*, 190 D.P.R.

854, 868 (P.R. 2014). As the Supreme Court explained in *U.S. Trust Co.*, where the State is a party

to the contract, "complete deference to a legislative assessment of reasonableness is not

appropriate because the State's self-interest is at stake. A governmental entity can always find a

use for extra money, especially when taxes do not have to be raised. If a State could reduce its

financial obligations whenever it wanted to spend the money for what it regarded as an important

public purpose, the Contract Clause would provide no protection at all." 431 U.S. at 26.

     ii.     Here, the Post-Petition Legislation does not serve an important public purpose.

Movants insist that the Legislation was necessary to move to a "Pay-Go" system, to put the pension

system on a sounder footing, and to alleviate a fiscal crisis. FOMB Br. 33; RC Br. 15. But as

discussed, *supra* at 36, ERS was already a pay-as-you-go system. To the extent any aspect of the

Post-Petition Legislation enhanced the ability of pensioners to be repaid, it was the increase of the

employer contribution rate, not the purported switch to a "Pay-Go" system. In reality, the Post-

Petition Legislation's only economic purpose was to divert collateral away from a set of disfavored

creditors, to eliminate massive bankruptcy claims against the Commonwealth, and to favor of the

Commonwealth's preferred set of creditors. That cannot be an important public purpose.

     Indeed, courts have recognized that legislation violates the Contracts Clause if, as is true

here, it was enacted simply for "the financial benefit of the sovereign," *Buffalo Teachers Fed'n*,

464 F.3d at 368, or in order to "provid[e] a benefit to special interests," *Energy Reserves Grp.*, 459

U.S. at 412; *see also Allied Structural Steel*, 438 U.S. at 242 (legislation "enacted to protect … a

favored group" may violate the contracts clause (discussing *Home Bldg. & Loan Ass'n v. Blaisdell*,

290 U.S. 398, 445 (1934))). While Movants insist (FOMB Br. 55; RC Br. 30) that the purpose of the Post-Petition Legislation was to address a fiscal crisis, its assertions are not entitled to deference where Claimants' allegations reveal the Commonwealth's true motivations, *see United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 45 (1st Cir. 2011). Instead, as Claimants have properly pled, the Commonwealth enacted the Post-Petition Legislation to increase its liquidity, relieve itself of payment obligations, make it less expensive to pay pensions, and favor ERS's pensioners over Bondholders. Adversary Compl. Claims ¶¶ 83-98. In any event, the purpose of the Post-Petition Legislation is a factual question and thus cannot provide a reason to dismiss Claimants' Contracts Clause claims now. *See Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 500 (1st Cir. 2012) ("All well-pleaded facts are to be taken as true and we draw all reasonable inferences from the complaint in plaintiffs' favor.").

iii.     Moreover, even if the Post-Petition Legislation did serve an important public purpose, it is not reasonable or necessary to accomplish that purpose. "[T]he reasonableness inquiry asks whether the law is reasonable in light of the surrounding circumstances," while "the necessity inquiry focuses on whether Puerto Rico imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well." *United Auto.*, 633 F.3d at 45-46. Factors considered include whether the legislation "(1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency." *Id.* at 46; *see Energy Reserves Grp.*, 459 U.S. at 410 n.11. If the Commonwealth did not "consider … other policy alternatives," or if it otherwise acted unreasonably under the circumstances, its choice would not be necessary or reasonable. *U.S. Tr. Co.*, 431 U.S. at 30-31; *see Buffalo Teachers Fed'n*, 464 F.3d at 371. And, where "the State's self-

54

interest is at stake," a court affords "less deference to a legislative determination of reasonableness and necessity." *Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.*, 173 F.3d 46, 59 (1st Cir. 1999).

With respect to the first *United Auto* factor, the record demonstrates that the fiscal "emergency" addressed by the Post-Petition Legislation was nothing new. Because the Commonwealth was aware of ERS's actuarial deficiency for decades, including before ERS entered the Bond Resolution, FOMB Br. 8, it cannot now claim that its impairment of Claimants' contract rights was suddenly "necessary." *See U.S. Tr. Co.*, 431 U.S. at 31 (considering whether public policy justifications were "unforeseen and unintended" at the time the covenant was entered into). In similar circumstances, the Illinois Supreme Court rejected the state's argument that the reduction of retirement annuity benefits was "necessary" to secure the state's financial health and the wellbeing of its citizens. The court pointed out that the state's funding problems "were entirely foreseeable" and that if the legislature found itself in crisis, "it is a crisis for which the [legislature] is largely responsible." *In re Pension Reform Litig.*, 2015 IL 118585, ¶ 66, 32 N.E.3d 1, 22. So too here. Puerto Rico's long-running pension problems were expected and largely of ERS's and the Commonwealth's own making, as Act 106 itself acknowledges. *See* Act 106, at 2-3 (recounting a long line of "unwise public administration policies," beginning in 2001, that caused the current crisis); Act 116 (noting that the Commonwealth's failure to pay required contributions, including those due under Enabling Act § 2-116, contributed to ERS's financial crisis).

With respect to the second *United Auto* factor, Claimants have sufficiently alleged that the Post-Petition Legislation sought to protect "particular individuals" rather than "a basic societal interest." As Claimants have alleged, one purpose of the Post-Petition Legislation was to evade ERS's obligations to Bondholders in order to use the money ERS would otherwise have been obligated to pay Bondholders to satisfy the Commonwealth's obligations to pensioners. Indeed, if

the Commonwealth truly intended to restore the fiscal health of the pension system more broadly, rather than simply to evade ERS's obligations to a disfavored set of creditors, it could have "spread the burden … across various sectors of society" by enforcing the contribution requirements that already existed. *United Auto.*, 633 F.3d at 47. Unlike in *United Automobile*, where plaintiffs pled "no facts … to suggest that Act No. 7 was enacted to benefit a special interest at the expense of Puerto Rico's public employees," *id.*, the Post-Petition Legislation seeks to protect one set of ERS creditors at the expense of another set of its creditors.[33] *See* Adversary Compl. Claims ¶ 172.

Next, the third *United Auto* factor also weighs in favor of Claimants because the effect on Claimants is neither of reasonable magnitude nor time-limited. The Post-Petition Legislation, by permanently dismantling ERS and taking all its assets, was designed to ensure that Claimants would never be repaid billions of dollars. This is no temporary measure.

Finally, the fourth *United Auto* factor weighs in Claimants' favor because the Post-Petition Legislation was not the only way for the Commonwealth to ensure the stability of the pension system. As Claimants alleged, the aspect of the Post-Petition Legislation that stabilizes the pension system is the increased employer contributions mandated by the Pay-Go Fee. But there is no reason employer contributions could not have been increased within the existing statutory scheme, without dismantling ERS. Adversary Compl. Claims ¶ 171. Nor was it necessary to eliminate ERS to move to a pay-as-you-go system, as ERS was already operating on a pay-as-you-go basis.

The Board attempts to fend off this obvious alternative by suggesting it was impossible to pay both pensioners and Bondholders. *See* FOMB Br. 56 ("Wishing there were more money to pay creditors, however, does not create it."). Of course, one of the easiest ways for a financially-

---

[33] These facts likewise distinguish this case from this Court's decision in *FOMB for P.R.*, 297 F. Supp. 3d at 287-88, where it concluded that the plaintiff had failed to plead sufficient facts to infer that the legislation was enacted to protect particular individuals.

strapped government entity to address its difficulties is to cut and run on its debts. But if there are

other ways to address those difficulties without impairing those obligations, the government entity

cannot take this easy way out. *See U.S. Tr. Co.*, 431 U.S. at 30-31; *Buffalo Teachers Fed'n*, 464

F.3d at 371. It is hardly unreasonable to suggest that employer contributions could have been

increased to ERS, within the existing statutory scheme, Adversary Compl. Claims ¶¶ 84, 171—

particularly when the Post-Petition Legislation did in fact increase employer contribution rates,

*see id.* ¶ 53. And Movants fail at all to address Claimants' suggestion that contributions from public

corporations and municipalities alone—that is, leaving aside the central government—would have

been sufficient to fully service the ERS Bonds. *Id.* ¶ 94. In any case, at the very least, Movants

have failed to provide a "substantial factual basis" at this stage of the litigation to overcome

Claimants' facially valid allegation the Commonwealth could have accomplished its goals without

substantially impairing Claimants' contract with ERS through the Post-Petition Legislation.[34]

### 3.   The Post-Petition Legislation Violated the Takings Clauses of the U.S. and Puerto Rico Constitutions

Claimants also have stated facially valid claims for violations of the Takings Clauses of

the U.S. and Puerto Rico Constitutions because the Commonwealth took Claimants' "private

property, … without just compensation" and not for a "public use." U.S. Const. amend. V

("[P]rivate property [shall not] be taken for public use, without just compensation."); *see* P.R.

---

[34] Accordingly, this case is unlike *In re FOMB for P.R.*, where a plaintiff alleged in a conclusory fashion that debt service on the pertinent bonds could have been paid "with enough left over to address truly 'essential' services without 'significant impact.'" 297 F. Supp. 3d at 288. Similarly, this case is unlike *Trinidad Hernández*, where the Puerto Rico Supreme Court likewise faulted the plaintiffs for arguing in only "a general manner, that less burdensome alternatives existed" and where they had not pled facts regarding the feasibility and burden of those alternatives. 188 D.P.R. at 837-38; *see also* FOMB Br., Ex. G, at 5-6. Here, by contrast, there is no question that: (1) a pension system (ERS) is already in place, *see, e.g.*, Adversary Compl. Claims ¶ 171; (2) with employees to do the job (because they will be kept on in Commonwealth government, *see* Act 106, § 5.2, at 31); and (3) employer contributions could be increased (because they have been, *see, e.g.*, Adversary Compl. Claims ¶ 53). Those facts, which appear in the Complaint and the exhibits attached to it (Act 106), offer a facially valid basis to identify an available "more moderate course," *United Auto.*, 633 F.3d at 46, for purposes of stating an actionable impairment under the Contracts Clause. *See In re Hemingway Transp., Inc.*, 993 F.2d at 925; *supra* at 11-12.

Const. art. II, § 9 ("Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law.").[35] To make out a takings claim, "plaintiffs must first show that they possess a recognized property interest," and second, that the challenged action "cause[d] an illegal taking of [that] interest[]." *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 973-74 (1st Cir. 1993). In addition, no government can take private property if it lacks a legitimate "public use" for doing so. *See Fideicomiso de la Tierra del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 17 (1st Cir. 2010).

Here, the Commonwealth fails at every step. The Post-Petition Legislation not only took Claimants' recognized property rights by seizing their collateral, but it also did so for no legitimate public purpose. Put another way, by enacting the Post-Petition Legislation, the Commonwealth "t[ook] away rights of the [Bondholders] in specific property"—entitling Claimants to just compensation under the Fifth Amendment. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935). Movants therefore fail to overcome the facial validity of Claimants' takings claims. *See In re Hemingway Transp., Inc.*, 993 F.2d at 925; *supra* at 11-12.

### a. Claimants Have Asserted Recognized Property Interests

As Claimants have repeatedly alleged, they hold valid, perfected security interests in and liens on the Pledged Property confiscated by the Commonwealth. Those liens are indisputably "property" for purposes of the Fifth Amendment. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 616 (2013). Indeed, the Supreme Court has "repeatedly held that the government

---

[35] Movants do not resist application of the Takings Clause to the Commonwealth of Puerto Rico. *See also Elena v. Municipality of San Juan*, 677 F.3d 1, 7 (1st Cir. 2012) ("The Fifth Amendment, extended to the states (and Puerto Rico) by the Fourteenth, permits government takings of private property only for public use and with just compensation to the individual deprived of the property."). Claimants additionally submit that the Takings Clause applies to Puerto Rico by its own force (including to the Board, a federal actor) under the *Insular Cases* because protection from the government's unlawful assumption of private property is "a fundamental right which goes wherever the jurisdiction of the United States extends." *Dorr v. United States*, 195 U.S. 138, 148 (1904).

takes property when it seizes liens" enforceable under applicable non-bankruptcy law. *Id*. To give just a few examples, in *Armstrong v. United States*, the Supreme Court held that a materialman's nonrecourse lien was a property right giving rise to a takings claim. 364 U.S. 40, 44, 46 (1960). And likewise in *Louisville Joint Stock Land Bank v. Radford*, the Court determined that the Takings Clause protects property rights in mortgages. 295 U.S. at 601-02. Because Claimants have alleged the existence of valid, enforceable liens in the Pledged Property, *see, e.g.*, Claim Addenda ¶ 23; Admin. Expense Claims ¶ 37; Adversary Compl. Claims ¶¶ 137-163, they have alleged a constitutionally protected property interest. And, as explained, *see supra* at 13-16, Claimants' collateral includes more than just the future employer contributions addressed in the 552 Decision. The taking of this "additional" collateral, just as any other property, violates the Takings Clause.[36]

If that were not enough, the Post-Petition Legislation also takes Claimants' contractual right to receive principal and interest payments from ERS. Much like liens, "[t]here is no question that '[v]alid contracts are property'" under the Takings Clause. *Chang v. United States*, 859 F.2d 893, 895 (Fed. Cir. 1988) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)); *see also Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 610-12 (D.P.R. 2015) (denying motion to dismiss taking claim based on statute that destroyed contractual right to seek appointment of a receiver), *aff'd on other grounds*, 805 F.3d 322 (1st Cir. 2015). This is true "whether the obligor [is] a private individual, a municipality, a State, or the United States." *Lynch*, 292 U.S. at 579; *accord Nat'l Educ. Ass'n-R.I. ex rel. Scigulinsky v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 172 F.3d 22, 30 (1st Cir. 1999) ("If there were a contractual right to such payment, that right itself would be property for the purposes of the Takings Clause."). Claimants thus have alleged

---

[36] Additionally, if the Supreme Court reverses the First Circuit's 552 Decision, the Commonwealth would be responsible for the unlawful transfer of the post-petition employer contributions as well as this other collateral, and Claimants reserve their right to present such arguments if the 552 Decision is reversed.

not one, but two protected property interests unlawfully taken by the Commonwealth.[37]

Rather than address Claimants' arguments on their actual terms, the Board attempts a sleight of hand. It argues that Claimants have failed even to "allege[] what was 'taken,'" FOMB Br. 41, because Claimants have not sought to establish a specific decrease in Bond value as a result of the Commonwealth's actions. This argument mistakes the nature of the property at issue in Claimants' takings claim, basic economics, and Claimants' obligations at the pleading stage.

As the Board well knows, Claimants have not asserted a taking of the Bonds or Bond value. They have asserted a direct taking of their collateral and their contractual right to repayment. *See* Claim Addenda ¶ 23 ("The ERS Bondholders possess a constitutionally protected property interest in the form of valid, perfected security interests in and liens on the Pledged Property as well as the contractual right to timely payment of principal and interest. … The Post-Petition Legislation

---

[37] The Board argues that "impairments of unsecured contractual rights do not constitute a taking" because *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211 (1986), overrules *Lynch* and holds that contractual rights are not "property" for purposes of the Fifth Amendment. FOMB Br. 20 n.13. But that is not *Connolly*'s holding. *Connolly* holds only that the destruction of such rights is not *always* a taking—not, as the Board suggests, that contractual rights can *never* be the subject of a valid takings claim. 475 U.S. at 224 ("[T]he fact that legislation disregards or destroys existing contractual rights does not *always* transform the regulation into an illegal taking." (emphasis added)). In fact, the very authority cited by the Board acknowledges precisely that. In *Pro-Eco, Inc. v. Board of Commissioners of Jay County*, 57 F.3d 505 (7th Cir. 1995), the Seventh Circuit specifically stated that "[t]he [*Connolly*] Court would not say that contractual rights are never property, but it did not find them compensable in *Connolly*, where the United States took nothing for its own use and Congress nullified a contractual provision only by acting within its powers," *id.* at 510. And that makes sense. If *Connolly* had so held, the Court would have had no need to march through the three regulatory takings factors. To be sure, after *Connolly*, courts review the taking of a contractual right under the regulatory takings rubric. But that does not mean they do not consider whether such property rights have been taken at all. *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273 (1940), is also not to the contrary. In *Wright*, the Court interpreted a provision of the Bankruptcy Act to grant a private debtor the right to redeem property subject to a private creditor's lien before that property was sold at auction to satisfy the debt. *Id.* at 277-78. It added that the value of the collateral was all that particular secured creditor was constitutionally entitled to from a private debtor. *See id.* at 278. This, of course, tells us nothing about the general ground rules between private parties and the government, let alone what constitutes "property" for purposes of the Fifth Amendment. Likewise, in *Bank of N.Y. v. Treco* (*In re Treco*), 240 F.3d 148 (2d Cir. 2001), the plaintiff, The Bank of New York, alleged a taking of the "'adequate protection' for the value of its secured claim" by virtue of a provision of the Bankruptcy Code requiring it to turn over certain funds back to the debtor, *id.* at 161. The Bank did not, however, assert the taking of any contractual right to repayment. It is not surprising then that the Second Circuit concluded that this claim rose and fell with the Bank's ability to prove a "secured claim." *See id.* at 161-62 (concluding that Bank of New York's taking claim "rests on the premise that BNY's claim [against the debtor] is in fact secured" and citing *Louisville Joint Stock Land Bank*, 295 U.S. at 602, which found that the taking of secured collateral violates the Fifth Amendment).

provided no compensation of any kind for the transfer of the ERS Bondholders' property to the Commonwealth and therefore constitutes an unconstitutional taking of the Pledged Property."); Admin. Expense Claims ¶ 37 (same); Adversary Compl. Claims ¶ 5 (same). Even the Board itself has acknowledged that Claimants have asserted a "lien on the $190.48 million that the [Oversight] Board agrees was transferred from [ERS] to the Commonwealth"—property that remains in the Commonwealth's custody today. FOMB Br. 9 n.9 (emphasis in original). The taking of *that* property (along with the other collateral Claimants allege has been similarly taken)—not the value of the Bonds that Bondholders hold—forms the basis of Claimants' takings claim.[38]

Because Claimants do not allege a taking of the value of the Bonds, they need not allege a diminution in the fair market value of the Bonds. Rather, the proper valuation question (if relevant at this stage at all) is the value of the taken property—*i.e.*, the Claimant's collateral and their contractual right to repayment. *See United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961) ("The guiding principle of just compensation is reimbursement to the owner for the property interest taken."). And Claimants have repeatedly alleged that the value of that property is "the principal amount of the ERS Bonds and any and all interest accruing thereon until the date compensation is paid." *See, e.g.*, Claim Addenda ¶ 23; *see also* Admin. Expense Claims ¶ 37; Adversary Compl. Claims ¶ 161. Only by incorrectly reframing the inquiry to focus on the wrong property is the Board able to argue, implausibly, that Claimants have not alleged any loss "suffered as a result of [the] alleged taking." FOMB Br. 42.

But even accepting that Bond value has relevance here (it does not), it is common sense that the complete dissolution of the party responsible for payment of the ERS Bonds and the

---

[38] Contrary to the Board's suggestion, these property rights belong to Claimants, not ERS. FOMB Br. 43. And Claimants have standing to vindicate the taking of their own property rights.

removal of all assets that could be used to repay ERS's Bondholders would have a negative

economic impact on the value of the ERS Bonds. And, as Claimants have alleged, the Post-Petition

Legislation has had just that effect. *See* Adversary Compl. Claims ¶ 97 ("Act 106, moreover,

contemplates that pension beneficiaries will receive 100% of the amount they are owed while ERS

Bondholders will receive pennies on the dollar."); *see also* Supp. ¶¶ 10, 15 ("[B]y interfering with

ERS's ability to pay the Bondholders principal and interest [and] depriving the Claimants of their

collateral under the Bond Resolution, [the Commonwealth has left] Bondholders to receive pennies

on the dollar for their original investment."). Thus, even if reduction in the Bonds' market value

were the proper measure of damages, Claimants' allegations are sufficient at the pleading stage.[39]

---

[39] The Board also suggests that the Commonwealth may have a viable defense to some claims if certain Bondholders acquired ERS Bonds subsequent to the Post-Petition Legislation and cannot show an express and valid assignment of the relevant takings claim from the prior holder as per the Assignment of Claims Act. FOMB Br. 42 (citing *United States v. Dow*, 357 U.S. 17, 22 (1958)).

But this is a studied misreading of the Assignment of Claims Act, which applies to the assignment of claims against the "United States Government." 31 U.S.C. § 3727 (defining "assignment" as "a transfer or assignment of any part of a claim *against the United States Government* or of an interest in the claim" (emphasis added)). The Commonwealth of Puerto Rico is, of course, not the "United States Government." As such, the Assignment of Claims Act does not apply to these claims. Moreover, under New York law, "[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferror, whether or not such claims or demands are known to exist." N.Y. Gen. Oblig. Law § 13-107 (McKinney); *see also Commerzbank AG v. U.S. Bank Nat'l Ass'n*, __ F. Supp. 3d __, No. 16CV4569, 2020 WL 2036723, at *5 (S.D.N.Y. Apr. 28, 2020) (concluding that New York law applies to the sale of a certificate via the Depository Trust Company because "DTC actually holds the certificates and effectuates the transactions [and so] the transactions actually occurred in New York and are governed by New York law"); *New Ponce Shopping Ctr., S.E. v. Integrand Assur. Co.*, 86 F.3d 265, 267 (1st Cir. 1996) (noting that Puerto Rico applies the "dominant or significant contacts test for contract and tort actions," which—like the Restatement test applied in *Commerzbank*—looks to the law in "the jurisdiction with the most significant contacts to the disputed issues"). For these same reasons, the Fiscal Agent may assert such claims, as they do not—the Board's contrary assertion notwithstanding—"depend on each bondholder's particular circumstances." FOMB Br. 43.

Regardless, Claimants are not required to anticipate and plead around the Commonwealth's affirmative defenses, *see Gomez v. Toledo*, 446 U.S. 635, 640, (1980), and particularly not in a proof of claim, which is prima facie valid, *see supra* at 11-12. To the extent any of the Bondholders purchased their interests in the Bonds after the passage of the Post-Petition Legislation and failed to obtain the proper assignments, Movants are free to renew their objections to those specific claims after discovery. The validity of any individual Claimant's assignment of rights cannot be resolved before this Court (or Movants) have even reviewed those assignments (or considered any alleged defects). *See Gray*, 544 F.3d at 324 ("Where a court grants a Rule 12(b)(6) or Rule 12(c) motion based on an affirmative defense, the facts establishing that defense must: (1) be 'definitively ascertainable from the complaint and other allowable sources of information,' and (2) 'suffice to establish the affirmative defense with certitude.'").

And in any case, because it is clear that at least some Bondholders purchased interests in the Bonds prior to the passage of the Post-Petition Legislation, *see* ERS Bondholder Groups' Supp. Response to Interrogatory No. 17 (subject to protective order), any such issues would not justify wholesale dismissal of Claimants' takings claims.

Finally, to the extent the Board argues that Claimants must provide an individualized, specifically-quantified diminution in Bond value for each Claimant simply to survive a motion to dismiss validly submitted claims, they are wrong on the law. At this stage, Claimants' factual allegations are presumed valid. Fed. R. Bankr. P. 3001(f); *In re Hemingway Transp., Inc.*, 993 F.2d at 925. It is Movants, not Claimants, that must offer substantial evidence to overcome that presumption. *Id.*; *see supra* at 11-12. And that, they have not done. Moreover, even if the traditional pleading standard did apply, it would be met. *See supra* at 12 n.8. It is certainly "plausible" to believe that the Bonds decreased in value (or, more relevantly, that Claimants' collateral had economic value that Claimants are unable to avail themselves of) as a result of the Post-Petition Legislation. Any individualized questions as to the amount of economic damage suffered by each Bondholder is an issue for the remedial phase, not a motion to dismiss.[40]

### b.    Claimants Have Sufficiently Alleged A Taking

Claimants have also sufficiently alleged that the Post-Petition Legislation represents a direct taking of their collateral and an indirect taking of their contractual right to repayment.

Government action that directly appropriates, destroys, or ousts an owner from property constitutes a direct taking. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (noting that a taking occurs "where government requires an owner to suffer a permanent physical invasion of her property—however minor," or where "regulations … completely deprive an owner of all economically beneficial use of her property"). This applies, of course, to the seizure of private

---

[40] The Board cites various authority indicating that Claimants must show "an" economic impact to prevail on their claim. *See* FOMB Br. 42 (citing *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157 (Fed. Cir. 2014); *Hendler v. United States*, 175 F.3d 1374, 1385 (Fed. Cir. 1999); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1366 (Fed. Cir. 1999)). And Claimants have. *See supra* at 13-16. These cases do not support the much broader proposition that Bondholders must individually quantify their damages simply to plead a takings claim. Indeed, without discovery, and potentially expert analysis, Claimants would be unable to determine the exact property taken by the Commonwealth as part of the Post-Petition Legislation, let alone the precise value of the taking that occurred.

funds just like any other private property. *See, e.g.*, *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162-64 (1980).

By comparison, a regulatory taking occurs where the government has regulated private property "so onerous[ly] that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Certain governmental actions—specifically, those that "compel the property owner to suffer a physical invasion of his property" or "prohibit all economically beneficial or productive use"—categorically result in a regulatory taking. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). Outside of these "categories," courts look to various factors to determine whether a regulatory taking has occurred, such as: (1) "the character of the governmental action," (2) "the extent to which the [action] has interfered with distinct investment-backed expectations," and (3) "[t]he economic impact of the regulation on the claimant." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

i.      Contrary to the Board's conclusory assertion "that the Post-Petition Legislation does not require or contemplate any 'physical invasion'" or deprivation "of any property," FOMB Br. 43, the Post-Petition Legislation represents a direct, literal, taking of Claimants' collateral. As even the Board seems to acknowledge, Claimants cannot currently use or access their collateral. FOMB Br. 9 (recognizing that "ERS was required [by the Commonwealth] to sell its assets and transfer the proceeds, in addition to any existing available funds, to the Puerto Rico Department of Treasury's general fund"). And how could they? This property remains exclusively in the Commonwealth's custody and under the Commonwealth's exclusive control, where it has been for years. That is the very definition of a direct taking.

Put another way, the government has made useless Claimants' substantive property rights in the collateral. As in other cases, that ouster represents a direct taking. In *Armstrong*, for example, the Supreme Court held that where the government transferred collateral on which petitioners had liens from a third party, "the liens were destroyed" for the government's advantage, and required just compensation. 364 U.S. at 48-49. In *Radford*, the Court similarly recognized that the Frazier-Lemke Act took "substantive rights in specific property acquired by the Bank prior to the [A]ct" by seizing the Bank's rights "to retain the lien until the indebtedness thereby secured is paid," "to realize upon the security by a judicial public sale," "to determine when such sale shall be held," "[to] hav[e] the mortgaged property devoted primarily to the satisfaction of the debt," and "to control … the property during the period of default." 295 U.S. at 590, 594-95. As in these examples, the Post-Petition Legislation eliminates—rather than merely diminishes—Claimants' rights in the Pledged Property and allows the Commonwealth to dissipate it for other creditors' benefit. Because the Post-Petition Legislation "result[s] in a complete destruction of the property right of the secured party," it is best analyzed as an unlawful direct (or "per se") taking. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 75-76 (1982).[41]

ii.     The Post-Petition Legislation clearly effects a taking of Claimants' collateral under the direct test. But both tests compel the same result. As noted, to determine whether a regulatory taking has occurred, courts consider the "character of the governmental action," its "economic impact … on the claimant," and its "interfere[nce] with distinct investment-backed expectations."

---

[41] The Board points to *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211 (1986), and *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006), to show that the "'taking' of a contractual right" should be treated as a regulatory taking. But the Board ignores that Claimants have alleged both the taking of a contractual right *and* the taking of their collateral. Claim Addenda ¶ 23; Admin. Expense Claims ¶ 37; Adversary Compl. Claims ¶¶ 137-163. The Board offers no authority to establish that the taking of Claimants' collateral should also be treated as a regulatory taking, and, as in *United States v. Security Industrial Bank*, because "the governmental action here would result in a complete destruction of the property right of the secured party, the case fits but awkwardly into [that] analytic framework[.]" 459 U.S. at 75-76.

*Penn Cent.*, 438 U.S. at 124. Each factor militates in Claimants' favor.

As to the character of the government action: by reducing the value of the liens and Claimants' contractual rights to zero and physically transferring the collateral to a place where Claimants cannot access it, the Post-Petition Legislation is "tantamount to a direct appropriation" of Claimants' property. *Lingle*, 544 U.S. at 537. The First Circuit has already expressed "doubt [as to] the constitutionality" of a rule that would permit "the Commonwealth [to] expend every penny of the Movants' collateral, leaving the debt entirely unsecured." *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511-12 (1st Cir. 2017). Indeed, as Claimants allege, the very purpose of Joint Resolution 188 was to target ERS's Bondholders and strip their liens so that the Commonwealth could use the unencumbered funds to pay other creditors, like the pensioners, first. And, as is relevant to the second factor, the Commonwealth achieved its purpose. Without collateral or even a counterparty from which to collect, Claimants have completely lost the economic value of both their collateral and their contractual bargain. *See* Admin. Expense Claims ¶ 97 ("Act 106, moreover, contemplates that pension beneficiaries will receive 100% of the amount they are owed while ERS Bondholders will receive pennies on the dollar."). Finally, Claimants have also set forth how the Post-Petition Legislation interfered with Bondholders' investment-backed expectations. *See supra* at 46-51.

As to the economic impact on Claimants, Movants' efforts to show that Bondholders' loss was somehow too insignificant, as a matter of law, to constitute a regulatory taking fall far short. At the outset, Movants argue that the 552 Decision eliminates any property interest Claimants may have had. But as explained above, *see supra* at 13-16, Claimants have secured interests beyond the collateral addressed in the 552 Decision as well as the contractual right to repayment from the Pledged Property. Even the Board concedes that this additional collateral (which includes the

Accounts Receivable) is worth at least a hundred million dollars, and Claimants allege that the amount is much, much higher. Moreover, Claimants' contractual right to repayment was an enormously valuable right. Even without a lien, absent the Post-Petition Legislation, ERS would still have been contractually obligated to deposit employer contributions in the Fiscal Agent's account, where they would have been used to pay the principal and interest due on the Bonds. The Post-Petition Legislation's interference with that valuable right imposed collective harm on Claimants measured in the billions of dollars. The Commonwealth's offer to return the small amount of collateral it asserts was taken cannot even begin to make up for these losses.

In response, the Board attempts to characterize the Post-Petition Legislation as a mere "adjustment of 'the benefits and burdens of economic life to promote the common good.'" FOMB Br. 46. But for Claimants, this was no mere adjustment. This was a taking of the entirety of their valid collateral and right to repayment—all for the very purpose of "forcing [Claimants] to bear public burdens" (*i.e.*, the burden of properly funding state pension plans) "which in all fairness and justice, should be borne by the public as a whole." *Murr*, 137 S. Ct. at 1943; *see also In re Pension Reform Litig.*, 32 N.E.3d 1, 22 (Ill. 2015) ("[T]he law was clear that the promised [pension] benefits would … have to be paid, and that the responsibility for providing the State's share of the necessary funding fell squarely on the legislature's shoulders. Accordingly, the funding problems which developed were entirely foreseeable. The General Assembly may find itself in crisis, but it is a crisis which other public pension systems managed to avoid and, … it is a crisis for which the General Assembly itself is largely responsible."). That the Commonwealth faced a fiscal emergency—of its own making—does not excuse the unconstitutional taking of private property in this way. *See also supra* at 55.

The Board next endeavors to establish that Bondholders' economic loss "does not support

a taking" because Claimants retain "many elements of the bundle of rights" in their allegedly taken property. FOMB Br. 44. But the Board fails to explain precisely how this is so. Specifically, it fails to explain how Claimants retain any rights in collateral that the Commonwealth has taken and held in its sole possession since 2017. And it likewise fails to explain how Claimants retain a valuable economic interest in their contractual right to repayment when their contractual counterparty has been dissolved and made insolvent. Instead, the Board points vaguely to Claimants' non-existent "rights under the Resolution, subject to the Commonwealth's ability to reduce or even eliminate the Employers' Contributions." FOMB Br. 44. As a practical matter, this redefines Claimants' contractual rights as a right to repayment if and when the Commonwealth decides to repay. But nothing in the Bond Resolution so drastically limits Claimants' right to repayment.[42] As Claimants have repeatedly pled, the Resolution confers a right to repayment of principal and interest. *See, e.g.*, Claim Addenda ¶ 23 ("The ERS Bondholders possess a constitutionally protected property interest in the form of … the contractual right to timely payment of principal and interest."). And the Post-Petition Legislation nullifies that right by sapping ERS of its assets and then dissolving it entirely. That suffices to make out a takings claim, especially at this early stage.[43]

Movants next argue that because the Post-Petition Legislation did not take away Claimants' right to file a breach of contract claim, it did not actually "take" anything from Claimants at all.

---

[42] As indicated (*see supra* at 46-47), the only document that even references a potential change in employer contributions is the Official Statement, which is not a part of the Bond contract.

[43] The Board's cited authorities address deprivations different in both extent and kind. *See McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 18 (1st Cir. 1993) (addressing "economic regulation" that "deprive[d] appellant only of his right to terminate the lease upon the FDIC's appointment as receiver"); *Gilbert v. City of Cambridge*, 932 F.2d 51, 53-54, 56 (1st Cir. 1991) (addressing requirement that property owners obtain a permit before converting residential rental unit into a condominium); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 609 (1993) (addressing regulatory change to ERISA-regulated multiemployer pension plans, which required participating employers to pay their "proportionate share of the plan's 'unfunded vested benefits,'" upon withdrawal); *Hadacheck v. Sebastian*, 239 U.S. 394, 404-05 (1915) (addressing a habeas petition involving misdemeanor violation of ordinance making it unlawful to run a brickyard within city limits).

FOMB Br. 48; RC Br. 26-27. But, of course, the Post-Petition Legislation *did* take away, as a practical matter, any viable breach of contract claim Claimants may have had by dissolving Claimants' contractual counterparty (ERS) and rendering it insolvent. Movants cannot truly believe that a breach of contract claim (particularly, as Movants argue, a nonrecourse claim where the only collateral has been taken) against a party rendered insolvent by the very legislation being challenged is a meaningful alternative remedy. "[T]he Post-Petition Legislation" may not "*purport* to deprive Claimants of their right to assert a breach of contract claim against ERS," RC Br. 27 (emphasis added), but it, in reality, does just that.

Finally, Movants argue that the taking of Claimants' collateral and contractual right to repayment did not violate Bondholders' investment-backed expectations because Bondholders had fair warning that employer contributions could change. As previously explained, however, Bondholders had no such fair warning. *See supra* at 46-51.

To be sure, property rights are, in some sense, always subject to alteration by the government; but that is the reality the Fifth Amendment was designed to address. The fact that an individual may hold property subject to the possibility of seizure by the government does not mean that she has no protectable property right at all. To the contrary, where, as here, an identifiable property right is eliminated through government action, the Fifth Amendment requires the government to pay just compensation.

### c.    Movants' Remaining Arguments Likewise Lack Merit

Both the Board and the Retiree Committee suggest that a special standard applies where the government acts to address fiscal emergencies. The law, however, does not support this assertion. There is no insolvency exception to the Takings Clause. "The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Radford*, 295 U.S. at 589. Even during the depths of the Great Depression, the Supreme Court held that "the

Fifth Amendment commands that, however great the [N]ation's need, private property shall not be thus taken even for a wholly public use without just compensation." *Id*. at 602. The cases cited by Movants fail to resuscitate the argument. These authorities stand only for the uncontroversial proposition that minimal and temporary deprivations of property do not rise to the level of a taking. For example, in *Buffalo Teachers Federation*, 464 F.3d at 374-76, the Second Circuit considered whether temporarily freezing expected wage increases was a taking and ruled, unsurprisingly, that it was not. And in *Ropico, Inc. v. City of New York*, 425 F. Supp. 970 (S.D.N.Y. 1976), the court addressed the constitutionality of New York's Moratorium Act, which "suspend[ed] for a limited period the rights of certain of its creditors to sue in the state courts to obtain immediate full payment on their notes." *Id*. at 977. These cases are fully consistent with *Radford*'s ruling that the complete destruction of "rights in the specific property held as security" is a taking, 295 U.S. at 594-95.

The Board next argues that to the extent the Commonwealth had a contractual obligation to Claimants, breach of contract—and not the Takings Clause—provides the proper mechanism for recovery. FOMB Br. 48. But Claimants do not allege a breach of the Commonwealth's duties under any contract. Indeed, the Commonwealth is not even a party to the Bond Resolution. The Commonwealth's unconstitutional legislative decisions—not its breach of any contractual duties—are the unlawful acts that have destroyed Claimants' property rights. The Takings Clause provides the correct legal framework to address that misconduct.

The Board also opposes Claimants' request for a declaration that Claimants' takings claim cannot be impaired on the ground that "it presents a question that depends on contingencies that may never come to pass" and is therefore unripe for consideration. FOMB Br. 48. Here too, the law and the facts say otherwise. Under Bankruptcy Rule 4007, a creditor may bring an adversary proceeding seeking a determination of nondischargeability at any time. Fed. R. Bankr. P. 4007;

*see also Moushigian v. Marderosian*, 764 F.3d 123, 128 (1st Cir. 2014) (describing "the bankruptcy policies favoring the orderly and timely disposition of [nondischargeability] claims"). And, as the United States has previously explained, this Court cannot confirm a plan that would "impair [a] constitutional claim for just compensation." *In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014); *accord* Br. for the United States at 6-7, *Detroit*, 524 B.R. 147 (No. 13-53846), Dkt. No. 6664 ("To the extent that the Plan proposes … to pay less than the full amount of a claim based on a just compensation award, regardless of when that award or the facts giving rise to it occur, i.e., prepetition or post-petition, such treatment would raise substantial constitutional questions. The Just Compensation Clause would appear to require these claims to be treated as nondischargeable."). This Court clearly can address the dischargeability of Claimants' takings claim, *see* 11 U.S.C. § 944(c)(1), and it should do so here.

Moreover, any argument that nondischargeability is unripe because the plan may result in full compensation runs headlong into the actual facts of this case. Debtors have disavowed any intention to offer just compensation through the plan confirmation process by implementing legislation that transferred Claimants' collateral and ERS's other assets to the Commonwealth, and then contesting these claims. *Cf. González-Álvarez v. Rivero-Cubano*, 426 F.3d 422, 426-27 (1st Cir. 2005) (allowing suit because "the state has always clearly denied that any compensation would be due and there is no state remedy available for seeking compensation"). Indeed, as of now, the Board has refused even to pay adequate protection for any period after October 2017. *See* No. 17-3283, Dkt. No. 1978, at ¶ 1; *Peaje Invs.*, 845 F.3d at 511-12.

To the extent the Board also challenges the ripeness of the takings claim itself, they are wrong on that score as well. The Supreme Court has made clear that when the government deprives a private individual of property, "the property owner may sue the government *at that time* in federal

71

court for the 'deprivation' of a right 'secured by the Constitution.'" *Knick v. Twp. of Scott*, 139 S.
Ct. 2162, 2170 (2019) (emphasis added). Nor does the First Circuit's decision in *In re FOMB for
P.R.*, 919 F.3d 638 (1st Cir. 2019), have any bearing here. The ripeness problem in that case was
that "a taking ha[d] yet to occur." *Id.* at 647; *see also id.* (indicating plaintiffs sought "a declaration
about the legality of actions that the Commonwealth may undertake in the future"). More
fundamentally, the court's ripeness analysis centered on a since-overruled requirement that takings
plaintiffs first exhaust state remedies before pursuing takings claims in federal court. *See id.* (citing
*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985)).
The Supreme Court subsequently eliminated that requirement in *Knick*, 139 S. Ct. at 2170
(overruling *Williamson County*). Thus, to the extent the First Circuit believed exhaustion of the
confirmation process was a predicate to a valid takings claim, that is no longer the case after *Knick*.

Finally, the Board argues that Claimants' takings claim should be dismissed as duplicative
of the adversary proceeding litigation. FOMB Br. 60. But Claimants' takings claims are not
duplicative of those raised elsewhere, and in any case, should not be dismissed before any court
has had an opportunity to resolve them.[44] *See supra* at 30.

### d. The Post-Petition Legislation Lacks a Public Purpose

Claimants have also stated a valid claim that the Commonwealth's acquisition of their

---

[44] The Retiree Committee, alone, contends that Claimants' takings claim against the Board is premature until
Claimants seek relief under the Tucker Act in the Court of Federal Claims. RC Br. 26. The Board does not make that
claim, and this Court should not address it; indeed, the Committee likely lacks standing even to raise it. *See Town of
Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1648 (2017).

In any case, the existence of a court of claims case against the federal government does not justify dismissal
here. For starters, the court of claims process is not a "procedure" to obtain relief *against the Commonwealth of Puerto
Rico*. And even if it were, as the Supreme Court has recently held, "a property owner has a claim for a violation of the
Takings Clause as soon as a government takes his property for public use without paying for it." *Knick*, 139 S. Ct. at
2170. As such, "the property owner may sue the government at that time in federal court for the 'deprivation' of a
right 'secured by the Constitution.'" *Id.* Finally, even if § 552 (and not the Commonwealth) is responsible for the
taking of Claimants' liens on post-petition contributions, the Commonwealth remains independently responsible for
its own taking of the other collateral and contractual rights.

property violates the Fifth Amendment for another, independent reason: the transfer of property

from one creditor to another, solely to benefit the second creditor, is not a valid "public purpose."

However broadly "public use" may be interpreted, *see generally Kelo v. City of New London*, 545 U.S. 469 (2005), "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation," *id.* at 477. The Post-Petition Legislation violates that command. Notwithstanding statements of legislative intent, the manifest purpose of Joint Resolution 188 and Act 106 is to ensure that pensioners and other Commonwealth creditors are paid at the expense of Claimants. *See* Act 106, § 1.4 (declaring "as the public policy of the Government of Puerto Rico the protection of the pension benefits of all government retirees who were Participants of the aforementioned three Retirement Systems"). And to the extent Movants dispute the purpose of the Post-Petition Legislation, fact questions preclude dismissal at this stage.

The Board (FOMB Br. 40-41) and Retiree Committee (RC Br. 28) nonetheless argue that under *Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno*, 604 F.3d 7 (1st Cir. 2010), and *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229 (1984), the transfer worked by the Post-Petition Legislation is and need be only rationally related to a public purpose. But *Fideicomiso* and *Midkiff* did not involve such obvious transfers of funds from A to B. *See Midkiff*, 467 U.S. at 233-34, 242, 245 (the purpose of condemnation and transfer of land by government to tenants in order to reduce the concentration of land ownership traceable to the pre-statehood Hawaiian monarchy was not to confer a private benefit but rather to address perceived societal evil of a "land oligopoly"); *Fideicomiso*, 604 F.3d at 17-18 (transfer of lands from trust back to Commonwealth for more effective management). As the Supreme Court in *Kelo* observed, "transferring citizen *A*'s property to citizen *B* for the sole reason that citizen *B* will put the property to a more productive

73

use and thus pay more taxes … would certainly raise a suspicion that a private purpose was afoot."
545 U.S. at 486-87. Similarly, the Board's position here is an assertion that it would prefer
pensioners and Commonwealth creditors, rather than Bondholders, to receive the monies
contractually promised under the Bond Resolution. Politically expedient though that result may
be, it amounts to an "impermissible favoritism of private parties" that was not present in *Kelo*,
where "[t]he identities of most of the private beneficiaries were unknown at the time" of planning.
*Id.* at 493 (Kennedy, J., concurring).

In any case, even if this Court found that the Commonwealth had a valid public purpose in
repurposing Claimants' property for the benefit of other, unsecured ERS creditors, the
Commonwealth still must compensate Claimants for that taking. *See supra* at 57-72.

### 4.   The Commonwealth Was Unjustly Enriched

Claimants have properly pled a claim for unjust enrichment. Under Puerto Rico law, unjust
enrichment "is a general [equitable] doctrine" appropriate where "nonapplication would perpetuate
the inequity that someone may unjustly enrich himself at the expense of another." *Rosario Rivera
v. Ramos*, 5 P.R. Offic. Trans. 152, 156 (1976). To state a claim, Claimants must allege: (1)
enrichment, (2) a corresponding loss, (3) a connection between the loss and the enrichment, (4)
lack of cause justifying the enrichment, and (5) absence of a legal prohibition on "an enrichment
without cause." *Ortiz Andújar v. Commonwealth*, 22 P.R. Offic. Trans. 774, 780 (1988). Here, the
Commonwealth has been unjustly enriched by the Post-Petition Legislation in three ways: (i) by
directly seizing Claimants' collateral; (ii) by relieving itself of the obligation to pay at least $400
million of accrued but unpaid employer contributions; and (iii) by diverting the stream of future
employer contributions from ERS (where ERS would have been contractually obligated to use the

funds to repay the ERS Bonds) to the Commonwealth.[45] *See Ortiz Andújar*, 22 P.R. Offic. Trans. at 781-89 (permitting unjust enrichment claims against the Commonwealth or its agencies); *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 14 P.R. Offic. Trans. 896, 900 (1983) (same).

Movants dispute this straightforward conclusion for four reasons: (1) any such claim belongs to ERS, not Claimants; (2) Claimants have failed to allege facts to satisfy the unjust enrichment standard; (3) unjust enrichment cannot be invoked where doing so contravenes public policy or claimants have alleged other claims for relief; and (4) PROMESA precludes a common law claim for unjust enrichment. FOMB Br. 34-40; RC Br. 25-26. Each argument fails.

a.      First, Claimants are the proper parties to claim unjust enrichment. In arguing otherwise, the Board misapprehends the relevant injury and the limited purpose of derivative standing in bankruptcy. *See* FOMB Br. 34-36. What the Claimants have actually alleged is that the Commonwealth has harmed *them* by taking the funds from which Claimants were promised repayment. Derivative standing in bankruptcy is limited to circumstances in which a trustee declines to pursue an avoidance claim on the debtor's behalf. *See In re Racing Servs., Inc.*, 540 F.3d 892, 898 (8th Cir. 2008). Claimants do not need derivative standing to invoke their own harms and assert their own rights to payment as part of the claims process, as they have done with this and each of their other claims. *See In re Bernadin*, 610 B.R. 787, 800 (Bankr. E.D. Pa. 2019) ("The purpose of a proof of claim is to demand payment from the debtor's bankruptcy estate based on an existing debt. In this respect, the claims process mirrors the demand for judgment made by a creditor-plaintiff in a civil action complaint."). Claimants' allegations plead that their loss is the Commonwealth's gain. The Board argues that derivative standing is unavailable to Claimants in

---

[45] Importantly, the diversion of the stream of future employer contributions can give rise to a claim for unjust enrichment whether or not Claimants retained a lien on post-petition employer contributions. This is because, without the Post-Petition Legislation, ERS would have continued to receive employer contributions and would have been contractually obligated to use those contributions to pay the ERS Bonds.

part because PROMESA § 305 prevents this Court from entering an order depriving ERS of an asset. FOMB Br. 35. Because Claimants do not need derivative standing to plead their claim, however, there is no chance that Claimants will deprive ERS of any asset by bringing the claim, so PROMESA § 305 is irrelevant.

b.      Second, Claimants have adequately pled the elements of unjust enrichment. Movants focus on the first element, arguing that the Commonwealth cannot have been enriched because it assumed ERS's obligation to pay pensions. This is wrong for several reasons. For one, it is contrary to the facts. As explained, at most, the Commonwealth may have assumed ERS's administrative responsibility to collect employer contributions and make pension payments. The Commonwealth has always had the obligation to ensure payment of its retirees, and it acquired the participating employers' contributions to cover their retirees. Even if the Commonwealth took on these administrative responsibilities, that hardly compensates ERS for the $2 billion of assets taken and the release of at least $400 million of accumulated debt. Indeed, even the Board appears to have realized this, as the proposed joint plan of adjustment belatedly purports to make up for this seizure by "purchas[ing]" these assets from ERS. *See* No. 17-3283, Dkt. 11946, at § 2.4.

In addition, Movants' argument ignores that the Pledged Property could not have been used by ERS to pay pensions until *after* it had serviced Claimants' debt. *See* Adversary Compl. Claims ¶¶ 71, 75. The Post-Petition Legislation enriches the Commonwealth by purporting to transfer ERS's assets to the Commonwealth free of Claimants' liens and ERS's contractual obligation to use Pledged Property to pay Bondholders. By siphoning those assets without taking on ERS's corresponding obligations, the Commonwealth enriched itself at Bondholders' expense.

Moreover, even if the right to receive post-petition employer contributions is not property, their redirection to the Commonwealth in an effort to circumvent Claimants' liens still had the

effect of unjustly enriching the Commonwealth at Bondholders' expense. The Board suggests that Claimants do not satisfy the standard for unjust enrichment because whatever benefit the Commonwealth received was passed on to its pensioners. FOMB Br. 37. But what the Commonwealth subsequently did with the funds it unjustly acquired is irrelevant. If a defendant takes $5,000 from a plaintiff, the defendant is not immune from an unjust enrichment claim just because she gave the $5,000 to a third party.

Next, as explained at length above, the fact that the Commonwealth claims to hold $190.48 million of ERS's assets for Claimants' benefit does not defeat Claimants' unjust enrichment claim. Those assets are insufficient to compensate Claimants for their losses and, in any event, until the assets are returned, the claim remains alive. *See supra* at 16-18.

Finally, Claimants have also adequately pled the remaining elements of the claim. The Commonwealth's enrichment is at Bondholders' expense, because the Post-Petition Legislation's seizure of ERS's assets caused Claimants to lose (i) their collateral, (ii) their interest in past due employer contributions owed by the Commonwealth, and (iii) their right to be paid from a particular stream of funds (employer contributions). And there is a connection between the loss and the enrichment, because the same circumstance—the Post-Petition Legislation—caused both. *See Ortiz Andújar*, 22 P.R. Offic. Trans. at 785. Additionally, that enrichment is unjustifiable, because Claimants did not consent to the unconstitutional transfer of their property and the Commonwealth enacted the Post-Petition Legislation for the purpose of evading Claimants' liens, eliminating the Commonwealth's debt to ERS, and giving the Commonwealth more money to satisfy its pension obligations. Adversary Compl. Claims ¶ 133; *see supra* at 52-57, 72-74. Any disagreement on this point shows only that the claim must proceed to discovery. And finally, no legal provision or public policy precludes the application of the unjust enrichment doctrine here.

*See* FOMB Br. 38. To the contrary, applying the doctrine accords with public policy and the Commonwealth's Constitution, which declares that "[t]he right to … the enjoyment of property is recognized as a fundamental right of man." P.R. Const. art. II, § 7.

c.      Third, Claimants' other claims do not prevent them from asserting an unjust enrichment claim. Movants argue that Claimants cannot assert an unjust enrichment claim because they have a contractual remedy that they can pursue in the Title III proceeding. *See* FOMB Br. 37-38; RC Br. 25. The Retiree Committee goes so far as to claim that the doctrine of unjust enrichment applies only when no statute generally applies. RC Br. 25. As a matter of Puerto Rico law, however, the doctrine of unjust enrichment may apply so long as no "legal provision … *precludes*" it. *Ortiz Andújar*, 22 P.R. Offic. Trans. at 788 (emphasis added). Hence, an unjust enrichment remedy is not automatically displaced just because a statute or contract covers the subject matter. To the contrary, unjust enrichment may provide a remedy in the case of a statute whose "formalities have not been observed." *Plan Bienestar Salud*, 14 P.R. Offic. Trans. at 904.

Even more critical is the fact that Claimants do not have a contract *with the Commonwealth* that could foreclose an unjust enrichment claim against it. To be sure, it is the Commonwealth's unjust enrichment that is preventing ERS from meeting its contractual bond repayment obligations. But Claimants' contract is with *ERS*, not the Commonwealth, and in all of Movants' cases, a claim for unjust enrichment failed because, unlike here, the enriched party was party to a contract that addressed the issue.[46] *See* FOMB Br. 36-37; RC Br. 25-26. To be sure, Claimants will not be able

---

[46] *See P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011) ("Sprint cannot now evade compliance with such pact [with the plaintiff] by raising inapplicable equitable principles."); *Punta Lima, LLC v. Punta Lima Dev. Co., LLC*, No. 19-cv-1673 (FAB), 2020 WL 710770, at *15 (D.P.R. Feb. 11, 2020) (allegedly enriched party was party to contract "govern[ing] much of what defendant contends is unjust enrichment"); *Westernbank P.R. v. Kachkar*, No. 07-cv-1606, 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009) (The unjust enrichment "doctrine does not apply because contracts for the collateral also exist between *the parties*, detailing the terms of the transfers of collateral, which were made in return for the bank's temporary forbearance." (emphasis added)).

to recover twice on both their contractual and equitable claims. But that limitation does not prevent Claimants from stating a claim for unjust enrichment in the alternative, particularly in light of ongoing litigation over whether the Bonds are *ultra vires*. *See* Fed. R. Civ. P. 8(d)(2)-(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140-41 (1st Cir. 2012) ("[Even if] damages for breach of contract and unjust enrichment are mutually exclusive, … it is accepted practice [under Rule 8] to pursue both theories at the pleading stage.").

d.     Finally, PROMESA does not preclude a claim for unjust enrichment under Puerto Rico law. *See* FOMB Br. 34, 39-40. To the extent the Board argues that PROMESA does so by statutorily "govern[ing] the parties' relationships and rights to recovery," it misapprehends the mechanism by which PROMESA governs those rights.[47] PROMESA provides no independent protection of a claimant's right to recovery except by allowing the claimant to file claims. *See* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 501). Unlike a statute that provides a substantive legal remedy—such as for conversion or fraudulent conversion—for a party's unjust enrichment at the expense of another, Claimants have no right to recovery under PROMESA unless they are allowed to pursue their claims as part of the claims process. And while the contract-based claims that Claimants have also brought, if successful, could ultimately preclude some recovery on a theory of unjust enrichment, it would be premature to dismiss those claims now, in particular because Movants dispute the validity of the relevant contract.

### 5.  The Commonwealth Is Liable Under PROMESA § 407

Claimants have also sufficiently alleged a violation of PROMESA § 407. Section 407 of

---

[47] Because Claimants have adequately pled a claim for unjust enrichment under Puerto Rico law, the Court need not reach the question whether federal law also recognizes such a claim.

PROMESA imposes liability for "any property of any territorial instrumentality of Puerto Rico [that] is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors." 48 U.S.C. § 2195(a). Under § 407, the Commonwealth is liable for the transfer, in violation of United States and Puerto Rico law, of ERS assets on which Claimants have a lien. The Board's attempt to dismiss Claimants' § 407 claim fails on each count.

a.       First, the Board is wrong to contend (FOMB Br. 61, 64) that Claimants may not bring their claim as part of the claims process, but instead may only bring their § 407 claim only once the automatic stay is no longer in effect. While § 407's "enforceability" subsection makes clear that a § 407 cause of action cannot override the automatic stay, it does not bar Claimants from bringing a § 407 claim as part of the claims process. "Claim[s]" are broadly defined in the Bankruptcy Code to include any "right to payment, whether or not such right is … unliquidated, … contingent, … [or] unmatured." 11 U.S.C. § 101(5); *see also* 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 101 into PROMESA); *see also In re Skorich*, 482 F.3d 21, 25 (1st Cir. 2007) ("Both halves of section 101(5)'s definition explicitly say that it does not matter if a claim is contingent and unmatured."). A § 407 claim is just like any standard fraudulent transfer claim, which cannot be pursued in state court while an automatic stay is in effect but which may still give rise to a claim as part of the bankruptcy claims process. Notably, Movants have not argued that Claimants' other claims, which are also subject to the automatic stay, cannot now be pursued in the claims process.

b.       Second, mounting an even broader line of attack, the Board next contends that no § 407 claim can ever be allowed prior to confirmation of a plan because the transfer may be

retroactively validated by such a plan. FOMB Br. 64 (citing PROMESA § 201(b)(1)(M)). But PROMESA provides for no such retroactive validation. Using the past tense, the plain language of § 201(b)(1)(M) makes clear that before the inter-debtor transfer can take place, the plan of adjustment must already have "permitted" the transfer. It does not absolve inter-debtor transfers that occurred prior to a plan confirmation. 48 U.S.C. § 2141(b)(1)(M). The Board's reading also conflicts with § 407's plain language. As the Board admits (FOMB Br. 64), § 407(b) specifically allows such a claim to be brought if the court grants relief from the stay, which may occur well before confirmation of a plan. In any case, if this Court concludes that a § 407 claim cannot be pursued now, then the claim would be non-dischargeable, and Claimants would be able to bring the claim against the Commonwealth after confirmation of a plan.

c.     Third, the Board's argument (FOMB Br. 62) that Claimants do not meet the requirements of § 407's first cause of action likewise fails. The Board contends that Claimants have no lien on ERS assets transferred to the Commonwealth other than the so-called "Transferred Assets" that the Board represents will be returned to Claimants subject to the validity of their liens. As explained above, however, the parties dispute the amount of Claimants' collateral and the amount of ERS assets that have been transferred. Moreover, even if the Commonwealth is genuine in its offer to return that collateral, a third party's decision to take and hold collateral for the purported "benefit" of a secured creditor is never a valid reason to dismiss the creditor's claims. Until the Commonwealth does return Claimants' collateral, this claim remains very much alive.

In any case, § 407's first cause of action is not limited to liens; it also establishes liability for any property in which a creditor has a valid "pledge." Under the Bond Resolution, ERS pledged that Claimants would have a lien on and would be paid from a particular stream of funds— employer contributions. The fact that the 552 Decision has constricted the scope of Claimants'

liens, however, does not affect the enforceability of the contractual pledge. Hence, even if the Commonwealth returned their collateral, Claimants would still have a valid § 407 claim based on the Bond Resolution's pledge.

d.     Next, the Board argues that there was no transfer "in violation of applicable law," because the transfer was made pursuant to the Post-Petition Legislation, and PROMESA preempted the Enabling Act's requirement to pay Employers' Contributions. As established, however, the transfers violated the Contracts and Takings Clauses of the U.S. and Puerto Rico Constitutions, as well as the automatic stay and various Puerto Rico laws, including the law against fraudulent transfers. *See supra* at 28-29; *infra* at 83-87. PROMESA neither preempted those laws, nor eliminated the ERS Enabling Act's employer contribution requirements. *See supra* at 25-28. Any preemption argument is therefore irrelevant.[48]

e.     Finally, it does not matter that the transfer took place pursuant to legislation. Section 407 would be virtually meaningless if it insulated transfers initiated by legislation. A government debtor would have a ready means to circumvent § 407's prohibition simply by cloaking its transfer in an official act. Under the Board's reasoning, the Commonwealth could enact a law transferring all of the assets of the Highways and Transportation Authority to the Puerto Rico Electric Power Authority, and then argue that such a transfer is immune from PROMESA §

---

[48] If anything, PROMESA, which expressly states that any fiscal plan should "respect the relative lawful priorities" found in "agreements of a … covered territorial instrumentality in effect prior to the date of enactment," 48 U.S.C. § 2141(a)(1)(N), preempts the Post-Petition Legislation, which is designed to pick winners and losers in contravention of PROMESA's priority scheme. As the legislative history to 48 U.S.C. § 2141 states, the need for adequate funding for pension systems "does not allow for pensions to be unduly favored over other indebtedness in a restructuring." H.R. Rep. No. 114–602, at 45 (2016). Moreover, bankruptcy law makes clear that a state may not prefer itself or its favored constituencies in a bankruptcy case. *See In re City of Stockton (Stockton II)*, 526 B.R. 35, 57 (Bankr. E.D. Cal. 2015) ("[S]pecial insulation of a state actor in a municipal insolvency is contrary to chapter 9 precedent." (*citing Mission Indep. Sch. Dist. v. Texas*, 116 F.2d 175, 176-78 (5th Cir. 1940) (Texas cannot immunize bonds held by state from impairment in a chapter 9 proceeding))); *In re City of Detroit*, 504 B.R. at 255 (a state "cannot reorder the distributional priorities of the bankruptcy code"). The Commonwealth violated that prohibition by passing legislation in order to circumvent ERS's obligations to Bondholders in preference of pensioners.

407's prohibition on inter-debtor transfers because it was done pursuant to legislation. Having enacted PROMESA § 407 for government debtors, Congress could not have meant to allow those debtors to circumvent this prohibition so long as they did so legislatively rather than by fiat.

### 6.  The Commonwealth Fraudulently Acquired ERS Assets

Claimants have also sufficiently alleged that the Commonwealth fraudulently acquired ERS's assets. Puerto Rico's Civil Code allows creditors to "impugn the acts which the debtor may have performed in fraud of [a creditor's] right," 31 L.P.R.A. § 3028, and allows for rescission of contracts "executed in fraud of creditors, when the latter cannot recover, in any other manner, what is due them," 31 L.P.R.A. § 3492(3). In addition, "[a]ny person who may have acquired in bad faith things alienated in fraud of creditors must indemnify the latter for the losses and damages caused to them by the alienation whenever, for any reason whatsoever, it should be impossible for him to return them." 31 L.P.R.A. § 3499. The Commonwealth must therefore indemnify Claimants for the fraudulent transfer to it of ERS's assets through the Post-Petition Legislation. Supp. ¶ 11.

a.    Movants first challenge Claimants' standing to assert a claim for fraudulent transfer. FOMB Br. 66; RC Br. 30. Under Puerto Rico law, however, a fraudulent transfer claim belongs to the creditor, not the debtor, in the first instance. *See, e.g.*, *De Jesus Diaz v. Carrero*, 12 P.R. Offic. Trans. 786, 789, 793 (1982) (holding that "creditors may attack the acts which [a debtor] may have performed in fraud of their right"). While the "commencement of bankruptcy gives the trustee the right to pursue recovery of fraudulently conveyed assets to the exclusion of all creditors," *In re Integrated Agri, Inc.*, 313 B.R. 419, 427 (Bankr. C.D. Ill. 2004), once the statute of limitations expires or a trustee otherwise abandons its fraudulent transfer claim, the right to pursue the claim reverts to the creditor. *See id.* at 427-28 ("A creditor regains standing to pursue a state law fraudulent conveyance action, in its own name and for its own benefit, once the statute of limitations expires on the bankruptcy trustee's right to bring the claim."); *see also Unisys Corp.*

*v. Dataware Prods., Inc.,* 848 F.2d 311, 314 (1st Cir. 1988) (once the trustee has "given up" its right to pursue a fraudulent transfer action, that right "repose[s] in" the creditor).

Here, ERS's representative, the Board, abandoned the claim by failing to bring it within the Bankruptcy Code's applicable statute of limitations, which expired on March 30, 2020. Thus, the right to pursue the claim reverted to Claimants, and they have standing to pursue it. Indeed, for this reason, Movants' reliance on this Court's rejection of the ERS Bondholder Groups' motion to appoint a § 926 trustee to pursue fraudulent transfer claims under Bankruptcy Code § 544(b) is misplaced. That decision was issued before ERS abandoned the claim by failing to bring it within the statutory limitations period, and it therefore has no bearing on Claimants' standing today.

Moreover, throughout the § 926 proceedings, Movants argued that § 544(b) gave the trustee power to avoid only *pre*-petition and not *post*-petition transfers. *See, e.g.*, No. 17-3566, Dkt. No. 728 (D.P.R. Nov. 26, 2019), at 13-14. If Movants are right, then § 544(b) has never posed a barrier to a creditor's standing to pursue a claim seeking recovery for the *post*-petition fraudulent conveyance of assets. A trustee loses its "exclusive right to maintain a fraudulent conveyance cause of action" when it "no longer has a viable cause of action." *Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993). By implication, if the trustee never had a viable cause of action in the first place, the trustee never had an exclusive right, and the Bankruptcy Code poses no barrier to a creditor's standing to bring a fraudulent transfer claim.

b.       Movants next argue that the Post-Petition Legislation does not amount to a fraudulent transfer for several reasons, none of which are persuasive.

First, contrary to Movants' suggestion (FOMB Br. 67; RC Br. 32), the Post-Petition Legislation is not immune from being a fraudulent transfer simply because it is legislation. *See supra* at 28-29. Rather, where the Puerto Rico legislature has wanted to insulate legislatively

84

mandated transfers from challenge under the Civil Code, it has expressly done so. *See, e.g.*, Act 1-2015 § 2.02(f) ("Notwithstanding any other provision of law, including Articles 1242 through 1251 of the Civil Code of Puerto Rico, the allocation of Pledged Revenues to the Authority may not be revoked or rescinded until the Refinancing Bonds … have been paid in full, and no person may bring an action claiming said revocation or rescindment.").

Second, the Board argues (FOMB Br. 67) that the transfer was not fraudulent because the Commonwealth provided valuable consideration (in the form of assuming ERS's pension obligations). But any consideration provided by the Commonwealth was negligible at best and vastly inadequate to compensate ERS and Claimants for the billions of dollars taken from them. Claimants allege that the Commonwealth transferred all or substantially all of ERS's property to the Commonwealth, and eliminated claims that ERS had against the Commonwealth, without assuming all of ERS's obligations, in particular ERS's significant obligations to its Bondholders. *See In re Teligent, Inc.*, 325 B.R. 81, 86 (Bankr. S.D.N.Y. 2005) (holding that "release of an obligation to pay money" is a transfer for purposes of a fraudulent transfer claim). Even if the Commonwealth did take on some administrative responsibilities from ERS (such as the obligation to collect contributions and make pension payments), it did not assume any new liabilities to pensioners. Rather, the Commonwealth always has been ultimately liable for pensions owed to its former employees, and nothing in the Post-Petition Legislation changes that. And, moreover, the Commonwealth simultaneously acquired the right to receive Pay-Go Fees from employers to cover these employers' pension payments. In light of this, assuming ERS's administrative tasks hardly provided adequate consideration for the seizure of $2 billion of ERS's assets and elimination of the Commonwealth's obligation to pay at least $400 million in accrued but unpaid employer contributions. Moreover, apart from consideration, the relationship between the debtor and the

transferor, as well as the state of the business of the debtor, are relevant to a finding of fraudulence. *See De Jesus Diaz*, 12 P.R. Offic. Trans. at 789, 795; *U.S. Fid. & Guar. Co. v. Guzmán*, 2012 WL 4790314, at *6 (D.P.R. Sept. 20, 2012) (citing *In re El Mundo Corp.*, 208 B.R. 781, 783 & n. 1 (D.P.R. 1997)). Here, the Commonwealth knew about ERS's obligations to Bondholders, and it enacted the Post-Petition Legislation as a means to avoid those obligations to enable the Commonwealth to use those assets for other purposes.

Third, the Retiree Committee also argues (RC Br. 32) that ERS lacked intent to defraud, which, it claims, is required to state a fraudulent transfer claim. As an initial matter, the issue of intent cannot be resolved on the pleadings, and so this is not a basis for dismissal. In any event, under Puerto Rico law, actual intent is not required; it is enough that a debtor "knew of the results of his action." *In re Sepulveda Figueras*, 193 B.R. 118, 120-21 (Bankr. D.P.R. 1996); *see also De Jesus Diaz*, 12 P.R. Offic. Trans. at 796 ("[F]raud does not require evidence of the purpose or aim of the debtor to harm his creditors, it suffices to show that he knew about the results produced."). Because intent is not an element of the claim, it does not matter whether ERS acted with intent to defraud or intent to comply with the Post-Petition Legislation, so long as ERS "knew" that the transfers would harm its creditors.[49]

---

[49] In any case, even if Puerto Rico law required actual intent—which it does not—the Commonwealth's fraudulent intent should be imputed to ERS because the Commonwealth was "in a position to dominate or control [ERS's] disposition of … property." *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 941 (N.D. Tex. 2011); *see also In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) ("We may impute any fraudulent intent of [the transferee] to the transferor [the debtor] because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property."). Under the "control" rule, the intent of the transferee will be imputed to the transferor where "(1) the controlling transferee possessed the requisite intent to hinder, delay, or defraud the debtor's creditors; (2) the transferee was in a position to dominate or control; and (3) the domination and control related to the debtor's disposition of the property." *U.S. Bank Nat'l Ass'n*, 817 F. Supp. 2d at 941. "In the typical case, the controlling transferee stands either to gain directly or to confer benefits upon others by securing possession of the property and keeping it out of the reach of creditors." *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 445 (S.D.N.Y. 2001). Here, the Commonwealth had the requisite intent. It enacted legislation with the manifest purpose of confiscating Claimants' collateral and prioritizing paying pensioners in fraud of ERS's Bondholders. The Commonwealth was in a position to control ERS by passing legislation that required ERS to transfer its assets to the Commonwealth and permanently dismantled ERS. That form of control directly related to the disposition of ERS's property.

Fourth, the Retiree Committee contends (RC Br. 32) that Articles 1064 and 1243 of the Civil Code, 31 L.P.R.A. §§ 3028, 3492, do not apply here because Article 1064 is a remedy of last resort and Article 1243 applies only to contracts. That Article 1064 is a remedy of last resort poses no problem for Claimants' fraudulent transfer claim. Because Claimants and ERS's other creditors will exhaust ERS's own property, Article 1064 is their remedy of last resort. And even if Article 1243 does not directly apply because Claimants do not have a contract with the Commonwealth, Claimants can still bring a fraudulent transfer claim. For one, Claimants have also asserted claims based upon Article 1250, *see* Supp. ¶ 11, which, among other things, is not limited to contracts. 31 L.P.R.A. § 3499. Moreover, even without a contract, creditors may "impugn the acts which the debtor may have performed in fraud of their right." 31 L.P.R.A. § 3028. Such actions to rescind are "evaluated with reference to the principles of contract law derived from" provisions of the Puerto Rico Civil Code, such as § 3492(3). *Guzmán*, 2012 WL 4790314, at *6; *see also* Act 1-2015 § 2.02(f) (insulating transfers required by the Act from challenge).

Finally, the Retiree Committee asserts (RC Br. 31) that the Post-Petition Legislation cannot be a fraudulent transfer because it merely amends prior law and did not transfer property. But Movants provide no reason why a change to existing law enacted by an interested party cannot be challenged as a fraudulent transfer, when the change directs the transfer alleged to be fraudulent. And Movants themselves recognize that the Post-Petition Legislation certainly provided for the transfer of ERS's assets to the Commonwealth. *See, e.g.*, RC Br. 4; FOMB Br. 9.

### 7. The Commonwealth Tortiously Interfered with the Contract Between ERS and Claimants

Claimants have set forth a facially valid claim that the Commonwealth tortiously interfered with their contract with ERS by depriving ERS of the funds it needs to repay Claimants the contracted-for principal and interest and making it impossible for ERS to repay Claimants from a

contracted-for stream of funds (employer contributions). Supp. ¶ 13. In response, Movants assert

three arguments, but none are persuasive.

a.       First, the Board argues (FOMB Br. 73-74) that Claimants fail to allege "fault" by

the Commonwealth. But under Puerto Rico law, a third party's knowledge of the damage she will

cause demonstrates fault sufficient to state a claim for tortious interference. *See Gen. Office Prods.*

*Corp. v. A.M. Capen's Sons, Inc.*, 15 P.R. Offic. Trans. 727, 733 (1984) ("If the third person knows

that a damage will be caused, he is liable."); *Gen. Office Prod. Corp. v. A.M. Capen's Sons, Inc.*,

780 F.2d 1077, 1080 (1st Cir. 1986) (reversing grant of summary judgment where a material issue

remained as to whether defendant knew of an exclusive dealership arrangement between plaintiff

and a manufacturer when it sold the manufacturer's products in Puerto Rico). And Claimants have

alleged that the Commonwealth was aware of ERS's obligations to the Claimants under the Bond

Resolution and of the effect that the legislation would have on those obligations. This is sufficient

to state a claim for tortious interference. Supp. ¶ 13.

b.       Additionally, the Board argues that there is no liability when a party uses "lawful

means to protect legitimate interests distinct from competition for the benefits of the contract."

FOMB Br. 74 (quoting Restatement (Third) of Torts: Liability for Economic Harm § 17, cmt. g).

But the Post-Petition Legislation was not "lawful" means because, once again, it violated both

federal and Puerto Rico law. *See supra* at 28-29. Nor did the Commonwealth have a "legitimate"

interest in confiscating Claimants' property because it was convenient or profitable to do so. And,

in any case, the Commonwealth did not use those means to protect interests "*distinct* from

competition for the benefits of the contract." Rest. (Third) of Torts § 17, cmt. g (emphasis added).

In fact, it did precisely the opposite, using the law to redirect the contract's benefits to itself.

c.       Finally, the Board argues that the Commonwealth could not have tortiously

interfered with the Bond Resolution because the Official Statement made clear that employer contributions were subject to change. But the Commonwealth did not merely "change" employer contributions; it deliberately enacted legislation designed to bypass one set of ERS creditors—Bondholders—in favor of another set of creditors—the pensioners—whose claims were subordinated by the Bond Resolution and ERS Enabling Act. As discussed, *supra* at 46-51, that interference went far beyond what Bondholders could have reasonably expected would happen, and it amounts to tortious interference with contract.

### 8. The Commonwealth Aided and Abetted ERS's Breach of Duties

Claimants have stated a claim that the Commonwealth aided and abetted ERS's breach of its contractual, statutory, and other duties. As explained below, Movants do not genuinely dispute that ERS breached its contractual duties to Claimants. *See infra* at 102.[50] As alleged, the Commonwealth aided and abetted those breaches and others by consistently failing to make its statutorily required contributions to ERS and ultimately stripping ERS of the assets it needed to make the contractually-required payments to Claimants. *See* Supp. ¶ 12. Movants have failed to overcome the facial validity of this claim. *See Hemingway*, 993 F.2d at 925; *supra* at 11-12.

As previously indicated, *see supra* at 20-23, any remedy against the Commonwealth would not be constrained by the limited recourse provision in the Bond Resolution as the Board suggests, FOMB Br. 73. The Commonwealth is not a party to or third-party beneficiary of the Bond Resolution, and so even if the Bond Resolution did limit Claimants to recovering from collateral with respect to claims for breach of the agreement itself (it does not, *see supra* at 18-20), that limitation would have no bearing on independent torts committed by the Commonwealth.

---

[50] The Board points to paragraphs 140 to 149 of its brief as "establish[ing] that there cannot be a breach of duty by ERS owed to Claimants." FOMB Br. 73. But none of those paragraphs addresses ERS's breach of its contractual duties under the Bond Resolution. In any case, Claimants incorporate their responses to the arguments made in paragraphs 140 to 149 of the Board's brief here as well. *See supra* at 83-88, and *infra* at 90, 92, 104, 107-10.

### 9.  The Commonwealth Is Liable for Conversion

Claimants have also stated a claim for conversion against the Commonwealth based on its malicious and wrongful exercise of authority over Claimants' collateral and contract rights. Supp. ¶ 14. Seeking to dismiss the claim, the Board first argues (FOMB Br. 74-75) that if Claimants do have valid security interests in assets transferred from ERS to the Commonwealth, they will receive their value. The Board thus admits that the Commonwealth is, in fact, exercising authority over property in which Claimants have identified a property interest. But a defendant's promise to return property that is not her own and over which she admittedly exercises control does not defeat a claim for conversion. Moreover, the value of the assets subject to Claimants' liens transferred to the Commonwealth is still disputed. Finally, the Board further contends that the conversion claim cannot survive if the Post-Petition Legislation is valid, but, once again, the Legislation is invalid as a violation of both federal and Puerto Rico law. *See supra* at 16-18, 28-29.

### 10. The Commonwealth Is Liable for General Fault and Negligence

Similarly, Claimants have stated a claim for general fault and negligence against the Commonwealth. Under Article 1802 of the Civil Code of Puerto Rico, a party that "by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31 L.P.R.A. § 5141. Accordingly, the Commonwealth must repair the damage they caused Bondholders by enacting the Post-Petition Legislation. The Board does not deny that the Post-Petition Legislation damaged Bondholders. Instead, it falls back (FOMB Br. 75) on the argument that the Legislation was valid and that the government may not be held liable under Puerto Rico's general fault or negligence statute for acts of legislation. As explained above, however, the Legislation was invalid as a violation of both federal and Puerto Rico law, *see supra* at 28-29, and because the Post-Petition Legislation was not a valid act of legislation, it does not protect the Commonwealth against liability under Article 1802. *Cf. Colon-Diaz v. Dep't of Educ.*,

No. CV 09-1564 (JAG/BJM), 2010 WL 11679378, at *1 (D.P.R. June 8, 2010) (awarding

judgment against the Puerto Rico Department of Education for violation of Article 1802); *Adames*

*Mendez v. United States*, 652 F. Supp. 356, 359 (D.P.R. 1987) (permitting claim to proceed against

the government on the basis of Article 1802), *aff'd*, 873 F.2d 1432 (1st Cir. 1989).

### 11. The Pledged Property Remains Subject to Movants' Liens Under the UCC

Claimants have asserted valid liens on all Pledged Property unaffected by § 552 under both

11 U.S.C. § 506(a) and the Uniform Commercial Code. Claim Addenda ¶ 22; Admin. Expense

Claims ¶ 36; Supp. ¶ 20; Adversary Compl. Claims ¶¶ 111-131. Movants offer no defense on the

merits, nor even an affirmative explanation as to why these liens may not be valid as alleged. And

because, as explained, the existence of the Lien Scope AP does not justify dismissal, *see supra* at

16-18, the Court has no reason to dismiss these claims—which are relevant to most if not all of

Claimants' other requests for relief—before the Lien Scope AP has concluded.

### 12. The Commonwealth Is Liable for Harm from the Stay

Claimants have properly alleged a claim under 11 U.S.C. § 922(c) for harm from the

Debtors' failure to protect Claimants' property interest during the automatic stay. In particular, the

continuation of the automatic stay has harmed their interest in the Pledged Property, for which—

despite repeated efforts—Claimants have been unable to obtain adequate protection. Admin.

Expense Claims ¶ 42. The 552 Decision does not negate these allegations (*see* FOMB Br. 64-65)

because § 552 only impacts one category of Claimants' collateral: the post-petition employer

contributions. The 552 Decision does not affect Claimants' right to any of the prepetition collateral

Claimants have repeatedly alleged remains very much subject to their valid liens, *see supra* at 13-

16, and the majority of which remains disputed and *not* reserved in any separate account for

Claimants' so-called "benefit," *see supra* at 16-18.

The Board argues that "Claimants cannot plausibly allege such collateral has been diminished, as they have not established which assets constitute their collateral in the first instance." FOMB Br. 65. But rather than offering a reason to dismiss these claims at the pleading stage, the Board's argument underscores exactly why these issues rest on disputed questions of fact that can only be resolved with discovery. Certainly Movants have not offered a "substantial factual basis" to overcome Claimants' contention that their collateral—which remains in the custody of the Commonwealth or other third parties, not ERS—has been dissipated during the pendency of the automatic stay. *See In re Hemingway Transp., Inc.*, 993 F.2d at 925; *supra* at 11-12. And granting adequate protection payments to compensate for the risk that collateral will lose value while retained by a debtor is commonplace in bankruptcy cases. *See* 11 U.S.C. § 362(d)(1); *In re Wheeler*, 12 B.R. 908, 909 (Bankr. D. Mass. 1981) ("Adequate protection suggested in 11 U.S.C. § 361 means that the debtor has given proper assurance to the creditor that the latter's interest in the collateral is protected while the right of possession is denied to the creditor.").

Moreover, the Board asserts that as of the petition date, ERS had $2 billion worth of assets that are the subject of the contested Lien Scope AP, including, among other things, Accounts Receivable. Lien Scope Adv. Compl. ¶ 1. Yet the Board's public filings reflect that these assets have significantly diminished.[51] And, indeed, Act 106 on its face purports to cancel the Accounts Receivable and convert them to a component of the Pay Go Fees, even though the concedes the Accounts Receivable are Claimants' collateral. Act 106 § 2.4(e) ("Beginning July 1, 2017, [participating employers] shall not be required to make employer contributions, including the Additional Uniform Contribution … [to] the Retirement Systems, but shall be required to pay their

---

[51] *See* Mediation: Summary of Cash Restriction Analysis, at 6 (Oct. 2, 2019), *available at* https://emma.msrb.org/ES1313543-ES1026175-ES1428126.pdf (asserting that, as of June 2019, only $632 million was required to purchase ERS's assets).

applicable Pay-Go fee based on the parameters established in this Act."). Given this, there appears to be little question that the assets subject to Claimants' lien have diminished. Therefore, at a minimum, it would be premature to dismiss this claim before the Lien Scope AP has resolved some of the questions about the scope of the liens.

## B.   The Commonwealth Is Liable for Claims Based On Its Other Wrongful Conduct

### 1.  The Commonwealth Violated the January Stipulation

Claimants properly state a claim that the Commonwealth violated the January Stipulation with respect to employer contributions received by ERS before May 2017.

Although the Board asserts (FOMB Br. 64) that the First Circuit already ruled that ERS and the Commonwealth did not violate the January Stipulation, this is incorrect. This Court's ruling on the January Stipulation, which the First Circuit affirmed, was limited to "the Creditors' rights and remedies with respect to employer contributions received by the ERS during the month of *May 2017*." *In re FOMB for P.R.*, 590 B.R. 577, 599 & n.24 (D.P.R. 2018) (emphasis added), *aff'd in relevant part*, 914 F.3d 694 (1st Cir. 2019). This Court, however, "dismissed without prejudice" any claim "regarding other obligations under the January Stipulation," including Claimants' rights and remedies regarding employer contributions that should have been deposited prior to April 2017. *Id.* at 599 (emphasis added). Claimants' right to those monies—which are substantial given that the January Stipulation required the Commonwealth to deposit monthly contributions from July 2016 through April 2017—is pending here, and should not be dismissed.

Movants have not attempted to challenge the factual sufficiency of this claim. Nor could they. As discovery has already shown, and as Claimants will prove as a factual matter here at the appropriate time, between the enactment of PROMESA in July 2016 and April 2017, ERS's custodian (the Secretary of Treasury) received employer contributions from the Commonwealth,

but rather than placing that money in the segregated account—as it was required to do pursuant to the January Stipulation—ERS, through its custodian, used that money for ERS's purposes, thereby violating the January Stipulation. Nothing in that stipulation permitted this arrangement, and because that money never reached the segregated account established by the January Stipulation or the Fiscal Agent, Claimants were never able to recover it as collateral. Claimants have thus sufficiently stated a claim for these amounts.

### 2.   Collateral Transferred to the Commonwealth from ERS Pursuant to the Moratorium Act Was Taken in Violation of the Takings Clauses

In the Supplement, Claimants alleged that to the extent any collateral was transferred from ERS to the Commonwealth pursuant to the Moratorium Act, such a transfer was made without paying just compensation to Claimants in violation of the U.S. and Puerto Rico Takings Clauses. *See* Supp. ¶ 27, 30. Specifically, Claimants alleged that on April 6, 2016, the Commonwealth enacted Act No. 21-2016, called the "Puerto Rico Emergency Moratorium and Financial Rehabilitation Act" (also known as the "Moratorium Act"). Supp. ¶ 27. The Moratorium Act gave the Governor unfettered authority to issue executive orders declaring a complete moratorium on payments by certain government entities on outstanding debt obligations if that entity were in a state of emergency. Supp. ¶ 27 (citing Act No. 21-2016 § 201(a)). It also provided a blanket stay on creditor remedies, including the commencement or continuation of any judicial proceeding that could result in recovery from covered entities, an order related to covered debt obligations, or the application of any property or revenues related to covered debt obligations. Supp. ¶ 27. Acting under the auspices of the Moratorium Act, Governor Garcia Padilla issued EO-2016-31 on April 6, 2016. Supp. ¶ 27. The order suspended "any obligation of ERS[ ] pursuant to the [Bond Resolution] to transfer contributions made by employers that participate in [the] ERS, and any assets in lieu thereof or derived thereunder paid to [the] ERS under [Act 447] to the [Fiscal

Agent]." Supp. ¶ 27 (quoting EO-2016-31). It also suspended the Commonwealth's obligations to "make or transfer Employer Contributions to ERS up to the amount of debt service payable by ERS during fiscal year 2016-2017." Supp. ¶ 27. ERS continued to receive certain contributions but did not transfer them to the Fiscal Agent as required by the Bond Resolution, and as needed in order for Claimants to obtain payment. Supp. ¶ 27. These allegations suffice to make out a valid takings claim at the pleading stage.

Movants, for their part, do not dispute that any property so taken would be a "taking" under the Fifth Amendment. Instead, the Board places the blame on Claimants for failing to specify exactly what collateral has been taken. FOMB Br. 78. But, of course, Claimants' claims are presumed valid absent "substantial evidence" to the contrary. *See supra* at 11-12. And to the extent the Board argues that "no security interests were impaired, and no assets taken," FOMB Br. 77, they quibble with Claimants' factual allegations, not the legal basis for their claims. *But see* Supp. ¶ 27. Movants offer no factual support, let alone substantial evidence, for this assertion.

Indeed, the Board itself describes the Moratorium Act as authorizing Governor Padilla's executive order "suspend[ing] 'any obligation of ERS pursuant to [the Resolution] to transfer contributions made by employers that participate in ERS, and any assets in lieu thereof or derived thereunder paid to ERS under [Act 447] to the [Fiscal Agent].'" FOMB Br. 8 (emphasis in original). Thus, even if it were Claimants' burden to plausibly plead these claims, it is certainly plausible that Claimants lost collateral (*e.g.*, employer contributions) as a result.[52] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Courts accept plausible allegations as true for purposes of a motion to dismiss). Similarly, it is plausible to believe the Commonwealth failed to make required employer contributions to the Fiscal Agent on account of the Moratorium Act and EO-2016-31,

---

[52] The 552 Decision would have no impact on these claims because the relevant conduct occurred prepetition.

and that such a failure also amounts to a taking of Claimants' collateral.

Regardless, Claimants also allege a taking of their contractual right to payment of principal and interest, even beyond the taking of their security interests, meaning that the Moratorium Act's unlawful suspension of such payments to ERS would also amount to a taking on that independent basis. *See* Supp. ¶ 27.[53] In any event, Claimants cannot know precisely what collateral has been taken before discovery reveals more about the financial transactions between ERS, the Commonwealth, and others during this time. It would therefore be premature to dismiss this claim before Claimants have had the opportunity to learn these details.

The Board additionally contends that ERS alone has standing to recover for any wrongful suspension of employer contributions. FOMB Br. 77-78. But as explained, *see supra* at 13-20, the property taken (Claimants' collateral and contractual rights) belongs to Claimants, not ERS. And Claimants clearly have standing to vindicate a taking of their own property and interference with their contractual right to repayment. *See, e.g.*, *Hodel v. Irving*, 481 U.S. 704, 711 (1987) (finding standing based on deprivation of the fractional interest plaintiff would have inherited).[54]

### 3. Any Revisions to the Enabling Act that Converted, Deferred, or Cancelled Owed But Unpaid Employer Contributions Was a Taking

In the Supplement, Movants also alleged that revisions to the ERS Enabling Act that converted, deferred, or cancelled past-due employer contribution obligations amounted to a taking of Claimants' property. In particular, Claimants alleged that prior to the ERS petition date, many

---

[53] For the reasons explained above, *see supra* at 16-18, the Lien Scope AP does not justify dismissal. Indeed, the Lien Scope AP will not determine whether or not the Moratorium Act represents a "taking" of Claimants' property under the Fifth Amendment.

[54] The Board also argues that the claim against ERS should be dismissed because "the Commonwealth—and not ERS—promulgated the Moratorium Act and the ERS Executive Order." FOMB Br. 83. That may be so, but without discovery Claimants (and this Court) cannot know who did what with respect to the dissipation of Claimants' collateral and the assets that secured their contractual right to repayment as a result of the Act. This claim is therefore inappropriate for dismissal at this early stage. In any event, Claimants *have* asserted this claim against the Commonwealth as well.

employers, including the Commonwealth, owed ERS substantial calculated but unpaid employers' contributions in fixed amounts. *See* Supplement ¶ 31. For example, the Supplement noted that the Statement of Motives to Act 116 stated that, in 2011, the Puerto Rico Aqueduct and Sewer Authority owed ERS $833,219,000 and the State Insurance Fund owed ERS $984,943,000. *Id.* The Supplement further alleged that, upon information and belief, these amounts and other amounts owed pursuant to Enabling Act § 2-116 were never paid to ERS and remained calculated and owing to ERS as of the petition date. *Id.*

Employer contributions like these that were "calculated and owed, but not paid to [ERS] before the filing of the Title III petition" are critically important because, as the First Circuit's 552 Decision recognized, "[t]he Board concedes that the Bondholders have a security interest in those receivables." *In re FOMB*, 948 F.3d at 472 n.13. Consequently, because those Accounts Receivable were Claimants' collateral, any actions by the Commonwealth that purported to cancel, forgive, discharge, or convert the receivables into another obligation was an unconstitutional taking of Claimants' property without just compensation. And, in fact, given that the Board has represented that it believes the value of the Accounts Receivable was a mere $105.5 million as of the petition date, it is a reasonable inference that something occurred between 2011 and the petition date to convert, cancel, or modify the past-due obligations of covered employers.

Movants, again, do not contend that any revisions to the Enabling Act that altered the past-due payment obligations of participating employers would not amount to a taking. Instead, they assert that Claimants' claim should be dismissed because "Claimants do not identify any specific revisions to the Enabling Act" or "allege anything has been taken," and because "to the extent any assets retained by ERS are subject to Claimants['] security interest as determined by the Lien-Scope AP, Claimants will receive the value thereof." FOMB Br. 78. Movants are wrong.

Most critically, *the value of any Accounts Receivable is not at issue in the Lien Scope AP*. The Lien Scope AP concerns only whether certain disputed categories of assets are collateral, not the amount of collateral in categories (like Accounts Receivable) that the Board has conceded are collateral. That question can only be answered in the context of this litigation over Claimants' claims and the Administrative Expense Motions. *See supra* at 16-18. As a result, it is simply not the case that the Lien Scope AP will produce a final value for Claimants' collateral, which Movants can then return to satisfy Claimants' claims. Moreover, as explained above, the fact that an adverse party has promised to return collateral is not a sufficient basis for dismissing a claim; the claim must remain alive until any taken property is actually returned. *See id.*

In addition, Claimants are not required to allege with perfect specificity exactly how their collateral was taken and in what amounts in order to survive a motion to dismiss. Claimants have alleged facially valid claims based on having an interest in property (the Accounts Receivable); that a significant portion of those Accounts Receivable has apparently been cancelled, forgiven, converted into another form, or otherwise taken without Claimants' consent; and that, if Claimants can prove that these changes were made pursuant to revisions to the Enabling Act, including, for example, the repeal of Enabling Act § 2-116 by § 9 of Act 3-2013, or other Commonwealth government action, such revisions would amount to a taking. Nothing more was required. *See In re Hemingway Transp., Inc.*, 993 F.2d at 925; *supra* at 11-12.

### 4.   The Commonwealth Unlawfully Failed to Pay Prepetition Contributions

Finally, Claimants have stated a claim that the Commonwealth failed to make statutorily required employer contribution payments to ERS prior to the petition date. Although Movants seek dismissal of all claims except for certain limited recourse claims against ERS, *see* FOMB Br. 1-2, they offer no explanation as to why this Court should dismiss Claimants' claim against the Commonwealth for failure to make prepetition employer contributions as required by operative

law at the time. In fact, the Commonwealth owed ERS hundreds of millions of dollars in past due

unpaid employer contributions as of the petition date. Claim Addenda ¶ 27. Bondholders were

personally harmed by the failure to make such payments, which would have been subject to

Claimants' uncontested lien on prepetition employer contributions. This facially valid claim

should not be dismissed. *See In re Hemingway Transp., Inc.*, 993 F.2d at 925; *supra* at 11-12.

None of Movants' general arguments justify dismissal either. The 552 Decision has no

relevance here because the payments at issue are prepetition payments unaffected by § 552. *See*

552 Decision at 31, n.12 (recognizing the Board's concession that Claimants "have a security

interest in the [accounts] receivable[]"). PROMESA likewise cannot be said to have "preempted"

the Commonwealth's obligations to make payments before PROMESA even existed. *See* FOMB

Br. 27-29. And even if the Commonwealth could somehow take advantage of the limited recourse

provisions in the Bond Resolution, the payments at issue would be collateral from which Claimants

have the clear right to collect.

## III.   THE CLAIMS ASSERTED AGAINST ERS SHOULD NOT BE DISMISSED

Movants next turn to Claimants' claims against ERS, offering specific arguments for their

dismissal. But all of these claims are facially valid and should be allowed to proceed.

### A.   Section 506(b) of the Bankruptcy Code Does Not Provide a Basis for Dismissing the Fiscal Agent's Claims for Fees, Expenses, and Indemnification

The Fiscal Agent filed a proof of claim against ERS for its reasonable fees and expenses

incurred in connection with its powers and duties under the Bond Resolution and for

indemnification, *see* Claim No. 16777 ¶¶ 12-13, which ERS is obligated to pay in accordance with

Section 804 of the Bond Resolution. *See* Bond Resolution § 804. As a preliminary matter, it is

unclear whether the Board actually seeks to put this claim at issue in its motion to dismiss. The

Fiscal Agent's motion for allowance of its fees and expenses as an administrative expense claim

[No. 17-3283, Dkt. No. 9299] was excluded expressly from the current briefing schedule and is stayed pending further order of the Court or agreement between the parties. *See* No. 17-3283, Dkt. No. 12446 ¶ 3 n. 4. Because the Board's prior objection to the Fiscal Agent's claim for fees, expenses, and indemnification is incorporated by reference in its motion to dismiss, *see* FOMB Br. 11 n.10, 79, the Fiscal Agent is compelled to address it here.

The Board's argument for dismissing the Fiscal Agent's claim on the basis that § 506(b) of the Bankruptcy Code permits recovery of costs only to the extent that the claimholder is oversecured, *see* No. 17-3283, Dkt. No. 9701, ¶¶ 13-14, must be rejected. First, dismissal on this basis is premature because there is no final order determining the scope of the Fiscal Agent's security interests. Second, so long as the Fiscal Agent is partially secured, its claim for fees, expenses, and indemnification has priority in payment vis-à-vis the ERS Bondholders.[55] Third, assuming *arguendo* that the Fiscal Agent is undersecured, the courts of appeals that have considered this issue since 2007 have unanimously rejected the Board's position and allowed undersecured creditors' claims for contractual fees and expenses that accrued after the bankruptcy petition. *See SummitBridge Nat'l Invs. III, LLC v. Faison*, 915 F.3d 288, 295 (4th Cir. 2019) (there is nothing "in § 506(b) that could be deemed an express disallowance of unsecured claims for post-petition attorneys' fees"); *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143, 148 (2d Cir. 2009) ("[W]e hold that section 506(b) does not implicate unsecured claims for post-petition attorneys' fees, and it therefore interposes no bar to recovery."); *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 843 (9th Cir. 2009) ("[C]laims for postpetition attorneys' fees cannot be disallowed simply because the claim of the creditor is unsecured."); *see also Wilmington Tr. Co.*

---

[55] ERS's obligations to the Fiscal Agent are secured by a lien prior to that of the ERS Bondholders on any and all funds at any time held by the Fiscal Agent under the Resolution. *See* Resolution § 804.

*v. Tribune Media Co. (In re Tribune Media Co.)*, No. 15-01116-RGA, 2008 WL 6167504, *2 (D.

Del. Nov. 26, 2018) (reversing bankruptcy court that disallowed post-petition fees of unsecured

indenture trustee). "[D]isallowing claims in their entirety based on section 506(b)," which is

exactly what the Board suggests, "defies common sense." *Gencarelli v. UPS Capital Bus. Credit*,

501 F.3d 1, 6 (1st Cir. 2007) (allowing claims for prepayment penalties as unsecured claims, even

if unreasonable under § 506(b), if valid under § 502). Because § 506(b) of the Bankruptcy Code

does not limit the allowability of unsecured claims for contractual post-petition fees and expenses

under § 502, any effort by the Board to dismiss the Fiscal Agent's claim on that basis must fail.

### B.   Claimants' Request for a Determination of Secured Status in the ERS Title III Case Is Not Duplicative of Claims in the Lien Scope Adversary Proceeding

Movants next argue that Claimants' request for determination of secured status—asserted

originally in Adv. Proc. 17-219 and 17-220 and incorporated by reference into Claimants' proofs

of claim and Administrative Expense Motions—is duplicative of the Lien Scope AP and should

be dismissed. FOMB Br. 31-32.

Movants, however, fundamentally misunderstand the nature of the Lien Scope AP. The

claims and counterclaims asserted in that adversary proceeding seek only a determination about

whether Claimants' lien attaches to certain disputed categories of assets, and related issues such

as avoidance. *See supra* at 16-18. No claim or counterclaim in the Lien Scope AP purports to

assign a value to those disputed categories of assets, let alone assign a value to the entirety of

Claimants' secured claim. Indeed, even if the Lien Scope AP were to assign a value to the disputed

categories of assets, there would still be a major dispute between the parties concerning the value

of the Accounts Receivable, which has never been a subject of litigation in the Lien Scope AP

because the Board conceded Accounts Receivable to be Claimants' collateral.

Thus, far from being "duplicative," Claimants' request for a determination of secured status

is one of the most significant claims presently before the Court in this contested matter. It is only through that claim that a value for the secured portion of Claimants' claim will be determined, which will also then fix the value of any unsecured deficiency claim.

## C.    ERS Is Liable for Claims Based On the Post-Petition Legislation

### 1.   ERS Breached the Bond Resolution

Claimants have properly pled that ERS breached its contractual duties under the Bond Resolution. Neither the Board nor Retiree Committee actually quibbles with the reality that ERS failed to satisfy its contractual obligations under the Bond Resolution, as Claimants allege. *See* Claim Addenda ¶ 14-19; Admin. Expense Claims ¶ 28-33. By contrast, the Board expressly acknowledges that Claimants retain what they characterize as "nonrecourse Claims against ERS for unpaid principal and interest on the ERS Bonds." FOMB Br. 2. Of course, as explained, those claims are not nonrecourse. *See supra* at 18-20.

Movants' general arguments, even if successful, also do not justify dismissal. That is, Claimants' breach of contract claim against ERS is not altered, let alone eliminated, by the 552 Decision because ERS is still liable for its contractual breaches even if Claimants do not have a valid interest in the post-petition employer contributions. *See id.* at 18-20. Even if Claimants' ability to recover from ERS were reduced, that would not justify dismissal of these claims. And likewise, even if the claims are nonrecourse (they are not), Claimants would still have the right to collect from their prepetition collateral. *See id.* at 19. Thus, it would be premature to dismiss these contract claims without determining the scope of Claimants' prepetition collateral.

### 2.   ERS Was Unjustly Enriched

Claimants have sufficiently alleged that ERS unjustly enriched itself at Bondholders' expense by retaining the money it received for the Bonds while evading all the responsibilities it assumed. *See, e.g.*, Claim Addenda ¶ 20; Admin. Expense Claims ¶ 34. The Board provides

(FOMB Br. 60) just one reason to dismiss, arguing that Claimants have also asserted contract claims against ERS. But, as discussed, Claimants may plead in the alternative at this stage. *See* Fed. R. Civ. P. 8(d)(2)-(3); *supra* at 79. Allowing Claimants' unjust enrichment and other non-contractual claims against ERS to proceed is particularly appropriate in light of the ongoing *ultra vires* litigation. If the Court determines that the ERS Bonds were issued *ultra vires* and that Claimants cannot recover amounts payable on the ERS Bonds under Section 8-202 of the Uniform Commercial Code, Claimants would have a right to pursue non-contractual claims against ERS. The Board also argues that any unjust enrichment claim would be a prepetition claim, but that does not provide grounds for dismissal. In any case, the unjust enrichment claim is a post-petition claim, for the reasons discussed in Claimants' Rule 12(c) Motion. *See supra* at 23-24.

### 3. ERS Caused the Commonwealth's Unjust Enrichment

Claimants have also sufficiently alleged that ERS caused the Commonwealth's unjust enrichment and Claimants' corresponding harm through ERS's breach of its contractual duties. Supp. ¶ 16. Claimants are therefore entitled to recover the assets transferred from ERS to the Commonwealth to the extent necessary to make Claimants whole. *Id.* The Board disagrees, arguing (FOMB Br. 70) that "'breach of duties causing unjust enrichment' is not a cognizable cause of action." Critically, however, the Board fails to identify any element of the claim that this theory of recovery fails to satisfy. And, as discussed, Claimants may plead unjust enrichment in the alternative to its contract-based claims. *See* Fed. R. Civ. P. 8(d)(2)-(3); *supra* at 79.

### 4. ERS Committed a Fraudulent Transfer

As discussed, *supra* at 8-10, 83-87, Claimants have properly pled that ERS transferred its assets to the Commonwealth in fraud of its Bondholders. Supp. ¶ 3. Movants repeat their arguments (FOMB Br. 66-67; RC Br. 30-33) with respect to the fraudulent acquisition claim, and those arguments fail once again for the same reasons. *See supra* at 83-87. The Retiree Committee

further contends (RC Br. 33) that a fraudulent transfer claim can be brought only against the transferee, not ERS. But Puerto Rico law allows creditors to "impugn the acts which the debtor may have performed in fraud of [a creditor's] right." 31 L.P.R.A. § 3028. The statute thus makes clear that the debtor-transferor is a proper defendant to such a claim. In arguing to the contrary, the Committee relies only on two inapposite cases interpreting 11 U.S.C. § 550, a federal provision that is irrelevant to Claimants' claim under Puerto Rico law.

### 5.   ERS Committed Dolo in the Evasion of Contractual Duties

Claimants have also stated a claim that ERS, knowingly and intentionally, evaded its contractual obligations. Supp. ¶ 4. Article 1054 of the Civil Code of Puerto Rico prohibits "dolo" or "deceit" in the performance of a contractual obligation. 31 L.P.R.A. § 3018; *see also Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler Corp.*, 92 F. Supp. 2d 8, 18 (D.P.R. 2000) (defining such performance as "where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation" (citing 31 L.P.R.A. § 3018)). ERS evaded compliance with the Bond Resolution by failing to take action to require public employers, including the Commonwealth, to satisfy their statutory obligations to pay employer contributions, thereby imperiling ERS's ability to fulfill its obligations to Bondholders. ERS further evaded compliance by failing to oppose the Post-Petition Legislation (as it was contractually obligated to do), and transferring all of its assets to the Commonwealth, even though ERS knew that doing so would make it impossible to satisfy its obligations to Bondholders.

The Board contends (FOMB Br. 67) that a fraud-in-the-performance claim cannot be based on compliance with "legislation," unless the legislation is unconstitutional. As discussed, *supra* at 28-29, the Post-Petition Legislation was unconstitutional and also invalid as a violation of the automatic stay. By the Board's own concession, compliance with invalid legislation can be an evasion of contractual duties. Moreover, the Post-Petition Legislation meets the standard for a

fraud-in-the-performance claim and nothing in the Post-Petition Legislation suggested that that provision of Puerto Rico law had been repealed. There is thus no reason to think it cannot provide a basis for this claim. *See id.* In any event, the Board ignores the many other ways that ERS evaded its contractual obligations, beyond simple compliance with the Post-Petition Legislation.

The Board next suggests that ERS's actions are excusable given the circumstances. But such factual arguments cannot justify dismissal at the pleadings stage. *See supra* at 11-12. In any event, the Board's reasons offer no legal defense. The Board claims that ERS needed to work "hand-in-hand" with the Commonwealth, but ERS made an express contractual commitment to the contrary, promising to "oppose any attempt by the Legislature of the Commonwealth to reduce the Employers' Contribution Rate or to make any other change in the Act or any other relevant legislation that would have a material adverse effect on Bondholders." Bond Resolution § 709(2). In any case, the circumstances did not justify circumventing ERS's obligations to its Bondholders. As explained, *supra* at 36, 53-57, any funding shortfalls could have been remedied by increasing employer contributions to ERS within the existing statutory scheme.

Finally, the Board asserts that even if the Court finds "dolo," Claimants are entitled to no more than unpaid principal and interest. But it is premature to determine Bondholders' damages. And, in any case, any argument about the amount of damages does not offer grounds for dismissal.

### 6. ERS Violated the Covenant of Good Faith

Claimants have also stated a claim against ERS for breaching the covenant of good faith in its performance of its contractual obligations. Supp. ¶ 5. Under Puerto Rico law, contractual obligations include not only the express terms, but also "all the consequences which, according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. § 3375. ERS breached its duty to perform in good faith not only by failing to oppose the Post-Petition Legislation, but also by acting in concert with the Commonwealth to enact that Legislation, which

had the purpose and effect of making it impossible for ERS to satisfy its other obligations to Claimants under the Bond Resolution. *See Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 108 (1st Cir. 2001) (emphasizing "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party" (quoting Restatement (Second) of Contracts § 205a (1981))); *New Comm Wireless Servs., Inc. v. SprintCom, Inc*., 287 F.3d 1, 12 (1st Cir. 2002) (examining the "totality of the circumstances" to determine whether "the party's actions appear arbitrary, deceitful, or animated by some improper purpose").

Seeking to dismiss (FOMB Br. 68-69) the claim, the Board argues only that there can be no claim for a "bad faith" breach of contract. But Claimants make no such claim. Instead, they are asserting that ERS breached the Bond Resolution by failing to perform its obligations in good faith, a duty recognized under Puerto Rico law.

### 7.  ERS Committed Negligent Performance

Claimants also state a claim that ERS negligently performed under the Bond Resolution by failing to take steps to vindicate Claimants' rights, reduce its underfunding, and oppose the Post-Petition Legislation, all of which foreseeably damaged Bondholders. Supp. ¶ 6.

The Board contends (FOMB Br. 69) that the claim must be dismissed because the Enabling Act was amended numerous times since 1999 to shore up ERS's finances. Again, the Board's factual disagreement does not justify dismissal at this stage. But, in any event, those amendments say nothing about *ERS's* performance, because it was the Commonwealth, not ERS, that amended the Enabling Act. *See* FOMB Br. 8. Moreover, the Board's objection does not address ERS's other shortcomings beyond simply its failure to reduce its underfunding.

Next, the Board argues (FOMB Br. 69) that contractual breaches cannot give rise to a claim for negligence, but much like its bad faith argument, the Board misapprehends the nature of the claim. Puerto Rico law provides that negligence in the performance of contract can give rise to a

breach-of-contract claim. *See* 31 L.P.R.A. § 3018; *Santiago Nieves v. A.C.A.A.*, No. RE-86-266, 1987 WL 448258 (P.R. Nov. 25, 1987).

Finally, the Board argues (FOMB Br. 70) that the remedy for this claim is a right to declare default and nothing more. But because Claimants have alleged a breach of specific covenants in the Bond Resolution, Bondholders are entitled to expectation damages. *See* 31 L.P.R.A. § 3018 ("Those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby."). In any case, a dispute over available remedies is not grounds to dismiss the claim.

### 8. ERS Is Subject to Promissory Estoppel

As Claimants have alleged, ERS made several fraudulent promises with reason to assume that Bondholders would rely on those promises to their detriment, as Bondholders did, and ERS is therefore liable to Claimants for the value of such promises. Supp. ¶ 8. These facts state a facially valid claim for relief under the doctrine of promissory estoppel. *See* Restatement (Second) of Contracts § 90 (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.").

The Board argues first that broken promises are ubiquitous in bankruptcy, and so presumably should not state a claim for relief. FOMB Br. 70 ("All claims in bankruptcy arise out of debtors' broken promises."). The first part may be so, but bankruptcy exists precisely to provide the recipient of a broken promise with a claim in bankruptcy for the value thereof. That is of course what Claimants seek here. Additionally, the Board argues that promissory estoppel claims cannot "lie where a contract governs the dispute at issue," but, as previously explained, Claimants have the right to plead contract-based and tort-based theories in the alternative. *See supra* at 79. Finally,

the Retiree Committee argues that declaratory and injunctive relief is not available through a proof

of claim. But the right to an equitable remedy can serve as the basis for a claim in bankruptcy if

that equitable remedy can give rise to a right to payment. *See* 11 U.S.C. § 101(5)(B) (defining

"claim" as the "right to an equitable remedy for breach of performance if such breach gives rise to

a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed,

contingent, matured, unmatured, disputed, undisputed, secured, or unsecured"). Claimants'

promissory estoppel claim represents such a claim and so should not be dismissed here.

### 9. ERS Committed Conversion

Claimants also have stated a claim against ERS for conversion. Supp. ¶ 9. ERS maliciously

and wrongfully exercised authority over Claimants' property by knowingly and intentionally

working with the Commonwealth to enact the Post-Petition Legislation, failing to oppose the

enactment, and selling its assets and transferring its funds to the Commonwealth, thus indefinitely

depriving Claimants of their collateral and contract rights.

The Board offers the same reasons to dismiss this claim as for the conversion claim against

the Commonwealth, and they fail for the same reasons. *See supra* at 90; FOMB Br. 71. The Board

also suggests that Claimants cannot have a conversion claim against ERS because a contract

governs their rights. But at the pleading stage, a party may "allege both contract and tort theories

of recovery." *Westernbank P.R. v. Kachkar*, No. CV 07-1606 (ADC/BJM), 2008 WL 11357939,

at \*10 (D.P.R. Sept. 5, 2008), *report and recommendation adopted*, No. CV 07-1606 (ADC), 2009

WL 10681037 (D.P.R. Aug. 20, 2009); *see supra* at 79.

### 10. ERS Is Liable for General Fault and Negligence

Claimants also have stated a claim that ERS acted with fault or negligence when it

foreseeably damaged Bondholders by failing to oppose the enactment of the Post-Petition

Legislation and selling its assets and transferring funds to the Commonwealth. Supp. ¶ 10.

The Board contends (FOMB Br. 71-72) that Claimants cannot state a claim for efforts ERS did or did not take to comply with the Post-Petition Legislation, but it does not explain why. That Legislation was unconstitutional and void, and there is no apparent reason why ERS cannot be held liable for failing to oppose the law, which it was contractually obligated to do. The Board also argues that Claimants cannot have a tort claim when a contract governs their rights, but as just discussed, Claimants may plead both claims in the alternative. *See supra* at 79. Finally, as explained in Claimants' Rule 12(c) Motion, *see supra* at 18-20, Claimants' recovery would not be limited to nonrecourse unsecured prepetition claims for unpaid principal and interest, but in any case, the measure of recovery does not offer grounds for dismissal.

### D.   ERS Is Liable for Claims Based on the Issuance of the ERS Bonds

#### 1.   ERS Breached Representations and Covenants on Ability to Provide Liens

If the 552 Decision stands, Claimants have properly pled that ERS breached representations and covenants in the Bond Resolution. In particular, ERS represented and covenanted that the Pledged Property—which included ERS's right to receive future employers' contributions—was a legal asset of ERS on which ERS had the power to grant liens. Supp. ¶ 21 (citing Bond Resolution p. VI-15, § 705). In the Bond Resolution, ERS specifically represented that it was "duly authorized under the [Enabling] Act to … create a security interest on the Pledged Property in the manner and to the extent provided in this Resolution." Bond Resolution p. VI-1, § 705. It likewise represented that "[t]he Bonds are and will be the valid and legally binding special obligations of [ERS], enforceable in accordance with their terms and the terms of this Resolution" and covenanted that ERS "shall at all times, to the extent permitted by law, defend, preserve and protect the assignment of the Pledged Property and all the rights of … the Beneficiaries and the Bondowners under this Resolution against all claims and demands of all persons whomsoever." *Id.* The Resolution, in

turn, defines "Pledged Property" as encompassing all "Revenues," including, among other things, all employer contributions paid from *and after* the date of the Bond Resolution received by the ERS or the Fiscal Agent "and any assets in lieu thereof or derived thereunder which are payable to [the ERS] pursuant to [the ERS Enabling Act]." Bond Resolution § 501, Exh. B, VI-33, VI-36, VI-37. If the 552 Decision is upheld, ERS's representations will have been false, and ERS will have breached its covenant regarding its power to grant liens on the Pledged Property. *Id.*

The Board argues that these representations were not false because ERS had a legal asset in the form of the already "calculable and owed" employer contributions on which it could grant valid liens to Claimants. FOMB Br. 80-81. Perhaps so, but that is not what ERS actually promised Bondholders in the Bond Resolution. To the contrary, the Resolution promised Bondholders a lien on *all* employer contributions (past and future), as well as the "right to receive" the same. If ERS did not have an existing asset in the form of a right to receive future employer contributions, those covenants would have been false. Moreover, the Resolution specifically provides that "the pledge, assignment and grant of security interest provided … shall be valid and binding, *and the Pledged Property shall immediately be subject to the lien* of this pledge, assignment and security interest." Bond Resolution § 501 (emphasis added). And that makes sense. It belies reason (and the Resolution) to think that Bondholders would have exchanged billions of dollars for the right only to contributions already "calculable and owed" at the time of the agreement. *See Cent. Int'l Co. v. Kemper Nat. Ins. Cos.*, 202 F.3d 372, 375 (1st Cir. 2000) (describing "the reasonable expectation of the parties" as "the central object of all contract interpretation"); *Garbincius v. Boston Edison Co.*, 621 F.2d 1171, 1177 (1st Cir. 1980) (contracts should be construed to reach sensible result if possible); E. Allan Farnsworth, *Farnsworth on Contracts* Vol. II, § 7.10, at 255 (standard of reasonableness as fundamental principle of contract interpretation).

As explained, any remedy for violations would not be nonrecourse, *see supra* at 18-20, and these claims should not be dismissed before the Lien Scope AP has concluded, *see supra* at 16-18.

### 2.   ERS Breached Representations and Covenants on Ability to Issue Bonds

As Claimants have alleged, ERS represented and covenanted that it had authority to issue the ERS Bonds and that the Bonds were valid. Supp. ¶ 21; *see* Bond Resolution § 705 ("The System is duly authorized under the [Enabling] Act to create and issue the Bonds and to adopt this Resolution[.]"). If, as the plaintiffs in the Ultra Vires AP argue, the Bonds were *ultra vires*, those representations will have been false. Movants offer no response on the merits of this claim, and this Court should not dismiss it before the Ultra Vires AP has ended. *See supra* at 30-31.

### 3.   ERS Committed Dolo in the Bond Issuance

Claimants have properly pled that ERS engaged in fraud (or "dolo") in inducing Bondholders to purchase interests in the ERS Bonds on the basis of material misrepresentations. *See* Supp. ¶ 4. Article 1054 of the Civil Code of Puerto Rico prohibits "dolo" or "deceit" in the formation of a contract. 31 L.P.R.A. § 3408; *see also Generadora De Electricidad Del Caribe, Inc.*, 92 F. Supp. 2d at 18 (defining such performance as "where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation" (citing 31 L.P.R.A. § 3018)). Here, ERS made misrepresentations in the Bond Resolution, intending that Bondholders rely on those misrepresentations, as they did. Supp. ¶ 23. Because of Bondholders' reliance on those misrepresentations, Bondholders spent billions on bonds that cannot be repaid. These facts suffice to state a claim under 31 L.P.R.A. § 3408.

The Board resists this conclusion on the grounds that "ERS accurately represented in which assets it could grant a security interest." FOMB Br. 81. As explained above, that is not the case. *See supra* at 109-11. In any event, it is somewhat beside the point. ERS engaged in dolo as to several other contractual representations, see *infra* at 112-13, not just those related to the liens on

post-petition employer contributions. Movants have not explained why those misrepresentations, which this Court accepts as alleged, do not suffice to state a legal claim against ERS.

The Board's remaining arguments also fail. There is no reason to dismiss this claim because of the Ultra Vires AP. *See supra* at 30-31. Indeed, the Ultra Vires AP will not determine in any sense whether ERS engaged in fraud in evading its contractual obligations. Likewise, as explained, such claim is not untimely (FOMB Br. 81-82). *See supra* at 31.

### 4. ERS Committed Negligent Misrepresentation

Claimants have properly pled that ERS made negligent misrepresentations in connection with the Bond Resolution. Thus, even if ERS's misrepresentations, *see supra* at 109-11, were merely negligent, Claimants have a valid cause of action under 31 L.P.R.A. § 5141, which imposes liability for negligent misrepresentations by a party that cause damage to another. Supp. ¶ 24.

The Board resists on the ground that "ERS accurately represented in which assets it could grant a security interest." FOMB Br. 82. Again, it did not. *See supra* at 109-11. And still again— and more importantly—this is not the only misrepresentation ERS made. *See id.* For example, ERS covenanted in the Bond Resolution that it would "at all times, to the extent permitted by law, defend, preserve and protect the assignment of the Pledged Property and all the rights of the Fiscal Agent, the Beneficiaries and the Bondowners under this Resolution against all claims and demands of all persons whomsoever." Bond Resolution § 705. Nevertheless, ERS, the Board, and others argued before the First Circuit that ERS could not grant a lien on its right to receive employers' contributions because that interest did not amount to property. Supp. ¶ 24. Movants fail to explain how that does not contradict ERS's representation that it would do just the opposite.

The Board's other arguments also fail to justify dismissal. As already explained, Claimants reserve the right to argue tort and contract claims in the alternative. *See supra* at 79. And the Ultra Vires AP will not address whether ERS engaged in negligent misrepresentations as part of the

Bond Resolution, and it therefore cannot justify dismissal. *See supra* at 30-31. Finally, any claim against ERS for negligent misrepresentations in connection with the issuance of the ERS Bonds would not be a nonrecourse claim for the reasons stated above. *See supra* at 18-20.

### 5.  ERS and Claimants Made a Mutual Mistake of Law

If the misrepresentations regarding ERS's ability to provide valid liens on the Pledged Property and ability to issue the ERS Bonds were not fraudulent or negligent, Claimants have a facially valid claim that the parties' agreement was based on a mutual mistake and should be rescinded. *See* Supp. ¶ 25; *Banco Commercial De P.R. v. Royal Exch. Assur. Corp.*, 71 F.2d 933, 934 (1st Cir. 1934) (finding mutual mistake where agreement was contrary to the parties' intent); *see also Casanova v. P.R.-Amer. Ins. Co.*, No. O-77-287, 1978 WL 48889 (P.R. Jan. 31, 1978) ("Mutual mistake, misrepresentation, or concealment, are taken as good reasons for rescission of contract by the insurer."). "To state a claim of mutual mistake of fact that would support rescission of a contract, minimally, the plaintiff should allege that it was mistaken as to the underlying facts of the parties' agreement and that defendant was mistaken as to some certain part of the agreement." 27 Williston on Contracts § 70:15 (4th ed.). Claimants allege just that, *see* Supp. ¶ 25.

The Board largely recycles the same arguments here as well. *See* FOMB Br. 82-83. They fail for the same reasons. As explained, Claimants have identified actual misrepresentations. *See supra* at 109-11. And, as also explained, *see supra* at 30-31, the Ultra Vires AP does not justify dismissal because, among other things, the Ultra Vires AP will not actually decide whether there has been a mutual mistake that justifies rescission of the Bond Resolution.

The Retiree Committee adds one other rebuttal: that any mistake is one "of law" and thus the doctrine does not apply. RC Br. 33-34. This is incorrect. To start, the mistakes here involve both law and fact. More importantly, as the Supreme Court has made clear, "[t]he fact that interpretation or construction of a contract presents a question of law and that, therefore, the

mistake [is] one of law is not a bar to granting relief." *Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands*, 247 U.S. 385, 389 (1918) (compiling like authorities); *see also Falcone v. Pierce*, 864 F.2d 226, 231 (1st Cir. 1988) ("Under modern principles of contract law, mistake of law can serve as a basis for rescission.") (citing 3 A. Corbin, Corbin on Contracts § 618 (1960)). The Retiree Committee's cases stand only for the uncontroversial proposition that a mistake of fact can form the basis of rescission. That, of course, is true. But a mistake of law can as well.

### 6.  ERS Committed Breach of Warranty

Claimants have adequately alleged a claim for breach of the warranties contained in the Purchase Contract. (FOMB Br. 83; RC Br. 34.) As part of the Purchase Contract, ERS represented and warrantied that the ERS Bonds were "valid, binding and legally enforceable obligations of the System," that ERS "ha[d] full legal right, power and authority to adopt the Bond Resolution, [and] to enter into … a Security Agreement … between [ERS] and The Bank of New York Mellon … and to issue and deliver the Bonds to the Underwriters," and that with one limited exception, it did not need the "approval, permit, consent, or authorization of, or registration or filing with, any governmental or public agency or authority not already obtained or made … in connection with the execution or adoption and delivery by the System of, or the due performance of its obligations under this Purchase Contract, the Bonds, the Bond Resolution, the MCDA and the Security Agreement." Supp. ¶ 26 (citing to Purchase Contract ¶ 6(b), (d)). As discussed above, if the 552 Decision stands or if the Bonds are declared to be *ultra vires*, these representations and warranties will have been false. *See supra* at 109-11. It would therefore be premature to dismiss this claim before the Ultra Vires AP has been resolved.

Claimants have standing to pursue these breaches as the successors and assigns of the underwriters, Supp. ¶ 26. (RC Br. 34.) Under New York law, "[u]nless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer,

whether or not such claims or demands are known to exist." N.Y. Gen. Oblig. Law § 13-107 (McKinney); *see also Commerzbank AG v. U.S. Bank Nat'l Ass'n*, __ F. Supp. 3d __, No. 16CV4569, 2020 WL 2036723, at *5 (S.D.N.Y. Apr. 28, 2020) (concluding that New York law applies to the sale of a certificate, like the ERS Bonds, through the Depository Trust Company because "DTC actually holds the certificates and effectuates the transactions [and so] the transactions actually occurred in New York and are governed by New York law"); *New Ponce Shopping Ctr., S.E. v. Integrand Assur. Co.*, 86 F.3d 265, 267 (1st Cir. 1996) (noting that Puerto Rico applies the "dominant or significant contacts test for contract and tort actions," which—like the Restatement test applied in *Commerzbank*—looks to the law in "the jurisdiction with the most significant contacts to the disputed issues"). Even if this were not the case, it would be premature to dismiss the case on this basis because Claimants would need discovery, including third-party discovery, to establish the Bond-by-Bond chain of title.

As with other claims, the Board also argues that this claim should be dismissed as duplicative of the Ultra Vires AP, and that any remedy would be limited to a prepetition nonrecourse claim against ERS. FOMB Br. 83. For the reasons already explained, those arguments also fail here. *See supra* at 18-20, 30-31.[56]

## CONCLUSION

Claimants have stated numerous facially valid claims against the Commonwealth and ERS for violations of federal and Commonwealth law. This Court should deny the motions to dismiss.

---

[56] For the reasons described in Section II, *supra*, Claimants have also adequately pled claims against ERS for violations of the takings clause through the Moratorium Act, *see supra* at 94-96; violations of the January stipulation, *see supra* at 93-94; violations of § 922(c), *see supra* at 91-93; and the violations raised in the Ultra Vires AP, *see supra* at 30-31, and Lien Scope AP, *see supra* at 16-18.

In San Juan, Puerto Rico, today June 17, 2020.

/s/ Alfredo Fernández-Martínez                    /s/ Bruce Bennett

Alfredo Fernández-Martínez                        Bruce Bennett (*pro hac vice*)
DELGADO & FERNÁNDEZ, LLC                           JONES DAY
PO Box 11750                                      555 South Flower Street
Fernández Juncos Station                          Fiftieth Floor
San Juan, Puerto Rico 00910-1750                  Los Angeles, CA 90071
Tel. (787) 274-1414                               Tel. (213) 489-3939
Fax: (787) 764-8241                               Fax: (213) 243-2539
afernandez@delgadofernandez.com                   bbennett@jonesday.com
USDC-PR 210511
                                                  Benjamin Rosenblum (*pro hac vice*)
                                                  JONES DAY
                                                  250 Vesey Street
                                                  New York, New York 10281
                                                  Tel. (212) 326-3939
                                                  Fax: (212) 755-7306
                                                  brosenblum@jonesday.com

                                                  Geoffrey S. Stewart (*pro hac vice*)
                                                  Matthew E. Papez (*pro hac vice*)
                                                  Sparkle L. Sooknanan (*pro hac vice*)
                                                  JONES DAY
                                                  51 Louisiana Ave. N.W.
                                                  Washington, DC 20001
                                                  Tel. (202) 879-3435
                                                  Fax: (202) 626-1700
                                                  gstewart@jonesday.com
                                                  mpapez@jonesday.com
                                                  ssooknanan@jonesday.com

*Counsel for Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd., and SV Credit, L.P.*

*/s/ Alicia I. Lavergne-Ramírez*
José C. Sánchez-Castro
USDC-PR 213312
jsanchez@lsplawpr.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@lsplawpr.com

SÁNCHEZ & PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*
John K. Cunningham (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax- Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*

/s/ Albéniz Couret-Fuentes
Albéniz Couret-Fuentes
USDC-PR Bar No. 222207
SEPULVADO, MALDONADO &
COURET
304 Ponce de León Ave. – Suite 990
San Juan, PR 00918
Telephone: (787) 765-5656
Facsimile: (787) 294-0073
Email: acouret@smclawpr.com

/s/ Luke A. Sizemore
Eric A. Schaffer (*pro hac vice*)
Luke A. Sizemore (*pro hac vice*)
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Email: eschaffer@reedsmith.com
Email: lsizemore@reedsmith.com

C. Neil Gray (*pro hac vice*)
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
Email: cgray@reedsmith.com

*Counsel for The Bank of New York, Mellon, as fiscal agent*