UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

             Debtors.[1]

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

PUERTO RICO ELECTRIC POWER
AUTHORITY,

             Debtor.

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

PROMESA
Title III

No. 17 BK 4780-LTS

MEMORANDUM OPINION REGARDING PREPA'S URGENT MOTION FOR ENTRY OF AN
ORDER AUTHORIZING PREPA TO ASSUME CERTAIN CONTRACTS WITH ECOELÉCTRICA,
L.P. AND GAS NATURAL APROVISIONAMIENTOS SDG, S.A. (DOCKET ENTRY NO. 12579)

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Before the Court is *PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 12579 in Case No. 17-3283, the "Motion").[2] The Motion, filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), requests entry of an order assuming two agreements pursuant to Section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a).[3]

The Court has subject matter jurisdiction of this contested matter pursuant to 48 U.S.C. § 2166(a). The Court heard oral argument on the Motion on June 3, 2020. Having considered carefully all of the submissions[4] and arguments made in connection with the Motion, the Court grants the Motion for the following reasons.

---

[2] The Motion was also filed as Docket Entry No. 1951 in Case No. 17-4780. All docket entry references herein are to entries in Case No. 17-3283, unless otherwise specified.

[3] The sections of the Bankruptcy Code cited in this Memorandum Opinion and Order are made applicable in the above-captioned cases by Section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2161(a).

[4] In addition to the Motion, the Court has reviewed the *Declaration of Fernando M. Padilla in Support of PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 12580, the "Padilla Declaration"), the *Response to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 12958, the "Windmar Opposition"), the *Motion in Opposition to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 1974 in Case No. 17-4780, the "UTIER Opposition"), *PREPA's Omnibus Reply to Objections to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 13172, the "Reply"), *Windmar's Sur-Reply to PREPA's Omnibus Reply to Objections to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 2010 in Case No. 17-4780), the *Sur-Reply to PREPA's Omnibus Reply to Objections to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.*

BACKGROUND

Prior to commencing its Title III case, the Puerto Rico Electric Power Authority ("PREPA") entered into two contracts that are the subjects of the Motion. First, PREPA executed a Power Purchase and Operating Agreement, dated March 10, 1995 (the "Pre-Restatement PPOA") with EcoEléctrica, L.P. ("ECO"), pursuant to which ECO imports liquefied natural gas ("LNG"), converts it to natural gas for use at ECO's cogeneration facility in Peñuelas (the "ECO Facility"), and supplies power generation capacity to PREPA. Second, PREPA executed a Natural Gas Sale and Purchase Agreement, dated March 28, 2012 (the "Pre-Restatement GSPA," and, together with the Pre-Restatement PPOA, the "Pre-Restatement Contracts"), with Gas Natural Aprovisionamientos SDG, S.A. ("Naturgy"), pursuant to which Naturgy imports LNG, converts it to natural gas, and supplies it for use at PREPA's Costa Sur generating facility (the "Costa Sur Facility").

Together, the Pre-Restatement Contracts form the basis of what PREPA describes as the "LNG-to-Power Program," which is responsible for up to 40% of Puerto Rico's baseload power needs. (Padilla Decl. ¶ 5.) The conversion of LNG to natural gas that is required for the LNG-to-Power Program relies upon the ECO-owned and Naturgy-operated LNG terminal facility in Peñuelas, as that facility is the only one in the vicinity of the Costa Sur Facility and the ECO Facility capable of performing that function. (Padilla Decl. ¶ 6.)

The Pre-Restatement GSPA and the Pre-Restatement PPOA were set to expire in December 2020 and March 2022, respectively. (Padilla Decl. ¶ 5.) In late 2018, PREPA began the process of renegotiating the terms of the Pre-Restatement Contracts to reduce costs in a

---

(Docket Entry No. 2012 in Case No. 17-4780), and the *Sur-Reply to PREPA's Omnibus Reply to Objections to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with Ecoeléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (Docket Entry No. 2013-1 in Case No. 17-4780).

manner consistent with PREPA's 2018 and 2019 certified fiscal plans. (Padilla Decl. ¶ 6.) That negotiation process resulted in the execution of the Amended and Restated Power Purchase and Operating Agreement, dated as of March 27, 2020 (Docket Entry No. 12579-2, the "ECO PPOA"), and the Amended and Restated Natural Gas Sale and Purchase Agreement, dated as of March 23, 2020 (Docket Entry No. 12579-3, the "Naturgy GSPA," and, together with the ECO PPOA, the "Contracts"). The Contracts would extend the LNG-to-Power Program until September 2032, while modifying certain aspects of the contractual relationships between PREPA and the contract counterparties. (See Mot. ¶ 10 (describing "key terms of each of the Contracts . . . and how these terms differ from the original terms of the Pre-Restatement Contracts"); Padilla Decl. ¶ 7.) Among other changes to the terms of the Pre-Restatement Contracts, the ECO PPOA modifies the Pre-Restatement PPOA by tasking PREPA with the primary responsibility for procuring and supplying LNG for ECO's generation of electricity pursuant to the ECO PPOA. (ECO PPOA at 30-32.)

The Oversight Board filed the Motion on April 1, 2020. On April 27, 2020, two objections were filed. The Windmar Objection was filed by Windmar Renewable Energy ("Windmar"), a power producer that is a party to power purchase and operating agreements with PREPA. The UTIER Objection was filed by Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. ("UTIER")—PREPA's primary labor union—and a number of environmental groups: Comité Diálogo Ambiental, Inc., El Puente de Williamsburg, Inc. - Enlace Latino de Acción Climática, Comité Yabucoeño Pro-Calidad de Vida, Inc., Alianza Comunitaria Ambientalista del Sureste, Inc., Sierra Club and its Puerto Rico chapter, Mayagüezanos por la Salud y el Ambiente, Inc., Coalición de Organizaciones Anti-Incineración, Inc., Amigos del Río Guaynabo, Inc., Campamento Contra las Cenizas en Peñuelas, Inc., and CAMBIO P.R.

(collectively, the "Environmental Groups" and, together with UTIER and Windmar, the "Objectors").

### DISCUSSION

In addition to a number of arguments concerning the merits of PREPA's decision-making process and the terms of the Contracts, the instant dispute presents a number of threshold issues that must be addressed before the substantive merits of the Motion.  First, the Oversight Board asserts in its Reply that the Objectors do not have standing to object to the Motion.  Second, the Objectors argue that the Contracts are actually new post-petition agreements that cannot be assumed under Section 365(a), which only permits debtors to assume pre-petition agreements.  Third, the Oversight Board and the Objectors disagree as to the standard that the Court should apply in reviewing the Motion.

1.   Standing

The Oversight Board argues, as a threshold matter, that the entities that have raised objections to the Motion lack legally protected interests that provide them standing to raise their objections to the Motion.  (See Reply ¶¶ 38-44.)

Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C.A. § 1109(b) (Westlaw through P.L. 116-143).  Section 1109(b) does not, however, eliminate the prudential standing requirements ordinarily applicable to parties in federal courts.  See Sentinel Trust Co. v. Newcare Health Corp.

(In re Newcare Health Corp.), 244 B.R. 167, 171 (B.A.P. 1st Cir. 2000); see also In re Quigley Co., 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008); SWE & C Liquidating Trust v. Saudi Arabian Oil Co. (In re Stone & Webster, Inc.), 373 B.R. 353, 361 (Bankr. D. Del. 2007), aff'd, 2008 WL 4890896 (D. Del. Nov. 12, 2008). Prudential standing requires a claimant to demonstrate that "his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked." Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012) (quoting Pagán v. Calderón, 448 F.3d 16, 27 (1st Cir. 2006)).

The Court will first address UTIER and Windmar's standing. The Oversight Board argues that Windmar and UTIER have failed to demonstrate that assumption of the Contracts would cause them a pecuniary injury. (Reply ¶ 43.) Moreover, the Oversight Board alleges that Windmar and UTIER's "true concerns" are primarily "policy and business" interests rather than injuries arising out of their status as creditors. (Reply ¶¶ 43-44.) According to the Oversight Board, Windmar and UTIER therefore lack a legally protected grievance underlying their objections, and do not have standing to object at all.

UTIER and Windmar assert that they are creditors of PREPA or are acting on behalf of creditors of PREPA. Windmar has filed an amended proof of claim asserting claims of $6,484,105.70 against PREPA arising out of alleged breaches of contracts. UTIER is a labor union representing certain PREPA workers and retirees, and it has filed a proof of claim asserting over $2.3 billion of claims against PREPA. As such, Windmar and UTIER are creditors of PREPA or represent the interests of creditors of PREPA, and they are parties in interest within the meaning of Section 1109 of the Bankruptcy Code.

Moreover, as creditors or parties representing the interests of creditors, Windmar and UTIER have a stake in PREPA's Title III case; they are reliant on PREPA for payment of their claims, and they will suffer an injury to the extent that PREPA lacks resources to pay those debts. Section 365(a) is a provision intended to empower trustees (or, here, the Oversight Board) to "maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not," L.R.S.C. Co. v. Rickel Home Centers (In re Rickel Home Centers, Inc.), 209 F.3d 291, 298 (3d Cir. 2000), and creditors like UTIER and Windmar are among the potential beneficiaries of such value maximization.

UTIER and Windmar's allegations that PREPA has made ill-advised strategic decisions in its negotiation of the Contracts and that assumption of the Contracts would be, for a wide range of reasons, financial disadvantageous for PREPA, are consistent with the creditor concerns that are within the zone of interests covered by Section 365(a). Cf. Costa v. Marotta, Gund, Budd & Dzera, LLC, 281 F. App'x 5, 6 (1st Cir. 2008) ("As a creditor, Costa had standing to advance such objections as a basis for seeking denial (or disgorgement) of the requested fees."); Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 388 (2d Cir. 1997) (holding that creditors had standing to challenge sale order where they "declare[d] that Guccio Gucci's conduct diminished the value of the estate's assets, thereby limiting their recovery as creditors"). Moreover, when a debtor is authorized to assume a contract, "[a]ssumption not only requires cure, but it subjects the estate to potential administrative liability for failure of future performance, thus priming the claims of general unsecured creditors." McLean Indus., Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.), 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989). These pecuniary concerns are adequate to confer standing on UTIER and Windmar.

The Oversight Board disputes UTIER's and Windmar's merits arguments and maintains that those arguments are not relevant to the ultimate determination that the Court must make with respect to the Motion.  The Oversight Board also disputes the relevance of certain other arguments raised by Windmar and UTIER concerning, among other topics, Puerto Rico's energy and environmental policies.   The Oversight Board's arguments regarding the merits and relevance of objections are not proper bases for categorically denying the standing of objecting parties to raise arguments in the first place.  The Court therefore rejects the Oversight Board's contention that UTIER and Windmar lack standing to object to the Motion.

The other group of Objectors is comprised of environmental groups that filed a joint objection to the Motion with UTIER.  Unlike UTIER and Windmar, however, the Environmental Groups have not asserted interests in PREPA's Title III case as creditors; rather, they allege that their injuries and stake in the Motion arise from the environmental and public policy interests affected by the Contracts and from the fact that their members are ratepayers who rely on PREPA for energy.

Because the Environmental Groups filed their objection jointly with UTIER and because their objections largely overlap with the arguments raised by Windmar, their interests are adequately represented by the participation of UTIER and Windmar.  In the exercise of its reasoned discretion, the Court may choose to address the merits of the Motion before addressing standing issues.  See Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006) ("There is no . . . rule that demands the resolution of objections based on prudential [standing] concerns before other issues can be adjudicated."); see also McBee v. Delica Co., 417 F.3d 107, 127 (1st Cir. 2005) ("[W]e do not wish to force . . . courts to reach more difficult issues when there is an exceptionally easy method—on the merits—for the defendant to prevail.").  Because the Court's

adjudication of the Motion will require it to address the arguments raised jointly by UTIER and the Environmental Groups, the Court finds it unnecessary to address the Environmental Groups' standing at this juncture.

2.  Applicability of Section 365(a) to the Contracts

The Objecting Parties contend that the Contracts cannot be assumed pursuant to Section 365(a) because PREPA's post-petition execution of the Contracts extinguished the Pre-Restatement Contracts and created new post-petition obligations. (UTIER Obj. ¶¶ 56-57; Windmar Obj. at 4.) The Oversight Board has not disputed the premise that Section 365(a) is inapplicable to post-petition Contracts; instead, the Oversight Board posits that PREPA and the counterparties to the Contracts merely amended the terms of preexisting prepetition executory agreements such that the Contracts do not constitute new agreements. (Reply ¶ 28.)

Section 365(a) of the Bankruptcy Code provides, in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C.A. § 365(a) (Westlaw through P.L. 116-143).[5] The application of Section 365(a) is limited to contracts that existed as of the petition date. See In re Leslie Fay Cos., Inc., 168 B.R. 294, 300 (Bankr. S.D.N.Y. 1994) ("There are cases which have addressed the question of whether section 365 applies to postpetition agreements; the learning from these cases is that contracts . . . entered into postpetition are not subject to rejection under section 365."); see also Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d 291, 295 (1st Cir. 2004) ("Section 365 generally allows the trustee in bankruptcy—or, as in

---

[5] In a case commenced under Title III of PROMESA, the term "trustee," as used in Section 365(a) of the Code, refers to the Oversight Board. See 48 U.S.C. § 2161(c)(7).

this case, the debtor-in-possession—to assume or reject any pre-petition executory contract or unexpired lease, subject to the approval of the bankruptcy court.").

Under Puerto Rico law, "[a]n obligation may be modified by changing its object or principal conditions, yet, in order for it to be extinguished and substituted by another, it is necessary that it be so expressly declared or that the old and new obligations be totally incompatible." Francisco Garraton, Inc. v. Lanman & Kemp-Barclay & Co. Inc., 559 F. Supp. 405, 407 (D.P.R. 1983); see also 31 L.P.R.A. § 3242 ("In order that an obligation may be extinguished by another which substitutes it, it is necessary that it should be so expressly declared, or that the old and new be incompatible in all points.").

"The Civil Code of Puerto Rico establishes stringent requirements for novation. While . . . the extinction of a principal obligation also extinguishes all accessory obligations, not every modification of an agreement produces extinction." FDIC v. P.L.M. Int'l, Inc., 834 F.2d 248, 251 (1st Cir. 1987) (citation omitted). Moreover, "novation is never presumed, but . . . it must be established without any trace of doubt. We have also established that novation is always a question of intention, and that such intention must be inferred from the surrounding circumstances of each particular case." Warner Lambert Co. v. Tribunal Superior, 1 P.R. Offic. Trans. 527, 544 (P.R. 1973).

The Contracts do not express an intention to extinguish the Pre-Restatement Contracts. Rather, the Contracts state that the parties' intention is "to agree to amend and restate the Pre-Restatement PPOA in its entirety" (ECO PPOA at 3-4), and to "enter into this Agreement, which amends and restates the Pre-Restatement GSPA in its entirety." (Naturgy GSPA at 2.) The parties' intention to avoid entry into a new post-petition agreement is further reflected in the conditions precedent applicable to each of the Contracts: the parties agreed that

the Contracts cannot become effective until the Court enters an order providing for the assumption of the Contracts, a condition that will be impossible to fulfill if the Contracts are new post-petition agreements. (See Naturgy GSPA at 3, 14 (requiring "entry of the Assumption Order by the PROMESA Court"); ECO PPOA at 5, 18 (requiring that "the Assumption Order shall have been entered by the PROMESA Court and become a Final Order").)

Mere modification of terms is not enough to extinguish obligations. See 31 L.P.R.A. § 3241 (providing that obligations may be modified "[b]y the change of their object or principal conditions"); Francisco Garraton, Inc., 559 F. Supp. at 407. Although the Objecting Parties argue that the terms of the Contracts are so different from the terms of the Pre-Restatement Contracts that their execution effectuates a tacit novation (see, e.g., UTIER Opp. ¶ 73; Windmar Opp. at 5), the changes to the obligations do not "meet the high standard of complete incompatibility" required under Puerto Rico law. FDIC v. P.L.M. Int'l, Inc., 834 F.2d at 251. Rather, the Contracts maintain and extend the same fundamental relationship among the parties: PREPA purchases electrical generation capacity from ECO and LNG from Naturgy.

Finally, although Windmar has referenced a November 4, 2019, letter from PREPA's executive director to the Puerto Rico Energy Bureau ("PREB") which states that the ECO PPOA "restructure[s]" the Pre-Restatement ECO PPOA by "convert[ing] the [Pre-Restatement] ECO PPOA into a tolling arrangement" and that the Naturgy GSPA "can be considered a new contractual obligation for PREPA" (Windmar Opp. at 5-6), the proffered quotations are not a proper basis for determining whether the Contracts, as a legal matter, continue or extinguish obligations because, as demonstrated above, their texts unambiguously contemplate the continuation and modification—rather than the extinguishment—of the Pre-Restatement Contracts. See Vulcan Tools of P.R. v. Makita U.S.A., Inc., 23 F.3d 564, 567 (1st

Cir. 1994) ("When an agreement leaves no doubt as to the intention of the parties, a court should not look beyond the literal terms of the contract."). The creation of new obligations does not necessarily extinguish prior ones; the Puerto Rico Civil Code expressly contemplates non-extinctive modifications that "change" the "object or principal conditions" of prior obligations. See 31 L.P.R.A. § 3241. Windmar's quotations from the letter to PREB are insufficient to demonstrate either an express intention of the parties to extinguish prior obligations or any complete incompatibility between the prior and current obligations.

Accordingly, the Contracts are prepetition executory contracts that can be assumed pursuant to Section 365(a) of the Code. The Court now turns to the parties' arguments concerning the standard of review applicable to, and the merits of, the proposed assumption.

3. The Standard Applicable to the Motion

The Court will next address the dispute between the Oversight Board, on the one hand, and UTIER and the Environmental Groups, on the other, concerning the standard applicable to the Court's review of the Motion. The Oversight Board contends that the Court should apply the deferential business judgment test that courts ordinarily apply to requests to assume or reject contracts pursuant to Section 365(a). (Mot. ¶ 19.) UTIER and the Environmental Groups argue that the Court should apply a stricter standard that weighs "(1) PREPA's business interests, (2) the interests of Title III creditors, (3) the interests of the consumers and ratepayers, (4) the environmental impact of the ARAs and . . . (5) the public interest, including Puerto Rico's economic stability." (UTIER Opp. ¶ 87.)

"By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a

fresh start.'" Eagle Ins. Co. v. BankVest Capital Corp. (In re BankVest Capital Corp.), 360 F.3d 291, 296 (1st Cir. 2004) (quoting Gannett v. Carp (In re Carp), 340 F.3d 15, 25 (1st Cir. 2003)). Although the Bankruptcy Code does not prescribe a standard applicable to a court's review of a motion under Section 365(a), courts typically apply a deferential business judgment standard. Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 879 F.3d 389, 394 (1st Cir.), rev'd and remanded on other grounds, 139 S. Ct. 1652 (2019). In certain limited circumstances, however, courts have applied a stricter standard that scrutinizes a broader range of equities in determining whether a contract may be rejected pursuant to Section 365(a).[6] See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 525-26 (1984) (rejection of collective bargaining agreement); In re Mirant Corp., 378 F.3d 511, 525 (5th Cir. 2004) (rejection of contract for wholesale interstate sale of electricity). UTIER and the Environmental Groups argue that the stricter test is appropriate here because of PREPA's "unique role" as "the main energy provider and exclusive distributor of energy in Puerto Rico" and the attendant public interest in PREPA's decisions. (UTIER Opp. ¶¶ 44-46.)

        The seminal case establishing the balance of equities standard with respect to certain executory contracts is the Supreme Court's decision in Bildisco. In Bildisco, the Supreme Court held that the business judgment test was inapplicable to motions seeking authorization to reject collective bargaining agreements. 465 U.S. at 525-26. Instead, the Court held, a debtor seeking to reject a collective bargaining agreement first would have to demonstrate that "reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution," id. at 526, and then would have to show that "the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities

---

[6]     For ease of reference, the Court will refer to this approach as the "balance of equities" standard.

balance in favor of rejecting the labor contract." Id. In doing so, the Supreme Court adopted the standard for the rejection of collective bargaining agreements set forth by the Third Circuit and the Eleventh Circuit in NLRB v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72 (3d Cir. 1982) and In re Brada Miller Freight Sys., Inc., 702 F.2d 890 (11th Cir. 1983), respectively. See Bildisco, 465 U.S. at 525-26 ("We agree with the Court of Appeals below, and with the Court of Appeals for the Eleventh Circuit in in a related case, In re Brada-Miller Freight System, Inc., 702 F.2d 890 (1983) . . . .").

The Supreme Court's departure from the ordinary business judgment standard applicable to most Section 365(a) motions recognized, like the approach that had previously been taken by several circuit courts, the "special nature of a collective-bargaining contract" under federal law. Id. at 524; see also In re Brada Miller Freight Sys., Inc., 702 F.2d at 897 (stating that the "minimal burden" of "showing that rejection would benefit the estate" is "insufficient to protect the special rights accruing to employees under the federal labor laws"); Shopmen's Local Union No. 455 v. Kevin Steel Prod., Inc., 519 F.2d 698, 706 (2d Cir. 1975) ("[B]ecause of the importance of the policies behind the [National Labor Relations] Act, bankruptcy courts must scrutinize with particular care petitions to reject collective bargaining agreements . . . ."). Application of heightened scrutiny to the rejection of collective bargaining agreements allowed courts to "reconcile the apparent conflict between the NLRA"—which "provides that no party to a collective bargaining agreement may 'terminate or modify' the agreement without following a specified procedure"—with the deferential standard that is generally applicable to the rejection of executory contracts pursuant to Section 365(a). In re Bildisco, 682 F.2d at 78.

Here, in contrast, UTIER and the Environmental Groups have not identified any comparable federal or Commonwealth policy that would be circumvented by the Court's

application of the deferential standard that is typically applicable to contract assumption motions, nor have UTIER and the Environmental Groups identified any indication of congressional intent to vary that deferential standard. Cf. Bildisco, 465 U.S. at 526 ("The standard which we think Congress intended is a higher one than that of the 'business judgment' rule . . . ."); see also In re Brada Miller Freight Sys., Inc., 702 F.2d at 896 ("[T]his Court finds it more beneficial to recognize the conflict in the statutory language and attempt to reconcile the statutes in a manner which best effectuates the intent of Congress."). Instead, UTIER and the Environmental Groups argue that the higher standard is warranted because PREPA and its decisions are important to its many stakeholders and, more broadly, to the "entire population of Puerto Rico." (UTIER Opp. ¶ 46.) The Supreme Court's decision in Bildisco does not extend so far as to support the notion that any contract assumption that may have a significant public impact must be subjected to a higher standard of scrutiny; many decisions taken by many debtors (including the debtors in the above-captioned Title III cases) can have far-reaching consequences for their stakeholders. Cf. In re Pilgrim's Pride Corp., 403 B.R. 413, 425 (Bankr. N.D. Tex. 2009) ("If the bankruptcy court must second-guess every choice by a trustee or debtor in possession that may economically harm any given locale, the business judgment rule applicable to contract rejection and many other decisions in the chapter 11 process will be swallowed by a public policy exception."). Notwithstanding this reality, Congress has only rarely modified the application of Section 365 to provide for different standards or procedures for assumption or rejection of particular types of contracts. Cf. Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.), 330 F.3d 36, 44 (1st Cir. 2003) ("[I]n response to Bildisco, Congress amended the Code by adding 11 U.S.C. § 1113, which provides special treatment for collective bargaining agreements. . . . Congress's familiarity with Bildisco and its failure to provide special treatment to garden

variety employment contracts indicates that Congress intended that employment contracts be subject to the general principles governing executory contracts outlined in Bildisco.").

Furthermore, although UTIER and the Environmental Groups have cited In re Mirant Corp., 378 F.3d 511 (5th Cir. 2004) and In re FirstEnergy Solutions Corp., 945 F.3d 431 (6th Cir. 2019) in arguing that the Court should apply the stricter level of review with respect to motions concerning the sale and transmission of electricity (UTIER Opp. ¶¶ 82, 85), those cases do not carve out energy supply as a general category requiring heightened scrutiny.  Rather, the courts in those cases imposed the balance of equities standard where application of the business judgment standard would have circumvented the public interest-oriented statutory scheme which was established by Congress in the Federal Power Act (the "FPA") and which ordinarily is overseen by the Federal Energy Regulatory Commission ("FERC").  See In re Mirant, 378 F.3d at 525 ("The FPA and the filed rate doctrine protect the public interest by imposing severe limitations upon a public utility's ability to alter the terms of those contracts after they are certified by FERC. . . .  [The filed rate] doctrine does not allow FERC to change a filed rate based upon the purely private concern that the rate 'is unprofitable to the public utility.'"); see also In re FirstEnergy Sols. Corp., 945 F.3d 431, 454 (6th Cir. 2019) ("We conclude that an adjusted standard best accommodates the concurrent jurisdiction between, and separate interests of, the Bankruptcy Code (court) and the FPA (FERC).").  Thus, while the Mirant court recognized the "public interest inherent in the transmission and sale of electricity," 378 F.3d at 525, the legal significance of that public interest in the Section 365 context arose from potential circumvention of a specific federal regulatory scheme that itself required consideration of the public interest.  Id. ("Clearly the business judgment standard normally applicable to rejection motions is more deferential than the public interest standard applicable in FERC proceedings to

alter the terms of a contract within its jurisdiction. Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity."); see also In re FirstEnergy Sols. Corp., 945 F.3d at 454 ("[W]hen a Chapter 11 debtor moves the bankruptcy court for permission to reject a filed energy contract that is otherwise governed by FERC, via the FPA, the bankruptcy court must consider the public interest and ensure that the equities balance in favor of rejecting the contract.").

FERC is not the relevant regulator with respect to the Contracts at issue here, and the public regulator with jurisdiction over the Contracts pursuant to Commonwealth law, PREB, has approved the Contracts. Furthermore, to the extent that PREB's decision is not yet final, the proposed form of order submitted by the Oversight Board would preserve PREB's authority with respect to the Contracts. Accordingly, there are no circumstances warranting the extension of the Bildisco balance of equities standard to the instant matter.

4. Application of the Business Judgment Standard

"A motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." In re Vent Alarm Corp., No. 15-09316-MCF11, 2016 WL 1599599, at *3 (Bankr. D.P.R. Apr. 18, 2016). Instead, "a debtor must simply put forth a showing that assumption or rejection of the executory contract or unexpired lease will benefit the Debtor's estate." Id. "A court will generally not second-guess a debtor's business judgment regarding whether the assumption or rejection of a contract will benefit the debtor's estate." In re Genco Shipping & Trading Ltd., 509 B.R. 455, 463 (Bankr. S.D.N.Y.

2014). Significantly, the "scope of [a court's] inquiry regarding the business judgment standard . . . does not include an evaluation of whether the Debtors made the <u>best or even a good</u> business decision but merely that the decision was made in an exercise of the Debtors' business judgment." <u>In re Old Carco LLC</u>, 406 B.R. 180, 196 (Bankr. S.D.N.Y. 2009); <u>see also</u> <u>In re Trans World Airlines, Inc.</u>, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'") (quoting <u>In re Wheeling–Pittsburgh Steel Corp.</u>, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987)).

Here, the Oversight Board has met its burden of demonstrating that the assumption of the Contracts is a sound exercise of PREPA's business judgment and not the product of bad faith, whim, or caprice. <u>See</u> <u>In re Genco Shipping & Trading Ltd.</u>, 509 B.R. at 463.

The Contracts were the subject of a lengthy negotiation and approval process, including review and approval by PREPA's governing board, the Oversight Board, and PREB. (<u>See</u> Padilla Decl. ¶ 9; <u>see also</u> Reply ¶ 23.) PREPA engaged the engineering firm Sargent & Lundy, whose analysis concluded that the Contracts would allow PREPA to meet the savings targets contained in PREPA's fiscal plan (<u>see</u> Docket Entry No. 1974-2 at pp. 36 of 67), thereby benefitting PREPA. The Oversight Board's review of the Contracts also concluded that they produced savings compared to the Pre-Restatement Contracts. (Padilla Decl. ¶ 9; <u>see also</u> Windmar Obj. at 14-15 (stating that the Oversight Board's review and approval of the Contracts was limited to compliance with the fiscal plan savings targets).) Furthermore, the Contracts lock in PREPA's contractual relationships with Naturgy and ECO until 2032, ensuring PREPA's long-term ability to provide electricity to its customers notwithstanding the expiration of the Pre-

Restatement Contracts and Naturgy's control of the LNG terminal facility in Peñuelas. (Padilla Decl. ¶ 10.) According to the Padilla Declaration, there are no current outstanding defaults under the Contracts that will require PREPA to pay cure costs in order to assume the Contracts. (Padilla Decl. ¶ 15.) The Court finds, based on this record, that PREPA's decision to assume the Contracts was the product of, and falls within the exercise of, reasoned business judgment.

The concerns expressed by the Objecting Parties regarding the substantive wisdom of the terms of the Contracts and the policy decisions underlying the Contracts (such as, for example, Puerto Rico's continued reliance on fossil fuels) do not justify a departure from the business judgment rule, and the Court thus will not second-guess the decisions made by PREPA in its negotiation and execution of the Contracts. That conclusion is especially relevant where, as here, the Contracts have been approved by the regulator that has been tasked by the Commonwealth with ensuring that the Contracts are consistent with Commonwealth laws.

CONCLUSION

For the foregoing reasons, the Court will enter a separate order granting the Motion.

Dated: June 22, 2020

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge