UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------x

In re:                                                                     PROMESA
                                                                           Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of                                         No. 17 BK 3283-LTS

THE COMMONWEALTH OF PUERTO RICO                                            (Jointly Administered)
et al.,

          Debtors.[1]

-----------------------------------------------------------x

OPINION AND ORDER IN CONNECTION
WITH PRELIMINARY HEARING REGARDING MOTION CONCERNING
APPLICATION OF THE AUTOMATIC STAY TO THE REVENUES SECURING THE CCDA BONDS

---

[1]      The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

APPEARANCES:

FERRAIUOLI LLC

By:      Roberto Cámara-Fuertes
         Sonia Colón
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917

MILBANK LLP

By:      Dennis F. Dunne
         Atara Miller
         Grant R. Mainland
         John J. Hughes, III
55 Hudson Yards
New York, NY 10001

ARENT FOX LLP

By:      David L. Dubrow
         Mark A. Angelov
1301 Avenue of the Americas
New York, NY 10019

         and

         Randall A. Brater
1717 K Street, N.W.
Washington, DC 20006

*Attorneys for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

By:      María E. Picó
802 Ave. Fernández Juncos
San Juan, PR 00907

BUTLER SNOW LLP

By:      Martin A. Sosland
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240

         and

         Jason W. Callen
150 3rd Ave., S., Suite 1600
Nashville, TN 37201

*Attorneys for Financial Guaranty Insurance
Company*

O'NEILL & BORGES LLC

By:      Hermann D. Bauer
         Gabriel A. Miranda
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP

By:      Martin J. Bienenstock
         Jeffrey Levitan
         Timothy W. Mungovan
         Ehud Barak
Eleven Times Square
New York, NY 10036

         *and*

         Michael A. Firestein
         Lary Alan Rappaport
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

         *and*

         Colin R. Kass
1001 Pennsylvannia Ave., N.W.
Washington, DC 20004

*Attorneys for the Financial Oversight and
Management Board as Representative of the
Commonwealth*

MARINI PIETRANTONI MUÑIZ LLC

By:      Luis C. Marini-Biaggi
         Carolina Velaz-Rivero
250 Ponce de León Ave., Suite 900
San Juan, PR 00918

O'MELVENY & MYERS LLP

By:      John J. Rapisardi
7 Times Square
New York, NY 10036

         *and*

         Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

         *and*

Case:17-03283-LTS   Doc#:13540   Filed:07/02/20   Entered:07/02/20 08:44:23   Desc: Main
Document   Page 3 of 41


CASELLAS ALCOVER & BURGOS P.S.C.

By:   Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936

CADWALADER, WICKERSHAM & TAFT LLP

By:   Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        William J. Natbony
        Ellen M. Halstead
        Thomas J. Curtin
        Casey J. Servais
200 Liberty Street
New York, NY 10281

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

SEPULVADO, MALDONADO & COURET

By:   Albéniz Couret Fuentes
304 Ponce de León Ave. Suite 990
San Juan, PR 00918

REED SMITH LLP

By:   Eric A. Schaffer
        Luke A. Sizemore
        Jared S. Roach
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

*Attorneys for The Bank of New York Mellon*

    Elizabeth L. McKeen
    Ashley M. Pavel
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

CASILLAS, SANTIAGO & TORRES LLC

By:   Juan J. Casillas Ayala
        Israel Fernández Rodríguez
        Juan C. Nieves González
        Cristina B. Fernández Niggemann
P.O. Box 195075
San Juan, PR 00919

PAUL HASTINGS LLP
By:   Luc A. Despins
        James R. Bliss
        James B. Worthington
        G. Alexander Bongartz
200 Park Avenue
New York, NY 10166

*Attorneys for the Official Committee of Unsecured Creditors*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is *Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon's Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds* (Docket Entry No. 10104 in Case No. 17-3283,[2] the "CCDA Stay Relief Motion").  Through the CCDA Stay Relief Motion, Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Assured Guaranty Corp. ("AGC"), Assured Guaranty Municipal Corp. (together with AGC, "Assured"), and the Bank of New York Mellon ("BONY"), in its capacity as trustee (the "Trustee") to the holders of bonds issued by the Puerto Rico Convention Center District Authority ("CCDA") (collectively, the "CCDA Movants"), seek a declaration that the automatic stay imposed by Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")[3] does not apply to an anticipated lawsuit (the "CCDA Enforcement Action") against CCDA and the Puerto Rico Tourism Company (the "Tourism Company"), among other defendants, relating to bonds issued by CCDA.  In the alternative, the CCDA Movants seek relief from the automatic stay pursuant to subsections 362(d)(1) and 362(d)(2) of the Bankruptcy Code, 11 U.S.C. §§ 362(d)(1), (2),[4] in order to pursue the CCDA Enforcement Action.  Further in the alternative, the CCDA Movants seek an order directing the Commonwealth to provide adequate protection for their alleged collateral.

---

[2]     All docket entry references herein are to entries in Case No. 17-3283, unless otherwise specified.

[3]     PROMESA is codified at 48 U.S.C. §§ 2101 et seq.  References to "PROMESA" sections in this Opinion and Order are to the uncodified version of the statute.

[4]     The provisions of the Bankruptcy Code cited herein are made applicable in these Title III cases by section 301(a) of PROMESA.  See 48 U.S.C. § 2161.

On June 4, 2020, the Court held a preliminary hearing (the "Preliminary Stay

Relief Hearing") on the CCDA Stay Relief Motion, as well as on two similar stay relief motions

relating to bonds issued by the Puerto Rico Highways and Transportation Authority and the

Puerto Rico Infrastructure Financing Authority,[5] respectively, pursuant to subsection 362(e)(1)

of the Bankruptcy Code, 11 U.S.C. § 362(e)(1), "to determine whether the movants have

standing to sue and security or other property interests in the relevant revenues."  (*Final Case

Management Order for Revenue Bonds*, Docket Entry No. 12186, the "Revenue Bonds Order," ¶

1.d.)  In light of the limited scope of the Preliminary Stay Relief Hearing as established by the

Revenue Bonds Order, the parties' arguments with respect to the CCDA Stay Relief Motion have

to date focused largely on the applicability of the automatic stay to the CCDA Enforcement

Action and the nature and extent of the CCDA Movants' alleged property interest in certain hotel

tax revenues that had previously been used to make payments to holders of the CCDA Bonds.

The Court has considered carefully all of the arguments and submissions made in

connection with the CCDA Stay Relief Motion.[6]  The Court has subject matter jurisdiction of

---

[5]     See *Motion of Assured Guaranty Corp., Assured Guaranty Municipal Corp., Ambac
Assurance Corporation, National Public Finance Guarantee Corporation, and Financial
Guaranty Insurance Company for Relief from the Automatic Stay, or, in the Alternative,
Adequate Protection* (Docket Entry No. 10102, the "HTA Stay Relief Motion");
*Amended Motion of Ambac Assurance Corporation, Financial Guaranty Insurance
Company, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and U.S. Bank
Trust National Association, Concerning Application of the Automatic Stay to the
Revenues Securing PRIFA Rum Tax Bonds* (Docket Entry No. 10602, collectively with
the CCDA Stay Relief Motion and the HTA Stay Relief Motion, the "Stay Relief
Motions").

[6]     In addition to the CCDA Stay Relief Motion, the Court has carefully reviewed the
following pleadings: the *Opposition of Commonwealth of Puerto Rico to Motion of
Ambac Assurance Corporation, Financial Guaranty Insurance Company, Assured
Guaranty Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon
Concerning Application of the Automatic Stay [ECF No. 10104]* (Docket Entry No.
10615, the "Opposition"); the *Partial Joinder of Official Committee of Unsecured
Creditors in Support of Opposition of Commonwealth of Puerto Rico to Motion of Ambac*

---

this contested matter pursuant to 48 U.S.C. § 2166(a).  For the following reasons, the Court

concludes that (i) the CCDA Enforcement Action is subject to the automatic stay, (ii) the CCDA

Movants have a colorable claim to a security interest in funds deposited in the Transfer Account

(as defined herein), and (iii) the CCDA Movants have shown a reasonable likelihood that the

Tourism Company bank account at Scotiabank Puerto Rico with an account number ending in

"5142" ("Scotiabank -5142") is the Transfer Account and, thus, the CCDA Movants have a

colorable claim to a security interest in the funds that have been deposited therein.

---

*Assurance Corporation, Financial Guaranty Insurance Company, Assured Guaranty
Corp., Assured Guaranty Municipal Corp., and the Bank of New York Mellon
Concerning Application of the Automatic Stay [ECF No. 10104]* (Docket Entry No.
10636, the "UCC Joinder"); *AAFAF's Limited Joinder to the Opposition of Financial
Oversight and Management Board for Puerto Rico to Motion of Assured Guaranty Corp.,
Assured Guaranty Municipal Corp., Ambac Assurance Corporation, National Public
Finance Guarantee Corporation, and Financial Guaranty Insurance Company for Relief
from the Automatic Stay, or, in the Alternative, Adequate Protection [ECF No. 10104]*
(Docket Entry No. 10640, the "AAFAF Joinder"); *Ambac Assurance Corporation,
Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured Guaranty
Municipal Corp., and the Bank of New York Mellon's Reply in Further Support of Their
Motion Concerning Application of the Automatic Stay to the Revenues Securing the
CCDA Bonds* (Docket Entry No. 13313, the "Reply"); the *Sur-Reply of the
Commonwealth of Puerto Rico in Opposition to Motion of Ambac Assurance
Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured
Guaranty Municipal Corp., and the Bank of New York Mellon Concerning Application of
Automatic Stay [ECF No. 10104]* (Docket Entry No. 13160, the "Sur-Reply"); the
*Limited Joinder of Official Committee of Unsecured Creditors in Support of Sur-Reply of
the Commonwealth of Puerto Rico in Opposition to Motion of Ambac Assurance
Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured
Guaranty Municipal Corp., and the Bank of New York Mellon Concerning Application of
Automatic Stay [ECF No. 10104]* (Docket Entry No. 13168); and *Ambac Assurance
Corporation, Financial Guaranty Insurance Company, Assured Guaranty Corp., Assured
Guaranty Municipal Corp., and the Bank of New York Mellon's Response to the
Oversight Board's Sur-Reply in Further Support of Their Motion Concerning Application
of the Automatic Stay to the Revenues Securing the CCDA Bonds* (Docket Entry No.
13225, the "Sur-Sur-Reply").  The Court has also reviewed the declarations and exhibits
filed in connection with the aforementioned pleadings as well as the *Joint Informative
Motion Regarding the Treatment of Exhibits Submitted in Connection with the Lift Stay
Motions* (Docket Entry No. 13413).

I.

BACKGROUND

The following facts are undisputed, unless otherwise indicated.

The Tourism Company is a public corporation and instrumentality of the Government of the Commonwealth of Puerto Rico that was created under the Puerto Rico Tourism Company Act on June 18, 1970.  See 23 L.P.R.A. § 671a.  On September 2, 2000, the Commonwealth created CCDA, through Act No. 351-2000 (the "CCDA Enabling Act"), for the primary purpose of financing, constructing, and operating a convention center located in San Juan, Puerto Rico (the "Convention Center").  See 23 L.P.R.A. §§ 6401, 6402, 6404.  On September 9, 2003, the Commonwealth enacted Act No. 272 (the "Hotel Tax Act") to facilitate financing of the Convention Center.  See 13 L.P.R.A. § 2271 et seq.  CCDA subsequently issued bonds in the principal amount of approximately $469 million (the "CCDA Bonds") on March 24, 2006.  (See Mot. ¶ 14.)  According to the CCDA Stay Relief Motion, Ambac, FGIC, and Assured collectively insure 100% of the outstanding CCDA Bonds, totaling approximately $349 million in gross par value.  (Mot. ¶ 62.)

A.     The Hotel Tax Act

The Hotel Tax Act, inter alia, authorizes and directs the Tourism Company to impose and collect hotel occupancy taxes from hoteliers (the "Hotel Taxes") in the amounts specified therein.  See 13 L.P.R.A. § 2271o(b); see also id. § 2271a(a) (vesting the Tourism Company with the power to "[d]etermine, assess, impose, collect, enforce, regulate, and distribute" the Hotel Taxes).  Section 2271v of the Hotel Tax Act, entitled "Disposition of funds," dictates the manner of distribution of all Hotel Taxes upon their collection by the Tourism Company.  Pursuant to that provision, prior to the start of each fiscal year, the

Government Development Bank for Puerto Rico ("GDB") "shall determine and certify to the
[Tourism] Company and to [CCDA], the amount necessary for [CCDA] to make, during such
fiscal year and the first day of the following fiscal year . . . [f]ull and timely payment" on bonds
issued by CCDA "with the prior written authorization of the [Tourism] Company, to exclusively
carry out the development and construction of a new convention center and its related
infrastructure," among other related amounts.  Id. § 2271v(a)(1)-(4).  That amount "shall be
deposited in a special account to be maintained by [GDB] in the name of [CCDA] for the benefit
of the bondholders, noteholders or the holders of other obligations of [CCDA] . . . ."  Id. §
2271v(a).  GDB shall then "transfer the amounts deposited in such special account to the trustees
of the bondholders, noteholders or the holders of other obligations of [CCDA] . . . in accordance
with the written instructions provided to [GDB] by [CCDA]."  Id.

       Subsection 2271v(a) of the Hotel Tax Act specifies that the Tourism Company
"shall transfer to [GDB], for deposit in such special account," the required amounts "through
monthly transfers . . . of an amount equal to one tenth (1/10) of the amount determined and
certified by [GDB] as necessary for the payments to which the first part of this subsection
refers."  Id.  If the Hotel Taxes collected in any given month are insufficient to cover the required
monthly payments by the Tourism Company to GDB, the Tourism Company shall transfer to
GDB, "for deposit in such special account, the amount of such deficiency using to cover such
deficiency, the excess of the tax collected in subsequent months over the amount to be deposited
monthly in such subsequent months . . . ."  Id.  "Each month, after making the [required] transfer
. . . to [GDB] . . . , the [Tourism] Company shall distribute any remaining amount" for certain
other purposes enumerated in subsection 2271v(b) that are unrelated to the CCDA Bonds.  Id.

CCDA is authorized by the Hotel Tax Act, "with the prior written consent of the [Tourism] Company, to pledge or otherwise encumber the revenues product of the fixed tax collected which is to be deposited in [the above-referenced] special account . . . as security for the payment of the principal and interest on the bonds, notes or other obligations issued, assumed or incurred by" CCDA.  Id.  However, such pledge or obligation

> shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico.[7]  The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes. Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations . . . .

Id.  If "the total product of the [Hotel Taxes] presently assigned or to be assigned in the future to" CCDA "is used to service payments of the public debt and applied to cover the deficiencies in the amounts needed to make such payments, the amounts of" the Hotel Taxes used to cover such deficiency "shall be reimbursed to [CCDA] out of the first revenues received in the next fiscal year or subsequent fiscal years . . . from any remaining portion of the tax then in effect, subject to the provisions of Section 8 of Article VI . . . ."  Id.

---

[7]     Article VI, Section 8, of the Constitution of the Commonwealth of Puerto Rico provides: "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  Certain translations of the Spanish version of the Commonwealth Constitution, as well as the Hotel Tax Act and the Bond Documents, use the term "available resources" rather than "available revenues," when referring to Article VI, Section 8.  Because the parties to this motion practice have not substantively addressed the distinction between those two terms, solely for purposes of this Opinion and Order, the Court uses such terms as they are used in the relevant English versions of the documents.

Through the Hotel Tax Act, the Commonwealth "agree[d] and ma[de] a commitment with" holders of the CCDA Bonds that it will (i) "[n]ot reduce [the] tax and not decrease its rates, as fixed in § 2271o"; (ii) "not eliminate or reduce the tax to an amount lower than that established in § 2271o . . . or eliminate or reduce the rates of the tax fixed in § 2271o"; (iii) "make sure that the amounts that must be deposited in the special account [referenced above] . . . , are deposited in such special account as provided in this section"; and (iv) "not alter or limit the rights acquired hereby by [CCDA] to encumber or pledge the collections from the tax required to be deposited in the special account . . . and comply with the terms of any agreement entered into with, or for the benefit of the bondholders, noteholders or holders of other obligations" of CCDA.  Id.[8]

B.      The Bond Documents

In conjunction with the issuance of the CCDA Bonds, and in order to implement the above-referenced provisions of Hotel Tax Act, four separate agreements were executed: (i) the Assignment and Coordination Agreement between the Tourism Company and GDB (Docket Entry No. 10104-3, the "Assignment Agreement"); (ii) the Pledge and Assignment Agreement by and among CCDA, GDB, and JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Trustee (Docket Entry No. 10104-4, the "Pledge Agreement"); (iii) the Trust Agreement between CCDA and JPMorgan Chase, as Trustee (Docket Entry No. 10104-5, the "Trust Agreement"); and (iv) the First Supplemental Trust Agreement between CCDA and JPMorgan Chase, as Trustee

---

[8]      Similarly, in the CCDA Enabling Act, the Commonwealth "pledge[d] and agree[d] with the holders of any bonds issued under this chapter, and with those persons or entities that enter into contracts with [CCDA] pursuant to the provisions of this chapter, that it shall not limit nor alter the rights hereby conferred to [CCDA] until those bonds and the interest thereon are paid in full and said contracts are fully executed and honored by [CCDA]."  23 L.P.R.A. § 6450.

(Docket Entry No. 10615-4, the "Supplemental Trust Agreement").[9]

       1.   <u>The Assignment Agreement</u>

       Through the Assignment Agreement, the Tourism Company "creat[ed] a special fund called the Assignment and Coordination Agreement Holding Fund (the 'Holding Fund')" into which "[a]ll Hotel [Taxes] . . . will be deposited, as collected . . . ."  (Assignment Agreement § 1.)  The Holding Fund is comprised of "the Transfer Account and the Surplus Account."  (<u>Id.</u> § 2.)  Consistent with the Hotel Tax Act, the Assignment Agreement provides that, "[o]n a monthly basis, all Hotel Occupancy Tax Funds received by the Tourism Company shall be deposited in the Transfer Account" until certain conditions are met.[10]  (<u>Id.</u> § 4.)  "Thereafter, and only when the Transfer Account contains all moneys necessary to pay the bonds . . . , the Tourism Company shall deposit any excess funds into the Surplus Account, which account shall be available to be utilized in accordance with [13 L.P.R.A. § 2271v(b)]."  (<u>Id.</u>)

       The Tourism Company "[a]cknowledge[d], and agree[d] to comply with, its obligations under the [Hotel Tax Act] to transfer to GDB the monthly amounts required under" 13 L.P.R.A. § 2271v.  (<u>Id.</u> § 5.)  Additionally, the Tourism Company "[i]rrevocably pledge[d], assign[ed], transfer[red], convey[ed], grant[ed] and set[] over to GDB all rights it may legally have in amounts deposited in the Transfer Account collected by the Tourism Company as required under the provisions of . . . [13 L.P.R.A. § 2271v] up to the amounts certified by GDB . . . ."  (<u>Id.</u> § 6.)  The Tourism Company "[e]xpressly acknowledge[d] and consent[ed] to GDB

---

[9]     BONY is successor Trustee to JPMorgan Chase, as the original Trustee under the Trust Agreement.  (<u>See</u> Mot. ¶ 9.)

[10]    The Trust Agreement defines "Hotel Occupancy Tax Funds" as "all Hotel Occupancy Tax Revenues that are deposited in the Transfer Account" on and after March 24, 2006 (Trust Agreement § 1.01), and the Assignment Agreement and the Pledge Agreement incorporate the definitions in the Trust Agreement (Assignment Agreement at 1; Pledge Agreement § 1).

entering into that certain Pledge Agreement with [CCDA] and the Trustee . . . under which the
Hotel Occupancy Tax Funds transferred to GDB hereunder will be further pledged by [CCDA]
and transferred from GDB to the Trustee for the benefit of the [o]wners of the [CCDA] Bonds."
(Id. § 7.)

        Consistent with the provisions of the Hotel Tax Act, the Assignment Agreement
provides that, "[n]otwithstanding anything herein to the contrary, the assignment, transfer and
pledge of the Hotel Occupancy Tax Funds is made subject to the rights of the Commonwealth . .
. under Section 8 Article VI of the Constitution of the Commonwealth of Puerto Rico."  (Id. §
11.)  The Assignment Agreement "shall be binding upon the Tourism Company and GDB and
their successors and assigns and shall inure to the benefit of the [o]wners of the [CCDA] Bonds .
. . ." (Id. § 13.)  Further, under the Assignment Agreement, the "[o]wners of the [CCDA] Bonds
. . . , the Trustee and [CCDA] shall be deemed third party beneficiaries to this Assignment
Agreement[,] and [the] [a]ssignment and the right of the Tourism Company to pledge the
Transfer Account shall be deemed an agreement made for the benefit of the [o]wners of the
[CCDA] Bonds . . . ."  (Id. § 15.)

        2.  The Pledge Agreement

        Through the Pledge Agreement, GDB "create[d] and establishe[d] a special and
irrevocable account designated as the 'Hotel Occupancy Tax Pledge Account' (the 'Pledge
Account') to be held in trust by GDB on behalf of [CCDA] for the benefit of the [o]wners of the
[CCDA] Bonds, separate and apart from other funds of GDB."  (Pledge Agreement § 2(a).)
GDB and CCDA

> grant[ed], bargain[ed], convey[ed], assign[ed], mortgage[d] and
> pledge[d] a security interest to the Trustee . . . for the benefit of the
> [o]wners of the [CCDA] Bonds . . . , subject to the provisions of
> Section 8 of Article VI of the Constitution of the Commonwealth of

> Puerto Rico, to be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI . . . , but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes, (i) all Hotel Occupancy Tax Funds received from the Tourism Company, (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement, and (iii) all right title and interest of GDB in the Assignment Agreement.

(Id. § 2(b).)  Moreover, "GDB and [CCDA] acknowledge[d] and agree[d] that the Agreement[11]

shall be part of the Trust Estate under the Trust Agreement, pledged to the [o]wners of the

[CCDA] Bonds . . . ."  (Id. § 14.)

In section 3 of the Pledge Agreement, GDB agreed, "so long as there are any

[CCDA] Bonds [o]utstanding under the Trust Agreement, to deposit or cause to be deposited into

the Pledge Account, all Hotel Occupancy Tax Funds received from the Tourism Company as

received . . . ."  (Id. § 3(a).)  GDB likewise agreed to "(1) . . . make payments to the

Commonwealth . . . when required in accordance with Section 8 of Article VI of the Constitution

of the Commonwealth of Puerto Rico[,]" and "(2) . . . transfer or cause to be transferred to the

Trustee, all Hotel Occupancy Tax Funds . . . deposited to the Pledge Account."  (Id. § 3(b).)[12]

Furthermore, GDB agreed that it will "diligently enforce its rights under the Assignment

Agreement including its enforcement of the Hotel Occupancy Tax Funds transfer obligation of

---

[11]    Although "the Agreement" is not a defined term in the Pledge Agreement, the CCDA Movants contend that the term, as used in section 14, means the Pledge Agreement (see Mot. ¶ 44.), and that assertion appears to be undisputed.

[12]    In the event that the amounts transferred from the Tourism Company to GDB in a given calendar month are insufficient, section 4 of the Pledge Agreement requires GDB and the Trustee to promptly send a notice of the deficiency to CCDA and the Tourism Company. (Pledge Agreement § 4.)  Correspondingly, section 9 of the Assignment Agreement requires the Tourism Company to, upon receipt of such notice from GDB and the Trustee, "deposit sufficient funds from amounts held as Hotel Occupancy Tax Funds, to satisfy the requirements set forth in Section 3(b)(2) of the Pledge Agreement." (Assignment Agreement § 9.)

the [Tourism] Company."  (Id. § 5(b).)

              3.   The Trust Agreement and the Supplemental Trust Agreement

          Through the Trust Agreement, CCDA granted and conveyed to the Trustee a

security interest in

> (i)    all Hotel Occupancy Tax Funds;
>
> (ii)    [a]ll funds, accounts and all money from time to time held by the Trustee under this Trust Agreement or any Supplemental Trust Agreement in any fund or account other than (i) the Rebate Fund, (ii) any Defeasance Escrow Account and (iii) any fund or account created by a Supplemental Trust Agreement that is expressly excluded from the Trust Estate;
>
> (iii)    all right, title and interest of [CCDA] acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Pledge Agreement, and any money from time to time held thereunder including the Pledge Account created thereunder;
>
> (iv)    all right, title and interest of GDB acquired by the Trustee for the benefit of the Owners from GDB with respect to its rights under the Assignment Agreement, including the Transfer Account created thereunder, and any money from time to time held therein; [and]
>
> (v)    any and all other property, revenues or funds from time to time hereafter . . . granted, assigned or pledged as and for additional security hereunder, by [CCDA] or anyone else, in favor of the Trustee, which is hereby authorized to receive any and all such property at any and all times and to hold and apply the same subject to the terms hereof.

(Trust Agreement at 1-2.)  Importantly, as noted above, the Trust Agreement defines "Hotel

Occupancy Tax Funds" to mean "all Hotel Occupancy Tax Revenues that are deposited in the

Transfer Account on or after the date hereof."  (Id. § 1.01.)  The Trust Agreement provides that

"the Hotel Occupancy Tax Funds pledged pursuant to [the above-referenced granting clauses] . .

. shall be valid and binding from the time such funds are transferred to GDB . . . ."  (Id. at 2.)

The Supplemental Trust Agreement specifically authorized the issuance of, and set forth certain terms relating to, the CCDA Bonds.  (Supp. Trust Agreement §§ 2-4.)

C.      The Moratorium Laws and Historical Flow of the Hotel Taxes

On November 30, 2015, Governor Alejandro García-Padilla (the "Governor") issued Administrative Bulletin OE-2015-046 (Docket Entry No. 10104-7, the "First Clawback Order"), which declared that the projected cash flow for the fiscal year was insufficient to pay the public debt and to continue to cover the necessary expenses for the protection of the public welfare, and directed the Tourism Company to transfer the Hotel Taxes to the Puerto Rico Department of Treasury.  On April 6, 2016, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Rehabilitation Act, Act No. 21-2016 (Docket Entry No. 10104-8, the "Moratorium Act"), thereby authorizing the Governor to declare a state of emergency over the Commonwealth and its instrumentalities.  On June 30, 2016, by way of Administrative Bulletin EO-2016-31 (Docket Entry No. 10104-9, together with the First Clawback Order, the "Executive Orders"), the Governor invoked his authority under the Moratorium Act; declared CCDA to be in a state of emergency; and suspended all obligations of CCDA, the Tourism Company, and GDB to transfer the Hotel Taxes in accordance with the provisions of the Hotel Tax Act and the Bond Documents.  The Puerto Rico Financial Emergency and Fiscal Responsibility Act, Act No. 5-2017 (Docket Entry No. 10104-10), which was enacted on January 29, 2017, repealed certain sections of the Moratorium Act, but replaced them with substantively similar provisions and provided that the Executive Orders would remain in effect until otherwise ordered by the Governor.

From January 2015 until the First Clawback Order was issued in November 2015, the Hotel Taxes collected by the Tourism Company were deposited into Scotiabank -5142.

(Reply ¶ 13.)  During that period, all Hotel Taxes were moved from Scotiabank -5142 into an

account at GDB with an account number ending in "9758" ("GDB -9758"), which is referred to

in certain Tourism Company records as the "Room Tax Concentration Surplus" account.  (Id.)

Each month, approximately $3 million was transferred from GDB -9758 into an account at GDB

with account number ending in "9947" ("GDB -9947"), and any excess funds held in GDB -9758

were transferred to an account at Scotiabank with account number ending in "5144"

("Scotiabank -5144").  (Id. ¶¶ 13-14.)  Scotiabank -5144 held, and continues to hold, Tourism

Company revenues other than Hotel Taxes.[13]  (Id. ¶ 14.)  GDB made monthly transfers from

GDB -9947 to an account at BONY with an account number ending in "6334" ("BONY -6334"),

which funds were in turn used to make payments in connection with the CCDA Bonds.  (Id. ¶¶

14, 17.)  It is undisputed that GDB -9947 is the Pledge Account and BONY -6334 is the Bond

Payment Fund as those terms are defined in the Bond Documents.  (See id. ¶¶ 17, 18.)

      Following the Governor's issuance of the First Clawback Order, the flow of Hotel

Taxes changed several times.  As relevant here, in or around May 2016, the Tourism Company

began transferring funds from Scotiabank -5142 directly into Scotiabank -5144.  (Reply ¶ 15.)

Thereafter, beginning in or around August 2016 and through the present, the Tourism Company

has, through at least one intervening account at Banco Popular Puerto Rico, transferred the Hotel

Taxes held in Scotiabank -5142 into an escrow account at FirstBank Puerto Rico ("FirstBank").

(Id.)

      The CCDA Movants contend that, to date, there have been multiple defaults on

the CCDA Bonds, which have resulted in Ambac, FGIC, and Assured having to pay

---

[13]    Some of the funds held in Scotiabank -5144 were transferred to an account at Scotiabank
with an account number ending in "5138" and subsequently used for "Non-Debt Service
Outflow."  (See Reply ¶ 14.)

approximately $81.3 million in claims to holders of the CCDA Bonds.  (Mot. ¶ 62.)  The CCDA

Movants assert that, as of January 16, 2020, the Tourism Company was in possession of

approximately $135 million.  (Id. ¶ 63.)  However, the CCDA Movants assert that the funds

currently held in the FirstBank account are insufficient to pay amounts due and owing on the

CCDA Bonds.  (Reply ¶ 15.)

      D.      <u>The Proposed CCDA Enforcement Action</u>

      The CCDA Enforcement Action, a proposed civil action in the District of Puerto

Rico (<u>see</u> Docket Entry No. 10104-2, the "Complaint"), would assert claims against the Tourism

Company, GDB,[14] and CCDA (as well as their principal officers) in connection with their

alleged failure to ensure that the Hotel Taxes are used to make payments with respect to the

CCDA Bonds in accordance with the provisions of the Hotel Tax Act and the Bond Documents.

Specifically, the Complaint would seek relief in the form of (i) a writ of mandamus compelling

the Tourism Company, GDB, and CCDA (as well as their principal officers) to perform their

legal duties under the Hotel Tax Act and the Bond Documents, (ii) declaratory and injunctive

relief, (iii) monetary damages for breach of contract, unjust enrichment, and/or conversion by the

Tourism Company, GDB, and CCDA, and (iv) monetary damages for violation of PROMESA §

407.  The CCDA Movants do not contemplate naming the Commonwealth as a defendant in the

CCDA Enforcement Action.  (<u>See</u> Mot. ¶ 70.)

---

[14]    According to the proposed Complaint, in April 2016, many of GDB's fiscal agent
responsibilities, but not GDB's obligations under the Bond Documents, were transferred
to the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").
(Compl. ¶ 15.)  The Complaint also indicates that the GDB Debt Recovery Authority and
the GDB Public Entity Trust are named as defendants "to the extent that these entities
might assert any interest in the subject matter of this litigation."  (Id. ¶ 21.)

E.      Relevant Procedural History

The Oversight Board filed a petition for relief under Title III of PROMESA on behalf of the Commonwealth on May 3, 2017.  According to the CCDA Movants, Hotel Taxes "have been spent or improperly commingled in the Commonwealth's Treasury Single Account" during the pendency of the Commonwealth's Title III case.  (Mot. ¶ 65.)  On September 27, 2019, the Oversight Board filed the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 8765, the "Plan").  The Plan did not recognize holders of CCDA Bonds as secured creditors of the Commonwealth and contemplated offering an approximately 0.4% recovery to holders of claims "against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred" to CCDA.[15] (Plan, art. I, §§ 1.110, 1.111.)

In the *Interim Report and Recommendation of the Mediation Team* (Docket Entry No. 9365, the "Interim Report"), which was filed on November 27, 2019, the Court-appointed Mediation Team in these Title III cases recommended, inter alia, that the Court establish a schedule for litigation of the Stay Relief Motions.  After receiving feedback regarding the Interim Report from various parties in interest, on December 19, 2019, the Court entered the *Interim Case Management Order for Revenue Bonds* (Docket Entry No. 9620, the "Interim Order"), which set briefing deadlines and a Preliminary Stay Relief Hearing in connection with the Stay Relief Motions pursuant 11 U.S.C. § 362(e)(1) and defined the scope of issues that were to be addressed in the parties' briefing and at the hearing.

---

[15]      On February 28, 2020, the Oversight Board filed the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946), which proposes to treat allowed claims related to CCDA Bonds as general unsecured claims. (See art. I, § 1.127; art. XLVII.)

The CCDA Movants filed the CCDA Stay Relief Motion on January 16, 2020.

On January 31, 2020, the Court entered the *Amended Interim Case Management Order for*

*Revenue Bonds* (Docket Entry No. 10595), which modified the Interim Order to limit the scope

of additional briefing on the Stay Relief Motions to "issues of standing and secured status" and

clarified that the Preliminary Stay Relief Hearing would address "whether movants have

standing to sue and security or other property interests in the relevant revenues." (Revenue

Bonds Ord. ¶ 1.) The Oversight Board filed its Opposition to the CCDA Stay Relief Motion on

February 3, 2020. On February 10, 2020, the Mediation Team filed the *Amended Report and*

*Recommendation of the Mediation Team* (Docket Entry No. 10756). On February 14, 2020, the

Court entered the *Order Granting Urgent Motion to Adjourn Hearing on Motions for Relief from*

*the Automatic Stay and Extend Deadlines for Replies in Support of Motions for Relief from the*

*Automatic Stay* (Docket Entry No. 11057), which, inter alia, allowed CCDA Movants limited

discovery relating to factual representations in the Opposition concerning the historical flow of

Hotel Taxes. On March 10, 2020, the Court entered the Revenue Bonds Order. Thereafter, the

Court modified the briefing and hearing schedule several times and granted both the Oversight

Board and the CCDA Movants permission to submit supplemental briefs with respect to the

CCDA Stay Relief Motion.

The Court held the Preliminary Stay Relief Hearing on June 4, 2020.

## II.

## LEGAL STANDARDS

### A.   Section 362(a) of the Bankruptcy Code

Under section 362(a) of the Bankruptcy Code, the filing of a petition for

bankruptcy relief operates as a stay of, inter alia, "any act to obtain possession of property of the

estate or property from the estate"; "any act to create, perfect, or enforce any lien against

property of the estate"; and "any act to create, perfect, or enforce against property of the debtor

any lien to the extent that such lien secures a claim that arose before the commencement of the

case under this title." 11 U.S.C.A § 362(a)(3)-(5) (Westlaw through P.L. 116-145). Subsection

301(c)(5) of PROMESA provides that the term "property of the estate," when used in

incorporated provisions of the Bankruptcy Code, means property of a Title III debtor. 48

U.S.C.A. § 2161(c)(5) (Westlaw through P.L. 116-145); see Gracia-Gracia v. Fin. Oversight &

Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 939 F.3d 340, 349 (1st Cir.

2019) ("PROMESA and the municipal bankruptcy code instruct that we replace all instances of

'property of the estate' that appear in the incorporated provisions of the bankruptcy code with

'property of the debtor.'" (citation omitted)). Thus, in the Title III context, the automatic stay

applies to any action that implicates property of a Title III debtor, and consequently the reach of

the Title III automatic stay is broader than the reach of the automatic stay in a conventional

bankruptcy case. See Gracia-Gracia, 939 F.3d at 349.

      B.        **Section 362(d) of the Bankruptcy Code**

Section 362(d) of the Bankruptcy Code provides that, on "request of a party in

interest and after notice and a hearing, the court shall grant relief from the stay" provided under

section 362(a) "for cause, including the lack of adequate protection of an interest in property of

such party in interest," or, "with respect to a stay of an act against property under [section

362(a)], if—(A) the debtor does not have an equity in such property; and (B) such property is not

necessary to an effective reorganization[.]" 11 U.S.C.A. § 362(d)(1)-(2) (Westlaw through P.L.

116-145). A movant has the initial burden of establishing prima facie eligibility for relief from

the automatic stay. See Gracia-Gracia, 939 F.3d at 347 (citing Mazzeo v. Lenhart (In re

Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999)).  After that initial burden is met, the moving party

bears the ultimate burden of proof on the issue of the debtor's equity in property, and the party

opposing stay relief has the ultimate burden of proof on all other issues.  See 11 U.S.C. § 362(g).

Where, as here, a movant seeks relief from the automatic stay to pursue remedies

with respect to assets allegedly securing obligations, or for an award of adequate protection, the

court does not fully and finally adjudicate the merits of the parties' underlying claims of security

or beneficial interests in resolving the stay relief motion.  Rather, the court must determine

"whether the party seeking relief has a colorable claim to property of the estate."  Grella v.

Salem Five Cent Sav. Bank, 42 F.3d 26, 33 (1st Cir. 1994).  In Grella, the First Circuit

analogized this determination to that required in the context of a hearing for preliminary

injunctive relief, stating that a claim is colorable where there is a "reasonable likelihood that a

creditor has a legitimate claim or lien as to a debtor's property."  Id.; see Mission Prod.

Holdings, Inc. v. Schleicher & Stebbins Hotels, L.L.C. (In re Old Cold, LLC), 602 B.R. 798, 825

(B.A.P. 1st Cir. 2019) (characterizing a "colorable claim" as one "that is legitimate and that may

reasonably be asserted, given the facts presented and the current law") (quoting Jin Qing Li v.

Rosen (In re Jin Qing Li), BAP No. NC-17-1062-STaB, 2018 WL 1354548, at *4 (B.A.P. 9th

Cir. Mar. 12, 2018)).  "This is a low threshold: A colorable claim (one seemingly valid and

genuine) is not a difficult standard to meet."  In re Old Cold, 602 B.R. at 825 (quoting In re

Pansier, No. 18-22297-beh, 2019 WL 1495100, at *5 (Bankr. E.D. Wis. Apr. 3, 2019)).  In

evaluating whether a movant has demonstrated a colorable claim, however, the court considers

not only the movant's legal and factual contentions, but also defenses raised by the non-moving

party, weighing all relevant arguments in determining whether the movant has shown the

requisite reasonable likelihood of success.  See Grella, 42 F.3d at 34 ("[A] court may take into

account any matter that bears directly on the debtor's equity, or that clearly refutes a creditor's claim to the property.").

If a movant satisfies the threshold "colorable claim" standard, the court must then assess whether the movant has shown cause under 11 U.S.C. § 362(d)(1) or otherwise met its burden under 11 U.S.C. § 362(d)(2).  See, e.g., Gracia-Gracia, 939 F.3d at 350 (to prevail under § 362(d)(1), stay relief movants must show that the relevant factors weigh in their favor); In re Old Cold, 602 B.R. at 823-24 (noting that "the issue in the Stay Relief Motion was whether [the movant] had met its burden of establishing a colorable claim of a lien on property of the Debtor's estate and, if so, whether [the movant] was entitled to stay relief under § 362(d)(2)").  At this preliminary stage, the Court limits its inquiry under section 362(d) to whether the CCDA Movants have shown a reasonable likelihood that they possess a legitimate lien against, or other property interest in, the relevant assets.

III.

DISCUSSION

As noted, the primary issues before the Court at this juncture are whether the CCDA Enforcement Action is subject to the automatic stay[16] and, if so, whether and to what extent the CCDA Movants have a lien against, or other property interest in, the Hotel Taxes that have been, and those that will continue to be, retained by the Tourism Company.  The CCDA Movants contend that the automatic stay does not extend to the CCDA Enforcement Action because none of the proposed defendants is a Title III debtor and the Hotel Taxes are not and

---

[16]    Given the threshold nature of the question of stay applicability, the Court deems it within the scope of issues to be resolved in connection with the Preliminary Stay Relief Hearing.

have never been property of the Commonwealth, both because the Commonwealth does not levy,

collect, or hold the Hotel Taxes, and because the Commonwealth expressly alienated any rights it

might have had in such funds through the Hotel Tax Act.  The CCDA Movants further argue that

they have a security or other property interest in any Hotel Taxes that were pledged to the

repayment of the CCDA Bonds but retained by the Tourism Company.  For its part, the

Oversight Board asserts that the automatic stay applies to the CCDA Enforcement Action

because that action implicates Commonwealth property, and that the CCDA Movants' only

property right in relation to the Hotel Taxes is a security interest in funds actually deposited in

the Transfer Account.  In addition, the Oversight Board argues that any obligation that might

have been imposed by the Hotel Tax Act to fund the Transfer Account has been preempted by

Titles II and III of PROMESA.[17]  Because a finding that the CCDA Enforcement Action is not

subject to the automatic stay would obviate the need to consider any of the CCDA Movants'

additional arguments, the Court addresses the applicability of the automatic stay at the outset.

A.    Applicability of the Automatic Stay

As a preliminary matter, the Court notes that the CCDA Movants fail to explain

how the question of stay applicability should be evaluated in the current procedural context.

Although the CCDA Stay Relief Motion requests relief in the alternative—namely, a ruling that

the automatic stay does not apply to the CCDA Enforcement Action and, to the extent that such a

---

[17]    The Official Committee of Unsecured Creditors joins the Oversight Board's arguments in
opposition to the CCDA Stay Relief Motion, except with respect to any argument
regarding (i) the retention of the Hotel Taxes by the Tourism Company, and (ii) the
preemptive effect of sections 201 and 202 of PROMESA.  (See generally UCC Joinder.)
AAFAF joins the Oversight Board's arguments in opposition to the CCDA Stay Relief
Motion with respect to the CCDA Movants' lack of entitlement to relief from the stay as
against the Commonwealth or CCDA; the limited scope of the CCDA Movants' security
interest, if any; and the CCDA Movants' lack of any property right in the Hotel Taxes.
(See generally AAFAF Joinder.)

ruling is not granted, an order lifting the automatic stay or providing adequate protection—the
CCDA Movants do not identify the specific legal grounds for making the former request and
thus provide no guidance to the Court as to the proper allocation of legal burdens with respect to
the determinative issue of whether the CCDA Enforcement Action implicates property of the
Commonwealth.[18]   Indeed, the CCDA Movants' contentions in this regard seem to be internally
inconsistent.  (Compare Reply ¶ 38 (arguing that the "[CCDA] Movants have shown at least a
colorable claim that (i) the conditions of Article VI, Section 8 have not been satisfied in one or
more years, (ii) that there are other available resources of the Commonwealth from which public
debt can be paid, and (iii) that the Pledged Hotel Taxes[19] have, in vast majority, not been used to
pay public debt," and thereby implying that the CCDA Movants must show a reasonable
likelihood that the Commonwealth lacks a property interest in the Hotel Taxes), with id. ¶ 47
("[T]he Oversight Board fails to meet its burden of proving that Article VI, Section 8 was validly
triggered, or that the Commonwealth otherwise has an interest in the hotel taxes through a
retained right related to the delegation of taxing power." (emphasis added)).).  The Oversight
Board's only argument addressing this point is that "there is no basis to apply [the colorable

---

[18]     Under Rule 7001 of the Federal Rules of Bankruptcy Procedure, which is made
applicable in these proceedings by section 310 of PROMESA, any declaratory judgment
regarding the validity, priority, or extent of a lien or other interest in property must be
sought by way of adversary proceeding.  Fed. R. Bankr. P. 7001(2), (9).  The component
of the CCDA Stay Relief Motion pertaining to the applicability of the automatic stay is
therefore procedurally improper, as it seeks a declaration that the Commonwealth lacks a
property interest in the Hotel Taxes.  (See Mot. ¶ 8 ("[The CCDA] Movants proactively
seek a declaration that the automatic stay does not apply to the CCDA Enforcement
Action.").  Nonetheless, the Court will address the issue at this time pursuant to its
equitable powers under section 105(a) of the Bankruptcy Code.

[19]     The CCDA Movants define the term "Pledged Hotel Taxes" to mean "the portion of
Hotel Taxes pledged to the repayment of CCDA bonds."  (Mot. ¶ 3.)  Although that term
is not found in the Hotel Tax Act or the Bond Documents, the Court uses it in this
Opinion and Order when discussing the CCDA Movants' arguments.

claim standard] to . . . whether the stay applies in the first place." (Opp. ¶ 68.) The Oversight Board does not articulate its position as to the correct legal standard, instead asserting in a conclusory fashion that "the Commonwealth's reversionary interest alone triggers the automatic stay." (Id.)

Because the question of stay applicability arises in the context of a motion for relief from the automatic stay, and given that neither party has presented developed arguments with respect to the appropriate standard, it is the Court's view that the principles set forth in Grella for evaluating motions for stay relief under section 362(d) of the Bankruptcy Code provide a useful framework for analyzing the issue of stay applicability here. Further, because this issue turns on whether the CCDA Enforcement Action implicates property of the Commonwealth, the Court concludes that it is the CCDA Movants' burden to show a reasonable likelihood that the Commonwealth lacks a property interest in the Hotel Taxes. Cf. 11 U.S.C.A. § 362(g) (Westlaw through P.L. 116-145) (the party requesting stay relief "has the burden of proof on the issue of the debtor's equity in property"). As explained below, the CCDA Movants have not satisfied this burden.

The CCDA Movants contend that the Commonwealth granted legal title in the Hotel Taxes to the Tourism Company, and thus retained no property interest in such funds, when it transferred taxing authority to the Tourism Company through the Hotel Tax Act. In response, the Oversight Board asserts that the Commonwealth never explicitly transferred the property interest it had in these funds pursuant to Article VI, Section 2, of the Commonwealth Constitution and that the Hotel Tax Act cannot be interpreted as impliedly transferring ownership, particularly given that the Hotel Tax Act expressly makes the Hotel Taxes subject to retention under Article VI, Section 8, of the Commonwealth Constitution.

Article VI, Section 2 provides in relevant part that "[t]he power of the
Commonwealth . . . to impose and collect taxes and to authorize their imposition and collection
by municipalities shall be exercised as determined by the Legislative Assembly and shall never
be surrendered or suspended."  P.R. Const. art. VI, § 2.  Vested with this authority, the
Commonwealth, through the Hotel Tax Act, delegated to the Tourism Company the power to
"[d]etermine, assess, impose, collect, enforce, regulate, and distribute" the Hotel Taxes, 13
L.P.R.A. § 2271a(a), and directed the Tourism Company to distribute the Hotel Taxes in the
manner specified therein, see id. § 2271v.  In addition, the Hotel Tax Act authorized CCDA,
"with the prior written consent of the [Tourism] Company, to pledge or otherwise encumber the
revenues product of the fixed tax collected which is to be deposited in a special account as
required by the first paragraph of this subsection, as security for the payment of the principal and
interest on the bonds."  Id.  Any such pledge, however, "shall be subject to the provisions of
Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico."  Id.  In that
regard, the Hotel Tax Act further provides that "[t]he product of the collection of the tax shall be
used solely for the payment of the interest and the amortization of the public debt, as provided in
Section 8 of Article VI . . . , but only to the degree to which the other available resources to
which reference is made in said Section are insufficient for such purposes."  Id.

        To begin with, Article VI, Section 2 makes clear that the Commonwealth may not
divest itself of the power to "impose and collect taxes."  P.R. Const. art. VI, § 2.  Thus,
notwithstanding any provision of the Hotel Tax Act, the Tourism Company imposes and collects
the Hotel Taxes on behalf of the Commonwealth and pursuant to the Commonwealth's exclusive
power emanating from Article VI, Section 2.  Although this relationship does not preclude the
Commonwealth from transferring ownership of the Hotel Taxes after such funds are collected, it

restricts the Tourism Company's role at the collection phase to that of an agent of the

Commonwealth.  See Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary

relationship that arises when one person (a 'principal') manifests assent to another person (an

'agent') that the agent shall act on the principal's behalf and subject to the principal's control,

and the agent manifests assent or otherwise consents so to act.").  Accordingly, absent a transfer

of ownership of the Hotel Taxes by statute or otherwise, such funds remain property of the

Commonwealth.  To determine whether the Commonwealth retains ownership of the Hotel

Taxes post-collection, then, the Court must analyze the relevant provisions of the Hotel Tax Act.

As previously explained, the Hotel Tax Act merely delegates to the Tourism

Company the responsibility of administering Hotel Tax collection activities, 13 L.P.R.A. §

2271a, directs the Tourism Company to transfer a portion of the Hotel Taxes to GDB, id. §

2271v(a), and requires the Tourism Company's consent for any pledge of the Hotel Taxes.  Id.

The CCDA Movants fail to explain how any of these provisions effectuate a transfer of the

Commonwealth's ownership interest in the Hotel Taxes to the Tourism Company.  Express

language transferring ownership can be found nowhere in the Hotel Tax Act.  By way of

comparison, the statute governing the bonds that were issued by COFINA in connection with its

plan of adjustment, 13 L.P.R.A. § 12, which provides that the relevant taxes are "hereby

transferred to, and shall be the property of COFINA," provides an example of legislative action

to transfer property rights to an instrumentality.  Similarly, whereas 13 L.P.R.A. § 12 makes

clear that the taxes transferred to COFINA "shall not . . . constitute resources available to the

Commonwealth[,]" the Hotel Tax Act unequivocally makes any pledge thereunder subject to

Article VI, Section 8, thereby at the very least suggesting that the Hotel Taxes may constitute

available resources of, and thus property of, the Commonwealth.

The CCDA Movants provide no legal authority for their argument that, by

conferring on the Tourism Company the power to levy, collect, and otherwise administer the

Hotel Taxes, the Commonwealth granted the Tourism Company legal title to, and necessarily

divested itself of all ownership of, those funds.  The CCDA Movants contend that the Hotel Tax

Act "expressly authorizes the Tourism Company to 'levy, charge, and collect' Hotel Taxes."

(Sur-Sur-Reply ¶ 13 (quoting 13 L.P.R.A. § 2271o).)  Although this statement is true, express

authorization to perform these functions is not the equivalent of an express, or even implicit,

transfer of ownership.  Again, the Hotel Tax Act is devoid of language effectuating such a

transfer.  The CCDA Movants also assert that "the Commonwealth's delegation to the Tourism

Company of the power to impose and collect the Hotel Taxes is a legitimate use of its taxing

power, not an impermissible surrender of it" (Reply ¶ 45), but they do not explain why a

delegation of taxing power for a legitimate purpose means that a transfer in ownership of the

underlying taxes has occurred.  The CCDA Movants' reliance on the Court's decision regarding

the COFINA plan of adjustment, In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203

(D.P.R.) ("COFINA"), judgment entered, 366 F. Supp. 3d 256 (D.P.R. 2019), and

reconsideration denied, No. 17 BK 3283-LTS, 2019 WL 8403509 (D.P.R. Mar. 15, 2019), in

support of its argument is misplaced.  The Court's conclusion in that case that "the enactment of

the New Bond Legislation was a proper exercise of the Legislative Assembly's constitutional

power to designate revenues for a legitimate public purpose" was reached in the context of the

Court's consideration of whether the COFINA plan of adjustment complied with subsection

314(b)(3) of PROMESA, which provides, as a condition of confirmation, that the debtor must

not be "prohibited by law from taking any action necessary to carry out the plan[,]" 48 U.S.C.A.

§ 2174(b)(3) (Westlaw through P.L. 116-145).  COFINA, 361 F. Supp. 3d at 242.  The CCDA

Movants neglect to explain how a finding in <u>COFINA</u> that the transfer of ownership that

occurred there did not violate Commonwealth law—and, more specifically, that no objector to

the plan of adjustment had rebutted the presumption of validity of the statute in question, <u>id.</u> at

242-43—provides support for the CCDA Movants' theory here that such a transfer occurred

based on different, and meaningfully distinguishable, statutory language.

Accordingly, the CCDA Movants have failed to show a reasonable likelihood that

the Hotel Taxes are not property of the Commonwealth, and, consequently, they have not

satisfied their burden to show that the automatic stay does not apply to the CCDA Enforcement

Action, which would implicate Hotel Taxes collected by the Tourism Company pursuant to the

Commonwealth's delegation of authority under the Hotel Tax Act.

B.    <u>Nature and Extent of the CCDA Movants' Security Interest</u>

The CCDA Movants assert a security interest in the Pledged Hotel Taxes based

on two theories.  First, they argue that the Bond Documents grant them a lien on funds deposited

in the Transfer Account, and that discovery has shown that Scotiabank -5142, the account into

which the Hotel Taxes continue to be deposited, is in fact the Transfer Account.  Second, they

argue that, even if the Oversight Board is correct with respect to the nomenclature of the various

relevant bank accounts, the Bond Documents grant the CCDA Movants a lien against all funds

that should have been deposited into the Transfer Account.  The Oversight Board concedes that

the Bond Documents grant the CCDA Movants a security interest in funds deposited in the

Transfer Account.  (<u>See</u> Opp. ¶ 69.)  It is the Oversight Board's position that GDB -9758, which

has gone unfunded since 2016, is the Transfer Account.  The Oversight Board, moreover, insists

that the CCDA Movants' security interest does not extend beyond funds actually deposited in the

Transfer Account.

The Bond Documents granted the CCDA Movants a security interest in funds deposited in the Transfer Account as follows: Under the Assignment Agreement, the Tourism Company created the Holding Fund, comprised of the Transfer Account and the Surplus Account; assigned all of its rights to Hotel Taxes deposited in the Transfer Account to GDB; and consented to GDB entering into the Pledge Agreement with CCDA and JPMorgan Chase. (Assignment Agreement §§ 1, 2, 6, 7.)  The Pledge Account was created by GDB pursuant to the Pledge Agreement, and, through that agreement, GDB and CCDA granted a lien to JPMorgan Chase on "(i) all Hotel Occupancy Tax Funds received from the Tourism Company, [and] (ii) all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of this Pledge Agreement[.]"  (Id. § 2 (a), (b).)  GDB further agreed "to deposit or cause to be deposited into the Pledge Account[] all Hotel Occupancy Tax Funds received from the Tourism Company as received."  (Id. § 3.)  Finally, through the Trust Agreement, CCDA granted JPMorgan Chase a security interest in "all Hotel Occupancy Tax Funds."  (Trust Agreement at 1-2.)  It is undisputed that, when read together, these provisions grant the CCDA Movants a security interest in amounts deposited in the Transfer Account.  Furthermore, the parties do not dispute the actual flow of funds.  (See Sur-Reply ¶ 24.)  As noted, however, the parties disagree as to which account is the Transfer Account.

The CCDA Movants claim that discovery has established that Scotiabank -5142 is the Transfer Account (and that GDB -9758 is the Surplus Account).  The Oversight Board, by contrast, asserts that the CCDA Movants' theory is "fundamentally inconsistent" with the Bond Documents (Sur-Reply ¶ 28), that GDB -9758 is the Transfer Account, and that Scotiabank -5144 is the Surplus Account.  If the CCDA Movants are correct, their lien would extend to all Hotel Taxes collected by the Tourism Company since 2015 because such funds have at all

relevant times been deposited in Scotiabank -5142.  If the Oversight Board is instead correct, the

CCDA Movants' lien would not reach any Hotel Taxes, which have not been deposited in GDB -

9758 since 2016.

In support of their position, the CCDA Movants argue that (i) Tourism Company

documents refer to GDB -9758 as the "Room Tax – Concentration Surplus" account, and no

other relevant accounts are referred to using the term "surplus" (Reply ¶ 54); (ii) no documents

produced in discovery refer to any Tourism Company account as the "Transfer Account" (id. ¶

55); (iii) the Assignment Agreement provides that all Hotel Taxes must be "deposited, as

collected" into the Holding Fund, and all Hotel Taxes have at all relevant times been deposited in

the first instance into Scotiabank -5142 and not GDB -9758 (id.); (iv) bank statements show that

millions of dollars were transferred from GDB -9758 to unrelated accounts, and the Bond

Documents do not contemplate transfers from the Transfer Account to accounts other than the

Surplus Account and the Pledge Account (id.); and (v) Scotiabank -5144 cannot be the Surplus

Account because, unlike GDB -9758, it is not referred to in any documents using the word

"surplus" and it contained millions of dollars in unrelated funds, which is inconsistent with the

notion that it is part of the Holding Fund—a "special fund" established specifically to hold Hotel

Taxes (id.).  Additionally, the CCDA Movants contend that the testimony of the Tourism

Company's Rule 30(b)(6) witness, Timothy Ahlberg, that the Tourism Company considered

GDB -9758 to be the Transfer Account is inadmissible hearsay because it was not based on his

personal knowledge.  (Reply ¶ 53.)

The Oversight Board argues that (i) GDB -9758 must be the Transfer Account

because the Bond Documents require that the Pledge Account be funded by the Transfer Account

(Sur-Reply ¶ 28); (ii) under the CCDA Movants' theory, their security interest would have been

released when the funds were transferred from Scotiabank -5142 and deposited in GDB -9758,

and then would have reattached when the funds were transferred to the Pledge Account (id. ¶

29); (iii) the Transfer Account was established pursuant to the Assignment Agreement, which

was executed in March 2006, yet Scotiabank -5142 was opened in June 2011 (id. ¶ 30); (iv)

although GDB's account opening documents have not been located, other GDB accounts relating

to the CCDA Bonds were opened in 2006 and GDB -9758 is the only relevant account that could

have been opened in March 2006 (id.); and (v) Scotiabank -5142 cannot be the Transfer Account

because hoteliers have long deposited Hotel Taxes directly into Scotiabank -5142, and the

Assignment Agreement did not change the account into which hoteliers deposited such funds (id.

¶ 31).  The Oversight Board also contends that the testimony of Mr. Ahlberg is admissible to

establish the account that the Tourism Company considered to be the Transfer Account.  (Id. ¶ 33

n.8.)

Although the parties' respective arguments make clear that many factual disputes

on this issue remain outstanding, the CCDA Movants have met the colorable claim standard by

identifying Scotiabank -5142 as the account into which Hotel Taxes are accumulated,

demonstrating that there is no evidence in the record to corroborate the Oversight Board's

assertions regarding when GDB -9758 was created, and showing that extraneous distributions

appear to have been made from GDB -9758.  Furthermore, the title of GDB -9758 includes the

word "surplus" and there are no documents referring to any of the relevant accounts as the

"Transfer Account."  These facts, viewed in the light most favorable to the CCDA Movants,

provide support for the CCDA Movants' claim in the current disputed factual context.  Mr.

Ahlberg's testimony as to the Tourism Company's understanding that GDB -9758 is the Transfer

Account[20] and the remainder of the Oversight Board's arguments are insufficient to overcome the CCDA Movants' showing in the context of this motion practice.  Accordingly, the Court concludes that the CCDA Movants have a colorable claim to a security interest in the Hotel Taxes deposited in Scotiabank -5142.

The CCDA Movants' theory predicated on a more expansive security interest, however, finds no foundation in the record.  The CCDA Movants claim that the Bond Documents expressly give them a security interest not only in funds that were deposited in the Transfer Account, but also in any funds that should have been, but were not, deposited into that account.  (See Reply ¶ 60.)  They base their argument primarily on subsection 2(b)(ii) of the Pledge Agreement, under which CCDA and GDB granted holders of the CCDA Bonds a lien against "all moneys deposited in or required to be deposited in the Pledge Account pursuant to the provisions of th[e] Pledge Agreement."  (Pledge Agreement § 2(b).)  The CCDA Movants contend that subsection 2(b)(iii) of the Pledge Agreement, which pledges to holders of the CCDA Bonds "all right, title and interest of GDB to the Assignment Agreement[,]" requires all Pledged Hotel Taxes to be deposited into the Pledge Account because GDB has a right to receive the Pledged Hotel Taxes from the Tourism Company under sections 5, 7, and 9 of the Assignment Agreement, and, pursuant to section 3(a) of the Pledge Agreement, GDB is required to transfer such funds into the Pledge Account.  (See Reply ¶¶ 61-62.)  Additionally, the CCDA Movants contend that section 5(b) of the Pledge Agreement, which requires GDB to "diligently enforce its rights under the Assignment Agreement including its enforcement of the . . . transfer

---

[20]    The Court denies the CCDA Movants' motion to strike Mr. Ahlberg's testimony as inadmissible hearsay.  The Court has considered such testimony in connection with the Preliminary Stay Relief Hearing as a proffer of the Tourism Company's knowledge with respect to the identity of the Transfer Account and its ability to produce a witness at a final hearing who could provide admissible testimony regarding such knowledge.

obligation of the [Tourism] Company" recognizes that the Tourism Company's transfer

obligation is a right of GDB.  (See id. ¶ 63.)  None of these provisions, however, supports the

CCDA Movants' position.

      As explained above, the only funds expressly required to be deposited into the

Pledge Account under the Pledge Agreement are "all Hotel Occupancy Tax Funds received from

the Tourism Company as received . . . ."  (Pledge Agreement § 3(a).)  The Trust Agreement,

whose definitions are incorporated into the Pledge Agreement, defines "Hotel Occupancy Tax

Funds" to mean "all Hotel Occupancy Tax Revenues that are deposited in the Transfer Account

on or after the date hereof."  (Trust Agreement § 1.01.)  GDB's obligation to transfer funds

received from the Tourism Company into the Pledge Account under section 3 of the Pledge

Agreement therefore extends only to funds that were deposited into the Transfer Account and

which GDB actually received.  Similarly, although subsection (2)(b)(iii) of the Pledge

Agreement grants holders of CCDA Bonds a lien on "all right, title and interest of GDB to the

Assignment Agreement," no provision of the Assignment Agreement or the Pledge Agreement

gives GDB a property interest in funds other than those deposited in the Transfer Account nor

enables GDB or CCDA to pledge property in which it does not have an ownership interest.

Consequently, the only funds required to be deposited into the Pledge Account under the Pledge

Agreement are those funds that were actually deposited in the Transfer Account.[21]  Accordingly,

no provision of the Pledge Agreement or other Bond Document expands the scope of the CCDA

---

[21]    Contrary to the CCDA Movants' contention (see Reply ¶ 65), it is of no material
significance that the Tourism Company agreed to be bound by the terms of the Pledge
Agreement for the simple reason that no provision of the Pledge Agreement requires the
Tourism Company to transfer funds beyond those actually deposited in the Transfer
Account.

Movants' lien, and the CCDA Movants have failed to establish a colorable claim to any funds
beyond those deposited in the Transfer Account.

      C.      <u>Whether the Hotel Tax Act Grants the CCDA Movants a Statutory Lien</u>

      The CCDA Movants also argue that the Hotel Tax Act gives rise to a statutory
lien in favor of holders of CCDA Bonds by providing that the Pledged Hotel Taxes "shall be
used solely for the payment of the principal and interest on the bonds."  <u>See</u> 13 L.P.R.A. §
2271v(a).  The Oversight Board maintains that no statutory lien exists because this provision
merely permits CCDA to secure payment of the CCDA Bonds by making a pledge of revenues
but does not require it to do so.

> The Bankruptcy Code defines a statutory lien as:
>
> [A] lien arising solely by force of a statute on specified
> circumstances or conditions . . . , but [not including a] security
> interest or [a] judicial lien, whether or not such interest or lien is
> provided by or is dependent on a statute and whether or not such
> interest or lien is made fully effective by statute.

11 U.S.C.A. § 101(53) (Westlaw through P.L 116-145).  In <u>Peaje Invs. LLC v. Fin. Oversight &
Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)</u>, the First Circuit held that a
statutory provision which gave HTA the authority to issue bonds and pledge revenues to secure
payment of such bonds did not provide bondholders with a statutory lien.  899 F.3d 1, 10-13 (1st
Cir. 2018), <u>cert. denied Peaje Invs. LLC v. Fin. Oversight & Mgmt. Bd. for P.R.</u>, 139 S. Ct.
1169, 203 L. Ed. 2d 197 (2019) (mem.).  The First Circuit explained that, under the HTA
Enabling Act, a "pledge of revenues does not attach automatically when [HTA] passes a
resolution issuing bonds.  Rather, it arises only when the [HTA] chooses to grant it."  <u>Id.</u> at 12.
The First Circuit further reasoned that, "because the [HTA Enabling] Act does not automatically
trigger a lien upon the performance of a specified condition, apart from [HTA]'s decision to
grant a lien, it does not create a statutory lien."  <u>Id.</u>

Here, the CCDA Movants allege that the following provision of the Hotel Tax Act

gives rise to a statutory lien:

> [CCDA] is hereby authorized, with the prior written consent of the
> [Tourism] Company, to pledge or otherwise encumber the revenues
> product of the fixed tax collected which is to be deposited in a
> special account as required by the first paragraph of this subsection,
> as security for the payment of the principal and interest on the bonds,
> notes or other obligations issued, assumed or incurred by [CCDA],
> as described in the first paragraph of this subsection . . . .  Such a
> pledge or obligation shall be subject to the provisions of Section 8
> of Article VI of the Constitution of the Commonwealth of Puerto
> Rico.  The product of the collection of the tax shall be used solely
> for the payment of the interest and the amortization of the public
> debt, as provided in Section 8 of Article VI . . . , but only to the
> degree to which the other available resources to which reference is
> made in said Section are insufficient for such purposes.  Otherwise,
> the product of said collection, in the amount necessary, shall be used
> solely for the payment of the principal and interest on the bonds,
> notes or other obligations . . . .

13 L.P.R.A. § 2271v(a).  This provision of the Hotel Tax Act contains no express lien creating

language, and, like the statutory provisions at issue in Peaje, permits CCDA to secure the

payment of bonds by making a pledge of revenues, but does not require that it do so.  Here, as in

Peaje, "[a] pledge of revenues d[id] not attach automatically" when CCDA issued the CCDA

Bonds; rather, that pledge attached "only when [CCDA] cho[se] to grant it."  899 F.3d at 12.

Thus, because the Hotel Tax Act "does not automatically trigger a lien upon the performance of

a specified condition, apart from [CCDA]'s decision to grant a lien, it does not create a statutory

lien." Id.  This conclusion is supported by the fact that CCDA, through the Bond Documents,

specifically pledged the Hotel Taxes deposited in the Transfer Account as security for payment

on the CCDA Bonds, as contemplated by the Hotel Tax Act.  See id. at 10 (noting that security

interests and statutory liens are mutually exclusive).  Therefore, the CCDA Movants have failed

to establish a colorable claim to a statutory lien arising out of the Hotel Tax Act.

D.      Whether the CCDA Movants Have Equitable Ownership of the Hotel Taxes

In support of their claim to equitable ownership of the Pledged Hotel Taxes, the

CCDA Movants rely primarily on the provision of the Hotel Tax Act which provides that the

amount determined and certified by GDB as necessary to make all payments in connection with

the CCDA bonds "shall be deposited in a special account to be maintained by [GDB] in the name

of [CCDA] for the benefit of the bondholders . . . ." 13 L.P.R.A. § 2271v(a).  Moreover, in

connection with this argument, the CCDA Movants rely on the mandate of the Hotel Tax Act

that the Hotel Taxes pledged thereunder "shall be used solely for the payment of the principal

and interest on the bonds."  Id.  The Oversight Board argues that no provision of the Hotel Tax

Act transfers equitable ownership of the Hotel Taxes to holders of the CCDA Bonds or creates a

trust relationship, because the statute permits CCDA to use the Hotel Taxes for purposes other

than payment on the CCDA Bonds and because the statute contemplates, and the parties

executed, agreements governing the parties' respective rights and interests.

The CCDA Movants rely principally on Asociacion De Subscripcion Conjunta

Del Seguro De Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1 (1st Cir. 2007) and

Gracia-Gracia, both of which endorsed theories of equitable ownership based on a

Commonwealth statute governing the Commonwealth's compulsory automobile insurance

scheme (as amended, "Law 253").  Law 253 at all relevant times required liability insurance

coverage for all motor vehicles that travel on public thoroughfares in the Commonwealth.  Flores

Galarza, 484 F.3d at 6.  Every vehicle owner was required to either (i) pay the compulsory

liability insurance premium to the Secretary of the Treasury when licensing a vehicle or (ii) opt

out by purchasing equivalent or better private insurance.  Id. at 7.  The Secretary of the Treasury

was required to give the premiums to the Compulsory Liability Joint Underwriting Association

of Puerto Rico, or the "JUA."  Id.  Drivers without proof of private insurance at the time of

licensing had to pay the premium and were entitled to reimbursement by the JUA.  Id.  Under

Law 253, all private insurers were required to provide compulsory liability insurance in one of

two ways: (i) private insurers were required to provide compulsory liability insurance to motor

vehicle owners that requested it, unless those owners were "high-risk drivers," and (ii) private

insurers were required to provide compulsory liability insurances as members of the JUA.  Id.

(citations omitted).  In Flores Galarza, the JUA alleged that the Secretary of the Treasury had

wrongfully withheld insurance premiums from January 2000 through November 2002 in order to

alleviate the Commonwealth's cash flow problems.  Id. at 10-11.  The First Circuit held that the

JUA, rather than the Commonwealth, was the owner of the diverted premiums:

> Law 253 gives the JUA the power to hold property, and provides
> that the JUA 'shall receive' premiums from the Secretary and that
> the Secretary 'shall transfer' these premiums to the JUA.  While the
> Secretary collects the insurance premiums and holds them for some
> unspecified amount of time before relinquishing them to the JUA,
> the Secretary is not an insurer—he is merely the custodian of these
> funds.  As a custodian, the Secretary has no entitlement to the
> premiums, and his woefully undeveloped argument that the
> premiums do not vest in the JUA until the Secretary transfers them
> does not convince us otherwise.

Id. at 29.  Similarly, the First Circuit in Gracia-Gracia—which involved claims asserted by a

class of motorists who had paid duplicate premiums, rather than by the JUA—held that the

claimants had made a prima facie showing of the existence of a trust relationship based on

statutory language requiring the Secretary of Treasury to hold the relevant funds "in its fiduciary

capacity."  939 F.3d at 351; see 26 L.P.R.A. § 8055(j) ("The Secretary of the Treasury shall

retain the funds transferred by the Joint Underwriting Association in its fiduciary capacity for a

five (5)-year term counting from the date on which the retained funds are transferred by the Joint

Underwriting Association to the Secretary of the Treasury.").

Flores Galarza and its progeny are not instructive for purposes of this motion

practice.  Here, the Bond Documents govern the relationship between the parties and specifically

delineate the nature and scope of the security interest granted to holders of the CCDA Bonds.

Unlike individual motor vehicle owners required to pay premiums for car insurance under the

structure of Law 253, which expressly promised those individuals either insurance or a refund,

holders of CCDA Bonds lent money to CCDA and received bonds in return under specific

conditions spelled out in the Bond Documents.  Although the CCDA Movants claim that certain

provisions of the Bond Documents state that the Pledged Hotel Taxes will be held "in trust" for

the benefit of the CCDA bondholders, thereby "confirming that the CCDA bondholders are the

sole equitable owners of the Pledged Hotel Taxes from the moment the underlying Hotel Taxes

are collected" (see Mot. ¶ 80 (citing Assignment Agreement §§ 1, 4, 5; Pledge Agreement §§

2(a), 3(a)), none of the cited provisions supports that conclusion.  With respect to the Assignment

Agreement, section 1 established the Holding Fund and states that all Hotel Taxes "will be

deposited, as collected," therein; section 4 establishes the amount of Hotel Occupancy Tax Funds

that the Tourism Company must deposit into the Transfer Account; and, under section 5, the

Tourism Company agreed to comply with its transfer obligations under the Hotel Tax Act.

Section 2(a) of Pledge Agreement provides that the Pledge Account will be "held in trust by

GDB on behalf of [CCDA] for the benefit of the [o]wners of the [CCDA] Bonds," and section

3(a) states that GDB agrees to "deposit or cause to be deposited into the Pledge Account[] all

Hotel Occupancy Tax Funds received from the Tourism Company as received."  These and the

other provisions of the Bond Documents circumscribe the CCDA bondholders' rights with

respect to the Hotel Taxes in a manner that is consistent with the Hotel Tax Act.  See, e.g., 13

L.P.R.A. § 2271v(a) (the Tourism Company "shall transfer to [GDB], for deposit in such special

account," the required amounts "through monthly transfers . . . of an amount equal to one tenth (1/10) of the amount determined and certified by [GDB] as necessary for the payments to which the first part of this subsection refers"); id. (authorizing CCDA, "with the prior written consent of the [Tourism] Company, to pledge or otherwise encumber the revenues product of the fixed tax collected which is to be deposited in [the above-referenced] special account . . . as security for the payment of the principal and interest on the bonds, notes or other obligations issued, assumed or incurred by" CCDA).  The Hotel Tax Act does not expressly create an equitable ownership interest or trust relationship, and it would be anomalous for the Court to infer that the statute somehow granted holders of CCDA Bonds rights that are inconsistent with the limitations established by the Bond Documents.

Flores Galarza and Gracia-Gracia are further distinguishable because neither case involved revenues derived from the Commonwealth's constitutional power to levy and collect taxes; rather, in Flores Galarza, the Commonwealth collected insurance premiums owed to JUA, the statutory insurance provider, with the Commonwealth serving only as a "custodian of th[ose] funds," and in Gracia-Gracia, the Commonwealth held duplicate premiums that individual automobile owners had erroneously paid.  The claimants in both cases thus had pre-existing property rights to the funds at issue.  Here, by contrast, the CCDA Movants lack any such pre-existing rights.  Therefore, the CCDA Movants have not shown a reasonable likelihood that they have an equitable interest in any Hotel Taxes.

IV.

CONCLUSION

For the foregoing reasons, the Court concludes that (i) the CCDA Enforcement
Action is subject to the automatic stay, (ii) the CCDA Movants have a colorable claim to a
security interest in funds deposited in the Transfer Account, and (iii) the CCDA Movants have
shown a reasonable likelihood that Scotiabank -5142 is the Transfer Account and that their
security interest attaches to funds deposited therein.

The CCDA Stay Relief Motion is denied to the extent it seeks stay relief with
respect to Hotel Taxes other than those that have been deposited in the Transfer Account.  The
parties are directed to meet and confer and file a joint report as to their positions on the nature,
scope, and scheduling of further proceedings in connection with the CCDA Stay Relief Motion,
including any proceedings concerning stay relief with respect to the CCDA Movants' assertion
of unsecured claims.  The parties must use their best good faith efforts to present a joint
proposal.  The joint report must be filed by July 9, 2020, at 5:00 p.m. (Atlantic Standard Time).

SO ORDERED.

Dated: July 2, 2020

  /s/ Laura Taylor Swain   
LAURA TAYLOR SWAIN
United States District Judge