# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re*<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## AMBAC ASSURANCE CORPORATION'S MOTION TO STRIKE CERTAIN PROVISIONS OF THE AMENDED PLAN SUPPORT AGREEMENT BY AND AMONG THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, CERTAIN GO HOLDERS, AND CERTAIN PBA HOLDERS

**FERRAIUOLI LLC**

221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001

**MILBANK LLP**

55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770

***Attorneys for Ambac Assurance Corporation***

---

[1]  The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5233-LTS) (Last Four Digits of Federal Tax ID: 3801).

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION AND STANDING ...................................................................................... 4

RELEVANT FACTUAL BACKGROUND............................................................................ 7

I.       THE INITIAL PSA AND AMBAC'S MOTION TO STRIKE...........................................7

II.      THE EXECUTION OF THE AMENDED PSA..................................................................9

III.     THE CORONAVIRUS OUTBREAK AND REVISED FISCAL PLAN ........................10

IV.      RELEVANT PROVISIONS OF THE AMENDED PSA..................................................11

ARGUMENT ............................................................................................................................ 12

I.       THE AMENDED PSA IS INCONSISTENT WITH THE OVERSIGHT
         BOARD'S DUTIES UNDER PROMESA. ........................................................................12

         A.       The Amended PSA Improperly Constrains the Oversight Board by Tying
                  It to an Unconfirmable Plan of Adjustment.......................................................... 13

         B.       The Amended PSA Denies Creditor Rights Guaranteed in PROMESA. ............. 18

         C.       The Amended PSA Delegates Authority that Congress Expressly Reserved
                  to the Oversight Board. ......................................................................................... 19

II.      THE COURT SHOULD STRIKE THE BREAKUP FEE PROVISION AND
         OTHER PROVISIONS OF THE AMENDED PSA THAT VIOLATE
         PROMESA NOW. ..............................................................................................................22

CONCLUSION.......................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Eberly v. Moore*,
    65 U.S. 147 (1860)...............................................................................................4

*In re Genco Shipping & Trading Ltd.*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014)...........................................................17

*In re Jefferson Cty., Ala.*,
    491 B.R. 277 (Bankr. N.D. Ala. 2013) ..........................................................19

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010).............................................................16

**Statutes**

11 U.S.C. § 105...................................................................................................5

11 U.S.C. § 362.................................................................................................19

11 U.S.C. § 502.................................................................................................18

11 U.S.C. § 922.................................................................................................19

11 U.S.C. § 941.................................................................................................20

11 U.S.C. § 1109.................................................................................................6

11 U.S.C. § 1125...............................................................................................11

11 U.S.C. § 1129...............................................................................................15

28 U.S.C. § 1331.................................................................................................4

28 U.S.C. § 2166.................................................................................................4

48 U.S.C. § 2121...............................................................................................12

48 U.S.C. § 2126.................................................................................................4

48 U.S.C. § 2141...............................................................................................23

48 U.S.C. § 2147...............................................................................................21

48 U.S.C. § 2161.........................................................................................18, 19

48 U.S.C. § 2165 ..................................................................................................................5

48 U.S.C. § 2172 ...........................................................................................................20, 21

48 U.S.C. § 2174 .......................................................................................................14, 15, 23

Ambac Assurance Corporation ("Ambac") hereby submits this motion for an order, substantially in the form attached hereto as **Exhibit 1**, striking certain provisions of the Amended Plan Support Agreement (the "Amended PSA"),[2] dated as of February 9, 2020, by and among (a) the Oversight Board, as representative of the Commonwealth of Puerto Rico, the Puerto Rico Public Buildings Authority ("PBA"), and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), (b) certain holders of GO Bond Claims and/or CW Guarantee Bond Claims (the "GO Holders"),[3] and (c) certain holders of PBA Bond Claims (the "PBA Holders," and together with the GO Holders, the "Amended PSA Creditors")[4] as violative of PROMESA.  In support of its motion, Ambac respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      This motion to strike is aimed at irreversible issues associated with the Amended PSA.  Recent events have brought to the fore the concerns Ambac raised last summer in its initial motion to strike provisions of the earlier version of the PSA.[5]  The Oversight Board's certification of a substantially revised fiscal plan in May 2020 makes plain what Ambac has long contended (albeit for different reasons):   the Oversight Board, through the Amended PSA (and its predecessor), has tied the Commonwealth's hands to a plan of adjustment that the Oversight Board

---

[2] Capitalized terms not defined herein have the meanings given them in the Amended PSA.

[3] The GO Holders are defined in the Amended PSA as holders of GO Bond Claims and/or CW Guarantee Bond Claims, each as defined therein, which may include the advisors or managers who are advising or managing a holder of GO Bond Claims on behalf of such holder as set forth on Exhibit "A" thereto.

[4] The PBA holders are defined in the Amended PSA as holders of PBA Bond Claims, as defined therein, which may include the advisors or managers who are advising or managing a holder of PBA Bond Claims on behalf of such holder as set forth on Exhibit "B" thereto.

[5] The initial motion, drafted with respect to the Initial PSA (defined herein), was dismissed without prejudice to re-filing due to the execution of the Amended PSA. *See Amended Report and Recommendation of the Mediation Team* (ECF No. 10756) at 19 (recommending Ambac's initial motion be "denied without prejudice given signing of New PSA"); *Final Order Regarding (a) Stay Period, (b) Mandatory Mediation, and (c) Certain Deadlines Related Thereto* (ECF No. 12189).  Appendix A, at 1 (Ambac's initial motion to be "denied without prejudice").

itself now contends is unconfirmable, and in so doing has committed Puerto Rico to putting $100 million in the pockets of a group of short-term investors seeking to enrich themselves at the expense of the Commonwealth.

2.      Like the Initial PSA (defined herein), the Amended PSA is an agreement between the Oversight Board and a select creditor group, comprised primarily of hedge funds that purchased their holdings at steep discounts, that contemplates support for a plan of adjustment that favors its supporting creditors at the expense of almost every other party.  Compounding this injury is the fact that the Amended PSA, like the Initial PSA, contemplates the payment of a $100 million "breakup fee" to those favored creditors in the event the Oversight Board seeks to modify the proposed plan—even if the Oversight Board is compelled by extraneous economic circumstances to do so.  Given the Oversight Board's current positions, and certified fiscal plan, and as discussed in detail below, it is inevitable that this payment will be triggered.

3.      The Amended PSA therefore offends for two principal reasons:  first, it commits the Commonwealth to a plan that cannot be confirmed; and second, it commits to sending $100 million of the Commonwealth's resources to parties that have no long-term commitments in the Commonwealth.  Ambac intends to address the first deficiency in a fulsome objection to any proposed plan of adjustment premised on the Amended PSA at the relevant time.  This motion is limited to the second issue and urges the Court to strike those aspects of the Amended PSA that violate PROMESA and hinder the ability of the Commonwealth to effectively restructure.

4.      Of immediate and vital importance is the elimination of the $100 million "breakup fee" contained within the Amended PSA.  But other provisions also warrant the Court's attention, namely:  the Oversight Board's covenant to prevent parties in interest from exercising their rights, purported carve-outs from the automatic stay for certain actions of the Amended PSA Creditors,

and the impermissible delegation of the Oversight Board's exclusive authority over plans of adjustment and the issuance of new debt securities to certain Amended PSA Creditors.

5.      The Oversight Board's entry into this agreement is fundamentally inconsistent with its Congressionally-stated purpose.  PROMESA vests the Oversight Board with the responsibility of "provid[ing] a method for [the Commonwealth] to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).  The Amended PSA flies in the face of this directive.  There is no method by which the Commonwealth can achieve fiscal responsibility through the framework provided by the Amended PSA.   Rather than restoring creditor confidence, the Amended PSA requires the Oversight Board to deny certain creditor rights safeguarded by PROMESA while at the same time selectively awards the Amended PSA Creditors rights that PROMESA expressly reserves to the Oversight Board.

6.      Notwithstanding the serious issues with the terms of the Amended PSA, the Oversight Board committed to take all actions necessary to file a plan consistent with the Amended PSA (*see* Amended PSA § 4.1), which it did on February 28, 2020 (*see* ECF No. 11946).  If the Amended PSA is terminated, or any term of the Proposed Plan is modified in a manner that adversely impacts the legal or economic rights of the PSA Creditors, as the Oversight Board has publicly stated it must, Puerto Rico will be required to pay the Amended PSA Creditors up to $100 million.  (*See* Amended PSA §§ 6.1(b), 7.1(c)(i).)  Thus, the Oversight Board now finds itself (and has placed the Commonwealth) in an untenable position:  It must either cleave to and support a plan of adjustment that is unconfirmable—either because, as Ambac contends, it violates the U.S. and Puerto Rico Constitutions and PROMESA, or because, as the Oversight Board has publicly stated, it is no longer economically feasible in light of COVID-19—or breach the Amended PSA,

forcing the Commonwealth to dissipate $100 million in a gratuitous give-away to a select group of hedge funds.

7.        Ambac therefore moves the Court to exercise its equitable powers to enter an order striking (i) the breakup fee provision within the Amended PSA; (ii) the Oversight Board's covenant to prevent parties in interest from bringing claim objections; (iii) if the breakup fee is not stricken, the provision within the Amended PSA that purports to set aside the automatic stay with respect to actions that would trigger the breakup fee; and (iv) the provisions within the Amended PSA that give certain Amended PSA Creditors an impermissible veto over the form and substance of any plan of adjustment the Oversight Board proposes or debt securities to be issued thereunder. Action on these terms cannot wait until the plan confirmation stage.  It is critical that the Court strike from the Amended PSA those provisions that are contrary to PROMESA and the duties imposed on the Oversight Board now, before the Amended PSA is terminated and the Oversight Board squanders $100 million of Commonwealth funds.

## JURISDICTION AND STANDING

8.        This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this motion arises under PROMESA.  This Court also has jurisdiction under section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part."  48 U.S.C. § 2126(a). Further, this Court has jurisdiction under section 306(a), which grants this Court original and exclusive jurisdiction of all cases under Title III of PROMESA and original jurisdiction of all civil proceedings arising under Title III of PROMESA or arising in or related to cases under Title III of PROMESA.  *Id.* § 2166(a)(2).

9.        In addition, Article III courts possess inherent equitable powers to award the relief that Ambac seeks here.  *See, e.g.*, *Eberly v. Moore*, 65 U.S. 147, 158 (1860) ("The equitable

jurisdiction of the courts of the United States . . . [is used to] prevent hardship and injustice, and . . . is inherent in the organization of courts of justice."); *see also* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."). Given that termination of the Amended PSA is inevitable, the breakup fee provision of the Amended PSA is an unconscionable give-away that confers to the Commonwealth no value in return, and thus, can be stricken by this Court. The Court can similarly exercise its equitable powers to strike the other provisions described herein, which also violate PROMESA.

10.     Section 305 of PROMESA does not limit the Court's ability to strike certain provisions of the Amended PSA. Section 305 provides that "the court may not, by any stay, order, or decree, in the case or otherwise, interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the use or enjoyment by the debtor of any income-producing property." 48 U.S.C. § 2165. However, section 305 does not interfere with the Court's ability to determine issues relating to a proposed plan of adjustment, of which the Amended PSA is an integral part, such as approval of administrative claims or distribution of a breakup fee pursuant to a plan of adjustment. Consideration of a plan of adjustment and creditor treatment in connection therewith is at the core of this Court's Title III jurisdiction. Here, through the Amended PSA, the Oversight Board purports to pre-wire a plan distribution, rather than to effect some sort of interim distribution of Commonwealth property. As such, striking the offending provisions of the Amended PSA falls squarely within the ambit of the Court's authority.

11.     Further, even if the provision did apply here, section 305 of PROMESA provides an exception in cases where either "the Oversight Board consents or the plan so provides" for

5

action by this Court.  The Amended PSA contemplates the Court's involvement and consents to the Court's action.  It does so most clearly in section 7.1(b), which provides that the Amended PSA may be terminated in the event that "a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan."  Amended PSA § 7.1(b)(viii).  The Oversight Board acknowledges and consents to actions by this Court that may result in termination of the Amended PSA.  Accordingly, the Court has authority to grant the more limited relief sought herein—to strike the commitment to pay the breakup fee in the event the Amended PSA is terminated, and certain other limited provisions.

12.     Ambac has standing to bring this motion as a party in interest.  *See* 11 U.S.C. § 1109 (incorporated into Title III through PROMESA § 301(a)).  Section 1109(b) of the Bankruptcy Code provides that any "party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard *on any issue* in a case under this chapter."  11 U.S.C. § 1109(b) (emphasis added).  Thus, the sweep of section 1109(b) is broad and generous. Pursuant to section 1109(b), any party who can demonstrate any conceivable legal right to relief has standing to appear and be heard.

13.     As an insurer and holder of bonds issued by the Commonwealth, PBA, and other Commonwealth instrumentalities, Ambac is plainly a party in interest in these Title III proceedings.  As such, Ambac is entitled to object to any proposed plan of adjustment.  While Ambac will do so at the appropriate time, at this point Ambac is only asking the Court to prevent the Oversight Board from using the Amended PSA to effectively pre-wire a distribution to a select group of favored creditors and to strike other Amended PSA provisions that, if incorporated into a proposed plan, would make the plan fundamentally unconfirmable.  Ambac must seek relief now

before the Oversight Board irrevocably commits to a significant payment from the limited resources of the Commonwealth in pursuit of a patently unconfirmable plan.

## **RELEVANT FACTUAL BACKGROUND**

14.     On June 30, 2016, PROMESA was signed into law by the President of the United States (P.L. 114-187).  PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process of the Commonwealth and its instrumentalities.

15.     Pursuant to Act 2-2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") was appointed as the agent of and advisor to the Puerto Rico government, and granted authority with respect to the restructuring of any indebtedness issued by the Commonwealth and any governmental entity of the Commonwealth.

16.     On May 3, 2017, the Oversight Board filed a Title III petition on behalf of the Commonwealth in the United States District Court for the District of Puerto Rico.

## I.     THE INITIAL PSA AND AMBAC'S MOTION TO STRIKE

17.     On June 16, 2019, the Oversight Board announced that it had reached an agreement with a group of GO bondholders and PBA bondholders (the "Initial PSA"), on the framework for a plan of adjustment to address $35 billion of claims against the Commonwealth.  The bondholder groups that signed on to the Initial PSA largely consisted of the LCDC and the QTCB Group.

18.     AAFAF was not a signatory to the Initial PSA (nor is it a signatory to the Amended PSA).  In a press release issued shortly after the Oversight Board's announcement of the Initial PSA, Christian Sobrino Vega, AAFAF's CEO and President, stated that the Commonwealth government did not support the Initial PSA and would not support a plan of adjustment premised on the Initial PSA.  AAFAF further stated that "any financial consideration included in the PSA that seeks to incentivize support or subscription to the PSA should not be assumed to be available

7

now or in the future given that the Government of Puerto Rico has not provided its consent to the same." *See* Press Release, AAFAF, Authorized Statement of Christian Sobrino Vega, CEO and Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, Regarding Draft Plan Support Agreement for the Commonwealth and PBA (June 16, 2019), *available at* https://www.aafaf.pr.gov/assets/pr-authorized-statement-christian-sobrino-regarding-draft-psa-commonwealth-pba.pdf.

19.     On July 16, 2019, Ambac filed its *Motion to Strike Certain Provisions of the Plan Support Agreement By and Among the Financial Oversight and Management Board for Puerto Rico, Certain GO Holders, and Certain PBA Holders* (the "Motion to Strike") (ECF No. 8020), wherein it requested that the Court enter an order striking (i) the breakup fee provision within the Initial PSA; (ii) the provisions within the Initial PSA that deprived non-signatory PBA creditors from the due exercise of their right to propose a "Modification" for PBA under Title VI of PROMESA; (iii) the provision within the Initial PSA that purported to set aside the automatic stay with respect of certain actions; and (iv) the provisions within the Initial PSA that gave the PSA Creditors a veto over any plan of adjustment the Oversight Board proposes.

20.     The Official Committee of Unsecured Creditors (the "UCC") subsequently joined Ambac's Motion to Strike (ECF No. 8186).  Additionally, the Ad Hoc Group of Constitutional Debt Holders, Ad Hoc Group of GO Bondholders, Assured Guaranty Corp., and Assured Guaranty Municipal Corp. filed a Statement in Support of the Motion to Strike.  (ECF No. 8223.)

21.     The Court referred the Motion to Strike to mediation before oppositions were due. (ECF No. 8244; *see also* Hr'g Tr. 55:25-57:11 (July 24, 2019).)  During the mediation period, on September 27, 2019, the Oversight Board filed an initial Title III Joint Plan of Adjustment (the "Initial POA").  (ECF No. 8765.)  At the close of mediation, the Court denied the Motion to Strike

without prejudice to refiling, based on the understanding that an Amended PSA would soon be executed.  (ECF Nos. 10756, 12189.)

## II.    THE EXECUTION OF THE AMENDED PSA

22.    On February 9, 2020, the Oversight Board announced that it reached a new agreement with certain bondholders of the Commonwealth on a "substantially enhanced framework" for a Plan of Adjustment.  *See* Press Release, Fin. Oversight & Mgmt. Bd. for Puerto Rico, Oversight Board Reaches New, More Favorable Agreement to Restructure $35 Billion of Liabilities (Feb. 9, 2020).  The Amended PSA, dated February 9, 2020, contains the promises, covenants, and agreements entered into by the Oversight Board and the other Amended PSA Creditors in anticipation of a proposed plan of adjustment.  The signatories of the Amended PSA largely consisted of the LCDC, the QTCB Group, the GO Group, the Constitutional Debt Group, and Fir Tree.

23.    As with the Initial PSA, AAFAF is not a signatory to the Amended PSA.  In a press release issued shortly after the Oversight Board's announcement of its entry into the Amended PSA, Governor Wanda Vázquez Garced rejected the revised agreement.  Press Release, Officer of the Governor of Puerto Rico (Feb. 9, 2020), *available at* http://www.aafaf.pr.gov/assets/cp-declar-gob-wanda-vazquez-02-09-20.pdf.

24.    On February 10, 2020, Ambac, Assured Guaranty Municipal Corp., Assured Guaranty Corp., National Public Finance Guarantee, and Financial Guaranty Insurance Company ("FGIC") jointly issued a statement objecting to the Amended PSA.  *See Financial Guarantors Object to Flawed Amended Commonwealth Plan Support Agreement* (Feb. 10, 2020), *available at* https://assuredguaranty.newshq.businesswire.com/press-release/other/financial-guarantors-object-flawed-amended-commonwealth-plan-support-agreement.

25.     An amended disclosure statement (the "Amended DS") and amended plan of adjustment (the "Amended POA") reflecting the settlement in the Amended PSA were filed shortly after the execution of the Amended PSA, on February 28, 2020.  (ECF Nos. 11947, 11946).

## III.     THE CORONAVIRUS OUTBREAK AND REVISED FISCAL PLAN

26.     On March 21, 2020, the Oversight Board issued a press release addressing the impact the coronavirus outbreak was likely to have on the Commonwealth.  *See* Press Release, Fin. Oversight & Mgmt. Bd. for Puerto Rico, Oversight Board Statement on COVID-19 and the Commonwealth of Puerto Rico's Debt Restructuring Proceedings (Mar. 21, 2020), *available at* https://drive.google.com/file/d/1hA99AnTpmuhcAMTIScKL-06j8YXknZG2/view.     Following this press release, on March 23, 2020, the Oversight Board moved to adjourn deadlines related to briefing regarding, and hearings on, the Amended DS and Amended POA in light of the COVID-19 pandemic, (ECF No. 12485), which adjournment was granted on March 27, 2020 (ECF No. 12549).

27.     On May 1, 2020, the Oversight Board filed a further update with the Court regarding expected timing for the resumption of disclosure statement and plan-related litigation, noting that in order for such litigation to proceed, a revised fiscal plan for the Commonwealth must first be in place.  (ECF No. 13018 ¶ 13.)  The Court directed the Oversight Board to file a proposal for the Debtors' plan and disclosure statement process by July 15, 2020.  (ECF No. 13023.)

28.     The Oversight Board certified a revised fiscal plan for the Commonwealth on May 27, 2020 (the "May 2020 Fiscal Plan").  In the May 2020 Fiscal Plan—which accounts for the purported economic impact of COVID-19—the Oversight Board anticipates significantly reduced funds allocated to debt service as compared to the previous fiscal plan (upon which the Initial POA was premised).  Specifically, in the May 2020 Fiscal Plan the Oversight Board projects $8 billion available for debt service between 2020 and 2032, as compared to a $23 billion surplus over the

same period in the prior fiscal plan.  *See* Press Release, Fiscal Oversight and Management Board

for Puerto Rico, Certified 2020 Commonwealth Fiscal Plan (May 26, 2020), *available at*

https://mailchi.mp/6160eadd19e1/fombpr-press-release-7971694?e=c8297ed24c.   Despite these

substantially revised projections, the Oversight Board maintained in early June that it was "not

about to declare the PSA over, even if the likelihood is that it has to be adjusted."  (Hr'g Tr. 20:22-

23 (June 3, 2020).)  Upon information and belief, the Amended PSA has not been terminated.

## IV.  RELEVANT PROVISIONS OF THE AMENDED PSA

29.     In the Amended PSA, the Oversight Board represents and warrants that it is

authorized to execute the Amended PSA and perform its obligations thereunder.  (*See* Amended

PSA § 3.1(b).)

30.     In addition, the Oversight Board covenants in the Amended PSA that it shall take

"all actions necessary to obtain, and shall not, nor encourage any other person to, take any action

which would, or would reasonably be expected to, impede or preclude, the filing of the Plan[6] and

the Disclosure Statement,[7] the approval of the Disclosure Statement and entry of the Confirmation

Order."  (*See* Amended PSA § 4.1.)

31.     In the Amended PSA, the Oversight Board commits to provide several bonus

payments to certain signatories.

---

[6] The Recitals in the Amended PSA define "Plan" as the "Amended Title III Joint Plan of Adjustment of
the Commonwealth of Puerto Rico, et.al., as it may be amended, modified or supplemented . . ., which Plan
shall be consistent with the terms and provisions of this Agreement."  (Recital M, Amended PSA at 2.)  As
the Oversight Board filed the Amended POA following the execution of the Amended PSA, the Amended
POA is the "Plan" to which the Amended PSA refers.

[7] Section 1.2 of the Amended PSA defines the term "Disclosure Statement" as "the disclosure statement
filed with respect to the Plan with the Title III Court by the Oversight Board in the PROMESA Proceedings
in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings
in accordance with section 301 of PROMESA, which disclosure statement shall be in form and substance
reasonably satisfactory to each Party."  (Amended PSA § 1.2 (definition of "Disclosure Statement").)  As
the Oversight Board filed the Amended DS following the execution of the Amended PSA, the Amended
DS is the "Disclosure Statement" to which the Amended PSA refers.

a. *First*, "[i]n consideration for the fees and expense incurred . . . in connection with the negotiation and execution of [the Amended PSA] and the prosecution of approval of the [Amended DS and Amended POA]," the holders of GO bonds, PBA bonds, and PRIFA BANs that executed the Amended PSA on or before February 9, 2020 (the "Initial PSA Creditors," largely comprised of the LCDC, the QTCB Group, the GO Group, the Constitutional Debt Group, and Fir Tree), shall receive, in cash, their *pro rata* share of 1.25% of the aggregate amount of their GO, PBA, and Commonwealth-guaranteed bond claims (the "Consummation Costs"). (Amended PSA § 6.1(a).)

b. *Second*, "[i]n exchange for executing [the Amended PSA], and agreeing to all of its terms and conditions, including the agreement to 'lock-up' their bonds in accordance with the terms of [the Amended PSA]," all of the Initial PSA Creditors and any additional holders of GO bonds or PBA bonds that execute the Amended PSA (together, the "PSA Restriction Fee Creditors")[8] shall receive their *pro rata* share of $350 million, minus any amounts payable to such creditors as Consummation Costs (the "PSA Restriction Fee"). (Amended PSA § 6.1(b).)

c. *Third*, in the event the Amended PSA is terminated, the Initial PSA Creditors shall receive a fee of up to $100 million (the "Breakup Fee"). (Amended PSA § 6.1(b).)

The Oversight Board covenants that each of the Consummation Costs, the PSA Restriction Fee, and the Breakup Fee (together, the "PSA Fees") shall be payable, in cash, as an administrative expense claim under the Amended POA (in the case of the Consummation Costs and PSA Restriction Fee) or under the eventual plan of adjustment for the Commonwealth (in the case of the Breakup Fee).

## ARGUMENT

### I.   THE AMENDED PSA IS INCONSISTENT WITH THE OVERSIGHT BOARD'S DUTIES UNDER PROMESA.

32.    "The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  48 U.S.C. § 2121(a) (PROMESA § 101(a)).  PROMESA thus charges the Oversight Board with carrying out the

---

[8] The deadline for becoming a PSA Restriction Fee Creditor is the date and time at which holders of claims of 70% of the aggregate amount of GO bond claims, PBA bond claims, and bond claims with a Commonwealth guarantee have executed the Amended PSA.  (*See* Amended PSA §§ 1.2 (definition of "PSA Threshold Attainment"), 6.1(b).)

provisions of PROMESA, which Congress carefully calibrated to rehabilitate the financial health of the Commonwealth while protecting the rule of law and integrity of the markets.

33.     The Oversight Board's entry into the Amended PSA flouts this charge.  The Amended PSA constrains the Oversight Board in a manner inconsistent with PROMESA by tying it to an unconfirmable plan of adjustment and requiring it to pay a large Breakup Fee when the Amended PSA inevitably is terminated.  In addition, the Amended PSA both **_denies_** rights that PROMESA guarantees to creditors and selectively **_awards_** additional powers not present in PROMESA to certain creditors, upsetting the balance Congress struck in crafting PROMESA and laying plain the gamesmanship at the heart of the Commonwealth's restructuring efforts.

34.     Far from providing a path to restore access to the capital markets, the Oversight Board's actions will result in a further decline of market confidence:  the Amended PSA ensures that the Commonwealth will continue to defy its own laws in violation of PROMESA and disregard creditor protections for the benefit of a favored few.  In particular, the Amended PSA requires the Commonwealth to reject the vast majority of its revenue bond obligations out of hand, while favoring certain general unsecured creditors of the Commonwealth—like GO bondholders—with materially preferential treatment.  By selectively rewarding certain creditors and disenfranchising others, the Oversight Board all but ensures the Commonwealth's access to capital will continue to be restricted.

**A.     The Amended PSA Improperly Constrains the Oversight Board by Tying It to an Unconfirmable Plan of Adjustment.**

35.     Perhaps the most troubling provision of the Amended PSA is the Breakup Fee.  (*See* Amended PSA § 6.1(b).)  The Breakup Fee, capped at $100 million, is payable upon termination of the Amended PSA, which may occur upon any number of various conditions and be triggered by not only the Oversight Board but also the creditor signatories.

13

36.     The termination of the Amended PSA is a virtual inevitability.  The Oversight Board has all but confirmed as much in its statements addressing the purported impact of COVID-19.  As noted above, in the May 2020 Fiscal Plan, the Oversight Board reduced the amount available for debt service between 2020 and 2032 by 65% from the amount projected during the same time frame under the previous fiscal plan (upon which the Amended PSA was premised).  (*See supra* ¶ 28.)  The May 2020 Fiscal Plan makes it impossible for the Oversight Board to continue to support a plan of adjustment premised on the Amended PSA.

37.     Even in the absence of the May 2020 Fiscal Plan, the Amended POA is patently unconfirmable.  This too assures that the Breakup Fee will be triggered when the modifications needed to secure confirmation are eventually made.  Ambac intends to object to the Amended DS and Amended POA at the appropriate time, but the following non-exhaustive list enumerates several of the aspects of the Amended POA (required to conform to the Amended PSA) that render it unconfirmable.

38.     *First*, the Amended POA, as required by the Amended PSA, would violate section 407 of PROMESA, which bars the Commonwealth from (i) diverting property from a Puerto Rico instrumentality that applicable law requires to be transferred to the instrumentality for the benefit of creditors, or (ii) transferring property of a Puerto Rico instrumentality to itself, to the extent creditors of the instrumentality have a valid pledge of the transferred property (as revenue bondholders do here).  Thus, the Amended POA, premised on the Amended PSA, cannot satisfy section 314(b)(3) of PROMESA, which, among other things, prevents confirmation of a plan that requires the debtor to engage in conduct that is "prohibited by law."  *See* 48 U.S.C. § 2174(b)(3). The Amended POA would require the debtor to engage in illegal conduct, and therefore, cannot be confirmed.

39.     *Second*, the proposed plan fails to meet the requirements of section 314(b)(6) of
PROMESA, which makes clear that "the plan [must be] feasible and in the best interests of
creditors, which shall require the court to consider whether available remedies under the non-
bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors
than is provided by such plan . . . ."  48 U.S.C. § 2174(b)(6).  Thus, PROMESA requires that in
considering the best interests test in connection with evaluating a plan for confirmation, the court
must also consider recoveries that would have been available outside of bankruptcy as compared
to the recovery under the plan.  This includes any recoveries that creditors could receive by
pursuing available remedies under state or federal law for the Commonwealth's actions impairing
their bonds.  The framework contemplated under the Amended PSA does not do so—particularly
in failing to acknowledge the recourse revenue bondholders would have to their collateral outside
of bankruptcy.

40.     *Finally*, the PSA Fees constitute impermissible vote buying, which raises serious
concerns about whether the plan is presented in good faith—a necessary condition to confirmation
under Section 1129(a)(3) of the Bankruptcy Code.  To be sure, certain kinds of fees associated
with plan support agreements are commonly sought and may be valid if structured in an
appropriate manner.  Here, however, where the Oversight Board has solicited a non-representative
group of creditors[9] and pledged consideration above and beyond favorable treatment under a plan
to induce their support for that plan, there is clear evidence of impermissible vote buying—and to
the extent the Oversight Board argues that the PSA Fees are necessary to secure plan support, it

---

[9] Upon information and belief, the majority of Amended PSA Creditors are not long-term creditors of the
Commonwealth.  Paying the PSA Fees to such creditors drains funds that otherwise could be used to benefit
residents and creditors that have long-term interests of the Commonwealth in mind—a use of funds that
would be viewed far more favorably by traditional purchasers of Commonwealth debt in the capital
markets.

further establishes that such fees constitute vote buying.  This should result in the Amended PSA

Creditors' votes being disallowed.  *See In re Quigley Co.*, 437 B.R. 102, 132 (Bankr. S.D.N.Y.

2010) (disallowing votes procured in bad faith).  The impropriety of the Oversight Board's gambit

is especially evident in light of the Commonwealth government's express disavowal of the

Amended PSA and its predecessor.[10]  Put simply, the Oversight Board is buying votes through the

Amended PSA in order to circumvent its political problems with the very entities it is trying to

restructure.  No plan of adjustment can be confirmed under this framework.

     41.     Despite these infirmities in the Amended POA, the Breakup Fee prevents the

Oversight Board from pursuing any other path towards the Commonwealth's reorganization.  And

the Breakup Fee not only constrains the Oversight Board from pursuit of alternative plan

structures, it prohibits the Oversight Board even from discussing alternatives with other

creditors—notwithstanding that these alternatives may provide better recoveries for all

stakeholders.  (*See* Amended PSA § 4.1 ("The Oversight Board . . . shall not, nor encourage any

other person to, take any action which would, or would reasonably be expected to, impede or

preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure

Statement and the entry of the Confirmation Order and the consummation, implementation and

administration of the Plan. . .").)

     42.     In chapter 11 cases, the problem of a plan support agreement tying a debtor's hands

in all circumstances is generally ameliorated by the inclusion of a "fiduciary out": a provision that

allows the debtor to consider alternative restructuring proposals and terminate the agreement if the

---

[10] *See Objection of Elected Government Parties Regarding Plaintiff Financial Oversight and Management Board for Puerto Rico's Motion to Stay PBA Adversary Proceeding Pending Confirmation of Commonwealth Plan of Adjustment*, Adv. Pro. No. 18-00149 (ECF. No. 102) (arguing that the Initial PSA "is deeply flawed").

debtor determines, in its business judgment, that another plan structure is preferable.  *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464-65, 469 (Bankr. S.D.N.Y. 2014) (approving PSA notwithstanding a termination fee because it included a "fiduciary out that [gave] the Debtors the ability to receive, review and negotiate unsolicited proposals for any better alternative transaction").  There is no "fiduciary out" in the Amended PSA—the Oversight Board is prevented from considering ***any*** restructuring alternatives ***other than*** the Amended POA.  At an absolute minimum, the Amended PSA should include a fiduciary out to allow the Oversight Board to consider alternative proposals.  Moreover, given that the Commonwealth's Title III case will restructure municipal assets, the Oversight Board should be empowered to consider ***and to pursue*** alternative proposals without paying the Breakup Fee as the price for doing so.

43.    Without the Breakup Fee, the Oversight Board would be free to pursue alternatives in good faith.  The Amended PSA prevents the Oversight Board from walking away from an unconfirmable plan without costing the Commonwealth and its stakeholders $100 million—even if "the economic situation of the Commonwealth suffers a material adverse change which renders the confirmation of the Plan not feasible and consummation of the Plan impracticable." (Amended PSA § 7.1(b)(vi).)  The result is that the Oversight Board has irrevocably committed to providing the Amended PSA Creditors a fee.

44.    Because the Breakup Fee needlessly raises the transaction cost of pursuit of any other possible outcome for the Commonwealth's Title III case and requires the Oversight Board to pay precious dollars to the Amended PSA signatories in exchange for which the Commonwealth

will receive nothing—all at the expense of residents and creditors with long-term commitments to the Commonwealth—the Breakup Fee should be stricken.[11]

### B.    The Amended PSA Denies Creditor Rights Guaranteed in PROMESA.

45.    While providing the Oversight Board significant powers and leverage in adjusting the Commonwealth's debts,[12] PROMESA also affords Commonwealth creditors certain powers and protections.  The Amended PSA erodes these creditor safeguards to the detriment of many. Several examples of the Amended PSA's abrogation of creditor rights follow.

46.    *First*, the Oversight Board covenants in the Amended PSA to "tak[e] all reasonable efforts to *prevent any other person or entity* (private or governmental) from directly or indirectly commencing (or continuing to prosecute)" any "action or proceeding or asserting any claim or objection against any Initial PSA Creditors (or their respective trustees, fiscal agents, or paying agents) relating to the GO Bonds, the PBA Bonds, or the PRIFA BANs."  (Amended PSA § 4.1(f) (emphasis added).)  The right to bring a claim objection is one guaranteed to any "party in interest" under Bankruptcy Code section 502(a), which PROMESA incorporates into Title III.  11 U.S.C. § 502(a); *see* 48 U.S.C. § 2161(a) (PROMESA § 301(a)).  That the Oversight Board *covenants* to "prevent" any other person or entity—who may be a party in interest with requisite standing— from exercising its right to object to claims is remarkable.

47.    *Second*, the Amended PSA purports to set aside the automatic stay with respect of

---

[11] Alternatively, the Court may exercise its equitable powers to excuse compliance with the terms of the Breakup Fee where, as here, it would deter the Oversight Board from pursuing a plan of adjustment that is in the best interests of creditors and the Commonwealth alike.

[12] As alleged in its recently-filed adversary complaint against the Oversight Board and its members, Ambac maintains that Titles I, II, and III of PROMESA are unconstitutional and unenforceable on the ground that they violate the Bankruptcy Clause's uniformity requirement.  (*See* ECF No. 13231.)  Ambac expressly reserves all rights to argue that provisions of PROMESA purporting to give the Oversight Board overbroad and non-uniform powers in adjusting the Commonwealth's debts are unconstitutional and unenforceable.

certain actions, thereby setting aside a key creditor safeguard.  The Bankruptcy Code's automatic stay (11 U.S.C. §§ 362, 922), incorporated into PROMESA (48 U.S.C. § 2161(a)), is designed not only to protect debtors from creditor actions, but also to protect creditors while the debtor restructures.  *See In re Jefferson Cty., Ala.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013) (quoting H.R. Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97) ("The automatic stay also provides creditor protection.  Without it, certain creditors would be able to pursue their own remedies against the debtor's property.  Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.  Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.  A race of diligence by creditors for the debtor's assets prevents that.").  The Amended PSA, however, summarily provides that "[t]he automatic stay under Sections 362 and 922 of the Bankruptcy Code . . . shall not prohibit a Party from taking any action necessary" to terminate the Amended PSA.  (Amended PSA § 7.1(d).)  As discussed above, the termination of the Amended PSA has significant financial ramifications:  namely, the payment of the Breakup Fee to the Amended PSA signatories.  In the event the Breakup Fee is not stricken from the Amended PSA, a unilateral declaration that the automatic stay does not apply—and therefore no Court action or approval is needed—before a significant payment is triggered is a serious infringement on longstanding creditor rights, and removes a critical check on the process.

     **C.**    **The Amended PSA Delegates Authority that Congress Expressly Reserved to the Oversight Board.**

     48.    The Amended PSA also selectively provides certain PSA signatories with rights that PROMESA reserves for the Oversight Board, further upsetting the balance PROMESA strikes

between creditors and the Commonwealth.[13]

49.     Under PROMESA, the Oversight Board is the sole entity empowered to propose a plan of adjustment for the Commonwealth; creditors may not propose plans.  *See* 48 U.S.C. § 2172(a) (PROMESA § 312(a)) ("Only the Oversight Board, after the issuance of a certificate pursuant to section 104(j) of this Act, may file a plan of adjustment of the debts of the debtor."). Chapter 9 also prevents creditors from proposing plans of adjustment, reserving that right exclusively for municipal debtors.  *See* 11 U.S.C. § 941 ("The debtor shall file a plan for the adjustment of the debtor's debts.").  As the lone entity vested with power to propose a plan of adjustment, the Oversight Board should not delegate that power to a non-representative group of creditors.  It is highly unlikely that such a subset of creditors would exercise these delegated rights with an eye toward what is fair to all creditors, in the best interests of the debtor, and in furtherance of the goals of PROMESA.

50.     Yet through the Amended PSA, the Oversight Board does exactly this.  The Amended PSA requires the Oversight Board to defer to certain Amended PSA Creditors on the form and substance of the plan of adjustment by providing that the "Plan" be "acceptable in form and substance to the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group with respect to the treatment of GO Bond Claims and PBA Bond Claims" (Amended PSA, Recital M).  The Amended PSA also empowers this same group of creditors to enforce this right by terminating the Amended PSA and triggering the Breakup Fee if those creditors are unhappy with the plan of adjustment.  (*See* Amended PSA §§ 6.1(b), 7.1(c)(i) (the Breakup Fee is triggered if the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group jointly terminate

---

[13] As noted *supra* n.12, Ambac reserves all rights to argue that provisions of PROMESA purporting to give the Oversight Board overbroad and non-uniform powers in adjusting the Commonwealth's debts are unconstitutional and unenforceable.

the Amended PSA due to a modification in the Plan which "adversely economically . . . impacts

the treatment" of such creditors.)   This delegation of authority is flatly inconsistent with

PROMESA, which reserves the right to determine the content of the plan of adjustment "only" to

the Oversight Board, acting on behalf of the Commonwealth.   *See* 48 U.S.C. § 2172(a)

(PROMESA § 312(a)).

51.     The Oversight Board similarly contravenes PROMESA in granting power over the

form of debt securities to be issued under the plan of adjustment to this same subset of Amended

PSA Creditors.  PROMESA is clear that the Commonwealth may not issue new debt without the

consent of the Oversight Board.  *See* 48 U.S.C. § 2147 (PROMESA § 207) ("For so long as the

Oversight Board remains in operation, no territorial government may, without the prior approval

of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter

into similar transactions with respect to its debt.").  But through the Amended PSA, the Oversight

Board grants the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group a

veto over the form of debt securities to be issued in connection with the plan of adjustment:  the

New GO Bonds and COFINA Junior Lien Bonds (defined in Section 1.2 of the Amended PSA and

described in Exhibit "I" thereto).

52.     The Amended PSA requires the "Plan" to be consistent with Exhibit "I" to the

Amended PSA, which describes the debt securities to be issued (*see* Amended PSA, Recital M),

and further requires the "Plan" and its related "Definitive Documents" (which include "bond

resolutions") to be "acceptable in form and substance" or "reasonably satisfactory" (respectively)

to the Initial PSA Creditors (*id.* § 1.2 (definition of "Definitive Documents")).  This establishes an

effective veto in favor of the Constitutional Debt Group, the GO Group, the LCDC and the QTCB

Group over the debt securities to be issued.  These creditors, acting in concert, are empowered

both (i) to approve the form of the plan and related documents, including debt securities (*see* Amended PSA, Recital M, § 1.2), and (ii) to trigger the Breakup Fee if they determine that changes to the Plan result in adverse economic impact to the treatment of their claims (*see id.* §§ 6.1(b), 7.1(c)(i) (Breakup Fee is triggered if these four groups jointly terminate the Amended PSA due to modifications in the Plan which "adversely economically . . . impacts the treatment" of such creditors)). The resulting veto power over the form of debt securities issued is improper. As with the ability to propose a plan of adjustment, the ability to approve the issuance of debt is vested exclusively in the Oversight Board. Granting certain select creditors veto power with respect to this decision is inconsistent with the Oversight Board's duties under PROMESA.

53.    The Amended PSA therefore awards certain select creditors—the Constitutional Debt Group, the GO Group, the LCDC and the QTCB Group—an effective veto not only over the debt securities to be issued under the eventual plan of adjustment, but also over the form and substance of the plan itself. These are rights PROMESA reserves solely for the Oversight Board, acting on behalf of the Commonwealth.

## II.   THE COURT SHOULD STRIKE THE BREAKUP FEE PROVISION AND OTHER PROVISIONS OF THE AMENDED PSA THAT VIOLATE PROMESA NOW.

54.    As described above, the Amended PSA contemplates a plan of adjustment that is not confirmable. The Amended POA—and indeed any plan consistent with the Amended PSA—would violate the U.S. Constitution, Puerto Rico Constitution, provisions of PROMESA, and plan confirmation requirements.

55.    Nevertheless, the Oversight Board has bound itself to the Amended PSA, promising that it shall take "all actions necessary to obtain, and shall not, nor encourage any other person to, take any action with would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and entry of the

Confirmation Order." (*See* Amended PSA § 4.1.) And the Oversight Board has agreed that any modifications to a plan or disclosure statement that would adversely affect the treatment provided for creditors that have signed on to the Amended PSA would enable those creditors to terminate and trigger the Breakup Fee. (*See* Amended PSA §§ 6.1(b), 7.1(c)(i).)

56.     But modifications that adversely affect the PSA signatories' treatment are now all but certain, given the changes in the May 2020 Fiscal Plan for the Commonwealth to which the plan of adjustment must conform. *See* 48 U.S.C. § 2174(b)(7) (PROMESA § 314(b)(7)) (a plan of adjustment must be "consistent with the applicable Fiscal Plan" to be confirmed).[14] The Oversight Board's decision to enter into the Amended PSA thus represents a clear dereliction of the Oversight Board's duties under PROMESA and renders dissipation of a substantial sum virtually inevitable.

57.     Accordingly, the Court should exercise its inherent equitable powers to strike the unlawful provisions of the Amended PSA now, prior to the termination of the agreement by its terms, which would trigger the Breakup Fee. Ambac notes that it is not asking the Court to strike the entire Amended PSA. Rather, Ambac respectfully submits that the Court should solely strike the provisions that improperly bind the Oversight Board to a plan that has no possibility of being confirmed and that cause the Oversight Board to contravene the directions and requirements of PROMESA. If these provisions are stricken, the Oversight Board will be free to pursue alternatives in good faith without violating PROMESA and without paying an exorbitant sum to creditors in exchange for which the Commonwealth will receive nothing.

---

[14] Ambac continues to review the May 2020 Fiscal Plan and reserves all rights to argue that the May 2020 Fiscal Plan is premised on erroneous or misleading projections, which would violate the mandate of PROMESA § 201 and render any plan of adjustment premised on such fiscal plan unconfirmable. *See* 48 U.S.C. § 2141 (PROMESA § 201).

## <u>CONCLUSION</u>

For the reasons set forth herein, Ambac respectfully requests that the Court (a) enter an order, substantially in the form attached hereto as **<u>Exhibit 1</u>**, striking (i) the Breakup Fee provision within the Amended PSA; (ii) the Oversight Board's covenant to prevent parties in interest from bringing claim objections; (iii) if the Breakup Fee is not stricken, the provision within the Amended PSA that purports to set aside the automatic stay with respect to actions that would trigger the Breakup Fee; and (iv) the provisions within the Amended PSA that give certain Amended PSA Creditors an impermissible veto over the form and substance of any plan of adjustment the Oversight Board proposes or debt securities to be issued thereunder; and (b) grant such further relief as the Court deems just and proper.

Dated:  July 7, 2020
      San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*      
      Roberto Cámara-Fuertes (USDC-PR No. 219002)
      Sonia Colón (USDC-PR No. 213809)
      221 Ponce de León Avenue, 5th Floor
      San Juan, PR 00917
      Telephone: (787) 766-7000
      Facsimile:  (787) 766-7001
      Email:  rcamara@ferraiuoli.com
            scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*      
      Dennis F. Dunne (admitted *pro hac vice*)
      Atara Miller (admitted *pro hac vice*)
      Grant R. Mainland (admitted *pro hac vice*)
      John J. Hughes, III (admitted *pro hac vice*)
      55 Hudson Yards
      New York, NY 10001
      Telephone: (212) 530-5770
      Facsimile:  (212) 822-5770
      Email: ddunne@milbank.com
            amiller@milbank.com
            gmainland@milbank.com
            jhughes2@milbank.com

*Attorneys for Ambac Assurance Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com