**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*, | |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3566-LTS |
| as representative of | |
| THE EMPLOYEES RETIREMENT SYSTEM<br>OF THE GOVERNMENT OF THE<br>COMMONWEALTH OF PUERTO RICO, | |
| Debtor. | |

**THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF
THE COMMONWEALTH OF PUERTO RICO'S OPPOSITION
TO CLAIMANTS' MOTION FOR JUDGMENT
ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)**

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 6

   I.  Claimants' Request For A Judicial Determination That The Exception To
     Recourse Treatment Found In Section 1111(b)(1)(A)(ii) Does Not Apply If The
     Plan Currently On File Is Confirmed Seeks An Impermissible Advisory Opinion
     That Is Not Ripe For Decision. ......................................................................................... 6

   II.  The Retiree Committee Has Not Waived Its Rights To Argue Whether And How
     Section 1111(b)(1)(A)(ii) Applies As This Issue Is A Plan Confirmation Issue
     And Not A Claim Objection Issue. ................................................................................... 8

   III.  Claimants Do Not Possess Recourse Claims Against ERS For Their Alleged
     Extra-Contractual Causes of Action. ............................................................................. 10

   IV.  Even If Claimants Have Claims Beyond The Pledged Property (And They Do
     Not) Those Claims May Only Be Asserted In The ERS Case And Not In The
     Commonwealth Case. ..................................................................................................... 15

   V.  Claimants Have Not Established That Any Of Their Claims Are Entitled To
     Administrative Priority. .................................................................................................. 17

      A.  Section 552 Bars Claimants' "Non-Contractual Claims" Against The
        Commonwealth And ERS ................................................................................... 18

      B.  PROMESA Does Not Provide Administrative Priority For The Actual And
        Necessary Expenses Of Preserving The "Estate." .............................................. 19

      C.  Even If Section 503(b)(1)(A) Applies Without Limitation In PROMESA,
        Claimants' "Administrative" Claims Provided No Benefit To The "Estates." ........... 21

   VI.  Even If Claimants Could Assert Administrative Claims (And They Cannot),
     Those Claims Would Be Dischargeable. ........................................................................ 24

CONCLUSION.................................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*680 Fifth Ave. Assocs. v. Mutual Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.)*,
    29 F.3d 95 (2d Cir. 1994).................................................................................2, 15, 16

*Abbott Labs v. Gardner*,
    387 U.S. 136 (1967).................................................................................................1, 6

*ACP Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. of P.R.)*,
    919 F.3d 638 (1st Cir. 2018).....................................................................................1, 6

*ACP Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. of P.R.)*,
    300 F. Supp. 3d 328 (D.P.R. 2018).......................................................................1, 6, 8

*Bresler v Wilmington Tr. Co.*,
    761 F. App'x 160 (4th Cir. 2019) ...............................................................................15

*Curran v. Cousins*,
    509 F.3d 36 (1st Cir. 2007).....................................................................................4, 13

*Ecore Int'l, Inc. v. Downey*,
    343 F. Supp. 3d 459 (E.D. Pa. 2018) ..........................................................................12

*Energy Future Intermediate Holding Co. LLC v. UMB Bank, N.A.*
    *(In re Energy Future Holdings Corp.)*,
    531 B.R. 499 (Bankr. D. Del. 2015) ...............................................................................7

*Fin. Oversight & Mgmt. Bd. of P.R. v. Andalusian Global Designated Activity Co.*
    *(In re Fin. Oversight & Mgmt. Bd. of P.R.)*,
    948 F.3d 457 (1st Cir. 2020)........................................................................3, 4, 17, 18

*Fin. Oversight & Mgmt. Bd. of P.R. v. Andalusian Global Designated Activity Co.*
    *(In re Fin. Oversight & Mgmt. Bd. of P.R.)*,
    385 F. Supp. 3d 138 (D.P.R. 2019)............................................................................3, 4

*First Independent. Bank of Nevada v. Mohave State Bank*, No. CV-09-8195-PCT-PGR, 2010
    WL 1408890 (D. Ariz. Apr. 7, 2010) ..........................................................................14

*Hayes v. City of Detroit Water & Sewerage Dep't*,
    No. 14-14622, 2015 WL 7567504 (E.D. Mich. Nov. 25, 2015)...................................24

*In Matter of Beatriz Ready Mix, Inc.*,
    No. 08-04457 (SEK), 2009 WL 255890 (Bankr. D.P.R. Feb. 3, 2009)........................12

*In re Allen-Main Assocs. Ltd. P'ship,*
    223 B.R. 59 (B.A.P. 2d Cir. 1998) ...................................................................15, 17

*In re B.R. Brookfield Commons No. 1 LLC,*
    735 F.3d 596 (7th Cir. 2013) ......................................................................2, 15, 16

*In re City of Detroit, Michigan,*
    548 B.R. 748 (Bankr. E.D. Mich. 2016) ...............................................................25

*In re FBI Distrib. Corp.,*
    330 F.3d 36 (1st Cir. 2003) ...................................................................................22

*In re Hemingway Transport, Inc.,*
    954 F.2d 1 (1st Cir. 1992) ..............................................................................22, 23

*In re Mammoth Mart, Inc.,*
    536 F.2d 950 (1st Cir. 1976) .................................................................................23

*In re Montgomery Ward, LLC,*
    634 F.3d 732 (3d Cir. 2011) ...................................................................................9

*In re New York City Off-Track Betting Corp.,*
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) ......................................................19, 20, 21

*In re PCH Assocs.,*
    949 F.2d 585 (2d Cir. 1991) .........................................................................15, 17

*In re PWKH, Inc.,*
    No. BR 09-30010 (MFW), 2013 WL 5486835 (D.V.I. Sept. 30, 2013) ................12

*In re Salamon,*
    854 F.3d 632 (9th Cir. 2017) ..........................................................................2, 16

*In re Salamon,*
    528 B.R. 171 (B.A.P. 9th Cir. 2015) ......................................................................2

*In re Shefa, LLC,*
    535 B.R. 165 (E.D. Mich. 2015) ............................................................................1

*In re Shefa, LLC,*
    524 B.R. 717 (Bankr. E.D. Mich. 2015) ............................................................1, 7

*In re Stanley,*
    185 B.R. 417 (Bankr. D. Conn. 1995) ..................................................................10

*In re Tolentino,*
    No. 10-10511, 2010 WL 1462772 (Bankr. N.D. Cal. Apr. 12, 2010) ..............15, 17

*Kroblin Refrigerated Xpress, Inc. v. Pitterich*,
    805 F.2d 96 (3d Cir. 1986)..................................................................................12

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*,
    844 F.3d 318 (1st Cir. 2016)...............................................................................6

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)............................................................................................9

*O'Loghlin v. County of Orange*,
    229 F.3d 871 (9th Cir. 2000)............................................................................24

*Official Committee of Unsecured Creditors of D.F. Antonelli v. United States (In re Antonelli)*,
    No. 91-4-0254-PM, 1992 WL 435879 (Bankr. D. Md. Nov. 6, 1992).......................7

*Perry v. Wolaver*,
    506 F.3d 48 (1st Cir. 2007)...............................................................................12

*Reading Co. v. Brown*,
    391 U.S. 471 (1968)..........................................................................................17

*Steinke v. Sungard Fin. Sys., Inc.*,
    121 F.3d 763 (1st Cir. 1997).............................................................................12

*Tampa Bay Assocs., Ltd. v. DRW Worthington, Ltd. (In re Tampa Bay Assocs., Ltd.)*,
    864 F.2d 47 (5th Cir. 1989) ................................................................................7

*V.W. ex rel. Barber v. City of Vallejo*,
    No. 12-CV-1629, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013)...........................24

*Williams v. Metzler*,
    132 F.3d 937 (3d Cir. 1997).............................................................................12

**STATUTES**

11 U.S.C. § 502(b) ....................................................................................9, 10, 15, 17

11 U.S.C. § 503(b) ................................................................................... *passim*

11 U.S.C. § 506(a) ....................................................................................................21

11 U.S.C. § 541 ...................................................................................................19, 20

11 U.S.C. § 550(a) ....................................................................................................21

11 U.S.C. § 552 ....................................................................................................... *passim*

11 U.S.C. § 901(a) ....................................................................................................20

11 U.S.C. § 944(b) ...................................................................................................24, 25

11 U.S.C. § 1111 ...................................................................................................... *passim*

11 U.S.C. § 1122 ...............................................................................................................9

11 U.S.C. § 1322 ...............................................................................................................9

48 U.S.C. § 2161(a) ........................................................................................................24

48 U.S.C. § 2161(c)(5)................................................................................................20, 21

OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 901.04[13][a] (16th ed. 2020) ...............................................20, 25

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the

"**Retiree Committee**") objects (the "**Objection**") to *Claimants' Motion For Judgment On The*

*Pleadings Pursuant To Fed. R. Civ. P. 12(c)* [Dkt. 917][2] (the "**Rule 12(c) Motion**").

## INTRODUCTION

Claimants' Rule 12(c) Motion puts the proverbial cart before the horse and should be

denied as premature. Claimants ask this Court to determine on a final basis what their rights, if

any, may be under section 1111(b) of the Bankruptcy Code even though a serious challenge is

pending to the validity of Claimants' bonds and ERS is many months away from a hearing on

confirmation of a plan. If the Court concludes that Claimants' bonds are *ultra vires*, the Court will

never need to address Claimants' alleged section 1111(b) rights as it is beyond dispute that if

Claimants have no claims, section 1111(b) will "not somehow breathe life back into [their

claims]." *See, e.g.*, *In re Shefa, LLC*, 524 B.R. 717, 739 (Bankr. E.D. Mich. 2015), *aff'd,* 535 B.R.

165 (E.D. Mich. 2015). Claimants' use of Rule 12(c) as a vehicle to ask this Court to issue an

advisory opinion that assumes the outcome of the *ultra vires* dispute is improper, and the Rule

12(c) Motion should be denied on that basis alone. *See ACP Master, Ltd. v. Puerto Rico (In re Fin.*

*Oversight & Mgmt. Bd. of P.R.*), 300 F. Supp. 3d 328, 336-37 (D.P.R. 2018), *aff'd*, *ACP Master,*

*Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. of P.R.*), 919 F.3d 638 (1st Cir. 2018);

*Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v.*

*Sanders*, 430 U.S. 99 (1977).

More still, the Financial Oversight and Management Board (the "**Board**") has stated that

it will likely amend the current plan in light of the COVID-19 pandemic. Thus, even if the Court

---

[2] Unless otherwise noted, docket numbers refer to In re Employees Retirement System of the Government
of the Commonwealth of Puerto Rico, 17-bk-3566 (D.P.R.).

were constitutionally permitted to issue an advisory opinion (and of course it is not), it would make no sense for this Court to spend its time deciding whether or not a plan that the Board intends to amend meets the exception to recourse treatment set forth in section 1111(b)(1)(A)(ii). That issue, if it ever becomes ripe, is one for the confirmation hearing, when the actual plan the Board seeks to confirm is before this Court and *all* ERS Bondholders as of the yet unset record date as a class have had the opportunity to decide whether to make the election provided to them as a class under section 1111(b).

Making matters worse, Claimants' premature request for an advisory opinion is built on sophistry. Claimants blur the distinctions between the Commonwealth and ERS Title III Cases by implying that whatever rights they have under section 1111(b) in ERS's Title III Case carry over to their claims in the Commonwealth case. Not so. As three different Circuits—the Seventh, Second, and Ninth—have held, "[t]here is one prerequisite [to applying section 1111(b)]: the claim is secured *by a lien on the property of the estate*." *In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 598 (7th Cir. 2013) (emphasis added); *accord 680 Fifth Ave. Assocs. v. Mutual Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.)*, 29 F.3d 95, 98 (2d Cir. 1994); *In re Salamon*, 528 B.R. 171, 176 (B.A.P. 9th Cir. 2015), *aff'd*, 854 F.3d 632 (9th Cir. 2017). Claimants have *no* lien rights in any Commonwealth property, and thus do not have a claim in the Commonwealth case, much less a recourse claim for any deficiency amount. Indeed, the Offering Circular for the Bonds states multiple times that "[t]he Bonds are not an obligation of the Commonwealth of Puerto Rico or any of its other instrumentalities or political subdivisions" and "are not payable out of any moneys of the Commonwealth other than future Employer Contributions." [Commonwealth Dkt. 6482, Ex. C p.1, 2, 23, 37.]  The Bond Resolution states the same. (Rule 12(c) Motion, Ex. 1, at VI-1, §201.) Whatever rights, *if any*, Claimants have under section 1111(b) in the ERS Title III Case, section

1111(b) cannot and does not confer those rights in the Commonwealth case. Simply put, section 1111(b) does not somehow undo Claimants' unequivocal waiver of claims against the Commonwealth.

Equally disingenuous (and premature) is Claimants' assertion that their alleged "non-contractual" claims against the Commonwealth survive the waivers found in the Bond Resolution. All of these alleged non-contractual claims against the Commonwealth rest on the allegation that the Commonwealth wrongfully eliminated Claimants' collateral interests in Employer Contributions when it enacted the post-petition pension reform legislation. (Rule 12(c) Motion at 30-32.) Again, not so. Section 552 of the Bankruptcy Code, not the Commonwealth's post-petition pension reform legislation, is the reason why Claimants have no interest in post-petition Employer Contributions. This Court's and the First Circuit's section 552 decisions doom Claimants' alleged non-contractual claims on the merits, making it unnecessary to ever reach the issue of whether these non-existent, non-contractual claims have been waived. *See Fin. Oversight & Mgmt. Bd. of P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. of P.R.)*, 385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd*, 948 F.3d 457, 468 (1st Cir. 2020).

Finally, Claimants ask this Court to decide the priority of their alleged claims in a vacuum. Ignoring the agreed briefing schedule, Claimants jump the queue, asking the Court to rule on whether their claims are entitled to administrative priority without first addressing the merits of those claims. This, too, puts the cart before the horse. The parties already are briefing the merits of those claims and their alleged priority pursuant to an agreed schedule. [Dkt. 927.] And if the Court concludes the claims lack merit, the priority question need never be addressed. But if the Court addresses it, Claimants' assertion of priority fails both because PROMESA does not provide for administrative claims of the sort Claimants seek, and also because *all* of Claimants' alleged

3

non-contractual claims stem from their pre-petition contract. Thus, if any of the Claimants' non-contractual claims survive, they are pre-petition claims and are not entitled to administrative expense priority.

## BACKGROUND

Claimants' Rule 12(c) Motion accepts as true the facts as set forth in the Retiree Committee's *Omnibus Objection, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders of ERS Bonds Against ERS And The Commonwealth* [Commonwealth Dkt. 6482] (the "**Retiree Objection**"). *See Curran v. Cousins*, 509 F.3d 36, 43 (1st Cir. 2007). The Retiree Committee incorporates those facts herein. [Commonwealth Dkt. 6482 at ¶¶5-30.]

In addition, the Court should take judicial notice that since the Retiree Committee filed the Retiree Objection on April 23, 2019, this Court and the First Circuit have both addressed the impact of section 552 on the Claimants' liens, holding that section 552 terminated Claimants' liens in any Pledged Property in which ERS acquired rights on and after May 21, 2017 and that ERS also had no property interest in future Employer Contributions that were not yet due. *See Fin. Oversight & Mgmt. Bd. of P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. of P.R.)*, 385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd*, 948 F.3d 457, 468 (1st Cir. 2020).

Also relevant to the Rule 12(c) Motion is the fact that on September 27, 2019, the Board, on behalf of the Commonwealth, ERS, and the Puerto Rico Public Buildings Authority, filed the *Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, et al.* [Dkt. 672] (the "**Plan**"). That Plan provides in relevant part that, "[o]n the Effective Date, the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey, all of ERS's right, title and interest in ERS's assets, including, without limitation, such assets subject to a valid and perfected lien or security interest, for an aggregate purchase price equal to the sum of (a) one hundred percent

4

(100%) of the Cash in ERS accounts as of the Effective Date, (b) ninety-five percent (95%) of the face amount of performing ERS employee loans as of the Effective Date, (c) one hundred percent (100%) of the market price of the COFINA bonds held by ERS, as of the Effective Date, and (d) fifty percent (50%) of the book value of the ERS portfolio of private equity interests held by ERS as of the Effective Date, with such amount being approved by the Title III Court at the Confirmation Hearing and incorporated into the findings of fact set forth in the Confirmation Order." (Plan, § 2.4.)

The Plan has not moved toward confirmation. On May 1, 2020, the Board filed a status report with the Court indicating that, in light of the pandemic, it was "unprepared at this time to propose a schedule for the Debtors' plan and disclosure statement process." (Commonwealth Dkt. 13018 at ¶13.) On June 2, 2020, the Board filed a status report stating that it was "continu[ing] to collaborate with the Government to address the near and long-term economic effects of the pandemic and to determine the ramifications upon the filed plan of adjustment." (Commonwealth Dkt. 13337 at ¶4.) A third status report is due on July 15, 2020. (Commonwealth Dkt. 13023). The Board has indicated elsewhere that Plan will be revised before it proceeds to confirmation. (*See PROMESA Implementation During the Coronavirus Pandemic: Hearing Before the H. Comm. on Natural Resources*, at 9 (June 11, 2020) (statement of Natalie Jaresko, Exec. Dir., Fin. Oversight & Mgmt. Bd. of P.R.) (noting adjournment of consideration of Plan and Disclosure Statement due to "considerable uncertainty about the effect of COVID-19 on Puerto Rico").

## ARGUMENT

I.     **Claimants' Request For A Judicial Determination That The Exception To Recourse Treatment Found In Section 1111(b)(1)(A)(ii) Does Not Apply If The Plan Currently On File Is Confirmed Seeks An Impermissible Advisory Opinion That Is Not Ripe For Decision.**

"Article III, section 2 of the Constitution of the United States limits the exercise of federal judicial power to actual cases and controversies." *ACP Master*, 300 F. Supp. at 336. "A justiciable controversy must be 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion [on] what the law would be upon a hypothetical state of facts.'" *Id*. at 336-37 (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 241 (1937)). "Federal courts are not empowered to issue advisory opinions where there is no such actual controversy." *Id*. at 337 (citing *Aetna*, 300 U.S. at 241; *Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *Shell Oil Co. v. Noel*, 608 F.2d 208, 213 (1st Cir. 1979)); *see also ACP Master*, 919 F.3d. at 646 ("In the absence of an actual controversy, federal courts cannot issue advisory opinions.")

Similarly, the ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs*, 387 U.S. at 148. Two factors govern whether an action is ripe: whether "the issues raised are fit for judicial decision at the time the suit is filed and [whether] the party bringing suit will suffer hardship if 'court consideration' is withheld." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (quoting *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003)).

Applying these doctrines, the few bankruptcy courts to have addressed the issue have concluded that when pre-confirmation legal issues could be addressed by a proposed bankruptcy plan—or will potentially change at the plan-confirmation stage—they are unripe for adjudication.

*See, e.g.*, *Energy Future Intermediate Holding Co. LLC v. UMB Bank, N.A. (In re Energy Future Holdings Corp.)*, 531 B.R. 499, 510-11, 514 (Bankr. D. Del. 2015); *Official Committee of Unsecured Creditors of D.F. Antonelli v. United States (In re Antonelli)*, No. 91-4-0254-PM, 1992 WL 435879, at *3 (Bankr. D. Md. Nov. 6, 1992) ("While this court understands and appreciates the desire of the Plaintiffs to determine certain tax liabilities prior to confirmation, the issue presented at this point in time is not ripe for adjudication").

Here, the question Claimants want this Court to answer *in advance of a confirmation hearing* necessarily will yield an advisory opinion or one that is not ripe for determination. Claimants ask this Court to determine that the Plan that is currently on file does not satisfy the exception to recourse treatment found in section 1111(b)(1)(A)(ii). (*See* Rule 12(c) Motion at 9-16.) But many things could happen to change that answer by the time the Court holds a confirmation hearing. For starters, the Board will likely amend the Plan. Indeed, the Board has already paused the plan process and has publicly acknowledged that modifications will need to be made to take into account the impact of the COVID-19 pandemic on Puerto Rico's already fragile economy. Thus, the Court cannot right now say one way or the other whether the plan-sale exception will apply. Or, as contemplated by section 1111(b)(1)(A)(i), the ERS bondholders as a class could elect out of recourse treatment. Claimants represent only a subset of the ERS bondholders and the bonds continue to trade so the make-up of the class that will vote on the yet to be set record date is not yet even known. The Court also might find in the related litigation challenging the merits of the Claimants' claims that their bonds are *ultra vires* and unenforceable. If that were to happen, section 1111(b) would no longer be an issue because "once any amount of [a secured claim] is disallowed . . . , § 1111(b)(1)(A) does not somehow breathe life back into that amount." *Shefa, LLC*, 524 B.R. at 739; *accord Tampa Bay Assocs., Ltd. v. DRW Worthington, Ltd.*

7

(*In re Tampa Bay Assocs., Ltd.*), 864 F.2d 47, 51 (5th Cir. 1989) (post-petition foreclosure "extinguished the 'claim secured by a lien'" required to invoke section 1111(b)).

In short, the question of how section 1111(b) applies to the treatment of Claimants' bonds will only present a justiciable question at *a yet to be scheduled confirmation hearing* considering *a yet to be filed plan* and the ERS bondholders vote on how to proceed as a class in a *yet to be established voting process* following *a yet to be set record date* for ERS bonds. And how all of that will proceed will depend on the Court's ruling on the *ultra vires* issues. Before all of these future events occur a myriad of different things could happen—including even a settlement—that might render any decision at this time unnecessary. As this Court has succinctly explained, "[r]ulings on isolated or abstract points that will principally be useful in formulating or litigating future choices that might or might not be made are outside the authorized scope of declaratory relief." *ACP Master*, 300 F. Supp.3d at 337 (citing *Pub. Servs. Comm'n. of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 244 (1952)). Claimants' Rule 12(c) Motion should therefore be denied.

**II.    The Retiree Committee Has Not Waived Its Rights To Argue Whether And How Section 1111(b)(1)(A)(ii) Applies As This Issue Is A Plan Confirmation Issue And Not A Claim Objection Issue.**

Without citing a single relevant case, Claimants argue that the Retiree Committee and the other parties that have objected to Claimants' claims have "waived any argument that Claimants are not entitled to assert recourse claims against ERS pursuant to section 1111(b)(1)(A)." (*See* Rule 12(c) Motion at 8-9.) Claimants misapprehend the difference between an objection to the underlying merits of a claim and how that claim, once determined, is treated under the operative Bankruptcy Code provisions. But the structure of the Code and the text of section 1111(b) prove Claimants' argument to be in error.

The text of section 1111(b)(2) underscores that section 1111 of the Code has nothing to do with the underlying merits of a claim—and thus is not an issue that must be addressed when a

court determines the allowance of a claim under section 502. Section 1111(b)(2) provides that if the holders of a class of nonrecourse creditors make the election provided for in section 1111(b)(1)(A)(i), "such claim is a secured claim to the extent that such claim *is allowed*." 11 U.S.C. §1111(b)(2) (emphasis added). In other words, section 1111(b) establishes how a nonrecourse secured claim will be treated in a plan of reorganization *only after that claim is allowed*; other provisions of the Code—section 502 in particular—provide for the claim's allowance.

The structure of the Code supports this conclusion. Section 502 is entitled "Allowance of claims or interests," a title which suggests this is the Code provision that addresses the allowance of a claim, not section 1111(b). *See* 11 U.S.C. §502. Importantly, section 502 does not list as one of the grounds for disallowance of a claim that section 1111(b) does not apply to the claim. *See generally* 11 U.S.C. §502(b)(1)-(9). Indeed, if Claimants' waiver argument had legs, section 502 would be littered with references to other provisions of the Code requiring certain plan treatment of claims, such as sections 1122 or 1322. *See, e.g.,* 11 U.S.C. §§1122(a)-(b), 1322(a)-(c). The fact that it does not, when read in the context of the entire Code, demonstrates that allowance of claims is determined by reference to the grounds for disallowance found in section 502(b). *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). How an "allowed claim" is paid once it is allowed is governed by other Code provisions such as section 1111. Or as the Third Circuit explained, "[s]ection 1111(b)'s language and purpose indicate that the recourse transformation is for distribution purposes only." *See In re Montgomery Ward, LLC*, 634 F.3d 732, 740 (3d Cir. 2011).

Thus, neither the Retiree Committee nor any of the other parties objecting to Claimants' various claims (collectively, the "**Objecting Parties**") were required to raise the question of how a future plan might treat Claimants' claims. Indeed, when the Retiree Committee filed its objection—on April 23, 2019 (Commonwealth Dkt. 6482)—the Board had not yet even filed the Plan. Requiring an objecting party to anticipate what some future plan might say and to base its objection to a claim on the terms of that future plan is the height of absurdity. It is therefore not surprising that Claimants cite no applicable authority in support of their argument.[3]

Neither the Retiree Committee nor any of the Objecting Parties have waived anything by waiting to properly address the section 1111(b) issues until the hearing on confirmation of a plan. The Court should decline the Claimants' invitation to address a hypothetical plan confirmation issue that is wholly outside the scope of the allowability of Claimants' claims under section 502 of the Bankruptcy Code as incorporated into PROMESA.

## III.   Claimants Do Not Possess Recourse Claims Against ERS For Their Alleged Extra-Contractual Causes of Action.

In addition to seeking a premature finding about how section 1111(b) applies to their alleged deficiency claim, Claimants also ask the Court to hold that their alleged extra-contractual claims against ERS are entitled to recourse treatment. Claimants contend that their litany of alleged claims, all of which allege damage equal to what they are owed under their Bonds and are based on the Commonwealth's decision to reform its pension system, are distinct from their claims under

---

[3] Claimants do cite *In re Stanley*, 185 B.R. 417 (Bankr. D. Conn. 1995), for the proposition that section 1111(b)(1)(A) operates "automatically" but a careful reading of *Stanley* supports the Retiree Committee's argument. (Rule 12(c) Motion at 9). In *Stanley*, the nonrecourse secured creditors moved to vacate an order determining the value of their claims under section 506. The Court granted the motion, and in doing so, recognized that claims allowance is determined under section 502, not section 1111(b), stating the secured creditors were entitled to a deficiency claim because their "secured claim *ha[d] not been disallowed under § 502.*" *Id.* at 424 (emphasis added). The *Stanley* court did not suggest that section 1111(b)(1) rights were fixed in advance of plan confirmation or that an objection to section 1111(b)(1) treatment could be forfeited.

the Bond Resolution. Based on this alleged separation, Claimants contend that the waiver of recourse rights against ERS found in the Bond Resolution is not binding with respect to those extra-contractual claims even if an exception to section 1111(b) applies. (*See* Rule 12(c) Motion at 16-24).

This argument fails for multiple reasons. *First*, Claimants' request for this relief, like their section 1111(b) arguments, is premature given the posture of the litigation. At this point, the Retiree Committee and the other Objecting Parties have asked this Court to find as a matter of law that, even assuming the facts as alleged by Claimants are true, the alleged claims fail as a matter of law. But Claimants have not, at this stage, asked the Court to determine the merits of their alleged claims. In fact, the schedule established by the Court contemplates that if the Objecting Parties' motions to dismiss Claimants' administrative claims are not granted, the parties will proceed to discovery before further motion practice. [Dkt. 838 at ¶5.] Consequently, the Court cannot grant Claimants' requested relief at this stage of the litigation.

*Second*, the limitations on recoverability and in particular the waiver of any claims against the Commonwealth found in the Bond Resolution apply to these alleged claims. To support their position that the Bond Resolution (or at least those parts they do not like) does not apply, Claimants draw an artificial line between the Bonds and the Bond Resolution, arguing that their extra-contractual claims are based solely on their Bonds and not the Bond Resolution and thus, any limitation in the Bond Resolution is irrelevant to their extra-contractual claims. (Rule 12(c) Motion at 16-21). This argument fails, however, because the Bond Resolution and the Bonds are integrated agreements, and so the waivers and limitations found in the Bond Resolution apply to both claims arising from that contract and the Bonds themselves.

As the First Circuit has held, "[a]n integrated agreement may take the form of two documents." *Steinke v. Sungard Fin. Sys., Inc.*, 121 F.3d 763, 771 n.5 (1st Cir. 1997). "It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 107 (3d Cir. 1986); *accord Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 493 (E.D. Pa. 2018) ("where one contract refers to and incorporates the provisions of another both shall be construed together" (citing *Shehadi v. Ne. Nat'l Bank of Pa.*, 378 A.2d 304, 306 (Pa. 1977))).

Under Puerto Rico law, where multiple documents are "components of a single, interdependent, unified business transaction," that were "never intended" to be "individual, separate, self-standing and severable contracts," they are considered "portions of a single integrated transaction." *In Matter of Beatriz Ready Mix, Inc.*, No. 08-04457 (SEK), 2009 WL 255890, at *3, 5 (Bankr. D.P.R. Feb. 3, 2009); *see also Perry v. Wolaver*, 506 F.3d 48, 53 (1st Cir. 2007) ("If the parties enter into multiple contracts at the same time to complete a single transaction, 'the contracts ought to be construed together.'") (quoting *Crowe v. Bolduc*, 365 F.3d 86, 96 (1st Cir. 2004)); *Williams v. Metzler*, 132 F.3d 937, 947 (3d Cir. 1997) (in interpreting contracts, "the court should consider the situation of the parties, the attendant circumstances and the ends they sought to achieve").

Here, the Bond Resolution and the Bonds must be interpreted together as they concern the same subject matter and they explicitly rely on each other "such that neither of them separately embody the whole of the agreement." *In re PWKH, Inc.*, No. BR 09-30010 (MFW), 2013 WL 5486835, at *6 (D.V.I. Sept. 30, 2013).  The Bonds would not exist without the Bond Resolution.

The Bonds state that they were issued "pursuant to," and "for the purposes set forth in the Resolution." (*See generally* Form of ERS Series A Bond ("**Bond Certificate**") at A-18 (attached hereto as Exhibit A).)[4] The Bonds further provide that "reference to the Resolution and any and all supplements thereto and amendments thereof . . . is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds." (*Id.*) Thus, the Bond Resolution is the operative contract that governs the Bonds, creating the security interests that Claimants rely upon to support their claims. (*See* Rule 12(c) Motion at 19 (citing Bond Resolution §201)). This language demonstrates the fallacy of Claimants' argument that the Bonds are distinct from and independent of the Bond Resolution. If that were so, the Bonds would be entirely unsecured as their security derives from the Bond Resolution, as this is the agreement that grants the liens that secure the Bonds. The Bonds do not create security interests on their own. And without the Bond Resolution, any claim of legitimacy to the Bonds would evaporate as this is the operative document creating the Bonds. In short, the Bonds do not exist without the Bond Resolution, making the Bonds and the Bond Resolution an integrated contract.

Claimants' cited authority does not change this conclusion. In *USX Corp. v. Prime Leasing Inc.*, for example, the court found nonrecourse provisions in a note and security agreement did not extend to ancillary agreements because the nonrecourse language was *expressly limited to the documents in which they appeared*. 988 F.2d 433, 437-38 (3d Cir. 1993). Likewise, in *Duluth*

---

[4] In reviewing a Rule 12(c) motion, a court may consider "documents the authenticity of which are not disputed by the parties; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint." *Curran*, 509 F.3d at 44 (citation and alterations omitted).

*Lighthouse For The Blind v. C.G. Bretting Manufacturing Co.*, the court held that a nonrecourse provision was limited to the financing agreement, not a related sale agreement, because the agreements "serve[d] very different purposes" and were governed by different state law. No. 99-1601 JRT/RLE, 2001 WL 1640079, at *5 (D. Minn. Sept. 25, 2001). Similarly, in *People's Heritage Savings Bank v. Recoll Management, Inc.*, the non-recourse provision at issue limited itself to the "sale of the loan participation under this Agreement"—it did not broadly disclaim recourse like the language of the Bond Resolution. 814 F. Supp. 159, 161-62 (D. Me. 1993); *accord First Indep. Bank of Nevada v. Mohave State Bank*, No. CV-09-8195-PCT-PGR, 2010 WL 1408890, at *2 (D. Ariz. Apr. 7, 2010) (non-recourse provision limited to sale of loan participation).

In contrast here, the Bonds and Bond Resolution are governed by the same law—Puerto Rico law. (*See* Rule 12(c) Motion, Ex. 1, at VI-28, §1311; *see generally* Bond Certificate.) Neither the Bond Resolution nor the Bonds limit any of their provisions to the specific document; to the contrary, the Bonds were issued "pursuant to," and "for the purposes set forth in the Resolution." (Bond Certificate at A-18.) In short, the Bonds and Bond Resolution here are nothing like the ancillary agreements limiting recourse found to be separate from the underlying claims in the cases that the Claimants cite.

*Third*, Claimants' contention that their alleged extra-contractual claims are *unrelated* to the Bond Resolution and Bonds and thus not limited by their contracts is without merit. (*See* Rule 12(c) Motion at 23.) All of these alleged extra-contractual claims boil down to the assertion that when the Commonwealth reformed its pension system, these reforms impacted ERS's ability to repay the Bonds, damaging Claimants in an amount equal to Claimants' alleged deficiency claim. Without their Bond claims, Claimants could not possibly have any complaint with the

14

Commonwealth's pension reform legislation or any damages.  As the Fourth Circuit summarized in an analogous situation, "the tort claims are premised entirely on the failure to live up to a contractual promise. [Claimants] do not allege that tortious misconduct on the part of [ERS] caused them any injury beyond that already remedied in the contract action." *Bresler v Wilmington Tr. Co.*, 761 F. App'x 160, 163 (4th Cir. 2019). And section 502(b)(1) plainly disallows Claimants' end run around the contractual limits of their non-recourse claims: "section 502(b)(1) operates to disallow the unsecured or deficiency claim of such a creditor when the financing that provides the basis for the claim was advanced on a *nonrecourse* basis." *In re PCH Assocs.*, 949 F.2d 585, 604 (2d Cir. 1991) (emphasis in original); *see also In re Allen-Main Assocs. Ltd. P'ship*, 223 B.R. 59, 63 (B.A.P. 2d Cir. 1998) (where section 1111(b) is inapplicable, section 502(b)(1) requires the disallowance of purported general unsecured deficiency claims of a non-recourse secured lender). "[T]here is no rational basis for calling any portion of the [Claimants' alleged extra-contractual] claim unsecured when applicable law forbids the debt from being enforced any way except as secured. Deficiency claims are only allowed in bankruptcy to the extent that state law permits them." *In re Tolentino*, No. 10-10511, 2010 WL 1462772, at *1 (Bankr. N.D. Cal. Apr. 12, 2010).

Thus, absent application of section 1111(b), which cannot be decided until confirmation, if Claimants possess any extra-contractual claims (and they do not), those claims are not entitled to recourse against ERS and have been waived against the Commonwealth.

## IV.   Even If Claimants Have Claims Beyond The Pledged Property (And They Do Not) Those Claims May Only Be Asserted In The ERS Case And Not In The Commonwealth Case.

Even if Claimants' claims could extend beyond the Pledged Property (and they cannot), they cannot reach the Commonwealth. It is well-established that "[t]here is one prerequisite [to applying section 1111(b)]: the claim is secured by a lien on the property of the estate." *B.R. Brookfield Commons*, 735 F.3d at 598; *accord In re 680 Fifth Ave. Assocs*, 29 F.3d at 98. Here, to

the extent Claimants hold any lien it is against the collateral to which their alleged lien attached—
the ERS "Pledged Property"—and against that collateral alone. The Offering Circular makes this
point clear numerous times when it states that "[t]he Bonds are not an obligation of the
Commonwealth of Puerto Rico or any of its other instrumentalities or political subdivisions" and
"are not payable out of any moneys of the commonwealth other than future Employer
Contributions." (Commonwealth Dkt. 6482, Ex. C, p.1, 2, 23, 37). The Bond Resolution provides
the same. (Rule 12(c) Motion, Ex. 1, at VI-1, §201). Consequently, as Claimants implicitly
acknowledged, section 1111(b) cannot provide Claimants with a recourse claim against the
Commonwealth as Claimants do not have a secured claim against any property of the
Commonwealth. (*See* Rule 12(c) Motion at 7 ("Claimants are entitled to assert recourse claims
against ERS…."); *see generally id.* at 7-23 (discussing alleged recourse claims against only ERS).

Despite this, Claimants assert that even setting aside 1111(b), they "possess significant
unsecured deficiency claims, which may be pursued against … the Commonwealth." (Rule 12(c)
Motion at 24). To transform their non-recourse claims against ERS into recourse claims against
the Commonwealth, Claimants ask this Court to disregard the Bankruptcy Code, First Circuit
precedent, and the Bond documents themselves. Indeed, to follow Claimants' logic, this Court
would have to conclude that while section 552 indisputably cuts off the Claimants' *liens* on any
post-petition employer contributions, somehow Claimants still retain a claim for their "contractual
right to be paid from post-petition employer contributions," and, *then*, that their lien-less claim
somehow attaches to Commonwealth assets that are not employer contributions and are not paid
to ERS. (*Id.*) This is a bridge too far. To begin with, for Claimants to possess a "deficiency" claim
"for any deficiency between the value of their collateral and the principal and interest due under
the Bonds" (*id.*) there must be an underlying lien. *Salamon*, 854 F.3d at 637; *B.R. Brookfield*

*Commons*, 735 F.3d at 598; *680 Fifth Ave. Assocs.*, 29 F.3d at 98. But as the First Circuit held, whatever lien rights Claimants had on post-petition Employer Contributions were terminated by operation of section 552 when ERS filed its Title III petition. *In re Fin. Oversight & Mgmt. Bd. of P.R.,* 948 F.3d at 468-70.

In addition, as Claimants acknowledge "the Bond Resolution makes expressly clear that the Commonwealth is 'not liable' for the ERS Bonds." (Rule 12(c) Motion at 30). Thus, given that Claimants' alleged deficiency claim against the Commonwealth is contractual in nature, their claim fails because it attempts to undo the Commonwealth waiver and do precisely what the governing contracts prohibit—make the Commonwealth liable for payment on the Bonds.

But as set forth above, section 502(b)(1) disallows exactly this type of claim. Courts routinely hold that section 502(b)(1) precludes a non-recourse creditor from asserting a deficiency claim against the debtor. *See e.g. PCH Assocs.*, 949 F.2d at 604; *Allen-Main Assocs.*, 223 B.R. at 63; *In re Tolentino*, 2010 WL 1462772, at *1. Here, where Claimants press what amounts to a deficiency claim not only against the debtor and issuer of the non-recourse Bonds—ERS—but also against the Commonwealth, which the Bond documents expressly *excluded* from liability, there can be no doubt that section 502(b)(1) disallows those claims.

**V.    Claimants Have Not Established That Any Of Their Claims Are Entitled To Administrative Priority.**

Claimants also assert that their claims are entitled to an administrative expense priority under section 503(b)(1) of the Bankruptcy Code. (Rule 12(c) Motion at 25-33.) According to Claimants, their claims should be treated as administrative expenses under the standard set forth in *Reading Co. v. Brown*, 391 U.S. 471 (1968), despite the fact that the claims (i) arose pre-petition, and (ii) provided no benefit whatsoever to the Debtors' estates. Claimants' arguments fly in the face of *Reading* and should be rejected. As set forth in the Retiree Committee's *Motion To Dismiss*

17

*Proofs Of Claims And Administrative Expense Claims Asserted Against The Commonwealth And ERS By Certain Holders Of ERS Bonds And The Fiscal Agent* (Commonwealth Dkt. 13056), which the Retiree Committee incorporates by reference, whatever claims Claimants may possess, those claims are not entitled to administrative expense priority. This is so for three reasons: (1) section 552 cuts off Claimants' post-petition claims against both ERS and the Commonwealth; (2) because there is no "estate" created in PROMESA, Claimants cannot assert an administrative claim for preserving that non-existent estate; and (3) in any event, for a claim to qualify as an administrative expense claim, it must arise from a post-petition transaction between the creditor and the debtor, not a pre-petition transaction, as is the case with Claimants' claims. Nothing in the Rule 12(c) Motion refutes these points.

## A. Section 552 Bars Claimants' "Non-Contractual Claims" Against The Commonwealth And ERS.

Claimants' "non-contractual" administrative claims are built upon the legally inaccurate premise that the Commonwealth and ERS wrongfully eliminated the Pledged Property when the Commonwealth enacted the Post-Petition Legislation. (Rule 12(c) Motion at 30-33.) But even if the Commonwealth had not passed legislation that the Bonds explicitly acknowledged was a possibility (*see* Commonwealth Dkt. 6482, Ex. C, p.26), Claimants would not have had a right to post-petition Employer Contributions because section 552 cut off those lien rights. *Fin. Oversight & Mgmt. Bd. of P.R.,* 948 F.3d at 463 (under section 552, "any property acquired postpetition by the Title III debtor is not subject to any prepetition lien"). Thus, the fact of the matter is that any loss of Pledged Property suffered by Claimants is the result of section 552 of the Bankruptcy Code, not the Commonwealth's post-petition pension reform legislation. In short, the Commonwealth's post-petition pension reform did nothing to modify Claimants' rights to post-petition Employer Contributions or any other post-petition payments to the Commonwealth that Claimants may

allege a claim for, and Claimants therefore have no administrative claims against the Commonwealth or ERS.

**B.      PROMESA Does Not Provide Administrative Priority For The Actual And Necessary Expenses Of Preserving The "Estate."**

Claimants' administrative claims also fail because PROMESA, like chapter 9, "does not incorporate section 541 of the Bankruptcy Code, which provides for the creation of a bankruptcy 'estate.'" *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010). As a result, "courts have clearly established that in chapter 9 cases, there is no 'estate' property. *Id.* at 141-42 (collecting cases). This means that "there can be no administrative expenses for 'the actual and necessary costs of preserving the estate'"—*i.e.*, "no operating administrative expenses are permitted in a chapter 9 bankruptcy case." *Id.* at 142.

Unable to distinguish *Off-Track Betting*, Claimants instead try to cast the decision as one wholly at odds with the Bankruptcy Code and one that, if followed, would throw all municipal bankruptcies into chaos. (Rule 12(c) Motion at 26-30.) This reading is unwarranted: all *Off-Track Betting* holds is that because there is no "estate" in a municipal bankruptcy (a conclusion that is undisputed) there can be "no operating administrative expenses" in a municipal case. 434 B.R. at 142. In other words, the scope of section 503(b)(1) is more limited in a chapter 9 case than in other types of bankruptcy cases. That relatively modest holding is the correct interpretation of the law under chapter 9, and as Claimants admit, PROMESA and chapter 9 are identical in that "PROMESA, like chapter 9 does not incorporate section 541 of the Bankruptcy Code, and so no 'estate' is formed in a Title III case." (Rule 12(c) Motion at 27.) Claimants' purported justifications for reaching a different result under PROMESA, however, fail.

*First*, Claimants argue that "PROMESA § 301(a) incorporates the *entirety* of section 503," which is "in contrast to its approach to other sections of the Bankruptcy Code, where only *specific*

*subsections* were incorporated." (Rule 12(c) Motion at 27 (emphases in original).) Thus, according to Claimants, the interpretation given to section 503 in *Off-Track Betting* and endorsed by both leading bankruptcy treatises (6 COLLIER ON BANKRUPTCY ¶901.04[13][a] (16th ed. 2020); 5 NORTON BANKRUPTCY LAW AND PRACTICE §90:14 (2020)) is inappropriate here because it would "would make section 503(b)(1)(A) completely inapplicable," which is "inconsistent with the wholesale incorporation of section 503." (Rule 12(c) Motion at 27.)

That is a red herring. Like PROMESA, chapter 9 also incorporates the *entirety* of section 503. 11 U.S.C. §901(a). And, consistent with that statutory framework, the *Off-Track Betting* court gave due consideration to Congress's decision to exclude section 541 from chapter 9, reasoning that, without a chapter 9 "estate," administrative expenses under section 503(b)(1) "must be limited to 'expenses incurred in connection with the chapter 9 case itself,' and not operating expenses." *New York City Off-Track Betting*, 434 B.R. at 142 (quoting 6 COLLIER ON BANKRUPTCY ¶901.04[13][a]). That approach gives application *both* to chapter 9's wholesale incorporation of section 503 *and* its wholesale exclusion of section 541 by limiting administrative expenses to "expenses incurred in or in connection with the case." 6 COLLIER ¶901.04[13][a].

*Second*, relying exclusively on a 2013 article written by an associate at a law firm, Claimants argue that this Court should reject the approach taken by the court in *Off-Track Betting* because it would "do violence to the Title III process under PROMESA" by forcing the Court to strip out of PROMESA provisions of the Bankruptcy Code Congress explicitly incorporated in PROMESA. (Rule 12(c) Motion at 28 (citing Andrew Minear, *Unfortunate Consequences of a Patchwork Chapter*, 32 Am. Bankr. Inst. J. 38, 39 (Dec. 2013).) But the examples of "violence" to the Bankruptcy Code that Claimants cite from the Minear article are nothing more than imaginary hypotheticals unmoored from well-established principles of statutory interpretation. (*Id.*

20

at 28-30.) As Claimants acknowledge, PROMESA section 2161(c)(5) provides that "property of the estate" in a Title III case "means property of the Debtor." (Rule 12(c) Motion at 27 (citing 48 U.S.C. §2161(c)(5); *accord* 11 U.S.C. §902(1).) Every example from Claimants' purported parade of horribles is resolved by this provision because all of Claimants' examples involve direct reference to "property" of the "estate" (contrasted with section 503(b)(1), which refers just to "estate"). For example, section 506(a) provides that a secured creditor's claim is limited "to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. §506(a)(1). Given that the statutory language explicitly refers to estate property, a court will, of course, apply section 2161(c)(5)'s guidance.

Similarly, Claimants' suggestion that the Bankruptcy Code's avoidance provisions would become "useless" also has no basis. (Rule 12(c) Motion at 29.) Section 550 allows a trustee or debtor-in-possession to "recover, for the benefit of the estate, the property transferred" and avoided under various sections of the Bankruptcy Code. 11 U.S.C. § 550(a). Again, this statutory language explicitly refers to estate property and thus section 2161(c)(5) would apply.

In contrast, section 503's bare reference to the "estate" does not trigger section 2161(c)(5), which references "*property of the estate*." 48 U.S.C. §2161(c)(5). If Congress wanted "estate" to equal "debtor" it plainly could have so provided. It did not and consequently administrative expense claims under section 503 are "limited to expenses incurred in connection with the chapter 9 case itself." *Off-Track Betting*, 434 B.R. at 142 (internal quotations omitted). Claimants do not allege they fall under this test and cannot create an administrative claim where none exists.

### C.   Even If Section 503(b)(1)(A) Applies Without Limitation In PROMESA, Claimants' "Administrative" Claims Provided No Benefit To The "Estates."

At bottom, the entire question of whether and how section 503(b)(1)(A) applies in these Title III Cases is largely academic because, even if it does apply exactly as Claimants suggest,

Claimants have not and cannot show that their claims meet the requirements for section 503(b)(1)(A) administrative expense priority. The Rule 12(c) Motion altogether ignores the uncontroverted requirements that, to qualify for an administrative expense priority, a claim (1) "must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *In re FBI Distrib. Corp.*, 330 F.3d 36, 42 (1st Cir. 2003).

Here, Claimants cannot satisfy either requirement. *First*, Claimants cannot show that their claims arose from a post-petition transaction with ERS or the Commonwealth—a requirement under both section 503(b) and the Supreme Court's *Reading* exception. (Rule 12(c) Motion at 30-33.) Claimants gloss over the undisputable fact that all of their asserted claims are firmly rooted in the pre-petition past. The gist of all the administrative claims is that the Commonwealth and ERS impaired Claimants' pre-petition right to payment under the 2008 Bond Resolution through the enactment of the Post-Petition Legislation. In fact, as Claimants acknowledge, the only way Claimants possibly could have been harmed by the Post-Petition Legislation is *vis-à-vis* the Bond Resolution. (Rule 12(c) Motion at 31 (noting that "the contract between Claimants and ERS might supply the measure of damages…")). While Claimants concede (as they must) that their contract claims cannot give rise to an administrative expense, they then try and recast this contract claim into several other types of claims. (Rule 12(c) Motion at 33).

But as the First Circuit has noted, "[w]e are aware of no authority that the [*Reading*] exception encompasses a right to payment originating in a prepetition contract with the debtor." *In re Hemingway Transport, Inc.*, 954 F.2d 1, 7 (1st Cir. 1992). Claimants apparently are not either, as they do not cite any case where the alleged impairment of a right under a pre-petition contract

22

gives rise to a post-petition administrative expense claim. Indeed, in every bankruptcy case Claimants cite, the court rejected similar attempts to restyle a pre-petition contract claim as a new post-petition administrative claim. For example, Claimants cite *In re Abercrombie*, where the Ninth Circuit denied a request for an administrative claim precisely because the doctrine "does not apply … when the [claimant] transacted with the debtor prepetition." 139 F.3d 755, 758 (9th Cir. 1998). The claimant in *Abercrombie* based the amounts allegedly owed on a pre-petition contract, *id.*, just as all of Claimants' claims here are tied to ERS's pre-petition obligations under the Bond Resolution. (*See* Rule 12(c) Motion at 31 (stating that the Bond Resolution "suppl[ies] the measure of damages" for Claimants' claims). Given that fact, the Ninth Circuit had no trouble denying the administrative claim because "'[i]t is only when the *debtor-in-possession's* actions themselves— that is, considered *apart from any obligation of the debtor*—give rise to a legal liability that the claimant is entitled to a priority.'" *Id*. (emphasis added) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976), and citing *In re Jartan*, 732 F.2d 584 (7th Cir. 1984)). So too in *Hemingway Transport*, where the First Circuit denied an administrative expense request on the grounds that the "*prepetition* genesis [of the creditor's claim] ultimately distinguishes it from the *postpetition* losses accorded priority in *Reading*." 954 F.2d at 7 (emphasis added).

In reality, Claimants' "administrative" claims against ERS arose *solely* as a result of Claimants' pre-petition contractual relationship with ERS. These claims are "not entitled to priority as a cost and expense of administration simply because the [C]laimants' right to payment arises after the debtor-in-possession has taken some action." *Mammoth Mart*, 536 F.2d at 955. Claimants cannot use ERS's compliance with the Post-Petition Legislation to create an administrative priority for their run-of-the-mill pre-petition claims. All of their administrative claims should be denied on this basis alone.

*Second*, any benefit ERS (or the Commonwealth) would have received from the ERS Bonds was in 2008, when the bonds were first issued and nearly 10 years before any purported "estates" existed. Thus, it is impossible for Claimants to prove any benefit whatsoever to the Debtors' estates and, indeed, their Motion does not even address this requirement. Accordingly, regardless of how section 503(b)(1)(A) applies in PROMESA cases, it does not entitle Claimants to an administrative expense priority here because Claimants cannot show that any consideration given for the administrative claims benefited any Title III Debtor.

## VI.   Even If Claimants Could Assert Administrative Claims (And They Cannot), Those Claims Would Be Dischargeable.

Finally, Claimants argue, relying upon inapposite authority, that their alleged administrative claims are non-dischargeable and will survive confirmation of a plan of adjustment for ERS and the Commonwealth. (Rule 12(c) Motion at 33-35.) Assuming for the sake of argument that Claimants can establish that they hold administrative expense claims (and they will not be able to do so), those claims will be dischargeable.

Pursuant to section 944(b), confirmation of a plan of adjustment discharges "all debts" against a debtor as "of the time when [] the plan is confirmed." 11 U.S.C. §944(b) (incorporated into PROMESA pursuant to 48 U.S.C. §2161(a)). Plainly, section 944(b)'s discharge of "all debts" means that confirmation of a plan of adjustment discharges not only pre-petition claims, but also pre-confirmation claims. The Ninth Circuit's opinion in *O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000) in instructive. In *O'Loghlin*, the Ninth Circuit held that an employee's post-petition but pre-confirmation ADA claims against a chapter 9 debtor were discharged by operation of the court's confirmation of the debtor's plan of adjustment because the debtor's discharge "discharge[ed] its pre-*confirmation* debts." *Id.* at 873 (emphasis added); *see also Hayes v. City of Detroit Water & Sewerage Dep't*, No. 14-14622, 2015 WL 7567504, at *2 (E.D. Mich. Nov. 25,

2015) ("any claims set forth in the complaint that arose prior to the confirmation of the City's bankruptcy plan were discharged in bankruptcy"); *V.W. ex rel. Barber v. City of Vallejo*, No. 12-CV-1629, 2013 WL 3992403, at *2 (E.D. Cal. Aug. 2, 2013) (in chapter 9, claims that "arose after commencement of the bankruptcy, but before the confirmation date [] are barred" by the discharge injunction).

Ignoring section 944's discharge of "all debts" and these cases, Claimants rely primarily on *In re City of Detroit, Michigan*, 548 B.R. 748, 767-70 (Bankr. E.D. Mich. 2016), asserting that the court "ultimately held that one of the claims [in that chapter 9 case] arose post-petition and thus was not discharged by confirmation of the plan." (Rule 12(c) Motion at 35.) But the *Detroit* court held no such thing. In its opinion, the court noted that the chapter 9 debtor in *Detroit* "initially took the position that the claims were discharged and waived as long as they arose pre-*confirmation*." 548 B.R. at 761 n.48 (emphasis in original). "However, the City withdrew these arguments, and [then] only argue[d] that the claims [were] discharged or waived if they arose pre-*petition*." *Id.* (emphasis in original). Therefore, the question of whether a chapter 9 debtor's debts were discharged starting at the petition date or confirmation date was not before the court because "the City ha[d] asked the Court to consider only whether the claims [were] discharged because they arose pre-*petition*." *Id.*at 768 n.58. Claimants also ignore that the *Detroit* court referenced the Ninth Circuit's holding "that all pre-confirmation debts are discharged" in chapter 9, but noted that the *Detroit* debtor had "asked the Court to consider *only* whether the claims are discharged because they arose pre-*petition.*" *Id.* at 769 n. 59 (citing *O'Loghlin*, 229 F.3d at 871) (emphasis added). Thus, *Detroit* is of no help to Claimants here.[5]

---

[5] The Retiree Committee also notes that Claimants rely on the very section of COLLIER (¶901.04[13]) that also states that in municipal bankruptcies there are no operating administrative expenses like the ones Claimants assert. (*See* Rule 12(c) Motion at 35).

In sum, section 944 and applicable case law make clear that a plan of adjustment discharges *all* pre-confirmation debts against a debtor. Thus, even if Claimants were able to plead administrative claims against ERS and the Debtor, and as set forth in Section V they cannot, those claims are dischargeable.

## CONCLUSION

WHEREFORE, the Retiree Committee respectfully requests that the Court deny the Rule 12(c) Motion and grant such other relief as may be just.

Dated: July 8, 2020

JENNER & BLOCK LLP

By:
*/s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

Respectfully submitted,

BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By:
*/s/ A.J. Bennazar-Zequeira*
A.J. Bennazar-Zequeira
Edificio Union Plaza, Suite 1701
PH-A piso 18
Avenida Ponce de León
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired Employees of Puerto Rico*

26