**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: ) | |
| ) | PROMESA |
| ) | Title III |
| THE FINANCIAL OVERSIGHT AND ) | |
| MANAGEMENT BOARD FOR PUERTO RICO ) | |
| ) | Case No. 17-bk-03283 (LTS) |
| as representative of ) | |
| ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* ) | |
| ) | |
| Debtors.[1] ) | |
| X | |
| In re: ) | |
| ) | PROMESA |
| ) | Title III |
| THE FINANCIAL OVERSIGHT AND ) | |
| MANAGEMENT BOARD FOR PUERTO RICO, ) | |
| ) | Case No. 17-bk-03566 (LTS) |
| as representative of ) | |
| ) | **Re:  ECF No. 917** |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE ) | |
| GOVERNMENT OF THE COMMONWEALTH OF ) | Case No. 17-bk-03283 (LTS) |
| PUERTO RICO, ) | |
| ) | **Re:  ECF No. 13400** |
| - and - ) | |
| ) | *This Pleading Relates to ERS and* |
| THE FINANCIAL OVERSIGHT AND ) | *the Commonwealth Only, and* |
| MANAGEMENT BOARD FOR PUERTO RICO ) | *Should Be Filed in Both Dockets.* |
| ) | |
| as representative of ) | |
| ) | |
| THE COMMONWEALTH OF PUERTO RICO, ) | |
| ) | |
| Debtors. ) | |
| X | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

ANDALUSIAN GLOBAL DESIGNATED ACTIVITY )
COMPANY, CROWN MANAGED ACCOUNTS FOR )
AND ON BEHALF OF CROWN/PW SP, GLENDON )
OPPORTUNITIES FUND, L.P., LMA SPC FOR AND )
ON BEHALF OF MAP 98 SEGREGATED )
PORTFOLIO, MASON CAPITAL MASTER FUND )
L.P., OAKTREE-FORREST MULTI-STRATEGY, LLC )
(SERIES B), OAKTREE OPPORTUNITIES FUND IX, )
L.P., OAKTREE OPPORTUNITIES FUND IX )
(PARALLEL), L.P., OAKTREE OPPORTUNITIES )
FUND IX (PARALLEL 2), L.P., OAKTREE )
HUNTINGTON INVESTMENT FUND II, L.P., )
OAKTREE OPPORTUNITIES FUND X, L.P., )
OAKTREE OPPORTUNITIES FUND X (PARALLEL), )
L.P., OAKTREE OPPORTUNITIES FUND X )
(PARALLEL 2), L.P., OAKTREE VALUE )
OPPORTUNITIES FUND HOLDINGS, L.P., OCEANA )
MASTER FUND LTD., OCHER ROSE, L.L.C., )
PENTWATER MERGER ARBITRAGE MASTER )
FUND LTD., PWCM MASTER FUND LTD., )
REDWOOD MASTER FUND, LTD., AND SV )
CREDIT, L.P., )
)
- and - )
)
PUERTO RICO AAA PORTFOLIO BOND FUND, )
INC., PUERTO RICO AAA PORTFOLIO BOND FUND )
II, INC., PUERTO RICO AAA PORTFOLIO TARGET )
MATURITY FUND, INC., PUERTO RICO FIXED )
INCOME FUND, INC., PUERTO RICO FIXED )
INCOME FUND II, INC., PUERTO RICO FIXED )
INCOME FUND III, INC., PUERTO RICO FIXED )
INCOME FUND IV, INC., PUERTO RICO FIXED )
INCOME FUND V, INC., PUERTO RICO GNMA & )
U.S. GOVERNMENT TARGET MATURITY FUND, )
INC., PUERTO RICO INVESTORS BOND FUND I, )
PUERTO RICO INVESTORS TAX-FREE FUND, INC., )
PUERTO RICO INVESTORS TAX-FREE FUND, INC. )
II, PUERTO RICO INVESTORS TAX-FREE FUND III, )
INC., PUERTO RICO INVESTORS TAX-FREE FUND )
IV, INC., PUERTO RICO INVESTORS TAX-FREE )
FUND V, INC., PUERTO RICO INVESTORS TAX- )
FREE FUND VI, INC., PUERTO RICO MORTGAGE- )
BACKED & U.S. GOVERNMENT SECURITIES )
FUND, INC., TAX-FREE PUERTO RICO FUND, INC.,

TAX- FREE PUERTO RICO FUND II, INC., AND )
TAX-FREE PUERTO RICO TARGET MATURITY )
FUND, INC., )
 )
       - and - )
 )
THE BANK OF NEW YORK MELLON, AS FISCAL )
AGENT, )
 )
       Movants, )
 )
       v. )
 )
THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO, )
 )
       as representative of )
 )
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF THE COMMONWEALTH OF )
PUERTO RICO, )
 )
       - and - )
 )
THE FINANCIAL OVERSIGHT AND )
MANAGEMENT BOARD FOR PUERTO RICO )
 )
       as representative of )
 )
THE COMMONWEALTH OF PUERTO RICO, )
 )
       Respondents. )
_____ X

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................. 1

PROCEDURAL BACKGROUND......................................................................................... 4

ARGUMENT ......................................................................................................................... 4

I.     CLAIMANTS' MOTION MUST BE DENIED BECAUSE IT SEEKS
AN ADVISORY OPINION AND JUDGMENT ON UNRIPE
ISSUES. .................................................................................................................. 6

     A.     Whether Claimants' Hold Recourse Claims Against ERS or
Claims Entitled to Administrative Priority Are Not Fit for
Review. ....................................................................................................... 8

     B.     Denying the Motion Would Not Impose Substantial Hardship
on Claimants. ........................................................................................... 11

II.     CLAIMANTS ARE NOT ENTITLED TO JUDGMENT
DETERMINING THEY HAVE RECOURSE CLAIMS AGAINST
ERS. ...................................................................................................................... 13

     A.     Claimants Cannot Obtain Judgment They Have Recourse
Claims Under Bankruptcy Code § 1111(b) at the Claim
Objection Stage. ....................................................................................... 13

     B.     The Debtors Have Not Waived the Application of Section
1111(b)(1)(A)(ii), Which Applies Automatically.................................... 14

     C.     The Claims Cannot Be Treated as Recourse Under the
Proposed Plan Because the Claims Are Subject to Section
1111(b)(1)(A)'s Plan Sale Exception....................................................... 15

     D.     The "Exceptions to the Exception" Invoked by Claimants Are
Inapplicable and Unsupported. ................................................................ 16

          1.     The Plan Sale Exception Does Not Require a Creditor
to Have the Right to Credit Bid. ................................................. 17

          2.     The Plan Sale Exception Does Not Require a Public
Auction....................................................................................... 18

          3.     The Plan Sale Exception Does Not Require a Sale to
Occur at the Time of Confirmation............................................ 18

          4.     The Plan Provides for a Sale of All of Claimants'
Collateral.................................................................................... 19

     E.     Claimants Are Not Entitled to Judgment They Hold Recourse
Claims Against ERS for Non-Monetary Breaches of the
Resolution. ............................................................................................... 21

i

F.     Claimants Are Not Entitled to Judgment that They Hold
Recourse Claims Against ERS for Alleged "Unconstitutional,
Tortious, and Illegal Conduct." ................................................................... 26

III.     CLAIMANTS ARE NOT ENTITLED TO JUDGMENT THAT
THEIR CLAIMS HAVE ADMINISTRATIVE PRIORITY OR ARE
NON-DISCHARGEABLE ...................................................................................... 29

A.     The Claims Are Not Administrative Expenses. ........................................ 29

1.     Claimants Have Not Established a Right to Payment. ................... 29
2.     Claimants Have Not Established the Showing of
Unfairness Required under *Reading*. ............................................. 31
3.     Duly Enacted Legislation the Bondholders Were
Warned about Is Not Wrongful Conduct. ..................................... 33

B.     Claimants Are Not Entitled to Judgment That Their Claims
Are Non-Dischargeable. ........................................................................... 33

CONCLUSION ..................................................................................................................... 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. in Rehabilitation (In re 680
Fifth Ave. Assocs.),*
156 B.R. 726 (Bankr. S.D.N.Y. 1993) .................................................................................14

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) .................................................................................................6, 13

*Aurelius Capital Master, Ltd. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd.
for P.R.),*
919 F.3d 638 (1st Cir. 2019) ............................................................................................10

*Bank of New York v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns
Corp.),*
307 B.R. 432 (Bankr. S.D.N.Y. 2004) ...........................................................................10, 11

*Baum-Holland v. El Conquistador P'ship L.P., S.E.,*
336 F. Supp. 3d 6 (D.P.R. 2018) .....................................................................................28

*Camreta v. Greene,*
563 U.S. 692 (2011) ...........................................................................................................6

*Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,*
961 F. Supp. 353 (D.P.R. 1997) ......................................................................................28

*Corotoman, Inc., v. Cent. W. Va. Reg'l Airport Auth., Inc. (In re Corotoman,
Inc.),*
No. 2:19-BK-20134, 2020 WL 1493011 (Bankr. S.D.W. Va. Mar. 26, 2020) ........................4

*Delphi Indus., Inc. v. Stroh Brewery Co.,*
945 F.2d 215 (7th Cir. 1991) ...........................................................................................29

*Duluth Lighthouse For The Blind v. C.G. Bretting Mfg. Co.,*
No. 99-1601 ..............................................................................................................25, 26

*Energy Future Intermediate Holding Co. v. UMB Bank, N.A. (In re Energy Future
Holdings Corp.),*
531 B.R. 499 (Bankr. D. Del. 2015) .................................................................................11

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
45 F.3d 530 (1st Cir. 1995) .....................................................................................6, 7, 12

iii

*Fagot Rodriguez v. Republic of Costa Rica*,
   139 F. Supp. 2d 173 (D.P.R. 2001),
   *aff'd*, 297 F.3d 1 (1st Cir. 2002) ...................................................................27

*FDIC v. W.R. Grace & Co.*,
   877 F.2d 614 (7th Cir. 1989) ..........................................................................29

*Fin. Sec. Assur. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.
   P'ship)*, 116 F.3d 790, 804 (5th Cir. 1997) ...................................................18

*First Indep. Bank of Nev. v. Mohave State Bank*,
   No. CV-09-8195-PCT-PGR, 2010 WL 1408890 (D. Ariz. Apr. 7, 2010).......................22, 23

*Henson v. Santander Consumer USA, Inc.*,
   137 S. Ct. 1718 (2017).....................................................................................35

*Houston Sportsnet Fin., L.L.C. v. Houston Astros, L.L.C. (In re Houston Reg'l
   Sports Network, L.P.)*,
   886 F.3d 523 (5th Cir. 2018) ...........................................................................19

*In re Arch Wireless*,
   332 B.R. 241 (Bankr. D. Mass. 2005) .............................................................35

*In re B.R. Brookfield Commons No. 1 LLC*,
   735 F.3d 596 (7th Cir. 2013) ...........................................................................14

*In re Bloomingdale Partners*,
   155 B.R. 961 (Bankr. N.D. Ill. 1993) ..............................................................14

*In re Breland*,
   No. 16-2272-JCO, 2017 WL 2683980 (Bankr. S.D. Ala. June 21, 2017),
   *aff'd*, 610 B.R. 389 (S.D. Ala. 2019) .............................................................12

*In re Charlesbank Laundry, Inc.*,
   755 F.2d 200 (1st Cir. 1985)............................................................8, 30, 31, 32, 33

*In re City of Detroit*,
   548 B.R. 748 (Bankr. E.D. Mich. 2016)...........................................................34

*In re City of San Bernardino*,
   558 B.R. 321 (C.D. Cal. 2016) ...................................................................31, 32

*In re Constitution Plaza Assocs. Ltd. P'ship*,
   161 B.R. 563 (Bankr. D. Conn. 1993) .............................................................18

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   954 F.3d 1 (1st Cir. 2020)...........................................................................1, 16, 21

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
   948 F.3d 457 (1st Cir. 2020)........................................................................4, 5, 12

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
   No. 17 BK 3283-LTS, 2020 U.S. Dist. LEXIS 7992 (D.P.R. Jan. 7, 2020)..........................20

*In re Georgetown Park Apts., Ltd.*,
   103 B.R. 248 (Bankr. S.D. Cal. 1989) ...................................................................18

*In re Jeans.com*,
   491 B.R. 16 (Bankr. D.P.R. 2013)........................................................................31

*In re Midway Invs., Ltd.*,
   187 B.R. 382 (Bankr. S.D. Fla. 1995) ...................................................................17

*In re New York City Off-Track Betting Corp.*,
   434 B.R. 131 (Bankr. S.D.N.Y. 2010)...................................................................35

*In re R.L. Adkins Corp.*,
   No. 11-10241-rlj-11, 2013 WL 3357874 (Bankr. S.D. Tex. July 3, 2013),
   *aff'd*, 784 F.3d 978 (5th Cir. 2015)......................................................................15

*In re Richmond Unified Sch. Dist.*,
   133 B.R. 221 (Bankr. N.D. Cal. 1991) ..................................................................17

*In re Salamon*,
   854 F.3d 632 (9th Cir. 2017) ..............................................................................15

*In re Stanley*,
   185 B.R. 417 (Bankr. D. Conn. 1995) ..................................................................14

*In re W. Real Estate Fund, Inc.*,
   75 B.R. 580 (Bankr. W.D. Okla. 1987) ............................................................18, 19

*Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.*,
   449 F.3d 85 (1st Cir. 2006 ..............................................................................27, 28

*Jaffe-Spindler Co. v. Genesco, Inc.*,
   747 F.2d 253 (4th Cir. 1984) ..............................................................................29

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154, 161 (3d Cir. 1993)..........................................................................14

*Kiefer v. Woolley*,
   D.C. No. CV-89-05810-JDG, 2000 WL 59912 (9th Cir. Jan. 24, 2000)...............................29

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healy*,
   844 F.3d 318 (1st Cir. 2016)...............................................................................10

*Mangual v. Rotger-Sabat*,
   317 F.3d 45 (1st Cir. 2003) ............................................................................. 11

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
   312 U.S. 270 (1941) ........................................................................................ 7

*Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*,
   973 F.2d 18 (1st Cir. 1992) ........................................................................... 6, 8

*Norvell v. Sangre de Cristo Dev. Co.*,
   519 F.2d 370 (10th Cir. 1975) ......................................................................... 9

*Official Comm. of Unsecured Creditors of Antonelli v. United States (In re Antonelli)*,
   Nos. 91-4-0254-PM, 92-A-0134-PM, 1992 WL 435879 (Bankr. D. Md. Nov. 6, 1992) ....................................................................................................... 10

*P.R. Tel. Co. v. SprintCom, Inc.*,
   662 F.3d 74 (1st Cir. 2011) ............................................................................ 28

*Penn Terra, Ltd. v. Dep't of Envtl. Res., Commonwealth of Pa.*,
   733 F.2d 267 (3d Cir. 1984) .......................................................................... 32

*People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*,
   814 F. Supp. 159 (D. Me. 1993) ................................................................. 22, 23

*R.G. Fin. Corp. v. Vergara-Nunez*,
   446 F.3d 178 (1st Cir. 2006) ......................................................................... 4, 8

*Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712, 1992 WL
   755597 (P.R. 1992) ........................................................................................ 27

*Reading Co. v. Brown*,
   391 U.S. 471 (1968) ............................................................................. 30, 31, 32

*Reddy v. Foster*,
   845 F.3d 493 (1st Cir. 2017) ........................................................................... 7

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*,
   199 F.3d 26 (1st Cir. 1999) ......................................................................... 7, 12

*Rok Builders, LLC v. 2010-1 SFG Venture LLC (In re Moultonborough Hotel Grp., LLC)*, 726 F.3d 1 (1st Cir. 2013) ............................................................. 27

*Roman Catholic Bishop of Springfield v. City of Springfield*,
   724 F.3d 78 (1st Cir. 2013) ...................................................................... 7, 11, 12

*Tampa Bay Assocs., Ltd. v. DRW Worthington, Ltd. (In re Tampa Bay Assocs.,
Ltd.)*,
864 F.2d 47 (5th Cir. 1989) ................................................................15

*Texas v. United States*,
523 U.S. 296 (1998)...........................................................................6

*Travelers Ins. Co. v. 633 Third Assocs.*,
973 F.2d 82 (2d Cir. 1992)................................................................29

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989)..........................................................................34

*USX Corp. v. Prime Leasing Inc.*,
988 F.2d 433 (3d Cir. 1993)...............................................24, 25, 28

*Yorke v. NLRB*,
709 F.2d 1138 (7th Cir. 1983) ....................................................31, 32

**STATUTES**

19 L.P.R.A. § 1752(a) .........................................................................24

11 U.S.C. § 101(5) ..............................................................................34

11 U.S.C. § 101(12) ............................................................................34

11 U.S.C. § 363 .........................................................13, 14, 15, 17

11 U.S.C. § 503(b)(1)(A) ....................................................................31

11 U.S.C. § 507(a)(2)..........................................................................30

11 U.S.C. § 552 .........................................................1, 2, 4, 5, 20

11 U.S.C. § 727 ............................................................................33, 34

11 U.S.C. § 943(b)(4) .........................................................................11

11 U.S.C. § 944(b)......................................................4, 33, 34, 35

11 U.S.C. § 1111(b) ...................................................................*passim*

11 U.S.C. § 1141 ..........................................................................33, 34

48 U.S.C. §§ 2101–2241 .......................................................................1

48 U.S.C. § 2103 .................................................................................16

48 U.S.C. § 2161(a) .................................................................................................34

UCC § 9-102 cmt. 5(d) ............................................................................................20

OTHER AUTHORITIES

COLLIER ON BANKRUPTCY ¶ 1111.03...................................................................20

6 COLLIER ON BANKRUPTCY ¶ 901.04[13][b] ..............................................34, 35

F. Vazquez & E. Daucher, Column, Building Blocks, *Restructuring a
    Municipality under Chapter 9*, 29-6 ABIJ 50 (2010) .............................35

Fed. R. Bankr. P. 3014.............................................................................................13

Fed. R. Bankr. P. 3019(a) ........................................................................................10

Fed. R. Civ. P. 12(c) ..................................................................................... *passim*

Restatement (Second) of Torts, § 265 (Am. Law Inst. 1979).................................33

Restatement (Second) of Torts, § 895B(3)(a) (Am. Law Inst. 1979)......................33

U.S. Const. Article III, § 2 .........................................................................................6

**OPPOSITION TO CLAIMANTS' MOTION PURSUANT TO FED. R. CIV. P. 12(c) FOR
JUDGMENT ON THE PLEADINGS**

To the Honorable United States District Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Employees Retirement

System of the Government of the Commonwealth of Puerto Rico ("ERS," and together with the

Commonwealth, the "Debtors"), by and through the Financial Oversight and Management Board

for Puerto Rico (the "Oversight Board"), as the Debtors' sole representative pursuant to § 315(b)

of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2]

respectfully submit this opposition (the "Opposition") to *Claimants' Motion for Judgment on the*

*Pleadings Pursuant to Fed. R. Civ. P. 12(c)* [Case No. 17-bk-3283, ECF No. 13400; Case No. 17-

bk-3566, ECF No. 917] (the "Motion" or "Mot.") filed by certain groups of ERS Bondholders

("ERS Bondholder Groups") and The Bank of the New York Mellon, as Fiscal Agent for the ERS

Bonds (the "Fiscal Agent" and, together with the ERS Bondholder Groups, the "Claimants").

**PRELIMINARY STATEMENT**[3]

1.      Despite this Court and the First Circuit having determined that due to Bankruptcy

Code § 552, Claimants' lien would not attach to employer contributions earned after the ERS

petition date, Claimants argue the Commonwealth's post-petition PayGo statute provides them

constitutional, tort, and other claims, including administrative claims, for loss of the value of

employer contributions in which they would not have had an interest with or without the PayGo

statute.  As the First Circuit observed,[4] the Oversight Board and AAFAF agreed Claimants would

be paid the value of their prepetition collateral.  Nevertheless, Claimants are prosecuting their

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3] All capitalized terms not defined in this section have the meanings ascribed to them below.

[4] *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 10 (1st Cir. 2020).

constitutional, tort, and other claims against ERS and the Commonwealth as if their original nonrecourse secured claims in post-petition collateral were not blocked by § 552.  Moreover, they ask this Court to allow them recourse claims under Bankruptcy Code § 1111(b), before any confirmation hearing that would allow the Court to determine whether § 1111(b) applies and whether any of its exceptions apply.  To support their entitlement to recourse claims arising out of a nonrecourse bond issuance, Claimants cite inapposite decisions under which the purchaser of a participation in a nonrecourse loan was granted a recourse claim against the seller of the participation under the seller's contract with the purchaser as opposed to the borrower of the loan in which the purchaser purchased the participation.  And, to manufacture an administrative expense priority, Claimants argue that post-petition the Commonwealth terminated employer contributions payable to ERS, without noting that at most, a prepetition obligation was terminated, but in reality a right was exercised the Official Statement disclosed could be exercised before the bonds were issued.

2.     Claimants' claims arise from the enactment of the PayGo legislation in 2017 that changed the system for funding pensions, and Debtors moved to disallow them because, among other reasons, application of Bankruptcy Code § 552 to the pre-2017 pension system—and not any action by the Debtors—impaired Claimants' ability to recover on those claims.  *See* Motion to Dismiss.  Against that backdrop, Claimants seek judgment on the pleadings that the claims they assert are (i) recourse claims against ERS not susceptible to any exceptions based on the terms of the plan of adjustment presented for confirmation, and (ii) entitled to administrative priority, or are non-dischargeable as they arise post-petition.  The Motion seeks an advisory opinion based on a currently unknown final plan of adjustment, is meritless in any event, and should be denied for three independent reasons.

3.      *First*, neither issue is ripe.   Claimants concede their claims are contingent on uncertain future events.   For the sake of argument, if Claimants obtain the judgment they seek, but are unsuccessful in establishing liability or damages in subsequent proceedings independent of principal and interest, a ruling on the Motion would be solely an academic exercise.   Claimants also ignore that the Court has not approved a disclosure statement or commenced a confirmation hearing, which would allow adjudication on the discharge of claims including the application of Section 1111(b).

4.      *Second*, even if the Court took up Claimants' unripe request for judgment determining they have recourse claims, they have not established any right to judgment.   Claimants advance two theories for recourse status.   First, they assert the "plan sale exception" in Section 1111(b)(1)(A)(ii), which automatically bars recourse claims where collateral is to be sold under the plan, does not apply under the plan of adjustment filed by the Debtors in February.   But, the current proposed plan provides for such sale.   Second, Claimants assert they can override the nonrecourse provisions of their bonds and the Resolution because of alleged breaches of covenants and torts committed by ERS.   Claimants ignore the Resolution's nonrecourse provisions and, as established in the Motion to Dismiss, breaches of covenants only allow Claimants to declare a default for purposes of exercising nonrecourse remedies.   Tort causes of action are unavailable here, where the parties' relationship is contractual.

5.      *Third*, Claimants cannot obtain judgment that their claims are entitled to administrative priority or are non-dischargeable based on their alleged status as a post-petition creditor.   All their rights stem from prepetition contracts.   As set forth in the Motion to Dismiss, Claimants are not entitled to administrative priority as they do not allege that, post-petition, they provided beneficial property or services to the Debtors. Claimants' authorities are inapposite on

their facts and do not apply in the context of a bankruptcy case of a government entity.  Nor can

Claimants obtain judgment that their claims are non-dischargeable in view of Bankruptcy Code

§ 944(b), which provides, clearly and categorically, that *all* debts are dischargeable.

## PROCEDURAL BACKGROUND

6.     After the First Circuit affirmed this Court's ruling that Bankruptcy Code § 552

applied to Employers' Contributions generated and received by ERS after the filing of the ERS

Title III petition, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d 457 (1st Cir. 2020), the

parties agreed to entry of the Claims Scheduling Order (Case No. 17-bk-3283, ECF No. 12446

[amended at ECF No. 12901]), providing Claimants may file a motion for judgment pursuant to

Fed. R. Civ. P. 12(c).  The "pleadings" for purposes of the Motion consist of the proofs of claim,

the Administrative Expense Motions, the Supplements, the Claim Objections, and any Rule 12(b)

motions including the Motion to Dismiss (Case No. 17-bk-3283, ECF No. 13054).   Claims

Scheduling Order ¶ 7.  Also, for purposes of the Motion, "any allegation contained in the Claims,

the Administrative Expense Motions, or the Supplements" is considered denied unless "expressly

admitted in a Rule 12(b) motion or a Claim Objection[.]"  *Id.*

## ARGUMENT

7.     To enter judgment on the pleadings, the Court cannot resolve contested facts and

"may enter judgment on the pleadings only if the properly considered facts conclusively establish

[Claimants'] point."  *R.G. Fin. Corp. v. Vergara–Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).  As

such, where issues of fact remain that may preclude liability or damages, judgment on the

pleadings is inappropriate.  *See, e.g.*, *In re Corotoman, Inc.*, No. 2:19-BK-20134, 2020 WL

1493011, at *3 (Bankr. S.D.W. Va. Mar. 26, 2020).

8.     Claimants  cannot satisfy this standard.  The Motion is predicated on the theory that

ERS's alleged breach of covenants in the ERS Bond Resolution [Case No. 17-bk-3283, ECF No.

13400-1 (the "Resolution")] convert the ERS Bonds from nonrecourse to recourse obligations, and that the post-petition PayGo legislation (the "Post-Petition Legislation") is a tort committed by ERS and the Commonwealth that gives rise to recourse claims against ERS and administrative claims against the Commonwealth. If Claimants were correct, nonrecourse claims would not exist because virtually all defaults of nonrecourse obligations are accompanied by covenant breaches such as the covenant to pay. But, Claimants are not correct. Unsurprisingly, Claimants cite no decisions holding breach of a covenant in a nonrecourse financing creates a recourse obligation. Nor could they. *See infra* ¶ 43. Further, Debtors have not admitted breach of any such covenants and deny Claimants have suffered any damages.

9.   Claimants' contention that they have allowable administrative claims against the Commonwealth arising from its post-petition legislation terminating employer contributions to ERS fails for many reasons. First, even assuming the Commonwealth had an obligation not to repeal legislation requiring employer contributions to ERS, any such obligation was a prepetition obligation that arose when the ERS bonds were issued. Rejecting or otherwise breaching a prepetition obligation yields a prepetition claim even though the rejection or breach occurs post-petition. The First Circuit, however, observed in its decision concerning Bankruptcy Code § 552 "that the payment of future Contributions was contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures," and the bond documents "explicitly state[] that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions[.]" *In re Fin. Oversight & Mgmt. Bd. of P.R.*, 948 F.3d at 468–69. Thus, Claimants have no allowable claims for negligence or other wrongful conduct because they were warned in advance the legislature might terminate employer contributions. Second, Claimants provided nothing post-petition that was necessary to preserve the Commonwealth's property. In the absence

of a post-petition tort claim, administrative priority is not allowed by the statute absent necessary value for preserving the estate.

10.     Finally, even if any of the claims survive the Motion to Dismiss (which they should not), the rulings sought by Claimants here would require a resolution of disputed facts establishing liability and damages in their favor, which cannot be determined at the pleadings stage.  Further, the rulings Claimants seek concerning Bankruptcy Code § 1111(b) and discharge require a confirmation hearing.

## I.     CLAIMANTS' MOTION MUST BE DENIED BECAUSE IT SEEKS AN ADVISORY OPINION AND JUDGMENT ON UNRIPE ISSUES.

11.     Federal judicial power can only be exercised where there is a case or controversy. U.S. Const. art. III, § 2; *Camreta v. Greene*, 563 U.S. 692, 701 (2011).  To that end, the ripeness doctrine is rooted in constitutional, jurisdictional, and judicial economy concerns, and is applied to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  An unripe action is not an "actual case[] or controvers[y]" under Article III, and therefore "a court has no alternative but to dismiss . . . ." *Ernst & Young v. Depositors Econ. Prot. Corp.* ("*E&Y*"), 45 F.3d 530, 535 (1st Cir. 1995).

12.     Ripeness analysis has two prongs:  fitness, and hardship. *Texas v. United States*, 523 U.S. 296, 301 (1998).  "Fitness" speaks to whether a claim "involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." *Massachusetts Ass'n of Afro-Am. Police, Inc. v. Boston Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992).  This prong of the ripeness test is "pragmatic"—"issuing opinions based on speculative facts or a hypothetical record is an aleatory business, at best difficult and often impossible." *Id.* at 536.  Accordingly, the fitness prong requires "a substantial controversy . . . of sufficient immediacy and reality" in order for a

federal court to have jurisdiction. *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273

(1941). Importantly, the question of fitness "involves an assessment of whether it is *appropriate*

for the court to undertake the task." *E&Y*, 45 F.3d at 537 (emphasis added). For this reason, the

fitness prong considers whether a decision should be postponed to avoid issuing unnecessary

decisions when elements of a case are uncertain. *Roman Catholic Bishop of Springfield v. City of

Springfield*, 724 F.3d 78, 90 (1st Cir. 2013). "Hardship" turns on "whether the challenged action

creates a direct and immediate dilemma for the parties." *E&Y*, 45 F.3d at 535 (citation omitted).

As the First Circuit has found, "[i]n general, the greater the hardship, the more apt a court will be

to find ripeness." *Id.* at 536; *see also Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d

26, 33 (1st Cir. 1999). In general, "a mere possibility of future injury, unless it is the cause of

some present detriment, does not constitute hardship." *Roman Catholic Bishop of Springfield*, 724

F.3d at 90 (internal quotation omitted). Claimants bear the burden of satisfying both prongs of the

ripeness test. *See Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017).

13.     The Motion must be denied because the judgments it seeks—namely, that the

claims are recourse and are administrative expenses—cannot be granted based on disputed facts

in the pleadings. Among other things, Claimants have not established any liability or damages

independent of principal and interest on the ERS Bonds—and until they do, they cannot establish

(a) a right to payment from sources other than their collateral or (b) an administrative priority.

Claimants also seek rulings that § 1111(b)(2)(A)(ii) does not apply and that if they establish

administrative expense claims and the plan of adjustment does not provide for payment thereof,

such claims would not be discharged. These requests are wholly speculative as there is no

confirmation hearing scheduled, and therefore no actual plan of adjustment to be adjudicated. Nor

can Claimants show hardship, as they will not receive distributions until after a plan of adjustment is confirmed.

**A.     Whether Claimants' Hold Recourse Claims Against ERS or Claims Entitled to Administrative Priority Are Not Fit for Review.**

14.     *First*, putting aside Bankruptcy Code § 1111(b), whether Claimants are limited to their collateral or are subject to administrative priority are not ripe issues because both necessarily depend on Claimants establishing liability or damages independent of principal and interest. Claimants concede their claims are speculative, stating they could be recourse "if successful" (Mot. at 21, 26), and entitled to priority "[t]o the extent Claimants are able to prove any of these claims" (Mot. at 26), and "if Claimants prove these claims" (Mot. at 33), and "if [Claimants'] claims are successful" (Mot. at 33).  Unquestionably, the claims turn on "uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all," which is the hallmark of a hypothetical issue unfit for review.  *See Massachusetts Ass'n of Afro-Am. Police, Inc.*, 973 F.2d at 20.  And, unless and until Claimants establish a right to payment, they cannot obtain administrative expense status.  *See, e.g.*, *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 201 (1st Cir. 1985) (administrative expense status determined after the court's consideration of evidence).

15.     Any ruling Claimants are entitled to judgment would belie the "contested facts" Claimants acknowledge are not "conclusively establish[ed]" by the pleadings.  *See R.G. Fin. Corp.*, 446 F.3d at 182.  Until liability is established, no payment or claim allowance can be ordered.  The claims are subject to a Motion to Dismiss and even assuming it were denied and the Motion granted, there will still need to be further proceedings to resolve disputed factual issues.

16.     "It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies. . . . A justiciable controversy is distinguished from a difference or dispute of a hypothetical character or from one that is

8

academic." *Norvell v. Sangre de Cristo Dev. Co.*, 519 F.2d 370, 375 (10th Cir. 1975) (internal citations omitted).  Claimants' request that this Court use its scarce judicial resources for this purpose is inappropriate and the Motion should be denied on this basis alone.

17.    *Second*, even if Bankruptcy Code § 1111(b) applies to the claims, whether the plan sale exception in § 1111(b)(1)(A)(ii) applies will not be fit for review until there is a confirmation hearing.  Similarly, Claimants' request for judgment that their asserted Administrative Priority claims are not dischargeable requires that they establish such claims *and* that the plan of adjustment will not provide for payment thereof.  Again, Claimants' request is premature.

18.    This Court has already recognized this, previously dismissing on ripeness grounds an adversary proceeding seeking a declaratory judgment that claims were not subject to discharge. *See Atl. Med. Ctr., Inc. v. Commonwealth of Puerto Rico (In re: Commonwealth of Puerto Rico)*, No. 17-AP-278 (D.P.R.), ECF No. 65 (Memorandum Order).  The Oversight Board's *proposed* plan of adjustment does not alter this result. The mere filing of a plan of adjustment does not create an immediate controversy with respect to dischargeability.  To the extent Claimants have an issue with a plan they should raise it at the appropriate time—confirmation.  Only once a disclosure statement is approved, creditors vote, and a confirmation hearing commences may Claimants' (or any other party's) dispute over the status of their claims dependent on how the plan treats them, become ripe for adjudication (and, at that point, the Court will have discretion to adjudicate the dischargeability of Claimants' or other creditors' claims, either at confirmation or thereafter).  Thus, a plan that has merely been proposed is not *the* plan, as it is being negotiated and potentially amended.

19.    The First Circuit recently made clear that "no claims will be discharged, and no determinations will be made about the treatment of claims, until the plan of adjustment is

9

confirmed." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 638, 647 (1st Cir. 2019).  Any

ruling the claims are recourse or not subject to discharge prior to confirmation would be

hypothetical and unfit for review because "the Commonwealth has [not] arrived at a definitive

position regarding any disbursement of" its funds. *Id.* (citation omitted); *see also* Fed. R. Bankr.

P. 3019(a) (providing for plan modification at any time prior to confirmation).

20.     In sum, until a disclosure statement is approved, creditors vote on a plan, and a

confirmation hearing commences, a plan that is merely *proposed* and still subject to negotiation

cannot be the subject of a ripe claim.  *See Labor Relations Div. of Constr. Indus. of Mass., Inc. v.

Healy*, 844 F.3d 318, 327 (1st Cir. 2016) (finding claim seeking "pre-enforcement request for

relief" unripe); *In re Antonelli*, Nos. 91-4-0254-PM, 92-A-0134-PM, 1992 WL 435879, at *3

(Bankr. D. Md. Nov. 6, 1992) (dispute regarding proposed third-party transfers "not imminent as

the Plan must still be confirmed . . . ).[5]

21.     The case of *Bank of New York v. Adelphia Communications Corp. (In re Adelphia

Communications Corp.)*, 307 B.R. 432 (Bankr. S.D.N.Y. 2004), is particularly instructive.  There,

the court held a pre-confirmation dispute brought by subordinate debtholders regarding treatment

of their claims in a proposed plan was too contingent and speculative to satisfy Article III.  Because

of uncertainties whether the proposed plan would be considered for confirmation in its current

form the "dispute [was] inappropriate for determination at that time."  *Id.* at 439.

22.     That is the situation here.  The proposed plan of adjustment is subject to further

negotiation and further iterations of a plan could be proposed that render issues moot.[6]  Likewise,

---

[5] *See, e.g.*, *In re Caesars Entertainment Operating Co., Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. May 28, 2015), ECF
No. 1713, at 15 ("[T]he plan lacks the significance the Committee places on it. . . . [T]he proposed plan is simply *a*
plan.  Whether it is *the* plan, meaning the plan the debtors will ultimately seek to confirm, remains to be seen.").

[6] The Court noted at the April 22, 2020 omnibus hearing that the current plan may be further amended in light of
ongoing negotiations as well as the Commonwealth's financial situation due to the COVID-19 pandemic.  Hr'g Tr.,
Case No. 3:17-03283-LTS [ECF No. 12953] (Apr. 22, 2020), at 14:2-6 ("I take into account the possibility that the

any assertion that the current proposed plan's treatment of Claimants' collateral does not satisfy the plan sale exception in Bankruptcy Code § 1111(b) is a poorly disguised confirmation objection.[7]  The final terms of a plan of adjustment—including the treatment and discharge of the claims—will not be known until the Court approves a disclosure statement and commences a confirmation hearing.  *In re Energy Future Holdings Corp.*, 531 B.R. 499, 514 (Bankr. D. Del. 2015) (deeming request for declaratory relief unripe in light of uncertainty over "the structure of any *confirmed* plan") (emphasis added).

23.     In short, regardless of whether Bankruptcy Code § 1111(b) applies to the claims in the context of the current plan, the Motion seeks "premature adjudication" of currently "abstract disagreements" that would constitute an advisory opinion on unripe issues.  *See Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003).  Claimants doubtless believe "an early ruling might facilitate [Claimants'] negotiations" and allow them to "know better what litigation positions they might wish to take," but that "do[es] not confer subject matter jurisdiction where it is lacking." *Adelphia*, 307 B.R. at 440.  As a practical matter, judicial restraint is warranted here given the uncertainty surrounding Claimants' ability to prove their claims (Mot. at 21, 26, 33) and the lack of a confirmed plan of adjustment.  *See Roman Catholic Bishop of Springfield*, 724 F.3d at 90.

**B.     Denying the Motion Would Not Impose Substantial Hardship on Claimants.**

24.     Even if the Court were not required to deny the Motion for Claimants' failure to establish fitness, Claimants also cannot meet the "hardship" prong of the ripeness analysis.

---

Plan may be further amended as proposed, that may or may not make changes that are material to some or all of the issues that have been raised here."); 40:17-23 (acknowledging possibility of "further amended Plan").

[7] Claimants' reliance on Bankruptcy Code § 943(b)(4) to assert the plan sale exception cannot apply (Mot. at 12) is both inapposite and telling.  It is inapposite because § 943 is not incorporated via PROMESA § 301.  It is telling because it concerns whether a plan is *confirmable*, and betrays Claimants' understanding that satisfaction of the plan sale exception is an issue for confirmation—not here, during the claims objection process.

Claimants' concession that they have not yet succeeded on their claims independent of principal

and interest, and the lack of a plan of adjustment subject to a confirmation hearing, yield "a mere

possibility of future injury" rather than a "present detriment," and "does not constitute hardship."

*Roman Catholic Bishop of SPG*, 724 F.3d at 90 (citation omitted). As such, there can be no "direct

and immediate dilemma for the parties." And Claimants will not receive any distributions on their

claims until a plan of adjustment is consummated. *See E&Y*, 45 F.3d at 536; *see also Whitehouse*,

199 F.3d at 33; *In re Breland*, No. 16-2272-JCO, 2017 WL 2683980, at *4 (Bankr. S.D. Ala. June

21, 2017) (determination of claim premature because "any potential injury" to appellants "would

occur only once a plan is confirmed"), *aff'd*, 610 B.R. 389 (S.D. Ala. 2019).[8]

25.     In sum, Claimants ask the Court to enter judgment that they hold recourse claims

against ERS notwithstanding the terms of the Bonds and Resolution and hold claims entitled to

administrative priority that are non-dischargeable if not satisfied pursuant to a plan of adjustment,

even though such rulings would have no practical application if Claimants fail to establish liability

and damages independent of their nonrecourse claim for payment of principal and interest. As

explained above, the grounds for liability alleged in Claimants' Motion are refuted by the record

in this case. In short, as the First Circuit wrote, *In re Fin. Oversight & Mgmt. Bd. of P.R.*, 948

F.3d at 467, the bond documents warned the bond purchasers the Legislature could terminate

employer contributions payable to ERS. The actual termination cannot be a tort. And even if it

did give rise to a tort claim, it cannot be an administrative claim because the Commonwealth would

have terminated a prepetition Commonwealth obligation (assuming there was an enforceable

obligation). Post-petition rejections or breaches of prepetition obligations do not create

---

[8] Even if the Court were to grant the Motion, it would not cause Debtors to make any payment to Claimants prior to the effective date of the plan. Thus, denying the motion as unripe does not create any additional hardship more than the inherent hardship to creditors associated with any bankruptcy case.

administrative claims.  Also, the ultimate terms of a plan of adjustment will affect the arguments advanced by Claimants regarding § 1111(b) and the claim being an administrative expense claim or non-dischargeable.  That entry of a judgment on these issues now may have no effect in view of later, contingent events is the best evidence the Motion seeks an advisory opinion on unripe issues that would entangle the Court in an abstract disagreement.  *See Abbott Labs.*, 387 U.S. at 148-49.  The Court should deny the Motion.

## II.   CLAIMANTS ARE NOT ENTITLED TO JUDGMENT DETERMINING THEY HAVE RECOURSE CLAIMS AGAINST ERS.

### A.   Claimants Cannot Obtain Judgment They Have Recourse Claims Under Bankruptcy Code § 1111(b) at the Claim Objection Stage.

26.    Bankruptcy Code § 1111(b)(1)(A) expressly provides nonrecourse claims shall be allowed or disallowed as recourse claims "unless" (i) the class of claimholders under the plan make the § 1111(b)(2) election, (ii) the collateral is sold under the plan, (iii) the collateral is of inconsequential value, or (iv) the collateral is sold under § 363.  It could not be any clearer that the issue cannot be ripe before the terms of the plan are known and the value of the collateral at the time of confirmation is known.  Claimants argue their nonrecourse claims should be treated as recourse pursuant to Bankruptcy Code § 1111(b)(1)(A).  But, they cannot obtain judgment that their claims should be treated as recourse at this time, and cite no authority to support their position that such judgment is proper as part of the claims objection process.  Nor could they, as the Plan's treatment of their claims will determine whether Bankruptcy Code § 1111(b)(1)(A) applies, or if § 1111(b)(1)(A)(ii) forecloses such treatment.  Of course, the current plan of adjustment provides for a sale of all of Claimants' alleged collateral eliminating any nonrecourse treatment.  In any event, determination of this issue now is premature.  And Claimants' cited case law does not suggest otherwise.  Significantly, none of the cases cited by Claimants involves claim objections.  Further, Fed. R. Bankr. P. 3014, which provides for a § 1111(b)(2) election to be made as late as

any time prior to the conclusion of a disclosure statement hearing (or a later time fixed by the court), demonstrates that matters relating to § 1111(b) should be reserved for confirmation. *See In re Bloomingdale Partners*, 155 B.R. 961, 971 (Bankr. N.D. Ill. 1993).

**B.   The Debtors Have Not Waived the Application of Section 1111(b)(1)(A)(ii), Which Applies Automatically.**

27.   Claimants argue that because the Debtors did not assert the claims cannot be treated as recourse in their objections to those claims, the Debtors have waived the application of § 1111(b)(1)(A)(ii). Mot. at 9.  To the contrary, as Claimants admit, § 1111(b)(1)(A) applies automatically. *See* Mot. at 9 (citing *In re Stanley*, 185 B.R. 417, 428 (Bankr. D. Conn. 1995)) (noting § 1111(b)(1)(A) applies "automatically").  There is automatic treatment of nonrecourse secured claims as recourse, "*unless*" the collateral will be sold under § 363 or a plan.  11 U.S.C. § 1111(b)(1)(A)(ii) (emphasis added).  This occurs by operation of law.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 161 (3d Cir. 1993)   No affirmative action is required and no affirmative objection is required for the exceptions to that treatment to apply.

28.   The cases relied upon by Claimants address only the requirement that a creditor have a lien on property for its claim to be treated as recourse, and not the mechanics of § 1111(b)(1)(A) and its exceptions. *See In re 680 Fifth Ave. Assocs.*, 156 B.R. 726, 732 n.8 (Bankr. S.D.N.Y. 1993) (explaining § 1111(b) applies when a claim is secured by a lien on property, but observing "[t]he two exceptions listed in § 1111(b)(1)(B) have not been put in issue and therefore play no part in this decision"); *In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 601 (7th Cir. 2013) (holding a valid lien is a prerequisite for § 1111(b)(1)(A) to apply).  Just as the

14

conversion of a nonrecourse claim to recourse is automatic under § 1111(b)(1)(A), so is treatment as nonrecourse when a claimant's collateral is sold pursuant to a plan.[9]

**C.**   **The Claims Cannot Be Treated as Recourse Under the Proposed Plan Because the Claims Are Subject to Section 1111(b)(1)(A)'s Plan Sale Exception.**

29.   The "plan sale" exception of Section 1111(b)(1)(A)(ii) of the Bankruptcy Code establishes a nonrecourse claim cannot be treated as recourse if the creditor's collateral is to be sold pursuant to a plan. *See In re Tampa Bay Assocs., Ltd.*, 864 F.2d 47, 50 (5th Cir. 1989) ("Section 1111(b)(1)(A)(ii) explicitly excepts from the election option any nonrecourse holder whose secured property is sold pursuant to 11 U.S.C. § 363 or pursuant to a plan of reorganization."); *In re R.L. Adkins Corp.*, No. 11-10241-RLJ-11, 2013 WL 3357874, at *2 (Bankr. S.D. Tex. Jul 3, 2013) (explaining the parallel exception in § 1111(b)(1)(B)(ii) is "unequivocal" and provides that a creditor cannot make a § 1111(b)(2) election if "the property subject of its lien . . . is sold under the plan") (citation omitted), *aff'd*, 784 F.3d 978 (5th Cir. 2015). Claimants wrongly contend they have recourse pursuant to the Resolution. As Claimants admit, however, under the Resolution, the ERS Bonds have limited recourse to the "Pledged Property." Mot. at 7. The Plan provides, in relevant part: "On the Effective Date, the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey, all of ERS's right, title and interest in ERS's assets, including, without limitation, such assets subject to a valid and perfected lien or security interest . . . ." Plan § 2.4 [Case No. 17-bk-3283, ECF No. 11946 (the "Plan")]. Although the Plan provides for a sale of all of ERS's assets, including Claimants' collateral, Claimants argue, citing no authority, that these assets cannot be sold under the Plan because the Post-Petition Legislation already provided for the transfer of the assets to the Commonwealth. Mot. at 10.

---

[9] Where a claim is not secured by a valid lien, those claims are not afforded the protections of § 1111(b), and cannot be recourse against ERS. *See In re Salamon*, 854 F.3d 632, 637 (9th Cir. 2017).

30.     As Claimants well know, they complained about the transfer of collateral to the Commonwealth, and the Commonwealth and the Oversight Board agreed Claimants would be paid the value of the collateral.  Indeed, this is recited in the First Circuit's opinion affirming this Court's decision on Claimants' § 926 motion.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 10 (1st Cir. 2020).  Regardless of whether ERS should have transferred its assets pursuant to the Post-Petition Legislation, it has not.  ERS's assets remain property of the debtor, which can be sold pursuant to the Plan.

31.     Even if the Post-Petition Legislation did require ERS to transfer its assets in 2017, hypothetical acts that allegedly "should" have been performed under Puerto Rico law do not affect the property of ERS, nor the operation of PROMESA and the Plan in relation to such property. Indeed, this Court has exclusive jurisdiction over ERS's property pursuant to PROMESA § 306(b). The Post-Petition Legislation cannot alter ERS's rights under PROMESA or the applicability of § 1111(b) to the claims.  *See* 48 U.S.C. § 2103 (Title III "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this chapter").

**D.     The "Exceptions to the Exception" Invoked by Claimants Are Inapplicable and Unsupported.**

32.     Claimants argue, citing several purported exceptions to § 1111(b)(1)(A)(ii) that do not appear in the statute, that even assuming ERS's assets may be sold, the proposed sale under the Plan does not satisfy the plan sale exception.  These "exceptions" to the applicability of § 1111(b)(1)(A)(ii) that the Claimants seek to invoke include (1) a creditor must be permitted to credit bid, (2) collateral must be sold at public auction, (3) a sale must occur contemporaneously with plan confirmation, and (4) all assets must be sold.  Mot. at 12–14.  None of these requirements appears in the text of § 1111(b), and the authority relied upon by Claimants does not support their position.

16

### 1. The Plan Sale Exception Does Not Require a Creditor to Have the Right to Credit Bid.

33. Claimants argue that the plan sale exception does not apply because they are not entitled to credit bid under the proposed Plan. To the extent the Court determines Claimants have a right to credit bid they would be afforded such right. Ironically, Claimants' argument only demonstrates Claimants' request for relief is not ripe. At the confirmation hearing, the Court can rule Claimants are entitled to credit bid. If the Court issues that ruling, there is no reason why ERS would not grant Claimants the right to credit bid. Indeed, that would save ERS or the Commonwealth the money it would otherwise have to provide for the collateral. In any event, most likely, Claimants' contention that they must have the right to credit bid is wrong. The cases relied upon by Claimants only suggest a right to credit bid may be necessary because of the applicability of § 363(k) of the Bankruptcy Code, which is not incorporated into PROMESA. Some cases have cited § 363(k) for the position that § 1111(b)'s plan sale exception requires a creditor to have the right to credit bid. As one court explained, a "sale of property under section 363 *or under a plan* is excluded from treatment under section 1111(b) *because of the secured party's right to bid . . . under section 363(k)*." *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995) (emphasis added).

34. Claimants have not pointed to any authority to support the position that § 1111(b)(1)(A)(ii), on its own and without reference to § 363(k), requires that a creditor have the right to credit bid. As Claimants note, § 363(k) is not incorporated into PROMESA. Mot. at 10, PROMESA § 301(a). Section 363(k) is therefore inapplicable to § 1111(b) in this context, and the plan sale exception does not require that Claimants have a right to credit bid. *See In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("[T]here is no 'estate' under section

541, *and the debtor is free to use, sell or lease property without regard to the restrictions in section 363*. *See* section 901.") (emphasis added).

### 2.    The Plan Sale Exception Does Not Require a Public Auction.

35.    Citing no authority, Claimants argue that for the plan sale exception to apply, the collateral must be sold at a public auction.  However, courts hold both public and private sales are sales "under the plan" for purposes of § 1111(b).  *See, e.g.*, *In re Constitution Plaza Assocs. Ltd. P'ship*, 161 B.R. 563, 567 (Bankr. D. Conn. 1993); *In re Georgetown Park Aps., Ltd.*, 103 B.R. 248, 250 (Bankr. S.D. Cal 1989).  Nothing in § 1111(b) requires a public auction.

### 3.    The Plan Sale Exception Does Not Require a Sale to Occur at the Time of Confirmation.

36.    Claimants also argue that, for the plan sale exception to apply, the sale must occur contemporaneously with confirmation.  This is incorrect.  Courts hold only that the plan must provide some specificity as to when the sale will occur.  While a plan must provide some detail as to when the sale will occur, there is no set period of time in relation to confirmation within which the sale must occur.  *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 804  (5th Cir. 1997) (sale under plan can be two years after effective date); *In re W. Real Estate Fund, Inc.*, 75 B.R. 580, 589 (Bankr. W.D. Okla. 1987) ("The court is not required to, and does not, determine the length of time which may be allowed to transpire after confirmation before a proposed sale or the degree of specificity required in the terms and conditions of any proposed sale in order to permit the application of the § 1111(b)(1)(A)(ii) exception to the 'preferred status' afforded by § 1111(b)(1)(A). It simply holds that the total lack of specificity here is insufficient.").  In addition, sales pursuant to a reorganization plan rarely close at the time of confirmation but typically close after confirmation and on or prior to an effective date.

37.     In contrast to *Western Real Estate*, where the plan's sale provisions were "wholly lacking in specificity," 75 B.R. at 589, the Plan provides that ERS's assets will be sold to the Commonwealth on the Effective Date, and details the purchase price and other terms of the sale. Plan § 2.4.  In *T-H New Orleans Limited Partnership*, *supra*, there were no terms of sale.

38.     Claimants then argue that, because the transfer of all of ERS's assets was previously directed pursuant to the Post-Petition Legislation, the sale cannot occur on the Effective Date. Mot. at 14–15.  As explained above, regardless of whether such a transfer was required by the Post-Petition Legislation, that transfer did not occur.  Claimants do not cite to any provision of the Post-Petition legislation that precludes a transfer of ERS' assets to the Commonwealth as part of a sale transaction.  ERS has retained its assets, and those assets can be sold pursuant to the Plan on the Effective Date.  In addition, it does not matter that certain of ERS's assets were already transferred:  in connection with the Lien Scope Adversary Proceeding (Adv. Proc. Nos. 19-366 and 19-367), Claimants will receive the value of their collateral.

### 4.     The Plan Provides for a Sale of All of Claimants' Collateral

39.     Claimants argue, again citing no authority, that the plan sale exception applies only if all of a creditor's collateral is sold.  Mot. at 15.  To the contrary, the plan sale exception also applies in cases where less than all of a creditor's collateral is sold*.  See In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 526–27 (5th Cir. 2018) (explaining certain of a creditor's collateral was sold under the plan, so § 1111(b)(1)(B)(ii)'s plan sale exception applied with respect to that collateral, but did not apply with respect to other collateral that was not being sold, the value of which would be used to make the § 1111(b)(2) calculation).  Similarly, nothing in § 1111(b)(1)(A)(ii)'s plan sale exception requires all of a creditor's collateral to be sold.  A creditor's claim must be treated as nonrecourse with respect to its collateral that is sold.

40.     Regardless, the Plan *does* propose to sell all of Claimants' collateral; therefore this purported exception to § 1111(b)(1)(A)(ii) is inapplicable.  In addition, the fact that Bankruptcy Code § 552 prevents Claimants' security interests from attaching to certain property post-petition has no bearing on ERS's ability to sell ERS's assets as of the petition date in which Claimants allege a security interest.  Furthermore, Claimants' argument that certain of their collateral has diminished in value is irrelevant, as nothing in Bankruptcy Code § 1111(b) turns on adequate protection of the Claimants' interests.

41.     Claimants cite to COLLIER ON BANKRUPTCY (hereinafter, COLLIER) to argue § 1111(b) is meant to prevent debtors from enriching themselves at the expense of secured creditors.  Mot. at 16.  But COLLIER goes on to say that § 1111(b) achieves a balance between protecting the interests of debtors and creditors by "convert[ing], *with some exceptions,* nonrecourse deficiency claims into unsecured claims."  COLLIER ¶ 1111.03 (emphasis added).  Of course, the plan sale exception applies here and is a part of a statutory scheme meant to protect both debtors and creditors.  Indeed, as this Court has stated "[t]he goal of these PROMESA cases thus is not merely to maximize creditors' recoveries.  Rather, these restructuring cases require a more holistic approach that focuses on the continuation and future of a government and its instrumentalities and their ability to meet the needs of the Commonwealth's residents as well as provide proper recompense of creditors."  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17 BK 3283-LTS, 2020 U.S. Dist. LEXIS 7992, at *13-14 (D.P.R. Jan. 7, 2020).  Similarly, the First Circuit affirmed the denial of Claimants' § 926 motion stating: "Unlike a commercial bankruptcy, which attempts to 'balanc[e] the rights of creditors and debtors,' the 'principle [sic] purpose of chapter 9,' and by analogy PROMESA, 'is to allow municipal debtors the opportunity to continue

operations while adjusting or refinancing their creditor obligations.'" *In re Fin. Oversight & Mgmt.*

*Bd. for P.R.*, 954 F.3d at 7–8 (citation omitted).

      E.      **Claimants Are Not Entitled to Judgment They Hold Recourse Claims Against ERS for Non-Monetary Breaches of the Resolution.**

42.      Putting aside Bankruptcy Code § 1111(b), Claimants assert they are entitled to

judgment as a matter of law that their claims for breach of the Resolution allegedly unrelated to

payment of principal and interest are recourse claims. Claimants are wrong. If Claimants were

right, nonrecourse claims would not exist because defaults of nonrecourse credit agreements

virtually always include covenant defaults.

43.      *First*, as a threshold issue, Claimants cannot obtain a *judgment* that their claims for

breach of the Resolution are recourse at this juncture. Claimants do not have "allowable claims

against ERS's property based on ERS's breaches of the Resolution" as they contend (Mot. at 16–

17) because they concede such claims are contingent and unproven (Mot. at 21, 26, 33) and,

therefore, unripe. And, Claimants' attempt to assert recourse claims for non-payment-related

breaches of the Resolution must fail because they themselves seek "only a single recovery for the

principal and interest due under the ERS Bonds." Mot. at 21 n.11. Claimants cite no authority for

the proposition that nonrecourse creditors under bond documents are entitled to anything beyond

their collateral. The non-payment covenants in the Resolution exist for the sole purpose of

supporting repayment of the bonds and do not create independent recourse claims to circumvent

the nonrecourse credit. As a comment to the Uniform Commercial Code explains:

> A right to the payment of money is frequently buttressed by ancillary
> rights, such as rights arising from covenants in a purchase
> agreement, note, or mortgage requiring insurance on the collateral
> or forbidding removal of the collateral, rights arising from covenants
> to preserve the creditworthiness of the promisor, and the lessor's
> rights with respect to leased goods that arise upon the lessee's
> default. *This Article does not treat these ancillary rights separately*
> *from the rights to payment to which they relate.* For example,

> attachment and perfection of an assignment of a right to payment of
> a monetary obligation, whether it be an account or payment
> intangible, also carries these ancillary rights.

UCC § 9-102, cmt. 5(d) (emphasis added) (citation omitted).  Indeed, if a creditor's unsecured

deficiency claim could be resurrected by raising another cause of action based on the same

transaction it would write the exception in § 1111(b)(1)(A)(ii) out of the Bankruptcy Code.

Accordingly, the non-payment covenants in the Resolution exist solely to support repayment of

the bonds—not independent recourse claims against ERS.

44.     *Second*, Claimants assert "nonrecourse" provisions like Resolution § 201 can only

apply to "underlying obligations" (here, allegedly, the ERS Bonds) and do not limit recourse for

contractual breaches of the Resolution independent of nonpayment.  Any such construction would

conflict with the nonrecourse treatment provided for in the Bonds.  Claimants' argument fails

legally and as a matter of common sense.  Their legal theories of recovery are all predicated on,

arose under, or are related to the Resolution.  Absent the Resolution, Claimants would have had

no claim against the Debtors.  Indeed, the claims are limited to the amounts ERS owes them on

the ERS Bonds—which they admit.  Mot. at 21 n.11.  As a result, all of Claimants' causes of action

are subsumed within their claims on the ERS Bonds as nonrecourse obligations—making it

unsurprising they turn to inapplicable non-bankruptcy cases to attempt to support their argument.

45.     Claimants cite *People's Heritage Savings Bank* and *First Independent Bank of*

*Nevada* to support their theory of how to squeeze a recourse claim out of the Resolution authorizing

only nonrecourse bonds.  Mot. at 17–18.  But those cases do not support Claimants' argument

because they concerned loan participation agreements where there was a separate obligation of the

seller of a participation to the buyer of the participation—not a suit by a holder of the nonrecourse

obligation itself pursuant to a trust indenture or bond resolution.  *See People's Heritage Sav. Bank*

*v. Recoll Mgmt., Inc.*, 814 F. Supp. 159, 160 (D. Me. 1993) (hereinafter, "*PHSB*"); *First Indep.*

22

*Bank of Nevada v. Mohave State Bank*, No. CV-09-8195-PCT-PGR, 2010 WL 1408890, at *1 (D.

Ariz. Apr. 7, 2010) (hereinafter, "*FIBN*").  In both cases, a lender sold a participation in its loan

payment rights (but not the underlying loan itself) to the plaintiff buyers, and in both cases, the

sale of those rights was made without recourse as is customary in the sale of a participation.  *PHSB*,

814 F. Supp. at 163; *FIBN*, 2010 WL 1408890, at *2.  When a buyer purchases a participation in

a loan made by another lender to a borrower, the buyer agrees that the lender selling the

participation has no liability to the buyer for repayment of the loan if the borrower does not pay.

The buyer and the lender that made the loan are each taking the credit risk of the loan's borrower.

That is what nonrecourse means in that context.  It does not mean, however, that the lender selling

the participation has no liability to the buyer under the agreement governing the sale of the

participation.  That liability depends on what the agreement says.  Here, there is no such agreement.

There is only the Resolution authorizing nonrecourse bonds.  Here, both of the cases Claimants

cite concluded the nonrecourse provisions barred recourse based on a default under the underlying

loan in which the participation was sold, such that the participation-buyer could not force the seller

to make payments on the loan if the borrower defaulted.  *See id.*  In both cases the recourse claim

was based on a separate contract governing the sale of the participation (the "participation

agreements"), not the loan agreement (to which the buyer was not party).  Here, there is only a

loan agreement.  And in both cases cited by Claimants, the participation-buyers stated claims for

breach of the participation agreements because the alleged harm did not arise from the original

borrower's failure to pay on the underlying loan.  *See PHSB*, 814 F. Supp. at 164; *FIBN*, 2010 WL

1408890, at *3.

46.     Claimants are not purchasers of loan participations.  Their claims are as direct

holders of the nonrecourse obligation itself—namely, the ERS Bonds.  Claimants have no basis to

assert claims other than as holders of that underlying nonrecourse obligation; indeed, this is what makes them party to the Resolution in the first place.  *See* Resolution § 102.  Put simply, Claimants cannot both assert claims as holders of ERS Bonds and simultaneously avoid their nonrecourse status.

47.     *Third*, Claimants assert the ERS Bonds are "a separate contract" or "a separate, but related, agreement" to the Resolution, Mot. at 21, such that a nonrecourse provision in the ERS Bonds does not apply to breaches of the Resolution itself.  The argument makes no sense, and Claimants cite no authority for this proposition.  Nor could they:  the terms of a certificated security, as a matter of law, include those terms made part of the security by reference to an indenture or other document, making a breach of the security (the bond) a breach of the indenture and vice-versa.  *See* 19 L.P.R.A. § 1752(a) [UCC § 8-202(a)] ("the terms of a certificated security include terms stated on the certificate and terms *made part of the security by reference on the certificate* to another…*indenture, or document*….") (emphases added).  Here, the ERS Bonds do exactly that:  they state they are "*payable* by the System solely from the Pledged Property held under the Resolution" and make specific "*reference to* the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants" that contain detailed provisions concerning the rights of Claimants.  *See, e.g.*, Case No. 17-bk-3566, ECF No. 181-1, at 57 [Form of Term Bonds] (emphasis added).  As such, a breach of the covenants is a breach of the bond giving rise only to nonrecourse relief *payable solely from collateral*.

48.     Nor do Claimants' authorities (Mot. at 21) help their cause.  In *USX Corporation*, the lender made a loan to an equipment lessor for the purchase of telecommunications equipment

leased to a bank.  *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 434 (3d Cir. 1993).  The lender

foreclosed and sold the equipment pursuant to its rights under a Note and a Security Agreement.

*Id.*  The lender then sued the borrower for breach not of the Note or the Security Agreement (which

contained nonrecourse provisions) but for breach of the notice provisions of Collateral

Assignments pertaining to the equipment.  *Id.* at 434–35.  The borrower argued the nonrecourse

provisions in the Note and the Security Agreement (to which the lender was not a party) barred

suit for breach of the Collateral Assignments, but the Third Circuit disagreed, refusing to import

the nonrecourse language from the other agreements into the Collateral Assignments.  *Id.* at 437–

438.  Here, Claimants specifically seek recovery under the contract that itself contains the

nonrecourse language—the Resolution, which contains the ancillary covenants Claimants say ERS

breached.  Further, like *PHSB* and *FIBN*, the Third Circuit recognized the borrower conflated two

separate obligations between separate sets of persons—one under the Collateral Assignments, and

one under the Note—where only a default on the latter limited the lender's recourse.  *Id.* at 438.

49.     *Duluth Lighthouse* helps the Debtors, not Claimants.  It concerned a defendant's

counterclaims for breach of two agreements involving two transactions (a purchase of equipment,

and a loan)—Count I alleged breach of the Purchase Agreement, and Count II alleged breach of a

separate Financing and Security Agreement.  *Duluth Lighthouse For The Blind v. C.G. Bretting

Mfg. Co.*, No. 99-1601 JRT/RLE, 2001 WL 1640079, at *1 (D. Minn. Sept. 25, 2001).  Plaintiff

purchaser argued the nonrecourse provision of the Financing and Security Agreement should apply

to the Purchase Agreement, but the court disagreed in view of the absence of that language from

the Purchase Agreement, thereby allowing Count I to proceed.  *Id.* at *4.  But the court granted

summary judgment to the plaintiff on Count II, holding, as the defendant conceded, that

"[defendant's] remedy for plaintiff's default under the Financing and Security Agreement is to

proceed as a secured creditor against the collateral pledged in the agreement." *Id.* at *2. Here, again, Claimants assert breach of the agreement that contains nonrecourse language (viz. the Resolution)—and as *Duluth Lighthouse* demonstrates, the only available remedy under such an agreement "is to proceed as a secured creditor against the collateral pledged in the agreement." *See id.* As such, Claimants' own authority mandates denial of the Motion.

50.    Claimants next argue that limiting recourse to the collateral would render the covenants in Section VII of the Resolution meaningless. This is incorrect. Outside of Title III, a breach of such covenants would permit the Bondholders to declare a default and take steps to foreclose or otherwise realize on their collateral. And, Claimants have not established or even adequately pleaded any legally cognizable claim for breach of any covenant as noted in the Motion to Dismiss. All of that precludes judgment under Rule 12(c).

51.    *Fourth*, Claimants' argument that the "plain text" of Resolution § 201 demonstrates it applies only to "payment defaults" (Mot. at 19–20) is wrong because it limits Claimants' recovery to their collateral regardless of the nature of the default. Resolution § 201 (". . .nor shall any Bond . . . be payable out of any funds or assets other than the Pledged Property. . ."). Further, Resolution § 1102(1) is not inconsistent with applying the nonrecourse provisions of Resolution § 201 to monetary defaults and covenant breaches. All remedies under § 1102 are subject to § 201. Resolution § 1102 (providing for enforcement of "the rights of the Bondowners…*subject to the provisions of Section[] 201*….) (emphasis added).

### F.    Claimants Are Not Entitled to Judgment that They Hold Recourse Claims Against ERS for Alleged "Unconstitutional, Tortious, and Illegal Conduct."

52.    Aside from claims for breach of the Resolution, Claimants also assert they are entitled to judgment that they may pursue recourse claims arising out of noncontractual claims

against ERS.  Claimants' arguments lack merit.[10]  As a threshold matter, it is important to distinguish between Claimants' claims against ERS and Claimants' claims against the Commonwealth.  Here, Claimants' claims against ERS are governed solely by the Resolution. Claimants' claims against the Commonwealth for terminating employer contributions payable to ERS are not governed by the Resolution.  As explained above, however, the bond purchasers were warned by the Official Statement that the Commonwealth could do so, and thus no meritorious claim exists.

53.    Claimants cite no authority for the proposition they may recover under noncontractual theories where a contract governs the relationship between Claimants and ERS. Nor could they under Puerto Rico law.  *See Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.*, 449 F.3d 85, 90 (1st Cir. 2006) ("the [Puerto Rico Supreme Court] also emphasized that an action only for breach of contract lies 'when the damage suffered arises exclusively as a consequence of the breach of an obligation specifically agreed upon, which damage would not occur without the existence of a contract'") (quoting *Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712, 1992 WL 755597 (P.R. 1992)); [11] *see also In re Moultonborough Hotel Group, LLC*, 726 F.3d 1, 7 (1st Cir. 2013) ("Promissory estoppel . . . provides a basis for recovery when no contract exists."); *Fagot Rodriguez v. Republic of Costa Rica*, 139 F. Supp. 2d 173, 184 n.10 (D.P.R. 2001) (citation omitted) ("The Supreme Court of Puerto Rico has held that [Article 1802 of the Puerto Rico Civil Code, governing damage caused by fault or negligence, and Article 1054, governing

---

[10] Claimants incorrectly frame the issue on their Motion, which is not whether Claimants should be "*precluded* from seeking recovery for noncontractual claims merely because [they] may have a contractual relationship with [ERS]," Mot. at 22 (emphasis added), but whether Claimants are entitled to judgment on the pleadings as a matter of law that they are entitled to such recovery.  *See* Fed. R. Civ. P. 12(c).  As noted above, *see supra* Section I, Claimants have not established "independent violations of law" such that all facts (including damages) are uncontested.

[11] Further, Puerto Rico's general negligence statute does not apply in the context of a commercial transaction, like this one.  *Isla Nena Air Servs., Inc.*, 449 F.3d at 88.

27

damages cause in connection with contractual obligations] are mutually exclusive, observing that Article 1802 applies only when 'no prior obligation exists between the person causing the damage and the one receiving it.'"), *aff'd*, 297 F.3d 1 (1st Cir. 2002).

54.     As Claimants have no claim untethered to their status as holders of ERS Bonds, Claimants' noncontractual claims against ERS cannot survive, and those claims cannot be "re-labeled" as noncontractual claims to attempt to do so. *See Isla Nena Air Servs.*, 449 F.3d at 90.[12] Even if they did, Claimants have failed to state a claim as established in the Motion to Dismiss.[13]

55.     Claimants incorrectly suggest they are entitled to judgment because any "waiver" of their non-existent noncontractual claims against ERS would not be enforceable. Mot. at 23. Claimants cannot obtain judgment as a matter of law on claims just because they did not waive those claims. Also, Claimants' authorities are inapposite. Claimants' assertion that *Baum-Holland* concerns "waiver of constitutional claims" (Mot. at 23) is misleading, as the case says nothing about constitutional issues but instead concerns a routine waiver of tort remedies arising out of the rental of snorkeling equipment (and the waiver at issue was upheld in any event). *Baum-Holland v. El Conquistador P'ship L.P., S.E.*, 336 F. Supp. 3d 6, 26 (D.P.R. 2018). The *Casas Office Machines* case is a decision on a motion *in limine* ahead of trial—not the grant of judgment based on pleadings. *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 961 F. Supp. 353, 358 (D.P.R. 1997). In *Puerto Rico Telephone*, the court found waiver of a dolo argument on appeal. *Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 100 (1st Cir. 2011). And as for Williston on

---

[12] Claimants' own authority (Mot. at 18) makes this same point. *See USX Corp.*, 988 F.2d at 440 ("The district court therefore correctly rejected Count III as an impermissible attempt to convert a contract claim into a tort claim") (applying Pennsylvania law).

[13] Claimants' argument (Mot. at 22) also conflates *recourse* with any *remedy* available under that agreement. The Bonds are payable solely from collateral, Resolution § 201, and Claimants may seek whatever *remedy* may be available to them to be paid on that collateral subject to that limitation, and such remedies can be cumulative. Resolution §§ 1102, 1108. But the availability of multiple *remedies* to does not give Claimants *recourse*.

Contracts, Claimants are far from establishing an "intentional tort or crime" or "willful or grossly negligent" conduct that could support judgment on the pleadings.

56.     Claimants' remaining authorities do not support granting judgment in their favor. None is decided under Puerto Rico law; each is different factually and legally from the issues presented here; and none granted judgment on the pleadings to a party affirmatively as Claimants seek here. *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 256 (4th Cir. 1984) (owner of real property was liable to the mortgagee for the tort of waste under South Carolina law for failure to repair the roof of a building); *Kiefer v. Woolley*, D.C. No. CV-89-05810-JDG, 2000 WL 59912, at *2 (9th Cir. Jan. 24, 2000) (interpreting class action settlement where non-recourse provision was limited to a repurchase obligation, not a judgment on pleadings); *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 85 (2d Cir. 1992) (permitted filing of amended complaint, not judgment on nonrecourse provision); *Delphi Indus., Inc. v. Stroh Brewery Co.*, 945 F.2d 215, 218 (7th Cir. 1991) (addressing tortious interference claims against third party); *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 622-24 (7th Cir. 1989) (appeal from jury award for failure to disclose that assets granted as collateral were rendered worthless before a loan was made, not judgment on the pleadings).

## III.   CLAIMANTS ARE NOT ENTITLED TO JUDGMENT THAT THEIR CLAIMS HAVE ADMINISTRATIVE PRIORITY OR ARE NON-DISCHARGEABLE

### A.   The Claims Are Not Administrative Expenses.

#### 1.   Claimants Have Not Established a Right to Payment.

57.     Claimants have not established a right to payment on any of their claims, which precludes judgment as a matter of law for administrative expense treatment. The Debtors' pending Motion to Dismiss comprehensively addresses Claimants' assertion that they are entitled to

administrative priority.  Inasmuch as the Motion seeks to address the Motion to Dismiss, the Debtors briefly respond to those arguments.

58.    Administrative expense status is a priority applied to a claim against a debtor.  *See* 11 U.S.C. § 507(a)(2) (affording priority for administrative expenses).  As a mode of priority, it is distinct from, and logically depends on, the existence of the underlying right to payment.  Accordingly, administrative expense status, whatever the source of entitlement to that status, depends first on establishing a right to payment.  *See, e.g.*, *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 201 (1st Cir. 1985).  Likewise, in *Reading* the Supreme Court looked to "fairness to all persons having *claims* against an insolvent" to evaluate whether to grant priority to the movant's claim.  *Reading Co. v. Brown*, 391 U.S. 471, 477 (1968) (emphasis added).  Unlike here, in *Reading* there was no dispute as to underlying liability.  *Id.* ("Petitioner suffered . . . injury from what is here *agreed* to have been the negligence of the receiver . . . [and it] is *conceded* that . . . petitioner has a right to recover . . .") (emphasis added).  In *Reading Co.*, the bankruptcy trustee's post-petition negligence gave rise to an administrative claim.  As explained above, here, what ERS is accused of doing post-petition was to breach or reject a prepetition obligation to resist a legislative amendment terminating employers contributions to ERS.  To the extent the Commonwealth had an obligation not to terminate employer contributions to ERS (which the Commonwealth did not have as evidenced by the fact that the Official Statement warned bond purchasers it might happen), the Commonwealth breached that prepetition obligation post-petition.  Breaching prepetition obligations post-petition does not give rise to administrative claims.  Otherwise, all claims would be administrative claims.

59.    Here, Claimants have established nothing, and seek to jump the line prematurely to attain administrative expense status prior to being entitled to any payment arising from post-

petition events untethered to prepetition obligations. Claimants nowhere explain how the Post-Petition Legislation—the enactment of a Commonwealth statute—can be a "tort" in the first place. Notably, here, warning was given before the bonds were sold that such legislation might be enacted. The Debtors have disputed the right to payment with respect to each of Claimants' asserted causes of action. Motion to Dismiss ¶¶ 56–157.

60.    Furthermore, all the claims arise from a pre-petition transaction and cannot be said to "benefit" the Debtors post-petition and therefore cannot qualify as an administrative expense. *In re Jeans.com*, 491 B.R. 16, 24 (Bankr. D.P.R. 2013). For the reasons stated in the Motion to Dismiss, Claimants cannot establish administrative priority under Bankruptcy Code § 503(b)(1)(A). Motion to Dismiss ¶¶ 37–55.

### 2.    Claimants Have Not Established the Showing of Unfairness Required under *Reading*.

61.    Claimants rely exclusively on *Reading* to attempt to establish entitlement to administrative expense priority. In *Reading*, the Supreme Court determined that an undisputed tort claimant should receive administrative expense priority, because it would be unfair to effectively subordinate that claimant who had no relationship to the debtor to "those creditors for whose benefit the continued operation of the business . . . was allowed." *Reading*, 391 U.S. at 478. This logic was applied in *Charlesbank* by the First Circuit to a situation where a third party was injured by an intentional violation of law. As explained above, here the Post-Petition Legislation, at most, breached or rejected a prepetition obligation for employers to make contributions to ERS. This is not substantively different from any post-petition rejection of a prepetition contract. It always gives rise to a prepetition claim.

62.    Claimants cite to *Yorke v. NLRB*, 709 F.2d 1138, 1143 (7th Cir. 1983), and *In re City of San Bernardino*, 558 B.R. 321, 329-30 (C.D. Cal. 2016), to support their interpretation of

*Reading's* scope. Like *Reading* and *Charlesbank*, *Yorke* concerned an operating business—not a government entity—and held that if the trustee violated labor laws by failing to bargain over the effects of a decision to close a plant, the effects of that plant closure could be entitled to administrative expense priority. *Yorke*, 709 F.2d at 1140. *Yorke* demonstrates two things. First, post-petition violations of applicable federal labor law give rise to post-petition liability, the same as post-petition federal obligations not to contaminate the environment. *Cf. Penn Terra Ltd. v. Dep't of Envtl. Res., Commonwealth of Pa.*, 733 F.2d 267, 269, 278–79 (3d Cir. 1984) (automatic stay did not apply to state court order compelling coal surface miner to remediate 36 undisputed environmental law violations). Here, however, the obligation is not a post-petition obligation. If, notwithstanding the warning in the Official Statement, the Commonwealth had an obligation not to change employer contributions, it was a prepetition obligation. Second, *Yorke* shows a basis for liability must be established.

63.    *In re City of San Bernardino* was an appeal from a bankruptcy court's denial of a motion to lift the automatic stay to allow creditors to pursue a civil rights action in the district court, partly, the court ruled, because it would be "unfair to other similarly situated creditors" to lift the stay. 558 B.R. at 332–33. The district court's reference to *Reading* supports the proposition that the city's post-petition use of safety inspection permits to search residences for criminal activity creates post-petition torts giving rise to administrative expenses. *Id.* at 330. Claimants' statement that it "appl[ies] *Reading* to post-petition constitutional violations" (Mot. at 26) intentionally obfuscates *Bernardino's* actual application of *Reading*.[14]

---

[14] Some courts do not even apply *Reading* in chapter 9 cases. *See In re Jefferson County*, Case No. 11-05736, Hr'g Tr. at 34, 41 [ECF No. 2931], attached hereto as Exhibit 1, (Bankr. N.D. Ala. June 24, 2015) (holding the *Reading* doctrine is inapplicable in a Chapter 9 case and that *Reading* "has never been, based on [the court's] review of the case law, which was hundreds of cases, recognized in a Chapter 9 case.").

### 3. Duly Enacted Legislation the Bondholders Were Warned about Is Not Wrongful Conduct.

64.     Claimants attempt to equate administrative expense treatment for private acts of negligence or intentional wrongdoing with duly enacted legislation the Official Statement warned could occur before the ERS bonds were sold.  Adopting legislation cannot be a tort.  The same legislature that generally created tort causes of action is the legislature that passed the Post-Petition Legislation.  *See* Restatement (Second) of Torts, § 895B(3)(a) (Am. Law Inst. 1979) ("Even when a State is subject to tort liability, it and its governmental agencies are immune to the liability for acts and omissions constituting . . . the exercise of a . . . legislative function"); *id.* § 265 ("One is privileged to commit an act which would otherwise be . . . a conversion if he is acting in discharge of a duty or authority *created by* law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority.") (emphasis added).  Claimants point to *Charlesbank* in an attempt to bring their claims within the scope of *Reading*, but in that case the debtor deliberately disobeyed a court-ordered injunction—conduct that is nothing like duly enacted legislation here.  755 F.2d at 201.  Claimants' attempt to equate a tort or wrongful conduct (a fire under *Reading* or a zoning violation under *Charlesbank*) to legislation under Puerto Rico law that the Official Statement had warned bond purchasers could occur, should be rejected out of hand.

### B. Claimants Are Not Entitled to Judgment That Their Claims Are Non-Dischargeable.

65.     Claimants' fallback argument is that *if* their claims are not entitled to administrative priority, they are nevertheless non-dischargeable.  Mot. at 33–35.  Specifically, Claimants argue the "best interpretation" of Bankruptcy Code § 944(b) is to rule their claims are non-dischargeable by reading § 944(b) in conjunction with §§ 727(b) and 1141(d)(1)(a).  *Id.* at 34.  Claimants' argument is wrong.

66.     *First*, the plain language of § 944(b) disposes of Claimants' argument.  Section 944(b) provides that "the debtor is discharged from *all debts*," plainly and without qualification. 11 U.S.C. § 944(b) (emphasis added).  A "debt" is liability on a claim, and a "claim" is a right to payment (i.e., what Claimants have asserted).  *See* 11 U.S.C. §§ 101(5), 101(12).  As such, the claims are dischargeable under the plain language of § 944(b), and the inquiry ends there.  *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

67.     *Second*, whether Congress was more specific concerning whether pre- or post-petition debts are dischargeable in Bankruptcy Code §§ 727 and 1141 is irrelevant because neither provision was incorporated into PROMESA.  *See* 48 U.S.C. § 2161(a).  The court should not look to inapplicable provisions of the Bankruptcy Code to interpret § 944(b).  Section 944(b)(1), made applicable by PROMESA § 301(a), clearly provides "the debtor is discharged from all debts as of the time when–(1) the plan is confirmed."  That makes clear post-petition liabilities are discharged.

68.     *Third*, none of Claimants' authorities supports ruling their claims are non-dischargeable.  Claimants assert the *Detroit* case "concluded that post-petition claims are not discharged by plan confirmation in a chapter 9 case" (Mot. at 35), but that is not what the court ruled.  The court ruled a creditor's post-petition wrongful termination claim was not discharged and enjoined by the City's chapter 9 plan of adjustment:  "The City has limited its waiver and injunction arguments to prepetition claims."  *In re City of Detroit*, 548 B.R. 748, 761 n.48, 769 (Bankr. E.D. Mich. 2016).  *City of Detroit* does not even attempt to determine whether chapter 9 authorizes discharge of post-petition claims.  Likewise, Claimants' selective quotation from COLLIER (Mot. at 35) is misleading, as the section from which Claimants quote concerns whether a government debtor's *general operating expenses* constitute administrative expenses—not whether alleged post-petition debts writ large are non-dischargeable.  6 COLLIER ¶ 901.04[13][b]

34

("Section 503(b)(1) should not be read to include the general operating expenses of a municipality during the period that the chapter 9 case is pending."). Further, this section of COLLIER, following *In re New York City Off-Track Betting Corp.*, 434 B.R. 131 (Bankr. S.D.N.Y. 2010), states "as there is no estate created in a chapter 9 case, there can be no necessary costs and expenses of preserving the estate." *Id*. Claimants, however, explicitly rejected the *Off Track Betting* view earlier in their Motion. *See* Mot. at 26–30.[15]

69.     Claimants' remaining authorities are similarly inapposite. *Arch Wireless* concerned whether a creditor was subject to a confirmed plan despite not receiving notice of the claims bar date and the plan confirmation hearing—not whether debts are dischargeable under § 944(b). *In re Arch Wireless*, 332 B.R. 241, 250–56 (Bankr. D. Mass. 2005). Claimants' citation to *Henson* as support for ignoring the plain language of § 944(b) is puzzling, as the Supreme Court ruled based on the plain language of the statute at issue. *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1724–25 (2017). And, a 10-year-old "building blocks" article is simply not persuasive authority. *See* Mot. at 35 (quoting F. Vazquez & E. Daucher, Column, Building Blocks, *Restructuring a Municipality under Chapter 9*, 29-6 ABIJ 50 (2010)).

## CONCLUSION

70.     For the foregoing reasons, Claimants' Motion Pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings should be denied.

---

[15] Claimants' reliance on footnote 110 in the same section of COLLIER (Mot. at 34 n.13) is similarly misplaced as it is part of the same analysis of whether general operating expenses constitute administrative expenses. *See* 6 COLLIER ¶ 901.04[13][b] n.110.

Dated: July 8, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Jeffery W. Levitan (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Ehud Barak (*pro hac vice*)
William D. Dalsen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax. 787.722.1932
dvelawoffices@gmail.com

**OF COUNSEL FOR
A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 8, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Luis F. del Valle-Emmanuelli*

Luis F. del Valle-Emmanueli
