# Exhibit 1

```
                  UNITED STATES BANKRUPTCY COURT
                  NORTHERN DISTRICT OF ALABAMA
                       SOUTHERN DIVISION

IN RE:                        .  Case No. 11-05736
                              .
JEFFERSON COUNTY, ALABAMA,    .  Robert S. Vance Federal Building
                              .  1800 Fifth Avenue North
                              .  Birmingham, AL 35203
                              .
            Debtor.           .  June 19, 2015
. . . . . . . . . . . . . . . .  1:33 p.m.


                      TRANSCRIPT OF DECISION
               BEFORE HONORABLE THOMAS B. BENNETT
               UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:           Bradley Arant Boult Cummings LLP
                          By:  JAMES BLAKE BAILEY, ESQ.
                               PATRICK DARBY, ESQ.
                          One Federal Place
                          1819 Fifth Avenue North
                          Birmingham, AL 35203

For Andrew Bennett,       Law Offices of David Sullivan
et al.:                   By:  DAVID A. SULLIVAN, ESQ.
                          1728 3rd Avenue, N#400D
                          Birmingham, AL 35203


                          Cabaniss, Johnston, Gardner, Dumas &
                            O'Neal, LLP
                          By:  DONALD J. STEWART, ESQ.
                               ROY J. CRAWFORD, ESQ.
                          2001 Park Place North, Suite 700
                          Birmingham, AL 35203
```

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

                              Waller Lansden Dortch & Davis, LLP
                              By:  GERALD F. MACE, ESQ.
                              Nashville City Center
                              511 Union Street, Suite 2700
                              Nashville, TN 37219

For Rate Payers:              Berger Singerman
                              By:  PAUL A. AVRON, ESQ.
                              One Town Center Road, Suite 301
                              Boca Raton, FL 33486

                              Berger Singerman
                              By:  PAUL STEVEN SINGERMAN, ESQ.
                              1450 Brickell Avenue, Suite 1900
                              Miami, FL 33131

TELEPHONIC APPEARANCES:

For the Debtor:               Klee, Tuchin, Bogdanoff & Stern LLP
                              By:  DAVID M. STERN, ESQ.
                                   KENNETH N. KLEE, ESQ.
                              1999 Avenue of the Stars
                              Thirty-Ninth Floor
                              Los Angeles, CA 900-67

For Andrew Bennett,           Law Offices of Calvin B. Grigsby
et al.:                       By:  CALVIN B. GRIGSBY, ESQ.
                              490 Post Street
                              San Francisco, CA 94102

For Financial Guaranty        Adams and Reese, LLP
Insurance Company:            By:  RICHARD P. CARMODY, ESQ.
                              Regions Harbert Plaza
                              1901 6th Avenue North, Suite 3000
                              Birmingham, AL 35203

                              Dabney, PLLC
                              By:  H. SLAYTON DABNEY, ESQ.
                              303 Grande Court
                              Richmond, VA 23229

For JPMorgan Chase            Simpson Thacher & Bartlett, LLP
Bank, N.A.:                   By:  STEVEN M. FURHMAN, ESQ.
                              425 Lexington Avenue
                              New York, NY 10017

                              - - -

3

1          THE CLERK:  The Northern District of Alabama is now in

2     session.  The Honorable Thomas Bennett presiding.

3          THE COURT:  You may be seated.  Do you we have a list?

4     All right.  Somebody just joined on the phone.  Who is it?

5          MR. FUHRMAN:  Judge Bennett, it's Steve Fuhrman from

6     Simpson Thacher.  I got disconnected.

7          THE COURT:  All right.  That means you probably were

8     told you didn't need to be on.  All right.  We're here in

9     Jefferson County, Alabama, Case Number 11-5736.  The matter at

10    two o'clock is the request for an administrative priority filed

11    by what I'll call the Bennett claimants.  It essentially is for

12    legal fees and expenses incurred in connection with their

13    representation by Mr. Grigsby and the Grigsby Law Firm, and for

14    purposes of what I'm going to do, I'm going to refer to the claim

15    as the Grigsby claim at this point and so when I refer to the

16    Grigsby claim it really is the claim filed essentially on behalf

17    of what I call the Bennett claimants, and if you'll bear with me

18    while I segregate out some things.

19          All right.  As part of what I'm going to do today is

20    orally rule on some matters that I'd hoped to have drafted

21    something more formally in writing but I'm running out of time

22    before I depart this current job and do something else and so.

23          One of the important aspects of a Chapter 9 is to

24    recognize its differences from other cases under the Bankruptcy

25    Code and in this case what is relevant is the differences in

4

1  structure and what applies and what does not apply in a Chapter 9

2  versus a Bankruptcy Code Chapter 11 (indiscernible) case, and

3  some of the differences that are critical in connection with the

4  administrative claim that is the Grigsby claim are Sections 903

5  and 904 of the Bankruptcy Code, and a coupled with those are

6  Sections 941 and 942 of the Bankruptcy Code.

7        903 essentially retains state power and authority over

8  its municipal subdivisions among other factors, including how it

9  uses its property and revenues.  904 is a restriction on

10 jurisdiction of the Bankruptcy Court in connection with how a

11 municipal debtor deals with its property, its revenues, and other

12 assets for want of a better term, and restricts in critical

13 fashion what this court or any court can do in connection with

14 how it uses those monies and properties.

15       941 is the provision that provides the municipal debtor

16 may propose a plan.  It doesn't permit any other person or entity

17 to propose a plan.  Section 942 deals with the modification of a

18 plan of adjustment and it provides that the municipal debtor may

19 modify the plan and does not provide for modification by any

20 other person or entity.  And included in those entities that

21 cannot propose or modify a plan is this court or any other court

22 because it would be inconsistent, among other things, with the

23 restrictions imposed under 904 and the literal language of

24 Sections 941 and 942.

25       And so the clear import and impact is that the

5

1  municipal debtor is the only entity that may propose a plan and

2  is the only entity that is a debtor that may modify or make a

3  modification to a plan of adjustment.  It's not this court or any

4  other court that can make such a modification.

5          So what I initially have to do is to analyze the

6  structure of the Jefferson County plan of adjustment.  In Section

7  1.1, Number 6, defines an administrative claim as a claim for

8  administrative costs and expenses that are entitled to priority

9  and payment under the Bankruptcy Code Sections 503(b), 507(a)(2),

10 and 901.

11         901 really builds into Chapter 9 Sections 503(b) and

12 Sections 509(a)(2) and that's essentially what it does.  Section

13 507(a)(2) simply gives, you know, Chapter 9 context priority to

14 administrative expenses under 503(b), among others.  The others

15 are not relevant to he discussion here, and 503(b) is the

16 provision, a subsection of which the Grigsby claimant -- claim

17 relies, and it determines the scope subject to some case law

18 adjustment of what is an administrative claim under 503(b).

19         Section 1.1, Number 53, defines claim under the terms

20 of the plan as meaning any claim as that word is defined by the

21 Bankruptcy Code Section 101.5 against the county or against

22 property of the county whether or not asserted in the case.

23         Section 101.5 of the Bankruptcy Code defines a claim is

24 either is a right to payment or a right to an equitable remedy.

25 In this case the request is a right to payment potentially and

6

1    included in that is whether or not such a right is reduced to

2    judgment, whether its liquidated, unliquidated, fixed,

3    contingent, matured, un-matured, disputed, undisputed, legal,

4    equitable, secured, or unsecured.  If you'll bear with me for a

5    second I'll turn my own cell phone off.  The -- and so arguably

6    at this point the Grigsby claim as its presented is a right to

7    payment.

8            Section 2.2 of the plan deals with administrative

9    claims and has five types that are set forth in Section 2.2, Sub

10   (b) through Sub (d) detailing the treatment of administrative

11   claims.  The five categories are administrative claims generally,

12   cure payments, 503(b)(9) claims.  In Section 2.2(c) it is the

13   administrative claim for professional fees.  And then the last

14   category is administrative tax claims.

15           And so if you look at the types of claims, the category

16   that we're dealing with under the plan is category under Section

17   2.2(c) for professional fees.  Section 2.2(c) delineates

18   professional fees and provides that pursuant to Bankruptcy Code

19   943(b)(3) all amounts to be paid for services or expenses in the

20   case are incident to the plan must be fully disclosed to the

21   Bankruptcy Court and must be reasonable.  There should be paid to

22   each holder of a professional fee claim, which is a defined term,

23   professional fee claim, in full final and complete settlement

24   satisfaction or at least a discharge of such claim, and it goes

25   on to determine how those professional fee claims are to be paid.

7

1        Section 1.1, Number 175, defines professional fee claim

2   as meaning a claim to be satisfied pursuant to Section 2.2(c) of

3   the plan with respect to amounts to be paid a professional person

4   that has been duly retained by the county for services or

5   expenses in the case or incident to the case.  This particular

6   definition adds the following.  For the avoidance of doubt no

7   professional fee claim will be allowed or paid by the county if

8   the underlying professional's retention was by or on behalf of

9   any person other than the county or was otherwise not properly

10  authorized by the county commission.

11       Section 2.2 also defines, or excuse me, also sets forth

12  administrative claims generally and what an allowed claim is, and

13  to be an allowed claim under Section 2.2 -- excuse me, to be an

14  allowed administrative claim under Section 2.2., there is a

15  filing with the court and a service requirement on the motion.

16  Neither of those issues are at issue in this case.  And the

17  second category of requirements under 2.2 is that the Bankruptcy

18  Court has to enter a final order finding that such administrative

19  claim is an allowed claim.  And so with respects to the Grigsby

20  claim the issue for whether it's an allowed administrative claim,

21  as well as this Court will enter an order making such a

22  determination.

23       If you look at the structure of the county's plan, the

24  Grigsby claim must fall within orders defined as a professional

25  fee claim under Section 1.1, Number 125, and within Section

1   2.2(c) for its treatment as a professional fee, in order to be an

2   allowed administrative claim under the county's plan of

3   adjustment.

4        The clear language of Section 1.1, Number 175 defining

5   professional fee claim, the comparable section, Section 1.1,

6   Number 9, for an allowed administrative claim, and Section 2.2

7   dealing with the treatment of administrative claims, and the

8   impact of each its words, makes it clear that the Grigsby claim

9   is not a professional fee claim, not an allowed administrative

10  claim, and therefore not within the administrative claim

11  provisions in the plan.

12       Next, Section 2.2(e) limits priority treatment to only

13  those administrative claim allowable under Section 507(a)(2) of

14  the Bankruptcy Code and as is set forth in Section 2.2(b) to

15  allow administrative claims under the plan, which the Grigsby

16  claim is not.  This alone supports sustaining the objection to

17  the Grigsby claim.  However, even if I limited, which I'm not

18  going to, my analysis of the Grigsby claim I want to point out

19  that as part of the claim confirmation process for the county's

20  plan of adjustment no one objected to the structure of the plan

21  and its treatment for allowance of administrative claims, and

22  this includes what I'll call the Bennett claimants with respect

23  to the Grigsby claims.  Likewise, and it becomes relevant later

24  on, Norfolk Southern did not object to this structure and

25  treatment.

1    Just bear with me because I've got some things

2    (indiscernible).  The way the claim arrived before the Court was

3    within days following confirmation of Jefferson County's plan of

4    adjustment of its debt.  Andrew Bennett and others filed with

5    this court a document and it captioned request for allowance of

6    administrative claims.

7         The Bennett claimants are plaintiffs in the civil

8    action caption Andrew E. Bennett, et al. versus Jefferson County,

9    Alabama, et al., currently bearing Adversary Number 12-00120,

10   which I'll define as the Bennett adversary proceedings.   The

11   sole bases for the Bennett claimants' request for an

12   administrative expense is 11 U.S.C. 503(b)(3)(d) in conjunction

13   with Section 503(d)(4).  (b)(3) -- excuse me, Section

14   503(b)(3)(d) provides after notice and hearing they shall be

15   allowed administrative expenses other than claims allowed under

16   502 of this title, including actual necessary expenses other than

17   compensation and reimbursement specified in Paragraph 4 of this

18   subsection, incurred in this case by a creditor, an indenture

19   trustee, an equity security holder, or a committee representing

20   creditors or equity security holders, other than the committee

21   appointed under Section 1102 of this title in making a

22   substantial contribution in a case under Chapter 9 of this title.

23        With respect to Section 503(b)(4) it allows reasonable

24   compensation for some professional fees by an attorney of an

25   entity whose expense is allowable under Section 503(b)(3)(a),

1  (b), (c), (d), or (e), and so essentially if one analyzes the

2  Grigsby claim, in order to be an allowed claim with an

3  administrative priority under 503(b)(4) the services that were

4  performed had to be performed and within 503(b), in this case the

5  only one relied upon by the Grigsby and the Bennett claimants

6  503(b)(3)(d), which means that there has to be a creditor, and

7  indenture trustee, and equity security holder, or a committee

8  representing creditors and equity security holders that made a

9  substantial contribution in a case under Chapter 9.

10          Relying on Subpart (d) of 11 U.S.C. 503(b)(3) the

11  Bennett claimants posit an entitled to payment of $311,300 in

12  attorney fees and $29,266 in expenses for the Law Office of

13  Calvin B. Grigsby, not for any other law firm.  The idolization

14  attached to the request delineates the four attorneys and one

15  paralegal work in connection with the sought payment of legal

16  fees and expenses.

17          However, the Grigsby claim demonstrates that the

18  request is not just for payment of attorneys and a paralegal in

19  the Law Office of Calvin B. Grigsby.  One of the four listed

20  attorneys is not an attorney employed by the California entity

21  named in the Grigsby claim, the Law Offices of Calvin B. Grigsby,

22  rather he is an attorney with a separate law practice located in

23  Jefferson County, Alabama, who appears to have been utilized as

24  local counsel by the Bennett claimants.

25          Examination of the Grigsby claim reveals that all of

1    its contents, less nine words set forth in the last sentence of

2    the last paragraph of the claim, premises justification solely on

3    the asserted substantial contribution by the Bennett claimants in

4    the Jefferson County case arising from the Bennett adversary

5    proceeding.  Nothing else in the text of the Grigsby claim

6    mentions actions or conduct taken on behalf of the Bennett

7    claimants other than those related to the adversary proceedings.

8            Slipped in the last sentence of the last paragraph of

9    the Grigsby claim are these nine words, quote, in the filing and

10   defending of the proof of claim.  Prior to the filing of the

11   Grigsby claim only two claims were filed by the Bennett

12   claimants.  Both were identical in the amount of $1.6 billion and

13   each was filed as a general unsecured claim.  As a result, one of

14   the two was withdrawn by the Bennett claimants following various

15   objections to it.  This, plus the fact that the time entries

16   attached to the Grigsby claim indicate that as much as 238 hours

17   of the legal services for which administrative claim treatment

18   sought relate to the pre-petition -- or excuse me, relate to the

19   preparation filing and defending of the Bennett claimants general

20   unsecured claim.  These time categories make clear that some of

21   the legal fees in the Grigsby claim are those for the

22   preparation, filing, and defending of the Bennett claimants'

23   unsecured claims.

24           The total hours for legal services in the Grigsby claim

25   is 867, which includes as much as 258 hours dedicated solely to

1  the Bennett claimants' unsecured claims.  I use the phrase as

2  much as because the deficiencies in the itemization of the legal

3  services performed by the Law Offices of Calvin B. Grigsby,

4  there's a very little description of what was done, multiple days

5  without a breakout by hour or a portion thereof, or assigned

6  large blocks of time that are lumped together.  Essentially, the

7  Grigsby claim is grossly deficient in breaking down what was

8  done, when it was done, and who did what on any given date.

9  Rather, large blocks of time covering many days of giving generic

10 descriptions such as this one.

11         March 1st through April 10th, 2012 client relations

12 outline of proof of claim, Grigsby 45 hours, Sullivan 10 hours.

13 With respect to the 258 hours no reason is supplied for why

14 payment of legal fees associated with the filing and defending of

15 the Bennett claimants' unsecured claims.  They are simply

16 included by the nine words set forth in the last sentence of the

17 Grigsby claim, along with the deficient description and

18 itemization attached as part of the claim.  As may be coming

19 apparent to the reader, much of what has been filed in the

20 Jefferson County Chapter 9 case by the Bennett claimants has been

21 disjointed, scatological, tautological, and otherwise rife with

22 errors.

23         If one parses through Section 503(b)(3) and in

24 particular the subsection of it that's relied upon and solely

25 relied upon with respect to the Grigsby claim 503(b)(3)(d), the

1   necessary status of the claimants, the Bennett claimants, is that

2   they be either a creditor, an indenture trustee, an equity

3   security holder, or a committee representing creditors or equity

4   security holders.  This Court has previously determined and held

5   that the Bennett claimants are not creditors in the case and

6   that's the only category under 503(b)(3)(d) under which the

7   Grigsby claim could rest for purposes of whether it's an allowed

8   administrative claim.

9        The Bennett claimants clearly aren't an indenture

10  trustee, an equity security holder, or a committee of

11  representative creditors, or an equity security committee.  And

12  so with respect to that aspect to 503(b)(3)(d) the claim fails as

13  an administrative claim for failure to have the status of the

14  Bennett claimants as a creditor.  The residual provisions of

15  503(b)(3) simply don't apply and that is 503(b)(3)(a), (b), (c),

16  and (e) do not apply to the Bennett claimants.

17       The cases that are cited by the Bennett claimants

18  recognize the standard for determining what is the next

19  requirement under 503(b)(3)(d), which is making a substantial

20  contribution under Chapter 9 or 11 of this title in the

21  Bankruptcy Code.

22       The citation is that whether the services were rendered

23  solely to benefit the individuals seeking on the recovery or to

24  benefit all parties to the case.  The claimants cite In re Buttes

25  Gas and Oil Company for that proposition as a factor to look at.

1    Another factor that they cite is whether the service

2    provided a direct, significant, and demonstrable benefit to the

3    estate and the extent of the benefit being a principle factor.

4    They cite to In re Silia 101 Incorporated (phonetic) for that

5    proposition.

6    And the third factor is whether the services were

7    duplicative services rendered by attorneys from the committee,

8    the committees themselves, or the debtor and its attorneys.  And

9    if one steps back and also looks at a case cited in this case by

10   the county, In re Celotex Corp., the benefit must be, or a

11   contribution I should say, must be directly and materially

12   contributory to the reorganization.  It must foster and not

13   interrupt the progress of the reorganization, must be

14   considerable in amount, value, and worth, and the case that's

15   cited for that is In re Kidron, Incorporated.

16   When a Court looks at what transpired in the life of a

17   Chapter 9 case and looks at the claim that was filed, the Grigsby

18   claim, there is no evidence presented to the Court of a

19   demonstrated benefit by the Bennett claimants or by what is set

20   forth with respect to the Grigsby claim, and so there's no

21   evidence to support a benefit of any sort be direct or otherwise.

22   The second factor is that if one looks at what occurred

23   during the Jefferson County bankruptcy case the being charitable

24   with respect to how I would view what was done on behalf of the

25   Bennett claimants was duplicative at best of what was being done

1  by the county in litigation in state and federal courts, and

2  essentially repeated or made more difficult and more complex what

3  the county had to do in the bankruptcy case and in other state

4  and federal court litigation, in particular with respect to

5  dealing with the claims and the validity and the value with

6  respect to the sewer warrants.

7       And so at this point we have a problem of duplicative

8  effort being (indiscernible).  We have a problem of there not

9  being any demonstrated benefit with respect to what was done by

10  or on behalf of the Bennett claimants.

11       If you look at the claim, the Grigsby claim, most of

12  the basis of the claim, at least in terms of hours and dollar

13  amount, is a class action complaint motion to intervene in

14  Adversary Proceeding 12-0016, which was filed on September 6th,

15  2012 and was amended on September 29th, 2012, and it was amended

16  to the class action complaint.

17       The reality is that both the motion intervene and the

18  class action complaint and its first amendment were filed after

19  this Court had already taken under submission the legal issues

20  and facts necessary to decide the issues in Adversary Proceeding

21  12-0016.  As a result, this Court severed what was the Bennett

22  claimants' class action and moved it into a new Adversary

23  Proceeding 12-00120.

24       As initially filed, the class action complaint had no

25  claims asserted against the county other than as an a nominal

1  defendant for which no recovery was sought.  Because that

2  original claim and its first amendment were poorly written, they

3  were drafted more in trend of thought and in many respects were

4  unintelligible.  The Court granted a motion for a more definite

5  statement by the county and a second amended complaint was filed

6  on April 4th of 2013 naming only the county and the trustee of

7  the sewer warrants as defendants.

8          And so what you look at is a substantial aspect on

9  which the Grigsby claim was founded was essentially litigation

10 with respecting to the underlying validity and enforceability of

11 sewer warrants, which was litigation that was already pending

12 among others in New York and in Alabama in other courts, and so a

13 significant aspect of what they were doing is repetitive.

14         If one looks at the claim that's been filed by the

15 Bennett claimants, a portion of it would relate to what would be

16 pre-petition if anything, but the overwhelming majority in amount

17 of the asserted claim for 503(b)(3)(d) purposes is what is

18 theoretically to be paid in the future post-petition under the

19 agreements -- under the arguments presented by the claimants, and

20 their argument was essentially that they would be required to pay

21 potentially in the future higher rates and rates that they

22 shouldn't be required to pay.  However, the claimants present no

23 evidence of any sort that allows determination of any amount of

24 either portions of what the underlying claim would have been and

25 that is in part why the alternative basis of the Court on

1   determining that they want a creditor was to value the claim, the

2   $1.6 billion claim at zero.

3         The next aspect is that the actions and conduct that

4   are part of what the Bennett claimants believe supports the

5   payment of an administrative claim for the Grigsby claim legal

6   fees and expenses is really negative with respect to the case.

7   The Bennett claimants objected to the plan.  They objected to the

8   very settlements that formed the critical parts of the plan.

9   They appealed the plan confirmation seeking to have the plan

10  modified in a way only the claimants want, not that the general

11  creditor body wants, not the overwhelming majority and dollar

12  amount of the various classes of creditors and not for the

13  requisite number amount of the various creditors and the various

14  classes.

15        The claims in the Bennett action were and are those of

16  the county, as the Court has already held, not those of the

17  Bennett claimants, which further indicates that what was going on

18  was not for the benefit or a, excuse me, not a contribution of

19  any sort with respect to the case.

20        Overall, if one steps back and looks at the Bennett

21  claimants contentions on which the Grigsby claim is founded, what

22  was done was designed to advance the interest of the Bennett

23  claimants, not to benefit the debtor, not to make a substantial

24  contribution to the case or to other creditors, and most

25  certainly it did not make a substantial contribution in the

1   positive sense to the case.  Rather, it was negative because it

2   delayed matters, caused increased expenses to the debtor and

3   other creditors by way of added litigation and fights over

4   various aspects of the plan, and so if one steps back and

5   overlooks the fact that the Grigsby claim doesn't meet the

6   requirements for an administrative claim under a confirmed plan,

7   it also doesn't demonstrate or meet the requirements that the

8   Bennett claimants have a claim that would be allowable under

9   503(b)(3)(d), and as a result the Grigsby claim cannot be an

10  allowed claim for attorney compensation under 503(b)(4).

11          Furthermore, there is the additional factor under

12  503(b)(4) of reasonableness with respect to the claims.  And the

13  supporting documentation in no way demonstrates the

14  reasonableness of the compensation.  In fact, it doesn't

15  demonstrate to any degree this Court is able to ascertain in any

16  meaningful manner that the legal fees and expenses being sought

17  were not essentially for fees and costs incurred solely with

18  respect to the representation of Bennett claimants which provided

19  no contribution to the case, and as a result a Court is

20  sustaining the objection of Jefferson County to the what I've

21  defined as Grigsby claim and it's disallowed.  Anything further

22  on this one?

23                  (No audible response)

24          THE COURT:  All right.  Mr. Sullivan?

25          MR. SULLIVAN:  Nothing, Judge.

1          THE COURT:  Anybody on the phone have anything further?

2                      (No audible response)

3          THE COURT:  All right.  I'm going to leave the phone

4    line connected.  I've scheduled the Norfolk Southern claim for

5    three o'clock and so we'll leave it at three o'clock.

6          MR. GRIGSBY:  Your Honor?

7          THE COURT:  Yes?  Yes?

8          MR. GRIGSBY:  I mean, I've been in court with you

9    before, so the question is, am I going to be able to respond or

10   do you just want your testimony on the record?

11         THE COURT:  First of all, who is this?

12         MR. GRIGSBY:  Calvin Grigsby.

13         THE COURT:  Mr. Grigsby, the answer is I have just

14   ruled and this is not something to respond.  You're free to

15   appeal me.  You know, that's the way the system works.  I've made

16   my ruling and for good or bad, that's my ruling, and so with

17   respect to what I've called the Grigsby claim, that matter is

18   over and so we'll stand adjourned until three o'clock central

19   time.  The phone line --

20         MR. GRIGSBY:  But, Your Honor, I mean, if there's no

21   possibility to respond, why is this called a hearing?  I mean, we

22   got on the phone because we were told we were going to have a

23   hearing.

24         THE COURT:  Yes.  It was a hearing on the oral -- it

25   was the oral ruling is what it was set up for, Mr. Grigsby.  I'm

1  not here to debate.  I've made my ruling, Mr. Grigsby.  I

2  understand you don't like it.

3          MR. GRIGSBY:  Well, no, no.  That's not the issue.  I

4  just wanted to cite some cases.  For example, we represent a

5  group of special taxpayers in accordance with the rules, not just

6  a group of creditors.  There is some differences there in terms

7  of administrative fee requests.

8          THE COURT:  Mr. Grigsby, I --

9          MR. GRIGSBY:  (Indiscernible) --

10         THE COURT:  Mr. Grigsby, let me just.  This is over,

11 all right.  I made a ruling.  That's it.  It's not -- I'm not

12 going to take additional testimony, additional evidence or

13 anything else, all right.  You're recourse is either to accept

14 what I've done or appeal me.  I mean, that's the way I'm going to

15 leave it and we'll stand adjourned until three o'clock.  The

16 phone line will remain open.

17                      (Recess)

18         THE COURT:  ...we have Mr. Darby and Mr. Bailey here in

19 person and Mr. Crawford here in person, so I guess it's time to

20 get started.  As I indicated when I was summarizing for Avron and

21 Singerman a little of this is going to be repetitive but I don't

22 want to have to go between records, and so what I want to do

23 initially is do kind of a summary of the claim itself and some

24 background information.  Secondly, go through the structure of

25 the plan and then, thirdly, go through 503(b)(3) and what I'll

21

1   call the Redding (phonetic) build-in or add on to 503(b)(3) as

2   it's been interpreted in the Eleventh Circuit under N.P. Mining.

3   And so that's kind of an overall view of what I'm going to try

4   and do, either artfully or less than artfully.  We'll see.

5           And so in connection with Jefferson County, Alabama,

6   Case Number 11-5376, I'm entering an oral ruling on the

7   administrative claim request filed by Norfolk Southern and the

8   objection thereto filed by Jefferson County, and I guess it's

9   technically Norfolk Southern Railway Company.

10          The claim is predicated on an asserted entitlement to

11  refunds that aggregate $1,629,506.80.  224,976.52 were paid to

12  the county between the months between November 16th, 2011 to

13  January 20th of 2012.  982,484.34 were paid to the county from

14  January 21st, 2012 to January 20th, 2013.  An additional

15  $422,045.94 was paid to the county from January 21st to June 20th

16  of 2013.  And it was payments constituting consumer use and

17  educational consumer use tax paid by Norfolk Southern to

18  Jefferson County based on the dates that I've set forth.  These

19  payments began on and after the petition date for Jefferson

20  County's petition through June 20th of 2013.

21          The tax -- the makeup of the taxes is in outline form.

22  One percent educational use tax.  It's levied under Alabama Code

23  Section 40-12-4 in Jefferson County Ordinance Number 17-69.  A

24  one percent consumer use tax that is levied under Alabama Act

25  Number 67-405, and in total they aggregate two percent.

22

1      The makeup of the 1,629,506.80 between the educational

2  use tax and the consumer use tax is that approximately

3  $814,753.40 was paid in by Norfolk Southern with respect to the

4  educational use tax and an identical amount 4814,753.40 was paid

5  by Norfolk Southern in connection with the consumer use tax.

6      Under Alabama law the one percent educational use tax

7  allows the county to withhold what's called a collection fee from

8  the amounts of monies that are remitted then to the trustee for

9  the paying agent for the education warrants.  The collection fee

10 is approximately four percent of the gross proceeds collected of

11 the education use tax.  And essentially that means that with

12 respect to the educational use tax all but four percent of what

13 was paid in by Norfolk Southern to Jefferson County was paid in

14 to Jefferson County as the collecting agent with respect to the

15 education use tax.  The monies were not retained by the county.

16 Were simply collected on behalf of and for purposes of paying to

17 the trustee for the educational warrants that were issued and for

18 which the one percent education use tax was imposed.

19      The consumer use tax is divided into essentially two

20 equal parts.  The first one half share, as the parties have

21 called it, is distributed as follows.  One and a half percent of

22 that one half goes to the county's general fund.  Nine percent of

23 the one half goes to the Jefferson County Department of Health

24 and the balance of that first 50 percent goes to the indigent

25 care fund.

1          From the second one half share $100,000 per month goes

2    to the Birmingham-Jefferson Civic Center Authority, 31 percent

3    goes to the Jefferson County Department of Health, and the

4    balance goes to the county's general fund.

5          I set forth the allocation because, with respect to

6    both the -- and the flow of the monies, because both with respect

7    to a portion of the educational use tax, excluding the collection

8    fee, and with respect to the consumer use tax, there are portions

9    of the consumer use tax that, and of the educational use tax,

10   that do not go to the county.  They essentially go to an entity

11   or entities that are not technically Jefferson County as the

12   debtor in this case, and in particular the vast majority of the

13   educational use tax flows that way, and in particular the

14   consumer use tax goes to at least one entity that is not

15   Jefferson County in the context of this case, that is Birmingham-

16   Jefferson Civic Center Authority, and so it's not the debtor.

17   Additionally, it may be that the same is true -- I'm just going

18   to leave it at that.

19         Having set forth the structure, the claim from Norfolk

20   Southern rises or falls on whether these taxes were imposed

21   unlawfully on the purchase and/or use of diesel fuel for rail

22   transportation under the applicable state statutes, Alabama

23   ordinance, or the act of Alabama.  And it relies in significant

24   part on an Eleventh Circuit decision that was captioned in the

25   Eleventh Circuit, <u>CSX Transportation, Incorporated v. Alabama</u>

1  <u>Department of Revenue</u>, 720 F.3d 863, and Eleventh Circuit

2  decision from 2013, striking down the constitutionality of what

3  is represented or purported to believe or believed to be by

4  Norfolk Southern as a substantially similar tax, although it's

5  not the same tax that was involved in the <u>CSX</u> case.

6         That case was relatively recently reversed by the

7  Supreme Court of the United States on March 4th, 2015.  The

8  essential argument that was premised at the time the claim was

9  filed and before the ruling of the Supreme Court reversing the

10 Eleventh Circuit in significant part on the <u>CSX Transportation</u>

11 case was that under Alabama's Taxpayer's Bill of Rights and

12 Uniform Procedures Act, Alabama Code 40-2A-1 (sic), that Norfolk

13 Southern is entitled to a refund for overpaid or erroneously paid

14 taxes plus statutory allowed interest.

15        The gist of what happened on the Supreme Court's

16 reversal for what is relevant to this case is that -- and this --

17 I'm not going to attempt to read the Supreme Court's opinion, but

18 what essentially the Supreme Court said that the Eleventh Circuit

19 did wrong was that they didn't look to another comparable tax

20 that may be imposed on competitors, or in this case competitors

21 to rail carriers, that is comparable to a tax that is imposed on

22 rail carriers, and sent it back to the Eleventh Circuit to review

23 and determine whether a comparable tax on other competing

24 carriers in Alabama which are exempted from the rail carrier tax

25 is sufficient to sustain the rail carrier tax that was imposed

1  in that case on CSX, and not requiring that for commerce clause

2  purposes that a given tax be applied to all similar carriers,

3  only that the tax that is imposed, even if it's under a

4  different statutory scheme, is comparable with respect to the

5  competing carriers.  And that's -- I won't take that as a

6  literal interpretation of the Supreme Court but that's my view

7  of essentially what's at issue going back to the 11th Circuit

8  from the Supreme Court.

9        And so at this point in time, it is potentially

10  possible as it was then apparently on two prior points in time

11  that the tax in Alabama that is challenged by Norfolk Southern

12  -- or the taxes I should say -- in this case the educational

13  use tax and the consumer use tax, may be ultimately determined

14  to be valid, they may ultimately be determined by the Supreme

15  Court or the Eleventh Circuit to not be valid taxes.

16        And so, the real fight here is on the validity

17  constitutionally of the taxes at issue which has been an

18  ongoing dispute at least with respect to CSX on a comparable

19  type of tax if one accepts the characterization that Norfolk

20  Southern makes of the CSX case, which I'm not saying I don't

21  accept it, I just am saying if you assume that.  And so it --

22  my point really is that this is not an easy -- it is not -- it

23  is a relatively complex problem with respect to the CSX case

24  taxation.  It's been in front of the Supreme Court, my memory

25  is twice now and maybe it'll go up a third time sometime later

1   on.  It's an unusual type of situation that does not ordinarily

2   and generally occur.  All right.

3        So, let's at -- for purposes of what I have to do --

4   and this for those of you that were here at two o'clock when I

5   did -- dealt with the Grigsby claim, this will be a little bit

6   of a repeat but one -- when one is dealing with a Chapter 9

7   readjustment of debts of a municipal debtor, one has to pay

8   attention to the different structure of Chapter 9 from Chapter

9   11.  And in particular, one has to pay attention to Sections

10  903 and 904 of the Bankruptcy Code along with Sections 941 and

11  942 of the Bankruptcy Code.

12       Nine oh three is designed to retain the power of the

13  State over its municipalities or restricting the ability to

14  interfere with the power of the state to regulate and control

15  its municipal subdivisions including among other things its

16  uses -- the municipality's uses of its monies and properties.

17       Secondly, 904 is a limitation on the jurisdiction of

18  the Bankruptcy Court that goes beyond just what's in the

19  Bankruptcy Code but encompasses other restrictions that might

20  apply to a Bankruptcy Court or another federal court sitting as

21  a Bankruptcy Court.  And among other things, it preserves the

22  political integrity with respect to the county -- in this case,

23  Jefferson County -- and it preserves to the county itself the

24  ability to decide in its sole discretion how it uses its monies

25  and properties including its revenues.

**WWW.JJCOURT.COM**

1          Section 941 gives the county the -- the debtor in

2   this case -- the right to propose a plan of arrangement.  It

3   does not permit any other person or entity including this Court

4   or another court to propose a plan.  Similarly, Section 942

5   grants only to the county, not to another entity, not to this

6   Court or any other court, the right to modify the plan of

7   adjustment.

8          And the clear import and impact of these sections --

9   of the Bankruptcy Code and particular in Chapter 9 that I've

10   cited is that only the municipal debtor may propose a plan and

11   only the municipal debtor may modify a plan of adjustment.  And

12   again, by way of repetition, this Court can't propose or

13   modify, nor can any other court propose or modify without the

14   agreement or consent of, in this case, Jefferson County.

15          There's also another major implication from this structure

16   that relates to mootness and the issues of mootness.  When you

17   understand the structure of 903 and 904, along with 941 and 42,

18   and that being the categories of sections that deal with

19   restrictions on a power of the court and the power to interfere

20   with the political operations, the financial operations of the

21   municipality along with the restriction on who may propose a

22   plan and limit a plan, it makes, if one thinks about it, the

23   application of the mootness doctrines even more applicable in a

24   Chapter 9 case then they would otherwise be in a Chapter 11

25   case.

28

1        And so having said that, what I need to do initially

2   is to go through Jefferson County's plan.  In Section 1.1,

3   Number 6 defines administrative claim as a claim for

4   administrative costs or expenses that are entitled to priority

5   and payment under Bankruptcy Code Sections 503(b), 507(a)(2)

6   and Section 901.

7        Section 901 simply builds into Chapter 9 Section

8   503(b) and 507(a)(2).  It doesn't do more than that.  Section

9   507(a)(2) in a context of a Chapter 9 case gives the priority

10  to administrative expenses that are allowed expenses under

11  503(b).  There are certain residual items in 507(a)(2) that

12  have no application to this case and I'll deal with those.

13       And then 503(b) is the statutory provision of the

14  Bankruptcy Code incorporated into Chapter 9 and it deals with

15  the types subject to the Reading v. Brown, what I'll call

16  doctrine of what types of claims will be given administrative

17  priority treatment in a Chapter 9 case and outside of Chapter 9

18  in other cases.

19       Section 1.1 of the plan again, Number 53 defines a

20  claim to be any claim as that word is defined by Bankruptcy

21  Code Section 101.5 against the county or against property of

22  the county whether or not asserted in the case.  Section 101.5

23  of the Bankruptcy Code defines a claim as either a right to

24  payment or a right to an equitable remedy.

25       In this case the claim is arguably as presented by

1   Norfolk Southern a right to payment even though it may not be a

2   judgment.  Even though it's not liquidated necessarily at this

3   point in time.  It's -- and so, the next provision that I need

4   to look at is Section 2.2 of the plan which deals with

5   administrative claims and it has five types that are set forth

6   in Section 2.2(b) through (d) of the plan of adjustment.  The

7   five are administrative claims generally, what are called cure

8   payments, 503(b)(9) claims, professional fees and

9   administrative tax claims.

10          And so under the structure of the plan, the --

11   Norfolk Southern must fall because of the categories that there

12   are of administrative claims into Section 2.2(b)(1) for

13   administrative claims generally.  And that provision provides

14   that, unless the person holding an allowed administrative

15   claim, which is a defined term, agrees to different treatment

16   or has already been paid in full, such amount of such allowed

17   administrative claim, the county shall pay that person in --

18   person cash in an amount equivalent to the allowed amount of

19   such administrative claim without interest.  And then it

20   specifies the timing of the payment.

21          And so, that's the category that Norfolk Southern has

22   to fall into.  And as a result for administrative claims

23   generally it has to have an allowed administrative claim which

24   would fall within the literal language of Section 503(b)(3) or

25   would fall within the Reading v. Brown doctrine under

1  503(b)(3).

2          Joined with the code sections that I've referenced

3  and the prior plan sections that I've referenced are the

4  provisions of the county's plan in Section 2.2(e) which limits

5  what claims may be priority claims and it reads, the only

6  category of priority claim incorporated into Chapter 9 -- into

7  a Chapter 9 case through Bankruptcy Code Section 901(a) are

8  administrative claims allowed under the Bankruptcy Code's --

9  under Bankruptcy Code Section 507(a)(2).

10         The treatment of an allowed administrative claims

11  under the plan is described in Section 2.2(b) above and in

12  particular no other kinds of priority claims set forth in

13  Bankruptcy Code Section 507 are recognized during title to

14  priority in Chapter 9 on this case but rather are treated in

15  Chapter 9 and in this case and classified in the plan as

16  general unsecured claims.

17         And so essentially the structure at this point is

18  that in order to have a priority treatment under the terms of

19  the plan what Norfolk Southern must have is a claim that

20  essentially runs through the priority provision of Section

21  507(a)(2) which then has you look at 503(b)(3).  And so --

22  additionally Section 1.1, definition 9(b) -- Subpart (b),

23  defines an allowed administrative claim as a claim arising on

24  or after the petition date, excluding a 503(b)(9) claim, a

25  claim that has been allowed pursuant to Section 2.2(a) of the

1  plan.

2          Section 2.2(a) of the plan provides that for an

3  allowed administrative claim that there are -- is a filing and

4  a service of a motion requirement that's not in dispute as part

5  of this -- the Norfolk Southern claim and that the Bankruptcy

6  Court has to enter a final order allowing the claim.  And so

7  for purposes of today, that's the aspect that I've got to look

8  at with respect to the allowance of the claim.

9          I want to point out that the structure of the

10  county's plan and how it treats and implements administrative

11  claims was never objected to during the confirmation by any

12  party, whether it was the Grigsby/Bennett claimants or Norfolk

13  Southern or anybody else.

14          And that provision is not subject even to any pending

15  appeal.  The only appeal that I'm aware of is the Bennett

16  claimant's appeal and that was not part of their appeal either.

17  And so no one has actively objected to how that provision with

18  treatment and recognition of administrative claims is

19  structured.

20          And so for Norfolk Southern claim, whether it has an

21  administrative claim under the only applicable provision which

22  is for those classified as general administrative claims under

23  the Jefferson County plan of adjustment, rises or falls, at

24  least in part, for how it is treated under Section 503(b) of

25  the Bankruptcy Code.

1          Norfolk and Southard (sic) does not argue any

2    provision set forth in Section 503(b) is applicable, rather its

3    sole reliance is on <u>Reading Company v. Brown</u>, a United -- a

4    1968 decision of the Supreme Court of the United States,

5    deciding what was an administrative expense under a comparable

6    section of the Bankruptcy Act of 1898.  Section 64(a)(1)

7    alternatively cited as 11 U.S.C. Section 104(a) which has been

8    repealed, and so, what the Court has to do is look at the

9    Eleventh Circuit precedent to see if <u>Reading</u> survived the

10   enactment of the Bankruptcy Code.   Under the <u>N.P. Mining</u> case,

11   963 F.2d 1449, a Eleventh Circuit decision of 1992, this issue

12   is resolved.

13          Bear with me.  I've got a shift between documents.

14   So, if I look at the <u>N.P. Mining</u> case which dealt with punitive

15   penalties for mining reclamation violation, there were several

16   issues that the Eleventh Circuit looked at.  One was to resolve

17   whether 503(b) and the listing in 503(b) is an exclusive

18   listing of the only categories of claims that are entitled to

19   an administrative priority.

20          And it's analysis by comparison of the two including

21   words under Section 503(b) and by reference to the

22   (indiscernible) of the Bankruptcy Act which it deemed to be

23   substantially similar was that the listings in 503(b) were not

24   exclusive.  They were simply a listing of certain items but did

25   not exclude other items that were not specifically listed as

1   part of 503(b).

2          It also looked at <u>Reading v. Brown</u>, which is 391 U.S.

3   471, 1968 decision of the Supreme Court of the United States,

4   dealing with certain tort claims asserted against a bankruptcy

5   trustee payable -- and whether they were payable as an

6   administrative expense even though they were not beneficial to

7   the bankruptcy estate in that case.  And the type of tort claim

8   was a fire that started at the property.  It was in the Chapter

9   Roman Numeral 11 Bankruptcy case under the Bankruptcy Act and

10  spread through adjoining properties.  And part of the rationale

11  of <u>Reading</u> was that costs normally incident to the operation of

12  a business can be an administrative expense under what was

13  Section 104(a) of Title 11.  It was later repealed by the

14  Bankruptcy Code.

15         In deciding <u>N.P. Mining</u> the Eleventh Circuit did not

16  rely on the fairness to claim holders doctrine that was

17  discussed in <u>Reading</u> or environmental protection issues relied

18  on by other courts in the context of what the type of claim in

19  <u>N.P. Mining</u>, rather they relied upon the <u>Reading</u> opinion and a

20  statutory provision, 28 U.S.C. Section 959(b), that the

21  trustees operate in a state in compliance with state law as an

22  espoused policy of 28 U.S.C. Section 959(b).  That discussion

23  and what I've put forth on <u>N.P. Mining</u> is on Page -- is at --

24  excuse me -- 963 F.2d at 1453.

25         The Eleventh Circuit looked at the policies also

1  behind 503 -- Section 503(b) of the Bankruptcy Code and one was

2  to facilitate the rehabilitation of the insolvent business by

3  encouraging third parties to provide the business with

4  necessary goods and services.  And for purposes of 503(b), this

5  is not applicable to the county because the county is not

6  operating a business first of all and the collection or not of

7  a refund of taxes does not discourage or encourage, in this

8  case, Norfolk Southern to provide or not provide good or --

9  goods or services to the county, so that particular rationale

10  behind an underlying 503(b) doesn't exist in this case.

11       Second, the -- excuse me -- next, I should say, the

12  Eleventh Circuit looked to authority that dealt with and deemed

13  that 503(b) should be narrow interpreted to keep fees and

14  administrative expenses at a minimum to preserve as much of the

15  estate as possible to creditors.  In other words to preserve

16  the estate and pay those post-petition -- you pay only those

17  post-petition costs and expenses that are beneficial to the

18  estate.

19       This aspect of 503(b) was specifically rejected in

20  N.P. Mining and that's at Page 1454.  And it rejects the idea

21  that 503(b) only includes those post-petition costs and

22  expenses that benefit the estate and doesn't accept that.  And

23  to support why I projected that, it cites to Reading v. Brown

24  and what Reading cites is the actual and necessary costs should

25  include costs ordinarily incident to the operation of the

35

1  business.

2          And here, in the context of this case, we have a

3  state tax and a local comparable that are challenged as

4  unconstitutional, which as I pointed out early is not the

5  usual, customary, ordinary item that's incident to the

6  operation of the business.  If it is anything, it is the

7  converse, it is not an ordinary and hopefully should be an

8  infrequent and extraordinary event in the operation of any

9  business if the county were in business, which the county is

10  not.  And so, there's that aspect of <u>Reading</u> and that aspect of

11  <u>N.P. Mining</u> that this case doesn't mirror and (indiscernible)

12  much.

13          Next the Eleventh Circuit looks at <u>Reading</u> and

14  recognizes again that -- more correctly, that what you had was

15  a receiver operating in a Chapter 11 not a trustee and that

16  acts that -- that actual and necessary costs within the

17  Bankruptcy Act at the time includes post-petition costs

18  ordinarily incident to the operation of the business that do

19  not confer benefit on the estate and that these can qualify as

20  actual and necessary expenses of preserving the estate.

21          But <u>Reading</u> does not hold that in all cases costs

22  normally incident to the operation of the business are

23  administrative expenses.  Rather it held this only for some

24  cases and the Eleventh Circuit recognized this -- this is at

25  Pages 1454 and 55 of <u>N.P. Mining</u>.  And so, what you have so far

36

under <u>N.P. Mining</u> and under <u>Reading</u> is that there's a business being operated, that the claim occurred post-petition from the operation of the business and that if that's the case and they are ordinarily incident to the operation of the business, the possibility exists that they may be given administrative claim priority status in some cases but not all cases.

The Eleventh Circuit then looked at -- more detail at Reading's factors.  One was fairness.  And the fairness was to all persons having claims versus an insolvent debtor.  In <u>Reading</u>, the Supreme Court determined that a trustee's -- although it's technically a receiver's negligence, that occurred during the operation of a railroad, which is a business, not a municipal entity, entitled those harmed to be given an administrative priority.

The Supreme Court chose to put those who are harmed post-petition by the operation of a business -- that they be given a priority over existing creditors, meaning pre-petition creditors.  And what is -- what takes some time to -- at least for this Court to fathom through, is what is meant by fairness.  And <u>Reading</u>'s fairness was not in the global analysis of the fact -- of factors on treatment of all claims and what is fair.  Rather it was whether existing -- that is pre-petition creditors who wanted the reorganization to proceed for a hoped for better return, whether they should be paid equal to, above or below in priority with a class of post-petition creditors

1  that were harmed by the operation of the very business that the

2  pre-petition creditors want to operate.

3          And so essentially, the fairness that is looked at is

4  not allowing pre-petition creditors to enhance their recovery

5  by not paying post-petition creditors harmed by the post-

6  petition business operation and it was a recognition that the

7  post-petition creditors and the fairness was that if you're

8  harmed during the post-petition period in certain instances,

9  that those particular people should be paid ahead of pre-

10  petition creditors under the Bankruptcy Act, which the Eleventh

11  Circuit in N.P. Mining has determined that that sort of

12  fairness would -- in Reading would carry forward.  In N.P.

13  Mining, fairness was not an issue though and so they didn't

14  utilize it.  They basically determined that fairness does not

15  apply to the fines because they weren't compensation for an

16  injury in N.P. Mining and that discussion's at Page 1456.

17          Next the Court looked at Reading and it was based

18  upon placing tort claimants from post-petition operation of the

19  business and first priority and doing that would encourage

20  receivers to ensure the businesses they operate.  And they

21  determined in N.P. Mining that the encouragement factor didn't

22  exist but it -- in that case because they were not looking to

23  get civil penalties that were encouraged or discouraged the

24  purchase of reclamation bonds because they had not -- didn't

25  have a relationship to the actual cost in reclamation.

38

1          And so when we look at whether there's some

2    justification in this case that would justify applying the

3    Reading doctrine, the issue of encouragement or discouragement

4    of certain types of conduct needs to be looked at.  And here,

5    refunds of the types of taxes involved that would only occur if

6    the statutes and ordinances involved were ultimately struck

7    down -- wouldn't encourage or discourage any aspect of the

8    operation of a business if the county is considered a business,

9    which it is not.

10          And so the Reading factor of fairness doesn't apply

11    in this case.  The Reading factor of encouraging or

12    discouraging certain conduct doesn't apply in this case.  The

13    Eleventh Circuit also rejected the idea that the concept that

14    you must yield to governmental interest and public health and

15    safety because in the N.P. Mining case there was no threat like

16    health and safety based on their determinations and the fines

17    are not paid for environmental cleanup abatement of an

18    environmental hazard caused by the estate.  And that's at N.P.

19    Mining at Page 1458.

20          Similarly in this case, as with N.P. Mining, there's

21    no threat to public health or safety, there's no environmental

22    cleanup involved, and so that particular factor that other

23    courts have looked at to justify imposition or expansion of

24    Reading into other areas doesn't exist in this case.

25          Next N.P. Mining looks at 28 U.S.C. Section 959(b)

**WWW.JJCOURT.COM**

39

1    and the federal policy embedded in it.  And the policy that is

2    embedded into it is that a debtor-in-possession, a trustee and

3    I'll add although it's not in the Eleventh Circuit opinion,

4    certain others such as receivers, should manage and operate the

5    property in his or its possession according to the requisites

6    or requirements of valid laws of the states in which the

7    property is situated in the same manner as the owner or

8    possessor would be bound to do so that was -- if they were not

9    in bankruptcy.

10          And the Eleventh Circuit and N.P. Mining held that,

11   via Section 959(b), ensuring compliance with state laws is

12   sufficient to place civil penalties within costs ordinarily

13   incident to the operation of the business.  But in N.P. Mining

14   the underlying rationale for Section 959(b) and the legislative

15   history for how it arose, which was from a case that's

16   referenced as the Bardin doctrine (phonetic), was not to give

17   unfair advantage to the bankruptcy estate over non-bankrupt

18   competitors.  And here this underlying policy for Section

19   959(b) does not exist because there is not a bankrupt

20   competitor among other factors.

21          Next I'll point out an opinion that's a published

22   opinion in the Jefferson County case dealing with Cooper Green

23   Mercy Hospital.  I have a long discussion that's more than

24   detailed for why 28 U.S.C. Section 959 does not apply to a

25   Chapter 9 debtor.  And therefore this N.P. Mining rationale

40

1  does not exist here or supporting the making of a tax refund, a

2  post-petition cost ordinarily incident to the operation of a

3  business.  And it does not support it being within Section

4  503(b).  And rather than restate what's in my Jefferson County

5  opinion dealing with Cooper Green, I'll simply incorporate it

6  by reference.

7         The tax issue is also not applicable, which was one

8  recognized in Reading and by N.P. Mining.  When you have, as we

9  do in this case, a valid dispute over a complex issue regarding

10  the federal constitutionality of tax laws, which is not a

11  frivolous dispute, which is evidenced by what is cited by

12  Norfolk Southern as a comparable tax dealing with CSX

13  Transportation, which has been on multiple appeals to the

14  Supreme Court and has been sent back on multiple occasions.

15         And here the Supreme Court's reversal of the

16  decisions of lower courts on two prior occasions over a similar

17  state tax law that Norfolk Southern relies on evidences that

18  this is not a frivolous or easily resolved federal question of

19  law and therefore not likely that it is one that allows for a

20  refund of such a tax and it would not deter any future taxation

21  because either the tax is upheld and is fully collectable or it

22  is a one-time striking down of the tax and it's collection is

23  not repeatable.  And so, you can't have a deterrent issue

24  prospectively with respect to the tax that's at issue.

25         And so when one analyzes all of the Reading factors,

41

1  those that were used by the Eleventh Circuit and N.P. Mining,

2  they do not support the payment of Norfolk Southern as an

3  administrative priority expense in this Chapter 9 context nor

4  do they support what would have to happen in this case, which

5  has never occurred in a Chapter 9 case, and that is the

6  expansion of Reading from its recognition in Chapter 11 cases

7  under the Bankruptcy Code, it's recognition in Chapter Roman

8  Numeral 11 of the Bankruptcy Act.  It has never been, based on

9  this Court's review of the case law, which was hundreds of

10 cases, recognized in a Chapter 9 case.

11        And so when you look at the various factors, one, the

12 analysis of Reading and N.P. Mining was the operation of the

13 business -- and this is more by way of summary -- it's -- which

14 the county is not and so this Court would have to expand

15 Reading to apply to a non-business entity -- which has never

16 been done -- would have to expand it also to a municipal

17 debtor, which has never been done.

18        Section 28 U.S.C. 959 simply does not apply for the

19 reasons I've set forth in greater detail -- Section 28 U.S.C.

20 959 doesn't apply in a Chapter 9 case for a litany of reasons

21 that I've set forth and incorporate by reference in my Cooper

22 Green opinion in Jefferson County.

23        As I've already indicated, this Court would have to

24 expand Reading beyond how it's been utilized -- and I want to

25 point out something that's not recognized by any of the case

42

1  law and under the Bankruptcy Code -- <u>Reading</u> was a Chapter

2  Roman Numeral 11 case under the Bankruptcy Act.  And

3  reorganizations under the Bankruptcy Act occurred under Chapter

4  Roman Number 10 and under Chapter Roman Numeral 11.

5         Chapter 10 is the chapter that is most similar to

6  what is now Chapter 11 of the Bankruptcy Code.  Chapter Roman

7  Numeral 11 of the Bankruptcy Act had limited application to

8  affect only certain categories of debt, not all categories of

9  debt in theory I will tell you.

10        In theory it was designed with respect to a limit

11 category and I will tell you and I was involved in a case

12 called <u>Continental Realty</u> that was an Act case representing a

13 receiver in a Chapter 11 that actually went beyond the

14 categories it was supposed to apply to but in theory Chapter

15 Roman Numeral 11 of the Act had a far limited -- more limited

16 scope in its application and none of the cases pay attention to

17 that difference and whether it makes a difference in <u>Reading</u> --

18 in the application of <u>Reading</u> under Chapter 11 of the

19 Bankruptcy Code and that's an Arabic 11.  I'm not going to deal

20 with it today, I want to point out that there's a distinction

21 that nobody's paid attention to.

22        And so, the other differences that Chapter Roman

23 Numeral 11 of the Bankruptcy Act generally the person or entity

24 operating whatever business was was a receiver, not a trustee

25 and in Chapter 10 of the Bankruptcy Act the person that would

43

1   operate the entity was a trustee not a receiver which is more

2   comparable in Chapter 11 (indiscernible).  And so that muddies

3   the water on how this case would -- and the Reading case and

4   N.P. Mining would be moved over into a Chapter 9 even more when

5   you recognize that Chapter 9 doesn't operate anywhere like a

6   Roman Numeral Chapter -- excuse me -- Arabic Chapter 11 of the

7   Bankruptcy Code or under either a Chapter Roman Numeral 10 or

8   Roman Numeral 11 of the Bankruptcy Act.

9           And so given all those factors, the Court has

10  determined that the objection of Jefferson County to the

11  administrative claim treatment of Norfolk Southern should be

12  sustained and the claim is not allowed as an administrative

13  claim under the terms of the county's plan that is in Section

14  2.2(e) that means that should Norfolk Southern ultimately

15  prevail with respect to the legality -- I should say the

16  illegality of any of the consumer use tax or the education use

17  tax, it would be relegated under the terms of the plan as a

18  claim that's general unsecured not an administrative priority.

19  That's only if they ultimately prevail on their position that

20  the tax imposed -- that the two taxes imposed are

21  constitutionally or otherwise legally in front.

22          There is a further factor if you also look at N.P.

23  Mining.  It restricted what it allowed with respect to what

24  would be an administrative priority excluding any civil

25  penalties that arose out of violations that occurred pre-

44

1  petition and excluding those that arise out of civil penalties

2  imposed from operation -- from the time period that there were

3  no operations of the business, that is when a trustee was

4  appointed prospectively forward because the trustee didn't

5  operate the business.

6        The business operation is actually estoped under

7  N.P. Mining's fact slightly before the trustee was appointed

8  and all it was doing is they were essentially buying coal to

9  cover coal contracts and not mining coal.  And so to the extent

10 that there were impositions of penalties during that tine

11 period where there were no operations, there was no

12 administrative claim status.

13       I mention that because if you view and look at

14 Norfolk Southern's claim and should they ultimately prevail on

15 the illegality of the one or both of the education use tax or

16 consumer use taxes, for priority purposes they -- as I've

17 already indicated, they would not have a priority but with

18 respect to their general unsecured status, the fact is that

19 portions of both taxes did not get paid to the county.

20       Portions were effectively paid to the trustee for the

21 warrant holders with respect to the education use tax and

22 that's substantially all of that tax less the four percent

23 collection fee and then there are -- is a smaller portion of

24 the consumer use tax that was also not paid to the county.

25 They flowed through the county but they were essentially

45

1  collected for the benefit of somebody other than the county.

2        And so those monies were never received by the county

3  for the county's uses and are essentially not within what would

4  be a claim against the county.  They may be a claim against the

5  party that was the party that got the payment through the

6  county but they really aren't claims that essentially are from

7  monies that the county received for purposes of the county.

8        And so, should there be an ultimate determination

9  that there is a general unsecured claim, it would not be to the

10 extent of monies not paid to the county as the county.  It

11 would -- in other words, exclude monies that were simply

12 collected and -- as a past through for the benefit of the

13 recipients of the monies which were the trustee and a warrant

14 holders for payment to the warrant holders under the

15 educational use tax and with respect to at a minimum the

16 Birmingham Jefferson Civic Center Authority for the $100,00 a

17 month, whatever prorated portion of that monthly amount would

18 be allocated.

19       All right.  So, essentially the ruling is that there

20 is no Reading priority that would be built in to 503(b) under

21 the Supreme Court's decision or N.P. Mining.  Secondly, that

22 the factors that the Eleventh Circuit looked at relating to a

23 503(b) claim in conjunction with Reading aren't net in this

24 case and so that there is no entitlement to an administrative

25 priority.  That's the essential.

1        Now, the ultimate resolution of this claim and

2  whether it's a general unsecured is for a later date in time

3  depending on what ultimately happens either in the CSX case or

4  if that doesn't resolve it, ultimately in some potential future

5  challenge to the underlying taxes that are the basis of the

6  education use tax and the consumer use tax at issue here.

7        Unless there's something further, we'll stand

8  adjourned.  Oh, one other thing.  Would you folks draft a

9  proposed order that simply says something to the effect that

10  based on the findings of fact, conclusions of law set forth on

11  the record and incorporating in by reference what happened,

12  happened.  All right.

13        UNIDENTIFIED ATTORNEY:  Yes, Your Honor.  We'll share

14  --

15        THE COURT:  All right.

16        UNIDENTIFIED ATTORNEY:  -- (indiscernible) before we

17  submit it.

18        THE COURT:  That's fine.  Anything else?

19        UNIDENTIFIED ATTORNEY:  No, Your Honor.

20        THE COURT:  Mr. Stewart?

21        MR. STEWART:  Yes, sir?

22        THE COURT:  Anything else for here?

23        MR. STEWART:  No, sir.  Thank you.

24        THE COURT:  All right.  Thank you.  We'll stand

25  adjourned.

47

* * * * *

# C E R T I F I C A T I O N

        We, WENDY ANTOSIEWICZ and CINDY POST, court approved
transcribers, certify that the foregoing is a correct
transcript from the official electronic sound recording of the
proceedings in the above-entitled matter, and to the best of
our ability.


/s/ Wendy Antosiewicz

WENDY ANTOSIEWICZ


/s/ Cindy Post

CINDY POST


J&J COURT TRANSCRIBERS, INC.        DATE:   June 24, 2015


**WWW.JJCOURT.COM**