

# Ley Núm. 208 del año 2002

**(P. de la C. 2560), 2002, Ley 208**

**Para enmendar el Capítulo I; derogar el Capítulo II y enmendar y renumerar los capítulos III, IV, V, VI, VII, VIII, IX y X de la Ley Núm. 158 de 1999: Ley de la Carrera Magisterial**
**LEY NUM. 208 DE 28 DE AGOSTO DE 2002**

Para enmendar el Capítulo I; derogar el Capítulo II; enmendar y renumerar los Capítulos III, IV, V, VI, VII, VIII, IX y X de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, conocida como Ley de la Carrera Magisterial, a fin de atemperar sus disposiciones con las disposiciones de la Ley Núm. 149 de 15 de julio de 1999, según enmendada, Ley Orgánica del Departamento de Educación de Puerto Rico, y con la Ley Núm. 45 de 25 de febrero de 1998, Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico; para disponer sobre el sistema de clasificaciones; establecer procedimientos para ascensos y disponer sobre el Plan Individual de Mejoramiento Profesional y los programas de educación continua, y para incluir a los Orientadores Escolares, Trabajadores Sociales escolares, los Coordinadores de Programas Vocacionales y Coordinadores Industriales y a los Maestros Especialistas en Tecnología Instruccional en la Ley de Carrera Magisterial.

## EXPOSICION DE MOTIVOS

La Ley Núm. 158 de 18 de julio de 1999, "Ley de la Carrera Magisterial", se aprobó con el fin de propiciar la excelencia en los servicios educativos públicos del Estado Libre Asociado de Puerto Rico, y así darle plena vigencia al mandato constitucional que consagra el derecho de toda persona a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento de los derechos y libertades fundamentales. La mayoría de los sectores concernidos con el sistema de educación pública en Puerto Rico coincidieron en que los propósitos que perseguía esta legislación eran loables. No obstante, el transcurso del tiempo ha demostrado que es necesario aprobar enmiendas sustantivas a esta pieza legislativa.

Se hace imperativo atemperar las disposiciones de esta Ley a las disposiciones de la Ley Núm. 149 de 15 de julio de 1999, según enmendada, conocida como "Ley Orgánica del Departamento de Educación de Puerto Rico", y de la Ley Núm. 45 de 25 de febrero de 1998, "Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico".

Lamentablemente, la Ley de la Carrera Magisterial no tomó en consideración al personal docente que en esta Ley se incluye. Para subsanar esta falta, se incluyen ahora, además de los maestros y maestros bibliotecarios a los orientadores escolares, trabajadores sociales escolares, coordinadores de programas vocacionales, coordinadores industriales y el especialista en tecnología instruccional que posean certificados docentes expedidos conforme a la ley.

Case:17-03283-LTS Doc#:13658-2 Filed:07/14/20 Entered:07/15/20 12:27:03 Desc: Exhibit Page 2 of 123

http://www.lexjuris.com/lexlex/Leyes2002/lexl2002208.htm

Por otra parte, varias de las disposiciones de la Ley de la Carrera Magisterial resultan conflictivas con los términos del Convenio Colectivo vigente acordado al amparo de la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico.

El concepto de la Ley de la Carrera Magisterial no debe interferir con el libre juego de fuerzas de la negociación colectiva vigente. Dicho concepto está predicado en la noción de que el nivel de desarrollo que aspiramos para el magisterio y el personal de apoyo a la docencia requieren estímulos económicos o incentivos que complementen la negociación de salarios.

Además, consultas con los grupos de profesionales de la educación demuestran que se hacen necesarias ciertas enmiendas para reflejar mejor la realidad del desarrollo profesional y la experiencia de los maestros. No se promueven los propósitos legislativos cuando el resultado del estatuto, en la práctica, fue desalentar a profesionales docentes con considerable experiencia en el Sistema.

El propósito de este proyecto es, pues, subsanar las anteriores situaciones, hacer mayor justicia a los miembros de la carrera magisterial y atender sus preocupaciones, de manera que se cumplan con mayor efectividad los propósitos de la Ley de la Carrera Magisterial.

***DECRETASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:***

**Artículo 1.-**Se enmienda el Capítulo I de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:

"CAPITULO I

DISPOSICIONES GENERALES

Artículo 1.01.-Título

Esta Ley se conocerá como "Ley de la Carrera Magisterial".

Artículo 1.02.-Declaración de Propósitos

Las Exposiciones de Motivos de la Ley Núm. 158 de 18 de julio de 1999 y de esta Ley forman parte del texto normativo y constituyen su declaración de propósitos.

Artículo 1.03.- Miembros de la Carrera Magisterial

Serán miembros de la Carrera Magisterial los maestros del salón de clases, los maestros bibliotecarios, los orientadores escolares, los trabajadores sociales escolares, los maestros especialistas en tecnología instruccional, los coordinadores industriales y los coordinadores de programas vocacionales, que:

1.  Posean certificados regulares de maestro en la categoría en que se desempeñen,

2.  Tengan status permanente, y,

3.  Estén trabajando como maestros de salón de clases, maestros bibliotecarios, orientadores escolares, trabajadores sociales escolares, maestros especialistas en tecnología instruccional, coordinadores de programas vocacionales y coordinadores industriales y estén realizando las funciones inherentes en la categoría de puesto para el cual se les expidió el certificado regular.

Artículo 1.04.-Exclusiones

Estarán excluidos de la Carrera Magisterial los maestros con status probatorio, transitorio elegible y provisional.

Articulo 1.05.-El Reglamento de la Carrera Magisterial

El Secretario promulgará un Reglamento de la Carrera Magisterial, complementario de esta Ley, armonizando sus disposiciones con ésta."

**Artículo 2.-**Se deroga el Capítulo II de la Ley Núm. 158 de 18 de julio de 1999, según enmendada.

**Artículo 3.**-Se enmienda el  Capítulo III y se renumera como Capítulo II de la Ley  Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:

"CAPITULO II.

## CLASIFICACIONES MAGISTERIALES

Artículo 2.01.-Finalidad de la Clasificación y Nivel Magisterial

Las clasificaciones y niveles establecen un orden en la jerarquía según su preparación académica y años de experiencia.

Artículo 2.02.-Denominación de las Clasificaciones y Niveles Magisteriales
Las clasificaciones y niveles magisteriales tendrán las siguientes denominaciones:

1. Maestro de Salón de Clases

2. Maestro Bibliotecario

3. Orientador Escolar

4. Trabajador Social Escolar

5. Maestro Especialista en Tecnología Instruccional

6. Coordinador Industrial

7. Coordinador de Programas Vocacionales

En todas las clasificaciones anteriores existirán los niveles del I al IV, cuyos ocupantes cumplirán con todos los requisitos dispuestos en esta Ley y en la Ley de su profesión particular, si alguna.

Artículo 2.03.-Nivel I en cada Clasificación

El Nivel I en cada clasificación se otorgará al miembro de la Carrera Magisterial que:

(a) Obtenga la permanencia en el Sistema de Educación Pública, conforme a la Ley Núm. 312 de 15 de mayo de 1938, según enmendada.

(b) Radique Solicitud de Activación al amparo de esta Ley.

(c) Radique y se apruebe el Plan de Mejoramiento Profesional.

Artículo 2.04.-Nivel II en cada Clasificación

El Nivel II en cada clasificación se otorgará al miembro de la Carrera Magisterial  que apruebe los siguientes requisitos:

(a)    Dieciocho (18) créditos académicos en nivel subgraduado en áreas de estudios relacionados con las categorías de puestos incluidos en esta Ley, aprobados en una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

(b)    Doscientas (200) horas contacto en actividades de educación continuada, desde que se le reconoció el Nivel I.

(c)    Diez (10) años de experiencia docente en el Sistema de Educación Pública.

(d)    Evaluaciones satisfactorias de su desempeño docente; o en su lugar, los siguientes requisitos:

1.    Siete (7) años de experiencia docente en el Sistema de Educación Pública.

2.    Dieciocho (18) créditos académicos a nivel graduado en áreas de estudios relacionadas con la categoría del puesto en que se desempeña, aprobados en una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

3.    Doscientas (200) horas-contacto en actividades de educación continuada desde que se le reconoció el Nivel I.

4.    Evaluaciones satisfactorias de su desempeño docente

El reconocimiento de la clasificación será efectivo en la fecha en que el miembro de la Carrera Magisterial evidencie haber completado debidamente su Plan de Mejoramiento Profesional y el mismo haya sido aprobado por la autoridad correspondiente.

Artículo 2.05.-Nivel III en cada Clasificación

El Nivel III en cada clasificación se otorgará al miembro de la Carrera Magisterial que apruebe los siguientes requisitos:

(a)    Maestría en la categoría en que se desempeña.

(b)    Siete (7) años de experiencia docente en el Sistema de Educación Pública.

(c)    Doscientas (200) horas-contacto en actividades de educación continuada desde que se le reconoció el nivel que ocupa al momento de solicitar el ascenso.

(d)    Evaluaciones satisfactorias de su desempeño docente; o en su lugar, los siguientes requisitos:

1.    Cuarenta y cinco (45) créditos académicos a nivel graduado en áreas de estudios relacionadas con la categoría en que se desempeña, aprobados

en una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

2.   Cien (100) horas contacto en actividades de educación continuada desde que se reconoció el nivel que ocupa al momento de solicitar el ascenso.

3.   Siete (7) años de experiencia docente en el Sistema de Educación Pública.

4.   Evaluaciones satisfactorias de su desempeño docente.

El reconocimiento del nivel será efectivo en la fecha en que el miembro de la Carrera Magisterial evidencie haber completado debidamente su Plan de Mejoramiento Profesional y el mismo haya sido aprobado por la autoridad correspondiente.

Se les reconocerá el incentivo correspondiente al Nivel II a aquellos miembros de la Carrera Magisterial que asciendan del Nivel I al Nivel III y cumplan con todos los requisitos de éste Artículo.

Artículo 2.06.-El Nivel IV en cada Clasificación

El Nivel IV se otorgará al miembro de la Carrera Magisterial  que apruebe los siguientes requisitos:

(a)   Doctorado en la categoría en que se desempeña.

(b)   Doscientas (200) horas- contacto en actividades de educación continuada desde que se le reconoció el Nivel III.

(c)   Cien (100) horas de adiestramientos al personal docente de la escuela o del Sistema o que invierta cien (100) horas en un proyecto especial en beneficio del Sistema de Educación Pública.

(d)   Diez (10) años de experiencia docente en el Sistema.

(e)   Evaluaciones satisfactorias de su desempeño docente.

O en su lugar, los siguientes requisitos:

1.   Cuarenta y cinco (45) créditos académicos conducentes al grado de doctor en áreas  de estudios relacionadas con la categoría en que se desempeña, aprobados en una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

2.   Trescientas (300) horas contacto en actividades de educación continuada desde que se le reconoció el Nivel  III.

3.   Cien (100) horas de adiestramientos al personal docente de la escuela o del Sistema o  cien (100) horas en el desarrollo de un proyecto especial en beneficio del Sistema .

Case:17-03283-LTS   Doc#:13658-2   Filed:07/14/20   Entered:07/15/20 12:27:03   Desc:
Exhibit   Page 7 of 123

http://www.lexjuris.com/lexfex/Leyes2002/lexf2002208.htm

4.    Diez (10) años de experiencia docente en el Sistema.

5.    Evaluaciones satisfactorias de su desempeño docente.

El reconocimiento de la clasificación y nivel será efectivo en la fecha en que el miembro de la Carrera Magisterial evidencie haber completado debidamente su Plan de Mejoramiento Profesional y el mismo haya sido aprobado por la autoridad correspondiente.

Artículo 2.07.-Sustitución de Horas de Educación Continuada con Créditos Académicos.

Las horas de participación en programas de educación continuada podrán sustituirse con créditos académicos en cursos de las disciplinas relacionadas con la especialidad del miembro de la Carrera Magisterial.  A tal propósito, catorce (14) horas de participación en programas de educación continua equivaldrán a un (1) crédito académico. Los estudios formales, sin embargo, no se podrán sustituir por experiencias en programas de educación continuada.

Artículo 2.08.-Requisitos Indispensables para Ascensos

En los procedimientos relacionados con ascensos en nivel no se podrá dispensar ni se podrá obviar ninguno de los requisitos establecidos en este Capítulo, excepto lo dispuesto en el artículo 6.03.

Artículo 2.09.-Incentivos por nivel.

Los incentivos por nivel para los miembros de la Carrera Magisterial serán los siguientes:

1.    Para el Nivel I en cada clasificación se concederá a la persona en el momento en que adquiera el mismo, un siete (7) por ciento de su salario básico.

2.    Para el Nivel II en cada clasificación se concederá a la persona en el momento en que adquiera el mismo,  un nueve (9) por ciento de su salario básico.

3.    Para el Nivel III en cada clasificación se concederá a la persona en el momento en que adquiera el mismo, un veinticinco (25) por ciento de su salario básico.

4.    Para el Nivel IV en cada clasificación se concederá a la persona en el momento en que adquiera el mismo, un cuarenta (40) por ciento de su salario básico.

Artículo 2.10.-Revisión de Niveles

A propósito de estimular el cumplimiento con los Planes de Mejoramiento Profesional, el Secretario autorizará uno o más adelantos como incentivo para la conclusión de cada etapa de los mismos.

A tal efecto, un miembro de la Carrera Magisterial podrá recibir uno o más adelantos durante la vigencia de su Plan de Mejoramiento Profesional, pudiendo recibir el importe consolidado correspondiente a más de una etapa si concluyesen éstas en un mismo año o si las reclamase a la vez. Cada uno de los adelantos por etapa equivaldrá, en el caso de un miembro que se prepara para el Nivel II, a uno punto ocho (1.8) por ciento del salario básico dispuesto. En el caso de un miembro que se prepara para el Nivel III, a un cinco (5) por ciento del salario básico dispuesto. En el caso de un miembro que se prepara para el Nivel IV los adelantos por etapa equivaldrán a un ocho (8) por ciento del salario básico.

Artículo 2.11.-Procedimiento para la Revisión de Nivel en la Clasificación.

El procedimiento relacionado con revisiones de nivel en la clasificación al amparo del Artículo anterior será el siguiente:

1.  Los miembros de la Carrera Magisterial solicitarán la revisión de su nivel en la clasificación en la fecha que el Secretario señale en el Reglamento de la Carrera Magisterial que emita al efecto. La solicitud deberá acompañarse con una copia certificada del Plan de Mejoramiento Profesional, el cual será expedido por el Director de su escuela, así como con documentos que acrediten que el solicitante ha concluido satisfactoriamente la etapa del Plan en que basa su reclamo. Las solicitudes de revisión se radicarán en la oficina del Director.

2.  El Director constituirá un Comité de Evaluación de los Planes de Mejoramiento Profesional conjuntamente con un representante del Consejo Escolar, un facilitador docente para la clasificación particular y el delegado de la unión. Este Comité analizará las solicitudes sin entrar en consideraciones no relacionadas con el contenido de los Planes de Mejoramiento Profesional de los solicitantes. Concluido el análisis, someterán todos los expedientes al Secretario junto con un Informe con sus recomendaciones indicando si el candidato está o no está calificado. Los Directores informarán sobre tal determinación a los solicitantes.

3.  El Secretario revisará los informes de los Directores y el Comité, y tomará las determinaciones que procedan de acuerdo con la Ley. La determinación del Secretario se le informará a los solicitantes mediante el procedimiento que establezca el Reglamento de la Carrera Magisterial.

4.  Las determinaciones del Secretario serán revisables a través de los procedimientos de quejas agravios y arbitraje establecidos en la Ley Núm. 45 de 25 de febrero de 1998, conocida como "Ley de Relaciones del Trabajo para Servicio Público de Puerto Rico" y en el convenio colectivo entre el Departamento de Educación y el representante exclusivo de los empleados afectados.

Artículo 2.12.-Entrada de Personal Docente Externo

El Secretario podrá autorizar la entrada a la Carrera Magisterial a toda persona que cumpla con los requisitos del Capítulo II de esta Ley; disponiéndose que las personas así nombradas entrarán al Sistema en la clasificación y nivel que le corresponda, de acuerdo a su preparación, experiencia docente, horas contacto en actividades de educación continuada y evaluaciones satisfactorias de su desempeño."

**Artículo 4.-**Se enmienda el Capítulo IV y se renumera como Capítulo III de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:

## "CAPITULO III

## PROCEDIMIENTO DE ASCENSO

### Artículo 3.01.-Naturaleza del Ascenso

Los ascensos en niveles constituyen reconocimientos al esfuerzo consecuente de los miembros de la Carrera Magisterial que cumplen con su Plan de Mejoramiento Profesional. Ningún funcionario, Consejo o Comité del Departamento o de una escuela podrá negarse a reconocer la clasificación y nivel que hubiese alcanzado un miembro de la Carrera Magisterial al concluir su Plan de Mejoramiento Profesional si en su desempeño todas sus evaluaciones fuesen satisfactorias.

### Artículo 3.02.-Reconocimiento de Clasificaciones y Niveles Magisteriales

El reconocimiento de clasificaciones y niveles en la Carrera Magisterial constituye una facultad indelegable del Secretario.

### Artículo 3.03.-El Derecho a Ascenso

Tendrán derecho a ascenso en nivel los miembros de la Carrera Magisterial que demuestren, mediante la presentación de documentos fehacientes, que:

1. Han concluido satisfactoriamente sus Planes de Mejoramiento Profesional;

2. Han obtenido evaluaciones satisfactorias, de manera consistente, de su desempeño docente en donde se demuestra que poseen las destrezas profesionales enumeradas en el Artículo 2.01 de esta Ley.

Los años de servicio por sí solos no califican a ningún miembro de la Carrera Magisterial para ascenso en nivel.

### Artículo 3.04.-Solicitud de Reconocimiento de Nivel

El procedimiento relacionado con el ascenso en nivel al amparo del artículo anterior será el siguiente:

1. Los miembros de la Carrera Magisterial solicitarán el ascenso en nivel en la

fecha que el Secretario señale en el Reglamento de la Carrera Magisterial. La solicitud deberá acompañarse con una copia certificada del Plan de Mejoramiento Profesional, y con documentos fehacientes que acrediten que el solicitante ha concluido el mismo satisfactoriamente. Las solicitudes de reconocimiento de nivel se radicarán en la oficina del Director.

2.     Los Directores y el Comité analizarán las solicitudes sin entrar en consideraciones no relacionadas con lo dispuesto en el Artículo 4.03 de esta Ley. Concluido el análisis, someterán todos los expedientes al Secretario junto con un Informe con sus recomendaciones indicando si el candidato está o no está calificado para el nivel cuyo reconocimiento solicita. Los Directores informarán a los solicitantes sobre las recomendaciones que en cada caso se someterán al Secretario.

3.     El Secretario revisará los Informes de los Directores y el Comité y tomará las determinaciones que procedan de acuerdo con la Ley. La determinación del Secretario se le informará a los solicitantes mediante el procedimiento que establezca el Reglamento de la Carrera Magisterial.

4.     Las determinaciones finales del Secretario serán revisables a través de los procedimientos de quejas agravios y arbitraje establecidos en la Ley Núm. 45 de 25 de febrero 1998, conocida como "Ley de Relaciones del Trabajo para Servicios Público de Puerto Rico" y en el convenio colectivo entre el Departamento de Educación y el representante exclusivo de los empleados afectados.

**[Artículo 5.**-Se enmienda el Capítulo V y se renumera como Capítulo IV de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:]

## "CAPITULO IV

## PLANES DE MEJORAMIENTO PROFESIONAL

### Artículo 4.01.-Planes de Mejoramiento Profesional

Los Planes de Mejoramiento Profesional son programas de acción de cinco (5) años diseñados por los miembros de la Carrera Magisterial con el fin de dirigir sus esfuerzos a los objetivos que ellos mismos se han propuesto.

### Artículo 4.02.-Contenido de los Planes

Los planes combinarán los siguientes elementos:

1.     Estudios formales con crédito académico en instituciones universitarias acreditadas o reconocidas en Puerto Rico en áreas relacionadas con la especialidad;

2.     Horas de participación en actividades de educación continuada organizadas

por el Departamento, aprobadas por éste o por el Comité de Evaluación Continuada;

3.  Práctica supervisada en el área de su especialidad, y;

4.  Actividades académicas y no académicas, de valor para la escuela, los estudiantes y la comunidad, como el desarrollo de proyectos de investigación, la organización de actividades estudiantiles, la prestación de servicios de orientación a los alumnos y a sus padres, el ofrecimiento de adiestramientos al personal docente de la escuela y la atención de estudiantes con problemas de rezago o de estudiantes de alto rendimiento académico.

Artículo 4.03.-Preparación de los Planes

A la fecha de su ingreso a la Carrera Magisterial, lo mismo que al alcanzar un nuevo nivel, el miembro de la Carrera Magisterial preparará, en coordinación con el Director de su escuela, un Plan de Mejoramiento Profesional con el fin de capacitarse para el siguiente nivel.

Artículo 4.04.-Estructura de los Planes

Los planes se dividirán en cinco etapas. Para cada etapa, el miembro de la Carrera Magisterial precisará las metas y los objetivos específicos que se propone alcanzar en relación con la aprobación de créditos académicos en instituciones universitarias, horas de participación en cursillos y programas de educación continua y la organización de actividades como las que valida el Artículo 4.02 de esta Ley.

Artículo 4.05.-Radicación de los Planes y Confidencialidad de los Mismos

Los planes se radicarán en la oficina del Director, que será su custodio, y tendrán el carácter de documentos confidenciales mientras los miembros de la Carrera Magisterial no inicien el proceso correspondiente al reconocimiento de nivel pautado en el Capítulo III, o reclamen revisiones de su nivel al amparo del Artículo 2.10 de esta Ley.

Artículo 4.06.-Enmiendas a los Planes

Los miembros de la Carrera Magisterial, en coordinación con los Directores, podrán enmendar sus Planes de Mejoramiento Profesional. También podrán anejarles documentos o escritos que sean pertinentes en cualquier momento que lo estimen necesario.

Artículo 4.07.-Cumplimiento de los Planes de Mejoramiento Profesional

El desarrollo de los Planes de Mejoramiento Profesional será de la exclusiva responsabilidad de los miembros de la Carrera Magisterial. No obstante, los Directores harán los ajustes administrativos necesarios para facilitar su cumplimiento sin restarle horas de atención a los estudiantes.

Artículo 4.08.-Condición para Ascenso en Nivel

No serán elegibles para ascenso en nivel ni para revisión de niveles, los miembros de la Carrera Magisterial que no hubiesen cumplido con su Plan de Mejoramiento Profesional."

**Artículo 6.-**Se enmienda el Capítulo VI y se renumera como Capítulo V de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:

"CAPITULO V

EDUCACION CONTINUADA

Artículo 5.01.-Programa de Educación Continuada

Los programas de educación continua consistirán de cursos, seminarios, conferencias, talleres y actividades educativas con crédito académico u horas contacto. Serán impartidos o aprobados por el Departamento y darán la oportunidad de examinar temas y problemas de la educación o de desarrollar y perfeccionar destrezas profesionales de las respectivas responsabilidades de los miembros de la Carrera Magisterial.

Artículo 5.02.-Programas de Educación Continuada del Departamento

El Departamento planificará, organizará e impartirá, directamente o a través de universidades u otras instituciones educativas, programas de educación continuada dirigidos a satisfacer necesidades del Sistema de Educación Pública. La estructuración de estos programas se hará en estrecha colaboración con los componentes del Sistema.

Artículo 5.03.-Formulación del Programa de Educación Continuada

El Secretario cuidará que los programas de educación continuada:

1.    Respondan a las necesidades de las escuelas y sus componentes.

2.    Se programen en días y horas convenientes.

3.    Se celebren en lugares accesibles.

4.    Se anuncien con tiempo suficiente.

Artículo 5.04.-Comités de Educación Continuada

Cada escuela del Sistema de Educación Pública tendrá un Comité de Educación Continuada. El Comité consistirá de dos (2) miembros de la Carrera Magisterial designados por el Director, además de éste, quien será su Presidente.

Artículo 5.05.-Funciones del Comité de Educación Continuada

El Comité de Educación Continuada de la escuela realizará las siguientes funciones:

1.    Identificará las necesidades específicas de la escuela en lo referente a adiestramientos de corta duración.

2.  Colaborará en la divulgación y promoción de las actividades de educación continua en su escuela.

3.  Organizará conferencias y actividades profesionales para analizar temas tratados en los programas de educación continuada.

Artículo 5.06.-Informes de los Comités de Educación Continuada

Los informes semestrales de los Comités al Secretario constituirán la base para formular los Programas de Educación Continuada. Dichos informes se someterán en la fecha que indique el Secretario.

Artículo 5.07.-Ofrecimientos de Universidades

El Secretario coordinará y promoverá conjuntamente con el Presidente de la Universidad de Puerto Rico y los Presidentes de otras instituciones universitarias y educativas, en y fuera de Puerto Rico, el ofrecimiento de programas de estudios post graduados por la Universidad de Puerto Rico y otras universidades o instituciones educativas, en y fuera de Puerto Rico, con el propósito de satisfacer las necesidades del Sistema de Educación Pública y, en particular, las de los miembros de la Carrera Magisterial. También, promoverán la organización de actividades de desarrollo profesional del magisterio. Gestionará además, la formalización de acuerdos entre instituciones universitarias y educativas del país y además de otros países; así como del establecimiento de sistemas de convalidación de créditos por horas de participación en programas de educación continuada impartidos por las instituciones universitarias y educativas.

Artículo 5.08.-Desarrollo Profesional Continuo

Los Planes de Mejoramiento Profesional constituirán esfuerzos sistemáticos para renovar y desarrollar las destrezas de los miembros de la Carrera Magisterial. A ese fin, el Departamento proveerá tiempo en el calendario escolar para que cada miembro de la Carrera Magisterial desarrolle su propio Plan de Mejoramiento Profesional.

Artículo 5.09.-Otras Actividades de Educación Continuada

Todo miembro de la Carrera Magisterial obtendrá, de ser necesario, autorización para asistir a actividades de educación continuada ofrecidas por organizaciones profesionales u otras entidades. En todo caso deberá ser notificado al Comité de Educación Continuada a fin de asegurar que le sean acreditadas las horas correspondientes."

**Artículo 7.**-Se enmienda el Capítulo VII y se renumera como Capítulo VI de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:

"CAPITULO VI

EVALUACION DE LOS MIEMBROS DE LA CARRERA MAGISTERIAL

Artículo 6.01.-El Sistema de Evaluación

El sistema de evaluación de miembro de la Carrera Magisterial se establecerá con el fin de alentar el desarrollo de aptitudes y destrezas profesionales con arreglo a lo previsto en esta Ley. El Secretario de Educación establecerá los procedimientos para evaluar a los miembros de la Carrera Magisterial.

Artículo 6.02.-Evaluación de los miembros de la Carrera Magisterial

El Secretario establecerá en el Reglamento de la Carrera Magisterial los procedimientos para evaluar a los miembros de la misma. En el caso de los maestros de la sala de clases, se evaluará su labor mediante el análisis de los Planes de Mejoramiento Profesional, de entrevistas periódicas con los evaluados, de visitas a su salón y mediante el análisis del desempeño académico de sus estudiantes. En cuanto a los demás miembros de la Carrera Magisterial se evaluará su labor mediante el análisis de los Planes de Mejoramiento Profesional, de entrevistas periódicas con los evaluados, de visitas a sus centros de trabajo y mediante la evaluación de informes sometidos de labor realizada. Todos los miembros deben demostrar que poseen las destrezas profesionales propias de su clasificación. Las evaluaciones de sus directores podrán ser revisadas a través de los procedimientos de quejas agravios y arbitraje establecidos en la Ley Núm. 45 del 25 de febrero de 1998 conocida como "Ley de Relaciones del Trabajo para Servicio Público de Puerto Rico y en el convenio colectivo entre el Departamento de Educación y el representante exclusivo de los empleados afectado.

Artículo 6.03.-Areas de Difícil Reclutamiento

El Secretario podrá establecer por Reglamento incentivos para atraer o mantener en la Carrera Magisterial a aquellos candidatos o miembros con especialidades de difícil reclutamiento."

**Artículo 8.**-Se enmienda el Capítulo VIII y se renumera como Capítulo VII de la Ley Núm. 158 de 18 de julio de 1999, según enmendada para que se lea como sigue:

"CAPITULO VII

DEFINICION DE TERMINOS

Artículo 7.01.-Definiciones

A los efectos de esta Ley, los términos que se definen a continuación tendrán el significado que se indica.

1.  Carrera Magisterial - Sistema de niveles para promover el mejoramiento profesional del maestro de salón de clases, del maestro bibliotecario, del orientado escolar, del trabajador social escolar, del maestro especialista en tecnología instruccional, del coordinador industrial y del coordinador de programas vocacionales, a través de estudios formales, actividades

profesionales, práctica docente y clasificaciones y niveles que definen funciones y jerarquías en el Sistema de Educación Pública.

2.  Departamento - El Departamento de Educación de Puerto Rico.

3.  Director - El Director de Escuela.

4.  Educación Continuada - Conjunto de actividades educativas, con crédito académico u horas contacto.

5.  Estudios formales - Estudios universitarios conducentes a un grado académico.

6.  Evaluación - Proceso para ponderar el conocimiento adquirido, las capacidades y destrezas profesionales de los miembros de la Carrera Magisterial.

7.  Miembro de la Carrera Magisterial - Se refiere al maestro del salón de clase, al maestro bibliotecario, orientador escolar, trabajador social escolar, maestro especialista en tecnología instruccional, coordinador de programas vocacionales y coordinador industrial.

8.  Mejoramiento Profesional - El desarrollo y perfeccionamiento de las destrezas docentes por medio del estudio formal, la práctica docente y experiencias en programas de educación continua.

9.  Nivel - Lugar que ocupa un miembro de la Carrera Magisterial en su profesión, entre I y IV.

10. Organizaciones Profesionales- Todas aquellas que surjan del currículo de los Programas Académicos y todas aquellas bonafide que agrupan a Profesionales de la Educación para fines de su mejoramiento profesional.

11. Plan de Mejoramiento Profesional o Plan- Programa de cinco (5) años formulado con el fin de ampliar su conocimiento y promover el desarrollo de destrezas profesionales a través de estudios formales, de programas de educación continua y de práctica docente.

12. Reconocimiento de Clasificación y Nivel Magisterial - Proceso mediante el cual se reconoce que un miembro de la Carrera Magisterial ha cumplido su Plan de Mejoramiento Profesional y ha alcanzado un nuevo nivel.

13. Secretario - El Secretario de Educación.

14. Sistema - El Sistema de Educación Pública de Puerto Rico."

**Artículo 9.-**Se enmienda el Capítulo IX y se renumera como Capítulo VIII de la Ley   Núm. 158 de 18 de julio de 1999, lea como sigue:

Case:17-03283-LTS   Doc#:13658-2   Filed:07/14/20   Entered:07/15/20 12:27:03   Desc:
Exhibit   Page 16 of 123   https://www.lexjuris.com/lexlex/Leyes2002/lexl2002208.htm

## "CAPITULO VIII

## DISPOSICIONES PROVISIONALES

### Artículo 8.01.-Reconocimiento de Clasificaciones y Niveles Iniciales

Los orientadores escolares, trabajadores sociales escolares, maestros especialistas en tecnología instruccional, coordinadores de programas vocacionales y coordinadores industriales que estuviesen laborando en el Sistema a la fecha de vigencia de esta Ley podrán reclamar, dentro del año siguiente, la clasificación y nivel magisterial que les corresponda según las normas que con carácter provisional establece este Artículo.

A ese efecto se le reconocerá la ubicación de:

Nivel I - los funcionarios con permanencia; con no menos de dos (2) años de experiencia en el Sistema.

Nivel II - los funcionarios con permanencia; con más de dos (2) años y menos de trece (13) años de experiencia en el Sistema que tengan un grado de maestría otorgado por una institución educativa superior debidamente acreditada o reconocida en Puerto Rico; o con más de dos (2) años y menos de ocho (8) años de experiencia en el Sistema que tengan un grado de doctorado otorgado por una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

Nivel III - los funcionarios con permanencia, con no menos de trece (13) años de experiencia en el Sistema y que tengan un grado de maestría otorgado por una institución educativa superior debidamente acreditada o reconocida en Puerto Rico; o con no menos de ocho (8) años de experiencia en el Sistema y que tengan un grado de doctorado otorgado por una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

Nivel IV - los funcionarios con permanencia, con no menos de quince (15) años de experiencia en el Sistema y que tengan un grado de doctor otorgado por una institución educativa superior debidamente acreditada o reconocida en Puerto Rico.

### Artículo 8.02.-Reconocimiento de los rangos existentes.

Todo maestro y maestro bibliotecario, que voluntariamente y en virtud de la Ley 158 de 18 de julio de 1999, haya ingresado o sea miembro de la Carrera Magisterial al momento de vigencia de esta Ley y esté clasificado como:

1. Maestro Auxiliar, será denominado Maestro I o Maestro Bibliotecario I.

2. Maestro Asociado, será denominado Maestro III o Maestro Bibliotecario III.

3. Maestro, será denominado Maestro o Maestro Bibliotecario IV.

### Artículo 8.03.-Consideración de ascenso de los miembros existentes.

Todo maestro y maestro bibliotecario, que voluntariamente y en virtud de la Ley 158

de 18 de julio de 1999, haya ingresado o sea miembro de la Carrera Magisterial al momento de vigencia de esta Ley y desee se considerado para otro nivel diferente al que le corresponde en virtud del Artículo 8.02 de esta Ley, deberá cumplir con los requisitos inherentes al nivel para el cual solicita ascenso."

**Artículo 10.-**Se enmienda el Capítulo X y se renumera como Capítulo IX de la Ley Núm. 158 de 18 de julio de 1999, según enmendada, para que se lea como sigue:

"CAPITULO IX

DISPOSICIONES FINALES

Artículo 9.01.-Protección de Derechos

Ninguna disposición de esta Ley modifica, revoca, altera o invalida derechos adquiridos por el personal docente del Departamento de Educación Pública.

Artículo 9.02.-Vigencia de Reglamentos Existentes

Las normas administrativas y reglamentarias en vigor que no sean incompatibles con las disposiciones de esta Ley continuarán vigentes hasta que sean derogadas o enmendadas.

Artículo 9.03.-No Aplicabilidad de Leyes

Las disposiciones de la Ley Núm. 34 de 13 de junio de 1966, según enmendada, no serán de aplicación a los miembros de la Carrera Magisterial.

Artículo 9.04.-Separabilidad

Si cualquier parte de esta Ley fuese declarada inconstitucional por un Tribunal competente las demás disposiciones quedarán en vigor y efecto.

Artículo 9.05.-Asignación de Fondos

A partir del año fiscal 2000-01 los fondos para implantar esta Ley se consignarán anualmente en el Presupuesto de Gastos correspondientes al Departamento de Educación.

Artículo 9.06.-Vigencia

Esta Ley comenzará a regir inmediatamente después de su aprobación, con excepción de las disposiciones relacionadas con los incentivos correspondientes a los niveles los cuales entrarán en vigor a partir del 1ro. de julio de 2003.

Toda persona que no pertenezca a la Carrera Magisterial, cuya clasificación esté incluida en el Artículo 2.02 y desee participar de la Carrera Magisterial, tendrá un año, a partir de la vigencia de esta Ley, para solicitar su ingreso a la misma.

**Nota Importante:** Esta ley es copia de la ley original cuando fue aprobada, no incluye enmiendas posteriores a esta.

**Presione Aquí para regresar al Menú anterior y seleccionar otra ley.**

### ADVERTENCIA

**Este documento constituye un documento de las leyes del Estado Libre Asociado de P.R. que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las leyes de Puerto Rico. Su distribución electrónica se hace como un servicio público a la comunidad. Siempre busque leyes posteriores para posibles enmiendas a esta ley.**

# LexJuris de Puerto Rico siempre está bajo construcción.

© 1996-2002 LexJuris de Puerto Rico - Derechos Reservados

7/12/2020, 9:02 PM



# Ley Núm. 3 del año 2017

**(P. de la C. 451); 2017, ley 3**

### Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico y enmienda el Código de Rentas Internas del 1994, según enmendado.

### Ley Num. 3 de 23 de enero de 2017

Para crear la "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico"; a los fines de tomar medidas temporeras de emergencia necesarias para lograr que el Gobierno de Puerto Rico siga operando y ofreciendo servicios esenciales a la ciudadanía; establecer prohibiciones sobre la contratación de los servicios profesionales; encaminar al Gobierno en la ruta del manejo responsable de la deuda y sus obligaciones; enmendar la Sección 2101 de la Ley 120-1994, según enmendada, conocida como "Código de Rentas Internas de Puerto Rico de 1994," a los fines de extender la vigencia del arbitrio a la adquisición de cierta propiedad mueble y servicios; disponer que todo miembro de una junta o cuerpo rector de una corporación pública, con excepción de ciertos miembros de la Junta de Gobierno de la Universidad de Puerto Rico, de la Autoridad de Energía Eléctrica, de la Autoridad de Acueductos y Alcantarillados, de la Junta de la Corporación del Proyecto Enlace Caño Martín Peña, y los miembros de la Junta de la Compañía para el Desarrollo Integral de la Península de Cantera, deberá gozar de la confianza del Gobernador de Puerto Rico para poder ejecutar y llevar a cabo la política pública establecida; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

El Gobierno de Puerto Rico atraviesa por una crisis fiscal y socioeconómica sin precedentes en tiempos modernos. Las nefastas acciones y la errada política pública de la administración del Partido Popular, colocaron la Isla en un abismo económico y fiscal histórico que culminó con la imposición por el Congreso de una Junta de Supervisión Fiscal (JSF), a tenor con el Puerto Rico Oversight, Management and Economic Stability Act of 2016 (PROMESA).

La debacle que enfrenta Puerto Rico actualmente se debe a una serie de problemas de raíz, profundos y estructurales, que llevan manifestándose por varios años, y en algunos casos, de por varias décadas. El Gobierno de Puerto Rico ha acumulado una deuda de alrededor $70,000 millones (sin contar la deuda de los sistemas de retiro y otras, que aumentan el total a unos $140,000 millones) y desde el 2014 tiene una calificación crediticia por debajo del grado de inversión o "chatarra". La deuda de por sí no es negativa si se usa para invertir en obra permanente y proyectos que generan un retorno económico y social, pero es nefasta si se utiliza para pagar déficits operacionales. Esta última,

ha sido la consigna constante de las administraciones del Partido Popular.

Con la excepción del año 2012, cuando la economía de la Isla mostró indicios de recuperación, Puerto Rico ha tenido que enfrentar un decrecimiento económico de grandes proporciones. Desde el 2006 hasta el presente, el Índice de Actividad Económica (IAE), calculado por el Banco Gubernamental de Fomento, ha ido descendiendo de forma continua y acelerada, lo cual correlaciona con el rumbo negativo del Producto Interno Bruto (PIB real) y del Producto Estatal Bruto (PEB real) de Puerto Rico durante el mismo período. La situación se agravó desde el 2006 cuando, como consecuencia de políticas fiscales irresponsables, se usaron proyecciones irreales de ingresos para justificar gastos en exceso de los ingresos reales y se recurrieron a ingresos no recurrentes y a transacciones aisladas para intentar cubrir las obvias insuficiencias presupuestarias que resultaron. Todo lo anterior ha provocado una crisis en las finanzas del aparato gubernamental, al punto que se ha comprometido la capacidad del gobierno de cumplir con sus obligaciones y de invertir en proyectos de infraestructura y otras iniciativas de desarrollo económico y social, con resultados nefastos en todos los niveles de la sociedad.

Para el 2012, la economía había comenzado a despuntar y, como resultado de las medidas fiscales tomadas, los mercados recuperaron la confianza en el Gobierno y se logró aumentar la clasificación crediticia del Gobierno. Desafortunadamente, las acciones erradas y las políticas fallidas de la pasada administración, en conjunto con la falta de liderazgo y capacidad para enfrentar la crisis fiscal y socioeconómica, echaron por la borda los avances que se habían logrado y no han permitido que Puerto Rico logre reactivar su economía, pueda poner sus finanzas en orden ni pueda encaminarse hacia un desarrollo social y económico sostenible a largo plazo.

La improvisación de la Administración García Padilla tuvo como resultado la pérdida de confianza de los inversionistas. Ésta se centró en la renegociación de la deuda con énfasis en diferimiento de los pagos, lo que hubiese aumentado la carga de la deuda futura. El enfoque de la Administración García Padilla en la reestructuración de la deuda fue una distracción de la necesidad urgente de reducir los gastos gubernamentales, los cuales superaron los ingresos por $6,000,000,000 en el Año Fiscal de 2013 (último año de las finanzas auditadas). El servicio de la deuda del Gobierno de Puerto Rico de alrededor de $3,000,000,000 es un poco más del 10% del gasto total y la eliminación de la deuda por completo, sólo reduciría el déficit en un 50%.

La ineficiente política pública de la Administración García Padilla trató de encontrar una salida fácil y políticamente conveniente del caos que creó a través de sus cuatro (4) años de improvisaciones y políticas incoherentes. La Administración García Padilla rigió bajo la filosofía de "primero impuestos y después recortes". Esta filosofía propició la continuación del gasto desmedido y el rechazo a políticas públicas que hubiesen permitido manejar eficientemente los asuntos fiscales del Gobierno de Puerto Rico. También esta pasada administración aumentó la tasa del Impuesto Sobre Ventas y Uso de un 7% a un 11.5% y aprobó aumentos al arbitrio sobre el crudo. La Administración García Padilla nunca concretó eficiencias necesarias a la operación del Gobierno y al excesivo gasto gubernamental. Esa política pública de imponer más de un centenar de nuevos impuestos, ha tenido un efecto negativo en la economía y en la riqueza del puertorriqueño.

Cada intento de la Administración García Padilla de evitar una administración fiscal responsable llevó a Puerto Rico a alejarse de la estabilidad fiscal y la sostenibilidad. La Administración García Padilla propagó un discurso falaz con el fin de crear una dicotomía entre el proveer servicios esenciales a la población y el cumplimiento de los compromisos del Gobierno. Ésta afirmó que la deuda es "impagable" con el fin de evitar realizar los cambios estructurales y

operacionales necesarios para lograr eficiencias y poder dar cumplimiento a obligaciones contractuales del Gobierno de Puerto Rico y sus instrumentalidades. Esto creó un ambiente de incertidumbre entre inversionistas locales y extranjeros interesados en el crecimiento económico de Puerto Rico y eliminó el acceso del Gobierno a los mercados de capital.

La realidad de Puerto Rico hoy es que el Gobierno no es capaz de brindar servicios esenciales de manera eficiente o efectiva, y tampoco es capaz de cumplir con las obligaciones de pago a nuestros acreedores. Los mercados de capital perdieron la confianza en el Gobierno de Puerto Rico debido a la falta de trasparencia, carencia de formatos estandarizados para la recopilación y presentación de la información financiera del erario.

Entre las políticas de la Administración García Padilla que han llevado a la falta de credibilidad y acceso a la liquidez han incluido:

· Aprobar la legislación local sobre quiebras (la Ley de Recuperación) y luego insistir en litigar la constitucionalidad de esta Ley conociendo su poca probabilidad de éxito;

· Presionar al Congreso para que aplicara retroactivamente el Capítulo 9 del Código de Quiebras Federal a las subdivisiones del Gobierno de Puerto Rico;

· Incumplir con los bonos de la Corporación para el Financiamiento Público;

· Amenazar con incumplir indiscriminadamente todas las obligaciones del Gobierno de Puerto Rico sin tener en cuenta las prioridades establecidas por la Constitución, estatutos y contratos del Gobierno de Puerto Rico;

· Retrasar la publicación de los estados financieros auditados e intentar reemplazarlos con proyecciones y análisis de flujo de efectivo hechos a la medida;

· Realizar representaciones erróneas sobre la disponibilidad de recursos.

La Administración García Padilla, demostró falta de prudencia y negligencia ante la realidad económica de la Isla. Todas las acciones realizadas por la Administración García Padilla confirman que su único fin fue mantenerse en el poder para beneficiar a sus amigos mediante una malísima administración de los recursos del erario de Puerto Rico.

Las actuaciones de la pasada administración no estuvieron dirigidas a modificar las estructuras gubernamentales para lograr eficiencias operacionales. Las medidas de reforma fiscal estuvieron centradas en imponer más impuestos, en el impago de las obligaciones y en la improvisación a la hora de gobernar. La improvisación se caracterizó además por medidas extraordinarias que desangraron las finanzas de sectores que contaban con cierta autonomía fiscal. Ejemplo de esto es la retención de pagos a suplidores, retraso en el pago de reintegros a los contribuyentes y tomar dinero prestado de corporaciones públicas con el conocimiento de que no tenían capacidad de repago.

La ausencia de resultados positivos por parte de la pasada Administración es fácilmente constatable cuando repasamos las constantes degradaciones de las clasificaciones de la deuda del Gobierno de Puerto Rico. Las casas acreditadoras Moody's, Standard & Poor's y Fitch Ratings degradaron la deuda pública del Gobierno de Puerto Rico y sus corporaciones públicas a nivel

chatarra. El letargo financiero en el que se mantiene a Puerto Rico no tiene justificación, particularmente en tiempos donde las tasas de interés están a niveles tan bajos que algunas jurisdicciones han emitido deuda inclusive a tasas de interés negativas.

Es hora de implementar una administración y política pública que deje de improvisar y administrar las finanzas de año en año y empezar a abordar el desequilibrio a largo plazo entre el gasto y los ingresos. Nuestro compromiso en el Plan para Puerto Rico, es atender de manera responsable estas situaciones. Con el mandato recibido el pasado 8 de noviembre, es el momento de dejar atrás la filosofía del "me vale", enrollarnos las mangas y trabajar arduamente por el bienestar de Puerto Rico. Tenemos que mirar hacia el futuro y anticipar estos desafíos en lugar de simplemente sobrevivir de una crisis a la siguiente. Los líderes y funcionarios de los componentes gubernamentales de Puerto Rico deben concentrarse en equilibrar los gastos y los ingresos, reducir el nivel de intervención gubernamental en la economía de Puerto Rico y proporcionar un ambiente de negocios competitivo, donde impere la buena fe, para que los inversionistas y empresarios locales y externos lideren el camino hacia la recuperación económica.

Todas estas políticas erradas llevaron al Congreso de los Estados Unidos a promulgar PROMESA, delegando en una Junta de Supervisión Fiscal (JSF) la facultad de trabajar con el Gobierno de Puerto Rico para sacarnos de la crisis por la que atravesamos. La JSF reconoció que la economía de Puerto Rico está en declive con un problema severo, y que es una prioridad hacerla más competitiva.

La JSF ha indicado que Puerto Rico tiene un déficit fiscal masivo, una economía en declive y no se cuenta con acceso a los mercados. La JSF analizó qué ocurriría si no se toman medidas para corregir la actual situación fiscal. Este análisis resultó en una brecha presupuestaria de $67.5 billones proyectados. Aun si el Gobierno no hiciera pagos a la deuda existente, algo que no es una opción, Puerto Rico enfrenta un déficit de $3.2 billones. El Gobierno tiene que reducir gastos, aumentar recaudos o ambos para reducir el déficit de $7 billones. Esta Administración se ha comprometido con el Pueblo a hacer los ajustes necesarios para poner la casa en orden.

La Junta propuso trabajar 3 asuntos de inmediato, antes del 15 de febrero de 2017, fecha en que concluye la paralización del litigio sobre la deuda. Estos asuntos son:

- o Definir la naturaleza y magnitud de la situación económica y fiscal de Puerto Rico.
- o Proveer un marco de referencia al Gobierno para desarrollar políticas y planes para atender la situación fiscal y económica actual;
- o Proponer un camino para certificar un plan fiscal revisado como un próximo paso de inmediato.

Esta Administración reconoce que la JSF es una realidad. Por tal razón, es nuestro compromiso trabajar mano a mano con ella para echar a Puerto Rico hacia delante. A esos efectos, la JSF ha solicitado como prioridades de Puerto Rico el incluir un plan y compromiso para implementar cambios significativos dirigidos a:

- o Restaurar el crecimiento económico y crear una economía más competitiva. A corto plazo, se debe liberalizar el mercado laboral y los programas de ayuda social, reducir el costo energético, racionalizar y optimizar los impuestos y mejorar el proceso de permisos para promover la inversión.
- o Reestructurar el Gobierno para obtener presupuestos balanceados mientras se mantienen

los servicios esenciales para los puertorriqueños.
  o Restructurar el sistema de pensiones conforme a PROMESA y restablecer el acceso a los mercados capitales.

Para atender la crisis por la cual atravesamos, es menester crear una reforma laboral comprensiva, que incluya el aumentar la fuerza laboral de Puerto Rico, que ahora mismo es un 40% (comparado con 60% en USA) y reducir la tasa de desempleo (13% en comparación a 4.5% en los demás estados). También tenemos que lograr una reforma energética que logre buscar maneras de bajar el costo energético y mejorar su infraestructura. Debemos llevar a cabo una reforma contributiva que transforme el sistema tributario en uno más sencillo y transparente. Tenemos que mejorar el sistema de captación de impuestos, que está en un 65% versus un 85% a nivel nacional. Hay que agilizar el sistema de permisos para permitir que se beneficie de nueva inversión. También continuaremos expandiendo las alianzas público privadas, para mejorar la economía y la infraestructura.

Por otro lado, a tenor con PROMESA, el Task Force Congresional creado al amparo de esa ley, hizo una serie de recomendaciones al Congreso dirigido a la relación del Gobierno Federal con Puerto Rico, para asistir en que la Isla pueda salir de esta crisis. Uno de los principales objetivos de la JSF es trabajar con el plan fiscal que desarrolle el Gobierno de Puerto Rico y ponerlo en ejecución. Distinto a la pasada administración, que envió a la JSF un plan irreal que no tomaba en consideración la realidad fáctica y económica de Puerto Rico, esta Administración está comprometida en trabajar un plan realista y viable por el bienestar de Puerto Rico.

Por otro lado, desde el 2014, han estado en vigor varias disposiciones relacionadas a suspender temporeramente algunos beneficios que reciben los empleados públicos para tratar de atender la crisis fiscal. Aunque se trató de medidas temporeras, la situación en la que hemos recibido el Gobierno nos lleva a tener que incorporar en esta Ley algunas disposiciones que están programadas a vencer el 1ro. de julio de 2017.

Por otro lado, para garantizar el funcionamiento adecuado del Gobierno de Puerto Rico, es menester garantizar la continuidad de los ingresos del Gobierno. La Ley 154-2010, enmendó el Código de Rentas Internas de 1994, a los fines de crear un arbitrio a la adquisición de cierta propiedad mueble y servicios. Dicho arbitrio, es una de las fuentes más consistentes de ingreso a las arcas gubernamentales. En el Año Fiscal 2015-2016, el Gobierno de Puerto Rico recibió $1,862,303,000 provenientes de este arbitrio. Al mes de noviembre del Año Fiscal 2016-2017, han ingresado en las arcas gubernamentales más fondos por concepto de este arbitrio que a la misma fecha el Año Fiscal anterior. Este arbitrio ha demostrado funcionar y ha sido una fuente de ingreso consistente al erario. No obstante, esta fuente de recaudo, está destinada a expirar el 31 de diciembre de 2017. Debido a la difícil situación económica del Gobierno de Puerto Rico, esta Asamblea Legislativa entiende que es necesario, extender este arbitrio.

En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de la Constitución de Puerto Rico, se declara la existencia de una situación de urgencia económica y fiscal grave en Puerto Rico que hace necesaria la aprobación de esta Ley especial de carácter socioeconómico que ayude al Estado a contar con la liquidez suficiente para poder pagar la nómina de los empleados públicos y sufragar los servicios esenciales que ofrece a sus ciudadanos. Ejercemos este poder de razón de Estado, según discutido por el Tribunal Supremo de Puerto Rico como "aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar ciertas actividades con el propósito de

fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios". Domínguez Castro v. E.L.A., 178, D.P.R. 1, (2010), a la pág. 36.

De igual forma, nuestro más alto foro se ha expresado recientemente sobre el uso del poder de razón de Estado en momentos de crisis. En este sentido, dicho Foro expresó que la inminencia de la crisis fiscal decretada por la Ley 7-2009, conocida como "Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico", quedó evidenciada en su Exposición de Motivos. Luego de analizar la Exposición de Motivos de esa Ley, el Tribunal validó la Ley y dispuso que las medidas eran necesarias y razonables para adelantar el interés gubernamental importante que perseguía la Ley 7-2009 de frenar dicha crisis. Véase, Domínguez Castro v. E.L.A., supra, págs. 88-89. De igual forma, reconoció "la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado" y que en el ejercicio de dicho poder, "la Legislatura goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad". Íd., pág. 37.

Posteriormente, el Tribunal Supremo validó la Ley 3-2013 sobre el Sistema de Retiro de los Empleados Públicos en el caso Trinidad Hernández v. E.L.A., 188 D.P.R. 828 (2013), entendiendo que la Legislatura había ejercido el poder de razón de Estado para detener la insolvencia del Sistema de Retiro de Empleados Públicos. La Exposición de Motivos de esa disposición legal demostró que el Sistema de Retiro se encontraba en una crisis fiscal inminente, al punto que, de no tomarse las medidas los activos netos del sistema serían negativos y, para el Año Fiscal 2018–2019, se quedaría sin fondos suficientes para cubrir el pago de sus obligaciones, entre las que se encuentra el pago de pensiones a los propios pensionados. Íd., págs. 836-837. El Tribunal Supremo razonó que "de la exposición de motivos... se desprende que las medidas adoptadas son necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema". Añadió que, "ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños". Trinidad Hernández, supra, pág. 837. Concluyó que la norma es constitucional "porque, a pesar de que existe un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 839.

Del mismo modo, recientemente, en el caso Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico, 190 D.P.R. 854 (2014), el Tribunal Supremo pasó juicio sobre las medidas aprobadas mediante la Ley 160-2013 para solventar la crisis del Sistema de Retiro de Maestros y determinó que la ley no adelantaba el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema. Por ello, resolvió que la Ley 160–2013, en lo que respecta al menoscabo de obligaciones contractuales, es irrazonable y, por lo tanto, inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que las medidas aprobadas serán constitucionales si son razonables y necesarias "para adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 8.

Usando como base este marco legal, esta Asamblea Legislativa entiende que las medidas que se toman en esta Ley, son necesarias y razonables para atender de forma adecuada la crisis fiscal, económica y presupuestaria por la que atraviesa Puerto Rico. Esta medida, se promulga con la facultad de esta Asamblea Legislativa para aprobar y promulgar legislación económica dirigida a promover el bienestar de la comunidad puertorriqueña.

Finalmente, bajo la Constitución de Puerto Rico, se le concedió al Gobernador la facultad expresa para "[n]ombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado". Const. E.L.A., Art. IV, Sec. 4. No obstante, la Constitución no limita la facultad del gobernador para destituir empleados. Díaz Carrasquillo v. García Padilla, 191 D.P.R. 97, 112-13 (2014). Surge del Diario de Sesiones de la Convención Constituyente de Puerto Rico que se discutió la posibilidad de que la Asamblea Legislativa pudiera variar el término de duración del cargo de los secretarios de gobierno, inmiscuyéndose así con la Rama Ejecutiva pero, "ante la preocupación de que esto no fuera cónsono con el sistema republicano de gobierno que se pretendía perpetuar mediante la Constitución" se decidió que "no se debía establecer un término de duración para los cargos de los secretarios de gobierno". Díaz Carrasquillo, supra, citando 3 Diario de Sesiones de la Convención Constituyente 2268-2271 (1952).

Sobre el poder de un Gobernador para remover funcionarios nombrados a términos, el Tribunal Supremo de Puerto Rico ha expresado que un empleado gubernamental es de libre remoción por el Gobernador cuando incide en la formulación de política pública. Díaz Carrasquillo v. E.L.A., 191 D.P.R. 97 (2014). Solo en el caso de que un empleado realice funciones primordialmente *cuasi* legislativas o *cuasi* judiciales, al Gobernador se le podrá requerir que demuestre justa causa para su destitución. También es preciso analizar la totalidad de las circunstancias para determinar si, independientemente de las funciones que realiza el funcionario, las restricciones impuestas por la Asamblea Legislativa inciden en la facultad del Gobernador de descargar sus funciones ejecutivas. En la misma opinión, el Alto Foro subraya que "un funcionario público no puede reclamar un interés propietario sobre un cargo que ostentaba cuando este ha sido eliminado por la Asamblea Legislativa. *Id.* Cualquier cargo público comprendido dentro del Servicio Civil Clasificado puede ser abolido de buena fe por la Legislatura, pues las leyes de Servicio Civil no garantizan a ningún empleado público el derecho a ocupar un puesto que ya no es necesario. Gómez v. Negrón, 65 D.P.R. 305, 308 (1945). Esto aplica siempre y cuando la actuación sea de buena fe y no sea un subterfugio para destituir al empleado de su cargo, lo cual sucede cuando acto seguido a la derogación se crea otro cargo cuyos deberes y obligaciones son iguales al anterior, pero con otro nombre." Díaz Carrasquillo, supra.

Actualmente, como es sabido, nos encontramos bajo las disposiciones de la Ley PROMESA. Conforme el Art. 101 de dicha Ley, la JSF, a su plena discreción, en el momento que considere apropiado, podrá designar a cualquier instrumentalidad territorial como una instrumentalidad territorial cubierta y sujeta a las obligaciones de la referida Ley. A este momento, la JSF ha designado todas las corporaciones públicas como instrumentalidades cubiertas. En cuanto a estas instrumenalidades, la JSF podrá exigir, en su plena discreción, que el Gobernador las incluya en el plan fiscal aplicable o un plan fiscal por separado. Si la JSF opta por la segunda alternativa, podrá exigir que el Gobernador desarrolle dicho plan fiscal separado para la instrumentalidad en cuestión.

En general, según la Ley PROMESA, un plan fiscal contemplará estimados de recaudos y gastos; garantizará el financiamiento necesario para los servicios públicos esenciales; contemplará el financiamiento suficiente para los sistemas de retiro; contemplará la eliminación de déficit estructurales; contemplará una carga de endeudamiento que sea sostenible; mejorará la gobernanza fiscal; la rendición de cuentas y los controles internos; permitirá alcanzar las metas fiscales; creará previsiones financieras para el periodo cubierto; incluirá un análisis de sostenibilidad de deuda; contemplará los gastos capitales y las inversiones necesarias para promover el crecimiento económico; adoptará recomendaciones de la Junta; incorporará toda información adicional que la Junta estime necesaria; garantizará que los activos, fondos o recursos de una instrumentalidad no se presten, o transfieran de alguna forma no autorizada y respetará las prioridades aplicables.

Por otro lado, conforme el Artículo 205 de PROMESA, la JSF podrá someter en cualquier

momento recomendaciones al Gobernador o a la Legislatura sobre acciones que el gobierno territorial deba tomar para garantizar el cumplimiento del plan fiscal o para: promover de alguna otra manera la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la prestación de servicios. Hechas las recomendaciones, el Gobernador tendrá que someter una declaración indicando si el gobierno adoptará la recomendación. Si no la adopta, el Gobernador deberá explicar al Presidente de los Estados Unidos y al Congreso sus razones para no adoptarlas.

De las disposiciones antes mencionadas, debe quedar claro que, para poder trabajar con el plan fiscal que ha sido requerido y las disposiciones de PROMESA, este Gobierno tiene que garantizar que todas las entidades públicas, incluyendo las corporaciones públicas, estén en la misma página en cuanto al plan fiscal y la política pública trazada para cumplir con éste. Ante la JSF, el Presidente de los Estados Unidos y el Congreso, el Gobernador es el responsable de implantar el Plan Fiscal y dar explicaciones sobre lo que se hace o se deja de hacer en todas las instrumentalidades del Gobierno. Por tal razón, esta Asamblea Legislativa entiende que es menester que todos los funcionarios públicos de alta jerarquía, incluyendo los miembros de las juntas de directores de las diferentes corporaciones públicas, estén comprometidos con el plan fiscal que trabajaremos mano a mano con la JSF. Así pues, para poder cumplir con la Ley PROMESA y los requerimientos de la JSF, es indispensable que el Gobernador tenga la facultad de nombrar el personal requerido para implantar y ejecutar el plan fiscal. Ante esta nueva realidad, mediante la presente Ley, se deroga cualquier requisito de justa causa que pueda aplicar se declara se deberán gozar de la confianza del Gobernador todos los puestos de las Juntas de Directores de las corporaciones públicas que son nombrados por éste. Así mismo se autoriza al Primer Ejecutivo a nombrar inmediatamente a todos los miembros de dichas Juntas a los fines de poder cumplir ágilmente con el plan fiscal y demás requerimientos de la JSF.

Nos hacemos eco de las expresiones del Tribunal Supremo de Puerto Rico en <u>Santana Y Otros v. Gobernadora Sila María Calderón Y Otros, 165 D.P.R. 28, 47-48</u> (2005). En dicha ocasión, el Tribunal sentenció, y citamos:

"Nuestra Constitución por lo tanto adoptó un Poder Ejecutivo unitario al investir a un solo funcionario -el Gobernador- con la autoridad suprema en la Rama Ejecutiva "sin limitaciones de ninguna clase." Ello permite impartirle dinamismo y unidad de propósito a la Rama Ejecutiva; fortalece al Primer Ejecutivo en la protección de sus prerrogativas constitucionales frente a lo que serán intentos de socavar las mismas por las otras ramas; y le hace responsable único de la gestión de una de las tres ramas de gobierno frente a la ciudadanía.

El investir al Gobernador con la facultad y autoridad suprema en el Poder Ejecutivo "sin limitaciones de ninguna clase", requiere, para que esa expresión tenga verdadero contenido que, como mínimo, el Primer Ejecutivo tenga la autoridad legal para impartir instrucciones u órdenes de carácter obligatorio a los funcionarios de la Rama Ejecutiva que nombra, para que se tomen las medidas que a su juicio adelanten la política pública del gobierno. Ello a su vez supone que el Gobernador tiene la facultad de remover a ese funcionario si rehúsa actuar acorde a lo que es la política pública expresada por el Gobernador. Solo de esta forma el Primer Ejecutivo se cerciorará que se ejecuta la política pública establecida y se cumpla con la ley. En última instancia, el poder de destituir es equivalente al poder de controlar las acciones de los funcionarios del ejecutivo que formulan o contribuyen a formular política pública.

Por otro lado, la sección 4 del Art. IV de la Constitución, enumera los deberes, funciones y atribuciones constitucionales del Gobernador, entre las que se encuentra la obligación de "cumplir y hacer cumplir las leyes." Para cumplir con esta obligación constitucional el Gobernador tiene que nombrar funcionarios que le puedan asistir en

Case:17-03283-LTS   Doc#:13658-2   Filed:07/14/20   Entered:07/15/20 12:27:03   Desc:
Exhibit    Page 27 of 123

dicha encomienda. Es evidente que no es posible que tal responsabilidad recaiga exclusivamente sobre una persona.

La esencia del concepto poner en vigor la ley "no es la mera interpretación e implementación del mandato legislativo, sino es determinar quién ejerce la última autoridad sobre los oficiales que implementan la ley." Noriega v. Hernández Colón, 112 D.P.R. 406, 463 (1994). (Énfasis nuestro.) Secuela entonces de la obligación de cumplir y hacer cumplir la ley que se impone la Constitución, está el poder de ejercer "la última autoridad sobre . . .[los] oficiales" que asisten al Gobernador en el descargo de esa responsabilidad; lo que implica necesariamente el poder de remoción de quienes incumplan con esa responsabilidad."

Es bajo este marco legal, que esta Asamblea Legislativa, entiende que la crisis fiscal por la cual atraviesa Puerto Rico es superable pero, solo si el Gobernador cuenta con un equipo comprometido con implantar y hacer cumplir el plan fiscal que está siendo elaborado. Esta decisión no es un subterfugio para remover a funcionarios públicos de su cargo. Esta Ley no elige aquellos miembros que serán removidos, sino que se remueven a todos, para que sea el Gobernador quien los elija. Esta decisión no se toma de forma liviana sino que llegamos a ella por entender que, bajo el nuevo estado de Derecho creado por la aprobación de la Ley PROMESA y la llegada de la JRT, impedirle al Gobernador contar con el brazo ejecutivo a cargo de la corporaciones públicas, incidiría en la formulación de política pública y destinaría al fracaso la implantación del Plan Fiscal y la restructuración de la deuda. Por ende, estos funcionarios deben ser de libre remoción por el Gobernador.

***DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:***

Case:17-03283-LTS Doc#:13658-2 Filed:07/14/20 Entered:07/15/20 12:27:03 Desc
Exhibit    Page 28 of 123

Artículo 1.-Esta Ley se conocerá y podrá ser citada como "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico".

Artículo 2.-Primacía de esta Ley

Esta Ley se aprueba en el ejercicio del poder de razón del Estado, así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en el Artículo II, Secciones 18 y 19 de la Constitución de Puerto Rico, de aprobar leyes en protección de la vida, la salud y el bienestar del pueblo, así como en casos de grave emergencia cuando estén claramente en peligro la salud, la seguridad pública o los servicios gubernamentales esenciales, así como al amparo de la Secciones 7 y 8 del Artículo VI de la Constitución de Puerto Rico. Por esta razón, esta Ley tendrá primacía sobre cualquier otra ley.

Artículo 3.-Declaración de Política Pública

Es Política Pública de esta Asamblea Legislativa que la responsabilidad fiscal es la clave para que Puerto Rico recupere su credibilidad ante los inversionistas y mercados financieros, restablezca su crédito y regrese al camino del manejo responsable de la deuda y de sus finanzas, logrando una eficiente restructuración de la misma. Por tal razón, esta Asamblea Legislativa declara que esta Ley es razonable y necesaria para atender la grave crisis fiscal, económica y presupuestaria por la que atraviesa el Gobierno de Puerto Rico.

Esta política pública garantiza la continuidad de la gestión pública en áreas esenciales de salud, seguridad, educación, trabajo social y desarrollo, entre otros, así como la prestación de los servicios necesarios e indispensables para la ciudadanía.

Artículo 4.-Las medidas tomadas en esta Ley, estarán en vigor hasta el 1ro. de julio de 2021, o, si ocurre antes, el 1ro. de julio de cualquier Año Fiscal para el cual, como parte de su respectivo proceso de recomendación del Presupuesto General de Gastos sometido por el Gobernador a la Asamblea Legislativa, se haya incluido una certificación firmada por los funcionarios concernidos en la que:

(a)    El Presidente de la Junta de Planificación certifica que el crecimiento real en el Producto Nacional Bruto proyectado para dicho Año Fiscal es igual o mayor a uno punto cinco (1.5) por ciento;

(b)    el Director de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF) certifica que una reconocida casa de acreditación en los mercados de capital ha calificado, a la fecha de la certificación, el crédito de obligaciones generales del Gobierno de Puerto Rico como de grado de inversión; y

(c)    el Secretario de Hacienda y el Director de la Oficina de Gerencia y Presupuesto certifican que, el Año Fiscal concluido inmediatamente previo a la fecha en la cual se está presentando la certificación, cerró o se estima que haya cerrado sin refinanciamiento de obligaciones generales del Gobierno de Puerto Rico, ni financiamientos públicos o privados que se hayan utilizado para cubrir brechas en las proyecciones de recaudos o gastos en exceso de las asignaciones correspondientes.

Artículo 5.-Aplicabilidad.

Las disposiciones contenidas en esta Ley, serán aplicables a todas las Entidades de la Rama Ejecutiva del Gobierno de Puerto Rico. Para propósitos de esta Ley, se entenderá que el término "Entidad de la Rama Ejecutiva" incluye a todas sus agencias, así como a las instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico, irrespectivo del grado de autonomía fiscal o presupuestaria que de otra forma le confiriere su ley orgánica u otra legislación aplicable. Sin embargo, esta Ley no será de aplicación a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral a menos que expresamente así se disponga. Tampoco se considerará como Entidad de la Rama Ejecutiva para propósitos de esta Ley, a la Universidad de Puerto Rico y sus dependencias, ni a los Municipios.

Artículo 6.-Suspensión de algunos convenios, leyes o reglamentos.

Se entenderá suspendida, durante la vigencia de esta Ley, toda disposición o norma en convenio, ley, reglamentación o disposición administrativa que resulte contraria o interfiera con lo aquí dispuesto. Lo anterior incluye, sin que se entienda como una limitación, toda disposición o norma que establezca o pretenda establecer como obligación la ocupación de puestos adicionales, las condiciones en que se reemplazan empleados, la categoría de puestos ocupados; o que restrinja, o pretenda restringir de cualquier forma, la facultad del Gobierno de determinar el volumen o tipo de plantilla necesaria para su funcionamiento y para la provisión de servicios a la ciudadanía.

La Oficina de Gerencia y Presupuesto promulgará la reglamentación necesaria de acuerdo con las disposiciones de este Artículo.

Artículo 7.-Concesión de Aumentos en Beneficios Económicos o Compensación Monetaria Extraordinaria.

Desde y durante la vigencia de esta Ley, no se concederán aumentos en beneficios económicos ni compensación monetaria extraordinaria a los empleados de las Entidades de la Rama Ejecutiva, con excepción a:

(a) Licencias con sueldo para estudios, seminarios, cursos o talleres siempre y cuando se suscriba un acuerdo legal donde conste que el empleado beneficiado se obliga a brindar servicios por un tiempo equivalente al doble del tiempo que le tome completar los estudios, seminarios, cursos o talleres y el deber de devolución de la licencia pagada en caso de incumplimiento;

(b)      Programas de becas para empleado;

(c)      Programas de ayuda al empleado;

(d)      Programas de cuido de niños;

(e)      Planes de adiestramiento, capacitación y desarrollo hasta un máximo de seiscientos dólares ($600) por empleado.

No obstante lo anterior, con excepción de los programas de ayuda al empleado, y de los adiestramientos que brinda la Oficina de Capacitación y Asesoramiento Laboral y de la Administración de Recursos Humanos (OCALARH), la autoridad nominadora o su representante autorizado deberá considerar que las situaciones antes provistas constituyen un aumento en beneficios económicos o compensación monetaria extraordinaria cuando ello resulte necesario para atemperar los gastos de la Entidad de la Rama Ejecutiva al presupuesto aprobado o para superar una proyección de déficit operacional.

La Ley 66-2014 dispondrá lo que es considerado como un aumento en beneficio económico o una compensación monetaria extraordinaria y a cuáles empleados le habrá de aplicar. Los convenios colectivos vigentes se extenderán conforme al Artículo 8 de esta Ley.

Artículo 8.-Negociación de convenios vencidos.

Los convenios colectivos expirados a la fecha del comienzo de la vigencia de esta Ley o que expiren durante la vigencia de la misma, serán extendidos en cuanto a las cláusulas no económicas u otras cláusulas no afectadas por esta Ley, hasta el 30 de junio de 2021. Dicha extensión constituirá impedimento para la presentación y celebración de elecciones de representación.

Una vez terminada la vigencia de esta Ley, los sindicatos que al 1ro. de julio de 2014 representaban a los empleados unionados en cada Entidad de la Rama Ejecutiva, podrán comenzar la negociación de nuevos convenios colectivos, incluyendo cláusulas económicas y no económicas, y las Entidades de la Rama Ejecutiva negociarán los mismos, conforme la normativa y derecho aplicable, y considerando primordialmente las realidades de la situación económica y fiscal de la Entidad de la Rama Ejecutiva y del Gobierno en general.

Artículo 9.-Prácticas ilícitas.

La implementación de cualquier medida autorizada en esta Ley, ya sea por la Oficina de Gerencia y Presupuesto, las Entidades de la Rama Ejecutiva y sus respectivos funcionarios, el Gobernador, o cualquiera de los representantes de éstos, no constituirá una violación a los convenios colectivos existentes ni constituirá una práctica ilícita.

Las disposiciones contenidas en este Artículo le aplicarán también a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral.

Artículo 10.-Foro para dirimir controversias.

Cualquier controversia que surja a tenor con las disposiciones de esta Ley, será dirimida en la Comisión Apelativa del Servicio Público (CASP) o en la Junta de Relaciones del Trabajo, según sea el caso, conforme a las disposiciones de la Ley 66-2014.

Artículo 11.-Transporte Escolar.

Se autoriza y ordena al Secretario de Educación a continuar estableciendo medidas y estrategias alternas para maximizar la efectividad y costo eficiencia en el transporte escolar, particularmente la subcontratación directa o indirecta con los Municipios, así como con cualquier Entidad de la Rama Ejecutiva, o entidad privada que garantice un ahorro en el pago por la prestación del servicio, así como un estudio sobre las rutas del transporte escolar. Asimismo, se ordena al Secretario de Educación que, conjuntamente con la Oficina de Gerencia y Presupuesto, elaboren y/o revisen el plan de control adecuado de pagos efectuados por servicios prestados y la evaluación de documentos que validen la prestación de dichos servicios. El Departamento de Educación no podrá gastar cantidades mayores de fondos estatales en transporte escolar de la cantidad que se establezca en la Resolución Conjunta del Presupuesto General, o en caso que no se desglose y especifique con ese detalle en dicha Resolución Conjunta, la cantidad que se presupueste y se contabilice al inicio del Año Fiscal dentro de su presupuesto aprobado. Ni el Secretario de Educación ni la Oficina de Gerencia y Presupuesto podrán transferir fondos adicionales durante un Año Fiscal para cubrir gastos en exceso del presupuesto, ni posibles sobregiros por este concepto. Se le autoriza y faculta al Secretario de Educación a tomar todas las medidas necesarias para renegociar, reestructurar ò modificar los contratos con los porteadores para cumplir con el mandato de austeridad y control de gastos, según antes dispuesto. No obstante lo dispuesto en cualquier otra ley, el Secretario estará facultado a proveer, modificar o cancelar el contrato de servicio o acuerdo legal de cualquier porteador, de proveer servicios de transporte escolar en las zonas de servicio y bajo las condiciones que éste determine. Del mismo modo, el Secretario queda facultado a recobrar el dinero pagado, o a no pagar, por aquellos servicios de transporte escolar cobrado por estudiante matriculado, pero no prestado debido a ausentismo, traslado o deserción.

Artículo 12.-Control fiscal y reconstrucción económica.

CONGELACIÓN DE PUESTOS VACANTES.- Todos los puestos regulares de carrera, transitorios e irregulares que se encuentren vacantes a la fecha de esta Ley o que advengan vacantes con posterioridad a la vigencia de esta Ley, permanecerán vacantes hasta el 30 de junio de 2017. Ninguna agencia podrá llenar dichos puestos vacantes por cualquier método (nombramiento, promoción, traslado u otros) sin previa autorización escrita del Director Ejecutivo de la Oficina de Gerencia y Presupuesto (OGP).

PROHIBICIÓN DE CREACIÓN DE NUEVOS PUESTOS.- A partir de la vigencia de esta Ley, ninguna agencia podrá crear nuevos puestos regulares de carrera, transitorios o irregulares, o podrá renovar nombramientos de puestos transitorios e irregulares a su expiración, salvo la previa autorización escrita del Director Ejecutivo de la OGP.

ELIMINACIÓN DE PUESTOS DE CONFIANZA.- A partir de la vigencia de esta Ley, cada agencia deberá eliminar el veinte por ciento (20%) de todos los puestos de confianza autorizados salvo a la previa autorización escrita del Director Ejecutivo de la OGP.

REDUCCIÓN DE GASTOS OPERACIONALES.- A partir de la vigencia de esta Ley, cada agencia deberá reducir sus gastos operacionales para el remanente Año Fiscal en curso 2016-2017 por una cantidad equivalente al diez por ciento (10%) de la mitad del total de gastos presupuestarios para dicho Año Fiscal, salvo a la previa autorización escrita del Director Ejecutivo de la OGP.

PROCEDIMIENTOS DE EXCEPCIÓN.- El Director Ejecutivo de la OGP tendrá la autoridad para autorizar excepciones a esta Ley en caso de que el puesto en cuestión sea (a) requerido por mandato de ley federal o estatal o por orden del tribunal; (b) sea esencial para proteger la salud, seguridad y bienestar de los ciudadanos; (c) sea necesario para lograr las economías presupuestarias, para proteger ingresos estatales existentes o generar ingresos estatales adicionales; (d) sea necesario para proveer necesidades básicas a residentes de instituciones o facilidades del Estado; y (e) sea necesario para la administración y gobernabilidad de la agencia en cuestión.

PUESTOS ESENCIALES.- Para fines de esta Ley el Director Ejecutivo de la OGP puede considerar los siguientes puestos como esenciales para proteger la salud, seguridad y bienestar de los ciudadanos: (a) maestros que ofrecen servicios directos a estudiantes, (b) policías que ofrecen servicios directos en las comunidades, (c) profesionales de salud que ofrecen servicios directos a pacientes; y (d) trabajadores sociales que ofrecen servicios sociales directos a ciudadanos.

NULIDAD DE TRANSACCIONES DE PERSONAL CONTRARIAS A ESTA LEY.- Todo nombramiento o cualquiera otra transacción de personal realizada para llenar un puesto vacante o para crear u ocupar un nuevo puesto en contravención de esta Ley será nula. El Director Ejecutivo de la OGP queda por la presente autorizado a retirar del presupuesto de la agencia la partida

correspondiente a la compensación total (incluyendo beneficios y otras aportaciones) pagada por concepto del empleado ocupando el puesto en cuestión.

CORPORACIONES PÚBLICAS.- Se recomienda que las Corporaciones Públicas del Gobierno de Puerto Rico sigan las directrices de control fiscal referente a la eliminación de puestos de confianza en un veinte por ciento (20%) y la reducción de gastos operacionales para el remanente del Año Fiscal en curso 2016-2017 por una cantidad equivalente al diez por ciento (10%) de la mitad del total de gastos presupuestarios para dicho Año Fiscal.

VEHÍCULOS OFICIALES.- Las agencias podrán contar con los servicios de vehículo oficial, cuyo uso será determinado por la agencia. Esta disposición no aplica a vehículos de servicio tales como patrullas, ambulancias, camiones y otros vehículos necesarios para los servicios que presta la agencia, salvo la previa autorización escrita del Director Ejecutivo de la OGP.

TARJETAS DE CRÉDITO.- Se prohíbe el uso de tarjetas de crédito oficiales que son sufragadas con fondos públicos, salvo la previa autorización escrita del Director Ejecutivo de la OGP.

VIAJES FUERA DE PUERTO RICO.- Se prohíbe el uso de fondos públicos para viajes fuera de Puerto Rico por parte de funcionarios, empleados de agencias, excepto cuando tales viajes sean esenciales para el desempeño de funciones oficiales y los mismos hayan sido previamente autorizados por el Secretario de la Gobernación. Todo viaje debidamente autorizado tiene que cumplir cabalmente con los requisitos de los reglamentos en vigor con respecto a viajes fuera de Puerto Rico.

TELÉFONOS CELULARES Y OTROS SERVICIOS TECNOLÓGICOS.- Se prohíbe el uso de fondos públicos para el pago de teléfonos celulares, asistentes personales digitales (PDA's), equipo de servicio de Internet personal u otros servicios tecnológicos para uso exclusivo de jefes de agencia, empleados y funcionarios de las agencias. Cada agencia deberá ir cancelando todo contrato por los servicios antes descritos. El Director de la OGP podrá conceder dispensas a este requisito. Las agencias deberán someter para la autorización previa de la OGP todo plan para la adquisición de estos equipos.

REDUCCIÓN DE CONSUMO ENERGÉTICO Y CONSUMO DE SERVICIO DE ACUEDUCTOS Y ALCANTARILLADOS.- Los jefes de agencias tienen el deber de reducir el consumo de los servicios públicos de energía eléctrica, así como de acueductos y alcantarillados. A tales fines las agencias, deberán ejecutar e implementar aquellas gestiones e iniciativas que reduzcan anualmente el consumo total de energía eléctrica hasta lograr un ahorro promedio mínimo de un cinco por ciento (5%). En lo que corresponde al consumo de acueductos y alcantarillados, las entidades de la Rama Ejecutiva cuyos gastos de funcionamiento se sufragan total o parcialmente con recursos del Fondo General deberán reducir su gasto del consumo de acueductos y alcantarillados en un cinco por

ciento (5%) anual para los años fiscales 2016-17, 2017-18, 2018-19 y 2019-20 que refleje una reducción total de quince por ciento (15%) en los tres (3) años. El por ciento de la reducción se computará tomando como base el consumo de acueducto y alcantarillado realizado para el Año Fiscal 2015-16.

VACACIONES.- Cada agencia deberá desarrollar e implantar de forma inmediata un plan para reducir la acumulación de días de vacaciones en exceso de sesenta (60) días por parte de sus empleados. El empleado del servicio público que acumule más de sesenta (60) días al final de cada año natural, deberá disfrutar dicho exceso en la fecha más próxima en o antes de los seis (6) meses siguientes del próximo año natural.

REDUCCIÓN EN CUANTÍA DE CONTRATOS.- El gasto anual incurrido en servicios comprados o profesionales en cada agencia se reducirá en no menos de un diez por ciento (10%) en comparación con el incurrido en el Año Fiscal 2015-2016, y permanecerá por debajo de ese nivel, salvo la previa autorización escrita del Director Ejecutivo de la OGP.

CONTRATOS DE ARRENDAMIENTO.- Las agencias deberán someter a la Oficina de Gerencia y Presupuesto, dentro del periodo de treinta (30) días a partir de la vigencia de esta Ley, una lista de todos sus contratos de arrendamientos vigentes, su cuantía y un resumen de la justificación para su otorgamiento. Se especificarán aquellos contratos de arrendamiento que es menester mantener por mandato de ley, o para cumplir con una obligación no sujeta a discreción, o para preservar un servicio esencial a la ciudadanía.

La Oficina de Gerencia y Presupuesto podrá ordenar la no renovación de contratos de arrendamiento o modificación de los mismos a su vencimiento y eventual otorgación, salvo cuando ello resulte en detrimento de un servicio esencial o acarree un perjuicio económico mayor. En tal análisis, la Oficina de Gerencia y Presupuesto podrá, además, determinar la posibilidad de consolidar varias operaciones de varias agencias en un mismo local y renegociar los cánones y términos de los contratos de arrendamiento para lograr condiciones más favorables.

CONTRATOS EN CORPORACIONES PÚBLICAS.- Las Corporaciones Públicas deberán establecer medidas de control y reducción de gastos, por medio de sus cuerpos directivos relacionados a la contratación de arrendamientos y servicios.

GASTOS EN COMPRAS.- Se ordena a todas las agencias del Gobierno de Puerto Rico a reducir en un cinco por ciento (5%) los gastos en compras para el Año Fiscal 2016-2017, salvo a la previa autorización escrita del Director Ejecutivo de la OGP.

INFORME TRIMESTRAL.- Toda Entidad de la Rama Ejecutiva tendrá el deber ministerial de

preparar y enviar al Gobernador y a las Secretarías del Senado de Puerto Rico y la Cámara de Representantes, un informe trimestral, a partir de noventa (90) días luego de aprobada esta Ley y durante el periodo de su vigencia, que indique en forma segmentada y detallada las medidas tomadas, los resultados y toda aquella información pertinente que demuestre y pueda medir el cumplimiento con las disposiciones de esta Ley.

Las disposiciones de este Artículo estarán vigentes y serán de aplicación hasta el 30 de junio del 2017.

Artículo 13.-Planes para las Sentencias Finales y Firmes Pendientes De Pago

Ante el impacto negativo a la estabilidad fiscal y operacional del Gobierno de Puerto Rico, incluyendo los gobiernos municipales, que conllevaría el pago mediante una suma global, las disposiciones de este Artículo serán aplicables a todas las sentencias finales y firmes, con excepción de las relacionadas con expropiaciones, que a la fecha de la aprobación de esta Ley se encuentren pendientes de pago, así como a las que durante el transcurso de la vigencia de esta Ley se emitan, donde las agencias, instrumentalidades, corporaciones públicas, los municipios o el Gobierno de Puerto Rico estén en la obligación de efectuar un desembolso de fondos con cargo al Fondo General, el fondo de la corporación pública que se trate, o con cargo al presupuesto municipal, según fuera el caso.

En aquellos casos donde las agencias, instrumentalidades, corporaciones públicas, los municipios o el Gobierno de Puerto Rico, o funcionarios acogidos a los beneficios de esta Ley, estén en la obligación de efectuar un desembolso de fondos con cargo al Fondo General, al fondo de la corporación pública que se trate o con cargo al presupuesto municipal, según fuera el caso, y no exista un plan de pagos previamente acordado por escrito y aprobado por el Tribunal, se aplicarán las disposiciones contenidas en este Artículo. Ello con independencia de la naturaleza del fallo, o si se tratare de una transacción administrativa, extrajudicial o judicial. El Secretario de Justicia evaluará el plan de pago aplicable conforme a la cuantía de la sentencia, luego de lo cual solicitará una certificación de disponibilidad de fondos al Director de la Oficina de Gerencia y Presupuesto, la Junta de Gobierno o cuerpo rector de la corporación pública que se trate, o del Alcalde para el municipio correspondiente. Para efectos únicos de la aplicación de este Artículo el término Estado incluirá el Gobierno de Puerto Rico, las agencias e instrumentalidades, corporaciones públicas y los municipios. Los planes de pago serán realizados conforme a los siguientes términos:

(a)    Cuando la cantidad adeudada por el Estado, corporación pública o por un municipio fuere igual o menor a cien mil (100,000.00) dólares, podrá ser satisfecha mediante un plan de pago que comprenderá entre uno (1) a tres (3) años desde que la obligación de pago advenga final y firme.

(b)    Si la cantidad adeudada por el Estado, corporación pública o por un municipio fuere

mayor a cien mil (100,000.00) dólares, pero menor a un millón (1,000,000.00) de dólares, podrá ser satisfecha mediante un plan de pago que comprenderá entre tres (3) años y un (1) día a cuatro (4) años desde que la obligación de pago advenga final y firme.

(c)    Si la cantidad adeudada por el Estado, corporación pública o por un municipio fuere mayor a un millón (1,000,000.00) de dólares, pero menor o igual a siete millones (7,000,000.00) de dólares, podrá ser satisfecha mediante un plan de pago que comprenderá entre cuatro (4) años y un (1) día a siete (7) años desde que la obligación de pago advenga final y firme.

(d)    Si la cantidad adeudada por el Estado, corporación pública o por un municipio fuere mayor de siete millones (7,000,000.00) de dólares, pero menor a veinte millones (20,000,000.00) de dólares, se satisfará mediante un plan de pago que comprenderá entre siete (7) años y un (1) día a diez (10) años desde que la obligación de pago advenga final y firme.

(e)    Si la sentencia adeudada por el Estado, corporación pública o por un municipio fuere mayor de veinte millones (20,000,000.00) de dólares, el plan de pago que aplique a la misma se fijará como parte del proceso presupuestario siguiente a la fecha en que la obligación de pago advenga final y firme, tomando en consideración la situación fiscal, cuyo plan de pago nunca excederá la cantidad anual de tres millones (3,000,000.00) de dólares.

(f)    Para efectos de determinar el plan de pago aplicable, no se fragmentará la sentencia por cada reclamante, sino que se tomará como valor de partida la totalidad de la misma.

(g)    De no haber disponibilidad de fondos para honrar el plan de pagos en un Año Fiscal particular, éste será aplazado para el próximo Año Fiscal, teniendo el efecto de extender automáticamente dicho plan por el número de pagos no realizados.

(h)    En aquellos casos en que el Director de la Oficina de Gerencia y Presupuesto determine que el presupuesto de la agencia puede absorber el plan de pago de una sentencia emitida en su contra, así se lo informará a la agencia, quien deberá realizar los ajustes y negociaciones necesarias para sufragar la misma con cargo a su propio presupuesto, sin que sea necesario una asignación de fondos adicionales. En estos casos no se permitirá la presentación de una solicitud de fondos adicionales ante la Oficina de Gerencia y Presupuesto.

(i)      El Estado, la corporación pública o el municipio no realizará pago alguno a menos que el acreedor de la sentencia provea una certificación oficial emitida por la entidad pertinente, que indique la ausencia de deuda con el Departamento de Hacienda, el Centro de Recaudaciones de Ingresos Municipales y la Administración para el Sustento de Menores. En el caso de que el acreedor de la sentencia tenga deuda con alguna agencia, entidad o corporación pública del Estado o con el propio municipio, la cantidad de la misma se reducirá del total a pagar.  En caso de que el acreedor de la sentencia haya solicitado alguna revisión administrativa de la deuda, el Gobierno de Puerto Rico, la corporación pública o el municipio, según sea el caso, se abstendrá de emitir pago alguno hasta que el proceso de revisión haya culminado. De confirmarse la existencia de la deuda impugnada, la cantidad de la misma se reducirá del total a pagar.

Lo aquí establecido le será de aplicación a los Municipios, los cuales mediante ordenanza municipal establecerán los parámetros adecuados para su realización.

Los planes de pago de sentencias otorgados por virtud de este Artículo mantendrán su vigencia y disposiciones por el tiempo establecido en el plan de pago, sin que pueda afectarse o invalidarse por haberse expirado el tiempo de la vigencia de esta Ley.

Artículo 14.-Control fiscal en las corporaciones públicas.

Durante la vigencia de la presente Ley, toda corporación pública deberá suspender las cláusulas no económicas negociadas en los convenios vigentes que tienen efectos económicos directos o indirectos en la operación de la corporación pública que agravan la situación presupuestaria de la misma o que resulta necesaria suspender para aliviar la situación presupuestaria.  Se considerarán como cláusulas no económicas que pueden tener un efecto económico directo o indirecto aquellas enumeradas en el Artículo 17 de la Ley  66-2014.

Ante cualquier interrogante sobre si determinada disposición de un convenio tiene o no un efecto económico directo o indirecto en una corporación pública que agrava la situación presupuestaria de la misma o que resulte necesaria suspender para aliviar la situación presupuestaria se someterá una consulta a la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, quien responderá en un término no mayor de sesenta (60) días.  La contestación a dicha consulta será vinculante para la  corporación pública que la haya sometido.

Disponiéndose, además que las corporaciones públicas reconocerán a los empleados, unionados y no unionados los balances de licencias por vacaciones acumuladas a la fecha de vigencia de esta Ley, pero no podrán liquidar en efectivo los excesos acumulados antes y durante la vigencia de esta Ley.  Las corporaciones públicas deberán establecer un plan para agotar el exceso de los balances acumulados para los empleados, tanto unionados como no unionados, de manera tal, que al finalizar la vigencia de esta Ley no hayan acumulaciones en exceso de lo permitido.

De igual forma, el exceso por licencia de enfermedad acumulado por los empleados, unionados como no unionados, de las corporaciones públicas previo a la fecha de vigencia de esta Ley, se congelará al salario vigente al 30 de junio de 2014 y su liquidación en efectivo solamente se hará en caso de desvinculación del servicio público. El exceso de licencia por enfermedad que se acumule posterior a la vigencia de esta Ley, así como aquel que se acumule al 31 de diciembre de cada año deberá disfrutarse en o antes del 30 de junio del año siguiente del que fue acumulado; después de esa fecha se pierde tal balance.

Anualmente, toda corporación pública establecerá un proceso mediante el cual el Director Ejecutivo de la Entidad y los representantes de sus respectivos gremios, evaluarán de forma transparente la situación económica y las realidades fiscales de la respectiva corporación pública. A la luz de la evaluación, según el mecanismo adoptado y de establecerse que la corporación pública no opera con déficit, cuenta con una condición financiera estable, y no depende del Fondo General para su operación, se podrán iniciar negociaciones de aquellas cláusulas del convenio colectivo que han sido congeladas bajo las disposiciones de este Artículo. Al finalizar la vigencia de esta Ley, se reestablecerá el convenio colectivo vigente al momento de entrar en vigor esta Ley por el término restante de vigencia, si alguno, y tendrá efectos de carácter prospectivo.

Artículo 15.-Aportación de ahorros producto de la medida de reducción de gastos contemplados en esta Ley de corporaciones públicas en el campo de salud al déficit del Fondo General.

Los ahorros generados por la Administración de Compensación por Accidentes de Automóviles y la Corporación para el Fondo de Seguro del Estado, como producto de la aplicación de las disposiciones de esta Ley, de existir alguno, serán aportados al "Fondo de Servicios y Terapias a Estudiantes de Educación Especial", bajo la custodia del Departamento de Educación, durante la vigencia de esta Ley.

Artículo 16.-Aportación de ahorros producto de la medida de reducción de gastos contemplados en esta Ley de corporaciones públicas en el campo de desarrollo económico al déficit del Fondo General.

Los ahorros generados por las corporaciones públicas relacionadas con la promoción del desarrollo económico, y algunas otras corporaciones designadas en este Artículo, obtenidos por la aplicación de esta Ley, serán aportados a un fondo para atender la crisis fiscal del Fondo General.

Para propósitos de este Artículo, se considerarán como corporaciones públicas relacionadas

con la promoción del desarrollo económico, las siguientes instrumentalidades: la Administración de Terrenos, la Autoridad de Tierras de Puerto Rico, la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, la Autoridad para el Financiamiento de la Vivienda, el Banco de Desarrollo Económico para Puerto Rico, el Banco Gubernamental de Fomento para Puerto Rico, la Compañía de Fomento y Exportación, la Compañía de Fomento Industrial, la Compañía de Turismo, la Corporación de Seguros Agrícolas, y la Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico. Además, aportarán a este fondo la Junta de Gobierno del Servicio 9-1-1, y la Corporación del Centro Cardiovascular de Puerto Rico y el Caribe.

Las respectivas cantidades certificadas al 30 de junio de 2017 se considerarán de forma concluyente como los ahorros generados por esta Ley para el Año Fiscal 2016 subsiguiente, y serán transferidos al Departamento de Hacienda, por cada una de las corporaciones públicas correspondientes, comenzando en o antes del 31 de julio de 2017. Las corporaciones públicas obligadas a aportar al amparo de este Artículo repetirán las respectivas transferencias adicionales, por una cantidad idéntica a la pagadera durante el Año Fiscal 2017, comenzando el 31 de julio de 2018 para el Año Fiscal 2017, y en adelante cada 31 de julio, mientras estuviera en vigor esta Ley.

Artículo 17.-Presupuesto de la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

Para cualquier Año Fiscal que termine durante la vigencia de esta Ley, el presupuesto para la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente, será equivalente a su respectivo presupuesto del Año Fiscal previo ajustado por el porcentaje de reducción o incremento global en el Presupuesto General de Gastos con cargo al Fondo General, implícita en el presupuesto recomendado por el Gobernador. Dicho ajuste se calculará excluyendo las asignaciones propuestas para el servicio de la deuda constitucional del Presupuesto General de Gastos con cargo al Fondo General, tanto de la base del año previo como del monto recomendado para el Año Fiscal bajo consideración. Igualmente, dicho ajuste excluirá de ambas bases de comparación los respectivos presupuestos de la Rama Judicial, la Asamblea Legislativa, la Oficina del Contralor, el Procurador del Ciudadano, la Comisión de Derechos Civiles, la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

Artículo 18.-Prohibiciones respecto a la contratación de servicios, entre otros.

Se prohíbe la contratación de servicios profesionales o comprados en Entidades de la Rama Ejecutiva en exceso de diez mil (10,000.00) dólares en un mismo Año Fiscal, sin autorización previa escrita del Gobernador, o la persona que éste delegue. Cualquier contrato otorgado en incumplimiento de este requerimiento será nulo. Este requisito de autorización es en adición a, y no sustituye, cualquier otra normativa aplicable, incluyendo normativa del Gobernador, o la persona que

Case: 17-03283-LTS   Doc#:13658-2   Filed:07/14/20   Entered:07/15/20 12:27:03   Desc:
Exhibit     Page 40 of 123

éste delegue al amparo de Órdenes Ejecutivas de control de gasto, o normativa de la Oficina de Gerencia y Presupuesto.

Artículo 19.-Presupuesto de la Rama Judicial.

Para cualquier Año Fiscal que termine durante la vigencia de esta Ley, el presupuesto de la Rama Judicial será equivalente a su respectivo presupuesto del Año Fiscal previo, ajustado por el porcentaje de reducción o incremento global en el Presupuesto General de Gastos con cargo al Fondo General, implícita en el presupuesto recomendado por el Gobernador. Dicho porcentaje de ajuste se calculará excluyendo las asignaciones propuestas para el servicio de la deuda constitucional del Presupuesto General de Gastos con cargo al Fondo General, tanto de la base del año previo como del monto recomendado para el Año Fiscal bajo consideración. Igualmente, dicho ajuste excluirá de la base de comparación los presupuestos de la Rama Judicial, la Asamblea Legislativa, la Oficina del Contralor, el Procurador del Ciudadano, la Comisión de Derechos Civiles, la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

Para el Año Fiscal inmediatamente entrante al momento de terminación de la vigencia de esta Ley, la recomendación y aprobación del presupuesto de la Rama Judicial se regirá nuevamente por la legislación de ordinario aplicable. No se generará deuda, obligación, ni compromiso de asignación o pago futuro alguno, debido a cualquier brecha entre el presupuesto realmente asignado durante la vigencia de esta Ley, y lo que hubiere sido el presupuesto producto de la aplicación de las fórmulas u otra normativa contenidas en las leyes que de otra forma hubiesen gobernado la confección del presupuesto.

La Rama Judicial, en el ejercicio de las facultades que le confiere la Constitución de Puerto Rico, podrá adoptar cualquiera de las medidas de reducción y/o control de gastos indicadas en esta Ley que les resulte pertinente para atender cualquier insuficiencia presupuestaria proyectada durante el término de vigencia de la presente Ley.

Artículo 20.-Presupuesto de la Asamblea Legislativa y entidades adscritas.

Para cualquier Año Fiscal que termine durante la vigencia de esta Ley, el presupuesto para la Asamblea Legislativa y cada una de sus entidades adscritas, entiéndase la Oficina del Contralor, el Procurador del Ciudadano y la Comisión de Derechos Civiles, será equivalente a su respectivo presupuesto del Año Fiscal previo, ajustado por el porcentaje de reducción o incremento global en el Presupuesto General de Gastos con cargo al Fondo General, implícita en el presupuesto recomendado por el Gobernador. Dicho porcentaje de ajuste se calculará excluyendo las asignaciones propuestas para el servicio de la deuda constitucional del Presupuesto General de Gastos con cargo al Fondo General, tanto de la base del año previo como del monto recomendado para el Año Fiscal bajo consideración. Igualmente, dicho ajuste excluirá de la base de comparación los respectivos

presupuestos de la Rama Judicial, la Asamblea Legislativa, la Oficina del Contralor, el Procurador del Ciudadano, la Comisión de Derechos Civiles, la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

Para el Año Fiscal inmediatamente entrante al momento de terminación de la vigencia de esta Ley, la recomendación y aprobación del presupuesto de cada entidad afectada por este Artículo se regirá nuevamente por la legislación de ordinario aplicable. No se generará deuda, obligación, ni compromiso de asignación o pago futuro alguno, debido a cualquier brecha entre el presupuesto realmente asignado durante la vigencia de esta Ley, y lo que hubiere sido el presupuesto producto de la aplicación de las fórmulas u otra normativa contenidas en las leyes que de otra forma hubiesen gobernado la confección del presupuesto.

La Asamblea Legislativa y sus entidades adscritas, en el ejercicio de las facultades que les confiere la Constitución de Puerto Rico, podrán adoptar cualquiera de las medidas de reducción y/o control de gastos indicadas en esta Ley que les resulten pertinentes para atender cualquier insuficiencia presupuestaria proyectada durante el término de vigencia de la presente Ley.

Artículo 21.-Presupuesto de la Universidad de Puerto Rico y ciertas asignaciones de funcionamiento a los Municipios.

Para cualquier Año Fiscal que termine durante la vigencia de esta Ley, el subsidio de funcionamiento de las entidades gubernamentales que no forman parte del Gobierno Central, será equivalente al respectivo subsidio de funcionamiento para el Año Fiscal anterior a la aprobación de esta Ley. El término "entidades gubernamentales que no forman parte del Gobierno Central", para propósitos de este Artículo, se refiere a la Universidad de Puerto Rico y a los Municipios. El término "subsidios de funcionamiento", para propósitos de este Artículo, se refiere en lo que concierne a la Universidad de Puerto Rico, a la asignación dispuesta en inciso (a) del Artículo 3 de la Ley Núm. 2 de 20 de enero de 1966, según enmendada; y se refiere en lo que concierne a los Municipios, a las asignaciones dispuestas en el Artículo 2.06 de la Ley 83-1991, según enmendada, (Fondo de Exoneración) y en el inciso (c) del Artículo 16 de la Ley 80-1991, según enmendada, (Fondo de Equiparación).

Para el Año Fiscal inmediatamente entrante al momento de terminación de la vigencia de esta Ley, la recomendación y aprobación del presupuesto de cada entidad afectada por este Artículo se regirá nuevamente por la legislación de ordinario aplicable. No se generará deuda, obligación, ni compromiso de asignación o pago futuro alguno, debido a cualquier brecha entre el presupuesto realmente asignado durante la vigencia de esta Ley, y lo que hubiere sido el presupuesto producto de la aplicación de las fórmulas u otra normativa contenidas en las leyes que de otra forma hubiesen gobernado la confección del presupuesto.

Artículo 22.-Plan de reducción de consumo energético y del servicio de acueductos y alcantarillados en la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico.

Durante el periodo de vigencia de esta Ley, con relación a las Entidades de la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico cuyos gastos de funcionamiento se sufragan total o parcialmente con el Fondo General, se mantendrán sin incremento las tarifas base de servicios de acueductos y alcantarillados, vigentes al Año Fiscal anterior a la vigencia de esta Ley, a menos que se modifiquen por legislación posterior.

Artículo 23.-Prohibición de reclamaciones retroactivas al concluir la vigencia de esta Ley.

Con excepción de lo dispuesto en el Artículo 11 de la Ley 66-2014, sobre liquidaciones en efectivo por concepto del exceso de la licencia de vacaciones o enfermedad, cualquier compromiso u obligación que haya sido temporalmente suspendido mientras esté en vigor esta Ley no podrá ser reclamado retroactivamente, ni configurará crédito alguno, una vez ésta pierda su vigencia.

Artículo 24.-Implementación y Reglamentación.

A los fines de viabilizar la implementación de los propósitos de esta Ley, la Oficina de Gerencia y Presupuesto y la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico tendrán todas las facultades necesarias y convenientes para descargar las encomiendas aquí asignadas, incluyendo pero sin limitarse a: promulgar reglamentación; realizar o encomendar, a las agencias o departamentos que están a su cargo, que realicen los estudios que sean necesarios; requerir a las Entidades de la Rama Ejecutiva la información necesaria para realizar su encomienda; asesorar al Gobernador y a las Entidades de la Rama Ejecutiva en todo lo relativo a las medidas de control y reducción de gastos, medidas de impacto laboral y/o fiscal de las Entidades de la Rama Ejecutiva, así como evaluar, aprobar o rechazar peticiones en el renglón de los traslados, destaques, entre otros.

Del mismo modo, es Política Pública de esta Asamblea Legislativa que las facultades que le son conferidas a la Oficina de Gerencia y Presupuesto por virtud de esta Ley Especial tengan primacía sobre las respectivas leyes orgánicas de las Entidades de la Rama Ejecutiva según aquí definidas, sean agencias, instrumentalidades o corporaciones públicas. A tales fines, en lo que fuera pertinente y necesario, se interpretará que esta Ley Especial, durante el término de su vigencia, modifica, atempera o condiciona cualquiera de las disposiciones en las respectivas leyes orgánicas de las Entidades de la Rama Ejecutiva a los fines de que se cumpla lo mandatado en la presente Ley.

Por tanto, la Oficina de Gerencia y Presupuesto podrá establecer la reglamentación necesaria

dirigida a las Entidades de la Rama Ejecutiva, sean agencias, instrumentalidades o corporaciones públicas para implementar las disposiciones de la presente Ley. Toda reglamentación implementada por la Oficina de Gerencia y Presupuesto en virtud de esta Ley será de carácter mandatorio. La ausencia o falta de cualquier reglamento autorizado por la presente Ley, no será causa para invalidar ni dejar de aplicar sus disposiciones en ningún caso.

Artículo 25.-Inmunidad en cuanto a pleitos y foros.

Esta Ley no afecta la inmunidad que en cuanto a los pleitos y foros tiene el Gobierno de Puerto Rico y sus funcionarios u oficiales. Nada de lo dispuesto en esta Ley autoriza las acciones por daños y perjuicios contra el Gobierno de Puerto Rico, sus funcionarios o empleados por actos u omisiones de éstos últimos, resultante del cumplimiento de esta Ley. Nada de lo aquí provisto se interpretará que constituye una renuncia de la inmunidad soberana del Gobierno de Puerto Rico.

Artículo 26.-Responsabilidad Fiduciaria.

Todo Jefe de Agencia o Director Ejecutivo de cualquier departamento, instrumentalidad o corporación pública del Gobierno de Puerto Rico que incumpla con lo dispuesto en esta Ley, estará sujeto a una multa de doscientos dólares ($200) por instancia, y con un máximo de cinco mil dólares ($5,000) cumulativos por todas las instancias ocurridas en el mismo año natural. Dicha multa será pagada con fondos de la propia pecunia del empleado público.

La Oficina de Gerencia y Presupuesto estará a cargo de reglamentar e implementar las disposiciones en este Artículo relacionadas a la imposición de multas administrativas. Además, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de preparar y enviar al Gobernador y a las Secretarías del Senado de Puerto Rico y la Cámara de Representantes, un informe trimestral, a partir de noventa (90) días luego de aprobada esta Ley y durante el periodo de su vigencia, que indique en forma segmentada y detallada las medidas tomadas, los resultados y toda aquella información pertinente que demuestre y pueda medir el cumplimiento con las disposiciones de esta Ley.

Las disposiciones contenidas en este Artículo le aplicarán también a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral.

Artículo 27.-Se enmienda el inciso (b)(4)(C) de la Sección 2101 de la Ley 120-1994, según enmendada, conocida como "Código de Rentas Internas de Puerto Rico de 1994," para que lea como

sigue:

"Sección 2101.-Imposición de Arbitrio a la Adquisición de Cierta Propiedad Mueble y Servicios.

(a)      ...

(b)      ...

    (1)      ...

    (2)      ...

    (3)      ...

    (4)      Porcentaje Aplicable.- Para propósitos del apartado (a)(1), el porcentaje aplicable será:

        (A)      ...

        (B)      ...

        (C)      para los periodos comenzados después del 31 de diciembre de 2012 y terminados en o antes del 31 de diciembre de 2027, cuatro (4) por ciento.

    (5)      ...

    (6)      ...

(c)      ...

...".

Artículo 28.-Conflicto de idiomas.

El Artículo 27 de esta Ley se adopta en los dos (2) idiomas, español e inglés. En caso de conflicto entre ambas versiones, el texto en inglés prevalecerá, que será:

"Article 27.-Subsection (b)(4) of Section 2101 of Act 120-1994, as amended, is hereby amended to read as follows:

"Section 2101.-Imposition of Excise Tax on Certain Personal Property and Services

(a)      ...

(b)      ...

    (1)      ...

(2)        ...

(3)        ...

(4)        Applicable percentage.- For purposes of Subsection (a)(1), the applicable percentage shall be:

    (A)        ...

    (B)        ...

    (C)        For periods beginning after December 31, 2012 and ending on or before December 31, 2027, four (4) percent.

(5)        ...

(6)        ...

(c)        ...".

Artículo 29.-Disposiciones especiales sobre los miembros de las juntas de las corporaciones públicas

Por la presente Ley se declara que todo miembro de una junta o cuerpo rector de una corporación pública deberá gozar de la confianza del Gobernador de Puerto Rico para poder ejecutar y llevar a cabo la política pública establecida, toda vez que los mismos inciden en la formulación de política pública y en el plan fiscal que hay que presentar ante la Junta de Supervisión Federal. A partir de la vigencia de esta Ley, el Gobernador podrá remover de la junta de directores de una corporación pública, agencia, dependencia o instrumentalidad del Gobierno o de cualquier entidad que reciba subsidios del Gobierno de Puerto Rico incluyendo pero sin limitarse a la Universidad de Puerto Rico, a cualquier miembro que entienda que no está ejecutando la política pública establecida por éste o que no goce de su confianza para formular e implementar el plan fiscal requerido por la legislación federal conocida como PROMESA. Cualquier miembro de Junta que haya sido electo, permanecerá en su cargo hasta culminar el termino por el cual fue elegido o hasta que su sucesor tome posesión del cargo. Esta disposición le aplicará a la Autoridad de Acueductos y Alcantarillados, según la Sección 3 de la Ley Núm. 40 de 1 de mayo de 1945, según enmendada, y en la Autoridad de Energía Eléctrica, según la Sección 4 de la Ley Núm. 83 de 2 de mayo de 1941, según enmendada. En lo que respecta a la Junta de Gobierno de la Universidad de Puerto Rico, según el Artículo 3 de la Ley Núm. 1 de 20 de febrero de 1966, según enmendada, esta Ley solo le aplicará a los miembros nombrados por el Gobernador de Puerto Rico, entiéndase, que quedan expresamente excluido de la aplicación de este Articulo, los dos (2) representantes estudiantiles y los dos (2) representantes claustrales. Finalmente, los miembros de la Junta de la Corporación del Proyecto Enlace Caño Martin Peña, según la Ley 489-2004, según enmendada y los miembros de la Junta de la Compañía para el Desarrollo Integral de la Península de Cantera, según la Ley 20-1992, según enmendada, quedan expresamente excluidas de la aplicación de este Articulo.

El Secretario de la Gobernación, creará un comité compuesto por miembros del gabinete, quienes harán las recomendaciones correspondientes al Gobernador sobre las personas que deben ser

removidas por estas causas. Dicha determinación del Gobernador será final y ningún tribunal de justicia o foro podrá paralizar interlocutoriamente la remoción y el nombramiento del sustituto. El Gobernador procederá a hacer los nombramientos que entienda pertinente, que seguirán el procedimiento de confirmación establecido para cada junta.

Artículo 30.-Separabilidad

Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley en la mayor medida posible, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia. Esta Asamblea Legislativa hubiera aprobado esta Ley sin importar la determinación de separabilidad que el Tribunal pueda hacer.

Artículo 31.-Vigencia

Esta Ley comenzará a regir inmediatamente después de su aprobación.

**Notas Importantes:**
1. Esta ley es copia de la ley original cuando fue aprobada, no incluye enmiendas posteriores.
2. Presione Aquí para ver la **Ley Completa, con sus enmiendas integradas y Actualizada (Socios Solamente)**

---

Presione Aquí para regresar al Menú anterior y seleccionar otra ley.
Ver Índice por años hasta el presente
Para Búsquedas Avanzadas de todas las Leyes de Puerto Rico Actualizadas y Jurisprudencia **(Solo Socios)**

---

## ADVERTENCIA

Este documento constituye un documento de las leyes del Estado Libre Asociado de P.R. que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las leyes de Puerto Rico. Su distribución electrónica se hace como un servicio público a la comunidad. Siempre busque leyes posteriores para posibles enmiendas a esta ley.

Visite nuestro **Club de LexJuris de Puerto Rico.**

LexJuris de Puerto Rico siempre está bajo construcción.

y Jurisprudencia | Información | Agencias | AbogadoPR.com | ProfesionalesPR.com | Biografías | Historia | Pueblos de Puerto

cios | Publicidad | Directorios | Compras | Eventos | Noticias | Entretenimiento | Publicaciones CD | LexJurisBooks | Revista

Jurídica |

© 1996-2017 LexJuris de Puerto Rico - Derechos Reservados



# Ley Núm. 164 del año 2003

**(P. de la C. 3485), 2003, ley 164**

### Para conceder un aumento de sueldo de cien dólares a los empleados Públicos del Gobierno Central de ELA, efectivo el 1ro de enero de 2004
### Ley Núm.164 de 22 de julio de 2003

Para conceder un aumento' de sueldo de cien (100) dólares a los empleados Públicos del Gobierno Central del Estado Libre Asociado de Puerto Rico, efectivo el 1ro. de enero de 2004.

### EXPOSICION DE MOTIVOS

El propósito del servicio público a nivel central es el de brindar apoyo al desarrollo económico y social de Puerto Rico., Como tal, es el facilitador de los esfuerzos de la sociedad civil, En reconocimiento a la excelente labor y aportación que hacen los servidores públicos en beneficio de la sociedad, el Gobierno del Estado Libre Asociado de **Puerto Rico ha** propiciado diversas iniciativas para mejorar las condiciones de trabajo de los servidores públicos, mediante el diálogo en los procesos de negociación colectiva; aprobando leyes especiales para mejorar los beneficios marginales de los empleados públicos; concediendo aumentos a diversos grupos que incluyen: maestros, policías, bomberos y a empleados del Gobierno Central; propiciando, la revisión de planes de retribución; concediendo aumentos por mérito, aumentos o bonos de productividad y asistencia, entre otras.

Nuestra Administración, tiene el propósito de continuar ofreciendo las mejores condiciones salariales posibles a todos los servidores públicos, dentro de la realidad económica mundial y nuestra actual situación económica, de manera que se promueva el reclutamiento, selección y retención de los candidatos más aptos para el desempeño en el servicio público y a su vez se impulse una mayor productividad.

Conforme a lo anterior, se concede mediante esta Ley un nuevo aumento salarial de cien (100) dólares a ser efectivo en enero de 2004, a todos los empleados públicos que están bajo las condiciones estipuladas más adelante, disponiéndose que los empleados cubiertos bajo la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, que no hayan completado su proceso de negociación colectiva a la fecha de efectividad de esta Ley recibirán el aumento propuesto. No obstante, una vez recibido el aumento salarial otorgado por esta Ley, sólo podrán negociarse, colectivamente aumentos de sueldo adicionales con cargo al presupuesto para el Año Fiscal 2004-2005 y de futuros presupuestos.

*DECRETASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

**Artículo 1.-**Los aumentos concedidos al amparo de esta Ley serán de la siguiente forma:

Case:17-03283-LTS   Doc#:13658-2   Filed:07/14/20   Entered:07/15/20 12:27:03   Desc:
Exhibit    Page 49 of 123

(a) Cien (100) dólares mensuales de aumento de sueldo a los empleados públicos que al 31 de diciembre de 2003 estén en servicio activo, sin distinción de status ni categoría. Cuando en un puesto se prestaren servicios a jornada parcial, el aumento a concederse será proporcional a la jornada de trabajo. Aquellos empleados vinculados al servicio que no estén en servicio activo al 1 de enero de 2004, tendrán derecho a recibir el aumento efectivo a la fecha que se reintegre al servicio.

El aumento de sueldo se concederá aun cuando el empleado esté devengando un sueldo igual o superior al tipo máximo de la escala o que con el aumento excedan éste. Dicho aumento no afectará el marge1n retributivo de que disfrutan los empleados para mejoramiento salarial ni se ajustará a escala. Disponiéndose que las acciones de personal que se efectúen con posterioridad a la vigencia del presente aumento se tramitarán conforme a las normas que emita la Oficina Central de Asesoramiento Laboral y de Administración de Recursos Humanos, en armonía con la Ley Núm. 89 de 12 de julio de 1979, según enmendada, conocida como "Ley de Retribución Uniforme" y el Reglamento de Retribución Uniforme.

**Artículo 2.-**El costo del aumento de sueldo propuesto será sufragado por fondos a ser provistos mediante reembolso por la Oficina de Gerencia y Presupuesto, con cargo a las asignaciones que para este propósito se incluyeron en la Resolución Conjunta del Presupuesto General. Sin embargo, dicho reembolso cubrirá únicamente los sueldos que son sufragados con recursos provenientes del Fondo General. Se dispone que los empleados públicos que conforme a las fechas aquí establecidas cualifican para este aumento, pero cobran de otros fondos, reciban los mismos aumentos con cargo a los fondos especiales federales y estatales de los cuales cobran. Las agencias para las cuales trabajen este tipo de empleados públicos, así como aquellas cuyo presupuesto proviene de una fórmula, deberán hacer los ajustes correspondientes en dichos fondos para otorgar aumentos salariales, según lo dispuesto en este Artículo.

**Artículo 3.-**Para obtener el reembolso al que se hace referencia en el Artículo 2 de esta Ley, cada agencia que sufrague dichos aumentos del Fondo General someterá a la Oficina de Gerencia y Presupuesto una relación certificada que incluya nombre del empleado, número de: seguro social, clasificación del puesto, fecha que comenzó a trabajar, sueldo devengado y costo total para la agencia del aumento concedido. Dicha certificación debe recibirse en la Oficina de Gerencia y Presupuesto no más tarde del 1ro de abril de 2004.

**Artículo 4.-**Se excluyen de las disposiciones de esta Ley las siguientes agencias 0 dependencias públicas: (1) la Universidad de Puerto Rico; (2) las corporaciones públicas que tiene autoridad expresa para llevar a cabo convenios colectivos bajo las disposiciones de la Ley Núm. 130 de 8 de mayo de 1945, según enmendada, (3) los empleados municipales y/o aquellos que presten servicios a los municipios; (4) los empleados cubiertos por la Ley Núm. 45 de 25 febrero de 1998, según enmendada, que hayan suscrito un convenio colectivo a la fecha de la vigencia de esta Ley que incluya concesión de aumentos de sueldos; y (5) los miembros del Personal del Sistema de Rango del Cuerpo de Bomberos de Puerto Rico.

**Artículo 5.-**El aumento concedido mediante esta Ley será efectivo el 1 de enero de 2004.

**Artículo 6.-**Los aumentos de sueldo concedidos mediante esta Ley no tienen el efecto de interrumpir el tiempo par ser acreedor de un aumento por años de servicio.

**Artículo 7.-**Aquellos empleados cubiertos bajo la Ley Núm. 45 de 25 de febrero de 1998,

según enmendad, que reciban en este año fiscal el aumento dispuesto en esta Ley, sólo podrán negociar colectivamente aumentos de sueldo adicionales con cargo al presupuesto para el año fiscal 2004-2005 y de futuros presupuestos".

**Artículo 8.-**Toda disposición de ley que esté en conflicto con lo aquí dispuesto quedará sin efecto mientras tenga aplicabilidad esta Ley.

**Artículo 9.-**Esta Ley comenzará a regir inmediatamente después de su aprobación.

*Presidente de la Cámara*
*Presidente del Senado*

**Nota Importante:** Esta ley es copia de la ley original cuando fue aprobada, no incluye enmiendas posteriores.

**Presione Aquí para regresar al Menú anterior y seleccionar otra ley.**

### ADVERTENCIA

Este documento constituye un documento de las leyes del Estado Libre Asociado de P.R. que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las leyes de Puerto Rico. Su distribución electrónica se hace como un servicio público a la comunidad. Siempre busque leyes posteriores para posibles enmiendas a esta ley.

# LexJuris de Puerto Rico siempre está bajo construcción.

© 1996-2003 LexJuris de Puerto Rico - Derechos Reservados

7/12/2020, 8:23 PM



# Ley Núm. 96 del año 2002

**(P. de la C. 2634) 2002 ley 96**
**(Reconsiderado)**

### Para conceder un aumento de suelo de cien (100) dólares a los empleados públicos del gobierno.

### LEY NUM. 96 DE 1 DE JULIO DE 2002

Para conceder un aumento de sueldo de cien (100) dólares a los empleados públicos del Gobierno Central del Estado Libre Asociado de Puerto Rico, efectivo el 1ro. de julio de 2002.

### EXPOSICION DE MOTIVOS

Puerto Rico cuenta con miles de servidores públicos honestos y responsables que día a día dedican sus vidas al servicio de nuestra gente y  buscando el bienestar de todos los puertorriqueños. El servidor público del Siglo 21, como representante de la honestidad y la dignidad del trabajo, goza de la confianza de esta Administración.

De igual forma, esta Administración está consciente de los sacrificios que realizan estos servidores públicos, quienes trabajan incesantemente para proveerle a la ciudadanía un servicio de excelencia, a cambio de una remuneración que propenda a una vida con limitaciones.  Aún así, estos hombres y mujeres que honran el servicio público le siguen sirviendo con desprendimiento y dedicación a Puerto Rico.

En la década de los años ochenta, se comenzó a desarrollar una nueva orientación de la política pública en cuanto a salarios y beneficios marginales para los empleados públicos, con el propósito de colocar a éstos a la par con los empleados de la empresa privada, en la medida que lo permitan los recursos públicos.  A tono con esta política pública, en el pasado se legisló para concederles aumentos generales de salario, aumentos en la aportación patronal para el pago de primas de los planes médicos, y aumentos permitidos por la Ley Núm. 89 de 12 de julio de 1979, según enmendada, conocida como "Ley de Retribución Uniforme", entre otros.  Así también, diversos grupos han recibido aumentos de salarios mediante la aprobación de leyes especiales como es el caso de los policías y los maestros.

Es la intención de esta Administración y de esta Asamblea Legislativa reconocer la ardua tarea que realizan estos empleados públicos para adelantar la calidad y la eficiencia de nuestra administración pública.

Por tanto, aún ante la estrechez económica a la que nos enfrentamos, y reconociendo el reclamo de los diversos grupos que representan el sector laboral gubernamental, es imperante hacerle

Case:17-03283-LTS Doc#:13658-2 Filed:07/14/20 Entered:07/15/20 12:27:03 Desc:
Exhibit    Page 52 of 123

justicia a nuestros empleados públicos, concediéndoles un aumento salarial de cien (100) dólares mensuales a los empleados públicos que estén bajo las condiciones que más adelante se establecen.

*DECRETASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

**Artículo 1.-**Los aumentos concedidos al amparo de esta Ley serán de la siguiente forma:

(a)    Cien (100) dólares mensuales de aumento de sueldo a los empleados públicos que al 30 de junio de 2002 estén en servicio activo, sin distinción de status ni categoría. Cuando en un puesto se prestaren servicios a jornada parcial, el aumento a concederse será proporcional a la jornada de trabajo. Aquellos empleados vinculados al servicio que no estén en servicio activo al 1ro. julio de 2002 tendrán derecho a recibir el aumento efectivo a la fecha en que se reintegren al servicio.

El aumento de sueldo se concederá aun cuando el empleado esté devengando un sueldo igual o superior al tipo máximo de la escala o que con el aumento excedan éste. Dicho aumento no afectará al margen retributivo de que disfrutan los empleados para mejoramiento salarial, ni se ajustará a escala. Disponiéndose que las acciones de personal que se efectúen con posterioridad a la vigencia del presente aumento se tramitarán conforme a las normas que emita la Oficina Central de Asesoramiento Laboral y de la Administración de Recursos Humanos, en armonía con la Ley Núm. 89 de 12 de julio de 1979, según enmendada, conocida como "Ley de Retribución Uniforme" y el Reglamento de Retribución Uniforme.

(b)    Cien (100) dólares a los empleados organizados en sindicatos bajo la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, incluidos en unidades apropiadas cuyo resultado de la fórmula bajo la Sección 7.5 de la ley antes citada es de cero o negativo. Aquellas unidades apropiadas cuyo resultado de la fórmula arroje positivo, pero menos de cien (100) dólares, recibirán un aumento equivalente a la diferencia entre cien (100) dólares y el resultado de dicha fórmula.

**Artículo 2.-**El costo del aumento de sueldo propuesto será sufragado por fondos a ser provistos mediante reembolso por la Oficina de Gerencia y Presupuesto, con cargo a las asignaciones que para este propósito se incluyeron en la Resolución Conjunta del Presupuesto General. Sin embargo, dicho reembolso cubrirá únicamente los sueldos que son sufragados con recursos provenientes del Fondo General. Se dispone que los empleados públicos que conforme a las fechas aquí establecidas cualifican para este aumento, pero cobran de otros fondos, recibirán los mismos aumentos con cargo a los fondos especiales federales y estatales de los cuales cobran. Las agencias para las cuales trabajen este tipo de empleados públicos deberán hacer los ajustes correspondientes en dichos fondos para otorgar aumentos salariales, según lo dispuesto en este Artículo.

**Artículo 3.-**Para obtener el reembolso al que se hace referencia en el Artículo 2 de esta Ley, cada agencia que sufrague dichos aumentos del Fondo General someterá a la Oficina de Gerencia y Presupuesto una relación certificada que incluya nombre del empleado, número de seguro social, clasificación del puesto, fecha en que comenzó a trabajar, sueldo devengado y costo total para la agencia del aumento concedido. Dicha certificación debe recibirse en la Oficina de Gerencia y Presupuesto no más tarde del 1ro. de septiembre de 2002.

**Artículo 4.-**Se excluyen de las disposiciones de esta Ley las siguientes agencias o dependencias públicas: (1) la Universidad de Puerto Rico; (2) las corporaciones públicas que tienen

autoridad expresa para llevar a cabo convenios colectivos bajo las disposiciones de la Ley Núm. 130 de 8 de mayo de 1945, según enmendada; (3) los miembros uniformados de la Policía de Puerto Rico; (4) miembros del Personal del Sistema de Rango del Cuerpo de Bomberos de Puerto Rico; (5) los empleados municipales y/o aquellos que presten servicios a los municipios; (6) los empleados públicos cubiertos por la Ley Núm. 45 de 25 de febrero de 1998, según enmendada, incluidos en unidades apropiadas cuyo resultado de la fórmula de la Sección 7.5 de la ley antes citada es igual o mayor de cien (100) dólares mensuales.

**Artículo 5.-**Los aumentos concedidos mediante esta Ley serán efectivos a partir del 1ro. de julio de 2002.

**Artículo 6.-**Los aumentos de sueldo concedidos mediante esta Ley no tienen el efecto de interrumpir el tiempo para ser acreedor de un aumento por años de servicio.

**Artículo 7.-**Toda disposición de ley que esté en conflicto con lo aquí dispuesto quedará sin efecto mientras tenga aplicabilidad esta Ley.

**Artículo 8.-**Esta Ley comenzará a regir inmediatamente después de su aprobación.

**Presione Aquí para regresar al Menú anterior y seleccionar otra ley.**

---

### ADVERTENCIA

**Este documento constituye un documento de las leyes del Estado Libre Asociado de P.R. que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las leyes de Puerto Rico. Su distribución electrónica se hace como un servicio público a la comunidad. Siempre busque leyes posteriores para posibles enmiendas a esta ley.**

# LexJuris de Puerto Rico siempre está bajo construcción.

---

© 1996-2002 LexJuris de Puerto Rico - Derechos Reservados

---

microjuris.com

(P. de la C. 1922)

# LEY

Para crear la "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico", a los fines de declarar un estado de emergencia fiscal; adoptar un plan para manejar las consecuencias de la crisis fiscal y económica, de la degradación del crédito de Puerto Rico; establecer una gerencia estructurada para atender esta situación; disponer sobre la primacía de esta Ley y su aplicabilidad; establecer las pruebas de sostenibilidad fiscal que se fijan como metas y disponer sobre informes trimestrales; establecer medidas de reducción de gastos de la Rama Ejecutiva tales como la reducción de la contratación de servicios profesionales y comprados, ajustes en tarifas de servicios comprados y profesionales, reducción en la nómina de empleados de confianza, establecer controles para la ocupación de puestos vacantes y flexibilizar la facultad gubernamental para efectuar destaques o traslados debido a necesidades de servicio, normas y restricciones sobre concesión de aumentos en beneficios económicos o compensación monetaria extraordinaria, disposiciones sobre negociación de convenios colectivos y foros para dirimir controversias, disposiciones sobre transporte escolar, prohibición contra sobregiros presupuestarios; disponer sobre el control fiscal en las corporaciones públicas; proveer para la aportación de ahorros de corporaciones públicas al Fondo General; proveer sobre el presupuesto de la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente; disponer prohibiciones respecto a escoltas, viajes, contratación de servicios, entre otros; establecer un plan de reducción de gastos y contratos por concepto de arrendamientos; disponer de un plan de reducción de consumo energético y consumo de servicio de acueductos y alcantarillados; proveer medidas sobre el presupuesto en la Rama Judicial, Rama Legislativa, y otras entidades gubernamentales; establecer planes para las sentencias finales y firmes pendientes de pago; establecer prohibición respecto a reclamaciones sobre obligaciones suspendidas temporeramente por esta Ley; disponer sobre las responsabilidades, poderes y deberes de la Oficina de Gerencia y Presupuesto; disponer sobre inmunidad en cuanto a pleitos y foros; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

Por primera vez en nuestra historia constitucional, y a pesar de todas las medidas gubernamentales tomadas para atender las finanzas del País, el crédito público del Estado Libre Asociado de Puerto Rico (ELA) se ha visto comprometido a raíz de la degradación a nivel especulativo de sus bonos de obligación general por las principales agencias clasificadoras de crédito. *Véase, Banco Gubernamental de Fomento para Puerto Rico, Informes de las Agencias Clasificadoras sobre Bonos del ELA.*

Esta Asamblea Legislativa tiene la responsabilidad constitucional de "*mantener el crédito público, tan necesario para el mejoramiento económico del pueblo*". 4 *Diario de Sesiones de la Convención Constituyente* 2587 (1952). *Véase, además,* Trías Monge, 3 *Historia Constitucional de Puerto Rico* 224-225 (1982). De igual forma, esta Legislatura tiene el deber de velar por el

⊪microjuris.com

bienestar económico colectivo de Puerto Rico. *Véase, Domínguez Castro v. E.L.A.*, 178 D.P.R. 1, 15 (2010).

La pérdida del grado de inversión de la deuda pública pone en peligro la salud fiscal y económica del pueblo de Puerto Rico, y compromete indebidamente el crédito de nuestro País. Dicha degradación ha ocasionado graves daños a nuestra economía al producir diversos efectos adversos tales como la desvalorización de los bonos en circulación, pérdidas en las carteras de inversión de las instituciones y los ahorradores de la Isla tenedores de bonos, dificultad de acceder al mercado de bonos municipales para financiar obra pública, y la contracción en la actividad económica de Puerto Rico, lo que ha ocasionado una marcada reducción en los recaudos del Gobierno y, por consiguiente, en la capacidad del Estado para atender las necesidades del País. *Véase Commonwealth of Puerto Rico Quarterly Report (February 18, 2014)*; *Official Statement, Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A. Véase, además, Domínguez Castro v. E.L.A., supra*, págs. 53-55.

A lo anterior se añade que la degradación del crédito público podría resultar, y en algunos casos resultó, en la aceleración de ciertas obligaciones del ELA, la terminación de líneas de crédito o la necesidad de prestar colateral en efectivo para garantizar el pago de ciertos bonos, cuya suma podría ascender hasta aproximadamente $900 millones. *Véase Commonwealth of Puerto Rico Quarterly Report* a las págs. 4-6. Ello, unido a otras obligaciones que por sus propios términos están próximas a vencerse, limita dramáticamente la liquidez del Estado y su habilidad para cubrir la totalidad de las asignaciones presupuestarias del año fiscal vigente y el siguiente. *Id.* Entiéndase que el Estado necesita la liquidez suficiente para mantener operando el gobierno, puesto que se trata de la capacidad de tener el efectivo necesario para cumplir con sus obligaciones según éstas van venciendo. Si no se cuenta con el dinero suficiente para pagar dichas obligaciones, se pondría en riesgo el pago de la nómina de los empleados públicos, y otros desembolsos de dineros que son indispensables para ofrecer los servicios a la ciudadanía.

Las más recientes clasificaciones crediticias de las Obligaciones Generales del ELA, emitidas por las tres principales casas acreditadoras, Standard & Poor's Ratings Services, Moody's Investors Service y Fitch Ratings, han destacado el inmenso endeudamiento de Puerto Rico, la falta de liquidez y la dificultad para lograr su acceso, así como los déficits operacionales de los últimos 7 años, como las causas de la degradación al nivel especulativo de sus bonos. Ver informes de Standard & Poor's del 4 de febrero de 2014, de Moody's Investors Service de 7 de febrero de 2014 y de Fitch Ratings de 11 de febrero de 2014.

No obstante, la degradación no ha sido mayor debido a los esfuerzos de esta Administración en reducir la magnitud del déficit y al compromiso de que el presupuesto del año fiscal 2015 será balanceado. A esos efectos, Standard & Poor's en su informe de 4 de febrero de 2014 expresó lo siguiente: *"That the rating is not lower is due to the progress the current administration has made in reducing operating deficits, and what we view as recent success with reform of the public employee and teacher pension systems, which had been elusive in recent years. We view the reform as significant and could contribute to a sustainable path to fiscal stability. We view the current administration's recently announced intent to further reduce appropriations in fiscal 2014 by $170 million and budget for balance operations in fiscal 2015*

ꞏꞏꞏmicrojuris.com

*as potentially leading to credit improvement in the long run, but subject to near-term implementation risk that could lead to further liquidity pressure to the extent deficits continue."*

De igual forma, Moody's Investors Service expresó en su informe de 7 de febrero de 2014: "*The problems that confront the Commonwealth are many years in the making, and include years of deficit financing, pension underfunding, and budgetary imbalance, along with seven years of economic recession. These factors have now put the Commonwealth in a position where its debt load and fixed costs are high, its liquidity is narrow, and its market access has become constrained. In the face of these problems, the administration has taken strong and aggressive actions to control spending, reform the retirement systems, reduce debt issuance, and promote economic development. Despite these accomplishments, however, in our view the commonwealth's credit profile is no longer consistent with investment grade characteristics.*"

Por ultimo, Fitch Ratings en su informe de 11 de febrero de 2014, señaló: "*FISCAL MANAGEMENT EFFECTIVE AND COMMITTED: The Commonwealth's management has responded quickly and decisively to challenges that have arisen in recent years and the current administration has made significant progress in addressing longstanding credit issues. Fitch believes the commitment of management to achieving fiscal balance and honoring commitments to bondholders remains strong, and the governor recently announced a plan to balance the budget next year, one year earlier than previously expected.*"

Las casas acreditadoras tienen el compromiso del Estado Libre Asociado de Puerto Rico de tomar medidas afirmativas para enfrentar los problemas fiscales y presentar un presupuesto balanceado para el año fiscal 2015 y sobre ese compromiso han atenuado sus actos de degradar el crédito solamente una escala por debajo del grado de inversión. A esos efectos, en el *Investor Webcast* del 18 de febrero de 2014, así como en la presentación del 2 de mayo de 2014, dirigidos a los inversionistas, se hicieron representaciones a nombre del Estado Libre Asociado de Puerto Rico a los efectos de que el presupuesto del año fiscal 2015 se presentaría balanceado.

En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de nuestra Constitución, se declara la existencia de una situación de emergencia económica y fiscal grave en Puerto Rico que hace necesaria la aprobación de esta ley especial de carácter socioeconómico que le permita al Estado contar con la liquidez suficiente para poder pagar la nómina de los empleados públicos y sufragar los servicios esenciales que ofrece a sus ciudadanos. Ello, mediante la implementación de medidas de reducción de gastos y de estabilización fiscal para la recuperación económica de Puerto Rico, sin recurrir al despido de empleados públicos de carrera ni afectar las funciones esenciales de las agencias de gobierno que brindan servicios de seguridad, educación, salud o de trabajo social. Además, salvaguardando el mandato constitucional para el pago de intereses y amortización de la deuda pública. Precisamente, ejercemos ese poder de razón de Estado, según acogido por el Tribunal Supremo de Puerto Rico como "*aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios*". *Domínguez Castro v. E.L.A., supra,* pág. 36.

microjuris.com

Además, este ejercicio legislativo se realiza en consideración de los pronunciamientos más recientes del Tribunal Supremo de Puerto Rico relacionados al uso del poder de razón de Estado en momentos de crisis. En este sentido, dicho Foro expresó que la inminencia de la crisis fiscal decretada por la Ley Núm. 7-2009, llamada "*Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico*", quedó evidenciada en su Exposición de Motivos. Ese texto describía que el crédito del país "*se encontraba al borde de una degradación a condición de chatarra*", la cual "*sería catastrófica para Puerto Rico*", su "*impacto sería masivo a todos los niveles de la sociedad*" y "*llevaría a Puerto Rico a una profunda depresión económica nunca antes vista en nuestra historia*", "*cuyo impacto sería inimaginable*". Exposición de Motivos, Ley Núm. 7-2009. Tras evaluar los datos provistos en esa exposición, el Tribunal validó la Ley y dispuso que las medidas eran necesarias y razonables para adelantar el interés gubernamental importante que perseguía la Ley Núm. 7-2009 de frenar dicha crisis. *Véase, Domínguez Castro v. E.L.A., supra*, págs. 88-89. Asimismo, reconoció "*la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado*" y que en el ejercicio de dicho poder, "*la Legislatura goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad*". Íd., pág. 37. Incluso, aseveró que "*ha llegado a tomar conocimiento judicial de la precaria situación económica del país y de cómo esa situación económica se refleja, produciendo una grave crisis en las finanzas del Gobierno*". Íd., pág. 50.

Posteriormente, el máximo Foro Judicial validó la Ley Núm. 3-2013 que reformó el Sistema de Retiro de los Empleados Públicos en el caso Trinidad Hernández v. E.L.A., 188 D.P.R. 828 (2013), por entender que la Legislatura había ejercido el poder de razón de Estado para detener la imperiosa insolvencia del Sistema de Retiro de Empleados Públicos. La Exposición de Motivos de esa disposición legal demostró que el sistema de retiro se encontraba en una crisis fiscal inminente, al punto que, de no tomarse las medidas los activos netos del sistema serían negativos y, para el año fiscal 2018–2019, se quedaría sin fondos suficientes para cubrir el pago de sus obligaciones, entre las que se encuentra el pago de pensiones a los propios pensionados. Íd., págs. 836-837. Haciendo un ejercicio similar al de Domínguez Castro, *supra*, el Tribunal Supremo sostuvo que "*de la exposición de motivos... se desprende que las medidas adoptadas son necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema*". Añadió que, "*ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños*". Trinidad Hernández, *supra*, pág. 837. Concluyó que la norma es constitucional "*porque, a pesar de que existe un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin*". *Íd.*, pág. 839.

Del mismo modo, recientemente, en el caso Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico, 2014 T.S.P.R. 58, la Corte Suprema analizó las medidas aprobadas mediante la Ley Núm. 160-2013 para solventar la crisis del Sistema de Retiro de Maestros y determinó que la ley no adelantaba el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la

ʍicrojuris.com

solvencia del mismo sistema. Por ello, resolvió que la Ley Núm. 160–2013, en lo que respecta al menoscabo de obligaciones contractuales, es irrazonable y, por lo tanto, inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que las medidas aprobadas serán constitucionales si son razonables y necesarias *"para adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr ese fin"*. Íd., pág. 8.

Ciertamente, las medidas tomadas hasta este momento no han sido suficientes para atajar el problema económico y fiscal de Puerto Rico, sino que nos vemos obligados a utilizar nuevamente el poder de razón de Estado para manejar otra crisis, aún más grave. Como discutiremos más adelante, por años, los ingresos netos del Fondo General no han sido suficientes para cubrir los gastos operacionales recurrentes con cargo a dicho fondo. En el pasado, la práctica ha sido tomar dinero prestado para cubrir la insuficiencia creada por la diferencia entre los ingresos y gastos del Fondo General. Al mismo tiempo, las corporaciones públicas han experimentado una situación similar que tiene como resultado que la mayoría tengan pérdidas operacionales millonarias anualmente. Ésta situación, también se ha atendido tomando dinero prestado sin contar con una fuente de repago para pagar dichos préstamos.

Esas estrategias de financiar gastos operacionales con préstamos hacen que hoy enfrentemos un problema de liquidez grave, el cual pone en peligro que el gobierno cuente con el dinero suficiente para pagar la nómina de los empleados públicos y cubrir otros gastos operacionales. Por esto, es necesario que se tomen las medidas que aseguren que el gobierno cuente con el dinero necesario para pagar por los servicios que ofrece a la ciudadanía.

## Liquidez del Banco Gubernamental de Fomento para Puerto Rico

El Banco Gubernamental de Fomento para Puerto Rico (BGF o Banco) es el agente fiscal del ELA que tradicionalmente ha facilitado el financiamiento interno al gobierno y a sus instrumentalidades como paso previo a la emisión de deuda a largo plazo en el mercado de bonos municipales. El BGF también ha financiado los déficits operacionales de agencias del gobierno y corporaciones públicas, convirtiéndose en la mayor fuente de financiamiento a corto plazo para el gobierno. Siendo así, la liquidez y estabilidad financiera del BGF es esencial para garantizar la efectividad de su función como fuente de financiamiento del gobierno y facilitador del desarrollo económico de País.

Un examen de los estados financieros auditados del Banco de los años fiscales terminados el 30 de junio de 2000 hasta el 30 de junio de 2013, refleja un aumento sustancial en la relación entre los préstamos por cobrar y los activos totales de la entidad, el cual es un indicador de como se ha ido comprometiendo la liquidez de la institución. La Gráfica I muestra esta relación para los últimos trece años (en millones).

microjuris.com



Gráfica I: Relación entre Préstamos Netos y Total de Activos

Como se puede apreciar, los préstamos por cobrar, neto de la reserva para préstamos incobrables, que incluyen el dinero prestado a agencias gubernamentales, corporaciones públicas, municipios y a empresas privadas, aumentó significativamente por $6,088 millones en 13 años. Esta práctica de conceder préstamos para cubrir el déficit operacional del Fondo General y entidades públicas sin fuentes de repago ha afectado adversamente la liquidez y solidez financiera del Banco. Ejemplo de esto fue el patrón utilizado durante los pasados años de subsanar las deficiencias operacionales de la Autoridad de Carreteras y Transportación (ACT) a través de adelantos del BGF. Al 30 de junio de 2013, y según los estados financieros auditados por la firma Ernst & Young, LLP, la ACT debía al BGF un total de $2,043 millones en línea de crédito. Esto no solamente compromete el capital del Banco, sino que requiere que futuras administraciones aumenten tarifas y aprueben impuestos u otros cargos para saldar deudas incurridas por administraciones anteriores. Para atender este asunto, consciente de su responsabilidad de pagar las deudas del ELA, esta Administración aprobó la Ley Núm. 30-2013 y la Ley Núm. 31-2013, que proveyeron ingresos adicionales a la ACT para el pago de su deuda con el BGF.

En detalle, en el año fiscal 1999-2000, los préstamos en cartera del BGF totalizaron $3,547 millones lo que representaba un 43% del total de activos de la institución. En el año fiscal 2000-2001, hubo un aumento de $308 millones para terminar con un balance de $3,855 millones igual al 49% del total de activos. Luego, en el año fiscal 2001-2002, se experimentó una reducción de alrededor de $1,600 millones. Esta disminución fue el producto de la venta en el mercado de capital de préstamos a agencias y a corporaciones públicas sin fuentes de repago, según dispuesto por la Ley Núm. 164-2001. Con esa transacción, la relación de préstamos netos contra el total de activos se redujo a 26%. En el año fiscal 2002-2003, la cartera de préstamos terminó con un balance de $2,604 millones o el 29% del total de activos del Banco. En el año fiscal 2003-2004, se experimentó un aumento de cerca de $1,570 millones y los préstamos en cartera del BGF ascendieron a $4,176 millones, lo que representa un 45% del total de sus activos totales. Para los años fiscales 2004-2005 y 2005-2006 hubo un aumento en la partida de $1,472 millones y $1,620 millones, respectivamente. Esos aumentos fueron producto principalmente de préstamos otorgados al Departamento de Hacienda. Al cierre del año fiscal 2005-2006, el total de préstamos representaba el 57% del total de los activos totales del Banco.

ᴍɪcrojuris.com

Al finalizar el año fiscal 2006-2007, los préstamos disminuyeron en $1,036 millones. La reducción respondió mayormente a refinanciamientos o repago, a través de emisiones de bonos de la deuda de la Autoridad de Acueductos y Alcantarillados por $580 millones, la Autoridad de los Puertos por $301 millones y la Autoridad de Energía Eléctrica por $107 millones. Al 30 de junio del año fiscal 2007-2008 también hubo una disminución por $835 millones en el sector público, aunque aumentó la porción de préstamos a municipios por la creación del Fondo de Redención Municipal que aumentó el margen prestatario a los municipios. En los años fiscales 2008-2009 y 2009-2010 se reflejó un aumento significativo en la porción de préstamos a municipios por $174 millones y $291 millones, respectivamente.

En el año fiscal 2010-2011 hubo un aumento significativo por la cantidad de $1,411 millones. Ese año fiscal, la cartera de préstamos (netos) alcanzó los $8,360 millones o el 54% del total de activos del Banco. Luego de mantenerse prácticamente estable en el año fiscal 2011-2012, los préstamos (netos) reflejaron un aumento de $1,311 millones en el año fiscal 2012-2013. Al 30 de junio de 2013, el total de préstamos totalizó $9,635 millones de los $14,326 millones de activos totales del BGF equivalente al 67% de los activos.

Durante el año fiscal 2013-2014, el BGF ha extendido aproximadamente $1,200 millones en préstamos al ELA para el pago de obligaciones financieras con vencimiento durante el presente año fiscal, de los cuales se adeudan $623 millones al 30 de abril de 2014. Además, el ELA adeuda aproximadamente $1,200 millones en "Tax Revenue Anticipation Notes" de los cuales $900 millones vencen durante el presente año fiscal, $300 millones a inicios del año fiscal 2014-2015 y que se espera que tengan que ser renovados en su mayoría para proveer liquidez al Gobierno Central durante el próximo año fiscal.

La firma de Contadores Públicos Autorizados, KPMG LLP, auditó los estados financieros del BGF para el año fiscal terminado el 30 de junio de 2013. En su informe, los auditores enfatizan que, en su estado de situación al 30 de junio de 2013, el BGF tiene préstamos por cobrar al ELA y a sus corporaciones públicas por $6,900 millones o el 48% de los activos totales del Banco. Por otro lado, los préstamos por cobrar a los municipios totalizaron $2,212 millones o el 15% de los activos totales del BGF. La información que se presenta en la Tabla 1 se obtuvo de la nota número 7 de los estados financieros auditados del BGF al 30 de junio de 2013. En ella se muestra el detalle de los préstamos por cobrar (en miles):

### Tabla 1: Detalle de los préstamos por cobrar

|  | Fondo Operacional | Fondo de Desarrollo Turístico | Autoridad para el Financiamiento de la Vivienda | Fondo de Desarrollo | Total |
|---|---|---|---|---|---|
| Corp. Públicas y agencias | $6,889,134 |  |  |  | $6,889,134 |
| Municipios | 2,212,481 |  |  |  | 2,212,481 |
| Reserva | (4,000) |  |  |  | (4,000) |

microjuris.com

| | Fondo Operacional | Fondo de Desarrollo Turístico | Autoridad para el Financiamiento de la Vivienda | Fondo de Desarrollo | Total |
|---|---|---|---|---|---|
| Sub-Total | 9,097,615 | | | | 9,097,615 |
| Sector Privado | 39,935 | 376,361 | 360,014 | 21,259 | 797,569 |
| Reserva | (264) | (178,721) | (37,742) | (16,937) | (233,664) |
| Ingresos diferidos | - | - | (26,430) | - | (26,430) |
| Sub-Total | 39,671 | 197,640 | 295,842 | 4,322 | 537,475 |
| Total | $9,137,286 | $197,640 | $295,842 | $4,322 | $9,635,090 |

En la nota 4 de los estados financieros auditados se establece que los préstamos al ELA y a sus entidades públicas componen una cantidad sustancial de los activos del Banco. Como resultado de lo anterior, la liquidez y condición financiera del Banco, depende significativamente de la capacidad del Estado y sus corporaciones públicas para repagar su deuda.

No obstante, la mayoría de las corporaciones públicas enfrentan grandes retos fiscales y financieros, por lo que cualquier situación que afecte la capacidad de estas entidades para obtener el dinero necesario para repagar sus préstamos, tendrá un efecto adverso en la liquidez y la situación financiera del BGF. A esto se añade que la liquidez del Banco se ha visto significativamente afectada por tener un acceso limitado al mercado y una reducción significativa en la liquidez en los mercados de capital local.

En la propia nota a los estados financieros del BGF se define *"riesgo de liquidez"* como la habilidad para levantar el efectivo, cuando sea necesario cumplir con las obligaciones en el momento que venzan, a un costo razonable y con una pérdida mínima.

Como resultado de la degradación crediticia el costo de emitir deuda ha aumentado y se ha limitado la capacidad de acceder al mercado. Estas situaciones afectan adversamente la liquidez del BGF, pues limitan su capacidad para levantar efectivo. A su vez, representan una situación adversa para el ELA y sus corporaciones ya que el Banco se verá incapacitado de proveer el financiamiento interno a dichas agencias e instrumentalidades.

En el marco de lo anterior, la presente Administración tomó varias medidas para mejorar la liquidez del BGF. Por ejemplo, en marzo de 2014 se realizó una histórica emisión de bonos de obligaciones generales del ELA por la cantidad de $3,500 millones, cuyo producto neto fue utilizado, principalmente, para el repago de obligaciones del Estado con el BGF. También, se aprobó la Ley Núm. 24-2014 para que el BGF pueda requerir a ciertas entidades gubernamentales que transfieran el balance de sus cuentas de efectivo de instituciones en el sector privado al Banco. Además, dicha Ley, le prohíbe al BGF aprobar préstamos a corporaciones públicas que no puedan demostrar que cuentan con las fuentes de ingresos suficientes para cubrir el servicio de la deuda del nuevo financiamiento. Así, esta ley tiene el propósito de imponer disciplina fiscal a las entidades públicas y preservar la liquidez y situación

:microjuris.com

financiera del BGF.  Aunque estas medidas, junto a otros esfuerzos, han logrado aumentar la liquidez del Banco, este aún no tiene la solidez financiera suficiente como para satisfacer por sí solo las necesidades de financiamiento actuales del Gobierno del ELA y sus corporaciones públicas, máxime con el acceso limitado al mercado de estas entidades.

La condición adversa del BGF impacta también a toda la industria bancaria en el País, imponiéndole serias restricciones en la concesión de préstamos al Gobierno.  Las instituciones financieras privadas, locales e internacionales, las cuales en el pasado han servido como fuente de liquidez interina para el gobierno, han reducido y continúan reduciendo de manera significativa el crédito extendido al ELA y a otras instrumentalidades públicas, dejando de ser una opción viable de financiamiento interino.  También se ha experimentado un aumento en las tasas de interés que ha incrementado el costo de capital para el ELA, reduciendo la capacidad del gobierno de emitir deuda nueva.  La reducción en el acceso a los mercados de capital y al crédito provisto por instituciones financieras privadas también limita el volumen de la deuda que puede ser emitida y, por lo tanto, limita al gobierno a depender de financiamiento para sufragar sus operaciones gubernamentales.

Aunque la reciente emisión de bonos de obligación general mejoró la liquidez  del BGF al producir réditos netos de $3,200 millones, dicha transacción se utilizó principalmente para refinanciar deuda a corto plazo en manos privadas y del BGF, por lo que sus réditos netos no están disponibles para brindar financiamiento interino al gobierno sin afectar nuevamente la liquidez del Banco.  Esta emisión evitó un posible incumplimiento con ciertas obligaciones financieras y dio al ELA espacio para culminar e implementar su plan de ajuste fiscal hacia un presupuesto balanceado, sin financiamiento de déficit o refinanciamiento de deuda.  Dicha emisión se logró, a su vez, debido a los pasos significativos tomados por esta Administración hasta la fecha para cerrar la brecha presupuestaria y, en particular, con el compromiso por  su parte de aprobar un presupuesto balanceado para el año fiscal 2014-2015.  Es importante recalcar que los mercados de capital reciben de forma muy negativa el cuadre del presupuesto del Fondo General con más deuda.  Tampoco hay apetito en el mercado para comprar bonos del ELA o sus instrumentalidades, incluyendo los de la Corporación del Fondo de Interés Apremiante (COFINA), vehículo utilizado por la pasada Administración para financiar los déficits del Fondo General, salvo que se tomen las medidas necesarias para mitigar la carga que representa el déficit del Fondo General en el Departamento de Hacienda y en el BGF.

Con posterioridad a la referida emisión del 11 de marzo de 2014 por $3,500 millones, Standard & Poor's manifestó en su informe de 14 de marzo de 2014: "*In our opinion, the sale will relieve near-term liquidity pressure on the commonwealth.*" Y prosigue: "*While we have removed the CreditWatch designation, we have assigned a negative rating outlook, reflecting long-term economic and financial trends we see over the next two years. These include the potential for a larger deficit in fiscal 2014 than the $650 million that Puerto Rico now projects after passage of $170 million of mid-fiscal 2014 budget adjustments, and the potential for general fund operating deficits in fiscal 2015. There also remain potential ongoing working-capital liquidity needs for fiscal 2015 and plans by the commonwealth for additional bond sales in fiscal 2015. Puerto Rico will also need to start paying interest on the 2014 bonds in fiscal 2016.*"

ꞏmicroJuris.com

Las agencias acreditadoras están conscientes y han reconocido consistentemente que persiste un problema de liquidez en las arcas del Tesoro de Puerto Rico que solamente puede afrontarse con medidas agresivas que atiendan el persistente déficit presupuestario que se repite anualmente.  El País se ha comprometido ante el mercado mundial a así hacerlo y, como lo demuestran los comentarios de las casas acreditadoras, estamos ganando credibilidad con los esfuerzos que se hacen para enfrentar esta crisis.  De estos esfuerzos depende el mejoramiento de las clasificaciones crediticias de Puerto Rico.  Esta Ley es un paso imprescindible para alcanzar la estabilidad financiera y para lograr un presupuesto balanceado; así como para afirmar la credibilidad del País.  Pero no será el último, todavía quedan retos por atender, como nos lo recuerda Fitch Ratings, en su informe de 15 de abril de 2014 al recordarnos lo siguiente refiriéndose al presupuesto del año fiscal 2015 y a la reciente decisión del Tribunal Supremo sobre la Ley Núm. 160-2013: "*In the coming weeks the governor is expected to release his budget proposal for the fiscal year beginning July 1, which he has announced will be balanced. The court decision has no direct negative impact on the near-term budget, but the commonwealth has stated in the past that without reform the teachers retirement system would confront an annual cash flow deficit beginning in...*".

La reciente transacción de bonos de obligación general del ELA también utilizó una porción material del margen constitucional del ELA, limitando el uso de este mecanismo durante el futuro cercano.  A saber, nuestra Constitución establece que la deuda pública del ELA nunca podrá exceder el 15% del promedio de los ingresos provenientes de fuentes estatales durante los dos años fiscales inmediatamente anteriores.  Según el *Official Statement, Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A*, luego de la emisión antes mencionada, el límite constitucional es de 14.2%.  A su vez, la resistencia de los mercados de capital a sufragar los déficits del Fondo General también limita la capacidad del BGF a financiarlos porque permanecerían en su cartera, eventualmente agotando su capacidad de seguir cumpliendo su rol institucional como acreedor interino o de última instancia.

En resumen, es necesario que el ELA apruebe un presupuesto donde los ingresos sean iguales a los gastos, no sólo porque tener un presupuesto balanceado constituye una sana política pública y es nuestra responsabilidad con las generaciones venideras, sino porque los mecanismos utilizados por el ELA en el pasado ya no están disponibles.  Los mercados de capital no están dispuestos a financiar déficits presupuestarios.  La banca privada tampoco tiene la capacidad ni la disposición para hacerlo y el BGF tiene su liquidez comprometida.  Ante este escenario, es un interés apremiante del Estado controlar el gasto público de manera inmediata, significativa y contundente para poder sufragar los gastos del Fondo General sin recurrir a utilizar deuda como un origen de recursos.  Dada su gravedad, es necesario resaltar el trasfondo económico que nos condujo hasta esta situación.

## Condición Económica de Puerto Rico

La situación en que se encuentra la economía del País debe formar parte de nuestro marco de referencia para determinar el tipo de medidas fiscales que debemos implantar, como el impacto que tendrán las mismas en términos macroeconómicos.  Es por esta razón, que para propósito de entender esta pieza legislativa debemos evaluar la coyuntura actual de la economía de Puerto Rico, como también su trayectoria histórica. Debemos tener presente que la situación

..microjuris.com

fiscal no solo es reflejo de la falta de prudencia y efectividad en el manejo de los recursos del Estado de las pasadas administraciones, sino también de la incapacidad que ha tenido la economía de la Isla de generar crecimiento en la producción, empleos e ingresos. La capacidad de recaudar fondos, por parte del Estado, está condicionada por el nivel de desempeño de la economía del País. Las contribuciones y otros impuestos que pagan los individuos y empresas están directamente relacionados con el nivel de actividad económica y la cantidad de ingresos y ganancias que estos agentes económicos puedan generar.

La economía de Puerto Rico experimentó la recesión más larga y profunda de su historia reciente durante el periodo que comprende los años fiscales 2006 al 2011. Como se puede observar en la Gráfica II, este período de contracción económica superó, tanto en duración como en profundidad, las cuatro recesiones ocurridas en los años 1974-75, 1981-83, 1990-91 y 2001-03.



Esta última recesión se extendió por seis años y el Producto Nacional Bruto Real (PNBR) reflejó una reducción acumulada de 12.5%, mientras que las recesiones más severas, la del 1974-75 y 1981-83, duraron entre 1 y 2 años y el PNBR solo disminuyó en 1.91% y 5.13%, respectivamente. Por otra parte, la tasa de crecimiento anual promedio del PNBR fue de -2.1% en la recesión del 2006-11, mientras que en las recesiones del 1974-75 y 1981-83 fue de -1.91% y -2.60%, respectivamente. Las anteriores recesiones respondieron principalmente a factores relacionados con el ciclo económico de la economía de Estados Unidos y a nivel global y los efectos del aumento en el precio en el petróleo sobre nuestra economía.

Particularmente, nuestra primera recesión en tiempos recientes fue la de 1974-75 una donde el efecto del embargo petrolero de la OPEP provocó una recesión mundial que nos afectó de forma muy severa como se indicó anteriormente. Fue precisamente aquí cuando nos ocurrió nuestra primera crisis fiscal. El Gobierno de Puerto Rico encomendó un estudio que fue llevado a cabo por el destacado economista y Premio Nobel de Economía James Tobin. En este estudio se recomendaron muchas medidas tanto fiscales como económicas que algunas fueron implementadas y otras no. Si las medidas no implementadas relacionadas con la economía y el manejo de los problemas fiscales se hubiesen ejecutado, es probable que el País no estuviese

microjuris.com

actualmente en la situación fiscal en que se encuentra. Cabe indicar que durante esta época el gobierno tuvo problemas en accesar capital en los mercados y de poder pagar sus obligaciones. No obstante el efecto de la aprobación de la Sección 936 del Código de Rentas Internas Federal ayudó al País a salir de esta crisis.

En el caso de la recesión de 1982-83, ésta fue causada por el efecto de la contracción que experimentaba la economía de los Estados Unidos, el aumento del precio del petróleo y la reducción de las transferencias federales. Todos estos factores se conjugaron para inducir a la economía en una recesión muy severa.

La recesión de 1990-91 ha sido la más corta gracias a los efectos amortiguadores que tuvo sobre la economía los fondos recibidos por los daños que causó el Huracán Hugo a la Isla. Entre los fondos de FEMA y las compensaciones de las compañías de seguros se recibieron alrededor de $5,0000 millones. Esta inyección de fondos evitó que la recesión se extendiera o llegara a profundizarse.

Hasta aquí podemos notar que las recesiones ocurridas en la economía de Puerto Rico, previo al año fiscal 2006, coincidieron con periodos de contracción de la economía de Estados Unidos y de aumentos en el precio del petróleo a nivel global. El alto grado de vinculación de nuestra economía con la de los EEUU, así como nuestra vulnerabilidad a los precios del petróleo, provoca que estas recesiones se manifiesten en la Isla con particular intensidad. No obstante, una vez las condiciones económicas en los EEUU y los precios del petróleo se estabilizan, nuestra economía recuperó un patrón ascendente. Sin embargo, la recesión que comenzó en el año fiscal 2006 tiene unas causas internas particulares entre las que se encuentran las siguientes:

- La culminación del "phase-out" de la Sección 936 que conllevó la pérdida de más de 150,000 empleos directos e indirectos en el sector manufacturero;

- El cierre del gobierno durante la crisis fiscal 2006; y

- Los efectos negativos que tuvo la Ley Núm. 7-2009, la cual profundizó la recesión en los años fiscales 2009, 2010 y 2011.

En la Tabla 2 podemos ver un análisis comparativo de recesiones en la economía de Puerto Rico desde los años 1974-1975 hasta los años 2006-2011.

**Tabla 2: Análisis Comparativo de Recesiones en la Economía de Puerto Rico**

| Periodo | Duración | Tasas Crecimiento PNBR Acumulada | Tasas Crecimiento Anual de PNBR |
|---------|----------|----------------------------------|--------------------------------|
| 1974-75 | 1 año | -1.91% | -1.91% |
| 1981-83 | 2 años | -5.13% | -2.60% |
| 1990-91 | 7 meses | +0.9% | +0.9 |
| 2001-02 | 1 año | -0.3% | -0.3 |
| 2006-11 | 6 años | -12.50% | -2.1% |

:microjuris.com

**Fuente:** Junta de Planificación de Puerto Rico

Para los años fiscales 2012 y 2013, el PNBR presentó valores positivos, de 0.9% y 0.3%, respectivamente (ver Gráfica III). Recientemente, la Junta de Planificación de Puerto Rico presentó sus pronósticos económicos para los años fiscales 2014 y 2015, donde proyecta que el PNBR reflejará unos incrementos tenues de 0.1% y 0.2%, respectivamente. La Gráfica III refleja una estabilización pero muy débil.



**Fuente:** Junta de Planificación de Puerto Rico

Esto es así, ya que esta lenta recuperación que se observa en la economía de Puerto Rico se debe en gran parte al efecto que tuvo la inyección de alrededor de $7,000 millones en los fondos provenientes del *American Recovery and Reinvestment Act of 2009* (ARRA, por sus siglas en inglés) durante los últimos 3 años. No obstante, esta fuente de fondos se agotó como otras fuentes provenientes de las emisiones de bonos del gobierno central y las corporaciones públicas, las cuales se traducían en inversión pública. Es decir, las posibilidades de crecimiento económico en la Isla en los próximos años dependerán exclusivamente de la inversión privada y las exportaciones de bienes y servicios.

Por consiguiente, la aparente recuperación económica que se observa en la economía de Puerto Rico a partir del año fiscal 2012 parece que continuará siendo muy lenta y no permite afirmar que hemos superado la crisis. La situación se agrava aún más ante el hecho de que el Índice de Actividad Económica (IAE), que publica el BGF, refleja valores negativos en lo que va del año fiscal 2014. Como se puede observar en la Tabla 3, el valor promedio del IAE para el período de julio de 2013 a abril del 2014 fue de 127.1. Este dato es 4.3 puntos menor que el de 131.4 puntos registrado para el mismo período del año fiscal 2013 y representa una disminución de 3.3% en el indicador.

## Tabla 3: Índice de Actividad Económica

| Año Fiscal | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|

microjuris.com

| Año Fiscal | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Promedio Anual** | 154.6 | 155.0 | 152.9 | 149.1 | 141.7 | 134.7 | 130.8 | 130.9 | 130.8 | |
| **Diferencia** | 2.4 | 0.4 | -2.1 | -3.8 | -7.4 | -7.0 | -4.0 | 0.2 | -0.1 | |
| **% Cambio** | 1.6 | 0.3 | -1.3 | -2.5 | -4.9 | -4.9 | -2.9 | 0.1 | -0.1 | |
| **julio-abril** | | | | | | | | | | |
| **Promedio Anual** | 154.3 | 155.3 | 155.3 | 149.6 | 142.6 | 135.1 | 131.0 | 130.8 | 131.4 | 127.1 |
| **Diferencia** | 2.1 | 1.2 | -2.0 | -3.6 | -7.0 | -7.5 | -4.1 | -0.2 | 0.6 | -4.3 |
| **% Cambio** | 1.4 | 0.6 | -1.3 | -2.4 | -4.7 | -5.2 | -3.1 | -0.1 | 0.5 | -3.3 |

**Fuente:** Banco Gubernamental de Fomento

Ante el cuadro descrito anteriormente, existe un alto grado de preocupación respecto a las posibilidades de un proceso sostenido de recuperación de la economía de Puerto Rico que provea una creación sustancial adicional de ingresos al fisco y que permita mejorar la liquidez del gobierno. Consecuentemente, las tendencias más recientes sobre el comportamiento de la economía del País demuestran que esta continúa en un proceso de falta de dinamismo y capacidad de producción.

Cuando analizamos el desempeño de la economía de la Isla en un contexto histórico podemos ver que las tasas de crecimiento de alrededor de 7% que se experimentaron en la década del 60' se han tornado en negativas. Nuestra economía ha experimentado un cambio estructural donde ha perdido su capacidad competitiva que, unido a la inestabilidad de la Sección 936, han limitado la capacidad de crecimiento económico. Por ejemplo, durante las últimas cuatro décadas la economía local ha venido perdiendo su capacidad de crecimiento y de generar empleos. La reducción que ha tenido la tasa de inversión (Inversión Bruta Total/PNB) de 30% en los años 70' a 13% en años recientes es el mejor indicador de la pérdida de capacidad productiva futura de nuestra economía, según se muestra en la Gráfica IV.

microjuris.com



**Fuente:** Junta de Planificación de Puerto Rico

Las tasas de crecimiento moderado que tuvimos en las décadas del 80', 90', y parte del 2000' fueron alcanzadas en gran parte por los factores que se mencionan a a continuación.

- La actividad generada por el sector de la manufactura de las Corporaciones 936, principalmente, de las industrias de productos químicos y farmacéuticos.

- El flujo de pagos de transferencias del gobierno federal.

- El efecto compensatorio del empleo público.

- El uso excesivo de emisiones de deuda para financiar proyectos de inversión pública y el gasto de gubernamental.

- El impulso de la burbuja hipotecaria sobre el sector de la construcción.

- El endeudamiento del consumidor puertorriqueño.

- La expansión de la economía de Estados Unidos.

Sin lugar a dudas la eliminación de la Sección 936 profundizó los problemas de índole estructural que tenía la economía de la Isla y que comenzaron a observarse en los años 70'.

## Empleo

⠐ᴍicrojuris.com

La profundidad de la recesión experimentada por la economía de Puerto Rico, durante el período de 2006 al 2011, se reflejó con particular intensidad en el indicador del empleo total. Como se puede observar en la Gráfica V, los años fiscales 2008, 2009 y 2010, constituyen los años de mayor pérdida de empleos en la historia reciente de nuestra economía.  Desde el año fiscal 2006 la economía de Puerto Rico ha perdido un total de 207,000 empleos, lo que representa una disminución acumulada de un 16.6%.



**Fuente:** Departamento del Trabajo y Recursos Humanos: Encuestas de Viviendas

La Tabla 4 presenta un resumen del estado del empleo de las personas de 16 años o más durante los pasados diez años.  De la evaluación de estos datos, resalta el hecho de que del año 2006 al 2013, el empleo total muestra valores decrecientes ininterrumpidamente.  La tímida recuperación económica que refleja la economía, a partir del año 2012, no se ha traducido en un cambio en la tendencia decreciente en la variable del empleo total.

**Tabla 4: Estado de Empleo de las Personas de 16 años de Edad y Más: Años Fiscales**
**(en miles de personas)**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| Personas de 16 años o más | 2,884 | 2,886 | 2,899 | 2,906 | 2,908 | 2,910 | 2,914 | 2,920 | 2,921 | 2,906 |
|  |  |  |  |  |  |  |  |  |  |  |
| Grupo trabajador | 1,339 | 1,357 | 1,410 | 1,413 | 1,355 | 1,325 | 1,285 | 1,249 | 1,221 | 1,197 |
|  |  |  |  |  |  |  |  |  |  |  |
|   Empleados | 1,187 | 1,213 | 1,254 | 1,263 | 1,203 | 1,144 | 1,075 | 1,047 | 1,035 | 1,030 |
|   Desempleados | 152 | 144 | 156 | 150 | 152 | 181 | 210 | 202 | 185 | 167 |
|  |  |  |  |  |  |  |  |  |  |  |
| Tasa de Participación | 48.4 | 47.0 | 48.6 | 48.6 | 46.6 | 45.5 | 44.1 | 42.8 | 41.8 | 41.2 |
|  |  |  |  |  |  |  |  |  |  |  |
| Tasa de desempleo | 11.4 | 10.6 | 11.0 | 10.6 | 11.2 | 13.7 | 16.3 | 16.2 | 15.2 | 14.0 |
|  |  |  |  |  |  |  |  |  |  |  |

microjuris.com

| Tasa de Empleo | 41.2 | 42.0 | 43.3 | 43.5 | 41.4 | 39.3 | 36.9 | 35.9 | 35.4 | 35.4 |

**Fuente:** Departamento del Trabajo y Recursos Humanos, Negociado de Estadísticas del Trabajo, Encuesta de Vivienda

Por su parte, la tasa de desempleo ha mostrado una mejoría y se ha estabilizado en alrededor de 14%. No obstante, persisten factores como la disminución de la participación laboral y un aumento en la población mayor de 65 años que inciden sobre nuestra capacidad de recuperación económica.

## Tendencias Demográficas

Por primera vez, Puerto Rico experimenta una pérdida poblacional absoluta. El censo de población del año 2010 registra una disminución de 2.2% en el nivel poblacional, respecto al computado en el censo del año 2000. Por su parte, la Junta de Planificación proyecta que esta tendencia decreciente de la variable poblacional se mantendrá hasta por lo menos el año 2030. La merma poblacional estimada del año 2000 al 2013 es de 150,442 personas, lo que representa un descenso de alrededor de 4% de la población residente de la Isla. Según presentado en la Tabla 5 y la Gráfica VI, las reducciones en población proyectadas para los años 2020 y 2030 representan mermas decenales de 10.0% y 14.4%, respectivamente.

**Tabla 5: Población Estimada y Proyectada en Puerto Rico**

| Año | Número de Personas | % de Cambio Década |
|---|---|---|
| 1950 | 2,210,703 | 18.3% |
| 1960 | 2,349,544 | 6.3% |
| 1970 | 2,712,033 | 15.4% |
| 1980 | 3,196,520 | 17.9% |
| 1990 | 3,522,037 | 10.2% |
| 2000 | 3,808,610 | 8.1% |
| 2010 | 3,725,789 | -2.2% |
| 2020 | 3,352,315 | -10.0% |
| 2030 | 2,869,462 | -14.4% |

**Fuente:** Negociado del Censo Federal, División de Población

..microjuris.com



**Fuente:** Negociado del Censo federal, División de Población; y Junta de Planificación, Oficina del Censo

Según podemos observar en la Tabla 6, la reducción poblacional registrada tiene un componente demográfico producto de una reducción en el número de nacimientos por cada mil habitantes y un aumento en las defunciones por cada mil habitantes. Esta combinación de factores se traduce en una disminución continua en la tasa de aumento natural de la población, la que en el 2013 se estima en 2.5 personas por cada mil habitantes.

**Tabla 6: Estadísticas Demográfica Seleccionada (Años Fiscales)**

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| Población al 1ro de julio (En miles) | 3,827 | 3,821 | 3,805 | 3,783 | 3,761 | 3,740 | 3,722 | 3,687 | 3,652 | 3,615 |
| Nacimiento (En miles) | 51 | 51 | 49 | 47 | 46 | 45 | 42 | 42 | 41 | 39 |
| Defunciones (En miles) | 30 | 30 | 29 | 29 | 29 | 29 | 29 | 29 | 30 | 30 |
| Nacimientos por cada 1,000 habitantes | 13.4 | 13.3 | 12.8 | 12.4 | 12.1 | 12.0 | 11.4 | 11.4 | 11.2 | 10.8 |
| Defunciones por cada 1,000 habitantes | 7.7 | 7.8 | 7.5 | 7.8 | 7.7 | 7.8 | 7.9 | 7.9 | 8.2 | 8.3 |
| Aumento natural por cada 1,000 habitantes | 5.7 | 5.4 | 5.3 | 4.6 | 4.4 | 4.2 | 3.5 | 3.5 | 3.0 | 2.5 |

**Fuente:** Negociado del Censo federal, División de Población; Departamento de Salud de Puerto Rico; y Junta de Planificación, Oficina del Censo

Sin embargo, este factor por sí solo no explica la merma poblacional ocurrida en el decenio 2000 al 2010. La tendencia se configura al incluir el impacto de la emigración masiva de puertorriqueños que se mudan al exterior en busca de mejores oportunidades económicas.

La situación descrita plantea el problema de la fuga de talento, la pérdida de recursos humanos en edades productivas y su impacto negativo sobre los ingresos del fisco. Los mismos no pueden ser compensados, a corto o largo plazo, por cualquier reducción en los costos de ofrecer servicios que presta el gobierno a estos ciudadanos.

**Tabla 7: Datos Poblacionales Seleccionados**

microjuris.com

| | | Población de 65 Años o Más | | |
|---|---|---|---|---|
| | Población Total | Número de Personas | % | Mediana de Edad |
| 1950 | 2,210,703 | 85,578 | 3.9% | 18.4 |
| 1960 | 2,349,544 | 122,207 | 5.2% | 18.5 |
| 1970 | 2,712,033 | 177,077 | 6.5% | 21.6 |
| 1980 | 3,196,520 | 252,569 | 7.9% | 24.6 |
| 1990 | 3,522,037 | 340,884 | 9.7% | 28.5 |
| 2000 | 3,808,610 | 425,137 | 11.2% | 32.1 |
| 2010 | 3,725,789 | 541,998 | 14.5% | 36.9 |

**Fuente:** Negociado del Censo federal, División de Población

Por otra parte, el impacto del reto poblacional se complica por el envejecimiento progresivo relativo de nuestra población. Según se puede observar en la Tabla 7, el número de personas de 65 años o más, tanto en términos absolutos como en proporción a la población total, ha continuado su tendencia ascendente. El Censo del 2010 registró más de medio millón de personas en este renglón de edad, lo que representó un 14.5% de la población total. Es interesante destacar que la mediana de edad de nuestra población ha aumentado vertiginosamente al incrementarse de 18.5 años en el año 1960 a 36.9 años en el 2010.

La dinámica demográfica descrita plantea un inminente aumento en la demanda por servicios de salud y otros servicios necesarios para la atención adecuada de las personas de mayor edad. Esta situación inevitablemente se traducirá en presiones para incrementar el gasto público y un reto adicional para el logro del objetivo de configurar un presupuesto balanceado.

Como veremos a continuación, la tendencia poblacional, así como la baja participación laboral y la difícil situación económica que atraviesa la Isla tienen un impacto negativo en los ingresos netos del Fondo General.

## Ingresos Netos del Fondo General

Si analizamos el informe de Ingresos Netos al Fondo General preparado por el Departamento de Hacienda para los años fiscales 2003-2004 al 2012-2013, podemos observar que para el año fiscal 2003-2004 los ingresos netos del Fondo General totalizaron $7,985 millones mientras que para el año fiscal 2012-2013 (9 años después) esa cantidad fue de $8,502 millones. Esto quiere decir, que los recursos de fuentes estatales, tales como la contribución sobre ingresos, los impuestos sobre venta y uso y arbitrios, entre otros; sólo aumentaron en $517 millones en casi una década.

La Gráfica VII muestra los ingresos netos al Fondo General desde el año fiscal 2003-2004 al 2012-2013 (en millones).



Fuente: Departamento de Hacienda: Informe de Ingresos Netos al Fondo General

A continuación se presenta un análisis de los ingresos netos al Fondo General por sus principales fuentes de recursos, según incluido en el informe antes mencionado, estos son:

## Recaudos por Contribuciones sobre Ingresos (en millones)



Fuente: Departamento de Hacienda: Informe de Ingresos Netos al Fondo General

microjuris.com

Como puede observarse en la Gráfica VIII, esta partida de ingresos, que incluye la contribución sobre ingresos de individuos, corporaciones, sociedades, retenida a no residentes, intereses, dividendos y "tollgate tax", experimentó un aumento anual de un 3% a un 9% entre los años fiscales 2003-2004 al 2006-2007.  A partir de esa fecha ha experimentado una caída consistente que tiene un cambio más marcado en el año fiscal 2007-2008 donde bajó un 11% en comparación con el año fiscal anterior. La segunda reducción más marcada es en el año fiscal 2011-2012 con una reducción de 7%.

Hay varios factores que inciden en el comportamiento de este importante renglón de los ingresos netos al Fondo General. Entre estos, debemos destacar la recesión económica, que comenzó a finales del año 2006, y la disminución en la población de las personas en edad productiva.  También, hay que mencionar  que como parte de la reforma contributiva producto de la Ley Núm. 1-2011, se disminuyeron las tasas contributivas de los individuos y las corporaciones, lo que acentuó aún más la reducción en recaudos por este concepto de ingresos. El efecto de esta disminución se trató de compensar con las tasas contributivas aprobadas mediante la Ley Núm. 154-2010, la cual discutiremos más adelante.

Esta Administración aprobó la Ley Núm. 40-2013 restableciendo la tasa contributiva máxima de corporaciones en un 39% e introdujo la imposición de contribución adicional sobre ingreso bruto (Patente Nacional) con la intención de aumentar los ingresos por contribuciones sobre ingresos de corporaciones para el año fiscal 2013-2014.  Sin embargo, al 30 de abril de 2014, dichos recaudos estaban cerca de $380 millones por debajo de lo estimado.

Las proyecciones económicas de la Junta de Planificación, así como las tendencias poblacionales de la Isla, no dan base para anticipar que los recaudos por contribuciones sobre ingresos aumenten significativamente en un futuro cercano.

## Impuestos sobre Ventas y Uso (en millones)

microjuris.com



Fuente: Departamento de Hacienda: Informe de Ingresos Netos al Fondo General

En noviembre de 2006 y según dispuesto por la Ley Núm. 117-2006, se comenzó a cobrar un impuesto estatal de 5.5% sobre ventas y uso. Este impuesto sustituyó el arbitrio general de 5%. En el año fiscal 2006-2007, sus recaudos totalizaron $583 millones. El año fiscal 2007-2008 representó el primer año completo de recaudos, los cuales alcanzaron $911 millones. Como se desprende de la Gráfica IX, luego de esto bajó a $797 millones y $540 millones para los años fiscales 2008-2009 y 2009-2010, respectivamente. A partir de esa fecha su comportamiento ha sido lineal.

La razón principal para la disminución en los recaudos del impuesto sobre ventas y uso que ingresa al Fondo General es que, como consecuencia de las Leyes Núm. 1-2009 y la Ley 7-2009, se aumentó la porción de este impuesto que se destina al Fondo de Interés Apremiante para el pago de la deuda de la COFINA. De igual forma, hay que considerar que la Ley Núm. 91-2006 establece que la cantidad de dinero que ingresa al Fondo de Interés Apremiante aumenta automáticamente en un 4% anual hasta alcanzar la cantidad de aproximadamente $1,850 millones en el año 2041. Esto significa que si el ingreso total por este concepto se mantiene estable y no aumenta, la porción de dichos recaudos que ingresen al Fondo General será menor cada año.

La Ley Núm. 40-2013, según enmendada por la Ley Núm. 117-2013, modifica la forma en que se recauda y remite al Departamento de Hacienda el impuesto sobre ventas y uso. Según estimados del propio Departamento de Hacienda, se espera que los ingresos por este concepto aumenten en cerca de $170 millones para el año fiscal 2014-2015. Sin embargo, debido a la situación económica que atraviesa el País y al efecto del aumento automático de 4% en la cantidad del impuesto sobre venta y uso que ingresa al Fondo de Interés Apremiante para el pago de la deuda, no es razonable concluir que los recaudos por este concepto aumenten significativamente en un futuro cercano.

microjuris.com

## Arbitrios (en millones)



Fuente: Departamento de Hacienda: Informe de Ingresos Netos al Fondo General

Esta fuente de recursos incluye los arbitrios a las bebidas alcohólicas, productos del tabaco, productos del petróleo, vehículos de motor, carreras de caballo, primas de seguro, cemento y tragamonedas. De igual forma, incluyó hasta el año fiscal 2006-2007 el arbitrio general de 5% (sustituido por el impuesto sobre ventas y uso). También incluye, desde el año fiscal 2010-2011, el impuesto a las foráneas producto de la Ley Núm. 154-2010. Como se desprende de la Gráfica X, los recaudos por arbitrios se redujeron en $522 millones o un 32% del año fiscal 2005-2006 al 2006-2007 como resultado, principalmente, de la sustitución del arbitrio general por el impuesto sobre ventas y uso. El año fiscal 2007-2008 presenta una reducción adicional de $258 millones o un 23%, ya que este es el primer año fiscal que recoge el efecto completo del cambio de una fuente de ingreso a la otra.

El incremento sustancial que se observa en el año fiscal 2010-2011 es el resultado, principalmente, del nuevo arbitrio a las compañías foráneas (Ley Núm. 154-2010) que ese año generó ingresos por $678 millones. Este arbitrio nuevo tuvo recaudos de $1,876 millones y $1,677 millones para los años fiscales 2011-2012 y 2012-2013, respectivamente. Siendo en cada uno de estos años fiscales la razón principal del aumento o disminución de los recaudos por arbitrios.

Debe observarse que la Ley Núm. 154-2010 representó una sustitución y redistribución de las fuentes de recaudos del Fondo General con el agravante de que los recaudos producto de dicha ley para el año fiscal 2012-2013, que representaron cerca del 20% de los recaudos del Fondo General, provinieron de sólo 27 grupos de afiliadas, de los cuales 6 grupos fueron responsables del 75% de estos ingresos. A esta concentración de riesgo en los recaudos del

.:ᴍicrojuris.com

Fondo General, hay que añadirle que el arbitrio especial temporero vence en el 2017. A partir de esa fecha, entra en vigor la regla de fuente de ingresos (modified source of income rule). La forma final en que se implemente esta regla nueva no está definida aún por lo que no se puede estimar ni asegurar que se logre el mismo nivel de recaudos actuales. Otro factor que hay que considerar es cualquier acción que tome el Tesoro Federal en cuanto al trato contributivo que afecte el crédito que actualmente está disponible a nivel federal por el arbitrio pagado en Puerto Rico. Otro reto que enfrenta la Ley Núm. 154-2010 es que algunas patentes de productos manufacturados en la Isla vencen en los próximos años.

Esta Administración, mediante la Ley Núm. 2-2013, fijó en 4% y extendió hasta el año 2017 la Ley Núm. 154-2010. Algunos sectores han planteado la posibilidad de aumentar este arbitrio y hacerlo permanente. Sin embargo, hay factores determinantes alrededor del mismo que no nos garantizan el nivel de recaudos por este concepto ya que la decisión, principalmente, depende del Gobierno Federal (trato contributivo) o de decisiones de negocios del grupo de afiliadas que pagan el impuesto y que algunas de sus patentes vencen en los próximos años.

## Resumen de los Ingresos Netos

Los recaudos por contribución sobre ingresos, impuestos sobre ventas y uso y los arbitrios representan cerca del 90% de los ingresos netos del Fondo General. Estas tres fuentes de ingresos enfrentan grandes retos, que según se han expuesto anteriormente, incluyen, la prolongada recesión en la economía de la Isla, la disminución en la población en edad productiva, la cantidad de ingresos del impuesto sobre ventas y uso que se destinan al pago de deuda y que cerca del 20% de los ingresos del Fondo General provienen de la Ley Núm. 154-2010, específicamente de 27 compañías afiliadas. Esto, además de que el impuesto es de carácter temporero y termina en el 2017. Estos retos aumentan el nivel de incertidumbre sobre la cantidad de los recursos con que contará el ELA para cumplir con los servicios que ofrecen a sus ciudadanos.

## Estados Financieros Auditados

La Tabla 8 presenta los ingresos y gastos del Fondo General para los años fiscales 1999-2000 hasta 2011-2012, según se presentan en los estados financieros auditados del ELA, específicamente en el "Statement of Revenue and Expenditures-Budget and Actual-Budget Basis-General Fund" (en millones).

**Tabla 8: Ingresos y gastos del Fondo General para los años fiscales 1999-2000 hasta 2011-2012**

| Año Fiscal | Ingresos | Gastos | Pago de Prestamos y otras transferencias | Total | Déficit |
|---|---|---|---|---|---|
| 1999-2000 | $7,003 | $5,346 | $2,231 | $7,577 | ($574) |

microjuris.com

| | | | | |
|---|---|---|---|---|
| 2000-2001 | 6,872 | 5,302 | 2,820 | 8,122 | (1,250) |
| 2001-2002 | 7,186 | 8,542 | 584 | 9,126 | (1,940) |
| 2002-2003 | 7,341 | 7,366 | 677 | 8,043 | (702) |
| 2003-2004 | 7,834 | 7,942 | 981 | 8,923 | (1,089) |
| 2004-2005 | 8,603 | 8,908 | 809 | 9,717 | (1,114) |
| 2005-2006 | 8,423 | 9,461 | 936 | 10,397 | (1,974) |
| 2006-2007 | 8,718 | 8,786 | 921 | 9,707 | (989) |
| 2007-2008 | 8,207 | 8,809 | 515 | 9,324 | (1,117) |
| 2008-2009 | 7,584 | 9,927 | 963 | 10,890 | (3,307) |
| 2009-2010 | 7,593 | 9,640 | 728 | 10,368 | (2,775) |
| 2010-2011 | 7,994 | 9,075 | 1,548 | 10,623 | (2,360) |
| 2011-2012 | 8,573 | 9,911 | 2,055 | 11,966 | (3,393) |
| **Total** | **$101,929** | **$109,105** | **$15,768** | **$124,783** | **($22,854)** |

Como puede observarse, en todos estos años fiscales los gastos excedieron los ingresos netos del Fondo General. El déficit total de estos 13 años totalizó $22,854 millones. El promedio de los ingresos netos del fondo para el período comprendido entre los años fiscales 1999-2000 al 2011-2012 fue de $7,841 millones, mientras el gasto promedio (incluyendo pago de deuda) fue de $9,599 millones. Esto equivale a que en promedio los gastos con cargo al Fondo General superaron sus ingresos por la cantidad de $1,758 millones. Hay que destacar que, desde el año fiscal 2008-2009, el gasto total superó consistentemente los $10,000 millones, acercándose a los $12,000 millones en el año fiscal 2011-2012.

Como se demuestra en la Tabla 9, para cubrir los déficits de estos años se hicieron préstamos por $8,256 millones al BGF y préstamos de COFINA por $8,521 millones entre los años fiscales 2008-2009 al 2011-2012. Esto significa que en 13 años se tomaron prestados $16,777 millones para cubrir déficits presupuestarios. También se contó con $4,954 millones por ingresos no contributivos y otras transferencias, dejando una insuficiencia neta no cubierta por $1,123 millones.

**Tabla 9: Préstamos Para Cubrir Déficits de los Años 1999-2000 al 2011-2012**

microjuris.com

| Año Fiscal | Déficit | Préstamos | Préstamos COFINA | Loterías y otras Transferencias | Neto |
|---|---|---|---|---|---|
| 1999-2000 | ($574) | $55 | $- | $574 | $55 |
| 2000-2001 | (1,250) | 662 | - | 462 | (126) |
| 2001-2002 | (1,940) | 1,932 | - | 268 | 260 |
| 2002-2003 | (702) | 424 | - | 263 | (15) |
| 2003-2004 | ($1,089) | 695 | - | 286 | (108) |
| 2004-2005 | (1,114) | 756 | - | 433 | 75 |
| 2005-2006 | (1,974) | 1,345 | - | 168 | (461) |
| 2006-2007 | (989) | 340 | - | 145 | (504) |
| 2007-2008 | (1,117) | 290 | - | 152 | (675) |
| 2008-2009 | (3,307) | 172 | 3,328 | 127 | 320 |
| 2009-2010 | (2,775) | 148 | 2,688 | 350 | 411 |
| 2010-2011 | (2,360) | 560 | 1,552 | 862 | 344 |
| 2011-2012 | (3,393) | 877 | 953 | 864 | (699) |
| **Total** | **($22,854)** | **$8,256** | **$8,521** | **$4,954** | **($1,123)** |

Podemos concluir que el nivel de los gastos y obligaciones del Fondo General consistentemente ha sido mayor que los ingresos netos generados. Esta brecha fue cubierta con préstamos tanto del BGF como de COFINA. Como se explicó anteriormente, el problema de liquidez del BGF y el nivel de endeudamiento del país no permiten que se pueda seguir usando esta estrategia para cuadrar el Fondo General. Además, dicha práctica no responde a políticas públicas de administración fiscal sana y responsable.

## Deuda Pública

El total de deuda pública de la Isla alcanzó $64,957 millones en el año fiscal 2013. Este nivel de deuda pública representó el 91.8% del Producto Nacional Bruto en el año fiscal 2013 (ver Gráfica XI). El aumento vertiginoso que ha tenido la deuda pública durante los últimos años corresponde, principalmente, a las emisiones de deuda que fueron realizadas por anteriores administraciones, en particular la pasada Administración. Durante el periodo de 2009-2012, la deuda total aumentó en $17,828 millones, es decir en un 38%. De este aumento en la deuda, alrededor de $9,000 millones fueron emisiones de COFINA para financiar gastos operacionales del gobierno. Cabe indicar que en el total de deuda emitida no se incluye alrededor de $5,000 millones en notas emitidas del BGF para financiar también las operaciones del gobierno. Al

ʍicrojuris.com

considerar estas notas emitidas por la pasada Administración, aumentó la deuda pública en alrededor de $23,828 millones.

Por consiguiente, el incremento histórico en la deuda pública durante el cuatrienio pasado conllevó a que el nivel de deuda llegara a representar el 94.3% del PNB en el año fiscal 2012 en comparación con 74.8% en el año fiscal 2008. Sin lugar a dudas, el nivel de endeudamiento del País que llevó a cabo la pasada Administración contribuyó de forma significativa a la degradación a nivel de chatarra de los bonos del gobierno del ELA y a la crisis económica y de liquidez que nos encontramos actualmente.

### Gráfica XI: Por ciento de la Deuda Pública del Producto Nacional Bruto

**Fuente:** Banco Gubernamental de Fomento y Junta de Planificación

En la siguiente Gráfica XII, se incluye en el total de deuda pública los $5,086 millones de deuda que no grava el erario público. Actualmente esta deuda tiene una fuente de pago que proviene de fuentes de ingresos específicas como el rembolso del tabaco, asistencia federal, etc. Si consideramos dicha deuda, el monto total de deuda pública alcanzó a $70,043 millones en el Año Fiscal 2013.

..microjuris.com

**Gráfica XII: Total de Deuda en Circulación de Puerto Rico al 30 de junio de 2013 (en millones)**



**Fuente:** Banco Gubernamental de Fomento

Según podemos observar en la gráfica anterior, la deuda del Gobierno Central representa el 15.1% de la deuda total en el año fiscal 2012-2013. En cambio, la deuda de las corporaciones públicas y COFINA representa el 36.6% y el 21.7% de la deuda total, respectivamente.

## Corporaciones Públicas

Como es de conocimiento general, la crisis fiscal que está atravesando el País afecta directa e indirectamente a todos los sectores, incluyendo a las corporaciones públicas. Varias corporaciones públicas cargan con déficits millonarios debido a que sus gastos operacionales superan los ingresos que producen por los servicios que ofrecen. Para cubrir este déficit operacional, en el pasado se recurrió a solicitar dinero prestado al BGF sin tener fuentes de repago identificadas.

El problema que hoy enfrentan algunas de estas corporaciones es que no cuentan con el flujo de efectivo necesario para cumplir con sus obligaciones, incluyendo el repago de su deuda al BGF. Ejemplo de esto y como mencionamos anteriormente, es el caso de la ACT, que según sus estados financieros al 30 de junio de 2013, auditados por la firma de auditores Ernst & Young LLP, tienen un balance en líneas de crédito por pagar al Banco de $2,045 millones.

Asimismo, la Administración de Servicios Médicos (ASEM) presenta en sus estados financieros al 30 de junio de 2013, auditados por la firma de contadores públicos autorizados FPV & Galíndez, PSC, un balance en líneas de crédito por pagar al BGF por $273 millones. En

microjuris.com

el caso de la Administración de Seguros de Salud (ASES), sus estados financieros al 30 de junio de 2013, también auditados por la firma FPV & Galíndez, PSC, incluyen un balance en líneas de crédito por pagar al BGF por la cantidad de $171 millones.

Otra de las corporaciones públicas que tiene deudas con el BGF es la Autoridad de Acueductos y Alcantarillados (AAA). Según sus estados financieros al 30 de junio de 2013, auditados por la firma de contadores públicos Ernst & Young LLP, la AAA tiene un balance en líneas de crédito por pagar al Banco de $90 millones. Por otro lado, la Autoridad de los Puertos refleja en sus estados financieros al 30 de junio de 2013, auditados por la firma de auditores Nieves Velazquez & Co, PSC, un balance en líneas de crédito por pagar al BGF por la cantidad de $216 millones.

Estas cinco corporaciones públicas adeudaban al BGF alrededor de $2,795 millones en líneas de crédito al 30 de junio de 2013. Esta cantidad equivale al cuarenta y uno (41%) de los préstamos por cobrar a corporaciones públicas de $6,889 millones, según presentados en los estados financieros auditados del Banco.

## Presupuesto 2014-2015

En la Gráfica XIII se muestra el presupuesto del Fondo General recomendado para el año fiscal 2014-2015 totaliza $9,640 millones, los cuales se distribuyen de la siguiente manera:

Gráfica XIII




**Fuente:** Oficina de Gerencia y Presupuesto

Como puede observarse, los principales componentes de gasto del presupuesto del Gobierno, con cargo al Fondo General, son las fórmulas presupuestarias para la Universidad de Puerto Rico, los Municipios y la Rama Judicial; el pago de deuda; las aportaciones y leyes especiales de Sistemas de Retiro; y las aportaciones a la Reforma de Salud. A estas partidas se le asignan alrededor de $4,213 o el 44% del presupuesto recomendado.

⊷microjuris.com

El resto del presupuesto recomendado se asigna primariamente para gastos de nómina y otros gastos operacionales tales como renta, utilidades, transporte y compras en los Departamentos de Educación, Policía, Corrección y Familia. También incluye subsidios a las corporaciones públicas de salud y transporte colectivo.

El reto de lograr un presupuesto balanceado para el año fiscal 2014-2015 excede sustancialmente el déficit del año fiscal vigente. Esto, debido a que existen partidas de asignaciones que aumentan automáticamente, tales como las asignaciones por fórmula a la Universidad, Municipios y a la Rama Judicial, convenios colectivos pre-negociados, aumento en la amortización de pago de obligaciones generales y aumento en tasas de interés, aumentos en las aportaciones patronales a los sistemas de retiro, pleitos contra el gobierno y otros que aumentarían significativamente los gastos y obligaciones con cargo al Fondo General. A continuación se presenta la Tabla 10, la cual muestra el cambio para el presupuesto del año fiscal 2014-2015 si no se toman medidas para atemperar las obligaciones con cargo al Fondo General a los recursos con que cuenta el Estado para cumplir con las mismas (en millones):

**Tabla 10: Cambio para el presupuesto del Año Fiscal 2014-2015**

| | |
|---|---|
| Presupuesto vigente (año fiscal 2013-2014) | $9,770 |
| Aumento en servicio a la deuda | 648 |
| Aumentos en convenios colectivos | 181 |
| Aumentos por fórmulas de la UPR, Rama Judicial y Municipios | 132 |
| Aumento en asignaciones legisladas o asignaciones nuevas | 35 |
| Aumentos en leyes especiales de Sistemas de Retiro | 29 |
| Aumentos en Educación, Corporaciones y Otros | 202 |
| Total | $10,997 |

**Fuente**: Oficina de Gerencia y Presupuesto

Nótese que el aumento en el Fondo General sería mayor a $1,200 millones y tendríamos un presupuesto de gastos cercanos a los $11,000 millones. Por esta razón, el Estado se ve obligado a buscar los mecanismos de reducción de gastos que le permitan tener un presupuesto cónsono con su nivel de ingresos.

Según se explicó anteriormente, la alternativa de aumentar ingresos es limitada. Esta Administración ha sido consistente en su política fiscal de no aumentar impuestos directos a los contribuyentes. Dicha política fiscal está enmarcada en el reconocimiento del impacto que podría tener la misma sobre la débil recuperación que está reflejando nuestra economía. Esto es así ya que un aumento en los impuestos a las Personas les reduce su ingreso personal disponible y por ende su nivel de consumo. De acuerdo con la Junta de Planificación por cada dólar de reducción en el consumo total, se pierden de forma indirecta en la economía alrededor de $0.92 en el resto de la economía. Por consiguiente, si el gobierno optara por aumentar en $100 millones los impuestos sobre ingresos de la Isla podría la economía perder alrededor de $192 millones de forma directa e indirecta. A pesar de que el gobierno necesita aumentar sus recaudos para afrontar sus retos fiscales, la alternativa de aumentar los impuestos tendría un efecto

microjuris.com

negativo sobre el crecimiento de nuestra economía y por ende en los recaudos en el mediano plazo y largo plazo. Por lo tanto, las medidas que deben ser implantadas para mejorar el flujo de efectivo del Estado tiene que ocurrir, especialmente, mediante la reducción de gastos.

A continuación se detallan las medidas correctivas consideradas dentro del presupuesto recomendado para el año fiscal 2014-2015, para atajar el déficit presupuestario y los criterios utilizados para adoptarlas.

## Medidas de Ahorro en Presupuesto No Operacional

## Pago de Deuda

El pago de la deuda en el presupuesto recomendado para el Año Fiscal 2014-2015 asciende a $1,211 millones o 12.6% del presupuesto total recomendado. No se debe reducir la cantidad asignada para el pago de deuda, ya que fue, precisamente, la práctica de refinanciar deuda constitucional una de las causas principales que llevaron a Puerto Rico a la situación que hoy enfrentamos. En el presupuesto del año fiscal 2012-2013, se refinanció la cantidad de $775 millones en bonos de obligación general del ELA y de la Autoridad de Edificios Públicos, que son garantizados por el ELA y se pagan en su gran mayoría por la renta del Gobierno Central a la Autoridad. En el presupuesto del año fiscal 2013-2014, se redujo esta práctica y se refinanció la cantidad de $575 millones, en bonos de obligación general del ELA. En el presupuesto recomendado para el Fondo General en el año fiscal 2014-2015 se detiene por completo la práctica de refinanciamiento de bonos de obligación general del ELA. Para este año fiscal se recomienda un aumento de $745 millones para el pago de la deuda que recoge, la eliminación de la práctica de refinanciamiento, el aumento en la amortización del pago de la deuda al BGF y los bonos de obligación general, intereses más altos en los bonos de corto plazo *TRANs*, y otros efectos se reflejan en el presupuesto recomendado.

## Pagos a Sistemas de Retiro

Las leyes especiales y otras asignaciones a los Sistemas de Retiro – más allá de la aportación patronal básica – ascienden a $599 millones o 6.2% del presupuesto recomendado para el año fiscal 2014-2015. Los Sistemas de Retiro están en una situación precaria y reducir la aportación patronal adicional sería afectar la base de la Reforma establecida en la Ley Núm. 3-2013. El presupuesto recomendado considera un aumento en la aportación patronal del Estado de 1% incremental tanto a los Sistemas de Retiro de Empleados del Gobierno Central como a los Sistemas de Retiro de Maestros, conforme lo dispuesto en las leyes 114-2011 y 116-2011. En cuanto a la Aportación Adicional Uniforme de $120 millones otorgada en el año fiscal 2013-2014, y establecida en la Ley 3-2013, el presupuesto recomendado incluye una reducción de aproximadamente $90 millones. Aunque se enfrenta una crisis de un plazo muy corto en el Fondo General y en lo que supone la liquidez para el funcionamiento básico del Estado, esta Asamblea Legislativa entiende que una reducción mayor comprometería demasiado en el mediano y largo plazo la salud fiscal de ambos Sistemas de Retiro.

·mícrojuris.com

**Subsidios a Programa Mi Salud ("Reforma de Salud")**

La asignación del Fondo General para la Reforma de Salud totaliza $885 millones en el presupuesto recomendado para el año fiscal 2014-2015, y se mantiene intacta en 9.2% del total. La Reforma de Salud enfrenta una situación fiscal incierta. La emisión de Requisición de Propuestas realizada para seleccionar aseguradoras que suplan servicios en el año fiscal 2014-2015 fue declarada desierta ya que no habían suplidores dispuestos a proveer el servicio en todas las regiones bajo términos, incluyendo costos, que fueran aceptables para ASES y su Junta de Directores. Con la anuencia del gobierno federal, se extendió el contrato vigente hasta el 30 de abril de 2015, en cuyo momento se espera un aumento en los costos de la Reforma de Salud. Para el próximo año fiscal, ASES proyecta actualmente un déficit de $37.3 millones, y está elaborando un plan de acciones correctivas. Los costos de la Reforma de Salud son poco discrecionales ya que 89% de la población beneficiada participa de programas federales altamente reglamentados. Además, los costos van directamente a la salud de los menos privilegiados de la población. El programa de Reforma de Salud proyecta utilizar una cantidad sustancial de fondos no recurrentes provistos por el American Affordable Care Act of 2010; una vez agotado estos fondos – y ausente acción adicional por el Congreso de los Estados Unidos – la Reforma de Salud tendrá que reducir costos o aumentar ingresos para compensar por la pérdida de dichos fondos no recurrentes. Ante este cuadro, esta Asamblea Legislativa no consideró prudente reducir la asignación a la Reforma de Salud ni implantar legislación que reduzca los gastos de la Reforma de Salud.

**Asignaciones Especiales - Subsidio a Corporaciones Públicas**

Los subsidios a corporaciones públicas en el área de servicios de salud y transporte colectivo totalizan $137 millones o 1.4% del presupuesto, y representa un aumento de $47 millones al compararlo con el presupuesto del año fiscal anterior. Con este aumento, se pretender reducir el déficit operacional de estas corporaciones públicas como parte de un proceso de lograr mayor eficiencia en la operación de las mismas. Se debe señalar que ya se han hecho recortes sustanciales a la Autoridad de Transporte Marítimo; la Autoridad Metropolitana de Autobuses; y la Administración de Servicios Médicos por lo que el campo de acción en recortes adicionales en esta área es limitado.

**Aportaciones a la Universidad de Puerto Rico y Municipios**

Los gastos de funcionamiento de la Universidad de Puerto Rico se mantienen en $834 millones, o sea 8.7% del presupuesto recomendado para el año fiscal 2014-2015. Los gastos de funcionamiento de los Municipios se mantienen en $228 millones para el Fondo de Equiparación, establecido mediante la Ley 80-91, y $133 millones para el Fondo de Exoneración, establecido mediante la Ley 83-91; combinados, ambos fondos representan 3.8% del presupuesto recomendado para el año fiscal 2014-2015. Esta ley congela las fórmulas que determinarían, de otra forma, el presupuesto de estas entidades autónomas.

···microjuris.com

Aunque a la Universidad de Puerto Rico le hubiese correspondido un aumento en su presupuesto de $70 millones; se congela esta cantidad debido a la situación fiscal del país.  No obstante, esta Asamblea Legislativa entiende que una reducción neta adicional en el presupuesto de la Universidad de Puerto Rico, para hacerlo cónsono a las reducciones en las tres Ramas de Gobierno, haría un daño irreparable a la Universidad, incluyendo a su matrícula, cumplimiento con su deber educativo y sobre todo su viabilidad fiscal.  Esto, debido a experiencias recientes con reducciones presupuestarias y aumentos en los costos al estudiantado, que tuvieron consecuencias nefastas sobre la institución.  Esta Asamblea Legislativa entiende que una reducción presupuestaria a la Universidad, por sus características particulares, sería fiscalmente contraproducente y dañino a la economía del país, por lo cual la ley no incluye la Universidad de Puerto Rico en el recorte uniforme que abarca a las tres ramas del Gobierno Central.

Aunque a los Municipios le hubiese correspondido un aumento en su presupuesto de $13 millones ($10 millones para el Fondo de Exoneración y $3 millones para el Fondo de Equiparación), se congela esta cantidad debido a la situación fiscal del país.  No obstante, esta Asamblea Legislativa entiende que una reducción neta adicional en el presupuesto de los Municipios pondría a estos en una situación fiscalmente precaria, que eventualmente redundaría en despidos, jornadas parciales, financiamientos deficitarios, y precisamente los efectos que trata de evitar esta ley.  Los Municipios han tomado medidas drásticas en muchos casos para reducir sus gastos de funcionamiento, y no cuentan con las herramientas del Gobierno Central; una quiebra de un número importante de Municipios sería una carga sobre la economía, el fisco del país, y los servicios a la población.

## Asignaciones para la Asamblea Legislativa, Rama Judicial y Entidades Autónomas

Las Asignaciones Especiales para funcionamiento de la Rama Judicial totalizan $323 millones o 3.4% del presupuesto recomendado para el año fiscal 2014-2015; y las asignaciones recomendadas para el Presupuesto General de la Asamblea Legislativa totalizan $110 millones o 1.1% del presupuesto recomendado.  En ambos casos, la ley congela cualquier aumento, y dispone una reducción de 7.4% del presupuesto para el año fiscal 2014-2015.  Este recorte es equivalente a la reducción en el presupuesto total del Fondo General entre el año fiscal 2013-2014 y el recomendado para el año fiscal 2014-2015, si se excluye de ambos años el repago de la deuda constitucional y el presupuesto de las entidades autónomas, tales como la Comisión Estatal de Elecciones, la Oficina del Contralor, la Oficina de Ética Gubernamental, el Panel del Fiscal Especial Independiente y la Oficina de la Procuradora del Ciudadano.  De esta forma, no se interviene con la autonomía presupuestaria – entiéndase, la forma en que cada entidad maneja sus recursos  presupuestarios – pero se atemperan los presupuestos a la realidad fiscal del gobierno en general.  De la misma forma, no se hace una evaluación discrecional individualizada del nivel de presupuesto global de cada entidad, cuyo resultado favorable o desfavorable pueda entenderse como un intento de establecer influencia sobre dicha entidad.  Es importante señalar que los gastos de funcionamiento de la Rama Ejecutiva, una vez se excluyen elementos no operacionales tales como Pago de Deuda, Aportaciones a Retiro, Reforma de Salud, y Aportaciones por Fórmula, se reducen cumulativamente en un porcentaje mayor de aproximadamente 10.5%.

microjuris.com

## Otras Asignaciones Especiales

El resto de las Asignaciones Especiales, totalizan aproximadamente $406 millones, o 4.2% del presupuesto recomendado para el año fiscal 2014-2015. Esto representa una reducción de $177 millones o 30% en relación con el año fiscal 2013-2014. Estas asignaciones recogen una diversidad de conceptos desde aportaciones a terceros tales como fundaciones y museos, contingencias legales, y programas de agencias de gobierno. El recorte en este renglón fue sustancial y se enfatizó en aquellas asignaciones que no afectan el servicio directo a la población.

## Medidas de Ahorro en Presupuesto Operacional

Los gastos de funcionamiento del Gobierno totalizan $4,773 millones o 50% del presupuesto del Fondo General. De estos gastos, aproximadamente $2,471 millones corresponde a nómina que se sufraga directamente como tal en los sistemas de contabilidad; y $820 millones es nómina que se sufraga a través del Programa *Schoolwide* del Departamento de Educación, y se refleja como "Asignación Englobada" en la contabilidad presupuestaria.

## Nómina

Como punto de partida, es esencial señalar que durante el año fiscal 2013-2014, se redujo sustancialmente la plantilla de empleados en las agencias cuyos gastos de funcionamiento se sufragan total o parcialmente del Fondo General. Desde diciembre de 2012 a abril 30 de 2014, se redujo el número de empleados en estas agencias por 9,607 ó 8.45%, principalmente mediante disciplina en la re-contratación de empleados. Si se considera solamente aquellos empleados que se sufragan directamente del Fondo General – excluyendo aquellos pagados de fondos federales, fondos especiales o ingresos propios – la reducción neta fue de 7,849 ó 7.92%. Esta disciplina en la re-contratación de empleados fue una de las principales razones que fue posible enmendar el presupuesto del año fiscal 2013-2014 por $170 millones a mitad de año (en febrero) y mantener esta disciplina se estima que viabilizará ajustes en la asignación presupuestaria del próximo año por $116 millones.

Esta Administración ha sido muy analítica en las alternativas disponibles para promover la reducción de gastos de funcionamiento del gobierno. Como parte de este análisis se consideraron las medidas implantadas por virtud de la Ley 7-2009 que incluyó la cesantía de servidores del Gobierno Central que en aquella ocasión se estimó generaría una economía de unos $30,000 por empleado despedido. El efecto en las operaciones del gobierno de la cesantía masiva de empleados públicos al amparo de la Ley 7-2009 provocó un serio desfase en los servicios gubernamentales que se brindaban a la ciudadanía en sectores como la protección a los menores, la población de mayor edad, en los programas de beneficencia social, en los servicios del Departamento de Transportación y Obras Públicas, en las colecturías del Departamento de Hacienda, por sólo señalar algunos ejemplos. Esto sin mencionar el impacto adverso que tuvo en nuestra debilitada economía el despido de sobre 20 mil empleados gubernamentales, situación que analizamos más adelante. No podemos repetir los errores del pasado recurriendo a despidos masivos como mecanismo de reducción de gastos sin considerar el efecto de tal iniciativa en todas sus dimensiones.

microjuris.com

Desde el principio, esta Administración ha sido clara en que la alternativa de despedir empleados no es viable por el impacto nefasto que se experimentó como resultado de la Ley Núm. 7-2009.

## Impacto del Despido de Empleados por la Ley Núm. 7-2009

De los estudios realizados por el por el Catedrático retirado de la Universidad de Puerto Rico el Dr. Ángel Ruiz en el 2009 y el Dr. José I. Alameda en el 2012, se desprende que si el Gobierno de Puerto Rico decidiera implantar el despido de empleados públicos como estrategia básica para cuadrar el presupuesto del Gobierno Central, tendría que prescindir de más de 30,000 empleados.

Según el análisis del doctor Ruiz, el despido de 30,000 empleados resultaría en una pérdida inicial de más de $1,002 millones en ingresos salariales, una pérdida de $2,796.7 millones en producción intersectorial directa, indirecta e inducida, 55,764 empleos directos, indirectos e inducidos (30,000 directos y 25,764 empleos indirectos e inducidos) y una pérdida en ingresos salariales de $1,384.8 millones (de los cuales $1,002 millones son directos y la diferencia en indirectos e inducidos). Del total de empleos directos e indirectos, la manufactura perdería 3,379 empleados, el comercio 4,304 empleados, servicios comerciales 1,604, otros servicios profesionales 6,157 y la mayor pérdida sería en el gobierno con 36,245, dado el impacto inicial causado por el despido de 30,000 empleados públicos. Es importante resaltar que cuando se estiman los impactos inducidos, el comercio al por mayor y al detal sufre fuertes pérdidas en empleo.

Todos estos estimados contenidos en el informe del doctor Ruiz, a pesar de que se realizaron en el 2009, todavía tienen vigencia ya que su metodología está basada en la estructura económica de la Isla a esa fecha y esta no ha sufrido cambios sustanciales recientemente.

En el caso particular del estudio del doctor Alameda, los impactos fueron basados en los despidos de 17,147 empleados y una reducción en nómina de $647.9 millones, lo que provocó una reducción de 0.7% en el Producto Nacional Bruto para los años fiscales 2009 y 2010. Además, el efecto de la Ley Núm. 7-2009 causó un aumento de alrededor de 3.1% en la tasa de desempleo en el año fiscal 2010. Esto representó un total de 37,000 desempleados adicionales. Ante una disminución de 30,000 empleados y una reducción de nómina de más de $1,000 millones, es de esperar impactos mayores sobre la economía y el nivel de desempleo.

## Pérdida en Ingresos Fiscales

En términos del impacto fiscal, el doctor Ruiz señala en su estudio lo siguiente: "*es preocupante la gran pérdida en ingresos fiscales, lo cual tiende a reducir cualquier impacto positivo en los ahorros del gobierno que pueda derivarse de una política de despido de empleados públicos. Los estimados del estudio muestran que de reducirse el empleo en 30,000 la pérdida en ingresos fiscales totalizarían $317.8 millones. Es decir que, por cada empleo perdido en el gobierno, se dejan de recibir alrededor de $10,600 en recaudos por concepto de contribuciones. Esta disminución en ingresos fiscales empeoraría aún más la situación fiscal del*

..microjuris.com

*gobierno afectando adversamente los servicios públicos". Véase Boletín de Economía, Unidad de Investigaciones Económicas, Departamento de Economía, Universidad de Puerto Rico, Recinto de Río Piedras, Vol. X, Núm. 1, enero-junio 2009, Página 4.*

El doctor Ruiz concluye indicando que *"el despido de trabajadores genera impactos económicos negativos directos e indirectos. Estos se acentúan aún más en tiempos de recesión. Estos impactos no son exclusivamente económicos sino que se extienden al ámbito social. Los impactos incluyen pérdidas en ingresos fiscales. Al implantar una política de despido de empleados públicos sin previo análisis serio y profundo se corre el riesgo de afectar servicios públicos esenciales y provocar inestabilidad social y política. Por el lado del ámbito social el desempleo tiene un fuerte impacto emocional y sobre la salud de los individuos y sus familias. Por último, es importante enfatizar que bajo la situación económica actual este tipo de política agrava aún más la fase recesiva del ciclo económico alargando el periodo de recuperación y afectando la profundidad del ciclo".*

La reducción de jornada ha sido planteada como alternativa ante la crisis fiscal. No obstante, los efectos de una jornada parcial podrían resultar en un efecto negativo en la economía y en el servicio a la ciudadanía. Por lo tanto, se deben implantar medidas menos onerosas tales como las aquí propuestas y que sean cónsonas con la política pública de esta Administración.

## Otras Medidas de Reducción de Gasto en Nómina

Esta ley establece medidas correctivas en el área de nómina importantes.

Primero, se reduce un 10% adicional a la nómina de confianza mediante disposiciones que eleven a estatuto las restricciones existentes, que no permiten reclutamientos adicionales hasta que no se logre una reducción en nómina de 20% en comparación con diciembre de 2012.

Segundo, se congela el reclutamiento y se limita principalmente a puestos que son indispensables de servicio directo, que sufraguen con ingresos propios o con fondos federales, y que respondan a orden judicial, entre otros.

Tercero, se prohíben los aumentos en beneficios económicos. Esto incluye aumentos de sueldo o aportaciones a todos los grupos de empleados, incluyendo empleados de confianza. La primera acción que se debe tomar en esta situación es congelar aumento en costo de nómina. Cabe señalar que esta determinación tiene un impacto menos oneroso en el empleado, en el servicio que ofrece el gobierno y en la economía.

Cuarto, se prohíben los beneficios económicos extraordinarios. Estos incluyen Bonos de Navidad en exceso de $600 (el tope en el sector privado); Bonos de Verano en exceso de $200; y otras bonificaciones. Estos son bonificaciones que se conceden por virtud de estatuto o disposiciones reglamentarias, pero que no forman parte del salario básico del empleado. Esta Asamblea Legislativa entiende que se debe proteger el salario básico del empleado por encima de beneficios marginales, particularmente aquellos que son atípicos en el sector laboral en general.

ꓲꓲᴍicrojuris.com

Quinto, se contempla una reorganización en la plantilla de maestros del Departamento de Educación. La población de estudiantes en el sistema público se ha reducido desde 730 mil en la década de los 80s, hasta 430 mil en el presente, y se proyecta que pudiera mermar hasta 330 mil en los próximos 5 años. La razón de maestros por estudiantes, sin embargo, no se ha mantenido a la par. La reorganización de la planta física del Departamento de Educación, incluyendo la consolidación de aproximadamente 80 escuelas, así como el retiro ordinario de un número importante de maestros, permitirá la oportunidad de reducir la plantilla total de maestros, sin despidos, a la vez que se refuerza el servicio directo al estudiante.

La ley reconoce claramente el valor de la sindicalización de los empleados públicos y el entorno legal particular que les cobija. Por eso, se establece un mandato para un proceso alterno de negociación que redunde en ahorros económicos comparables y que modifique las disposiciones de la ley en cuanto a beneficios económicos incrementales y compensaciones extraordinarias.

En general, estas medidas de nómina son mucho menos onerosas que el despido de los empleados públicos e inclusive que la jornada parcial, pero resultan en ahorros sustanciales que, junto con el conjunto de medidas contempladas, subsanan el déficit operacional para el año próximo.

## Otros Gastos Operacionales

La ley dispone varias medidas en reducción de gastos operacionales excluyendo nómina. Éstas totalizan $1,482 millones o el 31.0% del presupuesto operacional y el 15.4% del presupuesto total recomendado del Fondo General para el año fiscal 2014-2015. Este renglón incluye, no solamente servicios, sino también, pago de utilidades y renta a corporaciones públicas tales como la Autoridad de Acueductos y Alcantarillados, la Autoridad de Energía Eléctrica, y la Autoridad de Edificios Públicos, entre otros.

Las medidas de reducción de gastos operacionales se enfocan en la reducción de precios y tarifas en los servicios.

Primero, se autoriza la reducción en tarifas de servicios comprados y profesionales sin necesidad de formalización escrita bilateral. La gran mayoría de los servicios comprados y profesionales en el Fondo General van dirigidas a servicios esenciales a la población. A modo de ejemplo, los cinco programas con las asignaciones presupuestarias mayores en servicios comprados y profesionales son, en orden: Escuelas de la Comunidad en el Departamento de Educación ($82 millones); Servicios de Salud a la Población Penal ($24 millones); Servicios Educativos Integrales a Personas con Impedimentos ($19 millones); Servicios a Confinados incluyendo alimentos ($19 millones); y Servicios de Salud de Discapacidad Mental ($16 millones). Es por esa concentración en servicios directos esenciales, que es fundamental desarrollar mecanismos para la ágil documentación de la renegociación de tarifas.

Segundo, se modifica la estructura reglamentaria y fiscal de los programas de transporte escolar. Los programas de transporte escolar se rigen por una estructura de supervisión reglamentaria geográfica que dificulta la competencia dinámica entre suplidores. El gasto de

.: microjuris.com

transporte escolar ha subido desde aproximadamente $120 millones en el año fiscal 2010-2011 a una proyección de $185 millones en el año fiscal 2013-2014, principalmente debido a acuerdos tarifarios revisados en el año natural 2012. Por la naturaleza esencial del servicio, el monto del gasto, y la estructura regulatoria, el Departamento de Educación necesita herramientas adicionales para lograr costo eficiencia contundente e inmediata.

Tercero, se implantan múltiples medidas de índole gerencial que van dirigidos a la sana administración fiscal en elementos de control de gastos y de gerencia financiera. Esto incluye normativa presupuestaria tales como prohibición de sobregiros presupuestarios, de certificaciones de fondos en proyección de sobregiro, transacciones sin autorización de la Oficina de Gerencia y Presupuestos o la Oficina del Gobernador, y otras. Incluye también planes de ahorro en áreas de consumo energético y arrendamiento de facilidades. Se eleva, además, a nivel de estatuto recortes de gastos que, aunque fiscalmente de poco impacto, representan una visión importante del ejemplo que debe dar el gobierno, incluyendo en renglones tales como escoltas, viajes y uso de dispositivos electrónicos. En general, la Asamblea Legislativa considera esta ley como una herramienta, no para proveer flexibilidades adicionales en la administración pública, sino como reforzar las estructuras de control fiscal.

Finalmente, la ley dispone que las medidas de control de gastos, tales como limitación de reclutamiento, reducción de gastos de servicios, y medidas de administración presupuestaria, entre otras, le aplicarán a las corporaciones públicas. No cabe duda que el modelo de gobernanza descentralizado de las corporaciones públicas, particularmente en infraestructura, ha resultado en estructuras de costos poco sustentables, y los correspondientes déficits y financiamientos del BGF que, dada la interconexión fiscal del gobierno, han agravado la situación del Fondo General.

Durante los pasados dos años fiscales, la asignación para las partidas de servicios profesionales y servicios comprados se ha reducido en $103 millones durante los pasados dos años fiscales, de una asignación de $447 millones en el año fiscal 2012-2013 a $344 millones en el año fiscal 2014-2015. Aunque las medidas contempladas producirán un ahorro, ante la magnitud de la brecha y la limitada base de gastos operacionales cuando se excluye nómina y pagos a corporaciones públicas, es necesario un programa de reducción mucho más amplio y abarcador, incluyendo impacto en nómina, asignaciones por fórmula, y todas aquellas acciones que sea posible tomar sin afectar los servicios básicos de salud, seguridad y bienestar de la población.

## Otras Medidas de Ahorros

Existe además una amplia gama de recortes que se han contemplado que no son parte de la ley ya que no requieren acción de esta Asamblea Legislativa o se están atendiendo por legislación aparte. Esto incluye (i) la consolidación de escuelas en el Departamento de Educación; (ii) reducción en el número de agencias y corporaciones públicas con el objetivo de mejorar la efectividad y costo eficiencia del sector público; (iii) reducción en asignaciones especiales del Fondo General para gastos de funcionamiento o programático de corporaciones públicas (por ejemplo, reducción de la asignación de la Compañía de Turismo para incentivos a la industria de cruceros); (iv) aportaciones de Fondos Especiales Estatales y de capital de

ⁱⁱmicrojuris.com

corporaciones públicas solventes, con balance suficiente, de forma que no incida en los programas ni funcionamiento de las respectivas entidades; y otros.

La Tabla 11 resume las medidas correctivas, las cuales totalizan $1,357 millones:

**Tabla 11: Medidas de Reducción de Gastos (en millones)**

| | |
|---|---|
| Costos de nómina, incluyendo, la no concesión de aumentos en beneficios económicos ni compensación monetaria extraordinaria; reducción en el gasto de nómina de empleados de confianza y el no reclutamiento de puestos vacantes | $337 |
| Congelar aumentos por fórmulas en la UPR, Rama Judicial y Municipios | 132 |
| Reducción en el Departamento de Educación, incluyendo, reducir el gasto en transporte escolar, ahorros en nómina de maestros por retiro y no contratación de plazas que no son indispensables y la reducción en costos operacionales por la reubicación de estudiantes en planteles de mayores servicios, mejor planta física y mejor aprovechamiento | 296 |
| Reducción en asignaciones especiales | 100 |
| Reducción en el presupuesto de la Rama Judicial, Asamblea Legislativa y entidades autónomas | 45 |
| Reducción en el gasto de servicios profesionales y comprados | 26 |
| Reducción en gasto de utilidades, el cual incluye ahorro en consumo | 37 |
| Modificación en aportaciones adicionales al Sistema de Retiro | 92 |
| Reasignación de Fondos Especiales Estatales en Agencias del Gobierno Central para el pago de demandas contra el Estado | 59 |
| Ajuste en corporaciones públicas, la cual incluye reducción en gastos de nómina y contratos por servicios profesionales y compras; la redistribución de recursos de las corporaciones públicas para sufragar obligaciones afines en el Fondo General; eliminación de ciertos subsidios de programas o funcionamiento y medidas adicionales de ingresos y ahorros en ASEM | 233 |
| **Total** | **$1,357** |

**Fuente:** Oficina de Gerencia y Presupuesto

Se subraya que se incluyen los empleados y las corporaciones públicas en general en esta ley porque son parte del ELA, razón por la cual su salud fiscal incide en la salud fiscal del Gobierno Central. Por ende, ya sea porque esta Ley mejora una situación precaria propia de una corporación o porque viabiliza que una corporación pública aporte directa o indirectamente a la situación del Fondo General, es necesario que estén cubiertas por el alcance de esta Ley. Para que el País proceda hacia sus aspiraciones sociales y económicas, es necesario que todo su gobierno sea fiscalmente sostenible.

Finalmente, esta ley incluye disposiciones que cambian la manera en que se cobran los litigios contra el Estado. El cúmulo de sentencias o pleitos contra el ELA en etapa adelantada asciende a cientos de millones de dólares y el estado de derecho vigente no provee para un sistema ordenado de pago, que permita que se pareen los pagos que se tienen que cumplir con los recursos disponibles; entendiendo siempre la obligación que existe de cumplir con lo requerido. El presupuesto recomendado para el año fiscal 2014-2015 solo incluye un fondo de $84 millones para cumplir con sentencias, acuerdos y estipulaciones; una asignación adicional de casi $16 millones debido al agotamiento de multas en el caso federal de Morales Feliciano; y el repago de una línea de crédito para pago de sentencias por casi $18 millones. El Estado está comprometido

.:microjuris.com

y en la mejor disposición de pagar, pero es apremiante que se establezca un proceso ordenado y estructurado para este proceso.

En virtud de la insuficiencia de fondos, la ley orgánica de la Oficina de Gerencia y Presupuesto (OGP), Ley Núm. 147 de 18 de junio de 1980, según enmendada, establece que el Gobernador o el Director de OGP deberá, en armonía con la Sección 8, Artículo VI, de la Constitución del Estado Libre Asociado de Puerto Rico, proceder conforme a las siguientes normas de prioridad en el desembolso de fondos públicos, cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año:

(1)  Ordenar el pago de los intereses y amortizaciones correspondientes a la deuda pública.

(2)  Ordenar que se atiendan los compromisos contraídos en virtud de contratos legales en vigor, sentencias de los tribunales en casos de expropiación forzosa, y obligaciones incluidibles para salvaguardar el crédito, y la reputación y el buen nombre del Gobierno del Estado Libre Asociado de Puerto Rico.

(3)  Ordenar que con cargo a las asignaciones para gastos ordinarios se atiendan preferentemente los desembolsos relacionados con:

    (A)  La conservación de la salud pública,

    (B)  La protección de personas y de la propiedad,

    (C)  Los programas de instrucción pública,

    (D)  Los programas de bienestar público,

    (E)  El pago de las aportaciones patronales a los sistemas de retiro y el pago de pensiones a individuos concedidas por leyes especiales y luego los demás servicios públicos en el orden de prioridades que el Gobernador determine, disponiéndose que los desembolsos relacionados con los servicios aquí enumeradas no tendrán prelación entre sí sino que podrán atenderse en forma simultánea; Disponiéndose, además, que los ajustes por reducción podrán hacerse en cualquiera de las asignaciones para gastos ordinarios incluyendo las áreas de servicios indicadas en este inciso.

(4)  Ordenar que se construyan las obras o mejoras permanentes cuyos contratos hayan sido debidamente formalizados; disponiéndose que se dará preferencia a obras de emergencia motivadas por catástrofes o actos de la naturaleza, accidentes fortuitos; y luego se procederá a la ejecución de aquellas que mejor respondan al desenvolvimiento de la vida normal y económica de Puerto Rico.

microjuris.com

(5)   Ordenar que se atienda el pago de los contratos y compromisos contraídos con cargo a asignaciones especiales de funcionamiento y luego se atienda preferentemente aquellas fases de los programas que están en proceso de desarrollo o en una etapa de planificación cuya posposición afecte directa o indirectamente los intereses de la clientela servida por el programa.

De acuerdo con este orden constitucional, la prioridad absoluta corresponde a la deuda pública, que para estos propósitos significa solamente los bonos de obligación general y la deuda expresamente garantizada por el ELA. No incluye, por ejemplo, la deuda de las corporaciones públicas, los municipios, o la deuda que depende de asignaciones legislativas. En segundo orden de prioridad se incluyen, entre otras, las *obligaciones ineludibles para salvaguardar el crédito, y la reputación y el buen nombre del Gobierno del Estado Libre Asociado de Puerto Rico*.

De no adoptarse las medidas de control de gastos de la presente ley especial, las obligaciones de operación del Gobierno superarían los recursos económicos disponibles. El orden de prelación mandatado por la Constitución forzosamente dejaría desprovisto al gobierno de la capacidad para continuar operando. Ello implicaría un escenario que supone una situación más onerosa para el País. El análisis ponderado de esta realidad fáctica previsible, ligado al hecho de que no existen otras alternativas menos onerosas para allegar los recursos que necesita el gobierno, tienen por consecuencia que las medidas aquí adoptadas son las menos onerosas para garantizar la operación del gobierno y evitar un cierre que implique que los empleados públicos queden sin poder devengar salario alguno, además de sumirnos en una recesión económica más profunda. Tomar más dinero prestado para financiar el déficit tampoco es una opción en este momento, ya que los mercados de capital no confían en que Puerto Rico va a poner en orden sus finanzas (recordemos que el gobierno de Puerto Rico lleva más de 10 años diciendo que va a eliminar el déficit estructural dentro de dos años). Menos aún podríamos aumentar los impuestos, pues ello tendría el efecto de agudizar la recesión.

Por tanto, esta Asamblea Legislativa entiende necesario la aprobación de la presente Ley a los fines de garantizar la operación del gobierno y por ende el bienestar general, evitando que se afecte la prestación de servicios esenciales al pueblo ante la emergencia fiscal que atraviesa el País. Además, sostiene que estas son las medidas menos onerosas para lograr ese objetivo. En cuanto a medidas que promuevan un interés legítimo para salvaguardar el bienestar general, el Tribunal Supremo de Puerto Rico ha reconocido la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón del estado. *Véase, Domínguez Castro v. E.L.A., supra.* Por tanto, esta Asamblea Legislativa está plenamente facultada para adoptar las medidas de carácter socioeconómico de la presente legislación a fin de viabilizar la reducción de gastos, en aras de evitar el cierre del gobierno y asegurar la prestación de servicios a los ciudadanos.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

## CAPÍTULO I.- DISPOSICIONES INICIALES

**Artículo 1.-Título.**

:microjuris.com

Esta Ley se conocerá como la "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico".

### Artículo 2.-Declaración de Propósito de Política Pública.

Se declara un estado de emergencia para la recuperación fiscal y económica, tras la degradación del crédito de Puerto Rico y la disminución de recaudos que afecta la liquidez del Estado, salvaguardando el mandato constitucional para el pago de intereses y amortización de la deuda pública, se adopta un plan para manejar las consecuencias de la misma y establecer una gerencia estructurada que permita cumplir con los compromisos del País. De igual manera, se garantiza la continuidad de la gestión pública en áreas esenciales de salud, seguridad, educación, trabajo social y desarrollo, entre otros, así como la prestación de los servicios necesarios e indispensables para la ciudadanía. Esta Ley tendrá como política pública la restauración del crédito público del Estado Libre Asociado de Puerto Rico mediante la eliminación a corto plazo del déficit del Fondo General y mejoras en la condición fiscal de las corporaciones públicas, sin recurrir al despido de empleados públicos de carrera o regulares, ni afectar las funciones esenciales de las agencias de gobierno que brindan servicios de seguridad, educación, salud o de trabajo social. Este plan estructurado resulta indispensable para proteger la disponibilidad de efectivo del Estado Libre Asociado de Puerto Rico de forma tal que no se afecte la prestación de los servicios indispensables que recibe la ciudadanía. Este plan considera los retos que Puerto Rico enfrenta para restaurar el crédito público y atender la incertidumbre sobre la duración, magnitud y costo del acceso a los mercados de capital en ausencia de una calificación de grado de inversión.

Así, la Asamblea Legislativa, en el ejercicio del poder de razón de Estado, está facultada para adoptar aquellas medidas que propendan a proteger la salud, la seguridad y el bienestar público, de forma estructurada mientras se atiende la situación fiscal por la que atraviesa el país. A tales efectos, es potestad de la Asamblea Legislativa aprobar leyes en aras de responder a intereses sociales y económicos, así como a situaciones de emergencia. La Sección 19 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico dispone que la enumeración de derechos contenida en el Artículo II no "se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo". Asimismo, la Sección 18 de la Carta de Derechos le confiere la facultad a esta Asamblea Legislativa para aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud, la seguridad pública o los servicios gubernamentales esenciales.

### Artículo 3.-Primacía de esta Ley Especial.

Esta Ley Especial se aprueba en el ejercicio del poder de razón del Estado, así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en el Artículo II, Secciones 18 y 19 de la Constitución del Estado Libre Asociado de Puerto Rico, de aprobar leyes en protección de la vida, la salud y el bienestar del pueblo, así como en casos de grave emergencia cuando estén claramente en peligro la salud, la seguridad pública o los servicios gubernamentales esenciales, así como al amparo de la Sección 7 y 8 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico. Por esta razón, esta Ley tendrá primacía sobre cualquier otra ley.

.ɱicrojuris.com

### Artículo 4.-Pruebas de Sostenibilidad Fiscal e Informes Trimestrales.

Con el propósito de promover la política pública de esta Ley, las medidas dispuestas en los Capítulos II y III seguirán en efecto hasta el 1ro de julio de 2017, o, si ocurre antes, el 1ro de julio de cualquier año fiscal para el cual, como parte de su respectivo proceso de recomendación del Presupuesto General de Gastos sometido por el Gobernador a la Asamblea Legislativa, se haya incluido una certificación firmada por los funcionarios concernidos en la que:

(a)     el Presidente de la Junta de Planificación certifica que el crecimiento real en el Producto Nacional Bruto proyectado para dicho año fiscal es igual o mayor a uno punto cinco (1.5) por ciento;

(b)     el Presidente del Banco Gubernamental de Fomento certifica que una reconocida casa de acreditación en los mercados de capital ha calificado, a la fecha de la certificación, el crédito de obligaciones generales del Estado Libre Asociado como de grado de inversión; y

(c)     la Secretaria de Hacienda y el Director de la Oficina de Gerencia y Presupuesto certifican que, el año fiscal concluido inmediatamente previo a la fecha en la cual se está presentando la certificación, cerró o se estima que haya cerrado sin refinanciamiento de obligaciones generales del Estado Libre Asociado ni financiamientos públicos o privados que se hayan utilizado para cubrir brechas en las proyecciones de recaudos o gastos en exceso de las asignaciones correspondientes.

Toda Entidad de la Rama Ejecutiva tendrá el deber ministerial de preparar y enviar al Gobernador y a las Secretarias del Senado de Puerto Rico y la Cámara de Representantes, un informe trimestral, a partir de noventa (90) días luego de aprobada esta Ley y durante el periodo de su vigencia, que indique en forma segmentada y detallada las medidas tomadas, los resultados y toda aquella información pertinente que demuestre y pueda medir el cumplimiento con las disposiciones de esta Ley.

### CAPÍTULO II.- MEDIDAS DE REDUCCIÓN DE GASTOS EN LA RAMA EJECUTIVA

### Artículo 5.-Aplicabilidad.

Las disposiciones contenidas en este Capítulo serán aplicables a todas las Entidades de la Rama Ejecutiva del Estado Libre Asociado de Puerto Rico.  Para propósitos de este Capítulo se entenderá que el término "Entidad de la Rama Ejecutiva" incluye  a todas sus agencias, así como a las instrumentalidades y corporaciones públicas del Estado Libre Asociado de Puerto Rico, irrespectivo del grado de autonomía fiscal o presupuestaria que de otra forma le confiriere su ley orgánica u otra legislación aplicable.  Sin embargo, no le aplicarán las disposiciones contenidas en este Capítulo a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral a menos que expresamente así se disponga.  No se considerará como Entidad de la Rama Ejecutiva para

microjuris.com

propósitos de este Capítulo a la Universidad de Puerto Rico y sus dependencias, ni a los Municipios.

**Artículo 6.-Reducción de la contratación de servicios profesionales y comprados en la Rama Ejecutiva.**

El gasto anual incurrido en servicios comprados o profesionales en cada Entidad de la Rama Ejecutiva se reducirá en no menos de un diez (10) por ciento en comparación con el incurrido en el año fiscal 2014, y permanecerá por debajo de ese nivel mientras esté vigente este Capítulo.

Esta reducción aplicará al cumulativo de servicios comprados y por servicios profesionales, a través de todos los orígenes de fondos; y aplicará de manera independiente a la suma del gasto anual incurrido en servicios comprados y profesionales con cargo al Fondo General. La implementación de esta medida podrá ser llevada a cabo mediante cualquiera de las siguientes opciones o una combinación de ellas:

(i) renegociación de la estructura de tarifas, costo o cuantía de los contratos existentes o los que serán renovados, con la correspondiente documentación;

(ii) limitación de otorgamiento de contratos a servicios indispensables;

(iii) cancelación o no renovación de aquellos contratos que resulten dispensables;

(iv) reducción en el alcance o en las horas de servicios contempladas en los contratos.

∴microjuris.com

Los servicios comprados o profesionales incluirán, sin limitarse a, seguros por responsabilidad pública, seguros por propiedad, cualquier otro tipo de seguro que no estén relacionados a la prestación de servicios médicos o de salud, servicios de apoyo tecnológico, servicios de apoyo técnico, servicios profesionales que requieran licencias del Estado, tales como: ingenieros, abogados, contadores públicos autorizados, arquitectos, agrimensores, tasadores, entre otros, servicios técnicos que requieran licencia tales como: peritos electricistas, maestros plomeros, mecánicos, entre otros, servicios de consultoría o asesoría, servicios de publicidad, servicios de relaciones públicas o representación, pago de anuncios o pautas en medios de comunicación, servicios de comunicación o telecomunicación, servicios de atención a clientes o abonados, servicios de facturación o cobros, servicios de cabildeo, servicios de seguridad, servicios de limpieza o mantenimiento, servicios de reparación o mantenimiento de infraestructura, servicios de reparación o mantenimiento de edificios o estructuras públicas, servicios de mantenimiento de áreas verdes, servicios de consultoría en recursos humanos o gerencia y servicios misceláneos. Se exceptúan los servicios comprados o profesionales de salud y de familia dirigidos a la prestación de servicios directos a niños y envejecientes, prestación a niños de educación especial, entre otros servicios indispensables de esta naturaleza. Las entidades de la Rama Ejecutiva y la Oficina de Gerencia y Presupuesto deberán tomar las salvaguardas necesarias, a los fines de garantizar que las disposiciones de este Artículo no acarreen la pérdida de fondos federales.

Toda Entidad de la Rama Ejecutiva vendrá obligada a rendir en un término de noventa (90) días un informe a la Asamblea Legislativa que incluya y desglose los contratos otorgados de servicios profesionales y comprados, a los cuales le aplicará la reducción de gastos dispuesta en este Artículo, incluyendo todo contrato que no esté en dicha categoría pero que los servicios que se describen en los mismos incluyan servicios profesionales y comprados. Cada Entidad de la Rama Ejecutiva certificará anualmente a la Oficina de Gerencia y Presupuesto, en o antes del 31 de julio de 2014, y cada 31 de julio subsiguiente, su gasto incurrido por concepto de servicios profesionales y comprados, entendiéndose como gasto el monto de los contratos otorgados o las compras realizadas durante el año fiscal previo, irrespectivo de la cuantía facturada o desembolsada sobre dichos servicios, e incluyendo desglose por origen de fondos, sea fondos federales, fondos especiales, ingresos propios, Fondo General o cualquier otro. El 31 de julio de 2014, se certificarán ambos gastos incurridos durante el año fiscal que termina el 30 de junio de 2013 y el año fiscal que termina el 30 de junio de 2014.

En o antes del 30 de agosto de 2014, y el 30 de agosto de cada año subsiguiente, la Oficina de Gerencia y Presupuesto someterá a la Asamblea Legislativa y a la Oficina del Gobernador un informe sobre las certificaciones recibidas. En caso que no se remita por el jefe de la Entidad de la Rama Ejecutiva la certificación requerida al 31 de julio correspondiente, la Oficina de Gerencia y Presupuesto emitirá su notificación de incumplimiento por una cantidad que equivaldrá a un gasto de veinticinco (25) por ciento por encima del nivel del año anterior. Para aquellas Entidades de la Rama Ejecutiva en que los informes reflejen un incumplimiento en el año previo, la Oficina de Gerencia y Presupuesto enviará una carta notificando el sobregasto al jefe correspondiente. Para aquellas Entidades de la Rama Ejecutiva cuyos gastos de funcionamiento se cubren de la Resolución Conjunta de Gastos de Funcionamiento, la Oficina de Gerencia y Presupuesto realizará, en o antes de 30 de septiembre de 2014, o 30 de septiembre de cada año subsiguiente, una transferencia de las cuentas de gastos de funcionamiento, por el

:microjuris.com

monto del sobregasto en el año previo, que ingresará al Fondo Presupuestario para los usos dispuestos por ley. En aquellas Entidades de la Rama Ejecutiva con tesoro propio, la autoridad nominadora o su representante estará autorizado y obligado a remitir un pago a la Secretaría de Hacienda por el monto del sobregasto notificado, a ser contabilizado en el Fondo Presupuestario. Dicho pago se podrá hacer en plazos iguales por el remanente del año fiscal; no obstante, el primer pago deberá ser enviado no más tarde de treinta (30) días de la fecha de la notificación por la Oficina de Gerencia y Presupuesto. La Entidad de la Rama Ejecutiva no podrá ajustar el pago por el monto del sobregasto que le haya sido notificado contra cualquier contraprestación u obligación que entienda el Estado le deba o tenga a su favor. No obstante lo anterior, la Oficina de Gerencia y Presupuesto podrá ajustar una deuda procedente del Estado contra el monto del sobregasto que le haya sido notificado a una Entidad de la Rama Ejecutiva, ello al amparo de esta Ley.

La Oficina de Gerencia y Presupuesto emitirá la normativa que regule este requisito.


### Artículo 7.-Ajustes en tarifas en servicios comprados y profesionales.

En consideración de la política pública que persigue esta Ley, las Entidades de la Rama Ejecutiva tendrán la potestad de reducir por cuenta propia la tarifa por servicios comprados o profesionales dentro del término de la vigencia de un contrato u otro documento de adquisición. Para ejercer esta potestad, la autoridad nominadora o representante autorizado de la Entidad de la Rama Ejecutiva deberá notificar por escrito al contratista o suplidor, con al menos diez (10) días de antelación, lo siguiente: la intención de modificación a los términos económicos, la fecha de efectividad, y la modificación que se realizará. El contratista o suplidor tendrá diez (10) días calendario para informar su aceptación o notificación de cancelación de contrato por escrito. Transcurrido ese periodo, la autoridad nominadora o representante autorizado de la Entidad de la Rama Ejecutiva, a su entera discreción, podrá dar curso a la reducción notificada. Si el contratista o suplidor, transcurrido ese periodo, continúa ofreciendo el servicio, se entenderá que ha aceptado la reducción propuesta, sin necesidad de una aceptación escrita u otra formalización. El ajuste en los términos de la obligación contractual será notificado, una vez efectivo, por mecanismo de carta, firmada solamente por la autoridad nominadora o representante autorizado de la Entidad de la Rama Ejecutiva, a la Oficina del Contralor, quien la hará formar parte del expediente físico y electrónico. Enviará, además, copia al contratista o suplidor, al Gobernador, o la persona que este delegue y al Director de la Oficina de Gerencia y Presupuesto. Reducciones al amparo de este Artículo no estarán sujetas a requisito de autorización adicional del Gobernador, o la persona que este delegue o la Oficina de Gerencia y Presupuesto, sin que se entienda que esta reducción releva, subsana o exime de requisito original de autorización inicial al contrato u otro documento objeto de la modificación.

Las reducciones autorizadas mediante este Artículo no podrán ser retroactivas, entiéndase aplicadas a servicios que ya hayan sido brindados a la fecha de efectividad de la modificación. Las disposiciones de este Artículo no crean un derecho unilateral independiente y separado de terminación por parte de un contratista o suplidor. Las notificaciones al contratista o suplidor al amparo de este Artículo tendrán que enviarse por correo certificado con acuse de recibo o

.:microjuris.com

mediante entrega personal, a un agente del suplidor o contratista o en la dirección de récord incluida en el documento de contratación o adquisición.

Las disposiciones contenidas en este Artículo le aplicarán también a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral.

La Oficina de Gerencia y Presupuesto podrá implementar las disposiciones reglamentarias que entienda necesarias para que se cumpla con las disposiciones del presente Artículo.

Nada de lo dispuesto en este Artículo será de aplicación a los servicios comprados y/o profesionales que sean sufragados con fondos federales, incluyendo su pareo de fondos estatales.

**Artículo 8.-Reducción en el gasto de nómina de empleados de confianza.**

Toda Entidad de la Rama Ejecutiva reducirá sus gastos de nómina en el servicio de confianza en un veinte (20) por ciento del gasto vigente al 30 de junio de 2012 y luego mantendrán tal reducción en años fiscales subsiguientes.

Cada autoridad nominadora o representante autorizado de la Entidad de la Rama Ejecutiva enviará a la Oficina de Gerencia y Presupuesto dentro de un término de sesenta (60) días, comenzando el 1ro de julio de 2014, un informe que detalle la plantilla de empleados de confianza al 30 de junio de 2014 en comparación con la plantilla al 30 de junio de 2012, incluyendo salarios, clasificación de puestos, y otra información.

La Oficina de Gerencia y Presupuesto emitirá la normativa estableciendo los formatos de la información que será provista, y la forma en que se considerará dentro de la comparación, elementos tales como funcionarios que estuvieron o estén ofreciendo servicios en destaque; cambio de clasificación de empleados de confianza a carrera y viceversa; diferenciales salariales otorgados; y cualquier otro elemento que sea relevante para poder configurar una comparable justa y equitativa en los niveles de gasto.

La Oficina de Gerencia y Presupuesto, a base de la normativa emitida, enviará comunicaciones a las autoridades nominadoras o representantes autorizados de la Entidades de la Rama Ejecutiva informando el estado de cumplimiento con este Artículo. Aquellas autoridades nominadoras o representantes autorizados que no cumplan con este Artículo, según les sea informado en su respectiva comunicación, deberán realizar los ajustes necesarios en su nómina de confianza para llegar a cumplimiento. Además, las autoridades nominadoras o representantes autorizados de las Entidades de la Rama Ejecutiva, mientras estén en incumplimiento, no podrán reclutar empleados de confianza, incluyendo remplazos. Cualquier nombramiento de confianza en contravención a lo aquí dispuesto será nulo. Se exceptúa de las disposiciones de este párrafo, y podrán ser nombrados sin consideración del nivel de nómina establecido por este Artículo, aquellos funcionarios que, por un sueldo igual o menor, remplace a otro funcionario de confianza que haya renunciado, cesado en funciones o haya sido destituido; y que (i) realicen, dentro de la estructura organizacional de la Entidad de la Rama Ejecutiva, una función de supervisión directa

⸱ɾ꯭ꭑꞮcrojuris.com

de dos o más empleados de carrera; (ii) dirijan un área funcional que sea indispensable al funcionamiento de la agencia, por ejemplo, Legal, Recursos Humanos o Tecnología; o que (iii) sean indispensables para el servicio o el funcionamiento de la agencia, según detallado en un narrativo suscrito por la autoridad nominadora de la Entidad de la Rama Ejecutiva. Las excepciones sobre nombramientos individuales, al amparo de este párrafo, requerirán autorización particular por el Gobernador, o la persona que este delegue, irrespectivo de la compensación salarial propuesta.

### Artículo 9.-Ocupación de Puestos Vacantes.

Las Entidades de la Rama Ejecutiva no realizarán nombramientos de empleados regulares o de carrera, transitorios o irregulares a partir del 1ro de julio de 2014 y mientras dure la vigencia de esta Ley. Se exceptúan de esta prohibición nombramientos de empleados que (i) proveen un servicio directo esencial a la ciudadanía; (ii) son indispensables e imprescindibles para asegurar el cumplimiento de los deberes ministeriales de la agencia; (iii) generan ingresos directos al Gobierno; (iv) sustituyan servicios que eran provistos mediante subcontratación al 30 de junio de 2014, cuando se pueda probar que esto redunda en un ahorro neto, considerando todos los costos relativos entre ambas opciones; (v) reclutamiento de empleados transitorios ejerciendo labores en el mismo puesto; (vi) son sufragados en más de un cincuenta (50) por ciento por fondos federales o ingresos propios; (vii) sean necesarios como mecanismo de pareo para fondos federales o como requerimiento de obtener tales fondos; o (viii) responden a un requerimiento específico y directo de un tribunal o foro administrativo competente para ocupar el puesto. Además, cuando fuera necesario ocupar un puesto vacante, se deberá optar como primera alternativa el traslado o destaque de empleados regulares y transitorios. En todos los casos que se tratase de un nuevo nombramiento, inclusive aquellos sujetos a excepción, se requerirá la autorización de la Oficina de Gerencia y Presupuesto previa a la ocupación del puesto. En aquellos nombramientos con un salario propuesto mayor a setenta mil (70,000) dólares se requerirá también autorización del Gobernador, o la persona que este delegue. La solicitud de ocupación del puesto a la Oficina de Gerencia y Presupuesto deberá venir acompañada por una certificación suscrita por la autoridad nominadora certificando la existencia y la aplicabilidad de la excepción bajo la cual se está sometiendo, un narrativo abundante sobre los fundamentos, y una confirmación de la inhabilidad de ocupar el puesto mediante traslado o destaque. En el caso de aquellos nombramientos que son sufragados solamente con fondos federales, la Oficina de Gerencia y Presupuesto deberá tramitar la autorización en un término no mayor de treinta (30) días a partir de la fecha de solicitud de ocupación del puesto.

Se entenderá suspendida toda disposición o norma en convenio, ley, reglamentación o disposición administrativa que resulte contraria o interfiera con lo aquí dispuesto. Lo anterior incluye, sin que se entienda como una limitación, toda disposición o norma que establezca o pretenda establecer como obligación la ocupación de puestos adicionales, las condiciones en que se remplazan empleados, la categoría de puestos ocupados; o que restrinja, o pretenda restringir de cualquier forma, la facultad del Gobierno de determinar el volumen o tipo de plantilla necesaria para su funcionamiento y para la provisión de servicios a la ciudadanía.

La Entidad de la Rama Ejecutiva, en su proceso de nombramiento, incluirá como parte de la documentación necesaria para perfeccionarlo, además del juramento y carta de nombramiento,

.:microjuris.com

un documento adicional donde el jefe de la Entidad de la Rama Ejecutiva o el funcionario delegado autorizado a nombrar, certifica el cumplimiento con las disposiciones de este Artículo, y el candidato a ser nombrado reconoce el riesgo de nulidad por incumplimiento y su derecho a exigir copia de las autorizaciones requeridas en este Artículo.   La Oficina de Gerencia y Presupuesto establecerá, mediante normativa, el formato del documento a ser cumplimentado por las partes, que será replicado y utilizado de forma íntegra en su contenido y formato.   Todo nombramiento efectuado en contra de las disposiciones de este Artículo será nulo.

Aquellas corporaciones públicas cuyos gastos de funcionamiento se sufragan total o parcialmente del Fondo General, seguirán el mismo procedimiento y requerirán las mismas autorizaciones que aquellas agencias o instrumentalidades cuyos gastos de funcionamiento se sufragan del Fondo General, incluyendo la autorización de la Oficina de Gerencia y Presupuesto, y del Gobernador, o la persona que este delegue.   Aquellas corporaciones públicas cuyos gastos de funcionamiento se sufragan totalmente de fondos propios u de otros orígenes, seguirán el mismo procedimiento y requerirán las mismas autorizaciones, salvo que, como prerrequisito de presentación de una solicitud de aprobación de nombramiento ante la Oficina de Gerencia y Presupuesto, y donde competa, del Gobernador, o la persona que este delegue, deberán obtener un endoso escrito a la solicitud por parte del Banco Gubernamental de Fomento.

### Artículo 10.-Traslados y destaques administrativos.

Con el fin de asegurar la continuidad, costo-eficiencia y calidad de los servicios gubernamentales, durante y hasta la vigencia de la presente Ley, previa autorización de la Oficina de Gerencia y Presupuesto se permitirán los traslados y los destaques administrativos de empleados regulares y transitorios entre puestos, clases y niveles de puestos, grupos de empleados, unidades apropiadas, de unidades sindicales a no sindicales y viceversa, entre Entidades de la Rama Ejecutiva; disponiéndose, que el empleado trasladado o en destaque deberá cumplir con los requisitos mínimos de preparación académica y experiencia necesaria para ocupar el puesto y que los destaques y traslados al amparo de este Artículo no podrán utilizarse como medida punitiva, hacerse arbitrariamente, ni resultar oneroso para el empleado.   Los destaques y traslados en una misma Entidad de la Rama Ejecutiva se realizarán por la propia autoridad nominadora o su representante autorizado sin necesidad de autorización previa o posterior por la Oficina de Gerencia y Presupuesto.

Estas acciones de personal no conllevarán que al empleado se le reduzca el sueldo o sus beneficios marginales.   Quedará en suspenso durante la vigencia de este Capítulo, toda aquella disposición de ley, reglamento, convenio, acuerdo o precepto que sea contrario a lo indicado en este Capítulo, disponiéndose que existirá total flexibilidad para realizar los traslados y destaques administrativos.

La Oficina de Gerencia y Presupuesto podrá implementar las disposiciones reglamentarias que entienda necesarias para que se cumpla con las disposiciones del presente Artículo.

### Artículo 11.-Concesión de Aumentos en Beneficios Económicos o Compensación Monetaria Extraordinaria.

ɱicroJuris.com

(a)     Desde y durante la vigencia de esta Ley no se concederán aumentos en beneficios económicos ni compensación monetaria extraordinaria a los empleados de las Entidades de la Rama Ejecutiva, con excepción a lo establecido en el inciso (d) de este Artículo.

(b)     Se considerará como aumento en beneficios económicos lo siguiente:

(i)     Aumentos de sueldo por años de servicio, servicio meritorio, retribución adicional por habilidades o competencia, y aumentos generales.

(ii)    Aumentos en aportaciones patronales para beneficios marginales, tales como plan médico, seguros de vida y otros seguros.

(iii)   Aumentos en aportaciones a planes de retiro más allá de las establecidas en ley para los sistemas de retiro gubernamentales.

(iv)    Aumentos en Bonos de Navidad, Bonos de Verano, o cualesquiera otras bonificaciones.

(v)     Aumentos por ascenso o traslados, excepto que tal ascenso o traslado resulte en un ahorro neto para la Entidad de la Rama Ejecutiva, eliminando la necesidad de reclutamiento de un empleado neto adicional; siempre que, dicho reclutamiento hubiese cumplido con los requisitos para ocupar puestos establecidos en el Artículo 9 de este Capítulo.

(vi)    Aumentos por reinstalación.

(vii)   Pagos de diferencial en salario por condiciones extraordinarias o por interinatos, excepto que dicho diferencial resulte en un ahorro neto, eliminando la necesidad de reclutamiento de un empleado neto adicional; siempre que, dicho reclutamiento hubiese cumplido con los requisitos para ocupar puestos establecidos en el Artículo 9 de este Capítulo.

(c)     Se considerará como compensación monetaria extraordinaria lo siguiente:

(i)     Liquidaciones en efectivo de licencia de vacaciones en exceso por liquidación final en caso de separación del empleado del servicio público. Disponiéndose que, durante la vigencia de esta Ley, el máximo de días que estarán sujetos a liquidación, en caso de separación de servicio, será de sesenta (60) días. De igual forma, durante la vigencia de esta Ley, el empleado del servicio público que acumule más de sesenta (60) días al final de cada año natural, deberá disfrutar dicho exceso en la fecha más próxima en o antes de los seis (6) meses siguientes del próximo año natural. Disponiéndose además que cada Entidad de la Rama Ejecutiva deberá pagar, en o antes del 31 de agosto de cada año, el exceso

.:microjuris.com

acumulado a la aprobación de esta Ley y durante su vigencia, cuando el empleado no haya podido disfrutarlo dentro del término aquí dispuesto por circunstancias extraordinarias del servicio ajenas a su voluntad. Todo lo que concierna a las licencias de vacaciones, en el caso de las corporaciones públicas, se atenderá conforme a lo que dispone el Artículo 17 de esta Ley.

(ii) Liquidaciones en efectivo de licencia por enfermedad en exceso por liquidación en caso de separación del empleado del servicio público. Disponiéndose que, el máximo de días que estarán sujetos a liquidación, en caso de separación de servicio durante la vigencia de esta Ley, será de noventa (90) días. El empleado mantendrá el balance acumulado a la aprobación de esta Ley, pero se eliminará la acumulación sobre dicho balance mientras esta Ley permanezca en vigor. Disponiéndose además que durante la vigencia de la Ley los balances anuales que se acumulen en exceso y que no se disfruten en o antes del 31 de diciembre del año correspondiente se entenderán renunciados. Todo lo que concierna a las licencias de enfermedad, en el caso de las corporaciones públicas, se atenderá conforme a lo que dispone el Artículo 17 de esta Ley.

(iii) Bono de Navidad en exceso de seiscientos (600) dólares.

(iv) Bono de Verano en exceso de doscientos (200) dólares.

(v) Pago de bonificaciones de cualquier cantidad por razón de productividad, ejecución, asistencia, puntualidad, retiro, día feriado particular, ratificación de convenio o aniversario de ratificación, o cualquier otro pago de bonificaciones monetarias por cualquier otro motivo o concepto que no sea Bono de Navidad o Bono de Verano dentro de los límites en este Artículo.

(vi) Concesión de días y horas libres con paga sin cargo a licencia alguna.

(vii) Licencias con paga que no estén establecidas estatutariamente.

(d) No se considerará como aumento en beneficios económicos ni o compensación monetaria extraordinaria lo siguiente:

(i) Licencias con sueldo para estudios, seminarios, cursos o talleres siempre y cuando se suscriba un acuerdo legal donde conste que el empleado beneficiado se obliga a brindar servicios por un tiempo equivalente al doble del tiempo que le tome completar los estudios, seminarios, cursos o talleres y el deber de devolución de la licencia pagada en caso de incumplimiento;

(ii) Programas de becas para empleados;

.microjuris.com

(iii)   Programas de ayuda al empleado;

(iv)   Programas de cuido de niños;

(v)   Planes de adiestramiento, capacitación y desarrollo hasta un máximo de seiscientos (600) dólares por empleado.

No obstante lo anterior, con excepción de los programas de ayuda al empleado, y de los adiestramientos que brinda la Oficina de Capacitación y Asesoramiento Laboral y de la Administración de Recursos Humanos (OCALARH), la autoridad nominadora o su representante autorizado deberá considerar que las situaciones antes provistas constituyen un aumento en beneficios económicos o compensación monetaria extraordinaria cuando ello resulte necesario para atemperar los gastos de la Entidad de la Rama Ejecutiva al presupuesto aprobado o para superar una proyección de déficit operacional.

(e)   En caso que la Entidad de la Rama Ejecutiva tenga interrogante sobre si la concesión o permanencia de un beneficio económico o laboral constituye un aumento en beneficio económico o una compensación monetaria extraordinaria, la autoridad nominadora o representante autorizado de la Entidad de la Rama Ejecutiva someterá una consulta a la Oficina de Gerencia y Presupuesto, quien responderá en un término de sesenta (60) días o menos; la contestación a dicha consulta será vinculante para la Entidad de la Rama Ejecutiva que la haya sometido.

(f)   Las limitaciones establecidas en este Artículo aplicarán a todo empleado de una Entidad de la Rama Ejecutiva, irrespectivo de su clasificación como empleado de confianza, empleados regular o de carrera, empleado transitorio o irregular; e irrespectivo de su función particular dentro de la Entidad de la Rama Ejecutiva.

(g)   Las limitaciones establecidas en este Artículo aplicarán a todo empleado de una Entidad de la Rama Ejecutiva, irrespectivo de disposición contraria en cualquier ley, normativa, reglamento, convenio colectivo, políticas, manuales de empleo, cartas circulares, cartas contractuales, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación o retribución. Esto incluye, sin que se entienda como limitación, la Ley Núm. 184-2004, según enmendada, conocida como la "Ley para la Administración de los Recursos Humanos en Servicio Público"; y los reglamentos emitidos y aprobados en caso de corporaciones públicas, por la respectiva junta de gobierno o autoridad nominadora; o en caso de otras entidades públicas, su respectivo organismo rector o autoridad nominadora.

microjuris.com

(h) La Oficina de Gerencia y Presupuesto podrá implementar las disposiciones reglamentarias que entienda necesarias para que se cumpla con las disposiciones del presente Artículo.

(i) En reconocimiento de la importancia de la sindicalización de empleados públicos, no solamente para representar el bienestar económico de los trabajadores, sino para elevar el servicio público al máximo de su potencial y mantener la paz laboral, se establece un proceso participativo alterno, y uniforme para lograr los objetivos de política pública de esta Ley, incluyendo el ahorro necesario dentro de los parámetros establecidos en los incisos (j) y (k), según sea el caso, siguiendo como principio rector la negociación colectiva. Los acuerdos alcanzados con los representantes autorizados de los empleados unionados, y a su vez, ratificados por escrito por la matrícula de unionados concernida y el representante autorizado de la Entidad de la Rama Ejecutiva mediante y conforme a los parámetros de la negociación aquí permitida, sustituirán lo dispuesto en los incisos (a), (b), (c) y (d) de este Artículo y cualquier otra disposición que resulte pertinente en esta ley y que haya sido objeto de la negociación. En todo proceso participativo alterno reconocido en esta Ley conducente a lograr una negociación entre las Entidades de la Rama Ejecutiva y las uniones sindicales se deberá proveer toda la información necesaria, como: informe de estado financiero auditado de la Entidad de la Rama Ejecutiva, informe de todos los contratos y sus cuantías, informes de todas las plazas de confianza y sus cuantías, entre otra información pertinente. Las Entidades de la Rama Ejecutiva deberán acceder a la petición realizada por una unión para comenzar el proceso participativo alterno.

Al cabo de culminado el término del proceso participativo dispuesto en esta Ley, la Entidad de la Rama Ejecutiva y la unión deberán notificar al Secretario del Trabajo y Recursos Humanos, la existencia de un estancamiento de las negociaciones, de haberlo, en el proceso de negociación. El Secretario podrá conceder quince (15) días adicionales para que culmine el esfuerzo de las partes para negociar.

(j) En caso de aquellas Entidades de la Rama Ejecutiva sujetas a la Ley Núm. 45-1998, según enmendada, se autoriza al Gobernador, o la persona que este delegue, al Director de la Oficina de Gerencia y Presupuesto, y al Secretario del Departamento del Trabajo y Recursos Humanos a llevar a cabo, comenzando en o antes del 1 de julio de 2014, una o varias negociaciones, conducidas personalmente por éstos o por sus representantes autorizados, para lograr mediante mutuo acuerdo enmiendas a los convenios colectivos vigentes que establezcan modificaciones a las condiciones económicas de empleo, que sustituyan a las dispuestas en los incisos (a), (b), (c) y (d) de este Artículo, pero que obtengan un ahorro promedio por empleado unionado, comparable al que hubiese sido obtenido mediante la aplicación de los referidos incisos, según estimado en la discreción y juicio de la Oficina de Gerencia y Presupuesto. Las enmiendas negociadas entrarán en efecto solamente para aquellas unidades apropiadas que adopten y ratifiquen las mismas, y tendrán en todo caso que tener

ꞏmicrojuris.com

efecto retroactivo al 1 de julio de 2014.  Sobre cualquier unidad apropiada que no haya adoptado y ratificado, en o antes del 31 de agosto de 2014, enmiendas al amparo de este inciso, se aplicarán de forma final e irrevocable las disposiciones de este Artículo, incisos (a), (b), (c), y (d), retroactivas al 1 de julio de 2014.  Se autoriza expresamente a la autoridad nominadora o al representante autorizado de la Entidad de la Rama Ejecutiva, a realizar los ajustes en nómina correspondientes para dar efecto a este inciso.

(k)     En caso de aquellas Entidades de la Rama Ejecutiva con empleados unionados no sujetos a la Ley Núm. 45-1998, según enmendada, la autoridad nominadora o el representante autorizado de la Entidad de la Rama Ejecutiva podrá negociar enmiendas a los convenios colectivos vigentes que establezcan modificaciones a las condiciones económicas de empleo, que sustituyan a las dispuestas en los incisos (a), (b), (c) y (d) de este Artículo, siempre y cuando dichas enmiendas hayan sido adoptadas y ratificadas por todas las partes en o antes del 31 de julio de 2014; que sean retroactivas al 1 de julio de 2014, y que el ahorro promedio por empleado unionado a obtenerse, mediante la implantación de estas enmiendas, sea comparable al que hubiese sido obtenido mediante la aplicación de los referidos incisos.

La meta de ahorro de la negociación, así como la consecución de dichos ahorros como resultado de las enmiendas propuestas, será determinada por la Junta de Directores u otro organismo rector de la Entidad de la Rama Ejecutiva concernida, cuya aprobación final será necesaria para la no aplicación de los incisos (a), (b), (c), y (d) de este Artículo.  En caso que las enmiendas no hayan sido firmadas y ratificadas al 31 de agosto de 2014, los incisos (a), (b), (c) y (d) se aplicarán de forma retroactiva al 1 de julio de 2014.  Se autoriza expresamente a la autoridad nominadora o al representante autorizado de la Entidad de la Rama Ejecutiva concernida, a realizar los ajustes en nómina correspondiente para dar efecto a este inciso.

**Artículo 12.-Negociación de convenios vencidos.**

Los convenios colectivos expirados a la fecha del comienzo de vigencia de esta Ley o que expiren durante la vigencia de este Capítulo II, serán extendidos en cuanto a las cláusulas no económicas u otras cláusulas no afectadas por esta Ley, hasta la fecha en que termine la vigencia de este Capítulo.  Dicha extensión constituirá impedimento para la presentación y celebración de elecciones de representación.

Una vez terminada la vigencia de este Capítulo II, los sindicatos que al 1ro de julio de 2014 representaban a los empleados unionados en cada Entidad de la Rama Ejecutiva, podrán comenzar la negociación de nuevos convenios colectivos, incluyendo cláusulas económicas y no económicas, y las Entidades de la Rama Ejecutiva negociarán los mismos, conforme la normativa y derecho aplicable, y considerando primordialmente las realidades de la situación económica y fiscal de la Entidad de la Rama Ejecutiva y del Gobierno en general.

..microjuris.com

### Artículo 13.-Prácticas ilícitas.

La implementación de cualquier medida autorizada en este Capítulo, ya sea por la Oficina de Gerencia y Presupuesto, las Entidades de la Rama Ejecutiva y sus respectivos funcionarios, el Gobernador, o cualquiera de los representantes de éstos, no constituirá una violación a los convenios colectivos existentes ni constituirá una práctica ilícita.

Las disposiciones contenidas en este Artículo le aplicarán también a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral.

### Artículo 14.-Foro para dirimir controversias.

La Comisión Apelativa del Servicio Público (CASP), o la entidad sucesora de ésta, en lo que corresponde a asuntos de naturaleza laboral o que de otra forma ordinariamente caerían dentro de la jurisdicción de CASP, tendrá jurisdicción primaria exclusiva para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme a este Capítulo, de aquellos empleados cubiertos o no cubiertos por las disposiciones de la Ley Núm. 45-1998, según enmendada, conocida como la Ley de Relaciones del Trabajo para el Servicio Público; así como de aquellos empleados no organizados sindicalmente de aquellas Entidades de la Rama Ejecutiva excluidas de la aplicación de las disposiciones de la Ley Núm. 184-2004, según enmendada, conocida como la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, y empleados de aquellas Entidades de la Rama Ejecutiva que no están organizados y les aplica las disposiciones de la Ley Núm. 184-2004.

Por su parte, la Junta de Relaciones del Trabajo, o la entidad sucesora de ésta, tendrá jurisdicción primaria exclusiva para atender apelaciones surgidas como consecuencia de acciones o decisiones tomadas conforme a este Capítulo, de aquellos empleados cubiertos por la Ley Núm. 130 de 8 de mayo de 1945, según enmendada. Disponiéndose, que conforme a lo indicado en esta Ley, ninguna actuación llevada conforme a sus disposiciones constituirá una violación a los convenios colectivos existentes, o una negativa a negociar de buena fe o una práctica ilícita.

### Artículo 15.-Transporte Escolar.

Se autoriza y ordena al Secretario de Educación a establecer medidas y· estrategias alternas para maximizar la efectividad y costo eficiencia en el transporte escolar, particularmente la subcontratación directa o indirecta con los Municipios, así como con cualquier Entidad de la Rama Ejecutiva, o entidad privada que garantice un ahorro en el pago por la prestación del servicio. Asimismo se ordena al Secretario de Educación que, conjuntamente con la Oficina de Gerencia y Presupuesto, elaboren un plan de control adecuado de pagos efectuados por servicios prestados y la evaluación de documentos que validen la prestación de dichos servicios. Dicho plan de control será promulgado dentro de un término no mayor de sesenta (60) días de la aprobación de esta Ley, y radicado ante las Secretarías de la Asamblea Legislativa no más tarde de los treinta (30) días de su adopción. El Departamento de Educación no podrá gastar cantidades mayores de fondos estatales en transporte escolar de la cantidad que se establezca en

microjuris.com

la Resolución Conjunta del Presupuesto General, o en caso que no se desglose y especifique con ese detalle en dicha Resolución Conjunta, la cantidad que se presupueste y se contabilice al inicio del año fiscal dentro de su presupuesto aprobado.  Ni el Secretario de Educación ni la Oficina de Gerencia y Presupuesto podrán transferir fondos adicionales durante un año fiscal para cubrir gastos en exceso del presupuesto, ni posibles sobregiros por este concepto.  Se le autoriza y faculta al Secretario de Educación a tomar todas las medidas necesarias para renegociar, reestructurar o modificar los contratos con los porteadores para cumplir con el mandato de austeridad y control de gastos, según antes dispuesto.  No obstante lo dispuesto en cualquier otra ley, el Secretario estará facultado a proveer, modificar o cancelar el contrato de servicio o acuerdo legal de cualquier porteador, de proveer servicios de transporte escolar en las zonas de servicio y bajo las condiciones que éste determine.  Del mismo modo, el Secretario queda facultado a recobrar el dinero pagado, o a no pagar, por aquellos servicios de transporte escolar cobrado por estudiante matriculado, pero no prestado debido a ausentismo, traslado o deserción.

### Artículo 16.-Prohibición contra sobregiros presupuestarios.

Se reitera la disposición del Artículo 8 de la Ley 103-2006, según enmendada, que prohíbe gastos en exceso de las asignaciones presupuestadas.  Todo empleado público que, con conocimiento de que la Entidad de la Rama Ejecutiva tiene una proyección de sobregiro en sus asignaciones con cargo al Fondo General, certifique o provea información incorrecta que sea usada en la preparación de dicha certificación, al Gobernador, o la persona que este delegue o o a la Oficina de Gerencia y Presupuesto, la disponibilidad de fondos para realizar una transacción, incluyendo nombramientos u otorgación de contratos; o realice la transacción sin las debidas autorizaciones, estará sujeto a una multa de doscientos (200) dólares por instancia, y con un máximo de cinco mil (5,000) dólares cumulativos por todas las instancias ocurridas en el mismo año natural.  El funcionario podrá descansar en proyecciones enmendadas que subsanen tal sobregiro, siempre que dichas proyecciones sean remitidas al Gobernador, o la persona que este delegue o a la Oficina de Gerencia y Presupuesto junto con, o previo a, la solicitud de autorización.  Disponiéndose que antes de aplicar la sanción antes dispuesta a un empleado público se le debe garantizar el debido procedimiento de ley a través de una vista informal, o cualquier otro procedimiento administrativo, o conforme esté dispuesto en un convenio colectivo.  La Oficina de Gerencia y Presupuesto estará a cargo de reglamentar e implementar las disposiciones en este Artículo, incluyendo lo relacionado a la imposición de multas administrativas.

Las disposiciones contenidas en este Artículo le aplicarán también a la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Panel del Fiscal Especial Independiente y la Oficina del Contralor Electoral.

### Artículo 17.-Control fiscal en las corporaciones públicas.

Durante la vigencia de la presente Ley, toda corporación pública deberá suspender las cláusulas no económicas negociadas en los convenios vigentes que tienen efectos económicos directos o indirectos en la operación de la corporación pública que agravan la situación presupuestaria de la misma o que resulta necesaria suspender para aliviar la situación

.microjuris.com

presupuestaria. Algunas cláusulas no económicas que pueden tener un efecto económico directo o indirecto lo son, sin que constituya una limitación, las siguientes:

    (a)    Planes de adiestramiento, capacitación y desarrollo, salvo en aquellas circunstancias en que sean extremadamente necesarios y de conformidad con los criterios establecidos en este Capítulo II;

    (b)    Licencias con sueldo para estudios, seminarios, cursos o talleres que sean contrarios con los criterios establecidos en este Capítulo II;

    (c)    Concesión de días y horas libres con paga sin cargo a licencia alguna;

    (d)    Toda disposición que impida asignar o reasignar tareas correspondientes a empleados, a un grupo de empleados, clase de puestos, niveles o unidad apropiada a los fines de hacer más costo efectiva la administración y operación de la corporación pública así como cumplir con los criterios de este Capítulo II;

    (e)    Toda disposición que impida el fraccionamiento de tareas o la asignación de horarios correspondientes a empleados, a un grupo de empleados, clase de puestos, niveles o unidad apropiada a los fines de hacer más costo efectiva la administración y operación de la corporación pública así como cumplir con los criterios de este Capítulo II;

    (f)    Toda disposición que impida la subcontratación de tareas asignadas a empleados, a un grupo de empleados, clase de puestos, niveles o unidad apropiada a los fines de hacer más costo efectiva la administración y operación de la corporación pública así como cumplir con los criterios de este Capítulo II;

    (g)    Disposiciones en cuanto a limitaciones de los derechos de gerencia o de administración del patrono a los fines de hacer más costo efectiva la administración y operación de la corporación pública y cumplir con los requerimientos de este Capítulo II;

    (h)    Disposiciones o cláusulas donde el patrono se obligue a dar fiel cumplimiento a lo acordado o pactado, en cuanto a los aspectos que estén en conflicto con las disposiciones de este Capítulo II;

    (i)    Requisitos de utilizar antigüedad, en la medida en que las disposiciones de antigüedad sean contrarias a lo dispuesto en este Capítulo II o constituyan una limitación para efectuar cambios en funciones, ascensos, descensos, reubicaciones, traslados, destaques u otras transacciones necesarias para evitar que se afecten los servicios en aras de hacer más costo efectiva la administración y operación de la corporación pública y cumplir con los requerimientos de este Capítulo II.

Ante cualquier interrogante sobre si determinada disposición de un convenio tiene o no un efecto económico directo o indirecto en una corporación pública que agrava la situación

microjuris.com

presupuestaria de la misma o que resulte necesaria suspender para aliviar la situación presupuestaria se someterá una consulta al Banco Gubernamental de Fomento, quien responderá en un término no mayor de sesenta (60) días. La contestación a dicha consulta será vinculante para la corporación pública que la haya sometido.

Disponiéndose, además que las corporaciones públicas reconocerán a los empleados, unionados y no unionados los balances de licencias por vacaciones acumuladas a la fecha de vigencia de esta Ley pero no podrán liquidar en efectivo los excesos acumulados antes y durante la vigencia de esta Ley. Las corporaciones públicas deberán establecer un plan para agotar el exceso de los balances acumulados para los empleados, tanto unionados como no unionados, de manera tal, que al finalizar la vigencia de esta Ley no hayan acumulaciones en exceso de lo permitido.

Disponiéndose además que el exceso por licencia de enfermedad acumulado por los empleados, unionados como no unionados, de las corporaciones públicas previo a la fecha de vigencia de esta Ley, se congelará al salario vigente al 30 de junio de 2014 y su liquidación en efectivo solamente se hará en caso de desvinculación del servicio público. El exceso de licencia por enfermedad que se acumule posterior a la vigencia de esta Ley, así como aquel que se acumule al 31 de diciembre de cada año deberá disfrutarse en o antes del 30 de junio del año siguiente del que fue acumulado; después de esa fecha se pierde tal balance.

A partir del primer año de la vigencia de esta Ley y anualmente por los próximos tres (3) años, toda corporación pública establecerá anualmente un proceso mediante el cual el Director Ejecutivo de la Entidad y los representantes de sus respectivos gremios, evaluarán de forma transparente la situación económica y las realidades fiscales de la respectiva corporación pública. A la luz de la evaluación, según el mecanismo adoptado y de establecerse que la corporación pública no opera con déficit, cuenta con una condición financiera estable, y no depende del Fondo General para su operación, se podrán iniciar negociaciones de aquellas cláusulas del convenio colectivo que han sido congeladas bajo las disposiciones de este Artículo. Al finalizar la vigencia de esta Ley, se reestablecerá el convenio colectivo vigente al momento de entrar en vigor esta Ley por el término restante de vigencia, si alguno, y tendrá efectos de carácter prospectivo.

**Artículo 18.-Aportación de ahorros de corporaciones públicas en el campo de salud al déficit del Fondo General.**

Los ahorros generados por la Administración de Compensación por Accidentes de Automóviles y la Corporación para el Fondo de Seguro del Estado, como producto de la aplicación de las disposiciones del Artículo 11 de este Capítulo, serán aportados al "Fondo de Servicios y Terapias a Estudiantes de Educación Especial", bajo la custodia del Departamento de Educación, creado mediante legislación especial separada a estos fines. De esta forma, se reduce la carga fiscal sobre el Fondo General que requiere proveer servicios adecuados a la población de educación especial, conforme la legislación federal, la política pública, y el entorno jurídico existente.

Ambas entidades certificarán, en o antes del 31 de julio de 2014, a la Oficina de Gerencia y Presupuesto, el número de empleados en su nómina al 30 de junio de 2014, y las cantidades

ꟾꟾicrojuris.com

pagadas durante el año fiscal que culminó en esa fecha, para cubrir los siguientes conceptos: Bono de Navidad; Bono de Verano; otras bonificaciones generales, incluyendo, sin limitación, por ratificación de convenios, por asistencia, puntualidad, productividad, o retiro; liquidación de licencias por enfermedad acumuladas en exceso y licencias por vacaciones acumuladas en exceso.   En caso de Bono de Navidad y Bono de Verano, se reducirá la certificación de cantidades pagadas por un monto equivalente al número de empleados que recibieron Bono de Navidad, multiplicado por seiscientos (600) dólares, más el número de empleados que recibieron Bono de Verano, multiplicado por doscientos (200) dólares.   La información se proveerá segregada por empleados unionados y empleados no-unionados.

Las respectivas cantidades certificadas al 30 de junio de 2014 se considerarán de forma concluyente como los ahorros generados por esta Ley para el año fiscal 2015 subsiguiente, y serán transferidos al Departamento de Hacienda, por la Administración de Compensación por Accidentes de Automóviles y la Corporación para el Fondo del Seguro del Estado, comenzando en o antes del 31 de julio de 2014.   Los fondos transferidos serán contabilizados a favor del Fondo de Servicios y Terapias a Estudiantes de Educación Especial.   Dichas transferencias podrán ser realizadas a plazos iguales por los meses remanentes del año fiscal, pero tendrán que ser completadas en su totalidad antes del 30 de junio de 2015.   La Administración de Compensación por Accidentes de Automóviles y la Corporación para el Fondo de Seguro del Estado repetirán las respectivas transferencias adicionales, por una cantidad idéntica a la pagadera durante el año fiscal 2015, comenzando el 31 de julio de 2015 para el año fiscal 2016, y en adelante cada 31 de julio, mientras estuviera en vigor este Capítulo.

**Artículo 19.-Aportación de ahorros de corporaciones públicas en el campo de desarrollo económico al déficit del Fondo General.**

Los ahorros generados por las corporaciones públicas relacionadas con la promoción del desarrollo económico, y algunas otras corporaciones designadas en este Artículo, obtenidos por la aplicación de las disposiciones del Artículo 11 de este Capítulo, serán aportados al "Fondo de Promoción de Empleo y Actividad Económica", bajo la custodia de la Compañía de Comercio y Exportación de Puerto Rico, creado mediante legislación especial separada a estos fines.   De esta forma, se reduce la carga que suponen actualmente las asignaciones de promoción de empleo e incentivos empresariales sobre el Fondo General.

Para propósitos de este artículo, se considerarán como corporaciones públicas relacionadas con la promoción del desarrollo económico, las siguientes instrumentalidades: la Administración de Terrenos, la Autoridad de Tierras de Puerto Rico, la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, la Autoridad para el Financiamiento de la Vivienda, el Banco de Desarrollo Económico para Puerto Rico, el Banco Gubernamental de Fomento para Puerto Rico, la Compañía de Fomento y Exportación, la Compañía de Fomento Industrial, la Compañía de Turismo, Corporación de Seguros Agrícolas, y la Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico.   Además, aportarán al Fondo de Promoción de Empleo y Actividad Económica las siguientes instrumentalidades no relacionadas directamente con el desarrollo económico: la Junta de Gobierno del Servicio 9-1-1, y la Corporación del Centro Cardiovascular de Puerto Rico y el Caribe.

᛫ᴍicrojuris.com

Cada una de estas entidades certificará, en o antes del 31 de julio de 2014, a la Oficina de Gerencia y Presupuesto, el número de empleados en su nómina al 30 de junio de 2014, y las cantidades pagadas durante el año fiscal que culminó en esa fecha, para cubrir los siguientes conceptos: Bono de Navidad; Bono de Verano; otras bonificaciones generales, incluyendo, sin limitación, por ratificación de convenios, por asistencia, puntualidad, productividad, o retiro; liquidación de licencias por enfermedad acumuladas en exceso y licencias por vacaciones acumuladas en exceso.  En caso de Bono de Navidad y Bono de Verano, se reducirá la certificación de cantidades pagadas por un monto equivalente al número de empleados que recibieron Bono de Navidad, multiplicado por seiscientos (600) dólares, más el número de empleados que recibieron Bono de Verano, multiplicado por doscientos (200) dólares.  La información se proveerá segregada por empleados unionados y empleados no-unionados.

Las respectivas cantidades certificadas al 30 de junio de 2014 se considerarán de forma concluyente como los ahorros generados por esta Ley para el año fiscal 2015 subsiguiente, y serán transferidos al Departamento de Hacienda, por cada una de las corporaciones públicas correspondientes, comenzando en o antes del 31 de julio de 2014.  Los fondos transferidos serán contabilizados a favor del Fondo de Promoción de Empleo y Actividad Económica.  Dichas transferencias podrán ser realizadas a plazos iguales por los meses remanentes del año fiscal, pero tendrán que ser completadas en su totalidad antes del 30 de junio de 2015.  Las corporaciones públicas obligadas a aportar al amparo de este Artículo repetirán las respectivas transferencias adicionales, por una cantidad idéntica a la pagadera durante el año fiscal 2015, comenzando el 31 de julio de 2015 para el año fiscal 2016, y en adelante cada 31 de julio, mientras estuviera en vigor este Capítulo.

**Artículo 20.-Presupuesto de la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.**

Para cualquier año fiscal que termine durante la vigencia de este Capítulo, el presupuesto para la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente, será equivalente a su respectivo presupuesto del año fiscal previo ajustado por el porcentaje de reducción o incremento global en el Presupuesto General de Gastos con cargo al Fondo General, implícita en el presupuesto recomendado por el Gobernador.  Dicho ajuste se calculará excluyendo las asignaciones propuestas para el servicio de la deuda constitucional del Presupuesto General de Gastos con cargo al Fondo General, tanto de la base del año previo como del monto recomendado para el año fiscal bajo consideración.  Igualmente, dicho ajuste excluirá de ambas bases de comparación los respectivos presupuestos de la Rama Judicial, la Asamblea Legislativa, la Oficina del Contralor, el Procurador del Ciudadano, la Comisión de Derechos Civiles, la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

**Artículo 21.-Prohibiciones respecto al uso de escoltas, viajes, contratación de servicios, entre otros.**

.mícrojuris.com

(a)     Se prohíbe el uso de fondos públicos en el pago de escoltas a los jefes de las Entidades de la Rama Ejecutiva. Por vía de excepción, y dado la naturaleza de las funciones que realizan, esta prohibición no será extensiva al Secretario de Estado, Secretario de Justicia, Secretario de Corrección y Rehabilitación y el Superintendente de la Policía.  De igual forma, el Gobernador de Puerto Rico podrá autorizar una escolta personal cuando sea necesario para proteger la salud, seguridad y bienestar de cualquier funcionario de Gobierno que se vea afectado como resultado de decisiones tomadas en el desempeño de su cargo.

(b)     Se prohíbe el uso de fondos públicos para viajes fuera de Puerto Rico por parte de los jefes de las Entidades de la Rama Ejecutiva o funcionarios de confianza, excepto cuando dichos viajes sean esenciales para el desempeño de funciones oficiales y los mismos hayan sido previamente autorizados por el Gobernador, o la persona que este delegue.  En caso de empleados que no sean de confianza ni jefes de las Entidades de la Rama Ejecutiva, se requerirá autorización del Gobernador, o la persona que este delegue en caso que: (i) viajen más de dos empleados para el mismo propósito en tiempo coetáneos; o (ii) el costo de alojamiento por noche exceda doscientos cincuenta (250) dólares.

(c)     Se prohíbe la contratación de servicios profesionales o comprados en  Entidades de la Rama Ejecutiva en exceso de cien mil (100,000.00) dólares en un mismo año fiscal, sin autorización previa escrita del Gobernador, o la persona que este delegue.  Cualquier contrato otorgado en incumplimiento de este requerimiento será nulo.  Este requisito de autorización es en adición a, y no sustituye, cualquier otra normativa aplicable, incluyendo normativa del Gobernador, o la persona que este delegue al amparo de Órdenes Ejecutivas de control de gasto, o normativa de la Oficina de Gerencia y Presupuesto.

(d)     Se prohíbe el uso de fondos públicos para el pago de teléfonos celulares, asistentes personales digitales (PDA's), equipos de servicio de Internet personal u otros servicios tecnológicos para uso exclusivo de jefes de agencia, empleados y funcionarios de las Entidades de la Rama Ejecutiva del Estado Libre Asociado de Puerto Rico.  A la aprobación de la presente Ley, se deberán ir cancelando todo contrato por los servicios antes descritos.  El Gobernador, o la persona que este delegue, podrá conceder dispensas a este requisito.

**Artículo 22.-Plan de reducción de gastos y contratos por concepto de arrendamientos.**

Las Entidades de la Rama Ejecutiva deberán someter a la Oficina de Gerencia y Presupuesto, dentro del periodo de treinta (30) días a partir de la vigencia de esta Ley, una lista de todos sus contratos de arrendamientos vigentes, su cuantía y un resumen de la justificación para su otorgación.  Se especificarán aquellos contratos de arrendamiento que es menester mantener por mandato de ley, o para cumplir con una obligación no sujeta a discreción, o para preservar un servicio esencial a la ciudadanía.

microjuris.com

La Oficina de Gerencia y Presupuesto podrá ordenar la no renovación de contratos de arrendamiento o la modificación de los mismos a su vencimiento y eventual otorgación, salvo cuando ello resulte en detrimento de un servicio esencial o acarea un perjuicio económico mayor. En tal análisis, la Oficina de Gerencia y Presupuesto podrá, además, determinar la posibilidad de consolidar varias operaciones de varias agencias en un mismo local y renegociar los cánones y términos de los contratos de arrendamiento para lograr condiciones más favorables.

Además, para todo contrato de arrendamiento o intención de arrendamiento se deberá cumplir con las siguientes directrices:

(a)   No se podrá renovar, otorgar un nuevo contrato o aumentar la cuantía pagada por concepto de arrendamiento sin la previa autorización de la Oficina de Gerencia y Presupuesto.

(b)   Toda Entidad de la Rama Ejecutiva, con la asistencia de la Oficina de Gerencia y Presupuesto, deberá analizar la alternativa de no renovar contratos de arrendamiento a su vencimiento cuando le sea viable poder consolidar las operaciones de las actividades realizadas en locales arrendados dentro de sus facilidades existentes o alguna otra facilidad pública disponible.

(c)   Toda Entidad de la Rama Ejecutiva que tenga un contrato vigente de arrendamiento o contemple su renovación o que contemple realizar un contrato de arrendamiento deberá solicitar una propuesta de arrendamiento de la Autoridad de Edificios Públicos y/o de cualquier otra Entidad de la Rama Ejecutiva, municipios u otra Rama de Gobierno, que pueda tener locales disponibles a los fines de evaluar si resulta costo efectivo otorgar un nuevo contrato con la entidad gubernamental.  Se entenderá que resulta costo efectivo realizar un nuevo contrato de arrendamiento con una entidad gubernamental cuándo:

(i)   se proyecte una reducción sostenida y continua por tal gasto operacional mayor de quince (15) por ciento,

(ii)   el mudar las operaciones de la agencia no crea un perjuicio en la prestación de servicios, y

(iii)   no existe impedimento legal para ello.

(d)   Todo contrato de arrendamiento otorgado en contravención a lo aquí dispuesto será nulo.

La Oficina de Gerencia y Presupuesto tendrá la discreción para realizar excepciones a lo aquí dispuesto en todo contrato de arrendamiento que sea requerido por mandato de ley federal o estatal o por orden del tribunal; sea esencial para proteger la salud, seguridad y bienestar de los ciudadanos y/o servidores públicos; y cuando sea necesario para cumplir un deber ministerial de la agencia en cuestión a fin de evitar un perjuicio en el servicio público.

microjuris.com

**Artículo 23.-Plan de reducción de consumo energético y disposición sobre el consumo del servicio de acueductos y alcantarillados.**

Las Entidades de la Rama Ejecutiva deben promover una utilización prudente y eficaz de los servicios públicos. En aras de cumplir con los objetivos y requerimientos de la presente emergencia fiscal que exige un uso responsable y efectivo de los limitados recursos del gobierno, se reafirma el deber de toda Entidad de la Rama Ejecutiva de reducir el consumo de los servicios públicos de energía eléctrica, así como de acueductos y alcantarillados.

En lo que corresponde al uso eficaz de la energía eléctrica, se dispone que todas las Entidades de la Rama Ejecutiva cumplirán cabalmente con los requisitos de conservación energética según establecidos en los Artículos 4.1, 4.2, y 4.3 de la Ley Núm. 57-2014, conocida como la "Ley de Transformación y Alivio Energético de Puerto Rico". Se autoriza a las Entidades de la Rama Ejecutiva a solicitar a la Oficina Estatal de Política Pública Energética (OEPPE) un ajuste del consumo base de energía establecido, en función de kilovatio hora consumido, a la luz de carga adicional provocada por nuevas instalaciones, edificaciones o mejoras a las edificaciones existentes, siempre y cuando la OEPPE certifique que la carga adicional provocada por la nueva instalación, edificación o mejora haya sido certificada como eficiente a la luz de los parámetros que para tales fines adopte por reglamento la OEPPE. La OEPPE adoptará la reglamentación necesaria para poner en vigor estos requisitos.

Durante el periodo de vigencia de este Capítulo, con relación a las Entidades de la Rama Ejecutiva cuyos gastos de funcionamiento se sufragan total o parcialmente con el Fondo General, se mantendrán sin incremento las tarifas base de servicios de acueductos y alcantarillados, vigentes al 1 de julio de 2014, a menos que se modifiquen por legislación posterior. Se considerará como la tarifa vigente al 1 de julio de 2014, la tarifa dispuesta en la Sección 8 de la Resolución Conjunta Núm. 16-2013, Sección que por la presente se reitera y ratifica retroactivamente a su vigencia, en la totalidad de sus términos.

Además, en lo que corresponde al consumo de acueductos y alcantarillados, las Entidades de la Rama Ejecutiva cuyos gastos de funcionamiento se sufragan total o parcialmente con recursos del Fondo General deberán reducir su gasto del consumo de acueductos y alcantarillados en un cinco (5) por ciento anual para los años 2014-15, 2015-16 y 2016-17 que refleje una reducción total de quince (15) por ciento en los tres (3) años. El por ciento de la reducción se computará tomando como base el consumo de acueducto y alcantarillado realizado para el año 2012-13. La Oficina de Gerencia y Presupuesto fiscalizará el adecuado cumplimiento en la reducción en gastos de acueductos y alcantarillados establecida para las Entidades de la Rama Ejecutiva. A las Entidades de la Rama Ejecutiva que incumplan con su tasa porcentual de reducción del gasto de acueducto y alcantarillados, la Oficina de Gerencia y Presupuesto podrá realizar una disminución en su presupuesto de gastos de funcionamiento para el año fiscal siguiente que será equivalente al valor monetario del consumo en exceso a la tasa de reducción establecida.

## CAPÍTULO III.- MEDIDAS SOBRE PRESUPUESTO DE LA RAMA JUDICIAL, RAMA LEGISLATIVA Y OTRAS ENTIDADES GUBERNAMENTALES

microjuris.com

**Artículo 24.-Presupuesto de la Rama Judicial.**

Para cualquier año fiscal que termine durante la vigencia de este Capítulo, el presupuesto de la Rama Judicial será equivalente a su respectivo presupuesto del año fiscal previo, ajustado por el porcentaje de reducción o incremento global en el Presupuesto General de Gastos con cargo al Fondo General, implícita en el presupuesto recomendado por el Gobernador. Dicho porcentaje de ajuste se calculará excluyendo las asignaciones propuestas para el servicio de la deuda constitucional del Presupuesto General de Gastos con cargo al Fondo General, tanto de la base del año previo como del monto recomendado para el año fiscal bajo consideración. Igualmente, dicho ajuste excluirá de la base de comparación los presupuestos de la Rama Judicial, la Asamblea Legislativa, la Oficina del Contralor, el Procurador del Ciudadano, la Comisión de Derechos Civiles, la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

Para el año fiscal inmediatamente entrante al momento de terminación de la vigencia de este Capítulo, la recomendación y aprobación del presupuesto de la Rama Judicial se regirá nuevamente por la legislación de ordinario aplicable. No se generará deuda, obligación, ni compromiso de asignación o pago futuro alguno, debido a cualquier brecha entre el presupuesto realmente asignado durante la vigencia de esta Ley, y lo que hubiere sido el presupuesto producto de la aplicación de las fórmulas u otra normativa contenidas en las leyes que de otra forma hubiesen gobernado la confección del presupuesto.

La Rama Judicial, en el ejercicio de las facultades que les confiere la Constitución del Estado Libre Asociado de Puerto Rico, podrá adoptar cualquiera de las medidas de reducción y/o control de gastos indicadas en esta Ley que les resulte pertinente para atender cualquier insuficiencia presupuestaria proyectada durante el término de vigencia de la presente Ley.

**Artículo 25.-Presupuesto de la Asamblea Legislativa y entidades adscritas.**

Para cualquier año fiscal que termine durante la vigencia de este Capítulo, el presupuesto para la Asamblea Legislativa y cada una de sus entidades adscritas, entiéndase la Oficina del Contralor, el Procurador del Ciudadano y la Comisión de Derechos Civiles, será equivalente a su respectivo presupuesto del año fiscal previo, ajustado por el porcentaje de reducción o incremento global en el Presupuesto General de Gastos con cargo al Fondo General, implícita en el presupuesto recomendado por el Gobernador. Dicho porcentaje de ajuste se calculará excluyendo las asignaciones propuestas para el servicio de la deuda constitucional del Presupuesto General de Gastos con cargo al Fondo General, tanto de la base del año previo como del monto recomendado para el año fiscal bajo consideración. Igualmente, dicho ajuste excluirá de la base de comparación los respectivos presupuestos de la Rama Judicial, la Asamblea Legislativa, la Oficina del Contralor, el Procurador del Ciudadano, la Comisión de Derechos Civiles, la Comisión Estatal de Elecciones, la Oficina de Ética Gubernamental, la Oficina del Contralor Electoral y el Panel del Fiscal Especial Independiente.

Para el año fiscal inmediatamente entrante al momento de terminación de la vigencia de este Capítulo, la recomendación y aprobación del presupuesto de cada entidad afectada por este Artículo se regirá nuevamente por la legislación de ordinario aplicable. No se generará deuda,

microjuris.com

obligación, ni compromiso de asignación o pago futuro alguno, debido a cualquier brecha entre el presupuesto realmente asignado durante la vigencia de esta Ley, y lo que hubiere sido el presupuesto producto de la aplicación de las fórmulas u otra normativa contenidas en las leyes que de otra forma hubiesen gobernado la confección del presupuesto.

La Asamblea Legislativa y sus entidades adscritas, en el ejercicio de las facultades que les confiere la Constitución del Estado Libre Asociado de Puerto Rico, podrán adoptar cualquiera de las medidas de reducción y/o control de gastos indicadas en esta Ley que les resulten pertinentes para atender cualquier insuficiencia presupuestaria proyectada durante el término de vigencia de la presente Ley.

### Artículo 26.-Presupuesto de la Universidad de Puerto Rico y ciertas asignaciones de funcionamiento a los Municipios.

Para cualquier año fiscal que termine durante la vigencia de este Capítulo, el subsidio de funcionamiento de las entidades gubernamentales que no forman parte del Gobierno Central, será equivalente al respectivo subsidio de funcionamiento para el año fiscal 2013-2014. El término entidades gubernamentales que no forman parte del Gobierno Central, para propósitos de este Artículo, se refiere a la Universidad de Puerto Rico y a los Municipios. El término subsidios de funcionamiento, para propósitos de este Artículo, se refiere en lo que concierne a la Universidad de Puerto Rico, a la asignación dispuesta en inciso (a) del Artículo 3 de la Ley Núm. 2 de 20 de enero de 1966, según enmendada; y se refiere en lo que concierne a los Municipios, a las asignaciones dispuestas en el Artículo 2.06 de la Ley Núm. 83-1991, según enmendada (Fondo de Exoneración) y en el inciso (c) del Artículo 16 de la Ley Núm. 80-1991, según enmendada (Fondo de Equiparación).

Para el año fiscal inmediatamente entrante al momento de terminación de la vigencia de este Capítulo, la recomendación y aprobación del presupuesto de cada entidad afectada por este Artículo se regirá nuevamente por la legislación de ordinario aplicable. No se generará deuda, obligación, ni compromiso de asignación o pago futuro alguno, debido a cualquier brecha entre el presupuesto realmente asignado durante la vigencia de esta Ley, y lo que hubiere sido el presupuesto producto de la aplicación de las fórmulas u otra normativa contenidas en las leyes que de otra forma hubiesen gobernado la confección del presupuesto.

### Artículo 27.-Plan de reducción de consumo energético y del servicio de acueductos y alcantarillados en la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico.

No se establecerán tarifas especiales ni preferenciales para el servicio de energía eléctrica a las Entidades de la Rama Legislativa, de la Rama Judicial y de la Universidad de Puerto Rico. Estas deben promover una utilización prudente y eficaz de los servicios públicos. En aras de cumplir con los objetivos y requerimientos de la presente emergencia fiscal que exige un uso responsable y efectivo de los limitados recursos del Gobierno, se reafirma el deber de toda Entidad de la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico de reducir el consumo de los servicios públicos de energía eléctrica, así como de acueductos y alcantarillados. El término Entidades de la Rama Legislativa y de la Rama Judicial incluirá toda dependencia u

microjuris.com

organismo adscrito o que forme parte de la Rama Legislativa o de la Rama Judicial, respectivamente.

En lo que corresponde al uso eficaz de la energía eléctrica, se dispone que todas las Entidades de la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico cumplirán cabalmente con los requisitos de conservación energética según establecidos en los Artículos 4.1, 4.2, y 4.3 de la Ley Núm. 57-2014, conocida como la "Ley de Transformación y Alivio Energético de Puerto Rico". Se autoriza a las Entidades de la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico a solicitar a la Oficina Estatal de Política Pública Energética (OEPPE) un ajuste del consumo base de energía establecido, en función de kilovatio hora consumido, a la luz de carga adicional provocada por nuevas instalaciones, edificaciones o mejoras a las edificaciones existentes, siempre y cuando la OEPPE certifique que la carga adicional provocada por la nueva instalación, edificación o mejora haya sido certificada como eficiente a la luz de los parámetros que para tales fines adopte por reglamento la OEPPE. La OEPPE adoptará la reglamentación necesaria para poner en vigor estos requisitos.

Durante el periodo de vigencia de este Capítulo, con relación a las Entidades de la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico cuyos gastos de funcionamiento se sufragan total o parcialmente con el Fondo General, se mantendrán sin incremento las tarifas base de servicios de acueductos y alcantarillados, vigentes al 1 de julio de 2014, a menos que se modifiquen por legislación posterior. Se considerará como la tarifa vigente al 1 de julio de 2014, la tarifa dispuesta en la Sección 8 de la Resolución Conjunta Núm. 16-2013, Sección que por la presente se reitera y ratifica retroactivamente a su vigencia, en la totalidad de sus términos.

Además, en lo que corresponde al consumo de acueductos y alcantarillados, las Entidades de la Rama Legislativa, Rama Judicial y Universidad de Puerto Rico cuyos gastos de funcionamiento se sufragan total o parcialmente con recursos del Fondo General deberán reducir su gasto del consumo de acueductos y alcantarillados en un cinco (5) por ciento anual para los años 2014-15, 2015-16 y 2016-17 que refleje una reducción total de quince (15) por ciento en los tres (3) años. El por ciento de la reducción se computará tomando como base el consumo de acueducto y alcantarillado realizado por entidad o dependencia para el año 2012-13. A solicitud de las Entidades a la Rama Legislativa, de la Rama Judicial o de la Universidad de Puerto Rico, la Autoridad de Acueductos y Alcantarillado podrá autorizar una variación en la base de consumo de acueductos y alcantarillados a la luz de demanda adicional por nuevas instalaciones o edificaciones.

### CAPÍTULO IV.- PLANES PARA LAS SENTENCIAS FINALES Y FIRMES PENDIENTES DE PAGO

#### Artículo 28.-Aplicabilidad y planes de pago.

Ante el impacto negativo a la estabilidad fiscal y operacional del Estado Libre Asociado de Puerto Rico, incluyendo los gobiernos municipales, que conllevaría el pago mediante una suma global, las disposiciones de este Capítulo serán aplicables a todas las sentencias finales y firmes, con excepción de las relacionadas con expropiaciones, que a la fecha de la aprobación de esta Ley se encuentren pendientes de pago, así como a las que durante el transcurso de la

microjuris.com

vigencia de esta Ley se emitan, donde las agencias, instrumentalidades, corporaciones públicas, los municipios o el Estado Libre Asociado de Puerto Rico estén en la obligación de efectuar un desembolso de fondos con cargo al Fondo General, el fondo de la corporación pública que se trate, o con cargo al presupuesto municipal, según fuera el caso.

En aquellos casos donde las agencias, instrumentalidades, corporaciones públicas, los municipios o el Estado Libre Asociado de Puerto Rico, o funcionarios acogidos a los beneficios de esta Ley, estén en la obligación de efectuar un desembolso de fondos con cargo al Fondo General, al fondo de la corporación pública que se trate o con cargo al presupuesto municipal, según fuera el caso, y no exista un plan de pagos previamente acordado por escrito y aprobado por el Tribunal, se aplicarán las disposiciones contenidas en este Artículo.  Ello con independencia de la naturaleza del fallo, o si se tratare de una transacción administrativa, extrajudicial o judicial.  El Secretario de Justicia evaluará el plan de pago aplicable conforme a la cuantía de la sentencia, luego de lo cual solicitará una certificación de disponibilidad de fondos al Director de la Oficina de Gerencia y Presupuesto, la Junta de Gobierno o cuerpo rector de la corporación pública que se trate, o del Alcalde para el municipio correspondiente.  Para efectos únicos de la aplicación de este Artículo el término Estado incluirá el Estado Libre Asociado de Puerto Rico, las agencias e instrumentalidades, corporaciones públicas y los municipios. Los planes de pago serán realizados conforme a los siguientes términos:

(a) Cuando la cantidad adeudada por el Estado, corporación pública o por un municipio fuere igual o menor a cien mil (100,000.00) dólares, podrá ser satisfecha mediante un plan de pago que comprenderá entre uno (1) a tres (3) años desde que la obligación de pago advenga final y firme.

(b) Si la cantidad adeudada por el Estado, corporación pública o por un municipio fuere mayor a cien mil (100,000.00) dólares, pero menor a un millón (1,000,000.00) de dólares, podrá ser satisfecha mediante un plan de pago que comprenderá entre tres (3) años y un (1) día a cuatro (4) años desde que la obligación de pago advenga final y firme.

(c) Si la cantidad adeudada por el Estado, corporación pública o por un municipio fuere mayor a un millón (1,000,000.00) de dólares, pero menor o igual a siete millones (7,000,000.00) de dólares, podrá ser satisfecha mediante un plan de pago que comprenderá entre cuatro (4) años y un (1) día a siete (7) años desde que la obligación de pago advenga final y firme.

(d) Si la cantidad adeudada por el Estado, corporación pública o por un municipio que fuere mayor de siete millones (7,000,000.00) de dólares, pero menor a veinte millones (20,000,000.00) de dólares, se satisfará mediante un plan de pago que comprenderá entre siete (7) años y un (1) día a diez (10) años desde que la obligación de pago advenga final y firme.

(e) Si la sentencia adeudada por el Estado, corporación pública o por un municipio fuere mayor de veinte millones (20,000,000.00) de dólares, el plan de pago que aplique a la misma se fijará como parte del proceso presupuestario siguiente a la fecha en que la obligación de pago advenga final y firme, tomando en

microjuris.com

consideración la situación fiscal, cuyo plan de pago nunca excederá la cantidad anual de tres millones (3,000,000.00) de dólares.

(f) Para efectos de determinar el plan de pago aplicable, no se fragmentará la sentencia por cada reclamante, sino que se tomará como valor de partida la totalidad de la misma.

(g) De no haber disponibilidad de fondos para honrar el plan de pagos en un año fiscal particular, este será aplazado para el próximo año fiscal, teniendo el efecto de extender automáticamente dicho plan por el número de pagos no realizados.

(h) En aquellos casos en que el Director de la Oficina de Gerencia y Presupuesto determine que el presupuesto de la agencia puede absorber el plan de pago de una sentencia emitida en su contra, así se lo informará a la agencia, quien deberá realizar los ajustes y negociaciones necesarias para sufragar la misma con cargo a su propio presupuesto, sin que sea necesario una asignación de fondos adicionales. En estos casos no se permitirá la presentación de una solicitud de fondos adicionales ante la Oficina de Gerencia y Presupuesto.

(i) El Estado, la corporación pública o el municipio no realizará pago alguno a menos que el acreedor de la sentencia provea una certificación oficial emitida por la entidad pertinente, que indique la ausencia de deuda con el Departamento de Hacienda, el Centro de Recaudaciones de Ingresos Municipales y la Administración para el Sustento de Menores. En el caso de que el acreedor de la sentencia tenga deuda con alguna agencia, entidad o corporación pública del Estado o con el propio municipio, la cantidad de la misma se reducirá del total a pagar. En caso de que el acreedor de la sentencia haya solicitado alguna revisión administrativa de la deuda, el Gobierno del Estado Libre Asociado, la corporación pública o el municipio, según sea el caso, se abstendrá de emitir pago alguno hasta que el proceso de revisión haya culminado. De confirmarse la existencia de la deuda impugnada, la cantidad de la misma se reducirá del total a pagar.

Lo aquí establecido le será de aplicación a los Municipios, los cuales mediante ordenanza municipal establecerán los parámetros adecuados para su realización, estando obligados a seguir lo dispuesto en los incisos (a), (b), (c), (d), (e), (f), (g) e (i) de este Artículo.

Los planes de pago de sentencias otorgados por virtud de este Artículo mantendrán su vigencia y disposiciones por el tiempo establecido en el plan de pago, sin que pueda afectarse o invalidarse por haberse expirado el tiempo de la vigencia de esta Ley.

### Artículo 29.-Acciones contra el Estado, Municipios y funcionarios.

No se podrá compeler a las agencias o instrumentalidades del Estado, corporaciones públicas o municipios, funcionarios o empleados, a hacer pago alguno respecto a una sentencia o plan de pago previamente autorizado, cuando no existan fondos para ello por haberse agotado la asignación legislativa destinada a esos fines, por lo que se prohíbe el embargo de fondos para

microjuris.com

hacer efectivo un fallo emitido contra el Estado. La determinación de falta de fondos para realizar dicho pago deberá ser certificada por la agencia o instrumentalidades del Estado, corporación pública o municipio que se trate, y en caso de fondos que provengan de asignaciones legislativas, incluyendo del Fondo General, deberá ser confirmada por la Oficina de Gerencia y Presupuesto, cuya determinación al respecto será concluyente.

El remedio disponible cuando no existan fondos para el pago de sentencias será el pago de interés sobre la cantidad adeudada conforme a lo establecido en las Reglas de Procedimiento Civil y las leyes especiales aplicables.

Lo dispuesto en este Artículo también le será aplicable a los Municipios.

**Artículo 30.-Derechos sustantivos.**

Las disposiciones de este Capítulo no crean derechos sustantivos ni causas de acción alguna que no existieran con anterioridad a su aprobación.

## CAPÍTULO V.-DISPOSICIONES FINALES

**Artículo 31.-Prohibición de reclamaciones retroactivas al concluir la vigencia de esta Ley.**

Con excepción de lo dispuesto en el Artículo 11(c), sobre liquidaciones en efectivo por concepto del exceso de la licencia de vacaciones o enfermedad, cualquier compromiso u obligación que haya sido temporalmente suspendido mientras esté en vigor esta Ley no podrá ser reclamado retroactivamente, ni configurará crédito alguno, una vez ésta pierda su vigencia.

**Artículo 32.-Implementación y Reglamentación.**

En vista del estado de emergencia fiscal, y a los fines de viabilizar la implementación de los propósitos de esta Ley, la Oficina de Gerencia y Presupuesto tendrá todas las facultades necesarias y convenientes para descargar las encomiendas aquí asignadas, incluyendo pero sin limitarse a: promulgar reglamentación; realizar o encomendar, a las agencias o departamentos que están a su cargo, que realicen los estudios que sean necesarios; requerir a las Entidades de la Rama Ejecutiva la información necesaria para realizar su encomienda; asesorar al Gobernador y a las Entidades de la Rama Ejecutiva en todo lo relativo a las medidas de control y reducción de gastos, medidas de impacto laboral y/o fiscal de las Entidades de la Rama Ejecutiva, así como evaluar, aprobar o rechazar peticiones en el renglón de los traslados, destaques, entre otros.

Se dispone, excepto por lo establecido en el Artículo 17, que es la intención de esta Asamblea Legislativa que las facultades que le son conferidas a la Oficina de Gerencia y Presupuesto por virtud de esta Ley Especial tengan primacía sobre las respectivas leyes orgánicas de las Entidades de la Rama Ejecutiva según aquí definidas, sean agencias, instrumentalidades o corporaciones públicas. A tales fines, en lo que fuera pertinente y necesario, se interpretará que esta Ley Especial, durante el término de su vigencia, modifica, atempera o condiciona cualquiera de las disposiciones en las respectivas leyes orgánicas de las Entidades de la Rama Ejecutiva a los fines de que se cumpla lo mandatado en la presente Ley.

microjuris.com

Por tanto, la Oficina de Gerencia y Presupuesto podrá establecer la reglamentación necesaria dirigida a las Entidades de la Rama Ejecutiva, sean agencias, instrumentalidades o corporaciones públicas para implementar las disposiciones de la presente Ley. Toda reglamentación implementada por la Oficina de Gerencia y Presupuesto en virtud de esta Ley será de carácter mandatorio. La ausencia o falta de cualquier reglamento autorizado por la presente Ley, no será causa para invalidar ni dejar de aplicar sus disposiciones en ningún caso.

### Artículo 33.-Inmunidad en cuanto a pleitos y foros.

Esta ley no afecta la inmunidad que en cuanto a los pleitos y foros tiene el Estado Libre Asociado de Puerto Rico y sus funcionarios u oficiales. Nada de lo dispuesto en esta Ley autoriza las acciones por daños y perjuicios contra el Estado Libre Asociado de Puerto Rico, sus funcionarios o empleados por actos u omisiones de éstos últimos, resultante del cumplimiento de esta Ley. Nada lo aquí provisto se interpretará que constituye una renuncia de la inmunidad soberana del Estado Libre Asociado de Puerto Rico.

### Artículo 34. -Separabilidad.

Si cualquier cláusula, párrafo, subpárrafo, artículo, disposición, sección, inciso, o parte de esta Ley, fuere declarada inconstitucional por un tribunal competente, la sentencia a tal efecto dictada no afectará, perjudicará, ni invalidará, el resto de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, artículo, disposición, sección, inciso, o parte de la misma, que así hubiere sido declarada inconstitucional.

### Artículo 35.-Vigencia.

Esta Ley entrará en vigor inmediatamente luego de su aprobación.