# EIF PR RESOURCE RECOVERY, LLC.

*c/o   V-Financial, LLC/Eco-Renovable LLC*
*P.O. Box 575*
*Gouldsboro, PA 18424*

July 15, 2020

*Via Electronic Mail*

Natalie Jaresko
Executive Director & Interim Revitalization Coordinator
The Financial Oversight and Management Board for Puerto Rico
PO Box 192018
San Juan, PR 00919-2018;

*RE: Arecibo Resource Recovery Project –Power Purchase and Operating Agreement*

Dear Ms. Jaresko:

On July 7, 2020, the Federal Oversight and Management Board (FOMB) filed Omnibus Motion (ECF No. 2050) with the Title III United States District Court. This letter is a request to not proceed with the component of the motion to authorize the rejection of the Power Purchase and Operating Agreement ("PPOA") between Energy Answers Arecibo, LLC and PREPA, dated December 4, 2009.  (Listed as item number 27 in Exhibit B of the Omnibus Motion).

The rejection of this particular PPOA is clearly not in the public interest. This PPOA has been the basis for the substantial development efforts to date for the much needed Arecibo Resource Recovery facility. We are therefore requesting that you not proceed with the stated action for item number 27, at least, until the Puerto Rico Energy Bureau ("PREB") considers our request that the Arecibo Resource Recovery facility, or the equivalent, be reinstated in the PREPA Integrated Resource Plan (IRP). We have been in conversation with PREB since late last year, have met with executive management and engineering, and expect a favorable determination. Our last face to face meeting was in February 2020. Unfortunately, the current pandemic has almost certainly delayed matters.

The following are some facts which may assist in your determination:

1.  This project is important for the health and well-being of the residents of Puerto Rico. It provides a viable option to manage over 3,000 tons per day of solid waste generated in the northern side of the Island. Many of the Sanitary Landfill Systems ("SRS") in Puerto Rico are currently in breach of environmental regulations and are under Unilateral Closing Orders from the Federal EPA. The noncompliant landfills pollute surface and ground water daily and threaten drinking water supplies. In addition, they are emitting a significant amount of green gases in clear violation to federal and state environmental regulations. Some 67% of Puerto Rico's 27 SRS's actually have limited useful lives that do not exceed 5 years, even before including the impacts of hurricane Maria. In fact by 2021-22, the northern corridor of the island will need a system with the capable of handling 3000 tons per day. (See Attachment # 1 that includes a presentation by Ing. Daniel Pagan PE, to the Puerto Rico Legislation in July of 2019 re the need to support the development of waste to energy in Puerto Rico.)

# *EIF PR RESOURCE RECOVERY, LLC.*

*c/o   V-Financial, LLC/Eco-Renovable LLC*
*P.O. Box 575*
*Gouldsboro, PA 18424*

2. This project can be revitalized in the shortest time frame. Prior to hurricane Maria, the project was practically fully permitted, with all relevant contracts, including the selection and negotiations with the EPC contractors completed.

3. This will be a State-of-the-Art facility that incorporates and utilizes the Best Available Control Technology as defined by the Environmental Protection Agency (EPA).

4. The project will provide well over $800 million in private capital, and over 7,000 direct and induced jobs during the construction period, among many other benefits. The revised business plan will also provide for the participating municipalities a carried interest in the project.

5. This project was clearly in line to be designated a critical project by the FOMB. (See Attachment #2, the Critical Project Application to FOMB, which was submitted in 2017 pre-hurricane Maria.) It provides a summary of reasons why this project should be designated a critical project and includes the Final Environmental Impact Statement and the status of the permit process.

6. EIF PR Resource Recovery, LLC ("EIF PR") is the Project Lender and has lent $20,122,500 for the project's development. Pursuant to the executed loan pledge and security agreements, it owns the project assets including the PPOA.  Article 20.2 sub-paragraph (f) of the PPOA indicates that if the project is terminated or rejected prior to the expiration of the Term, including pursuant to any bankruptcy law, then PREPA will enter into a new PPOA with the project lender (EIF PR). (See Attachment 3.)

We can expedite this much needed project and its benefits to the Puerto Rico community. It is entirely consistent with Puerto Rico's renewable energy objectives. More importantly, it will also help with the health and wellbeing of the residents of Puerto Rico through the implementation of a project that integrates the best available pollutant control technology. But, we need your help with this matter. We are available to discuss any of this and would very appreciate the removal of the PPOA from the list submitted to the Court to authorize its rejection.

Sincerely.
EIF PR RESOURCE RECOVERY, LLC.
*(As Project Lender)*

*Frank Vasquez*

Frank Vasquez
Chief Executive Officer
(570) 407-0226

Cc:   Jaime El Koury, FOMB Legal Counsel
Omar J. Marrero, PR AAFAF Executive Director
Ralph Kreil Rivera, PREPA Board President
Jose Ortiz, PREPA Executive Director
Edison Avilés Deliz, PR Energy Bureau Chairman
Paul V. Possinger, PROSKAUER ROSE LLP
Martin J. Bienenstock, PROSKAUER ROSE LLP
Luis F. Del Valle-Emmanuelli, LUIS F. DEL VALLE-EMMANUELLI USDC-PR No. 209514

# Ing. Daniel Pagan PE

Ingeniero Químico / Consultor Ambiental
Las Flores I-28
Terrazas de Guaynabo
Guaynabo, PR 00969

---

## Ponencia ante Comisión de Desarrollo Económico, Planificación, Telecomunicaciones, Alianzas Publico Privadas y Energía (R. de la C. # 1339) Presidente Representante Víctor Pares
### (8 de julio de 2019)

Por este medio deseamos agradecer la oportunidad brindada por la Comisión de Desarrollo Económico, Planificación, Telecomunicaciones, Alianzas Público Privadas y Energía de la Cámara de Representantes de Puerto Rico de ofrecer nuestros comentarios en el proceso de evaluación y Vistas Públicas sobre el Plan de cierre de varios Sistemas de Relleno Sanitario (SRS) que están en incumplimiento con la reglamentación ambiental en Puerto Rico. También presentaremos comentarios sobre las alternativas disponibles para el manejo de los residuos solidos una vez se implemente el cierre de dichos SRS.

Deseamos ofrecer nuestros comentarios basados en nuestra experiencia como Ex Director Ejecutivo de la Autoridad de Desperdicios Sólidos (ADS) (1992-1996), así como Ex Secretario del Departamento de Recursos Naturales y Ambientales (DRNA) (1996-2000). Simultáneamente ponemos a la disposición de esta Comisión nuestra experiencia profesional de sobre 46 años de trabajos en el Área Ambiental y Manejo de Residuos Sólidos en la Industria privada y el Gobierno.

**Trasfondo:**

Para el año 1992, ya el Gobierno de Puerto Rico había identificado el manejo de los residuos sólidos como uno de los retos apremiantes para nuestra comunidad y desarrollo económico de nuestra Isla.  Unido a lo anterior, el Gobierno de Puerto Rico entendía que la Reglamentación promulgada por la Agencia de Protección Ambiental estableció, que toda facilidad que no cesara operaciones para principios del mes de abril de 1994 tendría que cumplir con unos

1

requerimientos de cierre de facilidades adicionales entre ellos el muestreo de aguas subterráneas por un periodo de 30 años luego de su cierre. Así las cosas y con urgencia, desarrollamos un Plan de Trabajo para el cierre de forma coordinada de 32 SRS para antes de dicha fecha. Esta fue nuestra primera prioridad luego de haber sido seleccionado para dirigir la ADS a principios del año 1992.

También, nos dimos a la tarea de evaluar los trabajos técnicos que se habían realizado en la ADS bajo administraciones previas encaminadas a atender el Manejo Integrado de los Residuos Sólidos en Puerto Rico. Como parte de este esfuerzo evaluamos un primer trabajo de la ADS en unión a los consultores ambientales Quiñones Diez – Silva y Asociados / Brown and Caldwell en los que se planteó un sistema regional de manejo de Desperdicios Sólidos. En dicho trabajo se consideraban varias Plantas de Procesamiento de Residuos Sólidos (WTE) integrando la generación de electricidad como un componente de beneficio adicional. Aunque el trabajo realizado entendimos fue un esfuerzo en la dirección correcta, se encontró que en una Isla tan pequeña se requería el desarrollo de un Plan Integral a nivel Isla donde el objetivo principal debería ser obtener un sistema de trabajo que produzca los costos de operación más bajos, a la vez que se protegía el ambiente y se incentivaba el reuso y reciclaje de residuos.

Así las cosas, trabajamos en el desarrollo de un nuevo Plan Regional de Infraestructura para el Reciclaje y Disposición de los Desperdicios Sólidos en Puerto Rico en cual fue publicado en de marzo de 1995 ("Plan of Regional Infraestructure for Recycling and Disposal of Solid Waste in Puerto Rico").

Figura # 1



Luego de pasar por todos los procesos y procedimientos administrativos de cumplimiento ambiental y de la aprobación de la Junta de Planificación, a mediados de la época de los noventa (90) dicho Plan se elevó al Rango de Política Pública en el Gobierno de Puerto Rico.  Los aspectos más relevantes de dicho Plan eran entre otros:

- A la luz del cierre de los Sistemas de Relleno Sanitarios (SRS) del Área Norte y Oeste de nuestra Isla, se recomendaba la construcción de dos (2) Plantas de WTE una en el Municipio de Arecibo (Batey de la Central Cambalache) y una Segunda en el Batey de la Central Coloso en el Municipio de Aguada,
- Se proyectó que en Puerto Rico sólo se mantendrían en operación un total de 4 SRS localizados en el área Este y Sur de la Isla, en total cumplimiento con las Reglamentación Estatal y Federal que complementarían las operaciones de las dos (2) plantas de WTE recomendadas,
- Se estableció un programa de construcción de Planta de Transbordo y del uso de contenedores de transportación de 45 y 48 pies de largo de forma que se redujera y se controlaran los costos de transportación de los Residuos Sólidos en nuestra Isla. Lo anterior fue posible mediante una asignación inicial de Fondos del Gobierno Estatal de sobre $150 MM,
- Se desarrollaron estrategias para equiparar los costos del recícleme al de manufactura con material virgen, y
- Como último componente, se planteó que el manejo de los Residuos Sólidos en Puerto Rico ya no sería basado en el área geográfica municipal y si en la opción de manejo que ofreciera los menores costos de transportación para TODO el sistema.

En aquel entonces, visualizamos que la integración de las Plantas de WTE en la Matriz de generación de electricidad en Puerto Rico, le ofrecería al país dos (2) beneficios de inmediato. Estos a saber: (1) atender de forma responsable del manejo de los Residíos Sólidos luego del cierre de los SRS por medio del uso de Tecnologías Demostradas, Ambientalmente Seguras y que integran las Mejores Tecnologías Disponibles en el control de los contaminantes al medio ambiente y (2) el aprovechamiento de la energía contenida en los Residuos Sólidos como fuente de generación de electricidad en nuestra Isla. La figura # 2 incluye un artículo de periódico incluido en el "Puerto Rico Herald" de fecha 10 de agosto de 2000 donde se destaca una enmienda aprobada por la legislatura al Plan de Infraestructura de marzo de 1995, a los efectos de incluir en dicho Plan una nueva y **Tercera Planta de Recobro de Energía a ser ubicada en el Municipio de Caguas.**

3

**Figura # 2**



La integración de las tecnologías de WTE en el Manejo de los Residuos Sólidos, las cuales consideramos de importancia medular, requiere una evaluación minuciosa de los componentes de tecnología de control de contaminantes ambientales tanto a nivel federal por medio de un permiso de Prevención de Deterioro Significativo (PSD por sus siglas en Ingles), así como a nivel estatal de parte de la JCA.  En lo referente al manejo de los Residuos de Cenizas NO TOXICAS generadas por esta tecnología, las mismas se manejarían en los SRS que se mantendrían en operación en nuestra Isla o por medio de la construcción de una facilidad de menor capacidad dedicada al manejo exclusivo de este desperdicio NO Peligroso.

La consideración de las integración de Plantas de WTE fue requerido como parte de las opciones disponibles para el manejo de los residuos sólidos a la vez de obtener una generación de electricidad de CARGA BASE adicional en nuestra isla.  En aquel entonces se proyectó que las dos (2) Plantas de WTE inicialmente sugeridas aportarían sobre 70 MW al sistema eléctrico de la Autoridad de Energía Eléctrica (AEE) a la vez que manejarían sobre 3,000 toneladas de Residuos Sólidos por día, esto sin considerar 30 MW adicionales provenientes de la tercera planta a ser construida en el Municipio de Caguas.

Simultáneamente con el desarrollo del Plan Regional de Infraestructura para el Reciclaje y Disposición de los Desperdicios Sólidos en Puerto Rico, la ADS desarrolló un Plan de Trabajo

4

junto con la JCA encaminado a facilitar de forma organizada el cierre de treinta y dos (32) SRS de los sesenta y cuatro (64) que para el 1994 estaban en operación en Puerto Rico.  Entre los criterios para seleccionar los SRS a ser cerrados se destacaban los siguientes, entre otros: (1) Limitada Capacidad receptora, (2) Naturaleza e Impacto de la Contaminación Ambiental, en particular por los líquidos de Lixiviados, y (3) limitación de área para facilitar una expansión lateral.

Esta iniciativa como hemos destacado se completó a principios del mes de abril de 1994 con el cierre efectivo de 32 SRS siendo esta la primera iniciativa concertada del Gobierno de Puerto Rico de atender el reto del manejo de los Residuos Sólidos en nuestra Isla. Lo anterior requirió negociaciones y aprobaciones de las 32 Asambleas Legislativas concernidas y a su vez la negociación de las nuevas alternativas de disposición en los SRS restantes con la aprobación también de las Asambleas Legislativas de los Municipios receptores.

**En el 1992 se determinó que el Manejo correcto y ambientalmente adecuado de los Residuos Sólidos en Puerto Rico era una prioridad de la Administración de Gobierno de turno y necesaria para salvaguardar la salud y bienestar de nuestra comunidad.**  En vista de lo anterior y por primera vez, se instituyó un Programa de Construcción de Facilidades para facilitar la transportación de Residuos Sólidos a través de todo Puerto Rico, lo anterior por medio de una Inversión Capital de sobre $150. MM.  **Desafortunadamente esta iniciativa de atender este reto de forma prioritaria no fue continuada por NINGUNA de las administraciones de Gobierno subsiguientes.**

## Situación del Manejo de Residuos Sólidos al 2016:

En vista de la inacción de las Administraciones de Gobierno Subsiguientes al 2000 y de la limitada fiscalización de parte de la JCA, en los pasados ocho (8) años; la Agencia de Protección Ambiental Federal (EPA) ha ocupado el campo de trabajo tomado la iniciativa de establecer Órdenes de Cierre *unilaterales* para múltiples facilidades de SRS en Puerto Rico. Lo anterior se ha desarrollado sin que exista un plan de trabajo para el manejo integrado de los residuos sólidos a largo plazo y a nivel de nuestra Isla.

Recientemente y sin considerar el impacto de los Huracanes Irma y María se encontró que de los 27 SRS en operación en nuestra isla en la actualidad, dieciocho (18) de ellos o el 67% de la capacidad de SRS posee una vida útil muy limitada que NO sobrepasan los 5 años. (Ver Figura # 3) En otras palabras, lo que se encontró fue que para el 2021 - 2022 se requerirá en particular para el corredor norte de nuestra Isla, un sistema que permita manejar sobre 3,000 toneladas de Residuos Sólidos por día, sector de nuestra isla donde se encuentra nuestra más alta densidad poblacional. **Desafortunadamente grupos de nuestra sociedad se oponen a las**

opciones reales de manejo de residuos sólidos SIN presentar opciones viables para atender dicho reto de nuestra sociedad.

Figura # 3



## Plan de Manejo de Residuos Sólidos

**Situación Actual**

**(27 SRS** en Operación al 2016)

Candidatos a Cierre para el 2022

SRS privados

| Sistemas de Rellenos Sanitarios en Operación | | |
|---|---|---|
| Añasco | Arecibo | Arroyo |
| Barranquitas | Cabo Rojo | Carolina |
| Cayey | Culebra | Fajardo |
| Guayama | Hormigueros | Humacao |
| Isabela | Juncos | Florida |
| Jayuya | Juana Díaz | Lajas |
| Mayagüez | Moca | Ponce |
| Salinas | Toa Alta | Toa Baja |
| Vega Baja | Vieques | Yauco |
| Peñuelas (EC Waste) | Peñuelas (Eco System Inc.) | |

SRS localizados en el Corredor Norte de la Isla

Desafortunadamente los retos y la urgencia de atender el Manejo de los Residuos Sólidos en Puerto Rico NO fueron atendidos con diligencia por las Administraciones pasadas, lo que hace que este reto tome mayor relevancia ahora en el año 2019.

## Realidad de los SRS "Post" Huracanes Irma y María 2019:

Luego de los Huracanes Irma y María la situación relacionada con el Manejo de los Residuos Sólidos de Puerto Rico se agravó aún más en vista que se requirió el manejo, reciclaje y disposición de sobre 6.00 Millones de yardas cúbicas de residuos sólidos en un periodo de 14 meses. Esta realidad aceleró la reducción de la vida útil de los SRS en nuestra Isla, haciendo

6

URGENTE el desarrollo de un Plan Regional. Lo anterior destaca la necesidad de instituir una serie de alternativas ambientalmente adecuada y costo efectivas para el Manejo de los Residuos Sólidos en particular en el Norte de nuestra Isla a la luz de los cierres prospectivos de los siguientes SRS:

**Figura # 4**

| Toa Baja | Arecibo |
|---|---|
| Toa Alta | Isabela |
| Barranquitas | Moca |
| Vega Baja | Aguadilla [1/] |
| Florida | |

Nota # 1: SRS de Aguadilla ya está Cerrado bajo Orden de la EPA

Datos recientemente provistos de forma extraoficial por los funcionarios de la EPA demuestran que la capacidad receptora o vida útil de nuestros SRS se redujo en dos (2) años como resultado de la disposición de los Residuos Sólidos relacionados con los Huracanes Irma y María. Esta realidad le pone a la Administración de Turno un reto adicional pues requiere la implantación de estrategias de manejo de residuos sólidos concertadas ambientalmente adecuadas y costo efectivas de forma URGENTE, pues ninguna de la infraestructura requerida se construye en menos de 24 a 36 meses. Por tal razón, será la Administración Actual la responsable de promover un Plan de Manejo de Residuos Sólidos encaminado a atender las necesidades del Manejo de los Residuos Sólidos en cumplimiento con las reglamentaciones ambientales estatales y federales. Lo anterior se hace más relevante al considerar el futuro cierre de los SRS en las áreas norte y noroeste de la Isla.

Lo anterior está sustentado, como hemos indicado previamente en la realidad de que el 67% de las 27 facilidades de SRS en operación en la actualidad alguna de ellas deberá cerrar sus operaciones para los años 2021-2022. Dichos cierres están predicados en que estas facilidades no poseen la capacidad receptora o porque los niveles de contaminación ambiental relacionadas con sus operaciones no son justificables y/o aceptables. Se destaca que los SRS que violan la reglamentación ambiental son unas de las fuentes de emisión de gases de invernadero en nuestra isla. **Aun cuando las opciones de manejo de residuos sólidos que cumplen con la clasificación de la mejor tecnología disponible sobre pasan por mucho los niveles de reducción de emisiones de gases de invernadero, grupos de nuestra sociedad no los favorecen pero en dicha critica no proveen opciones reales para atender dicho reto**.

7

## Emisiones de Gases de Invernadero Generadas por los SRS que operan en Violación de la Reglamentación Ambiental en Puerto Rico

Se ha demostrado que los gases de descomposición de los residuos sólidos, mayormente metano son considerados como gases que promueven el efecto de Invernadero.  Así las cosas la EPA y la JCA han requerido a muchas de las facilidades de SRS que instalen quemadores de gases para controlar las emisiones de estos contaminantes.   Estas iniciativas se han visto afectadas por la limitación de fondos para la construcción de los mismos por los municipios dueños de dichas facilidades.

Utilizando el modelo de la EPA titulado "LandGEM Landfill Gas Emissions Model version 3.02", se demuestra que **las emisiones de gases de invernadero relacionadas con Plantas de WTE Modernas  generan un efecto neto de MENOS toneladas/año $CO_2$ equivalente.** Estos niveles de reducción de emisiones han sido evaluados y confirmados en múltiples Plantas de WTE en los Estados Unidos por la EPA. Estos resultados, que reflejan una reducción en los efectos de calentamiento global por emisiones de gases de invernadero, son consistentes con las publicaciones que sobre este particular reseñó en múltiples publicaciones técnicas de diferentes instituciones.  La Figura # 5 resume los hallazgos de publicaciones técnicas sobre las emisiones de gases de invernadero.

**Figura # 5**



Data Source:  Thorneloe SA, Weitz K, Jambeck J. Application of the U.S. Decision Support Tool for Materials and Waste Management. WM Journal 2006 August.

## Conclusión y Recomendaciones

En vista de los retos relacionados con el manejo de los residuos sólidos en Puerto Rico se recomienda la siguiente Hoja de Ruta:

- Según datos recientemente provistos por los representantes de la EPA, indicaron que los impactos de la disposición de los escombros del Huracanes Irma y María redujeron la Vida Útil de los SRS en Puerto Rico aproximadamente por dos (2) años,

- Que la proyección de cierres de SRS operando en VIOLACION de las reglamentación ambientales estatales y federales durante los próximos 4 a 5 años será de un 67% de los 27 SRS en operación en la actualidad,

- Que muchos de los SRS a ser cerrados están en el corredor norte de la Isla haciendo urgente la necesidad de desarrollar un proyecto que atienda la reducción de capacidad de disposición de residuos sólidos a ser generada una vez se concreten los cierres de los SRS,

- Que la Jerarquía de Manejo de Residuos Sólidos promulgada por la EPA ubica a la tecnología de WTE en un nivel superior a los SRS, siempre y cuando cumplan con la Mejor Tecnología Disponible según requerido por la Reglamentación federal,

- Se recomienda actualizar el "Plan of Regional Infrastructure for Recycling and Disposal of Solid Waste in Puerto Rico" de forma urgente, para de esta forma poseer una Hoja de Ruta en el desarrollo de estos cierres de SRS,

- Se planifique el cierre de los SRS que están VIOLACION de los parámetros mínimos de operación y control ambiental para cerrar los mismos de forma ordenada y evitar un disloque en los servicios y disposición de los residuos sólidos en Puerto Rico,

- Se utilice el diseño de Estaciones de Transbordo y Mini Estaciones de Transbordo disponibles en la Autoridad de Desperdicios Sólidos (ADS) y se evalúen también, otras opciones de estas facilidades que provean la infraestructura básica pero que su costo de construcción sea uno más limitado,

- En cuanto el reto del manejo de las sobre 3,000 toneladas por día para el corredor norte de la Isla proyectado para los años 2021-20122 se recomienda que se desarrolle con URGENCIA la Planta de WTE propuesta para el Municipio de Arecibo. Esta acción se RECOMIENDA que debe ser desarrollada bajo una nueva estructura de negocio que permita a los municipios ser socios en la misma, a la vez que se ajusten los costos de disposición en dicha facilidad a un promedio de $26 / tonelada.

- Se reconoce el impacto que en los aspectos de regular las tarifas de electricidad en Puerto Rico posee el Negociado de Energía de Puerto Rico (NEPR). Se destaca que la generación de electricidad por medio del uso de residuos sólidos como fuente de combustible por medio del uso de Plantas de WTE posee el potencial de generar electricidad a costos competitivos a la vez que atiende de forma responsable y ambientalmente segura el manejo de los residuos sólidos. Al considerar las Plantas de WTE debemos considerar que su función primordial es el manejo de los residuos sólidos y como un componente secundario la generación de electricidad. Así las cosas, se

9

menciona que la Ley 17 establece, además, nuevas metas específicas de cumplimiento sobre el uso de la energía renovable sostenible y alterna en Puerto Rico incrementando la Cartera de Energía Renovable hasta alcanzar al 2050 un 100% de energía provenientes de fuentes renovables. **Específicamente el NEPR debe aclarar que los Certificados de Energía Renovable INCLUYEN la tecnología de Energía Renovable Alterna tal y como se describen las Plantas de WTE.**

- Que la consideración y **uso de la Tecnología incluida en las Plantas de WTE Modernas está en armonía con la tendencia mundial del manejo de los residuos sólidos en particular en los Estados Unidos de América**.  En especifico se destaca el ejemplo de la Cuidad de **Palm Beach, en Florida donde recientemente adjudicó un Contrato de Operación y Mantenimiento para dos (2) Plantas de WTE propiedad de la Ciudad, una construida en el 2008 y la segunda desarrollada en el 2015 a una empresa privada**,

- Que el uso de la Tecnología de **WTE en la generación de electricidad de Carga Base es algo que el Gobierno de Puerto Rico debe respaldar con extrema urgencia** para no solo atender el manejo adecuado de los residuos sólidos a la vez de complementar la flota de generación de electricidad de la Autoridad de Energía Eléctrica (AEE).

- Para la consideración de la Comisión de Desarrollo Económico, Planificación, Telecomunicaciones, Alianzas Publico Privadas y Energía se incluyen como Anejo # 1 una serie de datos técnicos sobre las Plantas de WTE que destacan los beneficios de esta tecnología en lo referente al manejo de los residuos sólidos residenciales.


En San Juan Puerto Rico hoy 8 de julio de 2019.


Muchas Gracias

*Danny Pagán*

Ing. Danny Pagán PE

10

# ANEJO # 1

Anejo # 1:

Los datos e información incluidos en este anejo, están relacionadas con el desarrollo de la tecnología utilizada por las Plantas de WTE a nivel mundial, así como de los sistemas de control de contaminantes requeridos por la EPA bajo el concepto de Mejor Tecnología Disponible.  Las mismas se presentan con el interés de aclarar información NO correcta presentada por grupos de nuestra sociedad que se oponen a la utilización de esta tecnología en Puerto Rico, pero que desafortunadamente hasta esta fecha no han presentado opciones reales para atender el reto observado en el área norte de nuestra isla.

Estos datos los hemos dividido en varias áreas para facilitar su consideración y estudio.

## Datos sobre la Tecnologías de WTE y Requerimiento de ser Clasificada como la Mejor Tecnología Disponible por la EPA:

Considerando la situación prospectiva del cierre de varios SRS localizados en el área norte y noroeste de nuestra Isla, unido a la realidad de que la geología kárstica predominante en dicho corredor la cual no es adecuada para el desarrollo de nuevos SRS se requiere la consideración de plantas de WTE. Lo anterior se agrava al considerar que la localización de los abastos de aguas subterráneas más importantes de nuestra Isla están localizados en dicho corredor.

Así las cosas, para dichas áreas: (1) Norte y (2) Noroeste de Puerto Rico se consideró en el pasado el uso de tecnologías demostradas como la utilizada en Plantas de WTE para el manejo de los residuos sólidos, las cuales han sido reconocidas a nivel mundial y en particular en los Estados Unidos. Estas plantas deberán en su diseño maximizar la recuperación de materiales reciclables y generar energía de la manera más eficiente y limpia posible, utilizando como combustible el contenido calorífico de la corriente de residuos sólidos municipales.

Los Sistemas de Operación en una Planta de WTE Típica promueve la recuperación de metales ferrosos (tales como aceros y hierro) y no ferrosos (tales como aluminio y cobre).  Estos metales se pueden vender para su reciclaje, a los precios de mercado.

Como parte de los Sistemas de Operación de las Plantas de WTE, los residuos sólidos municipales que resultan luego *de la implantación de programas de reciclaje municipales*, se recibirán en la facilidad.  Dentro de la planta en general se llevan a cabo las siguientes tareas:
1) **Inspección mediante detectores de residuos sólidos** que puedan contener o medir niveles de radioactividad.
2) **Inspección visual para separar materiales** como tanques de gas propano, neveras, estufas ("White Goods") y otros similares.

12

3) **Trituración de los Residuos Sólidos** mediante unas trituradoras industriales tipo "high shear". El propósito de triturar los materiales que componen los residuos sólidos es aumentar la cantidad de superficie en la que ocurre la transferencia de calor.

4) **El material triturado (denominado en inglés "Processed Refuse Fuel" o "PRF")** se coloca sobre unas correas transportadoras tipo "conveyors" que pasan por debajo de unos imanes industriales para la separación de metales ferrosos.

5) **Tecnología de Combustión (caldera):**

En la próxima etapa el material se introduce a la caldera donde ocurre la combustión o destrucción termal de los residuos sólidos. Una de las opciones de caldera para las Plantas de WTE es del tipo "spreader stoker". Este tipo de caldera combina combustión de los residuos sólidos en suspensión y en sobre una parrilla para todo aquel material que es más pesado. Esta tecnología es un tipo de caldera que permite la alimentación continua de los residuos sólidos triturados. Los residuos sólidos en suspensión se mantienen como un lecho fluidizado ("fluidized bed"), en la que se introduce aire por debajo y los residuos sólidos se mantienen en suspensión en el aire mientras ocurre la combustión.

El propósito de llevar a cabo la combustión con el material en suspensión es optimizar el intercambio de calor y procurar una combustión completa mediante una mejor eficiencia en la transferencia de calor ("heat transfer"). Desde el punto de vista químico, los residuos de una combustión completa de material con contenido calorífico son Bióxido de Carbono ($CO_2$) y Agua ($H_2O$).

Los productos de combustión "incompleta" (Products of Incomplete Combustion o "PIC") consisten de moléculas con múltiples combinaciones de principalmente carbono, hidrógeno, oxígeno y cloruro, que a las temperaturas y presiones de operación son los precursores de contaminantes tales como las dioxinas y furanos. Por tanto, mediante la tecnología propuesta de la combustión en suspensión, se minimizan los PIC's y por ende, se minimiza la posibilidad de la generación de dioxinas y furanos. Estos datos se han demostrado de forma repetidamente por medio de muestreos de chimenea en otras plantas en los Estados Unidos y Europa donde se utiliza esta tecnología de caldera.

A continuación, se incluye un dibujo esquemático TIPICO de una caldera tipo "Spreader Stoker" similar a las utilizadas en múltiples proyectos de Plantas de WTE en los Estados Unidos.

13



Estas calderas tienen unos tubos por donde pasa agua ("wáter walls") y el calor que se genera dentro de la caldera se transfiere al agua, formando así vapor de agua.  El aire que se alimenta a la caldera se pre-calienta con el mismo calor que se genera de la caldera y se succiona del área de recibo de los residuos sólidos, lo que evita el escape de malos olores hacia el exterior del edificio.  La caldera tiene además un sobre-calentador primario, seguido de un atemperador con rociado interno y un sobre calentador final. El vapor sobrecalentado ("superheated steam") a una alta presión sale del sobre calentador hasta la entrada de la turbina para la generación de electricidad.

Las turbinas que se utilizarán en las Plantas de WTE integran tecnología moderna con una alta eficiencia en la producción de energía eléctrica.  Más adelante se discute la tecnología de las turbinas.

La caldera debe de estar diseñada para procesar una cantidad de toneladas diarias del material de residuos sólidos disponibles. Los residuos sólidos a ser utilizados como combustible exhiben usualmente un contenido calorífico promedio de 5,700 BTU/lb.

14

La tecnología disponible y utilizada en los Estados Unidos en las calderas de las Plantas de WTE modernas incluye el uso de parrillas perforadas por las que sube el flujo de aire que sirve para la combustión y para mantener los residuos sólidos (RDF) en suspensión durante la combustión. Del proceso de combustión el material procesado antes descrito, se produce una cantidad de cenizas que representan un total aproximado del 20% (por peso) del material que se alimenta a la caldera. Más adelante, se describen las cenizas, así como su manejo como un tema separado.

6) **Tecnología de Control de Emisiones (Mejor Tecnología Disponible):**

La salida de las emisiones de la caldera se conduce por ductos al sistema de control de emisiones. **Las tecnologías de control de emisiones requeridas para proyectos de Plantas de WTE requiere el cumplimiento estricto con los requisitos de la EPA conocidos como los Estándares de Rendimiento para Nuevas Fuentes "New Source Performance Standards" (NSPS) y con los requerimientos de la Mejor Tecnología de Control Disponible "Best Available Control Technology" (BACT).** Además, aplican los límites de emisión permisibles conocidos como Tecnología Máxima de Control Alcanzable "Maximum Achievable Control Technology "(MACT), para ciertas sustancias que están incluidas en el permiso federal a ser emitido por la EPA y conocido como el Permiso PSD ("Prevention of Significant Deterioration"). **El cumplimiento con estos límites para nuevas Plantas de WTE es requerido bajo la Ley de Aire Limpio federal, la Ley de Política Pública Ambiental de PR y los reglamentos federales y estatales que rigen la calidad del aire.**

La tecnología de control de emisiones generalmente utilizada para cumplir con los requerimientos de las Agencias Reguladoras del ambiente integra las siguientes cuatro (4) etapas que se describen a continuación:

1. **Un sistema de inyección de carbón activado** para remover metales pesados y compuestos orgánicos, incluyendo dioxinas y furanos que se hayan podido general.

2. **Un sistema de lavado en seco ("dry scrubber")** con recirculación y lecho fluorizado para remover gases ácidos mediante inyección de cal. Este sistema remueve los gases ácidos, principalmente ácido clorhídrico y ácido sulfúrico. El principio de esta tecnología de lavado seco (dry scrubber), se basa en unir niveles altos de circulación de sólidos, agua finamente atomizada, cal hidratada dentro de una cámara de lecho fluídizado. La cal y el agua atomizada se inyectan por separado en la cámara para disminuir la temperatura en el sistema y

aumentar la capacidad de absorción.  El material del lecho fluido consiste de sólidos, incluyendo hidróxido de calcio, ceniza de tope re-circulada del proceso de combustión e interrelación de los sólidos del filtro de tela.

Estos sistemas incluyen un equipo para el almacenamiento y la preparación solución acuosa hidróxido de amonia que se almacenará en tanques de capacidad adecuada. Además, se requiere el almacenamiento de la  cal en un silo que tiene que estar equipado con un filtro de tela para controlar las emisiones de particulado.

3. **Una unidad de filtros de tela ("baghouse")** para controlar las emisiones de particulado.  En estos filtros se atrapa el carbón activado que ya lleva adherido los metales y compuestos orgánicos, además del material de cal con ácidos neutralizados. Este material filtrado constituye la ceniza que se recoge y se conoce como Ceniza de Tope.

Al salir de la unidad de filtros de tela, se requiere la inyección de **una solución acuosa de hidróxido de amonia a la entrada del sistema de reducción catalítica selectiva regenerativa (RSCR)** para la reducción de emisiones de Óxidos de Nitrógeno (NOx).  (El NOx se forma porque el aire es 79% Nitrógeno y como resultado de la combustión, el Nitrógeno se convierte en NOx). Al salir del RSCR, un abanico impulsador lo conecta con la chimenea.

Los sistemas de control de emisiones requeridas por la EPA y la JCA para Plantas NUEVAS de WTE requieren la integración de los siguientes equipos de monitoreo continuo, entre otros:

- Emisiones de Dióxido de Azufre en la entrada al Turbosorp®;
- Emisiones de Monóxido de Carbono;
- Emisiones de Óxido de Nitrógeno;
- Opacidad;
- Temperatura de la Caldera;
- Temperatura a la entrada de la Unidad de Filtros de Tela;
- Concentraciones de Oxígeno y Bióxido de Carbono en la entrada al Turbosorp®, unido a la salida de la Unidad de Filtros de Tela; y
- Flujo de Vapor.

La operación y el diseño de los Sistema de Monitoreo Continuo para Emisiones (CEMS), requeridos para Plantas de WTE nuevas deberá estar conforme con las disposiciones del Título 40 C.F.R. Parte 60, Apéndice B, Sub Parte Eb.

Por otro lado, las Plantas nuevas de WTE deberán contar a su vez, con un sistema computadorizado dedicado a la recopilación y al procesamiento de los datos de los monitores de emisiones de la chimenea y los datos de la unidad operacional o caldera. Subsiguientemente, la reglamentación vigente requiere la preparación de informes sobre las emisiones de la chimenea con los datos recopilados., Estos datos usualmente son compilados en los  Sistemas de Control Digital de estas Plantas de WTE para monitorear el funcionamiento eficiente de las mismas y garantizar la salud y bienestar de las comunidades.

A continuación, un dibujo esquemático de un Sistema de Control de Emisiones utilizado en Nuevas Plantas de WTE en los Estados Unidos:



7) **Cenizas:**

   Como resultado del todo el proceso de operación a ser desarrollado en Plantas de WTE, que incluyen la Caldera y el Sistema de Control de Emisiones, se generan dos (2) tipos de cenizas:

   1. **La ceniza de fondo** que es la fracción más gruesa y pesada. Ésta permanece en la parrilla de la caldera y se recoge en la parte inferior de la caldera.

2. **La ceniza de tope** que es la fracción más fina y liviana. Ésta se recoge del sistema de control de emisiones.

Estos dos (2) tipos de cenizas representan un total aproximado del 20% (por peso) del material que se procesa en la planta. Debido a que éstas poseen características diferentes, las mismas se manejarán por separado.

La ceniza de tope se recoge en las tolvas de los calentadores de aire, las tolvas del Sistema de Control y las tolvas de la unidad de filtro de telas utilizando una correa transportadora. Una vez recogida, se transporta a un silo para almacenamiento.  La ceniza de fondo se recoge del fondo de la caldera y se descarga a una correa transportadora tipo "conveyor".

**Ambos tipos de ceniza constituyen _desperdicio sólido no peligroso_ de conformidad con la reglamentación aplicable, que es la promulgada al amparo de la ley federal conocida como Resource Conservation and Recovery Act (RCRA), y la Ley de Política Pública Ambiental de PR.  Los resultados de pruebas de toxicidad realizados en plantas con esta tecnología de control de emisiones en los Estados Unidos consistentemente demuestran que la composición química de ambos tipos de ceniza las clasifican como un desperdicio sólido no peligroso.**

8) **Las Turbinas de Generación de Energía Eléctrica:**

Una de las opciones para generar electricidad lo es el uso de turbinas de vapor de carcasa sencilla y de flujo sencillo con múltiples extracciones de vapor, unas controladas y otras no controladas. La turbina estará conectada a un generador eléctrico que tendrá las especificaciones requeridas para la producción de electricidad.

18

**EnergyAnswers**
**Arecibo**

VIA - ELECTRONIC MAIL

August 8, 2017

Mr. Noel Zamot
Revitalization Coordinator
Financial Oversight & Management Board of Puerto Rico
PO Box 192018
San Juan PR 00919-2018

RE:      Arecibo Resource Recovery Project – Application for Designation as a Critical Project

Dear Mr. Zamot:

Please allow this letter and the corresponding attachments to serve as the Arecibo Resource Recovery Facility's (the "Arecibo RRF"or the "Project") application for Critical Project status, as this is defined under section 503 of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA").

Energy Answers International, Inc. ("Energy Answers"), through its subsidiary, Energy Answers Arecibo, LLC ("EA Arecibo"), is developing the Arecibo RRF, a nominal gross 80 MW/net 70 MW Resource Recovery Facility to generate baseload renewable energy and recover valuable materials from approximately 2,300 tons per day ("tpd") of processed Municipal Solid Waste ("MSW"). The Project will be located in Barrio Cambalache, Municipality of Arecibo, Puerto Rico, at the former Global Fibers paper mill site - located less than ½ mile from its point of interconnection with the Puerto Rico Electric Power Authority ("PREPA").

In addition to producing renewable energy, the Project's technology enhances the recovery of ferrous and non-ferrous metals from the MSW and produces construction aggregates and other materials suitable for use in building and construction products. The technology to be employed represents the next generation of Energy Answers' Processed Refuse Fuel ("PRF") technology, developed by Energy Answers to maximize the recovery of renewable energy and marketable materials from MSW. The technology has been in continuous service since February 1989 at the SEMASS Resource Recovery Facility in Rochester, Massachusetts.

The Project began development activities in 2009 and is now in an advanced stage of development, with the ability to commence full construction within 2017 – providing Puerto Rico with a major private sector infrastructure investment and project that creates jobs, employs state of the art technology and protects human health and the environment.

The Project has entered into a 30-year Power Purchase and Operations Agreement ("PPOA") with PREPA for the purchase of all energy delivered to the interconnection point.  The Project has executed a long-term Waste Delivery and Supply Agreement ("WDSA") with the Solid Waste Management Authority of Puerto Rico ("SWMA") for the delivery of 2,100 tpd of MSW, which represents more than 20% of the total MSW generated in Puerto Rico. The term of this agreement coincides with the PPOA term.  The

Page 2
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

Project has been endorsed by all pertinent agencies and received all essential federal and local environmental approvals, including the U.S. EPA Prevention of Significant Deterioration ("PSD") permit. (See Attachment #1 containing a list of all the applicable environmental and construction permits pertaining to the Project and their status.)



**Project Site**
**Cambalache Sugar Mill and Global Fibers Paper Mill**

The importance of the Project to Puerto Rico, and its compatibility with both Island and national goals for renewable energy production, compliant solid waste management and sustainable development, has earned the Project support from local and federal government authorities and elected officials. The Project has been presented to Governors Fortuño, García Padilla and Rosselló and their advisory teams and has been confirmed as compliant with Puerto Rico's solid waste management public policy.

The Project will establish an advanced energy and materials recovery operation that, among other things, will dramatically lessen Puerto Rico's reliance on its severely limited, regulatorily non-complaint and rapidly diminishing landfill capacity in northern Puerto Rico and will also serve to reduce and, in most cases, eliminate collateral environmental impacts to Puerto Rico's water bodies (including groundwater), soils and air caused by continued landfilling.

In summary, the Project will:
• Prevent the burying of approximately 2,300 tons per day of waste in non-compliant landfills, thereby eliminating the associated environmental impacts on air, water, soil and human health;
• Generate 80 MW of baseload electricity at a competitive and stable price;
• Reduce the Island's dependence on imported fossil fuels, preventing the burning of approximately 110,000 gallons per day (or more than 35 million gallons per year) of imported fossil fuels;
• Reduce Puerto Rico's carbon footprint through major GHG reductions of over 1.1 million tons of $CO_2$ equivalent per year

Page 3
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

- Recover more than 200 tpd of valuable ferrous and non-ferrous recyclable materials, thereby significantly increasing the recycling and material reuse rates within participant communities;
- Provide long-term fully compliant, competitively priced waste disposal capacity for Puerto Rico;
- Create more than 7,000 direct, indirect and induced jobs during 3.5-year construction process;
- Create more than 150 permanent "green collar" jobs, plus an additional 600 full-time indirect and induced jobs during the 30-year operating life of the Project; and
- Complete all of the above under uniquely challenging economic conditions.

**Beneficial Impacts of the Arecibo RRF Project**

Puerto Rico is currently facing two major crises – in solid waste management and energy generation – that have reached "Emergency" levels, as this term is defined in section 501 (4) of PROMESA, which the Arecibo RRF project can positively impact.  A description of these crises and how the Arecibo RRF can positively impact them is provided below.

**The Solid Waste Management Crisis**

Twenty-two (22) of Puerto Rico's twenty-seven (27) landfills do not, and cannot, comply with local or federal environmental regulations.  These facilities have been in violation of the governing regulations for over 15 years, with only minimal efforts, if any, being made to improve the operating conditions of these facilities during this period.  The violations, and threats that they pose, are well documented by both the U.S. EPA and Puerto Rico Environmental Quality Board (EQB). (See Attachment #2 - Puerto Rico Limpio report: "The Poisoning of Puerto Rico".)

Municipal landfills are regulated under Subtitle D of the Resource Conservation and Recovery Act ("RCRA") and are required to meet, at a minimum, the federal standards established in Title 40 of the Code of Federal Regulations ("CFR") part 258.  For ease of understanding, these regulations can be segmented into three general categories: Location Restrictions, Construction Requirements and Operating Requirements.  While violations in Operating Requirements can be addressed through corrective actions, violations of landfill siting and construction regulations are difficult, and in most situations, not possible to correct.  The majority of Puerto Rico's 22 non-compliant landfills do not have functioning liner systems or any type of liner at all – a Construction Requirement of all compliant landfills.  Additionally, many of these landfills are located above or near underground aquifers used for drinking water and/or agricultural purposes; and many of the northern Puerto Rico landfills are located in karst regions, which are considered geologically unstable.  Both of these conditions are considered undesirable for siting compliant new landfills or for the compliant expansion of existing landfills.

As a result of the well documented non-compliant siting, construction and operation of these landfills, surrounding surface and ground waters are contaminated on a daily basis and Puerto Rico's drinking water is threatened.  The ability to construct new compliant landfills in northern Puerto Rico, where the majority of the population lives and the resultant waste is generated, is limited due to the geographical and seismic restrictions mentioned above.  Additionally, despite the best efforts of multiple local administrations and the EPA Region 2 office, recycling rates in Puerto Rico have remained stagnant at 10% - 15% for over fifteen years, limiting this approach as a potential means to meaningfully address the ongoing crisis in the immediate future.

Page 4
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

Although the EQB and EPA Region 2 have recently begun to take steps to close these facilities, their efforts have been met with resistance, partially due to the lack of a long-term alternative solution being available in northern Puerto Rico.

As described in greater detail in the environmental benefits section of this application letter, the Arecibo RRF will help address this crisis by providing fully compliant, long-term solid waste management capacity for more than 20% of the waste generated in Puerto Rico, allowing these non-compliant landfills to be closed in a responsible fashion after decades of non-compliant operation.

**The Energy Generation Crisis**
The average age of Puerto Rico's energy generating facilities is over 45 years old and the majority of these facilities are unable to meet the new EPA emissions standards without expensive renovations and/or fuel conversion.  Historically, older facilities tend to be less efficient, less reliable and therefore more costly to operate and maintain.  Additionally, the substantial capital and/or operating cost investments associated with the needed improvements are also necessary to allow these facilities to continue operating without generating fines and/or endangering human health and the environment.

According to PREPA, more than 60 percent of Puerto Rico's electricity is generated from petroleum-based fuel, 15 percent from natural gas, 15 percent from coal, and 2 percent from renewable energy (www.prepa.com, 2016). The Island neither produces nor refines petroleum and therefore all petroleum products are imported, resulting in power prices that are highly volatile and multiple times higher than that of typical U.S. power prices, even with fuel prices near historical lows.

Although Puerto Rico has enacted a Renewable Energy Portfolio Standard ("RPS") setting minimum thresholds for renewable energy generation, it currently lacks sufficient renewable energy generating capacity to meet its targets. The projects that PREPA is relying on to meet the RPS goals, which primarily include numerous solar facilities that have all been delayed for multiple years, when their outputs are combined, still do not produce enough renewable energy to meet the full RPS requirement.

As described in greater detail in the energy benefits sections below, the Arecibo RRF will help address this crisis by providing state of the art, fully compliant, baseload, renewable energy to Puerto Rico, produced from locally generated MSW/biomass, under a long-term contract with no ties to petroleum based fuels and their associated volatility - all of which help PREPA meet its statutory RPS goals.


**Availability of immediate private capital, loans, loan guarantees, or grants to implement, operate, and maintain the Project**
The Project has been under development for the past 5+ years by EA Arecibo, with development capital primarily provided by Energy Answers and Ares EIF - the Project's Sponsors.

- Energy Answers is an award-winning, international designer and developer of environmentally-sound resource recovery systems focused on generating clean, renewable energy and recovering valuable materials from MSW. Its flagship development project, the SEMASS Resource Recovery Facility, serves as the primary design basis for the Project.  Energy Answers, through its parent company and/or related entities, is anticipated to be an equity investor in the Project.

Page 5
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

- Ares EIF was founded in 1987 as one of the first private equity funds focused on the independent power industry, has raised over $5 billion in equity capital and invested in the development and construction of more than 6.3 GW of energy generation and transmission projects in the U.S., with underlying capital costs of nearly $8 billion.  Ares-EIF, holds the rights to invest the majority of the Project equity and is anticipated to be an equity investor in the Project.
- Piper Jaffray & Co. and Popular Securities have been retained by EA Arecibo to serve as the Project's financial advisors and debt placement agents and are now advanced in the process of procuring the Project Senior Debt and any additionally required equity beyond that provided by the Sponsors.  The Piper Jaffray and Popular Securities team has confirmed interest from third party lenders and investors in the financing of the Arecibo RRF.

Additional Financial Structuring Participants
- EA Arecibo is a special purpose entity organized solely for the purpose of owning and operating the Project.  The Project Senior Debt will be secured by the revenues of the Project as well as a mortgage covering the Project, and a collateral assignment of all material contracts entered into in connection with the Project, including waste supply, energy sales, construction and operations agreements.
- The Project will be constructed pursuant to a guaranteed fixed price, date certain, turnkey construction contract with SNC-Lavalin (the "SNC TCC"), one of the leading engineering, procurement and construction groups in the world, for the Project's critical facilities.  In addition to the SNC TCC, the Project will have a turnkey construction contract with Interlink Group LLC, a leading local developer/contractor, for certain auxiliary buildings, site work and utility interconnections.   Besides providing construction services, SNC-Lavalin will operate and maintain the Project pursuant to an arms-length Operations and Maintenance Agreement.

**Project cost and amount of Puerto Rico government funding to the Project**
The Project is currently projected to require approximately $860 million in total investment - with an expected structure of 75% Senior Debt and 25% Owner's Equity - under the following estimated breakdown:

- Construction Costs & Contingencies:                           $630 million
- Financing Costs, Interest During Const. & Reserve Funds:      $185 million
- Development Costs:                                            $ 45 million

No Puerto Rico government funds are anticipated to be necessary for the completion, financing or maintenance of the Project, though the Project will potentially endeavor to utilize any available tax credits and/or incentives. The Project's potential to access long term, tax-exempt funding will be subject to the availability of unencumbered volume cap for private activity bonds allocated to Puerto Rico. In 2016, Puerto Rico received approximately $350 million in volume cap allocation. Additionally, the Project began pursuit of a federal loan through the Rural Utility Service (RUS) in November 2014.  The Project has completed all but the final step in the rigorous National Environmental Policy Act (NEPA) Environmental Impact Statement ("EIS") review, after which the loan application process can commence.  Unfortunately, the weakening economic conditions of Puerto Rico and its instrumentalities,

Page 6
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

has delayed this process.  The Project team and local stakeholders are working to resolve the delay, complete the NEPA process and commence the loan review as quickly as possible.  The RUS loan program would potentially provide a loan of up to 75% of the total project cost at a rate equal to the 30-year US Treasury rate plus 1/8%.

**Project Environmental Benefits to Puerto Rico**

As a major solid waste and renewable energy project with the ability to replace outdated and non-compliant infrastructure in these sectors, the Arecibo Project will provide Puerto Rico with significant environmental improvements and benefits.  Specifically, the Arecibo Project will:

- Provide long-term, fully compliant solid waste disposal capacity, for more than 20% of the waste generated daily within Puerto Rico;
- Provide a solid waste management solution that facilitates the closure of currently operating non-compliant landfills that cannot meet federal or local environmental regulations;
- Prevent the burying of approximately 2,300 tons per day of waste in non-compliant landfills, thereby eliminating the associated environmental impacts on air, water, soil and human health;
- Help to end the daily contamination of surface and groundwater from uncontrolled landfill runoff and leachate;
- Recover more than 200 tpd of valuable ferrous and nonferrous recyclable materials, thereby significantly increasing the recycling and material reuse rates within participating communities;
- Convert more than 700,000 tons per year of solid waste into energy and reusable/recyclable materials;
- Generate 80 MW of renewable baseload electricity from a locally generated biomass fuel;
- Reduce the Island's dependence on imported fossil fuels, preventing the burning of approximately 110,000 gallons per day (or more than 35 million gallons per year) of such fuels;
- Reduce Puerto Rico's carbon footprint through major GHG reductions of over 1.1 million tons of $CO_2$ equivalent per year.

The Project has successfully confirmed its compliance with all applicable EPA, Army Corps of Engineer, Federal Emergency Management Agency ("FEMA"), Federal Aviation Administration ("FAA"), EQB, Puerto Rico Planning Board, Department of Natural and Environmental Resources ("DNER") environmental permitting requirements and received the necessary endorsements from all reviewing agencies. Under its Best Available Control Technology regimen, the Arecibo RRF will have the most stringent emission standards of any facility of this type in the US.  The Energy Answers PRF Technology is proven to be environmentally sound and reliable as evidenced by the SEMASS reference plant operations.  SEMASS consistently meets and exceeds U.S. EPA emission standards as demonstrated by its compliance with the emissions tests conducted over its 25+ year operating history.

The Puerto Rico Industrial Development Company ("PRIDCO") and the U.S. Department of Agriculture, Rural Utilities Service ("RUS") have each conducted and completed environmental impact analyses of the Project. PRIDCO's EIS, prepared in compliance with all applicable Puerto Rico laws and regulations, and reviewed by EPA Region 2 office as part of its PSD review process, confirms that the Arecibo RRF is projected to have no significant environmental impacts, and cites strong favorable impacts in relation to Puerto Rico's renewable energy and solid waste infrastructure management initiatives. The Final EIS published by RUS also confirmed that the Project will not have a significant impact on human health or the environment. (See Attachment #3 – RUS Final EIS)

Page 7
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

**Project Economic Benefits to Puerto Rico**
The Arecibo Project will be a major source of immediate and long-term economic stimulus, through the investment of hundreds of millions of dollars in local infrastructure, the creation of thousands of construction jobs and hundreds of long-term, full-time "green collar" jobs, all at a time when these benefits are critically needed in the Arecibo region and throughout Puerto Rico.  Additionally, the Arecibo Project represents approximately 20% of the total infrastructure development investment included in Puerto Rico's Certified Fiscal Plan.

Specifically, the Arecibo Project will:
- Provide over $750 million in private sector infrastructure investment during challenging economic times;
  - Of this total investment, over $600 million is construction and equipment spending.
- Purchase annually over $30 million in goods and services that can be supplied locally;
  - This consists of consumable materials, replacement parts, operating and office supplies and excludes royalty and other specialty payments to entities outside Puerto Rico;
- Create over 7,000 direct, indirect and induced jobs over its three plus year construction period,
  - These projections are based on a Socioeconomic Analysis and Economic Impact Assessment prepared by Estudios Tecnicos and subsequent man-hour analyses of the Project construction contracts.;
- Create approximately 150 direct and 600 indirect and induced long-term jobs for the 30-year life of the Project;
- Generate over $2.0 million in annual Municipal Tax payments;
  - This estimate includes the tax reductions anticipated from the receipt of Act 73/83 Tax Grants and is based on an analysis prepared by local accounting counsel;
- Pay over $30 million in central government taxes during the construction period;
  - This estimate includes the tax reductions anticipated from the receipt of Act 73/83 Tax Grants and is based on an analysis prepared by local accounting counsel;
- Pay over $75 million in Host Community taxes and fees over the life of the Project, plus provide an additional $100 million in free waste disposal services.
  - This is based on estimates from the existing Host Community Agreement between Energy Answers and the Municipality of Arecibo.

**Project Status**
The Project began initial development activities in 2009 and is now in an advanced stage, with the ability to commence full construction within 2017. The Project has obtained all environmental approvals necessary to commence construction, other than the issuance of the FEMA Conditional Letter of Map Revision (the "CLOMR").  All supporting studies and work required to issue the CLOMR have been submitted and approved by FEMA, with the issuance of the letter pending only the certification by the Project's engineer that certain demolition work has been completed.  Additionally, all essential contracts needed to construct and operate the Project are in place.  The Project has commenced the financing process and engaged Piper Jaffray & Company and Popular Securities to lead the debt procurement efforts and is working with Energy Answers and Ares-EIF to provide the necessary equity to construct and operate the facility.

Page 8
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

The Project is considered "shovel-ready" with an initial Limited Notice to Proceed ("LNTP") issued to the construction contractor in April 2017 and an expanded Notice to Proceed scheduled to be issued in September, 2017. The fully expanded construction program is to start upon completion of the Project financing, which is on-track for closing in fourth quarter 2017. The Project is facing the expiration of several of its major permits, the first and most critical being the September 10, 2017 expiration of the EPA PSD permit.  To avoid the expiration of this permit, it is essential that the Project complete certain contracting activities and onsite work prior to this date.

**Additional Critical Project Information**
- Ability to Reduce Puerto Rico's Reliance on Petroleum for Electricity Generation
  - The Arecibo RRF will directly and immediately reduce Puerto Rico's dependence on oil for electricity generation upon the commencement of operations as it will utilize PRF derived from locally generated MSW (biomass) as its primary fuel source.

- Ability to Improve Energy Infrastructure Performance and Overall Energy Efficiency
  - The Arecibo RRF will directly improve the overall performance of energy infrastructure by adding 80 (gross) megawatts of state of the art, fully compliant, baseload, renewable energy generation capacity located in Northern Puerto Rico, less than ½ mile from the Cambalache Transmission Center.  The provision of this power at 115 Kilovolts, allows for its easy integration into the existing PREPA system without the need for the costly system upgrades required to incorporate intermittent renewable energy such as wind and solar.  Additionally, the northern Puerto Rico location helps to minimize line loss and balance the PREPA grid, where the majority of the generation capacity is located in southern Puerto Rico.
  - Overall energy efficiency will be improved through the Project's use of the next generation of Energy Answers' PRF technology, an advancement of the well-proven technology in successful operation at the SEMASS reference facility for over 25 years, which is specifically designed to maximize the recovery of renewable energy and marketable materials from MSW. The PRF technology's use of a semi-suspension combustion boiler, instead of the more traditional mass-burn boiler, leads to a higher energy generation efficiency rate. As with other solid fuels (pulverized coal, sawdust, etc.), it is recognized that by reducing fuel particulate size, the combustion efficiency is increased and ash residue generation is decreased.  Before the waste is fed into the Energy Answers boiler, it is shredded into small particles, thereby increasing the available surface area for combustion and increasing energy generation and efficiency.  This, along with other system advantages, results in the Arecibo RRF having the highest projected energy efficiency rate, in terms of kilowatt hours generated per ton of waste combusted, of all U.S. based waste-to-energy facilities. (See Attachment #4 Energy Conversion Industry Summary.)

- Ability to Expedite Diversification and Conversion of Fuel Sources for Electric Generation
  - The Arecibo RRF will directly expedite the diversification of fuel sources from oil to a renewable and locally generated fuel source – Processed Refuse Fuel (PRF) produced from MSW (biomass).  PREPA has enacted a Renewable Energy Portfolio Standard, which includes "biomass (including MSW)" as an alternate renewable technology that can be used to meet the required renewable energy production requirements. Additionally, as a baseload facility with an average capacity factor of over 90%, the Arecibo RRF will increase the amount of

Page 9
Arecibo Resource Recovery Facility
Critical Project Application
August 8, 2017

renewable energy generated/purchased by PREPA by more than 150%, based on the total renewable energy generated/purchased by PREPA from January 2016 through January 2017.

- Ability to Promote the Development and Utilization of Energy Sources Found on Puerto Rico
  - The Arecibo RRF's renewable energy will be generated from PRF derived exclusively from MSW (biomass) and other waste materials generated within Puerto Rico.

- Ability to Contribute to Transitioning to Privatized Generation Capacities in Puerto Rico
  - The Arecibo RRF is a private sector initiative that is being developed, financed, constructed, owned and operated by private sector companies with no requirement for debt or equity funding from the Puerto Rico government.

In summary, even though the Arecibo RRF's development process has taken far longer than anticipated, required far more investment capital than planned, been subject to frivolous legal challenges and deceitful opposition tactics, the Project is well positioned to complete a private sector financing and commence construction in 2017, with the support of a Puerto Rico that is open for business.  It is our belief that the Arecibo RRF meets the stated requirements for designation as a Critical Project, as outlined in Title V of PROMESA, and that this designation will help coordinate the multiple involved parties to complete the final few steps required to bring the Project to a 2017 construction start and in doing so, help to ensure that the extensive economic, energy and environmental benefits that the Project provides are fully realized.

Respectfully,

*Mark J. Green*

Mark J. Green
Vice President
Energy Answers Arecibo, LLC

Attachments

Copy:   José B. Carrión III, Chairman, Fiscal Oversight and Management Board (FOMB)
        Natalie Jaresko, Executive Director, FOMB
        Aaron Bielenberg, Strategic Consultant to the FOMB
        Ricardo Ramos, Executive Director, PREPA
        Alfonso Orona, General Counsel to the Governor
        Maria Palou, Infrastructure Advisor to the Governor

# ATTACHMENT #1

Arecibo Resource Recovery Project

Permit Status Summary

| ID | Permit | Phase | TYPE | Review Agency | When Required | Application Submitted | Approval Received | Permit Reference Number | Exp. Date | FTP Site | English / Spanish | Budget | Compliance Action Requirement | Comments/ Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Location Approval of an Air Emissions Source (Rule 201) | D | AIR | EQB | | YES: Submitted on August 11, 2011 | YES: Final & Effective Permit Issued on December 16, 2014. | PFE-07-0811-0468-I-II-III-C | 12/16/2017 | YES | | | | Final & Effective EQB Air Emission Source Location and Construction Permit (Rules 201 & 203) issued on December 16, 2014. |
| 5 | Prevention of Significant Deterioration (PSD) Permit - (Clean Air Act. Section 40 CFR § 52.21) | D | AIR | EPA | | YES: Submitted on February 8, 2011 ; Deemed Complete on October 31, 2011 | YES: Final & Effective PSD Permit Issued on April 10, 2014. | N/A | Extension provided 9/10/2017 | YES | | | Conduct best available control technology (BACT) analysis and incremental emissions assessments for source Resource Recovery Facility administered by the Commonwealth, EPA permit approval. | Pursuant to condition I.A (and 40 CFR 52.21(b)(9)), the permit expires if construction is not commenced within 18 months of its effective date. Permit extension was approved extending permit an additional 18 month to 4/10/17. Second extension was provided for 5 month period on April 10, 2017 to September 10, 2017. |
| 27 | Permit to Construct an Air Emissions Source  (Rule 203) | D | AIR | EQB | | YES: Submitted on August 11, 2011 | YES: Final & Effective Permit Issued on December 16, 2014. | PFE-07-0811-0468-I-II-III-C | 12/16/2017 | YES | | | | See #1 above (Rule 201) |
| 28 | Permit for Construction of Non-hazardous Solid Waste Facility | D | Ash / Landfill / Waste | EQB | | YES: Submitted on 10/9/12 | YES: EQB Approval Resolution Issued on June 12, 2015. | IP-07-0104-RA | Extension provided 12/31/2017 | YES | | | | Final permit was issued on 9/1/2015 and valid for one (1) year from its effective date.  Extension requested in July 2016, with extension approved on June 28, 2017 extending the effective date of the permit to 12/31/2017. |
| 13 | Endorsement of Proposed Construction Possibly Affecting Navigable Air Space (49U.S.C. §1501). | D | Building / FAA / Other | FAA | | YES | YES: FAA letter (5-11-11) Extension #1 (10-25-12) Extension #2 (11-26-14) | 2010-ASO-7015-OE | Extension provided 12/2/2017 | YES | | | Notification must be given of any construction activities which may have an impact on navigable air space (stack height). | Complete. Extension #1 issued by FAA on 10/25/12. Extension #2 issued by FAA on 11/26/14. Extension #3 issued by FAA on 6/2/16.  Valid thru 12/2/17. |
| 20 | Site Development and Preliminary Design | D | Building / FAA / Other | PR Planning Board | | YES: Submitted on November 18, 2010 | YES: Part of PRPB Location Approval (12-10-10) Extension #1 (12-5-12) Extension #2 (12-18-14) | 2010-06-0231-JPU | Open Extension (See Comments) | YES | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | Complete. Pending conversion to Construction Permit with CLOMR approval. Two-year extension approved on December 5, 2012. Additional extension requested on November 26, 2014. On December 18, 2014, PRPB confirmed approval still valid, but exact expiration date pending on approval of new Joint Permit Regulation. New JPR was approved on March 24, 2015 and sets terms for valid approvals of two (2) years from JPR approval date. Planning Board Resolution JPI-31-10-2017 issued on March 1, 2017 provides that all Siting Consultations that were in effect as of June 2012, are still effective and in a state of suspense until a new regulation is issued.  The new regulations are expected to provide a 2-year extension, from the date of issuance of the new regulations, of the effective date of these Siting Consultations. |
| 21 | Anteproyecto-Design Plan Approval | D | Building / FAA / Other | PR Planning Board | | YES: Submitted on November 18, 2010 | YES: Part of PRPB Location Approval (12-10-10) | 2010-06-0231-JPU | See above. | YES | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | See #20 above. |
| | Permit for Meteorological Tower | D | Building / FAA / Other | OGPe | | N/A | | | N/A | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | Not Applicable. |
| | Permit for Meteorological Tower | D | Building / FAA / Other | OGPe | | N/A | | | N/A | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | Not Applicable. |

| ID | Permit | Phase | TYPE | Review Agency | When Required | Application Submitted | Approval Received | Permit Reference Number | Exp. Date | FTP Site | English / Spanish | Budget | Compliance Action Requirement | Comments/ Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | Consultation under NHPA | D | EIS / Land Use Planning | SHPO | | YES | YES: SHPO letter (10-28-10). "*no historic properties within project area*" | 10-25-10-01 | N/A | YES | | | | Complete. Does not expire. |
| 9 | Section 106 of the National Historic Preservation Act (NHPA). | D | EIS / Land Use Planning | ACHP | | N/A | | | N/A | | | | Provide comments on all project feature that affect cultural resources that are either listed or eligible for listing on the National Register of Historic Places (NRHP). | NOT REQUIRED. PROCESS ENDS AT SHPO LETTER. |
| 11 | Section 7 of Endangered Species Act | D | EIS / Land Use Planning | U.S. National Marine Fisheries Service | | YES | USNMF Email confirming project does not apply | | N/A | | | | Provide biological opinion on marine species of wildlife that are federally listed. | USNMF confirmed, via email. that the project is not within their jurisdiction. |
| 12 | Section 7 of Endangered Species Act | D | EIS / Land Use Planning | FWS | | YES | YES: USFWS letter (5-4-11) | FWS-72013-026 | N/A | YES | | | Provide biological opinion on species of wildlife and plants that are federally listed. | Complete. USFWS email on October 1, 2014 confirmed original letter is still valid. |
| 14 | Authorization for the Use of Maritime Terrestrial Zone | D | EIS / Land Use Planning | DNER | | N/A | | | N/A | | | | | Not required. DNER Endorsement requires ownership transfer of a 5-meter wide strip along the project site western boundary along the Rio Grande de Arecibo, and conservation of an additional 5-meter wide easement parallel to it. Land transfer/easement will be completed once the site property is acquired by the project. |
| 16 | Coastal Zone Management Act Consistency Determination | D | EIS / Land Use Planning | PRPB | | YES | YES: PRPB letter (2-4-11) | CZ-2011-1213-038 (JPA-1074) | N/A | YES | | | Determination of consistency with Commonwealth policies regarding development in the costal zone (required for all Federal permits potentially affecting costal zone). | Complete. Via letter, on February 4, 2011, the PRPB confirmed that the project does not require a Certificate of Consistency with the Puerto Rico Coastal Management Program. No further action is required. |
| 34 | Endorsement of the project | D | EIS / Land Use Planning | DNER, PREPA, PRASA, Institute of Puerto Rican Culture, Highway Authority, etc. | | YES | YES | | N/A | YES | | | This endorsement will be required for the issuance of the applicable permits from OGPe. | All relevant agencies have endorsed the project as part of both the EIS and Siting Consult processes. Agency recommendations will be procured by OGPe as part of the final construction permit administrative process. Permit remains effective as long as PB Siting Consultation is effective. |
| 24 | Approval of Electrical Energy Expansion | D | Transmission / Interconnect | Energy Affairs Administration | | YES | YES: EAA letter (5-11-11) | | N/A | YES | | | Approval of RRF generation of power. | Complete. Endorsement letter |
| 52 | Power Connection Approval | D | Transmission / Interconnect | PREPA | | YES: Final design drawings submitted to PREPA on February 1, 2013. | Most recent PSSe model comments received from PREPA 9/29/16. | AEE13-0-030 | | | | | | Received PREPA design endorsement and confirmation of interconnection point and voltage 01/31/14. Actively reviewing PSS/e model with PREPA as of November 2016. Received comments on Interconnection Design Drawings from PREPA on 9/29/16. Revised interconnection design drawings were submitted on 10/27/2016 for PREPA's final approval. Correspondence continued between EAA, PREPA and PSS/e modeler through March 2017, with new equipment to address final issues provided to modeler on April 14, 2017. Updated PSS/e model expected to be delivered to PREPA week of May 1, 2017. |
| 15 | Water Quality Certificate | D | Water - Discharge | EQB | | YES | YES | SAJ-2011-02033 JPA-1074 | 2/28/2019 | YES | | | Required for all Federal permits relating to water quality impacts, if any (e.g., COE Permits). | Complete. Expiration date is tied to the expiration date of the USACE Section 404 Wetlands Permit. |

| ID | Permit | Phase | TYPE | Review Agency | When Required | Application Submitted | Approval Received | Permit Reference Number | Exp. Date | FTP Site | English / Spanish | Budget | Compliance Action Requirement | Comments/ Notes |
|----|--------|-------|------|---------------|---------------|----------------------|-------------------|------------------------|-----------|----------|-------------------|--------|-------------------------------|-----------------|
| 25 | Endorsement for construction of water and sewer facilities | D | Water - Discharge | PRASA | | YES | YES | AAA-RN-11-07-0007 | Extension provided 8/2/2018 | | | | | PRASA endorsed project potable water and sanitary sewer connections. PRASA amended endorsement and approved potable water demand increase to 100k GPD 11/29/12. Endorsement valid thru 11/29/14.PRASA endorsement letter (3-30-11) Endorsement amended, potable demand 100k approved (11-29-12). A new extension was approved extending endorsement to 8/2/18. |
| 31 | Permit for the Construction of a Water Intake | D | Water - Intake | DNER | | NOT Required: Connection to existing DNER extraction facility, as per DNER Agreement executed on August 30, 2012 | | | | | | | | Complete. Water intake const permit is not required, as per Water Franchise agreement, connection to an existing DNER extraction facility. DNER Water Franchise challenged December 20, 2013. Puerto Rico Court of Appeals issues ruling on April 18, 2017, in favor of project overturning agency denial. |
| 39 | Permit for the Operation of a Water Extraction Franchise (intake) | D | Water - Intake | DNER | | YES: Submitted to DNER October 26, 2011 | YES: DNER Agreement executed on August 30, 2012 | O-FA-FAID6-SJ-00168-26102011 | | YES | | | Permit for the operation of a water extraction franchise (water intake or well) and the establishment of the sampling requirements, among other conditions. | Complete. Goes together with #30. DNER Water Franchise agreement executed on 8/30/12. DNER Agreement challenge pending resolution. |
| 30 | Survey of Maritime Terrestrial Zone | D | Water - Treatment | DNER | | See Comments | | | | | | | DNER's approval and certification of survey of Maritime Terrestrial Zone. | See #14 above. Surveying drawings of RGA River Buffer have been prepared, submittal is pending project site land purchase and transfer. |
| 6 | Wetlands jurisdictional determination (Section 404 of CWA). | D | Water - Wetlands | COE | | YES: Submitted to USACE in April 2010 | YES: Final Permit issued on April 16, 2014. | SAJ-2011-02033 (IP-EWG) | 2/28/2019 | YES | | | Process of identifying and locating jurisdictional Waters of the United States, including wetlands. | Final Permit issued by the USACE on April 16, 2014. Permit Condition #14 states that the compensatory mitigation work shall commence within 12 months of the permit's effective date. Due to the ongoing permit challenge process, this period expired on April 16, 2015. Discussions with the USACE have taken place and a letter was sent requesting clarification and extension of this condition, until challenge is resolved. Case was dismissed 2/12/16. |
| 7 | Individual Permit or a Nationwide Permit (Section 404 of CWA). | D | Water - Wetlands | COE | | See Comments | | SAJ-2011-02033 (IP-EWG) | 2/28/2019 | | | | Permit for the fill of Waters of the United States, including wetlands. | See #6 above. |
| 32 | General Consolidated Permit | DC | AIR | EQB | | See Comments | | | | | | | Required before construction for: Erosion and Sedimentation Control Permit and Plan, Air Permit for Fugitive Dust, Non-hazardous Waste Generation Permit (construction debris) | Will be procured as part of OGPe Earthwork Construction Permits. See #19 below. |
| 17 | Highway Permit | DC | Ash / Landfill / Waste | Highway Authority | | YES: Submitted design drawings on 10/3/12 | Comments letter received on 1/22/13. | 2012-068511-REC-36480 & 35840 | | | | | | See below. |
| 17 | Highway Permit | DC | Building / FAA / Other | Highway Authority | | YES: Submitted design drawings on 10/3/12 | YES: Preliminary approval letter issued on 7/12/13. Extension granted on 9/5/14 | 2012-068511-REC-36480 & 35840 | Extension Provided 11/7/2017 | | | | | DTOP issued preliminary approval letter on July 12, 2013. DTOP granted extension of preliminary approval on September 5, 2014 and second extension on September 4, 2015, which was valid for one (1) year. An additional one-year extension was granted on November 7, 2016. |

| ID | Permit | Phase | TYPE | Review Agency | When Required | Application Submitted | Approval Received | Permit Reference Number | Exp. Date | FTP Site | English / Spanish | Budget | Compliance Action Requirement | Comments/ Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 | Rough Grading Permit (Clearing and Grubbing) | DC | Building / FAA / Other | OGPe | | See Comments | | | | | | | | Will be procured as part of OGPe Earthwork Construction Permits. Permit package will Include; DNER Incidental Earth Extraction Permit, EQB General Consolidated Permit, and NPDES General Construction Permit / Stormwater Pollution Prevention Plan (SWPPP). |
| 33 | Incidental Permit for the Extraction of Materials for the Earth Crust Components | DC | Building / FAA / Other | DNER | | See Comments | | | | | | | Permit required for excavation, extraction and dredging of earth crust component for among other activities, activities incidental to a construction project approved by OGPe. Depending on the volume of the nature and volume of the extraction, an exemption can be requested from the DNER. | Will be procured as part of OGPe Earthwork Construction Permits. See #19 above. |
| 10 | NPDES  General Stormwater Permit for Construction Activity | DC | Water - Spill and SW | EPA | | See Comments | | | | | | | For construction sites larger that one acre, a permit is required for discharge of collected runoff from the site. NOI must be filed to EPA 14 calendar days before commencing earth-disturbing activities. | Will be procured as part of OGPe Earthwork Construction Permits. See #19 above. |
| 18 | Access Approval | C | Ash / Landfill / Waste | Highway Authority | | | | | | | | | | |
| 18 | Access Approval | C | Building / FAA / Other | Highway Authority | | | | | | | | | | |
| 22 | Construction Permit for Site Fill / Site Improvements / Site Infrastructure | C | Building / FAA / Other | OGPe | | | | | | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | |
| 23 | Construction Permit for Facility Structures | C | Building / FAA / Other | OGPe | | | | | | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | |
| | Permits for Transmission Structures | C | Building / FAA / Other | OGPe | | | | | | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | |
| 26 | Endorsement of Substation Construction | C | Transmission / Interconnect | PREPA | | | | | | | | | | |
| | Permits for Transmission Structures | C | Transmission / Interconnect | PREPA | | | | | | | | | | |
| 43 | Endorsement for the use of water and sewer facilities | C | Water - Discharge | PRASA | | | | | | | | | Review of compliance with applicable requirements to receive the services (e.g., payment of applicable bonds, etc.). | |
| 29 | Permit for the construction of a wastewater treatment system without discharges to a body of water | C | Water - Treatment | EQB | | | | | | | | | | |
| 40 | Permit to Operate an Air Emissions Source | CO | AIR | EQB | | | | | | | | | | |
| 41 | Permit for the Operation of a Non-Hazardous Solid Waste Facility | CO | Ash / Landfill / Waste | EQB | | | | | | | | | | |
| 37 | Permit to Store Flammable Liquids | CO | Building / FAA / Other | Fire Department | | | | | | | | | | |
| 38 | Use Permit (Occupancy Permit) | CO | Building / FAA / Other | OGPe | | | | | | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | |
| 46 | Endorsement for OGPe Use Permit | CO | Building / FAA / Other | Fire Department | | | | | | | | | | |
| 47 | Fire Prevention Inspection Certificate | CO | Building / FAA / Other | Fire Department | | | | | | | | | | |
| 48 | Endorsement for OGPe Use Permit | CO | Building / FAA / Other | Department of Health | | | | | | | | | Inspection required for issuance of use permit from OGPe. | |

| ID | Permit | Phase | TYPE | Review Agency | When Required | Application Submitted | Approval Received | Permit Reference Number | Exp. Date | FTP Site | English / Spanish | Budget | Compliance Action Requirement | Comments/ Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Permits for Hydrostatice Tanks Test | CO | Building / FAA / Other | OGPe | | | | | | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | |
| 44 | Pretreatment Permit | CO | Water - Discharge | PRASA | | | | | | | | | | |
| 45 | Water and sewer services Connection | CO | Water - Discharge | PRASA | | | | | | | | | | |
| 51 | Individual or General Stormwater Permit for Industrial Activities (CWA, Section 402). | CO | Water - Spill and SW | EPA | | | | | | | | | Industrial activities require individual or general permit for discharge of runoff from the site. A Stormwater Pollution Prevention Plan (SWPPP) needs to be prepared and | |
| | Permits for Hydrostatic Tanks Test | CO | Water - Spill and SW | Permits Management Office (OGPe) | | | | | | | | | Construction Plan Approvals. OGPe requires that design drawings be filed before construction and that the project be inspected upon completion. | |
| 42 | Permit for the Operation of a wastewater treatment system without discharges to a body of water | CO | Water - Treatment | EQB | | | | | | | | | | |
| 49 | Sanitary License | CO | Water - Treatment | Health | | | | | | | | | Inspection and approval of compliance with health department sanitation requirements applicable to the facility. | |
| 50 | License for Operators of Wastewater Treatment Plants | CO | Water - Treatment | State | | | | | | | | | Authorization to individuals to enable them to operate a wastewater treatment plant. Required for the operation of treatment plants regulated by PRASA and EQB. | |
| 36 | Fire Prevention Endorsement of Plans of Project | CO | Building / FAA / Other | Fire Department | | | | | | | | | | |
| 35 | Spill Prevention, Containment and Cleanup Plan (CWA, 33 U.S.C. §1321 (j)a). | CO | Water - Spill and SW | EPA | | | | | | | | | Plan for response to oil spills to prevent significant and substantial threat to the environment. | |
| | Acid Rain Permit | | AIR | | | | | | | | | | | |
| | Title V Permit | | AIR | | | | | | | | | | | |
| | Landfill Agreements | | Ash / Landfill / Waste | | | | | | | | | | | |
| | AST/UST Tank Registrations or Permits | | TBD | | | | | | | | | | | |
| | Local Noise Ordinance Permit | | TBD | | | | | | | | | | | |
| | Easements and ROW | | TBD | | | | | | | | | | | |
| | Odor Control Plan | | TBD | | | | | | | | | | | |
| | Title Insurance Commitment | | TBD | | | | | | | | | | | |
| | Ground Leases, subleases | | TBD | | | | | | | | | | | |
| | Surveys | | TBD | | | | | | | | | | | |
| | Geotechnical Review | | TBD | | | | | | | | | | | |
| | Landscaping Plan | | TBD | | | | | | | | | | | |
| | Zoning | | TBD | | | | | | | | | | | |
| | Lighting Plan | | TBD | | | | | | | | | | | |
| | Other Interconnection Agreements | | Transmission / Interconnect | | | | | | | | | | | |
| | Other Water Supply Discharge Agreements | | Water - Discharge | | | | | | | | | | | |

**Phase Legend:**
D - Development Phase
DC - Post-Development/Pre-Construction Phase
C - Construction Phase
CO - Post-Construction/Pre-Operation Phase

# ATTACHMENT #2

## The Poisoning of Puerto Rico

## By: Puerto Rico Limpio

# EXPOSING THE EPA'S NEGLECT OF PUERTO RICO'S LANDFILL CRISIS

An investigation by Puerto Rico Limpio



# EXPOSING THE EPA'S NEGLECT OF PUERTO RICO'S LANDFILL CRISIS

The U.S. Environmental Protection Agency (EPA) took little action despite documenting more than a decade of severe violations of federal landfill safety rules in Puerto Rico, and allowed most of the island's municipal landfills to operate as "open dumps", contaminating soil, water and air in violation of federal law.

These facts are exposed by a trail of EPA documents and communications obtained here by Puerto Rico Limpio through the Freedom of Information Act (FOIA), and made public exclusively in this report.

## No effective enforcement has ever happened in Puerto Rico, and EPA didn't effectively respond.

The documents show that over two decades, EPA staff documented a state of regulatory chaos where meetings and communications took place with Puerto Rico's governor, senior officials, its Environmental Quality Board (EQB), municipal leaders and landfill operators, and agreements were routinely broken, ignored, refused or stonewalled. In the end, no effective enforcement has ever happened in Puerto Rico, and EPA didn't effectively respond.



Judith Enck

## Here's What We Found

The EQB has never been minimally effective in enforcing federal standards since it was approved for this role by the EPA in 1994. **And EPA knew.**

Newly obtained documents show that shortly after EQB was granted enforcement power, **it gutted local landfills rules without notifying the EPA.**

The EPA learned of the secret rule changes in 2005 but **failed to take effective action to restore federal standards in Puerto Rico's regulations.**

Soon after Judith Enck took over as Regional Administrator of EPA Region 2, she pulled back on pressuring senior Puerto Rican authorities to act on senior staff's repeated and urgent warnings about threats to human health and the environment. **Since 2009, Enck limited her response to mostly ineffective closure actions against less than half of the landfills her staff has documented as unsafe.** Only one landfill has closed during her tenure.

1

# FOREWORD

By Dr. Michael K. Dorsey

Twenty-two years ago the President of the United States mandated all Federal agencies make "environmental justice" part of their mission by "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions" — including the Commonwealth of Puerto Rico.

The President's directive, enshrined in an Executive Order, compelled the U.S. Environmental Protection Agency (EPA) to turn to its newly-created Office of Environmental Justice to advance new programs and policies to guarantee American citizens equal environmental protection under the law. Though it was slow to recognize it, the EPA now accepts that equal environmental protections are often lacking in communities harmed first and most by the disproportionate siting and malfeasance of hazardous waste and other environmental and public health threats.

**Puerto Rico is by no means exempt from the scourge of environmental injustice — or what many scholars, over the past three decades and counting, prefer to dub: environmental racism.**

Adding to the misery of such injustice, many disproportionately burdened communities are often the most marginalized, commonly because of their racial or ethnic status and paltry income. In the United States hazardous waste and is disproportionately dumped on fellow poor, black and brown citizens living at the margins of an American dream as it becomes more akin to a nightmare. Puerto Rico is by no means exempt from the scourge of environmental injustice — or what many scholars call environmental racism.

Two-thirds or more of Puerto Rico's municipal landfills do not comply with EPA rules. There are not just one or two landfills out of compliance. The problem affects the entire island. Of the Commonwealth's 27 municipal landfills, at least 20 are noncompliant with basic environmental rules. Recently in a tersely worded letter to a Member of Congress, the EPA Regional Administrator with oversight responsibility

for the island's landfill crisis asserted: "For many years, the EPA has worked to improve the management of solid waste in Puerto Rico." Simultaneously the EPA also admits "landfills in Puerto Rico have not always been closed in accordance with the minimum federal and state regulations." This report reveals, through internal EPA documents, that the Agency has, in fact, simply failed to take appropriate actions for decades to address what it identified as an "imminent threat to human health and the environment."

Lofty claims of proper oversight alongside admissions of the abrogation of basic duties from the EPA are cause for serious concerns at the highest levels. Such contradictory claims raise serious questions about leadership, management oversight, and very well may point to criminal negligence. This report by Puerto Rico Limpio details almost a generation of "looking the other way" by the EPA and its counterpart on the island: the Puerto Rican Environmental Quality Board. The findings are beyond disturbing. Enforcement staff warnings and suggestions are dialed down or disregarded. All the while communities are left in harm's way to face problems that are only partially addressed, if at all.

The EPA is renewing its environmental justice agenda for the 21st century, in what it calls: EJ 2020. According to preliminary reports, "EJ 2020 is EPA's EJ plan of action that will involve every EPA office and region." It seems that Puerto Rico, pursuant to a 20th century presidential Executive Order, would be a great place to begin to renew serious work on environmental justice in the 21st century. At a minimum urgent resources and serious managerial oversight will be needed to stem the tide of the burgeoning landfill crisis. We should accept nothing less.



Dr. Michael K. Dorsey
is an appointee on the U.S. EPA's
National Advisory Committee.

# EXECUTIVE SUMMARY

The U.S. Environmental Protection Agency (EPA) took little action despite documenting more than a decade of severe violations of federal landfill safety rules in Puerto Rico, and allowed most of the island's municipal landfills to operate as "open dumps", contaminating soil, water and air in violation of federal law.

These facts are exposed by a trail of EPA documents and communications obtained here by Puerto Rico Limpio through the Freedom of Information Act (FOIA), and made public exclusively in this report.

The documents show that over two decades, EPA staff documented a state of regulatory chaos where meetings and communications took place with Puerto Rico's governor, senior officials, its Environmental Quality Board (EQB), municipal leaders and landfill operators, and agreements were routinely broken, ignored, refused or stonewalled. In the end, no effective enforcement has ever happened in Puerto Rico, and EPA didn't effectively respond.

## The Gross Malfeasance of the EQB

EPA files dating back to 1994 shows that Puerto Rico proposed an elaborate plan to create a fully compliant, safe and sustainable solid waste management system on the island when the Puerto Rico Environmental Quality Board (EQB) applied to the EPA for local enforcement authority. But as the years went on, the EPA documents show that the EQB's promises in its application were never carried out.

The documents show that the 1994 plan submitted by EQB called for expanded enforcement personnel, but the EPA stood by as the local authorities systematically eliminated landfill enforcement staff right under its nose during a key period: from 14 staffers in 2000, to 5 in 2005, to 1 in 2010 and eventually none in 2012.

Worse still, the EPA discovered in 2005 that shortly after local authority was granted, the EQB gutted key local landfill rules, taking them below federal standards without notifying the federal agency as required by law. Despite initial high level warnings from EPA Region 2 to the then-governor of Puerto Rico, the EQB dragged its feet in replying. After Judith Enck took over as administrator of Region 2, the records indicate high-level engagement with Puerto Rico's authorities ceased.



**The EPA took little action despite documenting more than a decade of severe violations.**

3

# The Dereliction of Duty by the EPA

But relative to the enormity of the problem documented by EPA Region 2 enforcement staff, the regional leadership did not take decisive action to revoke the Puerto Rico Environmental Quality Board's (EQB) enforcement authority and directly enforce federal laws at Puerto Rico's landfills.

**As the years went on, EPA documents show that the EQB's promises in its application were never carried out.**

In fact, under current Regional Administrator Judith Enck, a specific recommendation by enforcement staff to revoke the EQB's authority and directly enforce federal standards was made in the face of the landfill crisis presenting "an imminent and substantial threat to human health and the environment". But Enck ignored the recommendation and eased the pressure on local authorities. In turn, the communities around as many as two dozen landfills have likely been exposed to contamination of groundwater, shorelines, rivers, marine resources, protected wetlands and nature reserves, while the EPA recorded internal reports of years of violations of the Resources Conservation and Recovery Act (RCRA).

The sequence of internal EPA assessments from 2005 to 2014 show a repeated failure to shake up a landfill system in crisis on the island. Most of the landfills are repeatedly documented by EPA as being in "significant", "serious" or "widespread" non-compliance, and are characterized as "open dumps". Despite files that acknowledge decades of violations that threatened public health and environmental safety, the EPA is documented as using its unilateral intervention authority under Section 7003 over two decades only against less than half of the non-compliant landfills. The result of EPA's dereliction of its federal responsibility is that most of Puerto Rico's 27 current landfills that are described in EPA's own files as "unlined open dumps" — often in environmentally sensitive regions — and are still operating today.

Many of the areas impacted in Puerto Rico are lower income or impoverished with residents that do not have the same access to legal protections as wealthier communities. Such neglect constitutes a form of environmental injustice, where disadvantaged American communities in Puerto Rico receive less federal protection than others do on the mainland.



**Internal EPA files from 2005 to 2014 show a repeated failure to shake up a landfill system in crisis.**

4

# The report raises a number of alarming questions about why the EPA's actions were so neglectful in protecting Puerto Rico's communities.

- Why has EPA's current Region 2 administrator, Judith Enck taken such a tepid approach to the crisis despite repeated, glaring assessments for her entire term in office? Was EPA Administrator Gina McCarthy made aware of the landfill crisis? When, and to what extent?

- Has the EPA or the Puerto Rico government conducted environmental testing or assessments of the extent of water, air and ground contamination around landfill sites that have been allowed to violated safety rules for decades? Or were such investigations stymied internally?

- Are the non-compliant landfills also violating the federal Clean Air Act and Clean Water Act?

- What will a thorough review of the document trail inside the EQB, and between the EQB and the landfills, reveal about the 1997 gutting of local regulations? Were there financial interests in Puerto Rico directly involved that went beyond the municipalities themselves?

- With so many landfills not even sorting or supervising the incoming trash at these sites, how bad has illegal dumping of hazardous waste gotten in Puerto Rico under EPA's watch?

- And will further digging uncover crimes that were committed by individuals, companies and public officials and workers?



**Has the EPA or Puerto Rico conducted environmental testing on the extent of contamination around landfill sites in violation for decades?**

# I  WHAT THE EPA COULD HAVE DONE UNDER RCRA

In 1985, the Resource Conservation and Recovery Act (RCRA), Subtitle D, was adopted to govern waste disposal at municipal waste landfills in the United States, and the provision is administered by EPA. Regulations established under Subtitle D ban open dumping of waste and set minimum federal criteria for the operation of municipal waste and industrial waste landfills — landfills classified as "open dumps" are non-compliant with the federal minimum standards. Puerto Rico, which falls under Region 2 of the EPA, is included under RCRA Subtitle D.

Minimum operational requirements for municipal landfill operation impose: access control, liner protection for landfill cells, protection from and monitoring of methane gas build-up, liquid leachate collection and groundwater monitoring, and the daily coverage of municipal waste.

The minimum standards also include design criteria, location restrictions, financial assurance, corrective action (cleanup), and closure requirement. States play a lead role in implementing these regulations and may set more stringent requirements. In order to qualify as the lead

in implementing Subtitle D, states were required to apply to the EPA for a public review of their planned permitting program, and EPA approval of the adequacy of the state's permitting program.

The EPA is authorized to revoke its approval given to state permitting programs that are "inadequate", and unilaterally implement federal minimum standards upon landfills in states, or in jurisdictions like Puerto Rico.

So while a state or territory like Puerto Rico has authority to implement its permitting authority, EPA has sole power to revoke it, and importantly, it also has its own separate regulatory authority under RCRA Section 7003 to take action on the handling, transportation, or storage of solid waste where it may present "imminent and substantial endangerment to health and the environment" to bring lawsuits or issue orders. Citizens are also entitled to bring suit under RCRA 7002 against any person, including any governmental entity, who is "alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition or order which is effective pursuant to RCRA".



**The EPA is authorized to revoke its approval given to state permitting programs that are "inadequate", and unilaterally implement federal minimum standards.**

# II GROSS MALFEASANCE OF THE EQB, DOCUMENTED BY EPA

## Puerto Rico's Failed 1994 Plan

In 1994, the EPA reviewed an application for the permitting and enforcement authority for Puerto Rico's landfills to the EQB Puerto Rico Environmental Quality Board (EQB). To grant that authority, EPA was required to review Puerto Rico's proposed oversight, permitting and enforcement plans to determine that they were adequate.

On paper, the EQB's application appeared thorough and in line with the letter and spirit of RCRA, Subtitle D. Puerto Rico had 61 operating landfills at the time, and committed to permanently close 31 facilities: "Twenty-nine municipal SLFs (Plus 1 private facility) will be subject to the regulation after April 9, 1993 (29 municipals and 1 private). **Of these facilities, approximately 19 are scheduled for eventual closure over a 5 to 7-year transition period. …All existing facilities, including those scheduled for eventual closure, will be permitted under the Regulation and subject to the Part 258 technical requirements. After this transition is complete, approximately 11 regional facilities will continue to serve the Commonwealth."** Fig. 1

But the plan never left the paper it was written on. A review of internal memos written by EPA Region 2 enforcement officers from 2005 to 2014, which assess the situation of landfill enforcement in Puerto Rico, show that the EQB never carried out its plan, nor did it achieve the minimal amount of enforcement that should be tolerated by the EPA under RCRA. The assessments are so bad and unchanging that the officers resorted to repeating the same dire overview in the opening section of every document for nine years.

From the 2005 assessment, by enforcement officer Carl Plossl: **"Many operating landfills in Puerto Rico have been in significant non-compliance with Federal and Commonwealth solid waste landfill regulations for over 10 years and are considered open dumps that present an ongoing risk to human health and the environment. The Solid Waste Management Authority (SWMA) and the Environmental Quality Board (EQB) have not been effective in correcting this non-compliance. (…) Although approximately 30 open dumps have been closed in the last 15 years, the remaining 29 operating municipal solid waste landfills are still in significant noncompliance with both the Commonwealth and Federal Solid Waste Landfill regulations, and there has been no apparent effort made by the Government of Puerto Rico to implement the August 10, 1993 Solid Waste Management Plan."**

From the 2006 assessment, by Plossl and Adolph Everett: **"Most operating landfills in Puerto Rico have been in significant non-compliance with Federal and Commonwealth solid waste landfill regulations for over 11 years and are considered open dumps that present an ongoing risk to human health and the environment. The Solid Waste Management Authority (SWMA) and the Environmental Quality Board (EQB) have not been effective in correcting this non-compliance."**



**Puerto Rico's compliance plan never left the paper it was written on.**

PR Application for Determination of Adequacy of EQB Non Hazardous Solid Waste Management Permit Program Revised 02 17 94 (Fig. 1)

**PUERTO RICO'S**

**APPLICATION FOR DETERMINATION OF ADEQUACY**

**OF EQB NON-HAZARDOUS SOLID WASTE MANAGEMENT PERMIT PROGRAM**

**REVISED SUBMISSION**

**February 17, 1994**

Of these facilities, approximately 19 are scheduled for eventual closure over a 5 to 7-year transition period. (...). All existing facilities, including those scheduled for eventual closure, will be permitted (...) and subject to (...) technical requirements. After this transition is complete, approximately 11 regional facilities will continue to serve the Commonwealth.

From the 2008 assessment, by Plossl, Philip Flax and Kimiko Link: **"Most operating landfills in Puerto Rico have been in significant non-compliance with Federal and Commonwealth solid waste landfill regulations for over 12 years and are considered open dumps that present an ongoing risk to human health and the environment. The Solid Waste Management Authority (SWMA) and the Environmental Quality Board (EQB) have not been effective in correcting this non-compliance from a planning perspective (SWMA-lead) or a program implementation perspective (EQB-lead). In part, this has been attributable to the lack of an integrated Solid Waste Management Plan."**

From the 2010 assessment, by Everett and George Meyer: **"Many of Puerto Rico's landfills are near capacity, most are out of compliance with federal RCRA and CAA standards, and present an imminent and substantial threat to human health and the environment. Minimal recycling is performed. Although the Puerto Rico Environmental Quality Board (EQB) is approved to implement permitting and enforcement within the RCRA solid waste program, EQB has failed to do so. Likewise, the Puerto Rico Solid Waste Management Authority has not implemented any of the solid waste management plans proposed over the last 15 to 20 years."**

From the 2011 assessment, by Everett and Meyer: **"Many of Puerto Rico's landfills are near capacity, most are out of compliance with federal RCRA and CAA standards, and present an imminent and substantial threat to human health and the environment. Minimal recycling is performed. Although the Puerto Rico Environmental Quality Board (EQB) is approved to implement permitting and enforcement within the RCRA solid waste program, EQB has failed to do so. Likewise, the Puerto Rico Solid Waste Management Authority has not**

implemented any of the solid waste management plans proposed over the last 15 to 20 years."

From the 2012 assessment, again by Everett and Meyer: **"The majority of Puerto Rico's landfills are past or near capacity and may present an imminent and substantial threat to human health and the environment. Minimal municipal solid waste recycling programs are in place. Although the Puerto Rico Environmental Quality Board (EQB) is approved to implement permitting and enforcement within the RCRA solid waste program, EQB has largely not addressed non-compliant landfills via enforcement actions. Similarly, the Puerto Rico Solid Waste Management Authority has not implemented any of the solid waste management plans proposed over the last 15 to 20 years."** From the 2013 assessment, by Meyer: **"The majority of Puerto Rico's landfills are past or near capacity and may present an imminent and substantial threat to human health and the environment. Minimal municipal solid waste recycling programs are in place. Although the Puerto Rico Environmental Quality Board (EQB) is approved to implement permitting and enforcement within the RCRA solid waste program, EQB has largely not addressed non-compliant landfills via enforcement actions. Similarly, the Puerto Rico Solid Waste Management Authority has not implemented any of the solid waste management plans proposed over the last 15 to 20 years."**

From the 2014 assessment, by Leonard Voo and Judy Mitchell: **"The majority of Puerto Rico's landfills are past or near capacity, are out of compliance with operating criteria, and may present an imminent and substantial threat to human health and the environment."**



# EQB Guts Safety Rules

The issue of regulatory non-compliance is not just confined to the side of enforcement. In 1997, it crossed a new line into willful gutting of basic rules by the authorities themselves. That year, the Puerto Rican government amended the regulations approved by EPA in the permitting process. This change was done without notifying EPA, in violation of federal regulations, and was not noticed by EPA until 2005.

The changes in the regulations would exempt municipalities from financial assurance compliance, and allow new horizontal expansions to occur outside of the original boundaries of the landfill area and exempt them from liner and leachate collection requirements. It was a wholesale gutting of safety rules for landfills, and violated the EQB's duty to enforce federal standards.

**Then-Regional Administrator Alan Steinberg told Puerto Rico's governor the EPA could revoke local enforcement power.**

An internal EPA email reveals that the EPA discovered this violation of federal law almost a decade afterwards, in June 2005. The email is part of a thread among a group of enforcement staff at EPA Region 2 who are discussing "lateral expansion of the Toa Baja open dump" (a landfill that is still operating today). In it, one official informs the group that **"we have checked the current (our translation) vs. originally submitted EQB regulations regarding lateral expansion. (…) The original regulation, submitted as part of the program approval application, was written correctly but EQB has inappropriately revised it (…). This has island-wide major implications and needs to be corrected."** [Fig. 3]

The files show that then-Region 2 administrator Alan Steinberg immediately got involved, and the initial responses go to the highest officials in Puerto Rico. A subsequent November 30, 2005, internal email from the same EPA enforcement official, George Meyer, suggests the EQB had been confronted with the rule changes and denied it had happened. The email includes a thread indicating that Steinberg (identified by the initials of his title, "RA", in the email) had sent a letter to the Governor of Puerto Rico, setting out "milestones" for Puerto Rico to meet with EPA. The first milestone read: **"By November 30, 2005, officially notify EPA, in writing (in English), of all changes that have been made to the PR solid waste regulations since EPA approved PR's Solid Waste Mgt. Program."**

However, the email notes that in a meeting held by Steinberg in Puerto Rico, **"EQB repeated its claim that no regulatory changes have been made, so it is not clear if a response will be forthcoming."**

In February 2006, Anibal Jose Torres, the chief of staff to then-Governor Anibal Acevedo Vila, responded to Steinberg in a letter which noted the request for an English translation of the EQB's regulations as they stood, three months after Puerto Rico had been instructed to provide an analysis of the changes it had made. Torres wrote that the translation would be received at EPA in March 2006, and EPA's "comments" would be "evaluated", but further documents show that the EQB didn't reply until May of that year. But what was finally sent to the EPA later proved that EQB had broken the law.



**Puerto Rico gutted the rules without notifying EPA, in violation of federal law. The EPA found out.**

Lateral Expansion Finance Fact Sheets (Fig. 3)

| | |
|---|---|
| **From:** | Meyer.George@epamail.epa.gov |
| **To:** | Soderberg.Carl@epamail.epa.gov; Sawyer.William@epamail.epa.gov; Hazen.Robert@epamail.epa.gov; Everett.Addish@epamail.epa.gov |
| **Cc:** | Golumbek.Joel@epamail.epa.gov; Plossl.Carl@epamail.epa.gov |
| **Subject:** | Fw: Lateral Expansion & Finance Factsheets |
| **Date:** | Thursday, June 23, 2005 2:23:26 PM |
| **Attachments:** | lateral expansion.wpd |
| | Financal Requirement notes.wpd |

Gentlemen , we have checked the current ( our translation ) vs. originally submitted EQB regulations regarding lateral expansion ( see attachment below ). The original regulation, submitted as part of the program approval application , was written correctly but EQB has inappropiately revised it so that lateral expansion beyond the waste boundaries of an existing MSWLF unit is not necessarily considered lateral expansion. This has island - wide major implications and needs to be corrected. Your comment on our assessment is requested.

Carl , as you prepare the letter to EQB ( with a copy to the Mayor of Toa Baja ) objecting to the lateral expansion of the Toa Baja open dump , we should include our concerns with all the other areas on non-compliance at this facility and suggest that not only should it not be laterally expanded , but it should be closed as soon as possible because of its location . Toa Baja is one of the seven "Operation Compliance" Orders and Compliance Plans that EQB agreed to submit to EPA in draft for our review and comment and we will be commenting that the non-compliance is so severe and the Karst location so unsuitable

> ## We have checked the current (our translation) vs. originally submitted EQB regulations regarding lateral expansion. (...) The original regulation, submitted as part of the program approval application, was written correctly but EQB has inappropriately revised it (...). This has island-wide major implications and needs to be corrected.

Lateral Expansion & Finance Factsheets

*(See attached file: lateral expansion.wpd)(See attached file: Financial Requirement notes.wpd)*

```
...............................................................
CARL F. PLÖSSL
Environmental Engineer, Enforcement Officer
plossl.carl@epa.gov
Direct Dial: (212) 637-4137
Fax: (212) 637-4949
Mobile: (646) 498-3597
...............................................................
```



In a terse letter from Steinberg to Governor Acevedo Vila on October 5, 2006, Steinberg wrote that the agency received the English translation of EQB's landfill regulations on May 10, but hadn't received the analysis of any changes made along with an explanation that had been demanded for each change. "**EPA did not receive the Attorney General's description of the changes, the rationale for the changes, the certification that the changes were in effect, nor the assurance that the regulations were accurately translated," Steinberg wrote. Despite this, the EPA had still found that the gutting of key federal standards had indeed taken place at the EQB: "[W]e have noted a number of changes which are not consistent with federal requirements pursuant to 40 CFR Part 239 and Part 258. These changes include the definition of lateral expansion and the applicability of financial assurance requirements which were highlighted previously. We also noted a significant change to the definition of a composite liner. These changes, along with others EPA has noted, may jeopardize Puerto Rico's municipal solid waste landfill (MSWLF) permitting program approval status."** Fig.4 In order to leave no more wiggle room for the EQB, Steinberg attached the original, EPA-approved 1993 Puerto Rico regulations in Spanish which met federal standards to compare to the gutted standards EQB was using. Fig. 4

Steinberg's threat against the EQB's authority after his staff discovered the gutting of landfill regulations was an appropriate measure to consider. In the annual Puerto Rico landfill assessment written by EPA officials Carl Plossl, Philip Flax and Kimiko Link, from December 4, 2008, near the end of Steinberg's term in office, such an action was found to be feasible for the Agency to take, and potential legal or statutory pitfalls with direct EPA intervention and enforcement could be addressed: "**The consequences of failure to re-amend the regulations to be consistent with federal requirements could include withdrawal of program approval status which would result in EPA having direct enforcement authority for the 40 CFR Part 258 landfill requirements. However, EPA would not have permitting authority and consequently Puerto Rico would lose the flexibility afforded to approved states which allows construction of new landfills or expansion of existing ones in seismic zones (in which the entirety of Puerto Rico lies). However, EPA could possibly issue specific rules to accomplish this."** FIg. 5 Among the "options and recommendations" that the enforcement staff lists at the end of the document is, simply put: "**Withdraw program approval.**" Fig. 5

Oct 2006 Letter to PR Gov. Vila, from Alan Steinberg EPA; p. 13-1 (Fig. 4)



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 2
290 BROADWAY
NEW YORK, NY  10007-1866

OCT   5 2006

Honorable Aníbal Acevedo Vilá
Governor of the Commonwealth of Puerto Rico
La Fortaleza
P.O. Box 00902-0082
San Juan, PR  00902-0082

Dear Governor Acevedo Vilá:

On May 10, 2006 the U.S. Environmental Protection Agency (EPA) received an electronic copy of the English version of the Commonwealth's current solid waste management regulations from the Environmental Quality Board.  This submittal was provided in response to a specific request EPA made in our November 2, 2005 letter to you.  Although this submittal partially addresses our request, it does not address all the elements of the request.  Additionally, based on a preliminary review of this submittal, EPA has concerns regarding the consistency of the Commonwealth's current solid waste management regulations with federal requirements

In EPA's November 2, 2005 letter to you, among other things EPA requested that by November

**These changes, along with others EPA has noted, may jeopardize Puerto Rico's municipal solid waste landfill (MSWLF) permitting program approval status.**

waste regulations were a key component of EPA's approval of the Solid Waste Management Program.

In response to this request, on May 10, 2006, EPA received via email an electronic copy, translated into English, of the Commonwealth's most current solid waste management regulations. EPA did not receive the Attorney General's description of the changes, the rationale for the changes, the certification that the changes were in effect, nor the assurance that the regulations were accurately translated.

EPA has been assured verbally by the Chairman of the Environmental Quality Board, Carlos Lopez, that all regulatory changes required by EPA will be made.

EPA currently is reviewing the translated version of the regulations it received electronically. Upon our preliminary review, we have noted a number of changes which are not consistent with federal requirements pursuant to 40 CFR Part 239 and Part 258.  These changes include the definition of lateral expansion and the applicability of financial assurance requirements which were highlighted previously. We also noted a significant change to the definition of composite liner.

Internet Address (URL) • http://www.epa.gov
Recycled/Recyclable • Printed with Vegetable Oil Based Inks on Recycled Paper (Minimum 30% Postconsumer)

Dec 2008 PR Landfill Initiative; p. 9, 14-1 (Fig. 5)

**Superseded**
(click here for current version →)

| Subject | Puerto Rico Landfill Initiative | Location | Street Address:<br>City:<br>State:<br>Zip Code: |
|---|---|---|---|
| Contact | Carl Plossl<br>Philip Flax<br>Kimiko Link | Phone | 212-637-4066 |
| Department | DECA-RCB-SET | | |
| Last Updated | 12/04/2008 06:09 PM | | |

**Issue**

Most operating landfills in Puerto Rico have been in significant non-compliance with Federal and Commonwealth solid waste landfill regulations for over 12 years and are considered open dumps that present an ongoing risk to human health and the environment.   The Solid Waste Management Authority (SWMA) and the Environmental Quality Board (EQB) have not been effective in correcting this non-compliance from a planning perspective (SWMA-lead) or a program implementation perspective

The consequences of failure to re-amend the regulations to be consistent with federal requirements could include withdrawal of program approval status which would result in EPA having direct enforcement authority

Options and recommendations (...)
Withdraw program approval.

14



**The consequences of failure to re-amend the regulations to be consistent with federal requirements could include withdrawal of program approval status which would result in EPA having direct enforcement authority for the 40 CFR Part 258 landfill requirements.**

# III DERELICTION OF DUTY BY THE EPA

Alan Steinberg departed from his post of Regional Administrator during the transition between the Bush and Obama administrations. While he'd been personally engaged in raising EQB's gross malfeasance with Puerto Rico's top officials, and had explicitly warned about revoking EQB's enforcement authority, Steinberg never followed through on it. The reasons for this are unclear.

Every year, EPA Region 2 was informed by its enforcement staff that Puerto Rico's landfill system was in crisis, and that the EQB was not addressing it. In every assessment, there was meticulous documentation on how the EQB was not carrying out the plan it submitted in 1994 to obtain EPA's approval for its local enforcement authority. In every assessment, the enforcement staff warned Region 2 that a majority of Puerto Rico's landfills "present" or "may present" what is repeatedly described as "an imminent and substantial threat to human health and the environment" — the clear statutory trigger for EPA to intervene unilaterally.

But in the details of these internal assessments, it is revealed that only 2 open dumps have been fully closed in Puerto Rico over the last decade: Aguadilla (2006) and Santa Isabela (2012). Currently, at least 20 out of the remaining 27 landfill facilities are non-compliant with federal minimum standards, and in reviewing these internal assessments from 2005 onward, many of these facilities have never been compliant. The main difference most of them have with their former selves is that they have since been greatly expanded without regard for federal standards and now generate a lot more money per month than they did in 1994.

The records prove that the vast majority of Puerto Rico's landfills continually operate, year after year, in violation of federal rules. Comparing the number of open dumps in relation to compliant sites over the two decades under EQB authority, the results are clear: the EPA has taken little action to carry out its federal duty to the American citizens living near those sites in Puerto Rico. This represents a stunning dereliction of duty by EPA Region 2's leadership.

## When Judith Enck took over as President Obama's Regional Administrator, the pressure on the EQB ended.

While Steinberg was personally engaged on the matter, and raised the threat of appropriate EPA intervention, the documents show he didn't act on it. And the crisis was left to the next administration when he left the EPA in 2009.

In the transition, Acting Regional Administrator George Pavlou wrote to EQB chairman Pedro Nieves Miranda in August 2009. Nieves Miranda had also taken over in a new administration on the island, under Governor Luis Fortuño. The letter is a marker on how the EQB had still not corrected the gutting of landfill rules since no action had been taken over the course of three years: **"I am writing to re-emphasize the need that the Environmental Quality Board (EQB) take the necessary steps to revise Puerto Rico's solid waste regulations to be consistent with federal landfill criteria. (…) In 1997, the EQB modified the EPA-approved 1993 version of the regulations**



**The threat of EPA intervention was never acted on. The crisis was left to the next administration.**

16

without consulting EPA. The modified regulations significantly weakened landfill controls and have rendered Puerto Rico's regulations no longer consistent with the federal requirements."

Pavlou detailed the extent to which the EQB had gutted the rules: **"The key changes that EQB made which are of concern to EPA include: removal of the requirement that a professional engineer certify satisfaction of closure and post-closure standards; unacceptable revision of the lateral expansion definition; weakening of the hydraulic conductivity standard for composite liners; removal of education and licensing requirements for personnel involved with hydrology and ground water monitoring; revision of the definition of an "existing solid waste facility"; and, elimination of financial assurance requirements for municipalities."**

Pavlou confirmed the inaction on both sides: **"We have discussed this issue many times through previous correspondence and meetings with no resolution. (…) I would appreciate if you could make this a top priority."**

Nieves Miranda replied to Pavlou ten days later and was emphatic: **"This is a priority of this administration's regulatory agenda."** The new EQB head wrote that he'd created a special committee to work on amendments to local rules and **"our agenda includes a revision of all local regulations to assess their consistency with federal regulations and updating them."** He promised a revision by December 2009.

But when Judith Enck takes over as President Obama's Regional Administrator, the pressure on the EQB ceases. A clear policy shift takes place at the top of Region 2, despite continued warnings from the enforcement staff.

There were no emails, letters or memos obtained through FOIA showing Enck's interest in pressuring EQB despite repeated staff warnings.

The 2010 internal EPA assessment showed no concrete improvements in the overall condition of the landfill system from before Enck's arrival, nor results on the gutting of EQB rules. And it included something more active among the "options and recommendations". It read: **"Consider withdrawal of program approval, which would enable EPA to enforce the federal RCRA landfill requirements directly."**

The internal EPA assessments in 2011 and 2012 noted that the EQB sent its proposed rule revisions in early 2010 to EPA, which the federal agency found to be largely acceptable. But the effort on both sides ends there, according to the record. Puerto Rico never adopts the proper landfill rules, and Enck never raises the issue. The files show no evidence of Enck communicating with the Governor, or the EQB leadership, or pressuring them to act on the rules issue, or anything related to compliance. The 2011 report repeats, in the "options and recommendations" section: **"Consider withdrawal of program approval, which would enable EPA to enforce the federal RCRA landfill requirements directly."** Fig-6



Dec 2010 PR Landfill Initiative; p. 9, 17-1 (Fig. 6)

Superseded
(click here for current version ->)

| Subject | Puerto Rico Landfill Initiative | Location | Street Address:<br>City:<br>State:<br>Zip Code: |
|---|---|---|---|
| Contact | Adolph Everett<br>George Meyer | Phone | 212-637-4109 |
| Department | DEPP-RPB<br>DECA-RCB | | |
| Last Updated | 12/03/2010 09:40 AM | | |

**Issue**

Many of Puerto Rico's landfills are near capacity, most are out of compliance with federal RCRA and CAA standards, and present an imminent and substantial threat to human health and the environment. Minimal recycling is performed.  Although the Puerto Rico Environmental Quality Board (EQB) is approved to implement permitting and enforcement within the RCRA solid waste program, EQB has failed

Consider withdrawal of program approval,
which would enable EPA to enforce the federal
RCRA landfill requirements directly.

Then, in the 2012 assessment, the tone changes in the "options and recommendations" section: **"As a delegated solid waste program, EQB must implement its solid waste permitting and compliance sections to meet its authorization obligations."** This line is repeated in the 2013 and 2014 assessments from Region 2 staff.

## Enck's term shows spotty actions against last than half of the non-compliant landfills in Puerto Rico. Many were disregarded or stonewalled.

In the most recently available landfill assessment document from September 3, 2014, the results are clear from the lack of action from Enck: **"A letter requesting that EQB adopt the proposed revisions was sent in January 2011. As of 2/10/14, the changes have not been officially adopted (through promulgation). In recent discussions (…) EQB indicated that it was reviewing the regulation issue again to determine the next steps, which should include promulgating the necessary changes (Status: unchanged as of 5/5/14)."** Fig. 7

There was no record obtained through FOIA requests of any emails, letters or memos from Enck or mentioning Enck's interest in pressuring EQB or any Puerto Rico official to carry out their responsibilities in protecting the health and environment of the island. And there are no indications of Enck communicating with Puerto Rico's governors, or the heads of the EQB, about the failure to promulgate the rules that EPA had demanded Puerto Rico revise. It seems that by 2014, the issue was dropped.

The documents suggest a policy decision was made by Enck to back off from the EQB, despite the decades of documented illegality, chaos and failure to enforce minimal standards. And this hands-off attitude towards the EQB has been greatly compounded by the ineffectiveness of the regulatory actions under RCRA § 7003 that Enck decided to take instead.

EPA has authority under RCRA § 7003 to take action on the handling, transportation, or storage of solid waste where it may present "imminent and substantial endangerment to health and the environment" to bring suit or issue orders. Under the construct of issuing orders, EPA can either issue a unilateral order (UO), or an administrative order of consent (AOC) depending on whether consent exists. Alternatively, the EPA can ask the Justice Department to proceed to sue to enjoin landfill activities, or if appropriate to sue for criminal penalties — often these proceedings end in a judicial consent decree.



19

Sept 2014 PR Landfill Initiative Fact Sheet, p. 10, 19, 20-1 (Fig. 7)



A letter requesting that EQB adopt the proposed
revisions was sent in January 2011. As of 2/10/14,
the changes have not been officially adopted (through
promulgation). In recent discussions (...) EQB indicated (...)
it was reviewing the regulation issue again to determine
the next steps, which should include promulgating the
necessary changes (Status:  unchanged as of 5/5/14).

The internal EPA reports on Puerto Rico's landfills during Enck's term in office from 2009 onward indicate both administrative and judicial orders in Puerto Rico have been spotty (only nine out of 20 or more non-compliant landfills are targeted for specific actions) and many were recorded as being disregarded by landfills. In in the more recent reports, these same facilities have been documented by the Region 2 enforcement staff as violating the Clean Air Act and the Clean Water Act.

## Year after year, Enck's staff described an island-wide system of open dumps and an ineffective EQB. She didn't use her authority to respond.

The EPA's most recent landfill assessment summarized the level of non-compliance that existed in 1994, has continued unabated for twenty two years:

> **"The Environmental Quality Board (EQB), responsible for permitting and compliance of landfills in Puerto Rico, remains ineffective in its regulatory and enforcement role. Many of the 29 operating landfills are not permitted, the majority are past or near capacity (62% past capacity), and years of enforcement actions by EQB have not resulted in significant improvements in compliance. EPA has inspected operating landfills and found pervasive noncompliance. Few of the landfills have liners or leachate controls, and several are located in karst terrain, exacerbating the risk of ground water contamination. EQB substantively modified its solid waste management regulations in 1997 without notifying EPA as required. EPA performed a comparison of the revised regulations against the 1993 regulations upon which Puerto Rico's program approval was based. Region 2 expressed its concerns about the regulatory changes and the potential jeopardy of Puerto Rico's program approval status to EQB and the Puerto Rico Governor's office numerous times since 2006."**

The 2014 EPA assessment also detailed the agency's full knowledge of how the EQB had systematically eliminated central enforcement staff over many years:

> **"In addition, EQB has eliminated or left open all central solid waste compliance and permitting staff positions. In 2000, EQB employed 14 central solid waste compliance and permitting staff, by 2005, it had been reduced to 5 (with expanded responsibilities). In 2010, staffing was reduced to 1. By 2012, EQB employed no central solid waste compliance and permitting staff."**

There is no record that has yet been located indicating that effective action had been taken to remedy the staffing situation, or by EPA to intervene directly as it has the authority to do. And given the repeated internal acknowledgments from these newly obtained documents that the EPA has concluded for at least a decade that most of Puerto Rico's landfills pose a substantial threat to the public, the EPA has a responsibility and a duty of care to provide equal protection under the law and specifically, under RCRA § 7003, to intervene urgently in Puerto Rico. To date, the EPA has failed to do this.

This means that Puerto Rico's landfill safety requirements have been non-compliant with federal standards for well over 15 years. The EQB gutted its own rules without notifying EPA as required and was told 9 years later to change them back or lose its enforcement authority. As of 2014 it had not completed the correction. Repeated annual assessments to Region 2 leadership warned of the situation and even recommended direct intervention. But EPA Region 2 under Judith Enck tinkered on the margins, sent letters and held meetings, issued orders or negotiated agreements with less than half the open dumps, most of which would be disobeyed.

Year after year, assessments issued by Enck's enforcement staff described an island-wide system of mostly open dumps as the Puerto Rico government dragged its feet in correcting an illegal set of rule changes from almost two decades ago. But unlike her predecessor, there is no record of Enck considering or discussing the revoking of EQB's authority, reflecting a hands-off approach to a flagrantly chaotic enforcement situation in Puerto Rico.

What is not clear from years of internal EPA assessments is how high the chain of information has traveled. But the documents clearly show that Region 2 Administrator Judith Enck has been aware of the depth and scale of the crisis, and the threat it has posed to human health and the environment, and has chosen not to use EPA's full legal authority to protect vulnerable communities in Puerto Rico.

# IV  CONCLUSION AND QUESTIONS STILL NEEDING ANSWERS

The paper trail exposing the poisoning of Puerto Rico is now becoming public, and the conclusions are clear: the EPA, the Puerto Rico authorities and most of the Commonwealth's municipal landfills have been either cooperating or colluding to allow a massive, toxic, illegal business of dumping thousands of tons of unregulated trash into holes in the ground all over the island. And it has been going on, right under the public's nose, for a decade or more. Increasing health threats emanating from these toxic sites such as the Zika virus, more than ever, mandate that we challenge the regulators to do their job.

## Such a situation, across so many toxic sites, would never be tolerated on the U.S. mainland. This is a case of environmental injustice.

Furthermore, the landfill crisis that EPA has allowed to unfold in Puerto Rico is unique. Such a situation, across so many toxic sites, would never be tolerated on the U.S. mainland. The communities where the landfills are located in Puerto Rico are mostly economically disadvantaged, and the Commonwealth of Puerto Rico does not enjoy the status of a U.S. state. The communities affected do not, therefore, have the same access to resources for protecting their rights as American citizens, nor do they have as much of a voice to express their concerns as better-off communities on the mainland. This makes the landfill crisis in Puerto Rico a clear case of environmental injustice. The EPA is not providing t protection to these communities that are enjoyed by more advantaged communities on the U.S. mainland.

**The remaining questions that must be asked by the people of Puerto Rico, the environmental justice movement in the United States, and those responsible in the Obama Administration and the US Congress for policing the EPA are these:**

- Why has Region 2 administrator Judith Enck taken such a hands-off, tepid approach to the crisis despite repeated, glaring reports from her enforcements staff for a decade or more? Was EPA Administrator Gina McCarthy made aware of the landfill crisis in Puerto Rico? When, and to what extent?

- What will a thorough review of the document trail inside the EQB, and between the EQB and the landfills, reveal about the 1997 gutting of local regulations? Were there financial interests in Puerto Rico directly involved that went beyond the municipalities themselves? Has the EPA or the Puerto Rico government conducted environmental testing or assessments of the extent of water, air and ground contamination around landfill sites that have been allowed to operate in violation of federal rules for decades? Has an assessment of hazardous waste dumping at these sites been conducted? Or were such investigations stymied internally?

- When are the non-compliant landfills going to be brought up to minimum EPA standards or closed?

- In addition to the volumes of violations of federal laws that have been documented in these files we've uncovered, were crimes committed? By whom? And if so, will there be justice?



The
**POISONING**
of **PUERTO RICO**

# ATTACHMENT #3

# Arecibo Waste-to-Energy and Resource Recovery Project Final Environmental Impact Statement

Prepared for:
U.S. Department of Agriculture, Rural Utilities Service

January 2017

# Arecibo Waste-to-Energy and

# Resource Recovery Project

# Final Environmental Impact Statement



**Prepared for:**

**U.S. Department of Agriculture, Rural Utilities Service**

**January 2017**

This page intentionally left blank.

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

LIST OF FIGURES ......................................................................................................... vi

LIST OF TABLES .......................................................................................................... vii

ACRONYMS ................................................................................................................... ix

1.0   INTRODUCTION .................................................................................................. 1-1

   1.1   Project Overview and Description ................................................................. 1-2

   1.2   Project Background ........................................................................................ 1-2

      1.2.1  Energy Supply ......................................................................................... 1-2
      1.2.2  Renewable Energy Portfolio Standards .................................................. 1-3
      1.2.3  Reserve Capacity .................................................................................... 1-4
      1.2.4  Solid Waste Management and Capacity ................................................. 1-4
      1.2.5  Disposal of Municipal Solid Waste ......................................................... 1-7
      1.2.6  Solid Waste Generation in Puerto Rico .................................................. 1-8
      1.2.7  Existing Operating Landfills Overview .................................................... 1-8
      1.2.8  Recycling Rates for Puerto Rico ........................................................... 1-10

   1.3   Purpose and Need for the Action ............................................................... 1-11

      1.3.1  Rural Utilities Service ............................................................................ 1-11
      1.3.2  Energy Answers' Purpose and Need ..................................................... 1-12
      1.3.3  Energy Needs in Puerto Rico ................................................................ 1-12
      1.3.4  Municipal Solid Waste Purpose and Need ............................................ 1-13

   1.4   Authorizing Actions .................................................................................... 1-13

   1.5   Public Participation .................................................................................... 1-18

      1.5.1  Scoping Process ................................................................................... 1-18
      1.5.2  Public Review and Comment Analysis .................................................. 1-19
      1.5.3  Issues Considered But Dismissed ........................................................ 1-20

2.0   PROPOSED ACTION AND ALTERNATIVES ..................................................... 2-1

   2.1   Alternatives Considered But Eliminated From Further Consideration ..................... 2-1

      2.1.1  Project Site Selection .............................................................................. 2-1
      2.1.2  Waste-to-Energy Technologies ............................................................... 2-3

         2.1.2.1   Gasification .................................................................................. 2-3
         2.1.2.2   Pyrolysis ...................................................................................... 2-3
         2.1.2.3   Plasma Arc Gasification .............................................................. 2-4
         2.1.2.4   Mass Burn .................................................................................... 2-4
         2.1.2.5   Processed Refuse Fuel ................................................................ 2-5
         2.1.2.6   Preferred Waste-to-Energy Technology ...................................... 2-5

      2.1.3  Water Sources ........................................................................................ 2-6

2.1.3.1   Puerto Rico Aqueduct and Sewer Authority's Water Main.......................2-6
2.1.3.2   Groundwater ..............................................................................................2-7
2.1.3.3   Surface Water.............................................................................................2-7
2.1.3.4   Brackish Water from Caño Tiburones .......................................................2-7
2.1.3.5   Reclaimed Water from Arecibo Waste Water Treatment Plant................2-8

2.1.4   Alternative Fuel and Renewable Energy Resources ......................................2-8

2.2   Selection of Proposed Alternative .............................................................................2-9

2.2.1   No-action Alternative......................................................................................2-9
2.2.2   Arecibo Waste-to-Energy and Resource Recovery Project .........................2-11

2.2.2.1   Receiving and Handling of Processed Refuse Fuel Raw Material...........2-20
2.2.2.2   Production and Storage of Processed Refuse Fuel...................................2-21
2.2.2.3   Processed Refuse Fuel Combustion.........................................................2-22
2.2.2.4   Design Parameters ...................................................................................2-24
2.2.2.5   Emission Control System.........................................................................2-24
2.2.2.6   Management and Recovery of Combustion Residues ..............................2-25
2.2.2.7   Electric Power Production .......................................................................2-26
2.2.2.8   Water Supply for Plant Operation...........................................................2-27
2.2.2.9   Supplementary Fuels...............................................................................2-28
2.2.2.10  Main Plant Buildings ..............................................................................2-28
2.2.2.11  Safety Controls........................................................................................2-29
2.2.2.12  Education Program...................................................................................2-31
2.2.2.13  Municipal Solid Waste Inspection Program ...........................................2-31
2.2.2.14  Household Hazardous Waste Collection ..................................................2-32

2.2.3   Flooding ........................................................................................................2-32
2.2.4   Stormwater Management ...............................................................................2-32

2.3   Utility support Works ..............................................................................................2-33

2.3.1   Brackish Water Pumping and Transfer Pipeline...........................................2-33
2.3.2   Power Transmission Line and Improvements to Existing Substation .........2-34

3.0   PRESENT ENVIRONMENT AND EFFECTS OF ALTERNATIVES......................3-1

3.1   Soils and Geology ......................................................................................................3-1

3.1.1   Affected Environment .....................................................................................3-1

3.1.1.1   Geology and Topography ..........................................................................3-1
3.1.1.2   Soils...........................................................................................................3-7

3.1.2   Effects Analysis ..............................................................................................3-8

3.1.2.1   Construction...............................................................................................3-9
3.1.2.2   Operation .................................................................................................3-10

3.2   Water Resources .......................................................................................................3-10

3.2.1   Affected Environment ...................................................................................3-10

3.2.1.1   Surface Water..........................................................................................3-10
3.2.1.2   Groundwater ...........................................................................................3-17
3.2.1.3   Flooding ..................................................................................................3-19

3.2.2   Effects Analysis ................................................................... 3-27

    3.2.2.1   Construction ....................................................... 3-30
    3.2.2.2   Operation ........................................................... 3-34

3.3   Air Quality ................................................................................. 3-36

  3.3.1   Affected Environment ......................................................... 3-36

    3.3.1.1   Regulatory Framework ....................................... 3-36
    3.3.1.2   Attainment Status ............................................... 3-39
    3.3.1.3   General Conformity ............................................ 3-39
    3.3.1.4   Permitting Requirements ..................................... 3-40
    3.3.1.5   Permitting History .............................................. 3-41
    3.3.1.6   Local Meteorology .............................................. 3-41
    3.3.1.7   Ambient Air Quality Monitoring Data (2012–2014) ............... 3-42
    3.3.1.8   Global Climate Change ....................................... 3-44

  3.3.2   Effects Analysis ................................................................... 3-44

    3.3.2.1   Construction ....................................................... 3-45
    3.3.2.2   Operation ........................................................... 3-46

3.4   Biological Resources .................................................................. 3-59

  3.4.1   Affected Environment ......................................................... 3-59

    3.4.1.1   Vegetation, Invasive Species, and Noxious Weeds ............... 3-59
    3.4.1.2   Wetlands and Riparian Areas ............................... 3-60
    3.4.1.3   Wildlife and Fish Resources ................................ 3-62
    3.4.1.4   Special Status Species ........................................ 3-62

  3.4.2   Environmental Effects ......................................................... 3-63

    3.4.2.1   Construction ....................................................... 3-66
    3.4.2.2   Operation ........................................................... 3-69

3.5   Land Resources .......................................................................... 3-70

  3.5.1   Affected Environment ......................................................... 3-70

    3.5.1.1   Land Use and Zoning .......................................... 3-70
    3.5.1.2   Formally Classified Lands ................................... 3-75

  3.5.2   Effects Analysis ................................................................... 3-75

    3.5.2.1   Construction ....................................................... 3-76
    3.5.2.2   Operation ........................................................... 3-76

3.6   Visual Resources ........................................................................ 3-78

  3.6.1   Affected Environment ......................................................... 3-78

    3.6.1.1   Existing Site-specific Aesthetics .......................... 3-79
    3.6.1.2   Key Viewpoints Associated with the Project .......... 3-80

  3.6.2   Effects Analysis ................................................................... 3-83

3.7   Acoustic Environment ................................................................ 3-86

3.7.1   Affected Environment .................................................................... 3-86

    3.7.1.1   Background .................................................................... 3-86
    3.7.1.2   Federal Guidelines .................................................. 3-87
    3.7.1.3   Puerto Rico Noise Pollution Control Regulations ............... 3-88
    3.7.1.4   Baseline Noise Levels .................................................. 3-89

3.7.2   Effects Analysis ................................................................. 3-91

    3.7.2.1   Construction ............................................................... 3-91
    3.7.2.2   Operation .................................................................... 3-93

3.8   Transportation .................................................................................. 3-96

3.8.1   Affected Environment ............................................................ 3-96

    3.8.1.1   Roads and Traffic ......................................................... 3-96
    3.8.1.2   Airports ..................................................................... 3-102

3.8.2   Effects Analysis ................................................................ 3-102

    3.8.2.1   Construction .............................................................. 3-102

3.9   Cultural Resources/Historic Properties ............................................ 3-103

3.9.1   Definition of Cultural Resources and Historic Properties ......... 3-103
3.9.2   Area of Potential Effects ...................................................... 3-104
3.9.3   Culture History Overview .................................................... 3-105

    3.9.3.1   Prehistoric Context ..................................................... 3-105
    3.9.3.2   Historic Context ......................................................... 3-112

3.9.4   Archeological Resources ...................................................... 3-116
3.9.5   Historic Structures .............................................................. 3-117
3.9.6   Effects Analysis ................................................................. 3-117

3.10   Public Health and Safety ................................................................ 3-117

3.10.1 Affected Environment .......................................................... 3-117
3.10.2 Effects Analysis ................................................................. 3-118

    3.10.2.1  Construction .............................................................. 3-118
    3.10.2.2  Operations ................................................................. 3-118

3.11   Socioeconomics and Environmental Justice ...................................... 3-124

3.11.1 Affected Environment .......................................................... 3-124

    3.11.1.1  Region of Influence ..................................................... 3-124
    3.11.1.2  Population and Demographics ....................................... 3-124
    3.11.1.3  Income ...................................................................... 3-125
    3.11.1.4  Labor Force and Unemployment ................................... 3-125
    3.11.1.5  Employment by Industry .............................................. 3-126
    3.11.1.6  Housing ..................................................................... 3-129
    3.11.1.7  Government and Emergency Services .............................. 3-129
    3.11.1.8  Utilities ..................................................................... 3-130
    3.11.1.9  Environmental Justice and Protection of Children ............. 3-130

3.11.2 Effects Analysis ................................................................. 3-131

3.11.2.1  Construction ................................................................ 3-131
3.11.2.2  Operation .................................................................... 3-132

**4.0   OTHER REQUIRED CONSIDERATIONS** ..................................... **4-1**

4.1   Unavoidable Adverse Impacts ................................................. 4-1

4.1.1  Air Quality ............................................................... 4-1
4.1.2  Land Resources ........................................................ 4-1
4.1.3  Visual Resources ...................................................... 4-1
4.1.4  Transportation .......................................................... 4-2

4.2   Irreversible and Irretrievable Commitments of Resources ....................... 4-2

4.3   Relationship between Short-Term Use of the Environment and the Maintenance and Enhancement of Long-Term Productivity ........................................... 4-3

4.4   Cumulative Effects Analysis ................................................. 4-3

4.4.1  Water Resources ....................................................... 4-5
4.4.2  Air Quality ............................................................... 4-6
4.4.3  Biological Resources .................................................. 4-7
4.4.4  Visual Resources ...................................................... 4-8
4.4.5  Acoustic Environment ................................................. 4-8
4.4.6  Transportation .......................................................... 4-9
4.4.7  Socioeconomic Resources and Environmental Justice ................. 4-9

**5.0   LIST OF PREPARERS** ........................................................ **5-1**

**6.0   REFERENCES** ................................................................ **6-1**

**APPENDIX A: SCOPING REPORT** ................................................... **6-1**

**APPENDIX B: REPRESENTATIVE CONDITIONS AND PHOTO-SIMULATIONS** .... **6-1**

**APPENDIX C: RESPONSES TO COMMENTS ON THE DRAFT ENVIRONMENTAL IMPACT STATEMENT** ........................... **6-1**

**APPENDIX D: LETTER FROM PUERTO RICO AQUEDUCT AND SEWER AUTHORITY** ..................................................................... **D-1**

**APPENDIX E: REVISED PRELIMINARY ENVIRONMENTAL IMPACT STATEMENT – RENEWABLE POWER GENERATION AND RESOURCE RECOVERY PLANT** .... **E-1**

# LIST OF FIGURES

Figure 2-1.    Location of Proposed Plant, Water Pipeline, and Transmission Line .............. 2-13

Figure 2-2.    Planned Area of Raw Material Collection for the Production of Processed Refuse
Fuel ........................................................................................................ 2-14

Figure 2-3.    Site Plan and Building Layout .......................................................... 2-18

Figure 2-4.    Simplified Power Generation and Resource Recovery Process Flow Chart ..... 2-19

Figure 2-5.    Processed Refuse Fuel Combustion in Spreader-Stoker Boiler........................ 2-23

Figure 3-1.    Regional Geologic Section of the Northern Karst Belt ...................................... 3-2

Figure 3-2.    Regional Geologic Map .................................................................... 3-4

Figure 3-3.    Topographic Site Map...................................................................... 3-6

Figure 3-4.    Project Site Soil Map ...................................................................... 3-8

Figure 3-5.    FEMA Flood Insurance Rate Map, Panel 230J ............................................. 3-21

Figure 3-6.    Proposed 100-year Floodway Limit and Cross Sections ................................. 3-22

Figure 3-7.    Proposed Bank Modification Site ........................................................ 3-23

Figure 3-8.    Area Inundated as a Result of Hurricane Georges ............................................ 3-26

Figure 3-9.    Proposed Geometry of Bank Modification Area ........................................ 3-32

Figure 3-10.   Existing Structures Located Within Area of Base Flood Elevation Increase .... 3-34

Figure 3-11.   Conceptual Illustration of Carbon Fluxes between Landscape/natural Systems and
Stationary Sources ...................................................................................... 3-53

Figure 3-12.   Jurisdictional Wetland Locations within Plant Site ........................................ 3-61

Figure 3-13.   Land Cover Surrounding the Project Area........................................................ 3-72

Figure 3-14.   Land Uses and Industries near the Project........................................................ 3-73

Figure 3-15.   Locations of Representative Viewpoints near the Proposed Project ................ 3-81

Figure 3-16.   Noise Sensitive Receptor Locations ................................................................ 3-89

Figure 3-17.   Transportation Network ................................................................................ 3-98

# LIST OF TABLES

Table 1-1.    Permits, Regulations, or Consultations Needed for Listed Agencies and Required Actions Necessary for the Project ................................................................. 1-14

Table 2-1.    Projected Sources of Raw Materials for the Processed Refuse Fuel ................ 2-15

Table 3-1.    Description of Soils at the Project Site ................................................................. 3-7

Table 3-2.    Soils and Geology Impacts Context and Intensity Definitions ........................... 3-9

Table 3-3.    Major Surface Water Features in the Lower Río Grande de Arecibo Valley .... 3-11

Table 3-4.    Río Grande de Arecibo U.S. Geological Survey Gage Information ................. 3-12

Table 3-5.    Monthly Flow Data for Río Grande de Arecibo at Central Cambalache, Puerto Rico ...................................................................................................................... 3-13

Table 3-6.    Total Surface Water Withdrawal for Arecibo in 2005 ....................................... 3-13

Table 3-7.    Monthly Total Precipitation (inches) for Arecibo Observation, Puerto Rico (1990–2014) ...................................................................................................................... 3-15

Table 3-8.    Assessment Units in the Río Grande de Arecibo Watershed ........................... 3-17

Table 3-9.    Groundwater Withdrawals for Arecibo by Public Sector ................................. 3-19

Table 3-10.   Peak Discharge Calculated by USGS for Hurricane Georges (September 1998) . 3-24

Table 3-11.   USACE Peak Discharge at Río Grande de Arecibo and Río Tanama .............. 3-24

Table 3-12.   FEMA Flood Insurance Study 100-Year Peak Discharge at Río Grande de Arecibo ................................................................................................................. 3-25

Table 3-13.   Peak Streamflow (Instantaneous) for USGS gage 50029000, Río Grande de Arecibo at Central Cambalache (1997–2014) .................................................... 3-25

Table 3-14.   100-Year Flood Levels for the Project Site ........................................................ 3-27

Table 3-15.   Water Resources Impacts Context and Intensity Definitions ............................ 3-28

Table 3-16.   Off-site Structures Identified for Demolition or Relocation ............................. 3-33

Table 3-17.   National Ambient Air Quality Standards ............................................................ 3-38

Table 3-18.   Existing Air Quality Monitoring Data, 2012–2014 ........................................... 3-43

Table 3-19.   Air Quality Impacts Contexts and Intensity Definitions .................................... 3-44

Table 3-20.   Potential to Emit Criteria and Hazardous Air Pollutants ................................... 3-47

Table 3-21.   Maximum Project Increment—Significant Impact Level Screening Analysis .. 3-50

Table 3-22.   Cumulative Air Quality Analysis Results for Criteria Pollutants ..................... 3-51

Table 3-23.   Greenhouse Gas Emissions Results ................................................................... 3-54

Table 3-24.   Federally Listed Species in the Project Area ..................................................... 3-62

Table 3-25.   Biological Resources Impacts Contexts and Intensity Definitions ................... 3-64

Table 3-26.    Land Use Impacts Context of Intensity of Effects ............................................. 3-76

Table 3-27.     Visual Resources Impacts Context of Intensity of Effects ............................... 3-84

Table 3-28.    Common Noise Sources and Noise Levels ..................................................... 3-87

Table 3-29.    Noise Level Limits......................................................................................... 3-88

Table 3-30.    Noise Sensitive Receptors............................................................................. 3-89

Table 3-31.    Baseline Sound Levels .................................................................................. 3-90

Table 3-32.    Acoustic Environment Impacts Context and Intensity Definitions ................. 3-91

Table 3-33.    Noise Level Ranges of Typical Construction Equipment................................. 3-92

Table 3-34.    Operating Equipment Noise Levels ............................................................... 3-93

Table 3-35.    Estimated Daytime Noise Impact ................................................................. 3-94

Table 3-36.    Estimated Nighttime Noise Impact ............................................................... 3-94

Table 3-37.    Traffic Volumes on PR-2 through Arecibo ..................................................... 3-99

Table 3-38.    Estimated Incoming and Outgoing Vehicles from the Project ...................... 3-101

Table 3-39.    Vehicle Type Distribution............................................................................ 3-101

Table 3-40.    Municipality Population Estimates and Puerto Rico Population Projections .. 3-124

Table 3-41.    Median Household Income Estimates, 2009–2013 ......................................... 3-125

Table 3-42.    Trends in Labor Force & Unemployment, 2011–2013................................... 3-126

Table 3-43.    Average Employment by Industry, 2009–2013 ............................................ 3-127

Table 3-44.    Evaluation of Area Household and Housing Characteristics, 2009–2013....... 3-129

Table 3-45.    Minority Status, Income, and Poverty Data for Select Areas, 2009–2013 ...... 3-131

# ACRONYMS

| | |
|---|---|
| AADT | annual average daily traffic |
| APE | area of potential effect |
| Arecibo WTE Project | Waste-to-Energy and Resource Recovery Project at the site of the former Global Fibers Paper Mill in Arecibo, Puerto Rico |
| BACT | Best Available Control Technology |
| BTU | British thermal unit |
| °C | degrees Celsius |
| cfs | cubic feet per second |
| CAA | Clean Air Act |
| cal. BP | calibrated years before present |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| COPC | constituents of potential concern |
| COPEC | contaminants of potential ecological concern |
| dB | decibel |
| dBA | A-weighted decibel |
| DE/EC | duplicate effective/existing condition model |
| Dynamic Itinerary | Dynamic Itinerary for Infrastructure Projects |
| EBSL | ecologically-based screening level |
| EIA | Energy Information Administration |
| EIS | environmental impact statement |
| Energy Answers | Energy Answers Arecibo, LLC |
| EPA | U.S. Environmental Protection Agency |
| EQB | Puerto Rico Environmental Quality Board |
| °F | degrees Fahrenheit |
| FEMA | Federal Emergency Management Agency |
| FE/PC | floodway encroachment/proposed condition model |
| FR | Federal Register |
| gpd | gallons per day |
| HDPE | high-density polyethylene |
| kV | kilovolt |
| $L_{eq}$ | equivalent continuous noise level |
| LOS | level of service |
| $\mu g/m^3$ | micrograms per cubic meter |

| | |
|---|---|
| MACT | Maximum Achievable Control Technology |
| mgd | million gallons per day |
| msl | mean sea level |
| MSW | municipal solid waste |
| MW | megawatt |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $NO_x$ | nitrogen oxides |
| NPDES | National Pollutant Discharge Elimination System |
| NRCS | Natural Resources Conservation Service |
| OGPe | Oficina de Gerencia de Permisos |
| $PM_{2.5}$ | particulate matter smaller than or equal to 2.5 microns |
| $PM_{10}$ | particulate matter smaller than or equal to 10 microns |
| PR-2 | State Road Puerto Rico-2 |
| PRASA | Puerto Rico Aqueduct and Sewer Authority |
| PRDNER | Puerto Rico Department of Natural and Environmental Resources |
| PREPA | Puerto Rico Electric Power Authority |
| PRIDCO | Puerto Rico Industrial Development Company |
| PSD | Prevention of Significant Deterioration |
| Regional Infrastructure Plan | Regional Infrastructure Plan for Recycling and Solid Waste Disposal |
| REPS | Renewable Energy Portfolio Standard |
| ROI | region of influence |
| RSCR | regenerative selective catalytic reduction |
| RUS | Rural Utilities Service |
| SLERA | Screening Level Ecological Risk Assessment |
| SWMA | Puerto Rico Solid Waste Management Authority |
| TCDD | tetrachlorodibenzo-p-dioxin |
| USACE | U.S. Army Corps of Engineers |
| USC | United States Code |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| Vazquez WTP | Dr. Santiago Vazquez Water Treatment Plant |
| WTE | Waste-to-Energy |

# 1.0      INTRODUCTION

Energy Answers Arecibo, LLC (Energy Answers), is a private developer and operator of waste-to-energy (WTE) and resource recovery projects. Energy Answers International, the parent company of Energy Answers, develops integrated solid waste management and resource recovery facilities that utilize municipal solid waste (MSW) to generate energy. Energy Answers proposes to construct and operate a new 79-megawatt (MW) WTE and resource recovery project at the site of the former Global Fibers Paper Mill in Arecibo, in the Commonwealth of Puerto Rico (Puerto Rico) (hereinafter referred to as the Arecibo WTE Project or Project).

Energy Answers has approached the Rural Utilities Service (RUS), an agency within the United States Department of Agriculture (USDA), and indicated its intent to obtain a loan or a loan guarantee. RUS has determined that the issuance of a loan or loan guarantee would constitute a major federal action and that an environmental impact statement (EIS) is the appropriate level of environmental review for this proposed action under the National Environmental Policy Act of 1969 (NEPA) (42 United States Code [USC] §§ 4321 *et seq.*).

RUS has prepared this EIS in compliance with the requirements of NEPA, the Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 Code of Federal Regulations [CFR] §1500–1508), RUS Environmental Policies and Procedures (7 CFR §1794[1]), the RUS Scoping Guide for RUS Funded Projects requiring Environmental Impact Statements (RUS Bulletin 1794A-603), RUS Environmental Policies (7 CFR §1970), RUS Staff Instruction 1970 Subpart D - NEPA Environmental Impact Statements and other applicable regulations.

This EIS was prepared to meet the following key objectives:

- Identify baseline conditions in the Arecibo WTE Project area

- Identify and assess potential impacts on the natural and human environment that might result from implementation of the proposed Project if RUS decides to provide funding

- Describe and evaluate the no-action alternative

- Identify specific mitigation measures, as appropriate, to minimize environmental impacts

- Facilitate decision making by RUS and other applicable federal regulatory agencies responsible for the issuance of associated permits and approvals

This chapter presents an overview of the proposed Project and describes the Arecibo WTE Project and connected actions (Sections 1.1 and 1.2), the purpose and need for the Project

---

[1] 7 CFR Part 1794, and Bulletins, were rescinded and replaced by 7 CFR Part 1970, and subparts, on April 1, 2016

(Section 1.33), and the regulatory framework and authorizing actions that are pertinent to the Project (Section 1.44).

## 1.1      PROJECT OVERVIEW AND DESCRIPTION

Energy Answers proposes to construct a WTE generation and resource recovery project in the Cambalache Ward of Arecibo, Puerto Rico. The Project would receive and process approximately 2,300 tons of MSW per day and generate a net output of approximately 67 MW, which the Puerto Rico Electric Power Authority (PREPA) would purchase. The preferred location for the plant is the site of the former Global Fibers Paper Mill; the plant would encompass approximately 79.6 acres (32 hectares) of the 90-acre parcel. The proposed Project would include the following components: MSW receiving and processing building; a processed refuse fuel storage building; a boiler and steam turbine; an emission control system; an ash processing and storage building; and other associated infrastructure and buildings. The proposed Project also would require the installation of an approximately 2-mile (3.2 kilometers) raw water line for cooling and process water, and construction of a 115 kilovolt (kV) transmission line approximately 0.8 mile (1.2 kilometers) long to transmit the energy to PREPA's electrical grid.

## 1.2      PROJECT BACKGROUND

Puerto Rico is challenged by its dependency on fuel imports for energy sources. It also faces challenges in meeting its solid waste management requirements through the existing network of aging landfills. The following sections discuss the recent past and present situation related to energy and solid waste management in Puerto Rico as it relates to Energy Answers' identification of an opportunity to construct and operate a WTE Project.

### 1.2.1    Energy Supply

According to PREPA, in 2013, 55.3 percent of Puerto Rico's electricity came from petroleum, 27.6 percent from natural gas, 16 percent from coal, and 1.1 percent from renewable energy (PREPA 2015). The electric power and transportation sectors are the largest petroleum consumers. About two-thirds of petroleum-based electricity generating capacity consumes No. 6[2] residual fuel oil and one-third consumes No. 2 diesel fuel. Despite the island's overall low energy consumption, Puerto Rico's per capita petroleum consumption is about four-fifths of the U.S. average, primarily because of its dependence on residual fuel oil and diesel fuel for two-thirds of the island's electricity. The island neither produces nor refines petroleum, so all petroleum products are imported. Prior to the oil price crash of 2014–2015, high world petroleum prices drove typical Puerto Rico power prices to two to three times the U.S. average. In response

---

[2] ASTM specifies the various fuel grades. No. 6 fuel oil is commonly called industrial or heavy industrial fuel oil when used by utilities for electricity and steam generation. No. 2 diesel fuel is also typically marketed as No. 2 heating oil.

to these high oil prices and low natural gas prices, PREPA developed plans to add natural gas capability at its five largest petroleum-burning plants. The first natural gas conversion, at the Costa Sur (South Coast) station in Guayanilla, is operating, but other conversions depend on construction of liquefied natural gas import terminals and gas distribution infrastructure.

## 1.2.2    Renewable Energy Portfolio Standards

In July 2010, Puerto Rico enacted the island's first Renewable Energy Portfolio Standard (REPS) in an effort to spur renewable energy development and reduce Puerto Rico's dependence on imported foreign oil. Under the law, PREPA was required to supply 12 percent of its electricity from renewable sources starting in 2015, scaling up to 15 percent by 2020 and 20 percent by 2035.

Green energy resources fall into two categories. As defined by the Commonwealth Energy Public Policy Office, the first category is "sustainable renewable energy," which includes solar, wind, geothermal, renewable biomass, qualified hydroelectric energy, marine and hydrokinetic, ocean thermal, and any other "clean or renewable energy," and the second category is "alternative renewable energy," which includes energy derived from MSW, landfill gas, anaerobic digestion, fuel cells, and any other "alternative energy." Renewable biomass, qualified hydroelectric, and MSW are further defined in the law. The different categories were created with a potential federal renewable energy standard in mind: the "sustainable renewable energy resources" would qualify under Puerto Rico's standard and also a potential, future federal standard; the "alternative renewable energy" resources would only qualify for Puerto Rico's standard.

To meet the renewable electricity standard, PREPA is focusing on wind, solar, and WTE projects. The utility has signed long-term power purchase agreements with renewable energy developers for about 1,000 MW of renewable capacity, which could supply enough renewably sourced electricity to meet the 2015 portfolio standard if all the projects are built. The first of those utility-scale renewable energy projects started operations in 2012. A 24-MW solar photovoltaic plant at Guayama, managed by the same company that owns Puerto Rico's coal plant, and a 26-MW solar photovoltaic plant at Loiza also initiated operations. A 95-MW wind farm at Santa Isabel became Puerto Rico's first operating wind generator and the largest wind facility in the Caribbean. A 23-MW wind project at Punta de Lima, Naguabo, also started up in 2012.

Overall, Puerto Rico had 5,616 MW of installed electrical capacity as of 2012 (EIA 2015b). Given that four-fifths of the energy used in Puerto Rico comes from petroleum (EIA 2016), it is extremely vulnerable to the fluctuations in the cost of oil. During 2012, there were 20.026 billion kilowatt-hours of generation of which 0.148 billion was renewable generation, including hydro, geothermal, wind, solar, tidal, wave, biomass, and waste.

Puerto Rico needs to promote fuel diversification and develop domestic renewable energy resources. The proposed WTE facility would contribute to the fuel diversification of the generation both owned and purchased by PREPA to allow the utility to become less reliant on older less efficient and potentially non-compliant (with U.S. Environmental Protection Agency [EPA] regulations) coal-fired generation and oil-fired capacity that can be both a volatile and relatively expensive source of generation. Operation of the proposed project would make an approximately 3 percent contribution to PREPA's renewable energy needs.

## 1.2.3    Reserve Capacity

The proposed WTE Project is expected to operate continuously at a relatively high annual capacity factor close to 94 percent to produce approximately 550,000 megawatt-hours of electrical energy on an annual basis, providing a reliable baseload source of power that would add to PREPA's reserve capacity levels. The traditional mainland reserve requirement is 15 to 20 percent. However, PREPA is required to maintain generation reserve levels above 40 percent to 50 percent of the utility's maximum peak loads to ensure that the electrical system in Puerto Rico is operated and maintained in an adequate and reliable manner. PREPA anticipates reducing its existing reserve levels to close to 32 percent by 2019 because of the need to retire significant amounts of electric generating units that are inefficient and potentially non-compliant with EPA regulations. PREPA's high reserve capacity levels are required because of Puerto Rico's island geography, mountainous topography, lack of an off-season for electric demand allowing plant maintenance and overhaul during reduced load periods, and its relatively high year-round load factor of 77 to 89 percent.

The reserve requirement is further exacerbated by the fact that relatively few large power plant sites carry the distribution of loads combined with a less than robust electrical transmission system. More than 40 percent of PREPA generation originates from four plant sites. The combination of a concentrated generation system and lack of adequate transmission increases susceptibility to adverse weather and storm-related power outages. PREPA has improved, and will continue to improve, the reliability of the electrical grid by making system improvements and upgrades to the transmission system and adding electric generating units such as the proposed Project to help the utility maintain adequate reserve margins and promote the diversity of plant locations.

## 1.2.4    Solid Waste Management and Capacity

Puerto Rico's public policy regarding solid waste management is established, among others, by the Solid Waste Authority Organic Act (Act No. 70 of June 13, 1978, as amended), the Solid Wastes Reduction and Recycling Act of Puerto Rico (Act No. 70 of September 18, 1992, Recycling Act, as amended), and by the regulations promulgated by the Puerto Rico Solid Waste Management Authority (SWMA). These acts and regulations are designed to minimize the solid

waste volume generated on the island. As ordered by the Recycling Act, the hierarchy for solid waste disposal options was established as follows:

- Source reduction

- Reuse

- Recycling/composting

- WTE plants

- Landfill

EPA, Region 2, made the following observations about solid waste management in Puerto Rico (EPA 2015a):

- The management and disposal of solid waste in Puerto Rico has long been a challenge.

- The problem is intensified by the limited disposal space available on an island community and Puerto Rico's delicately balanced ecosystem.

- Puerto Rico's residents generate more waste than people living on the mainland, and recycling rates on the island are lower.

- Most of Puerto Rico's solid waste ends up in one of the island's landfills, most of which do not comply with Puerto Rico's and federal landfill requirements.

- The solution is a comprehensive and integrated solid waste management plan that calls for a reduction in the amount of solid waste generated, an increase in the recycling rate, the use of waste to produce energy, and the proper and efficient management of all landfills.

SWMA and the Puerto Rico Environmental Quality Board (EQB) have responsibility for managing and regulating solid waste on the island while the municipalities carry out the day-to-day handling, collection and treatment of the waste. Island wide, the solid waste management system in Puerto Rico serves 78 municipalities that generate about 4 million tons per year of residential, commercial, and industrial waste. This infrastructure includes programs that promote source reduction/reuse and recycling of these wastes; 9 material recovery facilities, 4 composting plants, 17 transfer stations, and 27[3] sanitary landfill systems.

SWMA has the task of establishing and executing public policy with respect to the technical, administrative, and operational aspects of the solid waste management system. Under this authority, SWMA creates mandatory disposal regions and identifies priority infrastructure projects. SWMA also established the solid waste framework for Puerto Rico that includes:

---

[3] The number of active landfills varies depending on the date of the source document because numerous landfills received closure orders from the EPA and EQB; some of which have extended their closure dates.

(1) transfer stations, (2) recyclable materials recovery plants, (3) compost plants, and (4) energy recovery plants.

Subsequently, in 2003, SWMA prepared a *Solid Waste Management Strategic Plan* (PRIDCO 2010). The strategic plan included areas that had not been addressed in previous plans, such as market development and public participation. In addition to these efforts, SWMA completed two large studies around the same time. One of them, the *Solid Waste Characterization Study* (SWAMA 2003), consisted of an analysis of the quantities and characteristics of the solid waste stream. The second study, *Assessment, Diagnosis and Recommendations for Landfill Systems*, 2004, also known as the Landfill Useful Life Study, provided a detailed analysis of the remaining capacity of all disposal facilities or landfills. These efforts identified a solid waste management system with numerous challenges, including landfills that did not comply with EPA and Resource Conservation and Recovery Act regulations.

Executive Order 2007-48, issued by the Governor of Puerto Rico and approved on November 2, 2007, ordered a reduction on the use of landfills as a principal method of disposition and management of solid waste in Puerto Rico. In response to this executive order, the findings of the above-mentioned studies, and a need to address solid waste management into the future, SWMA developed its *Dynamic Itinerary for Infrastructure Projects* (Dynamic Itinerary) (SWMA 2008). The main objective of the Dynamic Itinerary is to develop and implement infrastructure strategies to manage Puerto Rico's solid waste in a safe and efficient manner for the next 25 years in compliance with regulations. The Dynamic Itinerary provides strategic guidance for the development of the appropriate infrastructure needed to manage the solid waste until 2030. As part of the Dynamic Itinerary, SWMA evaluated the 32 operating sanitary landfill systems in Puerto Rico at the time of publication to identify their individual expansion capacities. The evaluation used the criteria outlined in 40 CFR §258, Subpart B that specifies the construction, operation, and closure criteria for sanitary landfill systems. Using this evaluation and based on public policy that established the reduction in the use of sanitary landfill systems as the main method for solid waste handling and disposal in Puerto Rico, SWMA determined the potential expansion capabilities of these systems.

The Dynamic Itinerary proposed strategies to reach at least a 35 percent diversion rate on or before 2016. The scenarios in the capacity model include:

- **Do Nothing Scenario**—The projections of the disposal capacity model for the Do Nothing scenario, where no additional disposal or processing capacity is added and no growth in the diversion rate is achieved, show that Puerto Rico would run out of disposal capacity by 2018, demonstrating the need for urgent action in terms of planning and execution of waste management strategies, including diverting recyclable materials from landfills and simultaneously provide adequate disposal capacity for solid waste.

- **Base Case Scenario**—Under this scenario, SWMA-planned diversion strategies reach the diversion goals, which would result in seven operating landfills (34.9 million tons of landfill capacity) with 17.8 years of useful life left at the end of the planning period (2030). The Base Case scenario establishes the steps necessary to reduce the use of sanitary landfill systems as a primary alternative to manage MSW, including material source reduction, increased recycling, enhanced use of transfer stations, and expansion of some landfills to extend the useful life of the island's existing landfills. It also defines the initial goals to increase the diversion rate and incorporates two WTE facilities (a 1,560 ton per day facility in the northeast region in service by 2013 and a 1,350 tons per day facility in the northwest region in service in 2012).

- **Back-up Case Scenario**—This scenario estimates that the diversion rate goal of 35 percent would be met in 2030 instead of 2016, implements most of the same management strategies as the Base Case Scenario with the exception of development of the WTE plants, and estimates that in 2030 there would be only eight landfills in operation (21.1 million tons of landfill capacity) with 7.5 years of useful life left.

In 2011, EQB adopted Resolution No. R-11-16-5, as amended by Resolution No. R-12-8 of May 4, 2012, which mandated, among other things, compliance by all landfills in Puerto Rico, within 36 months, with the requirements of Regulation No. 5717 adopted by EQB on November 14, 1997, as amended, and Subtitle D of the Federal Resource Conservation and Recovery Act and applicable local laws and regulations, for the closure of non-compliant landfills. In September 2014, EQB issued a series of letters to municipalities with non-compliant landfills reiterating the need for the closure of these facilities.

Federal and state regulations are important factors in Puerto Rico's solid waste management system and ultimately are used by agencies to determine facilities that will continue to operate and those that will close. The most critical regulations that affect current landfill facilities are the EPA's Subtitle D[4] (40 CFR §258) regulations of the Resource Conservation and Recovery Act that enforce requirements for the construction, operation, and closure of landfills.

## 1.2.5    Disposal of Municipal Solid Waste

Puerto Rico currently faces significant challenges to its management of solid waste on the island. The island, which is 100 miles by 35 miles, has limited areas that are geologically suitable for new landfill development. All but a few of its current landfills are out of compliance with local and EPA regulations. EPA has issued closure orders to several of Puerto Rico's landfills, and those in non-compliance continue to operate because there are no other viable options for

---

[4] Resource Conservation and Recovery Act Subtitle D focuses on state and local governments as the primary planning, regulating, and implementing entities for the management of non-hazardous solid waste. EPA developed federal criteria for the proper design and operation of MSW landfills and other solid waste disposal facilities, and Puerto Rico has adopted these criteria into its solid waste programs.

disposal of solid waste. Landfill leachate has contaminated portions of the island's groundwater resources, and landfill gas emissions are unmonitored and uncollected in almost all locations, creating significant hazards for local residents.

It is expected that most of the landfill facilities in Puerto Rico will be closed by 2018, including all the facilities in the northern region except for one, which would experience limited expansion. The proposed WTE facility would provide a viable option to dispose of some of the solid waste generated in northern Puerto Rico and alleviate some of the stress on the solid waste system. The proposed facility would divert solid waste that would otherwise end up at a landfill that is either non-compliant or one that is in compliance but would be reaching full capacity within the next few years.

The proposed WTE facility would be located in northern Puerto Rico where it would receive MSW from municipalities along the north-central and north-eastern side of the island, as well as the central mountainous region. This region currently produces more than 4,000 tons/day of MSW and is projected to generate about 4,500 tons/day of waste in 2020 through 2025. Note that, on September 18, 1992, a law was passed in Puerto Rico that established a recycling target of least 35 percent for the island; however, recycling rates have hovered under or around 10 percent for more than 10 years, partially because of a lack of markets, the high cost of transportation, and limited public participation. SWMA reported that recycling rates have steadily increased from 6.8 percent in 2004 to 14 percent in 2014. Even if recycling rates of 35 percent were achieved by 2020, approximately 3,000 tons/day of MSW would still require disposal at a landfill or processing at a WTE facility.

## 1.2.6    Solid Waste Generation in Puerto Rico

The projected solid waste generation in the Dynamic Itinerary was calculated based on 2006 population projections published by the Puerto Rico Planning Board and assumed that the estimated daily generation rate would remain constant in the future. The Dynamic Itinerary used a daily generation rate of 5.6 pounds (2.5 kilograms) per person, based on historical solid waste generation data and above the U.S. average of 4.4 pounds (2.0 kilograms) per person per day (EPA 2015b). SWMA has been tracking and updated this information and estimated a daily generation rate of 5.0 pounds per person in 2014 based on total solid waste generation and population data.

## 1.2.7    Existing Operating Landfills Overview

According to SWMA, between 2010 and 2011, Puerto Rico had 24 operating landfills managed by private and public entities (excluding landfills under compliance and/or closure orders by EQB and EPA). There are closure orders issued by EPA and locally by EQB, closure agreements, and closure plans in place for 21 non-compliant landfills, but the landfills have

continued operation because, among other things, there are no viable alternatives for the management of the displaced waste that would facilitate the implementation of these closures.

The Dynamic Itinerary projected the closure of additional landfills over a 25-year timeframe, based on a disposal capacity model that considered the remaining useful life of the landfills documented in the *Useful Life Study*. The capacity model also assumed disposal rates for each landfill and a potential feasible waste flow transfer scenario from closed landfills to other remaining landfills. According to the Dynamic Itinerary, the remaining landfills were divided in two categories: (1) non-compliant landfills that would not be expanded for various reasons; and (2) landfills that potentially comply with Resource Conservation and Recovery Act Subtitle D requirements but would not be expanded. In the Dynamic Itinerary, SWMA expected most of the remaining landfill facilities to close by 2018, including all the facilities in the Northern Region, except for Isabela, which would experience limited expansion.

The 21 municipal landfills designated for closure by EQB/EPA include the following:

| | |
|---|---|
| Añasco | Arroyo |
| Arecibo | Barranquitas |
| Cayey | Culebra |
| Florida | Guayama |
| Isabela | Jayuya |
| Juana Díaz | Juncos |
| Lajas | Moca |
| Santa Isabel *(Closed)* | Toa Alta |
| Toa Baja | Vega Baja |
| Vieques | Yabucoa *(Closed)* |
| Yauco | |

Additionally, 35 municipalities send MSW to landfills designated for closure by EQB/EPA, including:

| | | |
|---|---|---|
| Aguada | Aguadilla | Aguas Buenas |
| Aibonito | Barceloneta | Bayamón |
| Camuy | Cataño | Ciales |
| Coamo | Comerio | Corozal |
| Dorado | Guánica | Guayanilla |
| Hatillo | Lares | Las Marías |

| Las Piedras | Manatí | Maricao |
| Maunabo | Morovis | Naranjito |
| Orocovis | Patillas | Peñuelas |
| Quebradillas | Rincón | Sabana Grande |
| San Germán | San Sebastian | Utuado |
| Vega Alta | Villalba | |

The eight compliant landfills, as certified by EQB, include:

| Cabo Rojo* | Carolina* |
| Fajardo* | Hormigueros* |
| Humacao | Mayagüez |
| Ponce | Salinas |

Note:      * – landfills whose compliance with EPA Sub-Title D regulations has not been confirmed

The 17 municipalities sending their waste to these EQB-compliant landfills include:

| Adjuntas | Bayamón* | Caguas |
| Canóvanas* | Cataño* | Ceiba* |
| Cidra | Guaynabo* | Gurabo* |
| Hormigueros | Loíza* | Luquillo* |
| Naguabo* | Río Grande* | San Juan |
| San Lorenzo* | Trujillo Alto* | |

Note: * – municipalities sending their waste to landfills whose compliance
       with EPA Sub-Title D regulations has not been confirmed

## 1.2.8    Recycling Rates for Puerto Rico

SWMA reported the recycling rates achieved in Puerto Rico for 2004 through 2014. According to SWMA, the rates were based on the document *Measuring Recycling: A Guide for State and Local Government* published by EPA in 1997. SWMA reported that recycling rates have steadily increased from 6.8 percent in 2004 to 14 percent in 2014. It is important to note that the September 18, 1992, Law No. 70 for the Reduction and Recycling of Solid Waste in Puerto Rico established a recycling target of at least 35 percent. Therefore, Puerto Rico continues to not meet this standard.

## 1.3      PURPOSE AND NEED FOR THE ACTION

The following section describes the purpose and need for the Project. The purpose and need is described with reference to the factors influencing the need for the Project and the agency actions involved in developing the Project. RUS, as the lead agency, will use this analysis as a factor in making decisions related to providing financial assistance (e.g., engineering design, consistency with RUS programs, and providing financial assistance) for the proposed Project.

### 1.3.1     Rural Utilities Service

RUS is authorized to make loans and loan guarantees to finance the construction of electric distribution, transmission, and generation facilities, including system improvements and replacements required to furnish and improve electric service in rural areas, as well as demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems. Energy Answers is requesting financing assistance from RUS for the proposed 79 MW WTE and resource recovery project. RUS' proposed federal action is to decide whether to provide financing assistance (e.g., loan or loan guarantee) for the Project. Completing the NEPA process is one requirement, along with other technical and financial considerations, in processing Energy Answers' application.

The Rural Electrification Act of 1936, as amended (7 USC §§901 et seq.), generally authorizes the Secretary of Agriculture to make rural electrification and telecommunication loans, including specifying eligible borrowers, preferences, purposes, terms and conditions, and security requirements. RUS agency actions include the following:

- Provide engineering reviews of the purpose and need, engineering feasibility, and cost of the proposed Project

- Ensure that the proposed Project meets the borrower's requirements, prudent utility practices, and the electric service needs of the rural areas to be served by the proposed Project.

- Evaluate the financial ability of the borrower to repay its potential financial obligations to RUS.

- Review and study reasonable alternatives to the proposed Project.

- Ensure that fuel supply, water supply, and waste stream issues have been adequately addressed to meet proposed Project needs and all applicable local, state, and federal requirements.

- Ensure NEPA and other environmental requirements and RUS environmental policies and procedures are satisfied prior to taking a federal action.

Once the NEPA process is complete and a record of decision is prepared, Energy Answers can apply to RUS for the loan. Once an application is received, RUS engineering staff and financial loan application specialists will evaluate the ability of the applicant to repay the loan to RUS.

## 1.3.2      Energy Answers' Purpose and Need

Energy Answers' proposal would address a combination of energy and environmental issues in Puerto Rico. It would provide an alternative to landfilling solid waste using proven technology to both process and incinerate solid waste while producing heat and stream for electrical energy production that would add to PREPA's energy reserve capacity levels and help diversify the fuel sources for energy on the island. Energy Answers is a developer and operator of WTE and resource recovery facilities and has proposed the Project after evaluating it as an opportunity to provide a service to Puerto Rico that is consistent with its business model.

## 1.3.3      Energy Needs in Puerto Rico

Administrative Bulletin No. OE-2010-034 (Executive Order), issued on July 19, 2010, by Governor Luis G. Fortuño, declared an emergency regarding the power generation infrastructure in Puerto Rico. The executive order triggered an expedited process of Law No. 76 for the development of projects that promote new power generation infrastructure that use alternative sources to petroleum fuels, sustainable renewable energy sources, and alternative renewable energy. The executive order had a limited life and could not be extended beyond Governor Fortuño's term of office, which expired at the end of 2012; however, it set in motion actions that address the need to diversify the island's energy supply.

Puerto Rico still depends on oil-derived fuels for the majority of its energy supply. On May 27, 2014, Governor Alejandro Garcia-Padilla signed into law Act 57, known as the "Act for the Transformation and Energy Relief of Puerto Rico," which implements reforms that repeal and replace a number of existing sections of Puerto Rico law related to energy resources. Act 57 recognizes that Puerto Rico needs to evolve from its dependence on fossil fuels and use to the maximum extent possible the island's energy resources, such as sun and wind, conservation efforts, and efficiency improvements.

High dependence on oil also contributes to greater environmental pollution, which in turn, affects the health and safety of Puerto Ricans. The federal government established measures to mitigate some of these health hazards, through standards known as the Mercury and Toxic Air Standards, which compel Puerto Rico to transform the electric power generation system to comply with these standards by 2015 (Act 57). Development of the proposed Project responds to the need to develop an alternative generation source to oil-derived fuels and reduces the fossil fuel emissions associated with petroleum fuel sources and methane emissions from diverting the waste from landfills.

As described in section 1.2.2, *Renewable Energy Portfolio Standards*, PREPA must develop alternative energy solutions to meet these standards. Beginning in 2015, under the law, PREPA is required to supply 12 percent of its electricity from renewable sources, scaling up to 15 percent by 2020, and 20 percent by 2035. The proposed Project would help PREPA meet this standard because waste-to-energy is considered renewable under the REPS.

Lastly, PREPA is required to maintain generation reserve levels above 40 percent to 50 percent of the utility's maximum peak loads to ensure that the electrical system in Puerto Rico is operated and maintained in an adequate and reliable manner. PREPA anticipates reducing its existing reserve levels to close to 32 percent by 2019 because of the need to retire significant amounts of inefficient and potentially EPA non-compliant electric generating units. The proposed WTE Project is expected to operate continuously at a relatively high annual capacity factor close to 94 percent to produce approximately 550,000 megawatt-hours of electrical energy on an annual basis, providing a reliable baseload source of power that would add to PREPA's reserve capacity levels.

### 1.3.4    Municipal Solid Waste Purpose and Need

The proposed Project addresses the dwindling number of certified landfills for municipal and industrial solid waste by providing an alternative end use for the waste and recovering recyclable materials. In doing so, the Project would help address the solid waste management limitations related to long-term landfill constraints and extend the life span of the landfills certified to remain open. The reduction in the contribution of solid waste to landfills also would have a measureable reduction in the amount of greenhouse gas emissions from landfill methane production.

### 1.4    AUTHORIZING ACTIONS

**Table 1-1** summarizes the federal, state, and local laws, regulations, associated permits, approvals, coordination and other required actions that would be necessary for the Project.

**Table 1-1.    Permits, Regulations, or Consultations Needed for Listed Agencies and Required Actions Necessary for the Project**

| Agency | Law or Regulation | Agency Action |
|---|---|---|
| RUS | NEPA | - Review and approve NEPA documentation<br><br>- Ensure that all actions associated with the Project are in compliance with all applicable federal, state, and local regulations<br><br>- Decide whether to approve financing assistance for the Project<br><br>- Sign Record of Decision |
| | RUS Environmental Policies and Procedures | - Consult with appropriate agencies to provide decision makers with information to ensure that decisions and actions are based on an understanding of environmental consequences |
| | Executive Order 11988, *Floodplain Management* (issued by the President of the United States) | - Avoid, to the extent possible, the long- and short-term, adverse impacts associated with the occupancy and modification of floodplains |
| | Executive Order 11990, *Protection of Wetlands* (issued by the President of the United States) | - Ensure that short- and long-term impacts on wetlands are avoided where practical alternatives exist |
| | Executive Order 13112, *Invasive Species* (issued by the President of the United States) | - Do not authorize, fund, or carry out actions that are likely to cause or promote the introduction or spread of invasive species in the United States<br><br>- Implement all feasible and prudent measures to minimize risk of harm from introduction or spread of invasive species |
| USACE | Clean Water Act, Section 404 | - Regulate and provide permits for the discharge of dredged or fill material in jurisdictional wetlands of waters of the United States |
| | Rivers and Harbors Act Section 10 | - Regulate and provide permits for structures or work in, over, or otherwise affecting navigable waters of the United States |

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017

| Agency | Law or Regulation | Agency Action |
|---|---|---|
| USFWS/National Marine Fisheries Service | Endangered Species Act Section 7 | - Avoid/minimize impacts to threatened and endangered species and critical habitat<br><br>- Participate in Section 7 consultation<br><br>- Review the biological assessment and provide a biological opinion, if necessary |
| | Migratory Bird Treaty Act | - Avoid/minimize impacts on migratory birds and habitat |
| | Bald and Golden Eagle Protection Act | - In accordance with the permitting program established by the Division of Migratory Bird Management, if activities require the removal or relocation of an eagle nest, a permit is required from the Regional Bird Permitting Office |
| | Fish and Wildlife Conservation Act | - Ensure that mitigation measures conserve wildlife and wildlife habitat. |
| | Fish and Wildlife Coordination Act | - In coordination with PRDNER, provide consultation if it is determined that the proposed Project would affect water resources. |
| | Clean Water Act, Section 404 | - Work with USACE and EPA to ensure regulation of discharge of dredged or fill material in jurisdictional wetlands of water of the United States |
| | National Invasive Species Act | - Prevent the introduction and spread of nonnative invasive species as a result of Project activities |
| | Magnuson-Stevens Fishery Conservation and Management Act | - Provide consultation if the Project may adversely affect Essential Fish Habitat |
| USDA-NRCS | Farmland Protection Policy Act | - Identify and quantify adverse impacts that the Project may have on farmlands<br><br>- Minimize contribution to the unnecessary and irreversible conversion of agricultural land to non-agricultural uses |
| U.S. Department of Labor | Occupational Safety and Health Act | - Ensure that Occupational Health and Safety Administration standards are met during the construction, maintenance, and operation of the proposed Project |
| Federal Aviation Administration | Determination of No Hazard to Air Navigation | - Issue a determination stating whether the Project would be a hazard to air navigation |

| Agency | Law or Regulation | Agency Action |
|---|---|---|
| EPA | CAA Section 309 | - Review and comment on EISs for major federal actions and provide rating |
| | CAA PSD Permit | - Under 40 CFR §52, ensure that the Project is designed, constructed, and operated to comply with national ambient air quality standards |
| | Resource Conservation and Recovery Act | - Ensure that the treatment, storage, and disposal of hazardous wastes associated with the Project would be handled in accordance with Resource Conservation and Recovery Act regulations |
| | Noise Control Act | - Ensure that the Project is designed in a manner that furthers the national policy of promoting an environment free from noise that may jeopardize health and welfare |
| | Clean Water Act, Sections 318, 402, 405 | - Obtain a National Pollutant Discharge Elimination System General Stormwater Permit for construction activity |
| | Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* | - Identify and address disproportionately high and adverse human health or environmental effects on minority populations and low income populations |
| Puerto Rico Planning Board | Coastal Zone Management Act Consistency Determination | |
| EQB, PRDNER, PREPA, PRASA, Institute of Puerto Rican Culture, and Highway Authority | | - Endorse the Project |
| PR Energy Affairs Administration | | - Endorse the Project |
| EQB | Clean Water Act, Section 401 | - Obtain Water Quality Certificate |
| | | - Obtain permit for the construction of a wastewater treatment system without discharges to a body of water |
| | | - Obtain permit to operate an air emissions source |
| | | - Obtain permit for the operation of a non-hazardous solid waste facility |
| | | - Obtain permit for the operation of a wastewater treatment system without discharges to a body of water |

Arecibo Waste-to-Energy Project
Final EIS
January 2017

| Agency | Law or Regulation | Agency Action |
|---|---|---|
| PRASA | | - Endorse construction of water and sewer facilities |
| | | - Obtain pretreatment permit |
| | | - Endorse the use of water and sewer facilities |
| | | - Obtain use permit (occupancy permit) |
| PRDNER | | - Obtain permit for the construction of a water intake, if required |
| | | - Obtain permit for the operation of a water extraction franchise (intake) |
| | Authorization for the Use of Maritime Terrestrial Zone | - Survey Maritime Terrestrial Zone |
| | | - Obtain incidental permit for the extraction of materials for the earth crust components |
| OGPe | | - Obtain general consolidated permit |
| | | - Obtain rough grading permit (clearing and grubbing) |
| Highway Authority/OGPe | | - Obtain access approval and highway improvements construction permit |
| OGPe | | - Obtain construction permit for facility structures |
| | | - Obtain construction permit for site fill/site improvements/site infrastructure |
| | | - Obtain permits for transmission structures |
| | | - Obtain permits for hydrostatic tanks test |
| PREPA | | - Endorse substation construction |
| | | - Endorse transmission structures construction |
| | | - Obtain power connection approval |
| Fire Department | | - Obtain permit to store flammable liquids |
| | | - Endorse OGPe use permit |
| | | - Obtain Fire Prevention Inspection Certificate |
| Department of Health | | - Endorse OGPe use permit |
| | | - Obtain sanitary license |

Notes:   CAA – Clean Air Act, EIS – environmental impact statement, EPA – U.S. Environmental
Protection Agency, EQB – Puerto Rico Environmental Quality Board, NEPA – National
Environmental Policy Act, NRCS – Natural Resources Conservation Service, OGPe – Oficina de

Gerencia de Permisos, PRASA – Puerto Rico Aqueduct and Sewer Authority, PRDNER –
Puerto Rico Department of Natural and Environmental Resources, PREPA – Puerto Rico
Electric Power Authority, PSD – Prevention of Significant Deterioration, RUS – Rural Utilities
Service, USACE – U.S. Army Corps of Engineers, USDA – U.S. Department of Agriculture,
USFWS – U.S. Fish and Wildlife Service

## 1.5      PUBLIC PARTICIPATION

NEPA requires that agencies responsible for preparing environmental review documents involve
the public in environmental review of projects. Prior to development of an EIS, the responsible
agencies determine what information is to be evaluated in the EIS. A "scope" is a determination
of what issues need to be assessed in the environmental review to fully inform decision makers
and the public about the possible impacts of a project or potential alternatives. In part, these
issues are identified during the scoping process for a project. Through the scoping process, RUS
invited federal, state, and local units of government; organizations; and individuals interested in
the Project to comment on the Project and to identify issues and concerns to be addressed in the
EIS. This section summarizes the scoping process and issues raised that will be addressed in the
EIS.

### 1.5.1      Scoping Process

On April 12, 2013, RUS published in the *Federal Register* [FR] a Notice of Intent to Prepare a
Supplemental Final EIS in connection with potential impacts related to the proposal by Energy
Answers (78 FR 21908). In accordance with 7 CFR §1794.74[5] and 40 CFR §1502.21, RUS
intended to incorporate by reference the 2010 environmental impact analyses and documentation
prepared by the Puerto Rico Industrial Development Company (PRIDCO). PRIDCO served as a
lead agency in preparation of an EIS prepared under the Puerto Rico Environmental Public
Policy Act, Article 4(B)(3), (Law No. 416, September 22, 2004). The EIS is referred to as the
PRIDCO EIS, and it is included as Appendix E of this EIS.

According to the April 12, 2013, Notice of Intent, the supplemental final EIS was scheduled for
publication in March 2013, and the public was invited to submit comments on the proposal to
prepare a supplemental final EIS to inform RUS' decision making in its environmental review
process.

On November 28, 2014, RUS published a *Notice of Cancellation of the Supplemental Final EIS
and Notice of Public Scoping and Intent to Prepare an Environmental Impact Statement* (79 FR
70846). Through this notice, RUS announced that it was cancelling its Notice of Intent for the
supplemental final EIS and announced its intent to conduct public scoping and prepare an EIS.
The public was invited to submit comments concerning the public scoping, the Notice of Intent,

---

[5] 7 CFR Part 1794 was rescinded and replaced by 7 CFR Part 1970 on April 1, 2016

or to participate as a "consulting party" under Section 106 of the National Historic Preservation Act. These comments were to be submitted to RUS on or before December 29, 2014.

On January 14, 2015, following the closing of the comment period, RUS published a *Notice of Extension of Public Comment Period, Notice of Public Scoping Meeting and Intent to Prepare an Environmental Impact Statement* (80 FR 1892). Through this notice, RUS extended the comment period by an additional 30 days from the date of the notice to February 13, 2015. The notice also announced that a public scoping meeting would be held on January 28, 2015, from 3:00 p.m.–7:00 p.m. at the *Colegio de Ingenieros y Agrimensores de Puerto Rico, Capítulo de Arecibo,* Ave. Manuel T. Guillan 1, Arecibo. Project-related information was available at RUS' website[6] and at the *Tribunal General de Justicia, Centro Judicial*, and the *Casa Alcaldía del Municipio de Arecibo.* In addition, individuals who contacted RUS were provided with information on the date and format of the proposed public scoping meeting.

The public scoping meeting was conducted in an open house format with a court reporter available for transcription of verbal comments. The meeting provided the public with the opportunity to learn more about the Project and to provide comments on potential environmental issues associated with the Project. Overall, 134 attendees registered on the sign-in sheets. Additionally, 38 members of the public signed up to provide verbal statements, and 34 people gave verbal comments at the meeting; their comments were transcribed by a court stenographer. Forty-six written comments were submitted at the meeting using the comments sheets provided, and an additional four prepared comments were submitted at the meeting, including comments from the Puerto Rico Mayors' Association. In addition to the comments received during the scoping meeting, RUS received scoping comments in the form of written letters or emails from private citizens, government agencies, and nongovernmental organizations during the 2014 and 2015 public scoping comment periods.

### 1.5.2    Public Review and Comment Analysis

The scoping report is attached to this document as Appendix A, and the concerns expressed during the public scoping meeting are summarized below.

- The meeting attendees were upset with the government of Puerto Rico's review and approval process of the 2010 PRIDCO EIS (see Appendix E) and expressed concern that the Project was rushed through without adequate oversight.

- The attendees stated that the air emissions permit issued by EPA did not adequately protect the health of the community. Particular concerns were expressed with emissions of lead and

---

[6] Available at: http://www.rd.usda.gov/publications/environmental-studies/impact-statements/arecibo-waste-energy-generation-and-resource.

a high incidence of childhood lead poisoning in the area. Concerns were also expressed that the air dispersion modeling was inadequate and did not use proper data and assumptions.

- Commenters expressed concern that Energy Answers' health and safety risk assessment was inadequate, and that sufficient documentation or explanation was not provided to allow for the community to evaluate the results of the analysis.

- Commenters suggested that the Project would prevent or discourage the recycling of MSW.

- The public expressed concerns that the format of the scoping meeting was not conducive to people providing comments because they were used to the format of public hearings.

- The public expressed concerns about the public notifications for the RUS scoping meeting and the lack of explanation of its purpose.

Appendix C contains a summary of comments and responses to those comments and indicates, where appropriate, how we modified the text of the final EIS. The comments are grouped by topic for convenience

## 1.5.3    Issues Considered But Dismissed

Issues and potential concerns covering a wide range of natural and human resources for the Project were identified and discussed, as summarized in the Scoping Report (RUS 2015). Upon review and consideration of the comments received and resources identified, all issues were deemed appropriate for consideration and evaluation as part of the EIS process. Therefore, none of the issues and concerns raised during the scoping process was dismissed from further evaluation. This EIS contains a comprehensive review of the issues raised during scoping, as well as others that were not raised but are typical for a project of this nature. However, given the proposed Project would occupy a former industrial use site with private agricultural or vacant lands surrounding the property and no recreation resources in the vicinity that could potentially be affected, the EIS does not evaluate potential effects to recreation resources.

# 2.0     PROPOSED ACTION AND ALTERNATIVES

Under NEPA regulations established by CEQ, RUS is required to identify and evaluate reasonable alternatives to the Project, as well as the no-action alternative. Reasonable alternatives are those that are "practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant" (CEQ 1981). In determining reasonable alternatives, RUS is required to consider a number of factors that may include, but are not limited to "the proposed action's size and scope, state of the technology, economic considerations, legal considerations, socioeconomic concerns, availability of resources, and the timeframe in which the identified need must be fulfilled" (40 CFR §1500–1508).

NEPA requires that federal agencies evaluate reasonable alternatives to their proposed actions. The purpose of and need for the proposed action determines the range of reasonable alternatives. Therefore, in both the context of this EIS and the need under NEPA, reasonable alternatives to the proposed WTE facility have been explored and evaluated.

The proposed Project meets multiple needs, some of which are outside of the authority of the electric programs of RUS. Project needs that are compatible with the electric programs of RUS include: (1) providing a dispatchable electrical generation resource that adds to PREPA's reserve capacity levels, (2) helping PREPA to meet the REPS enacted by Puerto Rico and use cleaner and more environmentally friendly energy resources, and (3) decreasing Puerto Rico's dependence on imported fossil fuels and contributing to the fuel diversification of the generation both owned and purchased by PREPA.

## 2.1     ALTERNATIVES CONSIDERED BUT ELIMINATED FROM FURTHER CONSIDERATION

Several factors influencing the development of this type of project were considered early in the process to meet the purpose and need. Those factors evaluated included location, WTE technologies, and sources of water for steam and cooling purposes throughout the operations phases of the Project. This section discusses the alternatives that have been considered throughout the planning process but were eliminated for various reasons from further consideration. These alternatives, as well as other alternatives considered as a result of the purpose and need for the Project, are summarized below.

### 2.1.1     Project Site Selection

As part of its planning phase, Energy Answers conducted a site selection study to identify a potential site for the proposed Project's location (CSA Group 2010a). One of the stated objectives in guiding location and site preferences for the study was to look for Brownfield and inactive industrial or physical disturbed sites that would be suitable for recovery and the

proposed use, avoiding undisturbed properties. Energy Answers evaluated 33 potential site locations as part of its evaluation. Because of the island's geography, a substantial portion of the potentially suitable sites was situated at the confluences of coastal plains and river valleys and frequently subject to flooding. The potentially suitable sites also were relatively far from developed areas.

Energy Answers implemented a tiered four-phase analysis, which included the following:

- Exclusion Analysis—excluded those sites with location characteristics that are protected by precautionary policies and regulations from land use and environmental perspective

- Inclusion Analysis—included sites with specific, desirable, project-driven characteristics that are necessary for the viability and proper execution of the WTE and resources recovery facility

- Suitability Analysis using GIS-based suitability model—classified and described the level of suitability of the sites identified in the previous phase

- Comparative Assessment—compared and ranked the most suitable sites

Through this tiered approach, Energy Answers reduced the number of potential sites to six sites that met the majority of the inclusion criteria after the Inclusion Analysis. Those sites, according to the Suitability Analysis, were all classified as *high and medium suitable*. The Comparative Assessment evaluated project-specific parameters, such as philosophical objectives, community and regional considerations, and schedule and feasibility. The following sites ranked in the top three of the Comparative Analysis and represented the most suitable sites for the proposed Project:

- Central Cambalache Sugar Mill and Global Fibers Paper Mill complex in Arecibo

- Phillips Petroleum Plant Area in Guayama

- Old Paper Mill/Bottling Factory in Guaynabo

The Phillips Petroleum Plant Area is located on the south side of the island, which is outside the SWMA's Dynamic Itinerary northwest region (target service area) and already has the majority of electrical generation capacity on the island. The Old Paper Mill/Bottling Factory in Guaynabo is also located outside the SWMA's Dynamic Itinerary northwest region outside the target service area. Use of either of these sites would require transporting wastes for long distances from the source area within the northwest region, resulting in higher transportation costs and associated emissions and cause increased road congestion along north-south road networks. Therefore, Energy Answers identified the Central Cambalache Sugar/Global Fibers Paper Mill complex site as the preferred site for the proposed Project and narrowed this selection to the Global Fibers Paper Mill property as the preferred property.

## 2.1.2      Waste-to-Energy Technologies

Several WTE technologies produce energy from MSW, and alternative thermal conversion technologies for MSW are discussed below. Thermal energy is referred to as the energy that uses heat to generate power either as electricity or steam.

### 2.1.2.1      Gasification

Gasification is a method for extracting energy from organic materials, such as wood and biomass. In addition, fossil fuels and petroleum-derived materials like plastics can be gasified to generate electricity by converting carbon materials, such as organic fuel, petroleum, coal, or biomass, into carbon monoxide (CO) and hydrogen by reacting the raw material at high temperatures with a controlled amount of oxygen and/or steam. The resulting gas mixture is called synthesis gas or syngas. Syngas may be used directly in internal combustion engines, used to produce methanol and hydrogen, or converted into synthetic fuel.

In the process, a limited amount of oxygen or air is introduced into a reactor to oxidize some of the organic material to produce CO and energy, which drives a second reaction that converts further organic material into hydrogen and carbon dioxide ($CO_2$). A third reaction occurs from the previous one when residual water from the organic material mixes with the CO to produce methane and excess $CO_2$.

Gasification can be considered a hybrid between pyrolysis and combustion because it involves the oxidation of a substance, meaning that the oxygen that is added is not sufficient for the fuel to be completely oxidized and for full combustion to occur. The temperatures employed are typically above 1,200 degrees Fahrenheit (°F) (650 degrees Celsius [°C]). One of the main products produced by gasification is an ash with low carbon content. The calorific value of syngas from gasification and pyrolysis is far lower than natural gas. During gasification, part of the fuel (organic material) is burned to provide the temperature necessary to heat the remaining organic material.

### 2.1.2.2      Pyrolysis

Pyrolysis is the thermal degradation of a substance in the absence of oxygen. This process requires an external heat source to maintain the required temperature. Typically, temperatures between 570 to 1,500°F (300°C to 850°C) are used during pyrolysis of materials, such as MSW. The product produced from pyrolysis is a solid residue known as char, which is formed by carbon and non-combustible materials and synthetic gas (syngas). The syngas is a mixture of flammable constituents such as CO, hydrogen, methane, and volatile organic compounds (VOCs). A portion of these can be condensed to produce oils, waxes, and other substances. It has a calorific value that is lower than the value of natural gas. Pyrolysis differs from combustion in that it does not involve reactions with oxygen, water, or any other reagents. The difference from hydrous pyrolysis is that hydrous pyrolysis consists of placing decomposed organic material in

the presence of superheated water or steam. Pyrolysis, on the other hand, consists of indirect heating of the organic material in an oxygen-free environment to produce hot gases that are used to produce electricity and heat.

### 2.1.2.3    Plasma Arc Gasification

Plasma arc gasification is a waste treatment technology that uses electrical energy and high temperatures created by an electrical arc gasifier. The arc in a device called a plasma converter breaks down waste primarily into elemental gas and solid waste. The process has been intended to be a net generator of electricity, depending upon the composition of input wastes, and to reduce the volumes of waste being sent to landfill sites.

This technology consists of a relatively high voltage electric current that is passed between two electrodes, spaced apart, that create an electrical arc. Inert gas under pressure is passed through the arc into a sealed container of waste material, reaching temperatures as high as 25,000°F (13,900°C) in the arc column. The temperature a few feet from the torch can be as high as 5,000 to 8,000°F (2,760 to 4,427°C). At these temperatures, most types of waste are broken into a gaseous form, and complex molecules are separated into individual atoms.

A reactor operates at a relatively negative pressure, meaning that the feed system is supported by a gaseous removal system, and then by a solids removal system. Depending on the input waste (plastics tend to be high in oxygen and carbon), gas from the plasma can be removed as synthetic gas, which may be converted into alternate fuels at later stages.

### 2.1.2.4    Mass Burn

The mass burn technology burns municipal wastes without separating recyclables from non-recyclables and without prior waste processing. In this type of combustion, municipal wastes are fed directly into a furnace, and generally large items and potential hazardous materials are removed prior to combustion. Mass burning plants process from 200 to 3,000 tons of MSW per day.

In typical large-scale mass burn operations, refuse trucks transport waste to a pit inside a building where traveling cranes move the waste to a boiler. In some facilities, tires from vehicles, appliances, and larger wastes are separated, removed, and are sent to a landfill. Front loaders are used to crush furniture and boxes.

After large items have been sorted and crushed, the remaining materials are transported through a feed hopper to the boiler. The boilers, which are diverse in design and usually constructed in situ, convey waste on grates through the boiler to burn. The grate moves below the materials continuously as it feeds the waste into the boiler. The system blows air through the boiler to promote the burning process.

In some facilities, large materials get stuck in the feeding hopper and in the ash exhaust where available space is reduced, resulting in a decrease in the efficiency of burning waste and recoverable energy. On the other hand, the energy, which is released on or near the grate, results in a sufficiently high temperature to melt glass and metal, making its subsequent recovery difficult and expensive. In addition, the high temperature of the ash and burned residual materials requires the ash to be quenched in water, further complicating the process to recover valuable materials.

### 2.1.2.5    Processed Refuse Fuel

Processed refuse fuel technology is a variation of the mass burn system. It was introduced in the United States in the 1970s and was referred to as refuse derived fuel. The idea behind the refuse derived fuel technology was to process MSW before it is introduced to incinerator boilers. The MSW often would be shredded for size reduction and ran under magnets for ferrous metal removal. Some refuse derived fuel technologies included eddy current separators for aluminum removal, while other refuse derived fuel facilities first would have the MSW placed on large conveyor belts where employees would hand pick items such as corrugated cardboard, propane tanks, ropes, hoses or other items that would be problematic in the shredding process. By producing a more uniform fuel, the intent is that the boilers would not be exposed to significant variations in heating content and would not require as robust a design. Compared to mass burn facilities, the processed refuse fuel process produces a more homogeneous fuel and results in less bottom ash. However, a processed refuse fuel facility requires:

- Increased labor costs to operate the shredders

- Increased energy requirements for the shredders

- Increased down time required for repairs and maintenance of the shredders

- Increased capital costs to install the shredders

- Recognition that not all of the solid waste arriving on-site is suitable for fuel and non-recoverable portions must be landfilled along with the bottom ash

### 2.1.2.6    Preferred Waste-to-Energy Technology

Both mass burn and processed refuse fuel facilities have been operating throughout the United States for more than 20 years, and both types of facilities have been demonstrated to be feasible and reasonable technologies for generating electricity through the combustion of MSW. However, after evaluating alternative technologies and based on its experience operating a processed refuse fuel facility in Massachusetts[7] Energy Answers selected the processed refuse

---

[7] Energy Answers International currently owns and operates the SEMASS WTE facility in southeastern Massachusetts. The proposed Arecibo facility would be a newer version of the technologies used at the SEMASS plant.

fuel technology for use in the Arecibo Project. Energy Answers' proposal builds on its experience operating the SEMASS facility and improves on the processed refuse fuel technologies and operations of such a facility. The preferred processing includes a few differences, most notably the processing of the waste fuel prior to combustion (separate out materials and shred it into smaller, more uniform size pieces which helps with a uniform burn and the removal of ferrous metals), and injection of air under the grates during combustion to assist in a uniform burn. The separation of ferrous metal from the waste stream before entering the boiler and remaining metals from the ash streams, further increases the amount of material recovered and recycled and diverted from landfill. In addition to separating out the ferrous- and non-ferrous metals from the bottom ash, Energy Answers' proprietary process also separates the granular material known as Boiler Aggregate$^{TM}$, which Energy Answers would market as a construction material if there is a market for the material. Under the proposed action, this bottom ash material would be transported to an EPA-compliant landfill until alternative markets with approved applications mature.

## 2.1.3    Water Sources

The proposed Project would need about 2.1 million gallons per day (mgd) of water for all of its processes. This demand includes about 100,000 gpd of potable water for domestic and boiler makeup water and about 2.0 mgd of non-potable water for cooling and process needs. Energy Answers provided a feasibility analysis of potentially available water sources necessary for the Project's cooling process. Considering the Project location and the cooling process water quality requirements, the following water sources were identified and analyzed:

- Puerto Rico Aqueduct and Sewer Authority (PRASA) water main

- Groundwater

- Surface water

- Brackish water from Caño Tiburones discharged through the Puerto Rico Department of Natural and Environmental Resources (PRDNER) El Vigía Pumping Station into the Atlantic Ocean

- Reclaimed water from Arecibo Waste Water Treatment Plant

### 2.1.3.1    Puerto Rico Aqueduct and Sewer Authority's Water Main

The Project site is located within PRASA's Miraflores and Superaqueduct Service Area, which is supplied by Dr. Santiago Vazquez Water Treatment Plant (Vazquez WTP) and three wells. Arecibo treated water storage tanks distribute the water from the plant to the service area. Water could be supplied from PRASA's distribution system by connecting a new pipeline from the Project site to the existing 36-inch pipeline at the intersection of Avenue Domingo Ruiz with Highway PR-22.

PRDNER's *Plan de Aguas de Puerto Rico* estimates that PRASA currently serves an average daily demand of 5.76 mgd of water within the Miraflores and Superaqueduct Service Area. The Vazquez WTP performance targets are expected to increase Arecibo treated water storage tank production to produce a surplus of about 0.40 mgd of water after 2010, which could supply the potable water requirement for the Project. However, this increase will not be enough to satisfy an additional 2.0 mgd of cooling and process water demand. For these reasons, PRASA's water main was not evaluated further.

### 2.1.3.2    Groundwater

Energy Answers consultants prepared a pump test report for a 240-foot well drilled at the site. Groundwater quality was also monitored in the study (PRIDCO 2010). The report concluded that based on the initial tests, the well can produce a yield of at least 1.0 mgd of water without significant drawdown in the underlying aquifer. The initial tests did not rule out higher withdrawal rates as being equally feasible. Quality analysis showed total dissolved solids values greater than 15,000 milligrams per liter, indicating the presence of brackish water in the aquifer. Based on the pumping test results, it is uncertain whether this source would produce the required 2.0 mgd of water needed for cooling and process water. For this reason, groundwater was not evaluated further for use as the Project's primary cooling and process water source. Further study would be required to confirm the availability of the required 2.0 mgd of water, prior to the use of groundwater as a backup or alternate source of cooling water.

### 2.1.3.3    Surface Water

Energy Answers evaluated the feasibility of extracting surface water from Río Grande de Arecibo, which is located west of the site. The Global Fibers Paper Mill, a former paper mill at the site, used surface water from the river for its process water needs. The paper mill ceased operations in 1996; its PRDNER water permit expired and the river intake structure was subsequently abandoned. Surface water from the Río Grande de Arecibo is currently diverted upstream of this location for treatment and delivery for municipal uses. Energy Answers reported that of the 102 mgd of water potentially available in the river system, 100 mgd were dedicated to delivery to the Vazquez WTP. Consequently, the ability to permit the withdrawal of water for Project purposes would be difficult given the ecological needs in the river system. For this reason, surface water was not evaluated further.

### 2.1.3.4    Brackish Water from Caño Tiburones

This alternative involved obtaining water from the Caño Tiburones estuary. Caño Tiburones extends eastward from the Río Grande de Arecibo to the Río Grande de Manatí as a western boundary and covers approximately 7,000 acres (2,832 hectares). In 1998, the government of Puerto Rico designated 3,428 acres (1,387 hectares) of the Caño Tiburones as a natural reserve to protect the island's largest wetland and its animal and flora species.

El Vigía Pumping Station was constructed in 1949 to provide drainage and control water levels at the Caño Tiburones. PRDNER operates a brackish water pumping system that contributes to the restoration of Caño Tiburones by minimizing saline intrusion in the wetland. As part of this pumping system, PRDNER currently discharges approximately 100 mgd of excedent brackish water into the Atlantic Ocean through El Vigía Pumping Station. The pumping system includes the pumping station located at El Vigía sector and the discharge channel that ends in an area adjacent to the Arecibo Yacht Club (*Club Náutico*). Currently there are two, 1,500 horsepower pumps operating in the station, each with capacity to pump 80,000 gallons per minute. These pumps are operated with two electric power generators.

Under this alternative, approximately 2.1 mgd (i.e., 1,460 gallons per minute) of brackish water would be pumped through a 14-inch diameter and 2-mile (3,200-meter) long force line to the plant (see **Figure 2-1**). This volume represents approximately 2 percent of PRDNER's daily discharge of brackish water into the ocean. The pumping proposed by Energy Answers would only apply to the excedent brackish water that PRDNER otherwise discharges daily into the outflow channel. This alternative would use brackish wastewater, thereby minimizing the use of potable water for facility operations.

### 2.1.3.5    Reclaimed Water from Arecibo Waste Water Treatment Plant

This alternative consisted of reusing water from the Arecibo's Waste Water Treatment Plant discharge. The Project's cooling and process water needs would require about 2.0 mgd of water with a water quality equal to or better than a typical effluent of a secondary waste water treatment plant. Therefore, discharge data for Arecibo Waste Water Treatment Plant was reviewed and analyzed to verify that this facility consistently discharges the amount of water required by the cooling and process needs. To meet the water quality standards required for the Project, additional treatment would be necessary to remove nutrients (such as phosphorous) to avoid problems such as biological growth and corrosion in the cooling towers. Development of this alternative would require a secondary treatment technology, a new pump station at the waste water treatment plant, and a 3.35-mile-long (5.4-kilometer-long) pipeline. Although this alternative would reduce the amount of effluent discharged to the Atlantic Ocean, the construction costs associated with the secondary treatment plant and pipeline resulted in higher costs than the proposed alternative. For this reason, reclaimed waste water was not evaluated further.

## 2.1.4    Alternative Fuel and Renewable Energy Resources

Renewable energy resources such as wind, solar, and biomass would promote fuel diversification on the island and allow PREPA to add to its renewable energy needs to meet the REPS. However, renewables such as wind and solar are variable energy resources with capacity factors less than 35 percent. As such, they do not provide a reliable or sustainable electrical energy

source that PREPA can dispatch as needed to meet its load requirements and add to the utility's needed reserve capacity levels.

A renewable biomass plant that burns wood or other organic matter could provide a reasonable alternative to the proposed Project because it would contribute to PREPA's renewable energy needs and add to the utility's reserve capacity levels. Renewable biomass facilities typically operate continuously and are capable of operating at relatively high annual capacity factors (from 70 percent to more than 85 percent). The construction cost of a renewable biomass facility could be comparable to or even less expensive than a WTE facility of the same size. However, operations of a renewable biomass facility are affected by the amount of feedstock available and the cost for acquiring and transporting the feedstock to the facility. Feedstock for a renewable biomass facility would most likely be commodity priced and would not result in any tipping fees. Although application of this technology in Puerto Rico and the available feedstock to fuel the facility could be further studied, it doubtful that enough wood or organic waste would be available to fuel the facility on a continuous long-term basis and at the scale of the proposed Project.

Other reasonable alternatives to the electrical energy to be produced by the proposed WTE facility include fossil fuel-fired generating units such as (1) baseload coal, fuel oil, or natural gas-fired steam units, or (2) facilities that typically burn fuel oil or natural gas and meet peaking load needs (i.e., diesel and gas combustion turbine units). These types of facilities would add to PREPA's reserve capacity levels because they would either be running on a nearly continuous basis with a relatively high capacity factor basis or they would be readily available to operate and be dispatched as needed. However, these types of generating facilities would not help the island to promote fuel diversification and decrease its dependence on fossil fuels nor would they contribute to the utility's renewable energy needs.

## 2.2     SELECTION OF PROPOSED ALTERNATIVE

NEPA requires that an EIS consider a full range of alternatives to the proposed action and fully evaluate all reasonable alternatives. In addition, the EIS must also consider the no-action alternative. Two alternatives are analyzed in detail in this EIS—Energy Answers' proposal to construct the Arecibo WTE and Resource Recovery Project and the no-action alternative.

### 2.2.1     No-action Alternative

Under the no-action alternative, RUS would not provide financial assistance to Energy Answers to construct the Project. For the purposes of this analysis under NEPA, RUS assumes that under the no-action alternative, the Project would not be constructed. The existing environment within the Project area would remain the same, and no land would be used for a WTE facility, ancillary facilities, transmission line, or a water pipeline. The residents of Puerto Rico would continue to have solid waste management disposal issues. In addition, electricity sources will continue to

rely on imported oil and coal resources. The no-action alternative does not meet the identified purpose and need for the Project.

The Dynamic Itinerary (discussed above in section 1.2.4, *Solid Waste Management and Capacity*) was developed to address the constraints on solid waste management on Puerto Rico and particularly the limitations on the capacity of the existing landfills. The Dynamic Itinerary capacity model evaluated three scenarios. Under the no-action alternative, solid waste management disposal pathways would most closely follow the Dynamic Itinerary's Do Nothing scenario and Back-up Case scenario.

The Do Nothing scenario shows the future available capacity in the event that there is no additional disposal or processing capacity added, and no growth in the diversion rates is achieved. The purpose of showing this scenario is to demonstrate what the remaining "useful life" is for the current management system as of 2006. The Do Nothing scenario shows that Puerto Rico would run out of disposal capacity by 2018, demonstrating the need for urgent actions in terms of planning and execution of waste management strategies.

The following assumptions were considered in the Do Nothing scenario:

- The diversion rate of 15.3 percent remains constant from 2006 to 2030.

- No alternative technology processing facilities are implemented during the period.

- Existing landfills use all of their remaining useful life before closing.

- No landfill expansions are implemented.

- Transfer of waste from closed to operating landfills is facilitated through the use of transfer stations.

- Additional disposal capacity associated with the new Peñuelas landfill, coming on line in 2010, is included.[8]

- The scenario uses the same waste generation projections as in the base case and back-up scenarios.

The Back-up scenario model projection primarily relies on landfill expansions and new transfer stations for long-term solid waste management (i.e., the diversion rate goal of 35 percent would be met in 2026 instead of 2016, and the alternative technology processing facility is never implemented). Under this scenario, eight landfills would be in operation in 2030 with 7.5 years of useful life left.

---

[8] The Peñuelas landfill started operating in 2011.

The following assumptions were considered in the Back-up Case scenario:

- The diversion rate in Puerto Rico begins at 15.3 percent in 2006 and reaches the 35 percent goal in 2026.

- No alternative technology processing facilities are constructed during this period.

- Existing landfills use all of their remaining useful life before closing.

- Seven landfills are expanded outside of their current footprint, including Cabo Rojo, Fajardo, Humacao, Juncos, Ponce, Peñuelas New, and Yauco for a total additional capacity of 70.6 million tons.

- The expansion for the Isabela landfill would be performed with the purpose of mitigating environmental conditions at the site and stabilizing the slopes of the landfill. This expansion was calculated in approximately 0.6 million ton.

- The transfer of waste from closed to operating landfills is facilitated through the use of transfer stations.

- The incoming capacity added by the new Peñuelas landfill, coming on line in 2010, is included. However, this landfill could begin operating because the construction phase of the landfill could start at any moment.[9]

The projection of the Do Nothing scenario demonstrates that Puerto Rico would run out of disposal capacity by 2018; under the Back-up Case scenario in 2030 there would be eight operating landfills with 21.1 million tons of availability capacity and 7.5 years of remaining useful life.

## 2.2.2      Arecibo Waste-to-Energy and Resource Recovery Project

This section describes the Arecibo WTE and Resource Recovery Project, including the proposed location, areas to be served, main components, preliminary construction schedule, security controls for the plant, flood design, contingency plans for emergency events, and off-site works necessary to: (1) supply brackish water for the cooling tower and steam production in the boilers, and (2) connection of the electricity produced at the plant to PREPA's electric distribution network.

The plant would be located in a site of approximately 79.6 acres (82 *cuerdas*[10]) of area, which formerly housed the Global Fibers Paper Mill. The site is located at Km 73.1 of State Road PR-2 (PR-2) of the Cambalache Ward in Arecibo. **Figure 2-1** shows the site and adjacent land on an

---

[9] The Peñuelas landfill started operating in 2011.

[10] In Puerto Rico, a cuerda is a traditional unit of land area equivalent to nearly 3,930 square meters or 0.97 acre.

aerial photograph. The industrial activity in the site began in the late 1950s and ceased in the mid-1990s.

The site is bordered on the north by 68.9 acres (71 *cuerdas*) of land belonging to Finca Santa Bárbara, owned by the Puerto Rico Land Authority and partly used for growing hay; on the south by 14.6 acres (15 *cuerdas*) of vacant land owned by the Puerto Rico Land Authority and the site of the former Central Cambalache Sugar Mill; on the west by the Río Grande de Arecibo; and on the east by PR-2.

The existing structures in the eastern side of the proposed Project site are steel frame structures, several of which have been abandoned. The existing topography is essentially flat and varies in elevation from 3.3 to 24.6 feet (1.0 to 7.5 meters) above mean sea level (msl). Five percolation ponds, which were part of the infrastructure previously used at the site to store stormwater and process water from the operation of the paper mill, are located in the west-northwest and southeast portions of the site. Artificial channels that run through the property were also created as part of the stormwater and process water drainage system. These artificial channels connect to another channel that runs along the northern boundary of the site and discharge into the Río Grande de Arecibo. Currently, the channels and ponds are not in use.

The Cambalache Ward—the site location—is located within the alluvial valley of the Río Grande de Arecibo where agricultural uses, industrial activities, and small isolated communities coexist. In the past, the former Central Cambalache Sugar Mill dominated land use in the area. In the early 1980s, 55 percent of the land was used for growing sugarcane, approximately 30 percent for rice cultivation, and 15 percent for cattle grazing. The main use of the land has remained agricultural (primarily to produce hay), although the former Central Cambalache Sugar Mill ceased operations in the early 1980s.

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017



**Figure 2-1.    Location of Proposed Plant, Water Pipeline, and Transmission Line**

The Project would use solid waste as the raw material for the production of energy. Because of its location, the plant would receive MSW from the municipalities along the north-central and north-western side of the island, as well as the mountain region (see **Figure 2-2**).



**Figure 2-2.    Planned Area of Raw Material Collection for the Production of Processed Refuse Fuel**

**Table 2-1** summarizes the estimated waste generation for the geographical area described above. It should be noted that even if the region reaches its 35 percent recycling target, a large amount of waste would remain that must be managed in an environmentally responsible and safe way. These projections do not take into account the quantities of waste that could be available as a result of future landfill closures, commitments with municipalities outside the indicated geographical area, or contracts with private carriers that could potentially use the Project to dispose of their waste. Energy Answers has entered into an agreement with the Puerto Rico Solid Waste Management Authority (SWMA or locally known as La Autoridad de Desperdicios Sólidos or ADS) for the delivery of municipal waste from the above described region to ensure the waste volume needed to produce 2,100 tons per day of processed refuse fuel (assumed 2,300 tons per day before removal of ferrous metals and non-combustible materials), which is need for the proposed Project to operate at its generation capacity.

Arecibo Waste-to-Energy Project
Final EIS                                                                                                                    January 2017

**Table 2-1.    Projected Sources of Raw Materials for the Processed Refuse Fuel from the Planned Area of Raw Material Collection**

| Year | Population Projections[a] | Solid Waste Generation Projection (tons/year)[b] | Solid Waste Generation Projection (tons/day) | % Recycling | Amount of Waste after Recycling (tons/day)[c] |
|------|------|------|------|------|------|
| 2012 | 3,667,084 | 1,602,449 | 3,480[d] | 14.7[e] | 2,985 |
| 2020 | 3,500,000 | 1,627,799 | 4,460[b] | 35[b] | 2,899 |
| 2025 | 3,500,000 | 1,644,732 | 4,506[b] | 35[b] | 2,929 |

[a] U.S. Department of Commerce (2012), Pew Research Center (2015)
[b] SWMA (2008)
[c] Energy Answers (2010)
[d] Energy Answers (2015)
[e] SWMA (2015)

**Figure 2-3** shows the schematic layout of the plant and other buildings on the property, while **Figure 2-4** shows a simplified energy and resource recovery flow chart. The Project would have the following main components:

- MSW receiving and storage
- Processed refuse fuel processing and storage
- Processed refuse fuel combustion in spreader-stoker boilers
- EPA-permitted emission control system, monitoring system, and filing of periodical reports
- Management and recovery of combustion residues
- Production of alternative renewable energy (steam and electricity)
- Water use for operation (cooling, process, and boilers)
- Capability to manage alternative fuels
- Rehabilitation of an industrial site and building construction
- Process automatic control systems

Once produced, the processed refuse fuel would be fed to one of two identical process lines, each with capacity of 1,050 tons per day. The process would use the following sequence of units or equipment: (1) processed refuse fuel feed line; (2) spreader-stoker boiler with a design heat input rate of 500 million British thermal units (BTU) per hour; (3) activated carbon injection system to remove heavy metals and dioxins/furans; (4) Turbosorp® dry scrubber that removes acids by injecting lime in a fluidized bed; (5) fabric filters (baghouse) to control particulate emissions, including metals; (6) ammonium hydroxide injection system followed by regenerative selective

catalytic reduction unit to reduce emissions of nitrogen oxides; (7) induced draft fan, and (8) stack.

Steam from the boilers would be used to generate electricity using a turbine generator. As a result, enough electricity would be produced for in-plant usage and for sale to PREPA. Each boiler would have three auxiliary burners that use fuel no. 2 (ultra-low sulfur distillate) for startup and shutdown and, when and if necessary, to maintain temperature in case of short term interruptions of processed refuse fuel feed.

In addition to processed refuse fuel, the Project could handle any of the following alternative fuels: automotive shredder residue, tires or tire derived fuel, and processed urban wood waste. Only one alternative fuel could be combusted at any time, and only when well blended with processed refuse fuel. The amount of these wastes that could be used would be confirmed through performance tests and would be included in the federal and local plant emission control permits, as applicable.

The plant would consist of the following components (see **Figure 2-4**):

- Component 1: Receiving solid waste

  o A reduction in the amount of solid waste generated by communities, industry, and government would be actively promoted through programs to reduce, recycle, and compost.

- Component 2: Production of processed refuse fuel

  o Solid waste arriving at the plant would be weighed, unloaded, and inspected.

  o Non-ferrous metal would be separated, ferrous metal would be recovered using industrial magnets, and the remaining solid waste would be shredded to form the processed refuse fuel.

- Component 3: Power generation

  o In the third stage the combustion of processed refuse fuel takes place in spreader-stoker boilers that produce steam and generate electricity using a steam turbine.

  o Energy Answers' patented technology includes the use of grates in the boiler, where a stream of distribution air would blow the processed refuse fuel into the boiler to stimulate the more efficient suspended combustion, which in turn results in a reduction in ash generation.

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017

- Component 4: Metal and ash recovery

  o The process would generate two types of ashes (fly ash and bottom ash), which would represent approximately 20 percent (by weight) of the processed refuse fuel generated at the plant.

  o It is at this stage that the Emission Control System evaluated and approved by EPA is activated. This Emission Control System constitutes the Maximum Achievable Control Technology (MACT) and the Best Available Control Technology (BACT).

  o It is at this stage that the conditioning of fly ash occurs, resulting in a material that has been consistently proven as non-hazardous by analytical methods (Toxicity Characteristic Leaching Procedure, TCLP), has a consistency similar to that of mortar, has the capacity to harden as cement, and has been found able to be effectively reused or safely disposed of as a landfill cover material.

  The bottom ash, once collected, will be processed through a proprietary Energy Answers technology that produces Boiler Aggregate™. This aggregate has been effectively used as a material that allows the ventilation of landfill gas, for road paving and other construction-related products.



**Figure 2-3.    Site Plan and Building Layout**



**Figure 2-4.     Simplified Power Generation and Resource Recovery Process Flow Chart**

As shown in **Figure 2-5**, the proposed Project would recover approximately 80 tons of ferrous metals, 8 tons of non-ferrous metals and 184 tons of bottom ash (boiler aggregate). Of the 2,100 tons per day of processed refuse fuel that enters the boilers, 184 tons would be captured as bottom ash and 246 tons would be captured as conditioned fly ash (mixed with hydrated lime) resulting in a reduction of 1,686 tons per day of waste from entering the landfills.



**Figure 2-5.  Material Flow Diagram**

### 2.2.2.1    Receiving and Handling of Processed Refuse Fuel Raw Material

The MSW material would arrive daily at the plant by trucks, which vary in type and size, and would be weighed on scales located at a weigh station. From the weigh station, incoming trucks would be directed to the enclosed, ventilated MSW tipping and storage area for inspection.

The storage area would be designed to store approximately 6,000 tons of MSW. In this area, readily recyclable waste along with waste that cannot be processed or accepted for processing would be separated from acceptable waste. Waste that is deemed acceptable and can be processed would be shredded to produce the processed refuse fuel. Waste that cannot be accepted or processed would be rejected and re-directed to the weighing station before leaving the plant and being transported to a licensed facility for disposal or to recycling markets. According to data from the SEMASS Plant, about 1 percent (by weight) of the initial waste received at that facility was non-processable or unacceptable material (which was removed prior to processing).

Readily recyclable waste (that is present in large quantities and is easily discernible and separable), such as bulk old corrugated cardboard or white goods, would be removed in the designated sorting stations and stored for recycling and sale locally or internationally. As part of the plant operation, a quality control program would be implemented to prevent the delivery of unacceptable waste to the Project. Unacceptable materials would be rejected at the time of inspection. The non-processable material would be separated and transported to consumer markets or a licensed facility for disposal. Acceptable and unacceptable materials are described below:

- **Acceptable materials** would be processed into processed refuse fuel and include materials that have the typical characteristics of household waste collected as part of MSW collection programs, commercial/retail waste, and non-hazardous solid waste from industrial facilities.

- **Unacceptable materials** would not be processed into processed refuse fuel and consist of, but are not limited to, radioactive materials, explosives, hazardous waste, biomedical waste, liquids, motor vehicles except automotive shredder residue[11], trailers, boats, biological waste, pathological waste, infectious and chemotherapy waste, agricultural machinery, vehicle batteries, cathode ray tubes, fluorescent lamps, thermostats or any other material that can be hazardous or pose a substantial threat to health and safety, or has a reasonable possibility of adversely affecting the plant in any way.

- **Non-processable materials** cannot be processed at the plant because of their size or type.

### 2.2.2.2    Production and Storage of Processed Refuse Fuel

The MSW would be converted into processed refuse fuel using two process lines consisting of slow speed shear shredders followed by ferrous metal separators. This system would operate for a period of 24 hours per day, 7 days a week. While two shredders are required for operation, three will be provided, so that one unit will always be undergoing maintenance or be in a standby mode to back up the two operating shredders. The operation would begin when the loader collects the MSW and places it in the vicinity of stationary grapple cranes that feed the shredders. After shredding, the material would be discharged onto conveyor belts, where a magnetic separator would remove a large portion of the ferrous material. Conveyors would carry the processed refuse fuel to the processed refuse fuel storage building. The processed refuse fuel would be stored adjacent to the MSW receiving building, in a building that would contain a structure at least 25 feet (7.6 meters) high to store up to 6,000 tons of processed refuse fuel, equivalent to approximately 3 days of operation. The plant would be designed to combust processed refuse fuel with an average heat content of 5,700 BTU/pound, within a range of 4,600

---

[11] Automotive shredder residue is currently considered a supplementary fuel in the EPA PSD permit; however, Energy Answers must conduct a demonstration consistent with the PSD permit to incorporate automotive shredder residue into the processed refuse fuel stream.

to 7,600 BTU per pound; an average moisture content of about 25 percent and approximately 20 percent of inert material.

### 2.2.2.3    Processed Refuse Fuel Combustion

Using loaders, the processed refuse fuel would be transferred from the storage area to a reclaim conveyor system for transport to the storage bins that feed the two boilers. Each boiler would receive processed refuse fuel at a nominal rate of approximately 44 tons per hour. The conveyor belts in the processed refuse fuel storage area would be variable speed to allow the proper delivery rate of processed refuse fuel to each of the processed refuse fuel feed systems.

Once in the boiler feed chutes, the processed refuse fuel would fall by gravity to a point about 6 feet (1.8 meters) above the boiler grate where it would be blown into the boiler by a stream of distribution air. Lighter materials would burn in suspension, while heavier portions of the processed refuse fuel, including the non-combustibles, would drop to the rear of the grate where burnable, heavier material would be burned. The grate would move from the back to the front of the boiler at a speed adjusted to allow time for complete processed refuse fuel burnout. After final burnout, the ash would drop into the bottom ash hoppers (devices for the management of granular or pulverized material) where the dry ash would be continuously removed via a bottom ash removal system located below the boiler ash hoppers. **Figure 2-6** provides an illustration of the process of combustion of processed refuse fuel in the boiler.



**Figure 2-6.    Processed Refuse Fuel Combustion in Spreader-Stoker Boiler**

Steam would be produced in each steam generator (boilers) from the heat generated by the combustion of processed refuse fuel. Each steam generator would consist of a waterwall boiler, superheater, steam and mud drums, economizer, and air heater. The superheater assembly would consist of a primary superheater, followed by a desuperheater complete with spray internals and then a final superheater. The main steam system would transport high-pressure, superheated steam from the superheater outlets to the turbine inlet for the generation of electricity. The boilers would be designed to use No. 2 fuel (ultra-low sulfur distillate) that would be used during startup and shutdown and to maintain system temperature at 1,500°F (800°C) during short-term

plant upsets. Fuel would not be used for power generation. Under normal operation, combustion air for the boilers would be drawn from the MSW and processed refuse fuel receiving and storage areas by a forced draft fan supplying air to the windbox under the grate to the plenum chambers. This design would serve to minimize the emissions of fugitive dust and odor from the plant.

### 2.2.2.4    Design Parameters

The plant would be designed to process approximately 2,100 tons per day of processed refuse fuel with a heat content of 5,700 BTU per pound and would have the capacity to manage alternative fuels and to generate steam and electric power. Each boiler would have a design heat input rate of 500 million BTU per hour, which translates to an approximate processed refuse fuel feed rate of 44 tons per hour per boiler. The maximum short-term operating level of each boiler would be equivalent to 110 percent of the design capacity, and the minimum would be 60 percent. Each boiler unit would have a nominal production capacity of 359,779 pounds of steam per hour at 830°F and 850 psig at discharge of first superheater stop valve, and the Project would have the capability of extracting some steam for sale at 250 pounds per square inch gage (psig) or condensing all of the steam for reuse using a four cell cooling tower.

### 2.2.2.5    Emission Control System

The design and operation of the emission control systems would meet EPA-applicable standards, such as the Standards of Performance for New Stationary Sources and the Best Available Control Technology (BACT) requirements as described in the EPA Prevention of Significant Deterioration (PSD) permit. In addition, Maximum Achievable Control Technology (MACT) emission limits apply for the substances included in the federal permit known as PSD and the local permit known as the Puerto Rico EQB Rule 405.

Four independent emission control systems are proposed for each boiler and would consist of the following:

- An activated carbon injection system to remove heavy metals and dioxins/furans

- A Turbosorp® dry circulating fluid bed scrubber system to remove acid gases from the boiler flue gas with lime injection

- A fabric filter (baghouse) to control particulate emissions (including metals)

- A regenerative selective catalytic reduction (RSCR) system (including an oxidation catalyst and selective catalytic reduction modules) to reduce emissions of nitrogen oxides ($NO_x$)

- A drift eliminator to control the particulate emissions from the cooling tower

These technologies qualify as MACT and BACT. The Turbosorp® system would remove acid gases, primarily hydrogen chloride and sulfuric acid, from the boiler flue gas. The principle of the Turbosorp® dry scrubbing technology is to bring together high levels of solid circulation,

finely atomized water, hydrated lime, and flue gas within a circulating bed reactor. Lime and finely atomized water are injected independently into the turboreactor to lower flue gas temperatures and enhance absorption capacity. The fluid bed material is composed of solids, including calcium hydroxide, recirculated fly ash from the combustion process, and solid reaction products from the fabric filter. Upon leaving the turboreactor, the solid particles are separated from the flue gas in a baghouse and recycled back to the reactor. Following the fabric filter, the flue gas is injected with an aqueous ammonia solution and enters the RSCR and then an induced draft fan, which would be connected to the stack.

Each air quality control system would include a complete system for the storage of the Turbosorp® and the RSCR reagents, hydrated lime and aqueous ammonia, respectively. Aqueous ammonia solution would be stored in a 12,000-gallon storage tank. Lime would be stored in a silo with a bin vent filter to control particulate emissions. The proposed air quality control system would be equipped with devices that would continuously monitor the following parameters: $NO_x$, CO, sulfur dioxide ($SO_2$), and $CO_2$. Numerous other pollutants would be monitored monthly or annually, with special initial monitoring required during the first year of operation (refer to EQB Construction Permit for a detailed list of the monitoring requirements).

The continuous emission monitoring systems equipment would be designed and operated in conformance with the performance specifications of 40 CFR §60, Appendix B, as referenced from 40 CFR §60, Subpart Eb. The plant would have a dedicated computer system to accumulate and process monitoring data from the stack gas monitors and boiler operating data. It would be instrumental for preparing reports of stack gas emissions as required by EPA and EQB. The data also would be shared by the digital control system of the plant for performance monitoring. The plant stack would have a maximum height of 351 feet (107 meters) from ground level in accordance with Good Engineering Practices. Federal Aviation Administration requirements for stack lightning would be incorporated into its design, which also would include platforms and access paths for emission monitoring.

### 2.2.2.6    Management and Recovery of Combustion Residues

Processed refuse fuel combustion would result in the generation of the following two types of ash:

- Bottom ash, which is the heavier, coarse fraction of the ash that remains on the boiler grate and is collected at the bottom of the boiler

- Fly ash, which is the lighter, finer fraction of the ash that is carried by combustion gases to the air pollution control equipment where it is removed

These two ash streams represent a total of approximately 20 percent (by weight) of the processed refuse fuel that would be processed at the plant. Bottom ash, after separating out the recoverable metals and adding conditioning water would comprise 270 tons per day (12.9 percent of the 2,100 tons of processed refuse fuel) while fly ash (combined with hydrated lime and activated

carbon solids as part of the air pollution control system, and with the addition of conditioning
water) would comprise 200 tons per day (9.5 percent). Because the two ash streams have
different characteristics, they would be collected and managed separately, as noted below:

- Fly ash handling system—Fly ash would be collected from the air heater hoppers,
  Turbosorp® hoppers, and fabric filter hoppers using drag flight conveyors and then
  transported into a storage silo.

- Bottom ash handling system—Each boiler would be equipped with four bottom ash hoppers
  and four siftings hoppers, which would discharge into a bottom ash discharge conveyor
  located at each hopper outlet.

The bottom ash hopper would discharge onto two collection conveyors passing under each
boiler. Each of the common redundant collection conveyors would have a design conveying
capacity of 125 percent to 150 percent, based on the maximum hourly design and production rate
of both boilers discharging to the same conveyor.

Fly ash would be conditioned with the addition of a conditioning agent (if required) and water.
The process is expected to result in a material that is considered nonhazardous based on Toxicity
Characteristic Leaching Procedure testing.

Energy Answers proposes to dispose of the fly ash waste in an authorized landfill in compliance
with the applicable legal requirements. The bottom ash would be conveyed from the boilers to
the ash processing building where it would be processed by separating it into three components:
ferrous metal, non-ferrous metals (e.g., aluminum, brass, and copper), and a granular material
known as Boiler Aggregate™. Energy Answers states Boiler Aggregate™ has been
demonstrated to have useful applications as a substitute for conventional aggregate in asphaltic
underlayment and other construction-related products (PRIDCO 2010); however, as of this
writing, Energy Answers plans to send the material to an authorized landfill, until such time as
testing of the actual ash produced demonstrates it complies with applicable environmental and
commercial requirements and its reuse receives regulatory approval.

### 2.2.2.7    Electric Power Production

The steam turbine would be a single-casing, single-flow extraction machine with three
uncontrolled and one controlled extraction and a downward or axial exhaust. The turbine would
be directly coupled to an electrical generator that operates at 3,600 revolutions per minute and
would be sized at 110 percent of the rated flow of both boilers. Turbine throttle conditions would
be 850 pounds per square inch and 830°F (440°C). The generator would be specified to produce
approximately 79 MW. Electric power exported from the proposed Project would be transmitted
through a switchyard to PREPA transmission system. The main and auxiliary transformers
would be located at the Project's electrical switchyard, located south of the power central
structure or powerhouse, and would be equipped with containment dikes to retain oil in the event

of leakage. The electrical switchyard also would contain a circuit breaker, a disconnect switch, provisions for electric power metering and other interconnection criteria. A takeoff tower would provide the interface with the transmission line. The necessary power for the proposed Project would be provided by an auxiliary transformer, which would receive power from the switchyard. The auxiliary transformer would be sized so that it would be capable of providing auxiliary power during normal, startup, and shutdown operations. The auxiliary transformer would supply the 4.16-kV switchgear, which would be the distribution source for all large motors, the 480 kV load centers and motor control centers, and all other station loads.

### 2.2.2.8    Water Supply for Plant Operation

Brackish water would be obtained from the PRDNER El Vigía Pumping Station discharge into the Atlantic Ocean, through a force line to the plant for process and cooling water. The brackish water will be stored on-site in a brackish water storage pond with a capacity of approximately 5 million gallons, which will feed into a cooling and process water storage tank with the capacity of 700,000 gallons. The brackish water storage pond will be lined with a high-density polyethylene (HDPE) liner. The plant cooling water system also would require chemical controls to prevent the formation of solid deposits and control corrosion, oxygen content, and pH of the water and steam. These chemicals are typically provided by the chemical supplier in portable totes or drums, and added at low level concentrations (parts per million) to the cooling water cycle. All treatments of process water would occur downstream of the storage pond, in the closed loop piping and vessels of the facility's treatment and distribution system. Potable water would be supplied to the demineralizer system to provide high-purity demineralized boiler makeup water as required to maintain boiler system performance. The demineralized water supply for the system would offset the boiler blow down (typically 1 percent of the steam production rate) necessary to maintain required steam quality and cycle performance. Deionized water also would be produced, which could be used for cleaning the equipment inside the steam cycle and for cleaning and maintenance of the demineralization system.

The demineralization system would be a three-stage process, based on reverse osmosis membrane technology: (1) pretreatment particulate filtration and dechlorination with either granular activated carbon adsorption and chemical dechlorination; (2) reverse-osmosis demineralization; and, (3) final demineralization "polishing." Plant ancillary systems would include backwash and cleaning systems, chemical injection systems and possibly an ion exchange regeneration system using sulfuric acid and sodium hydroxide solutions. The exact system configuration and optimization are highly sensitive to service water quality. Further characterization would be conducted during the Project design phase to refine the indicated treatment scheme to minimize water use, chemical use, and wastewater generation. A steam cycle and water analysis system would be provided, consisting of a sampling panel with coolers, valves, pressure and temperature gauges, continuous sample analyzers and local grab sample

Arecibo Waste-to-Energy Project
Final EIS                                                                                January 2017

connections. Sample points include boiler drum saturated steam, boiler drum water, feed water to the economizer inlet, and condensate to the deaerator.

### 2.2.2.9    Supplementary Fuels

As per the approved PSD Permit, the plant may also use supplementary fuels, including automotive-shredder residue, tire-derived fuel, and processed urban wood waste if it is blended with the processed refuse fuel (only one supplementary fuel type at a time may be used). Prior to using any supplementary fuel, Energy Answers must conduct a combustion demonstration program to verify the efficiency of the municipal waste combustor units' air pollution control equipment in reducing the air pollutants resulting from the combustion of the supplementary fuels and must submit to EPA a report that documents the results of the trial program. Once the combustion demonstration program has been successfully completed, the use of the supplemental fuels will be governed by the conditions established in the PSD permit which limit their use to only one supplemental fuel at a time. The maximum daily amounts of supplementary fuels for the two combustors (combined) are:

- Tire-derived fuels: 330 tons per day

- Auto-shredder residue: 268 tons per day

- Processed urban wood waste: 898 tons per day

### 2.2.2.10    Main Plant Buildings

The plant would consist of the following main buildings, which follows the same sequence as the schematic site plan (**Figure 2-3**):

- MSW receiving and processing building for MSW receiving and processing areas, where trucks would deposit waste; readily recyclable, unacceptable, and non-processable materials would be removed; and acceptable materials would be shred to produce processed refuse fuel

- Processed refuse fuel storage building

- Adjacent buildings that would house the two spreader-stoker boilers, steam turbine, and employee facilities (e.g., cafeteria, dining room, training area, and dressing room)

- Ash processing building where fly ash would be conditioned and processed prior to disposal; bottom ash would be collected and processed to separate and recover ferrous metals from nonferrous metals and to produce Boiler Aggregate™

- Warehouse

- Existing former paper mill building

- Administrative building

### 2.2.2.11   Safety Controls

The plant would have control systems whose main goal is to promote plant and staff safety during operations, both on the site and in the surrounding areas. Security controls to be implemented are described below:

**Fire Protection System**

The main objective of the fire protection system is to provide the plant with an adequate detection and alarm system and a means for controlling and extinguishing fires. The fire protection system would be developed according to the requirements of the Puerto Rico Fire Department and the Puerto Rico Human Safety and Fire Protection Code and would follow the guidelines of the National Fire Protection Association. In addition, local fire protection codes would be incorporated into the design of the plant.

The fire protection system would be a loop-type distribution system designed to service the main buildings of the project. It would consist of a water fire main around the plant servicing a yard hydrant system and sprinkler, deluge and standpipe systems within the various buildings. A jockey pump and redundant fire pumps would be installed to boost the pressure and flow as necessary.

Isolated structures, such as the administration building, may be served directly from the municipal water supply. Fire hydrants would be located at approximately 250-foot (76-meter) intervals. Hose cabinets would be located adjacent to yard fire hydrants. Post-indicating valves and/or underground valves with roadway boxes would be furnished to isolate sections of the yard main and individual building supplies. The source of water for the fire systems would be the raw water storage tank. The water system would be supplemented by portable extinguishers throughout the plant, in accordance with the current applicable regulations.

A detection and alarm system would be designed as part of the fire protection system and would meet the requirements of the National Fire Protection Association. The fire alarm system would actuate the audible alarms required for building evacuation signals. Three hundred thousand gallons of water would be stored at all times and reserved for the fire protection system.

**Control Systems**

MSW processing operations and boiler and the power block operations would be monitored and controlled from a central control room in the power block building. Ash processing would be controlled from the ash processing building. Pan/tilt/zoom cameras would be provided at the MSW and processed refuse fuel storage areas that also can monitor the storage transfer belt conveyor discharge. The fuel feed system to the boilers would be provided with one camera at each boiler feed conveyor.

A distributed control system would provide overall plant control and monitoring functions. The distributed control system would include microprocessor-based process control units and redundant data. The distributed control system microprocessor control units would be redundant, with diagnostics to alert the control room operator of a malfunction. Separate programmable controllers would be provided for packaged equipment such as the water treatment system, lime slurry preparation and fire protection.

A burner management system would be provided to supervise the operation of the boiler auxiliary natural gas burners. The burner management system would include boiler purge, burner light-off, burner shutdown, burner safety, and overall management of these features. The burner management system would conform to National Fire Protection Administration standards.

The turbine would be controlled by an electro-hydraulic governor system with operator interface from the main control room. Generator controls for synchronization, voltage regulation, and generator breaker operation would be hardwired for control from the main control room. Unit protective functions would be directly wired to turbine trip, boiler trip, electrical lockout relays, etc., with a minimum of interposing relays or solid-state devices in the circuit. Other self-controlling loops, such as feed water heater drain control, would be local to equipment.

Equipment requiring periodic actuation while the plant is in normal operation, such as conveyors, burners, and other load-dependent equipment, would be controlled from the main control room while the plant is operating. Two operator stations would be provided as part of the main control room console. Boiler and turbine panel inserts would be supplied and integrated into the main control room auxiliary panel. Printers and engineers' work stations would be provided for performing program modifications. The operator would be alerted to abnormal conditions by LCD station displays and by alarm printer(s). The LCD stations would have access to all the information transmitted on the data network. The distributed control system also would provide specific shift and daily logs to augment the operator's log. These would be automatically printed or printed upon demand. The operator also would be able to create additional logs. These logs would summarize fuel consumption, lime reagent, power, and water usage.

**Ventilation and Air Conditioning Systems**

Designated zones of the plant would be equipped with a ventilating and air conditioning system where necessary to provide an environment suitable for personnel and/or equipment operations, with consideration to maintaining acceptable conditions of temperature, humidity, filtration, fresh air supply, pressurization, air movement and exhaust removal of vitiated or contaminated air. Outside ambient conditions of temperature and relative humidity would be used for design of the system. MSW, processed refuse fuel, and ash processing, storage and equipment areas would not be air conditioned but would have ventilation systems designed for dust and odor control.

## 2.2.2.12    Education Program

Energy Answers would conduct an education program to prevent delivery of unacceptable and non-processable wastes to the plant. A brochure would be prepared for distribution to schools and residential areas to alert and educate the public of the proper way to handle and dispose of household hazardous waste. A separate brochure would be prepared for commercial, industrial, and institutional customers identifying the unacceptable wastes that should not be delivered to the plant and alternative means of disposal of such wastes. Depending on availability, Energy Answers proposes to provide presentations to students in science and environmental courses and training schools, regarding recycling and proper disposal of solid waste. All waste haulers would be advised about unacceptable wastes and would be required to sign statements that they are not collecting and delivering such wastes to the site. Warning signs and listings of unacceptable waste materials would be located near the main gate and ahead of the incoming truck scales. During the first few months of operation and periodically thereafter, the scalehouse operator would query drivers to determine if their waste loads contain unacceptable waste. All known loads consisting of unacceptable waste would be rejected.

## 2.2.2.13    Municipal Solid Waste Inspection Program

Several measures would be taken at the site to inspect the incoming waste stream for the presence of unacceptable and non-processable waste. The scalehouse would be equipped with radiation detectors just ahead of the incoming scales to screen all truck deliveries for radioactive waste. If the alarm sounds, further inspection of the load would be conducted. Upon confirmation of the presence of radioactive waste, the load would be rejected and the appropriate authorities notified.

Waste delivery trucks which have been properly identified, screened and weighed-in would proceed to the MSW tipping area to be unloaded. Loads would be visually inspected during unloading onto the tipping floor. Random inspections of vehicles also would be conducted to detect unacceptable and non-processable items. Waste loads deemed unacceptable by the operations personnel would be rejected, and the driver would be issued a written rejection slip. A record would be maintained of unacceptable waste deliveries, by delivery vehicle, and repeated deliveries by a particular vehicle or by a particular waste hauler would result in a prohibition of future deliveries to the plant. Special handling procedures would be implemented in the event of returned waste, and vehicles carrying rejected waste would be weighed out before leaving the site.

Specific procedures for the management of hazardous waste that inadvertently arrives at the plant would be developed in accordance to a Plant Operation, Management and Safety Manual. An extensive training program would be provided for the waste receiving area attendants and frontend loader operators so they can inspect for and remove unacceptable and non-processable waste materials from the waste stream that has been unloaded and accepted. The operators of the

grapple cranes that feed the shredders would provide additional inspection of the acceptable waste stream. Unacceptable materials discovered in the acceptable waste stream would be removed and stored in a designated area of the MSW tipping area, to be loaded into a container or transfer trailer for shipment to licensed disposal facilities. Non-processable items discovered in the acceptable waste stream would be removed or recovered, if possible, or disposed of in accordance with applicable regulations.

### 2.2.2.14   Household Hazardous Waste Collection

Energy Answers would encourage and work with municipalities that the plant serves to conduct "hazardous waste days," for the special collection of household hazardous wastes, through contract agreements with the concerned municipalities. Energy Answers would work with communities and licensed hazardous waste disposal contractors to establish such collection programs and/or drop-off programs at the plant. As soon as the program is implemented, it would be published in the residential and commercial brochures.

## 2.2.3     Flooding

The Río Grande de Arecibo is located west of the site that has been proposed for the development of the plant. Based on the Flood Insurance Rate Map (FIRM), Panel 230J of November 18, 2009, the site is located in a Zone AE within the floodway of the Río Grande de Arecibo, with a base flood (100-year) elevation of 17.06 feet (5.2 meters) above msl.

Energy Answers conducted a Hydrological-Hydraulic Study to determine Río Grande de Arecibo flood levels for the 10-, 50-, 100-, and 500-year events and to revise the limits of the floodway within the site, taking into account the existing topography and model estimates. The study provides the hydraulic modeling and required documentation to request from the Federal Emergency Management Agency (FEMA) and the Puerto Rico Planning Board an amendment to the floodway limits. The model was prepared to determine the new floodway limits for a 100-year event, where regulatory limits and the new floodway limit were analyzed. The new floodway limits were determined along Río Grande de Arecibo based on the highest allowable increase of 0.3 meters in flood level.

## 2.2.4     Stormwater Management

In addition to the flooding analysis, a preliminary assessment of the stormwater retention capability of the site was conducted for compliance with Section 14.0, Stormwater Management, Planning Regulation No. 3, *Planning Board Subdivision and Urbanization Regulation*. The peak stormwater discharge produced by the site in its existing and proposed states was preliminarily determined. Stormwater discharge generated by the proposed development shall not exceed the existing discharge. The assessment consisted of a hydraulic modeling of the site to determine the dimensions of the ponds that would limit the proposed peak discharge, so that it does not exceed the existing peak discharge for storms with different recurrences.

Two retention ponds, each approximately 6.6 feet (2 meters) deep, are proposed to be located in the northwest and southwest corners of the Project site. However, the final dimensions of the ponds would be defined during the design of the Project. Preliminarily, the Project has been divided into three drainage areas. The stormwater discharge would be directed to the two ponds, using the Project's final slopes to direct runoff as surface flow into the ponds. The stormwater discharge would keep the existing drainage pattern and would reduce the Project peak discharge, in compliance with Puerto Rico Planning Board Regulation No. 3, *Subdivision and Urbanization*.

## 2.3      UTILITY SUPPORT WORKS

The Project would require the completion of utility work to bring brackish water to the plant and to connect the electric power produced by the plant to the PREPA network. In addition, the plant would be connected to PRASA's water line and sanitary trunk located on PR-2 adjacent to the Project site. Following are the details of the proposed utility work.

### 2.3.1      Brackish Water Pumping and Transfer Pipeline

PRDNER operates a brackish water pumping system that contributes to the maintenance of Caño Tiburones by helping to manage saline intrusion into the wetland and by protecting regional farms, roadways, and residences from flooding. As part of this pumping system, PRDNER historically pumps between 30 and 100 mgd of brackish water into the Atlantic Ocean through El Vigía Pumping Station and has the capacity to pump up to 150 mgd, if required. In addition to this pumping capacity, the El Vigía Pumping Station discharges brackish water twice daily during low tides through gravity flow. The pumping system is composed of the pumping station located at El Vigía and the discharge channel that ends in an area adjacent to the Arecibo Yacht Club. Currently, two 1,500-horsepower pumps operate in the station, each with capacity to pump 80,000 gallons per minute. These pumps are operated with two diesel powered electric generators. The pumping station has two aboveground storage tanks with capacities of 5,000 and 280 gallons (i.e., daily tank) to store the diesel fuel used by the generators.

Approximately 2.0 mgd (i.e., 1,390 gallons per minute) of brackish water would be pumped through a 14-inch-diameter (35.56-centimeter-diameter) and 1.98-mile-long (3,200-meter-long) force line to the plant (see **Figure 2-1**). This volume represents a small percentage of PRDNER's average daily pumped discharge of brackish water into the ocean (not including the daily discharge to the ocean associated with gravity flow). The withdrawal proposed by Energy Answers would be from the brackish water that PRDNER discharges daily into the dedicated channel, and not in addition to that water. PRDNER and Energy Answers have signed an agreement confirming the validity of the proposal to the use of the brackish water from its daily discharge. In addition to making the necessary modifications required for pumping water for Project purposes, the agreement requires Energy Answers to make additional improvements to the El Vigía Pumping Station (e.g., deferred maintenance like new paint, dredge sediment from

pump pits, install trash racks and flow meters, etc.) and become responsible for routine maintenance of all pumping and support systems located in the station.

The brackish water line to the plant would be located in the pump station downstream of the sluice gates that constitute the PRDNER extraction point. Two pumps with pumping capacity of 1,460 gallons per minute each would be installed to transfer brackish water to the plant. These pumps would work alternately and would be backed up by an emergency generator of up to 100 horsepower capacity that would maintain operation in the event of interruptions in PREPA's electrical service. The emergency generator would use diesel fuel that would be stored in an aboveground storage tank with a secondary containment system, as required by the current regulations.

The force line would be installed along the right of way of State Roads PR-681, PR-6681, and PR-2 to the plant. The line would be installed in a trench at a depth of 4.1 feet (1.25 meters) beneath the existing street level. Approximately 5,886 cubic yards (4,500 cubic meters) of material would be excavated for the proposed trench, and approximately 65 percent of this amount would be reused to refill the trench. In addition, selected fill material would be used for the installation of the pipeline.

The existing infrastructure in these state roads was identified, and no impediment is expected for the installation of the proposed pipeline. The proposed route would cross the existing bridge at PR-681 (near the Arecibo Yacht Club), with the pipeline running attached to its right side in the direction of PR-2. Currently, no pipes are installed on that side of the bridge, so support structures for the installation of the brackish water line would be needed. As part of the installation of the pipeline, a Maintenance of Traffic Plan would be prepared and submitted to the Highway and Transportation Authority, outlining the security and operational measures that would be established and implemented during this process so that temporary impacts to traffic would be minimal.

## 2.3.2    Power Transmission Line and Improvements to Existing Substation

The proposed Project would produce 79 MW of electric power. Approximately 67 MW would be sold to PREPA through a purchase agreement and delivered at the Project interconnection point.

To determine the best route for the transmission line to the existing substation, parameters such as the distance from the Project interconnection point, parcel owners of adjacent properties, adjacent land use, existing utility easements, flooding areas, wetlands, and the costs associated with the construction of the electrical system were considered. PREPA evaluated several interconnection alternatives for the proposed Project and determined that the preferred electrical interconnection point would be the Cambalache Transmission Center, located approximately 0.5 mile (804 meter) south of the plant site. The power would be transmitted from the proposed

Project at 115kV and would connect to the high voltage side of PREPA's 115 kV to 38 kV transformer located at the Cambalache Transmission Center.

Of the evaluated alternatives, the best route was determined to be a feeder or dual conductor simple circuit line. The aerial feeder line leaves the plant heading south and would run parallel (with an easement of approximately 25 feet [7.62 meter] wide) to the west side of the PR-2, up to the southern boundary of the former Central Cambalache Sugar Mill where it would continue west until reaching the Cambalache Transmission Center. The aerial power line would run on steel poles that would be approximately 70 feet (21.5 meter) above ground level and have a span length of 150 feet (45.7 meters) apart.

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017

This page intentionally left blank.

# 3.0    PRESENT ENVIRONMENT AND EFFECTS OF ALTERNATIVES[12]

In this section, we address each affected environmental resource. For each resource, we first describe the affected environment—the existing condition and baseline against which to measure the effects of the proposed Project and then the environmental effects of the proposed Project, including proposed mitigation measures. The following resources are analyzed in this section: Soils and Geology, Water Resources, Air Quality, Biological Resources, Land Resources, Visual Resources, Acoustic Environment, Transportation, Cultural Resources, Public Health and Safety, and Socioeconomics. The following resources were eliminated from consideration: Recreation Resources.

## 3.1    SOILS AND GEOLOGY

### 3.1.1    Affected Environment

#### 3.1.1.1    Geology and Topography

**Regional Geologic and Topographic Setting**

Limestone constitutes the underlying geology of approximately 28 percent of the island of Puerto Rico. The island's north coast is underlain by a formation known as the north coast limestone region, or Karst Belt (USDA 2001), with limestone formations in the region reaching top elevations of 1,739 feet (530 meters) above msl. This region extends for approximately 87 miles (140 kilometers) in an east-west direction along the north coast with a maximum width of about 14 miles (22 kilometers) near Arecibo (Monroe 1976). The underlying limestone stratigraphy of the Arecibo region, as compared to the greater North Coast, is presented in **Figure 3-1**.

---

[12] Unless otherwise indicated in this section, information is taken from or is based on the Revised Preliminary Environmental Impact Statement – Renewable Power Generation and Resource Recovery Plant (PRIDCO 2010).



Source: USDA (2001)

**Figure 3-1.    Regional Geologic Section of the Northern Karst Belt**

The sequence of limestone formation from the late to mid Tertiary period was the result of wind dynamics and intermittent oceanic regressions and transgressions that occurred between the Oligocene and Miocene epochs. It was during this time that the oldest tertiary strata emerged and the North Coast of Puerto Rico sank as a result of ongoing orogenic processes in the Caribbean region. These processes culminated with deposits of consolidated sand dunes that date from the Pliocene and Holocene epochs and have since been overlain by more recent sedimentary deposits.

The specific geology of the Arecibo region is illustrated in **Figure 3-2** and includes the following formations (Briggs 1968):

- Aymamón Limestone (Tay)—consists chiefly of fine to medium grained limestone, white to light gray with mixed moderate tones of orange, and contains a high degree of purity. In some places it can be mottled with light brown streaks, light gray and light reddish brown. Commonly chalky, locally coarsely fragmented. It can reach 709 feet (216 meters) in thickness. Karstic mogote physiography was developed along the base and middle parts of the formation.

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017

- Camuy Limestone (Tca)—fine to medium grained, with different tones of orange, yellow, and light brown. Ranges in composition from a pure limestone to a somewhat clayey limestone interbedded with light gray chalk, clayey chalk, and marl. Approximately 561 feet (171 meters) in thickness.

- Floodplain alluvium (Qa)—moderately well-sorted, gradational stratified sand, gravel, silt, and clay. Largely composed of quartz, feldspar, and plutonic rock fragment sand grains, but silicified plutonic-rock and volcanic-rock pebbles and cobbles are common. The thickness of these deposits varies from 0–230 feet (0–70 meters).

- Swamp deposits (Qs)—adjacent to meanders of Río Grande de Arecibo on its floodplain, tributaries, and Caño Tiburones east/northeast of the Project site. Sediments consist of mixed clay, sandy clay, and silty clay that is black, gray, and blue-gray. Water saturated, it contains a high degree of organic material. Thickness varies from 0–10 feet (0–3 meters).

- Beach Deposits (Qbq)—chiefly quartz sand, coarse to medium grained, well-sorted with minor concentrations of feldspar, plutonic rock fragments, and calcium carbonate.

- Sand dunes (Qd)—medium grained sand that is 0–32 feet (0–10 meters) thick.

- Transitional Deposits (Qdt)—wind-blown sand from dunes and beaches mixed by natural government agencies or by cultivation with blanket deposits, lagoonal, or swamp deposits.

- Cemented dunes (Qcd)—friable to well-indurated calcite-cemented, thin-bedded, commonly cross-bedded, locally fossiliferous, sandstone with interbedded conglomerates.

- Blanket Deposits (QTs)—quartz sand, medium to fine grained, white to light gray, contains less than 2 percent impurities.

- Fill Deposits or (Qf) Artificial Fill (Af)—consists of a mixture of poorly sorted sediments of calcite, sand, and clay fragments that reach an average depth of 13 feet (0–4 meters) from surface grade.



**Figure 3-2.    Regional Geologic Map**

Several prominent geologic formations are evident in the Arecibo region. Caño Tiburones, which occupies an extensive swampy area extending from the valley of the Río Grande de Arecibo until it reaches the municipality of Barceloneta, is one of the most prominent geologic features in the region. It contains swamp and peaty marsh deposits at msl or near msl. Floodplain alluvial deposits from the Río Grande de Arecibo adjoin Caño Tiburones to the east.

The Arecibo region possesses a topography that varies greatly in elevation, with typical karst features such as karst hills or karst haystack hills (mogotes) as well as sinkholes, buried karst, and low rolling hills. Typical karstic hills reach 164 feet (50 meters) in elevation above valley plains and inter karstic hill valley elevations. The foot of the mogotes spans 328 to 492 feet (100 to 150 meters) in diameter (Briggs 1968). Steeper relief can be observed towards the southern sector of the quadrangle where short chains of mogotes reach maximum altitudes of 820 feet (250 meters) msl. The lower Río Grande de Arecibo Valley is located approximately 45 miles (72 kilometers) west of San Juan and occupies an area of 31.5 square miles (81.6 square kilometers) (Quiñones-Aponte 1986). Karstic depressions and steep hills border the western and

southern limits of the valley. Irregular plains with minor karst features, river valleys, floodplains, and coastal rolling lowlands also characterize the area.

The lower valley of the Río Grande de Arecibo is one of the most prominent features on the Arecibo quadrangle. Elevation gradients in this alluvial valley range from almost vertical cliff walls at elevations of 590 feet (180 meters) above the level of the river floodplain, up to 820 feet (250 meters) above msl toward the southern sector of the quadrangle where abrupt topography dominates. Riverbanks contain irregular, moderately developed karstic features, which are found on both sides of the alluvial valley and represent the transition zone with adjacent terrain. Both riverbanks exhibit a gradational decrease in elevation towards the north, where the river mouth is found, and to the northeast until reaching Caño Tiburones.

In 1999, Law 292 (known as Ley para la Proteccion y Conservacion de la Fisiografia Karsica de Puerto Rico, or more simply, Ley del Karso) was passed to protect 35 percent of the karst. The Departamento de Recursos Naturales y Ambientales de Puerto Rico was given the responsibility of completing a study within two years of the law's passage to determine the areas of the karst most needing protection and conservation. The project site and surrounding vicinity are not in proximity to any of the karst areas with priority conservation status as identified in that study, including the state forests and other protected areas that are currently protected under the law (Hall and Day 2011).

**Local Geology and Topography**

The Project site is located on the western segment of the coastal plain on a coastal flat land portion of the Río Grande de Arecibo's alluvial floodplain in the Cambalache Ward of the municipality of Arecibo. The area immediately surrounding the Project site is dominated by alluvium deposits amid older, Tertiary-era limestone outcrops such as the Camuy Formation. Natural weathering processes have resulted in a landscape where sporadic karstic hills protrude amid the flat coastal corridor that is part of the Río Grande de Arecibo floodplain. The alluvial valley formation began with the erosion and dissolution of limestone bedrock around the Middle Miocene Epoch due to abrasion and acid rain (Monroe 1976). This process gave way to the development of a canyon with steep slopes that narrow further inland and to the south.

The geologic composition of the Project site itself consists mainly of organic material deposits mixed with sandy, silty, and clayey fine sediments from alluvial and swamp deposits generally found near meanders of the Río Grande de Arecibo. Geologic deposits that underlie the Project site consist of 230-foot (70-meter)-thick Río Grande de Arecibo floodplain alluvium (Qa) and 10-foot (3-mete)-thick swamp deposits (Qs). Geologic formations consist chiefly of moderately well-sorted gradationally bedded sand, silt, and clay. These sediments are composed of unconsolidated material that was deposited during the Río Grande de Arecibo's periods of flood and discharge. Swamp deposits were deposited in areas adjacent to the Río Grande de Arecibo and are composed of clay. These sediments are water saturated and have a high organic content

(Briggs 1968). Aligned and discontinuous low-lying outcrops of limestone belonging to the
Camuy Formation are present to the east and west of the Project site. To the southeast and
southwest of the Project site, short ranges of karstic hills and mogotes from the Aymamón
Limestone Formation are evident, showing typical karst topographic features.

Local topography at the property proposed for the Project buildings (plant site) has been
previously impacted by the industrial activities of a paper mill that ceased operations in 1996.
**Figure 3-3** shows the existing topography of the site. The prevailing topographic characteristic
of the Project site is flat land, with the site and surrounding areas dominated by the Río Grande
de Arecibo floodplain and therefore level with elevations that vary from 3.2 feet up to 24.6 feet
(1 meter up to 7.5 meters) msl (USGS 1982). The topography is typical of floodplains that are
associated with waterways. Approximately 3,907 feet (1,191 meters) of artificial channels flow
throughout the property, which also contains five artificial ponds.



**Figure 3-3.    Topographic Site Map**

### 3.1.1.2    Soils

**Soils at the Project Site**

Within the study area, the dominant soil order (the highest level of soil taxonomy) is Mollisols. Mollisols are developed under grassland vegetation and tend to be classified as prime farmland. The soils in the area have a soil temperature regime reflecting their northern location, a soil moisture regime reflecting a moist climate, and mixed mineralogy (NRCS 2006). Soil orders are composed of numerous soil series (the lowest level of soil taxonomy). Series found at the Project site are described in greater detail in **Table 3-1**. According to the Natural Resource Conservation Service (NRCS) Soil Survey for the Arecibo area, soils found at the Project site are those of the Toa-Coloso-Bajura Association and consist of Toa silty clay loam (To) and Coloso silty clay (Cn). These soils are directly associated to the Río Grande de Arecibo alluvial valley and have a good farming potential. Soils of this association are relatively deep and occur on almost flat terrain. The soils are well to poorly drained, with clayey and loamy characteristics. Historically, these soils have been used to grow sugar and food crops, as well as used for cattle grazing.

**Table 3-1.    Description of Soils at the Project Site**

| Soil | Description | Area of Occurrence |
|------|-------------|--------------------|
| Toa silty clay loam (To) | The Toa series consists of very deep, well drained, moderately permeable soils on river floodplains. These soils formed in stratified alluvial sediments of mixed origin. The mean annual temperature is about 78°F, and the mean annual precipitation is about 70 inches (1.8 meters). Slopes range from 0 to 2%. Permeability is moderate. Most areas of Toa soils are used for the production of sugarcane. Some areas include tame grasses used for pasture. Vegetation consists of native and introduced species. | Western portion of the Project site |
| Coloso silty clay (Cn) | The Coloso series consists of very deep, somewhat poorly drained, slowly permeable soils on floodplains and low terraces. These soils are formed in stratified loamy and clayey alluvial sediments. The mean annual precipitation is about 80 inches (2 meters) and the mean annual air temperature is about 78°F. Slopes range from 0 to 8%. Drainage is somewhat poor, with slow permeability. Most areas of Coloso soils are used for sugarcane production. Some areas are used for pasture, and a few areas are in woodland that consists of native and introduced species. | Eastern portion of the Project site |

**Figure 3-4** shows the distribution of these soils at the plant site.



**Figure 3-4.    Project Site Soil Map**

**Prime and Unique Farmland Soils**

Prime farmland soils, as defined by USDA, are soils that have been determined to have the best combination of physical and chemical properties for agricultural production (NRCS 2015). In addition, land may be classified as prime farmland if it is drained, irrigated, or of statewide importance, as determined by the state. Both types of soils that occur at the Project site have been classified as prime farmland. Toa silty clay loam is classified as prime farmland, and Coloso silty clay is also classified as prime farmland if drained.

## 3.1.2    Effects Analysis

Impacts on soils and geology include how the proposed Project could potentially impact these resources from the construction and operation of the plant, water pipeline, and transmission line. Most of the impacts would occur during construction and likely would be temporary. This section discusses the potential effects of the proposed Project on the various soil and geologic resources throughout the Project area. To determine whether the proposed Project would have

the potential to result in significant impacts on soil and geologic resources, it is necessary to consider both the duration and the intensity of the impacts. Definitions for duration and intensity of soils and geology impacts established for this Project are described in **Table 3-2**.

**Table 3-2.      Soils and Geology Impacts Context and Intensity Definitions**

| Geology and Soils | | | |
|---|---|---|---|
| Context (Duration) | Low Intensity | Moderate Intensity | High Intensity |
| Short term: During construction period<br><br>Long term: Life of the Project (50 years) | Disturbance to geology or soils from construction and operation would be detectable but localized and discountable. Erosion and/or compaction would occur from construction and operation in localized areas. | Disturbance would occur over a relatively wide area from construction and operation of the Project. Impacts to geology or soils would be readily apparent and result in short-term changes to the soil character or local geologic characteristics. Erosion and compaction impacts would occur over a wide area. | Disturbance would occur over a large area from construction and operation of the Project. Impacts to geology or soils would be readily apparent and would result in short-term and long-term changes to the character of the geology or soils over a large area both in and out of the Project boundaries. Erosion and compaction would occur over a large area. |

### 3.1.2.1      Construction

**Geology and Topography**

The Project site would be flood-proofed as part of the initial construction of the Project. The design high water elevation for stormwater detention storage is approximately 19.6 feet (6 meters) above msl. The nominal finished floor elevation of the plant buildings is approximately 20.7 feet (6.3 meters) above msl. As a result, plant construction would involve the modification of the existing drainage canals to open more floodway and raising the footprint elevation of the site so that it is above the 100-year floodplain. These activities would involve movement of earth to construct the Project.

Adverse impacts on geology and topography resulting from the construction of the Project would be long-term and moderate as a result of the removal of existing material within the floodway and recontouring of the landscape. Cut and fill techniques would be implemented, which would modify the landscape at the site, and new material would be brought in to raise the elevation of the site. Impacts on geology and topography would be confined to the Project site itself and would not extend beyond the site footprint and immediate vicinity.

**Soils**

Impacts on soils at the Project site would be minor. Although an estimated 80 acres (32.4 hectares) of soils would be taken out of potentially productive agricultural uses at the site of the Project, the majority of the site was formerly used for industrial purposes and land at the plant site is currently overgrown and vacant. Only the properties north of the plant site are currently in active agricultural use. Thus, the Farmland Protection Policy Act is not applicable for this Project. Of the 80 acres (32.4 hectares) on-site, 42.3 acres (17.1 hectares) is Coloso silky clay (Cn) and 41.5 acres (16.8 hectares) are Toa silky clay loams (To). The resulting loss in soils would be confined to the Project site itself and would not extend beyond the immediate vicinity.

### 3.1.2.2   Operation

**Geology and Topography**

During the operational lifetime of the Project, there would be no impacts on geology or topography. Geologic features and landforms would not be disturbed during plant operation. Because no landscape changes would occur as the result of plant operation, surface geology would be unaffected. The underlying bedrock geology would similarly remain undisturbed given that no ground-penetrating activities would occur during plant operation. Overall, there would be no long-term impacts on geology and topography.

**Soils**

No impacts would occur on soils during the operational lifetime of the Project. Soils outside of the plant footprint would remain undisturbed because plant operations would not result in measurable changes to soils. Soil structure and underlying substrate would remain intact, and the suitability of prime farmland soils outside of the plant footprint for agricultural uses would be unaffected.

## 3.2      WATER RESOURCES

### 3.2.1    Affected Environment

#### 3.2.1.1    Surface Water

**Surface Water Features**

Located in the central area of Arecibo near Cambalache, the Project is within the Río Grande de Arecibo floodplain. With its headwaters located in the Cordillera Central mountain range, the Río Grande de Arecibo flows north to the Atlantic Ocean draining an area of 209 square miles (541 square kilometers) (EPA 2010). The Río Grande de Arecibo is one of the largest drainage basins in Puerto Rico with eight major tributaries and two main-stem reservoirs. The Río Grande de Arecibo has the highest mean-annual discharge of all Puerto Rican river systems, averaging about 504 cubic feet per second (cfs) (14.2 cubic meters per second [cms]) (Quinones-Aponte 1986). The only major tributary near the Project, the Río Tanama, enters the Río Grande de

Arecibo an estimated 3 miles (4.8 kilometers) upstream from the Project, near Tanama Ward. The Río Tanama has a mean-annual discharge of about 107 cfs (3 cms) and a drainage area of 58 square miles (150 square kilometers) (Quinones-Aponte 1986). Although, not designed for flood control purposes, the two major reservoirs within the watershed, Lago Dos Bocas and Lago Caonillas, offer peak flow attenuation during large storm events.

The Río Grande de Arecibo Watershed is split into two distinct geomorphic regions (Quinones-Aponte 1986). The upper watershed consists mainly of undeveloped forested areas with steep canyon-like terrain. The lower watershed consists of a coastal floodplain that is relatively flat with significant areas of ponding water in some overbank areas. River banks in this area contain irregular, moderately developed karstic features and dip in elevation towards the north, toward the river mouth (Quinones-Aponte 1986). The Río Grande de Arecibo enters a wide alluvial floodplain downstream of the Highway PR-22 bridge before meandering past the west side of the plant. The floodplain is 2.5 miles (4 kilometers) wide, and extends from the river mouth at the Atlantic Ocean about 7 miles (11.2 kilometers) upstream. Topography in this area is relatively flat, as described in Section 3.1, *Soils and Geology*. The Project site is located along the eastern portion of the Río Grande de Arecibo floodplain west of the Río Grande de Arecibo main channel. The Caño Tiburones wetland is located to the east, and Arecibo Bay and the Atlantic Ocean are located to the north. **Table 3-3** shows the distance and direction from the existing structures at the plant to the major surface water features found in the lower Río Grande de Arecibo Valley.

**Table 3-3.     Major Surface Water Features in the Lower Río Grande de Arecibo Valley**

| Feature | Distance from Project Boundary (feet [meters]) | Direction from Project |
|---|---|---|
| Río Grande de Arecibo | 0.00–1,056 [322] | West |
| Río Tanama | 11,086 [3,380] | Southwest |
| Caño Tiburones | 5,278 [1,609] | East |
| Arecibo Bay/Atlantic Ocean | 5,278 [1,609] | North |

Five artificial ponds, constructed when the site was used as a paper mill, remain on the site. Located on the southeastern side of the Project area, one pond was used for retention of water from the former paper mill. The four remaining ponds on the western side of the Project area acted as infiltration ponds to store stormwater and discharged stored waters by percolation to the Río Grande de Arecibo. These ponds are currently not in use and do not store water. Near the plant area, 3,907 feet (1,191 meters) of artificial channels were created as part of the stormwater and process water drainage system. These channels connect to a larger channel along the northern boundary of the Project site that discharges to the Río Grande de Arecibo. No rivers or creeks cross directly through the immediate Project site.

**U.S. Geological Survey Gages**

**Table 3-4** provides information on the three U.S. Geological Survey (USGS) gages directly upstream from the Project. The closest streamflow recording gage, USGS gage no. 50029000, *Río Grande de Arecibo at Central Cambalache*, is located an estimated 0.75 mile (1.2 kilometers) upstream from the plant. USGS gage no. 50028400, *Río Tanama at Charco Hondo*, is located an estimated 3 miles (4.8 kilometers) upstream from the plant, near the confluence of the Río Tanama and Río Grande de Arecibo. USGS gage no. 50027750, *Río Grande de Arecibo Abv Arecibo*, is located just above the confluence of the Río Tanama and Río Grande de Arecibo, an estimated 4 miles (6.4 kilometers) upstream from the Project site (USGS 2015a).

As shown in **Table 3-4**, the Central Cambalache and the Charco Hondo gages have the longest periods of record (46 years) and are both located just upstream from the Project site. As a result, information from these gages has been used to represent long-term inflows to the Project site. **Table 3-5** shows monthly flow statistics based on daily average flows for the Río Grande de Arecibo at Central Cambalache. Flows from the period October 15, 1983, to September 30, 1996, were prorated to account for the difference in drainage area at the Central Cambalache gage (200 square miles or 518 square kilometers) and at the Arecibo gage (175 square miles or 453 square kilometers), assuming the drainage basins have similar hydraulic and meteorological characteristics. Flow data from the Charco Hondo gage was added to the Arecibo gage prior to prorating the flow values to the downstream Central Cambalache gage.

Monthly flows are generally highest in September, October, and November and lowest in January, February, and March. Flows range from a low of 18 cfs (0.5 cms) to a high of 16,914 cfs (479 cms).

**Table 3-4.     Río Grande de Arecibo U.S. Geological Survey Gage Information**

| Time Period From | Time Period To | Gage Name | Gage Number | Drainage Area mi² |
|---|---|---|---|---|
| 04/29/1982 | 09/30/2002 | Río Grande de Arecibo ABV Arecibo | 50027750 | 175 |
| 04/09/1969 | Present | Río Tanama at Charco Hondo | 50028400 | 58 |
| 05/19/1969 | Present | Río Grande de Arecibo at Central Cambalache | 50029000 | 200 |

Source:  USGS (2015b, 2015c, 2015d)

Arecibo Waste-to-Energy Project
Final EIS                                                                                       January 2017

**Table 3-5.     Monthly Flow Data for Río Grande de Arecibo at Central Cambalache, Puerto Rico**

| Month | Mean Flow (cfs) | Maximum Flow (cfs) | Minimum Flow (cfs) | Exceedance Flow (cfs)10% | Exceedance Flow (cfs)50% | Exceedance Flow (cfs)90% |
|---|---|---|---|---|---|---|
| October | 741 | 14,726 | 35 | 1,518 | 565 | 212 |
| November | 706 | 8,400 | 35 | 106 | 494 | 141 |
| December | 459 | 9,994 | 32 | 847 | 318 | 106 |
| January | 318 | 4,131 | 32 | 600 | 247 | 71 |
| February | 247 | 1,377 | 28 | 530 | 212 | 71 |
| March | 247 | 6,321 | 18 | 530 | 176 | 71 |
| April | 388 | 6,992 | 18 | 812 | 282 | 71 |
| May | 600 | 16,916 | 35 | 1,271 | 424 | 106 |
| June | 424 | 4,555 | 32 | 847 | 318 | 106 |
| July | 318 | 3,108 | 35 | 671 | 247 | 71 |
| August | 388 | 15,891 | 25 | 742 | 282 | 71 |
| September | 671 | 14,055 | 21 | 1,271 | 494 | 141 |

Source:  USGS (2015b, 2015c, 2015d)

[a]  Data from USGS Gage No. 50027750, Río Grande de Arecibo ABV Arecibo, PR, were prorated by 200/175 to account for the difference in drainage area between the gage and the downstream USGS gage no. 50029000 for the period October 15, 1983, to September 30, 1996.

**Water Withdrawals**

The Puerto Rico Aqueduct and Sewer Authority provides drinking water to Arecibo. Public water supply data for 2005 is provided in **Table 3-6**.

**Table 3-6.     Total Surface Water Withdrawal for Arecibo in 2005**

| Area | PRASA Surface Water Withdrawals (mgd) |
|---|---|
| Arecibo | 91.90 |

Source:  USGS (2012)

Note:   USGS maintains cooperative agreements with the Puerto Rico Aqueduct and Sewer Authority (PRASA) to compile water-use data and maintain an adequate database for major water use categories.

**Local Precipitation**

Mean-annual rainfall in the general area varies between 60 to 100 inches (152 to 254 centimeters) per year. Seasons in Puerto Rico are defined as follows: a relatively dry period from December to March, a spring-rainy period in April and May, a relatively short dry period in June and July, and a wet season from August to November. Data from the National Oceanic and Atmospheric Administration presented in **Table 3-7** shows total monthly rainfall from 1990 to 2014 for Arecibo. Total annual rainfall values and monthly mean, maximum, and minimum values are also provided.

**Surface Water Quality**

EQB promulgated the Water Quality Standards Regulation to comply with Section 305(b) of the Clean Water Act. USGS manages the network of surface water monitoring stations throughout the Río Grande de Arecibo Basin through a cooperative agreement with the government of Puerto Rico. The designated uses for waterbodies under the Water Quality Standards Regulation include: drinking water supply, preservation and propagation of desirable aquatic species, primary contact recreation, and secondary contact recreation.

EPA's 2010 Total Maximum Daily Loads report identified the impaired waters in the Río Grande de Arecibo Basin, which are subject to assessment methodologies and the beneficial uses discussed above. **Table 3-8** identifies the 12 assessment units in the Río Grande de Arecibo Basin (EPA 2010).

Of the 12 assessment units identified in **Table 3-8**, 5 are not listed. Two of the seven impaired assessment units fully support the designated uses of aquatic life or drinking water. Six of the seven impaired assessment units support the designated use of secondary contact recreation; none support the designated use of primary contact recreation. Water quality impairment sources include agricultural crop production, individual home sewage systems, managed pasture grazing, site clearance from development, and rural residential areas. There are 13 total permitted point source facilities in the Río Grande de Arecibo Basin. Nonpoint sources in the area include nearby agricultural practices and rural sewage systems (EPA, 2010).

Arecibo Waste-to-Energy Project
Final EIS                                                                                      January 2017

**Table 3-7.     Monthly Total Precipitation (inches) for Arecibo Observation, Puerto Rico (1990–2014)**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|--------|
| 1990 | 2.19 | 3.90 | 7.41 | 4.02 | 3.32 | 6.34 | 19.2 | 4.56 | 9.12 | 18.3 | 5.11 | 4.00 | 87.44 |
| 1991 | 1.31 | 6.77 | 4.07 | 7.27 | 9.41 | 9.41 | 4.87 | 11.8 | 6.49 | 5.39 | 4.23 | 3.94 | 74.94 |
| 1992 | 2.71 | 0.70 | 6.71 | 3.75 | 11.8 | 4.16 | 5.28 | 7.78 | M | M | 6.25 | 9.77 | M |
| 1993 | M | 2.06 | 2.43 | 10.61 | M | M | M | 5.48 | 11.9 | 9.98 | 7.81 | 1.07 | M |
| 1994 | 1.63 | 1.34 | 3.22 | 2.97 | 6.25 | 5.22 | 4.42 | 4.94 | 3.77 | 10.6 | 4.11 | 8.12 | 57.24 |
| 1995 | 4.11 | M | 3.28 | 2.80 | 25.7 | M | 8.02 | 12.7 | 16.04 | 7.68 | 4.77 | 3.28 | M |
| 1996 | 4.37 | 4.88 | 3.87 | M | 8.14 | 4.99 | 5.70 | 13.3 | 14.8 | 6.85 | 6.74 | 4.28 | M |
| 1997 | 14.4 | 2.37 | 2.66 | 1.85 | 6.74 | 2.63 | 9.01 | 8.51 | 2.94 | 6.28 | 2.96 | 2.94 | 63.27 |
| 1998 | 3.18 | 2.84 | 4.95 | 7.02 | 11.0 | 7.72 | 11.1 | 12.9 | 19.0 | 12.2 | 5.60 | 6.63 | 104.1 |
| 1999 | 2.71 | 5.38 | 4.94 | 5.33 | 6.02 | 13.0 | 6.15 | 8.10 | 10.8 | 14.0 | 12.2 | 10.5 | 99.24 |
| 2000 | 5.53 | 2.40 | 1.74 | 3.45 | 7.81 | 0.96 | 4.96 | 6.97 | 8.67 | 12.2 | M | 1.71 | M |
| 2001 | 4.22 | 3.03 | 3.86 | 5.26 | 12.5 | 7.40 | 6.19 | 6.96 | 4.12 | 8.53 | 10.7 | 10.1 | 82.96 |
| 2002 | 3.39 | 2.07 | 3.34 | 16.1 | 7.43 | 2.61 | 6.18 | 11.9 | 6.48 | 9.42 | 6.91 | 1.31 | 77.11 |
| 2003 | 4.43 | 2.40 | 2.11 | 13.3 | 7.33 | 7.27 | 3.13 | 9.59 | 9.43 | 13.1 | 10.4 | 6.05 | 88.48 |
| 2004 | 1.28 | 1.66 | 5.91 | 6.26 | 12.8 | 5.54 | 4.14 | 8.82 | 12.3 | 4.36 | 14.6 | 3.89 | 81.50 |
| 2005 | M | 2.35 | 0.44 | 19.6 | 15.1 | 7.42 | 6.52 | 12.5 | 6.26 | 7.73 | 6.80 | 0.77 | M |
| 2006 | 7.03 | 0.40 | 9.64 | 5.46 | 8.81 | 11.2 | 3.43 | 8.90 | 6.55 | 6.73 | 7.96 | 1.93 | 77.99 |
| 2007 | 2.59 | 6.92 | 8.53 | 7.87 | 10.9 | 5.20 | 2.84 | 10.2 | 6.52 | 5.13 | 6.23 | 10.2 | 83.11 |
| 2008 | 2.54 | 0.91 | 2.39 | 7.91 | 9.21 | 6.73 | 12.9 | 3.45 | 17.6 | 6.00 | 9.65 | M | M |
| 2009 | 3.03 | 7.99 | 6.71 | 2.23 | 7.65 | 9.97 | 5.41 | 8.97 | 11.07 | 4.32 | 7.37 | 1.77 | 76.49 |
| 2010 | 10.4 | 2.54 | 3.53 | 10.9 | 17.6 | 8.42 | 8.53 | 10.5 | 7.60 | 9.64 | 6.14 | 9.92 | 105.73 |
| 2011 | 1.57 | 2.22 | 7.24 | 4.50 | 9.59 | 11.1 | 11.7 | 7.03 | 11.2 | 10.2 | 14.6 | 5.71 | 96.74 |
| 2012 | 5.16 | 5.64 | 16.4 | 11.8 | 8.61 | 1.98 | 7.71 | 9.04 | 6.33 | 12.0 | 10.7 | 3.74 | 99.12 |

Arecibo Waste-to-Energy Project
Final EIS                                                                                           January 2017

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|------|------|------|------|------|------|------|------|------|------|------|------|--------|
| 2013 | 2.80 | 2.06 | 8.30 | 5.16 | 17.6 | 6.36 | M | 10.4 | 9.47 | 4.56 | 6.16 | 4.45 | M |
| 2014 | 0.84 | 1.41 | 0.45 | 4.93 | 8.07 | 5.33 | 6.83 | 16.9 | 7.80 | 10.3 | 6.93 | 4.45 | 74.24 |
| Mean | 3.92 | 2.93 | 5.37 | 8.32 | 10.7 | 6.49 | 6.47 | 9.47 | 8.76 | 8.28 | 8.94 | 4.77 | 86.92 |
| Max | 10.40 | 7.99 | 16.4 | 19.6 | 17.6 | 11.2 | 12.9 | 16.9 | 17.6 | 13.1 | 14.6 | 10.2 | 105.73 |
|  | 2010 | 2009 | 2012 | 2005 | 2010 | 2006 | 2008 | 2014 | 2008 | 2003 | 2011 | 2007 | 2010 |
| Min | 0.84 | 0.40 | 0.44 | 2.23 | 7.33 | 0.96 | 2.84 | 3.45 | 4.12 | 4.32 | 6.14 | 0.77 | 76.49 |
|  | 2014 | 2006 | 2005 | 2009 | 2003 | 2000 | 2007 | 2008 | 2001 | 2009 | 2010 | 2005 | 2009 |

Source:  National Oceanic and Atmospheric Administration (2014)
Notes:    M – absent data for specific time period

**Table 3-8.    Assessment Units in the Río Grande de Arecibo Watershed**

| Basin | 2006 Assessment Unit | State Impairment | Associated USGS Station | Priority Ranking |
|---|---|---|---|---|
| Río Grande de Arecibo | Río Grande De Arecibo (PRNR7A1) | Fecal coliform | 50029000, 50027250, A1-B | High |
| | Río Grande De Arecibo (PRNR7A2) | Fecal coliform | 50020500, A3-B, A3-A | High |
| | Tunel (PRNR7A3) | Fecal coliform | 50020500, A3-A | High |
| | Río Tanama (PRNR7B1) | Unlisted | _ | _ |
| | Río Tanama (PRNR7B2) | Fecal coliform | 50228000, A3-5 | High |
| | Río Caonillas (PRNR7C1) | Fecal coliform | 50026050, A4-A, A4-B | High |
| | Río Limon (PRNR7C2) | Fecal coliform | A1-B, A2-B, A1-A | High |
| | Río Yunes (PRNR7C3) | Fecal coliform | A2-A, A2-B | High |
| | Lago Dos Bocas | Unlisted | – | – |
| | Lago Caonillas | Unlisted | – | – |
| | Lago Garzas | Unlisted | – | – |
| | Terminal Basin | Unlisted | – | – |

Source:  EPA (2010)

### 3.2.1.2    Groundwater

**Aquifers**

Found within alluvial and shallow limestone aquifers, groundwater resources are abundant in the lower Río Grande de Arecibo Valley. An unconfined aquifer within the alluvial valley is hydraulically continuous with bordering limestone formations (Quinones-Aponte 1986). The entire aquifer system is divided into two separate hydraulic systems, the upper and lower aquifers. Groundwater from the alluvial upper aquifer has not been widely developed (Quinones-Aponte 1986). High capacity wells tend to draw from the lower aquifer that occurs below the dividing clay layer within the alluvium and underlying limestone. The upper aquifer is mainly non-confined within limestone formations and the coastal alluvial deposits found in the Arecibo area. The aquifer extends between the municipalities of Río Grande and Aguada, covering an area of 600 square miles (1,554 square kilometers) (Quinones-Aponte 1986).

The lower aquifer is located near the coast and has a confining unit composed of calcareous clayey rock and other limestone materials. The lower aquifer's extension into the Project site is not well known.

Transmissivity ranges from 3,000 square feet (279 square meters) per day in the upper alluvial area to 42,000 square feet (3,902 square meters) per day in the lower adjacent limestone areas (Quinones-Aponte 1986). Estimated values of hydraulic conductivity range from 25 to 40 feet (7.62 to 12.20 meters) per day for the alluvial aquifer (Quinones-Aponte 1986). Total groundwater flow through the aquifers within the Project area is estimated at 20.6 mgd. Groundwater flow within the Project area is from southwest to northeast with almost half of the flow going to the eastern area of Caño Tiburones where it discharges as springs and seeps (Quinones-Aponte 1986). The other half flows directly to the Atlantic Ocean.

The water table in the lower Río Grande de Arecibo Valley ranges in depth from 15 feet (4.6 meters) below the ground surface in alluvial areas up to 300 feet (91.4 meters) below the ground surface in the limestone upland areas (Quinones-Aponte 1986). Within the Project site, the water table occurs 20 to 40 feet (6 to 12 meters) above the clay confining layer. The water table varies in elevation from 2 to 5 feet (0.6 to 1.5 meters) between wet and dry months (Quinones-Aponte 1986). This relatively small variation in water level suggests constant recharge from surface waters to the alluvial upper aquifer.

**Surface/Groundwater Interactions**

Both the Río Tanama and Río Grande de Arecibo lose part of their annual flow to underground seeps near the Project area. Water infiltration from the Río Grande de Arecibo near the former Central Cambalache Sugar Mill accounts for about 11.6 mgd of the total flow of the groundwater system. A portion of the Río Tanama reemerges as the San Pedro Spring near Charco Hondo with an average discharge rate of 13 cfs (0.4 cms) and helps maintain minimum flows through the Project site (Quinones-Aponte 1986). According to USGS estimates, 36 inches (91.4 centimeters) of net precipitation also percolates to underground systems through sinkholes and other karst features found in the lower Río Grande de Arecibo Valley.

Groundwater Extractions—There are 20 extraction wells in the vicinity of the Project area. These wells were identified in the Puerto Rico Water Resources Comprehensive Plan and represent a combination of wells for public, agricultural, and industrial practices. The nine wells listed below are located within a 1,500-foot (457-meter) radius of the plant location.

- Cambalache 1

- Arecibo 03 McGuiness

- Arecibo 05 Cambalache

- Arecibo 06 Cambalache

- Central Cambalache

- Grace Paper 1

- Grace Paper 2

- Grace Paper 3

- Grace Paper 4

**Table 3-9** shows groundwater withdrawal amounts based on data supplied from PRASA for 2005. These values are for public water supply and industrial practices.

**Table 3-9.        Groundwater Withdrawals for Arecibo by Public Sector**

| Area | Type of Withdrawal | PRASA Groundwater Withdrawals (mgd) |
|------|--------------------|-------------------------------------|
| Arecibo | Public water supply | 11.47 |
| | Industry | 0.41 |

Source:  USGS (2012)

**Groundwater Quality**

The groundwater systems in the karst region of northern Puerto Rico are highly productive and offer important freshwater resources for human consumption, ecological integrity, and industrial and urban development. Spatial and historical distributions of contaminants in the northern karst aquifer show that transport processes in these aquifers are extremely complex and may be highly influenced by hydrologic conditions (Padilla 2011).

In 2000, two pump tests were performed to characterize water quality and productivity at the Project site. A groundwater test well was drilled to a maximum depth of 260 feet (79.2 meters) within the Project site, penetrating the upper aquifer system. The groundwater evaluation measured temperature, pH, total dissolved solids, and specific conductance. Field samples yielded variations in water temperature from 25.2°C to 24.9°C, a pH of 7.1, and high levels of conductivity and total dissolved solids. Conductivity measurements were between 25.0 and 28.7 micro siemens per centimeter. Total dissolved solid concentration was measured at 15,000 parts per million and the ionic concentration of the well water was approximately 50 percent that of seawater.

### 3.2.1.3    Flooding

As described in Section 3.2.1.1, *Water Resources*, the plant would be located in the lower Río Grande de Arecibo Basin. Published by FEMA in 1980, a Flood Insurance Study for the lower Río Grande de Arecibo Basin determined peak discharge, base flood elevations, and floodway limits for the reach of the Río Grande de Arecibo extending 10.5 miles (17 kilometers) upstream from the river mouth (GLM 2010). The plant would be located an estimated 1.2 miles

(2 kilometers) upstream from the river mouth. FEMA determined the study limit along the
eastern portion of the Río Grande de Arecibo floodplain to be the dike that runs southward from
the Caño Tiburones mouth, and parallels PR-2 for approximately 7 miles (11.2 kilometers)
(GLM 2010). According to the flood insurance rate map, the Project site has a base flood
(100-year) elevation of 17.1 feet (5.2 meters) above msl (GLM 2010). **Figure 3-5** shows the
FEMA flood insurance rate map, Panel 230J.

Energy Answers proposes to revise the floodway limits to follow the perimeter of the proposed
development, and to reclassify the land as Zone AE outside the floodway, in accordance with
updated regulations from the Puerto Rico Planning Board, effective January 7, 2010. The
proposed amendment would require a change to the topography of the floodplain area between
the Project and the Río Grande de Arecibo River channel to provide greater flow area along the
river bank. The generated fill would be used to raise the Project area outside the floodway limit.
The application for amending the Map for Flood Prone Area was filed with the Puerto Rico
Planning Board on October 8, 2010. **Figure 3-6** shows the proposed 100-year floodway limit
around the Project and FEMA-delineated cross sections. The Project is located at FEMA cross
section "D." **Figure 3-7** shows the area of the proposed bank modification, where field
elevations would be lowered to 8.2 feet (2.5 meters).



Source:  FEMA (2015), NRCS (2014), digitized by Louis Berger

**Figure 3-5.     FEMA Flood Insurance Rate Map, Panel 230J**

Arecibo Waste-to-Energy Project
Final EIS                                                                                                  January 2017



Source: GLM (2010)

**Figure 3-6.    Proposed 100-year Floodway Limit and Cross Sections**



Source: GLM (2010)

**Figure 3-7.      Proposed Bank Modification Site**

**U.S. Geological Survey Study**

USGS assessed peak discharges and flood levels for the Project in a study using a flood event that occurred in the lower Río Grande de Arecibo Basin as a result of the passing of Hurricane Georges in September 1998. USGS computed peak discharge over the spillways at the Caonillas and Dos Bocas Dams using recorded flood stage data and the theoretical spillway discharge rate curve for each reservoir (GLM 2010). **Table 3-10** shows the peak discharge calculated by USGS for the September 1998 event.

**Table 3-10.    Peak Discharge Calculated by USGS for Hurricane Georges (September 1998)**

| Location | Drainage Area mi² (km²) | Peak Discharge cfs (cms) |
|---|---|---|
| Río Grande de Arecibo at the Dos Bocas Dam | 440 (170) | 115,126 (3,260) |
| 50027750 Río Grande de Arecibo above Arecibo[a] | 450 (175) | 117,598 (3,330) |
| 50028400 Río Tanama at Charco Hondo | 150 (58) | 27,475 (78) |

Source:  GLM (2010)

[a] Does not include discharge from Río Tanama

## U.S. Army Corps of Engineers Study

USACE prepared a hydrologic-hydraulic study of the lower Río Grande de Arecibo Basin in July 1993. The study analyzed the proposed flood control project for the Río Grande de Arecibo and two of its tributaries (GLM 2010). The control project consists of approximately 2.8 miles (4.5 kilometers) of levee and floodwalls around the eastern and southern boundaries of the town of Arecibo, 1.8 miles (2.9 kilometers) of a trapezoidal earthen channel to divert flow from the upper Río Santiago Basin into the Río Grande de Arecibo floodplain, downstream of Highway PR-22, and 0.7 mile (1.1 kilometers) of levee north of Río Tanama, immediately upstream of PR-10 (GLM 2010). The USACE study determined peak discharge along Río Grande de Arecibo based on Log-Pearson III and HEC-1 flood frequency analyses performed with data from the USGS gage 50029000, *Río Grande de Arecibo at Central Cambalache*, combined with peak data from gage 50027750, *Río Grande de Arecibo Abv Arecibo*. **Table 3-11** presents the discharges calculated by USACE.

**Table 3-11.    USACE Peak Discharge at Río Grande de Arecibo and Río Tanama**

| Location | Area mi² (km)² | 100-year Peak Discharge (cfs [cms]) | |
|---|---|---|---|
| | | Log-Pearson III | HEC-1 |
| 50028400 Río Tanama at Charco Hondo | 58 (150) | N/A | 23,308 (660) |
| 50027750 Río Grande de Arecibo above Arecibo[a] | 175 (450) | N/A | 156,338 (4,427) |
| 50029000 Río Grande de Arecibo at Central Cambalache[b] | 200 (518) | 141,259 (4,000) | 171,982 (4,870) |

Source:  GLM (2010)

[a] Does not include discharge from Río Tanama.

[b] Gage closest to project site.

Arecibo Waste-to-Energy Project
Final EIS

January 2017

For the FEMA Flood Insurance Study, the highest, most conservative, peak discharge was used. **Table 3-12** presents the peak discharge used to determine the base flood elevation at the Project.

**Table 3-12.    FEMA Flood Insurance Study 100-Year Peak Discharge at Río Grande de Arecibo**

| Location | Drainage Area mi² (km²) | Peak Discharge (cfs) |
|----------|--------------------------|----------------------|
| Confluence with Río Tanama | 188 (487) | 200,587 (5,680) |

Source:  GLM (2010)

**Historical Floods**

A 1986 USGS report on the water resources of the lower Río Grande de Arecibo alluvial valley determined that major historical flooding events inundated the lower alluvial valley to an average flood level of 4 feet (1.2 meters) msl (Quinones-Aponte 1986). The report indicates that overbank flows occurred whenever the instantaneous discharge of the Río Grande de Arecibo exceeded 17,000 cfs (481 cms) at USGS gage 50029000, *Río Grande de Arecibo at Central Cambalache* (Quinones-Aponte 1986). **Table 3-13** shows the peak streamflow at USGS gage 50029000 for the period of 1997–2014. The 17,000 cfs (481 cms) events for water years 1998 and 1999 were a result of Hurricane Georges. **Figure 3-8**, a USGS historical flood atlas, shows the flooding caused by Hurricane Georges. Flood water levels in the plant site ranged from 17 to 24 feet (5.2 to 7.3 meters) above msl.

**Table 3-13.    Peak Streamflow (Instantaneous) for USGS gage 50029000, Río Grande de Arecibo at Central Cambalache (1997–2014)**

| Water Year | Date | Streamflow (cfs) | Streamflow (cms) |
|------------|------|------------------|------------------|
| 1997 | January 22, 1997 | 5,750 | 163 |
| 1998 | September 22,1998 | 17,000 [a] | 481[a] |
| 1999 | October 28, 1998 | 17,000 [a] | 481[a] |
| 2000 | October 31,1999 | 7,870 | 223 |
| 2001 | May 7, 2001 | 5,000 | 141 |
| 2002 | November 8, 2001 | 10,300 | 292 |
| 2003 | May 21, 2003 | 1,860 | 53 |
| 2004 | November 14, 2003 | 12,800 | 362 |
| 2005 | November 14, 2004 | 11,700 | 331 |
| 2006 | October 11, 2005 | 17,000 | 481 |
| 2007 | November 28, 2006 | 2,770 | 64 |
| 2008 | December 11, 2007 | 17,000 | 481 |
| 2009 | September 18, 2009 | 2,110 | 60 |

| Water Year | Date | Streamflow (cfs) | Streamflow (cms) |
|---|---|---|---|
| 2010 | August 31, 2010 | 6,160 | 174 |
| 2011 | August 23, 2011 | 17,000 | 481 |
| 2012 | March 29, 2012 | 15,600 | 441 |
| 2013 | October 26, 2012 | 6,430 | 182 |
| 2014 | August 24, 2014 | 11,500 | 326 |

Source:  USGS (2015e)

[a]  Discharge actually greater than indicated value.



Source: GLM (2010)

**Figure 3-8.     Area Inundated as a Result of Hurricane Georges**

**Energy Answers-Prepared Studies**

Based on the FEMA Flood Insurance Study, and the USGS and USACE studies, Energy Answers prepared a duplicate effective/existing condition model (DE/EC) to simulate the FEMA 100-year flow presented in **Table 3-12**, and match the FEMA effective flood profile. The model

was run for the 10-, 50-, 100-, and 500-year events (GLM 2010). The model included the Río Santiago diversion channel that was dug for the USACE flood control project.

In addition to the DE/EC model, Energy Answers prepared a floodway encroachment/proposed condition model (FE/PC) for the 100-year event to simulate regulatory limits, plus new floodway limits surrounding the Project site, based on the DE/EC model. This model included the proposed river bank modification between the Project's developed areas and the Río Grande de Arecibo channel, which would provide additional hydraulic conveyance capacity and compensate for the proposed encroachment around the plant (GLM 2010).

Both models were calibrated to match the FEMA effective 100-year water levels based on the calculated peak discharge. The DE/EC model was used to determine base flood elevations for the Project for the 10-, 50-, 100-, and 500-year flood levels (GLM 2010). **Table 3-14** provides the 100-year flood levels above msl calculated by FEMA, the DE/EC model, and the FE/PC model, which included the proposed river bank modification.

**Table 3-14.    100-Year Flood Levels for the Project Site**

| FEMA Cross Section | Distance Upstream from River Mouth miles (kilometers) | FEMA | DE Model | EC Model | Prop Model | Floodway Model |
|---|---|---|---|---|---|---|
| D (site) | 1.3 (2.1) | 17.06 (5.2) | 17.09 (5.21) | 17.13 (5.22) | 17.29 (5.27) | 17.26 (5.26) |

Source:  GLM (2010)
Note:    100-year flood levels are presented as meters about msl.

### 3.2.2    Effects Analysis

To determine whether the Project would have the potential to result in significant impacts to water resources, it is necessary to consider both the duration and the intensity of the impacts. Impacts on surface waters would occur during both construction and operation of the project and would likely be temporary. Impacts on groundwater during the operational phase of the Project as a result of spills and other potential pollutant releases from liquid storage tanks (e.g., diesel, ammonia) could occur. The potential impact of any spill and infiltration to groundwater would likely be short in duration, but moderate in intensity.

This section discusses the potential effects of the Project on the various water resources throughout the Project. Definitions for duration and intensity of water resources impacts established for this Project are described in **Table 3-15**.

**Table 3-15.    Water Resources Impacts Context and Intensity Definitions**

| Water Resources | | | |
|---|---|---|---|
| Context (Duration) | Low Intensity | Moderate Intensity | High Intensity |
| Short term: During construction period<br><br>Long term: Life of the Project (50 years or more) | The effect on surface and ground waters would be measurable or perceptible but small and localized. The effect would not alter the physical or chemical characteristics of the surface water or aquatic influence zone resource. | The effect on surface and ground waters would be measurable or perceptible and could alter the physical or chemical characteristics of the surface and ground water resources to an extent requiring mitigation but not to large areas. The functions typically provided by the water or aquatic influence zone would not be substantially altered. | The impact would cause a measurable effect on surface and ground waters and would modify physical or chemical characteristics of the surface and ground water. The impact would be substantial and highly noticeable. The character of the water or aquatic influence zone would be changed so that the functions typically provided by the water or aquatic influence zone would be substantially altered. |
| **Flooding** | | | |
| Short term: During construction period<br><br>Long term: Life of the Project (50 years or more) | Impacts would result in a detectable change to natural and beneficial floodplain values, but the change would be expected to be small, of little consequence, and localized. No appreciable increased risk of flood loss would occur, including impacts on human safety, health, and welfare. | Impacts would result in a change to natural and beneficial floodplain values that would be readily detectable and relatively localized. Location of operations in floodplains could increase risk of flood loss, including impacts on human safety, health, and welfare. | Impacts would result in a change to natural and beneficial floodplain values that would have substantial consequences on a regional scale. Location of operations would increase risk of flood loss including impacts on human safety, health, and welfare. |

Floodplain conversion alternatives analysis as required by Executive Order 11988, was conducted prior to the final Project site selection. Executive Order 11988 requires federal agencies to avoid, to the extent possible, the long and short-term adverse impacts associated with the occupancy and modification of floodplains, and to avoid direct and indirect support of floodplain development wherever there is a practicable alternative. Amended by Executive Order 13690 on January 30, 2015, Executive Order 11988 issued by the President of the United States defines floodplains in three different ways: using the best available climate model information, adding 2 feet to the mapped 100-year flood elevations, or using the floodplain area subject to flooding by the 0.2 percent annual chance flood. This final condition applies to the proposed plant area because it would be in an area that would be subject to the 0.2 percent annual flood;

however, following construction the site would be raised to a level that is outside of the 0.2 percent annual flood area.

As discussed in Section 2.1.1 of this document, Energy Answers conducted a comprehensive site selection process that considered and evaluated 33 potential site locations. Due to the Commonwealth's topography, a substantial portion of these sites were located at the confluences of the coastal plains and river valleys that are frequently subject to flooding and may contain wetlands. Therefore, Energy Answers' exclusion analysis did not include flood zones as exclusion criteria because development in these zones would be feasible when regulatory rules are incorporated into project design. During the comparative assessment, alternative sites located in a flood-prone area were considered less desirable and accordingly given a negative score for that particular criterion. Even though the proposed site (Central Cambalache Sugar Mill, including the Global Fibers Paper Mill site in Arecibo), received a negative score for being located in a flood-prone area, it received a higher overall score due to other factors such as proximity to similar land uses, current site conditions (i.e., previously developed industrial site), and lack of nearby residences. It was the only site of the final six carried forward in the comparative assessment that received a high suitability value.

Project designers initially proposed to avoid and/or minimize the conversion of floodplains and wetlands on the plant site by building a perimeter earthen dike system. However, Energy Answers decided to shift away from a dike system and to elevate the proposed site because of the need to conform to Section 65.10 of the National Flood Insurance Plan. This plan requires that all freeboard requirements be met and that a levee must tie into natural high ground at a minimum of 3 feet (0.9 meter) above the base flood elevation. Given that the entire proposed plant site is below the base flood elevation, FEMA recommended that the entire area be protected from flooding by elevating it to a level above the base flood elevation. This would require importing off-site fill material to bring the site grade above the 100-year floodway elevation and would prevent the site from avoiding impacts to on-site waters. To achieve this requirement, additional fill material must be brought on the plant site to raise the ground elevation to a height of 21 feet (6.3 meters) above msl.

Based on these factors and RUS' review of the proposed Project need, RUS determined that there is demonstrated need for the Project and that there are no practicable alternatives to avoiding the conversion of floodplains. Energy Answers would be required to implement mitigation for the conversion of these resources. Such mitigation would be performed in accordance with the requirements of the Section 404 permit and a Conditional Letter of Map Revision for this Project.

### 3.2.2.1     Construction

**Surface Water**

The Project would be constructed in the existing floodplain of the Río Grande de Arecibo. Plant construction would include excavating a portion of the Río Grande de Arecibo floodplain located west of the Project site to increase floodway capacity. Excavation and land-clearing activities associated with construction of the Project have the potential to contribute to sedimentation and the release of pollutants into nearby surface waters. Energy Answers proposes to incorporate preventive measures outlined in the Project's Soil Erosion Control Plan to prevent impacts on the Río Grande de Arecibo and surface water quality.

Adverse impacts on the Río Grande de Arecibo resulting from the construction of the Project would be short-term and moderate as a result of the removal of existing soil material within the floodway of the Río Grande de Arecibo. Construction of the Project would not result in a significant impact on the flow regime pattern of the Río Grande de Arecibo, because the proposed excavation would not alter the hydraulic section of the Río Grande de Arecibo channel. During construction, best management practices, including silt fences, sediment traps, and other procedures would be used to prevent erosion and the introduction of sediment into the river system.

Water quality impacts related to increased stormwater runoff would be mitigated through the construction of two retention ponds located in the northwest and southwest corners of the Project site. Hydraulic modeling of the site would determine the dimensions of the ponds needed to limit the proposed post-construction peak discharge at the plant site.

Long-term impacts on the Project site would include filling 2.42 acres (0.9 hectare) of wetlands to flood-proof the Project site to a height of 21 feet (6.3 meters) msl. The affected wetlands consist of 1.48 acres (0.6 hectare) of man-made stormwater collection canals and a 0.94 acre (0.4 hectare) overflow area associated with the northernmost canal. Wetland mitigation efforts proposed for an area contiguous to the plant site are discussed in Section 3.4.2.1, *Biological Resources*.

**Groundwater**

There would be little to no impact on local groundwater resources during construction of the Project. Groundwater would not be used as a source of water for construction-related practices. Construction activities would result in soil compaction and a related decrease in soil impermeability and the reduction in infiltration area around the plant. However, the anticipated soil compaction would have a small effect on the underlying large aquifer (600 square miles [1,554 square kilometers]). Impacts related to soil impermeability and a reduction in infiltration area would be confined to the plant site itself and would not extend beyond the plant footprint and its immediate vicinity.

Impacts on groundwater quality would be mitigated by measures presented in the Project's Spill Prevention Plan. Fuel and oil that would be used during construction would be placed in areas designed for storage and would be protected by secondary containment systems. Impacts related to potential chemical spills could adversely affect groundwater resources at the plant site and groundwater resources extending beyond the Project footprint.

**Water Infrastructure**

Construction of the Project would require an estimated 6,500 gallons per day (gpd) of potable water. Energy Answers proposes to receive potable water via the Vazquez WTP located approximately 4.8 miles (7.7 kilometers) southeast of the Project site. Water would be supplied to the Project through the existing 12-inch service line along PR-2 east of the Project. The Vazquez WTP has a water supply capacity of 100 mgd; therefore, no adverse impacts on existing drinking water infrastructure are expected.

**Flooding**

Effects on the Floodplain—To protect the facility from flooding and to minimize any changes to the floodway, Energy Answers proposes to excavate higher ground on the floodplain between the plant and the river channel to provide additional hydraulic conveyance capacity during floods. As a result, plant construction would involve modifying the existing drainage canals and basins to open more floodway, and raising the footprint elevation of the plant so that it is above the 100-year floodplain. The plant would be flood-proofed as part of the initial construction of the Project. The nominal finished floor elevation of the plant buildings would be approximately 21 feet (6.3 meters) above msl. Elevations within the floodplain area proposed to be modified would be lowered to a maximum 11.5 feet (3.5 meters) msl, while areas that are already lower than 11.5 feet (3.5 meters) would not be altered. **Figure 3-9** shows the proposed geometry of bank modification for the effected floodplain area. Although Project construction would not alter the current floodway limits beyond acceptable FEMA regulation standards, the Project would still be located in an area susceptible to large flooding events. Given the expected operational lifetime of the Project (between 30 and 50 years), there is a chance the facility would experience a significant flood inducing event (e.g., a hurricane). However, the design elevation places the facility above both the 100-year and 500-year flood elevations, minimizing the risk of a major flooding event affecting the Project.

Effects on Existing Structure—In a letter dated September 19, 2011, FEMA stated that base flood elevations would increase as a result of the Project. Section 65.12 of the National Flood Insurance Program requires that individual legal notices be sent to all property owners affected by the proposed increases in base flood elevations and that no structures are located in areas impacted by the increased base flood elevations. Landowner notifications were sent on December 5, 2011.



Source: GLM (2010)

**Figure 3-9.    Proposed Geometry of Bank Modification Area**

Project construction would result in an increase in base flood elevations along predominately undeveloped properties located east and west, as well as immediately upstream, of the Project site. As seen in **Figure 3-6**, the existing structures located along FEMA cross section "E" would not be subject to base flood elevation increases. Several structures located within the immediate plant area and a nearby off-site area would fall within the area of base flood elevation increase. **Figure 3-10** shows the structures that would be impacted by the increase in base flood elevation.

**Structures**

To satisfy Puerto Rico Planning Board (Regulation #13 – Regulations for Special Flood Areas Section 7.01(d)(4)) and EQB (Rule 531[P]) regulations, the plant must be designed so that the elevation of the lowest floor is up to or above the base flood elevation and that non-hazardous solid waste cannot be stored in the floodplain. In addition, the proposed Project must be consistent with FEMA flood insurance rate maps, which would need to be revised to account for the proposed elevation changes. The map revision process requires Energy Answers to model the potential changes in flood elevations within the floodway elevating the plant site would have. Removal of structures that potentially could be affected by the changes in flood elevations, and

certification that the structures were removed by a professional engineer are required before the
Puerto Rico Planning Board and FEMA, respectively, would approve the proposed Project and
make the required map revisions. To ensure the properties affected by the increase in the base
flood elevation meet the Puerto Rico Planning Board regulations and as a requirement by FEMA
to approve the Conditional Letter of Map Revision, Energy Answers has agreed to demolish or
move the structures. The structures identified east of the Project site were primarily used for
agricultural purposes, including ancillary support structures for a commercial hydroponic farm.

A topographic survey performed for the off-site location determined the elevation at the property
to be 9.8 feet (3 meters) msl. Energy Answers hydraulic modeling indicates the maximum base
flood elevation increase at the structures due to modifications at the plant site is 0.22 feet (0.07
meter). **Table 3-16** lists the structures that were found at the off-site location and the current
status of each. In a letter dated November 1, 2012, Interlink Construction (Ponte 2012) provided
the scope of work and status of each facility. Structures #1, #3, #5, and #6 were approved for
demolition; structure #2 would be relocated elsewhere within the off-site area, and structure #4
would be removed from the site.

**Table 3-16.    Off-site Structures Identified for Demolition or Relocation**

| Building Number | Building Name | Demolished | Relocated | Presence of Lead | Presence of Asbestos |
|---|---|---|---|---|---|
| 1 | Packing and storage building (hydroponic garden | Yes | | No | No |
| 2 | Storage trailer | | Yes | | |
| 3 | Office and bathroom building | Yes | | No | No |
| 4 | Water tanks (2) | | Yes | | |
| 5 | Abandoned Farm structure | Yes | | No | No |
| 6 | Residential structure | Yes | | Yes | No |

Source:  Ponte (2012)

At the Project site, existing structures include former Global Fibers Paper Mill buildings.
According to the topographic survey, the ground elevation around the buildings is 14.7 feet
(4.5 meters) msl. The maximum base flood elevation increase at these structures is 0.98 feet
(0.30 meters). **Figure 3-10** shows the location of the existing buildings, including three main
concrete and structural steel industrial structures and two concrete and structural steel
office/storage structures. A meeting minutes document dated February 28, 2012, from the Risk
Assessment, Mapping, and Planning Partners includes a description of an action plan to

demolish, raise, or flood-proof the structures impacted by the increases in base flood elevations due to the Project (Hannan 2012). For the on-site structures, one of the main industrial structures and both of the office/storage structures would be demolished prior to Project construction. The two remaining buildings would be flood-proofed in accordance with the regulations (44 CFR 60.3). Once the action plan is in place and implemented, a professional engineer would be able to certify that no structures are located in areas impacted by the increase in base flood elevations in accordance with Section 65.12 of the National Flood Insurance Program regulations.



Source: NRCS (2014)

**Figure 3-10.   Existing Structures Located Within Area of Base Flood Elevation Increase**

### 3.2.2.2    Operation

**Surface Water**

During the operational lifetime of the Project, there would be short-term, moderate impacts on surface water quantity and quality. Best management practices would be implemented to minimize impacts of stormwater discharge into the Río Grande de Arecibo. The installation of

grease traps, rip-rap, and filters to the in inlet areas of the stormwater system, would mitigate the majority of adverse effects. With proper maintenance of these stormwater best management practices and the development of an inspection plan schedule prior to and after precipitation events, the Project would have little to no impact to surface waters throughout its operational lifetime. The Project would not generate direct discharges of pollutants to the Río Grande de Arecibo or other surface waters. The sanitary and sewage systems for the plant would be connected to the existing sanitary line located along PR-2.

The plant would require about 2.1 mgd of water for all of its processing needs. This demand includes about 2.0 mgd of non-potable water for process and cooling water. As discussed previously, the 2.0 mgd for Project operational processes would be obtained from the existing Caño Tiburones Natural Reserve discharge via the existing El Vigía Pumping Station. To manage water levels in the Caño Tiburones wetland and to protect regional farms and roadways from flooding, brackish water is being pumped from Caño Tiburones to the Atlantic Ocean via the El Vigía Pumping Station. In addition to this pumping operation, brackish water exits the Caño Tiburones Natural Reserve via gravity flow twice daily at low tides through the El Vigía Pumping Station. The pump station is operated by PRDNER and has a daily brackish water pumping rate that varies from year to year, but that historically has pumped approximately between 30 to 100 mgd. The proposed use would involve diverting about 2.0 mgd of the existing 30 to 100 mgd discharge (approximately 2 to 7 percent) and diverting it from the estuary that empties into Arecibo Harbor approximately 3,500 feet (1,000 meters) downstream of the El Vigía Pumping Station. Energy Answers would install dedicated pumps that would meet the water flow requirements. The resulting minor reduction in flow would pose little to no impact on the existing condition of estuary downstream of the El Vigía Pumping Station.

Initial estimates placed the potable water demand for the operation of the Project at 10,000 gpd. In a November 29, 2012, letter and by acceptance from PRASA, the demand for potable water for Project operations was increased to 100,000 gpd. This increase in demand is anticipated to have little to no impact on surface water.

**Groundwater**

During the operational lifetime of the Project, there could be minor impacts on local groundwater resources. During normal operations, there would be no effect on groundwater because groundwater extraction would not be used to supply the normal water needs of the Project for any of its operational procedures. If groundwater were to be used for backup or emergency purposes, the impacts to the groundwater would be long term in duration and moderate in intensity. There is the potential to pollute groundwater resources in the Project area via chemical spills; however, if this were to occur, adverse effects on groundwater would be prevented or limited by the implementation of measures presented in Energy Answers' Spill Prevention Plan and proposed stormwater best management practices.

**Water Infrastructure**

Operation of the Project would require an estimated 100,000 gpd of potable water for boiler
makeup and sanitary use. No adverse impacts on the existing drinking water infrastructure are
expected.

Non-potable water supplies would be supplied from the brackish water that is discharged into the
Atlantic Ocean from the El Vigía Pumping Station at Caño Tiburones. The Project is not
anticipated to have an impact on the existing non-potable water infrastructure.

Energy Answer's proposal to discharge 800,000 gpd of wastewater during the operation of the
Project would have little impact on local wastewater infrastructure. The Arecibo Regional
Wastewater Treatment Plant is located 2 miles (3.2 kilometers) northeast of Project, and has a 10
mgd capacity and an average flow of 4.3 mgd. The effluent from the wastewater treatment plant
is discharged into the Atlantic Ocean. PRASA indicated, by letter dated November 29, 2012
(Appendix D), that there would be enough capacity in the 48-inch trunk sewer line and at the
wastewater treatment plant to serve the Project. PRASA's approval for the Project is conditional
on Energy Answers preparing a plan for treating the discharge in accordance with the wastewater
treatment plant's industrial pretreatment program requirements.

**Flooding**

The flood levels caused by Hurricane Georges represent an outlier in terms of typical streamflow
expected at the Project. Although there were other storm events in 2005, 2007, and 2011 that led
to instantaneous flows in excess of 17,000 cfs (481 cms), the monthly average of flows near the
plant site for all years fall below the 17,000 cfs (481 cms) mark. Energy Answers should
establish flood management measures in the event of other extreme events similar to the flooding
the plant site experienced as a result of Hurricane Georges. Energy Answers' proposal to
excavate higher ground as shown in **Figure 3-7** and to construct the facility at a base elevation of
121 feet (6.3 meters) msl would provide the necessary hydraulic conveyance capacity and flood
protection for the 100 year flood level the Project site may experience. Although the facility
would operate above the 100-year flood level, the ability to transport waste to the site could be
disrupted because low-lying roads within the Arecibo Valley would be inundated by flood water
temporarily preventing deliveries to the plant. The potential effects of flooding on human health
and safety are discussed in section 3.10.2.2, *Public Health and Safety, Operations, Flooding*.

## 3.3    AIR QUALITY

### 3.3.1    Affected Environment

#### 3.3.1.1    Regulatory Framework

The Clean Air Act (CAA) and its amendments led to the creation of National Ambient Air
Quality Standards (NAAQS) for six criteria air pollutants: CO, $SO_2$, ozone, particulate matter

(PM), nitrogen dioxide ($NO_2$), and lead. There are two types of NAAQS—primary standards and secondary standards. Primary standards set limits to protect public health, including the health of sensitive populations such as asthmatics, children, and the elderly, with an adequate margin of safety. Secondary standards set limits to protect public welfare, including protection against decreased visibility, damage to animals, crops, vegetation, and buildings (EPA 2014a).

**Table 3-17** summarizes the primary and secondary NAAQS for the criteria pollutants. The six criteria pollutants are briefly described below.

- **Carbon monoxide**—CO is a colorless, odorless gas emitted from combustion processes, including engine exhaust. Elevated CO concentrations can cause adverse health impacts by reducing oxygen delivery to vital organs. Very high concentrations can cause death (EPA 2014b). CO is most commonly a consideration in the evaluation of congested signalized intersections with high traffic volumes.

- **Lead**—Lead is a toxic heavy metal that can have numerous adverse health impacts, including neurological damage to children and cardiovascular effects in adults (EPA 2014c). Lead emissions can contribute to exposure through the air directly or indirectly by causing soil/water contamination. Prior to the phase out of leaded gasoline, automobiles were a source of lead emissions. According to EPA, the major sources of lead emissions in the air today are ore and metals processing and piston-engine aircraft operating on leaded aviation gasoline (EPA 2014c).

- **Nitrogen dioxide**—$NO_2$ is one of a group of reactive gases called nitrogen oxides or $NO_x$. $NO_2$ forms small particles that penetrate deep in the lungs and can cause or worsen existing respiratory system problems such as asthma, emphysema, or bronchitis. $NO_2$ emission sources include automobiles and trucks, construction equipment, and industrial sources, among others. $NO_x$ are also a precursor to the formation of ozone (EPA 2014g).

- **Ozone**—Ground-level ozone is an important component of smog and is formed through reactions of $NO_x$ and VOCs in the presence of sunlight. Sources of $NO_x$ and volatile organic compound emissions include both mobile and stationary sources. Health effects of ozone exposure include respiratory irritation, reduced lung function, and worsening of diseases such as asthma. People with lung disease, children, older adults, and people who are active outdoors may be particularly sensitive to ozone. Elevated ozone can also impact sensitive vegetation (EPA 2014h). Ozone formation is a regional air quality concern; therefore, the potential impacts in terms of ozone formation are addressed by quantifying the contribution of the Project to precursor emissions rather than predicting project-specific ozone concentrations.

- **Particulate matter**—PM is a broad class of air pollutants that exist as liquid droplets or solids, with a wide range of size and chemical composition. Smaller particulates that are smaller than or equal to 10 and 2.5 microns in size ($PM_{10}$ and $PM_{2.5}$) are of particular health

concern because they can get deep into the lungs and affect respiratory and heart function. Particulates can also impact visibility; damage soil, plants, and water quality; and stain stone materials (EPA 2014i). PM emission sources include heavy-duty trucks and other equipment with diesel engines, industrial sources, and fugitive dust from unpaved roads and construction sites.

- **Sulfur dioxide**—$SO_2$ is part of a group of reactive gases called oxides of sulfur. Health effects of $SO_2$ exposure include adverse respiratory effects, such as increased asthma symptoms (EPA 2015e). The largest sources of $SO_2$ emissions are from fossil fuel combustion at power plants/industrial facilities, electrical utilities, and residential/commercial boilers. Mobile sources are not a significant source of $SO_2$ emissions (EPA 2008).

**Table 3-17.    National Ambient Air Quality Standards**

| Pollutant | Primary / Secondary | | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| CO | Primary | | 8-hour | 9 ppm | Not to be exceeded more than once per year |
| | | | 1-hour | 35 ppm | |
| Lead | primary and secondary | | Rolling 3-month average | 0.15 $\mu g/m^3$ | Not to be exceeded |
| $NO_2$ | Primary | | 1-hour | 100 ppb | 98th percentile, averaged over 3 years |
| | primary and secondary | | Annual | 53 ppb | Annual mean |
| Ozone | primary and secondary | | 8-hour | 0.075 ppm | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| PM | | primary | Annual | 12 $\mu g/m^3$ | Annual mean, averaged over 3 years |
| | $PM_{2.5}$ | secondary | Annual | 15 $\mu g/m^3$ | Annual mean, averaged over 3 years |
| | | primary and secondary | 24-hour | 35 $\mu g/m^3$ | 98th percentile, averaged over 3 years |
| | $PM_{10}$ | primary and secondary | 24-hour | 150 $\mu g/m^3$ | Not to be exceeded more than once per year on average over 3 years |
| $SO_2$ | primary | | 1-hour | 75 ppb | 99th percentile of 1-hour daily maximum concentrations, |

| Pollutant | Primary / Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|
| | | | | averaged over 3 years |
| | secondary | 3-hour | 0.5 ppm | Not to be exceeded more than once per year |

Source:  NAAQS (2014)

Notes:  CO – carbon monoxide, $NO_2$ – nitrogen dioxide, PM – particulate matter, ppb – parts per billion, ppm – parts per million, $SO_2$ – sulfur dioxide, $\mu g/m^3$ – microns per cubic meter

### 3.3.1.2    Attainment Status

Areas that do not meet NAAQS are classified as nonattainment areas for that pollutant. Areas that have never been designated nonattainment for a pollutant and NAAQS are considered attainment areas. State implementation plans are designed to bring nonattainment areas into compliance with the NAAQS, including the establishment of emissions "budgets" or the maximum emissions allowed for different source categories to ensure the air quality standards would be met. Former nonattainment areas currently meeting the NAAQS are designated maintenance areas and must have maintenance plans for 20 years.

The Project is located in an attainment are for all criteria pollutants except for lead. A portion of Arecibo, the area within a 2.5-mile (4-kilometer) radius of the Battery Recycling Company facility, is designated a nonattainment area for lead (EPA 2015f). The Battery Recycling Company, which is located 0.75 mile (1.2 kilometers) from the Project site, was found to be in violation of federal hazardous materials management requirements and entered into an agreement to take corrective measures in 2012 (EPA 2012a). The corrective measures include completely enclosing the lead recycling processing areas, installing new dust collection systems, and washing trucks and pavement to reduce the spread of lead dust into the environment. Air quality monitoring data for 2013 and 2014 appear to show these control measures have substantially reduced ambient lead concentrations compared to 2012 levels (see **Table 3-18**), and the area may potentially be redesignated to "maintenance" in the future if the current trend continues.

### 3.3.1.3    General Conformity

Section 176(c) of the CAA (42 USC §7506[c]) requires federal agencies that license, permit, or approve any activity to demonstrate that the action conforms to the applicable state implementation plan before the action is approved. In this context, "conformity" requires that federal actions be consistent with the objective of state implementation plans to eliminate or reduce the severity and number of violations of NAAQS, and achieve expeditious attainment of those standards. EPA's general conformity regulations at 40 CFR, §93, Subpart B apply to federal activities except those covered under transportation conformity (40 CFR §93, Subpart A).

General conformity regulations apply to a federal action in a nonattainment or maintenance area if the total of direct and indirect emissions of the relevant criteria pollutants and precursor pollutants caused by the federal action equal or exceed certain *de minimis* rates. If the action will cause emissions above the *de minimis* rates and the action is not otherwise exempt, "presumed to conform," or included in the existing emissions budget of the state implementation plan, the agency must conduct a conformity determination before it takes the action.

For this project, general conformity does not apply because major sources requiring a PSD permit are exempted (40 CFR §93.153[d][1]). Despite the non-applicability of general conformity, it should be noted that lead is the only pollutant for which the Project area is designated as nonattainment or maintenance, and the Project's proposed emissions of lead (0.31 ton per year) are well below the *de minimis* threshold for lead (25 tons per year).

### 3.3.1.4    Permitting Requirements

The New Source Review program, enacted by the U.S. Congress in 1977 as part of the CAA amendments, aims to preserve air quality in NAAQS attainment areas and achieve progress toward clean air in nonattainment areas. In attainment areas (including Arecibo at the time the permitting process began), the New Source Review program is implemented under the federal program known as PSD. Under the PSD program, major sources are required to install BACT to reduce emissions; perform an air quality analysis to demonstrate the source will not cause an exceedance of the NAAQS; conduct an analysis of impacts on soils, vegetation, and visibility; and provide an opportunity for public input during the permit review process (EPA 2014d).

In addition, the Project would be subject to the Standards of Performance for New Stationary Sources codified under Title 40 CFR §60, which specify the minimum performance requirements for certain new sources or modifications of existing sources. The plant also would be subject to National Emissions Standards for Hazardous Air Pollutants and therefore would be considered a major source under Section 112 of the CAA. Section 112 establishes standards to reduce hazardous air pollutant emissions based on control technology. The emission control system of the plant would meet the control level considered MACT (Energy Answers 2011a).

EQB Regulations for the Control of Atmospheric Pollution, Rules 201, 202, and 203 establish the local requirements for approval and construction permits for major stationary sources. Rule 201 describes the rules for granting location approval for a new major stationary source. Among the rules is a requirement to demonstrate that emissions from the new major stationary source will not cause any NAAQS to be exceeded. In addition, a public hearing is required for the location approval. The EQB permit application describes the operation of the new source, the emission control system, and the air quality impact analysis that demonstrates that the increase in allowable emissions from the proposed new major stationary source would not significantly cause or contribute to air pollution in violation of any NAAQS.

EQB Rules 401 to 417 set emission rules applicable to authorized stationary sources. To this end, Rule 403 states specific limitations for the emission of air pollutants with opacity greater than 20 percent in an average of 6 minutes. Rule 406 sets a limit to the emission of particulate matter in excess of 0.3 pound per million BTU. Rule 407 specifies an allowable emission rate of particulate matter from non-fuel burning equipment (e.g., silos, and conveyors) based on the total weight of the material to be processed. In general, it is anticipated that the emission limits established in the PSD are equal or more stringent than those permitted by Rules 403, 406, and 407. Thus, by complying with the PSD requirements, the Project also would be in compliance with EQB air quality standards.

### 3.3.1.5    Permitting History

The PSD application for the Project was submitted to EPA Region 2 in February 2011 (Energy Answers 2011a). In response to EPA comments, the PSD air quality modeling analysis was revised and refined several times and was finalized in October 2011. On May 9, 2012, EPA issued a preliminary determination to approve the PSD permit. A public review period of 105 days was provided and six public hearings were held between June 25, 2012, and August 27, 2012. EPA reviewed all the comments, prepared responses to those comments, and made changes to the draft permit, as appropriate. EPA issued the final PSD permit on June 11, 2013 (EPA 2013a). The permit decision was appealed administratively through EPA's Environmental Appeals Board. Except for a limited revision with respect to biogenic $CO_2$ emissions, the PSD permit decision was upheld by the Environmental Appeals Board. The final PSD permit became effective on April 10, 2014 (EPA 2014e). A Permit to Construct Application was submitted to EQB under Rule 201 and Rule 203 in August 2011 and the final EQB permit was issued in December 2014.

### 3.3.1.6    Local Meteorology

The annual average temperature in the zone of the Project site is 77.9ºF (25.5ºC) and normally only varies a few degrees from winter to summer (in part due to the temperature moderating influence of the ocean). The maximum and minimum average temperature in Arecibo fluctuates between 87.7ºF (30.9ºC) and 68.0ºF (20.0ºC). Arecibo received 53.01 inches (134.6 centimeters) of precipitation per year on average for the 30-year period from 1971 to 2000.

The winds in the Project area blow from the east in almost all months of the year with an average speed that varies from 6 to 9 miles per hour (9.7 to 14.5 kilometers per hour). An important characteristic of the coastal areas is the temporary adjustment of the eastern trade winds caused by the daily breeze from the land and the sea, which regularly form in the coastal perimeter of the island. The typical pattern is that during daytime hours the wind blows almost constantly from the ocean to the land and after sunset, the wind direction changes off the land—from the mountains to the sea.

### 3.3.1.7    Ambient Air Quality Monitoring Data (2012–2014)

Existing ambient air quality monitoring data (for 2012–2014, after Energy Answers applied for the PSD permit) for the criteria pollutants was obtained from EPA's AirData portal, which incorporates the monitoring data reported by EQB (EPA 2014f). Two lead monitoring stations are located near the battery recycling plant. For pollutants other than lead, no active ambient air quality monitors are located near the Project site or Arecibo. Therefore, **Table 3-18** includes the closest available regional monitors for the remaining criteria pollutants, the majority of which are located in and around the San Juan area. The available monitoring data provide a general context for understanding existing air quality conditions; however, they are not an official determination by EPA regarding whether or not the NAAQS were met at a specific monitor or whether or not the data were sufficient for EPA to make such a determination. It should be noted there are several limitations to the 2012–2014 data in terms of the number of measurements that affect the determination of completeness. For example, although the data showed improved lead concentrations in 2013 and 2014, the small number of measurements taken makes it impossible to attribute this improvement with certainty to changes in ambient concentrations or measurement bias, although the implementation of EPA corrective measures and reduced activity by the Battery Recycling Facility would seem to support this conclusion.

The available CO, $NO_2$, ozone, $PM_{2.5}$, and $PM_{10}$ data show concentrations below the NAAQS. The lead NAAQS was exceeded once (three-month rolling average) in 2012, and the annual average in 2012 was nearly at the level of the three-month average NAAQS (0.15 micrograms per cubic meter [$\mu g/m^3$]). High $SO_2$ levels occurred in San Juan in 2013; however, this level may have been an anomaly due to substantially lower concentrations at the same monitor in 2012 and 2014.

Arecibo Waste-to-Energy Project
Final EIS                                                                                      January 2017

**Table 3-18.    Existing Air Quality Monitoring Data, 2012–2014**

| Pollutant | Average Time | National Ambient Air Quality Standards | 2012 | 2013 | 2014 | Monitor Location |
|---|---|---|---|---|---|---|
| CO | 8 hour | 9 ppm | 3.2 ppm | 2.8 ppm | 2.7 ppm | San Juan 72-127-0003 |
| | 1 hour | 35 ppm | 14.9 ppm | 10.7 ppm | 11.5ppm | |
| Lead* | Rolling 3-month average | 0.15 µg/m3 | 1 exceedance 0.14 annual average | 0 Exceedances 0.08 annual average | 0 Exceedances 0.05 annual average | Project Area 72-013-0001 |
| $NO_2$ | 1 hour | 100 ppb | 24 ppb (2007) | 35.8 ppb (2012) | ND | San Juan 72-033-0008 |
| | Annual | 53 ppb | 8.13 ppb (2007) | 19.8 ppb (2012) | ND | |
| Ozone | 8 hour | 0.075 ppm | 0.045 ppm (4th highest) | 0.034 ppm (4th highest) | 0.038 ppm (4th highest) | Juncos 72-077-0001 |
| $PM_{2.5}$ | Annual | 12 µg/m³ | 7.5 µg/m³ | 6.6 µg/m³ | 5.9 µg/m³ | San Juan 72-061-0005 |
| | 24 hour | 35 µg/m³ | 18.2 µg/m³ (98th Percentile) | 11.8 µg/m³ (98th Percentile) | 13.9 µg/m³ (98th Percentile) | |
| $PM_{10}$ | 24 hour | 150 µg/m³ | 98 µg/m³ | 74 µg/m³ | 96 µg/m³ | San Juan 72-033-0004 |
| $SO_2$ | 1 hour | 75 ppb | 35 ppb (99th Percentile) | 89 ppb (99th Percentile) | 26 ppb (99th Percentile) | San Juan 72-033-0004 |
| | 3 hour | 500 ppb | 35 ppb | 107 ppb | 16.6 ppb | |

Source:  EPA (2014f)

Note:    *Lead monitoring data for 2013 and 2014 is based on a low number of valid measurements, below EPA criterion of 75 percent completeness. CO – carbon monoxide, $NO_2$ – nitrogen dioxide, PM – particulate matter, ppb – parts per billion, ppm – parts per million, $SO_2$ – sulfur dioxide, µg/m³ – microns per cubic meter

### 3.3.1.8   Global Climate Change

Emissions of greenhouse gases such as $CO_2$, methane, nitrous oxide, and fluorinated gases contribute to global climate change (EPA 2015c). Earth's average temperature has risen by 1.4°F over the past century (EPA 2015c). Average global temperatures are expected to increase by 2°F to 11.5°F by 2100, depending on the level of future greenhouse gas emissions (National Research Council 2010). The global warming of the past 50 years is primarily due to human activities such as the burning of fossil fuels and deforestation (U.S. Global Change Research Program 2014). Islands such as Puerto Rico have particular vulnerability to climate change related impacts, including higher sea levels, more powerful tropical storms and hurricanes, and warmer, more acidic coastal waters (EPA 2015c).

In 2014, CEQ issued *Revised Draft Guidance for Greenhouse Gas Emissions and Climate Change Impacts* (CEQ 2014). The draft guidance recommends NEPA documents consider both the impact of the changing climate on the project (such as changes in environmental resource conditions, increased flooding risk, more extreme temperatures, to the extent such information is available for the project area), and the impact of the project on greenhouse gas emissions. The draft guidance suggests 25,000 metric tons of $CO_2$-equivalent ($CO_2e$) per year as the level above which quantification of greenhouse gas emissions may be warranted. The draft guidance recommends considering mitigation measures to lower greenhouse gas emissions.

### 3.3.2   Effects Analysis

This section discusses potential impacts, their duration, and intensity on air quality and greenhouse gas emissions resulting from the construction and operation of the proposed Project, including the no-action alternative. Definitions for context and intensity are described in **Table 3-19**.

**Table 3-19.    Air Quality Impacts Contexts and Intensity Definitions**

| Air Quality | | | |
|---|---|---|---|
| **Context (Duration)** | **Low Intensity** | **Moderate Intensity** | **High Intensity** |
| Short term: During construction period

Long term: Life of the Project (50 years) | The impact on air quality associated with emissions from the operation, maintenance and construction is measureable, but localized and small such that emissions do not exceed EPA's *de minimis* criteria for a general conformity analysis, or the EPA | The impact on air quality would be measurable and primarily localized, but have the potential to result in regional impacts. Emissions of criteria pollutants associated with operation, maintenance and construction would be at the EPA's *de minimis* criteria levels for general conformity | The impact on air quality would be measurable on a local and regional scale. Emissions from operation, maintenance and construction are high, such that they would exceed EPA's *de minimis* criteria levels for a general conformity analysis and the EPA mandatory reporting threshold for |

| Air Quality | | | |
|---|---|---|---|
| Context (Duration) | Low Intensity | Moderate Intensity | High Intensity |
| | mandatory reporting threshold for greenhouse gas emissions. | analysis and the EPA mandatory reporting threshold for greenhouse gas emissions. | greenhouse gas emissions. |

### 3.3.2.1   Construction

Construction activities would result in temporary emissions of criteria pollutants through vehicle exhaust and fugitive dust. These emissions would be greatest during the early phases of construction when ground clearing and excavation activities are ongoing. For diesel construction trucks and equipment, the primary pollutants of concern are PM and $NO_x$. PM emissions (primarily $PM_{10}$) also would be generated from fugitive dust from exposed soil, unpaved roads, and increased traffic/soil loading on paved roads. The Project site would require 382,000 cubic meters of fill material, generating construction trips along PR-2, PR-10, Highway PR-22, PR-8861, and PR-861. The 2010 traffic study assumed this activity would generate 480 daily trips for an estimated time of 228 days. Construction activities would generally occur between 6:00 a.m. to 10:00 p.m. The trips that would be generated during the construction of the Project represent an increase of 1.59 to 2.73 percent in traffic volume on PR-2.

Ambient air quality near the construction site would decrease as a result of construction activity; however, concentrations of criteria pollutants exceeding the NAAQS are not anticipated at sensitive receptors because the nearest occupied area with receptors is 598 yards (547 meters) to the southeast (noise receptor R-4), and air quality construction mitigation measures would be employed as discussed below.

The following air quality mitigation measures would be implemented during construction.

- **Utilization of newer equipment**—Heavy duty diesel construction equipment greater than 50 horsepower would meet EPA Tier 2 or better emission standards. Older equipment greater than 100 horsepower would incorporate diesel particulate filters or other EPA-approved retrofit technology to reduce PM emissions (EPA 2015d).

- **Dust control**—Fugitive dust control plans would be required as part of contract specifications. For example, stabilized truck exit areas would be established for washing off the wheels of all trucks that exit the construction site. Tracking pads would be established at construction exits to prevent dirt from being tracked onto roadways. Any truck routes within the site would be either watered as needed or, in cases where such routes would remain in the same place for an extended duration, the routes would be stabilized, covered with gravel, or temporarily paved to avoid the re-suspension of dust. During dry weather, exposed soil

areas (unpaved access roads, soil piles, staging areas) would be watered once per day to control fugitive dust. All trucks hauling loose material would have their loads securely covered prior to leaving the construction sites. To minimize fugitive dust emissions, vehicles on-site would be limited to a speed of 15 miles per hour.

- **Idling limits**—Idling times would be minimized either by shutting equipment off when not in use or reducing the maximum idling time to 5 minutes. Clear signage indicating idling limits would be provided for construction workers at all access points.

### 3.3.2.2    Operation

**Overview of Emissions Sources and Control Measures**

The main potential sources of emissions from the plant would consist of two combustion units (i.e., spreader-stoker boilers),  ash management systems, an activated carbon storage silo, a lime storage silo, an emergency generator, a firefighting pump, a four-chamber cooling tower, and an ammonia storage tank.

The municipal combustion units would use processed refuse fuel as their primary fuel and would be capable of using supplemental fuel, when available, consisting of automotive shredder residue, tire-derived fuel, and processed urban wood waste. These supplemental fuels would replace a portion of the processed refuse fuel; however, they would be subject to the same emissions standards as set for processed refuse fuel combustion.

MSW would be received at the tipping floor of the storage area and separated into acceptable, unacceptable, non-processable, and readily recyclable materials. Acceptable materials would be shredded and then processed to magnetically remove approximately 70 percent of the ferrous metal, which would be recycled. The remaining processed material, which is known as processed refuse fuel, would be stored or loaded on conveyors to stoke the boilers. Supplemental fuels would be distributed separately from the MSW, and unloaded and stored in a designated space in the enclosed MSW storage area. Tire-derived fuel and processed urban wood waste would be received already shredded or would be shredded at the facility. Automotive shredder residue would be delivered only in shredded form. Supplemental fuels could be mixed with MSW before being shredded or could be mixed directly in the processed refuse fuel stream before burning. Supplemental fuels would only be mixed and burned with processed refuse fuel, and there would only be one supplemental fuel present in the processed refuse fuel mixture at any given time. Mixing supplemental fuel with processed refuse fuel is subject to completion of a combustion demonstration program and EPA approval, as discussed in Section 2.2.2.9.

Each municipal waste combustion unit would have a nominal production capacity of 359,779 pounds of steam per hour. The steam originating from municipal waste would operate a steam turbine, which would have the capacity to produce about 79 MW of electricity, for a net Project output of about 67 MW after in-plant needs are considered. Ultra-low sulfur diesel would be

used with a maximum sulfur concentration of 0.0015 percent (15 parts per million by weight) for: the auxiliary municipal waste combustion unit burners during warm-up and shut-down, and for maintaining the temperature of the combustion chamber during short-term interruptions in the supply of waste; the emergency generator; the firefighting pump; and the RSCR system burners to provide the necessary temperature range for nitrogen control.

Each municipal waste combustion unit would use the following air pollution control equipment: a Turbosorp dry circulating gas scrubber, an activated carbon injection system, fabric filters, and a RSCR system with a catalytic oxidizer module and a selective catalytic reduction module. The fabric filters would control the particulate emissions resulting from the emission units of the ash management systems and the silos. Additionally, the cooling tower would be equipped with drift eliminators for controlling particulate emissions. The air pollution control system would pneumatically inject the powdered activated carbon and lime from their respective storage silos into the flue gas stream where they would adsorb vaporized compounds and then collect in the fly ash particulate collection system. Fabric filters at the silos to control emissions from these sources would be changed on a regular basis, and all used fabric filters would be combusted in the municipal waste combustion units or discarded with bottom and fly ash at an EPA-approved landfill.

**Emissions Inventory**

**Table 3-20** provides an overview of the annual emissions of criteria and non-criteria pollutants associated with the operation of the Project. **Table 3-20** also indicates the thresholds for PSD applicability and whether or not PSD review applies to the Project for each pollutant.

**Table 3-20.    Potential to Emit Criteria and Hazardous Air Pollutants**

| Pollutant | PSD Significant Emission Rate (tons/year) | Proposed Emission Rate (tons/year) | PSD Review Required |
|---|---|---|---|
| Carbon monoxide | 100 | 357 | Yes |
| Nitrogen oxides (as $NO_2$) | 40 | 352 | Yes |
| Sulfur dioxide | 40 | 260 | Yes |
| Particulate matter (PM) − filterable | 25 | 51.7 | Yes |
| Particulate matter < 10 microns ($PM_{10}$) − filterable and condensable | 15 | 104 | Yes |
| Particulate matter < 2.5 microns ($PM_{2.5}$) − filterable and condensable | 10 | 90 | Yes |
| Volatile organic (as ozone precursor) | 40 | 52.4 | Yes |
| Lead | 0.6 | 0.31 | No |

Arecibo Waste-to-Energy Project
Final EIS

January 2017

| Pollutant | PSD Significant Emission Rate (tons/year) | Proposed Emission Rate (tons/year) | PSD Review Required |
|---|---|---|---|
| Beryllium | 0.0004 | 0.0032 | Yes |
| Nickel | NA | 0.024 | NA |
| Cadmium | NA | 0.041 | NA |
| Chromium | NA | 0.016 | NA |
| Zinc | NA | 0.93 | NA |
| Ammonia | NA | 28.8 | NA |
| Fluorides (as HF) | 3 | 10.8 | Yes |
| Mercury | 0.1 | 0.0692 | No |
| Sulfuric acid | 7 | 16.6 | Yes |
| Hydrogen chloride | NA | 124 | NA |
| Municipal waste combustor organics-measured as 2,3,7,8-Tetrachlorodibenzodioxin (TCDD-2378) | 3.5E-6 | 4.07E-05 | Yes |
| Municipal waste combustor metals (measured as particulate matter) | 15 | 42.8 | Yes |
| Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride) | 40 | 415 | Yes |
| Arsenic | Any Emission Rate | 0.0020 | Yes |

Source:  Energy Answers (2011b)

Note:    NA − Not Applicable, no PSD significant emission rate established

## Air Quality Modeling

A detailed air quality modeling analysis was completed in support of the PSD permit application (February 2011, revised July 2011 and October 2011). The latest available version of the AERMOD (11103) dispersion model was used at the time of the final modeling analysis was performed.[13]

---

[13] AERMOD is a steady-state plume model that incorporates air dispersion based on planetary boundary layer turbulence structure and scaling concepts, including treatment of both surface and elevated sources, and simple and complex terrain. Key inputs to AERMOD include the emission rate for the various sources associated with the Project, the physical Project configuration (including details of the exhaust stack height and diameter), meteorology data that is used to simulate how project emissions would affect ambient concentrations at specific receptors, and terrain data defining the ground level for receptors and emission sources. Refer to the October 2011 PSD Air Quality Modeling Analysis (Revised) for detailed information on each of the modeling assumptions.

The air quality modeling examined the impacts of normal operations under a variety of boiler load scenarios, as well as the impact from boiler startup and shutdown emissions. A screening analysis was completed that first compared the maximum potential impact to the "Significant Impact Level" under PSD regulations. If an individual facility projects an increase in air quality impacts less than the corresponding Significant Impact Level, its impact is said to be *de minimis,* and the permit applicant is not required to perform a more comprehensive, cumulative modeling analysis. A cumulative analysis involves measuring the impact of the new facility in addition to impacts from other existing sources in the area (including background concentrations).

**Table 3-21** summarizes the results of the screening analysis, showing that the Significant Impact Level would be exceeded for the 1-hour $NO_2$, 1-hour $SO_2$, and the 24-hour $PM_{2.5}$ NAAQS. The modeled concentrations were below the Significant Impact Level for 24-hour $PM_{10}$, 1-hour and 8-hour CO, annual $NO_2$ and the 3-hour, 24-hour, and annual $SO_2$. Therefore, a cumulative analysis was not necessary for these NAAQS below the Significant Impact Level.

**Table 3-21.    Maximum Project Increment—Significant Impact Level Screening Analysis**

| Pollutant | Averaging Time | Maximum Project Increment (µg/m3) | Significant Impact Level (µg/m3) | Significant Impact Level Exceeded? |
|---|---|---|---|---|
| CO | 1-hr | 118.5 (startup of 1 boiler while second boiler is active) | 2000 | No |
| | 8-hr | 33.7 (normal operations, 80% load) | 500 | No |
| $PM_{10}$ | 24-hr | 2.65 (normal operations, 80-110% load) | 5 | No |
| **$PM_{2.5}$** | **24-hr** | **1.95 (normal operations, 100% load)** | **1.2** | **Yes** |
| | Annual Average | 0.18 **(normal operations, 100% load)** | 0.3 | No |
| **$SO_2$** | **1-hr** | **40.7 (normal operations, 100% load)** | 7.8 | **Yes** |
| | 3-hr | 22.03 (normal operations, 100% load) | 25 | No |
| **$NO_2$** | **1-hr** | **55.84 (normal operations 110% load)** | **7.5** | **Yes** |
| | Annual Average | 0.80 (normal operations, 100% load) | 1.0 | No |

Note:    µg/m³– micrograms per cubic meter. Bold text denotes pollutants/standards that would exceed Significant Impact Level and require further analysis.

A cumulative air modeling analysis was completed in accordance with EPA's *Guidelines on Air Quality Models* (40 CFR §51, Appendix W) to evaluate compliance with the 1-hour NAAQS for $NO_2$ and $SO_2$ as well as for the 24-hr $PM_{2.5}$ averaging period.

**Table 3-22** summarizes the results, demonstrating that the NAAQS would not be exceeded. The "total concentration" shown in the table includes the background concentrations obtained from ambient air quality monitoring data and representing the existing or baseline air quality in the Project area. The total concentration also includes the incremental impact of Project-related emissions and the impact of other major air pollutant sources in the region. It is this combination of existing air quality, Project impacts, and impacts of other sources that constitutes a

"cumulative analysis" for PSD purposes. The cumulative analysis is also consistent with the NEPA definition of cumulative impacts at 40 CFR §1508.7.

The process of identifying "other sources" to include in the cumulative analysis began with identifying the relevant study area for each pollutant (significant impact area) based on dispersion modeling. The study areas for $SO_2$, $NO_2$, and $PM_{2.5}$ were 2.2 miles, 2.8 miles, and 0.9 mile (3.6 kilometers, 4.5 kilometers, and 1.5 kilometers) around the Project site, respectively. Major and minor sources within these study areas were inventoried; additional major sources within 31 miles (50 kilometers) of the study area were also added. Emissions information for other sources was obtained from EQB Air Quality Division and EPA Region 2, and included reviewing permit files and EPA's Air Facility System and National Emissions Inventory databases. A detailed list of other sources and the emission rates assumed for each are provided in the October 2011 Revised PSD Modeling report (Energy Answers 2011b). Other sources on the south side of the island (which are separated from the Project area by a mountain range), were excluded following a screening analysis showing these sources would not appreciably affect the receptors in the Project area. The modeling parameters were reviewed and approved by EPA.

**Table 3-22.    Cumulative Air Quality Analysis Results for Criteria Pollutants**

| NAAQS | Maximum Increment— Project Plus Other Sources | Background Concentration | Total Concentration | NAAQS | NAAQS Exceeded? |
|---|---|---|---|---|---|
| 1-hour $NO_2$ | 85.5 | 65.2 | 150.7 | 188 | No |
| 1-hour $SO_2$ | 94.23 | 66.44 | 160.67 | 196 | No |
| 24-hour $PM_{2.5}$ | 9.25 | 16 | 25.3 | 35 | No |
| Annual $PM_{2.5}$ | 2.03 | 5.05 | 7.5 | 12 | No |

Notes:   Background concentration for $NO_2$ based on 2005–2007 data from the monitor in Catano (Monitor ID 72-033-0008) according to the Tier 2 approach.

Background concentration for $SO_2$ based on 2003–2005 data from the monitor in Barceloneta (Monitor ID 72-017-0003 following a Tier 3 approach).

Background concentrations for $PM_{2.5}$ based on 2007–2009 data from the monitor in Barceloneta (Monitor ID 72-017-0003).

A PSD analysis of lead emissions was not required for permitting purposes because the maximum annual emissions of 0.31 ton per year is below the significant emission rate of 0.6 ton/year. Nevertheless, Energy Answers completed a lead dispersion modeling analysis voluntarily during the permitting of the Project. Results of this analysis indicated that the maximum predicted concentration of lead is 0.00056 $\mu g/m^3$, which is well below the 0.15 $\mu g/m^3$ NAAQS (3-month average).

As noted previously in the regulatory framework section, the primary NAAQS are established by EPA to protect public health with an adequate margin of safety, while the secondary NAAQS provide public welfare protection, including protection against decreased visibility and damage to animals, crops, vegetation, and buildings. Compliance with the NAAQS means that Project-related emissions of the criteria pollutants $NO_2$, $SO_2$, $PM_{2.5}$, and lead would not adversely impact sensitive populations (e.g., asthmatics, children, and the elderly), agriculture (e.g., soils and livestock), and vegetation/wildlife.

With respect to impacts from non-criteria and hazardous air pollutants, Section 3.11, *Public Health and Safety*, summarizes the Human Health Risk Assessment (HHRA) completed for this project.

**Greenhouse Gas Emissions**

With respect to greenhouse gas emissions, this Project would use waste that would otherwise be landfilled to produce electricity. Landfilled waste results in the emissions of methane, a very potent $CO_2$ equivalent ($CO_2e$) source.[14] In addition, the electricity produced by the Project is expected to displace electricity generated by fossil-fuel based sources. Therefore, an analysis of the net effect of the Project on greenhouse gas emissions considers the direct emissions from the combustion of MSW, as well as the avoided emissions from landfills and fossil fuel power generation if the Project is not built. This section explains the key terminology with respect to biogenic and non-biogenic greenhouse gas emissions, the methodologies used to quantify emissions, and the results.[15]

Key Terminology—Biogenic $CO_2$ emissions are defined as "$CO_2$ emissions related to the natural carbon cycle, as well as those resulting from the production, harvest, combustion, digestion, fermentation, decomposition, and processing of biologically based materials" (EPA 2014j). Biogenic $CO_2$ emissions have a smaller net atmospheric contribution of $CO_2$ than non-biogenic emissions (e.g., from the combustion of fossil fuels) because fossil fuels such as coal or oil are effectively isolated from the carbon cycle underground and emissions from these fuels would not occur but for human activities. In contrast, the emissions released when burning a biological material such as a tree need to be considered in the context that the eventual natural decomposition of the tree also would have released greenhouse gas emissions if it was not

---

[14] $CO_2e$ is a metric measure used to compare the emissions from various greenhouse gases based upon their global warming potential. For example, methane has a global warming potential of 21, which means that methane will cause 21 times as much warming as an equivalent mass of carbon dioxide over a 100-year time period. Expressing greenhouse gas emissions on a $CO_2e$ basis provides a common unit for comparing the total emissions of various greenhouse gases (EPA 2013b, 2015c).

[15] Unless otherwise noted, all information in this section is from a combination of the following sources: Energy Answers 2011a, 2011c (September), and Scott 2011 (November). The September 2011 report and November 2011 email supersede portions of the February 2011 initial application; however, much of the basic methodologies detailed in the initial application remain the same.

burned. The evaluation of biogenic emissions involves complex considerations of the timing of emissions over time. **Figure 3-11** conceptually illustrates the fluxes of carbon addressed in EPA's guidance on assessing biogenic $CO_2$ emissions from stationary sources, including the transfer of biogenic materials to the stationary source (blue line) and flows of carbon (black arrows).



Source: EPA (2014j)

**Figure 3-11.   Conceptual Illustration of Carbon Fluxes between Landscape/natural Systems and Stationary Sources**

The Project would emit both biogenic and non-biogenic emissions based on the varied composition of MSW. For example, paper/cardboard materials combusted are considered biogenic emissions, while emissions from combusting plastics are considered non-biogenic. It should be noted that the effect of greenhouse emissions on the atmosphere and climate change is the same regardless of whether the source is biogenic or non-biogenic. Therefore, the evaluation of greenhouse gas emissions for this Project discloses total emissions in addition to the breakdown by biogenic and non-biogenic.

Methodology—Energy Answers prepared a BACT analysis for greenhouse gas emissions. EPA determined that off-setting emissions from avoided landfill and oil-fired power plant emissions could not be specifically credited as part of the PSD permitting process. However, these offsetting emissions are relevant for the broader consideration of environmental impacts under NEPA.

The maximum emissions for the potential fuel mixes to be used by the plant (processed refuse fuel, tire-derived fuel, automotive shredded residue, and processed urban wood waste) were calculated based on 40 CFR 98 Subpart C Table C-1 for $CO_2$, and Table C-2 for methane and $N_2O$. The calculation assumed an annual steam generation of 6,264 million pounds per year.

The calculation of oil-fired power plant displaced emissions assumed two 500 million BTU/hour units consuming a total of 62,571,429 gallons/year.

EPA's LandGEM Landfill Gas Emissions Model version 3.02 was used to quantify displaced landfill emissions. The model provides a relatively simple approach to quantifying landfill emissions based on empirical data from U.S. landfills. The landfill analysis assumed a landfill with a capacity of 38,325,000 short tons, an opening year of 2013, and a closure year of 2062. The average emissions over the life of the landfill (including the post-closure period) were used.

Results—**Table 3-23** summarizes the greenhouse gas emissions analysis results. The Project would directly emit 924,750 tons/year $CO_2e$. However, these emissions would be offset by displaced landfill and oil-fired power plant emissions avoided by the Project. Therefore, the net effect of the Project on greenhouse gas emissions would be a reduction of -1,107,818 tons/year $CO_2e$, assuming no landfill methane flaring. If the landfill is assumed to flare 100 percent of methane emissions, the Project would still result in a net greenhouse gas emissions reduction; however, the size of the greenhouse gas emissions reduction would be reduced to -93,721 tons/year $CO_2e$. These numbers represent the upper and lower bounds of Project effects on greenhouse gas emissions. Detailed information on the extent to which landfill methane flaring or landfill gas collection occurs at Puerto Rico's landfills is not available, but it would be reasonable to assume the percent of methane combusted is substantially less than 100 percent, given the observation of a lack of gas control at most of the landfills.

**Table 3-23.    Greenhouse Gas Emissions Results**

| Emissions Source | Non-Biogenic $CO_2e$ (Max tons/year) | Biogenic $CO_2e$ (Max tons/year) | Total Greenhouse Gas Emissions as $CO_2e$ (tons/year) |
|---|---|---|---|
| Energy Answers facility stack emissions[a] | 466,619 | 763,509 | 924,750 |
| Transportation to Energy Answers facility | 1,187 | 0 | 1,187 |
| Displaced landfill emissions (no methane flaring) | 0 | 1,319,354 | 1,319,354 |
| Displaced landfill emissions (100% methane flaring) | | 305,257 | 305,257 |
| Displaced oil-fired power plant emissions | 712,679 | 0 | 712,679 |
| Transportation emissions to landfill | 1,722 | 0 | 1,722 |

| Net change – no landfill flaring | -246,595 | -555,845 | -1,107,818 |
| Net change – with 100% landfill flaring of methane | -246,595 | 458,252 | -93,721 |

[a] Non-biogenic and biogenic emissions for the facility do not sum to the total because the numbers reflect the maximum possible emissions under different fuel use scenarios.

**Visibility Impacts**

According to the revised air quality modeling report, visibility impairment at the local level is not expected as a result of the types and quantities of emissions from the plant sources. The opacity of combustion exhausts from the plant would be low, typically at or approaching zero. Emissions of primary particulates and sulfur oxides due to combustion also would be low due to the installation of advanced controls. The contribution of emissions of volatile organic compounds to the potential for haze formation in the area would be minimal given the low volatile organic compound emission rate from the plant. Emissions of $NO_x$ would be controlled using state-of-the-art technology such that any potential for visibility impairment associated with $NO_x$ would be minimized.

A visibility analysis of the potential plume from the boiler stacks was conducted using VISCREEN.[16] The analysis was conducted to evaluate whether the plume would be visible especially from nearby protected areas, including the Cambalache Forest and Río Abajo Forest. The findings of the VISCREEN analysis incorporating the revised particulate matter emissions indicated that the plume from the Project stack would be below the visibility screening criteria for these areas.

**Screening Level Ecological Risk Assessment**

Energy Answers prepared a Screening Level Ecological Risk Assessment (SLERA) to evaluate potential ecological risks associated with emissions from the proposed Project and a Human Health Risk Assessment, which is discussed in Section, 3.11, *Public Health and Safety* (Arcadis 2010a,b). The SLERA focused on evaluating potential adverse effects on ecological receptors (wildlife) within a 6.2-mile (10-kilometer) radius of the proposed Project from predicted constituent concentrations in environmental matrices (i.e., soil, surface water, and sediment) as a result of the Project's air emissions.

Constituents of potential concern (COPCs) were initially identified based recommendations provided in EPA guidance (EPA 2005, 2003, 1998, 1997), and on stack test data generated from a Resource Recovery Facility with a similar design to the proposed facility (SEMASS Unit 3)

---

[16] VISCREEN is an EPA-approved atmospheric plume visibility model that calculates the potential impact of a plume of specified emissions for specific transport and dispersion conditions. VISCREEN is a conservative tool for estimating visual impacts in accordance with the Workbook for Plume Visual Impact Screening and Analysis (Revised) (EPA 1992). Details for the VISCREEN analysis are provided in the February 2011 PSD application.

located in Massachusetts. Emission rates estimates were also based on SEMASS Unit 3 data and limits established in the PSD permit prepared for that facility, which are in some cases greater than those of the Project.

Air dispersion and deposition modeling combined source emission rates and facility information (i.e., source parameters and building profile) with physical data from the area surrounding the proposed Project (i.e., meteorology, terrain, and land use information) to estimate unitized ambient air concentrations and deposition fluxes. Potential emissions were modeled for risk assessment purposes using AERMOD. Since COPCs emitted from the combustion unit flues are dispersed and deposited as either vapors or particulates (i.e., particles or particle bound), AERMOD was run to generate estimates of air concentrations and deposition fluxes for vapor phase, particle phase, and particle bound COPCs. Fate and transport models recommended by EPA (EPA 2005) were used to estimate COPC concentrations in environmental media (e.g., soil, surface water) and other components of the environment that may contribute to exposure.

Potential impacts on land and surface water within a 6.2-mile (10-kilometer) radius of the Project were evaluated. The SLERA integrated the four components of an ecological risk assessment (EPA 1998, 1997) as described below:

1. **Problem Formulation** is the first step in the SLERA process during which the site setting, the conceptual site model, and assessment and measurement endpoints are described (EPA 1998).

2. **Exposure Assessment** involves the process of estimating the magnitude of chemical exposure, identifying potentially exposed ecological receptors, and evaluating potentially complete exposure pathways. The process considers various site-related conditions, such as air dispersion and deposition modeling results, proximity to environmentally sensitive areas, and receptor-specific activity patterns. For this SLERA, exposure-point concentrations were calculated based on the results of air dispersion and deposition modeling.

3. **Effects Assessment** involves comparing the calculated exposure-point concentrations of contaminants of potential ecological concern (COPEC) in various media (i.e., soil, surface water, and sediment) at receptor locations to ecologically-based screening levels (EBSLs) for different classes of receptor organisms. The purpose of this comparison is to identify the potential for adverse effects on receptor populations.

4. **Risk Characterization** estimates the level of potential risk for ecological receptors with potentially complete exposure pathways identified in the Problem Formulation and Exposure Assessment steps of the SLERA. Risks are estimated by comparing maximum detected concentrations in each modeled medium to the EBSLs identified in the Effects Assessment.

Based on the information above, the SLERA examined the potential coincidence of environmentally sensitive areas, COPEC, and complete exposure pathways at ecological habitat areas or environmentally sensitive areas within 6.2 miles (10 kilometers) of the plant. The risk characterization step of the SLERA integrated and evaluated the results of the data screening and nature of ecological exposures to provide a characterization of potential ecological risk based on site-specific conditions.

The following conclusions were reached regarding potential ecological risk associated with the plant:

- Exposure pathways for wildlife to site-related COPEC are present within the 6.2-mile (10-kilometer) radius, but are expected to be limited to habitat areas such as the state forests to the southwest and southeast and the conservation areas to the northeast because of their distance from the emissions source and/or being positioned away from the area of greatest dispersion and deposition.

- Comparison of the worst-case maximum COPEC results for soil to EBSLs showed concentrations of COPEC to be at least several orders-of-magnitude less than the soil EBSLs. As a result, the potential for risk to ecological receptors exposed to soil is anticipated to be negligible.

- Comparison of the worst-case maximum COPEC results for surface water (Caño Tiburones area) to EBSLs showed concentrations of COPEC to be at least one order-of-magnitude less than the surface water EBSLs and three orders-of-magnitude less than the sediment EBSLs. As a result, the potential for risk to ecological receptors exposed to surface water and sediment is anticipated to be negligible.

- Comparison of the worst-case maximum COPEC results for sediment (Caño Tiburones area) to EBSLs showed concentrations of COPEC to be at least three orders-of-magnitude less than the sediment EBSLs. As a result, the potential for risk to ecological receptors exposed to sediment is anticipated to be negligible.

Due to COPEC concentrations in soil, and surface water and sediment that are orders-of-magnitude less than the conservative ecological screening levels, a low potential for ecological risk is expected for habitat areas within 6.2 miles (10 kilometers) of the plant.

**Ultrafine Particulates/Nanoparticles**

Particulate matter contains a range of particle sizes, including $PM_{2.5}$ and $PM_{10}$ for which NAAQS have been established under the CAA. Ultrafine particles are defined as particles that are 100 nanometers or less in diameter, and no NAAQS have been established to date for these extremely small particles. Both animal and human studies provide evidence for respiratory and cardiovascular effects associated with exposure to ultrafine particles; however, a comprehensive

literature review completed by the Health Effects Institute in 2013 concluded there were limitations and contradictions in the available studies that prevent drawing definitive conclusions on ultrafine particle-specific health effects (as opposed to health effects caused by other size particles) (Health Effects Institute 2013).

In the absence of a specific standard, $PM_{2.5}$ emissions are an indicator for ultrafine particles (EPA 2012b). As discussed previously, a cumulative impact analysis was prepared for $PM_{2.5}$ and showed health-based NAAQS would not be exceeded at the receptors affected by the Project. The fabric filters that would be used by the proposed Project would be effective in removing ultrafine particles, as they are in removing $PM_{2.5}$ (EPA 2013c). Studies have shown the fabric filters are effective across the range of particle sizes (Buonanno et al. 2011). Therefore, ultrafine particle-specific health effects beyond those already addressed through $PM_{2.5}$ analysis are not reasonably foreseeable.

**Hauling of Solid Waste and Ash**

The 2010 traffic study determined the Project would generate a total of 453 trips per day, 70 percent of which would consist of heavy trucks. These trips would be spread throughout the day, with 64 or fewer occurring in any one of the peak hours. The traffic study also concluded that the Project would not cause adverse impacts on congestion or the performance of the transportation system. Specific operational improvements were recommended to improve traffic flow, such as adjustments to signal timing and acceleration/deceleration lanes. Based on the traffic study results and lack of severe congestion on the roadways that would be used to access the Project site (e.g., level of service [LOS] E and LOS F), an intersection hot-spot analysis for CO, $PM_{2.5}$ or PM10 is not warranted based on consideration on the EPA criteria used for transportation conformity.

Transportation conformity does not apply to the Project, but the criteria provide a useful basis for evaluating the potential significance of mobile-source related emissions. For example, among the criteria triggering a CO hot-spot analysis is a project in CO nonattainment or maintenance area and "affecting intersections that are at level of service D, E, or F, or those that will change to level of service D, E, or F because of increased traffic volumes related to the project."  For PM hot-spots, the criteria include "highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles" (40 CFR §93.123[b][1][i]). A significant number of diesel vehicles is subsequently explained using an example of "facilities with greater than 125,000 annual average daily traffic (AADT) and 8 percent or more of such AADT is diesel truck traffic" or 10,000 AADT. The heavy duty truck traffic generated by the project and the total truck volumes on PR-2 are far below this level, demonstrating the project is not a "project of local air quality concern" warranting a PM hot-spot analysis due to truck traffic. Trucks hauling solid waste and ash would be required to be covered to avoid airborne distribution of dust and hauled materials.

## 3.4      BIOLOGICAL RESOURCES

### 3.4.1      Affected Environment

The Project site is bordered to the west by the Río Grande de Arecibo, which has one of the largest watersheds on the island. The Caño Tiburones swamp is located approximately 1 mile (1.6 kilometers) to the east of the site. This is the most extensive wetland in Puerto Rico covering an area of 5,500 acres (22.3 square kilometers) between the Río Grande de Manatí to the east and the Río Grande de Arecibo to the west. The Caño Tiburones Natural Reserve, which encompasses some of this wetland system is located approximately 0.9 mile (1.5 kilometers) from the eastern limit of the Project site. The Biological Resources Project Area includes the Project site, the interconnection to the substation and the proposed brackish water line (Figure 1) and the habitat areas within 6.2 miles (10 kilometers) of the Project site.

#### 3.4.1.1      Vegetation, Invasive Species, and Noxious Weeds

The Project site presents typical vegetation of abandoned industrial areas and is dominated by herbaceous species, mostly grasses and vines, and the invasive shrub black mimosa (*Mimosa pigra*). Woody species are found on small patches throughout the property, especially along the southern and western borders of site and along the Río Grande de Arecibo and the existing (abandoned) stormwater canals. The CSA Group (CSA Group 2010b) conducted a flora and fauna study for the Project site and for (1) the former Central Cambalache Sugar Mill, whose land adjoins the southern border of the Project and would contain the Project's transmission line interconnection to the Central Cambalache substation; and (2) the rights-of-way of PR-2, PR-6681, and PR-681, where a raw water line would be installed to obtain water from the pump station in Islote Ward and sent to the plant. A total of 159 species of plants were identified in the Project site and the former Central Cambalache Sugar Mill, all of which are considered common species in the region.

Pastures extend through most of the Project site and show the highest species diversity. These areas are dominated by grasses (Poaceae family) such as Guinea grass (*Megathyrsus maxima*), African Bermuda grass (*Cynodon nlemfuensis*), Bermuda grass (*Cynodon dactylon*), railroad track grass (*Dichanthium annulatum*), and to a lesser degree species such as bur grass (*Cenchrus echinatus*), goose grass (*Eleusine indica*), and several species of Paspalum. In isolated areas where the ground remains relatively humid or with surface water, para grass (*Urochloa mutica*) forms almost monotypic patches. Among the grasses and other herbs, the shrub black mimosa forms dense thickets, especially within the five abandoned ponds in the Project site. Along the bank of the Río Grande de Arecibo and borders of the ponds, the exotic wildcane (*Gynerium sagittatum*) has become established. Also, vines abound forming dense and extensive aggregations dominated by moon vine (*Ipomoea alba*).

Tree cover is relatively scarce and dominated by African tulip tree, tall albizia, and Panama berry (*Muntingia calabura*). The entrance to the Project site via PR-2 has several trees planted for

landscaping purposes that include Indian almond (*Terminalia catappa*), fish tail palm (*Caryota urens*), and Benjamin ficus (*Ficus benjamina*). The terrain at the former Central Cambalache Sugar Mill, owned by the Puerto Rico Land Authority, presents a flora similar to that described for the Project site. Areas near the substation show a mixture of shrubs and herbaceous species with common and invasive trees characteristic of impacted landscapes. In the junction between the former Central Cambalache Sugar Mill and PR-2, where Energy Answers would install the proposed transmission line interconnection, Guinea grass and talquezal grass (*Paspalum virgatum*) dominate the landscape. Other shorter grasses such as Mexican crown grass (*Paspalum fasciculatum*) and hilo grass (*Paspalum conjugatum*) abound in the area.

The vegetation where Energy Answers would install the proposed brackish water pipeline along PR-2, PR- 6681, and PR-681 is composed of common species found along the edges of roads and impacted areas. Along this section of PR-2, the vegetation consists primarily of grasses with Guinea grass dominating along southern crab grass (*Digitaria ciliaris*), and hilo grass. Some large tall albizia trees, royal poinciana, monkey pod (*Pithecellobium dulce*), golden apple (*Spondias cytherea*), and coconut palm (*Cocos nucifera*) are found along the green fringes. At the junction with PR-6681, common species associated with humid areas, such as umbrella flatsedge (*Cyperus involucratus*) and jungle rice (*Echinocloa colona*), mix with other herbs that prefer open areas like wild balsam apple (*Momordica charantia*), blue day flower (*Commelina erecta*), shepherd's needle (*Bidens alba*), and ocean blue morning glory (*Ipomoea indica*).

Along PR-681, the dominance of herbaceous and vine species continues by forming hedges along the green fringes of the road. Behind the hedge, there is a canal parallel to PR-681 that is lined with trees of white mangrove (*Laguncularia racemosa*), red mangrove (*Rhizophora mangle*), and a few black mangroves (*Avicennia germinans*). Besides the mangrove trees, the banks of the canal also show scattered inland leather fern (*Acrostichum danaeifolium*). Other species found between the mangroves and the road include coconut palms, Spanish cork (*Thespesia populnea*), Indian almond, royal poinciana, mahogany (*Swietenia mahogoni*), and coin vine (*Dalbergia ecastaphyllum*). At the end of the route in the proposed water extraction site at El Vigía Pumping Station, white mangrove, cattail (*Typha domingensis*), and water lilies (*Nymphaea ampla*), indicative of wet areas, abound.

### 3.4.1.2    Wetlands and Riparian Areas

Energy Answers conducted a wetland study at the Project site and associated transmission line and brackish water pipeline areas to determine the location of wetlands and streams that comply with the requirements for federal jurisdiction under Section 404 of the Clean Water Act (CSA Group 2010c). The CSA Group delineated wetlands according to the 1987 USACE Wetlands Delineation Manual, looking for the three necessary components of a wetland (hydrophytic vegetation, hydrology, and hydric soils). The study showed that a total of approximately 2.4 acres (9,793.4 square meters) of inland jurisdictional wetlands occur within the Project site. This

acreage consists of a series of palustrine unconsolidated bottom man-made abandoned canals totaling 1.5 acres (5,989.4 square meters) or 1,191.1 feet (363.1 meters) that are found in the property and 0.954 acre (3,804.1 square meters) of a small wetland in an overflow area where the canals interconnect. These canals drain through a short canal on the north central border of property to the Río Grande de Arecibo, which occurs just outside the study area. These channels were part of the water management system associated with the paper manufacturing processes and stormwater management. These channels are abandoned and covered by exotic vegetation such as, Guinea grass (*Megathyrsus (Panicum) maximun*), malojillo (*Brachiaria purpurascens*) and cane grass (*Gynerium sagittarum*), the latter along the upper borders of the ditches. The CSA Group did not identify any jurisdictional wetlands at either the Old Central Cambalache parcel where the proposed transmission line interconnection would occur or along the area crossed by the proposed water pipeline. **Figure 3-12** shows the location of jurisdictional wetlands within the Project site.



Source:  CSA Group (2010c), NRCS (2014), digitized by Louis Berger

**Figure 3-12.   Jurisdictional Wetland Locations within Plant Site**

### 3.4.1.3    Wildlife and Fish Resources

As part of the flora and fauna study, the CSA Group observed a total of 56 species of vertebrates, with most species being birds of which 44 were identified (CSA 2010b). The most common bird species at the Project site were bananaquit (*Coereba flaveola*), greater Antillean grackle (*Quiscalus niger*), rock pigeon (*Columba livia*), common ground-dove (*Columbina passerina*), northern mockingbird (*Mimus polyglottos*), gray kingbird (*Tyrannus dominicensis*), smooth-billed ani (*Crotophaga ani*), black-faced grassquit (*Tiaris bicolor*), and orange-cheeked waxbill (*Estrilda melpoda*). Other observed vertebrate groups included two mammals and ten species of amphibians and reptiles, including the small Indian mongoose (*Herpestes auropunctatus*), several species of coquí frogs (E*leutherodactylus spp.*), and anoles (*Anolis spp.*).

The wildlife in the former Central Cambalache Sugar Mill and along the proposed raw water pipeline was very similar to what was described for the Project site.

Because there are no streams or rivers located within the immediate Project site or the transmission line or water pipeline rights-of-way, there are no fish species in the immediate Project footprint. However, the Río Grande de Arecibo is located immediately to the east of the Project facility, and has a plentiful fish population.

### 3.4.1.4    Special Status Species

**Federally Listed Species**

According to the U.S. Fish and Wildlife Service's (USFWS) Information, Planning, and Conservation System, several federally listed species could occur in the Project area (**Table 3-24**). The USFWS report identifies species found in the general area and is not indicative of those species that are likely to occur on the specific site. The CSA Group's Flora and Fauna study (2010b) did not observe any federally listed species in the Project area. In the 2011 letter, USFWS indicated that suitable habitat for federally listed species is not present within the Project site (Muniz 2011).

**Table 3-24.    Federally Listed Species in the Project Area**

| Species Name | Status |
|---|---|
| **Amphibians** | |
| Puerto Rican crested toad (*Peltophryne lemur*) | Threatened |
| **Birds** | |
| Puerto Rican broad-winged hawk (*Buteo platypterus brunnescens*) | Endangered |
| Puerto Rican sharp-shinned hawk (*Accipiter striatus venator*) | Endangered |
| Puerto Rican parrot (*Amazona vittata*) | Endangered |
| Roseate tern (*Sterna dougallii dougallii*) | Threatened |
| **Ferns and Allies** | |

Arecibo Waste-to-Energy Project
Final EIS                                                                              January 2017

| Species Name | Status |
|---|---|
| (*Tectaria estremerana*) | Endangered |
| **Flowering Plants** | |
| Beautiful goetzea (*Goetzea elegans*) | Endangered |
| Chupacallos (*Pleodendron macranthum*) | Endangered |
| Erubia (*Solanum drymophilum*) | Endangered |
| Palma de manaca (*Calyptronoma rivalis*) | Threatened |
| Palo de nigua (*Cornutia obovata*) | Endangered |
| Palo de rosa (*Ottoschulzia rhodoxylon*) | Endangered |
| (*Auerodendron pauciflorum*) | Endangered |
| **Mammals** | |
| West Indian manatee (*Trichechus manatus*) | Endangered |
| **Reptiles** | |
| Hawksbill sea turtle (*Eretmochelys imbricata*) | Endangered |
| Leatherback sea turtle (*Dermochelys coriacea*) | Endangered |
| Puerto Rican boa (*Epicrates inornatus*) | Endangered |

Source: USFWS (2016)

In its November 12, 2015, email (Stanley 2015), USFWS indicated that its comments regarding the lack of suitable habitat for federally listed species on the Project site contained in its September 22, 2011, letter are still valid.

**Commonwealth-Listed Species**

As part of the Flora and Fauna Study, the CSA Group (2010b) reviewed the PRDNER Natural Heritage Division's Critical Species List. This list includes all Commonwealth or federally listed threatened or endangered species, as well as other species whose populations are small or that are indicative of the presence of specific habitats within Puerto Rico. The PRDNER data base did not show any reports of special-status species at the Project site. During the field study, no special-status species were observed.

## 3.4.2   Environmental Effects

This section discusses potential effects on vegetation, wildlife, and special status species resulting from construction and operation of the proposed Project, including the no-action alternative. Definitions for duration and intensity developed for this Project are described in **Table 3-25**.

Arecibo Waste-to-Energy Project
Final EIS

January 2017

**Table 3-25.    Biological Resources Impacts Contexts and Intensity Definitions**

| Biological Resources | | | |
|---|---|---|---|
| **Context (Duration)** | **Low Intensity** | **Moderate Intensity** | **High Intensity** |
| Vegetation | | | |
| Short term: During construction period<br><br>Long term: Life of the Project (50 years or more) | Impacts to native vegetation would be detectable but discountable and would not alter natural conditions measurably. Infrequent disturbance to individual plants could be expected but without affecting local or range-wide population stability. Infrequent or insignificant one-time disturbance to local populations could occur, but sufficient habitat would remain functional at both the local and regional scales to maintain the viability of the species. Opportunity for increased spread of noxious weeds would be detectable but discountable. There would be some minor potential for increased spread of noxious weeds. | Impacts to native vegetation would be detectable and/or measurable. Occasional disturbance to individual plants could be expected. These disturbances could affect local populations negatively but would not be expected to affect regional population stability. Some impacts might occur in key habitats, but sufficient local habitat would remain functional to maintain the viability of the species both locally and throughout its range. Opportunity for increased spread of noxious weeds would be detectable and/or measurable. There would be some moderate potential for increased spread of noxious weeds. | Impacts to native vegetation would be measurable and extensive. Frequent disturbances of individual plants would be expected with negative impacts to both local and regional population levels. These disturbances could negatively affect local populations and could affect range-wide population stability. Some impacts might occur in key habitats, and habitat impacts could negatively affect the viability of the species both locally and throughout its range. Opportunity for increased spread of noxious weeds would be measurable and extensive. There would be major potential for increased spread of noxious weeds. |
| Wetlands | | | |
| Short term: During construction period<br><br>Long term: Life of the Project (50 years or more) | The effect on wetlands would be measurable or perceptible but small in terms of area and the nature of the impact. A small effect on size, integrity, or connectivity would occur; however, wetland function would not be affected and natural restoration would occur if left alone. | The impact would cause a measurable effect on one of the three wetlands indicators (size, integrity, connectivity) or would result in a permanent loss of wetland acreage over small areas. However, wetland functions would not be adversely affected. | The impact would cause a measurable effect on two or more wetlands indicators (size, integrity, connectivity) or a permanent loss of large wetland areas. The impact would be substantial and highly noticeable. The character of the wetland would be changed so that the functions typically provided by the wetland would be substantially altered. |

| Biological Resources | | | |
|---|---|---|---|
| **Context (Duration)** | **Low Intensity** | **Moderate Intensity** | **High Intensity** |
| **Wildlife** | | | |
| Short term: During construction period

Long term: Life of the Project (50 years or more) | Impacts to native species, their habitats, or the natural processes sustaining them would be detectable, but discountable, and would not measurably alter natural conditions. Infrequent responses to disturbance by some individuals could be expected but without interference to feeding, reproduction, resting, or other factors affecting population levels. Small changes to local population numbers, population structure, and other demographic factors could occur. Sufficient habitat would remain functional at both the local and range-wide scales to maintain the viability of the species. | Impacts to native species, their habitats, or the natural processes sustaining them would be detectable and/or measurable. Occasional responses to disturbance by some individuals could be expected with some negative impacts to feeding, reproduction, resting, migrating, or other factors affecting local population levels. Some impacts might occur in key habitats. However, sufficient population numbers or habitat would retain function to maintain the viability of the species both locally and throughout its range. | Impacts to native species, their habitats, or the natural processes sustaining them would be detectable, and would be extensive. Frequent responses to disturbance by some individuals would be expected with negative impacts to feeding, reproduction, or other factors resulting in a decrease in both local and range-wide population levels and habitat type. Impacts would occur during critical periods of reproduction or in key habitats and would result in direct mortality or loss of habitat that might affect the viability of a species. Local population numbers, population structure, and other demographic factors might experience large changes or declines. |
| **Special-status Species** | | | |
| Short term: During construction period

Long term: Life of the Project (50 years or more) | Impacts to sensitive species, their habitats, or the natural processes sustaining them would be detectable, but discountable, and would not measurably alter natural conditions. Infrequent responses to disturbance by some individuals could be expected but without interference to feeding, reproduction, resting, or other factors affecting population levels. Small changes to local population numbers, | Impacts to sensitive species, their habitats, or the natural processes sustaining them would be detectable and/or measurable. Some alteration in the numbers of sensitive or candidate species, or occasional responses to disturbance by some individuals could be expected with some negative impacts to feeding, reproduction, resting, migrating, or other factors affecting local population levels. Some impacts might occur in key | Impacts to sensitive species, their habitats, or the natural processes sustaining them would be detectable and would be permanent. Substantial impacts to the population numbers of sensitive or candidate species, an impact to the population numbers of any federally listed species, or interference with their survival, growth, or reproduction would be expected. There would be direct or indirect impacts on candidate or |

| Biological Resources | | |
|---|---|---|
| **Context (Duration)** | **Low Intensity** | **Moderate Intensity** | **High Intensity** |

| Context (Duration) | Low Intensity | Moderate Intensity | High Intensity |
|---|---|---|---|
| | population structure, and other demographic factors might occur. However, some impacts might occur during critical reproduction periods or migration for a species but would not result in injury or mortality. Sufficient habitat would remain functional at both the local and range-wide scales to maintain the viability of the species. No take of federally listed species or impacts to designated critical habitat is expected to occur. Impacts would likely result in a may affect, unlikely to adversely affect determination. | habitats. However, sufficient population numbers or habitat would remain functional to maintain the viability of the species both locally and throughout its range. No mortality or injury of federally listed species is expected; however, some disturbance to individuals or impacts to potential or designated critical habitat could occur. Impacts would likely result in a may affect, unlikely to adversely affect determination. | sensitive species populations or habitat, resulting in substantial reduction to species numbers, take of federally listed species numbers, or the destruction or adverse modification of designated critical habitat. Impacts would like result in an adverse effect determination. |

### 3.4.2.1    Construction

**Vegetation and Wildlife**

Project construction would result in both short- and long-term impacts on vegetation and wildlife habitat. Project construction would result in the permanent loss of approximately 80 acres (0.32 square kilometer) of abandoned pasture with some patches of forest habitat. Because this is a previously disturbed site, the vegetation lost includes many invasive species and is not high quality habitat. Construction of the proposed brackish water pipeline is not expected to impact wildlife habitat, because Energy Answers would construct it within road rights-of-ways immediately adjacent to the edge of asphalt. Most vegetation lost as a result of this construction would be invasive species. In addition, Energy Answers would adhere to the conditions of both its Section 404 Clean Water Act Permit and its Soil Erosion Control Plan for the site. As such, Energy Answers would follow best management practices to ensure that no vegetation beyond the approved limits of disturbance would be impacted. Therefore, the Project would not impact the nearby Caño Tiburones Nature Reserve, which is located 0.9 mile (1.5 kilometers) from the boundary of the Project site. Overall, Project construction would have a short-term, low impact on regional vegetation diversity and habitat quality because the habitat lost would be low quality and is plentiful in the region around the Project site.

Although, as mentioned, the majority of the Project site is abandoned pasture, Energy Answers would need to cut some trees at the site, which would result in the permanent loss of this forested habitat. To mitigate the impacts of the loss of trees, Energy Answers conducted a tree inventory in compliance of Regulation #25 (Regulation for Planting, Cutting and Forestation for Puerto Rico, of November 24 1998, as amended) in those areas within the Project's footprint where trees would be impacted. In addition, Energy Answers prepared a tree planting plan as part of its September 24, 2012, DS-2 Permit Application Submission that identifies where trees would be replanted on-site. Because trees would be replanted on-site, overall, the Project would not have a long-term impact on forest habitat.

Project construction also would result in short-term, low intensity impacts on wildlife in the vicinity of construction areas. Some wildlife would be temporarily displaced during construction due to the loss of habitat and construction noise and activity. It is possible that some smaller slower-moving wildlife species such as small rodents, may be lost if they do not leave the Project site prior to the start of construction; however, because the site does not contain any unique wildlife habitat or species, plentiful habitat is available in adjacent areas and wildlife population would not be impacted long term.

**Wetlands**

Energy Answers would need to fill all 2.4 acres (9,793.4 square meters) of on-site wetlands for Project construction. According to the CSA Group's response to USACE with additional information regarding the Section 404 of the Clean Water Act application (CSA Group 2012), the impacted wetlands provide low wetland ecological function and value because the vegetative cover of the impacted wetlands has such low floristic diversity and rarely retains water by their own design. The functions and values that would be lost when Project construction fills in these wetlands include: sediment deposition or filtration from runoff and stormwater and groundwater recharge. The Project would not affect any wetlands or waters of the U.S. along the proposed transmission line interconnection or the brackish water pipeline.

In addition to the on-site wetlands to be impacted, the Río Grande de Arecibo is adjacent to the Project site. To protect the  Río Grande de Arecibo from direct impacts during Project construction, Energy Answers would implement its erosion and sediment control plan, which contains best management practices that would prevent contaminants from entering the stormwater that drains into the river and would contain and minimize erosion and sedimentation. Implementing the erosion and sedimentation control plan would minimize impacts to the Río Grande de Arecibo during Project construction.

Energy Answers proposes a compensatory wetland mitigation package that includes: (1) the creation of 9.3 acres (37,676.2 square meters) of persistent emergent palustrine wetlands on-site within the Río Grande de Arecibo floodway; (2) the preservation through a Conservation Trust of 37 acres (0.2 square kilometer) of the remnant site parcel, including the creation of 9.3 acres

(37,676.2 square meters) of wetlands; and, (3) the long-term protection of the mitigation sites through required monitoring and the Conservation Easement. The newly created wetland would be planted with native herbaceous and shrub species including but not limited to members of the following genera: *Pterocarpus officinalis*, *Anonna globra*, *Amphitecna latifolia*, *Eleocharis*, *Calophyllum antillarum*, *Andira inermis*, *Roystonea borinquen*, *Cyperus* and *Fimbristylis* sedges, *Acrostichum* ferns, *Ludwigia*, *Sagittaria*, and *Polygonum*, all of which are found locally in the nearby wetlands, including the Caño Tiburones Nature Reserve (CSA Group 2012). In addition, Energy Answers would plant woody species such as *Pterocarpus officinalis*, *Anonna glabra*, *Amphitecna latifolia*, *Andira inermis*, *Calophyllum calaba*, and *Roystonea borinquena* along the edge of the new wetland.

On April 17, 2014, USACE issued Energy Answers a Section 404 Permit for the Project, which included conditions that Energy Answers' proposed mitigation plan be implemented within 6 months from the date of initiating the authorized work or 12 months from the effective date of the permit, whichever first occurs (USACE 2014). On June 10, 2015, Energy Answers submitted a letter to USACE requesting an extension of this timeframe as a result of delays in obtaining all the required government approvals for the Project for reasons beyond the control of Energy Answers. In addition to the mitigation plan identified above, USACE also required Energy Answers to implement a monitoring plan to ensure that the permit-specified performance standards are met. The performance standards for the mitigation site include such things as: 80 percent cover by appropriate wetland species, less than 5 percent invasive exotic plant cover, and less than 20 percent mortality of planted wetland species.

Although filling 2.4 acres (9,793.4 square meters) of wetlands at the Project site would result in the loss of certain functions and values, as discussed above, the proposed compensatory mitigation plan would adequately replace these losses at an almost 4:1 ratio. The plant species proposed to be planted are native wetland species that are attractive to wildlife. In addition to wildlife habitat, these plant species and wetland soils would provide improved sediment deposition or filtration from runoff and stormwater, water storage, and groundwater recharge. Creating the 9.3 (37,676.2 square meters) acre wetland and preserving the entire 37 acres (0.2 square kilometer) remnant portion of the Project site parcel under a conservation easement would result in the Project having no net impact on wetlands.

Executive Order 11990, *Protection of Wetlands*, requires federal agencies to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands. USDA Departmental Regulation 9500-3, *Land Use Policy*, states that when land use regulations or decisions are inconsistent with USDA policies and procedures for the protection of wetlands and floodplains, USDA agencies shall not assist in actions that would convert wetlands and floodplains to other uses or encroach upon them, unless (1) there is a demonstrated, significant need for the project, program, or facility, and (2) there are no practicable alternative actions or sites that would avoid the conversion of these lands or, if

conversion is unavoidable, reduce the number of acres to be converted or encroached upon directly and indirectly.

As discussed in Section 2.1.1, *Project Site Selection*, Energy Answers conducted a comprehensive site selection process that considered and evaluated 33 potential site locations. Due to the Commonwealth's topography, a substantial portion of these sites were located at the confluences of the coastal plains and river valleys that are frequently subject to flooding and may contain wetlands. Project designers initially proposed to avoid and/or minimize the conversion of floodplains and wetlands on the plant site by building a perimeter earthen dike system. However, as discussed in Section 3.2.2, Energy Answers decided not to construct a dike system and to elevate the proposed site because of the need to conform to Section 65.10 of the National Flood Insurance Plan. This would require importing off-site fill material to bring the site grade above the 100-year floodway elevation and would prevent the site from avoiding impacts to on-site wetlands.

Based on these factors and RUS' review of the proposed Project need (see Section 1.3), RUS has determined that there is demonstrated need for the Project and that there are no practicable alternatives to avoiding the conversion of wetlands. Energy Answers will be required to implement mitigation for the wetland conversion, as contained in the Section 404 permit and specified above.

**Special-status Species**

Project construction and operation would have no effect on federally listed species. USFWS has repeatedly indicated that suitable habitat for federally listed species is not present within the Project site (Muniz 2011, et al). While exposure pathways from operational emissions are present within the Project area the ecological risk to habitat within the Project area is orders of magnitude less than the conservative estimates presented in the Screening Level Ecological Risk Assessment. Levels are so low as to not warrant any additional evaluation (PRIDCO 2010). Likewise, the CSA Group (2010b) reviewed the PRDNER Natural Heritage Division's Critical Species List and conducted surveys at the Project site and transmission line and pipeline rights-of-way and did not identify any Commonwealth listed or special-status species in the Project area. Therefore, the Project would have no effect on Commonwealth-listed species.

### 3.4.2.2    Operation

Project operation would not have a direct impact on biological resources. Energy Answers would construct a permanent stormwater retention system at the plant that would include unlined stormwater retention ponds to provide filtration and temporary retention of waters exiting the site, helping to control nutrient and contaminant runoff, and sediment filtration into the Río Grande de Arecibo. In addition, because the wetland mitigation site would be located between the Project facility and the Río Grande de Arecibo, it would, in conjunction with the proposed

site stormwater facilities, protect the river from any run off or sedimentation from the Project during operations.

As discussed in Section 3.3.2.2, *Air Quality*, Energy Answers' consultant Arcadis prepared a SLERA to evaluate potential ecological risks associated with emissions from the Project (Arcadis 2010a). The SLERA results indicate that COPEC concentrations in soil, surface water, and sediment would be orders-of magnitude less than the conservative ecological screening levels. This would result in a low potential for ecological risk for habitat areas within 6.2 miles (10 kilometers) of the Project site. Therefore, Project operation would present a low potential of ecological risk to wildlife or vegetation in the Project vicinity.

## 3.5    LAND RESOURCES

### 3.5.1    Affected Environment

#### 3.5.1.1    Land Use and Zoning

The Project is located in the municipality of Arecibo in the area of Cambalache Ward along the north coast of Puerto Rico. Land use in this region is characterized by expansive areas of agricultural fields and marshlands. Some small residences and a few industrial developments are located near the Project site, but the largest residential and commercial area is the city of Arecibo, located approximately 1.3 miles (2 kilometers) to the northwest. Demographics of the area are discussed in Section 3.12, *Socioeconomic Resources*.

Cambalache Ward is located in the Río Grande de Arecibo floodplain. Most of the coastal valley is used for agricultural purposes while the urban center of Arecibo is closer to the coast and scattered along PR-2. Land use in Cambalache has been mostly agricultural for the past few decades, primarily due to the presence of the Central Cambalache Sugar Mill. Between 1982 and 1983, sugarcane cultivation occupied approximately 55 percent of the valley, rice plantations about 30 percent, and livestock pastures approximately 15 percent. Forest land constitutes another predominant use covering approximately 41 percent of the total Río Grande de Arecibo Basin land area, while urban development and rural settlements comprise around 13 percent. Since the closing of the Central Cambalache Sugar Mill in the 1980s, there have been very few changes in the land use of the region. **Figure 3-13** shows generic land cover classes in the Project area, which can be used as a surrogate for land uses. Aerial photography of the same area shows evidence of the agricultural lands throughout the Río Grande de Arecibo Valley.

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017





Source:USGS (2014), NRCS (2014), digitized by Louis Berger

**Figure 3-13.   Land Cover Surrounding the Project Area**

Commercial and industrial uses within 2 miles (3.2 kilometers) of the plant are shown on **Figure 3-14**. The closest agricultural land use is immediately east of PR-2 and across from the plant. The closest house is located southeast of the plant site, adjacent to PR-2. This house is located 569 meters (1,867 feet) from the center of the plant site. Five other homes are located in this housing cluster while four residences are located in Santa Barbara neighborhood, approximately 0.34 mile (550 meters) north of the plant, west of PR-2.

Most of the Project site has been altered by the previous activities of the Global Fibers Paper Mill. The natural topography was modified to reach the existing ground level for the construction of the paper mill structures, ponds, channels, and other elements. The structures on the west side of the Project site are made of steel frame construction and are in deteriorated conditions.

Arecibo Waste-to-Energy Project
Final EIS

January 2017

The closest school is located at approximately 1,480 meters (0.9 mile) northwest of the plant site, and the closest hospital is located at approximately 2,035 meters (1.3 miles) northwest of the plant site.

Adjacent owners and primary land uses include: Finca Santa Barbara owned by the Land Authority of Puerto Rico to the north; Land Authority of Puerto Rico property to the south and east; PR-2 leading to the city of Arecibo to the east; and the Río Grande de Arecibo to the west. The old Global Fibers Paper Mill buildings and structures still remain on the property.

The majority of the property where the plant would be built was previously used for producing medium and heavy weight recycled paper from waste paper and sugarcane fiber between 1959 and 1995. Energy Answers' investigative studies indicated some areas of contamination on the property, most notably, asbestos contained in existing buildings and areas of "spot" contamination (i.e., stained soils near fuel and hydraulic oil aboveground storage tanks and fueling areas).



**Figure 3-14.   Land Uses and Industries near the Project**

The proposed non-potable water pipeline right-of-way would parallel PR-2, PR-6681, and PR-681. These state roads are used for transportation, infrastructure (aboveground electricity, buried water and wastewater lines), and communications. The proposed transmission line would cross the currently abandoned sugar mill property due south of the plant.

**Law for the Protection and Conservation of Karstic Physiography of Puerto Rico**

Law No. 292 of August 21, 1999, as amended, known as the Law for the Protection and Conservation of Karstic Physiography of Puerto Rico, (Law 292) provides for the protection, conservation, and the prohibition of the destruction of the karstic physiography, its formations and natural materials, such as flora, fauna, soil, rocks, and minerals; and the avoidance of transportation and sale of natural materials without permission. This law instructs the Secretary of PRDNER to prepare a study to define the areas that deserve protection and cannot be used for the extraction of materials from the earth's crust with commercial purposes or for commercial exploitation. This law also mandates that the recommendations of this study be incorporated in the Regulation for the Extraction, Removal and Dredging of Earth Crust Materials and in the regulations of PRDNER, so that areas of karst region can be zoned for preservation.

On June 6, 2008, PRDNER finished the Karst Study, based on the parameters of function and value established by Law 292. The Karst Study establishes and defines a conservation priority area of the karstic region of Puerto Rico. However, PRDNER has not finished the amendment to the earth crust regulation to include the priority conservation area, nor has it completed the zoning designation.

**Zoning**

The proposed plant property is zoned IL-2 (heavy industrial) for the footprint of the buildings and UR (developable land) for the remainder of the property. IL-2 zoning comes with limitations that require special siting considerations regarding the type of industries permitted to operate in this zone. Puerto Rico Planning Board Regulation No. 4, Section 30.03, Additional Uses, defines the IL-2 zoning uses to include warehouse storage for petroleum and its products, electrical stations, and combustible conversion facilities. Structure heights are established according to Section 30.04, (Heights in IL-2) with consideration to the nature of the specific industry. Adjacent properties to the south (the former Central Cambalache Sugar Mill and existing hardware store shown in **Figure 3-14**) are also zoned IL-2. A small portion of the parcels that would be crossed by the electric transmission line are not zoned. Lands to the west, north, and east of the Project site are zoned UR, developable land.

Energy Answers consulted the Puerto Rico Planning Board to verify the Project would be consistent with the most current plan. At that time, the Municipality of Arecibo was working on the fourth and final phase of the zoning plan and had recently finalized draft zoning maps in digital format; however, the Puerto Rico Planning Board had not officially approved the Arecibo Municipal Land Use Plan. Nevertheless, the entire Project site, according to sheets 058, 044,

034, 027, 057, 043, 033, and 026 of the Arecibo Municipal Land Use Plan, would be zoned as I-P (heavy industrial) in the subsequent plan. This new zoning classification is established to classify heavy industrial areas that are developed or would be developed for specific projects which, because of their nature and identify, require a special location.

### 3.5.1.2   Formally Classified Lands

Formally Classified Lands are properties administered either by federal, state, or local agencies or have been given special protection through formal legislative designation. There are no formally classified lands adjacent to the proposed plant site or transmission line. Caño Tiburones Natural Reserve was designated on October 16, 1998, and includes 3,805 acres (1,540 hectares). The water pipeline would pump water from the El Vigía Pumping Station at the head of Caño Tiburones and transfer water that would otherwise be pumped into the Atlantic Ocean. There are no other formally classified lands adjacent to the Project in the area.

### 3.5.2   Effects Analysis

Impacts on land use resources include how the Project could potentially affect elements of the human and land use environments, and include the types of allowable uses. The effects from the Project on many of these factors are mostly limited to the construction and operation of the former Global Fibers Paper Mill site (brownfield), construction of the water pipeline in the road right-of-way, and clearing of the transmission right-of-way, construction of the structures, stringing the lines, and the maintenance of the cleared right-of-way for the life of the Project.

This section discusses the potential effects of the Project on the various land uses throughout the Río de Arecibo Grande Valley. The intensity of the impacts on land use can be described through the thresholds shown in **Table 3-26**.

**Table 3-26.    Land Use Impacts Context of Intensity of Effects**

| Land Use | | | |
|---|---|---|---|
| **Context—Duration** | **Low intensity** | **Moderate Intensity** | **High Intensity** |
| Short term: During construction period

Long term: Life of the Project (50 years) | Other than at the footprint of Project features (e.g., plant buildings, water pipeline, and transmission line) surrounding land uses would continue without interruption. Existing neighboring land uses such as transportation, industrial, agricultural, and residential uses may experience temporary construction-related disturbances and intermittent, infrequent interruptions due to operation and maintenance. There would be no conflicts with local zoning. | Previous land uses (e.g., industrial, agricultural, and residential) surrounding the plant would be diminished or required to change to be compatible with the Project. Only a few parcels within the Project area would require zoning changes to be consistent with local plans. Some parcels within the Project area (water pipeline right-of-way, transmission right-of-way) may require a change in land ownership. | More than 25 percent of the land surrounding the Project features (plant, water pipeline right-of-way, transmission right-of-way.) would require a change in land ownership. All land use (e.g., industrial, agricultural, and residential) on these parcels would be discontinued. Most parcels of land within the Project area would require zoning changes to be consistent with local plans. |

### 3.5.2.1    Construction

Changes in topography would be required to accommodate flood flows in Río Grande de Arecibo and the construction of the plant and ancillary structures. Development of the Project on a former industrial use site (brownfield) would be consistent with the historical use of the site. A limited number of existing structures near the proposed Project site would need to be removed. Construction of the water pipeline would require work performed within road rights-of-way; however, once complete, the rights-of-way would return to their designed uses. As such, effects from construction of the Project would be short term and of low intensity. Overall the change from abandoned use to a power plant that uses MSW as fuel would be consistent with the historical industrial use of the property, local zoning, and surrounding land uses.

### 3.5.2.2    Operation

Operation of the Project would restore industrial use activities associated with energy production to the site previously used in the manufacture of paper products. The existing brownfield site would be converted to an active property consistent with neighboring industrial land uses such as battery recycling, historic sugarcane mill, hardware store, and transmission substation. Residences in the area are few and separated by open agricultural spaces; however, they could be affected by this revitalization of the property and the potential changes this would bring to the

area. Potential changes on traffic patterns are discussed in Section 3.8, *Transportation*, and changes in noise levels are discussed in Section 3.7, *Acoustic Environment*. The proposed use of the plant site is consistent with the proposed Arecibo Municipal Land Use Plan and the applicable zoning. Similarly, the water pipeline would remain buried in the road right-of-way resulting in no change to the adjacent land uses. Water withdrawals would occur from water destined for the Atlantic Ocean from the El Vigía Pumping Station, which is pumped to maintain water quality for Caño Tiburones. Diverting this water to the plant would have no effect on the classification of the Caño Tiburones as a formal nature reserve. Potential effects on the water and biological resources are discussed in Section 3.2.2, *Water Resources*, and Section 3.4.2, *Biological Resources*, respectively. The transmission line would require maintenance of the right-of-way and exclude inconsistent uses within this corridor for the life of the Project.

The Project would fully comply with the public policy established by Law 292 for the Protection and Conservation of Karstic Physiography of Puerto Rico and the current rule of law, because although the Project is within the Karstic Region of the Puerto Rico North Coast, it is located on the alluvial deposits of the Río Grande de Arecibo Valley and not on typical features of karst physiography such as haystacks (mogotes) or sinks (sumideros). Moreover, the plant would be located about 1.3 miles (2 kilometers) northeast and approximately 3 miles (5 kilometers) northwest from the boundary of the priority conservation area established under Law 292.

Processing the MSW would produce fly and bottom ash. The dry weight of this byproduct is projected to be about 20 percent of the weight of the processed refuse fuel or about 420 tons per day. Energy Answers proposes to mix the fly ash with a conditioning agent and water and ship it to an EPA subtitle-D compliant landfill. The bottom ash, which represents about 75 percent of the total ash, also has the potential to be conditioned and used as construction materials (e.g., road base, foundation material, aggregate); however, Energy Answers proposes to dispose of this material at a landfill until a market for its use develops.

Conditioned fly ash can be used as a lining within landfills, while the coarser bottom ash can be used as road base material within a fully lined landfill that is equipped with leachate control equipment designed to collect leachate and runoff, as opposed to being considered an additional waste component. Combined ash (both fly and bottom ash) is typically used as an alternative daily cover instead of soil. As such, the Plant would provide a destination for MSW, alleviating landfill space constraints at existing landfills and creating a byproduct that would be returned to landfills, thereby reducing the total weight destined for landfills by between 80 to 90 percent and thereby slowing the rate at which landfills reach capacity.

As described in Section 1.3, *Purpose and Need*, landfill space and capacity have become limited. Diverting 2,300 tons per day of MSW to the plant for processing would result in the production of ash that requires landfilling. Assuming the plant converts 20 percent of the processed refuse fuel to ash (dry basis), this would result in about 420 tons per day or about 140,000 tons per year,

considering the annual Project availability. Over a 50-year period, the plant would generate about 7 million tons of ash. Assuming all of this ash was sent to a landfill and used as an alternative daily cover, landfill space would not be compromised. Using a standard conversion for sand and gravel, 315 tons equals about 225 cubic yards of ash disposal per day. Federal regulations require landfill operators to use a minimum of 6 inches (15.2 centimeters) of earthen materials as daily cover; however, regulations also allow for the use of alternative covers such as ash, which would eliminate the need for excavation and transport of soil at the landfill site. Use of the mixed ash as a landfill cover would further extend the capacity of the landfills by not using capacity for the burial of the entire ash waste load.

Overall, operation of the Project would revitalize a brownfield site. Changes in land use surrounding the plant are unlikely to occur given the potential for flooding and existing industrial uses in proximity to the Project. Landfill life expectancies would be extended via the transformation of the MSW to ash slowing the rate at which landfill capacities would be reached. As a result, land uses are likely to remain unchanged for the long term. Overall, the Project would result in low intensity level changes to land use surrounding the Project site.

## 3.6    VISUAL RESOURCES

### 3.6.1    Affected Environment

The proposed Project is located about 1.25 miles (2 kilometers) from the city of Arecibo within the Río Grande de Arecibo floodplain. The overall area is characterized by tropical and subtropical moist broadleaf forest, mountains, floodplains, and coastal shorelines. Local elevations range from just above sea level to about 1,700 feet (530 meters) msl.

The components of the proposed Project would be located in an area that is visually characterized by broad, flat floodplains/agricultural lands bordered by highly vegetated mountains to the south and the Atlantic Ocean to the north. This tropical environment is conducive to rapid colonization of new vegetation to disturbed lands and dense vegetation obstructing views across the flat floodplain areas. Longer views are possible from elevated locations outside the floodplain. The proposed Project would occupy the former Global Fiber Paper Mill property within the floodplain with the water pipeline and transmission line running across the Río Grande de Arecibo floodplain. The floodplain is mostly flat and is bordered by mountains to the south that gradually wrap around the river, sloping to the ocean just west of the city of Arecibo. The communities of Arecibo, Cambalache, Domingo Ruiz, Tanama, and Bajadero are located around the floodplain within 2–3 miles (3.3–4.8 kilometers) from the paper mill site. There are no visual resource inventories, management classes, frameworks, or systems in place for lands in and around the proposed Project.

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017

#### 3.6.1.1    Existing Site-specific Aesthetics

**Plant Site**

Most of the proposed plant site has been previously altered by activities associated with the former Global Fibers Paper Mill. Natural topography was modified to accommodate the construction of the paper mill structures, ponds, channels, and other elements throughout the site. The remaining steel skeletal structures on the west side of the property have been stripped of their outer walls, exhibiting deteriorated conditions. The remaining structural elements contrast with the surrounding vegetation; however, this site is an abandoned industrial site along PR-2, neighboring an abandoned sugar mill, and close to the battery recycling plant. Alfalfa farming or fallow plots is the dominate land use throughout the floodplain. Unmaintained vegetative growth on the property obstructs most views and limits sight distances from 10 to a few hundred feet at most on the property. In addition to the abandoned sugar mill and battery recycling plant, other neighboring properties are predominantly rural, with some clustered residential and industrial properties along PR-2 south of the proposed plant site. Farther southeast of the proposed plant site, the topography rises out of the valley and residential housing increases. North and west, the topography is flat and dominated by the presence of the Río Grande de Arecibo. Sight lines throughout the area towards the plant site are obstructed by herbaceous and shrub vegetation along farm property lines, surrounding the river and the overgrowth at the property from lack of maintenance since the mill closed. A small cluster of residential structures are nearby.

Although the landscape is relatively flat at the proposed plant site, views are obstructed by roadside vegetation before the landscape opens up across the agricultural lands. Fields are separated by tree lines further diminishing the views across open agricultural areas while some fields are fallow and full of quickly colonizing stands of shrubs and other tall vegetation. Human-made disturbances that visibly stand out from the landscape include roads, transmission line, the two brick stacks from the abandoned sugar mill, and the working stacks from the Cambalache power plant on PR-681 north of the plant site.

**Transmission Line and Pipeline**

The proposed water pipeline would be co-located in the road right-of-way along PR-681, PR-6681, and PR-2. The proposed pipeline corridor would consist mainly of relatively flat to gently sloping topography providing good sightlines to motorists using the corridor. Similar to other areas in region, the area is dominated by the colors and textures of the physical landscape, including asphalt, vehicles, guardrails, road markings, signage, and shoulder vegetation. The proposed transmission line would exit the plant and cross the neighboring abandoned sugar mill property to the south connecting with the existing substation about 0.75 mile (1.2 kilometers) away.

Almost all of the visible features throughout the Río Grande de Arecibo Valley are the result of modifications to the landscape from human settlement in and around the area. These include

farming; residential and commercial developments; flood control measures; transportation infrastructure like roads, bridges, airports, communication towers, and power plants; and transmission and distribution lines. The expansive scale of the floodplain and flat topography of the valley are muted and minimized by the presence of these visual obstructions and the fast growing vegetation. The overall character is typical for the regional landscape setting in Puerto Rico.

### 3.6.1.2    Key Viewpoints Associated with the Project

Many of the features associated with constructing the proposed Project would be visible from public roads or lands that adjoin the proposed Project site. Changes to the landscape would be most visible to people who use PR-2 and  less noticeable from PR-681, Highway PR-22, and the area near the residences along Avenue Domingo Ruiz south of the proposed Project and along PR-10 on the southeast side of Arecibo. **Figure 3-15** shows the locations of the key observation points; representative photos from each location are included in Appendix B.



**Figure 3-15.   Locations of Representative Viewpoints near the Proposed Project**

**Avenue Domingo Ruiz**

The community of Domingo Ruiz is located about 1.3 miles (2 kilometers) from the proposed Project. Avenue Domingo Ruiz runs north-south along the western edge of this community and intersects with PR-2 at the north end of the road. Views from Avenue Domingo Ruiz towards the former paper mill site capture a typical setting within the area, with foreground views of overgrown agricultural fields and tree lines around the property obstructing longer views across the flat valley. A pair of brick stacks at the old sugar mill are visible in the distance.

**PR-2**

PR-2 is the main travel route connecting Arecibo to the north with Domingo Ruiz and communities south. Between these two areas, the flat floodplain is marked with sparse residential structures; extensive agricultural fields; and some commercial, industrial, and abandoned buildings, including the former paper and sugar mills. The road runs primarily through the middle of the valley and views along the road provide direct access to the proposed property. Trees and other tall vegetation left to grow along property lines paralleling PR-2 provide intermittent views beyond the road corridor to motorists using this route.

**Yacht Club Parking Lot**

The Yacht Club parking lot is located 1 mile (1.6 kilometers) north of the proposed Project site, along PR-681. When the marina is open, it is very busy and almost completely full with boats parked in each of its approximately 100 slips. The view out to the ocean is this location's key viewpoint. PR-681 is the main travel route for this location. Besides the Ocean view, the areas surrounding the marina are mostly forested, so there are no direct views to the proposed Project from this location, although some of the Cambalache Power Plant's taller stacks are visible in the direction of the Project site.

**Intersection of PR-2 and PR-6681**

The intersection of PR-2 and PR-6681 is about 0.5 mile (0.8 kilometer) north of the proposed Project along PR-2. This area has some fields to the south, with wooded areas to the north and east. To the west are some smaller buildings surrounded by woody landscapes. Also to the south, across the flat field, are the remaining buildings on the Project site peeking over the tree tops.

**Intersection PR-10 and PR-2 near Arecibo**

Motorists traveling east on PR-2 leaving Arecibo, have a view into the distance over the existing tree line as the road transitions out of the city and across the floodplain. Driving farther east, drivers cross over the multiple channels of the Río Grande de Arecibo. These crossings have mostly forested areas on each of their banks. None of the remaining former paper mill structures are visible looking southeast toward the proposed Project site because of the tree cover around the site.

### PR-2 near Residences

Views from PR-2 near the small community of residences just south of the proposed plant site are dominated by the divided highway. Mature trees line both sides of the highway precluding continuous direct views into the adjacent lands, most of which are farmed or were farmed in the past and are now overgrown. This is also the case with views into the former paper mill property. Motorists using PR-2 through this stretch of road are exposed to typical highway visual resources such as signs, pavement, intersections, and the adjacent property features. PREPA transmission lines parallel the east side of the highway connecting the Cambalache Power Plant north of this site and the existing substation where the proposed Project would connect. The lines cross the highway south of these residences and the former paper mill property.

### PR-10 near the Baseball Stadium

Views from near PR-10 on the southeast side of Arecibo near the baseball stadium toward the proposed Project site include low lying agricultural lands in the foreground and the former sugar mill stacks in the middle ground distance. Views looking east capture the flat terrain of the floodplain with no tall features in the skyline visible beyond the brick stacks of the former sugar mill.

### PR-22 West of PR-10

PR-22 is a four-lane divided highway (most similar to an interstate in the contiguous United States) along the north shore of the island. West of the Río Grande de Arecibo, the highway crosses the foothills and descends in elevation towards the floodplain, offering sweeping, albeit short-lived views to motorists traveling through this area, across the floodplain. The elevated position of this viewpoint provides unobstructed views of the existing structures of both the former paper and sugar mill sites. The roof of the former paper mill site is clearly visible due to its white color and rectangular shape, which contrast with the mostly natural vegetation and flat topography in the near ground. These structures are the central feature in the middle ground viewing area as motorists travel east on PR-22 down the modest grade.

## 3.6.2    Effects Analysis

Construction and operation of the proposed Project would use the existing Global Fibers Paper Mill property and redevelop the industrial site into a new WTE project, introducing visual elements similar to those that existed on the site in the past. These elements would include buildings, modifications to the road network, stacks, water pipelines and transmission line, landscaped grounds, fences, and water detention ponds.

This section discusses the potential effects of the proposed Project on the visual resources throughout the Río de Arecibo Grande Valley. The intensity of the impacts visual resources can be described through the thresholds shown in **Table 3-27**.

**Table 3-27.    Visual Resources Impacts Context of Intensity of Effects**

| Visual Resources | | | |
|---|---|---|---|
| Context (Duration) | Low Intensity | Moderate Intensity | High Intensity |
| Short term: During construction period<br><br>Long term: Life of the project (50 years) | Proposed changes could attract attention but would not dominate the view or detract from current user activities. | Proposed changes would attract attention and contribute to the landscape but would not dominate. User activities would remain unaffected. | Changes to the characteristic landscape would be considered significant when those changes dominate the landscape and detract from current user activities. |

No new roads would be developed to access the Project site, because access to the site already exists; however, new entrances and exit driveways would be built. Construction in the road right-of-way would be required to place the water pipeline. This pipeline would be buried and out of view once the Project is operational. The area above the pipeline would be resurfaced with the native material and maintained to protect the pipeline (e.g., mowing).

Construction of the transmission line would occur within a 25-foot (7.6 meter) right-of-way, resulting in effects on a total of 1.5 acres (0.6 hectare) that would be required for the lines. The transmission line would connect to an existing substation on land neighboring the former Central Cambalache Sugar Mill property, a distance of about 0.5 mile (0.8 kilometer).

Energy Answers proposes a landscaping plan that would help minimize the visual contrast with the construction and operations of a new facility at the currently unmaintained property.

The most common views of the construction activity and the resulting changes in landscape would be from public roads. To most viewers, construction within the existing footprint of the former paper mill would bring activity to the vacant parcel similar to past operations. Construction activity would include active heavy machinery and earth-moving equipment associated with developing the new structures at the site.

Because of its location in the floodplain along PR-2 and its relatively obstructed setting, a portion of construction activities at the plant site would be visible from parts of Domingo Ruiz and Arecibo. Activities would be most visible to people traveling along the local roads in the vicinity of the plant site; however, the overall ability to see specific activities on the site would be difficult because vegetation along the road would disrupt the view, and the speed of the vehicles passing the site would create relatively short viewing times. Motorists travelling on PR-2 in the vicinity of the plant site represent the largest number of viewers potentially affected by construction, while the residents in the small community along PR-2 would have the greatest viewing times as a result of their proximity. The view of construction activities would become

more prominent after the elevation of the site is increased above the base flood elevations. The clearing of vegetation along PR-2 would provide clear sight lines into the property allowing longer viewing times; however, the speed passing vehicles would remain unchanged resulting in short viewing windows.

Construction of the water pipeline would be in the road right-of-way adjacent to PR-681, PR-6681, and PR-2 and would be clearly visible to passing motorists. Activities would focus around the exposed trench as workers install the proper substrate, pipe, and backfill material. Construction would introduce a visible scar along the road right-of-way; however, the tropical environment should aid in a fast vegetative recovery over the pipeline. Transmission line construction activities would introduce heavy machinery into the plant area and along the property line closest to PR-2 across the Central Cambalache Sugar Mill property to connect with the existing substation. Construction would require clearing and grading of existing material and the setting of steel poles every 150 feet (45.7 meters).

Construction activities of the plant, water line, and transmission line would likely last up to 3 years. Although construction equipment and activities could be visible from numerous viewpoints throughout the area, the majority of people viewing the construction would be motorists passing the active construction areas. As a result, the impact of these changes on the landscape character during construction would be moderate.

**Effects of Operations on Viewsheds**

Under Energy Answers' proposal, the buildings and transmission line would introduce new and different uses to the former Global Fibers Paper Mill site. Proposed buildings would be visible from areas within the Río Grande de Arecibo Valley; however, the details would be difficult to ascertain depending on the viewpoint because the features would typically be in the viewer's middle ground and obstructed by vegetation in the foreground. These new structures would supplement and restore industrial uses to the currently vacant and neglected property. The presence of the proposed stack would introduce a new tall visual feature currently absent from the plant site; however, the adjacent abandoned sugar mill has two such stacks, albeit slightly lower, on its property. Photosimulations from key observation points around the Río Grande de Arecibo Valley depict the potential new visual elements that the proposed Project would introduce to the area (Appendix B).

Because the elevation of the Project would be raised to site the plant above the base flood elevation, the buildings would be most visible to viewers in the foreground and middle ground distance, with diminished visibility proportional to the observer's distance. Views of the new facilities, most notably the 351-foot (107-meter) tall plant stack could be visible from parts surrounding the Río Grande de Arecibo floodplain; however, the narrow lines would be muted in the greater landscape. In the foreground and middle ground view distances, the new buildings,

truck traffic, and landscaped grounds would restore a former industrial site currently in dilapidated conditions from years of abandonment and neglect.

The transmission line would be most visible to motorists on PR-2 passing in front of the plant and substation properties because the line would run along the road just outside the road right-of-way in a new right-of-way. Because there are existing steel pole transmission lines running along the east side of PR-2 that connect to the existing substation, the operation of the new line would create a modest increase to the industrial development along this stretch of road. Towers built with a dull finish would be consistent with construction trends designed to minimize visual contrast from new transmission line. Operation of the water pipeline would not be noticeable because the pipeline would be buried.

Overall, operation of the proposed Project would result in new visual resources in the existing landscape. The new buildings and landscaped exterior of the plant site would replace the abandoned mill and introduce new structures to the former industrial site. Raising the plant footprint above the base flood elevation would increase its visibility from middle ground distances.

## 3.7     ACOUSTIC ENVIRONMENT

### 3.7.1     Affected Environment

#### 3.7.1.1     Background

Noise is defined as unwanted sound. The degree to which unwanted sounds can impact the human environment ranges from levels that interfere with speech and sleep to levels that can cause adverse health effects, such as hearing loss and psychological effects. Human response to noise is subjective and can vary greatly between different people. Factors that influence an individual's response to unwanted sound include the frequency, intensity, pattern, time of day, amount of background noise, and the nature of the work or human activity that is exposed to the noise source.

Transient noise sources, such as passing aircraft or motor vehicles, produce noise usually of short duration. Stationary sources such as urban freeways, commercial and industrial facilities, and transmission lines, substations, and transformers can emit noise over a longer period. Ambient noise at any one location is all noise generated by typical sources such as traffic, neighboring businesses or industries, and weather (wind or rain). The ambient noise level is typically a mix of noise from natural and man-made sources that may be near or distant.

Sound is made up of tiny fluctuations in air pressure. Sound, within the range of human hearing, can vary in intensity by more than one million units. Therefore, a logarithmic scale, known as the decibel (dB) scale, is used to quantify sound intensity and to compress the scale to a more manageable range.

Sound is characterized by both its amplitude (how loud it is) and frequency (or pitch). The human ear does not hear all frequencies equally. In fact, the human hearing organs of the inner ear deemphasize very low and very high frequencies. The A-weighted decibel (dBA) is used to reflect this selective sensitivity of human hearing. This scale puts more weight on the range of frequencies where the average human ear is most sensitive and less weight on those frequencies that humans do not hear as well. The human range of hearing extends from approximately 3 dBA to around 140 dBA. **Table 3-28** shows a range of typical noise levels from common noise sources.

**Table 3-28.    Common Noise Sources and Noise Levels**

| Sound Pressure Level (dBA) | Typical Sources |
|---|---|
| 160 | Jet aircraft takeoff |
| 140 | 75-piece orchestra |
| 110 | Blaring radio |
| 100 | Auto on highway |
| 90 | Voice – shouting |
| 70 | Voice – conversational level |
| 30 | Voice – very soft whisper |

Source:  EPA (1973)

Environmental noise is often expressed as a sound level occurring over a stated period of time, typically 1 hour. When the acoustic energy is averaged over a stated period of time, the resulting equivalent sound level represents the energy-based average sound level for that period. This is called the equivalent continuous noise level ($L_{eq}$), and it represents an energy-based average (or mean) noise level occurring over a stated time period. The $L_{eq}$ represents a constant sound that, over the specified period, has the same acoustic energy as the time-varying sound. This metric is used as a baseline by which to compare project-related noise levels (i.e., noise modeling results, which are also expressed as an hourly $L_{eq}$) and to assess the potential project-related noise increase over existing (or ambient) conditions.

### 3.7.1.2    Federal Guidelines

Federal codes, primarily the Occupational Safety and Health Act of 1970, exist that address worker exposure noise levels. These regulations would be applicable during construction and operation of the Project. These codes limit worker exposure to noise levels of 85 dB or lower over an 8-hour period. EPA (1974) has established general guidelines for noise levels in sensitive areas. These general guidelines have been established to give state and/or local governments guidance in establishing local laws, ordinances, rules, or standards. EPA guidelines suggest that the average residential outdoor noise level should be 55 dB and the indoor level should be 45 dB. The indoor level also applies to hospitals, schools, and libraries.

Arecibo Waste-to-Energy Project
Final EIS                                                                                              January 2017

### 3.7.1.3    Puerto Rico Noise Pollution Control Regulations

Noise Pollution Control Regulations have been adopted by EQB (*Puerto Rico Noise Pollution Control Regulation, Amended Version*, 1987) and establish different sound level criteria for daytime and nighttime hours. As defined by EQB, the daytime period begins at 7:01 a.m. and ends at 10:00 p.m., with the nighttime period beginning at 10:01 p.m. and ending at 7:00 a.m.

Maximum noise levels have been established for four categories of land use—residential, commercial, industrial, and quiet zones (Zones I, II, III and IV). **Table 3-29** identifies the noise levels prescribed by EQB for the four zones.

**Table 3-29.    Noise Level Limits**

| Emitting Source | Receiving Zones Noise Levels dBA | | | | | | | |
| | Zone 1 (Residential) | | Zone 2 (Commercial ) | | Zone 3 (Industry) | | Zone 4 (Quiet) | |
| | Day | Night | Day | Night | Day | Night | Day | Night |
|---|---|---|---|---|---|---|---|---|
| Zone I | 60 | 50 | 65 | 55 | 70 | 60 | 50 | 45 |
| Zone II | 65 | 50 | 70 | 60 | 75 | 65 | 50 | 45 |
| Zone III | 65 | 50 | 70 | 65 | 75 | 75 | 50 | 45 |

Source:  EQB (1987)

Note:      Units = noise level exceeded 10% of the measurement period ($L_{10}$)

EQB uses a dBA that is exceeded 10 percent of the time for the period under consideration as its unit of measurement. This is the noise level exceeded for 10 percent of the time of the measurement period. For example, a noise limit of $L_{10}$ 75 dBA means that over a period of one hour, the noise from regulated activities can only exceed 75 dBA for a total of 6 minutes or, 1 minute over a period of 10 minutes.

In accordance with the Regulation for the Control of Noise Pollution provisions, the noise level limits in **Table 3-28** are adjusted depending on the level of ambient noise at a sensitive receptor. For example:

- If existing noise levels are less than the level specified in **Table 3-29** by more than 5 dBA, the limits specified in **Table 3-29** are applied

- If existing noise levels are less than the level specified in **Table 3-29** by less than 5 dBA, 3 dBA are added to the limits

- If existing sound levels are greater than the level specified in **Table 3-29**, 5 dBA are added to the limits specified

- For any stationary noise source that emits noises in cycles, or in repetitions of impulsive noises, the limits specified are reduced by 5 dBA

#### 3.7.1.4    Baseline Noise Levels

To establish baseline sound levels, Energy Answers measured sound levels at sensitive receptors during the daytime and nighttime hours. These receptors are described in **Figure 3-16** and on **Table 3-30**. The selected receptors (R1 through R5) correspond to the closest locations that represent each of the four zones (Zones I, II, III, and IV) in which the greatest noise impact from a Project is expected to occur. In addition, three receptors (R6, R7, and R8) were selected along PR-2 to characterize existing daytime traffic-related noise levels in nearby residential areas.



Source:  CSA (2010d), NRCS (2014), digitized by Louis Berger

**Figure 3-16.   Noise Sensitive Receptor Locations**

**Table 3-30.    Noise Sensitive Receptors**

| Receptor | Zone Classification | Description |
|---|---|---|
| 1 | Zone II – Commercial | Farmacia Del Carmen |
| 2 | Zone IV – Quiet | Hospital Dr. Susoni |
| 3 | Zone III – Industrial | Battery Recycling, Inc. |

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017

| Receptor | Zone Classification | Description |
|----------|--------------------|-------------|
| 4 | Zone I – Residential | Residential Properties |
| 5 | Zone I – Residential | Residential Properties Santa Barbara Parcel |
| 6 | Zone I – Residential | Domingo Ruiz Ward (Residential) |
| 7 | Zone I – Residential | Domingo Ruiz (Residential) |
| 8 | Zone I – Residential | Domingo Ruiz (Residential) |

Source:  CSA Group (2010d)

Sound level measurements were taken at these receptors on January 21 and 22, 2010, and again on February 16, 2010, and March 27, 2010, during daytime and nighttime periods. Note that night time noise measurements were not made for Receptors 6-8. The results of these measurements are provided in **Table 3-31**.

**Table 3-31.    Baseline Sound Levels**

| Receptor | Measurement Period | Monitored Level | |
|----------|--------------------|-----------------|-----------------|
| | | $L_{eq}$ dB(A) | $L_{10}$ dB(A) |
| 1 | Day | 66.2 | 68.1 |
| | Night | 63.1 | 66.0 |
| 2 | Day | 66.8 | 68.8 |
| | Night | 66.7 | 68.8 |
| 3 | Day | 74.1 | 78.3 |
| | Night | 68.9 | 73.9 |
| 4 | Day | 71.1 | 74.9 |
| | Night | 66.8 | 70.3 |
| 5 | Day | 61.1 | 64.0 |
| | Night | 60.1 | 63.5 |
| 6 | Day | 61.0 | 66.9 |
| | Night | N/A | N/A |
| 7 | Day | 56.6 | 62.1 |
| | Night | N/A | N/A |
| 8 | Day | 70.7 | 72.0 |
| | Night | N/A | N/A |

Source:  CSA Group (2010d)

## 3.7.2      Effects Analysis

Impacts on the acoustic environment include those from construction and operation of the Project. Construction equipment and vehicles would use highways and local roadways to access the Project site. Large equipment, including, drill rigs, cranes, low boys, large trucks, bucket trucks, graders, excavators, and dump trucks would be required to construct the plant, excavate and install the waterline line, and pull the transmission line. Operation of the plant would include truck traffic to haul MSW on-site and recoverables, recyclables, and wastes off site in addition to the constant combustion of the processed shredded fuel and and generation of electricity. Potential noise impacts are commonly divided into two groups: temporary and long term. Temporary impacts are associated with noise generated by construction activities. Long-term impacts are associated with impacts on surrounding land uses generated by operation of the Project and those impacts that occur at or in proximity to the Project site. The intensity of the impacts on land use are in **Table 3-32**.

**Table 3-32.      Acoustic Environment Impacts Context and Intensity Definitions**

| Acoustic Environment | | | |
|---|---|---|---|
| **Context (Duration)** | **Low Intensity** | **Moderate Intensity** | **High Intensity** |
| Short term: During the construction period<br><br>Long term: Life of the Project (50 years) | Noise impacts could attract attention, but would not dominate the soundscape or detract from current user activities. | Noise impacts would attract attention, and contribute to the soundscape, but would not dominate. User activites would remain unaffected. | Impacts on the characteristic soundscape would be considered significant when those impacts dominate the soundscape and detract from current user activities. |

The assessment of potential noise impacts considers the introduction of anticipated noise levels generated during Project construction and operation to ambient noise levels in areas where sensitive receptors exist. The Project would have a significant effect on the environment if noise generated during construction or operation would:

- Result in a significant increase in noise levels to sensitive receptors in the area

- Conflict with applicable noise restrictions or standards imposed by regulatory agencies

### 3.7.2.1      Construction

Construction activities could cause an increase in sound that is well above ambient noise levels. Noise sources from Project construction activities would include equipment that is typically found at large-scale construction sites. A variety of sounds are emitted from graders, loaders, trucks, pavers, and other work activities and processes. Construction equipment usually exceeds

Arecibo Waste-to-Energy Project
Final EIS                                                                              January 2017

the ambient sound levels by 20 to 25 dBA in an urban environment and up to 30 to 35 dBA in a
quiet suburban area (EPA 1971). **Table 3-33** presents a list of construction equipment that might
be used for the Project and associated noise levels that would result from their use.

Construction activities with higher noise levels, such pile driving, would primarily be limited to
occur only during daytime hours. Noise levels at 15 meters (50 feet) from earth-moving
equipment typically range from 73 to 96 dBA. Construction equipment noise typically has a
drop-off rate of 6 dBA per doubling of distance (EPA 1971). Based on this standard, noise levels
associated with the earth-moving equipment would be approximately 67 to 90 dBA at 30 meters
(100 feet) from the source.

**Table 3-33.    Noise Level Ranges of Typical Construction Equipment**

| Construction Equipment | Noise Levels in dBA at 50 feet (15 meters)* |
|---|---|
| Trucks | 82–95 |
| Cranes (moveable) | 75–88 |
| Cranes (derrick) | 86–89 |
| Vibrator | 68–82 |
| Saws | 72–82 |
| Pneumatic Impact Equipment | 83–88 |
| Jackhammer | 81–98 |
| Pumps | 68–72 |
| Generators | 71–83 |
| Compressors | 75–87 |
| Concrete Mixers | 75–88 |
| Concrete Pumps | 81–85 |
| Front Loader | 73–86 |
| Back Hoe | 73–95 |
| Pile Driving (peaks) | 95–107 |
| Tractor | 77–98 |
| Scraper/Grader | 80–93 |
| Paver | 85–88 |

Source:  EPA (1971)

Note:    *Construction equipment equipped with noise control devices would be expected to generate
         lower noise levels than shown in this table.

Noise associated with construction activity at the nearest existing residences (approximately
1,700 to 1,900 feet [520 to 580 meters] from the nearest proposed construction area) would not
be perceptible, especially given the ambient noise sources in the area. Noise associated with the

loudest construction activity, pile driving or the installation of sheet pile, would increase the sound level at the closest residence, Receptor 4, by less than 1 dBA, a level that is imperceptible. Therefore, the anticipated off-site noise levels during the construction phase would not be expected to noticeably increase the existing ambient noise environment within the Project area.

The active construction phase of the Project is projected to last approximately 3 years, with the balance of the approximately 42 month construction schedule dedicated to commissioning and startup. Pile driving, expected to occur over a 13 month period, is the construction activity expected to produce the most noise. However, based on the noise impact results during the construction phase of the project, no significant increases in noise levels are expected during the pile driving activities at any receptors, because the closest receptor (Receptor 4) to the Project is approximately 1,800 feet (550 meters) away. Additionally, pile driving activities would be conducted during the day. Because construction noise levels associated with the proposed Project would be temporary, and Energy Answers would adhere to EQB noise regulations, the construction noise from the Project would be short term and of moderate intensity.

### 3.7.2.2    Operation

The Project's operation is expected to increase the noise levels at the receptors surrounding the property due to noise from facility operations and increased truck traffic accessing the site. **Table 3-34** describes the primary equipment that would be used within the Project that could generate noise impacts on the surrounding areas to the site.

**Table 3-34.    Operating Equipment Noise Levels**

| Potential Noise Sources | Noise Levels in dBA |
|---|---|
| Truck maneuver area | 75 |
| Tipping floor activity | 85 |
| Shakers | 55 |
| Boilers | 78 |
| Cooling tower | 85 |
| Blowers | 95 |
| ID fans (casings) | 43 |
| Building vent fans | 63 |
| Dust collector systems | 70 |
| Condensers | 92 |
| Transformers | 60 |
| Steam generators | 75 |
| Deareators | 100 |
| Precipitators | 96 |

Arecibo Waste-to-Energy Project
Final EIS                                                                            January 2017

| Potential Noise Sources | Noise Levels in dBA |
|---|---|
| Stack | 93 |

Source:  CSA Group (2010d)

Note:    Sound levels are for all three system modules combined without sound attenuation by silencers, buildings, and shielding.

Most of the equipment described in **Table 3-34** would be located within the plant buildings. Therefore, it is estimated that the noise generated from this equipment would be reduced from 10 to 15 dBA.

**Table 3-35** and **Table 3-36** describe the noise levels that would be generated by the equipment operation on the receptors located closer to the plant for daytime and nighttime, respectively. The location of the equipment was estimated using the Project's site plan. Calculations were performed using the noise levels generated by the deareators operation (100 dBA), because it would be the noisiest equipment in the plant. A deaerator is a device that is widely used for the removal of air and other dissolved gases from the feedwater to steam-generating boilers. Deareators would be located inside a building. The interior of the building may provide some noise attenuation to the emission source and the receptors under evaluation; therefore, a reduction of 20 dBA was estimated.

**Table 3-35.    Estimated Daytime Noise Impact**

| Receptor | Distance to Receptor (Feet) | Daytime Noise Levels dBA | | | | |
|---|---|---|---|---|---|---|
| | | Background $L_{10}$ | Maximum Expected Level | $L_{10}$ Due to Operation | Total Combined $L_{10}$ | Daytime Regulation for Operation |
| 1 | 5,380 | 68.1 | 38.8 | 41.8 | 68.1 | 70 |
| 2 | 6,214 | 68.8 | 37.6 | 40.6 | 68.8 | 55 |
| 3 | 3,363 | 78.3 | 42.8 | 45.8 | 78.3 | 80 |
| 4 | 1,795 | 74.9 | 47.0 | 50.0 | 74.9 | 70 |
| 5 | 1,916 | 64.0 | 45.1 | 48.1 | 64.2 | 68 |

Source:  CSA Group (2010d)

**Table 3-36.    Estimated Nighttime Noise Impact**

| Receptor | Distance to Receptor (Feet) | Nighttime Noise Levels dBA | | | | |
|---|---|---|---|---|---|---|
| | | Background $L_{10}$ | Maximum Expected Level | $L_{10}$ Due to Operation | Total Combined $L_{10}$ | Nighttime Regulation for Operation |
| 1 | 5380 | 66.0 | 38.8 | 41.8 | 66.0 | 70 |

Arecibo Waste-to-Energy Project
Final EIS                                                                                        January 2017

| Receptor | Distance to Receptor (Feet) | Nighttime Noise Levels dBA | | | | |
|---|---|---|---|---|---|---|
| | | Background $L_{10}$ | Maximum Expected Level | $L_{10}$ Due to Operation | Total Combined $L_{10}$ | Nighttime Regulation for Operation |
| 2 | 6214 | 68.8 | 37.6 | 40.6 | 68.8 | 50 |
| 3 | 3363 | 73.9 | 42.8 | 45.8 | 73.9 | 78 |
| 4 | 1795 | 70.3 | 47.0 | 50.0 | 70.4 | 55 |
| 5 | 1916 | 63.5 | 45.1 | 48.1 | 63.7 | 55 |

Source:  CSA Group (2010d)

The noise impact assessment showed that there would essentially be no change in the noise level due to the operation of the plant during daytime hours because of the distance between the plant and the receptors and the existing high ambient noise levels. The total combined levels at Receptors 2 and 4 exceeded EQB thresholds limits for a quiet suburban or a residential zone; however, background noise levels from these receptors already exceeded EQB threshold limits for these zones.

Calculations of operation noise levels for the nighttime period showed a *de minimis* increase at Receptor 5 of 0.2 dBA. An increase of 0.2 dBA is not perceptible to the human ear. The total combined noise levels at Receptors 2, 4, and 5 were above EQB threshold limits for the nighttime period; however, background noise levels for these receptors already exceeded EQB noise limits for the nighttime period.

Operation of the Project would result in an increased level in vehicular traffic on PR-2 in the Project vicinity, specifically solid waste trucks that would unload waste at the plant. (Traffic is discussed in detail in Section 3.8.) A total of 227 vehicle trips would be generated per day, of which 70 percent or 159 would be heavy trucks. This is less than 2 percent of the existing traffic volume on PR-2. Even taking into account the higher noise levels generated by trucks compared to autos, noise levels along PR-2 are expected to increase by less than 3 dBA, a change that is considered barely perceptible.

All receptors are currently affected by the noise generated by the traffic of cars and trucks on PR-2 because the area is in commercial and industrial use. Ambient noise levels at Receptors 6 and 7 (66.9 and 62.1 dBA, respectively) did not exceed the Federal Highway Administration's guidelines of 70 dBA for noise abatement on Type II Highway Projects (2011); however, the ambient level at Receptor 8 did. It is important to note that Receptors 6 and 8 are located less than 25 feet (8 meters) from PR-2, which in this area is a four-lane divided highway, and Receptor 8 is less than 1,100 feet (345 meters) from Antonio Nery Juarbe Airport.

Operation of the Project is not expected to increase the noise levels already experienced in the area or surrounding areas during the daytime or nighttime periods. The noise from plant operation would therefore be long term and of low intensity.

Energy Answers proposes the following construction noise mitigation measures:

- Restrict construction activities to daytime hours (7:00 a.m. to 7:00 p.m.)

- Ensure that all construction equipment has noise mufflers and is in good working order

- Incorporate the use of silencers, permanent barriers, and/or shielding into the equipment to be used during the operation of the Project

- Position the noisiest equipment as far away as possible from the most sensitive areas

- Construction noise would also be mitigated by some of the air quality construction impact mitigation measures, such as limitations on idling and vehicle speeds

## 3.8    TRANSPORTATION

### 3.8.1    Affected Environment

#### 3.8.1.1    Roads and Traffic

The northwest area is served by an excellent road network that consists mainly of primary and secondary roads. This network has been improved as follows.

The construction of primary and secondary roads allow easy access from north to south, east to west, or around the island, considerably shortening travel time and connecting to the tertiary roads system. This network of primary and secondary roads is used by freight trucks to transport food and general merchandise to commercial and industrial sectors at different areas of the island and also is used by private vehicles. The roads are defined below according to the Federal Highway Administration Manual of Uniform Devices for Traffic Control (Federal Highway Administration 2009) of Department of Transportation and Public Works, as amended.

- Highway is an arterial roadway system divided by a central median, with or without frontage road, with full access control and overpass intersections with all other public roads.

- Main road is a road that typically has the highest traffic volume in its access to an intersection.

- Secondary road is a road that typically has lower traffic volume in its access or accesses to an intersection.

The main connecting roads between the Arecibo region and the municipalities of the Northern Island Area include:

- PR-2 is the longest road in Puerto Rico's network system. It begins in its intersection with Ponce de León Avenue in Santurce, San Juan Municipality, and extends from east to west connecting all the municipalities of the North Coast up to the Aguadilla Municipality. From there, it extends north to south through the western part of the island, up to the Ponce Municipality. East of the Project site, PR-2 consists of four lanes, two in each direction divided by a concrete median barrier, where there are also left turning lanes at the center of the road, protected by median barriers.

- Highway PR-22 is a four-lane toll road that begins in San Juan Municipality and extends from east to west connecting the municipalities of the north side of the island ending in the Hatillo Municipality. In the vicinity of the Project site it consists of four lanes separated by a grassy median. Along the entire route, there are six alternating one-way toll plazas.

- PR-10 begins in the Ponce Municipality and extends from south to north, ending in the Arecibo Municipality. The intersection that is close to the Project site consists of four lanes with no median barrier.

From these roads, PR-2 provides excellent direct access to the Project site on its eastern side. PR-2 can be accessed from the east by Highway PR-22 or by the west from PR-10 in Arecibo (**Figure 3-17**). **Table 3-37** shows traffic volumes on PR-2 through Arecibo.

To maintain traffic efficiency on-site, the Project would have separate entrances for trucks and automobiles. Each access would have two lanes—an entrance and an exit lane. Deceleration and acceleration lanes are proposed for both accesses to provide safety for those entering and exiting the project, and to reduce conflicts with oncoming traffic on PR-2. Access #1, the north entrance, would be used for heavy vehicles only. Energy Answers estimates that 75 percent of the heavy vehicles would travel from the eastern part of the island, and 25 percent would travel from the west. Access #2, the south entrance, would mainly be used as the employee/visitor entrance. Energy Answers estimates that 50 percent of the cars would travel from the eastern part of the island, and 50 percent would travel from the west.

Arecibo Waste-to-Energy Project
Final EIS                                                        January 2017



Source:  NRCS (2014), digitized by Louis Berger

**Figure 3-17.   Transportation Network**

Arecibo Waste-to-Energy Project
Final EIS

January 2017

**Table 3-37.    Traffic Volumes on PR-2 through Arecibo**

| Route Number | Km Marker | Classification | Municipality | Location | Year | AADT |
|---|---|---|---|---|---|---|
| 2 | 75.45 | Primary Urban | Arecibo | Between PR-10 and Ave. Constitución | 2005 | 21492 |
| 2 | 75.7 | Primary Urban | Arecibo | Between Ave. Constitución and Ave. Rotario | 2005 | 21801 |
| 2 | 77 | Primary Urban | Arecibo | Between Calle Ángel M. Marín and Calle Unión | 2005 | 21215 |
| 2 | 77.7 | Primary Urban | Arecibo | Between Calle Unión and Calle de La Cruz | 2005 | N/A |
| 2 | 72.3 | Secondary | Arecibo | Between Access Highway PR-22 and PR-638 | 2006 | 29703 |
| 2 | 74.15 | Secondary | Arecibo | West of PR-6681 | 2006 | 17425 |
| 2 | 76.4 | Primary Urban | Arecibo | Between Calle Susoni and PR-129 | 2006 | 14794 |
| 2 | 76.75 | Primary Urban | Arecibo | Between PR-129 and Ángel M. Marín | 2006 | 15308 |
| 2 | 77.65 | Primary Urban | Arecibo | Between Calle Unión and Calle de La Cruz | 2006 | 22155 |
| 2 | 70.35 | Primary | Arecibo | Between PR-638 and Highway PR-22 Access | 2007 | 30364 |
| 2 | 70.4 | Secondary | Arecibo | Between PR-638 and Highway PR-22 Access | 2008 | 30589 |
| 2 | 79.26 | Primary Urban | Arecibo | Between Calle De La Cruz and Ave. san Daniel | 2009 | 19966 |
| 2 | 76.7 | Primary | Arecibo | Between PR-129 and Calle Celis Aguilera | 2010 | 15131 |
| 2 | 77.65 | Primary | Arecibo | Between Calle de la Cruz and Calle Unión | 2010 | 28102 |
| 2 | 70.4 | Secondary | Florida | Between PR-638 and Highway PR-22 | 2012 | 23383 |
| 2 | 74.9 | | Arecibo | Arecibo Urban Limit and PR-10 | 2012 | 19632 |
| 2 | 76.4 | Primary Urban | Arecibo | Between Calle Sulsoni and PR-129 | 2012 | 12084 |
| 2 | 77 | Primary Urban | Arecibo | Between Calle Marín and Calle Unión | 2012 | 11224 |

Source:   data.Pr.gov (2012)

Note:      AADT – annual average daily traffic

Energy Answers conducted a traffic study in March 2010 to assess the capacity and operation of the current traffic conditions, determine the future potential impact on major intersections around the Project site, and establish mitigation measures as a result of the operation of the Project. To this end, several field inspections were conducted at the following intersections to observe the traffic pattern in the area:

- Intersection 1: PR-2 with PR-10 and Juan Rosado Avenue

- Intersection 2: PR-2 with Victor Rojas Avenue

- Project's north entrance: located on road PR-2, Km. 73.1

- Project's south entrance: located on road PR-2, Km. 73.6

Levels of service (LOS) were used as the main criteria to describe the traffic conditions of the road network. Evaluation criteria included different types of roads and their associated components, including ramps and intersections. Category designations varied according to the conditions of the roads, the type of roads, and associated components. All references related to LOS are from the Highway Capacity Manual and the Puerto Rico Guidelines for the Preparation of Traffic Access of the Department of Transportation and Public Works.

LOS A represents excellent, ideal traffic conditions, while the LOS F represents the worst conditions and heavy vehicular congestion. LOS is based on average delays experienced by vehicles crossing intersections, both signalized and unsignalized.

The categories for each LOS are described below:

- LOS A—An excellent road condition with low traffic and high speeds

- LOS B—Very good condition with certain traffic restrictions

- LOS C—Good condition with controlled speed due to high traffic volumes

- LOS D—Acceptable condition with unstable flow and tolerable operation speeds

- LOS E—Traffic flow becomes unstable and frequent stops occur, with considerable delays and increases in vehicular congestion

- LOS F—Vehicular congestion with frequent lockstep

As part of the traffic study, Energy Answers projected that approximately 453 trips (227 vehicles) would be generated by the Project in a 24-hour period. The summary of incoming and outgoing vehicles from the Project is presented in **Table 3-38**. Approximately 30 percent of the Project's incoming and outgoing vehicles would be cars and 70 percent would be trucks (**Table 3-39**).

**Table 3-38.    Estimated Incoming and Outgoing Vehicles from the Project**

| Vehicles in 24 Hours | Enter Peak Hour Volume (a.m.) | Exit Peak Hour Volume (a.m.) | Enter Peak Hour Volume (p.m.) | Exit Peak Hour Volume (p.m.) |
|---|---|---|---|---|
| 453 | 56 | 11 | 14 | 50 |

**Table 3-39.    Vehicle Type Distribution**

| Vehicle Type | Enter Peak Hour Volume (a.m.) | Exit Peak Hour Volume (a.m.) | Enter Peak Hour Volume (p.m.) | Exit Peak Hour Volume (p.m.) |
|---|---|---|---|---|
| Cars | 17 | 3 | 4 | 15 |
| Heavy Vehicles | 39 | 8 | 10 | 35 |
| Total | 56 | 11 | 14 | 50 |

Based on the findings of the traffic study, Energy Answers proposed a number of road improvements to maintain traffic levels in the area. These improvements include:

- Intersection 1: PR-2, PR-10, and Juan Rosado Avenue—At present, drivers are using the PR-10 shoulder as an exclusive right-turning lane. Energy Answers recommends that the shoulder pavement marking be erased and a right-only lane with a storage length of 60 feet (18.3 meters) be marked. Traffic signs indicating this is a right-only lane also would be installed, and the traffic signals would be changed according to the recommendations from the appendix of the traffic study.

- Intersection 2: PR-2 and Victor Rojas Avenue—At present, drivers are using the westbound shoulder as an exclusive right-turning lane. Energy Answers recommends that the shoulder pavement marking be erased and replaced by a right-only lane with a storage length of 400 feet (122 meters). Traffic signs indicating the new right-only lane also would be installed to guide the traffic, and the traffic light time would be adapted according to the recommendations from the Energy Answers' traffic study.

- Intersection 3: PR-2 and the North entrance (Access #1) to the Project—Project design includes a 400-foot (122-meter) deceleration lane and a 350-foot (107-meter) acceleration lane to enter and exit the Project for southbound traffic. A 350-foot (107-meter) left-turning lane is proposed for northbound traffic, as well as devices to alert drivers that a truck crossing is ahead. The traffic devices would be installed according to the Manual of Uniform Devices for Traffic Control on Public Roads, DTPW 2009 Edition (*Manual de Dispositivos Uniformes para el Control del Tránsito en las Vías Públicas*). Finally, a traffic light would be installed based on the times defined in the Energy Answers' traffic study.

- Intersection 4: PR-2 and the South entrance (Access #2)—Energy Answers proposes a 400-foot (122-meter) deceleration lane and a 350-foot (107-meter) acceleration lane to enter and exit the Project site for southbound traffic. Additionally, Energy Answers proposes a 350-foot (107-meter) left-turning lane for northbound traffic, as well as the necessary devices to alert that a truck crossing is ahead. The traffic devices would be installed according to the Manual of Uniform Devices for Traffic Control on Public Roads, DTPW 2009 Edition.

During Project construction, a Maintenance of Traffic plan would be prepared and implemented in compliance with the Department of Traffic and Public Works guidelines. Once the Project is completed, pavement markings and traffic signing would be placed according to the aforementioned Manual of Uniform Devices.

### 3.8.1.2   Airports

Regional aviation infrastructure of the north coast of Puerto Rico includes four public-use airports, which are part of the local and national airport network. These are Fernando Luis Ribas Dominicci Airport in Isla Grande, Luis Munoz Marín International Airport in Carolina, Antonio Nery Juarbe Airport in Arecibo, and Rafael Hernández International Airport in Aguadilla. Luis Muñoz Marín and Rafael Hernández Airports are both international airports.

Antonio Nery Juarbe Airport in Arecibo is approximately 1.26 miles (2 kilometers) southeast of the Project, in the Barrio Santana, (PR-2, Km 69.5) on a 159-acre (164-*cuerdas*) site. It is 5 miles (8 kilometers) southeast from the city of Arecibo and 50 miles (80.4 kilometers) west of San Juan. The airport has passenger terminal facilities, ground transportation, and runways and taxiways with capacity for commercial flights. Originally it was used for military purposes, although it is currently used for general aviation, with an average of eight departures and arrivals daily. On March 31, 1947, the airport was transferred by the U.S. Navy to the Puerto Rico Ports Authority, along with the Mercedita Airport and the old Santa Isabel Airport.

### 3.8.2   Effects Analysis

### 3.8.2.1   Construction

It is anticipated that during the construction phase of the Project trucks hauling aggregates to modify the topography of the site would increase traffic flow. Aggregate hauling trucks and heavy equipment would have access to the Project site via PR-2, PR-10, Highway PR-22, PR-8861, and PR-861. Using an estimated 10 mile-trip (16 kilometers) (round trip) by 20 hauling trucks with capacities of 20 metric tons and 3 hours per trip for hauling aggregates (material) would generate 480 daily trips for an estimated time of 228 days. The travel time would be set from 6:00 a.m. to 10:00 p.m. This estimate is a daily average and may vary as a result of weather conditions and other factors. According to data provided to Energy Answers from the Puerto Rico Highway Department, the average daily traffic in for PR-2 in the Project area (near the intersection with PR-10) was between 19,632 (2012 count) and 21,492 (2005 count) vehicles per

day. Thus, the estimated number of trips that would be generated during construction of the Project represent an increase of 2.4 to 2.2 percent in traffic volume.

However, the traffic impacts during construction of the Project would be short term (about 8 months) and modest because the road network in the area was designed to accommodate the estimated increase. Similarly, construction of the proposed Project would likely require the use of cranes for the buildings and stack. The use of cranes in large scale construction is common practice and would not have any effect on air travel at nearby airports.

Once the plant is operational, the volume of traffic entering and exiting the plant would increase by 227 additional vehicles per day. This includes the staff and administration operating the plant as well as the truck traffic arriving with MSW and departing with waste, recyclables, recoverable metals, and ash destined for landfill. These additional vehicles represent less than 2 percent of the existing number of vehicles on PR-2. Because traffic levels have not substantially changed since the Energy Answers traffic study was conducted, these conclusions are still valid.

The construction and operation of the Project would require a 313-foot, aboveground stack, which could interfere with airspace and air travel at nearby airports. On November 26, 2014, the Federal Aviation Administration issued a letter to Energy Answers indicating that the Project would have no substantial adverse effect on the safe and efficient utilization of the navigable airspace or by the operation of air navigation facilities (Federal Aviation Administration 2014). As such, airplanes and helicopters using the nearby airport would not be compromised due to the presence of the proposed stack once the Project is operational.

## 3.9      CULTURAL RESOURCES/HISTORIC PROPERTIES

### 3.9.1    Definition of Cultural Resources and Historic Properties

This section of the EIS identifies known cultural resources in the Project area that may be potentially affected by the Project. Cultural resources would continue to be identified as consultation under Section 106 of National Historic Preservation Act proceeds.

There is no legal or generally accepted definition of "cultural resources" within the federal government; however, the term is used to refer to historic, aesthetic, and cultural aspects of the human environment. Under NEPA, the human environment includes the natural and physical (e.g., buildings) environment, and the relationships of people to that environment. Accordingly, a thorough NEPA analysis should address the human (social and cultural) and natural aspects of the environment, and the relationships between them. In meeting its requirements as the lead agency for NEPA, RUS must consider the impact of its actions on all aspects of the human environment, including "cultural resources."

Cultural resources include archaeological sites, defined as locations "that contain the physical evidence of past human behavior that allows for its interpretation;" buildings; structures; and traditional resources and use areas (NPS 1997). Those cultural resources that qualify for listing in the National Register of Historic Places (NRHP) must meet one or more of the following criteria for evaluation.

- The quality of significance in American history, architecture, archaeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling and association, and:

- Criterion A—that are associated with events that have made a significant contribution to the broad patterns of our history; or

- Criterion B—that are associated with the lives of persons significant in our past; or

- Criterion C—that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

- Criterion D—that yielded, or may be likely to yield, information important in prehistory or history.

In general, these resources must also be greater than 50 years in age. Properties less than 50 years of age must be exceptionally important to be considered eligible for listing, as outlined in NRHP Bulletin Number 22 (Sherfy and Luce 1998).

The NRHP is a commemorative listing of those resources significant to the American past. Those cultural resources listed on or eligible for listing on the NRHP are designated "historic properties." Under the National Historic Preservation Act, as amended 2006, "historic property" means "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion on the National Register of Historic Places," including artifacts, records, and material remains related to such a property or resource (16 USC 470w). In accordance with Section 106 of the National Historic Preservation Act, 16 USC §470f, RUS is required to consider the effects of its undertakings on historic properties. The regulation, "Protection of Historic Properties" (36 CFR §800), implementing Section 106 establishes the process through which RUS and other federal agencies consider effects on historic properties in their decision making.

## 3.9.2     Area of Potential Effects

Pursuant to Section 106, RUS must consider whether any historic property within the Project's area of potential effect (APE) could be affected by the Project. The APE is defined as the geographic area or areas within which an undertaking may directly or indirectly cause alterations

in the character or use of historic properties, if any such properties exist. In this case, the APE can be described by three areas: the proposed renewable power generation and resource recovery plant, the proposed changes to the floodplain and the connection routes of a brackish water line and electric transmission line.

The proposed renewable power generation and resource recovery plant APE is on a property measuring 79.6 acres (82 *cuerdas*) bounded to the east by PR-2, to the north and south by vacant lots, and to the west by the Río Grande de Arecibo River.

Modifications to the floodplain within the project site as described in Section 3.2.1.3 will cause some change of floodplain elevations.  This area is included in the APE.

The new brackish water line would follow about 1.9 miles (3,100 meters) in the rights-of-way of PR-2, PR-681, and PR-6681. existing new electric transmission line would be extended from the existing substation, 2,789 feet (850 meters) north to the proposed plant APE across undeveloped property (Eduardo Questell y Asociados 2010a).

## 3.9.3      Culture History Overview

### 3.9.3.1      Prehistoric Context

The prehistoric cultural sequence of Puerto Rico, based on the general cultural chronology for the Caribbean, is generally divided into two periods: the Mesoindian or Archaic Period from ca 6000 calibrated years before present (cal. BP) to ca. 1900 cal. BP, and the Neoindian or Ceramic Period, from ca. 2400 cal. BP to European settlement around 1500 AD (SEAC 2009).

**Mesoindian (7000 BP–2400 BP)**

Ortiroid (7000 BP to 2400 BP)—The first settlers of Puerto Rico arrived on the island between 7000 cal. BP and 6000 cal. BP, after crossing the Caribbean Sea in canoes or rafts, probably from the region south of the Yucatan Peninsula (present-day Belize) (Encyclopedia of Puerto Rico [EPR] 2004). To date, the oldest known settlement on the island is at Angostura, with a calibrated date of 6900 cal. BP (Rodriguez Ramos 2007, Ayes Suarez 1988). Other early occupation sites include Hato Viejo (5190 cal. BP), Paso del Indio, Vega Baja (4860 cal. BP), Maruca, Ponce (4850 cal. BP) and Puerto Ferro, Vieques (4140 cal. BP) (Rodriguez Ramos 2007, Ayes Suárez and Dávila 1993, EPR 2004). Rodriguez presents a sequence of calibrated radiocarbon dates obtained from Pre-Arawak settlements in Puerto Rico that demonstrates a continuous occupation from first settlement to 1810 cal. BP (Rodriguez Ramos 2007). These established early sites contradict the settlement model for Puerto Rico developed by Irving Rouse in the 1950s. In this model, Puerto Rico was uninhabited until approximately 3000 cal. BP, when a preceramic population (labeled as Corosan Ortiroid) migrated to the island from Trinidad. This small, widely dispersed population, according to Rouse's model, was easily displaced by the next wave of immigrants, who began arriving in 2400 cal. BP (Rouse 1992).

Rouse postulated a general settlement pattern for the Lesser Antilles that moved south to north, based on his analysis of radiocarbon dates. Rodriguez, however, argues that the presence of radiocarbon dates in Puerto Rico that predate any samples obtained from the rest of the Lesser Antilles by more than 1000 years calls into question both Rouse's origination and directional settlement models for Puerto Rico (Rodriguez Ramos 2007).

The first inhabitants of Puerto Rico were primarily semi-nomadic or nomadic, with subsistence patterns that focused on gathering, fishing (coastal/ freshwater fish and shellfish), and small-game hunting rather than agriculture. Settling first along the coast and in mangrove swamps, they migrated as needed to follow the available food supplies and procure natural resources from the mountainous interior (EPR 2004, Vega 1992). This transitory settlement pattern is questioned by Rodriguez Ramos, who points out that recent paleo-environmental studies (Burney et al. 1994, Siegel et al. 2005, Sara et al. 2003) have indicated that pre-Arawak societies, beginning ca. 5300 cal. BP, altered the landscape, shaping the environment to suit their needs. He notes that "the early evidence for anthropogenic alterations of the environment of Puerto Rico is not only indicative of cultivation practices but might also be related to the construction of what Rhindos (1984) has labeled agrolocalities. These are built landscapes that served both to humanize the distribution of important resources and to enact a sense of territoriality in such groups" (Rodriguez Ramos 2007). Other possible markers for a higher degree of sedentism and/or territorialism in pre-Arawak societies than previously suspected include sites with multiple burials in a formal space (Ortiz [Kosti-Karell 2003] and Maruca [Crespo Torres 2004, Rodríguez López 2004]), the presence of multiple middens with configurations similar to those at long-term habitation sites during other periods (Angostura [Rodríguez López 1997, Siegel 1992]), and the presence of complete lithic tool assemblages at some sites, rather than just tools for a specific activity (Maruca, Angostura) (Rodriguez Ramos 2007).

Rouse has proposed two subseries for the Ortioroid cultures: Coroso and Krum Bay. In Puerto Rico, the Krum Bay subseries is primarily restricted to the north coast and the island of Vieques. Subsistence strategies emphasized shellfish, birds, turtles, and fish as the primary food sources. Habitation sites tended to be open air and located near the coast, and the artifact assemblage included stone, bone, and shell pendants and beads, shell picks, fairly fine-grained basalt flake tools, hammerstones, and partially ground stone celts (SEAC 2009).

Sites of the Coroso subseries occur across Puerto Rico, including all the coasts, and into the interior of the island. Both open air sites near shell middens and cave sites have been identified for this subseries. According to the faunal assemblage for Coroso sites, Early Coroso populations maintained a generalized diet of crabs, turtles, fish, and shellfish, while later Coroso groups tended to focus on shellfish as a primary source of food. Flaked tools, pebble grinders, hammerstones, pebble choppers, shell plates, and shell scrapers characterize the artifact assemblage (SEAC 2009).

Recent starch grain analysis studies conducted on Pre-Arawak stone tools from the Maruca and Puerto Ferro sites have also called into question the date for the introduction of agriculture. The analysis showed the presence in Puerto Rican Pre-Arawak contexts of such domesticated plants as maize, beans, tannia, and sweet potatoes, as well as the use of wild resources such as yam and zamia (Pagan Jimenz et al. 2005). Other studies have produced similar results for both non-native grains (maize) and local cultivated plants (zamia) (Fortuna 1980, 1981, Newsom and Pearsall 2003, Siegel et al. 2005, Veloz Maggiolo 1980). In Rodriguez Ramos view, "this evidence conclusively indicates that the origins of agriculture in the Antilles predate the entrance of both L[a] H[uerta] and Cedrosan Saladoid societies to the islands" (Rodriguez Ramos 2007).

The common assertion is that the pre-Arawak people typically took shelter in caves or rockshelters, occasionally building temporary expedient structures, since the transitory nature of culture did not warrant the construction of long-term structures (Rouse 1992). Terrestrial shell midden sites are thought to be evidence of temporary subsistence activity areas (e.g. Dávila Dávila 2003, Espenshade et al. 1986, Figueroa 1991, Tronolone et al. 1984, Veloz et al. 1975). Rodriguez Ramos, however, argues that the currently established residential patterns stem from an absence of complete archaeological analysis, as past excavations of open air pre-Arawak sites have focused on large shell middens while disregarding the surrounding space where evidence of residential features might exist. He contends that more archaeological studies focusing on the void space around these middens should be conducted in an effort to determine the presence or absence of residential features, particularly in light of the discovery of postmolds at the Maruca site in southern Puerto Rico (Rodriguez Lopez 2004, Rodriguez Ramos 2007).

The artifact assemblage of Pre-Arawak societies is dominated by lithic technologies, with an absence of ceramics. However, pottery has been recovered from Pre-Arawak contexts in north central Puerto Rico, most notably at the Cueva La Templadera site (Martinez 1994). At other sites, the presence of pottery within Pre-Arawak contexts has been documented but has been deemed to be intrusive (i.e. Cueva Gamelos [Dávila 1981:177]), while pot shards that have returned early radiocarbon dates are seen as anomalous (e.g. Palmar de Animas [Siegel and Joseph 1993:45]). Rodriguez Ramos contends that the dismissal of such finds as "intrusive" and "anomalous" explains the low recordation of ceramics from Pre-Arawak contexts (Rodríguez Ramos 2005; Rodriguez Ramos et al. 2008). In regard to the non-ceramic technologies, several formal preceramic typologies have been produced, including Kozlowski (1974), Pina et al. (1976), Rouse (1951), and Rouse and Allaire (1978). Though the typologies may diverge in the details, the general established typology divides Pre-Arawak artifacts into three primary groups: Pattern 1, Pattern 2, and Pattern 3. Pattern 1 includes the ground stone artifacts, such as mortars, grinders, and stone balls. Pattern 2 consists of the flaked stone artifacts, such as lanceolate points, knives, choppers, and scrapers, with the occasional presence of ground stone tools. A shell tool assemblage containing tools such as gouges, utilized conch vessels, and picks, characterizes Pattern 3 (Vega 1992). Rodriguez Ramos (2007) provides an extensive analysis of the ground and flake stone tool technologies of Pre-Arawak societies in Puerto Rico.

Major sites of the Ortoiroid period in Puerto Rico include the Corosan sites of Cueva de María la Cruz (Loíza Cave), Cayo Cofresí, Coroso site, and Playa Blanca, and the Krum Bay site of Cana Hondo on the island of Vieques (SEAC 2009).

**Neoindian [2400 cal. BP to 500 BP]**

**Saladoid/Huecoid (2400 BP to 1400 BP)**—According to the traditional view of Puerto Rican prehistoric settlement, the pre-Arawak societies of Puerto Rico were displaced by the arrival of the people from the Arawak linguistic group, who began migrating to the island from the middle and lower Orinoco Basin (present-day Venezuela) around 2400 cal. BP (Rouse 1992, EPR 2004). This new influx of people brought with them a major shift in subsistence practices, settlement patterns, societal organization, and technologies. Among the major changes visible in the archaeological record are: the shift from hunter-gatherer subsistence strategies to horticulture; the widespread introduction of ceramics; and the settlement of permanent villages (Vega 1992). Rouse's settlement model emphasizes the conquest and subsequent displacement of the first inhabitants of Puerto Rico by the Arawak groups. Rouse and Alegría's (1990:80) statement that "[s]ince the Corosans [Pre-Arawak] were a relatively small population, they may have been absorbed by the Hacienda Grande who replaced them in Puerto Rico. Alternately, they may have been pushed into Hispaniola and assimilated into its El Caimito population. In either event, they would have contributed little to the subsequent peoples and cultures of the Greater Antilles," succinctly summarizes the traditional view.

However, alternative models have been proposed recently that emphasize transculturation and coexistence over conflict, with the two groups managing to cohabitate the island. Rodriguez Ramos, a proponent of the coexistence model, argues that the existence in the archaeological record of Pre-Arawak sites dating to 1910 cal. BP (Paseo del Indio; Clark et al. 2003, Walker 2005) and 1800 cal. BP (Yanuel 9 site, Tronolone et al. 1984) shows that the Pre-Arawak population was still inhabiting the island at least 600 years after the arrival of the Arawaks. In the case of Paseo del Indio, the habitation was located in relative proximity to an Arawak settlement (Maisabel) Further, the archaeological evidence suggests that simple trade networks may have been in place between the two groups, based on the presence of a radiolarian limestone celt at the Paseo del Indio site, a raw material only available from St. Martin, while the archaeological assemblage at Maisabel included calcite, a raw material obtained from the karst hills surrounding Paseo del Indio (Rodriguez Ramos 2007, Siegel 1992).

This group of Arawak people is typically divided into two subgroups within Puerto Rico: the Saladoid and Huecoid, based on distinctive cultural manifestations in pottery and other artifacts. The Saladoid group, which inhabited western Puerto Rico, settled first on the coastal plains and along estuaries. Around 1600 cal. BP, the Saladoids started to shift their settlements to the interior valleys, before finally occupying the piedmont of the Cordillera Central. Archaeological deposits found at the caves in Trujillo Alto as well as communal cave dwellings excavated in 1995 at the Paseo del Indio site in Vega Baja suggest that the Saladoid people may have

switched from open-air settlements to cave dwellings during this phase (EPR 2004). The Huecoid group occupied eastern Puerto Rico and the island of Vieques, with major settlements at La Hueca, on Vieques, and Punta Candelaro near the modern city of Humadao (Chanlatte and Narganes 1980, EPR 2004).

Community organization during this period is centered around a central plaza, with the inhabitants occupying oblong communal structures called *malocas*. The central plaza typically faced a semi-circular cluster of shell middens. Excavated burials at sites from this time period, typically located underneath the central plaza or the shell middens, show an equitable distribution of grave goods, indicating a fairly egalitarian social structure (EPR 2004, SEAC 2009).

Subsistence strategies shifted during this period. The Saladoid and Huecoid groups practiced horticulture, and their primary food source was the cultivated cassava (manioc) plant, supplemented by maize, cocoyam, pineapple, and other fruits and vegetables. Hunting and gathering subsistence practices, though secondary to farming, were also employed, providing needed protein in the form of small game, fish, and shellfish. Based on the increased quantities of claws in the faunal remains recovered from excavated sites, the land crab was a particularly important element of the diet (EPR 2004).

The Saladoid artifact assemblage is typically defined by the presence of its distinctive pottery wares, which include white-on-red, black paint, orange slip, and negative-painted designs. Ceramic vessel forms include zoomorphic effigy vessels, trays, and platters (some depicting animals native only to South America), jars and bowls with D-shaped strap handles, censers, and bell-shaped vessels (SEAC 2009). The motifs are often connected to terrestrial food sources such as crabs and in some cases were incised or modeled onto the vessels (Vega 1992). Other diagnostic artifacts include jewelry made from mother-of-pearl, tiny beads, and semiprecious stones, as well as cohoba pipes, *zemis*, and lithic pendants carved or worked from exotic materials (e.g., jasper-chalcedony, amethyst, crystal quartz, fossilized wood, greenstones, carnelian, lapis lazuli, turquoise, garnet, epidote, and obsidian). These pendants are shaped to resemble South American raptors, and their widespread distribution across the Caribbean suggests the existence of a significant trade network for both raw materials and luxury items (Vega 1992, SEAC 2009). In contrast, the Huecoid artifact assemblage primarily consists of unadorned ceramic vessels, though the bird-shaped pendants described above are also present (EPR 2004).

The earliest known Arawak settlement is the site of Hacienda Grande, Loíza, located in northeastern Puerto Rico. In the south central region surrounding Ponce, sites dating to the Saladoid time period or with Saladoid components include Tibes, La Vega, Las Flores, Buenos Aires, Tecla, Canas, Carmen, and Hernandez Colon (Vega 1992). Huecoid sites are typically found in eastern Puerto Rico.

**Ostionoid or Pre-Taíno (1400 BP to 800 BP)**—Around 1400 cal. BP, a marked shift appears in the pottery making styles throughout the Antilles, including Puerto Rico, suggesting the rise of a new cultural group within the Caribbean. The traditional explanation for this new culture was the migration of a new group of peoples from the northern South American coast that spread throughout the Antilles, similar to the previous wave of Saladoid people (Haag 1963, SEAC 2009). Current theories, however, suggest internal rather than external forces at work, and favor the natural evolution of the Saladoid culture into the Ostionoid (SEAC 2009). As the National Park Service website notes, "there seems to be a breakdown in cultural continuity between the Caribbean Islands and mainland South America due to the lack of trade goods, such as the Saladoid exotic stone pendants, and the concomitant rise of regional ceramic styles in both Puerto Rico and the Virgin Islands" (SEAC 2009). While the reasons for the apparent disintegration of the trade network remain unknown, a lack of contact with outside cultural groups would explain the development of regional pottery styles, and the focus on internal development.

Like the Saladoid groups before them, the Ostionoid cultures continued to practice agriculture, produce pottery, and reside in sedentary villages. While settlement patterns did not shift dramatically, new site types emerge, the size and general complexity of established village settlements increased, ball courts and ceremonial stone-lined plazas began appearing in the archaeological record, and the frequency of the religious icons known as *zemis* increased within the artifact assemblage (SEAC 2009, EPR 2004). The new site types include dispersed and lineal settlements. In dispersed settlements, individual dwellings, possibly farmsteads, were spaced out over the landscape rather than organized around a central plaza. In the lineal arrangement, the plaza as the main focal point was replaced by a river bank or coastline. The spatial configuration of established villages also changed during the Ostionoid period. Around 1100 cal. BP, the communal dwellings began to be replaced by smaller oblong structures situated around a stone or earthen mound-lined central plaza usually decorated with stone figures or petroglyphs, and public and ritual spaces became formally divided (Vega 1992:). Overall the trend toward greater complexity, coupled with the expenditure of manpower and resources for ceremonial spaces and activities, suggests that the societal structure during the Ostionoid period was shifting from an egalitarian tribal system to a ranked hierarchy of chiefdoms, with each chieftain presiding over a specific region.

Subsistence strategies continued to focus on agricultural food sources like cassava, maize, cocoyam, and other fruits and vegetables, supplemented by shellfish, fish, and small game. However, archaeological evidence suggests that protein sources favored during this period shifted from land crabs to shelled animals, based on the relative proportions of faunal remains for each animal (SEAC 2009).

The Ostionoid culture, like the previous Saladoid culture, is divided into two subseries based on varying artifact assemblages, the Ostionan and the Elenan Ostionoid. The Ostionan subgroup

populated the western half of Puerto Rico, while the Elenan Ostionoid peoples inhabited the eastern side of the island. Both groups followed similar settlement patterns, and developed ball courts, lined plazas, and ceremonial centers (SEAC 2009).

The Ostionan artifact assemblage includes ceramics, stone, clay and shell *zemis*, and stone celts. The ceramics were typically decorated with zoomorphic modeled and appliqué designs, and were often polished, with red paint (or a red slip) covering the entire vessel surface. Later decorative motifs expanded to include horizontal bands of geometric line-and-dot incising. The introduction of petroglyphs is also associated with this subgroup (SEAC 2009, Vega 1992). The early Elenan Ostionoid ceramic assemblage is typically decorated with red- or black-painted geometric designs and strap handles. In later assemblages, ceramics typically lack strap handles, bowls are the dominate vessel forms, and painted and polished decorative methods are largely abandoned, replaced by modeling and incising (SEAC 2009).

Major Ostionan sites in western Puerto Rico include Boquerón, Calvache, Las Cucharas, Las Mesas, Llanos Tuna, Abra, Buenos Aires, Cañas, Carmen, Diego Hernandez, and Pitahaya. In eastern Puerto Rico, Tibes, El Bronce, Santa Elena, Monserrate, Vacia Talega, and Collores provide examples of major Elanan Ostionoid sites. In the south central region near Ponce, the major Ostionoid sites include Tibes, El Bronce, El Bronce II, El Bronce III, Tiburones, Tizol, Maraguez, Holiday Inn, Canas, and Los Caobos (SEAC 2009, Vega 1992). Tibes and El Bronce are discussed in more detail below.

**Chicoid/Chican-Ostionoid or Taíno (800 cal. BP to 500 BP)**—According to Rouse's model, the Ostionoid culture evolved into the Chicoid or Taíno Culture around 800 cal. BP, possibly as the result of cultural influence from inhabitants of the Dominican Republic that may have established a colony on the south coast of Puerto Rico during this time. This group practiced a new ceramic tradition known as the Boca Chica style, and evidence of its influence starts to appear in native Puerto Rican ceramic styles at the beginning of the Chicoid period (Rouse 1992, EPR 2004, SEAC 2009).

During the 300 years before Spanish colonization, the Taíno people experienced rapid population growth, with both the number of sites and size of settlements increasing. Settlement patterns became concentrated, with large settlements clustered around a central ceremonial center. Current theories on Taíno societal and political structure suggest confederations of large territorial units, each ruled by a powerful chieftain. This chiefdom society might have continued to increase in complexity to the formation of a state, had its development not been interrupted by the arrival of the Spanish (EPR 2004, SEAC 2009).

Community organization during the Chicoid period was developed around multiple public plazas lined with monolithic stones, including a central plaza and several outlying plazas. The *cacique* or chieftain for each village lived in a large rectangular house at the head of the main plaza,

while the other inhabitants lived in round dwellings 6 to 8 meters (19.7 to 26.2 feet) in diameter that were arranged around the main plaza according to social hierarchy, clan, or lineage. In addition to the ball courts and plazas, communal structures such as temples would have been constructed in the village (EPR 2004).

Agricultural activities continued to provide the primary source of subsistence for the Taíno people. In addition to garden and orchards placed around each dwelling, the Taíno produced cassava, corn, and other plants from farm fields that surrounded the village. These fields were typically irrigated by a complex system of mounds and furrows (EPR 2004).

The Taíno artifact assemblage includes ceramics, polished ground stone tools such as choppers and axes, mortars, pestles, and unique objects such as carved stone idols and large polished ground stone collars or rings. As noted above, the native Capá (western) and Esperanza (eastern) ceramic styles were heavily influenced by the Boca Chica ceramic tradition. The major characteristics of this style include surface polishing, complicated vessel forms, a lack of paint or slips, and elaborate incised, modeled, and punctuated designs. The native Taíno could have learned the Boca Chica style from trade ware, examples of which have been recovered from both Capa and Espenranza sites, and then incorporated the new designs and techniques into their own vessels (SEAC 2009).

Examples of major ceremonial centers dating to the Chicoid period include Caguana in western Puerto Rico, and Cuevas-2 in eastern Puerto Rico (SEAC 2009). In the Ponce Region, Chicoid sites include Punto Oro, Caracoles, El Bronce, and Tibes II (Vega 1992:28). Lundberg speculates that the decreased number of Chicoid sites in the south central region compared to Ostionoid sites may be the result of population consolidation into larger settlements (Sickler et al 1983).

### 3.9.3.2    Historic Context

European explorers first encountered the island of Puerto Rico in 1493, during Christopher Columbus's second voyage to the Americas, but the island was not explored until 1504 when Vicente Yanes Pinzon led a survey. His exploration of the island resulted in both the introduction of large domesticated livestock (horses, goats, and pigs), and a royal grant to Pinzon with the title of "Capitan General y Gobernador." Rather than settling in Puerto Rico, Pinzon chose to focus on establishing settlements in Brazil (Vega 1992).

Accounts of the indigenous population during the contact period were written by Fernández Oviedo (1526, 1535) and Fray Bartolomé de las Casas (1542, 1561, 1566), and provide a glimpse into the culture and society of the Taíno people. These accounts describe a stratified society divided into the upper class (*nitaino*), the priesthood (*bohique*), and the common workers (*nabora*), all ruled by the *cacique*, or chieftain. Indigenous settlements might have held as many as 2,000 dwellings, with plazas where religious and political ceremonies and feasts were held, and ball courts where the ceremonial ball game of *batey* was played. Oviendo provides a detailed

account of the *areytos*, or feasts of the Taíno people, which included ritual singing and dancing (Oviendo 1526). In addition, the plazas also served as the focal point of communal activities such as gambling and as centers for markets where goods could be traded at the regional level. Taíno social structure was both hereditary and matrilineal (EPR 2004).

The first European settlement in Puerto Rico, a minor outpost, was briefly established at Caparra in 1508 by Juan Ponce de Leon, before being relocated to the natural harbor at Rich Port (now San Juan) the following year. De Leon had entered into a formal agreement (capitulación) with the Spanish crown to settle Puerto Rico and would be appointed as governor in 1509 (Vega 1992, Schimmer 2010). As Spanish colonists began to settle the island in force, the indigenous population began to suffer the effects. The Taíno population was shifted to econmienda settlements and subjected to forced labor in return for the promise of military protection (Rouse 1992). An attempted revolt by the Taíno, led by Agueybana II, was quickly suppressed by the Spanish at the Battle of Yaguecas in 1511 (NPS n.d. [a]). Following the revolt, a second settlement, San Germain, was founded in the southwest region of the island (Schimmer 2010). Despite an attempt to reform the forced labor system in 1512, and the emancipation of the native population by royal decree in 1520, the Taíno death rate continued to rise. Within a few decades, the indigenous population of Puerto Rico had been largely eradicated on the island by disease, violence, and suicide (Rouse 1992). A 1530 government census documents only 1,148 Taíno living on the island (Schimmer 2010). The Spanish chronicler de Las Casas described the impact of Spanish colonization on the Antilles:

> The island of Cuba is nearly as long as the distance between Valladolid and Rome; it is now almost completely depopulated. San Juan [Puerto Rico] and Jamaica are two of the largest, most productive and attractive islands; both are now deserted and devastated. On the northern side of Cuba and Hispaniola the neighboring Lucayos comprising more than sixty islands including those called Gigantes, beside numerous other islands, some small some large. The least felicitous of them were more fertile and beautiful than the gardens of the King of Seville. They have the healthiest lands in the world, where lived more than five hundred thousand souls; they are now deserted, inhabited by not a single living creature. All the people were slain or died after being taken into captivity and brought to the Island of Hispaniola to be sold as slaves…More than thirty other islands in the vicinity of San Juan are for the most part and for the same reason depopulated, and the land laid waste. On these islands I estimate there are 2,100 leagues of land that have been ruined and depopulated, empty of people [de Las Casas 1542].

The general route from Europe to the Americas during the sixteenth through eighteenth centuries, dictated by ocean currents and trade winds, guided ships directly past Puerto Rico. Because the island was the first large land mass that could provide shelter, fresh water, and other supplies, it was logical for Spain to establish a military presence there as an attempt to control the route and protect its South and North American possessions. The construction of fortifications began in 1533 at San Juan. In 1539, construction started on Castillo San Felipe del Morro, a process that was not completed until 1790. Construction on the San Juan city walls and

a second large fort, the Castillo San Cristobal, was started in 1634 and completed in 1783. San Juan and its fortifications were the target of several English (1595, 1598) and Dutch (1625) attacks during the sixteenth and seventeenth centuries, but Spain retained control over the island (NPS n.d. [b]). The southern side of the island was far less heavily fortified, though Spanish ships on route to Mexico and Santo Domingo did follow the southern coast and resupply at Añasco Bay (Vega 1992).

Because Puerto Rico was a Spanish possession, the Catholic Church dominated the religious development of the island during the sixteenth century. Pope Julius II established one of the three dioceses for the Americas in Puerto Rico in 1511, and Alsonso Manso, the island's first appointed bishop, arrived in 1513 (Jones 1911). The Catholic Church, while advocating the reformation of the encomienda system, also pressed the native populations to convert to Catholicism.

Named for Arasibo, the cacique of a nearby Taíno village, the city of Arecibo is one of the oldest in Puerto Rico, appearing first in a census made in 1530. It was noted that sugarcane, coffee, tobacco, and corn were grown there. In 1616, a group of around 80 families living at the mouth of the Río Grande de Arecibo were officially recognized as a town with a parish under the governorship of Captain Felipe de Beaumont y Navarra (Eduardo Questell y Asociados 2010b, EPR 2015).

Arecibo was subjected to various minor military incursions during the eighteenth century, including a failed English invasion in 1702. The two attacking English vessels were repulsed through the actions of the Spanish colonel Antonio de los Reyes Correa. Following the engagement, the colonel was awarded the Royal Effigy medal by the Spanish crown and was promoted to captain. Arecibo is still known as the "Village of Captain Correa," in honor of this engagement (EPR 2015).

During the nineteenth century, Arecibo became one of the principal centers of economic progress in the region. Agricultural activities continued to dominate the economy of the region. However, the subsistence farming of earlier centuries gave way to a plantation system where non-native, often French, landowners exploited slaves, typically imported from Africa, to produce export crops such as sugarcane, coffee, and sugar (EPR 2010). Though Puerto Rico's slave population in the nineteenth century accounted for only 10 percent of the total population, the relative proportion of slaves was much higher, with more brutal working conditions, in agricultural sectors such as Arecibo. In 1873, the Spanish government emancipated all slaves on the island. (Kinsbruner 2004).

In a secondary economic development, Madrid opened the ports of several Puerto Rico cities to foreign trade in 1805. The Spanish government hoped that doing so would both increase trade with other Spanish-American ports and reduce smuggling activities and illicit trading with

foreign nationals (Vega 1992). In addition to the principal crops of sugar and coffee, other products exported from Puerto Rico included tobacco, cotton, animal hides, and meat (Kinsbruner 2004).

The major military engagement of the nineteenth century from the perspective of the inhabitants of Puerto Rico was the Spanish-American war of 1898. American forces landed at Guanica, and marched to the town of Ponce, occupying Yauco en route. After only minor skirmishes, the U.S. troops, supported by the arrival of three U.S. naval ships in Ponce Bay, captured Ponce, and the Spanish military retreated into the mountains (Library of Congress 2011, Rivero 1973). No serious fighting occurred on the island, and the war ended after only a few weeks. In the 1898 Treaty of Paris that ended hostilities, Spain ceded Puerto Rico to the United States, and a military government was established for the island (Kinsbruner 2004).

Agriculture remained a dominant force in the economy in the first half of the twentieth century, and sugar became the dominant export after 1900. With the transition to American rule, however, Puerto Rico found itself cut off from its traditional trading partners of Spain and other European countries. Into this void stepped U.S. investors, who, lured by the tax-free status of the island's sugar, imported it to the United States, where it was refined and sold. The typical Puerto Rican farmer saw very little benefit from this arrangement, as most of the profit went to American sugar refining companies. Moreover, agricultural practices shifted from small family farms to large-scale business-owned operations. By 1930, large corporations, many of them based in the United States, controlled 45 percent of Puerto Rican sugarcane production (Kinsbruner 2004).

Economic stagnation gripped the island during the late 1920s and 1930s. Hurricanes in 1928 and 1932 caused widespread destruction to houses and businesses on the island, while at the same time Puerto Rico was plunged into the same depression occurring in the United States and much of the rest of the world. The depression caused severe deprivation to much of the island's population, only minimally mitigated by relief programs introduced as part of Franklin D. Roosevelt's New Deal (Kinsbruner 2004). The Nationalist movement, fueled by local discontent with the economy and Puerto Rico's status as a territory, began during this period, led by Pedro Albizo Campos. While the movement began as a political party, some of its adherents eventually turned to violence. The most violent episode occurred in Ponce in 1937, when police and Nationalist party members clashed during a parade, resulting in 20 deaths and 100 wounded (Kinsbruner 2004).

While Puerto Rico was not significantly impacted by the outbreak of World War II, the post-war economic revival that occurred in the United States also stimulated the economy of the island. In Arecibo, agricultural production of sugar and coffee remained important, but efforts were made to expand into other economic spheres such as commerce and distilling (Kinsbruner 2004). Today, with a population of around 100,000 people, Arecibo has industries related to textiles,

chemical production, and electronics equipment. The service industry, business, agriculture, and fishing are also important to the local economy (EPR 2015).

### 3.9.4    Archeological Resources

In an effort to identify historic properties and other cultural resources that may be affected by the Project, Eduardo Questell y Asociados (2010a, 2010b) conducted archival research, surface, and subsurface investigations. The archival research included information from the following sources:

- Council for the Protection of the Terrestrial Archaeological Heritage of Puerto Rico
- Puerto Rico State Historic Preservation Office
- *Archaeological Sites in Puerto Rico*, by S.K. Lothrop (manuscript in possession of Questell y Asociados)
- Field notes of the archaeological sites of Puerto Rico made by Dr. Irving B. Rouse (on file at the Puerto Rico State Historic Preservation Office)
- Inventory of Historic Engineering and Industry of Puerto Rico (on file at the Puerto Rico State Historic Preservation Office)
- Historic American Engineering Record Inventory (on file at the Puerto Rico State Historic Preservation Office)
- Literature from the State Historic Preservation Office on archaeological, geographical, and geological sites
- Local informants
- Other Puerto Rican archaeologists

Archival research revealed that there are three previously known historic properties in the vicinity of the Project APE. Again, the APE is defined as the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. In this case, the APE can be divided into two areas: the proposed renewable power generation and resource recovery plant, and the connection routes of a brackish water line and electric power line.

The proposed renewable power generation and resource recovery plant APE is on a property measuring 79.6 acres (82 *cuerdas*) bounded to the east by PR-2, to the north and south by vacant lots, and to the west by the Río Grande de Arecibo River.

The new brackish water line would follow about 1.9 miles (3,100 meters) in the rights-of-way of PR-2, PR-681, and PR-6681. Also a new electric transmission line would be extended 0.53 mile (850 meters) north from an existing substation to the proposed plant APE across undeveloped property (Eduardo Questell y Asociados 2010a).

The first previously known historic property is AR005 ("*El Caney*"), a prehistoric site located 4,921 feet (1,500 meters) north-northeast of the proposed resource recovery plant and 492 feet (150 meters) west of the proposed brackish water line route. The second is AR004 ("*Pozo del Obispo*"), another prehistoric site located 7,874 feet (2,400 meters) north-northeast of the resource recovery plant and 1,640 feet (500 meters) north of the brackish water line route. The third property consists of the ruins of the historic *Hacienda Santa Bárbara*, located 2,297 feet (700 meters) north-northeast of the resource recovery plant.

No previously unknown archaeological sites or isolated finds were discovered during the surface and subsurface investigations conducted within the Project APE by Eduardo Questell y Asociados (2010a, 2010b).

### 3.9.5    Historic Structures

An abandoned paper mill now stands on the location of the proposed recovery plant. The mill and associated structures were constructed between 1957 and 1959 and had been closed prior to 1998. Eduardo Questell y Asociados noted (2010b) that the structures were rapidly deteriorating and that there was an abundance of modern trash that had been dumped on the property. Because of its lack of integrity, the remains of the mill have been recommended as not eligible for listing on the NRHP.

### 3.9.6    Effects Analysis

Because there are no known historic properties identified within the current APE, no historic properties would be affected by the Project. Additionally, no new roads outside the APE for access to or construction of the Project are anticipated. If any historic properties are discovered or unanticipated effects on historic properties are found during implementation of this undertaking after RUS has completed the Section 106 process, the post-review discovery procedures found in 36 CFR 800.13 would be triggered.

If human remains are encountered, work would halt in the vicinity of the find, and the coroner and the Puerto Rico State Historic Preservation Office would be notified immediately, pursuant to 36 CFR §800.13 of the National Historic Preservation Act, *Post-Review Discoveries*.

### 3.10    PUBLIC HEALTH AND SAFETY

### 3.10.1    Affected Environment

As discussed in Section 1.3, the purpose and need for the Project is to address solid waste management on the north side of the island and generate renewable energy in the process. There are potential human health and safety impacts related to the construction and operation of the Project. Construction impacts are confined to the Project property; operation impacts are confined to the general vicinity surrounding the Project in the Río Grande de Arecibo Valley.

As described in Section 1.2.7, *Existing Operating Landfills Overview*, Puerto Rico should have had 24 landfills in operation by the end of 2010. Seven of these landfills are compliant with EPA Subtitle D requirements. The Puerto Rico Solid Waste Authority is responsible for the management of solid and hazardous waste on the island. The proposed combustion of MSW has the potential to expose the public to emissions from the combustion units or from the disposal of the residual ash. Human health risks arise from both direct and indirect exposure pathways. EPA and the EQB regulate the amount of allowable emissions. Energy Answers has applied for and obtained a PSD permit that is required prior to construction of the Project. The Project is subject to both federal and Puerto Rico air quality control regulations and emission limits.

## 3.10.2    Effects Analysis

### 3.10.2.1    Construction

During the construction phase, standards and occupational safety programs applicable to construction would be implemented by the general contractor as required in 29 CFR Part 1926, including scaffolding safety; fall prevention; personal protective equipment; excavation safety; ladder safety; electrical safety; hand tools safety; crane safety; critical lifts; material handling, order, and cleanliness; vehicles safety; and contractor safety. Water would be used to control fugitive dust generation caused by earth disturbance activities and materials used during construction works, as well as the transit of heavy equipment. Confirmation of these measures at the end of each work day (for dust control) and the end of each work week (for safety protocols) would ensure workers are provided a safe working environment while constructing the Project.

### 3.10.2.2    Operations

EPA administers the PSD program in Puerto Rico and therefore is responsible for issuing PSD permits for major new stationary sources or major modifications to existing major stationary sources. Whenever a new major stationary source or a major modification is constructed, the source must apply for and obtain a PSD permit that meets regulatory requirements including:

- BACT, which is an emissions limitation based on the maximum degree of reduction achievable for each pollutant based on specific factors

- An ambient air quality analysis that demonstrates all the emission increases do not cause or contribute to a violation of any applicable PSD increment or NAAQS

- An additional impact analysis to determine direct and indirect effects of the proposed source on industrial growth in the area, soil, vegetation, and visibility

- Consideration of public comments, including an opportunity for citizens to request a public hearing

EPA issued a PSD permit to Energy Answers for the Project on June 11, 2013. A discussion of the PSD and estimated air emissions is provided in Section 3.3, *Air Quality*.

**Human Health Risk Assessment for Non-Criteria/Hazardous Air Pollutants**

Non-criteria pollutants for which NAAQS have not been established also were evaluated during the permitting of the Project through the completion of an HHRA (originally completed in 2010, and revised in October 2011, and discussed further in Energy Answers' 2011 Environmental Justice Evaluation [Arcadis 2011, 2010b]). The HHRA was consistent with EPA's guidance on Human Health Risk Assessment Protocol for Hazardous Waste Combustion Facilities (EPA 2005). Emissions were evaluated based on the following general approach.

Project emissions (e.g., chemicals or chemical classes), including polycyclic aromatic hydrocarbons, dioxins, furans, and metals (antimony, arsenic, beryllium, cadmium, chromium VI, cobalt, copper, lead, manganese, mercury, molybdenum, nickel, selenium, tin, vanadium, and zinc), polychlorinated biphenyls, hydrochloric acid, and hydrofluoric acid gases, were evaluated in the HHRA. In the context of an HHRA, these chemicals are called COPCs.

The HHRA analysis included a calculation of COPC concentrations in air, COPC deposition rates onto the earth's surface, and COPC concentrations in a variety of environmental media (e.g., soil, surface water, sediment) and food items (e.g., milk, beef, pork, poultry, home-grown produce, eggs, fish) through which humans may be indirectly (i.e., ingestion) exposed.

The HHRA analysis also included calculations regarding the potential exposures to COPCs for several different types of individuals or "receptors" living within 6.2-mile (10-kilometer) radius from the Project that could be exposed to COPC from the Project. The receptors used in the HHRA included: suburban resident (adult and child), urban resident (adult and child), farmer (adult and child), fisher (adult and child), and nursing infants. Each adult and child receptor was assumed to be simultaneously exposed to COPCs through one of more of the following exposure pathways—via inhalation (COPCs in air), soil ingestion, drinking water from surface water sources, and food ingestion (locally grown produce (e.g., lettuce, other leafy produce, corn, peas, fruits), milk from local dairies, beef, poultry from locally raised animals, fish from local surface waterbodies, and eggs. Each adult receptor was assumed to be the mother of a breast-fed infant, and therefore the nursing infant was assumed to be exposed to dioxins/furans via breast milk.

Specifically, exposure to COPCs was calculated using a "reasonable maximum exposure" scenario, to overestimate the potential for exposure and associated health hazards to provide a conservative (health protective) evaluation.

The exposure duration parameter used in the HHRA is 70 years for evaluating cancer risks. For evaluating non-cancer health effects, the exposure durations are 40 years for farmer receptor, 30 years for other adult receptors, and 6 years for child receptors.

For assessing the human exposure through food ingestion, it was assumed that 100 percent of a particular type of food consumed was grown or raised within the 6.2-mile (10-kilometer) radius of the proposed Project.

The HHRA also included other examples of a reasonable maximum exposure by assuming that a farmer drinks 6 cups (1.4 liters) of untreated drinking water from a local surface water source (North Coast Aqueduct System known as Superacueducto or reservoir), eats locally raised beef, poultry, produce, eggs, pork, and milk, and that 100 percent of the food is affected by COPCs from the proposed Project, for 350 days per year, and for 40 years out of a lifetime.

The drinking water ingestion pathway considered exposure to COPCs potentially associated with combustion emissions from the proposed Project that are deposited onto a surface waterbody used as a drinking water source (e.g., a reservoir). The main water system in the region, the Superacueducto, was modeled as a waterbody receptor, and it was conservatively assumed that the potable water from it was untreated.

Exposure to milk from dairy cows was evaluated by estimating COPC concentrations in the cow's diet and through incidental ingestion of soil. It was assumed that the cow's diet consisted of forage (pasture grass and hay), grain, and silage (grain that has been stored and fermented). It was conservatively assumed that 100 percent of the animal's diet is grown locally on soil that receives COPC deposition and COPC in soil are 100 percent bioavailable, and metabolism does not decrease the COPC concentration in fat and muscle tissue. The milk ingestion pathway was modeled at the farmer receptor location, and the pathway cancer risks and non-cancer hazards were added to each receptor evaluated.

The fish ingestion pathway considered exposure to COPCs that are deposited onto fishable waterbodies. Three fishable waterbodies were selected for the fish ingestion pathway: the estuary where the Río Grande de Arecibo meets Puerto Arecibo, Cienega Tiburones, and Puerto Arecibo.

The HHRA included a calculation of the  chronic (long-term) cancer risks and non-cancer hazards for each receptor by combining all the exposure estimates for all COPCs and all exposure pathways (including untreated drinking water, milk, beef, and other locally raised animal products).

For example, to calculate the cancer risks and non-cancer hazard index values for the farmer receptor, all the following farmer's exposure pathways were totaled, including air inhalation, soil ingestion, ingestion of locally grown produce, ingestion of drinking water from surface source (reservoir), ingestion of beef, milk from dairy cows, poultry, eggs, and pork.

The HHRA also included a calculation of the acute (short-term) non-cancer risks caused by exposure to COPCs through inhalation. Additionally, the potential for non-cancer health effects

from oral (ingestion) exposure to dioxin/furan expressed as toxic equivalent 2, 3, 7, 8-tetrachlorodibenzo-p-dioxin (TCDD) for nursing infants and adults was calculated.

Based on the HHRA, the calculated Excess Lifetime Cancer Risks, and Non-cancer Hazard Indices for all COPCs combined and across all exposure pathways, fall within, or are less than the acceptable EPA range and benchmark. EPA generally finds excess lifetime cancer risks between one-in-ten thousand (1E-04) and one-in-a million (1E-06) (or less) and non-cancer hazard indices of less than 1 to be considered an acceptable level of risk. Furthermore, the HHRA indicated that the potential for acute (i.e., short -term) exposure is less than the EPA benchmark, and the estimated dioxin/furans, expressed as toxic equivalent 2, 3, 7, 8-TCDD, intakes from ingestion are less than the national average background exposure level for nursing infants and adults.

In conclusion, the analysis completed in the HHRA showed that potential risks associated with the combined emissions estimated to result from the two proposed combustors were below the EPA cancer risk range and benchmark levels for human health. Consequently, the Project is not expected to have an adverse impact on human health.

**Ash Management**

Ash generated through the combustion of MSW at the plant would be stored on-site for a short term until its final destination in a landfill. A conditioning agent and water would be mixed with the fly ash component essentially locking in heavy metals and other harmful elements into a mortar-like compound so it could be transported to a landfill where it can be used as a cap. Energy Answers would condition the bottom ash, and the Boiler Aggregate™ product could be marketed as a construction material (e.g., road base). Although neither federal nor most state regulations categorically restrict the use of MSW combustor ash (as long as the ash is determined to be nonhazardous in accordance with regulatory testing criteria), the presence of trace metals, such as lead and cadmium, in MSW combustor ash, and concern over leaching of these metals, as well as the presence of dioxins and furans in selected ash fractions (fly ash), has led many regulatory agencies to take a cautious approach in approving the use of MSW combustor ash as a substitute aggregate material (Federal Highway Administration 2012).

The use of the boiler ash components would be considered secondary raw material and could displace primary materials like sand and gravel. In Europe, bottom ash is used in road construction, as a foundation material; in noise barriers, as a capping layer on landfill sites; and in some countries as an aggregate in asphalt and concrete (Confederation of European WTE Plants n.d.). The use of ash in granular base and fill applications in the United States has been limited primarily to demonstrations (Federal Highway Administration 2012). Until the Boiler Aggregate™ produced at the Project has been tested to demonstrate its conformance with environmental and commercial standards, until it has received regulatory approval for reuse, and

until a market is realized, the byproduct of plant operations would be transported to an EPA Subtitle D-compliant landfill.

**Safety Controls**

The plant would maintain a safety program aimed at preventing occupational injuries in all its processes. The program would include occupational safety training; accident research and prevention; first aid care; fire prevention and protection; and training in the areas of emergency response, natural disasters, hazards communication, personal protective equipment, permit-required confined space, hazardous energy control, human resources, cutting and welding, laboratory safety, material handling, electrical safety, emergency response groups, respiratory and hearing protection, and industrial hygiene.

As described in Section 2.2, *Selection of Proposed Alternative*, the Project would incorporate fire protection devices such as dedicated water mains for fire hydrants and alarm systems. The fire protection system would be developed according to the requirements of the Puerto Rico Fire Department and the Puerto Rico Human Safety and Fire Protection Code. The system would follow the guidelines of the National Fire Protection Association, which develops, publishes, and disseminates more than 300 consensus codes and standards intended to minimize the possibility and effects of fire and other risks (National Fire Protection Association 2014). The 300,000 gallons of water stored at the Project site all times and reserved for the fire protection system exceeds National Fire Protection Association standards.

Integrated video surveillance systems would assist in monitoring equipment operations and worker safety. Audible warning systems would notify workers and nearby citizens of an emergency at the plant. The nearest fire station is 1.4 miles (2,290 meters) northwest of the plant site. MSW, processed refuse fuel, and ash processing, storage, and equipment areas would have ventilation systems designed for dust and odor control.

**Flooding**

As described in Section 3.2, *Water Resources*, the Río Grande de Arecibo could overtop its banks and flood the surrounding valley. To minimize the risk of damage to the Project from flooding, the Project would be flood-proofed by constructing the plant footprint (through the placement of earthen fill) so that all major plant buildings and equipment systems would have a ground floor or base elevation 1 meter above the 100-year floodplain elevation. While this would protect plant buildings and equipment from inundation, it would not prevent major floods from possibly inundating area roadways that provide access to the plant. Normal plant operations depend on roadway access for: waste and other materials and services to be delivered, combustion ash and recovered metals to be removed, and employees to arrive and depart.

Energy Answers proposes to develop and implement detailed flood response procedures in the emergency response sections of the overall Project Operating Plan that would be fully developed

during construction and submitted to EQB prior to operation. Similar to all aspects of the Operating Plan, the primary focus would be on safety, including the safety of plant employees, other persons accessing the plant, and the surrounding community.

The Project's designated emergency response team, consisting of full-time employees under the leadership of the plant safety manager, would be mobilized as soon as a flood threat materializes. This team would include sufficient personnel to operate the plant over a multi-shift duration in the event that normal roadway access to the plant is completely cut off by flooding. The team would coordinate with state and local agencies to monitor flood stages and determine which pre-determined response actions should be deployed. State and local coordinating agencies would include the following agencies (with a brief description of each agency's role):

- State Emergency and Disaster Management Agency (AEMEAD, for Agencia Estatal para el Manejo de Emergencias y Administración de Desastres): During emergency events, this state agency is responsible for all response coordination.

- Arecibo Emergency Management Office: May provide first response efforts and local coordination with AEMEAD and other state agencies.

- State Highway and Transportation Authority (ACT, for Autoridad de Carreteras y Transportación): Responsible for all works, including clearing debris and repairs on state roads (e.g., PR-2 in front of the Project site).

- Arecibo Public Works Department: Responsible for all works, including clearing debris and repairs on municipal roads; may provide early emergency response for road clearing on state roads.

- State and Arecibo Police: Responsible for road closures and traffic control.

If it were determined that roadway access to the plant could be curtailed or completely cut off, a communication program would be implemented to:

- Notify regular shift employees to remain at home and await further instructions;

- Notify all municipalities and their waste haulers to redirect the transport of waste to permitted, compliant landfills under pre-arranged waste disposal arrangements until the emergency passes; and

- Notify ash and metal haulers and other material and service providers to stand down until instructed otherwise.

At the same time, the emergency response team would secure the plant. Assuming PREPA does not instruct the Project to curtail power production, the team would operate the plant for as long as practicable, using stored waste and processed refuse fuel. The ability of the plant to continue operating would be governed by the availability of fuel, consumables used in the operation (such

as lime and activated carbon), and storage in the permitted on-site ash storage structures. If a limitation were reached in any of these areas, the plant would be shut down following standard operating procedures. The emergency response team would remain on-site to maintain the security of all plant systems. In the event of an extended flood, the emergency response team would be relieved as necessary by replacement workers brought to the site by emergency craft. Once flooding subsided and roads were back in service, normal operations would resume.

## 3.11    SOCIOECONOMICS AND ENVIRONMENTAL JUSTICE

### 3.11.1    Affected Environment

#### 3.11.1.1    Region of Influence

The region of influence (ROI) for socioeconomics is defined as the geographical area within which the principal direct and secondary socioeconomic effects of actions associated with the Project would likely occur, and where most consequences for local jurisdictions would be expected. The proposed Project would be sited within the Cambalache Ward, located in the municipality of Arecibo, Puerto Rico. Located on the north shore of the main island of Puerto Rico, the Arecibo municipality occupies 126 square miles, making it one of the larger municipalities on the island (Government of Puerto Rico 2015a). The region of influence is defined as Arecibo, as well as the contiguous municipalities, Hatillo, Utuado, Ciales, Florida, and Barceloneta. In addition, the metropolitan areas of San Juan and Ponce are included in the ROI, because these cities are in close enough to Arecibo that construction workers and personnel would most likely commute from these cities.

It is anticipated that these municipalities and metropolitan areas would house a majority of the population that would serve as the construction and operational workforces for the Project. All dollar values in this section are presented in 2013 dollar values unless stated otherwise.

#### 3.11.1.2    Population and Demographics

Of the six municipalities that make up the ROI, Arecibo (the location of the Project) is the largest in terms of population while the metropolitan area of San Juan has the largest population overall. Like Puerto Rico as a whole, population declined in Arecibo for the period 2000 through 2013. The population of Puerto Rico is projected to continue to decline through 2030. All six municipalities presented in **Table 3-40** saw population increases from 1990 to 2000, although San Juan and Ponce experienced declines in population for the same time period (U.S. Department of Commerce 1990, 2013a, Pew Research Center 2015).

**Table 3-40.    Municipality Population Estimates and Puerto Rico Population Projections**

| Geography | 1990 | 2000 | 2009-2013 | 2020 | 2030 |
|---|---|---|---|---|---|
| **Puerto Rico** | 3,522,037 | 3,808,610 | 3,682,966 | 3,500,000 | 3,400,000 |
| Arecibo | 93,985 | 100,131 | 95,185 | | |

Arecibo Waste-to-Energy Project
Final EIS                                                                                               January 2017

| Geography | 1990 | 2000 | 2009-2013 | 2020 | 2030 |
|-----------|------|------|-----------|------|------|
| Hatillo | 32,703 | 38,925 | 41,932 | | |
| Utuado | 34,980 | 35,336 | 32,593 | | |
| Ciales | 18,084 | 19,811 | 18,509 | | |
| Florida | 8,689 | 12,367 | 12,645 | | |
| Barceloneta | 20,947 | 22,322 | 24,884 | | |
| **San Juan** | 437,745 | 421,958 | 374,129 | | |
| **Ponce** | 187,749 | 155,038 | 132,106 | | |

Source:  U.S. Department of Commerce (2013a), Pew Research Center (2015)
Note:      Projection data not available at the municipality level.

### 3.11.1.3    Income

Median household incomes for the six municipalities that make up the ROI are examined in
**Table 3-41**. All six had median incomes lower than Puerto Rico as a whole for the period 2009
to 2013. Of the six, Hatillo enjoyed the highest median household income at $19,199, while
Ciales had the lowest at $13,802, or 70 percent of Puerto Rico's median household income.
Overall, the San Juan urban zone exhibited the highest median household income at $22,687
(U.S. Department of Commerce 2013b).

**Table 3-41.    Median Household Income Estimates, 2009–2013**

| Geography | Median Household Income | Percent of Puerto Rico Median Household Income |
|-----------|------------------------|------------------------------------------------|
| **Puerto Rico** | $19,624 | 100% |
| Arecibo | $16,977 | 87% |
| Hatillo | $19,199 | 98% |
| Utuado | $14,852 | 76% |
| Ciales | $13,802 | 70% |
| Florida | $16,750 | 85% |
| Barceloneta | $14,848 | 76% |
| **San Juan** | $22,687 | 116% |
| **Ponce** | $17,545 | 89% |

Source:  U.S. Department of Commerce (2013b)

### 3.11.1.4    Labor Force and Unemployment

Of the six municipalities in the ROI, Arecibo, Hatillo, and Utuado saw declines in
unemployment from 2011 to 2013. Arecibo had the largest increase in labor force participation
for the same time period. Puerto Rico experienced a decline in unemployment from 2011 to
2013, although labor force participation increased (U.S. Department of Labor 2013). Both San

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017

Juan and Ponce saw declines in both unemployment and labor force participation for the time period shown. Trends in labor force and unemployment are presented in **Table 3-42**.

**Table 3-42.    Trends in Labor Force & Unemployment, 2011–2013**

| Geography | 2011 | | 2013 | | Percent Change Labor Force 2011–2013 |
|---|---|---|---|---|---|
| | Labor Force | Unemployment | Labor Force | Unemployment | |
| **Puerto Rico** | 1,222,543 | 16.0% | 1,170,784 | 14.3% | -4.4% |
| Arecibo | 26,226 | 16.3% | 28,177 | 14.6% | 6.9% |
| Hatillo | 12,168 | 18.3% | 11,822 | 16.3% | -2.9% |
| Utuado | 8,059 | 20.0% | 7,768 | 18.6% | -3.7% |
| Ciales | 4,556 | 22.7% | 4,619 | 25.2% | 1.4% |
| Florida | 3,335 | 20.6% | 3,352 | 21.4% | 0.5% |
| Barceloneta | 7,386 | 18.2% | 7,454 | 19.0% | 0.9% |
| **San Juan** | 782,812 | 15.0% | 752,335 | 12.8% | -4.1% |
| **Ponce** | 117,786 | 16.8% | 113,778 | 15.5% | -3.5% |

Source:  U.S. Department of Labor (2013)

### 3.11.1.5    Employment by Industry

**Table 3-43** presents average employment by industry from 2009 to 2013 for Puerto Rico and the six municipalities within the ROI, as well as San Juan and Ponce. Within Arecibo, the largest industry sector in terms of employment is educational services, healthcare, and social assistance, with 26 percent of total employment, followed by manufacturing with 13.9 percent. The employment distribution among the presented industry sectors within the ROI is similar to that of greater Puerto Rico, with educational services, healthcare and social assistance; retail trade; manufacturing; and public administration representing the largest sectors.

Within Puerto Rico, construction commands 6 percent of total employment, or 65,828 persons employed. Within the ROI, Ciales and Florida have the highest employment percentages in construction, at 7.8 percent for both municipalities (U.S. Department of Commerce 2013c). Employment projections are not available at the municipality level; however, the government of Puerto Rico projects island-wide employment in the construction sector will decline between 2012 and 2022 overall, by approximately 9.8 percent (Government of Puerto Rico, Department of Labor and Human Resources 2015).

**Table 3-43.   Average Employment by Industry, 2009–2013**

| Employment Type | Puerto Rico | | Arecibo | | Hatillo | | Utuado | | Ciales | | Florida | | Barceloneta | | San Juan | | Ponce | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total | Industry Total | Percent of Total |
| **Total Employment** | 1,099,138 | 100% | 24,526 | 100% | 12,412 | 100% | 6,604 | 100% | 3,659 | 100% | 3,286 | 100% | 5,474 | 100% | 136,017 | 100% | 37,211 | 100% |
| Agriculture, forestry, fishing and hunting, and mining | 14,535 | 1.3% | 359 | 1.5% | 313 | 2.5% | 346 | 5.2% | 74 | 2.0% | 61 | 1.9% | 37 | 0.7% | 286 | 0.2% | 281 | 0.8% |
| Construction | 65,828 | 6.0% | 1,085 | 4.4% | 804 | 6.5% | 428 | 6.5% | 286 | 7.8% | 256 | 7.8% | 237 | 4.3% | 7,945 | 5.8% | 1,774 | 4.8% |
| Manufacturing | 102,420 | 9.3% | 3,401 | 13.9% | 1,259 | 10.1% | 280 | 4.2% | 583 | 15.9% | 403 | 12.3% | 817 | 14.9% | 5,416 | 4.0% | 3,853 | 10.4% |
| Wholesale trade | 32,146 | 2.9% | 439 | 1.8% | 222 | 1.8% | 65 | 1.0% | 38 | 1.0% | 12 | 0.4% | 261 | 4.8% | 4,687 | 3.4% | 759 | 2.0% |
| Retail trade | 146,147 | 13.3% | 3,289 | 13.4% | 1,753 | 14.1% | 858 | 13.0% | 507 | 13.9% | 281 | 8.6% | 920 | 16.8% | 14,593 | 10.7% | 5,675 | 15.3% |
| Transportation and warehousing, and utilities | 40,822 | 3.7% | 755 | 3.1% | 320 | 2.6% | 403 | 6.1% | 73 | 2.0% | 115 | 3.5% | 81 | 1.5% | 4,867 | 3.6% | 1,183 | 3.2% |
| Information | 19,222 | 1.7% | 466 | 1.9% | 151 | 1.2% | 16 | 0.2% | 15 | 0.4% | 71 | 2.2% | 109 | 2.0% | 3,617 | 2.7% | 562 | 1.5% |
| Finance and insurance, real estate rental and leasing | 58,834 | 5.4% | 787 | 3.2% | 440 | 3.5% | 189 | 2.9% | 72 | 2.0% | 54 | 1.6% | 202 | 3.7% | 10,591 | 7.8% | 1,377 | 3.7% |
| Professional, scientific, management, administrative, waste management services | 102,274 | 9.3% | 1,798 | 7.3% | 923 | 7.4% | 460 | 7.0% | 198 | 5.4% | 234 | 7.1% | 539 | 9.8% | 18,648 | 13.7% | 3,055 | 8.2% |
| Educational services, and health care and social assistance | 256,271 | 23.3% | 6,387 | 26.0% | 3,431 | 27.6% | 1,919 | 29.1% | 1,058 | 28.9% | 946 | 28.8% | 1,258 | 23.0% | 30,196 | 22.2% | 9,823 | 26.4% |
| Arts, entertainment, recreation, accommodation and food services | 94,481 | 8.6% | 1,469 | 6.0% | 966 | 7.8% | 516 | 7.8% | 220 | 6.0% | 229 | 7.0% | 324 | 5.9% | 14,217 | 10.5% | 3,864 | 10.4% |
| Other services, except public administration | 60,421 | 5.5% | 1,235 | 5.0% | 817 | 6.6% | 264 | 4.0% | 82 | 2.2% | 167 | 5.1% | 171 | 3.1% | 9,910 | 7.3% | 1,913 | 5.1% |
| Public administration | 105,737 | 9.6% | 3,056 | 12.5% | 1,013 | 8.2% | 860 | 13.0% | 453 | 12.4% | 3,286 | 100% | 518 | 9.5% | 11,044 | 8.1% | 3,092 | 8.3% |

Arecibo Waste-to-Energy Project
Final EIS

January 2017

This page intentionally left blank.

Arecibo Waste-to-Energy Project
Final EIS

January 2017

### 3.11.1.6    Housing

**Table 3-44** provides insight into housing characteristics for Puerto Rico and the six municipalities within the ROI. Of the municipalities within the ROI, Utuado had the lowest rental vacancy rate for the time period (3 percent). San Juan had the highest rate at 9.5 percent. Median home values were lower in all six municipalities compared to Puerto Rico, except for Hatillo, which had a median home value of $134,500. Of the geographies presented, housing values were highest in San Juan ($166,400) and lowest in Utuado ($99,900). Owner occupancy exceeded 70 percent in all the ROI municipalities except for Utuado, while San Juan and Ponce exhibited owner occupancy percentages of 54.1 and 65.1 percent, respectively (U.S. Department of Commerce 2013d).

**Table 3-44.    Evaluation of Area Household and Housing Characteristics, 2009–2013**

| Geography | Total Housing Units | Percent Occupied | Percent Vacant | Total Occupied | Percent Owner Occupied | Percent Renter Occupied | Rental Vacancy Rate | Median Housing Values |
|---|---|---|---|---|---|---|---|---|
| **Puerto Rico** | 1,524,877 | 80.7% | 19.3% | 1,230,868 | 70.1% | 29.9% | 7.6% | $121,200 |
| Arecibo | 40,692 | 80.1% | 19.9% | 32,590 | 72.4% | 27.6% | 7.1% | $101,700 |
| Hatillo | 16,156 | 84.8% | 15.2% | 13,708 | 71.5% | 28.5% | 3.2% | $134,500 |
| Utuado | 12,977 | 79.0% | 21.0% | 10,247 | 65.5% | 34.5% | 3.0% | $99,900 |
| Ciales | 7,143 | 78.7% | 21.3% | 5,624 | 70.6% | 29.4% | 3.2% | $104,300 |
| Florida | 4,810 | 85.2% | 14.8% | 4,099 | 74.6% | 25.4% | 3.8% | $108,700 |
| Barceloneta | 9,588 | 85.4% | 14.6% | 8,184 | 78.6% | 21.4% | 4.6% | $104,500 |
| **San Juan** | 182,203 | 79.2% | 20.8% | 144,380 | 54.1% | 45.9% | 9.5% | $166,400 |
| **Ponce** | 55,549 | 83.9% | 16.1% | 46,626 | 65.1% | 34.9% | 7.0% | $108,000 |

Source:  U.S. Department of Commerce (2013d)

### 3.11.1.7    Government and Emergency Services

Civilian law enforcement in Puerto Rico is provided by the Puerto Rico Police Department, an island-wide government agency. The island is divided into 14 police regions; each is operated by a "comandancia," and is further divided into districts. The Project is located in the Arecibo police region (Government of Puerto Rico 2015b). Fire protection is provided by the Puerto Rico Fire Department, an island-wide government operated agency. The agency operates six districts across the island, the Project is located in the Arecibo district; the district's main station is located in Arecibo (Government of Puerto Rico 2015c).

Metro Pavia Health System operates the two hospitals in Arecibo, Hospital Metropolitano Dr. Susoni Arecibo and Hospital Metropolitano Cayetano Colly Toste Arecibo. Hospital Metropolitano Dr. Susoni Arecibo has 134 beds and includes an emergency room, pediatric services, a vascular laboratory, and MRI (Metro Pavia Health System, 2015). Hospital

Metropolitano Cayetano Colly Toste Arecibo has 198 beds. In addition, both San Juan and Ponce have multiple hospitals and medical centers (American Hospital Directory 2015).

### 3.11.1.8    Utilities

Electrical power in Puerto Rico is generated and operated by PREPA, which operates five main power plants. According to PREPA, 55 percent of power is generated using fuel-oil, 27.6 percent using natural gas, 16 percent using coal, and 1.1 percent is hydroelectric (PREPA 2015). Puerto Rico electric system generating capacity is 6,023 MW with a peak demand reached in September 2005 of 3,685 MW.

PRASA provides water and sewer service to the island. The agency is divided into five operational regions. The Project would occur within the North region, which includes Arecibo (Authority of Aqueducts and Sewers 2015).

### 3.11.1.9    Environmental Justice and Protection of Children

On February 11, 1994, President Clinton issued Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*. Executive Order 12898 directs agencies to address environmental and human health conditions in minority and low-income communities so as to avoid the disproportionate placement of any adverse effects from federal policies and actions on these populations. The general purposes of this executive order are as follows:

- Focus the attention of federal agencies on human health and environmental conditions in minority communities and low-income communities with the goal of achieving environmental justice.

- Foster nondiscrimination in federal programs that substantially affect human health or the environment.

- Improve data collection efforts on the impacts of decisions that affect minority communities and low-income communities and encourage more public participation in federal decision making by ensuring documents are easily accessible (e.g., in multiple languages and readily available).

As defined by the Environmental Justice Guidance Under NEPA (CEQ 1997), "minority populations" include persons who identify themselves as Asian or Pacific Islander, Native American or Alaskan Native, Black (not of Hispanic origin), or Hispanic. Race refers to census respondents' self-identification of racial background. Hispanic origin refers to ethnicity and language, not race, and may include persons whose heritage is Puerto Rican, Cuban, Mexican, and central or South American.

A minority population exists where the percentage of minorities in an affected area either exceeds 50 percent or is meaningfully greater than in the general population. Low-income

populations are identified using the U.S. Census Bureau's statistical poverty threshold, which is based on income and family size. The U.S. Census Bureau defines a "poverty area" as a census tract with 20 percent or more of its residents below the poverty threshold and an "extreme poverty area" as one with 40 percent or more below the poverty level. A census tract is a small geographic subdivision of a county and typically contains between 2,500 and 8,000 persons (U.S. Department of Commerce, 2013e).

As illustrated in **Table 3-45**, the U.S. Census classifies the majority of the population of Puerto Rico, the ROI, and the selected census tracts as minority because the U.S. Census definition of minority includes those who identify as Hispanic or Latino. Within each of these geographies, 98 percent or more of the population identified themselves as Hispanic or Latino (U.S. Department of Commerce 2013f). As defined by the U.S. Department of Commerce, the entire island of Puerto Rico is considered an "extreme poverty area," as is the ROI and the selected census tracts.

**Table 3-45.    Minority Status, Income, and Poverty Data for Select Areas, 2009–2013**

| Geography | Total Population | Percent Minority | Percent of Population Below Poverty Level |
|---|---|---|---|
| **Puerto Rico** | 3,682,966 | 99.2% | 45.1% |
| Arecibo | 95,185 | 99.5% | 47.4% |
| Hatillo | 41,932 | 99.5% | 46.1% |
| Utuado | 32,593 | 99.6% | 55.8% |
| Ciales | 18,509 | 99.8% | 60.6% |
| Florida | 12,645 | 99.8% | 54.8% |
| Barceloneta | 24,884 | 99.6% | 54.2% |
| **San Juan** | 374,129 | 99.5% | 40.4% |
| **Ponce** | 132,106 | 98.7% | 50.2% |
| **Census Tract 3003.01** | 3,259 | 100% | 47.8% |
| **Census Tract 3003.02[a]** | 5,720 | 100% | 31.8% |
| **Census Tract 3016** | 4,112 | 98.4% | 43.4% |

Source:  U.S. Department of Commerce (2013f)

[a] Includes the proposed Project

## 3.11.2    Effects Analysis

### 3.11.2.1    Construction

The Project includes construction and operation of a WTE plant in Arecibo, and the associated water, power, and sewer lines to service the plant. Socioeconomic impacts on the ROI would include an increase in construction employment during the construction of the plant. Due to the proximity of San Juan and Ponce (49 miles [79 kilometers] and 44.7 miles [72 kilometers],

respectively) and adequate existing infrastructure, it is anticipated the construction workforces could commute from these cities as well as from the nearby municipalities and Arecibo. Some of the construction workforce could also be temporarily housed on-site.

It is anticipated that most of this employment demand would be met with workers already living in Puerto Rico because the island already has adequate existing construction workforce (averaging approximately 66,000 total employed between 2009 and 2013) living near the Project.

It also is anticipated that some construction workers, particularly those with specific skills, would come from outside Puerto Rico. The additional employment from construction would have an impact on the local economy, in terms of sales volume and taxation, and on emergency services within the ROI.

Two construction contractors would be engaged to complete the construction phase of the Project, with an anticipated construction period of 3 years. It is further anticipated that the Project would employ 4,286 full-time equivalent construction jobs. Each full-time equivalent job equates to 2,080 hours of paid work per year (Energy Answers Arecibo, 2014). Similar sized projects in other areas of the United States typically require between 300 and 1,000 construction workers; however, this may not account for all the trades involved in preparing the materials or other Commonwealth-specific practices.

While some construction personnel may come from outside Puerto Rico, a significant impact on housing or government services is not anticipated. Because some construction workers associated with the Project may commute from throughout the ROI (such as from Ponce and San Juan) and from other areas in Puerto Rico, impacts on the economy and emergency services would be distributed beyond the immediate Project area.

### 3.11.2.2   Operation

**Employment**

Socioeconomic impacts on the ROI would include an increase in employment in terms of plant operations. Similar to construction employment, the proximity of the Project to the metropolitan areas of San Juan and Ponce and the smaller urban center of Arecibo could supply the workforce required for operations. The additional employment from operations would have an impact on the local economy, in terms of sales volume and taxation, and on emergency services within the ROI. The Project will employ approximately 150 full-time operating personnel for 50 operating years. The total annual payroll in 2015 dollars is projected to be about $8.5 million. While any impacts on sales volume or taxation likely would be positive, these socioeconomic impacts associated with long-term operations are not anticipated to be significant. While some operating personnel may come from outside Puerto Rico, a significant impact on housing or government services is not anticipated.

**Ash Production**

A byproduct associated with WTE plants is the production of waste ash that is typically distributed to landfills. The dry weight of this byproduct is projected to be about 20 percent of the weight of the processed refuse fuel or about 420 tons per day. Energy Answers proposes to mix the fly ash produced by the plant with a conditioning agent and water and ship it to an EPA subtitle-D compliant landfill. Energy Answers proposes to dispose of the bottom ash at a landfill until a market for its use as a construction material (e.g., road base) develops. Conditioned fly ash can be used as a lining within landfills, while the coarser bottom ash can be used as road base material within a fully lined landfill that is equipped with leachate control equipment designed to collect leachate and runoff, as opposed to being considered an additional waste component. As such, it is not anticipated that any additional personnel would be required at the landfill, and no significant socioeconomic impacts are expected.

**Environmental Justice and Protection of Children**

One of the paramount principals of environmental justice is community participation.  Under NEPA, and other forums, the community has been provided the opportunity to be involved in the analysis of the action.  RUS has reached out to the community through publication of the NEPA analysis as well as through a public meetings held with interpreters and a translator. Notices, analysis and hearings have been translated, in both English and Spanish, in order to foster effective and meaningful participation.

As previously stated the analysis presented in the HHRA (PRIDCO 2010) has not identified any significant environmental or human health impacts that may directly or indirectly affect people or their activities as a result of the Project. Under the criteria defined by the U.S. Census Bureau, the ROI and the census tracts that would contain and surround the Project all contain impoverished populations and proportionally high minority populations. Indeed, Puerto Rico as a nation is demographically 99.2 percent minority under these criteria for the time period analyzed. As such, the identified non-significant impacts described previously would not have any *disproportionate* impacts on minorities or impoverished populations. This assessment is reinforced by the EPA's Region 2 Interim Environmental Justice Policy that states, "In certain circumstances, a Community of Concern may be virtually indistinguishable from any of its neighbors for a given Environmental Justice demographic factor. The examples in Region 2 are in Puerto Rico and the U.S. Virgin Islands , where every community is classified as Hispanic, in the case of Puerto Rico, and as communities of color in the case of the U.S. Virgin Islands, even though additional racial differences may exist. When the population in the larger area incorporating the Community of Concern is relatively homogeneous for a given Environmental Justice demographic factor, it is usually not useful to compute a difference in that factor between the Community of Concern and the reference area" (EPA 2000).

The Project is not anticipated to disproportionately affect the health of children in the ROI as a result of the construction and operation of the WTE plant. There may be some children living near the plant; however, no significant environmental or human health impacts have been identified as a result of the Project. There are not expected to be any adverse impacts on children living in the vicinity of the Project or within the ROI.

Additionally, the Project is not anticipated to disproportionately affect the health of children in the ROI as a result of the distribution of ash to any identified landfills. No significant environmental or human health impacts have been identified with the distribution of ash to Puerto Rican landfills. As a result, no adverse impacts on children living in the vicinity of any landfills is anticipated.

**Municipal Solid Waste**

It is anticipated that some municipalities may be required to transport waste to the proposed Project. These municipalities would therefore incur any costs or fees associated with transport and facility use. These associated costs could potentially increase in the future as a result of anticipated landfill closures. There are currently 21 municipal landfills designated for closure by 2018; however, most of them remain in operation because there is no viable alternative for waste management. The operation of the proposed Project could allow for some of these municipal landfills to cease operation, and associated waste could be directed to the proposed Project.

# 4.0    OTHER REQUIRED CONSIDERATIONS

## 4.1    UNAVOIDABLE ADVERSE IMPACTS

Unavoidable adverse impacts are the effects on natural and human resources that would remain after mitigation measures have been applied. As discussed below, unmitigated adverse impacts would remain in the areas of air quality, visual resources, and transportation.

### 4.1.1    Air Quality

As described in Section 3.3.2, *Air Quality*, the PSD permit (and use of BACT) show that the Project is designed to the maximum extent practicable to minimize emissions from the plant; however, estimated emissions would exceed the 100 tons/year intensity threshold described at the beginning of Section 3.3.2 and would therefore be considered  a high impact. Specifically, emissions of CAA criteria pollutants CO, $NO_x$, $SO_2$, and $PM_{10}$ would exceed 100 tons/year (see **Table 3-20**). The Project also would emit a number of non-criteria hazardous air pollutants. As a result, regional air quality would be incrementally impacted during the operation of the Project. However, based on the air quality modeling supporting the EPA-approved PSD permit that considered the design of the Project, meteorological conditions, background concentrations, and other emission sources in the region, emissions at this level would not exceed the NAAQS or health risk thresholds.

### 4.1.2    Land Resources

The revitalization of the currently abandoned Global Fibers Paper Mill to an operating WTE plant and resource recovery facility would convert the vacant property to a working industrial site. Because the property was previously used in a similar capacity, the change in use is modest considering active uses; however, because the property is currently abandoned, the change in use is more substantive. The property is currently zoned for industrial type uses, which dictate the types of allowable uses on the property.

### 4.1.3    Visual Resources

As described in Section 3.6.3, *Visual Resources*, the proposed Project would result in new visual resources as a result of its construction and operation. Construction activities would be short term; however, once the Project is operating, the finished buildings and facilities, traffic, and visible steam emissions would be visible from select locations throughout the Río Grande de Arecibo Valley. Construction and operation of the Project at the former Global Fibers Paper Mill would revitalize a currently abandoned property and restore industrial type activities on the premises consistent with historical uses.

## 4.1.4      Transportation

The proposed Project's potential impact on traffic conditions were examined at four intersections for 2010 and 2013 conditions (when the Project was modeled to be operating at full capacity), and future conditions in 2018. After implementation of the proposed physical and traffic operational improvements, unmitigated impacts in the form of additional wait times at traffic lights, would remain at three intersections. Although these increased wait times are unavoidable, the overall wait times at intersections along PR-2 near the Project would be increased by a maximum of 45 seconds as a result of the installation of a new traffic signal at the north entrance (Access #1). New Project-generated trips would be similar to those that existed during operations of the Global Fibers Paper Mill and the Central Cambalache Sugar Mill; however, traffic should flow more smoothly with the proposed improvements, and because only one of these two vacant properties would be reinstated as a functioning industrial use.

## 4.2      IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES

Irreversible commitment of resources refers to the loss of future options for resource development or management, especially of nonrenewable resources such as cultural resources. Construction and operation of the proposed Project would require the permanent conversion of approximately 79.6 acres (82 cuerdas) of area for the plant. However, the area is private land that formerly housed the Global Fibers Paper Mill (brownfield) and was used for industrial purposes. Construction of the water pipeline would occur in road right-of-way and the Department of Transportation would maintain the cleared right-of-way for the life of the Project. Construction of the transmission line would require a new right-of-way across the vacant Cambalache Sugar Mill property; PREPA would maintain (clearing and mowing) the right-of-way for the life of the Project. The introduction of plant would result in a long-term change to the visual landscape; however, the area proposed for the plant currently has several structures from the Global Fibers Paper Mill, and the change would constitute a different set of structures in the same area. The proposed Project would be constructed in the existing floodplain of the Río Grande de Arecibo and would include excavation to increase floodway capacity. However, construction of the Project would not result in a significant impact on the flow regime pattern of the Río Grande de Arecibo because the proposed excavation would not alter the hydraulic section of the Río Grande de Arecibo channel. The Project also would include filling 2.42 acres (0.9 hectare) of wetlands, and wetland mitigation efforts would focus on an area contiguous to the plant site. The construction of the Project would require the irretrievable commitment of non-recyclable building materials and fuel consumed by construction equipment.

## 4.3    RELATIONSHIP BETWEEN SHORT-TERM USE OF THE ENVIRONMENT AND THE MAINTENANCE AND ENHANCEMENT OF LONG-TERM PRODUCTIVITY

Regulations for the preparation of an EIS require that the relationship between short-term use of the environment and the maintenance and enhancement of long-term productivity be addressed.

Long-term benefits of the proposed Project would occur at the expense of short-term impacts in the vicinity of the Project site. These short-term impacts would occur during the construction period, which is estimated to last three and a half years. Construction activities would include demolition, a combination of clearing and grubbing, excavating, surfacing, paving, erecting structures, and landscaping. Short-term impacts on local noise, air quality, water quality, and natural resources, as well as traffic, could occur at and in the area surrounding the Project site. During construction, short-term gains to the local economy would occur from employment of providers of services and supplies. It is projected that the Project will create over 4,000 construction jobs.

The proposed Project would require the permanent conversion of approximately 79.6 acres (82 cuerdas) of area for the plant. Impacts on geology and topography of the construction of the Project would be long term, resulting from the excavation within the floodway and recontouring of the landscape. The proposed Project requires filling of 2.42 acres (9,793.39 square meters) of on-site wetlands; however, the proposed compensatory mitigation plan would adequately replace these losses at an almost 4:1 ratio.

Landfill life expectancies would be extended via the transformation of the MSW to ash, which would slow the rate at which landfill capacities would be reached. The Project will employ about 150 full-time operating personnel once completed. The net effect of the Project on greenhouse gas emissions reduction would be in the range of 1,107,818 tons/year $CO_2$e to 93,721 tons/year $CO_2$e. The Project would also allow for the proper closure of non-compliant landfills and aid PREPA in diversifying its fuel mix to meet the renewable energy goals of Puerto Rico.

## 4.4    CUMULATIVE EFFECTS ANALYSIS

The following section provides an overview of past, present, and reasonably foreseeable future actions that have affected, are affecting, or have the potential to affect, the resources analyzed in the cumulative effects analysis.

The cumulative effects analysis includes projects that have been filed with Puerto Rico Planning Board from 2005 to 2015 (March) that are located in the Río Grande de Arecibo Watershed, or other appropriate geographic scope. Energy Answers originally conducted a cumulative effects analysis as part of the 2010 preliminary draft EIS (PRIDCO 2010). Since that time, only four siting consultation projects have been filed with the Puerto Rico Planning Board, including two

solar generation projects, construction of a new sanitary lift pump in downtown Arecibo, and one commercial development. Since the 2010 preliminary draft DEIS was published, the Via Verde Project was withdrawn indefinitely so it is no longer considered as part of this cumulative effects analysis. The USACE Flood Control project on the Río Grande de Arecibo Watershed is still active and is included in the analysis.

The cumulative effects analysis excludes from consideration those resources where significant cumulative effects are not expected. The following resources were eliminated from consideration: soils and geology, land resources, public health and safety, and cultural resources/historic properties. This EIS considers the following resources under cumulative effects: water resources, air quality, biological resources, visual resources, acoustic environment, transportation, and socioeconomics and environmental justice.

The geographic scope for the analysis of cumulative effects associated with the proposed projects in a foreseeable time horizon, including the Project, was defined based on the scope or boundary of the resource. For those resources, such as air quality, visual resources, and acoustic environment, that have specific studies that are, by definition, cumulative analyses, the geographic scope is that which is contained in the study.

The geographic spatial scope considered in the cumulative effects analysis for the various resources is:

- **Water Resources**—The scope for this resource is the Río Grande de Arecibo Watershed.

- **Air Quality**—The scope for this resource was defined according to the guidelines for Air Quality Models EPA (40 CFR § 51) and the selected model AERMOD.

- **Biological Resources**—The scope for this resource is the Río Grande de Arecibo Watershed and Caño Tiburones.

- **Visual Resources**—The scope for this resource is the area within visual proximity to the Project.

- **Acoustic Environment**—The scope for this resource is the area around the Project to the nearest receptors, as defined in section 3.7, *Acoustic Environment*.

- **Transportation**—The capacity and current traffic operation was evaluated and the potential impact on future major intersections around the Project site was determined. At the same time, the potential impacts of other proposed projects in the area were also considered.

- **Socioeconomics and Environmental Justice**—The scope for this resource includes the economy, population, and public services with a spatial scope that includes the whole ROI, defined as Arecibo, the contiguous municipalities of Hatillo, Utuado, Ciales, Florida, and Barceloneta, and the metropolitan areas of San Juan and Ponce.

### 4.4.1      Water Resources

The spatial extent of the analysis for water resources, both surface water and groundwater, is the Río Grande de Arecibo Watershed.

As discussed in Section 3.2, *Water Resources*, the construction and operation of the Project would have little to no impact on groundwater. The Project would not extract groundwater to supply its water needs (other than for emergency or backup supply, which would be the subject of further study), nor is water extraction proposed from rivers and streams that also function as aquifer recharge areas. The Project also would not have a cumulative effect on the potential degradation of groundwater and the public water supply because any potential Project effects on groundwater quality would be mitigated by measures presented in the Project's Spill Prevention Plan. The Project would not have a cumulative impact on groundwater recharge because of the limited footprint of the Project and the presence of large permeable surfaces in the Río Grande de Arecibo Watershed. In addition, the application of best management practices in the Spill Prevention Plan would prevent contaminant spills from gaining access to the subsurface during the Project's construction and operation activities.

As described in Energy Answers' Hydrologic and Hydraulic Study, the Project would, however, increase the amount of impermeable surface in the watershed, which could result in increased runoff downstream. When combined with other proposed projects in the watershed, runoff downstream could be increased substantially. To avoid negative cumulative impacts downstream, Energy Answers would implement their proposed stormwater best management practices. The proposed impervious portion of the plant's footprint would have a small effect on the underlying large aquifer (600 square miles [1,554 square kilometers]). Other projects recently built or proposed in the watershed include residential, commercial, and industrial developments. It is likely that developers of these projects would implement stormwater measures such as partially permeable pavements, underground chambers to retain stormwater runoff to discharge into existing systems, or others. Impacts related to soil impermeability and a reduction in infiltration area for the Arecibo WTE Project would be confined to the plant site itself and would not extend beyond the plant footprint and immediate vicinity. Therefore, the cumulative effect of the Project on both surface water and the underlying aquifer would be minimal.

The Project and other projects in the watershed could cumulatively affect surface water through an increased risk of contamination of streams due to loss of riparian vegetation. The removal of natural vegetation in river valleys could reduce the strip of riparian vegetation to the minimum of 16.4 feet (5 meters) allowed by law. The ability of vegetation to absorb nutrients and pollutants would be reduced to what the vegetation could absorb. If these projects do not implement pollution control programs for dispersed sources of contamination and solid waste collection, the amount of pollutants that reach streams and rivers could increase, eventually representing potential cumulative impacts in their respective estuaries. The Project, however, is not expected

to generate additional significant cumulative impacts caused by nonpoint source pollution in the Río Grande de Arecibo Basin because it would not remove riparian vegetation or cause any point source pollution. In addition, Energy Answers' implementation of the Project's Spill Prevention Plan and stormwater best management practices would further minimize the potential for the Project to contribute to surface water contamination in the Río Grande de Arecibo Basin.

The Project would not result in a significant impact on the flow regime pattern of the Río Grande de Arecibo, which is located on the western boundary of the site, because the proposed excavation would not alter the hydraulic section of the Río Grande de Arecibo channel. Project construction, however, would result in a small increase in base flood elevations along predominately undeveloped properties located east and west, as well as immediately upstream, of the Project site. To achieve the desired floodway limits around the Project, Energy Answers proposes to excavate higher ground on the floodplain between the plant and the river channel for additional hydraulic conveyance capacity. As a result, plant construction would involve modifying the existing drainage canals to open more floodway, and raising the footprint elevation of the plant so that it is above the 100-year floodplain. Cumulatively, along with other projects located within the Río Grande de Arecibo Watershed, the projected impact for the development of these projects would not be adverse because of the minimal extent of the increased base flood areas.

As mentioned in Section 3.2.2, *Water Resources*, the Project's effects on surface water resources would be limited to an increase in the generation of stormwater runoff and local precipitation runoff. However, Energy Answers would take the necessary mitigation measures during Project construction, and therefore, it is not expected that the Project would cause an adverse cumulative impact on surface water resources, particularly the Río Grande de Arecibo. Additionally, it is not expected that the temporary impacts associated to the removal of soil during Project construction would degrade the quality of surface water because Energy Answers would implement the best management practices contained in the Soil Erosion Control Plan. As such, the Project would not contribute to cumulatively impacting surface water quality.

## 4.4.2    Air Quality

A detailed air quality modeling analysis was completed in support of the PSD permit application (February 2011, revised July 2011 and October 2011), using the latest available version of the AERMOD dispersion model. The modeled concentrations were below the Significant Impact Level for 24-hour $PM_{10}$, 1-hour and 8-hour CO, annual $NO_2$, and the 3-hour, 24-hour, and annual $SO_2$. Therefore, a cumulative analysis was not necessary for these NAAQS below the Significant Impact Level.

A cumulative air modeling analysis was completed in accordance with EPA's *Guidelines on Air Quality Models* (40 CFR §51, Appendix W) to evaluate compliance with the 1-hour NAAQS for

$NO_2$ and $SO_2$ as well as for the 24-hr $PM_{2.5}$ averaging period. As shown in Section 3.2.2, *Air Resources*, and **Table 3-22**, the NAAQS would not be exceeded. The "total concentration" shown in the table includes the background concentrations obtained from ambient air quality monitoring data and represents the existing or baseline air quality in the Project area. The total concentration also includes the incremental impact of Project-related emissions and the impact of other major air pollutant sources in the region. It is this combination of existing air quality, Project impacts, and impacts of other sources that constitutes a "cumulative analysis" for PSD purposes. The cumulative analysis is also consistent with the NEPA definition of cumulative impacts at 40 CFR §1508.7.

The process of identifying "other sources" to include in the cumulative analysis began with identifying the relevant study area for each pollutant (significant impact area) based on dispersion modeling. The study areas for $SO_2$, $NO_2$, and $PM_{2.5}$ were 2.2 miles, 2.8 miles, and 0.93 mile (3.6 kilometers, 4.5 kilometers, and 1.5 kilometers) around the Project site, respectively. Major and minor sources within these study areas were inventoried; additional major sources within 31 miles (50 kilometers) of the study area were also added. Emissions information for other sources was obtained from EQB Air Quality Division and EPA Region 2 and included reviewing permit files and EPA's Air Facility System and National Emissions Inventory databases. A detailed list of other sources and the emission rates assumed for each are provided in the October 2011 Revised PSD Modeling report. Other sources on the south side of the island (which are separated from the Project area by a mountain range), were excluded following a screening analysis showing these sources would not appreciably affect the receptors in the Project area. The modeling parameters were reviewed and approved by EPA.

A PSD analysis of lead emissions was not required for permitting purposes because the maximum annual emissions of 0.31 tons per year are below the significant emission rate of 0.6 tons per year. Nevertheless, Energy Answers completed a lead dispersion modeling analysis voluntarily during the permitting of the Project. Results of this analysis indicated that the maximum predicted concentration of lead is 0.00056 $\mu g/m^3$, which is well below the 0.15 $\mu g/m^3$ NAAQS (3-month average).

Compliance with the NAAQS means that Project-related emissions of the criteria pollutants $NO_2$, $SO_2$, $PM_{2.5}$, and lead would not have a cumulative adverse impact on sensitive populations (e.g., asthmatics, children, and the elderly), agriculture (e.g., soils and livestock), and vegetation/wildlife.

## 4.4.3    Biological Resources

As discussed in Section 3.4, *Biological Resources*, the development of the Project would have long-term impacts on 2.4 acres (9,793.4 square meters) that comprise wetlands of the United States. Energy Answers' Section 404 Permit for the Project requires the establishment of 9.3

acres (37,635.8 square meters) of wetlands as compensatory mitigation. Because impacts on wetlands require mitigation at a ratio of at least 1:1, a cumulative impact on this resource is not expected even if other projects affect wetlands because wetlands areas would be increased after the mitigation for this Project is completed.

The property was previously used for industrial purposes; however, at present it is a vacant property with skeletal remains of the buildings as noted in Section 1.2, *Project Background*. Over time the vegetation has matured, resulting in a mix of early successional and opportunistic species throughout the formal industrial site. This type of growth may provide habitats to birds and other migratory species different than the agricultural land use habitats that dominate the immediate surrounding area; however, given that the proposed Project would revitalize a former industrial site and implement a number environmental protection measures, it is not anticipated that any species of interest for conservation purposes or valuable ecological habitats would be significantly affected or that the Project would contribute cumulative impacts on the resource because the existing vegetation is not of importance or of significant size and distribution to support large populations.

### 4.4.4    Visual Resources

The proposed plant site was used for decades as a paper mill and is currently abandoned and unmaintained. The historical industrial use provided the original context for the visual setting surrounding the property. Given the current state of disrepair, construction activities would be marginally less attractive as the vacant site is developed into a modern industrial facility with landscaped grounds. Once construction is complete, the visual attractiveness of the property would be improved. Over the short term, the visual resources would be changed from a passive, degraded former industrial site to an active construction site with workers, heavy machinery, scaffolding, dust, and truck traffic bringing materials to the site. These conditions would last for the duration of the construction period, estimated to be up to 3 years. Once construction is complete, operation of the plant would provide a new visual centerpiece along PR-2 with modern architecture, industrial shapes and textures, formal landscaping, and a steady flow of truck traffic entering and leaving the site. There are no other projects in the vicinity that would be visible from the plant site that would contribute to cumulative effects on the visual resources in the area. Therefore there would be no cumulative impacts on visual resources associated with the proposed Project.

### 4.4.5    Acoustic Environment

Agriculture and community development activities have occurred and continue to occur in the Project area, creating a localized level of noise that depends on the activity and is not significant in scale. Project construction activities could cause an increase in sound that is well above ambient noise levels in the area immediately surrounding the plant. However, construction noise at the nearest residential receptor would not be perceptible, especially given the ambient noise

sources in the area. Noise associated with the loudest construction activity, pile driving or the installation of sheet pile, would increase the sound level at the closest residence, Receptor 4, by less than 1 dBA, a level that is imperceptible. Therefore, the anticipated off-site noise levels during the construction phase would not be expected to noticeably increase the existing ambient noise environment in the Project area.

The Project's operation is expected to increase the noise levels at the receptors surrounding the property due to noise from facility operations and increased truck traffic accessing the site. However, the noise impact assessment showed that there would essentially be no change in the noise level due to the operation of the plant during daytime hours because of the distance between the plant and the receptors and the existing high ambient noise levels. Operation of the Project would result in an increased level in vehicular traffic on PR-2 in the Project vicinity, specifically solid waste trucks that would unload waste into the plant and haul recyclables and waste off site. Since all receptors are currently affected by the noise generated by the traffic of cars and trucks on PR-2, because the area is in commercial and industrial use, and since the increase in traffic caused by the Project will be less than 2 percent of existing levels, there will be no perceptible increase in noise as a result of Project traffic. When taken cumulatively with existing noise sources and proposed new development, the Project would not have a long-term effect.

## 4.4.6    Transportation

Energy Answers conducted a traffic study that projected traffic volume for 2013 and 2018 using anticipated annual growth for four intersections (Intersection #1: PR-2, PR-10 and Juan Rosado Avenue, Intersection #2: PR-2 and Victor Rojas Avenue, and the intersections of PR-2 with the two entrances to the site). After implementation of the proposed physical and traffic operational improvements, additional wait times at traffic lights would remain at three intersections. Although these increased wait times are unavoidable, the overall wait times at intersections along PR-2 near the Project would increase by a maximum of 45 seconds as a result of the installation of a new traffic signal at the north entrance (Access #1). Because these increases are minimal, the Project would not have any adverse cumulative impacts on traffic.

## 4.4.7    Socioeconomic Resources and Environmental Justice

The cumulative effects analysis spatial scope includes the whole ROI, which is defined as Arecibo and the contiguous municipalities of Hatillo, Utuado, Ciales, Florida, and Barceloneta. In addition, the metropolitan areas of San Juan and Ponce are included in the ROI because these cities are close enough to Arecibo that construction workers and personnel would most likely commute from these cities.

Project construction is projected to create over 4,000 construction jobs over three and a half years. While some construction personnel may come from outside Puerto Rico, a significant

impact on housing or government services is not anticipated. Because some construction workers associated with the Project may commute from throughout the ROI (e.g., from Ponce and San Juan) and from other areas in Puerto Rico, impacts on the economy and emergency services would be distributed beyond the immediate Project area. Labor mobility could have effects on the provision of public services in the area, namely fire stations, police stations, hospitals, and schools. However, it is difficult to determine if additional facilities would be needed. For example, the Police Department considers the territorial area of the municipalities, the crime rate, the floating population, among other criteria for determining the facilities that are needed. Likewise, the Department of Education, and the Department of Recreation and Sports, among other agencies have specific criteria for determining the need for additional facilities.

Project operations also would result in additional employment. This additional employment would have an impact on the local economy in terms of sales volume and taxation and on emergency services within the ROI. The Project will employ approximately 150 full-time operating personnel once. While any impacts on sales volume or taxation would likely be positive, these socioeconomic impacts associated with long-term operations are not anticipated to be significant. While some operating personnel may come from outside Puerto Rico, a significant impact on housing or government services is not anticipated.

In terms of cumulative effects, the Project, together with the potential proposed projects in the area would generate a low-intensity positive economic impact due to the socioeconomic activity in the area. These effects would be reflected in the area of new direct, indirect, and induced jobs as new business and commercial activity occur.

## 5.0    LIST OF PREPARERS

<u>Rural Utility Service</u>

Lauren McGee Rayburn—Project Manager, Furnished guidance to contractor, participated in preparation of EIS, evaluated EIS and source material (Environmental Scientist; M.S. Environmental Science; B.S. Ag./Earth and Environmental Science), 7 years of experience.

Steven Polacek—Project Manager, Participated in preparation of EIS, evaluated EIS and source material (Environmental Protection Specialist; B.A. Environmental Studies), 10 years of experience.

Dr. Erika Martin Seibert—Cultural Resources (Acting Federal Preservation Officer; PhD American Studies, M.A.A. Anthropology; B.A. Anthropology), 24 years of experience.

Kenneth Solano—Engineering/Technical Review and Evaluation (Chief, Engineering Branch; M.S. Mechanical Engineering; B.S. Mechanical Engineering), 36 years of experience.

Charles M. Philpott—Engineering/Technical Review and Evaluation (Chief, Engineering Branch; B.S. Electrical Engineering), 51 years of experience.

<u>Louis Berger</u>

Douglas Cotton—Project Director (Senior Project Manager; M.S. Urban & Regional Planning; B.A. Geography), 34 years of experience.

Jot Splenda—Project Manager, Traffic, Land Use, Public Health and Safety, and Visual Resources (Senior Project Manager; M.E.S.M. Water Resource Management; B.S. Ecology and Evolution), 14 years of experience.

Suni Shrestha—Deputy Project Manager, Scoping Report, Unavoidable Adverse Effects, Irreversible and Irretrievable Commitments (Deputy Project Manager; B.S. Environmental Analysis and Planning), 16 years of experience.

Sue Davis—Biological Resources (Manager, Energy Permitting; B.S., Wildlife Management), 19 years of experience.

Nicholas Funk—Water Resources (Hydrologist; M.S. Water Resources Science; B.S. Environmental Science and Policy), 1 year of experience.

Coreen Johnson—Editorial (Senior Technical Editor; B.A. English). 23 years of experience.

Deborah Mandell—Editorial (Senior Technical Editor; M.B.A Finance and Marketing; B.A. Government). 26 years of experience.

Todd Reveley—Socioeconomics (Economist; M.S. Applied Economics; B.A. Sociology), 10 years of experience.

Jay Sander—Cultural Resources (Senior Archaeologist; M.A. Anthropology; B.A. Anthropology), 20 years of experience.

Joshua Schnabel—Soils, Topography, and Geology (Environmental Planner; B.A. Sociology; M.A. Geography), 10 years of experience.

Leo Tidd, AICP—Air Quality (Principal Planner; M.P.A. Environmental Science and Policy; B.S. Environmental Studies), 9 years of experience.

# 6.0    REFERENCES

Altenergymag.com. 2009. Altenergymag Interview – J. Ristau, August 1, 2009. Available at:
      http://altenergymag.com/content.php?post_type=1356. Accessed April 20, 2015.

American Hospital Directory. 2015. Individual hospital statistics for Puerto Rico. Available at:
      http://www.ahd.com/states/hospital_PR.html. Accessed April 13, 2015.

Arcadis 2011. Environmental Justice Evaluation. Prepared for Energy Answers International,
      Inc. Prepared by Arcadis G&M of North Carolina, Inc., Raleigh, North Carolina.
      October.

Arcadis. 2010a. Screening Level Ecological Risk Assessment for the Renewable Energy Power
      Plant to be located in Arecibo. October.

Arcadis. 2010b. Appendix K: Human Health Risk Assessment. Revised Preliminary
      Environmental Impact Statement. Renewable Power Generation and Resources Recovery
      Plant. Prepared for Energy Answers International, Inc. Prepared by Arcadis G&M of
      Michigan, LLC, Novi, Michigan. October.

Authority of Aqueducts and Sewers. 2015. Regiones Operacionales, Nuestra Autoridad.
      Available at: http://www.acueductospr.com/NUESTRAAUTORIDAD/regiones.html.
      Accessed April 14, 2015.

Ayes Suárez, C.M. 1988. *Evaluación arqueológica tipo Fase 2, Angostura, Florida Afuera,
      Barceloneta, Puerto Rico.* Copies available at the Consejo para la Protección del
      Patrimonio Arqueológico Terrestre de Puerto Rico, San Juan.

Ayes Suárez, C.M. and O. Dávila. 1993. *Angostura: Un campamento arcaico temprano del valle
      del Manatuabón Bo. Florida Afuera, Barceloneta, Puerto Rico.* Copies available at the
      Consejo para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico, San
      Juan.

Briggs, R.P. 1968. Geologic map of the Arecibo Quadrangle, Puerto Rico. U.S. Geological
      Survey, Miscellaneous Geologic Investigations Map I-551, Scale 1:20,000. Available at:
      http://pubs.er.usgs.gov/publication/i551. Accessed April 13, 2015.

Buonanno G., M. Scungio, L. Stabile, and W. Tirler. 2012. Ultrafine particle emission from
      incinerators: The role of the fabric filter, Journal of the Air & Waste Management
      Association, 62:1, 103-111, DOI: 10.1080/10473289.2011.636501.

Burney, D.A., L.P. Burney and R.D.E. McPhee. 1994. Holocene Charcoal Stratigraphy from Laguna Tortuguero, Puerto Rico, and the Timing of Human Arrival on the Island. *Journal of Archaeological Science* 21: 273-281.

CEQ (Council on Environmental Quality). 2014. *Revised Draft Guidance for Greenhouse Gas Emissions and Climate Change Impacts*. Available at: https://www.whitehouse.gov/sites/default/files/docs/nepa_revised_draft_ghg_guidance_searchable.pdf.

CEQ. 1997. Environmental Justice Guidance under the National Environmental Policy Act. Executive Office of the President. Washington, DC. Available at: http://www.epa.gov/compliance/ej/resources/policy/ej_guidance_nepa_ceq1297.pdf. Accessed April 3, 2015.

Chanlatte, L.A. and Y. Narganes. 1980. La Hueca, Vieques: nuevo complejo cultural agroalfarero en la Arqueología Antillana. *Proceedings of the 8th International Congress for Caribbean Archaeology*, 501-523.

Clark, J.J., J.B. Walker, and R. Rodríguez Ramos. 2003. Depositional History and Evolution of the Paso del Indio Site, Vega Baja, Puerto Rico. *Geoarchaeology* 18(6): 625-648.

Confederation of European Waste-to-Energy Plants. n.d. Environmentally sound use of bottom ash. Available at: http://www.cewep.eu/information/publicationsandstudies/statements/ceweppublications/586.August__Up-dated_CEWEP_paper_on_the_Environmentally_sound_use_of_bottom_ash_.html. Accessed May 2015.

Crespo Torres, E. 2004. Análisis osteológico de restos humanos procedentes de Maruca: Un sitio precerámico al sur de Puerto Rico. In Excavaciones en el yacimiento Arcaico de Maruca, Ponce, Puerto Rico, compiled by Miguel Rodríguez López, Appendix 7. Report on file at the Consejo para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico, San Juan.

CSA Group (CSA Group, Inc.). 2012. Letter from José A. Salguero-Faría Senior Scientist CSA Group, Inc. San Juan, Puerto Rico to Sindulfo Castillo, Chief, Antilles Regulatory Section Antilles Office Jacksonville District Corps of Engineers San Juan, Puerto Rico. Dated March 15, 2012.

CSA Group. 2010a. Appendix M: Site Selection Study Revised Preliminary Environmental Impact Statement. Renewable Power Generation and Resources Recovery Plant. Prepared for Energy Answers International, Inc. November 2010.

CSA Group. 2010b. Appendix E: Flora and Fauna Study. Revised Preliminary Environmental Impact Statement. Renewable Power Generation and Resources Recovery Plant. Prepared for Energy Answers International, Inc. Prepared by CSA Group, San Juan, Puerto Rico. November 2010.

CSA Group. 2010c. Appendix E: Wetland Jurisdictional Determination Study. Preliminary Environmental Impact Statement. Renewable Power Generation and Resources Recovery Plant. Prepared for Energy Answers International, Inc. Prepared by CSA Group, San Juan, Puerto Rico. November.

CSA Group. 2010d. Appendix G: Noise Study. Preliminary Environmental Impact Statement. Renewable Power Generation and Resources Recovery Plant. Prepared for Energy Answers International, Inc. Prepared by CSA Group, San Juan, Puerto Rico. November.

data.Pr.gov. 2012. Annual Average Daily Traffic 2002–2012. Available at: https://data.pr.gov/Transportaci-n/Informe-AADT-2002-2012-Transito-Promedio-Diario/7kaq-zyym.

de las Casas, B. 1566. Apologetic History of the Indies. From *Apológetica historia de las India.* Madrid 1909; originally translated for *Introduction to Contemporary Civilization in the West* Columbia University Press, New York, 1946, 1954, 1961. Available at: http://www.columbia.edu/acis/ets/CCREAD/lascasas.htm. Accessed April 2015.

de las Casas, B. 1561. *History of the Indies*. College of San Gregorio. First published 1875.

de las Casas, B. 1542. *Brief Account of the Destruction of the Indians.* Available at: http://www.swarthmore.edu/SocSci/bdorsey1/41docs/02-las.html. Accessed April 2015.

Dublin Waste to Energy. 2015. Frequently asked questions for the Dublin Waste to Energy Project, Dublin Bay. Available at: http://dublinwastetoenergy.ie/?page_id=322. Accessed April 20, 2015.

Eduardo Questell y Asociados. 2010a. Connection Routes of the Brackish Water Line and the Electrical Line for the Renewable Power Generation and Resource Recovery Plant: Islote and Cambalache Wards, Arecibo, Puerto Rico. Prepared for CSA Group. Copies available at the Consejo para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico, San Juan.

Eduardo Questell y Asociados. 2010b. Renewable Power Generation and Resource Recovery Plant: Road PR-2, KM 72.8, Cambalache Ward, Arecibo, Puerto Rico. Prepared for CSA Group. Copies available at the Consejo para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico, San Juan.

EIA (Energy Information Administration). 2015a. Puerto Rico Fact Page. Available at:
www.eia.gov/state/?sid=RQ.

EIA. 2015b. International Energy Statistics. Available at:
http://www.eia.gov/cfapps/ipdbproject/IEDIndex3.cfm?tid=2&pid=2&aid=7. Accessed
March 19, 2015

EIS. 2016. Puerto Rico Territory Energy Profile. Available at:
https://www.eia.gov/state/print.cfm?sid=RQ.  Accessed April 1, 2016.

Energy Answers (Energy Answers International, Inc.). 2014. Construction Jobs Creation Report,
June 18, 2014. Construction Jobs Calculation.

Energy Answers. 2011a. Arecibo Puerto Rico Renewable Energy Project. Prevention of
Significant Deterioration (PSD) Air Permit Application. February.

Energy Answers. 2011b. Arecibo Renewable Energy Project Arecibo. Revised PSD Air Quality
Modeling Analysis. Prevention of Significant Deterioration (PSD) Air Quality Modeling
Analysis. (Revised $PM_{10}/PM_{2.5}$ Analysis). October.

Energy Answers. 2011c. Arecibo Renewable Energy Project Arecibo. Additional Information
Requested by EPA for the PSD Air Permit Application. September.

Energy Answers. 2010. Draft Preliminary Material Separation Plan. Energy Answers
International, Inc. August 2010.

Energy Recovery Council. 2014. The 2014 Energy Directory of Waste-to-Energy Facilities.
Nationwide Economic Benefits of the Waste-to-Energy Sector by Eileen Berenyi, PhD.
Available at: http://energyrecoverycouncil.org/userfiles/files/ERC_2014_Directory.pdf.
Accessed April 20, 2015.

EPA (U.S. Environmental Protection Agency) 2015a. Available at:
http://www.epa.gov/region2/cepd/solidwaste_in_puerto_rico.html, updated October 5,
2010. Accessed April 6, 2015.

EPA. 2015b. Available at: http://www.epa.gov/epawaste/nonhaz/municipal/, updated February
14, 2014. Accessed April 6, 2015.

EPA. 2015c. Overview of Greenhouse Gases. Available at:
www.epa.gov/climatechange/ghgemissions/gases.html, updated April 14, 2015.

EPA. 2015d. National Clean Diesel Campaign. Verified Technologies List. Available at:
http://www.epa.gov/cleandiesel/verification/verif-list.htm, updated April 23, 2015.

EPA. 2015e. Sulfur Dioxide, Health. Available at:
        http://www.epa.gov/airquality/sulfurdioxide/health.html, updated March 25, 2015.

EPA. 2015f. Green Book. Lead (2008) Nonattainment Areas. Available at:
        http://www.epa.gov/airquality/greenbook/mnp.html, updated January 30, 2015.

EPA. 2014a. National Ambient Air Quality Standards (NAAQS). 2014. Available at:
        http://www.epa.gov/air/criteria.html, updated October 21, 2014.

EPA. 2014b. Carbon Monoxide, Health. Available at:
        http://www.epa.gov/airquality/carbonmonoxide/health.html, updated October 21, 2014.

EPA. 2014c. Air & Radiation, Six Common Pollutants, Lead in Air. Available
        http://www.epa.gov/airquality/lead/health.html, updated August 14, 2014.

EPA. 2014d. Prevention of Significant Deterioration (PSD) Basic Information Available at:
        http://www.epa.gov/nsr/psd.html#add, updated October 8, 2014.

EPA. 2014e. Final Permit-Prevention of Significant Deterioration (PSD) of Air Quality Energy
        Answers Arecibo Puerto Rico Renewable Energy Project. Available at:
        http://www.epa.gov/region02/air/permit/energyanswers/energy_answers_final_permit_ap
        ril_2014.pdf.

EPA. 2014f. Air data. Available at: http://www.epa.gov/airdata/.

EPA. 2014g. Nitrogen Dioxide, Health. Available at:
        http://www.epa.gov/airquality/nitrogenoxides/health.html, updated August 15, 2014.

EPA. 2014h. Ground Level Ozone, Basic Information. Available at:
        http://www.epa.gov/airquality/ozonepollution/basic.html, updated November 26, 2014.

EPA. 2014i. Particulate Matter, Health. Available at:
        http://www.epa.gov/airquality/particlepollution/health.html, updated May 6, 2014.

EPA. 2014j. Framework for Assessing Biogenic $CO_2$ Emissions from Stationary Sources. United
        States Environmental Protection Agency, Office of Air and Radiation Office of
        Atmospheric Programs, Climate Change Division. Available at:
        http://www.epa.gov/climatechange/downloads/Framework-for-Assessing-Biogenic-CO2-
        Emissions.pdf.

EPA. 2013a. Final Permit – Prevention of Significant Deterioration (PSD) of Air Quality Energy
        Answers Arecibo Puerto Rico Renewable Energy Project. Available at:

http://www.epa.gov/region02/air/Final%20PSD%20Permit,%20Energy%20Answers%20
Arecibo,%20LLC.pdf.

EPA. 2013b. Glossary of Climate Change Terms. Available at:
http://www.epa.gov/climatechange/glossary.html#C, updated September 9, 2013.

EPA. 2013c. Responses to Public Comments on the Clean Air Act Prevention of Significant
Deterioration of Air Quality Draft Permit for Energy Answers Arecibo, LLC, Arecibo
Puerto Rico Renewable Energy Project. U.S. Environmental Protection Agency, Region
2. New York, New York. June.

EPA. 2012a. EPA Reaches Agreement with Battery Recycling Company, Inc. of Arecibo, Puerto
Rico to Reduce Lead Pollution. Available at:
http://yosemite.epa.gov/opa/admpress.nsf/0/3CA67DC35658625D852579AD00615CDF,
updated April 26, 2015.

EPA. 2012b. National Ambient Air Quality Standards for Particulate Matter, December 14,
2012. Available at http://www.epa.gov/pm/2012/finalrule.pdf.

EPA. 2010. Commonwealth of Puerto Rico, Office of the Governor, Environmental Quality
Board. Total Maximum Daily Loads (TMDL) Río Grande de Arecibo Watershed.
Available at:
http://www.epa.gov/waters/tmdldocs/Fecal%20Coliform%20TMDL%20Rio%20Grande
%20de%20Arecibo.pdf, updated July 2, 2010. Accessed April 2, 2015.

EPA. 2008. National Emissions Inventory. Review, Analysis and Highlights. Office of Air
Quality Planning and Standards, Air Quality Assessment Division, Emissions Inventory
and Analysis Group, Research Triangle Park, North Carolina.

EPA. 2005. Human Health Risk Assessment Protocol for Hazardous Waste Combustion
Facilities. Final. Office of Solid Waste and Emergency Response (5305W). EPA530-R-
05-006. Available at: http://www.epa.gov/osw/hazard/tsd/td/combust/risk.htm.
September.

EPA. 2003. Ecological Soil Screening Levels for Iron - Interim Final. OSWER Directive 9285.7-
69. U.S. Environmental Protection Agency, Office of Solid Waste and Emergency
Response. Available at: http://rais.ornl.gov/documents/eco-ssl_iron.pdf. November.

EPA. 2000. Region 2 Interim Environmental Justice Policy, December 2000. Available at:
http://www.epa.gov/region2/ej/ejpolicy.pdf. Accessed June 9, 2015.

EPA. 1998. Guidelines for Ecological Risk Assessment. EPA/630/R-95/002F. U.S.
Environmental Protection Agency. Available at:
http://www2.epa.gov/sites/production/files/2014-
11/documents/eco_risk_assessment1998.pdf. April.

EPA. 1997. Ecological Risk Assessment Guidance for Superfund: Process for Designing and
Conducting Ecological Risk Assessments. EPA 540-R-97-006. U.S. Environmental
Protection Agency. Available at:
http://www.epa.gov/oswer/riskassessment/ecorisk/ecorisk.htm. June.

EPA 1992. Workbook for Plume Visual Impact Screening and Analysis (Revised). Available at:
http://www.epa.gov/scram001/userg/screen/WB4PlumeVisualOCR.pdf.

EPA. 1974. Information on Levels of Environmental Noise Requisite to Protect Public Health
and Welfare with an Adequate Margin of Safety. Prepared by the U.S. Environmental
Protection Agency, Office of Noise Abatement and Control. March.

EPA. 1973. Public Health and Welfare Criteria for Noise. Prepared by the U.S. Environmental
Protection Agency, Office of Noise Abatement and Control. Washington, D.C. July 27.

EPA. 1971. Community Noise. Prepared by Wyle Laboratories. Available for the EPA National
Service Center for Environmental Publications. Available at:
http://www.epa.gov/nscep/index.html.

EPR (Encyclopedia of Puerto Rico). 2004. Prehistory of Puerto Rico. Encyclopedia of Puerto
Rico, National Endowment for the Humanities. Available at:
http://www.enciclopediapr.org/ing/article.cfm?ref=06102004&page=1. Accessed April
2015.

EPR. 2015. Arecibo. Encyclopedia of Puerto Rico, National Endowment for the Humanities.
Available at: http://www.enciclopediapr.org/ing/article.cfm?ref=09022301&page=1.
Accessed February 18, 2015.

EQB (Puerto Rico Environmental Quality Board). 1987. Regulation of the Environmental
Quality Board for the Control of Noise Pollution, Amended Version.

Espenshade, C.T., D. Blanton, J.W. Joseph, and D. Lorne. 1986. Site Specific Archaeological
Survey and Additional Reconnaissance of Selected Portions of the Proposed Voice of
America Relay Station, Cabo Rojo, Puerto Rico. Copies available at the Puerto Rico State
Historic Preservation Office, San Juan.

Federal Aviation Administration. 2014. Determination of No Hazard to Air Navigation. Letter from the Federal Aviation Administration, Southwest Regional Office, Fort Worth, Texas, to CSA Group, San Juan, Puerto Rico. November 26.

Federal Highway Administration. 2012. User Guidelines for Waste and Byproduct Materials in Pavement Construction. Publication Number: FHWA-RD-97-148. Available at: http://www.fhwa.dot.gov/publications/research/infrastructure/structures/97148/mswca1.cfm, updated April 23, 2012. Accessed April 2015.

Federal Highway Administration. 2011. Highway Traffic Noise: Analysis and Abatement Guidance. FHWA-HEP-10-025. December.

Federal Highway Administration. 2009. Manual of Uniform Traffic Control Devices, with revisions numbers 1 and 2 incorporated, dated May 2012.

FEMA (Federal Emergency Management Agency). 2015. National Flood Hazard Layer Status. Available at: http://www.floodmaps.fema.gov/NFHL/status.shtml. Accessed May 7, 2015.

Figueroa, Jesús. 1991. La *Fase Arcaica Cayo Cofresí y las Culturas Recolectoras de las Antillas.* Unpublished Master's Thesis, Estudios Puertorriqueños, Centro de Estudios Avanzados de Puerto Rico y el Caribe, San Juan.

Figueroa, Jesus S. Lugo. 2006. *Proyecto Centro de Convenciones Municipio Autonomo de Ponce, Sector Finca Multeado Estrella, Barrio Playa, Ponce Puerto Rico.* Prepared for the Centro International de Mercadeo, Guaynabo, Puerto Rico by Jesus S. Figueroa Lugo, Arqueologo Oficina de Permisos, Ponce.

Figueroa, Jesus S. Lugo. 1987. Archaeological Evaluation (Phase II), Puerto Rico Highway Authority, Construction of Segment of PR 14 (Avenida Malecon), Ponce Puerto Rico. Prepared for the Division of Environmental Studies, Puerto Rico Highway Authority, San Juan by Jesus S. Figueroa Lugo.

Fortuna, Luis. 1981. Informe palinológico. In *Estudio de cuatro nuevos sitios paleoarcaicos en la Isla de Santo Domingo*, edited by Ortega, Elpidio and José Guerrero, pp. 83-89. Editora Taller: Santo Domingo.

Fortuna, Luis. 1980. El maíze en la dieta indígena. In *Boletín del Museo del Hombre Dominicano* 13:159-169.

GLM (Gregory L. Morris Engineering). 2010. Hydrologic-Hydraulic Study of Río Grande de Arecibo, Renewable Power Generation and Resource Recovery Facility, Arecibo, Puerto Rico. San Juan, Puerto Rico.

Government of Puerto Rico. 2015a. PR.gov. Geographies: Arecibo Municipality. Available at: http://www2.pr.gov/Directorios//Pages/InfoMunicipio. Accessed March 30, 2015.

Government of Puerto Rico. 2015b. Policia de Puerto Rico. Comandancia de Arecibo. Available at: http://www.policia.pr.gov/. Accessed: April 13, 2015.

Government of Puerto Rico. 2015c. Cuerpo de Bomberos de Puerto Rico. Zona de Arecibo. Available at: http://www.bomberos.pr.gov/. Accessed: April 13, 2015.

Government of Puerto Rico. Department of Labor and Human Resources. 2015. Puerto Rico Long Term Industry Projections, 2012–2022. Available at: http://www.trabajo.pr.gov/det_estadistica.asp?cnt_id=165. Accessed April 13, 2015.

Haag, William G. (editor). 1963. *Early Indian Farmers and Village Communities*. National Survey of Historic Sites and Buildings, National Park Service, Washington.

Hall, A. and M. Day. 2011. Ecotourism in the state forest karst of Puerto Rico. *Journal of Cave and Karst Studies* 76(1):30–41.

Hannan, C. 2012. Meeting minutes from conference call for Arecibo Resource Recovery Facility CLOMR 11-02-1972R. February 28.

Health Effects Institute. 2013. HEI Review Panel on Ultrafine Particles. Understanding the Health Effects of Ambient Ultrafine Particles. HEI Perspectives 3. Health Effects Institute, Boston, MA. Available at: http://pubs.healtheffects.org/getfile.php?u=893.

Jones, W. 1911. Porto Rico. In *The Catholic Encyclopedia*. Robert Appleton Company, New York. Available from New Advent at http://www.newadvent.org/cathen/12291b.htm. Accessed April 2015.

Kinsbruner, J. 2004. Puerto Rico. Microsoft Encarta Reference Library. Available at: http://www.fjcollazo.com/images/puerto_rico.htm. Accessed April 2015.

Kosti-Karell, D. 1993. *Status Report on Archaeological Phase III Mitigation Investigation for the Condominio Flamboyán Project in Boquerón, Cabo Rojo.* Copies on file at the Consejo para la Protección del Patrimonio Arqueólogico Terrestre de Puerto Rico, San Juan, Puerto Rico.

Kozlowski, J.K. 1974. *Preceramic Cultures in the Caribbean.* Zeszyty Naukowe Uniwersyteru Jagiellonkiego. Prace Archeologiczne.

Arecibo Waste-to-Energy Project
Final EIS                                                                                                      January 2017

Library of Congress. 2011. The World of 1898: The Spanish American War, Ponce, Puerto Rico. Library of Congress files. Available at: http://www.loc.gov/rr/hispanic/1898/ponce.html. Accessed April 2015.

Lopez Cantos, A. 1975. *Historica de Puerto Rico, 1650-1700.* School of Spanish American Studies, Seville.

Metro Pavia Health System. 2015. Metro Pavia Health System hospital network, Hospital Metropolitano Dr. Susoni Arecibo and Hospital Metropolitano Cayetano Colly Toste Arecibo. Available at: http://www.metropavia.com/RedDeHospitales.cfm. Accessed April 13, 2015.

Monroe, W.H. 1976. The Karst Landforms of Puerto Rico. Geological Survey Professional Paper 899. Department of the Interior, USGS in cooperation with the Puerto Rico Department of Natural and Environmental Resources.

MSW Management. 2012. The Economic Development Benefits of Waste-to-Energy Facilities. February 6, 2012. Available at: http://www.mswmanagement.com/MSW/Articles/The_Economic_Development_Benefits _of_WastetoEnergy_15968.aspx. Accessed April 20, 2015.

Muniz. E. 2011. Personal Communication. Letter from Edwin E. Muniz, Field Supervisor, USFWS, Caribbean Field Office to Lillian Matea Santos, Ferraiuoli LLC, Hato Rey, Puerto Rico.

National Fire Protection Association. 2014. Codes and Standards. Available at: www.nfpa.org/codes-and-standards. Accessed May 8, 2015.

National Oceanic and Atmospheric Administration. 2014. NOWData-NOAA Online Weather Data, Arecibo OBSY. Available at: http://www.weather.gov/climate/xmacis.php?wfo=sju, updated December 18, 2014. Accessed April 8, 2015.

National Park Service. n.d. (a). A Historical Overview of Colonial Puerto Rico: The Importance of San Juan as a Military Outpost. Available at: http://www.nps.gov/saju/historyculture/index.htm. Accessed April 2015.

National Park Service. n.d. (b). San Juan National Historic Site. Official Brochure, National Park Service, U.S Department of the Interior, San Juan.

National Park Service. 2011. Centro Ceremonial Indigena Data Form. National Register of Historic Places Database. National Park Service. Available at:

http://nrhp.focus.nps.gov/natregsearchresult.do?fullresult=true&recordid=14. Accessed
April 2015.

National Research Council. 2010. Americas Climate Choices: Panel on Advancing the Science
of Climate Change. Board on Atmospheric Sciences and Climate, Division on Earth and
Life Studies. The National Academies Press. Washington, D.C. Available at:
http://www.nap.edu/openbook.php?record_id=12782.

Newsom, L.A. and D.M. Pearsall. 2003. Trends in Caribbean Archaeobotany. In *People and
Plants in Ancient North America*, edited by Minnis, P. N., pp. 347-412. Smithsonian
Books: Washington.

NRCS (United States Department of Agriculture, Natural Resources Conservation Service).
2015. Prime & Other Important Farmlands Definitions. Available at:
http://www.nrcs.usda.gov/wps/portal/nrcs/detail/pr/soils/?cid=nrcs141p2_037285.
Accessed April 13, 2015.

NRCS. 2014. Geospatial Data Gateway. Available at: https://gdg.sc.egov.usda.gov/. Accessed
May 7, 2015.

NRCS. 2006. Land Resource Regions and Major Land Resource Areas of the United States.
Department of Agriculture Handbook 296. Available at:
http://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/survey/?cid=nrcs142p2_053624.
Accessed April 13, 2015.

Oviendo, F. 1535. *La historia general y natural de las Indias.* Seville. Available at:
http://www.ems.kcl.ac.uk/content/etext/e026.html. Accessed April 2015.

Oviendo, F. 1526. La Natural hystoria de las Indias. Toledo.

Padilla, I., C. Irizarry, and K. Steele. 2011. Historical Contamination of Groundwater Resources
in the North Coast Karst Aquifers of Puerto Rico. Available at:
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3999440/. Accessed April 27, 2015.

Pew Research Center. 2015. Puerto Rican Population Declines on Island, Grows on Mainland,
August 6, 2014. Available at: http://www.pewhispanic.org/2014/08/11/puerto-rican-
population-declines-on-island-grows-on-u-s-mainland/ph-2014-08-11-puerto-rico-0-05/.
Accessed April 10, 2015.

Pina, P., F.M Veloz Maggiolo and M. Garcia Arevalo. 1976. Esquema para una revision de
nomenclatures arqueologicas del poblamiento preceramico en las Antilles. In: *Actas del
XLI Congreso International de Americanistas*, 3:693–697.

Ponte, G. 2012. Personal Communication. Email from G. Ponte to M. Green, regarding
    Description & Schedule for Scope of Services, Finca Monte Grande & Hydroponic
    Garden Required FEMA Remediation Work, Energy Answers Arecibo, LLC.
    November 1.

PREPA (Puerto Rico Electric Power Authority). 2015. Operational Profile as of August 14,
    2013. Available at: http://www.aeepr.com/investors/operationalProfile.aspx. Accessed
    April 14, 2015.

PRIDCO (Puerto Rico Industrial Development Company). 2010. Revised Preliminary
    Environmental Impact Statement – Renewable Power Generation and Resource Recovery
    Plant. Puerto Rico Industrial Development Company, San Juan, Puerto Rico.
    November 26.

Quiñones-Aponte, V. 1986. Water Resources of the Lower Río Grande de Arecibo Alluvial
    Valley, Puerto Rico. U.S. Geological Survey, Water-Resources Investigations Report 85-
    4160, San Juan, Puerto Rico. Available at: http://pubs.usgs.gov/wri/1985/4160/report.pdf.

Quiñones-Aponte, V., and F. Gomez-Gomez. 1986. Potentiometric surface of the alluvial aquifer
    and hydrologic conditions in the Salinas quadrangle, Puerto Rico, March 1986: U.S.
    Geological Survey Water-Resources Investigations Report 87-4161. 1 sheet, scale
    1:20,000.

Rhindos, D.R. 1984. The Origins of Agriculture: An Evolutionary Perspective. Academic Press:
    Orlando.

Rivero, A. 1973. Cronica de la Guerra Hispano-Americana en Puerto Rico. Plus Ultra, New
    York.

Rodriguez Lopez, M. 2004. *Excavaciones en el yacimiento Arcaico de Maruca, Ponce, Puerto
    Rico: Informe Final*. Copies available at the Consejo para la Protección del Patrimonio
    Arqueológico Terrestre de Puerto Rico, San Juan.

Rodriguez Lopez, M. 1997. Religious Beliefs of the Saladoid People. In *The Indigenous People
    of the Caribbean*, edited by S. M. Wilson, pp. 80-87. University Press of Florida,
    Gainesville.

Rodriguez, M. 1985. *Proyecto Plaza del Caribe: Informe Arqueologico (Fase II), Yacimiento
    Caracoles, Ponce Puerto Rico.* Prepared for Environmental Systems Engineering of
    Puerto Rico, Inc. by Miguel Rodriguez, Llato Rey.

Rodriguez Ramos, R. 2007. *Puerto Rican Precolonial History Etched in Stone.* Unpublished Ph.D. Dissertation, University of Florida. Available at: http://www.box.net/shared/gul7lzccx7. Accessed April 2015.

Rodriguez Ramos, R. 2005. The Crab-Shell Dichotomy Revisited: The Lithics Speak Out. In *Ancient Borinquen: Archaeology and Ethnohistory of Native Puerto Rico*, edited by Siegel, Peter, pp. 1-54. University of Alabama Press: Tuscaloosa.

Rodriguez Ramos, R., E. Babilonia, L. Antonio Curet, and J. Ulloa. 2008. The Pre-Arawak Pottery Horizon in the Antilles: A New Approximation. *Latin American Antiquity*, 19(1): 47-63. Available at: http://www.cubaarqueologica.org/document/rrr04.pdf. Accessed April 2015.

Rouse. I. 1992. The Taínos: Rise and Decline of the People who Greeted Columbus. Yale University Press: New Haven.

Rouse, I. 1951. Areas and Periods of Culture in the Greater Antilles. In *Southwestern Journal of Anthropology,* 7:248-265.

Rouse, I. and R.E. Alegría. 1990. *Excavations at María de la Cruz Cave and Hacienda Grande Village Site, Loiza, Puerto Rico*. Yale University Publications in Anthropology, No. 80. Yale University Press: New Haven.

Rouse, I. and L. Allaire. 1978. Caribbean. In *Chronologies in New World Archaeology.* Edited by R. E. Taylor and C. W. Meighan. Academic Press, New York.

RUS (Rural Utilities Service). 2015. Arecibo Waste-to-Energy and Resource Recovery Project Environmental Impact Statement Scoping Summary Report. April.

Sara, T.R., J.J. Ortiz, and L.A. Newsom. 2003. Recent Paleoenvironmental Investigations on Vieques Island, Puerto Rico. Paper presented at the XXIIth International Congress for Caribbean Archaeology, Dominican Republic.

Schimmer, R. 2010. Puerto Rico. Yale University Genocide Studies Program. Available at: http://www.yale.edu/gsp/colonial/puerto-rico/index.html. Accessed April 2015.

Scott, K. 2011. Personal Communication. Email on November 30, 2011, from Energy Answers' consultant Kevin Scott to V. Petriman, EPA, transmitting revised greenhouse gas emissions tables.

Sherfy, M., and R.W. Luce. 1998. Guidelines for Evaluating and Nominating Properties that Have Achieved Significance Within the Past Fifty Years. *National Register Bulletin*. National Park Service, Washington D.C.

Sickler Robinson, L., E.R. Lundberg, J.B. Walker, and G.S. Vescelius. 1983. Archaeological
Data Recovery at El Bronce, Puerto Rico, Final Report Phase I. U.S. Army Corps of
Engineers, Jacksonville District.

Siegel, P.E. 1992. *Ideology, Power, and Social Complexity in Prehistoric Puerto Rico.* Ph.D.
dissertation, State University of New York, Binghamton. University Microfilms, Ann
Arbor.

Siegel, P.E. and J.W. Joseph. 1993. Archaeological Data Recovery at El Palmar de las Animas
(Site VB-27) and the Concrete Well Site (Site VB-32), Río Cibuco Flood Control Project,
Municipio de Vega Baja, Puerto Rico. Copies available at the Puerto Rico State Historic
Preservation Office, San Juan, Puerto Rico.

Siegel, P.E., J.G. Jones, D.M. Pearsall, and D.P. Wagner. 2005. Environmental and Cultural
Correlates in the West Indies: A View from Puerto Rico. In *Ancient Borinquen:
Archaeology and Ethnohistory of Native Puerto Rico*, edited by P. Siegel, pp. 88-121.
University of Alabama Press: Tuscaloosa.

Southeast Archaeological Center. 2009. Prehistory of the Caribbean Cultural Area. U.S. Forest
Service, Department of the Interior, Tallahassee. Available at:
http://www.nps.gov/seac/caribpre.htm. Accessed April 2015.

SWMA (Solid Waste Management Authority). 2003. Final Report Waste Characterization Study.
Prepared by Wehran–Puerto Rico, Inc. October 24, 2003.

SWMA. 2008. Dynamic Itinerary for Infrastructure Projects Public Policy Document. Prepared
by MP Engineers of Puerto Rico. May 2008.

SWMA. 2015. Indicadores 2009 al 2015. Solid waste generation and recycling totals for 2009
through first quarter of 2015.

Tibes Catalogue. 2003. *Catalogue of the Tibes Indigenous Ceremonial Center.* Part of the
Catalogue of the Archaeological Collection from the Museum of Tibes Indigenous
Ceremonial Center. Published by the Puerto Rican Foundation for the Humanities and the
Office of Culture and Tourism, Autonomous Municipality of Ponce.

Tronolone, C.A., M.A. Cinquino, and C.E. Vandrei. 1984. Cultural Resource Reconnaissance
Survey for the Vieques Naval Reservation. Copies available at the Puerto Rico State
Historic Preservation Office, San Juan.

USACE (U.S. Army Corps of Engineers). 2014. Department of the Army Permit. Permit No.
SAJ-2011-02033. Dated April 17, 2014.

U.S. Department of Commerce. 2012. U.S. Census Bureau. American Fact Finder. Geography: Puerto Rico. Available at: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml. Accessed: 3-23-2016.

U.S. Department of Commerce. 2013a. United States Census Bureau. 2000, 2009–2013 American Community Survey 5-Year Estimates. For Geographies: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities, San Juan and Ponce Urban Zones. Available at: http://factfinder2.census.gov. Accessed April 10, 2015.

U.S. Department of Commerce. 2013b. United States Census Bureau. 2009–2013 American Community Survey 5-Year Estimates. For Geographies: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities. Available at: http://factfinder2.census.gov. Accessed April 10, 2015.

U.S. Department of Commerce. 2013c. United States Census Bureau. 2009–2013 American Community Survey 5-Year Estimates. For Geographies: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities, San Juan and Ponce Urban Zones. Available at: http://factfinder2.census.gov. Accessed April 10, 2015.

U.S. Department of Commerce. 2013d. United States Census Bureau. 2009–2013 American Community Survey 5-Year Estimates for: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities, San Juan and Ponce Urban Zones. Available at: http://factfinder2.census.gov. Accessed April 10, 2015.

U.S. Department of Commerce. 2013e. United States Census Bureau. Available at: http://factfinder2.census.gov. Accessed April 14, 2015.

U.S. Department of Commerce. 2013f. United States Census Bureau. 2009–2013 American Community Survey 5-Year Estimates for: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities, San Juan and Ponce Urban Zones, Census Tracts 3003.01, 3003.02, 3016. Available at: http://factfinder2.census.gov. Accessed April 10, 2015.

U.S. Department of Commerce. 1990. United States Census Bureau. 1990 Population Estimates for: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities. Available at: https://www.census.gov/popest/data/historical/1990s/municipios.html. Accessed April 10, 2015.

USDA (U.S. Department of Agriculture). 2001. *Puerto Rican Karst-A Vital Resource*. Forest Service General Technical Report WO-65. August 2001.

U.S. Department of Labor. 2013. Bureau of Labor Statistics. 2011–2013. State and Local Unemployment Rates for: Puerto Rico, Arecibo, Hatillo, Utuado, Ciales, Florida, Barceloneta Municipalities. Available at: http://www.bls.gov/lau/. Accessed April 13, 2015.

USFWS (U.S. Fish and Wildlife Service). 2015. Trust Resource List. Information, Planning, and Conservation System (IPAC). Available at: https://ecos.fws.gov/ipac/wizard/trustResourceList!prepare.action. Generated April 28, 2015.

U.S. Global Change Research Program. 2014. National Climate Assessment. Available at: http://nca2014.globalchange.gov. Accessed April 2015.

USGS (U.S. Geological Survey). 2015a. USGS Water Data for Puerto Rico. Available at: http://waterdata.usgs.gov/pr/nwis/nwis, updated April 17, 2015. Accessed April 6, 2015.

USGS. 2015b. USGS 50029000 Río Grande de Arecibo at Central Cambalache, PR. Available at: http://nwis.waterdata.usgs.gov/pr/nwis/dv/?site_no=50029000, updated April 17, 2015. Accessed April 6, 2015.

USGS. 2015c. USGS 50027750 Río Grande de Arecibo Abv Arecibo, PR. Available at: http://nwis.waterdata.usgs.gov/pr/nwis/dv/?site_no=5002775, updated April 17, 2015. Accessed April 6, 2015.

USGS. 2015d. USGS Río Tanama at Charco Hondo, PR. Available at: http://waterdata.usgs.gov/nwis/dv/?site_no=50028400, updated April 17, 2015. Accessed April 6, 2015.

USGS. 2015e. Peak Streamflow at USGS 50029000 Río Grande de Arecibo at Central Cambalache, Puerto Rico. Available at: http://nwis.waterdata.usgs.gov/pr/nwis/peak?site_no=50029000, updated April 17, 2015. Accessed April 17, 2015.

USGS. 2014. National Gap Analysis Program. Land Cover Data Portal. Available at http://www.floodmaps.fema.gov/NFHL/status.shtml, updated September 2, 2014. Accessed May 7, 2015.

USGS. 2012. USGS Caribbean Water Science Center Puerto Rico Public-Supply Water Withdrawals and Deliveries, 2005. Available at: http://pr.water.usgs.gov/infodata/wateruse-public_supply-alt.html, updated December 12, 2012. Accessed April 7, 2015.

Arecibo Waste-to-Energy Project
Final EIS                                                                                         January 2017

USGS. 1982. Arecibo Topographic Map. United States Geographical Survey map. Original scale
1:20,000.

Vargas. M. 2014. Personal Communication. Email between Maritza Vargas, USFWS, Caribbean
Field Office to José A. Salguero-Faría, Technical Leader Environmental Sciences, CSA
Group, San Juan, Puerto Rico. October 1, 2014.

Vega, J. 1992. *Archaeological Reconnaissance, Ponce Wastewater Treatment Plant, Deep
Ocean Outfall Study, Ponce Puerto Rico.* Prepared for the Puerto Rico Aqueduct and
Sewer Authority by Dr. Jesus Vega, Underwater and Terrestrial Archaeology, San Juan.

Veloz Maggiolo, M. 1980. *Las sociedades Arcaicas de Santo Domingo*. Museo del Hombre
Dominicano, Serie Investigaciones Antropológicas No. 16, Fundación Garcia Arévalo,
Santo Domingo.

Veloz Maggiolo, M., J. González, E.J. Maiz, and E. Questell. 1975. Cayo Cofresí: Un sitio
precerámico de Puerto Rico. Ediciones Taller: Santo Domingo.

Walker Jeffery B. 2005. The Paso del Indio Site, Vega Baja, Puerto Rico: A Progress Report. In
*Ancient Borinquen: Archaeology and Ethnohistory of Native Puerto Rico*, edited by P.
Siegel, pp. 55-87. University of Alabama Press: Tuscaloosa.

Arecibo Waste-to-Energy Project
Final EIS                                                                 January 2017

This page intentionally left blank.

# APPENDIX A: SCOPING REPORT

This appendix is available digitally online at
https://www.rd.usda.gov/publications/environmental-studies/impact-statements/arecibo-waste-energy-generation-and-resource

Printed copies of this appendix will be provided upon request. Please contact the following:

Steven Polacek
Rural Utilities Service
1400 Independence Ave SW, Stop 1571
Washington, DC 20250
(202) 205-9805
steve.polacek@wdc.usda.gov

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017

This page intentionally left blank.

Arecibo Waste-to-Energy Project
Final EIS                                                                                      January 2017

# APPENDIX B: REPRESENTATIVE CONDITIONS AND PHOTO-SIMULATIONS

This page intentionally left blank.

Arecibo Waste-to-Energy Project
Final EIS                                                                                          January 2017

Figures B-1 to B-10 show the existing visual resources from the key observation points discussed in Section 3.6.1.2 *Key Viewpoints Associated with the Project,* and provide a simulation of what the completed proposed plant would look like within its current surroundings.



**Figure B-1a.      Key Observation Point 1 – Looking Northwest from Avenue Domingo Ruiz, South of PR-2**



**Figure B-1b.      Key Observation Point 1 – Photosimulation of Project from Avenue Domingo Ruiz**

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017



**Figure B-2a.        Key Observation Point 1 Alternate – View from Avenue Domingo Ruiz
towards the Project Site**



**Figure B-2b.        Key Observation Point 1 Alternate – Photosimulation from Avenue
Domingo Ruiz towards the Project Site**

Arecibo Waste-to-Energy Project
Final EIS                                                                      January 2017



**Figure B-3a.**    **Key Observation Point 2 – Looking Southwest from the Yacht Club Parking Lot**



**Figure B-3b.**    **Key Observation Point 2 – Photosimulation of Project from the Yacht Club Parking Lot**



**Figure B-4a.**      **Key Observation Point 2 (Alternative) – Looking Southwest from Neighborhood just North of the Yacht Club**



**Figure B-4b.**      **Key Observation Point 2 (Alternative 2) – Looking Southwest from Neighborhood just North of the Yacht Club**

Arecibo Waste-to-Energy Project
Final EIS                                                                              January 2017



**Figure B-5a.        Key Observation Point 3 – Looking Southeast off of PR-681 near
                       Intersection with PR-2**



**Figure B-5b.        Key Observation Point 3 – Photosimulation of View towards Plant from
                       PR-681 near Intersection with PR-2**

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017



**Figure B-6a.**     **Key Observation Point 3 (Alternative) – Looking Southeast off of PR-681 near Intersection with PR-2**



**Figure B-6b.**     **Key Observation Point 3 (Alternative) – Photosimulation of Project from PR-681 near Intersection with PR-2**

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017



**Figure B-7a.     Key Observation Point 4 – View of Project looking Southeast off PR-2, before Crossing the Río Grande de Arecibo**



**Figure B-7b.     Key Observation Point 4 – Photosimulation of Project Looking Southeast off PR-2, before Crossing the Río Grande de Arecibo**

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017



**Figure B-8a.      Key Observation Point 5 – Looking Northwest off of PR-2 near
Residences**



**Figure B-8b.      Key Observation Point 5 – Photosimulation Looking towards Project Site
from PR-2 near Residences**

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017



**Figure B-9a.    Key Observation Point 6 – Looking East towards Project Site from PR-10 near the Baseball Stadium**



**Figure B-9b.    Key Observation Point 6 – Photosimulation Looking towards Project Site from PR-10 near the Baseball Stadium**

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017



**Figure B-10a.     Key Observation Point 7 – Looking East from Highway PR-22**



**Figure B-10b.     Key Observation Point 7 – Photosimulation of Project Site from Highway PR-22**

# APPENDIX C: RESPONSES TO COMMENTS ON THE DRAFT ENVIRONMENTAL IMPACT STATEMENT

Arecibo Waste-to-Energy Project
Final EIS                                                                January 2017

This page intentionally left blank.

# APPENDIX C: RESPONSES TO COMMENTS ON THE DRAFT ENVIRONMENTAL IMPACT STATEMENT

The draft environmental impact statement (EIS) for the Arecibo Waste-to-Energy Project was issued on July 29, 2015, and comments on the draft EIS were due on November 12, 2015. The following entities filed comments:

| Commenter | Date |
|---|---|
| Federation of Mayors of the Commonwealth of Puerto Rico | August 19, 2015 |
| ConWaste | August 20, 2015 |
| Puerto Rico Mayors Association | August 20, 2015 |
| Sierra Club Puerto Rico | August 20, 2015 |
| Wanda J. Soler Rosario (Gobierno Municipal de Barceloneta) | August 17, 2015 |
| Municipality of Fajardo | August 19, 2015 |
| Municipality of Toa Baja | August 19, 2015 |
| Coalition of Anti-Incineration Organizations | August 20, 2015 |
| Colegio de Médicos Cirujanos de Puerto Rico (College of Surgeons of Puerto Rico) | August 20, 2015 |
| Colegio de Químicos de Puerto Rico (College of Chemists of Puerto Rico) | August 20, 2015 |
| Colegio de Médicos Cirujanos de Puerto Rico (College of Physicians and Surgeons of Puerto Rico) | November 12, 2015 |
| Municipality of Guaynabo | August 20, 2015 |
| Municipality of Mayaguez | August 20, 2015 |
| Oficina Estatal de Conservación Histórica (State Historic Preservation Office) | September 16, 2015 |
| Arecibo Limpio | August 20, 2015 |
| Arecibo Municipal Legislature | September 15, 2015 |
| Center for Biological Diversity | November 10, 2015 |
| Puerto Rican Ornithological Society (SOPI) | November 10, 2015 |
| Cambio | November 11, 2015 |

| Commenter | Date |
|---|---|
| University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc. | November 12, 2015 |
| Earth Justice | November 12, 2015 |
| U.S. Department of the Interior, Office of Environmental Policy and Compliance | November 12, 2015 |
| Global Alliance for Incinerator Alternatives | November 12, 2015 |
| U.S. Environmental Protection Agency | November 23, 2015 |

In addition, more than 3,800 comment letters were received from individuals, of which 3,771 were part of an automatic postcard/letter mailing campaign.

The comments received are summarized below. We provide responses to those comments, and indicate, where appropriate, how we modified the text of the final EIS. The comments are grouped by topic for convenience.

**General**

**Comment G-1:** Earth Justice comments that the Project does not satisfy the U.S. Department of Agriculture, Rural Utilities Service (RUS), stated purpose and need and notes that the draft EIS is misleading for several reasons, including: (1) the electricity that will be generated by the Project is not needed; (2) it is unlikely that the Project will receive the solid waste it needs to operate at capacity; (3) without a water supply the Project will not be feasible; (4) the legal status of the Project is in question; and (5) RUS has failed to explain how funding the Project is within its authority.

**Response:** Although it appears that Puerto Rico has enough electricity generation to meet its current needs, the government has enacted a Renewable Energy Portfolio Standard (REPS) that would shift energy generation from the current petroleum-derived sources to increasing amounts of renewable sources. In doing so, Puerto Rico must also balance reserve capacity and reliability to ensure that the electrical needs of island residents can be met. In addition, Puerto Rico has been adding wind and solar capacity as described in 1.2, *Project Background*, in the EIS. In order to balance these requirements, Puerto Rico must develop renewable sources while simultaneously ensuring that existing sources (and subsequent capacity) continue to provide reliable electricity delivery system. The proposed Project would be considered a renewable energy source under the REPS.

Energy Answers has an agreement with the Puerto Rico Solid Waste Management Authority (SWMA) to secure solid waste. As recycling rates increase, more waste would be diverted to

recycling centers; however, waste that is not in recycling containers would be delivered to the Project as potential fuel for processing.

There is no information to support the claims that there is not a water source for the Project or that the legal status is in question. Energy Answers has received federal permits to proceed with the Project. Should Caño Tiburones water not be available, well water, waste water or river withdrawals, or some combination could be proposed and evaluated.

Information on the electric program loan and loan guarantee requirements, including rural eligibility requirements, can be found at 7 Code of Federal Regulations (CFR) §1710.

**Comment G-2:** The Center for Biological Diversity is concerned that the draft EIS does not assess potential direct and indirect environmental impacts on air quality, water quality, species habitat, visual resources, and environmental justice.

**Response:** The EIS meets the standards set by the Council on Environmental Quality (CEQ) on the contents of an EIS and level of analysis to meet the National Environmental Policy Act (NEPA) regulations.

**Comment G-3:** An individual commenter asks if RUS or another entity is the author of the draft EIS?

**Response:** RUS is the lead agency and lead author of the EIS with assistance from a third party contractor specializing in the preparation of NEPA documents.

**Comment G-4:** An individual commenter indicates that the draft EIS does not include proper information on the reasons why other sites were not considered. The technology assessment does not evaluate anaerobic digestion in place of incineration, and other technologies that are available are not considered. The commenter notes that the landfill congestion problem is not well defined in the EIS, and the proposal does not list the municipalities that will be served by the Project. The automotive shredding refuse disposal problem is not even disclosed. Finally, the commenter notes that the draft EIS does not address recent migration patterns.

**Response:** Energy Answers assessed the proposed Project location and based its proposal to construct and operate a waste-to-energy (WTE) plant on potentially available sites that met its criteria. Energy Answers concluded that the Arecibo site meets all of its criteria better than the other sites. Anaerobic digestion occurs when organic matter decomposes biologically in the absence of oxygen. The proposed WTE Project would use a much broader range of municipal solid waste (MSW), allowing for a more comprehensive solid waste management strategy than anaerobic digestion. As a result, anaerobic digestion was not considered a viable alternative. Alternative WTE technologies were evaluated in Section 2.1.2, *Waste-to-Energy Technologies,* of the draft EIS.

With regard to the statement that the congestion problem is not well defined, we have expanded the discussion related to solid waste management and SWMA's waste management forecast scenarios in Section 1.2, *Project Background*. The EIS includes the list of municipalities that would supply solid waste to the Project in Section 1.2.10, *Existing Operating Landfills Overview*, of the draft EIS (Section 1.2.7 of the final EIS). As for automotive shredder residue, the EIS clearly evaluates the potential for Energy Answers to include automotive shredder residue in its operations; however, Energy Answers must meet its obligations under the U.S. Environmental Protection Agency (EPA) Prevention of Significant Deterioration (PSD) permit, which allows, after completion of a combustion demonstration program, the combustion of up to 268 tons per day.

The EIS relies on the most current population information available for the island.

**Comment G-5:** Ten people submitted comments expressing support for the Project and urged RUS to approve the Project as soon as possible. The commenters note the following considerations as a basis for their support:

- The Project will contribute to addressing the waste disposal problem of Puerto Rico, which is a small island, with dense populations and limited space available for new landfills.

- The Project will bring economic opportunities such as jobs and other investments to the Arecibo area.

- The Project will combust MSW that cannot be recycled; therefore, instead of burying thousands of tons of waste in the landfill, the waste will be used to generate electricity.

**Response:** RUS acknowledges receipt of these comments and notes that a response is not necessary because the comments do not seek any changes to the EIS.

**Comment:** An individual commented in support of the Project, indicating that it is time that Arecibo go ahead with new opportunities and new methods for properly handling waste and generating energy. The individual requests that the draft EIS be accepted with the purpose of obtaining funding.

**Response:** RUS acknowledges receipt of these comments and notes that a response is not necessary because the comments do not seek any changes to the EIS.

## Project Overview and Description

**Comment P-1:** An individual comments that the draft EIS does not disclose the amount of trash that would be deposited in the proposed facility.

**Response:** Section 1.1, *Project Overview and Description*, clearly states the facility would receive about 2,300 tons of MSW per day.

## Project Background

**Comment PG-1:** An individual comments that the solid waste problem in Puerto Rico is not a current one.

**Response:** There is no information available to support the comment that solid waste management in Puerto Rico is not facing challenges as a result of limited disposal space, an existing network of aging landfills, and high waste generation rates coupled with low recycling rates.

## Project Alternatives

**Comment PA-1:** Earth Justice comments that the draft EIS fails to consider reasonable alternatives and that the overall analysis in the draft EIS is inadequate. In addition, Earth Justice notes that RUS failed to consider reasonable alternatives to divert waste from Puerto Rico's landfills and extend the life of existing landfills (e.g., source reduction, reuse, recycling, compost-to-energy/anaerobic digester facility) and to reduce Puerto Rico's dependence on oil-fired electric generation (e.g., renewables, energy efficiency programs, landfill gas energy). Furthermore, Earth Justice indicates that RUS' assessment of different site locations and alternative waste incineration technologies in the draft EIS is inadequate and that the no-action alternative presents an inaccurate baseline for comparison with the action alternatives.

**Response:** As described in the EIS, the Puerto Rico Electric Power Authority (PREPA) is the agency that oversees electricity generation and transmission throughout the island and SWMA is the authority for solid waste management and comprehensive planning on the island. These two agencies have policies in place that allow for the construction and operation of a WTE project that would meet their solid waste management and renewable energy production goals. In addition, comments from EPA on the PSD permit application process state that the development and implementation of waste management plans, including recycling programs, and the decisions of what would constitute the best waste management disposal options (including WTE facilities) for a community (e.g., municipality, state) are best made by local and state government(s) (i.e., SWMA and local municipalities). Similarly, the implementation of renewable energy projects that reduce the island's dependence on fossil fuels, the decisions regarding the types of projects, and the capacity and production capabilities for the island are best made by the local and state government. In this vein, this EIS evaluates the proposed action, which is the use of RUS financing to construct the electricity project, and as such, diverting waste, reducing oil consumption, and energy efficiency are outside the scope of the EIS.

Similarly, the evaluation of different site locations and alternative waste technologies does meet the CEQ guidelines for evaluating the proposed action and alternatives.

**Comment PA-2:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the alternatives analysis presented in the draft EIS are limited to a very brief discussion of different WTE technologies and note that less impactful alternatives were neither discussed nor analyzed, and as a result, the most beneficial options were ignored.

**Response:** The alternatives presented and available to RUS are clearly presented in the draft EIS. It is up to RUS to decide whether or not to make a loan, provide a loan guarantee, or do neither. Energy Answers is proposing a very specific project, and the NEPA process provides the opportunity to identify measures to avoid or reduce impacts or potential mitigation measures for potential effects; however, it is not for RUS to propose alternative WTE projects that it would fund.

**Comment PA-3:** EPA comments that pursuant to NEPA and the CEQ NEPA regulations, RUS should evaluate and discuss additional alternatives in the EIS. Specifically, EPA recommends that the EIS should explore and evaluate all reasonable alternatives, and it should include an analysis and discussion as to whether, in lieu of the proposed WTE Project, the MSW landfill capacity problem in Puerto Rico could be satisfactorily addressed through comprehensive source reduction, materials reuse, and recycling and composting programs. EPA recommends the SWMA 2008 Dynamic Itinerary "Back-up Case scenario," which considers a 35 percent diversion rate and no alternative WTE technology be analyzed and discussed in the EIS.

**Response:** Alternatives including comprehensive source reduction, materials reuse, and recycling and composting programs are outside the scope of this EIS and outside the scope of reasonable alternatives that RUS can finance with its Electric Programs. Although, there is a dual need for both projects (waste issues and energy demand), Electric Programs will only consider alternatives that are eligible for financing under the Rural Electrification Act.

**<u>Regulatory Requirements</u>**

**Comment RR-1:** The U.S. Department of the Interior, Office of Environmental Policy and Compliance, comments that it has determined that suitable habitat for federally listed species in its purview is not present in the project site; therefore, it concludes that no adverse effects on federally listed species are anticipated, and consultation under Section 7 is not needed. In addition, the U.S. Department of the Interior notes that the draft EIS addresses both the U.S. Army Corps of Engineers permit conditions (wetlands) and the U.S. Fish and Wildlife Service Endangered Species Act determination adequately.

**Response:** Comment noted.

## Aquatic Resources

*Water Supply*

**Comment WS-1:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the draft EIS does not consider the environmental consequences of the proposed extraction of 2.1 million gallons per day (mgd) of water from Caño Tiburones. In addition, the University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., suggest that the draft EIS over relies on Appendix B, Hydrologic-Hydraulic study of PRIDCO EIS 2010, and does not consider alternatives. Finally, they note that the draft EIS does not consider the decision letter from Puerto Rico Department of Natural and Environmental Resources (PRDNER) discussing the fact that a Caño Tiburones pump does not pump 100 mgd and that this is merely an overstated remark by Energy Answers.

**Response:** The 2.1 mgd of water from Caño Tiburones is water that is currently being pumped into the ocean to manage the Caño Tiburones ecosystem by controlling its water level. Energy Answers would install new, dedicated pumps to meet its projected water flow requirements, thus the capability of existing pumps is not relevant.

**Comment WS-2:** Cambio and an individual comment that the PRDNER has denied the permit for use of water from Caño Tiburones. At the public hearing, Osvaldo Rosario made a similar comment.

**Response:** The comment that the PRDNER water franchise has been denied is misleading because it is presented as if it is a final determination, when in fact, the denial has been challenged, and a final determination is yet to be issued.

**Comment WS-4:** The Center for Biological Diversity comments that draft EIS inadequately considers the environmental impacts that would result from pumping water from a wetland, and that the draft EIS must analyze alternatives to meet water needs. Additionally, the Center notes that the draft EIS does not provide enough detail on impacts on potable water supplies.

**Response:** The comment incorrectly states that water would be pumped from a wetland. Brackish water is currently pumped from Caño Tiburones at a diversion structure to manage the Caño Tiburones ecosystem by controlling its water levels. The Project would divert a percentage of that water pumped into the ocean for use at the facility, thus diverting an already pumped water source from Caño Tiburones. Regarding the Center's comment on impacts on potable water supplies, the EIS notes that up to 100,000 gallons per day of potable water for construction activities and operations (employees and boiler make-up water) would be delivered from the local municipal source as described in Section 2.1.3.1, *Puerto Rico Aqueduct and Sewer Authority's Water Main*, of the EIS, which is well within the capacity of the Santiago Vazquez Water Treatment Plant.

*Floodplains*

**Comment FP-1:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the draft EIS does not consider the effect of locating a WTE facility within the ecologically rich meanders of the Arecibo River. They also comment that the draft EIS fails to analyze the potential water quality dangers associated with floodplain modifications.

**Response:** Section 3.4, *Biological Resources*, of the draft EIS addresses the biological setting that the proposed Project would occupy, including its location on property along the Río Grande de Arecibo. Modifications to the floodplain are addressed in Section 3.2, *Water Resources*. Best management practices required as part of the PRDNER permit are designed to limit dangers to water quality.

**Comment FP-2:** Earth Justice comments that the draft EIS does not comply with Executive Order 11988 and CEQ guidance concerning floodplain management and flood risks.

**Response:** Section 3.2, *Water Resources*, of the EIS evaluates the potential flooding risk resulting from the modification of the site topography to construct the facility above the 100-year floodplain consistent with Executive Order 11988 and CEQ guidance.

**Comment FP-3:** An individual commenter notes that the draft EIS relies on a flawed human health risk assessment (HHRA) and suggests that the HHRA fails to consider the risks from various pathways, including the risks associated with stored ash within the floodplain when flood and toxic materials could be disbursed by flood water.

**Response:** The proposed Project site would be regraded so the lowest elevation of the facility would be above the 100-year floodplain. The effects of the grading and extra material on flooding is discussed in Section 3.2, *Water Resources*. As indicated in Section 3.2.2.1, by raising the finished floor elevations of Project buildings (including all the floors on which MSW or ash would be placed) one meter above the 100-year floodplain, it also places those floors above the 500-year flood elevation, therefore minimizing the risk of water from a major flooding event reaching stored Project MSW or ash.

*Flooding*

**Comment F-1:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the analysis of flood risk in the draft EIS is not complete because the effect of a potential flooding event on the incineration facility is not analyzed.

**Response:** Potential flooding is discussed in Section 3.2.1.3, *Flooding*, of the draft EIS. Further, the evaluation of flooding on facility operations goes beyond the requirements of an EIS—the purpose of the document is to evaluate the effects of a proposed action on the human

environment and not vice versa. RUS will perform appropriate technical feasibility assessments
as a part of its separate engineering and underwriting processes after Energy Answers submits a
formal application to the agency for financial assistance. Additional analysis has been added to
the final EIS in Section 3.10.2, *Public Health and Safety, Effects Analysis*, to address the
potential for temporary disruptions to the plant during flood events if vehicles are prevented from
using area roads necessary to access the plant.

*Water Pumping*

**Comment WP-1:** An individual commenter notes that the Project would extract large amounts
of water from a river or lake and suggests that there should be other options for waste
management.

**Response:** The proposed Project would use water currently being pumped into the ocean and
divert a percentage of that water to industrial uses, thus not affecting the originating stream or
lake referenced in the comment. Solid waste management options are limited in Puerto Rico
because of the dwindling number of certified landfills and the approaching capacity at existing
landfills. A comprehensive solid waste management approach would incorporate all measures,
including source reduction, reuse, recycling, WTE, and landfilling. The proposed Project is only
one part of a solid waste management plan proposed for the island. Other solid waste
management approaches are outside the scope of the EIS.

**Comment WP-2:** An individual comments that the draft EIS incorrectly states that
approximately 100 mgd of brackish water from the Caño Tiburones pumping station goes into
the Atlantic Ocean. The transfer of water to the WTE plant would hurt the wetland.

**Response:** The EIS correctly states this water is pumped into the ocean. A portion of this water
would be diverted to the plant for use in the WTE process. The water pumped from Caño
Tiburones is currently going to the ocean, and a portion of that water would be diverted to the
WTE plant so the proposed Project would not result in a reduction in the amount of water
available to the wetlands of Caño Tiburones.

*Water Quality*

**Comment WQ-1:** Earth Justice comments that the draft EIS fails to adequately consider impacts
on the quality of surface water and groundwater and excludes existing information regarding the
existing brownfield site and the implications of karst geology.

**Response:** The EIS considers the potential impacts on surface water and groundwater in Section
3.2, *Water Resources*. We have included additional information in the final EIS on the karst
geology in the region.

**Comment:** Ela M. Cruz, representing Citizens of el Karson Organization, commented that the proposed Project is within the karst geologic region of Puerto Rico, which is recognized as an important area for aquifer recharge and as a source of clean drinking water for more than 460,000 people and an industry that supports more than 100,000 jobs. The law for the conservation of the karst physiographic region (law 292 of August 21, 1999) protects, preserves, and manages the karst for the benefit of present and future generations. It represents one of our most precious non-renewable natural resources because of its geomorphology and the particular ecosystems developed in the region. The organization opposes the Project because it is incompatible with the long-term solutions to protect these important water sources.

**Response:** The final EIS includes more discussion of the karst physiographic region within Puerto Rico and its importance to the region.

**Comment WQ-2:** The Center for Biological Diversity comments that the draft EIS is inadequate in terms of its analysis of impacts on groundwater because it (1) fails to describe the plan for responding to spills or leaks; (2) does not adequately disclose the impacts of storing brackish water on-site and the chemicals that would be used to treat the brackish water and associated containment plans; and (3) does not detail the disposal plans for the brackish water and fails to include surface water impacts related to air emissions fallout, debris, and sediment.

**Response:** The EIS discloses the potential impacts on groundwater in Section 3.2, *Water Resources*. The EIS describes the proposed facilities and the perimeter dike systems that would contain any spills onto the property. Spill prevention plans would address any chemical spills at the facility. Brackish water would not be disposed but treated and used in the system to produce steam for electricity production and/or sale. Effluent from facility operations would be directed to the wastewater treatment plant.

*Wetlands*

**Comment W-1:** The Center for Biological Diversity comments that the draft EIS does not adequately consider sediment, runoff, and pollutant discharge impacts on wetlands.

**Response:** Section 3.4, *Biological Resources,* of the EIS describes the potential impacts on wetlands from construction and operation of the proposed Project. Specifically, the EIS describes the amount of existing wetlands that would be filled to elevate the ground floor elevation of the Project above the 100-year flood level and the types of operations that would occur on the site. The proposed facility would be located at a former industrial site, and additional sediment, runoff, or pollutant discharges to wetlands are not anticipated during Project operations.

## Wildlife/Habitat

**Comment WH-1:** Earth Justice comments that the draft EIS inadequately assesses the Project's impacts on biological resources and federally protected species and notes that the resource evaluation should be expanded beyond the footprint of the proposed Project site.

**Response:** The U.S. Fish and Wildlife Service (USFWS), the agency that oversees the protection of federally protected species provided a letter confirming that there are no known federally protected species in the proposed Project area.

**Comment WH-2:** The Center for Biological Diversity comments that the draft EIS does not include impacts related to fish even though the Project will modify the floodplain of the adjacent river. In addition, the Center for Biological Diversity notes that the draft EIS lacks information regarding federally listed species in the area, cites contradictory numbers of species on-site, and does not correctly consider wildlife displacement impacts. Finally, the Center indicates that the geographic scope considered in the draft EIS is limited.

**Response:** The Project would not alter the Arecibo River in any way that would affect fish. The EIS discloses the known federally listed species in the area; it is unclear which species the Center for Biological Diversity is referring to that should be included. The existing site is a former mill now in a state of disrepair. The geographic scope of the EIS is consistent with the proposed Project and its potential effects.

## Threatened and Endangered Species

**Comment TES-1:** The Center for Biological Diversity comments that draft EIS fails to consider cumulative impacts on threatened and endangered species and notes that the draft EIS must consider impacts on the Puerto Rican parrot and other birds. In addition, at the public hearing, José A. Colón Lopez, on behalf of Puerto Rican Ornithological Society, commented that the Puerto Rican parrot is an endangered species, and the only aviary is about 8 miles south of the proposed Project. The toxins released in the emissions could derail the restoration efforts of bringing the Puerto Rican parrot back from a population of 13 to now more than 500. He indicated the strong opposition of the society to this incineration Project.

**Response:** A discussion of biological resources has been added to Section 4.4.3, *Cumulative Effects, Biological Resources*, of the final EIS to discuss broader impacts on bird habitat from development projects. However, USFWS, the authority on endangered species in this process, has submitted a letter indicating there would be no adverse effects on listed species.

## Cultural Resources

**Comment C-1:** Oficina Estatal de Conservación Histórica (State Historic Preservation Office) comments that it is not clear in the draft EIS whether any new access roads or work staging areas would be needed for this Project and where they would be located. The area of potential effect (APE) should be expanded if any of these roads or staging areas will be placed outside the boundaries of the plant property or the linear right-of-way. Section 3.9.6, *Cultural Resources/Historic Properties*, *Effects Analysis*, should be revised to indicate that if historic properties are discovered or unanticipated effects on historic properties found during implementation of this undertaking after RUS has completed the Section 106 process, this would trigger the post review discovery procedures found in 36 CFR §800.13. In addition, the Oficina requests that all future correspondence include the Oficina Estatal de Conservación Histórica project number.

**Response:** The proposed Project would use existing roads and rights-of-way to construct the plant and linear facilities in the APE as currently defined to accommodate these features. Section 3.9.6, *Cultural Resources/Historic Properties*, *Effects Analysis*, has been revised in the final EIS to address this comment.

**Comment C-2:** Earth Justice comments that the draft EIS fails to adequately analyze the Project's impacts on historic and cultural resources. Three known historic sites are mentioned in the draft EIS; however, later in the document, the text says there are no historic sites. The draft EIS fails to recognize other listed areas as well.

**Response:** The EIS describes the three known prehistoric sites in the vicinity of the proposed Project; however, these sites are outside the APE. There are no known historic sites within the APE.

## Air Quality

**Comment AQ-1:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that qualitative data in the draft EIS fails to inform readers about the environmental impacts of the proposed action in clear terms and with sufficient information to make a reasoned choice between the no-action and proposed alternatives and mitigations. They suggest that the draft EIS should include the effect of the waste combustion units' energy output and a comparison of net greenhouse gas emissions and carbon exchange that would occur with and without the implementation of the proposed action. Furthermore, they note that the analysis should consider carbon sequestration potential and the net change in carbon stocks that are relevant in light of the proposed actions and timeframes under consideration. The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., also note that the draft EIS fails to consider the rate of emissions between the alternative actions and the non-action alternative.

**Response:** Emissions are considered relative to the proposed action and the no-action alternative. Additional requested analysis on carbon sequestration is outside the scope of the EIS.

**Comment AQ-2:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that draft EIS does not consider the potential negative impact of the air emissions from the incinerator on agriculture and the potential harm to the milk producing industry.

**Response:** The EIS relies on the HHRA, which includes an analysis on the potential risks associated with a full suite of agricultural issues, including consumption of locally grown meat and byproducts like milk.

**Comment AQ-3:** Earth Justice comments that the draft EIS fails to take a hard look at greenhouse gas emissions from the proposed WTE facility. It also notes that the draft EIS incorrectly states that the proposed facility will reduce greenhouse gas emissions.

**Response:** The evaluation in the EIS of greenhouse gas emissions potentially associated with the proposed Project is based on EPA-developed information in the PSD permit public record.

**Comment AQ-4:** The Center for Biological Diversity comments that the draft EIS does not adequately consider the Project's site area re-designation as a nonattainment area for lead and fails to reference the Lead Nonattainment State Implementation Plan for Arecibo and its associated requirements. The draft EIS misleads public and decision makers on matters related to lead emissions and other standards. An individual also comments that the draft EIS fails to acknowledge that the proposed site is classified as a non-attainment area and should not be developed. Another individual commented that the plant is proposed in an area currently listed as non-compliant for lead pollution, indicating the entire area is polluted. He noted that allowing this Project to be built and operate in this area would only make matters worse because municipal waste would be incinerated. In addition, the draft EIS uses incorrect baseline data to conclude emissions will not have a significant impact. The Center for Biological Diversity also comments that the draft EIS is inadequate in addressing a number of related topics such as: not considering the pending challenge to Energy Answers' PSD permit in U.S. Court; an insufficient cumulative effects analysis for air quality; failure to address potential emission impacts from the combustion of processed refuse and supplementary fuels; an estimate of vehicle emissions from construction traffic, and an incomplete and inadequate greenhouse gas analysis.

**Response:** Comments related to lead poisoning were received during the scoping process, and the topic was included in Section 3.3, *Air Quality*, of the draft EIS, which contains information about non-attainment for lead. EPA has already issued the PSD permit, and lead is not a pollutant regulated by this PSD. EPA, in responding to comments on the PSD permit, noted that lead is one of the criteria pollutants to which PSD applies in attainment areas. However, Arecibo is in a nonattainment area for lead, so EPA does not have authority to regulate it under the PSD program. EPA also noted that the lead emission rate of the Energy Answers facility is 0.31 ton

per year which is below the significant emission rate that would trigger review if lead were a PSD pollutant. A "significant emission rate" at a major source of lead is defined as 0.6 ton per year. If lead were a PSD regulated pollutant, Energy Answers' lead emissions rate of 0.31 TPY would fall below this threshold. Lead is regulated via Puerto Rico's nonattainment permit program; however, EPA's understanding is that the emissions of lead also fall below the de minimis thresholds for nonattainment regulation.

The combustion of supplementary fuels is approved under the existing PSD permit after a demonstration period verifies the efficiency of the municipal waste combustor units' air pollution control equipment in reducing the air pollutants resulting from the combustion of the supplementary fuels. Energy Answers could petition to use supplementary fuels and would have to monitor and report emissions reports consistent with provisions of the PSD permit. With regard to construction vehicle traffic, Section 3.3.2, *Air Quality, Effects Analysis*, includes an analysis of construction traffic and greenhouse gas emissions.

**Comment AQ-5:** An individual comments that the proposed plant would violate current air laws that restrict burning.

**Response:** The proposed Project received an EPA PSD permit, allowing for the discharge of emissions within the limits set in the permit.

**Comment AQ-6:** An individual commenter notes that the Project as proposed would emit a small percentage of toxic material. Additionally, the Project would create high amounts of ash that would need to be addressed.

**Response:** Section 3.3, *Air Quality*, of the EIS contains information about emissions. Section 3.8, *Transportation*, addresses the transport of ash waste to an off-site landfill.

**Comment AQ-7:** An individual comments that draft EIS inaccurately assesses the ability of the proposed plant to mitigate global warming effects.

**Response:** The proposed WTE Project addresses a suite of issues facing Puerto Rico, including a renewable energy portfolio demands and a shrinking amount of landfill space—this project was conceived to address both. As for its contribution to global warming, the Project would reduce future amounts of methane produced by MSW in landfills, which is 25 times more efficient at trapping Earth's radiation than carbon dioxide.

**Comment AQ-8:** The Global Alliance for Incinerator Alternatives comments that the draft EIS incorrectly states that the WTE Project will result in a reduction of greenhouse gas emission and notes that burning waste is dirtier than coal and emits toxic heavy metals. The Alliance also comments that the analysis of greenhouse gas impacts in the draft EIS analysis fails to compare

the Project to the greenhouse gas benefits provided by existing recycling and composting infrastructure and programs.

**Response:** Methane is produced naturally by the decomposition of organic matter in landfills and escapes to the atmosphere. Pound for pound, the comparative impact of methane on climate change is more than 25 times greater than carbon dioxide ($CO_2$). As such, reductions in methane offset the production of $CO_2$ greenhouse gas emissions as presented in Section 3.3, *Air Quality*. The comparison of alternatives is based on reasonable alternatives. The draft EIS includes a comparison of the no-action alternative (existing recycling/composting/waste management programs) with the proposed action. Section 1.2.4, *Solid Waste Management and Capacity*, of the EIS also describes the waste hierarchy, which is source reduction, reuse, recycle/composting, and then WTE and landfills.

### Energy Supply and Power Generation

**Comment ES-1:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the draft EIS fails to analyze relevant information regarding PREPA's power generation system, specifically PREPA's current generating capacity, its need for new energy, and its plans for fuel diversification and compliance with EPA's new Maximum Achievable Control Technology (MACT) regulations for power plants. In addition, the University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., note that the analysis in the draft EIS fails to recognize that PREPA has a generating capacity surplus and a trending scenario of lower energy sales and fewer clients as a result of the Puerto Rico's economic climate and declining population. They also comment that the rationale in the draft EIS that WTE will help in fuel diversification is overstated and insignificant. Finally, the University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., indicate that the draft EIS fails to analyze the effects of the proposed Project on the price of energy for consumers.

**Response:** The possible RUS action would be to approve or deny a request for financial assistance through a loan or loan guarantee to construct and operate the WTE facility. Alternatives for modifying PREPA's power generation system is beyond the scope of this EIS. Energy Answers, as a private developer, has a dual purpose and need for the project that addresses solid waste and energy production, whereas the RUS Electric Program is solely focused on the generation and transmission of the electricity projects under its authority.

The Project was developed as a response to PREPA's request for power generating proposals and the island's REPS requirements, which call for increasing amounts of renewable energy sources on the island. Section 1.2.1, *Energy Supply*, discusses the state of the electric supplies and energy sources currently available in Puerto Rico.

**Comment PG-1:** An individual comments that draft EIS is not clear on the level of generation the plant will produce.

**Response:** The draft EIS notes that the proposed Project would generate about 67 megawatts (MW) of electricity for distribution to the PREPA electric grid.

## Environmental Justice

**Comment EJ-1:** Earth Justice comments that the discussion on environmental justice in the draft EIS is inadequate, and the conclusion that no environmental justice analysis is required is wrong and clearly overstated. Earth Justice recommends that the EIS should not use a rigid comparison of the community of concern to the reference area, but rather should take a more flexible and adaptable approach accounting for a totality of factors.

**Response:** The EIS analysis of environmental justice was based on information developed by EPA as part of the PSD Permit public record and, in that case, EPA determined that issuing the PSD permit to Energy Answers would not result in disproportionately high and adverse human health or environmental effects on minority and low-income populations. The purpose of the executive order initiating environmental justice analysis is to direct agencies to address environmental and human health conditions in minority and low-income communities to avoid the disproportionate placement of any adverse effects from federal policies and actions on these populations. The EIS clearly details the populations potentially affected in the region of influence and specifically notes that these populations are considered minority and low income consistent with CEQ definitions (1997). The EIS also concludes that the potential impacts of the proposed Project would not have disproportionate impacts on minorities or impoverished populations.

**Comment EJ-2:** One individual objects to the way the region and its people are depicted in the draft EIS.

**Response:** To comply with the requirements of NEPA, the EIS process includes various classifications created to evaluate environmental justice issues to communities. Unfortunately these classifications can be interpreted as offensive in a setting where income and race metrics are compared to the rest of the U.S. The final EIS provides additional context in the environmental justice discussion that alters the metrics to better reflect Puerto Rico and its citizens.

## Land Use

**Comment LU-1:** The Center for Biological Diversity comments that the draft EIS does not disclose the proposed grade of the proposed on-site modifications, thereby preventing an analysis of possible sediment runoff. In addition, it notes that the draft EIS does not adequately analyze alternatives to floodplain modifications or impacts related to removing structures in the floodway.

**Response:** The EIS discloses (see 3.2.2., *Water Resources*, *Effects Analysis*) the changes to the site topography required to construct the facilities above the 100-year floodplain. Any alternatives to floodplain modifications would require the addition of soil to elevate the proposed Project out of the floodway.

## Solid Waste Management

**Comment SWM-1:** Comite Dialogo Ambiental, Inc., comments that the draft EIS fails to understand that new public policy in Puerto Rico is establishing a hierarchy of methods aimed at increasing recycling and composting of discarded materials and that the EIS should consider other alternatives.

**Response:** The EIS includes the solid waste hierarchy that was signed into law in 1992 and includes: source reduction, reuse, recycle/composting, WTE, and landfills. In the EIS, RUS only considers alternatives for eligible Rural Electrification Act purposes. Alternatives are required to meet the Power Purchase Agreement that was executed with PREPA.

**Comment SWM-2:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the draft EIS does not consider the environmental and cost consequences of transporting MSW from different points in Puerto Rico to the proposed WTE facility or public and environmental effects of transportation practices as they relate to solid waste transport. The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., also note that the draft EIS contains no discussion or analysis of potentially toxic ash content.

**Response:** The traffic study referenced in Section 3.8, *Transportation*, indicates the road network in the area of the proposed Project would accommodate the estimated increase in truck traffic entering and leaving the site. Section 3.8, *Transportation*, and 3.10 *Public Health and Safety*, describe the transport of the ash material to an EPA-approved landfill. We have added additional analysis to Section 3.11, *Socioeconomics and Environmental Justice*, in the final EIS to address the likelihood of increased operational expenses for municipalities that may be required to transport waste to the proposed facility compared to the existing costs associated transporting waste to a closer landfill. This qualitative discussion is balanced against the dwindling number of compliant landfills and the constraints on landfill capacities, which eventually would result in increases to operational budgets and solid waste management costs over time regardless of this project.

**Comment SWM-3:** Cambio comments that Section 1.2.1 of the draft EIS incorrectly states that the SWMA and the EQB have local responsibility for managing solid waste on the island and suggests that the municipalities are the entities with legal authority to establish and manage waste collection and disposal in Puerto Rico.

Case:17-03283-LTS   Doc#:13683-1   Filed:07/15/20   Entered:07/15/20 20:21:54   Desc:
Exhibit A   Page 327 of 354
Arecibo Waste-to-Energy Project
Final EIS

January 2017

**Response:** Cambio incorrectly states that the EIS give the municipalities the legal authority to establish and manage waste collection and disposal in Puerto Rico. In fact, this misconception is contradictory to the Puerto Rico Court of First Instance's ruling in the case of Solid Waste Management Authority v. Energy Answers Arecibo, LLC, which states: "the power to decide who is authorized to manage the solid waste disposal is contingent upon the public policy of the Commonwealth, which clearly states that the SWMA is the entity with the power to require the delivery of solid waste to a particular location. Furthermore, Article 12 of the Solid Waste Authority Law, supra, establishes that: It is the public policy of the Common wealth of Puerto Rico [...] giving the Authority the power set forth herein to require, direct and enforce the delivery of solid waste to particular disposal facilities."

**Comment SWM-4:** Earth Justice comments that the draft EIS fails to show that the Project will actually receive all the solid waste it intends to burn. In addition, Earth Justice notes that the draft EIS fails to take hard look at estimated ash production and proposed methods to manage it. Finally, Earth Justice observes that the draft EIS accepts as true, without further study or analysis, Energy Answers' claim that it can effectively make the ash waste stream nonhazardous.

**Response:** The EIS evaluates the proposed action, which is whether RUS will provide a loan or loan guarantee for the proposed Project. In evaluating the proposed Project, Energy Answers has supplied the contractual agreement with SWMA to provide municipal solid waste to the Project. As such, the EIS assesses possible impacts of operating the plant as proposed and is not required to show proof that the Project would actually receive the solid waste material.

Ash management and production is addressed in multiple places in the EIS, including Section 3.10, *Public Health and Safety,* and Section 3.11, *Socioeconomics and Environmental Justice*. Currently the ash is proposed to be trucked to an EPA-compliant landfill for disposal. Ash from currently operating WTE plants throughout the United States is disposed at approved Resource Conservation and Recovery Act landfills, and there is no information suggesting that the ash from this facility would not also meet these standards for landfill disposal. As discussed in Section 3.10, *Public Health and Safety*, Energy Answers proposes to collect the bottom and fly ash and other entrained components (e.g., activated carbon, lime) and deliver them to an EPA-regulated landfill.

**Comment SWM-5:** The Center for Biological Diversity comments that the draft EIS does not adequately analyze the impacts of storing and disposing combustion residues and fails to account for what happens to "rejected" waste that does not get processed. The draft EIS also fails to address where hazardous ash residue would be disposed and does not consider the impacts on landfills from bottom and fly ash. The Center for Biological Diversity also notes that the draft EIS fails to identify key aspects of on-site storage of processed refuse fuel before incineration. In addition, impacts related to storing MSW on-site are not addressed.

**Response:** The EIS adequately analyzes the impacts of management and disposal of combustion residues and the rejected waste that is un-processible. Waste arriving on-site would be inspected and unacceptable loads would be turned away. Waste items separated during on-site recycling and deemed unsuitable for combustion and energy capture would be recycled or landfilled appropriately. Ash originating from the facility would be hauled to a certified landfill to be disposed. Certified landfills would meet regulatory design standards to protect the environment, thus additional analysis on the impact of the ash to landfills is unnecessary. Design elements (e.g., covered pavilion, air pressure differences to control nuisance smells) have been considered in the potential impacts related to on-site storage of MSW, which would be on the order of hours to a few days during outages. The design elements would ensure impacts are limited to within the facility buildings.

**Comment SWM-6:** An individual comments that the draft EIS incorrectly states that Puerto Rico will run out of disposal capacity by 2018. Puerto Rico has created a recycling program in most of its cities that has not been incorporated into the draft EIS analysis. In addition, solid waste generation numbers presented in the draft EIS are not correct.

**Response:** Solid waste generating data were obtained from SWMA and include solid waste generation and recycling rates from as recent as 2014. The final EIS has been updated to include the most recent information.

## Socioeconomics

**Comment SE-1:** The Federation of Mayors of the Commonwealth of Puerto Rico comments that there is deep concern and dissatisfaction about the lack of information in draft EIS on the financial model proposed. The draft EIS also lacks a discussion regarding the economic impacts on the affected municipalities' in the event these municipalities are required to provide their municipal wastes to Energy Answers for incineration. The draft EIS does not provide any information concerning the anticipated increases in transportation costs and tipping fees and potential detrimental effects on the municipalities' operational budgets. The Federation requests that the draft EIS be revised to include these financial considerations into the socioeconomic impacts section. Ingrid Vila, on behalf of Fundadores de Cambio, commented that it is inappropriate for RUS to consider funding a project that is contrary to a law that requires the municipalities to contract for their solid waste disposal.

**Response:** We have added additional analysis to Section 3.11, *Socioeconomics and Environmental Justice*, in the final EIS to address the likelihood of increased operational expenses for municipalities that may be required to transport waste to the proposed facility compared to the existing costs associated transporting waste to a closer landfill. This qualitative discussion is balanced against the dwindling number of compliant landfills and the constraints on

landfill capacities, which eventually would result in increases to operational budgets and solid waste management costs over time regardless of this project.

**Comment SE-2:** The Puerto Rico Mayors Association comments that the draft EIS fails to include any information that assesses the social and economic impacts on municipalities in Puerto Rico. The draft EIS does not contain essential and critical information on the foreseeable significant and damaging socioeconomic impacts on the operational budgets and public services of affected municipalities as a result of increases in waste transportation and tipping costs associated with hauling MSW to Arecibo. The draft EIS does not properly evaluate the noted steady improvements in landfill operations, waste reduction, minimization, and recycling efforts that should be viewed objectively under the category of no-action alternative. The Puerto Rico Mayors Association comments that financial assistance to Energy Answers should be denied. Ingrid Vila, on behalf of Fundadores de Cambio, commented that the EIS discussion on the no-action alternative is superficial and inadequate, and that RUS is bound by NEPA to present all available reasonable alternatives in the final EIS.

**Response:** The EIS presents information on the state of landfills provided by SWMA as accurately as possible, including the island's limited remaining supply of landfills and the increasing recycling rates. Solid waste management under the no-action alternative is informed by SWMA's Dynamic Itinerary (SWMA 2008), which concludes that the island will continue to have solid waste management disposal issues.   The no-action alternative presented in the EIS fulfills the requirements for NEPA analysis.

**Comment SE-3:** The Municipalities of Fajardo and Toa Baja comment that the proposed incinerator would have a devastating economic impact in the municipalities. The operational model of the proposed facility would render and make ineffective any serious recycling efforts. The municipalities note that the operational model is in direct opposition to the stated policy of both EPA and the Puerto Rico Environmental Quality Board. The draft EIS also inaccurately suggests a growing population while in fact, Puerto Rico has experienced a population decline.

**Response:** A comprehensive solid waste management strategy for the island of Puerto Rico will require multiple strategies, including source reduction, reuse, recycling/composting, WTE, and landfill. Operating landfills will be a part of the comprehensive solution; however, their use is last in the hierarchy of solid waste management. Given the state of solid waste management presented by SWMA in its 2008 Dynamic Itinerary, the proposed Project could provide assistance to municipalities faced with non-compliant or space-limited landfills. SWMA estimates increases in recycling rates across the island; however, even with the estimated increase in recycling, there will be substantial amounts of solid waste requiring transport to either a WTE facility or a landfill.

**Comment SE-4:** Municipality of Guaynabo comments that the proposed Project will impact or violate law No. 81 of 1981 (Autonomous Municipalities of Puerto Rico Law). The proposed Project would interrupt current strategies aimed at recycling and waste management and have economic impacts on municipalities and on municipal budgets for the costs of transportation and disposal. In addition, the proposed Project would threaten municipal jobs. Furthermore, Municipality of Guaynabo comments that the Project promotes establishing a monopoly on waste management.

**Response:** The EIS does not take a position as to whether or not the proposed Project is in violation of any laws related to the autonomy of municipalities. With regard to the potential effects the Project may have on the municipalities that have been identified as supplying MSW to the facility, Section 3.11, *Socioeconomics and Environmental Justice*, in the final EIS has been revised to address the potential increases to operational budgets related to increased travel times for municipalities. Ultimately, this increase in cost related to travel would likely be offset by increased landfill costs as a result of the number of closing, at capacity, or non-compliant landfills throughout Puerto Rico that will be unable to accept MSW.

**Comment SE-5:** ConWaste comments that the draft EIS fails to properly assess the proposed Project's impacts on the municipal recycling programs in Puerto Rico. Energy Answers' operational model for the plant is totally removed and disengaged from the existing municipal recycling programs and in direct conflict with such efforts. ConWaste believes that the Energy Answers' operational business model would encourage increased domestic waste incineration to meet its tipping fee and energy sale expectations while discouraging municipal recycling initiatives; undermining waste prevention programs; and jeopardizing the effective implementation of reducing, reusing, and municipal recycling efforts. ConWaste comments that the draft EIS does not address the incompatibility of increasing recycling efforts in the designated municipalities and suggests that the final EIS should present a more comprehensive analysis of alternatives that would not undermine municipal recycling efforts and programs. Furthermore, ConWaste suggests that the final EIS should evaluate and assess the potential impacts on municipalities that would not be able to implement effective reduction and recycling programs because of increases in the cost of transporting and disposing of their MSW at the proposed facility. Finally ConWaste notes that no information is provided in the draft EIS concerning the anticipated increases in transportation costs and tipping fees and potential impacts on the operational budgets.

**Response:** The draft EIS evaluates potential impacts of RUS' action to either approve or deny financial assistance to Energy Answers for constructing and operating the WTE facility. The evaluation of alternative solid waste management strategies is outside the scope of the EIS and actions that would be eligible for financing through RUS Electric Programs.

A comprehensive solid waste management strategy for the island of Puerto Rico will require multiple strategies, including source reduction, reuse, recycling/composting, WTE, and landfill. Operating landfills will be a part of the comprehensive solution; however, it is the last option in the hierarchy of solid waste management. Given the state of solid waste management presented by SWMA in its 2008 Dynamic Itinerary, the proposed Project could provide assistance to municipalities faced with non-compliant landfills or landfills approaching capacity. SWMA estimates increases in recycling rates across the island, but even with the estimated increase in recycling, disposal of substantial amounts of solid waste will still be required in either WTE or landfill.

The alternatives in the EIS address the range of alternatives presented to RUS so it may decide whether to make a loan or loan guarantee to Energy Answers for its proposed Project in accordance with the requirements of the Rural Electrification Act.

**Comment SE-6:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the draft EIS fails to consider the very serious fiscal and economic situation of Puerto Rico as well as the economic consequences of the Project, including its viability. The draft EIS relies on incomplete and outdated information and does not include the fact that RUS lacks the authority to issue a loan or loan guarantee to Energy Answers. The draft EIS wrongly states the Project is modest in design. The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., further note that approval of this Project will negatively affect other federal efforts (i.e., recycling programs) and observe that the draft EIS limits the effects analysis of socioeconomic aspects to alleged increases in employment.

**Response:** The EIS states the increase in truck traffic during construction of the project would result in a modest increase because the roads were designed to accommodate the estimated increase and that the addition of the transmission line in an area with other industrial development, including other transmission lines, would have a modest impact to the land use of the site. This is materially different from suggesting the design of the plant itself is modest. The size of the Project and the potential impacts are considered substantial enough to trigger an EIS (as opposed to an environmental assessment). As for this Project's potential to negatively affect recycling programs, the proposed Project is consistent with the SWMA's comprehensive solid waste management plan for the island of Puerto Rico, which involves all tiers of the solid waste hierarchy. Section 3.11.2 of the EIS, *Socioeconomics and Environmental Justice, Effects Analysis*, has been updated to include a qualitative discussion of the potential effects the transport of MSW would have on the municipalities where the MSW originates. This discussion is balanced with SWMA forecasts in landfill closures and capacity constraints in the future, which would also likely increase the costs to these same municipalities.

**Comment SE-7:** The Coalition of Anti-Incineration Organizations comments that it opposes the federal loan to the Energy Answers WTE facility because the Project puts the dairy industry at risk and because the funds being used for the facility are public instead of private.

**Response:** The HHRA referenced as part of Energy Answers' project investigated milk consumption as a potential pathway. Results from that analysis are presented consistently in the EIS in Section 3.10, *Public Health and Safety*.

**Comment SE-8:** Cambio comments that the draft EIS incorrectly states that the initial waste disposal tariff is $36/ton.

**Response:** The waste supply agreement Energy Answers has with SWMA contemplates the implementation of Municipality Agreements and does not fix the prices on the Municipality Agreements or prevent them from being lower than the $36.05 established in the Energy Answers-SWMA agreement. A subsequent amendment to the agreement includes language to specifically ensure that municipalities have access to the lowest-priced, long-term, fully compliant solid waste management capacity available.

**Comment SE-9:** Earth Justice comments that the draft EIS fails to explain the legal status of the Project, and that RUS fails to explain how funding the Project is within its authority. In addition, Earth Justice notes that the draft EIS does not use a readily available tool for analyzing the social cost of carbon from the proposed incinerator. The draft EIS also ignores many adverse, long-term effects on municipalities required to supply the WTE facility with MSW.

**Response:** Information on the electric program loan and loan guarantee requirements, including rural eligibility requirements, can be found at 7 CFR §1710. Although the EIS does not use the specific tool referenced by Earth Justice to calculate the social cost of carbon, it does disclose, consistent with the EPA-issued PSD permit, the estimated amounts of carbon (and greenhouse gas emissions) produced by the Project and relies on methods and analysis common to NEPA proceedings. To provide additional context to the potential effects to the municipalities, we have updated the EIS to include a qualitative discussion on the potential effects that hauling the MSW to the facility may have on the originating municipalities.

**Comment SE-10:** An individual requests that additional information be included in the final EIS concerning Energy Answers' loan application.

**Response:** This issue is addressed in final EIS in Section 1.3.1, *Rural Utilities Service*.

**Comment SE-11:** An individual comments that the draft EIS is not clear on the loan process for the proposed WTE facility and asks why the Project is now seeking public funds when it originally was supposed to be privately funded. The individual is opposed to RUS providing

funding to Energy Answers' project because funds for other proposed projects for rural communities with infrastructure needs will not be available.

**Response:** Once the NEPA process is complete and a record of decision is signed, Energy Answers could submit its application for a loan. RUS engineering and financial analyst specialists would evaluate the loan application for its merits and the terms under which RUS would make a loan.

**Comment SE-12:** An individual comments that the draft EIS fails to disclose that incineration is the most expensive process for disposing of waste and generating electricity and objects to RUS providing loans to a private company.

**Response:** Consistent with RUS' authority, the proposed action is the loan or loan guarantee for the Energy Answers' Waste-to-Energy Project. Because there are no other waste-to-energy alternatives under consideration there is no need to compare the price of combustion of the solid waste with other solid waste management scenarios or energy production alternatives. RUS provides loans to private companies throughout the United States and additional information on the electric program loan and loan guarantee requirements, including rural eligibility requirements, can be found at 7 CFR §1710.

## Public Health and Safety

**Comment PHS-1:** The University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., comment that the analysis presented in the draft EIS establishes that "the potential risks associated with the combined emissions estimated to result from the two proposed combustors were below the EPA cancer risk range and benchmark levels for human health." However, the University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., find the analysis inadequate because the draft EIS does not use clear and accessible language and lacks an alternatives assessment in its risk analysis. In addition, the University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., note that the draft EIS does not properly consider the health effects of the dangerous dioxins, nanoparticles, and other pollutants, nor does it consider the combined emissions of trucks. Finally, the University of Puerto Rico School of Law and Puerto Rico Legal Services, Inc., finds that the 6.2-mile limit for health evaluations included in the draft EIS is much too narrow.

**Response:** The language used to present the potential effects of the proposed Project on the public health and safety meets the CEQ Guidelines for NEPA documents. As described in Section 2.0, *Proposed Action and Alternative*, Energy Answers evaluated various WTE technologies, determined that the proposed Project was its preferred method, and pursued and obtained a PSD permit from EPA. The proposed action for RUS is to make a loan or loan guarantee for the Project. As such, there are no alternatives to assess with regard to risk—only

the proposed Project and the emissions set by the PSD permit (and the risks summarized in Section 3.10, *Public Health and Safety*).

**Comment:** Guarisa Arias commented that Section 3.10.2.2 of the EIS appears to have ambiguous language, noting that the study on pollutants describes something hypothetical where a person consumes milk and eggs from a single farm that is 10 kilometers away and it will not have adverse effects on their health, while elsewhere the EIS says the study does relate to cancer. Another individual comments that, if this Project is funded, it will be environmental and health genocide that will hurt the agricultural farming in the Arecibo area and the milk and meat industries. Lastly, another individual made similar comments that the proposed Project would have negative impacts on health, children, and agriculture.  Dr. Cruz Maria Nazario commented during the public hearing that waste incineration indisputably produces persistent substances, irritants (including carcinogens), respiratory obstructions, and other substances harmful to human health. Dioxins and furans, substances that are highly toxic to humans and that result from burning waste are of particular concern to public health professionals. Contamination of land and water and bioaccumulation of contaminants in the fat in the milk will result from the incineration of solid waste.

**Response:** The HHRA was conducted in accordance with the relevant regulatory guidance noted above and, as such, is unlikely to underestimate the potential for adverse health effects. The HHRA discusses the associated uncertainty and concludes that, "Overall, assumptions used to complete this assessment were conservative and are expected to overestimate cancer risks and noncancer hazards associated with emissions from the proposed RRF." In so doing, the assessment notes that, "It was conservatively assumed that 100 percent of the animal's diet is grown locally on soil that receives COPC deposition, COPCs in soil are 100 percent bioavailable, and metabolism does not decrease the COPC concentrations in fat and muscle tissue." Section 3.10, *Public Health and Safety*, includes a summary of the HHRA, which specifically analyzed the potential risk to milk and meat products and concluded that the Excess Lifetime Cancer Risks and Non-cancer Hazard Indices for all the constituents of potential concern combined and across all pathways, fall within, or are less than the acceptable EPA range and benchmark.

**Comment PHS-2:** Earth Justice comments that the assessment of impacts on public health in the draft EIS does not withstand scrutiny because the analysis does not consider numerous studies that show incinerators around the world lead to excessive levels of cancers in the affected populations. The analysis in the draft EIS unlawfully relies on the HHRA conducted by Energy Answers, which underestimates risks. Earth Justice comments that the analysis in the draft EIS incorrectly assumes that air emissions will be similar to the SEMASS facility. In addition, the analysis does not take a hard look at the impacts of lead exposure posed by the incinerator and provides no basis for any conclusion that lead emissions in Arecibo are declining. Finally, Earth

Justice comments that the draft EIS does not comply with NEPA's mandate to consider cumulative impacts on human health.

**Response:** Waste-to-energy facilities of many different configurations, design standards, and regulatory requirements exist around the world. To compare each of those to the setting here is unreasonable when the HHRA performed meets the standards for analyzing risks from this particular proposed Project.  As for the comments related to relying on the SEMASS facility, air emissions from waste-to-energy facilities are based on the technology used and the composition of the fuel. Studies related to the potential fuel mixture that would arrive at the proposed Arecibo plant are similar to those in SEMASS facility; as such there should be similar emission levels.

As stated in Section 3.3, *Air Quality*, according to EPA, the major sources of lead emissions in the air today are ore and metals processing and piston-engine aircraft operating on leaded aviation gasoline (EPA 2014c). Emission estimates of lead from the proposed plant resulted in the findings that a PSD analysis of lead emissions was not required for permitting purposes because the maximum annual emissions of 0.31 ton per year is below the significant emission rate of 0.6 ton/year. The analysis also summarizes Energy Answers' additional effort to model lead dispersion rates which also showed lead concentrations well below NAAQS.

**Comment PHS-3:** The Center for Biological Diversity comments that the draft EIS does not address environmental impacts from its temporary workforce. It also indicates that the draft EIS needs to analyze human health impacts from all emission and contaminant sources and concludes that the scope of alternatives in the draft EIS is too narrow.

**Response:** The temporary work force would be supplied locally and regionally, resulting in a short-term boon to the local businesses (e.g., hotels, restaurants) serving the workers.

**Comment PHS-4:** An individual comments that the air pollution in Arecibo is already a problem because of surrounding factories and notes that the WTE plant will make these problems worse. The individual also comments that there is no concern for the numerous laws being broken and suggests that the health of the population is more important than any reason for this plant.

**Response:** The EPA PSD permit issued for the Project accounted for the ambient air quality and potential impacts associated with a new WTE facility. To protect the air quality and ultimately, human health, the PSD permit sets emission limits for specific compounds as described in Section 3.3, *Air Quality*.

**Comment PHS-7:** An individual comments that information presented in the draft EIS is wrong on critical issues like the direction of air flow from the proposed stack. The air will carry toxicity and produce sickness. The commenter notes that the economy and population of Puerto Rico have been decreasing, resulting in decreased energy usage, and suggests that the plant is not

needed in the current energy climate. Also, the individual comments that Puerto Rico is in debt, and funding a project like this will only increase the debt.

**Response:** Air dispersion information is based on real data from the local area. Section 3.3, *Air Quality*, addresses the potential impacts on air quality while Section 3.10, *Public Health and Safety*, addresses potential impacts on the public. Although it is true that the population of Puerto Rico has been decreasing over the past decade, the amount of energy from renewable sources is well below the REPS set by the Puerto Rican government. This Project would help to meet those standards. So, although the energy demand may be dropping because of population migration, the overall energy mix is required to change. A loan or loan guarantee from RUS would be made to Energy Answers and it would be responsible for repayment, not the Puerto Rico government.

**Comment PHS-8:** An individual comments that the proposed Project would jeopardize the health of nearby citizens. Recycling is minimal and composting is not practiced either, both would be better options. The individual requests that RUS provide funds to other options.

**Response:** While it is commonly accepted that recycling and composting are preferable to WTE on the solid waste management hierarchy, this Project could still be successful and compatible with improvements to island-wide recycling and composting rates. SWMA has set a target of 30 percent recycling island wide, which if met would help extend the life of existing landfills; however, it would not solve all the solid waste management issues identified by SWMA. A comprehensive solid waste management program includes all of the solid waste management strategies, including source reduction, reuse, recycling/composting, WTE, and landfill.

**Comment PHS-9:** An individual comments that the installation of this incinerator is not appropriate for Puerto Rico. Arecibo is still trying to recover from past experiences with companies that contaminated the area. The commenter notes that EPA or EQB (Junta de Calidad Ambiental de Puerto Rico or JCA) do not have the tools or resources to constantly monitor the environment for pollution, and suggests that recycling is the way to go forward.

**Response:** Recycling is part of a comprehensive solid waste management program; however, recycling programs alone cannot alleviate the pressures facing landfills on Puerto Rico. A comprehensive solid waste strategy would include all forms of solid waste management including WTE. Reporting requirements for point source emissions are required by the EPA PSD permit and provide the tool for tracking air quality associated with the WTE facility.

## Comments from Public Hearing Transcript

**Comment:** At the public hearing, Mirabelle Marrero, Vice President at ConWaste, commented that Energy Answers' business model assumes that the 2,100 tons a day of public waste that it will receive as prime material for incineration and recuperation of energy will have already gone through pre-classification, material recuperation, and recycling. This operating model will be implemented totally unconnected to and separate from the municipal recycling programs and in direct conflict with those efforts. This Project will discourage recycling initiatives and undermine waste prevention and reduction efforts. She notes that the draft EIS does not analyze that the proposed Project is incompatible with the recycling efforts of the municipalities.

**Response:** Recycling efforts in the municipalities should continue as planned with separation occurring at the source of solid waste production.  Solid waste from bins not including recyclables would be transported to the Project for use in the plant instead of to a landfill which is where it would be disposed of without the Project. The two actions, recycling and shipping solid waste to the Project are independent of each other and should not influence the recycling effort at the household level.

**Comment:** At the public hearing, Raúl Santiago, on behalf of the Puerto Rico Mayors Federation, commented that Energy Answers' proposed Project is inconsistent with the law because it will force municipalities to truck their waste at their expense and tipping fees to the proposed plant.

**Response:** Similar to written comments provided by Federation of Mayors.

**Comment:** At the public hearing, Osvaldo Rosario commented that the declaration by the prior administration that there is an energy emergency is outdated and that declaration has expired. He noted that Puerto Rico has an energy surplus. Based on the cost of the plant and operations and maintenance, this will be the most expensive electricity in history.

**Response:** The plant would be considered renewable under Puerto Rico's REPS. The cost would be part of RUS loan package analysis.

**Comment:** At the public hearing, Osvaldo Rosario commented that the text in Section 2.1.2.6 of the draft EIS regarding the analysis of different technologies dismisses all technologies, including mass burn, but that Energy Answers is proposing essentially a mass burn Project with some metal removal prior to burning. As such, this alternative should be dismissed as well.

**Response:** Additional text is included in Section 2.1 of the final EIS that highlights the differences between mass burn and the proposed Project.

**Comment:** Osvaldo Rosario commented that the ash is not useful as depicted in the draft EIS and nobody wants it.

**Response:** As described in the EIS, Energy Answers proposes to dispose of both the bottom ash and fly ash in an EPA-approved landfill.

**Comment:** Osvaldo Rosario commented that Energy Answers intends to recycle everything arriving at the plant that is readily recyclable, but that this idea is nonsense because everything will arrive at the plant compacted in the transport trucks ready for mass burn.

**Response:** The EIS describes the material processing sequence in which select recyclable materials are separated out prior to combustion. Additional ferrous and nonferrous metals are also separated out post-combustion as part of the bottom ash processing.

**Comment:** Dr. Obed Garcia, on behalf of Colegio de Médicos Cirujanos de Puerto Rico commented that President Obama's Clean Power Plan proposal is inconsistent with supporting Energy Answers' proposed plant.

**Response:** The Clean Power Plan is a plan aimed at combating climate change that was first proposed by EPA in June 2014 and a final plan was unveiled by President Obama in August 2015. The Clean Power Plan sets a national limit on carbon pollution produced from power plants and requires states to meet specific standards with respect to carbon emissions. States are free to reduce emissions by various means and must submit emission reduction plans by September 2016. Because the emission reduction plans have not yet been submitted it is not clear if waste-to-energy is included in Puerto Rico's emission reduction plan. Given that Puerto Rico included waste-to-energy on its list of renewable energy technologies for consideration under its REPS it is unlikely the Project would be considered inconsistent with the Clean Power Plan objectives. In addition, overall emissions from the Project would pose less global warming potential due to the reduction in landfill methane production resulting from the diversion of waste from landfilling by the Project.

**Comment:** Osvaldo Rosario commented that the EIS fails to discuss the activated carbon and lime material that will be used in the emission traps to reduce the amount of toxic and carcinogenic compounds. He also noted that the EIS fails to discuss the fate of the compounds in the traps and the activated carbon and lime that potentially could represent a greater risk than the ash generated.

**Response:** The final EIS includes an enhanced discussion on activated carbon and lime and its eventual fate as part of the fly ash waste material that would be disposed of at an EPA-approved landfill.

**Comment:** Osvaldo Rosario commented that earlier versions of Energy Answers' proposal differed from the EIS in the commitment to burning automotive shredder residue, construction wood waste, and automobile tires in addition to domestic waste. The EIS only adds up to 72 percent of the 2,100 tons in the EIS from domestic waste thus the supplementary fuels will be part of the domestic supply for the plant to function.

**Response:** We have added to the discussion of supplementary fuels in Section 2.2.2.9 of the final EIS to indicate the daily limits of supplementary fuel as specified in the EPA PSD permit. As described in the EIS, supplementary fuels would be allowed after Energy Answers conducts a combustion demonstration to verify the efficiency of the control equipment in reducing the air pollutants resulting from the combustion of these fuels. As described in the PSD permit, during the combustion demonstration period, Energy Answers would determine the maximum acceptable content of chlorine and heavy metals in automotive shredded residue for which the hydrogen chloride and heavy metals emission limits specified in the permit will be continuously met.

**Comment:** Osvaldo Rosario commented that Energy Answers' wind model states that winds are traditionally north-south; however, all the airports in the area face northwest, and the Federal Aviation Administration requires planes to take off into the wind. We should trust the Federal Aviation Administration.

**Response:** The EPA approved the modeling wind directions and documented its approval in the record for the PSD permit. The typical wind direction is discussed in Section 3.3.1.6, *Local Meteorology*, of the EIS.

**Comment:** Osvaldo Rosario commented that the EIS includes no information about the risk of nanoparticles on human health. The EIS notes that some nanoparticles will remain in the filters, but suggests that they pose no risk. Mr. Rosario indicated that he was sure that a risk exists and that part of the 40 percent unaccounted for (in the mass balance) includes nanoparticles that are not getting caught. Pedro Saade Lloreas commented that the EIS concludes that nanoparticles can be ignored. This conclusion is reached without any support, and the only study supporting it is one performed by an institute that receives more than 50 percent funding from the automobile industry.

**Response:** The EPA PSD permit allows for the emission of nanoparticles within limits originating from municipal waste combustor organics (measured as dioxins and furans) at the following concentrations:

   a. 10 nanograms per dry standard cubic meter, corrected to 7 percent oxygen (average of three test runs; minimum 4 hour/test run)

   b. 5.10E-06 lb/hr (1-hour average)

   c. 2.036E-05 TPY (12-month rolling total)

Energy Answers is required to monitor and report air quality monitoring results, which are required to show emissions below these concentrations for the duration of the PSD permit.

**Comment:** Gregorio Suarez Igartua, representing the municipality of Mayaguez and its mayor Jose Guillermo Rodriguez, commented that the Project would be financed by RUS, and the loan would be paid back through contract payments generated by the agreement between Energy Answers and SWMA and the municipalities generating the contracted waste. This contract would result in an additional $6 million in expenses for the municipality to manage its solid waste. He commented that this type of agreement is unlawful and that the municipality is prepared to defend itself through the courts.

**Response:** RUS has not received a loan application from Energy Answers and cannot comment on revenue streams associated with the Project. Those analyses would be performed after RUS conducts an evaluation of a loan application.

**Comment:** Ingrid Vila, on behalf of Fundadores de Cambio commented that the EIS incorrectly relies on the previously prepared Energy Answers EIS, which presented population projections from 2006. The most recent 2013 census information states Puerto Rico population will decrease through 2050, with a corresponding downward trend in solid waste generation.

**Response:** Section 1.2.6, *Solid Waste Generation in Puerto Rico*, and Section 3.11, *Socioeconomics and Environmental Justice*, in the final EIS includes updated population data to present the most current information available.

**Comment:** Ingrid Vila, on behalf of Fundadores de Cambio, commented that the Project would generate less than 0.026 of the energy demand of Puerto Rico and would not provide any energy benefits for the alleged rural area that is the intended target impact area for this investment of federal funds. As a result, she indicated that the Project is incompatible with the policy that justifies the existence of RUS.

**Response:** Information on the electric program loan and loan guarantee requirements, including rural eligibility requirements, can be found at 7 CFR §1710. Need is described in Section 1.3, *Purpose and Need for the Action*.

**Comment:** Myrna Conty commented that on behalf of everyone at the public hearing that we offended that the people before us do not understand what we are saying and do not speak any Spanish. Further, we are vocal in our opposition. We are not drug dealers, and you do not need to bring police dogs to a public meeting. We are offended at the way we are being treated here and suggest that at the final meeting you have the decency to bring people that speak Spanish since you are the decision makers.

**Response:** RUS followed its public involvement procedures located in 7 CFR §1794 and standard industry practices when conducting the hearing. The meeting was recorded, with transcription services performed in both Spanish and English. The meeting facilitator and support personnel were bilingual. Security officers were present to maintain order, conduct crowd control, and ensure the safety of RUS staff and the public.

**Comment:** Dr. Angel Gonzalez commented that Energy Answers was untruthful because it originally said the Project would be privately financed, and now Energy Answers is seeking public financing. In addition, Energy Answers first said the Project would supply 4,000 jobs; however, its project in Baltimore (with twice the amount of solid waste) only requires 400 employees. Dr. Gonzalez also noted that as the population ages, people consume less so there will be less fuel for their incinerator.

**Response:** RUS has conducted an independent review of the jobs proposal as part of the EIS.

**Comment:** Dr. Angel Gonzalez noted that the EIS does not disclose how the ash will be taken off–site and which roads will be used.

**Response:** The EIS correctly characterizes Energy Answers proposal to send both bottom and fly ash waste to an EPA-approved landfill. The actual site is left to market conditions and is not considered part of the analysis.

**Comment:** Dr. Angel Gonzalez commented that if the proposed Project is an energy project, then the EIS should evaluate alternative energies like wind and solar as part of the decision making process.

**Response:** The EIS is prepared to analyze the potential effects from the proposed action, which is providing a loan to build the proposed WTE Project.

**Comment:** Pedro Saade Lloreas commented that the EIS is disrespectful to the people of this town because it presents information that Energy Answers already presented. He noted that not a single doctor appears on the list of preparers and that the EIS does not include a single sentence on the limitations of the models or data presented, suggesting that all statements are assumed to be definitive.

**Response:** The EIS was prepared independently of Energy Answers and relied on previously prepared materials for Energy Answers and the EPA PSD permit process.

**Comment:** Pedro Saade Lloreas commented that there are strong conclusions drawn in the EIS without sufficient data to support them. He specifically cited the lack of computations relied on to conclude that the Project will be good for the global climate.

**Response:** As discussed in the EIS and the EPA PSD permit, the amount of greenhouse gas emissions from MSW combustion would result in a reduction compared to the baseline landfill option, which produces methane, a more potent greenhouse gas.

**Comment:** Pedro Saade Lloreas commented that the impact of transportation of the ashes is not considered.

**Response:** Section 3.8, *Transportation*, addresses the additional truck trips that would occur to and from the plant site during Project operations, including the transport of ash materials off site.

**Comment:** At the public hearing, Aleida Centeno Rodriguez commented that Section 3.2.1.1 of the EIS states the Project would be located in prime farmland, which would take this land out of agricultural use, leaving us without prime places to grow our foods. The contamination that may result from the Project to the air and water would only add to this.

**Response:** The commenter incorrectly states the EIS describes the Project as proposed for a site designated as prime farmland. The facility would be located on an industrial site/brownfield site. The Farmland Policy Protection Act does not apply to this Project because of the former industrial nature of the proposed site.

**Comment:** Aleida Centeno Rodriguez commented that the EIS relied on the Arcadis report that did not analyze Arecibo but analyzed Catano, San Juan as the control population as part of the analysis. That report did not recognize that Arecibo has pollution sources like the Battery Recycling Company, ITON, GE Caribbean, Thermo King, PREPA, Safetech Corporation Carolina, Sanjo, Merck Sharp & Dohme, Pfizer, Abbott, Avis, Safety-Kleen, Golden Hammer and Macom Inc.

**Response:** Energy Answers has received a PSD permit from EPA that allows emissions from the Project at levels deemed below thresholds that would deteriorate the environment.

**Comment:** Aleida Centeno Rodriguez commented that the Arcadis study also failed to include in its analysis all the toxic compounds and hazardous wastes already present in the Arecibo area (listed them on the record). The report also omits the fact that Energy Answers is proposing that 30 percent of the garbage would be tires, wood contaminated with insecticides or lead paint, and plastic parts from cars—all hazardous waste.

**Response:** The commenter is incorrect in stating that the EPA PSD permit would allow the burning of hazardous wastes. The PSD permit is very clear about the potential use of supplementary fuels such as automotive shredder residue, construction wood waste, and automobile tires. Energy Answers must first conduct a demonstration that confirms no deterioration of air quality would be associated with burning supplementary fuels. In addition, the PSD permit only allows the mixing of one fuel type at a time with the processed refuse fuel

and sets limits on the daily quantities that could be combusted. Lastly, the PSD permit clearly states the automotive shredder residue is required to be free of fluids, batteries, air bags, mercury switches, or catalytic converters, and the wood waste is required to be free of paint, stain, coatings, or wood preservatives (such as formaldehyde, copper, chromium, arsenate, creosote, or pentachlorophenol). In addition, the tire derived fuels are required to be made from de-wired scrap tires (de-wired scrap is defined as scrap tires with their metal content removed).

**Comment:** Jesus Garcia Oyola commented that this Project will produce pollution that will get into the air, water, and soil, which will then get into the grass and be eaten by the cows and get into their meat and milk, polluting our grandchildren.

**Response:** The potential ecological and human risk was evaluated as part of the EPA PSD permit process and is presented in the EIS. With respect to impacts from non-criteria and hazardous air pollutants, Section 3.11, *Public Health and Safety*, summarizes the HHRA completed for this project.

**Comment:** Javier Biaggi noted that at no point in the EIS does the value of the 2.1 million gallons of water required to operate the plant appear in terms of biological components. The water is needed in the ecosystem or else the fish of Arecibo will be destroyed.

**Response:** The EIS describes the water withdrawal as a small fraction of the overall discharge from the El Vigía Pumping Station. The water for the Project would be pumped from water already discharged from the Caño Tiburones to manage the Caño Tiburones ecosystem by controlling its water level.

**Comment:** Rafael Pitre commented that the EIS fails to analyze the impact of the 2.1 million gallon withdrawal on the fishery and especially on the fish hatchery thriving along the route where that water is not deposited. He noted that this withdrawal will cause the fishery in Arecibo to collapse.

**Response:** The total volume of water that would be diverted from the existing point of discharge to the Project would represent 2 percent of PRDNER's daily discharge to the ocean and would not have any noticeable effect on the volumes provided to the reach downstream of the diversion.

**Comment:** Guarisa Arias noted that RUS is supposed to supply energy, water, and telecommunication services to rural communities, and noted that the rural areas of Puerto Rico are quite different from the rural areas in the U.S.

**Response:** Information on electric program loan and loan guarantee requirements, including rural eligibility requirements, can be found at 7 CFR §1710.

**Comment:** Guarisa Arias commented that the wind study presented by Energy Answers does not correspond with the National Oceanic and Atmospheric Administration (NOAA) data on winds in Puerto Rico. According to NOAA, Puerto Rico is located in the trade winds, which are one of the most consistent wind currents in the world running east to west. Most of the dairy industry of Puerto Rico is west of the incinerator and that will be at risk from air pollutants.

**Response:** Section 3.3.1.6, *Local Meteorology,* of the EIS describes the wind patterns and recognizes the presence of trade winds in the region and the local wind patterns that blow onshore during the day and reverse at night.

**Comment:** Francis Torres Fernández and Pedro Saade Lloreas made similar comments during the public hearing that the socioeconomic analysis in the EIS is lacking because the economic impact on the municipalities required to bring trash to the incinerator is not studied. Pedro Saade Lloreas commented that the Project will be an economic disaster and that the EIS failed to discuss the economic consequences of this Project. Mr. Saade Lloreas asked about are the numbers and wondered who will pay for the Project? He also urged the group to listen to the municipalities, the Association, and the Federation.

**Response:** Similar to Comment SE-1 above, we have added additional analysis to Section 3.11, *Socioeconomics and Environmental Justice*, in the final EIS to address the likelihood of increased operational expenses for municipalities that may be required to transport waste to the proposed facility compared to the existing costs associated transporting waste to a closer landfill. This qualitative discussion is balanced against the dwindling number of compliant landfills and the constraints on landfill capacities, which eventually would result in increases to operational budgets and solid waste management costs over time regardless of this project.

**Comment:** Elisa Llenza commented that Energy Answers has a history of submitting false documents to obtain the water franchise permits from the Department of Natural Resources, which came to light in February 2014 when the water permit was denied. Ms. Llenza commented that Energy Answers falsified two graphs in its permit, which gives the Department of Natural Resources the right to deny the permit application.

**Response:** Thank you for your comment.

**Comment:** Elisa Llenza commented that this process does not make any sense. She noted that no loan application exists yet but we are discussing the project's environmental impacts. Also, she commented that RUS is supposed to work to benefit agriculture and lower the cost of energy. There are other ways of making energy and the contract that Energy Answers has for selling the energy to the PREPA is higher than what PREPA spends to produce electricity, which is distributed throughout the entire island, not just the local communities here, which is not how RUS is supposed to fund projects.

Arecibo Waste-to-Energy Project
Final EIS                                                                                          January 2017

**Response:** Information on the electric program loan and loan guarantee requirements, including rural eligibility requirements, can be found at 7 CFR §1710.

**Comment:** Miguel Sarriera commented that this process does not address the problem—which is solid waste—with solid waste solutions that benefit the people and the planet. He noted that we are discussing an incineration project, which is bad for our health and bad for our planet (global warming) and all this talk about financing a system does not provide long-term mechanisms to address these problems.

**Response:** The proposed action before RUS is financing the electricity project and the fuel of choice proposed by the developer is solid waste. Alternative fuel sources and solid waste management alternatives are outside the scope of RUS Electric Program authorization.

Arecibo Waste-to-Energy Project
Final EIS                                                                                          January 2017

# APPENDIX D: LETTER FROM PUERTO RICO AQUEDUCT AND SEWER AUTHORITY

Arecibo Waste-to-Energy Project
Final EIS                                                                    January 2017

This page intentionally left blank.



**Autoridad de Acueductos
y Alcantarillados**

Gobierno de Puerto Rico

P.O. Box 7066, San Juan PR 00916-7066
Tel. (787) 999-1717
Fax (787) 999-1772
Avenida Barbosa #618 Hato Rey, PR

Proyectos Públicos y Privados

29  de noviembre de 2012


Ing. Edwin Irizarry Lugo
Director Ejecutivo
Oficina de Gerencia de Permisos (OGPe)
PO BOX 41179
San Juan, Puerto Rico 00940-1179


 Estimado ingeniero Irizarry:


**AAA-RN-11-07-0007  ARECIBO- PLANTA GENERACION DE ENERGIA RENOVABLE
PR-2, KM. 37.1, BO. CAMBALACHE
250  UEQ  AGUA POTABLE
2000 UEQ ALCANTARILADO SANITARIO
JP: 2010-06-0231-JPU
(RECOMENDACIÓN  ENMENDADA)**

Nos referimos al proyecto de epígrafe, sometido ante nuestra consideración para que se informe en cuanto a las facilidades de agua y alcantarillado sanitario existentes, que puedan servir al mismo. De acuerdo al memorial explicativo el proyecto propuesto consiste de una planta de generación de energía renovable con un consumo diario de agua de 100,000 GPD, cual representa un aumento de 90,000 GPD de los 10,000 GPD previamente aprobados y manteniendo la descarga sanitaria previamente aprobada de 800,000 GPD en carta de Recomendaciones original.

El cómputo final de las unidades equivalentes estará basado en lo que, al presentar los planos hidráulicos, resulte ser la demanda requerida para el proyecto propuesto. Si las unidades equivalentes,  resultan ser diferente a lo contemplado para fines de esta evaluación, esta Autoridad se reserva el derecho de modificar los términos de esta recomendación

El servicio de agua podrá ser prestado mediante conexión a la línea de agua de 12" de diámetro en la carretera PR2, para los 100,000 GPD (250 unidades equivalentes de vivienda).

Será necesario que el desarrollador del proyecto aporte a esta Autoridad, la cantidad de quinientos ($500.00) dólares por cada unidad de vivienda o su equivalente a conectarse, por el derecho a hacer uso del sistema de distribución de agua existente.

El servicio de alcantarillado para este proyecto, podrá ser prestado mediante conexión a la tubería troncal de alcantarillado sanitario de cuarenta y ocho pulgadas (48") de diámetro existente en la PR-2.  La descarga se estima en 800,000 GPD (2,000 unidades equivalentes de vivienda).  El proponente deberá realizar consulta a la División de Pretratamiento de la AAA, para que determine los requisitos de descarga al sistema.

Será necesario que el desarrollador del proyecto aporte a esta Autoridad, la cantidad de quinientos ($500.00) dólares por cada unidad de vivienda o su equivalente a conectarse, por el derecho a hacer uso del sistema de alcantarillado sanitario existente.

NORTE

AAA-RN-11-07-0007  ARECIBO- PLANTA GENERACION DE ENERGIA RENOVABLE
PR-2, KM. 37.1, BO. CAMBALACHE (250 UEQV DE AGUA POTABLE & 2000 UEQV DE
ALCANTARILADO SANITARIO
JP: 2010-06-0231-JPU
(RECOMENDACIÓN ENMENDADA)
29 DE NOVIEMBRE DE 2012
Página 2 de 2

Antes de iniciar el proceso de construcción, deberán someter para aprobación de esta Autoridad,  los planos de las obras de acueducto y/o alcantarillado para los que se solicita permiso, los cuales deberán estar sellados y firmados por el profesional responsable de los mismos.  Estos incluyen, según aplique al caso, planos que contemplen:

- Sistemas de distribución de agua y de alcantarillado sanitario y su conexión a los sistemas de la AAA
- Relocalización o extensión de obras de acueducto y/o alcantarillado
- Obras Extramuros e Instalaciones para ser transferidas a la AAA para su operación

Deberá cumplirse con los requisitos establecidos en el *Reglamento Conjunto de Permisos para Obras de Construcción y Usos de Terrenos*.

Los planos  deberán ser sometidos y aprobados por esta Autoridad, de acuerdo al Reglamento para la Certificación de Planos de Construcción, antes de proceder con la construcción de las obras.

El desarrollador entregará un disco con el archivo digital de los planos del proyecto en escala, orientado al norte y en formato DWG o DXF y en PDF. Éste tiene que incluir un polígono (área) de la extensión territorial del proyecto georeferenciado al sistema de coordenadas North American Datum del 1983 (NAD 83).   Además, tiene que indicar si la unidad de medida utilizada es en pies o metros y la revisión del NAD 83 que utilizó. El disco debe identificarse con el número del proyecto, nombre y dirección del mismo.

Al someter el plano final para aprobación, se deberá cumplir también con los siguientes requisitos:

1. Someter los documentos de certificación del ingeniero o arquitecto debidamente cumplimentados
    a. AAA-972  (Solicitud de Aprobación de Planos de Construcción)
    b. AAA-1294 (Certificación de Ingeniero o Arquitecto)

2. Someter un estimado desglosado y por partida de las obras de acueducto y/o alcantarillado a  instalarse en el proyecto.

Estas recomendaciones estarán vigentes por el término de dos (2) años, a partir de la fecha de esta comunicación, al cabo del cual, de no haberse sometido planos de construcción de las obras de acueducto y alcantarillado sanitario, el proyecto deberá someterse nuevamente ante la consideración de esta  Autoridad.

Cordialmente,

Ing. Ángel Rafael Ramos Pabón, P.E.
Gerente Técnico Región Norte
Proyectos Públicos y Privados


/arp
c: Coordinador PPP, Inspector, Director Área Operaciones, Desarrollador, Expediente, Archivo de Lectura

Arecibo Waste-to-Energy Project
Final EIS                                                                                            January 2017

## APPENDIX E: REVISED PRELIMINARY ENVIRONMENTAL IMPACT STATEMENT – RENEWABLE POWER GENERATION AND RESOURCE RECOVERY PLANT

This appendix is available digitally online at
https://www.rd.usda.gov/publications/environmental-studies/impact-statements/arecibo-waste-energy-generation-and-resource

Printed copies of this appendix will be provided upon request. Please contact the following:

Steven Polacek
Rural Utilities Service
1400 Independence Ave SW, Stop 1571
Washington, DC 20250
(202) 205-9805
steve.polacek@wdc.usda.gov

Arecibo Waste-to-Energy Project
Final EIS                                                                                    January 2017

# ATTACHMENT #4

# Energy Conversion Efficiency - Net Power Production Comparison

**WTE Facility Energy Conversion Comparison Table**

| Ranking by Net kWh/ton Produced | Plant Name | Plant State | Tons Combusted Per Year | Net kWh/ton Produced |
|---|---|---|---|---|
| | **Proposed Plant** | | | |
| | Arecibo Renewable Energy Project | PR | 762,540 | 752 |
| | **Existing Plants** | | | |
| 1 | Commerce Refuse To Energy | CA | 102,384 | 703 |
| 2 | Penobscot Energy Recovery | ME | 242,683 | 663 |
| 3 | Wheelabrator Millbury Facility | MA | 480,118 | 662 |
| 4 | Wheelabrator Falls | PA | 519,997 | 652 |
| 5 | Wheelabrator Bridgeport | CT | 753,513 | 641 |
| 6 | H Power | HI | 495,738 | 640 |
| 7 | Onondaga County Resource Recovery | NY | 332,355 | 621 |
| 8 | North County Regional Resource | FL | 581,548 | 611 |
| 9 | Wheelabrator Lisbon | CT | 191,332 | 595 |
| 10 | Maine Energy Recovery | ME | 208,339 | 593 |
| 11 | Covanta Mid-Connecticut Energy | CT | 645,777 | 591 |
| 12 | Covanta Hempstead | NY | 965,054 | 584 |
| 13 | Wheelabrator Westchester | NY | 690,449 | 584 |
| 14 | Covanta Hennepin Energy | MN | 363,804 | 578 |
| 15 | Wheelabrator Saugus | MA | 410,428 | 571 |
| 16 | Covanta Fairfax Energy | VA | 1,043,000 | 566 |
| 17 | Huntington Resource Recovery Facility | NY | 332,977 | 561 |
| 18 | Covanta Haverhill | MA | 590,209 | 560 |
| 19 | Lee County Solid Waste Energy | FL | 501,195 | 560 |
| 20 | Montgomery County Resource Recovery | MD | 557,080 | 558 |
| 21 | Pasco Cnty Solid Waste Resource Recovery | FL | 326,442 | 549 |
| 22 | Wheelabrator South Broward | FL | 793,998 | 545 |
| 23 | Union County Resource Recovery | NJ | 545,193 | 542 |
| 24 | Hillsborough County Resource Recovery | FL | 446,325 | 533 |
| 25 | Wheelabrator North Andover | MA | 447,429 | 533 |
| 26 | SEMASS Resource Recovery | MA | 1,079,602 | 533 |
| 27 | Wheelabrator North Broward | FL | 816,454 | 532 |
| 28 | Wheelabrator Concord Facility | NH | 191,571 | 532 |
| 29 | Lancaster County Resource Recovery | PA | 405,398 | 530 |
| 30 | Covanta Bristol Energy | CT | 195,927 | 528 |
| 31 | Covanta Warren Energy | NJ | 155,792 | 526 |
| 32 | Covanta Essex Company | NJ | 923,029 | 519 |
| 33 | Wheelabrator Spokane | WA | 268,072 | 514 |
| 34 | American Ref-Fuel of SE CT | CT | 262,959 | 513 |
| 35 | York County Resource Recovery | PA | 425,562 | 512 |
| 36 | Covanta Lake County Energy | FL | 167,756 | 502 |
| 37 | American Ref-Fuel of Delaware Valley | PA | 1,196,989 | 496 |
| 38 | McKay Bay Facility | FL | 304,987 | 494 |
| 39 | Montenay Montgomery LP | PA | 407,618 | 493 |
| 40 | Covanta Stanislaus Energy | CA | 252,200 | 493 |
| 41 | Wheelabrator Hudson Falls | NY | 169,141 | 489 |
| 42 | Wheelabrator Gloucester LP | NJ | 190,484 | 478 |
| 43 | Regional Waste Systems | ME | 171,278 | 477 |
| 44 | Covanta Babylon Energy | NY | 232,254 | 477 |
| 45 | Camden Resource Recovery Facility | NJ | 332,699 | 460 |
| 46 | Covanta Alexandria/Arlington Energy | VA | 345,089 | 438 |
| 47 | Pinellas County Resource Recovery | FL | 780,967 | 409 |
| 48 | Wheelabrator Claremont Facility | NH | 72,841 | 405 |
| 49 | Covanta Wallingford Energy | CT | 132,380 | 401 |
| 50 | Miami Dade County Resource Recovery Facility | FL | 770,369 | 396 |
| 51 | Pioneer Valley Resource Recovery | MA | 129,617 | 358 |
| 52 | Bay Resource Management Center | FL | 144,991 | 350 |
| 53 | MacArthur Waste to Energy Facility | NY | 167,278 | 322 |
| 54 | Dutchess Cnty Resource Recovery Facility | NY | 150,474 | 306 |
| 55 | MMWAC Resource Recovery Facility | ME | 68,605 | 227 |
| 56 | New Hanover County WASTEC | NC | 85,123 | 221 |

| Existing Plant Summary Statistics | | |
|---|---|---|
| Mean | 420,801 | 513 |
| Standard Deviation | 281,027 | 101 |
| Maximum | 1,196,989 | 703 |
| Minimum | 68,605 | 221 |

Source: *EIA-923 January –December Final, Nonutility Energy Balance and Annual Environmental Information Data,
2007-2011,  available at http://www.eia.doe.gov/cneaf/electricity/page/eia906_920.html*

## PPOA Between PREPA and Energy Answers Arecibo, LLC
## Effective 4th day of December 2009

[Energy Answers proposes to develop a resource recovery renewable, fuel power plant in Arecibo, Puerto Rico which will use Fuel derived from municipal solid waste and which will initially be a Facility pursuant to PURPA (the "Facility")]

**ARTICLE 20.2**

(f)     If this Agreement is terminated prior to the expiration of the Term due to a Breach by Energy Answers (in which case PREPA shall notify the Project Lenders of such termination) or if this Agreement is rejected or disaffirmed pursuant to any bankruptcy law or proceeding or other similar law or proceedings affecting creditors' rights generally with respect to a bankruptcy proceeding relating to Energy Answers or otherwise, PREPA agrees, if there are outstanding obligations to a Project Lender, subject to the receipt of all necessary approvals, to enter into a new power purchase and operating agreement with the Project Lender (or its designee or nominee; provided that such designee or nominee either is controlled by the Project Lender or is approved by PREPA) for the remainder of the Term upon all of the covenants, agreements, terms, provisions and limitations of this Agreement, effective as of the date of such termination.