**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>          as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>          Debtor.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>          as representative of<br><br>PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY,<br><br>          Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3567-LTS |

**URGENT MOTION FOR BRIDGE ORDER, AND MOTION FOR APPOINTMENT AS
TRUSTEES UNDER 11 U.S.C. § 926, OF AMBAC ASSURANCE CORPORATION,
ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP.,
FINANCIAL GUARANTY INSURANCE COMPANY, AND NATIONAL PUBLIC
FINANCE GUARANTEE CORPORATION**

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID:  3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID:  3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID:  9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID:  3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID:  3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

JURISDICTION AND VENUE ...............................................................................................6

FACTUAL BACKGROUND....................................................................................................6

I.     Movants Insure HTA Bonds .........................................................................................6

II.    HTA Was Established As A Corporate Entity Distinct From The Commonwealth
And Has Issued Its Own Bonds ....................................................................................6

III.   The Commonwealth Begins To Raid And Divert The Pledged Revenues .........................7

IV.   Congress Enacts PROMESA, And FOMB Begins Representing The
Commonwealth And HTA While The Commonwealth Continues To Raid The
Pledged Revenues ........................................................................................................8

V.    The Commonwealth's Unlawful Diversion of HTA's Revenues Has Devastated
HTA's Finances, Threatening Its Ability to Access the Capital Markets and to
Maintain Critical Infrastructure for the People of Puerto Rico.........................................11

PROCEDURAL HISTORY....................................................................................................13

ARGUMENT .........................................................................................................................15

I.     Movants Should Be Appointed Co-Trustees Under Bankruptcy Code § 926 ...................15

       A.    Section 926 Permits A Title III Court To Appoint A Trustee To Pursue
Avoidance Actions On Behalf Of The Debtor.....................................................16

       B.    HTA Has Claims Against The Commonwealth Under Sections 549, 544
And 548 That FOMB Has Unjustifiably Refused to Pursue.................................17

            1.    A Trustee Could Avoid Postpetition Transfers Under § 549....................17

            2.    A Trustee Could Avoid Transfers Under Section 544..............................19

            3.    A Trustee Could Avoid Transfers Under Section 548..............................21

                  a.    A Trustee Could Avoid Transfers As Intentional Fraudulent
Transfers Under § 548(a)(1)(A)...................................................21

                  b.    A Trustee Could Avoid Transfers As Constructive Fraudulent
Transfers Under Section 548(a)(1)(B). .........................................23

       C.    Movants' Interests Are Aligned With Those Of HTA And Other HTA
Bondholders. ...................................................................................................24

## TABLE OF CONTENTS (cont'd)

Page

II.     FOMB's Refusal To Bring Claims Under Sections 549, 544 And 548 Lacks Merit ........24

    A.     FOMB Suffers From An Unresolvable Conflict Of Interest Because It Currently Represents Parties With Opposing Interests In The Same Case And Is Disregarding The Best Interests Of HTA And HTA's Creditors.............25

    B.     Timely Appointment Of A Trustee Is Necessary To Preserve HTA's And HTA Bondholders' Rights. ...................................................................27

III.    The First Circuit's Andalusian Decision Supports Appointment of a Section 926 Trustee For HTA ...............................................................................27

    A.     Granting The HTA 926 Motion Serves The Purposes Of PROMESA.................28

    B.     The Need To Respect Puerto Rico Law Weighs In Favor Of Granting The HTA 926 Motion.......................................................................30

    C.     The HTA 926 Motion Does Not Raise The Same "Proliferation of Actions" Concerns As The ERS 926 Motion. .......................................31

    D.     Failure To Grant The HTA 926 Motion Would Result In A Substantive Consolidation Prohibited By PROMESA § 304(f)..................................32

CONCLUSION........................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Ambac Assurance Corp. v. HTA,
   No. 16-1893, 2016 WL 2930924 (D.P.R. May 19, 2016) .............................................1, 15, 26

In re Augie/Restivo Baking Co.,
   860 F.2d 515 (2d Cir. 1988).........................................................................................27

In re Catco Recycling, LLC,
   No. 14–11021, 2016 WL 556173 (Bankr. D.N.H. Feb. 10, 2016) .........................................22

Commodity Futures Trading Comm'n v. Weintraub,
   471 U.S. 343 (1985)....................................................................................................26

De Jesus Diaz v. Carrero,
   12 P.R. Offic. Trans. 786, 112 D.P.R. 631 (1982).................................................................20

In re Duke & Benedict, Inc.,
   265 B.R. 524 (Bankr. S.D.N.Y. 2001) ...........................................................................23

In re El Mundo Corp.,
   208 B.R. 781 (D.P.R. 1997)...........................................................................................20

In re The Financial Oversight and Management Board for Puerto Rico,
   432 F. Supp. 3d 25 (D.P.R. 2020), aff'd sub. nom. Andalusian Glob.
   Designated Activity Company, et al. v. FOMB, 954 F.3d 1 (1st Cir. 2020) .................. *passim*

In re Gibson Grp., Inc.,
   66 F.3d 1436 (6th Cir. 1995) .......................................................................................16

In re GSC, Inc.,
   453 B.R. 132 (Bankr. S.D.N.Y. 2011).............................................................................33

In re Hemingway Transp., Inc.,
   954 F.2d 1 (1st Cir. 1992).............................................................................................33

In re Jackson,
   459 F.3d 117 (1st Cir. 2006)..........................................................................................24

In re Luciani,
   584 B.R. 449 (Bankr. D. Mass. 2018) .............................................................................22

In re Lyondell Chem. Co.,
   554 B.R. 635 (S.D.N.Y. 2016)...................................................................................21, 22

In re Marrero,
   382 B.R. 861 (B.A.P. 1st Cir. 2008) ...................................................................17

Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs,
   926 F.2d 1248 (1st Cir. 1991) ...........................................................................22

In re N.Y. City Off-Track Betting Corp.,
   No. 09-17121, 2011 WL 309594 (Bankr. S.D.N.Y. Jan. 25, 2011) ........................16

In re Owens Corning,
   419 F.3d 195 (3d Cir. 2005)...............................................................................33

In re Sarner,
   No. 10-17487-JNF, 2010 WL 3282589 (Bankr. D. Mass. Aug. 19, 2010) .............26

In re Sepulveda Figueras,
   193 B.R. 118 (Bankr. D.P.R. 1996) ...................................................................20

In re Snider Bros.,
   18 B.R. 230 (Bankr. D. Mass. 1982) ..................................................................33

In re Tougas,
   338 B.R. 164 (Bankr. D. Mass. 2006) ................................................................17

In re Tribune Co. Fraudulent Conveyance Litig.,
   946 F.3d 66 (2d Cir. 2019)................................................................................21

United States v. McCombs,
   30 F.3d 310 (2d Cir. 1994)................................................................................22

In re WHET, Inc.,
   750 F.2d 149 (1st Cir. 1984) (*per curiam*)..........................................................26

In re WM Distribution, Inc.,
   571 B.R. 866 (Bankr. D.N.M. 2017) .................................................................26

Woods v. City Nat'l Bank & Tr. Co. of Chi.,
   312 U.S. 262 (1941).........................................................................................26

In re Zenox, Inc.,
   173 B.R. 46 (Bankr. D.N.H. 1994) ...................................................................22

**Federal Statutes**

11 U.S.C. § 301(b) .............................................................................................13

11 U.S.C. § 362......................................................................................9, 11, 19

11 U.S.C. § 362(a)(3) ..................................................................................4, 9, 11, 19

11 U.S.C. § 544 ......................................................................................................2, 5, 16

11 U.S.C. § 544(b) ..................................................................................................19, 20

11 U.S.C. § 545 ......................................................................................................5, 16, 35

11 U.S.C. § 546(a) ..................................................................................................13

11 U.S.C. § 547 ......................................................................................................5, 16, 35

11 U.S.C. § 548 ......................................................................................................2, 16

11 U.S.C. § 548(a) ..................................................................................................5, 21

11 U.S.C. § 548(a)(1) .............................................................................................22

11 U.S.C. § 548(a)(1)(A) .......................................................................................21, 23

11 U.S.C. § 548(a)(1)(B) .......................................................................................23

11 U.S.C. § 549 ......................................................................................................2, 16

11 U.S.C. § 549(a) ..................................................................................................5, 17, 18, 19

11 U.S.C. § 549(a)(2)(B) .......................................................................................11

11 U.S.C. § 549(d) ..................................................................................................13

11 U.S.C. § 550 ......................................................................................................5, 16, 35

11 U.S.C. § 550(a) ..................................................................................................5, 16

11 U.S.C. § 926(a) ..................................................................................................*passim*

28 U.S.C. § 1331 ....................................................................................................6

28 U.S.C. § 1391(b) ...............................................................................................6

PROMESA § 101 ....................................................................................................9

PROMESA § 101(a) ...............................................................................................24, 28

PROMESA § 201(b)(1) ..........................................................................................28

PROMESA § 201(b)(1)(B) .....................................................................................29

PROMESA § 201(b)(1)(M) .....................................................................................9, 18, 25, 29

PROMESA § 201(b)(1)(N) ..................................................................................................9, 18, 29

PROMESA § 201(c) ...........................................................................................................................9

PROMESA § 201(e) ...........................................................................................................................9

PROMESA § 202(c)(1) ....................................................................................................................19

PROMESA § 203(d) .........................................................................................................................29

PROMESA § 209 ..............................................................................................................................28

PROMESA § 301(a) ................................................................................................................. *passim*

PROMESA § 301(d) .........................................................................................................................17

PROMESA § 303 .....................................................................................................................1, 30, 31

PROMESA § 303(1) ................................................................................................................9, 18, 31

PROMESA § 303(3) ........................................................................................................9, 18, 29, 31

PROMESA § 304(f) .................................................................................................................. *passim*

PROMESA § 305 ........................................................................................................................30, 31

PROMESA § 306(a) ...........................................................................................................................6

PROMESA § 307(a) ...........................................................................................................................6

PROMESA § 405(m) ........................................................................................................................28

PROMESA § 407 ........................................................................................................................25, 29

**Federal Rules**

Fed. R. Bankr. P. 6001 .....................................................................................................................17

**Puerto Rico Statutes and Authorities**

9 L.P.R.A. § 2002 ...........................................................................................................6, 25, 30, 35

9 L.P.R.A. § 2004 ...........................................................................................................................30

9 L.P.R.A. § 2013(a)(2) .....................................................................................................................7

9 L.P.R.A. § 2021 ................................................................................7, 10, 25, 35

9 L.P.R.A. § 5681 ................................................................................7, 10, 25, 35

13 L.P.R.A. § 31751 ...............................................................................10, 35

13 L.P.R.A. § 31751(a) ..............................................................................7, 25

13 L.P.R.A. § 31751(a)(1) .............................................................................7

13 L.P.R.A. § 31751(a)(1)(D) ........................................................................7

31 L.P.R.A. § 3492 ..................................................................................20

31 L.P.R.A. § 3498 ..................................................................................20

Act No. 447 of 1951 § 1 ............................................................................34

Act No. 21 of 2016 ...............................................................................8, 9, 12

Act No. 26 of 2017 .............................................................................10, 18, 19

Administrative Bulletin No. EO-2015-46 ...........................................................7, 16

H.R. Joint Res. 188, 18th Leg. Assem., June 6, 2017 ..................................................34

## Other Authorities

6 Collier on Bankruptcy ¶ 926.02 (16th ed. rev. 2018) .................................................16

*Amicus Curiae in Support of Neither Party*, <u>Ambac Assurance Corp. v.
   Commonwealth of Puerto Rico</u>, Case No. 18-1214 (1st Cir. June 29, 2018).........................29

J. Stephen Gilbert, <u>Substantive Consolidation in Bankruptcy: A Primer</u>, 43 Vand.
   L. Rev. 207, 209 (1990) (citing 5 Collier On Bankruptcy ¶ 1100.06[1], at
   1100-31 to -32 (L. King 15th ed. 1979)) .............................................................33

Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together, "Assured"), Financial Guaranty Insurance Company ("FGIC"), and National Public Finance Guarantee Corporation ("National") (collectively, "Movants"), secured creditors of the Puerto Rico Highways and Transportation Authority ("HTA") through their insurance of secured revenue bonds (the "HTA Bonds"), respectfully move the Court for entry of an order, substantially in the form attached as Exhibit B (the "Proposed Order"), appointing them as trustees under Section 926 of Title 11 of the United States Code (the "Bankruptcy Code") to pursue the claims attached in Exhibit C (the "Proposed Complaint") on behalf of HTA against the Commonwealth of Puerto Rico (the "Commonwealth") (the "HTA 926 Motion").

While the HTA 926 Motion is pending, Movants also respectfully request, on an urgent basis, the entry of a bridge order substantially in the form attached as Exhibit A ("Proposed Bridge Order").[2] The Government Parties have indicated they will oppose this urgent relief.

## PRELIMINARY STATEMENT

1.      Debtor HTA, a public corporation distinct from the Commonwealth, was established to provide the people of Puerto Rico with roads and means of transportation, improve movement of traffic, and clear roadways of hazards.  To finance this critical infrastructure, HTA was assigned its own streams of revenues, including Toll Revenues and Excise Taxes (as defined below), which HTA then pledged as security so that it could issue the HTA Bonds.  Now, however, an ongoing scheme by the Commonwealth government and the Financial Oversight and Management Board for Puerto Rico ("FOMB") has devastated HTA's finances.  Through unlawful Commonwealth legislation and executive orders that are expressly preempted by Section 303 of

---

[2] With the exceptions of Exhibit A (the Proposed Bridge Order), Exhibit B (the Proposed Order), and Exhibit C (the Proposed Complaint), which are attached to this Motion, all other references to Exhibits refer to those attached to the *Declaration of William J. Natbony in Support of Motion for Appointment as Trustees under 11 U.S.C. § 926 of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation* ("Mot. Decl."), filed contemporaneously.

the Puerto Rico Oversight, Management, and Economic Stability Act ("<u>PROMESA</u>"), as well as various purported fiscal plans and budgets that likewise violate PROMESA and other binding law, FOMB and the Commonwealth have destroyed HTA's financial health.  These efforts to strip HTA of its property and divert HTA's revenues to Commonwealth coffers have rendered the corporation little more than an insolvent, empty shell—unable to pay its debt service, maintain the island's infrastructure, or even fund its own operations in the absence of future largesse from the Commonwealth that may never come.

2.      No responsible steward of a public corporation would ever allow the destruction and divestment that has befallen HTA, whose operations have been crippled and whose access to the capital markets may never recover.  Yet FOMB, as HTA's representative, has done just that, overseeing the unlawful diversion of HTA's resources *to the Commonwealth, which FOMB also represents*.  This Motion aims to remove that untenable conflict of interest and restore HTA's property, for the benefit of HTA's Bondholders and all who rely on the highways and infrastructure that HTA builds and maintains.

3.      Specifically, Movants respectfully ask the Court to appoint them as co-trustees under 11 U.S.C. § 926 to pursue avoidance claims on behalf of HTA against the Commonwealth under 11 U.S.C. §§ 548, 549 and 544.  To the extent this Court's recent ruling on the HTA lift-stay motion found that the lift-stay movants failed to establish in that context HTA's ownership of Excise Taxes that were diverted to the Commonwealth,[3] Movants disagree with that ruling and are hopeful it will be reversed on appeal.  Movants thus submit this HTA 926 Motion now to preserve their rights under Section 926; waiting for a reversal would risk running afoul of (i) this Court's deadline to file Section 926 motions, and (ii) the statute of limitations for HTA avoidance actions.

---

[3] *Opinion and Order in Connection with Preliminary Hearing* 27–28, ECF No. 13541 ("[T]he HTA Movants have not demonstrated a legal basis for their assertion that Fund 278 monies are actually owned by HTA.").

4.      Indeed, as matters stand, the statute of limitations for HTA to bring avoidance actions will expire on or around August 14, 2020.  See infra ¶ 30.  To maintain the status quo and prevent irreparable harm to HTA and its Bondholders in the likely event this Motion and any related appeals cannot be finally resolved before that date, Movants respectfully request that the Court immediately grant the following emergency relief (the "Emergency Relief"):  Movants shall be preliminarily appointed as co-trustees for HTA and authorized to file a complaint substantially in the form of the Proposed Complaint commencing an avoidance action (the "HTA Avoidance Action") on HTA's behalf on or before August 14, 2020, but under the conditions that (i) the HTA Avoidance Action shall be immediately stayed pending the appointment of Movants as co-trustees on a permanent basis, including following any successful appeal of an order of this Court denying the HTA 926 Motion; and (ii) alternatively, in the event any order of this Court denying the HTA 926 Motion becomes final and un-appealable, including following any grant or denial of a request for a writ of certiorari to the United States Supreme Court, the HTA Avoidance Action shall automatically be dismissed with prejudice.  See Ex. A (Proposed Bridge Order).  A grant of this Emergency Relief is eminently equitable, because it will preserve the status quo while the HTA 926 Motion is finally resolved and, in the meantime, will not require any parties to expend resources on prosecuting or defending the HTA Avoidance Action.  To further conserve legal and judicial resources, the merits of this HTA 926 Motion could then be heard at the September 23, 2020 hearing on FOMB's motion for partial summary judgment that is pending in Adversary Proceeding No. 20-00005 (the "HTA Summary Judgment Motion").[4]

5.      Resolution of the merits is necessary to address FOMB and the Commonwealth's ongoing scheme to strip HTA of its property.  Pointedly, FOMB, notwithstanding its fiduciary

---

[4] *Motion of the Commonwealth of Puerto Rico, by and through the Financial Oversight and Management Board, Pursuant to Bankruptcy Rule 7056 for Partial Summary Judgment*, Adv. Proc. No. 20-00005-LTS, ECF No. 55.

obligations to HTA, has refused to support on HTA's behalf the reversal of the Court's lift-stay

ruling in regards to HTA's property interest, or bring on HTA's behalf the avoidance claims against

the Commonwealth that would be necessary to preserve HTA's property interests. This comes as

no surprise, given that the pursuit of such claims would not only require that FOMB reveal the

misappropriation of HTA's funds that has continued to take place on its watch, but also lay bare

FOMB's inability to overcome the intractable conflict in which it operates, given its simultaneous

representation of both HTA and the Commonwealth in these Title III cases.

6.      Where, as here, a conflict of interest disables the debtor or its representative from

faithfully representing the estate by pursuing claims on its behalf, Section 926 of the Bankruptcy

Code provides a remedy. From events that have already transpired in these cases, FOMB clearly

understands the importance of each individual debtor's having independent representation when

the Commonwealth and its instrumentalities possess adverse interests. When in the throes of an

irreconcilable dispute between the Puerto Rico Sales Tax Financing Corporation ("COFINA") and

the Commonwealth—both of which were Title III Debtors represented by FOMB—FOMB

ultimately requested the appointment of an independent representative for each of COFINA

(Bettina M. Whyte, who was selected by COFINA creditors) and the Commonwealth (the official

committee of unsecured creditors) so that each independent Title III Debtor would have loyal

representatives and advisors. See Adv. Proc. No. 17-03283-LTS, ECF No. 996. The establishment

of that governance structure set COFINA up for (thus far) the only successful exit from these Title

III proceedings. FOMB's refusal to chart a similar course here is perplexing but in any event

cannot be defended given the similar conflict issues between the Commonwealth and HTA.

7.      In its effort to rehabilitate the Commonwealth from its crisis through PROMESA,

the U.S. Congress provided a means to remedy abuses such as these. First, by incorporating the

Bankruptcy Code's automatic stay, 11 U.S.C. § 362(a)(3), PROMESA § 301(a) prohibits the

Commonwealth's postpetition efforts to retain possession of and exercise control over HTA's property.  Second, PROMESA allows a debtor to avoid and recover the value of an unauthorized or fraudulent transfer of property.  See PROMESA § 301(a) (incorporating 11 U.S.C. §§ 544, 549(a), 548(a), 550 into PROMESA).  The relevant provisions allow HTA to recoup the property unlawfully diverted to (and by) the Commonwealth and/or the value of such property.  Third, PROMESA allows a Title III court, on request of a creditor, to appoint a trustee to pursue such avoidance claims where the debtor has refused to do so.  11 U.S.C. § 926(a).  That appointment power was designed precisely for situations like this, where FOMB, based on its conflict of interest, has unreasonably refused to sue the Commonwealth on behalf of HTA.

8.      Movants have attached hereto a Proposed Complaint setting forth certain of HTA's claims against the Commonwealth.  See Ex. C.  Movants have asked FOMB to pursue these claims, but FOMB has refused to take action.  See Mot. Decl. Ex. 1; Mot. Decl. Ex. 2.  The Court therefore should allow Movants to pursue these claims as trustees, so that HTA's property can be restored for the benefit of its Bondholders and its own financial future.[5]  By respecting valid security interests and repaying a meaningful portion of its debts, HTA can regain access to the financial markets as PROMESA envisioned.  But none of PROMESA's goals would be served by allowing FOMB and the Commonwealth to continue pillaging a public corporation whose healthy operation is critical to Puerto Rico's well-being.  For all these reasons and those set forth below, the Motion should be granted.

---

[5] The Proposed Complaint is in draft form and subject to revision.  If appointed as trustees, Movants intend to meet and confer with one another and with the DRA Parties before filing their complaint.  Movants further reserve their rights to bring claims related to those set forth in the Proposed Complaint, such as claims under Section 545 and Section 547, which allow for the avoidance of statutory liens or preference payments made to other creditors or insiders.  See 11 U.S.C. §§ 545, 547.  In turn, Section 550 would operate to ensure that any value recovered through the commencement of claims brought under Sections 544, 545, 547, 548 or 549 is recovered for the benefit of the estate.  See 11 U.S.C. § 550(a) ("to the extent that a transfer is avoided under section 544, 545, 547, 548, 549 . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . .").  Accordingly, Section 550 is a remedy for such avoided transfers, as set forth in the Proposed Complaint's prayer for relief.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1331 and

PROMESA § 306(a).  Venue is proper pursuant to 28 U.S.C. § 1391(b) and PROMESA § 307(a).

## FACTUAL BACKGROUND

### I.      Movants Insure HTA Bonds.

10.      Movants insure approximately $2.9 billion gross par of HTA Bonds currently

outstanding.  Under their insurance agreements and/or insurance policies, Movants are deemed to

be the sole holders of the HTA Bonds that they insure for purposes of, or otherwise have control

rights over, consents and other HTA Bondholder actions, including exercising rights and remedies

of HTA Bondholders.  See, e.g., Mot. Decl. Exs. 3–12.  Under the HTA Resolutions and/or their

insurance agreements or policies, Movants are also recognized as third-party beneficiaries.

Movants are fully subrogated to the rights of the HTA Bondholders for claims they have paid.

Mot. Decl. Exs. 3–12.

### II.     HTA Was Established As A Corporate Entity Distinct From The Commonwealth And Has Issued Its Own Bonds.

11.      In 1965, HTA was created as a public corporation responsible for constructing

highways and other transportation systems in Puerto Rico.  See Act No. 74-1965 (the "Enabling

Act").  The Enabling Act identifies HTA as a "body corporate and politic . . . consisting of a public

corporation," meaning that HTA is a corporate entity with a separate corporate existence from the

Commonwealth.  See 9 L.P.R.A. § 2002.  Pursuant to the Enabling Act, HTA has issued HTA

Bonds secured by a gross lien consisting of a perfected security interest in pledged revenues,

including (i) revenues derived from HTA's toll facilities (the "Toll Revenues"); (ii) special excise

taxes consisting, among other things, of taxes on gasoline, diesel, crude oil, cigarettes, and other

special excise taxes collected by the Commonwealth (the "Tax Revenues"); and (iii) special excise

taxes consisting of motor vehicle license fees collected by the Commonwealth (the "Vehicle Fees"; together with the Tax Revenues, the "Excise Taxes"; and together with the Toll Revenues and the Tax Revenues, the "Pledged Revenues").

12.     The Commonwealth's Secretary of Treasury acts as a collection agent on behalf of HTA and the HTA Bondholders with respect to the Excise Taxes.  Upon collection, the Secretary of Treasury is not permitted to deposit the Excise Taxes into the Commonwealth's General Fund.  See, e.g., 13 L.P.R.A. § 31751(a) (Mot. Decl. Ex. 13).  Instead, the statutes governing ownership and use of the Excise Taxes require the Secretary of Treasury to hold the Excise Taxes in a "special deposit in the name and for the benefit of [HTA]."  13 L.P.R.A. § 31751(a)(1)(D) (Mot. Decl. Ex. 13); 9 L.P.R.A. § 5681; see also 9 L.P.R.A. § 2021 ("The total proceeds of the fifteen-dollar ($15) increase in the fees to be paid for public and private automobile licenses shall be covered into a Special Deposit in behalf and for the benefit of the Highways and Transportation Authority of Puerto Rico.").  Once collected, the Excise Taxes constitute trust funds that are property of HTA and held in trust for HTA and the HTA Bondholders.  See, e.g., 13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681 (collectively, and including any related statutes, the "Excise Tax Statutes").  The Excise Tax Statutes mandate that, up to the amount necessary to pay principal and interest on the HTA Bonds, the Excise Taxes may not be used for any other purpose.  The Toll Revenues also constitute property of HTA held in trust for the benefit of the HTA Bondholders.  See 9 L.P.R.A. § 2013(a)(2).

**III.     The Commonwealth Begins To Raid And Divert The Pledged Revenues.**

13.     In 2015, the Commonwealth began a series of actions that deprived HTA of the ability to use the Pledged Revenues to pay the HTA Bonds.

14.     First, on November 30, 2015, former Governor García Padilla issued Administrative Bulletin No. EO-2015-46 (the "Clawback Order," Mot. Decl. Ex. 14), which

directed the Secretary of the Treasury to withhold the Excise Taxes, purportedly for application to

the public debt, instead of for application to the HTA Bonds as required by the Excise Tax Statutes.

15.    Next, on April 6, 2016, the Commonwealth enacted a moratorium law (Act No. 21-

2016, the "Next Moratorium Law," Mot. Decl. Ex. 15) that purported to authorize the Governor to

declare states of emergency with respect to a number of public entities, including HTA, and to

prohibit the payment of principal or interest by HTA on the HTA Bonds, including by suspending

the obligation to transfer the Excise Taxes to the Fiscal Agent.  See Mot. Decl. Ex. 15 § 201(d)(ii).

16.    Beginning on April 30, 2016, pursuant to the First Moratorium Law, the Governor

issued a series of orders (including any subsequent orders issued under any moratorium law, the

"Moratorium Orders")[6] that prohibited payments of principal and interest on the HTA Bonds,

including by diverting the Pledged Revenues from the payment of the HTA Bonds to other,

unauthorized purposes.  Since the codification of the First Moratorium Law and the issuance of

these initial Moratorium Orders, the Commonwealth has enacted additional moratorium laws

(collectively, including the First Moratorium Law and any additional moratorium laws that the

Commonwealth may purport to enact in the future, the "Moratorium Laws"),[7] and Governors have

issued additional Moratorium Orders, which have continued in effect the prohibition of payment

of principal and interest on the HTA Bonds, including by diverting the Pledged Revenues from the

payment of the HTA Bonds and dissipating the Pledged Revenues for unauthorized purposes.

**IV.    Congress Enacts PROMESA, And FOMB Begins Representing The Commonwealth
And HTA While The Commonwealth Continues To Raid The Pledged Revenues.**

17.    On June 30, 2016, President Obama signed PROMESA into law.  PROMESA,

among other things, sought to remedy what Congress viewed as the abuses of creditor rights

---

[6]    The relevant Moratorium Orders include those included in Mot. Decl. Ex. 16.

[7]    The Moratorium Laws include those included in Mot. Decl. Ex. 17.

committed by the Commonwealth prior to PROMESA's enactment, including the First Moratorium Law, the Moratorium Orders, and the Clawback Order.  For that reason, PROMESA expressly preempted (i) any moratorium law (including the Moratorium Laws) and (ii) any "unlawful executive orders" (including the Clawback Order and the Moratorium Orders) that alter the rights of holders of any debt of a territorial instrumentality or divert funds from one instrumentality to another or to the Commonwealth.  PROMESA § 303(1), (3).  PROMESA also incorporated the Bankruptcy Code's automatic stay provision to protect a debtor filing for Title III protection from "any act to obtain possession of property of the [debtor] or of property from the [debtor] or to exercise control over property of the [debtor]." 11 U.S.C. § 362(a)(3); PROMESA § 301(a) (incorporating § 362 into PROMESA).

18.     In addition, PROMESA (i) created FOMB; (ii) required FOMB to develop or approve fiscal plans governing the finances and budgets of the Commonwealth and its public corporations, including HTA; and (iii) authorized, but did not require, FOMB to file a petition on behalf of the Commonwealth or its public corporations, including HTA, to commence a court-supervised debt adjustment proceeding, provided that certain statutory prerequisites had been satisfied (Title III).  PROMESA §§ 101, 201(c), 201(e), 304(f).

19.     Beginning in March 2017, FOMB developed a series of fiscal plans for the Commonwealth and HTA.  PROMESA requires a fiscal plan to "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory." PROMESA § 201(b)(1)(M).  PROMESA also requires a fiscal plan to "respect the relative lawful priorities or lawful liens, as may be applicable, in . . . laws . . . or agreements of a covered territory or covered territorial instrumentality."  PROMESA § 201(b)(1)(N).

20.     However, the fiscal plans developed by FOMB to date fail to comply with these

provisions.   For one thing, each purports to divert the Excise Taxes from HTA to the Commonwealth.  See, e.g., Decl. Exs. 18, 19, 23, 25, 27. Purportedly in an effort to comply with these unlawful fiscal plans, the Commonwealth, on or about April 29, 2017, enacted a "Fiscal Plan Compliance Law" (Act No. 26-2017, including, as amended or superseded, the "Compliance Law", Mot. Decl. Ex. 20).  Chapter 4 of the Compliance Law provides for the Commonwealth to expropriate property, in the form of "surplus" revenues, from its public corporations (e.g., HTA) and their bondholders.  Accordingly, Chapter 4 permits the Commonwealth to expropriate the Pledged Revenues, and makes no provision for payment by HTA of its secured debt.

21.     Chapter 6 of the Compliance Law provides that "any special State fund and any other income of the agencies and public corporations [including HTA] shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate." Mot. Decl. Ex. 20 at 91.  Funds held in special funds in the Commonwealth Treasury include the Excise Taxes.  See, e.g., 13 L.P.R.A. § 31751; 9 L.P.R.A. §§ 2021, 5681. Chapter 6 also requires that the Excise Taxes be used "in accordance with . . . the Fiscal Plan." 2017 P.R. Laws 26 (Chapter 6).   Chapter 6 therefore authorizes the continued diversion and dissipation of Pledged Revenues to the extent provided for in a fiscal plan or budget.

22.     Accordingly, the Commonwealth's diversion of HTA's funds has been accomplished under color of legislation, executive orders, and fiscal plans and budgets that are preempted by PROMESA, violate PROMESA, and violate the legislation and contractual agreements that give rise to the HTA Bondholders' rights to the Pledged Revenues.

23.     Furthermore, the Commonwealth continued to retain possession of and exercise control over HTA's property after HTA filed its Title III petition even though PROMESA prohibits "any act to obtain possession of property of [HTA] or of property from [HTA] or to exercise control over property of [HTA]."   11 U.S.C. § 362(a)(3); PROMESA § 301(a) (incorporating

-10-

§ 362).  The Commonwealth's postpetition acts to obtain possession and control of HTA's

property violate the automatic stay and thus are "not authorized" under Title III.  See 11 U.S.C.

§ 549(a)(2)(B) (providing for avoidance of transfers that are "not authorized under [Title III]").

**V.      The Commonwealth's Unlawful Diversion of HTA's Revenues Has Devastated HTA's Finances, Threatening Its Ability to Access the Capital Markets and to Maintain Critical Infrastructure for the People of Puerto Rico**

24.      The Commonwealth's misconduct has been extremely detrimental to HTA and has

effectively rendered it insolvent.   Before the Commonwealth's misconduct, there had been

sufficient Excise Taxes to satisfy HTA's periodic payments and other obligations to bondholders.

For example, HTA received $531.8 million in Excise Tax revenues in FY 2014 and $554.2 million

in FY 2015.  See Mot. Decl. Ex. 29 (Audited Financial Statements, Puerto Rico Highways and

Transportation Authority, Year Ended June 30, 2015), at 12–13.  This revenue exceeded HTA's

debt service by over $130 million in FY 2015 and $200 million in FY 2014, see id. at 12–13, thus

enabling HTA to satisfy its obligations to bondholders while providing additional liquidity to

support its operations.  But since HTA's Title III was filed, the Commonwealth has transferred

over $1 billion in Excise Taxes from HTA to itself.[8]  The Commonwealth continues to siphon

approximately $30 to 50 million in Excise Taxes from HTA each month, a rate at which over $400

million will be diverted annually.  Mot. Decl. Ex 30 (HTA_STAY0000001).

25.      The Government Parties are well aware of the havoc these transfers wreak on

HTA's finances.  For example, HTA's 2016 audited financial statements expressly acknowledge

that the diversion of the Pledged Revenues, beginning with the Clawback Order, "diminished"

HTA's ability to pay its debts, stating: "[The Clawback Order] had a significant negative effect on

---

[8] See Mot. Decl. Ex 30 (HTA_STAY0000001, a spreadsheet showing  diversion of Excise Tax Revenues amounting to $27,695,000 in June 2017, $378,921,000 in FY 2018, $408,059,000 in FY 2019, and $212,151,000 as of November in FY 2020); see also Audited Financial Statements, Puerto Rico Highways and Transportation Authority, Year Ended June 30, 2018 at 34 ("During the fiscal year ended June 30, 2018, the Authority did not receive taxes amounting to approximately $299.3 million.").

[HTA's] liquidity . . . . [W]ithout the taxes and other revenues allocated by the Commonwealth . . . , [HTA] is unable to deposit additional monies in the bond payment reserve accounts and without additional deposits *the ability to continue making the schedule payments on the bonds issued is diminished."* Mot. Decl. Ex. 24 at 28-29 (emphasis added). FOMB similarly acknowledged in HTA's April 28, 2017 fiscal plan (Mot. Decl. Ex. 25) that HTA's fiscal situation "was recently aggravated" by the diversion of the Excise Taxes, calling into question HTA's ability to repay the HTA Bonds. See Ex. 25 at 16. HTA's most recent audited financial statements, from fiscal year 2018 (the "2018 Financial Statements", Mot. Decl. Ex. 26) similarly admit that HTA "does not have sufficient funds available to fully repay its various obligations as they come due" and expressed "substantial doubt about [HTA's] ability to continue as a going concern." Mot. Decl. Ex. 26 at 3. The 2018 Financial Statements also admit that "the [First Moratorium Law], the related executive orders, and subsequent to the enactment of PROMESA certain developments in connection with actions of the Oversight Board . . . have had a significant negative effect on [HTA's] liquidity . . . . There is no indication that the conditional allocation of gasoline, oil, diesel, and petroleum taxes to [HTA] will resume . . . . Without the taxes and other revenues conditionally allocated by the Commonwealth . . . , [HTA] has been unable to make the scheduled payments on its outstanding bonds and fund its reserve accounts accordingly." Id. at 34.

26.     The 2020 HTA Fiscal Plan likewise lays bare the devastating impact of the Commonwealth's misappropriation of HTA's assets going forward. The Commonwealth will collect hundreds of millions in HTA's Excise Taxes, and yet the Fiscal Plan forecasts the continued misappropriation of the lion's share of HTA's revenues. As a direct result, the Fiscal Plan anticipates that HTA as it currently operates will be hopelessly insolvent over the next thirty years to the tune of $6.4 *billion*. Mot. Decl. Ex. 31 (2020 HTA Fiscal Plan) at 33–34. FOMB hopes to

address this shortfall through a series of "fiscal measures," primarily by increasing fares, fine collections, and reassessing contracts for Tren Urbano, the heavy rail system in San Juan that has been foisted onto HTA's balance sheet.  *Id.* 43–44.  But there is no guarantee these measures will yield the revenue increases and cost reductions that FOMB claims, and even FOMB's own untested projections would close the deficit by only $4.7 billion, leaving HTA insolvent by a $1.7 billion deficit over FY 2021 through FY 2049.  *Id.*  And, critically, by stripping HTA of its Excise Taxes, the Fiscal Plan leaves it with little or nothing to repay its debts and thus regain access to the capital markets.  Indeed, as the Fiscal Plan shows, without receiving its Excise Taxes, HTA cannot remain solvent and still make the $11.9 billion in capital expenditures the Fiscal Plan posits are necessary to maintain its infrastructure over the next thirty years.  *Id.* at 41–42.  Thus, under FOMB's supervision, HTA has no credible way of regaining access to the capital markets to finance these expenditures as required by Commonwealth law and as contemplated by PROMESA.

## PROCEDURAL HISTORY

27.     Avoidance actions under Bankruptcy Code Sections 549, 544 and 548 must be brought within certain specified time periods.  The statute of limitations for an action or proceeding under Section 549 is "two years after the date of the transfer sought to be avoided."  11 U.S.C. § 549(d).  The statute of limitations for an action under Sections 548 or 544 is within two years of the commencement of the Title III case.  11 U.S.C. § 546(a) ("2 years after the entry of the order for relief"); id. § 301(b) ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief. . . .").  HTA filed for Title III protection on May 21, 2017. As a result, any claims under §§ 548 or 544 were originally set to expire no later than May 21, 2019.

28.     However, on April 26, 2019, the Court approved a tolling stipulation (ECF No. 6531, the "First Tolling Stipulation", Mot. Decl. Ex. 21) under which FOMB, on behalf of the

Commonwealth, and the Puerto Rico Fiscal Agency and Financial Advisory Authority

("AAFAF"), on behalf of HTA, agreed that the statutory deadline for avoidance actions "shall

expire two hundred seventy (270) days from and after the date on which the Statutory Deadlines

would have expired in the absence of this Stipulation."  Mot. Decl. Ex. 21 ¶ 1.  Accordingly, per

the First Tolling Stipulation, the statute of limitations would have expired on February 15, 2020.

29.     Anticipating this February 15 expiration of the statute of limitations, certain

Movants, on January 15, 2020, sent a letter (the "Demand Letter", Mot. Decl. Ex. 1) to FOMB

demanding that FOMB pursue avoidance actions on behalf of HTA against the Commonwealth

resulting from the unlawful diversion of Excise Taxes.  On January 29, 2020, FOMB sent a letter

responding to the Demand Letter (the "Demand Letter Response", Mot. Decl. Ex. 2) in which

FOMB refused to pursue such actions, erroneously reasoning that "they are not actions to recover

HTA's property.  They are actions to collect property you think the Commonwealth must transfer

to HTA pursuant to a pre-PROMESA statute providing for such appropriations."

30.     FOMB and AAFAF subsequently moved for—and this Court approved—entry of

a second tolling stipulation (ECF No. 9722, the "Second Tolling Stipulation", Mot. Decl. Ex. 22)

that extended the statutory deadlines by an additional one hundred eighty-one (181) days beyond

the period set forth in the First Tolling Stipulation, i.e. until approximately August 14, 2020.

31.     Following entry of the Second Tolling Stipulation, the Mediation Team filed an

amended report (ECF No. 10756, the "Amended Report") in which it recommended that this Court

"set a schedule for the filing of, and determination of, any motion seeking relief addressing alleged

continuing conflicts of interest of the FOMB and the Government of Puerto Rico acting for both

the Commonwealth and HTA."  Amended Report at 13.

32.     Movants objected to this aspect of the Amended Report on the basis that (i) there

is no statutory deadline to move for appointment of a trustee under Section 926 of the Bankruptcy

Code; and (ii) Movants would not know whether relief under Section 926 could be pursued until

their then-pending motion to lift the automatic stay (ECF No. 10102, the "HTA Lift Stay Motion")

had been fully adjudicated.  See ECF No. 11493 (the "Amended Report Objection") § II.

33.      Nevertheless, the Court adopted this aspect of the Amended Report and ordered

that conflict motions, including Section 926 motions, be filed by "15 days after the Court's ruling

in connection with the preliminary hearing on the HTA Lift Stay Motion."  ECF No. 12186 ¶ 3.

34.      The Court entered its ruling in connection with the preliminary hearing on July 2,

2020.  ECF No. 13541.  On July 10, Movants filed an urgent motion to adjourn the 15-day deadline,

except as to Section 926 motions.  ECF No. 13606.  On July 13, the Court entered a bridge order

extending that deadline until seven (7) days after the urgent motion is resolved.  ECF No. 13612.

## ARGUMENT

### I.      Movants Should Be Appointed Co-Trustees Under Bankruptcy Code § 926.

35.      FOMB has declined to prosecute HTA's claims against the Commonwealth.  This

is unsurprising.  Given its simultaneous representation of the Commonwealth and HTA, these

claims present a conflict of interest because they would require the Commonwealth to remedy its

own wrongdoing.  FOMB's refusal jeopardizes HTA's financial future and frustrates the fiduciary

duty owed by HTA to its Bondholders, depriving them of their bargained-for rights.  See, e.g.,

Ambac Assurance Corp. v. HTA, No. 16-1893, 2016 WL 2930924, at *2 (D.P.R. May 19, 2016)

(recognizing HTA's "fiduciary duties" to HTA Bondholders).  But this Court can cure FOMB's

inaction.  By incorporating Section 926 of the Bankruptcy Code, PROMESA authorizes the Court

to appoint a trustee to prosecute certain types of avoidance actions the debtor has refused to pursue.

Movants' Proposed Complaint identifies at least four causes of action under the Bankruptcy

Code—one under Section 549, one under Section 544, and two under Section 548.  FOMB should

have asserted at least these claims against the Commonwealth based on the Commonwealth's transfer of HTA's assets to itself under color of the Moratorium Laws, Moratorium Orders, Clawback Order, Compliance Law, and fiscal plans.  A trustee appointed by this Court under Section 926 would be able to avoid those transfers and recover their value for HTA and its creditors.  Accordingly, this Court should appoint Movants as co-trustees under Section 926.

A.     **Section 926 Permits A Title III Court To Appoint A Trustee To Pursue Avoidance Actions On Behalf Of The Debtor.**

36.     Section 926 provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of [the Bankruptcy Code], then on request of a creditor, the court may appoint a trustee to pursue such cause of action."  11 U.S.C. § 926(a); see PROMESA § 301(a) (incorporating § 926(a) into PROMESA).  As relevant here, Sections 548, 549 and 544 allow the debtor to avoid unlawful transfers, and Section 550(a) allows the debtor to recover the transfers or their value from the transferee.

37.     The existence of a conflict of interest is sufficient reason to appoint a trustee.  See generally 6 Collier on Bankruptcy ¶ 926.02 (16th ed. rev. 2018) ("The reason for Section 926(a) derives from the possible reluctance of a debtor to bring an action . . . during the course of a chapter 9 case" because "the debtor actually favors the transfer rather than opposes it.").  "Section 926 explicitly anticipates and is intended to address those scenarios in which the debtor does not consent to the pursuit of a cause of action."  In re N.Y. City Off-Track Betting Corp., No. 09-17121, 2011 WL 309594, at *6 (Bankr. S.D.N.Y. Jan. 25, 2011).  As courts have recognized in the analogous context of derivative standing, a debtor abuses its discretion and acts unjustifiably where it "acts under the influence of conflicts of interest."  In re Gibson Grp., Inc., 66 F.3d 1436, 1441 (6th Cir. 1995).  And where appointment of a trustee is warranted, "the court is given unfettered discretion in determining whom to appoint as trustee."  6 Collier, supra, ¶ 926.02[3].

**B.    HTA Has Claims Against The Commonwealth Under Sections 549, 544 And 548 That FOMB Has Unjustifiably Refused to Pursue.**

38.    As co-trustees under Section 926, Movants could pursue viable claims by HTA against the Commonwealth under 11 U.S.C. §§ 549, 544, and 548.  These claims are summarized below and set forth in greater detail in the Proposed Complaint, which is incorporated herein by reference and attached as Exhibit C.

**1.    A Trustee Could Avoid Postpetition Transfers Under § 549.**

39.    Under Section 549 of the Bankruptcy Code, a "trustee may avoid a transfer of property . . . that occurs after the commencement of the case; and . . . that is not authorized under [Title III of PROMESA] or by the court."  11 U.S.C. § 549(a).[9]  PROMESA makes this power available to a trustee appointed under Bankruptcy Code § 926.  See id. § 926(a) (trustee may pursue action under § 549(a)); PROMESA § 301(a) (incorporating §§ 549(a) and 926 into PROMESA).

40.    To establish a § 549(a) claim, the trustee must allege that (1) property of the debtor existed, (2) such property was transferred, (3) such transfer occurred after commencement of the case, and (4) the transfer was not authorized by Title III or the court.  See In re Tougas, 338 B.R. 164, 177-78 (Bankr. D. Mass. 2006); accord In re Marrero, 382 B.R. 861, 865-66 (B.A.P. 1st Cir. 2008).  The burden of proof then shifts to the "entity asserting the validity of [the] transfer."  Fed. R. Bankr. P. 6001.

41.    Here, since the commencement of the Title III cases, the Commonwealth has collected the Excise Taxes as HTA's agent, and then, in violation of Title III and without approval of this Court, has transferred the Excise Taxes for its own use—including, for example, by depositing such property in the Commonwealth's general fund, using it to fund government

---

[9] See also PROMESA § 301(d) ("Solely for purposes of [Title III of PROMESA], a reference to 'this title', 'this chapter', or words of similar import in a section of [the Bankruptcy Code], made applicable in a case under [Title III of PROMESA] by [section 301(a) of PROMESA] . . . shall be deemed to be a reference to [Title III of PROMESA].").

expenses, or purporting to use it for payment of debts other than the HTA Bonds.  See Proposed
Complaint ¶¶ 99, 104, 107.  Although the Commonwealth may purport to have made these
transfers under color of the Moratorium Laws, Moratorium Orders, fiscal plans, budgets and
Compliance law, the transfers were not authorized by Title III or by this Court, and indeed, those
laws and executive orders were unauthorized.

42.    Specifically, PROMESA preempts (i) any moratorium law (including the
Moratorium Laws, Moratorium Orders, fiscal plans, budgets, and Compliance Law) and (ii) any
"unlawful executive orders" (including the Moratorium Orders) that alter the rights of holders of
any debt of a territorial instrumentality or divert funds from one instrumentality to another or to
the Commonwealth.  PROMESA § 303(1), (3).  In any event, Title III itself contains no
authorization for such transfers, and the automatic stay forbids them.  Accordingly, all postpetition
transfers of HTA property to the Commonwealth constitute "transfer[s] of property of [HTA] . . .
not authorized under [Title III of PROMESA]."  11 U.S.C. § 549(a).

43.    Furthermore, the fiscal plans, budgets and the Compliance Law violate PROMESA.
Specifically, section 201(b)(1)(M) of PROMESA requires a fiscal plan to "ensure that assets,
funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise
used for the benefit of a covered territory or another covered territorial instrumentality of a covered
territory."  Section 201(b)(1)(N) of PROMESA requires a fiscal plan to "respect the relative lawful
priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a
covered territory or covered territorial instrumentality in effect prior to the date of enactment of
[PROMESA]."  FOMB's fiscal plans to date (i) purport to *mandate*, rather than prevent, the types
of inter-debtor transfers that are prohibited under section 201(b)(1)(M), and (ii) give no
consideration whatsoever to priorities and liens under Commonwealth law.  Budgets must be
compliant with PROMESA, including the foregoing provisions.  See, e.g., Section 202(c)(1).  For

-18-

the same reason, the Compliance Law, which seeks to enforce the fiscal plans, also violates PROMESA.

44.    In any event, any postpetition transfers of HTA property to the Commonwealth—whether purportedly made under color of the Moratorium Laws, Moratorium Orders, fiscal plans and Compliance Law or not—violate the automatic stay, which bars the Commonwealth from engaging in "any act to obtain possession of property of [HTA] or of property from [HTA] or to exercise control over property of [HTA]." 11 U.S.C. § 362(a)(3); PROMESA § 301(a) (incorporating § 362 into PROMESA). The Moratorium Laws, Moratorium Orders, fiscal plans and Compliance Law do not somehow override the automatic stay, and the Commonwealth's efforts to obtain possession of HTA's property for its own benefit constitute automatic stay violations.

45.    As such, a trustee would have authority to avoid the transfers under Section 549 because the laws through which the Commonwealth diverted HTA's funds were "unauthorized," not only under Title III (which is all that section 549(a) requires), but also under PROMESA more generally. 11 U.S.C. § 549(a).

### 2.    A Trustee Could Avoid Transfers Under Section 544.

46.    Section 544(b)(1) of the Bankruptcy Code provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowable] unsecured claim." PROMESA makes this power available to a trustee appointed under Bankruptcy Code § 926. See 11 U.S.C. § 926(a) (trustee may pursue action under § 544(b)); PROMESA § 301(a) (incorporating §§ 544(b) and 926 into PROMESA).

47.    Here, the applicable law is Puerto Rico fraudulent transfer law, as set forth in the Civil Code of Puerto Rico. 31 L.P.R.A. §§ 3492, 3498. Specifically, a transaction that is executed in "fraud of creditors, when the latter cannot recover . . . what is due them" may be rescinded. 31

L.P.R.A. § 3492.  Puerto Rico law further provides that "contracts by virtue of which the debtor

alienates property, without monetary consideration, are presumed to be executed in fraud of

creditors." 31 L.P.R.A. § 3498.[10]

48.     In considering whether a transfer is fraudulent, the debtor need not have "intended

to harm his creditors;" it is enough "that he knew of the results of his action."  In re Sepulveda

Figueras, 193 B.R. 118, 120-21 (Bankr. D.P.R. 1996); see also De Jesus Diaz v. Carrero, 12 P.R.

Offic. Trans. 786, 796, 112 D.P.R. 631, 638 (1982) ("fraud does not require evidence of the

purpose or aim of the debtor to harm his creditors, it suffices to show that he knew about the results

produced").  Courts also consider whether the transfer was for inadequate consideration or made

in haste, the debtor's insolvency, the relationship between the debtor and the transferee, and the

state of the business of the debtor and of the judicial claims against him.  See id. at 795; In re El

Mundo Corp., 208 B.R. 781, 782-83 (D.P.R. 1997)).

49.     Consistent with this framework, the diversion from HTA to the Commonwealth of

funds to which the HTA Bondholders and HTA are legally entitled constitutes a fraudulent transfer

under Puerto Rico law and, consequently, under Bankruptcy Code § 544(b).  First, HTA received

no consideration; the property was merely diverted.  Second, the transfers were made to the

Commonwealth, an insider of HTA.  Third, the Commonwealth's unlawful diversion of funds has

left HTA without the resources to pay what is due to its creditors.  Indeed, the most recent HTA

Fiscal Plan projects that HTA will have a total cash of flow of only $860 million during the entire

five-year period from Fiscal Years 2021-2025, and over that same period HTA has or will incur

$1.272 billion in operating expenses.  See Mot. Ex. 23 at 35, 38.  But even if the full $860 million

---

[10] The English translation of 31 L.P.R.A. § 3498 on Westlaw mistakenly translates the statute as "Contracts by virtue of which the debtor alienates property, for a good consideration, are presumed to be executed in fraud of creditors." However, the Spanish phrase translated as "for a good consideration" on Westlaw is "a título gratuito," which actually means without monetary consideration.  See Mot. Decl. Ex. 32 (certified translation)

were diverted to service HTA's debt, it would be grossly insufficient to pay the approximately

$1.812 billion in debt service coming due on the HTA Bonds during this period.  See Mot. Decl.

Ex. 23.  Thus, the Commonwealth's transfers of the Excise Taxes are fraudulent transfers under

Puerto Rico law, and a trustee would have authority to avoid them under Section 544.

### 3.        A Trustee Could Avoid Transfers Under Section 548.

50.        Section 548 of the Bankruptcy Code provides a mechanism to recover a debtor's

dissipation of assets where such dissipation constitutes an intentional or constructive fraudulent

transfer.  11 U.S.C. § 548(a).  An intentional fraudulent transfer is "one in which there [is] 'actual

intent to hinder, delay, or defraud' a creditor," and a constructive fraudulent transfer is "a transfer

for less than reasonably equivalent value made when the debtor was insolvent or was rendered so

by the transfer."  In re Tribune Co. Fraudulent Conveyance Litig., 946 F.3d 66, 73 (2d Cir. 2019).

PROMESA makes the power to avoid such fraudulent transfers available to a trustee appointed

under Bankruptcy Code § 926.  See 11 U.S.C. § 926(a) (trustee may pursue action under § 548);

PROMESA § 301(a) (incorporating §§ 548 and 926 into PROMESA).

### a.        A Trustee Could Avoid Transfers As Intentional Fraudulent Transfers Under § 548(a)(1)(A).

51.        As explained above, a trustee can avoid a transaction as an intentional fraudulent

transfer where the trustee demonstrates "actual intent to hinder, delay or defraud any entity to

which the debtor was or became . . . indebted."  In re Lyondell Chem. Co., 554 B.R. 635, 650

(S.D.N.Y. 2016).  "The debtor's actual intent to defraud 'need not target any particular entity or

individual as long as the intent is generally directed toward present or future creditors of the

debtor.'"  Id.  "The debtor must have had an intent to interfere with creditors' normal collection

processes or with other affiliated creditor rights for personal or malign ends."  Id.  Additionally,

"where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of

the adequacy of consideration given." <u>United States v. McCombs</u>, 30 F.3d 310, 328 (2d Cir. 1994).
Here, the diversion of HTA's funds has permitted HTA to avoid debt service on its outstanding
obligations and caused diminution in the Pledged Revenues' value by at least $1 billion since HTA
filed for Title III protection.  <u>See</u> <u>supra</u> ¶¶ 24–25.

52.     Furthermore, because "it is often impracticable, on direct evidence, to demonstrate
an actual intent to hinder, delay or defraud creditors," courts "frequently infer fraudulent intent
from the circumstances surrounding the transfer."  <u>Max Sugarman Funeral Home, Inc. v. A.D.B.</u>
<u>Inv'rs</u>, 926 F.2d 1248, 1254 (1st Cir. 1991).  Among the "badges of fraud" are:  (i) actual or
threatened litigation against the debtor; (ii) a transfer of all or substantially all of the debtor's
property; (iii) insolvency or other unmanageable indebtedness on the part of the debtor; and (iv) a
special relationship between the debtor and the transferee.  <u>Id.</u>  In evaluating whether a special
relationship exists, courts consider whether the transferee is an insider.[11]  While "the presence of
a single badge of fraud may spur mere suspicion, the confluence of several can constitute
conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a
legitimate supervening purpose."  <u>Id.</u> at 1254-55 (citation omitted).

53.     These "badges of fraud" exist here.  First, HTA's unlawful diversion of funds was
initiated towards the end of 2015, at which time Puerto Rico was not entitled to any form of relief
under the Bankruptcy Code.  At that time, HTA and its creditors were attempting to negotiate a
consensual restructuring of HTA's debt, with the understanding that litigation would likely ensue
if such a consensual restructuring could not be achieved.  As a bargaining chip in these

---

[11] <u>In re Luciani</u>, 584 B.R. 449, 462 (Bankr. D. Mass. 2018) (explaining that "transactions involving insiders are subject
to greater scrutiny than those at arms length" in the context of a cause of action under § 548(a)(1)); <u>In re Catco
Recycling, LLC</u>, No. 14–11021, 2016 WL 556173, at *10 (Bankr. D.N.H. Feb. 10, 2016) (explaining that badges of
fraud existed where "[the transferee] was an 'insider' within the meaning of the Bankruptcy Code, [due to her status
as] a relative of . . . the person in control of the Debtor."); <u>In re Zenox, Inc.</u>, 173 B.R. 46, 50 (Bankr. D.N.H. 1994)
(explaining that where the transfer "was made to a corporate insider," the badges of fraud were sufficient "to sustain
the cause of action under § 548(a)(1)").

negotiations, and against the backdrop of potential litigation, the Commonwealth and HTA threatened to initiate "clawbacks" if creditors did not accede to their demands.  When no agreement with HTA's creditors was reached, the Commonwealth carried through on this threat by issuing the Clawback Order, which transferred substantially all of HTA's tax revenues, rendering HTA unable to service its debt.  Following HTA's Title III filing, the Commonwealth diverted more than $1 billion of the Excises Taxes and continues to divert more.  See supra ¶ 24.  HTA became insolvent or otherwise unable to manage its debts as a result of these transfers.  See supra ¶¶ 25–26.  Furthermore, the existence of a "special relationship" cannot be disputed – the Excise Taxes have been transferred to the Commonwealth, an HTA insider.  Additionally, parties to the transfer were aware of HTA's obligations to the HTA Bondholders, the harm that the diversion of HTA's funds would cause the HTA Bondholders, and the various laws and agreements that gave rise to the HTA Bondholders' lawful rights to the Pledged Revenues.  There are abundant indicia of fraud in these circumstances, and a trustee would therefore be authorized to avoid the transfers as intentional fraudulent transfers under Bankruptcy Code section 548(a)(1)(A).

### b.    A Trustee Could Avoid Transfers As Constructive Fraudulent Transfers Under Section 548(a)(1)(B).

54.    Additionally, a trustee can avoid a transaction as a constructive fraudulent transfer where the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and "became insolvent as a result of such transfer or obligation."  11 U.S.C. § 548(a)(1)(B).  Courts measure the value of what was given and received in the transaction.  In re Duke & Benedict, Inc., 265 B.R. 524, 532 (Bankr. S.D.N.Y. 2001) (explaining the under section 548, a trustee must prove that the debtor received less than fair consideration or reasonably equivalent value at the time of the transaction).  In determining whether a debtor was rendered insolvent as a result of the challenged transfer, a court must "examine the ability of the debtor to

generate enough cash from operations and sales of assets to pay its debts and remain financially

stable after a transfer." In re Jackson, 459 F.3d 117, 123 (1st Cir. 2006) (internal quotation marks

omitted). There need not be a finding of post-transfer insolvency; instead, "difficulties which are

short of insolvency in any sense but [] likely to lead to insolvency at some time in the future" are

sufficient. Id. at 124.

55.     Here, HTA received no consideration in exchange for the transfer of the Excise

Taxes to the Commonwealth. The funds were just taken. Additionally, HTA and FOMB have

effectively conceded that HTA's insolvency was to some degree related to the transfer of the

Excise Taxes to the Commonwealth. See supra ¶ 25–26. Given these circumstances, a trustee

would have the authority to avoid the transfers of funds to the Commonwealth as a constructive

fraudulent transfer.

### C.     Movants' Interests Are Aligned With Those Of HTA And Other HTA Bondholders.

56.     Movants are well-positioned to fulfill the role of Section 926 trustees because, like

other HTA Bondholders, they are creditors of HTA, seek payment from HTA and are thus

motivated to pursue this litigation. Moreover, Movants insure both HTA Bonds issued under

HTA's 1968 bond resolution and HTA Bonds issued under HTA's 1998 bond resolution, meaning

that Movants' interests are aligned with those of both 1968 and 1998 HTA Bondholders. Movants'

interests are also aligned with those of HTA itself, which has an interest in recovering the funds

necessary to pay its existing debts so that it can regain solvency and once again "achieve . . . access

to the capital markets." PROMESA § 101(a).

### II.    FOMB's Refusal To Bring Claims Under Sections 549, 544 And 548 Lacks Merit.

57.     Movants respectfully believe that the First Circuit will not affirm the Court's

preliminary lift-stay ruling regarding property interests. See supra ¶ 3. Indeed, HTA, not the

Commonwealth, is the true beneficial owner of the Excise Taxes.  See Proposed Complaint § I.

Moreover, FOMB is not in a position to objectively assess or diligently defend HTA's interests,

or even consider the chance of success on appeal, because FOMB simultaneously represents not

only HTA, but also the Commonwealth, and FOMB has consistently (and inexcusably) favored

the Commonwealth's interests over those of HTA.  In view of FOMB's conflict of interest, the

decision on whether to pursue HTA's avoidance claims against the Commonwealth cannot be left

to FOMB.  Instead, a trustee should be appointed under Section 926 for that purpose.

A.   **FOMB Suffers From An Unresolvable Conflict Of Interest Because It
Currently Represents Parties With Opposing Interests In The Same Case And
Is Disregarding The Best Interests Of HTA And HTA's Creditors.**

58.   FOMB's role in diverting HTA's funds to the Commonwealth demonstrates its

refusal to recognize HTA's separate corporate existence under Puerto Rico law.  See, e.g. 9

L.P.R.A. § 2002 (establishing HTA as a "body corporate and politic . . . consisting of a public

corporation"); 13 L.P.R.A. § 31751(a) (establishing that the Commonwealth's Secretary of the

Treasury cannot deposit Excise Taxes in the Commonwealth's general fund and instead must hold

them in a special deposit in the name and for the benefit of HTA and its bondholders); see also 9

L.P.R.A. § 5681; 9 L.P.R.A. § 2021.  PROMESA, like Puerto Rico law, also recognizes HTA's

status as an independent debtor.  For example, fiscal plans under PROMESA are expressly

required to ensure that "assets, funds, or resources" of HTA are not "transferred to, or otherwise

used for the benefit of" the Commonwealth.  PROMESA § 201(b)(1)(M).  Similarly, PROMESA

provides a cause of action to protect creditors from inter-debtor transfers.  See PROMESA § 407.

Indeed, PROMESA provides that "nothing in [Title III] shall be construed as authorizing

substantive consolidation of the cases of affiliated debtors."  PROMESA § 304(f).  The diversion

of HTA's funds to the Commonwealth disregards HTA's status and, when combined with FOMB's

conflicts of interest, operates to collapse HTA and the Commonwealth into a single entity, thereby

effecting the very *de facto* substantive consolidation prohibited by PROMESA.

59.    Movants have every reason to believe that FOMB will refuse to bring an avoidance

action on HTA's behalf even if, through a First Circuit appeal of the lift-stay decision or otherwise,

it is determined that HTA owns the Excise Taxes.  Beyond having its own interests, HTA owes

fiduciary duties to its creditors, including the HTA Bondholders.  FOMB, as HTA's representative,

has those same duties.  See, e.g., Ambac Assurance Corp. v. HTA, No. 16-1893, 2016 WL

2930924, at *2 (D.P.R. May 19, 2016) (recognizing HTA's "fiduciary duties" to HTA

Bondholders).[12]  But HTA and FOMB cannot fulfill those duties if they are simultaneously

beholden to the Commonwealth's conflicting interests.[13]   And PROMESA's prohibition of

substantive consolidation is especially relevant here, where the HTA Bondholders' decision to

lend HTA money contemplated no recourse against the general credit of the Commonwealth. See

In re Sarner, No. 10-17487-JNF, 2010 WL 3282589, at *4 (Bankr. D. Mass. Aug. 19, 2010)

(explaining that courts consider "whether creditors dealt with the entities as a single economic unit

and did not rely on their separate identity in extending credit" when determining whether

substantive consolidation is permissible); In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d

Cir. 1988) (explaining that substantive consolidation requires consideration of "whether creditors

dealt with the entities as a single economic unit and 'did not rely on their separate identity in

---

[12] See also, e.g., Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985) ("[I]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."); In re WHET, Inc., 750 F.2d 149, 149 (1st Cir. 1984) (*per curiam*) (trustee "owes a fiduciary duty to debtor and creditors alike to act fairly and protect their interests").

[13] See, e.g., Woods v. City Nat'l Bank & Tr. Co. of Chi., 312 U.S. 262, 269 (1941) ("A fiduciary who represents security holders in a reorganization may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.  Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that trodden by the crowd.'"); In re WM Distribution, Inc., 571 B.R. 866, 872 (Bankr. D.N.M. 2017) ("Simultaneous representation of two related debtors presents a potential for an actual conflict of interest . . . . Courts often find such dual representation a disqualifying actual conflict.").

extending credit'").

**B.**     **Timely Appointment Of A Trustee Is Necessary To Preserve HTA's And HTA Bondholders' Rights.**

60.     As noted above, avoidance actions under Sections 549, 544 and 548 must be brought within certain specified time periods.  See supra ¶ 27.  Notwithstanding the urgency created by these time limitations, FOMB has expressed no interest in pursuing these claims and, more recently, has flatly refused to take any action—including to extend the statute of limitations to permit the First Circuit to review the Court's lift-stay rulings regarding property interests.  See Demand Letter Response, Mot. Decl. Ex. 2.  Movants seek appointment by this Court to preserve the right to pursue the claims set forth in the Proposed Complaint and any other similar claims in advance of the looming August 14, 2020 deadline for bringing claims under Sections 544 and 548.  At minimum, the Court should grant the Proposed Bridge Order to preserve existing rights.

**III.     The First Circuit's *Andalusian* Decision Supports Appointment of a Section 926 Trustee For HTA.**

61.     On November 19, 2019, a group of ERS bondholders (the "ERS Bondholders") sought the appointment of a trustee for ERS under Section 926 (ECF No. 9260, the "ERS 926 Motion").  This Court denied the ERS 926 Motion, and the First Circuit affirmed.  See In re The Financial Oversight and Management Board for Puerto Rico, 432 F. Supp. 3d 25 (D.P.R. 2020), aff'd sub. nom. Andalusian Glob. Designated Activity Company, et al. v. FOMB, 954 F.3d 1 (1st Cir. 2020) ("Andalusian").  Although the ERS 926 Motion was denied, the underlying principles articulated by the First Circuit actually support granting the HTA 926 Motion here.  The First Circuit focused on (i) the purposes of PROMESA, which here support granting the HTA 926 Motion; (ii) the need to respect Puerto Rico law, which here supports authorizing HTA to take action to remedy the Commonwealth's *violations* of that law; and (iii) the inappropriateness of the ERS Bondholders' efforts to "proliferate" duplicative actions, which is not a concern here.

62.     Moreover, permitting the Commonwealth to confiscate HTA's property here would amount to a substantive consolidation prohibited under PROMESA § 304(f), further justifying appointment of a Section 926 trustee.  Unlike in <u>Andalusian</u>, where the First Circuit concluded that the Commonwealth's transfer of ERS property aligned with ERS's own interest in achieving efficiency in the Commonwealth government, here HTA can have no interest in forfeiting its own funds to pay Commonwealth expenses that are unrelated to HTA's corporate purpose.  Rather, the assets of one Debtor (HTA) are simply being taken to pay the creditors of a different affiliated Debtor (the Commonwealth).  That is substantive consolidation, and PROMESA prohibits it.

### A.    <u>Granting The HTA 926 Motion Serves The Purposes Of PROMESA.</u>

63.     As an initial matter, the First Circuit in <u>Andalusian</u> indicated that the decision whether to grant a Section 926 motion should be guided by the "purpose" of the applicable statute, be it chapter 9 or PROMESA.  <u>Andalusian</u>, 954 F.3d at 8.  In the case of PROMESA, Congress made that "purpose" explicit.  The *express* purpose of PROMESA is to "**provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets.**"  PROMESA § 101(a) (emphasis added); <u>see also</u> PROMESA §§ 201(b)(1), 209.[14]  Each of the two goals of

---

[14] In addition, PROMESA § 405(m) states that "A comprehensive approach to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico is necessary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process."  Congress's reference to a *fair* and orderly process indicates that the Court is to consider the interests of HTA and its creditors rather than only the interests of the Commonwealth government, because otherwise the process would not be "fair."  Moreover, PROMESA § 405(m) indicates that FOMB's primary tasks are supposed to be to (i) remedy "fiscal, management, and structural problems" in the Commonwealth government and (ii) make "adjustments" to spending that "exempt[] no part of the Government of Puerto Rico."  But FOMB has failed in these two primary tasks assigned to it by Congress.  <u>See</u>, <u>e.g.</u>, Mot. Decl. Ex. 27 at 10 (2020 Commonwealth fiscal plan providing for increased government spending and acknowledging that "the Government has still failed to achieve meaningful economic growth through structural reforms or drive operational change that would deliver greater responsiveness and efficiency of government services").  Instead of completing the tasks assigned to it by Congress, FOMB has sought to offload the costs of its own failure onto disfavored creditors (like Movants) and disfavored instrumentalities (like HTA) by pursuing debt adjustments with respect to such creditors and instrumentalities to the exclusion of the other, more fundamental tasks assigned to it by Congress.  Neither Movants nor HTA should be forced to subsidize FOMB's failure to carry out its Congressional mandate, and appointing a trustee to pursue HTA's claims against the Commonwealth could help to refocus FOMB on the real goals of PROMESA, which are fiscal responsibility, access to capital markets, and corresponding structural reform.

PROMESA identified by Congress weighs in favor of granting the HTA 926 Motion.

64.    *First*, by achieving "fiscal responsibility," Congress clearly meant that Puerto Rico

needed to reduce unnecessary government spending.  See, e.g., PROMESA § 203(d) (authorizing

FOMB to "make appropriate reductions in nondebt expenditures.").[15]  Congress certainly did *not*

intend for Puerto Rico to continue funding any *non-essential* government operations (cf.

PROMESA § 201(b)(1)(B), authorizing fiscal plans to fund only "essential public services"), nor

did Congress intend to permit the Commonwealth under any circumstances to pillage the assets of

its instrumentalities, like HTA, and especially not for the purpose of funding non-essential

operations.  See PROMESA § 201(b)(1)(M);[16] see also, e.g., PROMESA §§ 303(3), 407.

65.    *Second*, by prioritizing "access to the capital markets," Congress clearly intended

for Puerto Rico and its instrumentalities to maintain or improve their standing in the capital

markets by paying their existing debts to the maximum extent possible, consistent only with

maintaining "*essential* public services" (PROMESA § 201(b)(1)(B) (emphasis added)).  See, e.g.,

PROMESA § 201(b)(1)(N) (requiring fiscal plans to "respect the relative lawful priorities or

lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered

territory or covered territorial instrumentality in effect prior to the date of enactment of

[PROMESA]").[17]  HTA is by dint of Commonwealth law responsible for constructing, maintaining

---

[15] See also, e.g., Brief of Congressman Rob Bishop, Chairman of the House Committee on Natural Resources, as *Amicus Curiae in Support of Neither Party*, Ambac Assurance Corp. v. Commonwealth of Puerto Rico, Case No. 18-1214 (1st Cir. June 29, 2018) (the "Bishop Brief"), Mot. Decl. Ex. 28 at 8 (noting that PROMESA was enacted in part to remedy Puerto Rico's practice of "spending in excess of appropriated amounts").

[16] "A Fiscal Plan developed under this section shall . . . provide a method to achieve fiscal responsibility and access to the capital markets, and . . . (M) **ensure that assets, funds, or resources of a territorial instrumentality [e.g. HTA] are not loaned to, transferred to, or otherwise used for the benefit of a covered territory [i.e. the Commonwealth]** . . . , unless permitted by the constitution of the territory, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI."  PROMESA § 201(b)(1)(M) (emphasis added).

[17] See also, e.g., Bishop Brief, Mot. Decl. Ex. 28 at 2 ("Congress also required the Commonwealth to deal fairly with its existing creditors and respect their rights, to enable conditions by which Puerto Rico could reach access to credit at reasonable rates of interest in the capital markets."); id. at 4 ("the Committee [on Natural Resources] included protections for creditors' rights before, during and after a Title III case to ensure any nonconsensual restructuring

and operating its system of highways.  9 L.P.R.A. §§ 2002, 2004.  It must regain access to the capital markets to fulfill its mission.  To do so requires adequate financial resources, which the Excise Tax Statutes were intended to provide and *would* provide, but for the wrongful transfers.

66.     Congress's express purposes in enacting PROMESA will therefore be served by permitting HTA to recover its property from the Commonwealth so that HTA can regain financial health, pay its existing debts and regain access to the capital markets.  Even assuming the Commonwealth were required to reduce funding for some small portion of non-essential services or operations as a result of HTA's recovery of its assets from the Commonwealth, that too would be in full accord with Congress's goal of "fiscal responsibility."[18]

**B.     The Need To Respect Puerto Rico Law Weighs In Favor Of Granting The HTA 926 Motion.**

67.     The First Circuit in Andalusian also held that this Court did not abuse its discretion by considering the deference to Puerto Rico law displayed in Sections 303 and 305, and elsewhere in PROMESA, because "the 2017 [ERS] transfer [at issue in Andalusian] was made pursuant to the Legislature's enactment of a Puerto Rico joint resolution and statute."  Andalusian, 954 F.3d at 9.  The First Circuit therefore concluded that denial of the ERS 926 Motion was justified in part because the legislation authorizing the challenged ERS transfer constituted a valid exercise of the Commonwealth's legislative powers and was therefore valid Puerto Rico law.

68.     The facts of Andalusian stand in stark contrast to the facts here, where the Enabling Act and Excise Tax Statutes prohibit the Commonwealth's confiscation of HTA's assets, and the

_____

[18] In denying the ERS 926 Motion, both this Court and the First Circuit cited case law indicating the "principle [*sic*] purpose of *chapter 9*," as opposed to PROMESA, "is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations."  Andalusian, 954 F.3d at 8.  To the extent these chapter 9 precedents have any application at all to PROMESA, they at minimum cannot be read to override Congress's express, statutory codifications of PROMESA's purposes.

would not be adverse to Puerto Rico's future access to capital markets."); id. at 16 ("The Oversight Board and the fiscal plans must ensure that any debt restructuring—in Title III or otherwise—restores fiscal discipline and respects creditor interests as PROMESA requires, so that Puerto Rico can return to the capital markets.").

purported justification for violating these laws run afoul of the Contract Clause of the United States Constitution.  The Commonwealth's and FOMB's actions diverting the HTA revenues were *not* valid exercises of Puerto Rico law, but rather consisted entirely of (i) "moratorium laws" that are expressly preempted by PROMESA § 303(1) (see Proposed Complaint ¶¶ 123–128); (ii) "unlawful executive orders" that are expressly preempted by PROMESA § 303(3) (see Proposed Complaint ¶¶ 129–133); and (iii) *ultra vires* fiscal plans and budgets that exceeded FOMB's statutory authority under PROMESA and that do not even qualify as "Fiscal Plans" or "Budgets" as defined in PROMESA (see Proposed Complaint ¶¶ 101–121).  The First Circuit's endorsement of reliance on Section 303 in deciding a 926 motion therefore weighs in favor of granting the HTA 926 Motion here, where the challenged laws are expressly *preempted* by Section 303, meaning that denying HTA the ability to challenge those laws would *subvert* rather than further the goals of Section 303.  Indeed, given that the Commonwealth's confiscation of HTA's assets violates and "interferes" with valid Puerto Rico law, including the Excise Tax Statutes and the Puerto Rico Constitution, the policies underlying Sections 303 and 305 weigh in favor of permitting HTA to vindicate Puerto Rico law by bringing avoidance actions to counteract the Commonwealth's unlawful seizure of its assets.

### C.    The HTA 926 Motion Does Not Raise The Same "Proliferation of Actions" Concerns As The ERS 926 Motion.

69.    Both this Court's denial of the ERS 926 Motion and the First Circuit's affirmation of that denial focused on the fact that the ERS Bondholders had "brought other Title III court actions [in addition to the ERS 926 Motion], which the [ERS] Bondholders concede seek the same relief as would be sought in the proposed avoidance actions."  Andalusian, 954 F.3d at 10; see also In re Financial Oversight and Management Board, 432 F. Supp. 3d at 31 ("The [ERS] Bondholders have vigorously sought to protect their financial interests and have challenged the

Commonwealth's Pay-Go Legislation on multiple fronts and on a wide range of theories.  Those proceedings will continue in due course.").  Thus, a primary rationale for both this Court's and the First Circuit's decisions was the desire "to seek to avoid a proliferation of actions seeking essentially the same remedy," because "[e]ach such proceeding potentially drains assets which could be put to other uses."  <u>Andalusian</u>, 954 F.3d at 11.

70.     These concerns regarding the potential "proliferation of actions" that undergirded the denial of the ERS 926 Motion weigh differently here, where Movants have taken all reasonable steps to avoid pursuing avoidance actions as trustees while their other actions remain pending.  As noted above, Court-imposed deadlines (which Movants opposed), together with FOMB's refusal to toll the statute of limitations any further, leave Movants no choice but to preserve their rights by filing the HTA 926 Motion now.  <u>See</u> <u>supra</u> ¶¶ 27–34.  While Movants are committed to avoiding any needless "proliferation of actions," Movants cannot reasonably be expected to simply forfeit their Section 926 rights through the passage of time, nor should they be prejudiced or penalized for following the schedules imposed on them and where, unlike in the case of the ERS Bondholders, the timing of their 926 motion was not of their choosing.  The concerns about the "proliferation of actions" that were central to this Court's and the First Circuit's denial of the ERS 926 Motion should therefore play no role in the Court's decision with respect to the HTA 926 Motion before it now.  Moreover, to the extent the Court wishes to minimize duplication and conserve resources, it could grant the Proposed Bridge Order and set the HTA 926 Motion to be heard, as noted above, in conjunction with the pending HTA Summary Judgment Motion covering related issues.  <u>See</u> <u>supra</u> ¶ 4.

**D.      Failure To Grant The HTA 926 Motion Would Result In A Substantive Consolidation Prohibited By PROMESA § 304(f).**

71.     Section 304(f) of PROMESA provides that nothing in Title III may be construed as

-32-

authorizing "substantive consolidation of the cases of affiliated debtors." This means that in evaluating FOMB's refusal to bring avoidance actions on behalf of HTA, the Court must consider the different juridical identities and distinct interests of the different Title III Debtors that FOMB represents. In <u>Andalusian</u>, the First Circuit concluded that there was no impermissible substantive consolidation because the disputed legislation advanced ERS's own interest in achieving economy and efficiency in the Commonwealth government. Here, in contrast, HTA has no interest in handing over its own funds to the Commonwealth to pay expenses unrelated to HTA's mission or governmental purposes. The assets belonging to one Debtor are simply being taken and used to pay the creditors of a different affiliated Debtor. That is the essence of substantive consolidation.[19]

72.     In the ERS 926 Motion, the ERS Bondholders sought appointment as trustee to pursue avoidance actions to recover (i) employer contributions that the Commonwealth was obligated to pay to ERS and (ii) property that ERS had sold to the Commonwealth and conveyed to the General Fund without adequate compensation. <u>See</u> ERS 926 Motion. This transfer of funds was integral to the Commonwealth's efforts to restructure its pension system to implement a "pay as you go" pension system. <u>See</u> Preamble, H.R. Joint Res. 188, 18th Leg. Assem., June 6, 2017. In denying the ERS 926 Motion, the Court found it was "not unreasonable" for FOMB to decline

---

[19] Substantive consolidation "is a process by which the assets and liabilities of different entities are consolidated and treated as a single entity." J. Stephen Gilbert, <u>Substantive Consolidation in Bankruptcy: A Primer</u>, 43 Val. L. Rev. 207, 209 (1990) (citing 5 Collier On Bankruptcy ¶ 1100.06[1], at 1100-31 to -32 (L. King 15th ed. 1979)); <u>see also</u> <u>In re Hemingway Transp., Inc.</u>, 954 F.2d 1, 11-12 (1st Cir. 1992) (". . [s]ubstantive consolidation merges the assets and liabilities of the debtor entities into a unitary debtor estate."). Substantive consolidation, "in almost all instances, threatens to prejudice the rights of creditors . . . because separate debtors will almost always have different ratios of assets to liabilities[;] [t]hus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower." <u>In re Snider Bros.</u>, 18 B.R. 230, 234 (Bankr. D. Mass. 1982); <u>see also</u> <u>Hemingway Transp.</u>, 954 F.2d at 12 (noting that "[substantive] consolidation can cause disproportionate prejudice among claimants required to *share* the debtors' pooled assets") (emphasis in original); <u>In re Owens Corning</u>, 419 F.3d 195, 206 (3d Cir. 2005) ("The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution."). For these reasons, even absent the express prohibition of substantive consolidation in PROMESA § 304(f), a proposed substantive consolidation can render a proposed plan un-confirmable. <u>See</u> <u>In re GSC, Inc.</u>, 453 B.R. 132, 165 (Bankr. S.D.N.Y. 2011) (finding that debtor's proposed plan "was unlikely to be confirmed in the near future" due to, *inter alia*, disputes among the parties regarding "the proposed substantive consolidation of some but not all of the Debtors").

to cause ERS to challenge the Commonwealth's authority to "enact legislation restructuring and reforming its pension system." In re Financial Oversight and Management Board, 432 F.Supp.3d at 30. The First Circuit affirmed, explaining that "the interests of [ERS] itself" include governance of the Commonwealth: the ERS Enabling Act specified that "[t]he funds of the System . . . shall be used and applied . . . for the payment of retirement and disability annuities . . . *in order to achieve economy and efficiency in the administration of the Government of the Commonwealth of Puerto Rico*." Andalusian, 954 F.3d at 8 (emphasis in original).

73.     In other words, ERS's interests under Commonwealth law were not different from the Commonwealth's interests. The Commonwealth established ERS to provide retirement benefits to Commonwealth employees. See Act 447 of 1951 § 1. The employer contributions to ERS came from Commonwealth funds. See id. § 21(f) ("The contributions by each employer shall be budgeted and appropriated each year concurrently with the appropriations made for the salaries of compensations of the employees."). And the Commonwealth established ERS as a trust responsible for collecting, investing, and distributing the employer contributions it received. Id. § 15. As trustee, ERS did not own the property it held. Once the Commonwealth implemented the "pay as you go" system, ERS's role and mission under Commonwealth law were supplanted, and the challenged transfers were in service of Commonwealth legislation. Thus the First Circuit concluded that consideration of governance interests of the Commonwealth did not amount to "substantive consolidation" in violation of PROMESA § 304(f).

74.     This reasoning does not extend to HTA. In contrast to ERS, Puerto Rico law treats HTA and the Commonwealth as distinct corporate entities with separate rights and interests. HTA was established to provide the people of Puerto Rico with roads and means of transportation, improve movement of traffic, and clear roadways of hazards. 9 L.P.R.A. § 2002. To allow HTA to finance this work, the Commonwealth enacted the Excise Tax Statutes that assigned a special

stream of revenues to HTA.  HTA owns these revenues and is entitled to deploy the funds for its

"corporate purposes"—including, as mandated by statute, for the payment of the HTA Bonds.  See

13 L.P.R.A. § 31751; 9 L.P.R.A. §§ 2021, 5681.  Thus, FOMB and this Court cannot regard HTA's

and the Commonwealth's interests as one.  Indeed, FOMB filed distinct Title III petitions in this

Court for HTA and the Commonwealth.

75.     From HTA's perspective, FOMB's refusal to bring an avoidance action is plainly

unjustified.  The Commonwealth's refusal to transfer Excise Taxes to HTA—which by statute are

HTA property—directly undercuts HTA's mission under Puerto Rico law in multiple respects.

Since the early 2000s, HTA received well over $300 million a year for its corporate purposes under

the Excise Tax Statutes prior to the Commonwealth's retention of funds.  See HTA Audited

Financial Statements, June 30, 2001, HTA_STAY0045485; HTA, Independent Auditors' Report,

June 30, 2016, at 9–10.   HTA requires these transfers to satisfy its obligations to HTA

Bondholders, which in turn will enable HTA to return to the capital markets and carry out its

mission of developing, maintaining, and improving roadways for the people of Puerto Rico.

## CONCLUSION

76.     For the foregoing reasons, Movants respectfully request that the Court: (i) on an

urgent basis, enter a bridge order substantially in the form of Exhibit A; (ii) enter an order

substantially in the form of Exhibit B appointing Movants as co-trustees to pursue the claims set

forth in the Proposed Complaint (Exhibit C) and any similar or related claims under Sections 544,

545, 547, 548, 549(a), or 550 of the Bankruptcy Code on behalf of HTA against the

Commonwealth; and (iii) grant any further relief the Court may deem proper.

**Certification of Compliance with**
**Local Rule 9013-1 and Tenth Amended Case Management Procedures**

Pursuant to Local Rule 9013-1 and ¶ I.H of the *Tenth Amended Notice, Case Management and Administrative Procedures*, the undersigned counsel hereby certify that they have (a) carefully examined the matter and concluded that there is a true need for an urgent decision; (b) not created the urgency through any lack of due diligence; and (c) made reasonable, good-faith communications in an effort to resolve or narrow the issues that are being brought to the Court.

*[Remainder of page intentionally left blank]*

Dated: July 17, 2020
San Juan, Puerto Rico


CASELLAS ALCOVER & BURGOS P.S.C.     CADWALADER, WICKERSHAM & TAFT LLP


By: _/s/ Heriberto Burgos Pérez_          By: _/s/ Mark C. Ellenberg_
    Heriberto Burgos Pérez                  Howard R. Hawkins, Jr.*
    USDC-PR 204809                         Mark C. Ellenberg*
    Ricardo F. Casellas-Sánchez            William J. Natbony*
    USDC-PR 203114                         Ellen M. Halstead*
    Diana Pérez-Seda                       Thomas J. Curtin*
    USDC-PR 232014                         Casey J. Servais*
    P.O. Box 364924                        200 Liberty Street
    San Juan, PR 00936-4924                New York, NY 10281
    Telephone:  (787) 756-1400             Telephone:  (212) 504-6000
    Facsimile:  (787) 756-1401             Facsimile:  (212) 504-6666
    Email:    hburgos@cabprlaw.com         Email:    howard.hawkins@cwt.com
        rcasellas@cabprlaw.com                   mark.ellenberg@cwt.com
        dperez@cabprlaw.com                      bill.natbony@cwt.com
                      ellen.halstead@cwt.com
_Attorneys for Assured Guaranty Corp._        thomas.curtin@cwt.com
_and Assured Guaranty Municipal Corp._        casey.servais@cwt.com


                                  * Admitted _pro hac vice_

                                  _Attorneys for Assured Guaranty Corp. and_
                                  _Assured Guaranty Municipal Corp._

**ADSUAR MUNIZ GOYCO
SEDA & PEREZ-OCHOA PSC**
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile: 787.756.9010
Email:  epo@amgprlaw.com
         loliver@amgprlaw.com
         acasellas@amgprlaw.com
         larroyo@amgprlaw.com

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007
Email: jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        kelly.diblaso@weil.com
        gabriel.morgan@weil.com

By:  /s/ *Eric Pérez-Ochoa*
Eric Pérez-Ochoa
USDC-PR No. 206314

/s/ *Luis Oliver-Fraticelli*
Luis Oliver-Fraticelli
USDC-PR No. 209204

/s/ *Alexandra Casellas-Cabrera*
Alexandra Casellas-Cabrera
USDC-PR No. 301010

/s/ *Lourdes Arroyo-Portela*
Lourdes Arroyo Portela
USDC-PR No. 226501

*Attorneys for National Public Finance
Guarantee Corp.*

By: /s/ *Robert Berezin*
Jonathan Polkes*
Gregory Silbert*
Robert Berezin**
Kelly Diblasi*
Gabriel A. Morgan*

* admitted *pro hac vice*
**pro hac vice* application forthcoming

*Attorneys for National Public Finance
Guarantee Corp.*

FERRAIUOLI LLC

By: /s/ *Roberto Cámara-Fuertes*
    ROBERTO CÁMARA-FUERTES
    USDC-PR NO. 219,002
    E-mail:    rcamara@ferraiuoli.com

By: /s/ *Sonia Colón*
    SONIA COLÓN
    USDC-PR NO. 213809
    E-mail:    scolon@ferraiuoli.com

    221 Ponce de Leon Ave., 5th Floor
    San Juan, PR 00917
    Tel.:    (787) 766-7000
    Fax:    (787) 766-7001

*Counsel for Ambac Assurance Corporation*

MILBANK LLP

By: /s/ *Atara Miller*
    DENNIS F. DUNNE*
    ATARA MILLER*
    GRANT R. MAINLAND*
    JOHN J. HUGHES*
    55 Hudson Yards
    New York, New York 10001
    Tel.:    (212) 530-5000
    Fax:    (212) 530-5219
    Email:    ddunne@milbank.com
            amiller@milbank.com
            gmainland@milbank.com
            jhughes2@milbank.com

*admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*

ARENT FOX LLP


By: /s/ *David L. Dubrow*
        DAVID L. DUBROW*
        MARK A. ANGELOV*
        1301 Avenue of the Americas
        New York, New York 10019
        Tel.:        (212) 484-3900
        Fax:        (212) 484-3990
        Email:      david.dubrow@arentfox.com
                    mark.angelov@arentfox.com


By: /s/ *Randall A. Brater*
        RANDALL A. BRATER*
        1717 K Street, NW
        Washington, DC 20006
        Tel.:        (202) 857-6000
        Fax:        (202) 857-6395
        Email:      randall.brater@arentfox.com

*admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

By: /s/ *María E. Picó*
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    E-mail: mpico@rexachpico.com


*Attorneys for Financial Guaranty Insurance Company*

BUTLER SNOW LLP

By: /s/ *Martin A. Sosland*
    Martin A. Sosland (pro hac vice)
    5430 LBJ Freeway, Suite 1200,
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    E-mail: martin.sosland@butlersnow.com

    Jason W. Callen (pro hac vice)
    150 3rd Avenue, South, Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    E-mail: jason.callen@butlersnow.com

*Attorneys for Financial Guaranty Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2020, I caused the foregoing document to be electronically

filed with the Clerk of the Court for the United States District Court for the District of Puerto Rico

by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.


New York, New York

July 17, 2020


By:  */s/ Robert Berezin*          
Robert Berezin*
* Admitted *pro hac* vice

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[20] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

## [PROPOSED] BRIDGE ORDER GRANTING URGENT MOTION BY AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., FINANCIAL GUARANTY INSURANCE COMPANY, AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

---

[20] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THIS MATTER is before the Court on the Urgent Motion for a Bridge Order filed by Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together, "Assured"), Financial Guaranty Insurance Company ("FGIC"), and National Public Finance Guarantee Corporation ("National") (collectively, "Movants").

UPON CONSIDERATION of the Urgent Motion, the relevant portions of the docket, and being otherwise fully advised in the matter, it is hereby **ORDERED** that:

1.  The Urgent Motion is **GRANTED** as set forth herein.

2.  Pursuant to Section 926 of title 11 of the United States Code, Movants are hereby preliminarily appointed as co-trustees for Puerto Rico Highways and Transportation Authority ("HTA") and authorized to file a complaint substantially in the form of the Proposed Complaint, attached as Exhibit C to the Motion, commencing an avoidance action (the "HTA Avoidance Action") on HTA's behalf against the Commonwealth of Puerto Rico (the "Commonwealth") on or before August 14, 2020.

3.  The HTA Avoidance Action shall be immediately stayed pending the appointment of Movants as co-trustees on a permanent basis, including following any successful appeal of an order of this Court denying the HTA 926 Motion.

4.  Alternatively, in the event any order of this Court denying the HTA 926 Motion becomes final and un-appealable, including following any grant or denial of a request for a writ of certiorari to the United States Supreme Court, the HTA Avoidance Action shall automatically be dismissed with prejudice.

Dated: _____, 2020      SO ORDERED:


_____
Honorable Laura Taylor Swain
United States District Court Judge

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE COMMONWEALTH OF PUERTO RICO,

Debtor.[21]

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY ("HTA"),

Debtor.

PROMESA
Title III

No. 17 BK 3567-LTS

**[PROPOSED] ORDER GRANTING MOTION FOR APPOINTMENT AS TRUSTEES
UNDER 11 U.S.C. § 926 OF AMBAC ASSURANCE CORPORATION, ASSURED
GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., FINANCIAL
GUARANTY INSURANCE COMPANY, AND NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION**

---

[21] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THIS MATTER is before the Court on the Motion filed by Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together, "Assured"), Financial Guaranty Insurance Company ("FGIC"), and National Public Finance Guarantee Corporation ("National") (collectively, "Movants") for an order appointing them as trustees, pursuant to Section 926 of title 11 of the United States Code, to pursue on behalf of the Puerto Rico Highways and Transportation Authority ("HTA") against the Commonwealth of Puerto Rico (the "Commonwealth") the claims set forth in the Proposed Complaint attached as Exhibit C to the Motion, and any similar or related claims under section 544, 545, 547, 548, 549(a), or 550 of the Bankruptcy Code.

The Court having reviewed the Motion and the relevant portions of the docket; the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a); the Court determining that venue of this proceeding and the Motion in this district is proper under 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a); notice of the Motion being adequate and proper under the circumstances; upon the record of the hearing on the Motion; and after due deliberation and sufficient cause appearing; therefore, and being otherwise fully advised in the matter, it is hereby **ORDERED** that:

1. The Motion is **GRANTED** as set forth herein.

2. Ambac, Assured, FGIC, and National (collectively, the "Co-Trustees") are hereby appointed as co-trustees for HTA to pursue the claims set forth in the Proposed Complaint attached as Exhibit C to the Motion and any similar or related claims under section 544, 545, 547, 548, 549(a), or 550 of the Bankruptcy Code.

3. The Co-Trustees are authorized to file one or more complaints asserting the claims set forth in the Proposed Complaint attached as Exhibit C to the Motion

and any similar or related claims under section 544, 545, 547, 548, 549(a), or 550 of the Bankruptcy Code.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.


Dated: _____, 2020          SO ORDERED:


                                            _____
                                            Honorable Laura Taylor Swain
                                            United States District Court Judge