**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, through Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation in their capacity as co-trustees under 11 U.S.C. § 926,<br><br>Plaintiff,<br><br>-against-<br><br>THE COMMONWEALTH OF PUERTO RICO, THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, HON. WANDA VAZQUEZ GARCED, in her official capacity as the Governor of the Commonwealth of Puerto Rico, OMAR MARRERO, in his official capacity as the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, and HON. FRANCISCO PARES ALICEA, in | Adversary No. _____<br><br><br>**[PROPOSED] ADVERSARY COMPLAINT** |

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID:  3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID:  8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID:  3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID:  9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

his official capacity as the Secretary of Treasury of the
Commonwealth of Puerto Rico,

                              Defendants.

## [PROPOSED] ADVERSARY COMPLAINT

TO THE HONORABLE COURT:

NOW COMES Plaintiff the Puerto Rico Highways and Transportation Authority ("HTA"),
through Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal
Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee
Corporation (together, the "Co-Trustees") as court-appointed trustees under 11 U.S.C. § 926(a),
and respectfully states, alleges, and prays as follows:

### NATURE OF THIS ADVERSARY PROCEEDING

1.      Beginning in 2015, the Commonwealth of Puerto Rico (the "Commonwealth") has
engaged in a series of actions that transferred HTA's assets to the Commonwealth for its own
benefit, in the process rendering HTA insolvent.  First, the Commonwealth issued Administrative
Bulletin No. EO-2015-46 (the "Clawback Order"), which directed the Commonwealth's Secretary
of Treasury to withhold certain excise taxes rather than apply them to the payment of bonds issued
by HTA ("HTA Bonds") as required by 13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. §§ 2013(a)(2),
2021, and 5681 (collectively, and including any similar or related statutes, "The Excise Tax
Statutes").  Second, it enacted a 2016 moratorium law (Act No. 21-2016, the "First Moratorium
Law,") authorizing the Governor of the Commonwealth to declare states of emergency for Puerto
Rico public entities, including HTA, and prohibiting the payment of principal or interest by such
entities, including through the suspension of the Commonwealth's obligation to transfer excise tax
revenues to HTA's bank accounts and/or the suspension of HTA's obligations to transfer excise
tax revenues to the fiscal agent (the "Fiscal Agent") for the HTA Bonds.   Third, the
Commonwealth enacted additional moratorium laws (collectively, including the First Moratorium

Law and any additional moratorium laws that the Commonwealth may enact in the future, the "Moratorium Laws") and issued various orders under the Moratorium Laws (including any order issued under any moratorium law, the "Moratorium Orders") prohibiting payments of principal and interest on the HTA Bonds, including by transferring the HTA revenues pledged as collateral for the payment of the HTA Bonds to the Commonwealth for other, unauthorized purposes.

2.      The Commonwealth, including the Financial Oversight and Management Board for Puerto Rico ("FOMB"), has also transferred HTA's funds pursuant to a series of *ultra vires* fiscal plans (including any amended or superseding fiscal plan, the "Fiscal Plans") that (i) purport to require the transfer of HTA's assets, funds, and resources to the Commonwealth and for the Commonwealth's benefit notwithstanding that Section 201(b)(1)(M) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") requires a fiscal plan to "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory," and (ii) violate priorities and liens under Puerto Rico law, notwithstanding that Section 201(b)(1)(N) of PROMESA requires a fiscal plan to "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of [PROMESA]."

3.      In furtherance of these unlawful and *ultra vires* Fiscal Plans, and purportedly to enforce compliance with them, the Commonwealth also enacted a "Fiscal Plan Compliance Law." Act No. 26-2017 (including as amended or superseded, the "Compliance Law").  The Compliance Law disregards HTA's separate corporate existence and HTA's property rights.  Specifically, chapter 4 of the Compliance Law purports to authorize the Commonwealth to expropriate property, in the form of "surplus" revenues, from HTA and the HTA Bondholders.  Therefore,

chapter 4 authorizes the expropriation of revenues that secure the HTA Bonds while making no provision for payment by HTA of its secured debt.  Additionally, chapter 6 of the Compliance Law provides that "any special State fund and any other income of the agencies and public corporations [including HTA] shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate."  Among the funds held in such special funds are excise taxes that constitute property of HTA pledged to secure the HTA Bonds and held in trust by the Secretary of Treasury "in the name and for the benefit of [HTA]." See, e.g., 13 L.P.R.A. § 31751; 9 L.P.R.A. § 5681; see also 9 L.P.R.A. § 2021.  Chapter 6 also conditions the use of the Excise Taxes on such use being "in accordance . . . with the Fiscal Plan." Chapter 6 of the Compliance Law therefore purports to authorize continued diversion of funds that constitute property of HTA and that secure the HTA Bonds.

4.      The Commonwealth provided HTA with no consideration in exchange for this unauthorized siphoning of HTA's funds, thereby aggravating HTA's financial distress and rendering it insolvent and unable to pay its debts.

5.      On ____, 2020, the Court entered an order appointing the Co-Trustees as trustees to pursue the claims set forth herein on behalf of HTA and against the Commonwealth.  See ECF No. __.  Accordingly, Plaintiff HTA, through the Co-Trustees, seeks a judgment for avoidance of transfers, and recovery of the funds transferred, from HTA to the Commonwealth pursuant to §§ 544(b), 549(a), 548(a) and 550 of title 11 of the United States Code (the "Bankruptcy Code").

**THE PARTIES**

6.      Plaintiff HTA is a public corporation created by Act No. 74-1965 (the "Enabling Act") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico.

7.      Co-Trustee Assured Guaranty Corp., or "AGC", is a Maryland insurance company with its principal place of business at 1633 Broadway, New York, New York 10019.

8.      Co-Trustee Assured Guaranty Municipal Corp., or "AGM", is a New York insurance company with its principal place of business at 1633 Broadway, New York, New York 10019.

9.      Co-Trustee National Public Finance Corporation, or "National," is a New York insurance company with its principal place of business at 1 Manhattanville Road, Purchase, NY 10577.

10.      Co-Trustee Ambac Assurance Corporation, or "Ambac," is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One World Trade Center, 41st Floor, New York, New York 10007.

11.      Co-Trustee Financial Guaranty Insurance Company, or "FGIC," is a stock insurance company organized under the laws of New York, with its principal office located at 125 Park Avenue, New York, New York 10017.

12.      Defendant the Commonwealth is a United States territory subject to the laws of the United States.

13.      Defendant FOMB is an entity established under Title I of PROMESA to provide a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets.

14.      Defendant the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") is an entity created pursuant to the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, P.R. Act No. 21-2016.

15.      Defendant Wanda Vazquez Garced ("Governor Vazquez" and, including, as applicable, any predecessor or successor holding the office of Governor of the Commonwealth,

the "Governor") is the Governor of the Commonwealth.  Plaintiff sues the Governor, and any successors thereto, in her official capacity.

16.     Defendant Omar Marrero (including, as applicable, any predecessor or successor holding the office of Executive Director of AAFAF, the "AAFAF Executive Director") is the Executive Director of AAFAF and in that capacity is empowered to implement the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law.  Plaintiff sues the AAFAF Executive Director, and any successors thereto, in his official capacity.

17.     Defendant Hon. Francisco Parés Alicia (including, as applicable, any predecessor or successor holding the office of Secretary of Treasury of the Commonwealth, the "Secretary of Treasury") is the Secretary of Treasury of the Commonwealth and in that capacity is empowered to implement the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law.  Plaintiff sues the Secretary of Treasury, and any successors thereto, in his official capacity.

## JURISDICTION AND VENUE

18.     This action seeks avoidance of transfers pursuant to §§ 549, 544 and 548 of the Bankruptcy Code and to recover the value of those transfers pursuant to § 550.

19.     This Court has jurisdiction over all claims and causes of action in this adversary proceeding pursuant to PROMESA § 306(a)(2) because they arise in or are "related to" the above-captioned Title III cases.  This Court has personal jurisdiction over all of the Defendants pursuant to PROMESA § 306(c).

20.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "[t]he Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]."  PROMESA § 310; Fed. R. Bankr. P. 7001.

21.     Venue is proper under PROMESA § 307 because this adversary proceeding is brought in a Title III case.

## FACTUAL ALLEGATIONS

### I.     HTA And The HTA Bonds

22.     Plaintiff HTA is a public corporation created by the Enabling Act to assume responsibility for the construction of highways and other transportation systems in Puerto Rico. The Enabling Act specifically identifies HTA as a "body corporate and politic . . . consisting of a public corporation," meaning that HTA has a distinct corporate existence from the Commonwealth.  See 9 L.P.R.A. § 2002.  Pursuant to the Enabling Act, HTA issued the HTA Bonds under general bond resolutions (the "Resolutions") adopted in 1968 (the "1968 Resolution") and 1998 (the "1998 Resolution").

23.     Under the Resolutions, the HTA Bonds are secured by a gross lien consisting of a perfected security interest in pledged revenues, including (i) revenues derived from HTA's toll facilities (the "Toll Revenues"); (ii) special excise taxes consisting of, among other things, taxes on gasoline, diesel, crude oil, cigarettes, and other special excise taxes collected by the Commonwealth (the "Tax Revenues"); and (iii) special excise taxes consisting of motor vehicle license fees collected by the Commonwealth (the "Vehicle Fees"; together with the Tax Revenues, the "Excise Taxes"; and together with the Toll Revenues and the Tax Revenues, the "Pledged Revenues").  Each Resolution constitutes a contract between HTA and the HTA Bondholders as well as a "security agreement," including as defined in section 101(50) of title 11 (the "Bankruptcy Code") of the United States Code.  11 U.S.C. § 101(50).  Therefore, the pledges of the Pledged Revenues to the HTA Bondholders under the 1968 and 1998 Resolutions constitute "security interests," including as defined in section 101(51) of the Bankruptcy Code.  11 U.S.C. § 101(51).

24.     Furthermore, on February 7, 2002, HTA entered into a security agreement (the "2002 Security Agreement") with Co-Trustees and other holders of HTA Bonds issued under the 1998 Resolution, under which such HTA Bondholders were granted "a security interest in the Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund (and all accounts therein), maintained under the [1998] Resolution, **and all amounts required to be on deposit therein by the terms of the [1998] Resolution**, including all proceeds and after-acquired property, subject to application as permitted by the [1998] Resolution."

25.     The Secretary of Treasury acts as a collection agent on behalf of HTA and the HTA Bondholders with respect to the Excise Taxes.  Upon collection, the Secretary of Treasury is required by statute to hold the Excise Taxes in a "special deposit in the name and for the benefit of [HTA]," separate and distinct from the Commonwealth's General Fund.   13 L.P.R.A. § 31751(a)(1)(D) (Ex. E, ECF No. 10107); 9 L.P.R.A. § 5681; *see also* 9 L.P.R.A. § 2021.

26.     The Commonwealth's financial statements define "special deposit fund" as a fund with respect to which the Commonwealth acts in a fiduciary capacity, and the term includes revenue and agency accounts for which the Commonwealth acts in an agent's capacity.  A special deposit is used to account for funds held by the Commonwealth in a trustee capacity, or as an agent for others, including other governmental units.  Special deposits fall into the broader category of "Special Revenue Funds."  The Commonwealth defines "Special Revenue Funds" as "Commonwealth governmental funds *separate from the General Fund* that are created by law, *are not subject to annual appropriation* and have specific uses established by their respective enabling legislation.  *Special Revenue Funds are funded from*, among other things, revenues from federal programs, tax revenues *assigned by law to public corporations* and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds."  TSA Cash Flow for October & November FY2018, CW_STAY0000229-242 at 231; 2020 TSA

-8-

Cash Flow for the month of January FY20, CW_STAY0000914-933 at 916; TSA Cash Flow as of March 8, 2019.

27.     The Excise Taxes are—at all times—required to be designated for the benefit of HTA and its Bondholders and are *not* to be considered as part of the General Fund.  Moreover, joint resolutions itemizing appropriations to be charged to the Commonwealth's General Fund contain no line items for contributions to HTA on account of the Excise Taxes, yet these same resolutions do contain line item contributions for other public corporations such as the Employee Retirement System.

28.     The Commonwealth's longstanding practices in implementing the Excise Tax Statutes show that it has treated the Excise Taxes as HTA's money, not the Commonwealth's.  For example, through governmental fund accounting, the Commonwealth tracks financial resources (i.e., monies) by segregating them into "funds"—including a "general fund" and "special revenue funds"—that record revenues and expenditures in accordance with various legal requirements.

29.     As relevant here, the Commonwealth uses a special fund to implement Treasury's obligation under the Excise Tax Statutes to cover the Excise Taxes into a "special deposit" for the benefit of HTA.  In Treasury's accounting system, that special fund is known as Fund 278 (and its various tax-specific account designations), and it records all Excise Taxes as soon as they are collected by Treasury.  Fund 278 meets all the requirements of the Commonwealth's definition of a special revenue fund as set forth above. The Commonwealth's accounting system separately identifies the General Fund as Fund 111, which is mutually exclusive of Fund 278; indeed, the Excise Taxes are never credited to the General Fund at collection.

30.     The Commonwealth placed the Excise Taxes in Fund 278 and designated the revenue streams generated by the Excise Taxes as held by HTA to ensure their traceability while in the custody of Treasury.  The Excise Taxes were consistently recorded as part of Fund 278, a

fund that, by definition, is not subject to annual appropriations.  For example, when the Excise

Taxes are collected by the Treasury and deposited into the Treasury's collections bank account,

the Treasury records an increase in Fund 278 in those amounts.  Historically, the Excise Taxes did

not appear in the Commonwealth's General Fund budgets.

31.     Amounts from Fund 278 have been withdrawn at the direction of HTA, and no

evidence suggests that Treasury exercised independent control over revenues deposited into Fund

278, for example by rejecting or blocking any withdrawals from Fund 278 directed by HTA.

Transfer authorization forms and Treasury documentation show that the authority to approve

Excise Tax withdrawal transactions from Fund 278 was delegated to HTA.  See, e.g., Treasury

Circular Letter 1300-01-99 (listing Form SC 735 payment vouchers as "[d]ocuments for which

data entry and approval have been delegated to the agencies").  The Treasury Circular Letter

provides HTA with the power to transfer amounts from Fund 278 because HTA fits the Circular

Letter definition of an "agency" whose funds are within the custody of the Treasury Secretary.

32.     Pursuant to the Excise Tax Statutes, the Excise Taxes, up to the amount necessary

to pay principal and interest on the HTA Bonds, may not be used for any other purpose.  See, e.g.,

13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. § 2021, 5681.  Further, the Excise Tax Statutes give rise to

statutory liens in favor of the HTA Bondholders on the Excise Taxes.  See 11 U.S.C. § 101(53).

The Commonwealth has explicitly acknowledged in legislation that the Excise Taxes are imposed

to finance highway, traffic, and transportation facilities and systems.  The Toll Revenues likewise

constitute trust funds collected and held by HTA on behalf of the HTA Bondholders and are

property of HTA and the HTA Bondholders—not of the Commonwealth.  See 9 L.P.R.A.

§ 2013(a)(2).

33.     Any time the Commonwealth is in possession of Pledged Revenues, it holds such

Pledged Revenues for the benefit of HTA and the HTA Bondholders.  Any time HTA is in

possession of Pledged Revenues, HTA holds possession of such Pledged Revenues for the benefit of the HTA Bondholders.

34.     The Excise Tax Statutes grant HTA and the HTA Bondholders the most senior possible interests in the Excise Taxes consistent with Section 8, Article VI of the Commonwealth Constitution ("Article VI, Section 8").[2]  To this end, the Excise Tax Statutes grant HTA and the HTA Bondholders full beneficial ownership of the Excise Taxes, subject only to the conditions that, in a fiscal year in which Article VI, Section 8 is in effect, the Commonwealth may "claw back" the Excise Taxes (i) to be used *solely* to pay the public debt, but (ii) *only if the public debt remains unpaid after a first application of all other available resources to the payment of public debt*.  See Assured Guar. Corp. v. García-Padilla, 214 F. Supp. 3d 117, 121 (D.P.R. 2016) ("The funds from these taxes and tax liens may be used to pay the public debt if no other Commonwealth resources are available.").  The preconditions to a "clawback" of the Excise Taxes under Article VI, Section 8 have never been satisfied, because the Commonwealth has at all relevant times had sufficient available resources to pay the public debt on a first-priority basis in accordance with Article VI, Section 8.[3]  In any event, the Commonwealth ceased paying the public debt as of July 1, 2016, and no valid "clawback" can exist during any period in which the public debt is not being paid.

---

[2] Article VI, Section 8 provides: "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.

[3] For example, the Commonwealth's general fund budgets for fiscal years 2017, 2018, 2019, and 2020 contemplated that the Commonwealth would make total expenditures of $8.78 billion (see, e.g., Reorg Research, "Puerto Rico Legislature Passes $8.78B Fiscal 2017 General Fund Budget" (July 1, 2016)), $9.562 billion (see FOMB, "FY18 Budget" (June 30, 2017)), $8.757 billion (See FOMB, "Press Release: Oversight Board Submits FY19 Commonwealth Compliant Budget Certified by Unanimous Written Consent" (June 30, 2018), and $9.1 billion (see FOMB, "FY20 Certified Budget for the Commonwealth of Puerto Rico" (June 30, 2019), respectively, in these fiscal years.  Meanwhile, total debt service on the public debt in each of these fiscal years was anticipated as only $1.128 billion, $1.065 billion, $1.090 billion, and $1.118 billion, respectively.

35.     The HTA Bondholders have perfected their liens on the Pledged Revenues, including by filing financing statements.

36.     Through the Enabling Act, the Commonwealth covenanted with the HTA Bondholders that it would "not limit or restrict the rights or powers . . . vested in [HTA by the Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  9 L.P.R.A. § 2019.

37.     But for the diversion of collateral securing the HTA Bonds pursuant to the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law, HTA would be solvent and could pay its debts in full.  For example, before FOMB and the Commonwealth took those actions, HTA received $531.8 million in Excise Tax revenues in FY 2014 and $554.2 million in FY 2015.  *See* Audited Financial Statements, Puerto Rico Highways and Transportation Authority, Year Ended June 30, 2015), at 12–13.  That revenue exceeded HTA's debt service by over $130 million in FY 2014 and $200 million in FY 2015, *see id* at 13, thus enabling HTA to satisfy its obligations to bondholders while providing additional liquidity to support its operations.

38.     As described below, however, the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law have since caused HTA to default on debt service payments due on the HTA Bonds on or around July 1, 2016; January 1, 2017; July 3, 2017; January 1, 2018; July 1, 2019, and January 1, 2020, and July 1, 2020.

## II.     The Commonwealth Begins To Divert HTA's Funds Prior To PROMESA's Enactment.

39.     Beginning in 2015, the Commonwealth has engaged in a series of actions that diverted the Pledged Revenues from the payment of the HTA Bonds and destroyed the value of these revenues to HTA and the HTA Bondholders.  During the period in which the Commonwealth and HTA initiated this diversion of Pledged Revenues from the payment of the HTA Bonds, the

Commonwealth and HTA were involved in discussions with HTA Bondholders regarding a possible restructuring of HTA's finances.  On information and belief, a primary purpose of HTA and the Commonwealth's diversion of Pledged Revenues from the payment of the HTA Bonds was, and continues to be, to hinder HTA Bondholders' ability to collect on the HTA Bonds, including as a means of providing HTA and the Commonwealth with "leverage" vis-à-vis HTA Bondholders in restructuring negotiations.  The Commonwealth, HTA, and their officers therefore implemented the various diversions of the Pledged Revenues, including pursuant to the Claw Back Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law, with actual intent to hinder, delay, and defraud HTA Bondholders.

40.    Commonwealth finances confirm that the primary purpose of this diversion was to hinder, delay, and defraud HTA Bondholders.  Apparently, the Commonwealth has no need or use for the Excise Taxes it has been diverting, and instead has simply been allowing the cash balance of the Commonwealth's "Treasury Single Account" to build up over the period in which the Commonwealth has been diverting the Excise Taxes.  For example, in December 2017, FOMB and AAFAF disclosed that the Treasury Single Account ("TSA") balance was $1.542 billion, the first time FOMB and AAFAF had made such a disclosure.  Since then, the balance of the TSA alone has risen to approximately $9 billion, which balance includes, on information and belief, Excise Taxes covered into Fund 278 but not subsequently transferred to HTA Bondholders as required under the Excise Tax Statutes and the Resolutions.  Given (i) the large and increasing balance of the TSA and (ii) the abundance of monies in the TSA, other than Excise Taxes, from which the Commonwealth could fund its expenditures, the Commonwealth clearly has no

particular need or use for the Excise Taxes (other than to hinder, delay, and defraud HTA's creditors).[4]

### A.      The Clawback Order

41.      On November 30, 2015, former Governor García Padilla issued the Clawback Order, which directed the Secretary of Treasury to withhold the Excise Taxes, purportedly for application to the public debt, instead of applying the Excise Taxes to the payment of the HTA Bonds as required by the Excise Tax Statutes.  The Clawback Order did not constitute a valid exercise of authority under Article VI, Section 8, because, among other things, Article VI, Section 8 requires the public debt to be paid "first," and requires all other expenses to be subordinated to the payment of the public debt.  The Clawback Order, however, expressly provided for other expenses to be paid "at the same time" ("a su vez") as the public debt, and not on a subordinate basis, thereby violating or failing to implement Article VI, Section 8.  The Clawback Order also violated Article VI, Section 8 and the Excise Tax Statutes, because they permit the Commonwealth to "claw back" the Excise Taxes only (i) to pay the public debt and (ii) only if no other "available resources" are available for this purpose.  However, (i) funds diverted by the Commonwealth pursuant to the Clawback Order were *not* used to pay the public debt, and (ii) "resources" other than the Excise Taxes were demonstrably "available" from which the public debt could have been

---

[4]      The actual intent of FOMB, HTA, and the Commonwealth, to hinder, delay, and defraud HTA Bondholders was confirmed through remarks by FOMB's counsel during oral argument before the First Circuit in <u>Ambac Assurance Corp. v. Commonwealth</u>, Case No. 18-1214 (1st Cir.) on January 15, 2019.  At that hearing, a member of the First Circuit panel asked FOMB's counsel to explain the purpose of a June 20, 2017 letter (the "<u>AAFAF Letter</u>") sent by AAFAF's counsel to the HTA Fiscal Agent, instructing the Fiscal Agent not to apply funds held in the Fiscal Agent's HTA reserve accounts to HTA Bond payments.  The First Circuit panel member asked FOMB's counsel, "I still am puzzled when you say there's nothing keeping HTA from paying over those funds now, then why aren't they paying them? . . . What about the funds in these segregated [reserve] accounts?" FOMB's counsel conceded, "If they're not being used for any other purpose they could go to [Ambac-insured HTA] bondholders." The panel then asked, "So why aren't they?" FOMB's counsel replied, "**It's probably because there are mediations in place and discussions and it's all part of one package.**"  The member of the First Circuit panel accurately observed, "**What I just heard you say, literally, is there's no law keeping them from doing it but they're doing it to gain leverage in negotiations.**"

paid.  Indeed, the "Whereas" clauses in the Clawback Order indicated that the Commonwealth was continuing to fund "expenses" ("los gastos") *other* than payments on the public debt.  The public debt therefore could have been paid using the resources used to fund these other "expenses" rather than by using the Excise Taxes.

42.     In January 2016, Assured filed a lawsuit[5] challenging the Clawback Order, among other things, on the grounds that it was not authorized under Article VI, Section 8.  In response to Assured's claims, the Commonwealth defendants filed a motion to dismiss based *solely* on sovereign immunity.[6]  On October 4, 2016, the Court denied the Commonwealth defendants' motion to dismiss.[7]  On October 14, 2016, rather than attempting to defend the merits of the Clawback Order in further litigation, the Commonwealth announced that it had allowed the Clawback Order to expire at the end of Fiscal Year 2016.[8]

43.     To date, the Commonwealth has not used approximately $147 million of the funds that it confiscated under the Clawback Order, and instead continues to hold those funds.  The fact that the Commonwealth government has not used these funds demonstrates that the Clawback Order—like the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law that followed—was not primarily a response to a real or immediate liquidity crisis, but instead constituted a tactic to gain leverage in restructuring negotiations by hindering, delaying, and defrauding HTA's creditors.

---

[5]    See Assured Guar. Corp. v. García-Padilla, No. 16-cv-1037 (D.P.R. Jan. 7, 2016), ECF No. 1; Fin. Guar. Ins. Co. v. García Padilla, No. 16-cv-1095 (D.P.R. Jan. 19, 2016), ECF No. 1.

[6]    See Assured Guar., No. 16-cv-1037, ECF No. 25; Fin. Guar., No. 16-cv-1095, ECF No. 37.

[7]    See Assured Guar., 214 F. Supp. 3d at 120, 130 (denying defendants' motion to dismiss as to plaintiff Assured; granting in part and denying in part defendants' motion to dismiss as to plaintiff Financial Guaranty).

[8]    See Assured Guar., No. 16-cv-1037, ECF No. 59.

### B.   The Moratorium Laws And Orders.

44.   On April 6, 2016, the Commonwealth enacted the First Moratorium Law, which authorized the Governor to declare states of emergency with respect to a number of Puerto Rico public entities, including HTA, and to prohibit the payment of principal or interest by such entities, including by suspending the obligations of such entities to transfer funds to the relevant bond trustees or fiscal agents.  See § 201(d)(ii).

45.   Beginning on April 30, 2016, pursuant to the First Moratorium Law, the Governor issued a series of Moratorium Orders that prohibited payments of principal and interest on the HTA Bonds, including by diverting the Pledged Revenues from the payment of the HTA Bonds to other, unauthorized purposes.  Since the enactment of the First Moratorium Law and the issuance of these initial Moratorium Orders, the Commonwealth has enacted additional Moratorium Laws and Governors have issued additional Moratorium Orders, thereby continuing the prohibition of payment on the HTA Bonds, including by diverting the Pledged Revenues for unauthorized purposes.

### III.   The Commonwealth Continues To Divert HTA's Funds Following PROMESA's Enactment, Including Through *Ultra Vires* Fiscal Plans And Budgets.

46.   On June 30, 2016, President Obama signed PROMESA into law.  The stated purpose of PROMESA is to "establish [FOMB] to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes."   H.R. 5278, 114th Cong. (2016) (preamble).  The stated purpose of FOMB is to "provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).

47.   Among other things, PROMESA (i) requires FOMB to develop and/or approve fiscal plans governing the future finances and budgets of the Commonwealth and its public corporations, including HTA (Title II); (ii) provides a mechanism for adjusting the Commonwealth's bond debt or the bond debt of the Commonwealth's public corporations on a

-16-

largely consensual basis (Title VI); and (iii) following "good-faith efforts to reach a consensual restructuring with creditors" and the satisfaction of certain other requirements, authorizes, but does not require, FOMB to file a petition on behalf of the Commonwealth or its public corporations, including HTA, to commence a court-supervised debt adjustment proceeding (Title III). PROMESA §§ 101, 201(c), 201(e), 206(a)(1), 304(f).

48.     Sections 201(a)-(d) of PROMESA establish procedures for the development and/or approval of fiscal plans.  Generally speaking, FOMB may approve a fiscal plan in the form proposed by the Governor if the proposed fiscal plan complies with the requirements of PROMESA.  PROMESA § 201(c)(3)(A).  Alternatively, FOMB may develop its own fiscal plan in the event the Governor fails to submit a fiscal plan that complies with PROMESA by the deadline set by FOMB.  PROMESA § 201(d)(2).

49.     More specifically, Section 201(a) of PROMESA requires FOMB, as soon as practicable following appointment of all of its members and its chair, to provide the Governor with a schedule for the development and submission of a Commonwealth fiscal plan.  PROMESA § 201(a).

50.     Section 201(c)(2) of PROMESA then requires the Governor to develop a "proposed Fiscal Plan" for submission to FOMB.  PROMESA § 201(c)(2).  Section 201(c)(3) next requires FOMB to review the Governor's proposed fiscal plan "to determine whether it satisfies the requirements set forth in [Section 201(b)]."  Id. § 201(c)(3).  Finally, Section 201(c)(3) requires FOMB *either* (i) to "approve the [Governor's] proposed Fiscal Plan" if it "satisfies" the requirements of Section 201(b), *or* (ii) to provide the Governor with (a) a "notice of violation" that includes recommendations for revisions and (b) an opportunity to correct the applicable violations of Section 201(b).  Id. § 201(c)(3)(A), (B).

51.     In the event FOMB issues a "notice of violation," Section 201(d)(1) of PROMESA requires the Governor to submit a revised proposed fiscal plan in accordance with the schedule established by FOMB.  PROMESA § 201(d)(1).

52.     Alternatively, in the event that the Governor fails to submit a proposed fiscal plan that satisfies the requirements of Section 201(b) of PROMESA before the deadline established by FOMB, Section 201(d)(2) requires FOMB to "develop and submit to the Governor and the Legislature a Fiscal Plan **that satisfies** the requirements set forth in [Section 201(b)]."  PROMESA § 201(d)(2) (emphasis added).

53.     Notably, while PROMESA purports to authorize FOMB to approve or reject a fiscal plan proposed by the Governor under Section 201(c)(2) or 201(d)(1) in FOMB's "sole discretion," PROMESA does *not* confer any discretion on FOMB in developing its own fiscal plan under Section 201(d)(2).  Section 201(d)(2) states categorically that a fiscal plan developed under Section 201(d)(2) must "satisf[y] the requirements" set forth in Section 201(b).  See PROMESA § 201(d)(2).

A.     **The Original Fiscal Plan**

54.     On October 14, 2016, Governor Padilla submitted a proposed fiscal plan for the Commonwealth (the "First Proposed Fiscal Plan").  On November 23, 2016, FOMB issued a notice of violation (the "First Violation Notice"), identifying areas in which the First Proposed Fiscal Plan failed to comply with PROMESA.  The First Violation Notice also established a deadline of January 31, 2017 for Governor Padilla to submit a revised proposed fiscal plan.

55.     Following the inauguration of Governor Rosselló on January 2, 2017, FOMB sent Governor Rosselló a supplemental notice of violation on January 18, 2017 (the "Second Violation Notice"), which provided additional recommendations for revisions to the First Proposed Fiscal Plan.

-18-

56.     At a public meeting on January 28, 2017, FOMB extended Governor Rosselló's deadline to submit a revised proposed fiscal plan from January 31, 2017, to February 28, 2017. On February 28, 2017, Governor Rosselló submitted a revised proposed fiscal plan (the "Second Proposed Fiscal Plan") to FOMB.

57.     On March 9, 2017, FOMB sent Governor Rosselló a notice of violation (the "Third Violation Notice") stating that the Second Proposed Fiscal Plan did not "comply with the requirements set forth in PROMESA."   Among other deficiencies, the Third Violation Notice noted that the Second Proposed Fiscal Plan failed to "provide sufficient data to determine whether [the Second Proposed Fiscal Plan] satisfies PROMESA § 201(b)(1)(M) [prohibiting misappropriation of pledged revenues] and (N) [requiring respect for lawful priorities and liens][.]."  The Third Violation Notice also set a deadline of March 11, 2017 for Governor Rosselló to submit a further revised proposed fiscal plan.

58.     On or around March 11, 2017, Governor Rosselló submitted another revised proposed fiscal plan (the "Third Proposed Fiscal Plan"), which ultimately formed the basis for the first fiscal plan developed and purportedly certified by FOMB (the "Original Fiscal Plan").  Like the Second Proposed Fiscal Plan, the Third Proposed Fiscal Plan failed to provide data demonstrating compliance with Sections 201(b)(1)(N) and 201(b)(1)(M) of PROMESA, which was one of the areas of non-compliance with PROMESA identified in the Third Violation Notice.

59.      On March 13, 2017, FOMB purported to certify the Original Fiscal Plan, which was based on the Third Proposed Fiscal Plan, but which included two amendments by FOMB. Neither of the amendments made by FOMB addressed or remedied the Original Fiscal Plan's non-compliance with 201(b)(1)(N) and (M) as identified in the Third Violation Notice.  No subsequent Fiscal Plan developed by FOMB has ever remedied or addressed the deficiencies with respect to Sections 201(b)(1)(N) and (M) identified in the Third Violation Notice.

60.     The Original Fiscal Plan included a list of "Legal & contractual issues not determined by the Fiscal Plan." The "issues not determined by the Fiscal Plan" included "What is an essential service," a determination necessary for satisfying the Section 201(b)(1)(B) requirement that a fiscal plan "ensure[s] the funding of essential public services." FOMB's subsequent fiscal plans likewise did not determine what services are "essential."

61.     On April 7, 2017, two members of the United States Senate, Hon. Thom Tillis and Hon. Tom Cotton, sent a letter to FOMB chair José B. Carrión III expressing concern that the Original Fiscal Plan did not comply with PROMESA because it (i)  failed to comply with lawful priorities and liens established by Puerto Rico's constitution, (ii) failed to differentiate between non-essential and essential spending, (iii)  elevated all non-debt spending above debt service, and (iv) used unexplained economic assumptions. The Senators requested that FOMB "promptly supply our staffs with a compliance certification for the Fiscal Plan and set forth in detail how each requirement of Section 201(b)(1) of PROMESA has been satisfied."

62.     FOMB's April 25, 2017 response to the Senators essentially conceding that the Original Fiscal Plan did not comply with lawful priorities and liens. FOMB claimed that the word "respect" in Section 201(b)(1)(N) of PROMESA means something other than "comply with," which in FOMB's view gave the Original Fiscal Plan the "flexibility" violate lawful priorities and liens. FOMB failed to provide the Senators with the requested compliance certification setting forth in detail how each requirement of Section 201(b)(1) was purportedly satisfied. FOMB could not provide any such certification because the Original Fiscal Plan did not satisfy each subsection of 201(b)(1), particularly Sections 201(b)(1)(N) and 201(b)(1)(M).

63.     Senator Cotton replied to FOMB on June 13, 2017, stating, "I must be frank: I found your answers vague and unresponsive." The Senator continued, "[FOMB] claims that Congress, in using the word 'respect,' actually gave the board 'flexibility' to decide which legal obligations

to meet—which, in my book, is the exact opposite of what the word 'respect' means.  According to the <u>Wall Street Journal</u>, retail investors in mutual funds nationwide stand to lose $5.4 billion as a result of [FOMB's] bizarre interpretation.  If this is what 'respecting' legal obligations means, what would 'disrespecting' them look like?"  The Senator also "point[ed] out that [FOMB's] letter didn't address why the Fiscal Plan fails to distinguish between essential expenses and non-essential ones."

64.    On May 3, 2017, FOMB commenced a proceeding under Title III of PROMESA on behalf of the Commonwealth.

65.    On May 21, 2017, FOMB commenced a proceeding under Title III of PROMESA on behalf of HTA.

### B.    The May 2018 And June 2018 Fiscal Plans

66.    In September 2017, Hurricanes Irma and Maria reached Puerto Rico.  Following the hurricanes, FOMB announced that it planned to revise the Original Fiscal Plan.  After several deadline extensions, on January 24, 2018, the Commonwealth government submitted an initial draft revised fiscal plan (the "<u>Fourth Proposed Fiscal Plan</u>").  On February 5, 2018, FOMB issued a notice of violation (the "<u>Fourth Violation Notice</u>"), stating that the Fourth Proposed Fiscal Plan failed to comply with PROMESA and establishing a deadline of February 12, 2018 for the Commonwealth government to submit a further revised draft of the fiscal plan.

67.    On February 12, 2018, the Commonwealth government submitted a further revised draft fiscal plan (the "<u>Fifth Proposed Fiscal Plan</u>").

68.    On February 16, 2018, FOMB issued a press release stating that it intended to certify a revised fiscal plan by March 30, 2018.

69.     On March 23, 2018, FOMB issued a press release postponing the certification of the revised fiscal plan, and stating that it intended to "announce a new certification date as soon as practicable."

70.     On March 23, 2018, the Commonwealth submitted a further revised draft fiscal plan (the "Sixth Proposed Fiscal Plan").

71.     On March 28, 2018, FOMB issued a notice of violation (the "Fifth Violation Notice"), stating that the Sixth Proposed Fiscal Plan failed to comply with PROMESA and establishing a deadline of April 5, 2018 for the Commonwealth government to submit a further revised draft of the fiscal plan.

72.     On March 29, 2018, Congressman Rob Bishop, Chairman of the House Committee on Natural Resources (the "Natural Resources Committee") and one of the principal drafters of PROMESA, sent a letter to FOMB chair José B. Carrión III, expressing concern that the Sixth Proposed Fiscal Plan did not comply with PROMESA.  Chairman Bishop stated that "the draft plans released by Governor Rosselló circumvent the stated purpose of [PROMESA]."  Chairman Bishop explained:  "[I]t is imperative you adhere to the tenets and Congressional mandate of PROMESA, while providing an avenue for Puerto Ricans to recover from the storms.  This careful balance requires you to transparently assess the economic impact of the hurricanes and 'respect the relative lawful priorities or lawful liens' of debt issued, while working cooperatively with creditors on holistic solutions to revitalize the local economy and stabilize Puerto Rico's finances.'"  Chairman Bishop noted that "[a] good start would be to determine what constitutes 'essential public services,' clearly defining where governmental cuts should occur.  Furthermore, the recognition of existing debt is paramount to Puerto Rico's recovery, and will require much greater degrees of transparency, accountability, goodwill and cooperation on the part of the Puerto Rican government and [FOMB]."  Chairman Bishop concluded by stating, "[t]o date, the [Natural

Resources Committee] has been unsatisfied with the implementation of PROMESA, and the lack of respect for the Congressional requirements of the Fiscal Plan.  And now, due to intentional misinterpretations of the statute, the promise we made to Puerto Rico may take decades to fulfill. I ask that you adhere to the mandates of PROMESA and work closely with creditors and the Puerto Rican government as you finalize and certify the Fiscal Plans[.]"

73.     On April 5, 2018, the Commonwealth submitted a further revised draft fiscal plan (the "Seventh Proposed Fiscal Plan").

74.     Rather than approve the Seventh Proposed Fiscal Plan as proposed by Governor Rosselló, FOMB developed its own fiscal plan (the "April 2018 Fiscal Plan") under Section 201(d)(2) of PROMESA.  FOMB released the April 2018 Fiscal Plan publicly on April 18, 2018. At a public meeting on April 19, 2018, FOMB purported to reject the Seventh Proposed Fiscal Plan and certify the April 2018 Fiscal Plan.

75.     FOMB subsequently revised and purportedly re-certified the April 2018 Fiscal Plan on May 30, 2018 (the "May 2018 Fiscal Plan") and on June 29, 2018 (the "June 2018 Fiscal Plan"). The April 2018 Fiscal Plan was not developed or revised in a manner designed to address Congressman Bishop's criticisms of FOMB's implementation of the fiscal plan process, nor was any subsequent Fiscal Plan developed or revised in a way to address Congressman Bishop's criticisms.

C.     **The October 2018 Fiscal Plan**

76.     On August 1, 2018, FOMB announced that it was initiating the process of revising the June 2018 Fiscal Plan to incorporate material new information.  FOMB initially set a deadline of August 17, 2018 for the Commonwealth to submit a proposed revised Commonwealth fiscal plan, but subsequently extended that deadline to August 20, 2018.

77.     On or around August 20, 2018, AAFAF published a proposed revised fiscal plan (the "Eighth Proposed Fiscal Plan").

78.     On August 30, 2018, FOMB issued a notice of violation (the "Sixth Violation Notice"), stating that the Eighth Proposed Fiscal Plan failed to comply with PROMESA and establishing a deadline of September 7, 2018 for the Commonwealth government to submit a further revised draft of the fiscal plan.

79.     On or around September 7, 2018, AAFAF published a further proposed revised fiscal plan (the "Ninth Proposed Fiscal Plan").

80.     Rather than approve the Ninth Proposed Fiscal Plan as proposed by Governor Rosselló, FOMB developed its own fiscal plan (the "October 2018 Fiscal Plan") under Section 201(d)(2) of PROMESA.  FOMB released the October 2018 Fiscal Plan publicly on October 22, 2018.  At a public meeting on October 23, 2018, FOMB purported to reject the Ninth Proposed Fiscal Plan and certify the October 2018 Fiscal Plan.

**D.     The May 2019 Fiscal Plan**

81.     On January 18, 2019, FOMB announced that it was initiating the process of developing yet another new fiscal plan.  FOMB initially set a deadline of February 22, 2019 for the Commonwealth to submit a proposed Commonwealth fiscal plan.  The Commonwealth subsequently received an extension until March 18 to submit a proposed fiscal plan.

82.     On or around March 11, 2019, AAFAF published a further proposed revised fiscal plan (the "Tenth Proposed Fiscal Plan").

83.     On March 15, 2015, FOMB issued a notice of violation (the "Seventh Violation Notice"), stating that the Tenth Proposed Fiscal Plan failed to comply with PROMESA and establishing a deadline of March 22, 2019 for the Commonwealth government to submit a further

revised draft of the fiscal plan.  In a letter dated March 23, 2018, FOMB subsequently extended the deadline for the Commonwealth to submit a further revised fiscal plan to March 27, 2019.

84.     On or around March 28, 2019, AAFAF published a further proposed revised fiscal plan (the "Eleventh Proposed Fiscal Plan").

85.     Rather than approve the Eleventh Proposed Fiscal Plan as proposed by Governor Rosselló, FOMB developed its own fiscal plan (the "May 2019 Fiscal Plan") under Section 201(d)(2) of PROMESA.  FOMB released the May 2019 Fiscal Plan publicly on May 9, 2019.  At a public meeting on May 9, 2019, FOMB purported to reject the Eleventh Proposed Fiscal Plan and certify the May 2019 Fiscal Plan.

### E.     The May 2020 Fiscal Plan

86.     On May 26, 2020, FOMB released a new fiscal plan that it had developed under Section 201(d)(2) (the "May 2020 Fiscal Plan").  FOMB purported to certify the May 2020 Fiscal Plan during a public meeting on May 27, 2020.  As of the filing of this Complaint, the May 2020 Fiscal Plan remains the most recent Fiscal Plan developed by FOMB.

### F.     Fiscal Plan and Budget Requirements

87.     To qualify as a "Fiscal Plan" as defined in PROMESA, a fiscal plan must satisfy a series of substantive requirements set forth in Section 201(b)(1) of PROMESA.  Specifically, Section 5(10) of PROMESA defines a "Fiscal Plan" as "**a Territory Fiscal Plan** or an Instrumentality Fiscal Plan."  PROMESA § 5(10) (emphasis added).  Section 5(22) of PROMESA in turn defines "Territory Fiscal Plan" as "a fiscal plan for a territorial government submitted, approved, and certified **in accordance with section 201.**"  Id. § 5(22) (emphasis added).

88.     The Fiscal Plans developed by FOMB to date are not "in accordance with Section 201[(b)]," and therefore fail to qualify as "Fiscal Plans" as defined in PROMESA.

89.    Similarly, to qualify as a "Budget" as defined in PROMESA, a budget must be "in accordance with" a fiscal plan that satisfies the substantive requirements set forth in Section 201(b)(1) of PROMESA.  Specifically, Section 5(4) of PROMESA defines a "Budget" as "the **Territory Budget** or an Instrumentality Budget, as applicable."  PROMESA § 5(4) (emphasis added).  Section 5(21) of PROMESA in turn defines "Territory Budget" as "a budget for a territorial government submitted, approved, and certified **in accordance with section 202 [of PROMESA].**"  Id. § 5(21) (emphasis added).

90.    Any budgets based on the Fiscal Plans (any such budget based on a Fiscal Plan, a "Budget") are not "in accordance with section 202 [of PROMESA]," because Section 202 authorizes FOMB to submit to the Governor and the Legislature only a "compliant budget."  See, e.g., PROMESA § 202(e)(3).  PROMESA defines a "compliant budget" as "a budget that is prepared **in accordance with . . . the applicable Fiscal Plan**."  See PROMESA § 5(6) (emphasis added).  Because the Fiscal Plans do not qualify as "Fiscal Plans" as defined in PROMESA, and because the Budgets were prepared in accordance with the Fiscal Plans rather than in accordance with a fiscal plan meeting PROMESA's definition of a "Fiscal Plan," the Budgets are not "compliant budgets" as defined in PROMESA and do not qualify as "Budgets" as defined in PROMESA.

91.    Furthermore, under PROMESA, FOMB had no authority to develop the Fiscal Plans, because on their face, the Fiscal Plans violate Section 201(b) of PROMESA.  FOMB developed the Fiscal Plans under Section 201(d)(2) of PROMESA, and Section 201(d)(2), by its terms, did not grant FOMB any discretion in developing the Fiscal Plans.  Rather, under Section

201(d)(2), FOMB had authority only to develop a fiscal plan that strictly "satisfies the requirements set forth in [Section 201(b)]," and the Fiscal Plans do *not* satisfy these requirements.[9]

92.     Similarly, FOMB had no authority to develop the Fiscal Plans because FOMB refused to make numerous determinations necessary to determine whether the Fiscal Plans complied with Section 201(b) of PROMESA, including determinations as to (i) what lawful priorities and liens exist under Puerto Rico law (Section 201(b)(1)(N)); (ii) which government entities are entitled to the assets, funds, and resources governed by the Fiscal Plans and whether any transfers of funds from one entity to another mandated under the Fiscal Plans are illegal (Section 201(b)(1)(M)); and (iii) which government services qualify as "essential public services" and whether the Fiscal Plans adequately fund such essential public services (Section 201(b)(1)(B)). In purporting to develop the Fiscal Plans, FOMB failed even to consider any of these requirements, much less reach determinations with respect to them.

93.     Therefore, FOMB's purported development and certification of the Fiscal Plans exceeded FOMB's statutory authority and was *ultra vires* and invalid, and FOMB has never made a "certification determination" with respect to any Fiscal Plan as such term is used in PROMESA.

94.     Furthermore, because the Budgets were based on Fiscal Plans that were *ultra vires*, invalid, and exceeded FOMB's statutory authority, and because FOMB's purported development and certification of Budgets based on those Fiscal Plans likewise exceeded FOMB's statutory authority, the Budgets were themselves *ultra vires* and invalid, and FOMB has never made a "certification determination" with respect to any Budget as such term is used in PROMESA.

---

[9]     In the event Defendants assert that FOMB developed any of the Fiscal Plans under Section 201(f) of PROMESA, this makes no difference, because Section 201(f) similarly grants FOMB no discretion.  Rather, Section 201(f) merely authorizes FOMB and the Governor to jointly develop a fiscal plan that "**meets** the requirements [of Section 201(b)]," meaning that a fiscal plan developed under Section 201(f) must strictly "meet" the Section 201(b) requirements. PROMESA § 201(f).

IV.    **The Compliance Law Helps Implement The Commonwealth's Diversion Of HTA's Funds Pursuant To The *Ultra Vires* Fiscal Plans**

95.    On or about April 29, 2017, the Commonwealth enacted the Compliance Law, which purports to act as an enforcement mechanism for the *ultra vires* Fiscal Plans.

96.    Chapter 4 of the Compliance Law provides for the Commonwealth to expropriate property in the form of "surplus" revenues from its public corporations (including HTA) and their bondholders.  Chapter 4 contains no provision for payment to the HTA Bondholders of their secured debt.  Instead, through Chapter 4, the Commonwealth has unilaterally authorized itself to sweep the Pledged Revenues from HTA in exchange for no consideration.

97.    Chapter 6 of the Compliance Law provides as follows:

[Article 6.02]

[A]s of July 1st, 2017, any special State fund and any other income of the agencies and public corporations shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate[.]

\*       \*       \*

As of July 1st, 2017, any special State funds created by law for specific purposes shall continue to be used for the purposes for which they were allocated by law, in accordance with the Recommended Budget of the Office of Management and Budget and the Fiscal Plan. . . .  **Should there be any inconsistency between the law and the use of the funds with the Fiscal Plan, the purpose provided for in the Fiscal Plan approved in accordance with PROMESA shall prevail.**

98.    Funds held in "special funds" in the Commonwealth Treasury include Excise Taxes constituting trust funds held by the Secretary of Treasury in the name and for the benefit of HTA.  See, e.g., 13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. § 2021, 5681.  By conditioning the uses of these special funds on such uses being "in accordance . . . with the Fiscal Plan," Chapter 6 fails to treat HTA as a distinct corporate entity and also fails to preserve the segregation of the Pledged Revenues for the benefit of HTA and its bondholders.  Furthermore, by requiring that the Excise

Taxes be deposited in the Commonwealth Treasury rather than transferred to HTA and the HTA

Bondholders, Chapter 6 mandates the transfer of the Excise Taxes from HTA to the

Commonwealth for no consideration and without authorization under Title III or by the Court.

## V.   The Commonwealth Continues to Divert HTA's Funds Through Joint Resolutions

99.     On or about July 2, 2018, the Legislative Assembly of the Commonwealth (the

"Legislative Assembly") passed a Joint Resolution (the "Joint Resolution") repurposing the Excise

Taxes on crude oil.  Specifically, the Legislative Assembly authorized the use of $239,850,000 of

the crude oil Excise Taxes for the payment of payroll and related expenses to the Department of

Education and Police Bureau of the Department of Public Safety during the fiscal year ending on

June 30, 2019.  The Legislative Assembly later increased this amount to $299,444,000 through a

subsequent Joint Resolution.  These funds were similarly repurposed for payroll of the Department

of Education and Police Bureau of the Department of Public Safety.

100.    The supposed authority for the unlawful diversion of the Excise Taxes, which

constituted HTA property pledged to the HTA Bondholders as collateral, was the Government of

Puerto Rico's police powers.  The police powers do not authorize such unlawful diversions.

Accordingly, the repurposing of nearly $300,000,000 of the crude oil Excise Taxes to pay for

public services administered by public corporations other than HTA is an egregious violation of

the Excise Tax Statutes.

## VI.   The Fiscal Plans And The Compliance Law Do Not Authorize Transfers Of HTA Property To The Commonwealth Because The Fiscal Plans And The Compliance Law Violate PROMESA And Are *Ultra Vires*.

### A.     The Fiscal Plans And The Compliance Law Fail To Respect Lawful Priorities And Liens  In Violation Of PROMESA § 201(b)(1)(N).

101.    Section 201(b)(1)(N) of PROMESA requires a fiscal plan to "respect the relative

lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements

of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of [PROMESA]."[10]  The Fiscal Plans and the Compliance Law, on their face, violate Section 201(b)(1)(N) because they give no consideration to priorities and liens under Commonwealth law and do not even reference or identify any such priorities or liens.

102.    A fiscal plan cannot "respect" priorities and liens that it does not even acknowledge. At a bare minimum, to determine whether the Fiscal Plans respected priorities and liens, FOMB would have needed to determine what priorities and liens exist under Puerto Rico law.  FOMB, however, has refused to make this determination required by PROMESA.  FOMB had no authority to develop the Fiscal Plans without first making the determinations required by Section 201(b)(1)(N) of PROMESA.

103.    The Fiscal Plans assume that the expenses of the Commonwealth will be paid first, including from HTA's funds, and leave only residual revenues to public corporations like HTA and to their bondholders, including HTA Bondholders.  Thus, the Fiscal Plans favor one set of creditors—Commonwealth creditors with run-of-the-mill unsecured claims for the operating expenses of government—over all other creditors, including those holding secured HTA Bonds.

104.    The Fiscal Plans and the Compliance Law also violate the lawful liens in effect prior to the enactment of PROMESA because they purport to require the Commonwealth to unlawfully pool the Pledged Revenues, which are HTA's and the HTA Bondholders' property and on which the HTA Bondholders have contractual and statutory liens, with the Commonwealth's unencumbered revenues.  The Fiscal Plans and the Compliance Law purport to pool all resources, including Pledged Revenues, into a single pot and use them to fund any and all Commonwealth

---

[10]    The stated purpose of Sections 201(b)(1)(N) and 201(b)(1)(M) of PROMESA is to "ensure fiscal plans keep intact the structural hierarchy of prioritized debt."  Committee on Natural Resources, Markup Memorandum at 3 (May 23, 2016).

expenses at the expense of public corporations (like HTA) and their bondholders.  This pooling of the Pledged Revenues rests on the incorrect assumption that the stream of Pledged Revenues belong to the Commonwealth and that HTA is a mere recipient of appropriations from the Commonwealth, as reflected in Exhibit 15 and Chapter 22.1 of the current May 2020 Fiscal Plan.

105.    Similarly, the Fiscal Plans and the Compliance Law fail to first use the Commonwealth's unencumbered available resources to pay public debt, as required by Article VI, Section 8 and the Excise Tax Statutes.  In fact, the current May 2020 Fiscal Plan *includes* HTA Excise Taxes in the Commonwealth's projected revenue streams and surplus calculations. Additionally, the Fiscal Plans also fail to use the Excise Taxes for the payment of the HTA Bonds or of the public debt, which are the only two purposes for which the Excise Taxes may be used.

**B.    The Fiscal Plans And The Compliance Law Mandate The Misappropriation Of Pledged Revenues In Violation Of PROMESA § 201(b)(1)(M).**

106.    The Fiscal Plans and the Compliance Law, on their face, also violate Section 201(b)(1)(M) of PROMESA, which requires a compliant fiscal plan and a "compliant budget" to "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under [T]itle III, or a Qualifying Modification approved under [T]itle VI[.]"  PROMESA § 201(b)(1)(M).  By its plain terms, this section of PROMESA prohibits illegal transfers of Pledged Revenues to the Commonwealth or for the Commonwealth's benefit.  The Fiscal Plans and the Compliance Law actually *require* such illegal transfers by mandating that the

Commonwealth misappropriate, for its own general use, Pledged Revenues that constitute assets, funds, or resources of HTA and its bondholders.[11]

107.   Specifically, the Fiscal Plans simply pool the Pledged Revenues with the Commonwealth's general revenues.

108.   However, the Pledged Revenues are either generated directly by HTA (in the case of the Toll Revenues) or are assigned to HTA by statute for the benefit of bondholders[12] (in the case of the Excise Taxes).   As such, the Pledged Revenues constitute "assets, funds, [and] resources" of the relevant "territorial instrumentality" (i.e., HTA) that cannot legally be loaned to, transferred to, or otherwise used for the benefit of the Commonwealth.

109.   FOMB did not even consider Section 201(b)(1)(M) in purporting to develop the Fiscal Plans.  Specifically, in order to determine whether the Fiscal Plans comply with Section 201(b)(1)(M), FOMB would first have needed to determine which "assets, funds, or resources" governed by the Fiscal Plans belong to which government entities and whether any transfers mandated by the Fiscal Plans from one entity to another are lawful or unlawful.  FOMB has refused, however, to make these determinations required by PROMESA.  FOMB has no authority to purport to develop a fiscal plan without first making the determinations required by Section 201(b)(1)(M).

110.   Furthermore, FOMB conceded in the Third Violation Notice that the Second Proposed Fiscal Plan did "not provide sufficient data to determine whether it satisfies PROMESA § 201(b)(1)(M) and (N)."  Yet the Fiscal Plans subsequently developed by FOMB provide no more relevant data than did the Second Proposed Fiscal Plan.  If, as FOMB has admitted, it was

---

[11]   For these same reasons, the Fiscal Plans and Compliance Law also violate section 928(a) of the Bankruptcy Code, made applicable to these proceedings by Section 301(a) of PROMESA.

[12]   See 13 L.P.R.A. § 31751(a)(1) (governing Excise Taxes assigned to HTA); 9 L.P.R.A. §§ 2021, 5681 (governing Vehicle Fees assigned to HTA).

impossible for FOMB to determine whether the Second Proposed Fiscal Plan complied with Sections 201(b)(1)(M) and (N), then it was equally impossible for FOMB to make such a determination with respect to subsequent Fiscal Plans, and FOMB in fact made no such determination.

### C.    The Fiscal Plans And The Compliance Law Fail To Ensure The Funding Of Essential Public Services In Violation Of PROMESA § 201(b)(1)(B).

111.    Because the Fiscal Plans fail to differentiate between essential and non-essential services, the Fiscal Plans, on their face, also violate Section 201(b)(1)(B) of PROMESA, which requires a fiscal plan to ensure the funding of "*essential* public services."    PROMESA § 201(b)(1)(B) (emphasis added).  Clearly, Congress intended the use of the word "essential" to be a limitation on the services to be funded; otherwise it would have simply required a fiscal plan to fund all government services.  Because the Fiscal Plans do not even identity which services are essential, it is impossible to determine whether all of the services funded under the Fiscal Plans qualify as "essential," and by funding all government services, essential or not, the Fiscal Plans breach Congress's funding limitation.

112.    Notably, on June 16, 2017—some three months *after* the Original Fiscal Plan issued—FOMB sent Governor Rosselló a letter "reiterat[ing] [its] earlier requests urging [Governor Rosselló's] administration to make and communicate as soon as possible the necessary public policy determinations with respect to what it understands constitute 'essential services' in the context of PROMESA."   FOMB stated, "[a]s you know, in light of Puerto Rico's fiscal situation, a PROMESA-compliant budget needs to reflect appropriate allocations for the adequate funding of essential services, pension benefits, investments to spur growth and other PROMESA priorities. We can no longer afford business as usual."

113.     On November 28, 2017, the Co-Trustees and certain other parties in interest filed a motion (the "2004 Motion") seeking authorization to conduct an examination of the Commonwealth and of FOMB under Rule 2004 of the Federal Rules of Bankruptcy Procedure (Case No. 17-03283-LTS, ECF No. 1870).  The 2004 Motion requested, among other things, "Materials reflecting the definition of 'essential services,' and any supporting workbook or schedule analyzing the cost of the same."  Id. at 13.

114.     On December 14, 2017, Judge Judith Gail Dein conducted a hearing on the 2004 Motion.  At the hearing, counsel to AAFAF admitted that absolutely no documents defining "essential services" had been provided to FOMB or used in the development of the Fiscal Plans. See Dec. 14, 2017 H'rg. Tr. at 47.

115.     The fact that no documents defining "essential services" exist demonstrates that FOMB made no determination as to whether the Fiscal Plans satisfied Section 201(b)(1)(B) of PROMESA and gave no consideration to that issue.

116.     In any event FOMB, through its officers, has admitted many times in public that it has never even attempted to define "essential public services."

117.     For example, during a press conference on October 23, 2018, FOMB's executive director, Natalie Jaresko, stated, "[FOMB] does not take the position that we need to define 'essential services.' We see the law as requiring that we ensure that the essential services are funded and that through this budget and the collaboration with the Governor we have funded the services that are necessary for the people of Puerto Rico. But it doesn't require us to define essential services."[13]

---

[13] Financial Oversight & Management Board, *Press Conference – Oversight Board's 15th Public Meeting* at 38:43, VIMEO LIVESTREAM (Oct. 23, 2018), https://oversightboard.pr.gov/videos/#e3NdbLgxAGM.

118.    On May 2, 2019, at a hearing before the Natural Resources Committee on the status of PROMESA, Congressman Garcia asked FOMB's executive director, Natalie Jaresko, "Would you define what essential public services are?"  See Natural Resources Committee, "Hearing on the Status of the Puerto Rico Oversight, Management, and Economic Stability Act," May 2 2019. Jaresko responded, "We have not made a strict decision or definition of public services."  Id. Jaresko added that "Part of the reason for not defining [essential public services] is that there are many things that occur that you could argue are not essential services necessarily but are needed. And some of them for example are funding for NGOs some of the folks who are sitting at this table which are incredibly valuable but may not fit a traditional definition of essential services."  Id.

119.    Similarly, at FOMB's sixteenth public meeting held on May 9, 2019, FOMB's General Counsel, Jamie El Koury, stated: "On the essential services point **we have not defined essential services** because PROMESA itself sets forth a structure whereby we have to actually consider 14 factors when we come up with our fiscal plan.  Essential services is just one of those factors what we have tried to do is balance the 14 factors rather than just defining essential services and coming up with a strict nomenclature for that."[14]

120.    Thus, at the time it purported to develop the Original Fiscal Plan, FOMB had no definition of "essential services" and was unable to determine whether the Original Fiscal Plan reflected appropriate allocations for the adequate funding of essential services.  Moreover, no definition of "essential services" has emerged in the subsequent years, and at no point has FOMB made or been able to make the determination required by Section 201(b)(1)(B) with respect to any Fiscal Plan.

---

[14] Financial Oversight & Management Board, *16th Public Meeting* at 57:16, YOUTUBE (May 9, 2019), https://www.youtube.com/watch?v=-NGZhrjVDuE.

121.     Indeed, as Jaresko's May 2, 2019 testimony to the Natural Resources Committee shows, FOMB refused to define "essential public services" primarily to allow it to authorize expenses that are not, in fact, "essential public services," and fund these non-essential items while flouting other requirements of Section 201, such as the requirement to respect priorities and liens. Contrary to Mr. El Koury's statements, therefore, FOMB's Fiscal Plans are not the product of a "balancing" of the various requirements of Section 201.  They are not an application of Section 201 at all.   Instead, FOMB's Fiscal Plans are the product of FOMB's disregard for Section 201 in favor of a set of funding priorities that are neither guided by, nor compliant with, Section 201.

**VII.     The Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, And Compliance Law Do Not Authorize Transfers Of HTA Property To The Commonwealth, Because Section 303 Of PROMESA Prohibits And Preempts Each Law, Plan and Budget.**

122.     PROMESA further protects HTA and its creditors against the types of abuses perpetrated by the Commonwealth under the Clawback Order, Moratorium Laws, and Moratorium Orders in the pre-PROMESA period by (i) preempting Commonwealth legislation and executive orders that unlawfully alter or impair the rights of bondholders, and (ii) prohibiting the illegal transfer of funds between government entities.  PROMESA §§ 303(1), (3).  Specifically, Congress designed Section 303 of PROMESA to preempt the Moratorium Laws and Moratorium Orders, and Section 303 also preempts and prohibits the Fiscal Plans and the Compliance Law.

**A.     Section 303(1) of PROMESA Preempts the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, the Budgets, and the Compliance Law.**

123.     One of Congress's objectives in enacting PROMESA was to overturn the Clawback Order and various moratorium laws, including the First Moratorium Law, and the Moratorium Orders.  Specifically, the legislative history of PROMESA indicates that Congress recognized that "Puerto Rico's local politicians [had] . . . accelerated the [alleged] fiscal crisis on the island through the passage of harmful legislation, including the recent debt moratorium [i.e., the First

Moratorium Law]."[15] In order to undo the First Moratorium Law and any similar "harmful legislation," Congress enacted Section 303(1) of PROMESA, which expressly preempts "moratorium laws"—such as the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law—that impose a non-consensual moratorium on creditors:

> [A] moratorium law, but solely to the extent that it prohibits the payment of principal or interest by an entity not described in section 109(b)(2) of [T]itle 11 [of the] United States Code, may not bind any creditor of a covered territory or any covered territorial instrumentality thereof that does not consent to the . . . moratorium[.]

PROMESA § 303(1).

124.     While Section 303(1) was generally modeled on section 903 of the Bankruptcy Code, its scope is different, and broader, than the scope of section 903. Specifically, section 903 does not contain Section 303(1)'s references to a "moratorium law" and "moratorium." These terms were added to Section 303 specifically in reference to the First Moratorium Law and to the Moratorium Orders that were in effect at the time PROMESA was enacted, and specifically for the purpose of invalidating the First Moratorium Law, the related Moratorium Orders, and any similar moratorium legislation that the Commonwealth subsequently might enact.

125.     Generally, a "moratorium" is defined as "a ***temporary*** prohibition of an activity."[16] The Moratorium Laws and Moratorium Orders constitute moratorium laws, because they impose a temporary prohibition on various activities, including payment of principal and interest on the HTA Bonds. The Fiscal Plans and the Compliance Law similarly prohibit payments of principal and interest on the HTA Bonds, including by requiring the Commonwealth and HTA to divert the Pledged Revenues from which the HTA Bonds must be paid to other purposes and by requiring

---

[15]   See H.R. Rep. No. 114-602 at 40.

[16]   See Oxford Living Dictionary: English, https://en.oxforddictionaries.com/definition/moratorium.

the Commonwealth and HTA to enact Budgets and other laws that will not provide for the full payment of principal and interest on the HTA Bonds.

126.    Similarly, Black's Law Dictionary defines a "moratorium" as "[a]n authorized **postponement**, usu[ally] a lengthy one, in the deadline for paying a debt or performing an obligation." Black's Law Dictionary 1101 (9th ed. 2009) (emphasis added).  As Black's definition shows, the term "moratorium" refers to a prohibition or postponement that is *temporary*.  The Moratorium Laws, the Moratorium Orders, the Fiscal Plans, the Budgets, or the Compliance Law need not impose a permanent prohibition on the payment of principal and interest to fall within the scope of Section 303(1) of PROMESA.

127.    Section 303(1) of PROMESA contains an exception from preemption solely to the extent that a moratorium law restricts debt payments by an "entity . . . described in section 109(b)(2)" of the Bankruptcy Code.  PROMESA § 303(1).  The types of entities described in section 109(b)(2) of the Bankruptcy Code include "bank[s]," and this exception was specifically created so that the First Moratorium Law would not be preempted to the extent it imposed a moratorium on debt payments by the Government Development Bank for Puerto Rico ("GDB").  This exception does not apply to HTA and the Commonwealth because, unlike GDB, they are not "entit[ies] . . . described in section 109(b)(2)" of the Bankruptcy Code.

128.    Therefore, the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, the Budgets, and the Compliance Law are expressly preempted by Section 303(1) of PROMESA and are invalid, null and void.

**B.    Section 303(3) of PROMESA Preempts the Moratorium Orders**

129.    One of Congress's main concerns in drafting and enacting PROMESA was to stop the illegal diversions and misappropriations of funds (including HTA funds) that the

Commonwealth had implemented under the Clawback Order, the First Moratorium Law, and the

Moratorium Orders.

130.    Specifically, in response to criticisms that the automatic stays under PROMESA

could "give Puerto Rico's government an opportunity to shuffle money around" in a manner

detrimental to particular government entities or to creditors, Congress included multiple sections

of PROMESA that prohibit the transfer of funds between debtors and provide creditors with a right

to sue if any such unlawful transfers do occur.  These sections were expressly intended to preempt

the Moratorium Laws and Moratorium Orders even while an automatic stay was in effect, and the

automatic stays under PROMESA were in no way intended to shield the Moratorium Laws or

Moratorium Orders from preemption.  Among these sections of PROMESA specifically designed

to prevent illegal transfers under the Clawback Order, the First Moratorium Law, and the

Moratorium Orders was Section 303(3) of PROMESA, which expressly preempts "unlawful

executive orders," such as the Clawback Order and Moratorium Orders, as follows:

> [U]nlawful executive orders that alter, amend, or modify rights of
> holders of any debt of the territory or territorial instrumentality, or
> that divert funds from one territorial instrumentality to another or to
> the territory, shall be preempted by this Act.

PROMESA § 303(3).

131.    The Moratorium Orders are "executive orders" that (i) "divert funds" from a

"territorial instrumentality" (i.e., HTA) to "the territory" (i.e., the Commonwealth), and that

(ii) unlawfully "alter, amend, [and] modify" the rights of the HTA Bondholders.   More

specifically, the Moratorium Orders are "unlawful" because they violate the Excise Tax Statutes

by authorizing the use of Excise Taxes for purposes other than payment of the HTA Bonds.

132.    Similarly, the Moratorium Orders are "unlawful" because they violate the

Commonwealth's statutory covenants with the HTA Bondholders not to limit HTA's rights and

powers under the Enabling Acts until the HTA Bonds have been paid in full.  See 9 L.P.R.A. § 2019.

133.   The Moratorium Orders also violate numerous other provisions of Commonwealth law, including (i) the Enabling Act's provision authorizing HTA to determine the use of Toll Revenues (9 L.P.R.A. § 2012(e)(2)); (ii) the Enabling Act's provision authorizing HTA to pledge Toll Revenues to payment of the HTA Bonds (9 L.P.R.A. § 2004(l)); and (iii) the Resolutions pledging Toll Revenues to payment of the HTA Bonds.

## VIII.   Postpetition Transfers Of HTA Property To The Commonwealth Violate The Automatic Stay.

134.   PROMESA incorporates the Bankruptcy Code's automatic stay provision to protect a debtor filing for Title III protection from "any act to obtain possession of property of the [debtor] or of property from the [debtor] or to exercise control over property of the [debtor]." 11 U.S.C. § 362(a)(3); PROMESA § 301(a) (incorporating § 362 into PROMESA).

135.   Notwithstanding the imposition of the automatic stay following HTA's Title III filing on May 21, 2017, the Commonwealth continued to confiscate HTA's property for itself unabated during the postpetition period.  All such postpetition transfers of HTA property to the Commonwealth—including any such transfers purportedly made under color of the Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, or Compliance Law—violated the automatic stay, including because they constituted acts "to obtain possession of property of [HTA] or of property from [HTA] or to exercise control over property of [HTA]." 11 U.S.C. § 362(a)(3); PROMESA § 301(a) (incorporating § 362 into PROMESA).  Even if the Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law were valid (which they are not), they do not override the automatic stay.  The Commonwealth's postpetition efforts to obtain

possession of and exercise control over HTA's property for its own benefit are textbook automatic stay violations.

136.    The Commonwealth's postpetition acts to obtain possession of and to exercise control over HTA's property cannot be "authorized under [Title III]," because the automatic stay expressly prohibits such acts.   11 U.S.C. §§ 362(a)(3), 549(a)(2)(B); PROMESA § 301(a) (incorporating §§ 362 and 549 into PROMESA).   These postpetition acts by the Commonwealth to obtain possession of and control over HTA's property are therefore avoidable under section 549.

## FIRST CLAIM FOR RELIEF

### Request For Avoidance Of Unauthorized Postpetition Transfers Under 11 U.S.C. § 549

137.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 136 above.

138.    Section 549 of the Bankruptcy Code provides that a "trustee may avoid a transfer of property . . . that occurs after the commencement of the case; and . . . that is not authorized under [Title III] or by the court."  11 U.S.C. § 549(a)(1), (2)(B).

139.    The Excise Taxes are property of HTA and the HTA Bondholders.

140.    Under the Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, Compliance Law, and/or Joint Resolution, the Excise Taxes were transferred to the Commonwealth.

141.    On information and belief, the Commonwealth has transferred over $300 million in Excise Taxes to itself annually since the Commonwealth and HTA filed their Title III Cases.

142.    Any postpetition transfers of the Excise Taxes to the Commonwealth or for the Commonwealth's benefit, including under color of the Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, Compliance Law, or Joint Resolution, were not authorized under Title III or by the Court.

143.     Accordingly, any postpetition transfers of the Excise Taxes to the Commonwealth or for the Commonwealth's benefit should be avoided pursuant to § 549(a) of the Bankruptcy Code.

144.     HTA is also entitled to the value of the transfers under § 550 of the Bankruptcy Code.

## SECOND CLAIM FOR RELIEF

### Request For Avoidance Of Transfers Under 11 U.S.C. § 544

145.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 144 above.

146.     Section 544(b) of the Bankruptcy Code provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowable] unsecured claim."

147.     The Civil Code of Puerto Rico allows rescission of a transaction that is executed "in fraud of creditors, when the latter cannot recover . . . what is due them."  31 L.P.R.A.  § 3492.

148.     The Civil Code of Puerto Rico further provides that "[c]ontracts by virtue of which the debtor alienates property, without monetary consideration, are presumed to be executed in fraud of creditors."  31 L.P.R.A. § 3498.[17]

149.     Any transfers of the Excise Taxes from HTA to the Commonwealth or for the Commonwealth's benefit are voidable under Puerto Rico law as fraudulent transfers.

150.     The transfers were made to defraud HTA's creditors.

---

[17] The English translation of 31 L.P.R.A. § 3498 on Westlaw mistakenly translates the statute as "Contracts by virtue of which the debtor alienates property, for a good consideration, are presumed to be executed in fraud of creditors."

151.    HTA received no or inadequate consideration for the transfers.  Through the diversion of funds, the Commonwealth emptied HTA's coffers without assuming HTA's obligations—including those owed to the HTA Bondholders.

152.    Upon information and belief, at the time of the transfers, the Commonwealth and HTA were aware of HTA's obligations to the HTA Bondholders, as well as the harm that the HTA Bondholders would suffer as a result of the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law, and issued or enacted the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law as a means to evade HTA's obligations under the HTA Bonds and instead use HTA's assets for other, unauthorized purposes.

153.    Upon information and belief, the transfers effectuated by the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law rendered HTA insolvent and unable to pay the HTA Bonds.

154.    HTA's insolvency is related to transfer of the Excise Taxes to the Commonwealth. For example, HTA's 2016 audited financial statements expressly acknowledge that the diversion of the Pledged Revenues, beginning with the Clawback Order, "diminished" HTA's ability to pay its debts, stating: "[The Clawback Order] had a significant negative effect on [HTA's] liquidity . . . [W]ithout the taxes and other revenues allocated by the Commonwealth . . . , [HTA] is unable to deposit additional monies in the bond payment reserve accounts and without additional deposits *the ability to continue making the scheduled payments on the bonds issued is diminished.*"

155.    FOMB has acknowledged in HTA's April 28, 2017 fiscal plan that HTA's fiscal situation "was recently aggravated" by the diversion of the Excise Taxes, calling into question HTA's ability to repay the HTA Bonds.

156.    HTA's most recent audited financial statements, from fiscal year 2018 (the "2018 Financial Statements") similarly admit that HTA "does not have sufficient funds available to fully repay its various obligations as they come due" and expressed "substantial doubt about [HTA's] ability to continue as a going concern."  The 2018 Financial Statements also note that "the [First Moratorium Law], the related executive orders, and subsequent to the enactment of PROMESA certain developments in connection with actions of the Oversight Board . . . have had a significant negative effect on [HTA's] liquidity . . . There is no indication that the conditional allocation of gasoline, oil, diesel, and petroleum taxes to [HTA] will resume . . . Without the taxes and other revenues conditionally allocated by the Commonwealth . . . , [HTA] has been unable to make the scheduled payments on its outstanding bonds and fund its reserve accounts accordingly."

157.    The 2020 HTA Fiscal Plan likewise lays bare the devastating impact of the Commonwealth's misappropriation of HTA's assets going forward.  The Commonwealth will collect hundreds of millions in HTA's Excise Taxes, but the Fiscal Plan forecasts the continued misappropriation of the lion's share of HTA's revenues by the Commonwealth.  As a result, the Fiscal Plan anticipates that HTA as it currently operates will be hopelessly insolvent over the next thirty years to the tune of $6.4 *billion*.  FOMB hopes to address this shortfall through a series of "fiscal measures," primarily by increasing fare revenues, fine collections, and reassessing contracts for Tren Urbano, the heavy rail system in San Juan that has been foisted onto HTA's balance sheet.  But there is no guarantee these measures will yield the revenue increases and cost reductions that FOMB claims, and even FOMB's own untested projections would close the deficit by only $4.7 billion, leaving HTA insolvent by a $1.7 billion deficit over FY 2021 through FY 2049.  By stripping HTA of its Excise Taxes, the Fiscal Plan leaves HTA with little or nothing to repay its debts.

158.     The transfers effected by the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law should be avoided pursuant to § 544(b) of the Bankruptcy Code as fraudulent transfers under Puerto Rico law.

159.     HTA is also entitled to the value of the transfers under § 550 of the Bankruptcy Code.

### THIRD CLAIM FOR RELIEF

### Request For Avoidance Of Transfers Under 11 U.S.C. § 548(a)(1)(A)

160.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 159 above.

161.     Section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to avoid any transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

162.     At the time of the transfers of HTA's funds, the Commonwealth and HTA were aware of HTA's obligations to the HTA Bondholders, of the harm diversion of HTA's funds would cause to the HTA Bondholders, and of the relevant provisions of the Excise Tax Statutes, the Resolutions, the 2002 Security Agreement, and PROMESA giving rise to the HTA Bondholders' rights.

163.     The transfers effectuated pursuant to the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law were made with actual intent to hinder, delay, and defraud the HTA Bondholders.

164.     The following badges of fraud indicate that the Commonwealth made the transfers with actual intent to hinder, delay, and defraud the HTA Bondholders:  (a) the transfers rendered HTA insolvent and unable to pay the HTA Bonds; (b) as an instrumentality of the Commonwealth,

HTA has a special relationship with the transferee; and (c) HTA received no consideration for the transferred property.

165.    The transfers effected by the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law should be avoided pursuant to § 548(a)(1)(A) of the Bankruptcy Code as actual fraudulent transfers.

166.    HTA is also entitled to the value of the transfers under § 550 of the Bankruptcy Code.

**FOURTH CLAIM FOR RELIEF**

**Request For Avoidance Of Transfers Under 11 U.S.C. § 548(a)(1)(B)**

167.    Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 166 above.

168.    In exchange for the transfer of the Excise Taxes to the Commonwealth or for the Commonwealth's benefit pursuant to the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law, HTA received less than reasonably equivalent value or no value at all.

169.    The transfers of HTA's funds pursuant to the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law rendered HTA insolvent and unable to pay the HTA Bonds.

170.    The transfers effected by the Clawback Order, Moratorium Laws, Moratorium Orders, Fiscal Plans, Budgets, and Compliance Law should be avoided pursuant to § 548(a)(1)(B) of the Bankruptcy Code as constructive fraudulent transfers.

171.    HTA is also entitled to the value of the transfers under § 550 of the Bankruptcy Code.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, based on the above and foregoing, Plaintiff HTA and the Co-Trustees pray

that the Court enter an order:

a.    Avoiding all postpetition transfers of the Excise Taxes to the
Commonwealth pursuant to § 549(a) of the Bankruptcy Code;

b.    Avoiding all transfers of the Excise Taxes to the Commonwealth pursuant
to § 544(b) of the Bankruptcy Code and Puerto Rico law;

c.    Avoiding all transfers of the Excise Taxes to the Commonwealth pursuant
to § 548(a)(1)(A)-(B) of the Bankruptcy Code; and/or

d.    Recovering the value of all Excise Taxes transferred to the Commonwealth
pursuant to § 550 of the Bankruptcy Code.

Dated: ____, 2020
San Juan, Puerto Rico


CASELLAS ALCOVER & BURGOS P.S.C.      CADWALADER, WICKERSHAM & TAFT LLP


By:_____          By:_____
  Heriberto Burgos Pérez                          Howard R. Hawkins, Jr.*
  USDC-PR 204809                                  Mark C. Ellenberg*
  Ricardo F. Casellas-Sánchez                     William J. Natbony*
  USDC-PR 203114                                  Ellen M. Halstead*
  Diana Pérez-Seda                                Thomas J. Curtin*
  USDC-PR 232014                                  Casey J. Servais*
  P.O. Box 364924                                 200 Liberty Street
  San Juan, PR 00936-4924                         New York, NY 10281
  Telephone:  (787) 756-1400                      Telephone:  (212) 504-6000
  Facsimile:  (787) 756-1401                      Facsimile:  (212) 504-6666
  Email:      hburgos@cabprlaw.com                Email:      howard.hawkins@cwt.com
              rcasellas@cabprlaw.com                          mark.ellenberg@cwt.com
              dperez@cabprlaw.com                             bill.natbony@cwt.com
                                                              ellen.halstead@cwt.com
  *Attorneys for Assured Guaranty Corp.*                      thomas.curtin@cwt.com
  *and Assured Guaranty Municipal Corp.*                      casey.servais@cwt.com

                                                  * Admitted *pro hac vice*

                                                  *Attorneys for Assured Guaranty Corp. and
                                                  Assured Guaranty Municipal Corp.*

**ADSUAR MUNIZ GOYCO
SEDA & PEREZ-OCHOA PSC**
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile: 787.756.9010
Email:  epo@amgprlaw.com
        loliver@amgprlaw.com
        acasellas@amgprlaw.com
        larroyo@amgprlaw.com


By:_____
        Eric Pérez-Ochoa
        USDC-PR No. 206314

        Luis Oliver-Fraticelli
        USDC-PR No. 209204

        Alexandra Casellas-Cabrera
        USDC-PR No. 301010

        Lourdes Arroyo Portela
        USDC-PR No. 226501

*Attorneys for National Public Finance
Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007
Email: jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        kelly.diblaso@weil.com
        gabriel.morgan@weil.com


By:_____
        Jonathan Polk
        Gregory Silbert*
        Robert Berezin**
        Kelly Diblasi*
        Gabriel A. Morgan*


* admitted *pro hac vice*
**pro hac vice* application forthcoming

*Attorneys for National Public Finance
Guarantee Corp.*

FERRAIUOLI LLC

MILBANK LLP

By:/_____
    ROBERTO CÁMARA-FUERTES
    USDC-PR NO. 219,002
    E-mail:    rcamara@ferraiuoli.com


By:_____
    SONIA COLÓN
    USDC-PR NO. 213809
    E-mail:    scolon@ferraiuoli.com

    221 Ponce de Leon Ave., 5th Floor
    San Juan, PR 00917
    Tel.:    (787) 766-7000
    Fax:    (787) 766-7001

*Counsel for Ambac Assurance Corporation*

By:_____
    DENNIS F. DUNNE*
    ATARA MILLER*
    GRANT R. MAINLAND*
    JOHN J. HUGHES*
    55 Hudson Yards
    New York, New York 10001
    Tel.:    (212) 530-5000
    Fax:    (212) 530-5219
    Email:    ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com

*admitted *pro hac vice*

*Counsel for Ambac Assurance Corporation*

ARENT FOX LLP


By:_____
     DAVID L. DUBROW*
     MARK A. ANGELOV*
     1301 Avenue of the Americas
     New York, New York 10019
     Tel.:     (212) 484-3900
     Fax:     (212) 484-3990
     Email:     david.dubrow@arentfox.com
              mark.angelov@arentfox.com


By:_____
     RANDALL A. BRATER*
     1717 K Street, NW
     Washington, DC 20006
     Tel.:     (202) 857-6000
     Fax:     (202) 857-6395
     Email:     randall.brater@arentfox.com

*admitted pro hac vice

*Counsel for Ambac Assurance Corporation*

REXACH & PICÓ, CSP

By: _____
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    E-mail: mpico@rexachpico.com


*Attorneys for Financial Guaranty Insurance
Company*

BUTLER SNOW LLP

By: _____
    Martin A. Sosland (pro hac vice)
    5430 LBJ Freeway, Suite 1200,
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    E-mail: martin.sosland@butlersnow.com

    Jason W. Callen (pro hac vice)
    150 3rd Avenue, South, Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    E-mail: jason.callen@butlersnow.com

*Attorneys for Financial Guaranty
Insurance Company*