# EXHIBIT   20

(H. B. 938)

**(No. 26-2017)**

(Approved April 29, 2017)

# AN ACT

To      create the "Fiscal Plan Compliance Act," in order to take measures as necessary to adjust the existing legal and juridical framework so as to allow the fullest compliance with the Fiscal Plan approved by the Financial Oversight Board, created by virtue of the Federal Law PROMESA; establish a uniform fringe benefit system, which includes the Christmas bonus and the healthcare plan contribution, for all the government employees and officials of the agencies, instrumentalities, and public corporations of the Government of Puerto Rico, except for the University of Puerto Rico; amend paragraphs (a), (e), and (m) of subsection 2 of Section 4.3 of Article 4, Section 5.2 of Article 5, subsections 1(d) and 4(1) of Section 6.4, subsection 2(b) of Section 6.8, Section 6.9 of Article 6, and subsections 3 and 5 of Section 7.2 of Article 7, add a new Section 2.11(a) to amend Section 3 of Act No. 125 of June 10, 1967, as amended, suspend the effectiveness of Article 9 and Section 10.2 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act"; renumber current Sections 10 through 20, as Sections 9 through 19; repeal Act No. 89-2016, known as the "Public Service Temporary Employment"; amend Sections 3, 6, and 7 of Act No. 253-1995, as amended, known as the "Compulsory Motor Vehicle Liability Insurance Act," in order to broaden the compulsory motor vehicle liability insurance coverage from four thousand dollars ($4,000) to four thousand five hundred dollars ($4,500); to authorize the review of premiums before June 30, 2017; to allow the members of the Joint Underwriting Association of the Compulsory Motor Vehicle Liability Insurance to report a special dividend as well as apply an incentivized tax to such dividend; provide for the distribution of the revenues collected on account of the incentivized tax and the premium adjustment to be covered into the General Fund; authorize the Government to use the surplus of public corporations as "available funds" to contribute to the General Fund; authorize a Committee composed of the heads of the Fiscal Agency and Financial Advisory Authority, the Office of Management and Budget, and the Department of the Treasury to modify the rates of public corporations in order to comply with

the metrics of the Fiscal Plan; establish the rules and principles that shall govern the sale process of real property of the Government of Puerto Rico; create a Real Property Evaluation and Disposal Committee; establish the public policy on the sale of real property; amend Sections 3, 7, and 8 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," in order to establish that appropriations and funds without specific fiscal year that have remained in the books without being disbursed or set aside for one (1) year shall be deemed to have fulfilled their purposes, and therefore, shall be closed and covered into the General Fund; provide that any special funds created by law for specific purposes shall be credited to the General Fund of the Commonwealth Fund and shall be deposited in the regular bank account of the Secretary of the Treasury for him to have full control thereof; amend Sections 2 and 6 of Act No. 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," in order to provide that the gradual increase in the general budget's item allocated to procurement for micro-, small-, and medium-sized businesses shall be granted if the fiscal situation of the Government so allows; to add a new Section 3020.05A and 3020.15, and amend Section 3020.05, Section 3020.13, Section 3020.14, Section 3030.14, Section 3030.18, Section 3050.01, Section 6042.08, and Section 6042.15 of Act No. 1-2011, as amended, better known as the "Internal Revenue Code for a New Puerto Rico," in order to modify the excise tax applicable to cigarettes and tobacco byproducts to increase the liquidity, address the economic and fiscal crisis that Puerto Rico is undergoing, and to prevent any impact on the most vulnerable sectors, as well as to discourage cigarette consumption; amend Section 2 of Act No. 91 of June 21, 1966, as amended,  to provide that until Fiscal Year 2020-2021 the annual contribution to the Emergency Fund shall be in the amount of ten million dollars ($10,000,000), and that beginning in Fiscal Year 2020-2021 said contribution shall not be less than zero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury to prepare the Recommended Budget chargeable to the General Fund; and for other related purposes.

# STATEMENT OF MOTIVES

## Introduction

Puerto Rico is currently undergoing a serious, historically unprecedented fiscal and social crisis. Said crisis was caused, in part, by a lack of expenditure controls, sustainable development measures, as well as management information systems that promote clarity and transparency in government affairs.

According to data provided by the U.S. Department of the Treasury, Puerto Rico is suffering a 14.6% cumulative economic contraction in the Gross State Product (actual GSP) with a forecast of an additional 3% contraction in the next two years. For years, the Government of Puerto Rico has operated with a structural deficit that has been financed with bond issues and loans from the Government Development Bank. The Government of Puerto Rico has been lacking liquidity for over a year, and the tax refunds, the payments to contractors, pensioners' funds, and intra-governmental loans have been used to substitute sources of liquidity and to spend over the available funds. The Government Development Bank has failed to meet its obligations to bondholders since May 1, 2016, and is no longer fulfilling its duty to provide liquidity. Moreover, we have no access to the market since the policies of past administrations have lessened the credibility of the Government of Puerto Rico. The retirement systems are insolvent.

As an example of the policies that brought us to this point, there was a 64%-increase in payroll expenditures from 2001 to 2008; and after a 33%-decrease between 2009 and 2012, another substantial increase followed between 2013 and 2016. To finance this excessive spending, the public debt increased 134% between 2000 and 2008. Moreover, under the philosophy of "primero impago, luego impuestos y después recortes" [first default, then taxes, and finally cuts] various measures were implemented during the previous four (4)-year term. This philosophy contributed to prolonging the excessive spending and the rejection of public policies

that would have allowed for the efficient administration of the fiscal affairs of the Government of Puerto Rico. Meanwhile, the necessary actions to achieve more efficient Government operations and cutback on government spending were not taken. Furthermore, even while the securities were plummeting and the economic debacle was underway, the Central Government was unable to produce the necessary financial information to understand the severity of the issue, and to submit accurate information to the Congress and other entities concerned with the issue. Consequently, the debt of the Government of Puerto Rico experienced several downgrades resulting in an adverse impact on all the sectors of the economy.

This crisis has greatly affected Puerto Rican families. The most vulnerable people within our society have been forced to make the greatest sacrifices, thus prompting thousands of Puerto Ricans to abandon the Island in search of better opportunities. The consequent decrease in the population has become one of the challenges to overcome in our path toward recovery.

## Puerto Rico's Colonial Status

The colonial status has impaired our capacity to face and solve this crisis, since we lack the sovereign powers of a state to regulate local affairs, which powers are conferred under the Tenth Amendment to the Constitution of the United States.

> For the U.S. Supreme Court, the adoption of the Constitution did not represent a change to the fundamental basis of the constitutional relationship between Puerto Rico and the United States. The Supreme Court continued to treat Puerto Rico as a political entity subject to the territory clause of the U.S. Constitution. [Our translation].

*See Pueblo v. Sánchez-Valle, et seq*. 192 D.P.R. 594, 631 (2015).

"There never was a transfer of sovereignty, but rather a delegation of powers." [Our translation] *Id*., p. 635.

This delegation of power does not constitute an irrevocable relinquishment nor a termination of the power of the Congress. The people of the United States granted the Congress vast powers to administrate the territories through the Constitution of United States of America. For such reason, the Congress cannot irrevocably yield a power that was not conferred upon it by the People of United States. [Our translation].

*Id*., p. 638.

Hence,

The Congress may allow the Commonwealth to remain as a political system indefinitely or, on the contrary, has the constitutional power to amend or revoke the internal administration powers exercised by the Government of Puerto Rico. In other words, Puerto Rico's internal government system is subject in its entirety to the political will and legal authority of the Congress. [Our translation]

*Id*., p. 641.

The sad truth is that the colonial status leaves us so defenseless that not even the U.S. citizenship that we have treasured since 1917 is guaranteed. The Congress has legislative discretion to grant privileges to citizens born in the territories, including the U.S. citizenship, but said right may be revoked at any time. In fact, the Federal Government has argued before the courts that territories do not have a right to citizenship, but that it is rather an act of legislative grace from the Congress. *See*, for example, *Tuaua v. United States*, 788 F.3d 300, (D.C. Cir. 2015).

Regarding the issue at hand, to illustrate the limitations resulting from the colonial status, it is worth noting that the states can claim the protections of the Federal bankruptcy law from which Puerto Rico was excluded and, since we do not have full representation in the Congress, there is little to nothing we can do about it.

We are also unable to enact our own legislation due to the express preemption provision of said Federal bankruptcy law, even when it leaves us unprotected. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.,* 136 S. Ct 1938 (2016) (declaring unconstitutional the "Puerto Rico Public Corporation Debt Enforcement and Recovery Act," Act No. 71-2014, better known as the "Commonwealth Bankruptcy Act."

<u>The Direct Result of our Colonial Status: PROMESA</u>

The policies of the past together with our defenselessness as a colony led the United States Congress to promulgate the Puerto Rico Oversight, Management, and Economic Stability Act, known as PROMESA, Public Law 114-187, which delegated vast powers to the Financial Oversight Board (hereinafter the "Oversight Board"). Once again, our lack of representation in the Congress resulted in the approval of said Act without the actual involvement of our People. Pursuant to PROMESA, any ongoing fiscal, budget, Legislative, or Executive actions taken in Puerto Rico, as well as any debt restructuring, whether consensual or not, issuance, guarantee, exchange, modification, repurchase, or redemption is subject to oversight.

Section 4 of PROMESA clearly provides that, "The provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." In this manner, the Congress expressly stated that said Act shall supersede any state legislation that is in conflict with PROMESA. Section 8(2) reasserts this provision by providing that the Government of Puerto Rico may not enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Oversight Board. Hence, we cannot promulgate legislation to defeat or impair PROMESA, its provisions, and its scope.

At this juncture, it is worth mentioning that under the Tenth Amendment, the Federal Government cannot impose on a state what PROMESA allows for territories. The Congress imposed a Board on Washington, D.C., which is not a state and is under the direct jurisdiction of the Congress. The Board in New York was created by the State Legislature, not the Congress. Detroit, which is a city and not a state, participated in a volunteer bankruptcy process. In sum, we must bear in mind that our current situation as well as the imposition of the Oversight Board are further consequences of a colonialism that has limited our development for the past 119 years.

Unfortunately, our colonial status and the lack of political power that is inherent thereto exacerbate the reality that has been imposed on us by the Congress through a Federal Law. This Law has supremacy over any local legislation, even our Constitution, and we were not afforded an opportunity to vote either on said law or for the President that approved it. Therefore, it is evident that in order to get out of this financial predicament it is crucial for us to solve the status issue. However, it is also an undeniable fact that we must work within PROMESA's parameters to set in motion the financial and fiscal recovery of Puerto Rico.

On October 30, 2016, the Oversight Board designated the Government of Puerto Rico, the Employees Retirement System and Judiciary Retirement System, the Teachers' Retirement System, the University of Puerto Rico, and 21 public corporations of Puerto Rico as "covered entities" subject to financial oversight pursuant to PROMESA. Section 405(b) of PROMESA further imposes a temporary stay on lawsuits and complaints against Puerto Rico and its instrumentalities on various matters hoping that the Government of Puerto Rico, on its own behalf and on behalf of its instrumentalities, may initiate voluntary negotiations with its creditors in order to reorganize and settle the repayment of the Government's debt obligations and, simultaneously, begin a responsible restructuring of the

Government of Puerto Rico and its instrumentalities geared to readjusting the essential services that the health, safety, and wellbeing of the residents of Puerto Rico warrant with the timely repayment of its debt obligations.

After investing millions of dollars in specialized consultants, the previous administration submitted a fiscal plan that was faulty and, thus, rejected by the Oversight Board forthwith for it did not solve the fiscal issues that said administration caused.

This Act, divided into Chapters, provides for different measures that this Administration is taking in order to comply with the Fiscal Plan imposed under the provisions of PROMESA. The matters addressed in this Act are related among themselves since they are all geared toward complying with the Fiscal Plan.

In this regard, Section 17 of Article III of the Constitution of Puerto Rico provides that: "Every bill, […] shall be confined to one subject, which shall be clearly expressed in its title, and any part of an act whose subject has not been expressed in the title shall be void." Said Section establishes the rule of only one subject, which requires that every law approved by the Legislative Assembly embraces no more than one subject. On this matter, the Supreme Court of Puerto Rico has held that said provision "does not require the title to be a detailed account of the contents of the law, but rather a mere indicator of the subject matter covered thereunder." [Translation supplied]. *Herrero v. Emmanuelli*, 179 D.P.R. 277, 295 (2010); *Rodríguez v. Corte*, 60 D.P.R. 919, 922 (1942).

Moreover, the case law has been consistent in establishing that only when a case is clear and conclusive it is thus warranted to void a law that violates said constitutional provision. *Dorante v. Wrangler of P.R.,* 145 D.P.R. 408, 429-431 (1998) and cases cited therein. Our highest court has "adopted a *stance* understandably lax not to curtail lawmakers." [Translation Supplied]. *Herrero v. Emmanuelli, supra. See also*, J.J. Álvarez-González, *Derecho Constitucional de*

*Puerto Rico y Relaciones Constitucionales con los Estados Unidos* [Constitutional Law of Puerto Rico and Constitutional Relationships with the United States], Bogotá, Editorial Temis, S.A., 2009, p. 244. In this sense, the Supreme Court has held that "**a strict interpretation of the constitutional provision may impair and hinder the legislative process, since it will compel the lawmaker to enact multiple laws to regulate one general subject or matter**." *Herrero v. Emmanuelli*, *supra*, [Emphasis added]. *See also*, M. H. Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389,393-394 (1958). That is,

> The requirement is not intended as a subterfuge to destroy valid legislation, but rather as a guarantee that the legislative process is to be carried out with transparency and that each bill is to be discussed and analyzed in depth before it is approved.

*Herrero v. Emmanuelli, supra*, pp. 295-296.

Therefore, upon examining the validity of an act in light of the one subject rule, it is necessary to consider all of the provisions of a law in order to determine whether these have a correlation or not and if they pertain to the subject expressed in the title. *Id*. What constitutes "only one subject" is construed liberally without neglecting the purpose and objective of the constitutional requirement. In this regard, "a statute may address all the topics related to the subject matter and all of the means that may be fairly considered to be supplementary and necessary or appropriate to fulfill the purposes inherent to the general subject." [Translation supplied]. *Id. See also*, R. E. Bernier & J.A. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico* [Approval and Interpretation of the Laws of Puerto Rico], Segunda Edición, San Juan, Publicaciones JTS, 1987, p. 81.

This Act addresses one subject: to achieve full compliance with the Fiscal Plan certified by the Board. For such reason, we promulgate this Act, which addresses several topics geared to complying with the Fiscal Plan.

<u>A New Government: Our Responsibility Before the Oversight Board</u>

Due to the foregoing, at the beginning of our administration, we found a cash deficit of over $7.6 billion as certified by the Federal Treasury and the Oversight Board. The Government had no access to capital markets, had a "junk" credit rating, had no liquidity and no transparency in public finances, public spending was excessive, and the public debt amounted to billions of dollars. Furthermore, the Governor had the enormous task of recovering the credibility of the Island in the market and before the Oversight Board. We must guarantee a Government that spends in accordance with the actual revenues generated.

Since January 2nd, we have been implementing a systematic plan to control government spending, reactivate our economy, and allow for the conditions to create more and better jobs in the private sector. We are showing the world that Puerto Rico is open to do business in a safe and stable governmental environment.

The measures submitted by the Governor and approved by this Legislative Assembly during these first three (3) months of this administration have changed the course of Puerto Rico and have set it on a path of fiscal responsibility.

On February 28, 2017, the Governor submitted a Fiscal Plan that is complete, thorough, real, and also sensible to the needs of our People and those who are most vulnerable. After weeks of uncertainty, reason and sound judgment prevailed. On March 13, 2017, the Oversight Board accepted and certified our Fiscal Plan together with a series of contingencies to guarantee that government employees shall not be dismissed, the workweek shall not be affected, the People's access to healthcare services shall be maintained, and the pensions of those who are most vulnerable shall be protected. This Fiscal Plan is the only option available to avoid dismissing government employees, eliminating the right to healthcare, and to maintain the solvency of our retirement systems while the government continues to operate as usual and complies with the parameters in order to avoid the imposition of more

stringent measures which are part of the contingencies of the Plan as approved by the Financial Oversight Board. Some of these contingencies are: the full elimination of the Christmas bonus for all government employees, and the imposition of furloughs which shall render the Government inoperative.

The Fiscal Plan's approved measures are geared toward achieving the fiscal goals, promoting the economic development and our capacity to reestablish our credibility, allowing the change to translate into a long-term benefit rather than a mere cutback and, most of all, ensuring that those who are most vulnerable and those who work hard every day have a better quality of life.

The validation of the Fiscal Plan represents the recognition of the credibility of the new Government administration. We have shown that the times of incoherence and improvisation are over to give way to working as a team and obtaining results that inure to the benefit of Puerto Rico. We went from the "me vale" and the lack of credibility to having a Fiscal Plan that also addresses our socioeconomic development and meets the objective of cutting back on spending, but most importantly allows us to build a better society.

The changes we are implementing are not easy and will take time, but they will also yield results within the first two years. Under the certified Fiscal Plan, we shall be able to strike a balance between revenues and expenditures by Fiscal Year 2019. Now is the time to execute these changes. The contingencies of the Fiscal Plan require the Government's compliance. Liquidity must be ensured in order to avoid any impact on the salary of government employees, the health of the People, and the income of pensioners.

This Act is promulgated in order to adjust the legal framework and the case law to meet the requirements that the Oversight Board made in connection with the Fiscal Plan approved by virtue of PROMESA. To achieve this and in view of the serious economic and fiscal emergency situation of Puerto Rico, it is necessary to

approve this Act by virtue of the power of Police Power and in accordance with Sections 18 and 19 of Article II and Sections 7 and 8 of Article VI of the Constitution of Puerto Rico, in order to provide the Government with the sufficient liquidity to defray the payroll of government employees and the essential services offered to the People. We exercise this Police Power to take the necessary measures in order to comply with the Fiscal Plan and to set Puerto Rico into a path of financial recovery. Complying with this Plan constitutes a compelling interest of the Commonwealth in order to maintain its operations and protect those who are most vulnerable.

> As defined by the Supreme Court of Puerto Rico, the Police Power is,
> That power inherent to the State which is used by the Legislature to prohibit or regulate certain activities for the purpose of furthering or protecting the public peace, morals, health, and general welfare of the community, which may be delegated to municipalities." [Our translation]

*Domínguez Castro v. E.L.A.*, 178, D.P.R. 1, 36 (2010).

Our Highest Court recently held that the measures taken to address an emergency are valid insofar as these are necessary and reasonable to further a profound government interest. *See Trinidad v. E.L.A.*, 188 D.P.R. 828 (2013) and *Domínguez Castro v. E.L.A.*, *supra*, pp. 88-89. Likewise, the Supreme Court recognized "the precariousness of the economy as a reality that actually matters in the definition of the scope of government action under the Police Power" and that, in the exercise of said power, "the Legislature has a broad authority to approve economic regulation geared to promoting the welfare of the community." [Translation supplied]. *Domínguez Castro v. E.L.A.*, *supra*, p. 37. Associate Justice Kolthoff-Caraballo, on behalf of the Supreme Court, stressed that both our jurisdiction and the rest of the world "are living times that are very convoluted financially and economically. It would seem as if the economy of countries around

the world are intertwined and tangled with the tail of a kite that is unable to finally take off." [Translation supplied]. *Domínguez Castro et al. v. E.L.A. I*, 178, D.P.R. 1, 415 (2010), certiorari denied, *Domínguez Castro v. Puerto Rico*, 131 S. Ct. 152 (2010). In this manner, the Court recognized that it must be aware that there was a reality which it described as "hard and unpleasant." [Translation supplied]. In view of this historic reality, the Court deemed it necessary to try and aim for an altruistic interest in the pursuit of the "collective economic wellbeing at the expense of the individual wellbeing." [Translation supplied]. Furthermore, in *Herrero y otros v. E.L.A.,* 179 D.P.R. 277 (2010), the Court reasserted its recognition of the economic crisis in our jurisdiction and stated that, in the context of providing a remedy that entailed the disbursement of public funds in order to redress taxpayers, it was not "unaware of the difficult condition of the public finances of the Island." [Translation supplied]. *Id*. in p. 309.

In *Trinidad Hernandez v. E.L.A.*, *supra*, the Supreme Court validated Act No. 3-2013, on the Retirement System of Public Employees, for understanding that the Legislative Assembly had exercised its Police Power to stop the insolvency of the Retirement System of Public Employees. The Supreme Court held that "from the statement of motives […] it can be ascertained that the measures adopted are necessary and reasonable to properly address the financial crisis that threatens the actuarial solvency of this system." [Translation supplied]. The Court added that "this certainly constitutes a serious public interest since, guaranteeing the economic solvency of the system benefits all of the participants therein and partially addresses the fiscal crisis of the Island, thus protecting the welfare of all Puerto Ricans." [Translation supplied]. *Trinidad Hernandez v. E.L.A.*, *supra*, p. 837. It concluded that the provisions of said Act are constitutional "since, notwithstanding the substantial impairment to the contractual obligations in question, the measures implemented are reasonable and necessary to safeguard the actuarial solvency of the

Retirement System, and there are no less burdensome measures to achieve this purpose." [Translation supplied]. *Id*., p. 839.

Likewise, in *Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico*, 190 D.P.R. 854 (2014), the Court recently passed judgment on the measures approved under Act No. 160-2013 to solve the crisis of the Teachers' Retirement System and determined that the law did not further a serious public interest as required in our Constitution in the case of retirement system reforms, that is, to guarantee the solvency of the system itself. For such reason, the Court held that Act No. 160-2013, in what pertains to the impairment of contractual obligations, was unreasonable and therefore unconstitutional. *Id*, p. 12. At that time, the Court was emphatic in stressing that, should those measures be reasonable and necessary to "further the actuarial solvency, and should there be no less burdensome measures to achieve these purposes" then the measures approved would be held to be constitutional. [Translation supplied]. *Id*., p. 8.

Based on the aforementioned legal framework, this Legislative Assembly believes that the measures taken in this Act are necessary and reasonable to properly address the fiscal, economic, and budget crisis of Puerto Rico. Moreover, these measures are required in order to effectively implement the Fiscal Plan certified by the Oversight Board in accordance with PROMESA. Said Plan establishes fiscal adjustments to stabilize Government finances at a time where there is no access to the financial market. If these measures are not implemented, the social and economic welfare of Puerto Rico shall suffer irreparable damages. Hence, the implementation of the Fiscal Plan constitutes a compelling interest of the State in order to guarantee the public interest.

## Government Restructuring

The Plan for Puerto Rico promoted by this Administration, and which was supported by the People of Puerto Rico in the last general election through the democratic exercise of their right to vote, proposes the implementation of a new government structure that reduces public spending significantly and substantially improves the duties thereof. To achieve this, it is necessary to carefully evaluate the services rendered by the government in order to determine which of these services may be consolidated, delegated to the private sector, or eliminated because they are no longer necessary. To achieve this, the dismissal of government employees shall not be necessary, but rather a mobilization of said employees in accordance with the needs for service of our people.

Consistent with the foregoing, and as part of the first measures taken by this Administration in order to address the fiscal crisis through a government restructuring, Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," was approved. Said Act transforms the Government into a Sole Employer in order for public officials to become Government employees rather than employees of the different entities, thus allowing for a better use of the human resources, wherever there is a pressing need, through the mobility mechanism without requiring the employee to resign from the office he currently holds in order to start all over again at a new government instrumentality. The mobility mechanism seeks to reinforce the notion of what it means to strike a balance between the workforce and the rendering of public services. In doing so, the Government's human resources are distributed efficiently and a swift government structure is thus created, based on an ongoing evaluation of the needs. Moreover, we shall assist government employees in making the required adjustments and modifications to face the current fiscal crisis as well as any future challenges.

Act No. 89-2016, known as the "Temporary Jobs in the Public Service Act," was approved during the previous four (4)-year term presumably to correct the disparity in the treatment of temporary employees in the public service, and to require agencies to be diligent in the creation of jobs or the request for job creation. Said law was also enacted on the basis that the adequate classification of employees shall assist in the administration of human resources in the public service and prevent unnecessary expenditures. Moreover, under said Act, transitory employees who had been working for two (2) or more years discharging duties of a permanent need were granted a regular employee status, subject to certain eligibility criteria.

Notwithstanding, said Act has had the effect of increasing the government's payroll at a time when the public finances are undergoing an unprecedented crisis. The recruitment of temporary employees, whether they are classified as irregular, transitory, or contract employees, must not be used as a subterfuge for the subsequent creation of regular positions of permanent need, thus encumbering the State's funds without gauging the effectiveness of these resources in the rendering of services that the People warrant.

For such reason, setting Puerto Rico on the right path requires a paradigm shift such as the one proposed by this Administration under the Puerto Rico Socioeconomic Transformation Model included in the Plan for Puerto Rico. The mission is to establish a new government that enables economic development and whose vision is that of a government based on the scientific model, where evidence and results matter and citizen involvement constitute the main source of validation. To achieve this, the government must become a facilitator of economic development by implementing actual and conclusive reforms. Moreover, the government structure must be cost-effective, efficient, and transparent, and the public service must be based on integrity, excellence, responsibility, and accountability.

<u>Fringe Benefits Equality for all Government Employees</u>

Furthermore, as we have mentioned, it is common knowledge that our Island is undergoing a serious fiscal crisis and that the resources to meet the all of the government's obligations are limited. In the midst of such a new situation as the imposition of the Financial Oversight Board as well as the default on the debt incurred, the Government of Puerto Rico is compelled to restructure the government apparatus and direct resources to the areas that need them the most.

Puerto Rico is at a historical juncture where it needs the collaboration of all the sectors to adopt immediate solutions that contribute to the economic restoration of the Island. This Act addresses in a responsible and fair manner the lack of uniformity among government employee in terms of the fringe benefits they shall enjoy during this critical period in the local economy. During these next few years prior to the fiscal recovery of the Island, there is no justification to keep such a wide gap between the fringe benefits of the government employees of a few government agencies and those of the government employees of public corporations. In some public corporations, the employees have double or triple the amount of benefits that the employees of the central government have, which is not consistent with the current economic reality of Puerto Rico. Even worse, this creates a disparity among government employees by benefiting a few at the expense of many others. Moreover, the costs entailed by these unequal measures renders it unsustainable to comply with them at this time while keeping all government employees. For such reason, this Legislative Assembly deems it prudent to take actions to achieve savings and to enable us to keep all government employees thus avoiding their dismissal.

To provide a ballpark figure of the expenditures of the Public Corporations on account of fringe benefits, including the Christmas bonus and healthcare insurance contributions, the recommended budget for Fiscal Year 2017 submitted to the Oversight Board showed projected expenditures on these items in the amount of

$171.877 million. This amount does not include the University of Puerto Rico, the Puerto Rico Electric Power Authority, and the Aqueduct and Sewer Authority. Regarding the payment of overtime, the budgeted amount was $23.618 million dollars, and for sick and vacation leave liquidations the budgeted amount was $9.906 million dollars. This causes a disparity between the fringe benefits of the employees of the Central Government and the employees or officials of public instrumentalities or corporations. Public Corporations spend an average of $10,840 per employee on fringe benefits, while the Central Government spends an average of $2,523 per employee. Said disparity cannot be justified until the local economy recovers.

Moreover, according to statistics furnished by the Government Development Bank and the Puerto Rico Planning Board, in Fiscal Year 2016, public corporations were responsible for a debt amounting to $46,861.6 billion which represents 72.9% of the total public debt of the Government of Puerto Rico, which was estimated in $64.254 billion. The public corporations have increased their share in the debt from 68.9% in Fiscal Year 2004 to 72.9% in Fiscal Year 2016. In specific terms, the increase in the total public debt with respect to public corporations amounted to $23.484 billion which constitutes a 100.5%-increase. As a result, the debt of the public corporations for Fiscal Year 2016 was estimated at more than double the amount of Fiscal Year 2004.

For years, the situation at the public corporations has been that the financial clauses negotiated under certain collective bargaining agreements exceed to a great extent the provisions of law. This situation compromises the government's fiscal stability and jeopardizes the jobs of government employees given that this fiscal instability is unsustainable at these critical times. For instance, many corporation committed to the payment of overtime, even when they lack the funds therefor, at a rate of double or triple the amount of the salary of the employees. Likewise, they

reduced the number of accrued hours required in order to receive monetary compensation, in lieu of compensatory time-off.

In Puerto Rico, the right to overtime pay is provided for in Section 16 of Article II of the Bill of Rights of the Constitution, which sets forth that:

> The right of every employee to choose his occupation freely and to resign therefrom is recognized, as is his right to equal pay for equal work, to a reasonable minimum salary, to protection against risks to his health or person in his work or employment, and to an ordinary workday which shall not exceed eight hours. An employee may work in excess of this daily limit only if he is paid extra compensation as provided by law, at a rate never less than one and one-half times the regular rate at which he is employed.

This Act repeals Section 10.2 of Act No. 8-2017, which establishes the mechanism for overtime pay to be applicable to government employees. Said mechanism is to be integrated into this Act in order to extend its applicability to public corporations. The overtime pay method established in this Act provides that the employees shall be compensated at a rate of one and a half times. In doing so, the provisions set forth in the Constitution and the Federal Law that governs the payment of overtime are fully complied with.

Moreover, the Fair Labor Standards Act (FLSA), 29 U.S.C. §201-209, regulates the payment of overtime, among other matters, and is applicable to the government employees of the Government of Puerto Rico. The Supreme Court of Puerto Rico has held that, insofar as the state law is more beneficial for the employee than the FLSA, the federal law does not preclude the application of the state law for it is not in conflict therewith. The purposes of laws are, in said circumstances, perfectly reconcilable. *Vega v. Yiyi Motors, Inc.*, 146 D.P.R. 373 (1998).

The FLSA established that employees must receive overtime pay for hours worked over forty (40) in a workweek at a rate not less than time and one-half (1.5) their regular rates of pay. The FLSA also provides that public agency employees may receive compensatory time off, at a rate of not less than one and one-half (1.5) hours for each overtime hour worked, instead of cash overtime pay.

One of the purposes of this Act is to achieve that the operating expenses of the public corporations are incurred efficiently, responsibly, and cautiously to permanently reduce expenditures. The Government of Puerto Rico has a compelling interest in controlling the payroll expenses to safeguard the jobs, the feasibility of public corporations, as well as their finances. The precarious fiscal situation of the Government, its General Fund, and its Public Corporations compels us to establish controls on payroll expenses in excess of the amount budgeted in order to safeguard the feasibility of the public corporations and, in turn, the workweek and salaries of government employees.

Likewise, this Act establishes the fringe benefits to which all government employees shall be entitled during this fiscal crisis period, regardless of the agency or public corporation where they work. In doing so, the government employees of the different Government agencies shall receive the same benefits as the government employees of the different public corporations, whose current fringe benefits vary depending on the public corporation where they work. The union employees of the different agencies and public corporations are also entitled to different fringe benefits even when they work at the same agency or public corporation depending on the collective bargaining agreement under which they are covered. At a time when Puerto Rico is still undergoing a fiscal crisis and when the Oversight Board has threaten to eliminate the Christmas bonus of and implement furloughs for government employees, there is no justifiable reason for maintaining such a disproportionate and unreasonable disparity in fringe benefits which were agreed

upon at a time when the fiscal situation of Puerto Rico was different and there was no crisis as the one we have today.

As previously stated, in the past, our illustrious Supreme Court has upheld the validity of the economic statutes approved to take action at a time of crisis and urgency in Puerto Rico, and has recognized the "possibility that, in circumstances related to economic aspects, the Legislative Assembly may exercise its broad powers." *Domínguez Castro*, *supra*, p. 49 (2010) (omitted citation). Aware of the structural crisis of the Retirement System of Public Employees, said Honorable Court recently upheld the constitutional validity of the statute that amended the Public Employees Retirement Act, Act No. 3-2013, in order to address said crisis. *Trinidad Hernández v. ELA*, *supra*.

Article II, Section 7 of our Constitution states that: "No laws impairing the obligation of contracts shall be enacted." Art. II, Sec. 7, Commonwealth Const., L.P.R.A., Title 1. Said Contracts Clause does not establish an absolute prohibition on the rulemaking authority of the State in benefit of the public interest. *Bayrón Toro*, 119 D.P.R., p. 619.

The constitutional guarantee against the impairment of contractual obligations is only applicable when the modification adversely affects the fundamental terms and conditions of the contract which caused the execution thereof thus frustrating the expectations of the parties thereto. *Domínguez Castro*, *supra*. See also, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978); *El Paso v. Simmons*, 379 U.S. 497 (1965). The reasonableness of the Act is determined by mainly considering the substantiality of the public interest furthered by the statute and the extent of the impairment caused by the retrospective application thereof. *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 396 (1973). If the impairment is caused as a result of a reasonable and necessary modification to further the public interest, the court shall uphold its validity. *Bayrón Toro*, *supra*.

Even if the impairment is substantial, the constitutional prohibition is not absolute. The constitutional prohibition has to conform to the Police Power. *Bayrón Toro*, *supra*. When considering the validity of the statutes under the Contracts Clause, the applicable criterion is reasonableness. *Warner Lambert Co. v. Tribunal Superior*, *supra*. Hence, the function of the court is to strike a reasonable balance between the social interest of promoting the common good and the, also social, interest of protecting contractual transactions against the arbitrary and unreasonable application of the laws. *Id*.

Upon determining that the impairment is substantial, the evaluation of whether the modification seeks to further an important interest in benefit of the general welfare is thus warranted. If the impairment arises as a consequence of a reasonable and necessary modification geared to furthering a significant and lawful public interest, the validity of the law shall be upheld. *Bayrón Toro*, *supra*.

In *Buffalo Teachers Union[sic] v. Tobe*, 464 F.3d 362, 365 (2nd Cir. 2006), the Second Circuit held the following in regards to the evaluation that an adjudicatory forum shall conduct when assessing a complaint where the Contracts Clause is invoked:

> When a state is sued for allegedly impairing the contractual obligations […] the state will not be held liable for violating the Contracts Clause of the United States Constitution unless plaintiffs produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct.  On this issue, plaintiffs have the burden of proof because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern. (Emphasis added).

As an affirmation of the separation of powers doctrine, when assessing the reasonableness or necessity of the measure for purposes of the Contracts Clause, the Supreme Court of Puerto Rico has held that even though complete deference to a legislative assessment of reasonableness and necessity is not appropriate "this does not mean that the judicial forum is not compelled to show some deference to the determination of reasonableness and necessity made by the legislator in the exercise of his constitutional power, especially when socioeconomic regulations are at issue." *Domínguez*, *supra*. It is not appropriate either "to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem." *Id.*, p. 89. Said Court recently reasserted that "deference to the assessment of the Legislative Assembly of the reasonableness and necessity of the measure is called for." *Trinidad Hernández v. ELA*, *supra*. Furthermore, regarding the reasonableness of the measure "it is an established rule that it is not appropriate for courts to make a *de novo* determination whether another alternative exists to solve the problem. The determination made by the Legislative Assembly regarding the approved measures constitute a public policy exercise that calls for […] deference in this separation of powers system." [Translation supplied].  *Trinidad Hernández v. ELA*, *supra*.

We must keep in mind that, if it is deemed that there is an impairment of a contractual relationship, a court must analyze whether the legislation in question serves a legitimate public purpose. *Home Building & Loan Ass'n.*, *supra*, *U.S. Trust*, 431 U.S. at 25. The legitimate public purpose is defined as one "aimed at remedying an important general, social, or economic problem rather than providing a benefit to special interests." *Buffalo Teacher's Federation*, *supra*. Be it noted that it has been held that the economic and financial health of a state constitutes a legitimate public purpose. See, *Baltimore Teachers Union v. City Council of Baltimore et. al.*, 6 F.3d 1012, 1017 (4th Cir. 1993) (holding that a legislation enacted to reduce salaries and

address the state's grave fiscal crisis did not violate the contracts clause); *In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth.* 375 N.E.2d 384 (1978) (statute freezing municipal wages held to be constitutional given the fiscal emergency afflicting New York City); *Buffalo Teachers, supra* (the freezing of teachers' wages amidst a fiscal crisis was upheld).

In view of this situation, the Government of Puerto Rico was compelled by the Fiscal Plan approved by the Oversight Board to implement certain measures so as to be able to guarantee the jobs of thousands of Puerto Ricans, prevent the use of furloughs that would result in a reduction of up to twenty percent (20%) in their monthly salaries, and the full elimination of the Christmas bonus. As mentioned before, some of the measures that the Government committed to implement are: standardizing the fringe benefits of all the government employees, offering equal overtime pay in both the Public Corporations and the Central Government, standardizing the fringe benefits offered to the employees of both the Central Government and Public Corporations; eliminating the liquidation of vacation and sick leave accrued in excess; and offering government employees a vacation leave accrual rate equal to that of the employees of the private sector.

To achieve the objectives of this Act in the least burdensome manner for our government employees, it is hereby established that the provisions applicable to the leaves and the fringe benefits shall be temporary. Said leaves and benefits shall be restored as certified by the members of the Fiscal Plan Compliance Committee.

In order to comply with the certified Fiscal Plan, the provisions pertaining to fringe benefits established in Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," are hereby repealed and included in this Act and the application thereof is extended to the employees of Public Corporations. In doing so, the fringe benefits and overtime pay to which government employees are entitled shall be uniform regardless of their

workplace. Likewise, the monthly vacation leave accrual rate allowed is reduced, thus offering government employees the same vacation leave accrual rate of employees in the private sector, which is fifteen (15) days. Lastly, the payment of vacation and sick leave accrued in excess is also eliminated. It is provided, however, that supervisors are required to implement measures to ensure that government employees are able to use said leaves so that these are not forfeited.

We cannot overlook the fact that if the furlough program had taken effect immediately as proposed by the Oversight Board, Puerto Rico's economy would have suffered a devastating blow with the elimination of the Christmas bonus and a twenty percent (20%)-salary reduction for government employees. This situation prompted the establishment of the alternative measures stated above in order to procure the required funds without altering the workweek and salary of government employees.

<u>PROMESA and the Supremacy Clause</u>

Furthermore, it is important to stress the application and the mandate that the Congress of the United States of America, by virtue of its plenary powers over the Territory of Puerto Rico, imposed on the Island upon the enactment of PROMESA. Said Federal Act created the Oversight Board which was entrusted with the task of approving and supervising the execution of a Fiscal Plan for the economic stabilization of Puerto Rico, among a series of other tasks.

Said statute was approved on May 4, 2016, and includes a supremacy clause that states:

SECTION 1. […]

This Act may be cited as the "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA." […]

SEC. 4. SUPREMACY.

**The provisions of this Act shall prevail over any general or specific provisions of territory law**, State law, **or regulation that is inconsistent with this Act**.[Emphasis added].

Pursuant to Section 101 of PROMESA, the Oversight Board, in its sole discretion at such time as the Oversight Board determines to be appropriate, may designate any territorial instrumentality as a covered territorial instrumentality that is subject to the requirements of this Act. At this time, the Oversight Board has designated all of the public corporations as covered entities. Moreover, pursuant to Section 205 of PROMESA, the Oversight Board may at any time submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency. In the case of any recommendations submitted, the Governor shall submit a statement to the Oversight Board that provides notice as to whether the territorial government will adopt the recommendations. If the Governor notifies that the territorial government will not adopt any recommendations submitted, the Governor shall include in the statement explanations for the rejection of the recommendations, and the Governor shall submit such statement of explanations to the President and Congress of the United States.

In view of this, we must review the tasks with which the Oversight Board has been entrusted in order to oversee and guarantee compliance with the provisions of the approved Fiscal Plan.

We must bear in mind that PROMESA has supremacy over any legislation of the territory of Puerto Rico that is inconsistent with the motives, responsibilities, tasks, and objectives provided for in the federal statute, and the Oversight Board is the entity in charge of the execution thereof. Regarding this Act, the Board established that if the government, through the implementation of other measures,

fails to cut back on spending to achieve sufficient funds and establish an additional $200 million cash reserve by June 30, 2017, a furlough program for all government employees shall take effect on July 1st, 2017. This furlough program shall represent a reduction of up to twenty percent (20%) in the monthly salaries of our government employees. Likewise, the Board established that the full elimination of the Christmas bonus would be implemented for all government employees. The furlough alternative proposed by the Oversight Board shall be equivalent to four (4) days per month for most Executive Branch government personnel and two (2) days per month for teachers and frontline personnel at 24-hour institutions. The Oversight Board has also stated that there may be implemented reductions comparable to the Executive Branch furlough savings described above for other entities across the government, including public corporations and instrumentalities and the Legislative and Judicial Branches. Just as our Governor has mentioned in many forums, a furlough program is NOT an option. For such reason, we are taking precautionary measures in order to avoid having to resort to this contingency imposed by the Oversight Board.

Using this legal framework as a basis, this Legislative Assembly believes that the measures taken in this Act are necessary and reasonable to properly address the fiscal, economic, and budgetary crisis that Puerto Rico is undergoing, and constitute a valid legislative exercise.

The measures taken in this Act and the application thereof to all public union and nonunion employees who work at the Central Government and the Public Corporations are not taken lightly. To strike a balance of interests, we deem that the fringe benefits must be tempered with the current needs and the structural and fiscal crisis faced by the Government of Puerto Rico. In view of the new code of Law created as a result of the enactment of PROMESA and the arrival of the Oversight Board, this Act constitutes a reasonable, equitable, uniform, and necessary means to face the current crisis and is the only option available to the Government of Puerto

Rico to comply with the Fiscal Plan certified by the Oversight Board. This will enable us to avoid the imposition of a furlough on our government employees, which shall entail a twenty percent (20%)-reduction in their monthly salary, and the full elimination of the Christmas bonus. This Act is promulgated under the authority of this Legislative Assembly to approve and enact economic legislation geared to promoting the wellbeing of the People of Puerto Rico.

Special Dividend of the Joint Underwriting Association

of the Compulsory Liability Insurance

Act No. 253-1995, as amended, created the Joint Underwriting Association of the Compulsory Liability Insurance (ASC, Spanish acronym) as part of the compulsory liability insurance system for motor vehicles that was established in Puerto Rico at the time. Said insurance sought to find a solution to the damages caused to third-party motor vehicles as a result of a traffic accident, in accordance with the applicable claim requirements.

Originally, the liability insurance established under said Act provided for a three thousand dollar ($3,000)-cap. Act No. 201-2009 increased said cap to four thousand dollars ($4,000). It is worth mentioning that, regardless of said thirty-three percent (33%)-increase in the coverage, the cost of insurance premiums remained unchanged: ninety-nine dollars ($99) for private passenger vehicles, and one hundred forty-eight dollars ($148) for commercial vehicles.

Since said increase in coverage in 2009, the cost of goods and services in general has continued on the rise and the automotive industry was not the exception. Hence, the cost of vehicle parts and repairs is higher today than eight (8) years ago. For such reason, this Administration deems it pertinent to increase the compulsory liability insurance coverage to four thousand five hundred dollars ($4,500). Consistent with this increase, the ASC is hereby empowered to revise the cost of premiums on or before June 30, 2017.

Furthermore, the conditions under which the ASC was operating since its creation entailed a substantial increase in its capital. Since the ASC was the only provider of compulsory liability insurance for motor vehicles, it was necessary for the ASC to have a significant capital reserve to cover its operations and to satisfy the reserve requirement under the Insurance Code. Thus, Act No. 60-2013 authorized the report of a special dividend included with an incentivized tax which enabled the generation of additional revenues in the amount of one hundred million dollars ($100,000,000). Likewise, the report of another special dividend in the amount of forty-two million dollars ($42,000,000) was authorized under Act No. 157-2015, which included a special tax. However, after the market was open to competition to allow other insurance companies to offer their services at the option of the driver, it was deemed unnecessary for the ASC to maintain such a high capital reserve to which the members of the ASC have no access, since these members are the same companies that are competing against this entity as providers of liability insurance coverage services.

This Act authorizes the report of a special dividend enclosed with the corresponding incentivized tax. Once said dividend is reported to the ASC members, the Government would receive the amount of seventy million dollars ($70,000,000).

Contrary to the previous administration, which used the funds collected by virtue of laws similar to this one to distribute said funds among various entities, some of which had good intentions whereas others entailed an unnecessary waste of funds, this administration seeks address the lack of liquidity in order to protect the services offered to the people, the jobs in the public sector, and the income of the retirement system beneficiaries, among other similar purposes set forth in this Act.

For all of the foregoing, this Legislative Assembly authorizes the ASC to report a special dividend in the amount of seventy million dollars ($70,000,000) from its capital reserve with the corresponding fifty percent (50%)-special

contribution. In doing so, the ASC shall remit thirty five million dollars ($35,000,000) to the General Fund of the Government of Puerto Rico.

<u>Transfer of the Profits of Public Corporations to the General Fund</u>

One of the most transcendental measures approved by this administration is the enactment of Act No. 5-2017, known as the "Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017." Said Act sets forth as the public policy of the Government of Puerto Rico: "[…] to take all the required measures for Puerto Rico to establish fiscal responsibility within the Government and its instrumentalities necessary to satisfy its obligations and to assure the provision of those governmental services essential to the public health, safety, and welfare of the residents of Puerto Rico." It also states that the government may "exercise its Police Powers in a manner that recognizes the responsibility to meet the financial obligations of the Government of Puerto Rico and its instrumentalities, while continuing to provide governmental services essential to the health, safety, and welfare of the residents of Puerto Rico given the limited available resources of the Government of Puerto Rico and its instrumentalities." In other words, the government shall take all the necessary measures to ensure that the needs of its people are satisfied.

Act No. 5-2017 provides that as a result of the ongoing financial emergency and the enactment of PROMESA, the Legislative Assembly is responsible for exercising its Police Power. In this sense, said Act provides that the responsibility to meet the financial obligations of the Government of Puerto Rico and its instrumentalities must be recognized and that the essential Government services shall continue to be provided in order to guarantee the health, safety, and welfare of the residents of Puerto Rico given the limited resources available of the Government of Puerto Rico and its instrumentalities, all of which shall be consistent with the provisions of PROMESA.

In accordance with the foregoing, Act No. 5-2017 empowers the Governor to issue executive orders requiring the use of available resources to pay for essential services as the Governor deems necessary to protect the health, safety, and welfare of the residents of Puerto Rico, and establishing priority rules for the disbursement of public funds when resources available for a fiscal year are insufficient to cover the appropriations made for that fiscal year, among other measures, due to the limited resources of the Government.

In view of the aforementioned fiscal and economic situation, it seems evident that the Government of Puerto Rico is compelled to take measures in order to comply with the Fiscal Plan without hindering the essential services rendered to the people. To achieve this, the use of the State's available resources must be maximized, including the resources available to public corporations. For such reason, this legislation directs the public corporations and instrumentalities of the Government of Puerto Rico to transfer to the Department of the Treasury any funds necessary to guarantee the liquidity of the government.

The amount to be contributed by each of the public corporations shall be determined by a committee composed of the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget (OMB). For such determination, the committee shall take into account the surpluses of each corporation after covering their operating expenditures, and ensure that the services offered by these entities are not affected. Such funds shall be deposited in the General Fund of the Government of Puerto Rico to have available the liquidity required in the Fiscal Plan.

For all of the foregoing, and in view of the fiscal and economic emergency situation faced by Puerto Rico which must be addressed, this Legislative Assembly in the exercise of its Police Power, acknowledges the need to remedy the fiscal

emergency and thus promotes the mechanisms provided for in this Act to guarantee the liquidity of the Government of Puerto Rico, by using the resources available to the public corporations without it constituting a disproportionate burden to the people nor an adverse impact on the essential services rendered by the Government.

<u>Disposal of Real Property of the Executive Branch</u>

Furthermore, the economic and fiscal crisis of the Government has affected the full spectrum of our infrastructure, including our real property. The agencies, entities, and public corporations comprising the Executive Branch have countless unused real property that could be sold to the private sector for various purposes. For years, many of these properties have had no public use. However, their ample spaces and strategic location may be maximized by any trade or business to conduct their commercial activities. Some of these properties may even be repurposed and devoted to housing or nonprofit entities.

Puerto Rico unfortunately lacks a coherent and uniform public policy that furthers the efficient, effective, and coordinated sale of real property owned by the Government. For such reason, it is necessary to establish a legal framework that promotes a government real estate market and renders the transactions conducted in connection with these assets reliable. This shall yield multiple benefits: the Government shall increase the revenues generated from the disposal of the real property inventory as well as the liquidity, thus being able to mitigate the fiscal crisis; contribute a mechanism of economic activity to the market by allowing the private sector to become involved in the acquisition of the State's properties for commercial or residential purposes, while contributing to the creation of jobs; and fostering the social wellbeing given the possibility that said properties may be acquired by nonprofit entities to provide social services, etc. In sum, the possibilities are endless.

For such reason, it is important to have an appropriate model that promotes the disposal of real property within a framework of fair competition where the wellbeing and the public interest are the standard in each transaction. Hence, this Act creates the Real Property Evaluation and Disposal Committee and empowers it to take action as necessary to dispose of the real property, while maintaining a balance between the interests of the State as the seller, the buyer, and the citizens in general. This Act establishes the general guidelines for the approval of rules and regulations that shall standardize the sale of real property and provide more certainty to the transactions conducted in connection therewith.

This measure constitutes an additional step toward rescuing our People and overcoming the bad decisions made in the past. We have the unwavering commitment to strengthening the economic activity component. We are certain that the structure established herein provides for the mechanisms needed to strengthen the real estate market and procures more resources for the State in order to face the crisis and comply with the Fiscal Plan. That is our goal and nothing will stop us.

<u>Government Accounting Act and Special Funds</u>

The financial policy of the Government of Puerto Rico set forth in Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," relating to the control and accounting of public funds and property requires the books of the Government of Puerto Rico to clearly show the results of its financial operations, provide the financial information as necessary to manage the government's operations and to prepare and implement the budget, and constitute an effective control over the income, disbursements, funds, property, and other assets of the government. Likewise, it was established as public policy that no special funds or exclusive sources of repayment shall be established for specific purposes without taking into account the public wellbeing. This shall enable us to conduct government programs while overseeing the essential services, that fund appropriations for the

different government programs are limited to one specific year, and that all government revenues are covered into the general fund of the state treasury in order to defray government programs insofar as the Legislative Assembly deems it necessary, and in accordance with the items established in the Fiscal Plan approved. Unfortunately, throughout the years, a series of measures have been approved which have circumvented the foregoing and thus created multiple special funds for different programs. This situation has somehow distorted the mandate of the Accounting Act.

This Administration is committed to take any actions necessary to enable the Government to meet its obligations and comply with this public policy. The fiscal situation we are currently facing compels us to be more transparent and to assume more fiscal responsibility in our spending in order to achieve fiscal stability and a balanced budget, which shall make our economic recovery possible.

Upon analysis of the Government finances, various special appropriations for specific purposes or activities have been identified whose funds have remained unused for over one (1) year. In addition, appropriations without specific year limitation but with an annual recurrence have been identified for which there is no legal basis. Consequently, any expenditures chargeable to said funds for future fiscal years destabilize the cash flow of the Department of the Treasury since there is no control over the timing and the use given to said appropriations, all of which is in contravention of the public policy established in Act No. 230, *supra*.

In view of the grave fiscal situation faced by the Government, it becomes essential to implement a new methodology for the development, preparation, and execution of a government budget that allows for a substantial reduction of the State's spending without decreasing the amount and quality of the services it renders, yet eliminating inefficient services as well as inappropriate and obsolete programs. In this sense, the Zero-based Budgeting is a fiscal policy and budget strategy whose

main objective is to prevent the government from spending in excess of its revenues and, in turn, avoid an increase in the debt, and guarantee the sustainability of the public finances in the short- and long-term. The Zero-based Budgeting implemented by this Administration requires each department, agency, or instrumentality of the Government of Puerto Rico to document and justify each program to be included in and nourished from the Government's budget, based on the social and economic benefit of the programs, and according to the available resources. This mechanism entails an annual review of all of the programs and expenditures of the departments, agencies, or instrumentalities of the Government starting from zero and without taking into account the appropriations made in previous years. This facilitates the search for new ways to offer more efficient and effective services that contribute to improving the quality thereof, eliminating duplicity in the rendering of services, and cutting back on spending.

Likewise, there are countless special funds created by law for specific purposes. Said funds are disorganized and under the control of the government entities to which they were allocated. For such reason, the Secretary of the Treasury currently has direct access to only 65% of the funds of the Government of Puerto Rico, since all other special funds are on the accounts of their respective agency without any fiscal oversight from the Secretary of the Treasury. This lack of clarity results in a deficient oversight by the fiscal agencies of the Government which are prevented from having full control over the Treasury. This Act provides that special funds shall be transferred to the General Fund rather than to individual accounts for specific purposes. In doing so, the Secretary of the Treasury shall be able to keep better control and oversight, and establish payment priorities, which shall begin with the payment of the essential services rendered to our People.

In accordance with the foregoing, this Legislative Assembly deems it necessary to amend Act No. 230 of July 23, 1974, as amended, and known as the "Puerto Rico Government Accounting Act," for the purpose of adjusting said Act to the best fiscal practices that have been developed in the last few years in the continental U.S. and worldwide. For such purposes, we deem it important to clarify the meaning of special appropriations and limit the use thereof to one (1) year. Once the purpose of these special appropriations is fulfilled or if they were not claimed during the effectiveness thereof, these appropriations shall be reverted to the General Fund. In this manner, we will be able to continue improving the services rendered to our people and revitalize Puerto Rico's economy while complying with the fiscal control mechanisms required by the Certified Fiscal Plan.

<u>Government of the Commonwealth of Puerto Rico Procurement Reserves Act</u>

To recognize that strengthening our economy and creating jobs are the fundamental objectives of the public policy of the Government of Puerto Rico, different legislative pieces have been approved geared to boosting the local economy. One of them is Act No. 129-2005, which created the Government of the Commonwealth of Puerto Rico Procurement Reserves Act. Said Act was adopted to enable the components of the local economy to participate in the government procurement market to stimulate job creation and local investment. This Act seeks to sponsor small- and medium-sized businesses (Pymes) preferentially to contribute to increasing their sales as an efficient strategy for economic development and job creation.

However, in view of the grave fiscal situation faced by the Government, it becomes essential to implement a new methodology for the development, preparation, and execution of a government budget that allows for a substantial reduction of the State's spending without decreasing the amount and quality of the services it renders. Hence, we have evaluated all of the economic legislation that has

an impact on the general budget of the agencies of the Executive Branch in order to establish the necessary measures to adjust said legislation to the current economic reality of the Island.

For such purposes, this Legislative Assembly deems it necessary to amend Act No. 129-2015 for the purpose of tempering said Act to the fiscal situation of our public finances. To achieve this, we must fix at twenty percent (20%) the general budget's item allocated to the instrumentalities of the Government of Puerto Rico for purchases from micro-, small-, and medium-sized business until the fiscal situation of Puerto Rico allows for an increase thereto. Our goal is to continue contributing to such an important sector while responsibly addressing our fiscal reality and achieving the milestones set in the Fiscal Plan approved by the Board, in order to begin our journey towards economic recovery.

<u>Excise Taxes on Cigarettes and Tobacco Products</u>

In view of the need to procure more revenues to be able to comply with the Fiscal Plan, protect the jobs of government employees as well as protect the most vulnerable sectors, we introduced a reconfiguration of the applicable taxes on cigarettes, smokeless tobacco, tobacco-derived products, and electronic cigarettes. This reconfiguration of the applicable excise taxes on said products shall increase the basis subject to excise taxes as well as the current rates, thus fulfilling a dual purpose: to procure more funds to achieve a balanced budget and meet the parameters established in the Fiscal Plan, as well as to discourage cigarette consumption and tobacco purchase, which, as we all know, is detrimental to the public health, and is associated with the increase in respiratory diseases and different types of cancer.

The use of tobacco is one of the most concerning death causes among the population. However, it is highly preventable. The report of the Surgeon General of the United States entitled "The Health Consequences of Smoking" confirms that

twenty nine (29) chronic diseases are linked to smoking, namely, gallbladder, cervical, esophagus, kidney, laryngeal, lung, oral, pancreatic, and stomach cancer, leukemia, and cardiovascular diseases, among many others. Likewise, the report indicates that tobacco smoke can cause blood clots, sudden heart attacks, and cerebrovascular events. It was recently found that there are more diseases linked to the use of cigarettes, such as liver and colon cancer, diabetes, arthritis, inflammation, and immune function damage. *See*, Executive Summary of the Report, U.S. Public Health Service, *The Consequences of Smoking – 50 Years of Progress* (2014), p. 2.

In fact, between 2005 and 2009, smoking was responsible for more than 480,000 premature deaths annually among Americans 35 years of age and older. In addition, more than 87% of lung cancer deaths, 61% of all pulmonary disease deaths, and 32% of all deaths from coronary heart disease were attributable to smoking and exposure to secondhand smoke. *Id.*, p. 3.

Furthermore, the Centers for Disease Control and Prevention (CDC) indicate that in 2016 tobacco use was the leading cause of preventable disease, disability, and death in the United States. Each year, nearly half a million Americans die prematurely of smoking or exposure to secondhand smoke; another 16 million live with a serious illness caused by smoking. Smokers miss more work, visit a doctor more often, are hospitalized more often, and die 10 to 12 years earlier than nonsmokers. Each year, the United States spends nearly $170 billion on medical care to treat smoking-related disease in adults. See, https://www.cdc.gov/chronicdisease/resources/publications/aag/tobacco-use.htm.

The indirect impact of smoking is also highly detrimental to the health. In children, secondhand smoke has been linked to sudden infant death syndrome, acute respiratory infections, ear infections, and asthma attacks. It is disturbing that about 25% of nonsmoking Americans (58 million people) are exposed to secondhand smoke, including 15 million children aged 3 to 11 years. *Id.*

According to CDC's data, in the United States, nearly 15.1% of the population over the age of 18 smoked cigarettes in 2015, which is an estimated 36.5 million people–16.7% were men, and 13.6% were women. In Puerto Rico, even though the percentage is lower, the number is still a double digit. The statistics of the Department of Health of Puerto Rico show that by 2015 10.7% of the general population age 18 or over smoked cigarettes regularly–15.7% were men and 7.4% were women. These are significant percentages if we take into account the effects of secondhand smoke. In addition, the government has to incur considerable expenditures in connection with the health consequences entailed by smoking.

Currently, the excise tax per each cigarette pack is $3.40. This excise tax translated into $156 million in revenues for Fiscal Year 2014-2015. However, our government spends $19.16 per pack of cigarette consumed in healthcare costs and the loss of productivity, which constitutes $924 million. That is to say, the Government spends $15.76 more than it collects per pack of cigarette sold to take care of the health issues caused by smoking, which represents a global difference of $768 million. As a result, the increase in tobacco taxes is deemed to be a very cost-effective measure to improve public health and to generate fiscal revenues in the short- and long-term.

On the other hand, the Scientific Advisory Committee on Tobacco Product Regulation of the World Health Organization has stated that smokeless tobacco use is a significant part of the overall world tobacco problem. The Committee's report on smokeless tobacco includes the following potential harms: (a) promoting smokeless tobacco products may encourage individuals to adopt smokeless tobacco use in addition to continuing smoking; (b) use of smokeless tobacco products has been reported to increase the chances of subsequent initiation of smoking; (c) children who might not have started smoking may start smokeless tobacco use due to its ease of access; (d) the potential for long term harm caused by smokeless

tobacco products cannot be ruled out, such as the increased risk of developing oral cancer; and (e) all smokeless tobacco products are potentially addictive, since most of them have constituents that are known to be hazardous, such as tobacco-specific nitrosamines, and nicotine. Likewise, the Surgeon General of the United States of America has determined that the use of smokeless tobacco can cause other gum-related conditions and diseases in addition to oral cancer. According to the report entitled *Health Consequences of Using Smokeless Tobacco: A Report of the Advisory Committee to the Surgeon General*, the prolonged use of "smokeless tobacco" can also lead to the development of oral conditions, particularly leukoplakia, both in teenagers and adults.

The public policy of the Government of Puerto Rico is and has been to take measures in order to promote the prevention and cessation of tobacco use. One way to promote the prevention and cessation of tobacco use is to implement measures related to the imposition of taxes on tobacco byproducts, whether smoked or not.

In accordance with the foregoing, this Legislative Assembly deems it meritorious to increase the current tax on smokeless tobacco and cigarettes. This increase shall contribute to the fight against nicotine addiction, the cost of healthcare services in connection with patients who suffer from diseases related to or caused by their addiction to tobacco-byproducts, the evident cost and the loss of productivity in the workplace and the economy in general, and the need to generate more revenues for the treasury to comply with the Fiscal Plan and avoid reductions that could affect our most vulnerable sectors.

Emergency Fund

Act No. 91 of June 21, 1966, as amended, created the Emergency Fund for the purpose of having available the necessary funds to address unforeseen and unexpected public needs caused by calamities such as wars, hurricanes, earthquakes,

droughts, floods, and plagues, and for the purpose of protecting the life and property of the people, and the public credit.

The provisions of Act No. 91, *supra*, established that the operating expenses of the Commonwealth Emergency Management and Disaster Administration Agency may be financed with the resources appropriated to said Fund; that said Fund shall be capitalized annually by an amount not less than one-fifth (0.2%) of one percent of the total of the Joint Resolution for the Budget; said contribution shall be not less than one percent (1%) of the total net revenues for the previous fiscal year; and that the balance thereof shall never exceed one hundred fifty million dollars ($150,000,000), whichever is greater. However, legislation has been approved in the last decade to prevent any revenues from being covered into the Emergency Fund during specific fiscal years. What began as a transitory measure in Fiscal Year 2006-2007, since then, has become an ongoing practice in most fiscal years.

This Administration recognizes that in view of the grave fiscal situation faced by the Government, it becomes essential to implement a new methodology for the development, preparation, and execution of a government budget that allows for a substantial reduction of the State's spending without decreasing the amount and quality of the services it renders by eliminating inefficient services as well as inappropriate and obsolete programs. In this sense, it is important to establish and maintain a cash reserve to address unforeseen and unexpected public needs, such as the ones previously described, while taking into account that the contribution to said Fund must be made in accordance with the fiscal situation. For such reason, it is hereby established that a fixed contribution in the amount of ten million dollars ($10,000,000) shall be made until Fiscal Year 2020-2021. Furthermore, beginning with Fiscal Year 2020-2021, said contribution shall not be less than cero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury to draft the Recommended Budget chargeable to the General Fund.

In accordance with the foregoing, this Legislative Assembly deems it necessary to amend Act No. 91 of June 21, 1966, as amended, known as the "Emergency Fund," in order to provide for a more efficient use of the resources available to address any emergency situations or disasters that affect the Island during the following years.

### The Journey Toward Recovery Has Begun

Even though there are many obstacles that we must overcome in our journey toward a definite recovery, there is hope and optimism among our people. There is a new dawn for our Island and we cannot let Puerto Rico down. We must seize this moment and rise to the challenge to achieve the significant changes that Puerto Rico needs. We must face the crisis as a great challenge that we can transform into great opportunities. This challenge can lead us to build a fairer, worthier, and more progressive society. Hence, Act No. 7-2017 takes the most important step towards Puerto Rico's economic, social, and political recovery by setting in motion a process of immediate decolonization for the Island.

Now, we begin a process to transform the Government and render it more efficient by rehabilitating its finances and restoring the trust and credibility that we had lost. We strive for a Government that eliminates any wasteful expenditures, is more agile, and more accountable. This government shall be able to translate every tax dollar into action and services for the People. Now, we shall rise stronger than ever to live in a society where opportunities are accessible to every Puerto Rican and where everyone feels proud of having honored their commitment to our homeland.

***BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:***

CHAPTER 1.- INITIAL PROVISIONS

Section 1.01- Title

This Act shall be known and cited as the "Fiscal Plan Compliance Act."

Section 1.02.- Supremacy of this Act

This Act and all the provisions thereof are approved in the exercise of the Police Power, as well as the constitutional power conferred unto the Legislative Assembly in Sections 18 and 19 of Article II of the Constitution of Puerto Rico, to enact laws for the protection of the life, health, and general welfare of the people, as well as to enact laws in order to deal with grave emergencies that clearly jeopardizes the public health or safety or essential public services; and by virtue of Sections 7 and 8 of Article VI of the Constitution of Puerto Rico. Likewise, this Act was approved by virtue of the actions that Puerto Rico is required to take as a territory of the United States under the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) and the Fiscal Plan approved by the Financial Oversight Board. For such reason, this Act shall have supremacy over any other Act.

As of the date of approval of this Act, any organic, general, or special Act, article or section, guideline, clause and/or provision of any collective bargaining agreement, agreement, supplementary agreement, administrative order, policy, employment manual, circular letter, certification, regulation, rule, and employment condition, policy letter, classification or pay plan, contract letter, and/or provision which provides for fringe benefits that apply exclusively to union or nonunion employees or officials of the Government of Puerto Rico, including union or nonunion employees of the Public Corporations of the Government of Puerto Rico, shall be rendered ineffective, insofar as these are in contravention with the provisions of this Act. The foregoing does not preclude the right of labor unions to

negotiate employment conditions, salaries, and other nonfinancial clauses not included in this legislation, in accordance with the body of laws in effect.

Section 1.03.- Termination of Fiscal Measures

The Fiscal Plan Compliance Committee is hereby empowered to increase the benefits granted under this Act and to render ineffective any fiscal responsibility measures provided for in Chapter 2, upon determining that the fiscal situation has been stabilized and that it so allows.

CHAPTER 2.- FRINGE BENEFITS OF PUBLIC OFFICIALS OR EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO

Section 2.01.- Applicability

All of the provisions of this Act shall apply to the Entities of the Executive Branch of the Government of Puerto Rico, except as expressly excluded under this Act. For purposes of this Act, the term "Entity of the Executive Branch" includes all of the agencies, as well as the instrumentalities and public corporations of the Government of Puerto Rico regardless of the degree of fiscal and budgetary autonomy otherwise granted under their respective organic acts or any applicable legislation. The University of Puerto Rico shall be exempt from the application of this Act.

Section 2.02.- Municipalities

The municipalities shall be exempt from the application of this Chapter. However, the municipalities are hereby empowered to avail themselves of these provisions upon previous approval of a Municipal Ordinance to such effects.

Section 2.03.- Declaration of Public Policy

It is hereby reaffirmed the Declaration of Public Policy of Act No. 3-2017, known as the "Act to Address the Economic, Fiscal, and Budget Crisis to Guarantee the Operations of the Government of Puerto Rico," which sets forth that fiscal responsibility is critical for Puerto Rico to restore its credibility among investors and

financial markets, as well as its credit, and to return to a path of responsible management of its debt and finances, thus achieving the efficient restructuring thereof.

It is hereby declared as the public policy of the Government of Puerto Rico to establish discipline, control, and expenditure cutbacks in the agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico.

The Government of Puerto Rico recognizes the existing disparity between the fringe benefits granted to the employees of the Central Government and their counterparts in public corporations. To avoid laying off government employees, it is necessary to make adjustments in fringe benefit expenditures, while Puerto Rico remains stuck in the fiscal crisis. For such purpose, this Act promotes equality and uniformity in the fringe benefits available to all government employees and officials. All agencies and instrumentalities of the Government of Puerto Rico have the responsibility of assuring that the fringe benefits offered are consistent with the legislative intent that warranted the granting thereof, while striking a proper balance between the needs of employees and the optimum use of the resources available at this historical  juncture.

The public policy herein adopted guarantees the continuity of the public endeavor in critical areas such as health, security, education, social work, and development, among others, as well as the rendering of essential and indispensable services to the People. Moreover, this public policy seeks to protect not only the jobs of thousands of public officials and employees of the Government of Puerto Rico, but also our most vulnerable citizens. For such reason, and in compliance with the Fiscal Plan approved in accordance with PROMESA, the fringe benefits of government employees are herein uniformed in order to achieve additional savings.

In order to attain the objectives of this Act in the least burdensome manner for our government employees, it is hereby established that the provisions of Sections 2.04, 2.05, 2.08 through 2.11, and 2.18 shall be implemented temporarily and the effectiveness thereof shall expire the following fiscal year after the Government of Puerto Rico has achieved a balanced budget and the fiscal crisis has been overcome. We believe that this consideration strikes a fair balance between the objective of complying with the certified Fiscal Plan and the interest of preserving social justice, which are the bases for the protection of the benefits granted to our government employees. Said benefits shall be restored upon certification by the members of the Fiscal Plan Compliance Committee.

For purposes of this Act, the Fiscal Plan Compliance Committee shall be composed of one representative appointed by the Governor, one representative appointed by the Speaker of the House of Representatives, and one representative appointed by the President of the Senate of Puerto Rico. Said Committee shall adopt bylaws to govern its internal operations.

Section 2.04.- Fringe Benefits

The Government of Puerto Rico shall be responsible for ensuring that employees are able to enjoy the fringe benefits granted to them, and overseeing that they do so in accordance with a plan that maintains a proper balance between the needs for service, the employees' needs, and the responsible use of the available resources. In order to manage human resources uniformly, responsibly, reasonably, equitably, and fairly, the following fringe benefits shall be available to union or nonunion employees or officials of the Government of Puerto Rico, including public corporations, subject to the provisions of Section 2.03 of this Act.

The fringe benefits of the employees of the Executive Branch shall be:

1.     Vacation Leave

a.     As of the effectiveness of this Act, every government employee shall be entitled to accrue one and one-fourth (1 ¼) day of vacation leave for every month of service. This provision shall not apply to teaching personnel and school principals, except for the administrative and managerial personnel of the Department of Education, nor to teaching personnel of any educational institution of the Government of Puerto Rico, and law enforcement officers of the Puerto Rico Police, who shall continue to accrue vacation leave as they did prior to the approval of this Act for being excluded from the Sole Employer system created under Act No. 8-2017.

b.     The employees shall begin to accrue the vacation leave upon completion of a three (3)-month period and said leave shall be retroactive to the employment commencement date. Furloughed or part-time employees shall accrue vacation leave proportionately to the number of hours regularly worked.

c.     The vacation leave may be accrued up to a maximum of sixty (60) workdays at the end of any calendar year.

d.     Vacation leave is granted to employees in order to allow them a reasonable annual rest period. As a general rule, said leave shall be used during the calendar year in which it was accrued. Every agency or public instrumentality is required to devise a vacation plan for every calendar year, in collaboration with supervisors and employees, establishing the period during which employees shall enjoy their vacation time in the manner that is more compatible with the needs for service. Said plan shall be completed no later than on December 31st of every year, so that it takes effect on January 1st of the following year. The agencies, public instrumentalities, and all employees shall be responsible for the strict enforcement

of said plan. Exceptions shall only be made when there is a clear, unavoidable, and duly certified need for service.

      e.    The agency or public instrumentality is required to devise and implement a vacation plan diligently and in strict compliance with the provisions of this Act in order to prevent employees from having their vacation leave forfeited at the end of the calendar year and allow them to use it.

      f.    All employees shall be entitled to enjoy their vacation leave for a period of fifteen (15) workdays during each calendar year, of which not less than ten (10) days shall be enjoyed consecutively.

      g.    Employees who are unable to enjoy their vacation leave during a specific calendar year due to need for service evidenced in writing and as required by the agency or public instrumentality shall be exempt from the provisions of subsection (e) of this Section. In this case, the agency or public instrumentality is required to make the necessary adjustments so that the employee is able to enjoy at least any leave accrued in excess of the sixty (60)-day limit at the earliest date possible within the first three (3) months of the following calendar year.

      h.    The agency or public instrumentality shall be required to provide for the granting of the accrued vacation leave prior to a definite and permanent separation from service, and prior to a transfer to render services at a different public agency or instrumentality.

      i.    Typically, no vacation leave shall be granted for a period longer than fifteen (15) workdays per calendar year. However, the agency or public instrumentality may grant vacation leave in excess of fifteen (15) days up to a maximum of fifty (50) days, during any calendar year, to those employees who have accrued leave. When granting said leave, the following factors shall be considered together with the need for service:

1. The use of said leave for the employee's self-betterment, such as travel, and education, etc.;

2. Long-term illness of an employee after having exhausted the sick leave balance;

3. Personal issues of the employee requiring his attention;

4. If a leave of absence has been cancelled due to a need for service and as required by the agency;

5. The total leave accrued by the employee.

j. Due to extraordinary circumstances, advanced vacation leave may be granted to regular employees who have rendered services in the Government of Puerto Rico for over one (1) year, if there is certainty that the employee shall return to duty. The advanced vacation leave shall not exceed fifteen (15) workdays. The granting of advanced vacation leave shall require in all cases the previous written approval from the Appointing Authority. Any employee who has been granted advanced vacation leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned advanced leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him for said advanced leave.

k. In the event that an employee is granted a leave without pay, said employee shall not be required to exhaust the accrued vacation leave in order to use said leave without pay.

l. If vacation leave or advanced vacation leave is authorized, the advanced payment of the wages pertaining to said leave period may be also authorized, insofar as it is requested sufficiently in advance. Such authorization shall be made upon the leave's approval.

m.      One or more employees may donate, as an exception, up to a maximum of five (5) days of accrued vacation leave to another government employee who works in the same government entity, as provided in Act No. 44-1996, as amended, known as the "Act for the Ceding of Vacation Leave," when:

1.      The leave recipient has worked uninterruptedly for at least one (1) year in any government agency;

2.      The leave recipient has not shown a pattern of unscheduled absences, which constitutes noncompliance with the rules of the government entity;

3.      The leave recipient has exhausted all the leave to which he is entitled due to an emergency;

4.      The leave recipient or his representative has shown attesting evidence of the emergency and the need to be absent in excess of the leave accrued and already exhausted;

5.      The leave donor has accrued at least fifteen (15) days of vacation leave in excess of the amount of leave to be donated;

6.      The leave donor has submitted to the government entity where he is employed a written authorization consenting to the leave donation, including the name of the leave recipient;

7.      The leave recipient or his representative has accepted the proposed donation in writing.

2.      Sick Leave

a.      Every employee hired by the Government of Puerto Rico before the effective date of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," shall be entitled to accrue one and a half (1½) days of sick leave for every month of service.

b.      Every employee hired by the Government of Puerto Rico after the effective date of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," shall be entitled to accrue one (1) day of sick leave for every month of service.

c.      Furloughed or part-time employees shall accrue sick leave proportionately to the number of hours regularly worked.

d.      The sick leave shall be used when the employee is sick, has a disability, or is suffering from a contagious disease which requires him to be absent from work in order to protect his health or the health of others.

e.      All employees shall use up to a maximum of five (5) days per year of the accrued sick leave, insofar as they maintain a balance of at least twelve (12) days, for the purpose of requesting a special leave to be used:

1.      To care and tend to their sick children.

2.      To conduct any transactions relating to, or to care for, sick elderly persons or persons with disabilities within their family circle, that is, up to the fourth degree of consanguinity, second degree of affinity, persons living under the same roof, or persons of whom an employee is a legal guardian or has legal custody.

Provided, that the transactions to be conducted are consistent with the purposes for which the sick leave was granted, that is to say, that are related to the health care and attention of the persons mentioned herein.

a)      "Elderly persons" shall mean any person who is sixty (60) years of age or older.

b)      "Persons with disabilities" shall mean any person who has a physical, mental, or sensory disability that substantially limits one or more essential activities in his life.

3.      For the first appearance of any petitioner, victim, or claimant in any administrative and/or judicial proceedings before any Department, Agency, Public Corporation, or Instrumentality of the Government of Puerto Rico in any actions related to child support, domestic abuse, sexual harassment in the workplace, or gender discrimination. The employee shall furnish attesting evidence of said appearance as issued by the concerned authority.

f.      The sick leave shall be accrued up to a maximum of ninety (90) workdays at the end of any calendar year. The sick leave shall begin to accrue upon completion of a three (3)-month period of continuous employment and said leave shall be retroactive to the employment commencement date.

g.      The agency or public instrumentality is required to make all the necessary adjustments, diligently and in strict compliance with the provisions of this Act, in order to allow employees to use all the sick leave accrued during any calendar year whenever they so need. The employee may exhaust the sick leave accrued during any calendar year.

h.      If an employee were absent for over three (3) days due to an illness, a medical certificate may be required attesting to:

1.      The employee actually being ill, suffering from a contagious disease, or being unable to work during the period he was absent;

2.      The illness of the employee's children;

3.      The illness of elderly persons or persons with disability within his family circle, that is, up to the fourth degree of consanguinity, second degree of affinity, persons living under the same roof, or persons of whom the employee is the legal guardian or has legal custody.

In addition to the medical certificate, the inability of the employee to attend work due to an illness may be ascertained by any other appropriate means. The foregoing shall not be applied or construed in violation of the provisions of ADA nor of the "Family and Medical Leave Act of 1993" (FMLA).

i.      In the event that an employee is sick and has no sick leave accrued, up to a maximum of eighteen (18) workdays of advanced sick leave may be granted to any employee who has served in the Government of Puerto Rico for not less than one (1) year, if there is reasonable certainty that the employee shall return to duty. Any employee who has been granted advanced sick leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned sick leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him for said advanced leave.

j.      In the event of a long-term illness, once the sick leave is exhausted, an employee may exhaust his accrued vacation leave upon authorization from his immediate supervisor. Should the employee exhaust both leaves and he were still sick, a leave without pay may be authorized.

3.     Maternity Leave

a.      The maternity leave shall comprise the prenatal and postpartum rest period to which expectant employees are entitled. Likewise, it shall comprise the period to which an employee who has adopted a child is entitled, in accordance with the applicable legislation.

b.      Every expectant employee shall be entitled to a four (4)-week rest period before childbirth, and a four (4)-week rest period after childbirth. Provided that the employee may enjoy four (4) additional weeks to care and tend to the child.

Childbirth shall mean the act of giving birth to a child whether naturally or through lawful surgical obstetrics procedures. It shall likewise include any premature childbirth or involuntary abortion, even if the latter was legally induced by a medical specialist and takes place at any time during the pregnancy.

c. The employee may choose to enjoy only one (1) week of prenatal rest, and extend up to seven (7) weeks the postpartum rest period to which she is entitled, or up to eleven (11) weeks if the four (4) additional weeks to care and tend to the child are included. In these cases, the employee shall submit to the agency a medical certificate attesting to the fact that she is able to work up to one week before childbirth.

d. During the maternity leave, the employee shall earn her full wages.

e. In the case of an employee with a provisional appointment, the maternity leave of said employee shall not exceed the appointment period.

f. If childbirth occurs before the four (4)-week prenatal rest period elapses or before the employee began to enjoy her prenatal rest period, said employee may choose to extend the postpartum rest period for a period of time equivalent to that which she did not enjoy before childbirth.

g. When the estimated date of delivery was wrongly calculated and the employee has enjoyed her four (4) weeks of prenatal rest period without going into labor, said employee shall be entitled to an extension of the prenatal rest period with full pay until childbirth. In this case, the employee shall be entitled still to enjoy the four (4)-week postpartum rest period from the date of delivery as well as the four (4) additional weeks to care and tend to the child.

h. In the event of premature birth, the employee shall be entitled to enjoy the eight (8) weeks of maternity leave from the date of premature birth as well as the four (4) additional weeks to care and tend to the child.

i.      Any employee who suffers a miscarriage may claim up to a maximum of four (4) weeks of maternity leave. However, in order to avail herself of said benefit, the miscarriage shall produce the same physiological effects that usually arise as a result of childbirth, according to the determination and certification of the attending physician during the miscarriage.

j.      In the event that an employee suffers any postpartum complications that prevents her from returning to work once the postpartum rest period and the four (4) additional weeks to care and tend to the child have elapsed, the agency shall grant a sick leave to said employee.

In these cases, there shall be required a medical certificate stating the condition of the employee and the estimated duration thereof. If the employee has exhausted her sick leave, vacation leave shall be granted. In the event that the employee has exhausted both the sick and the vacation leaves, a leave without pay may be authorized for the period recommended by the physician.

k.      Any employee who adopts a preschooler, that is, a minor who is five (5) years of age or younger, who is not enrolled in any school, in accordance with the legislation and legal procedures in effect in Puerto Rico or any U.S. jurisdiction shall be entitled to the same full pay maternity leave benefits as an employee who gives birth. In the event that an employee adopts a minor who is six (6) years of age or older, said employee shall be granted maternity leave with full pay for a term of fifteen (15) days. This leave shall begin from the date on which the child is officially placed with the employee, which shall be certified in writing.

l.      The maternity leave shall not be granted to employees who are enjoying any other leave with or without pay. Any employees who are enjoying sick or vacation leave, or leave without pay due to pregnancy complications shall be exempt from this provision.

m.      Any expectant employee or employee who has adopted a minor is required to notify the agency in advance of her plan to enjoy maternity leave and to return to duty.

n.      The agency may authorize the advanced payment of any wages corresponding to the maternity leave period, insofar as the employee so requests in advance, as appropriate. If the employee returns to duty before the postpartum rest period ends, such employee shall be required to refund the balance pertaining to the unused maternity leave.

o.      In the event that the newborn dies before the maternity leave period ends, the employee shall be entitled to claim only the portion of the postpartum rest period up to the first eight (8) weeks of unused maternity leave. Provided, that the four (4)-week additional period benefit to care for and tend to the child shall cease as of the date on which the child died. In this case, the employee may avail herself of any other leave to which she is entitled.

p.      The employee may request to return to duty before the postpartum rest period ends, insofar as the employee submits to the agency a medical certificate attesting to her ability to return to duty. In this case, it shall be understood that the employee is relinquishing the balance of unused maternity leave to which she is entitled.

4.      Paternity Leave

a.      The paternity leave shall comprise a period of fifteen (15) workdays from the date of birth of a child.

b.      When claiming this right, the employee shall certify that he is legally married or cohabitates with the mother of the child and that he has not committed domestic abuse. Said certification shall be made by submitting the form required by the agency for such purposes, which shall also include the signature of the mother of the child.

c.      The employee shall request the paternity leave and submit the birth certificate as soon as possible.

d.      The employee shall earn full wages during the paternity leave period.

e.      In the case of an employee with a provisional appointment, the paternity leave shall not exceed the appointment period.

f.      The paternity leave shall not be granted to employees who are enjoying any other type of leave with or without pay. The employees who have been granted vacation or sick leave shall be exempt from this provision.

g.      Any employee who adopts a child, together with his spouse or domestic partner, in accordance with the legislation and legal procedures in effect in Puerto Rico or any U.S. jurisdiction shall be entitled to a paternity leave that shall comprise a fifteen (15)-day period to be counted from the date on which the child is officially placed with the employee, which shall be certified in writing. When claiming this right, the employee shall certify that he is legally married, if applicable, and that he has not committed domestic abuse, or a sexual- or child abuse-related offense. Said certification shall be made by submitting the form required by the agency for such purposes, which shall also include the signature of his spouse.

Any employee who individually adopts a preschooler, that is, a minor who is five (5) years of age or younger, who is not enrolled in any school, in accordance with the legislation and legal procedures in effect in Puerto Rico or any U.S. jurisdiction shall be entitled to eight (8) weeks of paternity leave which shall begin to count from the date on which the child is officially placed with the employee, which shall be certified in writing. In the event that an employee adopts a minor who is six (6) years of age or older, said employee shall be entitled to paternity leave with full pay for a term of fifteen (15) days.

When claiming this right, the employee shall certify that he has not committed domestic abuse, nor a sexual- or child abuse-related offense.

Paragraphs (d), (e), and (f) of this subsection shall apply equally in the event that an employee requests the leave benefits set forth in the previous paragraphs.

h.    The employee may request to return to duty before the paternity leave period to which he is entitled ends. In this case, it shall be understood that the employee is relinquishing the balance of unused paternity leave to which he is entitled.

5.    Special Breastfeeding Leave with Pay

a.    Breastfeeding mothers who return to work after enjoying maternity leave shall be granted the opportunity to nurse their children for a period of one (1) hour during each full-time work day, which may be divided into two (2) thirty (30)-minute sessions or three (3) twenty (20)-minute sessions, to go where the child to be breastfed is being cared for, should the company or employer have a child care center in its facilities, or to express breast milk at the place provided for such purposes in the workplace. Said places shall guarantee nursing mothers privacy, safety, and hygiene. Said place must have electrical outlets and ventilation. If the employee is working on a part-time basis and the workday exceeds four (4) hours, the period granted shall be thirty (30) minutes for every consecutive four (4)-hour working period.

b.    Within the workplace, the breastfeeding period shall have a maximum duration of twelve (12) months, to be counted as of the date the employee returns to duty.

c.    Employees who wish to avail themselves of this benefit shall submit to the employer a medical certificate, during the period corresponding to the fourth (4th) and the eighth (8th) months of age of the infant, attesting to the fact and

certifying that she is breastfeeding her baby. Said certificate shall be submitted not later than five (5) days before each period. Provided, that the employer shall designate an area or physical space that guarantees the privacy of the breastfeeding mother, as well as her safety and hygiene, without this entailing the creation or construction of physical or organizational structures, contingent upon the availability of resources of the government entities. The agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico shall adopt regulations on the operation of said breastfeeding areas.

6.      Leave Without Pay

a.      If the cause for which the leave was granted ceases, the employee shall report for duty immediately or notify the public agency or instrumentality of the reasons why he is unavailable, or of his decision not to return to work.

b.      In addition to the leaves without pay that each agency or public instrumentality may grant by regulations, the following may be granted:

1.      To career employees with regular status, to render services in other agencies of the Government of Puerto Rico or in a private entity.

2.      To career employees with regular status, to protect their status or the rights to which they may be entitled in cases of:

a)      A disability claim before the Retirement System of the Government of Puerto Rico or other entity, and the employee has exhausted his sick and vacation leaves.

b)      Having suffered a work-related accident and undergoing medical treatment with the State Insurance Fund Corporation or pending a final determination concerning the employee's accident, and the employee has exhausted his sick and vacation leaves.

3.      To employees who so request after the birth of their child. Provided, that this type of leave without pay may be granted for a period of time which shall not exceed six (6) months as of the date on which it is authorized.

4.      To employees with regular status who are transferred to positions of trust in the Office of the Governor or in the Legislative Assembly, while rendering said services.

5.      To employees with regular status who have been elected in the general elections or have been selected to fill a vacancy of an elective public office within the Executive or Legislative Branch, including the offices of Resident Commissioner in the United States and Mayor, while rendering said services.

7.   Special Leaves

A special leave for a justified cause shall be granted, with or without pay, as the case may be, to union or nonunion government employees or officials. Provided, that said leaves shall be governed by the special laws that provide therefor.

a.      Court leave to serve as witness – Any employer is hereby prohibited from making deductions from the employee's salary or vacation or sick leave for the days and time spent by an employee duly summoned by the Department of Justice or a court, serving as a witness in a criminal action.

b.      Court leave for jury duty – Any employee summoned for jury duty shall be entitled to a leave with pay and to receive compensation from his employer on account of meals and mileage, in accordance with the regulations adopted by each agency, instrumentality, or public corporation, as if it were an official duty of said employee or official.

c.      Official duty – Every employee summoned in an official capacity to appear before any Court of Justice, the State Attorney's office, or administrative or government body, or government agency shall be entitled to a leave with pay for the period he was absent from work as a result of said summons.

d.      Blood donation leave – Every employee of the Government of Puerto Rico, its instrumentalities, and public corporations shall be granted a blood donation leave with pay for a period of four (4) hours per year.

e.      Parental involvement leave – Every employee of the Government of Puerto Rico, its instrumentalities, and public corporations shall be entitled to four (4) work hours without making any deductions from the employee's pay or any leave, at the beginning of each school semester and four (4) work hours at the end of each school semester to visit their children's school in order to learn about their academic achievements. The foregoing notwithstanding, any employee whose children are enrolled in the Special Education Program of the Department of Education shall have up to ten (10) hours per semester to conduct any transaction relating to their children.

f.      Leave without pay to participate in sports – A leave without pay shall be granted to every government employee who was duly selected and certified by the Board for the Development of Full-Time High Performance Puerto Rican Athletes as an elite athlete or high-performance trainer for the Olympic, Paralympic, Pan-American, and Central America and the Caribbean Games, and Regional or World Championships. This leave shall have a term of up to one (1) year with the right to renewal, insofar as the Board approves it and it is so notified to the employer on or before thirty (30) days from its expiration. This leave allows eligible athletes and trainers to be absent from work without losing leave, with a job guaranteed, and without affecting any of the benefits and vested rights during the time these are participating in said trainings and/or competitions.

During the leave period, the Board shall be responsible for the participants' wages. Therefore, the Board shall be required to remit to the employer the amount pertaining to the legal deductions made to the employees so as to allow the employer to continue making the payments pertaining to said contributions.

g.      Special leave to participate in sports - A special leave is hereby established to be granted to every government employee duly certified by the Puerto Rico Olympic Committee as an athlete to represent Puerto Rico in the Olympic Games, Paralympic Games, Pan-American Games, and Central America and the Caribbean Games, and Regional or World Championships. This leave shall be cumulative and shall not exceed thirty (30) workdays per calendar year.

h.      Leave of absence to renew driver's license – Every employee may use up to two (2) hours from his workday, without charge to any leave and with pay, to renew his driver's license, insofar as the holding of said license is an essential requirement to perform his job given the nature thereof.

i.      Leave of absence for volunteer emergency service – Every employee who is a disaster service certified volunteer of the American Red Cross may be granted a leave of absence with pay for a period not to exceed thirty (30) calendar days within a twelve (12)-month period in order to render special disaster services for the American Red Cross.

This leave shall be granted insofar as the American Red Cross requests the services of the official and upon approval of the agency, instrumentality, or public corporation where the official works. The American Red Cross shall issue a certificate to the employee for the services rendered and the duration thereof. The employee shall submit said certificate to the agency, instrumentality, or public corporation where he works.

j.      Military leave – Every employee who is a member of the Puerto Rico National Guard or of the Reserve components of the United States Armed Forces shall be entitled to a leave with pay for a maximum of thirty (30) days every year when on military service, as part of a training, or to attend drills or camp, as required.

k.     Leave of absence for child immunization – Every employee who so requests may be granted up to two (2) hours to take his children to a government or private institution for immunization, every time a vaccine is required, as established in the immunization card of his children. The employee must submit a certification of the place, time, and date were the vaccines where administered to his children for the purpose of justifying the time used, as established for this type of leave. Otherwise, the time used shall be charged to compensatory time off, vacation leave, or it shall be deducted from the employee's wages.

l.     None of the provisions of this Act shall impair the rights granted to government employees under the provisions in effect of the Federal Medical Leave Act (FMLA).

Section 2.05.- Holidays

Every government employee or official of the Government of Puerto Rico shall only be entitled to the holidays declared as such by the Governor of Puerto Rico or by law. The holidays to be observed by government employees are the following:

1.     New Year's Day, January 1st.

2.     Three Wise Men Day, January 6.

3.     Birthday of Martin Luther King Jr., the third Monday in January.

4.     George Washington's Birthday, Presidents' Day, and the Puerto Rican Illustrious Persons Day: Eugenio María de Hostos, José de Diego, Luis Muñoz-Rivera, José Celso Barbosa, Ramón Emeterio Betances, Román Baldorioty-de Castro, Luis Muñoz-Marín, Ernesto Ramos-Antonini, and Luis A. Ferré, the third Monday in February.

5.     U. S. Citizenship Day, March 2.

6.     Abolition Day, March 22.

7.     Good Friday, according to the date on which it occurs every year.

8.      Memorial Day, the last Monday in May.

9.      Independence Day, July 4.

10.     Labor Day, the first Monday in September.

11.     Columbus Day, the second Monday in October.

12.     Veterans Day, November 11.

13.     Discovery of Puerto Rico and Puerto Rican Culture Day, November 19.

14.     Thanksgiving Day, the fourth Thursday in November.

15.     Christmas Day, December 25.

Section 2.06.-  Day Care Centers

Every official or employee of the Government of Puerto Rico, its instrumentalities, and public corporations, where there are areas duly set up to operate as Day Care Centers and/or to be used as care centers for preschoolers, shall be entitled to the use thereof. The users of this service shall make a financial contribution geared to improving the operations of the Center; provided, that each agency, instrumentality, or public corporation shall determine a reasonable amount to be paid for using said facilities and services.

Section 2.07.- Uniform Employer Contribution to the Healthcare Plan of the Employees of Public Corporations.

The Executive and Legislative Branches shall identify additional savings and resources to prevent adversely affecting the employees' contributions to the payment of the healthcare plan. If the projected savings of the Fiscal Plan are not achieved, the difference shall be offset through a program to match the Government's contributions to the healthcare plan. Only then, as of July 1st, 2018, every official or government employee, whether union or nonunion, who works for any Public Corporation, except for the University of Puerto Rico, shall be entitled to an employer contribution to be determined by the Fiscal Plan Compliance Committee using as a basis the metrics established in the Fiscal Plan, but in no case said

contribution shall be less than the one hundred dollar ($100)-employer contribution established by law for Central Government employees. FAFAA may negotiate and reach agreements on an insurance coverage that is less expensive with private insurers or public coverage to be selected by the employees of the Government as Sole Employer or by agency or groups of agencies. Any reduction in the employer contribution to the healthcare plan shall require FAFAA to offer a less expensive insurance coverage to said government employees. However, every employee, or dependent thereof, of a public corporation who is currently enrolled in the healthcare plan and who suffers from a preexisting catastrophic, chronic, or terminal illness shall continue to receive the employer contribution in effect for his healthcare plan, without any change, for the term he remains in the public service.

Section 2.08.-  Bonus

As of the effective date of this Act, the only financial bonus to be granted to government employees of the Central Government and the public corporations thereof shall be the Christmas Bonus. The employees shall be entitled to a bonus in the amount of six hundred dollars ($600) for every year said employee has rendered services in the Government of Puerto Rico for at least six (6) months.

Section 2.09.- Compensation for Work in Excess of the Regular Work Schedule

1.    The work schedule of each agency or public instrumentality shall be designed so that the need to work beyond the regular work schedule established for employees by the agency or public instrumentality is reduced to a minimum. However, employees may be required to render services beyond their daily or weekly work schedule, or on any other day when services are suspended by the Governor without charge to any leave, due to the special nature of the services to be rendered; the need for service to protect and preserve the life and property of citizens; any emergency situation; an event of force majeure; any weather

disturbances; and unforeseen or maintenance situations as necessary to continue offering essential services. In these cases, the supervisor of the employee shall issue a previous authorization therefor, to be approved by the appointing authority or by the official to whom it delegates. Supervisors shall take measures to ensure that when an employee remains working, the employee is doing so by virtue of an express authorization.

2.      Employees shall be entitled to receive a compensatory time off, at the rate of one and one-half time, for services rendered beyond their regular daily or weekly work schedule, or during their meal break, and for services rendered during holidays, days off, or days on which the Governor suspends services without charge to any leave. The compensatory time off shall be enjoyed by the employee within six (6) months as of the date on which the employee has worked overtime. If due to the need for the service, this were not possible, compensatory time off may be accrued for up to a maximum of two hundred and forty (240) hours. In the case of employees who discharge duties related to public safety, emergency response, or seasonal activities, as these terms are defined in the Fair Labor Standards Act, except for the provisions of Section 10 of Act No. 53-1996, and Section 2.09 of Act No. 20-2017, said employees may accrue up to four hundred and eighty (480) hours. Overtime compensation through compensatory time off shall not be allowed for hours accrued by the employee in excess of the aforementioned limits. However, police officers, as provided in Section 2.09 of Act No. 20-2017, shall be paid at the rate of one and one-half time and shall have the option to choose the payment of these hours without the need to accrue them as compensatory time off, and said overtime pay shall not be included in their gross income and shall be exempt from taxation. This shall not apply to employees of public corporations who shall be entitled to overtime pay at a rate of one and one-half time from the first hour accrued

as provided in this Act, except when the applicable collective bargaining agreement provides for the accrual of compensatory time off.

3.      Any employee who discharges administrative, executive, or professional duties, as these terms are defined in the Fair Labor Standards Act shall be exempt from the provisions of subsection (2) above.

Section 2.10.-  Liquidation of Vacation and Sick Leave Accrued in Excess

Every agency, instrumentality, or public corporation must recognize to every government employee, whether union or nonunion, any vacation and sick leave accrued as of the effective date of this Act; however, no leave accrued before the effective date of this Act shall be liquidated in cash.

Every agency or public instrumentality shall be required to immediately outline a plan whereby union or nonunion employees shall exhaust any leaves accrued in excess so that, by December 31st, 2017, there are no sick or vacation leave accrued in excess of the ceilings. Provided, further, that any accrued leave in excess of the ceilings shall be forfeited if unused after said date.

As of the effective date of this Act, no government employee, whether union or nonunion, who works for the Government of Puerto Rico, in any of its agencies, instrumentalities, or public corporations shall be entitled to receive a payment on account of the liquidation of vacation or sick leave accrued in excess.

Section 2.11.- Lump-Sum Payments for Vacation Leave Upon Separation from Public Service

As of the effective date of this Act, any government employee, whether union or nonunion, shall only be entitled to a lump-sum payment for accrued vacation leave as of the date of separation from service, which shall in no case exceed sixty (60) days. The employee may authorize the transfer of said balance and/or excess existing prior to the approval of this Act to the Retirement System to be credited as time worked.

Section 2.11(a).- Section 3 of Act No. 125 of June 10, 1967, as amended, is hereby amended to read as follows:

"The Governor shall regulate all that pertains to the granting and enjoyment of leaves and the amount of the final compensation payments, including the payment of the death benefit, in connection with the officials designated by the Governor, except for the members of the Judiciary, ombudsmen, prosecutors, and property registrars. For purposes of the final compensation payment, which shall in no case exceed an amount equal to two (2) month's salary, the Governor shall take into consideration factors such as the need for service, the term during which the employee held office, and the fiscal status of the government agency or entity, the nature of the duties discharged, and the credits for any accrued and unused vacation leave from previous Government employment upon transfer to hold an office appointed by the Governor, among others. Those persons who receive a final compensation payment, pursuant to the provisions of this Act, shall be required to refund the amount thus received if, as a result of acts that occurred while discharging their public duty, such persons are convicted of misappropriation, embezzlement, or theft of public funds; crimes against the public treasury or public duty, as classified in the Penal Code of Puerto Rico.

…"

Section 2.12.- Section 4.3 of Article 4 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 4.3.-  Powers and Duties of the Office and the Director

In addition to any other powers and duties conferred under this Act, the Office and the Director shall have the following:

1.      …

2. Powers and Duties of the Office.-

a. To centralize the duties of the Government of Puerto Rico Human Resources Administration and Transformation Office that are compatible with the provisions of this Act.

b. …

c. …

d. …

e. To provide advice on labor-related matters to the agencies of the Executive Branch in all that pertains to the procedures for election and certification of labor unions; the negotiation and administration of collective bargaining agreements; and any other labor-related areas of the agencies, as provided in Act No. 45-1998. While discharging its advisory duties relating to collective bargaining pursuant to Act No. 45-1998, the Office shall coordinate and supervise the creation and operation of a Bargaining Committee, composed of its staff as well as the staff designated by the Office of Management and Budget. The Office shall conduct comparative studies on collective bargaining agreements and shall provide training in the field of labor to those agencies that so request.

f. …

g. …

h. …

i. …

j. …

k. …

l. …

m. To manage the Central Job Posting Register for Recruitment, Promotion, and Training in the Government and keep it up to date. Likewise, it shall keep an online register; provided, that public agencies and instrumentalities as well

as public corporations, except for the Office of the Governor proper, the Municipalities, the Supreme Court, the Office of the Chief Justice, the Office of the Court Administrator, the Legislative Assembly, and the Municipal Legislatures, carry out their duty of forwarding, on a monthly basis, any recruitment and promotion opportunities to the Government of Puerto Rico Human Resources Administration and Transformation Office. The Office shall call for interview candidates from the list maintained by said Office. All applications for training shall be forwarded to the Government of Puerto Rico Human Resources Administration and Transformation Office within at least thirty (30) days before the training date. The Office shall evaluate the need and convenience of the training and shall approve or deny the same.

          n.      …

          o.      …

          p.      …

          q.      …

          r.      …

          s.      …

          t.      …

        …"

Section 2.13.- Section 5.2 of Article 5 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Article 5.- The Government of Puerto Rico Human Resources Administration and Transformation System.-

Section 5.1.-  …

Section 5.2.-  Exclusions.-

The provisions of this Act shall not apply to the following Government agencies and instrumentalities:

1.      …

…

5.      The Office of the Governor proper.

…

8.      …

However, public corporations or public-private partnerships shall adopt personnel regulations incorporating the merit system in the administration of their human resources, as provided in this Act, and submit a copy thereof to the Office. The Office is hereby empowered to conduct compliance audits of the essential areas of the merit system.

Likewise, the concept of mobility and the mechanism established by the Office to implement the movement of government employees shall apply to public corporations or public-private partnerships, agencies that operate as private companies or businesses such as the Participatory Public-Private Partnerships (APP+P), and to the municipalities."

Section 2.14.- Subsections 1(d) and 4(1) of Section 6.4 are hereby amended, and a new subsection 5 is hereby added to Article 6 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 6.4.- Provisions on Promotions, Transfers, Demotions, and Mobility.-

…

1.      …

a.      …

     b.    …

     c.    …

     d.    …

Furthermore, special qualifications of the employees shall be understood to be additional experience; academic education beyond minimum requirements; and the results obtained in the Evaluation System adopted by the Agencies and developed by the Office.

     e.    …

2.    …

3.    …

4.    Mobility

…

1.    The Government of Puerto Rico Human Resources Administration and Transformation Office in conjunction with the Office of Management and Budget shall have one (1) year as of the approval of this Act to devise mobility plans, which shall address the immediate needs for rendering services in the Government of Puerto Rico.

2.    …

3.    …

4.    …

5.    …

6.    …

7.    …

8.    …

9.    …

10.    …

11.    …

12.     …

13.     …

5.     Other Actions

(a)     Detail – The temporary assignment of a public official or employee from an agency of the Executive Branch or municipality, and vice versa, is hereby authorized in order to render mutual services at any other of said jurisdictions. Detailed employee or officials shall continue to hold the same office and shall keep all of their rights as officials or employees of said agency. Detail is an administrative action that allows for the maximization of the use of human resources in a cost-effective manner according to the Merit System. Under extraordinary circumstances, the use of this mechanism between officials and employees of the Executive Branch and other Government Branches, shall be allowed insofar as the detailed official receives his wages from the Branch for which he works, in accordance with the rules established therefor by the Office of Management and Budget. Detail may be used for a one (1)-year term, which may be extended as necessary.

(b)     Administrative Designation or Assignment – Is the formal and temporary designation made by an appointing authority to an employee in order for said employee to render services of the same or similar nature in another office of the same agency."

Section 2.15.- Subsection 2(b) of Section 6.8 of Article 6 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 6.8.-  Habilitation in the Public Service

…

1.     …

2.     …

a.      …

b.      Any convicted government employee who has been granted a suspended sentence or parole and is serving his sentence in the community under those limitations imposed by the entities of the Government's Corrections System, may file a request for habilitation at any time with the Department of Labor and Human Resources or, in default thereof, the Agency where he is employed, shall be required to file it. The employee shall continue to hold office until the Secretary of the Department of Labor and Human Resources determines otherwise.

c.      …

d.      …"

Section 2.16.- Section 6.9 of Article 6 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 6.9.-  Prohibition

In order to ensure the faithful application of the Merit System in the Public Service during pre- and post-electoral periods, the Appointing Authorities of the agencies, instrumentalities, and public corporations of the Government of Puerto Rico shall refrain from making any personnel transaction relating to the essential areas of the Merit System, such as appointments, promotions, demotions, or transfers; nor shall they be able to make changes to position categories, nor shall they use  the employee's mobility during the election prohibition period. Provided, that during said period, no personnel actions or changes whatsoever with a retroactive effect may be processed or recorded in the employee's personnel folder. Any changes resulting from the completion of a probationary period and the imposition of disciplinary measures shall be exempt from this prohibition. Noncompliance with this provision shall render any transaction thus carried out null.

This prohibition shall comprise the period of two (2) months before and two (2) months after the holding of the General Elections of Puerto Rico.

Upon the Office's approval, exceptions from this prohibition may be made in the event of urgent and unavoidable needs for service duly evinced and certified pursuant to the rules issued by the Office to such effect. For purposes of this Section, urgent or unavoidable needs shall be understood as any essential or crucial actions for which there is a pressing need to carry them out in order to discharge the functions of the agency, instrumentality, or public corporation. It shall not include actions that are deemed merely convenient or beneficial, whose solution may be extendable until the regular process therefor is concluded."

Section 2.17.-  Subsections 3 and 5 of Section 7.2 of Article 7 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 7.2.-  General Pay Rules

The following guidelines shall apply to all government agencies under this Act:

1.      …

2.      …

3.      The Office shall administer their pay plan in connection with the essential areas of the merit system. When conducting transactions relating to public service career employees, none of these[sic] shall take an action that attempts against or that is contrary to the merit system.

4.      …

5.      No amendment or modification to the position classification and evaluation plan may negatively affect the base salary of the employee.

…"

Section 2.18.-  The effectiveness of Article 9 and Section 10.2 of Article 10 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby suspended, subject to the provisions of Section 2.03 of this Act.

Section 2.19.-  Nullity

As of the effective date of this Act, any clauses or provisions of a collective bargaining agreement, covenant, supplementary agreement, regulations, administrative order, circular letter and/or contract letter, whereby union or nonunion government employees or officials of the Government, including union or nonunion employees of the Public Corporations of the Government of Puerto Rico, are granted more fringe benefits than those authorized herein shall be null and ineffective. The adoption of any authorized measure to comply with the foregoing provisions by any agency or public corporation of the Government of Puerto Rico shall not constitute a violation of the existing collective bargaining agreements. It shall neither constitute an unlawful practice.

Section 2.20.-  Relation to other Laws

The following laws shall remain in full force to the extent the provisions thereof are not in conflict with this Act:

a.      Act No. 62 of June 23, 1969, as amended known as the "Military Code of Puerto Rico."

b.      Act No. 122-1996, as amended, known as the "Employees Summoned as Witnesses in Criminal Cases Act."[sic]

c.      Act No. 44-1996, as amended, known as the "Act for the Ceding of Vacation Leave."

d.      Act No. 203-2007, as amended, known as the "Bill of Rights of the Puerto Rican Veteran for the 21st Century."

e.      Act No. 58-1994, as amended, known as the "Emergency Service Voluntary Leave Act."

f.      Act No. 122 of July 12, 1986, as amended, known as the "Employees Summoned as Witnesses in Criminal Cases Act."

g.      Act No. 281-2003, as amended, known as the "Puerto Rico Jury Service Administration Act."

h.      Act No. 24-2002, as amended.

i.      Act No. 49 of June 27, 1987, as amended.

j.      Act No. 134-1998, as amended.

k.      Act No. 154-2000, as amended.

l.      Regarding the Municipalities, the provisions of Act No. 81-1991, as amended, known as the "Autonomous Municipalities Act of the Commonwealth of Puerto Rico of 1991," shall remain in full force without any impairment. The provisions of this Act shall apply to any Municipality that so determines upon approving a Municipal Ordinance to such effect.

Section 2.21.- Repeal

Act No. 89-2016, better known as the "Public Service Temporary Employment Act," is hereby repealed.

### CHAPTER 3.-  JOINT UNDERWRITING ASSOCIATION OF THE COMPULSORY LIABILITY INSURANCE

Section 3.01.-  Subsection (m) of Section 3 of Act No. 253-1995, as amended, is hereby amended to read as follows:

"Section 3.- Definitions

For purposes of this Act, the following terms and phrases shall have the meaning stated below:

(a)      …

…

(m)     Compulsory Liability Insurance.- Means the insurance required by this Act and that responds for damages caused to third party motor vehicles as a result of a traffic accident, for which the owner of the vehicle covered by this insurance is legally liable, and through the use of which said damages were caused, according to the system for the initial determination of liability created pursuant to this Act. Said insurance shall have coverage limit of four thousand five hundred dollars ($4,500) per accident. The Commissioner, upon request of insurance companies that offer the compulsory liability insurance, or *motu proprio*, may review and modify the limits and rate of the compulsory liability insurance every two (2) years, in accordance with the applicable provisions of Chapter 12 of the Code, which take into account every insurer in the Compulsory Liability Insurance market. However, the coverage limits shall never be less than three thousand five hundred dollars ($3,500).

…"

Section 3.02.-  Subsections (f) and (h) of Section 6 of Act No. 253-1995, as amended, better known as the "Compulsory Motor Vehicle Liability Insurance Act," are hereby amended to read as follows:

"Section 6.-  Joint Underwriting Association—Creation

(a)     …

…

(f)     Insurers that underwrite the compulsory liability insurance, including the Joint Underwriting Association, upon receipt of their respective premiums after deducting the fee established in Section 7(b)(1), shall deduct five percent (5%) of said premiums, as provided in Section 7(b)(2). Every insurer and the Joint Underwriting Association shall be responsible for remitting to the Department of the Treasury the amount pertaining to the fee collected on the total premiums underwritten during a month, not later than the fifth (5th) day of the following month. The Department of the Treasury shall prescribe by regulations the manner in which

this payment shall be made and may design and agree on other methods for the collection of this fee, insofar as said change results in the effective and continuous collection thereof. On the same date, every insurer and the Joint Underwriting Association shall be responsible for remitting to the Department of the Treasury the amount pertaining to the fee established in Section 7(b)(3). The Department of the Treasury shall prescribe by regulations the manner in which this payment shall be made and may design and agree on other methods for the collection of this fee, insofar as said change results in the effective and continuous collection thereof.

…

(h)     All members of the Joint Underwriting Association shall share in the annual profits and losses thereof, as determined in accordance with the Annual Statement required under Section 3.310 of the Code, in the percentage that the direct net premiums underwritten in Puerto Rico during the previous year for each one of the insurers, for insurance against any loss, expense, or liability for the loss or the damage caused to persons or property, resulting from the possession, conservation, or use of a land vehicle, aircraft, or draft animal or mount, or incidental thereto, all of which in accordance with Section 4.070 of the Code, represented by the total of the direct net premiums underwritten in Puerto Rico during said year for that type of insurance.

(1)     …

(2)     …

(3)     Special Dividend and Special Payment 2017:

(i)     The Joint Underwriting Association is hereby empowered to report to its members a special dividend before June 30th, 2017, subject to the provisions of this subsection, in the amount of seventy million dollars ($70,000,000) subject to the imposition of a one-time special tax of fifty percent (50%). Dividends received by private insurers that are members of the Joint Underwriting Association

shall not be subject to any other tax. Any revenues on account of the one-time special tax herein established shall not be considered for purposes of the computation of any of the existing formulas used to determine budget appropriations to be earmarked during the constitutional budget process.

(ii)    Within a term that shall not exceed fifteen (15) days as of the approval of this Act, the Board shall call a meeting and shall submit for the approval of all of the members of the Joint Underwriting Association the declaration of the authorized special dividend. It is hereby provided that the dividend may be approved by the vote of members who have a combined proportional share of over fifty percent (50%), in accordance with the most recent determination made by the Office of the Insurance Commissioner. The determination made at the Meeting shall be binding.

(iii)    Considering the public benefit of this measure, and its authorization by the Legislative Assembly, the provisions of subsection (j) of this Section shall apply to the actions taken by the Board, the members, and the personnel of the Association.

(iv)    If the dividend statement is approved at the meeting, the Joint Underwriting Association shall make a special payment in the amount of thirty-five million dollars ($35,000,000) within a term that shall not exceed ninety (90) days, to the Department of the Treasury, which shall deposit said funds in the General Fund of the Government of Puerto Rico. During said term, the Joint Underwriting Association shall pay to the members thereof the authorized dividends, pursuant to the proportional share of each member.

…"

Section 3.03.- Subsections (a), (b), and (d) of Section 7 of Act No. 253 of December 27, 1995, as amended, are hereby amended to read as follows:

"Section 7.- Premiums

(a)      The initial uniform premium of the compulsory liability insurance shall be ninety-nine dollars ($99) for each private passenger vehicle and one hundred forty-eight dollars ($148) for each commercial vehicle. The review and adjustment of the premium on or before June 30, 2017, in accordance with the provisions of subsection (e) of this Section, is hereby authorized.

The Commissioner may fix a premium other than that established herein for the compulsory liability insurance of those vehicles to which the Department of Transportation and Public Works has issued transitory or provisional licenses.

(b)      Service Fees

1)      …

2)      …

3)      An additional administrative fee is hereby established which shall be proportional to the increase in revenues on account of adjustments to the uniform premium, in accordance with the provisions of subsections (a) and (e) of this Section. The applicable percentage to determine the appropriate amount in the event of increase of the premium shall be computed by dividing the net increase of the premium pursuant to the amount established in subsection (a) of this Section, by the adjusted total cost of the premium. The resulting percentage shall be applied to the income generated by the insurers, including the Joint Underwriting Association after the administrative costs and any production costs related to the premium are deducted. The remaining balance after applying the percentage as established in this formula shall be transferred to the General Fund of the Government of Puerto Rico. This fee does not constitute a tax on a premium.

4)      These fees shall not apply to policies issued through a traditional insurance, but rather shall be deemed to be part of the compulsory liability insurance premium and shall be guaranteed within the premium dollar distribution.

(c)      …

(d)      Every insurer of the compulsory liability insurance may submit to the Commissioner for his approval any rate rules and schedules that include guidelines for the application of late fees to the uniform premium for private passenger and commercial vehicles that are insured under this premium, as the case may be, subject to the provisions of Chapter 12 of the Code, taking as a basis the frequency and seriousness of the losses of the insured.

(e)      …

…"

## CHAPTER 4.- TRANSFER OF PUBLIC CORPORATIONS, AGENCIES, AND INSTRUMENTALITIES  TO THE GENERAL FUND; CREATION OF THE COMMITTEE AND ADJUSTMENTS TO FEES, DUTIES, AND RATES

Section 4.01.- Transfer of Surplus

The public corporations, agencies, and instrumentalities of the Government of Puerto Rico are hereby directed to transfer to the Department of the Treasury any surplus of the revenues generated. Said funds shall be deemed to be available resources of the State and shall be deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico in order to meet the liquidity requirements provided for in the Fiscal Plan adopted by virtue of the provisions of the Puerto Rico Oversight, Management, and Economic Stability Act of 2016, Public Law 114-187, better known as PROMESA.

Section 4.02.- Committee

The amount of funds to be contributed by each of corporation and instrumentality shall be determined by a committee composed of the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget, which committee may establish the rates needed to comply with the provisions of the Fiscal Plan approved for the Government of Puerto Rico, and that which governs the corporations. This committee shall ensure that the fund transfer provided in Section 4.01 of this Act does not affect the services offered by public corporations and instrumentalities, and that the surplus consists of the balance available after the operating costs and obligations of said entities are covered, in accordance with the expenditures budget recommended by the Office of Management and Budget for each fiscal year.

Moreover, this committee is hereby empowered to review the sources of income of the public corporations, agencies, and instrumentalities, and to adjust, increase, or decrease any fee, duty, rate, tariff, cost, premium, or any revenue of similar nature, for the purpose of complying with the metrics provided in the Fiscal Plan of the Government of Puerto Rico. The committee may also impose an additional administrative fee on those contributions it deems necessary, which fee may range from five (5) to ten (10) percent, in order to comply with the metrics of the Fiscal Plan certified by the Financial Oversight Board.

This Act shall have supremacy over any law whereby any fee, duty, rate, tariff, cost, premium, or any revenue of similar nature is thus established, and the committee is hereby empowered to review, increase, or decrease the amount thereof even when said amount is provided by law. The committee shall be empowered to review, increase, or decrease these revenues notwithstanding the provisions of any

other law, regulations, or administrative order that establishes a specific amount for these revenues.

Any provisions of laws, regulations, administrative orders, corporate resolution, or any other documents of similar nature that limit or reduce the funds that may be transferred by a public corporation, agency, or instrumentality of the Government of Puerto Rico to the General Fund as provided in this Chapter are hereby suspended.

The committee is hereby empowered to promulgate any other administrative order, circular letter, or regulations as are necessary for its operation and compliance with the provisions of this Act.

Section 4.03.-  Exclusions

The University of Puerto Rico, created by virtue of Act No. 1 of January 20, 1966, as amended, known as the "University of Puerto Rico Act," and the Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico created by virtue of Act No. 114-2001, as amended, better known as the "Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico Act," the "Municipal Finance Corporation Act," Act No. 19-2014, as amended, better known as COFIM (Spanish acronym), the "Special Joint Committee on Legislative Donations Act"[sic], Act No. 20-2015, and the "Standing Committee on the Comptroller's Special Reports," Act No. 83 of June 23, 1954, as amended, are hereby excluded from the provisions of this Chapter. Any funds held by community-based organizations and public corporations that constitute funds received from private entities are hereby excluded from the application of this Chapter.

Regarding the "Dedicated Sales Tax Act," Act No. 9[sic]-2006, as amended, better known as COFINA (Spanish acronym), the Executive Branch is hereby empowered to use COFINA funds occasionally, only as the last resort, and subject to the filing of a sworn certification with the Legislative Assembly. The filing of said

certification shall not be construed as implying that the Executive Branch shall have unlimited access to COFINA funds. Said certification shall state the need, term, and amount of funds to be used to cover a significant occasional deficiency in the cash flow to comply with the Fiscal Plan of the Government of Puerto Rico. Said certification shall be signed and sworn by the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), and the Executive Director of the Office of Management and Budget. These officials shall sign the certification under oath, which task shall be nontransferable. In said certification, the officials shall attest to the correctness, accuracy, and veracity of the information, pursuant to the fiscal reality of the Government of Puerto Rico.

Section 4.04.-  Compliance Clause

All transfers made by virtue of the provisions of this Chapter shall be subject to the requirements of Section 201(b)(1) (M) of Public Law 114-187, known as the Puerto Rico Oversight, Management, and Economic Stability Act or PROMESA.

CHAPTER 5.- DISPOSAL OF REAL PROPERTY OF THE GOVERNMENT

Section 5.01.-  Public Policy

In order to provide more resources to the Treasury, it is hereby declared as the public policy of the Government of Puerto Rico to make better use of the State's currently unutilized real property. It is hereby further promoted that any currently unutilized real property be devoted to activities, whether for nonprofit, commercial, or residential, geared toward advancing the general welfare and, in turn, fostering the activation of the real estate market and the economy in general.

To comply with this public policy, the design of a new efficient and effective procedure for the sale of real property based on the principles of competition, transparency, economic development, job creation, wellbeing, and the public interest is hereby authorized.

Section 5.02.-  Definitions

For purposes of this Chapter, the following terms shall have the meaning stated below:

A.      Real Property - Those that cannot be moved or transferred from one place to another, such as land, buildings, etc., as well as everything attached to an immovable in a fixed manner, in such a way that it cannot be separated therefrom without breaking the matter or damaging the object; and that belong to the agencies, entities, instrumentalities, and public corporations of the Executive Branch of the Government of Puerto Rico.

B.      Committee – The Real Property Evaluation and Disposal Committee.

C.      Disposal – The process whereby the Government of Puerto Rico assigns the title of ownership, possession, use, or enjoyment of real property for the better use thereof.

D.      Live Outcry Auction – The auction process whereby bidders physically meet at a previously agreed time and venue to place their bids for a specific real property that was disclosed prior to the public bid. Bidders bid openly against each other.

E.      Sealed Bid – The auction process whereby bidders submit their secret bids in a sealed envelope. The process for this type of auction shall be prescribed by regulations.

F.      Direct Sale – The process to dispose of a property to a party that has met the criteria to be prescribed by regulations.

Section 5.03.-  Real Estate Evaluation and Disposal Committee

The Real Estate Evaluation and Disposal Committee is hereby created in order to exercise all the necessary powers, which are not contrary to this or any other Act, for the disposal of the real property of the Executive Branch of the Government of Puerto Rico.

The Committee shall be composed of the following public officials:

a.     The Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA).

b.     The Director of the Office of Management and Budget.

c.     The Secretary of the Department of Economic Development and Commerce.

The Executive Director of FAFAA shall chair the Committee.

The Committee shall meet at least once every month and as necessary from time to time in order to expedite the works, and at the time and place deemed convenient. Provided, that the members of the Committee shall not earn any wages whatsoever nor receive per diems for discharging the duties and authorities entrusted to them under this Act. Provided, further, that none of the provisions herein shall apply to real property of the Industrial Development Company, the Government Development Bank, the Land Administration, the Convention Center District Authority and the subsidiaries thereof, respectively, insofar as these have established as of the effective date of this Act, a process for the sale of real property that is consistent with this Chapter.

Section 5.04.-  Executive Director

Once the Committee is constituted, it shall designate an Executive Director who shall have all the powers delegated by the Committee relating to the implementation of the public policy set forth herein. The Executive Director shall recommend the Committee any interagency personnel transfers in order to designate human resources to achieve the objectives of this Act in accordance with Act No. 8-2017. The Committee shall designate the location of the Office of the Executive Director.

Section 5.05.-  Powers of the Committee

The Committee shall have the following powers:

a.      To approve rules, regulations, circular letters, and guidelines as are necessary to discharge their duties and functions.

b.      To adopt an official seal and alter it as convenient.

c.      To sue and be sued in its own name.

d.      To negotiate and execute contracts, process the disposal of real property of the Executive Branch of the Government of Puerto Rico as well as any instruments and agreements, with natural or juridical persons, as are necessary or convenient to exercise the powers and discharge the functions herein conferred.

e.      To bring any judicial action to protect or enforce the public policy established in this Act.

f.      To appoint officials, agents, and employees as are necessary to properly achieve the objectives and purposes for which the Committee was created, and establish the powers, faculties, and duties, as well as the terms and conditions of employment as provided in this Act. Provided, that appointments shall be made in accordance with the provisions of Act No. 8-2017.

g.      To contract personnel to conduct live outcry auctions, in accordance with the provisions of this Chapter and the regulations adopted for such purposes.

h.      To establish real estate investment trusts similar in nature to the trusts defined in Section 1082.01(a) of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico."

i.      To contribute real property to any real estate investment trust created pursuant to Section 5.05(h) of this Act. The Government shall participate in any development carried out by the companies making contributions in accordance with this subsection.

Section 5.06.- Duties and Obligations of the Committee

For the purpose of implementing the public policy herein set forth, the Committee shall have the following duties:

a.      To prescribe by regulations a uniform, efficient, and effective procedure for the disposal and transfer of the real property of the Executive Branch of the Government of Puerto Rico, whether through live outcry auction, sealed bid, or direct sales. Such procedure shall provide for a fair competition system that guarantees the public interest. The Committee shall clearly provide the circumstances under which a direct sales shall be conducted.

b.      To coordinate, in conjunction with the Real Property Reviewing Board created by virtue of Act No. 235-2014, the preparation and/or update of an official inventory of all the real property of every agency, entity, instrumentality, and public corporation of the Executive Branch of the Government of Puerto Rico, excluding the property of the University of Puerto Rico.

c.      To obtain from the Real Property Reviewing Board a certification including every surplus real property available for disposal to be outfitted by any agency, entity, instrumentality, or public corporation of the Executive Branch of the Government of Puerto Rico.

d.      To evaluate every request for purchase, lease, or other conveyance of ownership of real property submitted by any natural or juridical person, whether for profit or not, including municipalities, and to ensure compliance with this Act and any rules and regulations approved by the Committee.

e.      To conduct any type of study, inspection, analysis, or other transaction relating to real property, including to ensure that such property is properly recorded in the Property Registry and have the title and meet any other requirement established by the laws in effect.

f.     To appraise any real property subject to disposal. To conduct such appraisal, the Committee may require and use personnel as needed, by virtue of the mechanism provided therefor under Act No. 8-2017.

Section 5.07.-  Real Property Disposal

The disposal of real property of the Executive Branch of the Government of Puerto Rico shall be governed by a fair and transparent process whereby participants are afforded equal opportunities, always safeguarding the public interest and welfare. For such purposes, any disposal shall be conducted in accordance with the purposes established in this Act while maintaining a balance between the need to increase the State's revenues, promote economic development, ensure the wellbeing of the society, and/or create jobs.

The Committee shall dispose of real property using as a basis the fair market value to be determined by the appropriate evaluation and appraisal procedure, or by assuring that the property is used for the benefit of the public interest.

The Executive Director of the Committee or his representative may serve as an authorized agent to carry out any transaction related to the title of the real property.

Section 5.08.-  Conflict of Interests

Any conflict of interest that may arise among the members of the Board while discharging their functions under this Act shall be addressed in accordance with the provisions of Act No. 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011."

Section 5.09.-  Savings Clause

No real property of the Executive Branch of the Government of Puerto Rico used as housing by any person having the usufruct thereof shall be disposed of.

CHAPTER 6.-  PUERTO RICO GOVERNMENT ACCOUNTING ACT

Section 6.01.-  A new subsection (o) is hereby added to Section 3 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," to read as follows:

"Section 3.-  Definitions

When used in this Act, the following terms shall mean:

(a)     …

…

(o)     Special Appropriations – Appropriations approved through Joint Resolutions that limit the use of the allocated funds."

Section 6.02.- Subsection (b) is hereby amended and a new subsection (e) is hereby added to Section 7 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," to read as follows:

"Section 7.-  Deposit of Public Funds

a)     …

All public funds of the agencies which are not allocated by law for a specific purpose, shall be credited to the General Fund of the Commonwealth Treasury and shall be deposited entirely in the Secretary's checking account or in any other bank account he may deem convenient to establish. Likewise, it is hereby provided, that as of July 1st, 2017, any special State fund and any other income of the agencies and public corporations shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate. The Secretary of the Treasury is further empowered to determine the order of priority of the payments to be disbursed chargeable to special State funds and other income, in accordance with the budget approved and the Fiscal Plan without it being construed as a limitation on the powers conferred to the Governor and the Puerto Rico Fiscal Agency and Financial Advisory Authority by virtue of

the provisions of Act No. 5-2017. This provision shall have supremacy over any other provision that is in contravention of or inconsistent with the provisions of this Act. For each fiscal year, any amount in excess of the budgeted amount authorized by the Office of Management and Budget to the agencies and public corporations originating from special State funds shall be covered into the Budget Fund created by virtue of Act No. 147 of June 18, 1980, as amended. This provision shall not apply to funds allocated to municipalities on account of the Sales and Use Tax. This provision shall not apply to funds originating from private donations received by government entities with a social welfare function.

…

(e)     As of July 1st, 2017, any special State funds created by law for specific purposes shall continue to be used for the purposes for which they were allocated by law, in accordance with the Recommended Budget of the Office of Management and Budget and the Fiscal Plan. Likewise, the Office of Management and Budget is hereby empowered to create a reserve under its custody, as prescribed by regulations, which allows budget control for any item of expenditures chargeable to special State funds and other income. Should there be any inconsistency between the law and the use of the funds with the Fiscal Plan, the purpose provided for in the Fiscal Plan approved in accordance with PROMESA shall prevail."

Section 6.03.-  Subsections (h), (l), and (m) of Section 8 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," are hereby amended to read as follows:

"Section 8.-  Public Fund Appropriations.

(a)     …

…

(h)     Appropriations and funds without fiscal year limitation that have remained in the books without movement of disbursement or obligation for one (1) year shall be deemed, for purposes of this Act, as if they had achieved their purposes; therefore, the same shall be closed and deposited immediately in the General Fund, except for appropriations and funds without fiscal year limitation appropriated for carrying out the capital improvements that have been accounted for and entered in the books. These funds shall have a term of three (3) years as of the legal effectiveness of the appropriation, to be disbursed and to achieve the purposes for which they were appropriated. Once said three (3)-year term elapses, any encumbered and unencumbered balances of capital improvement funds shall be closed and covered into Fund 301. This provision shall only apply to appropriations made prior to Fiscal Year 2017-2018, and shall not apply to appropriations made by the Legislative Assembly through Legislative Donations or appropriations on account of the Sales and Use Tax.

If the agency or body receiving the capital improvements funds deems that the term of the appropriation should be extended for a period greater than three (3) years, said agency or body may request such an extension to the Office of Management and Budget stating the need to keep such resources within at least three (3) months prior to the expiration of said term. During said period, the Office of Management and Budget shall analyze the request and determine the need to keep the appropriation in effect, the extension term for said appropriation, and the amount thereof. Said resources shall be rescheduled by the Legislative Assembly.

(i)     …

…

(l)     As a general rule, any appropriation that remains one (1) year without being entered in the books shall be deemed to be automatically cancelled, and new legislative action shall be required to use the moneys thus cancelled. In exceptional

cases where grounds for failure to enter an appropriation in the books during said one (1)-year term are shown, such as the delay in court determination of lawsuits, and the impossibility of carrying out a public work due to physical, technical, or legal difficulties, an appropriation may be accounted for even after the lapse of the aforementioned one (1)-year term.

The Secretary shall notify the Legislative Assembly of the action cancelling appropriations under the circumstances described in this subsection, within thirty (30) days following the date on which said cancellation was made.

(m)    The Secretary shall transfer periodically to the surplus of the General Fund of the State Treasury, in accordance with the law, the balances of deposit accounts that have remained unused or without movement in the accounting books for one (1) year, and which, in his opinion, are not necessary or do not meet the purposes for which they were created. Provided, that any claim that the Secretary may be required to pay with respect to said balances, after they have been transferred as provided above, shall be paid from any available funds not otherwise appropriated."

CHAPTER 7.- GOVERNMENT PROCUREMENT RESERVES ACT

Section 7.01.- Section 2 of Act No. 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," is hereby amended to read as follows:

"Section 2.-  Declaration of Public Policy

It shall be the public policy of the Government of Puerto Rico to establish a Reserves Program which requires the Government of Puerto Rico and its instrumentalities to set aside at least twenty percent (20%) of the total of the item allocated for procurement in their general budget to be allocated to micro-, small- and medium-size businesses; provided, that the fiscal situation so allows or that it generates savings to the Treasury.

Provided, that in an effort to continue strengthening the micro-, small-, and medium-sized business sector, it is hereby established that the reserve percentage for such purposes shall continue to increase gradually as follows:

1.      Thirty percent (30%) for fiscal year 2016-2017;

2.      Thirty-two percent (32%) for fiscal year 2017-2018;

3.      Thirty-five percent (35%) for fiscal year 2018-2019;

4.      Thirty-eight percent (38%) for fiscal year 2019-2020;

5.      Forty percent (40%) for fiscal year 2020-2021;

This gradual increase shall be applied if the Office of Management and Budget establishes that the fiscal situation allows for said increase or if savings for the treasury are generated. Moreover, the Secretary of the Treasury shall be required to set aside at least three percent (3%) of the cash flow received to pay the item allocated for the procurement of supplies from micro-, small-, and medium-sized businesses whole invoices have been processed correctly by the departments, agencies, instrumentalities, entities, municipalities, and public corporations of the Government to which this Act applies."

Section 7.02.-  Subsection (1) of Section 6 of Act No. 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," is hereby amended to read as follows:

"Section 6.-  Reserves Program

(1)      A new expense item shall be created to which twenty percent (20%) of the procurement budget item of each agency shall be allocated. Provided, that the procurement budget item of each agency shall increase thirty percent (30%) for Fiscal Year 2016-2017; thirty-two percent (32%) for Fiscal Year 2017-2018; thirty-five percent (35%) for Fiscal Year 2018-2019; thirty-eight percent (38%) for Fiscal Year 2019-2020; and forty percent (40%) for Fiscal Year 2020-2021; provided, that

the fiscal situation so allows. The OMB shall prescribe by regulations the requirements to comply with said reserve percentage.

  …"

## CHAPTER 8.-  EXCISE TAX ON CIGARETTES AND TOBACCO-DERIVED PRODUCTS

  Section 8.01.- Section 3020.05 of Act No. 1-2011, as amended, is hereby amended to read as follows:

  "Section 3020.05.- Cigarettes

  (a)  An excise tax of seventeen dollars ($17.00) shall be imposed, paid, and collected on each hundred or fraction of one hundred (100) cigarettes. For purposes of this Code, the term 'cigarette' shall mean any product that contains nicotine and is intended to be burnt or heated under ordinary conditions of use, and which consist of or contains:

    (1)  Any roll of finely cut natural or synthetic tobacco or any other finely cut natural vegetable or synthetic matter, or any mixture thereof, or any other finely cut solid matter or substance wrapped in paper or in any substance or material not containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be used, offered to, or purchased by, consumers as a cigarette; and

    (2)  whose length, circumference, and weight does not exceed the maximum length, circumference, and weight prescribed by the Secretary through regulations, circular letter, or other administrative determination of general nature.

  (b)  Cigarettes manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed on the boxes, packages, or packs in which they are packed, a label with the information and characteristics as prescribed by regulations. Each cigarette box, package, or pack must bear the word '*tributable*'

or 'taxable' stamped on a visible place and in clear and legible form. These provisions shall not apply to exempt cigarettes under Section 3030.18 of this Code."

Section 8.02.- A new Section 3020.05A is hereby added to Act No. 1-2011, as amended, to read as follows:

"Section 3020.05A.- Cigarettes, Cigars, Snuff, Cigarette Paper, and Cigarette Tubes

(a)     In addition to any other excise tax imposed under this Subtitle, an excise tax of up to eight dollars and fifty cents ($8.50) shall be imposed, paid, and collected on each hundred or fraction of one hundred (100) cigarettes.

(b)     An excise tax shall be imposed, paid, and collected on any cigarette, snuff, cigarette paper, and tube, as provided below:

(1)     Cigars: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction thereof.

(2)     Loose Tobacco: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction thereof.

(3)     Cigarette Paper: Three dollars ($3.00) for every fifty papers or fraction thereof that does not exceed six and a half inches (6½"). If cigarette papers measure more than six and a half inches (6½") in length, every two and three quarters of an inch (2¾"), or fraction thereof, shall be considered one (1) cigarette paper.

(4)     Cigarette Tubes: Three dollars ($3.00) for every fifty cigarette tubes or fraction thereof that does not measure more than six and a half inches (6½"). If cigarette tubes measure more than six and a half inches (6½") in length, every two and three quarters of an inch (2¾"), or fraction thereof, shall be considered one (1) cigarette tube.

(c)      Definitions – For purposes of this Section and of any applicable provision of this Subtitle, the following terms shall have the meaning stated below:

(1)      Cigar – Shall mean any product that contains nicotine and is intended to be burnt or heated under ordinary conditions of use, and which consist of or contains:

(i)      Any roll of finely cut natural or synthetic tobacco or any other finely cut natural vegetable or synthetic matter, or any mixture thereof, or any other finely cut solid matter or substance wrapped in paper, leaf tobacco, or in any substance or material which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be used, offered to, or purchased by, consumers as a cigar, cigarillos, little cigar or any other product; and

(ii)      other than a cigarette, as such term is defined in Section 3020.05 of this Code.

(2)      Loose Tobacco – Shall mean any type of tobacco whether or not mixed with any other substance, which is not wrapped in any material, and that because of its appearance, the type of tobacco used in the filler, or its packaging or labeling, is likely to be used, offered to, or purchased by, consumers as roll-your-own tobacco or pipe tobacco. This term also includes whole tobacco leaves.

(3)      Cigarette Paper – Shall mean any paper, or any other material other than tobacco used to roll cigarettes or cigars.

(4)      Cigarette Tube – Shall mean a cigarette made into a hollow cylinder for use in making cigarettes or cigars.

(d)      The cigars, loose tobacco, cigarette wrappers, and cigarette tubes that are manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed on the boxes, packages, or packs in which they are packed, a label with the information and characteristics as prescribed by regulations. Each box, package, or pack of cigars, loose tobacco, cigarette wrappers, and cigarette tubes

must bear the word '*tributable*' or 'taxable' stamped on a visible place and in clear and legible form. In those cases in which the good is sold individually, it shall bear the word '*tributable*' or 'taxable' stamped on a visible place and in clear and legible form as prescribed by the Secretary. These provisions shall not apply to exempt goods under Section 3030.18 of this Code."

Section 8.03.- Section 3020.13 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3020.13.- Smokeless Tobacco

(a)    An excise tax shall be imposed, paid, and collected on smokeless tobacco manufactured in or imported into Puerto Rico. For purposes of this subtitle, the term 'smokeless tobacco' shall mean any tobacco-derived product that:

(1)    Is intended to be consumed without creating combustion or burning, and

(2)    Is found or sold in foil packages, pouches, and/or in discrete single-use unit, in the form of lozenges, tablets, pouches, and dissolvable strips, among others.

(b)    The excise tax provided in this Section shall be imposed as follows:

(1)    Chewing Tobacco: One dollar ($1.00) for every pound or fraction thereof. From May 1st, 2017, the excise tax shall be five dollars ($5.00) for every pound or fraction thereof.

(2)    Snuff or any other tobacco-derived product: Three dollars and two cents ($3.02) for every pound or fraction thereof. From May 1st, 2017, the excise tax shall be four dollars and fifty-three cents ($4.53) for every pound or fractions thereof.

(c)    Tobacco-derived products manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed upon the boxes, packages, or packs in which they are packed, a label with the information and characteristics as

are prescribed by regulation. Every cigarette box, package, or pack must bear the word '*tributable'* or 'taxable' stamped on a visible place and in clear and legible form. These provisions shall not apply to goods exempt under Section 3030.18 of this Code."

Section 8.04.- Section 3020.14 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3020.14.- Appropriation of Funds

The Secretary of the Treasury shall deposit any revenues collected by virtue of Sections 3020.05, 3020.05A, 3020.13, and 3020.15 directly in the General Fund."

Section 8.05.-  A new Section 3020.15 is hereby added to Act No. 1-2011, as amended, to read as follows:

"Section 3020.15.- Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a)     Definitions.- For purposes of this Section and of any applicable provisions of this Subtitle, the following terms shall have the meaning stated below:

(1)     Electronic Cigarette.- Shall mean any noncombustible product that employs a heating element, power source, electronic circuit, or other electronic, chemical, or mechanical means that can be used to produce vapor from nicotine in a solution or other form, which because of its appearance, size, or its packaging and labeling, is likely to be used, offered to, or purchased by, consumers as an electronic cigarette, vaporizer, or electronic pipe.

(2)     Nicotine Cartridge.- Shall mean a vapor cartridge or any other container holding liquid nicotine that is intended to be used with or in an electronic cigarette or vaporizer.

(3)     Vaporizer.- Shall mean any noncombustible product that employs a heating element, power source, electronic circuit, or other electronic, chemical, or mechanical means that can be used to produce vapor from nicotine in a solution or other form, which cannot be considered an electronic cigarette according

to the definition of preceding paragraph (1). This term shall include, without it being understood as a limitation, hookas and vaporizers used to administer drugs not approved by the Food and Drug Administration (FDA).

(b)     An excise tax shall be imposed, paid, and collected on electronic cigarettes, nicotine cartridges, and vaporizers as follows:

(1)     Electronic Cigarette: Three dollars ($3.00) for every electronic cigarette.

(2)     Nicotine Cartridges: Five cents ($0.05) for every millimeter of nicotine solution or any other substance, whether it contains nicotine or not, in each nicotine cartridge. This excise tax shall not be prorated.

(3)     Vaporizers: Six dollars ($6.00) for every unit.

(c)     Electronic cigarettes, nicotine cartridges, and vaporizers manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed upon the boxes, packages, or packs in which they are packed, a label with the information and characteristics as prescribed by regulation; provided, that nicotine cartridges shall indicate in their boxes, packages, or packs the actual milliliters of nicotine solution, as prescribed by the Secretary. Every box, package, or pack must bear the word '*tributable'* or 'taxable' stamped on a visible place and in clear and legible form. In those cases in which the good is sold individually, it shall bear the word '*tributable'* or 'taxable' stamped on a visible place and in clear and legible form as prescribed by the Secretary. These provisions shall not apply to exempt goods under Section 3030.18 of this Code."

Section 8.06.- Section 3030.18 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3030.18.- Exemption on Cigarettes, Cigars, Loose Tobacco, Cigarette Paper, Cigarette Tubes, Chewing Tobacco, Snuff, Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a)      Cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers sold or transferred to foreign-flag and United States ships and those sold to foreign warships and to ships of a foreign country on courtesy visits to Puerto Rico, shall be exempt from the tax imposed in this Subtitle. This exemption shall only be allowed when the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers are delivered in accordance with the rules and procedures established by the Secretary, and the violation thereof shall entail the obligation of the importer or the distributor, as the case may be, to pay the corresponding excise taxes. Any importer or distributor who wishes to avail himself of this exemption shall post a bond to respond for the payment of said excise taxes.

(b)      Likewise, cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers which, having been withdrawn from the factories or ports, are removed from the market because they are unsuitable for regular consumption, shall be exempt from the payment of excise taxes; provided, they are destroyed under the supervision of the Secretary. In such case, the Secretary shall refund or credit the tax to the person who paid it.

(c)      Furthermore, cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers shall be exempt from the excise tax imposed in this Subtitle when these are sold or transferred to users, as defined in Act No. 23-1991, as amended, of post exchanges, canteens, or other facilities operated by the Puerto Rico National Guard Institutional Trust or the Concessionaire thereof.

(d)     Cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers manufactured in or introduced into Puerto Rico for export shall be exempt from the excise tax imposed in this Subtitle subject to the requirements or conditions prescribed by the Secretary through regulations; provided, that said exemption shall not apply to cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers sold in Shops and Air or Maritime Terminals to persons who remain within the United States customs territory."

Section 8.07.- Subsection (a) of Section 3050.01 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3050.01.-  License Fees for Wholesale or Retail Dealers of Certain Goods

(a)     Any wholesale or retail dealer of any of the goods listed hereinafter, who sells the goods at a fixed place or as an itinerant merchant, shall pay an annual tax as a license fee at the rate established in the following table:

| DEALERS | FEES | |
|---|---|---|
| Cigarettes – Wholesaler | | $750 |
| Cigarettes – Retailer Fixed Place, Itinerant Merchant and for each Cigarette Vending Machine | | $300 |
| Cigarette Wholesales from Motor Vehicles – per vehicle | | $300 |
| Fuel – Wholesaler | Class A | $6,000 |
| | Class B | $2,500 |
| Fuel – Retailer | Class A | $900 |
| | Class B | $100 |
| Retailer – Sale of Alcoholic Beverages, Cigarettes, and Vehicle Parts and Accessories – per venue | | $200 |
| Motor Vehicles – Dealers | Class A | $1,000 |
| | Class B | $200 |

| Vehicle Parts and Accessories Retail and Wholesale | Class A | $2,000 |
|---|---|---|
| | Class B | $800 |
| | Class C | $100 |
| Retail Dealers in Cigarettes and Alcoholic Beverages for a Limited Time (15 days) | | $25 |
| Retail Dealers – Auto Shows for a Limited Time (Vehicles, Parts, and Accessories) (15 days) | | $100 |
| Concrete – Manufacturer or Wholesale Dealer | Class A | $250,000 |
| | Class B | $200,000 |
| | Class C | $80,000 |
| Gunsmith – Dealer in Weapons and Ammunition | | $200 |

(1)     …

…"

Section 8.08.- A new subsection (d) is hereby added to Section 6042.08 of Act No. 1-2011, as amended, to read as follows:

"Section 6042.08.-  Cigarette-related Crimes

(a)     …

(b)     …

(c)     …

(d)     Any person shall be guilty of a misdemeanor and shall be punished by a five thousand dollar ($5,000)-fine if:

(1)     He acquires cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers as a user, as defined in Act No. 23-1991, as amended, in post exchanges, canteen, or other facilities operated by the Puerto Rico National Guard Institutional Trust or the Concessionaire thereof, and subsequently sells or transfers the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers thus acquired to any person who is not entitled to the exemption provided in subsection (c) of Section 3030.18 of this Code; or

(2)     He acquires cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers at Post Exchanges located in military facilities of the United States of America in Puerto Rico, and subsequently sells or transfers the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers thus acquired to any person who is not entitled to acquire said goods from said establishments."

Section 8.09.- Subsection (a) of Section 6042.15 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 6042.15.- Penalty for Failure to File Excise Tax Declaration and Monthly Excise Tax Return

(a)     Any person required to file the Excise Tax Declaration, the Monthly Excise Tax Return, or the Bill of Sale that fails to file such return as required in Sections 3020.08(c)(8), 3020.09(c), and 3020.10, in the form, date, and manner prescribed therein, shall be imposed a penalty of one hundred dollars ($100) or ten percent (10%) of the tax obligation established in said declaration or return, whichever is higher.

(b)     …"

Section 8.10.-  Transitory Provisions

(a)     Any person subject to the annual tax on account of license fee under Section 3050.01 of Act No. 1-2011 that, as of May 1st, 2017, holds a Retail or Wholesale Dealer License in effect shall be subject to the new rates provided in Section 8.07 of this Act after the due date to pay the appropriate license fee in accordance with subsection (b) of Section 3060.08 of Act No. 1-2011.

(b)     The Secretary of the Treasury shall prescribe by regulations, circular letter, or other administrative determination of general nature, the necessary rules for the application of these transitory provisions.

## CHAPTER 9.- EMERGENCY FUND

Section 9.01.- Section 2 of Act No. 91 of July[sic] 21, 1966, as amended, is hereby amended to read as follows:

"Section 2.-

Beginning Fiscal Year 1995-96, the Emergency Fund shall be capitalized annually by an amount not less than one-fifth of one percent (0.2%) of the total of the Joint Resolution for the Budget. Beginning Fiscal Year 1998-99, said contribution shall be not less than one percent (1%) of the total net revenues for the previous fiscal year. Provided, that, through Fiscal Year 2020-2021, said contribution shall be at least ten million dollars ($10,000,000). From Fiscal Year 2020-2021 and thereafter, said contribution shall not be less than zero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury to prepare the Recommended Budget chargeable to the General Fund. The Governor of Puerto Rico and the Director of the Office of Management and Budget, by delegation of the latter, may direct that any amount in excess of the amount herein fixed from any source of income be deposited in the Fund, when deemed convenient. The balance of said Emergency Fund shall never exceed one hundred fifty million dollars ($150,000,000)."

## CHAPTER 10.- FINAL PROVISIONS

Section 10.01.-  Immunity Relating to Lawsuits and Forums

This Act shall not affect the immunity of the State and the officials and officers thereof in connection with lawsuits and forums. None of the provisions of this Act authorizes tort claims against the State, its officials or employees for actions or omissions of the latter resulting from the enforcement of this Act. None of the provisions herein constitute a waiver of the sovereign immunity of the Government of Puerto Rico.

Section 10.02.- Rules of Interpretation

The words and phrases used in this Act shall be construed within the context and meaning approved for common and ordinary use, and the rules of interpretation recognized under our code of laws.

Section 10.03.- Incompatibility

Any organic, general, or special law, article, or section of any Act, guidelines, collective bargaining agreements, agreements, supplementary agreements, administrative orders, policies, employment manuals, circular letters, certifications, regulations, rules and employment conditions, policy letters, job classification or pay plans, contract letters, and/or applicable provisions that are in contravention of the provisions of this Act are hereby repealed.

Section 10.04.-  Supremacy

The provisions of this Act and the regulations or rules adopted thereunder shall prevail over any other provision of law, regulations, or rules that are inconsistent with the former.

Section 10.05.-  Severability

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act were held to be null or unconstitutional, the ruling, holding, or judgment to such effect shall not affect, impair, or invalidate the remainder of this Act. The effect of said holding shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act thus held to be null or unconstitutional. If the application to one person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act were held to be null or unconstitutional, the ruling, holding, or judgment to such effect shall not affect or invalidate the application of the remainder

of this Act to such persons or circumstances where it may be validly applied. It is the express and unequivocal will of this Legislative Assembly that the courts enforce the provisions and application thereof to the greatest extent possible, even if it renders ineffective, nullifies, invalidates, impairs, or holds to be unconstitutional any part thereof, or even if it renders ineffective, invalidates, or holds to be unconstitutional the application thereof to any person or circumstance. This Legislative Assembly would have approved this Act regardless of any determination of severability that the Court may make.

Section 10.06.-  Effectiveness

This Act shall take effect immediately after its approval.

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 26-2017 (H. B. 938)**

of the **1st Regular Session** of the **18th Legislative Assembly of Puerto Rico:**

**AN ACT**     to create the "Fiscal Plan Compliance Act," in order to take measures as
necessary to adjust the existing legal and juridical framework so as to allow
the fullest compliance with the Fiscal Plan approved by the Financial
Oversight Board, created by virtue of the Federal Law PROMESA; establish
a uniform fringe benefit system, which includes the Christmas bonus and
the healthcare plan contribution, for all the government employees and
officials of the agencies, instrumentalities, and public corporations of the
Government of Puerto Rico, except for the University of Puerto Rico; […]

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on this 13th day of December, 2017.


Orlando Pagán-Ramírez
Acting Director