# EXHIBIT   28

No. 18-1214

# United States Court of Appeals for the First Circuit

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS & TRANSPORTATION AUTHORITY,

*Debtors.*

AMBAC ASSURANCE CORPORATION,

*Plaintiff-Appellant,*

– against –

COMMONWEALTH OF PUERTO RICO; FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; PUERTO RICO HIGHWAYS & TRANSPORTATION AUTHORITY; RICARDO ROSSELLO NEVARES; RAUL MALDONADO GAUTIER; JOSE IVAN MARRERO

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States District Court for the District of Puerto Rico, San Juan in No. 3:17-AP-00159-LTS (Hon. Laura Taylor Swain, U.S. District Judge)*

**MOTION OF CONGRESSMAN ROB BISHOP, CHAIRMAN OF THE HOUSE COMMITTEE ON NATURAL RESOURCES, FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY**

BRUCE R. ZIRINSKY
ZIRINSKY LAW PARTNERS PLLC
375 Park Avenue, Suite 2607
New York, NY 10152
(212) 763-0192

*Counsel for Amicus Curiae*

ROSADO; GERARDO JOSE PORTELA FRANCO; JOSE B. CARRION III;
ANDREW G. BIGGS; CARLOS M. GARCIA; ARTHUR J. GONZALEZ; JOSE
R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.;
CHRISTIAN SOBRINO,

*Defendants-Appellees,*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

*Intervenor,*

JOHN DOES 1-12,

*Defendants.*

Pursuant to Federal Rule of Appellate Procedure 29, the Hon. Rob Bishop, Chairman of the House Committee on Natural Resources, respectfully moves for leave to file an *amicus curiae* brief.

Undersigned counsel has contacted counsel of record for petitioners and respondents regarding this motion to participate as *amicus curiae*. Counsel for appellees the Financial Oversight and Management Board and the Puerto Rico Fiscal Agency and Financial Advisory Authority have consented to this motion. No Counsel for any party has indicated opposition to the motion. However, at the time of filing of this motion, not all parties had responded to the request.

Rep. Bishop is a member of Congress who serves as Chairman of the United States House of Representatives Committee on Natural Resources, which has broad jurisdiction over Puerto Rico and other "[i]nsular areas of the United States." Rule X of the Rules of the House of Representatives (115th Cong.). Rep. Bishop oversaw the drafting and enactment of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). As Chairman, Rep. Bishop remains committed to ensuring that the intentions of PROMESA are realized, and that Puerto Rico "achieves fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a). Rep. Bishop has an interest in ensuring that PROMESA is interpreted by this and other courts consistent with legislative intent.

Rep. Bishop's brief is relevant and desirable, as required by Federal Rule of Appellate Procedure 29(b)(2).  On June 5, 2018, this Court heard oral argument in a related appeal, *Financial Oversight and Management Board for Puerto Rico v. Ad Hoc Group of PREPA Bondholders*, No. 17-2079.  During the course of that argument, Judge Kayatta requested that, "in cases going forward," parties to proceedings concerning Puerto Rico's restructuring put PROMESA "in context" and explain both how PROMESA operates and the differences between PROMESA and the Bankruptcy Code.  Rep. Bishop possesses special knowledge of PROMESA and its legislative history, which, if allowed to be presented in an *amicus curiae* brief, is likely to assist the Court in both placing PROMESA "in context" and interpreting PROMESA consistent with legislative intent.

For the foregoing reasons, *amicus* requests that the Court grant this motion to file a brief as *amicus curiae*, as filed herewith.

June 29, 2018                              Respectfully submitted,

/s Bruce R. Zirinsky
Bruce R. Zirinsky
Zirinsky Law Partners PLLC
375 Park Avenue
Suite 2607
New York, NY 10152
Phone: (212) 763-0192
bzirinsky@zirinskylaw.com

*Counsel for Amicus Curiae*
*Representative Rob Bishop*

## CERTIFICATE OF SERVICE

I, Bruce R. Zirinsky, hereby certify that on this 29th date of June, 2018, a true and correct copy of the foregoing Motion For Leave To File An *Amicus Curiae* Brief was filed in accordance with the Court's CM/ECF Guidelines and served via the Court's CM/ECF system on all counsel of record.

/s Bruce R. Zirinsky
Bruce R. Zirinsky

# No. 18-1214

# United States Court of Appeals
# for the First Circuit

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF
PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO
RICO HIGHWAYS & TRANSPORTATION AUTHORITY,

*Debtors.*

AMBAC ASSURANCE CORPORATION,

*Plaintiff-Appellant,*

– against –

COMMONWEALTH OF PUERTO RICO; FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO; PUERTO RICO FISCAL
AGENCY AND FINANCIAL ADVISORY AUTHORITY; PUERTO RICO
HIGHWAYS & TRANSPORTATION AUTHORITY; RICARDO ROSSELLO
NEVARES; RAUL MALDONADO GAUTIER; JOSE IVAN MARRERO

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the United States District Court for the
District of Puerto Rico, San Juan in No. 3:17-AP-00159-LTS
(Hon. Laura Taylor Swain, U.S. District Judge)*

**BRIEF OF CONGRESSMAN ROB BISHOP, CHAIRMAN OF THE
HOUSE COMMITTEE ON NATURAL RESOURCES, AS *AMICUS
CURIAE* IN SUPPORT OF NEITHER PARTY**

BRUCE R. ZIRINSKY
ZIRINSKY LAW PARTNERS PLLC
375 Park Avenue, Suite 2607
New York, NY 10152
(212) 763-0192

*Counsel for Amicus Curiae*

ROSADO; GERARDO JOSE PORTELA FRANCO; JOSE B. CARRION III;
ANDREW G. BIGGS; CARLOS M. GARCIA; ARTHUR J. GONZALEZ; JOSE
R. GONZALEZ; ANA J. MATOSANTOS; DAVID A. SKEEL, JR.;
CHRISTIAN SOBRINO,

*Defendants-Appellees,*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

*Intervenor,*

JOHN DOES 1-12,

*Defendants.*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................2

ARGUMENT .............................................................................................5

I.     PROMESA PROVIDES FOR INDEPENDENT OVERSIGHT OF
       DEBT RESTRUCTURING, CONDITIONED WITH THE
       NECESSARY PROTECTION OF CREDITOR RIGHTS TO
       ENSURE A RETURN TO THE CAPITAL MARKETS ...........................5

       A.     PROMESA Was A Response Both To Puerto Rico's Debt
              Crisis And To Unilateral Debt-Related Actions That Instigated
              Litigation ............................................................................6

       B.     PROMESA Was Designed To Resolve Puerto Rico's Debt
              Crisis Through Consensual Settlement And Restructuring, With
              Title III Proceedings As A Last Resort ................................10

       C.     Section 303 of PROMESA Preempts Unilateral Debt-Related
              Remedies ...........................................................................16

II.    FISCAL PLANS, DESIGNED TO GOVERN PUERTO RICO FOR
       EXTENDED PERIODS OF TIME, ARE SUBJECT TO
       MANDATORY CREDITOR PROTECTIONS AND JUDICIAL
       REVIEW ..............................................................................................17

       A.     Fiscal Plans Were Designed To Ensure Good Governance In
              The Commonwealth And Its Instrumentalities Regardless Of
              Whether Title III Proceedings Were Ever Initiated ..............18

       B.     Section 201(b) Contains Mandatory Requirements that All
              Fiscal Plans Must Meet, Including Protections For Creditors ...........19

III.   TO ENSURE FUTURE ACCESS TO CAPITAL MARKETS, THE
       TITLE III PROCESS WAS INTENDED TO PROTECT CREDITOR
       RIGHTS AND ENSURE AN EQUITABLE RESULT ................................21

       A.     PROMESA Contains Creditor Protections That Operate During
              The Pendency Of A Title III Proceeding ..............................21

       B.     PROMESA Requires The Plan Of Adjustment To Protect
              Creditor Rights ..................................................................23

CONCLUSION ...........................................................................................24

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Statutes**

11 U.S.C. § 362 ....................................................................................................4, 22

11 U.S.C. § 903 ...........................................................................................................16

11 U.S.C. § 922 ....................................................................................................4, 21

11 U.S.C. § 928 ....................................................................................................4, 21

48 U.S.C. § 2121 ...............................................................................................1, 2, 10

48 U.S.C. § 2124 ..........................................................................................12, 13, 14

48 U.S.C. § 2141 ...................................................................................................*passim*

48 U.S.C. § 2142 ...........................................................................................................18

48 U.S.C. § 2144 ...........................................................................................................18

48 U.S.C. § 2146 ..........................................................................................12, 13, 14

48 U.S.C. § 2149 ...........................................................................................................10

48 U.S.C. § 2161 ..............................................................................................9, 21, 22

48 U.S.C. § 2163 ...............................................................................................3, 16, 17

48 U.S.C. § 2174 .........................................................................................4, 5, 18, 23

48 U.S.C. § 2194 ..............................................................................................15, 24

48 U.S.C. § 2231 ..............................................................................................11, 13

**Legislative Materials**

H.R. 870 114th Cong. (2015) ......................................................................................10

H.R. 4900, 114th Cong. § 201(b) (2016) .................................................................20

H.R. 5278, 114th Cong. § 201(b) (2016) .................................................................20

H.R. Rep. No. 114-602 (2016)...........................................................................11, 18

Markup Memorandum from House Committee on Natural Resources
    on H.R. 5278, PROMESA at 4 (May 23, 2016),
    https://naturalresources.house.gov/uploadedfiles/markup_memo_--
    _h.r._5278_05.24.16__05.25.16.pdf.........................................12, 13, 14, 18, 20

*Hearing To Consider A Bill For The Puerto Rico Oversight,
    Management, and Economic Stabilization Act (PROMESA):
    Hearing Before H. Comm. on Nat. Res.*, 114th Cong. (Apr. 13,
    2016) (testimony of Susheel Kirpalani, Chairperson of the
    Bankruptcy and Restructuring Group, Quinn Emanuel Urquhart &
    Sullivan, LLP),
    https://naturalresources.house.gov/uploadedfiles/testimony_mr._ki
    rpalani.pdf ............................................................................................23

*Puerto Rico's Fiscal Problems: Examining the Source and Exploring
    the Solution: Hearing Before the S. Comm. on the Judiciary*, 114th
    Cong. (Dec. 1, 2015) (written testimony of Alejandro J. Garcia
    Padilla, Governor of the Commonwealth of Puerto Rico),
    https://www.judiciary.senate.gov/download/garcia-padilla-
    testimony-12-1-15...................................................................................6

Rule X of the Rules of the House of Representatives (115th Cong.).......................1

S. 1774 114th Cong. (2015)..................................................................................10

*The Need for the Establishment of a Puerto Rico Financial Stability
    and Economic Growth Authority: Hearing Before the H. Comm. on
    Nat. Res.*, 114th Cong. (Feb. 2, 2016) (Testimony of Carlos Garcia,
    Former Chairman, President & CEO of the Government
    Development Bank for Puerto Rico),
    https://naturalresources.house.gov/uploadedfiles/garcia_testimony_
    updated_2_3_16.pdf ...............................................................................8

*The Need for the Establishment of a Puerto Rico Financial Stability
    and Economic Growth Authority: Hearing Before the H. Comm. on
    Nat. Res.*, 114th Cong. (Feb. 2, 2016) (written testimony of
    Anthony A. Williams, Strategic Advisor to Dentons, US LLP),
    https://naturalresources.house.gov/uploadedfiles/testimony_hon._a
    nthony_williams.pdf ...............................................................................11

Hearing Memorandum, *U.S. Dep't of the Treasury's Analysis of the Situation in Puerto Rico: Hearing Before the H. Comm. on Nat. Res.*, 114th Cong. (Feb. 25, 2016), https://naturalresources.house.gov/uploadedfiles/hearing_memo_--_fc_ov_hrg_02.25.16.pdf ...................................................................11

*U.S. Dep't of the Treasury's Analysis of the Situation in Puerto Rico: Hearing Before the H. Comm. on Nat. Res.*, 114th Cong. (Feb. 25, 2016) (testimony of Antonio Weiss, Counselor to the Secretary), https://naturalresources.house.gov/uploadedfiles/testimony_weiss.pdf ......................................................................................6, 7

**Other Authorities**

Ballentine's Law Dictionary .....................................................................13

David Skeel, *Fixing Puerto Rico's Debt Mess*, Wall St. J. (Jan. 5, 2016), https://www.wsj.com/articles/fixing-puerto-ricos-debt-mess-1452040144 ....................................................................................23

Joanisabel González, *Government fails to submit financial statements three years in a row*, El Nuevo Día (May 7, 2018), https://www.elnuevodia.com/english/english/nota/governmentfailst osubmitfinancialstatementsthreeyearsinarow-2420632/ .......................6

Mary Williams Walsh, Puerto Rico Defaults on Debt Payments, N.Y. Times (Jan. 4, 2016), https://www.nytimes.com/2016/01/05/business/dealbook/puerto-rico-defaults-on-debt-payments.html...................................................7

Press Release, Financial Oversight and Management Board for Puerto Rico, Oversight Board Certifies COFINA Title III Filing (May 5, 2017), https://drive.google.com/file/d/1QhP_PkamlOXsUga7n33lplg28m 7xOWGd/view .....................................................................................15

Press Release, Financial Oversight and Management Board for Puerto Rico, Oversight Board Certifies Title III Filing (May 22, 2017) https://drive.google.com/file/d/1Uwp19GIjBfC1tEjq_ebGrZtZDG Dws4Hg/view .....................................................................................15

Press Release, Financial Oversight and Management Board for Puerto
    Rico, Oversight Board Certifies Title III Filing (May 3, 2017),
    https://drive.google.com/file/d/1f7En7U3r1YgJdn0pcVvmJ6PHtT
    26qbTF/view ................................................................................................15

U.S. Gov't Accountability Off., GAO-18-387, Puerto Rico: Factors
    Contributing to the Debt Crisis and Potential Federal Actions to
    Address Them 1 (2018),
    https://www.gao.gov/assets/700/691675.pdf.......................................................8

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Representative Rob Bishop represents the 1st District of Utah.[1] Since the onset of the 114th Congress, Rep. Bishop has served as Chairman of the United States House of Representatives Committee on Natural Resources, which has broad jurisdiction over "[i]nsular areas of the United States," including Puerto Rico.[2]

During his time as Chairman, Rep. Bishop oversaw the drafting and enactment of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), as well as multiple hearings on the efficacy of PROMESA's implementation.  As Chairman, Rep. Bishop remains committed to ensuring that the intentions of PROMESA are realized, and that Puerto Rico "achieve[s] fiscal responsibility and access to the capital markets."[3]  Rep. Bishop is thus dedicated to assisting the federal courts and the Federal Oversight and Management Board in better understanding the intent of PROMESA.

Accordingly, Rep. Bishop submits this brief to provide the Court with the background and history that will facilitate proper interpretation of PROMESA.

---

[1] No party's counsel authored the brief in whole or in part.  No party or party's counsel—nor any person except *amicus* and his counsel—contributed money intended to fund the preparation or submission of this brief.

[2] Rule X of the Rules of the House of Representatives (115th Cong.).

[3] 48 U.S.C. § 2121(a).

## PRELIMINARY STATEMENT

The Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") is Congress' response to the Puerto Rico debt crisis, a problem decades in the making and with enormous complexity and scope. The bill that became PROMESA originated with the House of Representatives Committee on Natural Resources (the "Committee"), which *amicus* Rep. Bishop chairs. PROMESA's text and structure reflect the testimony received in hearings before the Committee and dialogue between the Committee and stakeholders, including Puerto Rico and its creditors.

The policy judgment embodied in PROMESA is stated clearly in its first substantive provision, Section 101(a): "The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."[4]  Congress determined that, along with providing access to restructuring support, the Commonwealth's financial house must be placed in order to remedy the decades of financial mismanagement that led to the present crisis. Congress also required the Commonwealth to deal fairly with its existing creditors and respect their rights, to enable conditions by which Puerto Rico could reach access to credit at reasonable rates of interest in the capital markets.

The purpose espoused in Section 101 governs all of PROMESA's provisions.

_____

[4] 48 U.S.C. § 2121(a).

PROMESA prioritizes consensual resolutions, makes a nonconsensual restructuring available only as a last resort, and provides that creditors' rights must be protected during negotiations and any restructuring process. *Amicus* respectfully submits that the intent of the Committee as reflected in its design of the statute is highly relevant and should assist the Court in its interpretation of PROMESA. This amicus brief provides important background to PROMESA's enactment and context to the Court regarding specific provisions that allow the purpose of PROMESA to be fulfilled.

First, Section 303, 48 U.S.C. § 2163, preempts the unilateral debt-related measures deployed by Puerto Rico prior to the passage of PROMESA, and prevents Puerto Rico from taking such actions while the Oversight Board exists. The purpose of this preemption is to establish federal law as the only debt relief regime available to the Commonwealth, and to make room for negotiations and voluntary resolution between creditors and the Commonwealth, to be mediated by the Oversight Board.

Second, the Committee built fiscal reform and creditor protections into the requirements for a fiscal plan, the governing documents used to outline "a method to achieve fiscal responsibility and access to the capital markets."[5] Among other provisions, a fiscal plan "shall" "respect the relative lawful priorities or lawful liens" in place prior to the enactment of PROMESA, and ensure that the assets of one

---

[5] 48 U.S.C. § 2141(b)(1).

territorial instrumentality are not transferred or otherwise used for the benefit of another.[6]

Third, the Committee included protections for creditors' rights before, during and after a Title III case to ensure any nonconsensual restructuring would not be adverse to Puerto Rico's future access to capital markets.  During the pendency of a Title III proceeding, creditors' rights are protected by key provisions of the bankruptcy code incorporated into Title III in Section 301(a), 48 U.S.C. § 2161(a).  Specifically, 11 U.S.C. § 362(d)(1) permits the Title III court to lift the automatic stay to let creditors seek relief if their collateral is not adequately protected.  Furthermore, 11 U.S.C. §§ 922 and 928, the "special revenue" provisions of Chapter 9 of the Bankruptcy Code, are intended to ensure that revenue streams pledged to bondholders continue to pay out during a Title III proceeding just as they would during a Chapter 9 bankruptcy by municipal debtors.  Title III also contains creditor protections that apply at confirmation of a plan of adjustment, the means by which a debtor exits Title III.  A plan of adjustment cannot be confirmed unless it complies with the applicable fiscal plan—which itself must respect lawful priorities and liens, as per Section 201.[7]  And Section 314(b)(6), mandates that no plan can be confirmed unless it is in the "best interests of creditors," as determined by a comparison of what

---

[6] 48 U.S.C. §§ 2141(b)(1)(M, N).

[7] 48 U.S.C. § 2174(b).

creditors' recovery would be "under the non-bankruptcy laws and constitution of the territory."[8]

Taken together, these provisions achieve the goals of PROMESA by providing restructuring support and implementing necessary financial and governmental reforms while protecting creditor rights, thereby allowing for future market access and enabling Puerto Rico to exercise fiscal discipline. Through these measures, the Committee intended to enable the negotiated, voluntary settlement and restructuring of debt, and to ensure that Puerto Rico regains the ability to borrow at reasonable rates from the capital markets in the future.

## **ARGUMENT**

### I.   **PROMESA PROVIDES FOR INDEPENDENT OVERSIGHT OF DEBT RESTRUCTURING, CONDITIONED WITH THE NECESSARY PROTECTION OF CREDITOR RIGHTS TO ENSURE A RETURN TO THE CAPITAL MARKETS**

Congress enacted PROMESA because Puerto Rico was in crisis. The territory had assumed too much debt and its government had begun implementing unilateral debt-related measures that would leave it unable to restore desperately needed access to the capital markets. To address these issues, PROMESA preempted these unilateral actions, and established an independent overseer to manage debt restructuring—preferably through consensual negotiations with creditors or, as a last

---

[8] 48 U.S.C. § 2174(b)(6).

resort, through a restructuring case under Title III.

### A. PROMESA Was A Response Both To Puerto Rico's Debt Crisis And To Unilateral Debt-Related Actions That Instigated Litigation

The Committee was first presented with the Puerto Rican debt crisis towards the end of 2015. At that time, the territory was facing an insurmountable burden exceeding $70 billion of debt, and a pension liability of over $40 billion.[9] It was also a foregone conclusion that Puerto Rico's accounting was in chaos, with the territory's most recent audited financials being for the 2014 Fiscal Year.[10] This fiscal crisis had prompted then-Governor Padilla to authorize more than $1 billion in emergency liquidity actions, including "not paying tax refunds"; "selling assets of the worker's compensation fund"; and "advancing the liquidation of assets of [Puerto Rico's] pension systems."[11]

---

[9] *U.S. Dep't of the Treasury's Analysis of the Situation in Puerto Rico: Hearing Before the H. Comm. on Nat. Res.*, 114th Cong. (Feb. 25, 2016) (testimony of Antonio Weiss, Counselor to the Secretary), https://naturalresources.house.gov/uploadedfiles/testimony_weiss.pdf ("*Weiss Testimony*").

[10] *See* Joanisabel González, *Government fails to submit financial statements three years in a row*, El Nuevo Día (May 7, 2018), https://www.elnuevodia.com/english/english/nota/governmentfailstosubmitfinancialstatementsthreeyearsinarow-2420632/.

[11] *Puerto Rico's Fiscal Problems: Examining the Source and Exploring the Solution: Hearing Before the S. Comm. on the Judiciary*, 114th Cong. (Dec. 1, 2015) (written testimony of Alejandro J. Garcia Padilla, Governor of the Commonwealth of Puerto Rico), https://www.judiciary.senate.gov/download/garcia-padilla-testimony-12-1-15.

When these unilateral measures proved inadequate, Puerto Rico defaulted on $174 million of debt in January 2016, by "clawing back" funds owed to instrumentalities in order to pay general obligation bonds—those issued with the full faith and credit of the Commonwealth.[12]  At the time, Puerto Rico had no access to debt restructuring.  The default sent a red flag for Puerto Rico's future and brought on litigation.[13]

As Congress debated an appropriate course of action, Puerto Rico turned to more extreme unilateral measures.  In April 2016, the Commonwealth enacted the Moratorium Law (Act No. 21-2016), which purportedly authorized the Governor of Puerto Rico to indefinitely suspend payment on the Commonwealth's debt.  The Governor suspended payments on bonds through a series of executive orders (the "Moratorium Orders") issued under the Moratorium Law beginning on April 30, 2016.  More litigation followed.

As the Committee worked to establish a framework under federal law to restructure Puerto Rico's debt, it determined that independent oversight was needed to manage the restructuring process.  Puerto Rico's debt crisis did not occur overnight or by happenstance.  Rather, decades of mismanagement by the Puerto

---

[12] Mary Williams Walsh, *Puerto Rico Defaults on Debt Payments*, N.Y. Times (Jan. 4, 2016), https://www.nytimes.com/2016/01/05/business/dealbook/puerto-rico-defaults-on-debt-payments.html.

[13] *Weiss Testimony*.

Rican government and its instrumentalities created the dire economic circumstances that faced the Puerto Rican people.  Indeed, Puerto Rico's "inadequate financial management and oversight practices," such as overestimating revenue collection and spending in excess of appropriated amounts, coupled with "policy decisions," like allowing debt proceeds to pay for balanced budgets, led Puerto Rico to its economic demise.[14]  With a lack of transparent financial data, a broken permitting and regulatory system, and no access to capital markets, Puerto Rico was unable to right its financial ship on its own.

The Committee therefore determined that any legislative solution would require a strong, independent overseer to manage Puerto Rico's fiscal house until it emerged from the crisis.  Testimony at hearings before the Committee in February 2016 reflected a need for Congress to make debt restructuring available for Puerto Rico only alongside a "long-term fiscal and economic authority" capable of addressing "comprehensively all of Puerto Rico's issues."[15]  The hearings further

---

[14] U.S. Gov't Accountability Off., GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* 1 (2018), https://www.gao.gov/assets/700/691675.pdf.

[15] *See The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority: Hearing Before the H. Comm. on Nat. Res.*, 114th Cong., at 5 (Feb. 2, 2016) (Testimony of Carlos Garcia, Former Chairman, President & CEO of the Government Development Bank for Puerto Rico), https://naturalresources.house.gov/uploadedfiles/garcia_testimony_updated_2_3_1 6.pdf.

indicated that any authority created by federal legislation would need to be independent, free from island political influence, and empowered to oversee Puerto Rico's fiscal and governmental activities, including the authority to enforce structural changes through budgets.[16]

The legislation developed in response to these hearings was designed to instill fiscal discipline, restore legal order, uncover the fiscal data behind the island's finances, return the island to the capital markets, and prohibit contagion effects into other municipal markets.  The Committee agreed to provide Puerto Rico access to restructuring, conditioned by the inclusion of provisions to prioritize consensual negotiations, improve transparency on the island, preempt unilateral debt-related measures, and protect the best interests of creditors.  If nonconsensual restructuring were to ultimately prove necessary, the legislation provided that it could occur only under clear federal mandates that would respect creditor interests and enable Puerto Rico's future access to capital markets.

The result of this process was PROMESA, signed into law by President Obama on June 30, 2016, which establishes the Federal Oversight and Management Board ("Oversight Board" or "Board").  The Board's purpose "is to provide a method for [Puerto Rico and its instrumentalities] to achieve fiscal responsibility and

---

[16] *Id.* at 7.

access to the capital markets,"[17] which will occur when Puerto Rico has "access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government" and has a balanced budget "for at least 4 consecutive fiscal years."[18]

### B.   PROMESA Was Designed To Resolve Puerto Rico's Debt Crisis Through Consensual Settlement And Restructuring, With Title III Proceedings As A Last Resort

A key objective for the Oversight Board was to facilitate consensual resolutions between the Commonwealth and its creditors.  From the onset, the Committee was inundated with calls from the Administration and other interested parties for Puerto Rico to have access to debt restructuring.  However, the Committee rejected the notion that free access to bankruptcy would be helpful for the economic future of Puerto Rico.  This rejection echoed a similar conclusion throughout Congress, as both the House and the Senate had ignored proposed legislation that would have simply allowed Puerto Rico access to bankruptcy protections under Chapter 9 of the Bankruptcy Code.[19]  Through hearings, the Committee eventually concluded that although Puerto Rico needed to restructure debt, "[m]uch of the debt restructuring . . . may occur through consensual agreements between the creditors

---

[17] 48 U.S.C. § 2121(a).

[18] 48 U.S.C. § 2149.

[19] *See* H.R. 870 114th Cong. (2015); S. 1774 114th Cong. (2015).

and Puerto Rico, if a strong, independent oversight authority exists to advocate for the development of such voluntary agreements."[20]  As Mayor Anthony Williams recognized in his testimony before the Committee on April 13, 2016, nonconsensual "debt adjustment powers" were to be made available to the Oversight Board only "as a last resort."[21]  Therefore, PROMESA mandated that bankruptcy proceedings under Title III be available only as a last resort if voluntary negotiations failed.

Indeed, the Committee envisioned that most—if not all—creditor claims would be resolved not under Title III but under Title VI, which authorizes collective action by creditors to voluntarily restructure debts.  Like other parts of PROMESA, Title VI mandates protection of the "best interest of creditors" and careful classification of similarly situated debtors.[22]  The Oversight Board was designated the "Administrative Supervisor"[23] of voluntary negotiations under Title VI and was

---

[20] Hearing Memorandum, *U.S. Dep't of the Treasury's Analysis of the Situation in Puerto Rico: Hearing Before the H. Comm. on Nat. Res.*, 114th Cong., at 1 (Feb. 25, 2016), https://naturalresources.house.gov/uploadedfiles/hearing_memo_--_fc_ov_hrg_02.25.16.pdf.

[21] *The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority: Hearing Before the H. Comm. on Nat. Res.*, 114th Cong., at 2 (Feb. 2, 2016) (written testimony of Anthony A. Williams, Strategic Advisor to Dentons, US LLP), https://naturalresources.house.gov/uploadedfiles/testimony_hon._anthony_williams.pdf.

[22] *See* H.R. Rep. No. 114-602 at 54 (2016).

[23] 48 U.S.C. § 2231(a)(1).

expected to play a substantive role in the development of consensual resolutions, as reflected by Section 104(i) of PROMESA.[24]

Although the Oversight Board has steered debtors into Title III proceedings, Title III was created as a last resort, to be used in truly intractable cases after a lengthy negotiation period proved fruitless.  To implement this, the Committee imposed several gating requirements on the Oversight Board to prohibit a rush into the Title III restructuring process and to ensure the Oversight Board would consistently and proactively engage with the creditor community.[25]  The Committee not only envisioned these gating requirements as substantial hurdles that would be overcome only by "truly unsustainable debt,"[26] but also as mandated items that were intended to encourage dialogue between affected parties, promote transparency in financial data, and return Puerto Rico to the capital markets, before resort could be made to Title III.

The first gating requirement under Section 206 instructs the Oversight Board to determine if the debtor entity has made "good-faith efforts to reach a consensual

---

[24] 48 U.S.C. § 2124(i).

[25] *See* 48 U.S.C. § 2146.

[26] Markup Memorandum from House Committee on Natural Resources on H.R. 5278, PROMESA at 4 (May 23, 2016), https://naturalresources.house.gov/uploadedfiles/markup_memo_--_h.r._5278_05.24.16__05.25.16.pdf ("Markup Memo").

restructuring with creditors."[27]   The Committee envisioned such consensual efforts being made "through the Title VI process, or some other voluntary mechanism negotiated between the parties,"[28] such as the Restructuring Support Agreement that the Puerto Rico Electric Power Authority had reached with creditors.[29]   The good-faith standard was included to ensure negotiations between the entity and the holders of debt had occurred without "culpable negligence or a wilful [sic] disregard of the rights of others and in the honest and reasonable belief that the act is rightful."[30]

Another gating requirement under Section 206 focused on transparency.   It mandated that the debtor entity have "adopted procedures necessary to deliver timely audited financial statements" and "made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring."[31]   The Committee required this gating mechanism to ensure the Oversight Board, and interested persons, including

---

[27] 48 U.S.C. § 2146(a)(1).

[28] Markup Memo at 4.

[29] Amended and Restated Restructuring Support Agreement (Mar. 14, 2016), http://www.gdb.pr.gov/investors_resources/documents/PREPA-ARRSA-SPVAmendment-March142016_EXECUTED-REDACTED.PDF.  Although Sections 104(i)(3) and 601(g)(2)(B) of PROMESA (48 U.S.C. §§ 2124(i)(3), 2231(g)(2)(B)) required the Oversight Board to approve the Restructuring Support Agreement, the Oversight Board refused to do so.

[30] *Good Faith*, Ballentine's Law Dictionary (3d ed. 1969*)*.

[31] 48 U.S.C. § 2146(a)(2).

creditors, had access to enough financial information to "determine whether the entity actually needs restructuring."[32]   The purpose of Section 206(a)(2) was to require the Oversight Board to implement transparency measures sufficient to support dialogue about the fate of an entity before beginning a Title III case. [33]

The final gating provision is the requirement that a fiscal plan be certified before any Title III case commences.[34]   As explained below, the role played by a fiscal plan is not confined to Title III proceedings.  Fiscal plans must be developed for territorial entities even if they never file a Title III case, and the plans' effects reach outside the Title III proceedings.  But by requiring that a fiscal plan be in place *before* a debtor enters Title III proceedings, PROMESA directs the Oversight Board to first develop a path back to fiscal responsibility and capital markets access for the entity whose debt the Board wants to restructure—a path that complies with all the

---

[32] Markup Memo at 5.

[33] The Oversight Board has broad powers to access whatever information would be needed to make intelligent, fiscally sound decisions about the future of a territory, or territorial entity, including the authority to hold hearings under oath, to obtain "copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities."  48 U.S.C. §§ 2124(c, d).  Furthermore, "[t]he Oversight Board may issue subpoenas requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board."  *Id.* § 2124(f).

[34] 48 U.S.C. § 2146(a)(3).

requirements set forth in Section 201(b), 48 U.S.C. § 2141(b), as discussed below.

Despite the clear intent and design of the gating provisions, the Oversight Board filed Title III cases for four debtors within one month of the expiration of the stay under Section 405, 48 U.S.C. § 2194.[35]  The Committee did not intend for the expiration of the stay to prompt the initiation of Title III cases; rather, the automatic stay was included to allow the Oversight Board ample time to establish itself under the statutory framework of PROMESA, and to initiate voluntary negotiations under Title VI.[36]  The Board's haste to begin what was meant as a last resort has sown confusion in the lower court's interpretation of PROMESA.  PROMESA should be read and interpreted with the understanding that the Oversight Board (and the fiscal

---

[35] COFINA's Title III case was filed on May 5, 2017.  Press Release, Financial Oversight and Management Board for Puerto Rico, Oversight Board Certifies COFINA Title III Filing (May 5, 2017),
https://drive.google.com/file/d/1QhP_PkamlOXsUga7n33lplg28m7xOWGd/view.
The Commonwealth of Puerto Rico's Title III case was certified on May 3, 2017.
Press Release, Financial Oversight and Management Board for Puerto Rico, Oversight Board Certifies Title III Filing (May 3, 2017),
https://drive.google.com/file/d/1f7En7U3r1YgJdn0pcVvmJ6PHtT26qbTF/view.
The Highway and Transit Authority and Employees Retirement System Title III cases were filed on May 22, 2017.  Press Release, Financial Oversight and Management Board for Puerto Rico, Oversight Board Certifies Title III Filing (May 22, 2017)
https://drive.google.com/file/d/1Uwp19GIjBfC1tEjq_ebGrZtZDGDws4Hg/view.

[36] *See* H. Rep. 114-602 at 52 ("The stay ensures order during the initial few months of the Oversight Board's existence, thereby allowing the Oversight Board the opportunity to establish its foundational structure and begin its monumental task of ensuring Puerto Rico regains access to capital markets.")

plans) were intended to operate for an extended period of time prior to any Title III proceedings—if, indeed, such proceedings ever needed to be filed.  The Oversight Board and the fiscal plans must ensure that any debt restructuring—in Title III or otherwise—restores fiscal discipline and respects creditor interests as PROMESA requires, so that Puerto Rico can return to the capital markets.

### C.    Section 303 Of PROMESA Preempts Unilateral Debt-Related Remedies

Having established federal guidelines for the restructuring of debts, PROMESA prevents the Commonwealth from implementing its own unilateral measures through legislative or executive action.   In addition to the general preemption provision contained in Section 4, Section 303 of PROMESA preempts unilateral actions by the Commonwealth that impede consensual negotiations or upset the balance of interests reflected in PROMESA.  Section 303(1) provides that "a territory law prescribing a method of composition of indebtedness or a moratorium law, . . . solely to the extent that it prohibits the payment of principal or interest . . . may not bind any creditor . . . that does not consent to the composition or moratorium."[37]  This provision largely tracks a similar prohibition in Chapter 9, 11 U.S.C. § 903(1), but includes an important difference—it adds the language barring moratorium laws.  This language was included to address the April 2016

---

[37] 48 U.S.C. § 2163(1).

Moratorium Law enacted by the Commonwealth, and preempts that law and any similar territorial laws that purport to adjust or postpone debt obligations.

Section 303(3) preempts "unlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory[.]" This provision was prompted by the Moratorium Orders and 2015 executive orders "clawing back" funds owed to territorial instrumentalities, and it preempts those executive orders and similar orders.[38]

Under PROMESA, Title III is the only form of nonconsensual debt restructuring available to the Commonwealth and its instrumentalities.  Section 303 preempts unilateral debt-related measures that would have interfered with voluntary resolution of debt repayment and PROMESA's mandates.

## II.  FISCAL PLANS, DESIGNED TO GOVERN PUERTO RICO FOR EXTENDED PERIODS OF TIME, ARE SUBJECT TO MANDATORY CREDITOR PROTECTIONS AND JUDICIAL REVIEW

The Oversight Board must approve a fiscal plan for all territorial entities that receive restructuring support under PROMESA.  The approved fiscal plan must satisfy mandatory requirements set forth in Section 201(b), 48 U.S.C. § 2141(b), including requirements that protect creditor rights.

---

[38] 48 U.S.C. § 2163(3).

A.   **Fiscal Plans Were Designed To Ensure Good Governance In The Commonwealth And Its Instrumentalities Regardless Of Whether Title III Proceedings Were Ever Initiated**

The fiscal plan serves as the "cornerstone for the structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards 'fiscal responsibility and access to capital markets.'"[39]   The Committee envisioned fiscal plans as governing documents that would "require Puerto Rico to balance its budgets, incorporate pro-growth reforms, and ensure legislative acts advance Puerto Rico towards the goal of fiscal responsibility and regaining access to the capital markets."[40]

Once a fiscal plan is in place for the Commonwealth or a territorial instrumentality, the entity must comply with it in its official acts.  Section 202, 48 U.S.C. § 2142, requires that territorial and instrumentality budgets be consistent with the fiscal plan.  Section 204, 48 U.S.C. § 2144, requires that all contracts, rules, regulations, and orders conform to the fiscal plan, and gives the Oversight Board extensive powers to ensure compliance.  And if the Commonwealth or an instrumentality enters a Title III case, Section 314(b)(7), 48 U.S.C. § 2174(b)(7), requires that the plan of adjustment by which the entity emerges from Title III must be consistent with the fiscal plan.  In short, the fiscal plan sets policy for the

---

[39] H.R. Rep. No. 114-602 at 45.

[40] Markup Memo at 3.

covered territory or territorial instrumentality at a sufficient level to ensure fiscal responsibility and restore access to capital markets.

As should be clear, the fiscal plan is not a mere blueprint for a plan of adjustment in a Title III case.  Rather, the fiscal plan is a negotiated document with economic and governmental consequences to which all budgets, laws, contracts, rules, regulations, and executive orders must conform for the duration of the Oversight Board's mandate—in Title III or outside of it.

### B.    Section 201(b) Contains Mandatory Requirements That All Fiscal Plans Must Meet, Including Protections For Creditors

Fiscal plans are the most important tool PROMESA created to promote fiscal responsibility and access to capital markets in Puerto Rico.  Accordingly, Congress imposed requirements on the development of the plans in Section 201(b) of PROMESA to further these objectives.  The requirements of Section 201(b) are not optional.  A fiscal plan "shall" include each of the delineated items.[41]  If the Title III court finds the approved fiscal plan fails to comply with the requirements of Section 201(b), then the court should direct the Oversight Board to revise such plan accordingly.

Section 201(b) was modified during the legislative process to ensure the lawful priorities and liens held by creditors would be respected.   The initial

---

[41] 48 U.S.C. § 2141(b).

introduced version of PROMESA, HR 4900, was silent on the hierarchy of creditor rights in respect to fiscal plans.[42]   Responding to concerns expressed by Committee members and the creditor community, the Committee wrote in two new provisions in the reintroduced version of PROMESA, H.R. 5278, which required fiscal plans to: 1) prohibit the unlawful transfer of assets, funds, or resources between instrumentalities, and 2) "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality."[43]   These provisions were included to "ensure fiscal plans keep intact the structural hierarchy of prioritized debt."[44]

These additions to Section 201(b), which were included in the final legislation, prevent the Oversight Board from altering or impairing lawful liens and priorities held by creditors when developing fiscal plans. Congress intended for fiscal plans to govern the Commonwealth and its instrumentalities for an extended period of time, and to apply mostly outside of Title III proceedings, so these creditor protections and other Section 201(b) requirements are not limited to Title III cases.

---

[42] *See* H.R. 4900, 114th Cong. § 201(b) (2016).

[43] *See* H.R. 5278, 114th Cong. § 201(b) (2016).

[44] Markup Memo at 3.

III. **TO ENSURE FUTURE ACCESS TO CAPITAL MARKETS, THE TITLE III PROCESS WAS INTENDED TO PROTECT CREDITOR RIGHTS AND ENSURE AN EQUITABLE RESULT**

As noted, PROMESA prioritizes consensual resolutions over nonconsensual restructuring under Title III. The Committee drafted Title III of PROMESA to give the Oversight Board recourse to a Chapter 9-like bankruptcy process only if absolutely necessary. Here too, however, the Committee was concerned about the potentially inequitable treatment of creditors. The Committee intended PROMESA to ensure, among other things, that any debt restructuring would remain fair to creditors and that creditor rights would be protected at all stages of a Title III case. Again, the reinforcement of these protections is necessary to allow Puerto Rico and other territorial entities covered by PROMESA future access to the capital markets.

A. **PROMESA Contains Creditor Protections That Operate During The Pendency Of A Title III Proceeding**

This brief has already discussed the necessary statutory protections for creditors and other stakeholders before a Title III case is filed, including gating obligations in Section 206 and Section 201(b)'s requirements for a fiscal plan. PROMESA provides still more protections within Title III proceedings.

First, PROMESA incorporates 11 U.S.C. §§ 922 and 928, the "special

revenue" provisions from Chapter 9 of the Bankruptcy Code.[45]  Because government entities typically cannot mortgage their assets to creditors, they instead offer revenue bonds—liens on ongoing streams of revenues like taxes, tolls, or fees.  Several territorial instrumentalities in Puerto Rico, including the Highway & Transportation Authority (HTA) and the Puerto Rico Electric Power Authority (PREPA) have significant outstanding revenue bond debt.  This debt is "non-recourse," meaning that creditors cannot collect from any source other than the pledged revenues.  Taken together, the special revenue provisions ensure that creditors' liens on special revenues streams are not interrupted by the filing of a Title III case, exempting their claims from the automatic stay.

Second, PROMESA incorporates 11 U.S.C. § 362(d), which permits the Title III court to lift the automatic stay to enable creditors to pursue remedies in other courts where necessary.[46]  In particular, Section 362(d) *requires* the Title III court to lift the stay if secured creditors' collateral is not adequately protected.  Like the special revenue provisions, Section 362(d) provides relief to creditors during a Title III case, before a plan of adjustment has been proposed or confirmed.

---

[45] 48 U.S.C. § 2161(a).

[46] 48 U.S.C. § 2161(a).

### B.     PROMESA Requires The Plan Of Adjustment To Protect Creditor Rights

Once a Title III case proceeds to plan confirmation, PROMESA provides additional protections not found in Chapter 9 of the Bankruptcy Code.  Upon the introduction of the first draft of PROMESA, the Committee heard testimony that Chapter 9 proceedings throughout the country had failed to respect creditor rights despite Chapter 9's intent[47]—a failure that had been recognized by at least one member of the Oversight Board.[48]

To ensure that these failures would not be repeated in Puerto Rico, the Committee included two key creditor protections at the plan confirmation stage of every Title III proceeding.  First, the Court cannot confirm a plan of adjustment unless it is "consistent with the applicable Fiscal Plan certified by the Oversight Board under title II."[49]  By requiring the plan of adjustment to conform to the fiscal plan, PROMESA mandates that the plan of adjustment "respects the relative lawful priorities or lawful liens" of creditors.[50]

---

[47] *Hearing To Consider A Bill For The Puerto Rico Oversight, Management, and Economic Stabilization Act (PROMESA): Hearing Before H. Comm. on Nat. Res.*, 114th Cong. (Apr. 13, 2016) (testimony of Susheel Kirpalani, Chairperson of the Bankruptcy and Restructuring Group, Quinn Emanuel Urquhart & Sullivan, LLP), https://naturalresources.house.gov/uploadedfiles/testimony_mr._kirpalani.pdf.

[48] *See* David Skeel, *Fixing Puerto Rico's Debt Mess*, Wall St. J. (Jan. 5, 2016), https://www.wsj.com/articles/fixing-puerto-ricos-debt-mess-1452040144.

[49] 48 U.S.C. § 2174(b)(7).

[50] *See* 48 U.S.C. § 2141(b)(1)(N).

Second, Section 314(b)(6) requires that any plan be "in the best interests of creditors," in light of the recovery creditors could reach through "available remedies under the non-bankruptcy laws and constitution of the territory."[51]  Together these provisions ensure that the Title III process protects creditors' rights and definitively precludes the confirmation of a plan that would result in an adverse result for creditors and hinder Puerto Rico's return to the capital markets.

PROMESA should be interpreted as a comprehensive statutory process designed to restore fiscal responsibility and access to capital markets for Puerto Rico.  These provisions ensure that creditor rights are protected at all stages of the PROMESA process, from the initial Section 405 stay, 48 U.S.C. § 2194, through a period of voluntary negotiation, to the filing of a Title III case, its pendency, and confirmation of a plan of adjustment.  The ongoing fair treatment of creditors embodied in these statutory sections is essential to achieving the underlying purposes of PROMESA.

## **CONCLUSION**

For all of the foregoing reasons, Representative Bishop requests that all parties and the Court respect the letter and intent of PROMESA.

---

[51] 48 U.S.C. § 2174(b)(6).

June 29, 2018                            Respectfully Submitted,

/s Bruce R. Zirinsky
Bruce R. Zirinsky
Zirinsky Law Partners PLLC
375 Park Avenue
Suite 2607
New York, NY 10152
Phone: (212) 763-0192
bzirinsky@zirinskylaw.com

*Counsel for Amicus Curiae*
*Representative Rob Bishop*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,228 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Bruce R. Zirinsky

Bruce R. Zirinsky

- 26 -