UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY ("HTA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |

**DECLARATION OF ATARA MILLER IN SUPPORT OF MOVANTS'
CONSOLIDATED SUPPLEMENTAL BRIEF REGARDING
<u>REVENUE BOND LIFT STAY MOTIONS</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Atara Miller, hereby declare, pursuant to 28 U.S.C. § 1746:

1. I am a member of the law firm Milbank LLP, counsel to Ambac in the above-captioned proceedings ("Proceedings"). I am admitted *pro hac vice* to practice before this Court in the Proceedings.[2]

2. I submit this declaration in support of *Movants' Consolidated Supplemental Brief Regarding Revenue Bond Lift Stay Motions* (the "Supplemental Brief").

3. The purpose of this declaration is to put certain relevant exhibits before the Court, and additionally to briefly summarize certain basic facts that support CCDA Movants' contentions that (i) the Commonwealth lacks equity in the Transfer Account Monies, and (ii) CCDA Movants' interest in the Transfer Account Monies is not adequately protected.

I. **DISCOVERY AND AN EVIDENTIARY HEARING ARE NEEDED TO THE EXTENT THAT THE COURT'S RESOLUTION OF THE CCDA LIFT STAY MOTION TURNS ON A PRECISE CALCULATION OF THE AMOUNT OF CCDA MOVANTS' LIEN.**

4. As set forth below, CCDA Movants contend that the existing factual record, while limited, is sufficient to show that the Commonwealth lacks equity in the Transfer Account Monies and that CCDA Movants' interest therein is not adequately protected. CCDA Movants interpret the Court's *Order Scheduling Further Proceedings in Connection With the Revenue Bond Stay Relief Motions* (Case No. 17 BK 3283-LTS, ECF No. 13607 (the "Supplemental Briefing Order")), as indicating that the Court expects to be able to resolve the remaining issues in the CCDA Lift Stay Motion as a matter of law.

5. To the extent that the Court determines that resolution of the CCDA Lift Stay Motion turns on factual issues and that the *prima facie* factual showing made below is insufficient to permit the Court to grant the CCDA Lift Stay Motion, CCDA Movants would respectfully renew

---

[2] Capitalized terms not defined herein have the meanings given to them in the Supplemental Brief.

- 2 -

their request for discovery into these issues in advance of any evidentiary hearing at which the relevant facts could be presented. After the Court's Preliminary Hearing Ruling (*Opinion and Order in Connection With Preliminary Hearing Regarding Motion Concerning Application of the Automatic Stay to the Revenues Securing the CCDA Bonds*, Case No. 17 BK 3283-LTS, ECF No. 13540 (the "Preliminary Hearing Order")), which directed the parties "to meet and confer and file a joint report as to their positions on the nature, scope, and scheduling of further proceedings in connection with the CCDA Stay Relief Motion" (Preliminary Hearing Order at 41), CCDA Movants requested an opportunity to seek discovery into issues such as the Commonwealth's equity in the property and adequate protection—and proposed that the parties then meet-and-confer on a schedule for substantively briefing the issues.[3] CCDA Movants, together with HTA Movants and PRIFA Movants, proposed to address certain other claims barred by PROMESA § 305 on an expedited schedule limited to briefing of legal issues.

6. The Court did not grant CCDA Movants' request for discovery and a meet-and-confer on a schedule, but instead directed that issues regarding the Transfer Account Monies be briefed along with the legal issues relating to PROMESA § 305. (*See* Supplemental Briefing Order.) CCDA Movants understand that the Court expects to be able to resolve the remaining issues affecting the CCDA Lift Stay Motion expeditiously, an objective that CCDA Movants share, but CCDA Movants wish to make clear that the factual record as it currently stands does not permit a precise or complete calculation of the value of CCDA Movants' property interest without additional discovery.

---

[3] *Joint Status Report With Respect to Further Proceedings Regarding the Revenue Bond Stay Relief Motions*, Case No. 17 BK 3283-LTS, ECF No. 13601 at 5-6 ("Addressing these issues [of equity and adequate protection] will require additional discovery . . . . CCDA Movants propose that the Parties be directed to meet-and-confer concerning a discovery plan and schedule, and present a joint report to the Court[.]").

7. The value of CCDA Movants' property interest could be affected by, among other factors, amounts required to be calculated under section 3 of the Assignment Agreement. CCDA Movants have not obtained in discovery sufficient information that would enable them to calculate all of the amounts under section 3 of the Assignment Agreement.

8. Although CCDA Movants have obtained some discovery in connection with the CCDA Stay Motion, the discovery was limited by Court order to certain specific factual assertions contained in three paragraphs of FOMB's Stay Opposition.[4] The paragraphs at issue did not relate to precise calculation of the valuation of the lien, whether it is adequately protected, or the Commonwealth's equity therein.

9. The CCDA Movants have endeavored to set out certain basic facts that establish a *minimum* value of their lien on the Transfer Account Monies, as set forth below, and to show that even that minimum value is not adequately protected (and that the Commonwealth has no equity in the Transfer Account Monies). But to the extent that the Court determines that factual issues concerning the value of the lien, adequate protection, or equity need to be resolved before the Court can make a final determination on the CCDA Stay Motion, the CCDA Movants respectfully would request discovery in advance of an evidentiary hearing at which the relevant facts would be presented.[5]

---

[4] *See Order Granting Urgent Motion to Adjourn Hearing on Motions for Relief from the Automatic Stay and Extend Deadlines for Replies in Support of Motions for Relief from the Automatic Stay*, Case No. 17 BK 3283-LTS, ECF No. 11057.

[5] CCDA Movants also note that they respectfully disagree with the Court's conclusion that they have a colorable claim only to the Transfer Account Monies. The discussion of Movants' lien on the Transfer Account Monies herein is without prejudice to Movants' contentions, set out in the CCDA Lift Stay Motion, that they have broader rights.

II. **THE COMMONWEALTH LACKS EQUITY IN THE TRANSFER ACCOUNT MONIES, AND CCDA MOVANTS' INTEREST THEREIN IS NOT ADEQUATELY PROTECTED.**

a. **The Value of Movants' Property Interest in the Transfer Account Monies Is, at a Minimum, More Than $139 Million.**

10. Section 3 of the Assignment Agreement defines the amount of Required Payments, which the Tourism Company is required to deposit into the Transfer Account from the incoming Hotel Taxes.

11. A GDB certificate showing the amount of Required Payments for the 2014-2015 and 2015-2016 fiscal years was produced; the Required Payments amount was $3,033,000 per month for the first ten months of the fiscal year, for total Required Payments of $30.3 million in each fiscal year. *See Hughes Decl.* (ECF No. 13007), Ex. 37, CCDA_STAY0004297 at CCDA_STAY0004305 [GDB Certificate for fiscal year 2014-2015]; Ex. 53, CCDA_STAY0004231 at CCDA_STAY0004238 [GDB Certificate for fiscal year 2015-2016].[6]

12. The discovery record indicates that the Required Payments were made until November 2015, after which time the flow of funds changed. Accordingly, in the 2015-2016 fiscal year, $15.165 million (five of the ten Required Payments) were made in accordance with the pre-default flow of funds, with the funds reaching the Bond Payment Fund (the "BONY -6334" account). *See* Ex. 54 [BONY0000000059]. Documents produced in discovery indicate that an additional $15.165 million in Required Payments did not reach the BONY -6334 account in the 2015-2016 Fiscal Year.

13. CCDA Movants expect that discovery would show that the Required Payments for the 2016-2017, 2017-2018, 2018-2019, and 2019-2020 fiscal years were, *at a minimum*, at least as

---

[6] These documents, and others referenced herein, are covered by the authenticity and admissibility stipulation previously submitted as Exhibit 20 to the *Hughes Declaration*, ECF No. 13007 ("Hughes Decl.").

- 5 -

much as the Required Payments in the 2014-2015 and 2015-2016 fiscal years, and that the Required Payments were not made in those fiscal years in accordance with the Bond Documents.

14. Accordingly, the total Required Payments for these four fiscal years (2016-2017 through 2019-2020) was, at a minimum, $121.32 million. Additionally, at least an additional $3,033,000 in Required Payments would be due for July 2020. Accordingly, from the time period from December 2015 through July 2020, the Required Payments that are currently due and owing but which have not flowed in accordance with the Bond Documents is, at a minimum, $139.518 million.

15. At my direction, calculations of the missed principal and interest payments on the CCDA bonds were performed. The amount of payments currently due and owing to bondholders that have not been made is more than $110 million.

16. CCDA Movants note that the actual Required Payments are significantly higher than the amounts listed above in Paragraph 14. The failure of the Tourism Company and GDB to transfer funds as required under the Bond Documents, starting in December 2015, resulted in deficiencies that would increase the Required Payments in subsequent fiscal years. Additionally, CCDA Movants' interest in the Transfer Account Monies significantly exceeds the amount set forth in Paragraph 15 for several reasons; among others, the Assignment Agreement requires the Tourism Company to transfer amounts sufficient "to replenish the Debt Service Reserve Fund," and CCDA Movants' lien thus extends beyond the amount immediately required for debt service. CCDA Movants provide the basic calculation set forth above, consistent with the limited purposes for which this information is submitted, to show the *minimum* value of Movants' property interest in the Transfer Account Monies.

17. Bank account statements produced in discovery for the Scotiabank/Oriental -5142 Account list the total "Deposits" for each month under the "Account Summary[.]" *See, e.g.*, Ex. 55, CCDA_STAY0006241-6245. For the following fiscal years, the statements reflect total deposits or credits into the Scotiabank/Oriental Account -5142 in at least the following amounts:

    i. In the 2016-2017 fiscal year, the gross deposits into the Scotiabank/Oriental -5142 account were at least $69 million.

    ii. In the 2017-2018 fiscal year, the gross deposits into the Scotiabank/Oriental -5142 account were at least $75 million.

    iii. In the 2018-2019 fiscal year, the gross deposits into the Scotiabank/Oriental -5142 account were at least $73 million.

    iv. In the 2019-2020 fiscal year, the gross deposits into the Scotiabank/Oriental -5142 account were at least $47 million, as of February 2020. Movants have not obtained in discovery a complete set of account statements for the 2019-2020 fiscal year.

    b. **Funds in the Transfer Account.**

18. As of January 31, 2020—the most recent date for which bank account statements were provided—the Scotiabank/Oriental -5142 account contained $6,042,656.65. *See* Ex. 55, CCDA_STAY0006241-6245.

19. As of January 31, 2020—the most recent date for which bank account statements were provided—the FirstBank -3961 account contained $94,207,853.07. *See* Ex. 56, CCDA_STAY0001070-1071.

20. The value of the funds held in the Scotiabank/Oriental -5142 account and the FirstBank -3961 account combined is $112.4 million. This amount is *far* less than the total unpaid principal on the CCDA bonds of $335.6 million, which does not include interest.

### III. FACTS RELATED TO ARTICLE VI, SECTION 8

21. As with the value of the lien, CCDA Movants require additional discovery to comprehensively address Article VI, Section 8, but include a few basic facts to illustrate that this provision was not triggered in the fiscal years at issue.

22. In the relevant fiscal years for which information is available, the Commonwealth's TSA state collection inflows included *at least* the following, among many other available resources:

    i. In 2017-2018, the TSA state collection inflows totaled $11.6 billion, according to AAFAF's Department of Treasury Single Account Cash Flow Report, as of June 29, 2018, *available at* https://www.aafaf.pr.gov/wp-content/uploads/fy19-weeklytsacashflow-06-28-19.pdf.

    ii. In 2018-2019, the TSA state collection inflows totaled $13.7 billion, according to AAFAF's Department of Treasury Single Account Cash Flow Report, as of June 28, 2019, *available at* https://www.aafaf.pr.gov/wp-content/uploads/fy19-weeklytsacashflow-06-28-19.pdf.

    iii. In 2019-2020, the TSA state collection inflows totaled $10.6 billion, according to AAFAF's Department of Treasury Single Account Cash Flow Report, as of June 26, 2020, *available at* https://www.aafaf.pr.gov/wp-content/uploads/fy20-weeklytsacashflow-6-26-20.pdf.

23. In the relevant fiscal years for which information is available, the Commonwealth's general fund appropriations were as follows:

      i.      In 2017-2018, general fund appropriations totaled $9.6 billion. *See Hughes Decl.* (ECF No. 13007), Ex. 14 (FOMB FY18 Budget).

      ii.      In 2018-2019, general fund appropriations totaled $8.8 billion. *See Hughes Decl.* (ECF No. 13007), Ex. 15 (Press Release: Oversight Board Submits FY19 Commonwealth Complaint Budget Certified by Unanimous Written Consent).

      i.      In 2019-2020, general fund appropriations totaled $9.1 billion. *See Hughes Decl.* (ECF No. 13007), Ex. 16 (FY20 Certified Budget for the Commonwealth of Puerto Rico).

24. The Commonwealth has not included GO debt service in its appropriations for the relevant fiscal years. In the relevant fiscal years, the amount of GO debt service was $1.1 billion per year. *See Hughes Decl.* (ECF No. 13007), Ex. 14 (FOMB FY18 Budget).

25. CCDA Movants prepared the charts attached as Exhibit 57 and 58 hereto, to summarize the above information. As shown herein, TSA state collection inflows exceed the sum of general fund appropriations and GO debt service in each fiscal year from the 2017-2018 fiscal year through the 2019-2020 fiscal year.

26. No Hotel Taxes were applied to GO debt service in the 2016-2017, 2017-2018, 2018-2019, and the 2019-2020 fiscal years. *See* CCDA Lift Stay Reply, Ex. 38 (April 14, 2020 McKeen Letter).[7]

27. Because of gaps in the discovery record, it is not possible to comprehensively address Article VI, Section 8 for any fiscal year, and the existing factual record is particularly

---

[7] The government has contended that Hotel Taxes were applied to GO debt service during a short period, from December 2015 to March 2016. *See Hughes Decl.* (ECF No. 13007), Ex. 38 (April 14, 2020 McKeen Letter). This contention is disputed and would need to be addressed with other factual issues if the Court determines it is material to the resolution of the CCDA Lift Stay Motion.

limited with respect to the 2015-2016 and 2016-2017 fiscal years. Additional discovery would be needed to obtain information comparable to that provided in Paragraphs 22 and 23 for the 2015-2016 and 2016-2017 fiscal years. Movants dispute that Article VI, Section 8 was validly triggered in any fiscal year. But even assuming *arguendo* that Article VI, Section 8 had been triggered in the 2015-2016 and 2016-2017 fiscal years, CCDA Movants contend that would not reduce the value of their lien, because the Required Payments under section 3 of the Assignment Agreement would increase in subsequent years to include "any amounts due in connection with prior payments for which there were insufficient funds."

## IV. OTHER EXHIBITS ATTACHED TO THE SUPPLEMENTAL BRIEF

28. Attached hereto as Exhibit 59 is a true and correct copy of Ambac's *Adversary Complaint* in Case No. 17 BK 3283-LTS, No. 17 BK-3567-LTS, 17-159-LTS, ECF No. 1.

29. Attached hereto as Exhibit 60 is a true and correct copy of Assured's *Adversary Complaint* in Case No. 17 BK 3283-LTS, 18-59-LTS, ECF No. 1.

30. Attached hereto as Exhibit 61 is a true and correct copy of *Defendant Financial Guaranty Insurance Company Answer, Counterclaim, and Third-Party Claim to Complaint Pursuant to Bankruptcy Rules 3007 and 7001 Objecting to and Challenging Validity, Enforceability, and Extent of Prepetition Security Interests and Seeking Other Relief* in Case No. 17 BK 3283-LTS, 19-363-LTS, ECF No. 4.

## V. REDACTIONS

31. Pursuant to paragraph 2 of the *Amended Joint Standing Order on Sealing and Redacting* (Case No. 17-03283-LTS, ECF No. 13630), certain exhibits submitted herein contain redactions in compliance with Rule 9037, and in some cases of ink signatures. Because the ink signatures are immaterial to the purpose for which the exhibit is cited, Defendants are not seeking

- 11 -

to submit unredacted versions of the exhibits under seal unless the Court would like to review unredacted versions.

 I declare, under penalty of perjury, that the foregoing statements are true and correct.

Executed: New York, New York
     July 20, 2020

             /s/ *Atara Miller*