# **<u>EXHIBIT 60</u>**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| ASSURED GUARANTY CORP.; ASSURED GUARANTY MUNICIPAL CORP.; and FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; HON. RICARDO ANTONIO ROSSELLÓ NEVARES; GERARDO PORTELA FRANCO; and HON. RAÚL MALDONADO GAUTIER,<br><br>Defendants. | Adversary Proceeding<br><br>No. 18-_____-LTS |

## ADVERSARY COMPLAINT

Plaintiffs Assured Guaranty Corp. ("AGC") and Assured Guaranty Municipal

Corp., f/k/a Financial Security Assurance Inc. ("AGM" and, together with AGC, "Assured"), by

---

[1]    The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

Case:17-03283-LTS Doc#:13744-9 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc:
Miller Declaration Ex. 60 Complaint 1 Page 3 of 102

Case:18-00059-LTS Doc#:11 Filed:05/29/18 Entered:05/29/18 21:31:16 Desc: Main
Document Page 2 of 101

their attorneys Casellas Alcover & Burgos P.S.C. and Cadwalader, Wickersham & Taft LLP; and Plaintiff Financial Guaranty Insurance Company ("FGIC", and together with Assured, "Plaintiffs"), by its attorneys Rexach & Picó, CSP and Butler Snow LLP, for their Adversary Complaint against defendants the Commonwealth of Puerto Rico; the Financial Oversight and Management Board for Puerto Rico; the Puerto Rico Fiscal Agency and Financial Advisory Authority; Hon. Ricardo Rosselló Nevares; Gerardo Portela Franco; and Hon. Raúl Maldonado Gautier, allege as follows:

## NATURE OF THIS ADVERSARY PROCEEDING

1.      The Financial Oversight and Management Board ("FOMB") developed and approved a revised fiscal plan (attached hereto as "Exhibit 1", and including any revisions thereto, or any similar superseding fiscal plan, the "Revised Fiscal Plan") that, on its face, violates the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") and the United States Constitution (the "U.S. Constitution"). The violations include (i) failure to respect the relative lawful priorities and lawful liens, in effect prior to the enactment of PROMESA, established by the constitution, laws, and agreements of the Commonwealth, as required by PROMESA § 201(b)(1)(N); (ii) failure to ensure that assets, funds, or resources of an agency are not transferred to or otherwise used for the benefit of other agencies, instrumentalities, or the Commonwealth, as required by PROMESA § 201(b)(1)(M); (iii) failure to identify expenses for essential public services, as required by PROMESA § 201(b)(1)(B); (iv) violations of Sections 303 and 407 of PROMESA and section 928 of the Bankruptcy Code; and (v) violations of the Contracts, Takings, and Due Process Clauses of the U.S. Constitution. Because of these clear violations, the Revised Fiscal Plan is unlawful and unconstitutional and cannot provide the basis for a plan of adjustment under Title III of PROMESA. Any plan of

adjustment that follows the Revised Fiscal Plan, as required by PROMESA § 314, would not be confirmable, on its face.

2. Accordingly, Plaintiffs seek a judgment declaring that the Revised Fiscal Plan is unlawful and unconstitutional, and declaring that FOMB cannot use the Revised Fiscal Plan as the basis for proposing a plan of adjustment in the pending Title III case for the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"). To the extent necessary, the Court should grant complementary injunctive relief. Plaintiffs are entitled to immediate review of their claims at this juncture, and such review is necessary to prevent the ongoing violations of PROMESA and the U.S. Constitution.

3. Plaintiffs issued insurance policies that guarantee payments on general obligation bonds ("<u>GO Bonds</u>") issued by the Commonwealth. As "public debt," the GO Bonds are entitled to a first-priority payment status under the constitution of the Commonwealth (the "<u>Commonwealth Constitution</u>") and related statutes and are entitled to payment before all other obligations payable from the Commonwealth's general revenues.

4. Plaintiffs also insure bonds issued by the Puerto Rico Highways and Transportation Authority ("<u>PRHTA</u>"), the Puerto Rico Convention Center District Authority ("<u>PRCCDA</u>"), and the Puerto Rico Infrastructure Financing Authority ("<u>PRIFA</u>", and together with PRHTA and PRCCDA, the "<u>Authorities</u>"). The bonds issued by the Authorities (the "<u>Authority Bonds</u>") are secured by enforceable, perfected liens on pledged special revenues.

5. Beginning under the administration of former Governor García Padilla, and continuing under the current administration of Governor Rosselló, the Commonwealth and the Authorities have engaged in a pattern of unlawfully evading the payment of their debts, in the process impairing Plaintiffs' contractual rights and invading Plaintiffs' property interests in the pledged special revenues.

6.     This long-standing pattern of unlawful and unconstitutional conduct began no later than in November 2015, when then-Governor García Padilla issued Administrative Bulletin No. EO-2015-46 (the "Clawback Order" (attached hereto as "Exhibit 2A" and English translation attached hereto as "Exhibit 2B")), which unconstitutionally modified the priorities of the GO and Authority Bonds and confiscated the pledged special revenues.

7.     The Commonwealth's pattern of unlawful and unconstitutional conduct continued in 2016, 2017, and 2018, when the Commonwealth enacted a series of moratorium laws (collectively, and including any similar or superseding moratorium law, the "Moratorium Laws") and issued related moratorium orders (collectively, and including any similar or superseding executive orders, the "Moratorium Orders") that purported to authorize the Governor to override the GO Bond priority and the Authorities' special revenue pledges, and to confiscate the pledged special revenues for the Commonwealth's general purposes.

8.     Following the appointment of FOMB in August 2016, Governor Rosselló's administration worked with FOMB to perpetuate the Commonwealth's illegal and unconstitutional modifications of debt priorities and diversions of pledged special revenues (i) through the development and approval of an initial fiscal plan for the Commonwealth that was approved by FOMB on March 13, 2017 (as amended, the "Original Fiscal Plan" (attached hereto as "Exhibit 3"), and together with the Revised Fiscal Plan, the "Fiscal Plans"), and (ii) through the enactment of a "Fiscal Plan Compliance Law" (Act No. 26-2017, including as amended or superseded, the "Compliance Law" (attached hereto as "Exhibit 4A" and English translation attached hereto as "Exhibit 4B")) that further implements and perpetuates the violations of constitutional and statutory priorities, contract impairments, and illegal confiscations of property mandated by the Original Fiscal Plan.  The Original Fiscal Plan and the Compliance Law, on their face, violated numerous provisions of PROMESA, including, particularly, (i) PROMESA

§ 201(b)(1)(N), which requires a fiscal plan to "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of [PROMESA];" (ii) PROMESA § 201(b)(1)(M), which requires a fiscal plan to "ensure that assets, funds, or resources of a territorial instrumentality [such as the Authorities] are not . . . transferred to, or otherwise used for the benefit of a covered territory [such as the Commonwealth];" and (iii) PROMESA § 201(b)(1)(B), which requires a fiscal plan to "ensure the funding of essential public services." FOMB lacked authority under PROMESA to approve a fiscal plan that, on its face, failed to make any attempt to comply with these and other applicable provisions of PROMESA.

9.     In response to Hurricanes Irma and Maria in September 2017, FOMB and the Commonwealth decided to revise the Original Fiscal Plan.  This revision process gave FOMB and the Commonwealth an opportunity to cease their unlawful conduct and to start complying with their obligations under PROMESA, the U.S. Constitution, and Commonwealth law.  Unfortunately, however, the Revised Fiscal Plan approved by FOMB on April 19, 2018 instead exacerbated the unlawful nature of the Original Fiscal Plan, including through violations of PROMESA § 201(b)(1)(N), PROMESA § 201(b)(1)(M), PROMESA § 201(b)(1)(B), and other key provisions of PROMESA.  Because the Revised Fiscal Plan is not "in accordance" with these and other applicable provisions of PROMESA, the Revised Fiscal Plan does not qualify as a "Fiscal Plan" as defined in PROMESA.  Furthermore, because the Revised Fiscal Plan, on its face, violates these and other applicable provisions of PROMESA, FOMB acted outside of its authority when it purported to approve the Revised Fiscal Plan.

10.     Whether undertaken pursuant to the Clawback Order, the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, or the Compliance Law, the Commonwealth's and FOMB's unlawful modifications of debt priorities and diversions of secured bondholder

collateral have one thing in common: Each violates the Contracts, Takings, and Due Process clauses of the U.S. and Commonwealth Constitutions, along with PROMESA and numerous other provisions of federal and Commonwealth law.

11.     Plaintiffs therefore seek a declaration that the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law violate the U.S. Constitution, are preempted by or otherwise invalid under PROMESA, and cannot be used as the basis for a Title III plan of adjustment.

## **THE PARTIES**

12.     Plaintiff Assured Guaranty Corp. or AGC is a Maryland insurance company with its principal place of business at 1633 Broadway, New York, New York 10019.

13.     Plaintiff Assured Guaranty Municipal Corp. or AGM is a New York insurance company with its principal place of business at 1633 Broadway, New York, New York 10019.

14.     Plaintiff FGIC is a New York stock insurance corporation with its principal place of business at 463 Seventh Avenue, 16th Floor, New York, New York 10018.

15.     Defendant the Commonwealth of Puerto Rico or the Commonwealth is a territory of the United States.

16.     Defendant the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") is a public corporation organized under the laws of the Commonwealth.

17.     Defendant FOMB was created under Section 101(c)(1) of PROMESA as an "entity within the [Commonwealth] government." PROMESA § 101(c)(1).

18.     Defendant Hon. Ricardo Rosselló Nevares ("<u>Governor Rosselló</u>" or the "<u>Governor</u>") is the Governor of the Commonwealth.  Plaintiffs sue the Governor, and any successors thereto, in his official capacity.

19.     Defendant Gerardo Portela Franco (the "<u>AAFAF Executive Director</u>") is the Executive Director of AAFAF and in that capacity is empowered to implement the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law. Plaintiffs sue the AAFAF Executive Director, and any successors thereto, in his official capacity.

20.     Defendant Hon. Raúl Maldonado Gautier (the "<u>Secretary of Treasury</u>") is the Secretary of Treasury of the Commonwealth and in that capacity is empowered to implement the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law.  Plaintiffs sue the Secretary of Treasury, and any successors thereto, in his official capacity.

## <u>JURISDICTION AND VENUE</u>

21.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under PROMESA and the U.S. Constitution.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.   In addition, this Court has jurisdiction under Section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against [FOMB], and any action otherwise arising out of [PROMESA], in whole or in part."  PROMESA § 106(a).  Further, this Court has jurisdiction under Section 306(a) of PROMESA, which grants this Court original and exclusive jurisdiction of all cases under Title III of PROMESA and original jurisdiction of all civil proceedings arising under Title III of PROMESA or arising in or related to cases under Title III of PROMESA.

22.    This Court has personal jurisdiction over all of the Defendants pursuant to Section 306(c) of PROMESA.

23.    Plaintiffs seek a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.  An actual and justiciable controversy has arisen and exists between the parties with respect to the issues and claims alleged herein.

24.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "[t]he Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]."  PROMESA § 310; Fed. R. Bankr. P. 7001.

25.    Venue is proper in this District under Section 307 of PROMESA.

## LEGAL AND FACTUAL BACKGROUND

### I.    Plaintiffs Insure Bonds Issued By Puerto Rico And Its Instrumentalities

26.    Plaintiffs are leading providers of financial guaranty insurance, which is a type of insurance whereby an insurer guarantees scheduled payments of interest and principal as and when due on a bond or other obligation.  Plaintiffs insure scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world.

27.    Governments, including the Commonwealth and its public corporations, historically have taken advantage of financial guaranty insurance because it significantly enhances their ability to raise funds at a lower interest rate.  The economic value of financial guaranty insurance to the issuers is a savings in interest costs, reflecting the difference in yield payable on the higher rated insured obligation from that on the same lower rated obligation if uninsured.  Such insurance is especially important to issuers such as the Commonwealth and its

public corporations, who have—and will continue to have—significant borrowing needs, notwithstanding their lower credit rating.

28.     Plaintiffs have standing to bring this adversary proceeding as parties in interest in these Title III cases, and because under their insurance agreements and/or insurance policies, Plaintiffs are deemed to be the sole owners of the bonds that they insure for purposes of, or otherwise have control rights over, consents and other bondholder actions, including exercising rights and remedies.  Plaintiffs are also generally express third party beneficiaries of the resolutions, indentures, or trust agreements under which the bonds are issued.  As such, and as Section 301(c)(3)(B) of PROMESA expressly recognizes, financial guaranty insurers such as Plaintiffs are authorized to act on behalf of the holders of the bonds they insure, including in litigation generally, in these Title III cases, and in this adversary proceeding, and Plaintiffs' right to act on behalf of bondholders is not dependent upon a default or subrogation.  In addition, however, Plaintiffs have been subrogated to the rights of bondholders upon paying the claims of such bondholders following a default, as set forth below.  Payment by Plaintiffs neither satisfies nor discharges an issuer's obligation to pay and, to the extent Plaintiffs make payments to bondholders, Plaintiffs step into the shoes of such bondholders and effectively become the owners of their bonds.

29.     Plaintiffs insure the following types of Puerto Rico government debt at issue in this adversary proceeding:

**A.     <u>GO Bonds</u>**

30.     Assured insures approximately $1.4 billion of general obligation bonds ("<u>GO Bonds</u>") issued by the Commonwealth.  FGIC insures approximately $280 million in principal amount of GO Bonds issued by the Commonwealth.  Because of defaults resulting from the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law

with respect to principal and interest payments due on the GO Bonds on July 1, 2016; January 1, 2017; July 1, 2017; and January 1, 2018, Assured has paid approximately $405 million in aggregate claims by GO Bondholders, and FGIC has received claims totaling approximately $82 million and will process and make payments to GO Bondholders in respect of such claims in accordance with FGIC's plan of rehabilitation. Plaintiffs are now fully subrogated to the rights of the GO Bondholders for the claims they paid. In addition, Assured holds GO Bonds independently of its insurance policies.

### B. Authority Bonds

31. In addition to GO Bonds, Plaintiffs insure the Authority Bonds issued by the Authorities. The Authority Bonds are secured by statutory and perfected contractual liens on specific pledged special revenue streams (collectively, the "Pledged Special Revenues"). Each of the Authorities is a public corporation separate and distinct from the Commonwealth, and under the Authorities' respective enabling acts, the Commonwealth (prior to its diversion of their revenues) is not responsible for the Authorities' bond debts, just as the Authorities are not responsible for the general fund obligations of the Commonwealth. Specifically, Plaintiffs insure the following categories of Authority Bonds:

#### 1. PRHTA Bonds

32. PRHTA is a public corporation created by Act No. 74-1965 (the "PRHTA Enabling Act") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico. Pursuant to the PRHTA Enabling Act, PRHTA has issued certain bonds (the "PRHTA Bonds") under general bond resolutions (the "PRHTA Resolutions") adopted in 1968 and 1998.

33. Under the PRHTA Resolutions, the PRHTA Bonds are secured by a gross lien on special revenues, including (i) revenues derived from PRHTA's toll facilities (the

"Pledged Toll Revenues"); (ii) special excise taxes consisting of taxes on gasoline, diesel, crude oil, and other special excise taxes collected by the Commonwealth (the "PRHTA Pledged Tax Revenues"); and (iii) special excise taxes consisting of motor vehicle license fees collected by the Commonwealth (the "Vehicle Fees"; together with the PRHTA Pledged Tax Revenues, the "PRHTA Pledged Special Excise Taxes"; and together with the Pledged Toll Revenues and the PRHTA Pledged Tax Revenues, the "PRHTA Pledged Special Revenues"). Each PRHTA Resolution constitutes a contract between PRHTA and the holders (including Plaintiffs, the "PRHTA Bondholders") of the PRHTA Bonds. Each PRHTA Resolution also constitutes a "security agreement," including as defined in section 101(50) of title 11 (the "Bankruptcy Code") of the United States Code. 11 U.S.C. § 101(50). The liens on the PRHTA Pledged Special Revenues granted to the PRHTA Bondholders under the PRHTA Resolutions constitute "security interests," including as defined in section 101(51) of the Bankruptcy Code. 11 U.S.C. § 101(51).

34.    The Secretary of Treasury acts as a collection agent on behalf of the PRHTA Bondholders with respect to the PRHTA Pledged Special Excise Taxes. Upon collection, the Secretary of Treasury is required by statute to hold the PRHTA Pledged Special Excise Taxes in a segregated account for the benefit of PRHTA and its bondholders and to transfer the PRHTA Pledged Special Excise Taxes to the fiscal agent for the PRHTA Bonds (the "PRHTA Fiscal Agent") each month for the benefit of PRHTA Bondholders. From the time of their collection, the PRHTA Pledged Special Excise Taxes constitute trust funds that are property of the PRHTA Bondholders and not of the Commonwealth. See, e.g., 13 L.P.R.A. § 31751(a)(1); 9 L.P.R.A. §§ 2013(a)(2), 2021, 5681 (collectively, and including any related statutes, the "PRHTA Excise Tax Statutes"). Pursuant to the PRHTA Excise Tax Statutes, the PRHTA Pledged Special Excise Taxes may not be used for any purpose other than payment of

the PRHTA Bonds, and the PRHTA Excise Tax Statutes give rise to statutory liens in favor of Plaintiffs and other PRHTA Bondholders on the PRHTA Pledged Special Excise Taxes.  See 11 U.S.C. § 101(53).  The Commonwealth has explicitly acknowledged in legislation that the PRHTA Pledged Special Excise Taxes are imposed to finance highway, traffic, and transportation facilities and systems.

35.     The Pledged Toll Revenues likewise constitute trust funds collected and held by PRHTA on behalf of PRHTA Bondholders and are property of the PRHTA Bondholders and not of the Commonwealth.  See 9 L.P.R.A. § 2013(a)(2).

36.     At any time that the Commonwealth or PRHTA is in possession of PRHTA Pledged Special Revenues, the Commonwealth or PRHTA holds possession of such PRHTA Pledged Special Revenues for the PRHTA Bondholders' benefit, subject only to a valid "clawback," as defined below.[2]

37.     The PRHTA Bondholders' liens on the PRHTA Pledged Special Revenues are perfected, including by the filing of financing statements.

38.     The Commonwealth covenanted with the holders of the PRHTA Bonds in the PRHTA Enabling Act that it would "not limit or restrict the rights or powers . . . vested in [PRHTA by the PRHTA Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  9 L.P.R.A. § 2019.

---

[2]     As set forth in greater detail below, the Excise Tax Statutes grant Authority Bondholders first-priority liens on the Pledged Special Excise Taxes, subject only to the conditions that, in a fiscal year in which the Constitutional Debt Priority Provision is in effect, the Pledged Special Excise Taxes may be "clawed back" (i) to be used *solely* to pay the public debt, but (ii) *only if the public debt remains unpaid after a first application of all other available resources to the payment of public debt*.  These preconditions to a "clawback" of the Pledged Special Excise Taxes have never been satisfied, because the Commonwealth has at all relevant times had sufficient available resources to pay the public debt in accordance with the Constitutional Debt Priority Provision.

39.     PRHTA Bonds are non-recourse bonds, payable solely from the PRHTA
Pledged Special Revenues.  Moreover, because PRHTA Bonds are secured by a "gross lien" on
all of the PRHTA Pledged Special Revenues, operating expenses of PRHTA may only be paid
*after* PRHTA satisfies its debt service and reserve fund requirements with respect to PRHTA
Bonds.

40.     Assured insures approximately $1.4 billion of PRHTA Bonds currently
outstanding, and FGIC insures approximately $447 million of PRHTA Bonds currently
outstanding.  Under their insurance agreements and/or insurance policies, Plaintiffs are deemed
to be the sole owners of the PRHTA Bonds that they insure for purposes of, or otherwise have
control rights over, consents and other bondholder actions, including exercising rights and
remedies of PRHTA Bondholders.  Plaintiffs are also recognized as third-party beneficiaries
under the PRHTA Resolutions.  In addition, Assured holds PRHTA Bonds independently of its
insurance policies.

41.     But for the diversion of collateral securing the PRHTA Bonds pursuant to
the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law,
PRHTA would be solvent and could pay its debts in full.  Instead, the Moratorium Laws, the
Moratorium Orders, the Fiscal Plans, and the Compliance Law have caused defaults with respect
to debt service payments due on PRHTA Bonds on or around July 1, 2016; January 1, 2017; July
3, 2017; and January 1, 2018.  Assured has paid approximately $109 million in aggregate claims
by PRHTA Bondholders, and FGIC has received claims totaling approximately $38 million and
will process and make payments to PRHTA Bondholders in respect of such claims in accordance
with FGIC's plan of rehabilitation.  Plaintiffs are now fully subrogated to the rights of PRHTA
Bondholders for the claims they paid.  Unless and until Defendants begin complying with

PROMESA and the U.S. Constitution, these payment defaults will continue, and Plaintiffs will pay additional claims.

42.     In addition to its indebtedness on account of PRHTA Bonds, PRHTA is indebted to the Government Development Bank for Puerto Rico (the "GDB") with respect to certain lines of credit (the "Subordinated GDB Lines of Credit") whose repayment is subordinated to the repayment of PRHTA Bonds.  For example, the 2010 official statement for the PRHTA Bonds states that "[PRHTA] has financed some of its recent capital expenditures and working capital requirements with Government Development Bank lines of credit, **the repayment of which is subordinate to the [PRHTA Bonds].**"  Highway Revenue Refunding Bonds  Offering  Official  Statement  at  32  (June  17,  2010),  http://www.gdb-pur.com/investors_resources/documents/PRHighwayaFIN_000.pdf (emphasis added).

### 2.     **PRCCDA Bonds**

43.     PRCCDA is a public corporation created by Act No. 351-2000 (September 2, 2000) (the "PRCCDA Enabling Act") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico, and related improvements and facilities. See 23 L.P.R.A. §§ 6402, 6404.  Pursuant to the PRCCDA Enabling Act, PRCCDA has issued approximately $468 million of revenue bonds (the "PRCCDA Bonds") under a Trust Agreement dated as of March 24, 2006 (the "PRCCDA Trust Agreement").

44.     Pursuant to the PRCCDA Enabling Act, Act No. 272-2003 (the "Hotel Tax Act"), and the PRCCDA Trust Agreement, the PRCCDA Bonds are secured by a lien on certain special excise taxes consisting of hotel occupancy taxes (the "PRCCDA Pledged Tax Revenues") imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act.  The PRCCDA Trust Agreement constitutes a contract between PRCCDA and the holders (including Plaintiffs, the "PRCCDA Bondholders") of the PRCCDA

Bonds. The PRCCDA Trust Agreement constitutes a "security agreement," including as defined in section 101(50) of the Bankruptcy Code. The lien on the PRCCDA Pledged Tax Revenues granted to the PRCCDA Bondholders under the PRCCDA Trust Agreement constitutes a "security interest," including as defined in section 101(51) of the Bankruptcy Code.

45. Whereas, in the case of the other Authority Bonds, the Secretary of Treasury acts as the collection agent on behalf of the bondholders, in the case of the PRCCDA Bonds, it is the Puerto Rico Tourism Company that acts as the collection agent on behalf of the PRCCDA Bondholders with respect to the PRCCDA Pledged Tax Revenues. Upon collection, the Puerto Rico Tourism Company is required by statute to transfer the PRCCDA Pledged Tax Revenues to a special account maintained by the GDB in the name of PRCCDA, but for the benefit of the PRCCDA Bondholders, and the PRCCDA Pledged Tax Revenues constitute trust funds that are property of the PRCCDA Bondholders and not of the Commonwealth. See 13 L.P.R.A. § 2271v. Pursuant to 13 L.P.R.A. § 2271v and related statutes (the "PRCCDA Excise Tax Statutes"), the PRCCDA Pledged Tax Revenues may not be used for any purpose other than payment of the PRCCDA Bonds, and the PRCCDA Excise Tax Statutes give rise to a statutory lien in favor of the PRCCDA Bondholders on the PRCCDA Pledged Tax Revenues.

46. At any time that the Commonwealth, the Puerto Rico Tourism Company, the GDB, or PRCCDA is in possession of PRCCDA Pledged Tax Revenues, such entity holds possession of such PRCCDA Pledged Tax Revenues for the PRCCDA Bondholders' benefit, subject only to a valid "clawback," as defined below.

47. The PRCCDA Bondholders' lien on the PRCCDA Pledged Tax Revenues is perfected, including by statute. See 23 L.P.R.A. § 6441(d).

48. The Commonwealth covenanted with the PRCCDA Bondholders in the PRCCDA Enabling Act that it would "not limit nor alter the rights [conferred on PRCCDA by

the PRCCDA Enabling Act] until [the PRCCDA Bonds] and the interest thereon are paid in full." 23 L.P.R.A. § 6450. Moreover, under the PRCCDA Trust Agreement, PRCCDA, as an agent of the Commonwealth, covenanted with the PRCCDA Bondholders that the Commonwealth (i) will make sure that the amounts of the PRCCDA Pledged Tax Revenues must be deposited in the accounts as provided in the PRCCDA Trust Agreement and (ii) will not limit or impair the rights of PRCCDA to comply with its obligations to repay the PRCCDA Bonds in full.

49. Assured insures approximately $152 million of the outstanding PRCCDA Bonds and FGIC insures approximately $97 million of the outstanding PRCCDA Bonds. Under a First Supplemental Trust Agreement to the PRCCDA Trust Agreement, dated as of March 24, 2006, Plaintiffs are deemed to be third-party beneficiaries and have standing to enforce any right, remedy, or claim arising thereunder.

50. But for the diversion of collateral securing the PRCCDA Bonds pursuant to the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law, PRCCDA would be solvent and could pay its debts in full. Instead, the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law have caused defaults with respect to debt service payments due on PRCCDA Bonds on July 1, 2017, and January 1, 2018. Assured has paid approximately $4 million in aggregate claims by PRCCDA Bondholders, and FGIC has received claims totaling approximately $2 million and will process and make payments to PRCCDA Bondholders in respect of such claims in accordance with FGIC's plan of rehabilitation. Plaintiffs are now fully subrogated to the rights of PRCCDA Bondholders for the claims they paid. Unless and until Defendants begin complying with PROMESA and the U.S. Constitution, these payment defaults will continue, and Plaintiffs will pay additional claims.

### 3. PRIFA Bonds

51. PRIFA is a public corporation created by Act No. 44-1988 (the "PRIFA Enabling Act", and together with the PRHTA Enabling Act and the PRCCDA Enabling Act, the "Authority Enabling Acts") for the purpose of providing financial and other types of assistance to political subdivisions, public agencies, and instrumentalities of the Commonwealth. Pursuant to the PRIFA Enabling Act, PRIFA has issued certain special excise tax revenue bonds (the "PRIFA Bonds") under a Trust Agreement (the "PRIFA Trust Agreement") dated as of October 1, 1988.

52. Under the PRIFA Trust Agreement, the PRIFA Bonds are secured by a lien on a portion of a federal special excise tax imposed on rum and other items produced in the Commonwealth and sold in the United States (the "PRIFA Pledged Tax Revenues", and together with the PRHTA Pledged Special Excise Taxes and the PRCCDA Pledged Tax Revenues, the "Pledged Special Excise Taxes"). The PRIFA Trust Agreement constitutes a contract between PRIFA and the holders (including Plaintiffs, the "PRIFA Bondholders") of the PRIFA Bonds. The PRIFA Trust Agreement also constitutes a "security agreement," including as defined in section 101(50) of the Bankruptcy Code. The lien on the PRIFA Pledged Tax Revenues granted to the PRIFA Bondholders under the PRIFA Trust Agreement constitutes a "security interest," including as defined in section 101(51) of the Bankruptcy Code.

53. The Secretary of Treasury collects the PRIFA Pledged Tax Revenues from the Federal government and is required by statute to hold the PRIFA Pledged Tax Revenues in a special fund for the benefit of the PRIFA Bondholders. The PRIFA Pledged Tax Revenues constitute trust funds that are property of the PRIFA Bondholders and not of the Commonwealth. 3 L.P.R.A. § 1914. Pursuant to 3 L.P.R.A. § 1914 and related statutes (collectively, the "PRIFA Excise Tax Statutes," and together with the PRHTA Excise Tax Statutes and the PRCCDA

Excise Tax Statutes, the "Excise Tax Statutes"), the PRIFA Pledged Tax Revenues may not be used for any purpose other than payment of the PRIFA Bonds, and the PRIFA Excise Tax Statutes give rise to a statutory lien in favor of Assured and other PRIFA Bondholders on the PRIFA Pledged Tax Revenues.

54.     At any time that the Commonwealth or PRIFA holds PRIFA Pledged Tax Revenues, the Commonwealth or PRIFA holds possession of such PRIFA Pledged Tax Revenues for the PRIFA Bondholders' benefit, subject only to a valid "clawback," as defined below.

55.     The PRIFA Bondholders' lien on the PRIFA Pledged Tax Revenues is perfected, including by statute.  See 3 L.P.R.A. § 1907(a).

56.     In the PRIFA Enabling Act, the Commonwealth covenanted with the holders of the PRIFA Bonds that it would "not limit or alter the rights [conferred on PRIFA by the PRIFA Enabling Act] until such bonds and the interest thereon are paid in full."  3 L.P.R.A. § 1913.

57.     Assured insures approximately $18 million of the outstanding PRIFA Bonds through secondary market insurance policies, and FGIC insures approximately $688 million[3] of the outstanding PRIFA Bonds.  But for the diversion of collateral securing the PRIFA Bonds pursuant to the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law, PRIFA would be solvent and could pay its debts in full.  Instead, the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law have caused defaults with respect to debt service payments due on PRIFA Bonds on January 1, 2016;

---

[3]     The approximately $688 million of PRIFA Bonds insured by FGIC consists of approximately $238 million in principal amount of serial bonds and approximately $450 million in full maturity value of capital appreciation bonds.

July 1, 2016; January 1, 2017; July 1, 2017; and January 1, 2018.  Assured has paid approximately $2 million in aggregate claims by PRIFA Bondholders, and FGIC has received claims totaling approximately $40 million and will process and make payments to PRIFA Bondholders in respect of such claims in accordance with FGIC's plan of rehabilitation. Plaintiffs are now fully subrogated to the rights of PRIFA Bondholders for the claims they paid. Unless and until Defendants begin complying with PROMESA and the U.S. Constitution, these payment defaults will continue, and Plaintiffs will pay additional claims.

## II.    Lawful Priorities And Liens Under Commonwealth Law

58.    A number of provisions of the Commonwealth Constitution and of Commonwealth statutory law define the relative priority of (i) the public debt, including the GO Bonds; (ii) the Authority Bonds; and (iii) the other obligations of the Commonwealth and Authorities.  These constitutional and statutory provisions are incorporated into Plaintiffs' contracts with the Commonwealth and the Authorities.  In an earlier decision denying the Commonwealth's motion to dismiss Assured's complaint challenging the Clawback Order, the Court carefully described and set out these priorities.  Assured v. García-Padilla, 214 F. Supp. 3d 117, 120 (D.P.R. 2016).  The relevant provisions include the following:

### A.    The Constitutional Debt Priority Provision

59.    Section 8 of Article VI of the Commonwealth Constitution (the "Constitutional Debt Priority Provision") creates a priority for GO Bonds and other "public debt" over the Commonwealth's other expenditures by requiring the "public debt" to be paid "first":

> In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, **interest on the public debt and amortization thereof shall first be paid**, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

P.R. Const. art. VI, § 8 (emphasis added).

60.     Public debt, including GO Bonds, thus enjoys a priority (the "Public Debt Priority") over all other government expenditures whenever available resources are not sufficient to meet appropriations.[4]  Because of its constitutional status, the Public Debt Priority cannot be overridden by the Commonwealth's police power, even in a financial emergency.  See, e.g., Flushing Nat'l Bank v. Mun. Assistance Corp. for N.Y., 358 N.E.2d 848, 852 (N.Y. 1976) (holding that a "fugitive recourse to the police power" may not be used to "displace inconvenient but intentionally protective constitutional limitations").

61.     Moreover, after giving effect to the Public Debt Priority, the Constitutional Debt Priority Provision incorporates other legal priorities, created by statute, by stating that, following payment of the public debt, "other disbursements shall . . . be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  Among the statutory priorities incorporated into the Constitutional Debt Priority Provision and thereby granted constitutional protection are (i) the statutory priorities and liens established by the Excise Tax Statutes and (ii) the statutory priorities established by the Commonwealth's Management and Budget Office Organic Act (Act No. 147-1980 (June 1980) (the "OMB Act")).

62.     The Defendants have violated the Constitutional Debt Priority Provision and the OMB Act, by using available resources to pay expenses with lower priorities, while simultaneously not paying the public debt and the Authority Bonds.

---

[4]     In addition to GO Bonds, Assured also insures approximately $146 million of bonds, and FGIC insures approximately $2 million of bonds, issued by the Puerto Rico Public Buildings Authority ("PBA") and guaranteed by the Commonwealth (the "PBA Bonds").  To date, as a result of defaults on the PBA Bonds caused by the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law, Assured has paid approximately $42 million in aggregate claims to PBA Bondholders, and FGIC has received claims totaling approximately $2 million from PBA Bondholders and will process and make payments to PBA Bondholders in accordance with FGIC's plan of rehabilitation.  The Commonwealth's guaranty obligations with respect to the PBA Bonds enjoy the same priority as the GO Bonds under the Constitutional Debt Priority Provision.

### B.     The Excise Tax Statutes

63.     In order to make the Authority Bonds attractive to investors, the Excise Tax Statutes grant Authority Bondholders the most senior possible lien on the Pledged Special Excise Taxes consistent with the Constitutional Debt Priority Provision.  To this end, these statutes grant Authority Bondholders first-priority liens on the Pledged Special Excise Taxes, subject only to the conditions that, in a fiscal year in which the Constitutional Debt Priority Provision is in effect, the Pledged Special Excise Taxes may (i) be used *solely* to pay the public debt, but (ii) *only if the public debt remains unpaid after a first application of all other available resources to the payment of public debt*.  Together, these two preconditions to any "clawback" of Pledged Special Excise Taxes[5] establish the priority (the "<u>Authority Bond Priority</u>") of the Authority Bonds over *all* disbursements other than public debt.  As a prior decision from this Court described it, "The funds from these taxes and tax liens may be used to pay the public debt if no other Commonwealth resources are available."  <u>Assured Guar.</u>, 214 F. Supp. 3d at 121. These preconditions to a "clawback" of the Pledged Special Excise Taxes have never been satisfied, because the Commonwealth has at all relevant times had sufficient available resources to pay the public debt in accordance with the Constitutional Debt Priority Provision.

64.     The Authority Bond Priority, including these two preconditions to any clawback, is expressly set forth in the following Excise Tax Statutes:

(a)     **<u>PRHTA Pledged Tax Revenues Pledged to Payment of PRHTA Bonds:</u>** "The proceeds from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Government of Puerto Rico, insofar as the other available resources referred to in said Section do not suffice to attain such purposes. **Otherwise, the proceeds from said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the**

---

[5]     Because the Pledged Toll Revenues do not constitute "available resources," they can never be subject to "clawback" to pay the public debt.

Authority and to meet any stipulation agreed on by the Authority to the holders of its bonds and other obligations." 13 L.P.R.A. § 31751(a)(3)(C) (emphasis added).

(b)   **Vehicle Fees Pledged to Payment of PRHTA Bonds:** "[S]aid pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, until the other resources available, referred to in said section, are insufficient for such purposes, otherwise, **the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations."** 9 L.P.R.A. § 2021 (emphasis added); see also 9 L.P.R.A. § 5681.

(c)   **PRCCDA Pledged Tax Revenues Pledged to Payment of PRCCDA Bonds:** "The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes. **Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related financing agreement contemplated herein, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements."** 13 L.P.R.A. § 2271v (emphasis added).

(d)   **PRIFA Pledged Tax Revenues Pledged to Payment of PRIFA Bonds:** "[PRIFA] is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes." 3 L.P.R.A. § 1914.

C.    **The OMB Act**

65.    In furtherance of the Constitutional Debt Priority Provision, and consistent with the Excise Tax Statutes, Section 4(c) of the OMB Act sets certain "priority guidelines" for the disbursement of available resources in a fiscal year in which the Constitutional Debt Priority Provision is in effect.    The priorities set by the Legislative Assembly in the OMB Act first require "payment of interest and amortizations corresponding to the public debt."  23 L.P.R.A. § 104(c)(1).    The "priority guidelines" next assign a second-priority status to "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico," including, to the extent applicable, the Authority Bonds.[6]  Id. § 104(c)(2).

66.    "Regular expenses" related to government operations receive a *third*-priority status (after public debt and Authority Bonds) under Section 4(c) of the OMB Act, with priority within this group given to expenses related to "[c]onservation of public health," "[p]rotection of persons and property," "[p]ublic education programs," "[p]ublic welfare programs," and "[p]ayment of employer contributions to retirement systems and payment of pensions to individuals granted under special statutes," followed by "remaining public services in the order of priority determined by the Governor."    23  L.P.R.A.  § 104(c)(3)(A)-(E). Necessary "adjustments due to reductions may be made" to the appropriations for any of these enumerated "service areas."  Id. § 104(c)(3)(E).

---

[6]    The Pledged Toll Revenues are not subject to the OMB Act waterfall, because they are not general revenues and do not constitute "available resources." Similarly, the Pledged Special Excise Taxes are not subject to the OMB Act waterfall, because the Pledged Special Excise Taxes are not general revenues and can never be used for any purpose other than to pay the Authority Bonds or, following a *valid* clawback, the public debt.  Even in the event the OMB Act waterfall were found to apply to the Pledged Special Excise Taxes, however, the Pledged Special Excise Taxes could only be applied to the first two items in the waterfall, namely payment of the public debt or of "legal contracts in force" (i.e., the Authority Bonds).

Case:17-03283-LTS Doc#:13744-9 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc:
Miller Declaration Ex 60 Complaint Page 25 of 102

Case:18-00059-LTS Doc#:1-1 Filed:05/29/18 Entered:05/29/18 20:49:37 Desc: Main
Document Page 24 of 100

67.    Finally, the OMB Act's "priority guidelines" assign the lowest priorities to "construction of capital works or improvements" (fourth priority) (23 L.P.R.A. § 104(c)(4)) and "contracts and commitments contracted under special appropriations" (fifth priority) (id. § 104(c)(5)).

## III.    The Clawback Order

68.    On November 30, 2015, former Governor García Padilla issued the Clawback Order, which directed the Secretary of Treasury and the Puerto Rico Tourism Company to withhold the Pledged Special Excise Taxes, purportedly for application to the public debt, instead of applying the Pledged Special Excise Taxes to the payment of the Authority Bonds as required by the Excise Tax Statutes.

69.    The Clawback Order unlawfully modified the Public Debt Priority by expressly providing for other expenses to be paid "at the same time" ("a su vez") as the public debt.  See Ex. 2A at 2; Ex. 2B at 2.  By contrast, the Constitutional Debt Priority Provision requires the public debt to be paid "first," and not at the same time as, other expenses.  See P.R. Const. art. VI, § 8.  Even worse, the Defendants actually have paid the lower priority expenses ahead of the public debt, which is not being paid at all.

70.    The Clawback Order also unlawfully modified the Authority Bond Priority, because its "Whereas" clauses indicated that the Commonwealth was continuing to fund general "expenses" ("los gastos") *other* than payments on the Authority Bonds.  See Ex. 2A at 2; Ex. 2B at 2.  Pursuant to the Authority Bond Priority, the Authority Bonds enjoy priority over these other expenses.

71.    In January 2016, Assured and FGIC filed lawsuits[7] challenging the
Clawback Order on the grounds that the Clawback Order violated the Contracts, Takings, and
Due Process Clauses of the U.S. Constitution.  In response to Assured's claims and certain of
FGIC's claims, the Commonwealth defendants filed a motion to dismiss based *solely* on
sovereign immunity,[8] and in which the defendants did not even attempt to contest the merits of
Assured's and FGIC's claims under the Contracts, Takings, and Due Process Clauses.  On
October 4, 2016, the Court denied the defendants' motion to dismiss.[9]  On October 14, 2016,
rather than attempting to defend the merits of the Clawback Order in further litigation, the
Commonwealth announced that it had allowed the Clawback Order to expire at the end of Fiscal
Year 2016.[10]

72.    To date, the Commonwealth government has not used approximately $147
million of the funds that it confiscated under the Clawback Order, and instead continues to hold
those funds.   The fact that the Commonwealth government has not used these funds
demonstrates that the Clawback Order—like the Moratorium Laws, Moratorium Orders, Fiscal
Plans, and Compliance Law that followed—was not a response to a real or immediate liquidity
crisis, and instead constituted a cynical tactic to gain leverage in restructuring negotiations by
unlawfully violating creditors' constitutional and statutory debt payment priorities, impairing
creditors' contracts, and taking creditors' property.

---

[7]    See Assured Guar. Corp. v. García-Padilla, No. 16-cv-1037 (D.P.R. Jan. 7, 2016), ECF No. 1; Fin.
Guar. Ins. Co. v. García Padilla, No. 16-cv-1095 (D.P.R. Jan. 19, 2016), ECF No. 1.

[8]    See Assured Guar., No. 16-cv-1037, ECF No. 25; Fin. Guar., No. 16-cv-1095, ECF No. 37.

[9]    See Assured Guar., 214 F. Supp. 3d at 120, 130 (denying defendants' motion to dismiss as to plaintiff
Assured; granting in part and denying in part defendants' motion to dismiss as to plaintiff Financial
Guaranty).

[10]    See Assured Guar., No. 16-cv-1037, ECF No. 59; see also Fin. Guar., No. 16-cv-1095, ECF No. 66.

## IV.    The Moratorium Laws And The Moratorium Orders

73.    On April 6, 2016, the Commonwealth enacted a Moratorium Law (Act
No. 21-2016, the "First Moratorium Law" (attached hereto as "Exhibit 5A" and English
translation attached hereto as "Exhibit 5B")) that authorized the Governor of the Commonwealth
to declare states of emergency with respect to a number of Puerto Rico public entities.  The First
Moratorium Law delegates the Commonwealth's police power to the Governor, expressly stating
that "pursuant to the Commonwealth's police powers, we the Legislative Assembly of the
Commonwealth of Puerto Rico have resolved to provide the Governor with powers to declare a
state of emergency for the Commonwealth and its instrumentalities[.]"[11]

74.    In particular, Section 201(d) of the First Moratorium Law provides that:

> If ordered by the Governor during the emergency period created by
> this section, the following obligations may be suspended or
> modified, if applicable, until the end of the covered period, without
> the need for further legislation—
>
> *        *        *
>
> ii.        any statutory or other obligation to transfer money (or its
> equivalent) to pay or secure any covered obligation (or take any
> action in furtherance thereof)[.]

Ex. 5B at 68 § 201(d)(ii).

75.    Section 201(b) of the First Moratorium Law generally provides for a stay
of any actions to recover on the "Covered Obligations" of a Puerto Rico public entity with
respect to which a state of emergency has been declared.  Ex. 5B at 66-68 § 201(b).  The First
Moratorium Law defines "Covered Obligation" to include "any interest obligation [or] principal
obligation."  Id. at 61 § 103(*l*).

---

[11]    Ex. 5B at 53 (¶ F); see also id. at 67 § 201(b)(iv) ("[T]he Governor may take any and all actions that
are reasonable and necessary . . . to protect the health, safety and welfare of the residents of the
Commonwealth[.]").

76.     On May 5, 2016, the Commonwealth enacted Act No. 40-2016 (attached hereto as "Exhibit 6", containing English translation within text), which amended the First Moratorium Law to (i) define GDB as a "depositary institution" and (ii) define "prioritizing the safety, soundness and stability" of depositary institutions as an "essential service[.]"  Ex. 6 at  4-5 §§ 8(kk), 9.  Therefore, under the First Moratorium Law as amended by Act No. 40-2016, payments to GDB purportedly qualify as payments for "essential services" that have priority over debt service, including on PRHTA Bonds.  This allows the GDB, whose claims against PHRTA are unequivocally subordinated to the secured PRHTA Bondholders, to receive payments from PRHTA Pledged Special Revenues ahead of senior secured PRHTA Bondholders.

77.     Beginning on April 30, 2016, pursuant to the First Moratorium Law, Governor García Padilla issued a series of Moratorium Orders that prohibited payments of principal and interest on the GO and Authority Bonds, violated the constitutional and statutory priorities of the GO and Authority Bonds, impaired Plaintiffs' rights under the GO and Authority Bonds and related contracts, and took the Pledged Special Revenues in which Plaintiffs have property interests without providing just compensation.  These Moratorium Orders included:

- Administrative Bulletin OE-2016-14 ("EO-14" (attached hereto as "Exhibit 7A" and English translation attached hereto as "Exhibit 7B")), which, among other things, declared a state of emergency with respect to PRIFA.

- Administrative Bulletin No. EO-2016-18 ("EO-18" (attached hereto as "Exhibit 8A" and English translation attached hereto as "Exhibit 8B")), which, among other things, (i) declared a state of emergency with respect to PRHTA; (ii) ordered the suspension of all obligations of PRHTA to transfer PRHTA Pledged Special Revenues to the PRHTA Fiscal Agent for the payment of the PRHTA Bonds; and (iii) authorized PRHTA to utilize the PRHTA Pledged Special Revenues for the provision of "essential services for the protection of the health, security, and well-being of the residents of the Commonwealth."  Ex. 8B at 5-6.

- Administrative Bulletin No. OE-2016-27 ("<u>EO-27</u>" (attached hereto as "<u>Exhibit 9A</u>" and English translation attached hereto as "<u>Exhibit 9B</u>")), which, among other things, (i) extended the state of emergency for PRIFA declared in EO-14 and (ii) suspended PRIFA's obligation to transfer PRIFA Pledged Tax Revenues to the PRIFA bond trustee for the payment of the PRIFA Bonds.

- Administrative Bulletin No. EO-2016-30 ("<u>EO-30</u>" (attached hereto as "<u>Exhibit 10A</u>" and English translation attached hereto as "<u>Exhibit 10B</u>")), which, among other things, (i) declared a state of emergency with respect to the Commonwealth; (ii) declared a moratorium on the Commonwealth's obligation to make payments on any bonds or notes issued or guaranteed by the Commonwealth (including the GO Bonds);[12] (iii) extended the emergency period for PRHTA through the entirety of the "covered period," which the First Moratorium Law defined to mean through and including January 31, 2017, subject to a possible two-month extension by the Governor; (iv) suspended payment of all debt obligations of PRHTA under the PRHTA Resolutions that come due during the covered period, except for payments that can be made from funds on deposit with the PRHTA Fiscal Agent; (v) extended EO-14 and EO-27 as they relate to PRIFA in force through the entirety of the "covered period;" and (vi) suspended the payment of all PRIFA Bonds payable from PRIFA Pledged Tax Revenues.

- Administrative Bulletin No. EO-2016-31 ("<u>EO-31</u>" (attached hereto as "<u>Exhibit 11A</u>" and English translation attached hereto as "<u>Exhibit 11B</u>")), which, among other things, (i) continued the suspension of PRHTA's obligations under the PRHTA Resolutions to transfer PRHTA Pledged Special Revenues to the PRHTA Fiscal Agent;[13] (ii) declared a state of emergency with respect to PRCCDA; (iii) declared a moratorium on PRCCDA's obligation to pay the PRCCDA Bonds; and (iv) suspended PRCCDA's obligation to transfer the PRCCDA Pledged Tax Revenues to the trustee for the PRCCDA bonds.

---

[12]  EO-30 thus modifies and violates the Constitutional Debt Priority Provision by permitting other expenses to be paid ahead of the "public debt," including the GO Bonds.

[13]  Remarkably, EO-31 does *not* suspend or modify PRHTA's obligation to transfer revenues pledged for the payment of the Subordinated GDB Lines of Credit, and, instead, only modifies PRHTA's obligation to GDB to the extent necessary to provide PRHTA with the revenues it requires to fund operating expenses or "essential services." Ex. 11B at 3. The net result is that EO-18, EO-30, and EO-31 authorize PRHTA to divert PRHTA Pledged Special Revenues to the payment of subordinated PRHTA operating expenses or to the insider affiliate GDB. The Moratorium Laws and the Moratorium Orders thus unlawfully prioritize payment to GDB of junior debt and other expenses masquerading as "essential services" ahead of payments to the senior secured PRHTA Bonds, and permit the unlawful diversion of the PRHTA Pledged Special Revenues for those purposes.

78. By their terms, the Moratorium Orders were set to expire on January 31, 2017. However, on January 29, 2017, the Commonwealth enacted a second Moratorium Law (Act No. 5-2017, the Puerto Rico Financial Emergency and Fiscal Responsibility Act, or the "Second Moratorium Law" (attached hereto as "Exhibit 12A" and English translation attached hereto as "Exhibit 12B")). The Second Moratorium Law purported to continue the existing Moratorium Orders in effect notwithstanding the fact that the Moratorium Orders would otherwise have expired by their terms on January 31, 2017.

79. Despite leaving the Moratorium Orders in effect, the Second Moratorium Law also purported to repeal Chapters 1 and 2 of the First Moratorium Law. In repealing Chapter 2 of the First Moratorium Law, the Second Moratorium Law repealed two provisions (the "Compensation Provisions") of the First Moratorium Law that purported to provide a method for parties whose property was taken by the Commonwealth pursuant to the First Moratorium Law to seek compensation.[14]

80. The fact that the Commonwealth included these Compensation Provisions in the First Moratorium Law demonstrates the Commonwealth's recognition that the First Moratorium Law authorized takings of property for which just compensation was required under the U.S. and Commonwealth Constitutions. By leaving in place the Moratorium Orders effecting such takings while simultaneously *repealing* the Compensation Provisions, the Second Moratorium Law abandoned any pretense of complying with the constitutional requirement to

---

[14] First, in the event the Governor expropriated property pursuant to the power of eminent domain as authorized under Section 201(b)(iv) of the First Moratorium Law, Section 201(b)(iv) of the First Moratorium Law permitted affected parties to seek "just compensation or other relief . . . in the Court of First Instance, San Juan Part." Ex. 5B at 67-68 § 201(b)(iv). Second, in the event the Governor effected a taking that did not constitute an "expropriation" under Section 201(b)(iv), Section 204 of the First Moratorium Law permitted affected parties to seek "adequate protection" from the Court of First Instance of the Commonwealth, San Juan Part "to the extent required by applicable constitutional law," i.e., the Takings Clauses of the U.S. and Commonwealth Constitutions. See id. at 72 § 204(b).

provide just compensation, and demonstrated that the ongoing takings of property that continue to occur pursuant to the Moratorium Laws and Moratorium Orders are unconstitutional.

81.    On April 30, 2017, the Governor issued another Moratorium Order, Administrative Bulletin No. EO-2017-031 ("EO-2017-031" (attached hereto as "Exhibit 13A" and English translation attached hereto as "Exhibit 13B")), which extended the effectiveness of the previous Moratorium Orders until August 1, 2017.

82.    On or around July 19, 2017, the Commonwealth enacted a third Moratorium Law (the "Third Moratorium Law" (attached hereto as "Exhibit 14A" and English translation attached hereto as "Exhibit 14B")), which extended the effectiveness of the Moratorium Orders through the end of December 2017 and allowed the Governor to further extend the effectiveness of the Moratorium Orders by executive order in six-month increments as long as FOMB remains in place.

83.    On January 2, 2018, the Governor issued another Moratorium Order, Administrative Bulletin No. EO-2017-76 ("EO-2017-76" (attached hereto as "Exhibit 15A" and English translation attached hereto as "Exhibit 15B")), which further extended the effectiveness of the other Moratorium Orders for an additional six months until June 30, 2018.

84.    The pattern and practice of continued extensions of the Moratorium Orders, dating back to April 2016, supports the conclusion that Defendants will continue to extend the Moratorium Orders indefinitely.

## V.    PROMESA And The Fiscal Plans

85.    On June 30, 2016, President Barack Obama signed PROMESA into law. The stated purpose of PROMESA is to "establish [FOMB] to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes."  H.R. 5278, 114th Cong. (2016) (preamble).  The stated purpose of FOMB is to "provide a method for

a covered territory to achieve fiscal responsibility and access to the capital markets."
PROMESA § 101(a).

86.     Among other things, PROMESA (i) requires FOMB to approve fiscal
plans governing the future finances and budgets of the Commonwealth and its instrumentalities,
including the Authorities (Title II); (ii) provides for a mechanism for adjusting the
Commonwealth's bond debt or the bond debt of its instrumentalities on a largely consensual
basis (Title VI); and (iii) following "good-faith efforts to reach a consensual restructuring with
creditors," authorizes, but does not require, FOMB to file a petition on behalf of the
Commonwealth or its instrumentalities, including the Authorities, to commence a court-
supervised debt adjustment proceeding (Title III).

87.     In order to qualify as a "Fiscal Plan" under PROMESA, a fiscal plan must
satisfy a series of requirements set forth in Section 201(b) of PROMESA. Only a fiscal plan that
satisfies the requirements of Section 201(b) is eligible for approval by FOMB.

88.     Sections 201(c)-(f) of PROMESA establish procedures for the
development, review, revision, approval, and certification of fiscal plans. Specifically, Section
201 establishes two methods by which a fiscal plan may be approved and certified by FOMB.
First, FOMB may approve and certify a fiscal plan in the form proposed by the Governor if the
proposed fiscal plan complies with the requirements of PROMESA. PROMESA § 201(c)(3),
(e)(1). Alternatively, FOMB may develop and certify its own fiscal plan in the event the
Governor fails to submit a fiscal plan that complies with PROMESA by the deadline set by
FOMB. PROMESA § 201(d)(2), (e)(2).

89.     Section 201(a) of PROMESA requires FOMB, as soon as practicable
following appointment of all of its members and its chair, to provide the Governor with a

schedule for the development, submission, approval, and certification of a Commonwealth fiscal plan. PROMESA § 201(a).

90. Section 201(c)(2) of PROMESA then requires the Governor to develop a "proposed Fiscal Plan" for submission to FOMB. PROMESA § 201(c)(2). Section 201(c)(3) next requires FOMB to review the Governor's proposed fiscal plan "to determine whether it satisfies the requirements set forth in [Section 201(b)]." Id. § 201(c)(3). Finally, Section 201(c)(3) requires FOMB *either* (i) to "approve the [Governor's] proposed Fiscal Plan" if it "satisfies" the requirements of Section 201(b), *or* (ii) to provide the Governor with (a) a "notice of violation" that includes recommendations for revisions and (b) an opportunity to correct the applicable violations of Section 201(b). Id. § 201(c)(3)(A), (B).

91. In the event FOMB issues a "notice of violation," Section 201(d)(1) of PROMESA requires the Governor to submit a revised proposed fiscal plan in accordance with the schedule established by FOMB. PROMESA § 201(d)(1).

92. Alternatively, in the event that the Governor fails to submit a proposed fiscal plan that satisfies the requirements of Section 201(b) of PROMESA before the deadline established by FOMB, Section 201(d)(2) requires FOMB to "develop and submit to the Governor and the Legislature a Fiscal Plan **that satisfies** the requirements set forth in [Section 201(b)]." PROMESA § 201(d)(2) (emphasis added).

93. Notably, while PROMESA purports to authorize FOMB to approve or reject a fiscal plan proposed by the Governor under Section 201(c)(2) or 201(d)(1) in FOMB's "sole discretion,"[15] PROMESA does *not* confer any discretion on FOMB in developing,

---

[15] In any event, a government entity's "discretion" never includes the authority to violate the law. See, e.g., United States v. Phillipos, 849 F.3d 464, 468 (1st Cir. 2017), cert. denied, 138 S. Ct. 683 (2018). Therefore, the Revised Fiscal Plan, or any other fiscal plan, would be subject to review for its compliance

submitting, and certifying its own fiscal plan under Sections 201(d)(2) and 201(e)(2). Section 201(d)(2) states categorically that a fiscal plan developed under Section 201(d)(2) must "satisf[y] the requirements" set forth in Section 201(b). See PROMESA § 201(d)(2).

A.    **The Original Fiscal Plan**

94.    On October 14, 2016, Governor Padilla submitted a proposed fiscal plan for the Commonwealth (the "First Proposed Fiscal Plan"). On November 23, 2016, FOMB issued a notice of violation (the "First Violation Notice"), identifying areas in which the First Proposed Fiscal Plan failed to comply with PROMESA. The First Violation Notice also established a deadline of January 31, 2017 for Governor Padilla to submit a revised proposed fiscal plan.

95.    Following the inauguration of Governor Rosselló on January 2, 2017, FOMB sent Governor Rosselló a supplemental notice of violation on January 18, 2017 (the "Second Violation Notice"), which provided additional recommendations for revisions to the First Proposed Fiscal Plan.

96.    At a public meeting on January 28, 2017, FOMB extended Governor Rosselló's deadline to submit a revised proposed fiscal plan from January 31, 2017, to February 28, 2017. On February 28, 2017, Governor Rosselló did submit a revised proposed fiscal plan (the "Second Proposed Fiscal Plan") to FOMB.

97.    On March 9, 2017, FOMB sent Governor Rosselló a notice of violation (the "Third Violation Notice" (attached hereto as "Exhibit 16")) stating that the Second Proposed Fiscal Plan did not "comply with the requirements set forth in PROMESA." Ex. 16 at 1. Notably, among other deficiencies, the Third Violation Notice noted that the Second Proposed

---

with PROMESA, the U.S. Constitution, and other laws, even if purportedly approved under Section 201(c)(3) of PROMESA.

Fiscal Plan failed to "provide sufficient data to determine whether [the Second Proposed Fiscal Plan] satisfies PROMESA § 201(b)(1)(M) [prohibiting misappropriation of pledged revenues] and (N) [requiring respect for lawful priorities and liens][.]." Id. at 1 n.1. The Third Violation Notice also set a deadline of March 11, 2017 for Governor Rosselló to submit a further revised proposed fiscal plan.

98. On or around March 11, 2017, Governor Rosselló submitted another revised proposed fiscal plan (the "Third Proposed Fiscal Plan"), which ultimately formed the basis for the Original Fiscal Plan. Like the Second Proposed Fiscal Plan, the Third Proposed Fiscal Plan failed to provide data demonstrating compliance with Sections 201(b)(1)(N) and 201(b)(1)(M) of PROMESA, which was one of the areas of non-compliance with PROMESA identified in the Third Violation Notice.

99. On March 13, 2017, FOMB purported to approve and certify the Original Fiscal Plan, which was based on the Third Proposed Fiscal Plan, but which included two amendments by FOMB. Neither of the amendments made by FOMB addressed or remedied the Original Fiscal Plan's non-compliance with 201(b)(1)(N) and (M) as identified in the Third Violation Notice.

100. On April 7, 2017, two members of the United States Senate, Hon. Sen. Thom Tillis and Hon. Tom Cotton (the "Senators"), sent a letter (attached hereto as "Exhibit 17") to José B. Carrión III, the chair of FOMB, expressing their concern that the Original Fiscal Plan was not compliant with PROMESA because of (i) its failure to comply with lawful priorities and liens established by Puerto Rico's constitution, (ii) its failure to differentiate between non-essential and essential spending, (iii) its elevation of all non-debt spending above debt service, and (iv) its unexplained economic assumptions. The Senators specifically requested that FOMB "promptly supply our staffs with a compliance certification for the Fiscal

Plan and set forth in detail how each requirement of Section 201(b)(1) of PROMESA has been satisfied." Ex. 17 at 1.

101.  On April 25, 2017, FOMB issued a written response (attached hereto as "Exhibit 18") to the Senators.  Instead of straightforwardly addressing the Senators' concerns, FOMB's April 25 letter essentially conceded that the Original Fiscal Plan does not comply with lawful priorities and liens.  Specifically, FOMB claimed that the word "respect" in Section 201(b)(1)(N) of PROMESA means something other than "comply with," which in FOMB's view gave the Original Fiscal Plan the "flexibility" to *dis*respect and violate lawful priorities and liens, a result that would be contrary to generations of federal constitutional and bankruptcy law.  See Ex. 18 at 12.  FOMB failed to provide the Senators with the requested compliance certification setting forth in detail how each requirement of Section 201(b)(1) was purportedly satisfied.  In fact, FOMB was unable to provide any such certification, because the Original Fiscal Plan obviously did not satisfy each subsection of 201(b)(1), and in particular did not satisfy Sections 201(b)(1)(N) and 201(b)(1)(M).  In addition, FOMB was unable to make, and in fact had not made, the determinations required by Sections 201(b)(1)(N), 201(b)(1)(M), and 201(b)(1)(B), and for this reason was not able to provide the requested certification reflecting these determinations.

102.  On June 13, 2017, Senator Cotton replied in a letter (attached hereto as "Exhibit 19") to FOMB.  The Senator stated, "I must be frank: I found your answers vague and unresponsive." Ex. 19 at 1.  The Senator continued, "[FOMB] claims that Congress, in using the word 'respect,' actually gave the board 'flexibility' to decide which legal obligations to meet— which, in my book, is the exact opposite of what the word 'respect' means.  According to the Wall Street Journal, retail investors in mutual funds nationwide stand to lose $5.4 billion as a result of [FOMB's] bizarre interpretation.  If this is what 'respecting' legal obligations means,

what would 'disrespecting' them look like?" Id.  The Senator also "point[ed] out that [FOMB's]

letter didn't address why the Fiscal Plan fails to distinguish between essential expenses and non-

essential ones." Id.

103.     On May 3, 2017, FOMB commenced a proceeding under Title III of

PROMESA on the Commonwealth's behalf, the first such proceeding filed under Title III of

PROMESA.  The Original Fiscal Plan was therefore in effect prior to, and independently of, any

Title III proceeding.

104.     On the same day that the Title III case for the Commonwealth was filed,

Assured commenced an adversary proceeding (the "Original Adversary Proceeding")[16] seeking

declaratory and injunctive relief with respect to the Original Fiscal Plan on the grounds that the

Original Fiscal Plan violated PROMESA and the U.S. Constitution.

**B.**     **The Revised Fiscal Plan**

105.     In September 2017, Hurricanes Irma and Maria made landfall in Puerto

Rico.  Following the hurricanes, FOMB announced that it planned to undertake revisions to the

Original Fiscal Plan.   Initially, FOMB set December 22, 2017 as the deadline for the

Commonwealth government to propose a revised fiscal plan.

106.     In light of the changed circumstances, and in the hope that FOMB would,

given the chance, conduct a more open plan development process, Plaintiffs voluntarily

dismissed the Original Adversary Proceeding without prejudice.  See Adv. Proc. No. 17-125-

LTS, ECF No. 108.

---

[16]   The Original Adversary Proceeding was originally filed under Case No. 3:13-cv-01584 in the United
States District Court for the District of Puerto Rico. The Original Adversary Proceeding was subsequently
transferred to the docketing system of the United States Bankruptcy Court for the District of Puerto Rico
as Adversary Proceeding No. 17-125-LTS.  See Assured Guar. Corp. v. Commw. of P.R., Adv. Proc. No.
17-125-LTS (D.P.R.).

107.    On December 20, 2017, FOMB extended the deadline for the Commonwealth to submit a revised proposed fiscal plan to January 10, 2018. On or around January 10, 2018, FOMB further extended this deadline to January 24, 2018.

108.    On January 24, 2018, the Commonwealth government submitted an initial draft revised fiscal plan (the "Fourth Proposed Fiscal Plan"). On February 5, 2018, FOMB issued a notice of violation (the "Fourth Violation Notice"), stating that the Fourth Proposed Fiscal Plan failed to comply with PROMESA and establishing a deadline of February 12, 2018 for the Commonwealth government to submit a further revised draft of the fiscal plan.

109.    On February 12, 2018, the Commonwealth government submitted a further revised draft fiscal plan (the "Fifth Proposed Fiscal Plan").

110.    On February 16, 2018, FOMB issued a press release stating that it intended to approve and certify a revised fiscal plan by March 30, 2018.

111.    On March 23, 2018, FOMB issued a press release postponing the certification of the revised fiscal plan, and stating that it intended to "announce a new certification date as soon as practicable."

112.    On March 23, 2018, the Commonwealth submitted a further revised draft fiscal plan (the "Sixth Proposed Fiscal Plan").

113.    On March 28, 2018, FOMB issued a notice of violation (the "Fifth Violation Notice"), stating that the Sixth Proposed Fiscal Plan failed to comply with PROMESA and establishing a deadline of April 5, 2018 for the Commonwealth government to submit a further revised draft of the fiscal plan.

114.    On March 29, 2018, Congressman Rob Bishop, Chairman of the House Committee on Natural Resources (the "Natural Resources Committee") and one of the principal architects of PROMESA, sent a letter to José B. Carrión III, the chair of FOMB (attached hereto

as "Exhibit 20"), expressing concern that the Sixth Proposed Fiscal Plan did not comply with PROMESA. Specifically, Chairman Bishop stated that "the draft plans released by Governor Rosselló circumvent the stated purpose of [PROMESA]." Ex. 20 at 1. Chairman Bishop went on to state, "[I]t is imperative you adhere to the tenets and Congressional mandate of PROMESA, while providing an avenue for Puerto Ricans to recover from the storms. This careful balance requires you to transparently assess the economic impact of the hurricanes and 'respect the relative lawful priorities or lawful liens' of debt issued, while working cooperatively with creditors on holistic solutions to revitalize the local economy and stabilize Puerto Rico's finances.'" Id. at 2. Chairman Bishop noted that "[a] good start would be to determine what constitutes 'essential public services,' clearly defining where governmental cuts should occur. Furthermore, the recognition of existing debt is paramount to Puerto Rico's recovery, and will require much greater degrees of transparency, accountability, goodwill and cooperation on the part of the Puerto Rican government and [FOMB]." Id. Chairman Bishop concluded by stating, "[t]o date, the [Natural Resources Committee] has been unsatisfied with the implementation of PROMESA, and the lack of respect for the Congressional requirements of the Fiscal Plan. And now, due to intentional misinterpretations of the statute, the promise we made to Puerto Rico may take decades to fulfill. I ask that you adhere to the mandates of PROMESA and work closely with creditors and the Puerto Rican government as you finalize and certify the Fiscal Plans[.]" Id. at 3.

115.    On April 5, 2018, the Commonwealth submitted a further revised draft fiscal plan (the "Seventh Proposed Fiscal Plan").

116.    Rather than approve the Seventh Proposed Fiscal Plan as proposed by the Governor, FOMB developed the Revised Fiscal Plan under Section 201(d)(2) of PROMESA. FOMB released the Revised Fiscal Plan publicly on April 18, 2018. At a public meeting on

April 19, 2018, FOMB purported to reject the Seventh Proposed Fiscal Plan and approve and certify the Revised Fiscal Plan.

117.    To qualify as a "Fiscal Plan" as defined in PROMESA, a fiscal plan must satisfy a series of substantive requirements set forth in Section 201(b)(1) of PROMESA. Specifically, Section 5(10) of PROMESA defines a "Fiscal Plan" as "**a Territory Fiscal Plan** or an Instrumentality Fiscal Plan."   PROMESA § 5(10) (emphasis added).   Section 5(22) of PROMESA in turn defines "Territory Fiscal Plan" as "a fiscal plan for a territorial government submitted, approved, and certified **in accordance with section 201.**"   Id. § 5(22) (emphasis added).

118.    Like its predecessor, the Revised Fiscal Plan is not "in accordance with Section 201(b)," and therefore fails to qualify as a "Fiscal Plan" as defined in PROMESA.

119.    Furthermore, under PROMESA, FOMB had no authority to approve or certify the Revised Fiscal Plan, because on its face, the Revised Fiscal Plan violates Section 201(b) of PROMESA.  FOMB developed and approved the Revised Fiscal Plan under Section 201(d)(2) of PROMESA and certified it under Section 201(e)(2) of PROMESA, and Sections 201(d)(2) and (e)(2), by their terms, do not grant FOMB any discretion in developing, approving, or certifying the Revised Fiscal Plan.  Rather, under Sections 201(d)(2) and (e)(2), FOMB had authority only to approve a fiscal plan that strictly "satisfies the requirements set forth in [Section 201(b)]," and the Revised Fiscal Plan does *not* satisfy these requirements.[17]

---

[17]    In the event Defendants argue that FOMB developed the Revised Fiscal Plan under Section 201(f) of PROMESA, this makes no difference, because Section 201(f) similarly grants FOMB no discretion. Rather, Section 201(f) merely authorizes FOMB and the Governor to jointly develop a fiscal plan that "**meets** the requirements [of Section 201(b)]," meaning that a fiscal plan developed under Section 201(f) must strictly "meet" the Section 201(b) requirements.  PROMESA § 201(f).

120.     Similarly, FOMB had no authority to approve the Revised Fiscal Plan, because FOMB refused to make numerous determinations necessary to determine whether the Revised Fiscal Plan complied with Section 201(b) of PROMESA, including determinations as to (i) what lawful priorities and liens exist under Puerto Rico law (Section 201(b)(1)(N)); (ii) which government entities are entitled to the assets, funds, and resources governed by the Revised Fiscal Plan and whether any transfers of funds from one entity to another mandated under the Revised Fiscal Plan are illegal (Section 201(b)(1)(M)); and (iii) which government services qualify as "essential public services" and whether the Revised Fiscal Plan adequately funds such essential public services (Section 201(b)(1)(B)).   In purporting to approve the Revised Fiscal Plan, FOMB failed even to consider any of these requirements, much less reach determinations with respect to them.   Therefore, FOMB's purported approval of the Revised Fiscal Plan exceeded FOMB's statutory authority and was *ultra vires* and invalid.

121.     The full implications and illegality of the Revised Fiscal Plan can be seen in the Compliance Law, which further "implements" the Fiscal Plans by impairing the contractual rights of Plaintiffs and other stakeholders and depriving them of their property without just compensation or due process of law.

## VI.    The Compliance Law

122.     On or about April 29, 2017, the Commonwealth enacted the Compliance Law.  The Compliance Law further implements the contract impairments and unlawful takings of property mandated by the Fiscal Plans.  Chapters 4 and 6 of the Compliance Law (Ex. 4A at 66-68, 72-25; Ex. 4B at 82-85, 91-94) are particularly egregious and obviously illegal and unconstitutional.    Chapter 4, entitled "Transfer Of Public Corporations, Agencies, and Instrumentalities to the General Fund," purportedly authorizes the Commonwealth to simply misappropriate secured bondholder collateral and other property to which the Commonwealth

has no legal entitlement. Chapter 6, meanwhile, similarly purports to authorize the Commonwealth to simply appropriate for its own use trust funds held in special accounts in the Commonwealth treasury for the benefit of the Authorities and their bondholders.

A.     **Chapter 4 Of The Compliance Law**

123.    Article 4.01 of Chapter 4 of the Compliance Law provides for the Commonwealth to expropriate property in the form of "surplus" revenues from its public corporations and their bondholders:

> [Article] 4.01.- Transfer of Surplus
>
> The public corporations, agencies, and instrumentalities of the Government of Puerto Rico are hereby directed to transfer to the Department of the Treasury any surplus of the revenues generated. Said funds shall be deemed to be available resources of the State and shall be deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico in order to meet the liquidity requirements provided for in the Fiscal Plan adopted by virtue of the provisions of the Puerto Rico Oversight, Management, and Economic Stability Act of 2016, Public Law 114-187, better known as PROMESA.

Ex. 4B at 82.

124.    Article 4.02 of Chapter 4 of the Compliance Law in turn purports to establish a committee empowered to determine what amounts of bondholder collateral are to be expropriated from the Commonwealth's public corporations and transferred to the Commonwealth pursuant to Article 4.01:

> [Article] 4.02.-Committee
>
> The amount of funds to be contributed by each of corporation and instrumentality shall be determined by a committee composed of the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget, which committee may establish the rates needed to comply with the provisions of the Fiscal Plan approved for the Government of Puerto Rico, and that which governs the

> corporations. This committee shall ensure that the fund transfer provided in Section 4.01 of this Act does not affect the services offered by public corporations and instrumentalities, and that the surplus consists of the balance available after the operating costs and obligations of said entities are covered, in accordance with the expenditures budget recommended by the Office of Management and Budget for each fiscal year.

Ex. 4B at 83.

125.    Chapter 4 makes absolutely no provision for payment by the Authorities of their secured debt.  Instead, under Chapter 4, the Commonwealth purports to authorize itself to unlawfully take the Pledged Special Revenues pledged to payment of the Authority Bonds without just compensation.

126.    Equally unlawfully and unconstitutionally, Chapter 4 defines the revenues that the Commonwealth may expropriate to include all revenues that do not constitute "operating costs and obligations" of the relevant Authority.  In the case of Authorities, such as PRHTA, that have given a "gross pledge" of their revenues to bondholders, Chapter 4 *reverses* the priorities established by the gross pledge, essentially providing that operating expenses of the Authority have a first priority status over all of its other obligations, including its debt obligations.

127.    Moreover, Article 4.02 defines as "available resources" those Pledged Special Revenues (the "Operating Revenues") that are generated by an Authority itself, such as Pledged Toll Revenues generated by PRHTA's operations.  Such Operating Revenues do not constitute "available resources" under the Commonwealth Constitution and are not subject to "clawback" by the Commonwealth even under the very limited circumstances under which a "clawback" of the Pledged Special Excise Taxes is permitted.   The Commonwealth's misappropriation of these Operating Revenues under Chapter 4 constitutes an unlawful taking.

### B.    Chapter 6 Of The Compliance Law

128.    Chapter 6 of the Compliance Law amends Act No. 230-1974 (July 23, 1974), known as the "Government Accounting Act of Puerto Rico" (as amended, the "Accounting Act"), among other things by providing under Article 7(a) and (e) of the Accounting Act, as amended:

> [Article 6.02]
>
> [A]s of July 1st, 2017, any special State fund and any other income of the agencies and public corporations shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate[.]
>
> *        *        *
>
> As of July 1st, 2017, any special State funds created by law for specific purposes shall continue to be used for the purposes for which they were allocated by law, in accordance with the Recommended Budget of the Office of Management and Budget and the Fiscal Plan. . . .  **Should there be any inconsistency between the law and the use of the funds with the Fiscal Plan, the purpose provided for in the Fiscal Plan approved in accordance with PROMESA shall prevail.**

Ex. 4B at 92, 93 (emphasis added).

129.    Funds held in "special funds" in the Commonwealth treasury include Pledged Special Revenues "allocated" to the Authorities "by law" and constituting trust funds held by the Department of Treasury on behalf of the relevant Authority for the benefit of its bondholders.  In particular, the PRHTA Pledged Special Excise Taxes are held in a special fund in the Commonwealth Treasury on PRHTA's behalf for the benefit of its bondholders prior to transfer to the PRHTA Fiscal Agent.  See, e.g., 13 L.P.R.A. § 31751; 9 L.P.R.A. § 2021. Similarly, PRIFA Pledged Tax Revenues are held in a special fund in the Commonwealth Treasury prior to being transferred to the trustee for the PRIFA Bonds.  See 3 L.P.R.A. § 1914. By conditioning the uses of these special funds on their being "in accordance with the Budget

recommended by the Office of Management and Budget and with the Fiscal Plan," Chapter 6 subverts the purposes for which the Pledged Special Revenues were assigned by law.

130.    Chapter 6 further flaunts the fact that the Fiscal Plans deprive bondholders of their statutory entitlements and substantially impair their contractual rights, stating "[s]hould there be any inconsistency between **the law** and the use of funds with the Fiscal Plan, **the purpose provided for in the Fiscal Plan . . . shall prevail**." Ex. 4B at 93 (emphasis added). The admitted effect of the Compliance Law, then, is to deprive Plaintiffs and other parties of constitutional, statutory, contractual, and property rights to which they are entitled by law.

## VII.    The Revised Fiscal Plan And The Compliance Law Violate PROMESA

### A.    The Revised Fiscal Plan And The Compliance Law Fail To Respect Lawful Priorities And Liens (PROMESA § 201(b)(1)(N))

131.    Section 201(b)(1)(N) of PROMESA requires a fiscal plan to "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of [PROMESA]."[18]    The Revised Fiscal Plan and the Compliance Law give no consideration at all to priorities and liens under Commonwealth law and do not even reference or identify any such priorities or liens.    Indeed, the word "lien" appears nowhere in the Revised Fiscal Plan, and the word "priority" never appears in the context of debt or creditors.

132.    A fiscal plan cannot "respect" priorities and liens if it does not even acknowledge them.    At a bare minimum, in order to determine whether the Revised Fiscal Plan respected priorities and liens, FOMB would have needed to determine what priorities and liens exist under Puerto Rico law.    FOMB, however, has refused to make this determination required

---

[18]    The stated purpose of Sections 201(b)(1)(N) and 201(b)(1)(M) of PROMESA is to "ensure fiscal plans keep intact the structural hierarchy of prioritized debt."    Committee on Natural Resources, Markup Memorandum at 3 (May 23, 2016) (attached hereto as "Exhibit 21").

by PROMESA. FOMB had no authority to approve a fiscal plan without first making the determinations required by Section 201(b)(1)(N) of PROMESA.

133. Indeed, far from respecting priorities and liens, the Revised Fiscal Plan assumes that the expenses of the Commonwealth and its various agencies and instrumentalities will be paid first, leaving the remaining revenues to the remaining unpaid creditors. Thus, the Revised Fiscal Plan favors one set of creditors—those with run-of-the-mill unsecured claims for the operating expenses of government—over all other creditors, including those holding public debt and secured bonds.

134. As set forth above, the Constitutional Debt Priority Provision, the Excise Tax Statutes, and the OMB Act together establish the lawful priorities and liens in effect prior to the enactment of PROMESA. The Revised Fiscal Plan violates the Public Debt Priority and the Authority Bond Priority, however, because it assumes that non-debt expenses of the Commonwealth government can be paid before debt service on the public debt and the Authority Bonds. By contrast, a PROMESA-compliant fiscal plan would require that (i) the public debt must be paid first from all available resources, (ii) the Authority Bonds must be paid from the Pledged Special Revenues (except in the unlikely scenario that the public debt remains unpaid after a first application of all other available resources to the payment of such public debt), and (iii) the remaining available resources must be budgeted to other government expenditures in accordance with the priorities set out in the OMB Act.

135. The Revised Fiscal Plan also violates the priorities established by Section 4(c)(3) of the OMB Act by failing even to attempt to prioritize as between different categories of third priority "regular expenses" of government. This is contrary to the OMB Act's express requirement that expenditures related to health, public safety, education, and welfare be given

priority over other government services and over capital improvements, albeit in both cases only after the payment first of public debt and the Authority Bonds.

136.    The Revised Fiscal Plan also violates the priorities set forth in the OMB Act by requiring the Commonwealth to fund "Capital expenditures."  See, e.g., Ex. 1 at 22-23, 124.  Under the OMB Act, capital expenditures enjoy a fourth priority and cannot be funded until the public debt (first priority) and the Authority Bonds (second priority) have been paid.

137.    The Revised Fiscal Plan and the Compliance Law also violate the lawful liens in effect prior to the enactment of PROMESA, because they require the Commonwealth to unlawfully commingle the Pledged Special Revenues, which are the Authority Bondholders' property and on which the Authority Bondholders have contractual and statutory liens, with the Commonwealth's unencumbered revenues.  The Revised Fiscal Plan and the Compliance Law pool all resources, including Pledged Special Revenues, into a single pot and use them to fund any and all Commonwealth expenses.

138.    Similarly, the Revised Fiscal Plan and the Compliance Law fail to first use the Commonwealth's unencumbered available resources to pay public debt, as required by the Constitutional Debt Priority Provision and the Authority Bond Priority, and fail to segregate Pledged Special Revenues for the payment of the Authority Bonds or of the public debt, which are the only two purposes for which such Pledged Special Revenues may be used.

**B.      The Revised Fiscal Plan And The Compliance Law Mandate The Misappropriation Of Pledged Special Revenues (PROMESA § 201(b)(1)(M))**

139.    The Revised Fiscal Plan and the Compliance Law, on their face, also violate Section 201(b)(1)(M) of PROMESA, which requires a compliant fiscal plan to "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality

of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under [T]itle III, or a Qualifying Modification approved under [T]itle VI[.]" PROMESA § 201(b)(1)(M). By its plain terms, this section of PROMESA prohibits illegal transfers of Pledged Special Revenues to the Commonwealth or for the Commonwealth's benefit. The Revised Fiscal Plan and the Compliance Law actually *require* such illegal transfers by mandating that the Commonwealth misappropriate, for its own general use, Pledged Special Revenues that constitute assets, funds, or resources of the Authorities and their bondholders.[19]

140. Specifically, the Revised Fiscal Plan fails to preserve the segregation of the Pledged Special Revenues and instead simply commingles the Pledged Special Revenues with the Commonwealth's general revenues. For example, the Revised Fiscal Plan expressly mandates, under the heading "HTA," that "Clawbackable [*sic*] revenues [i.e., the PRHTA Pledged Special Excise Taxes] *flow directly* to [the] Commonwealth." Ex. 1 at 135 (emphasis added). As noted above, the conditions to a "clawback" have never been satisfied, and there is therefore no basis in Puerto Rico law for the Revised Fiscal Plan to mandate that the PRHTA Pledged Special Excise Taxes must "flow" to the Commonwealth.

141. Similarly, the Revised Fiscal Plan "consolidate[s]" the funds of all "Independently Forecasted Non-Enterprise Component Units," including PRCCDA,[20] and of all "Special Revenue Funds / Enterprise Funds" "into Central Government revenue and expenses," meaning that the Revised Fiscal Plan also mandates the transfer of all other Pledged Special

---

[19] For these same reasons, the Revised Fiscal Plan and Compliance Law also violate section 928(a) of the Bankruptcy Code, made applicable to these proceedings by Section 301(a) of PROMESA, as set forth below.

[20] The Revised Fiscal Plan identifies PRCCDA as one of the "Independently Forecasted Component Units" included in the Revised Fiscal Plan. See Ex. 1 at 23. The Revised Fiscal Plan also identifies PRIFA as one of the "Entities Covered By The New Fiscal Plan," meaning that the Revised Fiscal Plan "consolidates" (i.e., commingles) the PRIFA Pledged Tax Revenues with the Commonwealth's general funds. See Ex. 1 at 118.

Excise Taxes (such as the PRCCDA Pledged Tax Revenues and the PRIFA Pledged Tax Revenues) to the Commonwealth government.  Ex. 1 at 135.

142.    The Revised Fiscal Plan similarly classifies Vehicle Fees and other Pledged Special Excise Taxes as "General Fund Revenues."  See Ex. 1 at 123.

143.    Furthermore, the Revised Fiscal Plan mandates the creation of an "Office of the Chief Financial Officer for Puerto Rico" ("OCFO"), one of the functions of which will be to "**Enforce** and manage a **consolidated** treasury single account for the Government; this involves **consolidating** visibility and control of **all Government bank accounts** . . . and creating a true Treasury Single Account."  Ex. 1 at 62 (emphasis added).  Therefore, the Revised Fiscal Plan mandates that the Commonwealth, through the OCFO, illegally transfer Pledged Special Revenues to a consolidated "Treasury Single Account," where the Pledged Special Revenues will be commingled with general Commonwealth revenues.

144.    However, the Pledged Special Revenues are either generated directly by the relevant Authority (in the case of the Pledged Toll Revenues) or are allocated to the relevant entity by statute for the benefit of bondholders[21] (in the case of the other Pledged Special Revenues).  As such, the Pledged Special Revenues constitute "assets, funds, [and] resources" of the relevant "territorial instrumentality" (i.e., an Authority) that cannot legally be loaned to, transferred to, or otherwise used for the benefit of the Commonwealth.

145.    The use of Pledged Special Revenues to fund Commonwealth general expenditures under the Revised Fiscal Plan thus violate Section 201(b)(1)(M), again rendering the Revised Fiscal Plan non-compliant and in violation of PROMESA.

---

[21]    See 13 L.P.R.A. § 31751(a)(1) (governing Special Excise Taxes assigned to PRHTA); 9 L.P.R.A. §§ 2021, 5681 (governing Vehicle Fees assigned to PRHTA); 13 L.P.R.A. § 2271v (governing PRCCDA Pledged Tax Revenues); 3 L.P.R.A. § 1914 (governing PRIFA Pledged Tax Revenues).

Case:17-03283-LTS Doc#:13744-9 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc:
Miller Declaration Ex. 60 Complaint Page 50 of 102

Case:18-00059-LTS Doc#:174 Filed:05/29/18 Entered:05/29/18 21:31:16 Desc: Main
Document Page 49 of 102

146.    Clearly, FOMB did not even consider Section 201(b)(1)(M) in purporting to approve the Revised Fiscal Plan.  Specifically, in order to determine whether the Revised Fiscal Plan complies with Section 201(b)(1)(M), FOMB would first have needed to determine which "assets, funds, or resources" governed by the Revised Fiscal Plan belong to which government entities and whether any transfers mandated by the Revised Fiscal Plan from one entity to another are lawful or unlawful. FOMB has refused, however, to make these determinations required by PROMESA.  FOMB had no authority to purport to approve a fiscal plan without first making the determinations required by Section 201(b)(1)(M).

147.    Furthermore, FOMB conceded in the Third Violation Notice that the Second Proposed Fiscal Plan did "not provide sufficient data to determine whether it satisfies PROMESA § 201(b)(1)(M) and (N)."  Ex. 16 at 1 n.1.  Yet the Revised Fiscal Plan provides no more relevant data than did the Second Proposed Fiscal Plan.  If, as FOMB has conceded, it was impossible for FOMB to determine whether the Second Proposed Fiscal Plan complied with Sections 201(b)(1)(M) and (N), then it was equally impossible for FOMB to make such a determination with respect to the Revised Fiscal Plan, and FOMB in fact made no such determination.

## C.    The Revised Fiscal Plan And The Compliance Law Fail To Ensure The Funding Of Essential Public Services (PROMESA § 201(b)(1)(B))

148.    Because the Revised Fiscal Plan fails to differentiate between essential and non-essential services, the Revised Fiscal Plan, on its face, also violates Section 201(b)(1)(B) of PROMESA, which requires a fiscal plan to ensure the funding of "*essential public services.*"  PROMESA § 201(b)(1)(B) (emphasis added).  Clearly, Congress intended the use of the word "essential" to be a limitation on the services to be funded; otherwise it would

have simply required a fiscal plan to fund all government services.[22]  Because the Revised Fiscal Plan does not even identity which services are essential, it is impossible to determine whether all of the services funded under the Revised Fiscal Plan qualify as "essential," and by funding all government services, essential or not, the Revised Fiscal Plan breaches the funding limitation Congress erected.

149.    For example, on June 16, 2017—some three months *after* the purported approval of the Original Fiscal Plan—FOMB sent Governor Rosselló a letter (attached hereto as "Exhibit 22") in which FOMB "reiterate[d] [its] earlier requests urging [Governor Rosselló's] administration to make and communicate as soon as possible the necessary public policy determinations with respect to what it understands constitute 'essential services' in the context of PROMESA."  Ex. 22 at 3.  FOMB went on to state, "[a]s you know, in light of Puerto Rico's fiscal situation, a PROMESA-compliant budget needs to reflect appropriate allocations for the adequate funding of essential services, pension benefits, investments to spur growth and other PROMESA priorities. We can no longer afford business as usual."  Id.

150.    Therefore, at the time it purported to approve the Original Fiscal Plan, FOMB had no definition of "essential services," and no such definition has emerged in the intervening months.  Accordingly, at the time FOMB purported to approve the Revised Fiscal Plan, FOMB still did not have a definition of "essential services" that would have permitted it to make the determination required by Section 201(b)(1)(B), and FOMB in fact made no such determination.   Indeed, the terms "essential services" and "essential public services" never appear in the Revised Fiscal Plan.

---

[22]   The Commonwealth Constitution likewise distinguishes between "essential public services" and other public services.

151. Notably, on November 28, 2017, Plaintiffs and certain other parties in interest filed a motion (the "2004 Motion") seeking authorization to conduct an examination of the Commonwealth and of FOMB under Rule 2004 of the Federal Rules of Bankruptcy Procedure (Case No. 17-03283-LTS, ECF No. 1870). The 2004 Motion requested, among other things, "Materials reflecting the definition of 'essential services,' and any supporting workbook or schedule analyzing the cost of the same." Id. at 13.

152. On December 14, 2017, Judge Judith Gail Dein conducted a hearing on the 2004 Motion. At the hearing, counsel to AAFAF admitted that absolutely no documents defining "essential services" had been provided to FOMB or used in the development of the Fiscal Plans. See Dec. 14, 2017 H'rg. Tr. at 47 (excerpt attached hereto as "Exhibit 23").

153. The fact that no documents defining "essential services" exist demonstrates that FOMB made no determination as to whether the Revised Fiscal Plan satisfied Section 201(b)(1)(B) of PROMESA and gave no consideration to that issue.

**D.     The Revised Fiscal Plan Violates Section 407 Of PROMESA And Section 928 Of The Bankruptcy Code**

154. In addition to Section 201(b) of PROMESA, the Revised Fiscal Plan violates numerous other mandatory provisions of PROMESA.

155. For example, Section 407 of PROMESA prohibits transfers of any property of any territorial instrumentality of Puerto Rico (including the Authorities) "in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which depriv[e] any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors[.]" PROMESA § 407(a). The Pledged Special Revenues are property of the Authorities held in trust or in a custodial capacity for the benefit of the Authority

Bondholders, and the Authority Enabling Acts and Excise Tax Statutes constitute (i) "applicable law[s] under which [the Authority Bondholders] ha[ve] a valid pledge of, security interest in, or lien on [the Pledged Special Revenues]" and (ii) "applicable law[s] assuring the transfer of [the Pledged Special Excise Taxes] to [the Authorities] for the benefit of [the Authority Bondholders]." Id. By requiring the Pledged Special Excise Taxes to "flow" to the Commonwealth instead of to the Authorities for the benefit of the Authority Bondholders, the Revised Fiscal Plan violates Section 407 and is clearly unlawful. See Ex. 1 at 135.

156.    Similarly, section 928(a) of the Bankruptcy Code—made applicable by Section 301(a) of PROMESA—provides that "special revenues acquired by the debtor after commencement of the case *shall* remain subject to any lien resulting from any security arrangement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a) (emphasis added). The Revised Fiscal Plan completely disregards Plaintiffs' liens on the Pledged Special Revenues, however, by mandating that the Pledged Special Revenues be transferred to the Commonwealth (in the case of the Pledged Special Excise Taxes) or otherwise used for purposes other than payment of the Authority Bonds. The Revised Fiscal Plan is clearly unlawful in that it violates section 928(a).[23]

---

[23]    While section 928(b) of the Bankruptcy Code creates a narrow exception permitting special revenues "derived from a project or system" to be applied to the "necessary operating expenses of such project or system," the section 928(b) exception does not apply to the Pledged Special Excise Taxes, because (i) the Pledged Special Excise Taxes are not being applied to the Authorities' operating expenses, but rather are being confiscated by the Commonwealth, and (ii) the Pledged Special Excise Taxes are not "derived from" the Authorities' "projects or systems," but rather are derived from taxes. Furthermore, the Pledged Toll Revenues are not being used in accordance with section 928(b) in that the Pledged Toll Revenues are being used (i) to pay expenses that are not "necessary," (ii) to pay expenses (such as capital improvements) that are not "operating expenses," and (iii) to pay expenses that are not expenses of the "project or system" from which the Pledged Toll Revenues are derived, namely the specific toll roads that generate the Pledged Toll Revenues.

## VIII.  Section 303 Of PROMESA Prohibits And Preempts The Moratorium Laws, The Moratorium Orders, The Revised Fiscal Plan, And The Compliance Law

157.  In addition to (i) protecting creditors' priorities and liens in Section 201(b) of PROMESA, (ii) protecting creditors against inter-debtor transfers in Section 407 of PROMESA, and (iii) protecting creditors' liens on pledged special revenues through incorporation of section 928 of the Bankruptcy Code, PROMESA further protects creditors against the abuses perpetrated by the Commonwealth under the Clawback Order, Moratorium Laws, and Moratorium Orders in the pre-PROMESA period by (i) preempting Commonwealth legislation and executive orders that unlawfully alter or impair the rights of bondholders and (ii) prohibiting the illegal transfer of funds between government entities.  Specifically, Congress designed Section 303 of PROMESA to preempt the Moratorium Laws and Moratorium Orders, and Section 303 also preempts and prohibits the Revised Fiscal Plan and the Compliance Law.

### A.  Section 303(1) Of PROMESA Preempts The Moratorium Laws, The Moratorium Orders, The Revised Fiscal Plan, And The Compliance Law

158.  One of Congress's objectives in PROMESA was to overturn the Clawback Order and the First Moratorium Law and to return to the regime established by the Commonwealth Constitution and the OMB Act.  Specifically, the legislative history of PROMESA indicates that Congress recognized that "Puerto Rico's local politicians [had] . . . accelerated the [alleged] fiscal crisis on the island through the passage of harmful legislation, including the recent debt moratorium [i.e., the First Moratorium Law]."[24]  In order to undo the First Moratorium Law and any similar "harmful legislation," Congress enacted Section 303(1) of PROMESA, which expressly preempts "moratorium laws"—such as the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law—that impose a non-consensual moratorium on creditors:

---

[24]  Ex. 21 at 2.

-53-

> [A] moratorium law, but solely to the extent that it prohibits the
> payment of principal or interest by an entity not described in
> section 109(b)(2) of [T]itle 11 [of the] United States Code, may not
> bind any creditor of a covered territory or any covered territorial
> instrumentality thereof that does not consent to the . . .
> moratorium[.]

PROMESA § 303(1).

159.    While Section 303(1) was generally modeled on section 903 of the
Bankruptcy Code, its scope is different, and broader, than the scope of section 903.  Specifically,
section 903 does not contain Section 303(1)'s references to a "moratorium law" and
"moratorium."   These terms were added to Section 303 specifically in reference to the First
Moratorium Law, EO-14, EO-18, and EO-27, all of which already were in effect at the time
PROMESA was enacted, and specifically for the purpose of invalidating the First Moratorium
Law, EO-14, EO-18, and EO-27, and any similar moratorium legislation that the Commonwealth
subsequently might enact.

160.    Generally, a "moratorium" is defined as "a ***temporary*** prohibition of an
activity."[25]  The Moratorium Laws and Moratorium Orders constitute moratorium laws, because
they impose a temporary prohibition on various activities, including payment of principal and
interest on the GO Bonds and Authority Bonds.  The Revised Fiscal Plan and the Compliance
Law similarly prohibit payments of principal and interest on the GO Bonds and the Authority
Bonds by requiring the Commonwealth and the Authorities to divert the available resources and
Pledged Special Revenues from which the GO Bonds and the Authority Bonds must otherwise
be paid to other purposes and by requiring the Commonwealth and Authorities to enact budgets
and other laws that will not provide for the full payment of principal and interest on the Bonds.

---

[25] See  Oxford  Living  Dictionary:  English,  https://en.oxforddictionaries.com/definition/
moratorium).

161.     Similarly, Black's Law Dictionary defines a "moratorium" as "[a]n authorized **postponement**, usu[ally] a lengthy one, in the deadline for paying a debt or performing an obligation."  Black's Law Dict. 1101 (9th ed. 2009) (emphasis added).  Even a "lengthy" postponement is not permanent, however.  Therefore, the Black's definition likewise reflects the fact that the term "moratorium" generally refers to a prohibition or postponement that is *temporary*, and there is absolutely no requirement that the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, or the Compliance Law impose a permanent prohibition on the payment of principal and interest in order for them to fall within the scope of Section 303(1) of PROMESA.

162.     Section 303(1) of PROMESA contains an exception from preemption solely to the extent that a moratorium law places a moratorium on debt payments by an "entity . . . described in section 109(b)(2)" of the Bankruptcy Code.  PROMESA § 303(1).  The types of entities described in section 109(b)(2) of the Bankruptcy Code include "bank[s]," and this exception was specifically created so that the First Moratorium Law would not be preempted to the extent it imposed a moratorium on debt payments by the GDB.  Plaintiffs do not challenge the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, or Compliance Law as applied to debt payments by GDB, however, and instead challenge the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law as applied to entities (the Commonwealth and the Authorities) that are not "entit[ies] . . . described in section 109(b)(2)" of the Bankruptcy Code.   Furthermore, Plaintiffs have not consented to the moratoria imposed under the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law.

163.     Therefore, the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law are expressly preempted by Section 303(1) of PROMESA and are invalid, null, and void.

### B. Section 303(3) Of PROMESA Preempts The Moratorium Orders

164.    As noted above, one of Congress's main concerns in drafting and enacting PROMESA was to stop the illegal diversions and misappropriations of funds that the Commonwealth had implemented under the Clawback Order, the First Moratorium Law, and the Moratorium Orders (including EO-14, EO-18, and EO-27) that were in effect as of the enactment of PROMESA.  Specifically, in response to criticisms that the automatic stays under PROMESA could "give Puerto Rico's government an opportunity to shuffle money around" in a manner detrimental to creditors, Congress included "multiple sections of [PROMESA] [that] prohibit the transfer of funds between debtors and provide creditors with a right to sue if any such unlawful transfers do occur."[26]  These sections were expressly intended to preempt the Moratorium Laws and Moratorium Orders even while an automatic stay was in effect, and the automatic stays under PROMESA were in no way intended to shield the Moratorium Laws or Moratorium Orders from preemption.  Among these sections of PROMESA specifically designed to prevent illegal transfers under the Clawback Order, the First Moratorium Law, and the Moratorium Orders was Section 303(3) of PROMESA, which expressly preempts "unlawful executive orders," such as the Clawback Order and Moratorium Orders, as follows:

> [U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act.

PROMESA § 303(3).

165.    The Moratorium Orders are "executive orders" that (i) "divert funds" from a "territorial instrumentality" (PRHTA, PRCDDA, or PRIFA, as applicable) to "the territory" (i.e., the Commonwealth), and that (ii) unlawfully "alter, amend, [and] modify" the rights of (a)

---

[26]    Ex. 21 at 4.

GO Bondholders and other holders of public debt to receive payment "first" from available resources and (b) Authority Bondholders to receive payment from the Pledged Special Revenues, except where no other resources are available to pay the GO Bonds or other "public debt." More specifically, the Moratorium Orders are "unlawful" because they (i) violate the Constitutional Debt Priority Provision by authorizing payment of other expenses at the same time as, or ahead of, the public debt, and (ii) violate the Excise Tax Statutes by authorizing the use of Pledged Special Excise Taxes (a) for purposes other than payment of the Authority Bonds to which those funds are pledged, notwithstanding the fact that the preconditions for a clawback have not been satisfied, and (b) for purposes other than payment of the public debt.

166. Similarly, the Moratorium Orders are "unlawful" because they violate the Commonwealth's statutory covenants with the Authority Bondholders not to limit the Authorities' rights and powers under the Authority Enabling Acts until the Authority Bonds have been paid in full. See 9 L.P.R.A. § 2019 (covenant with PRHTA Bondholders); 23 L.P.R.A. § 6450 (covenant with PRCCDA Bondholders); 3 L.P.R.A. § 1913 (covenant with PRIFA Bondholders). Further, the Moratorium Orders are unlawful because they violate the OMB Act (as described above).

167. The Moratorium Orders also violate numerous other provisions of Commonwealth law, including (i) the provision of the PRHTA Enabling Act authorizing PRHTA to determine the use of Pledged Toll Revenues (9 L.P.R.A. § 2012(e)(2)); (ii) the provision of the PRHTA Enabling Act authorizing PRHTA to pledge Pledged Toll Revenues to payment of PRHTA Bonds (9 L.P.R.A. § 2004(*l*)); and (iii) the provisions of the PRHTA Resolutions that in fact pledge Pledged Toll Revenues to payment of PRHTA Bonds.

168. Finally, the Moratorium Orders are "unlawful" because they (i) violate the Contracts Clauses of the U.S. and Commonwealth Constitutions, by substantially impairing the

contractual rights of Plaintiffs and other Authority Bondholders, as described below, and (ii) violate the Takings and Due Process Clauses of the U.S. and Commonwealth Constitutions, by taking the Pledged Special Revenues in which Authority Bondholders have a property interest without providing just compensation.[27]

## IX. The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, And Compliance Law Violate The U.S. Constitution

### A. The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, And Compliance Law Violate The Contracts Clause

169.    The Contracts Clause of Article I of the U.S. Constitution (the "Contracts Clause") provides that "**[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]**"  U.S. Const. art. I, § 10, cl. 1 (emphasis added).  The Contracts Clause prohibits States or the Commonwealth from enacting laws that would permit borrowers (including the States or the Commonwealth) to abrogate their debts at the expense of creditors.

170.    In enacting each of the Moratorium Laws, the Commonwealth "passed" a "law."  In addition, in issuing and continuing the Moratorium Orders, Governor García Padilla and Governor Rosselló (collectively, the "Governors") purported to exercise the Commonwealth's police power.  The police power is a legislative power.  See, e.g., P.R. Const. art. II, § 19 ("The power of the **Legislative Assembly** to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively.") (emphasis added).  Therefore, the Governors' issuance and continuance of the Moratorium Orders, as

---

[27]    The stay provisions of the First Moratorium Law and of the Moratorium Orders also render the First Moratorium Law and the Moratorium Orders unlawful and unconstitutional.  Pursuant to Section 201(b) of the First Moratorium Law, the Moratorium Orders purport to prohibit the commencement or continuation of all actions, claims, and proceedings "in any court of whatever jurisdiction" that are "related to" the Bonds.  Ex. 5B at 66-68 § 201(b).  Under the U.S. Constitution, state courts cannot stay actions in federal courts and state or Commonwealth laws and executive orders cannot stay federal court proceedings, nor can such local laws stay federal constitutional claims filed in federal court.  Therefore, the First Moratorium Law and the Moratorium Orders are unlawful and violate the U.S. Constitution.

purported exercises of the Commonwealth's police power, constituted legislative acts that likewise effected a change in Commonwealth law.

171.  The Compliance Law constitutes a "law" that was "passed" by the Commonwealth.  In addition, and independently of its implementation through the Compliance Law, the Revised Fiscal Plan also has the force of law and constitutes a "law" for purposes of the Contracts Clause.  Among other things, the Revised Fiscal Plan dictates to the Legislative Assembly what types of budgets (PROMESA § 202) and other legislation (PROMESA § 204) the Legislative Assembly may pass.  Moreover, as noted below, FOMB has already exercised its powers under Section 204 of PROMESA to block legislation enacted by the Legislative Assembly on the grounds that such legislation was inconsistent with a fiscal plan.[28] Accordingly, in authorizing FOMB to approve fiscal plans, the U.S. Congress clearly delegated a portion of the Commonwealth's legislative power to FOMB.

172.  The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law substantially impair the contractual rights of bondholders and of Plaintiffs. Plaintiffs insured, and bondholders purchased, the GO Bonds and the Authority Bonds (collectively, the "Bonds") in reliance on the Public Debt Priority and the Authority Bond Priority, both of which priorities were incorporated into Bondholders' and Plaintiffs' contracts with the Commonwealth and the Authorities.[29]  Moreover, Plaintiffs insured the Authority Bonds in reliance on the Authorities' promises to pledge the Pledged Special Revenues exclusively to the payment of the relevant Bonds, subject only to the conditions specified in the Constitutional Debt Priority Provision and the Excise Tax Statutes.  However, by altering these priorities and

---

[28]  See Letter dated August 30, 2017 from José B. Carrión III, the chair of FOMB to Governor Rosselló and other Commonwealth officials (attached hereto as "Exhibit 24").

[29]  In the same way, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law impair the priority of the Commonwealth's guarantee of the PBA Bonds that Plaintiffs also insure.

diverting Pledged Special Revenues from their contractually agreed upon purposes, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law substantially impair (i) the contractual rights of GO Bondholders to be paid on a first-priority basis from available resources and (ii) the contractual rights of Authority Bondholders and Plaintiffs to be secured by, and ultimately paid from, the Pledged Special Revenues.

173.    The Commonwealth also covenanted with Authority Bondholders in the Authority Enabling Acts that it would not limit or restrict the rights or powers vested in the Authorities until all Authority Bonds had been paid in full.  See 9 L.P.R.A. § 2019 (covenant with PRHTA Bondholders); 23 L.P.R.A. § 6450 (covenant with PRCCDA Bondholders); 3 L.P.R.A. § 1913 (covenant with PRIFA Bondholders).  By limiting the Authorities' rights and powers to fulfill the terms of their pledge of Pledged Special Revenues to the payment of Authority Bonds, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law impair the Commonwealth's covenants with Authority Bondholders.

174.    The Commonwealth, including FOMB, cannot justify this substantial impairment of Plaintiffs' and Bondholders' rights by claiming that it was exercising the Commonwealth's police power in enacting the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law, because the police power cannot override constitutional limitations. See, e.g., Flushing, 358 N.E.2d at 852 (holding that a "fugitive recourse to the police power" may not be used to "displace inconvenient but intentionally protective constitutional limitations").  The Commonwealth, including FOMB as "an entity within the [Commonwealth] government," therefore has no power to override the Constitutional Debt Priority Provision or the statutory priorities incorporated therein, including the Authority Bond Priority.

175.    Alternatively, even if the Commonwealth somehow were permitted to exercise its police power to override the Commonwealth Constitution, it could do so only to the

extent the resulting impairments of Plaintiffs' and of Bondholders' contractual rights constituted a reasonable and necessary means of serving an important public purpose.

176. Here, the substantial contract impairments effected by the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law do not protect a basic societal interest, because they are designed to benefit particular individuals. For example, while the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law cut off funds for the repayment of Bondholders and other financial creditors, they permit and/or require substantially full funding of pension benefits and fail to mandate any significant reduction in the size of the government workforce. The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law therefore benefit particular special interest groups, such as government pensioners and employees, rather than the societal interest more generally.

177. Notably, although the Revised Fiscal Plan provides for some modest reductions in pension benefits, José B. Carrión, the chair of FOMB, has acknowledged that these insubstantial cuts are mere window-dressing designed to protect pensioners from the more significant cuts inflicted by the Revised Fiscal Plan on Plaintiffs and other financial creditors. As Mr. Carrión recently stated in an interview:

> If we don't [implement the pension benefit cuts provided for in the Revised Fiscal Plan], there exists the probability that the judge takes the issue of the percentage into her hands and decides for more severe cuts. . . . **Legally, the bondholders in effect have rights over pensioners, which are unsecured creditors. In effect, there is a reality that first come the bondholders and afterwards come the pensioners.** We want to ensure that the cut [to pension benefits] will be modest and we can justify the debt restructuring in front of the judge.

Reorg Research, "PROMESA Board, Commonwealth in Talks to 'Improve' Certified Fiscal Plan," Apr. 24, 2018, at 1 (emphasis added) (attached hereto as "Exhibit 25").

178.    Therefore, by Mr. Carrión's own admission, even the nominal pension cuts provided for in the Revised Fiscal Plan serve to benefit a particular special interest group, namely pensioners, at the expense of the larger public purposes and societal interests—such as respect for priorities and liens, fiscal responsibility, and capital market access—reflected in PROMESA.

179.    Moreover, the substantial contract impairments effected by the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law are neither necessary nor reasonable.

180.    As an initial matter, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law cannot possibly constitute a "reasonable and necessary" response to Puerto Rico's alleged financial difficulties, because Congress specifically legislated a different response. Congress clearly did not view overriding Bondholders' contract rights as a "reasonable" or "necessary" means of addressing Puerto Rico's alleged problems, because Congress specifically provided that creditors' priorities, liens, and other rights must be "respected" (PROMESA § 201(b)(1)(N)). Congress also expressly preempted the Moratorium Laws and Moratorium Orders, which had already begun to impair Bondholders' rights at the time of PROMESA's enactment (PROMESA § 303).

181.    In any event, the Commonwealth and FOMB were not facing a bona fide fiscal emergency at the time the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law were enacted, and the Commonwealth and FOMB in any event had many more reasonable alternatives for dealing with any supposed financial difficulties that the Commonwealth was allegedly experiencing.

182.    In particular, the purported debt sustainability analysis contained in the Revised Fiscal Plan fails to demonstrate that the impairments of the Public Debt Priority and the

Authority Bond Priority effectuated by the Revised Fiscal Plan and the Compliance Law are reasonable or necessary, because this purported debt sustainability analysis is flawed and inaccurate.  In particular, the Revised Fiscal Plan purports to compare Puerto Rico's capacity to pay debt to that of "U.S. States," but misleadingly purports to show, based on a variety of metrics, that Puerto Rico's existing debt burden is greater than that of the supposedly comparable U.S. States.  See Ex. 1 at 27-28.  Crucially, the Revised Fiscal Plan expressly ignores the fact that "Puerto Rico residents do not pay Federal income taxes," and that the debt burdens of the supposedly comparable U.S. States would in fact be much *greater than that of Puerto Rico* if the federal tax burden on the residents of those states were included in the analysis.  See id.  The GDB itself has stated, on behalf of the Commonwealth, that the "**GDB believes that any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt**."  The Commonwealth of Puerto Rico, "Update on Fiscal and Economic Progress, FY 2014 Q1 Investor Webcast – October 15, 2013" at 57 (attached hereto as "Exhibit 26").  Furthermore, the GDB itself has acknowledged, on behalf of the Commonwealth, that "[i]**f one factors in the federal debt load, PR would rank last in outstanding debt per capita amongst all US jurisdictions.**"  Id. (emphasis added).  The self-serving and self-interested debt sustainability analysis contained in the Revised Fiscal Plan is therefore designed to understate Puerto Rico's true debt capacity, and the reality is that Puerto Rico has significant additional debt capacity as compared to U.S. states.

183.  Furthermore, the Revised Fiscal Plan concedes that Puerto Rico has a significant informal economy that is not currently subject to effective taxation.  As the Revised Fiscal Plan states, "[a]bout one quarter of Puerto Rican workers participate in the informal economy according to Estudios Técnicos, substantially higher than any mainland state."  Ex. 1 at 35.  Integrating this informal economy into the formal economy and subjecting income

generated in the currently informal sectors of the economy to taxation would further boost Puerto Rico's debt capacity, a fact that again demonstrates that the purported debt sustainability analysis contained in the Revised Fiscal Plan is inaccurate and misleading.

184.    The revenue and economic growth projections and debt sustainability analysis in the Revised Fiscal Plan are also unreliable, because the Revised Fiscal Plan is based on a model that assumes only a single, worst-case "downside" scenario for all relevant variables. The revenue and economic growth projections in the Revised Fiscal Plan are therefore unrealistically conservative, because economic growth and revenues are likely to outperform this worst-case scenario.

185.    The revenue and economic growth projections and debt sustainability analysis in the Revised Fiscal Plan are also unreliable in that the model underlying the Revised Fiscal Plan does not accurately reflect economic stimulus from federal aid received by Puerto Rico as a result of Hurricanes Irma and Maria. The economic stimulus from federal aid should result in both a larger and a more sustained increase in economic growth and government revenues than is reflected in the Revised Fiscal Plan.

186.    The Moratorium Laws and Compliance Law also contain various recitals regarding the Commonwealth's purported fiscal emergency and supposed inability to fund public services. Because these recitals are self-serving and intended to justify contract impairments that are in the Commonwealth's own self-interest, these recitals are entitled, at best, to only limited deference from this Court. Moreover, the broad references to a fiscal emergency in these recitals are too general to justify the specific impairments effected by the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law. In any event, the assertions in these recitals are inaccurate, and the Commonwealth does not in fact face any

significant liquidity crisis or other fiscal emergency that would justify the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, or the Compliance Law.[30]

187.   In particular, in December 2017, FOMB and AAFAF disclosed the existence of $6.875 billion held in government accounts, including $1.542 billion in the Commonwealth's "Treasury Single Account" (the "TSA"), that had not previously been publicly disclosed, much of which was held by the Commonwealth government at the time it enacted the First Moratorium Law and at all times thereafter.[31]   This exceeds the total amount of Pledged Special Revenues expropriated under the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law.   Therefore, Defendants could have significantly reduced or entirely avoided any expropriation of Pledged Special Revenues and any impairment of the Authority Bond Priority if they had simply used some portion of their $6.875 billion in undisclosed liquidity.

---

[30]   PROMESA also contains certain findings regarding an alleged fiscal emergency in Puerto Rico. Notwithstanding these findings, however, PROMESA (i) requires a Fiscal Plan to respect lawful priorities and liens (PROMESA § 201(b)(1)(N)); (ii) requires a Fiscal Plan to ensure that assets, funds, and resources are not illegally transferred from one government entity to another (PROMESA § 201(b)(1)(M)); and (iii) expressly preempts moratorium laws, including the Moratorium Laws and the Moratorium Orders.   Clearly, Congressional findings related to PROMESA cannot be used to justify measures expressly prohibited by PROMESA, such as the Revised Fiscal Plan (which disrespects lawful priorities and liens and mandates illegal transfers in contravention of Section 201(b) of PROMESA) and the Moratorium Laws and Moratorium Orders.

[31]   Defendants were plainly aware of the $6.875 billion in liquidity. In any event, Defendants should have thoroughly audited their own finances to look for additional funds rather than impair Plaintiffs' contracts, and it was entirely unreasonable for Defendants to impair Plaintiffs' contracts before accurately determining the Commonwealth's true liquidity position.   To the extent Defendants assert that some of the $6.875 billion is "restricted," the same is true of the Pledged Special Revenues and the "available resources" from which the public debt is required to be paid.   Indeed, the Constitutional Debt Priority Provision establishes the most fundamental and inviolable possible restriction on funds, and it was therefore unreasonable for Defendants to impair the Public Debt Priority rather than whatever restrictions may or may not have existed on their $6.875 billion in reserves.   Similarly, the Pledged Special Revenues are not merely restricted, but are encumbered by liens, and it was therefore unreasonable for Defendants to impair the Authority Bond Priority rather than whatever restrictions may or may not exist on the $6.875 billion.

188.    Similarly, the total amount of debt service the Commonwealth has failed
to pay on the GO Bonds as a result of Defendants' impairment of the Public Debt Priority under
the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law is only around
$2.9 billion.  Therefore, Defendants could have significantly reduced or entirely avoided any
impairment of the Public Debt Priority if they had simply used some portion of the $6.875 billion
in undisclosed liquidity.

189.    Furthermore, to the extent the $6.875 billion includes amounts that have
accumulated as a result of the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and
the Compliance Law, the fact that the Commonwealth has permitted these amounts to
accumulate unused demonstrates that the Commonwealth had no need for the funds it saved or
confiscated by way of the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the
Compliance Law, and that the Commonwealth certainly had no "emergency" need for such
funds.  The fact that the Commonwealth has permitted these amounts to accumulate unused also
demonstrates that the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the
Compliance Law were not narrowly tailored to address any purported liquidity crisis or fiscal
emergency, because these measures have swept in large quantities of cash that the
Commonwealth did not need in order to fund services or for any other particular purpose and that
therefore could have been used to pay debt service, in the process helping to preserve or restore
Puerto Rico's access to the capital markets.

190.    Indeed, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan,
and Compliance Law were not necessary to overcome a shortfall in liquidity, and instead have
resulted in the Commonwealth having *too much liquidity*.[32]  Far from serving a public purpose,

---

[32] Given this excess liquidity, the Commonwealth presently has access to funds sufficient to cover debt
service payments *and* payments for essential government services.

the excess liquidity the Commonwealth has accumulated as a result of the Moratorium Laws, the Moratorium Orders, the Fiscal Plans, and the Compliance Law has prevented the Commonwealth from obtaining federal Community Disaster Loan ("CDL") Program[33] financing that the Commonwealth otherwise could have used to help Puerto Rico recover from Hurricanes Irma and Maria.

191. Specifically, on October 26, 2017, the President signed into law the *Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017*, Pub. L. No. 114-72, which included $4.9 billion for CDL loans to assist the Commonwealth, the U.S. Virgin Islands, and local governments in Florida and Texas in maintaining essential services as a result of hurricanes Harvey, Irma, and Maria.

192. On January 9, 2018, two officials of the federal government—Alex Amparo, Assistant Administrator Recovery Directorate of the Federal Emergency Management Agency, and Gary Grippo, Deputy Assistant Secretary for Public Finance of the U.S. Department of Treasury (together, the "Federal Officials")—sent a letter (the "FEMA Letter" (attached hereto as "Exhibit 27")) to the AAFAF Executive Director summarizing the federal government's policy for providing this CDL assistance to the Commonwealth, its instrumentalities, and its municipalities. The FEMA Letter notes that the Commonwealth, the Puerto Rico Electric Power Authority ("PREPA"), and the Puerto Rico Aqueduct and Sewer Authority ("PRASA") "projected in late September 2017 that they would exhaust their operating funds on or about October 31, 2017. However, as of December 29, 2017, the Commonwealth central cash balance was approximately $1.7 billion. . . . In addition to its central cash balance,

---

[33] The purpose of the CDL Program is to provide loans to eligible recipients that have suffered a substantial loss of tax and other revenues as a result of a major disaster and that demonstrate a need for federal financial assistance to perform essential governmental functions.

on December 18, 2017, the Commonwealth released a report indicating that $6.875 billion in

unrestricted and restricted cash was on deposit in over 800 accounts across all Commonwealth

governmental entities. . . . Because the Commonwealth's central cash balance, as publicly

reported, has consistently exceeded $1.5 billion in the months following the hurricanes, and

considering the implications of the reported $6.875 billion of total cash across the

Commonwealth, the Federal Government will institute, as a matter of policy, a Cash Balance

Policy that will determine the timing of CDLs to the Commonwealth and its instrumentalities,

including PREPA and PRASA. Under this Cash Balance Policy, funds will be provided through

the CDL Program when the Commonwealth's central cash balance decreases to a certain level."

Ex. 27 at 1-2.

193. The federal government has therefore determined that, in light of the

Commonwealth's large central cash balance and the $6.875 billion in government accounts, the

Commonwealth has no unmet liquidity needs that would justify CDL loans, and the

Commonwealth's *excess* liquidity has therefore resulted in what amounts to a denial of CDL

financing from the federal government, to the detriment of Puerto Rico.

194. On March 2, 2018, Puerto Rico's Resident Commissioner, Jennifer

González, acknowledged the harm being caused to the public interest by the Commonwealth's

excess liquidity and stated that the Commonwealth government should consider using this

surplus liquidity to resume payments on the public debt as a means of restoring investor

confidence and access to the capital markets. The Resident Commissioner said, "[m]aking a

serious evaluation [of the possibility of resuming payments on the public debt] will contribute to

creating the environment that will enable Puerto Rico access to these [capital] markets again.

We are going to be in hurricane season again in a few months, and we don't have access to these

markets. This is very dangerous." Reorg Research, "Resident Commissioner Says

Commonwealth Should Analyze Using Budget Surplus to Make Debt Interest Payments, Calls Lack of Market Access 'Dangerous,'" Mar. 2, 2018, at 1 (attached hereto as "Exhibit 28").

195.    The U.S. Congress clearly agreed with the Resident Commissioner that regaining access to the capital markets was in Puerto Rico's public interest, because Congress made this one of the two primary goals of PROMESA and of FOMB, along with achieving fiscal responsibility.  See PROMESA §§ 101(a), 201(b)(1), 209(1).  Yet clearly, the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law hinder, rather than serve, this preeminent public purpose.

196.    Notably, the Commonwealth's liquidity and revenues have continued to improve since the time of the Commonwealth's December 2017 disclosures.  For example, on May 16, 2017, The Bond Buyer reported that "Puerto Rico's cash position as of May 4 was 7% ahead of its July 2017 forecasts, as April revenues came in 18% stronger than projected."  Robert Slavin, "Puerto Rico is 7% ahead of cash forecasts as April revenues come in strong," The Bond Buyer, May 16, 2018, https://www.bondbuyer.com/news/puerto-rico-is-7-ahead-of-cash-forecasts-on-strong-april-revenues.

197.    On the same date, El Nuevo Día reported that the Commonwealth's liquidity was at "record levels" and specifically noted that "the [TSA] is at its highest level of the whole fiscal year and even exceeds the projections of [AAFAF]."  Joanisabel González, "Liquidity at record levels," El Nuevo Día, May 16, 2018. https://www.elnuevodia.com/english/english/nota/liquidityatrecordlevels-2422552/.  El Nuevo Día also noted that the Commonwealth was experiencing an "upward trend" in its revenues, reporting that "According to [AAFAF], last April [2018] the collections of the Treasury were about $223 million over those of April 2017."  Id.

198.    On May 18, 2018, AAFAF reported that cash balances across Commonwealth bank accounts had increased to approximately **$8.684 billion** as of April 30, 2018.  AAFAF further reported that the TSA balance had increased to **$2.690 billion** as of April 30.

199.    In addition to tapping the Commonwealth's billions of dollars in liquidity and taking advantage of its improving revenues, the Commonwealth and FOMB also had many other means of addressing the Commonwealth's alleged economic difficulties that would have been more reasonable than the enactment of the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law.

200.    For example, consistent with the intent of PROMESA, the Commonwealth and FOMB could have pursued a consensual restructuring to reduce principal outstanding, defer maturities, and pay interest in kind.  Such a consensual restructuring would have allowed for a significant reduction of Puerto Rico's debt obligations, afforded the Commonwealth time to reestablish economic growth, and helped the Commonwealth to regain capital market access while avoiding protracted and costly litigation.  In fact, the Commonwealth had a workable blueprint for such a consensual restructuring in the form of the restructuring support agreement ("PREPA RSA") between PREPA and its creditors, which had been negotiated in earnest for nearly two years on a consensual basis.  The PREPA RSA provided for, among other liquidity-enhancing features, (i) haircuts on uninsured legacy debt; (ii) an amortization holiday on new debt securities; (iii) credit support provided by creditors to allow PREPA to issue securities at lower coupons; (iv) new debt securities in the form of capital appreciation bonds, which paid interest in kind for a fixed period of time; and (v) new money investments to fund PREPA's operations and transformation.  Just as with the broader Commonwealth, PREPA's operational and financial mismanagement spanned decades, but creditors were willing to make sacrifices and

negotiate constructively toward a solution that would have allowed PREPA to become a world-class utility.

201.    Rather than support the consummation of the PREPA RSA, FOMB decided to reverse course in favor of a scorched-earth strategy that prioritized non-consensual Title III debt adjustment over consensual arrangements with creditors.  Such an approach was then, and is today, by no means necessary to maintain sufficient liquidity and "breathing room" to implement financial and structural reforms.  Many levers remain available to the parties to ensure the Commonwealth maintains adequate liquidity, while still meeting mutually-agreed-upon, restructured obligations to creditors.  Not surprisingly, many of these levers are the same as those agreed to in the PREPA RSA, including haircuts, deferral of principal and interest—whether on all or certain credits—and securitizations to obtain lower-cost financing, including new money investments for growth.  In exchange, the Commonwealth could provide current interest, validation of liens and pledges, or other forms of consideration that would not unduly pressure liquidity and that would protect creditors.

202.    As a purely illustrative example, the Commonwealth and creditors could agree to a consensual debt restructuring that resets debt service to levels that the Commonwealth can support even based on conservative economic assumptions.  For instance, through constructive negotiation, the parties could agree to material accommodations including a principal debt service holiday, an exchange of existing debt for new securities with a long-dated tenor, the use of capital appreciation bonds, and the structuring of an overall limit on debt service set as a percentage of the Commonwealth's "own source" revenues.  With respect to exchange rates and pro forma interest rates, the Commonwealth could differentiate between (i) "senior" credits, such as (a) GO, PBA, and other Commonwealth-guaranteed debt and (b) secured credits such as PRHTA, PRCCDA, PRIFA, and other special-tax-backed debt, and (ii) "junior" credits

that lack security, guarantees, or pledged revenues or that are contractually subordinated.  For example, senior credits could exchange into longer-dated bonds after an initial principal holiday and begin to amortize with excess cash available after payment of interest.  Junior credits could exchange at discounts to face value and begin to amortize after repayment of the senior credits.  New interest rates on the senior and junior exchange debt could be set to reflect the new security, priority, and tenor of the respective tranche.

203.    The following analysis shows that, based on Defendants' projections in the Revised Fiscal Plan and assuming that the federal government provides at least 40% of Medicaid funding (which is a conservative assumption), there would be sufficient cash available over the next five years to pay an agreed level of contractual debt service.  Thereafter, based on Fiscal Year 2023 estimated cash for debt service, the same, reasonable federal Medicaid assumption, and a reasonable assumption of a long-term 2.5% growth rate, the Commonwealth could support over $50 billion of debt at a 5% interest rate and 2053 final maturity.  This implied debt capacity exceeds the estimated total Commonwealth claims currently outstanding.

| Illustrative Cash for Debt Service & Implied Debt Capacity | |
|---|---|
| **Cash Flow Available for Debt Service** | |
| 5 Year Average: FY'18 – FY'22 | $1.477 billion |
| Terminal Year: FY'23 | $2.576 billion |
| **Illustrative Pro Forma Terms** | |
| Long-Term Growth Rate in Cash Flows | 2.5% |
| Interest Rate | 5.0% |
| Tenor (Years) | 30 |
| **Long-Term Debt Capacity** | **$53.04 billion** |

204.    Had such offers been on the table at the time Defendants enacted the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law, the parties would likely have been able to reach a near-term, multi-year forbearance and debt service holiday, during which time the Commonwealth could have focused its efforts on fostering long-term

economic growth without necessarily impairing creditors' ultimate recoveries. Beyond the illustrative example above, there are certainly many iterations of restructuring arrangements that could help the Commonwealth achieve its economic and social goals while at the same time being palatable to creditors. But none of these can be discussed or negotiated while FOMB and the Commonwealth continue their stubborn and myopic focus on non-consensual debt restructurings, the terms of which are to be dictated by the flawed, unilaterally-developed, and inexplicably conservative Revised Fiscal Plan.

205.    In addition to pursuing a consensual restructuring as outlined above, other reasonable alternatives available to FOMB and the Commonwealth included:

- Adjusting the Commonwealth's budget in accordance with the "priority guidelines" set forth in the OMB Act. Notably, the Revised Fiscal Plan itself assumes approximately $21.44 billion in revenues for Fiscal Year 2019, meaning that the Commonwealth and its instrumentalities could pay their approximately $2.75 billion in contractual debt service (including for the Authorities and all other issuers covered by the Revised Fiscal Plan) and still have approximately $18.86 billion to fund other expenses. Thus, the Commonwealth could pay all debt service if it merely undertook a modest 5.8% trimming of nondebt expenses.

- Distinguishing between essential and non-essential services, as required by the Commonwealth Constitution and Section 201(b)(1)(B) of PROMESA, and prioritizing essential over non-essential services as required by the OMB Act.

- Eliminating structural deficits as required by Section 201(b)(1)(D) of PROMESA.

- Complying with the Commonwealth's future budgets by making appropriate reductions in *non-debt* expenditures when necessary, as required by Section 203(d)(1) of PROMESA.

- Raising additional revenues, as required by the Commonwealth Constitution in a fiscal year in which appropriations exceed estimated resources. See P.R. Const. art. VI, § 7.

- Collecting taxes on income generated within Puerto Rico's large, and currently untaxed, "informal" economy.

206. Notably, the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law have aggravated rather than improved PRHTA's fiscal situation, and therefore serve no public purpose with respect to PRHTA. As stated in the fiscal plan for PRHTA that FOMB purported to certify on or around March 28, 2017 (attached hereto as "Exhibit 29"), PRHTA's fiscal situation "was recently aggravated" by the diversion of the Pledged Special Excise Taxes. See Ex. 29 at 16. To the extent Defendants contend that some aspect of the Moratorium Laws or Moratorium Orders benefitted PRHTA, such as the diversion of the Pledged Toll Revenues, then the obvious alternative would have been to cease making illegal payments to GDB on account of the Subordinated GDB Lines of Credit. Any such illegal payments made to GDB since the Moratorium Orders first went into effect could, and should, have been used first to make payments on the senior secured PRHTA Bonds and then to fund PRHTA operating expenses. Moreover, despite the Commonwealth's self-serving findings to the contrary, payments to GDB do not constitute "essential services," because GDB, unlike PRHTA, does not provide any direct services to the people of Puerto Rico.

207. In addition to ceasing PRHTA's illegal payments to an insider creditor, the Commonwealth, FOMB, and PRHTA could have addressed PRHTA's alleged economic difficulties by, among other things:

- giving PRHTA the full economic benefit of the Pledged Special Revenues rather than requiring the Commonwealth to siphon off the Pledged Special Revenues for its own benefit;

- more significantly reducing PRHTA expenditures;

- increasing toll revenues by raising tolls (including in line with inflation)[34] and adding previously untolled roads to the PRHTA toll system;

---

[34] The revised PRHTA fiscal plan (the "Revised PRHTA Fiscal Plan" (attached hereto as "Exhibit 30")) approved by FOMB on April 20, 2018, acknowledges that "[PRHTA] has not increased tolls in line with inflation." Ex. 30 at 49-52.

- optimizing toll collections;[35]

- seeking increased federal funding, including by targeting discretionary federal grants;[36]

- disposing of real estate assets;[37]

- entering into public-private partnerships to lower PRHTA's expenses and increase its revenues; and

- negotiating a consensual restructuring of PRHTA's debt.

208.    In view of these more reasonable alternatives, the Revised Fiscal Plan, Compliance Law, Moratorium Laws, and Moratorium Orders do not constitute a reasonable or necessary means of serving an important public purpose and therefore violate the Contracts Clause.

209.    In addition, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law are not appropriately tailored to the purpose of addressing the Commonwealth's alleged fiscal crisis, because they impair all Bonds and confiscate all Pledged Special Revenues regardless of the Commonwealth's actual liquidity needs.

210.    Furthermore, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law fail to impose any reasonable conditions on the Defendants' impairment of the Bonds and confiscation of the Pledged Special Revenues.  For example, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law fail to condition any impairment on court approval or on payment of compensation to Plaintiffs or other Bondholders.

---

[35]  See Revised PRHTA Fiscal Plan at 53-54.

[36]  The Revised PRHTA Fiscal Plan acknowledges that federal grants are a viable way to increase PRHTA's revenues.  See Ex. 30 at 52.  The Revised PRHTA Fiscal Plan also acknowledges that "[Puerto Rico] has not secured any discretionary grants over the last 5 years," id., meaning that Puerto Rico had, but failed to pursue, the opportunity to obtain federal grants at the time that it instead imposed the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law.

[37]  See Revised PRHTA Fiscal Plan at 55.

211. The impairments effected by the Moratorium Laws and Moratorium Orders are also not limited to the duration of the alleged emergency, because the Governor has the power to extend the effectiveness of the Moratorium Laws and Moratorium Orders indefinitely, and he has continued to do so even as the Commonwealth's finances have improved.

212. Similarly, the impairments effected by the Revised Fiscal Plan and Compliance Law are also not limited to the duration of the alleged emergency, because the Revised Fiscal Plan by its terms will last for six years, notwithstanding the fact that the Revised Fiscal Plan itself shows economic growth returning by Fiscal Year 2019 (see Revised Fiscal Plan at 9), and the Compliance Law in any event renders the impairments effected by the Revised Fiscal Plan permanent even following expiration of the Revised Fiscal Plan.

**B.**     **The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, And Compliance Law Violate The Takings And Due Process Clauses**

213. The Takings Clause of the Fifth Amendment to the U.S. Constitution (the "Takings Clause") provides that **"private property [shall not] be taken for public use, without just compensation."** U.S. Const. amend. V. The Takings Clause applies to the States, and the Commonwealth, by virtue of the Due Process Clause.

214. The Pledged Special Revenues constitute property of (i) the Authority Bondholders and (ii) the Authorities in their capacity as custodians and trustees for the Authority Bondholders. The Pledged Special Revenues do not constitute property of the Commonwealth. To the extent Defendants are permitted to hold the Pledged Special Revenues, they hold them in trust or in a custodial capacity for the benefit of the Authority Bondholders.

215. Moreover, Authority Bondholders have a gross lien on the Pledged Special Revenues. A lien is a property interest protected by the Takings and Due Process

Clauses.  As express third party beneficiaries of the lien on the Pledged Special Revenues,

Plaintiffs have a lawful property right and interest in the Pledged Special Revenues, protected by

the Fifth Amendment (and section 928(a) of the Bankruptcy Code).

216.    GO Bondholders are also entitled by the Constitutional Debt Priority

Provision to receive payment of the GO Bonds on a first-priority basis, and Authority

Bondholders are entitled by the Constitutional Debt Priority Provision and by statute to receive

the Pledged Special Revenues.  A constitutional or statutory entitlement to receive a benefit

constitutes a property interest protected by the Takings and Due Process Clauses.

217.    In addition, GO Bondholders have a contractual right to receive payment

on a first-priority basis from available resources, and Authority Bondholders have a contractual

right to receive payment from the Pledged Special Revenues.  A contractual right constitutes a

form of property for purposes of the Takings and Due Process Clauses.

218.    The Moratorium Laws and Moratorium Orders provide no procedure for

Plaintiffs to seek just compensation.  The Second Moratorium Law repealed the Compensation

Provisions, which were intended to provide a procedure for parties whose property interests had

been taken pursuant to the Moratorium Orders to seek just compensation.  As such, no procedure

now exists for Plaintiffs to seek just compensation for the takings effectuated by the Second

Moratorium Law and the Moratorium Orders, and the Commonwealth has not provided Plaintiffs

with any such compensation.

219.    The Revised Fiscal Plan assumes the continued operation of the

Moratorium Laws and Moratorium Orders.

220.    Moreover, independently of the Moratorium Laws and Moratorium

Orders, the Revised Fiscal Plan and Compliance Law take Plaintiffs' property by diverting to

other uses the available resources and Pledged Special Revenues from which the GO Bonds and Authority Bonds are required to be paid.

221.   The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law thus violate the Takings and Due Process Clauses by taking Plaintiffs' and Bondholders' property without providing Plaintiffs and Bondholders with just compensation or with due process of law.[38]

222.   Plaintiffs' challenge to the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law is a facial challenge that became ripe immediately upon the enactment and effectiveness of the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law, as applicable.  See, e.g., Yee v. City of Escondido, Cal., 503 U.S. 519, 534 (1992).  Furthermore, pursuant to the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law, Defendants have directly appropriated and continue to directly appropriate funds (the Pledged Special Revenues) that belong to Plaintiffs and in which Plaintiffs have property interests.

## X.   Plaintiffs Are Directly Injured By The Revised Fiscal Plan, Moratorium Laws, Moratorium Orders, And Compliance Law

223.   Plaintiffs are directly injured by the Revised Fiscal Plan, because it (i) dictates that the Commonwealth will continue to subordinate debt service to the payment of all expenses, thereby overriding Plaintiffs' lawful priorities and (ii) requires that the Commonwealth

---

[38]   In addition, the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law violate the contracts, takings, and due process clauses of the Commonwealth Constitution for the same reasons they violate the Contracts, Takings, and Due Process Clauses in the U.S. Constitution.  The contracts clause of the Commonwealth Constitution provides that "[n]o laws impairing the obligation of contracts shall be enacted."   P.R. Const. art. II, § 7.   The takings clause of the Commonwealth Constitution provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."  Id. § 9.  The due process clause of the Commonwealth Constitution provides "[n]o person shall be deprived of his liberty or property without due process of law."  Id. § 7.

confiscate the Pledged Special Revenues from the Authorities and their bondholders, thereby depriving Plaintiffs' of their guaranteed revenue streams.

224. Under PROMESA, once FOMB certifies a fiscal plan, the fiscal plan has the force of law. This is true regardless of whether a Title III proceeding is pending, and a fiscal plan has legal efficacy independently of confirmation of a Title III plan of adjustment. As FOMB has itself asserted in a complaint it filed in this Court, "[o]nce certified by the FOMB . . . the Governor **must comply** with the fiscal plan." Fin. Oversight & Mgmt. Bd. for P.R. v. Rosselló Nevares, Adv. Proc. No. 17-250-LTS (D.P.R.), ECF No. 1 ¶ 8 (emphasis added). Therefore, the Revised Fiscal Plan itself deprives Plaintiffs of their priorities and Pledged Special Revenues.

225. For example, Section 202 of PROMESA requires the budgets of the Commonwealth and its instrumentalities, including the Authorities, to comply with the applicable certified fiscal plans. On May 10, 2018, FOMB enforced the Revised Fiscal Plan under Section 202 by issuing a "Notice of Violation" (attached hereto as "Exhibit 31") rejecting a budget proposed by the Governor on the grounds that the proposed budget "is not compliant with the [Revised Fiscal Plan] as certified by [FOMB] on April 19, 2018." Ex. 31 at 1.

226. Similarly, Section 204 of PROMESA requires future Commonwealth legislation to comply with the certified fiscal plans of the Commonwealth and its instrumentalities. FOMB's powers under Section 204 include the power to "prevent[] the enforcement or application" of any law that does not comply with a certified fiscal plan. See PROMESA § 204(a)(5). FOMB has already exercised its powers under Section 204 of PROMESA to block legislation that FOMB deemed inconsistent with the Original Fiscal Plan. For example, on or around August 30, 2017, FOMB sent the Governor and other Commonwealth officials a letter notifying them that Act No. 47 of 2017, which expanded the powers of the

Commonwealth's Patient Advocate's Office to commence summary proceedings on behalf of private citizens to stay a health insurance company's coverage determination, did not comply with the Original Fiscal Plan. See Ex. 24. FOMB's letter expressly stated that "[FOMB] reserve[s] the right to take such actions as we consider necessary, consistent with Section 204(a)(5), including preventing the enforcement or application of Act 47." Ex. 24 at 3.

227.    Furthermore, Section 104(k) of PROMESA expressly empowers FOMB to bring "CIVIL ACTIONS" to enforce the terms of a certified fiscal plan. Section 104(k) states, "[FOMB] may seek judicial enforcement of its authority to carry out its responsibilities under [PROMESA]." PROMESA § 104(k). Pursuant to its powers under Section 104(k), FOMB has already brought a civil action against Governor Rosselló to enforce the Original Fiscal Plan, notwithstanding the fact that no Title III plan of adjustment has to date been confirmed. See Adv. Proc. No. 17-250-LTS, ECF No. 1. Obviously, FOMB could not have brought such a civil action to enforce a fiscal plan unless the fiscal plan already had the force of law even prior to confirmation of a plan of adjustment.

228.    In addition, the Revised Fiscal Plan injures Plaintiffs because any Title III plan of adjustment must be "consistent with the applicable Fiscal Plan certified by FOMB under [T]itle II." PROMESA § 314(b)(7). Because the Revised Fiscal Plan violates PROMESA and the U.S. Constitution, any plan of adjustment that is "consistent" with the Revised Fiscal Plan will similarly violate PROMESA and the U.S. Constitution. Therefore, so long as the Revised Fiscal Plan is in place, it will be impossible for Plaintiffs to be subject to a plan of adjustment that complies with statutory and constitutional mandates.

229.    The Moratorium Laws, Moratorium Orders, and Compliance Law also directly injure Plaintiffs by requiring the Commonwealth and its Authorities to override Plaintiffs' priorities and divert their Pledged Special Revenues.

230.    As a direct result of the Revised Fiscal Plan, the Moratorium Laws, Moratorium Orders, and the Compliance Law, Plaintiffs face the imminent prospect of additional defaults on the bonds they insure, which will cause significant financial harm to Plaintiffs.  This prospect is not hypothetical—Assured already has had to pay over $616 million in claims, and FGIC has already received claims totaling approximately $162 million, as a result of the reordering of priorities and diversions of collateral effectuated by the Moratorium Laws, Moratorium Orders, Fiscal Plans, and Compliance Law, and Plaintiffs will inevitably have to pay hundreds of millions of dollars in additional claims if Defendants continue to disrespect lawful priorities and divert collateral pursuant to, and as required by, the Revised Fiscal Plan.

## XI.    **Plaintiffs Are Entitled To Immediate Review Of Their Claims**

231.    Because Plaintiffs are directly injured by the unlawful and unconstitutional Revised Fiscal Plan, Moratorium Laws, Moratorium Orders, and Compliance Law, Plaintiffs are entitled to review of their statutory and constitutional claims.  Indeed, both the First Circuit and the Supreme Court have emphasized that there is "'a strong presumption in favor of judicial review[.]'"  Bernardo ex rel. M & K Eng'g, Inc. v. Johnson, 814 F.3d 481, 495 (1st Cir. 2016) (quoting INS v. St. Cyr, 533 U.S. 289, 298 (2001)).

232.    The Revised Fiscal Plan, Moratorium Laws, Moratorium Orders, and Compliance Law flout the mandates of PROMESA and the U.S. Constitution, and nothing in PROMESA furnishes the "clear and convincing" evidence necessary to conclude that Congress stripped federal courts of authority to ensure compliance with these "legislative mandate[s]."  Mach Mining, LLC v. EEOC, 135 S. Ct. 1645, 1651 (2015).

233.    Indeed, PROMESA contemplates a role for this Court in reviewing whether the Revised Fiscal Plan complies with the requirements of Section 201(b) of PROMESA, as well as the other mandates of PROMESA and the U.S. Constitution.

234.     For example, PROMESA charges this Court with confirming a plan of adjustment under Title III.  Section 314(b)(7) of PROMESA, in turn, requires that the Court ensure that a plan of adjustment is "consistent with" the Fiscal Plan.  This Court cannot confirm a plan of adjustment that violates PROMESA and the U.S. Constitution.  It is therefore necessary for this Court to review the lawfulness and constitutionality of the Revised Fiscal Plan in order to ensure that this Court will be able to confirm a plan of adjustment that is "consistent with" the Revised Fiscal Plan without violating other provisions of PROMESA or the U.S. Constitution itself.

235.     Here, the Revised Fiscal Plan's violations of Sections 201(b), 303 and 407 of PROMESA and section 928 of the Bankruptcy Code, as well as its violations of the Contracts, Takings, and Due Process Clauses of the U.S. Constitution, make it very plain that this Court could not confirm a plan of adjustment on the basis of the Revised Fiscal Plan.

236.     In addition, a plan of adjustment based on the Revised Fiscal Plan could not satisfy many other confirmation requirements specified in Section 314 of PROMESA and section 1129 of the Bankruptcy Code, including (i) the requirement that the plan of adjustment "compl[y] with the provisions of [Title III]" (PROMESA § 314(b)(2)); (ii) the requirement that the debtor "not [be] prohibited by law from taking any action necessary to carry out the plan [of adjustment]" (PROMESA § 314(b)(3)); (iii) the requirement that the plan of adjustment be "feasible and in the best interests of creditors" (PROMESA § 314(b)(6)); and (iv) the "absolute priority rule" of section 1129(b)(2)(B) of the Bankruptcy Code (11 U.S.C. § 1129(b)(2)(B)).

237.     Moreover, because the Revised Fiscal Plan consolidates[39] the assets of multiple Debtor entities, including the Commonwealth and PRHTA, it effectuates a substantive

---

[39]     See Ex. 1 at 63, 127, 138.

consolidation in violation of Section 304(f) of PROMESA, which provides that "nothing in [Title III] shall be construed as authorizing substantive consolidation of the cases of affiliated debtors." PROMESA § 304(f). A plan of adjustment based on the Revised Fiscal Plan would therefore be unconfirmable in that it would violate Section 304(f).

238. Given that it is already clear that no plan of adjustment based on the Revised Fiscal Plan could be confirmed, the Court should exercise its statutory and equitable powers to declare that the Revised Fiscal Plan is unlawful and unconstitutional, and to further declare that the Court will not hold a confirmation hearing on any plan of adjustment issued under the Revised Fiscal Plan. To the extent necessary, complementary injunctive relief should be granted.

239. Notably, Section 312 of PROMESA provides that only FOMB may file a plan of adjustment. However, where, as here, FOMB fails to file a plan of adjustment with the petition, Section 312 of PROMESA also gives this Court authority to "set" the time at which FOMB "shall file a plan of adjustment." PROMESA § 312(b). The Court therefore may, and should, exercise its authority under Section 312 to order that FOMB may not file a plan of adjustment until it has approved and certified a fiscal plan that complies with PROMESA and the U.S. Constitution.

240. Similarly, section 105(d) of the Bankruptcy Code, which is incorporated into PROMESA § 301, provides, "[t]he court, on its own motion or on the request of a party in interest . . . may issue an order . . . prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically, including an order that . . . sets a date by which the debtor, or trustee if one has been appointed, shall solicit acceptances of a plan[.]" 11 U.S.C. § 105; PROMESA § 301(a). Permitting FOMB to file and solicit acceptances with respect to a plan of adjustment that is clearly unconfirmable would

constitute an enormous waste of the Court's own resources and of the time and resources of all parties in interest. Therefore, an order staying FOMB's ability to file a plan of adjustment based on the Revised Fiscal Plan would help to ensure that this case is handled expeditiously and economically, and the Court should enter such an order.

241.    Furthermore, section 105(a) of the Bankruptcy Code provides, "[t]e court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). It is "necessary" and "appropriate" for the Court to prohibit FOMB from filing a plan of adjustment based on the unlawful and unconstitutional Revised Fiscal Plan.

242.    Defendants may attempt to point to Section 106(e) of PROMESA as a purported barrier to judicial review. But Plaintiffs do not challenge the Board's certification decisions; they challenge the violation of multiple independent statutory provisions that require any fiscal plan to adhere to the requirements of Section 201(b), and that impose additional statutory limits on a fiscal plan.

243.    In any event, courts have long held that "even when the statutory language *bars* judicial review," an exception exists for claims—like those raised in this Adversary Complaint—that an "agency exceeded the scope of its delegated authority or violated a clear statutory mandate." Hanauer v. Reich, 82 F.3d 1304, 1307 (4th Cir. 1996) (emphasis added); see also Leedom v. Kyne, 358 U.S. 184, 188 (1958) (applying this principle to vacate a determination made by the National Labor Relations Board "in excess of [the Board's] delegated powers and contrary to a specific prohibition in the [National Labor Relations Act]").

244.    Furthermore, Section 106(e) of PROMESA poses no impediment to the Court's review of Plaintiffs' claims that the Revised Fiscal Plan violates Sections 303 and 407 of PROMESA and Section 928(a) of the Bankruptcy Code, because FOMB has never made a

"certification determination" with respect to Section 303 or Section 407 of PROMESA or section 928 of the Bankruptcy Code and has no authority under PROMESA to do so.

245.     At a minimum, Plaintiffs' request that the Court decline to hold a confirmation hearing with respect to a proposed plan of adjustment based on the Revised Fiscal Plan cannot possibly be viewed as a challenge to FOMB's purported certification of the Revised Fiscal Plan, because the Revised Fiscal Plan would remain certified and in effect even if the Court were to grant such relief.    Therefore, Plaintiffs' request that the Court not hold a confirmation hearing based on the Revised Fiscal Plan does not implicate Section 106(e) of PROMESA.

## XII.    If Plaintiffs' Claims Are Unreviewable, PROMESA Is Unconstitutional

246.     By its plain terms, PROMESA permits review of Plaintiffs' claims.    If, however, this Court were to hold that PROMESA makes the Revised Fiscal Plan unreviewable, PROMESA would then violate the U.S. Constitution's procedural due process protections, as well as its bar on unlimited delegations of legislative authority.

### A.     Denying Review Of Plaintiffs' Claims Would Violate Procedural Due Process

247.     The Due Process Clause guarantees that an individual may not be deprived of a protected interest without some "meaningful opportunity" to challenge whether the deprivation satisfies the requirements of the statutory scheme under which it is carried out. Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

248.     Here, the Pledged Special Revenues constitute property of (i) the Authority Bondholders and (ii) the Authorities in their capacity as custodians and trustees for the Authority Bondholders.    The Pledged Special Revenues do not constitute property of the Commonwealth.    Authority Bondholders also have liens on the Pledged Special Revenues.    A lien is a property interest protected by the Due Process Clause.

249.    GO Bondholders are also entitled by the Constitutional Debt Priority Provision to receive payment of the GO Bonds on a first-priority basis, and Authority Bondholders are entitled by the Constitutional Debt Priority Provision and by statute to receive the Pledged Special Revenues.  A constitutional or statutory entitlement to receive a benefit constitutes a property interest protected by the Due Process Clause.

250.    In addition, GO Bondholders have a vested contractual right to receive payment on a first-priority basis from available resources, and Authority Bondholders have a vested contractual right to receive payment from the Pledged Special Revenues.  A contractual right constitutes a protected property interest for purposes of the Due Process Clause.

251.    The Revised Fiscal Plan deprives Plaintiffs of those protected interests. Accordingly, the Due Process Clause entitles Plaintiffs to a "meaningful opportunity" to challenge the Revised Fiscal Plan for compliance with the statutory limits set forth in PROMESA.  <u>Mathews</u>, 424 U.S. at 349.  If PROMESA prevents Plaintiffs from obtaining judicial review, then it violates the Due Process Clause.

**B.    Denying Review Of Plaintiffs' Claims Would Violate The Nondelegation Principle**

252.    If PROMESA forecloses meaningful review of the Revised Fiscal Plan, it also violates the nondelegation doctrine.  That doctrine protects the U.S. Constitution's choice to vest certain powers in the Legislative Branch by prohibiting Congress from making a wholesale delegation of its Article I powers to another entity.  <u>Panama Ref. Co. v. Ryan</u>, 293 U.S. 388, 421 (1935).

253.    A statute complies with the nondelegation doctrine only when it both provides an "intelligible principle" to guide the implementing agency *and* includes some mechanism by which a "court [could] ascertain whether" the agency has correctly adhered to that

principle. See Touby v. United States, 500 U.S. 160, 168-69 (1991); accord United States v. Bozarov, 974 F.2d 1037, 1041-42 (9th Cir. 1992).

254.    The doctrine therefore prevents Congress from granting FOMB the *unreviewable* authority to create a fiscal plan that dictates the economic future of Puerto Rico and irrevocably affects the rights of Puerto Rico's citizens and creditors.

## FIRST CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 That FOMB Exceeded Its Authority In Purporting To Develop And Approve The Revised Fiscal Plan, Against All Defendants)**

255.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

256.    FOMB exceeded its statutory authority under PROMESA when it purported to develop and approve the Revised Fiscal Plan, because FOMB refused to make a number of determinations that PROMESA requires FOMB to make as a prerequisite to approval of a fiscal plan, including determinations as to (i) what relative lawful priorities and liens exist under Puerto Rico law and whether the Revised Fiscal Plan respects such lawful priorities and liens (PROMESA § 201(b)(1)(N)); (ii) whether the Revised Fiscal Plan "ensure[s] that assets, funds, or resources of a territorial instrumentality are not . . . transferred to . . . [the Commonwealth]" (PROMESA § 201(b)(1)(M)); (iii) what government services constitute "essential public services" for purposes of Section 201(b)(1)(B) of PROMESA; and (iv) whether the Revised Fiscal Plan ensures the funding of such services (PROMESA § 201(b)(1)(B)).

257.    Moreover, the Revised Fiscal Plan, on its face, violates Sections 201(b)(1)(B), 201(b)(1)(M), 201(b)(1)(N), 303, and 407 of PROMESA, as well as section 928(a) of the Bankruptcy Code (as incorporated into PROMESA), and FOMB lacked any statutory authority to develop or approve a fiscal plan that, on its face, violates PROMESA.

258.     Plaintiffs are therefore entitled to an order declaring that FOMB lacked authority to develop or approve the Revised Fiscal Plan.

259.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## SECOND CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of Section 201(b)(1)(N) Of PROMESA, Against All Defendants)**

260.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

261.     Plaintiffs are entitled to an order declaring that the Revised Fiscal Plan and the Compliance Law violate Section 201(b)(1)(N) of PROMESA, because they do not respect the relative lawful priorities and lawful liens in the constitution, other laws, and agreements of the Commonwealth and the Authorities in effect prior to the date of enactment of PROMESA.

262.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## THIRD CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of Section 201(b)(1)(M) Of PROMESA, Against All Defendants)**

263.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

264.     Plaintiffs are entitled to an order declaring that the Revised Fiscal Plan and the Compliance Law violate Section 201(b)(1)(M) of PROMESA, because they fail to ensure that assets, funds, or resources of a territorial instrumentality are not illegally loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered

territorial instrumentality of a covered territory, and indeed require and implement such illegal transfers.

265. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## FOURTH CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of Section 201(b)(1)(B) Of PROMESA, Against All Defendants)

266. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

267. Plaintiffs are entitled to an order declaring that the Revised Fiscal Plan and the Compliance Law violate Section 201(b)(1)(B) of PROMESA, because they fail to distinguish between essential and non-essential public services or ensure the funding of essential public services.

268. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## FIFTH CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Failure To Comply With Sections 5(10) And 5(22) Of PROMESA, Against All Defendants)

269. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

270. Plaintiffs are entitled to an order declaring that the Revised Fiscal Plan does not constitute a "Fiscal Plan" as defined in Sections 5(10) and 5(22) of PROMESA, because it is not "in accordance with section 201" of PROMESA.

271.   An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

### SIXTH CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of Section 407 Of PROMESA, Against All Defendants)**

272.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

273.   Section 407 of PROMESA prohibits transfers of any property of any territorial instrumentality of Puerto Rico (including the Authorities) "in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which depriv[e] any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors."  PROMESA § 407(a).

274.   The Pledged Special Revenues are property of the Authorities held in trust or in a custodial capacity for the benefit of the Authority Bondholders, and the Authority Enabling Acts and Excise Tax Statutes constitute (i) "applicable law[s] under which [the Authority Bondholders] ha[ve] a valid pledge of, security interest in, or lien on [the Pledged Special Revenues]" and (ii) "applicable law[s] assuring the transfer of [the Pledged Special Excise Taxes] to [the Authorities] for the benefit of [the Authority Bondholders]."  PROMESA § 407(a).

275.   By requiring the Pledged Special Excise Taxes to "flow" to the Commonwealth instead of to the Authorities for the benefit of the Authority Bondholders, the Revised Fiscal Plan violates Section 407 of PROMESA.

Case:18-00059-LTS Doc#:13744-9 Filed:05/29/18 Entered:05/29/18 10:49:31 Desc: Main
Document Page 91 of 102

276.     Plaintiffs are entitled to an order declaring that the Revised Fiscal Plan violates Section 407 of PROMESA and is therefore unlawful.

277.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## SEVENTH CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202, For Violations Of 11 U.S.C. § 928(a), Against All Defendants)

278.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

279.     Section 928(a) of the Bankruptcy Code, as made applicable by Section 301(a) of PROMESA, provides that "special revenues acquired by the debtor after commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a).

280.     The Revised Fiscal Plan disregards, and destroys the value of, Plaintiffs' liens on the Pledged Special Revenues by mandating that the Pledged Special Revenues be transferred to the Commonwealth (in the case of the Pledged Special Excise Taxes) or otherwise used for purposes other than payment of the Authority Bonds.

281.     Plaintiffs are entitled to an order declaring that the Revised Fiscal Plan violates section 928 of the Bankruptcy Code (as incorporated into PROMESA) and is therefore unlawful.

282.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## EIGHTH CLAIM FOR RELIEF

**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202, For A Declaration Pursuant To PROMESA §§ 314 and 304(f) And 11 U.S.C. § 1129 That No Title III Plan Of Adjustment Based On The Revised Fiscal Plan Can Be Confirmed, Against All Defendants)**

283.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

284.    PROMESA requires any Title III plan of adjustment to be "consistent with the applicable Fiscal Plan[.]"  PROMESA § 314(b)(7).

285.    However, any plan of adjustment based on the Revised Fiscal Plan could not satisfy many of the other confirmation requirements specified in Section 314 of PROMESA and section 1129 of the Bankruptcy Code, including (i) the requirement that the plan of adjustment "compl[y] with the provisions of [Title III]" (PROMESA § 314(b)(2)); (ii) the requirement that the debtor "not [be] prohibited by law from taking any action necessary to carry out the plan [of adjustment]" (PROMESA § 314(b)(3)); (iii) the requirement that the plan of adjustment be "feasible and in the best interests of creditors" (PROMESA § 314(b)(6)); and (iv) the "absolute priority rule" of section 1129(b)(2)(B) of the Bankruptcy Code (11 U.S.C. § 1129(b)(2)(B)).

286.    Moreover, because the Revised Fiscal Plan consolidates the assets of multiple Debtor entities, including the Commonwealth and PRHTA, it effectuates a substantive consolidation in violation of Section 304(f) of PROMESA, which provides that "nothing in [Title III] shall be construed as authorizing substantive consolidation of the cases of affiliated debtors." PROMESA § 304(f).  A plan of adjustment based on the Revised Fiscal Plan would therefore be unconfirmable in that it would violate Section 304(f) of PROMESA.

287.     Plaintiffs are therefore entitled to an order declaring that no Title III plan of adjustment based on the Revised Fiscal Plan can be confirmed under Sections 314 and 304(f) of PROMESA and section 1129 of the Bankruptcy Code.

288.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

### NINTH CLAIM FOR RELIEF
**(Pursuant To 11 U.S.C. § 105(a) And (d) And PROMESA § 312(b), To Declare That The Court Will Not Hold A Confirmation Hearing On The Revised Fiscal Plan)**

289.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

290.     FOMB exceeded its statutory authority in purporting to develop and approve the Revised Fiscal Plan.

291.     The Revised Fiscal Plan violates Sections 201(b)(1)(B), 201(b)(1)(M), 201(b)(1)(N), 303, and 407 of PROMESA; violates section 928(a) of the Bankruptcy Code (made applicable to these proceedings by Section 301(a) of PROMESA); does not constitute a "Fiscal Plan" as defined in PROMESA; is unconstitutional under the Contracts Clause; and is unconstitutional under the Takings and Due Process Clauses.

292.     Moreover, no Title III plan of adjustment based on the Revised Fiscal Plan can be confirmed under Sections 314 and 304(f) of PROMESA and section 1129 of the Bankruptcy Code.

293.     Plaintiffs respectfully request that this Court exercise its powers under Section 312(b) of PROMESA and sections 105(a) and 105(d) of the Bankruptcy Code to issue an order declaring that the Court will not hold a confirmation hearing on the Revised Fiscal Plan.

Case 17-03283-LTS Doc#13744-9 Filed 07/20/20 Entered 07/20/20 21:16:16 Desc: Miller Declaration Ex. 60 Complaint Page 95 of 102

Case 18-00059-LTS Doc#13744-1 Filed 05/29/18 Entered 05/29/18 20:49:37 Desc: Main Document Page 94 of 102

To the extent the Court deems it necessary and appropriate, the Court should enter complementary injunctive relief.

**TENTH CLAIM FOR RELIEF**
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of The Contracts Clause, Against All Defendants Other Than The Commonwealth)**

294.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

295.    The Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law constitute laws that substantially impair Plaintiffs' contractual rights and the contractual rights of Bondholders and that are neither reasonable nor necessary to serve an important public purpose.

296.    Plaintiffs are entitled to an order declaring that the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law are unconstitutional in that they violate the Contracts Clause.

297.    An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

**ELEVENTH CLAIM FOR RELIEF**
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of The Takings Clause And Due Process Clause, Against All Defendants Other Than The Commonwealth)**

298.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

299.    Pursuant to the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law, the Defendants have taken and continue to take the Plaintiffs' property without just compensation or due process of law.

Case:18-00059-LTS Doc#:1 Filed:05/29/18 Entered:05/29/18 21:49:37 Desc: Main Document Page 95 of 102

300.     Plaintiffs are entitled to an order declaring that the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law are unconstitutional in that they violate the Takings and Due Process Clauses.

301.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## TWELFTH CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of And Preemption Under PROMESA § 303(1), Against All Defendants)

302.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

303.     The Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law are preempted by Section 303(1) of PROMESA, because they constitute moratorium laws that impose a non-consensual moratorium on creditors.

304.     Plaintiffs are entitled to an order declaring that the Moratorium Laws, the Moratorium Orders, the Revised Fiscal Plan, and the Compliance Law are preempted by Section 303(1) of PROMESA and are invalid, null, and void.

305.     An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## THIRTEENTH CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 For Violations Of And Preemption Under PROMESA § 303(3), Against All Defendants)

306.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

307. The Moratorium Orders are preempted by Section 303(3) of PROMESA, because they constitute unlawful executive orders that alter, amend, or modify rights of holders of the Bonds and that authorize the diversion of funds from one territorial instrumentality (PRHTA, PRCCDA, and PRIFA) to another (GDB) or to the territory, i.e., the Commonwealth.

308. Plaintiffs are entitled to an order declaring that the Moratorium Orders are preempted by Section 303(3) of PROMESA.

309. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

## FOURTEENTH CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant To 28 U.S.C. §§ 2201 And 2202 Declaring That PROMESA Violates Article I, Section 1 Of The U.S. Constitution And The Due Process Clause)**

310. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

311. Nothing in PROMESA precludes judicial review of the Revised Fiscal Plan's compliance with Section 201(b) of PROMESA or with PROMESA more generally.

312. Nonetheless, and in the alternative, to the extent Defendants may assert that Section 106(e) of PROMESA purports to limit or preclude judicial review of the Revised Fiscal Plan's compliance with Section 201(b) of PROMESA or with PROMESA more generally, any such preclusion of judicial review would violate the Due Process Clause of the U.S. Constitution.

313. Moreover, Article I, Section 1 of the U.S. Constitution requires that, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States[.]" U.S.

Const. art. I, § 1. Accordingly, Congress cannot delegate its legislative power to an agency without providing an intelligible principle for the agency to follow.

314. To the extent Defendants may assert that Section 106(e) of PROMESA purports to limit or preclude judicial review of the Revised Fiscal Plan's compliance with Section 201(b) of PROMESA or with PROMESA more generally, any such preclusion of judicial review would deprive FOMB of any intelligible principle that could limit or constrain FOMB's powers under Section 201 of PROMESA and would deprive Plaintiffs and other creditors of any mechanism by which a court could ascertain whether FOMB has correctly adhered to any such intelligible principle. Any such preclusion of judicial review would thereby render PROMESA an unconstitutional delegation of legislative power to FOMB.[40]

315. Therefore, if this Court determines that PROMESA bars review of the Revised Fiscal Plan, Plaintiffs are entitled to an order declaring that PROMESA (i) is unconstitutional in that it violates the Due Process Clause and (ii) constitutes an unconstitutional delegation of legislative power outside of Congress in violation of Article I, section 1 of the U.S. Constitution and constitutional principles of separation of powers.

## **RELIEF DEMANDED**

316. WHEREFORE Plaintiffs Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Financial Guaranty Insurance Company respectfully request that the Court enter judgment against Defendants as follows:

---

[40] To the extent Defendants argue that Section 201 of PROMESA granted FOMB "discretion" in approving and certifying the Revised Fiscal Plan, any such discretion would likewise function as an unconstitutional barrier to judicial review of the Revised Fiscal Plan's compliance with Section 201(b) and as such would deprive FOMB of an "intelligible principle" to guide its decision-making under Section 201.

(a)    Declaring that FOMB lacked authority to develop or approve the Revised Fiscal Plan, and that such purported development and approval were *ultra vires* and invalid and should be declared to be without force or effect;

(b)    Declaring that the Revised Fiscal Plan and the Compliance Law violate Section 201(b)(1)(N) of PROMESA;

(c)    Declaring that the Revised Fiscal Plan and the Compliance Law violate Section 201(b)(1)(M) of PROMESA;

(d)    Declaring that the Revised Fiscal Plan and the Compliance Law violate Section 201(b)(1)(B) of PROMESA;

(e)    Declaring that the Revised Fiscal Plan does not constitute a "Fiscal Plan" as defined in Sections 5(10) and 5(22) of PROMESA;

(f)    Declaring that the Revised Fiscal Plan violates Section 407 of PROMESA and is therefore unlawful;

(g)    Declaring that the Revised Fiscal Plan violates section 928 of the Bankruptcy Code (as incorporated into PROMESA) and is therefore unlawful;

(h)    Declaring that no Title III plan of adjustment based on the Revised Fiscal Plan can be confirmed under Sections 314 and 304(f) of PROMESA and section 1129 of the Bankruptcy Code;

(i)    Declaring that the Court will not hold a confirmation hearing on the Revised Fiscal Plan and, to the extent the Court deems it necessary and appropriate, entering complementary injunctive relief;

(j)    Declaring that the Moratorium Laws, Moratorium Orders, Revised Fiscal Plan, and Compliance Law are unconstitutional and void in that they violate the Contracts Clause;

(k)     Declaring that the Moratorium Laws, Moratorium Orders, Revised Fiscal

Plan, and Compliance Law are unconstitutional and void in that they violate the Takings and Due

Process Clauses;

(l)     Declaring that the Moratorium Laws, Moratorium Orders, Revised Fiscal

Plan, and Compliance Law are preempted by Section 303(1) of PROMESA;

(m)     Declaring that the Moratorium Orders are preempted by Section 303(3) of

PROMESA;

(n)     To the extent the Court determines that PROMESA bars review of the

Revised Fiscal Plan, declaring that PROMESA (i) is unconstitutional in that it violates the Due

Process Clause and (ii) constitutes an unconstitutional delegation of legislative power outside of

Congress in violation of Article 1, section 1 of the Constitution and constitutional principles of

separation of powers; and

(o)     Granting Plaintiffs such other and further relief as this Court may deem

just and proper.

Dated:     San Juan, Puerto Rico
           May 23, 2018

CASELLAS ALCOVER & BURGOS P.S.C.

By: */s/ Heriberto Burgos Pérez*
     Heriberto Burgos Pérez
     USDC-PR 204809
     Ricardo F. Casellas-Sánchez
     USDC-PR 203114
     Diana Pérez-Seda
     USDC-PR 232014
     P.O. Box 364924
     San Juan, PR 00936-4924
     Telephone:  (787) 756-1400
     Facsimile:  (787) 756-1401
     Email:  hburgos@cabprlaw.com
              dperez@cabprlaw.com

CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Howard R. Hawkins, Jr.*
     Howard R. Hawkins, Jr.*
     Mark C. Ellenberg*
     Ellen V. Holloman*
     Ellen Halstead*
     Gillian Burns*
     Thomas J. Curtin*
     Casey J. Servais*
     200 Liberty Street
     New York, NY 10281
     Telephone:  (212) 504-6000
     Facsimile:  (212) 406-6666
     Email:  howard.hawkins@cwt.com
              mark.ellenberg@cwt.com
              ellen.holloman@cwt.com
              ellen.halstead@cwt.com
              gillian.burns@cwt.com
              thomas.curtin@cwt.com
              casey.servais@cwt.com

     *Admitted *pro hac vice* in No. 17-BK-03283-LTS

     *Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

REXACH & PICÓ, CSP

By: /s/ María E. Picó

María E. Picó
USDC-PR 123214
802 Ave. Fernández Juncos
San Juan PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
E-mail:    mpico@rexachpico.com

BUTLER SNOW LLP

By: /s/ Martin A. Sosland

Martin A. Sosland*
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
E-mail:    martin.sosland@butlersnow.com

Stanford G. Ladner*
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: (646) 606-3996
Facsimile: (646) 606-3995
E-mail:    stan.ladner@butlersnow.com

Christopher R. Maddux*
J. Mitchell Carrington*
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Telephone: (601) 985-2200
Facsimile: (601) 985-4500
E-mail:    chris.maddux@butlersnow.com
           mitch.carrington@butlersnow.com

*Admitted *pro hac vice* in No. 17-BK-03283-LTS

*Attorneys for Financial Guaranty Insurance
Company*