# **EXHIBIT 61**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

   as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,

                 Debtor.[1]

PROMESA
Title III

Case No. 17-BK-03283 (LTS)

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

   as representative of

PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY,

  and

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF ALL TITLE III
DEBTORS (OTHER THAN COFINA),

  as section 926 trustee of

Adv. Proc. No. 19-ap-00363-LTS

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "**Commonwealth**") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("**PREPA**") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (the Commonwealth, COFINA, HTA, ERS and PREPA, each a Debtor and collectively, the "**Debtors**") (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Case:17-03283-LTS Doc#:13744-19 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc:
Miller Declaration Ex. 61 Answer Page 2 of 79

Case:19-00363-LTS Doc#:44-1 Filed:06/19/19 Entered:06/19/19 20:59:29 Desc: Main
Document Page 3 of 80

| PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY |
| --- |
|    Plaintiffs, |
|    v. |
| AMBAC ASSURANCE CORPORATION, *et al.* |

| FINANCIAL GUARANTY INSURANCE<br>COMPANY |
| --- |
|    Counterclaim and Third-Party Claim Plaintiff, |
|    v. |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO |
|    Counterclaim Defendant |
|    and |
| JOSÉ B. CARRIÓN III, ANDREW BIGGS,<br>CARLOS M. GARCIA, ARTHUR J.<br>GONZÁLEZ, ANA J. MATOSANTOS, JOSÉ R.<br>GONZALEZ, DAVID A. SKEEL, CHRISTIAN<br>SOBRINO, JOHN AND JANE DOES, and THE<br>COMMONWEALTH OF PUERTO RICO, |
|    Third-Party Defendants |

**DEFENDANT FINANCIAL GUARANTY INSURANCE COMPANY
ANSWER, COUNTERCLAIM, AND THIRD-PARTY CLAIM TO COMPLAINT
PURSUANT TO BANKRUPTCY RULES 3007 AND 7001 OBJECTING TO AND
CHALLENGING VALIDITY, ENFORCEABILITY, AND EXTENT OF PREPETITION
SECURITY INTERESTS AND SEEKING OTHER RELIEF**

Financial Guaranty Insurance Company ("***FGIC***"), by and through its attorneys Rexach

& Picó, CSP and Butler Snow LLP, hereby Answers the Complaint Pursuant to Bankruptcy

Case:19-00363-LTS Doc#:43-10 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Page 4 of 80

Rules 3007 and 7001 Objecting to and Challenging Validity, Enforceability, and Extent of Prepetition Security Interests and Seeking Other Relief [Dkt. # 562] (the "**Complaint**") and asserts a Counterclaim and Third-Party Claim as follows:

## ANSWER

1.       Admitted that: (a) FGIC has asserted liens (in proofs of claims and otherwise) to HTA's Revenues beyond those deposited with the Fiscal Agent; (b) FGIC has asserted (in proofs of claim and otherwise) liens in HTA's Revenues and Toll Revenues that are enforceable and perfected and continue to attach post-petition; and (c) there is a dispute between HTA and FGIC regarding the extent and enforceability of FGIC's liens in HTA's Revenues and Toll Revenues.[2] FGIC denies the remaining allegations in Paragraph 1.

2-5.       Paragraphs 2 through 5 contain solely legal conclusions to which no responses are required.   To the extent responses are required, FGIC denies the allegations in Paragraph 2 through 5.

6.       Admitted.

7.       Paragraph 7 contains solely legal conclusions to which no response is required.   To the extent a response is required, FGIC notes that the legal conclusions expressed appear contrary to the holding in *Aurelius Investment, LLC v. Puerto Rico*, 915 F.3d 838 (1st Cir. 2019), and FGIC therefore denies the allegations in Paragraph 7.

8.       FGIC admits the allegations in the first and second sentences of Paragraph 8 but denies that the Official Committee of Unsecured Creditors of all Title III Debtors is a proper

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms as in the Complaint.

Case:19-00363-LTS Doc#:44 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Page 4 of 80

plaintiff in this case. FGIC is without sufficient knowledge or information to admit or deny the allegations in the third sentence of Paragraph 8.

9.     FGIC admits that it is an insurer of Bonds that has filed claims against HTA and that those claims are entitled to secured status in HTA's Title III case. FGIC is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 9.

10.     FGIC admits that its name, proof of claim number, and address is listed on Exhibit A. FGIC is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 10.

11.     Paragraph 11 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that this Court has subject matter jurisdiction over this proceeding.

12.     Paragraph 12 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that this Court has personal jurisdiction over it in this proceeding but asserts that it is without sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 12.

13.     Paragraph 13 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that venue is proper in this Court for this proceeding.

14.     Paragraph 14 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that there is an actual, justiciable controversy between the parties but denies that Plaintiffs have asserted valid claims and otherwise denies the allegations in Paragraph 14.

15.     Admitted.

4

16.     Paragraph 16 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC states that the Enabling Act speaks for itself and denies any allegations contained in this paragraph that are inconsistent with the plain language of the Act.

17.     Paragraph 17 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC states that the 1968 Resolution and 1998 Resolution speak for themselves and denies any allegations contained in this paragraph that are inconsistent with the plain language of the resolutions.

18-25.    The allegations contained in Paragraph 18-25 are directly solely to the 1968 HTA Bonds.  As FGIC does not insure or otherwise have holdings in the 1968 HTA Bonds, no response is required to these allegations.  To the extent a response is required, Paragraphs 18 through 25 contain solely legal conclusions to which no responses are required.  FGIC further states that the 1968 Resolution speaks for itself and denies any allegations contained in these paragraphs that are inconsistent with the plain language of this document.  FGIC otherwise is without sufficient knowledge or information to admit or deny the allegations in Paragraphs 18 through 25.

26-34.    Paragraphs 26 through 34 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC states that the 1998 Resolution speaks for itself and denies any allegations contained in these paragraphs that are inconsistent with the plain language of this document.  FGIC otherwise denies the allegations in Paragraphs 26 through 34.

35-36.    Paragraphs 35 through 36 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC states that the 1998

Case:19-00393-LTS Doc#:44-19 Filed:06/10/19 Entered:06/10/19 10:58:29 Desc: Main Document Page 7 of 80

Security Agreement speaks for itself and denies any allegations contained in these paragraphs that are inconsistent with the plain language of this document. FGIC otherwise denies the allegations in Paragraphs 35 through 36.

37-39. Paragraphs 37-39 contain solely legal conclusions to which no responses are required. To the extent that responses are required, FGIC denies that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds that FGIC insures.

40-48. Paragraphs 40 through 48 contain solely legal conclusions to which no responses are required. To the extent that responses are required, FGIC states that Article 9 speaks for itself and denies any allegations contained in these paragraphs that are inconsistent with the plain language of this provision. FGIC otherwise denies that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds

49-54. The allegations contained in Paragraph 49-54 are directly solely to the 1968 HTA Bonds. As FGIC does not insure or otherwise have holdings in the 1968 HTA Bonds, no response is required to these allegations. To the extent a response is required, FGIC states that the financing statements referenced and quoted in Paragraphs 50 through 54 speak for themselves and FGIC denies any allegations contained in these paragraphs that are inconsistent with the plain language of these documents. FGIC otherwise is without sufficient knowledge or information to admit or deny the allegations in Paragraphs 49 through 54.

55. FGIC admits that at least six financing statements were filed that name HTA as the debtor and the 1998 Bondholders as secured party or the beneficiaries of the secured party. FGIC is without sufficient knowledge or information to admit or deny whether only six such financing statements were filed.

56-61.  FGIC states that the financing statements referenced and quoted in Paragraphs 56 through 61 speak for themselves and FGIC denies any allegations contained in these paragraphs that are inconsistent with the plain language of these documents.  FGIC otherwise denies the allegations in Paragraphs 56 through 61.

62.   Denied.

63.   Paragraph 63 contains solely legal conclusions to which no response is required. To the extent that a response is required, FGIC denies the allegations in Paragraph 63.

64-68.  Paragraphs 64 through 68 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC states that the provisions of Commonwealth law referenced and cited speak for themselves and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of these documents.  FGIC otherwise denies the allegations in Paragraphs 64 through 68.

69-70. Admitted.

71-73.  Paragraphs 71 through 73 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC states that the provisions of PROMESA cited and quoted speak for themselves and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of these provisions.  FGIC otherwise denies the allegations in Paragraphs 71 through 73.

74.   FGIC admits that the Oversight Board purported to certify seven fiscal plans but denies that the Oversight Board did so in compliance with PROMESA and therefore denies that these fiscal plans are lawful and compliant with PROMESA.  FGIC also denies the characterization of the so-called "HTA Allocable Revenues" and denies the remaining allegations in Paragraph 74.

75.     FGIC admits that the Oversight Board purported to certify the HTA Fiscal Plan but denies that the Oversight Board did so in compliance with PROMESA and therefore denies that the HTA Fiscal Plans is lawful and compliant with PROMESA.  FGIC also denies the characterization of the so-called "HTA Allocable Revenues" and denies the remaining allegations in Paragraph 75.

76.     FGIC admits that the Oversight Board purported to certify the Certified FY19 Budget but denies that the Oversight Board did so in compliance with PROMESA and therefore denies that the Certified FY19 Budget is lawful and compliant with PROMESA.  FGIC also denies the characterization of the so-called "HTA Allocable Revenues" and denies the remaining allegations in Paragraph 76.

77.     FGIC admits that the Oversight Board developed and authored the FY19 Revenue Letter but denies that the Oversight Board did so in compliance with PROMESA and therefore denies that the FY19 Revenue Letter and Certified FY19 Budget are lawful and compliant with PROMESA.  FGIC also denies the characterization of the so-called "HTA Allocable Revenues" and denies the remaining allegations in Paragraph 77.

78.     FGIC admits that the Oversight Board purported to certify the May 2019 Fiscal Plan but denies that the Oversight Board did so in compliance with PROMESA and therefore denies that the May 2019 Fiscal Plan is lawful and compliant with PROMESA.  FGIC also denies the characterization of the so-called "HTA Allocable Revenues" and denies the remaining allegations in Paragraph 78.

79.     FGIC admits the allegations in the second sentence of Paragraph 79.  FGIC is without sufficient knowledge or information to admit or deny the allegations in the first sentence of Paragraph 79.

80.     FGIC responses to the allegations in Paragraphs 1-79 are incorporated herein.

81-86. The allegations contained in Paragraph 81-88 are directly solely to the 1968 HTA Bonds.  As FGIC does not insure or otherwise have holdings in the 1968 HTA Bonds, no response is required to these allegations.  To the extent a response is required, FGIC states that Paragraphs 81 through 83 contain solely legal conclusions to which no responses are required and that the 1968 Resolution and Defendants' proofs of claims speak for themselves and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of these documents.    FGIC otherwise is without sufficient knowledge or information to admit or deny the allegations in Paragraphs 81 through 86.

87-88.  Denied.

89.     FGIC's responses to the allegations in Paragraphs 1-88 are incorporated herein.

90-92.  Paragraphs 90 through 92 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC states that the 1998 Resolution speak for itself and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of the 1998 Resolution.  FGIC otherwise denies the allegations in Paragraphs 90 through 92.

93-94.  Denied.

95.     FGIC states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in Paragraph 95 that are inconsistent with the plain language of the proofs of claims.

96.     Paragraph 96 contains solely legal conclusions to which no response is required.  To the extent a response is required, FGIC admits that there is an actual, substantial, and justiciable controversy between it and Plaintiffs.

Case:19-00363-LTS Doc#:43-4 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Ex. 61 Answer Page 10 of 79

97-98. Denied

99.     FGIC's responses to the allegations in Paragraphs 1-98 are incorporated herein.

100-108. The allegations contained in Paragraph 100-108 are directly solely to the 1968 HTA Bonds. As FGIC does not insure or otherwise have holdings in the 1968 HTA Bonds, no response is required to these allegations. To the extent a response is required, FGIC denies that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds. FGIC further states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of these documents. FGIC otherwise is without sufficient knowledge or information to admit or deny the allegations in Paragraphs 100 through 108.

109.    Denied.

110.    FGIC's responses to the allegations in Paragraphs 1-109 are incorporated herein.

111-114. Paragraphs 111 through 114 contain solely legal conclusions to which no responses are required. To the extent that responses are required, FGIC denies both that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds and that Plaintiffs are entitled to avoid FGIC's liens in the HTA bonds.

115-117. Denied.

118.    FGIC states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in Paragraph 118 that are inconsistent with the plain language of the proofs of claims.

119.    Paragraph 119 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that there is an actual, substantial, and justiciable controversy between it and Plaintiffs.

120.    Denied.

121.    FGIC's responses to the allegations in Paragraphs 1-120 are incorporated herein.

122-123.    Paragraphs 122 through 123 contain solely legal conclusions to which no responses are required. To the extent that responses are required, FGIC denies both that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds and that HTA is entitled to a priority over FGIC's liens in the HTA bonds.

124-126.  Denied.

127-129.    Paragraphs 127 through 129 contain solely legal conclusions to which no responses are required. To the extent that responses are required, FGIC denies both that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds and that HTA is entitled to a priority over FGIC's liens in the HTA bonds.

130-132.  Denied.

133.    FGIC's responses to the allegations in Paragraphs 1-132 are incorporated herein.

134-143.  The allegations contained in Paragraph 134 through 143 are directly solely to the 1968 HTA Bonds. As FGIC does not insure or otherwise have holdings in the 1968 HTA Bonds, no response is required to these allegations. To the extent a response is required, FGIC denies that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds. FGIC further states that the 1968 Financing Statements and Defendants' proofs of claims speak for themselves and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of these documents. FGIC otherwise is without sufficient knowledge or information to admit or deny the allegations in Paragraphs 134 through 143.

144.    Denied

145.    FGIC's responses to the allegations in Paragraphs 1-144 are incorporated herein.

146-149.  Paragraphs 146 through 149 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC denies both that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds and that Plaintiffs are entitled to avoid FGIC's liens in the HTA bonds.

150.   FGIC states that the 1998 Financing Statements speak for themselves and FGIC denies any allegations in Paragraph 150 that are inconsistent with the plain language of the proofs of claims.  FGIC otherwise denies the allegations in Paragraph 150.

151.   Paragraph 151 contains solely legal conclusions to which no response is required.  To the extent that a response is required, FGIC states that Article 9 of the Uniform Commercial Code speaks for itself and denies both that Article 9 is applicable with respect to the HTA bonds and that Plaintiffs are entitled to avoid FGIC's liens in the HTA bonds.

152-153.  Denied.

154.   FGIC states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in Paragraph 154 that are inconsistent with the plain language of the proofs of claims.

155.   Paragraph 155 contains solely legal conclusions to which no response is required.  To the extent a response is required, FGIC admits that there is an actual, substantial, and justiciable controversy between it and Plaintiffs.

156.   Denied.

157.   FGIC's responses to the allegations in Paragraphs 1-156 are incorporated herein.

158-159.  Paragraphs 158 through 159 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC denies both that Article

9 of the Uniform Commercial Code is applicable with respect to the HTA bonds and that HTA is entitled to a priority over FGIC's liens in the HTA bonds.

160.  FGIC states that the 1968 Financing Statements and 1998 Financing Statements speak for themselves and FGIC denies any allegations in Paragraph 160 that are inconsistent with the plain language of those documents.  FGIC otherwise denies the allegations in Paragraph 160.

161.    Denied.

162-166.   Paragraphs 162 through 166 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC denies both that Article 9 of the Uniform Commercial Code is applicable with respect to the HTA bonds and that HTA is entitled to a priority over FGIC's liens in the HTA bonds.

167-169.  Denied.

170.    FGIC's responses to the allegations in Paragraphs 1-169 are incorporated herein.

171-186.  The allegations contained in Paragraphs 171 through 186 are directly solely to the 1968 HTA Bonds.  As FGIC does not insure or otherwise have holdings in the 1968 HTA Bonds, no response is required to these allegations.  To the extent a response is required, FGIC denies that PROMESA preempts or otherwise eliminates FGIC's liens in the HTA bonds.  FGIC further denies that the May 2019 Fiscal Plan and Certified FY19 Budget are lawful and compliant with PROMESA. FGIC also states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in these paragraphs that are inconsistent with the plain language of these documents.  FGIC otherwise is without sufficient knowledge or information to admit or deny the allegations in Paragraphs 171 through 186.

187-188.  Denied.

189.     FGIC's responses to the allegations in Paragraphs 1-188 are incorporated herein.

190-192.     Paragraphs 190 through 193 contain solely legal conclusions to which no responses are required.  To the extent that responses are required, FGIC denies that its liens in the HTA bonds is prevented from attaching to Revenues or rights to receive Revenues post-petition.

193.     FGIC states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in Paragraph 193 that are inconsistent with the plain language of the proofs of claims.

194.     Paragraph 194 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that there is an actual, substantial, and justiciable controversy between it and Plaintiffs.

195-196.  Denied.

197.     FGIC's responses to the allegations in Paragraphs 1-196 are incorporated herein

198.     FGIC states that Defendants' proofs of claims speak for themselves and FGIC denies any allegations in Paragraph 198 that are inconsistent with the plain language of the proofs of claims.

199-200.  Denied.

201.     Paragraph 201 contains solely legal conclusions to which no response is required. To the extent a response is required, FGIC admits that there is an actual, substantial, and justiciable controversy between it and Plaintiffs.

202.     Denied.

FGIC denies that Plaintiffs are entitled any relief and denies any and allegations in the Complaint to the extent they are not otherwise expressly admitted above.

## FIRST AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred by the doctrine of judicial estoppel due to positions taken and statements made by Plaintiffs in related proceedings, including, but not limited to, that fiscal plans certified by the Oversight Board are not binding.

## SECOND AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred in that Defendants, alternatively and at minimum, hold equitable liens in HTA's revenues.

## THIRD AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred for failure to state a claim for reasons including, but not limited to, Article 9 of the Uniform Commercial Code not applying to the HTA bonds.

## FOURTH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims are barred in the event that members of the Oversight Board were not properly appointed in accordance with the Appointments Clause and that, as a result, prior actions taken by the Oversight Board are void *ab initio*.

## COUNTERCLAIM AND THIRD-PARTY CLAIM

## PARTIES

1.     Counter-Claim Defendant the Financial Oversight and Management Board for Puerto Rico (the "***Oversight Board***") is an entity established under PROMESA to provide a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets. 48 U.S.C. § 2121(a), (b). The Oversight Board is the statutory trustee of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority in their Title III cases.

15

48 U.S.C. §§ 2124(k), 2161(c)(7). The Oversight Board is subject to each of the thirteen counts, being Counts I through XIII.

2. Third-Party Defendant José B. Carrión III is named in his official capacity as the Chairman and a member of the Oversight Board. Mr. Carrión is subject to the mandamus claims, being Counts XI, XII, and XIII.

3. Third-Party Defendant Andrew Biggs is named in his official capacity as a member of the Oversight Board. Mr. Biggs is subject to the mandamus claims, being Counts XI, XII, and XIII.

4. Third-Party Defendant Carlos M. García is named in his official capacity as a member of the Oversight Board. Mr. García is subject to the mandamus claims, being Counts XI, XII, and XIII.

5. Third-Party Defendant Arthur J. González is named in his official capacity as a member of the Oversight Board. Mr. González is subject to the mandamus claims, being Counts XI, XII, and XIII.

6. Third-Party Defendant Ana J. Matosantos is named in her official capacity as a member of the Oversight Board. Ms. Matosantos is subject to the mandamus claims, being Counts XI, XII, and XIII.

7. Third-Party Defendant José R. Gonzalez is named in his official capacity as a member of the Oversight Board. Mr. Gonzalez is subject to the mandamus claims, being Counts XI, XII, and XIII.

8. Third-Party Defendant David A. Skeel is named in his official capacity as a member of the Oversight Board. Mr. Skeel is subject to the mandamus claims, being Counts XI, XII, and XIII.

9. Third-Party Defendant Christian Sobrino is named in his official capacity as the ex officio member and the Governor's Representative to the Oversight Board. Mr. Sobrino is subject to the mandamus claims, being Counts XI, XII, and XIII.

10. Defendants John and Jane Does are the unknown successors to the named members of the Oversight Board. Defendants Does are subject to the mandamus claims, being Counts XI, XII, and XIII.

11. Third-Party Defendant the Commonwealth of Puerto Rico is a territory of the United States of America organized pursuant to the Constitution of the Commonwealth of Puerto Rico, effective July 25, 1952. The Commonwealth is named for notice purposes regarding Count VIII, which seeks a declaration that the Unauthorized Laws, as defined in Count VIII and relied on by the Oversight Board to approve and certify Fiscal Plans and Budgets, are unconstitutional.

12. Plaintiff FGIC is a New York Stock insurance corporation with its principal place of business at 463 Seventh Avenue, 16th Floor, New York, New York 10018.

## JURISDICTION, VENUE AND STANDING

13. This Court has federal question subject matter jurisdiction because this action arises under Title III of PROMESA, relates to Title III cases of the Commonwealth and HTA, and is an action against the Oversight Board. 28 U.S.C. § 1331, 48 U.S.C. § 2166, 48 U.S.C. § 106(a).

14. This Court has personal jurisdiction over all the Defendants pursuant to PROMESA § 306(c). 48 U.S.C. § 2166(c).

15. Plaintiff seeks declarations and related relief pursuant to 28 U.S.C. §§ 2201 and 2202.

Case:19-00363-LTS Doc#:4-19 Filed:06/19/19 Entered:06/19/19 20:59:29 Desc: Main
Document Page 19 of 80

16.     Plaintiff seeks writs of mandamus and prohibition under the All Writs Act and Mandamus Act. 28 U.S.C. §§ 1361 and 1651.

17.     Plaintiff asserts claims under Art. I, Section 10, Clause 1, and the Fifth and Fourteenth Amendments of the United States Constitution in addition to substantially similar claims under the Commonwealth Constitution.

18.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "[t]he Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]." 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.

19.     Venue is proper in this District under PROMESA § 307. 48 U.S.C. § 2167.

20.     Plaintiff has standing to bring this action, including as a party in interest in these Title III cases. Under Plaintiff's respective insurance agreements, insurance policies, and applicable bond documents, it is deemed to be the sole owner of the HTA Bonds that it insures for purposes of consents and other bondholder actions, including exercising rights and remedies, or Plaintiff otherwise has control rights over such bonds.

21.     Plaintiff is also an express third party beneficiary of the resolutions under which the HTA Bonds were issued. As such, PROMESA § 301(c)(3)(B) expressly recognizes that financial guaranty insurers, such as Plaintiff, are authorized to act on behalf of the holders of the bonds they insure, including in litigation generally, in these Title III cases, and in this adversary proceeding, and Plaintiff's rights to act on behalf of PRHTA Bondholders is not dependent upon a default or subrogation. 48 U.S.C. § 2161(c)(3)(B). In addition, Plaintiff has been subrogated to the rights of HTA Bondholders upon paying the claims of such HTA Bondholders

following the unlawful actions of the Oversight Board, the Commonwealth and HTA, as set forth below.

### THE COMMONWEALTH CONSTITUTION REGARDING APPROPRIATIONS AND THE CONSTITUTIONAL CLAWBACK

22.     The Constitution of the Commonwealth of Puerto Rico is recognized as the sovereign local law in the Commonwealth by the applicable federal law of the United States, as expressed in the Puerto Rican Foreign Relations Act. 48 U.S.C.A. § 731b ("Fully recognizing the principle of government by consent, sections 731b to 731e of this title are now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption.").

23.     The Commonwealth Constitution delegates the appropriations power to the Legislative Assembly of Puerto Rico. *See* P.R. Const., Art. III, § 9.

24.     The Commonwealth Constitution articulates the scope of the legislative appropriations power. *See* P.R. Const., Art. VI, §§ 2, 6, 7, and 8.

25.     Appropriations rules generally follow the "centuries-old concept that one legislature may not bind the legislative authority of its successors." *U.S. v. Winstar Corp.*, 518 U.S. 839, 872 (1996) (quoting 1 W. Blackstone, Commentaries on the Laws of England 90 (1765)). This means that appropriations are generally discretionary for any given fiscal period unless the legislative body is authorized by the applicable constitution to anticipate revenues and contract for debt and, thereby, bind the appropriations power of future legislatures.

26.     The Commonwealth Constitution expressly authorizes the Legislative Assembly to bind the appropriations power of future Legislative Assemblies. *See* P.R. Const., Art. VI, §§ 2, ("The power of the Commonwealth of Puerto Rico to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly[,]"). The

Case:17-03283-LTS Doc#:13744-10 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc: Miller Declaration Ex. 61 Page 20 of Page

Case:19-00363-LTS Doc#:43-4 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Ex H - Answer Page 21 of 80

Legislative Assembly may contract for, or authorize the contracting of, debts, which create a mandatory and continuing appropriation until the contracted for debt is fully paid.

27.     The Commonwealth Constitution includes provisions colloquially referred to as the "***Constitutional Clawback***." P.R. Const., Art VI, §§ 2 and 8. The Constitutional Clawback mandates that, when insufficient revenues exist to make all discretionary and mandatory appropriations, public debts[3] (e.g., general obligation bonds) must be paid from first revenues of the Commonwealth and that revenues in surplus of public debts are paid in accordance with the order of priorities established by law. P.R. Const., Art VI, § 8.

28.     The Commonwealth Constitution clearly mandates that public debts must be paid first under Art. VI, § 8, and that public debt holders may enforce this mandatory duty pursuant to Art. VI, § 2. The priority is plain, and the enforcement right is exclusive.

29.     The Constitutional Clawback does not permit the Commonwealth to renege on mandatory and continuing appropriations by diverting pledged revenues to discretionary expenditures. Instead, the Constitutional Clawback only permits withholding mandatory and continuing appropriations if public debts cannot be paid first from general fund revenues.

30.     The Constitutional Clawback not only is expressed in the Commonwealth Constitution but also was authorized by the United States Congress upon its consideration of the Amendment to the Commonwealth Constitution that was later ratified by the Commonwealth on December 10, 1961. Public Law 87-121, 75 Stat. 245 (August 3, 1961).

---

[3] Public debts as stated herein shall mean bonds or notes whereby the full faith, credit, and taxing power of the Commonwealth has been pledged or guaranteed thereto.

## PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY LEGISLATION AND BONDHOLDER AGREEMENTS

31.     The Legislative Assembly enacted the Puerto Rico Highway and Transportation Authority Act, being Act No. 74, adopted June 23, 1965, as amended (the "***Enabling Act***," codified at 9 L.P.R.A. § 1901, *et seq.*) and, thereby, created the Puerto Rico Highways & Transportation Authority ("***HTA***"), as a public corporation and instrumentality of the Commonwealth.

32.     The Legislative Assembly amended the Puerto Rico Internal Revenue Code of 1994 by Act No. 34, adopted July 16, 1997, as further amended (the "***Internal Revenue Code***," now codified at 13 L.P.R.A. § 30001, *et seq.*) and, thereby, established certain excise taxes, including taxes on gasoline, gas oil, diesel oil, crude oil, partially finished and finished oil by-products, and any other hydrocarbon mixtures (the "***HTA Excise Taxes***") that "shall be covered into a special deposit of the Highways and Transportation Authority for its corporate purposes". 13 L.P.R.A. § 31751.

33.     The Internal Revenue Code mandates that the Secretary of the Puerto Rico Department of the Treasury "shall transfer" or "shall pay" the HTA Excise Taxes into the special deposit of HTA. 13 L.P.R.A. § 31751.

34.     The Government of Puerto Rico through the Internal Revenue Code agreed and committed to bondholders of HTA that it will not eliminate or reduce the HTA Excise Taxes and that it will "ensure that [the HTA Excise Taxes] shall be covered into a special deposit in the name and for the benefit of [HTA] . . . until said bonds issued at any time, including their interest, have been paid in full." 13 L.P.R.A. § 31751.

35.     The Legislative Assembly pledged to bondholders of HTA that any deficiency in the reserve funds of HTA "shall be reimbursed" to HTA by the Government of Puerto Rico

from first proceeds of "any other taxes in effect on any other fuel or means of propulsion used, among other purposes, to propel highway vehicles" and any remaining part of the HTA Excise Taxes that was not already otherwise pledged to HTA. 13 L.P.R.A. § 31751.

36.     The Legislative Assembly enacted the Vehicle and Traffic Law being Act No. 22, adopted January 7, 2000, as amended (the "*Vehicle Law*," codified at 9 L.P.R.A. § 5001, *et seq.*) and, thereby, established motor vehicle license fees and taxes (the "*Vehicle Fees*") that "shall be covered in its entirety into a Special Deposit in the name and for the benefit of the Highways and Transportation Authority." 9 L.P.R.A. § 5681.

37.     The Enabling Act, the Internal Revenue Code, and the Vehicle Law shall hereinafter collectively be referred to as the "*HTA Acts*."

38.     The Vehicle Law authorizes HTA to pledge or encumber the Vehicle Fees for the payment of the principal of and interest on any bonds of HTA and that "the proceeds of said tax, in the necessary amount, shall be used solely for the payment of principal of and interest on the bonds and other obligations of the Authority and to meet any stipulation agreed upon by the Authority to the holders of its bonds and other obligations." 9 L.P.R.A. § 5681.

39.     The Legislative Assembly through the Vehicle Law pledged to bondholders of HTA that it would not reduce the Vehicle Fees. 9 L.P.R.A. § 5681.

40.     The Vehicle Law makes the Vehicle Fees subject to the Constitutional Clawback but expressly states that the Vehicle Fees when subject to the Constitutional Clawback "shall not be covered into the General Fund of the Government of Puerto Rico when collected, but shall be covered into the aforementioned Special Deposit for the benefit of the Authority." 9 L.P.R.A. § 5681.

41.    The HTA Excise Taxes and the Vehicle Fees shall hereinafter be collectively referred to as the "**HTA Taxes**."

42.    The Legislative Assembly appropriated and pledged the HTA Taxes to HTA to finance HTA's projects and systems, including the issuance of bonds therefor.

43.    This appropriation and pledge of the HTA Taxes is mandatory and continuing, except for the express and limited circumstances provided in the Constitutional Clawback.

44.    HTA also derives revenues from the HTA's toll facilities (the "**Toll Revenues**").

45.    The HTA Taxes and the Toll Revenues shall hereinafter be collectively referred to as the "**HTA Special Revenues**."

46.    The Legislative Assembly through the Enabling Act authorized HTA to issue and sell its own bonds, including the "pledging" of "the entire gross or net revenues and present and future income or other funds of the Authority" to "secure payment of the principal of and interest" on such bonds. 9 L.P.R.A. § 2012. This authorization is by special statute and includes provisions for the creation, perfection, priority, or enforcement of this lien. *See*, *e.g.*, 9 L.P.R.A. §§ 2012, 2013, and 2019, which create and govern the pledge.

47.    The Commonwealth through the Enabling Act pledged to bondholders of HTA that "it will not limit or restrict the rights or powers hereby vested in the Authority until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 9 L.P.R.A. § 2019.

48.    The Enabling Act states that bondholders "shall have the right and power, for the equal benefit and protection of all holders of bonds similarly situated:

(1) By mandamus or other suit, action, or proceeding at law or in equity to enforce his rights against the Authority, its officers, agents, and employees to perform and carry out its and their duties and obligations under this chapter and its and their covenants and agreements with bondholders;

(2) by action or suit in equity to require the Authority to account as if it were the trustee of an express trust;

(3) by action or suit in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the bondholders, and

(4) to bring suit upon the bonds."

9 L.P.R.A. § 2013(a).

49.     Reliant on the HTA Acts, HTA entered into certain Puerto Rico Highways and Transportation Authority Resolutions, being Nos. 68-18, adopted June 13, 1968, and 98-06, adopted February 26, 1998 (the "**Resolutions**"); whereby, HTA pledged the HTA Special Revenues to the holders of bonds issued under the Resolutions.

50.     The Resolutions unequivocally state that the Commonwealth has "allocated" and "pledged" the HTA Taxes to HTA and its bondholders under the HTA Acts.

51.     Reliant on the HTA Acts, the Commonwealth's pledges thereunder, and the Resolutions, HTA issued certain bonds (the "**HTA Bonds**") and, thereby, contracted with the holders of the HTA Bonds (the "**HTA Bondholders**").

52.     The provisions and pledges of the Commonwealth, through the HTA Acts, were incorporated into the HTA Bonds.

53.     The provisions and pledges of HTA, through the Resolutions, were incorporated into the HTA Bonds.

54.     The provisions of other applicable Commonwealth laws at the time the HTA Bonds were issued also were incorporated into the HTA Bonds.

55.     The HTA Bonds are non-recourse bonds, payable solely from the HTA Special Revenues.

## FGIC'S INTERESTS IN THE HTA BONDS

56.     FGIC is a provider of financial guaranty insurance, which is a type of insurance whereby an insurer guarantees scheduled payments of interest and principal as and when due on a bond or other obligation. FGIC insures scheduled principal and interest payments when due on public finance, structured finance and other obligations. Under relevant provisions of the applicable bond documents, bond insurance policies, insurance agreements, and applicable law, FGIC is afforded certain rights with respect to the obligations it insures and is treated as the holder of the bonds it insures. In addition, payment by FGIC under a policy neither satisfies nor discharges an issuer's obligation to pay and, to the extent FGIC makes such payments, it obtains assignments of rights from the bondholders, becomes owner of the bonds, and/or becomes subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

57.     Under its insurance agreements and policies insuring payment of principal of and interest on the HTA Bonds, FGIC is deemed to be the sole owner of the HTA Bonds that FGIC insures for purposes of, or otherwise has control rights over, consents and other bondholder actions, including exercising rights and remedies of HTA Bondholders. FGIC is also recognized as a third-party beneficiary under the Resolutions.

58.     FGIC presently insures the following HTA Bonds issued under the 1998 HTA Resolution, which are defined and discussed below:

    a.     Transportation Revenue Bonds, Series G, and Transportation Revenue Refunding Bonds, Series H;

    b.     Subordinated Transportation Revenue Bonds (Series 2003);

    c.     Transportation Revenue Refunding Bonds, Series I, and Transportation Revenue Bonds, Series J;

    d.     Transportation Revenue Refunding Bonds, Series L; and

    e.     Transportation Revenue Refunding Bonds, Series N.

59.     HTA issued $635,685,000 in principal amount of Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds, Series G, and Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series H (the "*Series G & H TRBs*"). FGIC insured the payment of principal of and interest on $160,400,000 in principal amount of Series G & H TRBs pursuant to that certain *Municipal Bond New Issue Insurance Policy*, Policy Number 03010506 (the "*Series G & H TRBs Insurance Policy*").

60.     HTA issued $320,545,000 in principal amount of Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds (Series 2003) (the "*Subordinated TRBs*"). FGIC insured the payment of principal of and interest on $140,235,000 in principal amount of Subordinated TRBs pursuant to those certain *Municipal Bond New Issue Insurance Policy*, Policy Number 03010507, *Municipal Bond Whole Maturity Secondary Market Insurance Policy*, Policy Number 03020048, *Municipal Bond Partial Maturity Secondary Market Insurance Policy*, Policy Number 03020049, and *Municipal Bond Partial Maturity Secondary Market Insurance Policy*, Policy Number 03020051 (the "*Subordinated TRBs Insurance Policies*").

61.     HTA issued $488,235,000 in principal amount of Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series I, and Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds, Series J (the "*Series I & J TRBs*"). FGIC insured the payment of principal of and interest on $95,625,000 in principal amount of Series I & J TRBs pursuant to that certain *Municipal Bond New Issue Insurance Policy*, Policy Number 04010258, (the "*Series I & J TRBs Insurance Policy*").

62.     HTA issued $598,285,000 in principal amount of Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series L (the "*Series L*

TRBs"). FGIC insured the payment of principal of and interest on $48,015,000 in principal amount of Series L TRBs pursuant to that certain *Municipal Bond New Issue Insurance Policy*, Policy Number 05010655 (the "**Series L TRBs Insurance Policy**").

63.     HTA issued $1,502,904,943.95 in principal amount of Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds, Series N (the "***Series N TRBs***"). FGIC insured the payment of principal of and interest on $263,790,000 in principal amount of Series N TRBs pursuant to that certain *Municipal Bond New Issue Insurance Policy*, Policy Number 07010057 (the "**Series N TRBs Insurance Policy**").

64.     For HTA Bonds that FGIC makes required payments in respect of claims submitted under its insurance policies due to HTA's payment default, FGIC "shall become the owner of the [HTA Bonds], appurtenant coupon or right to payment of principal or interest on such [HTA Bonds] and shall be fully subrogated to all of the Bondholder's rights thereunder, including the right to payment thereof."

65.     On June 28, 2012, the Superintendent of Financial Services of the State of New York was appointed rehabilitator of FGIC by the Supreme Court of the State of New York (the "**Rehabilitation Court**") in connection with the rehabilitation proceeding captioned *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (the "**Rehabilitation Proceeding**"). On June 11, 2013, the Rehabilitation Court issued an order approving the First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013 (together with the Plan Supplement (as defined therein) and all exhibits thereto, including the Restructured Policy Terms (as defined therein), the "**Plan of Rehabilitation**") and

authorizing the implementation of the Plan of Rehabilitation.[4]  On August 19, 2013, the Plan of Rehabilitation became effective and, as provided in the Restructured Policy Terms, modified each of FGIC's policies. *See* Restructured Policy Terms § 3.1 ("From and after the Effective Date, the Plan shall (i) become part of each Policy and shall supersede any provision of any Policy that is inconsistent with the Plan and (ii) govern treatment of all Claims under Policies that have not been paid in full as of the date of the Order of Rehabilitation."); *see also* Plan of Rehabilitation § 3.1 ("Effective as of the Effective Date, any and all Policies in force as of the Effective Date . . . automatically and without any further actions . . . shall be modified by the Plan. The Plan shall supersede any and all provisions of each Policy that are inconsistent with the Plan."). Generally, the Restructured Policy Terms provide that FGIC will pay a certain percentage of each permitted policy claim in cash with the remainder of the permitted policy claim treated as a deferred payment obligation, paid if and to the extent excess cash becomes available, in accordance with the terms of the Plan of Rehabilitation.

66.    FGIC has received claims totaling approximately $76.47 million under its policies[5] insuring HTA Bonds and has made payments to the HTA Bondholders in respect of such claims in accordance with its respective policies (such payments, the "**Policy Payments**"). As of the date of this filing, FGIC anticipates receiving substantial additional claims under its policies insuring HTA Bonds and making substantial additional Policy Payments.

---

[4] The Plan of Rehabilitation is incorporated herein by reference and any capitalized terms used but not defined in this paragraph shall have the meanings ascribed to them in the Plan of Rehabilitation. The summary and description of the Plan of Rehabilitation is qualified in its entirety by reference to the Plan of Rehabilitation. A copy of the Plan of Rehabilitation is accessible at the following address: http://fgic.com/policyholderinfocenter/planrehadexibits.pdf.

[5] Unless the context otherwise requires, references herein to FGIC's policies or insurance policies means those policies as modified by the Plan of Rehabilitation.

67.     In addition, FGIC may be reimbursed for any amounts so paid, as well as for any costs of collection and enforcement (the "***Collection Costs***"), together with interest on the foregoing from the date paid or incurred to the date of payment. FGIC has already, and will continue to, incur substantial Collection Costs in undertaking to enforce its rights and remedies with respect to the HTA Bonds.

### THE PUERTO RICO UNIFORM COMMERCIAL CODE

68.     The Legislative Assembly enacted a version of Article 9 of the Uniform Commercial Code by Act No. 241, adopted September 19, 1996, as amended (the "***Commercial Code***").

69.     Article 9 of the Commercial Code expressly excluded governmental pledges and transfers from its scope: "The provisions of this Chapter shall not apply… to a transfer by a government, political subdivision or governmental instrumentality or agency to the extent such a transfer is governed by special statute."  Commercial Code § 9-104(e).

70.     The Legislative Assembly revised its Commercial Code by Act No. 21, adopted January 17, 2012, as amended (the "***Revised Commercial Code***"), and the Revised Commercial Code became effective January 17, 2013.

71.     Article 9 of the Revised Commercial Code also excludes governmental pledges from its scope. 19 L.P.R.A. § 2219(c)(2) ("This chapter does not apply to the extent that . . . the constitution or another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state.").

72.     Article 9 of the Commercial Code and the Revised Commercial Code do not apply to governmental pledges, appropriations, transfers, liens, priorities, or security interests.

73.     The Commercial Code and the Revised Commercial Code do not apply to the HTA Acts, the Resolutions, the HTA Bonds, and the priorities or liens of the HTA Bondholders.

74.     Notwithstanding the inapplicability of the Commercial Code and the Revised Commercial Code, the HTA Bondholders filed financing statements regarding their liens in the HTA Special Revenues. (Compl. ¶¶ 55-61, as answered hereby).

## PROMESA AND THE OVERSIGHT BOARD'S LEGAL DUTIES

75.     Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**" codified at 48 U.S.C. §§ 2101, *et seq.*) to establish the Oversight Board and to provide methods and procedures for Puerto Rico to achieve fiscal responsibility and access to the capital markets.  48 U.S.C. § 2141(a) and (b).

76.     The Oversight Board is responsible for developing, approving and certifying Fiscal Plans[6] for the Commonwealth and its covered instrumentalities. 48 U.S.C. § 2141(a).

77.     Each Fiscal Plan shall provide a method to achieve fiscal responsibility and access to the capital markets and conform to fourteen additional enumerated requirements. 48 U.S.C. § 2141(b). Three of those additional requirements are particularly relevant here. 48 U.S.C. § 2141(b)(1) (A), (M), and (N).

78.     First, PROMESA §201(b)(1)(A) states: "A Fiscal Plan developed under this section shall, with respect to the territorial government or covered territorial instrumentality, . . . *be based on applicable laws* or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan[.]" 48 U.S.C. § 2141(b)(1)(A)  (emphasis added).

---

[6] "Fiscal Plan" is defined at 48 U.S.C. § 2104(10).

79.     The Oversight Board when developing, approving, or certifying a Fiscal Plan has a clear legal duty to base such a Fiscal Plan on "applicable laws" or "specific bills."

80.     Second, PROMESA §201(b)(1)(N) states: "A Fiscal Plan developed under this section shall, with respect to the territorial government or covered territorial instrumentality, . . . *respect the relative lawful priorities or lawful liens*, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality *in effect prior to the date of enactment of this Act*[.]" 48 U.S.C. § 2141(b)(1)(N) (emphasis added).

81.     The Oversight Board when developing, approving, or certifying a Fiscal Plan has a clear legal duty to use the assets, funds, or resources of HTA for the sole benefit of HTA.

82.     Third, PROMESA §201(b)(1)(M) states: "A Fiscal Plan developed under this section shall, with respect to the territorial government or covered territorial instrumentality, . . . ensure that assets, funds, or resources of a territorial instrumentality *are not loaned to, transferred to, or otherwise used for the benefit of a covered territory* or another covered territorial instrumentality of a covered territory, *unless permitted by the constitution of the territory*, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI[.]" 48 U.S.C. § 2141(b)(1)(M)  (emphasis added).

83.     The Oversight Board when developing, approving, or certifying a Fiscal Plan has a clear legal duty to respect the relative lawful priorities or lawful liens in the Commonwealth Constitution, other laws, and agreements.

84.     Any action by the Oversight Board to develop, approve, or certify a Fiscal Plan that does not comply with these clear legal duties is *ultra vires* and the resulting Fiscal Plan, approval, and certification are invalid and void *ab initio*.

85.     PROMESA § 106(e) limits review of Oversight Board certifications of Fiscal Plans, but "Section 106(e) does not, however, deprive the Court of jurisdiction to entertain Plaintiff's claims that the Fiscal Plan is invalid or unenforceable as violative of the Contracts, Takings and Due Process Clauses of the federal Constitution." *Ambac v. Commonwealth of Puerto Rico*, 297 F.Supp. 3d 269, 284 (D. P.R. 2018).

86.     The Oversight Board is responsible for approving and certifying Budgets[7] that comply with the Fiscal Plans. 48 U.S.C. § 2142.

87.     A Budget must, therefore, be based on applicable law, use assets, funds, or resources of an instrumentality solely for the benefit of that instrumentality, and respect the lawful priorities or lawful liens just like a Fiscal Plan.  48 U.S.C. § 2142.

88.     Any action by the Oversight Board to approve or certify a Budget that does not comply with these clear legal duties is *ultra vires* and the resulting Budget, approval, and certification are invalid and void *ab initio*.

89.     The Oversight Board shall determine in its sole discretion that the Commonwealth or its instrumentalities should file a petition to commence a title III case. 48 U.S.C. §§ 2146, 2164.

90.     On May 3, 2017, the Oversight Board filed a petition commencing a title III case for the Commonwealth. (Dkt. No. 1 in Case No. 17-03823).

91.     On May 21, 2017, the Oversight Board filed a petition commencing a title III case for HTA. (Dkt. No. 1 in Case No. 17-03567).

92.     The Oversight Board is the only entity that may file a plan of adjustment in the title III cases. 48 U.S.C. § 2172(a).

---

[7] Budget is defined at PROMESA, § 5(4).

Case:19-00363-LTS Doc#:43-4 Filed:06/19/20 Entered:06/19/20 58:29 Desc: Main Document Ex. 1 Answer Page 35 of 73

93.     PROMESA § 314(b) imposes seven requirements on the Oversight Board before this Court may confirm a proposed plan of adjustment. 48 U.S.C. § 2174(b). Two of those requirements are particularly relevant here. 48 U.S.C. § 2174(b) (6) and (7).

94.     First, PROMESA § 314(b)(6) states: "The court shall confirm the plan if . . . the plan is feasible and in the best interests of creditors, which shall require the court to consider whether *available remedies under the non-bankruptcy laws and constitution of the territory* would result in a greater recovery for the creditors than is provided by such plan[.]" 48 U.S.C § 2174(b)(6) (emphasis added).

95.     Second, PROMESA § 314(b)(7) states: "The court shall confirm the plan if . . . the plan is consistent with the applicable Fiscal Plan certified by the Oversight Board under title II." 48 U.S.C § 2174(b)(7). PROMESA § 314(b)(7) incorporates by reference the Fiscal Plan requirements of PROMESA § 202(b)(1)(A) and (N). Therefore, a plan of adjustment must be consistent with a Fiscal Plan's requirement that it *be based on applicable laws* and that it *respect the relative lawful priorities or lawful liens*, as may be applicable, in the constitution, other laws, or agreements of the Commonwealth or covered Commonwealth instrumentality in effect prior to the date of enactment of this Act, and that the assets, funds, or resources of an instrumentality be used solely for the benefit of that instrumentality. 48 U.S.C § 2174(b)(7), incorporating 48 U.S.C. § 2141(b)(1) (A), (M), and (N).

96.     The Oversight Board when developing and proposing a plan of adjustment has a clear legal duty to propose in good faith a plan of adjustment that is feasible, in the best interests of creditors, and complies with the Fiscal Plan requirements. A plan is not proposed in good faith and is *per se* unconfirmable if it (i) does not provide HTA Bondholders with a better recovery than they otherwise would receive under the Commonwealth Constitution and HTA

Case:19-00363-LTS Doc#:43-4 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Page 34 of 80

Acts, (ii) is not based on the HTA Acts, and (iii) does not respect the priorities or liens of the HTA Bondholders.

## THE BASIC FEDERAL RULE GOVERNS PROPERTY AND LIEN RIGHTS UNDER PROMESA

97.     Congress created PROMESA as an analog to chapter 9 of the Bankruptcy Code.

98.     PROMESA § 306(c) gives the presiding district court "exclusive jurisdiction of all property, wherever located, of the debtor as of the commencement of the case[.]" 48 U.S.C. 2166. Title III of PROMESA does not define the "property" subject to its jurisdiction but, instead applies the "basic federal rule" in bankruptcy:[8]

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.

*Butner v. United States,* 440 U.S. 48, 55 (1979).

---

[8] The United States Supreme Court has previously discussed the "basic federal rule" in bankruptcy:

> Indeed we have long recognized the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.' Accordingly, when the Bankruptcy Code uses the word "claim"—which the Code itself defines as a "right to payment," 11 U.S.C. § 101(5)(A)—it is usually referring to a right to payment recognized under state law. As we stated in *Butner*, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) (quoting *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20 (2000) and *Butner v. United States,* 440 U.S. 48, 57, 54 (1979)).

99. The basic federal rule is referenced throughout PROMESA, including as follows:

   a.  PROMESA § 314(b)(6) expressly references non-bankruptcy laws and the constitution of the territory when formulating a confirmable plan. 48 U.S.C. § 2174(b)(6).

   b.  PROMESA § 201(b)(1) (A), (M), and (N) expressly reference "applicable laws," and "transfers…permitted by the constitution of the territory [,]" and the "relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act." 48 U.S.C. 2141(b)(1)(A), (M), and (N).

   c.  PROMESA § 204(c)(3) contemplates the prohibition and rescission of any laws that "either permit the transfer of any funds or assets outside the ordinary course of business or that are *inconsistent with the constitution or the law of the territory*." 48 U.S.C. § 2144(c)(3) (emphasis added).

   d.  PROMESA § 407(a) holds liable a transferee that causes the transfer of "any property of any territorial instrumentality of Puerto Rico" that is "in violation of *applicable law* under which any creditor has a valid pledge of, security interest in, or lien on such property" or that "deprives any such territorial instrumentality of property to such territorial instrumentality for the benefit of its creditors." 48 U.S.C. 2195(a) (emphasis added).

100.  PROMESA cannot be understood to repeal, replace, or preempt affirmative federal and Commonwealth law but, instead, must be understood as the creation of a federal mechanism for the equitable administration of claims against the Commonwealth.

   As one bankruptcy scholar has put the point: Whether 'limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.'

*Mission Product Holdings, Inc. v. Tempnology, LLC, No. 17-1657, slip op. at 11 (U.S. May 20, 2019)* (quoting D. Baird, Elements of Bankruptcy 97 (6th ed. 2014) (internal editorial marks by Justice Kagan omitted)).

101.  "Property" is determined under PROMESA by looking to applicable federal and Commonwealth law under the basic federal rule.

102.  "Lien" is broadly defined in the Bankruptcy Code to mean a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37).

103.  The term "property" used in § 101(37) for purposes of PROMESA means property of the debtor under applicable non-bankruptcy law. *See* 48 U.S.C. § 2161(5). Black's Law Dictionary at 1063 (10th ed. 2014) (defining "lien" as "a legal right or interest that a creditor has **in another's property**, lasting usually until a debt or duty that it secures is satisfied.") (emphasis added).

104.  A "charge" is undefined in the Bankruptcy Code but generally means the "control of the acts, workings, or disposition of something."[9] Similarly, an "interest" is undefined in the Bankruptcy Code but generally means a "right, title, or legal share in something."[10]

105.  The Bankruptcy Code contemplates several types of liens, including "special revenues" pledges at § 902(2), "statutory liens" at § 101(53), "judicial liens" at § 101(36), and "security interests" at § 101(51), but nothing in the Bankruptcy Code limits the types of liens to these specified categories.

106.  Indeed, Congress, when drafting PROMESA, identifies protected property interests but without a consistent and meaningful scheme, as it refers to such property interests as "lawful priorities or lawful liens" at § 201(b)(1)(N), a "security interest or lien" at § 405(k), and a "pledge of property," a "security interest in property," and a "lien on property" at § 407(a). 48 U.S.C. §§ 2141 (b)(1)(N), 2194(k), 2195(a). "Priorities" and "pledges" are not defined terms.

---

[9] Webster's Third New International Dictionary at 377 (2002) ("***Webster's Third***").

[10] Webster's Third at 1178.

Case 17-03283-LTS Doc#:13744-19 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc: Main
Miller Declaration Ex. 61 Answer Page 37 of Page 38 of 80

107.  "Special revenues pledges" are specific to municipal and territorial debtors in chapter 9 of the Bankruptcy Code, which is incorporated into PROMESA. 48 U.S.C. § 2161(a). The Bankruptcy Code clearly contemplates that special revenue pledges are "liens." 11 U.S.C. §§ 928(a) ("special revenues . . . shall remain subject to any lien resulting from any security agreement . . .", 928(b) (identifying any "lien on special revenues"), and 922(a)(2) (identifying "a lien on or arising out of taxes or assessments"). Moreover, PROMESA § 601(d)(3)(D) clearly contemplates in title VI that the pledge of a "dedicated revenue stream" (i.e., special revenues) must be classified into a "Secured Pool," which is defined as a pool "consisting only of Bonds that are *secured by a lien on property*[.]" 48 U.S.C. § 2231(a)(14) and (d)(3)(D).

108.  The Bankruptcy Code and PROMESA clearly contemplate that a special revenue pledge is a lien on property, and the property subject to the lien is the dedicated revenue stream assigned under applicable law (here, the HTA Acts and Resolutions).

109.  The HTA Acts and Resolutions grant HTA Bondholders rights to control the acts, workings, and disposition of the HTA Special Revenues, a dedicated revenue stream, along with a right, title, or legal share in the HTA Special Revenues. The HTA Acts provide a mandamus remedy that would not exist if the HTA Bondholders did not have such rights in and to the HTA Special Revenues and if the Commonwealth and HTA did not have clear legal duties under the HTA Acts and Resolutions.

110.  The HTA Bondholders have liens in the HTA Special Revenues, and, thereby, property interests in the HTA Special Revenues.

## THE FISCAL PLANS AND BUDGETS

111.  The Oversight Board approved and certified certain Commonwealth Fiscal Plans, dated October 14, 2016 (the "*2016 Fiscal Plan*"), March 13, 2017, as corrected on April 18, 2017 (the "*2017 Fiscal Plan*"), June 29, 2018 (the "*2018 Fiscal Plan*"), and May 9, 2019 (the

"*May 2019 Fiscal Plan*") and a certain Fiscal Plan for HTA, dated April 20, 2018, and revised June 29, 2018 (the "*HTA Fiscal Plan*"). The 2016 Fiscal Plan, the 2017 Fiscal Plan, the 2018 Fiscal Plan, the May 2019 Fiscal Plan, and the HTA Fiscal Plan hereinafter shall be collectively referred to as the "*Fiscal Plans*." The Fiscal Plans are hereby incorporated by reference.

112.   Despite the mandate of PROMESA § 201(b)(1)(A), (M), and (N) that Fiscal Plans be based on "applicable laws," only allow "transfers" that are "permitted by the constitution," and "respect the lawful priorities or lawful liens" in the Commonwealth Constitution, other laws, and agreements, the Oversight Board made no attempt to base the  Fiscal Plans on the HTA Acts and Resolutions and has wholly ignored the priorities or liens of the HTA Bondholders. The Fiscal Plans misappropriate, divert, transfer, and expend the HTA Special Revenues from the HTA Bondholders to fund other expenses of the Commonwealth and HTA. The Oversight Board admits this by stating "[e]ach fiscal plan required that the Commonwealth retain the [HTA Taxes] to meet the fiscal plan's cash flow projections and requirements." (Compl. at ¶¶ 74 and 78). "The HTA Fiscal Plan does not provide for the payment of any of the [HTA Taxes] to HTA." (Compl. at ¶ 75).

113.   The Oversight Board certified a budget for the Commonwealth for the fiscal year 2018-2019, dated June 30, 2018 (the "*Certified FY19 Budget*"), and a certain Budget for HTA, dated June 30, 2018 (the "*HTA Budget*"). The Certified FY19 Budget and the HTA Budget hereinafter shall be collectively referred to as the "*Budgets*." The Budgets are hereby incorporated by reference.

114.   Like the Fiscal Plans, the Budgets misappropriate, divert, transfer, and expend the HTA Special Revenues from HTA Bondholders to fund other expenses of the Commonwealth and HTA. *See*, *e.g.*, HTA Budget, Ex. 1 (showing zero revenues from HTA Taxes and zero

expenditures towards HTA Bonds). The Oversight Board admits these diversions and expenditures are occurring. (Compl. at ¶¶ 76-77).

115.   None of the Fiscal Plans or Budgets include estimates of revenues and expenditures that are based on the HTA Acts and Resolutions.

116.   The HTA Fiscal Plan estimates that for fiscal years 2018 through 2023, the Commonwealth will retain $3.3 billion of HTA Taxes. HTA Fiscal Plan at 29, 89 ("This 'retained' revenue is clawed back by the CW, and passes through HTA's balance sheet."). And, during the same fiscal years, the HTA Fiscal Plan does not project to pay anything to HTA Bondholders.

117.   The May 2019 Fiscal Plan at § 5.1 includes revenue forecasts for fiscal years 2018-2024 that include HTA Taxes, but § 5.2, which includes expenditure forecasts for the same years, does not include payments of the debt service on the HTA Bonds in accordance with the HTA Acts and Resolutions.

118.   Throughout the May 2019 Fiscal Plan,[11] it states that any presentation of "debt service" is "[p]resented for illustrative purposes only and does not represent anticipated future payments on restructured debt." At no point does the May 2019 Fiscal Plan compel the expenditure of the HTA Taxes to the HTA Bondholders.

119.   The May 2019 Fiscal Plan clearly states that it eliminates "all appropriations," which presumably includes the mandatory and continuing appropriations of HTA Taxes to HTA and its bondholders:

> ***All appropriations authorized in any prior fiscal year,*** including appropriations
> without a specific fiscal year, ***are eliminated and no disbursement of public***

---

[11] The other Fiscal Plans contain statements similar to those contained in the 2019 Fiscal Plan and such statements are incorporated herein by reference to the Fiscal Plans.

*funds may be covered by such appropriations* . . . In addition, this restriction on the use of appropriations of prior fiscal years shall not apply to: (1) programs financed in whole or in part with federal funds; or (2) orders by the United States district court with jurisdiction over all matters under Title III of PROMESA.

2019 Fiscal Plan at 138 (emphasis added).

120.   Despite these representations, the May 2019 Fiscal Plan acknowledges the HTA Special Revenues have been "assigned by law." May 2019 Fiscal Plan at page 30 ("The Commonwealth collects a significant portion of its revenues through Special Revenue Funds,[12] which are funded from, among other sources, *tax revenues assigned by law*, fees and charges for services by agencies, dividends from public corporations and financing proceeds.") (emphasis added). The May 2019 Fiscal Plan wholly disregards the prior assignment of the HTA Special Revenues to HTA and its bondholders.

121.   Moreover, the May 2019 Fiscal Plan at page 34 states: "the Oversight Board has certified [Special Revenue Funds] expenditures starting with the FY2019 budget process, with the objective of applying controls and reporting requirements to ensure transparency and accountability for these revenues and expenditures." But, upon information and belief, these expenditures do not include the payment of the principal of or interest on the HTA Bonds, despite the statutory purpose of the Special Revenue Funds being a mechanism to secure the HTA Bonds and to be used solely to pay principal and interest on those bonds.

122.   The May 2019 Fiscal Plan also indicates that the HTA Special Revenues will no longer be deposited in accordance with the HTA Acts and Resolutions. Rather, the HTA Special Revenues will be confiscated and deposited into a "Treasury Single Account." 2019 Fiscal Plan

---

[12] Special Revenue Funds is a term in the 2019 Fiscal Plan that appears to include the special accounts and deposits created under the HTA Acts and Resolutions.

at 78 ("Additionally, ensure all dedicated revenue streams attributable to [Special Revenue Funds] have their funds first deposited in the newly established Treasury Single Account.").

123.   The Certified FY19 Budget at page 14 explicitly states that "Special Revenues Funds" are "Funds created by law, not subject to annual appropriations and have specific uses established by their respective enabling legislation." It also shows at page 30 that there is no budgeted debt service for bonds other than federal debts, PREPA, and PRASA.

124.   Upon information and belief, the Commonwealth and its officers at the direction of the Oversight Board are depositing HTA Taxes into a Treasury Single Account and not in the special accounts and deposits of HTA.

125.   Upon information and belief, the Oversight Board never intended to base estimates of revenues and expenditures in the  Fiscal Plans or the Budgets on the HTA Acts and Resolutions and did not intend to respect (or even consider) the priorities or liens of HTA Bondholders.

126.   In accordance with the Fiscal Plans and the Budgets, the Commonwealth passed a certain Oil Excise Tax Resolution dated June 30, 2018; whereby, it purportedly authorized certain portions of the HTA Taxes to be transferred to pay the expenses of the Department of Education and the Department of Security.

127.   Upon information and belief, the Oversight Board, the Commonwealth, HTA, and any officers thereof are knowingly expending HTA Special Revenues in accordance with the Fiscal Plans and the Budgets while disregarding the HTA Acts and Resolutions and the lawful priorities or lawful liens of the HTA Bondholders.

128.   Upon information and belief, each fiscal year, the Fiscal Plans and Budgets have misappropriated, diverted, and transferred not less than $514 million of HTA Taxes from HTA

to other debts and obligations of the Commonwealth and misappropriated Toll Revenues not

less than $167 million to other debts and obligations of HTA. HTA Fiscal Plan at 41 (showing

$514.612 million of HTA Taxes misappropriated, diverted, transferred, and expended towards

obligations other than the HTA Bonds in fiscal year 2018); HTA Budget, Ex. 1 (showing $167

million of Toll Revenues expended towards obligations other than the HTA Bonds in fiscal year

2018).

## **SPECIAL BILLS AND ORDERS OF THE COMMONWEALTH**

129.    The Commonwealth enacted a Moratorium Law, being Act No. 21, adopted April

6, 2016 (the "*First Moratorium Law*") that authorized the Governor of the Commonwealth to

declare states of emergency with respect to a number of Puerto Rico public entities.

130.    Section 201(d) of the First Moratorium Law provides that the Governor during a

state of emergency may suspend or modify "any statutory or other obligation to transfer money

(or its equivalent) to pay or secure any covered obligation (or take any action in furtherance

thereof)[.]"

131.    Section 201(b) of the First Moratorium Law generally provides for a stay of any

actions to recover on the "Covered Obligations" of a Puerto Rico public entity with respect to

which a state of emergency has been declared. The First Moratorium Law, § 103(l), defines

"Covered Obligation" to include "any interest obligation [or] principal obligation."

132.    The Commonwealth enacted Act No. 40, adopted May 5, 2016, which amended

the First Moratorium Law to (i) define GDB as a "depositary institution" and (ii) define

"prioritizing the safety, soundness and stability" of depositary institutions as an "essential

service." *See* Act No. 40-2016 §§ 9, 8(kk). Therefore, under the First Moratorium Law as

amended by Act No. 40-2016, payments to GDB purportedly qualify as payments for "essential

services" that have priority over debt service.

133.   Beginning on or about April 30, 2016, pursuant to the First Moratorium Law, Governor García Padilla issued a series of Moratorium Orders that prohibited payments of principal of and interest on the HTA Bonds. These Moratorium Orders violated the constitutional and statutory priorities of the HTA Bonds, impaired FGIC's rights under the HTA Bonds and related contracts, and took the HTA Special Revenues in which FGIC has property interests without providing just compensation. These Moratorium Orders included:

a.   Administrative Bulletin No. EO-2016-18, which, among other things, (i) declared a state of emergency with respect to HTA; (ii) ordered the suspension of all obligations of HTA to transfer HTA Special Revenues to the HTA Fiscal Agent for the payment of the HTA Bonds; and (iii) authorized HTA to utilize the HTA Special Revenues for the provision of "essential services for the protection of the health, security, and well-being of the residents of the Commonwealth."

b.   Administrative Bulletin No. EO-2016-30, which, among other things, (i) declared a state of emergency with respect to the Commonwealth; (ii) declared a moratorium on the Commonwealth's obligation to make payments on any bonds or notes issued or guaranteed by the Commonwealth (including the GO Bonds); (iii) extended the emergency period for HTA through the entirety of the "covered period," which the First Moratorium Law defined to mean through and including January 31, 2017, subject to a possible two-month extension by the Governor; and (iv) suspended payment of all debt obligations of HTA under the 1968 and 1998 Resolutions that come due during the covered period, except for payments that can be made from funds on deposit with the HTA Fiscal Agent.

c.   Administrative Bulletin No. EO-2016-31, which, among other things, continued the suspension of HTA's obligations under the Resolutions to transfer HTA Special Revenues to the HTA Fiscal Agent.

134.   By their terms, the Moratorium Orders were set to expire on January 31, 2017. However, the Commonwealth enacted the Puerto Rico Financial Emergency and Fiscal Responsibility Act, being Act No. 5, adopted January 29, 2017 (the "**Second Moratorium Law**"). The Second Moratorium Law purported to continue the existing Moratorium Orders in

effect notwithstanding the fact that the Moratorium Orders would otherwise have expired by their terms on January 31, 2017.

135.   On or about April 30, 2017, the Governor issued another Moratorium Order, Administrative Bulletin No. EO-2017-031 ("*EO-2017-031*"), which extended the effectiveness of the previous Moratorium Orders until August 1, 2017.

136.   The Commonwealth enacted a third Moratorium Law, being Act No. 46, adopted July 19, 2017 (the "*Third Moratorium Law*"), which extended the effectiveness of the Moratorium Orders through the end of December 2017 and allowed the Governor to further extend the effectiveness of the Moratorium Orders by executive order in six-month increments as long as the Oversight Board remains in place.

137.   On or about January 2, 2018, the Governor issued another Moratorium Order, Administrative Bulletin No. EO-2017-76, which further extended the effectiveness of the other Moratorium Orders for an additional six months until June 30, 2018.

138.   On  or about June 29, 2018, the Governor issued another Moratorium Order, Administrative Bulletin No. EO 2018-023, which further extended the effectiveness of the other Moratorium Orders for an additional six months until December 31, 2018.

139.   On or about December 27, 2018, the Governor issued another Moratorium Order, Administrative Bulletin No. EO-2018-053, which further extended the effectiveness of the other Moratorium Orders for an additional six months until June 30, 2019.

140.   The Commonwealth enacted the Fiscal Plan Compliance Act, being Act No. 26, adopted April 29, 2017 (the "*Compliance Law*"), as a "special bill" under PROMESA.

141.   Chapter 4 of the Compliance Law, entitled "Transfer of Public Corporations, Agencies, and Instrumentalities to the General Fund," purportedly authorizes the

Commonwealth and its officers to misappropriate pledged revenues and other property to which the Commonwealth has no legal entitlement. Chapter 6 of the Compliance Law, meanwhile, similarly purports to authorize the Commonwealth to simply appropriate for its own use funds held in special accounts in the Commonwealth treasury for the benefit of HTA and its bondholders.

142.   Chapter 4 of the Compliance Law makes absolutely no provision for payment by HTA of their secured debt.  Instead, under Chapter 4, the Commonwealth purports to authorize itself to unlawfully take the HTA Special Revenues without just compensation.

143.   Moreover, Article 4.02 of the Compliance Law defines "available resources" to include revenues that are generated by an authority itself, such as the Toll Revenues generated by HTA's operations. The Toll Revenues do not constitute "available revenues" or "available resources" under the Commonwealth Constitution and are not subject to the Constitutional Clawback.

144.   Chapter 6 of the Compliance Law amends the Government Accounting Act of Puerto Rico, being Act No. 230, adopted July 23, 1974, as amended (the "***Accounting Act***").

145.   Among other things amended, the Compliance Law amends Article 7(a) and (e) of the Accounting Act to state:

> [A]s of July 1st, 2017, any special State fund and any other income of the agencies and public corporations shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate. . . .
>
> . . .
>
> As of July 1st, 2017, any special State funds created by law for specific purposes shall continue to be used for the purposes for which they were allocated by law, in accordance with the Recommended Budget of the Office of Management and Budget and the Fiscal Plan. . . . **Should there be any inconsistency between the law and the use of the funds with the Fiscal Plan, the purpose provided for in**

the Fiscal Plan approved in accordance with PROMESA shall prevail. (emphasis added)

146.    Funds held in "special funds" in the Commonwealth treasury include HTA Taxes appropriated and assigned to HTA "by law" and constituting trust funds held by the Department of Treasury on behalf of HTA for the benefit of HTA Bondholders. By conditioning the uses of these special funds on their being "in accordance with the Budget recommended by the Office of Management and Budget and with the Fiscal Plan," Chapter 6 of the Compliance Law subverts the purposes for which the HTA Taxes were appropriated and assigned by law.

147.    Chapter 6 of the Compliance Law further flaunts the fact that the Fiscal Plans deprive HTA Bondholders of their statutory entitlements and substantially impairs their contractual rights, stating "Should there be any inconsistency between the law and the use of funds with the Fiscal Plan, the purpose provided for in the Fiscal Plan . . . shall prevail."  The admitted effect of the Compliance Law, then, is to deprive FGIC and other parties of constitutional, statutory, contractual, and property rights to which they are entitled by law.

## COUNT I

### DECLARATORY JUDGMENT THAT THE HTA BONDHOLDERS HAVE A LAWFUL PRIORITY OR LIEN IN THE TOLL REVENUES

148.    Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

149.    The Enabling Act expressly contemplates that HTA shall own and operate the traffic and transportation facilities[13] in the Commonwealth.  See, e.g., 9 L.P.R.A. §§  2004(d), (f), (i), and (j).  Moreover, the Commonwealth and its instrumentalities and political

---

[13] Traffic and transportation facilities is broadly defined at 9 L.P.R.A. § 2003(c) to include all property, systems, and infrastructure that could relate to the purposes of HTA.

subdivisions have transferred "title to property" in the traffic and transportation facilities to HTA. 9 L.P.R.A. §§ 2009, 2010.

150. The Toll Revenues are derived from the ownership and operations of the traffic and transportation facilities, projects and systems of HTA that are primarily used or intended to be used primarily to provide transportation and other services.

151. The Toll Revenues are, therefore, special revenues of HTA. 11 U.S.C. § 901(2)(A) and (D).

152. HTA, exercising its control over the Toll Revenues, contracted with the HTA Bondholders to issue the HTA Bonds, and thereby, conferred rights on the HTA Bondholders to protect and enforce the payment of Toll Revenues to HTA Bondholders.

153. The HTA Bondholders have a clear legal right to compel the payment of the HTA Bonds from the Toll Revenues.

154. The HTA Bondholders have a right, title, or legal share in the Toll Revenues.

155. The HTA Bondholders have "a charge against or interest in [the Toll Revenues] to secure payment of a debt or performance of an obligation," and, therefore, a lien in the Toll Revenues. 11 U.S.C. § 101(37). Alternatively, HTA Bondholders have a priority in the Toll Revenues.

156. A real and immediate controversy exists regarding the expenditure of the Toll Revenues in the HTA Fiscal Plan and the HTA Budget without respecting the priorities or liens of the HTA Bondholders.

157. FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due

Case:19-00363-LTS Doc#:47-1 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Page 48 of

to the misappropriation, diversion, and transfer of the Toll Revenues from the HTA Bondholders to other obligations of HTA.

158.   This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the HTA Fiscal Plan, and the HTA Budget that it may take and expend the Toll Revenues without respecting the priorities or liens of the HTA Bondholders. Moreover, the Oversight Board, HTA, and any officers thereof have taken and expended the Toll Revenues without respecting the priorities or liens of the HTA Bondholders.

159.   Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the HTA Bondholders have a lawful priority or lien in the Toll Revenues.

## COUNT II

### DECLARATORY JUDGMENT THAT HTA BONDHOLDERS HAVE A LAWFUL PRIORITY OR LIEN IN THE HTA TAXES

160.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

161.   The Legislative Assembly through the HTA Acts appropriated and pledged the HTA Taxes to HTA, and, thereby, created a mandatory and continuing appropriation of the HTA Taxes to HTA and its bondholders.

162.   In furtherance of that mandatory and continuing appropriation, HTA Acts mandate that the HTA Taxes be deposited into a special deposit in the name of HTA for the benefit of the HTA Bondholders.

163.   Furthermore, the Commonwealth through the HTA Acts pledged to HTA Bondholders not to reduce or eliminate this mandatory and continuing appropriation of HTA Taxes to HTA until the HTA Bondholders are paid in full.

164.  The Oversight Board, the Commonwealth, the Legislative Assembly, and any officers thereof have no discretion regarding control over the acts, workings, disposition, or appropriations of the HTA Taxes.

165.  The HTA Acts give HTA full control over the HTA Taxes.

166.  HTA, exercising its control over the HTA Taxes, passed the Resolutions and contracted with the HTA Bondholders to issue the HTA Bonds, and thereby, conferred rights on the HTA Bondholders to protect and enforce the Commonwealth's mandatory and continuing appropriation of HTA Taxes.

167.  HTA and its bondholders have clear legal rights to compel the mandatory and continuing appropriation of HTA Taxes into the special deposits in the name of HTA, and the HTA Bondholders have a clear legal right to compel the payment of the HTA Bonds from the special deposits in the name of HTA.

168.  The HTA Bondholders, therefore, have a right, title, or legal share in the HTA Taxes.

169.  Moreover, the HTA Bondholders have "a charge against or interest in [the HTA Taxes] to secure payment of a debt or performance of an obligation," and, therefore, a lien in the HTA Taxes. 11 U.S.C. § 101(37).

170.  The HTA Taxes constitute special revenues. 11 U.S.C. § 901(2)(B) and (E).

171.  The liens of the HTA Bondholders were created and governed by special statute that provides for the creation, perfection, priority, or enforcement of the liens of HTA Bondholders and, therefore, are not subject to the Commercial Code or the Revised Commercial Code.

172.    The HTA Bondholder liens are valid and binding from the time they were made without the need for a public or notarized instrument, physical delivery thereof, perfection, or any other act. Alternatively, the liens of the HTA Bondholder in the HTA Taxes were perfected by properly filed financing statements.

173.    The HTA Bondholder liens against the Commonwealth arise by force of the HTA Acts.

174.    The HTA Bondholder liens against HTA arise by force of the HTA Acts and Resolutions and the security included in the HTA Bonds.

175.    Alternatively, the HTA Bondholders have a priority in the HTA Taxes, which is only subject to the rights of public debt holders under, and subject to the terms and conditions of, the Constitutional Clawback.

176.    A real and immediate controversy exists regarding the expenditure of the HTA Taxes in the Fiscal Plans and the Budgets without respecting the priorities or liens of the HTA Bondholders.

177.    FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Taxes from the HTA Bondholders to other obligations of the Commonwealth.

178.    This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and the Budgets that it may take and expend the HTA Taxes for purposes that are not authorized by the HTA Acts. Moreover, the Oversight Board, the Commonwealth, and any officers thereof have taken and expended the HTA Taxes for such unauthorized purposes.

179.   Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. §
2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the HTA Bondholders
have lawful priorities or liens in the HTA Taxes.

**COUNT III**

**DECLARATORY JUDGMENT THAT
THE CONDITIONS PRECEDENT FOR EXERCISING
THE CONSTITUTIONAL CLAWBACK DO NOT EXIST
AND THAT ANY TRANSFERS OF HTA TAXES PURPORTEDLY BASED ON
THE CONSTITUTIONAL CLAWBACK ARE *ULTRA VIRES* AND VOID *AB INITIO***

180.   Each allegation contained in the preceding paragraphs is incorporated herein by
reference as if fully set forth herein.

181.   The Commonwealth Constitution mandates that appropriations of general fund
revenues be made each fiscal year to cover the payment of principal of and interest on public
debt. P.R. Const., Art. VI, §§ 6, 7, 8.

182.   The appropriations made for any fiscal year shall not exceed general fund
revenues. P.R. Const., Art. VI, § 7.

183.   The Legislative Assembly has a mandatory duty to appropriate general fund
revenues to pay the principal of and interest on public debt.

184.   Only where collected general fund revenues are insufficient to pay principal of
and interest on public debt can HTA Taxes that qualify as "available revenues" or "available
resources" be clawed back to pay public debt.

185.   At all times relevant, the Commonwealth has collected general fund revenues
sufficient to pay the principal of and interest on public debt.

186.   In 2016, the Commonwealth was obligated to pay approximately $1.1 billion
towards the principal of and interest on general obligation bonds but only paid $351.9 million to
general obligation bondholders, leaving approximately $778.8 million unpaid. Commonwealth

of Puerto Rico, Basic Financial Statements and Required Supplementary Information, dated
June 30, 2016 (the "**2016 Financial Statements**") at 28. Also in 2016, general fund revenues
grossed approximately $9.495 billion. Certified FY19 Budget at 20.[14] Based on these
Commonwealth reported figures, the Commonwealth collected general fund revenues in 2016
that were sufficient to pay the entire principal of and interest on public debt. Because general
fund revenues of the Commonwealth were sufficient to pay public debt, the Commonwealth did
not have authority under the Constitutional Clawback to take HTA Taxes in 2016.

187.   The Commonwealth's mandatory debt service on general obligation bonds for the
fiscal years 2017 through 2018 is as follows:

2017 – $1.161 billion
2018 – $1.098 billion

188.   Upon information and belief, the Commonwealth's mandatory debt service on
general obligation bonds never exceeded $1.16 billion in any fiscal year.

189.   Upon information and belief, the Commonwealth has not serviced any debt
obligations during the pendency of the title III cases of the Commonwealth and HTA.

190.   The Certified FY19 Budget projects general fund revenues for the fiscal years
2016, 2017, and 2018, as follows:

| Year | General Fund Revenue |
|---|---|
| 2017 – | $9.192 billion |
| 2018 – | $9.562 billion |

---

[14] The 2018 Commonwealth Budget improperly includes certain tax revenues in the general
fund, including excise taxes from rum remittances (which were allocated and assigned to, and are
owned by, the Puerto Rico Infrastructure Financing Authority) and hotel occupancy taxes (which
were allocated and assigned to, and are owned by, the Puerto Rico Convention Center District
Authority). Regardless of the improper inclusion of certain revenues in the general fund
revenues, the projected general fund revenues are sufficient to cover debt service on public debts.

191.   Based on these Commonwealth reported figures, the Commonwealth had or will have general fund revenues in fiscal years 2016-2018 that are sufficient to pay the entire principal of and interest on public debt.

192.   Upon information and belief, the Commonwealth collected general fund revenues in fiscal years 2016-2019 that are sufficient to pay the entire principal of and interest on public debt.

193.   At no time in fiscal years 2016-2019 were collected general fund revenues of the Commonwealth insufficient to pay public debt; therefore, the Oversight Board, the Commonwealth, and any officers thereof did not have a right to clawback HTA Taxes in any of those fiscal years.

194.   Upon information and belief, the Commonwealth will continue to collect general fund revenues in excess of the public debt service for the foreseeable future.  *See* May 2019 Fiscal Plan, § 5.1 at 26-32 (showing sufficient revenues available through fiscal year 2024).

195.   The Oversight Board, the Commonwealth, and any officers thereof have a mandatory duty to appropriate general fund revenues to pay the principal of and interest on the public debt in each fiscal year.

196.   The failure of the Oversight Board, the Commonwealth, and any officers thereof to appropriate general fund revenues to pay the principal of and interest on the public debt in each fiscal year is *ultra vires*.

197.   The *ultra vires* actions of the Oversight Board, the Commonwealth, and any officers thereof cannot trigger the conditions precedent for the use of the Constitutional Clawback.

198.    The Oversight Board, the Commonwealth, and any officers thereof have a mandatory duty to transfer the HTA Taxes to HTA to pay the HTA Bonds.

199.    The refusal of the Oversight Board, the Commonwealth, and any officers thereof to transfer HTA Taxes to HTA and its bondholders is *ultra vires*.

200.    Any misappropriation, diversion, or transfer of HTA Taxes by the Oversight Board, the Commonwealth, and any officers thereof from their dedicated purposes under the HTA Acts and the Constitutional Clawback is *ultra vires* and void *ab initio*.

201.    A real and immediate controversy exists regarding the purported use of the Constitutional Clawback to justify the taking of the HTA Taxes from HTA and its bondholders.

202.    FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Taxes from the HTA Bondholders to other obligations of the Commonwealth.

203.    This controversy is ripe for determination inasmuch as the Oversight Board, the Commonwealth, and any officers thereof are asserting in litigation, the Fiscal Plans, and the Budgets that the Constitutional Clawback authorizes them to take and expend the HTA Taxes. Moreover, the Oversight Board, the Commonwealth, and any officers thereof have taken and expended the HTA Taxes for purposes other than those authorized under the HTA Acts.

204.    Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the conditions precedent for exercising the Constitutional Clawback do not exist and that any transfers of HTA Taxes purportedly based on the Constitutional Clawback are *ultra vires* and void *ab initio*.

## COUNT IV

### DECLARATORY JUDGMENT THAT
### THE OVERSIGHT BOARD ACTED *ULTRA VIRES*
### WHEN APPROVING THE FISCAL PLANS AND THE
### BUDGETS WITHOUT RESPECTING THE PRIORITIES AND
### LIENS OF THE HTA BONDHOLDERS, AND, THEREFORE, THE FISCAL
### PLANS AND THE BUDGETS ARE ILLEGAL, INVALID, AND VOID *AB INITIO*

205.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

206.   PROMESA § 201(b)(1)(N) mandates that the Oversight Board in developing, approving, or certifying any Fiscal Plan shall "***respect the relative lawful priorities or lawful liens***, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act." 48 U.S.C. § 2141(b)(1)(N) (emphasis added).

207.   PROMESA § 202 mandates that the Oversight Board in approving, or certifying any Budget shall determine whether a Budget is "compliant with the applicable Fiscal Plan." 48 U.S.C. 2142(c).

208.   By mandating that a Budget comply with a Fiscal Plan, PROMESA imposes the Fiscal Plan requirements at § 201(b)(1) onto the Oversight Board when approving and certifying a Budget under § 202.

209.   The HTA Bonds are secured by the priorities or liens on the HTA Special Revenues.

210.   Despite the priorities or liens of HTA Bondholders, the Oversight Board, through the Fiscal Plans and the Budgets, illegally estimates and expends the HTA Special Revenues toward debts and obligations of the Commonwealth and HTA other than the HTA Bonds.

211. The Oversight Board acted *ultra vires* by approving the Fiscal Plans and the Budgets that do not respect the priorities or liens of HTA Bondholders.

212. The Fiscal Plans and the Budgets, therefore, are illegal, invalid, and void *ab initio*.

213. A real and immediate controversy exists regarding the Oversight Board's development, approval, and certification of Fiscal Plans and Budgets that purportedly authorize the Commonwealth and HTA to expend HTA Special Revenues on obligations other than the principal of and interest on the HTA Bonds.

214. FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Special Revenues from the HTA Bondholders to other obligations of the Commonwealth.

215. This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and the Budgets that it may take and expend the HTA Taxes for purposes that are not authorized by the HTA Acts. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Special Revenues for such unauthorized purposes.

216. Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the Oversight Board acted *ultra vires* when approving the Fiscal Plans and the Budgets without respecting the priorities and liens of the HTA Bondholders, and, therefore, the Fiscal Plans and the Budgets are illegal, invalid, and void *ab initio*.

Case:19-00363-LTS Doc#:43-4 Filed:06/19/19 Entered:06/19/19 20:58:24 Desc: Main
Document Page 58 of 80

## COUNT V

### DECLARATORY JUDGMENT THAT
### THE OVERSIGHT BOARD ACTED *ULTRA VIRES*
### WHEN APPROVING THE FISCAL PLANS AND THE
### BUDGETS BECAUSE NEITHER IS BASED ON THE
### HTA ACTS, AND, THEREFORE, THE FISCAL PLANS
### AND THE BUDGETS ARE ILLEGAL, INVALID, AND VOID *AB INITIO*

217.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

218.   PROMESA § 201(b)(1)(A) mandates that any Fiscal Plan developed, approved, or certified by the Oversight Board shall "***be based on applicable laws*** or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan[.]" 48 U.S.C. § 2141(b)(1)(A) (emphasis added).

219.   PROMESA § 202 mandates that the Oversight Board in approving, or certifying any Budget shall determine whether a Budget is "compliant with the applicable Fiscal Plan." 48 U.S.C. 2142(c).

220.   By mandating that a Budget comply with a Fiscal Plan, PROMESA imposes the Fiscal Plan requirements at § 201(b)(1) onto the Oversight Board when approving and certifying a Budget under § 202.

221.   The Fiscal Plans and the Budgets do not estimate and expend HTA Special Revenues based on the HTA Acts and Resolutions, and the HTA Special Revenues have been illegally estimated and expended toward debts and obligations of the Commonwealth and HTA other than the HTA Bonds.

222.   No "specific bills" can be enacted by the Legislative Assembly to reasonably achieve the projections of the Fiscal Plans and the Budgets because to do so would

57

unconstitutionally impair the HTA Bonds and cause an unlawful taking of the HTA Bondholders' property without just compensation and adequate protection.

223. The Oversight Board acted *ultra vires* by approving the Fiscal Plans and the Budgets that are not based on the HTA Acts and Resolutions or that are based on the unlawful or unconstitutional specific bills, including the Unauthorized Laws.

224. The Fiscal Plans and the Budgets, therefore, are illegal, invalid, and void *ab initio*.

225. A real and immediate controversy exists regarding the Oversight Board's development, approval, and certification of Fiscal Plans and Budgets that purportedly authorize the Commonwealth to expend HTA Special Revenues on obligations other than the principal of and interest on the HTA Bonds.

226. FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Special Revenues from the HTA Bondholders to other obligations of the Commonwealth and HTA.

227. This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and Budgets that it may take and expend the HTA Special Revenues for purposes that are not authorized by the HTA Acts and Resolutions. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Special Revenues for such unauthorized purposes.

228. Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the Oversight Board acted *ultra vires* when approving the Fiscal Plans and the Budgets that are not based on the

HTA Acts and Resolutions, and, therefore, the Fiscal Plans and the Budgets are illegal, invalid, and void *ab initio*.

## COUNT VI

### DECLARATORY JUDGMENT THAT
### THE OVERSIGHT BOARD ACTED *ULTRA VIRES*
### WHEN APPROVING THE FISCAL PLANS AND THE
### BUDGETS THAT PROVIDE FOR THE TAKING OF THE HTA TAXES TO BE USED
### FOR THE BENEFIT OF THE COMMONWEALTH, AND, THEREFORE, THE FISCAL PLANS
### AND THE BUDGETS ARE ILLEGAL, INVALID, AND VOID *AB INITIO*

229.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

230.   PROMESA § 201(b)(1)(M) mandates that any Fiscal Plan developed, approved, or certified by the Oversight Board shall "ensure that assets, funds, or resources of a territorial instrumentality *are not loaned to, transferred to, or otherwise used for the benefit of a covered territory* or another covered territorial instrumentality of a covered territory, *unless permitted by the constitution of the territory*, an approved plan of adjustment under title III, or a Qualifying Modification approved under title VI[.]" 48 U.S.C. § 2141(b)(1)(M)   (emphasis added).

231.   PROMESA § 202 mandates that the Oversight Board in approving, or certifying any Budget shall determine whether a Budget is "compliant with the applicable Fiscal Plan." 48 U.S.C. 2142(c).

232.   By mandating that a Budget comply with a Fiscal Plan, PROMESA imposes the Fiscal Plan requirements at Section 201(b)(1) onto the Oversight Board when approving and certifying a Budget under Section 202.

233.   The Fiscal Plans and the Budgets transfer the HTA Taxes to the Commonwealth to be used for the benefit of the Commonwealth.

234.    The HTA Taxes were assigned to HTA by the HTA Acts and are assets, funds, or resources of HTA.

235.    The Commonwealth Constitution and the HTA Acts do not authorize the Commonwealth to take and use the HTA Taxes. The Commonwealth Constitution through the Constitutional Clawback expressly contemplates the limited and tailored circumstances where the Commonwealth may clawback the HTA Taxes and those circumstances do not exist.

236.    No plan of adjustment under title III has been proposed or approved, and none could be proposed or approved that authorizes the taking of the HTA Taxes without the consent of the HTA Bondholders.

237.    No Qualifying Modification under title VI has been approved, and none could be proposed or approved that authorizes the taking of the HTA Taxes without the consent of the HTA Bondholders.

238.    The HTA Taxes purportedly are not being loaned to the Commonwealth because the Commonwealth is expending the HTA Taxes, but, even if the taking of the HTA Taxes from HTA was a temporal loan to the Commonwealth, such loaning of the HTA Taxes is also unlawful under PROMESA § 201(b)(1)(M).

239.    The Oversight Board acted *ultra vires* by approving the Fiscal Plans and the Budgets that cause the transfer the HTA Taxes to the Commonwealth to be used for the benefit of the Commonwealth in violation of PROMESA § 201(b)(1)(M).

240.    The Fiscal Plans and the Budgets, therefore, are illegal, invalid, and void *ab initio*.

241.    A real and immediate controversy exists regarding the Oversight Board's development, approval, and certification of Fiscal Plans and Budgets that purportedly authorize

the Commonwealth to take and expend HTA Taxes on obligations other than the principal of and interest on the HTA Bonds.

242.   FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Taxes from the HTA Bondholders to other obligations of the Commonwealth.

243.   This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and Budgets that it may take and expend the HTA Taxes for the benefit of the Commonwealth. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Taxes for such unauthorized purposes.

244.   Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the Oversight Board acted *ultra vires* when approving the Fiscal Plans and the Budgets that provide for the taking of the HTA Taxes to be used for the benefit of the Commonwealth, and, therefore, the Fiscal Plans and the Budgets are illegal, invalid, and void *ab initio*.

## COUNT VII

**DECLARATORY JUDGMENT THAT
THE FISCAL PLANS AND THE BUDGETS
IMPAIR THE HTA BONDS AND VIOLATE THE
CONTRACTS CLAUSES OF THE UNITED STATES AND
COMMONWEALTH CONSTITUTIONS AND, THEREFORE,
ARE ILLEGAL, INVALID, AND VOID *AB INITIO***

245.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

246.   The United States Constitution, Art. I, § 10, cl. 1, prohibits any State, including the Commonwealth, from "pass[ing] any . . . law impairing the obligation of contracts." And, the Commonwealth Constitution, Art. II, § 7, also provides that "[n]o laws impairing the obligation of contracts shall be enacted." Together, these provisions hereinafter are referred to as the "**Contracts Clauses**."

247.   The Commonwealth Constitution delegates the Commonwealth's appropriation power to the Legislative Assembly.

248.   The Legislative Assembly exercised its legislative power to establish a mandatory and continuing appropriation of HTA Taxes to HTA and its bondholders pursuant to the HTA Acts.

249.   The HTA Taxes were raised solely for the purposes established by HTA Acts.

250.   Taxpayers, including the citizens of Puerto Rico, pay HTA Taxes for the legitimate and specific governmental purposes established by the HTA Acts.

251.   The HTA Bondholders have priorities or liens in the HTA Taxes arising by force of the HTA Acts, the Resolutions, and the HTA Bonds.

252.   The HTA Acts were incorporated into the HTA Bonds.

253.   PROMESA established the Oversight Board to oversee the legislative appropriations power where it made the Oversight Board responsible for developing, approving, and certifying Fiscal Plans and Budgets that estimates revenues and expenditures for the Commonwealth and HTA.

254.   The Fiscal Plans and the Budgets interfere with and impair the mandatory and continuing appropriations of HTA Taxes to HTA and its bondholders by misappropriating and diverting HTA Taxes from their dedicated purposes under the HTA Acts and Resolutions.

255.   The Fiscal Plans and the Budgets interfere with and impair HTA's pledge of the Toll Revenues under the HTA Acts and Resolutions by misappropriating and diverting Toll Revenues from their dedicated purposes under the HTA Acts and Resolutions.

256.   The Oversight Board, the Commonwealth, HTA, and any officers thereof lack constitutional and statutory authority to misappropriate, divert, or transfer the HTA Tax Revenues from their dedicated purposes under the HTA Acts and Resolutions.

257.   The Commonwealth Constitution through the Constitutional Clawback expressly contemplates the limited and tailored circumstances where the Commonwealth has emergency powers to clawback the HTA Taxes and those circumstances do not exist.

258.   Such misappropriations and diversions of HTA Special Revenues are *per se* unreasonable and unnecessary because they serve no legitimate and lawful governmental purpose. The only legitimate and lawful purposes of the HTA Special Revenues are the purposes specified in the HTA Acts and Resolutions. Furthermore, nothing in PROMESA or the Commonwealth Constitution authorizes the misappropriation, diversion, or transfer of HTA Special Revenues from their dedicated purposes under the HTA Acts and Resolutions.

259.   A real and immediate controversy exists regarding the Oversight Board's development, approval, and certification of Fiscal Plans and Budgets that purportedly authorize the Commonwealth and HTA to expend HTA Special Revenues on obligations other than the principal of and interest on the HTA Bonds.

260.   FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Special Revenues from the HTA Bondholders to other obligations of the Commonwealth and HTA.

261.  This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and the Budgets that it may take and expend the HTA Special Revenues for purposes that are not authorized by the HTA Acts and Resolutions. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Special Revenues for such unauthorized purposes.

262.  Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the Fiscal Plans and the Budgets impair the HTA Bonds and violate the Contracts Clauses and, therefore, are illegal, invalid, and void *ab initio*.

## COUNT VIII

**DECLARATORY JUDGMENT THAT
THE UNAUTHORIZED LAWS AND THE
FISCAL PLANS AND THE BUDGETS BASED ON
THE UNAUTHORIZED LAWS IMPAIR THE HTA
BONDS AND VIOLATE THE CONTRACTS CLAUSES
OF THE UNITED STATES AND COMMONWEALTH CONSTITUTIONS
AND, THEREFORE, ARE ILLEGAL, INVALID, AND VOID *AB INITIO*.**

263.  Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

264.  The HTA Acts are applicable laws of the Commonwealth under PROMESA § 201(b)(1)(A)(i).

265.  The First Moratorium Law, the Second Moratorium Law, the Third Moratorium Law, the Compliance Law, the Moratorium Orders, and any other substantially similar Commonwealth laws or orders that purportedly authorize the misappropriation, diversion, or transfer of HTA Special Revenues from their dedicated purposes under the HTA Acts (collectively, the "**Unauthorized Laws**") are purportedly incorporated into the Fiscal Plans and the Budgets as either "applicable law" or "special bills" under PROMESA § 201(b)(1)(A).

266.   The Unauthorized Laws substantially impair the Commonwealth's and HTA's contractual obligations to the HTA Bondholders under the HTA Acts and Resolutions by purportedly authorizing the misappropriation, diversion, or transfer of HTA Special Revenues from their dedicated purposes under the HTA Acts and Resolutions.

267.   Any Fiscal Plans or Budgets based on the Unauthorized Laws similarly impair the contractual obligations of the Commonwealth and HTA to the HTA Bondholders under the HTA Acts, the Resolutions, and the HTA Bonds.

268.   The Oversight Board, the Commonwealth, and any officers thereof impaired the HTA Bonds and violated the Contracts Clauses by passing the Unauthorized Laws and the Fiscal Plans and the Budgets based on the Unauthorized Laws.

269.   The Commonwealth Constitution through the Constitutional Clawback expressly contemplates the limited and tailored circumstances where the Commonwealth has emergency powers to clawback the HTA Taxes and those circumstances do not exist.

270.   Such misappropriation, diversion, or transfer of HTA Special Revenues is *per se* unreasonable and unnecessary because they serve no legitimate and lawful governmental purpose. The only legitimate and lawful purposes of the HTA Special Revenues are the purposes specified in the HTA Acts and Resolutions. Furthermore, neither PROMESA nor the Commonwealth Constitution expressly authorize laws or special bills that misappropriate, divert, or transfer the HTA Special Revenues from their dedicated purposes under the HTA Acts and Resolutions.

271.   A real and immediate controversy exists regarding the Oversight Board's development, approval, and certification of Fiscal Plans and the Budgets that purportedly authorize the Commonwealth to pass the Unauthorized Laws that the permit the

Commonwealth, HTA, and any officers thereof to expend HTA Special Revenues on obligations other than the principal of and interest on the HTA Bonds.

272.   FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Special Revenues from the HTA Bondholders to other obligations of the Commonwealth and HTA.

273.   This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and Budgets and the Commonwealth and HTA are asserting under the Unauthorized Laws that they may take and expend the HTA Special Revenues for purposes that are not authorized by the HTA Acts and Resolutions. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Special Revenues for such unauthorized purposes.

274.   Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the Unauthorized Laws and the Fiscal Plans and the Budgets based on the Unauthorized Laws impair the HTA Bonds and violate the Contracts Clauses of the United States and Commonwealth Constitutions and, therefore, are illegal, invalid, and void *ab initio*.

**COUNT IX**

**DECLARATORY JUDGMENT THAT
THE OVERSIGHT BOARD AND COMMONWEALTH
BY MISAPPROPRIATING, DIVERTING, AND EXPENDING
HTA SPECIAL REVENUES IN THE FISCAL PLANS AND
THE BUDGETS HAVE TAKEN HTA BONDHOLDERS' PROPERTY
WITHOUT JUST COMPENSATION AND ADEQUATE PROTECTION
IN VIOLATION OF THE TAKINGS AND DUE PROCESS CLAUSES OF THE UNITED
STATES AND COMMONWEALTH CONSTITUTIONS**

275.    Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

276.    The Fifth Amendment to the United States Constitution states: "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fourteenth Amendment of the United States Constitution states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." P.R. Const., Art. II, § 9, states: "Private property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law. . . ." P.R. Const., Art. II, § 7 states: "No person shall be deprived of his liberty or property without due process of law." Together, these provisions hereinafter are referred to as the "***Takings and Due Process Clauses***."

277.    HTA Bondholders have liens on the HTA Special Revenues.

278.    Such liens are property interests of the HTA Bondholders.

279.    The Oversight Board approved and certified Fiscal Plans and Budgets that misappropriate, divert, and transfer the HTA Special Revenues from their dedicated purposes under the HTA Acts and Resolutions.

280.    At the Oversight Board's direction, the Commonwealth, HTA, and any officers thereof have collected and expended HTA Special Revenues during the pendency of the title III cases of the Commonwealth and HTA without any payments to HTA Bondholders.

281.    At the Oversight Board's direction, the Commonwealth, HTA, and any officers thereof have deprived the HTA Bondholders of their entire property interest in the HTA Special Revenues during the pendency of the title III cases of the Commonwealth and HTA.

282.    This deprivation is neither conjectural nor speculative because HTA Special Revenues have been raised, collected, and expended during the pendency of the Commonwealth's and HTA's title III cases without any payments to HTA Bondholders.

283.    The Fiscal Plans and the Budgets neither provide HTA Bondholders with just compensation nor adequately protect the liens of the HTA Bondholders.

284.    The HTA Bondholders' rights to receive the HTA Special Revenues have been taken.

285.    The HTA Bondholders' rights to retain their liens until the HTA Bonds are paid in full have been taken.

286.    The HTA Bondholders' rights secured by the special accounts and special deposits created by the HTA Acts and Resolutions have been taken.

287.    The HTA Bondholders' rights to mandate that HTA Special Revenues be appropriated, transferred and expended in accordance with the HTA Acts and Resolutions have been taken.

288.    A real and immediate controversy exists regarding the Oversight Board's development, approval, and certification of Fiscal Plans and Budgets that purportedly authorize

the Commonwealth to expend HTA Special Revenues on obligations other than the principal of and interest on the HTA Bonds.

289.   FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Special Revenues from the HTA Bondholders to other obligations of the Commonwealth and HTA.

290.   This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and the Budgets that it may take and expend the HTA Special Revenues for purposes that are not authorized by the HTA Acts and Resolutions. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Special Revenues for such unauthorized purposes.

291.   Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the Oversight Board, Commonwealth, HTA, and any officers thereof by misappropriating, diverting, and expending the HTA Special Revenues in the Fiscal Plans and the Budgets have taken the HTA Bondholders' property without just compensation and adequate protection in violation of the Takings and Due Process Clauses.

## COUNT X

### DECLARATORY JUDGMENT THAT THE RETROACTIVE APPLICATION OF PROMESA WITHOUT ADEQUATE PROTECTION OF THE HTA BONDHOLDERS' PROPERTY IS A TAKING THAT VIOLATES THE TAKINGS AND DUE PROCESS CLAUSES OF THE UNITED STATES AND COMMONWEALTH CONSTITUTIONS

292.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

293.   The HTA Bondholders have priorities or liens in the HTA Special Revenues.

294.   PROMESA §§ 201 and 202 require the Oversight Board to approve and certify Fiscal Plans and Budgets that are based on the HTA Acts and respect the priorities or liens of the HTA Bondholders. Any Fiscal Plan or Budget that transfers HTA Special Revenues in accordance with the HTA Acts and Resolutions should not present a constitutional question. And, any Fiscal Plan or Budget that does not transfer HTA Special Revenues in accordance with the HTA Acts and Resolutions are unlawful as is stated in Counts III, IV, V, VI, VII, VIII, and IX above.

295.   To the extent it is determined that PROMESA and any Fiscal Plan or Budget thereunder permits the Oversight Board, the Commonwealth, HTA, or any officers thereof to misappropriate, divert, transfer, or expend the HTA Special Revenues in violation of the HTA Acts and Resolutions without just compensation or adequate protection to the HTA Bondholders, PROMESA permits the taking of substantive rights acquired by HTA Bondholders prior to PROMESA and does not provide adequate protection to the HTA Bondholders.

296.   The HTA Bondholders' rights to receive the HTA Special Revenues have been taken.

297.   The HTA Bondholders' rights to retain their liens until the HTA Bonds are paid in full have been taken.

298.   The HTA Bondholders' rights secured by the special accounts and deposits created by the HTA Acts and Resolutions have been taken.

Case:17-03283-LTS Doc#:13744-19 Filed:07/20/20 Entered:07/20/20 21:16:16 Desc: Miller Declaration Ex. 61 Answer Page 71 of 79

Case:19-00363-LTS Doc#:41-4 Filed:05/19/19 Entered:06/19/19 10:59:24 Desc: Main Document Page 72 of 80

299. The HTA Bondholders' rights to mandate that HTA Special Revenues be appropriated, transferred and expended in accordance with the HTA Acts and Resolutions have been taken.

300. A real and immediate controversy exists regarding whether PROMESA authorizes the Oversight Board to develop, approve, and certify Fiscal Plans or Budgets that purportedly authorize the Commonwealth and HTA to take and expend HTA Special Revenues on obligations other than the principal of and interest on the HTA Bonds.

301. FGIC is suffering an injury in fact that is substantial, concrete, and particularized because it made Policy Payments in respect of claims submitted under its insurance policies due to the misappropriation, diversion, and transfer of the HTA Special Revenues from the HTA Bondholders to other obligations of the Commonwealth and HTA.

302. This controversy is ripe for determination inasmuch as the Oversight Board is asserting in litigation, the Fiscal Plans, and the Budgets that PROMESA authorizes it to take and expend the HTA Special Revenues for purposes that are not authorized by the HTA Acts and Resolutions. Moreover, the Oversight Board, the Commonwealth, HTA, and any officers thereof have taken and expended the HTA Special Revenues under the wrongful theory that PROMESA preempts the HTA Acts and Resolutions.

303. Accordingly, FGIC is entitled to a judicial declaration pursuant to 28 U.S.C. § 2201, as well as further appropriate relief under 28 U.S.C. § 2202, that the retroactive application of PROMESA without adequate protection of the HTA Bondholders' property is a taking that violates the Takings and Due Process Clauses.

## COUNT XI

**A WRIT OF MANDAMUS TO
MANDATE THE OVERSIGHT BOARD REVOKE
THE INVALID FISCAL PLANS AND BUDGETS
AND DEVELOP AND APPROVE FISCAL PLANS AND BUDGETS
THAT ARE BASED ON HTA ACTS AND RESOLUTIONS
AND RESPECT THE PRIORITIES OR LIENS OF THE HTA BONDHOLDERS**

304.    Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

305.    PROMESA mandates that the Oversight Board develop, approve, and certify Fiscal Plans and Budgets that are based on applicable law, including the HTA Acts.

306.    PROMESA mandates that the Oversight Board develop, approve, and certify Fiscal Plans and Budgets that respect the priorities or liens of the HTA Bondholders.

307.    PROMESA mandates that the Oversight Board develop, approve, and certify Fiscal Plans and Budgets that do not transfer assets, funds, or resources of HTA to the Commonwealth.

308.    To the extent the Oversight Board's responsibilities regarding any Fiscal Plan or Budget is determined to be executive, ministerial, or administrative, the Oversight Board has a clear and indisputable duty to develop, approve, and certify Fiscal Plans and Budgets that are based on the HTA Acts and Resolutions and respect the priorities or liens of the HTA Bondholders, and use the HTA Taxes for the benefit of HTA.

309.    As alleged above, the Fiscal Plans and Budgets are not based on the HTA Acts and Resolutions, do not respect the priorities or liens of HTA Bondholders, and transfer HTA Taxes from HTA to the Commonwealth and, therefore, are illegal, invalid, and void *ab initio*.

310.    PROMESA does not provide a statutory remedy for the HTA Bondholders to obtain relief to prevent the Oversight Board's *ultra vires* acts and compel the Oversight Board

Case:19-00363-LTS Doc#:4-1 Filed:05/19/19 Entered:05/19/19 20:58:29 Desc: Main Document Page 74 of 80

to abide by the HTA Acts and Resolutions and respect the priorities or liens of the HTA Bondholders.

311.   A writ of mandamus is appropriate to achieve the rational ends of PROMESA, including respecting the priorities or liens of the HTA Bondholders, and will aid the just, speedy, and inexpensive determination of this case.

312.   A Writ of Mandamus should issue under the All Writs Act, 28 U.S.C. § 1651, and the Mandamus Act, 28 U.S.C. § 1361, to mandate the Oversight Board and its members revoke the invalid Fiscal Plans and Budgets and to compel the Oversight Board and its members to develop, approve, and certify Fiscal Plans and Budgets that are based on the HTA Acts and Resolutions and that respect the priorities or liens of the HTA Bondholders.

## COUNT XII

### A WRIT OF PROHIBITION TO PROHIBIT THE OVERSIGHT BOARD FROM APPROVING ANY FISCAL PLANS OR BUDGETS THAT ARE NOT BASED ON THE HTA ACTS AND RESOLUTIONS AND DO NOT RESPECT THE PRIORITIES OR LIENS OF THE HTA BONDHOLDERS

313.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

314.   PROMESA mandates that the Oversight Board develop, approve, and certify Fiscal Plans and Budgets that are based on applicable law, including the HTA Acts.

315.   PROMESA mandates that the Oversight Board develop, approve, and certify Fiscal Plans and Budgets that respect the priorities or liens of the HTA Bondholders.

316.   To the extent the Oversight Board's responsibilities regarding any Fiscal Plan or Budget is determined to be executive, ministerial, or administrative, the Oversight Board has a clear and indisputable duty to develop, approve, and certify Fiscal Plans and Budgets that are

based on the HTA Acts and Resolutions and that respect the priorities or liens of the HTA Bondholders, and use the HTA Taxes for the benefit of HTA.

317.   As alleged above, the Fiscal Plans and Budgets are not based on the HTA Acts and Resolutions, do not respect the priorities or liens of HTA Bondholders and, therefore, are illegal, invalid, and void *ab initio*, and do transfer HTA Taxes from HTA to the Commonwealth.

318.   PROMESA does not provide a statutory remedy for the HTA Bondholders to obtain relief to prevent the Oversight Board's *ultra vires* acts and compel the Oversight Board to abide by the HTA Acts and Resolutions and respect the priorities or liens of the HTA Bondholders.

319.   A writ of prohibition is appropriate to achieve the rational ends of PROMESA including respecting the priorities or liens of the HTA Bondholders, and will aid the just, speedy, and inexpensive determination of this case.

320.   A writ of prohibition should issue under the All Writs Act, 28 U.S.C. § 1651, and the Mandamus Act, 28 U.S.C. § 1361, to prohibit the Oversight Board and its members from developing, approving, and certifying Fiscal Plans or Budgets that are not based on the HTA Acts and Resolutions and do not respect the priorities or liens of the HTA Bondholders.

## <u>COUNT XIII</u>

### <u>A WRIT OF PROHIBITION TO PROHIBIT THE OVERSIGHT BOARD FROM PROPOSING ANY PLAN OF ADJUSTMENT THAT IS *PER SE* UNCONFIRMABLE</u>

321.   Each allegation contained in the preceding paragraphs is incorporated herein by reference as if fully set forth herein.

322.   The Oversight Board is the only entity that may file a plan of adjustment in the title III cases of the Commonwealth and HTA.

323.    PROMESA § 314(b) imposes burdens on the Oversight Board for it to obtain confirmation of any proposed plan of adjustment.

324.    PROMESA § 314(b)(7) incorporates by reference the Fiscal Plan requirements of PROMESA § 202(b)(1)(A), (M), and (N) which require a Fiscal Plan to be based on the HTA Acts and Resolutions and to respect the priorities or liens of HTA Bondholders, and to use the HTA Taxes for the benefit of HTA.

325.    As alleged above, the Fiscal Plans and Budgets are not based on the HTA Acts and Resolutions, do not respect the priorities or liens of HTA Bondholders, and transfer HTA Taxes from HTA to the Commonwealth and, therefore, are illegal, invalid, and void *ab initio*.

326.    Because the Fiscal Plans are illegal, invalid, and void *ab initio* the Oversight Board cannot demonstrate that a plan of adjustment is proposed in good faith and in accordance with applicable law, including PROMESA. 48 U.S.C. § 2174(b)(1), (2), (3), (5), (6), and (7); 11 U.S.C. § 1129(a)(3).

327.    To the extent the Oversight Board's responsibilities regarding plans of adjustment are determined to be executive, ministerial, or administrative, the Oversight Board has a clear and indisputable duty to propose plans of adjustment in good faith and based on the HTA Acts and Resolutions and respecting the priorities or liens of the HTA Bondholders.

328.    A plan of adjustment that is not based on the HTA Acts and Resolutions and does not respect the priorities or liens of the HTA Bondholders is *per se* unconfirmable.

329.    PROMESA does not provide a statutory remedy for HTA Bondholders to obtain relief to prevent the Oversight Board's *ultra vires* acts and compel the Oversight Board to abide by the HTA Acts and Resolutions and respect the priorities or liens of HTA Bondholders.

Case:19-00363-LTS Doc#:4374-19 Filed:07/20/29 Entered:07/20/29 20:58:29 Desc: Main Document Page 77 of 80

330.   A writ of prohibition is appropriate to achieve the rational ends of PROMESA including respecting the priorities or liens of the HTA Bondholders, and will aid the just, speedy, and inexpensive determination of this case.

331.   A writ of prohibition should issue under the All Writs Act, 28 U.S.C. § 1651, and the Mandamus Act, 28 U.S.C. § 1361, to prohibit the Oversight Board and its members from proposing a *per se* unconfirmable plan of adjustment.

## PRAYERS FOR RELIEF

**WHEREFORE**, FGIC prays that judgment be entered for it as follows:

(1)     Declaring that FGIC, as a HTA Bondholder, has a lawful priority or lien in the Toll Revenues;

(2)     Declaring that FGIC, as a HTA Bondholder, has a lawful priority or lien in the HTA Taxes;

(3)     Declaring that the conditions precedent for exercising the Constitutional Clawback do not exist and that any transfers of HTA Taxes purportedly based on the Constitutional Clawback are *ultra vires* and void *ab initio*;

(4)     Declaring that the Oversight Board acted *ultra vires* when approving the Fiscal Plans and the Budgets without respecting the priorities and liens of HTA Bondholders, and, therefore, the Fiscal Plans and the Budgets are illegal, invalid, and void *ab initio*;

(5)     Declaring that the Oversight Board acted *ultra vires* when approving the Fiscal Plans and the Budgets because none are based on the HTA Acts and Resolutions, and, therefore, the Fiscal Plans and the Budgets are illegal, invalid, and void *ab initio*;

(6)     Declaring that the Oversight Board acted *ultra vires* when approving the Fiscal Plans and the Budgets that provide for the taking of the HTA Taxes to be used for the benefit of

Case:19-00363-LTS Doc#:43-4 Filed:06/19/19 Entered:06/19/19 20:58:29 Desc: Main Document Ex.1 Answer Page 78 of 80

the Commonwealth, and, therefore, the Fiscal Plans and the Budgets are illegal, invalid, and void *ab initio*.

(7)     Declaring that the Fiscal Plans and the Budgets impair the HTA Bonds and violate the Contracts Clauses of the United States and Commonwealth Constitutions and, therefore, are illegal, invalid, and void *ab initio*;

(8)     Declaring that the Unauthorized Laws and the Fiscal Plans and the Budgets based on the Unauthorized Laws impair the HTA Bonds and violate the Contracts Clauses of the United States and Commonwealth Constitutions and, therefore, are illegal, invalid, and void *ab initio*;

(9)     Declaring that the Oversight Board and Commonwealth by misappropriating, diverting, and expending HTA Special Revenues in the Fiscal Plans and the Budgets have taken HTA Bondholders' property without just compensation and adequate protection in violation of the Takings and Due Process Clauses of the United States and Commonwealth Constitutions;

(10)     Declaring that the retroactive application of PROMESA without adequate protection of the HTA Bondholders' property is a taking that violates the Takings and Due Process Clauses of the United States and Commonwealth Constitutions;

(11)     Issue a writ of mandamus to mandate the Oversight Board revoke the invalid Fiscal Plans and Budgets and develop and approve Fiscal Plans and Budgets that are based on HTA Acts and the Resolutions and respect the priorities or liens of the HTA bondholders;

(12)     Issue a writ of prohibition to prohibit the Oversight Board from approving any Fiscal Plans or Budgets that are not based on the HTA Acts and Resolutions and do not respect the priorities or liens of the HTA Bondholders;

Case:19-00363-LTS Doc#:47-11 Filed:06/19/19 Entered:06/19/19 00:59:29 Desc: Main Document Ex. 61 Page 79 of 80

(13)    Issue a writ of prohibition to prohibit the Oversight Board from proposing any plan of adjustment that is *per se* unconfirmable; and

(14)    Providing for additional or alternative relief that furthers equity and justice and is appropriate under the law and circumstances of the case.

Dated: June 11, 2019

Respectfully submitted,

REXACH & PICÓ, CSP

By: */s/ María E. Picó*
María E. Picó
USDC-PR 123214
802 Ave. Fernández Juncos
San Juan PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
E-mail: mpico@rexachpico.com

BUTLER SNOW LLP

By: */s/ Martin A. Sosland*
Martin A. Sosland (*pro hac vice*)
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
E-mail: martin.sosland@butlersnow.com
*\*Admitted pro hac vice in Case No. 17-BK-03283-LTS and Case No. 17-BK-03567-LTS*

Jason W. Callen
150 3rd Ave., S., Suite 1600
Nashville, TN 37201
jason.callen@butlersnow.com
Telephone:  615-651-6774
Facsimile:  615-651-6701
*\*Admitted pro hac vice in Case No. 17-BK-03283-LTS and Case No. 17-BK-03567-LTS*

*Attorneys for Financial Guaranty Insurance Company*

Case 17-03283-LTS Doc#13744-19 Filed 07/20/20 Entered 07/20/20 21:16:16 Desc:
Miller Declaration Ex. 61 Answer Page 79 of 79

Case 19-00363-LTS Doc#4-19 Filed 06/11/19 Entered 06/11/19 20:58:29 Desc: Main
Document Page 80 of 80

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY**, that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will notify case participants.

Dated: June 11, 2019.                    Respectfully submitted,


                                        By: */s/ Martin A. Sosland*

                                            Martin A. Sosland

                                        *Attorney for Financial Guaranty Insurance Company*