## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| | ) | Case No. 17-bk-3283 (LTS) |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.* | ) | |
| | ) | |
| Debtors.[1] | ) | |
| | X | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| | ) | Case No. 17-bk-3566 (LTS) |
| as representative of | ) | |
| | ) | **Re:  ECF Nos. 891 & 923** |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | Case No. 17-bk-3283 (LTS) |
| PUERTO RICO, | ) | |
| | ) | **Re:  ECF Nos. 13054 & 13464** |
| - and - | ) | |
| | ) | ***This Pleading Relates to ERS and*** |
| THE FINANCIAL OVERSIGHT AND | ) | ***the Commonwealth Only, and*** |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | ***Should Be Filed in Both Dockets.*** |
| | ) | |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, | ) | |
| | ) | |
| Debtors. | ) | |
| | X | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID:8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO,

- and -

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

as representative of

THE COMMONWEALTH OF PUERTO RICO,

Movants,

v.

ANDALUSIAN GLOBAL DESIGNATED ACTIVITY
COMPANY, CROWN MANAGED ACCOUNTS FOR
AND ON BEHALF OF CROWN/PW SP, GLENDON
OPPORTUNITIES FUND, L.P., LMA SPC FOR AND
ON BEHALF OF MAP 98 SEGREGATED
PORTFOLIO, MASON CAPITAL MASTER FUND
L.P., OAKTREE-FORREST MULTI-STRATEGY, LLC
(SERIES B), OAKTREE OPPORTUNITIES FUND IX,
L.P., OAKTREE OPPORTUNITIES FUND IX
(PARALLEL), L.P., OAKTREE OPPORTUNITIES
FUND IX (PARALLEL 2), L.P., OAKTREE
HUNTINGTON INVESTMENT FUND II, L.P.,
OAKTREE OPPORTUNITIES FUND X, L.P.,
OAKTREE OPPORTUNITIES FUND X (PARALLEL),
L.P., OAKTREE OPPORTUNITIES FUND X
(PARALLEL 2), L.P., OAKTREE VALUE
OPPORTUNITIES FUND HOLDINGS, L.P., OCEANA
MASTER FUND LTD., OCHER ROSE, L.L.C.,
PENTWATER MERGER ARBITRAGE MASTER
FUND LTD., PWCM MASTER FUND LTD.,
REDWOOD MASTER FUND, LTD., AND SV
CREDIT, L.P.,

- and -                                                    )
                                                           )
PUERTO RICO AAA PORTFOLIO BOND FUND,        )
INC., PUERTO RICO AAA PORTFOLIO BOND FUND )
II, INC., PUERTO RICO AAA PORTFOLIO TARGET  )
MATURITY FUND, INC., PUERTO RICO FIXED      )
INCOME FUND, INC., PUERTO RICO FIXED        )
INCOME FUND II, INC., PUERTO RICO FIXED     )
INCOME FUND III, INC., PUERTO RICO FIXED    )
INCOME FUND IV, INC., PUERTO RICO FIXED     )
INCOME FUND V, INC., PUERTO RICO GNMA &     )
U.S. GOVERNMENT TARGET MATURITY FUND,       )
INC., PUERTO RICO INVESTORS BOND FUND I,    )
PUERTO RICO INVESTORS TAX-FREE FUND, INC., )
PUERTO RICO INVESTORS TAX-FREE FUND, INC. )
II, PUERTO RICO INVESTORS TAX-FREE FUND III, )
INC., PUERTO RICO INVESTORS TAX-FREE FUND )
IV, INC., PUERTO RICO INVESTORS TAX-FREE    )
FUND V, INC., PUERTO RICO INVESTORS TAX-    )
FREE FUND VI, INC., PUERTO RICO MORTGAGE-   )
BACKED & U.S. GOVERNMENT SECURITIES         )
FUND, INC., TAX-FREE PUERTO RICO FUND, INC., )
TAX- FREE PUERTO RICO FUND II, INC., AND    )
TAX-FREE PUERTO RICO TARGET MATURITY        )
FUND, INC.,                                 )
                                            )
- and -                                     )
                                            )
THE BANK OF NEW YORK MELLON, AS FISCAL      )
AGENT,                                      )
                                            )
Respondents.                                )
_____ X

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

LEGAL STANDARD .............................................................................................. 5

ARGUMENT ........................................................................................................... 6

I.     CLAIMANTS ARE NOT ENTITLED TO ANY ADMINISTRATIVE
EXPENSES. ....................................................................................... 6

     A.     The Section 552 Decision Precludes All Administrative Expense
Claims Against the Commonwealth and ERS. ........................... 6

          i.     The Post-Petition Legislation Did Not Affect ERS Petition
Date Assets................................................................................. 6

          ii.     Additional Uniform Contributions Are Not the
Bondholders' Collateral, and Even if They Were, Claims
Based on AUC Are Precluded by the Section 552 Decision. ......... 9

          iii.     Disputes Regarding Scope and Value of Collateral Are
Irrelevant to Assertions of Administrative Claims. ..................... 10

          iv.     Any Rights Claimants May Have as Unsecured
Claimholders Against ERS Cannot Result in Claims
Against the Commonwealth.......................................................... 11

     B.     The Post-Petition Legislation Does Not Give Rise to Any
Administrative Claims Against ERS or the Commonwealth or
Claims That Are Nondischargeable. .......................................... 15

     C.     The Bondholders' Claims Are Preempted by PROMESA. ....................... 18

     D.     The Bondholders' Other Arguments Are Meritless................................. 20

II.     THE CLAIMS ASSERTED AGAINST THE COMMONWEALTH
SHOULD BE DISMISSED. ............................................................... 21

     A.     Claimants Have Failed to State a Claim that the Commonwealth Is
Liable for Claims Based on the Post-Petition Legislation. ..................... 21

          i.     Claimants Have Failed to State a Claim that the
Commonwealth Violated the Automatic Stay. ............................. 21

          ii.     The Post-Petition Legislation Does Not Violate the
Contracts Clause. ....................................................................... 24

          iii.     The Post-Petition Legislation Is Not an Unconstitutional
Taking. ....................................................................................... 37

          iv.     Claimants Have Failed to State a Claim that the
Commonwealth Was Unjustly Enriched....................................... 47

          v.     Claimants Have Failed to State a Claim that the
Commonwealth Is Liable for the Post-Petition Legislation
Under PROMESA Section 407.................................................... 49

i

vi.    Claimants Have Failed to State a Claim that the
Commonwealth Fraudulently Acquired ERS Assets. .................. 51

vii.   Claimants Have Failed to State a Claim that the
Commonwealth Tortuously Interfered with the Resolution. ........ 52

viii.  Claimants Have Failed to State a Claim that the
Commonwealth Aided and Abetted ERS's Breach of
Duties. ....................................................................................... 53

ix.   Claimants Have Failed to State a Claim that the
Commonwealth Committed Conversion. .................................... 53

x.    Claimants Have Failed to State a Claim that the
Commonwealth Is Liable for General Fault and
Negligence. ................................................................................ 53

xi.   The Lien-Scope AP Will Determine to Which Property
Claimants' Liens Attach. ........................................................... 54

xii.  Claimants Have Failed to State a Claim that the
Commonwealth Is Liable for Harm from the Automatic
Stay. .......................................................................................... 54

B.    The Commonwealth Is Not Liable for Claims Based on Its Other
Alleged Conduct. ................................................................................. 54

i.    Claimants Have Failed to State a Claim that the
Commonwealth Violated the January Stipulation. ...................... 54

ii.   Claimants Have Failed to State a Claim that They Were
Harmed by the Moratorium Act. ................................................. 55

iii.   Claimants Have Failed to State a Claim that Revisions to
the ERS Enabling Act Took Their Property. ............................... 56

iv.   Claimants Have Failed to State a Claim that the
Commonwealth Failed to Pay Prepetition Contributions. ............ 56

III.   THE CLAIMS ASSERTED AGAINST ERS SHOULD BE DISMISSED. ........ 56

A.    Claimants' Request for a Determination of Secured Status in the
ERS Title III Case Duplicates Claims in the Lien-Scope AP and
Should Be Dismissed. .......................................................................... 57

B.    Claimants Fail to State a Claim that ERS Is Liable for Claims
Based on the Post-Petition Legislation. ................................................ 57

i.    Claimants Are Entitled to No More than Nonrecourse
Claims Against ERS for Unpaid Principal and Interest on
the ERS Bonds. .......................................................................... 57

ii.   Claimants Have Failed to State a Claim that ERS Was
Unjustly Enriched. ...................................................................... 57

iii.   Claimants Have Failed to State a Claim that ERS Caused
the Commonwealth's Unjust Enrichment. ................................... 58

iv.   Claimants Have Failed to State a Claim that ERS
Committed a Fraudulent Transfer. .............................................. 58

v.      Claimants Have Failed to State a Claim that ERS
        Committed Dolo in the Evasion of Contractual Duties. ............... 58

vi.     The Remaining Claims Against ERS Also Fail to State a
        Claim and Must Be Dismissed......................................................... 59

vii.    All Claims that ERS is Liable Based on the Issuance of the
        ERS Bonds Should be Dismissed for Failure to State a
        Claim. ............................................................................................. 59

**CONCLUSION** .................................................................................................... **60**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*1256 Hertel Ave. Assocs., LLC v. Calloway,*
761 F.3d 252 (2d Cir. 2014)........................................................................41, 42

*Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.),*
963 F.2d 1449 (11th Cir. 1992) ..........................................................................17

*Ambac Assurance Corp. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt.
Bd. for P.R.),*
297 F. Supp. 3d 269 (D.P.R. 2018), *aff'd*, 927 F.3d 597 (1st Cir. 2019), *cert.
denied sub nom., Ambac Assurance Corp. v. Fin. Oversight & Mgmt. Bd. for
P.R.*, 140 S. Ct. 856 (2020) ..........................................................................33, 35

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.
(In re Fin. Oversight & Mgmt. Bd. for P.R.),*
954 F.3d 1 (1st Cir. 2020) ........................................................................... passim

*Appolo Fuels, Inc. v. United States,*
381 F.3d 1338 (Fed. Cir. 2004)...........................................................................44

*Armstrong v. United States,*
364 U.S. 40 (1960)...............................................................................................41

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................................................................6, 52

*Bank of N.Y. v. Treco (In re Treco),*
240 F.3d 148 (2d Cir. 2001)................................................................................38

*Bayron Toro v. Serra,*
19 P.R. Offic. Trans. 646 (P.R. 1987)............................................................30, 44

*Blank v. Eavenson,*
530 F. App'x 364 (5th Cir. 2013) .......................................................................34

*BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
301 F. Supp. 3d 306 (D.P.R. 2017)......................................................................13

*Bruesewitz v. Wyeth LLC,*
562 U.S. 223 (2011)............................................................................................22

*Bruin Portfolio, LLC v. Leicht (In re Leicht),*
222 B.R. 670 (B.A.P. 1st Cir. 1998) ...................................................................43

iv

*Buffalo Teachers Fed'n v. Tobe*,
    464 F.3d 362 (2d Cir. 2006)...................................................................... passim

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993)....................................................................................42

*Connolly v. Pension Benefit Guaranty Corporation*,
    475 U.S. 211 (1986)....................................................................................39

*De-Jesus-Adorno v. Browning Ferris Indus. of P.R., Inc.*,
    160 F.3d 839 (1st Cir. 1998)......................................................................53

*Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Tribune*
    *Co. Fraudulent Conveyance Litig.)*,
    946 F.3d 66 (2d Cir. 2019).........................................................................51

*Diaz-Diaz v. Fortuño-Burset*,
    No. 11-1632, 2012 WL 2498912 (D.P.R. June 27, 2012) .........................32

*Emerald Casino, Inc. v. Ill. Gaming Bd. (In re Emerald Casino, Inc.)*,
    2003 U.S. Dist. LEXIS 23216 (N.D. Ill. Dec. 23, 2003) ..........................23

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
    459 U.S. 400 (1983)........................................................................25, 30, 32

*FCC v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003)....................................................................................20

*Fideicomiso de la Tierra del Caño Martin Peña v. Fortuño*,
    604 F.3d 7 (1st Cir. 2010)..........................................................................46

*Filiatrault v. Comverse Tech., Inc.*,
    275 F.3d 131 (1st Cir. 2001)......................................................................31

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*
    *(In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    948 F.3d 457 (1st Cir. 2020)............................................................... passim

*Franklin Mem'l Hosp. v. Harvey*,
    575 F.3d 121 (1st Cir. 2009)......................................................................44

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010)....................................................................................50

*Hawaii Hous. Auth. v. Midkiff*,
    467 U.S. 229 (1984)....................................................................................46

*In re Berry Estates Inc.*,
  49 B.R. 1002 (S.D.N.Y. 1985) .................................................................................. 20

*In re City of Detroit*,
  524 B.R. 147 (Bankr. E.D. Mich. 2014) ................................................................. 34

*In re City of San Bernardino*,
  6:12-bk-28006, ECF No. 2164 (Bankr. C.D. Cal. Feb. 7, 2017) ........................... 34

*In re City of Stockton*,
  526 B.R. 35 (Bankr. E.D. Cal. 2015) ............................................................... 24, 34

*In re City of Vallejo*,
  2:08-bk-26813, ECF No. 1113 (Bankr. E.D. Cal. Aug. 4, 2011) ........................... 34

*In re Cty. of Orange*,
  8:94-bk-22272, ECF No. 3418 (Bankr. C.D. Cal. May 16, 1996) .......................... 34

*In re Davis*,
  539 B.R. 334 (S.D. Ohio 2015) .............................................................................. 41

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  297 F. Supp. 3d at 287–88 ...................................................................................... 33

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  390 F. Supp. 3d 311 (D.P.R. 2019) ......................................................................... 23

*In re Hemingway Transp., Inc.*,
  954 F.2d 1 (1st Cir. 1992) ................................................................................. 16, 17

*In re Jeans.com*,
  491 B.R. 16 (Bankr. D.P.R. 2013) .......................................................................... 16

*In re Nortel Networks, Inc.*,
  469 B.R. 478 (Bankr. D. Del. 2012) ......................................................................... 5

*In re Nortel Networks, Inc.*,
  669 F.3d 128 (3d Cir. 2011) .................................................................................... 24

*In re Old Carco LLC*,
  424 B.R. 633 (Bankr. S.D.N.Y. 2010) .................................................................... 17

*In re Pension Reform Litigation*,
  2015 IL 118585 ....................................................................................................... 35

*In re Santos & Nieves, Inc.*,
  814 F.2d 57 (1st Cir. 1987) ..................................................................................... 50

*In re Spiegel, Inc.*,
337 B.R. 821 (Bankr. S.D.N.Y. 2006) ................................................................5

*In re WorldCom, Inc.*,
322 B.R. 530 (Bankr. S.D.N.Y. 2005) ................................................................6

*Jarecki v. G. D. Searle & Co.*,
367 U.S. 303 (1961) .........................................................................................50

*Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.)*,
993 F.2d 915 (1st Cir. 1993) ..............................................................................5

*Kelo v. City of New London*,
545 U.S. 469 (2005) ....................................................................................45, 46

*Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*,
505 F.3d 109 (2d Cir. 2007) .............................................................................14

*Local Div. 589, Amalgamated Transit Union v. Massachusetts*,
666 F.2d 618 (1st Cir. 1981) ............................................................................37

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) .........................................................................................41

*Lowry v. Baltimore & Ohio R.R. Co.*,
707 F.2d 721 (3d Cir. 1983) .............................................................................40

*Lynch v. United States*,
292 U.S. 571 (1934) .........................................................................................39

*Maine Educ. Ass'n Benefits Tr. v. Cioppa*,
695 F.3d 145 (1st Cir. 2012) ............................................................................43

*Mass. Div. of Emp't & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.)*,
291 F.3d 111 (1st Cir. 2002) ............................................................................17

*Medina & Medina v. Country Pride Foods, Ltd.*,
631 F. Supp. 293 (D.P.R. 1986) .......................................................................48

*Meoli v. Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*,
463 B.R. 28 (Bankr. W.D. Mich. 2012) ...........................................................52

*Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Comm'r of P.R.*,
125 F.3d 9 (1st Cir. 1997) ................................................................................29

*Midland Nat'l Life Ins. Co. v. Citizens & S. Nat'l Bank*,
    641 F. Supp. 516 (M.D. Ga. 1986) ......................................................22

*Morton Arboretum v. Thompson*,
    605 F. Supp. 486 (N.D. Ill. 1984) ......................................................28

*Ohio v. Kovacs*,
    469 U.S. 274 (1985).................................................................19, 20

*Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*,
    164 F.3d 677 (1st Cir. 1999) ............................................................43

*Penn Central Transportation Co. v. City of New York*,
    438 U.S. 104 (1978)................................................................41, 42

*Pennsylvania Dep't of Pub. Welfare v. Davenport*,
    495 U.S. 552 (1990).....................................................................20

*Phelps v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. (In re Nucorp Energy Sec. Litig.)*,
    772 F.2d 1486 (9th Cir. 1985) ..........................................................40

*Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty.*,
    57 F.3d 505 (7th Cir. 1995) ............................................................39

*Reading Co. v. Brown*,
    391 U.S. 471 (1968).....................................................................15

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984).....................................................................43

*S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*,
    207 B.R. 57 (S.D.N.Y. 1997).............................................................14

*Sal Tinnerello & Sons, Inc. v. Town of Stonington*,
    141 F.3d 46 (2d Cir. 1998)..............................................................36

*SEC v. Brennan*,
    230 F.3d 65 (2d Cir. 2000)..............................................................23

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002).....................................................................41

*Trinidad Hernández v. E.L.A.*,
    188 D.P.R. 828 (P.R. 2013) ....................................................30, 37, 44

*United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuño*,
    633 F.3d 37 (1st Cir. 2011) ...............................................................32, 34, 35, 36

*United States v. Giorgi*,
    840 F.2d 1022 (1st Cir. 1988) ........................................................................29

*United States v. Michigan*,
    518 F. Supp. 966 (E.D. Mich. 1981) .............................................................28

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
    945 F.3d 3 (1st Cir. 2019) ..............................................................................18

*Von Hoffman v. City of Quincy*,
    71 U.S. 535 (1866) .........................................................................................27

*W.B. Worthen Co. ex rel. Bd. of Comm'rs of St. Improvement Dist. No. 513 of Little Rock v. Kavanaugh*,
    295 U.S. 56 (1935) .........................................................................................27

*Wolff v. City of New Orleans*,
    103 U.S. 358 (1880) .......................................................................................27

*Wright v. Union Cent. Life Ins. Co.*,
    311 U.S. 273 (1940) .......................................................................................38

*Zenon v. Guzman*,
    924 F.3d. 611 (1st Cir. 2019) .........................................................................15

**STATUTES**

3 L.P.R.A. § 766 .......................................................................................................48

19 L.P.R.A. § 2002(2) ..............................................................................................50

11 U.S.C. § 101 ........................................................................................................50

11 U.S.C. § 502(b)(1) ..............................................................................................13

11 U.S.C. § 922(c) ...................................................................................................11

11 U.S.C. § 1111(b)(1)(A)(ii) ..................................................................................12

11 U.S.C. § 552 .............................................................................................2, 9, 13, 47

11 U.S.C. § 926 ........................................................................................................14

N.Y. Gen. Oblig. Law § 13–107 ..............................................................................40

PROMESA § 5(7) ....................................................................................................................18

PROMESA § 201(b)(1)(N) ....................................................................................................49

PROMESA § 314 .........................................................................................................21, 49, 55

PROMESA § 314(b) ..............................................................................................................10

PROMESA § 405(m) .............................................................................................................32

PROMESA § 407 ...........................................................................................................49, 50, 51

U.C.C. § 9-102(2) (2000) ......................................................................................................50

**OTHER AUTHORITIES**

David Gray Carlson, *Bankruptcy's Organizing Principle*, 26 Fla. St. U.L. Rev.
549 (1999) .......................................................................................................................13

ERS, *Annual Financial Information Fiscal Year 2016* .........................................................7, 15

Fed. R. Bankr. P. 7001(2) ......................................................................................................10

**REPLY IN SUPPORT OF MOTION
OF THE COMMONWEALTH
OF PUERTO RICO AND THE
EMPLOYEES RETIREMENT SYSTEM OF
THE GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO TO DISALLOW AND DISMISS CLAIMS
ASSERTED OR FILED BY ERS BONDHOLDERS AND THE ERS
FISCAL AGENT PURSUANT TO BANKRUPTCY RULES 3007(B) & 7012(B)**

To the Honorable United States District Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Employees Retirement

System of the Government of the Commonwealth of Puerto Rico ("ERS," and together with the

Commonwealth, the "Debtors"), by and through the Financial Oversight and Management Board

for Puerto Rico (the "Oversight Board"), as the Debtors' sole Title III representative pursuant to

section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*

("PROMESA"),[1] respectfully submit this reply to *Claimants' Brief in Opposition to Motions to*

*Dismiss Claimants' Proofs of Claim and Motions for Allowance of Administrative Expense Claims*

[Case No. 17-bk-3283, ECF No. 13464; Case No. 17-bk-3566, ECF No. 923] (the "Response") in

support of the *Motion of the Commonwealth of Puerto Rico and the Employees Retirement System*

*of the Government of the Commonwealth of Puerto Rico to Disallow and Dismiss Claims Asserted*

*or Filed by ERS Bondholders and the ERS Fiscal Agent Pursuant to Bankruptcy Rules 3007(b) &*

*7012(b)* [Case No. 17-bk-3283, ECF No. 13054; Case No. 17-bk-3566, ECF No. 891] (the

"Motion").[2]  In further support of the Motion, the Oversight Board respectfully represents:

## PRELIMINARY STATEMENT

1.      The Bondholders have initiated a barrage of litigation challenging the Post-Petition

Legislation, enacted to prevent the collapse of the Commonwealth's almost totally unfunded

---

[1] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[2] All undefined terms herein shall have the meaning ascribed to them in the Motion or the Response, as applicable.

pensions system, responsible for making tens of billions of dollars of pension payments to thousands of Commonwealth retirees.  Included in this barrage are the Proofs of Claim and Administrative Expense Motions, filed against both the Commonwealth and ERS, which the Oversight Board seeks to have disallowed and dismissed by the Motion.

2.      This reply answers each of Claimants' multiple claims, but the bulk of the claims and this reply are academic because the claims defy black letter law that debtors are entitled to breach prepetition obligations.  Plain and simple.  To be sure, Claimants' claimed collateral was largely eliminated by Bankruptcy Code section 552.  ERS and the Commonwealth committed to pay Claimants the value of other collateral in existence on the ERS Petition Date.  That should end the matter.  But, Claimants have propounded a kitchen sink of claims stemming from their incorrect premise that they have constitutional claims against the Commonwealth for impairing ERS's contractual obligations.  Claimants build on their false foundation by parlaying their contract impairment claims into claims for takings of contract rights, and on and on.  We answer all those claims below, but each fails at its inception.

3.      In its moving papers, the Oversight Board demonstrated the First Circuit's Section 552 Decision precludes the constitutional claims asserted against the Commonwealth and ERS. Because the statutory obligations of employers to make contributions not yet "calculated and owed" as of the ERS Petition Date was a mere expectancy, and not a property interest of ERS, the Bondholders had no security interest in Employers' Contributions even under the old legislative regime.  Thus, the Bondholders could not suffer a taking because there was nothing to take, and the Post-Petition Legislation could not impair the Bondholders because they were already impaired by Bankruptcy Code section 552(a).  And the Bondholders retain their nonrecourse claims against ERS.

2

4.       Currently, with the obligations of government employers to make Employers'
Contributions eliminated by the Post-Petition Legislation, Claimants will receive a distribution
equal to the value of ERS's assets on the ERS Petition Date (to the extent those assets are subject
to Claimants' perfected security interest).   In the hypothetical scenario where the Post-Petition
Legislation had never been enacted, government employers would continue to make payments to
ERS to the extent they were legally or financially able to do so (or such payments were not
preempted).   But, these theoretical postpetition payments would still not be subject to the ERS
Bondholders' security interest by virtue of section 552, nor would they be the source of Bondholder
recovery as the Bondholders hold nonrecourse claims (under both the Resolution and the Plan
through the application of § 1111(b)(1)(A)(ii)).   In that hypothetical scenario, Claimants would
have the exact same distribution they have now—the value of their collateral on the ERS Petition
Date and its proceeds.

5.       The Bondholders maintain that their claims survive section 552's application
because they have (i) recourse claims against ERS and (ii) postpetition claims against the
Commonwealth for constitutional violations for the Post-Petition Legislation's alleged impairment
of their unsecured claimholder rights.   But, this claim is purely hypothetical:  it assumes that
(a) ERS will propose a plan of adjustment that entitles Claimants to convert their nonrecourse
claims into recourse claims; (b) the amounts required to be paid to ERS by employers exceed the
amount of benefit payments that were the obligation of ERS; and (c) more assets would be
available for distribution to ERS's unsecured claimholders absent the Post-Petition Legislation.
That hypothetical also requires assumptions regarding the validity and treatment of the $58.5
billion claim the Retiree Committee filed against ERS on behalf of pensioners.  A cause of action
cannot be predicated on such speculation, and must be dismissed.  But even if Claimants were

3

unsecured, recourse claimholders, unsecured claimholders of ERS lack standing to assert a claim

against the Commonwealth; only ERS would have standing, assuming there were a basis for such

claim (there is not).

6.      Claimants also assert their claims remain viable because the First Circuit's decision

did not extend its ruling to Additional Uniform Contributions (the "AUC"), on which Claimants

have allegedly asserted a lien.  Response at 15.  But this is a red herring for at least two reasons.

*First*, as the First Circuit recognized (without explicitly deciding), the AUC is not within the

Bondholders' security interest.  It was imposed by a statute enacted after the ERS Bonds were

issued and so is not part of the collateral package granted to Claimants.  *Second*, even if the AUC

were part of the Bondholders' collateral, postpetition AUC are not proceeds of prepetition

collateral.  Under the First Circuit's logic in its Section 552 Decision, ERS's rights to receive

payment (under the 2013 statute creating the AUC) are not its property unless the payments were

"calculable and owed" as of the ERS Petition Date.  The First Circuit's conclusion that statutory

provisions addressing the system's actuarial deficiency are not a "property interest" that can serve

as collateral fortifies this conclusion.  Of course, disputes about the scope or value of collateral do

not give rise to administrative expense claims under the Bankruptcy Code or PROMESA.

7.      Throughout three years of litigation over the Post-Petition Legislation, the

Bondholders have accused the Commonwealth of "confiscating" and "seizing" their collateral.

Yet until filing their response to the Motion, they have never identified that alleged collateral.

Now, for the first time, the Bondholders try to do so, asserting that their allegedly "transferred"

collateral includes Accounts Receivable, AUC, employee loans and employee loan payments,

funds remitted to ERS by the Fiscal Agent, and traceable funds in deposit accounts.  Response at

14.  But aside from the AUC (addressed above), the Bondholders plead nothing more than naked

4

conclusions that ERS transferred their asserted collateral to the Commonwealth. In fact, other than the Transferred Assets, ERS continues to hold those assets, and so questions concerning the scope and value of the Bondholders' alleged security interest in those assets will be resolved in the Lien-Scope AP and other proceedings. But it is not an appropriate dispute for the Court to resolve here.

8.      The Bondholders' laundry list of other alleged claims against the Commonwealth turns on the Post-Petition Legislation itself being unlawful or otherwise impairing their recoveries and, as demonstrated, should also be dismissed. And, as explained in the Motion, their efforts to conjure recourse claims against ERS also fail. Thus, the Bondholders' only allowable claims in these Title III cases are nonrecourse claims against ERS for unpaid principal and interest on the ERS Bonds.

## LEGAL STANDARD

9.      Claimants advocate for the wrong legal standard for the Motion. They assert dismissal is appropriate only if the Oversight Board can "either (1) show that the claims fail as a matter of law, accepting Claimants' allegations as true, or (2) present a 'substantial factual basis to overcome' the prima facie validity of those allegations . . .". Response at 12 (internal citations omitted). That is wrong. The cases Claimants cite for that standard all concerned claim objections under Bankruptcy Rule 3001, not motions to dismiss under Bankruptcy Rule 7012. *See, e.g.*, *Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993) (presumption of validity applied in litigation of section 502(e) claim objection). But Bankruptcy Rule 3001 and *prima facie* validity do not apply here, where the parties have agreed that Bankruptcy Rule 7012 applies. [Case No. 17-bk-3566, ECF No. 836 ¶ 11]. And even absent such agreement, courts resolving motions to dismiss proofs of claim apply the "more rigorous" Rule 12(b) standard. *In re Nortel Networks, Inc.*, 469 B.R. 478, 497 (Bankr. D. Del. 2012); *see also In re Spiegel, Inc.*, 337 B.R. 821, 823 (Bankr. S.D.N.Y. 2006) (applying the Rule 12(b) standard to a

5

motion to dismiss a proof of claim); *In re WorldCom, Inc.*, 322 B.R. 530, 535 (Bankr. S.D.N.Y.

2005) (same). This "more rigorous" standard requires "plausible allegations" more detailed than

the bald conclusions in the Proofs of Claim and Administrative Expense Motions. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (courts need not accept conclusory assertions devoid of factual

support).

## ARGUMENT

## I.   CLAIMANTS ARE NOT ENTITLED TO ANY ADMINISTRATIVE EXPENSES.

### A.   The Section 552 Decision Precludes All Administrative Expense Claims Against the Commonwealth and ERS.

10.     Claimants proffer three theories why their administrative expense claims allegedly

survive the Section 552 Decision. *First*, they contend their security interests in ERS Petition Date

assets, which are not affected by section 552, have been "taken" by the Post-Petition Legislation.

Response at 12. As part of these allegations, they argue the First Circuit did not address AUC, and

that somehow AUC gives rise to administrative expense claims. *Second*, they argue that the Post-

Petition Legislation interfered with their contractual rights and interest as unsecured claimholders

of ERS. *Id.* *Third*, the Bondholders argue that disputes regarding the scope of their security

interest and the value of collateral give rise to administrative expense claims unrelated to Section

552. All these theories fail as a matter of law.

#### i.   The Post-Petition Legislation Did Not Affect ERS Petition Date Assets.

11.     Claimants assert they have "valid, perfected liens on a variety of . . . prepetition

property" including the Accounts Receivable, AUC, employee loans and employee loan payments,

and other funds, Response at 13–14, and that they were "deprived of this collateral when the Post-

Petition Legislation commanded ERS to transfer *all* of its assets . . . to the Commonwealth." *Id.*

at 14 (emphasis in original).

12.     But a mere command to transfer assets, without plausible allegations showing the assets were actually transferred, cannot state a claim.  The Bondholders' sole allegation on this score is that "far more than just $190.4 million has been transferred[.]"  Response at 15.  But Claimants do not substantiate this conclusion with any facts, even after deposing numerous current and former ERS employees and administrators, and obtaining tens of thousands of pages of documents related to ERS's financial condition.[3]  The only assets to which the Bondholders' security interest even arguably has attached are (a) assets held by ERS and (b) the $190.4 million ERS transferred to the Commonwealth.  Claimants' conclusory statements that other ERS assets were transferred to the Commonwealth cannot survive the Motion.

13.     The Bondholders allege in the Response, for the first time, that the Post-Petition Legislation "eliminate[d] the $411 million-plus claim that ERS had against the Commonwealth for failure to make mandatory employer contributions[.]"  Response at 36.  This is nothing more than sleight of hand.  The lowercase "employer contributions" Claimants reference are not the Employers' Contributions constituting the Accounts Receivable, which the Oversight Board acknowledges is subject to the Bondholders' security interest.  Rather, they are AUC receivables. ERS, *Annual Financial Information Fiscal Year 2016*, at 13 n.1 ("The Commonwealth owes ERS more than $411 million on account of *Additional Uniform Contribution* (AUC) payments that ERS no longer receives.") (emphasis added) (cited in the Response at 5 n.5).  As explained above, the

---

[3] Over the last three years, the Bondholders, in discovery related to ERS's financial condition and the Post-Petition Legislation, have received more than two hundred thousand pages of documents spanning from before the 2008 bond issuance to the present.  To date, the Bondholders have taken the 30(b)(6) deposition of ERS **three times** on financial issues, first in 2017, second in 2019 and again in June 2020.  In 2019, the 30(b)(6) deposition of ERS also specifically covered the Post-Petition Legislation and any transfers made by ERS to the Commonwealth in connection therewith, as did the 30(b)(6) depositions the Bondholders took of AAFAF and the Commonwealth (for which the designated witness was an official from Puerto Rico's Department of Treasury).  After receiving such extensive discovery, it is unjustifiable for the Bondholders to make an assertion that has no factual basis and is contradicted by the discovery they received.

Bondholders do not have a security interest in the AUC or AUC receivables.  Nor do the Bondholders have standing to assert a claim against the Commonwealth for these amounts, as the claim belongs to ERS, not the Claimants.  And even if they did, any claim against the Commonwealth for unpaid AUC is unsecured and arose prepetition, meaning that the Commonwealth's obligation is governed by Title III of PROMESA and was not "eliminated" by the Post-Petition Legislation.  Response at 8.

14.     Claimants also assert that "Act 106 . . . purports to cancel all past due employer contributions owed to ERS and to make those amounts satisfied by payment of Pay-Go Fees" effectuating a "transfer[] [of] Accounts Receivable [from ERS] to the Commonwealth[,]" depriving them of "potentially billions of dollars of Claimants' collateral."  Response at 15, 34 (citing section 2.5 of Act 106).  Claimants identify no factual basis for this allegation in the thousands of documents they received concerning ERS's receivables or extensive deposition testimony (including a deposition of ERS's most senior finance employee in June 2020) in the Lien Scope AP—or elsewhere.  Claimants have identified no Accounts Receivable (or any other receivables) which have actually been cancelled pursuant to this provision, because none have.

15.     Further, Claimants significantly overstate the effect of section 2.5 of Act 106.  They assert that two government agencies owed ERS almost a billion dollars of unpaid employer contributions that may have been cancelled or transferred from ERS to the Commonwealth.  Again, they do not find support in any ERS financial records or depositions, but rely on a snippet from a 2011 statement of motives drafted by the Legislative Assembly for pension reform legislation.  In any event, the value of accounts receivable held by ERS and subject to Claimants' security interest will be distributed to them pursuant to a plan of adjustment notwithstanding anything provided for in the Post-Petition Legislation.

> ii. **Additional Uniform Contributions Are Not the Bondholders'
> Collateral, and Even if They Were, Claims Based on AUC Are
> Precluded by the Section 552 Decision.**

16.      Claimants also argue that their asserted security interest in the AUC payable after

the ERS Petition Date remains unaffected by Section 552 Decision because, after the Bondholders

sought a rehearing *en banc*, the First Circuit added a footnote declining explicitly to rule on the

AUC.   But the logic of the Section 552 Decision remains undisturbed and leaves no doubt

Claimants' have no security interest in the AUC.  The First Circuit held the Bondholders' security

interest is limited "to those contributions payable to the System pursuant to Sections 2-116, 3-105,

and 4-113 of the Enabling Act."  *Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob.

Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 948 F.3d 457, 467 (1st Cir.

2020).   The AUC are not payable pursuant to any of those three sections, and accordingly, the

Bondholders lack any interest therein.

17.      Even if AUC were subject to Claimants' security interest, section 552 prevents such

security interest from attaching to *postpetition* AUC.  The First Circuit rejected the notion that the

"right to receive" payments required by a statute was property because that right was a mere

expectancy depending on future uncertain events, and was a function of legislation that, as the

original bond purchasers were warned in advance, could be changed by a subsequent legislature.

*In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d at 468–69 ("the Bond Resolution explicitly

states that the legislature of the Commonwealth might reduce (or, by implication, eliminate)

Employers' Contributions, and so adversely affect the Bondholders") (internal quotation marks

and alterations omitted).  Thus, postpetition AUC cannot be proceeds of a "right to receive."  Nor

could postpetition AUC be proceeds of any obligation of employers to reduce ERS's actuarial

deficit for the same reason, and because the statutory provisions regarding the actuarial deficit do

not mandate payments. *Id.* at 470 ("there is no security interest granted by the Security Agreement in payments on any purported employer obligation to pay down the actuarial deficit").

        **iii.**      **Disputes Regarding Scope and Value of Collateral Are Irrelevant to Assertions of Administrative Claims.**

18.    Claimants assert the Commonwealth's promise to return any assets determined to be the Bondholders' collateral is insufficient because there is disagreement on both the scope and value of their collateral. Response at 16. But the Bondholders do not explain why these disagreements matter. Issues regarding the scope or value of collateral are not properly adjudicated in a proof of claim or a motion for payment of administrative expenses. In fact, the Bankruptcy Rules explicitly require that "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" must be determined through an adversary proceeding, Fed. R. Bankr. P. 7001(2), and the parties have agreed to resolve those issues in the Lien-Scope AP.

19.    Disputes over value of the assets in which the Bondholders might have a security interest are premature and irrelevant here. If the Bondholders have a secured claim, they will receive any value to which they are entitled in a plan of adjustment, which must comply with section 1129(b)(2)'s protections for secured claimholders. PROMESA § 314(b) (incorporating section 1129(b)(2) through PROMESA § 301(a)). Though the Oversight Board has conceded Claimants have a security interest in ERS's accounts receivable for prepetition Employers' Contributions, those accounts receivable are unsecured, their collection is uncertain, and they may be worth only pennies on the dollar. This is because, as the First Circuit explained, ERS's remedy (i) for unpaid municipal Employers' Contributions is to seek payment from CRIM, and (ii) for other unpaid Employers' Contributions is to seek payment from the Commonwealth. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d at 466 ("The Enabling Act's provisions do not accord the System any remedy or mechanism to collect delinquent Contributions."). Specifically, "upon

receiving a certificate of debt from the Administrator of the System, it [CRIM] . . . is obligated to pay the delinquent Employers' Contributions of municipalities on or before the fifteenth (15) day of each month. . . ." *Id.* at 465 (internal quotation marks omitted). Similarly, it is the Commonwealth's Secretary of the Treasury who must pay the delinquent Employers' Contributions of "an agency, public corporation, or any [Commonwealth-level government] entity . . . ." *Id.* (internal citations omitted).

20.     In any event, the Bondholders do not explain how a dispute over the value of collateral can give rise to an administrative claim, let alone any claim. To the extent they argue the value of their collateral has diminished (it has not), the appropriate course of action was to seek adequate protection; if such protection is provided, but the creditor still has a claim arising from the stay of action against property, that claim may be entitled to administrative expense priority. 11 U.S.C. § 922(c). However, ERS has not needed to provide adequate protection in connection with the ERS Petition Date assets, and the Bondholders' latest motion to lift the automatic stay or provide adequate protection was denied in light of the Section 552 Decision, because they did not allege and prove a security interest entitled to adequate protection that was diminishing in value due to the automatic stay or the debtor's use, sale, or lease of the property. [Case No. 17-bk-3566, ECF No. 640].[4]

> iv.     **Any Rights Claimants May Have as Unsecured Claimholders Against ERS Cannot Result in Claims Against the Commonwealth.**
>
> a.     **Claimants Do Not Have Unsecured Claims Against ERS.**

---

[4] When the Bondholders brought their motions seeking to lift the stay for adequate protection, their briefing focused on their alleged rights in the PayGo Payments and did not address ERS Petition Date assets. [Case No. 17-bk-3566, ECF No. 583].

11

21.     Claimants argue "the Post-Petition Legislation also sharply diminished, if not eliminated, Claimants' ability to be repaid on unsecured claims against ERS[,]" which alleged rights are not impaired by the Section 552 Decision.  Response at 18.  As explained in the Motion and in the Oversight Board's response, incorporated here, to Claimants' Rule 12(c) Motion, Claimants alleged rights based on unsecured claims they do not hold because their recovery is limited to their collateral.  [Case No. 17-bk-3566, ECF No. 932] (the "Rule 12(c) Response").  As set forth in the Motion and below, purported breaches of the Resolution and related alleged harms all arising therefrom do not create a recourse claim where the Resolution itself does not provide for one.  Rule 12(c) Response ¶¶ 42–56.  Additionally, section 1111(b) of the Bankruptcy Code does not provide them a recourse claim, as they contend.  Instead, section 1111(b)(1)(A)(ii) applies automatically when a claimants' collateral is sold pursuant to a plan, as would be Claimants' collateral under the Plan if it is confirmed.  Rule 12(c) Response ¶¶ 27–28; *see also* 11 U.S.C. § 1111(b)(1)(A)(ii).  As a practical matter, there is no reason ERS would propose any plan that does not sell the collateral unless it is sold before a plan is confirmed.  The pre-plan or plan sale avoids the recourse claim.

22.     Claimants also argue, without citing any authority, that notwithstanding the Section 552 Decision, they "retain their contractual right to be paid from post-petition employer contributions" and can assert unsecured claims against assets that would have constituted collateral outside of bankruptcy.  Response at 19.  But those rights do not "remain enforceable" postpetition, as Claimants allege.  Bankruptcy impairs contracts, such as the Resolution, and Claimants' recovery is governed by Title III of PROMESA, which provides nonrecourse creditors the proceeds of a perfected security interest in their collateral when assets of the debtor are sold.  In any event, the Bondholders do not explain how they are unsecured claimants with respect to certain

of ERS's assets (like the postpetition Employers' Contributions in which they have no security

interest) but not others, or how an unsecured claim against those assets provides them with recourse

against ERS.  Nonrecourse debt instruments provide rights to payments, which are always backed

by (alleged) *collateral*; there is not a separate, unsecured right to monies to be paid in the future.

In other words, the Bondholders have only one claim: a secured claim, and section 552 limits the

collateral subject to that secured claim but does not sever it into a secured claim and an unsecured

claim.[5]  11 U.S.C. § 502(b)(1); *see also* David Gray Carlson, *Bankruptcy's Organizing Principle*,

26 Fla. St. U.L. Rev. 549, 583 & n.140 (1999) ("If *A* has no recourse, then avoidance of the lien

means that *A* has no claim in the bankruptcy at all.").

> **b.    Even if Claimants Have a Deficiency Claim Against ERS,
> Unsecured Claimholders Have No Rights Against Third Parties
> (Such as the Commonwealth) Who May Have Harmed ERS.**

23.    Claimants argue they have claims against the Commonwealth based on "its

independent violations of the U.S. and Puerto Rico Constitutions, the Bankruptcy Code,

PROMESA, and Puerto Rico tort and fraudulent transfer law."  Response at 21–22.  Any acts

committed by the Commonwealth would have harmed only ERS directly, however, and the

Bondholders merely derivatively.  Unsecured claimholders (the Bondholders) of a debtor (ERS)

have no rights against a third party (the Commonwealth) that may have harmed the debtor.  That

right belongs solely to ERS.  As this Court previously held, a creditor of a creditor lacks standing

to assert the rights of the latter.  *See BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for

P.R.)*, 301 F. Supp. 3d 306 (D.P.R. 2017).  Circuit courts have consistently held party-in-interest

---

[5] Even if the Bondholders are right, and they can assert claims against ERS with respect to the Pledged Property held
by ERS, including Employers' Contributions in which they lack a security interest, the Employers' Contributions were
eliminated on July 1, 2017, roughly six weeks after the ERS Petition Date (May 21, 2017).  Accordingly, at best, this
allegation grants the Bondholders an unsecured claim against ERS in the amount of Employers' Contributions
received from May 21, 2017 to July 1, 2017

standing under Bankruptcy Code section 1109(b) does not arise if a party seeks to assert a right purely derivative of another party's rights in the bankruptcy case. *See Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 118 (2d Cir. 2007) ("Bankruptcy court is a forum where creditors and debtors can settle their disputes *with each other.* Any internal dispute between a creditor and that creditor's investors belongs elsewhere.") (emphasis in original); *S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 61–62 (S.D.N.Y. 1997) ("The concept [of party-in-interest standing] does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors. . . [Appellant] cannot establish standing by raising another person's legal rights.") (internal quotation marks and citations omitted). This reasoning is obvious—the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor is trying to do with its rights.

24.     Further, the Bondholders have tried, and failed, to obtain appointment as trustee to bring avoidance and other actions against the Commonwealth for enacting the Post-Petition Legislation. *Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 954 F.3d 1, 5 (1st Cir. 2020). The appointment of a trustee under section 926 of the Bankruptcy Code is the only vehicle for an unsecured claimholder to assert claims against a third party under PROMESA. Claimants lack standing to assert ERS's claims against the Commonwealth.

**c.     It Is Speculation to Assert that Unsecured Claimholder Recoveries Were Diminished by the Post-Petition Legislation.**

25.     Even if Claimants had standing, their theory—that their recovery as unsecured claimholders against ERS was diminished by the Post-Petition Legislation and unaffected by the Section 552 Decision—is speculative at best. Claimants argue that ERS would have had more assets to distribute to unsecured creditors than it currently has if the Post-Petition Legislation were

14

not enacted.  For starters, Claimants ignore the reality that the Commonwealth's pension funds

were nearly depleted (and now are).  Given that fact, with or without the Post-Petition Legislation,

it is inconceivable that governmental employers would use their scarce resources to pay the

Bondholders rather than their own retirees.  To plead such a bizarre claim, Claimants must assume

ERS remains obligated to pay pensions to retirees and the amounts of payments it receives from

employers would exceed the pension payments.  Claimants cannot make such an allegation as the

shortfall between collections and pension payments is the root cause of the Commonwealth's

pension crisis.  *See, e.g.*, ERS, *Annual Financial Information Fiscal Year 2016*, at 1 (noting that

in the Fiscal Year ended June 30, 2016, ERS paid $1.627 billion in benefits against only $1.209

billion in net contributions and investment gains, and "the System's net assets held in trust for

pension benefits decreased by approximately $584 million").  In addition, Claimants would have

to credibly allege how their recovery would be impacted by the Retiree Committee's $58.5 billion

claim against ERS.  *See* Proof of Claim No. 21534; *see also*, *infra* n.18.  Obviously, any diminution

of ERS's unsecured claimholders' recovery caused by the Post-Petition Legislation, as opposed to

the pension system's lack funds to pay retirees, is pure speculation that cannot support a cause of

action.  *See Zenon v. Guzman*, 924 F.3d. 611, 615–16 (1st Cir. 2019) (a complaint must be based

on non-conclusory, non-speculative facts to defeat a motion to dismiss).

> **B.**     **The Post-Petition Legislation Does Not Give Rise to Any Administrative Claims Against ERS or the Commonwealth or Claims That Are Nondischargeable.**

26.     In their Response (and by incorporation, their Rule 12(c) Motion), Claimants rely

on the *Reading* Supreme Court case to attempt to establish entitlement to administrative expense

priority.  Response at 23–34 (citing *Reading Co. v. Brown*, 391 U.S. 471 (1968)).  *Reading* is not

remotely applicable here and provides Claimants no support.  In *Reading*, the bankruptcy trustee's

postpetition tort liability was held to be an administrative expense.  Otherwise, it would be unsafe

to do business or to interact with a bankruptcy trustee or postpetition debtor in possession. Here, the Commonwealth determined to default on a prepetition obligation to make Employers' Contributions to pay prepetition debt. The Post-Petition Legislation is nothing more than a determination by the Commonwealth that itself and its instrumentalities should no longer honor a prepetition obligation to make Employers' Contribution to pay ERS Bonds issued prepetition. If a default on prepetition debt creates a postpetition administrative claim, then all prepetition claims become postpetition administrative claims whenever the debtor determines postpetition not to pay them. At its core, that is what Claimants are urging. Nonsense.

27.    As explained above, Claimants also contend ERS breached or rejected a prepetition obligation to resist a legislative amendment terminating Employers' Contributions to ERS. Breaching prepetition obligations postpetition does not give rise to administrative claims. *In re Jeans.com*, 491 B.R. 16, 24 (Bankr. D.P.R. 2013); *see also* Motion ¶¶ 37–55. As aforesaid, otherwise, every postpetition nonpayment of prepetition obligations would lead to administrative claims. Knowing this, Claimants attempt to bifurcate their claims into contractual and so-called "non-contractual" causes of action. *See* Response at 23–24. For the reasons herein and those in the Rule 12(c) Response, which are incorporated fully herein, Claimants' arguments should be rejected.

28.    Claimants rely on *In re Hemingway Transportation, Inc.*, 954 F.2d at 7, to argue there is no prepetition genesis with respect to their assertions against the Commonwealth or with the "non-contractual" assertions against ERS. Response at 24. Of course, the ERS Bonds were issued prepetition, the obligations of employers to make contributions to ERS were prepetition obligations, and ERS's covenant to resist adverse legislation was a prepetition covenant. In *Hemingway Transportation*, a chapter 11 debtor sold a piece of real property the debtor had

16

previously leased and then purchased prepetition.  954 F.2d at 3.  After conversion of the chapter

11 case, a chapter 7 trustee was faced with a contribution action for environmental cleanup by the

purchaser, and sued the former owner/landlord in connection with its prior ownership.  *Id.* at 4.

When the trustee's suit failed because of an indemnification clause in the prepetition lease between

the debtor and former owner, the former owner made an administrative expense claim for

attorneys' fees in defending the trustee's suit.  *Id.*  The First Circuit noted that requests for

administrative expense priority must be strictly construed and rejected application of *Reading*

because the former owner's "attorney fees were incurred. . . . based on [the former owner's]

*prepetition* ownership . . . ." *Id.* at 7.  Even though the trustee's postpetition suit was based on the

trustee's own attempts to maximize liquidation value, the prepetition ownership of property gave

the claim a prepetition genesis.  Like the claims in *Hemingway Transportation*, the claims here

against both the Commonwealth and ERS are based on the Resolution, a prepetition contract, and

prepetition statutes requiring payment to ERS.

29.     More fundamentally, Claimants' bifurcation logic defies *Reading* itself.  *Reading*

is a "special category" of administrative expenses based on considerations of fundamental fairness.

*In re Hemingway Transp., Inc.*, 954 F.2d at 5.  The justification for creating this special category

is that "a bankruptcy estate is operated for the benefit of its general creditors, and that those injured

by the operation of the estate should be made whole before the creditors receive their own shares."

*Mass. Div. of Emp't & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.)*,

291 F.3d 111, 124 (1st Cir. 2002).[6]  Claimants cite no authority for severing "non-contractual"

---

[6] Courts have at times pointed to the governmental interest in public health and safety to justify application of *Reading* in environmental context.  *See Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1457–59 (11th Cir. 1992) (discussing cases).  Unlike those cases, the enforcement of Claimants' private monetary interests further weighs against the application of *Reading*.  *See In re Old Carco LLC*, 424 B.R. 633, 647 (Bankr. S.D.N.Y. 2010) ("here the Affected Dealers are attempting to advance their private interests and rights under the state Dealer Laws, as opposed to an effort to advance a state's interest in protecting the health and safety of the general public.  Even less is there any imminent and identifiable hazard presented.  Therefore, the analysis of the cases

assertions from contractual assertions, which arise from the same facts. Most fundamentally, Claimants nowhere explain how the Commonwealth and ERS's postpetition defaults on prepetition obligations can possibly elevate the prepetition claims into administrative claims and why that would not obliterate all bankruptcy law.

### C.   The Bondholders' Claims Are Preempted by PROMESA.[7]

30.     As the Resolution and Official Statement acknowledged, statutory appropriations could be changed at any time by the Legislature, and the Bondholders were aware of this risk. *See* Ex. B at VI-16 (Resolution § 709); Ex. B at 26 (Official Statement); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d at 468–69. Once PROMESA was enacted and the Oversight Board was formed, the power to appropriate and control expenditures (including any standing appropriations) was given to the Oversight Board, regardless of any Puerto Rico law (including the Post-Petition Legislation).[8] Without this basic power there would be no ability to effectuate and implement a balanced budget that would lead to restructuring of the Commonwealth's obligations and eventually to market access. As the First Circuit has held, under PROMESA, "[s]imply put, . . . there can be no spending from sources not listed in [a certified] budget, regardless of what any territorial laws say." *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019). The Oversight Board subsequently certified fiscal plans and budgets that did not provide for Employers' Contributions.

---

that extended the *Reading* rationale to situations involving environmental hazards is not applicable.") (citations omitted).

[7] The Bondholders contend that the Debtors' preemption arguments are untimely and have been waived. Response at 25. But this is incorrect. The Initial Procedures Order set an objection deadline to object to the ERS Bond Claims. [Case No. 17-bk-3283, ECF No. 8818-2 at 2]. It did not restrict the Debtors' ability to raise arguments in its Motion to Dismiss or in response to the Administrative Expense Motions.

[8] Contrary to the Bondholders' assertion that preemption of appropriations is limited to the Commonwealth, Response at 26, PROMESA Title II applies to all covered territorial instrumentality (as defined in PROMESA §5(7)), and each of their budgets is certified by the Oversight Board pursuant to PROMESA.

31.     The Motion establishes that the statutes requiring Employers' Contributions or other payments to ERS were preempted by PROMESA.  In response, the Bondholders do not dispute that PROMESA "preempted any Commonwealth budget that might have sought to appropriate employer contributions."  *See* Response at 26.  Rather, they argue in conclusory fashion that "[w]hatever the reason, failure to actually appropriate those funds neither abrogates nor suspends the Government's pre-existing commitment to pay . . . [a]nd that obligation remains enforceable in the courts." *Id.* at 26–27 (citations and internal alternations omitted).  But the cases Movants cite are all non-bankruptcy cases; in bankruptcy, obligations—even statutory obligations—are breached and are unenforceable. *See Ohio v. Kovacs*, 469 U.S. 274, 279 (1985) (holding breach of statute and court order gave rise to dischargeable unsecured claim, and rejecting argument that breach should be treated differently because it "was a breach of the statute, not a breach of an ordinary commercial contract which concededly would give rise to a claim" that was dischargeable in bankruptcy).  Further, preemption does not eliminate the Bondholders' claims against ERS; it merely overrides the Commonwealth's obligation to appropriate money for employer contributions.  The Bondholders' argument that a security interest would continue to attach to accumulated accounts receivable arising from preemption ignores the Section 552 Decision, which prevents the security interest from attaching as of the ERS Petition Date.  Even if the Employers' Contributions were still being made, they would not help Claimants due to the Section 552 Decision.  The Commonwealth cannot be held liable for not making appropriations that were preempted by PROMESA.[9]   Put differently, if by operation of federal law, the

---

[9] The Bondholders' argument that "the Post-Petition Legislation did not purport to repeal the Puerto Rico statutory provisions on which Claimants based their claims," Response at 29, is inapposite.  The Oversight Board does not argue that pre–Post-Petition Legislation acts have been repealed (either explicitly or implicitly); rather appropriations under them have been preempted.

19

Commonwealth is prohibited from making appropriations to ERS (as it is), then the Commonwealth cannot be liable for not making such appropriations, as any obligation to appropriate money has been preempted.  Contrary to the Bondholders' argument, Response at 26–27, preemption of the Commonwealth's appropriation obligations does not change ERS's obligations under the Resolution or the scope of the Bondholders' security interest.  The claim remains the same, and preemption merely prevents appropriations from flowing into ERS.  Notably, these contributions were owed to ERS, not to the Bondholders, who cannot assert ERS's rights.  *See supra* ¶ 23.  Finally, the statutory obligation to make Employers' Contributions or other payments (if any) originated prepetition, and therefore can, at most, give rise to only a prepetition unsecured claim against the Commonwealth, which can be discharged through a plan of adjustment.  *See Kovacs*, 469 U.S. at 279.[10]

### D.   The Bondholders' Other Arguments Are Meritless.

32.   Repeatedly, the Bondholders seek to insert issues in this proceeding that will be resolved in the Lien-Scope AP and the *Ultra Vires* AP.  *See* Response at 2 (arguing that the value of their security interest "can only be resolved" in this proceeding); *id.* at 30–31 (seeking to maintain *ultra vires* claims in this proceeding).   But as explained above, the value of the Bondholders' collateral has no place in a motion for allowance and payment of an administrative expense claim, or claims for breaches of contract or violations of law, and cannot be determined in this proceeding.  *See supra* ¶ 7.  All claims with respect to the Bondholders' alleged interest in ERS Petition Date assets should be dismissed here, because the Lien-Scope AP will determine to

---

[10] *See also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (continuing right under statute to pay installment payments for FCC license is dischargeable unsecured claim); *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552 (1990) (statutory criminal restitution obligation dischargeable as unsecured claim); *In re Berry Estates Inc.*, 49 B.R. 1002 (S.D.N.Y. 1985) (penalty for violating statute regarding rent limits dischargeable).

which assets their security interest attaches, and a plan of adjustment or a pre-plan transaction will provide for treatment of that secured claim in accordance with PROMESA section 314.

33.    Similarly, claims regarding whether the ERS Bonds' issuance was *ultra vires* should also be dismissed here.  "Claimants agree that the *ultra vires* issues should be decided by the *ultra vires* litigation."  Response at 30.  It is not judicially efficient to continue those parallel claims in this proceeding, too.  While Claimants suggest that dismissal could somehow prejudice them, *id.*, they nowhere explain what prejudice might befall them if the *ultra vires* claims are dismissed here.[11]

## II.    THE CLAIMS ASSERTED AGAINST THE COMMONWEALTH SHOULD BE DISMISSED.

### A.    Claimants Have Failed to State a Claim that the Commonwealth Is Liable for Claims Based on the Post-Petition Legislation.

34.    Claimants assert no less than sixteen legal theories of liability against the Commonwealth.  All should be dismissed.

#### i.    Claimants Have Failed to State a Claim that the Commonwealth Violated the Automatic Stay.

##### a.    The Post-Petition Legislation Was a Valid Exercise of Legislative Authority and is Exempt Under Bankruptcy Code § 362(b)(4).

35.    In the Motion, the Oversight Board showed that Claimants could not be damaged by any alleged stay violation because (i) Claimants lacked any interest in the statutory payment

---

[11] Claimants also allege that none of the bases asserted in the Supplement is untimely, by arguing that a claim is simply the right to payment under the ERS Bonds or Post-Petition Legislation, and that every theory supporting such alleged right is the "basis" for such claims.  Response at 31.  But Claimants' word games are belied by the Claims Scheduling Order, which provides that "[w]hile the Supplements can explain and provide additional support for the 'additional *claims'* identified in [specific paragraphs of certain pleadings,] the Supplement cannot identify new claims, and if it does identify new claims, the Government Parties and Committees reserve their rights to object to those claims, including as untimely."  [Case No. 17-bk-3283, ECF No. 12446 at 3–4] (emphasis added).  And Claimants assert theories which are untimely, such as claims arising under the Purchase Contract, which were not mentioned in the proofs of claim filed by the ERS Bondholders.

obligations in favor of ERS and (ii) the Commonwealth's exercise of its legislative power does not violate the automatic stay.  Claimants nevertheless assert that the Post-Petition Legislation ordered the transfer of all of ERS's assets and the "conversion or cancelling of Accounts Receivable" and that PROMESA sections 303 and 305 do not apply to transfers of property.  Response at 34–35. But Claimants do not and cannot allege that assets were transferred or cancelled (other than the transfer of $190.4 million).

36.     Claimants argue that the Post-Petition Legislation was not a valid exercise of legislative power but was enacted to eliminate claims against ERS and the Commonwealth.  They allege no facts to support this accusation, which squarely contradicts the legislature's statement of motives.  *See infra* ¶¶ 76, 80.  The Bondholders state they will seek discovery to show that this statement of motives was somehow a sham, but the legislative record is publicly available.  Other than the statutory text and, perhaps, the legislative history (if the Court deemed it necessary to review), nothing else could be used to interpret the purpose of the Post-Petition Legislation.  As "[s]tatutes are not contracts," "it is the intent of the legislature and not of any other 'party' which is decisive in their construction."  *Midland Nat'l Life Ins. Co. v. Citizens & S. Nat'l Bank*, 641 F. Supp. 516, 520 (M.D. Ga. 1986) (citation omitted).  The legislative intent, of course, is reflected in the text of the Post-Petition Legislation, including in the statement of motives.  Reliance on any other party's interpretation or understanding of "intent" would be irrelevant and wholly inappropriate.  *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (rejecting reliance on "post-enactment legislative history" in interpreting the National Childhood Vaccine Injury Act).  Moreover, the Bondholders fail to acknowledge that in 2019 the Court permitted discovery into the Post-Petition Legislation's purpose as part of the Bondholders' lift stay proceedings, but the Court limited that discovery because questions regarding the Bondholders' rights "will turn

22

principally on the interpretation and application of the terms of the applicable Bond Resolution and Commonwealth statutes."[12]  Having failed even to acknowledge these facts, Claimants utterly fail to explain how any more discovery is warranted or why the Court should revisit its prior well-reasoned decisions.

37.     Further, the Bondholders' argument that Bankruptcy Code section 362(b)(4)'s exemption for "actions" does not encompass legislative proceedings, Response at 40, ignores the only case to specifically address the issue.  Claimants' statutory interpretation and citation to the legislative history of section 362(b)(4), Response at 40–41, interprets an outmoded version of section 362(b)(4).  As courts have recognized, Congress amended section 362(b)(4) in 1998 to expand the exception to acts under sections 362(a)(3) and (6).  *See SEC v. Brennan*, 230 F.3d 65, 74 (2d Cir. 2000) (explaining through the 1998 amendment Congress "expand[ed] the scope of the exception to cover proceedings 'to obtain possession of property of the estate . . . or to exercise control over property of the estate' otherwise stayed").  "Thus, the current statutory language expressly contemplates allowing government regulatory and police action to obtain possession of property of the estate . . . or to exercise control over property of the estate." *Emerald Casino, Inc. v. Ill. Gaming Bd. (In re Emerald Casino, Inc.)*, 2003 U.S. Dist. LEXIS 23216, at *24 (N.D. Ill. Dec. 23, 2003) (internal quotation marks omitted).

38.     Finally, Claimants argue (again, directly contrary to Act 106's statement of motives) that the Post-Petition Legislation was enacted for a pecuniary purpose.  *See infra* ¶ 76.  Therefore, Claimants' citation to *Nortel Networks*, Response at 42, is inapposite, as the Post-Petition Legislation was not an instance of a "government primarily seek[ing] to protect a

---

[12] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 390 F. Supp. 3d 311, 324 (D.P.R. 2019) (citing *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3283-LTS, 2019 WL 3565942, at *2–3 (D.P.R. June 5, 2019)).

pecuniary governmental interest in the debtor's property [.]" *In re Nortel Networks, Inc.*, 669 F.3d 128, 139–40 (3d Cir. 2011). Similarly, *In re City of Stockton*, which the Bondholders cite to argue that section 303 and 305 of PROMESA do not exempt the Post-Petition Legislation from review because it "extend[s] to financial relations between the state and its municipalities," Response at 35 (citing 526 B.R. 35, 54 (Bankr. E.D. Cal. 2015)), is not on point, as the Post-Petition Legislation was enacted to ensure pension benefits could be made to retirees. Further, as stated above, any discovery cannot establish motives not stated by the legislature.

> **b.  Even if the Commonwealth Violated the Automatic Stay (Which It Did Not), Claimants Have Not Been Damaged and Lack Standing to Assert a Violation.**

39.     Claimants' allegations that the Post-Petition Legislation violated the automatic stay are deficient because, even if true, Claimants suffered no damages. As explained above, the Post-Petition Legislation did not impair the Bondholders' security interests with respect to future Employers' Contributions or AUC as the Section 552 Decision precluded those interests' postpetition attachment. *See supra* ¶ 4. Further, their theory that the ERS Bonds are recourse to a "stream of income under the Bond Resolution," Response at 34, is incorrect, and does not form the basis of any damages arising from the Post-Petition Legislation. *See supra* ¶ 22.

40.     Additionally, any alleged cancellation of Accounts Receivable, Response at 34, even if true (which it is not), is irrelevant. As explained above, the Lien-Scope AP will determine in which assets the Claimants have a security interest as of the ERS Petition Date and the Plan will provide the Bondholders the value of their collateral notwithstanding the Post-Petition Legislation. *See supra* ¶¶ 11–12. Claimants therefore lack standing to enforce ERS's automatic stay.

> **ii.  The Post-Petition Legislation Does Not Violate the Contracts Clause.**

41.     The Bondholders do little to address the objective fact that the disclosures accompanying the bond offering, combined with Puerto Rico's long history of regulating the

24

pension system, put investors on notice that any contractual rights associated with the ERS Bonds

could be substantially impaired by future legislation.  Nor can the Bondholders credibly dispute

that the Post-Petition Legislation was reasonable or necessary to ensure the ability of the

Commonwealth to make payments to retirees and beneficiaries, as ERS had long been underfunded

and was at a critical risk of insolvency.

> **a.     The Post-Petition Litigation Did Not Substantially Impair the Bondholders' Reasonable Expectations.**

42.     The Bondholders fail to establish that the Post-Petition Litigation operated as a

substantial impairment of their rights relative to their reasonable expectations when entering into

the debt agreements.  "One whose rights, such as they are, are subject to state restriction, cannot

remove them from the power of the State by making a contract about them."  *Energy Reserves*

*Grp., Inc. v. Kansas Power & Light Co*., 459 U.S. 400, 411 (1983).

> **1.     The Bondholders' argument that their contractual rights were substantially impaired ignores the objectively reasonable expectations of the parties at the time the contract was entered into.**

43.     The Bondholders argue, Response at 44–46, that the Post-Petition Legislation

substantially impaired their rights under the Resolution by diverting the funds that ERS would

have used to make payments to them.  But that argument fails to address the relevant inquiry:

whether the Bondholders had notice that legislation could impair their contractual right to receive

payments based on ERS's receipt of Employers' Contributions.  Their own allegations establish

that they did.

44.     The Bondholders concede that they "were on notice that the Commonwealth might

reduce the contribution rate in a way that would adversely affect employer contributions. . . ."

Response at 47.  Indeed, the Official Statement warned potential investors that ***"[t]he Legislature***

***of the Commonwealth could reduce the Employer Contribution rate or make other changes in***

25

*existing law that adversely affect the amount of Employer Contributions*," Ex. B at 26 (Official Statement) (emphasis original)—a warning that is confirmed in the Resolution's provision establishing that the Employers' Contribution rate was only "initially" set at 9.275% of the Covered Payroll.   Ex. B at VI-33 (Resolution).   The Official Statement also warned the Bondholders that the Commonwealth "could make changes to the Act that are adverse to the Bondholders, including reducing the rate at which participating Government Employers are required to contribute to the System[,]" and that if such a change was made, "the ability of the System to pay debt service on Bonds when due could be adversely impacted." Ex B. at 26 (Official Statement).   The Official Statement even went so far as to alert the Bondholders that conditions which could reduce the Employers' Contribution rate included situations "where there is severe financial stress affecting one or more of the Government Employers." *Id.*

45.   The Bondholders provide no explanation why they would reasonably believe that any future decrease in Employers' Contributions could not reduce those contributions to zero, Response at 47, nor do they specify how much of a decrease they reasonably expected could occur (*i.e.*, would a reduction to 5% have been reasonable? 2%? .01%?).   Nor can they, as the plain language of the Official Statement and the Resolution sets no limit on the degree to which the Employers' Contributions rate could be decreased.   Without any such limiting language, neither the Official Statement nor the Resolution can be judged to do anything other than put the Bondholders on notice that the rate could be decreased even down to zero.   *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d at 468–69.

46.   The three cases on which the Bondholders rely are all inapposite because none of the debtors were in bankruptcy and none involved disclosure to creditors that the amounts they expected to receive under their contract could be reduced, unlike here.   There is no prohibition

against a Title III debtor determining to default on prepetition obligations.  In fact, it is the Title

III debtor's duty to do so.  Moreover, unlike here, none of Bondholders' authorities involved

creditors advised in advance that the source of their repayment may be legislated away.  In *Van*

*Hoffman*, an Illinois statute directed the city to levy a special tax for the sole purpose of generating

funds to pay annual interest on the bonds in question, and to use those funds "[for] no other purpose

whatsoever."  *Von Hoffman v. City of Quincy*, 71 U.S. 535, 536 (1866).  Unlike here, the city did

not expressly notify bondholders of the risk that the city might reduce the special tax used to repay

their bonds.  *Id*.  Similarly, in *Wolff*, there was no evidence that the bondholders were on notice

that legislation could be passed which would eliminate their special tax levy.  *Wolff v. City of New*

*Orleans*, 103 U.S. 358, 360 (1880).  Here, by contrast, the Bondholders made their investment

fully apprised of the fact that they assumed the risk that the Employers' Contributions (which were

collected for the primary purpose of paying pensions, not interest) would be reduced by future

legislation.[13]

47.    Although ERS and the Commonwealth are both Title III debtors and have every

right to default on their obligations to the Bondholders regardless of whether the Bondholders had

been forewarned of the risk, contrary to the Bondholders' unsubstantiated argument, Response at

47, the Oversight Board also correctly relies upon the Official Statement accompanying the

issuance of the bonds to establish that the ERS Bondholders were on notice that Employers'

Contributions were subject to change.[14]  The Bondholders provide no compelling reason that the

---

[13] *W.B. Worthen Co.* suffers from the same fatal distinction:  there is no evidence that the relevant contract put the
bond purchasers on notice that Arkansas might pass legislation reducing the penalties associated with bond payment
defaults.  *W.B. Worthen Co. ex rel. Bd. of Comm'rs of St. Improvement Dist. No. 513 of Little Rock v. Kavanaugh,*
295 U.S. 56, 59–60 (1935).

[14] Indeed, it seems that the Bondholders do not themselves truly believe the Official Statement is irrelevant to
establishing the parties' expectations given that they cite several passages in support of their own arguments.  *See,
e.g.*, Response at 49–50.

27

Official Statement should not inform the parties' reasonable expectations under the contract. Indeed, the Official Statement was attached to the Resolution when the Resolution was adopted, and neither document contains any provision to suggest the documents should not be read together as a whole.[15]  *See* Ex. B.

48.     The Bondholders' reliance on *Morton Arboretum v. Thompson* is unavailing.  Far from "expressly rejecting [an] argument that the Official Statement, rather than the Resolution, controls[,]" Response at 47, the court there merely held the plaintiffs could not rely on the specific language of that particular official statement as creating a contractual obligation because its language did not create an "obligation."  *Morton Arboretum v. Thompson*, 605 F. Supp. 486, 491 n.5 (N.D. Ill. 1984).  The plaintiffs attempted to characterize disclosures in the official statement regarding the possibility of early bond retirement as a contractual obligation, but both parties' descriptions of the statement reflected that the discussion of future prospects simply was not contractual in nature.  *Id.*  Nowhere did the court even address whether an official statement accompanying the issuance of bonds may inform the parties' reasonable expectations of obligations that actually exist under the contract.[16]

49.     Moreover, the Bondholders were well aware that ERS was in dire financial straits, the very issue that precipitated the desire for the bonds to be issued in the first place.  *See, e.g.*, Ex. B at 2 (notifying potential investors of the ERS's "$9.956 billion unfunded accrued actuarial

---

[15] Although the Bondholders point to § 1310 of the Bond Resolution in support of their argument, Response at 47, § 1310 repeals only resolutions "in conflict" with the Bond Resolution.  Ex. B at VI-28.  But far from conflicting with one another, the Official Statement and the Bond Resolution work in tandem to explicitly put the Bondholders on notice that the Employers' Contributions were subject to decrease without limitation.  Ex. B at 26 (Official Statement); Ex. B at VI-33 (Resolution).

[16] *United States v. Michigan*, 518 F. Supp. 966 (E.D. Mich. 1981), also is clearly inapposite.  In that case the court held that the provision of the official statement accompanying the issuance of bonds was, essentially, inapplicable to provide notice because it directly contradicted a previous regulatory provision setting forth certain bond terms. *Id.* at 970.  Here, the Official Statement does not contradict the Resolution, and the documents were not only issued simultaneously, but were attached to one another.

liability"). They were also aware of the fiscal issues facing the Puerto Rican government and its instrumentalities—the sole sources of repayment of their bonds, *id.*—and, in fact, were expressly warned that the worsening of the government's and its instrumentalities' financial condition might cause the Legislature to take action adversely affecting those contributions, *id.* at 26. Indeed, the First Circuit observed the risk and warning language in the Official Statement here and noted how the Bondholders received an above-market interest rate. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 948 F.3d at 464 n.2.

> **2.     The Bondholders' reasonable expectations is an objective question, which can be decided on a Motion to Dismiss.**

50.     Finally, the Bondholders' assertion that their expectations present a fact issue that cannot be resolved without discovery, Response at 47, is simply false. The evaluation of the parties' reasonable expectations is an objective inquiry, and therefore can be determined on a motion to dismiss. *See, e.g.*, *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete Through Ins. Comm'r of P.R.*, 125 F.3d 9, 14 (1st Cir. 1997) (affirming dismissal for failure to state a claim, finding that an act of the Puerto Rico legislature which dissolved the government entity with which plaintiff contracted did not violate the contracts clause—because plaintiff was aware when entering into the contract that the industry was heavily regulated and the "subject matter of the contract might well undergo further regulation," "it was reasonable to expect that the legislature could terminate [the government entity's] existence in the event that [it] did not fulfill its purposes, or a new crisis ensued"); *United States v. Giorgi*, 840 F.2d 1022, 1028 (1st Cir. 1988) (holding that although interpretation of a contract may sometimes be a question of fact, the analysis of the "reasonable expectations of the parties [based on the contract] can be ascertained under an objective standard").

29

51.     The Bondholders do not, and cannot, deny that legislative authority to regulate and alter public-employee benefits and municipal bonds is well-settled.  *Bayron Toro v. Serra*, 19 P.R. Offic. Trans. 646, 664 (P.R. 1987); *see also* Ex. G (*Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (P.R. 2013)) (both the bond resolution and the accompanying official statement made clear that legislation of the Commonwealth could reduce or adversely impact the employers' contributions). Both the Official Statement and the Resolution contained unequivocal language that the rate of the Employers' Contributions could be adversely affected by legislative action.  Ex. B at 26 (Official Statement); Ex. B at VI-33 (Resolution).  The Bondholders therefore cannot escape the conclusion that their reasonable expectations were not impaired by the Post-Petition Legislation.  *Energy Reserves Grp.*, 459 U.S. at 416 (rejecting Contracts Clause challenge by claimant that "knew its contractual rights were subject to alteration" because contracts "expressly recognize[d] the existence of extensive regulation by providing that any contractual terms [we]re subject to relevant present and future state and federal law").

52.     References in the Official Statement to the Enabling Act's requirements, which the Bondholders discuss at length, Response at 48, are immediately followed by a bolded warning that the legislature has the power to make changes in existing law, making the Enabling Act an unreliable source of security for bond purchasers that could be permissibly compromised.  Ex. B at 26 (Official Statement).  Further, language in the Official Statement stating that the legislature might choose not to reduce the Employers' Contribution rate, and that employers are bound to provide for the pensions of their employees, does not nullify the unequivocal language informing the Bondholders of the significant risk that the legislature would reduce the Employers' Contribution rate based on, among other things, a deterioration in the financial condition of the Commonwealth government and its instrumentalities, which is precisely what happened here.

Indeed, all of the potential protections listed in the Official Statement on which Bondholders rely, Response at 49, are qualified by a disclaimer stating only that the following factors "*may* . . . provide *some* protection to Bondholders[,]" Ex. B at 38 (Official Statement) (emphases added)— a far cry from guaranteeing those protections would immunize the Bondholders from future acts of the legislature that are specifically forewarned on the preceding page.

53.     Finally, the Bondholders' first-time vague and unsubstantiated references to the assurances of ratings agencies cannot create their claim.  Response at 48.  Such indisputably extrinsic evidence is irrelevant to the parties' reasonable expectations arising from the unambiguous plain language warning of the prospect that the legislature's power to reduce Employers' Contribution rates was unbounded.  *Filiatrault v. Comverse Tech., Inc.*, 275 F.3d 131, 137 (1st Cir. 2001) ("[e]xtrinsic evidence is generally inadmissible" where "[t]he dispositive question is purely a matter of interpreting unambiguous contract language").  And the Bondholders' assertion that they would never have purchased the bonds if they expected their contractual right to repayment would be impaired is not only illogical (investors spend hundreds of millions of dollars on risky investments across the nation every single day),[17] but also relies on an inaccurate premise:  far from lacking any hope of recovery, the Bondholders have their claims against ERS and those claims will be treated in accordance with Title III.  Motion ¶¶ 112–13.

> b.     **Even if the Bondholders' Interests Were Substantially Impaired, Which They Were Not, the Post-Petition Legislation Was Reasonable and Necessary.**

54.     The Bondholders fail to plead facts sufficient to support a reasonable inference that the Post-Petition Legislation was unreasonable or unnecessary to effectuate an important

---

[17] Indeed, such an exception would certainly swallow the rule, for what party to a contract negatively impacted by legislation would not also argue "if I had known I would not receive the consideration I desired under the contract, then why would I enter into the contract on those terms?"

governmental purpose.  As a preliminary matter, although "less deference" is owed where the state

has an interest in the contract allegedly impaired, the Legislature's decision that such legislation

is "reasonable and necessary" is still entitled to "meaningful deference."  *United Auto., Aerospace,*

*Agric. Implement Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 44 (1st Cir. 2011) ("*UAW*")

(dismissing contracts clause claim where "plaintiffs failed to plead sufficient facts from which a

court could reasonably infer that [the legislation] was unnecessary or unreasonable" after giving

meaningful deference); *accord*, *e.g.*, *Diaz-Diaz v. Fortuño-Burset*, No. 11-1632, 2012 WL

2498912, at *3 (D.P.R. June 27, 2012) (granting motion to dismiss and holding that "less deference

does not imply no deference to the state's decision") (internal quotation marks omitted).

55.     The Bondholders' assertion, Response 53–54, that the Post-Petition Legislation did

not serve an important public purpose is at odds with reality starting with the pension system

running out of funding.  A legitimate public purpose exists when the legislation is aimed to address

a "general social or economic problem."  *Energy Reserves Grp*., 459 U.S. at 412.  PROMESA

section 405(m) contains Congressional findings of a fiscal emergency in Puerto Rico and the

government's inability to provide its citizens with effective services.  There can be no doubt that

the fiscal crisis facing the Commonwealth is a general economic problem, nor that the goal of

ensuring benefits payments to retiree citizens addresses a general social problem.  The Post-

Petition Legislation's Statement of Motives explains that Act 106 was an exercise of the "Police

Power" to "safeguard the welfare of our retirees and public employees," "protect those who are

most vulnerable[,]" address "the serious economic and fiscal emergency situation of Puerto Rico,"

and "set Puerto Rico [o]nto a path of financial recovery."  Ex. F at 9 (Act 106, Statement of

Motives).  The Legislature concluded Act 106 "provides the legal framework that would allow us

to comply with the provisions and achieve the goals set for the Retirement Systems under the

32

[Oversight Board's] Fiscal Plan," which "establishes fiscal adjustments to stabilize Government finances at a time where there is no access to the financial market." *Id*. at 12.  And "[a]s Congress acknowledged, the Commonwealth's exceptional fiscal situation resulted in the passage of PROMESA, an unprecedented action which seeks to "protect a basic societal interest." *Ambac Assurance Corp. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 297 F. Supp. 3d 269, 287 (D.P.R. 2018) (finding on a motion to dismiss that Puerto Rico's adoption of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act to be reasonable and necessary to address the Commonwealth's present fiscal emergency), *aff'd*, 927 F.3d 597 (1st Cir. 2019), *cert. denied sub nom.*, *Ambac Assurance Corp. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 140 S. Ct. 856 (2020).

56.     The Bondholders' conclusory assertion that the Post-Petition Legislation is instead aimed at stealing funds from "disfavored creditors" to "financial[ly] benefit [] the sovereign[,]" Response at 53, ignores the stated reasons for the Post-Petition Legislation, which was to help fulfill the Commonwealth's responsibilities to provide services necessary to protect "those who are most vulnerable," and to prevent a situation where, "[i]f these measures [we]re not implemented, the social and economic welfare of Puerto Rico [would] suffer irreparable damages." Ex. F at 12 (Act 106, Statement of Motives).  This Court has recognized that allegations like the Bondholders' here do not "plausibly support an inference that the declarations of emergency conditions are mere subterfuges for nefarious conduct." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 297 F. Supp. 3d at 287–88 (rejecting allegations that Puerto Rico's adoption of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act was enacted "under cover of an emergency" to "protect 'particular individuals' rather than 'a basic societal interest'").  Even the authority on which the Bondholders rely recognizes that "the legislative interest in addressing a

33

fiscal emergency is a legitimate public interest[.]" *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006).

57.     Indeed, asserting the pensioners are a "favored group" while the Bondholders are "disfavored" simply ignores the reality that Puerto Rico is in a massive Commonwealth–wide fiscal crisis threatening the public health and safety of all Puerto Rican citizens, and that the Commonwealth has taken a broad panoply of actions, of which the Post-Petition Legislation is only one piece, to address that crisis for the benefit of all its citizens.  The Commonwealth is entitled to "meaningful deference," and the Bondholders have provided nothing more than wild conjecture that the Legislature's motivations are not precisely what it says. *Blank v. Eavenson*, 530 F. App'x 364, 370 (5th Cir. 2013) ("[s]peculation, however, is not the applicable pleading standard").[18]

58.     The Bondholders' alternative argument—that even if an important public purpose existed, the Post-Petition legislation was not reasonable or necessary to accomplish it under the factors set forth in *UAW*, 633 F.3d at 44, Response at 54–55—is also unavailing.  In *UAW*, the First Circuit explained that, courts should consider whether the legislation "(1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was

---

[18] Regardless, depriving hundreds of thousands of retirees of their pension and pushing them below the poverty line would have grave macroeconomic consequences on the Commonwealth and its ability to generate growth.  Indeed, because of the importance of pensioners chapter 9 cases have treated pensioners differently than general unsecured claimholders *See, e.g.*, *In re City of Detroit*, 524 B.R. 147 (Bankr. E.D. Mich. 2014) (approving classification and different treatment of pension claims, at approximately 60% recoveries, and general unsecured creditors at approximately 13% recoveries); *see also In re City of Stockton*, 526 B.R. at 60 (confirming plan providing nearly 100% recovery to pensions and 1% recovery to GUCs because the elimination of certain post-employment benefits showed pensioners were "sharing the pain"); *In re Cty. of Orange*, Order Confirming [2988-1] Plan [Chapter 9] by County of Orange, 8:94-bk-22272, ECF No. 3418 (Bankr. C.D. Cal. May 16, 1996) (confirming plan with no impairment of pension claims); *In re City of San Bernardino*, Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernardino, California, 6:12-bk-28006, ECF No. 2164 (Bankr. C.D. Cal. Feb. 7, 2017) (same); *In re City of Vallejo*, Order Confirming Second Amended Chapter 9 Plan, 2:08-bk-26813, ECF No. 1113 (Bankr. E.D. Cal. Aug. 4, 2011) (same).

tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency."  633 F.3d at 46.

59.     The Bondholders' focus for the first factor is too narrow, ignoring the fact that the Post-Petition Legislation was but one piece of the comprehensive effort to resolve the Commonwealth's fiscal crisis, which was certainly an emergency measure.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 297 F. Supp. 3d at 288 ("Plaintiff's narrow focus on [a narrow aspect of legislation among the greater PROMESA scheme] is inconsistent with the breadth of the fiscal, public health, safety, welfare and recovery concerns that combine to form the crisis the Challenged Actions purport to address").  Their attempt to downplay the fiscal crisis threatening the stability of the Commonwealth's stability is indefensible.  The Governor of Puerto Rico signed the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, P.R. Act No. 21-2016, in 2016 in response to the serious and urgent nature of the liquidity crisis throughout the Commonwealth.  Indeed, the First Circuit in *UAW* itself recognized that Puerto Rico's $3.2 billion deficit constituted an emergency.  633 F.3d at 47.

60.     Further, in asserting that the Commonwealth cannot now argue that the fiscal crisis is an "emergency" when it was responsible for causing ERS's insolvency, Response at 55, the Bondholders ignore the Commonwealth's numerous prior unsuccessful reforms that failed to save ERS.  Motion ¶ 16.  Unlike the legislature in *In re Pension Reform Litigation*, which ignored warnings and implemented only half-measures bound to fail to fix the problem that it had directly created, 2015 IL 118585, ¶¶ 11–21, here "[s]everal attempts were made in the past to reform the three Retirement Systems."[19]  Ex. E at 2 (Joint Resolution 188).  "However, these measures were

---

[19] Additionally, the legislation in *In re Pension Reform Litigation* burdened those receiving retiree benefits, *id.*, whereas here the legislation at issue is aimed at benefiting pensioners.

unsuccessful and their results insufficient," *id.*, with many of the reasons for the failure falling outside of the Commonwealth's direct control, including changes in the Participants' life expectancy, early retirement programs, and bond issues that yielded no benefits due to failed investments.  Ex. F at 17 (Act 106, Statement of Motives).

61.     As to the second *UAW* factor (*i.e.*, whether the legislation protects a societal interest), the Bondholders' focus is again too myopic.  The Post-Petition Legislation is one part of the Commonwealth's comprehensive reform framework.   Considering the totality of those measures, the Bondholders are hardly the only group asked to share the burden associated with the Commonwealth-wide fiscal crisis, and certainly not the only group of instrumentality creditors be affected by legislation to remedy the crisis.   *See* Motion ¶ 122 (listing examples of other Commonwealth-wide laws that Puerto Rico enacted to address the fiscal crisis and return the Commonwealth to fiscal responsibility).

62.     The third, fourth, and fifth *UAW* factors simply require that the legislation be "tailored appropriately to its purpose[,]" "impose[] reasonable conditions[,]" and be "limited to the duration of the emergency."  633 F.3d at 46.  Again, the Bondholders ignore that, given the meaningful deference afforded to the Commonwealth, the Commonwealth "need not prove its choice the best among the available alternatives; rather [the Bondholders] must prove that there is no rational relationship between the [Commonwealth's] ends and its means."  *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 (2d Cir. 1998) ("[m]erely contending that there was a better way, [plaintiff] has not carried its burden" in proving it was likely to succeed on the merits of its contract clause claim and denying motion for preliminary injunction).

63.     The Bondholders' insistence that this Court second-guess the Commonwealth's decision simply because the Bondholders have invented their own alternative is not supported in

the law.  *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 643 (1st Cir. 1981) (choosing between potential legislative alternatives "is a task far better suited to legislators than to judges"); *see also Buffalo Teachers Fed'n*, 464 F.3d at 372 (expressly rejecting proposed alternative to simply raise taxes, holding "we find no need to second-guess the wisdom of picking the wage freeze over other policy alternatives").  Nor is it supported in fact, as the Bondholders' insistence that insolvent government instrumentalities could have increased their contributions belies reality.  *See* Ex. G (*Trinidad Hernández*, 188 D.P.R. 828 (affirming dismissal where plaintiffs failed to show that their alternatives, such as increasing the tax capture rate, were "feasible")).  And the Bondholders provide no reason why their preferred half–measure would succeed after decades of instrumentalities failing to provide adequate contributions even at the previous Employers' Contribution rate.  Their allegations and rehabilitative arguments related to these factors are simply implausible and defy the economic realities and circumstances necessitating the Commonwealth's passage of the Post-Petition Legislation.

64.     There is no doubt that the Commonwealth's means (the Post-Petition Legislation as it fits into the Commonwealth's comprehensive economic reforms) are rationally related to its ends:  to ensure that necessary benefits are paid to retirees, to address the Commonwealth's overarching financial emergency, and to set the Commonwealth on the road to recovery.

**iii.     The Post-Petition Legislation Is Not an Unconstitutional Taking.**

65.     The Bondholders' response also does little to address the many dispositive flaws in their Takings allegations.  First, the Bondholders cannot identify a cognizable predicate property interest that survived the Section 552 Decision.  Second, any taking that could have occurred would be a permissible regulatory taking, as it was carried out for the common good to help address the Commonwealth's fiscal crisis, and in line with reasonable investor expectations in the heavily regulated area of public pensions.  The Bondholders cannot plausibly allege that any "taking"

would not have been for a "public use" in light of the Legislature's rational aim of safeguarding the Commonwealth's fiscal health and provision of public services.

> a.    **The Bondholders Fail to Allege a Recognized Property Interest.**

66.    Although the Bondholders describe the allegedly "taken" property in which they have an interest as "additional collateral," it is not "collateral" at all, but merely *unpaid* pre-petition revenues that they *hoped* various employers would pay at some point *in the future*.  Response at 15-16.    In other words, this "collateral" was always contingent on continuing employer contributions, which were in turn "contingent on Puerto Rico's future fiscal status and the decisions of future Puerto Rico legislatures."    Section 552 Decision at 468.    As explained previously, *see, e.g.*, Motion ¶ 110 (citing Ex. B at 26 (Official Statement); Ex. B at VI-33 (Resolution)), these contingencies were "explicitly contemplated" in the "language in the Bond Resolution and the Official Statement for the bonds," Section 552 Decision at 468.    The Bondholders' stated property interest thus amounts to an expectancy which, due to legislative developments well within the Bondholders' contemplation, never materialized.    An expectancy is not a property interest that can give rise to a Takings claim.    *See id.* at 468 n.8 (collecting cases).

67.    The Bondholders' second alleged property interest (*i.e.*, their "contractual right to receive principal and interest payments from ERS") fares no better.    Response at 59.    That interest, which arises from the same employer contributions, likewise describes an expectancy rather than property protected under the Takings Clause.    Additionally, their interest in this property is unsecured, *see* Response at 19, and unsecured property interests cannot serve as the basis of a Takings claim.    *See, e.g.*, *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940); *Bank of N.Y. v. Treco (In re Treco)*, 240 F.3d 148, 161 (2d Cir. 2001) ("If the claim is unsecured, it is not 'property' for purposes of the Takings Clause.").

68.    The Bondholders rely heavily on *Lynch v. United States*, 292 U.S. 571, 579 (1934) to argue that contract rights are valid property interests for Takings purposes, but as they concede in passing, *see* Response at 60 n.37, *Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211 (1986), overruled that aspect of *Lynch*.  *See Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cty.*, 57 F.3d 505, 510 n.2 (7th Cir. 1995) ("The *Lynch* analysis does not resemble the takings jurisprudence of today, and, in light of *Connolly*, we do not believe it controls.").  The Bondholders quibble over whether *Connolly* left open the possibility that a contract can ever ground a Takings claim, failing to acknowledge that in the 85 years following *Lynch*, the Supreme Court has not once held that unsecured rights arising from contract are property under the Takings Clause.  *See* Motion ¶ 39 n.13; *see also Buffalo Teachers Fed'n*, 464 F.3d at 374–75 (expressing "misgivings" about whether "valid contracts constitute property under the Takings Clause" in light of post-*Lynch* decisions, but ultimately finding no taking on other grounds).  Indeed, the Bondholders fail to marshal any relevant example of a successful Takings claim arising from the impairment of unsecured contractual rights, instead electing to quote extensively from the overruled language of *Lynch* and cases that parrot it.  *See* Response at 59.  Regardless of whether it is possible for *secured* contractual rights to give rise to a Takings claim as a theoretical matter, here the Bondholders' alleged contractual rights are admittedly *unsecured*, *see, e.g.*, Response at 20, and therefore simply do not constitute cognizable property interests under the Takings Clause.

### b.    The Bondholders Fail to Allege a Taking Without Just Compensation.

69.    To the extent any cognizable property interest exists here, the Bondholders also fail to allege that it has been taken without just compensation.  The Bondholders fail to explain how the transfer of assets (if any) between two Puerto Rican government entities compromises any

rights the Bondholders might have.[20]   This is especially so in light of the Oversight Board's preservation of $190.48 million—the amount transferred from ERS to the Commonwealth—for distribution covering any valid liens in transferred assets held by the Bondholders.   *See* Motion ¶ 18 n.9.

70.   The Bondholders' characterization of this sum as a mere party's "promise" that does not warrant dismissal of their claim, Response at 18, overlooks the fact that the First Circuit not only acknowledged, but *relied on* the Oversight Board's representation that it would distribute these funds to the Bondholders to the extent they hold valid liens.   *Andalusian*, 954 F.3d at 10 (citing Oversight Board representation as "an additional fact which supports the Title III court's decision" at issue).   Thus, notwithstanding their conclusory assertion that the transfer of assets from ERS to the Commonwealth had a negative economic impact on pre-petition interests, Response at 62, the Bondholders fail to explain how they have suffered a Taking:   depending on the outcome of the Lien Scope AP, the Bondholders will either have valid liens on which they can collect, or they will have no liens, and therefore no property interests in transferred assets.[21]

c.   <b>Any Taking Was a Permissible Regulatory Taking.</b>

---

[20] The Bondholders also lack standing for this reason.  As the Oversight Board pointed out in the Motion, any claims arising from this transfer belong to ERS, not the Bondholders as creditors of a creditor.  Motion ¶ 82.  The Bondholders' response that they "have standing to vindicate the taking of their own property rights," Response at 61 n.38, asks this Court to assume such rights existed and were impaired by the post-petition asset transfer, despite the pending determination of the scope of such rights in the Lien-Scope AP, and the reservation of funds to pay any valid liens the Bondholders are found to possess.

[21] The Bondholders argue that the Assignment of Claims Act does not apply to their claim, and that under New York law, they automatically step into the shoes of the rights of the seller of the bonds.  Response at 62 n.39.  However, federal law governs whether there is an automatic assignment of federal claims such as a Takings claim.  *See Phelps v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. (In re Nucorp Energy Sec. Litig.)*, 772 F.2d 1486, 1489 (9th Cir. 1985) ("A claim which arises under a federal statute and implicates federal policy is appropriately decided under federal law").  Federal law does not automatically assign claims to the purchaser of a debt document.  *See, e.g.*, *Lowry v. Baltimore & Ohio R.R. Co.*, 707 F.2d 721, 722 (3d Cir. 1983).  In any event, if state law applies, under New York law, which is the governing law pursuant to the Resolution, "state law claims [are] not automatically transferred when the underlying security was sold."  *In re Nucorp Energy Sec. Litig.*, 772 F.2d at 1493.  Further, assuming that New York law applies, N.Y. Gen. Oblig. Law § 13–107 does not apply, as that section expressly applies to only claims against the issuer, the indenture trustee, and any guarantor.  The Commonwealth, of course, is none of those entities.

40

71.     If a taking had occurred in this case, it would have been a permissible regulatory taking.  To start, the Bondholders attempt to characterize the Post-Petition Legislation's pension system reform as a *per se* regulatory taking, but the *per se* taking framework is inapplicable to the alleged intangible property interests here.[22]  *See, e.g.*, *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 265–67 (2d Cir. 2014) (applying regulatory factors to analyze alleged taking of judicial lien and expressing skepticism as to whether a *per se* regulatory taking analysis is ever appropriate for non-physical property); *In re Davis*, 539 B.R. 334, 346 (S.D. Ohio 2015) ("[T]he Court doubts that the [per se regulatory taking] test was meant to apply to intangible personal property.").

72.     The cases Bondholders cite, *Armstrong v. United States*, 364 U.S. 40 (1960), and *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935), Response at 65, do not support a different conclusion.  Both *Armstrong* and *Radford*—the *only* two cases where the Supreme Court held that government destruction of a lien constituted a taking—predate *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), the Supreme Court's seminal regulatory taking case.  *See 1256 Hertel Ave.*, 761 F.3d at 263 n.7.  Indeed, *Penn Central* even re-

---

[22] The Bondholders' separate argument that they suffered a non-regulatory, "direct" taking consisting of a "physical invasion" of property does not withstand scrutiny.  Response at 64.  As they acknowledge elsewhere in their brief, the Bondholders' claims pertain to security interests in "Pledged Property," which in turn consists of alleged rights to various pre-petition sources of revenue.  *See* Response at 14.  By their own admission, no physical invasion of real property occurred here, rendering any physical taking analysis inapposite.  *See, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322–25 (2002) (discussing physical versus regulatory taking dichotomy).

Nor does a transfer of interests between two government entities as part of a pension system reform effort create any sort of "direct" taking claim on behalf of the Bondholders.  *See, e.g.*, *Buffalo Teachers Fed'n*, 464 F.3d at 374 (concluding that wage freeze that deprived plaintiff unions of a contractual right to raises should be analyzed as a regulatory as opposed to physical taking because the deprivation did "not present the 'classic taking' in which the government directly appropriates private property" but arose rather from a "public program adjusting the benefits and burdens of economic life to promote the common good") (internal quotation marks and citations omitted).  That is especially so here, where the Bondholders maintain various rights and will be able to realize the value of valid and perfected security interests.  *See Andalusian*, 954 F.3d at 10; *see also* Motion ¶ 163 ("[T]o the extent any assets retained by ERS are subject to Claimants' security interest as determined by the Lien-Scope AP, Claimants will receive the value thereof.").

characterized *Armstrong* as a regulatory taking decision, analyzing it within the *Penn Central* framework. 438 U.S. at 127. "Thus, it is far from clear that the Supreme Court would analyze the government's destruction of liens using a framework other than the regulatory takings frameworks set forth in [*Penn Central*]." *1256 Hertel Ave.*, 761 F.3d at 263 n.7.

73.     Perhaps recognizing this argument's shortcomings, the Bondholders also apply the *Penn Central* factors to their newly packaged Takings claims. Their argument falls short for several reasons. *First*, the Bondholders argue that the transfer of assets completely destroyed their property interests in liens on those assets. The record demonstrates that this is far from true, as even the Bondholders acknowledge that they will be able to collect some amount—and potentially the full amount, *see Andalusian*, 954 F.3d at 10—on any valid liens that they might possess. *See* Response at 17 (discussing Commonwealth funds set aside to cover Claimants' liens in transferred assets); *id.* at 62, 66 (quoting portions of Adversary Complaint and Supplement that admit Bondholders will receive payout). Furthermore, the fact that ERS Bonds were sold following the Post-Petition Legislation demonstrates that the Bondholders retained an economically viable use of their property. And several of their other asserted rights remain uncontested. *See* Motion ¶ 87. The Bondholders' complaint that *the value* of their property interests may have been reduced despite retaining an economically viable use of such property is simply insufficient to maintain a Takings claim. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (collecting cases).

74.     But even if the value of the Bondholders' liens had been completely destroyed, that destruction still would not constitute a cognizable economic loss for a regulatory takings analysis. As the First Circuit has recognized, where a lien is subject to certain conditions at the time of its creation, destruction of the lien through the occurrence of those conditions cannot create a

cognizable economic loss for purposes of a Takings analysis.  *See Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 686 (1st Cir. 1999) (applying *Penn Central* factors and holding that avoidance of liens did not cause cognizable economic impact on claimant despite lien destruction because "at its inception, the lien was subject to and limited by the debtor's power to avoid the lien under [Bankruptcy Code] § 522(f)"); *accord Bruin Portfolio, LLC v. Leicht (In re Leicht)*, 222 B.R. 670, 683-84 (B.A.P. 1st Cir. 1998).  Here, the Bondholders' rights to payments were subject, from their inception, to reduction based on a decrease in the Employers' Contribution rate.  *See supra* ¶¶ 44–45.  *See* Ex. B at 26 (Official Statement); Ex. B at VI-33 (Resolution). Economic losses arising from such a reduction are not cognizable under the first *Penn Central* factor.

75.    *Second*, the Bondholders' argument that the regulation here interferes with their reasonable investment-backed expectations fails for the same reasons and then some.   The Bondholders were put on notice that the Employers' Contributions were subject to reduction before they purchased those bonds.  *Id.*  This makes sense:  public-employee benefits and municipal bonds are subject to extensive state regulation.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) (noting that expectations must be adjusted in areas that "ha[ve] long been the source of public concern and the subject of government regulation").

76.    Puerto Rico's history of pension system reform underscores the point, and further informs reasonable investor expectations here.  *See* Motion ¶ 90; *see also Maine Educ. Ass'n Benefits Tr. v. Cioppa*, 695 F.3d 145, 154 (1st Cir. 2012) (finding "historically heavy and continuous regulation" of industry by state government that issued regulation in question detracted from reasonable investment-backed expectations).  Indeed, a reform passed just a few years before the bond issuance here directly addressed the worsening economic conditions the Commonwealth

43

faced.  *See* P.R. Act No. 305-1999, Statement of Legislative Intent (describing ERS financial
condition as "critical" "with an actuarial deficit that exceed[ed] [$5.9] billion"); *see also Appolo
Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (describing claimant's awareness
of "the problem that spawned the [challenged] regulation" as essential consideration in investment-
backed expectations assessment).  And Puerto Rico's courts have consistently upheld changes to
the pension system to promote its solvency.  *See Bayron Toro v. Serra*, 19 P.R. Offic. Trans. 646,
664 (P.R. 1987) (affirming dismissal of complaint); *see also* Ex. G (*Trinidad Hernández*, 1888
D.P.R. 828).   Each of these factors put the Bondholders on notice that the Employers'
Contributions and other ERS payment sources, and the system of which they were a part, were
subject to potentially significant legislative reforms.   Having undertaken the risk that the
legislature would pass legislation negatively affecting their investment, the materialization of that
risk is not a proper basis on which to ground a Takings claim.

77.    *Third*, the character of the governmental action here does not support the
Bondholders' Takings theory.    The Bondholders' arguments simply repackage their
mischaracterization of the Commonwealth's action as a *per se* taking, and they fail here for the
same reasons they did above—namely, that the alleged takings arise not from "a physical
invasion," but from a "public program adjusting the benefits and burdens of economic life to
promote the common good."  *See Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 128-29 (1st Cir.
2009) (quoting *Penn Central*, 438 U.S. at 124); *Buffalo Teachers*, 464 F.3d at 375 ("[T]he public
program to help Buffalo obtain fiscal stability is one which the state had a right to initiate and
regulate.").  It is only by adopting an unduly narrow focus on specific aspects of the Post-Petition
Legislation, and misconstruing it as a simple transfer of assets to avoid the Bondholders' security
interests, that they are able to conclude otherwise.  *See* Response at 66.

44

78.     The reality is that the Post-Petition Legislation was passed in accordance with the March 2017 Fiscal Plan, a much broader plan touching on every aspect of life in Puerto Rico. Motion ¶ 75.  The March 2017 Fiscal Plan and the Post-Petition Legislation sought to address the Commonwealth's imminent fiscal emergency, an undertaking that required all constituencies with an interest in the Commonwealth's future to bear some burdens.  Motion ¶¶ 94–95.  For its part, the Post-Petition Legislation aimed to protect the retirement benefits of public employees, who provide services to *all* residents of Puerto Rico; this goal clearly promotes the common good, not the narrow interests of just a few as the Bondholders would have the Court believe.  Motion ¶ 96. The Bondholders' complaint that they alone bear the burdens willfully ignores the bigger picture, not to mention the fact that the Bondholders retain various rights and will be able to receive distributions the extent they hold any valid and perfected security interests.  Motion ¶ 87.  The Bondholders thus fail adequately to plead that the nature of the government action here is indicative of an impermissible regulatory taking.

### d.     The Post-Petition Legislation Was Enacted for a Public Purpose.

79.     The Bondholders separately allege that the Post-Petition Legislation was not passed for a public purpose, and therefore that any transfer of their property necessarily constituted a taking.  In advancing that argument, the Bondholders reductively characterize the Post-Petition Legislation as "the transfer of property from one creditor to another, solely to benefit the second creditor," again ignoring the larger public aim of the Legislation, and the economic crisis in Puerto Rico that those measures were designed to address.[23]  *See supra* ¶ 55.

---

[23] Citing *Kelo v. City of New London*, 545 U.S. 469, 477, 493 (2005), the Bondholders characterize the Post-Petition Legislation as a naked transfer of "the property of *A*" to "another private party *B*" arising from an "impermissible favoritism of private parties."  Response at 73–74.  That characterization is spurious.  Providing adequate pension funding for public employees benefits *all citizens* of the Commonwealth, just as the *Kelo* Court found that the city's seizure of property through eminent domain for economic development benefited the entire community, notwithstanding potential transfers from prior property owners to commercial entities.  545 U.S. at 474, 483–84; *see*

80.     Though the Bondholders may wish to disregard statements of legislative intent, *see* Response at 73 ("Notwithstanding statements of legislative intent . . ."), the case law uniformly indicates such statements are entitled not only to consideration, but deference.  *See Fideicomiso de la Tierra del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 11–12, 18 (1st Cir. 2010) (considering on motion to dismiss stated legislative purpose for challenged law and observing "[o]ur review of whether a taking is for 'public use' is necessarily deferential"); *Kelo*, 545 U.S. at 483 ("For more than a century, our public use jurisprudence has . . . afford[ed] legislatures broad latitude in determining what public needs justify the use of the takings power.").[24]  The record here reflects a legislative judgment that providing adequate funding for public services will promote the Commonwealth's fiscal health and maintain functioning government services for its entire citizenry.  *See* Motion ¶ 75.  The Bondholders' disagreement with that judgment does not create a Takings claim.  *See Fortuño*, 604 F.3d at 18 ("Public policy disagreements about the best of several rational means to accomplish legitimate public purposes are not the grist of a Takings Clause claim.").  Because the Post-Petition Legislation is rationally related to a public purpose, it does not violate the "public use" requirement.  *Id.* at 17–18.

---

*also Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241–42, 244 (1984) (holding that State's purpose of combatting "social and economic evils of a land oligopoly" qualified as a valid public use, and immediate transfer of properties to private individuals upon State taking did not diminish public character of taking).

[24] The Bondholders' attempts to distinguish *Fortuño* and another case, *Midkiff*, 467 U.S. 229, on the facts are unavailing.  First, the Bondholders' argument that those cases did not "involve such obvious transfers of funds from A to B" is mistaken.  Response at 73.  For example, *Fortuño* involved the "immediate" revocation of the *plaintiff's* title to land and reversion of that land to the Commonwealth, an indisputably more "direct" transfer than the one alleged here, where the transfer was made between two government entities, neither of which are plaintiffs/claimants.  604 F.3d at 10–12; *see also Midkiff*, 467 U.S. at 231–32 (concerning whether Takings Clause "prohibits the State of Hawaii from taking, with just compensation, title in real property from lessors and transferring it to lessees in order to reduce the concentration of ownership of fees simple in the State").

More fundamentally, the facts of *Fortuño* and *Midkiff* have no bearing on the legal standard that applies to "no public use" Takings claims.  Namely, as the Oversight Board stated when it cited these cases, legislation "rationally related to a public purpose" does not "violate the 'public use' requirement."  Motion ¶ 76.

iv.    **Claimants Have Failed to State a Claim that the Commonwealth Was
Unjustly Enriched.**

81.    In its Motion, the Oversight Board demonstrated four independent reasons why the

Bondholders failed to state an unjust enrichment claim:

> (i) any claim for unjust enrichment belongs to ERS, not Claimants,
> (ii) Claimants failed to state a claim for unjust enrichment, (iii) a
> claim for unjust enrichment does not exist where Claimants have
> other claims, such as contract claims, that govern the dispute at
> issue, and (iv) to the extent Claimants assert a claim for unjust
> enrichment under federal law, PROMESA precludes such a claim,
> and federal common law does not apply here.

Motion ¶ 63 (internal citations omitted).

82.    In response, Claimants assert that the Commonwealth unjustly enriched itself by

(i) seizing collateral, (ii) relieving itself of an over $400 million obligation to ERS, and

(iii) diverting future employer contributions from ERS to itself.  Claimants' assertions all fail

because (a) no collateral will be retained by the Commonwealth, (b) any relief from payment

obligations arises from the Commonwealth's status as a Title III debtor, not the Post-Petition

Legislation, and (c) the "diversion" of payments will be used for the same purpose that ERS would

use them—to pay pensions—and section 552 freed those payments from any security interest

asserted by the Bondholders.

83.    To counter arguments in the Motion that any unjust enrichment claims belong to

ERS, the Bondholders assert that the Commonwealth took funds from ERS that would have been

used by ERS to pay Bondholders.  Response at 75.  To the extent this is an argument that ERS has

a "right to receive" statutorily mandated payments, the Section 552 Decision held that the "right

to receive" Employers' Contributions not yet due is not property—so it could not enrich the

Commonwealth.  If such "right" were somehow transferrable, section 552 cut off the Bondholders'

security interest in those funds.  This highlights that any harm the Bondholders suffered was derivative of ERS.

84.     The Bondholders add that "without the Post-Petition Legislation, ERS would have continued to receive employer contributions and would have been contractually obligated to use those contributions to pay the ERS Bonds."  Response at 75 n.45.  This statement is detached from reality.  ERS has filed a petition for relief under Title III of PROMESA.  Prepetition contractual obligations are no longer enforceable.  Even if Employers' Contributions were still made, they would not be paid to Bondholders.  Accordingly, any impact from the Post-Petition Legislation was on ERS, and not Claimants, and the Claimants cannot assert any claims against the Commonwealth.

85.     Even assuming the Bondholders could bring an unjust enrichment claim, they have failed to adequately plead the elements.  The Bondholders assert that the Commonwealth always had the obligation to pay pensions so the Commonwealth's assumption of this obligation cannot obviate an unjust enrichment claim.  Response at 76.  But before the Post-Petition Legislation, the ERS Enabling Act required ERS to make payments to retirees and beneficiaries for virtually all participants in ERS.  3 L.P.R.A. § 766.  The Bondholders simply ignore that the Post-Petition Legislation relieved ERS of those obligations and the Commonwealth assumed all pension payment duties for retirees, including those of municipalities and public corporations.

86.     Claimants' contention that their other claims do not prevent them from asserting an unjust enrichment claim also are incorrect.  Response at 77.  Claimants have alleged many claims against the Commonwealth, including Takings and Contracts Clause claims.  An unjust enrichment action will not lie where other actions are available—even if none is ultimately successful. *Medina & Medina v. Country Pride Foods, Ltd.*, 631 F. Supp. 293, 302 (D.P.R. 1986).  Finally, PROMESA

protects Claimants' rights through the plan of adjustment requirements in PROMESA section 314, and do not allow for an unjust enrichment claim. Motion ¶¶ 71–74.

> ### v.  Claimants Have Failed to State a Claim that the Commonwealth Is Liable for the Post-Petition Legislation Under PROMESA Section 407.

87.   Claimants allege they are entitled to a claim arising from a violation of section 407 of PROMESA. Response at 79–80. But section 407 does not create an independent right to payment. Instead, it provides a remedy for creditors whose property is "transferred in violation of applicable law." PROMESA § 407. As explained above, the Post-Petition Legislation did not transfer any property in violation of applicable law, so the claim fails at the start. Both of section 407's causes of action require a property transfer.[25] In addition, both PROMESA and the Post-Petition Legislation are applicable law. As demonstrated above, the Post-Petition Legislation does not violate any laws of Puerto Rico or the United States and PROMESA preempts any Puerto Rico law that requires appropriations inconsistent with the certified budgets and fiscal plans.

88.   Even if section 407 did provide an independent right to payment, the Bondholders have failed to plead its element. The Bondholders cannot have an allowable section 407 claim during the Title III case because the plan of adjustment may ratify prior transfers, thereby eliminating any claims based on section 407. Further, the precise phraseology of PROMESA section 201(b)(1)(N), which deals with the certifications of fiscal plans, is irrelevant. The material point is that section 201(b)(1)(N) explicitly recognizes that a plan of adjustment may authorize transfers of property subject to a security interest. The Bondholders' argument that a plan of adjustment cannot "retroactively" validate transfers is plainly wrong, as a plan of adjustment

---

[25] Notably, in addition to there not being a transfer, the Section 552 Decision made clear that Claimants do not have a property interest in the postpetition Employers' Contributions. Thus, Bondholders fail section 407's first cause of action. In addition, section 407's second cause of action also requires that the transfer to ERS was "for the benefit of its creditors." PROMESA § 407. The Bondholders do not even try to show that they meet that requirement.

inherently deals with past claims for violations of the law or agreements.  The Bondholders offer

no reason why section 407 claims can only be dealt with on a prospective basis, unlike all other

claims.

89.     Finally, the Bondholders' creative argument that section 407 establishes liability

for "any property in which a creditor has a valid 'pledge'" is mistaken.  Response at 81.  Unlike

"security interest" and "lien," "pledge" is not defined in the Bankruptcy Code.  *See* 11 U.S.C.

§ 101.  "Pledge" is commonly recognized as a synonym for the creation of a security interest.

Former U.C.C. § 9-102(2) (2000) ("This Article applies to security interests created by contract,

including pledge . . ."); former 19 L.P.R.A. § 2002(2).  Section 407 speaks of transfers of

"property" in which a creditor has a right.  PROMESA § 407.  Under Puerto Rico law (as

everywhere else in the United States), "pledge" means "lien."  *In re Santos & Nieves, Inc.*, 814

F.2d 57, 60 (1st Cir. 1987) ("[W]hen property is pledged in Puerto Rico, the pledgor remains the

owner of the property and the pledgee receives a lien on the property for the value of the debt.").

Thus section 407 requires that the property be pledged in the sense of being subject to a lien.  This

result is also dictated by the rule of statutory construction *noscitur a sociis*, which holds that "a

word may be known by the company it keeps," *Graham Cty. Soil & Water Conservation Dist. v.

United States ex rel. Wilson*, 559 U.S. 280, 287 (2010); *Jarecki v. G. D. Searle & Co.*, 367 U.S.

303, 307 (1961) ("The maxim *noscitur a sociis*, that a word is known by the company it keeps,

while not an inescapable rule, is often wisely applied where a word is capable of many meanings

in order to avoid the giving of unintended breadth to the Acts of Congress.").  Here, "pledge" is

mentioned in a list of property interests: "a valid pledge of, security interest in, or lien on such

property."  PROMESA § 407.  The word "pledge" must be construed as limited to a property

interest, in line with Puerto Rico law, which considers a pledge to be the equivalent of a lien.

50

90.     Except for the Transferred Assets, no property of ERS was transferred pursuant to the Post-Petition Legislation.  And the Bondholders' argument that they have a "pledge" of a contractual right to payments of employer contributions—Response at 81—falls short.  *See supra* ¶ 20.  This claim must be dismissed.[26]

### vi.     Claimants Have Failed to State a Claim that the Commonwealth Fraudulently Acquired ERS Assets.

91.     Claimants allege that creditors have standing to challenge fraudulent transfers. Response at 83.  But here, if the Commonwealth's actions were wrongful (which they were not), then ERS is the creditor of the Commonwealth.  Claimants are creditors of a creditor, and have no rights to assert ERS's claims.  *See supra* ¶ 23.  Further, at the end of the two-year period for bringing avoidance actions under section 544 of the Bankruptcy Code, no party—debtor or creditor—may bring such claim.  *See Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 89-90 (2d Cir. 2019) ("[N]o provision for the reversion of claims vested in the trustee *et al.* by Section 544 exists. . . . [H]aving to draw an inference of reversion of rights from that provision's statute of limitations might well have appeared as a leap several bridges too far . . . .").[27]

92.     Claimants assert that ERS "abandoned" any fraudulent conveyance action.  But the abandonment provision of the Bankruptcy Code (section 554) was not incorporated into PROMESA.  Moreover, the ERS automatic stay prevents the Bondholders from asserting

---

[26] Even if the Bondholders had a claim under section 407, at best, the Bondholders have an unsecured claim, not an administrative expense claim, because section 407 only gives a claim for the value of the property, and the claim does not satisfy the requirements for an administrative expense claim.

[27] Here, ERS and the Commonwealth tolled the expiration of the two-year period by which the statute of limitations would expire on the time for ERS to bring avoidance actions, in order to provide the Court of Appeals for the First Circuit an opportunity to rule on the Bondholders' appeal of this Court's denial of their request to be appointed trustees under section 926 of the Bankruptcy Code.  [Case No. 17-bk-3566, ECF No. 376].  The First Circuit affirmed this Court, *Andalusian*, 954 F.3d at 5, and the time within which to bring avoidances actions expired.

fraudulent conveyance claims against the Commonwealth.  *See Meoli v. Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*, 463 B.R. 28, 34–35 (Bankr. W.D. Mich. 2012) (Bankruptcy Code § 362(a)(6) stayed creditor's unjust enrichment claim seeking money from third-party bank alleging fraudulent transfers from debtor).

93.     Even assuming that ERS abandoned viable, timely claims against the Commonwealth, Claimants' argument that section 544(b) never posed a barrier to a creditor's standing to pursue recovery on behalf of post-petition fraudulent conveyances, Response at 84, is belied by their motion to be appointed trustee under section 926 of the Bankruptcy Code.

94.     Claimants also fail to state a claim that ERS did not receive equivalent consideration in exchange for the property allegedly transferred by the Post-Petition Legislation. *See supra* ¶ 25.  First, the Section 552 Decision held that future Employers' Contributions were not property, and therefore, could not be "transferred" for purposes of a fraudulent conveyance claim.  Second, there is no dispute that ERS has been relieved of its obligation to make pension payments, which it lacked the funds to do.  In any event, Claimants must do more than allege that "the Commonwealth transferred all or substantially all of ERS's property to the Commonwealth[.]"  Response at 85.  They must support that conclusory allegation with specific facts that would make the claim plausible.  *Iqbal*, 556 U.S. at 678.  They have not and cannot, and their fraudulent transfer claim must be dismissed for this reason as well.

### vii.     Claimants Have Failed to State a Claim that the Commonwealth Tortuously Interfered with the Resolution.

95.     As discussed above, it is the Section 552 Decision, and not the Post-Petition Legislation, that has prevented Claimants' security interest from attaching to postpetition Employers' Contributions.  *See supra* ¶ 4.  Legislation is not a tort, and even assuming it were, no property was confiscated, as any ERS Petition Date assets in which Claimants have an interest will

be determined in the Lien-Scope AP and the Bondholders will receive the value of such assets pursuant to a pre-plan sale or plan of adjustment for ERS. *See supra* ¶ 22. Finally, and as discussed above, the Bondholders had notice of adverse changes to the Employers' Contributions, including their elimination. *See supra* ¶¶ 44–45.

### viii. Claimants Have Failed to State a Claim that the Commonwealth Aided and Abetted ERS's Breach of Duties.

96.     Claimants still have not identified the elements of a claim of "aiding and abetting another party's breach of its duties" or any support for such a claim. For this reason alone, this claim must be dismissed.

### ix. Claimants Have Failed to State a Claim that the Commonwealth Committed Conversion.

97.     Claimants still have not explained how a government can be held liable for conversion; in particular, where the government passed legislation and took acts pursuant thereto. *See also* Rule 12(c) Response ¶ 64. This claim is predicated on the Post-Petition Legislation violating Puerto Rico or federal law, which as set forth above, is not the case, so the claim must be dismissed.

### x. Claimants Have Failed to State a Claim that the Commonwealth Is Liable for General Fault and Negligence.

98.     To be liable for fault or negligence under Article 1802 of the Civil Code of Puerto Rico, a party must breach a duty it has toward another, which causes provable damages. *See De-Jesus-Adorno v. Browning Ferris Indus. of P.R., Inc.*, 160 F.3d 839, 842 (1st Cir. 1998). Claimants have failed to allege that the Commonwealth had a duty to the Bondholders not to reduce or eliminate the Employers' Contributions. The duty (if any) was to ERS, and Claimants have no basis for asserting this duty even applies in the governmental context. In any event, Claimants

have not sufficiently demonstrated that the Post-Petition Legislation harmed them or violated any provision of law.  Accordingly, this claim must be dismissed.

### xi.   The Lien-Scope AP Will Determine to Which Property Claimants' Liens Attach.

99.     Claimants assertion that they "have asserted valid liens on all Pledged Property unaffected by § 552[,]" Response at 91, is duplicative of the matters to be determined in the Lien-Scope AP.  Those claims should therefore be dismissed here, as Claimants will not be prejudiced by having their rights in ERS Petition Date assets determined in that proceeding, which are the only assets in which they could possibly have "valid liens [in] Pledged Property unaffected by § 552".  Response at 91.

### xii.   Claimants Have Failed to State a Claim that the Commonwealth Is Liable for Harm from the Automatic Stay.

100.    Claimants have failed to allege how the automatic stay has harmed their interests, if any.  *See supra* ¶¶ 39–40.  Further, any section 922(c) claim must be asserted against ERS, not the Commonwealth, as the Commonwealth is not in possession of any Bondholder collateral, with the possible exception of the Transferred Assets, for which no adequate protection is required because there has been no allegation of a diminution in value.  The Bondholders will receive the value of the Accounts Receivable in an ERS plan of adjustment or pre-plan sale even if their interpretation of Act 106 is correct.  Accordingly this claim must be dismissed.

### B.   The Commonwealth Is Not Liable for Claims Based on Its Other Alleged Conduct.

### i.   Claimants Have Failed to State a Claim that the Commonwealth Violated the January Stipulation.

101.    The Commonwealth did not have obligations under the January Stipulation, and so cannot be held liable for violating it.  Rather, the January Stipulation required *ERS*, during the pendency of the stay under section 405 of PROMESA, to transfer Employers' Contributions to a

segregated account. Claimants merely state, without specifics, that "[a]s discovery has already shown, and as Claimants will prove as a factual matter here at the appropriate time, between the enactment of PROMESA in July 2016 and April 2017, ERS's custodian (the Secretary of Treasury) received employer contributions from the Commonwealth . . . [and] used that money for ERS's purposes, thereby violating the January Stipulation. Response at 93–94.

102. But the Bondholders provide no basis for the allegation that Puerto Rico's Secretary of the Treasury was ERS's "custodian," which is not supported by any citation and does not make sense. The Secretary of Treasury leads the Treasury Department of the Commonwealth and does not act as a "custodian," which itself is a vague term. If Bondholders contend that the Treasury Department received Employers' Contributions from the Commonwealth that were not paid to ERS, at most that is an ERS receivable to be determined in the Lien-Scope AP. Thus, even if true, this is an unsecured claim against the Commonwealth, based on events prior to the Commonwealth Petition Date.

> ii.   **Claimants Have Failed to State a Claim that They Were Harmed by the Moratorium Act.**

103. Claimants betray the speculative nature of this claim by stating that "*to the extent any collateral was transferred*" in violation of applicable law, Claimants are owed just compensation. Response at 94 (emphasis added). But this does not allege an injury; it alleges a possible injury, and the Claimants cannot get an advisory opinion.

104. In any event, if Claimants had an attached security interest to certain assets, such as Accounts Receivable, that went unpaid as a result of the Moratorium Act, ERS holds the Accounts Receivable or their traceable proceeds giving rise to a secured claim that will receive treatment in a Plan in compliance with section 314 of PROMESA. The allegation does not create a separate basis for Commonwealth liability. And any allegation that the Moratorium Act resulted

in a Taking of contractual rights fails because, among other reasons, such contractual rights cannot

be "taken."  *See supra* ¶ 68; Motion ¶ 39 n.13.

### iii.   Claimants Have Failed to State a Claim that Revisions to the ERS Enabling Act Took Their Property.

105.   Claimants allege that revisions to the ERS Enabling Act that cancelled unpaid

Employers' Contributions amount to a taking.  Response at 96–97.  But like their Moratorium Act

claims, they do not specify how such contributions were cancelled.  Any Employers' Contributions

"calculated and owed, but not paid" to ERS will be recognized as the Bondholders' collateral in

an ERS plan of adjustment or pre-plan sale.  Further, as discussed herein, the Bondholders have

no claims based on the Post-Petition Legislation, so even if other ERS Enabling Act revisions did

harm their interests, they lead to a prepetition unsecured claim against the Commonwealth and

nothing more.  Again, Claimants are calling the Commonwealth's cessation of making Employers'

Contributions to ERS a taking.  At most, it is simply a breach of a prepetition obligation.

### iv.   Claimants Have Failed to State a Claim that the Commonwealth Failed to Pay Prepetition Contributions.

106.   ERS, and not the Bondholders, owns any claim against the Commonwealth for

unpaid employer contributions, so the Bondholders' claims in this regard must be disallowed.  The

Lien-Scope AP will determine the accounts constituting the Accounts Receivable in which

Claimants have a security interest.  Those accounts—*i.e.*, claims against the Commonwealth for

unpaid obligations—may give rise to prepetition unsecured claims, which will receive

distributions pursuant to a plan of adjustment in the Commonwealth's Title III case.

## III.   THE CLAIMS ASSERTED AGAINST ERS SHOULD BE DISMISSED.[28]

---

[28] The Oversight Board does not address Claimants' response in support of the Fiscal Agent's alleged entitlement to fees, expenses, and indemnification under Bankruptcy Code section 506(b), as the Oversight Board agrees with Claimants that such claim is not at issue in the current briefing schedule.  Response at 99–100.  The claims of the Fiscal Agent for fees, expenses, and indemnification shall be addressed in subsequent proceedings.  In the event the

### A. Claimants' Request for a Determination of Secured Status in the ERS Title III Case Duplicates Claims in the Lien-Scope AP and Should Be Dismissed.

107.   The Lien-Scope AP, as Claimants acknowledge, "seek[s] only a determination about whether Claimants' lien attaches to certain disputed categories of assets . . . ." Response at 101.   Because no "value" will be assigned to Claimants' alleged secured claim, however, Claimants assert their request for a determination of secured status should proceed here.   Not so. First, questions of value are premature, because it remains uncertain to which assets Claimants' security interest attaches.   Once it is determined which assets are subject to Claimants' security interest, any disputes regarding the assets' value should be addressed in an ERS plan of adjustment. Proofs of claim or requests for allowance and payment of administrative claims are not the proper vehicle to address collateral valuation issues.

### B. Claimants Fail to State a Claim that ERS Is Liable for Claims Based on the Post-Petition Legislation.

#### i. Claimants Are Entitled to No More than Nonrecourse Claims Against ERS for Unpaid Principal and Interest on the ERS Bonds.

108.   No party disputes that ERS has not made certain interest payments on the ERS Bonds as required under the Resolution.   As explained herein, claims arising from this breach are nonrecourse, and Claimants will receive the value of ERS assets subject to any valid and perfected security interest.

#### ii. Claimants Have Failed to State a Claim that ERS Was Unjustly Enriched.

109.   Claimants allege that ERS was unjustly enriched by borrowing money, and then not paying it back.   Response at 102–03.   If true, every delinquent borrower would be found to

___

Court grants the Motion, in full or in part, the Oversight Board will submit a revised proposed order reserving the Fiscal Agent's claim for fees, expenses, and indemnification.

have been unjustly enriched by their borrowings, which is not the law.  Further, Claimants are not entitled to assert equitable or tort theories of damages when a contract—the Resolution—governs their rights with respect to ERS.  *See* Rule 12(c) Response ¶¶ 42–56.

### iii. Claimants Have Failed to State a Claim that ERS Caused the Commonwealth's Unjust Enrichment.

110.   Curiously, Claimants allege that "the Board fails to identify any element of the claim that this theory of recovery fails to satisfy."  Response at 103.  But the Claimants failed to identify *any* elements of their alleged cause of action of "causing another's unjust enrichment."  This fails to state a claim and should be dismissed.  And, as explained above, the Commonwealth is not unjustly enriched in any event.

### iv. Claimants Have Failed to State a Claim that ERS Committed a Fraudulent Transfer.

111.   Claimants allege that ERS's compliance with the Post-Petition Legislation is a fraudulent transfer.  Response at 103–04.  But they have cited no support for their assertion that complying with the law is itself a violation of the law, nor could they.  Further, as explained above, the Commonwealth is not the beneficiary of any fraudulent transfer.  *See supra* ¶¶ 91–94.  Moreover, ERS and the Commonwealth have committed to pay Claimants the value of their collateral subject to a valid and perfected security interest.

### v. Claimants Have Failed to State a Claim that ERS Committed Dolo in the Evasion of Contractual Duties.

112.   Claimants allege that ERS failed "to require public employers, including the Commonwealth . . . to pay employer contributions, thereby imperiling ERS's ability to fulfill its obligations to Bondholders."  Response at 104.  But until the ERS Title III filing, the Bondholders do not allege there was any failure to pay scheduled interest on the ERS Bonds.  If anything, any delinquencies will provide a windfall to the Bondholders, as the amount of Accounts Receivable—

the only asset category in which the Bondholders have a security interests—is higher at this time

as a result of untimely collections.  Further, finding that a statute is unconstitutional is a necessary,

but not sufficient, condition for holding a party liable for complying with that statute.  Where

compliance was reasonable, as was ERS's compliance with the Post-Petition Legislation, ERS

cannot be held liable for such acts taken in compliance.  In any event, these claims are all simply

repackaged allegations of violations of the Resolution, for which the Bondholders will receive a

nonrecourse claim for unpaid principal and interest.

### vi. The Remaining Claims Against ERS Also Fail to State a Claim and Must Be Dismissed.

113.    Claimants allege an additional assortment of claims sounding in tort or equity,

including that ERS violated the implied covenant of good faith, Response at 105–06, that ERS

committed negligent performance, Response at 106–07, that ERS is subject to promissory

estoppel, Response at 107–08, that ERS committed conversion, Response at 108, and that ERS is

liable for general fault and negligence.  Response at 108–09.  As explained in the Motion, each of

these claims fails on the merits.  Additionally, they are duplicative of the Bondholders' underlying

claims under the Resolution, and cannot be asserted separately here.  *See* Rule 12(c) Response

¶¶ 42–56.  And even if they could be asserted separately, as an independent cause of damages,

they would still not entitle the Bondholders to anything more than a nonrecourse claim for unpaid

principal and interest.

### vii. All Claims that ERS is Liable Based on the Issuance of the ERS Bonds Should be Dismissed for Failure to State a Claim.

114.    Claimants' other claims, focusing on wrongs ERS allegedly perpetrated in

connection with the issuance of the ERS Bonds, including that ERS breached representations and

covenants, Response at 111, and that ERS committed a breach of warranty, Response at 114–15,

also must be dismissed for the reasons set forth in the Motion.

115.    These claims, distilled, allege that ERS breached a representation to the
Bondholders when it "represented and covenanted that the Pledged Property—which included
ERS's right to receive future Employers' Contributions—was a legal asset of ERS on which ERS
had the power to grant liens." Response at 109.[29]  However, assuming the ERS Bonds were not
*ultra vires*, which will be determined in the *Ultra Vires* AP, ERS's representations were accurate.
But for the enactment of PROMESA and the effect of section 552, the Bondholders would have
had a property interest in all future employer contributions.  ERS did not—nor could it have, or
been expected to—grant an indefeasible property right in all future Employers' Contributions
notwithstanding the possible enactment of subsequent legislation which would limit such rights.
It did grant a security interest in all Employers' Contributions calculable and owing at the time of
the Resolution, in addition to those that would become calculable and owing, which is what the
Bondholders bargained for, despite Claimants' exhortation they bargained for more.  Response at
110.  But ERS cannot grant a security interest in something—future Employers' Contributions—
in which it does not have a property right itself.  In any event, even if such claims had merit they
would still not entitle the Bondholders to anything more than a nonrecourse claim for unpaid
principal and interest.

## **CONCLUSION**

116.    For the foregoing reasons and those set forth in the Motion, the Oversight Board
respectfully requests that this Court enter an order dismissing and disallowing the Claims with
prejudice.

---

[29] This claim is also made in the Response at 111 ("ERS Committed Dolo in the Bond Issuance"); Response at 112
("ERS Committed Negligent Misrepresentation"); and Response at 113 ("ERS and Claimants Made a Mutual Mistake
of Law").

Dated: July 22, 2020
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Jeffery W. Levitan (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Joshua A. Esses (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax. 787.722.1932
dvelawoffices@gmail.com

**OF COUNSEL FOR
A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918
Tel: (787) 751-6764/ 763-0565
Fax: (787) 763-8260

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Employees Retirement
System of the Government of the
Commonwealth of Puerto Rico*

61