## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*, | |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3566-LTS |
| as representative of | |
| THE EMPLOYEES RETIREMENT SYSTEM<br>OF THE GOVERNMENT OF THE<br>COMMONWEALTH OF PUERTO RICO, | |
| Debtor. | |

## THE OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO'S REPLY IN SUPPORT OF MOTION TO DISMISS PROOFS OF CLAIMS AND ADMINISTRATIVE EXPENSE CLAIMS ASSERTED AGAINST THE COMMONWEALTH AND ERS BY CERTAIN HOLDERS OF ERS BONDS AND THE FISCAL AGENT

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "**Title III Cases**"), along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................................1

ARGUMENT ...................................................................................................................2

I.   The First Circuit Decisions Doom Claimants' Claims. .........................................2

II.  The Claims Are Not Entitled To Administrative Expense Priority. ...........................7

III. Claimants' Attempts to Manufacture New Administrative Claims Fail...................9

IV.  There Is No Plausible Basis to Find the Post-Petition Legislation Illegal or Wrongful. .........13

V.   The Post-Petition Legislation Is Not Unconstitutional. ..........................................14

     A.  The Post-Petition Legislation Is Not An Unconstitutional Taking....................14

     B.  The Post-Petition Legislation Does Not Violate the Contract Clause. .............20

     C.  The Post-Petition Legislation Did Not Violate The Automatic Stay.................23

VI.  Claimants Fail to Plausibly State Any Claim Against the Commonwealth............26

VII.   Claimants Do Not Allege Plausible Avoidance Claims. ....................................28

VIII.  Claimants' Promissory Estoppel And Unsupported Claims Should Be Dismissed. .........33

IX.  The Retiree Committee Has Standing To Object To The Claims. ...........................34

CONCLUSION.................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Abercrombie,*
139 F.3d 755 (9th Cir. 1998) ...............................................................................11

*Allegre Villa v. United States,*
60 Fed. Cl. 11 (Cl. Ct. 2004)...............................................................................16

*In re Allen-Main Assocs. Ltd. P'ship,*
223 B.R. 59 (B.A.P. 2d Cir. 1998)........................................................................28

*Ana María Sugar Co. v. Castro,*
28 D.P.R. 241, 1920 WL 3321 (P.R. 1920) ...........................................................32

*Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd.
(In re Fin. Oversight & Mgmt. Bd.),*
954 F.3d 1 (1st Cir. 2020) ..................................................................... *passim*

*In re AppliedTheory Corp.,*
312 B.R. 225 (Bankr. S.D.N.Y. 2004)...................................................................12

*Assured Guar. Corp. v. FOMB,*
872 F.3d 57 (1st Cir. 2017).................................................................................35

*Audette v. Kasemir (In re Concepts Am., Inc.),*
No. 14-B-34232, 2018 WL 3019629 (Bankr. N.D. Ill. June 14, 2018) ..................29

*Bank of N.Y. Mellon v. COFINA (In re Fin. Oversight & Mgmt. Bd.),*
301 F. Supp. 3d 306 (D.P.R. 2017)........................................................................5

*Baybank-Middlesex v. Ralar Distributors, Inc.,*
69 F.3d 1200 (1st Cir. 1995)............................................................................8, 9

*Bogan v. Scott-Harris,*
523 U.S. 44 (1998)..............................................................................................25

*Bostock v. Clayton Cty., Georgia,*
140 S. Ct. 1731 (2020)........................................................................................25

*Boston Trading Grp. v. Burnazos,*
835 F.2d 1504 (1st Cir. 1987).............................................................................31

*Bresler v Wilmington Tr. Co.,*
761 F. App'x 160 (4th Cir. 2019) ........................................................................28

*Buffalo Teachers Fed'n v. Tobe*,
    464 F.3d 362 (2d Cir. 2006)....................................................................................17, 19

*In re Business Express, Inc.*,
    No. 96-10130, 2000 WL 33679420 (Bankr. D.N.H. Feb. 11, 2000) .......................................35

*C.B. Trucking, Inc. v. Waste Mgmt., Inc.*,
    137 F.3d 41 (1st Cir. 1998) .........................................................................................26

*Cerame-Vivas v. Aguiar*,
    99 D.P.R 45, 51 (P.R. 1970) ......................................................................................32

*In re Ciavarella*,
    28 B.R. 823 (Bankr. S.D.N.Y. 1983) ...........................................................................29

*In re Colonial Mortg. Bankers Corp.*,
    324 F.3d 12 (1st Cir. 2003) ..........................................................................................7

*In re Computer Learning Centers, Inc.*,
    344 B.R. 79 (Bankr. E.D. Va. 2006) ............................................................................33

*Connolly v. PBGC*,
    475 U.S. 211 (1986) ..................................................................................................19

*In re Continental Airlines*,
    125 F.3d 120 (3d Cir. 1997) ........................................................................................33

*In re Copperfield Investments, LLC*,
    421 B.R. 604 (Bankr. E.D.N.Y. 2020) ..........................................................................30

*Cordero-Hernandez v. Hernandez-Ballesteros*,
    449 F.3d 240 (1st Cir. 2006) .......................................................................................26

*Cortes-Ramos v. Martin-Morales*,
    894 F.3d 55 (1st Cir. 2018) ....................................................................................26, 27

*In re Coughlin*,
    27 B.R. 632 (B.A.P. 1st Cir. 1983) ..............................................................................32

*De Jesús Díaz v. Carrero*,
    112 D.P.R. 631, 12 P.R. Offic. Trans. 786 (P.R. 1982)......................................................31

*In re FBI Dist. Corp.*,
    330 F.3d 36 (1st Cir. 2003) ....................................................................................12, 35

*Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuño*,
    604 F.3d 7 (1st Cir. 2010) ...........................................................................................19

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
  297 F. Supp. 3d 269 (D.P.R. 2018)......................................................................22

*Fin. Oversight & Mgmt. Bd. v. Andalusian Global Designated Activity Co.*
  *(In re Fin. Oversight & Mgmt. Bd.),*
  948 F.3d 457 (1st Cir. 2020) .................................................................. *passim*

*In re Furr's Supermarkets, Inc.,*
  359 B.R. 356 (B.A.P. 10th Cir. 2007) (unpub.)...............................................10, 11

*Gonzalez v. Lopez Quinones,*
  46 D.P.R. 843 (P.R. 1934) ......................................................................33

*Harman v. First Am. Bank of Md.,*
  956 F.2d 479 (4th Cir. 1992) ..................................................................31

*Haw. Hous. Auth. v. Midkiff,*
  467 U.S. 229 (1984)........................................................................18, 19

*In re HNRC Dissolution Co.,*
  396 B.R. 461 (B.A.P. 6th Cir. 2008)........................................................11, 14

*In re IDL Dev., Inc.,*
  No. 18-14808, 2019 WL 5799325 (Bankr. D. Mass. Nov. 1, 2019) .......................12

*In re Irving Tanning Co.,*
  555 B.R. 70 (Bankr. D. Me. 2016)..............................................................31

*Kelo v. City of New London,*
  545 U.S. 469 (2005)........................................................................18, 19

*In re Kenny G. Enters.,*
  512 B.R. 628 (C.D. Cal. 2014) .................................................................29

*Knick v. Twp. of Scott,*
  139 S. Ct. 2162 (2019)..........................................................................14

*Louisville Joint Stock Land Bank v. Radford,*
  295 U.S. 555 (1935)...............................................................................15

*M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prod., Inc.,*
  31 F. Supp. 2d 226 (D.P.R. 1998)..............................................................27

*In re Marrero,*
  382 B.R. 861 (1st Cir. 2008).....................................................................29

*Masso-Torrellas v. Municipality of Toa Alta,*
  845 F.3d 461 (1st Cir. 2017).....................................................................16

*In re McLain*,
   604 B.R. 108 (Bankr. D. Mass. 2019) ..................................................................27

*Mercado-Boneta v. Administracion del Fondo*,
   125 F.3d 9 (1st Cir. 1997) ........................................................................21, 22

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1652 (2019) ....................................................................................11

*In re Montreal, Maine & Atl. Ry., Ltd.*,
   956 F.3d 1 (1st Cir. 2020) ..................................................................................8

*In re N.Y. Int'l Hostel, Inc.*,
   157 B.R. 748 (S.D.N.Y. 1993) ..........................................................................29

*In re New York City Off-Track Betting Corp.*,
   434 B.R. 131 (Bankr. S.D.N.Y. 2010) ................................................................7

*In re Nortel Networks, Inc.*
   669 F.3d 128 (3d Cir. 2011) ..............................................................................25

*O'Hara v. Diageo-Guinness, USA, Inc.*,
   306 F. Supp. 3d 441 (D. Mass. 2018) ................................................................7

*Ocasio v. Hogar Geobel Inc.*,
   693 F. Supp. 2d 167 (D.P.R. 2008) ....................................................................2

*In re Old Carco LLC*,
   424 B.R. 633 (Bankr. S.D.N.Y. 2010) ..............................................................12

*Oliveras v. Banco Popular de Puerto Rico (In re Alicea Casanova)*,
   595 B.R. 616 (Bankr. D.P.R. 2018) ..................................................................30

*Paret-Ruiz v. U.S.*,
   827 F.3d 167 (1st Cir. 2016) ............................................................................14

*In re PCH Assocs.*,
   949 F.2d 585 (2d Cir. 1991) ........................................................................12, 28

*Peaje Investments LLC v. Fin. Oversight & Mgmt. Bd. of P.R.
   (In re Fin. Oversight Mgmt. Bd. of P.R.)*,
   899 F.3d 1 (1st Cir. 2018) ..................................................................................9

*In re Pension Reform Litig.*,
   2015 IL 118585 (2015) ....................................................................................22

*Matter of Pointer*,
   952 F.2d 82 (5th Cir. 1992) ........................................................................29, 30

*Reading Co. v. Brown*,
    391 U.S. 471 (1968)................................................................8

*Remexcel Managerial Consultants, Inc. v. Arlequin*,
    583 F.3d 45 (1st Cir. 2009)...............................................4, 6

*Rentas v. Gomez*,
    559 B.R. 305 (Bankr. D.P.R. 2016) ...................................30

*In re Residential Capital, LLC*,
    2016 WL 3240256 (Bankr. S.D.N.Y. June 3, 2016)............33

*Rieser v. Dinsmore & Shohl, LLP (In re Troutman Enters., Inc.)*,
    356 B.R. 786, 2007 WL 205640 (B.A.P. 6th Cir. 2007) (unpub.)...................................28, 29

*In re Roberts*,
    607 B.R. 635 (Bankr. N.D. Ill. 2019) .................................33

*Ropico, Inc. v. City of New York*,
    425 F.Supp. 970 (S.D.N.Y. 1976) .......................................17

*Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*,
    486 B.R. 75 (S.D.N.Y. 2012)...............................................11

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984).............................................................15

*In re Ruiz*,
    No. 03-10412, 2006 WL 3898318 (Bankr. D.P.R. Mar. 3, 2006) ............................................2

*In re Salamon*,
    854 F.3d 632 (9th Cir. 2017) ..............................................12

*San Geronimo Caribe Project, Inc. v. Acevedo-Vila*,
    687 F.3d 465 (1st Cir. 2012)................................................7

*In re Schneiderman*,
    251 B.R. 757 (Bankr. D.C. 2000) .......................................29

*In re Sentinel Mgmt. Grp., Inc.*,
    728 F.3d 660 (7th Cir. 2013) ..............................................32

*Serrano v. Torres*,
    61 D.P.R. 162, 166 (P.R. 1942) ..........................................31

*In re Sona Mobile Holdings Corp.*,
    No. 13-CV-4702, 2014 WL 5781101 (S.D.N.Y. Nov. 6, 2014).............................................27

*In re Stewart Foods, Inc.*,
    64 F.3d 141 (4th Cir. 1995) ...................................................................................12

*Strahan v. Sec'y, Massachusetts Exec. Office of Energy & Envtl. Affairs*,
    436 F. Supp. 3d 470 (D. Mass. 2020) ....................................................................26

*The Texas Co. (P.R.) v. Estrada*,
    50 D.P.R. 743 (P.R. 1936) .....................................................................................31

*In re Tolentino*,
    No. 10-10511, 2010 WL 1462772 (Bankr. N.D. Cal. Apr. 12, 2010) ....................28

*Tomsic v. Pitocchelli (In re Tri-Star Techs. Co.)*,
    260 B.R. 319 (Bankr. D. Mass. 2001) ...................................................................29

*Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*,
    258 F.3d 385 (5th Cir. 2001) .................................................................................11

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ...........................................................................................15

*Trinidad Hernandez v. ELA*,
    188 D.P.R. 828 (P.R. 2013) ...................................................................................13

*UAW Int'l v. Fortuño*,
    633 F.3d 37 (1st Cir. 2011) ..............................................................................21, 22

*United States v. Sec. Indus. Bank*,
    459 U.S. 70 (1982) .................................................................................................15

*Velazquez-Ortiz v. F.D.I.C.*,
    No. 11-CV-1757 PG, 2012 WL 1345174 (D.P.R. Apr. 18, 2012) .................2, 8, 10

*In re Vertullo*,
    610 B.R. 399 (B.A.P. 1st Cir. 2020) .........................................................................9

*In re Weinschneider*,
    395 F.3d 401 (7th Cir. 2005) .................................................................................11

*Matter of Woodbrook Assocs.*,
    19 F.3d 312 (7th Cir. 1994) ...................................................................................12

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. Amend. V ............................................................................................14, 16

31 L.P.R.A. § 3028 ................................................................................................33

11 U.S.C. § 502(a) ................................................................................................35

11 U.S.C. § 549 ........................................................................................28, 29, 30

11 U.S.C. § 552........................................................................................... *passim*

11 U.S.C. § 704(a)(5) ............................................................................................35

11 U.S.C. § 1103(c)(5) ..........................................................................................35

48 U.S.C. § 2141(b)(1)(C) ....................................................................................13

48 U.S.C. § 2161(a) ..............................................................................................35

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3007(c) ......................................................................................34

Fed. R. Bankr. P. 9019 ..........................................................................................34

9 COLLIER ¶ 3007.01 n.26 ....................................................................................34

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**") hereby files its reply in support of its *Motion to Dismiss Proofs of Claims and Administrative Expense Claims Asserted Against the Commonwealth and ERS by Certain Holders of ERS Bonds and the Fiscal Agent* (Dkt.892) ("**Motion to Dismiss**" or "**RCMot.**").[2]

## INTRODUCTION

All of Claimants' alleged administrative claims are just variations on a common theme: that the Post-Petition Legislation, which rescued the Commonwealth's pension system, legally wronged Claimants by eliminating their interest in future Employer Contributions and impairing their ability to collect on their Bonds. (*See* Group Proof of Claim ¶12; Admin.Cl. ¶24; Suppl. ¶¶3-8). But faced with two recent First Circuit Decisions that are fatal to their alleged claims— *Fin. Oversight & Mgmt. Bd. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd.)*, 948 F.3d 457, 467-68 (1st Cir. 2020) (the "**552 Decision**"); *Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)*, 954 F.3d 1, 7-10 (1st Cir. 2020) (the "**Trustee Decision**", and together with the 552 Decision, the "**First Circuit Decisions**")—Claimants attempt a substantial pivot in their response brief, contending that even if §552 eliminated their liens in post-petition Employer Contributions, their alleged collateral interests in ERS's pre-petition accounts receivable and Additional Uniform Contributions ("**AUC**") and their interests as unsecured creditors in Employer Contributions still provide a basis for their alleged Claims. While this shift marks an impermissible attempt to amend their Claims, it does not change the fact that the First Circuit Decisions and the Bond Resolution require dismissal of *all* of their Claims, even as informally amended.

---

[2] Unless otherwise noted, docket numbers refer to In re Employees Retirement System of the Government of the Commonwealth of Puerto Rico, 17-bk-3566 (D.P.R.).

## ARGUMENT

### I.    The First Circuit Decisions Doom Claimants' Claims.

Claimants spill considerable ink arguing that the First Circuit Decisions do not matter. (Cl.Br.13-26.) But they do. By ruling that ERS had no property interest in future Employer Contributions and that Claimants' liens in future Employer Contributions terminated as of ERS's petition date, the First Circuit destroyed Claimants' argument that the Commonwealth took something from ERS (or from Claimants) when it enacted the Post-Petition Legislation. *Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468. Put another way, the Post-Petition Legislation could not have taken anything away from ERS or Claimants because neither had any right to the "thing" allegedly being taken—future Employer Contributions. That should have been the end of the story for the Claims, all of which depend on this taking theory.

But now that this theory of recovery has evaporated, Claimants attempt to amend their Claims by arguing that the Post-Petition Legislation took different property from them: pre-petition accounts receivable owed to ERS and AUCs, neither of which they argue are impacted by the First Circuit Decisions. (Cl.Br.14-16). There are multiple problems with this argument.

*For starters*, Claimants cannot amend their Claims in a brief responding to a motion to dismiss. The cases forbidding this practice are legion: *Velazquez-Ortiz v. F.D.I.C.*, No. 11-CV-1757 PG, 2012 WL 1345174, at *6 (D.P.R. Apr. 18, 2012) (refusing to "consider after-the-fact allegations" that plaintiff only introduced in brief opposing a motion to dismiss); *Ocasio v. Hogar Geobel Inc.*, 693 F. Supp. 2d 167, 172 (D.P.R. 2008) (refusing to consider new factual allegations in opposition brief because doing so would result in "unfair surprise" to opposing party); *accord In re Ruiz*, No. 03-10412, 2006 WL 3898318, at *2 (Bankr. D.P.R. Mar. 3, 2006) ("Bar dates however, are not to be vitiated by amendments [to claims], and the courts must ensure that the amendments do not introduce wholly new grounds of liability"). The Claims are silent about the

Post-Petition Legislation taking away ERS's rights in its accounts receivable or AUCs; indeed, the Claims make no mention of accounts receivable or AUCs. (*See* Admin.Cl. ¶¶25-26, 29-31, 35, 37-38, 40-41; Suppl. ¶¶3-4, 6-9, 11-12, 15, 17.) Claimants cannot now introduce new, "after-the-fact allegations" concerning these asset classes to escape the First Circuit's 552 Decision.[3]

*Second*, the Post-Petition Legislation could not have deprived Claimants of a security interest in the AUCs because Claimants never had a security interest in AUCs to begin with. The starting point for this analysis is the Bond Resolution, which only granted Claimants a security interest in "Pledged Property." (Dkt.891-1, pdf.pg.218.) "Pledged Property" is defined in relevant part as "All Revenues." (Dkt.891-1, pdf.pg.253.) "Revenues" are defined as "All Employer Contributions received by [ERS] or the Fiscal Agent." (*Id*. pdf.pg.254.) "Employer Contributions" are defined to mean "the contributions paid from and after the date hereof that are made by Employers and any assets in lieu thereof or derived thereunder which are payable to [ERS] ***pursuant to Sections 2-116, 3-105 and 4-113 of the Act*.**" (*Id*. pdf.pg.250 (emphasis added).) Based on the text of the Bond Resolution, Claimants only have a lien on contributions paid by Employers to ERS "pursuant to Sections 2-116, 3-105 and 4-113 of the ERS Enabling Act." (*Id*.) But employers pay AUCs pursuant to a different section of the ERS Enabling Act—§5-117. (Act 32-2013.) Because employers paid AUCs to ERS pursuant to a different section of the Act not mentioned in the definition of "Employer Contributions," AUCs are not "Employer Contributions" as defined in the Bond Resolution and thus are not "Revenues" and not "Pledged Property." In short, Claimants do not have a security interest in AUCs.

---

[3] The Claims do assert an unsecured claim for an alleged *pre-petition* modification to accounts receivable but make no similar allegation for any post-petition action. (Suppl. §31) ("However, to the extent employer contributions were eliminated or cancelled through prepetition revisions to the ERS Enabling Act or other prepetition conduct….")

This conclusion inevitably flows from the First Circuit's 552 Decision. Although the First Circuit did not decide the question of Claimants' security interest in AUCs, it did decide how the definition of Employer Contributions found in the Bond Resolution should be read. Relying upon the "series qualifier" cannon of construction, the First Circuit held that the clause "which are payable to the System pursuant to Sections 2-116, 3-105 and 4-113" limited both "contributions paid from and after the date hereof that are made by the Employers" and "any assets in lieu thereof or derived thereunder" which are "payable to [ERS]." 948 F.3d at 467. This reading was a necessary component of the First Circuit's ruling, is law of the case, and entitled to preclusive effect. *Remexcel Managerial Consultants, Inc. v. Arlequin*, 583 F.3d 45, 53 (1st Cir. 2009) (law of the case doctrine "prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case"). Applying it here necessarily means Claimants have no lien in AUCs. *Cf. Opinion And Order In Connection With Preliminary Hearing Regarding Motion Of Assured Guaranty Corp. [And Others] For Relief From Automatic Stay, Or In The Alternative, Adequate Protection.* (Case 17-3283, Dkt.13541, pg.32-33) (applying 552 Decision to HTA Bond Resolution).

*Third*, even if AUCs fell within the Bond Resolution's definition of "Employer Contributions," ERS did not have a property interest in AUCs as of its petition date that were not yet due from employers and thus Claimants could not have a lien upon future AUCs and any such lien would have been extinguished by §552. The First Circuit held in its 552 Decision that ERS did not have a property interest in Employer Contributions that were not yet due under the Act and Claimants therefore did not have a lien on not yet due Employer Contributions, making their right to assert such a lien subject to §552. 948 F.3d at 468. The same logic applies to AUCs, which came due each fiscal year and were based on an annual calculation of ERS's projected assets and each

employer's contribution obligations for that fiscal year. (Act 32-2013, §§3, 4.) ERS's interests in AUCs that were not yet due were therefore merely an expectancy under Puerto Rico law. 948 F.3d at 468 n.8. Thus, even if AUCs were Employer Contributions, Claimants could only first have a lien on those AUCs when they came due, making §552 applicable, and cutting off any alleged lien interests Claimants held in AUCs as of the petition date. *Id.* at 468-70. In short, Claimants did not have any property interest in future AUCs (nor did ERS) on the date the Commonwealth enacted the Post-Petition Legislation.

*Fourth*, Claimants contend that even if they did not possess a lien on future Employer Contributions and AUCs, the Post-Petition Legislation still damaged them because it eliminated ERS's right to receive these payments thereby reducing ERS's ability to repay Claimants' alleged unsecured deficiency claim. (Cl.Br.18-20.) Whether Claimants have an unsecured deficiency claim pursuant to §1111(b) is subject to dispute and cannot be decided until a confirmation hearing, but even if one assumes that Claimants will have an unsecured deficiency claim, it does not matter to the analysis of their alleged administrative Claims. Because the First Circuit held that ERS did not have a property interest in future unpaid Employer Contributions and the same reasoning would apply to AUCs, the Commonwealth did not take any property away from ERS when it enacted the Post-Petition Legislation and there are no claims for ERS to bring. 948 F.3d at 468. Further, as unsecured creditors, Claimants have no standing to sue for alleged harms suffered by ERS, even if those alleged harms impacted ERS's ability to repay them. *Bank of N.Y. Mellon v. COFINA (In re Fin. Oversight & Mgmt. Bd.)*, 301 F. Supp. 3d 306, 312 (D.P.R. 2017). Claimants were not granted standing to pursue ERS's claims, and when they asked to pursue to some of the legal theories identified in their Claims in the name of ERS, this Court denied that request and the First Circuit affirmed. *Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10. In short, the First Circuit

5

Decisions doom Claimants' theory that they can pursue their Claims as an alleged unsecured creditor.

*Fifth*, Claimants argue that they were damaged because Act 106 "purports to cancel the Accounts Receivable and convert them to a component of the Pay Go Fees…." (Cl.Br.92). But Act 106 applied that change prospectively ("[b]eginning July 1, 2017"). (Act 106 §2.4(e).) Consequently, the 552 Decision is directly on point because when ERS filed its Title III petition in May 2017, it had no cognizable property interest in the Accounts Receivable or AUCs that would become due after July, 2017. Instead, as with post-petition Employer Contributions, ERS had a "mere expectancy" in these future accounts, which "is not itself a property interest." 948 F.3d at 468 n.8. Thus, neither ERS nor Claimants were damaged by this part of Act 106.

*Sixth*, Claimants contend that they were "deprived" of their alleged collateral when the Post-Petition Legislation "commanded ERS to transfer all of its assets" to the Commonwealth and that the First Circuit Decisions do not impact this theory of recovery. (Cl.Br.14.) Claimants are again wrong. Claimants previously argued that they should be granted standing (or a trustee appointed) to recover the $190.4 million of property ERS transferred to the Commonwealth notwithstanding the Commonwealth's agreement to return $190.4 million if Claimants have a lien on the funds. (Cl.Br.17-18.) This Court denied that request and the First Circuit affirmed and in doing so held that the Commonwealth's agreement to hold the funds until Claimants' interests in them could be determined protected Claimants. *Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10-11. That ruling is law of the case and ends the debate about whether Claimants have post-petition claims to recover the $190.4 million ERS transferred to the Commonwealth. *Remexcel Managerial Consultants*, 583 F.3d at 53.

*Seventh*, Claimants contend that the Commonwealth's agreement to hold the $190.4 million is not sufficient because ERS may have transferred other property. (Cl.Br.16-18.) But this Court can take judicial notice from ERS's financial reports that ERS transferred only $190.4 million of property to the Commonwealth. *See, e.g., In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 19 (1st Cir. 2003) ("matters of public record are fair game in adjudicating Rule 12(b)(6) motions"); *San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 471 (1st Cir. 2012) (taking judicial notice of judicial decisions); *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 450 (D. Mass. 2018) (noting that when a public record "contradicts an allegation in the complaint, the [public record] document trumps the allegation"). In short, the indisputable fact is that the potential universe of Pledged Property is either still at ERS or is being held for Claimants' benefit. Under either scenario, the Post-Petition Legislation did not damage Claimants because it has not denied Claimants the ability to recover from Pledged Property if they hold a valid lien.

*Finally*, Claimants' argument that a dispute over the *value* of the Pledged Property saves the Claims from dismissal is a red herring. (Cl.Br.16-17). If Claimants are found to have a lien on certain property and if there is a dispute about its value, this Court will decide that dispute and nothing in the Post-Petition Legislation prevents the Court from doing so.

## II.     The Claims Are Not Entitled To Administrative Expense Priority.

Claimants rely upon their Rule 12(c) Motion to support their argument that their Claims are entitled to administrative priority or are non-dischargeable. (Cl.Br.23-25.) The Retiree Committee incorporates its Opposition to the Rule 12(c) Motion. (Dkt.930.) In sum, Claimants are wrong because:

- As *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010) (the only case that addresses the issue) holds and the two leading bankruptcy treatises correctly note, while there are administrative expenses in a municipal bankruptcy, there can be no "operating" administrative expenses under §503(b)(1)—

the type Claimants seek—as there is no "estate" under chapter 9 or PROMESA (Dkt.930 at 19-21);

- Even if "operating" administrative expense were allowed, the claims here do not qualify as Claimants do not (and could not) allege that they provided a post-petition benefit to ERS or the Commonwealth, a necessary condition for allowance of a §503(b)(1) claim (*id*. at 21-24);

- Even if the Supreme Court's exception in *Reading Co. v. Brown*, 391 U.S. 471 (1968) to the traditional test for granting an administrative claim under §503(b)(1) could apply under PROMESA, it would not apply here as all of the alleged claims are rooted in the pre-petition past because they are based on ERS's failure to fulfill its pre-petition obligations under the ERS Bonds. (*Id*.) Claimants implicitly concede this point as to ERS (Cl.Br.24) and as for the Commonwealth, Claimants cannot rebut the fact that the entire basis for their assertion that the Post-Petition Legislation is wrongful is because it caused ERS to breach its contractual obligations in connection with the ERS Bonds; and

- Section 944 and applicable case law make clear that a plan of adjustment discharges *all* pre-confirmation debts against a debtor. (Dkt.930 at 24-26.)

Seeking to salvage their claim to administrative priority, Claimants contend that they possess an administrative claim under §922(c) due to a lack of adequate protection. (Cl.Br.91-93.) But to establish a claim for adequate protection, Claimants needed to identify specific collateral that has been diminished by operation of the automatic stay. *See In re Montreal, Maine & Atl. Ry., Ltd.*, 956 F.3d 1, 7 (1st Cir. 2020) (party requesting adequate protection "bore the burden of proof before the bankruptcy court to demonstrate the value of the [collateral]"); *Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1204 (1st Cir. 1995) (affirming denial of administrative expense claim for failure of adequate protection where creditor "failed to present a plausible argument on the threshold issue of whether in fact it suffered a loss"). Claimants have not done that (*see* Admin.Cl. ¶42) and it is too late to try to do so in their response to a motion to dismiss. *Velazquez-Ortiz,* 2012 WL 1345174, at *6.

Claimants' new allegations are unavailing in any event. (Cl.Br.92-93.) Claimants contend that their adequate protection claim is viable because "their collateral—which remains in the

custody of the Commonwealth or other third parties, not ERS—has been dissipated during the pendency of the automatic stay." (*Id.* at 92.) But the only pre-petition ERS property that has been transferred post-petition is being held for Claimants' benefit. *See Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 10. The fact that the Commonwealth is holding the property for Claimants' benefit does not establish an adequate protection claim because the fact that the Commonwealth is holding the property "caused no loss" to Claimants. *Baybank-Middlesex*, 69 F.3d at 1204.

Likewise, Claimants' argument that adequate protection is necessary to protect them from the "risk that collateral will lose value" serves them no better. (Cl.Br.92). Claimants point to Act 106 as that risk arguing that "Act 106 on its face purports to cancel the Accounts Receivable and convert them to a component of the Pay Go Fees…." *Id*. But Act 106 applies prospectively "[b]eginning July 1, 2017." (Act 106 §2.4(e).) The First Circuit's 552 Decision, however, held that §552 cut-off Claimants liens in Employer Contributions before July 1, 2017 so Act 106 could not have diminished Claimants' collateral. 948 F.3d at 466-70. Because the property impacted by Act 106 was not Claimants' collateral or ERS's property, Act 106 cannot serve as the basis for Claimants' alleged §922(c) claim. *See, e.g., Peaje Investments LLC v. Fin. Oversight & Mgmt. Bd. of P.R. (In re Fin. Oversight Mgmt. Bd. of P.R.)*, 899 F.3d 1, 12 (1st Cir. 2018) ("With the only asserted lien … found not to exist, for purposes of this appeal Peaje claims no relevant property interest necessary to compel relief from the automatic stay"); *In re Vertullo*, 610 B.R. 399, 404 (B.A.P. 1st Cir. 2020).

## III.   Claimants' Attempts to Manufacture New Administrative Claims Fail.

Having no effective rebuttal to the impact of the First Circuit Decisions on their Claims, Claimants attempt to use their alleged unsecured claims against ERS to create a new administrative claim, arguing that "any illegal post-petition acts that deprived ERS of the ability to repay Claimants as unsecured creditors can give rise to [administrative] claims." (Cl.Br.20). Because

Claimants never asserted this alleged claim in their Claims, they are barred from asserting it now. *Velazquez-Ortiz,* 2012 WL 1345174, at *6.

Claimants also argue that their pre-petition "constitutional, contract, and tort claims are not subject to the limited recourse provisions of the Bond Resolution and are an independent basis for unsecured claims against ERS" and thus their impairment also can give rise to an administrative claim. (Cl.Br.19.) The Retiree Committee has addressed at length why this is not so in its response to the Bondholders Rule 12(c) Motion. (*See* Dkt.930 at 10-15.) To quickly summarize here: given that every Claim is based on alleged violations of the Bond Resolution, Claimants cannot escape that contract's express language limiting their recovery to the Pledged Property.

In any event, even if Claimants do possess unsecured claims against ERS, Claimants' theory that they possess an *administrative claim* because the Post-Petition Legislation made it more difficult for them to recover on that unsecured claim does not hold water because the law recognizes no such claim. Claimants essentially ask this Court to recognize a claim for tortious interference with an unsecured claim but there does not appear to be any case that has held that if a debtor takes an action post-petition that makes it more difficult for a creditor to obtain a recovery on its unsecured claim, a new claim arises and that new claim elevates the unsecured claim into an administrative claim. Such a rule would have sweeping implications. Almost any action a debtor takes post-petition arguably could diminish at least one unsecured creditor's recovery in bankruptcy. If Claimants' theory was correct, bankruptcy courts would do little else other than determine disputes over whether an unsecured claim has been transformed into an administrative expense claim.

It is therefore no surprise that the case law holds the opposite. For example, in *In re Furr's Supermarkets, Inc.*, the creditor entered into a pre-petition contract with the debtor, a grocery store,

under which the creditor agreed to consign stamps to the debtor and the debtor agreed to pay the creditor the proceeds of any stamp sales. 359 B.R. 356 (B.A.P. 10th Cir. 2007) (unpub.). After filing for bankruptcy, the debtor "fail[ed] to account for either the stamps or the proceeds thereof" and the creditor sought an administrative expense claim for the debtor's disposition of its collateral under *Reading*. *Id.* at *3. The court denied the motion holding that even if the creditor's property had been converted, "[t]his amounts to nothing more than a breach of debtor's payment obligation under the [pre-petition contract]" and therefore not an administrative expense claim. *Id.* *Furr's Supermarkets* is just one of many examples of courts refusing to allow a creditor to morph an unsecured claim into an administrative expense or priority claim. For instance, the Sixth Circuit BAP has recognized decisions from numerous circuits denying administrative expense status to claims that ultimately "stem[] from pre-petition contracts," despite the claimants' creative attempts to plead such unsecured claims as administrative claims under *Reading*. *In re HNRC Dissolution Co.*, 396 B.R. 461, 484 n.18 (B.A.P. 6th Cir. 2008) (citing *In re Sunarhauserman, Inc.*, 126 F.3d 811 (6th Cir. 1997); *In re Weinschneider*, 395 F.3d 401 (7th Cir. 2005); *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385 (5th Cir. 2001); *In re Abercrombie*, 139 F.3d 755, 759 (9th Cir. 1998); *accord Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*, 486 B.R. 75, 91-93 (S.D.N.Y. 2012) (denying administrative expense claim based upon costs that matured post-petition under pre-petition contract).

Finally, an analogous situation arises in the context of executory contracts. Section 365(g) provides that when a creditor's pre-petition contract with the debtor is rejected, that creditor's post-petition claims in connection with that contract are treated as a pre-petition unsecured claim. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019). Courts routinely reject attempts to turn those claims into administrative claims reasoning that Congress could not

have intended that result. *See, e.g., In re FBI Dist. Corp.*, 330 F.3d 36, 42 (1st Cir. 2003) (affirming order denying administrative expense priority where there "was no postpetition agreement" between debtor and creditor because rejection gives rise only to a "prepetition general unsecured claim for breach of contract damages, one not entitled to administrative priority"); *In re Stewart Foods, Inc.*, 64 F.3d 141, 144-46 (4th Cir. 1995); *In re IDL Dev., Inc.*, No. 18-14808, 2019 WL 5799325, at *3 (Bankr. D. Mass. Nov. 1, 2019) ("Generally, a claimant is not entitled to an administrative claim because a debtor does not immediately reject an executory contract"); *In re Old Carco LLC*, 424 B.R. 633, 640 (Bankr. S.D.N.Y. 2010), *aff'd by In re Old Carco LLC*, No. 10-CV-2800, 2010 WL 4455648 (S.D.N.Y. 2010) ("affording rejection claims administrative priority would effectively eliminate the purpose behind providing a debtor with the power to reject a contract"); *In re AppliedTheory Corp.*, 312 B.R. 225, 236-37 (Bankr. S.D.N.Y. 2004).

So too here. An unsecured claim based on §1111(b), like the one Claimants assert, is a creature of the Bankruptcy Code created by Congress—it gives a creditor a recourse claim where none would exist under state law. *In re PCH Assocs.*, 949 F.2d 585, 604 (2d Cir. 1991). In doing so, however, Congress made the decision to treat such recourse claims as pre-petition general unsecured claims. *Matter of Woodbrook Assocs.*, 19 F.3d 312, 318 (7th Cir. 1994). To allow a creditor to then turn around and use this claim or any unsecured claim to create an administrative priority claim would be to turn the Bankruptcy Code on its head. *In re Salamon*, 854 F.3d 632, 636 (9th Cir. 2017) (refusing to allow creditor to manipulate a §1111(b) claim in a manner to "afford him more rights in bankruptcy than he would otherwise have under state law"); *accord FBI Dist.*, 330 F.3d at 42-46. Consequently, the Court should reject Claimants' invitation to create an administrative claim based on an alleged impairment of an unsecured claim.

**IV.    There Is No Plausible Basis to Find the Post-Petition Legislation Illegal or Wrongful.**

As explained in the Motion to Dismiss (RCMot.14-18), a third reason for dismissing all of Claimants' post-petition claims is the fact that all such claims are based on the false premise that "[i]t is difficult to imagine a more egregious violation of the law than the Commonwealth working to dismantle ERS and taking all of its assets by enacting the Post-Petition Legislation." (Admin.Cl. ¶26). To support these bare-boned conclusions, the Claims are cloaked in the language of "fraud" and that the Post-Petition Legislation was passed with "knowing" and "intentional" harm to Claimants in mind. (Supp. ¶¶4-6, 11, 23).

But Claimants allege no facts beyond these legal conclusions. Nor could they do so. For starters, Claimants do not dispute that the Commonwealth has broad authority to "adopt changes that guarantee the stability and solvency of the [retirement] system." *See Trinidad Hernandez v. ELA*, 188 D.P.R. 828, 835 (P.R. 2013) (per curiam). Likewise, Claimants do not dispute that PROMESA charges the Oversight Board with creating a fiscal plan that "provide[s] adequate funding for public pension systems." 48 U.S.C. § 2141(b)(1)(C). Similarly, Claimants cannot factually challenge the fact that the Post-Petition Legislation was passed to correct ERS's "severe underfunding." (*See* Admin.Cl. ¶3; *see also id*. Ex. A ¶¶55-56, 58-59).

Given the Commonwealth's authority to do what it did, the burden is on Claimants to allege some *facts* to support their theory that the law was passed as a ruse to hide the Commonwealth's true intention of harming Claimants. Claimants have now had three years to find something to support this claim. The fact that they cannot is telling and confirms that there was nothing nefarious or unlawful with the Post-Petition Legislation. And, as explained *supra*, to the extent Claimants' contractual right to obtain a lien on ERS's after-acquired property has been negatively impacted since ERS's title III filing, that is the result of §552(a) of the Bankruptcy Code, Puerto Rico property law, and the nature of the Pledged Property.

13

As for ERS, Claimants provide no rebuttal to the fact that its post-petition actions cannot be unlawful given that all ERS did was follow the law (the Post-Petition Legislation). And the case law is clear: where, as here, a governing statute permits the conduct that allegedly breaches the creditor's contract with the debtor, that lawful conduct cannot be considered "wrongful" such that the *Reading* exception applies to grant administrative expense status. *HNRC Dissolution*, 396 B.R. at 484 (no administrative claim for actions creating withdrawal liability under ERISA, which actions the statute "permitted, and even anticipated"). Consequently, all of Claimants' "intent" claims (of which there are many) must be dismissed.

## V.     The Post-Petition Legislation Is Not Unconstitutional.

Claimants attempt to salvage some of their post-petition claims by asserting the Post-Petition Legislation is unlawful because it violates superior laws—either the U.S. and Puerto Rico Constitutions or the Bankruptcy Code's automatic stay. These arguments are meritless as well.

### A.     The Post-Petition Legislation Is Not An Unconstitutional Taking.

Claimants offer four primary arguments against dismissal of their takings claim:[4]

*First*, Claimants maintain that their "perfected security interests in and liens on the Pledged Property," and "contractual right to receive principal and interest payments from ERS" are

---

[4] Although *Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019) overruled the Supreme Court's prior instruction that takings plaintiffs must first exhaust state remedies before pursuing their claim in federal court, 139 S. Ct. at 2170, *Knick* did not disturb the Court's long-established precedent that the only venue for takings claims exceeding $10,000 against the federal government is in the Court of Federal Claims, under the Tucker Act, *id.* Indeed, the Court clarified that "[a] claim for just compensation brought under the Tucker Act is not a prerequisite to a Fifth Amendment takings claim—it *is* a Fifth Amendment takings claim." *Id.* at 2174 (emphasis in original). Claimants are currently litigating a Tucker Act claim against the Oversight Board for effecting a taking by directing the Commonwealth to enact the Post-Petition Legislation. *See Altair Global Credit Opportunities Fund (A), LLC et al. v. U.S.*, No. 17-CV-970 (Cl. Ct. 2017). In that action, Claimants have argued the United States is legally obligated to pay them *all* of the compensation they think they are owed for the very same alleged takings they have raised in this court. *See Complaint, Altair Global Credit Opportunities Fund(A), LLC v. United States*, No. 17-CV-970, Dkt.1 (Cl. Ct. July 19, 2017). This court's jurisdiction over this identical takings claim for compensation is questionable at best. *See Paret-Ruiz v. U.S.*, 827 F.3d 167, 177 (1st Cir. 2016) (holding that the Court of Federal Claims "has exclusive jurisdiction for constitutional claims against the United States exceeding $10,000," and that other

cognizable property interests under the Takings Clause. (Cl.Br.58-59.) But the 552 Decision made clear that Claimants' liens in Pledged Property were cut-off as of ERS's petition date by operation of §552 and thus Claimants had no perfected property interest in future Employer Contributions at the time the Commonwealth enacted the Post-Petition Legislation. 948 F.3d at 466-70. This leaves them with an unsecured "contractual right" against ERS—a right that the Supreme Court has long held can be legislatively impaired without constitutional issue, especially in the bankruptcy context. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 74-75 (1982); *see also Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (stating in context of takings claim that "[u]nder the bankruptcy power Congress may discharge the debtor's personal obligation, because, unlike the states, it is not prohibited from impairing the obligation of contracts").

*Second*, Claimants argue that the Post-Petition Legislation effects a taking "by reducing the value" of their "liens" on the Pledged Property and their contractual rights "to zero," "physically transferring the collateral to a place where [they] cannot access it," and "interfer[ing]" with their "contractual right to repayment" of principal and interest. (Cl.Br.66; *see also id.* at 64, 67.) But to the extent that Claimants have any right to the Pledged Property, the First Circuit has held that that right was always subject to elimination. 948 F.3d at 468-69 ("[T]he Bond Resolution

---

federal courts "have no jurisdiction to consider a taking claim where the amount in controversy exceeds that amount." (internal quotation marks omitted)); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.").

If Claimants contend that the Retiree Committee also "likely lacks standing" to press the effect of Claimants' Tucker Act action on this case (*see* Cl.Br.72 n.44), they are wrong. *Town of Chester, N.Y. v. Laroe Estates, Inc.,* 137 S. Ct. 1645 (2017), which they cite, merely holds that an intervenor must possess Article III standing to seek *relief* different than that sought by the party it supports. 137 S. Ct. at 1651-52. The relief sought by the Retiree Committee on Tucker Act grounds is, as with its other arguments, a dismissal with prejudice, the same relief the Board seeks. The Retiree Committee does not need standing to make this argument.

explicitly states that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so adversely affect the Bondholders.").[5] That Claimants' "right" in the Pledged Property might be zeroed out by the Commonwealth was thus not a taking, but inherent to the right itself.

Any contractual right to repayment Claimants have is similarly subject to these contractual limitations: Claimants do not allege that the ERS Bond Resolution required participating employers to guarantee any amount of employer contributions, or provided Claimants a remedy for a reduction or cessation in employer contributions. Claimants, then, have the right to be paid from *available* Pledged Property, but no right to ERS's maintenance of any minimum amount of Pledged Property. And if Claimants had a contractual right to any part of the Pledged Property before the Post-Petition Legislation, nothing in that Legislation purports to strip Claimants of that right, or of their right to seek what they are owed through a breach of contract claim against ERS— which they have done.[6] *Masso-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017); *see also Allegre Villa v. United States*, 60 Fed. Cl. 11, 18 (Cl. Ct. 2004) ("When a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking."). Moreover, the only "transfer[]" of this Property that could have occurred pursuant to the Post-Petition Legislation is the $190.48 million that ERS transferred to the Commonwealth, and

---

[5] Claimants assert that Movants cannot cite to the Offering Statement "because the operative contract was the Bond Resolution." (Cl.Br.47.) The First Circuit, however, has considered both the Offering Statement and the Bond Resolution to understand ERS's obligations and the Claimants' expectations for the bonds. *Fin. Oversight & Mgmt. Bd.*, 948 F.3d at 468-69. Moreover, Claimants themselves cite to the Offering Statement where they believe it helps them. (*See* Cl.Br.47-50.)

[6] Claimants argue that their takings claim exists independently of any breach of contract claim they might have against ERS, because the Commonwealth's "unconstitutional legislative decisions . . . destroyed" their property rights. (Cl.Br.70.) But as explained above, the Post-Petition Litigation did no such thing.

which is now being held for Claimants' benefit. *Fin. Oversight & Mgmt. Bd.,* 954 F.3d at 10-11.
Claimants lack access to these funds not because the Post-Petition Legislation's transfer was an
unconstitutional taking, but because whether they have a valid lien on the funds at all is in dispute.
*Id.* If they are owed anything from ERS, they will recover it once this dispute is resolved. *Id.*

*Third*, Claimants ask this Court to ignore the critical context in which the Post-Petition
Legislation was enacted. As the Retiree Committee demonstrated in its Motion to Dismiss, courts
are less likely to find that legislative actions like the Post-Petition Litigation, which was taken to
address a "profound and severe fiscal crisis," are "takings." (RCMot. 27-28 (quoting Admin.Cl.
Exs. A.B, A.C).) Claimants largely avoid engaging with this argument. To be sure, Claimants
weakly suggest that a government's emergency response to a financial crisis is limited by the
Takings Clause unless it involves only "minimal and temporary deprivations of property."
(Cl.Br.70.) But neither of the cases Claimants cite in support actually places such a limit on when
or how the government can regulate in a financial crisis. *See Buffalo Teachers Fed'n v. Tobe*, 464
F.3d 362, 375-76 (2d Cir. 2006) (finding that wage freeze did not substantially interfere with
investment-backed expectations because it prospectively affected a small increase in wages, and,
"[u]ltimately," the wage freeze was not a taking because it helped city "obtain fiscal stability");
*Ropico, Inc. v. City of New York*, 425 F.Supp. 970, 977 (S.D.N.Y. 1976) (emphasizing "the
pressing public emergency" threatening the financial stability of New York City in finding that
temporary suspension of creditor right to sue was not a taking). And Claimants' approach—which
renders governments largely powerless to deal with financial crises—has little to recommend it.

Tellingly, Claimants ignore *New Haven Inclusion Cases*, 399 U.S. 392 (1970), which
involved public bondholders like themselves, in analogous circumstances; there, the Supreme
Court found "no constitutional bar" to the "substantial loss" a railroad's reorganization had

17

imposed on its secured bondholders, because the bondholders had "invested their capital in a public utility that does owe an obligation to the public," and therefore "assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." 399 U.S. at 491-92 (internal citation omitted). So too for Claimants, who were warned through the Bond Resolution and Offering Statement that their bonds were not immune from the Commonwealth's legislative activity, *see* 948 F.3d at 468-69: they assumed the risk that the legislature would consider "the interests of the public . . . as well as theirs," 399 U.S. at 492, in addressing Puerto Rico's "unprecedented financial and social crisis," (Admin.Cl. Ex. A.C).

*Fourth*, Claimants' takings claim fundamentally asks this court to second-guess the Commonwealth's—and Congress's—findings on the severity and seriousness of Puerto Rico's financial crisis, and the Commonwealth's judgment that the Post-Petition Legislation was necessary to protect pensioners and the pension system from the worst of the crisis. And they ask the Court to do so based on nothing more than their conclusory allegations of ulterior motives. But judicial review of a legislature's determination that a taking is for a "public use" is "extremely narrow," which means that the taking need only be "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240-41 (1984); *Kelo v. City of New London*, 545 U.S. 469, 480 (2005) (noting that, "[w]ithout exception, our cases have defined [public use] broadly, reflecting our longstanding policy of deference to legislative judgments in this field.").

The "public purpose" of the Post-Petition Legislation—to safeguard pensioners and stabilize the pension system—is obvious. (*See* RCMot. 27-28.) Claimants, however, reduce the purpose to simply "the transfer of property from one creditor to another, solely to benefit the second creditor." (Cl.Br.73.) This mischaracterizes and erases the "public use" character of the Post-Petition Legislation, which transfers ERS's assets to a public entity, the Commonwealth, to

18

better administer a new public retirement pension system for public servants in the midst of a financial crisis. (*See* RCMot. 27-28.) Contrary to Claimants' assertion (Cl.Br.73), this transfer of property to the Commonwealth, to rectify a crisis in financing a public system, is not distinguishable from the government's transfer of private property to address a public crisis in land ownership upheld in *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 233-34, 242, 245 (1984), or the Commonwealth's reclamation of private land to ensure more efficient management and stewardship upheld in *Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuño,* 604 F.3d 7, 18 (1st Cir. 2010). And even if Claimants' characterization of the Post-Petition Legislation's purpose were accurate, the purpose would not be any less public or valid under the Takings Clause. *See Kelo*, 545 U.S. at 485 (noting that "the government's pursuit of a public purpose will often benefit individual private parties"); *Connolly v. PBGC*, 475 U.S. 211, 223 (1986) ("Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another"); *Buffalo Teachers Fed'n*, 464 F.3d at 375-76 ("We recognize the possibility that the net effect of the wage freeze may well be to take from Peter to pay Paul, but such burden shifting does not, without more, amount to a regulatory taking"). The Commonwealth thus can impair senior creditors' interests for the benefit of junior creditors without running afoul of the Takings Clause, if doing so serves the valuable public purpose of stabilizing the government's finances and protecting the health and safety of pensioners.[7]

---

[7] Claimants also suggest that the Commonwealth enacted the Post-Petition Legislation as "[p]olitically expedient" "favoritism" toward pensioners and Commonwealth creditors, at Claimants' expense. (Cl.Br.74.) But they have alleged nothing to support these contentions. As a consequence, they raise no question of fact that would preclude dismissal.

**B.      The Post-Petition Legislation Does Not Violate the Contract Clause.**

Claimants' arguments against dismissal of their Contract Clause claim largely recapitulate their takings arguments—they argue that the Post-Petition Legislation substantially impaired their contractual rights by redirecting the Pledged Property to the Commonwealth and leaving them without a remedy for this "breach" (Cl.Br.45, 51), and that the Legislation's true purpose was to transfer property from disfavored creditors to the Commonwealth's preferred creditors (*id*. at 53-54). The Retiree Committee's arguments for dismissal are thus largely the same, as well: the Post-Petition Legislation deprives Claimants of nothing they could not obtain through their pending breach of contract action; any part of the Pledged Property they are owed is being held for their benefit and will be returned to them if their claimed lien on the funds is found valid; and Claimants' conclusory allegations of the Legislation's secretly nefarious purpose cannot create a question of fact when the actual purpose of the Legislation is so obviously for the public good.

Claimants' three additional arguments in support of their Contract Clause claim also fail. *First*, Claimants attempt to analogize the Post-Petition Legislation to legislation authorizing a municipality to borrow money, and then stripping it of its taxing power and its ability to repay its debt. (Cl.Br.45-46.) But this analogy makes no sense here. The Post-Petition Legislation does not disturb ERS's obligation to pay whatever pre-petition Pledged Property Claimants are owed, or Claimants' right, if any, to these funds. Nor does the Legislation impede ERS's ability to pay any owed funds, when the Pledged Property transferred pursuant to the Legislation is being held for Claimants' benefit. *See Fin. Oversight & Mgmt. Bd.,* 954 F.3d at 10. Claimants have not been paid the Pledged Property they believe they are due, not because of the Post-Petition Legislation, but because whether they are actually owed anything is in dispute.

*Second*, Claimants' theory of "substantial impairment" turns on their allegation that they had no reasonable expectation that "employer contributions could be wholly diverted or

eliminated." (Cl.Br.47.) They concede, however, that they were "on notice that the Commonwealth might reduce the contribution rate" in a manner adverse to Employer Contributions. (*Id.*) Claimants cannot have it both ways. Notice that the Commonwealth could reduce the contribution rate was notice that the Commonwealth could reduce the rate to ***zero***—nothing in the Bond Resolution promised otherwise. Claimants' assertion that they could not expect that ERS might be eliminated, and the pension system reorganized, is also untenable: as the First Circuit has recognized, the Bond Resolution and ERS Offering Statement each expressly warn that the Commonwealth could pass legislation adverse to the bonds. 948 F.3d at 469 (finding that, per the Bond Resolution, prior employer contribution funding scheme "could be disregarded by a subsequent legislature (to the Bondholders' detriment)," and that the Offering Statement "put the Bondholders on notice that . . . the Commonwealth legislature could, and likely would, reduce [employers' contributions] if it could not fully fund its planned appropriations.").

What Claimants allege is an expectation that the Bond Resolution would contract away the Commonwealth's right to regulate its pension system for the public good; such an expectation is *per se* unreasonable. *See UAW Int'l v. Fortuño*, 633 F.3d 37, 43 (1st Cir. 2011) ("[T]he Contract Clause has traditionally been interpreted to avoid limiting a state's ability to govern."); *Mercado-Boneta v. Administracion del Fondo*, 125 F.3d 9, 14 (1st Cir. 1997) ("The Contract Clause's prohibition of any state law impairing the obligation of contracts must be accommodated to the State's inherent police power to safeguard the vital interests of its people."). Claimants' Contract Clause claim should be dismissed for this reason alone.

*Third*, Claimants' arguments that the Post-Petition Legislation was unreasonable or unnecessary are, at best, unfounded policy disagreements—not facts sufficient to state a claim. Contrary to Claimants' assertion (Cl.Br.55), the Post-Petition Legislation was no less an

emergency measure because the fiscal crisis was not "new." The single state court decision Claimants cite, (*id.* 55), does not hold otherwise because it is completely inapposite to this case. *See In re Pension Reform Litig.*, 2015 IL 118585, ¶ 66 (2015) (involving state-law challenge to reduction of pensioners' benefits, based on state constitutional amendment prohibiting pension reduction). Claimants also wrongly assert that the Post-Petition Legislation did not "spread the burden," (Cl.Br.56 (quoting *UAW.*, 633 F.3d at 47))—to the contrary, the Legislation was passed with a budget and fiscal plan that reduced payroll and operating expenses, and placed the burden of making certain payments into the PayGo system onto active employees. (Admin Motion Ex. A.C, §3.3).

Claimants' remaining arguments quibble with the Commonwealth's decision to move to a new, better structured retirement system, claiming that it would have been more reasonable to simply keep trying with the ERS system. (Cl.Br.56-57.) But the Claims themselves refute the reasonableness of this approach, by acknowledging that the employer-funded ERS pension system was chronically underfunded and failed, time and again, to achieve stability. (Admin.Cl. ¶3.) Claimants' proposed alternatives are not enough to stave off dismissal when the Claims do not allege facts that demonstrate these alternatives' feasibility or viability. *UAW*, 633 F.3d at 46; *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 297 F. Supp. 3d 269, 288-89 (D.P.R. 2018). In the absence of specific allegations supporting Claimants' sweeping claims of ulterior motives or better alternatives, this court should defer to the Post-Petition Legislation's recognition that its new rules were necessary and reasonable to protect pensioners during Puerto Rico's unprecedented fiscal crisis, and dismiss Claimants' Contract Clause claim. *UAW*, 633 F.3d at 46-47 (affirming dismissal of Contract Clause claim that did not allege legislation was "unreasonable or unnecessary"); *Mercado-Boneta*, 125 F.3d at 16.

### C.     The Post-Petition Legislation Did Not Violate The Automatic Stay.

The argument that the Post-Petition Legislation violated ERS's automatic stay lacks merit
for multiple reasons. *First*, as explained in the Retiree Committee's Motion to Dismiss and *supra*,
no stay violation occurred because either the Post-Petition Legislation did not implicate an interest
in ERS's property given the First Circuit's 552 Decision and any transfer of ERS assets is being
held for Claimants' benefit. (R.C.Mot.23).

*Second*, Claimants' argument that PROMESA §§ 303 and 305 do not apply because the
Post-Petition Legislation does not constitute an exercise of its "political or governmental powers"
is plainly wrong. (Cl.Br.35). If the Post-Petition Legislation, which was designed to save the
Commonwealth's pension system—a system even Claimants admit was at the time in crisis mode
due to "severe underfunding"—is not an exercise of political or governmental powers, it is hard to
imagine what would qualify. (*See* Admin.Cl. ¶3; *Id*. Ex. A ¶¶55-56, 58-59; *id.* Exs. A.B-A.C.)

Unable to find support for this novel theory, Claimants settle for repeating their all too
familiar, unsupported, and rebutted refrain that the pension reforms enacted by the Post-Petition
Legislation should be ignored because the hidden purpose of Post-Petition Legislation was to
"destroy[]" the "Commonwealth's financial relationship with ERS" in order "to eliminate
bankruptcy claims against itself and ERS." (Cl.Br.36). Nothing in the Post-Petition Legislation,
however, purported to or could be read as "legislatively annul[ling] bankruptcy claims against [the
Commonwealth]." (*Id*. 37.) Whatever claims Claimants possessed against a Title III debtor on its
petition date, Claimants still hold today even if the collateral base to satisfy those claims has been
implicated by §552, Puerto Rico law, or even the Post-Petition Legislation.

To the extent Claimants' argument is that a municipal debtor's "political or governmental
powers" do not encompass acts that may implicate the debtor-creditor relationship that too is
wrong as otherwise PROMESA §§ 303 and 305 would serve no purpose. Claimants continue to

misapprehend that these provisions must be read as written (expansively) because "[u]nlike a commercial bankruptcy, which attempts to balance[e] the rights of creditors and debtors, the principle purpose of chapter 9, and by analogy PROMESA, is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations." *Fin. Oversight & Mgmt. Bd.*, 954 F.3d at 7-8 (original change) (internal quotations omitted).

Claimants also cannot rebut that the Post-Petition Legislation is protected for another reason—it constitutes an exercise of the Commonwealth's police and regulatory powers under §362(b)(4). Claimants make the peculiar assertion that this provision "does not apply to legislative acts at all." (Cl.Br.39-40). Given that legislation is a primary means by which a government's police and regulatory powers are enforced, Claimants' position cannot be true. In support of their argument, Claimants rely on *In re Albion Disposal, Inc.*—an out of circuit case—which does hold that §362(b)(4) only applies to a formal "action or proceeding, such as a lawsuit or administrative proceeding, that had been, or was about to be, brought by a governmental unit." 217 B.R. 394, 410 (W.D.N.Y. 1997). In doing so, however, Claimants misrepresent a First Circuit decision, *Parkview Adventist Medical Center v. United States* that rejects *Albion Disposal's* interpretation of §362(b)(4). 842 F.3d 757 (1st Cir. 2016).

In *Parkview*, the First Circuit held that the termination of a contract by a governmental entity triggered §362(b)(4) because all that is needed for that provision to apply is that "the governmental action is designed primarily to protect the public safety and welfare. If so, the government action ... is exempt." *Id*. at 763 (internal quotations omitted). Claimants argue that *Parkview* concerned a "regulatory proceeding" but that is not so. (Cl.Br.42). There, the governmental entity first terminated the contract and that decision was later upheld when the debtor challenged the determination in an administrative proceeding. Before the bankruptcy court,

however, the debtor sought a determination that the government entity's termination of the contract violated the automatic stay, not the administrative judge's determination; in fact, the debtor claimed the stay was violated *before* requesting the administrative hearing. 842 F.3d at 758, 762 n.11. Consequently, *Parkview* stands for the proposition that §362(b)(4) applies outside of the context of a formal legal proceeding. *Id.* at 763 (holding that the "government action—here the termination of the Provider Agreement—is exempt" from the automatic stay.)[8] Plainly, Claimants' contrary position is not the law in the First Circuit.

Moreover, the Post-Petition Legislation easily satisfies the First Circuit's test as the Post-Petition Legislation explains that its purpose is to "safeguard[]" pensions for Government retirees. (Admin.Cl. Ex. A.B at 2; Ex. A.C at 5.). Claimants argue that the Post-Petition Legislation's exhaustive recitation of its purpose is insufficient and that Claimants should be given the opportunity through discovery to test their theory that the true but hidden meaning of these laws was to harm them. (Cl.Br.43). But the Supreme Court has long rejected similar attempts to reach into the minds of legislators and ignore the statute itself. *See Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) ("it simply is 'not consonant with our scheme of government for a court to inquire into the motives of legislators'") (quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951)); *accord Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1744 (2020) ("we are governed" by the "provisions of [] legislative commands rather than the principal concerns of our legislators").

And even if there were limited instances where such discovery might be allowed, this is not that case. At this point, Claimants have spent years in numerous proceedings obtaining

---

[8] This conclusion is further supported by the fact that in so holding, the First Circuit favorably cited the Third Circuit's decision in *In re Nortel Networks, Inc.* 669 F.3d 128, 140 (3d Cir. 2011) for the proposition that "[i]f the purpose of the *law* is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay applies." *Parkview Adventist Med. Ctr.*, 842 F.3d at 763 (emphasis added).

discovery they hoped would prove their claims. If such evidence exists, Claimants would have found it by now. Instead, after three years Claimants have come up with nothing more than unsupported allegations. There is no need to "drag the case on further" and the claims should be dismissed. *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 244 (1st Cir. 2006) (affirming order denying discovery because "plaintiffs had not been diligent in attempting to collect information that would allow them to fully allege [their] claim"); *Strahan v. Massachusetts Exec. Office of Energy*, 436 F. Supp. 3d 470, 477 (D. Mass. 2020) ("Because Plaintiff failed to state a claim for relief, 'he is not entitled to discovery, cabined or otherwise'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)); *cf. C.B. Trucking, Inc. v. Waste Mgmt., Inc.*, 137 F.3d 41, 45 (1st Cir. 1998) (affirming summary judgment because plaintiff had "failed to identify any material evidence that it was likely to uncover if it was given additional time to conduct discovery").

In sum, there is no plausible basis for finding that the Post-Petition Legislation violated ERS's automatic stay and this claim should be dismissed.

## VI.    Claimants Fail to Plausibly State Any Claim Against the Commonwealth.

All of Claimants' Claims (both pre-petition and post-petition) against the Commonwealth are preempted by the Bond Resolution, which states: "[t]he Bonds shall be special obligations of [ERS] payable solely from the Pledged Property without recourse against other assets of the System. The Commonwealth shall not be liable for the Bonds or any Ancillary Bond Facility." (Bond Resolution §201.) Claimants argue this language means nothing at all because the Commonwealth cannot be protected by a contract "the Commonwealth did not sign, is not a party to, and cannot itself enforce." (Cl.Br.21). In support of this argument, Claimants cite the First Circuit's decision in *Cortes-Ramos v. Martin-Morales*, a case involving the enforcement of an arbitration clause. 894 F.3d 55 (1st Cir. 2018). There, plaintiff entered a songwriting contest and submitted a music video in connection with that contest. *Id.* at 56. In so doing, plaintiff agreed to

be bound by the contest's rules, which included an arbitration provision for any dispute arising in connection with the contest. *Id*. After the contest was over, defendant (who was the host of the competition) released a music video plaintiff said was similar to the video plaintiff had submitted and plaintiff brought suit. *Id*. at 56-57. The question the First Circuit addressed was whether the arbitration provision required plaintiff to pursue his claim against defendant in arbitration. The court held that it did not because the arbitration provision not only did not mention defendant but also "exclude[d] [defendant] from its reach…." *Id*. at 60.

*Cortes-Ramos* has no applicability here. In contrast to the arbitration provision there, the pertinent contract language here expressly references the Commonwealth. In addition, the entire purpose of the provision is to protect the Commonwealth from liability. Consequently, the Bond Resolution "with special clarity … reveal[s] the requisite intent by the parties" to benefit the Commonwealth, making this provision enforceable. *Id*.; *accord In re McLain*, 604 B.R. 108, 119 (Bankr. D. Mass. 2019) (finding debtor was third party beneficiary of mortgage that "explicitly acknowledge[d] that the benefits of the underlying Note (the funds advanced) were intended to benefit the debtor"); *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prod., Inc.*, 31 F. Supp. 2d 226, 238 (D.P.R. 1998) (finding that plaintiffs were "intended third-party beneficiaries of contracts" between private companies and government of Puerto Rico that "provide[d] for the protection of land owned by plaintiffs"); *In re Sona Mobile Holdings Corp.*, No. 13-CV-4702, 2014 WL 5781101, at *4 (S.D.N.Y. Nov. 6, 2014) (Swain, J.) (finding plaintiff to be a third party beneficiary of contract where "the circumstances indicate[d] that the promisee intend[ed] to give the third party the benefit of the promised performance").

Claimants also argue that their express waiver of recovery against the Commonwealth is irrelevant to their constitutional, statutory, and tort claims against the Commonwealth. (Cl.Br.21-

22). But Claimants may not create an end-run around their waiver by the mere use of labels. No

matter how Claimants try to spin their claims, there is no denying that at their heart the Claims

seek to have the Commonwealth held as a joint obligor with ERS on the payment of the Bonds.

As Claimants acknowledge, their claims are based on the argument that "the Commonwealth

deprived [Claimants] of their ability to be repaid the principal and interest owed to them under the

ERS Bonds" and therefore their damages are measured by "their investment in the ERS Bonds."

(Cl.Br.22). In other words, every claim against the Commonwealth is directly tied to Claimants

not receiving promised payments under the Bonds, which is precisely what the waiver language in

the Bond Resolution protects against. *See PCH Assocs*., 949 F.2d at 604; *see also Bresler v*

*Wilmington Tr. Co.*, 761 F. App'x 160, 163 (4th Cir. 2019); *In re Allen-Main Assocs. Ltd. P'ship*,

223 B.R. 59, 63 (B.A.P. 2d Cir. 1998); *In re Tolentino*, No. 10-10511, 2010 WL 1462772, at *1-2

(Bankr. N.D. Cal. Apr. 12, 2010).

## VII.   Claimants Do Not Allege Plausible Avoidance Claims.

Claimants also have not and cannot allege a plausible claim to avoid the Post-Petition

Legislation. *First*, Claimants argue that the Trustee Decision "has no bearing on Claimants'

standing today" because now that the statute of limitations has run on the claims, "the right to

pursue the claim[s] reverted to Claimants, and they have standing to pursue [them]." (Cl.Br.84.)

In so arguing, Claimants misapprehend the nature of the post-petition claims they seek to bring,

conflating them with state law fraudulent transfer claims to avoid a pre-petition transfer. But here,

the alleged "transfer" took place after ERS filed its petition when the Commonwealth enacted the

Post-Petition Legislation. Therefore, if this alleged "transfer" is a transfer at all (and for reasons

argued at RCMot. 30-31 it is not), the only statutory basis to avoid it is §549 of the Bankruptcy

Code; state law fraudulent transfer statutes incorporated into the Code through §544 simply do not

apply. *See Rieser v. Dinsmore & Shohl, LLP (In re Troutman Enters., Inc.)*, 356 B.R. 786, 2007

WL 205640, at *9-10 (B.A.P. 6th Cir. 2007) (collecting cases) (unpub.); *accord In re Kenny G. Enters.*, 512 B.R. 628, 635-36 (C.D. Cal. 2014); *Audette v. Kasemir (In re Concepts Am., Inc.)*, No. 14-B-34232, 2018 WL 3019629, at *6-7 (Bankr. N.D. Ill. June 14, 2018); *Tomsic v. Pitocchelli (In re Tri-Star Techs. Co.)*, 260 B.R. 319, 323-24 (Bankr. D. Mass. 2001); *In re Schneiderman*, 251 B.R. 757, 762-63 (Bankr. D.C. 2000).

Because there is no state law analogue to §549 that is available to creditors outside of a title III or bankruptcy case, and, in fact, the event in question here had not even happened by the ERS petition date, there was no pre-petition claim to "revert" back to Claimants once the statute of limitations expired. *See, e.g., Matter of Pointer*, 952 F.2d 82, 88 (5th Cir. 1992) ("the plain language of §549 restricts its use to trustees or debtors-in-possession"); *In re N.Y. Int'l Hostel, Inc.*, 157 B.R. 748, 753 (S.D.N.Y. 1993) ("creditors of the estate have no right to proceed independently in their own names" under §549); *In re Ciavarella*, 28 B.R. 823, 825 (Bankr. S.D.N.Y. 1983) (same); *cf. In re Marrero*, 382 B.R. 861, 865 (1st Cir. 2008) ("It is the trustee who is invested with the discretion to pursue or not pursue avoidance [under section 549] in a given instance; and it is the trustee who must weigh the relative costs and benefits of avoidance").

Indeed, Claimants' prior motions to obtain standing prove the point. If Claimants truly believed that actions to avoid a post-petition transaction reverted to creditors once the limitations period expired, they would have simply waited to raise the claims. Instead, they filed two emergency motions asking to be appointed as trustees to pursue the claims, arguing "time is of the essence, because the periods prescribed by the applicable statutes of limitations under PROMESA on these two claims [the same claims at issue here] expire in several months," which would "*shut the door permanently*" on those claims. (Dkt.361 at 3, 19 (emphasis added); *see also* Dkt.704 at 16.) Claimants obtained emergency consideration based on these statements, thereby estopping

them from denying that the claims are expired now. And in any event, their prior position was
correct. Any action to avoid the Post-Petition Legislation is time-barred and must be dismissed.
*See, e.g., Pointer*, 952 F.2d at 88 (creditor lacked standing to pursue section 549 claim for
additional reason that it was untimely) (citing 11 U.S.C. § 549(d)); *In re Copperfield Investments,
LLC*, 421 B.R. 604, 612 (Bankr. E.D.N.Y. 2020) (same).

But even if Claimants had standing to avoid the Post-Petition Legislation, none of the
claims they assert are plausible. Claimants continue to argue that legislation may be subject to
avoidance but still—even after filing numerous briefs arguing this point—cannot identify a single
case from any jurisdiction where a court has ever done so. (Cl.Br.84-85). Moreover, it is readily
apparent why the Post-Petition Legislation is not subject to avoidance. Given the First Circuit's
ruling that ERS had no property interest in Act 447, 948 F.3d at 468, the Commonwealth could
not have transferred anything belonging to ERS when it amended Act 447. *See Oliveras v. Banco
Popular de Puerto Rico (In re Alicea Casanova)*, 595 B.R. 616, 618 (Bankr. D.P.R. 2018) ("for a
debtor to transfer property, the debtor must first have an interest in that property").

Further, even if the Post-Petition Legislation could be a transfer, it certainly was not a
fraudulent one because any transfer ERS made was involuntary. Claimants' contrary arguments
miss the point. If fraudulent transfer statutes could apply to a post-petition transfer (and they do
not), the relevant intent is that of the transferor/debtor deprived of the property—which here is
alleged to be ERS. *See Rentas v. Gomez*, 559 B.R. 305, 317 (Bankr. D.P.R. 2016) ("'[a]ctual
fraudulent conveyance claims under Section 548(a)(1)(A) turn on the intent of the debtor in
making the transfer; the state of mind of the transferee is irrelevant'"). But the Post-Petition
Legislation happened to ERS; ERS did not pass these laws. Claimants themselves have made this
very point: arguing in the First Circuit that "ERS had no choice in the matter [of the Post-Petition

Legislation], so the transfer of its property was by definition involuntary." (Case No. 20-1065 (1st Cir.), 2020 WL 291892, at *35-36.)

Claimants' concession is fatal to any claim to avoid the Post-Petition Legislation because it is well established that involuntary actions cannot be made with an actual intent to defraud. *See, e.g., Boston Trading Grp. v. Burnazos*, 835 F.2d 1504, 1508-09 (1st Cir. 1987) (discussing three "paradigm[s]" of actual fraudulent conveyances, all of which require knowing, intentional acts by the transferor); *Harman v. First Am. Bank of Md.*, 956 F.2d 479, 484 (4th Cir. 1992) ("actual fraudulent intent requires a subjective evaluation of the debtor's motive"); *In re Irving Tanning Co.*, 555 B.R. 70, 80 (Bankr. D. Me. 2016). Because controlling Puerto Rico case law requires proof of fraud, Claimants' Claims cannot be sustained. *Serrano v. Torres*, 61 D.P.R. 162, 166 (P.R. 1942); *The Texas Co. (P.R.) v. Estrada*, 50 D.P.R. 743 (P.R. 1936) ("[a]s a general rule, fraud is not presumed, and the one who alleges it must prove its existence….").

Ignoring this case law, Claimants argue that intent is not required because "it is enough that a debtor knew of the results of his action." (Cl.Br.86) (internal quotations omitted). To support this proposition, Claimants quote *In re Sepulveda Figueras*, which misstates Puerto Rican law. 193 B.R. 118, 120 (Bankr. D.P.R. 1996). *Sepulveda* relies upon *De Jesús Díaz v. Carrero*, 112 D.P.R. 631, 12 P.R. Offic. Trans. 786 (P.R. 1982) for the proposition that knowledge of a result is sufficient for fraudulent transfer purposes. But in *Carrero*, the Puerto Rico Supreme Court did not hold that intent need not be shown under Puerto Rico law. Instead, the Puerto Rico Supreme Court held that "fraud does not require *evidence* of the purpose or aim of the debtor to harm his creditors, it suffices to show that he knew about the results produced." *Id*. at 787 (emphasis added). In other words, all *Carrero* does is articulate the traditional principle that when you act intentionally, you intend the natural consequences of your action and therefore the party seeking to avoid a fraudulent

31

transfer need not bring forth direct evidence of the transferor's subjective intent. *See In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) (holding that for the purposes of fraudulent transfer law "every person is presumed to intend the natural consequences of his acts."); *accord In re Coughlin*, 27 B.R. 632, 636 (B.A.P. 1st Cir. 1983) ("Courts may assume that debtors intend the natural consequences of their acts"). But here, as Claimants concede, ERS did not act at all. Thus, Claimants' voluntary act cases have no applicability to involuntary acts and Claimants cite no case where fraudulent intent was found when the debtor acted involuntarily.

Understanding the weakness of this position, Claimants next attempt to push the intent question to another day arguing that ERS's intent "cannot be resolved on the pleadings." (Cl.Br.86.) It is, however, undisputed that ERS did not enact the Post-Petition Legislation. Finally, even if the alleged transfer was voluntary, ERS still could not have acted, as a matter of law, with fraudulent intent, because the Puerto Rico Supreme Court has held that "no transfer is fraudulent if it is done for a legal cause." *Ana María Sugar Co. v. Castro*, 28 D.P.R. 241, 1920 WL 3321, at *3 (P.R. 1920). And the Puerto Rico Supreme Court has held that a law is presumed valid unless and until the Puerto Rico Supreme Court declares the law unconstitutional. *See Cerame-Vivas v. Aguiar*, 99 D.P.R. 45, 51 (P.R. 1970). Thus, any action ERS took pursuant to the Post-Petition Legislation, as a matter of law, could not have been done with a fraudulent intent. Claimants provide no rebuttal to this legal principle, which dooms their fraudulent transfer claims.

Further, Claimants are unable to escape the fact that the two provisions of Puerto Rico law they base their claims upon (Article 1064 and Article 1243) do not apply. Claimants implicitly acknowledge that they cannot bring a claim under Article 1243 "because Claimants do not have a contract with the Commonwealth…." (Cl.Br.87.) As for their Article 1064 claim, Claimants acknowledge this provision provides "a remedy of last resort" only available after all of the

32

transferor's assets have been exhausted but argue that bar "poses no problem … [b]ecause Claimants and ERS's other creditors will exhaust ERS's own property." (*Id.*) Claimants cite nothing to support the proposition that a creditor's *belief* that a debtor's funds will be insufficient to satisfy its debt satisfies Article 1064's requirement. And, in any event, the Claims do not make this allegation. Similarly, Claimants continue to ignore that Article 1064 only applies if the creditor already has "attached the property of which the debtor may be in possession"—a necessary step Claimants do not claim to have taken. 31 L.P.R.A. §3028.[9]

## VIII.   Claimants' Promissory Estoppel And Unsupported Claims Should Be Dismissed.

Claimants also seek specific performance of the Bond Resolution. (Suppl. ¶8). But specific performance of contractual obligations is not a form of relief available in a proof of claim. *See, e.g.*, *In re Computer Learning Centers, Inc.*, 344 B.R. 79, 92 n.17 (Bankr. E.D. Va. 2006); *In re Residential Capital, LLC*, 2016 WL 3240256, at *6 (Bankr. S.D.N.Y. June 3, 2016). Claimants respond that equitable claims that give rise to a right to payment are appropriate in a proof of claim (Cl.Br.108), but their promissory estoppel claim is much broader and seeks to compel ERS to comply with all of its promises under the Bond Resolution—many of which have nothing to do with payment. (Suppl. ¶8). Therefore, this claim is an attempt to improperly use a proof of claim to compel post-petition compliance with a pre-petition contract. *See In re Continental Airlines*, 125 F.3d 120, 133-36 (3d Cir. 1997) (denying specific performance where creditor sought damages through proof of claim); *In re Roberts*, 607 B.R. 635, 655-56 (Bankr. N.D. Ill. 2019).

---

[9] Claimants also assert a fraudulent transfer claim against ERS—the transferor. There does not appear to be any case from any jurisdiction where this is a recognized cause of action. Claimants argue that Puerto Rico law is a unicorn in this regard because Article 1064 provides that a creditor may "impugn the acts which the debtor may have performed in fraud…" and that allows the debtor to be sued for its fraudulent transfer. (Cl.Br.104). That is baseless. There is no case where this provision has been used to bring suit against the transferor nor could there be given that the Puerto Rico Supreme Court has long-held that this provision "is of a rescissory nature." *Gonzalez v. Lopez Quinones*, 46 D.P.R. 843 (P.R. 1934).

In a footnote, Claimants also argue that the claims identified on Ex. D to the Motion to Dismiss have not been abandoned because those claims were expanded upon in the Supplement. (Cl.Br.31n.18). Not so. The following claims either are not referenced in the Supplement or referenced without any supporting factual allegations and should be dismissed: (1) alter ego; (2) subrogation; (3) avoidance; (4) breach of fiduciary duty; (5) breach of express and implied warranty; (6) fraudulent misrepresentation; (7) violations of various securities laws; (8) equity or constructive trust; (9) equitable subordination; (10) reimbursement; and (11) contribution..

## IX.   The Retiree Committee Has Standing To Object To The Claims.

Buried in Claimants' Response is the statement that the "Retiree Committee does not have standing to interpose its own claim objection where the debtor is already pursuing an objection." (Cl.Br.21). The Court can easily dispose of this argument because its Initial Procedures Order stated that "[t]he Creditors' Committee and Retiree Committee … are authorized to proceed under Bankruptcy Rule 3007(c), as incorporated by section 310 of PROMESA, with their Objections to the ERS Bonds on an omnibus basis…." (Dkt.676 §2). Further this Court's *Order Granting Urgent Joint Motion for Entry of a Schedule for Resolution of the ERS Bondholder Claims and Administrative Expense Motions*, identified the Retiree Committee as a "Party" entitled to file briefs concerning the validity of Claimants' Claims. (Dkt.838 §12).

Moreover, Claimants are doubly wrong as the Retiree Committee would have standing to pursue its objection even under Claimants' incorrect reading of the law as the Retiree Committee filed its claim objection *before* the Oversight Board. *In re Thompson* does not stand for the proposition that once a debtor files a claim objection all other objections are mooted. 965 F.2d 1136 (1st Cir. 1992). The issue the court faced in *Thompson* was not whether a creditor may file an objection to a proof of claim but whether the creditor had *appellate* standing under Bankruptcy Rule 9019 to appeal the approval of a settlement of an adversary proceeding to which the creditor

was not a party. *Id*. at 1140. In so ruling, the court rejected the argument that the creditor's objection to the settling party's proof of claim relieved the creditor of the need to intervene in the adversary proceeding. *Id*. at 1146-47.

In any event, *Thompson* was a chapter 7 case and the First Circuit's discussion concerns the unique role a *trustee* plays in the claim objection process under §704(a)(5) of the Bankruptcy Code, which expressly tasks a trustee with the duty of "examin[ing] proofs of claim and object[ing] to the allowance of any claim that is improper." 11 U.S.C. §704(a)(5). There is no corresponding provision in chapter 11, chapter 9, or PROMESA and it is well-settled that outside of the trustee context, any "party in interest" may object to claims. 11 U.S.C. §502(a); *see also* 48 U.S.C. §2161(a) (listing Bankruptcy Code provisions incorporated into PROMESA, including section 502 but omitting section 704(a)(5)); *Assured Guar. Corp. v. FOMB*, 872 F.3d 57, 63 (1st Cir. 2017) (a committee is a "party in interest" under the Bankruptcy Code). Further, even if there are circumstances where courts in the name of case efficiency limit an individual creditor's ability to challenge a proof of claim such a rule plainly does not apply to an official committee such as the Retiree Committee. *FBI Dist. Corp.*, 330 F.3d at 40 (adjudicating claim objection pursued by creditors' committee); *In re Business Express, Inc.*, No. 96-10130, 2000 WL 33679420 (Bankr. D.N.H. Feb. 11, 2000) (same); 9 Collier ¶ 3007.01 n.26 (a committee has the general authority to object to claims under §1103(c)(5) of the Bankruptcy Code).

## CONCLUSION

WHEREFORE, for the reasons stated herein and in the Board's Reply Brief, which the Retiree Committee joins, the Retiree Committee respectfully requests that the Court grant the Retiree Committee's Rule 12(b) Motion and grant such other relief as may be just.

Dated: July 22, 2020

JENNER & BLOCK LLP

By:
*/s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)


Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
Landon Raiford (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

Respectfully submitted,

BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By:
*/s/ A.J. Bennazar-Zequeira*
A.J. Bennazar-Zequeira
Edificio Union Plaza, Suite 1701
PH-A piso 18
Avenida Ponce de León
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired
Employees of Puerto Rico*