# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re:* | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Case No. 17-bk-03283 (LTS) |
|     as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
|     *Debtors.*[1] | |

## UNDERWRITERS' INFORMATIVE MOTION REGARDING EXHIBITS IN CONNECTION WITH THE JULY 29-30, 2020 OMNIBUS HEARING

Defendants in Adversary Proceeding Nos. 19-00422 and 20-00047, UBS Financial Services Inc.; UBS Securities LLC; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Morgan Stanley & Co. LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; RBC Capital Markets LLC; Santander Securities LLC; Samuel Ramirez & Co., Inc.; and Raymond James & Associates, Inc. (collectively, "Underwriters"), through their undersigned counsel, respectfully submit this informative motion regarding exhibits in connection with the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); (v) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 1928-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

July 29-30, 2020 Omnibus Hearing, pursuant to paragraph 7 of the Court's July 21, 2020 *Order Regarding Procedures for July 29-30, 2020, Omnibus Hearing* [Dkt. No. 13746] (the "Procedures Order").

1.       Below is a list of exhibits Underwriters may rely on at the July 29-30, 2020 Hearing in connection with Plaintiffs' Motion for Remand and Memorandum in Support Thereof, Dkt. No. 31, *Nat'l Pub. Fin. Guarantee Corp. et al. v. UBS Fin. Servs. Inc. et al. (In re Commonwealth of Puerto Rico)*, Adv. Proc. No. 19-00422 (D.P.R. Oct. 9, 2019) and Plaintiff's Motion to Remand and Memorandum in Support, Dkt. No. 22, *Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al. (In re Commonwealth of Puerto Rico)*, Adv. Proc. No. 20-00047 (D.P.R. Apr. 20, 2020) (together, the "Remand Motions").

2.       Underwriters are not aware of any objections to the use of these exhibits. Underwriters continue to rely on the entirety of their written submissions on the Remand Motions, including all exhibits attached thereto, and reserve the right to refer to any exhibit or demonstrative identified in any other informative motions filed pursuant to paragraph 7 of the Procedures Order with respect to the Remand Motions.

| Underwriters' Exhibit | Description | ECF Location |
|---|---|---|
| **National – Adv. Proc. No. 19-00422** | | |
| Exhibit 1 | Complaint | 32-1 |
| Exhibit 2 | Official Statement for Puerto Rico Electric Power Authority, Power Revenue Bonds, Series LL, dated June 13, 2002 | 2-2 |
| **Ambac – Adv. Proc. No. 20-00047** | | |
| Exhibit 3 | Complaint | 1-1 |
| Exhibit 4 | Official Statement for Puerto Infrastructure Financing Authority, Special Tax Revenue Bonds, Series 2005A, and Special Tax Revenue Refunding Bonds, Series 2005C, dated June 2, 2005 | 2-1 |

Dated: July 28, 2020
      New York, New York

Respectfully submitted,

*/s/ Peter G. Neiman*

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Philip D. Anker (*pro hac vice*)
Peter G. Neiman (*pro hac vice*)
Ross E. Firsenbaum (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.:  (212) 230-8800
E-mail:   philip.anker@wilmerhale.com
          peter.neiman@wilmerhale.com
          ross.firsenbaum@wilmerhale.com

– and –

McCONNELL VALDÉS LLC
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Tel.: (787) 250-2631 / 5628
Fac.: (787) 759-8282
E-mail:   rcq@mcvpr.com
          lfr@mcvpr.com
          mpc@mcvpr.com

*/s/ Roberto C. Quiñones-Rivera*
Roberto C. Quiñones-Rivera
USDC-PR No. 211512

Leslie Y. Flores-Rodríguez
USDC-PR No. 223601

Myrgia M. Palacios-Cabrera
USDC-PR No. 230807

*Counsel to Defendants UBS Financial
Services Inc.; UBS Securities LLC;
Citigroup Global Markets Inc.; Goldman
Sachs & Co. LLC; J.P. Morgan Securities
LLC; Morgan Stanley & Co. LLC; Merrill
Lynch, Pierce, Fenner & Smith Inc.; RBC*

*Capital Markets LLC; and Santander
Securities LLC*

Adv. Proc. No. 19-00422

*Counsel to Defendants Merrill Lynch,
Pierce, Fenner & Smith Inc.; Citigroup
Global Markets Inc.; Goldman Sachs & Co.
LLC; J.P. Morgan Securities LLC; Morgan
Stanley & Co. LLC; Samuel Ramirez & Co.,
Inc.; Raymond James & Associates, Inc.;
and UBS Financial Services Inc.*

Adv. Proc. No. 20-00047

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2020, a true and correct copy of this **INFORMATIVE MOTION** was electronically filed with the Court using the CM/ECF system, which caused notification of such filing to be served upon all counsel of record in the above-captioned bankruptcy case.

/s/ Peter G. Neiman
Peter G. Neiman (*pro hac vice*)

WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Tel.:  (212) 230-8800
E-mail:  peter.neiman@wilmerhale.com

# Exhibit 1

[Certified Translation]

*10-3-19*

*Daniel Tomlinson*
DANIEL TOMLINSON
CERTIFIED TRANSLATOR
ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS

## COMMONWEALTH OF PUERTO RICO
## SAN JUAN SUPERIOR COURT

NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION; and MBIA
INSURANCE CORPORATION,

Plaintiffs,

v.

UBS FINANCIAL SERVICES, INC.; UBS
SECURITIES LLC; CITIGROUP GLOBAL
MARKETS INC.; GOLDMAN SACHS & CO.
LLC; J.P. MORGAN SECURITIES LLC;
MORGAN STANLEY & CO. LLC; MERRILL
LYNCH, PIERCE, FENNER & SMITH INC.;
RBC CAPITAL MARKETS LLC; and
SANTANDER SECURITIES LLC,

Defendants.

Civil No.: _____

IN RE: Damages under the
*Doctrina de Actos Propios* and
Unilateral Declaration of Will

## COMPLAINT

**TO THE HONORABLE COURT:**

COMES NOW, the plaintiffs, National Public Finance Guarantee Corporation and MBIA Insurance Corporation, through their undersigned legal representation and very respectfully state, allege, and pray:

## INTRODUCTION

1.    Eight major banks inflicted a financial tragedy on the Commonwealth of Puerto Rico, its people, and others who likewise relied on said entities' good faith and proper conduct in Puerto Rico's municipal bond market. For over a decade, these banks urged Puerto Rico and its government agencies and instrumentalities to issue debt that was unsustainable on its terms. That debt bankrupted the Commonwealth and its agencies while the banks enriched themselves through massive commissions.

2.    Puerto Rico has suffered grave consequences as a result of these acts, which have pushed the Island into a financial abyss of historic proportions. After the municipal bonds defaulted, the Commonwealth made drastic cuts to public services, including pensions, health services, utilities, and basic infrastructure for power grids

and transportation. As a result, many citizens felt they had no job opportunities or their quality of life was so impacted that they had no choice but to abandon the Island. Puerto Rico citizens saw their savings and pensions, accumulated over lifetimes of sacrifice, plummet in value.

3. This lawsuit seeks to hold the banks accountable. By originating municipal bond issuances and marketing and selling the bonds, these banks held themselves out as gatekeepers of Puerto Rico's municipal bond market. Under laws designed to protect investors, the banks were required to investigate the truthfulness of key representations made in connection with the issuance of municipal bonds and to identify and disclose any materially false or incomplete statement by the issuers. The Commonwealth of Puerto Rico, its people, and many others, including the plaintiff-insurers, relied on the banks to carry out that due diligence and duty to investigate and to identify false or incomplete representations by the issuers—especially representations relating to the ability of the issuers to repay the debt in accordance with its terms.

4. Unlike other market participants, the banks had special access to information about the operations and financial well-being of the agencies and instrumentalities issuing the bonds. Based on the due diligence supposedly conducted by the banks regarding the statements, the market was assured that said issuers had the capacity to repay their debts in accordance with their terms. In accord with longstanding industry practice, the other market participants had the right to rely, and in fact did rely, upon the banks' good faith and due diligence. But the banks violated that trust.

5. For over forty years, Plaintiffs MBIA Insurance Corporation and National Public Finance Guarantee Corporation ("NPFG") together with Financial Guaranty Insurance Company ("FGIC"), NPFG's non-party predecessor-in-interest to certain policies at issue, (collectively "National") have insured public and municipal financial markets, including many bonds issued by the Commonwealth and its agencies to fund development and infrastructure on the Island. National has always been committed to protecting its insureds and its driving force is to reestablish the normal functioning of the municipal bond market with transparency and integrity. Imposing liability on the banks and ensuring that they fully meet their obligations will help restore that market and protect and support the growth of Puerto Rico's economy. This case thus provides this Court with the opportunity to facilitate Puerto Rico's return to the capital markets and financial stability, and to escape the crisis that has so affected the welfare of the people of Puerto Rico.

6.     Each defendant-bank named in this action was a lead underwriter for one or more bonds issued by the Commonwealth and its instrumentalities, and/or was part of the group of underwriters responsible for marketing and/or selling multiple series of bonds over many years. Those banks competed to win the Commonwealth and its agencies as clients that would issue bonds to raise funds to cover their needs. The winning banks were selected by the Commonwealth and its instrumentalities to fulfill the task of marketing and selling bonds to investors. The underwriter banks, defendants herein, had unmatched access to the issuers, such as,—the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), the Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Highways and Transportation Authority ("PRHTA"), and the Puerto Rico Sales Tax Financing Corporation ("CO-FINA")—and drew on those relationships with the agencies and instrumentalities to encourage and enable those entities to issue billions of dollars of bonds with no regard for the risks entailed in taking on such extraordinary debt obligations. These banks with serious conflicts of interest—took advantage of the financial situation of the Puerto Rico Government to promote the profitability of huge volumes of bonds. By doing so, they obtained billions in profits at the expense of the people of Puerto Rico.

7.     In order to underwrite the bonds, the banks had to disseminate Official Statements (the "Official Statements") for each of the bonds. By doing so, the banks represented they were complying with federal laws and municipal bond market customs and norms that required them to reasonably investigate the bonds' offering materials and to notify the market if they found any of that information to be untrue or materially incomplete. The banks' conduct assured the market that all participants—including Plaintiffs—could rely on the issuers' information that appeared on the Official Statements. However, the banks did not scrutinize these materials with due diligence as they assured the market that they had done. Instead, they rushed to market one series of bonds after another with materially false or incomplete information, hiding massive risks that destined the bonds to default.

8.     To make the bonds as attractive as possible to investors—and thus to facilitate the issuance of as many bonds as possible—the banks repeatedly solicited bond insurance from bond insurers (also known as monoline insurers), including National. "Wrapping" the bonds with this insurance issued by National made them more marketable because the insurance tethered the insurers' creditworthiness to the bonds.

9.     The Official Statements disseminated by the banks were integral to the banks' efforts to secure insurance for the bonds. For the insurers, Plaintiffs herein, to

3

evaluate the risks involved in insuring a particular bond, the banks, as part of their solicitations, provided the insurers with draft and final Official Statements describing the bonds, including representations about the financial health of the issuing entities (and thus, fundamentally, their ability to repay the debt on its terms) and the proposed uses of the money to be raised. In doing so, the banks made to the Plaintiffs herein the same false assurances they made to the Commonwealth and the investors—that they had investigated the offering materials' disclosures and had concluded the information contained therein was true and complete.

10.    Relying in good faith on the banks' representations, National issued billions of dollars in irrevocable insurance policies guaranteeing the bonds—allowing the issuances to move forward and the banks to collect substantial fees. Contrary to the banks' representations, however—and as recently revealed—the banks chose not to investigate critical information they provided to National in the Official Statements, and that information turned out to be false. As examples, the issuers' debt service coverage ratios were overstated, their projected revenues were overstated, and the issuers hid the fact that they had not spent and likely would not spend their funds as represented. These false and incomplete statements hid the very real risk that the bonds would not be repaid when due in accordance with their terms. Had the banks investigated, as they were obligated to do, they would have learned the truth and would have been required to alert National along with other market participants.

11.    The grave risks hidden by these false statements eventually materialized, with tragic consequences. When the bonds defaulted, Puerto Rico and its agencies were left without the funds necessary to provide essential services. There were drastic cuts to pensions, healthcare, utilities, and education. Funds to build and maintain roads and bridges dried up. Many public schools closed. Jobs disappeared.

12.    National suffered substantial damage too, paying out over $720 million in claims payments as of July 1, 2019—obligations that it intends to continue to fully honor—thereby mitigating the harm that the banks caused to bondholders. For over forty years, National has insured Puerto Rico issuances, helping to finance improved facilities and services for the people of the Commonwealth. In this role, National has protected many of those who invest in Puerto Rico's bonds. Through this lawsuit, National now seeks to hold the banks accountable for their unscrupulous conduct and impose consequences for their failure to act with transparency, integrity, and in accord with the rules of fair play, and to ensure that such conduct never happens again.

13.    National brings this lawsuit in equity under the *doctrina de actos propios* and the doctrine of unilateral declaration of will in order for justice to be done.

The legacy of the banks' unjust conduct will affect Puerto Rico for generations. The banks not only disregarded their obligation to act as zealous gatekeepers, but took advantages of the prevailing circumstances in Puerto Rico, leading Puerto Rico straight into its current crisis. While the banks enriched themselves, they caused great damage to the Commonwealth, its people, and National. They should now bear the costs of their illicit conduct.

<p align="center">*     *     *</p>

14.     Between 2001 and 2014, major banks—including UBS Financial Services, Inc.; UBS Securities LLC; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Morgan Stanley & Co. LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; RBC Capital Markets LLC; and Santander Securities LLC (collectively, "Defendants")—underwrote over $66 billion worth of bonds issued by the Commonwealth of Puerto Rico and its agencies and instrumentalities.

15.     The bonds at issue here could not have been issued on marketable terms without National's insurance and guarantees, known as "financial guaranty insurance" or "monoline insurance." According to their terms, the bonds would pay investors set amounts of principal and interest. The cash to make these payments was to come from the issuers' revenues and funds. National insured the eventual risk that when due an issuer might not have enough funds to pay the bondholders all they were owed; if there were a shortfall, National would step in and cover the difference. By guaranteeing that bondholders would be paid in full, the insurance issued by National made the bonds more attractive to investors, and thus easier to issue and market for Defendants.

16.     As was customary in the industry, Defendants solicited insurance for each bond by providing National with information and materials required in an insurance application, which was supplemented up until the time of issuance. Each insurance application included transaction documents, including draft and then final versions of offering materials that would be publicly registered with the United States Securities and Exchange Commission. These materials, called "Official Statements," included a representation that: "The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws[.]" Those laws, enacted for the protection of investors, required the underwriter banks to investigate the completeness and truthfulness of the information in the Official Statements and have a reasonable basis to believe that that information was true and complete.

17. In their solicitations, Defendants did not have to provide National with Official Statements that included certifications they had complied with federal securities laws (National is an insurer that does not purchase any security and has no securities law claim)—but the reality is that they chose to do so, touting their compliance with securities laws. By doing so, they assumed the obligation of reasonably investigating the information in the Official Statements. National placed great weight on these representations and the investigations that the banks stated they had done, and in good faith fully relied upon them. It had to do so, in part, because the bonds' issuers were exempt from registration and reporting requirements under the federal securities laws, meaning very little reliable information about the bonds was otherwise publicly available. As is generally true with municipal bonds, then, the only reliable source of information were the alleged investigations "conducted" by the underwriters, including Defendants.

18. Defendants knew it was custom and usage and a generalized practice in the bond insurance industry for underwriters to provide insurers with Official Statements that the underwriters had investigated and that their representations were true and complete. Because underwriters—including Defendants—had direct access to the issuers, while insurers and other market players did not, the bond insurance industry depended and relied upon underwriters' good faith in providing insurers with duly vetted, accurate information about issuers and their creditworthiness. As all participants in the bond market—including Defendants—well knew, or should have known, this system was key to the most efficient functioning of the municipal bond market and thus to the ability of government entities to obtain financing for public projects.

19. Through their actions and representations, Defendants assured National they would investigate the Official Statements and form a reasonable belief that the statements were true and complete, and would inform National of any materially false statements or omissions. Therefore, National relied in good faith on Defendants' assurances that Defendants had conducted the corresponding investigations before the bonds were issued. Defendants' actions and representations—providing the Official Statements—clearly were designed so that National would so rely.

20. Relying in good faith on Defendants' representations in their assurances, and based on the information Defendants provided in the Official Statements regarding the financial health of the issuers, National insured over $11 billion in debt for Puerto Rico governmental entities between 2001 and 2007. By their terms, these insurance policies were, and remain, irrevocable. Once National issued its insurance,

it was forced to comply with its obligations, even if it later learned that it had been given false information before it issued the policies. National in fact has not failed to fulfill its commitments to the bondholders—and has honored every claim on those policies and intends to continue doing so.

21.     The underwriting banks, including Defendants, profited splendidly from these bond issuances, taking in hundreds of millions of dollars. Each Defendant earned massive fees from each bond issue. Some also sold the bonds through special closed-end mutual funds that were limited to bona fide Puerto Rico residents, allowing them to make additional fees. Some also sold the issuers interest rate swaps—contracts that made the issuers responsible for paying high fixed interest rates instead of the bonds' variable rates—charging the issuers large fees to enter into the swaps and even larger fees to exit those same swaps when interest rates plunged. Some underwriters even encouraged some issuers to issue additional bonds—also destined to default—so those issuers could obtain the funds needed to pay off that massive compensation. Because the underwriters could collect commissions regardless of whether the bonds were repaid, underwriters, including Defendants, cared little or not at all whether the bonds ultimately were paid on their terms or were good investments so long as the underwriters were successful in the short run. Thus, their interests were in direct conflict with the interests of the Commonwealth, its people, and others, like National, who wanted the bonds to succeed in the long term.

22.     While on the one hand Defendants benefited from these transactions, nearly all the other participants suffered large losses and damages. The issuers were severely affected when the bonds defaulted, as they initially ran woefully short of funds necessary to initially provide essential services. The people of Puerto Rico were also impacted, as the government was unable to provide those services. The bondholders, many of whom were Puerto Rico residents, also suffered in the wake of defaults and as the value of their investments plummeted. But Defendants—who, as gatekeepers, should have prevented the issuance of overly risky debt and warned the public of those risks—have, until now, faced no real consequences for their unlawful conduct.

23.     Recent investigations revealed that Defendants did not verify and validate key statements in the materials they provided to National concerning critical metrics like debt covenants, estimated revenues, and use of proceeds generated from the issuances. Defendants never formed a reasonable belief that those statements were true and complete—in fact, those statements were false. The Defendant's representations made the bonds look less risky than they really were. Those

misrepresentations, along with Defendants' equally deceptive representations that they had conducted reasonable investigations, allowed and encouraged the Commonwealth and its agencies and instrumentalities to pile up debt they definitely have not been able to repay in accordance with its terms.

24.     Just like the Commonwealth, the people of Puerto Rico, and the issuers, National was let down by its reliance on the underwriters' word and representations, including Defendants, and has been seriously harmed as a result.

25.     Defendants' incomplete representations have caused National immense and unprecedented damage. Induced by Defendants into issuing irrevocable insurance policies, National has been forced to pay over $720 million in claims payments as of July 1, 2019, honoring its obligations to bondholders, and anticipates it will have to pay out hundreds of millions of dollars more. Had National known that Defendants would not investigate the information as they represented, it never would have issued the insurance policies.

26.     These extraordinary circumstances warrant application of the *doctrina de actos propios* and/or the unilateral declaration of will, both of which the Supreme Court of Puerto Rico has expressly recognized as equitable claims under Puerto Rico law.

27.     The *doctrina de actos propios*—which has its roots in the Roman law principle *venire contra factum proprium* and was later recognized in the Spanish jurisprudence, as well as in the jurisprudence of many other civil jurisdictions—is designed to protect "legitimate expectations" and "good faith" and to "prohibit[] . . . behavior that would result in an unreasonable interference with a legitimately created trust relationship, that allowed the other party to reasonably rely on the original conduct." Thiago Luis Sombra, *The Duty of Good Faith Taken to a New Level: An Analysis of Disloyal Behavior*, 9 J. Civ. L. Stud. 28, 31 (2016). The *doctrina de actos propios* "aim[s] to raise good faith to the condition of a general principle that is autonomous, abstract, and subject to being invoked for a variety of legal relations, but with consideration of the peculiar aspects of each case." *Id.* at 34.

28.     Current law in Puerto Rico acknowledges a broad interpretation of the *doctrina de actos* propios as decided by the Puerto Rico Supreme Court forty years ago in *International General Electric v. Concrete Builders, Inc.*, 4 P.R. Offic. Trans. 1221, 1231 (P.R. 1976). The doctrine permits a claimant to recover damages upon establishing an "attack upon good faith," even where no contractual relationship exists between the parties. *Id.* at 1229.

29.     The doctrine is supple and gives the Court a "wide margin of freedom," allowing it to shape the doctrine's application to fit the circumstances as equity so requires. LUIS DÍEZ-PICAZO PONCE DE LEÓN, LA DOCTRINA DE LOS ACTOS PROPIOS: UN ESTUDIO CRÍTICO SOBRE LA JURISPRUDENCIA DEL TRIBUNAL SUPREMO [THE *DOCTRINA DE ACTOS PROPIOS*, A CRITICAL STUDY OF THE JURISPRUDENCE OF THE SUPREME COURT], 74 (Civitas Thomson Reuters (Legal) ed., 2nd ed. 2014) (hereinafter DÍEZ-PICAZO, DOCTRINA DE ACTOS PROPIOS).

30.     "Through [*doctrina de actos propios]* application, essential interests are safeguarded to achieve an effective interaction at all levels of daily life. It is expected that the relations between the members of society are characterized by the qualities of honesty and sincerity, so that at all times we can rest upon the truthfulness of the representations or acts of others, according to how they act." *O.C.S. v. Universal*, 2012 TSPR 165, 172 (P.R. Nov. 1, 2012). The doctrine builds in part on the understanding that "good faith requires the person to behave coherently in relation to the trust that their acts may have previously generated on others." DÍEZ-PICAZO, DOCTRINA ACTOS PROPIOS, at 80. Intent is irrelevant, because "[t]he center of gravity of the rule is not in the will of its author, but in the trust generated in third parties[.]" *O.C.S.*, 2012 TSPR 165 at 173, *citing* A. GULLON BALLESTEROS EN I. SIERRA GIL DE LA CUESTA, COMENTARIOS DEL CODIGO CIVIL [Comments on the Civil Code], Barcelona, Ed. Bosch, 2000, T. 1, pg. 397. Puerto Rico courts readily apply this doctrine in commercial disputes, including where—as here—claims are made against banks by a plaintiff whose legitimate good-faith expectations have been undermined. *E.g.*, *MMB Dev. Grp., Ltd. v. Westernbank Puerto Rico*, 762 F. Supp. 2d 356, 370 (D.P.R. 2010) (plaintiff stated claim under the *doctrina de actos propios* against bank by "alleg[ing] that [the bank] represented that it would extend the closing period on the loans and eventually deliver on the promised loans to [a third-party]; that these acts and declarations of [the bank] painted to plaintiff an inaccurate portrait that [the bank] was willing and able to deliver on the loans; and that" the plaintiff acted in good faith and detrimental reliance on the bank's "acts and declarations").

31.     Similarly, by means of a unilateral declaration of will "a person might have an obligation towards another person, as long as their intention is clear, arises from a suitable judiciary act and is not contrary to the law, the moral or the public order." *Nationstar Mortg., LLC v. de Jesús Roldan*, No. K CD2012-2549 (908), 2014 WL 1692581 (TCA), at *5 (P.R. Cir. Mar. 31, 2014). It demands that "[o]nce the obligation is constituted," so long as the obligation is not effectively withdrawn, "the declaring party is subject to compensate for the damages of its non-compliance." *Id.* at

9

*6. In effect, the unilateral declaration of will doctrine fills the gap that arises when a party makes a concrete promise with the intention that others rest and rely on that promise.

32. The Puerto Rico Supreme Court reiterated the force and effect of this doctrine just over a decade ago, based on a recognition "that growth and commercial traffic justified the possibility of giving full force and effect to acts in which only one person intended to bind himself or herself—as in a unilateral declaration of intention." *Ortiz v. P. R. Tel.*, 2004 TSPR 133 (P.R. 2004). "[T]he adoption of the unilateral declaration of intent as a source of obligation is based on the need of [the Commonwealth's] order to protect the trust deposited in good faith by the one who trusts in a promise of this nature." *Nationstar*, 2014 WL 1692581, at *6.

33. The elements for applying both the *doctrina de actos propios* and unilateral declaration of will are fully satisfied in this case. The existence and operation of the municipal bond market has always been based on the trust and reliance of insurers such as National on the good faith conduct of the parties.

34. Because this case plainly raises an issue of vital public importance for the Commonwealth, public policy fully supports this Court acting in equity and applying both the *doctrina de actos propios* and unilateral declaration of will. *See* P.R. LAWS ANN. tit. 31, § 7 (2016) ("When there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration.").

35. *First*, applying the *doctrina de actos propios* and the unilateral declaration of will to the facts reported here will rectify the unjust and inequitable situation created by Defendants. The Puerto Rico bond crisis is one of the great economic disasters of the twenty-first century. Issuers have defaulted, harming their reputations and creditworthiness, and essential services for the citizens of Puerto Rico were affected. In turn, bondholders unprotected by insurance have suffered from defaults and delayed payments, while the value of their investments has plummeted. National has suffered massive losses, having had to mitigate the harm to bondholders, having had to disburse over $720 million in claims payments as of July 1, 2019 and is facing hundreds of millions of dollars more. Defendants, meanwhile, have profited substantially, pocketing hundreds of millions of dollars in commissions and fees paid by the issuers of these bonds. If the remedies sought here are not granted, Defendants likely will keep their profits, while those who were really harmed continue to suffer the

resulting damages. This Puerto Rico court is the proper forum to provide a remedy for Defendants' unlawful conduct.

36.     *Second*, applying the *doctrina de actos propios* and unilateral declaration of will in this action will validate insurance industry norms, customs, and background assumptions. The ability to rely on underwriters' good faith is essential to the proper functioning of the municipal bond insurance market. Underwriters and municipal bond insurers do not typically enter into contracts directly; instead, insurers must rely in good faith on underwriters to present them with true and complete insurance applications because the underwriters have unique access to the issuers' information. Holding Defendants to account for failing to investigate whether the information they provided National was true and complete is the only and correct way to uphold those sound norms.

37.     *Third*, this suit presents an important opportunity to help restore the Commonwealth's access to the capital markets, which is so necessary to the recovery of the Island. When the municipal bond market functions properly, it provides government entities and its agencies and instrumentalities with low-cost capital and provides investors with a safe and sound investment. Defendants' violation of industry customs and norms have impaired this critical market by discouraging the participation of key entities that depend on underwriters' good faith. This Court has the extraordinary opportunity to restore the market's confidence by making clear that banks must either thoroughly vet the information of the bonds they underwrite or bear the costs of failing to do so.

38.     *Fourth*, although Defendants have acted contrary to the most elementary principles of equity and good faith, Plaintiffs do not have contractual or statutory remedies to vindicate their remedies as do the bondholders. National cannot pursue contract claims because there is no contract between National and Defendants. Nor is there any statutory framework or special legislation protecting National; unlike investors, National did not purchase bonds and thus has no claim under federal securities laws.

39.     National could not have brought these equitable claims earlier. Its injuries took years to manifest—the first claims payments were not made until 2016, and the extent of Defendants' conduct, contrary to good faith and equity, did not become clear until the publication of a special and comprehensive investigation report in August 2018, as described below.

40.     In sum, Defendants through their acts assured National that they had conducted complete and reasonable investigations regarding the terms of the bonds

that National insured, and National relied in good faith on those representations in issuing its insurance. But Defendants frustrated National's legitimate, good faith expectations by not conducting those investigations regarding the truthfulness of the representations they made in the insurance applications. They breached their obligation to act as the market's zealous gatekeepers. Accordingly, Defendants are now estopped from denying responsibility for the consequences of their failure to conduct the required investigations and what is right, fair and equitable, and should be ordered to compensate National accordingly.

## PARTIES

### I. Plaintiffs

41.     Plaintiff National Public Finance Guarantee Corporation ("NPFG") (formerly known as MBIA Insurance Corp. of Illinois) is a financial guaranty insurance company headquartered at 1 Manhattanville Road, Purchase, NY 10577. NPFG is a corporation organized under the laws of the state of New York and has its principal place of business in New York. It is a subsidiary of non-party MBIA Inc. through an intermediary holding company, National Public Finance Guarantee Holdings, Inc. A monoline insurer, NPFG insures municipal bonds, including tax-exempt and taxable indebtedness of U.S. political subdivisions, as well as utility districts, airports, health care institutions, educational facilities, student loan issuers, housing authorities, and other similar agencies and obligations issued by private entities that finance projects that serve a substantial public purpose.

42.     Plaintiff MBIA Insurance Corporation ("MBIA") is a financial guaranty insurance company headquartered at 1 Manhattanville Road, Purchase, NY 10577. MBIA is a corporation organized under the laws of the state of New York and has its principal place of business in New York. It is a subsidiary of non-party MBIA Inc. MBIA insures and reinsures structured finance and international public finance obligations sold in the new-issue and secondary markets.

43.     Non-party Financial Guaranty Insurance Company ("FGIC") is an insurance corporation headquartered at 463 Seventh Avenue, New York, NY 10018. FGIC is organized under the laws of the state of Delaware and has its principal place of business in New York. It is a monoline insurer that issues guaranty insurance policies insuring public finance, structured finance, and other obligations.

44.     Between 2001 and 2007, MBIA insured the following Puerto Rico bonds: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds Series 2002A, 2003C, and 2007A; PREPA, Power Revenue Bonds, Series LL and NN; PREPA, Power

Revenue Refunding Bonds, Series MM, SS, UU, and VV; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; and COFINA Sales Tax Revenue Bonds, Series 2007A under policy numbers 36358, 40952, 503220, 38324, 42162, 39115, 46002, 494781, 496040, 409190, 437160, 46994, 492151, and 499240. NPFG assumed responsibility for these policies in 2009, pursuant to a restructuring plan through which it became a subsidiary of National Public Finance Guarantee Holdings, Inc., itself a subsidiary of MBIA Inc. NPFG is obligated to pay any claims under these policies. To the extent NPFG does not pay any claim, MBIA remains obligated to pay the claims.

45. Also, between 2001 and 2007, FGIC insured the following Puerto Rico bonds: PREPA, Power Revenue Bonds, Series RR; PREPA, Power Revenue Refunding Bonds, Series OO and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A under policy numbers FG05010237, FG04010536, FG07010235, and FG07010326. NPFG is FGIC's successor-in-interest to these policies: MBIA assumed responsibility for FGIC's interests in the policies in September 2008; it assigned those interests to NPFG in February 2009; and FGIC subsequently novated the policies directly to NPFG in September 2012.

46. Hereinafter, for the purposes of this complaint, we refer to NPFG, MBIA, and FGIC collectively as "National."

## II. Defendants

47. Defendant UBS Financial Services, Inc. ("UBS Financial Services"), previously known as UBS PaineWebber Inc., is a broker-dealer registered with the Securities and Exchange Commission ("SEC") headquartered at 1200 Harbor Blvd, Weehawken, NJ 07086. UBS Financial Services and organized under the laws of the state of Delaware and has its principal place of business in New Jersey. UBS Financial Services is a subsidiary of non-party UBS Americas Inc., which in turn is a subsidiary of non-party UBS Americas Holding LLC, which in turn is a subsidiary of non-party UBS AG, which in turn is a subsidiary of non-party UBS Group AG, the ultimate parent. UBS Financial Services has been a registered broker-dealer in Puerto Rico since September 1, 1984.

48. Defendant UBS Securities LLC ("UBS Securities") is an SEC-registered broker-dealer headquartered at 1285 Avenue of the Americas, New York, NY 10019. UBS Securities is organized under the laws of the state of Delaware and has its principal place of business in New York. Formerly known as UBS Investment Bank, it is

a subsidiary of non-party UBS Americas Inc., which in turn is a subsidiary of non-party UBS Americas Holding LLC, which in turn is a subsidiary of non-party UBS AG, which in turn is a subsidiary of non-party UBS Group AG, the ultimate parent. UBS Securities has been a registered broker-dealer in Puerto Rico since June 4, 1992.

49.     UBS Financial Services and UBS Securities (collectively, the "UBS Defendants") underwrote the following bond issues: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds Series J; PRHTA, Transportation Revenue Refunding Bonds Series L and N; PREPA, Power Revenue Bonds Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and FG07010326. UBS Financial Services acted as lead underwriter for Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, 2002A and PREPA, Power Revenue Refunding Bonds, Series VV. UBS Securities acted as lead underwriter for Commonwealth of Puerto Rico, Public Improvement Refunding Bonds Series, 2007A and PRHTA, Revenue Refunding bonds, Series L.

50.     Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") is an SEC-registered broker-dealer headquartered at 388 Greenwich Street, New York, NY 10013. Citigroup Global Markets is organized under the laws of the state of New York and has its principal place of business in New York. It is an indirect subsidiary of non-party Citigroup Global Markets Holdings Inc., which in turn is a subsidiary of non-party Citigroup Inc. Citigroup Global Markets has been a registered broker-dealer in Puerto Rico since September 1, 1984.

51.     Citigroup Global Markets underwrote the following issues: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2003C and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series NN and RR; PREPA, Power Revenue Refunding Bonds, Series OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and FG07010326. Citigroup Global Markets acted as lead underwriter for the following bonds: PRHTA, Highway

14

Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; and PRHTA, Transportation Revenue Refunding Bonds, Series L and N.

52.    In 1998, Citigroup, Inc. became the successor by merger to Salomon Smith Barney; in 2003, Salomon Smith Barney was renamed Citigroup Global Markets. Before being renamed, Salomon Smith Barney underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A; PREPA, Power Revenue Bonds, Series LL; and PREPA, Power Revenue Refunding Bonds, Series MM. National insured these bonds under policy numbers 36358, 38324, and 39115.

53.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs LLC") is an SEC-registered broker-dealer headquartered at 200 West Street, New York, NY 10282. Goldman Sachs LLC is organized under the laws of the state of New York and has its principal place of business in New York. Goldman Sachs LLC is a subsidiary of non-party Goldman Sachs Group, Inc. ("Goldman Sachs"), which, subject to certain exceptions, has guaranteed the payment obligations of Goldman Sachs LLC. Formerly known as Goldman Sachs & Co., in April 2017, it converted to a limited liability company. Its activities include investment banking, institutional client services, investing and lending, and investment management. Goldman Sachs LLC is the U.S. broker-dealer of non-party Goldman Sachs and has been a registered broker-dealer in Puerto Rico since September 1, 1984.

54.    Goldman Sachs LLC underwrote the following issues: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and FG07010326. Goldman Sachs LLC acted as lead underwriter for PRHTA, Transportation Revenue Refunding Bonds, Series N; Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, 2003C; PREPA, Power Revenue Bonds, Series LL, MM, and NN; and COFINA, Sales Tax Revenue Bonds, Series 2007A.

55.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan Securities"), formerly known as J.P. Morgan Securities, Inc., is an SEC-registered broker-dealer headquartered at 277 Park Avenue, New York, NY 10172. J.P. Morgan Securities is organized under the laws of the state of Delaware and has its principal place of

business in New York. In 2010, it was converted from a corporation into a limited liability company. J.P. Morgan Securities is the principal broker-dealer and is a sub-sidiary of non-party JPMorgan Chase & Co. J.P. Morgan Securities has been a regis-tered broker-dealer in Puerto Rico since September 1, 1984. In 2008, Bear Steans & Co., Inc. merged with JPMorgan Chase & Co., becoming a subsidiary of JPMorgan Chase & Co.

56.      J.P. Morgan Securities and/or Bear Stearns & Co., Inc. underwrote Com-monwealth of Puerto Rico Public Improvement Refunding Bonds 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transpor-tation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and FG07010326. J.P. Morgan Securities acted as lead underwriter for PREPA, Power Revenue Bonds, Series OO, RR, SS, and UU.

57.      Defendant Morgan Stanley & Co. LLC ("Morgan Stanley LLC") is an SEC-registered broker-dealer headquartered at 1585 Broadway, New York, NY 10036. Morgan Stanley LLC is organized under the laws of the state of Delaware and has its principal place of business in New York. It is a subsidiary of non-party Morgan Stanley Domestic Holdings, Inc., which in turn is a subsidiary of non-party Morgan Stanley Capital Management, LLC, which in turn is a subsidiary of non-party Mor-gan Stanley, the ultimate parent. Morgan Stanley LLC engages in securities under-writing and distribution and financial advisory services. It is a primary U.S. broker-dealer of non-party Morgan Stanley and has been a registered broker-dealer in Puerto Rico since November 8, 1985.

58.      Morgan Stanley LLC underwrote the following issues: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transpor-tation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and

FG07010326. Morgan Stanley LLC acted as lead underwriter for PREPA Revenue bonds Series RR and SS, and Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2003C.

59. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an SEC-registered broker-dealer headquartered at One Bryant Park, New York, NY 10036. Merrill Lynch is organized under the laws of the state of Delaware and has its principal place of business in New York. Said company operates as a subsidiary of non-party BAC North America Holding Company, which in turn operates as a subsidiary of non-party NB Holdings Corporation, which in turn operates as a subsidiary of non-party Bank of America Corporation, the ultimate parent. Merrill Lynch is the primary U.S. broker-dealer of Bank of America. It has been a registered broker-dealer in Puerto Rico since September 1, 1984 and maintains an office in Puerto Rico located at 15 Second Street, Suite 210, Guaynabo, PR 00968.

60. Merrill Lynch underwrote the following issues: Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and FG07010326.

61. In 2010, Merrill Lynch became the successor by merger to Banc of America Securities LLC ("Banc of America Securities"). Banc of America Securities underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. National insured these bonds under policy numbers 36358, 38324, 39115, 409190, 40952, 42162, 437160, 46002, 46994, 492151, 494781, 496040, 499240, 503220, FG04010536, FG05010237, FG07010235, and FG07010326.

62. In 2009, Merrill Lynch became the successor by merger to Banc of America Investment Services, Inc., which had previously acquired LaSalle Financial Services, Inc., formerly known as ABN AMRO Financial Services, Inc. ("ABN AMRO").

ABN AMRO underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A; PREPA, Power Revenue Bonds, Series LL; and PREPA, Power Revenue Refunding Bonds, Series MM. National insured these bonds under policy numbers 36358, 38324, and 39115.

63.    Defendant RBC Capital Markets LLC ("RBC Capital Markets") is an SEC-registered broker-dealer headquartered at 200 Vesey Street, New York, NY 10281. RBC Capital Markets is organized under the laws of the state of Minnesota and has its principal place of business in New York. It is a subsidiary of non-party RBC USA Holdco Corporation, which in turn is a subsidiary of non-party RBC US Group Holdings LLC, which in turn is a subsidiary of non-party Royal Bank of Canada, the ultimate parent. In February 2008, RBC Capital Markets changed its name from RBC Dain Rauscher Inc. to RBC Capital Markets Corporation. In November 2010, the company converted from a corporation to a limited liability company. RBC Capital Markets has been a registered broker-dealer in Puerto Rico since May 16, 1997.

64.    RBC Capital Markets underwrote PRHTA, Transportation Revenue Refunding Bonds, Series N; PREPA, Power Revenue Refunding Bonds, Series UU and VV; COFINA, Sales Tax Revenue Bonds, Series 2007A; and Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2007A. National insured these bonds under policy numbers 492151, 494781, 496040, 499240, 503220, FG07010235, and FG07010326. RBC Capital Markets acted as lead underwriter for PRHTA, Transportation Revenue Refunding Bonds, Series N.

65.    Defendant Santander Securities LLC ("Santander Securities") is an SEC-registered broker-dealer headquartered at 2 Morrissey Boulevard, Dorchester, MA 02125. Santander Securities is organized under the laws of Puerto Rico and, during the relevant period, had its principal place of business in Puerto Rico. It operates as a subsidiary of non-party Santander Holdings USA, Inc., which in turn is a subsidiary of non-party and parent Banco Santander, S.A. In 2011, Santander Securities converted from a corporation to a limited liability company. Santander Securities has been a registered broker-dealer in Puerto Rico since December 3, 1996.

66.    Santander Securities underwrote the following issues: PRHTA, Transportation Revenue Refunding Bonds, Series N; PREPA, Power Revenue Refunding Bonds, Series UU and VV; COFINA, Sales Tax Revenue Bonds, Series 2007A; and Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2007A. National insured these bonds under policy numbers 492151, 494781, 496040, 499240, 503220, FG07010235, and FG07010326.

## JURISDICTION

67.     This Court has personal jurisdiction over each Defendant.

## I.     General Jurisdiction

68.     This Court has general jurisdiction over each Defendant because of each Defendant's ongoing and continuous contacts with Puerto Rico.

69.     Defendant UBS Financial Services is a registered broker-dealer in Puerto Rico. UBS Financial Services regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities.

70.     Defendant UBS Securities is a registered broker-dealer in Puerto Rico. UBS Securities regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities.

71.     Defendant Citigroup Global Markets is a registered broker-dealer in Puerto Rico. Citigroup Global Markets regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities. Further, Citigroup Global Markets serves as a consultant to the Financial Oversight and Management Board for Puerto Rico ("FOMB"), which was created pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA") to assist Puerto Rico in restructuring its debts. Specifically, in 2017, the FOMB, on behalf of Puerto Rico and certain of its agencies and instrumentalities—including PREPA, PRHTA, and COFINA—filed petitions under Title III of PROMESA seeking to restructure their debts (the "Title III Proceedings"). Citigroup Global Markets serves as a consultant to the FOMB in those Title III Proceedings and is the lead investment adviser for the restructuring and privatization of PREPA.

72.     Defendant Goldman Sachs LLC is a registered broker-dealer in Puerto Rico. Goldman Sachs LLC regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities. Goldman Sachs LLC participates in joint ventures with Puerto Rico entities, such as Autopistas Metropolitanas de Puerto Rico, LLC, that manages public toll roads in Puerto Rico.

73.     Defendant J.P. Morgan Securities is a registered broker-dealer in Puerto Rico. J.P. Morgan Securities regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting and selling multiple bonds issued by the Commonwealth and its agencies and instrumentalities. J.P. Morgan Securities

maintains physical offices in Puerto Rico from which it conducted its broker-dealer business.

74.    Defendant Morgan Stanley LLC is a registered broker-dealer in Puerto Rico. Morgan Stanley LLC regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities, and has clients in Puerto Rico. Morgan Stanley LLC maintained physical offices in Puerto Rico from which it conducted its broker-dealer business.

75.    Defendant Merrill Lynch is a registered broker-dealer in Puerto Rico. Merrill Lynch regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities. Merrill Lynch maintains physical offices in Puerto Rico from which it conducted its broker-dealer business.

76.    Defendant RBC Capital Markets is a registered broker-dealer in Puerto Rico. RBC Capital Markets regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities. Through its Tax Credit Equity Group, RBC Capital Markets manages investment funds that focus, in part, on properties in Puerto Rico.

77.    Defendant Santander Securities is incorporated in Puerto Rico and has its principal place of business in Puerto Rico. Santander Securities is a registered broker-dealer in Puerto Rico. Santander Securities regularly and systematically conducts brokerage business in Puerto Rico, including by underwriting multiple bonds issued by the Commonwealth and its agencies and instrumentalities. Santander Securities maintains physical offices in Puerto Rico from which it conducted its broker-dealer business.

## II.    Specific Jurisdiction

78.    The Court has specific jurisdiction over each Defendant under the procedural system, as each Defendant directly or through its agents transacted business in Puerto Rico, and National's claims arise out of and relate to those transactions.

79.    National's claims and injuries arise out of its insurance for bonds issued in Puerto Rico by the Commonwealth and its instrumentalities, including but not limited to, PREPA, COFINA, and PRHTA. Each bond was underwritten by Defendants, who transacted business in Puerto Rico either directly or through their agents with the Commonwealth, PREPA, COFINA, and/or PRHTA. Defendants procured

insurance from National for each bond issuance on behalf of the Commonwealth, PREPA, COFINA, and/or PRHTA.

80.    Each Defendant directly, or through its agents, directed communications—including by telephone, letter, fax, and e-mail—to addresses in Puerto Rico that directly relate to National's claims, including communications relating to National's bond insurance.

81.    The insurance policies that Defendants induced National to enter were signed in Puerto Rico.

82.    As underwriters, Defendants purchased the bonds issued by the Commonwealth, PREPA, COFINA, and/or PRHTA. They then sold those bonds to, among others, individuals or legal entities located in the Commonwealth. In exchange, the Commonwealth, PREPA, COFINA, and PRHTA paid the Defendants large fees.

83.    On information and belief, each Defendant had meetings in Puerto Rico relating to the issuances described herein, including contacts in Puerto Rico to market, pitch and sell bonds. According to a former branch manager of an affiliate of Defendant UBS Securities: "All the major banks in New York [came] to Puerto Rico on a regular basis to pitch deals. . . . They make commissions. They make fees. This is kind of like a moneymaking machine. As long as there are transactions coming and going, they're making a ton of money." Laura Sullivan, *How Puerto Rico's Debt Created a Perfect Storm before the Storm*, NPR (May 2, 2018), https://www.npr.org/2018/05/02/607032585/how-puerto-ricos-debt-created-a-perfect-storm-before-the-storm. Furthermore, Defendant Citigroup Global Markets had at least one meeting in Puerto Rico with National regarding the issuance of insurance for PREPA.

84.    Assuming *in personam* jurisdiction is reasonable. This forum has a compelling interest in adjudicating this dispute, which concerns uniquely Puerto Rico substantive law causes of action—including claims under Puerto Rico Civil Code § 7—and the allegations concern facts relating to the issuance of billions of dollars in Puerto Rico bonds. Defendants are well-capitalized and continue to do business here; they will not be burdened by appearing in this court. No other forum has as many contacts or such a compelling interest in adjudicating this dispute and all claims are capable of resolution here.

## **VENUE**

85.    Venue is proper in San Juan Trial Court, San Juan Superior Court, pursuant to P.R. LAWS ANN. tit. 32 App. V R. 3.5. Defendants Santander Securities, J.P.

Morgan Securities, Morgan Stanley LLC, and Merrill Lynch have a physical presence and offices in San Juan. Further, many of the acts and transactions alleged herein occurred in San Juan. The bonds were issued in San Juan and sold to persons in San Juan. The insurance policies issued by National were signed in San Juan. Relevant communications—including through meetings and by telephone, fax, e-mail, and letter—also occurred in San Juan.

## FACTUAL ALLEGATIONS

### I.  The Municipal Bond Market

86.  A municipal bond is a debt security, under which the bond's issuer owes the bond's holders a debt and must pay them interest, usually at fixed intervals, and must repay the principal by a later maturity date. Municipal bonds may be issued by state, local, territorial [commonwealth] governments or by one of their agencies, instrumentalities or subdivisions. Such bonds are typically used to finance public interest and infrastructure projects like roads, schools, housing, or public utilities.

87.  The market for municipal bonds is not heavily regulated. "[M]unicipal issuers are exempt from regulation by the SEC with limited exceptions." MSRB Regulatory Notice 2017-18, at 2 (Sept. 13, 2017), http://www.msrb.org/~/media/Files/Regulatory-Notices/Announcements/2017-18.ashx. Issuances of municipal bonds are "exempt from federal securities registration and reporting requirements that apply to other securities being offered to the public." SEC, *Investor Bulletin: The Municipal Securities Market* 1, (Feb. 12, 2018), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_munibondsmarket. Thus, any public disclosures about the bonds that the issuer chooses to make are voluntary. *See* Municipal Securities Disclosure, Exchange Act Release No. 26100 (Sept. 22, 1988).

### A.  Municipal Bond Underwriters

88.  A municipal bond issuer (in this case, all governmental instrumentalities) hires an underwriter—generally a bank—to market and sell the bonds. Among other things, the underwriter typically participates in drafting Official Statements that describe the bonds and are publicly filed with the SEC. The underwriter buys the bonds from the issuer, prices the bonds, and then resells them to investors at an initial offering.

89.  While each bond issuance typically has multiple underwriters, the majority of the issuances have at least one "lead underwriter" that takes the lead in (among other things) pricing the bonds, involving other underwriters in the issuance, allocating the amount of bonds to be sold among co-underwriters, coordinating

amongst the underwriters, and procuring bond insurance. Each issuance referred to in this case had at least one lead underwriter responsible for selling more bonds than the rest of the underwriting team and was entitled to receive larger fees.

90.     If an issuer decides to make public disclosures about its bonds, the SEC requires the underwriters (Defendants herein) to vet those disclosures and ensure, through a reasonable investigation, that they are true and complete. As the SEC has explained, "investors in the municipal markets rely on the reputation of the under-writers participating in an offering in deciding whether to invest." Disclosure, Release No. 26100, at *6. Accordingly, the SEC adopted SEC's Exchange Act Rule 15c2-12 ("Rule 15c2-12") to "stimulate greater scrutiny by underwriters of the representations made by issuers and the circumstances surrounding the offering." *Id.* Underwriters bear this burden because they are sophisticated "securities professionals" with experience in bond issuances that typically is far greater than that of the municipal issuers. *Id.*

91.     Rule 15c2-12 makes it "unlawful" for a bank to "act as an underwriter in a primary offering of municipal securities" of over $1 million unless, among other things, it "obtain[s] and review[s] an Official Statement" that contains key information about the issuance. 17 C.F.R. § 240.15c2-12. Underwriters put their names on the front covers of these Official Statements, thus attaching their reputations as well. Draft Official Statements may exclude certain information relating to the pricing, interest rates and yields for the bonds, but otherwise usually contain the same information as the final versions.

92.     As the SEC has explained in interpreting Rule 15c2-12: "by participating in an offering, an underwriter makes an implied recommendation about the securities. This recommendation implies that the underwriter has a reasonable basis for belief in truthfulness and completeness of the key representations contained in the [O]fficial [S]tatement." Municipal Securities Disclosure, Exchange Act Release No. 26985, at *2 (June 28, 1989). Thus, the underwriter must pursuant to Rule 15c2-12 perform a "reasonable investigation" to develop "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents [i.e., the Official Statements] used in the offerings." Disclosure, Release No. 26100, at *20. To conduct a reasonable investigation, an underwriter must also examine the truthfulness and completeness of statements made by the same issuer in past issuances: "An underwriter's obligation to have a reasonable basis to believe that the key representations in a final [O]fficial [S]tatement are true and accurate extends to an issuer's representations concerning past compliance with disclosure

obligations." U.S. Sec. and Exch. Comm'n., *Municipalities Continuing Disclosure Co-operation Initiative*, https://www.sec.gov/divisions/enforce/municipalities-continuing-disclosure-cooperation-initiative.shtml (last modified Nov. 13, 2014).

93.    In short, underwriters are in fact the market's gatekeepers. They "help address the informational asymmetries between investors and companies by verifying the credibility of contractual representations," including "the accuracy of financial statements" and "the risk profile of bonds." Stavros Gadinis & Colby Mangels, *Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. 797, 802 (2016).

94.    When underwriters do their jobs as expected, they can protect issuers from issuing debt that is likely to default. Disclosure, Release No. 26100. Consequently, if an underwriter finds that bond disclosures are materially false or incomplete, he should help the issuer correct the representation or simply refuse to participate in the offering—signaling to the market that something is wrong. *See* Gadinis, 73 Wash. & Lee L. Rev. at 810. Investors and others that rely upon this information will be able to assess if the issuer is likely to be able to repay the bonds it issues on the disclosed terms—an assessment that they can conduct only if the information disclosed is truthful and complete.

### B.    Municipal Bond Insurance

95.    In order to facilitate the marketing and sale of the bonds and make them more attractive to investors, municipal bond issuers may, as in this case, engage a bond insurer—also known as a monoline insurer—to provide financial guaranty insurance. In exchange for a premium, the bond insurer guarantees that it will pay interest or principal to holders of some of or all the bonds if the issuer defaults. By "wrapping" its own creditworthiness rating and ability to pay claims relating to the bonds, the bond insurer increases the creditworthiness and credibility, and hence the marketability, of the bonds. Without bond insurance, an underwriter might not be able to market a bond at the desired price—or at any price, depending on the creditworthiness of the issuer.

96.    Typically, an underwriter solicits municipal bond insurance from an insurer on behalf of an issuer. But the underwriter and the insurer do not enter into a contract, and the underwriter does not act as the issuer's agent; the insurance contract is between the insurer and the issuer (or an entity acting on the issuer's behalf, like an insurance agent).

97.    Per well-established industry norms, the underwriter submits an "insurance application" to the insurer to solicit bond insurance for an issuer. Unlike

applications for personal forms of insurance (like fire, car, or homeowner's), there is no standard insurance form; instead, the application for municipal insurance is a bundle of documents describing the issuer and the bonds, including draft Official Statements, three years of duly-audited financial statements, and draft legal documents describing the issuance. The underwriter continuously supplements the application with updated draft Official Statements, ultimately submitting the final version.

98.     By submitting Official Statements to an insurer for a policy to be issued, an underwriter assures the insurer that it will conduct a reasonable investigation into the truthfulness and correctness of those statements, and that the underwriter will have a reasonable basis to believe those statements and disclosures are materially true and complete. The underwriter is not required to send the insurer these materials and information, or to certify to the insurer that it will comply with federal securities laws. After the underwriter voluntarily provides those materials, however, the insurer is entitled to rely in good faith on the fact that the underwriter will conduct the investigations required by law.

99.     The underwriters' assurances are critical because underwriters have special access to the issuers—including to their financial information—that insurers and other market participants do not. To decide whether to issue insurance, a bond insurer must depend on information provided by the underwriter and on the underwriter's assurances that it has vetted that information. *See* Gadinis, 73 WASH. & LEE L. REV. at 809. As the SEC observed, bond insurers must "rely upon disclosure concerning the primary obligor" (i.e., the issuer) and the "reasonable investigation [by the underwriter] of the accuracy and completeness of key representations concerning the primary obligor." Disclosure, Release No. 26985, at *22.

100.     Typically, once a monoline insurer issues bond insurance, that insurance cannot be canceled—the insurer must pay claims, even if it issued the policy based on information that turns out to have been materially false or incomplete. The insurer cannot bring claims against the underwriters under the securities laws, because it did not purchase the bonds, but rather insured them. The insurer also cannot bring contract claims against an underwriter, as the two never enter into a contract.

101.     Therefore, it is vital that underwriters' information and assurances to bond insurers be true and complete. If an underwriter fails to conduct the promised review and allows bonds to come to market based on false or incomplete information, that omission can—and in this case did—cause catastrophic damage to the issuer, the insurer, and the market.

## II.   Defendants Underwrote the Bonds and Benefited Immensely from Each and Every One of Those Transactions

102.   Between 2001 and 2014, the Commonwealth and its instrumentalities and agencies—including PREPA, PRHTA, and COFINA—issued bonds totaling approximately $66,469,538,131 in principal value at issuance. Sixteen of those bonds are at issue here:

    a)    Power Revenue Bonds, Series LL

    b)    Power Revenue Refunding Bonds, Series MM

    c)    Power Revenue Bonds, Series NN

    d)    Power Revenue Refunding Bonds, Series OO

    e)    Power Revenue Bonds, Series RR

    f)    Power Revenue Refunding Bonds, Series SS

    g)    Power Revenue Refunding Bonds, Series UU

    h)    Power Revenue Refunding Bonds, Series VV

    i)    Public Improvement Refunding Bonds, Series 2002A

    j)    Public Improvement Bonds, Series 2003C

    k)    Public Improvement Refunding Bonds, Series 2007A

    l)    Highway Revenue Refunding Bonds, Series AA

    m)    Transportation Revenue Bonds, Series J

    n)    Transportation Revenue Refunding Bonds, Series L

    o)    Transportation Revenue Refunding Bonds, Series N

    p)    Sales Tax Revenue Bonds, Series 2007A

103.   As a result of the bond issuances, Defendants profited substantially in different ways.

104.   *First,* affiliates of some underwriters, including a Puerto Rico-based affiliate of the UBS Defendants, acted as financial advisors to the issuers and charged the issuers substantial fees for acting in that capacity. Special Investigation Report at 557-58 [the Special Investigation Report is described *infra* ¶¶ 130-133]. This advice was self-interested and allowed those affiliates to profit from the issuance of the bonds by obtaining millions of dollars from their self-interested advice.

105.   *Second*, the issuers paid Defendants to bring the issuances to market through an underwriter spread—that is, the difference between the price Defendants paid the issuer for the bonds and the price at which Defendants offered the bonds to investors. Typically, the underwriter spread was a percentage of the issuance's overall value and had three components, all paid to Defendants from the proceeds of the bond sale: (a) the takedown, paid to the underwriters for selling the securities

26

(usually the largest component of the spread); (b) management fees, paid to the lead underwriter for taking a lead role in the issuance; and (c) expenses, paid to the underwriters for executing the issuance, including the costs of the underwriter's counsel's fees, investor road shows incidental expenses, and technical aspects of issuances.

106.　As a result of the underwriter spread, Defendants made many millions of dollars. As an example, between 2000 and 2013, underwriters—including Defendants—were paid an estimated "$880 million" in management fees alone. Bill Faries, Martin Z. Braun & Michelle Kaske, *How Wall Street Fed Puerto Rico's $70 Billion Debt Binge*, BLOOMBERG NEWS (Oct. 22, 2013), https://www.bloomberg.com/news/articles/2013-10-22/how-wall-street-fed-puerto-rico-s-70-billion-borrowing-binge.

107.　Defendants increased the size of their underwriter spread by obtaining bond insurance from National. Without that insurance, it is likely that the issuers would not have been able to issue as many bonds or would have had to sell them at much lower prices. By successfully soliciting and obtaining National's insurance, Defendants increased the size and price of each bond issuance, which, in turn, increased Defendants' profits.

108.　*Third*, underwriters like the UBS Defendants and Defendant Santander Securities sold bonds through Puerto Rico Closed-End Funds ("Local CEFs") managed by their affiliates, reaping additional benefits. Local CEFs, which were sold exclusively to P.R. residents, are mutual funds, exempt from certain federal regulations on disclosure of information regarding leverage, and trading with affiliates. Special Investigation Report at 340-43. Local CEFs, were highly popular because they were "triple-tax exempt," that is, they were exempt from federal, state, and local taxes. *Id.* at 340. By selling bonds this way, these Defendants earned fees for managing the Local CEFs, additional fees for advising the Local CEFs, and sales commissions for selling shares in the Local CEFs. *Id.* at 357. These revenues were in the millions of dollars. For example, advisory and administrative fees, as well as primary and secondary market sales commissions associated with Local CEFs, contributed to half of the annual revenues of certain UBS-affiliates between 2004 and 2008. In 2008 alone, one affiliate's Local CEF business generated $94.5 million in revenues. *Id.* at 359. UBS-affiliated brokers made a three percent commission on the sales of Local CEF shares and received additional compensation based on amounts drawn from customers' lines of credit. *Id.* at 368.

109.　*Fourth*, many underwriters also earned interest rate swap management and termination fees on the bonds they underwrote. An interest rate swap is a contract in which two parties exchange one stream of interest payments for another.

27

Typically, the issuer of a fixed-rate bond will "swap" the interest payments it would receive from that bond in exchange for variable interest payments from the swap provider. The issuer pays the swap provider a fee for issuing the swap and, if the swap is terminated, may have to pay the provider a termination fee. *Id.* at 22, 418-19, 431.

110. Underwriters, including Defendants Morgan Stanley LLC, Merrill Lynch, UBS Defendants, J.P. Morgan Securities, and Goldman Sachs LLC, sold interest rate swaps to the Commonwealth, COFINA, and/or PREPA. *See* Complaint at 5-8, *The Official Committee of Unsecured Creditors of Puerto Rico v. Barclays Capital*, Case No. 19-00281, ECF 1 (Bankr. D.P.R. May 2, 2019); Special Investigation Report at 421, 432-33. These Defendants promoted the swaps as protecting these issuers against rising interest rates—which Defendants said would continue to rise—by swapping the bonds' variable interest rates for fixed interest rates. When the U.S. financial crisis began in 2007, however, variable interest rates plummeted, but the issuers still had to make high fixed-rate interest payments to Defendants.

111. That being the case, by 2009, the issuers had to terminate the swaps because they could not afford them—collectively, Puerto Rico bond issuers owed $1.32 billion in swap termination fees, more than 14% of the Commonwealth's annual budget and 17% of its actual revenues. Special Investigation Report at 413-14. The issuers ultimately paid over one billion dollars in such fees, including hundreds of millions of dollars to several Defendants. One estimate puts the total fees paid by the issuers to underwriters, including Defendants, at $1.6 billion. Saqib Bhatti & Carrie Sloan, ReFund America Project, *Scooping and Tossing Puerto Rico's Future*, 1 (Aug. 31, 2016), https://www.scribd.com/document/322588236/Scooping-and-Tossing-Puerto-Rico-s-Future#page=1&fullscreen=1.

112. *Finally*, underwriters, including Defendants, induced issuers facing large swap termination fees to issue additional bonds to pay down the outstanding debt from those fees. Collectively, the Commonwealth, PREPA, and COFINA incurred in excess of $800 million in new debt to pay swap termination fees they owed on old debt—including fees they owed to several Defendants, such as Defendants Morgan Stanley LLC, UBS Defendants, Citigroup Global Markets, J.P. Morgan Securities, Goldman Sachs LLC, and Merrill Lynch. Special Investigation Report at 432-33. Defendants benefited from these deals, which generated millions in revenue associated with the termination fees and the new bonds. Certain Defendants—including Santander Securities, J.P. Morgan Securities, Morgan Stanley LLC, and Goldman Sachs LLC—also earned additional fees by underwriting the new bonds. *See, e.g.*,

*Commonwealth of Puerto Rico, Official Statement for General Obligations Bonds of 2014, Series A*, 24-25 (2014).

113. As a result, Defendants had multiple incentives to profit and encourage the issuers to issue more and more debt—and practically no incentive to ensure that the bonds could perform in the long run. The issuances were so lucrative for the Defendants that they had every incentive to omit information indicative of potential default risks so that they could push the bonds to market. The prospect of insurance—which put insurers on the hook for any default—further incentivized Defendants to omit those risks since they knew that the insurers, and not the underwriters, would bear the risk. Defendants' interests were in gross conflict with those of the issuers, with bond insurers like National, with the bondholders, and with the people of Puerto Rico, who depended on the essential services that the issuers provided.

**III.** **To Induce National to Insure The Bonds, Defendants Assured National They Had A Reasonable Basis to Believe The Bonds' Official Statements Were True and Complete**

114. From 2001 to 2007, Defendants solicited and induced National to insure the timely payment of interest and principal payments, when due, on the bonds issued by the Commonwealth, PREPA, PRHTA, and COFINA, totaling approximately $11,465,305,000 of debt. For each issuance, and regardless of issuer, Defendants acted the same way: They submitted insurance applications to National, which they continuously supplemented, including draft and final Official Statements that had their names on the front cover.

115. Although Defendants purportedly did not explicitly guarantee that representations in the Official Statements were true and complete, Defendants could and did assure National that they had reasonably investigated those statements and had a reasonable basis to believe they were true and complete. Thus, each Official Statement stated: "The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of the transaction, but the Underwriters do not guarantee the accuracy or completeness of such information." *E.g.*, PREPA, *Official Statement for Power Revenue Bonds, Series NN* (2003).

116. As an integral step in soliciting National to provide bond insurance, Defendants submitted these Official Statements to National in draft and final form. In submitting the draft statements, Defendants touted their alleged compliance with the securities laws, acted as though they were abiding by municipal bond industry

custom and norms, and so assured National that they would perform a "reasonable investigation" to develop "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings." Disclosure, Release No. 26100. In submitting final Official Statements, Defendants assured National that they had completed that investigation and now reasonably believed that the statements were true and complete. Defendants intended that National would rely on these assurances—which it did.

## IV. Relying in Good Faith on Defendants' Assurances, National Issued Insurance for the Bonds That Could Not be Revoked

117. Upon information and belief, Defendants are experienced municipal bond underwriters that have underwritten at least hundreds, if not thousands, of municipal bond issuances outside of Puerto Rico. Where Defendants have sought insurance for municipal offerings, they have in the past done so by submitting Official Statements to insurers, which have relied upon the reasonable investigations of those underwriters in making insurance decisions in accordance with municipal bond industry custom and norms.

118. In deciding whether to insure the bonds, consistent with industry custom and norms, National had to rely on information submitted by Defendants, who had access to the issuers' financial information. It was objectively reasonable for National to do so. It was especially reasonable for National to rely on the specific information that Defendants presented and had purportedly vetted, as National could not reasonably verify that information on its own—publicly-available information about the Commonwealth was "notoriously unreliable[.]" John Dizard, *Puerto Rico's Number-Crunching Frustrates Even the Best Minds*, FIN. TIMES (Mar. 15, 2019), https://www.ft.com/content/132a4e75-9016-3757-9f4d-08baf3c7a798.

119. Based on the information provided by Defendants, and on Defendants' assurances that they had reasonably investigated those statements, National entered into agreements with the issuers to insure the bonds. These agreements allowed National to opt out of the transaction before the bond was issued if there were material adverse changes to the draft or final Official Statements or if National became aware of materially false statements or omissions in the application. If National did not opt out before the bonds were issued, the insurance policy it issued would be irrevocable.

120. National reviewed the draft and final Official Statements. It focused on assessing the likelihood of default, examining how the issuer was spending and would spend its funds; the issuer's debt ratios; the issuer's revenues, debts, and appropriations; and, if the issuance was secured by the issuer's revenues, the conditions of the

facilities that would generate the revenue and whether the issuer would spend the funds necessary to maintain or improve them.

121.  Based on the information in the applications—and because Defendants never notified National that any part of the statements were untrue or incomplete—National issued irrevocable insurance policies for the bonds at issue. Because National's insurance was irrevocable, National's long-term interests were fully aligned with those of the Commonwealth, PREPA, PRHTA, COFINA, and the people of Puerto Rico—none wanted the bonds to default.

**V.  The Issuers Default and National Honors Its Insurance Policies, Making Claims Payments Starting in 2016**

122.  Eventually, the bonds that underwriters, including Defendants, pushed to market bankrupted the Commonwealth.

123.  By 2015, Puerto Rico had a debt of approximately $72 billion—reportedly about "15 times the median bond debt of the 50 states" and far more than any of those states. Mary Williams Walsh, *The Bonds That Broke Puerto Rico,* N.Y. TIMES (June 30, 2015), https://www.nytimes.com/2015/07/01/business/dealbook/the-bonds-that-broke-puerto-rico.html. These debts caused a financial crisis. The Commonwealth supposedly had "lock[ed] up more and more of its resources to secure more and more bonds," which, "over the long term ... left less and less money to provide essential government services," such as "policing, staffing the public schools and providing clean water." *Id.*

124.  The Governor of Puerto Rico declared the island's debt "not payable." Michael Corkery & Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts Are 'Not Payable'*, N.Y. TIMES (June 28, 2015), https://www.ny-times.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-islands-debts-are-not-payable.html. Shortly thereafter, Puerto Rico issuers began defaulting on the payment of their obligations. These defaults devastated the people of Puerto Rico, especially retail investors, many of whom were "conservative" in their investment strategies and had invested heavily at the time of each issuance because they thought the bonds were safe investments. For example, a UBS Defendants' affiliate disclosed "nearly $3 billion in losses to Local CEF investors." Special Investigation Report at 340. Many investors immediately had their retirement savings severely diminished or fully wiped out. The defaults also harmed all of Puerto Rico's citizens in myriad ways. Due to the staggering financial crisis and loss of access to the municipal bond market, the Commonwealth closed essential institutions, including schools and hospitals; limited funding to important social services, such as healthcare and

31

infrastructure; and reduced maintenance of power grids and transportation net-works. *See id.* at 48; Thomas Health & Tory Newmyer, *Puerto Rico, with $73 billion in Debt, Forced Toward Bankruptcy*, WASH. POST (May 3, 2017), https://www.washingtonpost.com/business/economy/puerto-rico-with-73-billion-in-debt-forced-toward-bankruptcy/2017/05/03/92e39d76-3020-11e7-9534-00e4656c22aa_story.html?noredirect=on&utm_term=.59dff9c2442e; Sullivan, *supra* ¶ 83.

125.    Defaults by the Commonwealth, PREPA, and PRHTA triggered National's obligations to pay on its policies. National has taken responsible measures to mitigate the crisis, making every payment when due—more than $720 million as of July 1, 2019.

126.    National intends to make all future claims payments as well, which it estimates to be hundreds of millions of dollars.

127.    So far, National's payments have helped and will continue to help make bond investors whole, including Commonwealth citizens who have been affected by the financial turmoil caused by the defaults.

128.    While COFINA did not default, it entered bankruptcy-like proceedings, to National's detriment. Under Title III of PROMESA, the FOMB filed petitions on behalf of, and in representation of, Puerto Rico, and several of the Commonwealth's instrumentalities—including PREPA, PRHTA, and COFINA. In the context of said proceedings, in February 2019, a debt restructuring plan was approved for COFINA by means of which National reasonably expects to pay out over $100 million in claims. Other governmental instrumentalities have yet to emerge from their Title III PROMESA proceedings.

129.    While National, the issuers, and the people of Puerto Rico were deeply harmed by the massive defaults, the underwriters retained their massive profits. As a former bond broker from Defendant Morgan Stanley put it: "The banks [got] out, and everybody else [got] stuck with the bill." Sullivan, *supra* ¶ 83.

## VI. In 2018, A Special Investigation Revealed That—Contrary To Their False Assurances—Defendants Had Not Reasonably Investigated the Official Statements And Those Statements Were Materially False and Incomplete

130. The FOMB formed a Special Investigation Committee (the "Special Investigation") that investigated the origins of Puerto Rico's fiscal crisis. The results of the Special Investigation were released in a report in August 2018 (the "Special Investigation Report"). Through document request letters and subpoenas, the Special Investigation Committee obtained over 260,000 documents from 32 different parties including Puerto Rico entities, financial institutions, and financial advisors; it also interviewed 120 witnesses, including former and current government officials—and underwriters. Special Investigation Report at 25, 27.

131. The Committee's findings were shocking. It found that key representations in the Official Statements for the issuances it examined were incorrect or incomplete. The Special Investigation Report found that the underwriters, including Defendants, did not adequately examine the veracity of those representations—if they investigated at all. The Special Investigation Report further indicated that the underwriters took the same approach to other issuances that were not examined as part of the Special Investigation. *See id.* at Parts XI, XIV.

132. The Special Investigation's scope, as determined by the Committee, was limited: It looked at only the period from 2006 to 2015 and focused on only select issuers—the Commonwealth, PREPA, COFINA, and the Puerto Rico Aqueducts and Sewers Authority ("PRASA"). The Special Investigation Report stated that "[f]urther analysis and gathering of evidence by other stakeholders, with mandates different or broader than ours, will inform whether any potential causes of action or legal remedies identified in this Report can and should be pursued and, if so, in what manner and against whom." *Id.* at 30. The Report advised that its discussion of potential causes of action in the report "is not intended to provide an exhaustive or definitive list and analysis of all the causes of action that may be available[.]" *Id.*

133. The Special Investigation Report reveals that Defendants failed to reasonably investigate the truthfulness and completeness of Official Statements for the bonds at issue in this claim. The Report not only reveals the underwriters' wholly inadequate approach to PREPA issuances, but also strongly indicates that they took the same approach to other issuances that the Report did not fully analyze, if at all—including those of the Commonwealth, PRHTA, and COFINA. As shown below, multiple Defendants underwrote multiple bonds for each issuer and for several issuers. Six of the Defendants—J.P. Morgan Securities, the UBS Defendants (between UBS

Financial Services and UBS Securities), Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, and Merrill Lynch—participated in every issuance insured by National—while Defendants Santander Securities and RBC Capital Markets participated in each issuance insured by National in 2007. The issuers themselves had the same Defendants marketing and selling their bonds, had similar or identical disclosure problems, and the bonds they underwrote all defaulted more or less around the same time. Defendants had similar incentives for each issuance—to bring the bonds to market without performing investigations, the results of which could put their profits at risk.

### A. The Key Representations in PREPA's Official Statements Were Materially False and Incomplete

134. PREPA is responsible for conserving, developing, and utilizing Puerto Rico's power resources to promote Puerto Rico's general welfare.

135. PREPA's bonds are backed by PREPA's revenue from generating, transmitting, and distributing electricity. *E.g.*, PREPA, *Official Statement for Power Revenue Bonds, Series NN*, 5 (2003).

136. From 2001 to 2007, Defendants sought and obtained bond insurance from National, and National has made claims payments on the following PREPA bonds:

a. PREPA Power Revenue Bonds, Series LL dated June 13, 2002, with a maturity date of July 1, 2019. The lead underwriters were Goldman Sachs LLC and UBS PaineWebber Inc. (now known as UBS Financial Services). Other underwriters included Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), ABN AMRO Financial Services, Inc. (predecessor in interest to Defendant Merrill Lynch), Morgan Stanley LLC, Bear Stearns & Co., Inc. (predecessor in interest to Defendant J.P. Morgan Securities), and Salomon Smith Barney (predecessor in interest to Defendant Citigroup Global Markets). The purpose of these bonds was to finance a portion of the cost of various projects under PREPA's capital improvement program. National insured these bonds in the original par amount of $98,125,000. The first default on these bonds was July 3, 2017.

b. PREPA Power Revenue Refunding Bonds, Series MM dated September 20, 2002, with a maturity date of July 1, 2023. The lead underwriters were Goldman Sachs LLC and UBS PaineWebber Inc. (now known as UBS Financial Services). Other underwriters included Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), ABN

AMRO Financial Services, Inc. (predecessor in interest to Defendant Merrill Lynch), Morgan Stanley LLC, Salomon Smith Barney (predecessor in interest to Defendant Citigroup Global Markets), and Bear Stearns & Co., Inc. (predecessor in interest to Defendant J.P. Morgan Securities). The purpose of these bonds was to refund previously issued PREPA revenue bonds. National insured these bonds in the original par amount of $68,700,000. The first default on these bonds was July 3, 2017.

c.      PREPA Power Revenue Bonds, Series NN dated August 8, 2003, with a maturity date of July 1, 2033. The lead underwriters were Goldman Sachs LLC, Merrill Lynch, and J.P. Morgan Securities. Other underwriters included Morgan Stanley LLC, UBS Financial Services, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), and Citigroup Global Markets. The purpose of these bonds was to finance a portion of the cost of various projects under PREPA's capital improvement program and to repay a Government Development Bank ("GDB") line of credit. National insured these bonds in the original par amount of $272,290,000. The first default on these bonds was July 3, 2017.

d.      PREPA Power Revenue Refunding Bonds, Series OO dated August 12, 2004, with a maturity date of July 1, 2025. The lead underwriters were Morgan Stanley LLC, Merrill Lynch, and J.P. Morgan Securities. Other underwriters included Goldman Sachs LLC, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), UBS Financial Services, and Citigroup Global Markets. The purpose of these bonds was to refund previously issued PREPA revenue bonds. National insured these bonds in the original par amount of $124,550,000. The first default on these bonds was July 3, 2017.

e.      PREPA Power Revenue Bonds Series RR and PREPA Power Revenue Refunding Bonds Series SS dated March 24, 2005, with a maturity date of July 1, 2024 and July 1, 2025, respectively. The lead underwriters were Morgan Stanley LLC, Merrill Lynch, and J.P. Morgan Securities. Other underwriters included Goldman Sachs LLC, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), UBS Financial Services, and Citigroup Global Markets. The purpose of the Series RR bonds was to finance a portion of the cost of various projects under PREPA's capital improvement program and to repay certain notes held by the GDB. The purpose of the Series SS bonds was to refund previously issued PREPA revenue bonds. National insured these

bonds in the original par amount of $469,025,000. The first default on these bonds was July 3, 2017.

  f.  PREPA Power Revenue Refunding Bonds, Series UU dated April 19, 2007, with a maturity date of July 1, 2019. The lead underwriters were J.P. Morgan Securities and UBS Investment Bank (now known as UBS Securities). Other underwriters included Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), Morgan Stanley LLC, Goldman Sachs LLC, RBC Capital Markets, and Santander Securities. The purpose of these bonds was to refund previously issued PREPA revenue bonds. National insured these bonds in the original par amount of $77,290,000. The first default on these bonds was July 3, 2017.

  g.  PREPA Power Revenue Refunding Bonds, Series VV dated May 16, 2007, with a maturity date of July 1, 2035. The lead underwriters were J.P. Morgan Securities and UBS Investment Bank (now known as UBS Securities). Other underwriters included Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), Morgan Stanley LLC, Citigroup Global Markets, Goldman Sachs LLC, RBC Capital Markets, and Santander Securities. The purpose of these bonds was to refund previously issued PREPA revenue bonds. National insured these bonds for $302,600,000 and issued an additional insurance policy in the original par amount of $127,610,000. The first default on these bonds was July 3, 2017.

137. It was critical that statements regarding PREPA's long-term ability to earn revenues, minimize costs, and pay down debt through its revenue generating business be accurate. Because the bonds were backed by revenues from generating, transmitting, and distributing electricity, it was important that raised funds actually be spent as assured on the generation, transmission, and distribution of electricity—which would generate revenues—to minimize the risk of default.

138. In fact, key representations in the Official Statements were materially false and incomplete, including those regarding: (a) basic financial information, including debt service coverage ratios and their components, such as revenues; (b) how PREPA was spending money—including statements that it was spending money on generating, transmitting, and distributing electricity; and (c) the good repair of PREPA's systems. Defendants did not investigate and did not have a reasonable basis to believe the truthfulness and completeness of these disclosures.

139. *First*, the Official Statements represented PREPA's basic financial in-formation, including its historical and projected revenues, its expenses, its net reve-nues, and information about its existing debts, such as principal and interest amounts. The higher the revenues and the lower the expenses and debt obligations, the less likely PREPA would be to default on the proposed bonds.

140. The Official Statements provided by Defendants also disclosed PREPA's debt coverage requirements. In order to issue new bonds, and while any bond is out-standing, PREPA must "fix, charge, and collect [reasonable] rates and charges so that Revenues of the System [would] be sufficient to pay [then and future] Current Ex-penses and to provide 120% of the aggregate Principal and Interest Requirements for the [then] next fiscal year." *E.g.*, PREPA, *Official Statement for Power Revenue Bonds, Series TT and UU*, 10 (2007); PREPA, *Official Statement for Power Revenue Bonds, Series NN*, 7 (2003); PREPA, *Official Statement for Power Revenue Bonds, Series LL*, 10 (2002). Each Official Statement disclosed PREPA's historical and pro-jected debt service coverage calculations as the "ratio of [] Net Revenues to Principal and Interest Requirements." *E.g.*, PREPA, *Official Statement for Power Revenue Bonds, Series NN*, 34 (2003). These calculations were designed to show that PREPA's revenues would be sufficient to cover its operating expenses plus payments on its debt service—thereby minimizing the risk of default. A debt service coverage calculation showing a ratio above the requisite 120%, or 1.2, indicated PREPA was well posi-tioned to pay current and future expenses. The higher the calculation for PREPA was above the 1.2 ratio, the less risky an issuance appeared.

141. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securi-ties, and Merrill Lynch for the PREPA Power Revenue Bonds Series LL dated June 13, 2002 set forth the following "Historical Net Revenues and Coverage." These rep-resentations included, among other things, net revenue information leading to his-torical debt coverage ratios well over the requisite ratio of 1.2—between 1.46 and 1.77 for the preceding five years:

**Historical Net Revenues and Coverage**

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2002 |
| Average number of clients | 1,291,633 | 1,309,954 | 1,326,055 | 1,344,907 | 1,365,668 | 1,363,420 | 1,381,701 |
| Electric energy sales (in millions of kWh) | 16,118 | 17,457 | 16,989 | 18,145 | 18,723 | 14,043 | 14,264 |
| **Source of Net Revenues** | | | (dollars in thousands) | | | | |
| **Revenues:** | | | | | | | |
| Sales of electrical energy: | | | | | | | |
| Residential [2] | $ 491,316 | $ 524,128 | $ 471,070 | $ 633,151 | $ 779,682 | $ 586,798 | $ 541,472 |
| Commercial | 725,146 | 745,228 | 688,526 | 878,697 | 1,026,219 | 768,694 | 717,973 |
| Industrial | 346,185 | 350,292 | 299,295 | 391,906 | 436,313 | 329,199 | 282,886 |
| Other | 73,185 | 74,338 | 68,944 | 80,473 | 86,889 | 62,915 | 62,177 |
| | 1,635,832 | 1,693,986 | 1,527,835 | 1,984,227 | 2,329,103 | 1,747,606 | 1,604,508 |
| Revenues from Commonwealth for rural electrification | 1,068 | 1,007 | 941 | 881 | 705 | 522 | 558 |
| Other operating revenues | 8,662 | 11,841 | 8,827 | 10,240 | 8,210 | 6,541 | 6,452 |
| Other (principally interest earned) | 24,887 | 26,841 | 26,350 | 29,936 | 35,059 | 28,151 | 18,728 |
| | 1,670,449 | 1,733,675 | 1,563,953 | 2,025,284 | 2,373,077 | 1,782,820 | 1,630,246 |
| **Current Expenses:** | | | | | | | |
| Operations: | | | | | | | |
| Fuel | 648,899 | 625,346 | 500,920 | 801,433 | 944,760 | 728,422 | 535,232 |
| Purchased power | – | – | – | 64,517 | 177,330 | 125,390 | 163,203 |
| Other production | 37,378 | 43,658 | 42,818 | 55,690 | 56,301 | 41,925 | 43,131 |
| Transmission and Distribution | 76,735 | 86,901 | 83,385 | 94,793 | 105,034 | 74,922 | 84,724 |
| Customer accounting and Collection | 68,138 | 73,647 | 67,517 | 76,598 | 83,453 | 62,814 | 62,143 |
| Administrative and General | 148,376 | 139,986 | 142,866 | 151,069 | 139,117 | 103,977 | 112,658 |
| Maintenance [2] | 217,455 | 215,118 | 212,530 | 219,812 | 213,666 | 163,568 | 160,870 |
| Other | 1,920 | 1,501 | 2,725 | 2,911 | 3,028 | 2,285 | 2,448 |
| | 1,198,901 | 1,186,157 | 1,052,761 | 1,466,823 | 1,722,689 | 1,303,303 | 1,164,409 |
| **Net Revenues** | $ 471,548 | $ 547,518 | $ 511,192 | $ 558,461 | $ 650,388 | $ 479,517 | $ 465,837 |
| **Coverage** | | | | | | | |
| Principal and Interest Requirements | $ 291,239 | $ 316,138 | $ 348,963 | $ 346,417 | $ 367,796 | -- | -- |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.62 | 1.73 | 1.46 | 1.61 | 1.77 | -- | -- |

PREPA, *Official Statement for Power Revenue Bonds, Series LL*, 40 (2002).

142. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series LL dated June 13, 2002 set forth the following "Projected Net Revenues and Coverage." These representations included, among other things, net revenues leading to projected debt coverage ratios well over the requisite ratio of 1.2—between 1.54 and 1.77 over the following five years:

**Projected Net Revenues and Coverage**

| | Years Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2002[(1)] | 2003 | 2004 | 2005 | 2006 |
| Average number of clients | 1,384,206 | 1,403,844 | 1,424,481 | 1,444,121 | 1,464,762 |
| Electric energy sales (in millions of kWh) | 19,051.3 | 19,756.2 | 20,352.2 | 20,823.7 | 21,655.4 |
| Authority generation (gross)(in millions of KWh) | 19,576.6 | 17,157.5 | 17,622.1 | 18,393.2 | 19,512.4 |
| Purchased generation (gross)(in millions of KWh) | 2,986.0 | 6,195.0 | 6,435.0 | 6,221.0 | 6,085.0 |
| **Sources of Net Revenues** | (dollars in thousands) | | | | |
| Revenues: | | | | | |
| Sales of electrical energy: | | | | | |
| Residential | $ 717,119 | $ 766,354 | $ 782,243 | $ 809,770 | $ 851,101 |
| Commercial | 958,533 | 1,037,601 | 1,101,832 | 1,154,489 | 1,235,627 |
| Industrial | 377,723 | 411,788 | 430,525 | 454,049 | 481,285 |
| Other | 85,055 | 90,734 | 91,909 | 92,548 | 93,665 |
| | 2,138,430 | 2,306,477 | 2,406,509 | 2,510,856 | 2,661,678 |
| Revenues from Commonwealth for Rural Electrification | 739 | 704 | 591 | 161 | 116 |
| Other (principally, interests earned) | 33,573 | 37,115 | 39,115 | 41,115 | 43,115 |
| | 2,172,742 | 2,344,296 | 2,446,215 | 2,552,132 | 2,704,909 |
| Current Expenses[(2)]: | | | | | |
| Operations: | | | | | |
| Fuel | 696,408 | 594,334 | 638,146 | 699,579 | 786,835 |
| Purchased Power | 229,265 | 438,830 | 450,989 | 458,351 | 461,651 |
| Other Production | 44,707 | 35,533 | 36,268 | 37,019 | 37,785 |
| Transmission and Distribution | 85,672 | 83,400 | 85,126 | 86,888 | 88,686 |
| Customer Accounting and Collections | 82,614 | 79,707 | 81,356 | 83,040 | 84,759 |
| Administration and general | 171,986 | 181,624 | 185,382 | 189,219 | 193,138 |
| Maintenance | 233,057 | 249,901 | 255,071 | 260,352 | 265,741 |
| Other – Interest Charges | 3,263 | 2,027 | 2,078 | 2,130 | 2,183 |
| | 1,546,972 | 1,665,356 | 1,734,416 | 1,816,578 | 1,920,778 |
| **Net Revenues** | $ 625,770 | $ 678,940 | $ 711,799 | $ 735,554 | $ 784,131 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[(3)] | $ 392,043 | $ 382,519 | $ 430,888 | $ 477,554 | $ 500,056 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.60 | 1.77 | 1.65 | 1.54 | 1.57 |

*Id.* at 45.

143.   The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Refunding Bonds Series MM dated September 20, 2002 set forth the following "Historical Net Revenues and Coverage." These representations included, among other things, net revenue information leading to historical debt coverage ratios well over the requisite ratio of 1.2—between 1.62 in 2001 and 1.77 in 2002:

**Historical Net Revenues and Coverage**

| | Years Ended June 30, | |
|---|---|---|
| | 2001 | 2002* |
| Average number of clients | 1,365,668 | 1,383,888 |
| Electric energy sales (in millions of kWh) | 18,723 | 19,130 |
| **Source of Net Revenues** | (dollars in thousands) | |
| Revenues: | | |
| Sales of electrical energy: | | |
| Residential[1] | $ 779,682 | $ 725,797 |
| Commercial | 1,026,219 | 969,182 |
| Industrial | 436,313 | 382,140 |
| Other | 86,889 | 85,052 |
| | 2,329,103 | 2,162,171 |
| Revenues from Commonwealth for rural electrification | 705 | 739 |
| Other operating revenues | 8,210 | 8,514 |
| Other (principally interest earned) | 35,059 | 29,129 |
| | 2,373,077 | 2,200,553 |
| Current Expenses: | | |
| Operations: | | |
| Fuel | 944,760 | 720,292 |
| Purchased power | 177,330 | 227,923 |
| Other production | 56,301 | 56,029 |
| Transmission and Distribution | 105,034 | 114,971 |
| Customer accounting and collection | 83,453 | 84,689 |
| Administrative and general | 139,117 | 146,497 |
| Maintenance [2] | 213,666 | 212,959 |
| Other | 3,028 | 3,235 |
| | 1,722,689 | 1,566,595 |
| Net Revenues | $ 650,388 | $ 633,958 |
| **Coverage** | | |
| Principal and Interest Requirements | $ 367,796 | $ 392,043 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.77 | 1.62 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series MM*, 7 (2002).

144.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series NN dated August 8, 2003 set forth the following "Historical Net Revenues and Coverage." These representations included, among other things, net revenue information leading to historical debt coverage ratios well over the requisite ratio of 1.2—between 1.46 and 1.77 for the preceding five years:

**Historical Net Revenues and Coverage**

| Source of Net Revenues | Years Ended June 30, | | | | | Ten Months Ended April 30, | |
|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2002 | 2003 |
| Average number of clients | 1,309,954 | 1,326,055 | 1,344,907 | 1,365,668 | 1,383,888 | 1,382,464 | 1,399,919 |
| Electric energy sales (in millions of kWh) | 17,457 | 16,989 | 18,145 | 18,723 | 19,130 | 15,746 | 16,496 |
| | | | (dollars in thousands) | | | | |
| **Revenues:** | | | | | | | |
| Sales of electric energy: | | | | | | | |
| Residential [1] | $ 524,128 | $ 471,070 | $ 633,151 | $ 779,682 | $ 725,797 | $ 596,273 | $ 717,208 |
| Commercial | 745,228 | 688,526 | 878,697 | 1,026,219 | 969,182 | 795,670 | 920,852 |
| Industrial | 350,292 | 299,295 | 391,906 | 436,313 | 382,140 | 313,991 | 359,643 |
| Other | 74,338 | 68,944 | 80,473 | 86,889 | 85,052 | 70,010 | 76,746 |
| | 1,693,986 | 1,527,835 | 1,984,227 | 2,329,103 | 2,162,171 | 1,775,944 | 2,074,449 |
| Revenues from Commonwealth for rural electrification | 1,007 | 941 | 881 | 705 | 739 | 620 | 590 |
| Other operating revenues | 11,841 | 8,827 | 10,240 | 8,210 | 8,514 | 7,061 | 7,417 |
| Other (principally interest earned) | 26,841 | 26,350 | 29,936 | 35,059 | 22,257 | 23,520 | 14,731 |
| | 1,733,675 | 1,563,953 | 2,025,284 | 2,373,077 | 2,193,681 | 1,807,145 | 2,097,187 |
| **Current Expenses:** | | | | | | | |
| Operations: | | | | | | | |
| Fuel | 625,346 | 500,920 | 801,433 | 944,760 | 720,292 | 591,029 | 735,142 |
| Purchased power | -- | -- | 64,517 | 177,330 | 227,923 | 182,644 | 274,209 |
| Other production | 43,658 | 42,818 | 55,690 | 56,301 | 56,029 | 47,495 | 34,367 |
| Transmission and Distribution | 86,901 | 83,385 | 94,793 | 105,034 | 114,971 | 94,641 | 97,584 |
| Customer accounting and Collection | 73,647 | 67,517 | 76,598 | 83,453 | 84,689 | 69,241 | 74,818 |
| Administrative and General | 139,986 | 142,866 | 151,069 | 139,117 | 146,497 | 125,972 | 133,672 |
| Maintenance [2] | 215,118 | 212,530 | 219,812 | 213,666 | 212,959 | 178,485 | 191,903 |
| Other | 1,501 | 2,725 | 3,028 | 3,235 | 3,235 | 2,707 | 2,850 |
| | 1,186,157 | 1,052,761 | 1,466,823 | 1,722,689 | 1,566,595 | 1,292,214 | 1,544,545 |
| **Net Revenues** | $ 547,518 | $ 511,192 | $ 558,461 | $ 650,388 | $ 627,086 | $ 514,931 | $ 552,642 |
| **Coverage** | | | | | | | |
| Principal and Interest Requirements | $ 316,138 | $ 348,963 | $ 346,417 | $ 367,796 | $ 392,043 | - | - |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.73 | 1.46 | 1.61 | 1.77 | 1.60 | - | - |

PREPA, *Official Statement for Power Revenue Bonds, Series NN*, 35 (2003).

145.    The Official Statements provided by Defendants Goldman Sachs LLC, Merrill Lynch, J.P. Morgan Securities, Morgan Stanley LLC, UBS Financial Services, Merrill Lynch, and Citigroup Global Markets for the PREPA Power Revenue Bonds Series NN dated August 8, 2003 set forth the following "Projected Net Revenues and Coverage." These representations included, among other things, net revenues information leading to projected debt coverage ratios well over the requisite ratio of 1.2—between 1.54 and 1.76 over the following five years:

**Projected Net Revenues and Coverage**

| | Years Ending June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2003**[(1)] | **2004** | **2005** | **2006** | **2007** |
| Average number of clients | 1,401,379 | 1,420,024 | 1,439,656 | 1,458,277 | 1,477,899 |
| Electric energy sales (in millions of kWh) | 19,888.5 | 20,536.2 | 21,146.2 | 21,796.3 | 22,458.6 |
| Authority generation (gross)(in millions of KWh) | 23,676.2 | 24,326.3 | 25,048.8 | 25,818.9 | 26,603.4 |
| Purchased generation (gross)(in millions of KWh) | 5,303.0 | 6,195.0 | 6,622.0 | 6,519.0 | 6,351.0 |
| **Sources of Net Revenues** | (dollars in thousands) | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $ 848,704 | $ 919,870 | $ 907,407 | $ 929,614 | $ 949,605 |
| Commercial | 1,099,070 | 1,187,370 | 1,206,163 | 1,260,723 | 1,314,370 |
| Industrial | 430,351 | 463,224 | 456,183 | 464,602 | 472,026 |
| Other | 92,333 | 93,632 | 91,435 | 91,458 | 91,406 |
| | 2,470,458 | 2,664,096 | 2,661,188 | 2,746,397 | 2,827,407 |
| Revenues from Commonwealth for Rural Electrification | 704 | 591 | 161 | 116 | 76 |
| Other (principally, interests earned) | 28,333 | 38,247 | 40,247 | 42,247 | 44,247 |
| | 2,499,495 | 2,702,934 | 2,701,596 | 2,788,760 | 2,871,730 |
| Current Expenses[(2)]: | | | | | |
| Operations: | | | | | |
| Fuel | 840,722 | 873,970 | 812,568 | 847,038 | 880,163 |
| Purchased Power | 345,705 | 447,050 | 473,260 | 480,123 | 483,696 |
| Other Production | 40,861 | 51,174 | 52,924 | 54,737 | 56,616 |
| Transmission and Distribution | 112,306 | 112,329 | 116,170 | 120,150 | 124,274 |
| Customer Accounting and Collections | 88,827 | 97,207 | 100,531 | 103,975 | 107,544 |
| Administration and general | 159,094 | 164,563 | 170,189 | 176,021 | 182,063 |
| Maintenance | 236,314 | 243,862 | 252,200 | 260,841 | 269,795 |
| Other – Interest Charges | 3,187 | 2,078 | 2,129 | 2,182 | 2,238 |
| | 1,827,016 | 1,992,233 | 1,979,971 | 2,045,067 | 2,106,389 |
| Net Revenues | $ 672,479 | $ 710,701 | $ 721,625 | $ 743,693 | $ 765,341 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[(3)] | $ 382,519 | $ 427,088 | $ 447,143 | $ 476,260 | $ 498,184 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.76 | 1.66 | 1.61 | 1.56 | 1.54 |

*Id.* at 40.

146.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series OO dated August 12, 2004 set forth the following "Historical Net Revenues and Coverage." These representations included net revenue information leading to historical debt coverage ratios well over the requisite ratio of 1.2—between 1.46 and 1.77 for the preceding five years:

**Historical Net Revenues and Coverage**

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2003 | 2004 |
| Average number of clients | 1,326,055 | 1,344,907 | 1,365,668 | 1,383,888 | 1,401,301 | 1,399,182 | 1,417,196 |
| Electric energy sales (in millions of kWh) | 16,989 | 18,145 | 18,723 | 19,130 | 19,887 | 14,926 | 15,199 |
| **Source of Net Revenues (dollars in thousands)** | | | | | | | |
| **Revenues:** | | | | | | | |
| Sales of electric energy: | | | | | | | |
| Residential [1] | $ 471,070 | $ 633,151 | $ 779,682 | $ 725,797 | $ 867,684 | $ 645,339 | $ 667,594 |
| Commercial | 688,526 | 878,697 | 1,026,219 | 969,182 | 1,117,317 | 825,957 | 876,346 |
| Industrial | 299,295 | 391,906 | 436,313 | 382,140 | 432,296 | 323,775 | 326,052 |
| Other | 68,944 | 80,473 | 86,889 | 85,052 | 91,461 | 69,163 | 65,831 |
| | 1,527,835 | 1,984,227 | 2,329,103 | 2,162,171 | 2,508,758 | 1,864,234 | 1,935,823 |
| Revenues from Commonwealth for rural electrification | 941 | 881 | 705 | 739 | 704 | 531 | 441 |
| Other operating revenues | 8,827 | 10,240 | 8,210 | 8,514 | 9,625 | 6,713 | 7,107 |
| Other (principally interest earned) | 26,350 | 29,936 | 35,059 | 22,257 | 17,163 | 13,505 | 8,095 |
| | 1,563,953 | 2,025,284 | 2,373,077 | 2,193,681 | 2,536,250 | 1,884,983 | 1,951,466 |
| **Current Expenses:** | | | | | | | |
| Operations: | | | | | | | |
| Fuel | 500,920 | 801,433 | 944,760 | 720,292 | 886,425 | 662,954 | 640,248 |
| Purchased power | - | 64,517 | 177,330 | 227,923 | 339,082 | 238,991 | 316,638 |
| Other production | 42,818 | 55,690 | 56,301 | 56,029 | 44,990 | 31,569 | 36,443 |
| Transmission and Distribution | 83,385 | 94,793 | 105,034 | 114,971 | 119,408 | 88,304 | 99,156 |
| Customer accounting and Collection | 67,517 | 76,598 | 83,453 | 84,689 | 89,710 | 67,786 | 67,150 |
| Administrative and General | 142,866 | 151,069 | 139,117 | 146,497 | 163,517 | 120,359 | 120,513 |
| Maintenance [2] | 212,530 | 219,812 | 213,666 | 212,959 | 224,941 | 172,402 | 174,812 |
| Other | 2,725 | 2,911 | 3,028 | 3,235 | 3,403 | 2,579 | 2,757 |
| | 1,052,761 | 1,466,823 | 1,722,689 | 1,566,595 | 1,871,476 | 1,384,944 | 1,457,717 |
| **Net Revenues** | $ 511,192 | $ 558,461 | $ 650,388 | $ 627,086 | $ 664,774 | $ 500,039 | $ 493,749 |
| **Coverage** | | | | | | | |
| Principal and Interest Requirements | $ 348,963 | $ 346,417 | $ 367,796 | $ 392,043 | $ 381,178 | - | - |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.46 | 1.61 | 1.77 | 1.60 | 1.74 | - | - |

PREPA, *Official Statement for Power Revenue Bonds, Series OO*, 44 (2004).

147. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Refunding Bonds Series OO dated August 12, 2004 set forth the following "Projected Net Revenues and Coverage." These representations included net revenue information leading to projected debt coverage ratios well over the requisite ratio of 1.2—between 1.50 and 1.66 over the following five years:

## Projected Net Revenues and Coverage

| | 2004[1] | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| | | | Years Ending June 30, | | |
| Average number of clients | 1,417,718 | 1,435,492 | 1,451,494 | 1,467,257 | 1,483,712 |
| Electric energy sales (in millions of kWh) | 20,340.9 | 20,829.9 | 21,335.5 | 21,843.5 | 22,227.8 |
| Authority generation (gross)(in millions of KWh) | 19,610.0 | 17,220.0 | 16,729.0 | 16,995.0 | 17,819.0 |
| Purchased generation (gross)(in millions of KWh) | 5,947.0 | 7,511.0 | 7,381.0 | 7,736.0 | 7,511.0 |
| **Sources of Net Revenues** | | | (dollars in thousands) | | |
| **Revenues:** | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $ 890,747 | $ 946,457 | $ 932,257 | $ 948,313 | $ 972,547 |
| Commercial | 1,172,288 | 1,234,804 | 1,265,333 | 1,314,945 | 1,371,653 |
| Industrial | 441,271 | 469,497 | 473,687 | 479,943 | 492,712 |
| Other | 88,797 | 90,877 | 89,351 | 89,428 | 90,542 |
| | 2,593,103 | 2,741,635 | 2,760,628 | 2,832,629 | 2,927,454 |
| Revenues from Commonwealth for Rural Electrification | 591 | 161 | 116 | 76 | 26 |
| Other (principally, interests earned) | 24,766 | 27,403 | 29,403 | 31,403 | 33,403 |
| | 2,618,460 | 2,769,199 | 2,790,147 | 2,864,108 | 2,960,883 |
| Current Expenses[2]: | | | | | |
| Operations: | | | | | |
| Fuel | 850,461 | 898,527 | 869,098 | 886,653 | 948,386 |
| Purchased Power | 428,289 | 491,662 | 504,746 | 523,922 | 525,469 |
| Other Production | 49,231 | 50,141 | 51,179 | 52,238 | 53,319 |
| Transmission and Distribution | 127,245 | 123,446 | 126,000 | 128,608 | 131,270 |
| Customer Accounting and Collections | 91,457 | 100,671 | 102,754 | 104,881 | 107,052 |
| Administration and general | 161,650 | 166,519 | 169,964 | 173,481 | 177,073 |
| Maintenance | 235,776 | 251,058 | 256,253 | 261,557 | 266,971 |
| Other – Interest Charges | 3,278 | 2,130 | 2,183 | 2,237 | 2,293 |
| | 1,947,387 | 2,084,154 | 2,082,177 | 2,133,577 | 2,211,833 |
| **Net Revenues** | $ 671,073 | $ 685,045 | $ 707,970 | $ 730,531 | $ 749,050 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[3] | $ 433,837 | $ 413,077 | $ 473,299 | $ 477,508 | $ 488,681 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.55 | 1.66 | 1.50 | 1.53 | 1.53 |

*Id.* at 48.

148.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for PREPA Power Revenue Bonds Series RR and PREPA Power Revenue Refunding Bonds Series SS dated March 24, 2005 set forth the following "Historical Net Revenues and Coverage." These representations included net revenue information leading to historical debt coverage ratios well over the requisite ratio of 1.2—between 1.48 and 1.77 for the preceding five years:

**Historical Net Revenues and Coverage**

| | Years Ended June 30, | | | | | Six Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** | **2003** | **2004** |
| Average number of clients .......................... | 1,344,907 | 1,365,668 | 1,383,888 | 1,401,301 | 1,419,602 | 1,414,849 | 1,433,982 |
| Electric energy sales (in millions of kWh) .... | 18,145 | 18,723 | 19,130 | 19,887 | 20,260 | 10,524 | 10,441 |
| **Source of Net Revenues** | | | | | | | |
| **(dollars in thousands)** | | | | | | | |
| Revenues: | | | | | | | |
| Sales of electric energy: | | | | | | | |
| Residential [1] ......................................... | $ 633,151 | $ 779,682 | $ 725,797 | $ 867,684 | $ 897,965 | $ 459,461 | $ 503,949 |
| Commercial ........................................... | 878,697 | 1,026,219 | 969,182 | 1,117,317 | 1,171,110 | 588,581 | 632,700 |
| Industrial ............................................... | 391,906 | 436,313 | 382,140 | 432,296 | 444,070 | 219,251 | 244,177 |
| Other ..................................................... | 80,473 | 86,889 | 85,052 | 91,461 | 87,123 | 43,826 | 43,981 |
| | 1,984,227 | 2,329,103 | 2,162,171 | 2,508,758 | 2,600,268 | 1,311,119 | 1,424,807 |
| Revenues from Commonwealth for rural electrification ........................ | 881 | 705 | 739 | 704 | 591 | 294 | 78 |
| Other operating revenues ......................... | 10,240 | 8,210 | 8,514 | 9,625 | 8,565 | 5,233 | 4,919 |
| Other (principally interest earned) .............................................. | 29,936 | 35,059 | 22,257 | 17,163 | 3,582 | 642 | 8,883 |
| | 2,025,284 | 2,373,077 | 2,193,681 | 2,536,250 | 2,613,006 | 1,317,288 | 1,438,687 |
| Current Expenses: | | | | | | | |
| Operations: | | | | | | | |
| Fuel ........................................................ | 801,433 | 944,760 | 720,292 | 886,425 | 864,700 | 435,083 | 507,440 |
| Purchased power ................................... | 64,517 | 177,330 | 227,923 | 339,082 | 436,763 | 208,059 | 238,680 |
| Other production ................................... | 55,690 | 56,301 | 56,029 | 44,990 | 48,787 | 24,450 | 27,180 |
| Transmission and Distribution ............. | 94,793 | 105,034 | 114,971 | 119,408 | 136,509 | 68,270 | 74,747 |
| Customer accounting and Collection ........................................... | 76,598 | 83,453 | 84,689 | 89,710 | 91,763 | 44,558 | 51,065 |
| Administrative and General ................... | 151,069 | 139,117 | 146,497 | 163,517 | 163,049 | 82,865 | 90,487 |
| Maintenance [2] ...................................... | 219,812 | 213,666 | 212,959 | 224,941 | 234,563 | 114,895 | 118,932 |
| Other ..................................................... | 2,911 | 3,028 | 3,235 | 3,403 | 3,622 | 1,697 | 1,780 |
| | 1,466,823 | 1,722,689 | 1,566,595 | 1,871,476 | 1,979,756 | 979,877 | 1,110,311 |
| **Net Revenues** .......................................... | **$558,461** | **$650,388** | **$627,086** | **$664,774** | **$633,250** | **$337,411** | **$328,376** |
| **Coverage** | | | | | | | |
| **Principal and Interest Requirements** ........................................ | **$346,417** | **$367,796** | **$392,043** | **$381,178** | **$427,088** | - | - |
| **Ratio of Net Revenues to Principal and Interest Requirements** ........... | **1.61** | **1.77** | **1.60** | **1.74**[3] | **1.48** | - | - |

PREPA, *Official Statement for Power Revenue Bonds, Series RR and Power Revenue Refunding Bonds, Series SS*, 45 (2005).

149. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series RR and PREPA Power Revenue Refunding Bonds Series SS dated March 24, 2005 set forth the following "Projected Net Revenues and Coverage." These representations included net revenues information leading to projected debt coverage ratios well over the requisite ratio of 1.2—between 1.55 and 1.62 over the following five years:

## Projected Net Revenues and Coverage

| | Years Ending June 30, | | | | |
| | 2005[1] | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Average number of clients | 1,417,718 | 1,435,492 | 1,451,494 | 1,467,257 | 1,483,712 |
| Electric energy sales (in millions of kWh) | 20,474.3 | 21,335.5 | 21,843.5 | 22,227.8 | 22,657.1 |
| Authority generation (gross)(in millions of KWh) | 19,610 | 17,220 | 16,729 | 16,995 | 17,819 |
| Purchased generation (gross)(in millions of KWh) | 6,804 | 7,381 | 7,736 | 7,511 | 8,637 |
| **Sources of Net Revenues** | (dollars in thousands) | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $ 945,547 | $ 932,257 | $ 948,313 | $ 972,547 | $ 990,276 |
| Commercial | 1,224,497 | 1,265,333 | 1,314,945 | 1,371,653 | 1,425,599 |
| Industrial | 470,258 | 473,687 | 479,943 | 492,712 | 507,139 |
| Other | 88,358 | 89,351 | 89,428 | 90,542 | 90,843 |
| | 2,728,660 | 2,760,628 | 2,832,629 | 2,927,454 | 3,013,857 |
| Revenues from Commonwealth for Rural Electrification | 161 | 116 | 76 | 26 | 19 |
| Other (principally interests earned) | 27,507 | 29,403 | 31,403 | 33,403 | 35,403 |
| | 2,756,328 | 2,790,147 | 2,864,108 | 2,960,883 | 3,049,279 |
| Current Expenses[2]: | | | | | |
| Operations: | | | | | |
| Fuel | 918,616 | 869,098 | 886,653 | 948,386 | 925,539 |
| Purchased Power | 481,344 | 504,746 | 523,922 | 525,469 | 602,272 |
| Other Production | 52,253 | 51,179 | 52,238 | 53,319 | 54,423 |
| Transmission and Distribution | 136,677 | 126,000 | 128,608 | 131,270 | 133,988 |
| Maintenance | 244,452 | 256,253 | 261,557 | 266,971 | 272,497 |
| Client accounting and collection | 101,402 | 102,754 | 104,881 | 107,052 | 109,268 |
| Administration and general | 173,734 | 169,964 | 173,481 | 177,073 | 180,739 |
| Other – Interest Charges | 2,842 | 2,183 | 2,237 | 2,293 | 2,351 |
| | 2,111,120 | 2,082,177 | 2,133,577 | 2,211,833 | 2,281,077 |
| Net Revenues | $ 645,208 | $ 707,970 | $ 730,531 | $ 749,050 | $ 768,202 |
| **Coverage** | | | | | |
| Principal and Interest Requirements[3] | $ 398,450 | $ 455,302 | $ 470,632 | $ 474,802 | $ 496,942 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.62 | 1.55 | 1.55 | 1.58 | 1.55 |

*Id.* at 49.

150.   The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA Power Revenue Refunding Bonds Series UU dated April 19, 2007 set forth the following "Historical Net Revenues and Coverage." These representations included net revenue information leading to historical debt coverage ratios well over the requisite ratio of 1.2—between 1.48 and 1.74 for the preceding five years:

**Historical Net Revenues and Coverage**

| | Years Ended June 30, | | | | | Six Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2005 | 2006 |
| Average number of clients | 1,383,888 | 1,401,301 | 1,419,602 | 1,438,699 | 1,450,227 | 1,448,494 | 1,455,164 |
| Electric energy sales (in millions of kWh) | 19,130 | 19,887 | 20,260 | 20,507 | 20,620 | 10,739 | 10,737 |
| **Source of Net Revenues (dollars in thousands)** | | | | | | | |
| Revenues: | | | | | | | |
| Sales of electric energy: | | | | | | | |
| Residential [1] | $725,797 | $867,684 | $897,965 | $1,066,419 | $1,284,641 | $676,728 | $667,327 |
| Commercial | 969,182 | 1,117,317 | 1,171,110 | 1,350,731 | 1,656,770 | 845,063 | 855,003 |
| Industrial | 382,140 | 432,296 | 444,070 | 529,285 | 663,041 | 339,805 | 327,584 |
| Other | 85,052 | 91,461 | 87,123 | 91,675 | 104,486 | 52,712 | 50,966 |
| | 2,162,171 | 2,508,758 | 2,600,268 | 3,038,110 | 3,708,938 | 1,914,308 | 1,900,880 |
| Revenues from Commonwealth for rural electrification | 739 | 704 | 591 | 161 | 116 | 56 | 36 |
| Other operating revenues | 8,514 | 9,625 | 8,565 | 13,705 | 11,373 | 4,774 | 6,323 |
| Other (principally interest earned) | 22,257 | 17,163 | 3,582 | 8,146 | 11,498 | 2,830 | 12,432 |
| | 2,193,681 | 2,536,250 | 2,613,006 | 3,060,122 | 3,731,925 | 1,921,968 | 1,919,671 |
| Current Expenses: | | | | | | | |
| Operations: | | | | | | | |
| Fuel | 720,292 | 886,425 | 864,700 | 1,182,936 | 1,665,866 | 893,740 | 827,649 |
| Purchased power | 227,923 | 339,082 | 436,763 | 492,621 | 603,169 | 273,429 | 316,638 |
| Other production | 56,029 | 44,990 | 48,787 | 55,945 | 57,918 | 29,461 | 29,260 |
| Transmission and Distribution | 114,971 | 119,408 | 136,509 | 159,843 | 162,956 | 81,584 | 79,963 |
| Customer accounting and Collection | 84,689 | 89,710 | 91,763 | 107,932 | 106,927 | 53,747 | 52,354 |
| Administrative and General | 146,497 | 163,517 | 163,049 | 187,134 | 198,509 | 97,290 | 107,035 |
| Maintenance [2] | 212,959 | 224,941 | 234,563 | 232,464 | 236,633 | 124,152 | 123,461 |
| Other | 3,235 | 3,403 | 3,622 | 3,728 | 1,946 | 1,851 | 1,923 |
| | 1,566,595 | 1,871,476 | 1,979,756 | 2,422,603 | 3,033,924 | 1,555,254 | 1,538,283 |
| **Net Revenues** | $ 627,086 | $ 664,774 | $ 633,250 | $ 637,519 | $ 698,001 | $ 366,714 | $381,388 |
| **Coverage** | | | | | | | |
| Principal and Interest Requirements | $ 392,043 | $ 381,178 | $ 427,088 | $ 404,022 | $ 449,318 | | |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.60 | 1.74 | 1.48 | 1.58 | 1.55 | | |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series UU*, 45 (2007).

151. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA Power Revenue Refunding Bonds Series UU dated April 19, 2007 set forth the following "Projected Net Revenues and Coverage." These representations included net revenue information leading to projected debt coverage ratios well over the requisite ratio of 1.2—between 1.53 and 1.75 for the following five years:

47

**Projected Net Revenues and Coverage**

| | Years Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2007[(1)] | 2008 | 2009 | 2010 | 2011 |
| Average number of clients | 1,455,164 | 1,472,492 | 1,482,211 | 1,491,083 | 1,501,704 |
| Electric energy sales (in millions of kWh) | 20,749.3 | 21,113.1 | 21,645.5 | 22,202.2 | 22,796.8 |
| Authority generation (gross)(in millions of KWh) | 18,802.0 | 19,388.5 | 19,906.5 | 20,559.7 | 21,315.6 |
| Purchased generation (gross)(in millions of KWh) | 6,138.0 | 5,994.0 | 6,116.0 | 6,132.0 | 6,091.0 |
| **Sources of Net Revenues** | (dollars in thousands) | | | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
|   Residential | $1,306,965 | $1,332,023 | $1,295,130 | $1,251,747 | $1,244,922 |
|   Commercial | 1,713,602 | 1,765,622 | 1,754,359 | 1,733,165 | 1,756,159 |
|   Industrial | 659,857 | 671,090 | 656,484 | 637,916 | 638,240 |
|   Other | 105,701 | 107,502 | 104,137 | 100,771 | 99,264 |
| | 3,786,125 | 3,876,237 | 3,810,110 | 3,723,599 | 3,738,585 |
| Revenues from Commonwealth for Rural Electrification | 76 | 26 | 19 | - | - |
| Other Operating Revenues | 6,323 | - | - | - | - |
| Other (principally interests earned) | 26,350 | 29,832 | 31,832 | 33,832 | 35,832 |
| | 3,818,874 | 3,906,095 | 3,841,961 | 3,757,431 | 3,774,417 |
| Current Expenses[(2)]: | | | | | |
| Operations: | | | | | |
|   Fuel | 1,650,538 | 1,668,755 | 1,577,881 | 1,475,500 | 1,464,372 |
|   Purchased Power | 664,220 | 712,572 | 717,176 | 713,655 | 707,383 |
|   Other Production | 56,310 | 54,970 | 55,896 | 57,127 | 58,349 |
|   Transmission and Distribution | 149,685 | 141,706 | 144,092 | 147,265 | 150,415 |
|   Client accounting and collection | 107,496 | 112,079 | 113,966 | 116,475 | 118,967 |
|   Administration and general | 210,917 | 211,147 | 214,703 | 219,430 | 224,124 |
|   Maintenance | 253,894 | 265,109 | 269,573 | 275,508 | 281,402 |
|   Other – Interest Charges | 3,044 | 2,292 | 2,351 | 2,410 | 2,410 |
| | 3,096,104 | 3.168.630 | 3,095,640 | 3,007,371 | 3,007,422 |
| Net Revenues | $722,770 | $737,465 | $746,321 | $750,060 | $766,995 |
| **Coverage** | | | | | |
| Principal and Interest Requirements [(3)] | $455,022 | $420,543 | $452,317 | $464,976 | $501,873 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.59 | 1.75 | 1.65 | 1.61 | 1.53 |

*Id.* at 49.

152.  The Official Statements provided by Defendants J.P. Morgan Securities,
Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securi-
ties, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA
Power Revenue Refunding Bonds Series VV dated May 16, 2007 set forth the follow-
ing "Projected Net Revenues and Coverage." These representations included net rev-
enues leading to projected debt coverage ratios well over the requisite ratio of 1.2—
between 1.56 and 1.76 over the following four years:

### Projected Net Revenues and Coverage

| | 2007[1] | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| | | | Years Ending June 30 | | |
| Average number of clients | 1,455,164 | 1,472,492 | 1,482,211 | 1,491,083 | 1,501,704 |
| Electric energy sales (in millions of kWh) | 20,749.3 | 21,113.1 | 21,645.5 | 22,202.2 | 22,796.8 |
| Authority generation (gross)(in millions of KWh) | 18,802.0 | 19,388.5 | 19,906.5 | 20,559.7 | 21,315.6 |
| Purchased generation (gross)(in millions of KWh) | 6,138.0 | 5,994.0 | 6,116.0 | 6,132.0 | 6,091.0 |
| **Sources of Net Revenues** | | | (in thousands) | | |
| Revenues: | | | | | |
| Sales of electric energy: | | | | | |
| Residential | $1,306,965 | $1,332,023 | $1,295,130 | $1,251,747 | $1,244,922 |
| Commercial | 1,713,602 | 1,765,622 | 1,754,359 | 1,733,165 | 1,756,159 |
| Industrial | 659,857 | 671,090 | 656,484 | 637,916 | 638,240 |
| Other | 105,701 | 107,502 | 104,137 | 100,771 | 99,264 |
| | 3,786,125 | 3,876,237 | 3,810,110 | 3,723,599 | 3,738,585 |
| Revenues from Commonwealth for Rural Electrification | 76 | 26 | 19 | - | - |
| Other Operating Revenues | 6,323 | - | - | - | - |
| Other (principally interests earned) | 26,350 | 29,832 | 31,832 | 33,832 | 35,832 |
| | 3,818,874 | 3,906,095 | 3,841,961 | 3,757,431 | 3,774,417 |
| Current Expenses[2]: | | | | | |
| Operations: | | | | | |
| Fuel | 1,650,538 | 1,668,755 | 1,577,881 | 1,475,500 | 1,464,372 |
| Purchased Power | 664,220 | 712,572 | 717,176 | 713,655 | 707,383 |
| Other Production | 56,310 | 54,970 | 55,896 | 57,127 | 58,349 |
| Transmission and Distribution | 149,685 | 141,706 | 144,092 | 147,265 | 150,415 |
| Client accounting and collection | 107,496 | 112,079 | 113,966 | 116,475 | 118,967 |
| Administration and general | 210,917 | 211,147 | 214,703 | 219,430 | 224,124 |
| Maintenance | 253,894 | 265,109 | 269,573 | 275,508 | 281,402 |
| Other – Interest Charges | 3,044 | 2,292 | 2,351 | 2,410 | 2,410 |
| | 3,096,104 | 3,168,630 | 3,095,640 | 3,007,371 | 3,007,422 |
| **Net Revenues** | **$722,770** | **$737,465** | **$746,321** | **$750,060** | **$766,995** |
| **Coverage** | | | | | |
| Principal and Interest Requirements[1] | $455,022 | $419,568 | $451,343 | $464,004 | $491,850 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.59 | 1.76 | 1.65 | 1.62 | 1.56 |

PREPA, *Official Statement for Power Revenue Bonds, Series VV*, 13 (2007).

153.    The representations set forth above, made from 2002 to 2007, were false, misleading, and incomplete. The different representations about PREPA's debt coverage ratios, and its underlying revenues, were false statements. In each instance, the misstated information made PREPA appear to be more financially stable than it actually was and PREPA's proposed bond issuances appear to be less risky than they actually were.

154.    The Special Investigation Report found that "PREPA systematically included uncollected revenues when it calculated its ability to cover its operations and debt service," Special Investigation Report at 114, and that PREPA "inflated its debt coverage ratio," which "gave the appearance that it had the financial liquidity to support further bond issuances when almost certainly, as the ultimate insolvency of the Authority shows, it did not," *id.* at 139.

155.    PREPA exceeded its debt covenant (i.e., its ratio fell below 1.2) from 2011 through 2016, because its collected revenues were insufficient to cover its overhead and operational expenses. *Id.* at 562 (There is "consensus … that PREPA's [electricity] rates were insufficient to cover its operating expenses."). Indeed, PREPA admitted that from at least 2011 through 2016, "[PREPA's] rates were insufficient to cover overhead and operational costs," *see id.,* thus admitting that the bonds it issued in 2012 did NOT comply with its debt covenant. *Id.* at 136. It is reasonable to infer that PREPA also breached its debt covenant ratio for years prior to 2011.

156.    The Special Investigation Report makes clear that, contrary to their assurances, Defendants did not investigate PREPA's debt service coverage ratios at any point in time: "[U]nderwriters accepted PREPA's debt service calculations without conducting any of their own due diligence into the veracity of those figures" and "denied having conducted their own due diligence" into whether "PREPA's rates were not, in fact, sufficient to cover operating expenses." *Id.* at 562-63. That is, Defendants did not investigate PREPA's debt service coverage ratios—or the revenue, expenses, and debt information used to calculate the debt service coverage ratio—and so could not have formed any opinion as to their truthfulness or completeness—let alone a reasonable belief. Moreover, because Defendants underwrote PREPA bonds almost every year from 2001 to 2013, it is reasonable to infer that they treated PREPA issuances the same way in all those years—at no point did they investigate debt ratio calculations.

157.    Had Defendants reasonably investigated debt ratio calculations, they would, at the very least, have discovered that PREPA's rates were insufficient to cover expenses, and that it was systematically including uncollected revenues in its calculation—just as the Special Investigation revealed. Had National known either that the disclosures were false or that Defendants had not investigated them, it never would have issued its insurance.

158.    *Second*, the Official Statements represented how PREPA had spent and would spend its money—including, both revenues generated through its business operations and through bond issuances. The statements depicted PREPA as spending its money in prudent ways that tended to suggest PREPA's relative revenues would increase and its relative expenses would decrease in the long run, which in turn seemed to indicate that PREPA would be less likely to default in the long run. This representation was of special import because PREPA bonds were backed by PREPA's revenues.

159.     The Official Statements represented that PREPA had used and/or would use its funds to improve its generation, transmission, and distribution systems. The Official Statements included disclosures concerning the "historical total capital improvement program and financing sources" and "projected capital improvement program and financing sources."

160.     The Official Statements provided by Defendants for the PREPA Power Revenue Bonds Series LL dated June 13, 2002, which were issued in part to "finance a portion of the cost of various projects under its capital improvement program" for fiscal years 2002 through 2006, represented how much PREPA projected it would spend on capital improvements for production plants, transmission facilities, and distribution facilities, and whether the spending would be financed with internally generated funds or borrowed funds, PREPA, *Official Statement for Power Revenue Bonds, Series LL*, 7 (2002):

**Projected Capital Improvement Program**
**(in thousands)**

| | Years Ending June 30, | | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 | Total[1] |
|---|---|---|---|---|---|---|
| Capital Improvements | | | | | | |
| Production plant | $ 144,743 | $ 118,638 | $ 131,389 | $ 132,182 | $ 110,436 | $ 637,388 |
| Transmission facilities | 85,037 | 95,485 | 107,042 | 98,827 | 114,306 | 500,697 |
| Distribution facilities | 94,325 | 106,619 | 105,189 | 101,567 | 103,397 | 511,097 |
| Other[2] | 92,373 | 109,411 | 85,325 | 77,595 | 55,192 | 419,896 |
| | $ 416,478 | $ 430,153 | $ 428,945 | $ 410,171 | $ 383,331 | $ 2,069,078 |
| Financing Sources | | | | | | |
| Internally generated funds | $ 82,158 | $ 125,687 | $ 105,344 | $ 77,540 | $ 92,012 | $ 482,741 |
| Borrowed funds[3] | 334,320 | 304,466 | 323,601 | 332,631 | 291,319 | 1,586,337 |
| | $ 416,478 | $ 430,153 | $ 428,945 | $ 410,171 | $ 383,331 | $ 2,069,078 |
| Allowance for funds used during construction | $ 15,993 | $ 11,780 | $ 8,564 | $ 14,951 | $ 14,170 | $ 65,450 |

*Id.* at 32.

161.     The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds, Series NN dated August 8, 2003, which were issued in part to "finance a portion of the cost of various projects under its capital improvement program" for fiscal years 2003 through 2007, represented how much PREPA projected it would spend on capital improvements for production plants, transmission facilities, and distribution facilities, and whether the spending would be financed with internally generated funds or borrowed funds, PREPA, *Official Statement for Power Revenue Bonds, Series NN*, 4 (2003):

51

**Projected Capital Improvement Program**
**(in thousands)**

| | | Years Ending June 30, | | | | |
|---|---|---|---|---|---|---|
| | 2003[1] | 2004 | 2005 | 2006 | 2007 | Total [2] |
| **Capital Improvements** | | | | | | |
| Production plant ....................................... | $ 99,458 | $ 142,831 | $ 137,845 | $ 142,918 | $ 193,317 | $ 716,369 |
| Transmission facilities ............................. | 96,488 | 104,027 | 108,181 | 97,104 | 74,369 | 480,169 |
| Distribution facilities ............................... | 123,001 | 112,319 | 98,048 | 105,277 | 86,690 | 525,335 |
| Other [3] | 59,303 | 87,520 | 78,667 | 77,058 | 63,723 | 366,271 |
| | $ 378,250 | $ 446,697 | $ 422,741 | $ 422,357 | $ 418,099 | $ 2,088,144 |
| **Financing Sources** | | | | | | |
| Internally generated funds ..................... | $ 133,188 | $ 101,762 | $ 95,517 | $ 83,263 | $ 77,905 | $ 491,635 |
| Borrowed funds [4] | 245,062 | 344,935 | 327,224 | 339,094 | 340,194 | 1,596,509 |
| | $ 378,250 | $ 446,697 | $ 422,741 | $ 422,357 | $ 418,099 | $ 2,088,144 |
| Allowance for funds used during construction..... | $ 11,780 | $ 21,076 | $ 9,719 | $ 19,726 | $ 25,782 | $ 88,083 |

*Id.* at 27.

162.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Refunding Bonds Series OO bonds dated August 12, 2004 represented how much PREPA projected it would spend on capital improvements for production plants, transmission facilities, and distribution facilities, and whether the spending would be financed with internally generated funds or borrowed funds:

**Projected Capital Improvement Program**
**(in thousands)**

| | | Years Ending June 30, | | | | |
|---|---|---|---|---|---|---|
| | 2004[1] | 2005 | 2006 | 2007 | 2008 | Total [2] |
| **Capital Improvements** | | | | | | |
| Production plant ....................................... | $ 119,274 | $ 152,568 | $ 172,314 | $ 192,089 | $ 171,906 | $ 808,151 |
| Transmission facilities ............................. | 99,685 | 117,334 | 98,934 | 99,757 | 104,786 | 520,496 |
| Distribution facilities ............................... | 124,111 | 95,346 | 98,893 | 98,297 | 87,368 | 504,015 |
| Other [3] | 76,950 | 69,222 | 74,376 | 77,652 | 71,043 | 369,243 |
| Total ......................................................... | $ 420,020 | $ 434,470 | $ 444,517 | $ 467,795 | $ 435,103 | $ 2,201,905 |
| **Financing Sources** | | | | | | |
| Internally generated funds ..................... | $ 82,139 | $ 102,499 | $ 60,202 | $ 74,135 | $ 77,131 | $ 396,106 |
| Borrowed funds [4] | 337,881 | 331,971 | 384,315 | 393,660 | 357,972 | 1,805,799 |
| Total ......................................................... | $ 420,020 | $ 434,470 | $ 444,517 | $ 467,795 | $ 435,103 | $ 2,201,905 |
| Allowance for funds used during construction ... | $ 21,076 | $ 12,328 | $ 9,758 | $ 21,771 | $ 26,014 | $ 90,947 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series OO,* 35 (2004).

163.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series RR dated March 24, 2005, which were issued in part to "finance a portion of the cost of various projects under its capital improvement program for fiscal years 2005 and 2006," represented how much PREPA projected it would spend on capital improvements for production plants, transmission facilities, and distribution facilities, and how the spending had

been financed—internally generated funds or borrowed funds, PREPA, *Official State-ment for Power Revenue Bonds, Series RR and Power Revenue Refunding Bonds, Se-ries SS*, 5 (2005):

**Projected Capital Improvement Program**
**(in thousands)**

| | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| Capital Improvements | 2005[1] | 2006 | 2007 | 2008 | 2009 | Total[5] |
| Production plant | $ 128,802 | $ 172,314 | $ 192,089 | $ 171,906 | $ 138,519 | $ 803,630 |
| Transmission facilities | 122,888 | 98,934 | 99,757 | 104,786 | 78,794 | 505,159 |
| Distribution facilities | 119,222 | 98,893 | 98,297 | 87,368 | 64,281 | 468,061 |
| Other[3] | 81,300 | 74,376 | 77,652 | 71,043 | 46,115 | 350,486 |
| Total | $ 452,212 | $ 444,517 | $ 467,795 | $ 435,103 | $ 327,709 | $ 2,127,336 |
| Financing Sources | | | | | | |
| Internally generated funds | $ 82,995 | $ 77,379 | $ 80,191 | $ 90,190 | $ 83,807 | $ 414,562 |
| Borrowed funds[4] | 369,217 | 367,138 | 387,604 | 344,913 | 243,902 | 1,712,774 |
| Total | $ 452,212 | $ 444,517 | $ 467,795 | $ 435,103 | $ 327,709 | $ 2,127,336 |
| Allowance for funds used during construction ... | $ 9,328 | $ 9,758 | $ 21,771 | $ 26,014 | $ 25,092 | $ 91,963 |

*Id.* at 37.

164.     The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securi-ties, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA Power Revenue Refunding Bonds Series UU dated April 19, 2007 represented how much PREPA projected it would spend on capital improvements for production plants, transmission facilities, and distribution facilities, and whether the spending would be financed with internally generated funds or borrowed funds:

**Projected Capital Improvement Program**
**(in thousands)**

| | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| Capital Improvements | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
| Production plant | $291,200 | $242,811 | $208,620 | $130,787 | $107,970 | $981,388 |
| Transmission | 97,749 | 109,316 | 95,033 | 110,958 | 77,804 | 490,860 |
| Distribution | 84,076 | 81,445 | 78,030 | 79,733 | 78,215 | 401,499 |
| Other[1] | 58,468 | 52,694 | 51,860 | 80,884 | 70,302 | 314,208 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |
| Financing Sources | | | | | | |
| Internal Funds | 57,229 | 133,312 | 120,261 | 110,268 | 86,502 | 507,572 |
| Borrowed Funds[2] | 474,264 | 352,954 | 313,282 | 292,094 | 247,789 | 1,680,383 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series UU*, 37 (2007).

165.     The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS

Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA Power Revenue Refunding Bonds Series VV dated May 16, 2007 represented how much PREPA projected it would spend on capital improvements for production plants, transmission facilities, and distribution facilities, and whether the spending would be financed with internally generated funds or borrowed funds:

**Projected Capital Improvement Program**
**(in thousands)**

| | | Years Ending June 30 | | | | |
|---|---|---|---|---|---|---|
| Capital Improvements | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
| Production plant | $291,200 | $242,811 | $208,620 | $130,787 | $107,970 | $981,388 |
| Transmission | 97,749 | 109,316 | 95,033 | 110,958 | 77,804 | 490,860 |
| Distribution | 84,076 | 81,445 | 78,030 | 79,733 | 78,215 | 401,499 |
| Other[1] | 58,468 | 52,694 | 51,860 | 80,884 | 70,302 | 314,208 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |
| Financing Sources | | | | | | |
| Internal Funds | 57,229 | 134,287 | 121,235 | 111,240 | 96,525 | 507,516 |
| Borrowed Funds[2] | 474,264 | 351,979 | 312,308 | 291,122 | 237,766 | 1,667,439 |
| Total | $531,493 | $486,266 | $433,543 | $402,362 | $334,291 | $2,187,955 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series VV*, 37 (2007).

166.   The Official Statements provided by Defendants also included disclosures regarding sources and uses of funds, including whether PREPA would deposit funds into its "construction fund"—which holds "the proceeds of any bonds issued for the purpose of paying the cost of acquiring or constructing Improvements" to PREPA's systems (*i.e.*, any costs related to construction, such as for labor, engineers, architects, materials, and land). *See, e.g.*, PREPA, *Official Statement for Power Revenue Bonds, Series RR and Power Revenue Refunding Bonds, Series SS,* I-15 (2005). Deposits into the construction fund indicated that PREPA's net revenues would increase in the long term. Similarly, the Official Statements represented that PREPA would deposit money into escrow funds for refunded bonds, for the purpose of paying down other debt or expenses. By using these monies to cover its existing financial obligations, PREPA was supposedly freeing up funds for other purposes, such as construction, thereby making the bonds less risky.

167.   The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series LL dated June 13, 2002 represented the following regarding sources and uses of funds, including

that PREPA would deposit $106,000,000 into the construction fund and $425,881,025.00 in its escrow fund:

**Estimated Sources and Uses of Funds**

| | |
|---|---:|
| Sources: | |
| Principal amount of the Series KK Bonds | $ 401,785,000.00 |
| Principal amount of the Series LL Bonds | 98,125,000.00 |
| Net original issue premium | 43,119,586.45 |
| Total Sources | $ 543,029,586.45 |
| | |
| Uses: | |
| Deposit to Escrow Fund for Refunded Power Revenue Bonds | $ 425,881,025.00 |
| Deposit to 1974 Construction Fund | 106,000,000.00 |
| Underwriting discount, municipal bond insurance premiums and estimated legal, printing and other financing expenses | 11,148,561.45 |
| Total Uses | $ 543,029,586.45 |

PREPA, *Official Statement for Power Revenue Bonds, Series LL*, 7 (2002).

168. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Refunding Bonds Series MM dated September 20, 2002 represented the following regarding sources and uses of funds, including that PREPA would deposit $114,211,191.80 into the escrow fund for refunded power revenue bonds:

**Estimated Sources and Uses of Funds**

| | |
|---|---:|
| Sources: | |
| Principal amount of the Bonds | $105,055,000.00 |
| Net original issue premium | 9,880,295.85 |
| Other available moneys | 1,483,484.38 |
| Total Sources | $ 116,418,780.23 |
| | |
| Uses: | |
| Deposit to Escrow Fund for Refunded Power Revenue Bonds | $ 114,211,191.80 |
| Underwriting discount, municipal bond insurance premium and estimated legal, printing and other financing expenses | 2,207,588.43 |
| Total Uses | $ 116,418,780.23 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series MM*, 3 (2002).

169. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series NN dated August 8, 2003 represented the following regarding sources and uses of funds, including that PREPA would deposit $410,913,000 into the construction fund:

**Estimated Sources and Uses of Funds for the Bonds**

| | |
|---|---|
| Sources: | |
| Principal amount of the Bonds | $517,305,000.00 |
| Net original issue premium | 1,069,071.40 |
| Total Sources | $518,374,071.40 |
| | |
| Uses: | |
| Deposit to 1974 Construction Fund | $410,913,000.00 |
| Repayment of Government Development Bank line of credit | 90,000,000.00 |
| Underwriting discount, municipal bond insurance premium and estimated legal, printing and other financing expenses | 17,461,071.40 |
| Total Uses | $518,374,071.40 |

PREPA, *Official Statement for Power Revenue Bonds, Series NN*, 4 (2003).

170.  The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for PREPA Power Revenue Refunding Bonds Series OO and PP dated August 12, 2004, represented the following regarding sources and uses of funds, including that PREPA would deposit $244,224,171.48 into the escrow funds for the Series OO and PP refunded bonds:

**Estimated Sources and Uses of Funds**

*Series OO Bonds and Series PP Bonds*

| | |
|---|---|
| Sources: | |
| Principal amount of the Series OO Bonds and Series PP Bonds | $ 224,700,000.00 |
| Net original issue premium or discount | 17,754,262.45 |
| Other available moneys [(1)] | 7,094,192.08 |
| Total Sources | $ 249,548,454.53 |
| Uses: | |
| Deposit to Escrow Funds for the Series OO and Series PP Refunded Bonds | $ 244,224,171.48 |
| Underwriting discount, bond insurance premiums and estimated legal, printing and other financing expenses | 5,324,283.05 |
| Total Uses | $ 249,548,454.53 |

PREPA, *Official Statement for Power Revenue Refunding Bonds*, Series OO and PP, 9, (2004).

171.  The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Bonds Series RR dated March 24, 2005 represented the following regarding sources and uses of funds, including that PREPA would deposit $332,067,172.17 into the construction fund:

**Estimated Sources and Uses of Funds**

*Series RR Bonds*

Sources:

| | |
|---|---|
| Principal amount of the Series RR Bonds.................................. | $ 509,520,000.00 |
| Original issue premium.................................................... | 23,496,510.60 |
|     Total Sources ....................................................... | $ 533,016,510.60 |

Uses:

| | |
|---|---|
| Deposit to 1974 Construction Fund ......................................... | $ 332,067,172.17 |
| Repayment of Government Development Bank Line of Credit [1]............... | 167,932,827.83 |
| Capitalized interest on Series RR Bonds through January 1, 2006 ............ | 18,481,477.27 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses.................... | 14,535,033.33 |
|     Total Uses ......................................................... | $ 533,016,510.60 |

PREPA, *Official Statement for Power Revenue Bonds*, Series RR and SS, 7, (2005).

172.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PREPA Power Revenue Refunding Bonds Series SS dated March 24, 2005 represented the following regarding sources and uses of funds, including that PREPA would deposit $533,090,846 into the escrow fund for the refunded bonds:

**Estimated Sources and Uses of Funds**

...

*Series SS Bonds*

Sources:

| | |
|---|---|
| Principal amount of the Series SS Bonds.................................... | $ 483,930,000.00 |
| Net original issue premium................................................. | 28,084,075.15 |
| Other available moneys [1]................................................. | 30,315,281.82 |
|     Total Sources ....................................................... | $ 542,329,356.97 |

Uses:

| | |
|---|---|
| Deposit to Escrow Fund for the Refunded Bonds........................... | $ 533,090,846.40 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses.................... | 9,238,510.57 |
|     Total Uses ......................................................... | $ 542,329,356.97 |

PREPA, *Official Statement for Power Revenue Bonds, Series RR and SS*, 7 (2005).

173.    The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA Power Revenue Refunding Bonds Series UU dated April 19, 2007 represented the following regarding sources and uses of funds, including that PREPA would deposit $1,328,964,760.50 into the escrow fund for the Refunded Bonds:

**Estimated Sources and Uses of Funds**

...

*Series UU Bonds*

Sources:

| | |
|---|---:|
| Principal amount of the Series UU Bonds ................................................. | $1,300,035,000.00 |
| Net original issue premium .......................................................... | 25,352,703.80 |
| Other available moneys [(1)] .......................................................... | 21,777,849.17 |
| Total Sources .................................................. | $1,347,165,552.97 |

Uses:

| | |
|---|---:|
| Deposit to Escrow Fund for the Refunded Bonds......................................... | $1,328,964,760.50 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses.................... | 18,200,792.47 |
| Total Uses ............................................. | $1,347,165,552.97 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series TT and UU*, 7 (2007).

174. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PREPA Power Revenue Refunding Bonds Series VV dated May 16, 2007 represented the following regarding sources and uses of funds, including that PREPA would deposit $637,315,730.38 into the escrow fund:

**Estimated Sources and Uses of Funds**

Sources:

| | |
|---|---:|
| Principal amount of the Bonds......................................................... | $557,410,000.00 |
| Net original issue premium .......................................................... | 82,016,511.80 |
| Other available moneys [(1)] .......................................................... | 12,619,072.92 |
| Total Sources .................................................. | $652,045,584.72 |

Uses:

| | |
|---|---:|
| Deposit to Escrow Fund for the Refunded Bonds......................................... | $637,315,730.38 |
| Underwriting discount, municipal bond insurance premiums, and estimated legal, printing and other financing expenses.................... | 14,729,854.34 |
| Total Uses ............................................. | $652,045,584.72 |

PREPA, *Official Statement for Power Revenue Refunding Bonds, Series VV*, 3 (2007).

175. In sum, the Official Statements represented that PREPA would use $1,181,047,344 of the bond proceeds for construction purposes and $1,753,699,290 to pay down other debt or expenses, with the expectation that it would spend the money freed up by those expenditures on capital improvements for energy production, transmission, and distribution. Indeed, the Official Statements for each issuance reflected that hundreds of millions of dollars—generated through bond issuances and internal revenues—would be spent on these capital improvements. *See supra* ¶¶ 159-165.

176. These statements regarding how money was and would be spent, however, were false and incomplete, as indicated in the Special Investigation Report. The Special Investigation Report included an illustrative analysis of how PREPA actually

spent the funds generated by PREPA bonds issued between March 2010 and August 2013, which had been earmarked for construction. A forensic review could not account for a staggering *$430 million* of these funds. As the Special Investigation Report stated: "To contextualize this figure, we note the difference represents approximately 86% of the $500 million in funds from PREPA's 2013A Power Revenue bond offering that PREPA represented would be allocated to the Construction Fund." Special Investigation Report at 144. The Special Investigation Report also revealed that Defendants did not "monitor[]" any "actual use of proceeds" by PREPA "in relation to the represented uses identified in relevant offering documents" at any point. *Id.* at 5.

177.  The Special Investigation Committee did not examine how PREPA actually spent funds generated by bonds issued pre-2010 or funds generated internally, explicitly noting that it was leaving this subject to other parties: "We chose to publish this finding, noting that further analysis by other stakeholders, with mandates different from or broader than ours, could lead to additional, more definitive findings on the subject," *id.* at 144, and "we expect this to be of further inquiry for the interested parties." *Id.* at 564.

178.  A United States Government Accountability Office ("GAO") Report to certain Congressional Committees dated May 2018 on "Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them" (the "GAO Report") further confirms that PREPA did not spend money as represented. *See* U.S. Gov't Accountability Office, GAO-18-387, Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them (2018), https://www.gao.gov/assets/700/691944.pdf. Among other things, the GAO "reviewed Puerto Rico government documents on its financial condition and on its processes for budget development and execution, debt issuance, and financial management[]" and interviewed current and former government officials. *Id.* at 2-3. The GAO concluded that, despite the great sums of money that PREPA purportedly allocated for construction and capital improvement, "PREPA did not update or improve its electric generation and transmission systems, which hampered their performance and led to increased production costs." *Id.* at 25.

179.  In sum, PREPA did not spend money as the Official Statements distributed and circulated by Defendants said it would. It is reasonable to infer that PREPA also did not spend the proceeds of the bonds at issue here as it represented. Defendants did not investigate how PREPA had spent or would spend these bond proceeds— or PREPA's revenue, expense, and debt information—and so Defendants could not have formed an opinion or belief as to the truthfulness or completeness of

representations in the Official Statements on those subjects. The same Defendants were underwriting bonds in the 2010-2013 timeframe as in the 2001-2007 timeframe. There is no reason to believe Defendants treated the later issuances differently. These conclusions are bolstered by the fact that PREPA issued bonds almost every year between 2001 and 2013, and the same underwriters underwrote multiple PREPA issuances.

180.   Defendants did not reasonably investigate these expenditures and did not have a reasonable basis to believe they were true and complete. Had Defendants reasonably investigated how PREPA spent its bond proceeds, they would have at the very least discovered that PREPA was not using funds as represented in the statements. Specifically, underwriters of later issuances would have discovered, as part of their reasonable investigation into the issuance, that how money was spent was misstated in prior statements—as the Special Investigation revealed. Had National known either that the disclosures were false or that Defendants had not investigated them, it never would have issued its insurance.

181.   *Third*, Defendants represented in each Official Statement that PREPA's "production plant and transmission and distribution system is in good repair and sound operating condition." *E.g.*, PREPA, *Official Statement for Power Revenue Refunding Bonds, Series OO and PP*, 30 (2004). The healthier the system, the more likely PREPA would be to generate greater net revenues from the system over time, and the less likely PREPA would be to default on the proposed bond obligations.

182.   The Special Investigation Report shows that these statements were false and incomplete. The statements were made "in the context of considering the system's age"—a qualification that was never disclosed. Special Investigation Report at 135. Moreover, PREPA did not even have sufficient funds to "retire old facilities and build new ones"—another fact that was never disclosed. *Id.*

183.   The Chairman of the Puerto Rico Energy Bureau (previously the Puerto Rico Energy Commission), the independent body that regulates Puerto Rico's energy supply, recently observed that PREPA's "power plants are decrepit, with some more than 40 years old." Umair Irfan, *Puerto Rico's Blackout, the Largest in American History, Explained,* Vox (May 8, 2018), https://www.vox.com/2018/2/8/16986408/puerto-rico-blackout-power-hurricane. Likewise, recent reports submitted to the Puerto Rico Energy Bureau observed that "[i]t is difficult to overstate the level of disrepair or operational neglect at PREPA's generation facilities." Expert Report of Fisher and Horowitz, P.R. Energy Comm. *In re Review of Rates of The Puerto Rico Electric Power Authority*, No. CEPR-AP-2015-0001, 27 (November 23, 2016),

60

http://energia.pr.gov/wp-content/uploads/2016/11/Expert-Report-Revenue-Require-ments-Fisher-and-Horowitz-Revised-20161123.pdf. Recent public news reports fur-ther confirm that PREPA's systems were "decrepit, corroded and poorly maintained." James Glanz & Frances Robles, *How Storms, Missteps and an Ailing Grid Left Puerto Rico in the Dark*, N.Y. TIMES, May 6, 2018, https://www.nytimes.com/interac-tive/2018/05/06/us/puerto-rico-power-grid-hurricanes.html.

184.    Defendants did not perform a reasonable investigation into the state of repair and operating condition of PREPA's systems, nor did they form a reasonable basis as to the truthfulness and completeness of dependent statements. This conclu-sion is bolstered by the fact that PREPA issued bonds almost every year between 2001 and 2013, and the same underwriters underwrote multiple PREPA issuances. Had Defendants visited the facilities, as a reasonable investigation requires, they would have discovered the disrepair—just as the Special Investigation revealed. Had National known either that the disclosures were false or that Defendants had not investigated them, it never would have issued its insurance.

**B.    The Key Representations in the General Obligation Bonds Official Statements Were Materially False and Incomplete**

185.    The Puerto Rico Public Improvement Fund is intended to pay for various responsibilities that the Commonwealth has assumed on behalf of its citizens, includ-ing police and fire protection, education, public health and welfare programs, eco-nomic development, and municipal fiscal affairs. Bonds issued for this fund—so-called "General Obligation" or "GO" bonds—are general obligations of the Common-wealth, backed by its good faith, credit, and taxing power, and payable from the Com-monwealth's general funds. Under the Puerto Rico Constitution, GO bondholders have the first claim on the Commonwealth's available resources.

186.    From 2001 to 2007, Defendants sought and obtained bond insurance from National, and National has made claims payments, on the following GO bonds:

a.    The Series 2002A bonds dated October 11, 2001 with a maturity date of July 1, 2021. The lead underwriter was UBS PaineWebber Inc. (now known as UBS Financial Services). Other underwriters included Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Mer-rill Lynch), ABN AMRO Financial Services, Inc. (predecessor in interest to De-fendant Merrill Lynch), Goldman Sachs LLC, Morgan Stanley LLC, Salomon Smith Barney (predecessor in interest to Defendant Citigroup Global Mar-kets), and Bear Stearns & Co., Inc. (predecessor in interest to Defendant J.P. Morgan Securities). The purpose of the bonds was to fund the 2002 Public

Improvements Fund to carry out capital improvement programs including ag-
ricultural and tourism facilities, aqueduct and sewer facilities, schools and
similar projects, and to fund the Extraordinary Maintenance Fund, which is
used for infrastructure projects related to water resources. National insured
these bonds in the original par amount of $261,675,000. The first default on
the bond was July 1, 2016.

b.     The Series 2003C bonds dated April 16, 2003 with a maturity date
of July 1, 2028. The lead underwriters were Goldman Sachs LLC and Morgan
Stanley LLC. Other underwriters included Merrill Lynch, Banc of America Se-
curities (predecessor in interest to Defendant Merrill Lynch), UBS PaineWeb-
ber Inc. (now known as UBS Financial Services), J.P. Morgan Securities, and
Citigroup. The purpose of the Series 2003C bonds was to repay a GDB line of
credit in the amount of $11.3 million and to refund previously issued Public
Improvement bonds. National insured these bonds in the original par amount
of $466,995,000. The first default on the bonds was July 1, 2016.

c.     The Series 2007A bonds dated October 3, 2007 with a maturity
date of July 1, 2020. The lead underwriters were UBS Investment Bank (now
known as UBS Securities) and Morgan Stanley. Other underwriters included
Merrill Lynch, Banc of America Securities (predecessor in interest to Defend-
ant Merrill Lynch), Goldman Sachs LLC, Citigroup, RBC Capital Markets, J.P.
Morgan Securities, Bear, Stearns & Co., Inc. (predecessor in interest to De-
fendant J.P. Morgan Securities), and Santander Securities. The purpose of the
bonds was to pay off previously issued Public Improvement bonds. National
insured these bonds in the original par amount of $92,505,000. The first de-
fault on the bonds was July 1, 2016.

187.   It was critical to National and other market participants that all repre-
sentations regarding the Commonwealth's long-term ability to earn revenues and is-
sue further debt be accurate.

188.   In fact, revenue projections were systemically overstated (including rev-
enues that would never be collected), appropriations projections were likewise sys-
tematically understated, and, as a result, net revenues (as reflected by the difference
between projected revenues plus appropriations and actual revenues plus appropria-
tions) were constantly overestimated.

189.   A special report prepared on behalf of the Commonwealth and the GDB
in 2015 by economists concluded that Commonwealth budgets were overly optimistic,
noting that, from FY 2004 to 2014, "revenue forecasts … systematically exceeded

actual collections by some $1.5 billion each year (15% of the original budget)." Anne
O. Krueger, Ranjit Teja & Andrew Wolfe, GDB, *Puerto Rico – A Way Forward*, 9 (June
29, 2015), http://www.gdb.pr.gov/documents/puertoricoawayforward.pdf.

190.    Similarly, the GAO Report concluded, based on interviews with "[f]or-
mer Puerto Rico officials and experts in Puerto Rico's economy," that the Common-
wealth "frequently overestimated the amount of revenues it would collect in the com-
ing year." GAO Report at 16. "Overly optimistic revenue estimates allowed Puerto
Rico's legislature—with approval from the governor—to increase appropriations to
agencies in almost all the years while also passing purportedly balanced budgets.
When actual revenue fell short of the revenue estimates—and expenses were not ad-
justed accordingly—Puerto Rico's General Fund operated with a deficit." *Id*. at 17.
The report also explained that "Puerto Rico had difficulty collecting tax revenue," and
that politicians "in the revenue estimating process" "exerted pressure … to adopt op-
timistic revenue estimates." *Id*. at 18-19.

191.    The GAO Report concluded that the Commonwealth "regularly spent
more than the amounts Puerto Rico's legislature appropriated for a given fiscal year."
*Id*. at 19. In fact, "Puerto Rico spent in excess of appropriated general fund amounts
in nine of the thirteen most recent years for which data were available …. For the
nine years when Puerto Rico spent in excess of appropriated amounts, actual spend-
ing exceeded appropriated amounts by an average of 5.6 percent, or $459 million,
annually." *Id.*

192.    Because these projections included uncollected revenues, and thus over-
stated estimated revenues, and because the Commonwealth consistently understated
appropriations, the Commonwealth's combined estimated revenues and appropria-
tions consistently presented a picture far more favorable than actual combined reve-
nues and appropriations. The extent of these misrepresentations is illustrated by the

comparison of the Commonwealth's combined estimated revenues and appropriations
to its actual combined revenues and appropriations as identified by the GAO Report:



| Fiscal Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Represented | 0.64 | 0.65 | 0.57 | 0.14 | -0.20 | 0.57 | 0.40 | 0.44 |
| Actual | 0.39 | 0.24 | 0.03 | -0.1 | -0.88 | -0.08 | -0.59 | -2.32 |

*Source: U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-18-387, PUERTO RICO: FACTORS TO CONTRIBUTING TO THE
DEBT CRISIS AND POTENTIAL FEDERAL ACTIONS TO ADDRESS THEM (2018)*

193.    Bloomberg—which only has data since 2004—has similar *actual* reve-
nue estimates:



| Fiscal Year | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Represented* | 7.93 | 8.30 | 8.65 | 8.89 | 8.25 | 7.60 |
| Actual** | 7.01 | 7.67 | 8.21 | 8.45 | 7.72 | 7.21 |

*Source: Official Statements, Commonwealth of Puerto Rico Public Improvement Bonds and Public Improvement Refunding Bonds

**Source: Bloomberg, Commonwealth of PR, General Fund Income Statement, Total General Fund Tax Revenues

194. The differences between the GAO Report's estimates and Bloomberg's estimates shows the difficulties in independently verifying the Commonwealth's data—the publicly available data was unreliable. While the precise scale of the false and erroneous statements is impossible to determine, it is clear that the data was massively misrepresented.

195. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A represented estimated general fund revenues of $7,485,000,000 and appropriations of $7,371,398,000 for FY 2002. *Commonwealth of Puerto Rico*, *Official Statement for Public Improvement Refunding Bonds, Series 2002A*, I-37 (2001), However, the 2018 analysis conducted by the GAO found that actual general fund revenues combined with actual expenses were overstated by approximately $250,000,000.

196. Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the Commonwealth of Puerto Rico, Public Improvement Refunding Bonds Series 2003B and 2003C bonds represented estimated general fund revenues of $7,836,000,000 and appropriations of $7,530,938,000 in FY 2003 and projected general fund revenues of $7,925,000,000 and appropriations of $7,785,552,000 for FY 2004. *Commonwealth of Puerto Rico, Official Statement for Public Improvement Refunding Bonds, Series 2003B and 2003C*, I-48 (2003). However, the 2018 analysis conducted by the GAO found that actual general fund revenues combined with actual expenses were overstated by approximately $410,000,000 for FY 2003 and by approximately $540,000,000 for FY 2004.

197. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the Commonwealth of Puerto Rico Public Improvement Refunding Bonds Series 2007A bonds represented estimated general fund revenues of $8,890,047,000 and appropriations of $8,794,003,000 for FY 2007 and projected general fund revenues of $9,077,000,000

and appropriations of $8,776,298,000 for FY 2008. *Commonwealth of Puerto Rico, Official Statement for Public Improvement Refunding Bonds, Series 2007A*, I-55 (2007). However, the 2018 analysis conducted by the GAO found that actual general fund revenues combined with actual expenses were overstated by approximately $650,000,000 for FY 2007 and approximately $990,000,000 for FY 2008. Further, data compiled by Bloomberg shows that total general fund tax revenues for FY 2007 were approximately $440,000,000 less than estimates and for FY 2008 approximately $1,350,000,000 less than projections as represented in the Official Statements for the Series 2007A bonds.

198.    Defendants did not reasonably investigate these projections and did not have a reasonable basis to believe they were true or complete. Had Defendants reasonably investigated how the Commonwealth estimated its revenues and appropriations, they would have at the very least discovered those estimates and projections were incorrect or inaccurate—just as the GAO did when it investigated. Had National known either that the disclosures were false or that Defendants had not investigated them, it never would have issued its insurance.

## C.    The Key Representations in PRHTA's Official Statements Were Materially False and Incomplete

199.    PRHTA is a public corporation and governmental instrumentality of Puerto Rico that plans and manages the construction of all major projects relating to Puerto Rico's transportation system; it controls and supervises any highway and other transportation facilities that it owns, operates, or builds; it set tolls and other charges for the use of highways and other transportation facilities; and it conducts major repairs and maintenance of Puerto Rico's toll highways.

200.    PRHTA could issue "Highway Revenue Bonds" under Resolution No. 68-18, adopted by the Authority on June 13, 1968, as amended (the "1968 PRHTA Resolution"). These bonds were payable from, and secured by, certain revenues of the Authority, including: (i) current gasoline taxes, a portion of current gas oil and diesel oil taxes, and a portion of current motor vehicle license fees allocated to the Authority by the Commonwealth; (ii) toll revenues of PRHTA's traffic facilities financed with Highway Revenue Bonds and any extensions and improvements thereto; and (iii) certain investment earnings. 1968 PRHTA Resolution at 7, 11.

201.    PRHTA could also issue "Transportation Revenue Bonds" under Resolution No. 98-06, adopted by the Authority on February 26, 1998, as amended (the "1998 PRHTA Resolution"). These bonds were payable from, and secured by (i) excise taxes, up to $120 million per fiscal year, taxes imposed by the Commonwealth on certain

petroleum products; (ii) toll revenues of PRHTA's traffic facilities not financed with Highway Revenue Bonds; (iii) certain investment earnings; and (iv) revenues derived from bonds issued pursuant to the 1968 PRHTA Resolution after payment of debt service on the Authority's outstanding Highway Revenue Bonds. 1998 PRHTA Resolution at 3, 19.

202.    PRHTA issued bonds to finance directly certain capital improvements; to build new transportation projects; and to refund outstanding debt, thus making funds available to finance other projects.

203.    From 2003 to 2007, Defendants sought and obtained bond insurance from National, and National has made claims payments, on the following PRHTA bonds:

a.      PRHTA, Highway Revenue Refunding Bonds Series AA dated April 10, 2003, with a maturity date of July 1, 2023. The lead underwriters were Citigroup, Morgan Stanley LLC, and Merrill Lynch. Other underwriters included UBS PaineWebber Inc. (now known as UBS Financial Services), J.P. Morgan Securities, Goldman Sachs LLC, Merrill Lynch, and Banc of America Securities (predecessor in interest to Defendant Merrill Lynch). The purpose of these bonds was to refund a portion of previously issued bonds and pay costs of issuance of Series AA bonds. National insured these bonds in the original par amount of $196,440,000. The first default on the bonds was July 1, 2017.

b.      PRHTA, Transportation Revenue Bonds Series J, dated April 7, 2004, with a maturity date of July 1, 2018. The lead underwriters were Citigroup, Morgan Stanley LLC, and Merrill Lynch. Other underwriters included UBS Financial Services, J.P. Morgan Securities, Goldman Sachs LLC, and Banc of America Securities (predecessor in interest to Defendant Merrill Lynch). The purpose of these bonds was to finance various highway projects in the PRHTA's Construction Improvement Program, to make a deposit into the 1998 Senior Bond Reserve Account, to make a deposit into the 1998 Senior Bond Service account to be applied to pay interest on the Series J bonds, and to pay costs of the issuance of the Series J bonds. National insured these bonds in the original par amount of $106,745,000. The first default on the bonds was July 1, 2017.

c.      PRHTA, Transportation Revenue Refunding Bonds Series L, dated September 22, 2005, with a maturity date of July 1, 2035. The lead underwriters were Citigroup and UBS Financial Services. Other underwriters included Morgan Stanley LLC, J.P. Morgan Securities, Goldman Sachs LLC,

Merrill Lynch, and Banc of America Securities (predecessor in interest to De-fendant Merrill Lynch). The purpose of the Series L bonds was to refund a portion of the PRHTA's senior transportation revenue bonds and to pay costs of the Series L bonds issuance. National insured these bonds in the original par amount of $170,730,000. The first default on these bonds was July 1, 2017.

      d.     PRHTA, Revenue Refunding Bonds Series N, dated February 15, 2007, with a maturity date of July 1, 2041. The purpose of the Series N bonds was to refund a portion of the PRHTA's senior transportation revenue bonds and to pay the costs of the issuance of the Series N bonds. The lead underwrit-ers were Citigroup, RBC Capital Markets, and Goldman Sachs LLC. Other un-derwriters included Morgan Stanley LLC, UBS Investment Bank (now known as UBS Securities), Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), J.P. Morgan Securities, and Santander Securities. National insured these bonds in the original par amount of $337,075,000. The first default on these bonds was July 1, 2017.

204.   The Official Statements represented that, in certain circumstances, the Commonwealth had first priority on PRHTA's taxes and license fees, to the extent the Commonwealth's own revenues were insufficient to meet its obligations under the GO bonds. The Official Statements for PRHTA bonds explicitly incorporated Com-monwealth financial information, because of "[t]he possibility that a significant por-tion of [PRHTA's] revenues would have to be used to pay" GO Bonds. *E.g.*, PRHTA, *Official Statement for Transportation Revenue Refunding Bonds Series L*, 2 (2005).

205.   It was critical to National and other market participants that represen-tations relating to the Commonwealth's ability to claw back PRHTA's taxes and fees be accurate.

206.   In fact, as alleged above, the Commonwealth's estimated revenue collec-tions were systematically overstated and its appropriations were likewise systemati-cally understated. Defendants also made the following representations regarding PRHTA, which were also materially false and incomplete: (a) how PRHTA was spend-ing bond proceeds, including statements that it was spending those funds on high-ways and other revenue generating projects, like toll roads—which it was not; and (b) basic financial information, including debt service coverage ratios and the infor-mation used to calculate them, like revenues.

207.   *First*, Defendants did not have a reasonable basis to believe the Com-monwealth's estimated revenues and appropriations.

208. The PRHTA Official Statement for bond series AA incorporated by reference the Commonwealth's Financial Information and Operating Data Report included as Appendix I to the Official Statement relating to the Commonwealth's Public Improvement Bonds Series 2003 (the "Series 2003 Commonwealth Report"). The Series 2003 Commonwealth Report estimated general fund revenues of $7,465,000,000 and appropriations of $7,294,396,000 for FY 2002 and projected general fund revenues of $7,836,000,000 and appropriations of $7,460,111,000 for FY 2003. *Commonwealth of Puerto Rico, Official Statement for Public Improvement Refunding Bonds, Series 2003,* I-45 (2002). However, the 2018 analysis conducted by the GAO found that actual general fund revenues combined with actual expenses were overstated by approximately $250,000,000 for FY 2002 and $410,000,000 for FY 2003.

209. The PRHTA Official Statement for bond series J incorporated by reference the Commonwealth's Financial Information and Operating Data Report dated September 1, 2003 included as Appendix I to the Official Statement, dated October 3, 2003, relating to the Commonwealth's Public Improvement Bonds, Series 2004A (the "September 2003 Commonwealth Report"). The September 2003 Commonwealth Report estimated general fund revenues of $7,591,742,000 and appropriations of $7,590,059,000 for FY 2003 and projected general fund revenues of $7,925,000,000 and appropriations of $7,944,984,000 for FY 2004. *Commonwealth of Puerto Rico, Official Statement for Public Improvement Refunding Bonds, Series 2004A,* I-50 (2003). However, the 2018 analysis conducted by the GAO found that actual general fund revenues combined with actual expenses were overstated by approximately $410,000,000 for FY 2003 and by approximately $540,000,000 for FY 2004. Further, data compiled by Bloomberg shows that FY 2004 total general fund tax revenues was approximately $980,000,000 less than projections as represented in the September 2003 Commonwealth Report.

210. The PRHTA Official Statement for bond series L incorporated by reference the Commonwealth's Financial Information and Operating Data Report dated May 1, 2005 included as Appendix I to the Official Statement, dated June 2, 2005, of the Puerto Rico Infrastructure Financing Authority relating to its Special Tax Revenue Bonds, Series 2005A and 2005B (the "May 2005 Commonwealth Report"). The May 2005 Commonwealth Report estimated general fund revenues of $8,304,000,000 and appropriations of $8,962,015,000 for FY 2005 and projected general fund revenues of $9,684,000,000 and appropriations of $9,249,000,000 for FY 2006. *Puerto Rico Infrastructure Finance Authority, Official Statement for Special Tax Revenue Bonds, Series 2005A and 2005B,* III-44 (2005). However, the 2018 report by the GAO found

that actual general fund revenues combined with actual expenses were overstated by approximately $540,000,000 for FY 2004 and by approximately $240,000,000 for FY 2005. Further, data compiled by Bloomberg shows that total general fund tax revenues for FY 2004 were approximately $920,000,000 less than estimates and for FY 2005 were approximately $630,00,000 less than projections as represented in the May 2005 Commonwealth Report.

211. The PRHTA Official Statement for bond series N incorporated by reference the Commonwealth's Financial Information and Operating Data Report dated July 1, 2006 included as Appendix I to the Official Statement, dated August 2, 2006, relating to the offering of the Commonwealth's Public Improvement Refunding Bonds, Series 2006A and Series 2006B (the "July 2006 Commonwealth Report"). The July 2006 Commonwealth Report estimated general fund revenues of $8,645,024,000 and appropriations of 9,389,289,000 for FY 2006 and projected general fund revenues of $8,899,000,000 and appropriations of $8,524,803,000 for FY 2007. *Commonwealth of Puerto Rico, Official Statement for Public Improvement Refunding Bonds, Series 2006A and 2006B*, I-55 (2005). However, the 2018 analysis conducted by the GAO found that actual general fund revenues combined with actual expenses were overstated by approximately $680,000,000 for FY 2006 and by approximately $650,000,000 for FY 2007. Further, data compiled by Bloomberg shows that total general fund tax revenues for FY 2006 were approximately $430,000,000 less than estimates and for FY 2007 were approximately $450,000,000 less than projections as represented in the July 2006 Commonwealth Report.

212. Defendants did not reasonably investigate Official Statements of PRHTA bond issuances regarding Commonwealth of Puerto Rico finances, including the Commonwealth's revenue and appropriations estimates and projections and its ability to service its debt—even though Defendants underwrote bonds issued by the Commonwealth, PREPA, and PRHTA during the same time period. Had Defendants reasonably investigated, they would have discovered these statements were materially false and incomplete—just as the GAO did when it investigated the factors that contributed to the Puerto Rico debt crisis (*see supra* ¶¶ 178-179, 190-198). Had National known either that the disclosures were false or that Defendants had not investigated them, it never would have issued its insurance.

213.   *Second*, Defendants did not have a reasonable basis to believe disclosures regarding how PRHTA spent money, which were materially false and incomplete.

214.   Defendants represented in the Official Statements how PRHTA had spent and would spend its money—including monies generated through PRHTA's business operations and through bond issuances. Defendants indicated in those statements that PRHTA was unlikely to default on the proposed bonds because it was spending its money prudently, in a way that would have the tendency to increase revenues and decrease expenses in the long run.

215.   Statements that PRHTA had used or would use its funds to maintain, operate, repair, or improve highways, streets, bridges, and other transportation facilities indicated that PRHTA's net revenues would increase in the long term. In particular, statements that PRHTA would deposit funds into its "construction fund"—which holds the proceeds of any bonds issued for the purpose of paying construction costs—provided assurances that PRHTA's net revenues would increase.

216.   The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PRHTA Highway Revenue Refunding Bonds Series AA dated April 10, 2003, disclosed the following regarding sources and uses of funds, including that $522,475,000 would be deposited into the construction fund:

**Sources and Uses of Funds**

**Sources:**

| | |
|---|---|
| Principal Amount of 2003 Highway Revenue Bonds | $717,365,000.00 |
| Principal Amount of 2003 Transportation Revenue Bonds | 956,230,000.00 |
| Net Original Issue Premium | 80,116,608.35 |
| Other available moneys | 67,780,398.31 |
| Total Sources ................................................................ | $1,821,492,006.66 |

**Uses:**

| | |
|---|---|
| Deposit into 1998 Construction Fund | $522,475,000.00 |
| Payment of TIFIA Loan | 305,614,191.78 |
| Deposit to 1968 Escrow Fund | 796,880,008.08 |
| Deposit to 1998 Escrow Fund | 80,912,991.80 |
| Deposit to 1968 Reserve Account | 10,884,473.34 |
| Deposit to 1998 Senior Bond Reserve Account | 36,770,506.26 |
| Deposit to 2003 Subordinated Bonds Reserve Account | 26,512,201.26 |
| Underwriting discount and legal, printing, bond insurance and other financing expenses | 41,442,634.14 |
| Total Uses .................................................................. | $1,821,492,006.66 |

PRHTA, *Official Statement for PRHTA, Highway Revenue Refunding Bonds, Series AA*, 7 (2003).

71

217.   The Official Statements provided by Defendants UBS Securities, Citigroup Global Markets, J.P. Morgan Securities, Goldman Sachs LLC, and Merrill Lynch for the PRHTA Transportation Revenue Bonds Series J dated April 7, 2004 disclosed the following regarding sources and uses of funds, including that $360,000,000 would be deposited into the construction fund:

**Sources and Uses of Proceeds of the Series J Bonds**

**Sources:**

| | |
|---|---|
| Principal Amount of Series J Bonds............................. | $405,895,000.00 |
| Net Original Issue Premium..................................... | 7,550,647.10 |
| Total Sources................................................ | $413,445,647.10 |

**Uses:**

| | |
|---|---|
| Deposit into 1998 Construction Fund........................... | $360,000,000.00 |
| Deposit into 1998 Senior Bond Reserve Account............... | 24,275,575.00 |
| Deposit into 1998 Senior Bond Service Account................ | 22,104,922.85 |
| Underwriting discount and legal, bond insurance, printing, and other financing expenses.............................................. | 7,065,149.25 |
| Total Uses................................................... | $ 413,445,647.10 |

PRHTA, *Official Statement for Transportation Revenue Bonds, Series J*, 6 (2004).

218.   The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, and Merrill Lynch for the PRHTA Transportation Revenue Refunding Bonds Series L dated September 22, 2005, disclosed the following regarding sources and uses of funds, including that $294,220,068.41 would be deposited into the construction fund:

**Sources and Uses of Funds**

**Sources:**

| | |
|---|---|
| Principal Amount of the Bonds................................. | $1,499,910,000.00 |
| Net Original Issue Premium ................................... | 130,321,412.80 |
| Other Available Moneys ....................................... | 9,960,464.69 |
| Total Sources................................................ | $1,640,191,877.49 |

**Uses:**

| | |
|---|---|
| Deposit into 1998 Construction Fund.......................... | $ 294,220,068.41 |
| Deposit into 1968 Escrow Fund................................ | 112,939,249.11 |
| Deposit into 1998 Escrow Funds............................... | 667,426,462.75 |
| Deposit into 1998 Senior Bond Reserve Account.......... | 46,883,777.50 |
| Capitalized interest on Series K Bonds through July 1, 2006............................................. | 27,007,323.43 |
| Underwriting discount and legal, printing, municipal bond insurance policy and other financing expenses...... | 38,714,996.29 |
| Payment of GDB Line of Credit............................... | 453,000,000.00 |
| Total Uses................................................... | $1,640,191,877.49 |

PRHTA, *Official Statement for Transportation Revenue Refunding Bonds, Series L*, 7 (2005).

219. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PRHTA Transportation Revenue Refunding Bonds Series N dated February 15, 2007 disclosed the following regarding sources and uses of funds, including that $53,232,325.88 would be deposited into the construction fund:

**Sources and Uses of Funds**

| Sources: | |
|---|---|
| Principal Amount of the Bonds.................................................. | $2,184,860,553.00 |
| Net Original Issue Premium or Discount..................................... | 240,821,059.45 |
| Other available moneys .............................................................. | 42,951,730.36 |
| Total Sources .................................................................... | $2,468,633,342.81 |
| **Uses:** | |
| Deposit into 1998 Construction Fund......................................... | $ 53,232,325.88 |
| Deposit into 1968 Escrow Fund.................................................. | 497,283,713.96 |
| Deposit into 1998 Escrow Fund.................................................. | 1,650,106,990.44 |
| Deposit into 1998 Bond Reserve Account................................... | 3,932,464.00 |
| Underwriting discount and bond insurance premium, legal, printing, and other financing expenses.......................... | 62,638,375.43 |
| Repayment of Subordinated Transportation Revenue Bonds Series 2007A............................................................................. | 201,439,473.10 |
| Total Uses............................................................................ | $2,468,633,342.81 |

PRHTA, *Official Statement for Transportation Revenue Refunding Bonds, Series N*, 10 (2007).

220. PRHTA did not spend the money in the way it said it would. The Executive Director of PRHTA from 2005 to 2007 was investigated by the FBI for corruption—a fact that came to light after National had already issued its last policy for PRHTA. *El FBI Toca a Otra Puerta* [The FBI Knocks on Another Door], EL NUEVO DÍA (July 16, 2008), https://www.elnuevodia.com/noticias/politica/nota/elfbitocaaotrapuerta-431380/; *Ante el FBI un Supuesto Esquema de Corrupción* [The FBI Looking at an Alleged Corruption Scheme], EL NUEVO DÍA (Aug. 22, 2008), https://www.elnuevodia.com/noticias/locales/nota/anteelfbiunsupuestoesquemadecorrupcion-447158/.

221. Media reports after National had already issued its policies indicated that, despite extensive reported expenditures, PRHTA did not maintain the infrastructure as alleged. *See, e.g.*, *Designan Jefe Para el DTOP* [Chief Appointed for the Department of Transportation and Public Works], PRIMERA HORA (Mar. 27, 2007), https://www.primerahora.com/noticias/puerto-rico/nota/designanjefeparaeldtop-42234/; *Rechaza a Pesquera* [Pesquera Rejected], EL NUEVO DÍA (Sept. 7, 2009), https://www.elnuevodia.com/noticias/politica/nota/rechazoapesquera-612446/.

222.     Moreover, as described above, the Special Investigation Report's illus-
trative analysis showed that PREPA earmarked funds for construction that it did not
use as represented; the analysis could not account for $430 million during the period
under review. Given that the same banks were underwriting bonds for both PREPA
and PRHTA, and given those public instrumentalities' similarities, it is reasonable to
infer that PRHTA also did not spend its funds as represented. The Report also found
that Defendants did not "monitor" any "actual use of proceeds" by PREPA or PRASA
(the only other public utility it investigated) at any point. Special Investigation Re-
port at 5. It is likewise reasonable to infer that underwriters, including Defendants,
also did not monitor actual use of proceeds for PRHTA.

223.     Had Defendants reasonably investigated, they would have discovered
that these statements were materially false and incomplete. Defendants did not in-
vestigate and did not have a reasonable basis to believe the truthfulness and com-
pleteness of these disclosures. Had National known either that the disclosures were
false or that Defendants had not investigated them, it never would have issued in-
surance.

224.     *Third*, Defendants did not have a reasonable basis to believe PRHTA's
financial information and debt service coverage ratios, which were materially false
and incomplete.

225.      The Official Statements represented PRHTA's alleged basic financial
information, including its historical and projected revenues, its expenses, its net rev-
enues, and information about its existing debts, such as principal and interest
amounts. The higher the revenues and the lower the operational expenses and debt,
the less likely PRHTA would be to default on the proposed bonds.

226.     The Official Statements also disclosed PRHTA's debt service coverage
requirements, which required PRHTA, among other things, to have revenues over
150% greater than the principal and interest for senior transportation bonds (*i.e.*, a
debt service coverage ratio of over 1.5) and over 125% above the principal and interest
for its subordinated transportation revenue bonds (*i.e.*, a debt service coverage ratio
of over 1.25).

227.     Specifically, PRHTA could issue Senior Transportation Revenue Bonds
under the 1998 PRHTA Resolution

> provided that the 1998 Resolution Revenues for any 12 con-
> secutive months of the 15 months immediately preceding
> the issuance of such Senior Transportation Revenue Bonds
> ... are not less than 150% of the maximum Principal and
> Interest Requirements for any fiscal year thereafter on

> account of all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

*See, e.g.,* PRHTA, *Official Statement for Transportation Revenue Bonds, Series J,* 18-19 (2004).

228. PRHTA could issue Subordinated Transportation Revenue Bonds

> under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds … are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

*See, e.g., id.* at 19.

229. The Official Statements disclosed historical and projected debt service coverage calculations referred to as the "1998 Resolution Senior and Subordinated Coverage Ratio." This ratio was a key indicator of PRHTA's ability to access financing and of PRHTA's financial health—the higher the revenues, the lower the debt, the less likely the risk of default.

230. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital for the PRHTA, Revenue Refunding Bonds Series N dated February 15, 2007 represented the following "Historical Revenues and Debt Service Coverage," including net revenue information that led to 1998 Resolution Senior and Subordinated Coverage Ratios well over 1.5—between 2.66 and 1.61:

### HISTORICAL REVENUES AND DEBT SERVICE COVERAGE
(dollars in thousands)

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| 1968 Resolution Revenues: | | | | | |
| Gasoline taxes | $174,885 | $173,507 | $188,529 | $185,883 | $178,932 |
| Gas oil and diesel oil taxes | 18,922 | 15,298 | 14,556 | 16,679 | 15,676 |
| Subtotal | $193,807 | $188,805 | $203,085 | $202,562 | $194,608 |
| Motor vehicle license fees | 30,693 | 31,920 | 32,491 | 32,385 | 31,655 |
| Subtotal | $224,500 | $220,725 | $235,576 | $234,947 | $226,263 |
| Toll receipts | 130,498 | 135,352 | 141,378 | 146,286 | 189,618 |
| Investment income | 10,168 | 12,947 | 9,264 | 9,858 | 9,923 |
| Total 1968 Resolution Revenues | $365,166 | $369,024 | $386,218 | $391,091 | $425,804 |
| Debt Service on Highway Revenue Bonds | $177,400 | $95,056 | $120,723 | $153,925 | $145,080 |
| 1968 Resolution Coverage Ratio | 2.06 | 3.88 | 3.20 | 2.54 | 2.93 |
| Excess 1968 Resolution Revenues | $187,766 | $273,968 | $265,495 | $237,166 | $280,724 |
| | | | | | |
| 1998 Resolution Revenues: | | | | | |
| Petroleum Products Tax | $120,000 | $120,000 | $115,295 | $110,262 | $102,206 |
| Excess 1968 Resolution Revenues | 187,766 | 273,968 | 265,495 | 237,166 | 280,724 |
| | | | | | |
| Toll Receipts | | | | | 2,452 |
| Investment income | 11,198 | 11,586 | 11,440 | 16,692 | 16,801 |
| **Total 1998 Resolution Revenues** | **$318,964** | **$405,554** | **$392,230** | **$364,120** | **$402,183** |
| Debt Service on Senior Transportation Revenue Bonds | $116,150 | $135,168 | $162,868 | $196,726 | $225,891 |
| 1998 Resolution Senior Coverage Ratio[1] | 2.75 | 3.00 | 2.41 | 1.85 | 1.78 |
| Debt Service on Subordinated Transportation Revenue Bonds | $3,795 | $6,654 | $20,398 | $20,398 | $24,018 |
| **Total Debt Service on Transportation Revenue Bonds** | **$119,945** | **$141,822** | **$183,266** | **$217,124** | **$249,909** |
| **1998 Resolution Senior and Subordinated Coverage Ratio[2]** | **2.66** | **2.86** | **2.14** | **1.68** | **1.61** |
| Aggregate Revenues[3] | $496,364 | $500,610 | $512,953 | $518,045 | $547,263 |
| Aggregate Debt Service[4] | $297,345 | $236,878 | $303,989 | $371,049 | $394,989 |
| Aggregate Coverage Ratio[5] | 1.67 | 2.11 | 1.69 | 1.40 | 1.39 |

PRHTA, *Official Statement for Transportation Revenue Refunding Bonds, Series N*, 43 (2007).

231. The Official Statements provided by Defendants J.P. Morgan Securities, Morgan Stanley LLC, Goldman Sachs LLC, Citigroup Global Markets, UBS Securities, Merrill Lynch, Santander Securities, and RBC Capital Markets for the PRHTA, Revenue Refunding Bonds Series N dated February 15, 2007 represented the following "Projected Revenues and Debt Service Coverages," including net revenue information that led to 1998 Senior and Subordinate Debt Service Coverage Ratios over the following five years well over 1.5—between 1.81 and 1.62—until 2011, when it fell to 1.43; despite the dip to 1.43, the projections nonetheless satisfied tests for senior and subordinate debt coverage ratios (with, respectively, ratios of 1.74 and 1.35):

**PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**
**PROJECTED REVENUES AND DEBT SERVICE COVERAGE**
**(dollars in thousands)**

|  | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010** | **2011** |
| *1968 Resolution Revenues* | | | | | |
| Gasoline Taxes | $177,470 | $180,320 | $185,580 | $190,150 | $195,140 |
| Gas oil and diesel oil taxes | 15,500 | 12,500 | 12,750 | 9,000 | 9,000 |
| Subtotal | 192,970 | 192,820 | 198,330 | 199,150 | 204,140 |
| Motor vehicle license fees | 31,980 | 32,310 | 32,640 | 32,980 | 33,320 |
| Subtotal | 224,950 | 225,130 | 230,970 | 232,130 | 237,460 |
| Toll receipts | 205,760 | 214,950 | 223,780 | 232,710 | 242,290 |
| Investment Income | 8,950 | 9,018 | 9,033 | 9,149 | 9,075 |
| **Total 1968 Resolution Revenues** | **439,660** | **449,098** | **463,783** | **473,989** | **488,825** |
| Debt Service on Highway Revenue Bonds | 124,942 | 129,018 | 129,928 | 136,871 | 132,430 |
| 1968 Resolution Coverage Ratio | 3.52 | 3.48 | 3.57 | 3.46 | 3.69 |
| Excess 1968 Resolution Revenues | 314,718 | 320,080 | 333,855 | 337,118 | 356,395 |
| *1998 Resolution Revenues* | | | | | |
| Petroleum Products Tax | 101,160 | 102,780 | 105,780 | 108,380 | 111,230 |
| Investment Income | 17,543 | 18,548 | 19,374 | 19,702 | 19,776 |
| Eastern Corridor Toll Receipts | 16,130 | 21,000 | 21,630 | 22,279 | 22,947 |
| Subtotal 1998 Resolution Revenues | 134,833 | 142,328 | 146,784 | 150,360 | 153,953 |
| Excess 1968 Resolution Revenues | 314,718 | 320,080 | 333,855 | 337,118 | 356,395 |
| **Total 1998 Revenues** | **449,551** | **462,408** | **480,639** | **487,479** | **510,348** |
| Debt Service on 1998 Senior Transportation Revenue Bonds (1) | 206,476 | 248,765 | 266,382 | 269,902 | 274,187 |
| 1998 Senior Coverage Ratio (2) | 2.18 | 1.87 | 1.80 | 1.81 | 1.86 |
| Additional Bond Test, Senior Transportation Revenue Bonds (3) | 1.57 | 1.57 | 1.63 | 1.66 | 1.74 |
| Additional Bond Test, Subordinated Transportation Revenue Bonds (4) | 1.36 | 1.43 | 1.48 | 1.29 | 1.35 |
| **Available to Pay 1998 Subordinated Transportation Revenue Bonds (5)** | 243,074 | 215,703 | 214,057 | 217,577 | 236,162 |
| Debt service on 1998 Subordinated Transportation Revenue Bonds | 41,816 | 33,751 | 30,321 | 30,344 | 83,557 |
| Senior and Subordinate Debt Service | 248,292 | 280,457 | 296,903 | 300,246 | 357,744 |
| Senior and Subordinate Debt Service Coverage Ratio | 1.81 | 1.65 | 1.62 | 1.62 | 1.43 |
| Aggregate Revenues (6) | 574,493 | 591,426 | 610,567 | 624,349 | 642,972 |
| Aggregate Debt Service (7) | 373,234 | 409,475 | 426,831 | 437,116 | 490,174 |
| Aggregate Debt Service Coverage Ratio (8) | 1.54 | 1.44 | 1.43 | 1.43 | 1.31 |

*Id.* at 45.

232. The debt service coverage calculations and underlying information, such as revenues, were not accurately disclosed in the PRHTA Official Statement. For example, the calculations did not accurately reflect that the Commonwealth "frequently overestimated the amount of revenues it would collect in the coming year," as the GAO Report concluded, even though PRHTA revenues could potentially be clawed back by the Commonwealth to repay GO bond payments. GAO Report at 16.

233. Defendants did not diligently and reasonably investigate these statements, which were materially false and incomplete. The Special Investigation Report revealed that "PREPA systematically included uncollected revenues when it calculated its ability to cover its operations and debt service," Special Investigation Report at 114, and "inflated its debt coverage ratio," which "gave the appearance that it had the financial liquidity to support further bond issuances when almost certainly, as the ultimate insolvency of the Authority shows, it did not[.]" *Id.* at 139. Moreover, "the underwriters accepted PREPA's debt coverage service calculations without conducting any of their own due diligence into the veracity of those figures." *Id.* at 563. It is reasonable to infer that PHRTA also included uncollected revenues in its debt-

service calculations and that Defendants also accepted those calculations without investigating them.

234. Moreover, in limited circumstances, the Commonwealth can claw back PRHTA revenues to make payments on GO bonds. The same underwriters, including Defendants, underwrote bond issuances for both the Commonwealth and for PRHTA over the same time period—all nine Defendants underwrote both COFINA and PRHTA 2007 Series bonds. Defendants should have investigated PRHTA revenues in connection with their reviews of Commonwealth net revenues, but they did not. It is reasonable to infer that Defendants treated PRHTA bonds as they treated Commonwealth bonds—they did not perform a reasonable investigation into net revenues.

235. Defendants did not investigate and did not have a reasonable basis to believe the truthfulness and completeness of these disclosures. Had Defendants reasonably investigated, they would have discovered these statements were materially false and incomplete. Had National known either that the statements were false or that Defendants had not investigated them, it never would have issued the insurance.

**D.     The Key Representations in COFINA's Official Statements Were Materially False and Incomplete**

236. COFINA, created in July 2007, is a "corporate and political entity independent and separate from the Commonwealth of Puerto Rico," created to issue bonds secured by a sales and use tax ("SUT"). COFINA, *Official Statement for Sales Tax Revenue Bonds, Series 2007A*, 1 (2007).

237. In 2007, Defendants sought and obtained insurance from National, and National has made claims payments on COFINA Sales Tax Revenue Bonds Series 2007A, dated July 13, 2007, with a maturity date of August 1, 2046. The lead underwriter was Goldman Sachs LLC. The underwriting team included the following Defendants: UBS Investment Bank (now known as UBS Securities), Morgan Stanley LLC, Merrill Lynch, Banc of America Securities (predecessor in interest to Defendant Merrill Lynch), Citigroup, RBC Capital Markets, J.P. Morgan Securities, Bear, Stearns & Co., Inc. (predecessor in interest to Defendant J.P. Morgan Securities), and Santander Securities. The purpose of the bonds was to pay and retire a portion of the debt owed to the GDB and the Puerto Rico Finance Corporation ("PFC"). National insured these bonds under two policies in the original par amount of $440,396,676 and for $243,774,198.40, respectively, or $684,170,874.40, collectively.

238. COFINA emerged from bankruptcy-like proceedings with a debt adjustment plan confirmed by Federal Court under Title III of PROMESA in February 2019 (currently subject to appeal). The COFINA plan of adjustment reflects a settlement

among stakeholders of both COFINA and the Commonwealth regarding the alloca-tion and availability of the SUT. Pursuant to that plan, National reasonably expects to pay out over $100 million in claims.

239.   A key issue for the viability of COFINA bonds was whether "[SUT] could effectively be 'diverted' from the General Fund so as not to be subject to priority claims by GO Bondholders" under Article VI of the Puerto Rico Constitution. Arti-cle VI provides that holders of GO bonds "have priority rights to be paid from 'avail-able resources,' ahead of all other debts, in the event of a revenue shortfall." Special Investigation Report at 164. If the SUT revenue did not constitute an "available re-source," then the COFINA bonds would be backed by a revenue stream separate from and not shared with the GO bonds.

240.   Defendants provided National with Official Statements for the COFINA bonds that stated conclusively that SUT revenues were *not* "'available resources' of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the [Puerto Rico] Constitution." COFINA, *Official Statement for Sales Tax Revenue Bonds, Series 2007A*, 22 (2007).

241.   It was critical to National and other market participants that represen-tations relating to the Commonwealth's priority on COFINA's taxes and fees be ac-curate.

242.   In fact, these disclosures were materially incomplete. The Special Inves-tigation Report found that at least one lawyer advised COFINA's fiscal agent around March 2006 that the representation was materially incomplete because, "according to the [Puerto Rico Constitution], [SUT] *cannot* be diverted away from the General Fund." Special Investigation Report at 165. This legal opinion was sent to at least one underwriter. *Id.*

243.   The Special Investigation Report also found that in May 2007—two months *before* the bonds were issued—the law firm of Sidley Austin LLP ("Sidley"), which served as Puerto Rico's bond counsel, told COFINA's fiscal agent: "I think a court would have a hard time concluding just on the basis of the legislature saying so that the sales tax revenues are not 'available' to the Commonwealth should it need the money to pay [GO bond] debt." *Id.* Sidley advised that cautionary language should be provided in the Official Statement—but it was not. Sidley refused to provide a legal opinion that "if the issue were to come before the Puerto Rico Supreme Court, the sales tax securitization structure would be held constitutional and not be found to violate the GO Bondholders' priority rights under the Puerto Rico Constitution."

*Id.* at 530. According to the Special Investigation Report, at least one underwriter was aware of Sidley's legal opinion. *Id* at 165.

244.   Defendants never disclosed in Official Statements for the bonds that there were conflicting opinions as to the availability of SUT revenues for application to GO bondholders. It was not until 2009—long after National issued insurance for the bonds at issue—that Official Statements for new COFINA bonds admitted there were serious risks SUT could be claimed by the Commonwealth. Specifically, these new disclosures stated that "the opinions" that SUT was an independent source of revenue were "not a prediction of what a particular court … that reached the issue on the merits would hold and … are not a guarantee, warranty or representation." *Id.* at 531. Further, the new Official Statement advised that courts, including the Puerto Rico Supreme Court, could decide that SUT is in fact an available resource of the Commonwealth. *Id.* These new disclosures radically altered and materially increased the risk profile of the COFINA bonds.

245.   Defendants did not investigate and did not have a reasonable basis to believe the truthfulness and completeness of these disclosures. Had they reasonably investigated Defendants would have learned that counsel had recommended that the Official Statements contain cautionary language to the contrary—as the Special Investigation revealed. Had National known either that the disclosures were materially incomplete or that Defendants had not investigated them, it never would have issued its insurance.

### First Cause of Action: the *Doctrina de Actos Propios*

246.   National incorporates and adopts by reference, and realleges the foregoing factual allegations.

247.   Under Article 7 of the Puerto Rico Civil Code, "[W]hen there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration."

248.   Defendants solicited bond insurance by assuring National that they would form, were forming, and had already formed a reasonable basis to believe the Official Statements they provided to National were true and complete—including by reasonably investigating those statements before the bonds and insurance were issued. Defendants did so by, among other things, submitting insurance applications to National; touting their compliance with the securities laws (which required them

to have a reasonable basis for truthfulness and completeness and to perform a reasonable investigation); appearing to adhere to industry customs and norms (which required a reasonable investigation); and affixing their names on the Official Statements.

249. Defendants' assurances created a situation contrary to reality. Defendants did not act in accordance with their role as zealous gatekeepers in the municipal bond market. Specifically, they did not perform the required reasonable investigation or form a reasonable basis to believe that draft and final Official Statements were true or complete—including statements regarding issuers' debt service coverage ratios; issuers' basic financial information, such as their net revenues, information as to how the issuers had spent and would spend their funds, and the good repair of the issuers' facilities. Based on the findings of the Special Investigation, Defendants instead have apparently taken the position that they did not need to perform an investigation into these disclosures, which were substantially erroneous.

250. Defendants' assurances objectively induced National to issue irrevocable bond insurance policies. National relied in good faith on Defendants' acts all in detriment to its rights and best interests. Had National known the truth—that Defendants had *not* conducted reasonable investigations and did *not* have reasonable bases to believe the truthfulness and completeness of the Official Statements— National would not have issued its insurance. Because National relied on Defendants' assurances, it issued irrevocable insurance policies. It has paid out over $720 million in claims as of July 1, 2019 and reasonably expects to have to pay out hundreds of millions of dollars more in future claims payments that it otherwise would not have had to disburse.

251. There is no statutory remedy available to National. National may bring neither a securities law claim nor an *ex contractu* and/or *ex delicto* claim. The *doctrina de actos propios* operates to fill that gap in these extraordinary circumstances.

252. Defendants' actions caused serious harm throughout the Commonwealth, including harm to National totaling not less than $720 million.

253. Because Defendants acted without conducting their promised due diligence and investigation, they are now estopped from denying responsibility for the consequences of their failure to conduct said investigations and must compensate National accordingly for their unfair conduct.

**Second Cause of Action: Unilateral Declaration of Will**

254.    National incorporates and adopts by reference, and realleges the foregoing factual allegations.

255.    Under Article 7 of the Puerto Rico Civil Code, "[W]hen there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration."

256.    In submitting Official Statements to National, Defendants acted by their own will and intended to be bound by their assurances that they had performed a reasonable investigation and had formed a reasonable basis as to the truthfulness and completeness of the Official Statements prior to any bond issuance or issuance of insurance.

257.    National, as the recipient of Defendants' assurances, has standing to enforce Defendants' declaration.

258.    By assuring National that they had acted in accordance with the federal securities laws and industry customs and norms, Defendants clearly intended to be bound to perform a reasonable investigation and form a reasonable basis as to the truthfulness and completeness of the Official Statements prior to any bond issuance or issuance of insurance.

259.    The object of Defendants' obligation was simple—to induce National to insure the bonds.

260.    Defendants' statements to National that they had complied with the securities laws unequivocally represented that Defendants had a reasonable basis to believe the truthfulness and completeness of the Official Statements, including that they had reasonably investigated those statements.

261.    Defendants performed a suitable juridical act in providing the Official Statements to National as part of the insurance application and assuring National that they would comply with federal securities laws.

262.    Enforcing Defendants' obligation to conduct a reasonable investigation and to form a reasonable basis as to the truthfulness and completeness of the Official Statements is consistent with the law, morals and public policy.

263.    Because National relied in good faith on Defendants' assurances, it issued irrevocable insurance policies. It has paid out over $720 million in claims as of July 1, 2019 and reasonably expects to pay out hundreds of millions of dollars more in future claims payments.

264.   There is no statutory remedy available to National. National may bring neither a securities law claim nor an *ex contractu* and/or *ex delicto* claim. The unilateral declaration of will operates to fill that gap in these extraordinary circumstances.

265.   National relied in good faith on Defendants' actions and representations all to the detriment of its best interests. National would not have issued insurance had it known Defendants did not perform a reasonable investigation and did not have a reasonable basis as far as the truthfulness and completeness of the Official Statements. Defendants' actions and omissions caused serious harm throughout the Commonwealth, including harm to National totaling not less than $720 million.

**WHEREFORE**, National respectfully requests that the Honorable Court GRANT the above-captioned complaint and, as a result, enter judgment in favor of National ordering Defendants to pay National jointly and severally:

a) Damages currently estimated at an amount of no less than SEVEN HUNDRED TWENTY MILLION DOLLARS ($720,000,000), as well as all reasonably foreseeable damages that arise after the filing of the Complaint;
b) Prejudgment interest for recklessness and any other legal interest to which National is entitled;
c) Reasonable attorney's fees and costs; and
d) Granting National any other compensation or relief that is deemed fair and proper, pursuant to Rule 42.4 of the Rules of Civil Procedure, 32 L.P.R.A. Ap. V., R. 42.4

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 8th day of August 2019.

**VICENTE & CUEBAS**
*Attorneys for the Plaintiffs*
P.O. Box 11609
San Juan, PR 00910-1609
Telephone (787) 751-8000
Fax  (787) 756-5250

By: /s/ Federico Hernández Denton
FEDERICO HERNÁNDEZ DENTON
Uniform Registration Number: 3846
E-mail: fhd@vclawpr.com
fhernándezdenton@gmail.com

By: /s/ Harold D. Vicente
HAROLD D. VICENTE
Uniform Registration Number: 3966
E-mail: hvicente@vclawpr.com

By: /s/ Harold D. Vicente Colón
HAROLD D. VICENTE COLÓN
T.S.P.R. [PRSC]Número 11303
E-Mail: hdvc@vclawpr.com

By: /s/ Steven Liong Rodríguez
STEVEN LIONG RODRÍGUEZ
T.S.P.R. Número 19356
E-Mail: sliong@vclawpr.com

**SELENDY & GAY PLLC**
1290 Avenue of the Americas, New York, NY 10104
Tel: (212) 390 9000
Fax: (212) 390 9399

By: /s/ Philippe Z. Selendy
PHILIPPE Z. SELENDY
Uniform Registration Number: 9002
E-mail: pselendy@selendygay.com

By:  /s/ Andrew R. Dunlap
ANDREW R. DUNLAP
Uniform Registration Number: 9005
E-mail: adunlap@selendygay.com

By: /s/ Yelena Konanova
YELENA KONANOVA
Uniform Registration Number: 9010
E-mail: lkonanova@selendygay.com

*Pro Hac Vice admission pending*

# **Exhibit 2**

# $499,910,000
# Puerto Rico Electric Power Authority
## $401,785,000 Power Revenue Refunding Bonds, Series KK
## $98,125,000 Power Revenue Bonds, Series LL

The Power Revenue Refunding Bonds, Series KK and the Power Revenue Bonds, Series LL (collectively, the "Bonds") are being issued pursuant to a Trust Agreement, dated as of January 1, 1974, as amended, with State Street Bank and Trust Company, N.A., New York, New York, successor trustee (the "1974 Agreement").

The Bonds, the outstanding bonds of the Puerto Rico Electric Power Authority (the "Authority") previously issued under the 1974 Agreement and any additional bonds that the Authority may from time to time issue under the 1974 Agreement are payable solely from the net revenues of the Authority's electric system.

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- The Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Bonds will not receive definitive bonds.

- The Bonds are not subject to redemption.

- Interest on the Bonds will be payable on January 1, 2003 and on each July 1 and January 1 thereafter.

- The inside cover page contains information concerning the maturity schedule, interest rates and yields of the Bonds.

- The scheduled payment of principal and of interest when due on a portion of the Bonds will be guaranteed under insurance policies to be issued concurrently with the delivery of Bonds by Financial Security Assurance Inc., MBIA Insurance Corporation and XL Capital Assurance Inc. as set forth on the inside cover page.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, and certain other conditions.

- In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Bonds will be exempt from federal income taxation and the Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Exemption,* beginning on page 52 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Bonds, a description of certain rules that the Authority must comply with to preserve the federal tax exemption of interest, and other tax considerations.

- Fiddler González & Rodríguez, LLP, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Bonds will occur on or about July 2, 2002.

**The Bonds are not a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth nor any such municipalities or other subdivisions, other than the Authority, shall be liable for the payment of the principal of or interest on the Bonds.**

| | | |
|---|---|---|
| **Goldman, Sachs & Co.** | **Banc of America Securities LLC** | **UBS PaineWebber Inc.** |

| | | |
|---|---|---|
| **ABN Amro Financial Services, Inc.** | | **Bear, Stearns & Co. Inc.** |
| **Lehman Brothers** | **Wachovia Bank, National Association** | **Merrill Lynch & Co.** |
| **Morgan Stanley** | | **Salomon Smith Barney** |

June 13, 2002

# $499,910,000
# Puerto Rico Electric Power Authority
## $401,785,000 Power Revenue Refunding Bonds, Series KK
## $98,125,000 Power Revenue Bonds, Series LL

---

### $401,785,000 Power Revenue Refunding Bonds, Series KK

| Maturity (July 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2005 | $ 7,765,000 | 4.00% | 2.88% |
| 2008 | 9,050,000 | 5.00 | 3.75 |
| 2009‡ | 7,420,000 | 4.50 | 3.70 |
| 2010 | 19,000,000 | 5.00 | 4.15 |
| 2011 | 17,500,000 | 5.00 | 4.26 |
| 2011‡ | 26,200,000 | 4.00 | 4.06 |
| 2011‡ | 40,000,000 | 5.00 | 4.06 |
| 2012† | 17,500,000 | 4.00 | 4.09 |
| 2012† | 70,560,000 | 5.25 | 4.09 |
| 2013† | 2,000,000 | 4.50 | 4.21 |
| 2013† | 6,955,000 | 5.25 | 4.21 |
| 2014† | 8,140,000 | 5.50 | 4.31 |
| 2015† | 80,920,000 | 5.50 | 4.39 |
| 2015± | 24,120,000 | 5.50 | 4.39 |
| 2016± | 64,655,000 | 5.50 | 4.45 |

### $98,125,000 Power Revenue Bonds, Series LL

| Maturity (July 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2016± | $ 20,220,000 | 5.50% | 4.45% |
| 2017± | 71,550,000 | 5.50 | 4.50 |
| 2018± | 3,665,000 | 5.50 | 4.58 |
| 2019± | 2,690,000 | 5.50 | 4.66 |

---

† Insured by Financial Security Assurance Inc.
± Insured by MBIA Insurance Corporation.
‡ Insured by XL Capital Assurance Inc.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations, other than those contained herein, and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriters. This Official Statement does not constitute an offer to sell, or the solicitation of an offer to buy, nor shall there be any sale of the Bonds offered hereby by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from the Authority, the Commonwealth, and other official sources that are believed to be reliable, but it is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or the Commonwealth since the date hereof.

The Underwriters have provided the following sentence, as well as the following paragraph, for inclusion in this Official Statement: The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of their respective responsibilities to investors under, the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVERALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE BONDS OFFERED HEREBY AND OF OUTSTANDING POWER REVENUE BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Other than with respect to information concerning Financial Security Assurance Inc. ("FSA"), MBIA Insurance Corporation ("MBIA") and XL Capital Assurance Inc. ("XLCA") contained under the caption *Bond Insurance* and in Appendices V, VI and VII herein, none of the information in this Official Statement has been supplied or verified by FSA, MBIA and XLCA, respectively, and FSA, MBIA and XLCA make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information; (ii) the validity of the Bonds; or (iii) the tax exempt status of the interest on the Bonds.

[This page intentionally left blank]

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ....................... 1
OVERVIEW ......................................................... 2
   Operating Results ............................................. 3
   System Improvements and Additional Capacity .. 4
PLAN OF FINANCING ..................................... 6
   Power Revenue Refunding Bonds, Series KK ..... 6
   Power Revenue Bonds, Series LL ...................... 7
   Estimated Sources and Uses of Funds ................. 7
SECURITY ......................................................... 8
   Source of Payment ............................................ 8
   Flow of Funds Under 1974 Agreement ............. 8
   Rate Covenant ................................................ 10
   Reserve Account ............................................. 10
   Reserve Maintenance Fund, Self-insurance Fund
      and Capital Improvement Fund ..................... 10
   Additional Bonds ............................................ 11
   Subordinate Obligations .................................. 11
BOND INSURANCE ......................................... 12
   The FSA Bond Insurance Policy ....................... 12
   The MBIA Bond Insurance Policy ................... 12
   The XLCA Bond Insurance Policy ................... 15
   Concerning the Policies ................................... 17
PROPOSED SUPPLEMENTAL AGREEMENT 17
DESCRIPTION OF THE BONDS ...................... 17
   General ........................................................... 17
   Book-Entry Only System ................................. 18
   Discontinuance of the Book-Entry Only System 20
   Redemption Provisions .................................... 20
THE AUTHORITY ........................................... 20
   Powers ............................................................ 21
   Management .................................................... 21
THE SYSTEM .................................................... 23
   Generating Facilities ........................................ 23
   Transmission and Distribution Facilities .......... 25
   Adequacy of Capacity ..................................... 26
   Statistical Information ...................................... 29
   Historical Capital Improvement and Financing
      Program ....................................................... 31
   Projected Five-Year Capital Improvement and
      Financing Program ....................................... 31
   Rates ............................................................... 32
   Major Clients .................................................. 34
   Fuel ................................................................ 34
   Subsidies, Contributions in Lieu of Taxes and
      Set Aside ...................................................... 35
DEBT ................................................................. 37
   Rural Electrification Bonds .............................. 38

**Page**

   General Obligation Notes ................................. 38
   Principal and Interest Requirements .................. 38
NET REVENUES AND COVERAGE ................ 39
   Management's Discussion and Analysis of
      Operating Results ......................................... 41
   Factors Affecting the Utility Industry ................ 42
   Projected Net Revenues ................................... 43
ENVIRONMENTAL MATTERS ........................ 47
   Environmental Litigation ................................. 47
   Compliance Programs ...................................... 48
INSURANCE ...................................................... 50
   Coverage ........................................................ 50
   Self-insurance Fund ......................................... 50
LABOR RELATIONS ........................................ 50
PENSION PLAN ................................................ 51
LITIGATION ..................................................... 51
TAX EXEMPTION ............................................ 52
   Discount Bonds ............................................... 53
   Premium Bonds ............................................... 54
VERIFICATION OF MATHEMATICAL
   COMPUTATIONS .......................................... 54
UNDERWRITING .............................................. 54
MATERIAL RELATIONSHIPS ......................... 55
LEGAL MATTERS ............................................ 55
LEGAL INVESTMENT ...................................... 55
GOVERNMENT DEVELOPMENT BANK FOR
   PUERTO RICO ............................................. 55
INDEPENDENT ACCOUNTANTS ................... 55
RATINGS .......................................................... 56
CONTINUING DISCLOSURE ........................... 56
MISCELLANEOUS ............................................ 58
APPENDIX I — Definitions of Certain Terms .... I-1
   Summary of Certain Provisions of
   the 1974 Agreement Excluding Proposed
   Supplemental Agreement ............................... I-6
   Summary of Certain Provisions of
   Proposed Supplemental Agreement ............. I-16
APPENDIX II — Audited Financial
   Statements ................................................... II-1
APPENDIX III — Letter of the Consulting
   Engineers .................................................... III-1
APPENDIX IV —Proposed Form of Bond
   Counsel Opinions ....................................... IV-1
APPENDIX V – Specimen of Financial Security
   Assurance Inc.'s Insurance Policy .............. V-1
APPENDIX VI – Specimen of MBIA Insurance
   Corporation's Insurance Policy ................. VI-1
APPENDIX VII – Specimen of XL Capital
   Assurance Inc.'s Insurance Policy ........... VII-1

[This page intentionally left blank]

# $499,910,000
# Puerto Rico Electric Power Authority
## $401,785,000 Power Revenue Refunding Bonds, Series KK
## $98,125,000 Power Revenue Bonds, Series LL

### INTRODUCTORY STATEMENT

The purpose of this Official Statement of Puerto Rico Electric Power Authority (the "Authority"), which includes the cover page, the Appendices hereto and the information incorporated by reference as set forth below, is to furnish information in connection with the issuance and sale by the Authority of its $401,785,000 Power Revenue Refunding Bonds, Series KK (the "Series KK Bonds"), and $98,125,000 Power Revenue Bonds, Series LL (the "Series LL Bonds"; the Series KK Bonds and the Series LL Bonds are herein collectively called the "Bonds").

The Bonds will be issued under and secured by a Trust Agreement, dated as of January 1, 1974, as amended (the "1974 Agreement"), between the Authority and State Street Bank and Trust Company, N.A., successor trustee (the "1974 Trustee"). The Bonds, the $4,329,764,000 Puerto Rico Electric Power Authority Power Revenue Bonds to be outstanding after the issuance of the Series KK Bonds and the refunding of the Power Revenue Bonds refunded thereby (see *Plan of Financing*) (including $58,226,000 of bonds held by the United States Rural Utilities Service, see "Rural Electrification Bonds" under *Debt*) and such additional bonds as may be issued under the 1974 Agreement are herein collectively called the "Power Revenue Bonds."

The scheduled payment of principal of and interest on the Series KK Bonds maturing on July 1, 2012, 2013, 2014, and the $80,920,000 principal amount of the Series KK Bonds bearing interest at the rate of 5.50% per annum and maturing on July 1, 2015 will be insured by a municipal bond insurance policy (the "FSA Bond Insurance Policy") to be issued by Financial Security Assurance Inc. (the "FSA Insured Bonds") concurrently with the delivery of the Bonds. The scheduled payment of principal of and interest on the Series KK Bonds maturing on 2016, the $24,120,000 principal amount of the Series KK Bonds bearing interest at the rate of 5.50% and maturing on July 1, 2015, and all of the Series LL Bonds will be insured by separate municipal insurance policies (collectively, the "MBIA Bond Insurance Policy") to be issued by MBIA Insurance Corporation (the "MBIA Insured Bonds") concurrently with the delivery of the Bonds. The scheduled payment of principal of and interest on Series KK Bonds maturing on July 1, 2009, the $26,200,000 principal amount of Series KK Bonds bearing interest at the rate of 5% per annum and maturing on July 1, 2011 and the $40,000,000 principal amount of Series KK Bonds bearing interest at the rate of 5% per annum and maturing on July 1, 2011 will be insured by a municipal insurance policy (the "XLCA Bond Insurance Policy") to be issued by XL Capital Assurance Inc. (the "XLCA Insured Bonds") concurrently with the delivery of the Bonds. The FSA Insured Bonds, the MBIA Insured Bonds and the XLCA Insured Bonds are herein collectively called the "Insured Bonds."

Terms used in this Official Statement and not defined shall have the meanings given to them in Appendix I, *Definitions of Certain Terms*.

This Official Statement also includes the following documents, which have been filed with each nationally recognized municipal securities information repository ("NRMSIR") and are incorporated herein by reference:

(1) the Comprehensive Annual Financial Report of the Commonwealth of Puerto Rico (the "Commonwealth") for the fiscal year ended June 30, 2001 prepared by the Department of the Treasury (the

"Commonwealth's Annual Financial Report"), which includes the general purpose financial statements of the Commonwealth for the fiscal year ended June 30, 2001, together with the independent auditor's report thereon, dated January 21, 2002, of KPMG, LLP, San Juan, Puerto Rico, certified public accountants; and

(2) the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated May 10, 2002.

Any Appendix of an Official Statement of the Commonwealth or any appendix of an Official Statement of any instrumentality of the Commonwealth containing the same information as the Commonwealth's Annual Financial Report, filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB") after the date hereof and prior to the termination of any offering of the Bonds shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained herein or in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

## OVERVIEW

The Authority, which supplies virtually all of the electric power consumed in the Commonwealth, is one of the largest municipal utilities in the United States. The Authority was created in 1941 as a public corporation and governmental instrumentality of the Commonwealth. As of March 31, 2002, it served 1,381,701 clients and had utility plant totaling approximately $7.2 billion. Also as of that date, production plant in service totaled approximately $2.2 billion, based on original cost, with a dependable generating capacity of 4,905 megawatts ("MW") (including the cogeneration facility in commercial operation described below). In October 2001, the Authority realized a historical peak load of 3,297 MW.

In order to meet expected growth in demand, diversify its fuel sources to reduce the historic reliance on oil-fired generating units, and continue to improve the reliability of its service, the Authority is in the process of increasing its generating capacity from Authority-owned facilities and has also entered into long-term power purchase agreements with privately owned cogeneration facilities.

The Authority has entered into a long-term contract for the purchase of 507 MW of dependable generating capacity from a natural gas-fired cogeneration plant located in Peñuelas, Puerto Rico, and owned by EcoEléctrica, L.P., organized as a joint venture between subsidiaries of Edison International and Enron Corp. ("EcoEléctrica"). Under this agreement, EcoEléctrica operates the facility and assumes all operational risks related thereto. On March 21, 2000, EcoEléctrica started commercial operation. See "Generating Facilities" under *The System*.

On December 3, 2001, Enron Corp. filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. EcoEléctrica is a separate entity and is not currently subject to any bankruptcy proceedings. The Authority believes that Enron's bankruptcy proceedings should not materially affect EcoEléctrica's operations, generation capacity and fuel supply. EcoEléctrica's liquefied natural gas requirements are being supplied pursuant to an agreement expiring in 2019 with an entity unrelated to Enron Corp.

The Authority has also executed an agreement with AES Puerto Rico, L.P. ("AES-PR"), an affiliate of The AES Corporation ("AES"), to purchase 454 MW of dependable generating capacity from a coal-fired cogeneration facility currently under construction in Guayama, Puerto Rico. Construction of the AES-PR

facility commenced in November 1999. Commercial operation of the AES-PR facility is currently projected for the third quarter of 2002. See "Adequacy of Capacity" under *The System*.

The Authority continues with the licensing process in order to replace two 44 MW steam units in San Juan, Puerto Rico, with new generating units that are projected to provide a total of 464 MW of combined cycle capacity. The Authority is currently seeking an extension to its Prevention of Significant Deterioration ("PSD") permit which expired on May 31, 2002 from the Environmental Protection Agency ("EPA"). If the extension is not granted or if its approval is delayed, the scheduled completion of the project may be delayed. This project is expected to be operational during fiscal year 2005. See "Adequacy of Capacity" under *The System*.

The Authority also continues to improve its transmission and distribution system and is in the process of acquiring and installing sophisticated integrated automated systems to enhance the Authority's operations and improve service to its clients. The Authority is constructing new 230 kV transmission lines to complete the transmission loop on the eastern part of the island. The eastern loop will connect major switching and load centers and boost electric system capacity in Puerto Rico's eastern region. This project is expected to be operational in fiscal year 2003.

For the twelve months ended April 30, 2002, the average percentage of the Authority's generating capacity available for service ("equivalent availability") (calculated by including operations at the EcoEléctrica facility) was 80%, up from 60% for fiscal year 1992. Improved System availability, together with the Authority's progress in implementing its capacity expansion plan and improving its transmission and distribution system, have led to improvements in the reliability of the Authority's electrical service to its clients.

See "System Improvements and Additional Capacity," "Adequacy of Capacity" and "Transmission and Distribution Facilities" under *The System*.

**Operating Results**

During the period from fiscal year 1997 through fiscal year 2001, the number of clients served by the Authority increased at a compound annual rate of 1.4%, and electric energy sales in kilowatt hours ("kWh") increased at a compound annual rate of 3.8%. During this period, Revenues and Current Expenses increased at a compound annual rate of 9.2% and 9.5%, respectively. Excluding the cost of fuel oil and purchased power, Revenues and Current Expenses increased at a compound annual rate of 2.3% and 2.2%, respectively, during such period, primarily due to higher energy demand. In addition, during this period, fuel oil costs increased at a compound annual rate of 9.8%. Fuel and purchased power charges are passed on to clients through a separate charge included in electric service rates.

During the first nine months of fiscal year 2002, energy sales in kWh increased 1.6% and Revenues and Current Expenses decreased by 8.6% and 10.7%, respectively, compared to the same period for the prior fiscal year. The decrease in Revenues and Current Expense was mainly due to a decrease of $7.77 per barrel (or 25.7%) in the price of fuel oil, the cost of which is for the most part passed on to the Authority's clients. Excluding the cost of fuel oil and purchased power, Revenues and Current Expenses increased by 3.1% and 3.7%, respectively, compared to the same period for the prior fiscal year.

Net Revenues increased at a compound annual rate of 8.4% during the period from fiscal year 1997 to fiscal year 2001. For the first nine months of fiscal year 2002, Net Revenues decreased by 2.9% compared to the same period in fiscal year 2001. See "Management's Discussion and Analysis of Operating Results" under *Net Revenues and Coverage*.

Demand for energy is related to the level of economic and business activity in the Commonwealth, energy costs and climatological factors. According to the Commonwealth Planning Board statistics, real gross product increased by 1.7% in fiscal year 2001, 2.9% in fiscal year 2000, 4.2% in fiscal year 1999 and 3.2% in fiscal year 1998. The most recent real gross product forecast for fiscal year 2002, made in March 2002 and developed by Econométrica Inc., projects an increase in real gross product of 0.5% over fiscal year 2001. Projections of future peak energy demand for the five fiscal year period ending June 30, 2007 prepared by the Authority show an average annual increase of 3.5%.

The following table summarizes the operating results of the Authority for the five fiscal years ended June 30, 2001 and for the nine-month period ended March 31, 2001 and 2002. This table presents Net Revenues (exclusive of certain investment income) of the Authority under the provisions of the 1974 Agreement. These calculations of Net Revenues differ in several important respects from the Authority's calculations of net income prepared in accordance with generally accepted accounting principles. See Schedule II to the Financial Statements for the fiscal years ended June 30, 2000 and 2001 in Appendix II for a reconciliation of the Authority's net income under generally accepted accounting principles with its Net Revenues under the 1974 Agreement.

**Operating Results**
(dollars in thousands)

| | Fiscal Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2002 |
| Electric energy sales (in millions of kWh) | 16,118 | 17,457 | 16,989 | 18,145 | 18,723 | 14,043 | 14,264 |
| Percentage change from year before | 1.1 | 8.3 | (2.7) | 6.8 | 3.2 | 3.6 | 1.6 |
| Peak load (in MW) | 2,894 | 3,021 | 3,057 | 3,133 | 3,202 | 3,202 | 3,297 |
| Percentage change from year before | 5.6 | 4.4 | 1.2 | 2.4 | 2.2 | 2.2 | 3.0 |
| Total Revenues | $ 1,670,449 | $ 1,733,675 | $ 1,563,953 | $ 2,025,284 | $ 2,373,077 | $ 1,782,820 | $ 1,630,246 |
| Less: Current Expenses | 1,198,901 | 1,186,157 | 1,052,761 | 1,466,823 | 1,722,689 | 1,303,303 | 1,164,409 |
| Net Revenues | $ 471,548 | $ 547,518 | $ 511,192 | $ 558,461 | $ 650,388 | $ 479,517 | $ 465,837 |
| Principal and Interest Requirements | $ 291,239 | $ 316,138 | $ 348,963 | $ 346,417 | $ 367,796 | -- | -- |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.62 | 1.73 | 1.46 | 1.61 | 1.77 | -- | -- |

## System Improvements and Additional Capacity

To meet the expected growth in demand and enhance reliability of electric service to its clients, the Authority has improved its generating system and increased capacity through expansions and improvements of Authority-owned resources and acquisition of additional capacity pursuant to long-term contracts with operators of two cogeneration facilities.

A substantial portion of the capital expenditures for production plant for the five fiscal years ended June 30, 2001 was spent on the rehabilitation and life extension of generating plants in order to achieve and maintain higher levels of availability, reliability and efficiency. System equivalent availability has increased from 60% in fiscal year 1992 to 80% for fiscal year 2001. For the twelve-month period ended April 30, 2002, the System's equivalent availability remained equal to fiscal year 2001 at 80%.

4

The Authority has entered into agreements with two cogenerators, EcoEléctrica and AES-PR. Under these agreements, EcoEléctrica and AES-PR have agreed to design, finance, construct, own and operate two cogeneration facilities. These facilities will allow the Authority to reduce its dependency on fuel oil while passing on to the cogenerators the risks of development, construction and operation of such facilities, including the commitment to provide a fixed capacity and higher availability levels than the Authority currently achieves, for the term of the power purchase agreements.

Under the agreement with EcoEléctrica, the Authority is currently purchasing 507 MW of dependable generating capacity from a combined cycle power facility fueled primarily by natural gas, which facility began commercial operation on March 21, 2000. The EcoEléctrica project includes a terminal to receive and store liquefied natural gas ("LNG"). EcoEléctrica has entered into a twenty-year supply agreement to meet its expected need for LNG. The delivery of LNG commenced on July 11, 2000. See "Generating Facilities" under *The System*. See also *Overview* for a brief discussion of the effect that Enron's bankruptcy filing has on the project's operations.

Under the agreement with AES-PR, the Authority expects to purchase 454 MW of dependable generating capacity from a coal-fired cogeneration facility using two identical fluidized bed boilers and two steam turbines. Construction of the facility commenced in November 1999, and it is projected to be in service during the third quarter of 2002. See "Adequacy of Capacity—Additional Generating Facilities" under *The System*.

The Authority continues the licensing process in order to replace two 44 MW steam-generating units of the San Juan Steam Plant (Units 5 and 6), removed from service in fiscal year 1997. The Authority's PSD permit in connection with this project expired on May 31, 2002. The Authority is negotiating with EPA to extend the expiration of this permit. If the extension is not granted or if its approval is delayed, the scheduled completion of the project may be delayed. The new combined cycle generating units, which will provide 464 MW of dependable generating capacity, are currently projected to be in service in the summer of 2005. See *Litigation* for a discussion of a lawsuit brought by the principal contractor for this project.

The Authority also continues to improve and expand its transmission and distribution system. The Authority is expanding its 230 kilovolt ("kV") transmission lines, which add to the stability of the electric system, improve reliability of service to clients, and reduce transmission losses. See "Transmission and Distribution Facilities" under *The System*.

Set forth below is a summary of the Authority's historical total capital improvement program and financing sources for the five fiscal years ended June 30, 2001 and the projected capital improvement program and financing sources for the five fiscal years ending June 30, 2006. See "Historical Capital Improvement and Financing Program" and "Projected Five-Year Capital Improvement and Financing Programs" under *The System*.

5

**Capital Improvements**
(dollars in thousands)

| Capital Improvements | Fiscal Years | | | |
| --- | --- | --- | --- | --- |
| | 1997-2001 Total | % of Total | 2002-2006 Total | % of Total |
| Production Plant | $ 800,966 | 40.7% | $ 637,388 | 30.8% |
| Transmission facilities | 298,401 | 15.2 | 500,697 | 24.2 |
| Distribution facilities | 529,416 | 26.9 | 511,097 | 24.7 |
| Other | 339,228 | 17.2 | 419,896 | 20.3 |
| | $ 1,968,011 | 100.0% | $2,069,078 | 100.0% |
| **Financing Sources** | | | | |
| Internally generated funds | $ 414,033 | 21.0% | $ 482,741 | 23.3% |
| Borrowed funds | 1,553,978 | 79.0 | 1,586,337 | 76.7 |
| | $ 1,968,011 | 100.0% | $2,069,078 | 100.0% |

## PLAN OF FINANCING

### Power Revenue Refunding Bonds, Series KK

The Authority is issuing the Series KK Bonds pursuant to Section 210 of the 1974 Agreement to refund the following Power Revenue and Power Revenue Refunding Bonds (collectively, the "Refunded Power Revenue Bonds") on the redemption dates and at the redemption prices set forth below plus accrued interest to the dates fixed for redemption:

| Refunded Power Revenue Bonds | Maturity Date | Principal Amount to be Refunded | Interest Rate | Redemption Date | Redemption Price |
| --- | --- | --- | --- | --- | --- |
| REA Issue, Series A | 7/01/2010 | S 3,842,000 | 5.00% | 8/02/2002 | 100% |
| REA Issue, Series B | 7/01/2011 | 13,120,000 | 5.00 | 8/02/2002 | 100 |
| REA Issue, Series C | 7/01/2013 | 10,582,000 | 5.00 | 8/02/2002 | 100 |
| REA Issue, Series D | 1/01/2016 | 14,910,000 | 5.00 | 8/02/2002 | 100 |
| REA Issue, Series E | 1/01/2018 | 10,523,000 | 5.00 | 8/02/2002 | 100 |
| REA Issue, Series F | 7/01/2018 | 7,525,000 | 5.00 | 8/02/2002 | 100 |
| REA Issue, Series G | 7/01/2019 | 32,101,000 | 5.00 | 8/02/2002 | 100 |
| Series HH | 7/01/2003 | 10,435,000 | 4.25 | N/A | N/A |
| Series N | 7/01/2003 | 3,999,996[1] | 6.65 | N/A | N/A |
| | 7/01/2012 | 74,205,000 | 5.00 | 8/02/2002 | 100 |
| Series O | 7/01/2012 | 79,580,000 | 5.00 | 8/02/2002 | 100 |

(1) Capital Appreciation Bond; S13,488,875.40 initial principal amount currently outstanding. The Authority will pay $9,900,000 accreted value at maturity on July 1, 2003.

6

| Refunded Power Revenue Bonds | Maturity Date | Principal Amount to be Refunded | Interest Rate | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| Series P | 7/01/2003 | $ 4,465,000 | 6.75% | 8/02/2002 | 101% |
|  | 7/01/2004 | 4,765,000 | 6.75 | 8/02/2002 | 101 |
| Series R | 7/01/2003 | 5,285,000 | 6.10 | 8/02/2002 | 101½ |
| Series T | 7/01/2007 | 9,625,000 | 6.125 | 7/01/2004 | 102 |
|  | 7/01/2008 | 10,210,000 | 6.125 | 7/01/2004 | 102 |
|  | 7/01/2016 | 96,535,000 | 6.00 | 7/01/2004 | 102 |
| Series X | 7/01/2009 | 8,840,000 | 5.80 | 7/01/2005 | 102 |
|  | 7/01/2010 | 9,350,000 | 5.90 | 7/01/2005 | 102 |

The refunding will permit the Authority to realize savings on its debt service requirements on bonds outstanding under the 1974 Agreement. The Authority will deposit the net proceeds of the Series KK Bonds with the 1974 Trustee, as escrow agent, under the terms of an Escrow Deposit Agreement. The net proceeds will be invested in Government Obligations, the principal of and interest on which when due, will provide moneys sufficient to pay the principal of the redemption price of the Refunded Power Revenue Bonds and the interest coming due on the Refunded Power Revenue Bonds through their respective dates of maturity or redemption.

Upon the deposit with the 1974 Trustee referred to above, the Refunded Power Revenue Bonds will, in the opinion of Bond Counsel, no longer be outstanding under the provisions of the 1974 Agreement and the Refunded Power Revenue Bonds will thereupon be defeased.

**Power Revenue Bonds, Series LL**

The Authority is issuing the Series LL Bonds pursuant to Section 208 of the 1974 Agreement to finance a portion of the cost of various projects under its capital improvement program.

**Estimated Sources and Uses of Funds**

Sources:
Principal amount of the Series KK Bonds .................................................. $ 401,785,000.00
Principal amount of the Series LL Bonds .................................................. 98,125,000.00
Net original issue premium.......................................................................... 43,119,586.45
     Total Sources.................................................................................. $ 543,029,586.45

Uses:
Deposit to Escrow Fund for Refunded Power Revenue Bonds ................... $ 425,881,025.00
Deposit to 1974 Construction Fund............................................................. 106,000,000.00
Underwriting discount, municipal bond insurance premiums and
    estimated legal, printing and other financing expenses .......................... 11,148,561.45
    Total Uses ...................................................................................... $ 543,029,586.45

7

## SECURITY

The Bonds are not a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions, other than the Authority, and neither the Commonwealth nor any such municipalities or other political subdivisions, other than the Authority, are liable thereon, nor shall the Bonds be payable out of any funds other than those of the Authority as further described herein.

### Source of Payment

The Power Revenue Bonds will be payable solely from the Revenues (as defined under the 1974 Agreement) of the System after payment of the Current Expenses (as defined under the 1974 Agreement) of the Authority and any reserve therefor, and the Authority has covenanted to deposit in the 1974 Sinking Fund a sufficient amount of such Revenues after such payment to pay the principal of and the interest on all of the Power Revenue Bonds and to provide a reserve therefor. See Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement*, which should be read in conjunction herewith.

### Flow of Funds Under 1974 Agreement

The following schematic representation is provided only to guide readers and does not purport to be complete. Reference is hereby made to Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement*, which should be read in conjunction herewith.

8

**REVENUES**



(1) Monthly deposits to the Bond Service Account and the Redemption Account for all Power Revenue Bonds are capped at 1/6 of the interest due on the next interest payment date and 1/12 of the principal due on the next principal payment date and 1/12 of Amortization Requirements for the current fiscal year.

(2) Subject to replenishment at the option of the Authority.

**Rate Covenant**

The Authority has covenanted in the 1974 Agreement to fix, charge and collect rates so that Revenues of the System will be sufficient to pay Current Expenses and to provide 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any capitalized interest thereon for such fiscal year. For purposes of calculating Principal and Interest Requirements under the rate covenant and the additional bonds tests set forth below, the Accreted Value of any capital appreciation bonds of the Authority on their maturity dates shall be included as principal due and payable on said maturity dates. The Accreted Value at any date of a capital appreciation bond currently outstanding equals the original principal amount of such capital appreciation bond plus the interest accrued from its date of issuance to such date, based upon the interest rate used to calculate the yields thereof, compounded in the manner provided in the 1974 Agreement, and for future issues of capital appreciation bonds will be determined as provided in the respective resolutions of the Authority authorizing such issues. See "Rate Covenant" in Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.*

**Reserve Account**

The Authority has covenanted in the 1974 Agreement to accumulate in the 1974 Reserve Account an amount equal to the interest payable on all outstanding Power Revenue Bonds within the next 12 months, provided that for Power Revenue Bonds issued for other than refunding purposes, the amount to be so deposited in any month, as set forth in "Disposition of Revenues" in Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement,* need not exceed one-sixtieth of the amount of the increase in the interest payable within the next 12 months resulting from the issuance of such Power Revenue Bonds. In connection with the capital appreciation bonds of the Authority, the amount required to be on deposit in the 1974 Reserve Account with respect to the interest accrued thereon is to be derived from the interest rate used to calculate the yields for such bonds times the Accreted Value of such Power Revenue Bonds determined in the manner provided in the 1974 Agreement on the valuation date therefore occurring on or after the first day of the twelfth month succeeding the date of calculation.

The amount required to be accumulated in the 1974 Reserve Account will be approximately $249.9 million, after the refunding of the Refunded Power Revenue Bonds. As of March 31, 2002, approximately $255.8 million was on deposit to the credit of the 1974 Reserve Account, which amount is in excess of the amount required to be on deposit therein. The Authority will transfer the excess amount to the 1974 Bond Service Account.

**Reserve Maintenance Fund, Self-insurance Fund and Capital Improvement Fund**

The 1974 Agreement establishes the Reserve Maintenance Fund, the Self-insurance Fund and the Capital Improvement Fund. Revenues are deposited monthly into each of such Funds after the required deposits into the 1974 Sinking Fund as set forth in the schematic representation above for purposes of (a) paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, in the case of the Reserve Maintenance Fund, (b) paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the 1974 Agreement, in the case of the Self-insurance Fund, and (c) paying the cost of anticipated extensions and improvements which cost has not otherwise been provided for from the proceeds of the Power Revenue Bonds, in the case of the Capital Improvement Fund. Each of these Funds serves as an additional reserve for the payment of principal of and interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the 1974 Sinking Fund (including the 1974 Reserve Account) are insufficient for such purpose. See "Disposition

of Revenues" in Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.*

## Additional Bonds

Additional Power Revenue Bonds may be issued under the 1974 Agreement for the purpose of paying all or any part of the cost of any improvements to the System or for any other proper corporate purpose of the Authority; provided that, among other requirements, Net Revenues (as defined in the 1974 Agreement) of the Authority for 12 consecutive months out of the preceding 18 months, adjusted to reflect rates in effect on the date of issuance of such bonds, shall be not less than 120% of maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding, and that the average annual Net Revenues for the five fiscal years succeeding the issuance of such bonds, adjusted to reflect any rate schedule the Authority has covenanted to put in effect during such five fiscal years, as estimated by the Authority and approved by its Consulting Engineers, shall be not less than 120% of the maximum aggregate annual Principal and Interest Requirements for all Power Revenue Bonds then outstanding and the Power Revenue Bonds then to be issued.

Power Revenue Refunding Bonds may also be issued under the 1974 Agreement for the purpose of refunding all or any part of the outstanding Power Revenue Bonds of any series, subject to certain conditions as described herein in "Issuance of Power Revenue Bonds—Sections 208, 209 and 210 of the 1974 Agreement" under Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.*

Under the earnings coverage tests of the 1974 Agreement, Net Revenues for the twelve months ended March 31, 2002 of $636.7 million were 153% of the maximum aggregate annual Principal and Interest Requirements of $415.6 million on all outstanding Power Revenue Bonds. Average annual Net Revenues for the five fiscal years ending June 30, 2008 of $778.6 million are estimated to be 187% of the maximum aggregate annual Principal and Interest Requirements of $415.9 million on all outstanding Power Revenue Bonds (including the Bonds, but excluding the Refunded Power Revenue Bonds and certain other Power Revenue Bonds being defeased with other available moneys of the Authority; see *Debt* below).

## Subordinate Obligations

The Authority may incur or issue obligations for any proper corporate purpose secured by a pledge of moneys in the Subordinate Obligations Fund. If the Authority incurs any such obligations, Net Revenues of the Authority must be deposited monthly to the credit of the Subordinate Obligations Fund (after the required deposits have been made to the 1974 Sinking Fund and the Reserve Maintenance Fund) in amounts sufficient to pay such obligations as they become due.

The Authority may, in connection with the incurrence of any such obligations, limit the deposit to the Reserve Maintenance Fund referred to in the preceding paragraph to not more than $400,000 per month, notwithstanding any higher amounts recommended by the Authority's Consulting Engineers. If such deposit is so limited, the Authority will be required, immediately after each monthly deposit to the Subordinate Obligations Fund, to deposit to the Reserve Maintenance Fund (and prior to any deposits to the Self-insurance Fund and the Capital Improvement Fund) the amount of any such deficiency.

Unless a particular project financed with any such obligations is specified by the Authority as being part of the System, any revenues attributable to such project will not be pledged to the payment of Power Revenue Bonds and any expenses associated with such project will not be payable from Revenues as Current Expenses of the System. See "Disposition of Revenues" in Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.*

11

## BOND INSURANCE

### The FSA Bond Insurance Policy

The following information has been furnished by Financial Security Assurance Inc. ("FSA") for use in this Official Statement. No representation is made by the Authority as to the accuracy or completeness of the information. Reference is made to Appendix V for a specimen of the FSA Bond Insurance Policy.

*Bond Insurance Policy.* Concurrently with the issuance of the Bonds, FSA will issue its Municipal Bond Insurance Policy for the FSA Insured Bonds (the "FSA Bond Insurance Policy"). The FSA Bond Insurance Policy guarantees the scheduled payment of principal of and interest on the FSA Insured Bonds when due as set forth in the form of the FSA Bond Insurance Policy.

The FSA Bond Insurance Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida or any other insurance law.

*FSA.* FSA is a New York domiciled insurance company and a wholly-owned subsidiary of Financial Security Assurance Holdings Ltd. ("Holdings"). Holdings is an indirect subsidiary of Dexia, S.A., a publicly held Belgian corporation. Dexia, S.A., through its bank subsidiaries, is primarily engaged in the business of public finance in France, Belgium and other European countries. No shareholder of Holdings or FSA is liable for the obligations of FSA.

At March 31, 2002, FSA's total policyholders' surplus and contingency reserves were approximately $1,644,743,000 and its total unearned premium reserve was approximately $841,749,000 in accordance with statutory accounting principles. At March 31, 2002, FSA's total shareholders' equity was approximately $1,746,106,000 and its total net unearned premium reserve was approximately $693,860,000 in accordance with generally accepted accounting principles.

The financial statements included as exhibits to the annual and quarterly reports filed by Holdings with the SEC are hereby incorporated herein by reference. Also incorporated herein by reference are any such financial statements so filed from the date of this Official Statement until the termination of the offering of the FSA Insured Bonds. Copies of materials incorporated by reference will be provided upon request to FSA: 350 Park Avenue, New York, New York 10022, Attention: Communications Department (telephone (212) 826-0100).

The FSA Bond Insurance Policy does not protect investors against changes in market value of the FSA Insured Bonds, which market value may be impaired as a result of changes in prevailing interest rates, changes in applicable ratings or other causes. FSA makes no representation regarding the FSA Insured Bonds or the advisability of investing in the FSA Insured Bonds. FSA makes no representation regarding this Official Statement, nor has it participated in the preparation thereof, except that FSA has provided to the Authority the information presented under this caption and a specimen of the FSA Bond Insurance Policy for inclusion in this Official Statement.

### The MBIA Bond Insurance Policy

The following information has been furnished by MBIA Insurance Corporation ("MBIA") for use in this Official Statement. No representation is made by the Authority as to the accuracy or completeness of the information. Reference is made to Appendix VI for a specimen of the MBIA Bond Insurance Policy.

*Bond Insurance Policy.* The MBIA Bond Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the 1974 Trustee or its

12

successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the MBIA Insured Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Bond Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The MBIA Bond Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. The MBIA Bond Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of MBIA Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The MBIA Bond Insurance Policy also does not insure against nonpayment of principal of or interest on the MBIA Insured Bonds resulting from the insolvency, negligence or any other act or omission of the 1974 Trustee or any other paying agent for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the 1974 Trustee or any owner of a MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such MBIA Insured Bonds or presentment of such other proof of ownership of the MBIA Insured Bonds, together with any appropriate instruments to evidence the assignment of the insured amounts due on the MBIA Insured Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the MBIA Insured Bonds in any legal proceeding related to payment of insured amounts on the MBIA Insured Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners or the 1974 Trustee payment of the insured amounts due on such MBIA Insured Bonds, less any amount held by the 1974 Trustee for the payment of such insured amounts and legally available therefor.

*MBIA.* MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company"). The Company is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA has three branches, one in the Republic of France, one in the Republic of Singapore and one in the Kingdom of Spain. New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by MBIA, changes in control and transactions among affiliates. Additionally, MBIA is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of

13

the information regarding the MBIA Bond Insurance Policy and MBIA set forth under the heading "The MBIA Bond Insurance Policy" under *Bond Insurance*. Additionally, MBIA makes no representations regarding the Bonds or the advisability of investing in the Bonds.

The MBIA Bond Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*MBIA Information.* The Company files annual, quarterly and special reports, information statements and other information with the Securities and Exchange Commission (the "SEC") under File No. 1-9583. Copies of the SEC filings (including (1) the Company's Annual Report on Form 10-K for the year ended December 31, 2001, and (2) the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002), are incorporated herein by reference and are available (i) over the Internet at the SEC's web site at http://www.sec.com at the SEC's public reference room in Washington D.C.; (iii) over the Internet at the Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

Any documents filed by the Company pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act of 1934, as amended, after the date of this Official Statement and prior to the termination of the offering of the MBIA Insured Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

As of December 31, 2001, MBIA had admitted assets of $8.5 billion (audited), total liabilities of $5.6 billion (audited), and total capital and surplus of $2.9 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of March 31, 2002, MBIA had admitted assets of $8.6 billion (unaudited), total liabilities of $5.7 billion (unaudited), and total capital and surplus of $2.9 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

*Financial Strength Ratings of MBIA.* Moody's Investors Service ("Moody's") rates the financial strength of MBIA "Aaa."

Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") rates the financial strength of MBIA "AAA."

Fitch, Inc. ("Fitch") rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market prices of the MBIA Insured

Bonds. MBIA does not guaranty the market prices of the MBIA Insured Bonds nor does it guaranty that the ratings on the MBIA Insured Bonds will not be revised or withdrawn.

**The XLCA Bond Insurance Policy**

The following information has been furnished by XL Capital Assurance Inc. ("XLCA") for inclusion in this Official Statement. No representation is made by the Authority as to the accuracy or completeness of the information. Reference is made to Appendix VII for a specimen of the XLCA Bond Insurance Policy.

XLCA accepts no responsibility for the accuracy or completeness of this Official Statement or any other information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding XLCA and its affiliates set forth under this heading. In addition, XLCA makes no representation regarding the XLCA Insured Bonds or the advisability of investing in the XLCA Insured Bonds.

*General.* XLCA is a monoline financial guaranty insurance company incorporated under the laws of the State of New York. XLCA is currently licensed to do insurance business in, and is subject to the insurance regulation and supervision by, the State of New York, forty-four other states, the District of Columbia, Puerto Rico and the Republic of Singapore. XLCA has license applications pending, or intends to file an application, in each of those states in which it is not currently licensed.

XLCA is an indirect, wholly-owned subsidiary of XL Capital Ltd, a Cayman Islands corporation ("XL Capital Ltd"). Through its subsidiaries, XL Capital Ltd is a leading provider of insurance and reinsurance coverages and financial products to industrial, commercial and professional service firms, insurance companies and other enterprises on a worldwide basis. The common stock of XL Capital Ltd is publicly traded in the United States and listed on the New York Stock Exchange (NYSE: XL). **XL Capital Ltd is not obligated to pay the debts of or claims against XLCA.**

XLCA was formerly known as The London Assurance of America Inc. ("London"), which was incorporated on July 25, 1991 under the laws of the State of New York. On February 22, 2001, XL Reinsurance America Inc. ("XL Re") acquired 100% of the stock of London. XL Re merged its former financial guaranty subsidiary, known as XL Capital Assurance Inc. (formed September 13, 1999) with and into London, with London as the surviving entity. London immediately changed its name to XL Capital Assurance Inc. All previous business of London was 100% reinsured to Royal Indemnity Company, the previous owner at the time of acquisition.

*Reinsurance.* XLCA has entered into a facultative quota share reinsurance agreement with XL Financial Assurance Ltd ("XLFA"), an insurance company organized under the laws of Bermuda, and an affiliate of XLCA. Pursuant to this reinsurance agreement, XLCA expects to cede up to 90% of its business to XLFA. XLCA may also cede reinsurance to third parties on a transaction-specific basis, which cessions may be any or a combination of quota share, first loss or excess of loss. Such reinsurance is used by XLCA as a risk management device and to comply with statutory and rating agency requirements and does not alter or limit XLCA's obligations under any financial guaranty insurance policy. With respect to any transaction insured by XLCA, the percentage of risk ceded to XLFA may be less than 90% depending on certain factors including, without limitation, whether XLCA has obtained third party reinsurance covering the risk. As a result, there can be no assurance as to the percentage reinsured by XLFA of any given financial guaranty insurance policy issued by XLCA, including the XLCA Bond Insurance Policy.

As of December 31, 2001, XLFA had total assets, liabilities, redeemable preferred shares and shareholder's equity of US$543,538,559 (audited), US$244,403,576 (audited), US$39,000,000 (audited) and US$260,134,983 (audited) respectively, determined in accordance with GAAP. XLFA's insurance financial

15

strength is rated "Aaa" by Moody's and "AAA" by S&P and Fitch. In addition, XLFA has obtained a financial enhancement rating of "AAA" from S&P.

The obligations of XLFA to XLCA under the reinsurance agreement described above are unconditionally guaranteed by XL Insurance (Bermuda) Ltd ("XLI"), a Bermuda company and one of the world's leading excess commercial insurers. XLI is a wholly owned indirect subsidiary of XL Capital Ltd. In addition to having an "A+" rating from A.M. Best, XLI's insurance financial strength is rated "Aa2" by Moody's and "AA" by S&P and Fitch.

Notwithstanding the capital support provided to XLCA described in this section, the bondholders will have direct recourse against XLCA only, and neither XLFA nor XLI will be directly liable to the bondholders.

*Financial Strength and Financial Enhancement Ratings.* XLCA's financial strength is rated "Aaa" by Moody's and "AAA" by S&P and Fitch. In addition, XLCA has obtained a financial enhancement rating of "AAA" from S&P. These ratings reflect Moody's, S&P's and Fitch's current assessment of XLCA's creditworthiness and claims-paying ability as well as the reinsurance arrangement with XLFA described under "Reinsurance" above.

The above ratings are not recommendations to buy, sell or hold securities, including the XLCA Insured Bonds and are subject to revision or withdrawal at any time by Moody's, S&P and Fitch. Any downward revision or withdrawal of these ratings may have an adverse effect on the market prices of the XLCA Insured Bonds. XLCA does not guaranty the market price of the XLCA Insured Bonds nor does it guaranty that the ratings on the XLCA Insured Bonds will not be revised or withdrawn.

*Capitalization of XLCA.* As of December 31, 2000, XLCA had total admitted assets of $86,959,000 (audited), total liabilities of $5,275,000 (audited) and total capital and surplus of $81,684,000 (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities ("SAP"). As of December 31, 2001, XLCA had total admitted assets of $158,442,157 (audited), total liabilities of $48,899,461 (audited) and total capital and surplus of $109,542,696 (audited) determined in accordance with SAP.

For further information concerning XLCA and XLFA, see financial statements of XLCA and XLFA, and the notes thereto, incorporated by reference in this Official Statement. The financial statements of XLCA and XLFA are included as exhibits to the periodic reports filed with the Securities and Exchange Commission (the "SEC") by XL Capital Ltd and may be reviewed at the EDGAR website maintained by the SEC. All financial statements of XLCA and XLFA included in, or as exhibits to, documents filed by XL Capital Ltd pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities and Exchange Act of 1934 on or prior to the date of this Official Statement, or after the date of this Official Statement but prior to termination of the offering of the XLCA Insured Bonds, shall be deemed incorporated by reference in this Official Statement. Copies of the statutory quarterly and annual statements filed with the State of New York Insurance Department by XLCA are available upon request to the State of New York Insurance Department.

*Regulation of XLCA.* XLCA is regulated by the Superintendent of Insurance of the State of New York. In addition, XLCA is subject to regulation by the insurance laws and regulations of the other jurisdictions in which it is licensed. As a financial guaranty insurance company licensed in the State of New York, XLCA is subject to Article 69 of the New York Insurance Law which, among other things, limits the business of each insurer to financial guaranty insurance and related lines, prescribes minimum standards of solvency, including minimum capital requirements, establishes contingency, loss and unearned premium reserve requirements, requires the maintenance of minimum surplus to policyholders and limits the aggregate amount of insurance which may be written and the maximum size of any single risk exposure which may be

assumed. XLCA is also required to file detailed annual financial statements with the New York Insurance Department and similar supervisory agencies in each of the other jurisdictions in which it is licensed.

The extent of state insurance regulation and supervision varies by jurisdiction, but New York and most other jurisdictions have laws and regulations prescribing permitted investments, and governing the payment of dividends, transactions with affiliates, mergers, consolidations, acquisitions or sales of assets and incurrence of liabilities for borrowings.

**THE FINANCIAL GUARANTY INSURANCE POLICIES ISSUED BY XLCA, INCLUDING THE XLCA BOND INSURANCE POLICY, ARE NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.**

The principal executive offices of XLCA are located at 250 Park Avenue, 19th Floor, New York, New York 10177 and its telephone number at this address is (646) 658-5900.

### Concerning the Policies

As provided in the insurance agreements to be entered into by the Authority with each of FSA, MBIA and XLCA concurrently with the delivery of their respective municipal bond insurance policies, as long as FSA, MBIA and XLCA shall not be in default on their respective obligations under the municipal bond insurance policies, FSA, MBIA and XLCA shall be deemed to be the owner of the Insured Bonds insured by each of them for purposes of, among other things, (1) taking remedial actions under the 1974 Agreement and (2) the giving of consents to the execution of any supplemental agreement to the 1974 Agreement.

## PROPOSED SUPPLEMENTAL AGREEMENT

The Authority has proposed to execute a supplemental agreement (the "Supplemental Agreement") to the 1974 Agreement. Purchasers of the Bonds will have consented by their purchase to the terms of the Supplemental Agreement.

The Supplemental Agreement will permit the Authority to secure its obligations to providers of credit or liquidity facilities securing Power Revenue Bonds by granting liens on Revenues on a parity with Power Revenue Bonds. The Supplemental Agreement will be executed when owners of 100% of the outstanding Power Revenue Bonds consent thereto. Upon the issuance of the Bonds (and the refunding of the Refunded Power Revenue Bonds and the defeasance of certain other bonds and the concurrent defeasance of certain other Power Revenue Bonds as described in *Debt* below), the owners of approximately 98.79% of the outstanding Power Revenue Bonds will have consented to the execution of the Supplemental Agreement. See Appendix I, *Summary of Certain Provisions of Proposed Supplemental Agreement*, for additional information respecting the provisions of the Supplemental Agreement.

Copies of the proposed Supplemental Agreement are on file for inspection with the 1974 Trustee.

## DESCRIPTION OF THE BONDS

### General

The Bonds will bear interest at such rates and will mature on the dates and in the principal amounts set forth on the inside cover page of this Official Statement. The Bonds will be dated their date of delivery. Interest on the Bonds will be payable on each January 1 and July 1, commencing January 1, 2003. Principal of

and premium, if any, and interest on the Bonds will be payable in the manner described below under "Book-Entry Only System." The Bonds are being issued in fully registered form and, when issued, are to be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). DTC is to act as securities depository for the Bonds. Individual purchases of interests in the Bonds will be made in book-entry form only, in denominations of $5,000 or any multiple thereof. Purchasers of such interests will not receive definitive Bonds. Principal, redemption premium, if any, and interest are payable directly to DTC by the 1974 Trustee. Upon receipt of such payments, DTC is in turn to remit such principal and interest to the DTC Participants (as such term is hereinafter defined) for subsequent disbursement to the purchasers of interests in the Bonds. See "Book-Entry Only System" below. The Bonds are not subject to redemption.

**Book-Entry Only System**

The following information in this section concerning DTC and DTC's book-entry system has been obtained from sources (including DTC) that the Authority believes to be reliable, but none of the Authority, the 1974 Trustee, and the Underwriters takes any responsibility for the accuracy of such information.

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered Bond will be issued for each series and maturity of the Bonds, each in the aggregate principal amount of such maturity of the Bonds and will be deposited with DTC. So long as the nominee of DTC is the registered owner of the Bonds, such nominee will, subject to the limitations set forth under "Potential Bond Insurance" in *Security* above, be considered the sole owner or holder of the Bonds for all purposes under the 1974 Agreement and any applicable laws. Except as otherwise provided below, a Beneficial Owner (as hereinafter defined) of interests in the Bonds will not be entitled to have the Bonds registered in such owner's name, will not be entitled to receive definitive Bonds and will not be considered an owner or holder of the Bonds under the 1974 Agreement.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 85 countries that its participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC in turn is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, GSCC, MBSCC, and EMCC are also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange, LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others, such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The rules applicable to DTC and its Direct Participants are on file with the Securities and Exchange Commission (the "SEC"). More information about DTC can be found at www.dtcc.com.

18

Purchases of Bonds under the DTC System must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond (a "Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the documents governing the Bonds. For example, Beneficial Owners may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners.

Redemption notices shall be sent to Cede & Co. If less than all of the Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed. Neither DTC nor Cede & Co. will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal of and premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the 1974 Trustee, on the payment date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers, in bearer form or registered in "street name" and will be the responsibility of such Participant and not of DTC (or its nominee), the 1974 Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, premium and interest with respect to the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the 1974 Trustee, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the 1974 Trustee, or DTC's services with respect to the Bonds may be discontinued or terminated at any time by the Authority, in its sole discretion, and without the consent of any other person. In the event that DTC's services are so discontinued or terminated and no substitute securities depository willing to undertake the functions of DTC under the 1974 Agreement can be found which, in the opinion of the Authority, is willing and able to undertake such functions upon reasonable and customary terms, or in the event it is so determined that continuation of the system of book-entry transfers is not in the best interests of the Beneficial Owners, the Authority is obligated to deliver definitive Bonds to or for the account of such Owners.

*The Authority, the 1974 Trustee and the Underwriters will have no responsibility or obligation to DTC, Direct Participants, Indirect Participants or the Beneficial Owners of the Bonds with respect to (i) the accuracy of any records maintained by DTC, any Direct Participant or any Indirect Participant; (ii) the payment by DTC to any Direct Participant or any Indirect Participant of any amount due to any Beneficial Owner in respect of the principal of, or premium, if any, or interest on, any Bonds; (iii) the delivery of any notice by DTC, any Direct Participant or any Indirect Participant; (iv) the selection of Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (v) any other action taken or omitted to be taken by DTC or any Direct Participant or Indirect Participant. The current "rules" applicable to DTC are on file with the SEC and current "procedures" of DTC to be followed in dealing with its Participants are on file with DTC.*

## Discontinuance of the Book-Entry Only System

In the event that such book-entry only system is discontinued, the following provisions will apply: principal and the redemption premium, if any, on the Bonds will be payable in lawful money of the United States of America at the corporate trust office of the 1974 Trustee in New York, New York. Interest on the Bonds will be payable on each January 1 and July 1 by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1974 Trustee as of the close of business on the record date therefore (June 15 and December 15) as set forth in the 1974 Agreement. The Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the Bonds will be registerable and the Bonds may be exchanged at the corporate trust office of the 1974 Trustee in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

For every transfer of the Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## Redemption Provisions

The Bonds are not subject to redemption.

## THE AUTHORITY

The Authority was created a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth by the "Puerto Rico Electric Power Authority Act", Act No. 83 of the Legislature of Puerto Rico, approved May 2, 1941, as amended, re-enacted and supplemented (the "Act"). The Authority was formerly known as Puerto Rico Water Resources Authority.

The Authority was created for the purpose of conserving, developing and utilizing the water and power resources of the Commonwealth in order to promote the general welfare of the Commonwealth. It produces,

20

transmits and distributes electricity in Puerto Rico and is one of the largest municipal utilities in the United States.

The executive offices of the Authority are located at 1110 Ponce de León Avenue, San Juan, Puerto Rico 00907, telephone number (787) 289-4666.

## Powers

The Authority has broad powers under the Act, including, among others: to make contracts; to acquire properties by eminent domain or otherwise; to borrow money and to issue bonds for any of its corporate purposes; to secure the payment of its bonds and all other obligations by pledge of its revenues; to determine, fix, alter, charge and collect reasonable rates, fees, rentals and other charges for use of its facilities; and to have complete control and supervision of its properties and activities.

## Management

The Act provides that the Governing Board of the Authority (the "Board") shall be composed of nine members. The Secretary of Transportation and Public Works of the Commonwealth of Puerto Rico serves *ex officio* as a member of the Board, and six other members are appointed by the Governor with the advice and consent of the Senate of Puerto Rico. The remaining two members are client representatives elected directly by the Authority's clients. Members of the Board serve for a term of four years and members who are not *ex officio* can be reappointed or reelected. There is currently one vacancy on the Board. The members of the Board are set forth below.

| Name | Principal Occupation | Term Ends |
|---|---|---|
| José A. Del Valle-Vázquez, Chairman | Certified Public Accountant | July 2005 |
| José M. Izquierdo-Encarnación | Secretary of Transportation and Public Works | *Ex Officio* |
| José A. Bechara-Bravo | Lawyer and Businessman | February 2003 |
| José A. Fernández-Polo, P.E. | Civil Engineer and General Contractor | February 2003 |
| José Luis Rodríguez-Homs, P.E. | Engineer | February 2006 |
| Roberto Fuertes-Thillet | Lawyer and Consultant | Holding Over** |
| Modesto Iriarte, Jr. | Consultant | February 2003 |
| Zoilo López-Nieves* | Doctor of Medicine | September 2003 |

---

\* Consumer representative
\*\* Mr. Fuertes-Thillet will continue to serve as a member of the Board until his successor is appointed.

The Board appoints an Executive Director and a Vice Executive Director who are the principal operating officers of the Authority and are responsible for the general operation of the Authority.

*Héctor R. Rosario* was appointed Executive Director effective January 21, 2001. Mr. Rosario is a Certified Public Accountant and holds a Master's Degree in Business Administration. During his 31 years of service with the Authority, he has occupied various supervisory level positions, such as Supervisor-Customer Service; Supervisor-Bank Reconciliations Unit; Supervisor-Disbursements Section; Assistant Treasurer; and Treasurer.

*Luis E. Cruz*, Vice Executive Director, is a licensed Professional Electrical Engineer and Professional Planner and holds a Master's Degree in Engineering. He has 30 years of service with the Authority and among the positions he has occupied are: Supervisor-Statistical Section; Supervisor-Forecasting and Rates Studies; Supervisor-Engineering System Development Department; and Head-Planning and Research Division.

21

Other principal officers of the Authority include the following:

*Jorge Leavitt*, Director of Electric System, is a licensed Professional Electrical Engineer with 29 years of service at the Authority. He has occupied the positions of Electrical Engineer Supervisor I; Electrical Engineer Supervisor II; Advisor in Engineering; District Engineer; Electric Project Department Administrator; and Assistant Director-Distribution.

*Valeriano Otero*, Director of Transmission and Distribution, is a licensed Professional Electrical Engineer with 22 years of service with the Authority. He has occupied the positions of Line Supervisor III and District Engineer.

*Lourdes Alfonso*, Director of Customer Service, holds a Juris Doctor and a Bachelor's Degree in Business Administration, and has approximately 32 years of service with the Authority. Among the positions she has held are: Assistant Supervisor-Special Legal Services Department; Attorney at the Litigation Division; Head-Customer Service Division; and Attorney III at the Legal Directorate. She is also a Member of the Employees Retirement System's Board of Trustees.

*Luis Figueroa*, Director of Finance, is a Certified Public Accountant with 13 years of service at the Authority. During his tenure he has occupied positions of Technical Advisor to the Director of Finance; Assistant Comptroller-General Accounting; and Assistant Comptroller-Payroll and Budget.

*Héctor M. Alejandro*, Director of Planning and Environmental Protection, holds a Juris Doctor and is a licensed Professional Chemical Engineer. He has approximately 29 years of service with the Authority. Among the positions he has held are: Supervisor-Environmental Program Department; Assistant Head-Environmental Protection and Quality Assurance Division; Head-Environmental Protection and Quality Assurance Division; and Technical Advisor in Environmental Protection.

*Wilfredo Pantojas*, Director of Administrative Services, holds a Juris Doctor and a Master's Degree in Public Administration and has approximately 16 years of service with the Authority. Among the positions he has held are: Office Supervisor I-Electric System Directorate; Local Orders Manager; Office Supervisor II; and Assistant Head-Material Management Division.

*Edwin Rivera*, Director of Engineering, is a Licensed Professional Electrical Engineer with approximately 25 years of service at the Authority. During that time he has occupied various positions, including Superintendent-Electric System; Assistant Head-Electric Conservation Division; and Administrator at the Project Administration Office in the Engineering Directorate.

*Ana T. Blanes*, Director of Human Resources, holds a Juris Doctor and a Bachelor's Degree in Business Administration, with a concentration in Accounting, and has approximately 23 years of service with the Authority. During that time she has occupied positions of District Manager; Legal Officer; Assistance and Productivity Programs Administrator; and Labor Relations Officer.

*Maria M. Méndez*, General Counsel, holds a Juris Doctor and a Bachelor's Degree in Business Administration, with a concentration in Marketing, and has approximately 14 years of service with the Authority. She has occupied the positions of: Attorney at the Opinion-Legislation and Contract Division; Acting Assistant General Counsel; and Acting General Counsel.

The Authority retains the firm of Washington Group International, Inc., successor to Raytheon Engineers & Constructors, Inc., operating through its affiliated company Washington Engineers P.S.C., as Consulting Engineers (the "Consulting Engineers") to perform certain responsibilities under the 1974

22

Agreement. The Consulting Engineers' responsibilities include submitting an annual report to the 1974 Trustee setting forth their recommendations: (a) as to any necessary or advisable revisions of the Authority's rates and charges, (b) as to the amount that should be deposited monthly by the Authority during the ensuing fiscal year to the credit of various funds established under the 1974 Agreement for the purposes specified in the 1974 Agreement, and (c) as to any advice and recommendations as they deem advisable.

Ernst & Young LLP currently acts as the Authority's independent accountants responsible for auditing the Authority's financial statements for fiscal 2002.

## THE SYSTEM

The Authority is the supplier of virtually all of the electric power consumed in the Commonwealth. As of March 31, 2002, the System served 1,381,701 clients.

### Generating Facilities

As of March 31, 2002, investment in Authority-owned production plant in service totaled approximately $2.2 billion based on original cost, the total nameplate rating of the Authority-owned generating facilities of the System was 4,421 MW and their total dependable generating capacity was 4,398 MW. In addition, the Authority recently commenced purchasing power under a long-term power purchase agreement from a cogeneration facility operated by EcoEléctrica, with a net dependable generating capacity of 507 MW. The Authority has dispatch control over the EcoEléctrica facility, and its output is fully integrated into the System.

### Existing Generating Facilities
#### (in MW)

| Generating Plants | Nameplate Rating (77 Units) | Total (80 Units) | Steam (16 Units) | Three Combined Cycle Power Blocks (13 Units) | Combustion Turbine (25 Units) | Hydro (21 Units) | Other[1] (5 Units) |
|---|---|---|---|---|---|---|---|
| | | | | Dependable Generating Capacity | | | |
| Aguirre | 1,554 | 1,534 | 900[2] | 592[3] | 42[4] | — | — |
| Costa Sur | 1,118 | 1,132 | 1,090 | — | 42[4] | — | — |
| Palo Seco | 731 | 728 | 602 | — | 126[5] | — | — |
| San Juan | 400 | 400 | 400 | — | — | — | — |
| Mayagüez | 90 | 84 | — | — | 84[6] | — | — |
| Arecibo | 249 | 249 | — | — | 249[7] | — | — |
| Other Locations | 279 | 271 | — | — | 168[8] | 100 | 3 |
| Subtotal | 4,421 | 4,398 | 2,992 | 592 | 711 | 100 | 3 |
| Peñuelas – EcoEléctrica | — | 507 | — | 507[9] | — | — | — |
| Total | 4,421 | 4,905 | 2,992 | 1,099 | 711 | 100 | 3 |

(1) Consists of four diesel units in the Municipality of Culebra and one in the Municipality of Vieques with an aggregate dependable capacity of approximately 3 MW held on standby reserve.
(2) Consists of the Authority's two largest units, Aguirre Units 1 and 2, each with a dependable generating capacity of 450 MW.
(3) Consists of two combined-cycle power blocks, each made up of four 50 MW combustion turbine units and one 96 MW steam-turbine unit.
(4) Consists of two 21 MW units.
(5) Consists of six 21 MW units.
(6) Consists of four 21 MW units.
(7) Consists of three 83 MW units.
(8) Consists of eight 21 MW units.
(9) Consists of one combined-cycle power block owned by EcoEléctrica, made up of two 165 MW combustion turbine units and a 177 MW steam turbine unit.

23

The EcoEléctrica plant is a cogeneration facility installed by EcoEléctrica in the Municipality of Peñuelas. The facility includes a combined cycle power block, consisting of two combustion turbine units and one steam turbine unit, and a liquefied natural gas terminal. The Authority began purchasing power from EcoEléctrica in September 1999 during the testing and start-up phase of the facility. Commercial operation began on March 21, 2000. The Authority has entered into an agreement with EcoEléctrica to purchase all of the power produced by the facility for a term of 22 years, which commenced on March 21, 2000. The agreement requires EcoEléctrica to provide 507 MW of dependable generating capacity to the Authority. The Authority may purchase any energy produced by the facility in excess of 507 MW, if made available, by paying an energy charge only. No capacity charge would be imposed on the Authority for this "excess" power. EcoEléctrica has entered into a long-term supply agreement to meet its expected needs for natural gas at the facility. Deliveries of natural gas to the facility commenced on July 11, 2000.

The power purchase agreement with EcoEléctrica includes monthly capacity and energy charges to be paid by the Authority for the 507 MW of capacity, which EcoEléctrica is committed to provide. The capacity charge is subject to reduction, progressively to zero, if the facility does not achieve certain availability guarantees determined on a 12-month rolling average basis. The energy charges for power purchases are based on a number of factors including a natural gas related charge on a per kWh of energy basis and inflation indices. The EcoEléctrica purchased power costs incorporate a minimum monthly power or fuel purchase requirement based on an average capacity utilization factor on the part of the Authority. The Authority only pays for energy actually received (including energy in excess of the 507 MW guaranteed by EcoEléctrica). This element of the agreement, when combined with the possible reduction in the capacity charge described above, effectively transfers substantially all of the economic risk of operating the facility to EcoEléctrica.

See also *Overview* for a brief discussion of the effect that Enron's bankruptcy has on the operations of the project.

In the past, approximately 99% of the Authority's energy was produced by oil-fired units. Based on the Authority's ability to efficiently dispatch the EcoEléctrica facility and the AES-PR facility (described below under "Adequacy of Capacity") as part of its System, the Authority currently projects that approximately 15% of its energy sales will be produced by non-oil-fired units in fiscal year 2002 and close to 33% in fiscal year 2003.

Among other benefits, the integration of the EcoEléctrica and AES-PR cogeneration facilities into the Authority's System will reduce the impact of changes in energy costs to the Authority's clients resulting from short-term changes in fuel costs due to the manner of calculation of the energy charges under the respective agreements. While the agreements provide that energy charges will change based on different formulas relating to the prior year, each agreement fixes the energy price for each year of the contract at the beginning of such year. Fixing the energy component of the price for the whole year reduces the impact of seasonal or short duration variations in the market price of electricity. Because the energy price is fixed and known for the entire year, the Authority is able to achieve better economic dispatching and scheduling of maintenance outages of all of its generating units. In addition, the year delay in the effect of energy price changes for these two facilities on the Authority's energy costs reduces variations of the fuel and purchased power components in the price of electricity sold by the Authority by postponing the impact of the price changes and bringing these changes out of step with energy price changes in the above components produced by other fuels in the Authority's fuel mix.

All of the Authority's purchased power costs under the EcoEléctrica power purchase agreement are accounted for as operating expenses on the Authority's financial statements, are treated as a Current Expense under the 1974 Agreement, and are being recovered by the Authority pursuant to the purchased power charge under its current rate structure. Since the power purchase agreement with AES-PR contains substantially

similar relevant terms and conditions, the Authority anticipates that purchased power costs under the AES-PR agreement will be treated similarly.

**Transmission and Distribution Facilities**

The System includes an integrated electric transmission system, which permits each generating unit to provide electric power to the grid. Transmission plant in service as of March 31, 2002 totaled $981.0 million based on original cost. As of March 31, 2002, there were 2,306 circuit miles of transmission lines and 68 transmission switchyards. Transmission lines include 331 circuit miles of 230 kV lines, 676 circuit miles of 115 kV lines and 1,299 circuit miles of 38 kV lines. Transmission substations and 20 plant substations have a total transformer capacity of 9,653,966/16,325,250 kilovolt amperes ("kVA"), without fans and with fans, respectively.

During the period from fiscal year 1997 to fiscal year 2001, the Authority invested $827.8 million (or 42.1% of its capital improvement program) in its transmission and distribution system. The capital improvement program for the five fiscal years ending June 30, 2006 includes $1,011.8 million (or 48.9% of such program) for transmission and distribution facilities.

The Authority's 230 kV system interconnects its power plants with major switching centers and load centers throughout the island in order to allow the transmission of bulk power to and between these locations. The Authority recently finished construction of new 230 kV transmission lines that completed the transmission loops on the western part of the island. The western loop connects the new 249 MW combustion turbine plant in the Municipality of Arecibo with the Authority's Mayagüez switchyard, thereby improving the reliability of service to the northwestern part of the island, which is experiencing significant load growth.

The Authority is constructing new 230 kV transmission lines to complete the transmission loop on the eastern part of the island. The eastern loop will connect major switching and load centers on the eastern part of the island and boost electric system capacity in Puerto Rico's eastern region. The eastern loop is expected to be operating during fiscal year 2003.

Investment in distribution plant in service as of March 31, 2002 totaled $2.0 billion based on original cost. The capital improvement program for the five fiscal years ending June 30, 2006 totals $511.1 million for extensions and improvements to existing distribution lines to serve new clients and substations for accommodating new load growth areas. As of March 31, 2002, the electric distribution system included approximately 29,724 circuit miles of distribution lines and 995 distribution substations (684 are client-owned) with a total installed transformer capacity of 4,713,010/6,494,170 kVA, without fans and with fans, respectively.

The Authority has a continuing program to digitize all the transmission and distribution facilities into a Geographic Information System ("GIS"). This will allow the Authority to create a common database for all its transmission and distribution facilities. Over 38% of the distribution facilities and all of the transmission facilities have been digitized. The program is scheduled to be completed in fiscal year 2004.

The Authority's field operations are being computerized at the district level through the implementation of a Work Management System that has been in operation since December 1999. The Authority has completed communications facilities to link all the regions and district offices. Integration between the GIS and Work Management System has been completed. This integration enables the Authority to track all work from initiation to completion through the same system, while keeping all geographic information (such as maps) updated with necessary additions and modifications. The Authority has also upgraded its computer technology relating to this integration, achieving greater service reliability for its clients.

25

With the implementation of these systems, real time data of transmission and distribution activities are now available. This has produced further automation of the reporting and analysis pertaining to the operations of these systems, and has helped improve productivity and reduce costs.

The Authority regularly reviews and upgrades its operating and maintenance practices, with an emphasis on improving the reliability of its transmission and distribution system. In order to improve the productivity of its transmission and distribution employees, the Authority has instituted programs to assist them in both technical and supervisory training.

The Authority is currently improving its transmission system by constructing an underground 115 kV transmission circuit line around the San Juan metropolitan area, in order to reduce the incidents of loss of power in the aftermath of hurricanes and other major storms which strike the Island from time to time. The estimated cost for this project is $100 million. The Federal Emergency Management Agency has committed to provide grants to the Authority to defray a substantial part of this cost.

The Authority has entered into a long-term agreement for its optical fiber cable requirements with Puerto Rico Information Networks, Inc., a private not-for-profit corporation ("PRIN"). Under this agreement PRIN is required to design, build and transfer to the Authority title to all fiber optic cables installed on the Authority's rights-of-way (mainly its transmission lines). The agreement also provides for the long-term lease to PRIN of any surplus capacity of the cables installed. PRIN has installed 679 kilometers of the approximately 700 kilometers for the initial backbone network on the Authority's transmission lines. The network of fiber optic cable will allow the Authority to modernize its internal communication systems, which provide operations, load management, system protection and security, and other controls. The project is expected to be completed in the fall of 2002.

The Consulting Engineers are of the opinion that the Authority's production plant and transmission and distribution system are in good repair and sound operating condition. See Appendix III, *Letter of the Consulting Engineers*.

## Adequacy of Capacity

*General*

Electric utilities provide reliable service by establishing a level of dependable generating capacity, which is at least equal to their load plus a reserve sufficient to allow for scheduled maintenance, unscheduled outages (described below), reductions in generating capacity due to partial outages, and other unforeseen events. Unlike most United States electric utilities, which are able to purchase power from neighboring systems in the event of unscheduled outages of generating units or temporary surges in demand, the Authority, as an island utility, is not currently able to do so. In addition, the absence of significant seasonal variations in demand results in a relatively high load factor (78.0% in fiscal year 2000 and 78.9% in fiscal year 2001), which affords the Authority less flexibility to schedule maintenance. Therefore, the Authority must have greater total reserve capacity than other United States utilities to cover instances of generating unit outages (scheduled and unscheduled, partial or total).

For planning purposes, the Authority determines adequacy of capacity using probabilistic analytic methods widely used throughout the electric utility industry. The use of these methods takes into account the unique operational aspects of the Authority.

Improvements to the Authority's generating units since the early 1990's have extended their life and increased their availability, thereby substantially improving the System's equivalent availability. This has enabled the Authority to improve the quality of service to its clients. When coupled with the additional generating capacity included in the capacity expansion plan described below, maintaining the level of

equivalent availability at current levels should also allow the Authority to maintain better quality of service to its clients and meet forecasted increases in demand, with lower required reserve margins.

The Authority's program to extend the life and increase the availability of its generating units is composed of two parts. The first is a comprehensive preventive maintenance program pursuant to which the Authority continuously trains its maintenance employees and adheres to a schedule designed to ensure proper operating levels of all major generating units by removing units from service at regular intervals for necessary maintenance ("scheduled outages"). The second part of this program is a design modification program which includes a commitment by the Authority to improve the operation of generating units and the ability of units to operate at design capability and to reduce the risk of units being forced out of service or being forced to operate at partial output ("forced or unscheduled outages"). A portion of the $801.0 million in capital expenditures for the five fiscal years ended June 30, 2001 for production plant was spent for such design modification program.

The table below shows annualized equivalent availability and the equivalent forced outage rate (the average percentage of total dependable generating capacity which is unavailable throughout the year due to forced outages or partial generating capacity outages) for fiscal years 1997 through 2001 and for the twelve months ended March 31, 2002.

**Electric Generation Equivalent Availability and Reliability**

|  | | Years Ended June 30, | | | | Twelve Months Ended March 31, |
|---|---|---|---|---|---|---|
|  | _1997_ | _1998_ | _1999_ | _2000_ | _2001_ | _2002_ |
| Equivalent availability.......................... | 79% | 80% | 79% | 78% | 80% | 80% |
| Equivalent forced outage rate.............. | 11% | 11% | 8% | 9% | 8% | 8% |

By more effectively utilizing scheduled outages, and by implementing major design modifications, the Authority has reduced the need for extended maintenance downtime and increased the overall reliability of all of its generating facilities. As a result, total production plant availability increased from an average of 60% in fiscal year 1992, to an average of 80% for the twelve months ended March 31, 2002. The Authority calculates that each percentage point increase of System availability is equivalent to adding approximately 60 MW of available capacity to the System.

By including the EcoEléctrica and AES-PR facilities in the Authority's equivalent availability statistics, the Authority's total system equivalent availability should improve even further. Assuming EcoEléctrica and AES-PR meet their guaranteed availability of 93% and 90%, respectively, the Authority's total system availability should increase another 2%. The additional reserve capacity represented by these two cogeneration facilities should also afford the Authority the opportunity to extend maintenance periods on its own generation facilities and also favorably affect the System's equivalent availability.

*Projected Load Growth*

Projections of future load growth are a key component in the Authority's capacity planning. In its financial and capacity planning, the Authority receives three sources of information relating to economic activity. One is prepared by Econométrica Inc. using a macroeconomic model of the Commonwealth economy tied to Data Resources, Inc., one by Inter-American University using a macroeconomic model developed in conjunction primarily with DRI-WEFA, and one by the Commonwealth Planning Board. The Authority's forecasts of electric energy sales and income are based in part on the correlations between the consumption of electricity and various economic and financial activities in the Commonwealth as represented in the above-

mentioned models. The Authority continuously monitors actual performance relative to its forecasts and prepares new forecasts at least once a year.

The Authority incorporates the highest of the three forecasts as its base case for planning the additional generating capacity required by the System. Recognizing the inherent uncertainty of forecasting growth, the Authority ordinarily uses the lowest of the three forecasts in preparing its base case revenue forecast.

The Consulting Engineers have reviewed the Authority's projections of future load growth and estimates of peak load and have found them to provide a reasonable basis for planning purposes. See Appendix III, *Letter of the Consulting Engineers.*

*Additional Generating Facilities*

Based upon the Authority's improvement of its System equivalent availability and current peak load projections, the Authority and the Consulting Engineers believe that the additional generating units included in the Authority's capacity expansion plan, together with capacity currently available under the EcoEléctrica contract and projected to be available under the AES-PR contract, will meet projected energy demands and provide an improved quality of service through fiscal year 2009.

Construction of the AES-PR project, a cogeneration facility in the Municipality of Guayama, whose power will be purchased by the Authority, commenced in November 1999 and is currently projected to be completed during the third quarter of 2002. This clean burning coal technology facility will consist of two identical fluidized bed boilers and two steam turbines with 454 MW of dependable generating capacity. The Authority has entered into an agreement with AES-PR to purchase all of the power to be produced by this facility for a term of 25 years from the date of commercial operation. This project, along with the EcoEléctrica plant, will contribute to the Authority's efforts towards fuel diversification and improved reliability of service.

The contract with AES-PR is substantially similar to the EcoEléctrica contract described above in "Generating Facilities" under *The System.* The Authority will also have dispatch control over the cogeneration facility so that its output will be fully integrated into the System. Additionally, the Authority is only obligated to purchase energy actually produced by the facility.

The Authority continues the licensing process in order to replace two 44 MW steam-generating units of the San Juan Steam Plant (Units 5 and 6), removed from service in fiscal year 1997. The Authority's PSD permit in connection with this project expired on May 31, 2002. The Authority is negotiating with EPA to extend the expiration of this permit. If the extension is not granted, or if its approval is delayed, the scheduled completion of the project may be delayed. The new combined cycle generating units, which will provide 464 MW of dependable generating capacity, are currently projected to be in service in the summer of 2005. See *Litigation* for a discussion of a lawsuit brought by the principal contractor for this project.

The following table sets forth the Authority's additional generating capacity plan and the fiscal years in which the additional capacity is expected to be in service.

| Capacity Expansion Projects | Additional Capacity (MW) | Expected In-Service Fiscal Year |
| --- | --- | --- |
| AES Cogeneration Project | 454 | 2003 |
| Replacement San Juan 5 & 6 | 464 | 2005 |
| Total | 918 | |

Based on the Authority's current projections of peak load and improvement of the equivalent availability of its generating units, the Authority and the Consulting Engineers believe that completion of the aforementioned projects will provide the additional generating capacity needed to continue to provide reliable service to its clients through fiscal year 2009. The Authority believes that the aforesaid schedule of capacity additions can be achieved; however, there is no assurance that permitting or construction delays may not have a material adverse effect on such schedule. Based on its projections of peak load, the System's capacity and the maintenance by the Authority of the System's equivalent availability at its current level, the Authority believes that a delay in the completion of any one of these projects will not materially affect its ability to furnish reliable service.

The following table summarizes the Authority's projected peak load, dependable capacity, reserve margin and dependable reserve margin through fiscal year 2007 under the peak load projections shown below and incorporating the assumptions for additional capacity, including the AES-PR facility and the repowering of San Juan Steam Plant units 5 and 6, described above. Projections of future peak load (for capacity planning purposes) from fiscal year 2003 to fiscal year 2007 prepared by the Authority show an average annual increase of 3.5%.

| Fiscal Years Ending June 30, | Peak Load | Dependable Capacity | Reserve Margin | Dependable Reserve Margin (%) |
|---|---|---|---|---|
| | | (in MW, except percentages) | | |
| 2003 | 3,401 | 5,359 | 1,958 | 58 |
| 2004 | 3,521 | 5,309 | 1,788 | 51 |
| 2005 | 3,647 | 5,723 | 2,076 | 57 |
| 2006 | 3,776 | 5,638 | 1,862 | 49 |
| 2007 | 3,910 | 5,553 | 1,643 | 42 |

The Consulting Engineers have examined in detail the Authority's proposed long-term capacity expansion plan (and the methodologies and assumptions upon which it is based) and have found its development to be reasonable and generally consistent with utility industry practice and appropriate for the Authority.

**Statistical Information**

The following table sets forth certain statistical information regarding the System for the five fiscal years ended June 30, 2001 and for the nine-month period ended March 31, 2001 and 2002. For the fiscal years ended June 30, 2000, 2001 and thereafter, the information below reflects the inclusion of 507 MW of capacity provided pursuant to the EcoEléctrica contract.

### Statistical Information

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2002 |
| Nameplate rating at end of period (in MW) | 4,172 | 4,421 | 4,421 | 4,421 | 4,421 | 4,421 | 4,421 |
| Dependable generating capacity at end of period (in MW) | 4,149 | 4,398 | 4,398 | 4,905[1] | 4,905[1] | 4,905[1] | 4,905[1] |
| Peak load, 60-minute (in MW) | 2,894 | 3,021 | 3,057 | 3,133 | 3,202 | 3,202 | 3,297 |
| Reserve Margin (%) | 43.4 | 45.6 | 43.9 | 56.6 | 53.2 | 53.2 | 48.8 |
| Average load (in MW) | 2,185 | 2,366 | 2,299 | 2,443 | 2,526 | 2,517 | 2,554 |
| Load factor (%) | 75.5 | 78.3 | 75.2 | 78.0 | 78.9 | 78.6 | 77.5 |
| **Energy generated, purchased and sold (in millions of kWh):** | | | | | | | |
| Electric energy generated and purchased | 19,143 | 20,725 | 20,141 | 20,306 | 22,132 | 16,549 | 16,795 |
| Auxiliary equipment use | (1,115) | (1,167) | (1,122) | (1,064) | (1,124) | (849) | (807) |
| Net electric energy generated and purchased | 18,028 | 19,558 | 19,019 | 19,242 | 21,008 | 15,700 | 15,988 |
| Losses and unaccounted for | (1,910) | (2,101) | (2,030) | (1,097) | (2,285) | (1,657) | (1,724) |
| Electric Energy Sold | 16,118 | 17,457 | 16,989 | 18,145 | 18,723 | 14,043 | 14,264 |
| **Electric Energy Sales:** | | | | | | | |
| Residential | 5,480 | 6,068 | 5,939 | 6,385 | 6,631 | 4,968 | 5,184 |
| Commercial | 6,330 | 6,822 | 6,721 | 7,206 | 7,583 | 5,660 | 5,853 |
| Industrial | 3,855 | 4,089 | 3,881 | 4,091 | 4,019 | 3,040 | 2,881 |
| Other | 453 | 478 | 448 | 463 | 490 | 375 | 346 |
| | 16,118 | 17,457 | 16,989 | 18,145 | 18,723 | 14,043 | 14,264 |
| **Electric Energy Revenues (in thousands):** | | | | | | | |
| Residential | $ 491,316 | $ 524,128 | $ 471,070 | $ 633,151 | $ 779,682 | $ 586,798 | $ 541,472 |
| Commercial | 725,146 | 745,228 | 688,526 | 878,697 | 1,026,219 | 768,694 | 717,973 |
| Industrial | 346,185 | 350,292 | 299,295 | 391,906 | 436,313 | 329,199 | 282,886 |
| Other | 73,185 | 74,338 | 68,944 | 80,473 | 86,889 | 62,915 | 62,177 |
| | $1,635,832 | $1,693,986 | $1,527,835 | $1,984,227 | $2,329,103 | $1,747,606 | $1,604,508 |
| **Average revenue per kWh (in cents)** | | | | | | | |
| Residential | 8.97 | 8.64 | 7.93 | 9.92 | 11.76 | 11.81 | 10.44 |
| Commercial | 11.46 | 10.92 | 10.24 | 12.19 | 13.53 | 13.58 | 12.27 |
| Industrial | 8.98 | 8.57 | 7.71 | 9.58 | 10.86 | 10.83 | 9.82 |
| Other | 16.16 | 15.55 | 15.38 | 17.39 | 17.74 | 16.80 | 17.96 |
| All Classes | 10.15 | 9.70 | 8.99 | 10.94 | 12.44 | 12.44 | 11.25 |
| **Average number of clients:** | | | | | | | |
| Residential | 1,168,447 | 1,185,246 | 1,200,061 | 1,217,584 | 1,237,053 | 1,234,970 | 1,251,949 |
| Commercial | 117,436 | 119,421 | 120,825 | 122,243 | 123,380 | 123,182 | 124,657 |
| Industrial | 2,147 | 2,094 | 2,040 | 1,986 | 1,929 | 1,936 | 1,884 |
| Other | 3,603 | 3,193 | 3,129 | 3,094 | 3,306 | 3,332 | 3,211 |
| | 1,291,633 | 1,309,954 | 1,326,055 | 1,344,907 | 1,365,668 | 1,363,420 | 1,381,701 |
| **Monthly average revenue per client:** | | | | | | | |
| Residential | $ 35.04 | $ 36.85 | $ 32.71 | $ 43.33 | $ 52.52 | $ 52.79 | $ 48.06 |
| Commercial | 514.57 | 520.03 | 474.88 | 599.01 | 693.13 | 693.37 | 639.98 |
| Industrial | 13,436.77 | 13,940.31 | 12,226.10 | 16,444.53 | 18,848.84 | 18,893.42 | 16,683.53 |
| Other | 1,692.69 | 1,940.13 | 1,836.16 | 2,167.45 | 2,190.18 | 2,098.01 | 2,151.53 |
| All classes | $ 105.54 | $ 107.76 | $ 96.01 | $ 122.95 | $ 142.12 | $ 142.42 | $ 129.03 |

(1) Includes power purchased from the EcoEléctrica cogeneration facility.

**Historical Capital Improvement and Financing Program**

Capital improvements and their financing are made pursuant to a program established by the Authority and reviewed annually by the Consulting Engineers. The program for the five fiscal years ended June 30, 2001 and for the nine-month period ended March 31, 2001 and 2002 is shown in the following table.

| | Years Ended June 30, | | | | | | | Nine Months Ended March 31 | |
|---|---|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | Total[1] | 2001 | 2002 |
| | (in thousands) | | | | | | | | |
| **Capital Improvements** | | | | | | | | |
| Production plant | $ 175,507 | $ 175,158 | $ 154,407 | $ 179,119 | $ 116,775 | $ 800,966 | $ 69,571 | $ 89,688 |
| Transmission facilities | 49,766 | 65,252 | 53,816 | 48,826 | 80,741 | 298,401 | 55,862 | 60,866 |
| Distribution facilities | 71,630 | 107,952 | 133,847 | 86,848 | 129,139 | 529,416 | 100,131 | 103,452 |
| Other[2] | 67,531 | 51,019 | 67,694 | 85,591 | 67,393 | 339,228 | 54,743 | 39,399 |
| | $ 364,434 | $ 399,381 | $ 409,764 | $ 400,384 | $ 394,048 | $ 1,968,011 | $ 280,307 | $ 293,405 |
| **Financing** | | | | | | | | |
| Internally generated funds | $ 70,153 | $ 106,157 | $ 62,958 | $ 74,265 | $ 100,500 | $ 414,033 | $ 75,012 | $ 60,640 |
| Borrowed funds[3] | 294,281 | 293,224 | 346,806 | 326,119 | 293,548 | 1,553,978 | 205,295 | 232,765 |
| | $ 364,434 | $ 399,381 | $ 409,764 | $ 400,384 | $ 394,048 | $ 1,968,011 | $ 280,307 | $ 293,405 |
| Allowance for funds used during construction | $ 8,266 | $ 10,300 | $ 11,677 | $ 12,138 | $ 22,966 | $ 65,347 | $ 15,298 | $ 10,761 |

(1) Includes allowance for funds used during construction of $65.3 million for the five fiscal years ended June 30, 2001, and $15.3 million and $10.8 million for the nine-month period ended March 31, 2001 and March 31, 2002. respectively. The inclusion of such funds increases the carrying value of improvements by the amount of interest on borrowed construction funds used to finance plant additions during the period. See Note 2 to the Financial Statements under Utility Plant included in Appendix II hereto.

(2) Includes general land and buildings, general equipment, preliminary surveys and investigations.

(3) Includes interim financing for capital improvements and bond proceeds applied directly to construction.

**Projected Five-Year Capital Improvement and Financing Program**

Following a public hearing and approval by the Consulting Engineers, the Board must adopt the Authority's capital budget on or before the first day of the ensuing fiscal year. If revisions are required, the Board may amend the capital budget at any time during the fiscal year with the approval of the Consulting Engineers. The capital budget for fiscal year 2002 was adopted on June 13, 2001.

The projected capital improvement program for the five fiscal years ending June 30, 2002 through 2006 aggregates approximately $2.1 billion. It is currently estimated that $482.7 million, or approximately 23.3%, of the projected five-year capital improvement program will be financed by internally generated funds. Estimated capital costs reflect, among other factors, construction contingency allowances and annual cost escalations.

The five-year capital improvement program includes $637.4 million for production plant. A substantial part of this amount represents investment in the improvement of generating units to continue to improve their reliability and efficiency and increase the generating capacity of the System. The projected capital improvement program is consistent with the Authority's base case capacity expansion plan described under "Adequacy of Capacity" above.

In connection with its measures to provide for additional generating capacity, the Authority projects the cost of improving the generating plants to be approximately $522.6 million. All of the above projected expenditures have been included in the five-year capital improvement program for the five fiscal years ending June 30, 2006. In addition to the Authority's projected capital improvement program for fiscal years 2002 through 2006, the Authority has entered into agreements to purchase power from two cogeneration facilities with a combined dependable generating capacity of 961 MW consisting of 507 MW from the EcoEléctrica plant, which is already in operation, and 454 MW from the AES-PR project, which is expected to become

31

available during the third quarter of 2002. For a detailed discussion of each of the above capacity expansion projects, see "Generating Facilities" and "Adequacy of Capacity—Additional Generating Facilities" above.

The reduction, from $801.0 million to $637.4 million, in the amounts budgeted for production plant in the projected five-year capital improvement program compared to the historical five-year capital improvement program reflects (i) the completion of major capital expenditures and (ii) the purchase of additional generating capacity from cogeneration facilities during the five-year period, which purchase will be accounted for as operating expenses of the Authority. The projected capital improvement program also shows that the Authority will concentrate its efforts in improving and expanding its transmission facilities, particularly through the construction of new 230 kV lines.

The Consulting Engineers have examined the projected capital improvement program and found it to be reasonable. The capital improvement program is subject to periodic review and adjustment because of changes in expected demand, environmental requirements, design, equipment delivery schedules, costs of labor, equipment and materials, interest rates and other factors. The following table presents a summary of the projected capital improvement program for the five fiscal years ending June 30, 2006 and its projected financing.

### Projected Capital Improvement Program
(in thousands)

| | Years Ending June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | Total[1] |
| **Capital Improvements** | | | | | | |
| Production plant | $ 144,743 | $ 118,638 | $ 131,389 | $ 132,182 | $ 110,436 | $ 637,388 |
| Transmission facilities | 85,037 | 95,485 | 107,042 | 98,827 | 114,306 | 500,697 |
| Distribution facilities | 94,325 | 106,619 | 105,189 | 101,567 | 103,397 | 511,097 |
| Other[2] | 92,373 | 109,411 | 85,325 | 77,595 | 55,192 | 419,896 |
| | $ 416,478 | $ 430,153 | $ 428,945 | $ 410,171 | $ 383,331 | $ 2,069,078 |
| **Financing Sources** | | | | | | |
| Internally generated funds | $ 82,158 | $ 125,687 | $ 105,344 | $ 77,540 | $ 92,012 | $ 482,741 |
| Borrowed funds[3] | 334,320 | 304,466 | 323,601 | 332,631 | 291,319 | 1,586,337 |
| | $ 416,478 | $ 430,153 | $ 428,945 | $ 410,171 | $ 383,331 | $ 2,069,078 |
| Allowance for funds used during construction | $ 15,993 | $ 11,780 | $ 8,564 | $ 14,951 | $ 14,170 | $ 65,450 |

(1) Includes allowance for funds used during construction of $65.5 million for the five-year period ending June 30, 2006 (see footnote (1) to the table under "Historical Capital Improvement and Financing Program" above).

(2) Includes general land and buildings, general equipment, preliminary surveys and investigations.

(3) For the purpose of this table, it is assumed that of the total $1.7 billion Power Revenue Bonds expected to be issued in the five-year period ending June 30, 2006, $425.0 million is expected to be used to repay lines of credit with the Government Development Bank anticipated to be drawn during this period.

## Rates

The Authority has the power to determine, alter, establish and collect reasonable rates for electric service, which shall produce sufficient revenues to cover the operating costs of the Authority, the payment of the principal of and the interest on its bonds, and other contractual obligations. Public hearings are required before the setting of permanent rates, with the final approval vested solely within the Authority. Act No. 21 of the Legislature of Puerto Rico, approved May 31, 1985 ("Act No. 21"), provides uniform procedures for public hearings and review of the actions of certain public corporations, including the Authority, in connection with changes in the rates set by such public corporations. Act No. 21 also authorizes the Legislature by resolution to review rates of certain public corporations, including the Authority. At the request of another

public corporation covered by Act No. 21, the Secretary of Justice has rendered an opinion to the effect that Act No. 21 does not grant a veto power to the Legislature over rates adopted properly by such public corporation.

Until October 1999, electric service rates consisted primarily of (i) basic charges, made up of demand, client and energy related charges, which included a base fuel price of $2.00 per barrel; and (ii) fuel adjustment charges to recover the costs to the Authority of fuel oil above a base price of $2.00 per barrel. Effective November 1999, on a temporary basis, fuel adjustment charges were revised to recover also the cost of purchasing power. On March 28, 2000, following a public hearing, a permanent revision of the rate structure was approved to incorporate a purchased power charge to the electric service rates to recover the cost to the Authority of purchasing power. In addition, the $2.00 per barrel of fuel cost included in the basic charges was transferred to the fuel charges, effective on June 5, 2000. Consequently, revenues will reflect changes in the fuel charge and the purchased power charge caused by fluctuations in the price of fuel oil or purchased power. Basic charges averaged 6.1¢ per kilowatt-hour prior to the March 2000 revisions. The Authority has not increased basic charges since 1989. The following table presents the electric sales revenues derived from basic charges and fuel adjustment charges for the five fiscal years ended June 30, 2001 and the nine-month period ended March 31, 2001 and 2002 and purchased power charges for the fiscal years 2000 and 2001 and for the nine-month period ended March 31, 2001 and 2002.

### Electric Sales Revenues
### (in thousands)

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2002 |
| Basic charges | $ 983,602 | $1,054,041 | $1,035,471 | $1,086,783 | $1,070,693 | $ 797,476 | $ 821,959 |
| Fuel adjustment charges | 652,230 | 639,945 | 492,364 | 825,924 | 1,059,108 | 809,011 | 599,634 |
| Purchased power charges | — | — | — | 71,520 | 199,302 | 141,119 | 182,915 |
| | $1,635,832 | $1,693,986 | $1,527,835 | $1,984,227 | $2,329,103 | $1,747,606 | $1,604,508 |

The fuel charges imposed in any month are based upon the average of (i) the actual average fuel oil costs for the second preceding month and (ii) the estimated average fuel oil costs for the current month. Purchased power charges are based on estimated purchased power costs for the current month. To the extent that such charges do not fully recover actual fuel or purchase power costs (or recover more than such costs), charges are adjusted in the second succeeding month.

Under the Act, certain residential clients receive a subsidy for the fuel adjustment charge. Residential clients who qualify for the subsidy are billed the full applicable basic charges and fuel adjustment charges, with the applicable subsidy taking the form of a credit against the bill. In addition, under legislation approved in July 1985, certain tourism facilities, such as hotels certified by the Tourism Company, receive subsidies from the Commonwealth. See "Subsidies, Contributions in Lieu of Taxes and Set Aside-Subsidies" below for a more detailed description of these subsidies.

The Consulting Engineers have reviewed the Authority's rate schedules and believe that the Authority will receive sufficient Revenues to cover Current Expenses and to make the required deposits in the 1974 Sinking Fund, the 1974 Reserve Maintenance Fund, the Capital Improvement Fund and, if any are required, the Self-insurance Fund.

**Major Clients**

The public sector, which consists of the Commonwealth government and its public corporations and the municipalities (included primarily in the commercial category), accounted for 14.4% of kWh sales and 17.4% of revenues from electric energy sales for the twelve-month period ended April 30, 2002.

The ten largest industrial clients accounted for 4.7% of kWh sales and 3.6% of revenues from electric energy sales for the twelve months ended April 30, 2002. No single client accounted for more than 0.8% of electric energy sales or more than 0.6% of revenues from electric energy sales.

In September 1997, the Authority established a new reduced rate for large industrial clients connected at an 115kV voltage level and meeting certain criteria such as a minimum demand and a high load factor and power factor. This new rate is designed to induce such large clients to whom it may be economical to produce their own electricity to buy more electricity from the Authority and discourage their independent power production. As of April 30, 2002, three of the Authority's industrial clients were using such rate.

**Fuel**

For the fiscal year ended June 30, 2001, fuel oil expenses amounted to $944.8 million, or 54.8% of total Current Expenses ($801.4 million and 54.6% for the preceding fiscal year). For the nine months ended March 31, 2002, fuel oil expenses amounted to $535.2 million, or 46.0% of total Current Expenses. For the five fiscal years ended June 30, 2001, fuel oil expense was a fairly stable component of total Current Expenses, averaging 53.1% of total Current Expenses. See "Management's Discussion and Analysis of Operating Results" under *Net Revenues and Coverage*.

The Authority's thermal generating units, which produced 87% of the net electric energy generated by the System in fiscal year 2001, are fueled by No. 6 residual fuel oil, except for the smaller combustion-turbine units, the two Aguirre combined-cycle units and the 249 MW combustion turbine plant in Arecibo, which burn No. 2 distillate fuel oil. These combustion turbine units, the two combined cycle units and the 249 MW combustion turbine plant at Arecibo represent 29.7% of the System's aggregate dependable generating capacity.

Since the Authority is not interconnected with other utilities, it maintains some generating units operating as a reserve in anticipation of unscheduled outages or other unforeseen events ("spinning reserve"). Historically, the Authority has maintained 450 MW of spinning reserve. Based on its experience, however, the Authority has determined that it can provide reliable service to its clients while reducing spinning reserve by 200 MW. This reduction was first implemented during the current fiscal year and is estimated that it will result in fuel cost savings ranging between $20 million and $30 million annually.

As of March 31, 2002, 100% of the Authority's fuel requirements for its generation facilities were covered by one-year contracts, which expire at various times. The Authority's contracted fuel oil prices consist of an escalation factor plus a fixed price differential. The escalation factor reflects the fuel oil price at the New York market at the time of purchase. The fixed price differential compensates for the fact that the fuel oil is delivered in the Commonwealth and not New York. It also takes into account other aspects of the delivery such as maximum cargo volume and draft restrictions. The Authority does not expect any difficulty in renewing its contracts at price differentials similar to those currently in effect.

Since the Authority's dependence on fuel oil has decreased with the coming on line of the EcoEléctrica plant, the Authority's customary inventory of fuel oil will cover 35 days of ordinary operations, up from 25 days in the past. Although sources of fuel oil are continually changing as a result of variations in relative price, availability and quality, the Authority has never been forced to curtail service to its clients because of fuel oil

34

shortages. The Authority's total inventory capacity for fuel oil is 3.4 million barrels. As of March 31, 2002, the Authority had an inventory of 2.6 million barrels of fuel oil.

Average fuel oil costs and related costs of production for the five fiscal years ended June 30, 2001 and for the nine months ended March 31, 2001 and 2002 are shown in the following table.

**Fuel Costs**

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2002 |
| Average fuel oil cost per barrel (net of handling costs) | $ 20.28 | $ 18.38 | $ 14.56 | $ 23.54 | $ 29.33 | $ 30.19 | $ 22.43 |
| Number of barrels used (in millions) | 32.0 | 34.4 | 34.4 | 34.0 | 32.2 | 24.1 | 23.9 |
| Fuel oil cost (in millions) | $648.9 | $632.3 | $500.9 | $801.4 | $944.8 | $728.4 | $535.2 |
| Net kWh generated (including purchased power in 2000 and 2001)(in millions) | 17,888.5 | 19,493.4 | 18,876.8 | 19,065.1 | 18,159.2 | 13,566.6 | 13,758.3 |
| Average net kWh per barrel | 559.0 | 566.7 | 548.7 | 560.7 | 564.0 | 562.9 | 575.7 |
| Average fuel oil cost per net kWh generated (in cents) | 3.63 | 3.24 | 2.65 | 4.20 | 5.20 | 5.37 | 3.89 |

With the addition of the output of the EcoEléctrica facility to the Authority's System, the Authority's traditional dependence on oil-fired generation has decreased and is expected to decrease significantly more when the AES-PR facility becomes operational. By fiscal year 2003, when the AES-PR facility is currently projected to become commercially operational, the Authority projects that approximately 33% of its annual energy requirements will be provided by non-oil-fired generating facilities.

Earlier this fiscal year, the Authority entered into a series of contracts that will provide it with protection against increases in the price of fuel oil. Under these contracts, which cover 4 million barrels or about 13% of the Authority's projected 2002 fuel oil consumption requirements, the Authority will receive in cash the difference between the monthly average market price of No. 6 fuel oil above a fixed price per barrel (ranging between $21 and $22 per barrel depending on the contract). In addition, the Authority used payments it received from its two cogenerators in return for the granting by the Authority of certain waivers under their power purchase agreements, to capitalize a special fund to provide billing credits to certain of the Authority's clients to protect them against increases in the price of fuel oil. This fund will serve to smooth the effects of the fuel adjustment to certain clients, and is currently capitalized at approximately $50.7 million.

**Subsidies, Contributions in Lieu of Taxes and Set Aside**

*Subsidies*

Under the Act, a subsidy is provided for a portion of fuel charges to qualifying residential clients who use up to 425 kWh monthly or 850 kWh bi-monthly. This subsidy takes the form of a credit against their electric bills.

The Act limits this subsidy to a maximum of $100 million per year and limits the cost of fuel oil used in calculating the amount of such subsidy to a maximum of $30 per barrel. The residential clients must pay any fuel adjustment charge resulting from a price of fuel oil in excess of $30 per barrel.

Through fiscal year 1991, the subsidy was paid to the Authority by the Commonwealth each year and was recorded as a receivable on the Authority's financial statements. As of June 30, 1991, the amount owed by the Commonwealth to the Authority on account of this fuel oil subsidy program was $94.9 million. In October 1991, the Authority and the Commonwealth entered into a non-interest bearing fifteen-year payment plan, starting in fiscal year 1993, for the payment of this amount. As of March 31, 2002, the amount owed by

the Commonwealth was approximately $31.6 million. The Commonwealth has made all payments due under this plan through fiscal year ended June 30, 2002. Also in 1991, the Authority revised its subsidy implementing regulations to reduce the number of qualifying clients. Under these regulations, the subsidy has amounted to approximately $11.3 million per year for the five fiscal years ended June 30, 2001. All subsidy amounts arising since June 30, 1991 have been set-off against the electric energy sales set aside as discussed in *Contributions in Lieu of Taxes and Set Aside* below.

Hotels receive a subsidy in an amount equal to 11% of their monthly billing. In order to receive this subsidy, hotels must maintain their electric service accounts on a current basis. This subsidy takes the form of a credit against their electric bills.

All subsidy amounts are also set off against the electric energy sales set aside as discussed in *Contributions In Lieu of Taxes and Set Aside* below. All of such amounts have been paid in full through fiscal year ended June 30, 2001.

### Contributions In Lieu of Taxes and Set Aside

Under the Act, the Authority is required to pay to the Secretary of the Treasury (for distribution to the municipalities) from its Net Revenues, after certain defined expenditures and subject to compliance with its obligations under the 1974 Agreement, contributions in lieu of taxes in the amount of 6% of its gross electric energy sales computed on the basis of an annual average fuel oil price of up to $30 per barrel. Under certain circumstances, the Authority is empowered to raise the ceiling (if the price exceeds $30 per barrel) to provide the municipalities, through contributions in lieu of taxes, with sufficient income to offset their billings for consumption plus the necessary amounts to fulfill their obligations to the Authority. Contributions in lieu of taxes to municipalities can be used to offset accounts receivable balances owed to the Authority, as permitted by law. For fiscal year 2001, contributions in lieu of taxes to municipalities amounted to $121.9 million, of which $6.4 million was reimbursed to the municipalities and $115.5 million was used to offset or reduce outstanding accounts receivable balances. In addition, for the nine-month period ended March 31, 2002, contributions in lieu of taxes to municipalities amounted to $78.5 million.

The Act also requires the Authority to set aside annually from its Net Revenues an additional amount equal to 5% of the Authority's annual gross electric energy sales (based on kWh) (the "electric energy sales set aside"). One-fifth of the electric energy sales set aside are to be applied to cover the costs of the fuel oil subsidy program arising after June 30, 1991 (with any balance remaining being used to reduce the amounts owed by the Commonwealth to the Authority on account of such subsidy as of June 30, 1991). Another one-fifth of the electric energy sales set aside must be paid to the Secretary of the Treasury for distribution among the municipalities (in addition to the contributions in lieu of taxes described above). The balance of the electric energy sales set aside must be used to fund certain of the Authority's capital improvements and other purposes. The Authority's obligation to make available the electric energy sales set aside is also subject to the Authority's obligations under the 1974 Agreement.

If the Authority's Net Revenues, as defined in the Act, in any year are not sufficient to cover the contributions in lieu of taxes and the electric energy sales set aside, said contributions and set aside are reduced to the amount available, and the excess does not carry forward as a liability for future years. During the five fiscal years ended June 30, 2001, the Net Revenues of the Authority were not sufficient to permit the payment to the municipalities of the full contributions in lieu of taxes and provide for the full electric energy sales set aside due to the priority payments of certain obligations which are required by the 1974 Agreement including all deposits into the 1974 Sinking Fund.

In May 1998, the Municipality of Ponce filed a complaint against the Authority in the Court of First Instance, Superior Section San Juan Part requesting the payment by the Authority of the full contributions in lieu of taxes and electric energy sales set aside for prior fiscal years, as established in the Authority's enabling act. The complaint challenges the Authority's disposition of Net Revenues in order to make deposits to certain funds under the 1974 Agreement and a previous indenture for the purposes of paying costs of capital improvements and seeks a payment by the Authority in the amount by which the amount available to pay the contributions in lieu of taxes and electric energy sales set aside to the Municipality of Ponce has been reduced as a result of such disposition. The Authority believes that because the Act provides that the contributions in lieu of taxes and electric energy sales set aside are only payable after complying with the Authority's deposit obligations under the 1974 Agreement and such previous indenture, and shortfalls do not carry forward as future liabilities of the Authority as described above, it is legally entitled to make such deposits even if the effect is to reduce such contributions and set aside available to municipalities. See *Litigation*.

## DEBT

The following table sets forth the bonds and notes of the Authority outstanding as of March 31, 2002 and as adjusted for the issuance of the Bonds and the refunding of the Refunded Power Revenue Bonds. In addition, the column labeled "As Adjusted" excludes the Authority's Power Revenue and Revenue Refunding Bonds, Series N and O, maturing July 1, 2017 (the "Defeased N and O Power Revenue Bonds") which bonds are being defeased concurrently with the issuance of the Bonds from available moneys of the Authority.

|  | Outstanding as of March 31, 2002 | As Adjusted |
|---|---|---|
|  | (in thousands) | |
| Power Revenue Bonds |  |  |
| Publicly offered | $ 4,683,903[1] | $ 4,771,448[3] |
| Rural Electrification Bonds | 150,829 | 58,226 |
| Subordinate Obligations[2] | 43,689 | 43,689 |
|  | $ 4,878,421 | $ 4,873,363 |
| Notes |  |  |
| General Obligation Notes | 130,000 | 130,000 |
| Total | $5,008,421 | $ 5,003,363 |

(1) Includes $123.4 million of accretion on Capital Appreciation Bonds for the nine-months ended March 31, 2002.

(2) In connection with the installation of the Authority's fiber optic telecommunication system, see "Transmission and Distribution Facilities" under *The System* above, the Authority entered into an installment purchase agreement with PRIN under which the Authority will be obligated to make purchase price payments to PRIN to acquire the system. The Authority's obligation to make these payments will be satisfied from moneys in the Subordinate Obligations Fund under the 1974 Agreement. See "Flow of Funds Under 1974 Agreement" and "Subordinate Obligations" under *Security* above. The obligation of the Authority to make these installment purchase payments is subordinate to its obligation to pay the outstanding Power Revenue Bonds. The Authority has determined that the aforementioned telecommunication system will not be part of the System and as such, any rentals received by the Authority from the long-term lease of surplus fiber optic cable capacity to PRIN will not be pledged to the payment of the Power Revenue Bonds.

(3) Includes $65.8 million of accretion on Capital Appreciation Bonds for the nine-months ended March 31, 2002.

**Rural Electrification Bonds**

The Rural Utilities Service (formerly the Rural Electrification Administration) ("RUS") has purchased Power Revenue Bonds issued by the Authority to provide funds for the construction of distribution facilities to service RUS qualified areas. As of March 31, 2002, the Authority had issued to RUS a total of $301 million of its Power Revenue Bonds, $150.8 million of which were outstanding, at interest rates of 2% and 5%.

**General Obligation Notes**

The Authority has issued $125 million of its general obligation notes to certain commercial banks to finance the purchase of fuel oil. The notes are due on July 2, 2004. In December 1997, the Authority issued a $5 million note to EcoEléctrica to finance part of the Authority's cogeneration expenses in connection with EcoEléctrica's cogeneration plant in the Municipality of Peñuelas. The note is due October 30, 2004.

**Principal and Interest Requirements**

Principal and Interest Requirements, as used herein and as defined in the 1974 Agreement, means for any fiscal year the sum of all principal of, including Amortization Requirements for, and interest on, outstanding Power Revenue Bonds which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year. The following table shows the annual Principal and Interest Requirements for the outstanding Power Revenue Bonds after giving effect to the issuance of the Bonds and the refunding of the Refunded Power Revenue Bonds. In addition, the information in the following table excludes debt service on the Defeased N and O Power Revenue Bonds. The Amortization Requirements are subject to adjustment as provided in the definition thereof. See Appendix I, *Summary of Certain Provisions in the 1974 Agreement Excluding Proposed Supplemental Agreement.*

**Debt Service Requirements**

| Years Ending June 30, | Outstanding Principal and Interest Requirements[1] | The Bonds Maturity and Amortization Requirements | The Bonds Interest | The Bonds Total | Total Debt Service Requirements |
|---|---|---|---|---|---|
| 2003 ............... | $356,583,667.55 | | $25,935,094.90 | $25,935,094.90 | $382,518,762.45 |
| 2004 ............... | 383,939,805.05 | | 26,007,337.50 | 26,007,337.50 | 409,947,142.55 |
| 2005 ............... | 379,902,790.05 | $7,765,000.00 | 26,007,337.50 | 33,772,337.50 | 413,675,127.55 |
| 2006 ............... | 390,226,702.55 | | 25,696,737.50 | 25,696,737.50 | 415,923,440.05 |
| 2007 ............... | 380,979,395.05 | | 25,696,737.50 | 25,696,737.50 | 406,676,132.55 |
| 2008 ............... | 341,426,297.55 | 9,050,000.00 | 25,696,737.50 | 34,746,737.50 | 376,173,035.05 |
| 2009 ............... | 344,617,523.80 | 7,420,000.00 | 25,244,237.50 | 32,664,237.50 | 377,281,761.30 |
| 2010 ............... | 303,620,058.80 | 19,000,000.00 | 24,910,337.50 | 43,910,337.50 | 347,530,396.30 |
| 2011 ............... | 235,364,971.30 | 83,700,000.00 | 23,960,337.50 | 107,660,337.50 | 343,025,308.80 |
| 2012 ............... | 238,227,261.30 | 88,060,000.00 | 20,037,337.50 | 108,097,337.50 | 346,324,598.80 |
| 2013 ............... | 327,162,911.30 | 8,955,000.00 | 15,632,937.50 | 24,587,937.50 | 351,750,848.80 |
| 2014 ............... | 325,853,672.54 | 8,140,000.00 | 15,177,800.00 | 23,317,800.00 | 349,171,472.54 |
| 2015 ............... | 213,659,373.78 | 105,040,000.00 | 14,730,100.00 | 119,770,100.00 | 333,429,473.78 |
| 2016 ............... | 232,659,423.78 | 84,875,000.00 | 8,952,900.00 | 93,827,900.00 | 326,487,323.78 |
| 2017 ............... | 249,426,701.26 | 71,550,000.00 | 4,284,775.00 | 75,834,775.00 | 325,261,476.26 |
| 2018 ............... | 249,975,582.50 | 3,665,000.00 | 349,525.00 | 4,014,525.00 | 253,990,107.60 |
| 2019 ............... | 250,176,988.76 | 2,690,000.00 | 147,950.00 | 2,837,950.00 | 253,014,938.76 |
| 2020 ............... | 250,646,588.76 | | | | 250,646,688.76 |
| 2021 ............... | 250,236,731.26 | | | | 250,236,731.26 |
| 2022 ............... | 228,502,087.52 | | | | 228,502,087.52 |
| 2023 ............... | 228,206,206.26 | | | | 228,206,206.26 |
| 2024 ............... | 208,062,293.76 | | | | 208,062,293.76 |
| 2025 ............... | 181,664,125.02 | | | | 181,664,125.02 |
| 2026 ............... | 158,207,256.26 | | | | 158,207,256.26 |
| 2027 ............... | 158,206,162.50 | | | | 158,206,162.50 |
| 2028 ............... | 125,860,300.00 | | | | 125,860,300.00 |
| 2029 ............... | 90,780,212.50 | | | | 90,780,212.50 |
| 2030 ............... | 90,779,387.50 | | | | 90,779,387.50 |
| 2031 ............... | 48,283,437.50 | | | | 48,283,437.50 |
| Total ............ | $7,223,237,915.76 | $499,910,000.00 | $308,468,219.90 | $808,378,219.90 | $8,031,616,135.66 |

(1) Debt service requirements on all Power Revenue Bonds outstanding on March 31, 2002, excluding debt service on the Refunded Power Revenue Bonds and on the Defeased N and O Power Revenue Bonds.

## NET REVENUES AND COVERAGE

The following table presents the Net Revenues (exclusive of certain investment income) of the Authority under the provisions of the 1974 Agreement for the five fiscal years ended June 30, 1997 through 2001 and for the nine-month period ended March 31, 2001 and 2002 and the ratio of such Net Revenues to Principal and Interest Requirements on the Power Revenue Bonds. These calculations of Net Revenues differ in several important respects from the Authority's calculations of net income prepared in conformity with generally accepted accounting principles. For example, they do not include depreciation as a current expense and do not reflect interest expense as a deduction from Net Revenues.

39

## Historical Net Revenues and Coverage

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | **1997** | **1998** | **1999** | **2000** | **2001** | **2001** | **2002** |
| Average number of clients | 1,291,633 | 1,309,954 | 1,320,055 | 1,344,907 | 1,365,668 | 1,363,420 | 1,381,??? |
| Electric energy sales (in millions of kWh) | 16,118 | 17,457 | 16,989 | 18,145 | 18,723 | 14,043 | 14,??? |
| **Source of Net Revenues** | | | | (dollars in thousands) | | | |
| **Revenues:** | | | | | | | |
| Sales of electrical energy: | | | | | | | |
| Residential [1] | $ 491,316 | $ 524,128 | $ 471,070 | $ 633,151 | $ 779,682 | $ 586,798 | $ 541,??? |
| Commercial | 725,146 | 745,228 | 688,526 | 878,697 | 1,026,219 | 768,694 | 717,??? |
| Industrial | 346,185 | 350,292 | 299,295 | 391,906 | 436,313 | 329,199 | 282,886 |
| Other | 73,185 | 74,338 | 68,944 | 80,473 | 86,889 | 62,915 | 62,??? |
| | 1,635,832 | 1,693,986 | 1,527,835 | 1,984,227 | 2,329,103 | 1,747,606 | 1,604,??? |
| Revenues from Commonwealth for rural electrification | 1,068 | 1,007 | 941 | 881 | 705 | 522 | ??? |
| Other operating revenues | 8,662 | 11,841 | 8,827 | 10,240 | 8,210 | 6,541 | 6,??? |
| Other (principally interest earned) | 24,887 | 26,841 | 26,350 | 29,936 | 35,059 | 28,151 | 18,??? |
| | 1,670,449 | 1,733,675 | 1,563,953 | 2,025,284 | 2,373,077 | 1,782,820 | 1,630,??? |
| **Current Expenses:** | | | | | | | |
| **Operations:** | | | | | | | |
| Fuel | 648,899 | 625,346 | 500,920 | 801,433 | 944,760 | 728,422 | 535,??? |
| Purchased power | -- | -- | -- | 64,517 | 177,330 | 125,390 | 16,??? |
| Other production | 37,378 | 43,658 | 42,818 | 55,690 | 56,301 | 41,925 | 4,??? |
| Transmission and Distribution | 76,735 | 86,901 | 83,385 | 94,793 | 105,034 | 74,922 | 8,??? |
| Customer accounting and Collection | 68,138 | 73,647 | 67,517 | 76,598 | 83,453 | 62,814 | 62,??? |
| Administrative and General | 148,376 | 139,986 | 142,866 | 151,069 | 139,117 | 103,977 | 112,??? |
| Maintenance [2] | 217,455 | 215,118 | 212,530 | 219,812 | 213,666 | 163,568 | 166,??? |
| Other | 1,920 | 1,501 | 2,725 | 2,911 | 3,028 | 2,285 | 2,??? |
| | 1,198,901 | 1,186,157 | 1,052,761 | 1,466,823 | 1,722,689 | 1,303,303 | 1,163,??? |
| Net Revenues | $ 471,548 | $ 547,518 | $ 511,192 | $ 558,461 | $ 650,388 | $ 479,517 | $ 46?,??? |
| **Coverage** | | | | | | | |
| Principal and Interest Requirements | $ 291,239 | $ 316,138 | $ 348,963 | $ 346,417 | $ 367,796 | -- | |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.62 | 1.73 | 1.46 | 1.61 | 1.77 | -- | |

(1) Includes residential subsidy. See "Subsidies, Contributions in Lieu of Taxes and Set Aside" under *The System*.

(2) Includes, for maintenance of generating facilities, $125.5 million, $116.9 million, $126.1 million, $115.6 million and $113.0 million for fiscal years ended June 30, 1997, 1998, 1999, 2000 and 2001, respectively. For the nine-months ended March 31, 2001 and 2002 the maintenance expense of generating facilities was $90.9 million and $86.7 million, respectively.

**Management's Discussion and Analysis of Operating Results**

The following represents the Authority's analysis of its operations for the nine month period ended March 31, 2001 and 2002, and for the five fiscal years ended June 30, 2001.

For the nine months ended March 31, 2002 as compared to the nine months ended March 31, 2001, Revenues and Current Expenses decreased by $152.6 and $138.9 million, respectively, resulting in a decrease in Net Revenues of $13.7 million. The decrease in Revenues and Current Expenses was mainly due to a decrease of $7.77 per barrel (or 25.7%) in the price of fuel oil. Accounts receivable of the Authority decreased $16.2 million from $410.7 million on June 30, 2001 to $394.5 million on March 31, 2002. In addition, accounts receivable from the governmental sector increased slightly from $93.1 million on June 30, 2001 to $95.4 million in March 31, 2002.

For the fiscal year ended June 30, 2001 as compared to June 30, 2000, Revenues increased by $347.8 million and Current Expenses increased by $255.9 million, resulting in an increase in Net Revenues of $91.9 million. The increase was mainly due to an increase in electric energy sales (in kWh) by 3.2% and an increase of $5.79 per barrel (or 24.6%) in the price of fuel oil. Accounts receivable of the Authority increased from $385.2 million on June 30, 2000 to $410.7 million on June 30, 2001. In addition, accounts receivable from the governmental sector decreased from $113.6 million on June 30, 2000 to $93.1 million on June 30, 2001. This decrease was mainly due to the increase in the amount paid by the Authority in contributions of lieu of taxes from $82.0 million in fiscal 2000 to $115.5 million in fiscal 2001, which is used to offset the accounts receivable balance owed by the municipalities.

For the fiscal year ended June 30, 2000 as compared to June 30, 1999, Revenues increased by $461.3 million and Current Expenses increased by $414.1 million, resulting in an increase in Net Revenues of $47.2 million. The increases are mainly due to the damage caused by Hurricane Georges in September 1998, which affected the results for the preceding fiscal year and to an increase of $8.98 (or 61.7%) in the price per barrel of fuel oil. As a result, the accounts receivable of the Authority increased from $305.9 million on June 30, 1999 to $385.2 million on June 30, 2000. The increase on Accounts Receivable is related to the increase in Revenues and the proportion of accounts receivable to revenues is consistent with the preceding fiscal year. In addition, accounts receivable from governmental sector increased from $83.0 million on June 30, 1999 to $113.6 million on June 30, 2000 for the same reason.

For the fiscal year ended June 30, 1999, as compared to the fiscal year ended June 30, 1998, Revenues decreased by $169.7 million and Current Expenses decreased by $133.4 million, resulting in a decrease in Net Revenues of $36.3 million. The decrease in Revenues and Current Expenses was mainly due to a decrease of $3.83 per barrel (or 20.8%) in the price of fuel oil as well as the impact of the Hurricane Georges. Accounts receivable of the Authority decreased from $379.7 million on June 30, 1998 to $305.9 million on June 30, 1999. Accounts receivable from the governmental sector decreased from $164.9 million on June 30, 1998 to $83.0 million on June 30, 1999 mainly due to collections from Puerto Rico Aqueduct and Sewer Authority and other government agencies.

For the fiscal year ended June 30, 1998 as compared to June 30, 1997, Revenues increased by $63.2 million and Current Expenses decreased by $12.7 million resulting in an increase in Net Revenues of $76.0 million. The growth in Revenues was mainly due to an increase of 8.3% in energy sales with energy consumption increases in all categories of clients. On June 30, 1998, accounts receivables of the Authority were $379.7 million compared to $351.6 million on June 30, 1997. Accounts receivable from the governmental sector increased from $155.6 million on June 30, 1997 to $164.9 million on June 30, 1998.

For the fiscal year ended June 30, 1997 as compared to June 30, 1996, Revenues increased by $78.7 million and Current Expenses increased by $53.8 million, resulting in an increase of $24.9 million in Net Revenues. The growth in Revenues was mainly due to an increase of $68.1 million in fuel adjustment clause revenues as a result of higher fuel oil prices. Energy demand reflected a slight increase of 1.1% during this period. Current Expenses increased mainly due to a $1.59 per barrel increase in the average cost of fuel oil. Accounts receivable of the Authority decreased from $356.2 million on June 30, 1996 to $351.6 million on June 30, 1997. Accounts receivable from the governmental sector decreased from $159.4 million on June 30, 1996 to $155.6 million on June 30, 1997.

The following table presents the disposition of Net Revenues, in the order of priority of payment, for the five fiscal years ended June 30, 2001 and for the nine-months ended March 31, 2001 and 2002, in accordance with the provisions of the 1974 Agreement. As discussed above, the Net Revenues shown below and in "Projected Net Revenues" under *Net Revenues and Coverage* are calculated in a manner that differs in several important respects from the Authority's calculation of net income prepared in accordance with generally accepted accounting principles.

**Historical Disposition of Net Revenues**
**(in thousands)**

| | Years Ended June 30, | | | | | Nine Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2002 |
| **Disposition of Net Revenues** | | | | | | | |
| 1974 Revenue Fund: | | | | | | | |
| 1974 Sinking Fund: | | | | | | | |
| Interest | $ 196,552 | $ 216,384 | $ 224,935 | $ 224,758 | $ 240,459 | $ 179,607 | $ 183,292 |
| Principal | 110,045 | 116,199 | 139,704 | 145,058 | 146,989 | 110,196 | 118,765 |
| 1974 Reserve Account | (7,000) | (8,881) | - | - | - | - | - |
| Reserve Maintenance Fund | 3,960 | 5,004 | 6,000 | 7,000 | 7,000 | 5,247 | 5,247 |
| Self-insurance Fund | - | - | - | - | - | - | - |
| Capital Improvement Fund | 70,153 | 106,157 | 62,958 | 74,265 | 100,500 | 75,012 | 60,640 |
| General Obligation Notes: | | | | | | | |
| Interest | 1,025 | 718 | 410 | 103 | - | - | - |
| Contributions in lieu of taxes and other[1] | 96,813 | 111,937 | 77,185 | 107,277 | 155,440 | 109,455 | 97,893 |
| Net Revenues | $ 471,548 | $ 547,518 | $ 511,192 | $ 558,461 | $ 650,388 | $ 479,517 | $ 465,837 |

(1)     Including the following amounts retained by the Authority to offset certain Commonwealth obligations to the Authority, the residential subsidy and other subsidies granted to the hotel industry: $17.9 million, $20.0 million, $18.1 million, $23.5 million and $33.6 million for fiscal years ended June 30, 1997, 1998, 1999, 2000 and 2001, respectively. For the nine months ended March 31, 2001 and 2002, those subsidies amounted to $25.3 million and $19.4 million, respectively. See "Subsidies, Contributions in Lieu of Taxes and Set Aside" under *The System*.

## Factors Affecting the Utility Industry

The electric utility industry generally has faced and is facing certain adverse factors. These include (1) the cost of construction and operation of utility facilities, (2) the uncertain cost of capital, (3) regulations, licensing procedures, litigation and other factors which may delay the construction and increase the cost of new facilities or limit the use of, or necessitate costly modifications to, existing facilities, and (4) the substantially increased capital outlays and longer construction periods required for new facilities. The Authority is unable to predict the future effect of these or other factors upon its operations and financial condition.

42

The electric utility industry in the United States mainland is changing from a regulated monopoly business to a deregulated competitive industry. The Federal Energy Regulatory Commission ("FERC") has mandated wholesale wheeling and open access for transmission facilities owned by utilities that engage in interstate commerce. Many states have enacted or proposed laws and regulations which are designed to (i) insure open access to transmission facilities to promote wholesale power supply competition and (ii) phase in retail competition.

The Authority's competitive situation is different from that of most United States mainland utilities. There are no wholesale clients in the Commonwealth. The application of FERC's requirements to the Authority is limited because the Authority is not interconnected with any other utility. The Authority is not currently subject to FERC's regulations regarding wholesale wheeling.

The absence of mandated open access to the Authority's transmission and distribution system limits competition to on-site power for large industrial customers with little prospect of excess power sales. Additionally, the commercial availability of electric generating units depends heavily on economies of scale and tends not to be economic in small sizes, less than 60 MW, which size is significantly larger than the peak demand of the Authority's largest industrial customers.

The Authority continues to improve its competitive position by (i) improving its quality of service, (ii) rehabilitating its generating, transmission and distribution facilities to improve reliability and efficiency, (iii) diversifying its fuel sources, and (iv) adopting a capacity expansion plan which will meet its load requirements at the lowest System cost.

## Projected Net Revenues

The main assumptions used by the Authority in preparing the estimates of Net Revenues are the following:

Revenues........... Projected Revenues from sales of electric energy are based upon economic growth projections for the Commonwealth. The Revenue projections assume annual sales growth of 3.2%.

Fuel.................. Projected fuel prices are based upon an analysis prepared by the Authority. The following table sets forth projected average per barrel fuel prices:

### Projected Fuel Prices

| Years Ending June 30, | Average Price Per Barrel[1] |
|---|---|
| 2002 ..................... | $21.82 |
| 2003 ..................... | $21.35 |
| 2004 ..................... | $22.38 |
| 2005 ..................... | $23.59 |
| 2006 ..................... | $25.41 |

[1] This is a blended price of No. 2 and No. 6 fuel oil prices. The prices exclude handling charges.

The following table presents the Authority's estimates of Net Revenues for the five fiscal years ending June 30, 2006, in accordance with the provisions of the 1974 Agreement, and the ratio of Net Revenues to Principal and Interest Requirements for Power Revenue Bonds.

43

Beginning in fiscal year 2000, a portion of the Authority's electric sales is derived from energy purchased from cogenerators. See "Adequacy of Capacity" under *The System*. For purposes of the following table and the 1974 Agreement, all payments by the Authority for the purchase of such energy are treated as a Current Expense and will be passed through to its clients in the same manner as its fuel costs are passed through. Payments to be made by the Authority for the purchase of power will fluctuate based on plant availability, price changes and other factors. See "Generating Facilities" under *The System* for a description of the benefits to the Authority of the integration of the EcoEléctrica and AES-PR cogeneration facilities into the Authority's System.

## Projected Net Revenues and Coverage

| | Years Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2002[1] | 2003 | 2004 | 2005 | 2006 |
| Average number of clients | 1,384,206 | 1,403,844 | 1,424,481 | 1,444,121 | 1,464,762 |
| Electric energy sales (in millions of kWh) | 19,051.3 | 19,756.2 | 20,352.2 | 20,823.7 | 21,655.4 |
| Authority generation (gross)(in millions of KWh) | 19,576.6 | 17,157.5 | 17,622.1 | 18,393.2 | 19,512.4 |
| Purchased generation (gross)(in millions of KWh) | 2,986.0 | 6,195.0 | 6,435.0 | 6,221.0 | 6,085.0 |

| Sources of Net Revenues | (dollars in thousands) | | | | |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Sales of electrical energy: | | | | | |
| Residential | $ 717,119 | $ 766,354 | $ 782,243 | $ 809,770 | $ 851,101 |
| Commercial | 958,533 | 1,037,601 | 1,101,832 | 1,154,489 | 1,235,627 |
| Industrial | 377,723 | 411,788 | 430,525 | 454,049 | 481,285 |
| Other | 85,055 | 90,734 | 91,909 | 92,548 | 93,665 |
| | 2,138,430 | 2,306,477 | 2,406,509 | 2,510,856 | 2,661,678 |
| Revenues from Commonwealth for Rural Electrification | 739 | 704 | 591 | 161 | 116 |
| Other (principally, interests earned) | 33,573 | 37,115 | 39,115 | 41,115 | 43,115 |
| | 2,172,742 | 2,344,296 | 2,446,215 | 2,552,132 | 2,704,909 |
| Current Expenses[2]: | | | | | |
| Operations | | | | | |
| Fuel | 696,408 | 594,334 | 638,146 | 699,579 | 786,835 |
| Purchased Power | 229,265 | 438,830 | 450,989 | 458,351 | 461,651 |
| Other Production | 44,707 | 35,533 | 36,268 | 37,019 | 37,785 |
| Transmission and Distribution | 85,672 | 83,400 | 85,126 | 86,888 | 88,686 |
| Customer Accounting and Collections | 82,614 | 79,707 | 81,356 | 83,040 | 84,759 |
| Administration and general | 171,986 | 181,624 | 185,382 | 189,219 | 193,138 |
| Maintenance | 233,057 | 249,901 | 255,071 | 260,352 | 265,741 |
| Other – Interest Charges | 3,263 | 2,027 | 2,078 | 2,130 | 2,183 |
| | 1,546,972 | 1,665,356 | 1,734,416 | 1,816,578 | 1,920,778 |
| Net Revenues | $ 625,770 | $ 678,940 | $ 711,799 | $ 735,554 | $ 784,131 |

| **Coverage** | | | | | |
|---|---|---|---|---|---|
| Principal and Interest Requirements [3] | $ 392,043 | $ 382,519 | $ 430,888 | $ 477,554 | $ 500,056 |
| Ratio of Net Revenues to Principal and Interest Requirements | 1.60 | 1.77 | 1.65 | 1.54 | 1.57 |

(1) Based on actual results through March 31, 2002 and estimates for the remainder of the fiscal year.
(2) The Current Expenses (excluding fuel oil and purchased power) projections assume an annual growth of 2.0%.
(3) Includes debt service requirements for (i) the outstanding Power Revenue Bonds (including the Refunded Power Revenue Bonds and the Defeased N and O Power Revenue Bonds), and (ii) expected Power Revenue Bond issues, all at an assumed interest rate of 6.25% ($644.3 million in fiscal year 2004 and $463.9 million in fiscal year 2005) (no repayments of principal of these issues are assumed until after fiscal year 2004).

The Authority's estimates of Net Revenues, which were made as part of the adoption of its operating budget for fiscal year 2002, have been reviewed and analyzed by the Consulting Engineers. The Consulting Engineers have concluded that (i) the methodology used by the Authority in preparing its revenue and capacity projections generally follows accepted utility practice and is appropriate for the Authority, (ii) the Authority's estimates of future growth form a reasonable basis for its projected operating results, and (iii) the Authority's rates should generate sufficient revenues to pay its Current Expenses and debt service and to finance that portion of its capital improvement program that is currently anticipated to be financed with current operating revenues. See Appendix III, *Letter of Consulting Engineers*.

Although the Authority and the Consulting Engineers believe that the assumptions upon which the estimates of Net Revenues are based are reasonable, actual results may differ from the estimates as circumstances change. In addition, such projections were not intended to comply with the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial projections. The projections have been prepared on the basis of Net Revenues as defined in the 1974 Trust Agreement which differs in several important respects from the Authority's net income prepared in conformity with generally accepted accounting principles in that they do not include, for example, depreciation as a current expense and do not reflect interest expense as a deduction from Net Revenues.

The following table presents the projected disposition of Net Revenues, in the order of priority of payment, for the five fiscal years ending June 30, 2006, in accordance with the provisions of the 1974 Agreement.

### Projected Disposition of Net Revenues
### (in thousands)

| Disposition of Net Revenues | Years Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 |
| 1974 Revenue Fund: | | | | | |
| 1974 Sinking Fund: | | | | | |
| Interest | $247,982 | $249,878 | $255,621 | $288,626 | $292,492 |
| Principal | 158,357 | 137,937 | 178,402 | 188,928 | 207,564 |
| Reserve | -- | -- | -- | -- | -- |
| Reserve Maintenance Fund | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| Self-insurance Fund | -- | -- | -- | -- | -- |
| Capital Improvement Fund | 82,158 | 125,687 | 105,344 | 77,540 | 92,012 |
| Contributions in lieu of taxes and other[1] | 130,273 | 158,438 | 165,432 | 173,460 | 185,063 |
| Total Net Revenues | $625,770 | $678,940 | $711,799 | $735,554 | $784,131 |

(1) Include amounts to be retained by the Authority and used to pay interest on its General Obligation Notes and to offset certain Commonwealth obligations to the Authority, the residential subsidy and the subsidy granted to the hotel industry: $24.6 million, $20.0 million, $21.0 million, $22.8 million and $25.4 million for fiscal years ending June 30, 2002, 2003, 2004, 2005 and 2006, respectively. See "Subsidies Contributions in Lieu of Taxes and Set Aside" under *The System*.

46

## ENVIRONMENTAL MATTERS

The Authority's Planning and Environmental Protection Directorate (the "Directorate") is responsible for ensuring the Authority's compliance with all applicable federal and Commonwealth environmental laws and regulations. The Directorate is in charge of developing and implementing a comprehensive program to improve the Authority's performance in all applicable environmental media, taking into account new regulatory requirements as well as alleged instances of noncompliance cited by the Environmental Protection Agency ("EPA") and any other environmental agencies.

### Environmental Litigation

In February 1992, EPA conducted a multimedia inspection of the Authority's four thermoelectric plants as well as the Monacillos Transmission Center. EPA released a report of its findings in December 1992. In its findings, EPA identified several alleged instances of non-compliance related to the Authority's air, water and oil spill prevention control and countermeasures compliance programs.

The Authority and EPA undertook negotiations to resolve the issues regarding the deficiencies observed during the inspection and to ensure future compliance with all applicable laws and regulations. As a result of the negotiations, the Authority and EPA reached an agreement that resulted in a Consent Decree approved by the United States District Court for the District of Puerto Rico on March 19, 1999. In the Consent Decree, the Authority agreed to pay a civil penalty of $1.5 million and to implement additional compliance projects amounting to $4.5 million. The Authority made the payment for the final installment corresponding to the civil penalty and has updated deposits to the installments required by the Consent Decree for the additional environmental projects. Furthermore, the Consent Decree requires that the Authority improve and implement compliance programs and operations in order to assure compliance with environmental laws and regulations.

In September 1995, while preparing for Hurricane Luis, approximately 270,000 gallons of dilute sulfuric acid (low ph) wastewater were accidentally discharged from the Palo Seco power plant into the Bayamón River, affecting marine life and one percent of a nearby mangrove wetland. After investigations by EPA and the United States Department of Justice, the Authority was charged with violations of the Clean Water Act. On June 12, 1999, the Authority was ordered to pay a $140,000 fine, which it has paid, and was placed on probation for two years. Prior to the expiration of the probation period, the Authority was briefly in technical violation of the conditions of the probation. Said violation has been corrected. As a result of the foregoing, and although the original probation period has expired, the Authority and the U.S. Department of Justice are currently negotiating an extension to the original probation period. The Authority expects that a settlement agreement will be filed before the United States District Court during June 2002.

In November 1999, pursuant to the provisions of the Consent Decree, the Authority filed a Notice of Dispute Resolution with the United States District Court for the District of Puerto Rico to contest EPA's interpretation of the applicable method to determine visible emission from the generating units. In this Notice, the Authority disputes the specific location where to "read" the visible emissions of the plume. In December 1999, the Authority filed another Notice of Dispute Resolution pursuant to the Consent Decree to dispute EPA's determination that the Costa Sur power plant is a repetitious violator of the visible emission requirements of the Consent Decree. The Authority has received several notices of violation in this respect, but the outcome of such notices depends upon the resolution of EPA's interpretations explained above. Both Notices of Dispute Resolution are pending before the United States District Court.

**Compliance Programs**

The Authority continues to develop and implement a comprehensive program to improve environmental compliance in all applicable environmental media. This program has been and continues to be updated to conform to new regulatory requirements.

As of March 31, 2002, the Authority has incurred approximately $6.3 million in order to comply with said regulatory requirements. The Authority estimates that it will spend approximately $28.9 million for such purposes during fiscal year 2003.

*Air Quality Compliance*

The Authority has increased its effort to reduce visible emissions at the Aguirre and Costa Sur power plants. While current operating permits allow the utilization of No. 6 fuel oil with up to 1.5% sulfur content, the Authority continues voluntarily to burn No. 6 fuel oil with 1.0% sulfur content. In general, the Authority is consistently maintaining over a 99% level of compliance with in-stack opacity requirements.

The Authority is also reducing visible emissions by improving boiler maintenance and utilizing fuel additives. Currently, on an experimental basis, the Authority is using water and oil-based fuel additives at the Aguirre power plant and expects to use the same at the Costa Sur power plant.

EPA issued an administrative order to allow the removal of the SCR ("Selected Catalytic Reduction") system from the Authority's combustion turbine plant in Arecibo. As a result of the issuance of said administrative order, the PSD ("Prevention of Significant Deterioration") permit will be revised accordingly. The removal of the SCR system would have the effect of eliminating ammonia injection for Nitrogen Oxide emission control, resulting in expected savings of approximately $5 million annually.

EcoEléctrica's cogeneration project decreased the Authority's dependence on fuel oil. The completion of the AES-PR cogeneration project will also enable the Authority to further reduce its dependence on fuel oil.

After implementing the Air Quality Compliance Programs pursuant to the Consent Decree, the Authority is expected to be in full compliance with all visible emission requirements.

*Water Quality Compliance*

During this fiscal year, the Authority achieved a 98% level of compliance with the Clean Water Act regulations.

The Authority has completed compliance plans for abating water pollution at the Aguirre, San Juan, Costa Sur, and Palo Seco power plants as required by the Consent Decree. For fiscal year 2003, the Authority expects to spend approximately $3.14 million in water pollution abatement projects.

On April 13, 1995, the Authority submitted to EPA a 316(a) Reopener Clause Draft Final Plan of Study for the Costa Sur power plant, requesting that it be permitted to discharge into the Caribbean Sea heated water that was previously used as part of the plant's combustion/generation process ("thermal effluent"). In a letter dated December 20, 2000, EPA indicated that it was prepared to deny the Authority's 316(a) request for its thermal effluent discharge. After extensive negotiations, EPA agreed that the Authority should perform an assessment of possible alternatives. On March 21, 2001, the Authority submitted to EPA a proposed plan which included a phased review of alternatives for the discharge of its thermal effluent. Said plan also included an analysis that would determine the feasibility, reliability, potential effectiveness, and cost evaluation of these alternatives. In a letter dated August 23, 2001, EPA indicated that it would continue a cooperative

48

effort with the Authority in order to develop a compliance plan for the disposition of the plants' thermal effluent. Currently, the Authority is trying to schedule a meeting with EPA in order to clarify EPA's position regarding the Authority proposed plans. The Authority expects to be able to discuss its proposed alternatives and receive a response from EPA soon.

### Underground Injection Control Regulation

The Authority has prepared a compliance plan in order to comply with EQB's Underground Injection Control Regulation. The compliance plan consists of the licensing and construction of septic systems. In addition, the compliance plan includes the closing of systems where sanitary discharges can be connected to the facilities of the Puerto Rico Aqueduct and Sewer Authority. The Authority's Capital Improvement Program for fiscal year 2003 includes $4.1 million for the compliance plan. Currently, the Authority is reviewing the compliance plan before final submission to the EQB.

### Spill Prevention Control and Countermeasures Plan

To meet its obligations with respect to the Spill Prevention Control and Countermeasures Plan Act requirements and Consent Decree, the Authority will continue to implement corrective measures at all of its facilities. The compliance measures for this program are estimated to cost approximately $37.6 million. The Authority estimates that it will spend approximately $13.3 million during fiscal year 2003.

### PCB Testing

The Authority has completed a ten-year EPA-mandated program to sample, test and identify its oil-filled transformers and other equipment in order to comply with applicable PCB regulations. As of March 31, 2002, the Authority had sampled and analyzed approximately 137,909 distribution transformers. The Authority continues to implement a program for the removal and disposal of all transformers with a PCB concentration of 50 ppm or greater. The Authority estimates that approximately 3,000 PCB or PCB contaminated distribution transformers still need to be removed. This program was initially scheduled to be completed by December 31, 2001. EPA, however, has granted the Authority an extension to said program. At the expected rate of disposal of 2,000 units per year, the Authority expects to complete the program by the first quarter of fiscal year 2004. For fiscal year 2003, the Authority has allocated $4.0 million for the PCB removal and disposal program and an additional $1 million for the removal and disposal of the remaining PCB distribution transformers.

### Asbestos Abatement

The Authority is engaged in encapsulating and/or gradually removing asbestos-containing insulation from its power plants. For fiscal year 2003, the Authority has allocated $1.3 million for the asbestos abatement program.

### Capital Improvement Program

The Authority's Capital Improvement Program for the five fiscal years ending June 30, 2007 includes $97.8 million in order to comply with existing Commonwealth and federal environmental laws and regulations. The Authority believes it is taking the necessary steps to comply with all applicable environmental laws and regulations and Consent Decree requirements. See "Projected Five-Year Capital Improvement and Financing Program" under *The System*.

# INSURANCE

## Coverage

The Authority maintains, among others, insurance policies covering all-risk property (excluding transmission and distribution lines), boiler and machinery and public liability. The Authority has placed all-risk property and boiler and machinery policies with a combined coverage of $400 million per occurrence. The policies' self-retention in case of earthquake and windstorm losses is $25 million, $1 million for all other covered risks, except boiler and machinery losses which carry a $2 million retention.

The proceeds of the all-risk property, boiler and machinery policies are used prior to drawing upon the Reserve Maintenance Fund or the Self-insurance Fund established under the 1974 Agreement.

The public general liability policy covers property damage and bodily injury to third parties with a $50 million aggregate limit in excess of the self-retention limit of $1 million per occurrence.

The Authority's transmission and distribution facilities are as susceptible to adverse weather conditions, such as hurricanes, as electric utilities located on the east coast of the United States mainland. The Authority is currently self-insured with respect to property damage for its transmission and distribution systems, as are most other U.S. utilities. Accordingly, while the Authority and Consulting Engineers believe that the Authority reserves are generally sufficient, there can be no assurance that the Authority will be able to provide adequate coverage for damage that might be incurred as a result of any future adverse weather conditions.

In the Authority's opinion, its insurance coverage adequately indemnifies it against property damage or bodily injury resulting from the possession, operation and maintenance of the System by the Authority.

The State Insurance Fund, a Commonwealth agency which provides worker's compensation insurance, is funded by mandatory contributions from employers.

## Self-insurance Fund

The Authority has supplemented the 1974 Agreement to create a Self-insurance Fund, which is funded from Net Revenues (after deposits to the Sinking Fund and the Reserve Maintenance Fund). The Authority has no obligation to make deposits to, or to replenish, the Self-insurance Fund in the event of withdrawals therefrom. Amounts on deposit in the Self-insurance Fund are available for the payment of principal of and interest on the Power Revenue Bonds. As of March 31, 2002, approximately $75.3 million were on deposit in the Self-insurance Fund. See "Disposition of Revenues" under Appendix I, *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.*

# LABOR RELATIONS

As of April 30, 2002, the Authority had 9,557 employees (including Irrigation System Employees), of which 490 were temporary unionized employees. Of such employees, 6,765 were represented by four local unions. The Electrical Industry and Irrigation Workers Union ("UTIER") represents 5,372 employees engaged in operations and maintenance. The three other unions represent construction workers (Insular Union of Industrial and Electrical Construction Workers Union or "UITICE"), professional employees (Independent Professional Employees Union or "UEPI"), and pilots (Power Authority Pilots Union or "UPAEE") employed by the Authority.

50

The agreement with UITICE expires on January 29, 2005. The agreement with UTIER expires on November 14, 2005 and the agreement with UEPI expires on December 18, 2004. The agreement with UPAEE expires on July 2, 2002. There is a preliminary agreement between the Authority and UPAEE, which is subject to certain approvals, but is expected to be signed on or before July 2, 2002. This agreement with UPAEE would expire on July 2, 2006.

Of the 9,557 employees, 3,265 are employed in the transmission and distribution facilities directorate, 2,286 are employed in the generating facilities directorate, 1,624 are employed in the customer service directorate, and the remainder is employed in the administrative directorates and other areas. In order to improve the productivity of its employees, the Authority has instituted various programs to reduce absenteeism, increase safety measures, and reduce the level of drug use among its workers. In addition, the Authority continues to implement programs to provide both technical and supervisory training to its employees. The Authority believes that the implementation of these programs provides for more reliable service for its clients.

## PENSION PLAN

Employees' Retirement System of Puerto Rico Electric Power Authority (the "Retirement System"), a separate trust fund created by the Authority, administers the Authority's pension plan, which provides employee retirement and death benefits. The pension plan provides for contributions by both the Authority, based on annual actuarial valuations, and the plan members. The contributions recorded as of June 30, 2001 and March 31, 2002 were $34.9 million and $32.8 million, respectively. This represents 7.01% and 5.56% for the fiscal year 2001, and 7.01% and 7.82% for the nine months ended March 31, 2002, of covered payroll for normal cost and unfunded actuarial accrued liability for each of the indicated years. Employee contributions and other withholdings are being paid to the Retirement System on a current basis. In the nine months ended March 31, 2001, total pension expense of the Authority was approximately $32.8 million, including approximately $17.3 million for past service costs. Unfunded past service liability to be borne entirely by the Authority approximated $417 million as of June 30, 2001. As of June 30, 2001, the date of the last actuarial valuation of the Retirement System, the pension plan was 83% funded.

The Retirement System's financial statements are audited by a firm of independent public accountants that does not serve as independent accountants to the Authority. See *Independent Accountants*.

## LITIGATION

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the Bonds or in any way contesting or affecting the validity of the Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the 1974 Agreement or the existence or powers of the Authority.

The Authority is involved in various lawsuits arising in the normal course of business none of which, in the opinion of the Authority and its General Counsel, if decided against the Authority, would have a material adverse effect on the Authority's financial condition and/or operations. Among the cases currently pending, some deal with environmental issues. These are described above in "Environmental Litigation" under *Environmental Matters*.

In May 1998, the Municipality of Ponce filed a complaint against the Authority in the Court of First Instance, Superior Section San Juan Part requesting the payment by the Authority of the full contributions in lieu of taxes and electric energy sales set aside for prior fiscal years. The complaint challenges the Authority's disposition of Net Revenues in order to make deposits to certain funds under the 1974 Agreement and under a

51

previous indenture for the purposes of paying costs of capital improvements and seeks a payment by the Authority in the amount by which the amount available to pay contributions in lieu of taxes and electric energy sales set aside to the Municipality of Ponce has been reduced as a result of such disposition. The Authority has filed a motion to dismiss the complaint. Currently, the case is in the discovery phase. The Court has designated a special commissioner to study the allegations of the Municipality of Ponce. The Authority believes that because the Act provides that the contributions in lieu of taxes and electric energy sales set aside are only payable after complying with the Authority's deposit obligations under the 1974 Agreement and such previous indenture and shortfalls do not carry forward as future liabilities of the Authority as described above, it is legally entitled to make such deposits even if the effect is to reduce such contributions and set aside available to municipalities. As of May 31, 2002, 51 municipalities have filed complaints against the Authority requesting the payment by the Authority of the full contribution in lieu of taxes and electric energy sales set aside for prior fiscal years.

On May 18, 2000, Abengoa, Puerto Rico, S.E. ("Abengoa"), the Authority's contractor for the repowering of San Juan Units 5 and 6, unilaterally declared a termination of the contract and filed a complaint for breach of contract. The Authority filed a counter claim for breach of contract and for all damages caused to the Authority by the allegedly illegal contract termination. The Authority believes that the actions by the contractor will not materially affect the ability of the Authority to provide service nor will there be a material difference in the quality of service provided by the Authority.

## TAX EXEMPTION

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Authority must continue to meet after the issuance of the Bonds in order that interest on the Bonds is not included in gross income for federal income tax purposes. The Authority's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. The Authority has covenanted to comply, to the extent permitted by the Constitution of the Commonwealth and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent the Authority from complying with the requirements of the Code.

In the opinion of Sidley Austin Brown & Wood LLP, Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be includable in gross income for federal income tax purposes. Interest on the Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. No opinion is rendered by Sidley Austin Brown & Wood LLP on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as otherwise provided for in the documents pertaining to the Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual

recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the Bonds.

**Discount Bonds**

The excess, if any, of the amount payable at maturity of any maturity of the Bonds over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any maturity of the Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. In general, the issue price of a maturity of the Bonds is the first price at which a substantial amount of Bonds of that maturity was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bonds for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed herein. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bonds of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Bond to a purchaser (other than a purchaser who holds such Bond as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases such Bond as part of the initial offering and at the initial offering price as set forth on the inside cover page over the amount payable at maturity of such Bond is "Bond Premium." Bond Premium is amortized over the term of such Bond for federal income tax purposes (or in the case of a bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such bond). No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Bond. An owner of such Bonds is required to decrease his adjusted basis in such Bonds by the amount of amortizable bond premium attributable to each taxable year such Bonds are held. An owner of such Bonds should consult his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of such Bonds and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such Bonds.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Samuel Klein and Company will verify from the information provided to them the mathematical accuracy as of the date of the closing on the Bonds of the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Power Revenue Bonds. Samuel Klein and Company will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate discount of $2,878,216.83 from the initial public offering prices for such Bonds set forth or derived from information contained on the inside cover page hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all of the Bonds, if any such Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers and others at prices lower than the initial public offering prices. The offering prices may be changed from time to time by the Underwriters. The Authority has agreed to indemnify, to the extent permitted by law, the Underwriters against certain liabilities, including liabilities under federal securities laws.

Goldman, Sachs & Co. ("GS"), a managing underwriter, has entered into an agreement with FirstBank Puerto Rico ("FirstBank"), a bank organized under the laws of the Commonwealth, pursuant to which FirstBank has agreed to act as a consultant to GS in connection with the provision of underwriting and investment banking services to the Authority with respect to the Bonds. Pursuant to this arrangement, the existence of which has been disclosed to the Authority and Government Development Bank, FirstBank will be entitled to receive a portion of GS's net profits, if any, in connection with the underwriting of the Bonds. Other similar agreements with respect to the sharing of underwriting net profits have been entered into and disclosed to the Authority and Government Development Bank by the following Underwriters: Banc of America Securities LLC and Oriental Financial Services Corp.; Lehman Brothers Inc. and Santander Securities Corporation; Wachovia Bank, National Association and Doral Securities Inc.; Morgan Stanley & Co. Incorporated and Popular Securities, Inc.; and ABN Amro Financial Services, Inc. and Prudential Securities Incorporated.

## MATERIAL RELATIONSHIPS

Washington Group International, Inc., independent Consulting Engineers to the Authority, has a contractual relationship with AES to provide engineering, procurement, and construction services in connection with a combined cycle power plant under construction in New Jersey.

See also *Government Development Bank for Puerto Rico,* below.

## LEGAL MATTERS

The proposed form of opinions of Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, is set forth in Appendix IV to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, LLP, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank for Puerto Rico has acted as financial advisor to the Authority in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

## INDEPENDENT ACCOUNTANTS

The financial statements as of June 30, 2001 of the Authority included in Appendix II hereto have been audited by Ernst & Young LLP, San Juan, Puerto Rico, independent accountants, as stated in their report appearing therein. The financial statements of the Authority as of June 30, 2000 and for the year then ended have been audited by PricewaterhouseCoopers LLP, independent accountants.

The prospective financial information included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. Ernst & Young LLP has neither examined nor compiled the accompanying prospective financial information, and accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto.

The Ernst & Young LLP report for fiscal year 2001 included in Appendix II to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to the prospective financial information and should not be read to do so.

## RATINGS

The Bonds have been assigned ratings of "Baa1" by Moody's and "A-" by S&P. These ratings do not reflect the expected issuance by FSA, MBIA and XLCA or their respective insurance policies covering the Insured Bonds (the "Policies"). Moody's and S&P have given the Insured Bonds ratings of "Aaa" and "AAA", respectively, based on the expected issuance of the Policies. The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by any or all of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC, the Authority has covenanted in its resolution authorizing the issuance of the Bonds for the benefit of the Beneficial Owners (as defined in such Resolution and generally the tax owners of the Bonds):

(a)      to file within 275 days after the end of each fiscal year beginning after its fiscal year ending June 30, 2002, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) the Authority's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority's System and revenues, expenditures, financial operations and indebtedness generally found in this Official Statement; and

(b)      to file in a timely manner, with each NRMSIR or with the Municipal Securities Rulemaking Board ("MSRB"), and with any Commonwealth SID, notice of failure of the Authority to comply with clause (a) above and notice of any of the following events with respect to the Bonds, if material:

|       |   |
|-------|---|
| (i)   | principal and interest payment delinquencies; |
| (ii)  | non-payment related defaults; |
| (iii) | unscheduled draws on debt service reserves reflecting financial difficulties; |
| (iv)  | unscheduled draws on credit enhancements reflecting financial difficulties; |
| (v)   | substitution of credit or liquidity providers, or their failure to perform; |
| (vi)  | adverse opinions or events, affecting the tax exempt status of the Bonds; |
| (vii) | modifications to rights of security holders (including Beneficial Owners) of the Bonds; |
| (viii)| Bond calls; |
| (ix)  | defeasances; |
| (x)   | release, substitution, or sale of property securing repayment of the Bonds; and |
| (xi)  | rating changes. |

With respect to the following events:

Events (iv) and (v). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (vi). For information on the tax status of the Bonds, see *Tax Exemption.*

56

Event (viii). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "*Description of the Bonds—Redemption Provisions*", the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

As of May 31, 2002, there is no Commonwealth SID, and the name and address of each NRMSIR is: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn: NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Bonds, but the Authority does not undertake to provide notice of the occurrence of any material event except those events listed above.

The Authority acknowledges that its undertaking pursuant to the Rule described above is intended for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Authority's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority written notice of any request to cure such breach, and the Authority shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Notwithstanding the foregoing, no challenge to the adequacy of the information provided in accordance with the filings mentioned in paragraphs (a) or (b) above may be prosecuted by any Beneficial Owner except in compliance with the remedial and enforcement provisions contained in Article VIII of the 1974 Agreement. See "Remedies of Bondholders" under *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement* in Appendix I.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Authority; or

(2)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority elects that the Covenants shall be deemed amended accordingly.

The Authority has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters to comply with the Rule.

## MISCELLANEOUS

The foregoing summaries of or references to certain provisions of the 1974 Agreement, the proposed Supplemental Agreement, the various acts and the Bonds are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement (i) summaries of the 1974 Agreement and the proposed Supplemental Agreement, (ii) the financial statements of the Authority for the fiscal years ended June 30, 2001 and June 30, 2000, together with the independent accountants' report of Ernst & Young LLP, San Juan, Puerto Rico for fiscal year 2001, (iii) a letter from the Authority's Consulting Engineers, Washington Group International, Inc., regarding its opinion as to certain engineering matters in this Official Statement, (iv) the proposed form of opinions of Sidley Austin Brown & Wood LLP, Bond Counsel, and (v) a specimen of each of the Policies relating to the Insured Bonds.

The information set forth in this Official Statement, except for certain information on page (i) and the information appearing in *Underwriting, Material Relationships*, Appendices III, V, VI and VII and the information pertaining to DTC, FSA, MBIA and XLCA, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to DTC, FSA, MBIA and XLCA was supplied by DTC, FSA, MBIA and XLCA, respectively.

This Official Statement will be filed with the repository established by the MSRB and each NRMSIR.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____/s/ Héctor R. Rosario_____
    Executive Director

58

## DEFINITIONS OF CERTAIN TERMS

The following statements are definitions of certain terms defined in Section 101 of the 1974 Agreement and in this Official Statement.

"Accreted Value" means with respect to any Capital Appreciation Bonds (i) as of any Valuation Date, the amount set forth for such date in the resolution authorizing such Capital Appreciation Bonds and (ii) as of any other date, the sum of (a) the Accreted Value on the preceding Valuation Date and (b) the product of (1) a fraction, the numerator of which is the actual number of days having elapsed from the preceding Valuation Date and the denominator of which is the actual number of days from such preceding Valuation Date to the next succeeding Valuation Date and (2) the difference between the Accreted Values for such Valuation Dates.

"Amortization Accrual" means for any period the amount of an Amortization Requirement that would accrue during such period if such Requirement accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by the Authority, the monthly Amortization Requirement accrual for a term bond begins on the first day of each month in the fiscal year for which such Requirement has been established and shall end on the first day of the month succeeding the relevant Deposit Day.

As applied to the term bonds of any Series, "Amortization Requirement" for any fiscal year means the principal amount fixed or computed for such fiscal year for the retirement of such term bonds by purchase or redemption.

The Amortization Requirements for the term bonds of each Series shall be initially the respective principal amounts for each fiscal year as fixed in a resolution of the Board adopted prior to the issuance of the bonds of such Series. The aggregate amount of such Amortization Requirements for the term bonds of each Series shall be equal to the aggregate principal amount of the term bonds of such Series.

If at the close of any fiscal year the total principal amount of term bonds of any Series retired by purchase or redemption, or prior to the close of such fiscal year called for redemption, shall be in excess of the amount of the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series shall be reduced for such subsequent fiscal years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director in an order filed with the 1974 Trustee on or before the 10th day of July following the close of such fiscal year.

If at the close of any fiscal year the total principal amount of term bonds of any Series retired by purchase or redemption, or called for redemption, prior to the close of such fiscal year shall be less than the amount of the Amortization Requirements for the term bonds of such Series for such fiscal year, then the amount of the Amortization Requirements for the term bonds of such Series for the next succeeding fiscal year shall be increased by the amount of the excess of such deficiency over the amount then held to the credit of the Redemption Account in the 1974 Sinking Fund.

The 1974 Trustee is required, on or before the 15th day of July in each fiscal year, to compute the Amortization Requirements for the then current fiscal year for the term bonds of each Series then outstanding. The Amortization Requirement for the then current fiscal year shall continue to be applicable during the balance of such current fiscal year, and no adjustment shall be made during such year by reason of term bonds purchased or redeemed or called for redemption during such current fiscal year.

"Capital Appreciation Bonds" means any bonds as to which interest is payable only at the maturity or prior redemption of such bonds. For the purposes of (i) receiving payment of the redemption price if a Capital Appreciation Bond is redeemed prior to maturity, or (ii) receiving payment of a Capital Appreciation Bond if the principal of all bonds is declared immediately due and payable following an event of default as provided in Section 802 of the 1974 Agreement, or (iii) computing the principal amount of bonds held by the registered owner of a

Capital Appreciation Bond in giving to the Authority or the 1974 Trustee any notice, consent, request, or demand pursuant to the 1974 Agreement for any purpose whatsoever, the principal amount of a Capital Appreciation Bond shall be deemed to be its Accreted Value. In the case of Capital Appreciation Bonds that are convertible to bonds with interest payable prior to maturity or prior redemption of such bonds, the term "Capital Appreciation Bonds" shall be limited to the period prior to such conversion, and after such conversion, the bonds shall be viewed as any other bonds of the same type for purposes of the 1974 Agreement.

"Current Expenses" means the Authority's reasonable and necessary current expenses of maintaining, repairing and operating the System, including, but not limited to, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to capital expenditures, engineering expenses relating to operations and maintenance, fees and expenses of the 1974 Trustee and any paying agents, legal expenses, any payment to pension or retirement funds and all other expenses required to be paid by the Authority under the 1974 Agreement or by law or permitted by standard practices for public utility systems similar to the properties and business of the Authority, but shall not include any deposits to the credit of the 1974 Sinking Fund, the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund or the Capital Improvement Fund.

"Deposit Day" means the date by which all of the moneys then held to the credit of the Revenue Fund shall be withdrawn by the Treasurer and deposited in the manner set forth in "Disposition of Revenues" in *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement* below.

"Designated Maturity Bonds" means the indebtedness incurred by the Authority under the terms of a separate trust agreement or resolution, which indebtedness has a maturity of at (east ten (10) years and is secured, as to the unamortized principal thereof, on a subordinate basis to the bonds and for which (i) no amortization of principal has been established or (ii) the aggregate amount of the amortized principal that has been established is less than the principal amount of the indebtedness; provided that interest on said indebtedness and any amortized principal of said indebtedness may be payable on a parity, respectively, with interest on bonds and Amortization Requirements on term bonds, in which case said interest and amortized principal shall be calculated as Principal and Interest Requirements on bonds for purposes of the 1974 Agreement and shall otherwise be deemed to be, and be payable as interest and Amortization Requirements on, bonds for purposes of the 1974 Agreement.

"Extendible Maturity Bonds" means bonds the maturities of which, by their terms, may be extended by and at the option of the bondholder or the Authority.

"Independent Consultant" means the consultant at the time employed by the Authority under the provisions of the 1974 Agreement to perform and carry out the duties of the Independent Consultant.

"Interest Accrual" means for any period the amount of interest that would accrue during such period if such interest accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by the Authority, the monthly accrual in respect of interest on the bonds shall commence on the later to occur of the date of issue of the bonds of such Series and the date that is six months prior to the due date of such interest and shall end on the first day of the month following the relevant Deposit Day. In the case of Variable Rate Bonds, the amount deposited shall be based on the sum of the interest accrued through the business day preceding the relevant Deposit Day and the interest (calculated at the maximum rate of interest on such bonds, or if there is no such maximum rate, then at the rate on such bonds on the business day preceding the Deposit Day plus one percent (1%)) that would accrue on such Bonds from the Deposit Day to the later to occur of the first day of the next calendar month and any interest payment date on such Bonds occurring prior to the next Deposit Day.

"Net Revenues" means, for any particular period, the excess of the Revenues for such period over the Current Expenses for such period.

"Prefunded Municipals" means any bonds or other obligations of any state of the United States of America or the Commonwealth or of any agency, instrumentality or local governmental unit of such state or the Commonwealth (a) which are (x) not callable prior to maturity or (y) as to which irrevocable instructions have been given to the trustee of such bonds or other obligations by the obligor to give due notice of redemption and to call such bonds for redemption on the date or dates specified in such instructions, (b) which are secured as to principal, redemption premium if any, and interest by a fund consisting only of cash or Government Obligations or Time

I-2

Deposits, secured in the manner set forth in Section 601 of the 1974 Agreement, which fund may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (c) as to which the principal of and interest on such Government Obligations or Time Deposits, which have been deposited in such fund along with any cash on deposit in such fund, are sufficient to pay principal of and interest and redemption premium, if any, on the bonds or other obligations on the maturity date or dates thereof or on the redemption date or dates specified in the irrevocable instructions referred to in the subclause (a) above, as appropriate.

"Principal Accrual" means for any period the amount of principal that would accrue on serial bonds during such period if such principal accrued ratably on the basis of a year consisting of twelve (12) thirty-day months. Unless otherwise provided by the Authority, the monthly accrual in respect of the principal of serial bonds shall commence on the first day of the twelfth month preceding the due date of such principal and shall end on the first day of the month succeeding the relevant Deposit Day."

"Principal and Interest Requirements" means, for any fiscal year, as applied to the bonds of any Series issued under the 1974 Agreement, the sum of:

(a)        the amount required to pay the interest on all outstanding bonds of such Series which is payable on January 1 in such fiscal year and on July 1 in the following fiscal year,

(b)        the amount required to pay the principal of all outstanding serial bonds of such Series which is payable after July 31 in such fiscal year and on or prior to July 31 in the following fiscal year, and

(c)        the Amortization Requirement for the term bonds of such Series for such fiscal year.

The Principal and Interest Requirements shall be determined as required from time to time, by the 1974 Trustee. In computing such Principal and Interest Requirements for any fiscal year for the bonds of any Series, the 1974 Trustee shall assume that an amount of the term bonds of such Series equal to the Amortization Requirement for the term bonds of such Series for such fiscal year will be retired by purchase or redemption not later than July 1 in the following fiscal year.

To the extent all or a portion of the principal of, Amortization Requirements for or interest on any bonds of any Series are payable from sufficient moneys irrevocably set aside or deposited for such purpose with a bank or trust company (which may include the 1974 Trustee), or from Investment Obligations, as defined in the 1974 Agreement or from Time Deposits secured in the manner set forth in Section 601 of the 1974 Agreement, irrevocably set aside or deposited for such purpose with a bank or trust company (which may include the 1974 Trustee), the principal of and the interest on which Obligations or Deposits when due will provide sufficient moneys, to make such payments, such principal, Amortization Requirements or interest shall not be included in determining Principal and Interest Requirements; provided, however, that for purposes of compliance with the Authority's rate covenant see "Rate Covenant" in *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement*) said definition shall include any interest payable from any amount deposited to the credit of the Bond Service Account in the 1974 Sinking Fund from the proceeds of bonds to pay interest to accrue thereon. Upon request of the 1974 Trustee, the Authority shall cause to be delivered to the 1974 Trustee a certificate of an independent verification agent as to the sufficiency of the maturing principal amounts of any Investment Obligations or Time Deposits, together with interest thereon, set aside or deposited to pay said principal, Amortization Requirements and interest. If the Authority has notified the Trustee that a SWAP agreement is in effect in respect of Variable Rate Bonds, then for all purposes of this paragraph, except for the purpose of determining the aggregate Principal and Interest Requirements in the covenant as to rates contained in Section 502 of the 1974 Agreement (see "Rate Covenant" in *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement*), the interest rate on such Variable Rate Bonds shall be the SWAP rate under such SWAP agreement.

For purposes of determining the aggregate Principal and Interest Requirements in the aforementioned covenant as to rates, and the maximum aggregate Principal and Interest Requirements for purposes of Sections 712, 208, 209 and 210 of the 1974 Agreement, the interest rate on Variable Rate Bonds shall be assumed to be one

I-3

hundred ten percent (110%) of the greater of (i) the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been outstanding under the 1974 Agreement, and (ii) the rate of interest on such Variable Rate Bonds on the date of calculation. If Variable Rate Bonds are payable at the option of the bondholder and the source for payment of said put is a credit or liquidity facility, the "put" date or dates shall be ignored and the stated dates for Amortization Requirements and principal payments thereof shall be used for purposes of this calculation.

For purposes of determining the above requirements in the case of Put Bonds, the "put" date or dates shall be ignored if the source for payment of said put is a credit or liquidity facility and the stated dates for Amortization Requirements and principal payments shall be used. For purposes of determining the above requirements in the case of Extendible Maturity Bonds, the bonds shall be deemed to mature on the later of the stated maturity date or the date to which such stated maturity date has been extended. For purposes of determining the above requirements in the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included in the calculations of accrued and unpaid interest and principal requirements in such manner and during such period of time as is specified in the resolution authorizing such Capital Appreciation Bonds.

Principal and Interest Requirements on bonds shall be deemed to include the amount required to pay interest on outstanding Designated Maturity Bonds and any amortized principal of said Designated Maturity Bonds for any fiscal year, if said interest and amortized principal are payable on a parity with interest and Amortization Requirements on bonds.

"Put Bonds" means bonds, other than Variable Rate Bonds, which by their terms may be tendered by and at the option of the holders thereof for payment prior to the stated maturity thereof.

"Reserve Account Insurance Policy" and "Reserve Account Letter of Credit" mean (1) the insurance policy, surety bond or other acceptable evidence of insurance, if any, or (2) the irrevocable, transferable letter of credit, if any, respectively, deposited in the 1974 Reserve Account in lieu of or in partial substitution for cash or securities on deposit therein, for the purpose of making the payments required to be made from the 1974 Reserve Account under Section 510 of the 1974 Agreement. The issuer providing such insurance or letter of credit shall be a municipal bond insurer or a banking association, bank or trust company (or branch thereof) whose policy or bond or letter of credit results in the rating of municipal obligations secured by such policy or bond or such letter of credit, respectively, to be rated, at the time of deposit into the 1974 Reserve Account, in one of the three highest grades by either Standard & Poor's Corporation or Moody's Investors Service, or if both such corporations no longer perform the functions of a securities rating agency, a nationally recognized rating agency.

"Revenues" or "Revenues of the System" means all money received by the Authority in connection with or as a result of its ownership or operation of the System, including income derived from the sale of electricity generated or distributed by the System, the proceeds of use and occupancy insurance on the System or any part thereof and income from the investment of moneys under the 1974 Agreement, except income from the investment of moneys in the 1974 Construction Fund, the Reserve Maintenance Fund, the Capital Improvement Fund and the Subordinate Obligations Fund to the extent such income has been derived from the investment of moneys in such Fund to be used to pay Subordinate Obligations incurred to pay the cost of any work or properties which have not been included by the Authority as part of the System as provided in "Disposition of Revenues" in *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.* Except for the purpose of determining the amount of the Revenues in the covenant as to rates contained in Section 502 of the 1974 Agreement, Revenues shall not include any amounts paid to the Authority by a SWAP party in connection with Variable Rate Bonds.

"Subordinate Obligations" means any obligations of the Authority incurred as provided in "Disposition of Revenues" in *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement.*

"SWAP agreement" means an agreement between the Authority and a SWAP party whereby the SWAP party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on Variable Rate Bonds at or prior to the times such interest is due and payable in consideration of the Authority's payment to the SWAP party of amounts set forth in the SWAP agreement.

I-4

"SWAP party" means a person who is party to a SWAP agreement and whose senior obligations are rated at the time of the execution and delivery of such SWAP agreement in one of the three highest rating categories (without regard to gradations within a category) by (i) Standard & Poor's Corporation or its successor and (ii) Moody's Investors Service or its successor.

"SWAP rate" means the fixed rate per annum on the principal amount of Variable Rate Bonds covered by a SWAP agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the SWAP party less the amount paid to the Authority by the SWAP party by (ii) such principal amount of Variable Rate Bonds; provided, however, that if such SWAP agreement has been in effect for less than twelve months, such percentage shall be multiplied by a fraction equal to 360 divided by the number of days between the effective date of such SWAP agreement and the date of calculation determined on the basis of 30-day months.

"System" means all the properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be acquired or constructed by the Authority in connection with the production, distribution or sale of electric energy and the acquisition or construction of which shall be financed in whole or in part from the proceeds of bonds issued under the provisions of the 1974 Agreement or from moneys deposited to the credit of the 1974 Construction Fund, the Capital Improvement Fund or from Subordinate Obligations to the extent such works and properties have been included by the Authority as part of the System as provided in "Disposition of Revenues" in *Summary of Certain Provisions of the 1974 Agreement Excluding Proposed Supplemental Agreement*.

"Valuation Date" means with respect to any Capital Appreciation Bonds the date or dates set forth in the resolution authorizing such bonds on which Accreted Values are assigned to the Capital Appreciation Bonds.

"Variable Rate Bonds" means bonds issued with a variable, adjustable, convertible or similar interest rate which is not fixed in percentage at the date of issue for the term thereof but which may or may not be convertible to a fixed interest rate for the remainder of their term.

### SUMMARY OF CERTAIN PROVISIONS OF

### THE 1974 AGREEMENT EXCLUDING PROPOSED

### SUPPLEMENTAL AGREEMENT

*(See also Summary of Certain Provisions of Proposed Supplemental Agreement)*

The following statements are brief summaries of certain provisions of the 1974 Agreement. Said statements do not purport to be complete and reference is made to the 1974 Agreement, copies of which are available for examination at the office of the 1974 Trustee.

### Provision for Variable Rate Bonds, Put Bonds, Extendible Maturity Bonds, Capital Appreciation Bonds and other types of bonds

Under the 1974 Agreement, the Authority may issue Capital Appreciation Bonds, Variable Rate Bonds, Put Bonds, Extendible Maturity Bonds and other types of bonds which may from time to time be created. The interest rate calculation methods and interest rate payment dates, which need not be semi-annual, shall be established by the Authority prior to the issuance of particular Series of bonds. The features of Variable Rate Bonds shall be established prior to their issuance and may provide, in addition to provisions for conversion to a fixed interest rate, that bondholders may demand payment of principal and interest within a stated period. In this connection, the Authority may provide for the remarketing of bonds that have been tendered pursuant to the demand features and for a credit facility or liquidity facility which may be drawn upon to make principal and interest payments on the Variable Rate Bonds. The terms for Put Bonds may contain some of the above provisions. The terms for Extendible Maturity Bonds may include an option to extend the maturity of such bonds granted to bondholders and the Authority. The terms for Capital Appreciation Bonds shall include Valuation Dates, the Accreted Value on such dates, the manner in which and the period during which principal and interest shall be deemed to accrue on said bonds and the amount of any deposit required for the 1974 Reserve Account. (1974 Agreement, Sections 208, 209 and 210).

### Security for the Power Revenue Bonds

The Power Revenue Bonds are secured by a pledge of moneys in the Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund (the "1974 Sinking Fund"), a special fund created by the 1974 Agreement. (1974 Agreement, Section 507).

The Authority covenants to deposit with the 1974 Trustee, to the credit of the 1974 Sinking Fund, a sufficient amount of the Revenues, over and above the expenses of maintaining, repairing and operating the System and any reserve therefor, to pay the principal of and the interest on all Power Revenue Bonds as the same shall become due and payable and to create a reserve for such purpose. (1974 Agreement, Section 507).

The Power Revenue Bonds shall not be deemed to constitute a debt or obligation of the Commonwealth or any of its municipalities or other political subdivisions. (1974 Agreement, Section 701).

### Issuance of Power Revenue Bonds—Sections 208, 209 and 210 of the 1974 Agreement

Section 208 of the 1974 Agreement provides for the issuance of Power Revenue Bonds for Improvements, as defined in the 1974 Agreement, including the repayment of advances therefor, and to provide moneys for deposit to the Reserve Account in the 1974 Sinking Fund (the "1974 Reserve Account"), subject to the conditions and limitations therein. Power Revenue Bonds may be issued under Section 208 if, among other things:

      (i)      the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months immediately preceding the date of the issuance of such bonds, adjusted to reflect the then current rate schedule, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any

I-6

fiscal year thereafter on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued); and

   (ii)    the estimated average annual Net Revenues for the five fiscal years immediately following the fiscal year in which the issuance of such bonds occurs, adjusted to reflect the then current rate schedule and any rate schedule the Authority has covenanted to put in effect during such five fiscal years, shall be not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued. (1974 Agreement, Section 208).

Section 209 of the 1974 Agreement provides for the issuance of Power Revenue Bonds for any proper corporate purpose of the Authority (other than for refunding outstanding Power Revenue Bonds or for Improvements), upon the conditions and limitations set forth therein. Power Revenue Bonds may be issued under Section 209 if, among other things, the earnings tests described above for the issuance of bonds under Section 208 of the 1974 Agreement are satisfied. (1974 Agreement, Section 209).

Section 210 of the 1974 Agreement provides for the issuance of Power Revenue Bonds to refund prior to or at their maturities all or any part of the outstanding bonds of any Series issued under the 1974 Agreement, including the payment of any redemption premium, accrued interest and financing costs and for the purpose of providing moneys for deposit to the credit of the 1974 Reserve Account, subject to the conditions and limitations set forth therein. Power Revenue Refunding Bonds may be issued under Section 210 if, among other things, either (i) the earnings tests described above for the issuance of bonds under Section 208 of the 1974 Agreement (except that effect is given to the retirement of the bonds to be refunded) are satisfied or (ii) the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and the bonds then to be issued (after giving effect to the retirement of the bonds to be refunded) shall be less than the maximum aggregate Principal and Interest Requirements on account of all outstanding Power Revenue Bonds (excluding the bonds then to be issued). Power Revenue Refunding Bonds may be issued without compliance with the foregoing tests to refund serial bonds of any Series of Power Revenue Bonds maturing within one year thereafter (and to pay interest thereon to maturity, if deemed necessary by the Authority), if the Authority shall determine that the moneys in the 1974 Sinking Fund will not be sufficient for paying such serial bonds at their maturity. The proceeds of Power Revenue Refunding Bonds shall, to the extent practicable, be invested and reinvested by the Trustee, with the approval of the Executive Director, in Government Obligations, Prerefunded Municipals or in Time Deposits, secured in the manner set forth in Section 601 of the 1974 Agreement, and the moneys so invested shall be available for use when required. (1974 Agreement, Section 210).

## Collection of Revenues

*1974 General Fund*

A special fund is created by the 1974 Agreement and designated the "Puerto Rico Electric Power Authority General Fund" (the "1974 General Fund"). The Authority covenants that all Revenues, other than income from investments made under the provisions of the 1974 Agreement, will be deposited as received in the 1974 General Fund. (1974 Agreement, Section 503). On or before the 15th day of May in each year the Authority must prepare a proposed budget of Current Expenses and of Capital Expenditures for the ensuing fiscal year, showing separately, the amount to be expended during such fiscal year from moneys deposited to the credit of the 1974 Construction Fund and the amount of the working cash funds required for each month during such fiscal year. A public hearing on the proposed budget must be held on June 1 or on the first business day thereafter, and the Authority must finally adopt the Annual Budget on or before July 1. (1974 Agreement, Section 504). The Authority covenants that moneys in the 1974 General Fund will be used first for the payment of Current Expenses of the System, and that, if the amount expended in any fiscal year for Current Expenses shall exceed the amount provided therefor in the Annual Budget, the Authority will report such excess and the reasons therefor to the Consulting Engineers and to the 1974 Trustee as soon as practicable but not later than the end of the sixth month following the month in which such excess shall have occurred. (1974 Agreement, Section 505).

*1974 Revenue Fund*

A special fund is created by the 1974 Agreement and designated the "Puerto Rico Electric Power Authority Power Revenue Fund" (the "1974 Revenue Fund"). The Treasurer of the Authority is required to transfer each month from the 1974 General Fund to the 1974 Revenue Fund an amount equal to the amount of all moneys held in the 1974 General Fund at the end of the preceding month less an amount to be held as a reserve for Current Expenses equal to not more than 1/6 of the amount shown by the Annual Budget to be necessary for Current Expenses for the current fiscal year, such transfers to be made on the books of the Authority as of the close of the preceding month. (1974 Agreement, Section 506).

## Disposition of Revenues

*1974 Sinking Fund, Reserve Maintenance Fund, Subordinate Obligations Fund, Self-insurance Fund and Capital Improvement Fund*

On or before the 25th day of each month, the Treasurer shall withdraw from the 1974 Revenue Fund, all the moneys then in such Fund and deposit the moneys so withdrawn to the credit of the following Accounts and Funds in the following order:

1.  the Bond Service Account in the 1974 Sinking Fund, until there has been accumulated therein an amount equal to the sum of (i) the Interest Accrual on all the outstanding Power Revenue Bonds to and including the first day of the next calendar month, and (ii) the Principal Accrual on the outstanding serial bonds of each Series of outstanding Power Revenue Bonds to and including the first day of the next calendar month;

2.  the Redemption Account in the 1974 Sinking Fund, until there has been deposited therein an amount equal to the Amortization Accrual for the term bonds of each Series of Power Revenue Bonds then outstanding to and including the first day of the next calendar month;

3.  the 1974 Reserve Account until the balance therein is equal to the interest payable on all outstanding Power Revenue Bonds within the next ensuing 12 months; provided, however, that the monthly deposit in respect of any Series of Power Revenue Bonds issued under Section 208 or 209 of the 1974 Agreement need not exceed 1/60 of the amount of the increase in the interest payable within the next ensuing 12 months resulting from the issuance of bonds of such Series, and provided, further, that the monthly requirements for deposits to the 1974 Reserve Account shall be cumulative; and that in the case of Variable Rate Bonds, the minimum amount to be deposited in the 1974 Reserve Account which shall be funded over the period required herein, shall be based initially on the interest rate in effect on the date of issuance of the Variable Rate Bonds and then shall be adjusted on the 25th day of each subsequent month based on the actual interest accrued from the 25th day of the previous month to the date of adjustment, except that in the case of Variable Rate Bonds in respect of which the Authority has notified the Trustee that a SWAP agreement is in effect, the Trustee shall use the SWAP rate in calculating the interest payable on such Bonds within the next ensuing twelve (12) months; and that in the case of Capital Appreciation Bonds, the minimum amount required to be deposited in the Reserve Account shall be an amount derived from the interest rate which has been used to calculate the assumed yield on such bonds through their maturity times the Accreted Value of such bonds on the Valuation Date occurring at or after the first day of the twelfth succeeding month to the date of calculation of this requirement, as may be further specified in the resolution authorizing Capital Appreciation Bonds;

4.  the Puerto Rico Electric Power Authority Reserve Maintenance Fund (the "Reserve Maintenance Fund"), a special fund created by the 1974 Agreement, such amount of any balance remaining after making the deposits mentioned in paragraphs 1, 2 and 3 above as may be recommended by the Consulting Engineers; provided that the monthly requirements for deposit to the Reserve Maintenance Fund shall be cumulative, and provided further that in the event that the Authority shall covenant in respect of any Subordinate Obligation to limit the monthly deposit to the Reserve Maintenance Fund as described below in *Subordinate Obligations Fund*, the monthly deposit required by this paragraph shall be equal to the least of

I-8

(i)      the amount described above in this paragraph,

(ii)      $400,000, and

(iii)      an amount that when added to the amount then on deposit in the Reserve Maintenance Fund shall make the total amount on deposit equal to $10,000,000;

5.   one or more special accounts in the Puerto Rico Electric Power Authority Subordinate Obligations Fund (the "Subordinate Obligations Fund"), a special fund created under the 1974 Agreement, such amount of any balance remaining after making the deposits mentioned under paragraphs 1, 2, 3 and 4 above that together with amounts then on deposit in the Subordinate Obligations Fund will make the total amount then on deposit equal to any amounts required to be paid or accrued with respect to any Subordinate Obligations prior to the Deposit Day of the next succeeding month from or to the Subordinate Obligations Fund;

6.   if the Authority shall have covenanted with respect to Subordinate Obligations to limit its deposit to the Reserve Maintenance Fund in accordance with the provisions of the second proviso of paragraph 4 above and in fact the deposit to said Fund pursuant to paragraph 4 was limited to the amount described in clause (ii) or (iii) of such paragraph, the Reserve Maintenance Fund, such amount of any balance remaining after making the deposits under paragraphs 1, 2 3, 4 or 5 above as may be required to make the total amount deposited in the Reserve Maintenance Fund in such month equal to the amount described in clause (i) of clause (4) above;

7.   the Puerto Rico Electric Power Authority Self-insurance Fund (the "Self-insurance Fund"), a special fund created by the 1974 Agreement, such amount of any balance remaining after making the deposits mentioned in paragraphs 1, 2, 3 , 4, 5 and 6 above as may be determined by the Authority from time to time; and

8.   the Puerto Rico Electric Power Authority Capital Improvement Fund (the "Capital Improvement Fund"), a special fund created by the 1974 Agreement, such amount of any balance remaining after making deposits mentioned under paragraphs 1, 2, 3, 4, 5, 6 and 7 above as may be determined by the Authority, with the approval of the Consulting Engineers; provided that the monthly requirements for deposit to the Capital Improvement Fund shall be cumulative.

Any balance remaining after making the deposits under paragraphs 1 through 8 above may be used for any lawful purpose of the Authority. (1974 Agreement, Section 507).

If amounts applied to the payment of interest, principal and redemption price on bonds are paid by a credit or liquidity facility issuer, the amounts deposited in the Bond Service Account and the Redemption Account in the 1974 Sinking Fund allocable to said payment (other than a payment of the purchase price of bonds pursuant to a "put") may be paid to said credit or liquidity facility issuer. (1974 Agreement, Section 509).

Moneys in the 1974 Reserve Account shall be used by the 1974 Trustee first for the purpose of paying the interest on the Power Revenue Bonds and maturing principal of serial bonds whenever moneys in the Bond Service Account are insufficient for such purposes and thereafter for the purpose of making the required deposits to the Redemption Account mentioned in paragraph 2 above whenever the withdrawal from the 1974 Revenue Fund is insufficient for such purpose. Excess moneys in the 1974 Reserve Account shall be transferred to the Bond Service Account or may be used to reduce any Reserve Account Insurance Policy or Letter of Credit. (1974 Agreement, Section 510). The Authority may deposit a Reserve Account Insurance Policy or Letter of Credit into the 1974 Reserve Account, in lieu, or in partial substitution, of any required deposit into the 1974 Reserve Account. Said Reserve Account Insurance Policy or Letter of Credit may be secured by a lien on Revenues not inconsistent with the provisions of the 1974 Agreement and shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any date on which moneys are required to be paid out of the 1974 Reserve Account pursuant to Section 510 of the 1974 Agreement. If a disbursement is made under any Reserve Account Insurance Policy or Letter of Credit, the Authority shall be obligated either to reinstate the limits of such

I-9

Reserve Account Insurance Policy or Letter of Credit following such disbursement or to deposit into the 1974 Reserve Account moneys in accordance with the provisions of Section 507 of the 1974 Agreement in the amount of the disbursement made under such Reserve Account Insurance Policy or Letter of Credit. The Authority may at any time substitute (i) all or a portion of the moneys held to the credit of the 1974 Reserve Account with a Reserve Account Insurance Policy or Letter of Credit, (ii) all or a portion of any Reserve Account Insurance Policy on deposit in the 1974 Reserve Account with moneys or a Reserve Account Letter of Credit, or (iii) all or a portion of any Reserve Account Letter of Credit on deposit in the 1974 Reserve Account with moneys or a Reserve Account Insurance Policy. Any moneys on deposit in the 1974 Reserve Account in substitution of which a Reserve Account Insurance Policy or Letter of Credit is deposited shall, to the extent not required to fund any deficiencies in the amount then required to be on deposit in the 1974 Reserve Account, be released and immediately paid over to the Authority to be used by the Authority for any proper corporate purpose. Prior to the expiration date of any Reserve Account Insurance Policy or Letter of Credit then on deposit to the credit of the 1974 Reserve Account, the Authority shall be required to (x) cause the term of such Reserve Account Insurance Policy or Letter of Credit to be extended, (y) replace any such Reserve Account Insurance Policy with moneys (which may include, without limitation, moneys available under the Reserve Account Insurance Policy or from any other source available for such purpose) or a Reserve Account Letter of Credit, or (z) replace any such Reserve Account Letter of Credit with moneys (which may include, without limitation, moneys available under the Reserve Account Letter of Credit or from any other source available for such purpose) or a Reserve Account Insurance Policy; provided, that in the event that the Authority has not extended or replaced the expiring Reserve Account Insurance Policy or Letter of Credit by the fifth business day prior to its date of expiration, the expiring Reserve Account Insurance Policy or Letter of Credit shall, on such date, be drawn upon and the moneys so made available shall thereupon be deposited in the 1974 Reserve Account. (1974 Agreement, Section 510).

Moneys in the Reserve Maintenance Fund shall be used only for the purpose of paying the cost of unusual or extraordinary maintenance or repairs, maintenance or repairs not recurring annually and renewals and replacements, including major items of equipment. The Reserve Maintenance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the 1974 Sinking Fund, including moneys in the 1974 Reserve Account, are insufficient for such purpose. (1974 Agreement, Section 512).

Moneys in the Self-insurance Fund shall be used only for the purpose of paying the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required by the 1974 Agreement. See "Insurance" below. The Self-insurance Fund also serves as an additional reserve for the payment of the principal of and the interest on the Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the 1974 Sinking Fund, including the 1974 Reserve Account, and in the Reserve Maintenance Fund are insufficient for such purpose. (1974 Agreement, Section 512A).

Moneys in the Capital Improvement Fund shall be used only for the purpose of paying the cost of anticipated extensions and Improvements which cost has not otherwise been provided for from the proceeds of Power Revenue Bonds. The Capital Improvement Fund also serves as an additional reserve for the payment of principal of and the interest on Power Revenue Bonds and meeting the Amortization Requirements to the extent that moneys in the 1974 Sinking Fund, including the 1974 Reserve Account, in the Reserve Maintenance Fund and in the Self-insurance Fund are insufficient for such purpose. (1974 Agreement, Section 512B).

*Subordinate Obligations Fund*

Moneys in the Subordinate Obligations Fund shall be paid out or pledged by the Authority as necessary to enable the Authority to meet its Subordinate Obligations. Subordinate Obligations may be incurred or issued by the Authority for any proper corporate purpose of the Authority.

The Authority may covenant with the holders of any Subordinate Obligations to limit the deposits to the Reserve Maintenance Fund as authorized by paragraph 4 above and to add to the conditions, limitations and restrictions under which Power Revenue Bonds may be issued under the provisions of 1974 Agreement.

Subordinate Obligations shall be payable out of and may be secured by a pledge of (i) available amounts in the Subordinate Obligations Fund and (ii) any other available funds of the Authority. Any such payment or pledge shall be expressly subordinate and junior in all respects to the lien and charge of the Power Revenue Bonds upon the Revenues.

Before incurring any Subordinate Obligations the proceeds of which shall be applied to acquire or construct any works or properties by the Authority in connection with the production, distribution or sale of electric energy, the Authority shall specify by resolution whether or not such works or properties are to be included as part of the System. (1974 Agreement, Section 516).

*1974 Construction Fund*

A special fund is created by the 1974 Agreement and designated the "Puerto Rico Electric Power Authority Power System Construction Fund" (the "1974 Construction Fund"). The proceeds of any Power Revenue Bonds issued for the purpose of paying the cost of acquiring or constructing Improvements, together with the moneys received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the 1974 Reserve Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the 1974 Construction Fund and held by the Authority in trust. (1974 Agreement, Sections 208 and 401). Payments from the 1974 Construction Fund are made by the Executive Director or by any officer or employee of the Authority designated by him for such purpose. (1974 Agreement, Section 402).

**Rate Covenant**

The Authority covenants that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System so that the Revenues will be at all times sufficient to pay the Current Expenses of the System and to provide an amount at least equal to 120% of the aggregate Principal and Interest Requirements for the next fiscal year on account of all outstanding Power Revenue Bonds, reduced by any amount deposited in the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year.

The Authority further covenants that if at any time the Revenues shall not be sufficient to satisfy the foregoing covenant as to rates, it will revise the rates and charges for the services and facilities furnished by the System and, if necessary, it will revise its regulations in relation to the collection of bills for such services and facilities, so that such deficiency will be made up before the end of the next ensuing fiscal year. Should any deficiency not be made up in such next ensuing fiscal year, the requirement therefor, shall be cumulative and the Authority shall continue to revise such rates until such deficiency shall have been completely made up. (1974 Agreement, Section 502).

**Investment of Funds**

The 1974 Agreement provides for the following types of investments:

(a)    Government Obligations, which are (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government, including securities evidencing ownership interests in such obligations or in specified portions thereof (which may consist of specific portions of the principal of or interest on such obligations), (ii) bonds, debentures or notes issued by any of the following federal agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association, Federal Land Banks, or the Federal National Mortgage Association (including participation certificates issued by such Association) and (iii) all other obligations issued or unconditionally guaranteed as to principal and interest by any agency or person controlled or supervised by and acting as an instrumentality of the United States Government pursuant to authority granted by the Congress;

(b) Investment Obligations, which are (i) Government Obligations, (ii) obligations of any state or territory of the United States or political subdivision thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency), (iii) repurchase agreements with commercial banks fully secured by Government Obligations and (iv) any other investment obligations permitted for governmental instrumentalities under the laws of the Commonwealth which are rated in any of the three highest grades by a nationally recognized rating agency or which are collateralized by Investment Obligations; and

(c) Time Deposits, which are time deposits, certificates of deposit or similar arrangements with the 1974 Trustee, Government Development Bank for Puerto Rico or any bank or trust company which is a member of the Federal Deposit Insurance Corporation having a combined capital and surplus aggregating not less than $100,000,000. (1974 Agreement, Section 101).

Moneys in the Bond Service Account, the Redemption Account and the 1974 Revenue Fund shall be invested by the 1974 Trustee or by the Authority, as the case may be, in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when such moneys will be required for the purposes intended, or in Time Deposits; provided, that each such Time Deposit shall permit the moneys so placed to be available for use when required for the purposes intended.

Any moneys in the 1974 Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the 1974 Reserve Account shall be invested by the 1974 Trustee or the Authority, as the case may be, in Investment Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, in the case of the 1974 Construction Fund, the Self-insurance Fund, the Capital Improvement Fund and the Reserve Maintenance Fund, not later than the respective dates when the moneys invested will be required for the purposes intended, and in the case of the 1974 Reserve Account, as to approximately 50% of such moneys, not later than five years after the date of such investment, and as to the balance of such moneys, as directed by order of the Executive Director or other authorized officer of the Authority. In lieu of such investments, moneys in the 1974 Construction Fund, the Reserve Maintenance Fund, the Self-insurance Fund, the Capital Improvement Fund and the 1974 Reserve Account may be invested in Time Deposits which shall permit the moneys so placed to be available for use at the times provided for investments in Investment Obligations. (1974 Agreement, Section 602).

Any moneys in the Self-insurance Fund may also be invested by the Authority in any investments authorized by law for the Retirement System of the Employees of the Government for Puerto Rico and its Instrumentalities, but the Authority shall invest not less than the lesser of $25,000,000 and the entire balance in such Fund in Investment Obligations with an average weighted maturity of not more than three years.

Prior to investing any moneys in the Self-insurance Fund in other than Investment Obligations, the Authority shall obtain an Independent Consultant's report recommending what portion of moneys held in the Self-insurance Fund the Authority shall maintain invested in Investment Obligations and shall, after duly considering the report, formally adopt, subject to the consent of Government Development Bank for Puerto Rico, and maintain an investment policy first determining the minimum portion of the moneys held for the credit of the Self-insurance Fund to remain invested in Investment Obligations and then setting forth prudent investment principles, considerations and goals, including liquidity, diversification of assets, safety and rate or rates of return, that will govern the investment strategies and goals for the balance of the Self-insurance Fund and shall advise the Trustee in writing of those investments other than Investment Obligations that are authorized by said investment policy. (1974 Agreement, Section 602).

## Accounting

The Authority covenants that it will keep accurate records and accounts, according to standard practices for public utility systems similar to the properties and business of the Authority and applicable in such circumstances, of all items of cost and expenditures relating to the System, the Revenues collected and the application of the Revenues. The Authority further covenants that in the first month of each fiscal year it will cause an audit for the preceding fiscal year to be made of its books and accounts pertaining to the System by an independent firm of

certified public accountants widely known in the United States and approved by the 1974 Trustee. (1974 Agreement, Section 710). The Authority records Revenues and Current Expenses on the accrual basis.

**Release of Property**

The Authority covenants that so long as any Power Revenue Bonds shall be outstanding it will not sell, lease or otherwise dispose of or encumber the System or any part thereof and will not create or permit to be created any charge or lien on the Revenues ranking equally with or prior to the charge or lien on the Revenues of the Power Revenue Bonds. The Authority may, however, from time to time, sell machinery, fixtures, tools or other movable property or materials if the Authority shall determine that such articles are no longer needed or useful in connection with the construction or operation and maintenance of the System. Any such moneys received may be applied to replace any such properties sold or disposed of or shall be deposited in the Redemption Account or the 1974 Construction Fund. Other property forming part of the System, not needed or serving no useful purpose in connection with the System, may be sold, leased or transferred provided the proceeds of which shall be deposited in the Redemption Account or the 1974 Construction Fund and the rentals be deposited in the 1974 Revenue Fund.

Notwithstanding the previous paragraph, the Authority may abandon, sell, lease or transfer any property forming a part of the System, if, among other things, the Net Revenues for any 12 consecutive calendar months out of the 18 calendar months next preceding the date of such abandonment, sale, lease or transfer, adjusted to give effect to such abandonment, sale, lease or transfer and any replacement and to reflect the rate schedule then in effect, are not less than 120% of the maximum aggregate Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Power Revenue Bonds and if the 1974 Reserve Account is fully funded. Any transferee of said property may be considered in lieu of or in addition to the Authority for purposes of such coverage if the transferee agrees to assume the Authority's obligations under the 1974 Agreement. Said coverage test need not be met if the transferee is a public corporation or other governmental entity provided the coverage is not reduced due to such transfer. The proceeds of such sale shall be deposited in the Redemption Account or in the 1974 Construction Fund, at the option of the Authority, or shall be applied to the replacement of the property so sold. The rentals under any such lease shall be deposited in the 1974 Revenue Fund.

In addition, the Authority may lease portions of the System or make contracts or other arrangements or grant licenses or easements with respect to the operation or use of the System, if certain reports and certificates of the Consulting Engineers are provided that confirm, among other things, that operational covenants will be binding on the lessee or other contracting entity and that the lease, contract, license, easement or other arrangement provides for rent or other payments that are projected to be sufficient with other projected Net Revenues of the System to make all payments of the Principal and Interest Requirements for all Power Revenue Bonds. Rents received under any such lease, contract, license, easement or other management shall be included as Revenues. (1974 Agreement, Section 712).

**Insurance**

The Authority covenants that it will at all times carry insurance in a responsible insurance company or companies authorized and qualified under the laws of Puerto Rico to assume the risk thereof, covering such properties belonging to the System as are customarily insured, and against loss or damage from such causes as are customarily insured against, by companies engaged in similar business.

The Authority covenants that, immediately after any loss or damage, it will cause to be prepared plans and specifications for repairing, replacing or reconstructing the damaged property, and will forthwith proceed with the repair, replacement or reconstruction of the damaged or destroyed property unless it shall determine that the repair, replacement or reconstruction of such property is not essential to the efficient operation of the System. Any proceeds of any insurance not applied within 18 months after receipt by the Treasurer to repairing, replacing or reconstructing damaged or destroyed property shall be deposited in the Redemption Account or the 1974 Construction Fund, at the option of the Authority, unless the Authority shall be prevented from doing so by conditions beyond its control or unless the holders of 51% in aggregate principal amount of the Power Revenue Bonds then outstanding shall otherwise direct. (1974 Agreement, Section 707).

**Consulting Engineers and Independent Consultant**

The Authority covenants that so long as any of the Power Revenue Bonds are outstanding it will employ as Consulting Engineers an independent engineer or engineering firm having a wide and favorable repute in the United States for skill and experience in the construction and operation of electric systems. It shall be the duty of the Consulting Engineers to prepare an annual report setting forth their recommendations as to revisions of rates and charges. It shall be the duty of the Consulting Engineers to include in such report their recommendations as to the amount to be deposited in the Reserve Maintenance Fund, the Capital Improvement Fund and the Self-insurance Fund. (1974 Agreement, Section 706).

The Authority covenants that so long as any Power Revenue Bonds are outstanding it will employ as Independent Consultant one or more independent firms having a wide and favorable repute in the United States for expertise in risk management and other insurance matters related to the construction and operation of electric systems. It shall be the duty of the Independent Consultant to prepare at least biennially a report setting forth its recommendations, based on a review of the insurance then maintained by the Authority in accordance with the 1974 Agreement and the status of the Self-insurance Fund, of any changes in coverage, including its recommendations of policy limits and deductibles and self-insurance, and investment strategies for the Self-insurance Fund. (1974 Agreement, Sections 706 and 707).

**Modifications**

The Authority and the 1974 Trustee may, without the consent of the holders of the Power Revenue Bonds, enter into such supplemental agreements as shall not be inconsistent with the 1974 Agreement, to cure any ambiguity, to correct or supplement any provision in the 1974 Agreement which may be inconsistent with any other provision therein, to make any other provisions which shall not be inconsistent with the provisions of the 1974 Agreement, provided such action shall not adversely affect the interest of the bondholders, or to grant to or confer upon the 1974 Trustee for the benefit of the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders or the 1974 Trustee, or to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the 1974 Agreement other conditions, limitations and restrictions thereafter to be observed, or to add to the covenants and agreements of the Authority in the 1974 Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power reserved to or conferred upon the Authority by the 1974 Agreement. (1974 Agreement, Section 1101).

The holders of not less than 60% in aggregate principal amount of the Power Revenue Bonds at the time outstanding shall have the right, from time to time (anything contained in the 1974 Agreement to the contrary notwithstanding), to consent to and approve the execution by the Authority and the 1974 Trustee of such agreement or agreements supplemental thereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to, repealing or rescinding, in any particular, any of the terms or provisions contained in the 1974 Agreement or in any supplemental agreement; provided, however, that nothing contained in the 1974 Agreement shall permit, or be construed as permitting, (a) an extension of the maturity of any Power Revenue Bond, or (b) a reduction in the principal amount of any Power Revenue Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of the Revenues other than the lien and pledge created by the 1974 Agreement, or (d) a preference or priority of any Power Revenue Bond or Bonds over any other Power Revenue Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Power Revenue Bonds required for consent to such supplemental agreement. (1974 Agreement, Section 1102).

**Remedies of Bondholders**

Among the events described in the 1974 Agreement as "events of default" are the following:

(a)    payment of the principal of and redemption premium, if any, on any of the Power Revenue Bonds shall not be made when the same shall become due and payable, or

(b)    payment of any installment of interest shall not be made when the same shall become due and payable, or

(c)    the Authority shall for any reason be rendered incapable of fulfilling its obligations under the 1974 Agreement, or

(d)    default in meeting any Amortization Requirement, with the specified period of grace, or

(e)    if notice has been received by the 1974 Trustee and the Authority from the bank or other institution providing a credit or liquidity facility or other entity guaranteeing or securing bonds that an event of default has occurred under the agreement underlying said facility or if the issuer of a credit or liquidity facility or other entity has failed to make the facility available or to reinstate the interest component of the facility in accordance with its terms (but only to the extent provided for in the resolution authorizing the issuance of the Power Revenue Bonds secured by the credit or liquidity facility). (1974 Agreement, Section 802).

In the event of any such default the 1974 Trustee may, and upon the written request of the holders of not less than 20% in aggregate principal amount of all Power Revenue Bonds then outstanding shall, declare the principal of the Power Revenue Bonds then outstanding to be due and payable, and, providing it shall be indemnified to its satisfaction, the 1974 Trustee may, and upon the written request of the holders of not less than 10% in aggregate principal amount of the Power Revenue Bonds then outstanding shall, proceed to protect and enforce its rights and the rights of the bondholders under the 1974 Agreement by such suits, actions or special proceedings in equity or at law, or by such proceedings in the office of any board or officer having jurisdiction, either for the appointment of a receiver of the System as authorized by the Act or for the specific performance of any covenant or agreement or for the enforcement of any proper legal or equitable remedy, as the 1974 Trustee shall deem most effectual to protect and enforce the rights aforesaid; provided, however, that the 1974 Trustee shall not be required to proceed for the appointment of a receiver unless it shall have received the written request of the holders of not less than 25% in aggregate principal amount of such bonds then outstanding. (1974 Agreement, Sections 803, 804 and 902).

It is the intent of the 1974 Agreement that all proceedings shall be instituted and maintained for the benefit of all holders of outstanding Power Revenue Bonds. (1974 Agreement, Sections 808 and 809).

**Defeasance**

The 1974 Agreement provides that if, when the Power Revenue Bonds shall have become due and payable or shall have been duly called for redemption or irrevocable instructions to call said bonds for redemption or payment shall have been given by the Authority to the 1974 Trustee, the whole amount of the principal and the interest and the premium, if any, so due and payable upon all of the Power Revenue Bonds then outstanding shall be paid or sufficient moneys, or Government Obligations or Prefunded Municipals or Time Deposits secured in the manner set forth in Section 601 of the 1974 Agreement, the principal of and the interest on which when due will provide sufficient moneys, shall be held by the 1974 Trustee or the paying agents for such purpose under the provisions of the 1974 Agreement, and provision shall be made for paying all other sums payable by the Authority, then and in that case the right, title and interest of the 1974 Trustee thereunder shall cease, determine and become void, and the 1974 Trustee in such case, on demand of the Authority, shall release the 1974 Agreement. For purposes of determining whether sufficient amounts have been deposited for defeasance, the interest to become due on Variable Rate Bonds shall be calculated at the maximum rate permitted by the terms thereof, and the principal, premium and interest to become due on Put Bonds and Extendible Maturity Bonds shall mean the maximum amount payable upon the exercise of put options by holders of said bonds or extensions of maturity by the holders of said bonds or the Authority. (1974 Agreement, Section 1201).

**Bonds Not Deemed Outstanding**

The Power Revenue Bonds and portions of Power Revenue Bonds which have been duly called for redemption under the provisions of Article III of the 1974 Agreement, or with respect to which irrevocable

instructions to call for redemption or payment at or prior to maturity have been given to the 1974 Trustee in form satisfactory to it, and for the payment of principal or the redemption price and the accrued interest of which sufficient moneys, or Government Obligations or Prerefunded Municipals or Time Deposits secured in the manner set forth in Section 601 of the 1974 Agreement, shall be held in separate accounts by the 1974 Trustee or by the paying agents in trust for the holders of the bonds or portions thereof to be paid or redeemed, all as provided in the 1974 Agreement, shall not thereafter be deemed to be outstanding under the provisions of the 1974 Agreement. (1974 Agreement, Section 307)

## SUMMARY OF CERTAIN PROVISIONS OF
## PROPOSED SUPPLEMENTAL AGREEMENT

The following is a summary of certain provisions of the proposed Supplemental Agreement. The summary does not purport to be complete and reference is made to the proposed Supplemental Agreement, copies of which are available in substantially final form for examination at the principal corporate trust office of the 1974 Trustee.

**Third Supplemental Agreement**

The 1974 Agreement will be supplemented to provide that the Authority may grant a lien on Revenues on a parity with the lien of the holders of Power Revenue Bonds to providers of credit or liquidity facilities securing such bonds.

I-16

**APPENDIX II**

*Combined Financial Statements*
*and Supplemental Information*

*Puerto Rico Electric Power Authority*

*June 30, 2001*



[This page intentionally left blank]

Puerto Rico Electric Power Authority

Combined Financial Statements and
Supplemental Information

June 30, 2001

# Contents

Report of Independent Auditors .................................................................................................... 1

Audited Financial Statements

Combined Balance Sheets.......................................................................................................... 3
Combined Statements of Income ............................................................................................... 5
Combined Statements of Changes in Capitalization ................................................................. 6
Combined Statements of Cash Flows......................................................................................... 7
Notes to Combined Financial Statements .................................................................................. 9

Report on Compliance and on Internal Control over Financial
  Reporting based on an Audit of the Financial Statements
  In accordance with Government Auditing Standards.............................................................. 33

Supplemental Information

Schedule I.................................................................................................................................. 34
Schedules II-VII - Information Required by the
  1974 Trust Agreement........................................................................................................... 35

[This page intentionally left blank]

Case:17-03283-LTS Doc#:8542 Filed:09/09/09 Entered:09/09/09 18:01:54 Desc:Main
Document Exhibit Page 176 of 445

ERNST & YOUNG                    Ernst & Young LLP                    ■ Phone: (787) 759-8212
                                 273 Ponce de Leon Avenue              Fax:   (787) 753-0808
                                 Hato Rey, Puerto Rico 00917-1989      Fax:   (787) 753-0813
                                                                       www.ey.com

# Report of Independent Auditors

To the Governing Board of the
Puerto Rico Electric Power Authority

We have audited the accompanying balance sheet of the Puerto Rico Electric Power Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of June 30, 2001, and the related combined statements of income, changes in capitalization and cash flows for the year then ended. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of the Authority for the year ended June 30, 2000 were audited by other auditors whose report dated September 30, 2000, expressed an unqualified opinion on those statements.

We conducted our audit in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements present fairly, in all material respects, the financial position of the Authority as of June 30, 2001, and its results of operations and cash flows for the year then ended in conformity with accounting principles generally accepted in the United States.

In accordance with *Government Auditing Standards*, we have also issued our report dated September 28, 2001, on our consideration of the Authority's internal control over financial reporting and our tests of its compliance with certain provisions of laws, regulations, contracts and grants. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be read in conjunction with this report in considering the results of our audit.

Ernst & Young LLP is a member of Ernst & Young International, Ltd.

-1-

Our audit was conducted for the purpose of forming an opinion on the financial statements of the Puerto Rico Electric Power Authority taken as a whole. The supplemental information included in Schedules II - VII is presented for purposes of additional analysis and is not a required part of the financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and, in our opinion, is fairly stated in all material respects in relation to the financial statements taken as a whole, and are prepared in accordance with the terms of the 1974 Agreement (described herein).

*Ernst + Young LLP*

September 28, 2001 (except for the
  last paragraph of Note 17, as to
  which the date is October 26, 2001)

Stamp No. 1733680
affixed to
original of
this report.

# Puerto Rico Electric Power Authority

## Combined Balance Sheets

|  | June 30 | |
|---|---|---|
|  | **2001** | **2000** |
|  | *(In Thousands)* | |
| **Assets** | | |
| Utility plant: | | |
| Plant in service | **$ 5,596,586** | $ 5,445,867 |
| Accumulated depreciation | **(2,788,112)** | (2,588,253) |
|  | **2,808,474** | 2,857,614 |
| Construction in progress | **1,363,269** | 1,108,127 |
| Total utility plant, net | **4,171,743** | 3,965,741 |
| Restricted assets: | | |
| Cash and cash equivalents held by trustee for payment of principal and interest on bonds | **261,568** | 244,391 |
| Investments held by trustee | **319,021** | 297,491 |
| Construction fund and other special funds | **123,041** | 91,613 |
| Total restricted assets | **703,630** | 633,495 |
| Current assets: | | |
| Cash and cash equivalents | **92,364** | 70,534 |
| Receivables, net | **404,900** | 402,859 |
| Fuel oil, at average cost | **76,400** | 66,459 |
| Materials and supplies, at average cost | **146,435** | 164,700 |
| Prepayments and other assets | **26,134** | 14,959 |
| Total current assets | **746,233** | 719,511 |
| Other non-current receivables | **64,224** | 74,357 |
| Deferred debits: | | |
| Unamortized debt issue cost | **28,128** | 24,050 |
| Other | **22,593** | 22,736 |
| Total deferred debits | **50,721** | 46,786 |
| Total assets | **$ 5,736,551** | $ 5,439,890 |

|                                                          | June 30 | |
|----------------------------------------------------------|------------:|------------:|
|                                                          | **2001** | **2000** |
|                                                          | *(In Thousands)* | |
| **Capitalization and liabilities**                       |            |            |
| Capitalization:                                          |            |            |
| Contributed capital                                      | $ 139,984  | $ 139,983  |
| Retained earnings                                        | 324,571    | 282,677    |
|                                                          | 464,555    | 422,660    |
| Long-term debt, excluding current portion                | 3,951,216  | 3,485,426  |
| Total capitalization                                     | 4,415,771  | 3,908,086  |
| Noncurrent liabilities:                                  |            |            |
| Deferred credit for purchase of power                    | 46,894     | 49,366     |
| Sick leave benefits to be liquidated after one year      | 130,212    | 126,945    |
| Supplemental spouse survivor benefits                    | 41,900     | 47,040     |
| Pension benefits exchanged for forfeited sick leave      | 5,392      | 5,392      |
| Note payable to Government Development Bank for Puerto Rico (GDB) | -  | 263,000    |
| Total noncurrent liabilities                             | 224,398    | 491,743    |
| Current portion of long-term debt and notes payable which will be paid from restricted assets | 290,939 | 262,842 |
| Current liabilities:                                     |            |            |
| Notes payable to banks                                   | 125,000    | 125,000    |
| Accounts payable and accrued liabilities                 | 442,341    | 431,774    |
| Accrued interest                                         | 112,562    | 103,419    |
| Customers' deposits                                      | 125,540    | 117,026    |
| Total current liabilities                                | 805,443    | 777,219    |
| Total capitalization and liabilities                     | $5,736,551 | $5,439,890 |

*See accompanying notes.*

-4-

## Puerto Rico Electric Power Authority

### Combined Statements of Income

|  | Year ended June 30 | |
| --- | --- | --- |
|  | 2001 | 2000 |
|  | (In Thousands) | |
| Operating revenues | $2,331,989 | $1,987,336 |
| Operating expenses: | | |
| Operations: | | |
| Fuel | 944,760 | 801,433 |
| Purchased power | 177,330 | 64,518 |
| Other production | 56,566 | 56,014 |
| Transmission and distribution | 107,258 | 97,238 |
| Customer accounting and collection | 83,908 | 77,087 |
| Administrative and general | 140,183 | 152,164 |
| Maintenance | 215,180 | 221,502 |
| Depreciation | 233,169 | 209,960 |
| Total operating expenses | 1,958,354 | 1,679,916 |
| Operating income | 373,635 | 307,420 |
| Interest income | 45,239 | 29,110 |
| Other income | 9,309 | 15,671 |
| Income before interest charges and contribution in lieu of taxes | 428,183 | 352,201 |
| Interest charges: | | |
| Interest on bonds | 238,043 | 218,619 |
| Interest on other long-term debt | 2,415 | 6,240 |
| Other interest | 3,028 | 2,911 |
| Amortization of debt discount, issuance costs and refunding loss | 17,498 | 16,666 |
| Allowance for funds used during construction | (22,966) | (12,138) |
| Total interest charges, net | 238,018 | 232,298 |
| Income before contribution in lieu of taxes | 190,165 | 119,903 |
| Contribution in lieu of taxes | (148,271) | (98,495) |
| Net income | $ 41,894 | $ 21,408 |

*See accompanying notes.*

# Puerto Rico Electric Power Authority

## Combined Statements of Changes in Capitalization

### June 30, 2001

| | Contributed Capital | Retained Earnings | Long-Term Debt, Excluding Current Portion | Total Capitalization |
|---|---|---|---|---|
| | | | *(In Thousands)* | |
| Balance as of June 30, 1999 | $139,983 | $261,269 | $3,611,676 | $4,012,928 |
| Transfers to current liabilities | - | - | (143,512) | (143,512) |
| Accretion of capital appreciation bonds | - | - | 17,262 | 17,262 |
| Net income | - | 21,408 | - | 21,408 |
| Balance as of June 30, 2000 | 139,983 | 282,677 | 3,485,426 | 3,908,086 |
| Transfers to current liabilities | - | - | (157,248) | (157,248) |
| Proceeds from issuance of bonds, net of defeased bonds, original discounts, and including accretion of capital appreciation bonds | - | - | 623,038 | 623,038 |
| Net income | - | 41,894 | - | 41,894 |
| Balance as of June 30, 2001 | $139,983 | $324,571 | $3,951,216 | $4,415,770 |

*See accompanying notes.*

# Puerto Rico Electric Power Authority

## Combined Statements of Cash Flows

|  | Year ended June 30 | |
|---|---|---|
|  | 2001 | 2000 |
|  | *(In Thousands)* | |
| **Operating activities** | | |
| Cash flows from operating activities: | | |
| Operating income | $ 373,635 | $ 307,420 |
| Adjustment to reconcile operating income to net | | |
| cash provided by operating activities: | | |
| Depreciation | 233,169 | 209,960 |
| Amortization of asbestos removal costs | 2,469 | 1,977 |
| Provision for uncollectible accounts | 3,000 | 2,800 |
| Provision for obsolete material | 2,000 | - |
| Reserve for injuries and damages | 4,000 | - |
| Contribution in lieu of taxes | (148,271) | (98,495) |
| Changes in assets and liabilities that increase (decrease) cash: | | |
| Receivables | (28,105) | (98,682) |
| Fuel oil | (9,941) | (28,109) |
| Materials and supplies | 16,360 | (9,082) |
| Prepayments and other assets | 381 | (3,284) |
| Deferred debits | (16,100) | (7,452) |
| Noncurrent liabilities, excluding note payable to GDB | (4,345) | 9,602 |
| Accounts payable and accrued liabilities | 6,627 | 104,931 |
| Customers' deposits | 8,514 | 8,361 |
| Total adjustments | 69,758 | 92,527 |
| Net cash flows provided by operating activities | 443,393 | 399,947 |
| | | |
| Cash flows from noncapital financing activities: | | |
| Principal paid on general obligation notes | - | (5,000) |
| Proceeds from waiver to AES Puerto Rico, L.P. | - | 15,000 |
| Principal paid on fuel line of credit | (1,040,000) | (1,065,000) |
| Proceeds from fuel line of credit | 1,040,000 | 1,065,000 |
| Interest paid on fuel line of credit | (8,068) | (7,100) |
| Net cash flows (used in) provided by noncapital financing activities | (8,068) | 2,900 |
| | | |
| Cash flows from capital and related financing activities: | | |
| Construction expenditures | (405,860) | (426,125) |
| Proceeds received from FEMA | - | 41,616 |
| Allowance for funds used during construction | 22,966 | 12,138 |
| Net increase in construction funds | 23,585 | (68,244) |
| Power revenue bonds: | | |
| Proceeds from issuance of bonds, net of original discount | 600,002 | - |
| Principal paid on revenue bonds maturities | (144,863) | (140,861) |
| Interest paid on revenue bonds | (210,993) | (201,677) |
| Payment of bond anticipation notes | (299,000) | - |
| Proceeds from bond anticipation notes | 36,000 | 233,000 |
| Interest paid on bond anticipation notes | (6,044) | (2,599) |
| Net cash flows used in capital and related financing activities | (384,207) | (552,752) |

-7-

Puerto Rico Electric Power Authority

Combined Statements of Cash Flows (continued)

|  | Year ended June 30 | |
|  | 2001 | 2000 |
|  | *(In Thousands)* | |
| Cash flows from investing activities: | | |
| Purchases of investment securities | (1,480,156) | (1,629,842) |
| Proceeds from sale and maturities of investment securities | 1,456,331 | 1,644,723 |
| Interest on investments | 38,223 | 49,564 |
| Net cash flows provided by investing activities | 14,398 | 64,445 |
| Net increase (decrease) in cash and cash equivalents | 65,516 | (85,460) |
| Cash and cash equivalents at beginning of year | 336,528 | 421,988 |
| Cash and cash equivalents at end of year | $ 402,044 | $ 336,528 |
| Cash and cash equivalents: | | |
| Unrestricted | $ 92,364 | $ 70,534 |
| Restricted: | | |
| Cash and cash equivalents held by trustee for payment of principal and interest on outstanding bonds | 261,568 | 244,391 |
| Cash and cash equivalents held in construction and other special funds | 48,112 | 21,603 |
|  | $ 402,044 | $ 336,528 |

*See accompanying notes.*

-8-

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

June 30, 2001

## 1. Reporting Entity

Puerto Rico Electric Power Authority (the Authority) is a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the Commonwealth) created on May 2, 1941 pursuant to Act No. 83, as amended, re-enacted, and supplemented, of the Legislature of Puerto Rico (the Act) for the purpose of conserving, developing and utilizing the water and power resources of Puerto Rico in order to promote the general welfare of the Commonwealth. Under the entity concept, the Authority is a component unit of the Commonwealth. The Authority produces, transmits, and distributes substantially all of the electric power consumed in Puerto Rico.

The financial statements of the Authority include the financial position and operations of the Puerto Rico Irrigation Systems (Irrigation Systems). The Irrigation Systems is a division of the Authority pursuant to the provisions of the Act, and Acts Nos. 83 and 84, approved on June 20, 1955, regarding the Puerto Rico Irrigation Service, South Coast, and Isabela Irrigation Service, respectively, and the Lajas Valley Public Irrigation Law, approved on June 10, 1953, as amended.

The Authority has broad powers including, among others, to issue bonds for any of its corporate purposes. The Authority is required under the terms of a Trust Agreement, dated January 1, 1974, as amended (the 1974 Agreement), and the Act to determine and collect reasonable rates for electric service in order to produce revenues sufficient to cover all operating and financial obligations, as defined.

## 2. Summary of Significant Accounting Policies

The following is a summary of the most significant accounting policies followed by the Authority in preparing its financial statements:

### Basis of Accounting

The accounting and reporting policies of the Authority conform with the accounting rules prescribed by the Governmental Accounting Standards Board (GASB). As such, it functions as an enterprise fund. The Authority maintains its accounting records on the accrual method of accounting in conformity with generally accepted accounting principles. Although the Authority is not under Federal Energy Regulatory Commission (FERC) regulations, the Authority has adopted the uniform system of accounts prescribed by the FERC.

The Authority follows the provisions of GASB Statement No. 20, "Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that Use Proprietary Fund Accounting," which requires proprietary activities to apply all applicable GASB pronouncements as well as all Financial Accounting Standards Board (FASB) Statements and Interpretations, and

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 2. Summary of Significant Accounting Policies (continued)

### Basis of Accounting (continued)

Accounting Principles Board Opinions and Accounting Research Bulletins issued on or before November 30, 1989, unless the pronouncements conflict or contradict GASB pronouncements. This pronouncement permits the adoption of all FASB Statements and Interpretations issued after November 30, 1989, except for those that conflict or contradict GASB pronouncements. The Authority, as allowed by the GASB, decided not to implement any FASB Statement or Interpretation issued after November 30, 1989.

### Use of Estimates in the Preparation of Financial Statements

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Because of uncertainties inherent in the estimation process, it is possible that actual results could differ from those estimates.

### Utility Plant

Utility plant is carried at cost, which includes labor, materials, overhead, and an allowance for the cost of funds used during construction (AFUDC). AFUDC represents the cost of borrowed funds used to finance construction work in progress. AFUDC is capitalized as an additional cost of property and as a reduction of interest expense. Capitalized interest expense is reduced by interest income earned on related investments acquired with proceeds of tax exempt borrowings. Such costs are recovered from customers as a cost of service through depreciation charges in future periods. Capitalized interest expense in the years ended June 30, 2001 and 2000 amounted to $23 million and $12.1 million, respectively. These amounts are net of interest income earned on investments amounting to $20.6 million and $29.1 million, respectively.

Maintenance, repairs, and the cost of renewals of minor items of property units are charged to expense. Replacements of major items of property are charged to the plant accounts. The cost of retired property, together with removal cost less salvage, is charged to accumulated depreciation with no gain or loss recognized.

### Depreciation

Depreciation is computed on the straight-line method at rates considered adequate to allocate the cost of the various classes of property over their estimated service lives. The annual composite rate of depreciation, determined by the Authority's consulting engineers, was approximately 4.25% and 3.91% for 2001 and 2000, respectively.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 2. Summary of Significant Accounting Policies (continued)

### Investments

The Authority follows the provisions of GASB Statement No. 31, "Accounting and Financial Reporting for Certain Investments and for External Investment Pools," which requires the reporting of investments at fair value in the balance sheet and the recording of changes in fair value in the statement of income. The fair value is based on quoted market prices.

The funds under the 1974 Trust Agreement may be invested in:

- Government obligations, which are direct obligations of, or obligations whose principal and interest is guaranteed by the U.S. Government, or obligations of certain of its agencies or instrumentalities.

- Investment obligations of any of the states or territories of the United States or political subdivisions thereof (other than obligations rated lower than the three highest grades by a nationally recognized rating agency) and repurchase agreements with commercial banks fully secured by U.S. Government obligations.

- Time deposits with GDB or the Authority's Trustee under the 1974 Agreement or any bank or trust company member of the Federal Deposit Insurance Corporation having a combined capital and surplus of not less than $100 million.

Effective April 1999, the 1974 Agreement was amended to provide that permitted investments of moneys to the credit of the Self-insurance Fund will be expanded (subject to the Authority's adoption of an investment policy with the consent of GDB) to coincide with the investments permitted for the pension fund for employees of the Commonwealth of Puerto Rico and its instrumentalities. Such investments include various debt instruments, such as mortgage loans and leases, common and preferred stock, real property and various other financial instruments.

### Cash and Cash Equivalents

For purposes of the statements of cash flows, the Authority considers all highly liquid debt instruments with maturities of three months or less when purchased to be cash equivalents. Cash and cash equivalents included in the restricted funds are considered cash equivalents for purposes of the statements of cash flows.

### Receivables

Receivables are stated net of estimated allowances for uncollectible accounts, which are determined based upon past collection experience and current economic conditions.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 2. Summary of Significant Accounting Policies (continued)

### Unamortized Debt Expense

Debt expenses and discounts incurred in the issuance of bonds are deferred and amortized using the straight-line method, which approximates the interest method, over the term of the related debt.

The excess of reacquisition cost over the carrying value of long-term debt is deferred and amortized to expense using the straight-line method over the remaining life of the original debt or the life of the new debt, whichever is shorter.

### Materials and Supplies

Materials and supplies inventories are carried at average cost and are stated at the lower of cost or market.

### Asbestos Containment Deferred Costs

Maintenance costs incurred in the containment of asbestos are deferred and included in other deferred debits. Such costs are amortized as recovered in billings over an estimated life of 12 years.

### Pension Plan

Pension expense is equal to the statutory required contribution to the employees' retirement system. A pension liability or asset is reported equal to the cumulative difference between annual required contributions and actual contributions.

### Accounting for Compensated Absences

Accumulated unpaid vacation and sick leave pay are accrued when earned and an additional amount is accrued as a liability for the employer salary-related benefits associated with compensated absences using salary rates in effect at the balance sheet date.

The cost of compensated absences expected to be paid in the next twelve months is classified as accounts payable and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities.

### Revenue Recognition, Fuel Costs and Purchase Power

Clients are billed monthly, except for rural clients who are billed bimonthly. Revenues are recorded based on services rendered during each accounting period, including an estimate for unbilled services. Revenues include amounts resulting from a fuel and purchased power cost recovery clause (Fuel Adjustment Clause) which is designed to permit full recovery through customer billings of fuel costs and purchased power. Fuel costs and purchased power are reflected in operating expenses as the fuel is consumed.

-12-

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 2. Summary of Significant Accounting Policies (continued)

### Contributions in Lieu of Taxes and Governmental Subsidies

The Act exempts the Authority from all taxes that otherwise would be levied on its properties and revenues by the Commonwealth and its Municipalities, except as follows:

#### Municipalities

To the extent net revenues, as defined, are available, the Authority is required under the Act to make a contribution in lieu of taxes of 6% of gross electric sales. For these purposes, net revenues include gross electric energy sales (with certain exemptions) computed on the basis of an annual average fuel oil price of up to a maximum of $30 per barrel. The Authority, subject to its obligations under the 1974 Agreement, may modify the maximum annual average fuel price per barrel to a higher level to provide the Municipalities with sufficient income to absorb their billings for electricity consumption plus the necessary amounts to fulfill their obligation to the Authority. The contribution in lieu of taxes to Municipalities can be used to offset accounts receivable balances owed by the Municipalities to the Authority as permitted by law. Should, in any given year, the Authority's net revenues not be sufficient to cover the calculated maximum contribution in lieu of taxes, said contribution shall be reduced to the amounts available, and the excess does not carry forward as a liability for future years.

#### Commonwealth of Puerto Rico

To the extent net revenues are available the Authority is also required under the Act to set aside an additional 5% of gross electric sales for the purpose of (i) financing improvements, (ii) offsetting other subsidies (other than cost of fuel adjustments to certain residential clients) of the Commonwealth, and (iii) any other lawful corporate purpose. However, 20% of the 5% electric energy sales set aside for the Commonwealth must be applied against the cost of the Authority's fuel oil subsidy program. Another one-fifth of electric energy sales set aside must be paid to the Secretary of the Treasury for distributing among the Municipalities (in addition to contribution in lieu of taxes described above). Amounts assigned to (ii) above, are classified as a contribution in lieu of taxes in the accompanying statements of income and reduce the related accounts receivable in the balance sheets.

### Contributed Capital

The Authority records contributed capital as income.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 2. Summary of Significant Accounting Policies (continued)

### New Accounting Principle

GASB issued Statement No. 34 in June 1999. This statement substantially changes the Governmental financial reporting model for state and local governments. Also, under GASB 34, certain disclosure requirements will be added. The provisions of this Statement are effective for financial statements of fiscal years beginning after June 15, 2001. The Authority did not implement GASB 34 in fiscal year 2001.

### Reclassifications

Certain reclassifications have been made to the 2000 financial statements to conform with the 2001 financial statements presentation.

## 3. Utility Plant

As of June 30, utility plant consist of:

|  | 2001 | 2000 |
|---|---|---|
|  | (In Thousands) | |
| Distribution | **$1,854,205** | $ 1,779,033 |
| Transmission | **912,515** | 865,702 |
| Production | **1,400,143** | 1,396,978 |
| Other production | **533,782** | 511,027 |
| Hydroelectric | **85,679** | 85,677 |
| General | **779,714** | 776,986 |
| Irrigation systems | **30,548** | 30,464 |
|  | **5,596,586** | 5,445,867 |
| Less - Accumulated depreciation | **(2,788,112)** | (2,588,253) |
|  | **$2,808,474** | $ 2,857,614 |

## 4. Cash and Cash Equivalents

The 1974 Agreement established the General Fund, the Revenue Fund, and certain other funds (see Note 5). All revenues (other than income from investments and construction funds obtained from financing) are deposited in these funds. The monies held in these funds are presented as unrestricted cash and cash equivalents in the combined balance sheets.

-14-

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 4. Cash and Cash Equivalents (continued)

At June 30, 2001, the carrying amount and bank balance of cash deposits held by the Authority and restricted cash deposits held by the Trustee under the 1974 Agreement, are as follows (in thousands):

|  | 2001 | | 2000 | |
|  | Carrying Amount | Bank Balance | Carrying Amount | Bank Balance |
|---|---|---|---|---|
| Unrestricted | $ 92,364 | $ 103,413 | $ 70,534 | $ 74,748 |
| Restricted: | | | | |
| Held by the Trustee | 261,568 | 261,568 | 244,391 | 244,391 |
| Held by the Authority | 48,112 | 24,723 | 21,603 | 19,366 |
| | $402,044 | $389,704 | $336,528 | $338,505 |

Cash deposits, except for minor amounts, are covered by the Federal Deposit Insurance Corporation or collateral held on behalf of the Authority by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the Secretary) or its agent in the name of the Secretary.

## 5. Restricted Assets

At June 30, 2001 and 2000, certain investments and cash deposits of the Authority were restricted to comply with long-term principal and interest debt service requirements (sinking funds) as well as for self-insurance. These restricted assets are held by the Trustee under the 1974 Agreement, (see Note 8) in the following funds:

*Bond Service Account and Redemption Account* - Current year requirements for principal of and interest on Power Revenue Bonds. As of June 30, 2001, cash and cash equivalents in this account amounted to $262 million (2000 - $244 million).

*1974 Reserve Account* - Reserve for payment of principal of and interest on Power Revenue Bonds in the event moneys in Bond Service Account or Redemption Account are insufficient for such purpose.

*1974 Self-insurance Fund* - Fund to pay the cost of repairing, replacing or reconstructing any property damaged or destroyed from, or extraordinary expenses incurred as a result of, a cause which is not covered by insurance required under the 1974 Agreement. The 1974 Self-insurance Fund also serves as an additional reserve for the payment of the principal of and interest on the Power Revenue Bonds, and meeting the amortization requirements to the extent that moneys in the Bond Service Account, the Redemption Account and the 1974 Reserve Account are insufficient for such purpose.

# Puerto Rico Electric Power Authority

## Notes to Combined Financial Statements

### 5. Restricted Assets (continued)

At June 30, investments held by the Trustee consist of (in thousands):

|  | 2001 | 2000 |
|---|---|---|
| 1974 Reserve Account | $245,633 | $228,553 |
| 1974 Self - insurance Fund | 73,388 | 68,938 |
|  | $319,021 | $297,491 |

Investments held by Trustee under the 1974 Agreement are invested exclusively in securities of the U.S. Government and its agencies.

The Authority also has cash and investment securities held by the trust department of a commercial bank restricted for the following purposes:

*1974 Construction Fund* - Special fund created by the 1974 Agreement. The proceeds of any Power Revenue Bonds issued for the purpose of paying the cost of acquiring or constructing improvements, together with the money received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the 1974 Reserve Account, (iii) deposited in the Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the 1974 Construction Fund and held by the Authority in trust.

*Reserve Maintenance Fund* - Fund to pay the cost of unusual or extraordinary maintenance or repairs, not recurring annually and renewals and replacements, including major items of equipment. The Reserve Maintenance Fund also serves as an additional reserve for the payment of principal and interest on the Power Revenue Bonds and meeting the amortization requirements to the extent that moneys in the 1974 Sinking Fund, including money in the 1974 Reserve Account, are insufficient for such purpose.

*Cogeneration Fund* - Fund created on December 15, 1997 pursuant to an agreement between the Authority and EcoEléctrica L.P., a joint venture of private companies, for the purpose of enabling the Authority to pay certain expenses in connection with the Authority's activities concerning cogeneration planning and implementation.

*Other Fund* - During fiscal year 1999, one of the partners of EcoEléctrica, L.P. (EcoEléctrica) sold its interest in the partnership to a utility company. Pursuant to the agreement between the Authority and EcoEléctrica, the Authority received $29.6 million as a waiver of certain contractual provisions. During fiscal year 2000, the Authority received $18 million from AES Puerto Rico, L.P. (AES) as a waiver of certain contractual provisions of its co-generation contract. The Authority will use the proceeds received from EcoEléctrica and AES to reduce the cost of power to be purchased under the respective agreements thus reducing its customers' invoices.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 5. Restricted Assets (continued)

At June 30, the 1974 Construction Fund and other special funds consist of (in thousands):

|  | 2001 | | 2000 | |
|---|---|---|---|---|
|  | Cash and Cash Equivalents | Investments | Cash and Cash Equivalents | Investments |
| 1974 Construction Fund | **$40,619** | **$ 921** | $16,774 | $ 921 |
| Reserve Maintenance Fund | **2,397** | **30,178** | 80 | 23,711 |
| Cogeneration Fund | **5,096** | **-** | 4,749 | - |
| Other Fund | **-** | **43,794** | - | 45,378 |
|  | **$48,112** | **$74,893** | $21,603 | $ 70,010 |

Following is the composition of the investments in the 1974 Construction Fund and other special funds (in thousands):

|  | 2001 | 2000 |
|---|---|---|
| U.S. Government obligations | **$45,467** | $45,462 |
| Corporate bonds | **9,058** | 6,956 |
| Equity securities | **20,368** | 17,592 |
|  | **$74,893** | $70,010 |

-17-

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 6. Accounts Receivable

At June 30, receivables consist of (in thousands):

|  | 2001 | 2000 |
|---|---|---|
| Electric and related services: |  |  |
| Government agencies and municipalities | $ 93,126 | $113,577 |
| Residential, industrial, and commercial | 238,640 | 194,712 |
| Recoveries under fuel adjustment clause |  |  |
| under (over) billed | (6,098) | (4,742) |
| Unbilled services | 120,368 | 114,808 |
| Commonwealth subsidy (fuel adjustment clause) |  |  |
| for certain residential clients | 37,924 | 44,251 |
| Miscellaneous accounts and others | 15,895 | 25,605 |
|  | 499,855 | 488,211 |
| Allowance for uncollectible accounts | (35,355) | (33,155) |
|  | 464,500 | 455,056 |
| Accrued interest on investments | 4,623 | 3,924 |
| Accounts receivable from FEMA and |  |  |
| insurance company | - | 18,236 |
| Less - Other non-current receivables, mostly |  |  |
| related to Commonwealth | (64,223) | (74,357) |
|  | $404,900 | $402,859 |

On October 29, 1991, the Authority entered into an agreement with the Commonwealth for the payment of the outstanding fuel adjustment subsidy receivable amounting to approximately $94 million. Under this agreement, the Commonwealth will pay that amount over a fifteen-year period in installments of approximately $6.3 million per year, without interest. As of June 30, 2001, the outstanding fuel adjustment subsidy receivable amounted to approximately $37.9 million.

In addition, the Authority has other subsidies and reimbursable costs receivable from the Commonwealth which are reduced by means of charges (accounted for as a contribution in lieu of taxes and to the extent net revenues, as defined, are available) against a portion of the 5% of gross electric sales it is required to set aside under the Act. The portion of such receivables and other governmental receivables not expected to be collected during the next fiscal year are reflected in the accompanying balance sheets as other noncurrent receivables.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 7. Defeasance of Debt

During 1999 and in prior years, the Authority has refunded in advance certain Power Revenue Bonds and other obligations by placing the proceeds of new debt in an irrevocable trust to provide for future debt service payments on such bonds. Accordingly, the trust accounts, assets, and liabilities for the defeased bonds are not included in the Authority's financial statements. At June 30, 2001, $94.1 million of Power Revenue Bonds series M, N, O, P, R, T, and X, which remain outstanding are considered defeased.

## 8. Long-Term Debt

At June 30, long-term debt consists of:

|  | 2001 | 2000 |
|---|---|---|
|  | (In Thousands) | |
| Power Revenue Bonds payable: | | |
| publicly offered at various dates | | |
| from 1988 to 2000, interest ranging from 3.8% to 7.6%, | | |
| maturing to 2028 | $4,295,860 | $3,803,434 |
| RUS issues – interest of 5%, maturing to 2030 | 158,690 | 166,503 |
|  | 4,454,550 | 3,969,937 |
| Less unamortized discount and debt reacquisition costs | (217,395) | (226,669) |
| Revenue bonds payable, net | 4,237,155 | 3,743,268 |
| Note payable | 5,000 | 5,000 |
|  | 4,242,155 | 3,748,268 |
| Less current portion of long-term debt | (290,939) | (262,842) |
|  | $3,951,216 | $3,485,426 |

## Power Revenue Bonds Payable

The Authority has issued Power Revenue Bonds pursuant to the 1974 Agreement principally for the purpose of financing the cost of improvements, as such term is defined in the 1974 Agreement, and subject to the conditions and limitations set forth therein.

In the 1974 Agreement, the Authority covenants to fix, charge, and collect rates so that revenues will be sufficient to pay current expenses and to provide the greater of (i) the required deposits or transfers under the Sinking Fund, the 1974 Self-insurance Fund and the Reserve Maintenance Fund or (ii) 120% of the aggregate principal and interest requirements for the next fiscal year on account of all outstanding Power Revenue Bonds.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

**8. Long-Term Debt (continued)**

**Power Revenue Bonds Payable (continued)**

Gross revenues, exclusive of income on certain investments, less current expenses as defined in the Agreement have been pledged to repay Power Revenue Bonds principal and interest (see Note 5).

During fiscal year 2001, the Authority issued the Power Revenue Bonds, Series HH. The Authority issued these Bonds to finance a portion of the cost of various projects under its capital improvement program and to retire bond anticipation notes of the Authority issued for that purpose.

A summary of the net proceeds of the Power Revenue Bonds, Series HH, and application of the proceeds follows:

| | |
|---|---|
| Principal amount of Series HH Bonds Plus: | $612,240,000 |
| Accrued Interest | 2,494,154 |
| Less: | |
| Original issue discount | 2,104,800 |
| Net proceeds | $612,629,354 |
| Application of net proceeds: | |
| Payment of the bond anticipation notes issued to GDB for capital improvements | $299,000,000 |
| Deposit to the 1974 Construction Fund | 301,001,606 |
| Deposit to the 1974 Bond Service Account | 2,494,154 |
| Cost of Issuance | 10,133,594 |
| Total | $612,629,354 |

A summary of the Power Revenue Bonds Series HH issued during fiscal year 2001 follows:

| | |
|---|---|
| Term Bonds: | |
| Due July 1, 2029 | $283,515,000 |
| Due July 1, 2030 | 40,330,000 |
| Serial Bonds | 288,395,000 |
| | $612,240,000 |

The Term Bonds bear interest rates of 5.25% and 5.375, respectively. The Serial Bonds bear interest rates of 4.20% to 5.75% and mature from 2003 to 2020. Interest on the Term Bonds and Serial Bonds will be payable on each January 1 and July 1.

# Puerto Rico Electric Power Authority

## Notes to Combined Financial Statements

### 8. Long-Term Debt (continued)

### Power Revenue Bonds Payable (continued)

The scheduled payment of and interest on the Series HH Bonds when due, except for bonds maturing on July 1, 2003, is guaranteed under an insurance policy issued concurrently with the delivery of the Series HH Bonds by Financial Security Assurance Inc.

The series HH bonds maturing after July 1, 2010, except for the Series HH Bonds maturing on July 1, 2030, may be redeemed at the option of the Authority prior to maturity, from any available moneys (other than moneys deposited in the 1974 Sinking Fund in respect of an amortization requirement), upon not less than thirty (30) days' prior notice by mail, either in whole or part, and if in part, in such order of maturity as directed by the Authority, on July 1, 2010, and on any interest payment date thereafter, at the following prices (expressed as percentages of the principal amount) plus accrued interest to the date fixed for redemption:

| Redemption Date | Redemption Price |
|---|---|
| July 1, 2010 through June 30, 2011 | 101% |
| July 1, 2011 and thereafter | 100% |

The Series HH Bonds maturing July 1, 2030 may be redeemed at the option of the Authority prior to maturity, from any available moneys (other than moneys deposited in the 1974 Sinking Fund in respect of an amortization requirement), upon not less than thirty (30) days' prior notice by mail, either in whole or in part, on July 1, 2005, and on any interest payment date thereafter, at the following prices (expressed as percentages of the principal amount) plus accrued interest to the date fixed for redemption:

| Redemption Date | Redemption Price |
|---|---|
| July 1, 2005 through June 30, 2006 | 101% |
| July 1, 2006 and thereafter | 100% |

### Notes Payable

On December 15, 1997, the Authority borrowed $5,000,000 from EcoEléctrica (the Note) for the purpose of enabling the Authority to pay certain expenses in connection with Authority's activities concerning cogeneration planning and implementation. The Note bears interest at a rate per annum equal to LIBOR minus three percent (3%) and will be paid at the earliest of various events described in the Note agreement. As of June 30, 2001, the interest rate was 3.77% (2000 - 2.24%).

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 8. Long-Term Debt (continued)

### Scheduled Maturities of Long-Term Debt

The scheduled maturities of long-term debt with interest thereon at June 30, 2001, including sinking fund debt service requirements, are as follows:

| Year ending June 30 | Power Revenue Bonds | RUS Power Revenue Bonds | EcoEléctrica Note | Total |
|---|---|---|---|---|
| | | (In Thousands) | | |
| 2002 | $607,067 | $23,380 | $5,000 | $635,447 |
| 2003 | 373,499 | 15,719 | - | 389,218 |
| 2004 | 374,911 | 15,104 | - | 390,015 |
| 2005 | 370,992 | 13,525 | - | 384,517 |
| 2006-2009 | 1,425,419 | 52,547 | - | 1,477,966 |
| 2010-2014 | 1,545,812 | 57,326 | - | 1,603,138 |
| 2015-2019 | 1,230,249 | 41,884 | - | 1,272,133 |
| 2020-2024 | 906,681 | 17,565 | - | 924,246 |
| 2025-2030 | 507,195 | 8,619 | - | 515,814 |
| | 7,341,825 | 245,669 | 5,000 | 7,592,494 |
| Less: | | | | |
| Unamortized discount | (61,392) | - | - | (61,392) |
| Excess reacquisition costs | (156,003) | - | - | (156,003) |
| Interest | (3,045,965) | (86,979) | - | (3,132,944) |
| | 4,078,465 | 158,690 | 5,000 | 4,242,155 |
| Current portion, net of discount and excess reacquisition costs | (274,163) | (11,776) | (5,000) | (290,939) |
| Long-term debt, excluding current portion | $3,804,302 | $146,914 | $ - | $3,951,216 |

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

#### 9. Notes Payable to Banks and GDB

On July 3, 1995, the Authority, GDB, and certain banks entered into an agreement for a revolving line of credit to be used for financing fuel purchases. Under the agreement the Authority borrowed $125 million. The average effective interest rate during each year and at year-end was 6.76% and 4.12%, respectively, for 2001; and 5.63% and 6.74%, respectively, for 2000.

#### 10. Accounts Payable and Accrued Liabilities

|  | 2001 | 2000 |
|---|---|---|
|  | (In Thousands) | |
| Accounts payable, accruals, and withholdings in process of payment | $239,382 | $250,049 |
| Additional accruals and withholdings: | | |
| Injuries and damages and other | 24,877 | 20,938 |
| Accrued vacation and payroll benefits | 48,708 | 54,052 |
| Accrued sick leave and payroll benefits - exclusive of benefits to be liquidated after one year of approximately $130.2 million and $126.9 million in 2001 and 2000, respectively | 15,385 | 16,174 |
| Accrued accident leave | 3,973 | 3,973 |
| Accrued compensation | 24,186 | 22,150 |
| Accrued (prepaid) pension plan contribution and withholding from employees: | | |
| Employees' Retirement System | 3,188 | 4,529 |
| Supplemental unfunded benefit obligation spouse-survivor benefit - exclusive of benefit to be liquidated after one year of approximately $41 million in 2001 and $47 million in 2000 | 10,344 | 5,204 |
| Supplemental unfunded pension obligation exchanged for forfeited sick leave benefits - exclusive of benefits to be liquidated after one year of approximately $5.4 million in 2001 and 2000, respectively | 10,242 | 10,242 |
| Employees health plan | 17,972 | 16,010 |
| Contract retainage | 20,789 | 21,045 |
| Contribution in lieu of taxes | 6,381 | 1,800 |
| Other accrued liabilities | 16,914 | 5,608 |
|  | $442,341 | $431,774 |

-23-

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 11. Employees' Retirement Benefits

### Pension Plan

Plan Description

All of the Authority's permanent full-time employees are eligible to participate in the Authority's Pension Plan, a single employer defined benefit pension plan (the Plan) administered by the Employees' Retirement System of the Puerto Rico Electric Power Authority (the System). The System issues a publicly available financial report that includes financial statements and required supplementary information for the Plan. That report may be obtained by writing to the Retirement System of the Puerto Rico Electric Power Authority, PO Box 13978, San Juan, Puerto Rico 00908-3978.

Benefits include maximum retirement benefits of 75% of average basic salary (based on the three highest annual basic salaries) for employees with 30 years of service; also, reduced benefits are available upon early retirement. The Plan was amended on February 9, 1993 to provide revised benefits to new employees limiting the maximum retirement basic salary to $50,000. The plan was further amended in January 1, 2000 to provide improved retirement benefits to employees with 25 years or more of credited service. Disability and death benefits are also provided. Separation benefits fully vest upon reaching 10 years of credited service. Disability and death benefits are also provided.

If a member's employment is terminated before he becomes eligible for any other benefits under this Plan, he shall receive a refund of his member contribution plus interest compounded annually. The Plan is not subject to the requirements of the Employees Retirement Income Security Act of 1974 (ERISA).

Funding Policy and Annual Pension Cost

The contribution requirements of plan members and the Authority are established and may be amended by the Authority. The Annual Pension Cost (APC) and the Annual Required Contribution (ARC) were computed as part of an actuarial valuation performed as of June 30, 1998 and projected to June 30, 2000 and 2001 based on current year demographic data.

### Supplemental Benefits not Funded Through the System

Supplemental benefits were unfunded and such benefits were reimbursed to the System when paid up to December 31, 1999. Effective January 1, 2000, the Board of Trustees of the System approved the transfer of the obligation for supplemental benefits provided by the Authority and not funded through the System (supplemental pension obligations exchanged for forfeited sick leave benefits and the supplemental spousal survivor benefits) to the Retirement System. Also, the Board of Trustees of the System accepted an amortization period for the Plan of 40 years which commenced on June 30, 1996.

-24-

## Puerto Rico Electric Power Authority

## Notes to Combined Financial Statements

### 11. Employees' Retirement Benefits (continued)

Supplemental Pension Obligations Exchanged for Forfeited Sick Leave Benefits

The Authority's employees with over 20 years of service are entitled to exchange accrued sick leave for supplemental pension benefits and/or be paid in cash the value of such sick leave upon separation from employment.

The forfeited sick leave benefit expense is recognized based on an actuarial projection. The benefit obligation was determined based on an actuarial valuation as of June 30, 1994.

An accrued liability of $16.5 million and $15.6 million exists as of June 30, 2001 and 2000, respectively, including the current and non-current portions. The expense for the years ended June 30, 2001 and 2000 amounted to approximately $10.2 million and $9.5 million, respectively.

# Puerto Rico Electric Power Authority

## Notes to Combined Financial Statements

### 11. Employees' Retirement Benefits

The authority's annual pension cost for the year ended June 30, 2001 and related information for
the Plan and supplemental benefits follows:

|  | Pension Plan |
| --- | --- |
| Contribution rates: |  |
| Authority | 12.57% |
| Plan members | 10.41% |
| Annual pension cost (thousands) | $34,952 |
| Contributions made and accruals (thousands) | $34,952 |
| Actuarial valuation date | 6/30/2000 |
| Actuarial cost method | Entry age |
| Amortization method | Level percentage of pay, closed (4.5% payroll increases per year) |
| Remaining amortization period | 36 years |
| Asset valuation method | 3-year smoothed market |
| Actuarial assumptions: |  |
| Investment rate of return (net of administrative expenses)* | 8.5% |
| Projected salary increases* | 6.0% |
| *Includes inflation at | 3.5% |
| Cost-of-living adjustments | From 8% per year for yearly pension up to $3,600 and 4% per year for yearly pension between $3,600 and $7,200. For yearly Pensions in Excess of $7,200, the minimum adjustment is $600 per year. |

-26-

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 11. Employees' Retirement Benefits

| Fiscal Year Ending | Annual Pension Cost (APC) | Three-Year Trend Information (In Millions) Percentage of APC Contributed | Net Pension Obligation |
|---|---|---|---|
| Pension Plan | | | |
| 06/30/98 | $29.20 | 100% | $ - |
| 06/30/99 | 28.80 | 100% | $ - |
| 06/30/00 | 39.80 | 100% | $ - |
| 06/30/01 | 35.00 | 100% | $ - |

The annual required contribution amounted to $34 million.

### Post Retirement Health Benefits

The Authority also provides certain health care benefits for retired employees and spouses. Substantially all of the Authority's employees may become eligible for those benefits if they reach normal retirement while working for the Authority.

Costs of benefits provided by the Authority are based on a cost plus plan, except the prescribed medicine cost, which is based on a fixed cost premium. Such costs include claims received from the plan administrators, a charge for an administration fee and an accrual for incurred but not reported claims. The costs of health care benefits to retirees amounted to approximately $37.8 million in 2001 and $31.6 million in 2000. Currently, 8,886 retirees meet eligibility requirements.

-27-

# Puerto Rico Electric Power Authority

## Notes to Combined Financial Statements

### 12. Revenues from Major Clients and Related Parties

Electric operating revenues from major clients and related parties are as follows:

|  | 2001 | 2000 |
|---|---|---|
|  | (In Thousands) | |
| Governmental sector, principally instrumentalities, agencies and corporations of the Commonwealth of Puerto Rico | **$269,355** | $249,097 |
| Muncipalities | **103,124** | 98,678 |
|  | **$372,479** | $347,775 |

### 13. Contribution in Lieu of Taxes

|  | 2001 | 2000 |
|---|---|---|
|  | (In Thousands) | |
| Municipalities | **$121,890** | $83,772 |
| Commonwealth: | | |
| Hotels | **3,297** | 2,641 |
| Fuel adjustment subsidy | **22,379** | 11,046 |
| Other subsidies (offset against outstanding accounts receivable and reimbursable costs) | **705** | 1,036 |
|  | **$148,271** | $98,495 |

### 14. Retained Earnings

Retained earnings at June 30, 2001 and 2000 include $73.4 million and $68.9 million, respectively, which have been appropriated principally to provide a reserve for damaged or destroyed property of the Authority not fully covered by insurance as required by the 1974 Agreement. Funds set aside for self-insurance purposes are deposited in the Self-Insurance Fund held by the Trustee (see Note 5).

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 15. Commitments and Contingencies

### Environmental Matters

Facilities and operations of the Authority are subject to regulations under numerous Federal and Commonwealth environmental laws, including the Clean Air Act, Clean Water Act, and the National Pollutant Discharge Elimination System (NPDES). In February 1992, the Environmental Protection Agency (EPA) performed an inspection of various facilities of the Authority and became aware of deficiencies in different areas, principally air opacity; water quality; spill prevention control and countermeasures; and underground storage tanks. As a result, the Authority agreed to, among other things, make certain capital improvements and undertake Supplemental Environmental Projects (SEPs). The Authority also agreed to use fuel oil not exceeding a sulfur content of 1.5%, a vanadium content of 150 PPM and an asphaltenes content of 8% at its generating plants.

In addition, in 1999, the Authority and EPA reached an agreement whereby the Authority agreed to pay a civil penalty of $1.5 million and to implement additional compliance projects costing $4.5 million, both of which the Authority has accrued as of June 30, 2000, and to undertake improvements to its existing compliance programs and its operations in order to assure compliance with environmental laws and regulations.

In November 1999, the Authority filed a Notice of Dispute Resolution with the United States District Court for the District of Puerto Rico to dispute EPA's interpretation of the applicable method to determine visible emissions from the Authority's generating units. The specific location where to "read" the opacity of the plume is under advisement with the Court.

### Commitments to Purchase Power

In October 1994, the Authority signed a contract with AES Puerto Rico, L.P. (AES) to purchase power of approximately 454 megawatts generated from a coal fluidized bed combustion facility. The term of the agreement is for twenty-five (25) years. This project is currently in its final construction stage.

In March 1995, the Authority also signed a contract with EcoEléctrica, L.P. (EcoEléctrica) to purchase power of approximately 507 megawatts from a gas-fire combined cycle power plant. The term of the agreement is for twenty-two (22) years. This plant has commenced generating power.

Under both agreements, the cost of the purchased power will be based on the quantity of energy delivered and dependable capacity available, as more fully explained in the Agreements. The Authority also has the option to purchase the generating facilities if certain conditions, as defined in the agreements, are met. However, in no event will the exercise price of the purchase options be below fair value. The Authority is not responsible for and does not guarantee the debt or operations of AES or EcoEléctrica. Both agreements obligate the Authority to purchase power only if generated by the plants.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

**15. Commitments and Contingencies**

**Risk Management**

The Authority is exposed to various risks of losses related to torts; thefts of, damage to, and destruction of assets; errors and omissions; injuries to employees; and natural disasters. The Authority obtains coverage, among others, for up to a maximum of $250,000 for each general and liability claim, and $2,000,000, for each boiler and machinery and property liability claim. The property liability policy imposes windstorm and earthquake deductibles at 2% and 5% of the locations value subject to a maximum deductible of $25 million per occurrence. The Authority purchases commercial insurance for claims in excess of coverage provided through the property and casualty insurance program. The Authority considers its Self-insurance Fund sufficient to provide for its self-insurance risk (see Note 5). Claims expenditures and liabilities are recorded when it is probable that a loss has occurred and the amount of that loss can be reasonably estimated.

The Authority has a cost plus health insurance program covering substantially all employees. The Authority contracted an administrator for the processing, approval and payment of claims plus an administrative fee. The accrual for employees health plan includes the liability for claims processed and an estimate for claims incurred but not reported.

The State Insurance Fund Corporation (SIF) provides workers' compensation to the Authority. In addition, the Authority is self-insured to pay the difference between the SIF payment and (i) 100% of the employee salary during the first 104 weeks and (ii) 80% of the employee salary for 52 additional weeks.

In addition, the Authority is self insured for its transmission and distribution lines. Transmission and distribution lines amounted to approximately $2.6 billion and $2.7 billion at June 30, 2001 and 2000, respectively.

The retained earnings and restricted assets set aside in the Self-insurance Fund for self insurance amounted to approximately $73.4 million in 2001 and $68.9 million in 2000.

Changes in the balances of the health insurance program and other self-insurance risks during fiscal years 2001 and 2000 were as follows:

|  | Liability Beginning Balance | Expenses | Payments | Liability End Balance |
|---|---|---|---|---|
|  |  | (In Thousand) |  |  |
| 2001 | $40,921 | $95,344 | $89,443 | $46,822 |
| 2000 | $37,804 | $85,173 | $82,056 | $40,921 |

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 15. Commitments and Contingencies (continued)

### Contingencies

The Authority is a defendant or codefendant in several lawsuits incidental to its business, some involving substantial amounts. In those instances that management and legal counsel believe that the outcome of the litigation will be unfavorable to the Authority, a provision has been made to cover the estimated liability. Management, based on discussions with legal counsel, believes that the additional liability, if any, resulting from the ultimate resolution of these matters will not have a material effect on the Authority's financial position or results of operations.

On May 18, 2000, Abengoa, Puerto Rico, S.E. (Abengoa), the Authority's contractor for the repowering of San Juan steam plant units 5 and 6, unilaterally declared a termination of the contract and filed a complaint for breach of contract. The Authority has moved for time to answer the complaint and has filed a counter claim for the cost of the project and for all damages caused to the Authority by the alleged illegal contract termination. The Authority believes that the actions by the contractor will not materially affect the ability of the Authority to provide service nor will there be a material difference in the quality of service provided by the Authority.

In May 1998, the Municipality of Ponce filed a complaint against the Authority in the San Juan Superior Court requesting the payment by the Authority of the full contributions in lieu of taxes and electric energy sales set aside for prior fiscal years. The complaint challenges the application of the Net Revenues by the Authority in making deposits to certain funds under the 1974 Agreement and under a prior trust indenture (now terminated) for the purposes of paying costs of capital improvements and seeks a payment by the Authority in the amount by which the amount available to pay contributions in lieu of taxes and electric energy sales set aside to the Municipality of Ponce has been reduced as a result of such application. The Authority has filed a motion to dismiss the complaint. Since the filing of the suit by the Municipality of Ponce, eighteen other municipalities have filed similar claims. The Authority understands that because the Act provides that the contributions in lieu of taxes and electric energy sales set aside are only payable after complying with the Authority's deposit obligations under the 1974 Agreement and the prior indenture and shortfalls do not carry forward as future liabilities of the Authority as described above, it is legally entitled to make such deposits even if the effect is to reduce such contributions and set aside available to municipalities.

### a. Hurricane Georges

On September 21, 1998, Hurricane Georges passed through the Commonwealth causing substantial damage. The Commonwealth was declared an emergency zone by President Clinton, thus making it eligible for emergency assistance from the Federal Emergency Management Agency (FEMA).

The Authority's total damages from Hurricane Georges, including restoration costs, amounted to approximately $219.7 million, consisting of $9.1 million in damages to the generating plants, $177.8 million in damages to the transmission and distribution system and $32.8 million in other damages. Damages amounting to $121.5 million were charged to accumulated depreciation with no gain or loss recognized.

Puerto Rico Electric Power Authority

Notes to Combined Financial Statements

## 15. Commitments and Contingencies (continued)

### a. Hurricane Georges (continued)

As of June 30, 2000, the Authority has submitted claims to FEMA totaling $159.7 million and has received payments of $149.8 million, consisting of $133.8 million in FEMA payments and $16.0 million in matching contributions from the Government of the Commonwealth. Also, the Authority submitted claims in the amount of approximately $12.7 million to private insurers to cover damages to the generating units.

### b. Construction and Other Commitments

As of June 30, 2001, the Authority has commitments of approximately $400 million on active construction, maintenance, and engineering services contracts.

## 16. Supplemental Disclosures of Noncash Capital and Financing Information

The accreted value of capital appreciation bonds equals the original principal amount of such capital appreciation bonds plus interest accrued from its date of issuance. During the years ended June 30, 2001 and 2000, the accrued interest on capital appreciation bonds amounted to $17.2 million and $17.3 million, respectively.

## 17. Subsequent Events

The Authority is expected to issue Power Revenue Bonds to finance a portion of the cost of various projects under its capital improvement program and to pay certain bond anticipation notes. This bond issuance is expected to occur during the first quarter of the fiscal year ending June 30, 2002.

On October 26, 2001, the Authority entered into a long term agreement for its optical fiber cable requirements with Puerto Rico Information Network, Inc., a private not-for-profit corporation (PRIN). Under this agreement PRIN is required to design, build and transfer to the Authority title to all fiber optic cable installed on the Authority's rights-of-way (mainly its transmission lines). The agreement also provides for the long term lease to PRIN of any surplus capacity of the cables installed. In addition, the Authority is obligated to make purchase price payments of $43.7 million in October 2002 to acquire the fiber optic telecommunication system.

## Puerto Rico Electric Power Authority

## Supplementary Information

## June 30, 2001

## (In Millions)

| Actuarial Valuation Date | Actuarial Value of Assets (a) | Actuarial Accrued Liability (AAL) (b) | Unfunded AAL (UAAL) (b - a) | Funded Ratio (a/b) | Covered Payroll (c) | UAAL Percentage Of Covered Payroll (b) - (a)/(c) |
|---|---|---|---|---|---|---|
| Pension Plan | | | | | | |
| 6/30/98* | $1,267.9 | $1,495.2 | $227.3 | 85% | $273.8 | 83% |
| 6/30/99** | 1,443.0 | 1,537.9 | 94.9 | 94% | 276.8 | 34% |
| 6/30/00 | 1,549.6 | 1,799.4 | 249.8 | 86% | 278.1 | 90% |

Note 1: The system, as permitted by the GASB, reflects its investments at an average fair market value of the last three years to determine its actuarial funding.

* Estimated valuation, projected from actual 6/30/97 valuation.

** Estimated valuation, projected from actual 6/30/98 valuation. Does not reflect benefit improvements effective January 1, 2000.

Puerto Rico Electric Power Authority

Note to Schedules II-VII - Information Required by the 1974 Agreement

As of June 30, 2001 and 2000 and the Years then Ended

Schedules II - VII present certain information which is required by the 1974 Agreement. The Net Revenues data, as defined in the 1974 Agreement (Net Revenues), presented in Schedules II and III differ in some important respects from generally accepted accounting principles (GAAP). Such differences are explained below; Schedule II also presents a reconciliation of Net Revenues with GAAP.

The most significant differences between Net Revenues and GAAP are the following:

1) Revenues do not include investment income on investments in the construction fund (see Note 5 to the financial statements);
2) Depreciation and interest expense on bonds covered by the 1974 Agreement are not included as deductions in calculating Net Revenues;
3) Amortization of debt discount and issuance costs and the allowance for funds used during construction are not considered in the computation in calculating Net Revenues;
4) Contribution in lieu of taxes is not considered a deduction for purposes of Net Revenues;
5) Net Revenues do not include revenues or expenses of the Irrigation Systems (see Note 1 to the financial statements).

For further details and information on the definition of Net Revenues, please refer to the 1974 Agreement.

SCHEDULE II

Puerto Rico Electric Power Authority
Sources and Disposition of Net Revenues
Under the Provisions of the 1974 Agreement for the Years Ended June 30, 2001 and 2000
Statements of Income (GAAP) and Reconciliation of Net Income
*(In Thousands)*

| | 2001 | | | 2000 | | |
|---|---|---|---|---|---|---|
| | 1974 Agreement | Statement of Income (GAAP) | Reconciliation of Net Income | 1974 Agreement | Statement of Income (GAAP) | Reconciliation of Net Income |
| **Reconciliation of components of net income:** | | | | | | |
| Revenues: | | | | | | |
| Operating revenues | $2,329,103 | $2,331,989 | $ 2,886 | $1,984,227 | $1,987,337 | $ 3,110 |
| Revenues from Commonwealth for rural electrification | 705 | 705 | | 881 | 881 | |
| Other operating revenues | 8,210 | 8,210 | | 10,240 | 10,240 | |
| Other | 35,059 | 35,059 | | 29,936 | 29,936 | |
| Construction fund investment income and gain on sale of other properties | | 10,575 | 10,575 | | 3,724 | 3,724 |
| | 2,373,077 | 2,386,538 | | 2,025,284 | 2,032,118 | |
| **Current expenses:** | | | | | | |
| As shown | 1,722,689 | 1,725,185 | | 1,466,823 | 1,469,956 | |
| Other interest | | 3,023 | | | 2,911 | |
| Total as defined | 1,722,689 | 1,728,213 | (5,524) | 1,466,823 | 1,472,867 | (6,044) |
| Net revenues, as defined | 650,388 | | | 558,461 | | |
| Depreciation | | 233,169 | (233,169) | | 209,960 | (209,960) |
| **Disposition of Revenues: (not classified in order of payment)** | | | | | | |
| Interest on debt | 240,459 | 240,459 | | 224,861 | 224,861 | |
| Amortization debt discount and financing expenses | | 3,316 | | | 2,427 | |
| Amortization of bond defeasance | | 14,182 | | | 14,239 | |
| Allowance for funds used during construction | | (22,966) | | | (12,138) | |
| Net interest on long-term debt | 240,459 | 234,991 | 5,468 | 224,861 | 229,389 | (4,528) |
| **Power revenue bonds:** | | | | | | |
| Principal | 146,989 | | 146,989 | 145,058 | | 145,058 |
| Internal Funds | 100,500 | | 100,500 | 74,265 | | 74,265 |
| Reserve Maintenance Fund | 7,000 | | 7,000 | 7,000 | | 7,000 |
| Contribution in lieu of taxes | 155,440 | 148,271 | 7,169 | 107,277 | 98,494 | 8,783 |
| Total expenses (GAAP) | | 2,344,644 | | | 2,010,710 | |
| Net revenues, as defined | $ 650,388 | | | $ 558,461 | | |
| Net income | | $ 41,894 | $ 41,894 | | $ 21,408 | $ 21,408 |

*See accompanying Notes.*

<div align="right">SCHEDULE III</div>

### Puerto Rico Electric Power Authority

*Supplemental Schedule of Sources and Disposition*
*of Net Revenues under the Provisions of the 1974 Agreement*
*for the Years Ended June 30, 2001 and 2000*
*(In Thousands)*

| | 2001 | 2000 |
|---|---|---|
| **Sources of Net Revenues:** | | |
| Revenues: | | |
| Electric revenues | $2,329,103 | $1,984,227 |
| Revenues from the Commonwealth for rural electrification | 705 | 881 |
| Other operating revenues | 8,210 | 10,240 |
| Other (principally interest) | 35,059 | 29,936 |
| | 2,373,077 | 2,025,284 |
| | | |
| **Current Expenses:** | | |
| Operations: | | |
| Fuel | 944,760 | 801,432 |
| Purchased Power | 177,330 | 64,518 |
| Other production | 56,301 | 55,690 |
| Transmission and distribution | 105,034 | 94,793 |
| Customer accounting and collection | 213,666 | 76,598 |
| Administrative and general | 83,453 | 151,069 |
| Maintenance | 139,117 | 219,812 |
| Expenses related to Hurricane Georges | - | - |
| Interest (Other than long term debt) | 3,028 | 2,911 |
| | 1,722,689 | 1,466,823 |
| | | |
| Net revenues, as defined | $ 650,388 | $ 588,461 |
| | | |
| **Disposition of Net Revenues:** | | |
| **Revenue fund:** | | |
| Power revenue bonds - sinking fund requirements: | | |
| Interest | $ 238,044 | $ 218,621 |
| Principal | 146,989 | 145,058 |
| Reserve | - | - |
| Reserve maintenance fund | 7,000 | 7,000 |
| Debt discount and expenses | | |
| Balance available for capital improvements and other needs | 100,500 | 74,265 |
| | 492,533 | 444,944 |
| | | |
| **General obligation notes:** | | |
| Interest | 2,415 | 6,240 |
| Principal | - | - |
| | 2,415 | 6,240 |
| | | |
| Contribution in lieu of taxes and other: | 155,440 | 107,277 |
| | | |
| Net revenues, as defined | $ 650,388 | $ 558,461 |

*See accompanying Notes.*

SCHEDULE IV

Puerto Rico Electric Power Authority
Supplemental Schedule of Funds Under the Provisions of the 1974 Agreement
*(In Thousands)*

For the years ended June 30

| | 2001 | | | | 2000 | | | |
| | | Held by Authority Other Assets | Restricted Deposits with Trustee | | | Held by Authority Other Assets | Restricted Deposits with Trustee | |
| | Total | | Other Assets | Non-Current Assets | Total | | Other Assets | Non-Current Assets |
|---|---|---|---|---|---|---|---|---|
| **By Account** | | | | | | | | |
| 1974 Agreement (restricted): | | | | | | | | |
| Sinking Fund – principal and interest | $261,568 | | $261,568 | | $244,391 | | $244,391 | |
| Reserve account | 245,633 | | | $245,633 | 228,554 | | | $228,554 |
| Self Insurance Fund | 73,388 | | | 73,388 | 68,936 | | | 68,936 |
| Reserve Maintenance Fund | 32,612 | 32,612 | | | 23,792 | $23,792 | | |
| Construction Fund | | | | | | | | |
| Rural Utilities Service (RUS) | 1,388 | 467 | 921 | | 1,308 | 387 | 921 | |
| Other | 40,152 | 40,152 | | | 16,387 | 16,387 | | |
| Cogeneration Fund | 5,096 | 5,096 | | | 4,749 | 4,749 | | |
| PREPA Client Fund | 43,793 | 43,793 | | | 45,378 | 45,378 | | |
| General purpose (unrestricted): | | | | | | | | |
| General | 89,947 | 89,947 | | | 68,187 | 68,187 | | |
| Working funds | 2,417 | 2,417 | | | 2,347 | 2,347 | | |
| Total | $795,994 | $214,484 | $262,489 | $319,021 | $704,029 | $161,227 | $245,312 | $297,490 |
| **By type of assets held** | | | | | | | | |
| Working funds | $2,417 | 2,417 | | | $ 2,347 | $ 2,347 | | |
| Cogeneration Fund | 5,096 | 5,096 | | | 4,749 | 4,749 | | |
| PREPA Client Fund | | | | | | | | |
| Cash in bank and time deposits (by depository institutions): | | | | | | | | |
| Banco Popular de Puerto Rico | 7,621 | 7,621 | | | 13,558 | 13,558 | | |
| Citibank, N. A. | 54,447 | 54,447 | | | 30,076 | 30,076 | | |
| State Street Bank and Trust Co., N.A. | 261,568 | | 261,568 | | 244,391 | | 244,391 | |
| Banco Bilbao Vizcaya | 15 | 15 | | | 41 | 41 | | |
| Banco Bilbao Vizcaya, Mayaguez, PR | 2,073 | 2,073 | | | 559 | 559 | | |
| First Bank, San Juan, Puerto Rico | 782 | 782 | | | 480 | 480 | | |
| Banco Santander, Santurce, Puerto Rico | 24,051 | 24,051 | | | 16,245 | 16,245 | | |
| Roig Commercial Bank, Humacao, P.R. | 173 | 173 | | | 57 | 57 | | |
| Western Bank, Mayaguez, Puerto Rico | 785 | 785 | | | 7,171 | 7,171 | | |
| | 359,028 | 97,460 | 261,568 | | 319,674 | 75,283 | 244,391 | |
| Investment Securities | 436,966 | 117,024 | 921 | 319,021 | 384,355 | 85,944 | 921 | 297,490 |
| | $795,994 | $214,484 | $262,489 | $319,021 | $704,029 | $161,227 | $245,312 | $297,490 |

*See accompanying Notes.*

SCHEDULE V

Puerto Rico Electric Power Authority
Supplement Schedule of Changes in Cash and Investments by Funds
Year ended June 30, 2001
*(In Thousands)*

| | | General Purposes Funds | | | |
|---|---|---|---|---|---|
| | Total | General Fund | Revenue Fund | Working Fund | General Obligations Notes Fund |
| Balances at June 30, 2000 | $ 704,028 | $ 65,792 | $ 2,395 | $2,347 | $ - |
| Operations: | | | | | |
| Net revenues | - | (650,388) | 155,440 | - | - |
| Funds provided from internal operations | 501,164 | 501,164 | - | - | - |
| 1974 Agreement investment income | - | (9,685) | - | - | - |
| Offset of current year's contribution in lieu of taxes against certain government accounts receivable | - | 115,509 | (115,509) | - | - |
| Offset of current year's 5% contribution in lieu of taxes against Commonwealth of Puerto Rico debt and transfers to General Obligations Notes Fund | - | 33,550 | (33,550) | - | - |
| Funds used for construction | (405,638) | - | - | - | - |
| Funds used for restoration of plant | - | - | - | - | - |
| Proceeds from waiver granted to EcoElectrica | - | - | - | - | - |
| Financing: | | | | | |
| Proceeds received from FEMA | - | - | - | - | - |
| Proceeds from new bond issues-net of original issue discount | 600,002 | - | - | - | - |
| Defeased bonds-net of original issue discount | - | - | - | - | - |
| Accretion of capital appreciation bonds | 17,236 | 17,236 | - | - | - |
| Amortization of debt discount and excess reacquisition costs | 17,498 | 17,498 | - | - | - |
| Sinking Funds and account transfers | - | - | - | - | - |
| Notes issued for construction | 36,000 | - | - | - | - |
| Notes issued for fuel purchases | 1,040,000 | 1,040,000 | - | - | - |
| Payment of notes | (1,339,000) | (1,040,000) | - | - | - |
| Payment of interest | (225,105) | (8,068) | - | - | - |
| Payment of current maturities of long-term debt | (144,863) | - | - | - | - |
| Changes in assets and liabilities: | | | | | |
| Working funds | - | (70) | - | 70 | - |
| Accounts receivable (includes non-current) | (24,684) | (24,684) | - | - | - |
| Fuel oil | (9,941) | (9,941) | - | - | - |
| Materials and supplies | 16,360 | 16,360 | - | - | - |
| Prepayments and other | 409 | 409 | - | - | - |
| Deferred debits | 1,766 | 1,766 | - | - | - |
| Accounts payable and accrued liabilities (includes non-current) | 2,248 | 2,248 | - | - | - |
| Customer deposits | 8,514 | 8,514 | - | - | - |
| Interfund transfers, etc. | - | 4,164 | (8,745) | | - |
| Total before interfund accounts | 795,994 | 81,374 | 31 | 2,417 | - |
| Add (deduct) interfund accounts | - | 8,542 | - | - | - |
| Balances at June 30, 2001 | $ 795,994 | $ 89,916 | $ 31 | $2,417 | $ - |

*See accompanying Notes.*

-38-

| | Sinking Fund | | | | Other Funds | | |
|---|---|---|---|---|---|---|---|
| Interest 1974 Agreement | Principal 1974 Agreement | Reserve 1974 Agreement | Self Insurance Fund | Construction 1974 Agreement | Reserve Maintenance Fund | Cogeneration Fund | Clients Fund |
| $102,659 | $141,732 | $228,553 | $68,936 | $17,696 | $23,791 | $4,749 | $45,378 |
| 241,359 | 146,989 | - | - | 99,600 | 7,000 | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | 9,685 | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | (405,638) | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | 600,002 | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | 36,000 | - | - | - |
| - | - | - | - | (299,000) | - | - | - |
| (210,993) | - | - | - | (6,044) | - | - | - |
| - | (144,863) | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| (18,848) | 3,533 | 17,080 | 4,452 | (2,219) | 1,821 | 347 | (1,585) |
| 114,177 | 147,391 | 245,633 | 73,388 | 50,082 | 32,612 | 5,096 | 43,793 |
| | | | | (8,542) | | | |
| $114,177 | $147,391 | $245,633 | $73,388 | $41,540 | $32,612 | $5,096 | $43,793 |

Puerto Rico Electric Power Authority
Supplement Schedule of Changes in Cash and Investments by Funds
Year ended June 30, 2000
*(In Thousands)*

| | Total | General Purposes Funds | | | |
| | | General Fund | Revenue Fund | Working Fund | General Obligations Notes Fund |
|---|---|---|---|---|---|
| **Balances at June 30, 1999** | $ 751,125 | $ 73,835 | $ 22 | $2,317 | $ - |
| Operations: | | | | | |
| Net revenues | - | (558,461) | 107,277 | - | 103 |
| Funds provided from internal operations | 419,521 | 419,521 | - | - | - |
| 1974 Agreement investment income | - | (3,724) | - | - | - |
| Offset of current year's contribution in lieu of taxes against certain government accounts receivable | - | 83,772 | (83,772) | - | - |
| Offset of current year's 5% contribution in lieu of taxes against Commonwealth of Puerto Rico debt and transfers to General Obligations Notes Fund | - | 23,505 | (23,505) | - | - |
| Funds used for construction | (413,987) | - | - | - | - |
| Funds used for restoration of plant | - | - | - | - | - |
| Proceeds from waiver granted to EcoElectrica | 15,000 | - | - | - | - |
| Financing: | | | | | |
| Proceeds received from FEMA | 41,616 | 41,616 | - | - | - |
| Proceeds from new bond issues-net of original issue discount | - | - | - | - | - |
| Defeased bonds-net of original issue discount | - | - | - | - | - |
| Accretion of capital appreciation bonds | 17,262 | 17,262 | - | - | - |
| Amortization of debt discount and excess reacquisition costs | 16,666 | 16,666 | - | - | - |
| Sinking Funds and account transfers | - | 15,994 | - | - | - |
| Notes issued for construction | 233,000 | - | - | - | - |
| Notes issued for fuel purchases | 1,065,000 | 1,065,000 | - | - | - |
| Payment of notes | (1,065,000) | (1,065,000) | - | - | - |
| Payment of interest | (211,376) | (7,100) | - | - | - |
| Payment of current maturities of long-term debt | (145,861) | - | - | - | (5,000) |
| Changes in assets and liabilities: | | | | | |
| Working funds | - | (30) | - | 30 | - |
| Accounts receivable (includes non-current) | (95,882) | (95,882) | - | - | - |
| Fuel oil | (28,109) | (28,109) | - | - | - |
| Materials and supplies | (9,082) | (9,082) | - | - | - |
| Prepayments and other | (1,307) | (1,307) | - | - | - |
| Deferred debits | (7,452) | (7,452) | - | - | - |
| Accounts payable and accrued liabilities (includes non-current) | 114,533 | 114,533 | - | - | - |
| Customer deposits | 8,361 | 8,361 | - | - | - |
| Interfund transfers, etc. | - | (12,820) | 2,373 | - | 4,897 |
| Total before interfund accounts | 704,028 | 91,098 | 2,395 | 2,347 | - |
| Add (deduct) interfund accounts | - | (25,306) | - | - | - |
| Balances at June 30, 2000 | $ 704,028 | $ 65,792 | $ 2,395 | $2,347 | $ - |

*See accompanying Notes.*

| | Sinking Fund | | | | Other Funds | | |
|---|---|---|---|---|---|---|---|
| Interest 1974 Agreement | Principal 1974 Agreement | Reserve 1974 Agreement | Self Insurance Fund | Construction 1974 Agreement | Reserve Maintenance Fund | Cogeneration Fund | Clients Fund |
| $134,817 | $105,804 | $217,621 | $94,750 | $ 71,512 | $15,941 | $4,949 | $29,557 |
| 221,047 | 145,058 | - | - | 77,976 | 7,000 | - | - |
| - | - | - | - | 3,724 | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | (413,987) | - | - | - |
| - | - | - | - | - | - | - | 15,000 |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| (29,234) | 31,220 | 12,020 | (30,000) | - | - | - | - |
| - | - | - | - | 233,000 | - | - | - |
| - | - | - | - | - | - | - | - |
| (201,677) | - | - | - | (2,599) | - | - | - |
| - | (140,861) | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| (22,294) | 511 | (1,088) | 4,186 | 22,764 | 850 | (200) | 821 |
| 102,659 | 141,732 | 228,553 | 68,936 | (7,610) | 23,791 | 4,749 | 45,378 |
| - | - | - | - | 25,306 | - | - | - |
| $102,659 | $141,732 | $228,553 | $ 68,936 | $ 17,696 | $23,791 | $4,749 | $45,378 |

-41-

**Puerto Rico Electric Power Authority**
Supplemental Schedule of Changes in Long-Term
Debt and Current Portion of Long-Term Debt
Years ended June 30, 2001 and 2000
(*In Thousands*)

|  | 2001 | 2000 |
|---|---|---|
| Long-term debt excluding current portion: |  |  |
| Balance at the beginning of year | $3,485,426 | $3,611,676 |
| Transfers to current liabilities: |  |  |
| Power revenue bonds | (152,248) | (143,512) |
| General obligation notes | - | - |
| Note payable | (5,000) | - |
| Total transfers | (157,248) | (143,512) |
| Remainder | 3,328,178 | 3,468,164 |
| New issues: |  |  |
| Power revenue bonds | 612,240 | - |
| Power revenue refunding bonds | - | - |
| Note payable to EcoElectrica | - | - |
| Debt discount on new bond issues - net | (6,438) | - |
| Defeasance of bonds | - | - |
| Debt discount and excess reacquisition costs on cancelled bonds – net | - | - |
| Accretion of capital appreciation bonds | 17,236 | 17,262 |
| Balance at the end of year | $3,951,216 | $3,485,426 |
| Current portion of long-term debt: |  |  |
| Balance at beginning of year | $ 262,842 | $ 250,147 |
| Transfer from long-term debt | 157,248 | 143,512 |
| Payments to bondholders: |  |  |
| Power revenue - July 1 | (141,088) | (136,891) |
| Power revenue - January 1 | (3,775) | (3,970) |
| Obligations under capital lease | - | - |
| General obligation notes | - | (5,000) |
| Total payments | (144,863) | (145,861) |
| Amortization of debt discount and excess reacquisition costs | 15,712 | 15,044 |
| Balance at end of year | $ 290,939 | $ 262,842 |



June 13, 2002

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Dear Sirs:

Washington Group International, Inc. ("Washington"), operating through its affiliate Washington Engineers P.S.C., serves as the Consulting Engineers under the provisions of the Trust Agreement, dated as of January 1, 1974, as amended, by and between Puerto Rico Electric Power Authority (the "Authority") and State Street Bank and Trust Company, N.A., in the Borough of Manhattan, City and State of New York, successor trustee. Such Trust Agreement is referred to herein as the "Agreement", and the trustee under the Agreement is referred to herein as the "Trustee". The Agreement requires the Consulting Engineers annually to prepare and file with the Authority and the Trustee a report with their recommendations as to any necessary or advisable revisions of rates and charges and such other advices and recommendations as they may deem desirable. In addition, the report will include the amount that should be deposited monthly during the next fiscal year to the credit of the Reserve Maintenance Fund; the amount, if any, to be deposited to the Self-insurance Fund in the next fiscal year; and, the amount to be deposited to the Capital Improvement Fund in the next fiscal year. The most recent such recommendations and report provided to the Authority and the Trustee was dated as of June 2001.

In preparing this letter and in reaching the conclusions and opinions contained herein and referred to in the Official Statement to which this letter is appended, Washington has relied upon inquiries, observations and analyses made and conducted by it in the performance of its duties under the Agreement and upon its professional experience. Washington also has relied upon various financial, economic, political and other information and projections provided to it by the Authority and other sources, some of such information and projections having been accepted by Washington without it having conducted an independent investigation thereof. In addition, Washington has made assumptions which it believes to be reasonable to make including, but not limited to, the following:

      1.     that the Authority will adhere to its proposed schedule of programmed regular maintenance;

      2.     that the Authority will continue to maintain the effective availability of its generating units;

3.　　that the Authority's current capacity expansion plan will be realized as to increases in capacity and approximate timing;

4.　　that the Authority's forecasts of costs and availability of fuels are reasonable;

5.　　that financing will be available to the Authority at reasonable rates, in adequate amounts and at appropriate times;

6.　　that the Authority will not be adversely affected by labor disputes and will have adequate levels of labor productivity;

7.　　that there will be no material changes in the requirements of regulatory authorities, the Legislature of Puerto Rico will not enact any legislation that will adversely affect the Authority, nor will there be unforeseen technological developments;

8.　　that the demographic, statistical, economic and other information regarding Puerto Rico obtained by Washington from publicly available sources is reliable;

9.　　that the Authority will not be unduly affected by natural disasters; and

10.　　that the Authority will not experience unforeseeable or extraordinary conditions not included in usual estimates and opinions of engineers.

Based upon and subject to the foregoing which should be read in conjunction with and as part of the following conclusions, it is our considered opinion with respect to the Authority that:

1.　　The Authority's production, transmission and distribution plant is in good repair and sound operating condition;

2.　　The Authority's generating capacity expansion plan is adequate and should allow the Authority to meet targeted electric reliability criteria;

3.　　The Authority's projections of future load growth and estimates of peak load referred to in the Official Statement, to which this letter is appended, under the caption "Adequacy of Capacity" are reasonable for base planning purposes;

4.　　The Authority's revenue and base capacity planning forecasts (and the methodologies and assumptions on which they are based) are reasonable for planning purposes and are generally consistent with electric utility industry practices;

5.　　The Authority's current projected capital improvement program is reasonable and the estimated expenditures are consistent with the Authority's future needs;

6.　　The Authority's estimates of future growth form a reasonable basis for its projected operating results;

7.　　The Authority's electric rates and charges should generate sufficient revenues to pay its current expenses and debt service and to finance that portion of its capital improvement program that is currently anticipated to be financed with current operating revenues; and

III-2

8.      The 507 MW of capacity presently being provided by a cogenerator and the 454 MW of capacity expected to be available in the third quarter of 2002 as described in the Official Statement to which this letter is appended, and their role in the Authority's capacity expansion program should not cause the Authority to experience a meaningful reduction in control over its revenue producing capability as a result of the purchase rather than self-generation of electricity. The methodology used by the Authority in determining its avoided cost of generating or otherwise obtaining an equivalent amount of energy, pursuant to the Public Utilities Regulatory Policies Act of 1978, as amended (which requires the Authority to pay an amount based upon such avoided cost for power generated and made available to the Authority), is reasonable.

Very truly yours,

WASHINGTON GROUP INTERNATIONAL, INC.

George W. Romano, Jr.
Manager,
Utility Management
Services Department

[This page intentionally left blank]

PROPOSED FORM OF BOND COUNSEL OPINIONS                    APPENDIX IV

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| CHICAGO | 787 SEVENTH AVENUE | BEIJING |
| DALLAS | NEW YORK, NEW YORK 10019-6018 | HONG KONG |
| LOS ANGELES | TELEPHONE 212 839 5300 | LONDON |
| SAN FRANCISCO | FACSIMILE 212 839 5599 | SHANGHAI |
| WASHINGTON, D.C. | www.sidley.com | SINGAPORE |
| | FOUNDED 1866 | TOKYO |

July __, 2002

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Gentlemen:

We have examined the Puerto Rico Electric Power Authority Act (Act No. 83 of the Legislature of Puerto Rico, approved May 2, 1941, as amended and re-enacted by Act No. 19, approved April 8, 1942, as amended) creating Puerto Rico Electric Power Authority (formerly called Puerto Rico Water Resources Authority and herein called the "Authority"), a governmental instrumentality of the Commonwealth of Puerto Rico, and also Act No. 111, approved May 6, 1941, as amended by Act No. 153, approved May 14, 1943 (said Acts No. 83, No. 19, No. 111 and No. 153, as amended, being herein collectively called the "Authority Act").

We have also examined certified copies of the proceedings of the Governing Board of the Authority in authorizing the execution and delivery of the Agreement hereinafter referred to and certified copies of the proceedings and other proofs submitted relative to the authorization, issuance and sale of

**$401,785,000**
**PUERTO RICO ELECTRIC POWER AUTHORITY**
**POWER REVENUE REFUNDING BONDS, SERIES KK**
**Dated the date hereof.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of said Series KK Bonds (the "Bonds"). The Bonds are not subject to redemption.

We have also examined one of the Bonds as executed and authenticated.

From such examination, we are of the opinion that:

1.  The Authority Act is valid.

2.  Said proceedings have been validly and legally taken.

3.  The Bonds have been duly authorized and issued to refund the Authority's outstanding Puerto Rico Electric Power Authority Power Revenue and Power Revenue Refunding Bonds set forth in said resolution authorizing the issuance of the Bonds.

4.  As authorized by the Authority Act and by said proceedings, a trust agreement, dated as of January 1, 1974, as amended (herein called the "Agreement"), has been duly executed by and between the Authority and State Street Bank and Trust Company, N.A., successor Trustee, which contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds issued thereunder, the collection and disposition of revenues, the maintenance, repair and operation of the electric power properties of the Authority (such properties, together with all improvements, renewals and replacements thereof and extensions and additions thereto, being herein called the "System"), the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds issued thereunder.

5.  The Agreement provides for the issuance of additional Puerto Rico Electric Power Authority Power Revenue Bonds under the conditions and limitations therein set forth.

6.  The Bonds are valid and binding special obligations of the Authority, payable solely from the Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund established under the Agreement, to the credit of which Fund the Authority has covenanted to deposit a sufficient amount of revenues of the System, over and above the expenses of repair, maintenance and operation, to pay the principal of and interest on all bonds issued under the provisions of the Agreement (including the Bonds) as the same become due and payable and to create a reserve for such purpose, which Fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued under the Agreement (including the Bonds).

7.  The Agreement provides for the fixing and collecting by the Authority of rates and charges for the use of the services and facilities of the System sufficient for the payment of the expenses of the Authority incurred in the repair, maintenance and operation of the System and for the payment of the principal of and the interest on all bonds issued under the provisions of the Agreement (including the Bonds) as the same become due and payable including reserves for such purposes.

8.  The bonds issued under the provisions of the Agreement do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and such bonds are payable only out of the revenues of the System, to the extent provided in the Agreement.

9.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.  No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the Agreement or in the aforementioned resolution authorizing the issuance of the Bonds) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on the Bonds for federal income tax purposes.

Interest on the Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be includable in the computation of the federal alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is not included in gross income.

The Authority has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent the Authority from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

SIDLEY AUSTIN BROWN & WOOD LLP

| CHICAGO | 787 SEVENTH AVENUE | BEIJING |
| DALLAS | NEW YORK, NEW YORK 10019-6018 | HONG KONG |
| LOS ANGELES | TELEPHONE 212 839 5300 | LONDON |
| SAN FRANCISCO | FACSIMILE 212 839 5599 | SHANGHAI |
| WASHINGTON, D.C. | www.sidley.com | SINGAPORE |
| | FOUNDED 1866 | TOKYO |

July __, 2002

Puerto Rico Electric Power Authority
San Juan, Puerto Rico

Gentlemen:

We have examined the Puerto Rico Electric Power Authority Act (Act No. 83 of the Legislature of Puerto Rico, approved May 2, 1941, as amended and re-enacted by Act No. 19, approved April 8, 1942, as amended) creating Puerto Rico Electric Power Authority (formerly called Puerto Rico Water Resources Authority and herein called the "Authority"), a governmental instrumentality of the Commonwealth of Puerto Rico, and also Act No. 111, approved May 6, 1941, as amended by Act No. 153, approved May 14, 1943 (said Acts No. 83, No. 19, No. 111 and No. 153, as amended, being herein collectively called the "Authority Act").

We have also examined certified copies of the proceedings of the Governing Board of the Authority in authorizing the execution and delivery of the Agreement hereinafter referred to and certified copies of the proceedings and other proofs submitted relative to the authorization, issuance and sale of

<div align="center">

**$98,125,000**
**PUERTO RICO ELECTRIC POWER AUTHORITY**
**POWER REVENUE BONDS, SERIES LL**
**Dated the date hereof.**

</div>

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of said Series LL Bonds (the "Bonds"). The Bonds are not subject to redemption.

We have also examined one of the Bonds as executed and authenticated.

From such examination, we are of the opinion that:

1. The Authority Act is valid.

2. Said proceedings have been validly and legally taken.

3. The Bonds have been duly authorized and issued to provide funds for paying the cost of capital improvements to the electric power properties of the Authority (such properties, together with all improvements, renewals and replacements thereof and extensions and additions thereto, being herein called the "System").

4. As authorized by the Authority Act and by said proceedings, a trust agreement, dated as of January 1, 1974, as amended (herein called the "Agreement"), has been duly executed by and between the Authority and State Street Bank and Trust Company, N.A., successor Trustee, which contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds issued thereunder, the collection and disposition of revenues, the maintenance, repair and operation of the System, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds issued thereunder.

5. The Agreement provides for the issuance of additional Puerto Rico Electric Power Authority Power Revenue Bonds under the conditions and limitations therein set forth.

6. The Bonds are valid and binding special obligations of the Authority payable solely from the Puerto Rico Electric Power Authority Power Revenue Bonds Interest and Sinking Fund established under the Agreement, to the credit of which Fund the Authority has covenanted to deposit a sufficient amount of revenues of the System, over and above the expenses of repair, maintenance and operation, to pay the principal of and interest on all bonds issued under the provisions of the Agreement (including the Bonds) as the same become due and payable and to create a reserve for such purpose, which Fund is pledged to and charged with the payment of the principal of and interest on such bonds (including the Bonds).

7. The Agreement provides for the fixing and collecting by the Authority of rates and charges for the use of the services and facilities of the System sufficient for the payment of the expenses of the Authority incurred in the repair, maintenance and operation of the System and for the payment of the principal of and the interest on all bonds issued under the provisions of the Agreement (including the Bonds) as the same become due and payable, including a reserve for such purpose.

8. The bonds issued under the provisions of the Agreement (including the Bonds) do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and such bonds (including the Bonds) are payable only out of the revenues of the System, to the extent provided in the Agreement.

IV-5

9. Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation. No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the Agreement or in the aforementioned resolution authorizing the issuance of the Bonds) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on the Bonds for federal income tax purposes.

Interest on the Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be includable in the computation of the federal alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is not included in gross income.

The Authority has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent the Authority from complying with the requirements of the Code.

Respectfully submitted,

[To be signed "Sidley Austin Brown & Wood LLP"]

NY1 5215714v1



## MUNICIPAL BOND INSURANCE POLICY

ISSUER:

BONDS:

Policy No.: -N

Effective Date:

Premium:

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of Financial Security, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by Financial Security is incomplete, it shall be deemed not to have been received by Financial Security for purposes of the preceding sentence and Financial Security shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, Financial Security shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by Financial Security hereunder. Payment by Financial Security to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of Financial Security under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to Financial Security which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

Financial Security may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to Financial Security pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to Financial Security and shall not be deemed received until received by both and (b) all payments required to be made by Financial Security under this Policy may be made directly by Financial Security or by the Insurer's Fiscal Agent on behalf of Financial Security. The Insurer's Fiscal Agent is the agent of Financial Security only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of Financial Security to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, Financial Security agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to Financial Security to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

[Countersignature]                               FINANCIAL SECURITY ASSURANCE INC.


By _____              By _____
                                                          Authorized Officer


A subsidiary of Financial Security Assurance Holdings Ltd.                    (212) 826-0100
350 Park Avenue, New York, N.Y. 10022-6022

Form 500NY (5/90)

# FINANCIAL GUARANTY INSURANCE POLICY

## MBIA Insurance Corporation
## Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

### [PAR]
### [LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

COUNTERSIGNED:

MBIA Insurance Corporation

_____
Resident Licensed Agent

_____
President

Attest: _____
Assistant Secretary

_____
City, State

STD-RCS-6
4/95

[This page intentionally left blank]

# XL CAPITAL ASSURANCE

250 Park Avenue
New York, New York 10177
Telephone: (646) 658-5900

## MUNICIPAL BOND
## INSURANCE POLICY

**ISSUER:** [          ]

**Policy No:** [          ]

**BONDS:** [          ]

**Effective Date:** [          ]

**XL Capital Assurance Inc. (XLCA),** a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy (which includes each endorsement attached hereto), hereby agrees unconditionally and irrevocably to pay to the trustee (the "Trustee") or the paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the benefit of the Owners of the Bonds or, at the election of XLCA, to each Owner, that portion of the principal and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment.

XLCA will pay such amounts to or for the benefit of the Owners on the later of the day on which such principal and interest becomes Due for Payment or one (1) Business Day following the Business Day on which XLCA shall have received Notice of Nonpayment (provided that Notice will be deemed received on a given Business Day if it is received prior to 10:00 a.m. New York time on such Business Day; otherwise it will be deemed received on the next Business Day), but only upon receipt by XLCA, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in XLCA. Upon such disbursement, XLCA shall become the owner of the Bond, any appurtenant coupon to the Bond or the right to receipt of payment of principal and interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by XLCA hereunder. Payment by XLCA to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of XLCA under this Policy.

In the event the Trustee or Paying Agent has notice that any payment of principal or interest on a Bond which has become Due for Payment and which is made to an Owner by or on behalf of the Issuer of the Bonds has been recovered from the Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Owner within the meaning of any applicable bankruptcy law, such Owner will be entitled to payment from XLCA to the extent of such recovery if sufficient funds are not otherwise available.

The following terms shall have the meanings specified for all purposes of this Policy, except to the extent such terms are expressly modified by an endorsement to this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment", when referring to the principal of Bonds, is when the stated maturity date or a mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity, unless XLCA shall elect, in its sole discretion, to pay such principal due upon such acceleration; and, when referring to interest on the Bonds, is when the stated date for payment of interest has been reached. "Nonpayment" means the failure of the Issuer to have provided sufficient funds to the Trustee or Paying Agent for payment in full of all principal and interest on the Bonds which are Due for Payment. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to XLCA which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

XLCAP-005
Form of Municipal Policy [Specimen]

1

XLCA may, by giving written notice to the Trustee and the Paying Agent, appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy. From and after the date of receipt by the Trustee and the Paying Agent of such notice, which shall specify the name and notice address of the Insurer's Fiscal Agent, (a) copies of all notices required to be delivered to XLCA pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to XCLA and shall not be deemed received until received by both and (b) all payments required to be made by XLCA under this Policy may be made directly by XLCA or by the Insurer's Fiscal Agent on behalf of XLCA. The Insurer's Fiscal Agent is the agent of XLCA only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of XLCA to deposit or cause to be deposited sufficient funds to make payments due hereunder.

Except to the extent expressly modified by an endorsement hereto, (a) this Policy is non-cancelable by XLCA, and (b) the Premium on this Policy is not refundable for any reason. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Bond, other than at the sole option of XLCA, nor against any risk other than Nonpayment. This Policy sets forth the full undertaking of XLCA and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.

THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, XLCA has caused this Policy to be executed on its behalf by its duly authorized officers.

# SPECIMEN

Name:
Title:

# SPECIMEN

Name:
Title:

XLCAP-005
Form of Municipal Policy [Specimen]

2

# **<u>Exhibit 3</u>**

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC., GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, FORMERLY KNOWN AS J.P. MORGAN SECURITIES, INC., MORGAN STANLEY & CO. LLC, SAMUEL A. RAMIREZ & CO., INC., RAYMOND JAMES & ASSOCIATES, INC., and UBS FINANCIAL SERVICES INC. <br><br><br> Defendants. | Civil No.: _____ <br><br> IN RE: Damages due to Breach of Obligations Under the Doctrine of *Actos Propios* and Unilateral Declaration of Will |

## COMPLAINT

**TO THE HONORABLE COURT:**

COMES NOW, the Plaintiff, Ambac Assurance Corporation ("Ambac"), through its undersigned legal representation and very respectfully states, alleges, and prays:

## INTRODUCTION

1.      This is an action brought under the doctrines of *actos propios* and Unilateral Declaration of Will to recover hundreds of millions of dollars in damages caused by Defendants who, blinded by their thirst for fees, unlawfully induced Ambac to issue financial guarantees to facilitate various bond offerings underwritten by them and issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Puerto Rico Convention Center District Authority ("PRCCDA"), with Defendants failing to adhere to their most basic underwriting functions and responsibilities.

2.      For decades, Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated; Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC, formerly known as J.P. Morgan Securities, Inc.; Morgan Stanley & Co. LLC; Samuel A. Ramirez & Co., Inc.; Raymond James & Associates, Inc.; and UBS Financial Services Inc. ("Defendants") profited from their valuable positions as the underwriters of debt issuances by the Commonwealth of Puerto Rico ("Commonwealth") and its instrumentalities. Defendants solicited from Ambac financial guaranty insurance for the PRIFA and PRCCDA

issuances in order to increase their own profits in connection with those issuances. With insurance, the bonds could be issued with a lower interest rate, thus allowing PRIFA and PRCCDA to increase the amount of principal that could be issued and thereby increase the Underwriters' profits on the deal. To procure insurance from Ambac, Defendants provided Ambac with information on the issuances but failed to perform required due diligence and to disclose to Ambac that there were systemic deficiencies in the Commonwealth's financial reporting.

3. Ambac, relying on Defendants' representations, issued hundreds of millions of dollars of financial guaranty insurance for Puerto Rico bonds, including the bonds at issue here, which were issued by PRIFA and the PRCCDA. In doing so, Ambac exposed itself to the credit risk of the Commonwealth and its instrumentalities, obligating itself to make payments for the benefit of bondholders should there ever be a payment default on the insured bonds. These debt issuances enriched Defendants by millions of dollars in upfront fees and related compensation. Had Defendants informed Ambac that the revenue, expenses, and financial controls of the Commonwealth were systemically misrepresented for years, or that Defendants had failed to do due-diligence on the representations made to procure the financial guaranty insurance, Ambac would not have insured the PRIFA and PRCCDA Bonds. Now that those bonds have defaulted, Ambac has paid hundreds of millions of dollars in insurance claims caused by the systemic deficiencies Defendants failed to disclose.

4. Defendants knew or should have known of the Commonwealth's unreliable financial reporting and thus its fundamental lack of creditworthiness given their close relationships with those in charge of the Commonwealth's finances—in particular the Government Development Bank ("GDB"), the entity that selected underwriters for issuances of public debt. A revolving door existed between the GDB and Defendants: it was common for GDB employees, including senior GDB officials, to have worked for one of the Defendants, and for Defendants' employees to go work at the GDB. Given these connections, Defendants possessed superior knowledge of the Commonwealth's financial reporting and controls. Defendants were also repeat players: the GDB selected Defendants habitually for multiple debt issuances. As underwriters with due-diligence obligations, the Defendants had privileged access to information regarding the reliability of the financial controls in place at the various Puerto Rico agencies and entities that would have revealed their inherent

2

untrustworthiness and lack of creditworthiness. With access to and connections with the GDB. Defendants were uniquely positioned to ensure that the disclosures being made by the issuers were complete and accurate—a role that underwriters are required to fulfill under applicable regulations and that the market customarily expects and relies upon underwriters to fulfill.

5.      The Final Investigative Report published in August 2018 by the Independent Investigator retained by the Financial Oversight and Management Board for Puerto Rico revealed the reckless and deceptive conduct of Defendants and the GDB. The Final Investigative Report confirmed that underwriting banks, including Defendants, failed to perform due diligence on many aspects of financial reporting, despite being on notice that figures being used to market debt to investors were materially misleading. Underwriting banks also used stale financial information and profited on numerous sides of the same transaction—often acting as seller and buyer (on behalf of independent investors), as well as selling the issuer expensive financial products purportedly to reduce risk. The Final Investigative Report further revealed the conflicts of interest and failure of controls that engulfed the GDB and Defendants, as well as the extent of Defendants' access to material information concerning the true financial health and condition of the Commonwealth. Another report issued in May 2018 by the United States Government Accountability Office confirmed the effects of these weak controls: "the Puerto Rico government frequently overestimated the amount of revenue it would collect and Puerto Rico's agencies regularly spent more than the amounts Puerto Rico's legislature appropriated for a given fiscal year."[1]

6.      All of this information—previously unknown to Ambac—was material to the financial guaranty insurance provided by Ambac. Ambac is a monoline insurer that insures financial obligations. Ambac issued financial guaranty insurance policies insuring approximately $788 million in aggregate principal amount of bonds issued by PRIFA and PRCCDA. In doing so, Ambac reasonably and legitimately relied on Defendants to act in good faith and in accordance with industry custom and the Defendants' obligations under federal securities laws.

---

[1]  U.S. GAO, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (May 2018), *available at* https://www.gao.gov/assets/700/691944.pdf ("U.S. GAO Report").

7. By insuring the bonds, Ambac guaranteed to investors that it would make payments on the bonds if the issuers defaulted. When PRIFA and PRCCDA, the bond issuers, defaulted, Ambac upheld its end of the bargain. It has paid, and continues to pay, the interest and principal due on the bonds to investors—and has suffered enormous damages, which would have been avoided had Defendants been forthcoming and had they complied with their obligations as underwriters of the debt.

8. Had Defendants used their insider knowledge and superior access to information to properly review and investigate the Commonwealth's financial controls and conditions, they would have discovered—and should have already known—that there were systemic weaknesses and that the Commonwealth's financial disclosures made in connection with the PRIFA and PRCCDA bonds were inaccurate because of these systemic weaknesses.

9. Had Defendants revealed their knowledge or performed adequate due diligence, the market, investors, and insurers like Ambac would have been alerted to the deficiencies and the true risks associated with the bonds. And had Ambac known the truth— that the Commonwealth suffered from systemic deficiencies in fiscal controls, and that Defendants did not properly investigate or ensure that the information relevant to the bonds was fully and materially complete and accurate—Ambac would never have provided financial guaranty insurance on the PRIFA and PRCCDA bonds.

10. Through this lawsuit, Ambac seeks to remedy the significant damage caused by Defendants' conduct, and brings this suit under the doctrines of *actos propios* and Unilateral Declaration of Will. The Supreme Court of Puerto Rico has expressly recognized these doctrines under Puerto Rico law, and the extraordinary circumstances present here warrant their application.

11. *Actos propios* pursues the performance of good faith by all persons in the exercise of their legal rights and in the fulfillment of their obligations. The doctrine applies where an actor's behavior generates the appearance of a situation contrary to the reality that is capable of influencing the behavior of others and is the basis of the trust of another party proceeding in good faith. It is designed to protect the "legitimate expectations" and "good faith" and to "prohibit[] ... behavior that would result in an unreasonable interference with a legitimately created trust relationship, that allowed the other party to reasonably rely on the

original conduct." Thiago Luis Sobra, *The Duty of Good Faith Taken to a New Level: An Analysis of Disloyal Behavior*, 9 J. Vic. L. Stud. 28, 31 (2016).

12.     The Puerto Rico Supreme Court adopted a broad interpretation of the doctrine of *actos propios* more than forty years ago in *International General Electric v. Concrete Builders, Inc.* 4 P.R. Official. Trans. 1221, 1231 (P.R. 1976). Since then, the Puerto Rico Supreme Court has reaffirmed that "[t]hrough [this doctrine's] application … [i]t is hoped that the future between the members of society is characterized by the qualities of honesty and sincerity, so that at all times one can rest upon the truthfulness of the representations or acts of others." *O.C.S. v. Universal*, 2012 TSPR 165, 172 (P.R. Nov. 1, 2012). Under the doctrine, the intent of the actor is not an element of the cause of action because "[t]he center of gravity of the rule is not in the will of its author, but in the trust generated in third parties." *Id.* at 173. Puerto Rico courts readily apply this doctrine in commercial disputes, and have applied it where, as here, claims are made against banks by a plaintiff whose legitimate good-faith expectations have been undermined. *E.g.*, *MMB Dev. Grp. Ltd. V. Westernbank Puerto Rico*, 762 F. Supp. 2d 356, 370 (D.P.R. 2010).

13.     The Unilateral Declaration of Will has long been recognized as a source of obligations to bind entities like the Defendants. The Unilateral Declaration of Will provides that "a person can obligate himself in favor of another person, as long as his intention to be bound is clear, arises from an appropriate legal act and is not contrary to the law, morality or the public order." *Nationstar Mortg., LLC v. de Jesus Roldan*, No. K CD2012-2549 (908), 2014 WL 1692581 (TCA), at *5 (P.R. Cir. Mar. 31, 2014). If these conditions are met, "[o]nce the obligation is constituted," so long as the obligation is not effectively withdrawn, "the declaring party is subject to compensate for the damages of its non-compliance." *Id.* at *6. The Puerto Rico Supreme Court affirmed the binding force of a unilateral declaration of will more than a decade ago in *Ortiz v. P.R. Tel.*, 2004 TSPR 133 (P.R. 2004).

14.     The elements of both the doctrine of *actos propios* and the doctrine of Universal Declaration of Will are satisfied here. Because this case raises issues of public importance unique to the Commonwealth, public policy supports this Court acting in equity and applying both doctrines.

15.     Applying the doctrine of *actos propios* will help to rectify the unjust and inequitable situation created by Defendants in generating the appearance that the

Commonwealth had in place appropriate controls and that the financial information they provided to Ambac could be relied upon as accurate. Where, as here, "there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration." P.R. Laws Ann. tit. 31, § 7. Here, the existence and operation of the municipal bond market depended on the trust and reliance of investors and financial guaranty insurers such as Ambac on the good faith conduct of Defendants. There is no statute applicable to Ambac's claims. Nor could Ambac have brought these claims earlier—the first claims payments were not made by Ambac until January 2016 and the extent of Defendants' inequitable conduct did not become clear until the publication of the Final Investigative Report in August 2018.

16. Justice demands that the Court also acknowledge the binding force of Defendants' unilateral declaration of will. As is the case here, where there is an expression of unilateral, autonomous, free, revocable will, Commonwealth law imposes the right to demand compensation for the consequential damages and losses suffered by those induced by that expression of will. It is time for Defendants to be held to account for their behavior, and to compensate Ambac for the grave damage that their conduct has caused.

## PARTIES

### I. Plaintiff

17. Ambac is a Wisconsin stock insurance corporation with its principal place of business at One World Trade Center, New York, New York, 10007. Ambac is a monoline insurer that provides financial guarantees to the United States and global public finance, infrastructure and structured finance markets. Ambac insured certain bonds issued by the Commonwealth of Puerto Rico ("Commonwealth") and its instrumentalities, and underwritten by the Defendants, including the bonds at issue here, issued by PRIFA and PRCCDA.

### II. Defendants

18. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a United States-based financial services company headquartered at One Bryant Park, New York, NY 10036. Merrill Lynch is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. Merrill Lynch is a wholly owned

indirect subsidiary of Bank of America Corporation. Merrill Lynch is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

19. In 2010, Merrill Lynch became the successor by merger to Banc of America Securities LLC ("Banc of America"). Banc of America was an SEC-registered broker-dealer and an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

20. Citigroup Global Markets Inc. ("Citigroup") is a United States-based financial services company headquartered at 388 Greenwich Street, New York, NY, 10013. Citigroup is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. Citigroup is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

21. Goldman Sachs & Co. LLC ("Goldman Sachs") is a United States-based financial services company headquartered at 200 West Street, New York, NY, 10282. Goldman is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. Goldman Sachs is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

22. J.P. Morgan Securities LLC ("J.P. Morgan"), formerly known as J.P. Morgan Securities, Inc., is a United States-based financial services company headquartered at 383 Madison Avenue, New York, New York, 10179. J.P. Morgan is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. J.P. Morgan is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue

Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

23. Morgan Stanley & Co. LLC ("Morgan Stanley") is a United States-based financial services company headquartered at 1585 Broadway, New York, NY 10036. Morgan Stanley is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since November 8, 1985. Morgan Stanley is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

24. Samuel A. Ramirez & Co., Inc. ("Samuel A. Ramirez") is a United States-based financial services company headquartered at 61 Broadway, New York, New York, 10006. Samuel A. Ramirez is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since May 20, 1997. Samuel A. Ramirez is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

25. Raymond James & Associates, Inc. ("Raymond James") is a United States-based financial services company headquartered at 880 Carillon Parkway, St. Petersburg, FL, 33716. Raymond James is an SEC-registered broker-dealer and been a registered broker-dealer in Puerto Rico since September 1, 1984. Raymond James is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C; and PRCCDA, Hotel Occupancy Tax Revenue Bonds Series A. Ambac insures PRIFA and PRCCDA bonds respectively under policy numbers 24121BE and 25142BE.

26. UBS Financial Services Inc. ("UBS") is a United States-based financial services company headquartered at 1200 Harbor Boulevard, Weehawken, NJ 07086. UBS is an SEC-registered broker-dealer and has been a registered broker-dealer in Puerto Rico since September 1, 1984. UBS is an underwriter of PRIFA, Special Tax Revenue Bonds Series 2005A and Special Tax Revenue Refunding Bonds Series 2005C. Ambac insures the PRIFA bonds under policy numbers 24121BE.

## JURISDICTION

27. This court has personal jurisdiction over each Defendant.

**I.      General Jurisdiction**

28. This Court has general jurisdiction over each Defendant because each Defendant has continuous and systematic contact with Puerto Rico.

29. Citigroup is a registered broker-dealer in Puerto Rico. Citigroup conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities. Citigroup also consults for the Financial Oversight and Management Board of Puerto Rico ("FOMB"), which was created by the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA"). Citigroup has consulted on, *inter alia*, the bankruptcy proceedings initiated under Title III of PROMESA.

30. Goldman Sachs is a registered broker-dealer in Puerto Rico. Goldman Sachs conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities. Goldman Sachs is also a part of joint ventures with Puerto Rico entities, including Autopistas Metropolitanas de Puerto Rico, LLC, which manages public toll roads in Puerto Rico.

31. J.P. Morgan is a registered broker-dealer in Puerto Rico. J.P. Morgan conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities. J.P. Morgan also maintains offices in Puerto Rico from which it conducted its broker-dealer business.

32. Merrill Lynch is a registered broker-dealer in Puerto Rico. Merrill Lynch conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

33. Morgan Stanley is a registered broker-dealer in Puerto Rico. Morgan Stanley conducts continuous and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

34. Samuel A. Ramirez is a registered broker-dealer in Puerto Rico. Samuel A. Ramirez conducts continuous and systematic business in Puerto Rico, including, *inter alia*,

9

the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

35.     Raymond James is a registered broker-dealer in Puerto Rico. Raymond James conducts regular and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

36.     UBS is a registered broker-dealer in Puerto Rico. UBS conducts regular and systematic business in Puerto Rico, including, *inter alia*, the underwriting of bonds issued by the Commonwealth and its agencies and instrumentalities.

**II.     Specific Jurisdiction**

37.     The Court has specific jurisdiction over the Defendants because each Defendant transacted business in Puerto Rico and Ambac's claims arise out of those transactions.

38.     Ambac's claims arise out of the Defendants' underwriting of bonds issued by either the PRCCDA or the PRIFA.

39.     The Defendants purchased these bonds from the PRCCDA and PRIFA and sold them to, upon information and belief, citizens of Puerto Rico and others. Funds raised from the PRIFA and PRCCDA bonds were to be used for the benefit of the Commonwealth and its people. Defendants coordinated with PRCCDA and PRIFA to solicit financial guaranty insurance for these bonds from Ambac. On information and belief, Defendants had meetings in Puerto Rico in connection with the issuances of the bonds, including in relation to their promotion and sale and the procurement of financial guaranty insurance from Ambac.

40.     The exercise of jurisdiction is reasonable. The courts of Puerto Rico have a significant interest in adjudicating this dispute, which relates to the issuance of bonds by Commonwealth instrumentalities. The action is based on unique Puerto Rico doctrines. The Defendants will not be burdened as they have significant resources and continue to do business in Puerto Rico. Further, no other forum has a greater interest in adjudicating this dispute and the claims are capable of resolution here.

**VENUE**

41.     Venue is proper in San Juan pursuant to P.R. Laws Ann. tit. 32, App. VR. 3.5. Several of the transactions and key acts alleged herein occurred in San Juan. The bonds were issued and the related transactions closed in San Juan. The executive offices of PRIFA and

PRCCDA are in San Juan. Relevant communications took place, and relevant documents were produced, in San Juan.

### FACTUAL ALLEGATIONS

42. Between 2001 and 2014, major banks—including Defendants Merrill Lynch, Citigroup, Goldman Sachs, J.P. Morgan, Morgan Stanley, Samuel A. Ramirez, Raymond James, and UBS—underwrote more than $66 billion worth of municipal bonds that were issued by the Commonwealth of Puerto Rico and its instrumentalities.

43. Defendants were in a position to underwrite many of these offerings thanks to their close connections to the financial infrastructure of the Commonwealth. Because of these connections, Defendants knew or had reason to know of systemic deficiencies in the financial reporting of the Commonwealth and its instrumentalities. Defendants were also responsible under applicable regulations and industry custom to conduct due diligence on bond issuances and to form a reasonable basis for the belief that the official statements released in connection with bond issuances were accurate.

44. Instead of doing due-diligence and correcting or disclosing material inaccuracies in the Commonwealth's financial reporting, Defendants rubber stamped misleading and incomplete bond disclosures that materially misstated the bonds' risk profiles. Based on these inaccurate disclosures, Defendants promoted and sold these bonds to investors—and procured insurance on the bonds from insurers such as Ambac—all in violation of the applicable regulatory requirements and market expectations and practice.

11

## I.    Municipal Bond Underwriters

45.    Municipal bonds are debt securities. They are generally issued by state, local, territorial, or commonwealth governments, or by one of their agencies and typically are used to finance public projects such as roads, infrastructure, housing, schools, or public utilities.

46.    Generally, a municipal bond issuer owes the bond holders a debt and must pay them interest on that debt (usually at fixed intervals) and, at the bond's maturity or sinking fund redemption dates, must also make principal payments on the bonds.

47.    A municipal bond issuer ordinarily hires one or more municipal securities dealers to act as underwriters on the bond issuance. An underwriter's job is to market and sell the bonds to potential investors. Among other things, an underwriter usually participates in drafting the Official Statements that describe the bonds and that are publicly filed with the Municipal Securities Rulemaking Board ("MSRB"). The underwriter generally conducts due diligence and an overall inspection of the offering, maintains its own counsel, and often structures the financing. In the case of the bonds at issue, the defendant underwriters bought the bonds from the issuer, priced the bonds, and then resold them to investors in a primary offering. With this level of access and involvement, the defendant underwriters were best positioned to credibly indicate the accuracy and completeness of the issuer's disclosure. And the defendant underwriters were directly compensated for this gatekeeping role.

48.    An official statement is "the main document on which investors should be able to rely in making investment determinations." Overview of Disclosure Obligations for a Primary Offering of Municipal Securities (January 2018).[2] It describes the "essential terms of the bonds" and is "the most comprehensive source for information on the specific terms of bonds." Official Statements.[3] Official statements contain information on, among other things, the interest rate; timing and manner of payment on the principal of the bonds; the sources from which the state or local government has promised to make payment on the bonds; and a description of outstanding debt, the authority to incur it, and the future debt burden of the issuer. *Id.*

---

[2]    *Available at* https://www.msrb.org/~/media/Files/Resources/Overview-of-Disclosure-Obligations-for-Primary-Offering.

[3]    *Available at* https://www.msrb.org/EducationCenter/Municipal-Market/Lifecycle/Disclosure/Official-Statements.

49.     Before bonds can be offered to investors, the official statement must be "deemed final" by the issuer.  17 C.F.R. § 240.15c2-12.  A "deemed final" official statement is for the most part complete, except for the omission of certain information that may only be determined at pricing, such as interest rates and aggregate principal amounts.  17 C.F.R. § 240.15c2-12.

50.     Accurate and complete information on the bond and the issuer's ability to make debt service payments is vitally important to investors and other stakeholders to allow them to evaluate the risk of the investment and decide whether to invest.  Underwriters play an essential role in ensuring accurate information is provided.  Underwriters "stand[] between the issuer and the public purchasers," having superior access to information in their role of assisting the issuer in pricing, structuring the financing and preparing disclosure documents. Mun. Sec. Disclosure, Release No. 26100 (Sept. 22, 1988) ("Disclosure, Release No. 26100"); 17 C.F.R. § 240.15c2-12.

51.     In recognition of the disparity in investors' access to information compared to the access enjoyed by issuers and underwriters, the SEC has adopted Exchange Act Rule 15c2-12 to "prevent fraudulent, deceptive, or manipulative acts or practices."  17 C.F.R. § 240.15c2-12.

52.     Rule 15c2-12 makes it "unlawful" for an underwriter to "act as an underwriter in a primary offering of municipal securities" of over $1 million unless, among other things, it "obtain[s] and review[s] an Official Statement" that contains key information about the issuance.  17 C.F.R. § 240.15c2-12.  Underwriters put their own names on the front covers of these official statements, thereby attaching their reputations and lending credibility to the publication.

53.     Underwriters are prohibited from purchasing or selling bonds unless they have "reasonably determined" that the issuer or obligated person for whom financial or operating data is presented in the final official statement, has undertaken to provide the MSRB certain annual financial information, operating data and notices of specified events. 17 C.F.R. § 240.15c2-12.

54.     As the SEC has explained in guidance interpreting Rule 15c2-12: "by participating in an offering, an underwriter makes an implied recommendation about the securities. This recommendation implies that the underwriter has a reasonable basis for belief

13

in truthfulness and completeness of the key representations contained in the official statement." Municipal Securities Disclosure, Exchange Act Release No. 26985, at *7 (June 28, 1989). Pursuant to Rule 15c2-12, therefore, the underwriter must perform a "reasonable investigation" to develop "a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents [i.e., the official statements] used in the offerings." Disclosure, Release No. 26100, at *20.

55.    Investors expect to be able to rely on the accuracy of the official statements because their content is subject to the anti-fraud provisions of Section 17(a) of the Securities Act of 1933, and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. These sections prohibit any person from employing "any device, scheme, or artifice to defraud," "to make any untrue statement of material fact or omit a material fact," or to engage in any act, practice, or course of business "which operates as a fraud or deceit" in connection with the purchase or sale of a security. These sections also prohibit any person, including municipal issuers and brokers, "from making a false or misleading statement of material fact, or omitting any material facts necessary to make statements made by that person not misleading, in connection with the offer, purchase or sale of any security." *Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers & Others*, Release No. 42, at 12749 (Mar. 17, 1994).

56.    MSRB Rule G-17 also includes antifraud provisions and requires each dealer to deal fairly with all persons and prohibits underwriters from engaging in any "deceptive, dishonest, or unfair practice."

57.    In effect, underwriters function as the municipal bond market's gatekeepers. In that role, they "help address the informational asymmetries between investors and companies by verifying the credibility of contractual representations," including "the accuracy of financial statements" and "the risk profile of bonds." Stavros Gadinis & Colby Mangels, *Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. 797, 802 (2016).

58.    When underwriters do their jobs properly, they ensure the issuer makes accurate disclosures. The underwriters thereby help prevent an issuer from taking on debt that it is likely to default on, taking into account the issuers other obligations and available sources of payments. Disclosure, Release No. 26100. Importantly, if an underwriter finds that bond disclosures are materially false or incomplete, it can help the issuer correct the

disclosure or it can simply refuse to participate in the offering, thereby signaling to the market that something is wrong. *See Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. at 810. Investors and others that rely upon this information must be able to assess if the issuer is likely to be able to repay the bonds it issues on the disclosed terms—an assessment that they can conduct only if the information disclosed is truthful and complete.

59. Underwriters earn enormous fees for their services. Underwriters purchase bonds from the issuer at a lower price than what is offered to the market. Underwriters make money on this "underwriter spread" when they sell the bonds on to investors at the higher price. On the PRIFA and PRCCDA bonds at issue in this case, Defendants received underwriter discounts respectively of $8,635,874.33 and $3,094,920.88.

60. Underwriters can also sell related products to the issuer, such as interest fee swaps to hedge against risk that interest payments on variable-interest bonds will rise in the future. If the underwriting institution manages funds or investment plans, those entities can also purchase the bonds and make fees for managing this investment. These fees—which can reach the tens of millions of dollars for each issuance—do not depend on whether the bonds ultimately succeed or default. Underwriters therefore have an enormous profit incentive to bring bonds to market regardless of the underlying viability of the offering.

## II.     Municipal Bond Insurance

61. In order to more successfully market and sell the bonds and to make them more attractive to investors, municipal bond issuers can solicit, or have their underwriters or other advisors solicit, financial guaranty insurance from a monoline insurer, such as Ambac.

62. In exchange for a premium, the bond insurer guarantees that it will pay scheduled interest and/or principal to bondholders if the issuer defaults and fails to make these payments. This is often called "wrapping" the bonds. By "wrapping" its own credit rating and creditworthiness (i.e., ability to pay claims) around the bonds, the bond insurer enhances the creditworthiness and therefore marketability of the bonds. In most cases, it gives investors increased comfort that they will be paid on the bonds pursuant to the bonds' terms. Without bond insurance, an underwriter may not be able to market the bonds at all.

63. Typically, an underwriter solicits financial guaranty insurance from an insurer (such as Ambac) on behalf of the issuer. However, the underwriter and the insurer do not enter into a contract directly between themselves

64. Per well-established industry norms and customs, the underwriter solicits financial guaranty insurance by submitting to potential insurers a collection of documents that describe the issuer and the bonds. These documents often include the draft Official Statements, audited financial statements from the issuer or obligor, and legal documents concerning the issuance and the terms and conditions that apply to the bonds and the issuer. The underwriter continuously supplements its representations to the insurers with updated documents, including updated financials and draft official statements, until ultimately submitting the final version of the official statements.

65. By submitting official statements to an insurer, an underwriter assures the insurer that it has conducted or will conduct a reasonable investigation into the truth and completeness of those statements, and that the underwriter will have a reasonable basis to believe those statements are materially true and complete. When an underwriter provides such materials to an insurer, the insurer is entitled to rely in good faith on the fact that the underwriter will conduct the investigations required by law.

66. The underwriters' assurances are critical because underwriters have special access to the issuers—including to their financial information and condition—that financial guaranty insurers and other market participants do not. The information provided by the underwriter is submitted with the intention and expectation that the insurer will rely on it. Consequently, to decide whether to issue insurance, a bond insurer depends on information provided by the underwriter and on the underwriter's assurances that it has vetted that information. *See Collaborative Gatekeepers*, 73 Wash. & Lee L. Rev. at 809. As the SEC observed, bond insurers must "rely upon disclosure concerning the primary obligor" (i.e., the issuer) and the "reasonable investigation [by the underwriter] of the accuracy and completeness of key representations concerning the primary obligor." Disclosure, Release No. 26985, at *22.

67. Once a monoline insurer issues bond insurance, the insurer is at risk of receiving policy claims upon a bond default, even if it issued the policy based on information that turns out to have been materially false or incomplete.

68. It is vital that underwriters' disclosures and assurances to bond insurers be true and complete. If an underwriter fails to conduct the promised review and allows bonds to come to market based on false or incomplete information, that failure can—and in this

16

case did—allow for catastrophic damage to those that rely upon the underwriters to discharge their obligations, such as the insurer and the market.

### III. Defendants' Role In Debt Issuances Of The Commonwealth And Its Instrumentalities

69.     Defendants underwrote numerous debt issuances of the Commonwealth and its instrumentalities by taking advantage of Defendants' own position in and connections with Commonwealth institutions. Defendants then exploited these connections to make millions of dollars in fees on every side of these issuances.

70.     Defendants were selected as underwriters by Puerto Rico's Government Development Bank (the "GDB"), a public corporation of the Commonwealth that acted as fiscal agent and financial adviser on all issuances of debt by Puerto Rico and its instrumentalities. *See* Final Investigative Report at 52-5, 66. As recently revealed by the Final Investigative Report, a "revolving door" existed between the GDB and Defendants, as well as other underwriter banks. For example, Alfredo Salazar Conde, who acted as Chair of the GDB Board from 2005-2007, was formerly the Director of Operations in Latin America for Paine-Webber/UBS Financial Services, a predecessor of Defendant UBS. The Independent Investigator also discovered "it was not uncommon … for *empleados de confianza* [i.e., at-will employees] to join GDB from—or leave GDB for—positions with private financial institutions. Some of those financial institutions served as underwriting banks for Puerto Rico-Related Bonds…." *Id.* at 98. The Independent Investigator also found that GDB did not maintain adequate ethical safeguards to manage conflicts of interest. *Id.* at 406-07.

71.     Using their positions of influence with the GDB, Defendants and other underwriters would lobby the GDB to pursue more and more debt issuances. The GDB relied on Defendants and other underwriters for "scoop and toss" issuances, in which the Commonwealth and its instrumentalities issued billions of dollars in long-term debt in order to repay and refinance bonds. *Id.* at 81-84. Between 2005 and 2014, the Commonwealth and its instrumentalities issued at least $19.5 billion in debt in these types of "scoop and toss" transactions. *Id.* These types of issuances are often unsustainable in the long-run, but allowed Defendants to underwrite billions of dollars in debt (and earn significant fees for doing so) in the short-term.

72. Defendants and other underwriters also pitched the GDB on new financing initiatives. In one example highlighted by the Independent Investigator, in November 2006, Merrill Lynch proposed to the GDB a debt issuance to be made by the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS"). *Id.* at 198-99, 204-05. Merrill Lynch pitched this debt issuance as a way to remedy the ERS's chronic underfunding and also satisfy near-term obligations. Merrill Lynch also structured the proposed issuance specifically so that it would inflate the ERS's funding ratio "from 19% to 72%." *Id.* at 205. At the same time, UBS pitched the ERS Board to act as the investment consultant for the proceeds ERS hoped to generate from the issuance. *Id.* at 208. The ERS ultimately issued debt following Merrill Lynch's proposal in 2008, with UBS acting as lead underwriter and Merrill Lynch also acting as an underwriter.

73. Defendants and other underwriters also used their position of influence with the GDB and other government entities in the Commonwealth to pitch the GDB on a large portfolio of interest rate swaps. The most common form of interest rate swaps were "synthetic fixed swaps," in which the issuer of a variable-interest bond offering would contract with a counterparty (often an underwriter of the bond) to pay a fixed interest rate in exchange for receiving payments based on a floating interest rate. *See id.* at 417. While these types of swaps can mitigate some risk of interest rate fluctuations, those same fluctuations could leave the debt issuer paying more to its swap counterparty than it is receiving in return. *See id.* at 418-19. In addition, swaps carry termination risk, which could result in issuers having to pay large lump sums to their swap counterparties. *See id.* PRIFA entered into numerous swap transactions, and when those swaps were terminated, PRIFA was forced to pay over $61.8 million in termination payments. *Id.* at 432. Defendants, by contrast, received millions in compensation, with UBS, for example, receiving more than $93.1 million from its swap contracts with Puerto Rico and its instrumentalities. *Id.* at 433.

74. Defendants also exploited their position on the buy-side of debt issuances to artificially inflate demand. As the Independent Investigator detailed, underwriter banks created and managed 35 closed-end funds ("CEFs") in the local Puerto Rico market, with UBS alone sponsoring 23 of them. *Id.* at 339. These CEFs were exempt from the Investment Company Act of 1940 ("ICA"), which regulates (among other things) transactions with affiliates and leverage limitations. *Id.* The CEFs created by UBS and other underwriters

18

became a major purchaser of Puerto Rico bond issuances, which enabled the GDB to issue even more debt. *Id.* at 350-51. In one stunning example, UBS underwrote a $737 million bond offering of the Puerto Rico Sales Tax Financing Corporation, known as "COFINA."[4] The Independent Investigator found that "UBS Funds purchased 99.8% of [this] issuance. The remaining 0.2% was bought by a UBS open-end fund." Final Investigative Report at 351 n.56. UBS thus "reaped financial benefits at all stages in the process—from underwriting the bonds, to managing the Local CEFs containing the bonds, to selling the Local CEF shares and bonds to local retail investors." *Id.* at 358. "During 2008 alone, UBS [Puerto Rico's] Local CEF business earned the firm $94.5 million in revenue." *Id.* at 359. And in the ERS bond offering discussed in paragraph 72, *supra*, UBS "acted as lead underwriter and purchased over half of the issuance on behalf of its managed CEFs, while at the same time, another UBS [Puerto Rico] affiliate was engaged to provide investment consulting services to ERS. *Id.* at 557-58. The Independent Investigator found that, with respect to at least certain debt issuances, "[w]ithout the Local CEFs as an aggregate institutional bond purchaser, and conduit to the retail investor market through the subsequent sales of Local CEFs shares, it is unlikely these issuances would have gone to market." *Id.* at 351.

75. The CEFs were also able to inflate the buy-side market because they could use higher leverage ratios than funds governed by the ICA. UBS even provided leverage to retail clients, which allowed them to purchase debt with just 10%-25% of the nominal investment. *Id.* at 366. In total, "roughly $5 billion of the municipal bonds sold in the local market were sold as a consequence of leverage." *Id.* As the Independent Investigator concluded, "[t]hese leverage ratios suggest there was not a sustainable, deep local market for these local bonds and easy access to leverage by retail investors." *Id.*

### IV. Defendants And Other Banks Systemically Failed To Investigate And Adequately Disclose Material Information In The Official Statements Of Puerto-Rico Debt Issuances

76. Defendants' intimate connections with the GDB and other elements of the Commonwealth's financial infrastructure put them in an ideal position to know, investigate, and understand the creditworthiness of the Commonwealth's and its agencies' and the

---

[4] *See* http://www.gdb.pr.gov/pdfs/public_finance/COFINA-737MMbondissue25june08.pdf.

veracity of the representations made to solicit insurance for bond offerings. Indeed, underwriters have an obligation under federal securities laws to review the issuer's disclosure documents before offering, selling, or bidding for the securities, and to "have a reasonable basis for its belief as to the accuracy and completeness of the representations in the documents." Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers & Others, Release No. 42 (Mar. 17, 1994); 17 C.F.R. § 240.15c2-12. Underwriters are "obligated to contact the issuer to verify information." *Id.* But as the public and Ambac only recently learned, Defendants failed in their obligations, despite having privileged access to information about the Commonwealth's fiscal responsibility, to the material harm of the Commonwealth, its investors, and other stakeholders, including Ambac.

77.    At the most basic level, Defendants' connections to the GDB put them in the best position to know that GDB was failing in its most basic obligation as fiscal agent of the Commonwealth—to exercise adequate oversight of the financial conditions of Commonwealth instrumentalities issuing debt. The GDB had full authority to inspect the books and records of any instrumentality or public corporation of the Commonwealth. *Id.* at 84-85. Yet the Independent Investigator "found no meaningful evidence that GDB had an effective process in place to oversee important aspects of [Puerto Rico-related entities'] fiscal health, or to impose accountability for repayment of debts. For example, we found no meaningful evidence that the GDB monitored operational deficits, tracked how the Puerto Rico-Related Entities actually used their loan funds, or oversaw what the Puerto Rico-Related Entities actually did with the proceeds from their bond issuances." *Id.* at 85. "GDB did not implement any internal financial controls to monitor operational deficits until 2009...." *Id.* at 86.

78.    The systemic deficiencies in the Commonwealth's financial controls were also highlighted in a report issued in May 2018 by the U.S. Government Accountability Office ("GAO").[5] The GAO found that the Commonwealth systemically overestimated its revenue collection and underestimated its expenses: "According to current and former Puerto Rico officials and experts in Puerto Rico's economy and the municipal securities markets, Puerto Rico's government lacked adequate budgetary and other controls for effective financial management and oversight. This lack of effective practices and controls resulted

---

[5]    *See* U.S. GAO Report at 63.

in Puerto Rico's government: 1) overestimating the amount of revenue it would collect and 2) spending in excess of appropriated amounts." GAO Report at 15-16.

79.     The Independent Investigator also found that the GDB was aware of more specific deficiencies in financial reporting. For example, the Independent Investigator found that the Puerto Rico Electric Power Authority ("PREPA") issued over $4.4 billion in bonds between 2010 and 2013 alone, yet beginning in 2011, PREPA's rates charged to customers "were insufficient to cover overhead and operational costs." Final Investigative Report at 562, App'x B.1. "PREPA increased its revenue figure by including CILTs [contributions in lieu of taxes] and other accounts receivable that it had reason to believe it would *never* collect in revenues." *Id.* at 563. The Independent Investigator found evidence that "GDB knew by 2012, at the very latest, that if PREPA had used a revenue figure that accurately reflected the amount of revenues it expected to, and did, collect, then PREPA would not be able to satisfy the required debt coverage needed to issue" a 2013 bond issuance. *Id.* The Independent Investigator further stated that PREPA "chronically failed to ensure that it met its required debt coverage ratio." *Id.* at 139. Shockingly, numerous witnesses from underwriter banks admitted to the Independent Investigator that "the underwriters accepted PREPA's debt service calculations *without conducting any of their own due diligence into the veracity of those figures.*" *Id.* at 563 (emphasis added). In the 2013 PREPA offering alone, Defendants Merrill Lynch and UBS—who also underwrote the PRIFA and PRCCDA bonds at issue in this action—both acted as underwriters.

80.     The Independent Investigator also highlighted a general obligation bond offering by the Commonwealth in March 2014, in which Defendants Merrill Lynch and UBS again both acted as underwriters.[6]   The Independent Investigator found that the official statement for these bonds used "stale financial information." Final Investigative Report at 540-42.

81.     The Independent Investigator also found in the specific context of PREPA issuances that "neither GDB nor the underwriters monitored PREPA's *actual* use of bond proceeds as compared to the *represented* use of proceeds." *Id.* at 114. Thus $430 million of funds raised through debt issuances that were earmarked for a construction fund went to other

---

[6]   *See*
http://www.gdb.pr.gov/investors_resources/documents/CommonwealthPRGO2014SeriesA-FinalOS.PDF.

uses. *Id.* at 138, 146. Defendants Merrill Lynch and UBS acted as underwriters on at least some of these issuances.

82.     Defendants were in a unique position to know and should have known of these and similar deficiencies. Through their deep connections to the GDB, Defendants knew or should have known that the GDB had no adequate measures in place to monitor the accuracy of financial reporting by instrumentalities of the Commonwealth. Yet Defendants failed to ensure that the bonds' disclosures and the official statements accurately reflected that material information.

## V.     Defendants Underwrite And Ambac Insures The PRIFA And PRCCDA Bonds

### A. *The PRCCDA Bonds*

83.     PRCCDA is a public corporation of the Commonwealth that was created by Act No. 351 of September 2, 2000 (the "PRCCDA Enabling Act") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico and for related improvements and facilities ("Convention Center Project"). *See* P.R. Laws Ann. tit. 23, §§ 6402, 6404. Under the PRCCDA Enabling Act, PRCCDA has the power to issue bonds. *See* P.R. Laws Ann. tit. 23, § 6412(b), (e), (h). Pursuant to the PRCCDA Enabling Act, PRCCDA issued approximately $468 million in revenue bonds under a Trust Agreement dated March 24, 2006 (the "PRCCDA Trust Agreement"). The principal purpose of the bonds was to repay interim financing for the Convention Center Project and to provide financing for its completion.

84.     Pursuant to the PRCCDA Enabling Act, the PRCCDA Trust Agreement and Act 272-2003 (the "Hotel Tax Act") the PRCCDA bonds are secured by a lien on certain hotel occupancy taxes imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act.

85.     Ambac insured the Hotel Occupancy Tax Revenue Bonds Series A, issued by the PRCCDA on March 15, 2006 ("PRCCDA Bonds"). Ambac insured $137,090,000 of $468,800,000 in aggregate principal amount of the PRCCDA bonds. Principal payments on PRCCDA Serial Bonds are due annually on July 1 of the years 2017 through 2020 inclusive and for PRCCDA Terminal Bonds, mandatory redemptions from July 1, 2028 through July 1, 2031.

86.     The lead underwriter for the PRCCDA Bonds was Lehman Brothers.  The
PRCCDA Bonds were also underwritten by Banc of America; Citigroup; Goldman, Sachs;
JP Morgan; Merrill Lynch; Morgan Stanley; Raymond James & Associates, Inc.; and Samuel
A. Ramirez & Co.

### B. The PRIFA Bonds

87.     PRIFA is a public corporation of the Commonwealth created by Act 44-1988
(the "PRIFA Enabling Act") for the purpose of providing financial and other types of
assistance to political subdivisions, public agencies, and instrumentalities of the
Commonwealth.  Under the PRIFA Enabling Act, PRIFA has the power to issue bonds. *See*
P.R. Laws Ann. tit. 3, §§ 1906(d), (g), (l), 1907. Pursuant to the PRIFA Enabling Act, PRIFA
has issued certain special tax revenue bonds under a Trust Agreement (the "PRIFA Trust
Agreement") dated October 1, 1988.  The principal purpose of the bonds was to finance
infrastructure projects, including capital projects of the Puerto Rico Aqueduct and Sewer
Authority.

88.     Pursuant to the PRIFA Enabling Act and the PRIFA Trust Agreement, the
PRIFA Bonds are secured by a portion of the revenue that is required by law to be transferred
to it from a federal excise tax imposed on rum produced in the Commonwealth and sold in
the United States.

89.     Ambac insured two bond issuances of PRIFA at issue in this dispute, the
Special Tax Revenue Bonds Series 2005A ("Series 2005A") and the Special Tax Revenue
Bonds Series 2005C ("Series 2005C") both of which were issued on June 2, 2005
(collectively the "PRIFA Bonds").

90.     Ambac insured $115,993,063.65 of $309,102,577.35 in aggregate principal
amount of the Series 2005A Bond. Principal payments are due on the Series 2005A issuance
on July 1 of the years 2029, 2034 through 2037 inclusive, 2043, and 2044.

91.     Ambac insured $535,650,338.80 of $699,235,338.80 in aggregate principal
amount of the Series 2005C bond.  Principal payments are due July 1 of the years 2011
through 2018 and 2023 through 2028 inclusive.

92.     The co-lead underwriters for the PRIFA Bonds were Banc of America, Merrill
Lynch and UBS.  The PRIFA Bonds were also underwritten by Defendants Citigroup;

Goldman, Sachs; JP Morgan; Merrill Lynch; Morgan Stanley; Raymond James & Associates, Inc.; and Samuel A. Ramirez & Co.

### C. The Puerto Rico Constitution And Statutes Protect The PRIFA And PRCCDA Bonds

93. Ambac insured the PRIFA and PRCCDA Bonds based in part on the knowledge that these Bonds enjoy strict protections—second only to general obligation debt—under the Constitution and statutes of Puerto Rico.

94. Article VI, Section 7 of the Puerto Rico Constitution provides: "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." Puerto Rico Const. Art. VI, §7. This provision ensures the Commonwealth maintains a balanced budget each fiscal year by ensuring that revenues for the fiscal year are sufficient to cover operating expenses and general obligation debt service. If the mandatory tax increases compelled by Section 7 do not produce sufficient revenues to cover all remaining expenses for the fiscal year, Article VI, Section 8 requires that general obligation debt have first priority to the revenues available to the Commonwealth.

95. But after general obligation debt, the Commonwealth's Legislature has given second-priority status to, among other things, "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico." P.R. Laws Ann. tit. 23, § 104(c)(2). Only after these second-priority obligations are satisfied can the Commonwealth make payments for "regular expenses." P.R. Laws Ann. tit. 23, § 104(c)(3). In short, should the Commonwealth's available revenues not be sufficient to pay all appropriations, payments are required to go first to holders of general obligation debt, but second to holders of revenue bonds, such as the PRIFA and PRCCDA Bonds.

96. The statutes authorizing the PRIFA and PRCCDA Bonds reinforce these protections. The PRIFA Enabling Act provides:

> The Authority is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, *only when the other resources available referred to in said Section are insufficient for such purposes.*

24

P.R. Laws Ann. tit. 3, § 1914 (emphasis added). Likewise, the PRCCDA Enabling Act

provides:

> The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but *only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes.* Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related financing agreement contemplated herein, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements.

P.R. Laws Ann. tit., 13 § 2271v (emphasis added).

97.    The Official Statements for the PRIFA and PRCCDA Bonds repeated and

reemphasized these protections. For example, the PRIFA Official Statement represented:

> The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, *if other Commonwealth revenues are not sufficient therefore. The Commonwealth has never used Federal Excise Taxes for the payment of its general obligation debt or its guaranteed debt.*

PRIFA, Official Statement for Special Tax Revenue Bonds, Series 2005A and 2005B,

Special Tax Revenue Refunding Bonds, Series 2005C, S-2 (June 2, 2005) ("PRIFA Official

Statement") (emphasis added). The PRCCDA Official Statement similarly represented:

> Hotel Occupancy Tax revenues are available revenues under the Constitution. Accordingly, if needed, they may be applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, such revenues are to be used for such payments *only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. ... The Commonwealth has never applied taxes allocated to the various governmental authorities to the payment of its public debt....*

PRCCDA, Official Statement for Hotel Occupancy Tax Revenue Bonds, Series A, 22

(March 15, 2006) ("*PRCCDA* Official Statement") (emphasis added).

98.    Together, these constitutional and statutory provisions demonstrate that the

revenues dedicated to repayment of the PRIFA and PRCCDA Bonds can only be clawed

back by the Commonwealth to pay general obligation debt, and only when, after starting the

fiscal year with a balanced budget, all other available resources for an entire fiscal year are

insufficient to satisfy all general obligation debt. The clawback provisions were not intended

to—and do not provide—a source of revenues from which the Commonwealth can fund

government operations or any other expenditures.

**VI.  Defendants Induced Ambac To Insure The PRIFA And PRCCDA Bonds Through False And Reckless Representations And Material Omissions In The Official Statements**

99.     Ambac agreed to wrap the PRIFA and PRCCDA Bonds believing that they were supported by robust revenue streams and strong constitutional and statutory protections. But Defendants concealed a key and material risk in order to induce Ambac to issue financial guaranty policies: Defendants knew that the Commonwealth's fiscal controls lacked the regularity and reliability that are critical in a trustworthy borrower.  If Defendants had disclosed this information, Ambac would not have issued financial guaranty policies covering the PRIFA and PRCCDA Bonds.  But unbeknownst to Ambac at the time, Defendants used the same tactics that have been exposed by the Independent Investigator to induce Ambac to insure the PRCCDA Bonds and PRIFA Bonds.

100.     Defendants provided Ambac various documents, including draft and final official statements for the PRCCDA Bond and PRIFA Bonds ("Official Statements"), in order to solicit Ambac to insure the bonds.  In the Official Statements for the PRCCDA Bonds and the PRIFA Bonds provided to Ambac, Defendants represented that they had "reviewed the information in th[e] Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws." *PRCCDA Official Statement* at iii; *PRIFA Official Statement* at iii.

101.     While the Official Statements went on to claim that the "[u]nderwriters do not guarantee the accuracy or completeness of such information," Defendants' inclusion of such language does not relieve Defendants of their duties under federal securities laws.  Indeed, the SEC has made it clear that "in light of the underwriter's obligation [...] to review the official statement and to have a reasonable basis for its belief in the accuracy and completeness of the official statement's key representations, disclaimers by underwriters of responsibility for the information provided by the issuer or other parties … are misleading and should not be included in official statements."  Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers & Others, Release No. 42, n. 103 (Mar. 17, 1994); *see also,* Underwriter Disclaimers in Official Statements, Government Finance Officers Association (January 2000) ("disclaimer language … including the assertion that

26

the underwriters do not guarantee the accuracy or the completeness of the official statement"
is "inappropriate").[7]

102.    The Official Statements' passing reference that the Underwriters do not
"guarantee the accuracy or completeness of such information" neither releases them from
their obligation to conduct a reasonable investigation, nor does it signal to investors or
insurers relying on the Official Statements that Defendants did not have a reasonable basis
for their recommendation, in violation of their responsibilities under federal securities laws.
*Id.* Defendants cannot so easily abandon their duties of good faith and due care or disregard
their obligations under federal securities laws.

103.    In fact, as detailed above, Defendants' close connections to the GDB and the
Commonwealth's financial infrastructure gave them a privileged position to know that the
GDB did not exercise adequate oversight of the financial conditions of Commonwealth
instrumentalities issuing debt.  Defendants were also ideally situated to know that, as the
GAO has since reported, the Commonwealth's government lacked adequate budgetary and
other controls for effective financial management and oversight.  Defendants did not reveal
any of this material information.

104.    The Official Statements reveal that Defendants also failed to perform their
own due diligence, or to correct or notify Ambac of other misleading representations.  For
example, both Official Statements represented that budgeted General Fund revenues for
Fiscal Year 2006 totaled $9.684 billion.  Yet when the GAO analyzed the Commonwealth's
estimated and actual General Fund revenues, it concluded that the Commonwealth
overestimated its Fiscal Year 2006 General Fund revenues by $280 million, and
underestimated its General Fund Expenses by $400 million.[8]  Such inaccuracies reflect
financial mismanagement, a failure of internal controls, and general disregard for the rules
of financial reporting.  These inaccuracies also created a false impression of the
Commonwealth's finances and thus obfuscated the full extent of the risk that the

---

[7]  https://www.gfoa.org/underwriter-disclaimers-official-statements.    The    SEC
explains that Guidelines issued by the Government Finance Officers Association are viewed
as "in essence obligatory rules."    Statement of the Commission Regarding Disclosure
Obligations of Municipal Securities Issuers and Others, Release No. 34-31741 (March 9,
1994).  Statement of the Comm'n Regarding Disclosure Obligations of Mun. Sec. Issuers &
Others, Release No. 42, n. 103 (Mar. 17, 1994).

[8]  *See* U.S. GAO Report at 63.

Commonwealth might attempt to seize dedicated revenues supporting the Bonds and attempt to use them for other Commonwealth purposes, whether or not permitted by the Constitution. Defendants—through their close connections with the GDB detailed above—knew or should have known that their representations concerning the Commonwealth's General Fund revenues were misleading. Defendants instead turned a blind eye to these misleading representations and used them to support their underwriting efforts.

105.    In addition, with respect to the PRIFA Bonds, the Official Statement contained representations concerning the "Federal Excise Tax Revenues" that had been collected, and listed the source of this data as the "Puerto Rico Department of the Treasury, Office of Economic and Financial Affairs." PRIFA Official Statement at 20. Thanks to the Independent Investigator's Report, it is now known that Defendants did not perform any due diligence of similar revenue figures contained in other offerings. It follows that Defendants equally failed to perform required due diligence of the tax revenue figures represented in the PRIFA Bonds Official Statement.

106.    Defendants' lack of due diligence is further illustrated by differences in the revenue figures reported in the Official Statement PRIFA issued for the 2005 bonds at issue in this dispute compared to the Official Statement PRIFA issued in connection with its Special Tax Revenue Bonds, Series 2006, issued just over a year later in September 2006. PRIFA, Special Tax Revenue Bonds, Series 2006, 15 (2006) ("2006 Official Statement"). The 2006 Official Statement disclosed that "discrepancies" had been detected "in the information provided ... in connection with the actual amounts of Federal Excise Taxes received by the Commonwealth during each of the five fiscal years in the period ended June 30, 2005." 2006 Official Statement at 15.[9] These discrepancies caused the revenue figures in the 2005 Official Statement to be overstated (according to the revised numbers contained in the 2006 Official Statement) by $11.3 million for fiscal year 2001 and $7.07 million for fiscal year 2003. As shown by the Independent Investigator's Report, Defendants were fully aware of the deficiencies in financial reporting procedures at the GDB and instrumentalities of the Commonwealth, yet failed to disclose the lack of controls or perform required due diligence of these critical revenue figures.

---

[9]    *Available at* http://www.gdb.pr.gov/pdfs/affiliates/PRIFA-OS-Sept192006.pdf

107. With respect to the PRCCDA Bonds, the Official Statement contained representations concerning the historical and projected revenue the PRCCDA expected to collect through a Hotel Occupancy Tax. Pursuant to the Occupancy Tax Act of April 2004, the Commonwealth established specific tax rates that would be charged on rooms occupied at casinos, hotels, and other rental properties in the Commonwealth. However, as shown by the Independent Investigator's Report, instrumentalities of the Commonwealth set rates far too low to service future debt payments. Defendants were fully aware of, or should have been aware of, these systemic deficiencies, yet did nothing to ensure that the representations in the PRCCDA Official Statement concerning specific tax rates and anticipated collections were not misleading.

108. And at a foundational level, the Official Statements for both the PRIFA Bonds and PRCCDA Bonds contained misleading information concerning the finances of the Commonwealth as a whole. Accurate reporting of this information was vitally important to investors and other stakeholders such as Ambac because the dedicated revenue streams securing each bond offering could, under the extremely limited circumstances detailed above, be seized by the Commonwealth if it lacked resources to pay General Obligation debt. Had Defendants revealed their knowledge of the systemic inaccuracies in the Commonwealth's financial reporting, Ambac and others would have learned of the material risk that the Commonwealth lacked adequate financial controls, increasing the risk of default on the bonds. The Independent Investigator's Report confirmed that the GDB's oversight of the Commonwealth's financial reporting was grossly deficient. Had underwriters conducted proper diligence, in accordance with market expectations and their obligations under federal securities laws, misleading information concerning the Commonwealth's fiscal status would not have been disseminated as an accurate basis upon which Ambac should make its decisions.

109. Defendants all were aware or all had reason to be aware of these deficiencies in the Official Statements for the PRIFA Bonds and PRCCDA Bonds thanks to their long-standing ties with the GDB and others involved in the Commonwealth's financial infrastructure. Defendants were also in a position to be aware and were aware of these deficiencies thanks to their privileged status as underwriters of these offerings. Yet despite this superior knowledge, Defendants disseminated the Official Statements to Ambac, as well

as to investors and other stakeholders, knowing full well that these third parties would rely on the accuracy of the Official Statements and on the banks' customary gatekeeping role.

110.    Ambac reasonably relied in good faith on Defendants' representations and actions in providing the Official Statements, and legitimately expected that Defendants had fulfilled their responsibilities to review and investigate the disclosures contained in the Official Statements and ensure that these disclosures were materially complete and accurate.

111.    Based on their reliance on Defendants' representations and the disclosures in the Official Statements provided by Defendants, Ambac issued a financial guaranty insurance policy insuring $137,090,000 in aggregate principal amount of the PRCCDA Hotel Occupancy Tax Revenue Bonds Series A, and issued financial guaranty insurance policies insuring $115,993,063.65 in aggregate principal amount of the PRIFA Special Tax Revenue Bonds Series 2005A and $535,650,338.80 in aggregate principal amount of the PRIFA Special Tax Revenue Bonds Series 2005C.

### VII.    The PRCCDA And PRIFA Bonds Default And Ambac Honors Its Insurance Payment Obligations

112.    On November 30, 2015, the day before a debt service payment was due on public debt, the Governor of the Commonwealth issued Administrative Bulletin No. OE-2015-046 (the "First Executive Order"). The First Executive Order directed the Puerto Rico Department of Treasury (the "Department of Treasury") to withhold the PRIFA Pledged Funds for application to the public debt instead of releasing such Pledged Funds to PRIFA for application to the PRIFA Bonds. The First Executive Order also directed the Puerto Rico Tourism Company to transfer the PRCCDA Pledged Funds to the Department of Treasury for application to the public debt instead of releasing the PRCCDA Pledged Funds for application to the PRCCDA Bonds.

113.    On December 8, 2015, the Governor issued Administrative Bulletin OE-2015-49 (the "Second Executive Order"), which sought to implement the First Executive Order. The Second Executive Order purported to authorize the Secretary of Treasury to manage the Commonwealth's cash flow and to make disbursements from the Commonwealth's available resources for Fiscal Year 2016. These resources were presumed to include the Pledged Funds that had been withheld pursuant to the First Executive Order.

114.    As a result of these actions, on January 1, 2016, PRIFA defaulted on the Series 2005C bonds. Since then, the PRCCDA Bonds and the PRIFA Series 2005A and

2005C Bonds have also defaulted. Pursuant to its financial guaranty insurance policies on these bonds, as of January 31, 2020, Ambac has paid out approximately $52 million in relation to the PRCCDA Bonds and approximately $183 million in relation to the PRIFA Bonds.

115. Ambac has also made insurance claims payments on many other Puerto Rico bonds that are not the subjects of this lawsuit. Ambac has honored its obligations to make investors whole on the payments on Puerto Rico bonds where the issuers have defaulted, and in doing so has shielded them from the impact of defaults by Puerto Rico and its instrumentalities.

116. The Commonwealth, its people, its municipal bond investors, and Ambac have all suffered as a result of the massive bond defaults emanating from issuances promoted and underwritten by Defendants and other banks. Although Defendants have acted inequitably, there is no statutory claim available to Ambac to remedy this wrong. Ambac therefore brings these claims against Defendants to hold Defendants accountable for their actions and remedy this harm.

### First Cause of Action: Doctrine of Actos Propios

117. Ambac incorporates and re-alleges the foregoing factual allegations.

118. Article 7 of the Civil Code of Puerto Rico provides, "[w]hen there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in the accepted and established usages and customs, shall be taken into consideration." P.R. Laws Ann. tit. 31, § 7.

119. The doctrine of *actos propios* arises from the principle that "it is not lawful for any person is allowed to go or act against his or her acts." *Int'l Gen. Elec. v. Concrete Builders*, No. R-76-48, 1976 WL 40145, at * 2 (P.R. May 19, 1976) (unofficial translation). It seeks to ensure good faith conduct by all persons in the exercise of their rights and in the fulfillment of obligations incurred in various legal relationships. The confidence that these acts generates in third parties is protected because to oppose them would obviously constitute an attack against good faith.

120. Defendants induced Ambac to issue insurance by assuring Ambac that they would form and had formed a reasonable basis to believe the Official Statements they

31

provided to Ambac were true and complete, including by reasonably investigating those statements and ensuring that all material information was completely and accurately disclosed. Defendants did so by, among other things, submitting official statements and various other documents related to the bonds and the issuers to Ambac, expressing their compliance with the securities laws, creating the appearance that they had adhered to industry custom and norm requiring a reasonable investigation and full disclosure, and affixing their names and reputations to the Official Statements.

121. Defendants generated a situation contrary to reality by assuring Ambac that they had a reasonable basis to believe the truth and completeness of the statements in the documents they provided to Ambac, including the Official Statements for the PRCCDA and PRIFA Bonds at issue in this case. As underwriters, Defendants are required to have a reasonable basis for recommending any municipal securities. That obligation extends to reviewing in a professional manner the accuracy of the Official Statements with which the municipal bonds are associated. Defendants are also required to have a reasonable basis for belief in the truthfulness and completeness of the key representations made.

122. Defendants bolstered the façade of their reasonable due diligence that they created by confirming in the Official Statements that they had "reviewed the information in th[e] Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws." PRIFA Official Statement at ii; PRCCDA Official Statement at iii.

123. By providing Ambac with these documents, affixing their reputations as underwriters and stating they would comply with their legal obligations, Defendants created the appearance that they would conduct, and had conducted, a reasonable investigation. Their assertions, particularly forceful given their status as "gatekeepers" of the municipal bond market, are undeniably influential on the behavior of others, including Ambac.

124. Ambac, acting in good faith and legitimately expecting that Defendants would do the same, trusted in the appearance Defendants created and relied on that appearance to issue approximately $788 million of financial guaranty insurance on the PRIFA and PRCCDA bonds.

125. Defendants' actions have caused Ambac to incur not less than $234.9 million in losses as of January 31, 2020, from making claims payments in connection with the PRIFA

32

and PRCCDA bonds, and Ambac reasonably anticipates it will be required to pay even more in future claims payments.

126.    There is no statute applicable to Ambac's claims.  In such circumstances, the doctrine of *actos propios* applies to fill that gap and ensure good faith conduct and the fulfillment of obligations.

127.    Because Defendants acted inequitably and contrary to the appearance and trust that they created, they must be prevented from going against their own acts and denying responsibility for the consequences of their conduct—by compensating Ambac for the damage and loss that Ambac has suffered as a result.

### Second Cause of Action: Unilateral Declaration of Will

128.    Ambac incorporates and realleges the foregoing factual allegations.

129.    Article 1042 of the Civil Code of Puerto Rico provides, "[o]bligations are created by law, by contracts, by quasi contracts, and by illicit acts and omissions or by those in which any kind of fault or negligence occurs."

130.    The Supreme Court of Puerto Rico recognizes the Unilateral Declaration of Will as a source of obligations. By a promise or expression of unilateral will, a person can obligate him or herself to give, do or not do something in favor of another person, as long as the person's intention to be bound is clear, arises from an appropriate legal act, and is not contrary to law, morality or public order.

131.    Defendants acted in their sole will when they submitted to Ambac the Official Statements, and also in their inclusion of the assurance that they had "reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction…."

132.    Defendants performed a suitable juridical act when they provided the Official Statements to Ambac.  The Official Statements were provided as part of the materials on which Ambac would make its determination to insure the bonds.  It is commonly understood that the Official Statements are critical documents that provide information investors rely upon in evaluating the bond.

133.    Both with the provision of the Official Statements, as well as the assurances contained therein, Defendants expressed their sole will and clear intention to be bound by

their representation that they had conducted a reasonable investigation and had formed a reasonable basis as to the truth and completeness of the information provided.

134. There is no uncertainty, in form or content, in Defendants' assurances that they had conducted the requisite review "in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws." The laws, too, are clear as to the requirement for diligence by underwriters.

135. Also clear is the object of the obligation: to induce Ambac to insure the bonds which Defendants underwrote. It was for this express purpose that Defendants provided the information to Ambac and solicited Ambac to insure the bonds.

136. Ambac, as recipient of the Official Statements, has standing to enforce Defendants' declaration.

137. Enforcing Defendants' obligations to conduct a reasonable investigation and to form a reasonable basis as to the truth and completeness of the Official Statements is consistent with law, morals and public policy.

138. Defendants' promises and expressions induced Ambac to issue its financial guaranty insurance policies, guaranteeing payment of principal and interest on the bonds. Consequentially, Ambac has incurred approximately $234.9 million in damages as of January 31, 2020, and expects to incur more damages as a result of the PRIFA and PRCCDA bonds' default. Defendants are obligated by their unilateral declarations of will to compensate Ambac for the consequential damage it has suffered.

WHEREFORE, Ambac requests relief as follows:

a. Damages in an amount to be proven at trial, but in any event no less than $234.9 million, as well as reasonably foreseeable reliance damages;

b. Pre- and post-judgment interest and any other legal interest to which Ambac is entitled;

c. Reasonable attorney's fees and costs; and

d. Such other and further relief as the Court may deem just and proper.

Dated:  February 19th, 2020

RAÚL GONZÁLEZ TORO LAW
OFFICES, LLC
PO Box 270343
San Juan, PR 00927

Popular Center, Suite 1028
San Juan, PR 00918
Telephone: (787) 753-6090
Fax: (787) 294-5759
*Attorneys for Plaintiff*


*s/Raúl González Toro*
Raúl González Toro
RUA NUM.: 11781


Michael B. Carlinsky
Jane M. Byrne
Guyon Knight
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Attorneys for Plaintiff*

*Pro Hac Vice Admissions pending*

# Exhibit 4

NEW ISSUE
Book-Entry Only

**$1,332,962,916.15**

# PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
### $309,102,577.35 Special Tax Revenue Bonds, Series 2005A
### $324,625,000 Special Tax Revenue Bonds, Series 2005B
### $699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C

The $309,102,577.35 Special Tax Revenue Bonds, Series 2005A, the $324,625,000 Special Tax Revenue Bonds, Series 2005B, and the $699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C, are being issued by Puerto Rico Infrastructure Financing Authority pursuant to a Trust Agreement, dated as of October 1, 1988, as amended, with U.S. Bank Trust National Association, successor trustee.

The Series 2005 Bonds, together with any outstanding bonds that the Authority has issued and may issue from time to time under said Trust Agreement, are payable solely from and secured by a pledge of the revenues of the Authority, consisting of a specified amount of the first proceeds received by the Commonwealth of Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth, and other moneys deposited in the Sinking Fund established under the Trust Agreement. If the federal excise taxes returned to the Commonwealth in any fiscal year fall below such specified amount, the deficiency shall be payable from appropriations which the Legislature of Puerto Rico may, but is not legally required to, make upon request by the Authority. Such federal excise taxes, however, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor.

The Series 2005 Bonds will have the following characteristics:

- The Series 2005 Bonds will be dated their date of delivery.

- The Series 2005 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Series 2005 Bonds will not receive definitive Series 2005 Bonds.

- Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds identified on the inside cover page) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity or earlier redemption as part of the Bonds' Accreted Value.

- The Series 2005 Bonds are subject to redemption as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Series 2005 Bonds.

- Payment of the principal of and interest on the Series 2005A Bonds, certain Series 2005B Bonds and the Series 2005C Bonds when due will be insured by bond insurance policies as indicated on the inside cover page and as described herein.

- The issuance of the Series 2005 Bonds and the purchase of the Series 2005 Bonds by the Underwriters are subject to approval and legality by Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, and certain conditions.

- In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Matters*, beginning on page 27 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations.

- McConnell Valdés, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Series 2005 Bonds will occur on or about June 16, 2005.

---

UBS FINANCIAL SERVICES INC.  BANC OF AMERICA SECURITIES LLC   MERRILL LYNCH & CO.

| | | |
|---|---|---|
| **Citigroup** | **Goldman, Sachs & Co.** | **JP Morgan** |
| **Lehman Brothers** | **Morgan Stanley** | **Raymond James & Associates, Inc.** |
| **Samuel A. Ramírez & Co.** | | **Wachovia Bank, National Association** |

June 2, 2005

**$309,102,577.35**
**Special Tax Revenue Bonds, Series 2005A**

**$81,920,000 Serial Bonds***

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 2014 | $3,890,000 | 4.50% | 3.49% | 2022 | $5,525,000 | 5.50% | 3.93% |
| 2015 | 4,065,000 | 4.50% | 3.57% | 2023 | 5,835,000 | 5.50% | 3.94% |
| 2016 | 4,245,000 | 4.00% | 3.64% | 2024 | 6,155,000 | 5.50% | 3.96% |
| 2017 | 4,415,000 | 4.00% | 3.71% | 2025 | 6,495,000 | 5.50% | 3.98% |
| 2018 | 4,600,000 | 4.00% | 3.78% | 2026 | 6,850,000 | 5.50% | 4.01% |
| 2019 | 4,780,000 | 4.00% | 3.83% | 2027 | 7,230,000 | 5.50% | 4.02% |
| 2020 | 4,970,000 | 5.50% | 3.87% | 2028 | 7,625,000 | 5.50% | 4.03% |
| 2021 | 5,240,000 | 5.50% | 3.91% | | | | |

**Capital Appreciation Bonds**
**$227,182,577.35**

$23,779,963.20 Capital Appreciation Bonds due July 1, 2029 - Yield 4.56%†
$22,510,254.90 Capital Appreciation Bonds due July 1, 2030 - Yield 4.60%*
$21,400,138.95 Capital Appreciation Bonds due July 1, 2031 - Yield 4.62%*
$20,336,424.30 Capital Appreciation Bonds due July 1, 2032 - Yield 4.64%*
$19,318,407.90 Capital Appreciation Bonds due July 1, 2033 - Yield 4.66%*
$18,448,735.05 Capital Appreciation Bonds due July 1, 2034 - Yield 4.66%†
$17,566,407.30 Capital Appreciation Bonds due July 1, 2035 - Yield 4.67%†
$16,774,069.95 Capital Appreciation Bonds due July 1, 2036 - Yield 4.67%†
$11,460,988.15 Capital Appreciation Bonds due July 1, 2037 - Yield 4.67%†
$15,001,840.00 Capital Appreciation Bonds due July 1, 2042 - Yield 4.77%*
$14,311,260.00 Capital Appreciation Bonds due July 1, 2043 - Yield 4.77%†
$13,651,640.00 Capital Appreciation Bonds due July 1, 2044 - Yield 4.77%†
$12,622,447.65 Capital Appreciation Bonds due July 1, 2045 - Yield 4.77%*

**$324,625,000**
**Special Tax Revenue Bonds, Series 2005B**

**$10,780,000 Serial Bonds***

| Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2011 | $3,455,000 | 4.00% | 3.16% |
| 2012 | 3,590,000 | 4.00% | 3.28% |
| 2013 | 3,735,000 | 4.00% | 3.39% |

$20,000,000 - 5.00% Term Bonds due July 1, 2037 - Yield 4.50% (approx. price to call 104.001%)
$293,845,000 - 5.00% Term Bonds due July 1, 2041 - Yield 4.54% (approx. price to call 103.674%)

**$699,235,338.80**
**Special Tax Revenue Refunding Bonds, Series 2005C**

**$685,700,000 Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | Maturity July 1, | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|
| 2011 | $24,550,000† | 5.50% | 3.16% | 2020 | $39,745,000* | 5.50% | 3.87% |
| 2012 | 25,900,000† | 5.50% | 3.28% | 2021 | 41,930,000* | 5.50% | 3.91% |
| 2013 | 27,325,000† | 5.50% | 3.39% | 2022 | 44,240,000* | 5.50% | 3.93% |
| 2014 | 28,825,000† | 5.50% | 3.49% | 2023 | 46,670,000† | 5.50% | 3.94% |
| 2015 | 30,410,000† | 5.50% | 3.57% | 2024 | 49,235,000† | 5.50% | 3.96% |
| 2016 | 32,085,000† | 5.50% | 3.64% | 2025 | 51,945,000† | 5.50% | 3.98% |
| 2017 | 33,850,000† | 5.50% | 3.71% | 2026 | 54,800,000† | 5.50% | 4.01% |
| 2018 | 35,705,000† | 5.50% | 3.78% | 2027 | 57,815,000† | 5.50% | 4.02% |
| 2019 | 37,670,000* | 5.50% | 3.83% | 2028 | 23,000,000† | 5.50% | 4.03% |

$13,535,338.80 Capital Appreciation Bonds due July 1, 2028 - Yield 4.53%†

---

* Insured by Financial Guaranty Insurance Company
† Insured by Ambac Assurance Corporation

No dealer, broker, sales representative or other person has been authorized by the Authority, the Commonwealth or the Underwriters to give any information or to make any representations other than those contained or incorporated by reference herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority, the Commonwealth or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Series 2005 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth or incorporated by reference herein has been obtained from the Authority, the Commonwealth and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. This Official Statement is submitted in connection with the sale of the Series 2005 Bonds and may not be reproduced or used, in whole or in part, for any other purpose. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 2005 BONDS AND THE OTHER OUTSTANDING SPECIAL TAX REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

### TABLE OF CONTENTS

**Page**

SUMMARY STATEMENT . . . . . . . . . . . . . . . S-1
INTRODUCTORY STATEMENT . . . . . . . . . . . 1
THE AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . 2
PLAN OF FINANCING . . . . . . . . . . . . . . . . . . . . 4
THE SERIES 2005 BONDS . . . . . . . . . . . . . . . 5
SECURITY FOR THE BONDS . . . . . . . . . . . . . 9
BOND INSURANCE . . . . . . . . . . . . . . . . . . . . . . 13
FEDERAL EXCISE TAXES . . . . . . . . . . . . . . 17
THE PUERTO RICO RUM INDUSTRY . . . . . . 20
ADDITIONAL COMMONWEALTH
  APPROPRIATIONS . . . . . . . . . . . . . . . . . . . . 23
AUTHORITY DEBT . . . . . . . . . . . . . . . . . . . . . . 24
FINANCIAL ASSISTANCE TO BENEFITTED
  ENTITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
TAX MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . 27
VERIFICATION OF MATHEMATICAL
  COMPUTATIONS . . . . . . . . . . . . . . . . . . . . . . 28
ELIGIBILITY OF SERIES 2005 BONDS . . . . . . 29
UNDERWRITING . . . . . . . . . . . . . . . . . . . . . . . . 29
COMMONWEALTH COVENANT . . . . . . . . . . 29
GOVERNMENT DEVELOPMENT BANK
  FOR PUERTO RICO . . . . . . . . . . . . . . . . . . . . 29
LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . 30
RATINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Page**

CONTINUING DISCLOSURE . . . . . . . . . . . . . 30
MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . 32

Appendix I - Summary of the Trust
            Agreement . . . . . . . . . . . . . . . . I-1
Appendix II - Audited Financial Statements
            of the Authority, dated
            June 30, 2004 . . . . . . . . . . . . II-1
Appendix III - Commonwealth of
            Puerto Rico Financial
            Information and Operating
            Data Report, May 1, 2005 . . . III-1
Appendix IV - Proposed Form of Opinions
            of Bond Counsel . . . . . . . . . . IV-1
Appendix V - Table of Accreted Values
            for the Capital Appreciation
            Bonds . . . . . . . . . . . . . . . . . . . V-1
Appendix VI - Specimen Ambac Financial
            Guaranty Insurance Policy . . . VI-1
Appendix VII - Specimen Financial Guaranty
            Insurance Company Municipal
            Bond New Issue Insurance
            Policy . . . . . . . . . . . . . . . . . . VII-1

[This page intentionally left blank]

## SUMMARY STATEMENT

*The following is subject in all respects to the additional information contained in this Official Statement including the Appendices attached hereto. Certain capitalized terms used in this Summary Statement and elsewhere in this Official Statement are defined in "Definitions of Certain Terms" in Summary of the Trust Agreement in Appendix I. Certain other capitalized terms are used in this Official Statement as defined in this Summary Statement.*

**The Authority** . . . . . . . . . . . . . . .  Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), was created on June 21, 1988, for the purpose of providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth that develop and operate infrastructure facilities.

**Plan of Financing** . . . . . . . . . . . .  The bonds offered hereby, when and if issued (collectively, the "Series 2005 Bonds"), will be issued to finance certain capital projects of Puerto Rico Aqueduct and Sewer Authority ("PRASA") and other instrumentalities and municipalities of the Commonwealth; provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities; repay certain advances made to the Authority by Government Development Bank for Puerto Rico; refund all of the Authority's outstanding Special Tax Revenue Bonds, Series 1997A; and pay capitalized interest and certain costs of issuance of the Series 2005 Bonds. See *Plan of Financing*.

**Security for the Bonds** . . . . . . . .  The Authority's Special Tax Revenue Bonds, Series 1988A, Series 1997B, and Series 1998A, in the aggregate principal amount of $137,835,000, which will remain outstanding after the refunding described above (collectively, the "Remaining Bonds"), the Series 2005 Bonds, and any additional bonds that the Authority may from time to time issue under the Trust Agreement (collectively, the "Bonds") are payable solely from and secured by a pledge of Federal Excise Taxes (as defined below) and other moneys deposited to the credit of the Sinking Fund, as follows:

**Federal Excise Taxes** . . . . . . . . .  Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), requires that in each fiscal year after fiscal 1998, through fiscal 2006, the first $70 million, and in each fiscal year thereafter through fiscal 2052, the first $90 million, of certain federal excise taxes received by the Commonwealth be deposited in the Authority's Infrastructure Fund. Such taxes consist of the Federal Excise Taxes levied on rum and other articles produced in Puerto Rico and sold in the United States, which taxes are collected by the United States Treasury and returned to the Commonwealth (the "Federal Excise Taxes"). Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Commonwealth. The Trust Agreement requires the Authority to deposit in the Sinking Fund the Federal Excise Taxes and other moneys deposited in the Infrastructure Fund in such amounts as are required to meet the debt service requirement for all Bonds issued under the Trust Agreement.

Federal Excise Taxes have been transferred to the Commonwealth since 1917 in accordance with certain Acts of Congress. The amount of Federal Excise Taxes transferred to the Commonwealth is $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1,

2006, such amount will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed, unless a proposed one-year extension is approved by Congress. See "Pledged Revenues" under *Security for the Bonds* and "Imposition of Tax" under *Federal Excise Taxes*.

The table below shows the Federal Excise Taxes received by the Commonwealth in each of the last five fiscal years:

| Fiscal Year | Federal Excise Taxes |
|:-----------:|:--------------------:|
| 2000 | $235,397,855 |
| 2001 | 296,472,248 |
| 2002 | 307,906,661 |
| 2003 | 299,045,613 |
| 2004 | 302,785,007 |

The maximum Principal and Interest Requirements (net of capitalized interest) on the Series 2005 Bonds and the Remaining Bonds in any fiscal year is $86 million. During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received at least $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year.

The Federal Excise Taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance by the United States of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Additional Commonwealth Appropriations** . . . . . . . . . . . . . .

If the Federal Excise Taxes received by the Commonwealth in any fiscal year are insufficient to deposit $90 million ($70 million before fiscal 2007) in the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget, upon the Authority's request, to include in the recommended budget of the Commonwealth for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make any appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. See *Additional Commonwealth Appropriations*.

**Additional Bonds** . . . . . . . . . . . .

Additional Bonds secured on a parity with the Bonds may be issued for any purpose authorized by the Enabling Act, subject to compliance with certain financial tests provided in the Trust Agreement.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth** . . . . . . . .

The Federal Excise Taxes and other revenues received from the Commonwealth and deposited in the Infrastructure Fund are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if other Commonwealth revenues are not sufficient therefor. The Commonwealth has never used Federal Excise Taxes for the payment of its

general obligation debt or its guaranteed debt. The incurrence by the Commonwealth of general obligation debt is subject to a constitutional debt limit described herein.

Maximum annual debt service for the Commonwealth's outstanding general obligation debt plus debt service for fiscal 2005 on bonds for which the Commonwealth is currently making payments under its guaranty equals $741,648,153. This amount is equal to 9.97% of $7,439,000,000, which is the average of the adjusted annual internal revenues of the Commonwealth (which excludes Federal Excise Taxes) for the two fiscal years ended June 30, 2003 and 2004. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security for the Bonds*.

| | |
|---|---|
| **Interest** . . . . . . . . . . . . . . . . . . . . | Interest on the Series 2005 Bonds (other than the Capital Appreciation Bonds) will be payable on January 1 and July 1 of each year, commencing January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. Interest on the Capital Appreciation Bonds will accrue but will not be paid semi-annually. Instead, it will be paid at maturity as part of the Bonds' Accreted Value. |
| **Optional Redemption** . . . . . . . . . | The Series 2005B Bonds maturing July 1, 2037 and 2041, may be redeemed by the Authority prior to maturity, upon not less than 30 days' prior notice, either in whole or in part, and if in part, as directed by the Authority. See "Optional Redemption" under *Redemption Provisions*. |
| **Trustee** . . . . . . . . . . . . . . . . . . . . | U.S. Bank Trust National Association, successor trustee. |
| **Ratings** . . . . . . . . . . . . . . . . . . . . | Standard & Poor's: "BBB+;" Moody's: "Baa2." See *Ratings*. |
| **Bond Insurance** . . . . . . . . . . . . . . | The payment when due of principal of and interest on the Series 2005A Bonds, certain Series 2005B Bonds and the Series 2005C Bonds will be insured by bond insurance policies as indicated on the inside cover page and as described herein. See *Bond Insurance*. |
| **Tax Matters** . . . . . . . . . . . . . . . . . | In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes and the Series 2005 Bonds and interest thereon will be exempt from all state, Commonwealth and local income taxes. However, see *Tax Matters* beginning on page 27 of this Official Statement, for alternative minimum tax consequences with respect to interest on the Series 2005 Bonds, a description of certain rules that must be complied with to preserve federal tax exemption of interest, and other tax considerations. |

Case 17-02880-TLSS Doc#1685-41 Filed 07/28/20 Entered 07/28/20 11:30:56 Desc Main Document Exhibit Page 280 of 440

[This page intentionally left blank]

**$1,332,962,916.15**
**Puerto Rico Infrastructure Financing Authority**
**$309,102,577.35 Special Tax Revenue Bonds, Series 2005A**
**$324,625,000 Special Tax Revenue Bonds, Series 2005B**
**$699,235,338.80 Special Tax Revenue Refunding Bonds, Series 2005C**

### INTRODUCTORY STATEMENT

The purpose of this Official Statement is to provide certain information in connection with the issuance and sale by Puerto Rico Infrastructure Financing Authority (the "Authority") of its Special Tax Revenue Bonds, Series 2005A, in the aggregate principal amount of $309,102,577.35 (the "Series 2005A Bonds"), its Special Tax Revenue Bonds, Series 2005B, in the aggregate principal amount of $324,625,000 (the "Series 2005B Bonds"), and its Special Tax Revenue Refunding Bonds, Series 2005C, in the aggregate principal amount of $699,235,338.80 (the "Series 2005C Bonds" and together with the Series 2005A Bonds and the Series 2005B Bonds, the "Series 2005 Bonds"). A portion of the Series 2005A Bonds and Series 2005C Bonds (as shown on the inside cover) will be issued as Capital Appreciation Bonds (as defined in the Trust Agreement hereinafter mentioned).

The Series 2005 Bonds are being issued pursuant to Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended (the "Enabling Act"), a Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and a resolution of the Board of Directors of the Authority adopted on June 2, 2005 (the "Bond Resolution"). The Series 2005 Bonds are expected to be delivered on or about June 16, 2005.

This Official Statement includes brief descriptions of the Enabling Act, the Series 2005 Bonds (and the other outstanding Bonds of the Authority secured on a parity with the Series 2005 Bonds), the Bond Resolution and the Trust Agreement. Such descriptions do not purport to be complete and are qualified in their entirety by reference to such documents. All references to the Series 2005 Bonds are qualified in their entirety by reference to the definitive forms thereof contained in the Bond Resolution. Copies of all such documents and agreements are available for inspection during regular business hours at the offices of Government Development Bank for Puerto Rico ("Government Development Bank"), located at 140 Broadway, 38th Floor, New York, New York 10005 and at the Government Development Bank for Puerto Rico Building, Minillas Government Center, San Juan, Puerto Rico 00940, or at the corporate trust office of the Trustee at 100 Wall Street, Suite 1600, New York, New York 10005.

This Official Statement, which includes the cover page and the Appendices hereto, incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2004, together with the independent auditor's report thereon, dated April 8, 2005, of KPMG LLP ("KPMG"), certified public accountants (collectively, the "CAFR"). The CAFR has been filed by the Commonwealth with each nationally recognized municipal securities information repository ("NRMSIR"). KPMG did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units separately identified in their report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG, and their opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. This Official Statement also includes the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated as of May 1, 2005 (the "Commonwealth Report"), attached hereto as Appendix III.

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the CAFR that is filed with each NRMSIR and the Municipal Securities Rulemaking Board ("MSRB"), or any new or revised Commonwealth Report or CAFR, or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the CAFR that is filed with each NRMSIR, in each case after the date hereof and prior to the termination of the offering of the Series 2005 Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the CAFR shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a

statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, New York 10005, telephone number (212) 422-6420, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the CAFR may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below. The address of the MSRB is 1900 Duke Street, Suite 600, Alexandria, Virginia 22314, telephone number (703) 797-6600.

Certain capitalized terms used in this Official Statement are defined in "Definition of Certain Terms" in *Summary of Trust Agreement* in Appendix I. Certain other capitalized terms are defined in the Summary Statement.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the Authority's and the Commonwealth's operations and financial condition. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## THE AUTHORITY

**General**

The Commonwealth recognizes the importance of developing, maintaining and improving its infrastructure to promote Puerto Rico's economic development. Accordingly, the Commonwealth has established the Authority as a public corporation and instrumentality with two principal functions: (i) providing financial, administrative and other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth responsible for developing and operating infrastructure facilities, and (ii) providing an alternative means for directly financing those facilities.

The Enabling Act defines "infrastructure" to include public works and facilities of a substantial public interest, such as aqueduct and sewer systems including water supply systems, waste water treatment and disposal systems, improvements financed under the provisions of Title VI of the Federal Clean Water Act and Title I of the Federal Safe Drinking Water Act, solid and hazardous waste disposal systems, resource recovery systems, electric power systems, highways, roads, pedestrian walkways, parking facilities, airports, convention centers, bridges, maritime ports, tunnels, transportation systems including mass transportation, communication systems including telephones, industrial facilities, land and natural resources, public housing projects, and tourist, medical and agro-industrial infrastructure facilities.

The Authority has all the necessary and convenient powers to accomplish and effectuate the purposes and provisions of the Enabling Act, including the power to negotiate and enter into assistance agreements with political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth authorized to provide infrastructure for the purpose of carrying out necessary financing programs for the development of infrastructure and providing consulting, technical, administrative, advisory, and other assistance in all matters related to such facilities. Any such entity receiving assistance from the Authority (a "Benefitted Entity") may be required to comply with all

operational, administrative and budgetary requirements that the Authority considers pertinent to achieve the purposes of said assistance.

At its creation in 1988, the Authority's principal undertaking was to provide financial and other assistance to Puerto Rico Aqueduct and Sewer Authority ("PRASA") pursuant to the terms of an assistance agreement, as amended, between PRASA and the Authority. More recently, however, the Authority has signed assistance agreements with other Commonwealth instrumentalities and municipalities involved in infrastructure projects, including the Department of Education, the Department of Natural and Environmental Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation and the Special Communities Perpetual Trust. See *Plan of Financing* and *Financial Assistance to Benefitted Entities*.

The executive offices of the Authority are located at the Capital Center Building II, 235 Arterial Hostos Avenue, Suite 1601, San Juan, Puerto Rico 00918. The telephone number is (787) 763-5757.

**Powers**

The Authority has broad powers under the Enabling Act, including, among others, the power to: sue and be sued; make contracts; acquire properties by eminent domain or otherwise; borrow money and issue bonds for any of its corporate purposes, including the financing of the construction, rehabilitation, acquisition, repair, preservation and replacement of portions of the infrastructure of Puerto Rico; mortgage or pledge any property and pledge all or a portion of the Authority's revenues, including Federal Excise Taxes (see "Pledged Revenues" under *Security for the Bonds*) or other funds transferred by the Commonwealth to the Authority for the payment of the principal of and interest on any bonds issued by the Authority or bonds issued by a Benefitted Entity; provide assistance to Benefitted Entities as permitted by and consistent with the purposes of the Enabling Act; and fix, impose and collect rents, fees, rates and other charges for the use of any of its properties.

**Management**

The Enabling Act provides that the Board of Directors of the Authority (the "Board") shall be composed of the Board of Directors of Government Development Bank and the Secretary of the Treasury of Puerto Rico (in the event the Secretary of the Treasury is not a member of Government Development Bank's Board of Directors). Members of the boards or officers of any Benefitted Entity are specifically excluded from serving on the Board. The Secretary of the Treasury is the Chairman of the Board. The Board currently has one vacancy. The members of the Board are:

| Name | Term Ends | Occupation |
|------|-----------|------------|
| Juan C. Méndez | Indefinite | Secretary of the Treasury |
| Alfredo Salazar | September 22, 2008 | Chairman of the Board of Directors of Government Development Bank |
| Jorge P. Silva | September 22, 2006 | Secretary of Commerce and Economic Development |
| Ileana I. Fas | September 22, 2007 | Director of the Office of Management and Budget |
| José F. Rodríguez | September 20, 2008 | Businessman |
| Rafael Martínez | September 22, 2006 | Certified Public Accountant |

The Board appoints officers and employs agents and employees who are responsible for the general operation of the Authority. Set forth below is a brief biographical description of the Acting Executive Director of the Authority. The Authority currently does not have any other designated officers.

3

Magda L. Aguiar-Serrano, Esq. was appointed to the office of Acting Executive Director effective December 15, 2004. She is an attorney with over 22 years of experience working in several government entities, mainly in the areas of construction law, land acquisition and contracts. Ms. Aguiar-Serrano has been the Authority's Legal Director since February 2001. As such, she oversees all legal matters related to the Authority's construction projects on behalf of PRASA and other Benefitted Entities.

## PLAN OF FINANCING

### Series 2005A and 2005B Bonds

The Authority is issuing the Series 2005A and 2005B Bonds to (i) provide approximately $292 million in financial assistance to PRASA and other Commonwealth instrumentalities and municipalities in connection with certain capital projects, including the repayment of approximately $26 million for certain advances made to the Authority by Government Development Bank for the purpose of providing funds to pay certain capital improvements by the Authority or other Commonwealth instrumentalities, (ii) provide approximately $317 million in working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (iii) pay capitalized interest and costs of issuance of the Series 2005A and 2005B Bonds. The Bond proceeds earmarked for PRASA and non-PRASA projects will be deposited into a special construction fund administered by the Authority on behalf of the applicable Benefitted Entities.

### Series 2005C Bonds

The Authority is issuing the Series 2005C Bonds to refund all of its Special Tax Revenue Bonds, Series 1997A, on January 1, 2008 in the amounts and maturities identified in the table below (the "Refunded Bonds") and pay capitalized interest and costs of issuance of the Series 2005C Bonds.

| Maturity Date July 1, | Principal Amount to be Refunded | Interest Rate | Redemption Price | CUSIP No. |
|---|---|---|---|---|
| 2011 | $ 27,425,000 | 5.00% | 101% | 745220 AB9 |
| 2012 | 28,795,000 | 5.00% | 101% | 745220 AC7 |
| 2013 | 30,235,000 | 5.00% | 101% | 745220 AD5 |
| 2014 | 31,745,000 | 5.00% | 101% | 745220 AE3 |
| 2015 | 33,335,000 | 5.00% | 101% | 745220 AF0 |
| 2016 | 35,000,000 | 5.00% | 101% | 745220 AG8 |
| 2017 | 36,750,000 | 5.00% | 101% | 745220 AH6 |
| 2021 | 166,315,000 | 5.00% | 101% | 745220 AM5 |
| 2028 | 381,885,000 | 5.00% | 101% | 745220 AU7 |
| Total . . . . . . . . | $771,485,000 | | | |

This refunding will permit the Authority to realize present value savings on its debt service requirements on certain Bonds outstanding under the Trust Agreement. The Authority will deposit the net proceeds of the Series 2005C Bonds, together with certain other available moneys, with the Trustee, as escrow agent, in a special redemption fund under the terms of an Escrow Deposit Agreement. Such net proceeds, together with such other available moneys, will be invested in Government Obligations the principal of and interest on which when due, together with any moneys deposited with the Trustee remaining uninvested, will provide moneys sufficient to pay the principal of and redemption premium and interest on the Refunded Bonds on the date of redemption and the interest to accrue on such Bonds through the date of redemption.

Upon the deposit with the Trustee referred to above, in the opinion of Bond Counsel, the Refunded Bonds will no longer be outstanding under the provisions of the Trust Agreement. After such refunding, $137,835,000 aggregate

4

principal amount of the Authority's Special Tax Revenue Bonds, Series 1988A, Series 1997B, and Series 1998A , will remain outstanding (the "Remaining Bonds").

**Use of Proceeds**

Sources:

| | |
|---|---:|
| Principal Amount of Series 2005A Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 309,102,577.35 |
| Principal Amount of Series 2005B Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 324,625,000.00 |
| Principal Amount of Series 2005C Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 699,235,338.80 |
| Deposit from Bond Service Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19,287,125.00 |
| Net Original Issue Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 152,015,081.80 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 1,504,265,122.95 |

Uses:

| | |
|---|---:|
| Deposit into escrow for Refunded Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 820,034,071.30 |
| Deposit to Commonwealth's General Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 317,046,386.84 |
| Deposit to Special Construction Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 265,937,289.13 |
| Repayment of Government Development Bank Line of Credit . . . . . . . . . . . . . . . . | 26,331,792.08 |
| Deposit to Special Construction Fund (capitalized interest) . . . . . . . . . . . . . . . . . | 22,695,250.00 |
| Bond Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,724,970.87 |
| Underwriter's Discount, Legal, Printing and Other Issuance Expenses . . . . . . . . . | 10,495,362.73 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,504,265,122.95 |

A portion ($22,695,250.00) of the proceeds of the Series 2005A, Series 2005B and Series 2005C Bonds, as set forth in the table above, will be allocated to capitalized interest. This amount of capitalized interest, which will be irrevocably set aside for this purpose, will have the effect, by virtue of the definition of Principal and Interest Requirements (see paragraph (g) of said definition in *Summary of the Trust Agreement* in Appendix I), of reducing total debt service requirements in fiscal 2006 to $58.8 million, which is lower than the annual amounts of Special Tax Revenues deposited in the Infrastructure Fund, as described in "Pledged Revenues" under *Security for the Bonds*, during the period ending June 30, 2006, thereby enabling the Authority to satisfy the coverage tests for the issuance of additional Bonds. See "Additional and Refunding Bonds" under *Security for the Bonds*.

**THE SERIES 2005 BONDS**

**General**

The Series 2005 Bonds (except for the Capital Appreciation Bonds) will bear interest at the rates, payable on January 1 and July 1 in each year, beginning January 1, 2006 and, in the case of the Series 2005C Bonds, July 1, 2005. The Series 2005A Bonds maturing on July 1 of years 2029 through 2037, inclusive, and 2042 through 2045, inclusive, and the Series 2005C Bonds maturing on July 1, 2028, are being issued as "capital appreciation bonds" (such capital appreciation bonds are referred to herein as "Capital Appreciation Bonds"). The Capital Appreciation Bonds will accrue interest payable at maturity as part of their "Accreted Value" based on the yields set forth on the inside cover. The Accreted Value (per $5,000 maturity amount) of each maturity and series of the Capital Appreciation Bonds on each January 1 and July 1 is set forth in Appendix V hereof. The Accreted Value of the Capital Appreciation Bonds on any other date is calculated on the assumption that such Accreted Value increases in equal daily amounts, on the basis of a year of twelve 30-day months, up to the Accreted Value on the next January 1 or July 1, as appropriate.

The Series 2005 Bonds mature on the dates and in the principal amounts set forth on the inside cover. The Series 2005 Bonds will be dated the date of their delivery, which is expected to be on or about June 16, 2005. The Series 2005 Bonds will be issued in fully registered form, will be in denominations of $5,000 and any multiple thereof

5

($5,000 maturity amount and any multiple thereof in the case of the Capital Appreciation Bonds), and when issued will initially be registered only in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"), New York, New York, which will act as securities depository for the Series 2005 Bonds.  The Series 2005 Bonds are subject to redemption at the times and in the manner set forth below in "Redemption Provisions."

Simultaneously with the delivery of the Series 2005 Bonds:  (i) Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation ("Ambac Assurance"), has committed to issue a financial guaranty insurance policy in the form of Appendix VI insuring the payment when due of principal of and interest on the Series 2005A Bonds maturing July 1 of the years 2029, 2034 through 2037, inclusive, 2043 and 2044, and the Series 2005C Bonds maturing July 1 of the years 2011 through 2018, and 2023 through 2028, both inclusive, (the "Ambac Insured Bonds") as provided therein (the "Ambac Insurance Policy"); and (ii) Financial Guaranty Insurance Company, a New York stock insurance company ("Financial Guaranty"), has committed to issue a municipal bond new issue insurance policy in the form of Appendix VII insuring the payment when due of principal of and interest on the Series 2005A Bonds maturing July 1 of the years 2014 through 2028 and 2030 through 2033, both inclusive, 2042 and 2045; the Series 2005B Bonds maturing July 1 of years 2011 through 2013, inclusive; and the Series 2005C Bonds maturing July 1 of the years 2019 through 2022, inclusive (the "Financial Guaranty Insured Bonds"), as provided therein (the "Financial Guaranty Insurance Policy").  The Ambac Assurance Insured Bonds and the Financial Guaranty Insured Bonds are hereinafter sometimes collectively referred to as the "Insured Bonds."

As provided in the Bond Resolution, as long as Ambac Assurance and Financial Guaranty shall not then be in default on their respective Insurance Policies, they shall be deemed to be the owners of the respective Insured Bonds insured by them for purposes of, among other things, the giving of consents to the execution of any supplemental agreement to the Trust Agreement and for taking any remedial action under the Trust Agreement.

**Book-Entry Only System**

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority and the Underwriters believe to be reliable, but the Authority and the Underwriters take no responsibility for the accuracy thereof.

DTC will act as securities depository for the Series 2005 Bonds.  The Series 2005 Bonds will be issued as fully-registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC.  One fully-registered Series 2005 Bond will be issued in the aggregate principal amount of each maturity and series, and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934.  DTC holds and provides asset servicing for over 2 million issuers of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants (the "Direct Participants") deposit with DTC.  DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions, in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts.  This eliminates the need for physical movement of securities certificates.  Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations.  DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC").  DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, GSCC, MBSCC, and EMCC are also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC and the National Association of Securities Dealers, Inc.  Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants").  DTC has Standard & Poor's highest rating: AAA.  The DTC

6

Rules applicable to its Participants are on file with the Securities and Exchange Commission (the "SEC"). More information about DTC can be found at www.dtcc.com.

Purchases of the Series 2005 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2005 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2005 Bond (a "Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2005 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive definitive Series 2005 Bonds, except in the event that use of the book-entry system for the Series 2005 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2005 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Series 2005 Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2005 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Neither DTC nor Cede & Co. (or such other DTC nominee) will consent or vote with respect to the Series 2005 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2005 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, interest and other principal payments on the Series 2005 Bonds will be made to Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Authority, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, interest and other principal payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Trustee or the Authority, disbursement of such payments to Direct Participants is the responsibility of DTC, and disbursement of such payments to the Beneficial Owners is the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Series 2005 Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Series 2005 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, also definitive Series 2005 Bonds will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued, the following provisions will apply: principal of and interest on the Series 2005 Bonds will be payable at maturity in lawful money of the United States of America upon presentation and surrender of Series 2005 Bonds at the principal office of the Trustee in New York, New York.

7

The Series 2005 Bonds will be issued only as registered bonds without coupons in denominations of $5,000 and any multiple thereof ($5,000 maturity amount and any multiple thereof in the case of the Capital Appreciation Bonds). The transfer of the Series 2005 Bonds will be registrable and they may be exchanged at the principal office of the Trustee in New York, New York, upon the payment of any taxes or other governmental charges required to be paid with respect to such registration of transfer or exchange.

**Redemption Provisions**

The Series 2005A and 2005C Bonds are not subject to redemption prior to maturity.

*Optional Redemption.* The Series 2005B Bonds maturing July 1, 2037 and 2041 may be redeemed without premium at the option of the Authority prior to maturity, upon not less than thirty (30) days' prior notice, either in whole or in part, and if in part, as directed by the Authority, on any date not earlier than July 1, 2015, from any moneys available therefor (other than moneys held by the Trustee in respect of an Amortization Requirement), at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date.

*Amortization Requirements.* The Series 2005B Bonds maturing July 1, 2041 shall be redeemed in part on July 1, 2038, and each July 1 thereafter in the principal amounts equal to the Amortization Requirements (less the principal amount of any Series 2005B Bonds retired by purchase) from moneys in the Redemption Account at par plus accrued interest as follows:

| Fiscal Year ending June 30, | Amortization Requirements for Series 2005B Bonds due July 1, 2041 |
|---|---|
| 2038 | $67,845,000 |
| 2039 | 71,500,000 |
| 2040 | 75,500,000 |
| 2041 | 79,000,000* |
| Average life (years) | 34.6 |

---

\* Final maturity.

*Notice of Redemption.* At least thirty (30) days prior to any redemption, notice thereof will be sent by certified mail or other agreed method to DTC or if the book-entry only system is discontinued as described above, by first class mail, postage prepaid to the registered owners of the Series 2005 Bonds to be redeemed and to the national information services whose names and addresses are included in the most recent list thereof furnished to the Trustee by the Authority, as set forth in the Trust Agreement. Each notice of redemption shall contain, among other things, the CUSIP identification number and the numbers of the Series 2005 Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which Series 2005 Bonds are to be surrendered for payment of the redemption price. Any defect in such notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Series 2005 Bond will not affect the validity of the proceedings for the redemption of any other Series 2005 Bond. Any defect in such notice or the failure so to mail any such notice to any such national information service will not affect the effectiveness of a call for redemption.

*Selection of Series 2005 Bonds to be Redeemed.* If less than all of the Series 2005 Bonds of any one maturity and series are called for redemption, the particular Series 2005 Bonds or portions thereof to be redeemed will be selected by the Trustee by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Series 2005 Bonds and such DTC Participants shall in turn select those Beneficial Owners

8

whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion deems fair and appropriate.

*Effect of Redemption.* On the date designated for redemption, notice having been given as described above and moneys for payment of the principal of and redemption premium, if any, and accrued interest on the Series 2005 Bonds or portions thereof so called for redemption being held by the Trustee, interest on the Series 2005 Bonds or portions thereof so called for redemption shall cease to accrue. Subject to certain provisions of the Trust Agreement, Series 2005 Bonds and portions of Series 2005 Bonds which have been duly called for redemption under the provisions of the Trust Agreement, or with respect to which irrevocable instructions to call for redemption or to pay at maturity have been given, and for the payment of the principal of and redemption premium, if any, and the accrued interest on which sufficient moneys or investments permitted by law shall be held in separate trust for the owners of the Series 2005 Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Trust Agreement, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal thereof and the redemption premium, if any, and the accrued interest thereon from said separate trust.

## SECURITY FOR THE BONDS

The Bonds (including the Series 2005 Bonds) are payable solely from, and secured by a pledge of, the revenues and other moneys deposited in the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund (the "Sinking Fund") established under the Trust Agreement (the "Pledged Revenues"). The Sinking Fund includes the Bond Service Account, the Redemption Account and the Reserve Account. The last remaining outstanding Bonds secured by a pledge of the moneys on deposit in the Reserve Account will mature on July 1, 2005, at which time the Reserve Account will no longer apply to the Bonds. Consequently, no further reference will be made to the Reserve Account in this Official Statement.

**Pledged Revenues**

Pledged Revenues consist of: (i) such proceeds of the federal excise tax imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to the Commonwealth (the "Federal Excise Taxes") and deposited to the credit of the Sinking Fund, as required by the Enabling Act and the Trust Agreement; (ii) any other funds appropriated to the Authority to make up a deficiency in the amount of Federal Excise Taxes required to be transferred annually to the Authority, as provided in the Enabling Act, that are deposited to the credit of the Sinking Fund, and (iii) investment earnings on moneys on deposit to the credit of the Sinking Fund.

Under the provisions of Section 9 of the Puerto Rican Federal Relations Act and Section 7652(a) (3) of the United States Internal Revenue Code of 1986, as amended (the "Code"), any excise tax imposed and collected by the United States on articles produced in the Commonwealth and transported to the United States (less the estimated amount necessary for payments of refunds and drawbacks) is required to be transferred to the Commonwealth. Rum is the only article currently produced in Puerto Rico that is subject to the Federal Excise Tax. The United States Treasury is required by federal law to transfer to the Commonwealth the lesser of $10.50 per proof gallon ($13.25 per proof gallon during the period July 1, 1999 through December 31, 2005) or excise tax imposed on each proof gallon of rum produced in Puerto Rico and sold in the United States, currently set at the rate of $13.50 per proof gallon. For fiscal year 2004, the amount of Federal Excise Taxes transferred to the Commonwealth was $302,785,007. See *Federal Excise Taxes.*

The Enabling Act requires the Secretary of the Treasury of the Commonwealth to transfer to the Authority for deposit to the credit of the Puerto Rico Infrastructure Fund (the "Infrastructure Fund"), a special fund created by the Enabling Act to be maintained by or on behalf of the Authority, the first $70 million of Federal Excise Taxes received by the Commonwealth in each fiscal year after fiscal 1998 through fiscal 2006, and the first $90 million received in each fiscal year thereafter through fiscal 2052 (the Federal Excise Taxes deposited to the credit of the Infrastructure Fund are referred to as the "Special Tax Revenues"). During each of the last five fiscal years and during the current fiscal year, the Commonwealth has received the first $90 million of Federal Excise Taxes by the end of the fifth month of each fiscal year. See "Federal Excise Tax Revenues" under *Federal Excise Taxes.*

If the Federal Excise Taxes received in any fiscal year are insufficient to make the required deposit to the Infrastructure Fund, the Enabling Act authorizes the Secretary of the Treasury to advance funds to cover such insufficiency from any available funds and requires the Director of the Office of Management and Budget to include, upon the Authority's request, in the recommended budget for the corresponding fiscal year the appropriation needed to cover such insufficiency. The Commonwealth Legislature, however, is not legally obligated to make the necessary appropriation to cover such insufficiency. There has never been any insufficiency in the Infrastructure Fund requiring any action from the Commonwealth Legislature. For more information on the budgetary process of the Commonwealth, see *Additional Commonwealth Appropriations*.

Federal Excise Taxes have represented a stable source of revenues for the Commonwealth. The federal law requiring the transfer of Federal Excise Taxes to the Commonwealth has been in effect since 1917. In addition, since fiscal year 1988 Federal Excise Taxes have been no less than $166 million ($180 million if adjusted to take into account a change made by the Puerto Rico Department of the Treasury in June 1993 in the method used to report the collection of Federal Excise Taxes from an accrual to a cash basis). The level of Federal Excise Taxes transferred in the future may be affected by factors beyond the control of the Commonwealth, such as changes in federal legislation affecting the imposition or transfer of such taxes and conditions in the Puerto Rico rum industry.

Pursuant to the proposed Highway Reauthorization and Excise Tax Simplification Act of 2005 pending before Congress (the "2005 Highway Reauthorization Act"), the amount of Federal Excise Taxes per proof gallon transferred to the Commonwealth would increase from $13.25 to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, the Federal Excise Taxes transferred to the Commonwealth would revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. If the 2005 Highway Reauthorization Act becomes law, it will require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Puerto Rico Conservation Trust Fund, a Puerto Rico charitable trust (the "Conservation Trust Fund"). Based on 2004 sales of rum, the amount that would be required to be transferred to the Conservation Trust Fund in 2006 is approximately $13.6 million. The Conservation Trust Fund was established pursuant to a Memorandum of Understanding, dated December 24, 1968, between the U.S. Department of the Interior and the Commonwealth to protect and enhance the natural resources and beauty of Puerto Rico through the acquisition and active management of lands possessing great ecological, aesthetic or historical value in Puerto Rico. See *Federal Excise Taxes* and *The Puerto Rico Rum Industry*.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment*. The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged and, according to opinions rendered by the Secretary of Justice of the Commonwealth, any payments that are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Bonds do not constitute public debt of the Commonwealth.

Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the Enabling Act, however, such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never used Federal Excise Taxes for the payment of debt service on its public debt.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended, the Secretary of the Treasury is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by making prescribed monthly deposits into the Commonwealth Redemption Fund. As of April 30, 2005, the amount on deposit in the Redemption Fund was $299.5 million, which is the required amount for the payment of the July 1, 2005 period.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. The Constitution does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues (revenues raised under the provisions of Commonwealth legislation) consist principally of income taxes and excise taxes. Certain revenues, such as Federal Excise Taxes and customs duties, which are collected by the United States Government and returned to the Commonwealth, and motor vehicle fuel taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

As of December 31, 2004, $2.9 billion of Commonwealth guaranteed bonds of the Public Buildings Authority and $267 million of Commonwealth guaranteed obligations of Government Development Bank were outstanding. No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority or obligations of Government Development Bank.

As of December 31, 2004, the aggregate outstanding amount of the Series 1995 revenue bonds of PRASA guaranteed by the Commonwealth (the "PRASA Guaranteed Bonds") was $305.3 million. On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In April 2000, the Commonwealth extended its guaranty to all the outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of PRASA. The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005. In February 2004, this guaranty was extended through new legislation to cover PRASA's debt obligations issued until 2010. As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

Maximum annual debt service for the Commonwealth's general obligation debt outstanding as of December 31, 2004, is $600.6 million in fiscal 2020. This calculation does not take into account debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds are considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation. If such bonds are included therein, maximum annual debt service for the Commonwealth's general obligation debt outstanding would be $711.5 million in fiscal 2005. Debt service for the PRASA Guaranteed Bonds in fiscal 2005 (including for this purpose debt service payments due July 1, 2005) is $30.1 million. The sum of those amounts ($741.6 million) is equal to 9.97% of $7.439 billion, which is the average of the Commonwealth's adjusted internal revenues for the two fiscal years ended June 30, 2003 and 2004. See "Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt" under *Debt* in the Commonwealth Report.

**Flow of Funds**

Under the Trust Agreement, the Authority must withdraw Special Tax Revenues and other moneys from the Infrastructure Fund and make the following deposits:

(a) first, to the credit of the Bond Service Account, such amount as may be required to make the total amount to the credit of the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

11

(b)  second, to the credit of the Redemption Account, such amount as may be required to make the total amount then to the credit of the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Infrastructure Fund to make (i) any payment necessary to satisfy then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components and (ii) any required deposit into an Arbitrage Rebate Fund or comparable fund for a Debt Service Component. After making the foregoing applications, the Authority may apply any moneys to the credit of the Infrastructure Fund to any lawful purpose. See *Summary of the Trust Agreement* in Appendix I.

**Additional and Refunding Bonds**

Under the Trust Agreement, the Authority may issue additional Bonds for any lawful purpose of the Authority, provided that, among other things, the following coverage tests are met:

(a)  the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of issuance of such additional Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years, shall not be less than 200% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding, and the additional Bonds to be issued; and

(b)  the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such additional Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that requires such increased amount, if received from the federal government, to be deposited to the credit of the Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding, shall not be less than 100% of the maximum aggregate Principal and Interest Requirements for any Fiscal Year after the issuance of such additional Bonds on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the additional Bonds to be issued.

The average annual Federal Excise Taxes for the two Fiscal Years in the period ended June 30, 2004, computed on the basis of $13.25 per proof gallon, is equal to $303,539,000. That amount is more than 200% of $86 million, which is the maximum aggregate Principal and Interest Requirements for any Fiscal Year on all Bonds currently Outstanding and the Series 2005 Bonds, after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*. In addition, the average annual Special Tax Revenues and other moneys deposited to the credit of the Infrastructure Fund for the two Fiscal Years in the period ended June 30, 2004 is $90 million adjusted as permitted by the Trust Agreement to reflect the increase of Special Tax Revenues deposited to the Infrastructure Fund that will occur beginning in fiscal 2007. That amount is more than 100% of $86 million, which is the maximum aggregate Principal and Interest Requirements on the Remaining Bonds and the Series 2005 Bonds after taking into account the reduction in Principal and Interest Requirements resulting from the capitalized interest deposit described above in "Use of Proceeds" under *Plan of Financing*.

Additional Bonds may also be issued for the purpose of refunding all or a portion of any series of Bonds then Outstanding by meeting the coverage tests described in paragraphs (a) and (b) above or if (i) the Principal and Interest

12

Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of such refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

## BOND INSURANCE

**Ambac Insured Bonds**

The following information has been furnished by Ambac Assurance for use in this Official Statement. Reference is made to Appendix VI to this Official Statement for a specimen of the Ambac Insurance Policy. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payment Pursuant to Ambac Insurance Policy.* Ambac Assurance has made a commitment to issue the Ambac Insurance Policy relating to the Ambac Insured Bonds effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Insurance Policy, Ambac Assurance will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the Ambac Insured Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor (as such terms are defined in the Ambac Insurance Policy). Ambac Assurance will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which Ambac Assurance shall have received notice of Nonpayment from the Trustee. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac Assurance.

The Ambac Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac Assurance will remain obligated to pay principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does not insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Ambac Insurance Policy does not cover:

1.      payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

2.      payment of any redemption, prepayment or acceleration premium; or

3.      nonpayment of principal or interest caused by the insolvency or negligence of the Trustee.

13

If it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac Assurance to the extent of the payment under the Ambac Insurance Policy. Payment of interest pursuant to the Ambac Insurance Policy requires proof of Holder entitlement to interest payments and an appropriate assignment of the Holder's right to payment to Ambac Assurance.

Upon payment of the insurance benefits, Ambac Assurance will become the owner of the Ambac Insured Bond, appurtenant coupon, if any, or right to payment of principal or interest on such Ambac Insured Bond and will be fully subrogated to the surrendering Holder's rights to payment.

*Ambac Assurance Corporation*. Ambac Assurance is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth and the U.S. Virgin Islands, with admitted assets of approximately $8,585,000,000 (unaudited) and statutory capital of approximately $5,251,000,000 (unaudited) as of March 31, 2005. Statutory capital consists of Ambac Assurance's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit Markets Services, a Division of The McGraw-Hill Companies, Inc., Moody's Investors Service and Fitch Ratings have each assigned a triple-A financial strength rating to Ambac Assurance.

Ambac Assurance has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an Ambac Insured Bond by Ambac Assurance will not affect the treatment for federal income tax purposes of interest on such Ambac Insured Bond and that insurance proceeds representing maturing interest paid by Ambac Assurance under policy provisions substantially identical to those contained in its financial guaranty insurance policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor of the Ambac Insured Bonds.

Ambac Assurance makes no representation regarding the Ambac Insured Bonds or the advisability of investing in the Ambac Insured Bonds and makes no representation regarding, nor has it participated in the preparation of, this Official Statement other than the information supplied by Ambac Assurance and presented under the heading "Ambac Insured Bonds".

*Available Information*. The parent company of Ambac Assurance, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company . These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of Ambac Assurance's financial statements prepared in accordance with statutory accounting standards are available from Ambac Assurance. The address of Ambac Assurance's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

*Incorporation of Certain Documents by Reference*. The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

1.      The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2004 and filed on March 15, 2005;

2.      The Company's Current Report on Form 8-K dated April 5, 2005 and filed on April 11, 2005;

14

3.      The Company's Current Report on Form 8-K dated and filed on April 20, 2005;

4.      The Company's Current Report on Form 8-K dated May 3, 2005 and filed on May 5, 2005; and

5.      The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2005 and filed on May 10, 2005.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in *"Available Information"*.

## Financial Guaranty Insured Bonds

The following information has been provided by Financial Guaranty for use in this Official Statement. Reference is made to Appendix VII to this Official Statement for a specimen of the Financial Guaranty Insurance Policy. No representation is made by the Authority or the Underwriters as to the accuracy or completeness of this information.

*Payments Under the Policy.* Concurrently with the issuance of the Series 2005 Bonds, as indicated on the inside cover page of this Official Statement, Financial Guaranty will issue its Financial Guaranty Insurance Policy for the Financial Guaranty Insured Bonds. The Financial Guaranty Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the Financial Guaranty Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the issuer of the Financial Guaranty Insured Bonds (the "Issuer"). Financial Guaranty will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the Policy) from an owner of Bonds or the trustee or paying agent (if any) of the nonpayment of such amount by the Issuer. The Fiscal Agent will disburse such amount due on any Financial Guaranty Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in Financial Guaranty. The term "nonpayment" in respect of a Financial Guaranty Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a Financial Guaranty Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the Financial Guaranty Insurance Policy is non-cancellable by Financial Guaranty. The Financial Guaranty Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the Financial Guaranty Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the Financial Guaranty Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The Financial Guaranty Insurance Policy also covers the failure to pay interest on the stated date for its payment. In the event that payment of the Financial Guaranty Insured Bonds is accelerated, Financial Guaranty will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, Financial Guaranty will become the owner of the Financial Guaranty Insured Bond, appurtenant coupon or right to payment of principal or interest on each such Financial Guaranty Insured Bond and will be fully subrogated to all of the Bondholder's rights thereunder.

The Financial Guaranty Insurance Policy does not insure any risk other than Nonpayment by the Issuer, as defined in the Financial Guaranty Insurance Policy. Specifically, the Policy does not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the Trustee.

15

The Financial Guaranty Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

**Financial Guaranty Insurance Company**

Financial Guaranty, a New York stock insurance corporation, is a direct, wholly-owned subsidiary of FGIC Corporation, a Delaware corporation, and provides financial guaranty insurance for public finance and structured finance obligations. Financial Guaranty is licensed to engage in financial guaranty insurance in all 50 states, the District of Columbia and the Commonwealth and, through a branch, in the United Kingdom.

On December 18, 2003, an investor group consisting of The PMI Group, Inc. ("PMI"), affiliates of The Blackstone Group L.P. ("Blackstone"), affiliates of The Cypress Group L.L.C. ("Cypress") and affiliates of CIVC Partners L.P. ("CIVC") acquired FGIC Corporation (the "FGIC Acquisition") from a subsidiary of General Electric Capital Corporation ("GE Capital"). PMI, Blackstone, Cypress and CIVC acquired approximately 42%, 23%, 23% and 7%, respectively, of FGIC Corporation's common stock. FGIC Corporation paid GE Capital approximately $284.3 million in pre-closing dividends from the proceeds of dividends it, in turn, had received from Financial Guaranty, and GE Capital retained approximately $234.6 million in liquidation preference of FGIC Corporation's convertible participating preferred stock and approximately 5% of FGIC Corporation's common stock. Neither FGIC Corporation nor any of its shareholders is obligated to pay any debts of Financial Guaranty or any claims under any insurance policy, including the Financial Guaranty Insurance Policy, issued by Financial Guaranty.

Financial Guaranty is subject to the insurance laws and regulations of the State of New York, where it is domiciled, including Article 69 of the New York Insurance Law ("Article 69"), a comprehensive financial guaranty insurance statute. Financial Guaranty is also subject to the insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction, but generally require insurance companies to maintain minimum standards of business conduct and solvency, to meet certain financial tests, to comply with requirements concerning permitted investments and the use of policy forms and premium rates and to file quarterly and annual financial statements on the basis of statutory accounting principles ("SAP") and other reports. In addition, Article 69, among other things, limits the business of each financial guaranty insurer, including Financial Guaranty, to financial guaranty insurance and certain related lines.

For the three months ended March 31, 2005, and the years ended December 31, 2004, and December 31, 2003, Financial Guaranty had written directly or assumed through reinsurance, guaranties of approximately $14.8 billion, $59.5 billion and $42.4 billion par value of securities, respectively (of which approximately 71%, 56% and 79%, respectively, constituted guaranties of municipal bonds), for which it had collected gross premiums of approximately $84.4 million, $323.6 million and $260.3 million, respectively. For the three months ended March 31, 2005, Financial Guaranty had reinsured, through facultative and excess of loss arrangements, approximately 0.5% of the risks it had written.

As of March 31, 2005, Financial Guaranty had net admitted assets of approximately $3.215 billion, total liabilities of approximately $2.040 billion, and total capital and policyholders' surplus of approximately $1.175 billion, determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

The unaudited financial statements of Financial Guaranty as of March 31, 2005, the audited financial statements of Financial Guaranty as of December 31, 2004, and the audited financial statements of Financial Guaranty as of December 31, 2003, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading "*Financial Guaranty Insured Bonds*," or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by Financial Guaranty with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of Financial Guaranty (if any) included in documents filed by Financial Guaranty with the NRMSIRs subsequent to the date of this Official Statement and prior to the

termination of the offering of the Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

Financial Guaranty also prepares quarterly and annual financial statements on the basis of generally accepted accounting principles. Copies of Financial Guaranty's most recent GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. Financial Guaranty's telephone number is (212) 312-3000.

**Financial Guaranty's Credit Ratings**

The financial strength of Financial Guaranty is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of Financial Guaranty should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of Financial Guaranty. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the Financial Guaranty Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market prices of the Financial Guaranty Insured Bonds. Financial Guaranty does not guarantee the market prices or investment values of the Financial Guaranty Insured Bonds nor does it guarantee that the ratings on the Financial Guaranty Insured Bonds will not be revised or withdrawn.

**Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure that is provided to potential purchasers of the Series 2005 Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the Financial Guaranty Insurance Policy under the heading "*Financial Guaranty Insured Bonds*." In addition, Financial Guaranty makes no representation regarding the Series 2005 Bonds or the advisability of investing in the Series 2005 Bonds.**

## FEDERAL EXCISE TAXES

**Background**

The imposition of excise taxes has a long history under United States law, as does the transfer of Federal Excise Taxes to Puerto Rico. Such transfer is required under certain Acts of Congress that establish the unique political and legal relationship between Puerto Rico and the United States.

Excise taxes were first imposed in the United States in 1790 and have remained in force since then except for a short period in the early part of the 19th century. The transfer of Federal Excise Taxes to Puerto Rico began with the Organic Act of 1917, popularly known as the Jones Act, passed by Congress on March 2, 1917. Section 9 of the Jones Act provided that "all taxes collected under the revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the Island shall be covered into the Treasury of Puerto Rico." This transfer was intended to provide revenues for Puerto Rico government expenditures.

In 1950, when Congress enacted legislation providing for the establishment of a constitutional government in Puerto Rico, Section 9 of the Jones Act was incorporated as Section 9 of the Puerto Rican Federal Relations Act. The Puerto Rican Federal Relations Act is one of the federal statutes in force that defines the nature of the political and legal relationship between Puerto Rico and the United States.

A provision similar to Section 9 of the Puerto Rican Federal Relations Act also appears in Section 7652(a)(3) of the Code and currently reads as follows: "[all] taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States (less the estimated amount necessary for payment of refunds and drawbacks), or consumed in the island, shall be covered into the treasury of Puerto Rico."

## Imposition of Tax

Section 7652(a)(l) of the Code provides that "articles of merchandise of Puerto Rican manufacture coming into the United States and withdrawn for consumption or sale shall be subject to a tax equal to the internal revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture." Rum is the only article currently produced in Puerto Rico subject to federal excise tax.

Section 5001(a)(1) of the Code currently imposes a tax on all distilled spirits produced in or imported into the United States at the rate of $13.50 per proof gallon. A "proof gallon" is a liquid gallon consisting of 50% alcohol. Section 5001(a)(10) of the Code provides that, with certain exceptions, the tax upon any article containing distilled spirits brought from Puerto Rico into the United States for consumption or sale shall be at the same rate as the rate imposed on distilled spirits produced in the United States.

From 1951 until the enactment of the Deficit Reduction Act of 1984 (the "DRA"), the federal excise tax on distilled spirits produced in or imported into the United States was $10.50 per proof gallon. The DRA increased the tax to $12.50 per proof gallon, and amended Section 7652 of the Code to limit the amount of Federal Excise Taxes transferred to Puerto Rico to the lesser of $10.50 per proof gallon and the actual excise tax imposed under Section 5001 of the Code. Effective January 1, 1991, Section 5001(a)(l) was amended to increase the tax to $13.50 per proof gallon. The amount of Federal Excise Taxes transferred to Puerto Rico remained at $10.50 per proof gallon. In 1993, however, Section 7652 was amended to increase the amount of Federal Excise Taxes transferred to Puerto Rico to $11.30 per proof gallon during the five fiscal year period ended on September 30,1998. In 1999 and 2004, Section 7652 was further amended to raise the amount of Federal Excise Taxes transferred to Puerto Rico to $13.25 per proof gallon during the period after June 30, 1999 and before January 1, 2006. Beginning January 1, 2006, the amount of Federal Excise Taxes transferred to Puerto Rico will return to the lesser of $10.50 per proof gallon and the actual excise tax imposed.

If it becomes law, the 2005 Highway Reauthorization Act will increase the amount of Federal Excise Taxes per proof gallon transferred to Puerto Rico to $13.50 after December 31, 2005 and before January 1, 2007. After December 31, 2006, such amount will revert to the lesser of $10.50 per proof gallon and the actual excise tax imposed. The Act will also require the Commonwealth to transfer, until December 31, 2006, an amount equal to 50 cents per proof gallon of such Federal Excise Taxes to the Conservation Trust Fund within 30 days of each such Federal Excise Tax transfer to Puerto Rico. See "Conservation Trust Fund" below. Each transfer payment is to be treated as principal for an endowment, the income from which is to be used by the Conservation Trust Fund for the purposes for which it was established. If Puerto Rico fails to make a timely payment to the Conservation Trust Fund, the U.S. Secretary of the Treasury will deduct and withhold such unpaid amount from the next Federal Excise Tax transfer payment, plus interest, and will transfer such amounts directly to the Conservation Trust Fund. Such deduction, withholding, and direct payment will not be made if the U.S. Secretary of the Interior, after consultation with the Governor of Puerto Rico, finds that the failure of the Commonwealth to make the transfer payment was for good cause.

The United States has never reduced the amount of Federal Excise Taxes transferred to Puerto Rico below $10.50 per proof gallon. For a five-month period in 1986, however, Federal Excise Taxes were subject to sequestration under the Gramm-Rudman-Hollings Act ("GRH"). This sequestration ended when Congress enacted a law requiring that, notwithstanding GRH or any other provision of law, amounts required to be transferred to Puerto Rico under the Puerto Rican Federal Relations Act be paid in full to Puerto Rico.

There can be no assurance that the excise tax rate on distilled spirits will not be reduced or that such taxes will not be eliminated in the future or that there will not be a reduction in the amounts transferred to the Commonwealth.

## Collection of Taxes

In the case of rum shipped in bulk to the United States, Federal Excise Taxes are paid by distributors and importers on a semi-monthly basis, each payment representing the taxes on rum withdrawn from bonded warehouses during the immediately preceding two-week period for consumption in the United States. In the case of rum bottled in

Puerto Rico and shipped to the United States, Federal Excise Taxes are paid by producers in Puerto Rico when the rum is shipped to the United States.

The United States Department of the Treasury makes monthly transfers of Federal Excise Taxes to Government Development Bank for the account of the Puerto Rico Department of the Treasury consisting of: (i) excise taxes paid on rum bottled in Puerto Rico and shipped to the United States during the immediately preceding month, and (ii) excise taxes paid on rum shipped in bulk to the United States and retired for consumption two months prior to the date of such transfer.

The period elapsed between the time that a producer, distributor or importer pays the excise tax and the time that the United States Department of the Treasury remits such taxes to the Puerto Rico Department of the Treasury ranges between 30 and 90 days.

**Conservation Trust Fund**

Under a policy to protect and enhance the natural resources of Puerto Rico, the Commonwealth has transferred annually since 1999 to the Conservation Trust Fund an amount of Federal Excise Taxes equal to approximately 45 cents per proof gallon. During fiscal 2004, approximately $12.2 million was so transferred. Under the proposed 2005 Highway Reauthorization Act and based on 2004 rum sales, such transfer would increase to approximately $13.6 million in 2006. Given that the proposed federal mandate for such transfers to the Conservation Trust Fund would expire on December 31, 2006, the Authority believes that the deposit to the Infrastructure Fund has and will thereafter come ahead of any transfer to the Conservation Trust Fund in the event that the Federal Excise Taxes, net of such transfer, are insufficient to cover the required annual Infrastructure Fund deposit.

**Federal Excise Tax Revenues**

Throughout the 1950's and 1960's Federal Excise Taxes consisted principally of excise taxes on rum and tobacco. Since 1986, however, with the phasing out of the manufacture of tobacco products in Puerto Rico, all Federal Excise Taxes have consisted of taxes imposed on rum produced in Puerto Rico.

The table below shows the Federal Excise Taxes received with respect to rum during each of the five fiscal years ended June 30, 2004 and in the current fiscal year through May 2005. The figures shown represent the Federal Excise Taxes actually received by Government Development Bank for the account of the Puerto Rico Department of the Treasury in each month. In each case, the amounts shown are net of: (i) operational expenses incurred by the United States Department of the Treasury in processing and accounting for Federal Excise Taxes (approximately $8.9 million in fiscal 2004); (ii) amounts transferred by the Commonwealth Treasury to the Conservation Trust Fund (approximately $12.2 million in fiscal 2004); and (iii) federal excise taxes received in connection with rum produced in other countries (approximately $51.1 million in fiscal 2004), which are also transferred to the Commonwealth but are not deposited in the Infrastructure Fund pursuant to the terms of the Enabling Act and the Trust Agreement.

19

|  | **Federal Excise Tax Revenues Per Fiscal Year** (in thousands) | | | | | |
|---|---|---|---|---|---|---|
|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| July . . . . . . . . . . . . | $ 15,935 | $ 21,532 | $ 36,178 | $ 22,220 | $ 26,853 | $ 20,822 |
| August . . . . . . . . . | 21,682 | 25,018 | 23,583 | 27,167 | 21,896 | 18,545 |
| September . . . . . . . | 17,299 | 31,570 | 26,291 | 24,821 | 27,259 | 17,831 |
| October . . . . . . . . . | 13,572 | 22,942 | 26,850 | 24,545 | 28,676 | 19,233 |
| November . . . . . . . | 19,767 | 24,460 | 23,632 | 26,408 | 23,219 | 39,610 |
| December . . . . . . . | 25,533 | 37,266 | 34,071 | 28,671 | 36,530 | 26,468 |
| January . . . . . . . . . | 21,875 | 24,490 | 19,242 | 24,262 | 25,037 | 31,386 |
| February . . . . . . . . | 13,652 | 20,308 | 21,086 | 23,524 | 22,241 | 23,590 |
| March . . . . . . . . . . | 16,364 | 20,728 | 24,265 | 15,258 | 19,555 | 9,889 |
| April . . . . . . . . . . . | 16,372 | 22,394 | 25,883 | 26,337 | 20,537 | 31,760 |
| May . . . . . . . . . . . | 20,618 | 16,521 | 23,834 | 32,417 | 23,344 | 63,739 |
| June . . . . . . . . . . . | 32,729 | 29,244 | 22,990 | 23,415 | 27,638 | — |
| Total[(1)(2)] . . . . . | $235,398 | $296,473 | $307,907 | $299,046 | $302,785 | $302,873 |

(1)     If the excise tax transfer rate had been $10.50 per proof gallon, it is estimated that the total Federal Excise Taxes (in thousands) received would have been $186,542, $234,941, $244,002, $236,980 and $239,943 for fiscals 2000, 2001, 2002, 2003 and 2004, respectively.

(2)     Totals may not add due to rounding.

*Source: Puerto Rico Department of the Treasury, Office of Economic and Financial Affairs*

       As a result of administrative delays in the monthly reporting and payment of Federal Excise Taxes to the United States Treasury by certain U.S. rum importers and distributors, which delays are beyond the Commonwealth's control, the Federal Excise Taxes transferred to the Commonwealth in recent months have fluctuated. This caused the March 2005 Federal Excise Tax transfer to the Commonwealth to be less than the transfers for the same month in each of the last five fiscal years. During April and May 2005, however, the amount transferred was substantially higher than the amounts transferred in the same months in each of such fiscal years. Consequently, Federal Excise Tax transfers to the Commonwealth in fiscal 2005 have already surpassed the transfers for fiscal 2004.

## THE PUERTO RICO RUM INDUSTRY

**United States Rum Market**

       Rums produced in Puerto Rico dominate the United States rum market according to data collected by the Distilled Spirits Council of the United States. In 2004, Puerto Rico rums accounted for over 70% of total rum shipments to the United States.

       The following table shows the consumption of Puerto Rico rums in the United States relative to total consumption of rum in calendar 1995 and from calendar 2000 to 2004:

| | | | United States Rum Consumption by Brands (in thousands of gallons) | | | |
|---|---|---|---|---|---|---|
| | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 |
| Bacardí . . . . . . . . . . . . . . . | 15,097 | 17,594 | 18,212 | 18,545 | 19,353 | 20,090 |
| Castillo . . . . . . . . . . . . . . | 2,164 | 2,639 | 2,734 | 2,775 | 2,841 | 2,853 |
| Captain Morgan . . . . . . . . | 2,496 | 7,751 | 8,500 | 9,351 | 10,021 | 11,400 |
| Ron Rico . . . . . . . . . . . . | 1,438 | 1,182 | 1,270 | 1,331 | 1,331 | 1,284 |
| Other P.R. Brands[1] . . . . . | 413 | 166 | — | — | — | — |
| Total P.R. Brands . . . . . . . | 21,610 | 29,332 | 30,716 | 32,002 | 33,546 | 35,627 |
| Percent . . . . . . . . | 75.2% | 72.6% | 72.3% | 72.5% | 72.3% | 72.0% |
| Other Brands . . . | 7,142 | 11,067 | 11,771 | 12,130 | 12,837 | 13,826 |
| Total Rum Consumption . | 28,752 | 40,399 | 42,487 | 44,132 | 46,384 | 49,453 |

(1) Includes Don Q, Palo Viejo and Matusalem rums.

*Source: Adams Media Liquor Handbook 1995 and 2000-2004.*

One of the factors that has contributed to the success of Puerto Rico rums in the United States market is the strong advertising effort carried out by the Government of Puerto Rico directed at promoting the high quality of Puerto Rico rums. Pursuant to legislation adopted in 1971 and incorporated into the Puerto Rico Internal Revenue Code of 1994, up to ten percent (10%) of the Federal Excise Taxes attributable to bulk shipments of rum is deposited in a special fund (after the deposit to the Infrastructure Fund required by the Enabling Act) and used to promote the sale and consumer recognition of Puerto Rico rums in the United States. Also, for three decades Commonwealth law has imposed strict standards on production and aging requirements as a means of assuring the high quality of Puerto Rico rums.

Most rums that compete with Puerto Rico rums in the United States are produced in the United States Virgin Islands and other Caribbean countries. Some of these rums enjoy duty-free access to the United States under the Caribbean Basin Trade Partnership Act. To date such duty-free access has not had a significant impact on the market share enjoyed by Puerto Rico rums.

According to information obtained from Adams Media Liquor Handbook 2004, during the period from 1990 to 2004, rum's share of the distilled spirits market in the United States increased from 8.5% to 12.6%. One factor that accounts for the increase in market share of rum is the overall shift in consumer preference from heavier brown spirits, such as whiskey and bourbon, to white spirits, such as gin, vodka and rum. The following table shows this shift in consumer preference on a calendar year basis:

|  | **Distilled Spirits Market Share** | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 1995 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005[1] |
| Brown Spirits . . . . . . . . . . | 34.6% | 29.6% | 28.9% | 28.4% | 27.5% | 27.0% | 26.3% |
| American Whiskies . . . | 15.1 | 12.8 | 12.4 | 12.1 | 11.8 | 11.6 | 11.4 |
| Imported Whiskies . . . . | 19.5 | 16.9 | 16.5 | 16.2 | 15.7 | 15.4 | 14.9 |
| White Spirits . . . . . . . . . . | 65.4 | 70.4 | 71.1 | 71.6 | 72.5 | 73.0 | 73.7 |
| Rums . . . . . . . . . . . . . | 8.8 | 11.4 | 11.9 | 12.1 | 12.3 | 12.6 | 12.7 |
| Tequila . . . . . . . . . . . . | — | 4.9 | 4.4 | 4.7 | 4.8 | 5.0 | 5.2 |
| Vodka . . . . . . . . . . . . . | 23.4 | 24.2 | 25.1 | 25.7 | 26.2 | 26.6 | 26.9 |
| Gin . . . . . . . . . . . . . . . | 8.6 | 7.5 | 7.4 | 7.2 | 6.9 | 6.6 | 6.4 |
| Others[2] . . . . . . . . . . . | 24.6 | 22.2 | 22.4 | 21.9 | 22.4 | 22.2 | 22.4 |

(1)  Estimated by Government Development Bank based on preliminary figures.

(2)  Includes brandies, cordials, liqueurs, and prepared cocktails.  Tequila is included only for 1995.

*Source:  Adams Media Liquor Handbook 1995 and 2000-2004.*

Sales of distilled spirits in the United States have increased from 326.5 million gallons in 1995 to 394.0 million gallons in 2004.  This increase is attributable to new brands and subsegments within the industry and increases in consumer spending and in the drinking age population.  In 2004, the consumption of distilled spirits increased by 4.1%.  This is the largest increment seen in the industry in more than 20 years.  Also in 2004, rum consumption increased by 6.6%.  The Commonwealth attributes this growth to new product flavors introduced into the United States market.

It is expected that Puerto Rico rums will continue to play a dominant role in the United States market.  According to Adams Media Liquor Handbook 2004, it is expected that rum consumption in the United States will continue to increase in the period through 2008.

**Puerto Rico Rum Distillers**

The two Puerto Rico distillers that produce rum for sale in the United States are Bacardí Corporation ("Bacardí") and Destilería Serrallés, Inc. ("Serrallés").  Serrallés has been producing rum in Puerto Rico since the mid 1800's and Bacardí since the 1930's.  Bacardí has the largest operation, accounting for more than 60% of the total Puerto Rico rums sold in the United States.  During the last decade, Bacardí has been the top selling brand of distilled spirits in the United States.

The distilling operations of Bacardí and Serrallés in Puerto Rico are affected by various economic, regulatory and other factors that are beyond the control of the Commonwealth and that could influence their decision to maintain or expand these operations, which in turn could affect the level of Federal Excise Taxes transferred to Puerto Rico.  For example, labor and environmental compliance costs are higher in Puerto Rico than in neighboring Caribbean countries.  Distilling operations in Puerto Rico, however, enjoy federal and Puerto Rico income tax benefits and benefit from the goodwill associated with rum produced in Puerto Rico.

## ADDITIONAL COMMONWEALTH APPROPRIATIONS

Under the Enabling Act the Authority may request appropriations from the Commonwealth if Federal Excise Taxes in the amounts authorized by the Enabling Act are not received by the Commonwealth for deposit in the Infrastructure Fund, as described above, and the Director of the Office of Management and Budget is required, upon the Authority's request, to include such appropriations in the recommended budget for the corresponding fiscal year. The Commonwealth Legislature, however, is not legally obligated to make such appropriations. Since the enactment of the Enabling Act, the full amount of the Federal Excise Taxes required to be deposited in the Infrastructure Fund has been so deposited and no such appropriations have been requested by the Authority. Following is a brief description of the budgetary process of the Commonwealth.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by the Office of Management and Budget, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other sources for the ensuring fiscal year under (i) laws existing at the time the budget is estimated, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any item so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with his objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of a fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue to make payments of its operating and other expenses until a new budget is approved.

### Financial Control and Adjustment Procedures

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by the Office of Management and Budget based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of the Office of Management and Budget, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditures in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, make recommendations to the Legislature for new taxes, authorize borrowings under provisions of existing legislation, or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and

23

guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund Act"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public services. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund.  In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund.  The maximum balance of the Budgetary Fund may not exceed six percent of the total appropriations included in the budget for the preceding fiscal year.  As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million.  The Budgetary Fund's year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 90 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit.  The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year.  Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of any fiscal year.  As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

## AUTHORITY DEBT

The following table sets forth the bond and note obligations of the Authority as of April 30, 2005, and as adjusted for the issuance of the Series 2005 Bonds and the refunding of the Refunded Bonds.

| | Outstanding as of April 30, 2005[1] | As Adjusted |
|---|---|---|
| Notes[2] . . . . . . . . . . . . . . . . . . . . . . | $  22,973,949 | $          0 |
| Series 1988A Bonds . . . . . . . . . . . . | 1,635,000 | 1,635,000 |
| Series 1997A and 1997B Bonds . . . | 773,025,000 | 1,540,000 |
| Series 1998A Bonds . . . . . . . . . . . . | 134,660,000 | 134,660,000 |
| Series 2005 Bonds  . . . . . . . . . . . . . | 0 | 1,332,962,916 |
| Total . . . . . . . . . . . . . . . . . | $  932,293,949 | $1,470,797,916 |

---

(1)    Excludes $1.058 billion of the Authority's Series 2000A and 2000B Bonds, which are payable solely from the investment income of funds on deposit in the Authority's Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.

(2)    Line of credit of Government Development Bank to the Authority.

**Debt Service Requirements**

The following table sets forth the Principal and Interest Requirements on the Bonds for each fiscal year. Principal and Interest Requirements for any fiscal year comprise the sum of principal, including Amortization Requirements, and interest that is payable on January 1 in such fiscal year and on July 1 in the next fiscal year.

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2005 Bonds | | | Total Debt Service Requirements |
|---|---|---|---|---|---|
| | | Principal | Interest[1] | Total Debt Service | |
| 2005 | $ 27,397,219 | $ — | $ 1,571,396 | $ 1,571,396 | $ 28,968,615 |
| 2006 | 27,397,759 | — | 58,837,354 | 58,837,354 | 86,235,113 |
| 2007 | 27,399,469 | — | 57,992,400 | 57,992,400 | 85,391,869 |
| 2008 | 27,399,619 | — | 57,992,400 | 57,992,400 | 85,392,019 |
| 2009 | 27,397,394 | — | 57,992,400 | 57,992,400 | 85,389,794 |
| 2010 | 26,907,163 | — | 57,992,400 | 57,992,400 | 84,899,563 |
| 2011 | — | 28,005,000 | 57,992,400 | 85,997,400 | 85,997,400 |
| 2012 | — | 29,490,000 | 56,503,950 | 85,993,950 | 85,993,950 |
| 2013 | — | 31,060,000 | 54,935,850 | 85,995,850 | 85,995,850 |
| 2014 | — | 32,715,000 | 53,283,575 | 85,998,575 | 85,998,575 |
| 2015 | — | 34,475,000 | 51,523,150 | 85,998,150 | 85,998,150 |
| 2016 | — | 36,330,000 | 49,667,675 | 85,997,675 | 85,997,675 |
| 2017 | — | 38,265,000 | 47,733,200 | 85,998,200 | 85,998,200 |
| 2018 | — | 40,305,000 | 45,694,850 | 85,999,850 | 85,999,850 |
| 2019 | — | 42,450,000 | 43,547,075 | 85,997,075 | 85,997,075 |
| 2020 | — | 44,715,000 | 41,284,025 | 85,999,025 | 85,999,025 |
| 2021 | — | 47,170,000 | 38,824,700 | 85,994,700 | 85,994,700 |
| 2022 | — | 49,765,000 | 36,230,350 | 85,995,350 | 85,995,350 |
| 2023 | — | 52,505,000 | 33,493,275 | 85,998,275 | 85,998,275 |
| 2024 | — | 55,390,000 | 30,605,500 | 85,995,500 | 85,995,500 |
| 2025 | — | 58,440,000 | 27,559,050 | 85,999,050 | 85,999,050 |
| 2026 | — | 61,650,000 | 24,334,850 | 85,994,850 | 85,994,850 |
| 2027 | — | 65,045,000 | 20,954,100 | 85,999,100 | 85,999,100 |
| 2028 | — | 44,160,339 | 41,836,286 | 85,996,625 | 85,996,625 |
| 2029 | — | 23,779,963 | 62,217,287 | 85,997,250 | 85,997,250 |
| 2030 | — | 22,510,255 | 63,486,995 | 85,997,250 | 85,997,250 |
| 2031 | — | 21,400,139 | 64,597,111 | 85,997,250 | 85,997,250 |
| 2032 | — | 20,336,424 | 65,660,826 | 85,997,250 | 85,997,250 |
| 2033 | — | 19,318,408 | 66,678,842 | 85,997,250 | 85,997,250 |
| 2034 | — | 18,448,735 | 67,548,515 | 85,997,250 | 85,997,250 |
| 2035 | — | 17,566,407 | 68,430,843 | 85,997,250 | 85,997,250 |

25

| Years Ending June 30, | Remaining Bonds Debt Service Requirements | Series 2005 Bonds | | | Total Debt Service Requirements |
| | | Principal | Interest[1] | Total Debt Service | |
|---|---|---|---|---|---|
| 2036 | — | 16,774,070 | 69,223,180 | 85,997,250 | 85,997,250 |
| 2037 | — | 31,460,988 | 54,536,262 | 85,997,250 | 85,997,250 |
| 2038 | — | 67,845,000 | 14,692,250 | 82,537,250 | 82,537,250 |
| 2039 | — | 71,500,000 | 11,300,000 | 82,800,000 | 82,800,000 |
| 2040 | — | 75,500,000 | 7,725,000 | 83,225,000 | 83,225,000 |
| 2041 | — | 79,000,000 | 3,950,000 | 82,950,000 | 82,950,000 |
| 2042 | — | 15,001,840 | 70,998,160 | 86,000,000 | 86,000,000 |
| 2043 | — | 14,311,260 | 71,688,740 | 86,000,000 | 86,000,000 |
| 2044 | — | 13,651,640 | 72,348,360 | 86,000,000 | 86,000,000 |
| 2045 | — | 12,622,448 | 70,732,552 | 83,355,000 | 83,355,000 |
| Total[2] | $163,898,621 | $1,332,962,916 | $1,954,207,134 | $3,287,170,050 | $3,451,068,671 |

(1)  $22,695,250 of the interest shown in fiscal 2005 and 2006 will be paid from the portion of Series 2005 Bond proceeds deposited to the capitalized interest account, which amount is irrevocably set aside for the payment of interest on the Series 2005 Bonds (after taking into effect the refunding of the Refunded Bonds), plus earnings thereon. See " Use of Proceeds" under *Plan of Financing*.

(2)  Totals may not add due to rounding.

## FINANCIAL ASSISTANCE TO BENEFITTED ENTITIES

The Enabling Act empowers the Authority to provide financial, administrative, consulting, technical, advisory, and other assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth. In connection therewith, the Authority has executed assistance agreements with several Benefitted Entities, including PRASA, the Department of Education, the Department of Environmental and Natural Resources, the Highway and Transportation Authority, the Courts Administration Office, the Department of Transportation and Public Works, the Institute of Puerto Rican Culture, the Department of Sports and Recreation, the Fine Arts Center Corporation, and the Special Communities Perpetual Trust (collectively, the "Assistance Agreements"). The Authority has agreed to provide additional assistance to some of such Benefitted Entities by issuing the Series 2005 Bonds and utilizing the net proceeds as described under *Plan of Financing*.

The Assistance Agreements provide a contractual framework for the Authority to provide financial and other assistance to the Benefitted Entities in connection with their respective capital projects and working capital needs. In general, under the Assistance Agreements with Benefitted Entities other than PRASA, the Benefitted Entity assumes responsibility for the development of its capital project and agrees to indemnify and hold harmless the Authority in connection with the design, engineering and construction thereof. Under the PRASA Assistance Agreement, the Authority provides administrative support and assistance with respect to the undertaking and implementation of PRASA's on-going projects, and pending attainment of certain objectives, PRASA is subject to a "special period" during which the Authority is authorized to review and comment about any necessary changes to operating and capital budgets and capital improvement programs of PRASA. Pursuant to a proposed amendment to this agreement, the Authority will continue to provide financial, administrative, technical and other assistance to PRASA; however, PRASA will assume

26

primary responsibility for all new capital projects, including certain projects to be financed with proceeds of the Series 2005 Bonds.

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Commonwealth, the Authority, PRASA and certain other Benefitted Entities receiving proceeds of the Series 2005 Bonds must continue to meet after the issuance of the Series 2005 Bonds in order that interest on the Series 2005 Bonds is not included in gross income for federal income tax purposes. The failure of any of the foregoing entities to meet these requirements may cause interest on the Series 2005 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. Each of the Authority and the other entities mentioned above has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and the laws of the Commonwealth, so that interest on the Series 2005 Bonds will remain excluded from gross income for federal income tax purposes. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent any of the foregoing entities from complying with the requirements of the Code.

In the opinion of Sidley Austin Brown & Wood LLP, Bond Counsel, subject to continuing compliance by the Authority and the other entities mentioned above with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Series 2005 Bonds will not be includable in gross income for federal income tax purposes. Interest on the Series 2005 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Series 2005 Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. No opinion is rendered by Sidley Austin Brown & Wood LLP on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is otherwise provided for in the documents pertaining to the Series 2005 Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the Series 2005 Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the Series 2005 Bonds and the interest thereon will be exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the Series 2005 Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Series 2005 Bonds will not have an adverse effect on the tax-exempt status of the Series 2005 Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the Series 2005 Bonds.

## Discount Bonds

The excess, if any, of the amount payable at maturity of any maturity and series of the Series 2005 Bonds over the issue price corresponding thereto constitutes original issue discount. The amount of original issue discount that has

27

accrued and is properly allocable to an owner of any maturity and series of the Series 2005 Bonds with original issue discount (a "Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the Series 2005 Bonds. In general, the issue price of a maturity and series of the Series 2005 Bonds is the first price at which a substantial amount of Series 2005 Bonds of that maturity and series was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed above. Consequently, an owner of a Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any maturity of a Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of Discount Bonds of that maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a Discount Bond should consult with his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount relating to such Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such Discount Bond.

**Premium Bonds**

The excess, if any, of the tax basis of a Series 2005 Bond to a purchaser (other than a purchaser who holds such Bond as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases such Bond as part of the initial offering and at the applicable initial offering price as set forth on the inside cover page of this Official Statement over the amount payable at maturity of such Bond is "Bond Premium." Bond Premium is amortized over the term of such Bond for federal income tax purposes (or in the case of a Series 2005 Bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such Bond). No deduction is allowed for such amortization of Bond Premium; however, United States Treasury regulations provide that Bond Premium is treated as an offset to qualified stated interest received on the Series 2005 Bonds. An owner of such Bond is required to decrease his adjusted basis in such Bond by the amount of amortizable Bond Premium attributable to each taxable year such Bond is held. An owner of such Bond should consult with his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such Bond and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such Bond.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey, Demgen & Moore Inc. will verify from the information provided to them the mathematical accuracy, as of the date of the closing on the Series 2005C Bonds, of the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal of and interest, and redemption premium, if any, on the Refunded Bonds. Causey, Demgen & Moore Inc. will express no opinion on the assumptions provided to them, nor as to the exclusion from gross income the interest on the Series 2005 Bonds.

## ELIGIBILITY OF SERIES 2005 BONDS

The Series 2005 Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2005 Bonds from the Authority at an aggregate discount of $8,635,874.33 from the initial public offering prices for such Bonds, set forth (or derived from information set forth) on the inside cover hereof. The obligations of the Underwriters are subject to certain conditions precedent. The Underwriters will be obligated to purchase all Series 2005 Bonds if any such Bonds are purchased. The Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) and institutional purchasers at prices lower than the public offering prices which may be changed, from time to time, by the Underwriters.

Banc of America Securities LLC ("Banc of America Securities"), a co-senior underwriter, has entered into a written agreement with Oriental Financial Services Corp. ("Oriental Financial Services") pursuant to which Oriental Financial Services has agreed to act as a consultant to Banc of America Securities in connection with Banc of America Securities' provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a co-senior underwriter, has entered into a written agreement with BBVA Securities of Puerto Rico, Inc. ("BBVA Securities") pursuant to which BBVA Securities has agreed to act as a consultant to Merrill Lynch, in connection with Merrill Lynch's provision of underwriting and investment banking services to the Authority with respect to the Series 2005 Bonds. Pursuant to these agreements, the existence of which has been disclosed to the Authority and Government Development Bank, Oriental Financial Services and BBVA Securities will be entitled to receive, respectively, a portion of Banc of America Securities' and Merrill Lynch's actual net profits, if any, in connection with the underwriting of the Series 2005 Bonds. Other similar agreements with respect to the sharing of underwriting net profits have been entered into and disclosed to the Authority and Government Development Bank by: J.P. Morgan Securities, Inc. and R-G Investments Corporation, Goldman, Sachs & Co. and FirstBank Puerto Rico, Lehman Brothers, Inc. and Santander Securities Corporation, Morgan Stanley & Co. Incorporated and Popular Securities, Inc., and Wachovia Bank, National Association and Doral Securities, Inc.

The Authority has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the federal securities laws.

## COMMONWEALTH COVENANT

Pursuant to the Enabling Act, the Commonwealth has pledged to all holders of the Series 2005 Bonds that it will not limit or alter the rights or powers vested in the Authority by the Enabling Act so as to impair the rights of such holders until the Series 2005 Bonds and the interest thereon are fully met and discharged.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the offering of the Series 2005 Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2005 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates also participate in other financial transactions with Government Development Bank.

29

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, sale and delivery of the Series 2005 Bonds are subject to the unqualified approving legal opinion of Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel. The form of the proposed opinions of Bond Counsel is set forth in Appendix IV. Certain legal matters will be passed upon for the Underwriters by McConnell Valdés, San Juan, Puerto Rico.

## RATINGS

The Series 2005 Bonds have been assigned a rating of "Baa2," with a negative credit outlook, by Moody's Investors Service, and a rating of BBB+ by Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. The "Baa2" rating was assigned by Moody's on May 19, 2005, and was lowered from the "Baa1" rating that the Authority's bonds had immediately prior to such date. This new Moody's rating is the same rating assigned to the Commonwealth's general obligations on such date, which was also revised downward from "Baa1" to "Baa2." Standard & Poor's "BBB+" rating was assigned on May 24, 2005, and was the same rating the Authority's bonds had immediately prior to such date. The aforementioned ratings do not reflect the Ambac Insurance Policy for the Ambac Insured Bonds nor the Financial Guaranty Insurance Policy for the Financial Guaranty Insured Bonds, Moody's and Standard & Poor's are expected to assign the Insured Bonds ratings of Aaa and AAA, respectively.

Any explanation regarding the reasons for and the significance of such ratings must be obtained only from the respective rating agency furnishing the same. The ratings reflect only the respective opinions of such rating agencies. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by either or both of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Series 2005 Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule l5c2-12, as amended (the "Rule"), promulgated by the SEC, the Commonwealth (the "Obligated Person") and the Authority, as specifically stated hereinbelow, have agreed to the following for the benefit of the Beneficial Owners (generally the tax owners of the Series 2005 Bonds):

(a) The Obligated Person has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2005, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) the Obligated Person's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Obligated Person (including such data concerning the Authority and any other entity to the extent it has a material impact on the Obligated Person) and revenues, expenditures, operations and indebtedness generally found in the Commonwealth Report;

(b) The Authority has agreed to file within 305 days after the end of each fiscal year beginning after its fiscal year 2005, with each NRMSIR and with any Commonwealth SID, the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time together with data of the type presented in this Official Statement under *Federal Excise Taxes*, *The Puerto Rico Rum Industry,* and *Authority Debt* for the preceding fiscal year; and

(c) The Authority has agreed to file in a timely manner, with each NRMSIR or with the MSRB, and with any Commonwealth SID, notice of failure of the Obligated Person to comply with clause (a) above and of the Authority to comply with clause (b) above and notice of any of the following events with respect to the Series 2005 Bonds, if material:

(i)   principal and interest payment delinquencies;

(ii)    non-payment related defaults;

(iii)   unscheduled draws on debt service reserves reflecting financial difficulties;

(iv)   unscheduled draws on credit enhancements reflecting financial difficulties;

(v)    substitution of credit or liquidity providers, or their failure to perform;

(vi)   adverse tax opinions or events affecting the tax-exempt status of Series 2005 Bonds;

(vii)  modifications to rights of security holders;

(viii) Series 2005 Bond calls;

(ix)   defeasances;

(x)    release, substitution, or sale of property securing repayment of the Series 2005 Bonds; and

(xi)   rating changes.

Event (iii) may not be applicable, since the terms of the Series 2005 Bonds do not provide for "debt service reserves." For a description of the Series 2005 Bonds, see *The Series 2005 Bonds*.

In addition, with respect to the following events:

Events (iv) and (v). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2005 Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (vi). For information on the tax status of the Series 2005 Bonds, see *Tax Matters*.

Event (viii). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under *The Series 2005 Bonds*, the only open issue is which Series 2005 Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Series 2005 Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

The Obligated Person expects to provide the information described in clause (a) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline.

As of the date of this Official Statement, there is no Commonwealth SID, and the name and address of each NRMSIR is:  Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn: NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Series 2005 Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Obligated Person and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Series 2005 Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the Authority's or the Obligated Person's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants in paragraphs (a), (b) or (c) above (the "Covenants") or for any remedy for

breach thereof, unless such Beneficial Owner shall have filed with the Authority or the Obligated Person, as applicable, written notice of any request to cure such breach, and the Authority or the Obligated Person, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Series 2005 Bonds benefitted by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Notwithstanding the foregoing, no challenge to the adequacy of the information provided in accordance with the filings mentioned in paragraphs (a), (b) or (c) above may be prosecuted by any Beneficial Owner except in compliance with the remedial and enforcement provisions contained in Article VII of the Trust Agreement. See "Remedies of Bondholders" under *Summary of the Trust Agreement* in Appendix I. Moreover, proceedings filed by Beneficial Owners against the Obligated Person may be subject to the sovereign immunity provisions of Section 2 of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. § 3077 and § 3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Obligated Person, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Series 2005 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Obligated Person; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such resolution, ceases to be in effect for any reason, and the Authority or the Obligated Person, as applicable, elects that the Covenant shall be deemed amended accordingly.

The Authority and the Obligated Person have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters to comply with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the Trust Agreement, the Bond Resolution, the Escrow Deposit Agreement, the Assistance Agreements, the Enabling Act, the Constitution of Puerto Rico and the Series 2005 Bonds are subject to all the detailed provisions thereof. Such references and summaries do not purport to be complete and are qualified in their entirety by reference to such acts, laws, documents, agreements or decisions. Copies of the Trust Agreement, the Bond Resolution and the Escrow Deposit Agreement are available for inspection during regular business hours at the offices of Government Development Bank or at the principal corporate trust office of the Trustee.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

There is appended to this Official Statement a summary of the Trust Agreement (Appendix I), the audited financial statements of the Authority for the fiscal year ended June 30, 2004, together with the independent auditor's

report of KPMG (Appendix II), the Commonwealth Report (Appendix III), the proposed form of opinions of Sidley Austin Brown & Wood LLP, Bond Counsel (Appendix IV), the table of accreted values for the Capital Appreciation Bonds (Appendix V), and the financial guaranty insurance policy specimens of Ambac Assurance (Appendix VI) and Financial Guaranty (Appendix VII).

The information set forth in this Official Statement, except the information appearing in *Underwriting* and *Bond Insurance* and the information pertaining to DTC, was supplied by the Acting Executive Director of the Authority in her official capacity as such and is included in this Official Statement on her authority. The information set forth in the Commonwealth Report was supplied by certain officials of the Commonwealth, in their respective official capacities, or was obtained from publications of the Commonwealth, and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC and the information pertaining to Ambac Assurance and Financial Guaranty was provided by Ambac Assurance and Financial Guaranty, respectively.

This Official Statement will be filed with each NRMSIR and with the MSRB.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

By:_____/s/ Magda L. Aguiar-Serrano_____
Acting Executive Director

33

[This page intentionally left blank]

## SUMMARY OF THE TRUST AGREEMENT

The following is a summary of certain provisions of the Trust Agreement. This summary does not purport to be complete and is qualified in its entirety by reference to the Trust Agreement. Inasmuch as the last remaining outstanding Bonds having the benefit of the Reserve Account mature on July 1, 2005, the summary below no longer makes reference to the Reserve Account in the Sinking Fund.

### Definitions of Certain Terms

The following words and terms shall have the following meanings, unless the context otherwise requires. Words importing the singular number shall include the plural number in each case and vice versa, and words importing persons shall include firms and corporations, including public bodies.

"Accreted Value" shall mean, with respect to any Capital Appreciation Bond, an amount equal to the principal amount of such Capital Appreciation Bond on its date of original issuance plus the interest accrued on such Capital Appreciation Bond from such original issue date to the date of calculation, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond.

"Amortization Requirement" for the term Bonds of any series for any Fiscal Year shall mean the amount fixed or computed for the retirement by purchase or redemption of term Bonds in such Fiscal Year. If at or prior to the close of any Fiscal Year the total amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys exceeds the Amortization Requirement for such term Bonds for such Fiscal Year, then future Amortization Requirements for such term Bonds shall be reduced for subsequent Fiscal Years in such amounts aggregating the amount of such excess as shall be determined by the Executive Director of the Authority in an order filed with the Trustee on or before the 10th day following the close of such Fiscal Year. If at the close of any Fiscal Year the total principal amount of term Bonds of any series retired by purchase or redemption or called for redemption with Redemption Account moneys is less than the Amortization Requirement for such term Bonds for such Fiscal Year, then the Amortization Requirement for such term Bonds for the next Fiscal Year shall be increased by the amount of such deficiency.

"Appreciated Value" shall mean, (i) with respect to any Capital Appreciation and Income Bond until the Interest Commencement Date, an amount equal to the Accreted Value of such Bond and, (ii) as of any date of computation on and after the Interest Commencement Date, an amount equal to the Accreted Value of such Bond on the Interest Commencement Date.

"Arbitrage Rebate Fund" shall mean a fund or funds established by the Authority with a Qualified Depositary for the deposit of moneys necessary for payments required to be made to the United States of America in connection with any series of Bonds subject to arbitrage rebate requirements under the Code. The moneys in such fund or funds shall be applied only for the purposes for which such fund or funds are established and shall not be subject to a lien or charge in favor of the holders of any Bonds and shall not be pledged as security for the payment of any Bonds.

"Balloon Bonds" shall mean any Bonds, interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one Fiscal Year and for which maturing principal amount Amortization Requirements have not been designated.

"Capital Appreciation Bonds" shall mean any Bonds as to which interest is compounded on each of the dates designated for compounding and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by the resolution authorizing said Bonds.

"Capital Appreciation and Income Bonds" shall mean any Bonds as to which accruing interest is not paid prior to the Interest Commencement Date and the Appreciated Value for which is compounded periodically on the specified dates prior to the Interest Commencement Date for such Bonds, all as provided in the resolution authorizing such Bonds.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Credit Facility" shall mean an irrevocable letter of credit, policy of municipal bond insurance, guaranty, purchase agreement, credit agreement or similar facility in which the person providing such facility irrevocably agrees to provide funds to make payment of the principal of and premium, if any and interest on Bonds to which such Credit Facility relates.

"Debt Service Component" shall mean indebtedness incurred by the Authority which complies with the tests for the issuance of additional series of Bonds in the Trust Agreement and which is payable from moneys withdrawn from the Puerto Rico Infrastructure Fund on a pro rata basis with the deposits required to be made to the credit of the Bond Service Account and Redemption Account of the Sinking Fund under the Trust Agreement.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended at the option of the holders of the Bonds or the Authority.

"Fiscal Year" shall mean the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve consecutive month period designated by the Board.

"Government Obligations" shall mean (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) qualifying evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clause (i) above; (iii) municipal obligations whose payment is irrevocably secured by non-callable and non-prepayable obligations described in clause (i) or (ii) above deposited in an escrow account irrevocably pledged to the payment of such municipal obligations; and (iv) qualifying evidences of ownership of proportionate interests in fixture interest or principal payments on obligations specified in clause (in) above.

"Interest Commencement Date" shall mean, with respect to any Capital Appreciation and Income Bond, the specified date after which interest accruing on such Bond shall be payable periodically, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" shall mean any Bonds issued on an interim basis that are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" shall mean any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)     Government Obligations;

(ii)    obligations issued or guaranteed by an agency of the United States of America or person controlled by or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by Congress, whether now existing or hereafter organized, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, Farm Credit System, Student Loan Marketing Association and Federal National Mortgage Association and qualifying evidences of ownership of proportionate interests in future interest or principal payments in obligations specified in this clause (ii);

(iii)   bankers acceptances, certificates of deposit or time deposits of any bank (including the Trustee), trust company or savings and loan association (including any investment in pools of such obligations), which

I-2

to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a depository institution having, on the date of investment, a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by obligations described in clauses (i) or (ii) above held free and clear of claims by third parties, having a market value at least equal to the principal amount of such bankers acceptances, certificates of deposit or time deposits (or portion thereof not so insured), provided that the Trustee has a perfected security interest in the collateral;

(iv)    obligations issued by any state or territory of the United States of America or any political subdivision or instrumentality thereof, which are rated on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto;

(v)    any repurchase, reverse repurchase or investment agreement with any bank (including the Trustee) or trust company, insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any of the obligations described in (i) or (ii) above, provided that the Trustee has a perfected security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vi)    commercial paper rated, or backed by a letter of credit or line of credit rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto; and

(vii)    any other obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's Investors Service, Inc. or any successors thereto and Standard & Poor's Corporation or any successors thereto.

"Liquidity Facility" shall mean a letter of credit, policy of municipal bond insurance, guaranty, purchase agreement or similar facility in which the person providing such facility agrees to provide funds to pay the purchase price of Put Bonds upon their tender by the holders of Put Bonds.

"Federal Excise Taxes" shall mean the federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the Code and other provisions of law.

"Outstanding" when used with reference to the Bonds shall mean, as of any date of determination, all Bonds authenticated and delivered except:

(i)    Bonds cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)    Bonds that are deemed paid and no longer Outstanding under the Trust Agreement;

(iii)    Destroyed, mutilated, stolen or lost Bonds in lieu of which other Bonds have been issued pursuant to the provisions of the Trust Agreement, unless evidence satisfactory to the Trustee has been received that any such Bond is held by a bona fide purchaser; and

(iv)    for purposes of any consent or other action to be taken under the Trust Agreement by the holders of a specified percentage of principal amount of Bonds, Bonds held by or for the account of the Authority.

"Pledged Revenues" shall mean the Special Tax Revenues and any other moneys that have been deposited to the credit of the Sinking Fund.

I-3

"Principal and Interest Requirements" for any Fiscal Year, as applied to the Bonds of any series, shall mean the sum of:

(i)    the amount required to pay the interest on all Bonds of such series then Outstanding that is payable on each interest payment date in such Fiscal Year,

(ii)    the amount required to pay the principal of all serial Bonds of such series then Outstanding that is payable upon the maturity of such serial Bonds in such Fiscal Year, and

(iii)    the Amortization Requirement for the Outstanding term Bonds of such series for such Fiscal Year.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of this definition as if occurring on the last day of the preceding Fiscal Year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements:

(a)    The interest on Variable Rate Bonds shall be the interest to accrue on such Variable Rate Bonds for such Fiscal Year; provided, however, that (1) for purposes of determining the maximum Principal and Interest Requirements under the projected tests for the issuance of additional series of Bonds, the interest on Variable Rate Bonds shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been Outstanding, and (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and if a series of Variable Rate Bonds had not been Outstanding prior to the date of computation, the test set forth in clause (A) above shall be calculated as though said Variable Rate Bonds had been Outstanding for the twelve-month period by using the average interest rate for comparable securities for such period as certified by an underwriting or investment banking firm experienced in marketing such securities;

(b)    In the case of Put Bonds, the "put" date shall be ignored if a source for payment of said "put" is a Credit Facility or a Liquidity Facility, and the stated Fiscal Years for Amortization Requirements and dates for principal payments shall be used, and in the case of Bonds secured by a Credit Facility or a Liquidity Facility, the repayment terms of each Credit Facility or Liquidity Facility shall be ignored, unless the issuer of the Credit Facility or the Liquidity Facility has advanced funds thereunder and such amount has not been repaid, in which case the repayment obligation shall be used rather than the stated terms of the Bonds, if the repayment obligation is secured on a parity with Bonds;

(c)    In the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such staled maturity date has been extended;

(d)    In the case of Capital Appreciation Bonds, the principal and interest portions of the Accreted Value payable in any year shall be included in the year in which said payment is due;

(e)    In the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value shall be included in the year in which said principal and interest portions are due;

(f)    In the case of Balloon Bonds or Interim Bonds, the debt service requirements may be excluded and instead such Bonds may be treated as debt securities having a comparable federal tax status as such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years (as determined in the certificate described below), bearing a fixed interest rate equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds rated by Moody's Investors Services, Inc. or any successors thereto or Standard

I-4

& Poor's Corporation or any successors thereto comparably to that of the Authority, all as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g)     If all or a portion of a series of Bonds is payable from funds irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations, such principal or interest shall not be included in determining Principal and Interest Requirements.

The Principal and Interest Requirements for any Fiscal Year, as applied to Debt Service Components, shall mean the payments due and payable for such Fiscal Year and to the extent applicable, shall be determined in accordance with the foregoing rules.

"Put Bonds" shall mean Bonds that by their terms may be tendered at the option of the holder thereof for payment prior to maturity.

"Qualified Depositary or Depositories" shall mean one or more banks or trust companies designated or permitted to be designated by the Secretary of the Treasury of the Commonwealth as a depository for public funds, which institutions have been designated as depositories of the Authority by resolution.

"Special Tax Revenues" shall mean the Federal Excise Taxes deposited to the credit of the Puerto Rico Infrastructure Fund pursuant to the Act.

"Variable Rate Bonds" shall mean Bonds issued with an interest rate that is not fixed in percentage at the date of issue for the term thereof.

## Puerto Rico Infrastructure Fund

The Authority shall maintain with a Qualified Depositary the Puerto Rico Infrastructure Fund. The Authority shall not pledge or create any liens upon any moneys in the Puerto Rico Infrastructure Fund. All moneys deposited to the credit of the Puerto Rico Infrastructure Fund will be applied for the purposes and in the order set forth in the Trust Agreement.

## Sinking Fund and Accounts

A special fund is created under the Trust Agreement and designated the "Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund" (the "Sinking Fund") to be held by the Trustee. Two separate accounts are created in the Sinking Fund and designated "Bond Service Account" and "Redemption Account." Subject to the terms and conditions set forth in the Trust Agreement, moneys held to the credit of the Sinking Fund shall be held in trust and disbursed by the Trustee for the purposes set forth below.

As promptly as practicable upon the receipt of Special Tax Revenues or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund, the Authority shall withdraw an amount of such Special Tax Revenues and other moneys sufficient to make the following deposits in the following order:

(a)     to the Bond Service Account, the amount required to make the total amount then in the Bond Service Account equal to the sum of (i) the amount of interest then or to become within the current Fiscal Year due and payable on the Bonds of each series then Outstanding and (ii) the amount of principal of the Bonds of each series then or to become within the current Fiscal Year due and payable; and

(b)     to the Redemption Account, the amount required to make the total amount deposited in the then current Fiscal Year in the Redemption Account equal to the Amortization Requirement for such Fiscal Year for the term Bonds of each series then Outstanding plus the premium, if any, payable on such Bonds if such Bonds were to be redeemed in such Fiscal Year from moneys held in the Sinking Fund.

If an interest payment date or a principal payment date for any series of Bonds is the first day of a Fiscal Year, such payment date shall be included for purposes of the above deposits as if occurring on the last day of the preceding Fiscal Year.

If the Authority has incurred Debt Service Components, the Authority may withdraw moneys from the Puerto Rico Infrastructure Fund on a pro rata basis to make the deposits required in clauses (a) and (b) above and the deposits required to be made to the credit of comparable accounts established for the Debt Service Components. Notwithstanding the foregoing order of priorities, the Authority shall withdraw moneys from the Puerto Rico Infrastructure Fund to make any payment or deposit necessary to satisfy the then current arbitrage rebate requirements under the Code for Bonds and Debt Service Components.

After making the foregoing required applications and subject to the Authority's obligation to repay issuers of any Credit Facility any amounts owed to them, the Authority may apply any balance remaining to the credit of the Puerto Rico Infrastructure Fund for any lawful purpose.

### Withdrawals from Bond Service Account

The Trustee shall on each date for the payment of principal of or interest on Bonds, withdraw from the Bond Service Account and (1) remit by mail (or by wire transfer if so provided by resolution of the Board) to each holder of Bonds the amounts required for paying interest upon such Bonds as such interest becomes due and (2) set aside sufficient moneys for paying the principal of Bonds as such principal becomes due.

### Withdrawals from Redemption Account

Moneys held for the credit of the Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     subject to the provisions of paragraph (c) below, by purchase at a price not to exceed the principal of such Bonds plus the amount of the premium, if any, that would be payable on the next redemption date to the holders of such Bonds if such Bonds or portions of Bonds should be called for redemption on such date from the moneys in the Redemption Account.  No such purchase shall be made by the Trustee within the period of forty-five (45) days immediately preceding the date on which such Bonds are subject to call for redemption in part except from moneys other than the moneys set aside or deposited for the redemption of Bonds; or

(b)     subject to the provisions of paragraph (C) below, by redemption pursuant to the redemption provisions of the Trust Agreement from moneys in the Redemption Account such amount of Bonds or portions of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the moneys then in the Redemption Account as nearly as may be; provided, however, that not less than One Hundred Thousand Dollars ($100,000) principal amount of Bonds shall be called for redemption at any one time.

(c)     Moneys in the Redemption Account shall be applied by the Trustee in each Fiscal Year to the retirement of Bonds of each series then Outstanding in the following order:

*first,* the term Bonds of each such series to the extent of the related Amortization Requirement, if any, for such Fiscal Year, plus the applicable premium, if any, and, if the amount available in such Fiscal Year shall not be equal thereto, then in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding plus the applicable premium, if any;

*second*, any balance then remaining shall be applied to the purchase in accordance with paragraph (a) above of any Outstanding term Bonds whether or not they are then subject to redemption;

I-6

*third*, any balance then remaining shall be applied to the redemption of the term Bonds of each such series in proportion to the Amortization Requirement, if any, for such Fiscal Year for the term Bonds of each such series then Outstanding, plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of each such series originally issued under the provisions of the Trust Agreement.

**Additional and Refunding Bonds**

Bonds may be issued and secured by the Trust Agreement, subject to certain conditions, for any lawful purpose of the Authority, including paying any costs of issuance of such Bonds.

Among such conditions are the delivery to the Trustee of

(a)     a certificate of the Secretary of the Treasury of the Commonwealth setting forth:

(i)   the amount of the average annual Federal Excise Taxes for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have changed the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years;

(ii)  the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of the Bonds then Outstanding, the Debt Service Components then Outstanding and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 200%; and

(b)     a certificate of the Executive Director of the Authority setting forth:

(i)   the amount of the average annual Special Tax Revenues and other moneys deposited to the credit of the Puerto Rico Infrastructure Fund for the two (2) full Fiscal Years preceding the date of issuance of such Bonds, adjusted to give effect to legislation enacted on or prior to the date of original issuance of such Bonds that would have increased the foregoing amount if such legislation had been in effect throughout such two (2) full Fiscal Years and that required such increased amount, if received from the federal government, to be deposited to the credit of the Puerto Rico Infrastructure Fund until the Bonds theretofore issued and the Bonds to be issued are no longer Outstanding;

(ii)  the amount of the maximum aggregate Principal and Interest Requirements for any Fiscal Year on account of Bonds then Outstanding, Debt Service Components then Outstanding, and the Bonds to be issued; and

(iii) the percentage derived by dividing the amount in item (i) above by the amount in item (ii) above, which percentage shall not be less than 100%.

The above certificates need not be delivered for the issuance of refunding Bonds if the Executive Director of the Authority certifies that (i) the Principal and Interest Requirements on account of all Bonds and Debt Service Components Outstanding for each applicable Fiscal Year following the issuance of such refunding Bonds are equal to or less than the Principal and Interest Requirements for each such Fiscal Year on account of all Bonds and Debt Service Components Outstanding immediately prior to such issuance of refunding Bonds; or (ii) the maximum aggregate Principal and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding after the issuance of such refunding Bonds shall be equal to or less than the maximum aggregate Principal

I-7

and Interest Requirements for any Fiscal Year thereafter on account of all Bonds and Debt Service Components Outstanding prior to the issuance of such refunding Bonds.

**Investment of Moneys**

Moneys in the Bond Service Account and the Redemption Account shall, to the extent possible, be continuously invested at the written direction of the Authority, in Government Obligations that shall mature, or that shall be subject to redemption at the option of the holder thereof, not later than the respective dates when moneys held for the credit of said accounts will be required for the purposes intended.

Any investment earnings and profit or loss realized on the sale or maturity of such Obligations shall be credited or debited to the holding fund or account. If the required deposit to any account in the Sinking Fund has been made for the current Fiscal Year, investment earnings on moneys in such account shall be deposited to any other account of the Sinking Fund for which a required deposit has not been made, in the order provided above (see "Sinking Fund and Accounts"), and thereafter shall be credited to the Puerto Rico Infrastructure Fund.

**No Impairment**

So long as any of the Bonds shall be Outstanding, none of the Pledged Revenues will be used for any purpose other than as provided in the Trust Agreement, and no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the holders to such Pledged Revenues might be impaired or diminished.

**Inclusion of Shortfall in Budget; Request for Advances**

If the amount of projected Special Tax Revenues in any fiscal year of the Commonwealth is less than the maximum amount required to be so deposited under the Act, the Authority shall request the Director of the Office of Budget and Management of the Commonwealth to include in the budget the necessary appropriations to cover such deficiency. If in any fiscal year the amount of Special Tax Revenues deposited to the credit of the Infrastructure Fund are insufficient to permit the Authority to make the required deposits into the Sinking Fund, the Authority shall immediately notify the Secretary of the Treasury of the amount of such insufficiency and shall request said Secretary to make in accordance with the Act one or more advances to the Authority aggregating the amount of such insufficiency from and to the extent of any available funds under the control of said Secretary. The Authority shall deposit all such advances as and if received to the credit of the appropriate accounts in the Sinking Fund.

**Enforcement of Remedies**

There are no events of default under the Trust Agreement and the principal of the Bonds Outstanding is not subject to acceleration. At the request of the holders of not less than twenty percent (20%) of the aggregate principal amount of Bonds then Outstanding, the Trustee shall proceed to protect and enforce its rights and the rights of the holders under the laws of the Commonwealth or under the Trust Agreement.

**Supplemental Agreements Without Bondholder's Consent**

The Authority and the Trustee may from time to time and at any time, enter into agreements supplemental to the Trust Agreement, as shall not be inconsistent with the terms and provisions thereof, for the following purposes, among others:

(a)  to cure any ambiguity or formal defect or omission in the Trust Agreement or to correct or supplement any provision contained therein that may be defective or inconsistent with any other provisions contained therein; or

(b)  to grant to or confer upon the Trustee for the benefit of the Bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the Bondholders or the Trustee; or

(c) to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Trust Agreement, other conditions, limitations and restrictions thereafter to be observed; or

(d) to add to the covenants and agreements of the Authority in the Trust Agreement other covenants and agreements thereafter to be observed by the Authority or to surrender any right or power therein reserved to or conferred upon the Authority, or

(e) to qualify the Bonds or any of the Bonds for registration under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, to qualify the Trust Agreement as an "indenture" under the Trust Indenture Act of 1939, as amended; or

(f) to make such changes as may be necessary to adjust the terms of the Trust Agreement so as to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other Bonds as may be marketable from time to time; or

(g) to make such changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any series of Bonds.

**Modification with Consent of Holders of Majority of Bonds**

All other modifications to the Trust Agreement may be made only upon obtaining the consent and approval of the holders of not less than a majority in aggregate principal amount of the Bonds at the time Outstanding (or in case less than all of several series of Bonds then Outstanding are affected by the proposed supplemental agreement, the holders of not less than a majority in principal amount of the Bonds of each series so affected and Outstanding at the time the consent is given). Nothing contained in the Trust Agreement shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds Outstanding (a) an extension of the maturity of any Bond issued under the Trust Agreement (other than as provided by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (d) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental agreement. In lieu of the holders of Bonds secured by a Credit Facility or a Liquidity Facility, the provider thereof shall be viewed as the holder of such Bonds for purposes of consents to modifications.

**Defeasance**

If all the Outstanding Bonds shall have been paid or deemed to have been paid as provided below and all amounts due and owing to any provider of a Credit Facility or a Liquidity Facility shall have been paid, then and in that case the right, title and interest of the Trustee under the Trust Agreement shall cease, terminate and become void, and such Bonds shall cease to be entitled to any benefit or security under the Trust Agreement. In such event, the Trustee shall transfer and assign to the Authority all property then held by the Trustee, shall execute such documents as may be reasonably required by the Authority to evidence such transfer and assignment and shall turn over to the Authority any surplus in any account in the Sinking Fund.

Any Outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Trust Agreement when the whole amount of the principal of and interest on such Bond shall have been paid or when (a) there shall have been deposited with the Trustee or another fiduciary institution acting as escrow agent for the holder of such Bond either moneys in an amount which shall be sufficient, or sufficient Government Obligations or obligations issued by the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Federal Home Loan Banks or Student Loan Marketing Association, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (b) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the Trustee irrevocable instructions to give, as soon as practicable, a notice to the holder

of such Bond by first-class mail, postage prepaid, stating that the deposit of moneys or sufficient Government Obligations or other obligations mentioned in clause (a) of this paragraph has been made for the holder of such Bond and that such Bond is deemed to have been paid in accordance with the Trust Agreement and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

(With Independent Auditors' Report Thereon)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

**Table of Contents**

|  | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Management's Discussion and Analysis | 3 |
| Basic Financial Statements: | |
| Statement of Net Assets – Governmental Activities | 10 |
| Statement of Activities | 11 |
| Balance Sheet – Governmental Funds | 12 |
| Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds | 13 |
| Reconciliation of the Statement of Revenues, Expenditures and Changes in Fund Balances of Governmental Funds to the Statement of Activities and Governmental Funds | 14 |
| Notes to Basic Financial Statements | 15 |
| **Schedule** | |
| Schedule of Special Obligation Bonds 2000 Series A and B | 30 |

**Independent Auditors' Report**

The Board of Directors
Puerto Rico Infrastructure Financing Authority:

We have audited the accompanying financial statements of the governmental activities and each major fund of Puerto Rico Infrastructure Financing Authority (the Authority) (a component unit of the Commonwealth of Puerto Rico) as of and for the year ended June 30, 2004, which collectively comprise the Authority's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Authority's management. Our responsibility is to express opinions on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinions.

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities and each major fund of Puerto Rico Infrastructure Financing Authority as of June 30, 2004, and the respective changes in financial position thereof for the year then ended in conformity with accounting principles generally accepted in the United States of America.

The management's discussion and analysis on pages 3 through 9 is not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming opinions on the financial statements that collectively comprise the Authority's basic financial statements. The supplementary information included in this Schedule of Special Obligation Bonds 2000 Series A and B is presented for purposes of additional analysis and is not a required part of the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

KPMG LLP

February 11, 2005

Stamp No. 1988685 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

This Management's Discussion and Analysis (MD&A) of Puerto Rico Infrastructure Financing Authority (the Authority) is designed to (a) assist the reader in focusing on significant financial issues, (b) provide an overview of the Authority's financial activity, (c) identify changes in the Authority's financial position, and (d) identify individual issues or concerns.

Since the MD&A is designed to focus on the current year's activities, resulting changes, and currently known facts, please read it in conjunction with the Authority's financial statements, which follow this section.

**Financial Highlights**

- The Authority's net assets decreased by $255 million or 34% to $504 million as of June 30, 2004.

- The Authority's net change from governmental activities decreased by $437 million, from an increase of $182 million in 2003 to a decrease of $(255) million in 2004, of which $340 million is related to the net decrease in fair value of investments in the Permanent Fund, from a $183 million increase in 2003 to $(157) million decrease in 2004.

- The General Fund (the primary operating fund) and the Capital Projects Fund reflected on a modified-accrual basis, report an increase in fund balance of $20 million and a decrease of $192 million, respectively.

**Overview of the Financial Statements**

The financial statements consist of two parts—management's discussion and analysis (this section) and the basic financial statements, including the notes to the basic financial statements. The basic financial statements include two kinds of statements that present different views of the Authority:

- The first two statements are government-wide financial statements that provide information about the Authority's overall financial position and results. These statements, which are presented on an accrual basis, consist of the statement of net assets and the statement of activities.

- The remaining statements are fund financial statements of the Authority's four major governmental funds (general, capital projects, debt service, and permanent), for which activities are funded primarily from Commonwealth of Puerto Rico appropriations and investment income for which the Authority follows a modified-accrual basis of accounting.

- The basic financial statements also include a section of notes to basic financial statements that explains some of the information in the government-wide and fund financial statements and provides more detailed data.

- The notes to the basic financial statements are followed by a supplementary Schedule of the Special Obligation Bonds 2000 Series A and B.

The remainder of this overview section of the management's discussion and analysis explains the structure and contents of each of these statements.

The government-wide financial statements report information about the Authority as a whole using accounting methods similar to those used by private sector companies. The statement of net assets includes all of the

3                                                                                        (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

Authority's assets and liabilities. All the current year's revenues and expenses are accounted for in the statement of activities regardless of when cash is received or paid.

The fund financial statements provide more detailed information about the Authority's major funds and not the Authority as a whole. All the Authority's funds are governmental funds. These funds' statements focus on how cash and other financial assets flowing into the funds have been used.

**Financial Analysis of the Authority as a Whole (Government-wide Financial Statements Analysis)**

The government-wide financial statements were designed so that the user could determine if the Authority is in a better or worse financial condition from the prior year.

The following is a condensed summary of net assets for the Authority compared to the prior year:

|  | June 30 | | Increase |
|  | 2004 | 2003 | (decrease) |
|---|---|---|---|
| Current and other assets | $ 1,770,213,347 | 2,128,266,816 | (358,053,469) |
| Capital assets | 837,486,012 | 774,278,462 | 63,207,550 |
| Total assets | 2,607,699,359 | 2,902,545,278 | (294,845,919) |
| Other liabilities | 145,861,121 | 157,880,222 | (12,019,101) |
| Noncurrent liabilities | 1,957,974,402 | 1,985,317,765 | (27,343,363) |
| Total liabilities | 2,103,835,523 | 2,143,197,987 | (39,362,464) |
| Net assets: | | | |
| Invested in capital assets, net of debt | 115,268,280 | 214,553,334 | (99,285,054) |
| Restricted | 1,289,418,616 | 1,457,344,891 | (167,926,275) |
| Unrestricted | (900,823,060) | (912,550,934) | 11,727,874 |
| Total net assets | $ 503,863,836 | 759,347,291 | (255,483,455) |

As can be seen from the table above, the Authority's total net assets as of June 30, 2004 decreased by $255 million or 34% when compared to total net assets as of June 30, 2003. The assets decreased by $295 million or 10.2% compared to the prior year. This decrease resulted mostly from the net decrease in fair value of investments of $157 million and capital project transfers to the Puerto Rico Aqueduct and Sewer Authority (PRASA), another component unit of the Commonwealth of Puerto Rico (the Commonwealth), of $97 million.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

For the year ended June 30, 2004, the net increase of $63,207,550 in capital assets is mostly affected by a net change in construction in progress of $63,312,412, which was the result of the following construction works:

| | | |
|---|---|---:|
| Port of the Americas | $ | 5,412,720 |
| Education | | 238,037 |
| Water and Sewer Projects | | 160,170,262 |
| Less: | | |
| Projects transferred to PRASA | | (96,932,515) |
| Abandoned projects | | (5,576,092) |
| Change in construction work in progress | $ | 63,312,412 |

The total liabilities of the Authority decreased by $39 million or 2%. Such net decrease is mainly related to an increase in accounts payable and accrued expenses of $14 million, a decrease in due to PRASA of $22 million, and a decrease in long-term liabilities of $27 million, which is mainly related to the payment of maturing bonds and notes of $26 million.

The following schedule compares revenues and expenses of the Authority for the years ended June 30, 2004 and 2003.

| | Year ended June 30 | | Increase |
|---|---|---|---|
| | **2004** | **2003** | **(decrease)** |
| Revenues: | | | |
| Program revenues: | | | |
| Operating grants and contributions, and earnings (loss) on investments | $ (887,519) | 363,929,203 | (364,816,722) |
| General revenue: | | | |
| Contribution not restricted to specific programs | 4,000,000 | 4,000,000 | — |
| Investment income | 10,202 | 20,332 | (10,130) |
| Total revenue | 3,122,683 | 367,949,535 | (364,826,852) |
| Expenses: | | | |
| Program activities: | | | |
| General government | 1,637,599 | 2,769,226 | (1,131,627) |
| Aqueduct and sewer | 254,417,272 | 177,498,742 | 76,918,530 |
| Compliance, Section 301(h) | 781,570 | 4,753,260 | (3,971,690) |
| Revolving fund | 748,836 | 1,038,711 | (289,875) |
| Other | 1,020,861 | — | 1,020,861 |
| Total expenses | 258,606,138 | 186,059,939 | 72,546,199 |
| Change in net assets | $ (255,483,455) | 181,889,596 | (437,373,051) |

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

Operating grants and contributions and earnings (loss) on investments from governmental activities decreased by $365 million resulting from a net decrease of $340 million in the net change in fair value of investments, a decrease of $12 million in interest income from investments and interest-bearing demand deposits, a decrease of $18 million in contributions from PRASA, and an increase of $6.5 million in contributions from the Commonwealth.

*Expenses*

Net increase in expenses of $73 million includes a reduction of $1 million in the general government program mostly due to the termination of PRASA's contract administration, now becoming the responsibility of PRASA's executive office, and the termination of the tasks corresponding to the evaluation committee for the new PRASA administration contract. The increase of $77 million in the aqueduct and sewer program is mostly related to the transfers of water and sewer projects and contributions made to PRASA, as well as an increase in contributions made to the "Agua Para Todos" program. The reduction of $4 million in the environmental program [Compliance, Section 301 (h)] is due to the fact that PRASA absorbed most of these expenditures during fiscal year 2004.

During fiscal year 2003-2004, the Authority signed various assistance programs with other governmental entities including the Department of Transportation and Public Works, Department of Natural Resources, Puerto Rico Highway Authority, and Department of Education, among others. The Authority made contributions of $1,020,861 for the year ended June 30, 2004.

**Governmental Funds Financial Analysis**

Governmental funds are comprised of the General, Capital Projects, Debt Service, and Permanent Funds. Governmental funds use the current financial resources measurement focus that concentrates on near-term inflows and outflows. The General Fund is the general operating fund that is used to account for all financial resources, except those required to be accounted for in another fund. The following are facts and changes from the prior year:

*(a)*   *General Fund*

The General Fund expenditures decreased by $6 million from 2003 resulting from the termination of PRASA's contract administration and reduction in Section 301(h) expenses (environmental) and State Revolving Fund expenses due to the fact that PRASA and the Department of Health, respectively, absorbed most of these expenses during 2004. Also, a contribution from PRASA of $18 million was recorded as revenue in 2004 (presented as deferred revenue in 2003).

*(b)*   *Capital Projects Fund*

The Capital Projects Fund expenditures increased by $32 million mostly from a result of an increase of $11 million in capital outlays for water and sewer projects, an increase of $1 million in capital outlays for the Port of the Americas, and an increase of $20 million in contributions made to PRASA including the "Agua Para Todos" program. Also, revenue decreased by $6 million as a result of a $6 million increase in contributions from the Commonwealth and a $12 million decrease in investment income.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

    (c)    ***Debt Service Fund***

No major changes were observed in the Debt Service Fund during the fiscal year ended June 30, 2004.

    (d)    ***Permanent Fund***

The Permanent Fund earnings on investments decreased by $340 million due to a decrease in the net change in fair value of investments.

**Capital Assets and Debt Administration**

*Capital Assets*

Nondepreciable capital assets include construction work in process. Depreciable assets include furniture and equipment, vehicles, and leasehold improvements.

The following is a schedule of the Authority's capital assets as of June 30, 2004 and 2003:

|  | June 30 | | Increase |
|  | 2004 | 2003 | (decrease) |
|---|---|---|---|
| Construction in progress | $ 837,296,416 | 773,984,004 | 63,312,412 |
| Vehicles, furniture, and equipment | 667,948 | 597,401 | 70,547 |
| Leasehold improvements | 620,847 | 620,847 | — |
| Total assets | 838,585,211 | 775,202,252 | 63,382,959 |
| Accumulated depreciation | (1,099,199) | (923,790) | (175,409) |
| Total | $ 837,486,012 | 774,278,462 | 63,207,550 |

The Authority was created, among other things, to provide financial, administrative, and other assistance to municipalities, political subdivisions, public corporations, and instrumentalities of the Commonwealth to enable them to fulfill their public purpose of providing, preserving, operating, maintaining, repairing, replacing, and improving portions of the infrastructure. Infrastructure includes, among other things, water supply systems, and waste water treatment and disposal systems.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis

June 30, 2004

This year's major additions related to construction projects are as follows:

| Description | Location | Additions |
|---|---|---|
| Regional aqueduct | Fajardo | $ 30,136,676 |
| Regional aqueduct | North East | 18,823,557 |
| Cerrillos dam | Ponce | 11,621,812 |
| Transmission System | Juncos | 10,851,388 |
| Pump station and transmission line | Carolina | 10,599,084 |
| Regional aqueduct | Villalba | 8,643,886 |
| Interconnections | North Coast | 7,490,012 |
| Regional aqueduct | Fajardo | 7,431,275 |
| Rehabilitation of Incinerator (Puerto Nuevo) | San Juan | 5,793,594 |
| El Paraiso water distribution system | Ponce | 3,711,318 |
| Distribution System – Miramar | San Juan | 3,483,760 |
| Regional Sewer | Dorado | 3,426,472 |
| Rehabilitation Water Treatment Plant | Juncos | 2,547,540 |
| Sabana Eneas Sewer System | San Germán | 1,755,192 |
| | | $ 126,315,566 |

*Debt Outstanding*

At June 30, 2004, the Authority had approximately $2 billion in debt (bonds and notes) outstanding. The following is a schedule of outstanding bonds and notes as of June 30, 2004 and 2003:

| | June 30 | | Increase |
|---|---|---|---|
| | 2004 | 2003 | (decrease) |
| Bonds payable | $ 1,994,355,000 | 2,018,935,000 | (24,580,000) |
| Less bond discount and premium | 33,677,211 | 34,043,650 | (366,439) |
| Total bonds payable | 1,960,677,789 | 1,984,891,350 | (24,213,561) |
| Notes payable | 19,298,697 | 20,130,816 | (832,119) |
| Total bonds and notes payable | $ 1,979,976,486 | 2,005,022,166 | (25,045,680) |

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements, Required Supplementary Information,
and Supplementary Information

June 30, 2004

The following is a schedule of ratings for obligation debt:

|  | Moody's | Standard & Poor's |
|---|---|---|
| Special Tax Revenue Bonds, Series 1988A | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1997A | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1997B | Baa1 | BBB+ |
| Special Tax Revenue Bonds, Series 1998A | Baa1 | BBB+ |
| Special Obligation Bonds Series 2000A | Aaa | AAA |
| Special Obligation Bonds Series 2000B | Aaa | AAA |

Additional information on the Authority's long-term obligations can be found in note 6 to the basic financial statements.

**Financial Contact**

The Authority's financial statements are designed to present users with a general overview of the Authority's finances and to demonstrate accountability. If you have questions about the report or need additional financial information, contact Puerto Rico Infrastructure Financing Authority, Capital Center (Tower 2), 235 Ave. Arterial Hostos, Suite 1601, San Juan, PR 00918-1433.

## PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
### (A Component Unit of the Commonwealth of Puerto Rico)

Statement of Net Assets – Governmental Activities

June 30, 2004

| | |
|---|---:|
| **Assets:** | |
| Cash and cash equivalents and interest-bearing demand deposits | $ 133,244,048 |
| Investments and investment contracts | 324,958,500 |
| Accrued interest receivable, including $17,229,190 on nonexpendable restricted assets | 20,016,923 |
| Due from Puerto Rico Aqueduct and Sewer Authority | 370,492 |
| Prepaid expenses | 1,419,035 |
| Bond issue costs | 19,276,770 |
| Other assets | 650,572 |
| Assets held in trust | 1,270,277,007 |
| Capital assets: | |
| Nondepreciable – construction in progress | 837,296,416 |
| Depreciable, net | 189,596 |
| Total assets | 2,607,699,359 |
| **Liabilities:** | |
| Accounts payable and accrued expenses | 77,877,774 |
| Deferred revenue | 920,000 |
| Accrued interest payable | 38,799,697 |
| Long-term liabilities: | |
| Due in one year | 28,263,650 |
| Due in more than one year | 1,957,974,402 |
| Total liabilities | 2,103,835,523 |
| **Net assets:** | |
| Invested in depreciable capital assets, net of related debt | 115,268,280 |
| Restricted for: | |
| Capital projects | — |
| Debt service | 19,961,572 |
| Trust – nonexpendable | 1,287,506,196 |
| Other purposes | 13,181,416 |
| Unrestricted | (932,053,628) |
| Total net assets | $ 503,863,836 |

See accompanying notes to basic financial statements.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Activities

Year ended June 30, 2004

| Functions/programs: | | Expenses | Operating grants and contributions | Net loss on investments | Net (expenses) revenues and change in net assets governmental activities |
|---|---|---|---|---|---|
| Governmental activities: | | | | | |
| General government | $ | 1,637,599 | — | — | (1,637,599) |
| Aqueduct and sewer (including interest on long-term debt of $103,908,748) | | 254,417,272 | 72,558,319 | (77,201,992) | (259,060,945) |
| Port | | — | 3,700,000 | | 3,700,000 |
| Compliance, Section 301(h) | | 781,570 | — | — | (781,570) |
| Revolving Fund | | 748,836 | — | 56,154 | (692,682) |
| Other | | 1,020,861 | — | — | (1,020,861) |
| Total government activities | $ | 258,606,138 | 76,258,319 | (77,145,838) | (259,493,657) |
| General revenues: | | | | | |
| Contribution not restricted to specific programs | | | | $ | 4,000,000 |
| Investment income | | | | | 10,202 |
| Total general revenues | | | | | 4,010,202 |
| Change in net assets | | | | | (255,483,455) |
| Net assets, beginning of year | | | | | 759,347,291 |
| Net assets, end of year | | | | $ | 503,863,836 |

See accompanying notes to basic financial statements.

11

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Balance Sheet – Governmental Funds

June 30, 2004

| Assets | | General | Capital projects | Debt service | Permanent | Total governmental funds |
|---|---|---|---|---|---|---|
| Cash and cash equivalents and interest-bearing demand deposits | $ | 13,855,857 | 60,652,188 | 58,736,003 | — | 133,244,048 |
| Investments and investment contracts | | — | 324,958,500 | — | 1,270,277,007 | 1,595,235,507 |
| Interest receivable | | 4,213 | 2,758,255 | 25,265 | 17,229,190 | 20,016,923 |
| Due from Puerto Rico Aqueduct and Sewer Authority | | 370,492 | — | — | — | 370,492 |
| Other assets | | 650,572 | — | — | — | 650,572 |
| Total assets | $ | 14,881,134 | 388,368,943 | 58,761,268 | 1,287,506,197 | 1,749,517,542 |
| **Liabilities and Fund Balances** | | | | | | |
| Liabilities: | | | | | | |
| Accounts payable and accrued expenses | $ | 2,081,829 | 75,795,945 | — | — | 77,877,774 |
| Deferred revenue | | 920,000 | — | — | — | 920,000 |
| Total liabilities | | 3,001,829 | 75,795,945 | — | — | 78,797,774 |
| Fund balances: | | | | | | |
| Reserved for: | | | | | | |
| Capital projects | | — | 312,572,998 | — | — | 312,572,998 |
| Debt service | | — | — | 58,761,268 | — | 58,761,268 |
| Trust | | — | — | — | 1,287,506,197 | 1,287,506,197 |
| Other purposes | | 13,181,416 | — | — | — | 13,181,416 |
| Unreserved – general fund | | (1,302,111) | — | — | — | (1,302,111) |
| Total fund balances | | 11,879,305 | 312,572,998 | 58,761,268 | 1,287,506,197 | 1,670,719,768 |
| Total liabilities and fund balances | $ | 14,881,134 | 388,368,943 | 58,761,268 | 1,287,506,197 | |

| | | |
|---|---|---|
| Amounts reported for governmental activities in the statement of net assets are different because: | | |
| Capital assets used in governmental activities are not financial resources and, therefore, are not reported in the funds | | 837,486,012 |
| Prepaids and bonds issuance costs are not available to pay for current period expenditures and, therefore, are not deferred in the funds | | 20,695,805 |
| Liabilities, including bonds payable and notes payable, accrued interest payable, and other liabilities are not due and payable in the current period and, therefore, are not reported in the funds | | (2,025,037,749) |
| Net assets of governmental activities | $ | 503,863,836 |

See accompanying notes to basic financial statements.

PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
(A Component Unit of the Commonwealth of Puerto Rico)

Statement of Revenues, Expenditures, and Changes in Fund Balances – Governmental Funds

Year ended June 30, 2004

| | General | Capital projects | Debt service | Permanent | Total governmental funds |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| Interest and investment income: | | | | | |
| Interest-bearing demand deposits | $ 66,355 | 295,329 | — | — | 361,684 |
| Investments and investment contracts, net | — | 10,528,125 | 226,910 | 68,966,012 | 79,721,047 |
| Net decrease in fair value of investments | — | — | — | (157,202,624) | (157,202,624) |
| Contribution from the Commonwealth of Puerto Rico | 70,000,000 | 10,258,319 | — | — | 80,258,319 |
| Contribution from the Puerto Rico Aqueduct and Sewer Authority | 18,000,000 | — | — | — | 18,000,000 |
| Total revenues | 88,066,355 | 21,081,773 | 226,910 | (88,236,612) | 21,138,426 |
| Expenditures: | | | | | |
| Current: | | | | | |
| General government | 302,924 | 928,579 | — | — | 1,231,503 |
| Aqueduct and sewer | 94,871 | 48,063,364 | — | — | 48,158,235 |
| Compliance, Section 301(h) | 781,570 | — | — | — | 781,570 |
| State Revolving Funds | 748,836 | — | — | — | 748,836 |
| Buildings | — | 43,304 | — | — | 43,304 |
| Arts and entertainment | — | 639,151 | — | — | 639,151 |
| Transportation | — | 338,406 | — | — | 338,406 |
| Capital outlays: | | | | | |
| Aqueduct and sewer | — | 160,170,262 | — | — | 160,170,262 |
| Ports | — | 5,412,720 | — | — | 5,412,720 |
| Education | — | 238,037 | — | — | 238,037 |
| Other | — | 70,547 | — | — | 70,547 |
| Debt service: | | | | | |
| Payment of maturing bonds | — | — | 24,580,000 | — | 24,580,000 |
| Repayment of notes payable to Government Development Bank for Puerto Rico | — | — | 1,152,209 | — | 1,152,209 |
| Interest | — | — | 103,162,480 | — | 103,162,480 |
| Debt issue costs | — | — | 320,090 | — | 320,090 |
| Total expenditures | 1,928,201 | 215,904,370 | 129,214,779 | — | 347,047,350 |
| Excess (deficiency) of revenues over (under) expenditures | 86,138,154 | (194,822,597) | (128,987,869) | (88,236,612) | (325,908,924) |
| Other financing sources (uses): | | | | | |
| Refunding bond issued | — | — | 4,678,509 | — | 4,678,509 |
| Payment to refunding bond escrow agent | — | — | (4,358,419) | — | (4,358,419) |
| Transfers in | 2,421,626 | 5,030,336 | 132,670,346 | — | 140,122,308 |
| Transfers out | (68,783,923) | (2,421,626) | — | (68,916,759) | (140,122,308) |
| Total other financing sources (uses) | (66,362,297) | 2,608,710 | 132,990,436 | (68,916,759) | 320,090 |
| Net changes in fund balances | 19,775,857 | (192,213,887) | 4,002,567 | (157,153,371) | (325,588,834) |
| Fund balances, beginning of year | (7,896,552) | 504,786,885 | 54,758,701 | 1,444,659,568 | 1,996,308,602 |
| Fund balances, end of year | $ 11,879,305 | 312,572,998 | 58,761,268 | 1,287,506,197 | 1,670,719,768 |

See accompanying notes to basic financial statements.

13

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of the Statement of Revenues, Expenditures, and Changes in Fund Balances of
Governmental Funds to the Statement of Activities – Governmental Funds

Year ended June 30, 2004

Amounts reported for governmental activities in the statement of activities are different because:

| | |
|---|---:|
| Net changes in fund balances – total governmental funds | $ (325,588,834) |
| Governmental funds report capital outlays as expenditures. However, in statement of activities the cost of those assets is allocated over their estimated useful lives and reported as depreciation expense. This is the amount by which capital outlays exceeded transfers and depreciation in the current period | 63,207,550 |
| The issuance of long-term debt provides current financial resources to governmental funds, while the repayment of the principal of long-term debt consumes the current financial resources of governmental funds. Neither transaction, however, has any effect on net assets. Also governmental funds report the effect of issuance costs, premiums, discounts, and similar items when debt is first issued, whereas these amounts are deferred and amortized in the statement of activities. This amount is the net effect of these differences in the treatment of long-term debt and related items | 23,968,234 |
| Deferred revenue recorded in 2003 and revised against revenues in the governmental funds in 2004; however, reported as revenues in the 2003 statement of activities | (18,000,000) |
| Some expenses reported in the statement of activities do not require the use of current financial resources and, therefore, are not reported as expenditures in governmental funds | 929,595 |
| Changes in net assets of governmental activities | $ (255,483,455) |

See accompanying notes to basic financial statements.

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(1)    Summary of Significant Accounting Policies**

**(a)    Reporting Entity**

Puerto Rico Infrastructure Financing Authority (the Authority) is a component unit of the Commonwealth of Puerto Rico (the Commonwealth) created by Act No. 44 (the Act) of the Legislature of the Commonwealth on June 21, 1988. The Authority was organized to provide financial, administrative, and other types of assistance to public corporations of the Commonwealth that develop and operate infrastructure facilities. The Authority is exempt from taxation in Puerto Rico.

The accompanying basic financial statements present the combined financial position and results of operations of the entity as a whole, by major fund, that are governed by the Authority.

**(b)    Government-Wide and Fund Financial Statements**

*Government-Wide Financial Statements* – The statement of net assets and the statement of activities report information on all nonfiduciary activities of the Authority. The Authority has only governmental activities. The effect of interfund balances has been removed from the statement of net assets. Governmental activities generally are financed through intergovernmental revenues and other nonexchange revenues. Following is a description of the Authority's government-wide financial statements:

The statement of net assets presents the Authority's assets and liabilities, with the difference reported as net assets. Net assets are reported in three categories:

- Invested in capital assets consists of capital assets, net of accumulated depreciation and reduced by outstanding balances for bonds, notes, and other debt, if any, that are attributed to the acquisition, construction, or improvement of those assets.

- Restricted net assets result when constraints placed on net assets use are either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

- Unrestricted net assets consist of net assets which do not meet the definition of the two preceding categories. Unrestricted net assets often are designated to indicate that management does not consider them to be available for general operations. Unrestricted net assets often have constraints on resources which are imposed by management, but can be removed or modified.

The statement of activities demonstrates the degree to which the direct expenses of a given function or segment is offset by program revenues. Direct expenses are those that are clearly identifiable within a specific function. Program revenues include: (1) earnings (loss) on investments and changes in the fair value of investments and (2) grants and contributions that are restricted to meeting the operational or capital requirements of a particular function. Other items not meeting the definition of program revenue are instead reported as general revenue.

15                                                                    (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

*Funds Financial Statements* – Separate financial statements are provided for governmental funds. Major individual governmental funds are reported as separate columns in the fund financial statements. All funds of the Authority are major funds.

*(c)* *Measurement Focus, Basis of Accounting, and Financial Statements Presentation*

*Government-Wide Financial Statements* – The government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenues are recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. Grants and similar items are recognized as revenue as soon as all eligibility requirements have been met.

*Governmental Funds' Financial Statements* – The governmental funds' financial statements are reported using the current financial resources measurement focus and the modified-accrual basis of accounting. Revenues are recognized as soon as it is both measurable and available. Revenues are considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the Authority considers revenues to be available if they are collected within 60 days at the end of the current fiscal year-end. Other revenues are considered to be measurable and available only when cash is received by the Authority. Expenditures generally are recorded when a liability is incurred, as under accrual accounting. Modifications to the accrual basis of accounting include:

- Interest on general long-term obligations is recognized when paid.

- Debt service expenditures and claims and judgments are recorded only when payment is due.

*(d)* *Fund Accounting*

The financial activities of the Authority are recorded in individual funds, each of which is deemed to be a separate accounting entity. Fund accounting is designed to demonstrate legal compliance and to aid financial management by segregating transactions related to certain government functions or activities. A fund is a separate accounting entity with a self-balancing set of accounts. The financial activities of the Authority that are reported in the accompanying basic financial statements have been classified into the following major governmental funds:

**(i)    General Fund**

The General Fund is the general operating fund of the Authority that is used to account for all financial resources, except those required to be accounted for in another fund.

**(ii)    Capital Projects**

The Capital Projects Fund accounts for resources used or contributed for the acquisition or construction of capital assets and capital improvements.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(iii) Debt Service**

The Debt Service Fund accounts for the accumulation of resources for payment of interest and principal on long-term obligations.

**(iv) Permanent Fund**

The Permanent Fund is used to account for assets held by the Authority in which the trust principal (corpus) may not be expended but must be kept intact, that is, the capital must be maintained.

When both restricted and unrestricted resources are available for use, it is the Authority's policy to use restricted resources first, and then unrestricted resources as they are needed.

*(e)* *Budgetary Accounting*

The Authority is not required by the Act to submit a budget for approval by the Legislature of the Commonwealth; consequently, no formal budgetary accounting procedures are followed.

*(f)* *Investments and Investment Contracts*

Investments and investment contracts are carried at fair value, except for money market investments and participating investment contracts with a remaining maturity at the time of purchase of one year or less and nonparticipating investment contracts, which are carried at cost. Fair value is determined based on quoted market prices whenever available. For securities without quoted price, fair value represents quoted market prices for comparable instruments. Realized gains and losses from the sale of investments and unrealized changes in fair value are recorded as investment income.

*(g)* *Prepaid Expenses*

Certain payments to vendors represent costs applicable to future accounting periods and are recorded as prepaid items in the government-wide financial statements.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(h)  *Capital Assets*

Capital assets include construction in progress, furniture and equipment, vehicles, and leasehold improvements. Capital assets are reported in the government-wide financial statements. The threshold for capitalizing furniture and equipment, vehicles, and leasehold improvements is $750. Major capital outlays for capital assets and improvements are capitalized as projects are constructed. Capital assets are recorded at cost or estimated historical cost. Contributed assets are recorded at estimated fair market value at the time received. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets. The ranges of the useful lives are as follows:

| Assets | Years |
|---|---|
| Furniture and equipment | 3-5 |
| Vehicles | 3-5 |
| Leasehold improvements | Lesser of 5 years or lease term |

The costs of normal maintenance and repairs that do not add value to the asset or materially extend assets lives are not capitalized.

(i)  *Compensated Absences*

The Authority maintains a policy that permits employees to accumulate earned but unused vacation and sick pay benefits that will be paid to employees upon separation from Authority service if certain criteria are met. These benefits plus their related tax and retirement costs are classified as compensated absences. The Authority policy permits employees to either bank unused sick pay benefits or receive a cash buyout on an annual basis. Both the current and long-term portion of compensated absences are accrued and reported in the government-wide financial statements.

A liability for these amounts is reported in the governmental funds only if these have matured, for example as a result of employee resignations and retirements.

(j)  *Deferred Bond Issue Costs and Bond Discounts*

Discounts and issue costs related to long-term debt are amortized over the life of the debt principally by the effective-interest method. Notes payable, general obligation bonds payable, and revenue bonds payable in the government-wide financial statements are shown net of unamortized premium or discount. Bond issue costs are reported as deferred charges in the government-wide financial statements. Discount and issue costs related to general long-term debt in the governmental fund financial statements are recorded as expenditures when paid and, therefore, are not accounted for in subsequent periods. The net proceeds from bond issuances are presented as other financing sources in the governmental fund financial statements.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

(k)   *Interfund Transactions*

The Authority has operating transfers which are legally required transfers that are reported when incurred as "Transfer-in" by the recipient fund and as "Transfer-out" by the disbursing fund. Interfund receivables and payables have been eliminated from the statement of net assets.

(l)   *Reservations of Fund Balance*

Reservations of fund balance represent portions of fund balances that are limited for specific purpose, not appropriable, or not available for expenditure. The Authority has the following reservations of fund balance:

- *Capital Projects* – Represents net assets available to finance future capital outlays.

- *Debt Service* – Represents net assets available to finance future debt service payments.

- *Trust – Nonexpendable* – Represents net assets held in trust in which the principal (corpus) may not be expended. Investment earnings from the net assets held in Trust have been pledged for the debt service of long-term debt.

- *Other Purposes* – Represent cash reserved for future contributions to the Revolving Loan Funds (note 8).

(m)   *Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenditures during the reporting period. Actual results could differ from those estimates.

(n)   *Risk Management*

The Authority is responsible for assuring that the Authority's property is properly insured. Annually, the Authority compiles the information of all property owned and its respective market value and purchases the property and casualty insurance policies for the Authority. Insurance coverage for fiscal year 2004 remained similar to those of prior years. For the last three years, insurance settlements have not exceeded the amount of coverage.

(o)   *Deferred Revenue*

Deferred revenue arises when potential revenue does not meet the available criterion for recognition in the current period. Available is defined as due at June 30 and collected within 60 days thereafter to pay obligations due at June 30. Deferred revenue at the government-wide level arises only when the Authority receives resources before it has a legal claim to them.

19                                                                              (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(2)  Cash and Cash Equivalents**

The Authority's cash and cash equivalents are considered to be cash on hand, demand deposits, and short-term investments with original maturities of three months or less from the date of acquisition. The table presented below discloses the level of custody credit risk assumed by the Authority based upon how its deposits were insured or secured with collateral at June 30, 2004:

- *Category 1* – Insured or collateralized with securities held by the Authority or by its agent in the Authority's name.

- *Category 2* – Collateralized with securities held by the pledging financing institution's trust department or its agent in the Authority's name.

- *Category 3* – Uninsured and uncollateralized.

The following table presents the reported amount and depository bank balances of deposits with financial institutions at June 30, 2004:

| | Category | | | Bank balance | Carrying amount |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | | |
| Deposits with Government Development Bank for Puerto Rico (GDB) | $ — | — | 80,832,805 | 80,832,805 | 74,508,045 |
| Deposits with commercial banks | 58,736,003 | — | — | 58,736,003 | 58,736,003 |
| Total cash | $ 58,736,003 | — | 80,832,805 | 139,568,808 | 133,244,048 |

The Commonwealth requires that public funds deposited in commercial banks operating in Puerto Rico must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth. GDB (a component unit of the Commonwealth) is exempt from the collateral requirements.

**(3)  Investments and Investment Contracts**

In accordance with investment guidelines promulgated by GDB for agencies and public corporations of the Commonwealth under the authority provided by Act No. 113 of August 3, 1995 and Executive Order 1995-50A (the investment guidelines), the Authority is authorized to purchase or enter into the following investment instruments:

- U.S. government and agencies obligations

- Certificates of deposit

- Bankers' acceptances

- Commercial paper

- Participations in the Puerto Rico Government Investment Trust Fund

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

- Obligations of the Commonwealth of Puerto Rico, its agencies, municipalities, public corporation obligations, and instrumentalities

- Obligations of state and local governments of the United States

- Mortgage and asset-backed securities

- Corporate debt, including investment contracts

The investment guidelines also establish limitations and others guidelines

The Authority's investments and investment contracts are categorized into three levels to provide an indication of custodial risk assumed. These categories are as follows:

- *Category 1* – Insured or registered in the name of the Authority, or securities held by the Authority or its agent in the Authority's name.

- *Category 2* – Uninsured and unregistered in the name of the Authority, with securities held by the counterparty's trust department or agent in the Authority's name.

- *Category 3* – Uninsured and unregistered in the name of the Authority, with securities held by the counterparty, or by its trust department or agent but not in the Authority's name.

The following table shows the category, carrying amount, and fair value as of June 30, 2004 of investments:

| Type | Category | | | Carrying amount | Fair value |
| --- | --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | | |
| State and local government securities (SLGS) | $ 1,270,277,007 | — | — | 1,270,277,007 | 1,270,277,007 |
| Investment in the Puerto Rico Government Investment Trust Fund | — | 461,049 | — | 461,048 | 461,048 |
| Total categorized investments | $ 1,270,277,007 | 461,049 | — | 1,270,738,055 | 1,270,738,055 |
| Noncategorized investments: Guaranteed investment contracts | | | | 324,497,452 | |
| Total investments (including assets held in trust) | | | | $ 1,595,235,507 | |

The Puerto Rico Government Investment Trust Fund (the Investment Fund) is a collective investment trust created by the Secretary of the Treasury of the Commonwealth, as setter, and GDB, as a trustee, pursuant to Act No. 176 of August 11, 1995 of the Commonwealth for the purpose of providing eligible investors a way to invest in a money market portfolio.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(4) Capital Assets**

Capital assets activity for the fiscal year ended at June 30, 2004, was as follows:

| Governmental activities | Beginning balance | Increases | Decreases | Ending balance |
|---|---|---|---|---|
| Capital assets not depreciated: | | | | |
| Construction work in process | $ 773,984,004 | 165,821,019 | (102,508,607) | 837,296,416 |
| Capital assets being depreciated: | | | | |
| Furniture and equipment | 533,913 | 70,547 | — | 604,460 |
| Vehicles | 63,488 | — | — | 63,488 |
| Leasehold improvements | 620,847 | — | — | 620,847 |
| Total assets being depreciated | 1,218,248 | 70,547 | — | 1,288,795 |
| Less accumulated depreciation and amortization: | | | | |
| Furniture and equipment | (427,858) | (63,757) | — | (491,615) |
| Vehicles | (51,544) | (11,944) | — | (63,488) |
| Leasehold improvements | (444,388) | (99,708) | — | (544,096) |
| Total accumulated depreciation and amortization | (923,790) | (175,409) | — | (1,099,199) |
| Total capital assets being depreciated, net | 294,458 | (104,862) | — | 189,596 |
| Total governmental activities capital assets, net | $ 774,278,462 | 165,716,157 | (102,508,607) | 837,486,012 |

Total depreciation expense for the year ended June 30, 2004 amounted to $175,409 and was charged to general government activity.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

*Construction Commitments*

The Authority has active construction projects as of June 30, 2004. Commitments (in millions) on significant contracts were as follows:

| Description | Commitments | Expended | Remaining commitments |
|---|---|---|---|
| Regional projects | $ 853 | 643 | 210 |
| Short-term projects | 248 | 236 | 12 |
| Supplementary projects | 82 | 82 | — |
| Capital expenditures | 155 | 150 | 5 |
| | $ 1,338 | 1,111 | 227 |

**(5) Interfund Transfers**

Interfund transfers for the year ended June 30, 2004, consist of the following:

| | Transfers in | | | |
|---|---|---|---|---|
| Transfers out | General Fund | Capital Projects | Debt Service | Total |
| General Fund | $ — | 5,030,336 | 63,753,587 | 68,783,923 |
| Capital Projects | 2,421,626 | — | — | 2,421,626 |
| Permanent | — | — | 68,916,759 | 68,916,759 |
| | $ 2,421,626 | 5,030,336 | 132,670,346 | 140,122,308 |

The majority of the interfund transfers were for recurring operating expenditures.

23 (Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(6) Long-Term Debt**

**(a) *Changes in Long-Term Liabilities***

Long-term liability activity in the governmental activities for the year ended June 30, 2004, was as follows:

| | Beginning balance | Additions | Reductions | Ending balance | Due within one year |
|---|---|---|---|---|---|
| Series 1988 A Bonds | $ 18,270,450 | — | (13,960,000) | 4,310,450 | 2,675,000 |
| Series 1997 A and B Bonds | 791,824,550 | — | (2,805,000) | 789,019,550 | 15,995,000 |
| Series 1998 A Bonds | 134,660,000 | — | — | 134,660,000 | — |
| Series 2000 A and B Bonds | 1,074,180,000 | — | (7,815,000) | 1,066,365,000 | 8,285,000 |
| | 2,018,935,000 | — | (24,580,000) | 1,994,355,000 | 26,955,000 |
| Less bond discounts | 34,043,650 | — | (366,439) | 33,677,211 | — |
| Total bonds payable | 1,984,891,350 | — | (24,213,561) | 1,960,677,789 | 26,955,000 |
| Notes payable | 20,130,816 | 4,678,509 | (5,510,628) | 19,298,697 | 1,176,764 |
| Liabilities for claims and other contingencies | 6,000,000 | — | — | 6,000,000 | — |
| Accrued compensated absences | 238,169 | 23,397 | — | 261,566 | 131,886 |
| Long-term liabilities | $ 2,011,260,335 | 4,701,906 | (29,724,189) | 1,986,238,052 | 28,263,650 |

**(b) *Special Tax Revenue Bonds***

The Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds, Series 1988A Bonds (the Series 1988A Bonds) were issued to provide financial assistance, in the form of a capital contribution, to the Puerto Rico Aqueduct and Sewer Authority (PRASA). The assistance provided was to facilitate PRASA's financing of its capital improvement program. The Series 1988A Bonds bear interest, payable semiannually in January 1 and July 1, at rates, which range between 7.60% and 7.90% and mature at various dates through July 1, 2005. These Bonds are entitled to the benefits of a $17,001,500 irrevocable direct pay letter of credit issued by a commercial bank, which expires on August 28, 2005.

On December 4, 1997, the Authority issued $771,485,000 Special Tax Revenue Bonds, Series 1997A and $30,275,000 Special Tax Revenue Bonds, Series 1997B (the Series 1997A and 1997B Bonds). The proceeds thereof were used to repay the outstanding principal and interest under various lines of credit provided by GDB to PRASA ($640,366,537) and to establish a special construction fund, to be administered by the Authority on behalf of PRASA, to finance additional projects of PRASA's capital improvement program ($121,235,185). The Series 1997A and 1997B Bonds bear interest, payable semiannually on January 1 and July 1 at rates which range between 5.00% and 6.30% and mature at various dates through July 1, 2028. The Series 1997A Bonds maturing on or after July 1, 2008 may be redeemed at the option of the Authority prior to maturity at 101% from January 1, 2008 to December 31, 2008, 100.5% from January 1, 2009 to December 31, 2009, and 100% thereafter.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

On April 2, 1998, the Authority issued $134,660,000 Special Tax Revenue Refunding Bonds, Series 1998A (the Series 1998A Bonds). The Series 1998A Bonds bear interest, payable semiannually on January 1 and July 1 at rates, which range between 4.30% and 5.50% and mature at various dates through July 1, 2010. The Series 1998A Bonds maturing on July 1, 2009 and 2010 may be redeemed at the option of the Authority prior to maturity at 101% from July 1, 2008 to June 30, 2009 and 100.5% from July 1, 2009 to June 30, 2010.

Payment of principal of and interest on the Series 1997A Bonds, and the Series 1998A Bonds is insured by separate municipal bond insurance policies issued by an unrelated, insurance company.

The Series 1988 A Bonds, Series 1997 A Bonds, Series 1997 B Bonds, and the Series 1998 A Bonds (collectively, the Bonds) are payable solely from and secured by a pledge of federal excise taxes and other moneys deposited to the credit of a sinking fund established pursuant to a trust agreement.

The Act, as amended, requires that the first $70 million, up to fiscal year 2028, of federal excise taxes received by the Commonwealth be transferred to the Authority. Federal excise taxes consist of taxes received by the Commonwealth from the United States in connection with rum and other articles produced in Puerto Rico and sold in the United States that are subject to federal excise tax. The trust agreement requires the Authority to deposit to the credit of the sinking fund the federal excise taxes and other moneys deposited as are required to meet debt service requirements with respect to the Bonds. Rum is the only article currently produced in Puerto Rico subject to federal excise tax, the proceeds of which are required to be transferred from the federal government to the Commonwealth.

The federal excise taxes securing the Bonds are subject to a number of factors, including the continued imposition and remittance of such taxes to the Commonwealth and conditions affecting the Puerto Rico rum industry. If the federal excise taxes received by the Commonwealth in any fiscal year are insufficient, the Act requires that the Authority request and the Director of the Office of Management and Budget of the Commonwealth include in the budget of the Commonwealth for the corresponding fiscal year an appropriation necessary to cover such deficiency. The Commonwealth's Legislature, however, is not legally obligated to make the necessary appropriation to cover such deficiency.

The Authority is required under the trust agreement to establish a reserve account in the sinking fund to deposit and maintain therein an amount equal to the reserve requirement, as defined. Alternatively, the Authority may deposit to the credit of such reserve account an insurance policy or a letter of credit in lieu of any required deposit or in substitution of moneys on deposit in the reserve account. On the date of the issuance of the Series 1988A Bonds, the reserve account was fully funded in an amount equal to the reserve requirement from the proceeds of the Series 1988A Bonds and certain other moneys. In connection with the issuance of the 1997A and 1997B Bonds, the trust agreement was amended to eliminate the requirement that the Authority establish and maintain a reserve account in the sinking fund with respect to any bonds issued under the trust agreement, other than the Series 1988A bonds remaining outstanding after the advanced refunding described above.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Additional bonds, secured on parity with the Bonds, may be issued for any purpose authorized by the Act, subject to compliance with certain financial tests in the trust agreement.

*(c)* **Special Obligation Bonds**

On September 28, 2000, the Authority issued $1,037,750,000 Special Obligation Bonds, 2000 Series A and $54,800,000 Special Obligation Bonds, 2000 Series B (collectively, the 2000 Series Bonds) for the purpose of repaying certain notes issued by the Authority to GDB and financing certain aqueduct and sewer infrastructure development projects. The 2000 Series Bonds are limited obligations of the Authority payable solely from, and secured by, a pledge of all interest received by the Authority from U.S. Treasury securities and other eligible obligations deposited in a special account of the Trust Fund held by a trustee under an irrevocable and permanent trust. The 2000 Series A bonds bear fixed interest rates ranging from 4.10% to 5.50% payable semiannually on each April 1 and October 1. The 2000 Series B bonds bear a variable interest rate during each index rate period, as defined, at a rate equal to the sum of (i) the average of the Bond Market Association Municipal Swap Index for each day during such period and (ii) 0.65% (the Index Rate). The Index Rate on the 2000 Series B bonds may not be less than 1% nor more than 7.5% per annum. The 2000 Series A Bonds are subject to redemption, at the option of the Authority, on or after October 1, 2010 through September 30, 2011 at a redemption price of 101% and 100% thereafter. The 2000 Series B Bonds are subject to redemption, at the option of the Authority, at a price equal to the principal balance plus accrued interest to the date of redemption, on any date not earlier than October 1, 2010.

Debt service requirements at June 30, 2004, for bonds outstanding are as follows:

|  | Principal | Interest | Total |
|---|---|---|---|
| Fiscal year ending June 30: |  |  |  |
| 2005 | $ 26,955,000 | 104,593,334 | 131,548,334 |
| 2006 | 29,165,000 | 103,117,316 | 132,282,316 |
| 2007 | 30,695,000 | 101,729,623 | 132,424,623 |
| 2008 | 32,225,000 | 100,198,390 | 132,423,390 |
| 2009 | 34,050,000 | 98,473,383 | 132,523,383 |
| 2010-2014 | 200,095,000 | 463,733,753 | 663,828,753 |
| 2015-2019 | 260,215,000 | 405,841,216 | 666,056,216 |
| 2020-2024 | 337,560,000 | 328,859,572 | 666,419,572 |
| 2025-2029 | 437,830,000 | 228,944,734 | 666,774,734 |
| 2030-2034 | 203,535,000 | 142,394,588 | 345,929,588 |
| 2035-2039 | 271,070,000 | 76,300,050 | 347,370,050 |
| 2040-2041 | 130,960,000 | 7,436,225 | 138,396,225 |
|  | $ 1,994,355,000 | 2,161,622,184 | 4,155,977,184 |

*(d)* **Notes Payable**

On February 26, 2002, the Authority entered into a loan agreement with GDB where GDB lent the Authority the amount of $47,381,332 for the purpose of paying additional costs incurred or to be incurred by the Authority in the acquisition, construction, equipping, installation, and development

26

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

of certain aqueduct and sewer projects of PRASA. This loan matures on October 1, 2021 and bears an annual interest rate of 7.5%. Principal outstanding under this loan agreement amounted to $8,647,310 at June 30, 2004.

On January 16, 2002 (refinancing date), the Authority entered into a loan agreement (the Note). The note payable was originally a loan granted by GDB (the Old Note), but which, pursuant to Act No. 164 of December 17, 2001, the Puerto Rico Public Finance Corporation (PFC) acquired and restructured through the issuance of PFC Commonwealth Appropriation Bonds (PFC Bonds). The PFC Bonds were issued under trust indenture agreements where PFC pledged and sold the Note, along with other notes under the Act No. 164, to certain trustees and created a first lien on the pledged revenue (consisting of annual Commonwealth appropriations earmarked to repay the Note). In substance, the notes are payable to the corresponding trustees to which PFC pledged the notes.

During June 2004, PFC advance refunded a portion of certain of its outstanding Commonwealth appropriation bonds issued in 2001 under Act No. 164 of January 16, 2002. The Authority recognizes a mirror effect of this advance refunding by PFC in its own note payable in proportion to the portion of the Authority's note payable included in the PFC refunding. As a result, the Authority considered defeased and therefore removed from the balance sheet the portion refunded of $4,358,419. Refunding proceeds and bond issue costs of $4,678,509 and $320,090, respectively, were recognized and capitalized within the new refunding note and deferred through the note term. The aggregate debt service requirements of the refunding and unfunded notes will be funded with annual appropriations from the Commonwealth.

As a result of this advance refunding, the Authority has decreased its aggregate debt service payments by approximately $2.5 million over the next 27 years and obtained an economic gain (the difference between the present values of the debt service payments of the refunded and refunding notes) of approximately $300,000. At June 30, 2004, approximately $4.4 million of the notes refunded during June 2004 remain outstanding and are considered defeased.

The amount outstanding of the Note at June 30, 2004 was $10,651,387 and matures in July 2031. Interest on the unpaid principal amount of the Note is equal to the applicable percentage of the aggregate interest payable on PFC Bonds. The applicable percentage is the percentage representing the proportion of the amount paid by PFC on the Note to the aggregate amount paid by PFC on all the notes acquired by PFC under Act No. 164.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

Debt service requirements at June 30, 2004, for notes payable outstanding are as follows:

| Fiscal year ending June 30: | Principal | Interest | Total |
|---|---|---|---|
| 2005 | $ 1,176,764 | 225,756 | 1,402,520 |
| 2006 | 987,552 | 594,626 | 1,582,178 |
| 2007 | 970,973 | 960,379 | 1,931,352 |
| 2008 | 898,604 | 1,024,503 | 1,923,107 |
| 2009 | 952,669 | 1,077,736 | 2,030,405 |
| 2010-2014 | 3,588,157 | 5,464,110 | 9,052,267 |
| 2015-2019 | 2,400,580 | 4,151,623 | 6,552,203 |
| 2020-2024 | 2,015,530 | 2,326,908 | 4,342,438 |
| 2025-2029 | 3,101,325 | 1,114,741 | 4,216,066 |
| 2030-2032 | 3,206,543 | 191,323 | 3,397,866 |
| | $ 19,298,697 | 17,131,705 | 36,430,402 |

**(7) Transactions with Related Parties**

For the fiscal year 2003-2004, the Commonwealth contributed to the Authority $70,000,000 that will be used for debt service payments of the Bonds (note 6) and operating expenses plus $10,258,319 for other purposes.

Interest income on interest-bearing demand deposits with GDB amounted to $361,684 for the year ended June 30, 2004. Also, the Bank provides payroll services to the Authority at no cost.

The Authority transferred to PRASA during 2004 aqueduct and sewer projects amounting to $96,932,515, included as expenses of aqueduct and sewer in the accompanying statement of activities.

**(8) Revolving and Rotating Funds**

The Act, which created the Authority, as amended, provided for the establishment of the Puerto Rico Water Pollution Control Revolving Fund (the Revolving Fund), which is administered by the Puerto Rico Environmental Quality Board (EQB) and by the Authority in accordance with Title VI of the Water Pollution Control Act (Clean Water Act) of 1972. The EQB, as the designated instrumentality of the Commonwealth, is empowered to enter into capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), to accept capitalization grant awards made under Title VI of the Clean Water Act and, in conjunction with the Authority, to manage the Revolving Fund in accordance with the requirements of the Clean Water Act, the Act which created the Authority, as amended, and the Memorandum of Understanding entered into by and among EQB, PRASA, GDB, and the Authority.

On July 7, 1997, the Legislature of the Commonwealth enacted legislation, which, among other things, establishes the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund (the Drinking Water Fund) with the purpose of receiving financial assistance under the Clean Water Act and provides for the participation of the Authority in the administration of said fund.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

The net assets, revenues, and expenses of these loan funds are not included in the accompanying basic financial statements since the Authority acts only as administrator of the Revolving Fund and Drinking Water Fund.

**(9) Permanent Fund**

Act No. 92 of June 24, 1998 of the Legislature of the Commonwealth provides, among other things, for the creation of the Permanent Fund to be administered by the Authority. The Permanent Fund consists of a corpus account funded with a portion of the proceeds from the sale of assets of Puerto Rico Telephone Authority (PRTA) and additional accounts created or to be created by the Authority. Act No. 92 provides that the principal of the corpus account may not be reduced for any reason and that income received from the investment of moneys in the corpus account and other moneys received may be deposited in any of the additional accounts. On March 2, 1999, the Authority received $1.2 billion in connection with the sale of certain assets of PRTA which were deposited in the corpus account. Moneys deposited in the additional accounts are to be used first to pay the principal, premium, and interest of any bonds outstanding or to be issued by the Authority and then for the expansion, development, and modernization of infrastructure related to the aqueduct and sewer systems of Puerto Rico.

The moneys deposited in the Permanent Fund shall be invested up to $1 billion in: (1) direct obligations of the U.S. government; (2) obligations, the payment of principal and interest of which are unconditionally guaranteed by the U.S. government; (3) certificates of deposit of any bank, national bank association, or trust company organized and existing under the laws of the Commonwealth, the United States of America, or any of its states, on which the excess over the federal deposit insurance is secured by investments of the types described in (1) and (2) above; or (4) tax-exempt obligations of any state, instrumentality, agency, or political subdivision of Puerto Rico or the United States, the payment of principal and interest of which is secured by investments of the types described in (1) and (2) above.

Moneys in excess of $1 billion shall be invested in any of the instruments mentioned above or in any other instruments, including publicly traded common and preferred stock, not prohibited by investment guidelines adopted by GDB.

**(10) Commitments**

*Operating Leases*

The Authority leases office space under noncancelable operating leases expiring in fiscal year 2005. Rent expense for the year ended June 30, 2004 amounted to $440,447.

At June 30, 2004, the minimum annual future rentals under noncancelable leases are $218,025 for fiscal year ending June 30, 2005.

(Continued)

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2004

**(11) Contingencies**

At June 30, 2004, the Authority is a defendant in various legal proceedings arising from its normal operations. Management, based on the advice of its legal counsel, is of the opinion that the ultimate liability, if any, resulting from these pending proceedings and legal actions in the aggregate will not have a material effect on the Authority's financial statements. However, management is of the opinion that they will reach some settlements in certain cases; therefore, management recorded in the accompanying statement of net assets a liability for claims and other contingencies amounting to $6 million.

**(12) Subsequent Event**

On August 26, 2004, the Authority entered into a loan agreement with GDB related to a nonrevolving line of credit in an amount not to exceed $125,000,000 for the acquisition, construction, equipping, installation, and development of various infrastructure projects for municipalities, public corporations, political subdivisions, and Commonwealth's instrumentalities included within the Authority's Capital Improvements Program for fiscal year 2004-2005. The principal amount of the loan is due and payable on June 30, 2005.

<div align="right">**Schedule**</div>

**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
(A Component Unit of the Commonwealth of Puerto Rico)

Schedule of Special Obligation Bonds 2000 Series A and B – $1,092,550,000

Year ended June 30, 2004

1. Deposits to the credit of, and withdrawals from, each fund or account created under the provisions of the Trust Indenture:

| Account number<br>Account name | | 125912-011<br>Special<br>corpus | 125912-099<br>Trust<br>agreement | 125912-002<br>Bond service<br>account | 125912-008<br>Rebate Fund<br>account | 125912-005<br>Construction<br>Fund |
|---|---|---|---|---|---|---|
| Deposits, beginning balance | $ | 21,236,838 | 1,200,000,000 | 10,277,858 | 1,979,159 | 496,534,445 |
| Operating transfers in | | 67,754,609 | | 68,335,685 | 581,075 | |
| Interest earned from July 1, 2003 to June 30, 2004 | | 1,162,150 | 67,754,609 | 48,614 | 12,231 | 10,409,129 |
| Total deposits | | 90,153,597 | 1,267,754,609 | 78,662,157 | 2,572,465 | 506,943,574 |
| Less: | | | | | | |
| Operating transfers out | | 68,916,759 | 67,754,609 | — | — | — |
| Trust management charges and fees | | — | — | — | — | 3,475 |
| Payment of loan to Government Development Bank for Puerto Rico | | — | — | 1,152,209 | — | — |
| Payment of interest to Government Development Bank for Puerto Rico | | — | — | 143,791 | — | — |
| Interest payment to bondholders | | — | — | 55,600,594 | — | — |
| Principal payment to bondholders | | — | — | 7,815,000 | — | — |
| Total disbursements | | 68,916,759 | 67,754,609 | 64,711,594 | — | 3,475 |
| Requisition amounts for projects, takedowns | | | | | | 182,442,648 |
| Deposits as of June 30, 2004 | $ | 21,236,838 | 1,200,000,000 | 13,950,563 | 2,572,465 | 324,497,451 |

2. Description of the bonds issued, paid, purchased, or redeemed during each fiscal year and the outstanding principal amount of the bonds:

| | | |
|---|---|---|
| (a) Issued | $ | — |
| (b) Paid: | | |
|    Series A | | 7,405,000 |
|    Series B | | 410,000 |
| (c) Purchased or redeemed | | — |
| (d) Outstanding principal amount at June 30, 2004: | | |
|    Series A | | 1,012,680,000 |
|    Series B | | 53,685,000 |

See accompanying independent auditors' report.

Case 17-03283-LTS Doc#8541 Filed 07/28/20 Entered 07/28/20 11:30:56 Desc Exhibit A Page 357 of 406

[This page intentionally left blank]

<div align="right">APPENDIX III</div>

COMMONWEALTH OF PUERTO RICO
Financial Information and Operating Data Report
May 1, 2005

**TABLE OF CONTENTS**

<div align="right">**Page**</div>

INTRODUCTION ....................................................................................................................................1
    Geographic Location and Demography ...........................................................................................1
    Relationship with the United States .................................................................................................1
    Governmental Structure ...................................................................................................................1
    Political Trends ................................................................................................................................2
THE ECONOMY ......................................................................................................................................3
    General ..............................................................................................................................................3
    Economic Development Program for the Private Sector ..................................................................6
    Employment and Unemployment .....................................................................................................9
    Economic Performance by Sector ..................................................................................................10
    Higher Education ............................................................................................................................19
    Tax Incentives ................................................................................................................................20
DEBT ......................................................................................................................................................23
    Public Sector Debt .........................................................................................................................23
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ...........24
    Commonwealth Guaranteed Debt ...................................................................................................26
    Trends of Public Sector Debt .........................................................................................................27
PUBLIC CORPORATIONS ...................................................................................................................29
    Government Development Bank for Puerto Rico ............................................................................31
    Other Public Corporations .............................................................................................................32
INSURANCE MATTERS .......................................................................................................................37
RETIREMENT SYSTEMS .....................................................................................................................38
COMMONWEALTH FINANCIAL STATEMENTS ..............................................................................42
PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES ..............................................42
    Summary and Management's Discussion of General Fund Results ...............................................42
    Major Sources of General Fund Revenues .....................................................................................47
    Collections of Income and Excise Taxes .......................................................................................50
    Proposed Fiscal Reform .................................................................................................................50
    Transfers to General Obligation Redemption Fund .......................................................................51
    Components of General Fund Expenditures ...................................................................................51
    Federal Grants ................................................................................................................................52
BUDGET OF THE COMMONWEALTH OF PUERTO RICO ..............................................................53
    Office of Management and Budget .................................................................................................53
    Budgetary Process ..........................................................................................................................53
    Financial Control and Adjustment Procedures ..............................................................................53
    Appropriations ................................................................................................................................54
    Fiscal Year 2005 Budget ................................................................................................................55
    Fiscal Year 2006 Budget ................................................................................................................57
    Differences between Budget and Basic Financial Statements .......................................................59
LITIGATION ..........................................................................................................................................60

[This page intentionally left blank]

# COMMONWEALTH OF PUERTO RICO

## Financial Information and Operating Data Report
### May 1, 2005

## INTRODUCTION

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000, compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493, and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the fifty states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislature consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the Federal Judiciary and has its own United States District Court.

Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

Anibal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School. Since 1982, he has worked in the public sector as legislative advisor to the Governor of Puerto Rico, a member of the Puerto Rico House of Representatives and Resident Commissioner. From 1987 to 1989, he worked as a law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and later for Judge Levin Campbell of the First Circuit Court of Appeals.

Juan C. Méndez, Secretary of the Treasury, took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from the Georgetown University Law Center. During the second half of 2004 and prior to his appointment as Secretary of the Treasury, he worked as a senior tax manager for a Puerto Rico accounting firm. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a major Puerto Rico law firm.

Ileana F. Fas Pacheco, Director of the Office of Management and Budget ("OMB"), took office in January 2005. She is a graduate of the University of Puerto Rico, where she obtained a Bachelor's degree in Science with a major in Electrical Engineering. She obtained a Master's degree in Business Administration in International Management from Thunderbird, the American Graduate School of International Management. Since 2001, she has worked in the public sector as Special Assistant to the Puerto Rico Secretary of State, legislative assistant to the Resident Commissioner and Director of the Office of Federal Affairs of the Puerto Rico Department of Education. Prior to 2001, she worked as an electrical engineer at a major electronics company.

William Lockwood Benet was appointed President of Government Development Bank for Puerto Rico ("GDB") effective February 1, 2005. He is a graduate of Brown University and the Institute of Development Studies at the University of Sussex, where he became a development finance economist specialized in financing strategy, economic policy innovation, private equity, and life sciences. Prior to his appointment, he was managing director of Lockwood Financial Advisors and Generans Life Sciences and Chairman of the Board of Directors of Grupo Guayacán, a venture capital firm. From 1996 to 2000, he served as Director of the Center for the New Economy and Secretary of the PR Community Foundation. Prior to 1993, he served as Vice President and Assistant to three Presidents of the GDB.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total vote received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

| | **1988** | **1992** | **1996** | **2000** | **2004** |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8 | 49.9 | 51.1 | 45.7 | 48.2 |
| Puerto Rico Independence Party | 5.4 | 4.2 | 3.8 | 5.2 | 2.7 |
| Others | 0.1 | -- | 0.6 | 0.5 | 0.6 |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

| | **Senate** | **House** |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## THE ECONOMY

**General**

The Commonwealth has established policies and programs directed principally at developing the manufacturing and services sectors of the economy and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico has enjoyed more than two decades of almost continuous economic expansion. Almost every sector of the economy has participated in this expansion, and record levels of employment have been achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, a significant expansion in construction investment driven by infrastructure projects and private investment, primarily in housing, the relatively low cost of borrowing, and low oil prices in many years during this period.

Personal income, both aggregate and per capita, has increased consistently each fiscal year from 1985 to 2004. In fiscal year 2004, aggregate personal income was $46.8 billion ($43.8 billion in 2000 prices) and personal income per capita was $12,031 ($11,260 in 2000 prices).[*] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Transfer payments to individuals in fiscal year 2004 were $9.7 billion, of which $7.5 billion, or 77%, represented entitlements to individuals who had previously performed services or made contributions under programs such as Social Security, Veterans' Benefits, Medicare and U.S. Civil Service retirement pensions.

---

[*] Different price deflators are used for gross product and personal income statistics. The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce.

Total average monthly employment (as measured by the Department of Labor and Human Resources Household Employment Survey) has also increased. From fiscal year 2000 to fiscal year 2004, average monthly employment increased from 1,150,291 to 1,205,602.

The dominant sectors of the Puerto Rico economy are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, electronics, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second only to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross product for the five fiscal years ended June 30, 2004.

### Commonwealth of Puerto Rico
### Gross Product

| | **Fiscal Years Ended June 30** | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Gross product - $ millions[2] | $ 41,419 | $ 44,047 | $ 45,071 | $ 47,439 | $50,320 |
| Real gross product - $ millions (2000 prices) | 41,419 | 42,044 | 41,901 | 42,756 | 43,937 |
| Annual percentage increase in real gross product (2000 prices) | 3.0% | 1.5% | (0.3%) | 2.0% | 2.8% |
| U.S. annual percentage increase in real gross product (2000 prices) | 4.6% | 2.1% | 0.7% | 2.3% | 4.6% |

(1)    Preliminary.
(2)    In current dollars.

*Sources:* P.R. Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy.[*] Factors affecting the United States economy usually have a significant impact on the performance of the Puerto Rico economy. These include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the level of oil prices, the rate of inflation, and tourist expenditures. Consequently, the economic slowdown in the United States in 2001 and 2002, and the subsequent recovery in 2003 and 2004 (which continues in 2005) has also been reflected in the Puerto Rico economy.

The graph on the following page compares the growth rate of real gross product (or GNP) for the Puerto Rico and United States economies since fiscal 1990, and the forecast of the growth rate for fiscal years 2005 and 2006.

---

[*] During fiscal year 2004 (from July 2003 to June 2004) approximately 82% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 45% of Puerto Rico's imports.

Since the 1950s, the Puerto Rico Planning Board (the "Planning Board") has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce. In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes the economic accounts on an annual basis. Like the BEA, the Planning Board revises the macroeconomic numbers on a regular basis. The Planning Board has always classified the latest annual numbers as preliminary until they are revised and made final in conjunction with the release of new data each year. At present, all macroeconomic accounts for fiscal year 2004 are preliminary until the revised figures are released.

*Fiscal Year 2004*

The Planning Board's preliminary reports of the performance of the Puerto Rico economy during fiscal year 2004 indicate that the economy registered an increase of 2.8% in real gross product. Gross product was $50.3 billion in fiscal year 2004 ($43.9 billion in 2000 prices) compared to $47.4 billion in fiscal year 2003 ($42.8 billion in 2000 prices). This represents an increase in nominal gross product of 6.1%. Aggregate personal income increased from $44.7 billion in fiscal year 2003 ($42.4 billion in 2000 prices) to $46.8 billion in fiscal year 2004 ($43.8 billion in 2000 prices), and personal income per capita increased from $11,566 in fiscal year 2003 ($10,962 in 2000 prices) to $12,031 in fiscal year 2004 ($11,260 in 2000 prices). According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total monthly employment averaged 1,205,602 in fiscal year 2004 compared to 1,188,015 in fiscal year 2003, an increase of 1.5%. Concurrently, the unemployment rate decreased from 12.1% during fiscal year 2003 to 11.4% during fiscal year 2004.

*Fiscal Year 2005*

According to the Household Survey, total monthly seasonally adjusted employment for the first nine months of fiscal year 2005 averaged 1,233,100, an increase of 2.9% compared to 1,198,900 for the same period in fiscal year 2004. The seasonally adjusted unemployment rate for the first nine months of fiscal year 2005 was 10.8%, a decrease from 11.6% for the same period in fiscal year 2004. As in the past, the economy of Puerto Rico followed the performance of the United States economy.



**Real GNP Growth Rate**

% Change

* P.R. Planning Board
** Global Insight

■ P.R.*   ▨ U.S.**

Fiscal Years

| Year | P.R. | U.S. |
|------|------|------|
| '90 | 2.5 | 3.0 |
| '91 | 0.9 | 0.2 |
| '92 | 0.8 | 1.5 |
| '93 | 3.3 | 3.4 |
| '94 | 2.5 | 3.0 |
| '95 | 3.4 | 3.5 |
| '96 | 3.3 | 2.7 |
| '97 | 3.4 | 4.3 |
| '98 | 3.2 | 4.3 |
| '99 | 4.1 | 4.1 |
| '00 | 3.0 | 4.6 |
| '01 | 1.5 | 2.1 |
| '02 | -0.3 | 0.7 |
| '03 | 2.0 | 2.3 |
| '04 | 2.8 | 4.6 |
| '05 | 2.3 | 3.4 |
| '06 | 2.5 | 3.0 |

The Planning Board's current real gross national product forecast for fiscal year 2005, released in February 2004, projected an increase of 2.3%. The Planning Board confirmed this projection in February 2005. The major short-term factors that could have an adverse effect on the economy of Puerto Rico include the persistent high level of oil prices, the upward turn of short-term interest rates, and the devaluation of the United States dollar, which affects the value of imports to Puerto Rico. Although interest rates began to increase slightly at the end of fiscal year 2004, they still remain at relatively low levels, which could stimulate economic activity in Puerto Rico for the short and medium-term.

*Fiscal Year 2006*

The Planning Board's current real gross national product forecast for fiscal year 2006, released in February 2005, projects an increase of 2.5%. The major short-term factors that could have an adverse effect on the economy include those presented for fiscal year 2005 and the possibility of a deceleration of public investment due to the Commonwealth's fiscal difficulties, which could reduce activity in the construction sector. The continued upward trend of interest rates may also contribute to a possible slowing of economic activity in the construction sector. Although the current administration is working to maintain public investment, no assurance can be given that the Commonwealth will succeed in these efforts. For a discussion of the Commonwealth's fiscal difficulties, see "Fiscal Year 2005 Budget" and "Fiscal Year 2006 Budget" under *Budget of the Commonwealth of Puerto Rico*.

**Economic Development Program for the Private Sector**

The Commonwealth's economic development program for the private sector is now focused on initiatives aimed at producing a more diversified and sustainable economic development. The three principal elements of these initiatives are: (i) the promotion of foreign investment focused on life sciences and computing and information technology; (ii) the promotion of local investment in order to facilitate the development of a local entrepreneurial culture that builds upon the Commonwealth's competitive advantages in, among others, life sciences, tourism, commerce and services; and (iii) investment in infrastructure and human capital to complement the promotion of foreign and local investment and focus on the current and future needs for human capital.

The Commonwealth has formulated a strategic plan to enhance its competitiveness in knowledge-based economic sectors, such as research and development of science and technology products. Four major components of this strategic plan are: (i) build on the strong presence in Puerto Rico of multinational companies in the science and technology sectors; (ii) build on Puerto Rico's skilled workforce to promote the expansion of research and development facilities by companies currently operating in Puerto Rico; (iii) attract new companies in such sectors; and (iv) provide incentives for companies and entrepreneurs to engage in the process of innovation and commercialization of new products, and establish research and development facilities in Puerto Rico. The latter initiative includes the creation of the Puerto Rico Science & Technology Trust, a government-sponsored trust that will provide grants and financing to companies, entrepreneurs, and universities that engage in these activities.

The Commonwealth is also providing incentives to promote the establishment of distribution and call centers, the acquisition and development of patents, and the development of a local entrepreneurial class. Distribution and call centers located in the Commonwealth will benefit from special incentives such as: (i) an excise tax exemption on machinery and equipment acquired by a call center; and (ii) a preferential tax rate of 4% for call centers located in Puerto Rico if they offer services to Latin America and a preferential tax rate of 2% if they offer hemisphere or worldwide services. The Commonwealth has decided to focus on this type of industry because it is labor intensive, presents no environmental concerns, and is generally able to start operations quickly.

The Commonwealth is also promoting and developing the acquisition and development of patents. According to newly enacted legislation, the Secretary of the Treasury may (i) negotiate the payment of taxes on patent royalties; and (ii) reduce the tax rate on patent royalties to a rate as low as 2%.

These incentives are in addition to those already enacted for research and development carried out in the Commonwealth.

The Commonwealth has also taken action to further develop a local entrepreneurial class. To this end, the Commonwealth has enacted legislation providing local entrepreneurs with the following benefits: (i) tax incentives to retailers that use their distribution channels to sell products made in Puerto Rico in other jurisdictions; (ii) require that at least 15% of products and services purchased by public agencies be locally manufactured or provided; and (iii) the use of government-sponsored financing, marketing and/or training to promote the production of economically feasible products or services for Puerto Rico markets.

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development in Puerto Rico. See "Tax Incentives" below.

In this regard, the Commonwealth has enacted legislation extending certain benefits of its most recent tax incentive law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct as a current expense investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally manufactured recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against the Puerto Rico tax liability of investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against the Puerto Rico tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical facilities and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The maximum amount of such credits that may be authorized by the Secretary of the Treasury for any fiscal year is $15,000,000.

The Commonwealth has also enacted legislation which (i) reduces the capital gains tax from 20% to 10% in the case of individuals and estates and trusts, and from 25% to 12.5% in the case of corporations and partnerships organized under the laws of the Commonwealth or engaged in trade or business in the Commonwealth, for gains from the sale of eligible Commonwealth investments; and (ii) allows income tax credits for extraordinary investment in housing infrastructure. In addition, legislation was enacted that reduces the tax payable on interest on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts and estates to 10% under certain circumstances.

For fiscal year 2005, the Commonwealth enacted a "sunset provision" that lowered all long-term capital gains tax rates by 50%. In particular, gains realized from July 1, 2004 to June 30, 2005 from the sale or exchange of a capital asset by resident individuals, if held for more than six months, will be taxed at a rate of 5% (6.25% in the case of corporate taxpayers) if located in Puerto Rico and at a rate of 10% (12.5% in the case of corporate taxpayers) if located outside Puerto Rico. However, as part of the package of legislative measures proposed to increase General Fund revenues for fiscal years 2006 and 2007, the preferential capital gains rates will be eliminated and all capital gains will be taxed at a rate of 20%. See "Summary and Management's Discussion of General Fund Results" under *Puerto Rico Taxes, Other Revenues and Expenditures*.

In addition, legislation has been enacted: (i) amending the 1998 Tax Incentives Act to provide special income tax rates ranging from 0% to 2% to companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) reducing to 7% the capital gains rate applicable to gains realized on the sale of the stock of Puerto Rico corporations sold in an initial public offering made prior to December 31, 2007, or acquired in public offerings made prior to December 31, 2007; (iv) granting income tax exemption to the fees and interest income received by financial institutions in connection with loans or guarantees of loans made to finance tourism development projects; (v) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations of areas designated as tourism enhancement districts; (vi) granting income tax exemption to financial institutions for charges collected on obligations issued for the financing of tourism projects; (vii) granting tax exemption for investments in infrastructure made by housing developers; (viii) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (ix) rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures and the development of undeveloped or under-developed sites.

*Reduction of the Costs of Doing Business*

The Commonwealth believes that, to make Puerto Rico more competitive and foster investment, it needs to reduce the cost of doing business in Puerto Rico. In order to reduce the cost of doing business in Puerto Rico, the Commonwealth proposes to (i) promote the creation of more cogeneration power plants to diversify energy fuel sources and limit the dependence on oil imports for electric power generation; (ii) streamline the permitting process to accelerate and reduce the cost of investment in Puerto Rico; and (iii) create a multi-agency task force to expedite critical projects in the life sciences sector.

The Commonwealth is in the process of diversifying its energy fuel sources. Two cogeneration power plants, one of which is fueled by coal and the other by liquefied natural gas, have reduced Puerto Rico's dependence on oil imports for the generation of electricity by approximately 25%, from 99% to 74%. Currently, as part of the Electric Power Authority's capital improvement plan, the Authority is considering building an additional cogeneration power plant fueled by liquefied natural gas in the municipality of Mayagüez.

*Federal Tax Incentives*

In order to enhance the attractiveness for United States companies of establishing operations in Puerto Rico, the Commonwealth is seeking to provide for a new tax regime applicable to U.S.-based businesses that have operations in the Commonwealth or other U.S. possessions. In connection with the phase-out of Sections 30A and 936 of the United States Internal Revenue Code of 1986, as amended (the "Code") (see "Tax Incentives – Incentives Under the Code" below), the United States Senate requested the Joint Commission on Taxation ("JCT") and the General Accounting Office ("GAO") study the economic impact of said phase-out and present recommendations on alternative tax incentives for U.S.-based companies operating in Puerto Rico. Due to the one-year delay in the release of the GAO/JCT report, the Commonwealth plans to seek a temporary, one-year extension of Sections 30A and 936 of the Code, until the United States Congress has had an opportunity to evaluate and act upon the report. In anticipation of the final phase-out of Sections 30A and 936 of the Code, most U.S.-based companies operating under Sections 30A and 936 of the Code have converted from United States corporations to either Puerto Rico or foreign corporations, thus lessening the impact of the phase-out of those sections.

**Employment and Unemployment**

The number of persons employed in Puerto Rico during fiscal year 2004 averaged 1,205,602, a 1.5% increase from 1,188,015 in fiscal year 2003. Unemployment, although at relatively low historical levels, remains above the United States average. The average unemployment rate increased from 11.0% in fiscal year 2000 to 11.4% in fiscal year 2004. This increase in the unemployment rate is a result of the sluggish labor market following the economic recession experienced during fiscal years 2002 and 2003. For the first nine months of fiscal year 2005, the average monthly unemployment rate (seasonally adjusted) was 10.8%.

The following table presents annual statistics of employment and unemployment for fiscal year 2000 through fiscal year 2004 and monthly statistics for fiscal year 2005. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

<div align="center">

**Commonwealth of Puerto Rico**
**Employment and Unemployment [1]**

</div>

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | **(Annual Average)** | | |
| 2000 ................................ | 1,292 | 1,150 | 142 | 11.0% |
| 2001 ................................ | 1,277 | 1,144 | 134 | 10.5 |
| 2002 ................................ | 1,309 | 1,152 | 158 | 12.1 |
| 2003 ................................ | 1,352 | 1,188 | 164 | 12.1 |
| 2004 ................................ | 1,360 | 1,206 | 155 | 11.4 |
| **Fiscal Year 2005** | | **(Seasonally Adjusted)** | | |
| July ................................ | 1,410 | 1,273 | 137 | 9.7% |
| August............................. | 1,423 | 1,271 | 152 | 10.7 |
| September ........................ | 1,416 | 1,269 | 147 | 10.4 |
| October ............................ | 1,391 | 1,238 | 153 | 11.0 |
| November ........................ | 1,365 | 1,202 | 163 | 11.9 |
| December......................... | 1,387 | 1,235 | 152 | 11.0 |
| January............................. | 1,381 | 1,227 | 154 | 11.2 |
| February........................... | 1,354 | 1,223 | 131 | 9.7 |
| March............................... | 1,379 | 1,225 | 154 | 11.2 |

_____
(1) Thousands of persons 16 years of age and over. Totals may not add due to rounding.
(2) Unemployed as percentage of labor force.

*Source:* Department of Labor and Human Resources - Household Survey

**Economic Performance by Sector**

During the period between fiscal year 2000 and 2004, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross product for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross Product**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Manufacturing | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 |
| Services[2] | 24,920 | 26,615 | 26,913 | 28,688 | 30,505 |
| Government[3] | 5,478 | 5,992 | 6,303 | 7,006 | 7,389 |
| Transportation, communication and public utilities | 4,237 | 4,698 | 4,948 | 5,205 | 5,350 |
| Agriculture, forestry and fisheries | 529 | 348 | 277 | 314 | 435 |
| Construction[4] | 1,875 | 1,802 | 1,648 | 1,614 | 1,741 |
| Statistical discrepancy | 585 | 717 | 292 | (493) | (654) |
| Total gross domestic product[5] | $61,702 | $69,208 | $71,624 | $74,834 | $78,842 |
| Less: net payment abroad | (20,283) | (25,162) | (26,552) | (27,396) | (28,522) |
| Total gross product[5] | $41,419 | $44,046 | $45,071 | $47,439 | $50,320 |

_____
(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority.
(4) Includes mining.
(5) Totals may not add due to rounding.

_Source:_ Planning Board

The data for employment by sector or industries presented here, like in the United States, is based on the Payroll Survey, which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2000** | **2001** | **2002** | **2003** | **2004[2]** |
| Natural Resources and Mining | 1,425 | 1,455 | 1,292 | 1,173 | 1,182 |
| Construction | 73,492 | 73,729 | 69,208 | 68,701 | 68,355 |
| Manufacturing |  |  |  |  |  |
| Durable Goods | 57,383 | 56,249 | 49,348 | 47,534 | 45,886 |
| Non-Durable Goods | 85,550 | 82,236 | 72,595 | 69,319 | 70,000 |
| Sub Total | 142,933 | 138,485 | 121,943 | 116,853 | 115,886 |
| Trade, Transportation, |  |  |  |  |  |
| Warehouse & Utilities |  |  |  |  |  |
| Wholesale Trade | 32,000 | 32,327 | 31,489 | 31,218 | 32,344 |
| Retail Trade | 131,817 | 133,821 | 127,716 | 128,189 | 131,873 |
| Transportation, |  |  |  |  |  |
| Warehouse & Utilities | 19,458 | 19,285 | 17,603 | 17,124 | 16,926 |
| Sub Total | 183,275 | 185,433 | 176,808 | 176,531 | 181,144 |
| Information | 21,108 | 20,597 | 21,943 | 21,216 | 21,347 |
| Finance | 45,583 | 44,974 | 43,963 | 42,128 | 41,584 |
| Professional & Business | 96,750 | 97,164 | 95,223 | 96,938 | 95,006 |
| Educational & Health | 80,692 | 84,202 | 84,452 | 87,590 | 90,561 |
| Leisure & Hospitality | 65,942 | 66,435 | 64,273 | 66,200 | 68,263 |
| Other Services | 17,408 | 17,330 | 16,602 | 16,338 | 15,967 |
| Government | 286,133 | 282,723 | 288,679 | 298,751 | 303,914 |
| Total Non-Farm | 1,014,742 | 1,012,528 | 984,385 | 992,418 | 1,003,208 |

(1) The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
(2) Preliminary.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board estimates that in fiscal year 2004 manufacturing generated $34.1 billion, or 43.2%, of gross domestic product. During fiscal year 2004, payroll employment for the manufacturing sector was 115,886, a decrease of 0.8% compared with fiscal year 2003, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of July 2004, the average hourly manufacturing wage rate in Puerto Rico was 66.9% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by the large investment over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors assisting the

development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments.  Federal legislation enacted in 1996, however, which amended Section 936 of the Code, phases out the federal tax incentives during a ten-year period.  See "Tax Incentives - Incentives Under the Code" under *The Economy*.

The following table sets forth gross domestic product by manufacturing sector for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Pharmaceuticals | $13,580 | $16,620 | $18,681 | $19,072 | $20,138 |
| Machinery and metal products: | | | | | |
|     Machinery, except electrical | 2,031 | 3,376 | 3,845 | 3,528 | 3,499 |
|     Electrical machinery | 1,525 | 1,874 | 1,757 | 1,915 | 1,821 |
|     Professional and scientific instruments | 1,758 | 2,100 | 2,191 | 3,026 | 3,325 |
|     Other machinery and metal products | 341 | 316 | 312 | 291 | 313 |
| Food products | 1,912 | 1,974 | 2,092 | 2,289 | 2,332 |
| Other chemical and allied products | 777 | 765 | 578 | 496 | 475 |
| Apparel | 610 | 569 | 530 | 466 | 620 |
| Other[2] | 1,543 | 1,444 | 1,258 | 1,418 | 1,555 |
|     Total gross domestic product of manufacturing sector[3] | $24,079 | $29,037 | $31,243 | $32,501 | $34,078 |

---

(1)  Preliminary.
(2)  Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3)  Totals may not add due to rounding.

*Source:*  Planning Board

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group[1]**
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004[2]** |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,833 | 4,726 | 4,447 | 4,255 | 4,312 |
|   Cement and Concrete Products Manufacturing | 3,700 | 3,723 | 3,494 | 3,373 | 3,409 |
| Fabricated Metal Products | 7,267 | 7,218 | 6,403 | 6,054 | 5,780 |
| Computer and Electronic | 14,958 | 14,316 | 11,471 | 11,549 | 11,271 |
|   Navigational, Measuring | 4,617 | 4,330 | 4,661 | 4,186 | 4,409 |
| Electrical Equipment | 8,917 | 8,225 | 7,064 | 6,927 | 6,606 |
|   Electrical Equipment Manufacturing | 4,992 | 4,564 | 4,030 | 3,630 | 3,854 |
| Miscellaneous Manufacturing | 11,725 | 12,046 | 11,299 | 12,147 | 11,683 |
|   Medical Equipment and Supplies Manufacturing | 10,300 | 10,784 | 10,110 | 11,187 | 10,781 |
| Other Durable Goods Manufacturing | 9,683 | 9,718 | 8,255 | 6,602 | 6,234 |
|     Total – Durable Goods | 57,383 | 56,249 | 49,348 | 47,534 | 45,886 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 17,417 | 17,109 | 14,469 | 13,213 | 12,567 |
| Beverage and Tobacco Products Manufacturing | 3,425 | 3,571 | 3,423 | 3,352 | 3,757 |
| Apparel Manufacturing | 17,517 | 16,265 | 11,872 | 8,935 | 8,646 |
|   Cut and Sew Apparel Manufacturing | 16,358 | 15,162 | 11,174 | 8,914 | 8,642 |
| Chemical Manufacturing | 29,450 | 29,124 | 30,265 | 31,621 | 31,868 |
|   Pharmaceutical and Medicine Manufacturing | 24,300 | 24,275 | 25,707 | 27,337 | 28,157 |
| Plastics and Rubber Products | 4,108 | 3,820 | 3,399 | 3,154 | 3,007 |
|   Plastics Product Manufacturing | 3,675 | 3,412 | 3,105 | 2,875 | 2,686 |
| Other Non-Durable Goods Manufacturing | 13,633 | 12,347 | 9,206 | 9,044 | 10,155 |
|     Total – Non-Durable Goods | 85,550 | 82,236 | 72,595 | 69,319 | 70,000 |
| | | | | | |
|     Total Manufacturing Employment | 142,933 | 138,485 | 121,943 | 116,853 | 115,886 |

_____
(1)  Totals may not add due to rounding.
(2)  Preliminary.

*Sources:*  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 27,047 from fiscal year 2000 to fiscal year 2004.  This reduction in manufacturing employment occurred during a period of significant expansion in real manufacturing output, as reflected in the growth of exports.  This trend suggests a significant increase in manufacturing investment and productivity.  Most of the decrease in employment has been concentrated in labor intensive industries, particularly apparel, textiles, tuna canning, and leather products.

**Leading United States and Foreign Companies with Manufacturing Operations in Puerto Rico** [(1)]

| Employment 2,500 and over | Product | Employment 200 to 499 | Product |
|---|---|---|---|
| Baxter International, Inc. | Medical Devices | Alcan Finance (BDA) LTC | Plastics |
| Johnson and Johnson | Surgical Products | Atlantron Inc. | Computers |
| Pfizer Pharmaceuticals LLC | Pharmaceuticals | Bacardí Limited | Food |
| Wyeth | Pharmaceuticals | Biovail Corporation International | Pharmaceuticals |
| | | CEMEX | Cement |
| **Employment 1,000 to 2,499** | **Product** | Checkpoint Systems Inc. | Electronic Instruments |
| | | Coca Cola Company | Food |
| Abbot Laboratories | Pharmaceuticals | Colgate-Palmolive Company | Consumer Products |
| Altadis | Cigars | C.R. Bard | Surgical Instruments |
| Amgen, Inc. | Pharmaceuticals | Curtis Instruments Inc. | Electrical Instruments |
| Eaton Corporation | Electronic Instruments | Davis Creek Managing Partners | Metal Products |
| Edwards Lifesciences LLC | Surgical Instruments | E.I. DuPont de Nemours & Co. | Chemicals |
| Eli Lilly and Company | Pharmaceuticals | Eastern Canvas Products | Textile Products |
| General Electric Industrial Systems | Electronic Instruments | Espace Europee de Lenterprise | Pharmaceuticals |
| Glaxo Smithkline | Pharmaceuticals | Essilor International | Ophthalmic Products |
| Hewlett-Packard Co. | Computers | Hershey Foods Corp. | Food |
| Medtronic Europe SA | Surgical Instruments | ICN Pharmaceuticals Inc. | Pharmaceuticals |
| Merck & Co., Inc. | Pharmaceuticals | Loctite Corporation | Chemicals |
| Propper International Company | Apparel | Lutron Electronics Co. Inc. | Electronic Instruments |
| Sare Lee Corp | Apparel | Millipore Corporation | Surgical Instruments |
| Schering Plough Corporation | Pharmaceuticals | Mylan Laboratories, Inc. | Chemicals |
| Solectron Corporation | Electronic Instruments | Northrop Grumman Corporation | Electrical Instruments |
| Zimmer Holdings, Inc. | Pharmaceuticals | Novartis Holding AG | Ophthalmic Products |
| | | Nypro International | Medical Devices |
| **Employment 500 to 999** | **Product** | Owens Illinois Inc. | Glass and Plastics |
| | | Packaging Coordinators Inc. | Packaging Products |
| Advanced Medical Optics, Inc. | Ophthalmic Products | PepsiCo, Inc. | Food |
| Astra Zeneca PLC | Pharmaceuticals | Pilgrim's Pride Corporation | Food |
| Becton-Dickinson & Co. | Surgical Instruments | Procter & Gamble Co. | Pharmaceuticals |
| Cardinal Health, Inc. | Pharmaceuticals | Rocky Shoes & Boots | Footwear |
| Connors Bros. | Food | Siemens AG | Electrical Instruments |
| Dean Foods Company | Food | Sitnasuak Native Corporation | Apparel |
| Guidant Corp. | Medical Instruments | St. Jude Medical, Inc. | Surgical Instruments |
| Hamilton Sundstrand Corp. | Electrical Instruments | Standard Motor Products Inc. | Motor Vehicle Parts |
| Hubbel Incorporated | Electrical Instruments | Storage Technology Corp. | Electronics |
| Ingersoll-Rand Co. | Electrical Instruments | Symmetricom Inc. | Electronic Equipment |
| Ivax Pharmaceutical | Pharmaceuticals Ophthalmic | Thomas & Betts Corporation | Electrical Instruments |
| Pall Corporation | Filters | Timberland Company | Leather |
| Pharmacia Corporation | Pharmaceuticals | Watson Pharmaceutical, Inc. | Pharmaceuticals |
| Stryker Corp. | Surgical Instruments | | |
| Tyco, Int. | Security System | | |
| Tyco International | Surgical Products | | |
| Unilever PLC | Consumer Products | | |
| Warner-Lamber Company | Pharmaceuticals | | |
| Wellco Enterprise, Inc. | Leather | | |

_____
(1)  Based on the last employment figures reported by each company to PRIDCO.

_Source:_ PRIDCO, Office of Economic Research

_Services_

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between fiscal years 2000 and 2004, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 5.2%, while payroll employment in this sector increased at an average annual rate of 1.1%. It should also be noted that in the Puerto Rico labor market self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, in fiscal year 2003, the number of self-employed individuals was 180,464, out of which 46.0% were in the service sector and 10.5% were in the construction sector. The development of the services sector has been positively

affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture.  The services sector in Puerto Rico has a diversified base.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment.  In fiscal year 2004, services generated $30.5 billion of gross domestic product, or 38.7%, of the total.  Services employment grew from 510,758 in fiscal year 2000 to 513,872 in fiscal year 2004 (representing 51.2% of total employment).  This represents a cumulative increase of 0.6%.  Wholesale and retail trade, finance, insurance and real estate experienced significant growth in fiscal years 2000 to 2004, as measured by gross domestic product.  From fiscal year 2000 to 2004, gross domestic product increased in wholesale and retail trade from $8.3 billion to $9.6 billion and in finance, insurance, and real estate from $10.0 billion to $13.0 billion.  There are sixteen commercial banks and trust companies currently operating in Puerto Rico.  Total assets of these institutions as of December 31, 2004 were $94.3 billion.  As of December 31, 2004, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $66.8 billion.

The following tables set forth gross domestic product and employment for the services sector for fiscal years 2000 to 2004.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Wholesale and retail trade | $ 8,340 | $ 8,338 | $ 8,623 | $ 9,005 | $ 9,582 |
| Finance, insurance and real estate | 9,977 | 11,294 | 11,212 | 12,425 | 13,024 |
| Other services[2] | 6,603 | 6,982 | 7,078 | 7,257 | 7,899 |
| Total[3] | $24,920 | $26,615 | $26,913 | $28,688 | $30,505 |

(1)  Preliminary.
(2)  Includes tourism.
(3)  Totals may not add due to rounding.

*Source:* Planning Board

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector**
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004**[1] |
| Wholesale Trade | 32,000 | 32,327 | 31,489 | 31,218 | 32,344 |
| Retail Trade | 131,817 | 133,821 | 127,716 | 128,189 | 131,873 |
| Transportation, Warehouse & Utilities | 19,458 | 19,285 | 17,603 | 17,124 | 16,926 |
| Trade, Transportation, Warehouse & Utilities | 183,275 | 185,433 | 176,808 | 176,531 | 181,144 |
| Information | 21,108 | 20,597 | 21,943 | 21,216 | 21,347 |
| Finance | 45,583 | 44,974 | 43,963 | 42,128 | 41,584 |
| Professional and Business | 96,750 | 97,164 | 95,223 | 96,938 | 95,006 |
| Educational & Health | 80,692 | 84,202 | 84,452 | 87,590 | 90,561 |
| Leisure & Hospitality | 65,942 | 66,435 | 64,273 | 66,200 | 68,263 |
| Other Services | 17,408 | 17,330 | 16,602 | 16,338 | 15,967 |
| Total | 510,758 | 516,135 | 503,264 | 506,941 | 513,872 |

_____
(1)  Preliminary

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services - Tourism*

During fiscal year 2004, the number of persons registered in tourist hotels was 1,788,800, an increase of 3.3% over the number of persons registered during fiscal year 2003. The average occupancy rate in tourist hotels during fiscal year 2004 was 72.3% compared to 68.0% in fiscal year 2003. The average number of rooms rented in tourist hotels increased 4.8% during fiscal year 2004 compared with fiscal year 2003. The average number of rooms available in tourist hotels decreased 1.4% during fiscal year 2004 compared with fiscal year 2003.

In the first eight months of fiscal year 2005, the number of persons registered in tourist hotels was 1,189,900, an increase of 3.9% over the number of persons registered during the same period in fiscal year 2004. The number of non-resident tourists registered in tourist hotels during the first eight months of fiscal year 2005 increased 3.7% in comparison with the same period of fiscal year 2004. The average number of rooms rented in tourist hotels increased 2.3% during the first eight months of fiscal year 2005 compared to the same period in fiscal year 2004. The average occupancy rate in tourist hotels during the first eight months of fiscal year 2005 was 69.4% compared to 70.8% for the same period in fiscal year 2004. The decrease in the occupancy rate in tourist hotels during fiscal year 2005 was due to the introduction of new hotel rooms into the market.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2004.

**Commonwealth of Puerto Rico**
**Tourism Data**

| Fiscal Years Ended June 30 | Number of Visitors | | | | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| | Tourist Hotels[1] | Cruise Ship | Other[2] | Total | |
| 2000 ............................................. | 1,050,100 | 1,224,600 | 2,291,300 | 4,566,000 | $2,387.9 |
| 2001 ............................................. | 1,186,800 | 1,356,600 | 2,364,400 | 4,907,800 | 2,728.1 |
| 2002 ............................................. | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | 2,486.4 |
| 2003 ............................................. | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004[3] ......................................... | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |

(1)   Includes visitors in guesthouses.
(2)   Includes visitors in homes of relatives, friends, and in hotel apartments.
(3)   Preliminary.

*Sources:*  Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, is in the process of finishing the development of a convention center.  The convention center, which will be the largest in the Caribbean, is the centerpiece of a 100-acre private development including hotels, restaurants, cinemas, office space and housing.  The convention center district is being developed at a total cost of $1.3 billion to complement and improve Puerto Rico's competitive position in the convention and group travel segments.  The convention center is expected to open by the end of calendar year 2005, and seventeen conventions have already been booked for the first year.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico.  The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic events.

*Government*

The government sector of Puerto Rico plays an important role in the economy.  In fiscal year 2004, government accounted for $7.4 billion of Puerto Rico's gross domestic product, or 9.4%, of the total.  The government is also a significant employer, providing jobs for 303,914 workers, or 30.3%, of total non-farm payroll employment in fiscal year 2004.  The government's share of non-farm payroll employment (including the central government, the public corporations and the municipalities, but excluding the federal government), measured according to the payroll survey, had decreased from 34.9% in fiscal year 1980 to 26.4% in fiscal year 2000.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees).  Under this law, government employees are given collective bargaining rights subject to a number of limitations.  Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year.  During fiscal year 2006, the Commonwealth and its instrumentalities will begin to negotiate the economic and non-economic terms of at least forty collective bargaining agreements, which could have a material impact on the General Fund.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations on the island including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by twenty-five United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Puerto Rico and other Caribbean islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The island's major cities are connected by a modern highway system, which, as of December 31, 2004, totaled approximately 4,607 miles. The highway system comprises 379 miles of primary system highways, 230 miles of primary urban system highways, 954 miles of secondary system highways and 3,043 miles of tertiary highways and roads.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected to eventually serve the municipalities of Carolina and Caguas. Currently, Tren Urbano is operating free of charge until the first week of June 2005 as part of an education and familiarization program to introduce Tren Urbano to the population.

The Port of the Americas Authority, created by legislation, is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. In fiscal year 2004, the first phase of the Port of the Americas was completed. This initial phase included the improvement and expansion of the Port of Ponce at a cost of $40 million. During calendar year 2005, the Port of the Americas will begin its second phase relying on a $70 million line of credit provided by GDB. This second phase includes (i) dredging the entrance channel and adjacent areas of the Port of Ponce to a depth of 50 feet; (ii) reconstruction of container terminals at the Port of Ponce; (iii) commencement of certain required environmental mitigation procedures; and (iv) preparation of final construction schematics. Partial operation of the Port of the Americas could begin as early as calendar year 2006.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. However, during the period from fiscal year 2000 through fiscal year 2004, real construction investment decreased 3.3%. This decline is relatively small when compared to the relatively high levels of construction activity.

The total value of construction permits increased 21.2% for the same five-year period. Public investment has been an important component of construction investment. During fiscal year 2004, approximately 41% of the total investment in construction was related to public projects. During fiscal year 2004, the total value of construction permits increased 8.2% compared with fiscal year 2003. Average payroll employment in the construction sector during fiscal year 2004 was 68,355, a decrease of 0.5% from fiscal year 2003.

During fiscal year 2004, total sales of cement, including imports, decreased 1.9% compared with fiscal year 2003. This decrease in total sales of cement was attributable in part to heavy rains that affected the island in November 2003, causing a 31% decrease in sales as compared to November 2002. Excluding November 2003, total sales of cement for fiscal year 2004 increased 0.9%.

Total construction investment for fiscal year 2004 increased (in real terms) by 1.5%, which was the first increase in three years. For fiscal years 2005 and 2006, the Planning Board forecasts construction investment increases (in real terms) of 1.3% for each year. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. However, public investment in construction could be negatively affected by the Commonwealth's fiscal difficulties.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During fiscal year 2004, gross income from agriculture was $780.7 million, an increase of 2.8% compared with fiscal year 2003. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, and other products. During fiscal year 2004, traditional crops, livestock products, starchy vegetables, ornamental plants and other products contributed a higher percentage of the sector's income.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225, approved on December 1, 1995, increased the tax benefits available to bona fide farmers. Act No. 225 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s, college attendance and college attendance as a percentage of the college age population continued to increase.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| **Academic Year** | **Population 18-24 Years of Age** | **Higher Education Enrollment** | **Percent[1]** | **Population 18-24 Years of Age** | **Higher Education Enrollment** | **Percent[1]** |
| 1970 .................. | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 .................. | 397,839[2] | 130,105 | 32.7 | 30,022,000[2] | 12,096,895 | 40.3 |
| 1990 .................. | 417,636[2] | 156,147 | 37.4 | 26,961,000[2] | 13,621,000 | 50.5 |
| 2000 .................. | 428,892[2] | 176,015 | 41.0 | 27,143,455[2] | 15,312,000 | 56.4 |
| 2001 .................. | 425,519[3] | 185,015 | 43.5 | 27,831,000[3] | 15,873,000 | 57.0 |
| 2002 .................. | 422,549[3] | 190,776 | 45.1 | 28,342,000[3] | 15,608,000 | 55.1 |
| 2003 .................. | 418,390[3] | 199,842 | 47.8 | 28,899,571[3] | 15,756,000 | 54.5 |

(1)     Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2)     Based on census population as of April 1.
(3)     Estimated population (reference date July 1).
*Sources:*     United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island.  The University's total enrollment for academic year 2003-2004 was 68,627 students.  The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 43 public and private institutions of higher education located in Puerto Rico.  Such institutions have a current enrollment in excess of 130,285 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law.  Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing sector in Puerto Rico has been the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until recently, Sections 30A and 936 of the Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various industrial incentives laws designed to stimulate industrial investment in the island.  Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes.  The most recent of these industrial incentives laws is the 1998 Tax Incentives Act, a law aimed at promoting investment in Puerto Rico.

The benefits provided by the 1998 Tax Incentives Act are available to new companies as well as companies currently conducting tax exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grant.  The activities eligible for tax exemption include manufacturing, certain designated services performed for markets outside Puerto Rico, the production of energy from local

III-20

renewable sources for consumption in Puerto Rico and laboratories for scientific and industrial research. For companies qualifying thereunder, the 1998 Tax Incentives Act imposes income tax rates ranging from 2% to 7% for periods ranging from 10 to 25 years. In addition, it grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and between 80% and 60% thereafter, and 100% exemption from excise taxes with respect to raw materials and certain machinery and equipment used in the exempt activities. The 1998 Tax Incentives Act also provides various special deductions designed to stimulate employment and productivity, research and development and capital investment in Puerto Rico.

Under the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth and other designated investments are fully exempt from income and municipal license taxes. Individual shareholders of an exempted business are allowed a credit against their Puerto Rico income taxes equal to 30% of their proportionate share of the exempted business's income tax liability. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period is subject to a 4% income tax rate.

*Tourism Incentives Program*

For many years, Puerto Rico has also had incentives laws designed to stimulate investment in hotel operations on the island. The most recent of these laws, the Tourism Incentives Act of 1993, provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

As part of the incentives to promote the tourism industry, the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing hotel development projects. To date, the Fund has provided direct loans and financial guarantees for loans made or bonds issued to finance the development of seventeen hotel projects representing over 3,800 new hotel rooms.

*Incentives under the Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Prior to enactment of the Tax Reform Act of 1976, under Section 931 of the Code, United States corporations operating in Puerto Rico (and meeting certain source of income tests) were taxed only on income arising from sources within the United States.

The Tax Reform Act of 1976 created Section 936 of the Code, which revised the tax treatment of United States corporations operating in Puerto Rico by taxing such corporations on their worldwide income in a manner similar to that applicable to any other United States corporation but providing such corporations a full credit for the federal tax on their business and qualified investment income in Puerto Rico. The credit provided an effective 100% federal tax exemption for operating and qualifying investment income from Puerto Rico sources.

As a result of amendments to Section 936 of the Code made in 1996 (the "1996 Amendments"), the tax credit is being phased out over a ten-year period for companies that were operating in Puerto Rico in 1995 and is no longer available for corporations that establish operations in Puerto Rico after October 13, 1995. The 1996 Amendments also eliminated the credit previously available for income derived from certain qualified investments in Puerto Rico.

_Section 30A._  The 1996 Amendments added Section 30A to the Code.  Section 30A permits a "qualifying domestic corporation" ("QDC") that meets certain gross income tests to claim a credit (the "Section 30A Credit") against the federal income tax imposed on taxable income derived from sources outside the United States from the active conduct of a trade or business in Puerto Rico or from the sale of substantially all the assets used in such business ("possession income").  The Section 30A Credit will not be available for taxable years commencing on or after January 1, 2006.

The Section 30A Credit is limited to the sum of (i) 60% of qualified possession wages as defined in the Code, which includes wages up to 85% of the maximum earnings subject to the OASDI portion of Social Security taxes plus an allowance for fringe benefits of 15% of qualified possession wages; (ii) a specified percentage of depreciation deductions ranging between 15% and 65%, based on the class life of tangible property; and (iii) a portion of Puerto Rico income taxes paid by the QDC, up to a 9% effective tax rate (but only if the QDC does not elect the profit-split method for allocating income from intangible property).

In the case of taxable years beginning after December 31, 2001, the amount of possession income that qualifies for the Section 30A Credit is subject to a cap based on the QDC's possession income for an average adjusted base period ending before October 14, 1995 (the "income cap").

_Section 936._  Under Section 936 of the Code, as amended by the 1996 Amendments, United States corporations that meet certain requirements and elect its application ("Section 936 Corporations") are entitled to credit against their United States corporate income tax the portion of such tax attributable to income derived from the active conduct of a trade or business within Puerto Rico ("active business income") and from the sale or exchange of substantially all assets used in the active conduct of such trade or business.

Under Section 936 of the Code, a Section 936 Corporation may elect to compute its active business income, eligible for the Section 936 credit, under one of three formulas: (i) a cost-sharing formula, whereby it is allowed to claim all profits attributable to manufacturing intangibles and other functions carried out in Puerto Rico provided it makes a cost sharing payment in the amount required under Section 936 of the Code; (ii) a profit-split formula, whereby it is allowed to claim 50% of the combined net income of its affiliated group from the sale of products manufactured in Puerto Rico; or (iii) a cost-plus formula, whereby it is allowed to claim a reasonable profit on the manufacturing costs incurred in Puerto Rico.

The Section 936 credit is now only available to companies that were operating in Puerto Rico on October 13, 1995, and had elected the percentage of income credit provided by Section 936 of the Code.  Such percentage of income credit is equal to 40% of the federal income tax otherwise imposable on the Puerto Rico active business income or derived from the sale or exchange of substantially all assets used in such business.

In the case of taxable years beginning on or after 1998, the possession income subject to the Section 936 credit is subject to a cap based on the Section 936 Corporation's possession income for an average adjusted base period ending on October 14, 1995.  The Section 936 credit is eliminated for taxable years commencing on or after January 1, 2006.

_Controlled Foreign Corporations_

Because of the credit limitations and impending phase out of Sections 30A and 936 of the Code, many corporations previously operating thereunder have reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs").  A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders.  In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United

States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from over 120 corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics companies manufacturing in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to corporations operating under Sections 30A and 936 of the Code. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost sharing payments they might have opted to make, but CFCs are subject to a ten percent Puerto Rico withholding tax on royalty payments.

## DEBT

### Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below. The Constitution of Puerto Rico limits the amount of general obligation (full faith and credit) debt that can be issued or guaranteed by the Commonwealth. The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation. Direct debt of the Commonwealth is supported by Commonwealth taxes. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See *Public Corporations*. However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to resolutions adopted by the respective municipal assemblies. Debt of public corporations is issued pursuant to resolutions adopted by the governing bodies of the public corporations in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2004. Excluded from the table is debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products. Also excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.237 billion of outstanding bonds issued by the Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.444 billion of obligations of GDB issued to purchase certain Commonwealth public sector debt and for other purposes, of which $267 million is guaranteed by the Commonwealth.

**Commonwealth of Puerto Rico**
**Public Sector Debt**
**(in thousands)**

|  | December 31, 2004 |
|---|---|
| Puerto Rico direct debt[1] | $ 9,734,936 |
| Municipal debt | 2,016,106 |
| Public corporations debt |  |
|   Puerto Rico guaranteed debt[2] | 636,558 |
|   Debt supported by Puerto Rico appropriations or taxes[3] | 15,595,095 |
|   Other non-guaranteed debt[4] | 7,966,971 |
|   Total public corporations debt | 24,198,624 |
| Total public sector debt | $35,949,666 |

---

(1) Includes general obligation bonds, tax and revenues anticipation notes, and lines of credit provided by GDB. Excludes certain Commonwealth general obligation bonds that have been refunded with proceeds that were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance, even though such bonds will be considered outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation.

(2) Consists of $485.7 million of bonds issued by the Aqueduct and Sewer Authority and $150.9 million of State Revolving Fund Loans, incurred under various federal water laws. Excludes Public Buildings Authority bonds in the principal amount of $2.920 billion as of December 31, 2004 and $267 million of GDB bonds payable from available moneys of GDB.

(3) Represents, among others, bonds and notes issued by the Aqueduct and Sewer Authority, the Highway and Transportation Authority, the Housing Finance Authority, the Infrastructure Financing Authority, the Public Buildings Authority and the Public Finance Corporation.

(4) Excludes the following: $1.058 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.143 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $663 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities. If these amounts were included, total public corporation debt would be $27,667,431,000 and total public sector debt would be $39,419,727,000.

*Source:* Government Development Bank for Puerto Rico

    No deductions have been made in the above table for debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

**Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt**

    The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding as of December 31, 2004 and bonds of the Aqueduct and Sewer Authority for which debt service payments are being made under the Commonwealth guaranty.

The table excludes debt service on certain general obligation bonds refunded with refunding bonds the proceeds of which, pending the redemption of the refunded bonds, were invested in guaranteed investment contracts or other securities not eligible to effect a legal defeasance. Such refunded bonds will be considered to be outstanding under their respective authorizing resolutions and for purposes of calculating the Commonwealth's constitutional debt limitation. Had such bonds been included in the table, maximum annual principal and interest on all outstanding general obligation bonds would have been $711,522,695 during the fiscal year ending June 30, 2005. With respect to other debt of the Aqueduct and Sewer Authority, see *Public Corporations*. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

### Puerto Rico
### Debt Service Requirements*
### (In thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds | | Total Debt Service | PRASA Bonds Debt Service | Grand Total |
|---|---|---|---|---|---|
| | Principal | Interest | | | |
| 2005 | 132,585 | 357,776 | 490,361 | 30,127 | 520,489 |
| 2006 | 174,484 | 387,535 | 562,019 | 30,121 | 592,140 |
| 2007 | 161,722 | 400,175 | 561,897 | 30,126 | 592,024 |
| 2008 | 200,027 | 371,611 | 571,638 | 30,131 | 601,769 |
| 2009 | 238,840 | 328,465 | 567,304 | 30,123 | 597,428 |
| 2010 | 252,795 | 314,693 | 567,488 | 29,984 | 597,472 |
| 2011 | 264,197 | 300,913 | 565,110 | 29,928 | 595,039 |
| 2012 | 283,795 | 281,166 | 564,961 | 30,127 | 595,088 |
| 2013 | 301,335 | 263,690 | 565,025 | 30,128 | 595,152 |
| 2014 | 299,023 | 268,096 | 567,119 | 30,125 | 597,244 |
| 2015 | 313,125 | 254,313 | 567,437 | 30,126 | 597,563 |
| 2016 | 328,230 | 239,472 | 567,702 | 30,121 | 597,823 |
| 2017 | 343,802 | 224,283 | 568,084 | 30,122 | 598,206 |
| 2018 | 361,120 | 208,346 | 569,466 | 30,126 | 599,591 |
| 2019 | 394,356 | 175,751 | 570,107 | 30,125 | 600,231 |
| 2020 | 452,165 | 148,395 | 600,560 | 0 | 600,560 |
| 2021 | 322,480 | 126,181 | 448,661 | 0 | 448,661 |
| 2022 | 247,400 | 111,409 | 358,809 | 0 | 358,809 |
| 2023 | 214,650 | 100,363 | 315,013 | 0 | 315,013 |
| 2024 | 200,845 | 90,886 | 291,731 | 0 | 291,731 |
| 2025 | 209,670 | 82,365 | 292,035 | 0 | 292,035 |
| 2026 | 209,880 | 73,792 | 283,672 | 0 | 283,672 |
| 2027 | 219,380 | 64,555 | 283,935 | 0 | 283,935 |
| 2028 | 229,265 | 54,947 | 284,212 | 0 | 284,212 |
| 2029 | 239,770 | 44,716 | 284,486 | 0 | 284,486 |
| 2030 | 251,355 | 33,301 | 284,656 | 0 | 284,656 |
| 2031 | 263,020 | 21,752 | 284,772 | 0 | 284,772 |
| 2032 | 96,645 | 9,518 | 106,163 | 0 | 106,163 |
| 2033 | 68,080 | 5,111 | 73,191 | 0 | 73,191 |
| 2034 | 33,105 | 1,655 | 34,760 | 0 | 34,760 |
| | $ 7,307,144 | $ 5,345,232 | $ 12,652,376 | $ 451,540 | $ 13,103,915 |

*Totals may not add due to rounding.

*Sources:* GDB and Department of the Treasury

**Commonwealth Guaranteed Debt**

As of December 31, 2004, $2.920 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $219.5 million in fiscal year ending June 30, 2011, with their final maturity being July 1, 2036. No payments under the Commonwealth guaranty have been required to date for bonds of the Public Buildings Authority.

As of December 31, 2004, $267 million of Commonwealth guaranteed obligations of GDB were outstanding. No payments under the Commonwealth guaranty have been required for any obligations of GDB to date.

As of December 31, 2004, the aggregate outstanding principal amount of the Series 1995 revenue bonds of the Aqueduct and Sewer Authority guaranteed by the Commonwealth was $305.3 million. On January 2, 1997, the Commonwealth began to make debt service payments under the Commonwealth guaranty and expects to make all debt service payments required on these revenue bonds.

In addition, in April 2000, the Commonwealth extended its guaranty to all of the outstanding bonds issued by the Aqueduct and Sewer Authority to the United States Department of Agriculture, Rural Development, and to all of the outstanding loans by the State Revolving Funds for the benefit of the Aqueduct and Sewer Authority. The guaranty will also cover any additional bonds and loans that may be issued until June 30, 2005. In February 2004, this guaranty was extended through new legislation to cover debt obligations issued until 2010. As of June 30, 2004, the principal amount outstanding on these bonds was $180.3 million and the principal amount outstanding of these loans was $150.9 million.

**Trends of Public Sector Debt**

       The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross product (in current dollars) for the five fiscal years ended June 30, 2004 and the first six months of fiscal year 2005. As of December 31, 2004, outstanding short-term debt, relative to total debt, was 8.7%.

<div align="center">

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross Product**
**(dollars in millions)**[*]

</div>

| | Public Sector Debt | | | | | Gross Product[(1)] | |
|---|---|---|---|---|---|---|---|
| **June 30** | **Long Term** | **Short Term**[(2)] | **Short Term as % of Total** | **Total** | **Rate of Increase** | **Amount** | **Rate of Increase** |
| 2000………………… | $21,620 | $2,202[(3)] | 9.2% | $23,822 | 5.0% | $41,419 | 8.2% |
| 2001[(4)]……………… | 22,345 | 2,870[(5)] | 11.4 | 25,215 | 5.8 | 44,047 | 6.3 |
| 2002[(6)]……………… | 26,737 | 1,250[(3)] | 4.5 | 27,987 | 11.0 | 45,071 | 2.3 |
| 2003[(7)]……………… | 28,102 | 1,605[(3)] | 5.4 | 29,707 | 6.1 | 47,439 | 5.3 |
| 2004[(8)]……………… | 31,767 | 2,175 | 6.4 | 33,942 | 14.3 | 50,320 | 6.1 |
| December 31, 2004[(9)]… | 32,823 | 3,126 | 8.7 | 35,949 | 5.9 | N/A | N/A |

*Totals may not add due to rounding.
(1) In current dollars.
(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
(3) Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
(4) Excludes $397.0 million of bonds of Children's Trust outstanding on this date. If these bonds had been included, the rate of growth of public sector debt for fiscal year 2001 would have been 12.1%. Excludes $1.093 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(5) Includes a $164 million line of credit from GDB to the Secretary of the Treasury the proceeds of which were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.
(6) Excludes $390.1 million of bonds of Children's Trust outstanding on this date. Excludes $1.082 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(7) Excludes $1.171 billion of bonds of Children's Trust outstanding on this date. Excludes $1.074 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(8) Excludes $1.155 billion of bonds of Children's Trust outstanding on this date. Excludes $1.066 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(9) Excludes the following: $1.058 billion of Infrastructure Financing Authority bonds, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $1.143 billion of Children's Trust bonds which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2004 and the first six months of fiscal year 2005.

**Commonwealth of Puerto Rico**
**Public Sector Debt by Major Category**
**(dollars in millions)***

| June 30 | Commonwealth | | | Municipalities | | | Public Corporations[1] | | | Total | | Grand Total[4] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term[4] | Short Term[2] | Total | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | Total | Long Term | Short Term[2] | |
| 2000 | $5,349 | $ 0[3] | $5,349 | $1,396 | $ 68 | $1,464 | $14,875 | $2,134 | $17,008 | $21,620 | $2,202 | $23,822 |
| 2001 | 5,674 | 164[5] | 5,838 | 1,469 | 163 | 1,632 | 15,201[6] | 2,543 | 17,744 | 22,345 | 2,870 | 25,215 |
| 2002 | 6,025 | 91[3] | 6,116 | 1,618 | 177 | 1,795 | 19,094[7] | 982 | 20,076 | 26,737 | 1,250 | 27,987 |
| 2003 | 6,709 | 177[3] | 6,886 | 1,754 | 201 | 1,955 | 19,639[8] | 1,227 | 20,866 | 28,102 | 1,605 | 29,707 |
| 2004 | 7,758 | 761 | 8,519 | 1,820 | 226 | 2,046 | 22,190[9] | 1,187 | 23,377 | 31,768 | 2,174 | 33,942 |
| December 31, 2004 | 8,212 | 1,523 | 9,735 | 1,795 | 221 | 2,016 | 22,816[10] | 1,382 | 24,198 | 32,823 | 3,126 | 35,949 |

*Totals may not add due to rounding.
(1) Includes Commonwealth guaranteed debt.
(2) Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
(3) Does not include the tax and revenue anticipation notes which were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
(4) Includes the Transferred CRUV Debt.
(5) Includes a $164 million line of credit from GDB to the Secretary of the Treasury the proceeds of which were applied to pay debt service on general obligation bonds in lieu of funds available therefor in the General Fund.
(6) Excludes the following: $397.0 million original principal amount of bonds issued by Children's Trust; and $1.093 billion original principal amount of bonds issued by Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(7) Excludes the following: $390.1 million of bonds of Children's Trust outstanding on this date; and $1.082 billion of bonds of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(8) Excludes the following: $1.171 billion original principal amount of bonds of Children's Trust; and $1.074 billion of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(9) Excludes the following: $1.155 billion original principal amount of bonds of Children's Trust; and $1.066 billion of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(10) Excludes the following: $1.143 billion original principal amount of bonds of Children's Trust; $1.058 billion of Infrastructure Financing Authority outstanding on this date, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company; $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement; $97 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education; $87 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico; and approximately $113.4 million of bonds issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental or quasi-governmental functions are performed by public corporations. These are governmental entities created by the Legislature with varying degrees of independence from the central government. Public corporations are generally created to perform a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards appointed by the Governor with the advice and consent of the Senate, but some public corporations are subsidiaries of departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds under trust agreements or bond resolutions or notes under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2004 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government or is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service reserve funds. More detailed information about the major public corporations is presented in the following sections.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**December 31, 2004**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 485,668 | $ 0 | $ 485,668 | $150,890 | $ 142,082[(1)] | $292,972 | $ 636,558 | $ 142,082[(1)] | $ 778,640 |
| Electric Power Authority | 0 | 4,878,508 | 4,878,508 | 0 | 330,459 | 330,459 | 0 | 5,208,967 | 5,208,967 |
| Highway and Transportation Authority | 0 | 5,770,009[(2)] | 5,770,009 | 0 | 110,037 | 110,037 | 0 | 5,880,046 | 5,880,046 |
| Housing Finance Authority[(3)] | 0 | 627,012 | 627,012 | 0 | 89,623 | 89,623 | 0 | 716,635 | 716,635 |
| Industrial Development Company | 0 | 295,449 | 295,449 | 0 | 35,242 | 35,242 | 0 | 330,691 | 330,691 |
| Infrastructure Financing Authority | 0 | 909,320[(4)] | 909,320 | 0 | 23,325 | 23,325 | 0 | 932,645 | 932,645 |
| Public Buildings Authority | 2,920,327 | 0 | 2,920,327 | 0 | 3,561 | 3,561 | 2,920,327 | 3,561 | 2,923,888 |
| Public Finance Corporation | 0 | 4,311,827[(5)] | 4,311,827 | | 0 | 0 | 0 | 4,311,827[(4)] | 4,311,827 |
| Ports Authority | 0 | 74,985[(6)] | 74,985 | 0 | 387,786 | 387,786 | 0 | 462,771 | 462,771 |
| University of Puerto Rico | 0 | 409,108[(7)] | 409,108 | 0 | 30,035 | 30,035 | 0 | 439,143 | 439,143 |
| Others | 0 | 0 | 0 | 0 | 2,213,371 | 2,213,371 | 0 | 2,213,371 | 2,213,371 |
| Total[(8)] | $3,405,995 | $17,276,218 | $20,682,213 | $150,890 | $3,365,521 | $3,516,411 | $3,556,885 | $20,641,739 | $24,198,624 |

(1) Principal of and interest on this debt is reimbursed from Commonwealth appropriations.
(2) Excludes $153 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.
(3) Excludes the $663 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development.
(3) Excludes $1.058 billion of outstanding bonds of Infrastructure Financing Authority, which are payable solely from the investment income of funds on deposit in the Infrastructure Development Fund consisting of proceeds from the sale of a controlling interest in Puerto Rico Telephone Company.
(4) Payable primarily from Commonwealth appropriations.
(5) Excludes $96 million of Qualified Zone Academy Bonds issued by the Public Finance Corporation, which are payable from securities purchased with funds assigned by the Children's Trust to the Department of Education.
(6) Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which are solely payable from by the pledge of certain payments made by a private corporation under a special facilities agreement.
(7) Excludes $85 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by the Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, which are payable from rent payments made by the University of Puerto Rico
(8) Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.155 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, issued on October 10, 2002, which will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico.

**Government Development Bank for Puerto Rico**

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to make loans to private enterprises to aid in the economic development of Puerto Rico.

As of December 31, 2004, $1.4 billion of bonds and notes of GDB were outstanding. As of said date, GDB also had $4.7 billion in loans to the central government of the Commonwealth and its public corporations and municipalities. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2004.

Act No. 82 of June 16, 2002, authorizes GDB to transfer every year to the Commonwealth's General Fund up to 10% of its audited net income or $10,000,000, whichever is greater.

Act No. 271 of November 21, 2002, requires GDB to provide the Special Communities Perpetual Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million. As of April 18, 2005, GDB had disbursed to the Trust $320 million from two investment accounts held by GDB for the benefit of the Trust. GDB expects to replenish its equity capital with future net operating income. See "Other Public Corporations – Special Communities Perpetual Trust" below.

GDB has the following principal subsidiaries:

*Housing Finance Authority* (formerly known as Housing Finance Corporation) was originally created in November 1977 to provide needed rental-housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, the Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Authority. The Authority is engaged in insuring and servicing mortgages originated by the Urban Renewal and Housing Corporation. It also provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. Housing Finance Corporation had issued tax-exempt revenue bonds and notes to finance the construction of housing units approved for federal rental subsidies and to finance home ownership of single family housing units, which bonds and notes are now limited obligations of the Housing Finance Authority payable solely from revenues collected in respect of such housing units. The Federal Housing Administration has insured mortgages on certain of the housing units. As of December 31, 2004, $716.6 million of Housing Finance Authority bonds and notes were outstanding (excluding bonds payable solely from securities pledged to the payment of such bonds and bonds payable solely from federal funds).

As of December 31, 2004, the Authority also had outstanding $637.3 million of bonds issued to (i) pay obligations of the Commonwealth under law, (ii) fund certain payments of the Commonwealth under its mortgage subsidy program for low and moderate income families, (iii) guarantee certain insurance obligations of the Housing Bank and Finance Agency under certain programs.

*Tourism Development Fund* was created in November 1993 to promote Puerto Rico's hotel and tourism industry, primarily by making available direct loans and guarantees to secure the payment of private financing used for new hotel development projects. The Tourism Development Fund is also authorized to make capital investments and provide direct financing to tourism related projects. As of December 31, 2004, the Tourism Development Fund had outstanding direct loans and guarantees with

respect to the financing of fourteen hotel and tourism-related projects in an aggregate amount in excess of $572.6 million. See "Tax Incentives – Tourism Incentives Program" under *The Economy*.

The Tourism Development Fund has made payments under its guarantees and letters of credit in the aggregate amount of approximately $216.7 million with respect to several projects, including repayment in full of the bonds of three projects, which bonds had been declared due and payable at the direction of the Tourism Development Fund due to the failure of the borrowers of such projects to comply with their obligations under the related reimbursement agreements. After taking these payments and all related recoveries into consideration, the unrestricted net assets of the Tourism Development Fund as of December 31, 2004 were approximately $96.7 million (unaudited), and its allowance for loan losses on guarantees, loans, OREO and letters of credit was approximately $34.6 million (unaudited).

*Development Fund* was created in 1977 to provide an alternate source of financing to private enterprises in Puerto Rico that have difficulties in obtaining financing from traditional sources. The Development Fund may also guarantee obligations of these enterprises and invest in their equity securities.

*Capital Fund* was created in November 1993 for trading in debt obligations and publicly traded shares of domestic and foreign corporations.

*Public Finance Corporation* was created in December 1984 to provide agencies and instrumentalities of Puerto Rico with alternate means of meeting their financing requirements. As of December 31, 2004, the Corporation had $4.264 billion aggregate principal amount of bonds outstanding, substantially all of which have been issued to purchase debt of agencies and instrumentalities of the Commonwealth, and are payable from Commonwealth appropriations.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

## Other Public Corporations

*Aqueduct and Sewer Authority*. Puerto Rico Aqueduct and Sewer Authority ("PRASA") owns and operates a system of public water supply and sanitary sewer facilities.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the existing system and to finance its expansion for new users. Funds for this investment are expected to be provided through a combination of revenues from PRASA, bond issues, legislative appropriations, and federal grants. Debt service on revenue bonds is payable from net revenues of the system after payment of current expenses. Due to PRASA's financial difficulties (discussed below) and its inability to access the bond market, Act No. 45 was enacted in July 1994 to provide a Commonwealth guaranty of the principal and interest payments to the bondholders of all outstanding revenue bonds issued by PRASA. In addition, Act No. 45 was amended in 2000 to extend the Commonwealth payment guaranty to all outstanding bonds issued by PRASA to the United States Department of Agriculture, Rural Development, and loans granted by the Clean Water and Drinking Water State Revolving Funds for the benefit of PRASA. The guaranty will cover additional debt obligations issued by PRASA prior to July 1, 2005. In February 2004, this guaranty was extended through new legislation to include debt obligations issued until 2010. The total debt of PRASA was $778.6 million as of December 31, 2004.

From May 1995 until March 2004, the operation, management, repair, and maintenance of PRASA's systems were in the hands of private companies. The most recent agreement for the private management of PRASA's systems was entered into in May 2002 with Ondeo Puerto Rico, Inc. ("Ondeo"). In January 2004, Ondeo and PRASA agreed to terminate their agreement and in April 2004, the operation, management, repair, and maintenance of the PRASA systems returned to PRASA.

As part of the plan for the return of the operation and management of the PRASA systems to PRASA, legislation was enacted in March 2004 to restructure PRASA and provide further powers to improve its operational and financial management. The main areas of this restructuring included (i) decentralizing the administration of PRASA by creating five regions to provide greater efficiency in, and financial control of, the day to day administration and operational decision making process and execution; (ii) creating the positions of five Executive Regional Directors and an Executive Director for Infrastructure, who will, respectively, manage each region and manage capital improvement projects; and (iii) providing for six-year appointments for each of the Executive Regional Directors, Executive Director for Infrastructure and Executive Director in order to provide continuity to top management and better implement, supervise and revise as needed the ten-year plan and goals identified for PRASA in 2002. Further powers granted include the authority to make certain determinations and take certain actions with respect to compliance of the water and sewer system with various federal environmental laws.

PRASA has reported operational losses of $76.6 million, $152.4 million, $281.3 million, $209.7 million and $282.5 million during fiscal years 2000, 2001, 2002, 2003 and 2004, respectively. For fiscal year 2005, it is expected that PRASA will incur another operational loss, which will be covered with financial assistance provided by the Commonwealth's General Fund.

Beginning in fiscal year 2006, the Commonwealth's General Fund will cease to provide financial assistance to PRASA in order to alleviate the financial demands on the General Fund. In order to achieve fiscal independence, PRASA will have to implement various changes, such as (i) aggressive cost savings programs; (ii) a new and aggressive enforcement policy to identify and process delinquent customers; and (iii) rate increases for industrial, commercial and residential customers. Although PRASA will require GDB financial assistance until these measures are fully implemented, these measures are intended to allow PRASA to become financially independent in the future.

*Children's Trust* is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $1.171 billion aggregate principal amount of Tobacco Settlement Asset-Backed Bonds in October 2002. The bond proceeds were used, among other things, to pay the cost of certain capital expenses of the Commonwealth and certain capital and working capital expenses of PRASA. As of December 31, 2004, the outstanding principal amount of the bonds was $1.143 billion. These bonds and any other additional senior bonds issued by Children's Trust are secured by a statutory pledge of the payments made and to be made by participating manufacturers under the Master Settlement Agreement. To date, all payments required to be made under the Master Settlement Agreement have been made on a timely basis and Puerto Rico's share thereof has been received by Children's Trust.

*Convention Center District Authority* was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Convention Center and designated private parcels located within the Convention Center District in San Juan. The Authority currently has lines of credit with GDB totaling $415.7 million, of which $252.3 million was outstanding as of December 31, 2004.

The Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") financed the construction of a multi-purpose coliseum in San Juan, known as the Jose Miguel Agrelot Coliseum, with a line of credit provided by GDB. The Jose Miguel Agrelot Coliseum was recently completed and transferred to the Convention Center District Authority. Pursuant to Act No. 185 of August 3, 2004, AFICA also transferred the line of credit to the Convention Center District Authority. As of December 31, 2004, the line of credit had an outstanding balance of $136.2 million.

*Electric Power Authority* owns and operates the island's electric system. The capital improvement program for the five-year period ending June 30, 2009, is estimated to cost approximately $2.1 billion and will be financed primarily by borrowed funds, supplemented by internally generated funds. The Authority's bonded debt consists of Power Revenue Bonds, secured by a lien on net revenues of the electric system. As of December 31, 2004, the Authority's total debt was $5.209 billion, including $4.879 billion of bonds outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As a means of reducing its dependency on oil, the Authority has entered into long-term power purchase contracts with the operators of two cogeneration plants that use fuels other than oil. These two cogeneration projects consist of EcoElectrica LP's 507 megawatts liquefied natural gas plant at Guayanilla and a 454 megawatts clean coal facility at Guayama operated by an affiliate of Applied Energy Systems ("AES"). EcoElectrica's and AES's plants started commercial operations in March 2000 and November 2002, respectively. Currently, these two cogeneration plants provide approximately 26% of the Authority's energy needs.

*Health Insurance Administration* was created in 1993 to implement the health reform by negotiating and contracting for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of several designated regions of the island and pays such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covers all of the municipalities, and approximately 1.5 million persons were covered by the system during fiscal year 2004.

The total cost of the health insurance program for fiscal year 2005 is estimated at $1.354 billion, compared to $1.234 billion for fiscal year 2004 and $1.248 billion for fiscal year 2003. For fiscal year 2005, the General Fund covered $984 million of the total cost of the health insurance program, while the remaining $370 million was expected to be paid from federal, municipal and other sources. The fiscal year 2006 budget estimates the cost of the health insurance program to be $1.418 billion, of which the General Fund is estimated to cover $994 million, while the remaining $424 million is expected to be paid from federal, municipal and other sources.

*Highway and Transportation Authority* is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of the Authority, and federal and Commonwealth grants. Debt service on the Authority's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the gasoline tax; one-half of the proceeds of the tax on gas oil or diesel oil; all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year; highway toll revenues; and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and payments required to be made by the Commonwealth under its guarantees of bonds and notes to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment. In April 2004, the Authority issued approximately $140 million of bonds secured solely by Federal Highway Aid grant revenues. As of December 31, 2004, the Authority's total debt was $5.880 billion, including $5.770 billion of bonds outstanding.

The Authority has completed the first phase of a new mass transit system, known as Tren Urbano, to serve a portion of metropolitan San Juan. The first phase of Tren Urbano was constructed under several design/build contracts, including a design/build/operate contract covering the design and construction of the system and the operation of Tren Urbano for five years with an additional five-year option at the Authority's election. The cost of the first phase was $2.25 billion, which cost was financed by Federal Transit Administration grants, other federal funding sources and the Authority's own resources, including bond financings. Currently, the Authority is conducting an education and familiarization program to introduce Tren Urbano to the population. As part of this program, Tren Urbano is operating free of charge until the first week of June 2005.

The Authority is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon.  The toll bridge was financed with special facility revenue bonds of the Authority, the outstanding principal balance of which was $153.2 million as of December 31, 2004, payable by the private operator of the bridge principally from toll revenues.  The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994.  In certain circumstances as described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require the Authority, among other things, to assume the operator's obligations with respect to the special facility revenue bonds.  Some of those circumstances, including low toll revenues, exist at this time, but the Authority does not currently anticipate that the operator will exercise its remedy against the Authority.

*Puerto Rico Industrial Development Company* participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers.  The Company was merged with the Economic Development Administration in January 1998.  Rentals derived from the leasing of specified facilities of the Company are pledged to the payment of the Company's revenue bonds.  As of December 31, 2004, the Company's total debt was $330.7 million.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority* was created in June 1977.  The Authority has issued revenue bonds to finance industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies.  The bonds are payable solely from payments to be made to the Authority by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities.  As of December 31, 2004, approximately $2.2 billion of the Authority's bonds were outstanding.

*Infrastructure Financing Authority* was created in June 1988 to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing infrastructure facilities. The Authority is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities.  The Authority's enabling act also established the Puerto Rico Infrastructure Fund, funded with annual fixed amounts from the first proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States which are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended.  Currently, this amount is $70 million, and it will increase to $90 million for fiscal years 2007 to 2052.  Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury of Puerto Rico.  The Authority is using these amounts to provide financial support for various infrastructure and other projects.  As of April 30, 2005, the Authority's total debt was $1.990 billion.

The Authority is providing assistance to the Aqueduct and Sewer Authority, among other Benefited Entities, with regards to (i) the design and construction of various strategic regional water and sewer projects intended to provide improved services to targeted regions throughout the island; (ii) the implementation of an action plan to address a number of small water and sewer rehabilitation projects; (iii) the achievement of compliance with certain environmental laws; and (iv) the establishment of a prioritized capital program.

In June 1998, the Authority's enabling act was amended to establish the Infrastructure Development Fund, a permanent trust fund to be utilized by the Authority for the purpose of financing infrastructure projects.  The Infrastructure Development Fund was initially funded in March 1999 with $1.2 billion of proceeds received by the Telephone Authority from the sale of a controlling interest in

Puerto Rico Telephone Company. This initial amount will remain permanently deposited in a segregated, perpetual account, denominated the "corpus account," and must be invested exclusively in U.S. government or U.S. government-backed obligations. The income from such investment may only be used to finance infrastructure projects related to the Commonwealth's water and sewer systems. Other moneys in the Infrastructure Development Fund not attributable to the corpus account or the investment income thereon may be used for other infrastructure projects. The Authority is the custodian and administrator of the Infrastructure Development Fund. In October 2000, the Authority issued $1.093 billion of bonds payable from and secured by a pledge of the interest received by the Authority from the investments of the Infrastructure Development Fund. The proceeds of this bond issue are being used to finance certain aqueduct and sewer infrastructure development projects.

*Maritime Shipping Authority* commenced operations in 1974 upon the acquisition of three shipping lines serving Puerto Rico and the United States mainland. In 1995, the assets and operations of the Maritime Shipping Authority were sold to a private investor group. The remaining debt of the Authority was refinanced through the issuance of bonds by Public Finance Corporation, a subsidiary of GDB. The aggregate principal amount of such bonds outstanding as of December 31, 2004, was $328.5 million (not including accreted values of capital appreciation bonds outstanding). The bonds are payable from funds to be appropriated annually by the Legislature of Puerto Rico.

*Municipal Finance Agency* was created in 1972 as a municipal "bond bank" for Puerto Rico. The Agency is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on the Agency's bonds is payable from debt service payments on municipal bonds held by the Agency and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislature, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of December 31, 2004, the Agency had $1.237 billion of bonds outstanding.

*Ports Authority* owns and operates the major airport and seaport facilities in Puerto Rico. The Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of seaport equipment and property. Act No. 1 of January 1, 2000, authorized the transfer of the Authority's maritime ferry operations to Puerto Rico Maritime Transportation Authority, a newly created government agency. As of December 31, 2004, the Authority had $462.8 million in debt, including $314.8 million under a line of credit with GDB.

*Public Buildings Authority* is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by the Authority to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are further secured by the Commonwealth's guaranty. The Authority is authorized by law to have outstanding at any one time up to $3.325 billion of bonds guaranteed by the Commonwealth. As of December 31, 2004, $2.920 billion of such bonds of the Authority was outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds).

*Special Communities Perpetual Trust* is an irrevocable and permanent trust created in November 2002 as a public corporation. The Trust's principal purpose is to fund development projects which address the infrastructure and housing needs of underprivileged communities. Act No. 271 of November 21, 2002, requires GDB to provide the Trust with a $500 million line of credit and to make a capital contribution to the Trust of $500 million. In December 2004, GDB transferred to the Trust the $500 million capital contribution required by Joint Resolution No. 1027 of November 21, 2002 and $270.7 million, the amount remaining in the GDB $500 million line of credit. The amounts transferred to

III-36

the Trust were deposited in two investment accounts held by GDB for the benefit of the Trust, $320 million of which have been disbursed to the Trust as of April 18, 2005. As of December 31, 2004, the Trust's GDB line of credit had an outstanding balance of $425.1 million.

*Telephone Authority* was created in July 1974 when the Commonwealth purchased the Puerto Rico Telephone Company ("PRTC") from International Telephone and Telegraph Corporation. PRTC operates the principal telephone system in Puerto Rico.

In March 1999, the Telephone Authority sold a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated, which was acquired by Verizon Communications, Inc. The net proceeds of the sale received at closing were applied to defease outstanding bonds of the Authority in the principal amount of $756 million, to make a $1.2 billion deposit to the Infrastructure Development Fund held by the Infrastructure Financing Authority and to pay certain benefits to PRTC employees. In January 2002, Verizon exercised its option to purchase an additional 15% of PRTC stock for $172 million. The Commonwealth retains a 28% stock participation in PRTC. The proceeds from the Verizon stock option exercise and the remaining 28% ownership interest were transferred to the Employees Retirement System of the Commonwealth and its instrumentalities.

*University of Puerto Rico* (the "University"), with 68,627 students in academic year 2003-2004, is by far the largest institution of higher education on the island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements have been financed mainly by revenue bonds. As of December 31, 2004, the University's total debt was $439.1 million.

On December 21, 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project is being built and will be operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and will be leased to the University for a term equal to the term of the bonds with lease payments being in sufficient amounts to pay debt service on said bonds as they become due.

*Other public corporations* (not described above) have outstanding debt in the aggregate amount of $1.140 billion as of December 31, 2004. Debt service on $484.3 million of such outstanding debt is being paid from legislative appropriations. However, the Commonwealth is not obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by the Electric Power Authority and the Aqueduct and Sewer Authority, which is insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

Public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Commonwealth of Puerto Rico (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System"), and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System").

The University Retirement System and the Electric Power Authority Retirement System apply to employees of the University of Puerto Rico and Electric Power Authority, respectively. The Commonwealth is not required to contribute directly to those two systems, although a large portion of University revenues is derived from legislative appropriations.

The Teachers Retirement System covers public and private school teachers (primarily from the public sector) and employees, the Judiciary Retirement System covers judges, and the Employees Retirement System covers all other employees of the Commonwealth, its municipalities and instrumentalities. As of June 30, 2004, the total number of active members of the three systems was as follows: Employees Retirement System, 157,179; Teachers Retirement System, 78,500; and Judiciary Retirement System, 338. The three systems are financed by contributions made by employers (the Commonwealth, public corporations, and municipalities) and employees, and investment income. The central government is responsible for approximately 67% of total employer contributions to the Employees Retirement System, and the other 33% is the responsibility of public corporations and municipalities. The central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the systems and required contributions to the systems by employees are determined by law. Required employers' contributions to the systems are determined by law and are not actuarially determined. For the Employees Retirement System, required employer contributions consist of 9.275% of applicable payroll in the case of municipalities, central government and public corporations. Required employee contributions for the Employees Retirement System vary according to salary and how the individual employee's retirement benefits are coordinated with social security benefits. For the Judiciary Retirement System, required contributions consist of 20% of applicable payroll for the employer and 8% for the employees.

According to the most recent actuarial valuation of the Employees Retirement System and Judiciary Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2003, the total pension benefit obligation for the Employees Retirement System and Judiciary Retirement System was $11.2 billion and $166.7 million, respectively. The unfunded pension benefit obligation of the Employees Retirement System and Judiciary Retirement System for the same period was $9.2 billion and $105 million, respectively, representing a funding ratio of 17.4% and 37.1%, respectively. This actuarial valuation was completed in accordance with the "Projected Unit Credit" method and assumed an investment return of 8.5% per year and a salary increase of 5% per year.

In the case of the Employees Retirement System, Act No. 10 of May 21, 1992 provided for benefit increases of 3% every three years. The first 3% increase was granted to retirees who had been receiving their annuities for three or more years as of that date. The second 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1995. This increase is being financed by additional contributions from the employers. The third 3% increase was granted to retirees who had been receiving their annuities for three or more years as of January 1, 1998. This third increase is being partially funded with additional contributions from some of the employers. In June 2001, the Legislature approved a law providing a fourth 3% increase, effective as of January 1, 2001, in post-retirement annuity payments granted on or prior to January 1, 1998. This increase will be funded by the General Fund for retirees who were employees of the central government and by

municipalities and public corporations for retirees who were their employees.  In June 2003, the Legislature approved a law providing a fifth increase of 3% in post retirement benefits effective January 1, 2004.  This increase will also be funded by the General Fund for retirees who were employees of the central government and by municipalities and public corporations for retirees who were their employees.  Subsequent increases will depend upon the explicit approval of the System's Board of Trustees and the Legislature, and must provide a funding source.  In the case of the Judiciary Retirement System, Act No. 41 of June 13, 2001 provides a 3% increase in annuity payments, commencing on January 1, 2002 and every three years thereafter, to retirees who have been receiving their annuities for three or more years as of that date.  This increase will be funded by the General Fund.

In 1990, the organic act of the Employees Retirement System was amended to reduce the future pension liabilities of the Employees Retirement System.  Among other provisions, the legislation increased the level of contribution to the System and limited the retirement benefits for new employees by increasing the length of time for the vesting of certain benefits and reducing the level of benefits in the case of early retirement.  The legislation also reduced the level of occupational disability benefits and death benefits received by new employees.

In 1999, the organic act of the Employees Retirement System was further amended to change it, prospectively, from a defined benefit system to a defined contribution system.  This amendment provides for the establishment of an individual account for each employee hired by the Commonwealth after December 31, 1999 and for those current employees who elect to transfer from the existing defined benefit system.  The individual account of each current employee is credited initially with an amount equal to his aggregate contributions to the Employees Retirement System, plus interest.  Current employees who did not elect to transfer to the new defined contribution system will continue accruing benefits under the current defined benefit system.  The individual account of each participant of the new defined contribution system is credited monthly with the participant's contribution and is credited semiannually with a rate of return based on either of two notional investment returns.  Such accounts are not credited with any contribution by the employer.  Instead, employer contributions will now be used completely to reduce the accumulated unfunded pension liability of the Employees Retirement System.

The law approving the sale of a controlling interest in PRTC to a consortium led by GTE International Telecommunications Incorporated (subsequently acquired by Verizon Communications Inc.) provides that any future proceeds received by the government from the sale of its then remaining 43% stock ownership in PRTC will be transferred to the Employees Retirement System to reduce its accumulated unfunded pension benefit obligation.  In January 2002, Verizon exercised its option to purchase an additional 15% of the stock of PRTC for $172 million.  The proceeds of the sale were transferred to the Employees Retirement System.

The Employees Retirement System's disbursements of benefits during fiscal years 2002, 2003, and 2004 exceeded contributions and investment income for those years.  The cash shortfall for fiscal year 2002 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC.  The cash shortfall for fiscal year 2003 was covered with a portion of the proceeds from the sale to Verizon of the 15% stock ownership in PRTC and an advance from the Department of the Treasury.  The cash shortfall for fiscal year 2004 was also covered with advances received from the Department of the Treasury.  A cash shortfall, which will be covered either by a sale of assets or advances from the Department of the Treasury, is also expected for fiscal year 2005.

The Employees Retirement System anticipates that its future cash flow needs for disbursement of benefits to participants may exceed the sum of the employer and employee contributions received and its investment and other recurring income.  The Employees Retirement System expects to cover this cash flow imbalance in the next few fiscal years with the proceeds from the sale of the remaining shares of PRTC stock.  The Employees Retirement System is also evaluating other measures to improve its cash flows and funding ratio.  Some of these measures include, but are not limited to, the establishment of a maximum salary to calculate pension benefits, aggressive collection efforts with respect to employer

contributions owed by the Commonwealth, the municipalities and public corporations, the transfer to the Employees Retirement System of any amounts remaining in the Children's Trust after payment of all the outstanding bonds, and the assignment to the Employees Retirement System of a percentage of General Fund revenues and/or excess proceeds derived from the proposed tax reform being considered by the Commonwealth. See "Proposed Fiscal Reform" under *Puerto Rico Taxes, Other Revenues and Expenditures*.

In addition, legislation has been submitted that if enacted will authorize the issuance of pension obligation bonds ("POBs"). The POBs will contribute approximately $2 billion in assets to the Employees Retirement System and will be payable solely from the Commonwealth's General Fund. While the POBs are outstanding and the Commonwealth is paying debt service, General Fund transfers to the Employees Retirement System in any fiscal year will be reduced by an amount equal to the lesser of $100 million and the debt service on the POBs payable in such fiscal year. The proposed legislation also includes a measure that would increase employee and employer contributions to the Employees Retirement System from 8.275% and 9.275%, respectively, to 10% each. The Employees Retirement System projects that current contributions, together with investment and other recurring income, earnings on the $2 billion raised by the issuance of the POBs, and the proposed increase in employee and employer contributions will allow it to improve its funding ratio.

According to the most recent actuarial valuation of the Teachers Retirement System submitted by a firm of independent consulting actuaries, as of June 30, 2004, the accrued actuarial liability of the system was $4.702 billion and the value of its assets amounted to $2.403 billion, representing a funding ratio of 51%, and the resulting unfunded accrued liability was $2.299 billion. This funding ratio takes into account the recent turn around in the equities market, which has provided an investment return of 16.5%, and the restructuring of the portfolio's asset composition. The actuarial valuation assumed an investment return of 8%, yearly salary increases of 5%, employee and employer contributions of 9% and 8.5%, respectively, and a remaining amortization period of 16 years for the unfunded accrued liability.

The following table presents, in summary form, the income and expenses of the retirement systems for fiscal years 2002, 2003, and 2004. The investment income figures presented in the table include unrealized gains and losses.

**Commonwealth of Puerto Rico**
**Retirement Systems**
**Income and Expenses**
**(in thousands)**

| | Employees Retirement System | Judiciary Retirement System | Teachers Retirement System |
|---|---|---|---|
| **Fiscal Year Ending June 30, 2004** | | | |
| Income: | | | |
| Employers' contributions | $344,889 | $ 5,556 | $159,152 |
| Employee contributions | 294,013 | 2,578 | 110,548 |
| Investment income | 312,992 | 9,223 | 341,313 |
| Total | 951,894 | 17,357 | 611,013 |
| Expenses: | | | |
| Benefit payments | 718,219 | 9,927 | 324,611 |
| Administrative and other expenses | 39,635 | 1,360 | 26,069 |
| Total | 757,854 | 11,287 | 350,680 |
| Net Income | $194,040 | $ 6,070 | $260,333 |
| | | | |
| **Fiscal Year Ended June 30, 2003** | | | |
| Income: | | | |
| Employers' contributions | $330,404 | $ 5,536 | $ 140,264 |
| Employee contributions | 276,347 | 2,479 | 104,403 |
| Investment income | 57,132 | 4,131 | 51,998 |
| Total | 663,883 | 12,146 | 296,665 |
| Expenses: | | | |
| Benefit payments | 667,390 | 9,330 | 298,529 |
| Administrative and other expenses | 28,768 | 1,473 | 22,565 |
| Total | 696,158 | 10,803 | 321,094 |
| Net (Loss) Income | ($ 32,275) | $ 1,343 | ($ 24,429) |
| | | | |
| **Fiscal Year Ended June 30, 2002** | | | |
| Income: | | | |
| Employers' contributions | $308,228 | $ 5,412 | $124,152 |
| Employee contributions | 259,203 | 2,448 | 99,454 |
| Investment income | (306,008) | (7,791) | (41,068) |
| Total | 261,423 | 69 | 182,538 |
| Expenses: | | | |
| Benefit payments | 683,106 | 8,462 | 278,168 |
| Administrative and other expenses | 27,304 | 1,072 | 20,833 |
| Total | 710,410 | 9,534 | 299,001 |
| Net Loss | ($448,987) | ($ 9,465) | ($116,463) |

*Sources:* Employees Retirement System, Judiciary Retirement System, and Teachers Retirement System

# COMMONWEALTH FINANCIAL STATEMENTS

For fiscal year 2004, the financial statements of the Commonwealth were audited by KPMG LLP. KPMG LLP did not audit the financial statements of the Public Buildings Authority capital project fund (a major fund), and certain activities, funds and component units identified separately in their report. Those financial statements were audited by other auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, was based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth for fiscal year 2004, which includes the basic financial statements of the Commonwealth for fiscal year 2004, was filed by the Commonwealth with each nationally recognized municipal securities information repository on May 17, 2005.

# PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income taxes and excise taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

## Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal year 2002 through fiscal year 2004, the estimated revenues and expenditures for fiscal years 2005, and the budgeted revenues and expenditures for fiscal year 2006. The information relating to fiscal year 2005 is based on the estimate of revenues and expenditures for that fiscal year. The information relating to fiscal year 2006 is based on the proposed budget of revenues and expenditures for that fiscal year, which is currently under review by the Legislature.

The amounts shown on the table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. For example, in fiscal years 2003 and 2004, there were approximately $150 million and $85 million, respectively, of such expenditures that are not reflected in the table. A discussion of the

budget for fiscal year 2005 and the proposed budget for fiscal year 2006 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislature has by resolution agreed to appropriate funds. "Transfers to Agencies" represents moneys appropriated for the operation of the Health Facilities and Services Administration or, after the dissolution of that Administration, the Department of Health. General Fund revenues, expenditures and transfers as presented in the table differ from the General Fund revenues, expenditures and transfers as presented in the financial statements of the Commonwealth, as the latter statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2002 | 2003 | 2004(p) | 2005(e) | 2006(b) |
|---|---|---|---|---|---|
| Beginning cash balance | $ 125,154 | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 |
| **Revenues from internal sources:** | | | | | |
| Income Taxes: | | | | | |
| Individuals | 2,449,982 | 2,767,678 | 2,720,920 | 2,868,000 | 3,127,000 |
| Corporations | 1,706,137 | 1,776,985 | 1,831,027 | 2,005,000 | 2,252,000 |
| Partnerships | 2,670 | 2,101 | 3,005 | 2,000 | 3,000 |
| Withheld from non-residents | 583,256 | 517,141 | 631,100 | 575,000 | 628,000 |
| Tollgate taxes | 59,515 | 45,321 | 31,579 | 23,000 | 17,000 |
| Interest | 14,310 | 11,278 | 10,108 | 10,000 | 11,000 |
| Dividends | 62,548 | 49,790 | 70,192 | 74,000 | 74,000 |
| Total income taxes | 4,878,418 | 5,170,299 | 5,297,931 | 5,557,000 | 6,112,000 |
| Commonwealth excise taxes | | | | | |
| Alcoholic beverages | 249,705 | 299,582 | 296,302 | 302,000 | 316,000 |
| Cigarettes | 116,055 | 149,487 | 144,733 | 146,000 | 152,000 |
| Motor vehicles | 418,024 | 499,252 | 551,181 | 585,000 | 614,000 |
| Other excise taxes | 681,344 | 703,029 | 701,129 | 746,000 | 1,481,000 |
| Total Commonwealth excise taxes | 1,465,128 | 1,651,350 | 1,693,345 | 1,779,000 | 2,563,000 |
| Property taxes | - | - | - | - | - |
| Inheritance and gift taxes | 1,962 | 2,825 | 15,691 | 5,000 | 2,000 |
| Licenses | 82,575 | 85,876 | 84,231 | 89,000 | 123,000 |
| Other: | | | | | |
| Lottery | 61,358 | 67,621 | 65,387 | 70,000 | 63,000 |
| Electronic Lottery | 57,897 | 89,443 | 86,115 | 73,000 | 83,000 |
| Miscellaneous non-tax revenues | 562,213[1] | 438,457 | 379,501 | 370,000 | 362,000 |
| Total Other | 681,468 | 595,521 | 531,003 | 513,000 | 508,000 |
| Total revenues from internal sources | 7,109,551 | 7,255,866 | 7,622,201 | 7,943,000 | 9,308,000 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[2] | 314,253 | 309,958 | 328,921 | 337,000 | 350,000 |
| Customs | 30,595 | 25,918 | 34,266 | 24,000 | 26,000 |
| Total revenues from non-Commonwealth sources | 344,848 | 335,876 | 363,187 | 361,000 | 376,000 |
| Total net revenues | 7,454,399 | 7,841,742 | 7,985,388 | 8,304,000 | 9,684,000 |
| Other Income (refunds)[3] | 111,411 | (78,927) | 62,789 | (55,409) | - |
| Transfers to Redemption Fund[4] | (274,773) | (331,925) | (341,538) | (369,985) | (435,000) |
| Proceeds of notes and other borrowings[5] | 1,161,856 | 2,259,775 | 3,940,397 | 4,925,595 | |
| Repayment of notes and other borrowings[6] | (1,201,084) | (2,021,832) | (3,713,634) | (3,909,434) | |
| Adjusted revenues | 7,251,622 | 7,418,833 | 7,933,402 | 8,894,767 | 9,249,000 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 2,862,288 | 3,773,579 | 3,468,531 | 3,617,386 | 2,809,310 |
| Personal services | 2,884,636 | 3,119,476 | 3,951,387 | 4,783,567 | 5,667,093 |
| Other services | 764,655 | 583,343 | 400,594 | 389,346 | 595,637 |
| Materials and supplies | 106,294 | 80,491 | 73,757 | 72,411 | 143,521 |
| Equipment purchases | 20,397 | 33,170 | 20,572 | 20,707 | 33,439 |
| Capital outlays and other debt service | 73,806 | - | 675 | 78,598 | - |
| Transfers to agencies | 314,416 | - | - | - | - |
| Prior year disbursements | - | - | 88,432 | - | - |
| Total expenditures | 7,026,492 | 7,590,059 | 8,003,948 | 8,962,015 | 9,249,000 |
| Adjusted revenues less expenditures | 225,130 | (171,226) | (70,546) | (67,248) | - |
| Ending cash balance | $ 350,284 | $ 179,058 | $ 108,512 | $ 41,264 | $ 41,264 |

(p)  Preliminary.
(e)  Estimated; represents actual revenues as of April 2005 plus budgeted revenues for the months remaining in fiscal year 2005.
(b)  Budget, as proposed.
(1)  Includes certain non-recurring revenues totaling $244.1 million.
(2)  Excludes transfers by the Commonwealth to the Conservation Trust Fund and amounts deposited by the Secretary of the Treasury into a separate account for the promotion of Puerto Rico rums in foreign markets.
(3)  Consists of net revenue from General Fund's non budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(4)  Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited directly to the Redemption Fund from non-General Fund revenues.
(5)  Consists of proceeds of Commonwealth tax and revenue anticipation notes and borrowings from GDB.
(6)  Consists of repayment of Commonwealth tax and revenue anticipation notes and borrowings from GDB .

*Source:*  Department of the Treasury

*Proposed Budget Fiscal Year 2006 Compared to Current Budget Fiscal Year 2005*

General Fund total revenues for fiscal year 2006 are projected to be $9.684 billion, representing an increase of $1.4 billion, or 16.6%, from budgeted fiscal year 2005 revenues. The major changes from fiscal year 2005 are expected to be: (i) projected increases in income taxes from individuals of $259 million and income taxes from corporations of $247 million; and (ii) projected increases in motor vehicle excise taxes of $29 million and Commonwealth excise taxes of $784 million.

The projection of General Fund revenues for fiscal year 2006 is based on a projected nominal and real growth in gross national product of 5.9% and 2.5%, respectively. The projection of General Fund revenues assumes additional revenues of $1.004 billion from the following new legislative and administrative measures: (i) the elimination of the exemption for food, medicine, and certain other goods from the 5% general excise tax ($639 million); (ii) an increase in license fees for luxury cars ($30 million); (iii) a temporary surtax on financial institutions ($180 million); (iv) the elimination of the preferential capital gains rates ($60 million); and (v) an intensification of efforts to detect excise tax evasion through the purchase of X-Ray machines to monitor ship containers at ports of entry, the implementation of a program to improve collections, and heightened scrutiny on the payment of excise taxes on crude oil and its derivatives ($95 million).

Proposed expenditures for fiscal year 2006 total $9.684 billion, which is $830 million, or 9.4%, higher than the $8.854 billion budgeted for fiscal year 2005. The principal reasons for the differences are (i) education related expenditures, which are proposed to be approximately $448.3 million higher; (ii) health related expenditures, which are proposed to be approximately $74.5 million higher; (iii) public safety and protection related expenditures, which are proposed to be approximately $164.6 million higher; and (iv) debt service which will be $54.8 million higher.

*Estimated Fiscal Year 2005 Compared to Preliminary Fiscal Year 2004*

The General Fund budget for fiscal year 2005, which commenced on July 1, 2004, provides for total net revenues of $8.304 billion, which represents an increase of $319 million, or 4%, over the budget for fiscal year 2004. Total budgeted net revenues and estimated net revenues of the General Fund for fiscal year 2004, which ended on June 30, 2004, were $7.925 billion and $7.985 billion, respectively.

The major changes in estimated revenues for fiscal year 2005 compared to preliminary revenues for fiscal year 2004 are: (i) projected increases in total income taxes of $259 million; (ii) projected increases in total excise taxes of $85 million; and (iii) projected decreases in non-tax revenues of $10 million. The revised budget of General Fund revenues for fiscal year 2005, which revised budgeted items but not the total budget amount, assumes a 6.0% nominal and 2.3% real growth in gross product, and additional revenues of $81 million from the legislative measures described below. The original budget of General Fund revenues for fiscal year 2005 assumed a 5.7% nominal and 2.9% real growth in gross product. Budgeted revenues also include the proceeds of a $550 million loan from GDB secured by tax receivables. Such loan has a maximum term of ten years.

As a means of increasing revenues for fiscal year 2005, the following laws were enacted: (i) a "sunset provision" which enables early retirement or "rollover" of certain individual retirement account funds without penalties under the Commonwealth's income tax law; (ii) a one-year "sunset provision" for variable annuities by insurance companies in the United States held by Puerto Rico citizens for "rollovers" to variable annuities by Puerto Rico insurance companies; (iii) a transfer to the General Fund of compulsory motor vehicle insurance premiums for which reimbursement has not been claimed; and (iv) a "sunset provision" to lower all long-term capital gains tax rates by 50%. In particular, gains realized on or prior to June 30, 2005 by resident individuals from the sale or exchange of a capital asset, if the asset is held for more than six months, will be taxed at a rate of 5% (6.25% in the case of corporate taxpayers) if the asset is located in Puerto Rico and at a rate of 10% (12.5% in the case of corporate

taxpayers) if located outside Puerto Rico. Similarly, lump sum distributions by resident individuals on income from pensions will be taxed at a rate of 10%.

As of April 30, 2005, General Fund estimated total revenues for fiscal year 2005 were within the amount originally budgeted. According to the rate of collections as of April 30, 2005, total income taxes, license fees and revenues from non-Commonwealth sources are expected to be under budget. However, such reduction is expected to be offset by collections in excess of budgeted amounts of Commonwealth excise taxes, inheritance and gift taxes and other revenues from internal sources.

*Preliminary Fiscal Year 2004 Compared to Fiscal Year 2003*

General Fund total net revenues for fiscal year 2004 were $7.985 billion, representing an increase of $143 million, or 1.8%, from fiscal year 2003 net revenues. This amount excludes proceeds of a loan of $233 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The loan has a term of ten years, and may be repaid sooner to the extent that sufficient revenues are available for such purpose. This amount also excludes $82 million of additional non-recurring revenues. The major changes in revenues from fiscal year 2003 were: (i) increases in total income taxes of $128 million, mainly resulting from decreases in income taxes from individuals of $203 million and in income taxes withheld from non-residents of $114 million; (ii) increases in total excise taxes of $42 million; and (iii) decreases in other revenues of $65 million, mainly as a result of a decrease in miscellaneous non-tax revenues of $59 million. Approximately $170 million of the increase in total income taxes for fiscal year 2004 relates to the collection of past taxes as a result of an incentives plan implemented by the Secretary of the Treasury.

Total cash expenditures for fiscal year 2004 were $8.004 billion, which amount excludes certain amounts related to fiscal year 2004 but to be disbursed in fiscal year 2005. This amount also excludes approximately $293 million of additional expenditures that were not originally budgeted and are expected to be covered with reserve funds ($50 million), the reimbursement of certain federal education funds ($141 million), and other sources. After considering (i) debt service payments (separately identified in the table as "Transfers to Redemption Fund"), (ii) $227 million in net borrowings from GDB and other sources, and (iii) $63 million in other income from the General Fund's non-budgetary funds, the ending cash balance of the General Fund decreased from $179 million at the end of fiscal year 2003 to $109 million at the end of fiscal year 2004.

*Fiscal Year 2003 Compared to Fiscal Year 2002*

General Fund total net revenues for fiscal year 2003 were $7.842 billion, representing an increase of $388 million, or 5.2%, from fiscal year 2002 revenues. This amount includes proceeds of a loan of $250 million obtained from GDB, which is included as part of "Proceeds of notes and other borrowings." The loan has a term of five years, and may be repaid sooner to the extent that sufficient revenues are available for such purpose. The major changes from fiscal year 2002 were: (i) increases in income taxes from individuals of $318 million and in corporate income taxes of $71 million; (ii) increases in excise taxes on alcoholic beverages and cigarettes of $83 million, and increases in motor vehicle excise taxes of $81 million; (iii) an increase in electronic lottery revenues of $32 million; and (iv) a decrease in miscellaneous non-tax revenues of $124 million and in income taxes withheld from non-residents of $66 million. The decrease in miscellaneous non-tax revenues relates to certain special administrative measures that had been implemented by the Secretary of the Treasury in fiscal year 2002 and that do not apply to fiscal year 2003.

Total cash expenditures for fiscal year 2003 were $7.590 billion, which amount excludes certain amounts related to fiscal year 2003 but disbursed in fiscal year 2004. This amount also excludes $150 million of additional expenditures that were not originally budgeted and were covered with reserve funds, federal fiscal relief funds and other sources. The principal reason for these higher expenditures was higher than anticipated education costs. After considering (i) $332 million in debt service payments

(separately identified on the table as "Transfers to Redemption Fund"), (ii) $238 million in net borrowings from GDB (which includes the $250 million loan mentioned above) and other sources, and (iii) $79 million in reserves for future tax refunds reduced by estimated tax refunds (separately identified on the table as "Other Income (refunds)"), the ending cash balance of the General Fund was reduced from $350 million at the end of fiscal year 2002 to $179 million at the end of fiscal year 2003.

## Major Sources of General Fund Revenues

*Income Taxes*

The Commonwealth's income tax law, the Internal Revenue Code of 1994, as amended (the "PR Code"), imposes a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax is imposed on certain payments made to non-residents of Puerto Rico, which is collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code has five tax brackets for individuals with tax rates of 7%, 10%, 15%, 28%, and 33%. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at a rate of 10%.

Gain realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at a rate of 20%. It is taxed at a rate of 10% if the capital asset consists of certain property located or deemed located in Puerto Rico. Gains realized by Puerto Rico resident individuals, trusts and estates from the sale of stock of certain Puerto Rico corporations in an initial public offering made prior to January 1, 2008 are subject to a special capital gains rate of 7%.

On August 22, 2004, the Governor signed into law Act 226 to provide a temporary reduction in the long-term capital gains tax rate. Act 226 reduces the long-term capital gains tax rates by 50% for transactions that take place from July 1, 2004 through June 30, 2005, provided that the net long-term capital gain is reinvested in Puerto Rico.

Interest income in excess of $2,000 on deposits with Puerto Rico financial institutions is taxed at a rate of 17%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, and estates qualifies for a special 10% tax rate.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the industrial incentives program (see "Tax Incentives" under *The Economy* above), it is subject to tax at graduated rates.

The PR Code provides for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, are taxed at a maximum rate of 25% or 12.5% if the capital asset consists of certain property located or deemed located in Puerto Rico sold or exchanged after December 31, 2000. Act 226 reduces the long-term capital gains tax rates by 50% for transactions that take place from July 1, 2004 through June 30, 2005. Dividends received by Puerto Rico corporations and partnerships of foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general income tax rates. A dividends received credit may be available. A

special tax rate of 17% is applicable to dividend distributions of REITs received by corporations. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident corporations and partnerships qualifies for a special tax rate.

Certain corporations and partnerships covered by the tax incentives acts continue to be subject to a maximum tax rate of 45% on their taxable income. Corporations and partnerships covered by the Puerto Rico Tourism Incentives Act of 1993, as amended, are subject to a maximum tax rate of 42% on their taxable income. The PR Code also provides for an alternative minimum tax of 22%. Corporations and partnerships operating under a new grant of tax exemption issued under the 1998 Tax Incentives Act are subject to a maximum income tax rate of 7% during their basic exemption period.

The PR Code imposes a branch profits tax on resident foreign corporations less than 80% of whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations (including Section 936 Corporations) operating under new grants of tax exemption issued under the 1998 Tax Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by such corporations to non-resident recipients are subject to a 10% withholding tax. The basic tax on dividends paid to foreign corporate shareholders of Section 936 Corporations operating under grants of tax exemption issued under prior incentives laws is 10% but is subject to reduction if a percentage of the profits are invested in certain eligible instruments for specified periods of time.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% withholding tax.

*Excise Taxes*

The PR Code imposes a tax on articles and commodities that are imported into or manufactured in Puerto Rico for consumption in Puerto Rico and a tax on certain transactions, such as hotel occupancy, public shows, and horse racing. The excise tax on certain articles and commodities, such as cigarettes, alcohol and petroleum products, is based upon the quantity of goods imported. The excise tax on motor vehicles is based on its suggested retail price. The PR Code imposes a tax at an effective rate of 6.6% of the F.O.B. factory price for imported goods and 3.6% of the sales price of goods manufactured in Puerto Rico, except sugar, cement, cigarettes, motor vehicles and certain petroleum products, which are taxed at different rates. Goods to be used by the government, except for motor vehicles and construction equipment, are not exempt. Exemptions apply to certain articles, such as food and medicines, and to articles designated for certain users.

The Department of the Treasury, in an effort to balance the fiscal year 2006 budget, is proposing the elimination of the excise tax exemptions that apply to certain articles, such as food and medicines. The Department of the Treasury expects to raise approximately $630 million through this legislative initiative less approximately $100 million which would be returned to certain low income segments of the population.

*Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from the island to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is $13.50 per gallon. Of this amount, $13.25 per proof gallon has been or will be returned to the Treasury of Puerto Rico during the period from July 1, 1999 to December 31, 2005. Effective January 1, 2006, the amount returned will be reduced to the lesser of $10.50 per proof gallon and the actual excise tax imposed. Legislation is currently pending in both houses of the United States Congress, however, that would increase the amount of federal excise taxes per proof gallon transferred to the Commonwealth to $13.50 after December 31, 2005 and before January 1, 2007. This legislation would also allocate $0.50 of the total tax so returned to the Conservation Trust Fund, a charitable trust established in 1968 pursuant to a Memorandum of Understanding between the United States Department of the Interior and the Commonwealth whose mission is to protect natural resources in Puerto Rico.

*Property Taxes*

Personal property, which accounts for approximately 53% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, a special 1.03% tax on the assessed value of all property (other than exempted property) imposed by the Commonwealth for purposes of paying the Commonwealth's general obligation debt is deposited in the Commonwealth's Redemption Fund.

The following table presents the assessed valuations and real and personal property taxes collected for the fiscal years ending June 30, 2000 through 2004.

<div align="center">

**Commonwealth of Puerto Rico**
**Assessed Valuations and Real and Personal Property Taxes**
**(Commonwealth and Municipalities Combined)**
**(in thousands)**

</div>

| Fiscal Years Ended June 30 | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections |
|---|---|---|---|---|---|
| 2000 | 20,514,014 | 704,568 | 594,151 | 64,812 | 658,963 |
| 2001 | 21,575,063 | 736,667 | 614,411 | 70,496 | 684,907 |
| 2002 | 22,743,568 | 792,799 | 645,117 | 60,677 | 705,794 |
| 2003 | 23,138,903 | 824,933 | 671,163 | 79,421 | 750,584 |
| 2004 | 23,540,237 | 836,734 | 706,677 | 79,772 | 786,449 |

(1) Valuation set as of July 1 of each fiscal year.

*Source:* Municipal Revenues Collection Center

**Collections of Income and Excise Taxes**

The Department of the Treasury has continued its program for improving tax collections, which began in fiscal year 1986. The program has consisted, in part, of taking the initiative in sponsoring and implementing tax reform, particularly in the areas of excise taxes and income taxes, in order to decrease the incidences of nonpayment of taxes and to expand the taxpayer base. The program has also included (i) improving the methods by which delinquent taxpayers are identified, primarily through the use of computer analyses, (ii) computerizing the processing of tax returns, and (iii) identifying and eliminating taxpayer evasion.

**Proposed Fiscal Reform**

The Department of the Treasury has completed its evaluation of a plan formulated by its outside consultants to reform the Commonwealth's tax system. The objective of this reform would be to reduce the income tax rates for individuals and corporations while expanding the tax base by taxing persons not currently participating in the income tax system and simplifying the tax system in order to make its administration more effective.

On April 30, 2005, the Fiscal Reform Evaluation Commission, a group appointed by the Governor to review the proposed fiscal reform proposals and comprised of various representatives from the private and public sectors, delivered to the Governor a comprehensive report containing its recommendations with respect to the proposed fiscal reform. The Governor is currently analyzing the Commission's recommendations in order to prepare and present fiscal reform legislation. Although the final form of the proposed fiscal reform is uncertain, the Department of the Treasury expects the fiscal reform will be implemented beginning on January 1, 2007. The Department of the Treasury expects that the fiscal reform will have a positive net effect on General Fund revenues.

In an attempt to completely restructure the current tax system, the Commission recommends the imposition of a 10% flat tax rate on income earned by individuals and corporations. As a result, individual taxpayers would see a reduction in available income tax deductions, an increase in income exempt from taxation, and the creation of tax credits for the benefit of retirees and certain salaried workers. Although income tax deductions available to corporations would also be reduced, the Commission proposes certain special incentives to corporate taxpayers and a 10% tollgate tax on the repatriation by foreign corporations of earning and royalties.

Another key element of the Commission's recommendations includes the implementation of a hybrid consumption-based tax. The hybrid system would be composed of a value-added tax and a sales tax. Initially, consumption would be taxed at a rate of 10%, with a subsequent reduction to 9% five years after implementation. During the first five years, 1% of collections would be transferred to the municipalities. This transfer would be eliminated upon the reduction of the consumption tax rate to 9%.

The Commission also provided recommendations for fiscal reform at the municipal level. Some of these recommendations include the elimination of taxes on personal property and the reappraisal of real property values, which are currently assessed on the basis of 1958 property values. Also, the Commission recommended the regional consolidation of municipalities in an effort to share expenses.

Finally, the Commission provided non-tax based recommendations. For example, the Commission recommends a reduction in the current size of the government and the development and implementation of advanced technological systems in order to make government more efficient and effective.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, *per diems*, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligations payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law.

**Federal Grants**

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government, including public corporations, are estimated to be $5.279 billion for fiscal year 2006, an increase of $83.5 million, or 1.6%, from fiscal year 2005. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Department of the Treasury. The figures for fiscal years 2002, 2003 and 2004 are actual figures. The estimated figures for fiscal years 2005 and 2006 are based on the information submitted by each agency to the Office of Management and Budget.

**Commonwealth of Puerto Rico**
**Federal Grants[1]**
**(in thousands)**

|  | 2002 | 2003 | 2004 | 2005[1] | 2006[1] |
|---|---|---|---|---|---|
| Education | $ 734,917 | $ 828,992 | $1,081,236 | $992,658 | $1,046,439 |
| Social Services | 1,711,360 | 1,848,910 | 1,792,203 | 1,884,298 | 1,878,945 |
| Health | 333,154 | 367,916 | 444,348 | 478,068 | 489,556 |
| Labor and Human Resources[2] | 376,119 | 334,350 | 204,679 | 214,679 | 208,973 |
| Crime | 15,689 | 32,479 | 37,988 | 29,313 | 29,593 |
| Housing[3] | 385,592 | 312,869 | 366,408 | 383,219 | 629,228 |
| Drug and Justice | 9,822 | 11,995 | 31,349 | 13,071 | 32,811 |
| Agriculture and Natural Resources | 13,119 | 7,883 | 10,378 | 8,183 | 10,115 |
| Contributions to Municipalities | 59,191 | 59,191 | 59,002 | 56,371 | 53,744 |
| Other | 13,538 | 25,874 | 39,879 | 33,168 | 40,721 |
| TOTAL | $3,652,501 | $3,830,459 | $4,067,470 | $4,093,028 | $4,420,125 |

(1)   Estimated.
(2)   Amounts include grants to the Right to Work Administration, the Occupational Development and Human
       Resources Council.
(3)   Amounts include grants to the Public Housing Administration.

*Source:* Office of Management and Budget

**BUDGET OF THE COMMONWEALTH OF PUERTO RICO**

**Office of Management and Budget**

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the Administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislature an annual balanced budget of capital improvements and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Department of the Treasury, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislature may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislature, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislature with the Governor's objections. The Legislature, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the beginning of the fiscal year, the annual budget for the preceding fiscal year as originally approved by the Legislature and the Governor is automatically renewed for the ensuing fiscal year until a new budget is approved by the Legislature and the Governor. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Department of the Treasury, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury. Monthly reviews and expenditure cut-off procedures are followed to prevent expenditure in excess of appropriations.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislature a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislature for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. Currently, an amount equal to one percent of the General Fund net revenues of the preceding fiscal year is deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. As of May 1, 2005, the balance in the Budgetary Fund was $16.7 million. The Budgetary Fund's fiscal year-end balance is expected to be $40 million.

An Emergency Fund was created by Act No. 91 of June 21, 1966, as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended on August 28, 2003, to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. As of May 1, 2005, the balance in the Emergency Fund was $62.4 million.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i)    General Fund appropriations for recurring ordinary operating expenses of the central government and for contributions to public corporations, municipalities, and private organizations. Such appropriations are made by a single annual law known as the Joint Resolution of the General Budget.

(ii)    General Fund appropriations for special operating expenses and for capital expenditures. Such appropriations are authorized by separate law for one or more years for special programs or activities, which may be permanent or transitory.

(iii)    Disbursements of Special Funds for operating purposes and for capital improvements. For the most part, such disbursements do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv)    Bond Fund appropriations for capital expenditures financed by bonds. Such expenditures occur in one or more years.

In Puerto Rico, the central government has many functions, which in the fifty states are the responsibility of local government, such as providing public education, police and fire protection. The central government provides significant annual grants to the University of Puerto Rico and to the municipalities, as well as to PRASA, although these grants are expected to diminish shortly. See "Other Public Corporations – Aqueduct and Sewer Authority" under *Public Corporations.*

In the summaries of the central government budgets presented below, grants to the University of Puerto Rico are included in current expenses for education and debt service on general obligation bonds is included in current expenses for debt service. Debt service on Sugar Corporation notes paid by the Commonwealth is included in current expenses for economic development, and debt service on Urban Renewal and Housing Corporation bonds and notes and on Housing Finance Authority mortgage subsidy bonds paid by the Commonwealth is included in current expenses for housing.

For fiscal year 2005, it is projected that approximately 57% and 9% of the General Fund is committed for payment of the central government payroll and debt service on the direct debt of the Commonwealth, respectively. For fiscal year 2006, it is proposed that approximately 56% and 7% of the General Fund be committed for payment of the central government payroll and debt service on the direct debt of the Commonwealth, respectively. In the case of the judiciary branch, legislation approved in December of 2002 provides that, commencing with fiscal year 2004, the Commonwealth will appropriate annually to the judiciary branch an amount initially equal to 3.3% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage will increase until it reaches 4% in fiscal year 2008, and may be further increased upon review, with scheduled reviews every five years.

## Fiscal Year 2005 Budget

The consolidated budget for fiscal year 2005 totaled $24.842 billion. This amount includes General Fund total resources and appropriations of $8.854 billion, which represents an increase of $602 million, or 7.3%, over budgeted amounts for fiscal year 2004. These total resources include $8.304 billion of total revenues and $550 million of additional resources relating to a GDB loan secured by tax receivables. The budget for fiscal year 2005 was approved July 1, 2004.

<div align="center">

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2005**
**(in thousands)**

</div>

| | General Fund[(1)] | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $ 0 | - | $ 112,977 | $112,977 |
| Personal income taxes | 2,868,000 | - | - | 2,868,000 |
| Retained non-resident income tax | 575,000 | - | - | 575,000 |
| Corporate income taxes | 2,005,000 | - | - | 2,005,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 23,000 | - | - | 23,000 |
| 17% withholding tax on interest | 10,000 | - | - | 10,000 |
| 10% withholding tax on dividends | 74,000 | - | - | 74,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 302,000 | - | - | 302,000 |
| Motor vehicles and accessories | 585,000 | - | - | 585,000 |
| Cigarettes | 146,000 | - | - | 146,000 |
| Special excise tax on certain petroleum products | 0 | - | | 0 |
| General 5% excise tax | 573,000 | - | - | 573,000 |
| Other | 173,000 | - | 47,100 | 220,100 |

| | General Fund[1] | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Licenses | 89,000 | - | - | 89,000 |
| Miscellaneous non-tax revenues: | | | | |
|     Contributions from lottery fund | 70,000 | - | - | 70,000 |
|     Electronic lottery | 73,000 | - | - | 73,000 |
|     Registration and document certification fees | 218,000 | - | - | 218,000 |
|     Other | 152,000 | - | 296,907 | 448,907 |
| Total revenues from internal sources | 7,943,000 | | 456,984 | 8,399,984 |
| Revenues from non-Commonwealth sources: | | | | |
|     Federal excise taxes on off-shore shipments | 337,000 | - | - | 337,000 |
|     Federal grants | 0 | - | 4,093,028 [2] | 4,093,028 |
|     Customs | 24,000 | - | - | 24,000 |
| Total revenues from non-Commonwealth sources | 361,000 | - | 4,093,028 | 4,454,028 |
| Total revenues | 8,304,000 | - | 4,550,012 | 12,854,012 |
| Other: | | | | |
|     Other Income | 550,000 | - | - | 550,000 |
|     Balance from previous year | 0 | - | 576,600 | 576,600 |
|     Bonds authorized | 0 | 550,000 | - | 550,000 |
|     Total other sources | 550,000 | 550,000 | 576,600 | 1,676,600 |
| Total resources | 8,854,000 | $ 550,000 | 5,126,612 | 14,530,612 |
| Appropriations: | | | | |
| Current expenses: | | | | |
|     General government | 824,929 | - | 51,224 | 876,153 |
|     Education | 2,838,544 | - | 1,191,151 | 4,029,695 |
|     Health | 1,431,130 | - | 542,622 | 1,973,752 |
|     Welfare | 434,990 | - | 2,101,620 | 2,536,610 |
|     Economic development | 198,925 | - | 66,478 | 265,403 |
|     Public safety and protection | 1,558,232 | - | 89,497 | 1,647,729 |
|     Transportation and communications | 92,636 | - | 51,342 | 143,978 |
|     Housing | 26,539 | - | 206,341 | 232,880 |
|     Contributions to municipalities | 369,835 | - | 2,031 | 371,866 |
|     Special pension contributions | 239,684 | - | 0 | 239,684 |
|     Debt service | 380,201 | - | 112,977 | 493,178 |
|     Other debt service | 457,939 | - | 25,000 | 482,939 |
| Total appropriations-current expenses | 8,853,584 | - | 4,440,283 | 13,293,867 |
|     Capital improvements | 0 | 550,000 | 242,632 | 792,632 |
|     Total appropriations | 8,853,584 | 550,000 | 4,682,915 | 14,086,499 |
|     Year-end balance | 416 | - | 443,697 | 444,113 |
| Total appropriations and year-end balance | $ 8,854,000 | $ 550,000 | $ 5,126,612 | $14,530,612 |

(1)   Law No. 93 of August 20, 1997 establishes that resources that do not represent revenues become part of the Budgetary Fund.
(2)   Does not include grants received by agencies whose accounting systems are not centralized in the Department of the Treasury.

*Sources*: Department of the Treasury and Office of Management and Budget.

In the fiscal year 2005 budget, revenues and other resources of all budgetary funds total $13.405 billion, excluding balances from the previous fiscal year and general obligation bonds authorized. The net increase in General Fund revenues in the fiscal year 2005 budget, as compared to fiscal year 2004 preliminary results, is accounted mainly by increases in personal income taxes (up $52 million), corporate income taxes (up $ 179 million), 10% withholding tax on dividends (up $27 million), excise taxes on motor vehicles and accessories (up $42 million), general 5% excise tax (up $30 million), registration and document certification fees (up $47 million) and other miscellaneous non-tax revenues (up $31 million) and decreases in excise taxes on alcoholic beverages (down $11 million), cigarettes (down $13 million), and certain petroleum products (down $22 million), and electronic lottery (down $15 million).

Current expenses and capital improvements of all budgetary funds total $14.086 billion, an increase of $911 million from fiscal year 2004. The major changes in General Fund expenditures by program in fiscal year 2005 are: education (up $286.1 million), public safety and protection (up $163.5

million), special pension contributions (up $52.5 million), debt service on Commonwealth's general obligation and guaranteed debt (up $37.7 million), welfare (up $31.0 million), health (up $27.4 million), economic development (up $16.0 million), transportation and communications (up $9.1 million), contributions to municipalities (up $7.0 million), housing (up $1.7 million), and a decrease in other debt service, consisting principally of Commonwealth appropriation debt (down $29.7 million), and general government (down $43.5 million).

Expenditures for fiscal year 2005 are projected at $9.332 billion, which exceeds the General Fund budget by $478 million. The higher expenditures are in the areas of education, public safety and protection and health. The government expects to cover this budget imbalance with several financing mechanisms that will generate approximately $402 million in funds. These mechanisms include the use of a portion of the proceeds of a bond issue by Infrastructure Financing Authority to replace a General Fund budgetary allocation to the University of Puerto Rico in the amount of $200 million, income generated through debt service deposit (forward delivery) agreements, the release of excess funds held in various Commonwealth reserve funds, and the transfer of excess moneys deposited in various government trust funds, such as the Children's Trust. The remaining imbalance, if any, will be covered by expenditure reductions in various agencies.

The general obligation bond authorization for the fiscal year 2005 budget was $550 million.

## Fiscal Year 2006 Proposed Budget

The proposed consolidated budget for fiscal year 2006 totals $25.662 billion. This includes General Fund total resources and appropriations of $9.684 billion, which represents an increase of $830 million, or 9.4%, over budgeted amounts for fiscal year 2005. This consolidated budget also includes several revenue raising alternatives, some of which require legislative approval. These revenue raising measures consist of: (i) the elimination of the exemption for food, medicine, and certain other goods from the 5% general excise tax; (ii) an increase in license fees for luxury cars; (iii) a temporary surtax on financial institutions; (iv) the elimination of the preferential capital gains rates; and (v) strengthening efforts to detect excise tax evasion through the purchase of X-Ray machines to monitor ship containers at ports of entry, the implementation of a program to improve collections, and heightened scrutiny on the payment of excise taxes on crude oil and its derivatives.

The following table presents a summary of the Commonwealth's proposed central government budget for the fiscal year ending June 30, 2006.

### Commonwealth of Puerto Rico
### Summary of Central Government Annual Budget
### Fiscal Year Ending June 30, 2006
### (in thousands)

| | General Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $ 0 | - | $ 113,825 | $ 113,825 |
| Personal income taxes | 3,127,000 | - | - | 3,127,000 |
| Retained non-resident income tax | 628,000 | - | - | 628,000 |
| Corporate income taxes | 2,252,000 | - | - | 2,252,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 17,000 | - | - | 17,000 |
| 17% withholding tax on interest | 11,000 | - | - | 11,000 |
| 10% withholding tax on dividends | 74,000 | - | - | 74,000 |
| Inheritance and gift taxes | 2,000 | - | - | 2,000 |
| Excise taxes: | | | | |
| Alcoholic beverages | 316,000 | - | | 316,000 |
| Motor vehicles and accessories | 614,000 | - | | 614,000 |

| | | | | |
|---|---|---|---|---|
| Cigarettes | 152,000 | - | - | 152,000 |
| Special excise tax on certain products | 30,000 | - | | 30,000 |
| General 5% excise tax | 1,273,000 | - | | 1,273,000 |
| Other | 178,000 | - | 47,100 | 225,100 |
| Licenses | 123,000 | | - | 123,000 |
| Miscellaneous non-tax revenues: | | | | |
| Contributions from lottery fund | 63,000 | - | - | 63,000 |
| Electronic lottery | 83,000 | - | - | 83,000 |
| Registration and document certification fees | 231,000 | - | - | 231,000 |
| Other | 131,000 | - | 309,200 | 440,200 |
| Total revenues from internal sources | 9,308,000 | - | 470,125 | 9,778,125 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 350,000 | | 0 | 350,000 |
| Federal grants | 0 | - | 4,420,125 | 4,420,125 |
| Customs | 26,000 | | 0 | 26,000 |
| Total revenues from non-Commonwealth sources | 376,000 | - | 4,420,125 | 4,796,125 |
| Total revenues | 9,684,000 | - | 4,890,250 | 14,574,250 |
| Other: | | | | |
| Balance from previous year | 416 | - | 443,697 | 444,113 |
| Bonds authorized | 0 | 575,000 | 0 | 575,000 |
| Total other sources | 416 | 575,000 | 443,697 | 1,019,113 |
| Total resources | 9,684,416 | 575,000 | 5,333,947 | 15,593,363 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 931,843 | - | 51,844 | 983,687 |
| Education | 3,206,842 | - | 1,315,482 | 4,522,324 |
| Health | 1,610,519 | - | 508,895 | 2,119,414 |
| Welfare | 414,314 | - | 2,190,033 | 2,604,347 |
| Economic development | 258,116 | - | 69,252 | 327,368 |
| Public safety and protection | 1,722,809 | - | 93,860 | 1,816,669 |
| Transportation and communications | 113,232 | - | 58,605 | 171,837 |
| Housing | 24,793 | - | 323,818 | 348,611 |
| Contributions to municipalities | 411,134 | - | 1,985 | 413,119 |
| Special pension contributions | 278,631 | - | 0 | 278,631 |
| Debt service | 435,000 | - | 113,825 | 548,825 |
| Other debt service | 229,967 | - | 19,000 | 248,967 |
| Total appropriations-current expenses | 9,637,200 | - | 4,746,599 | 14,383,799 |
| Capital improvements | 46,800 | 575,000 | 487,149 | 1,108,949 |
| Total appropriations | 9,684,000 | 575,000 | 5,233,748 | 15,492,748 |
| Year-end balance | 416 | - | 100,199 | 100,615 |
| Total appropriations and year-end balance | $ 9,684,416 | $ 575,000 | $ 5,333,947 | $15,593,363 |

(1)  Does not include grants received by agencies whose accounting systems are not centralized in the Department of the Treasury.

*Sources*:  Department of the Treasury and Office of Management and Budget.

In the fiscal year 2006 budget, revenues and other resources of all budgetary funds total $14.574 billion, excluding balances from the previous fiscal year and general obligation bonds authorized. The net increase in General Fund revenues in the fiscal year 2006 budget, as compared to fiscal year 2005 budget, is accounted mainly by increases in corporate income taxes (up $247 million), personal income taxes (up $259 million), general excise of 5% (up $700.0 million), licenses (up $34 million), excise taxes on motor vehicles and accessories (up $29 million), federal excise taxes on offshore shipments (up $13 million), excise taxes on alcoholic beverages (up $14 million), excise taxes on cigarettes (up $6 million) and decreases in tollgate taxes (down $6 million), contributions from lottery fund (down $7 million) and other miscellaneous non-tax revenues (down $21 million).

The approval of the proposed budget for fiscal year 2006, together with the different alternatives presented to address the Commonwealth's financial condition, is currently being debated at the Legislature.  The president of the budget committee of the Legislature has indicated that he proposes to

approve a different budget that would include expenditure reductions totaling $1.3 billion, making it unnecessary to implement the tax measures being proposed to balance the budget. The Governor has indicated he would not approve a budget with such expenditure reductions. In light of the ongoing public debate over the budget, it is possible that a budget will not be approved by the Legislature by June 30, 2005, the end of the current fiscal year. In the event that the budget is not approved prior to the start of the new fiscal year, the Commonwealth's Constitution provides that the previous fiscal year's budget is automatically renewed until a new budget is developed and approved by the Legislature and signed by the Governor. In the event the budget is not approved and the prior fiscal year's budget is automatically renewed, OMB would have to implement new cost-cutting measures. OMB would likely recommend (i) cuts to all new projects or initiatives; (ii) the elimination of any incremental expenditures in existing projects; and (iii) the reduction of working hours for all non-essential employees. Such cost-cutting measures would be intended to achieve a reduction in expenditures of approximately $1.04 billion.

Current expenses and capital improvements of all budgetary funds total $15.493 billion, an increase of $1,406 million from fiscal year 2005. The major changes in General Fund expenditures by program in fiscal year 2006 are: education (up $368.3 million), health (up $179.4 million), public safety and protection (up $164.6 million), general government (up $106.9 million), economic development (up $59.2 million), debt service on Commonwealth's general obligation and guaranteed debt (up $54.8 million), contributions to municipalities (up $41.3 million), special pension contributions (up $38.9 million), transportation and communications (up $20.6 million), and a decrease in housing (down $1.7 million), welfare (down $20.7 million), and other debt service, consisting principally of Commonwealth appropriation debt (down $228.0 million).

The general obligation bond authorization for the proposed fiscal year 2006 budget is $575 million.

**Differences between Budget and Basic Financial Statements**

Revenue and expenditures, as reported by the Department of the Treasury in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Department of the Treasury include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)     Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of the Legislature of Puerto Rico, approved on June 25, 1955, as amended ("Act No. 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act No. 104 for damages up to a maximum amount of $75,000 or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action. Under certain circumstances, as provided in Act No. 9 of the Legislature of Puerto Rico, approved on November 26, 1975, as amended ("Act No. 9"), the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under Act No. 9.

With respect to pending and threatened litigation, as of June 30, 2004, the Commonwealth has included in its financial statements reported liabilities of approximately $219 million for awarded and anticipated unfavorable judgments. This amount represented the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The Commonwealth believes that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

The Commonwealth is a defendant in a lawsuit filed by an association of primary care health centers seeking to recover from the Commonwealth $120 million of Medicaid funds retained by the Department of Health since 1997. In June 2004, the First Circuit Court of San Juan determined that the Commonwealth must return these funds. The Commonwealth appealed this decision. As of June 30, 2004, the Commonwealth has accrued $120 million for this legal contingency.

The Commonwealth is a defendant in two lawsuits filed in local and federal district court by an association of insurance companies seeking to recover from the Commonwealth approximately $74 million of compulsory motor vehicle insurance premiums allegedly belonging to the insurance companies or their policyholders, which were transferred by the Secretary of the Treasury to the General Fund. The Commonwealth believes that its ultimate liability, if any, would not be significant.

The Commonwealth is also a defendant in a lawsuit filed in local court by the Municipality of Ponce seeking to recover from the Commonwealth approximately $40 million for capital improvements promised to such municipality. The Commonwealth settled these claims out of court as follows: (i) a $5 million cash payment; and (ii) an increase of $20 million in the municipality's existing line of credit for capital improvements.

The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights and other damages. Preliminary hearings and discovery proceedings are in progress. The amounts claimed exceed $7.8 billion; however, the ultimate liability cannot be presently determined. It is the opinion of the Commonwealth that the claims are excessive and exaggerated. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability in excess of amounts provided, if any, would not be significant.

# SIDLEY AUSTIN BROWN & WOOD LLP

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com
FOUNDED 1866

June ___, 2005

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

WRITER'S DIRECT NUMBER

WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005A Bonds"):

$309,102,577.35
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE BONDS, SERIES 2005A**
**Dated: June    , 2005.**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005A Bonds.

We have also examined one of the Series 2005A Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      The Puerto Rico Infrastructure Financing Authority Act is valid.

2.      Said proceedings have been validly and legally taken.

3.      The Series 2005A Bonds have been duly authorized and issued to provide funds to (i) provide financial assistance to PRASA and other Commonwealth instrumentalities or municipalities in connection with certain capital projects, (ii) repay certain advances made to the Authority by Government Development Bank, and (iii) pay capitalized interest and costs of issuance of the Series 2005A Bonds.

4.      As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005A Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005A Bonds) issued thereunder.

5.      The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

6.      The Series 2005A Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, as the same become due and payable.

7.      The bonds issued under the provisions of the Trust Agreement, including the Series 2005A Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including the Series 2005A Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.      Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005A Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005B and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005A Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005A Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005A Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005A Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005A Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005A Bonds and said Series 2005B and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005A Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005A Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,


[To be signed "Sidley Austin Brown & Wood LLP"]

# SIDLEY AUSTIN BROWN & WOOD LLP

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com

FOUNDED 1866

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

June ___, 2005

WRITER'S DIRECT NUMBER

WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No.44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005B Bonds"):

$324,625,000
PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY
SPECIAL TAX REVENUE BONDS, SERIES 2005B
Dated: June     , 2005.

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005B Bonds.

We have also examined one of the Series 2005B Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.     The Puerto Rico Infrastructure Financing Authority Act is valid.

2.     Said proceedings have been validly and legally taken.

3.     The Series 2005B Bonds have been duly authorized and issued to provide funds to (i) provide working capital assistance to certain instrumentalities of the Commonwealth authorized to provide infrastructure facilities, and (ii) pay capitalized interest and costs of issuance of the Series 2005B Bonds.

4.     As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005B Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005B Bonds) issued thereunder.

5.     The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

SIDLEY AUSTIN BROWN & WOOD LLP IS A DELAWARE LIMITED LIABILITY PARTNERSHIP
PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

6.    The Series 2005B Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, as the same become due and payable.

7.    The bonds issued under the provisions of the Trust Agreement, including the Series 2005B Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005B Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

8.    Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005B Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Refunding Bonds Series 2005C issued concurrently with the Series 2005B Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005B Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005B Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on the Series 2005B Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code.  Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005B Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005B Bonds and said Series 2005A and Series 2005C Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005B Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005B Bonds.  We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

Respectfully submitted,


[To be signed "Sidley Austin Brown & Wood LLP"]

# SIDLEY AUSTIN BROWN & WOOD LLP

<table>
<tr><td>

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

</td><td align="center">

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com

FOUNDED 1866

</td><td>

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

</td></tr>
</table>

June ___, 2005

WRITER'S DIRECT NUMBER                                                                                    WRITER'S E-MAIL ADDRESS

Puerto Rico Infrastructure Financing Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined the Puerto Rico Infrastructure Financing Authority Act (Act No. 44 of the Legislature of Puerto Rico, approved June 21, 1988, as amended) creating Puerto Rico Infrastructure Financing Authority (the "Authority"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"). We have also examined certified copies of the legal proceedings of the Board of Directors of the Authority in authorizing the execution and delivery of that certain Trust Agreement, dated as of October 1, 1988, as amended (the "Trust Agreement"), by and between the Authority and U.S. Bank Trust National Association, successor trustee (the "Trustee"), and certified copies of the proceedings and the proofs submitted relative to the authorization, issuance and sale of the following described bonds (the "Series 2005C Bonds"):

<div align="center">

**$699,235,338.80**
**PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY**
**SPECIAL TAX REVENUE REFUNDING BONDS, SERIES 2005C**
**Dated: June    , 2005.**

</div>

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, all as set forth in the resolution of the Authority authorizing the issuance of the Series 2005C Bonds.

We have also examined one of the Series 2005C Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.     The Puerto Rico Infrastructure Financing Authority Act is valid.

2.     Said proceedings have been validly and legally taken.

3.     The Series 2005C Bonds have been duly authorized and issued to (i) provide funds to refund all of the Authority's Special Tax Revenue Bonds, Series 1997A, and (ii) pay costs of issuance of the Series 2005C Bonds.

4.     As authorized by the Puerto Rico Infrastructure Financing Authority Act and by said proceedings, the Trust Agreement has been duly authorized, executed and delivered by the Authority and contains reasonable and sufficient covenants and provisions in accordance with law with respect to the custody and application of the proceeds of bonds (including the Series 2005C Bonds) issued thereunder, the collection and disposition of revenues, the conservation and application of all funds, the safeguarding of moneys on hand or on deposit and the rights and remedies of the Trustee and the holders of all bonds (including the Series 2005C Bonds) issued thereunder.

5.     The Trust Agreement provides for the issuance of additional Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds under the conditions and limitations therein set forth.

6.     The Series 2005C Bonds are valid and binding special obligations of the Authority, payable solely from the Pledged Revenues (as defined in the Trust Agreement).  Under the Trust Agreement, the Authority has agreed to

<div align="center">

IV-5

</div>

deposit to the credit of the Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Sinking Fund, a special fund created under the Trust Agreement, a sufficient amount of the Special Tax Revenues (as defined in the Trust Agreement) or other moneys deposited to the credit of the Puerto Rico Infrastructure Fund (as defined in the Trust Agreement) to pay the principal of and the interest on all bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, as the same become due and payable.

       7.     The bonds issued under the provisions of the Trust Agreement, including the Series 2005C Bonds, do not constitute an indebtedness of the Commonwealth of Puerto Rico or of any of its political subdivisions, other than the Authority, and neither the Commonwealth of Puerto Rico nor any of its political subdivisions, other than the Authority, are liable therefor, and such bonds, including without limitation, the Series 2005C Bonds, are payable solely from the Pledged Revenues, as further described in the Trust Agreement.

       8.     Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to continuing compliance with the covenants referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), regarding the use, expenditure and investment of Series 2005C Bond proceeds (and the proceeds of Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005A and Puerto Rico Infrastructure Financing Authority Special Tax Revenue Bonds Series 2005B issued concurrently with the Series 2005C Bonds) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Series 2005C Bonds is not includable in gross income for federal income tax purposes; and (ii) the Series 2005C Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

       Interest on the Series 2005C Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of the Series 2005C Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

       Each of the Commonwealth, the Authority, Puerto Rico Aqueduct and Sewer Authority and certain other benefitted entities receiving proceeds of the Series 2005C Bonds and said Series 2005A and Series 2005B Bonds has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on the Series 2005C Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Series 2005C Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth of Puerto Rico which would prevent any of the foregoing entities from complying with the requirements of the Code.

       Respectfully submitted,

       [To be signed "Sidley Austin Brown & Wood LLP"]

| Date | Series 2005 A CABs 07/01/2029 | Series 2005 A CABs 07/01/2030 | Series 2005 A CABs 07/01/2031 | Series 2005 A CABs 07/01/2032 | Series 2005 A CABs 07/01/2033 | Series 2005 A CABs 07/01/2034 | Series 2005 A CABs 07/01/2035 | Series 2005 A CABs 07/01/2036 |
|---|---|---|---|---|---|---|---|---|
| 6/16/2005 | 1,691.20 | 1,600.90 | 1,521.95 | 1,446.30 | 1,373.90 | 1,312.05 | 1,249.30 | 1,192.95 |
| 7/1/2005 | 1,694.35 | 1,603.90 | 1,524.85 | 1,449.10 | 1,376.55 | 1,314.60 | 1,251.75 | 1,195.25 |
| 1/1/2006 | 1,733.00 | 1,640.80 | 1,560.05 | 1,482.70 | 1,408.65 | 1,345.20 | 1,280.95 | 1,223.15 |
| 7/1/2006 | 1,772.50 | 1,678.55 | 1,596.10 | 1,517.10 | 1,441.45 | 1,376.55 | 1,310.85 | 1,251.75 |
| 1/1/2007 | 1,812.95 | 1,717.15 | 1,632.95 | 1,552.30 | 1,475.05 | 1,408.65 | 1,341.50 | 1,280.95 |
| 7/1/2007 | 1,854.25 | 1,756.65 | 1,670.70 | 1,588.30 | 1,509.40 | 1,441.45 | 1,372.80 | 1,310.85 |
| 1/1/2008 | 1,896.55 | 1,797.05 | 1,709.30 | 1,625.15 | 1,544.60 | 1,475.05 | 1,404.85 | 1,341.50 |
| 7/1/2008 | 1,939.80 | 1,838.40 | 1,748.75 | 1,662.85 | 1,580.55 | 1,509.40 | 1,437.65 | 1,372.80 |
| 1/1/2009 | 1,984.00 | 1,880.65 | 1,789.15 | 1,701.45 | 1,617.40 | 1,544.60 | 1,471.25 | 1,404.85 |
| 7/1/2009 | 2,029.25 | 1,923.90 | 1,830.50 | 1,740.90 | 1,655.10 | 1,580.55 | 1,505.60 | 1,437.65 |
| 1/1/2010 | 2,075.50 | 1,968.15 | 1,872.80 | 1,781.30 | 1,693.65 | 1,617.40 | 1,540.75 | 1,471.25 |
| 7/1/2010 | 2,122.85 | 2,013.45 | 1,916.05 | 1,822.65 | 1,733.10 | 1,655.10 | 1,576.70 | 1,505.60 |
| 1/1/2011 | 2,171.25 | 2,059.75 | 1,960.30 | 1,864.90 | 1,773.50 | 1,693.65 | 1,613.55 | 1,540.75 |
| 7/1/2011 | 2,220.75 | 2,107.15 | 2,005.60 | 1,908.20 | 1,814.80 | 1,733.10 | 1,651.20 | 1,576.70 |
| 1/1/2012 | 2,271.40 | 2,155.60 | 2,051.90 | 1,952.45 | 1,857.10 | 1,773.50 | 1,689.75 | 1,613.55 |
| 7/1/2012 | 2,323.15 | 2,205.15 | 2,099.30 | 1,997.75 | 1,900.40 | 1,814.80 | 1,729.20 | 1,651.20 |
| 1/1/2013 | 2,376.15 | 2,255.90 | 2,147.80 | 2,044.10 | 1,944.65 | 1,857.10 | 1,769.60 | 1,689.75 |
| 7/1/2013 | 2,430.30 | 2,307.80 | 2,197.40 | 2,091.55 | 1,989.95 | 1,900.40 | 1,810.90 | 1,729.20 |
| 1/1/2014 | 2,485.75 | 2,360.85 | 2,248.20 | 2,140.05 | 2,036.35 | 1,944.65 | 1,853.20 | 1,769.60 |
| 7/1/2014 | 2,542.40 | 2,415.15 | 2,300.10 | 2,189.70 | 2,083.80 | 1,989.95 | 1,896.50 | 1,810.90 |
| 1/1/2015 | 2,600.35 | 2,470.70 | 2,353.25 | 2,240.50 | 2,132.35 | 2,036.35 | 1,940.75 | 1,853.20 |
| 7/1/2015 | 2,659.65 | 2,527.55 | 2,407.60 | 2,292.50 | 2,182.00 | 2,083.80 | 1,986.10 | 1,896.50 |
| 1/1/2016 | 2,720.30 | 2,585.65 | 2,463.25 | 2,345.65 | 2,232.85 | 2,132.35 | 2,032.45 | 1,940.75 |
| 7/1/2016 | 2,782.30 | 2,645.15 | 2,520.15 | 2,400.10 | 2,284.90 | 2,182.00 | 2,079.90 | 1,986.10 |
| 1/1/2017 | 2,845.75 | 2,706.00 | 2,578.35 | 2,455.80 | 2,338.10 | 2,232.85 | 2,128.50 | 2,032.45 |
| 7/1/2017 | 2,910.65 | 2,768.20 | 2,637.90 | 2,512.75 | 2,392.60 | 2,284.90 | 2,178.20 | 2,079.90 |
| 1/1/2018 | 2,977.00 | 2,831.90 | 2,698.85 | 2,571.05 | 2,448.35 | 2,338.10 | 2,229.05 | 2,128.50 |
| 7/1/2018 | 3,044.90 | 2,897.00 | 2,761.20 | 2,630.70 | 2,505.40 | 2,392.60 | 2,281.10 | 2,178.20 |
| 1/1/2019 | 3,114.30 | 2,963.65 | 2,824.95 | 2,691.75 | 2,563.75 | 2,448.35 | 2,334.35 | 2,229.05 |
| 7/1/2019 | 3,185.30 | 3,031.80 | 2,890.25 | 2,754.20 | 2,623.50 | 2,505.40 | 2,388.85 | 2,281.10 |
| 1/1/2020 | 3,257.95 | 3,101.55 | 2,957.00 | 2,818.10 | 2,684.65 | 2,563.75 | 2,444.65 | 2,334.35 |
| 7/1/2020 | 3,332.20 | 3,172.90 | 3,025.30 | 2,883.45 | 2,747.20 | 2,623.50 | 2,501.75 | 2,388.85 |
| 1/1/2021 | 3,408.20 | 3,245.85 | 3,095.20 | 2,950.35 | 2,811.20 | 2,684.65 | 2,560.15 | 2,444.65 |
| 7/1/2021 | 3,485.90 | 3,320.50 | 3,166.70 | 3,018.80 | 2,876.70 | 2,747.20 | 2,619.90 | 2,501.75 |
| 1/1/2022 | 3,565.40 | 3,396.90 | 3,239.85 | 3,088.85 | 2,943.75 | 2,811.20 | 2,681.10 | 2,560.15 |
| 7/1/2022 | 3,646.65 | 3,475.00 | 3,314.70 | 3,160.50 | 3,012.30 | 2,876.70 | 2,743.70 | 2,619.90 |

V-1

APPENDIX V

| Date | Series 2005 A CABs 07/01/2029 | Series 2005 A CABs 07/01/2030 | Series 2005 A CABs 07/01/2031 | Series 2005 A CABs 07/01/2032 | Series 2005 A CABs 07/01/2033 | Series 2005 A CABs 07/01/2034 | Series 2005 A CABs 07/01/2035 | Series 2005 A CABs 07/01/2036 |
|---|---|---|---|---|---|---|---|---|
| 1/1/2023 | 3,729.80 | 3,554.95 | 3,391.25 | 3,233.85 | 3,082.50 | 2,943.75 | 2,807.75 | 2,681.10 |
| 7/1/2023 | 3,814.85 | 3,636.70 | 3,469.60 | 3,308.85 | 3,154.35 | 3,012.30 | 2,873.35 | 2,743.70 |
| 1/1/2024 | 3,901.85 | 3,720.35 | 3,549.75 | 3,385.60 | 3,227.85 | 3,082.50 | 2,940.40 | 2,807.75 |
| 7/1/2024 | 3,990.80 | 3,805.90 | 3,631.75 | 3,464.15 | 3,303.05 | 3,154.35 | 3,009.10 | 2,873.35 |
| 1/1/2025 | 4,081.80 | 3,893.45 | 3,715.65 | 3,544.55 | 3,380.00 | 3,227.85 | 3,079.35 | 2,940.40 |
| 7/1/2025 | 4,174.85 | 3,983.00 | 3,801.45 | 3,626.75 | 3,458.75 | 3,303.05 | 3,151.25 | 3,009.10 |
| 1/1/2026 | 4,270.05 | 4,074.60 | 3,889.25 | 3,710.90 | 3,539.35 | 3,380.00 | 3,224.85 | 3,079.35 |
| 7/1/2026 | 4,367.40 | 4,168.35 | 3,979.10 | 3,797.00 | 3,621.80 | 3,458.75 | 3,300.15 | 3,151.25 |
| 1/1/2027 | 4,467.00 | 4,264.20 | 4,071.05 | 3,885.10 | 3,706.20 | 3,539.35 | 3,377.20 | 3,224.85 |
| 7/1/2027 | 4,568.85 | 4,362.30 | 4,165.05 | 3,975.25 | 3,792.55 | 3,621.80 | 3,456.05 | 3,300.15 |
| 1/1/2028 | 4,673.00 | 4,462.60 | 4,261.30 | 4,067.45 | 3,880.90 | 3,706.20 | 3,536.75 | 3,377.20 |
| 7/1/2028 | 4,779.55 | 4,565.25 | 4,359.70 | 4,161.80 | 3,971.35 | 3,792.55 | 3,619.35 | 3,456.05 |
| 1/1/2029 | 4,888.50 | 4,670.25 | 4,460.45 | 4,258.35 | 4,063.90 | 3,880.90 | 3,703.85 | 3,536.75 |
| 7/1/2029 | 5,000.00 | 4,777.65 | 4,563.45 | 4,357.15 | 4,158.55 | 3,971.35 | 3,790.35 | 3,619.35 |
| 1/1/2030 | - | 4,887.55 | 4,668.90 | 4,458.25 | 4,255.45 | 4,063.90 | 3,878.85 | 3,703.85 |
| 7/1/2030 | - | 5,000.00 | 4,776.75 | 4,561.70 | 4,354.60 | 4,158.55 | 3,969.40 | 3,790.35 |
| 1/1/2031 | - | - | 4,887.10 | 4,667.50 | 4,456.10 | 4,255.45 | 4,062.10 | 3,878.85 |
| 7/1/2031 | - | - | 5,000.00 | 4,775.80 | 4,559.90 | 4,354.60 | 4,156.95 | 3,969.40 |
| 1/1/2032 | - | - | - | 4,886.60 | 4,666.15 | 4,456.10 | 4,254.00 | 4,062.10 |
| 7/1/2032 | - | - | - | 5,000.00 | 4,774.85 | 4,559.90 | 4,353.35 | 4,156.95 |
| 1/1/2033 | - | - | - | - | 4,886.15 | 4,666.15 | 4,455.00 | 4,254.00 |
| 7/1/2033 | - | - | - | - | 5,000.00 | 4,774.85 | 4,559.00 | 4,353.35 |
| 1/1/2034 | - | - | - | - | - | 4,886.15 | 4,665.45 | 4,455.00 |
| 7/1/2034 | - | - | - | - | - | 5,000.00 | 4,774.40 | 4,559.00 |
| 1/1/2035 | - | - | - | - | - | - | 4,885.90 | 4,665.45 |
| 7/1/2035 | - | - | - | - | - | - | 5,000.00 | 4,774.40 |
| 1/1/2036 | - | - | - | - | - | - | - | 4,885.90 |
| 7/1/2036 | - | - | - | - | - | - | - | 5,000.00 |
| 1/1/2037 | - | - | - | - | - | - | - | - |
| 7/1/2037 | - | - | - | - | - | - | - | - |
| 1/1/2038 | - | - | - | - | - | - | - | - |
| 7/1/2038 | - | - | - | - | - | - | - | - |
| 1/1/2039 | - | - | - | - | - | - | - | - |
| 7/1/2039 | - | - | - | - | - | - | - | - |
| 1/1/2040 | - | - | - | - | - | - | - | - |
| 7/1/2040 | - | - | - | - | - | - | - | - |

| Date | Series 2005 A CABs 07/01/2029 | Series 2005 A CABs 07/01/2030 | Series 2005 A CABs 07/01/2031 | Series 2005 A CABs 07/01/2032 | Series 2005 A CABs 07/01/2033 | Series 2005 A CABs 07/01/2034 | Series 2005 A CABs 07/01/2035 | Series 2005 A CABs 07/01/2036 |
|---|---|---|---|---|---|---|---|---|
| 1/1/2041 | - | - | - | - | - | - | - | - |
| 7/1/2041 | - | - | - | - | - | - | - | - |
| 1/1/2042 | - | - | - | - | - | - | - | - |
| 7/1/2042 | - | - | - | - | - | - | - | - |
| 1/1/2043 | - | - | - | - | - | - | - | - |
| 7/1/2043 | - | - | - | - | - | - | - | - |
| 1/1/2044 | - | - | - | - | - | - | - | - |
| 7/1/2044 | - | - | - | - | - | - | - | - |
| 1/1/2045 | - | - | - | - | - | - | - | - |
| 7/1/2045 | - | - | - | - | - | - | - | - |

V-3

| Series 2005 A CABs 07/01/2037 | Series 2005 A CABs 07/01/2042 | Series 2005 A CABs 07/01/2043 | Series 2005 A CABs 07/01/2044 | Series 2005 A CABs 07/01/2045 | Date | Series 2005 C CABs 07/01/2028 |
|---|---|---|---|---|---|---|
| 1,139.15 | 872.20 | 832.05 | 793.70 | 757.15 | 6/16/2005 | 1,781.20 |
| 1,141.35 | 873.90 | 833.65 | 795.30 | 758.65 | 7/1/2005 | 1,784.50 |
| 1,168.00 | 894.75 | 853.55 | 814.25 | 776.75 | 1/1/2006 | 1,824.95 |
| 1,195.25 | 916.10 | 873.90 | 833.65 | 795.30 | 7/1/2006 | 1,866.25 |
| 1,223.15 | 937.95 | 894.75 | 853.55 | 814.25 | 1/1/2007 | 1,908.55 |
| 1,251.75 | 960.30 | 916.10 | 873.90 | 833.65 | 7/1/2007 | 1,951.75 |
| 1,280.95 | 983.20 | 937.95 | 894.75 | 853.55 | 1/1/2008 | 1,996.00 |
| 1,310.85 | 1,006.65 | 960.30 | 916.10 | 873.90 | 7/1/2008 | 2,041.20 |
| 1,341.50 | 1,030.70 | 983.20 | 937.95 | 894.75 | 1/1/2009 | 2,087.45 |
| 1,372.80 | 1,055.25 | 1,006.65 | 960.30 | 916.10 | 7/1/2009 | 2,134.70 |
| 1,404.85 | 1,080.45 | 1,030.70 | 983.20 | 937.95 | 1/1/2010 | 2,183.05 |
| 1,437.65 | 1,106.20 | 1,055.25 | 1,006.65 | 960.30 | 7/1/2010 | 2,232.50 |
| 1,471.25 | 1,132.60 | 1,080.45 | 1,030.70 | 983.20 | 1/1/2011 | 2,283.05 |
| 1,505.60 | 1,159.60 | 1,106.20 | 1,055.25 | 1,006.65 | 7/1/2011 | 2,334.80 |
| 1,540.75 | 1,187.25 | 1,132.60 | 1,080.45 | 1,030.70 | 1/1/2012 | 2,387.65 |
| 1,576.70 | 1,215.55 | 1,159.60 | 1,106.20 | 1,055.25 | 7/1/2012 | 2,441.75 |
| 1,613.55 | 1,244.55 | 1,187.25 | 1,132.60 | 1,080.45 | 1/1/2013 | 2,497.05 |
| 1,651.20 | 1,274.25 | 1,215.55 | 1,159.60 | 1,106.20 | 7/1/2013 | 2,553.60 |
| 1,689.75 | 1,304.65 | 1,244.55 | 1,187.25 | 1,132.60 | 1/1/2014 | 2,611.45 |
| 1,729.20 | 1,335.75 | 1,274.25 | 1,215.55 | 1,159.60 | 7/1/2014 | 2,670.60 |
| 1,769.60 | 1,367.60 | 1,304.65 | 1,244.55 | 1,187.25 | 1/1/2015 | 2,731.10 |
| 1,810.90 | 1,400.25 | 1,335.75 | 1,274.25 | 1,215.55 | 7/1/2015 | 2,792.95 |
| 1,853.20 | 1,433.65 | 1,367.60 | 1,304.65 | 1,244.55 | 1/1/2016 | 2,856.20 |
| 1,896.50 | 1,467.80 | 1,400.25 | 1,335.75 | 1,274.25 | 7/1/2016 | 2,920.90 |
| 1,940.75 | 1,502.85 | 1,433.65 | 1,367.60 | 1,304.65 | 1/1/2017 | 2,987.05 |
| 1,986.10 | 1,538.65 | 1,467.80 | 1,400.25 | 1,335.75 | 7/1/2017 | 3,054.70 |
| 2,032.45 | 1,575.35 | 1,502.85 | 1,433.65 | 1,367.60 | 1/1/2018 | 3,123.90 |
| 2,079.90 | 1,612.95 | 1,538.65 | 1,467.80 | 1,400.25 | 7/1/2018 | 3,194.65 |
| 2,128.50 | 1,651.40 | 1,575.35 | 1,502.85 | 1,433.65 | 1/1/2019 | 3,267.05 |
| 2,178.20 | 1,690.80 | 1,612.95 | 1,538.65 | 1,467.80 | 7/1/2019 | 3,341.05 |
| 2,229.05 | 1,731.15 | 1,651.40 | 1,575.35 | 1,502.85 | 1/1/2020 | 3,416.70 |
| 2,281.10 | 1,772.40 | 1,690.80 | 1,612.95 | 1,538.65 | 7/1/2020 | 3,494.10 |
| 2,334.35 | 1,814.70 | 1,731.15 | 1,651.40 | 1,575.35 | 1/1/2021 | 3,573.25 |
| 2,388.85 | 1,857.95 | 1,772.40 | 1,690.80 | 1,612.95 | 7/1/2021 | 3,654.15 |
| 2,444.65 | 1,902.30 | 1,814.70 | 1,731.15 | 1,651.40 | 1/1/2022 | 3,736.95 |
| 2,501.75 | 1,947.65 | 1,857.95 | 1,772.40 | 1,690.80 | 7/1/2022 | 3,821.60 |

| Series 2005 A CABs 07/01/2037 | Series 2005 A CABs 07/01/2042 | Series 2005 A CABs 07/01/2043 | Series 2005 A CABs 07/01/2044 | Series 2005 A CABs 07/01/2045 | Date | Series 2005 C CABs 07/01/2028 |
|---|---|---|---|---|---|---|
| 2,560.15 | 1,994.10 | 1,902.30 | 1,814.70 | 1,731.15 | 1/1/2023 | 3,908.15 |
| 2,619.90 | 2,041.65 | 1,947.65 | 1,857.95 | 1,772.40 | 7/1/2023 | 3,996.65 |
| 2,681.10 | 2,090.35 | 1,994.10 | 1,902.30 | 1,814.70 | 1/1/2024 | 4,087.20 |
| 2,743.70 | 2,140.20 | 2,041.65 | 1,947.65 | 1,857.95 | 7/1/2024 | 4,179.75 |
| 2,807.75 | 2,191.25 | 2,090.35 | 1,994.10 | 1,902.30 | 1/1/2025 | 4,274.45 |
| 2,873.35 | 2,243.50 | 2,140.20 | 2,041.65 | 1,947.65 | 7/1/2025 | 4,371.25 |
| 2,940.40 | 2,297.05 | 2,191.25 | 2,090.35 | 1,994.10 | 1/1/2026 | 4,470.25 |
| 3,009.10 | 2,351.80 | 2,243.50 | 2,140.20 | 2,041.65 | 7/1/2026 | 4,571.50 |
| 3,079.35 | 2,407.90 | 2,297.05 | 2,191.25 | 2,090.35 | 1/1/2027 | 4,675.05 |
| 3,151.25 | 2,465.35 | 2,351.80 | 2,243.50 | 2,140.20 | 7/1/2027 | 4,780.95 |
| 3,224.85 | 2,524.15 | 2,407.90 | 2,297.05 | 2,191.25 | 1/1/2028 | 4,889.25 |
| 3,300.15 | 2,584.35 | 2,465.35 | 2,351.80 | 2,243.50 | 7/1/2028 | 5,000.00 |
| 3,377.20 | 2,645.95 | 2,524.15 | 2,407.90 | 2,297.05 | | |
| 3,456.05 | 2,709.10 | 2,584.35 | 2,465.35 | 2,351.80 | | |
| 3,536.75 | 2,773.70 | 2,645.95 | 2,524.15 | 2,407.90 | | |
| 3,619.35 | 2,839.85 | 2,709.10 | 2,584.35 | 2,465.35 | | |
| 3,703.85 | 2,907.55 | 2,773.70 | 2,645.95 | 2,524.15 | | |
| 3,790.35 | 2,976.90 | 2,839.85 | 2,709.10 | 2,584.35 | | |
| 3,878.85 | 3,047.90 | 2,907.55 | 2,773.70 | 2,645.95 | | |
| 3,969.40 | 3,120.60 | 2,976.90 | 2,839.85 | 2,709.10 | | |
| 4,062.10 | 3,195.05 | 3,047.90 | 2,907.55 | 2,773.70 | | |
| 4,156.95 | 3,271.25 | 3,120.60 | 2,976.90 | 2,839.85 | | |
| 4,254.00 | 3,349.25 | 3,195.05 | 3,047.90 | 2,907.55 | | |
| 4,353.35 | 3,429.15 | 3,271.25 | 3,120.60 | 2,976.90 | | |
| 4,455.00 | 3,510.95 | 3,349.25 | 3,195.05 | 3,047.90 | | |
| 4,559.00 | 3,594.65 | 3,429.15 | 3,271.25 | 3,120.60 | | |
| 4,665.45 | 3,680.40 | 3,510.95 | 3,349.25 | 3,195.05 | | |
| 4,774.40 | 3,768.20 | 3,594.65 | 3,429.15 | 3,271.25 | | |
| 4,885.90 | 3,858.05 | 3,680.40 | 3,510.95 | 3,349.25 | | |
| 5,000.05 | 3,950.05 | 3,768.20 | 3,594.65 | 3,429.15 | | |
| - | 4,044.25 | 3,858.05 | 3,680.40 | 3,510.95 | | |
| - | 4,140.75 | 3,950.05 | 3,768.20 | 3,594.65 | | |
| - | 4,239.50 | 4,044.25 | 3,858.05 | 3,680.40 | | |
| - | 4,340.60 | 4,140.75 | 3,950.05 | 3,768.20 | | |
| - | 4,444.10 | 4,239.50 | 4,044.25 | 3,858.05 | | |
| - | 4,550.10 | 4,340.60 | 4,140.75 | 3,950.05 | | |

| Series 2005 A CABs 07/01/2037 | Series 2005 A CABs 07/01/2042 | Series 2005 A CABs 07/01/2043 | Series 2005 A CABs 07/01/2044 | Series 2005 A CABs 07/01/2045 | Date | Series 2005 C CABs 07/01/2028 |
|---|---|---|---|---|---|---|
| - | 4,658.65 | 4,444.10 | 4,239.50 | 4,044.25 | | |
| - | 4,769.75 | 4,550.10 | 4,340.60 | 4,140.75 | | |
| - | 4,883.50 | 4,658.65 | 4,444.10 | 4,239.50 | | |
| - | 5,000.00 | 4,769.75 | 4,550.10 | 4,340.60 | | |
| - | - | 4,883.50 | 4,658.65 | 4,444.10 | | |
| - | - | 5,000.00 | 4,769.75 | 4,550.10 | | |
| - | - | - | 4,883.50 | 4,658.65 | | |
| - | - | - | 5,000.00 | 4,769.75 | | |
| - | - | - | - | 4,883.50 | | |
| - | - | - | - | 5,000.00 | | |

V-6

**APPENDIX VI**

## Ambac

**Financial Guaranty Insurance Policy**

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:

Policy Number:

Obligations:

Premium:

**Ambac Assurance Corporation (Ambac),** a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

Secretary

**SEAL**

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Authorized Officer of Insurance Trustee

Form No.: 2B-0012 (1/01)

VI-1

[This page intentionally left blank]



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

| Issuer: | Policy Number: | |
|---|---|---|
| | **Control Number:** | 0010001 |
| **Bonds:** | Premium: | |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

---

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
**T** 212·312·3000
**T** 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                          **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                                   Page 1 of 2

VII-2

[This page intentionally left blank]

[This page intentionally left blank]

Puerto Rico Infrastructure Financing Authority • Special Tax Revenue Bonds, Series 2005A and 2005B • Special Tax Revenue Refunding Bonds, Series 2005C

Case:17-03283-LTS Doc#:1685-1 Filed:07/28/20 Entered:07/28/20 11:30:56 Desc:Main
Exhibit Exhibit A Page 440 of 440



Recycled Paper - Printed by
IMAGEMASTER 800.452.5152