```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF PUERTO RICO

 3
     In Re:                      )        Docket No. 3:17-BK-3283(LTS)
 4                               )
                                 )        PROMESA Title III
 5   The Financial Oversight and )
     Management Board for        )
 6   Puerto Rico,                )        (Jointly Administered)
                                 )
 7   as representative of        )
                                 )
 8   The Commonwealth of         )
     Puerto Rico, et al.         )        July 29, 2020
 9                               )
                  Debtors,       )
10
     _____
11
12   In Re:                      )        Docket No. 3:17-BK-4780(LTS)
                                 )
13                               )        PROMESA Title III
     The Financial Oversight and )
14   Management Board for        )
     Puerto Rico,                )        (Jointly Administered)
15                               )
     as representative of        )
16                               )
     Puerto Rico Power           )
17   Authority,                  )
                                 )
18                  Debtor,      )
19   _____
20
21
22
23
24
25
```

```
 1  _____

 2  National Public Finance    ) Docket No. 3:19-AP-00422(LTS)
    Guarantee Corporation,     )
 3  et al.,                    )
                               )        in 3:17-BK-4780(LTS)
 4              Plaintiffs,    )
                               )
 5  v.                         )
                               )
 6  UBS Financial Services,    )
    Inc., et al.,              )
 7                             )
                Defendants.    )
 8  _____

 9  Ambac Assurance            ) Docket No. 3:20-AP-00047(LTS)
    Corporation,               )
10                             )        in 3:17-BK-3283(LTS)
                               )
11              Plaintiff,     )
                               )
12  v.                         )
                               )
13  Merrill Lynch, Pierce,     )
    Fenner & Smith,            )
14  Incorporated, et al.,      )
                               )
15              Defendants.    )

16  _____

17                     OMNIBUS HEARING

18  BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

19            UNITED STATES DISTRICT COURT JUDGE

20  AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

21            UNITED STATES DISTRICT COURT JUDGE

22  _____

23

24

25
```

```
 1   APPEARANCES:

 2   ALL PARTIES APPEARING TELEPHONICALLY

 3   For The Commonwealth
     of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
 4                            Mr. Brian S. Rosen, PHV
                              Ms. Laura Stafford, PHV
 5
     For National Public
 6   Finance Guarantee
     Corporation and MBIA
 7   Insurance Corporation:   Mr. Philippe Z. Selendy, PHV
                              Mr. Federico Hernandez Denton, Esq.
 8
     For Underwriters:        Mr. Peter G. Neiman, PHV
 9

10   For Ambac Assurance
     Corporation:             Mr. Jonathan E. Pickhardt, PHV
11
     For Puerto Rico Fiscal
12   Agency and Financial
     Advisory Authority:      Mr. John J. Rapisardi, PHV
13                            Mr. Luis C. Marini Biaggi, Esq.

14
     For the Special Claims
15   Committee:               Mr. Tristan G. Axelrod, PHV

16

17

18

19

20

21

22

23

24
     Proceedings recorded by stenography.  Transcript produced by
25   CAT.
```

```
 1                          I N D E X

 2   WITNESSES:                                        PAGE

 3        None.

 4

 5   EXHIBITS:

 6        None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    July 29, 2020

 3                                    At or about 9:42 AM

 4                          *      *      *

 5          THE COURT:  Good morning.  This is Judge Laura Taylor

 6   Swain.

 7               MS. NG:  Hi, Judge.  It's me, Lisa.

 8               THE COURT:  Good morning, Ms. Ng.

 9               Ms. Tacoronte, would you announce the case, please?

10               COURTROOM DEPUTY:  Absolutely, Your Honor.

11          The United States District Court for the District of

12   Puerto Rico is now in session.  The Honorable Laura Taylor

13   Swain presiding.  Also present, the Honorable Judith Dein.

14   God save the United States of America and this Honorable

15   Court.

16          In Re:  The Financial Oversight and Management Board

17   for Puerto Rico, as representative of the Commonwealth of

18   Puerto Rico, et al., PROMESA Title III, case number 17-3283,

19   for Omnibus Hearing.

20               THE COURT:  Buenos dias.  Good morning and welcome

21   counsel, parties in interest, and members of the public and

22   press.  We are once again convening telephonically for today's

23   Omnibus Hearing against a backdrop of circumstances that

24   present numerous challenges for all participants and

25   stakeholders in these Title III proceedings.
```

1    Our thoughts remain with all of those on the island

2  and on the mainland who have been affected directly and

3  indirectly by the coronavirus pandemic, as well as the people

4  on the island coping with the damage and unease brought about

5  by the most recent series of earthquakes that hit the southern

6  region of the island and the uncertainties of the storm

7  season.

8    To ensure the orderly operation of today's telephonic

9  hearing, all parties on the line must mute their phones when

10  they are not speaking.  If you are accessing these proceedings

11  on a computer, please be sure to select "mute" on both the

12  Court Solutions dashboard and your phone.

13    I remind everyone that, consistent with court and

14  judicial conference policies, and the Orders that have been

15  issued, no recording or retransmission of this hearing is

16  permitted by any person, including, but not limited to, the

17  parties, members of the public or the press.  Violations of

18  this rule may be punished with sanctions.

19    I will be calling on each speaker during these

20  proceedings.  When I do, please unmute yourself and identify

21  yourself by name for clarity of the record.  After the

22  speakers listed on the Agenda for each of today's matters have

23  spoken, I may provide an opportunity for other parties in

24  interest to address briefly any issues raised during the

25  course of the presentations that require further remarks.  If

1    you wish to be heard under these circumstances, please unmute

2    yourself and state your name clearly at the appropriate time.

3    I will call on the speakers if more than one person wishes to

4    be heard.

5        Please don't interrupt each other or me during this

6    hearing.  If we interrupt each other, it is difficult to

7    create an accurate transcript.  But having said that, I

8    apologize in advance for breaking this rule, as I may

9    interrupt if I have questions or if you go beyond your

10   allotted time.

11       If anyone has difficulty hearing me or another

12   participant, please say something immediately.  The time

13   allotments for each matter and the time allocations for each

14   speaker are set forth in the Agenda that was filed by the

15   Oversight Board on Monday, July 27.  The Agenda, which was

16   filed as docket entry No. 13847 in case 17-3283, is available

17   to the public at no cost on Prime Clerk for those interested.

18       I encourage each speaker to keep track of his or her

19   own time.  And the Court will also be keeping track of the

20   time and will alert each speaker when there are two minutes

21   remaining with one buzz, and when time is up, with two buzzes.

22       Here is an example of the buzz sound.

23       (Sound played.)

24       THE COURT:  If your allocation is two minutes or

25   less, you will just hear the final buzzes.

1          If we need to take a break, I will direct everyone to

2    disconnect and dial back in at a specified time.   This

3    morning's session will end by noon, and I don't expect to need

4    an afternoon session.

5          The first Agenda item is, as usual, status reports

6    from the Oversight Board and AAFAF.   As I requested in the

7    Procedures Order, these reports have been made in writing in

8    advance of this telephonic hearing and are available on the

9    public docket at docket entry Nos. 13874 and 13870 in case

10   17-3283.   I've reviewed the reports carefully, and I thank the

11   Oversight Board and AAFAF for the care and detail reflected in

12   the reports, which I find quite comprehensive.

13         I have some questions regarding ADR for the Oversight

14   Board, but first I will invite the Oversight Board to make any

15   additional or general remarks its representatives wish to make

16   on the record this morning.

17         MR. BIENENSTOCK:   Your Honor, this is Martin

18   Bienenstock of Proskauer Rose for the Oversight Board.   Good

19   morning.

20         THE COURT:   Good morning, Mr. Bienenstock.

21         MR. BIENENSTOCK:   Good health to everyone.

22         We didn't have additional remarks.   I think my

23   partner, Brian Rosen, is also on, and he would address the ADR

24   questions.

25         THE COURT:   Thank you, Mr. Bienenstock.

1          Mr. Rosen, are you on?  Mr. Rosen, would you unmute

2     and say something if you're on?

3               (No response.)

4               MR. BIENENSTOCK:  Your Honor, if --

5               THE COURT:  It sounds like something or someone

6     dropped.

7               Ms. Ng, can you tell whether Mr. Rosen is on the

8     dashboard?

9               MS. NG:  He's on the dashboard.  I'll unmute him.

10              Mr. Rosen, are you there?

11              MR. ROSEN:  I am on the phone, Your Honor.

12              THE COURT:  Okay.  Very good.  Good morning,

13    Mr. Rosen.

14              MR. ROSEN:  Good morning, Your Honor.

15              THE COURT:  And so this is Brian Rosen of Proskauer

16    speaking, yes?

17              MR. ROSEN:  Yes, Your Honor.

18              THE COURT:  Okay.  Very good.

19              I had some questions regarding ADR, and it's

20    basically to assist the Court with staffing and structural

21    decisions in connection with the evaluative mediation aspect

22    of ADR.  And so my general question is to ask you to discuss

23    your overall projected timeline for the ADR process.

24              I'm particularly interested in your view of the

25    earliest point at which you expect to have completed the offer

1    exchange phase with respect to any claims; and at what point

2    you would expect to begin increasing the number of claims per

3    notice; and what your target number of claims per notice and

4    frequency of notices might be; and then I'll have a couple of

5    other questions.  But the timetable and volume are the ones to

6    start with.

7         MR. ROSEN:  Yes, Your Honor.  And also, Your Honor,

8    Ms. Stafford, who you know, is also on the line, and she may

9    assist me at any point in time.

10        Your Honor, as we reflected in the status report, we

11   transferred a minimum amount of claims the first time, only

12   21, and we anticipate that we'll provide an update on

13   September 8th.  We are working with the Department of Justice,

14   the Puerto Rico Department of Justice with respect to bringing

15   in more claims into the ADR process, but we anticipate at this

16   time probably moving only in the same period -- excuse me, the

17   same amount of claims in, on a going-forward basis for the

18   first few times.  So we're talking about, Your Honor,

19   approximately 20 to 30 to 40 claims.  Each will include claims

20   not only against the Commonwealth and HTA, but also we've

21   included some that were against PREPA.

22        We are working with the providers, as we included in

23   there, and we're discussing with the Unsecured Creditors

24   Committee some issues associated with those providers.  We --

25        THE COURT:  This would be the arbitration providers?

1          MR. ROSEN:  Yes, Your Honor.

2          And specifically, we've been talking with JAMS and

3    AAA.  Those were the two providers that gave us proposals that

4    we found acceptable and that we wanted to continue a dialogue

5    with them.  And it is likely, Your Honor, that we would

6    probably utilize both of those just based upon the number.

7    And with some claims being mainland-based, and some being on

8    island, and one provider being able to accommodate us more

9    with on-island and more Spanish speaking arbitrators, so we

10   decided to bifurcate the roles to have it be a little bit

11   smoother running for not only the Oversight Board, but also

12   for the Puerto Rico Department of Justice.

13         We are working with the Department of Justice now

14   with respect to settlement bandwidth so that we can move this

15   forward quickly.  We don't anticipate -- or excuse me.  We do

16   anticipate being able to provide those offers in the time

17   frame that is required under the Order, which is the 60-day

18   time frame.

19         And so, with respect to the first 21 claims that were

20   placed into the ADR, we will provide those responses in the

21   beginning of September, or those settlement proposals.  We

22   don't anticipate needing the services, however, of the court

23   processes probably for another 30 to 60 days after that time

24   period, and it will be small claims.  We're hopeful that the

25   settlement offers that we make will be satisfactory obviously,

1    and there will be very few people that will be necessary from

2    the Court's perspective.

3              As these ramp up, Your Honor, we don't anticipate

4    getting more than probably 1,000 claims at the end of the day,

5    but that could change based upon the settlement processes and

6    the acceptances by the respective claimants.

7              THE COURT:  And so the 1,000, is that a net number

8    that you would expect might go to evaluative mediation, or is

9    the 1,000 the number of claims you would notice up for the ADR

10   process in total?

11             MR. ROSEN:  I think, Your Honor, it's probably in

12   total, but as we dig down a little bit more, as the bar date

13   on PBA comes about now and more claims are being filed there,

14   we may have to change that estimate, in which case we'll

15   obviously inform the Court.  But that is our guesstimate at

16   this time.

17             THE COURT:  Okay.  And again, just for clarity, for

18   me and for others, I think the last time we had spoken at an

19   Omni about numbers, there had been a guesstimate of ten to

20   fifteen thousand claims coming through ADR, if I'm not

21   mistaken.  And so --

22             MR. ROSEN:  Those were the total amount possible,

23   Your Honor, but as we continue to analyze and cull the

24   information, that number continues to be reduced.

25             THE COURT:  All right.  I very much appreciate that

1   clarification.  And it sounds to me as though with 20 to 40

2   claims per notice for, as you say, the next few times, would

3   it be fair to say that we shouldn't expect more than a couple

4   hundred at most to be noticed up and taken into the process

5   before the end of the year?

6           MR. ROSEN:  I think that's a fair number, Your Honor,

7   yes.

8           THE COURT:  And do you expect to be grouping these

9   claims substantively or conceptually in any way?

10          MR. ROSEN:  Well, Your Honor, as we indicated in the

11  status report, we're focused at this time on some litigation

12  phase and some accounts payable.  We'll probably continue to

13  do that with -- as the Puerto Rico DOJ gets more up to speed

14  on some of these and we can process more of the information,

15  probably veering a little bit more towards the

16  litigation-based claims rather than the accounts payable.

17          THE COURT:  And that's for the foreseeable near and

18  mid term?

19          MR. ROSEN:  Yes, Your Honor.

20          THE COURT:  And that actually covers all of my

21  questions.  And so you expect to be doing a notice per month

22  of the 20 to 40 claims?

23          MR. ROSEN:  Your Honor, I think under the Order, it's

24  anywhere from -- I think it's up to 60 days.  So it's probably

25  in that two-month time frame that we'll do the notices.

1          THE COURT:  Thank you.

2          MR. ROSEN:  I think the next batch, Your Honor, would

3     be in October.  I just want to make sure.  The status would be

4     due in September with -- excuse me.  I apologize.  The second

5     tranche will be August 24th.  We'll send more into the ADR

6     process.

7          THE COURT:  Okay.  And then after that, it would be

8     October?

9          MR. ROSEN:  Probably, Your Honor.  That would be our

10    goal.

11         THE COURT:  Thank you very much.  This is very

12    helpful.

13         MR. ROSEN:  My pleasure.

14         THE COURT:  And so I have no further questions for

15    the Oversight Board.  And I again thank AAFAF for its report.

16    I have no questions for AAFAF at this point, but did

17    Mr. Rapisardi or Mr. Marini wish to make any additional or

18    general comments?

19         MR. MARINI BIAGGI:  Good morning, Your Honor.  Luis

20    Marini for AAFAF.  I don't have any further comments other

21    than what we put in our status report.

22         THE COURT:  Thank you, Mr. Marini.

23         Are there any other counsel who have questions or

24    comments that they wish to make in connection with the status

25    report?  If you do, unmute yourself, and state your name

```
1    clearly, then wait for me to call on you to speak.

2         I know that the unmuting can be complicated, so I'll

3    wait 15 seconds before I go on.

4         All right.  That was 20 seconds, and so I am assuming

5    that there are no further comments.  Thank you all.

6         And so at this point, I will turn to the argument of

7    the Motions to Remand.  National's Motion to Remand is docket

8    entry No. 31 in adversary proceeding 19-422, and Ambac's

9    Motion to Remand is docket entry No. 22 in adversary

10   proceeding 20-047.  We have 60 minutes allocated for the oral

11   argument in total, and the first scheduled speaker is

12   Mr. Selendy for MBIA and National, who has been allocated 11

13   minutes.

14        Mr. Selendy.

15        MR. SELENDY:  Good morning, Your Honor.

16        THE COURT:  Good morning.

17        MR. SELENDY:  May it please the Court.  Philippe

18   Selendy for plaintiffs, National and MBIA, which I'll refer to

19   together as National.  I am on the line with my co-counsel,

20   Federico Hernandez Denton.  And today, National and Ambac will

21   share plaintiffs' time.

22        I'll address common issues for both insurers:  Why

23   these non-core claims against nondebtors will not affect the

24   estate; why this Court should remand; and why there's no

25   federal question.  Federico Hernandez Denton will then address
```

1   the nature of the claims and the Commonwealth's interest.  And

2   John Pickhardt will speak to points specific to Ambac.

3        As a threshold matter, defendants bear the burden of

4   establishing removal jurisdiction and disputed questions of

5   fact; and controlling substantive law must be construed in

6   favor of remand.  Importantly, the Claims Committee itself is

7   not advocating to keep the cases in this court.

8        The insurers here are asserting claims solely against

9   the underwriters of Puerto Rico municipal bonds.  They are

10  equitable claims under *actos propios* and unilateral

11  declaration of will, are based on Article VII of the Civil

12  Code.

13       As the Puerto Rico Supreme Court has held, the

14  doctrines are unique in the American system, with no ready

15  analog at common law.  *Actos propios* protects legitimate

16  expectations under a standard of exceptional good faith, while

17  unilateral declaration of will is like unilateral contract,

18  enforcing commitments made with the intent of affecting the

19  conduct of others.

20       What the insurers must show is that the banks made

21  false assurances of due diligence in a way contrary to

22  accepted norms in Puerto Rico.  If the banks violated their

23  assurances, leading National and Ambac to insure deals that

24  failed, the banks are responsible for the losses.

25  Significantly, the claims don't require any proof of debtor

 1 | misconduct.

 2 |       Now, according to the banks, there are two main

 3 | conceivable effects:  A reduction in the insurers' claims

 4 | against the estate, or an increase in the banks'

 5 | indemnification or contribution claims against the estate.

 6 | But as I'll explain, that's wrong.  There will be no effective

 7 | change in the insurers' claims, and the banks' claims are too

 8 | contingent and remote.  These non-core cases will not impact

 9 | the rights or liabilities of the estate or the administration

10 | of these proceedings.

11 |       First, defendants admit the insurers filed proofs of

12 | claim against the debtors for the exact same amounts claimed

13 | against the banks.  But if National and Ambac prevail, the

14 | banks will be subrogated automatically, dollar for dollar, to

15 | the insurers' claims under Section 3248 of Puerto Rico Civil

16 | Code.  3248(1) applies because the banks, as unsecured

17 | creditors, will be satisfying the debtors' obligations to

18 | preferential creditors.  And 3248(3) applies because the banks

19 | have an interest in the same debt that is the subject of the

20 | insurers' proofs of claim.

21 |       As the Supreme Court held in *Eastern Sands*, this

22 | statute applies automatically, not presumptively.  There are

23 | no exceptions or equitable defenses.  The result then is just

24 | a substitution of creditors, with no change in the

25 | classification of the insurers' filed claims against the

1    debtors.  That is an insufficient nexus to confer "relating

2    to" jurisdiction, as the cases of *Santa Clara* and *In re C&A*

3    confirm.

4           The banks --

5           THE COURT:  Mr. Selendy.

6           MR. SELENDY:  Yes.  Yes, Your Honor.

7           THE COURT:  Sorry to interrupt, but I warned you that

8    I might do that.

9           MR. SELENDY:  Of course.

10          THE COURT:  Given the magnitude of these claims and

11   the role that the insurers have played and are playing, as a

12   practical matter in the dynamics of the administration of the

13   estate and litigation issues, isn't it a little unrealistic to

14   say nothing changes when the claim holder changes, even if

15   that's automatic?

16          MR. SELENDY:  Well, the effect of a change in the

17   substitution of the creditor is not a change in the

18   classification of the claim.  And that switch, under

19   controlling First Circuit law, reflected in both these cases,

20   *Santa Clara* and *In re C&A*, doesn't constitute the type of

21   conceivable effect that is recognized in *Pacor*, which of

22   course the First Circuit is following.

23          In terms of the dollar amount of the claims, that's

24   not the relevant issue.  The question is will there be an

25   impact in some way to the rights or liabilities of the estate

1   or the administration.  And here, because it does operate

2   automatically, there is no effective change.  Indeed, as I

3   will cover later, if the Court were to decline to remand and

4   instead retain jurisdiction, there would be real burdens on

5   these proceedings because we're dealing with non-core Spanish

6   Civil Law claims that cannot be tried with streamlined

7   bankruptcy procedures.  And there are further complications

8   introduced by the fact that these are local law issues that

9   require consideration of local usage, custom and public

10   interest.

11          So if I may, Your Honor, I'll turn to the banks' own

12   claims for indemnification and contribution, which are too

13   remote.  As I mentioned, the First Circuit follows *Pacor* and

14   its progeny, which holds a -- claims are too contingent to

15   support "related to" jurisdiction if further litigation is

16   required on the claims.

17          No bank even filed a proof of claim for

18   indemnification or contribution, other than Santander.  The

19   bar date passed two years ago, and the remote chance that late

20   filed claims might be allowed cannot support jurisdiction.

21          Here, of course, the Special Committee issued their

22   report showing bank failures of due diligence back in mid

23   2018, and the FOMB, National and Ambac all filed complaints

24   long ago.  There's no excuse, as Rule 9006(b)(1) requires, for

25   the banks' neglect.

1          Santander's Proofs of Claim fair no better.  They are

2     contingent under the rule of *W.R. Grace,* because the debtors

3     are likely to object, as they did in COFINA, where Santander's

4     claims were disallowed, thus requiring further litigation.

5          There's also a second independent reason why the

6     banks' claims are all inadequate, and that is that they are

7     all conditional.  In the First Circuit, indemnification of

8     contribution claims only matter for "relating to" jurisdiction

9     if they're virtually automatic and unconditional.  The case of

10    *In re Montreal Maine* is a good example.

11         And here, even for the subset of deals where the

12    banks do have indemnification rights, the contracts impose

13    limits and conditions.  One important condition is in Section

14    13(a), which carves out debtor liability for any untrue

15    statement or omission by the banks.  Exactly what's alleged

16    here.  In addition, the law also implied exceptions for bad

17    faith and gross negligence, both of which again are implicated

18    here.

19         Finally, Your Honor, there's no precedent for the

20    banks' speculation that they might claim non-contractual

21    contribution for liability based on their own equitable

22    misconduct.

23         So in summary, no bank can identify any timely,

24    virtually automatic indemnification of contribution claims as

25    the First Circuit requires for there to be any impact

1   sufficing for "relating to" jurisdiction.  Even if this Court

2   were to conclude that there's some attenuated basis for

3   "relating to" jurisdiction, the cases still should be

4   remanded.

5          Comity dictates federal courts should be hesitant to

6   exercise jurisdiction when state issues substantially

7   predominate, and of course Commonwealth issues substantially

8   predominate here over bankruptcy issues.  The claims do not

9   challenge the legality, operation, intent or conduct of the

10  debtors; do not require interpretation of PROMESA; and do not

11  relate to the restructuring.

12         On the other hand, the claims do raise important

13  issues as to the interpretation and application of --

14         (Sound played.)

15         MR. SELENDY:  -- law.  *Actos propios,* and unilateral

16  declaration of will are claims that originate in Spanish Civil

17  Law or adopted by the Puerto Rico Supreme Court.  The contours

18  of the claims are still being developed.  And where issues of

19  local law are unsettled, their predominance is always

20  significant as the bankruptcy court held in *In re Acevedo*.

21  That favors remand.

22         I'll note the banks engaged in misdirection when they

23  compared Commonwealth courts to federal -- Commonwealth issues

24  to federal law generally, rather than the bankruptcy issues;

25  but even on that wrong standard, the banks fall short.  The

1   insurers don't bring federal securities claims and they

2   cannot -- there are no federal defenses to their equitable

3   claims.

4          Moreover, any impact or lack of impact on the estate

5   will be the same whether the cases are litigated here or in

6   the Commonwealth, just as in *Cambridge Place* where Judge Dein

7   recommended equitable remand, despite automatic debtor

8   liability for indemnification.  And notably, to give complete

9   assurance that there's no effect on the estate, National will

10  stay execution and enforcement of any judgment until after

11  Plan confirmation.  That makes this an easier case than *Vitol*

12  or *ASP*, both of which this Court remanded because claims were

13  expected to be resolved post confirmation, and in both of

14  which cases, debtors were involved.

15         Last, Your Honor, there's no federal question

16  jurisdiction.  Under the well-pleaded complaint rule, the

17  question raised by the insurers is simply whether Puerto Rico

18  equitable doctrines require the banks to live up to assurances

19  made in Puerto Rico years ago.  That's a fact bound, situation

20  specific question of local law.  There's no federal actor

21  here, no challenge to the validity of any federal law or

22  regulation, no risk of any precedent of systemic federal

23  import.  In fact, there's no question of federal law at all.

24         The banks admit they haven't performed --

25         (Sound played.)

 1          MR. SELENDY:  Your Honor, may I have 30 seconds and

 2     I'll finish?

 3          THE COURT:  Yes.  You may finish your thought.  Thank

 4     you.

 5          MR. SELENDY:  Thank you.

 6          The banks admit they had to perform reasonable due

 7     diligence.  They said so in all the offer materials.  And that

 8     context sets the basis for legitimate expectations in the

 9     Commonwealth's bond market.

10          It doesn't matter whether the obligations imposed by

11     the equitable doctrines overlap with those imposed by federal

12     law, as the United States Supreme Court made very clear in

13     *Merrill Lynch v. Manning* when it remanded state law claims

14     that referred repeatedly to violations of federal securities

15     regulations.  And the First Circuit case of *Municipality of*

16     *Mayaguez*, is the same effect.

17          Finally --

18          THE COURT:  Thank you.

19          MR. SELENDY:  Finally, if the Court were to weigh the

20     congressionally approved federal-state balance, Commonwealth

21     interests dominate.  Congress does approve of parallel state

22     regulation that touches upon securities matters, particularly

23     on municipal issuances, and Puerto Rico hasn't --

24          THE COURT:  Thank you, Mr. Selendy.

25          MR. SELENDY:  Thank you.

1          My counsel, the former Chief Justice of Puerto Rico

2    Supreme Court, Federico Hernandez Denton, will now address

3    Puerto Rico's overwhelming interest in defining its scope of

4    the equitable doctrines.  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Mr. Hernandez Denton.  Mr. Hernandez Denton, can you

7    unmute yourself?

8          Ms. Ng, would you see if there's anything you can

9    unmute?

10          (Discussion off the record.)

11          THE COURT:  Okay.  All right.  So we will wait.

12          Mr. Hernandez Denton, if you can just make sure that

13    you have pressed "unmute" on your phone, and if you have the

14    computer screen up, also on the computer screen.  And we will

15    wait for the courtroom deputy to see if she can do this from

16    the master screen.  I apologize for the delay.

17          Maddie, are you still there?

18          All right.  Thank you, everyone, for your patience.

19    We will just continue to wait.

20          MS. NG:  Judge?

21          THE COURT:  Yes, Ms Ng.

22          MS. NG:  I'm sorry.

23          (Discussion off the record.)

24          THE COURT:  Thank you both.

25          Good morning, Mr. Hernandez Denton.

1        MR. HERNANDEZ DENTON:  Yes.  Good morning, Your

2   Honor.  Thank you very much for your patience.  May it please

3   the Court, I'm Federico Hernandez Denton on behalf of

4   National.

5        First, I would like to thank Your Honor for your work

6   on this very important matter.

7        I am going to address the Commonwealth courts'

8   overriding interest in adjudicating those disputes, which

9   involve doctrines unique to the Civil Codes and its

10  institutions.  I am referring to *la doctrina de los actos*

11  *propios* and *la doctrina de la declaracion unilateral de*

12  *voluntad* as sources of obligations.  Both claims emanate from

13  Article VII of the Puerto Rico Civil Code, which expressly

14  enables the court to decide cases in accordance with equity.

15       These claims are rooted in our civil law tradition of

16  several centuries.  Applying *la doctrina de los actos propios*,

17  the Puerto Rico Supreme Court said, in *International General*

18  *Electric*, that "the rule that nobody is allowed to go against

19  his own acts is grounded and rooted in the general principles

20  of law.  And one should act in good faith in the juridical

21  life.  Contradictory behavior should be prevented."  And

22  that's the end of the quote.

23       Diaz Picasso, a very distinguished civil law lawyer,

24  a scholar, essentially analyzed the doctrine in a very often

25  quoted writing, and explained that the concept of *doctrina de*

1    *los actos propios* includes, and I'm quoting, "loyalty in the

2    dealing, as well as honest and faithful conduct, a criterion

3    of conduct according to which obligations should be

4    performed."  And that's my own translation, Your Honor.

5             As to *la declaracion unilateral de voluntad*, in

6    *Ortiz*, the Supreme Court of Puerto Rico expressly recognized

7    it as a source of obligations which enforces a claim on a

8    promise made with the intent to influence the conduct of

9    others.

10            In our civil law tradition, judges have significant

11   discretion to shape the contours of its claims, and to do so

12   must weigh the public interest, the customs and usage of the

13   community.  The Commonwealth courts are also free to recognize

14   new applications of old doctrines, and have done so on

15   multiple occasions to specific conducts of parties in

16   different types of conducts, in all aspects of human

17   interactions.

18            Considering its experience with those doctrines, the

19   Commonwealth courts are best suited to interpret -- to

20   interpret the Puerto Rico Civil Code and the institutions that

21   are derived from both doctrines, according to our customs --

22            (Sound played.)

23            MR. HERNANDEZ DENTON:  -- and usage.  They are also

24   in a better position to examine the developments of those

25   doctrines in countries with similar civil law traditions, from

1    Spain to Argentina.

2            We must bear in mind that in interpreting and

3    applying these doctrines to specific facts, a court

4    knowledgeable in civil law always takes into consideration the

5    extensive jurisprudence of the Supreme Court of Spain and of

6    other countries, as well as the civil law treatises.  These

7    experiences, as well as the application of the doctrines of

8    different conducts in several other countries carry great

9    weight in Puerto Rico jurisprudence.

10           In addition, the Commonwealth courts, steeped in

11   civil law tradition, are best suited to interpret these

12   Spanish language treatises, law review articles, and

13   jurisprudence in their original language.  The common law, on

14   the other hand, has no bearing on the interpretation or

15   application of *doctrina de los actos propios* or *la declaracion*

16   *unilateral de voluntad*.

17           With that in mind, former Associate Justice of the

18   Supreme Court, Jaime Fuster, and a well-known comparative law

19   scholar, explained in *Corraliza* that, as expressly stated in

20   his Opinion, that the federal court's attempts to use the

21   common law to interpret equitable claims has, in fact, caused

22   great confusion.  For example, the use of a secondary

23   statement to interpret *la doctrina de los actos propios*, while

24   comparing it to the Commonwealth concept of promissory

25   estoppel.

1   And another very well-known author, a Spanish author,

2   Jaramillo, in his treatise on *la doctrina de los actos*

3   *propios,* also addressed --

4   (Sound played.)

5   MR. HERNANDEZ DENTON:  -- and reminded us that *la*

6   *doctrina de los actos propios* is different than common law.

7   Let's not forget that the common law does not recognize *la*

8   *doctrina de la declaracion unilateral de voluntad* as a source

9   of obligations.

10   The Commonwealth courts should apply the civil law

11   doctrines to the facts that originate in the Complaint filed

12   by National in the Superior Court.  They are not touched --

13   they are not security claims, and have no real analog in

14   common law.  They are based on doctrines of good faith

15   principles.

16   Our courts are specifically powered by the Civil Code

17   to provide the equitable relief that we are requesting.  And

18   if I may have a few more seconds, finally, Your Honor, the

19   significance --

20   THE COURT:  Very briefly, please.

21   MR. HERNANDEZ DENTON:  Finally, Your Honor, the

22   significance and importance of both doctrines is so entrenched

23   in Puerto Rico that the recently adopted Civil Code reiterated

24   the importance of good faith and of *la doctrina de los actos*

25   *propios* in all of its acts, and has expressly codified *la*

1   *declaracion unilateral de voluntad*.  That often occurs after

2   civil law countries decide to revamp their legal systems and

3   actualize their civil codes, and incorporate judge-made

4   doctrines into the codes.

5           For the reasons previously stated, and in

6   consideration of comity, we respectfully request that this

7   Court remand this action to the Judicial Branch of Puerto

8   Rico.

9           Thank you, Your Honor, for the opportunity to address

10  this Court.  It has been a privilege and an honor for me to do

11  so today.

12          I will now turn the argument over to counsel for

13  Ambac, unless Your Honor has any questions that I might assist

14  you to be able to respond.

15          THE COURT:  No.  Thank you.  I have no questions.

16  And thank you very much for your argument.  The honor is

17  mine.

18          I'll turn now to Mr. Pickhardt.

19          Ms. Ng, can you make sure that you don't have any

20  muting on on your end?

21          MS. NG:  I'm here and I'm watching everything.

22          MR. PICKHARDT:  Good morning, Your Honor.  John

23  Pickhardt on behalf of Ambac.  Are you able to hear me okay,

24  Your Honor?

25          THE COURT:  Yes, I can.  Thank you so much.  Good

1   morning, Mr. Pickhardt.

2         MR. PICKHARDT:  Good morning.

3         Your Honor, I will be brief, because Ambac's Motion

4   to Remand should be granted for all of the same reasons that

5   Mr. Selendy and Judge Hernandez Denton described, including

6   that it is not related to this Title III proceeding; it does

7   not arise under federal law; and it involves unique equitable

8   doctrines that Puerto Rico has an overriding interest in

9   having its own courts adjudicate.

10         However, Ambac's Complaint also has an important

11   distinction which makes any argument that it belongs in this

12   Court even more attenuated, since the two bond issuances that

13   are the subject of Ambac's Complaint were not issued by any

14   Title III debtor.  Rather, Ambac's case involves bond

15   issuances by the Puerto Rico Infrastructure Financing

16   Authority, PRIFA, and by the Puerto Rico Convention Center

17   District Authority, PRCCDA, which, as Your Honor knows,

18   neither of which are Title III debtors that have appeared in

19   this proceeding.

20         The fact that the issuers are not Title III debtors

21   in Ambac's case is important for two reasons.  First, it means

22   that Ambac's case is distinct, because the official statements

23   that are at issue in Ambac's case were not issued by any Title

24   III debtor.  And while the conduct at issue in Ambac's case,

25   like National's case, is the underwriters' statements

1    regarding their due diligence efforts, the defendants have

2    nonetheless contended in opposing the remand that the conduct

3    of Title III debtors is nonetheless implicated.

4         That argument is especially attenuated in the case of

5    Ambac's Complaint, where the instrumentalities that issued the

6    official statements are not before this Court in this Title

7    III proceeding.  It is similarly much more difficult for

8    defendants to contend that a Title III debtor would somehow be

9    a defendant in Ambac's case but for the existence of this

10   Title III proceeding.  The Commonwealth is not a signatory on

11   the official statements, only the non-debtor instrumentalities

12   are.

13        It also means that the defendants' arguments

14   regarding involvement of Title III debtors as third-party

15   witnesses in Ambac's case is even more attenuated.  And to the

16   extent that third parties -- and this is all relevant, and, in

17   any event, will be associated with PRIFA and PRCCDA, not the

18   Commonwealth or any other Title III defendant.

19        Secondly, this distinction means that Ambac's case is

20   unique because no Title III debtor has any contract, any

21   agreements with the underwriter defendant with regard to the

22   bond issuance at issue in Ambac's case.  This is perhaps the

23   most important distinction, that the defendants rely very

24   heavily on the existence of underwriting agreements with Title

25   III debtors in arguing that National's case is related to

1    those proceedings.

2          Specifically, defendants argue that any recovery

3    against them would result in an indemnification claim against

4    the Title III debtor under their underwriting agreement, which

5    would impact those proceedings.  Mr. Selendy described all of

6    the substantial and insurmountable impediments for such a

7    claim in the case of National, but in addition to those, no

8    such indemnification claims could even possibly exist in

9    regard to Ambac's case because the underwriting agreements are

10   with PRIFA and PRCCDA, which are not Title III debtors.

11         The defendant also argued in the case of National

12   that their underwriting agreements would provide the basis for

13   contribution claims against Title III debtors.  Again, such

14   contractual contribution claims against a Title III debtor are

15   not even possible in the case of Ambac's actions.

16         And while defendants had, therefore, pivoted to

17   arguing that they have Commonwealth contribution claims

18   against the Commonwealth, in the case of Ambac, even that

19   argument is more attenuated given no Title III debtor signed

20   or issued the official statements on that issue, and

21   subsequently, would ultimately be precluded for all of the

22   reasons described by Mr. Selendy, including that such a claim

23   would be, you know, redundant of the automatic subrogation to

24   Ambac's claim.  There is no basis in identifying any improper

25   conduct by a Title III debtor.

1          And I would also just note in closing, Your Honor,

2     that in the arguments that were presented here, with respect

3     to --

4          (Sound played.)

5          MR. PICKHARDT:  -- there being no implication on the

6     Title III proceeding, it is further supported by the

7     Informative Motion that was filed by the Oversight Board in

8     which it indicated that Ambac's proceeding, "does not concern

9     or implicate any obligation of a debtor in the Title III

10    proceeding."  And similarly the Oversight Board said again,

11    "it does not appear to have any disputed issues of fact in

12    common with litigation brought by the Oversight Board."

13         And I understand that the Oversight Board will

14    address Your Honor later with respect to their informative

15    motion and their position in this case, which I understand

16    does not distinguish between, you know, Ambac and MBIA's case,

17    is what they -- you know, with respect to both actions, but

18    certainly the informative motion that they filed in respect of

19    Ambac's case, you know, and also a further persuasive reason

20    why this case should be remanded.

21         Unless Your Honor has any questions, I will conclude

22    there.

23         THE COURT:  Thank you, Mr. Pickhardt.  I have no

24    further questions for you.

25         MR. PICKHARDT:  Thank you, Your Honor.

1         THE COURT:  And so we will now turn to the argument

2    for the defendants opposing the motion.  I have Mr. Neiman

3    down for 28 minutes.

4         And, Ms. Ng, can you make sure that we don't have

5    anything blocked on our end?

6         MS. NG:  Will do, Judge.

7         THE COURT:  Thank you.

8         MR. NEIMAN:  Thank you, Your Honor.  Can you hear me

9    okay?

10         THE COURT:  Yes, I can.  Good morning.

11         MR. NEIMAN:  Hi, Your Honor.  This is Peter Neiman

12    from Wilmer Hale.  I represent the Underwriter defendants.

13         Your Honor, I was feeling a little old this morning

14    when I realized it was actually 18 years ago that I was before

15    you for three months.  I represented the government in a

16    criminal case.

17         THE COURT:  It was a long time ago, but we're still

18    young, right?

19         MR. NEIMAN:  Thank you, Your Honor.  I appreciate

20    that.

21         I wanted to start the conversation today by

22    addressing a couple of things that were said by my colleagues

23    on the other side that I think are not quite accurate.  And

24    the first is the suggestion from Mr. Selendy, and I think this

25    was also echoed by Mr. Pickhardt, that somehow the debtor

1   misconduct was not implicated in these adversary proceedings.

2   And I don't think you have to look any further than the

3   complaint in the adversary proceedings to know that that's not

4   correct.

5          Those complaints are just littered with allegations

6   that the offering statements contained material

7   misrepresentations about the financial condition of the

8   debtor.  Those are the debtor's statements.  And that would be

9   debtor misconduct if they said false things in the offering

10  documents.

11         The reason that both Mr. Pickhardt and Mr. Selendy

12  tried to claim the debtor misconduct is not at issue here is,

13  because we've cited two cases that are closely analogous on

14  the facts, the *Worldcom, Inc. Sec. Litig.* from this Court, and

15  the *SPV* decision from the Second Circuit that say, where

16  debtor misconduct is central, that by itself could establish

17  "related to" jurisdiction.  It clearly is central here,

18  because it's -- and it's all over their Complaint.

19         The second thing that I wanted to pick up on, and

20  this is related to a question that Your Honor asked, and the

21  response, I think, was a little inaccurate from Mr. Selendy.

22  Your Honor asked, wouldn't a substitution of parties itself be

23  an important impact.  We obviously don't concede at all that

24  -- their rights at subrogation, so on that -- that's one of

25  the issues here is substitution of parties, and I'll get to

1    that in a minute.  But they are suggesting to you, not

2    withstanding your practical question -- you know, to say the

3    least, the bond insurers have been important players in this

4    bankruptcy.  I think they've filed between them more than 490

5    filings in the Title III cases.  And they've been quite

6    aggressive litigants, that you might expect from firms that at

7    this point have no business other than litigation.  And as a

8    practical matter, it's certainly reasonable to think that

9    having their claims litigated or reduced would be quite

10   significant.

11          And Mr. Selendy, said, you know, you find First

12   Circuit authority in *Santa Clara*.  And *Santa Clara*, Mr.

13   Selendy repeatedly refers to in his brief as a First Circuit

14   decision.  It is not a First Circuit decision.  It's not

15   binding authority.  It's a decision of the Bankruptcy

16   Appellate Panel, which is not binding on a United States

17   District Court, period.

18          There are cases that go both ways on the question of

19   whether substitution of parties is itself sufficient "related

20   to" jurisdiction.  And I think on the facts here, as Your

21   Honor noted, given the significance of the bond issuers in

22   this case, there is jurisdiction, although we have plenty of

23   other arguments as well.

24          I also wanted to say, the suggestion that subrogation

25   is so clearly automatic here, that there's no possible

1   financial impact on the debtors.  I'll just note that they

2   make that claim, the plaintiffs, but they haven't cited a

3   single case that says that equitable defenses are unavailable

4   to subrogation in this context.  They haven't cited a single

5   case that says that subrogation is even available in this

6   context.

7          This is not a case in which an insurer or a guarantor

8   stated they had, in a hypothetical world in which it seems --

9   where they've progressed in a lawsuit, and they've paid, and

10  we go to seek subrogation, we would be in the position of

11  someone who had been found liable and had been found to have

12  engaged in misconduct, and traditionally, subrogation is

13  subject to equitable defenses in that kind of circumstance.

14  They've cited no case to suggest it isn't.

15         I'm just asking you to do a little thought

16  experiment, Your Honor, to -- when you're thinking about the

17  question of whether subrogation -- it's so automatic that you

18  should just review it here, assuming there's no possibility of

19  a financial impact.  Just imagine, Your Honor, that they

20  prevail in these cases, we pay the debt, and then we go to the

21  debtor and say, look, you should just pay us the same hundreds

22  of millions of dollars in cash and bonds that you were going

23  to pay the bond insurers.  So subrogation is automatic.  You

24  just have to pay us.

25         And ask yourself the question, in that circumstance,

1   would the debtors really say, the very smart and intelligent

2   lawyers who represent the debtors, would they really say, oh,

3   you know, you're right?  We have no possible defenses here.

4   We're just going to write you a check or issue bonds for

5   hundreds of millions of dollars, even though there's been no

6   cases cited that say that you're even entitled to subrogation,

7   and there's certainly no case that says that ordinary self --

8   equitable defenses don't apply.   We'll just send you a check.

9   We won't even litigate.   It's so clear that we won't even

10  litigate.  Or instead, would one expect and assume that in

11  that circumstance, the reaction of the debtor before writing a

12  big check would say, well, actually, there might be.  There's

13  some pretty obvious defenses here we'd like to assert, and

14  we'll test whether they apply or not.

15          There is no way that subrogation here is automatic as

16  the plaintiffs suggest, and it's certainly concludable that

17  the debtors would assert defenses and that they would prevail,

18  in which case there would be an enormous financial impact on

19  the estate.

20          I also wanted to address very quickly the suggestion

21  from Ambac that their case was materially different from the

22  National case in ways that their view favored remand.  And I

23  think the first thing that they suggested was, well, you know,

24  their case doesn't really involve any Title III debtor.  And

25  it's true that the bonds that they are suing about were not

1    issued by a Title III debtor, but their claim -- they've made

2    a claim against the Commonwealth related to those very bonds,

3    as you know, asserting that the Commonwealth did an improper

4    clawback and that was the reason why they didn't get paid --

5    that those bonds didn't get paid.  And they've made the exact

6    same claim in their case against us.

7           And so the conduct of the Title III debtor for that

8    reason is very much at issue, both in their claims against the

9    debtor and their claims against us.  And indeed, the

10   Commonwealth is the source of many of the statements in the

11   offering documents that are also central to their case against

12   us.

13          The official statements repeat over and over again

14   that the Commonwealth is one of the sources of the information

15   that they are alleging is false in their case against us.  So

16   their suggestion that this case is somehow very different from

17   the National case because the bonds were not issued by the

18   Commonwealth, but by an instrumentality that's not a Title III

19   debtor, I think really doesn't wash because, in fact, they've

20   put the conduct of the Commonwealth itself very much at issue,

21   both in their adversary proceeding against us and in the

22   claims they've made in the Title III proceeding.

23          So with those basic points, without -- I'd like to

24   just kind of walk through for the Court, in the time that I

25   have available, the reasons why we think this is clearly

1    "related to" jurisdiction here, and why we think that actually

2    remand would not be appropriate.

3            I also want to spend a few minutes talking about why

4    actually you don't even need to get to either of those issues,

5    because the adversary proceeding Complaints, which on their

6    face invoke the federal securities laws by name 57 times, and

7    also invoke the duties of underwriters under those federal

8    securities laws another 90 times, and identify exactly one

9    misrepresentation that they claim was made by the

10   underwriters, and that misrepresentation is -- claims to be

11   the representation that due diligence was conducted in

12   conformity with the federal securities laws.  And so it

13   shouldn't be surprising, given a complaint that reads like

14   that, that that provides for "arising under" jurisdiction

15   here.

16           Let me start with "related to" jurisdiction, and as I

17   think everybody agrees, you know, the standard here is whether

18   it's conceivable that the adversary proceeding could have an

19   impact on the bankruptcy.  That's a low bar by any measure,

20   and here it's more than conceivable for multiple reasons,

21   whether the bond insurers win these adversary proceedings or

22   whether we win these adversary proceedings, it's going to be

23   likely that it's going to have an impact.  And that's true

24   likely whether these adversary proceedings are resolved before

25   or after any plan is confirmed.

1          We've already talked about one type of impact, and

2    that is, you know, in a world in which the bond insurers win

3    and collect from us, that would mean, since they can't collect

4    the same dollars as they collect from us, they can't collect

5    from the estate, that would reduce their claims against the

6    estate.  And because subrogation is not -- is potentially

7    subject to things like equitable defenses, that could have a

8    huge financial impact on the estate, hundreds of millions of

9    dollars at least.  So that's one example.

10          A second example is, let's assume it's in a world in

11    which we prevail.  Could that have an impact on the estate?

12    And the answer is absolutely yes.  And let me just give you an

13    example of that.

14          It's quite conceivable that if we win the Ambac case,

15    for example, that that would actually eliminate Ambac's proofs

16    of claim against the Commonwealth on the bonds that are issued

17    in the adversary proceeding.

18          Ambac's proof of claim asserts, as I mentioned

19    before, that the Commonwealth lawfully diverted funds that

20    should have paid their bonds, and Ambac's Complaint in the

21    adversary proceeding makes the identical claim, that the

22    debtor of the Commonwealth lawfully diverted funds.

23          And, you know, we might well dispute that there's

24    anything wrongful about what they call a diversion, and they

25    might argue that it was Ambac's mistaken analysis that --

1   whether such diversions were allowed or when they were

2   permitted, and not any due diligence created by us that led to

3   their losses.  And if we won that argument, we would establish

4   the lawfulness of what Ambac provisionally calls the diversion

5   of funds.  That conclusion would be binding on Ambac, and that

6   would eliminate Ambac's claims against the debtors.  And

7   again, that's just another instance that's conceivable, which

8   is all that's required, and that's more than enough to show

9   "related to" jurisdiction.

10          I wanted to, for a moment -- you know, there's been

11  some suggestion in the papers and the proceedings that, you

12  know, the time involved it would that (indiscernible) somehow,

13  because of all the --

14          THE COURT:  Mr. Neiman, there was some interference a

15  couple of seconds ago, so if you can just backtrack 20

16  seconds?

17          MR. NEIMAN:  Oh, I'm sorry, Your Honor.  Is it better

18  now?

19          THE COURT:  Yes, it is.

20          MR. NEIMAN:  Thank you.  I had just started to talk

21  about kind of the timing issue.  Is that where I dropped out

22  at?

23          THE COURT:  Yes.

24          MR. NEIMAN:  Okay.  And so they suggested that that

25  timing, that is, what they call, at least in their papers and

1   in the adversary proceedings, you know, the likelihood that a

2   plan would be confirmed before these adversary proceedings

3   would be resolved, somehow weighing against "related to"

4   jurisdiction.  I just want to point out, we think that's wrong

5   for a number of different reasons.

6        It's wrong because "related to" jurisdiction is

7   determined at the time of removal.  It's not suggested by

8   subsequent events.  It's wrong because the First Circuit case

9   that we cited, *In re Boston Regional Hospital*, you know,

10  squarely says that "related to" jurisdiction can exist even in

11  an adversary proceeding filed after plan confirmation.  But

12  may affect distribution, but of course things that could

13  reduce or eliminate claims could certainly affect

14  distribution, particular creditors where the debtor agreed to

15  provisions that would allow for reductions in claims post

16  confirmation, where the creditor got paid from some other

17  source, which is at least conceivable here.

18       And frankly, of course, you know, in the very

19  uncertain world that we're all living in, you know, it's hard

20  for anybody to predict what's going to happen, when.  And I am

21  particularly curious for Ambac to be taking this position

22  about timing, given that they've, you know, sat and opposed

23  things like the Plan Support Agreement, that the Plan is

24  unconfirmable.

25       So our first admission of "related to" jurisdiction

1   is just related to financial impacts on the estate, potential

2   elimination of hundreds of millions of dollars in claims.

3   Whether we win or lose, and whether the adversary proceedings

4   are resolved before or after a plan is confirmed, that, by

5   itself, is more than sufficient for "related to" jurisdiction.

6          There's also the restitution of the parties, as I

7   spoke about before.  There's also the closely analogous cases

8   that we pointed to that say that where debtor is -- comity is

9   central, which it plainly is here, there's "related to"

10  jurisdiction.  And then there's also the whole issue of

11  indemnification and contribution.

12         So it's curious to me that the plaintiffs are so

13  confident that subrogation, which normally if it was equitable

14  defenses, and for which there's no contractual right, is

15  totally automatic, and no one would ever question it.  But the

16  indemnification claims Santander has, the common process

17  displayed, it's hopelessly contingent and could never be a

18  decision for "related to" jurisdiction, we don't think that's

19  right at all.

20         And we also have special contribution claims, and

21  we've cited the *SPV* case for the point that the absence of

22  timely filed proof of claim, which of course we couldn't have

23  filed, because they sued us after, after the bar dates had

24  run, and these are somehow deemed novel theories that I'm not

25  sure why we would have anticipated, and we think we fit well

1    within *SPV*.

2           So we think there's very, very substantial arguments

3    for "related to" jurisdiction here, and I think the Court

4    clearly has the power to hear this case.

5           Let me turn now to the arguments that the Court

6    should exercise its discretion to remand, not withstanding

7    that it has jurisdiction here.  And just a footnote, for a

8    moment, and I'll come back to this, and I mentioned it before

9    already, but obviously discretionary remand is only an issue

10   if the Court rejects our federal subject matter "arising

11   under" jurisdiction argument.

12          In other words, if we're right that this Complaint in

13   which almost every other word is a reference to the federal

14   securities laws, if we're right that this Complaint arises

15   under federal law, then discretionary remand is just off the

16   table.  And I'll come back to that at the end, but let me turn

17   now to the discretionary remand question, assuming it's

18   available in this case.

19          It's the plaintiffs' burden here.  We have the burden

20   to show "related to" jurisdiction, and I think we've more than

21   met that burden.  But it's the plaintiffs' burden to show that

22   remand is appropriate.  And the Supreme Court has made clear

23   that the ordinary obligation of a federal court to exercise

24   its jurisdiction when it's possibly been invoked is virtually

25   unflagging, and plaintiffs have not met that burden here.

1              This is a very substantial dispute between parties

2        who are absolutely central to the bankruptcy, the

3        underwriters, and the bonds that are at issue, and the

4        insurers of many of those bonds.  This is not some

5        long-running -- a case that's been in the Puerto Rico courts

6        for years, like a couple of cases that Your Honor has had

7        remanded.  We moved at the very outset.

8              And as I said, this case, you know, essentially turns

9        on questions of federal law.  This is a Complaint with, you

10       know, 57 direct -- two Complaints of 57 direct references to

11       federal securities laws, 90 references to the duties created

12       by those laws, and the only misrepresentation that they

13       identify is the representation that we conducted the due

14       diligence in accordance with the federal securities laws.

15             So they tell you, oh, this is really basically a

16       dispute under Puerto Rico law, and I just don't think that's

17       consistent with the Complaint that they filed.

18             THE COURT:  But there is no private right of action

19       under the cited rule, correct?

20             MR. NEIMAN:  That's absolutely right, Your Honor.

21       But in order to prevail in this case -- make no mistake about

22       it, in order to prevail in this case, they have to show that

23       the representation they've identified in their Complaint is

24       false.

25             None of these doctrines allow them to complain

1    because we said something that was true.  These documents

2    require them to show that we said something that was false.

3    And the only thing that they identified in the Complaint that

4    we said that was false is representation that we complied with

5    the obligations of due diligence under the federal securities

6    laws, which means they have to prove that we violated the

7    federal securities laws.

8            THE COURT:  But in --

9            MR. NEIMAN:  Then the --

10           THE COURT:   They have to prove liability under the

11   civil law doctrine has taken place that they invoked.

12           MR. NEIMAN:  Oh, that's right.  It's not sufficient

13   for them to prove that misrepresentation, but it's absolutely

14   essential.  And my point is just, Your Honor, that when

15   thinking about the discretionary issue, and when thinking

16   about whether state law issues predominate or federal law

17   issues predominate, the central thing that they need to show

18   in order to have any chance of prevailing is that we violated

19   the federal securities laws.  And I think that weighs heavily

20   against discretionary remand.

21           On the question -- let me just sort of walk Your

22   Honor through kind of the traditional factors one by one that

23   weigh in on discretionary remand, and articulate a view why we

24   think they all favor Your Honor keeping this case.

25           The first factor is the effect of the action on the

 1    administration of the bankruptcy estate.  We've already

 2    detailed why this could have a profound effect, potentially

 3    eliminating up to a billion dollars in claims, potentially

 4    sidelining or reducing the role for the most litigious

 5    claimants, potentially resulting in Ambac being precluded from

 6    asserting its improper clawback, in a sense.  All of that

 7    weighs very heavily against remand.

 8            National then -- in fact, Ambac offered what they

 9    considered to be a solution to this.  They said, oh, we'll

10    just wait, and we agree, we won't try to collect any -- we'll

11    stay any judgment that we might obtain until after a plan is

12    confirmed.

13            I just want Your Honor to pause for a second and

14    think about what they're suggesting, because that is a

15    suggestion that is probably not in the interest of the

16    creditors, and this Court should not agree to it.  If National

17    can collect against us and reduce the amount the debtor has to

18    pay to them, that's a good thing for other creditors, and it

19    could potentially free up as much as 720 million dollars.  But

20    instead of having to go to pay National, it could go to pay

21    other creditors.

22            I don't know why in the world they think this Court

23    would want to make that money unavailable to other creditors

24    by agreeing to some kind of collusive arrangement in which

25    National doesn't try to collect on the debt that they would

1    try to establish until after a plan is confirmed.  That makes

2    no sense at all.

3         This case is going to have a big effect on the

4    administration of the bankruptcy estate.  That weighs

5    substantially against remand.  That which -- and I believe

6    they talked about this a bit.  I do just want to remind the

7    Court that it's their burden to establish discretionary remand

8    when appropriate, which means it's their burden, when they

9    say, oh, this is all about Puerto Rico law, to show that

10   Puerto Rico law even applies to this controversy.  Let me give

11   you an analogy that suggests that it's a pretty good reason to

12   think it doesn't given who the parties are.

13        There's a non-Puerto Rico plaintiff suing non-Puerto

14   Rico defendants.  All the parties are located outside of

15   Puerto Rico here.  And the analogy that I thought of, the

16   basic claim is that we made some misrepresentation to them

17   that induced them to do something.  And, you know, we see

18   claims like that all the time in the securities world where

19   somebody claims, look, you lied to me about the quality of

20   some stock and I bought it.  That's analogous to the claim

21   that they're making here.

22        And that's the claim -- we don't stop and say, wait,

23   what's the -- that the stock that was at issue in this

24   misrepresentation case, you know, where are they located?  So

25   if I misrepresented to Mr. Selendy the quality of Microsoft

 1   and he wanted to sue me, he wouldn't say, well, Microsoft is

 2   in Seattle; we have to proceed to Washington.  You'd think

 3   where was I when you made the representation?  Where was

 4   Mr. Selendy when he heard it?  Where was the loss suffered?

 5   None of this has to do with happenstance of where the issue

 6   is.  And the same is true here.

 7            THE COURT:  That's an argument that you'll have to

 8   make in relation to Puerto Rico choice of law principles,

 9   since whether it's in the Commonwealth court or in the Title

10   III court, this litigation is being brought in Puerto Rico,

11   correct?

12            MR. NEIMAN:  That's correct, Your Honor.  But Puerto

13   Rico follows sort of the balance of interests test, and in a

14   case in which the plaintiffs are not from Puerto Rico and

15   defendants are all headquartered outside of Puerto Rico, where

16   the representations that were made in Puerto Rico with

17   regard -- I mean were made outside of Puerto Rico, where the

18   bonds were sold almost entirely outside of Puerto Rico, we

19   think, under Puerto Rico choice of law rules, Puerto Rico law

20   does not apply here.

21            The next factor -- and again, Your Honor, I think the

22   central point here is they're the ones that are trying to

23   convince you that state law predominates, and more

24   specifically, that Puerto Rico law predominates, because if

25   New York law controls here, that does not support a remand to

1 | a Puerto Rico court.

2 |     It's their burden to convince you that Puerto Rico

3 | law predominates, and there are very serious reasons to think

4 | that Puerto Rico law doesn't apply here.  Assuming for a

5 | second, for the purposes of the next point, the physical

6 | reasons for asserting state law -- assuming for the moment

7 | that Puerto Rico law does apply and they have this claim that

8 | is so difficult, we've cited a large number of cases where

9 | federal courts have applied the Puerto Rico law.  In none of

10 | them did the courts say it was too difficult for them to

11 | understand.

12 |     The case they cited from the Puerto Rico Supreme

13 | Court about confusion in the doctrine was criticizing lower

14 | Puerto Rico courts for their confusion.  It wasn't

15 | predominantly a case about confusion by federal courts.

16 |     And thankfully, the central issue is that if we ever

17 | get to Puerto Rico law, Puerto Rico law will only come into

18 | play if they can establish a misrepresentation.  That is, that

19 | we didn't comply with federal law when we said that we did.

20 | But there are some very obvious defenses under Puerto Rico law

21 | that are not going to expire in several enumerations of this

22 | doctrine.

23 |     The Puerto Rico Supreme Court has said that, for

24 | example, the "unilateral declaration of will" doctrine

25 | requires showing an unmistakable intention to be bound.  And

1   it couldn't be more unmistakable that there was no such

2   intention, because the offering documents themselves say we

3   don't guarantee the accuracy of these statements.  So I think

4   the prospect that this is going to turn on niceties of Puerto

5   Rico law is quite remote.

6        Secondly, I don't think there's any comity interest

7   here, which is the next factor highly related to the fact that

8   the actions are, as we just said --

9        (Sound played.)

10        MR. NEIMAN:  There's no right to a jury trial here,

11   so that factor weighs against remand.

12        And the next factor -- this case is sort of like

13   *Vitol*, where Your Honor thought remand was appropriate because

14   a lot of things were alleged, involving removal over a forum

15   selection clause, and court documents that were pending for

16   years prior to the removal to the Title III court, and state

17   law, unlike the claims here, did not turn on the question of

18   whether defendants' conduct complied with federal law.  So all

19   the traditional elements, we think, weigh against

20   discretionary remand.

21        Just a couple of other factual points that I want to

22   note, and then I'll get quickly to "arising under"

23   jurisdiction --

24        THE COURT:  You are under two minutes now, so make

25   your choices.

 1          MR. NEIMAN:  I'm sorry, Your Honor.  How much time do

 2   I have left?

 3          THE COURT:  Less than two minutes.  You had one

 4   beep.

 5          MR. NEIMAN:  Oh, Your Honor, I'm sorry.  I thought I

 6   heard that earlier.

 7          Okay.  Very quick here.  I think, as a practical

 8   matter, it makes much more sense for Your Honor to be managing

 9   this case.  The discovery is going to be largely directed

10   against the debtor, because they did allege there were false

11   statements in the offer documents, statements alleged to come

12   from the debtor.

13          It makes much more sense for Your Honor to be in a

14   position to sequence the legal issues in this case so that it

15   can be resolved on a schedule that makes sense with the

16   bankruptcy.  We are committed to working with the Court to do

17   that as quickly as possible.  And I think you also want to

18   avoid the prospect of inconsistent judgments if this case is

19   remanded.

20          And if we prevail in state court on the claim that

21   clawback was lawful, that would be binding on Ambac.  It might

22   be different than the conclusion Your Honor would reach.  Or,

23   vice versa, we might lose.  You might find clawback is lawful

24   and state court might find it's unlawful.  It doesn't make any

25   sense to create a possibility of inconsistent judgments.

```
 1              Then we turn, finally, Your Honor, to "arising under"
 2   jurisdiction.  I think everybody agrees that the Gunn and
 3   Grable tests apply here.  I don't think there is any
 4   reasonable dispute that there are federal issues in this case,
 5   given how the Complaint is written, and the only
 6   misrepresentation that they've identified --
 7              (Sound played.)
 8              THE COURT:  You can complete this thought.
 9              MR. NEIMAN:  Yeah.  Thank you, Your Honor.
10              And I would just say that we think that not only are
11   they present and necessary, but they're quite substantial
12   decisions about whether, as the plaintiffs have alleged, due
13   diligence somehow requires looking back at all prior offering
14   documents and confirming their accuracy each time you
15   underwrite an offering, or whether we have to follow up and
16   monitor whether the issue was identified differently than in
17   the offering documents.
18              Those are claims and duties under the federal
19   securities laws that we think don't exist here.  They're
20   actually presented in this case, and would be quite
21   disruptive, even more to the market of municipal bonds, if the
22   state court were then to determine that there were such
23   obligations.
24              And so, overall, we think there is "arising under"
25   jurisdiction here, there is "related to" jurisdiction here,
```

1    and discretionary remand would not be appropriate under the

2    settled law governing discretionary remand.

3              Thank you so much for your attention, Your Honor.

4    It's so good to be in front of you again.

5              THE COURT:  Thank you, Mr. Neiman.

6              And now we have Ms. Beville for the Special Claims

7    Committee and the Oversight Board for four minutes.

8              Ms. Ng, would you make sure that Ms. Beville is

9    unmuted on your end?

10             MS. NG:  Yes, I will, Judge.

11             THE COURT:  Thank you.

12             Ms. Beville?

13             Ms. Ng, is Ms. Beville on the dashboard?

14             MS. NG:  Judge, I don't see her on.

15             THE COURT:  If there is anyone else who is intending

16   to make this argument for the Special Claims Committee, would

17   you do the little hand wave thing on the dashboard?

18             And Ms. Ng, would you tell me if you see anyone

19   waving their hand on the dashboard?

20             MS. NG:  Will do.

21             Nobody's waving their hand.

22             THE COURT:  All right.  Then we will go on to the

23   rebuttal arguments.  And I have Mr. Selendy first for three

24   minutes.

25             Would you unmute, Mr. Selendy?

 1                MR. SELENDY:  Yes.  Thank you.  Can you hear me, Your

 2    Honor?

 3                THE COURT:  Yes, I can.  Thank you.

 4                MR. SELENDY:  Okay.  Thank you.

 5                Let me begin by saying that the idea that a stay of

 6    execution is collusion is ridiculous.  This Court approved

 7    exactly that in *Vitol* and in *ASP*.  And as to magnitude, the

 8    *Vitol* case involved 3.9 billion dollars at issue for the

 9    debtor.

10                I'll note that the banks remain still uncertain about

11    the applicable law, including the choice of law.  That favors

12    remand, as this Court held in *Sealink*.

13                In addition, Mr. Neiman said there is no case that

14    addresses the question of equitable defenses as to Puerto

15    Rico's statutory subrogation statute.  That's incorrect.  It's

16    -- *Eastern Sands* from the Supreme Court of Puerto Rico, which

17    said unequivocally that subrogation is automatic.  And this

18    is, frankly, part of the bank's pattern of disregard for

19    Puerto Rico law.

20                As to the substitution of creditors, we cited both

21    *Santa Clara* and the DPR case of *In re C&A*.  Mr. Neiman in

22    response did not raise any First Circuit case and instead

23    invoked out of the circuit law, *SPV* and *Worldcom*.

24                Your Honor asked the question about the absence of a

25    private right of action.  That unequivocally favors remand as

1  held in the case of *Mays v. Flint*.  There is no question that

2  the insurers here cannot assert claims under the federal

3  securities laws, and there is no private right of action under

4  15c2-12.

5  As to context, the Complaint does allege problems in

6  the deals and the background rules in the federal securities

7  laws, but that sets the basis for our review of underwriter

8  due diligence.  The question on the Complaints is simply

9  whether the banks violated their assurances of due diligence

10  as gate keepers to the market under the Puerto Rico equitable

11  doctrines.  For example, the National Complaint, paragraphs

12  248, 7 to 19, 93 to 94.

13  I'll note that Mr. Neiman failed to address the First

14  Circuit case of *Municipality of Mayaguez*, which is directly on

15  point on this issue, as well as the Supreme Court case of

16  *Merrill Lynch v. Manning*.

17  It doesn't matter if defendant's conduct violates

18  federal law as well as Puerto Rico law.  The question is not

19  about commonality of fact, as *Pacor* and *In re VideOcart* may

20  claim, but whether there is a conceivable impact.  And as we

21  demonstrated earlier, both through automatic subrogation and

22  because of the contingency and conditionality of the bank's

23  indemnification and contribution claims, there is no such

24  impact.

25  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          MR. SELENDY:  If you have any further questions, I'll

3     be glad to address them.

4          THE COURT:  Thank you.  I do not.

5          MR. SELENDY:  Thank you.

6          THE COURT:  And now Mr. Pickhardt, who has reserved

7     two minutes.

8          MR. PICKHARDT:  Your Honor, John Pickhardt on behalf

9     of Ambac.  Are you able to hear me?

10          THE COURT:  Yes, I can.  Thank you.

11          MR. PICKHARDT:  Your Honor, I will also be very

12     brief.

13          The Underwriters' briefs in support of remand of

14     National's case and its impact to Puerto Rico focus almost

15     entirely on the fact that the debtors were issuers.  In my

16     arguments pointing out that, for Ambac's case, the issuers are

17     not debtors, Mr. Neiman was focused primarily on suggesting

18     that, nonetheless, debtor's conduct is at issue, because the

19     Commonwealth clawback of funds would somehow be prevented from

20     adjudication in these proceedings.  That is

21     simply inaccurate.

22          The claims that are being asserted by Ambac, like

23     National's, concern statements that were made by the

24     underwriter at the time of the bond issuances and concerning

25     the due diligence that they conducted; and it will be those

1    statements and the basis for those statements that will be

2    adjudicated, not for propriety of the clawback that occurred a

3    decade or more later.

4            And so while Ambac has taken issue with the propriety

5    of the clawback, that is not something that is present for

6    adjudication in this case.  And we think, Your Honor, that

7    that is, frankly, one of the reasons that the Oversight Board

8    has agreed with Ambac that this is not a case that concerns or

9    implicates any conduct or obligations of the debtors.  And

10   Mr. Neiman's arguments do not, you know, convincingly suggest

11   otherwise.

12           I have nothing further, Your Honor, unless you have

13   any questions.

14           THE COURT:  No, I don't.  Thank you.

15           I have just received a message that Tristan Axelrod

16   from the SCC is raising his hand.  And I believe he's

17   Ms. Beville's colleague.

18           And so, Ms. Ng, can you unmute Mr. Axelrod?

19           And, Mr. Axelrod, I apologize for having skipped you

20   over.

21           MS. NG:  Judge, I --

22           MR. AXELROD:  Thank you, Judge Swain.  Are you able

23   to hear me now?

24           THE COURT:  Yes, I am.  Sorry about that.

25           MR. AXELROD:  Thank you.  I was disconnected earlier

1       the moment I was called, and I apologize for the delay.

2               May it please the Court.  These are motions to remand

3       litigation concerning bond issuances and the conduct of

4       financial professionals and government officials in connection

5       with those issuances.  Specifically, the Ambac litigation

6       concerns PRIFA bonds issued in 2005 and PRCCDA bonds issued in

7       2006.  The National litigation concerns PREPA, HTA and COFINA

8       bonds issued between 2001 and 2007.

9               The Special Claims Committee, the SCC, has a mandate

10      to preserve and prosecute litigation claims belonging to the

11      Title III debtors.  Pursuant to that mandate, we have

12      initiated a variety of litigation, including litigation

13      alleging misconduct by financial professionals in connection

14      with bond issuances.  And specifically, that can be found at

15      Adversary Proceeding 19-280, among others.

16              Due to the possibility of confusion between

17      litigation brought by the SCC and Ambac and the facts inherent

18      to that litigation, the SCC filed an informative motion

19      regarding the Ambac remand motion.  To repeat the substance of

20      that informative motion, the SCC has not commenced any

21      litigation relating to PRIFA and PRCCDA bonds that are the

22      subject of Ambac's litigation.  The SCC is unaware of any

23      facts at issue in Ambac's litigation that would be common to

24      any litigation brought by the SCC.

25              Certain parties have since inquired to the SCC

1   regarding the National litigation.  Although the SCC filed no

2   formal statement regarding the National remand motion, the

3   same is true regarding that litigation.  The SCC has not

4   commenced litigation relating to the PREPA, HTA and COFINA

5   bonds subject to National's litigation and is unaware of any

6   facts at issue therein that would be common to any litigation

7   brought by the SCC.

8          To be very clear, the SCC has not commenced

9   litigation relating to the bonds at issue in either the Ambac

10  or National Complaints, or any bond issuance or other

11  transaction from the same time period.  Certain parties have

12  approached the Oversight Board regarding the potential effects

13  of the Ambac and National litigation on the Title III

14  proceedings, and the Court has heard a fair amount on that

15  subject today.  And the SCC has reviewed those arguments and

16  the underlying facts.

17         The Oversight Board takes no position regarding the

18  propriety of an exercise of "related to" jurisdiction in this

19  instance, and likewise has no legal position as to the

20  applicability of "arising under" jurisdiction.  More

21  specifically, from the perspective of the Oversight Board, the

22  outcome of the Ambac and National litigation is not material

23  to any amounts paid by the debtors through and after the Title

24  III proceedings as treatment of allowed claims.  It is

25  certainly possible that the Ambac and National litigation

1    could impact the reconciliation and distribution on claims in

2    the Title III cases, but those claims are not ripe for

3    presentation and reconciliation at this time.  And the

4    Oversight Board declines at this time to devote resources to

5    projecting the outcome of this litigation and its attendant

6    effect on Title III proceedings and distributions.

7          Again, we acknowledge it is possible that the outcome

8    of this litigation could impact claims reconciliation and

9    payments, and we take no position as to whether such impact

10   justifies an exercise of this Court's jurisdiction.

11         If Your Honor has no further questions, I'll

12   conclude.

13         THE COURT:  Thank you.  I have no further questions.

14   Thank you, Mr. Axelrod.

15         MR. AXELROD:  Thank you.

16         THE COURT:  And since Mr. Axelrod did end up speaking

17   out of turn because of the technological issues, does

18   Mr. Selendy or Mr. Pickhardt wish to say anything further by

19   way of rebuttal?

20         First, Mr. Selendy?

21         Ms. Ng, make sure he's unmuted, please.

22         MR. SELENDY:  I am here, Your Honor.  Nothing

23   further.  Thank you.

24         THE COURT:  Thank you.

25         Mr. Pickhardt?

1          MR. PICKHARDT:  Your Honor, nothing further from me

2     either.  Thank you.

3          THE COURT:  Thank you so much.

4          I have reviewed carefully the submissions and

5     listened carefully to everything that has been said here this

6     morning.  I will now make an oral ruling in respect of these

7     motions.

8          Before the Court are *Plaintiffs' Motion for Remand*

9     *and Memorandum in Support Thereof*, Docket Entry No. 31, in

10    Adversary Proceeding No. 19-422 -- I'll refer to that as the

11    "National Motion" -- and *Plaintiff's Motion for Remand and*

12    *Memorandum in Support*, which is at Docket Entry No. 22 in

13    Adversary Proceeding No. 20-47, which I'll refer to as the

14    "Ambac Motion".  And I will refer to the two motions together

15    as the "Motions".

16         The Motions were filed by the Plaintiffs in the

17    adversary proceedings, whom I will refer to as National and

18    Ambac, respectively.  Each of the Motions requests entry of an

19    order remanding the Adversary Proceeding to the Commonwealth

20    Court of First Instance.  The Motions are opposed by the

21    Defendants in the adversary proceedings, each of which is an

22    underwriter that was involved in certain issuances of bonds by

23    the Commonwealth of Puerto Rico and certain Commonwealth

24    instrumentalities.

25         The Court has considered carefully the parties'

1   submissions and the arguments made on the record today.   The

2   Court now makes its oral ruling as to the motions, and

3   reserves the right to make non-substantive corrections in the

4   transcript of this ruling.   The Motions are granted for the

5   following reasons.

6        The Court will begin by addressing whether it has

7   subject matter jurisdiction of the adversary proceedings.

8        As a threshold matter, the Motions contend that the

9   Court lacks federal question jurisdiction of the adversary

10   proceedings.   The Court agrees.

11        Federal district courts are authorized by statute to

12   exercise jurisdiction over "all civil actions arising under

13   the Constitution, laws, or treaties of the United States."   28

14   U.S.C. Section 1331.   There are two means by which a case can

15   "arise under" federal law.   *See Gunn v. Minton*, 568 U.S. 251,

16   257, (2013) decision.

17        First, most directly and most commonly, federal

18   question jurisdiction can be 'invoked by plaintiffs pleading a

19   cause of action created by federal law.' ... *Municipality of

20   Mayaguez v. Corporacion Para el Desarrollo del Oeste, Inc.*,

21   726 F.3d 8, 13 (1st Cir. 2013) (quoting *Grable & Sons Metal

22   Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312

23   (2005)).

24        Second, federal question jurisdiction can arise in a

25   "'special and small category' of cases" in which a plaintiff

1  pleads a state law cause of action that "involves important

2  federal issues."  I again cite *Mayaguez*, 726 F.3d at 13, at

3  this point quoting *Empire Healthchoice Assurance, Inc., v.*

4  *McVeigh*, 547 U.S. 677, 699 (2006).

5       In the latter situation, however, "the mere presence

6  of a federal issue in a state cause of action does not

7  automatically confer federal-question jurisdiction."  *Nashoba*

8  *Commc'ns Ltd. P'ship No. 7 v. Town of Danvers*, 893 F.2d 435,

9  438 (1st Cir. 1990) (quoting *Merrell Dow Pharm. Inc. v.*

10 *Thompson*, 478 U.S. 804, 813 (1986)).  Rather, to assess

11 whether subject matter jurisdiction exists with respect to a

12 state law claim that raises a federal issue, courts assess

13 whether the state-law claim "necessarily raise[s] a stated

14 federal issue, actually disputed and substantial, which a

15 federal forum may entertain without disturbing any

16 congressionally approved balance of federal and state judicial

17 responsibilities."  *Grable*, 545 U.S. at 314.

18       The Complaints do not plead federal causes of action.

19 Further, the Court concludes that the *Grable* "substantial

20 federal question" basis for jurisdiction is not present

21 because any federal issues that may be litigated in connection

22 with the adversary proceedings are neither necessarily raised

23 by the Complaint such that the Court would be required to

24 address them in order to resolve the issues that are raised in

25 the Complaints, nor substantial such that they are of

1    importance to the federal system as a whole.

2         At their core, the Complaints allege that the

3    insurance applications submitted to Plaintiffs contained

4    misleading information, misrepresentations, and omissions.

5    Plaintiffs allege that they were thereby induced by Defendants

6    to provide insurance for certain bond issuances.  While the

7    Complaints reference due diligence obligations arising under

8    federal law, the alleged breaches for which Plaintiffs seek

9    damages are not breaches of federal law-imposed obligations.

10   Rather, the Complaints seek damages pursuant to Commonwealth

11   law on account of Plaintiffs' alleged detrimental reliance on

12   the bundle of information submitted in connection with the

13   insurance applications.

14        The potential presence of federal law affirmative

15   defenses such as the statute of repose under the

16   Sarbanes-Oxley Act is not a proper basis for exercising

17   federal jurisdiction.  *See Greenwich Fin. Servs. Distressed*

18   *Mortg. v. Countrywide Fin. Corp.*, 654 F. Supp. 2d, 192, 203

19   (S.D.N.Y. 2009).

20        It is certainly likely that the parties will look to

21   the requirements of federal law, including SEC Rule 15c2-12

22   (including case law or other persuasive interpretations of

23   those requirements) to support their arguments that

24   Defendants' conduct was or was not within the range of

25   diligence that might reasonably have been expected in light of

any representations that they made to Plaintiffs.  But those

arguments are not "necessarily raised" by the Complaint, which

grounds its request for relief in substantive doctrines of

Commonwealth law.

While the obligations purportedly imposed by those

doctrines may overlap with those imposed by federal law, the

mere overlap of issues between state law causes of action and

federal causes of action is not sufficient to support federal

jurisdiction. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

*Manning*, 136 S. Ct. 1562, 1574 (2016) in which the Court noted

that, not withstanding the federal courts' exclusive

jurisdiction over all suits "brought to enforce any liability

or duty created by" the Securities Exchange Act, "Congress

specifically affirmed the capacity of [state] courts to hear

state-law securities actions, which predictably raise issues

coinciding, overlapping, or intersecting with those under the

[Exchange] Act itself."

Nor do the Complaints present substantial federal

issues.  The substantiality inquiry "demands that a federal

question must be not only important to the parties, but

important to the federal system." *Municipality of Mayaguez*,

726 F.3d at 14.  The First Circuit has described two

situations that can meet the substantiality requirement:

First, an issue may be substantial where the

outcome of the claim could turn on a new

1       interpretation of a federal statute or regulation
2       which will govern a large number of cases.  In other
3       words, a case is more likely to be important to the
4       federal system as a whole if it presents "a nearly
5       'pure issue of law ... that could be settled once
6       and for all'" rather than an issue that is
7       "fact-bound and situation-specific" and whose
8       holding will more likely be limited to the facts of
9       the case.

10      ...

11      Second, a federal issue may also be substantial
12      where the resolution of the issue has "broader
13      significance ... for the Federal Government."

14  *Id.* (citations omitted)  As explained earlier, the Complaints
15  do not seek to enforce Rule 15c2-12, and the parties are in
16  agreement that the Plaintiffs lack a private right of action
17  through which they could enforce Rule 15c2-12, so the
18  Complaints do not raise an issue of whether private Plaintiffs
19  may enforce that rule.  Moreover, even if Defendants are
20  correct that the Complaints effectively challenge their
21  conduct as being inconsistent with federal law, the question
22  of whether Defendants operated in a manner consistent with
23  their due diligence obligations with respect to certain
24  issuances of bonds is fact intensive and lacks broader
25  significance for the federal government, and thus lacks

1   substantiality.

2       The Court now turns to whether the adversary

3   proceedings are "related to" the Title III cases.

4       Section 306(a)(2) of PROMESA confers on district

5   courts "original but not exclusive jurisdiction of all civil

6   proceedings arising under [PROMESA], or arising in or related

7   to cases under [PROMESA]."  48 U.S.C. Section 2166(a)(2).  The

8   jurisdictional language of Section 306(a)(2) is analogous to

9   that of the bankruptcy jurisdiction statute, 28 U.S.C. Section

10  1334(b).

11      The First Circuit has recognized the well-established

12  *Pacor* standard for determining whether a proceeding is

13  "related to" a bankruptcy case.  *In re Santa Clara County*

14  *Child Care Consortium*, 223 B.R. 40, 45 (B.A.P. 1st Cir. 1998)

15  (citations omitted).

16      That standard holds that "related to" jurisdiction

17  exists when "the outcome of [the] proceeding could conceivably

18  have any effect on the estate being administered in

19  bankruptcy."  *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d

20  Cir. 1984) (internal citations omitted).

21      Although the proceeding "need not necessarily be

22  against the debtor or against the debtor's property," its

23  "outcome" must be one that "could alter the debtor's rights,

24  liabilities, options or freedom of action (either positively

25  or negatively)" and in some way "impact[] ... the handling and

1    administration of the bankruptcy estate." *Id*.

2          Although the parties to the adversary proceedings are

3    not Title III Debtors, the outcome of the adversary

4    proceedings could conceivably affect the Title III cases.

5    Plaintiffs have asserted claims against the Title III Debtors,

6    and any recovery in the adversary proceedings will reduce the

7    amount of the claims that Plaintiffs may assert against the

8    Title III Debtors.  While Plaintiffs argue that Defendants

9    would be subrogated to their claims by operation of

10   Commonwealth law, resulting in a mere substitution of

11   creditors rather than a net change in the Debtors'

12   liabilities, Defendants have noted potential counterarguments

13   and defenses that the Title III Debtors would likely raise in

14   that scenario.  Thus, it is conceivable that the adversary

15   proceedings would change not only the identity of the

16   creditors, but would affect the Title III debtors' "rights,

17   liabilities [or] options" by providing them with new defenses

18   to claims prosecuted by Defendants and with potential net

19   reductions in the total amount of claims.

20          Accordingly, the adversary proceedings are

21   distinguishable from the situation before the Court in *Santa*

22   *Clara*, where there was no apparent question that the

23   declaratory judgment action would, if successful, simply swap

24   one creditor for another, with no change in overall

25   liabilities.  Thus, the Court concludes that it has "related

1    to" jurisdiction of the adversary proceedings pursuant to 48

2    U.S.C. Section 2166(a).  Such jurisdiction is not, however,

3    exclusive.  Accordingly, the Court turns to the Movants'

4    requests for equitable remand.

5         Although the Court has the authority to exercise

6    jurisdiction of the adversary proceedings, it will, in the

7    exercise of its discretion, grant Plaintiffs' request to

8    equitably remand the adversary proceedings.

9         Section 306(d) of PROMESA permits the Court to remand

10   adversary proceedings "on any equitable ground."  48 U.S.C.

11   Section 2166(d)(2).  Under the similar statutory provision

12   that applies to bankruptcy cases, courts in the First Circuit

13   look to the following non-exclusive list of factors in

14   determining whether equitable remand of a bankruptcy-related

15   claim or cause of action is appropriate:

16              (1) the effect of the action on the

17              administration of the bankruptcy estate; (2) the

18              extent to which issues of state law predominate;

19              (3) the difficulty of applicable state law; (4)

20              comity; (5) the relatedness or remoteness of the

21              action to the bankruptcy case; (6) the existence of

22              the right to a jury trial; and (7) prejudice to

23              the involuntarily removed party.

24   *Santa Clara*, 223 B.R. at 46.  The most relevant factors here

25   strongly support remand of the adversary proceedings.

1           Factors one and five support remand.  The adversary

2   proceedings are disputes among non-debtors.  Although the

3   outcome of the adversary proceedings may change the mix of

4   creditors and may affect the amount of the Title III Debtors'

5   liabilities, those considerations would, at most, only affect

6   creditors' recoveries to some degree.  There is no indication

7   that the outcomes of the adversary proceedings will materially

8   help, hinder, or otherwise affect the actual administration of

9   the Title III cases and the restructuring process.  At the

10  same time, there is a significant breadth, depth, and urgency

11  of adversary proceedings and contested matters already pending

12  in connection with these Title III cases, and retention of the

13  instant adversary proceedings would entail further burdening

14  of this Court's limited resources and the risk of trade offs

15  with the efficient resolution of core Title III matters.

16          With respect to the second, third, and fourth

17  factors, state law issues are significant and may require

18  reference to bodies of law that are unique to the

19  Commonwealth.  Merely determining the applicable substantive

20  law will require reference to Commonwealth choice of law

21  principles.  And, to the extent that Commonwealth substantive

22  law applies, the underlying claims are not common law causes

23  of action that exist in most states.  The Court believes that

24  the expertise of the Commonwealth Courts in applying

25  Commonwealth law will aid in the efficient and just resolution

1   of the adversary proceedings.  Thus, these factors support

2   remand.

3           Accordingly, the Court will enter an order granting

4   the Motions for the reasons stated on the record today.

5           That concludes the formal portion of the Agenda.  I

6   am a bit concerned that, because of our technical set up, I

7   may have missed anyone who wanted to make some comments on the

8   reports of AAFAF and the Oversight Board.

9           Ms. Ng, is it possible for you to unmute the people

10  with speaking lines or, very carefully, for hands' raised, or

11  both, so I can make sure that I didn't skip over anyone?

12          MS. NG:  Okay.  I don't see any hands raised so far.

13  And people are able to unmute and mute themselves, so I guess

14  if anybody wants to talk, they can unmute themselves.

15          THE COURT:  Okay.  So you don't have any muting on

16  them that would block them from unmuting themselves?

17          MS. NG:  No.  No.

18          THE COURT:  All right.  I will wait 20 seconds, and

19  if I hear a voice, I will call on that person.

20          All right.  That was 20 seconds.  Thank you all for

21  helping me make sure that I hadn't denied anyone the

22  opportunity to speak who was looking to speak.

23          There are a number of matters that are adjourned to

24  future Omnis.  Those are all listed on the Agenda filed at

25  13847 in the 17-3282 case.

1        And so this concludes the hearing Agenda for the July

2   Omnibus Hearing.  The next scheduled hearing date is the

3   September Omnibus Hearing scheduled for September 16th to

4   17th, 2020.  I expect that hearing to occur telephonically as

5   well.  And the Court will issue a procedures order providing

6   appropriate logistical details closer to the date of that

7   hearing.

8        Additionally, I would like to remind everyone that

9   the operative Case Management Order (Docket Entry No. 13512-2)

10  does not require the parties to serve paper courtesy copies of

11  the pleadings on the Court.  (See also Docket Entry No. 3730,

12  ¶3).  So please refrain from sending paper courtesy copies

13  until further notice in light of the limited physical presence

14  of staff at the courthouses currently.  And thank you for

15  cooperating with that request and being mindful of the

16  provisions of the Orders.

17       As always, I would like to thank the court staff in

18  Puerto Rico, Boston, and New York for their work in preparing

19  for and conducting today's hearing, and their superb ongoing

20  support of these very complex cases under very challenging

21  circumstances.

22       Stay safe and keep well, everyone.  And we

23  particularly wish all who are on the island safety in the

24  coming tropical storm.  Take care.  We are adjourned.

25  Good-bye.

1    (At 11:30 AM, proceedings concluded.)

2                          *       *       *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT     )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 76 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   July 29, 2020.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
August 24th 14:5
July 27 7:15
July 29, 2020 1:16,
   5:2, 76:9
September 16th 74:3
September 8th 10:13
'special 64:25
(1) 71:16
(2) 71:17
(2013) 64:16
(3) 71:19
(4) 71:19
(5) 71:20
(6) 71:21
(7) 71:22


< 1 >
1,000 12:4, 12:7,
   12:9
11 15:12
11:30 75:1
13 64:21, 65:2
13(a 20:14
1331. 64:14
1334(b 69:10
13512-2) 74:9
136 67:10
13847 7:16, 73:25
13870 8:9
13874 8:9
14. 67:22
15 15:3
1562 67:10
1574 67:10
15c2-12 57:4, 66:21,
   68:15, 68:17
17-3282 73:25
17-3283 5:18, 7:16
17-3283. 8:10
17-BK-3283(LTS 1:6,
   2:20
17-BK-4780(LTS 1:23,
   2:6
17th 74:4
18 34:14
19 57:12
19-280 60:15
19-422 15:8, 63:10

19-AP-00422(LTS 2:3
192 66:18
1984) 69:20
1986) 65:10
1990) 65:9
1998) 69:14
1st 64:21, 65:9,
   69:14


< 2 >
20 10:19, 13:1,
   13:22, 15:4,
   42:15, 73:18,
   73:20
20-047. 15:10
20-47 63:13
20-AP-00047(LTS 2:18
2001 60:8
2005 60:6
2005) 64:23
2006 65:4
2006. 60:7
2007. 60:8
2009). 66:19
2013) 64:21
2016 67:10
2018 19:23
2020 74:4
203 66:18
21 10:12, 11:19
2166(a 71:2
2166(a)(2 69:7
2166(d)(2 71:11
22 15:9, 63:12
223 69:14, 71:24
248 57:12
251 64:15
257 64:16
28 34:3, 64:13, 69:9
2d 66:18


< 3 >
3). 74:12
3.9 56:8
30 10:19, 11:23,
   23:1
306(a)(2 69:4, 69:8
306(d 71:9

308 64:22
31 15:8, 63:9
312 64:22
314. 65:17
3248 17:15
3248(1) 17:16
3248(3) 17:18
3730 74:11
3799 76:14
3: 1:6, 1:23, 2:3,
   2:6, 2:18, 2:20
3d 69:19


< 4 >
40 10:19, 13:1,
   13:22, 69:14
435 65:8
438 65:9
45 69:14
46. 71:24
478 65:10
48 69:7, 71:1, 71:10
490 36:4


< 5 >
545 64:22, 65:17
547 65:4
568 64:15
57 40:6, 46:10


< 6 >
60 11:23, 13:24,
   15:10
60-day 11:17
654 66:18
677 65:4
699 65:4


< 7 >
7 57:12, 65:8
720 48:19
726 64:21, 65:2,
   67:22
743 69:19
76 76:4

< 8 >
8 64:21
804 65:10
813 65:10
893 65:8

< 9 >
90 40:8, 46:11
9006(b)(1 19:24
93 57:12
94. 57:12
984 69:19
994 69:19
9:42 5:3
[exchange] 67:17
[or] 70:17
[PROMESA] 69:6
[PROMESA]. 69:7
[state] 67:14
[the] 69:17

< A >
AAA 11:3
AAFAF 8:6, 8:11,
  14:15, 14:16,
  14:20, 73:8
ability 76:5
able 11:8, 11:16,
  29:14, 29:23,
  58:9, 59:22, 73:13
absence 44:21, 56:24
Absolutely 5:10,
  41:12, 46:2,
  46:20, 47:13
acceptable 11:4
acceptances 12:6
accepted 16:22
accessing 6:10
accommodate 11:8
accordance 25:14,
  46:14
according 17:2,
  26:3, 26:21
Accordingly 70:20,
  71:3, 73:3
account 66:11
accounts 13:12,

13:16
accuracy 52:3, 54:14
accurate 7:7, 34:23,
  76:5
Acevedo 21:20
acknowledge 62:7
Act 25:20, 66:16,
  67:13, 67:17
action 29:7, 46:18,
  47:25, 56:25,
  57:3, 64:19, 65:1,
  65:6, 65:18, 67:7,
  67:8, 68:16,
  69:24, 70:23,
  71:15, 71:16,
  71:21, 72:23
actions 32:15,
  33:17, 52:8,
  64:12, 67:15
actor 22:20
Actos 16:10, 16:15,
  21:15, 25:10,
  25:16, 26:1,
  27:15, 27:23,
  28:2, 28:6, 28:24
acts 25:19, 28:25
actual 72:8
actualize 29:3
actually 13:20,
  34:14, 38:12,
  40:1, 40:4, 41:15,
  54:20, 65:14
addition 20:16,
  27:10, 32:7, 56:13
additional 8:15,
  8:22, 14:17
Additionally 74:8
address 6:24, 8:23,
  15:22, 15:25,
  24:2, 25:7, 29:9,
  33:14, 38:20,
  57:13, 58:3, 65:24
addressed 28:3
addresses 56:14
addressing 34:22,
  64:6
adjourned 73:23,
  74:24
adjudicate 30:9
adjudicated 59:2

adjudicating 25:8
adjudication 58:20,
  59:6
Administered 1:11,
  1:28, 69:18
administration 17:9,
  18:12, 19:1, 48:1,
  49:4, 70:1, 71:17,
  72:8
admission 43:25
admit 17:11, 22:24,
  23:6
adopted 21:17, 28:23
ADR 8:13, 8:23,
  9:19, 9:22, 9:23,
  10:15, 11:20,
  12:9, 12:20, 14:5
advance 7:8, 8:8
Advisory 3:24
advocating 16:7
affect 15:23, 43:12,
  43:13, 70:4,
  70:16, 72:4, 72:5,
  72:8
affected 6:2
affecting 16:18
affirmative 66:14
affirmed 67:14
afternoon 8:4
Agency 3:23
Agenda 6:22, 7:14,
  7:15, 8:5, 73:5,
  73:24, 74:1
aggressive 36:6
ago 19:19, 19:24,
  22:19, 34:14,
  34:17, 42:15
agree 48:10, 48:16
agreed 43:14, 59:8
agreeing 48:24
Agreement 32:4,
  43:23, 68:16
agreements 31:21,
  31:24, 32:9, 32:12
agrees 40:17, 54:2,
  64:10
aid 72:25
al 1:16, 2:5, 2:12,
  2:27, 3:6, 5:18
alert 7:20

all' 68:6
allegations 35:5
allege 53:10, 57:5,
  66:2, 66:5
alleged 20:15,
  52:14, 53:11,
  54:12, 66:8, 66:11
alleging 39:15,
  60:13
allocated 15:10,
  15:12
allocation 7:24
allocations 7:13
allotments 7:13
allotted 7:10
allow 43:15, 46:25
allowed 19:20,
  25:18, 42:1, 61:24
almost 45:13, 50:18,
  58:14
already 41:1, 45:9,
  48:1, 72:11
alter 69:23
Although 36:22,
  61:1, 69:21, 70:2,
  71:5, 72:2
America 5:14
American 16:14
among 60:15, 72:2
amount 10:11, 10:17,
  12:22, 18:23,
  48:17, 61:14,
  70:7, 70:19, 72:4
amounts 17:12, 61:23
Amy 76:13, 76:14
analog 16:15, 28:13
analogous 35:13,
  44:7, 49:20, 69:8
analogy 49:11, 49:15
analysis 41:25
analyze 12:23
analyzed 25:24
announce 5:9
answer 41:12
anticipate 10:12,
  10:15, 11:15,
  11:16, 11:22, 12:3
anticipated 44:25
anybody 43:20, 73:14
apologize 7:8, 14:4,

24:16, 59:19, 60:1
apparent 70:22
appear 33:11
APPEARANCES 3:1
appeared 30:18
APPEARING 3:3
Appellate 36:16
applicability 61:20
applicable 56:11,
  71:19, 72:19
application 21:13,
  27:7, 27:15
applications 26:14,
  66:3, 66:13
applied 51:9
applies 17:16,
  17:18, 17:22,
  49:10, 71:12,
  72:22
apply 28:10, 38:8,
  38:14, 50:20,
  51:4, 51:7, 54:3
Applying 25:16,
  27:3, 72:24
appreciate 12:25,
  34:19
approached 61:12
appropriate 7:2,
  40:2, 45:22, 49:8,
  52:13, 55:1,
  71:15, 74:6
approve 23:21
approved 23:20,
  56:6, 65:16
approximately 10:19
arbitration 10:25
arbitrators 11:9
Argentina 27:1
argue 32:2, 41:25,
  70:8
argued 32:11
arguing 31:25, 32:17
argument 15:6,
  15:11, 29:12,
  29:16, 30:11,
  31:4, 32:19, 34:1,
  42:3, 45:11, 50:7,
  55:16
arguments 31:13,
  33:2, 36:23, 45:2,

45:5, 55:23,
  58:16, 59:10,
  61:15, 64:1,
  66:23, 67:2
arise 30:7, 64:15,
  64:24
arises 45:14
arising 40:14,
  45:10, 52:22,
  54:1, 54:24,
  61:20, 64:12,
  66:7, 69:6
arrangement 48:24
Article 16:11, 25:13
articles 27:12
articulate 47:23
ASP 22:12, 56:7
aspect 9:21
aspects 26:16
assert 38:13, 38:17,
  57:2, 70:7
asserted 58:22, 70:5
asserting 16:8,
  39:3, 48:6, 51:6
asserts 41:18
assess 65:10, 65:12
assist 9:20, 10:9,
  29:13
Associate 27:17
associated 10:24,
  31:17
assume 38:10, 41:10
Assuming 15:4,
  37:18, 45:17,
  51:4, 51:6
Assurance 2:18,
  3:19, 22:9, 65:3
assurances 16:21,
  16:23, 22:18, 57:9
attempts 27:20
attendant 62:5
attention 55:3
attenuated 21:2,
  30:12, 31:4,
  31:15, 32:19
author 28:1
Authority 1:33,
  3:24, 30:16,
  30:17, 36:12,
  36:15, 71:5

authorized 64:11
automatic 18:15,
  20:9, 20:24, 22:7,
  32:23, 36:25,
  37:17, 37:23,
  38:15, 44:15,
  56:17, 57:21
automatically 17:14,
  17:22, 19:2, 65:7
available 7:16, 8:8,
  37:5, 39:25, 45:18
avoid 53:18
Axelrod 3:29, 59:15,
  59:18, 59:19,
  59:22, 59:25,
  62:14, 62:15,
  62:16


< B >
back 8:2, 19:22,
  45:8, 45:16, 54:13
backdrop 5:23
background 57:6
backtrack 42:15
bad 20:16
balance 23:20,
  50:13, 65:16
bandwidth 11:14
bank 19:17, 19:22,
  20:23, 56:18,
  57:22
Bankruptcy 19:7,
  21:8, 21:20,
  21:24, 36:4,
  36:15, 40:19,
  46:2, 48:1, 49:4,
  53:16, 69:9,
  69:13, 70:1,
  71:12, 71:17,
  71:21
bankruptcy-related
  71:14
bankruptcy. 69:19
banks 16:20, 16:22,
  16:24, 17:2, 17:4,
  17:7, 17:13,
  17:14, 17:16,
  17:18, 18:4,
  19:11, 19:25,

20:6, 20:12,
  20:15, 20:20,
  21:22, 21:25,
  22:18, 22:24,
  23:6, 56:10, 57:9
bar 12:12, 19:19,
  40:19, 44:23
based 11:6, 12:5,
  16:11, 20:21,
  28:14
basic 39:23, 49:16
basically 9:20,
  46:15
basis 10:17, 21:2,
  23:8, 32:12,
  32:24, 57:7, 59:1,
  65:20, 66:16
batch 14:2
bear 16:3, 27:2
bearing 27:14
beep 53:4
begin 10:2, 56:5,
  64:6
beginning 11:21
behalf 25:3, 29:23,
  58:8
behavior 25:21
believe 49:5, 59:16
believes 72:23
belonging 60:10
belongs 30:11
best 26:19, 27:11,
  76:5
better 20:1, 26:24,
  42:17
Beville 55:6, 55:8,
  55:12, 55:13,
  59:17
beyond 7:9
BIAGGI 3:25, 14:19
BIENENSTOCK 3:6,
  8:17, 8:18, 8:20,
  8:21, 8:25, 9:4
bifurcate 11:10
big 38:12, 49:3
billion 48:3, 56:8
binding 36:15,
  36:16, 42:5, 53:21
bit 11:10, 12:12,
  13:15, 49:6, 73:6

block 73:16
blocked 34:5
Board 1:10, 1:27,
  5:16, 7:15, 8:6,
  8:11, 8:14, 8:18,
  11:11, 14:15,
  33:7, 33:10,
  33:13, 55:7, 59:7,
  61:12, 61:17,
  61:21, 62:4, 73:8
Board. 33:12
bodies 72:18
bond 23:9, 30:12,
  30:14, 31:22,
  36:3, 36:21,
  37:23, 40:21,
  41:2, 58:24, 60:3,
  60:14, 61:10, 66:6
bonds 16:9, 37:22,
  38:4, 38:25, 39:2,
  39:5, 39:17,
  41:16, 41:20,
  46:3, 46:4, 50:18,
  54:21, 60:6, 60:8,
  60:21, 61:5, 61:9,
  63:22, 68:24
Boston 43:9, 74:18
bought 49:20
bound 22:19, 51:25
Branch 29:7
breaches 66:8, 66:9
breadth 72:10
break 8:1
breaking 7:8
Brian 3:7, 8:23,
  9:15
brief 30:3, 36:13,
  58:12
briefly 6:24, 28:20
briefs 58:13
bring 22:1
bringing 10:14
broader 68:12, 68:24
brought 6:4, 33:12,
  50:10, 60:17,
  60:24, 61:7, 67:12
Buenos 5:20
bundle 66:12
burden 16:3, 45:19,
  45:21, 45:25,

49:7, 49:8, 51:2
burdening 72:13
burdens 19:4
business 36:7
buzz 7:21, 7:22
buzzes 7:21, 7:25

< C >
C&A 18:2, 18:20,
  56:21
C. 3:25
call 7:3, 15:1,
  41:24, 42:25,
  73:19
called 60:1
calling 6:19
calls 42:4
Cambridge 22:6
capacity 67:14
Care 8:11, 69:14,
  74:24
carefully 8:10,
  63:4, 63:5, 63:25,
  73:10
carry 27:8
carves 20:14
cases 16:7, 17:8,
  18:2, 18:19, 21:3,
  22:5, 22:14,
  25:14, 35:13,
  36:5, 36:18,
  37:20, 38:6, 44:7,
  46:6, 51:8, 62:2,
  64:25, 68:2, 69:3,
  69:7, 70:4, 71:12,
  72:9, 72:12, 74:20
cash 37:22
CAT 3:49
category 64:25
cause 64:19, 65:1,
  65:6, 71:15
caused 27:21
causes 65:18, 67:7,
  67:8, 72:22
Center 30:16
central 35:16,
  35:17, 39:11,
  44:9, 46:2, 47:17,
  50:22, 51:16

centuries 25:16
Certain 60:25,
  61:11, 63:22,
  63:23, 66:6, 68:23
certainly 33:18,
  36:8, 38:7, 38:16,
  43:13, 61:25,
  66:20
certify 76:4
challenge 21:9,
  22:21, 68:20
challenges 5:24
challenging 74:20
chance 19:19, 47:18
change 12:5, 12:14,
  17:7, 17:24,
  18:16, 18:17,
  19:2, 70:11,
  70:15, 70:24, 72:3
changes 18:14
check 38:4, 38:8,
  38:12
Chief 24:1
Child 69:14
choice 50:8, 50:19,
  56:11, 72:20
choices 52:25
Cir 64:21, 65:9,
  69:14, 69:20
Circuit 18:19,
  18:22, 19:13,
  20:7, 20:25,
  23:15, 35:15,
  36:12, 36:13,
  36:14, 43:8,
  56:22, 56:23,
  57:14, 67:22,
  69:11, 71:12
circumstance 37:13,
  37:25, 38:11
circumstances 5:23,
  7:1, 74:21
citations 68:14,
  69:15, 69:20
cite 65:2
cited 35:13, 37:2,
  37:4, 37:14, 38:6,
  43:9, 44:21,
  46:19, 51:8,
  51:12, 56:20

Civil 16:11, 17:15,
  19:6, 21:16, 25:9,
  25:13, 25:15,
  25:23, 26:10,
  26:20, 26:25,
  27:4, 27:6, 27:11,
  28:10, 28:16,
  28:23, 29:2, 29:3,
  47:11, 64:12, 69:5
claimants 12:6, 48:5
claimed 17:12
Clara 18:2, 18:20,
  36:12, 56:21,
  69:13, 70:22,
  71:24
clarification 13:1
clarity 6:21, 12:17
classification
  17:25, 18:18
clause 52:15
clawback 39:4, 48:6,
  53:21, 53:23,
  58:19, 59:2, 59:5
clear 23:12, 38:9,
  45:22, 61:8
clearly 7:2, 15:1,
  35:17, 36:25,
  39:25, 45:4
Clerk 7:17
closely 35:13, 44:7
closer 74:6
closing 33:1
co-counsel 15:19
Code 16:12, 17:16,
  25:13, 26:20,
  28:16, 28:23
Codes 25:9, 29:3,
  29:4
codified 28:25
COFINA 20:3, 60:7,
  61:4
coinciding 67:16
colleague 59:17
colleagues 34:22
collect 41:3, 41:4,
  48:10, 48:17,
  48:25
collusion 56:6
collusive 48:24
comes 12:13

coming 12:20, 74:24
Comity 21:5, 29:6,
    44:8, 52:6, 71:20
Commc'ns 65:8
commenced 60:20,
    61:4, 61:8
comments 14:18,
    14:20, 14:24,
    15:5, 73:7
commitments 16:18
committed 53:16
Committee 3:29,
    10:24, 16:6,
    19:21, 55:7,
    55:16, 60:9
common 15:22, 16:15,
    27:13, 27:21,
    28:6, 28:7, 28:14,
    33:12, 44:16,
    60:23, 61:6, 72:22
commonality 57:19
commonly 64:17
community 26:13
comparative 27:18
compared 21:23
comparing 27:24
complain 46:25
Complaint 22:16,
    28:11, 30:10,
    30:13, 31:5, 35:3,
    35:18, 40:13,
    41:20, 45:12,
    45:14, 46:9,
    46:17, 46:23,
    47:3, 54:5, 57:5,
    57:11, 65:23, 67:2
Complaints 19:23,
    35:5, 40:5, 46:10,
    57:8, 61:10,
    65:18, 65:25,
    66:2, 66:7, 66:10,
    67:18, 68:14,
    68:18, 68:20
complete 22:8, 54:8
completed 9:25
complex 74:20
complicated 15:2
complications 19:7
complied 47:4, 52:18
comply 51:19

comprehensive 8:12
computer 6:11, 24:14
concede 35:23
conceivable 17:3,
    18:21, 40:18,
    40:20, 41:14,
    42:7, 43:17,
    57:20, 70:14
conceivably 69:17,
    70:4
concept 25:25, 27:24
conceptually 13:9
concern 33:8, 58:23
concerned 73:6
concerning 58:24,
    60:3
concerns 59:8, 60:6,
    60:7
concludable 38:16
conclude 21:2,
    33:21, 62:12
concluded. 75:1
concludes 65:19,
    70:25, 73:5, 74:1
conclusion 42:5,
    53:22
condition 20:13,
    35:7
conditional 20:7
conditionality 57:22
conditions 20:13
conduct 16:19, 21:9,
    26:2, 26:3, 26:8,
    30:24, 31:2,
    32:25, 39:7,
    39:20, 52:18,
    57:17, 58:18,
    59:9, 60:3, 66:24,
    68:21
conducted 40:11,
    46:13, 58:25
conducting 74:19
conducts 26:15,
    26:16, 27:8
confer 18:1, 65:7
conference 6:14
confers 69:4
confident 44:13
confirm 18:3
confirmation 22:11,

22:13, 43:11,
    43:16
confirmed 40:25,
    43:2, 44:4, 48:12,
    49:1
confirming 54:14
conformity 40:12
confusion 27:22,
    51:13, 51:14,
    51:15, 60:16
Congress 23:21,
    67:13
congressionally
    23:20, 65:16
connection 9:21,
    14:24, 60:4,
    60:13, 65:21,
    66:12, 72:12
consideration 19:9,
    27:4, 29:6
considerations 72:5
considered 48:9,
    63:25
Considering 26:18
consistent 6:13,
    46:17, 68:22
consisting 76:4
Consortium 69:14
constitute 18:20
Constitution 64:13
construed 16:5
contained 35:6, 66:3
contend 31:8, 64:8
contended 31:2
contested 72:11
context 23:8, 37:4,
    37:6, 57:5
contingency 57:22
contingent 17:8,
    19:14, 20:2, 44:17
continue 11:4,
    12:23, 13:12,
    24:19
continues 12:24
contours 21:17,
    26:11
contract 16:17,
    31:20
contracts 20:12
contractual 32:14,

44:14
Contradictory 25:21
contrary 16:21
contribution 17:5,
   19:12, 19:18,
   20:8, 20:21,
   20:24, 32:13,
   32:14, 32:17,
   44:11, 44:20,
   57:23
controlling 16:5,
   18:19
controls 50:25
controversy 49:10
convening 5:22
Convention 30:16
conversation 34:21
convince 50:23, 51:2
convincingly 59:10
cooperating 74:15
copies 74:10, 74:12
coping 6:4
core 66:2, 72:15
coronavirus 6:3
Corp. 66:18
Corporacion 64:20
Corporation 2:4,
   2:19, 3:12, 3:13,
   3:20
Corraliza 27:19
correct 35:4, 46:19,
   50:11, 50:12,
   68:20
corrections 64:3
cost 7:17
counsel 5:21, 14:23,
   24:1, 29:12
counterarguments
   70:12
countries 26:25,
   27:6, 27:8, 29:2
Countrywide 66:18
County 69:13
couple 10:4, 13:3,
   34:22, 42:15,
   46:6, 52:21
course 6:25, 18:9,
   18:22, 19:21,
   21:7, 43:12,
   43:18, 44:22

courtesy 74:10,
   74:12
courthouses 74:14
COURTROOM 5:10,
   24:15
Courts 21:5, 21:23,
   25:7, 26:13,
   26:19, 27:10,
   28:10, 28:16,
   30:9, 46:5, 51:9,
   51:10, 51:14,
   51:15, 64:11,
   65:12, 67:11,
   67:14, 69:5,
   71:12, 72:24
cover 19:3
covers 13:20
create 7:7, 53:25
created 42:2, 46:11,
   64:19, 67:13
creditor 18:17,
   43:16, 70:24
Creditors 10:23,
   17:17, 17:18,
   17:24, 43:14,
   48:16, 48:18,
   48:21, 48:23,
   56:20, 70:11,
   70:16, 72:4, 72:6
criminal 34:16
criterion 26:2
criticizing 51:13
CSR 76:14
Ct. 67:10
cull 12:23
curious 43:21, 44:12
currently 74:14
custom 19:9
customs 26:12, 26:21

< D >
damage 6:4
damages 66:9, 66:10
Danvers 65:8
Darue 64:22
dashboard 6:12, 9:8,
   9:9, 55:13, 55:17,
   55:19
date 12:12, 19:19,

74:2, 74:6
dates 44:23
day 12:4
days 11:23, 13:24
de 25:10, 25:11,
   25:16, 25:25,
   26:5, 27:15,
   27:16, 27:23,
   28:2, 28:6, 28:8,
   28:24, 29:1
dealing 19:5, 26:2
deals 16:23, 20:11,
   57:6
debt 17:19, 37:20,
   48:25
decade 59:3
decide 25:14, 29:2
decided 11:10
decision 35:15,
   36:14, 36:15,
   44:18, 64:16
decisions 9:21,
   54:12
declaracion 25:11,
   26:5, 27:15, 28:8,
   29:1
declaration 16:11,
   16:17, 21:16,
   51:24
declaratory 70:23
decline 19:3
declines 62:4
deemed 44:24
defendant 31:9,
   31:18, 31:21,
   32:11, 57:17
Defendants 2:14,
   2:29, 16:3, 17:11,
   31:1, 31:8, 31:13,
   31:23, 32:2,
   32:16, 34:2,
   34:12, 49:14,
   50:15, 52:18,
   63:21, 66:5,
   66:24, 68:19,
   68:22, 70:8,
   70:12, 70:18
defenses 17:23,
   22:2, 37:3, 37:13,
   38:3, 38:8, 38:13,

38:17, 41:7,
44:14, 51:20,
56:14, 66:15,
70:13, 70:17
defining 24:3
degree 72:6
Dein 2:35, 5:13,
22:6, 76:8
del 64:20
delay 24:16, 60:1
demands 67:19
demonstrated 57:21
denied 73:21
Denton 3:14, 15:20,
15:25, 24:2, 24:6,
24:12, 24:25,
25:1, 25:3, 26:23,
28:5, 28:21, 30:5
Department 10:13,
10:14, 11:12,
11:13
depth 72:10
DEPUTY 5:10, 24:15
derived 26:21
Desarrollo 64:20
described 30:5,
32:5, 32:22, 67:22
despite 22:7
detail 8:11
detailed 48:2
details 74:6
determine 54:22
determined 43:7
determining 69:12,
71:14, 72:19
detrimental 66:11
developed 21:18
developments 26:24
devote 62:4
dial 8:2
dialogue 11:4
dias 5:20
Diaz 25:23
dictates 21:5
different 26:16,
27:8, 28:6, 38:21,
39:16, 43:5, 53:22
differently 54:16
difficult 7:6, 31:7,
51:8, 51:10

difficulty 7:11,
71:19
dig 12:12
diligence 16:21,
19:22, 23:7, 31:1,
40:11, 42:2,
46:14, 47:5,
54:13, 57:8, 57:9,
58:25, 66:7,
66:25, 68:23
direct 8:1, 46:10
directed 53:9
directly 6:2, 57:14,
64:17
disallowed 20:4
disconnect 8:2
disconnected 59:25
discovery 53:9
discretion 26:11,
45:6, 71:7
discretionary 45:9,
45:15, 45:17,
47:15, 47:20,
47:23, 49:7,
52:20, 55:1, 55:2
discuss 9:22
discussing 10:23
Discussion 24:10,
24:23
displayed 44:17
dispute 41:23, 46:1,
46:16, 54:4
disputed 16:4,
33:11, 65:14
disputes 25:8, 72:2
disregard 56:18
disruptive 54:21
distinct 30:22
distinction 30:11,
31:19, 31:23
distinguish 33:16
distinguishable
70:21
distinguished 25:23
Distressed 66:17
distribution 43:12,
43:14, 62:1
distributions 62:6
District 1:1, 1:3,
2:33, 2:34, 2:36,

5:11, 30:17,
36:17, 64:11,
69:4, 76:1, 76:2,
76:7
disturbing 65:15
diversion 41:24,
42:4
diversions 42:1
diverted 41:19,
41:22
Docket 1:6, 1:23,
2:3, 2:18, 7:16,
8:9, 15:7, 15:9,
63:9, 63:12, 74:9,
74:11
doctrina 25:10,
25:11, 25:16,
25:25, 27:15,
27:23, 28:2, 28:6,
28:8, 28:24
doctrine 25:24,
47:11, 51:13,
51:22, 51:24
doctrines 16:14,
22:18, 23:11,
24:4, 25:9, 26:14,
26:18, 26:21,
26:25, 27:3, 27:7,
28:11, 28:14,
28:22, 29:4, 30:8,
46:25, 57:11,
67:3, 67:6
documents 35:10,
39:11, 47:1, 52:2,
52:15, 53:11,
54:14, 54:17
doing 13:21
DOJ 13:13
dollar 17:14, 18:23
dollars 37:22, 38:5,
41:4, 41:9, 44:2,
48:3, 48:19, 56:8
dominate 23:21
done 26:14
Dow 65:9
down 12:12, 34:3
DPR 56:21
dropped 9:6, 42:21
Due 14:4, 16:21,
19:22, 23:6, 31:1,

40:11, 42:2,
46:13, 47:5,
54:12, 57:8, 57:9,
58:25, 60:16,
66:7, 68:23
during 6:19, 6:24,
7:5
duties 40:7, 46:11,
54:18
duty 67:13
dynamics 18:12

< E >
E. 3:20
earlier 53:6, 57:21,
59:25, 68:14
earliest 9:25
earthquakes 6:5
easier 22:11
Eastern 17:21, 56:16
echoed 34:25
effect 18:16, 18:21,
22:9, 23:16,
47:25, 48:2, 49:3,
62:6, 69:18, 71:16
effective 17:6, 19:2
effectively 68:20
effects 17:3, 61:12
efficient 72:15,
72:25
efforts 31:1
either 40:4, 61:9,
63:2, 69:24
el 64:20
Electric 25:18
elements 52:19
eliminate 41:15,
42:6, 43:13
eliminating 48:3
elimination 44:2
emanate 25:12
Empire 65:3
enables 25:14
encourage 7:18
end 8:3, 12:4, 13:5,
25:22, 29:20,
34:5, 45:16, 55:9,
62:16
enforce 67:12,

68:15, 68:17,
68:19
enforcement 22:10
enforces 26:7
enforcing 16:18
Eng'g 64:22
engaged 21:22, 37:12
enormous 38:18
enough 42:8
ensure 6:8
entail 72:13
enter 73:3
entertain 65:15
entirely 50:18,
58:15
entitled 38:6
entrenched 28:22
Entry 7:16, 8:9,
15:8, 15:9, 63:9,
63:12, 63:18,
74:9, 74:11
enumerations 51:21
equitable 16:10,
17:23, 20:21,
22:2, 22:7, 22:18,
23:11, 24:4,
27:21, 28:17,
30:7, 37:3, 37:13,
38:8, 41:7, 44:13,
56:14, 57:10,
71:4, 71:10, 71:14
equitably 71:8
equity 25:14
especially 31:4
Esq 3:14, 3:25
essential 47:14
essentially 25:24,
46:8
establish 35:16,
42:3, 49:1, 49:7,
51:18
establishing 16:4
estate 15:24, 17:4,
17:5, 17:9, 18:13,
18:25, 22:4, 22:9,
38:19, 41:5, 41:6,
41:8, 41:11, 44:1,
48:1, 49:4, 69:18,
71:17
estate. 70:1

estimate 12:14
estoppel 27:25
et 1:16, 2:5, 2:12,
2:27, 3:6, 5:18
evaluative 9:21,
12:8
event 31:17
events 43:8
everybody 40:17,
54:2
everyone 6:13, 8:1,
8:21, 24:18, 74:8,
74:22
everything 29:21,
63:5
exact 17:12, 39:5
Exactly 20:15, 40:8,
56:7
examine 26:24
example 7:22, 20:10,
27:22, 41:9,
41:10, 41:13,
41:15, 51:24,
57:11
exceptional 16:16
exceptions 17:23,
20:16
Exchange 10:1, 67:13
exclusive 67:11,
69:5, 71:3
excuse 10:16, 11:15,
14:4, 19:24
execution 22:10,
56:6
exercise 21:6, 45:6,
45:23, 61:18,
62:10, 64:12,
71:5, 71:7
exercising 66:16
EXHIBITS 4:9
exist 32:8, 43:10,
54:19, 72:23
existence 31:9,
31:24, 71:21
exists 65:11, 69:17
expect 8:3, 9:25,
10:2, 12:8, 13:3,
13:8, 13:21, 36:6,
38:10, 74:4
expectations 16:16,

23:8
expected 22:13,
  66:25
experience 26:18
experiences 27:7
experiment 37:16
expertise 72:24
expire 51:21
explain 17:6
explained 25:25,
  27:19, 68:14
expressly 25:13,
  26:6, 27:19, 28:25
extensive 27:5
extent 31:16, 71:18,
  72:21


< F >
F. 66:18
F.2d 65:8, 69:19
F.3d 64:21, 65:2,
  67:22
face 40:6
fact 16:5, 19:8,
  22:19, 22:23,
  27:21, 30:20,
  33:11, 39:19,
  48:8, 52:7, 57:19,
  58:15, 68:24
fact-bound 68:7
factor 47:25, 50:21,
  52:7, 52:11, 52:12
Factors 47:22,
  71:13, 71:24,
  72:1, 72:17, 73:1
facts 27:3, 28:11,
  35:14, 36:20,
  60:17, 60:23,
  61:6, 61:16, 68:8
factual 52:21
failed 16:24, 57:13
failures 19:22
fair 13:3, 13:6,
  20:1, 61:14
faith 16:16, 20:17,
  25:20, 28:14,
  28:24
faithful 26:2
fall 21:25

false 16:21, 35:9,
  39:15, 46:24,
  47:2, 47:4, 53:10
far 73:12
favor 16:6, 47:24
favored 38:22
favors 21:21, 56:11,
  56:25
federal-question
  65:7
federal-state 23:20
Federico 3:14,
  15:20, 15:25,
  24:2, 25:3
feeling 34:13
Fenner 2:26, 67:9
few 10:18, 12:1,
  13:2, 28:18, 40:3
fifteen 12:20
filed 7:14, 7:16,
  12:13, 17:11,
  17:25, 19:17,
  19:20, 19:23,
  28:11, 33:7,
  33:18, 36:4,
  43:11, 44:22,
  44:23, 46:17,
  60:18, 61:1,
  63:16, 73:24
filings 36:5
Fin 66:17, 66:18
final 7:25
Finally 20:19,
  23:17, 23:19,
  28:18, 28:21, 54:1
Finance 2:3, 3:11
Financial 1:9, 1:26,
  2:11, 3:23, 5:16,
  35:7, 37:1, 37:19,
  38:18, 41:8, 44:1,
  60:4, 60:13
Financing 30:15
find 8:12, 36:11,
  53:23, 53:24
finish 23:2, 23:3
firms 36:6
Fiscal 3:22
fit 44:25
five 72:1
Flint 57:1

focus 58:14
focused 13:11, 58:17
follow 54:15
following 18:22,
  64:5, 71:13
follows 19:13, 50:13
FOMB 19:23
footnote 45:7
foreseeable 13:17
forget 28:7
formal 61:2, 73:5
former 24:1, 27:17
forth 7:14
forum 52:14, 65:15
forward 11:15
found 11:4, 37:11,
  60:14
four 55:7
fourth 72:16
frame 11:17, 11:18,
  13:25
frankly 43:18,
  56:18, 59:7
free 26:13, 48:19
freedom 69:24
frequency 10:4
front 55:4
funds 41:19, 41:22,
  42:5, 58:19
Fuster 27:18
future 73:24


< G >
G. 3:16, 3:29
Gail 2:35, 76:8
gate 57:10
gave 11:3
General 8:15, 9:22,
  14:18, 25:17,
  25:19
generally 21:24
gets 13:13
getting 12:4
give 22:8, 41:12,
  49:10
Given 18:10, 32:19,
  36:21, 40:13,
  43:22, 49:12, 54:5
glad 58:3

goal 14:10
God 5:14
going-forward 10:17
Good-bye 74:25
govern 68:2
governing 55:2
government 34:15,
   60:4, 68:25
Government. 68:13
Grable 54:2, 64:21,
   65:17, 65:19
Grace 20:2
grant 71:7
granted 30:4, 64:4
granting 73:3
great 27:8, 27:22
Greenwich 66:17
gross 20:17
ground. 71:10
grounded 25:19
grounds 67:3
grouping 13:8
Guarantee 2:4, 3:11,
   52:3
guarantor 37:7
guess 73:13
guesstimate 12:15,
   12:19
Gunn 54:2, 64:15


< H >
Hale 34:12
hand 21:12, 27:14,
   55:17, 55:19,
   55:21, 59:16
handling 69:25
hands 73:10, 73:12
happen 43:20
happenstance 50:5
hard 43:19
headquartered 50:15
health 8:21
Healthchoice 65:3
hear 7:25, 29:23,
   34:8, 45:4, 56:1,
   58:9, 59:23,
   67:14, 73:19
heard 7:1, 7:4,
   50:4, 53:6, 61:14

Hearing 2:32, 5:19,
   5:23, 6:9, 6:15,
   7:6, 7:11, 8:8,
   74:1, 74:2, 74:3,
   74:4, 74:7, 74:19
heavily 31:24,
   47:19, 48:7
held 16:13, 17:21,
   21:20, 56:12, 57:1
help 72:8
helpful 14:12
helping 73:21
Hernandez 3:14,
   15:20, 15:25,
   24:2, 24:6, 24:12,
   24:25, 25:1, 25:3,
   26:23, 28:5,
   28:21, 30:5
hesitant 21:5
Higgins 69:19
highly 52:7
hinder 72:8
hit 6:5
holder 18:14
holding 68:8
holds 19:14, 69:16
honest 26:2
Honorable 2:33,
   2:35, 5:12, 5:13,
   5:14, 76:6, 76:8
hopeful 11:24
hopelessly 44:17
Hospital 43:9
HTA 10:20, 60:7,
   61:4
huge 41:8
human 26:16
hundred 13:4
hundreds 37:21,
   38:5, 41:8, 44:2
hypothetical 37:8


< I >
Id 68:14, 70:1
idea 56:5
identical 41:21
identified 46:23,
   47:3, 54:6, 54:16
identify 6:20,

20:23, 40:8, 46:13
identifying 32:24
identity 70:15
imagine 37:19
immediately 7:12
impact 17:8, 18:25,
   20:25, 22:4, 32:5,
   35:23, 37:1,
   37:19, 38:18,
   40:19, 40:23,
   41:1, 41:8, 41:11,
   57:20, 57:24,
   58:14, 62:1, 62:8,
   62:9
impact[] 69:25
impacts 44:1
impediments 32:6
implicate 33:9
implicated 20:17,
   31:3, 35:1
implicates 59:9
implication 33:5
implied 20:16
import 22:23
importance 28:22,
   28:24, 66:1
important 20:13,
   21:12, 25:6,
   30:10, 30:21,
   31:23, 35:23,
   36:3, 65:1, 67:20,
   67:21, 68:3
Importantly 16:6
impose 20:12
imposed 23:10,
   23:11, 67:5, 67:6
improper 32:24,
   39:3, 48:6
inaccurate 35:21,
   58:21
inadequate 20:6
Inc. 2:12, 35:14,
   64:20, 64:22,
   65:3, 65:9, 67:9,
   69:19
include 10:19
included 10:21,
   10:22
includes 26:1
including 6:16,

30:5, 32:22,
56:11, 60:12,
66:21, 66:22
inconsistent 53:18,
53:25, 68:21
incorporate 29:3
Incorporated 2:27
incorrect 56:15
increase 17:4
increasing 10:2
indemnification
17:5, 19:12,
19:18, 20:7,
20:12, 20:24,
22:8, 32:3, 32:8,
44:11, 44:16,
57:23
independent 20:5
indicated 13:10,
33:8
indication 72:6
indirectly 6:3
indiscernible 42:12
induced 49:17, 66:5
influence 26:8
inform 12:15
information 12:24,
13:14, 39:14,
66:4, 66:12
Informative 33:7,
33:14, 33:18,
60:18, 60:20
Infrastructure 30:15
inherent 60:17
initiated 60:12
inquired 60:25
inquiry 67:19
Instance 42:7,
61:19, 63:20
instant 72:13
instead 19:4, 38:10,
48:20, 56:22
institutions 25:10,
26:20
instrumentalities
31:5, 31:11, 63:24
instrumentality
39:18
insufficient 18:1
Insurance 3:13,

66:3, 66:6, 66:13
insure 16:23
insurer 37:7
insurers 15:22,
16:8, 16:20, 17:3,
17:7, 17:11,
17:15, 17:20,
17:25, 18:11,
22:1, 22:17, 36:3,
37:23, 40:21,
41:2, 46:4, 57:2
insurmountable 32:6
intelligent 38:1
intending 55:15
intensive 68:24
intent 16:18, 21:9,
26:8
intention 51:25,
52:2
interactions 26:17
interest 5:21, 6:24,
16:1, 17:19,
19:10, 24:3, 25:8,
26:12, 30:8,
48:15, 52:6
interested 7:17,
9:24
interests 23:21,
50:13
interference 42:14
internal 69:20
International 25:17
interpret 26:19,
26:20, 27:11,
27:21, 27:23
interpretation
21:10, 21:13,
27:14, 68:1
interpretations
66:22
interpreting 27:2
interrupt 7:5, 7:6,
7:9, 18:7
intersecting 67:16
introduced 19:8
invite 8:14
invoke 40:6, 40:7
invoked 45:24,
47:11, 56:23,
64:18

involuntarily 71:23
involve 25:9, 38:24
involved 22:14,
42:12, 56:8, 63:22
involvement 31:14
involves 30:7,
30:14, 65:1
involving 52:14
island 6:1, 6:4,
6:6, 11:8, 74:23
issuance 31:22,
61:10
issuances 23:23,
30:12, 30:15,
58:24, 60:3, 60:5,
60:14, 63:22,
66:6, 68:24
issued 6:15, 19:21,
30:13, 30:23,
31:5, 32:20, 39:1,
39:17, 41:16,
60:6, 60:8
issuers 30:20,
36:21, 58:15,
58:16
issues 6:24, 10:24,
15:22, 18:13,
19:8, 21:6, 21:7,
21:8, 21:13,
21:18, 21:23,
21:24, 33:11,
35:25, 40:4,
47:16, 47:17,
53:14, 54:4,
62:17, 65:21,
65:24, 67:7,
67:15, 67:19,
71:18, 72:17
issues. 65:2
item 8:5
itself 16:6, 35:16,
35:22, 36:19,
39:20, 44:5
itself. 67:17


< J >
J. 3:6, 3:24
Jaime 27:18
JAMS 11:2

Jaramillo 28:2
John 3:24, 16:2,
    29:22, 58:8
Jointly 1:11, 1:28
Jonathan 3:20
Juan 5:1
Judge 2:33, 2:34,
    2:35, 2:36, 5:5,
    5:7, 22:6, 24:20,
    30:5, 34:6, 55:10,
    55:14, 59:21,
    59:22, 76:7, 76:8
judge-made 29:3
judges 26:10
judgment 22:10,
    48:11, 70:23
judgments 53:18,
    53:25
Judicial 6:14, 29:7,
    65:16
Judith 2:35, 5:13,
    76:8
July 74:1
juridical 25:20
jurisdiction. 65:7
jurisdictional 69:8
jurisprudence 27:5,
    27:9, 27:13
jury 52:10, 71:22
Justice 10:13,
    10:14, 11:12,
    11:13, 24:1, 27:17
justifies 62:10


< K >
keep 7:18, 16:7,
    74:22
keepers 57:10
keeping 7:19, 47:24
kind 37:13, 39:24,
    42:21, 47:22,
    48:24
knowledgeable 27:4
knows 30:17


< L >
la 25:10, 25:11,
    25:16, 26:5,

27:15, 27:23,
    28:2, 28:5, 28:7,
    28:8, 28:24, 28:25
lack 22:4, 68:16
lacks 64:9, 68:24,
    68:25
language 27:12,
    27:13, 69:8
large 51:8, 68:2
largely 53:9
Last 12:18, 22:15
late 19:19
later 19:3, 33:14,
    59:3
latter 65:5
Laura 2:33, 3:8,
    5:5, 5:12, 76:7
law-imposed 66:9
law. 64:19
lawful 53:21, 53:23
lawfully 41:19,
    41:22
lawfulness 42:4
laws 40:6, 40:8,
    40:12, 45:14,
    46:11, 46:12,
    46:14, 47:6, 47:7,
    47:19, 54:19,
    57:3, 57:7, 64:13
lawsuit 37:9
lawyer 25:23
lawyers 38:2
leading 16:23
least 36:3, 41:9,
    42:25, 43:17
led 42:2
left 53:2
legal 29:2, 53:14,
    61:19
legality 21:9
legitimate 16:15,
    23:8
Less 7:25, 53:3
liabilities 17:9,
    18:25, 69:24,
    70:12, 70:17,
    70:25, 72:5
liability 20:14,
    20:21, 22:8,
    47:10, 67:12

liable 37:11
lied 49:19
life 25:21
light 66:25, 74:13
likelihood 43:1
likely 11:5, 20:3,
    40:23, 40:24,
    66:20, 68:3, 68:8,
    70:13
likewise 61:19
limited 6:16, 68:8,
    72:14, 74:13
limits 20:13
line 6:9, 10:8,
    15:19
lines 73:10
Lisa 5:7
list 71:13
listed 6:22, 73:24
listened 63:5
Litig 35:14
litigants 36:6
litigate 38:9, 38:10
litigated 22:5,
    36:9, 65:21
litigation 13:11,
    18:13, 19:15,
    20:4, 33:12, 36:7,
    50:10, 60:3, 60:5,
    60:7, 60:10,
    60:12, 60:17,
    60:18, 60:21,
    60:22, 60:23,
    60:24, 61:1, 61:3,
    61:4, 61:5, 61:6,
    61:9, 61:13,
    61:22, 61:25,
    62:5, 62:8
litigation-based
    13:16
litigious 48:4
littered 35:5
little 11:10, 12:12,
    13:15, 18:13,
    34:13, 35:21,
    37:15, 55:17
live 22:18
living 43:19
local 19:8, 19:9,
    21:19, 22:20

located 49:14, 49:24
logistical 74:6
long 19:24, 34:17
long-running 46:5
look 35:2, 37:21,
   49:19, 66:20,
   71:13
looking 54:13, 73:22
los 25:10, 25:16,
   26:1, 27:15,
   27:23, 28:2, 28:6,
   28:24
lose 44:3, 53:23
loss 50:4
losses 16:24, 42:3
lot 52:14
low 40:19
lower 51:13
loyalty 26:1
Ltd 65:8
Luis 3:25, 14:19
Lynch 2:25, 23:13,
   57:16, 67:9

< M >
Maddie 24:17
Magistrate 2:35,
   76:8
magnitude 18:10,
   56:7
main 17:2
Maine 20:10
mainland 6:2
mainland-based 11:7
Management 1:10,
   1:27, 5:16, 74:9
managing 53:8
mandate 60:9, 60:11
manner 68:22
Manning 23:13,
   57:16, 67:10
Marini 3:25, 14:17,
   14:19, 14:20,
   14:22
market 23:9, 54:21,
   57:10
Martin 3:6, 8:17
master 24:16
material 35:6, 61:22

materially 38:21,
   72:7
materials 23:7
matter 7:13, 16:3,
   18:12, 20:8,
   23:10, 25:6, 36:8,
   45:10, 53:8,
   57:17, 64:7, 64:8,
   65:11
matters 6:22, 23:22,
   72:11, 72:15,
   73:23
Mayaguez 23:16,
   57:14, 64:20,
   65:2, 67:21
Mays 57:1
MBIA 3:12, 15:12,
   15:18, 33:16
Mcveigh 65:4
mean 41:3, 50:17
means 30:21, 31:13,
   31:19, 47:6, 49:8,
   64:14
measure 40:19
mediation 9:21, 12:8
meet 67:23
members 5:21, 6:17
Memorandum 63:9,
   63:12
mentioned 19:13,
   41:18, 45:8
mere 65:5, 67:7,
   70:10
Merely 72:19
Merrell 65:9
Merrill 2:25, 23:12,
   57:15, 67:9
message 59:15
met 45:21, 45:25
Metal 64:21
Mfg 64:22
Microsoft 49:25,
   50:1
mid 13:18, 19:22
million 48:19
millions 37:22,
   38:5, 41:8, 44:2
mind 27:2, 27:17
mindful 74:15
mine 29:17

minimum 10:11
Minton 64:15
minute 36:1
minutes 7:20, 7:24,
   15:10, 15:13,
   34:3, 40:3, 52:24,
   53:3, 55:7, 55:24,
   58:7
misconduct 17:1,
   20:22, 35:1, 35:9,
   35:12, 35:16,
   37:12, 60:13
misdirection 21:22
misleading 66:4
misrepresentation
   40:9, 40:10,
   46:12, 47:13,
   49:16, 49:24,
   51:18, 54:6
misrepresentations
   35:7, 66:4
misrepresented 49:25
missed 73:7
mistake 46:21
mistaken 12:21,
   41:25
mix 72:3
moment 42:10, 45:8,
   51:6, 60:1
Monday 7:15
money 48:23
monitor 54:16
month 13:21
months 34:15
Montreal 20:10
morning 5:5, 5:8,
   5:20, 8:3, 8:16,
   8:19, 8:20, 9:12,
   9:14, 14:19,
   15:15, 15:16,
   24:25, 25:1,
   29:22, 30:1, 30:2,
   34:10, 34:13, 63:6
Mortg 66:18
Motion 15:7, 15:9,
   30:3, 33:7, 33:15,
   33:18, 34:2,
   60:18, 60:19,
   60:20, 61:2, 63:8,
   63:11, 63:14

Motions 15:7, 60:2,
   63:7, 63:14,
   63:15, 63:16,
   63:18, 63:20,
   64:2, 64:4, 64:8,
   73:4
Movants 71:3
move 11:14
moved 46:7
moving 10:16
MS 3:8, 5:7, 5:8,
   5:9, 9:7, 9:9,
   10:8, 24:8, 24:20,
   24:21, 24:22,
   29:19, 29:21,
   34:4, 34:6, 55:6,
   55:8, 55:10,
   55:12, 55:13,
   55:14, 55:18,
   55:20, 59:17,
   59:18, 59:21,
   62:21, 73:9,
   73:12, 73:17
multiple 26:15,
   40:20
municipal 16:9,
   23:23, 54:21
Municipality 23:15,
   57:14, 64:19,
   67:21
mute 6:9, 6:11,
   73:13
muting 29:20, 73:15


< N >
name 6:21, 7:2,
   14:25, 40:6
Nashoba 65:7
nature 16:1
near 13:17
nearly 68:4
necessarily 65:13,
   65:22, 67:2, 69:21
necessary 12:1,
   54:11
need 8:1, 8:3, 40:4,
   47:17, 69:21
needing 11:22
negatively) 69:25

neglect 19:25
negligence 20:17
Neiman 3:16, 34:2,
   34:8, 34:11,
   34:19, 42:14,
   42:17, 42:20,
   42:24, 46:20,
   47:9, 47:12,
   50:12, 52:10,
   53:1, 53:5, 54:9,
   55:5, 56:13,
   56:21, 57:13,
   58:17, 59:10
neither 30:18, 65:22
net 12:7, 70:11,
   70:18
New 26:14, 50:25,
   67:25, 70:17,
   74:18
next 13:2, 14:2,
   50:21, 51:5, 52:7,
   52:12, 74:2
nexus 18:1
NG 5:7, 5:8, 9:7,
   9:9, 24:8, 24:20,
   24:21, 24:22,
   29:19, 29:21,
   34:4, 34:6, 55:8,
   55:10, 55:13,
   55:14, 55:18,
   55:20, 59:18,
   59:21, 62:21,
   73:9, 73:12, 73:17
niceties 52:4
No. 1:6, 1:23, 2:3,
   2:18, 7:16, 15:8,
   15:9, 29:15, 63:9,
   63:10, 63:12,
   63:13, 65:8,
   73:17, 74:9, 74:11
Nobody 25:18, 55:21
non-contractual
   20:20
non-core 15:23,
   17:8, 19:5
non-debtor 31:11
non-debtors 72:2
non-exclusive 71:13
non-puerto 49:13
non-substantive 64:3

nondebtors 15:23
None 4:5, 4:11,
   46:25, 50:5, 51:9
nonetheless 31:2,
   31:3, 58:18
noon 8:3
Nor 65:25, 67:18
normally 44:13
norms 16:22
Nos. 8:9
notably 22:8
note 21:22, 33:1,
   37:1, 52:22,
   56:10, 57:13
noted 36:21, 67:10,
   70:12
Nothing 18:14,
   59:12, 62:22, 63:1
notice 10:3, 12:9,
   13:2, 13:21, 74:13
noticed 13:4
notices 10:4, 13:25
novel 44:24
number 5:18, 10:2,
   10:3, 11:6, 12:7,
   12:9, 12:24, 13:6,
   43:5, 51:8, 68:2,
   73:23
numbers 12:19
numerous 5:24


< O >
object 20:3
obligation 33:9,
   45:23
obligations 17:17,
   23:10, 25:12,
   26:3, 26:7, 28:9,
   47:5, 54:23, 59:9,
   66:7, 66:9, 67:5,
   68:23
obtain 48:11
obvious 38:13, 51:20
obviously 11:25,
   12:15, 35:23, 45:9
occasions 26:15
occur 74:4
occurred 59:2
occurs 29:1

October 14:3, 14:8
Oeste 64:20
offer 9:25, 23:7,
   53:11
offered 48:8
offering 35:6, 35:9,
   39:11, 52:2,
   54:13, 54:15,
   54:17
offers 11:16, 11:25
Official 30:22,
   31:6, 31:11,
   32:20, 39:13,
   76:15
officials 60:4
offs 72:14
often 25:24, 29:1
Okay 9:12, 9:18,
   12:17, 14:7,
   24:11, 29:23,
   34:9, 42:24, 53:7,
   56:4, 73:12, 73:15
old 26:14, 34:13
omission 20:15
omissions 66:4
omitted 68:14,
   69:15, 69:20
Omni 12:19
Omnibus 2:32, 5:19,
   5:23, 74:2, 74:3
Omnis 73:24
on-island 11:9
once 5:22, 68:5
One 7:3, 7:21, 11:8,
   20:13, 25:20,
   35:24, 38:10,
   39:14, 40:8, 41:1,
   41:9, 44:15,
   47:22, 53:3, 59:7,
   69:23, 70:24, 72:1
ones 10:5, 50:22
ongoing 74:19
operate 19:1
operated 68:22
operation 6:8, 21:9,
   70:9
operative 74:9
Opinion 27:20
opportunity 6:23,
   29:9, 73:22

opposed 43:22, 63:20
opposing 31:2, 34:2
options 69:24, 70:17
oral 15:10, 63:6,
   64:2
Order 8:7, 11:17,
   13:23, 46:21,
   46:22, 47:18,
   63:19, 65:24,
   73:3, 74:5, 74:9
orderly 6:8
Orders 6:14, 74:16
ordinary 38:7, 45:23
original 27:13, 69:5
originate 21:16,
   28:11
Ortiz 26:5
others 12:18, 16:19,
   26:9, 60:15
otherwise 59:11,
   72:8
outcome 61:22, 62:5,
   62:7, 67:25,
   69:17, 69:23,
   70:3, 72:3
outcomes 72:7
outset 46:7
outside 49:14,
   50:15, 50:17,
   50:18
overall 9:23, 54:24,
   70:24
overlap 23:11, 67:6,
   67:7
overlapping 67:16
overriding 25:8,
   30:8
Oversight 1:9, 1:26,
   5:16, 7:15, 8:6,
   8:11, 8:13, 8:14,
   8:18, 11:11,
   14:15, 33:7,
   33:10, 33:12,
   33:13, 55:7, 59:7,
   61:12, 61:17,
   61:21, 62:4, 73:8
overwhelming 24:3
own 7:19, 19:11,
   20:21, 25:19,
   26:4, 30:9

< P >
P'ship 65:8
Pacor 18:21, 19:13,
   57:19, 69:11,
   69:19
PAGE 4:3
pages 76:4
paid 37:9, 39:4,
   39:5, 41:20,
   43:16, 61:23
pandemic 6:3
Panel 36:16
paper 74:10, 74:12
papers 42:11, 42:25
Para 64:20
paragraphs 57:11
parallel 23:21
part 56:18
participant 7:12
participants 5:24
particular 43:14
particularly 9:24,
   23:22, 43:21,
   74:23
PARTIES 3:3, 5:21,
   6:9, 6:17, 6:23,
   26:15, 31:16,
   35:22, 35:25,
   36:19, 44:6, 46:1,
   49:12, 49:14,
   60:25, 61:11,
   63:25, 66:20,
   67:20, 68:15,
   70:2, 74:10
partner 8:23
party 71:23
passed 19:19
patience 24:18, 25:2
pattern 56:18
pause 48:13
pay 37:20, 37:21,
   37:23, 37:24,
   48:18, 48:20
payable 13:12, 13:16
payments 62:9
PBA 12:13
pending 52:15, 72:11
people 6:3, 12:1,

73:9, 73:13
per 10:2, 10:3,
    13:2, 13:21
perform 23:6
performed 22:24
performed. 26:4
perhaps 31:22
period 10:16, 11:24,
    36:17, 61:11
permits 71:9
permitted 6:16, 42:2
person 6:16, 7:3,
    73:19
perspective 12:2,
    61:21
persuasive 33:19,
    66:22
Peter 3:16, 34:11
Pharm 65:9
phase 10:1, 13:12
Philippe 3:13, 15:17
phone 6:12, 9:11,
    24:13
phones 6:9
PHV 3:6, 3:7, 3:8,
    3:13, 3:16, 3:20,
    3:24, 3:29
physical 51:5, 74:13
Picasso 25:23
pick 35:19
PICKHARDT 3:20,
    16:2, 29:18,
    29:22, 29:23,
    30:1, 30:2, 33:5,
    33:23, 33:25,
    34:25, 35:11,
    58:6, 58:8, 58:11,
    62:18, 62:25, 63:1
Pierce 2:25, 67:9
pivoted 32:16
Place 22:6, 47:11
placed 11:20
plainly 44:9
Plaintiff 2:21,
    49:13, 63:11,
    64:25
Plaintiffs 2:7,
    15:18, 15:21,
    37:2, 38:16,
    44:12, 45:19,

45:21, 45:25,
    50:14, 54:12,
    63:8, 63:16,
    64:18, 66:3, 66:5,
    66:8, 66:11, 67:1,
    68:16, 68:18,
    70:5, 70:7, 70:8,
    71:7
Plan 22:11, 40:25,
    43:2, 43:11,
    43:23, 44:4,
    48:11, 49:1
play 51:18
played 18:11
played. 7:23, 21:14,
    22:25, 26:22,
    28:4, 33:4, 52:9,
    54:7
players 36:3
playing 18:11
plead 65:18
pleading 64:18
pleadings 74:11
pleads 65:1
Please 5:9, 6:11,
    6:20, 7:1, 7:5,
    7:12, 15:17, 25:2,
    28:20, 60:2,
    62:21, 74:12
pleasure 14:13
plenty 36:22
point 9:25, 10:1,
    10:9, 14:16, 15:6,
    36:7, 43:4, 44:21,
    47:14, 50:22,
    51:5, 57:15, 65:3
pointed 44:8
pointing 58:16
points 16:2, 39:23,
    52:21
policies 6:14
portion 73:5
position 26:24,
    33:15, 37:10,
    43:21, 53:14,
    61:17, 61:19, 62:9
positively 69:24
possibility 37:18,
    53:25, 60:16
possible 12:22,

32:15, 36:25,
    38:3, 53:17,
    61:25, 62:7, 73:9
possibly 32:8, 45:24
post 22:13, 43:15
potential 44:1,
    61:12, 66:14,
    70:12, 70:18
potentially 41:6,
    48:2, 48:3, 48:5,
    48:19
Power 1:32, 45:4
powered 28:16
practical 18:12,
    36:2, 36:8, 53:7
PRCCDA 30:17, 31:17,
    32:10, 60:6, 60:21
precedent 20:19,
    22:22
precluded 32:21,
    48:5
predict 43:20
predictably 67:15
predominance 21:19
predominantly 51:15
predominate 21:7,
    21:8, 47:16,
    47:17, 71:18
predominates 50:23,
    50:24, 51:3
preferential 17:18
prejudice 71:22
PREPA 10:21, 60:7,
    61:4
preparing 74:18
presence 65:5,
    66:14, 74:13
present 5:13, 5:24,
    54:11, 59:5,
    65:20, 67:18
presentation 62:3
presentations 6:25
presented 33:2,
    54:20
presents 68:4
preserve 60:10
presiding 5:13
press 5:22, 6:17
pressed 24:13
presumptively 17:22

pretty 38:13, 49:11
prevail 17:13,
    37:20, 38:17,
    41:11, 46:21,
    46:22, 53:20
prevailing 47:18
prevented 58:19
prevented. 25:21
previously 29:5
PRIFA 30:16, 31:17,
    32:10, 60:6, 60:21
primarily 58:17
Prime 7:17
principles 25:19,
    28:15, 50:8, 72:21
prior 52:16, 54:13
private 46:18,
    56:25, 57:3,
    68:16, 68:18
privilege 29:10
Probably 10:16,
    11:6, 11:23, 12:4,
    12:11, 13:12,
    13:15, 13:24,
    14:9, 48:15
problems 57:5
Procedures 8:7,
    19:7, 74:5
proceed 50:2
Proceeding 15:8,
    15:10, 30:6,
    30:19, 31:7,
    31:10, 33:6, 33:8,
    39:21, 39:22,
    40:5, 40:18,
    41:17, 41:21,
    43:11, 60:15,
    63:10, 63:13,
    63:19, 69:12,
    69:17, 69:21
proceeding. 33:10
process 9:23, 10:15,
    12:10, 13:4,
    13:14, 14:6,
    44:16, 72:9
processes 11:23,
    12:5
Prods 64:22
produced 3:48
professionals 60:4,

60:13
profound 48:2
progeny 19:14
progressed 37:9
projected 9:23
projecting 62:5
PROMESA 1:8, 1:25,
    5:18, 21:10, 69:4,
    71:9
promise 26:8
promissory 27:24
proof 16:25, 19:17,
    41:18, 44:22
Proofs 17:11, 17:20,
    20:1, 41:15
proper 66:16
property 69:22
propios 16:10,
    16:15, 21:15,
    25:11, 25:16,
    26:1, 27:15,
    27:23, 28:3, 28:6,
    28:25
proposals 11:3,
    11:21
propriety 59:2,
    59:4, 61:18
prosecute 60:10
prosecuted 70:18
Proskauer 8:18, 9:15
prospect 52:4, 53:18
protects 16:15
prove 47:6, 47:10,
    47:13
provide 6:23, 10:12,
    11:16, 11:20,
    28:17, 32:12, 66:6
provider 11:8
providers 10:22,
    10:24, 10:25, 11:3
provides 40:14
providing 70:17,
    74:5
provision 71:11
provisionally 42:4
provisions 43:15,
    74:16
Public 2:3, 3:10,
    5:21, 6:17, 7:17,
    8:9, 19:9, 26:12

punished 6:18
pure 68:5
purportedly 67:5
purposes 51:5
Pursuant 60:11,
    66:10, 71:1
put 14:21, 39:20


< Q >
quality 49:19, 49:25
question 9:22,
    15:25, 18:24,
    22:15, 22:17,
    22:20, 22:23,
    35:20, 36:2,
    36:18, 37:17,
    37:25, 44:15,
    45:17, 47:21,
    52:17, 56:14,
    56:24, 57:1, 57:8,
    57:18, 64:9,
    64:18, 64:24,
    65:20, 67:20,
    68:21, 70:22
questions 7:9, 8:13,
    8:24, 9:19, 10:5,
    13:21, 14:14,
    14:16, 14:23,
    16:4, 29:13,
    29:15, 33:21,
    33:24, 46:9, 58:2,
    59:13, 62:11,
    62:13
quick 53:7
quickly 11:15,
    38:20, 52:22,
    53:17
quite 8:12, 34:23,
    36:5, 36:9, 41:14,
    52:5, 54:11, 54:20
quote 25:22
quoted 25:25
quoting 26:1, 64:21,
    65:3, 65:9


< R >
raise 21:12, 56:22,
    67:15, 68:18,

70:13
raise[s] 65:13
raised 6:24, 22:17, 65:22, 65:24, 67:2, 73:10, 73:12
raises 65:12
raising 59:16
ramp 12:3
range 66:24
Rapisardi 3:24, 14:17
Rather 13:16, 21:24, 30:14, 65:10, 66:10, 68:6, 70:11
Re 1:6, 1:23, 5:16, 18:2, 18:20, 20:10, 21:20, 43:9, 56:21, 57:19, 69:13
reach 53:22
reaction 38:11
reads 40:13
ready 16:14
real 19:4, 28:13
realized 34:14
really 38:1, 38:2, 38:24, 39:19, 46:15
reason 20:5, 33:19, 35:11, 39:4, 39:8, 49:11
reasonable 23:6, 36:8, 54:4
reasonably 66:25
reasons 29:5, 30:4, 30:21, 32:22, 39:25, 40:20, 43:5, 51:3, 51:6, 59:7, 64:5, 73:4
rebuttal 55:23, 62:19
received 59:15
recent 6:5
recently 28:23
recognize 26:13, 28:7
recognized 18:21, 26:6, 69:11
recommended 22:7
reconciliation 62:1,

62:3, 62:8
record 6:21, 8:16, 64:1, 73:4
record. 24:10, 24:23
recorded 3:48
recording 6:15
recoveries 72:6
recovery 32:2, 70:6
reduce 41:5, 43:13, 48:17, 70:6
reduced 12:24, 36:9
reducing 48:4
reduction 17:3
reductions 43:15, 70:19
redundant 32:23
refer 15:18, 63:10, 63:13, 63:14, 63:17
reference 45:13, 66:7, 72:18, 72:20
references 46:10, 46:11
referred 23:14
referring 25:10
refers 36:13
reflected 8:11, 10:10, 18:19
refrain 74:12
regard 31:21, 32:9, 50:17
regarding 8:13, 9:19, 31:1, 31:14, 60:19, 61:1, 61:2, 61:3, 61:12, 61:17
region 6:6
Regional 43:9
regulation 22:22, 23:22, 68:1
regulations 23:15
reiterated 28:23
rejects 45:10
relate 21:11
related 19:15, 30:6, 31:25, 35:17, 35:20, 36:19, 39:2, 40:1, 40:16, 42:9, 43:3, 43:6, 43:10, 43:25, 44:1, 44:5, 44:9,

44:18, 45:3, 45:20, 52:7, 54:25, 61:18, 69:3, 69:6, 69:13, 69:16, 70:25
relatedness 71:20
relating 18:1, 20:8, 21:1, 21:3, 60:21, 61:4, 61:9
relation 50:8
relevant 18:24, 31:16, 71:24
reliance 66:11
relief 28:17, 67:3
rely 31:23
remain 6:1, 56:10
remaining 7:21
remanded 21:4, 22:12, 23:13, 33:20, 46:7, 53:19
remanding 63:19
remarks 6:25, 8:15, 8:22
remind 6:13, 49:6, 74:8
reminded 28:5
remote 17:8, 19:13, 19:19, 52:5
remoteness 71:20
removal 16:4, 43:7, 52:14, 52:16
removed 71:23
repeat 39:13, 60:19
repeatedly 23:14, 36:13
report 10:10, 13:11, 14:15, 14:21, 14:25, 19:22
Reporter 76:15
reports 8:5, 8:7, 8:10, 8:12, 73:8
repose 66:15
represent 34:12, 38:2
representation 40:11, 46:13, 46:23, 47:4, 50:3
representations 50:16, 67:1
representative 1:13,

1:30, 5:17
representatives 8:15
represented 34:15
request 29:6, 67:3,
   71:7, 74:15
requested 8:6
requesting 28:17
requests 63:18, 71:4
require 6:25, 16:25,
   19:9, 21:10,
   22:18, 47:2,
   72:17, 72:20,
   74:10
required 11:17,
   19:16, 42:8, 65:23
requirement 67:23
requirements 66:21,
   66:23
requires 19:24,
   20:25, 51:25,
   54:13
requiring 20:4
reserved 58:6
reserves 64:3
resolution 68:12,
   72:15, 72:25
resolve 65:24
resolved 22:13,
   40:24, 43:3, 44:4,
   53:15
resources 62:4,
   72:14
respect 10:1, 10:14,
   11:14, 11:19,
   33:2, 33:14,
   33:17, 33:18,
   63:6, 65:11,
   68:23, 72:16
respectfully 29:6
respective 12:6
respectively 63:18
respond 29:14
response 35:21,
   56:22
response. 9:3
responses 11:20
responsibilities.
   65:17
responsible 16:24
restitution 44:6

restructuring 21:11,
   72:9
result 17:23, 32:3
resulting 48:5,
   70:10
retain 19:4
retention 72:12
retransmission 6:15
revamp 29:2
review 27:12, 37:18,
   57:7
reviewed 8:10,
   61:15, 63:4
ridiculous 56:6
rights 17:9, 18:25,
   20:12, 35:24,
   69:23, 70:16
ripe 62:2
risk 22:22, 72:14
role 18:11, 48:4
roles 11:10
rooted 25:15, 25:19
Rose 8:18
ROSEN 3:7, 8:23,
   9:1, 9:7, 9:10,
   9:11, 9:13, 9:14,
   9:15, 9:17, 10:7,
   11:1, 12:11,
   12:22, 13:6,
   13:10, 13:19,
   13:23, 14:2, 14:9,
   14:13
Rule 6:18, 7:8,
   19:24, 20:2,
   22:16, 25:18,
   46:19, 66:21,
   68:15, 68:17,
   68:19
rules 50:19, 57:6
ruling 63:6, 64:2,
   64:4
run 44:24
running 11:11

< S >
S. 3:7, 67:10
S/ 76:13
safe 74:22
safety 74:23

San 5:1
sanctions 6:18
Sands 17:21, 56:16
Santa 18:2, 18:19,
   36:12, 56:20,
   69:13, 70:21,
   71:24
Santander 19:18,
   20:1, 20:3, 44:16
Sarbanes-oxley 66:16
sat 43:22
satisfactory 11:25
satisfying 17:17
save 5:14
saying 56:5
says 37:3, 37:5,
   38:7, 43:10
SCC 59:16, 60:9,
   60:17, 60:18,
   60:20, 60:22,
   60:24, 60:25,
   61:1, 61:3, 61:7,
   61:8, 61:15
scenario 70:14
schedule 53:15
scheduled 15:11,
   74:2, 74:3
scholar 25:24, 27:19
scope 24:3
screen 24:14, 24:16
Sealink 56:12
season 6:7
Seattle 50:2
SEC 35:14, 66:21
Second 14:4, 20:5,
   35:15, 35:19,
   41:10, 48:13,
   51:5, 64:24,
   68:11, 72:16
secondary 27:22
Secondly 31:19, 52:6
seconds 15:3, 15:4,
   23:1, 28:18,
   42:15, 42:16,
   73:18, 73:20
Section 17:15,
   20:13, 64:14,
   69:4, 69:7, 69:8,
   69:9, 71:2, 71:9,
   71:11

Securities 22:1,
   23:14, 23:22,
   40:6, 40:8, 40:12,
   45:14, 46:11,
   46:14, 47:5, 47:7,
   47:19, 49:18,
   54:19, 57:3, 57:6,
   67:13, 67:15
security 28:13
seek 37:10, 66:8,
   66:10, 68:15
seems 37:8
select 6:11
selection 52:15
self 38:7
send 14:5, 38:8
sending 74:12
sense 48:6, 49:2,
   53:8, 53:13,
   53:15, 53:25
September 11:21,
   14:4, 74:3
sequence 53:14
series 6:5
serious 51:3
serve 74:10
Services 2:11, 11:22
Servs 66:17
session 5:12, 8:3,
   8:4
set 7:14, 73:6
sets 23:8, 57:7
settled 55:2, 68:5
settlement 11:14,
   11:21, 11:25, 12:5
several 25:16, 27:8,
   51:21
shape 26:11
share 15:21
short 21:25
shouldn't 13:3,
   40:13
show 16:20, 42:8,
   45:20, 45:21,
   46:22, 47:2,
   47:17, 49:9
showing 19:22, 51:25
side 34:23
sidelining 48:4
signatory 31:10

signed 32:19
significance 28:19,
   28:22, 36:21,
   68:13, 68:25
significant 21:20,
   26:10, 36:10,
   72:10, 72:17
Significantly 16:25
similar 26:25, 71:11
similarly 31:7,
   33:10
simply 22:17, 57:8,
   58:21, 70:23
single 37:3, 37:4
situation 22:19,
   65:5, 70:21
situation-specific
   68:7
situations 67:23
skip 73:11
skipped 59:19
small 11:24, 64:25
smart 38:1
Smith 2:26, 67:9
smoother 11:11
sold 50:18
solely 16:8
solution 48:9
Solutions 6:12
somebody 49:19
somehow 31:8, 34:25,
   39:16, 42:12,
   43:3, 44:24,
   54:13, 58:19
someone 9:5, 37:11
Sons 64:21
Sorry 18:7, 24:22,
   42:17, 53:1, 53:5,
   59:24
sort 47:21, 50:13,
   52:12
Sound 7:22, 7:23,
   21:14, 22:25,
   26:22, 28:4, 33:4,
   52:9, 54:7
sounds 9:5, 13:1
source 26:7, 28:8,
   39:10, 43:17
sources 25:12, 39:14
southern 6:5

Spain 27:1, 27:5
Spanish 11:9, 19:5,
   21:16, 27:12, 28:1
speaker 6:19, 7:14,
   7:18, 7:20, 15:11
speakers 6:22, 7:3
speaking 6:10, 9:16,
   11:9, 62:16, 73:10
Special 3:28, 19:21,
   44:20, 55:6,
   55:16, 60:9
specific 16:2,
   22:20, 26:15, 27:3
Specifically 11:2,
   28:16, 32:2,
   50:24, 60:5,
   60:14, 61:21,
   67:14
specified 8:2
speculation 20:20
speed 13:13
spend 40:3
spoke 44:7
spoken 6:23, 12:18
SPV 35:15, 44:21,
   45:1, 56:23
squarely 43:10
staff 74:14, 74:17
staffing 9:20
Stafford 3:8, 10:8
stakeholders 5:25
standard 16:16,
   21:25, 40:17,
   69:12, 69:16
start 10:6, 34:21,
   40:16
started 42:20
state 7:2, 14:25,
   21:6, 23:13,
   23:21, 47:16,
   50:23, 51:6,
   52:16, 53:20,
   53:24, 54:22,
   65:1, 65:6, 65:12,
   65:16, 67:7,
   71:18, 71:19,
   72:17
state-law 65:13,
   67:15
stated 27:19, 29:5,

37:8, 65:13, 73:4
statement 20:15,
    27:23, 61:2
statements 30:22,
    30:25, 31:6,
    31:11, 32:20,
    35:6, 35:8, 39:10,
    39:13, 52:3,
    53:11, 58:23, 59:1
States 1:1, 2:34,
    2:36, 5:11, 5:14,
    23:12, 36:16,
    72:23, 76:7, 76:8
States. 64:13
status 8:5, 10:10,
    13:11, 14:3,
    14:21, 14:24
statute 17:22,
    56:15, 64:11,
    66:15, 68:1, 69:9
statutory 56:15,
    71:11
Stay 22:10, 48:11,
    56:5, 74:22
steeped 27:10
stenography 3:48
stock 49:20, 49:23
stop 49:22
storm 6:6, 74:24
streamlined 19:6
strongly 71:25
structural 9:20
subject 17:19,
    30:13, 37:13,
    41:7, 45:10,
    60:22, 61:5,
    61:15, 64:7, 65:11
submissions 63:4,
    64:1
submitted 66:3,
    66:12
subrogated 17:14,
    70:9
subrogation 32:23,
    35:24, 36:24,
    37:4, 37:5, 37:10,
    37:12, 37:17,
    37:23, 38:6,
    38:15, 41:6,
    44:13, 56:15,

56:17, 57:21
subsequent 43:8
subsequently 32:21
subset 20:11
substance 60:19
substantial 32:6,
    45:2, 46:1, 54:11,
    65:14, 65:19,
    65:25, 67:18,
    67:24, 68:11
substantiality
    67:19, 67:23, 69:1
substantially 21:6,
    21:7, 49:5
substantive 16:5,
    67:3, 72:19, 72:21
substantively 13:9
substitution 17:24,
    18:17, 35:22,
    35:25, 36:19,
    56:20, 70:10
successful 70:23
sue 50:1
sued 44:23
suffered 50:4
sufficient 36:19,
    44:5, 47:12, 67:8
sufficing 21:1
suggest 37:14,
    38:16, 59:10
suggested 38:23,
    42:24, 43:7
suggesting 36:1,
    48:14, 58:17
suggestion 34:24,
    36:24, 38:20,
    39:16, 42:11,
    48:15
suggests 49:11
suing 38:25, 49:13
suited 26:19, 27:11
suits 67:12
summary 20:23
superb 74:19
Superior 28:12
Supp 66:18
Support 19:15,
    19:20, 43:23,
    50:25, 58:13,
    63:9, 63:12,

66:23, 67:8,
    71:25, 72:1, 73:1,
    74:20
supported 33:6
Supreme 16:13,
    17:21, 21:17,
    23:12, 24:2,
    25:17, 26:6, 27:5,
    27:18, 45:22,
    51:12, 51:23,
    56:16, 57:15
surprising 40:13
Swain 2:33, 5:6,
    5:13, 59:22, 76:7
swap 70:23
switch 18:18
system 16:14, 66:1,
    68:4
system. 67:21
systemic 22:22
systems 29:2

< T >
table 45:16
Tacoronte 5:9
talked 41:1, 49:6
target 10:3
Taylor 2:33, 5:5,
    5:12, 76:7
technical 73:6
technological 62:17
telephonic 6:8, 8:8
TELEPHONICALLY 3:3,
    5:22, 74:4
ten 12:19
term 13:18
terms 18:23
test 38:14, 50:13
tests 54:3
thankfully 51:16
themselves 52:2,
    73:13, 73:14,
    73:16
theories 44:24
thereby 66:5
therein 61:6
Thereof 63:9
They've 36:4, 36:5,
    37:9, 37:14, 39:1,

39:5, 39:19,
  39:22, 43:22,
  46:23, 54:6
thinking 37:16,
  47:15
third 31:16, 72:16
third-party 31:14
Thompson 65:10
though 13:1, 38:5
thoughts 6:1
thousand 12:20
three 34:15, 55:23
threshold 16:3, 64:8
timeline 9:23
timely 20:23, 44:22
timetable 10:5
timing 42:21, 42:25,
  43:22
today 5:22, 6:8,
  6:22, 15:20,
  29:11, 34:21,
  61:15, 64:1, 73:4,
  74:19
together 15:19,
  63:14
total 12:10, 12:12,
  12:22, 15:11,
  70:19
totally 44:15
touched 28:12
touches 23:22
towards 13:15
Town 65:8
track 7:18, 7:19
trade 72:14
tradition 25:15,
  26:10, 27:11
traditional 47:22,
  52:19
traditionally 37:12
traditions 26:25
tranche 14:5
transaction 61:11
Transcript 3:48,
  7:7, 64:4, 76:4
transcription 76:5
transferred 10:11
translation 26:4
treaties 64:13
treatise 28:2

treatises 27:6,
  27:12
treatment 61:24
trial 52:10, 71:22
tried 19:6, 35:12
Tristan 3:29, 59:15
tropical 74:24
true 38:25, 40:23,
  47:1, 50:6, 61:3,
  76:5
try 48:10, 48:25,
  49:1
trying 50:22
turn 15:6, 19:11,
  29:12, 29:18,
  34:1, 45:5, 45:16,
  52:4, 52:17, 54:1,
  62:17, 67:25
turns 46:8, 69:2,
  71:3
two 7:20, 7:21,
  7:24, 11:3, 17:2,
  19:19, 30:12,
  30:21, 35:13,
  46:10, 52:24,
  53:3, 58:7, 63:14,
  64:14, 67:22
two-month 13:25
type 18:20, 41:1
types 26:16


< U >
UBS 2:11
ultimately 32:21
unavailable 37:3,
  48:23
unaware 60:22, 61:5
uncertain 43:19,
  56:10
uncertainties 6:6
unconditional 20:9
unconfirmable 43:24
underlying 61:16,
  72:22
understand 33:13,
  33:15, 51:11
underwrite 54:15
Underwriter 31:21,
  34:12, 57:7,

58:24, 63:22
Underwriters 3:16,
  16:9, 30:25, 40:7,
  40:10, 46:3, 58:13
underwriting 31:24,
  32:4, 32:9, 32:12
unease 6:4
unequivocally 56:17,
  56:25
unflagging 45:25
unilateral 16:10,
  16:17, 21:15,
  25:11, 26:5,
  27:16, 28:8, 29:1,
  51:24
unique 16:14, 25:9,
  30:7, 31:20, 72:18
United 1:1, 2:34,
  2:36, 5:11, 5:14,
  23:12, 36:16,
  64:13, 76:6, 76:8
unlawful 53:24
Unless 29:13, 33:21,
  59:12
unlike 52:17
unmistakable 51:25,
  52:1
unmute 6:20, 7:1,
  9:1, 9:9, 14:25,
  24:7, 24:9, 24:13,
  55:25, 59:18,
  73:9, 73:13, 73:14
unmuted 55:9, 62:21
unmuting 15:2, 73:16
unrealistic 18:13
Unsecured 10:23,
  17:16
unsettled 21:19
until 22:10, 48:11,
  49:1, 74:13
untrue 20:14
update 10:12
urgency 72:10
usage 19:9, 26:12,
  26:23
usual 8:5
utilize 11:6


< V >

v. 2:9, 2:23, 23:13, 57:1, 57:16, 64:15, 64:20, 64:22, 65:3, 65:8, 65:9, 66:18, 67:9, 69:19
validity 22:21
variety 60:12
veering 13:15
versa 53:23
vice 53:23
Videocart 57:19
view 9:24, 38:22, 47:23
VII 16:11, 25:13
violated 16:22, 47:6, 47:18, 57:9
violates 57:17
Violations 6:17, 23:14
virtually 20:9, 20:24, 45:24
Vitol 22:11, 52:12, 56:7
voice 73:19
volume 10:5
voluntad 25:12, 26:5, 27:16, 28:8, 29:1

< W >
wait 15:1, 15:3, 24:11, 24:15, 24:19, 48:10, 49:22, 73:18
walk 39:24, 47:21
Walker 76:13, 76:14
wanted 11:4, 34:21, 35:19, 36:24, 38:20, 42:10, 50:1, 73:7
wants 73:14
warned 18:7
wash 39:19
Washington 50:2
watching 29:21
wave 55:17
waving 55:19, 55:21
ways 36:18, 38:22

weigh 23:19, 26:12, 47:23, 52:19
weighing 43:3
weighs 47:19, 48:7, 49:4, 52:11
weight 27:9
welcome 5:20
well-established 69:11
well-known 27:18, 28:1
well-pleaded 22:16
Whether 9:7, 22:5, 22:17, 23:10, 36:19, 37:17, 38:14, 40:17, 40:21, 40:22, 40:24, 42:1, 44:3, 47:16, 50:9, 52:18, 54:12, 54:15, 54:16, 57:9, 57:20, 62:9, 64:6, 65:11, 65:13, 68:18, 68:22, 69:2, 69:12, 71:14
whole 44:10, 66:1, 68:4
whom 63:17
Wilmer 34:12
win 40:21, 40:22, 41:2, 41:14, 44:3
wish 7:1, 8:15, 14:17, 14:24, 62:18, 74:23
wishes 7:3
within 45:1, 66:24
without 39:23, 65:15
withstanding 36:2, 45:6, 67:11
WITNESSES 4:3, 31:15
won 42:3
word 45:13
words 45:12, 68:3
work 25:5, 74:18
working 10:13, 10:22, 11:13, 53:16
world 37:8, 41:2, 41:10, 43:19,

48:22, 49:18
Worldcom 35:14, 56:23
write 38:4
writing 8:7, 25:25, 38:11
written 54:5
wrongful 41:24

< Y >
year 13:5
years 19:19, 22:19, 34:14, 46:6, 52:16
York 50:25, 74:18
young 34:18
yourself 6:20, 6:21, 7:2, 14:25, 24:7, 37:25

< Z >
Z. 3:13