# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>    Debtor. | Case No. 17-BK-3567-LTS |

---

[1]  The Debtors in the jointly-administered Title III cases, along with each Debtor's respective Title III case number (listed as a bankruptcy case number due to software limitations) and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

| ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION,<br><br>      Movants,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>      Respondent. | Case No. 17-BK-3567-LTS<br><br>**Re: ECF No. 633, 673, 680, 778.** |
| AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., and U.S. BANK TRUST NATIONAL ASSOCIATION,<br><br>      Movants,<br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>      Respondent. | Case No. 17-BK-3283-LTS<br><br>**Re: ECF Nos. 10602, 12995, 13744** |
| AMBAC ASSURANCE CORPORATION, FINANCIAL GUARANTY INSURANCE COMPANY, ASSURED GUARANTY CORPORATION, ASSURED GUARANTY MUNICIPAL CORP., and THE BANK OF NEW YORK MELLON, as Fiscal Agent,<br><br>      Movants,<br>v. | Case No. 17-BK-3283-LTS<br><br>**Re: ECF No. 10104, 10615, 12997, 13744** |

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO

     Respondent.

**FOMB AND AAFAF CONSOLIDATED RESPONSE TO MOVANTS' CONSOLIDATED
SUPPLEMENTAL BRIEF REGARDING REVENUE BOND LIFT STAY MOTIONS**

# <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .............................................................................................................................. 6

   I.   MOVANTS HAVE BEEN, AND WILL BE, AFFORDED DUE PROCESS IN THE
TITLE III COURT .................................................................................................................. 6

     A.   Movants' Assertion of a "Due Process" Exception to the Automatic Stay Grossly
Misconstrues the First Circuit's Ambac Decision ................................................................. 6

     B.   The Title III Case Affords Movants Due Process ........................................................ 7

     C.   Movants Claims are Not Colorable ........................................................................... 11

   II.   MOVANTS FAIL TO SHOW "CAUSE" UNDER THE *SONNAX* FACTORS ........... 14

   III.   THE CCDA STAY SHOULD REMAIN IN PLACE .................................................... 17

     A.   CCDA Stay Relief Under § 362(d)(1) is Not Warranted Because Movants' Alleged
Collateral Is "Adequately Protected" ................................................................................... 18

     B.   CCDA Stay Relief Is Not Warranted Under § 362(d)(2). .......................................... 21

     C.   The Court Should Maintain the CCDA Stay Pending Resolution of the CCDA
Adversary Proceeding. ........................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ambac Assurance Corp. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*,
297 F. Supp. 3d 269 (D.P.R. 2018),
*aff'd*, 927 F.3d 597 (1st Cir. 2019),
*cert. denied*, 140 S. Ct. 856 (2020) ("*Ambac Dismissal*") ............................................. *passim*

*Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd.)*,
927 F.3d 597 (1st Cir. 2019)*,*
*cert. denied*, 140 S. Ct. 856 (2020) ("*Ambac*")............................................................. *passim*

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*,
954 F.3d 1 (1st Cir. 2020).......................................................................................18

*Cobb v. City of Stockton (In re City of Stockton)*,
909 F.3d 1256 (9th Cir. 2018) ................................................................................10

*Edward J. Berwind, Inc. v. Chicago Park Dist.*,
393 Ill. 317 (1946) ..................................................................................................10

*In re 300 Wash. St. LLC*,
528 B.R. 534 (Bankr. E.D.N.Y. 2015)...................................................................20

*In re Alliance Well Serv., LLC*,
551 B.R. 903 (Bankr. D.N.M. 2016) ......................................................................21

*In re Bennett Funding Grp., Inc.*,
255 B.R. 616 (N.D.N.Y. 2000)...............................................................................19

*In re Best Prods. Co.*,
138 B.R. 155 (Bankr. S.D.N.Y. 1992),
*aff'd*, 149 B.R. 346 (S.D.N.Y. 1992) .....................................................................21

*In re Breitburn Energy LP*,
571 B.R. 59 (Bankr. S.D.N.Y. 2017)......................................................................15

*In re Brian Wise Trucking, Inc.*,
386 B.R. 215 (Bankr. N.D. Ind. 2008)....................................................................21

*In re Cason*,
190 B.R. 917 (Bankr. N.D. Ala. 1995) ...................................................................21

*In re Chatham Parkway Self Storage, LLC*,
2013 WL 1898058 (Bankr. S.D. Ga. Apr. 25, 2013)...............................................19

*In re City of San Bernardino, California*,
 545 B.R. 14 (C.D. Cal. 2016) ....................................................................................25

*In re City of Stockton*,
 478 B.R. 8 (Bankr. E.D. Cal. 2012) ..............................................................................8

*In re Continental Airlines, Inc.*,
 146 B.R. 536 (Bankr. D. Del. 1992) .............................................................................21

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
 300 F. Supp. 3d 328 (D.P.R. 2018),
 *aff'd*, 919 F.3d 638 (1st Cir. 2019) ...............................................................................2

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
 899 F.3d 13 (1st Cir. 2018) ("*PREPA*") ....................................................................3, 7

*In re Indian Palms Assocs., Ltd.*,
 61 F.3d 197 (3d Cir. 1995)...........................................................................................22

*In re Leibowitz*,
 147 B.R. 341 (Bankr. S.D.N.Y. 1992) .........................................................................15

*In re May*,
 169 B.R. 462 (Bankr. S.D. Ga 1994) ...........................................................................19

*In re Nickels Midway Pier, LLC*,
 255 Fed. Appx. 633 (3d Cir. 2007) ..............................................................................11

*In re Sonnax Indus.*,
 907 F.2d 1280 (2d Cir. 1990)........................................................................................15

*In re Waverly Textile Processing*,
 214 B.R. 476 (Bankr. E.D. Va. 1997) ..........................................................................21

*In re Worldcom, Inc., et al.*,
 2003 WL 22025051 (Bankr. S.D.N.Y. Jan. 30, 2003)............................................19, 20

*Martin v. Henley*,
 452 F.2d 295 (9th Cir. 1971) ........................................................................................12

*Ohio v. Kovacs*,
 469 U.S. 274 (1985).........................................................................................................9

*Pa. Dep't of Pub. Welfare v. Davenport*,
 495 U.S. 552 (1990).........................................................................................................9

*Pointsett Lumber & Mfg. Co. v. Drainage Dist. No. 7*,
 119 F.2d 270 (8th Cir. 1941) ........................................................................................10

*Rederford v. US Airways, Inc.*,
　589 F.3d 30 (1st Cir. 2009)..................................................................................10

*Soares v. Brockton Credit Union (In re Soares)*,
　107 F. 3d 969 (1st Cir. 1997)...............................................................................15

*United States v. Sec. Indus. Bank*,
　459 U.S. 70 (1982).................................................................................................10

*Wright v. Union Central Life Ins. Co.*,
　304 U.S. 502 (1938).............................................................................................10

**STATUTES**

11 U.S.C. § 101(5)(B)................................................................................................11

11 U.S.C. § 361.........................................................................................................19

11 U.S.C. § 362.................................................................................................*passim*

11 U.S.C. § 365...........................................................................................................5

11 U.S.C. § 904...........................................................................................................8

11 U.S.C. § 922.....................................................................................................2, 3

11 U.S.C. § 928.....................................................................................................2, 3

11 U.S.C. § 1129..............................................................................................5, 8, 10

The Commonwealth[2] and HTA (together, the "Debtors"), by and through the FOMB, and

AAFAF, respectfully submit this consolidated reply (the "Reply") to Movants' supplemental brief

[ECF No. 13744; Case No. 17-03283-LTS] ("Supplemental Brief").[3]  The simplicity of the instant

dispute must not be lost amidst Movants' remarkable arguments.  Outside Title III and chapter 9,

courts can grant stay relief or order the debtor to provide adequate protection.  PROMESA § 305

prevents the Court from ordering adequate protection without FOMB consent, which is why the

First Circuit ruled the Court's alternative is to grant stay relief *if such relief is warranted*.  Now

that Movants' lack of property interests entitled to adequate protection except for monies sitting

safely in one account has been confirmed, stay relief is off the table absent satisfaction of the

*Sonnax* factors, which are impossible to satisfy in these circumstances, especially where all

Movants' claims are in their proofs of claim which are already being litigated.

## PRELIMINARY STATEMENT

1.      This Court dismissed with prejudice each of Ambac's "constitutional" claims either

on the merits, for failure to state a claim, or for lack of subject matter jurisdiction to overturn an

FOMB certification, or, in one instance involving money sitting in an account controlled by

Movants' agent, due to PROMESA § 305.[4]  The First Circuit affirmed, and the Supreme Court

---

[2]   Unless otherwise indicated, all ECF numbers referenced herein refer to docket in Case No. 17-3283-LTS.  Capitalized terms used but not otherwise defined shall have the meanings given to them in ECF Nos. 673, 10104, 10611, 12496, 13157, 13159, and 13160 (the "Lift Stay Replies").  All of the arguments advanced by Debtors in the Lift Stay Replies are reincorporated herein by reference and not waived.  The prefixes HTA, PRIFA, and CCDA are added to defined terms when necessary to distinguish between defined terms used in one of the respective Lift Stay Replies.  For purposes of this Reply, "Movants" shall refer to any party defined as a Movant in any of the Lift Stay Motions (as defined in the Supplemental Brief).

[3]   FOMB does not concede or waive any argument not discussed in this Reply as to the merits of the claims Movants seek to pursue if granted stay relief.

[4]   See *Ambac Assurance Corp. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 297 F. Supp. 3d 269, 286 (D.P.R. 2018) (Swain, J.) ("Ambac Dismissal").

denied *certiorari*.[5]  The other Movants' complaints under Bankruptcy Code section 922 and 928 were dismissed, and the dismissal was affirmed.[6]

2.      This Court has also determined Movants lack property interests in the revenues they claimed had been taken in violation of many constitutional provisions.[7]  But, Movants cling to their theory that executive orders, laws, and certified budgets caused the Commonwealth to default on its unsecured obligations to appropriate monies to HTA, PRIFA, and CCDA before and during the Commonwealth's Title III case, and are somehow more than defaults on unsecured claims. Movants say formal determinations to default are illegal moratorium agreements, which would mean territories are not allowed to default if they issue orders or enact statutes requiring defaults to save money for public purposes!  Movants claim such determinations of the Commonwealth to default do not simply impair contractual obligations and create or accelerate claims, but create nondischargeable violations of the Contracts Clause entitling them to "recognition of the invalidity of unconstitutional laws" (¶ 43) such as each underlying law, order, or budget providing no money for debt service.  Movants' ploy is thus to break their claims into little pieces and request abstract advisory rulings on each piece rather than establish the only relief that can help them – payment. Manifestly, Movants are not requesting an order determining a law is invalid so they can stare at it.  They want to be paid.  And even if every law were invalid (they are not) and nullified, nothing would change because Title III debtors do not need ancillary laws to breach payment obligations until a plan of adjustment ("Plan") is effective.

---

[5]   *Ambac Assurance Corp. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd.)*, 927 F.3d 597 (1stCir. 2019). ("Ambac"), *cert. denied*, 140 S. Ct. 856 (2020).

[6]   *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 300 F. Supp. 3d 328 (D.P.R. 2018), *aff'd,* 919 F.3d 638 (1st Cir. 2019).

[7]   *See* ECF No. 13541 ("HTA Lift Stay Decision") at 36; ECF No. 13542 ("PRIFA Lift Stay Decision") at 31; ECF No. 13540 ("CCDA Lift Stay Decision") at 41 (denying CCDA Lift Stay Motion "to the extent it seeks stay relief with respect to Hotel Taxes other than those that have been deposited in the Transfer Account.").

3.  Movants nevertheless mischaracterize the First Circuit's decision affirming the Court's dismissal with prejudice as reincarnating these claims.  They argue the First Circuit somehow recognized that "Movants are entitled to stay relief" because the relief sought in the Previous Complaints is precluded by PROMESA § 305.  Supp. Br. ¶ 6.  Remarkably, having filed thousands of pages of pleadings, Movants contend the First Circuit's decision rested on a finding that they have been deprived of their "due process rights."  *Id.*  Movants' requested relief is predicated on a fantastical retelling of events and misuse of Supreme Court decisions outside bankruptcy.  Their Lift Stay Motions should be denied in their entirety for the following reasons.

4.  *First,* the First Circuit's opinion in *Ambac* did not hold PROMESA § 305 (or its chapter 9 analogue) automatically triggers stay relief (¶ 6), especially where a movant seeks to bring claims that have already been dismissed on the merits.  Instead, the First Circuit simply dispensed with Ambac's argument that § 305 would run afoul of due process by referring back to its decision in *PREPA*.[8]  There, the First Circuit held that although PROMESA § 305 precluded the Court from appointing a receiver, § 305 does not bar the Court from granting stay relief to allow another court to order a receiver, if stay relief is warranted in the first place.  Movants totally ignore that *PREPA* (at 22-23) requires a thorough stay analysis involving collateral identification, valuation, risks and *Sonnax* factors.

5.  *Second*, due process concerns do not mandate stay termination here.  One would never know from Movants' Supplemental Brief that Movants already received due process – notice and hearing – on their Contract Clause, Takings Clause, Due Process, and Section 922 and 928 claims, among others.  They lost.  Movants have had their day(s) in court with respect to the Previous Complaints, which were dismissed.  Movants argument that the First Circuit granted

---

[8]  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 23 (1st Cir. 2018) ("PREPA").

them a do-over and overrode this Court's dismissal of the Previous Complaints, ignores that the

First Circuit affirmed.  That Movants lost some claims due to PROMESA § 106(e) cannot entitle

them to stay relief to sue somewhere else because there is nowhere else.[9]  When Movants lost a

claim, such as their Contracts Clause claim, because they failed to state a claim, stay relief is

neither warranted, nor would it relieve Movants of their claims' prior dismissal with prejudice.

When Movants lost because they were requesting an advisory ruling, their claim becomes no better

in another court.  This Court dismissed almost all the relevant claims on grounds other than § 305.

6.     *Third,* Movants cannot have another court decide their claims by repackaging them

as "constitutional" or "statutory."  As evidenced by Movants' proofs of claim, all these claims are

derivative of their bond claims and are simply separate legal theories in support of the same claim

for payment.  Every secured claimholder relies on the Fifth Amendment.  There is nothing novel

here other than Movants' attempts to make their claims appear unique.  The Court's determinations

that Movants have no property interests beyond a security interest in monies deposited in certain

specific accounts are similarly dispositive of these  claims.  Movants failed to convince this Court

that statutes providing for transfers from the Commonwealth to its instrumentalities granted

Movants property interests in Commonwealth assets.

7.     *Fourth,* Movants' hatch an argument (¶ 13) that when PROMESA § 305 applies,

the Court has no discretion but to rule for Debtors, including in the Adversary Proceedings,[10]

(where all of their claims are or will be litigated), and therefore Movants are deprived of due

process.  To state the argument is to refute it.  As shown above, *PREPA* demonstrates Movants are

all wrong.  The Adversary Proceedings seek disallowance of claims filed by Movants—a central

---

[9]   PROMESA § 106(a) requires that any action arising in whole or part out of PROMESA be brought in a U.S. district court.
Section 106(e) deprives that court of subject matter jurisdiction over fiscal plan and budget certifications.  Thus, there is no
court where Movants can bring such claims.

[10]   As defined in the Supplemental Brief.

component of this Court's powers—and do not implicate § 305.  Moreover, their "statutory' and
"constitutional" claims seek payment of  Movants' bond claims, which if allowed, will receive
treatment under a Plan, thus protecting any due process and property rights.[11]

8.      *Fifth*, all *Sonnax* factors militate in favor of retaining the stay—a fundamental
protection to enable debtors to adjust their debts in an orderly process.  Here Movants, as creditors
of Commonwealth instrumentalities, seek stay relief in the Commonwealth Title III case to compel
it to transfer funds to its instrumentalities and effectively "jump the line" to collect from the
instrumentalities before the Commonwealth's own creditors.  Such relief would subvert the
purpose of Title III as a comprehensive and orderly process to adjust debts, greatly interfere with
the Commonwealth's Title III case, and prejudice other creditors who may not be able to
participate fully in non-Title III proceedings.  Moreover, the Territorial Laws[12] that Movants define
to include certified fiscal plans (which are not laws), are nothing more than orders, laws, fiscal
plans, or budgets that do not provide for payment of debt service.  They do not discharge claims,
avoid liens, or prevent interest from accruing.  Rather, they manifest the Commonwealth's default.
Defaulting impairs contractual obligations.  That is what Title III is designed to allow.  Outside
Title III, the Supreme Court sometimes nullifies laws that impair contractual obligations.  Movants
cite that law to no avail.  Bankruptcy Code §§ 362, 365, and 1129 incorporated into Title III, invite
debtors to reject contracts, breach obligations to pay, and thereby impair contractual obligations.
Movants' citation of *Van Hoffman* (a Contracts Clause case outside bankruptcy) for use in Title
III is akin to entering a church and accusing the priest of practicing religion.

---

[11] Movants cannot change that reality by splitting their claims into little pieces and arguing the pieces involving constitutional
questions are separate claims entitled to be heard outside the Title III court.  Moreover, FOMB has the option of advising
the Court at the beginning of a stay relief hearing whether it will consent to orders otherwise barred by § 305.  But, here, it
is unlikely there is anything to try, given Movants' lack of property interests entitled to adequate protection.

[12] As defined in the Supplemental Brief.

9.     *Finally*, the CCDA Movants are not entitled to stay relief under §§ 362(d)(1) and

(d)(2).  To the extent Movants have the lien they claim , they are adequately protected because

there has been no diminution in the value of that collateral as a result of the automatic stay and

there will not be any going forward.  As to § 362(d)(2), the Commonwealth, has "equity" in the

disputed funds because any pledge to Movants was subject to the Commonwealth's rights to such

funds as its available resources.  The Retained Occupancy Taxes are also, therefore, necessary to

an effective reorganization and will be used for payment of GO bondholder claims under a plan.

10.     In any event, the CCDA Adversary Proceeding—where the parties' rights will be

determined—obviates the need for stay relief.  Movants should not be allowed to seize the funds

in the meantime.  At a minimum, there are "compelling circumstances" under § 362(e) to delay

the final hearing on the stay relief motion until the conclusion of the CCDA Adversary Proceeding.

## ARGUMENT

## I.     MOVANTS HAVE BEEN, AND WILL BE, AFFORDED DUE PROCESS IN THE TITLE III COURT

### A.  Movants' Assertion of a "Due Process" Exception to the Automatic Stay Grossly Misconstrues the First Circuit's Ambac Decision

11.     Movants' Supplemental Brief perpetuates their fiction that the First Circuit in

*Ambac* (i) "recognized Movants have a due process right to bring constitutional and statutory

causes of action" (¶ 2) and (ii) "concluded that, since PROMESA § 305 precludes this Court from

adjudicating these issues, to protect Movants' due process rights, this Court should lift the stay…"

(*id.*).  Movants even go so far as to boldly proclaim "the First Circuit has previously recognized

Movants are entitled to stay relief…." (¶ 6).  The First Circuit did no such thing.  Instead, in

affirming the *Ambac Dismissal* on the merits, the First Circuit noted, in *dicta*:

> At oral argument, counsel for Ambac also raised the possibility that our
> interpretation of section 305 would raise due process concerns because Ambac
> would be left without a venue in which to bring its constitutional claims.  But

> nothing in our holding today suggests that Ambac cannot seek traditional stay relief pursuant to 11 U.S.C. § 362 and raise its constitutional and statutory arguments in a separate action. As we explained in PREPA, section 305 "only bar[s] the Title III court itself from directly interfering with the debtor's powers or property." 899 F.3d at 21. It does not, however, impose any such restraint on another court.

*Ambac*, at 605 (citing *PREPA*, 899 F.3d at 23).  Put simply, the First Circuit merely opined that § 305 did not run afoul of due process because it did not *prevent* parties from seeking stay relief.  It did not recognize or so much as signal that the stay *must* or *should* be lifted in cases in which § 305 precludes the Court from granting the desired remedy.

12.    The First Circuit's observation in *Ambac* adds nothing new to the § 305 jurisprudence—instead it refers back to the First Circuit's reasoning in *PREPA*.  There, the First Circuit held, on appeal from a denial of a lift stay motion, that although the Title III Court was precluded from appointing a receiver by § 305, it could lift the stay to allow a non-Title III Court to consider such remedy.  Rather than *directing* the Court to lift the stay—the conclusion Movants urge here—it remanded the motion with explicit instructions described above.  Movants' argument that the First Circuit articulated a different standard in *Ambac* is unavailing.

**B.  The Title III Case Affords Movants Due Process**

13.    Movants argue the Title III case deprives them of due process because the Court is precluded from adjudicating Movants' constitutional and statutory arguments.  Supp. Br. ¶ 7.  Movants then accuse FOMB of turning the Adversary Proceedings into a one-sided affair by wielding § 305 to limit the Court to ruling in FOMB's favor.  *Id.* at 9.  The argument fails from its inception.  First, this Court's exclusive jurisdiction renders it the only court able to grant stay relief.  Second, if any of Movants' claims would require relief the Court cannot order due to § 305, the Court can tell FOMB it will grant stay relief unless FOMB grants consent at the outset.  Or, FOMB can volunteer consent.  Movants' analysis is highly unlikely to have any application, however, because the Court will not confirm a Plan unless it provides for Movants what Title III requires.

14.     The Title III case affords Movants due process in both the Plan process and the
Adversary Proceedings.  They are conducted in accordance with the Federal Rules of Bankruptcy
Procedure (*see* PROMESA § 310), and, to the extent the Court determines Movants have allowable
claims, they will be treated under a Plan, which protects creditors due process and substantive
property rights through 11 U.S.C. § 1129(b).  *In re City of Stockton*, 478 B.R. 8, 26 (Bankr. E.D.
Cal. 2012) is exactly on point.  There, the chapter 9 court held that while 11 U.S.C. § 904 precluded
it from granting movants' request to invalidate a city order, movants did not need stay relief to
pursue litigation in another forum to obtain due process because they had the right to pursue their
proofs of claim in the chapter 9 case.  *Id.* at 25-26.  Moreover, "[a]ny objection to a claim will be
litigated in this court under established procedures *that honor due process* without extensive and
expensive satellite litigation."  *Id.* (emphasis added).  Accordingly, here, as in *Stockton,* "the
bankruptcy policy of favoring a collective proceeding to work out a comprehensive solution to []
insolvency counsels against permitting nonbankruptcy litigation that would materially interfere
with the reorganization process." *Id.* at 26.

15.     To sidestep this outcome, Movants attempt to morph their bond claims against
Commonwealth instrumentalities into special "constitutional" claims warranting stay relief.  First,
Movants trace their supposed rights to statutes (¶ 33), which they concede are "contracts" between
them and the Commonwealth.  Supp. Br. ¶ 18.  Next, Movants claim that through such alleged
contract rights the Commonwealth created a "trust" and conveyed "property" to Movants (¶ 37)—
despite the Court having determined they do not even have a colorable claim to such property
interests.  Finally, Movants argue that any impairment of these "property rights" implicates the
Due Process Clause (¶ 37), Takings Clause (¶ 31), and Contract Clause (¶ 16).

16.     Movants' gambit to improve their nonrecourse bond claims fails.  *First,* the Court

has already determined Movants' rights are governed by, and limited to, those granted in the relevant bond resolutions and trust agreements, and they cannot manufacture property rights where none were expressly given.[13]  Moreover, while Movants assert they enjoy a covenant not to impair PRIFA's rights, the Court held that "that covenant is not itself a pledge of security."[14]

17.    *Second,* Movants' constitutional and statutory claims are all predicated on, derivative of, and traceable to their bond claims, and merely give rise to a right to payment.  If Movants' bond claims were paid in full, they would no longer have an injury under their "constitutional" and "statutory" theories.   In similar circumstances, this Court sustained an objection to a COFINA bondholder's "constitutional" claims, observing that while such claims were "not literally duplicative" of the master proof of claims, "both seek to realize rights to payment under the same instruments" and "are merely different legal arguments in support of the same claim for payment . . . ."  *See* Sept. 11, 2019 Hr'g Tr. at 47: 16-21, 49:10-11.  Here, all Movants' claims stem from the Commonwealth's failure to appropriate or transfer certain revenues to certain instrumentalities.  Whether that failure is commanded through a budget, Commonwealth statute, executive order, or determination to default in Title III, does not change the fact that it is at most a breach of a statutory obligation that gives rise to at most, an unsecured claim in favor of the instrumentalities and not Movants.[15]

---

[13] *See* HTA Lift Stay Decision at 26 (rejecting HTA Movants' "trust" theories because "specific resolutions govern the relationship between HTA and the Bondholders," and the "Excise Tax Statutes…do not [] purport to grant property rights in the Revenues before they are transferred."); PRIFA Lift Stay Decision at 21 ("The Court therefore concludes that there is no language in the PRIFA Enabling Act that itself creates a lien or a property interest in connection with the Commonwealth's statutory obligation to transfer the first $117 million in Rum Tax Remittances to the Infrastructure Fund each fiscal year.").  *See* CCDA Lift Stay Decision at 33 ("Movants' theory predicated on a more expansive security interest [than a security interest limited to Hotel Taxes deposited in Scotiabank -5142], however, finds no foundation in the record.").

[14] *In re Fin. Oversight & Mgmt. of P.R.*, 2020 WL 3791582 (D.P.R. July 2, 2020).

[15] Movants concede "a statute is itself treated as a contract."   ¶ 18.  But far from transforming their claim into a property interest, the Supreme Court has made clear a breach of a statutory obligation is no different for bankruptcy purposes than a breach of a similar promise in an ordinary contract, as both give rise to an unsecured claim.  *See, e.g., Ohio v. Kovacs*, 469 U.S. 274, 279 (1985) (holding breach of statute and court order gave rise to dischargeable unsecured claim); *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552 (1990) (statutory criminal restitution obligation dischargeable as unsecured claim).

18.     *Third,* however labeled, Movants' "constitutional" and "statutory" claims are dischargeable under a Plan and should be resolved where virtually every other claim will be resolved: in this Court.  The definition of a "claim" in bankruptcy is broad.[16] For this reason, no doubt, Movants included their "statutory' and "constitutional" theories in their proofs of claim.[17] Moreover, Movants' assertion that their Takings Clause claims are not dischargeable is contrary to the statute and law.  Bankruptcy Code § 1129(b)(2)(A) could not be clearer as to what can be paid to satisfy a secured claim, namely the value of the collateral.  Section 1129(b)(2)(B) shows what needs to be paid to unsecured claims.  Section 944 discharges all the claims.  The Supreme Court's jurisprudence[18] governing secured claims in bankruptcy would be meaningless if the secured claims were not dischargeable.  The only two Circuit Courts to have discussed the issue agree and the issue is not ripe in any event.[19]

19.     Movants attempt to obtain a different ruling outside the Title III process by arguing "[t]hese causes of actions are not 'claims' because the only remedy Movants seek is recognition of the invalidity of unconstitutional laws—not damages or another right to payment."  Supp. Br. ¶ 43.  This is not true:[20] the relief Movants seek is identical to the relief they in seek in their proofs of claim.  And aside from Movants not being selfless vindicators of the Constitution, their

---

[16] *See Rederford v. US Airways, Inc.*, 589 F.3d 30, 35-36 (1st Cir. 2009) (citation omitted) ("Congress gave the term 'claim' the 'broadest available definition' … to avoid distinctions among creditors depending on whether the right to payment stems from an equitable source, a legal source, or an equitable remedy that can be reduced to payment.")

[17] *See, e.g.,* Claim Nos. 33081, 37319, 50420, 57622, 83010, 101243, 122277.

[18] *See, e.g., Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 513-514 (1938).

[19] *See Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256 (9th Cir. 2018) (Takings Clause claims are dischargeable); *Pointsett Lumber & Mfg. Co. v. Drainage Dist. No. 7*, 119 F.2d 270 (8th Cir. 1941) (same). Movants' cite to *United States. v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982), but this case involved the retroactive elimination of secured property rights, not the issue of whether takings clause claims can be discharged, which the Supreme Court did not even discuss. Movants rely heavily on *Edward J. Berwind, Inc. v. Chicago Park Dist.*, 393 Ill. 317, 323 (1946), for the proposition that the diversion of pledged special funds is a taking. Supp. Br. ¶ 32. Indeed, *Berwind* emphasizes the tax collections taken had been assigned to the warrant holders. *Id.* at 338, 340. Here, all the pledges to secure the bonds were made by the instrumentalities, not by the Commonwealth.

[20] The First Circuit exposed the fallacy of this argument in *Ambac*, explaining that declaratory relief is simply another method of preventing the Commonwealth from complying with the territorial law. *Ambac*, at 605.

argument exemplifies their effort to confuse and to avoid the facts. The facts are telling. Commonwealth laws or a certified budget barring or not providing for debt service payments and appropriations from the Commonwealth to its instrumentalities, are wholly immaterial here because none of them are needed for the Commonwealth, as a Title III debtor, to refrain from transferring property before a Plan is effective. That leaves the certified fiscal plan, which is neither a law nor an executive order. But, even if it were a law, PROMESA § 106(a) requires that any action in whole or in part arising out of PROMESA, be brought in the U.S. District Court. And, § 106(e) deprives the District Courts of subject matter jurisdiction over challenges to whether fiscal plans or budgets should have been certified. There is absolutely no basis to send litigation to another court because no court has jurisdiction to entertain such challenge.[21] Given these clear legal parameters, it is not surprising Movants fail to spell out exactly what relief they want from which court on each of their claims. Moreover, most of their claims were dismissed with prejudice. Finally, Movants' desired declaratory judgments are effectively a request for equitable relief, which "may be treated as a claim for purposes of the Bankruptcy Code when granting monetary damages is a viable alternative."[22] Here, the whole drill is about Movants wanting money.

### C. Movants Claims are Not Colorable

20.     Movants' cries of lack of due process also fail because Movants' "constitutional" and "statutory" claims from their "Previous Complaints" were dismissed with prejudice, on non-305 grounds, and the dismissal was affirmed on appeal.

21.     Movants' minimize this Court's ruling by claiming the First Circuit overrode the

---

[21] And, if Movants contend § 106(e) does not bar constitutional challenges to fiscal plans and budgets, they will have overlooked that (a) they have already been determined not to have security interests or property interests in Commonwealth revenues, and (b) challenges on Contract Clause grounds are futile given that Title III is all the Commonwealth needs to impair contractual obligations.

[22] *In re Nickels Midway Pier, LLC*, 255 F. App'x 633, 638 (3d Cir. 2007) (citation omitted); 11 U.S.C. § 101(5)(B) (defining a claim as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . .").

*Ambac Dismissal* by ruling "solely on § 305 grounds."  Supp. Br.  ¶ 15.  Not so and would not matter.  The First Circuit affirmed.  The reasoning it shared does not retract its affirmance.  The First Circuit expressly recognized "[t]he Title III court carefully reviewed and rejected all of Ambac's requested relief, dismissing the complaint with prejudice."  *Ambac*, at 601.  Rather than delve into the merits of each claim, it confined its discussion to analyzing the two sections of PROMESA that prevent the Title III Court from granting Ambac's requested *relief*—§ 106(e) and § 305—affirming the Court's analysis of both.  *Id.*  Movants acknowledge the First Circuit did not address numerous counts in their "Previous Complaints" on appeal.[23]  But just because the First Circuit did not opine on an issue did not vacate this Court's dismissal with prejudice.[24]  Movants concede the ongoing vitality of the *Ambac Dismissal* by affirmatively relying on a finding that was favorable to them even though the First Circuit did not discuss it.[25]

22.     Accordingly, the dismissal of Movants' claims in their "Previous Complaints," with prejudice is binding.  Nevertheless, FOMB addresses them in turn below, while reincorporating all arguments made in support of its motion to dismiss the "Previous Complaints."[26]

23.     **Contract Clause Claims.**  In the *Ambac Dismissal*, the Court dismissed Movants' claims based on the Contract Clause because Ambac failed to show the Territorial Laws were "unreasonable or unnecessary to effectuate an important government purpose" (*id.* at 289), and not

---

[23] *See* Supp. Br. ¶ 29 ("Movants respectfully disagree with the Court's prior holding [relating to the Moratorium Laws and Moratorium Orders], which the First Circuit did not address on appeal.").

[24] At a minimum, the *Ambac Dismissal* is the "law of the case." A district court is entitled to treat its prior decisions as law of the case, absent compelling reasons not to (such as substantial injustice).  One such instance is where its decision was affirmed by the appellate court did not opine on a specific issue.  For example, in *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir. 1971), the Ninth Circuit held that a referee was "still entitled to rely on that earlier determination under the 'law of the case' doctrine" where "[t]he district court in its 1965 affirmance had refused to rule on the determination, and the referee could therefore continue to rely on its validity unless and until it was disapproved on review."

[25] *See* Supp. Br. ¶ 19 Movants also rely on the *Ambac Dismissal* in the Adversary Proceedings.  *See* Case No. 20-AP-05, ECF No. 94, at 6.

[26] *See* Case No. 17-AP-159, ECF No. 48, 100; Case No. 17-AP-155, ECF No. 46, 84; Case No. 17-AP-156, ECF No. 48, 86.

on PROMESA § 305 grounds.  The Court further held that Ambac "failed to allege plausibly that the Fiscal Plan is an exercise of Commonwealth legislative power." *Id.*  While Movants now argue that the budget developed pursuant to the fiscal plan is territorial legislation (¶ 19),[27] the Court need not entertain Movants' argument because, as the First Circuit held, all requests for injunctive relief that would have the effect of decertifying a fiscal plan (or budget), in *any* court, are precluded by PROMESA § 106(e).  *Ambac,* at 602.

24.     Movants' Contract Clause claims further fail because, as discussed above, they are "not a party" to the statutory covenants they say create "contracts."  The Territorial Laws halt appropriations to Commonwealth instrumentalities of certain revenues in which Movants have no property interest.  At most, breach of the statutes providing the Commonwealth would continue appropriating revenues while the bonds were outstanding give rise to unsecured claims, but even those claims may be disallowed because one legislature cannot bind future legislatures.

25.     **Preemption Claims.**  Movants seek to relitigate their claims that territorial legislation is preempted under PROMESA §§ 303(1) and 303(3) by introducing new allegations they believe bolster their arguments.  Supp. Br. at 10-11.  As explained above, however, these statutes simply required defaults, and did not purport to stop interest from accruing or to discharge or reschedule any debt.  § 303 cannot be sensibly interpreted to bar defaults.  The Court dismissed these claims on grounds other than § 305, finding (1) it lacked subject matter jurisdiction under § 106(e) to the extent the claims "seek[] to invalidate certification of the Fiscal Plan or prohibit actions predicated on such certification;" (2) failure to state a claim under § 303(1) because the Moratorium Orders and Laws were temporary and do not discharge or cancel the bonds; and (3) failure to state a claim under § 303(3) because the executive orders were not "unlawful." *Ambac*

---

[27] In any event, Movants now appear to concede that FOMB's budget constitutes a law that supersedes standing statutory appropriations, after vigorously opposing those arguments in the preliminary lift stay briefing.

*Dismissal* at 289. These judgments are binding, affirmed, and fully determinative on the merits.

26. **Takings Claims**.   Because Movants lack property or security interests beyond certain accounts, Movants argue that "statutory covenants between the Commonwealth and bondholders granted bondholders a property right in specific revenues that cannot be impaired." Supp. Br. ¶ 33.   This Court already determined Movants have no such property rights, and it is clear that contractual covenants do constitute property interests. Otherwise every unsecured promise to pay would be a secured claim.[28]   Moreover, this Court dismissed this claim on non-305 grounds, holding that "Plaintiff has failed to demonstrate that it has 'received a final decision from the state' regarding any alleged 'taking' of its property." *Ambac Dismissal* at 281.   Movants do not make any contrary argument.    And, of course, Movants Takings Claims ignore that Title III incorporates Fifth Amendment protections such as "adequate protection" and the Bankruptcy Code provisions regarding the treatment of secured claims; here, the Court found PRIFA and HTA Movants have no property interest at the Commonwealth to adequately protect.

27. **Due Process Claims**.   Movants' Due Process claims fail because they have not been deprived of notice and hearing for any reason including § 305.   Indeed, the Court observed: "It appears that Plaintiff's procedural due process claim is an attempt to evade the predicates for a *Takings Clause* claim, which, as discussed above, require a 'final decision' and the denial of 'just compensation.' The Court declines to address this claim separately.   For substantially the reasons discussed above, the Due Process claim is not ripe." *Ambac Dismissal* at 282 (citation omitted).[29]

## II.   MOVANTS FAIL TO SHOW "CAUSE" UNDER THE *SONNAX* FACTORS

28. "The   automatic   stay   is   among   the   most   basic   of   debtor   protections   under

---

[28] *See, e.g.,* ECF No. 10613 ¶ 7.

[29] In any event, Movants will have their day in Court with respect to the pending Adversary Proceedings and at confirmation.

bankruptcy law." *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 975 (1st Cir. 1997). As a result, "the general rule is that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted relief from the stay unless extraordinary circumstances are established to justify such relief."[30] Nonetheless, Movants seek stay relief as unsecured claimholders, asserting that, contrary to the First Circuit's clear instruction in *Ambac*, the Court need not balance the equities at all,[31] in an attempt to avoid the undeniable reality that all *Sonnax*[32] factors militate against granting the extraordinary relief of allowing Movants to act against Commonwealth revenues this Court determined they have no property interest in.

29. All relevant factors militate against stay relief because objections to Movants' proofs of claim are already teed up in the Title III case. Lifting the stay would *not* result in a complete resolution of any important issues in these Title III cases. Issues relating to the treatment of Movants' claims, the relative priority of the Commonwealth, GO bondholders, and Bondholders' claim to the retained revenues, among many other issues, would not be resolved, and would continue to be litigated in the Title III court. Moreover, Movants already litigated these issues in the Title III court—and lost. The treatment of retained revenues is a critical component of any Commonwealth Plan. Movants' claims are just some of the many competing claims against the same pool of funds, which only the Title III Court can fairly adjudicate.

30. As the Court already determined, Movants have no trust relationship with the

---

[30] *In re Breitburn Energy LP*, 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017) (quoting *In re Leibowitz*, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992))

[31] Movants argue there is "no need to balance the equities" if the court "lacks jurisdiction" due to PROMESA § 305. Supp. Br. ¶ 12. Movants' argument is a red herring because § 305 is not jurisdictional. *See Ambac Dismissal* at 284 ("Section 305 is not a jurisdictional provision but, rather, circumscribes a PROMESA Title III court's power to grant certain types of relief and so can preclude a litigant's ability to state a claim for the proscribed relief"). Further, if Movants' argument were credited, every holder of an unsecured promise by the Commonwealth to pay a claim in full need only request the Title III Court specifically enforce that promise—a remedy barred by § 305—to be afforded stay relief, subverting the purpose of Title III.

[32] *In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990).

Commonwealth, and therefore it is not acting in a fiduciary capacity for *Sonnax* purposes (factor 3), nor is there a specialized tribunal required to consider the relief (factor 4). Indeed, if any court is a specialized tribunal it is the Title III court, which has been addressing PROMESA, constitutional claims, and the relevant bond documents for years. The Court itself recognized as much, noting that Movants' claims could be litigated in the posture of a claim objection or plan confirmation. *Ambac Dismissal* at 280. There are no insurers (factor 5) or third parties (factor 6) involved, but rather the use of more than a $1 billion of Commonwealth revenues.

31.     Movants seek to obtain declarations that the retained revenues the Commonwealth proposes to use to pay GO bondholders under a Plan should be used to pay their claims, ahead of all other claimholders and in violation of the equality principle. This plainly prejudices the rights of other creditors (factor 7) and the Commonwealth's reorganization efforts. Moving litigation of these issues to a non-Title III court harms creditors where parties may not be able to intervene.

32.     Judicial economy (factor 10) also weighs heavily in Debtors' favor. Movants argue (¶ 47) that adjudicating their claims "in advance of plan confirmation and achieving finality will facilitate an orderly resolution to the Title III cases." Movants provide no explanation why their litigation (which, Movants argue, does not involve claims relevant to the Title III cases, ¶ 48) would do so. It would not. Instead, it would create litigation in another forum duplicative of the pending Adversary Proceedings, risking conflicting judicial decisions, and harming FOMB's ability to effectively negotiate with creditors. Movants propose to start new litigation in another forum, which has not been filed. Thus, the parties are not ready for trial (factor 11).

33.     The balance of harms (factor 12) also weighs heavily against stay relief. Movants argue the balance of harms favors stay relief as a failure to lift the stay will result in Movants being denied due process. Supp. Br. ¶ 49. Nowhere do Movants show how. Movants ignore that their

prior requests for declaratory relief were dismissed largely due to being requests for advisory rulings, and not due to § 305. Now that Movants are adjudged not to have property interests in Commonwealth assets, they cannot even argue the Court cannot order adequate protection because they are not entitled to it. Movants argue the only "harm" the Debtors will suffer from stay relief is "that they might have to defend the legality of their actions in court." Supp. Br. ¶¶ 50-51. But the merits of Movants' constitutional secured claims have already been determined against them, and whether they have an allowable claim is being actively litigated in the Adversary Proceedings. There is simply no due process concern.

34.     On the other hand, lifting the stay will cause the Debtors harm as Movants seek to invalidate laws put in place to address Puerto Rico's fiscal emergency, and fiscal plans and budgets enacted for the purpose of achieving fiscal responsibility and access to capital markets. It would also subvert the purpose of Title III as a fair and orderly process for the restructuring of debts as it would create satellite litigation whereby unsecured claimholders of Commonwealth instrumentalities would seek to attach their liens to Commonwealth revenues ahead of the Commonwealth's own creditors—an outcome fundamentally at odds with the equality principle.

## III.     THE CCDA STAY SHOULD REMAIN IN PLACE

35.     Movants seek to lift the CCDA stay because they colorably claimed a security interest in Scotiabank 5142.[33] But a colorable claim does not compel stay relief. Aside from the fact that "[c]laims may be colorable but not strong,"[34] Movants' § 362(d)(1) claim fails because their alleged collateral is "adequately protected." The cash is sitting there. Their § 362(d)(2) claim

---

[33] As Movants correctly point out, Oriental Bank became the successor to Scotiabank 5142. Movants were informed of this well before the prior briefing, however, the Debtors referred to Scotiabank 5142 because of the focus on the *historical* flow of funds, prior to the petition. For consistency, this response refers to the account as Scotiabank 5142.

[34] *Andalusian Global Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 10 (1st Cir. 2020)

also fails because the Commonwealth has "equity" in the alleged collateral, and the funds are "necessary to an effective reorganization," precisely because the Constitutional clawback provision permits—if not, compels—the Commonwealth to use those funds to pay down its GO debt, even after those funds have been deposited in the Transfer Account.  The Court, however, need not reach these questions now because, under § 362(e), "compelling circumstances" allow the Court to maintain the stay until ultimate ownership is determined as part of the CCDA Adversary Proceeding.  Put simply, this Court should not allow the Movants to take control over the *disputed* funds outside the supervision of this Court and these Title III proceedings.

### A.  CCDA Stay Relief Under § 362(d)(1) is Not Warranted Because Movants' Alleged Collateral Is "Adequately Protected"

36.     Movants fail to establish entitlement to stay relief because their purported collateral is adequately protected.  Movants do not deny that the Retained Occupancy Taxes are being segregated in FirstBank Puerto Rico ("FirstBank") accounts, separate from the Commonwealth's other funds.  This account has over $97 million, as of February 29, 2020.  The Tourism Company has maintained these segregated funds in the FirstBank accounts at least since Movants filed their Lift-Stay Motion, and the Commonwealth will ***affirmatively commit*** in any form acceptable to the Court to maintaining these existing funds in the FirstBank accounts until all ownership issues are resolved in the Adversary Proceeding.[35]   This commitment adequately protects Movants' alleged collateral,[36] as it fully addresses Movants' claim that "[t]here is no legal protection whatsoever ensuring that any funds will be available to Movants" if they prevail in the Adversary Proceeding.

---

[35] To be clear, the Commonwealth commits to maintaining the funds being held in FirstBank accounts -3961 and -2984.  The Commonwealth does not commit to continue depositing Hotel Occupancy Taxes in Scotiabank 5142, or its successor account at Oriental Bank.  As the Court correctly found, Movants have no property interest in Hotel Occupancy Taxes *prior* to deposit in the Transfer Account.  CCDA Lift Stay Decision at 35.

[36] *In re Bennett Funding Grp., Inc.*, 255 B.R. 616, 643–44 (N.D.N.Y. 2000) (debtor's holding of all lease proceeds in segregated accounts constitutes adequate protection."); *In re May*, 169 B.R. 462, 472 (Bankr. S.D. Ga 1994) (same).

*See* Supp. Br. ¶ 64.[37]

37.     Movants' "inadequate protection" argument is also based on a distortion.  In their view, their purported collateral is not adequately protected unless they receive immediate cash disbursements, unfettered control, or its "indubitable equivalent."  Supp. Br. ¶ 62 (citing 11 U.S.C. § 361).  But § 361 does ***not*** require giving Movants control over *any* property.  Adequate protection under § 361 is simply to protect against diminution of value.  Their contrary argument rests on a ***misquote*** of § 361.  They intentionally omit the provision that requires such conveyance only "to the extent that the stay . . . results in a decrease in the value" of the Movants' security interests.  11 U.S.C. § 361(1), (2).[38]  Put simply, an alternative to lifting the stay is to keep the collateral beyond anyone's reach and to "top it off" with additional capital *if needed* to prevent a decline in its value.[39]

38.     The stay is not causing a decline in Movants' collateral.  Unlike other assets, the Retained Occupancy Taxes consist of *cash* deposits, and thus, they are not subject to market vagaries and do not depreciate from use.  Thus, there is no need for top-off cash payments or replacement liens.  While Movants speculate that the banks holding these funds in segregated accounts will themselves collapse, they introduce *no facts* to show these banks are in imminent danger of failure.  Absent such a showing, there is no material risk to Movants' alleged collateral.

39.     Movants next argue the segregated funds do not fully cover the past due amounts

---

[37] Movants' reliance on *In re Chatham Parkway Self Storage, LLC*, 2013 WL 1898058, at *6 (Bankr. S.D. Ga. Apr. 25, 2013), is misplaced because there was no commitment to segregate the collateralized funds.  *Peaje* is similarly inapposite because the funds there were not segregated but were being diverted to "other uses."  *Peaje Invs. LLC v. Garcia-Padilla*, 845 F.3d 505, 510 (1st Cir. 2017).

[38] Movants also rely on § 361(3) for the proposition the court can order "other relief" instead of cash payments or supplemental liens so as to provide the movant with the "indubitable equivalent" of its interest in property.  But § 361(3) does not apply where Movants will *continue* to have exactly the same interest in their property going forward as they do today.  If they have a security interest in the Retained Occupancy Taxes today, they will have that same interest until disbursements are made after the Adversary Proceeding concludes.  Section 361(3) was designed to address situations, unlike here, where the Trustee sells or disposes of collateral, in which case adequate protection requires that they receive the "indubitable" equivalent.  There is not disposition contemplated here.

[39] *In re Worldcom, Inc.*, 2003 WL 22025051, at *6 (Bankr. S.D.N.Y. Jan. 30, 2003) ("secured creditors must prove a decline in value—or the threat of a decline—during the term of the automatic stay.")

on the CCDA Bonds.  But that is irrelevant.  The question is not whether the segregated accounts

fully cover the past-due amounts, but whether the value of the funds in those accounts are

diminishing as a result of the stay.  For example: Suppose a debtor owes $1 million on an

underwater house, with a market value of $500,000.  If the real-estate market is on the upswing,

the value of the collateral would be increasing, not diminishing, so there would be no need for

further adequate protection.  The same is true here.  Though Movants claim a default of $110

million and collateral of just $100 million, *see* Supp. Br. ¶¶ 55-56, they do not claim that the $100

million of segregated cash is diminishing in value.  Absence of an "equity cushion" is irrelevant.[40]

40.     Movants' argument that they lack adequate protection because, in the past, $15

million was "transferred out" of FirstBank account -3961 —a discrete one time transfer—lacks

merit for the same reason.[41]  Supp. Br. ¶ 65.  The adequate protection inquiry is forward-looking,

evaluated at the time the lift stay motion, thus rendering historical dissipation irrelevant.  *See In re

300 Wash. St. LLC*, 528 B.R. 534, 552 n.10 (Bankr. E.D.N.Y. 2015) ("If the value of the collateral

has declined, adequate protection is owed as of the time the creditor made its motion, rather than

from the filing of the petition.").[42]

41.     Finally, Movants cannot claim lack of adequate protection as to *future* Hotel

Occupancy Taxes not yet deposited in Scotiabank 5142.  Movants acknowledge their "lien is

---

[40] Movants' misplace reliance on *In re Worldcom, Inc.,* 2003 WL 22025051, at *7 (Bankr. S.D.N.Y. Jan. 30, 2003).  *Worldcom* did *not* hold adequate protection requires an equity cushion.  It simply noted that an equity cushion can prevent a finding of lack of adequate protection *if* the collateral value is otherwise declining.  *Id.*

[41] There were also four pre-petition transfers totaling $12,133,622.76.  Because were pre-petition transfers, they are irrelevant to Movant's stay relief motion.

[42] *In re Waverly Textile Processing*, 214 B.R. 476, 479 (Bankr. E.D. Va. 1997); *In re Brian Wise Trucking, Inc.*, 386 B.R. 215, 218 (Bankr. N.D. Ind. 2008) ("adequate protection under 362[d](1), is to cover depreciation of collateral from the date the motion seeking adequate protection is filed"); *In re Alliance Well Serv., LLC*, 551 B.R. 903, 907 (Bankr. D.N.M. 2016) (same; noting that it is the "majority view"); *In re Continental Airlines, Inc.*, 146 B.R. 536 (Bankr. D. Del. 1992) (adequate protection awarded only from date lift stay motion is filed); *In re Cason*, 190 B.R. 917 (Bankr. N.D. Ala. 1995) (same); *In re Best Prods. Co.*, 138 B.R. 155 (Bankr. S.D.N.Y. 1992) (same).

limited to revenues deposited into a specific account (the Transfer Account), meaning the lien will
***not necessarily attach to future revenues*.***"  Supp. Br. at 24 n.9. (emphasis added).  By definition,
if their lien does not attach to (future) revenues, their collateral cannot include those revenues, and
so there is nothing to protect.

### B.  CCDA Stay Relief Is Not Warranted Under § 362(d)(2).

42.      Movants are not entitled to stay relief under § 362(d)(2) because the Puerto Rico
Constitution provides that the Retained Occupancy Taxes are available resources of the
Commonwealth which it intends to use to partially satisfy GO debt, regardless of whether the funds
were deposited in the Transfer Account.  This renders them necessary for effective reorganization.

1.  <u>The Commonwealth Has Retained Equity In the Retained Occupancy Taxes
Under the Constitutional Clawback Provision.</u>

43.      Movants bear the burden to prove that the Commonwealth does ***not*** retain equity in
the Retained Occupancy Taxes.  11 U.S.C. § 362(g).  Movants cannot satisfy this burden because
the Commonwealth has retained a superior right to use the Retained Occupancy Taxes, even after
they have been deposited in the Transfer Account, to pay down the GO debt.  The
Commonwealth's ability to use these funds under a proposed plan through its Constitutional
clawback right gives the Commonwealth equity in the property.[43]

44.      Movants acknowledge that the Court ruled "the Hotel Taxes (meaning the revenue
stream, both past and future collections) are owned by the Commonwealth."  Supp. Br. ¶ 57.  As
original owner of these funds, the Commonwealth can only lose its ownership interest if it
expressly transfers them.  But the *only* document that could convey such a property interest is the
Assignment Agreement because it is the only agreement under which the Tourism Company

---

[43] *See In re Indian Palms Assocs., Ltd*., 61 F.3d 197, 207–08 (3d Cir. 1995)(equity analysis should focus on whether the debtor
could realize value from the property for the benefit of other creditors under a proposed plan).

transferred any property interest. The Assignment Agreement, however, makes clear that "the assignment, transfer, and pledge of the Hotel Occupancy Tax Funds is made subject to the rights of the Commonwealth of Puerto Rico under Section 8 Article VI of the Constitution of the Commonwealth of Puerto Rico." Assignment Agreement, § 11. As such, not only is the Commonwealth the original—and ongoing—owner of funds *before* they are deposited in the Transfer Account, it also retains a superior right to them *after* deposit in the Transfer Account.

45.     In response, Movants first argue that the Commonwealth does not hold "legal or equitable title" in the disputed funds because the "bondholders' lien attached." Supp. Br. ¶ 57. The Assignment Agreement negates that argument. "Hotel Occupancy Tax Funds" are defined as funds that have been "deposited in the Transfer Account." Assignment Agreement at 1 (incorporating Trust Agreement definitions); Trust Agreement, § 1.01. If Section 11 of the Assignment Agreement's incorporation of Section 8, Article VI did not apply to funds deposited in the Transfer Account—as Movants contend—then Section 11 would make no sense.

46.     Movant's argument—that, once a lien attaches, the debtor automatically loses all equity in the collateral—also lacks merit. Whether a debtor has "equity" in collateral is different from the question of who holds "legal or equitable" title. A bank (in so-called "title theory" states), for example, may hold legal title to a house until the mortgage is paid, but the homeowner may still have equity if the value of the house exceeds the amount due. Thus, the mere fact that property is subject to a lien is irrelevant to whether the debtor has equity in it.

47.     Movants next argue that the Commonwealth lacks equity because the CCDA debt exceeds the amount in the segregated accounts. But that is not relevant here because clawback gives the Commonwealth priority over secured creditors. None of Movants' cases involve situations where the debtor has *superior* rights to the creditor; rather, they involve cases where the

debtor's interest is relegated to collateral that might remain *after* satisfaction of the secured debt. In that circumstance, courts generally look to whether there is an equity cushion, the mirror of § 362(d)(1). That inquiry has no place where, as here, the secured creditor stands *behind* the debtor.

48.     Movants do not deny this. But they argue that the clawback does not give the Commonwealth equity in the Retained Occupancy Taxes because the condition precedent to exercising the clawback right has not been and cannot be triggered. Supp. Br. ¶ 59. The Constitution, however, allows the Commonwealth to use the Retained Occupancy Taxes so long as the Commonwealth's "appropriations" exceed its "available resources." Movants do not deny that this is the ***sole*** condition precedent under the Constitution. For each year at issue—and currently—appropriations, if made and not preempted, would have exceeded resources, a fact that is obvious since GO bondholders are not getting paid in full.[44] Movants say the Tax Act creates a "last dollars" defense, in which the Constitutional clawback is not triggered unless no other funds—secured or unsecured—can be first used to pay down the GO debt. That is not what the Constitution says—it does not give CCDA Bondholders, and them alone, priority over every other source of potential GO debt funding.[45] And it is the Constitution—not the Tax Act (or Movant's interpretation of it)—that governs the limited ownership transfer of Commonwealth property under § 11 of the Assignment Agreement.

---

[44] Movants present an attorney declaration by Ms. Miller that makes arguments, including about calculations purporting to show that (at least currently) available revenues have exceeded appropriations. The declaration should be disregarded because it violates the Court's page limit ruling and it is not based on personal knowledge. Ms. Miller's cherry-picked calculations are also misleading, because they do not include all appropriations, including—for example—debt service other than GO debt. The calculations neither cover the entire relevant period (including the pre-petition period), nor do they account for debt acceleration due to bankruptcy. Even ignoring these omissions, if all post-petition appropriations (including debt service) and all available resources were included, the former would exceed the latter by about $850 million per year on average. Put simply, Ms. Miller's calculations are insufficient to sustain *Movant's* burden that the clawback conditions were unsatisfied, and thus, that the Commonwealth lacks equity. In any event, these complex issues will be more fully explored and resolved during the Adversary Proceeding.

[45] The parties previously briefed the scope of the clawback right. Given space limitations, FOMB respectfully refers the Court to its Sur-Reply brief [ECF 13160, at ¶ 18] for a fuller explanation of the Movants' "last dollars" defense, and why it does not limit the Commonwealth's interest in these funds.

49.     As such, Movants cannot show that the Commonwealth lacks equity in funds that have been deposited in the segregated accounts, precluding relief under § 362(d)(2).

2.   The Retained Occupancy Taxes Are Necessary for Effective Re-Organization

50.     Stay relief under § 362(d)(2) is also not warranted because the funds in the segregated accounts are necessary for effective reorganization.  Again, unlike in the usual case, where a secured creditor stands *ahead* of the debtor, here, it stands behind the Commonwealth under the clawback provision.  But that is not the only reason.  The clawback provision is designed precisely to provide a source of funding for payment of the Commonwealth's GO debt.  Because satisfaction of this debt *must* take place in connection with these Title III cases, these funds are necessary for effective reorganization.  Movants' only response is to rehash their argument that the Commonwealth lacks any equity in these funds.  As discussed above, that argument fails.

**C.  The Court Should Maintain the CCDA Stay Pending Resolution of the CCDA Adversary Proceeding.**

51.     This Court held that Movants presented *only* a colorable claim that they possess a security interest in Scotiabank 5142.  Whether they *actually* have a security interest in money deposited in that account (or funds that passed through that account) should be decided as part of the CCDA Adversary Proceeding.  Movants do not deny they have filed proofs of claims respecting such funds, that the parties are currently litigating the issue in the Adversary Proceeding, or that the Adversary Proceeding is the most efficient forum for deciding these issues.  Thus, it is not a question of *whether* the issues will be decided in the Adversary Proceeding (they will be), but whether the Court should maintain the stay until that proceeding is concluded.  The answer is yes.

52.     Movants say otherwise, arguing the Court lacks discretion to leave the stay in place because they satisfied the requirements of §§ 362(d)(1) and (d)(2).  For reasons discussed above, that is wrong, and thus, the Court certainly has the power to keep the stay in place.

53.     But the Court need not definitively resolve these issues under §§ 362(d)(1) or (d)(2) because the Court has the authority under § 362(e) to maintain the stay until conclusion of the CCDA Adversary Proceeding.[46]  Section 362(e) allows the Court to delay the "final hearing" on a lift stay motion if there are "compelling circumstances" to do so.  While Movants argue that invoking § 362(e) here would "compromise the neutrality of the federal judiciary," they do not address the compelling circumstances standard or deny that it has been met.  Compelling circumstances exist here because lifting the stay now would cause irreparable injury to the Commonwealth and its other creditors by removing core disputes central to the Title III process from this Court's purview, including disputes directly relevant to the nature and extent of Movants' proofs of claim against the Commonwealth.  Once the money is gone, it cannot be retrieved.  That is why this Court already found "compelling circumstances" to continue the stay until now.  Those same circumstances remain in place, and so should the stay.

[*Remainder of page intentionally left blank*]

---

[46] *See In re City of San Bernardino, California*, 545 B.R. 14, 15 (C.D. Cal. 2016) (need to resolve pending motion in bankruptcy court relating to the parties' rights under a labor agreement provided compelling circumstance to extend the stay concerning that agreement for over a year and a half).

Dated: July 30, 2020
    San Juan, Puerto Rico

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative of the Debtors*

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Jeffrey W. Levitan
Ehud Barak
Daniel S. Desatnik
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email: mbienenstock@proskauer.com
    jlevitan@proskauer.com
    ebarak@proskauer.com
    ddesatnik@proskauer.com

Michael A. Firestein
Lary Alan Rappaport
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
    lrappaport@proskauer.com

*Attorneys for the Financial Oversight and Management Board as representative of the Debtors*

26

/s/ Peter Friedman

John J. Rapisardi
Nancy Mitchell
(Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, New York 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

-and-

Peter Friedman
(Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, D.C. 20006
Tel:  (202) 383-5300
Fax: (202) 383-5414

-and-

Elizabeth L. McKeen
Ashley M. Pavel
(Admitted *Pro Hac Vice*)
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: (949) 823-6900
Fax: (949) 823-6994

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

/s/ Luis C. Marini-Biaggi

Luis C. Marini-Biaggi
USDC No. 222301
Email: lmarini@mpmlawpr.com

Carolina Velaz-Rivero
USDC No. 300913
Email: cvelaz@mpmlawpr.com

**MARINI PIETRANTONI MUÑIZ LLC**
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel:  (787) 705-2171
Fax: (787) 936-7494

*Co-attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory Authority*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF

participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
