## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>**This Motion relates to PREPA and shall be filed in Lead Case No. 17 BK 3283-LTS and Case No. 17 BK 4780-LTS.** |

## JOINT STATUS REPORT

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To the Honorable United States District Court Judge Laura Taylor Swain:

On July 7, 2020, the Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of PREPA in these Title III cases pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with PREPA and the Oversight Board, the "Government Parties"), filed *PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* [ECF No. 2053] (the "Administrative Expense Motion").  On July 14, 2020, the Court entered its *Order Extending and Establishing Certain Deadlines Applicable to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement With LUMA Energy* [ECF No. 2068] (the "Scheduling Order").  In the Scheduling Order, the Court directed the Government Parties to confer with anticipated objectors to the Administrative Expense Motion and to file a joint status report (the "First Joint Status Report") by July 28, 2020 at 5:00 p.m. (A.S.T.), which deadline was subsequently extended to July 29, 2020 at 12:00 p.m. (A.S.T.) [ECF No. 2104].

On July 29, 2020, the Government Parties, together with the Anticipated Objectors (as defined below), submitted the First Joint Status Report [ECF No. 2106].  Therein, the Parties[2] provided an update to the Court on the status of their meet and confer discussions, the documents the Government Parties had agreed to produce, and remaining open issues between the Parties.

---

[2] The "Parties" consist of the Anticipated Objectors (as defined below) and the Government Parties.

Further, the Parties requested permission to file a second status report updating the Court on their progress on or before August 4, 2020.  The Court entered an order requiring the Parties to file a further status report (this "Second Joint Status Report") by August 4, 2020 at 5:00 p.m. (A.S.T.).

This Second Joint Status Report is being submitted by the following:

(i)     The Government Parties; and,

(ii)    The Official Committee of Unsecured Creditors of all Title III Debtors (except COFINA and PBA) ("UCC"); the Fuel Line Lenders;[3] Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER") and Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE"); and Whitefish Energy Holdings, LLC ("Whitefish").   The UCC, Fuel Line Lenders, UTIER, SREAEE, and Whitefish are referred to collectively as the "Anticipated Objectors."[4]

## I.    **Procedural Background[5]**

1.     On July 7, 2020, the Government Parties filed the Administrative Expense Motion on behalf of PREPA.

2.     The Scheduling Order required all discovery requests in connection with the Administrative Expense Motion be served on or before July 24, 2020.  Scheduling Order ¶ 3.  In addition, the Court ordered the Government Parties and the Anticipated Objectors to meet and confer regarding any discovery disputes, and if any disputes remained unresolved, to file the First

---

[3] The Fuel Line Lenders are Cortland Capital Market Services LLC, as successor administrative agent under a Credit Agreement, dated May 4, 2012, among PREPA, Scotiabank de Puerto Rico and certain lenders (the "Scotiabank Credit Agreement").

[4] In identifying the foregoing parties as "Anticipated Objectors," the Government Parties do not concede that any Anticipated Objector has standing to object to the Administrative Expense Motion or to intervene in this contested matter.

[5] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Administrative Expense Motion.

Joint Status Report.  *Id.*  The Court directed the parties to "describe the categories of documents and other discovery that have been agreed upon, and all issues in dispute with full position statements on each such issue."  *Id.*

3.     On July 23, 2020 and July 24, 2020, the Anticipated Objectors served the Anticipated Objectors' Discovery Requests.[6]

4.     On Monday, July 27, 2020, counsel for the Oversight Board sent an email to the Anticipated Objectors which (1) listed documents the Government Parties were prepared to produce in response to the Anticipated Objectors' Discovery Requests; (2) objected to certain requests the Government Parties deemed overly broad; (3) attached a proposed protective order governing the production of confidential information in this contested matter; and (4) requested that the Parties meet and confer.  Also, on Monday, July 27, 2020, the Parties met and conferred regarding the Anticipated Objectors' Discovery Requests.  On the Parties' meet and confer call, counsel for the Oversight Board agreed to further discuss (1) whether the Oversight Board would produce communications in response to the UCC Discovery Requests, and (2) whether the Oversight Board and PREPA would be willing to produce documents in response to certain UTIER Discovery Requests.  Counsel for the Oversight Board further agreed to provide an update on these issues later in the week.

5.     On July 29, 2020, the Parties submitted the First Joint Status Report.

6.     Thereafter, the Court entered its *Order Setting Further Status Report Deadline in Connection with LUMA Energy Administrative Expense Motion* on July 29, 2020.  ECF No. 2107.

---

[6] The Anticipated Objectors' Discovery Requests include the UTIER Discovery Requests, the UCC Discovery Requests, the FLL Discovery Requests, and the Whitefish Discovery Requests, each as defined in the First Joint Status Report.

Therein, the Court ordered the parties to submit a further joint status report on or before August 4, 2020, at 5:00 p.m. (A.S.T.), "describing any remaining discovery issues in dispute."

7.       On Friday, July 31, 2020, counsel for the Oversight Board sent an email to the Anticipated Objectors following up on the Parties' July 27 meet and confer discussion. Therein, the Oversight Board informed the UCC that, having further considered the UCC Discovery Requests, the Oversight Board was not willing to undertake the burden and expense required to produce communications relating to the Supplemental Agreement because, in the Oversight Board's view, the Supplemental Agreement is not relevant to the issues before the Court in considering the Administrative Expense Motion. In light of that determination, the Oversight Board further informed the UCC that it was not willing to provide deposition testimony regarding the Supplemental Agreement. Further, the Oversight Board informed UTIER that it was not willing to conduct a custodian and search term review for documents or communications responsive to the UTIER Document Request Nos. 1, 2, 3, and 4. However, the Oversight Board advised that to the extent documents responsive to these requests were included in what the Oversight Board intends to produce in response to other requests, the Oversight Board will not withhold the documents from production. In addition, the Oversight Board advised that it was not willing to respond to the UTIER Rog Nos. 1, 2, 3, 4, 5, 6, 7, and 9.

8.       Also, on Friday, July 31, 2020, the parties submitted a proposed protective order to the Court. ECF No. 2110.

9.       On Monday, August 3, 2020, the Government Parties made an initial document production. Although the Anticipated Objectors have not yet reviewed the production, the Government Parties have represented that the production contains over 7,800 pages of documents, consisting of (1) the request for proposals to operate the T&D system and addenda thereto; (2)

communications and documents made available to and received from LUMA Energy via Power
Advocate, including messages and attachments thereto, various drafts of a term sheet and the T&D
Contract, comments from LUMA Energy to the drafts of the term sheet, including issues lists
summarizing the comments, and memoranda to LUMA Energy from P3 summarizing comments
from LUMA that were accepted in the drafts of the term sheet and the LUMA contract; (3) certain
project logs and other due diligence documents including requests for clarification and related
responses; (4) minutes of Partnership Committee meetings; and (5) LUMA Energy's definitive
proposal and certain updates and clarifications to the proposal.

10.     On Monday, August 3, 2020, the Government Parties also served their responses
and objections to the Anticipated Objectors' Discovery Requests, attached hereto as Exhibits 1-5.
P3 served its responses and objections to the UCC's subpoena on July 31, 2020.

## II.   Matters in Dispute

### A.   UCC Discovery Requests

#### 1.   Government Parties' Statement

11.     On Friday, July 24, 2020 the UCC served identical Discovery Requests to the
Oversight Board, PREPA, AAFAF, and the Puerto Rico Public-Private Partnership Authority
("P3") seeking discovery related to the provisions of the Supplemental Agreement.   The
Government Parties and P3 object to the UCC Discovery Requests because negotiations related to
the Supplemental Agreement are not relevant to the approval of an administrative expense for the
Front End Obligations.   Nevertheless, in the interest of avoiding a dispute, the Oversight Board,
which negotiated the Supplemental Agreement, has agreed to produce drafts of the Supplemental
Agreement.

12.     The UCC Discovery Requests also seek, in addition to drafts of the Supplemental

Agreement, (1) communications regarding the Supplemental Agreement, as well as (2) deposition testimony regarding the Supplemental Agreement.  The Oversight Board, PREPA, AAFAF and P3 have not agreed to produce any email communications regarding the Supplemental Agreement or attaching drafts of the Supplemental Agreement.  On the July 27 meet and confer, however, the Oversight Board agreed to further consider the UCC's request for communications.

13.     In the July 31 email, counsel for the Oversight Board advised the UCC of its position with respect to the UCC's request for communications regarding the Supplemental Agreement.  As counsel for the Oversight Board explained, the Supplemental Agreement simply has no relevance to the issues before the Court with respect to the Administrative Expense Motion.  The Supplemental Agreement will only come into effect in the event that PREPA has not exited Title III prior to the conclusion of the Front-End Transition Period.  By that time, the administrative expense claim that is the subject of this motion—a claim for expenses incurred by LUMA during the Front-End Transition Period—will already have accrued and been paid.  The terms of the Supplemental Agreement accordingly have no bearing on the sole, narrow issue before the Court— whether to allow an administrative expense claim for expenses incurred during the Front-End Transition Period, prior to the time the Supplemental Agreement ever comes into effect.

14.     Federal Rule of Civil Procedure 26(b) permits discovery only into "nonprivileged matter that is *relevant* to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  The UCC must therefore demonstrate that the matters with respect to which it seeks discovery are relevant prior to conducting a burden analysis.  Here, the UCC Discovery Requests are not relevant to the limited issue before the Court.  In the interest of avoiding a dispute, the Oversight Board agreed to produce drafts exchanged as a showing of good faith and because of the minimal burden involved in locating such drafts for production. But the Oversight Board has at all times

maintained the irrelevance of even those documents. In light of the irrelevance of the Supplemental Agreement to the issues the Court must decide, the Oversight Board determined that it was unwilling to undertake the burden and expense of collecting, reviewing and producing communications related to the Supplemental Agreement.  By comparison, a communications review is materially more burdensome, and is not proportional to the needs of the matter in light of the burdens imposed when conducting an email search and the lack of relevance to the factual issues that are at stake in the Administrative Expense Motion.  *See* Fed. R. Civ. P. 26(b)(1).

15.     Because the Oversight Board is not willing to produce communications regarding the Supplemental Agreement, the Oversight Board also advised the UCC in its July 31 email that the Government Parties were not willing to agree to a Rule 30(b)(6) deposition of any of the Government Parties with respect to the Supplemental Agreement.

16.     The UCC's assertions that the Government Parties have failed to meet their meet and confer obligations are false.  On the July 27 meet and confer, counsel for the Government Parties advised that they would continue to consider and discuss the UCC Discovery Requests and would provide an update to the Anticipated Objectors.  Subsequently, counsel for the Government Parties conferred with their respective clients and amongst each other.  In the interest of efficiency, the Government Parties sent the July 31 email informing the UCC that the Government Parties intended to stand upon their relevance objections, as articulated at the Parties' July 27 meet and confer.  The next day, the UCC responded that it believed the Government Parties' position was inconsistent with the Parties' earlier discussions.  Counsel for the Government Parties responded on the same day and advised counsel for the UCC that they were available to discuss further, but in the interest of time, wanted to provide an update to the UCC on the Government Parties' current thinking.  Counsel for the UCC declined to discuss further.

17.     The UCC previously represented that it served identical requests to the Oversight Board, PREPA, P3 and AAFAF because it did not know which entities would have the information requested and initially expressed a willingness to meet and confer on that point. Accordingly, on Monday, July 27, 2020, AAFAF notified the Committee that the Supplemental Agreement was negotiated by the Oversight Board, with input from time to time from the P3 Authority, and, accordingly, any information AAFAF may have would be cumulative of what the Oversight Board could provide.  AAFAF has therefore requested that the UCC withdraw its requests to AAFAF. Notwithstanding its earlier representations, the Committee has insisted on cumulative discovery from AAFAF regarding the Supplemental Agreement.

18.     The UCC contends that AAFAF should be required to engage in cumulative discovery because its Executive Director, Omar Marrero, submitted a declaration in support of the Motion, and "Mr. Marrero and individuals working on his behalf are likely to have responsive documents as representatives of P3 if not as representatives of AAFAF."  *See* July 29, 2020 Joint Status Report, Dkt. 2106 at 9.  Neither contention justifies the burden and expense of requiring AAFAF to provide cumulative discovery regarding an agreement it did not negotiate.

19.     Mr. Marrero's declaration discusses the benefits of the T&D Contract and the necessity of the Front-End Transition Services to realize those benefits.  *See generally* Marrero Decl., Dkt. 2053-2.  The UCC does not seek testimony on either of these topics.  Rather, it seeks testimony regarding specific provisions of the Supplemental Agreement.  *See* July 29, 2020 Joint Status Report Ex. 2.  The Supplemental Agreement is not discussed in the Marrero Declaration, and the Partnership Committee Report attached as Exhibit A thereto makes clear the Supplemental Agreement was negotiated by the Oversight Board after the Partnership Committee, of which Mr. Marrero is a member, approved the LUMA O&M agreement.  See Marrero Decl. Ex. A § 5.3.1.

8

Mr. Marrero's declaration necessitates no further document production or discovery.

20.     Accordingly, AAFAF and P3 believe that any production of documents or other discovery from them concerning the Supplemental Agreement would either (i) be duplicative of any discovery from the Oversight Board (which took the lead on negotiating the Supplemental Agreement), or (ii) target communications which would be subject to privileges.

### 2.     UCC's Statement

21.     The Government Parties' wholesale refusal to produce additional documents is unwarranted.  As explained in the First Status Report, the UCC's requests and deposition topics are limited to two specific provisions in the T&D Contract:  (1) the requirement in Section 6.1 of the Supplemental Agreement that a Title III Plan and confirmation order be "reasonably acceptable to Operator," and (2) the "Operator Termination Fee," as that term is defined in the Supplemental Agreement.  These requests are relevant to the Administrative Expense Motion because the Court's approval of such motion paves the way for the Government Parties to implement the T&D Contract, including the Supplemental Agreement.

22.     The Government Parties claim that the Supplemental Agreement is irrelevant to the Administrative Expense Motion because it will only come into effect in the event PREPA has not exited from Title III prior to the conclusion of the Front-End Transition Period.  But this misses the point.  If the Court does not grant the Administrative Expense Motion, then the Operator has the right to terminate the T&D Contract, which would *ensure* that the Supplemental Agreement (and its offending provisions) never come into effect.  In any event, the Government Parties ignore that, at present, the Supplemental Agreement is highly likely to be needed based on where PREPA sits in the confirmation process.  According to the Administrative Expense Motion, the Front-End Transition Period will last approximately 12 months.  *See* Motion ¶ 35.  In their latest PREPA

status report, the Government Parties stated that they "are unprepared at this time to propose a schedule for the continuation of the 9019 Motion," and that "additional time is required to understand how and if the situation will impact PREPA and to what extent (if any) they should seek to amend the RSA." *See* Dkt. 2111 ¶ 25. Based on the Government Parties' own representations, it appears as if the chances of a PREPA Title III plan of adjustment being proposed (much less confirmed) within 12 months of the start of the Front-End Transition Period are low, and as a result it is likely that the Supplemental Agreement will come into effect.[7]

23.     Notwithstanding their objection to the relevance of the Committee's requests, the Government Parties say they are willing to produce "drafts of the Supplemental Agreement." The production of drafts alone, however, is insufficient. The UCC also needs discovery of communications between the parties who negotiated the Supplemental Agreement to understand the nature and origin of the provisions that give the Operator its consent right over any plan of adjustment and its right to receive the Operator Termination Fee.

24.     The central issue in any discovery dispute is whether the burden of the proposed discovery is proportional to the needs of the litigation. Here, however, the Government Parties have made no showing—or even argued—that the production would be burdensome. In fact, the Government Parties have categorically refused to even confer with the Committee regarding search terms, custodians, or other parameters for the collection and review of communications.

---

[7]     Moreover, it is not clear that the Supplemental Agreement (and its costs and various provisions) are, in fact, separate from the Front End Transition Period. Section 6.1 of the Supplemental Agreement provides that "The Parties shall follow the process set forth in the O&M Agreement for establishing the Service Commencement Date, upon which date this Supplemental Agreement shall terminate and be null and void." Accordingly, it appears that the Interim Period contemplated by the Supplemental Period is actually a part of the Front End Transition Period (because both end on the Service Commencement Date). Because the motion seeks to pay any amounts owed during the Front End Transition Period, this arguably applies to the fees payable under the Supplemental Agreement, and the Committee, therefore, has every right to discovery thereof.

This is despite their multiple representations they would do so.  Initially, during the parties' July 27, 2020 meet and confer, the Oversight Board's counsel stated that it was willing to further meet and confer with the UCC's counsel regarding the production of communications.  In the First Status Report, the Oversight Board reiterated this commitment, and the UCC relied on it in agreeing to defer the Court's consideration of the parties' dispute.[8]  Instead of following through on its promise to meet and confer, however, the Oversight Board informed the UCC via email on July 31 (without any further discussion with the UCC) that it and the other Government Parties were no longer willing to consider the production of communications.

25.     The Oversight Board and other Government Parties similarly failed to follow through on their commitment to further meet and confer regarding the UCC's request for deposition testimony.  In the First Status Report, the Government Parties stated that they would agree to "defer discussions regarding any deposition testimony until after document productions have been made."   However, in their July 31 email—prior to the production of any documents and again without conferring with the UCC—the Government Parties decided unilaterally that they are not willing to provide deposition testimony.

26.     On this record, where the Government Parties have failed to satisfy their meet and confer obligations, the UCC does not believe the Court can conclude that its narrow request for communications on two topics is disproportionate to the needs of this dispute.  At a minimum, the Court should order the Government Parties to meet and confer with the UCC in good faith to

---

[8]     *See* First Status Report ¶ 13 (Oversight Board stating it had "agreed to further consider the UCC's request"); *id.* ¶ (UCC stating that it appreciated that "the Oversight Board is willing to continue meeting and conferring with the UCC regarding a further search for additional responsive communications, including emails").

discuss the parameters of its requests and any burden they may entail.[9]

27.     In addition, AAFAF's specific objections to the UCC's requests are without merit. Contrary to AAFAF's assertion, the UCC has never insisted that it receive duplicative discovery from AAFAF custodians given counsel's representation that AAFAF was not primarily involved in negotiating the T&D Contract or the Supplemental Agreement.  Rather, the UCC's position has been that Mr. Marrero is a relevant custodian given his roles on the Partnership Committee and the P3's Governing Board of Directors.  In any event, AAFAF's contention that discovery of communications from Mr. Marrero would be "cumulative" of discovery from other Government Parties rings hollow given that the other Government Parties have refused to produce any communications.  AAFAF should, at a minimum, be ordered to meet and confer with the UCC regarding potentially responsive communications in the files of Mr. Marrero and individuals working at his direction.[10]

28.     Finally, it must be noted that the UCC received the first production of documents by the Government Parties at 8:00 pm last night.  As a result, the UCC has not had the opportunity to review any of the documents produced.  The UCC reserves the right to make additional arguments regarding its discovery requests based on the produced documents.  For example, while the Government Parties have agreed to produce "minutes of Partnership Committee meetings and written resolutions of the Partnership Committee," it is unclear if these minutes include

---

[9]     The UCC reserves the right to seek an adjournment of the hearing on Administrative Expense Motion if necessary to allow this meet and confer process and/or any further production of documents and scheduling of depositions to occur in advance of the UCC's approaching August 12, 2020 objection deadline.

[10]    Notably, while AAFAF emphasizes the Oversight Board's involvement in negotiating the Supplemental Agreement, AAFAF does not state that Mr. Marrero (or individuals that work for Mr. Marrero) was not involved in the negotiation or approval of the Supplemental Agreement, nor does AAFAF state that Mr. Marrero has no responsive documents—instead, AAFAF merely states that Mr. Marrero's declaration does not *address* the Supplemental Agreement.

presentations, summaries or analyses of the O&M Agreement that would be responsive to the UCC's requests, or would include written objections or other materials related to those Committee meetings.  Likewise, to the extent that presentations, summaries or analyses were presented to any of the Government Parties governing boards, such materials should be produced if responsive to the UCC's requests.

### B.     UTIER's Discovery Requests

#### 1.     Government Parties' Statement

29.     UTIER Document Request Nos. 1, 2, 3, and 4 and UTIER Rog Nos. 1, 2, 3, 4, 5, 6, 7, and 9 seek non-confidential document productions and interrogatory responses from the Oversight Board and PREPA regarding the impact of the Administrative Expense Motion on other stakeholders in PREPA's Title III case.  The Oversight Board and PREPA object to the UTIER Discovery Requests as overbroad insofar as they seek discovery regarding issues that are not relevant to the issues presented by the Administrative Expense Motion or the relief requested from the Court, that are outside the scope of the Administrative Expense Motion, and/or that are not proportional to the needs of the case, specifically and primarily the alleged impact of the requested administrative claim on other creditors and parties-in-interest in PREPA's Title III case.  *See, e.g.*, July 11, 2019 Hrg. Tr. 11:18-24 (holding that "impact of full RSA implementation on [PREPA's] operations and PREPA's ability to address the costs thereof are [] ones whose logistical impact on these narrowly focused 9019 proceedings would outweigh substantially any probative value in connection with the decision the Court must make"); *Memorandum Order Granting Motion for Protective Order and Order in Limine Precluding Evidence in Connection with 9019 Motion* [ECF No. 1543] (holding that evidence regarding "the long-term impact of full implementation of the RSA is outside the scope of the 9019 Motion" and excluding evidence regarding the potential

impact of the RSA on other creditors).  As set forth below, UTIER asserts the standard for allowance of an administrative expense claim in PREPA's Title III case is whether the expense will benefit the debtor's "estate," which it defines to include the debtor's creditors.  That position, which it attempts to support with chapter 11 case law, is wrong in the context of a municipal bankruptcy case, including this Title III case, where there is no "estate."[11]  Instead, an administrative expense claim is appropriate where (1) the services are necessary to preserve the operations of the debtor (i.e. to provide services to the public and carry out its mission), and (2) the debtor consents to payment of the claim as an administrative expense. *In re Craig Cty. Hosp. Auth.*, 572 B.R. 340 (Bankr. N.D. Okla. 2017).  Moreover, the Government Parties assert that even in chapter 11, the allowance of an administrative claim focuses on benefit to the debtor, its operations, and the administration of its bankruptcy case, and not necessarily on the impact of the claim on unsecured creditors or their recoveries.  The benefit of the services to creditor recoveries, therefore, is not material to the Administrative Expense Motion.

30.     Accordingly, in its July 31 email, the Oversight Board and PREPA advised UTIER that they were not willing to conduct a custodian and search term review to locate documents or communications with respect to UTIER Document Request Nos. 1, 2, 3, and 4, which seek documents and communications regarding the impact of the LUMA Contract on other stakeholders in PREPA's Title III case, and that they were not willing to substantively respond to UTIER Rog Nos. 1, 5, 7, and 9, which seek information regarding that same issue.  Further, the Oversight Board and PREPA also advised UTIER that they were not willing to substantively respond UTIER

---

[11] In addition, because PROMESA does not incorporate section 363 of the Bankruptcy Code, PREPA's can pay LUMA Energy's expenses as they come due in the ordinary course (which PREPA intends to do) without the Court's approval.  *See also* PROMESA § 305.  This fact further highlights why the administrative expense claim's impact on PREPA's other creditors is irrelevant to the issues presented by the Administrative Expense Motion.

14

Rog Nos. 2, 3, 4, and 6, because those requests seek information regarding the impact of the administrative expense claim on other creditors.  Neither the impact of the administrative expense claim on other creditors nor the impact of the LUMA Contract on other stakeholders in PREPA's Title III case are material to the narrow issue before the Court.

31.     However, to the extent the categories of documents the Government Parties have already agreed to collect and produce contain documents responsive to these requests, the Oversight Board and PREPA will not withhold documents solely on the basis that they contain information responsive to such requests.

2.     **UTIER's and SREAEE's Statement**

32.     The Oversight Board and PREPA still consider that discovery on the impact of the administrative expense priority on other claims is irrelevant. UTIER and SREAEE maintain that the requested discovery is proper and squarely within the scope of review for this contested matter. The Oversight Board and PREPA are improperly narrowing the scope of discovery in this case.

33.     The Oversight Board and PREPA seek administrative expenses priority under 11 U.S.C. § 503(b)(1)(A). Under this section, "[t]he burden of proving entitlement to priority payment as an administrative expense rests with the party requesting it as the traditional presumption favoring **ratable** distribution among all unsecured creditors requires strict construction of provisions governing requests for priority payment of administrative expenses." In re Malden Mills Industries, Inc., 303 B.R. 688, 707 (B.A.P. 1st Cir. 2004)citations omitted) (emphasis added).

34.     The standard requires benefit to the estate, which means benefit to the creditors, who are the intended beneficiaries of a bankruptcy estate. See, for example, Matter of Bay Broad., Inc., 182 B.R. 369, 374 (D.P.R. 1995)("The words 'actual and necessary' have been construed to require the debt **to benefit the estate and creditors**."(emphasis added)(citation omitted)). See,

15

also, In re PMC Mktg. Corp., 09-02048, 2013 WL 3367500, at *7 (Bankr. D.P.R. 2013)("A survey of case law reveals that the terms 'actual' and 'necessary' found in the statute are to be narrowly construed. Therefore, to qualify as an administrative expense entitled to priority, the expense must be an actual and necessary cost **of preserving the estate for the benefit of its creditors**."(emphasis added)(citations omitted)).

35.     Thus, all of UTIER's Discovery Requests regarding the impact of the administrative expense priority on PREPA's creditors are wholly relevant. These requests center on the following topics: (1) the justification for the administrative expense priority and the amount; (2) the impact of the administrative expense priority on PREPA's finances, and (3) the impact of the administrative expense priority on PREPA's ability to pay its unsecured creditors. In order to determine if PREPA has met the standard for an administrative expense priority, we need to know if the claim provides **a demonstratable benefit to the bankruptcy estate**. See In re Malden Mills Industries, Inc., 303 B.R. at 706. Benefit to the estate means benefit to PREPA's unsecured creditors. See, also, In re PMC Mktg. Corp., 09-02048, 2013 WL 3367500, at *7 (Bankr. D.P.R. 2013).

36.     Thus, it is essential for the Objectors to have access to any information regarding the impact the administrative expense claim has on PREPA's creditors. If the priority negatively affects PREPA's finances and, by consequence or directly, the unsecured creditors, without providing any monetary benefit in return, then there is no doubt that the claim only has the effect of depleting the estate, not benefiting it. The only way to ascertain which of these scenarios exists is with access to the information that UTIER and SREAEE have requested regarding that impact.

37.     The impact on stakeholders and creditors of approving this administrative expense is fundamental to determining the benefit of the contract to the state, particularly when PREPA's

budget certified by the Oversight Board on June 30, 2020, has a deficit of $125,663,000.00 due to the cost of the LUMA contract.[12]

### C.    Whitefish Discovery Requests

#### 1.    Government Parties' Statement

38.    The Government Parties reiterate their objections to the Whitefish Discovery Requests, as set forth in the First Joint Status Report.  The Oversight Board and PREPA will not respond to Whitefish's interrogatories and will not conduct separate searches for documents responsive to the Whitefish Discovery Requests.  The Government Parties will provide Whitefish with the documents produced in response to UTIER and the UCCs' requests and will not withhold documents produced to UTIER and the UCC solely on the basis that they contain information responsive to Whitefish's requests.  With respect to Whitefish's request that the Government Parties meet and confer regarding their objections to the Whitefish Discovery Requests, the Government Parties have offered to confer with Whitefish tomorrow, August 5, 2020.

#### 2.    Whitefish's Statement

39.    Whitefish restates and incorporates its position herein as set forth in the First Joint Status Report. Whitefish requests that the Government Parties meet and confer with Whitefish regarding their objections to the Whitefish Discovery Requests, and Whitefish further reserves its rights to file a Motion to Compel or other appropriate request for relief with the Court.

### D.    Fuel Line Lenders' Statement

40.    The Fuel Line Lenders restate and incorporate their position as set forth in the First

---

[12] See PREPA's Fiscal Plan p. 10 at https://drive.google.com/file/d/1paRgy0dJBkUH4-5eev7z2SuR0diil8g9/view: (…the 2020 Fiscal Plan projects a deficit of $132 million in FY2021, which is due to the front-end transition fee to the T&D operator…), and Certified Budget at:
https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/view

Joint Status Report, but otherwise take no position on the remainder of the report.


[*Remainder of page intentionally left blank*]

Dated:  August 4, 2020
        San Juan, Puerto Rico

Respectfully submitted,

**PROSKAUER ROSE LLP**

*/s/ Paul V. Possinger*

Martin J. Bienenstock (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Daniel S. Desatnik *(pro hac vice)*
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

Paul V. Possinger (*pro hac vice*)
70 West Madison
Suite 3800
Chicago, IL 60602-4342
Tel: (312) 962-3550
Fax: (312) 962-3551

Jennifer L. Jones (*pro hac vice*)
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 284-4509
Fax: (310) 557-2193

Laura E. Stafford (*pro hac vice*)
1 International Place
Boston, MA 02130
Tel: (617) 526-9714
Fax: (617) 526-9899
*Attorneys for the Financial Oversight and
Management Board as representative for the
Commonwealth of Puerto Rico and the Puerto
Rico Electric Power Authority*

**MARINI PIETRANTONI MUÑIZ LLC**

*/s/ Luis Marini*

**O'NEILL & BORGES LLC**

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
*Co-Attorney for the Financial Oversight and
Management Board as representative of the
Debtor*

**O'MELVENY & MYERS LLP**

*/s/ Elizabeth L. McKeen*

John J. Rapisardi (*pro hac vice*)
Nancy A. Mitchell (*pro hac vice*)
Maria J. DiConza (*pro hac vice*)
7 Times Square
New York, New York 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

-and-

Peter Friedman  (*pro hac vice*)
1625 Eye Street, NW
Washington, D.C. 20006
Tel:  (202) 383-5300
Fax:  (202) 383-5414

-and-

Elizabeth L. McKeen (*pro hac vice*)
Ashley M. Pavel (*pro hac vice*)
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel:  (949) 823-6900
Fax:  (949) 823-6994

*Attorneys for the Puerto Rico Fiscal Agency*

19

Luis C. Marini-Biaggi
USDC No. 222301
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel:  (787) 705-2171
Fax:  (787) 936-7494

*and Financial Advisory Authority and Puerto
Rico Electric Power Authority*

*Co-counsel for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C**

*/s/ Katiuska Bolaños*
Katiuska Bolaños
USDC-PR No. 231812
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 1105
San Juan, PR 00918
Tel.:  (787) 395-7133
Fax:  (787) 497-9664

*Counsel for Puerto Rico Electric Power
Authority*

*/s/ Juan J. Casillas Ayala*
Juan J. Casillas Ayala
USDC-PR No. 218312
Israel Fernández Rodríguez
USDC-PR No. 225004
Juan C. Nieves González
USDC-PR No. 231707
Cristina B. Fernández Niggemann
USDC-PR No. 306008
**CASILLAS, SANTIAGO & TORRES LLC**
PO Box 195075
San Juan, PR 00919-5075
Telephone: (787) 523-3434
Facsimile: (787) 523-3433
Email: jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*/s/ Luc A. Despins*
Luc A. Despins (admitted *pro hac vice*)
Nicholas A. Bassett (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Email: lucdespins@paulhastings.com
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of
Unsecured Creditors*

*/s/ Nayuan Zouariabani*
Nayuan Zouairabani
USDC-PR No. 226411

*/s/ Emil A. Kleinhaus*
Richard G. Mason (admitted *pro hac vice*)
Amy R. Wolf (admitted *pro hac vice*)

**MCCONNELL VALDÉS LLC**
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: (787) 250-5604
Facsimile: (787) 759-9225
Email: nzt@mcvpr.com

Emil A. Kleinhaus (admitted *pro hac vice*)
Michael H. Cassel (admitted *pro hac vice*)
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email: rgmason@wlrk.com
arwolf@wlrk.com
eakleinhaus@wlrk.com
mhcassel@wlrk.com

*Attorneys for Cortland Capital Market
Services LLC, as Administrative Agent*

/s/ Jessica E. Méndez-Colberg
Rolando Emmanuelli-Jiménez
USDC-PR No. 214105
Jessica E. Méndez-Colberg
USDC-PR No. 302108
**BUFETE EMMANUELLI, C.S.P.**
472 Tito Castro Ave.,
Marvesa Building Suite 106
Ponce, PR 00716
Telephone: (787) 848-0666
Facsimile: (787) 977-0323
Email: rolando@bufete-emmanuelli.com
jessica@bufete-emmanuelli.com
*Attorneys for Unión de Trabajadores de la
Industria Eléctrica y Riego and Sistema de
Retiro de los Empleados de la Autoridad de
Energía Eléctrica*

/s/ Ann Marie Uetz
Ann Marie Uetz (*pro hac vice*)
**FOLEY & LARDNER LLP**
500 Woodward Ave., Suite 2700
Detroit, MI 48226
Telephone (313) 234-7100
Facsimile (313) 234-2800
auetz@foley.com
*Counsel for WEH*

and

**C. CONDE & ASSOC.**

21

*/s/Carmen D. Conde Torres*
Carmen D. Conde Torres, Esq.
USDC 207312
*/s/Luisa S. Valle Castro*
Luisa S. Valle Castro, Esq.
USDC No. 215611
254 San José Street, 5th Floor
Old San Juan, Puerto Rico 00901
Telephone: 787-729-2900
Facsimile: 787-729-2203
E-Mail: condecarmen@condelaw.com
ls.valle@condelaw.com
*Counsel for WEH*