Hearing Date and Time: TBD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

```
--------------------------------------------------------------------- X
In re:                                              )
                                                    )
THE FINANCIAL OVERSIGHT AND                         )   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                   )   Title III
                                                    )
          as representative of                      )   Case No. 17-BK-03283 (LTS)
                                                    )
THE COMMONWEALTH OF PUERTO RICO, et al.,            )   (Jointly Administered)
                                                    )
          Debtors.¹                                 )
--------------------------------------------------------------------- X
In re:                                              )
                                                    )
THE FINANCIAL OVERSIGHT AND                         )   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                   )   Title III
                                                    )
          as representative of                      )   Case No. 17-BK-03566 (LTS)
                                                    )
THE EMPLOYEES RETIREMENT SYSTEM OF THE              )
GOVERNMENT OF THE COMMONWEALTH OF                   )
PUERTO RICO,                                        )
                                                    )
          Debtor.                                   )
--------------------------------------------------------------------- X
```

### CLAIMANTS' REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT
### ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-03283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-03284- LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-03567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-03566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-04780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-05233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ................................................................................................................ 3

I.    The Relief Sought Is Ripe ......................................................................... 3

    A.    Objectors Mischaracterize the Relief Claimants Seek............................ 3

    B.    If the Issues Are Unripe, the Motions to Dismiss Cannot Be
Granted ...................................................................................................... 5

    C.    The Legal Validity of Objectors' Objections Is Ripe for Resolution
Now ............................................................................................................ 6

II.    No Contractual Limitations on Recourse Apply To Claims Against ERS
Pursuant to Section 1111(b) ..................................................................... 9

    1.    The Post-Petition Legislation Has Already Ordered the
Transfer of ERS's Property to the Commonwealth for No
Consideration ............................................................................... 9

    2.    The Plan-Sale Exception Cannot Apply Because No Plan
Could Sell All of Claimants' Collateral ..................................... 11

    3.    Even if the Plan-Sale Exception Applies, the Proposed
"Sale" Fails It ............................................................................. 13

III.    Claimants Are Not limited to Recovery from Collateral Even Apart From
Section 1111(b) ....................................................................................... 14

    A.    Claimants Have Recourse Against the Pledged Property ...................... 15

    B.    The Bonds Do Not Limit Recourse for Breaches of the Bond
Resolution ............................................................................................... 15

    C.    The Bond Resolution Does Not Preclude Recourse Claims Against
ERS for Tortious, Unconstitutional, and Other Wrongful Conduct......... 19

IV.    Claimants' Post-Petition Claims Are Entitled to Administrative Expense
Priority Under Bankruptcy Code Section 503(b)(1) and Are
Nondischargeable....................................................................................... 20

    A.    Claimants' Post-Petition Claims Are Administrative Expenses............. 20

    1.    The Post-Petition Claims Meet the Requirements of Section
503(b)(1)(A) .............................................................................. 20

    a.    Claims Based Upon the Post-Petition Legislation
Did Not Arise Pre-Petition............................................. 21

    b.    The *Reading* Exception Does Not Require a
Showing of Unfairness in Individual Cases to Apply ...... 23

    c.    *Reading* Applies to Constitutional Claims ..................... 24

d.      Administrative  Expenses Are Allowable  in Title  III
Cases...........................................................................25

e.      *Reading* Does Not Require a Showing  that the
Administrative  Expenses Provided  a Benefit to the
Debtor's Property............................................................27

B.      The Claims Are Non-Dischargeable in this Proceeding. ........................28

CONCLUSION.....................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad
    Obligatorio v. Flores Galarza,*
    484 F.3d 1 (1st Cir. 2007) ...................................................................................10

*Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc.,*
    96 F.3d 10 (1st Cir. 1996) ...................................................................................16

*Bresler v. Wilmington Trust Co.,*
    761 F. App'x 160 (4th Cir. 2019) ........................................................................20

*Duluth Lighthouse for the Blind v. C.G. Bretting Mfg. Co.,*
    No. 99-1601, 2001 WL 1640079 (D. Minn. Sept. 25, 2001)...............................18

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
    45 F.3d 530 (1st Cir. 1995) ...................................................................................7

*First Indep. Bank of Nevada v. Mohave State Bank,*
    2010 WL 1408890 (D. Ariz. Apr. 7, 2010).....................................................17, 18

*Henson v. Santander Consumer USA Inc.,*
    137 S. Ct. 1718 (2017) .........................................................................................29

*In re 680 Fifth Ave. Assoc.,*
    29 F.3d at 97-98....................................................................................................14

*In re Abercrombie,*
    139 F.3d 755 (9th Cir. 1998) ..........................................................................22, 23

*In re Caesars Entm't Operating Co., Inc.,*
    562 B.R. 168 (Bankr. N.D. Ill. 2016) ................................................................7, 8

*In re Charlesbank Laundry, Inc.,*
    755 F.2d 200 (1st Cir. 1985)...........................................................................*passim*

*In re City of Detroit,*
    524 B.R. 147 (Bankr. E.D. Mich. 2014) ........................................................28, 29

*In re City of Detroit,*
    548 B.R. 748, 761 n.48 (E.D. Mich. 2016) .........................................................29

*In re City of San Bernardino,*
    558 B.R. 321 (C.D. Cal. 2016) .....................................................................8, 21, 24

*In re Corbett*,
  550 B.R. 170 (D. Mass. 2016) ......................................................................28

*In re GT Advanced Techs., Inc.*,
  547 B.R. 3 (D.N.H. 2016) ....................................................................21, 28

*In re Hemingway Transp., Inc.*,
  954 F.2d 1 (1st Cir. 1992) ....................................................21, 22, 23, 28

*In re Houston Reg'l Sports Network*,
  886 F.3d 523 (5th Cir. 2018) ......................................................................11

*In re Kent Terminal Corp.*,
  166 B.R. 555 (Bankr. S.D.N.Y. 1994) ........................................................13

*In re Mammoth Mart, Inc.*,
  536 F.2d 950 (1st Cir. 1975) ................................................21, 22, 23, 28

*In re Matrix Dev. Corp.*,
  No. 08-32798-TMB11, 2009 WL 2169717 (Bankr. D. Or. July 16, 2009) ...........................13

*In re Montgomery Ward, LLC*,
  634 F.3d 732 (3d Cir. 2011) ......................................................................14

*In re New York Off-Track Betting Corp.*,
  434 B.R. 131 (Bankr. S.D.N.Y. 2010) ..................................................25, 26

*In re Ponce de Leon*,
  1403, Inc., 523 B.R. 349, 389 (Bankr. D.P.R. 2014) ....................................10

*In re Tampa Bay Assocs., Ltd.*,
  864 F.2d 47 (5th Cir. 1989) ......................................................................13

*In re Waterways Barge Partnership*,
  104 B.R. 776 (Bankr. N.D. Miss. 1989) ....................................................14

*In re Western Real Estate Fund, Inc.*,
  75 B.R. 580 (Bankr. W.D. Okla. 1987) ....................................................14

*Isla Nena Air Services, Inc. v. Cessna Aircraft Co.*,
  449 F.3d 85 (1st Cir. 2006) ......................................................................20

*Marcial v. Tome*,
  144 D.P.R. 522, 537 (P.R. 1997) ..............................................................16

*Meridian Sec. Ins. Co. v. Sadowski*,
  441 F.3d 536 (7th Cir. 2006) ......................................................................7

*O'Loghlin v. County of Orange*,
  229 F.3d 871 (9th Cir. 2000) ....................................................................30

*Ocasio Jaurbe v. Eastern Airlines, Inc.*,
    125 D.P.R. 410 (P.R. 1990) ...................................................................20

*Peaje Investments LLC v. Garcia-Padilla*,
    845 F.3d 505 (1st Cir. 2017) ...............................................................10

*People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*,
    814 F. Supp. 159 (D. Me. 1993) ...............................................15, 17, 18

*Ramos Lozada v. Orientalist Rattan Furniture Inc.*,
    130 D.P.R. 712 (P.R. 1992) ...................................................................20

*Reading Co. v. Brown*,
    391 U.S. 471 (1968) ..................................................................*passim*

*Reddy v. Foster*,
    845 F.3d 493 (1st Cir. 2017) .................................................................7

*Riva v. Com. of Mass.*,
    61 F.3d 1003 (1st Cir. 1995) .................................................................7

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) .........................................................................26

*USX Corp. v. Prime Leasing Inc.*,
    988 F.2d 433 (3d Cir. 1993) .................................................................18

*Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.*,
    23 F.3d 564 (1st Cir. 1994) ...................................................................16

**STATUTES**

31 L.P.R.A. § 3471 ....................................................................................15

11 U.S.C. § 102 .........................................................................................15

11 U.S.C. § 361 .........................................................................................10

11 U.S.C. § 502 .........................................................................................15

11 U.S.C. § 503 ....................................................................................*passim*

11 U.S.C. § 510 .........................................................................................27

11 U.S.C. § 552 .........................................................................................27

11 U.S.C. § 902 .........................................................................................26

11 U.S.C. § 944 ....................................................................................28, 29

11 U.S.C. § 1111(b) ..............................................................................*passim*

11 U.S.C. § 1129 .......................................................................................10

48 U.S.C. § 2174(b)(3) ...............................................................................................11

**OTHER AUTHORITIES**

U.C.C. § 9-102 ..........................................................................................................19

Collier on Bankrutpcy (16th ed. 2020) .............................................................29-30

## PRELIMINARY STATEMENT

In *Claimants' Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)*, ECF No. 13400 in Case No. 17-3283 (the "Motion"), Claimants[2] sought judgment as a matter of law on two objections raised by Objectors—namely, "whether Claimants' recovery is limited solely to their collateral," and "whether Claimants' post-petition claims are allowable as administrative expenses or are nondischargeable." Mot. at 1.

As Claimants explained, the first question should be resolved in their favor for several reasons. First, contrary to Objectors' contention, the ERS Bonds do not limit Claimants' recovery to their collateral but expressly are payable from Pledged Property regardless of whether a valid and enforceable lien exists. Second, § 1111(b)(1)(A) of the Bankruptcy Code automatically converts Claimants' limited-recourse claims for principal and interest under the ERS Bonds to full-recourse claims. And third, Claimants' recovery for claims premised upon independent breaches of the Bond Resolution or tortious, unconstitutional, and otherwise unlawful conduct are not constrained by the limited-recourse provision of the ERS Bonds. Similarly, the second question should also be resolved in Claimants' favor because any allowable claims premised upon the Post-Petition Legislation are administrative expenses under § 503(b)(1)(A) and *Reading Co. v. Brown*, 391 U.S. 471 (1968), and, even if they are not administrative expenses, they are nondischargeable because they arose post-petition.

Objectors' principal response is that these issues are not ripe for decision. They argue that all issues except the § 1111(b) issue depend on Claimants establishing liability on their claims, which may never happen. With respect to § 1111(b), Objectors do not dispute that unless the Bonds are declared *ultra vires*, Claimants possess allowable claims for the principal and interest

---

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

due under the ERS Bonds. And they acknowledge that § 1111(b)(1)(A) automatically converts these claims to recourse claims unless an election is made by the ERS bondholders or an exception applies. They argue, however, that the Court should not consider § 1111(b) issues until plan confirmation, because the terms of the current plan are not final.

All of this is wrong, for several reasons. First, Objectors grossly mischaracterize Claimants' Motion. Claimants are not seeking a final judgment that they have recourse claims, administrative expense claims, or nondischargeable claims. Rather, as contemplated by the Scheduling Order, Claimants filed the Motion in response to Objectors' motions to dismiss Claimants' proofs of claim and administrative expense motions, seeking judgment as a matter of law foreclosing certain objections that the Objectors themselves first asserted in their motions to dismiss. Objectors' newfound argument that these issues are actually unripe cannot be credited.

More importantly, Objectors' new belief that these issues cannot be resolved now is puzzling because, if that is true, then the Court cannot grant Objectors' motions to dismiss. This is because Objectors' arguments for dismissal of the claims depend upon a finding that Claimants have no recourse beyond their collateral. And their argument that § 503(b)(1) and *Reading* do not apply is the central basis for dismissing the administrative expense motions, even if some claims are allowed to proceed. Simply put, if the recourse and/or administrative expense status of the claims cannot be decided until they are fully adjudicated and confirmation of a plan is sought, Claimants' claims must survive until then, and the motions to dismiss such claims must be denied.

In any event, as Objectors must know, these issues are ripe for decision, and they should be resolved in Claimants' favor. Section 1111(b)(1)(A)'s conversion to recourse claims cannot be overcome by the so-called "plan-sale exception," because the Post-Petition Legislation has already ordered the transfer of ERS's assets to the Commonwealth, ERS is not proposing to sell all the

collateral, and the proposed "sale" does not meet the plan-sale exception.  And although Objectors poke at the authority supporting Claimants' argument that the Bonds' limited-recourse provision does not apply to contract-breach and non-contractual claims, Objectors do not even attempt to provide an alternative interpretation of the Bonds or the Bond Resolution.  Nor can Objectors ignore the extensive recourse preserved in the ERS Bonds themselves.  Finally, Objectors' arguments against treatment of claims premised upon the Post-Petition Legislation as administrative expenses and nondischargeable claims are unpersuasive and should be rejected.

## **ARGUMENT**

### I.   **THE RELIEF SOUGHT IS RIPE**

Objectors' first and principal argument is that the issues raised in the Motion are not ripe for decision because the "claims are contingent on uncertain future events."  FOMB Opp. 3; RC Opp. 1.  In particular, Objectors argue that because Claimants must establish liability on their contract-breach, constitutional, tort, and other claims for those claims to be allowable, the Court should postpone consideration of whether any such claims would be full-recourse, administrative expenses, or nondischargeable until after liability is established.  FOMB Opp. 3.  Meanwhile, although they acknowledge that Claimants have allowable claims for principal and interest due under the ERS Bonds (subject to the *ultra vires* objection), Objectors argue that whether section 1111(b) applies should be postponed until plan confirmation because "the Court has not approved a disclosure statement or commenced a confirmation hearing, which would allow adjudication on the discharge of claims including the application of Section 1111(b)."  *Id*.  Objectors are wrong.

### A.  **Objectors Mischaracterize the Relief Claimants Seek**

First, in arguing that the issues are not ripe, Objectors mischaracterize the relief Claimants are seeking.  Claimants are not seeking a final judgment that they have full-recourse claims, administrative expense claims, or nondischargeable claims.  Rather, as the opening paragraph of

the Motion explained, Claimants are "seek[ing] judgment as a matter of law on two issues central to the objections lodged against their proofs of claim and motions for allowance of administrative expense claims." Mot. 1. These issues are "[f]irst, whether Claimants' recovery is limited solely to their collateral," and "[s]econd, whether Claimants' post-petition claims are allowable as administrative expenses or are nondischargeable." *Id*.

Importantly, it was *Objectors* who pressed the Court to resolve these issues as a matter of law in the motions to dismiss Claimants' claims. Objectors argued throughout the motions to dismiss that Claimants' claims should be dismissed because Claimants are limited to recovering from their collateral. *See, e.g.*, ECF No. 891 in Case No. 17-3566, at 23 ("FOMB MTD"); ECF No. 892 in Case No. 17-3566, at 1, 3, 18 ("RC MTD"). And Objectors devoted entire sections of their motions to dismiss to the argument that Claimants' administrative expense claims should be dismissed because "The Administrative Expense Claims Do Not Satisfy Bankruptcy Code § 503." FOMB MTD 21-27; *see also* RC MTD 6-11 (similar). Those filings made the same arguments Objectors make in their opposition to the Motion. *See, e.g.*, FOMB MTD 80 (arguing contract breach claims are subject to limited-recourse provisions); RC MTD 18-19 (same); FOMB MTD 25-26 (arguing claims do not satisfy § 503 or *Reading Co. v. Brown*, 391 U.S. 471 (1968)); RC MTD 8-9 (same); RC MTD 6-7 (arguing § 503(b)(1)(A) does not apply in PROMESA cases).

Because these two central legal arguments featured prominently in Objectors' motions to dismiss, Claimants filed the current Motion to respond to these objections and obtain judgment as a matter of law foreclosing them. The Scheduling Order expressly contemplated this, providing that the motions to dismiss would be part of the pleadings for purposes of any Rule 12(c) motion. *See* ECF No. 12446 in Case No. 17-3283, at ¶ 7. Claimants thus did not file their Motion in a vacuum—it was a component of the briefing contemplated by the Scheduling Order and merely

4

sought to articulate Claimants' arguments on two purely legal issues on which Objectors' motions to dismiss depend. For this reason, Claimants also incorporated the arguments in the Motion into their brief in opposition to the motions to dismiss. ECF No. 13464 in Case No. 17-3283, at 18, 23 ("Claimants' MTD Opp."). Having asked this Court through their motions to dismiss to resolve identical issues, it is difficult to credit Objectors' newfound belief that the issues are not ripe.

### B. If the Issues Are Unripe, the Motions to Dismiss Cannot Be Granted

More importantly, Objectors' newfound ripeness arguments are also puzzling because, if they are correct, the motions to dismiss cannot be granted.

For one, Objectors' nonrecourse argument is one of the central pillars of the motions to dismiss: The first paragraph of the Retiree Committee's motion to dismiss made this expressly clear, and the Oversight Board asserted the argument at least eight separate times. RC MTD 1, 18.[3] The gist of Objectors' argument is that all claims should be dismissed because (1) Claimants' recovery is limited to the value of their collateral by the limited-recourse provisions of the Bond Resolution; (2) under the Section 552 Decision, the value of Claimants' collateral was set on the ERS Petition Date; and (3) the Oversight Board has "promised" to pay Claimants the value of their collateral, which would fully satisfy Claimants' limited-recourse claims. *See* RC Opp. 18; FOMB Opp. 23. Of course, as Claimants argued in their opposition to the motions to dismiss, if Claimants *are not* limited to recovery from their collateral, this argument falls apart. Claimants' MTD Opp.

---

[3] *See* FOMB MTD at 23 ("Even if ERS did breach the Resolution (either before or after the ERS Petition Date), the claims are limited to Claimants' collateral, because the ERS Bonds are nonrecourse."); *id.* at 70 ("Further, even [if ERS negligently performed the contract], Claimants would be entitled to, at most, nonrecourse unsecured prepetition claims for unpaid principal and interest."); *id.* at 71 (same); *id.* at 73 ("Claimants ignore that the contract they had provided for nonrecourse claim for repayment of principal and interest."); *id.* at 79 ("Further, to the extent such Claims are validly asserted against ERS, they can provide Claimants with a claim no greater than a prepetition, nonrecourse Claim against ERS for the amount of unpaid principal and interest on their bonds."); *id.* ("[N]either can Claimants' contractual claims related to nonpayment of principal and interest, such as that ERS violated its prepetition covenants, provide them recourse against ERS."); *id.* at 82 ("In any event, Claimants' contract gives rise to a nonrecourse claim, regardless of which provisions are breached."); *id.* at 83 (same).

18-23. Then, paying Claimants the value of their collateral on the petition date would not fully satisfy Claimants' claims, as Claimants would also have very significant unsecured claims against ERS. *Id.* at 24. Moreover, because the Post-Petition Legislation dramatically undermined Claimants' ability to be repaid on those unsecured claims, Claimants' contract-breach, constitutional, automatic stay, tort, and other challenges to the Post-Petition Legislation remain live disputes that cannot be dismissed on the pleadings. *Id.* at 20-23.

Similarly, Objectors also argued for dismissal of Claimants' administrative expense claims on the ground that even if Claimants *could* assert claims premised upon the Post-Petition Legislation notwithstanding the Section 552 Decision and the limited-recourse nature of the ERS Bonds, those claims cannot be administrative expenses pursuant to § 503(b)(1)(A) and would be discharged by any plan of adjustment. FOMB MTD 25-26; RC MTD 6-9. Thus, Objectors argued, the Court should at least dismiss Claimants' administrative expense motions, even if it allowed Claimants' claims to otherwise go forward. Again, if these issues are not ripe, the Court cannot now determine whether Claimants' claims are administrative expenses or are nondischargeable, and this issue must also be kept alive until the claims are adjudicated on the merits.

## C. The Legal Validity of Objectors' Objections Is Ripe for Resolution Now

As noted above, if Objectors are correct that the legal validity of their objections cannot be resolved until plan confirmation or a full adjudication of the merits of Claimants' claims, the proper result is to deny the motions to dismiss and allow the parties to proceed to discovery and a final judgment on the claims and administrative expense motions. For several reasons, however, Objectors' ripeness arguments are meritless, and the Court can and should decide these issues now.

For one, contrary to Objectors' suggestion, there are no constitutional or jurisdictional ripeness concerns here. "Ripeness presents a constitutional issue and thus a jurisdictional one only when a *plaintiff's injury* 'depend[s] on so many future events that a judicial opinion would be

advice about remote contingencies.'" *In re Caesars Entm't Operating Co., Inc.*, 562 B.R. 168, 175 (Bankr. N.D. Ill. 2016) ("*CEOC*") (quoting *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 538 (7th Cir. 2006)) (emphasis added). That is, ripeness would present a constitutional question only if the *claims themselves* were remote or conjectural. Clearly they are not, as all claims are based on past events. Because the issues raised in the Motion are "part of a larger controversy that is neither conjectural nor speculative," *Sadowski*, 441 F.3d at 538-39, the Court has jurisdiction to decide them. Any ripeness concerns are merely prudential. *See CEOC*, 562 B.R. at 175.

Moreover, prudential ripeness considerations do not justify delaying resolution of the legal validity of Claimants' objections. Ripeness questions concern both the issues of "fit" and "hardship." *Riva v. Com. of Mass.*, 61 F.3d 1003, 1009 (1st Cir. 1995). "The prudential component of the fitness prong concerns whether resolution of the dispute should be postponed in the name of judicial restraint from unnecessary decision of constitutional issues." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017) (quotation marks omitted). Meanwhile, "[t]he hardship prong is wholly prudential and concerns the harm to the parties seeking relief that would come to those parties from our withholding of a decision at this time." *Id.* (quotations, citations, and alterations omitted).

The issues here are fit for review. Courts "exhibit a greater willingness to decide cases that turn on legal issues not likely to be significantly affected by further factual development." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995); *Riva*, 61 F.3d at 1009-10 (same). Thus, "'[c]laims that present purely legal issues are normally fit for judicial decision.'" *CEOC*, 562 B.R. at 176 (quoting *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011)). Here, each of the issues addressed by the Motion is purely legal—indeed, this is precisely why Objectors themselves sought Rule 12(b)(6) dismissals premised on them. In particular, whether provisions of the Bonds limit recourse for contract-

breach and non-contractual claims, and whether claims premised upon the Post-Petition Legislation qualify as administrative expense or nondischargeble claims, are purely legal questions of contract and statutory interpretation, respectively. Objectors have identify no arguably disputed facts that would interfere with resolution of these legal issues. Similarly, whether § 1111(b) overrides the Bonds' recourse limitations does not, as Objectors contend, turn on the specific terms of the final plan. Rather, because the Post-Petition Legislation has *already* ordered transfer of the assets to the Commonwealth, and because ERS has *already* used § 552 to cut off Claimants' pre-petition rights, the plan-sale exception will never apply, regardless of the terms of the final plan. The legal implications of those past events can and should be decided now, as a matter of law.[4]

Finally, the parties will suffer "hardship" if the issues are not resolved. Delaying resolution of the issues until plan confirmation or until all Claimants' claims are fully adjudicated on the merits will only foster uncertainty as the terms of a final plan are developed and negotiated. As in *CEOC*, "[t]he contractual dispute here is part of a much bigger bankruptcy puzzle, one the parties hope to solve through confirmation of a consensual plan. . . . To delay would serve only to keep alive a contractual dispute fit for decision now, 'prevent[ing] the litigants from shaping a settlement strategy and thereby avoiding unnecessary costs.'" *CEOC*, 562 B.R. at 176 (quoting *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 823 (6th Cir. 1981) (insurance coverage dispute was ripe even though underlying liability had not been determined)).[5]

_____

[4] Contrary to the Board's suggestion, FOMB Opp. 13-14, nothing precludes the Court from resolving the § 1111(b) issues through a claim objection. In *CEOC*, for example, the court did just that, rejecting an argument that the § 1111(b) issues were not ripe until the claimants' collateral was valued. *CEOC*, 562 B.R. 174-77. Similarly, courts have resolved questions regarding administrative expense treatment of claims in advance of those claims being proven. *See In re City of San Bernardino*, 558 B.R. 321, 329 (C.D. Cal. 2016) ("[I]nsofar as Newberry seeks damages or fees from the City for the alleged constitutional violation, they can file a claim for administrative expenses.").

[5] The Retiree Committee argues that the issues are not ripe for review because a determination that the Bonds are *ultra vires* would mean none of Claimants' claims could be allowed. RC Opp. 1. Of course, that is also true for the motions to dismiss and, indeed, *every* issue that is either pending or has already been decided in this case. This case has always proceeded on the assumption that the Bonds are valid until it is held otherwise.

## II.   NO CONTRACTUAL LIMITATIONS ON RECOURSE APPLY TO CLAIMS AGAINST ERS PURSUANT TO SECTION 1111(b)

As explained in the Motion, limitations on recourse that might otherwise affect claims against ERS do not apply pursuant to 11 U.S.C. § 1111(b)(1)(A) to any deficiency between the value of Claimants' secured claim and the principal and interest due under the Bonds. In their opposition briefs, Objectors do not contest Claimants' claims for principal and interest due under the Bonds (except on *ultra vires* grounds), and they acknowledge that unless an exception applies or Claimants' class elects different treatment, § 1111(b)(1)(A) automatically converts Claimants' limited-recourse claims to full-recourse claims. But Objectors argue that those recourse claims will be defeated by the plan-sale exception of § 1111(b)(1)(A)(ii), because ERS intends to sell its property to the Commonwealth pursuant to the plan. Objectors are wrong, for three reasons.

### 1.   The Post-Petition Legislation Has Already Ordered the Transfer of ERS's Property to the Commonwealth for No Consideration

For one, as Claimants explained in the Motion, the plan-sale exception cannot apply, regardless of the specific final terms of the plan, because the Post-Petition Legislation has already mandated that all of ERS's assets (or the proceeds thereof) be transferred to the Commonwealth for no consideration. Mot. 11-12. Objectors provide no real response to this argument. They assert only that (1) after Claimants objected to the Post-Petition Legislation, "the Commonwealth and the Oversight Board agreed Claimants would be paid the value of the collateral," FOMB Opp. 16; (2) "[r]egardless of whether ERS should have transferred its assets pursuant to the Post-Petition Legislation, it has not," *id.*; and (3) "[e]ven if the Post-Petition Legislation did require ERS to transfer its assets in 2017, hypothetical acts that 'should' have been performed under Puerto Rico law do not affect the property of ERS, nor the operation of PROMESA and the Plan in relation to such property," *id.* All of this is wrong, for several reasons.

First, whether Objectors have "agreed Claimants would be paid the value of the collateral"

9

(which they have not yet followed through on) is beside the point. Secured creditors are *always* paid the value of their collateral because § 1129(b)(2)(A) mandates this as a condition of a contested plan confirmation. *See* 11 U.S.C. § 1129(b)(2)(A); *In re Ponce de Leon, 1403, Inc.*, 523 B.R. 349, 389 (Bankr. D.P.R. 2014). Indeed, § 1111(b) presumes a secured creditor will be paid the value of its collateral, but that the collateral is worth less than the total claim.[6]

Second, similarly irrelevant is Objectors' factual contention that ERS has not actually transferred its property pursuant to the Post-Petition Legislation. For one, Claimants contest this claim because the Post-Petition Legislation itself transferred equitable ownership from ERS to the Commonwealth, even if ERS remained in possession of the assets as a holder for the benefit of the Commonwealth. *See Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007) (holding that Commonwealth-created entity had equitable ownership of funds held by Secretary of Treasury because Commonwealth statute required Secretary to transfer funds to entity). In any event, this argument is also beside the point because, as Claimants explained in the Motion, even if ERS still owns its property, the Post-Petition Legislation requires ERS to sell that property and transfer the proceeds to the Commonwealth *for no consideration. See* Mot. 11-12. Nothing in the Post-Petition Legislation allows the Commonwealth to pay for ERS's assets or ERS to retain money received for them. *Id.*

Finally, the Oversight Board's surprising claims that "acts that allegedly 'should' have been performed under Puerto Rico law do not affect the property of ERS, nor the operation of PROMESA and the Plan in relation to such property," and that "[t]he Post-Petition Legislation

---

[6] Objectors' supposed agreement also has no legal significance to these contested matters, and an embarrassed debtor's supposed promise is no substitute for Claimants' constitutional and other rights. *See Peaje Investments LLC v. Garcia-Padilla*, 845 F.3d 505, 514 (1st Cir. 2017) (rejecting ERS's representations regarding the safety of the ERS Bondholders' collateral). *Cf.* 11 U.S.C. § 361 (expressly providing that an administrative expense claim does not constitute adequate protection).

cannot alter ERS's rights under PROMESA or the applicability of § 1111(b) to the claims" are absurd. FOMB Opp. 16. PROMESA does not permit ERS and the Commonwealth to wantonly disregard Commonwealth law, particularly laws that were crafted by the Oversight Board and required by PROMESA's fiscal plan. If the Post-Petition Legislation requires ERS to transfer its assets to the Commonwealth for no consideration, ERS must comply with that directive (unless, of course, the law is void *ab initio* as a violation of the automatic stay or otherwise, as Claimants have argued). Indeed, because the Post-Petition Legislation does not allow ERS to retain the proceeds of any sale of its property, no plan that involves a "sale" of ERS property for consideration will be confirmable. *See* 48 U.S.C. § 2174(b)(3) (permitting Court to confirm a plan only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan").

## 2. The Plan-Sale Exception Cannot Apply Because No Plan Could Sell All of Claimants' Collateral

Next, the plan-sale exception cannot apply here because no plan can purport to sell all of Claimants' pre-petition collateral. Mot. 15-16. Rather, a significant portion of Claimants' pre-petition collateral has already been disposed of by the Post-Petition Legislation and ERS's use of § 552. *See* Mot. at 15. The Oversight Board offers two responses. First, citing *In re Houston Reg'l Sports Network*, 886 F.3d at 526-27, it argues that the plan-sale exception does not require all of a creditor's collateral to be sold, *see* FOMB Opp. 19. Second, Objectors assert (without elaboration or citation) that even if it does, the Plan nonetheless does propose to sell all of Claimants' collateral. *Id.* at 20. Both of the Board's arguments are wrong.

First, the Oversight Board's citation to *Houston Regional Sports Network* does not help it, as the case actually supports Claimants. There, the Fifth Circuit held that the sale of a portion of a secured creditor's collateral did not preclude the creditor from asserting rights under § 1111(b) as to the remainder. 886 F.3d at 526-27. That is exactly what Claimants argue here. Even if a

portion of the pre-petition Pledged Property is "sold" under the plan, the vast majority will not be, because it was already disposed of via the Post-Petition Legislation.  Just as in *Houston Regional Sports Network*, Claimants must be paid the value of any collateral that is sold, but they must *also* be able to exercise rights under § 1111(b) for property not sold.  *Id.*  Objectors have no authority to support their argument that the plan-sale exception defeats all recourse rights under § 1111(b), simply because a small portion of the collateral is sold.

Second, Objectors' assertion—without elaboration or citation—that "the Plan *does* propose to sell all of Claimants' collateral" is simply not true.  FOMB Opp. 20.  The collateral package possessed by Claimants before ERS's Title III case included employer contributions previously received by ERS, employer contributions calculated and owed but unpaid as of the petition date ("Accounts Receivable"), and the right to receive future employer contributions, among other things.  But while ERS purports to "sell" some of the collateral existing on the petition date—namely, some of the proceeds of employer contributions previously received—ERS does not even purport to sell either Accounts Receivable or the right to receive future employer contributions.

Nor could they be sold.  Section 2.5 of Act 106 has already converted ERS's Accounts Receivable into a debt owed to the Commonwealth, to be satisfied by payment of Pay-Go Fees. *See* Act 106 § 2.5 ("Payments made to the [Commonwealth's] Accumulated Pension Benefits Payment Account shall be deducted from the Contributions Owed and any other debt that, as of the effective date of this Act, government entities and other covered entities may have with the Retirement Systems . . . .").  And, of course, ERS has already used § 552 to severely curtail the scope of Claimants' lien on the right to receive future employer contributions, before those contributions were also converted into Pay-Go Fees.  *See* Act 106 § 2.4(e) ("Beginning July 1, 2017, [participating employers] . . . shall not be required to make employer contributions . . . to

12

the Accumulated Pension Benefits Payment Account or the Retirement Systems, but shall be required to pay their applicable Pay-Go fee based on the parameters established in this Act."). As recognized in *Houston Regional Sports Network*, Claimants can assert full-recourse claims in connection with the unsold portion of their pre-petition collateral.

### 3. Even if the Plan-Sale Exception Applies, the Proposed "Sale" Fails It

Finally, even *if* the plan-sale exception could apply here, the terms of the proposed Plan do not satisfy § 1111(b)(1)(A)(ii). As Claimants explained, courts have routinely recognized that in order for a "sale" to amount to a sale "under the plan," it must afford certain protections to secured creditors. *See* Mot. 12-15. Chief among these protections are the right to credit bid and the requirement that the sale occur substantially contemporaneous with the plan's effective date, through a public auction or fully-disclosed private sale. *Id.*

In response, Objectors argue that the plan need not give Claimants the right to credit bid, because the right to credit bid stems from Bankruptcy Code § 363(k), which is not incorporated into PROMESA. *See* FOMB Opp. 17 (citing *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n. 12 (Bankr. S.D. Fla. 1995)). This is not correct. Virtually all courts have held that the right to credit bid is required to meet the sale exception of § 1111(b) regardless of whether the sale is occurring through a plan or a § 363 sale. *See, e.g., In re Matrix Dev. Corp.*, No. 08-32798-TMB11, 2009 WL 2169717, at *4 (Bankr. D. Or. July 16, 2009) (compiling cases requiring secured creditor's right to credit bid at a sale in order for the exception to apply); *In re Kent Terminal Corp.*, 166 B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) (holding that "[i]f a *plan* proposes the sale of a creditor's collateral free and clear of liens, the lienholder has the unconditional right to bid in its lien") (emphasis added); *In re Tampa Bay Assocs., Ltd.*, 864 F.2d 47, 50 (5th Cir. 1989) ("Through these exceptions it appears that Congress intended to protect the nonrecourse undersecured creditor only if such a creditor is not permitted to purchase the collateral at a sale or if the debtor intends to

retain the collateral after bankruptcy and not repay the debt in full."); *In re Montgomery Ward, LLC*, 634 F.3d 732, 740 (3d Cir. 2011) ("If the debtor elects to sell the collateral in the Chapter 11 proceeding, the creditor can bid on it.").

These courts' recognition of the right to credit bid was not a consequence of § 363(k), but was because this right is necessary to approximate the creditor's pre-bankruptcy rights. *See In re 680 Fifth Ave. Assoc.*, 29 F.3d at 97-98. "The reason for inclusion of the exception contained in § 1111(b)(1)(B)(ii) is that a secured creditor who has the opportunity to protect his position by bidding in debt at the sale of his collateral and recovering his collateral, has the benefit of his bargain and requires no special protection." *In re Waterways Barge Partnership*, 104 B.R. 776, 782 (Bankr. N.D. Miss. 1989). If secured creditors are not permitted to bid their credit at a sale of their collateral, they have not received treatment similar to what they bargained for, and there is no justification for eliminating the important rights conferred by § 1111(b).[7]

## III.   CLAIMANTS ARE NOT LIMITED TO RECOVERY FROM COLLATERAL EVEN APART FROM SECTION 1111(b)

As explained in the Motion, even aside from § 1111(b), Claimants have significant unsecured claims because the Bonds provide recourse against the Pledged Property and do not limit Claimants' ability to recover for breaches of covenants, torts, constitutional violations, or other unlawful acts. Mot. 16-24. Again, Objectors' arguments to the contrary are not persuasive.

---

[7] Objectors' argument that the plan sale need not occur in a public auction or be contemporaneous with the effective date of the plan misunderstands Claimants' argument. Claimants did not argue that only a public auction can satisfy § 1111(b)(1)(A)(ii) or that the sale must necessarily occur on the effective date. Claimants argued—and courts have held—that if a sale is not public, then any private sale must "disclose[ ] the specifics of the sale, including the name of the purchaser, the sale price, the proposed closing date, other terms of the sale, and where the proposed sale will occur substantially contemporaneously with plan confirmation." *See* Mot. 13 (citing *Matrix Dev. Corp.*, 2009 WL 2169717 at *5); *In re Western Real Estate Fund, Inc.*, 75 B.R. 580, 589 (Bankr. W.D. Okla. 1987). Here, however, because the Post-Petition Legislation has already transferred equitable ownership of ERS's property to the Commonwealth, no such sale on the terms described in the plan can occur.

### A.  Claimants Have Recourse Against the Pledged Property

As an initial matter, as Claimants explained in the Motion, regardless of the precise scope of the limited-recourse provisions, Claimants' recovery under the ERS Bonds is not limited to their collateral because the Bonds and Bond Resolution expressly give Claimants recourse against the Pledged Property. Mot. 24.  While the Bonds provide that they are "payable by the System solely from the Pledged Property," nothing in the Bonds or the Bond Resolution requires the existence of a lien on Pledged Property or limits Claimants' recovery to the value of their collateral. Specimen ERS Bond at 1, attached hereto as Exhibit A; *see also* Bond Resolution § 201 (same). To the contrary, Claimants have significant unsecured claims against the Pledged Property, even without a lien.  *See* 11 U.S.C. § 102(2); 11 U.S.C. § 502; Mot. 24; Claimants' MTD Opp. 19. Thus, even if the Section 552 Decision cut off Claimants' lien on post-petition employer contributions, it did not alter the definition of Pledged Property and did not eliminate Claimants' contractual right to be repaid from the Pledged Property (including the stream of post-petition employer contributions).   Objectors are therefore wrong as a matter of law in asserting that Claimants' recovery is limited to their collateral.

### B.  The Bonds Do Not Limit Recourse for Breaches of the Bond Resolution

Next, contrary to Objectors' contention, neither the Bond Resolution nor the Bonds limit Claimants' recovery for breaches of covenants in the Bond Resolution.

Whether the Bond Resolution or the Bonds limit Claimants' recovery for breaches of the Bond Resolution is a question of contract interpretation.  *See, e.g., People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*, 814 F. Supp. 159, 162 (D. Me. 1993).  Under Puerto Rico law, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." 31 L.P.R.A. § 3471.  Puerto Rico law is therefore "strict in its mandate that courts should enforce the literal sense of a written contract, unless the

words are somehow contrary to the intent of the parties." *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 15 (1st Cir. 1996); *see also Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.,* 23 F.3d 564, 567 (1st Cir. 1994) ("When an agreement leaves no doubt as to the intention of the parties, a court should not look beyond the literal terms of the contract.").

Yet even though "the starting point of contract interpretation must be the expressions contained in the words," *Marcial v. Tome*, 144 D.P.R. 522, 537 (P.R. 1997), neither the Oversight Board nor the Retiree Committee even attempts an interpretation of the Bond Resolution or the Bonds that could support their claim that the Bonds' limited-recourse provision applies to breaches of covenants in the Bond Resolution.   Instead, as an afterthought in the last paragraph of its argument, the Oversight Board simply asserts, without citation or explanation, that the Bond Resolution's limited-recourse provision—§ 201—"limits Claimants' recovery to their collateral regardless of the nature of the default" and that "[a]ll remedies under § 1102 are subject to § 201." FOMB Opp. 26.

The Oversight Board is wrong. Section 201 of the Bond Resolution (which authorizes ERS to issue limited-recourse bonds) provides that "[t]he *Bonds* shall be special obligations of the System, payable solely from the Pledged Property without recourse against other assets of the System," and that "[n]or shall any *Bond* . . . be payable out of any funds or assets other than the Pledged Property . . . ." (emphases added). Similarly, the Bonds provide that "[t]his . . . *Bond* is payable by the System solely from Pledged Property held under the Resolution," and that "[t]here is pledged *to the payment of the principal or redemption price of, if any, and interest on the Bonds* in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution . . . ." Specimen ERS Bond at 1, 2 (emphases added).  Damages from covenant breaches, however, are not "payment[s] of the principal . . . and interest on the Bonds." *Id.*

16

Nor does the Oversight Board provide any basis for its assertion that § 1102(1)(ii) is "subject to" § 201. And, indeed, none exists. As Claimants explained in the Motion, *see* Mot. 19-20, § 1102(1)(ii) separately gives Claimants power (i) to bring actions "to enforce all rights of the Bondholders" under the Bond Resolution, Bond Resolution § 1102(1)(i); *and* (ii) to bring "actions upon the Bonds limited, upon recovery thereunder, to the Pledged Property," Bond Resolution § 1102(1)(ii). That § 1102 limits recovery under the Bonds to the Pledged Property, but contains no such limitation for enforcement of the Bond Resolution, shows that such claims are not limited.

Rather than interpret the actual text of the Bond Resolution or the Bonds, the Oversight Board instead focuses on irrelevant and unpersuasive distinctions of Claimants' cases. FOMB Opp. 22-24. The critical question, however, is the interpretation of the contracts at issue here, not the case law interpreting other, different documents. Objectors' total failure to provide an interpretation of the Bond Resolution or the Bonds that supports their position should be enough to resolve the issue in Claimants' favor. In any event, the case law is universally on Claimants' side. That case law explains that courts generally regard limited-recourse provisions as limiting only the underlying payment obligation, not recovery for breaches of other contractual obligations. *See, e.g.*, *People's Heritage Sav. Bank v. Recoll Mgmt., Inc.*, 814 F. Supp. 159, 160 (D. Me. 1993); *First Indep. Bank of Nevada v. Mohave State Bank*, 2010 WL 1408890, at *1 (D. Ariz. Apr. 7, 2010). Objectors have provided no authority to suggest the default rule is anything other than this, or any reason why the Bond Resolution should be interpreted differently.

Nor is there any merit to Objectors' supposed distinction between loan participation agreements and bonds. Objectors cite absolutely no authority for this distinction, and there is none. Claimants' cases do not suggest that their interpretation of the default rule for nonrecourse provisions had anything to do with the fact that the provision was contained in a loan participation

agreement, rather than another type of contract.  *See People's Heritage Sav. Bank*, 814 F. Supp. at

163;  *First Indep. Bank of Nevada*, 2010 WL 1408890, at *2-3.  To the contrary, they applied

principles of contract interpretation and relied on case law from tax disputes, mortgage contracts,

and secured transactions.  *See People's Heritage Sav. Bank*, 814 F. Supp. at 163.  And contrary to

Objectors' contention, courts have applied the default rule outside of the loan participation context,

including in equipment financing transactions cited by Claimants in the Motion.  *See USX Corp.*

*v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993);  *Duluth Lighthouse for the Blind v. C.G.*

*Bretting Mfg. Co.*, No. 99-1601, 2001 WL 1640079, at *3 (D. Minn. Sept. 25, 2001).

And, indeed, Objectors' distinction is artificial:  In the loan participation agreements at

issue in Claimants' cases, the sellers promised to pay the purchasers a portion of the payment

stream they received from the borrowers (without recourse if the payment stream was insufficient),

but they also promised to take other actions to preserve the payment stream and/or notify the

purchasers if the payment stream was in danger.  Faced with this, courts held that the nonrecourse

provisions applied only to actions seeking to recover the underlying payment obligation;  they did

not limit the purchasers' ability to pursue claims for breach of the other covenants in the

agreements.  The same is true here:  In the Bond Resolution, ERS promised to pay bondholders

from, among other things, the stream of employer contributions received from employers (without

recourse if the payment stream was insufficient),  but it also promised to take other actions to

protect the payment stream and/or notify bondholders if the payment stream was in danger.

Next, Objectors make much of the fact that the Bond Resolution and the Bonds are related

agreements that refer to each other for various reasons.  *See* FOMB Opp. 24-26; RC Opp. 11-14.

This, again, is beside the point.  There is no question that the Bonds and Bond Resolution are

related agreements, and Claimants did not argue otherwise.  But that does not answer the critical

question whether the limited-recourse provisions apply only to the payment obligation under the Bonds or also to all covenants included in the Bond Resolution. To answer that question, the Court must interpret § 201 of the Bond Resolution and the limited-recourse provision of the Bonds, and, as explained above and in the Motion, such an interpretation shows that recourse is limited to Pledged Property only on claims for payment of principal and interest due under the Bonds.

Finally, having nothing to support its position, the Board falls back on a comment to the definition of "General Intangibles" in U.C.C. Article 9. *See* FOMB Opp. 21-22 (citing U.C.C. § 9-102, cmt. 5(d)). That comment has nothing to do with limited-recourse provisions. It simply explains that Article 9's perfection and attachment rules do not turn on the distinction between the payment obligation and the covenants supporting that obligation. *See* U.C.C. § 9-102, cmt. 5(d) ("For example, attachment and perfection of an assignment of a right to payment of a monetary obligation, whether it be an account or a payment intangible, also carries these ancillary rights."). No court has relied on this comment to interpret the scope of a limited-recourse provision.

### C. The Bond Resolution Does Not Preclude Recourse Claims Against ERS for Tortious, Unconstitutional, and Other Wrongful Conduct

Claimants also are not precluded from seeking full recourse damages based on their claims asserted against ERS under the language of the Bond Resolution. The Bond Resolution expressly states that it does *not* preclude other rights or remedies: "[E]ach and every . . . remedy [under the Bond Resolution] shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute." Bond Resolution § 1108. Objectors do not dispute this fact. Instead, Objectors argue only that under Puerto Rico law, Claimants may not recover under a noncontractual theory when a contract exists, citing *Isla Nena Air Services, Inc. v. Cessna Aircraft C*o., 449 F.3d 85, 88-91 (1st Cir. 2006).

This, however, is a merits argument that has nothing to do with whether the limited-

recourse provision applies to non-contractual claims. In any event, Objectors' argument is also wrong. Puerto Rico law imposes no categorical bar against tort claims when a contract exists, and *Isla Nena* does not stand for the broad proposition Objectors assert. *Isla Nena* held simply that the economic loss rule precludes tort liability under Article 1802 of the Puerto Rico Civil Code in a products liability case. *Id.* Much more on point is *Ramos Lozada v. Orientalist Rattan Furniture Inc.,* in which the Puerto Rico Supreme Court extensively discussed contract and tort claims and made clear that the existence of a contract does not preclude tort liability.   130 D.P.R. 712 (P.R. 1992); *see also Ocasio Jaurbe v. Eastern Airlines, Inc.*, 125 D.P.R. 410 (P.R. 1990) (same).[8]

In any event, many of the claims asserted by Claimants are not tort claims at all, but are constitutional, automatic stay, fraud, and statutory claims, which Objectors do not even suggest are precluded because of the existence of the Bond Resolution.  Further, allowing Claimants' tort and other non-contractual claims against ERS to proceed is particularly appropriate in light of the ongoing *ultra vires* litigation.   If the Court determines that the ERS Bonds were issued *ultra vires* and that Claimants cannot recover amounts payable on the ERS Bonds under Section 8-202 of the Uniform Commercial Code, Claimants would have a right to pursue non-contractual claims against ERS notwithstanding Objectors' argument.  For the reasons explained in the Motion, none of these claims are barred by § 201 or the Bonds. Mot. 21-23.

## IV.   CLAIMANTS' POST-PETITION CLAIMS ARE ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY UNDER BANKRUPTCY CODE SECTION 503(b)(1) AND ARE NONDISCHARGEABLE

### A.  Claimants' Post-Petition Claims Are Administrative Expenses

#### 1.  The Post-Petition Claims Meet the Requirements of Section 503(b)(1)(A)

---

[8]   The Retiree Committee also relies on *Bresler v. Wilmington Trust Co.*, 761 F. App'x 160 (4th Cir. 2019). RC Opp. 15. There, the court found that a party could not "obtain a double recovery in tort and contract for the same injury." *Bresler*, 761 F. App'x at 162.  Objectors do not allege that a risk of double recovery exists here, however.

Claimants explained in their Motion why their post-petition claims are allowable as administrative expenses under *Reading Co. v. Brown*, 391 U.S. 471, 477-82 (1968), and its progeny. Motion at 25-26. Under the *Reading* exception, post-petition torts, unconstitutional conduct, and other wrongful acts are allowable as administrative expenses under § 503(b)(1)(A) of the Bankruptcy Code. *E.g.*, *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 203 (1st Cir. 1985); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1975); *In re City of San Bernardino*, 558 B.R. 321, 329-30 (C.D. Cal. 2016). Claimants' claims against the Commonwealth and ERS based on the Post-Petition Legislation arise post-petition and thus, if allowed, are administrative expenses under 11 U.S.C. § 503(b)(1). None of Objectors' contrary arguments are persuasive.

### a. Claims Based Upon the Post-Petition Legislation Did Not Arise Pre-Petition

Objectors first argue that the *Reading* exception is inapplicable. They assert that Claimants' claims have a pre-petition genesis because "the Commonwealth and ERS impaired Claimants' pre-petition right to payment under the 2008 Bond Resolution through the enactment of the Post-Petition Legislation." RC Opp. 22; *see also* FOMB Opp. 29-31. This argument fails.

Most notably, *the Commonwealth* was not a party to the Bond Resolution at all and, in fact, the Bond Resolution made expressly clear that the Commonwealth is "not liable" for the ERS Bonds. Bond Resolution §§ 201, 1305; *see also* Mot. 30-31. Without a pre-petition contractual relationship between the ERS Bondholders and the Commonwealth, there is no basis for stating that claims against the Commonwealth have a pre-petition genesis. *See In re Hemingway Transp., Inc.*, 954 F.2d 1, 7 (1st Cir. 1992) (*Reading* does not apply to claims arising from a "prepetition contract *with the debtor*" (emphasis added)); *In re GT Advanced Techs., Inc.*, 547 B.R. 3, 13 (D.N.H. 2016) (same). Indeed, Objectors offer no support whatsoever for their contrary assertion.

With respect to ERS, Objectors' heavy focus on the effective date of the Bond Resolution

misses the mark.  A claim does not arise pre-petition simply because post-petition wrongdoing affects a pre-petition contract.  Rather, the critical inquiry is whether the *source of the obligation to pay* is pre- or post-petition.   As the First Circuit has made clear, a claim arises post-petition when "[t]he source of the claimant's right to payment . . . originated during the postpetition period."  *Hemingway*, 954 F.2d at 7 n.7; *see also In re Abercrombie*, 139 F.3d 755, 759 (9th Cir. 1998) (explaining that the claim in *Hemingway* arose pre-petition because "*the source of the estate's obligation* remain[ed] [a] prepetition fee provision" (emphasis added)).  Both the Supreme Court and the First Circuit have made clear that the source of the obligation to pay on a post-petition tort claim is the tort itself.  *E.g.*, *Reading*, 391 U.S. at 482 ("[I]t is theoretically sounder . . . to treat tort claims arising" post-petition as administrative expenses); *Mammoth Mart*, 536 F.2d at 955 (recognizing that "[w]hen the debtor-in-possession commits a tort," the claim has a post-petition genesis).  While the contract between Claimants and ERS might supply the measure of damages for the unconstitutional and tortious acts, Claimants' claims nonetheless have their source in tort or constitutional law—not contract.  And the obligation to pay as a matter of tort or constitutional law did not arise until enactment of the Post-Petition Legislation.  The same analysis applies to all non-contractual claims asserted by Claimants against ERS (and the Commonwealth).

The authority cited by the Retiree Committee does not aid their cause.  They point out that *Hemingway* stated that "[w]e are aware of no authority that the [*Reading*] exception encompasses a right to payment originating in a prepetition contract with the debtor."  954 F.2d at 7; RC Opp. 23.  But Claimants' "right to payment" does not "originat[e] in a prepetition contract with [ERS]"—it originates in constitutional and tort law.  This language from *Hemingway* applies only to the extent that Claimants seek to recover for failure to pay principal and interest due under the Bonds and for breaches of the Bond Resolution by ERS.  Similarly, the Retiree Committee's

22

reliance on the Ninth Circuit's decision in *Abercrombie* is also misplaced. RC Opp. 23. Consistent with *Hemingway*, *Abercrombie* simply held that an "award of fees does not qualify as an administrative expense" because "[t]he Oregon court awarded attorneys' fees in accordance with the debtor's *prepetition* contract with [the claimant]." 139 F.3d 755, 758 (9th Cir. 1998). Thus, "the source of the estate's obligation remain[ed] the prepetition fee provision." *Id*. at 759. Nor does *Mammoth Mart* help. There, the First Circuit held that claims are "not entitled to priority as a cost and expense of administration simply because the claimants' right to payment arises after the debtor-in-possession has taken some action." 536 F.2d at 955; RC Opp. 23. This language again simply recognizes that what matters is whether the *source of the obligation* to pay arises pre- or post-petition, not simply whether the actions triggering the right to payment occurred after the petition date (such as with a post-petition breach of a pre-petition contract). *Mammoth Mart* aids Claimants because it makes clear that "[w]hen the debtor-in-possession commits a tort," like here, the claim has a post-petition genesis. *Id*. at 955.

### b. The *Reading* Exception Does Not Require a Showing of Unfairness in Individual Cases to Apply

The Oversight Board argues that *Reading* requires a showing of unfairness, which Claimants have not established. FOMB Opp. 31-32. Although *Reading* stemmed from a concern for fairness—that it was "more natural and just" to allow those injured by operation of a business during bankruptcy proceedings to "recover ahead of . . . those for whose benefit the business is carried on"—as a matter of doctrine, the exception does not require a showing of unfairness in individual cases. 391 U.S. at 482. Rather, the First Circuit has considered whether the fairness rationale applies categorically in deciding whether *Reading* applies. Thus, *In re Charles Bank Laundry, Inc.* stated that "[if] fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then, *a fortiori*, an intentional act which violates the law and

damages others should be so treated." *In re Charlesbank Laundry, Inc.*, 755 F.2d at 203.

In any event, even if *Reading* required a showing unfairness in individual cases, that requirement would be satisfied here. Claimants have asserted that the Commonwealth and ERS devised an unlawful scheme to enrich themselves and a group of favored creditors at the expense of Claimants. *See* Mot. 2-4. That conduct certainly meets any fairness requirement under *Reading*, which involved only a negligence claim. 391 U.S. at 473.

The Oversight Board also claims that *In re City of San Bernardino* does not stand for the straightforward proposition that *Reading* applies to post-petition constitutional violations. 558 B.R. 321, 329-30 (C.D. Cal. 2016); FOMB Opp. 32. Rather, the Board claims that *San Bernardino* reached this holding in part because it would have been "unfair to other similarly situated creditors" to rule otherwise. FOMB Opp. 32. But that quotation from *San Bernardino* concerned lifting the automatic stay, *not* the portion of the opinion discussing whether a party could seek administrative expenses. *See* 558 B.R. at 333. The relevant portion of *San Bernardino* says plainly and without qualification that "insofar as Newberry seeks damages or fees from the City for the alleged constitutional violation, they can file a claim for administrative expenses." *Id.* at 329. There is no mention that the *Reading* exception applies only after a showing of unfairness in the particular case. *See id.* In any event, for the reasons stated above, Claimants assert a wide variety of claims which would satisfy any unfairness requirement many times over.

### c.   *Reading* **Applies to Constitutional Claims**

The Oversight Board lastly argues that duly enacted legislation "cannot be a tort." FOMB Opp. 33. But that is a *merits* argument discussed more fully in the briefing on the motion to dismiss. *See* Claimants' MTD Opp. at 88-89. Claimants' position is only that, to the extent they succeed on the merits, their claims must be allowed as administrative expenses. In any event, the *Reading* exception is not strictly limited to torts but, under its fairness rationale, has been extended

to unconstitutional conduct, intentional wrongdoing, and other actions along those lines. *See supra* at 21; *Charlesbank Laundry*, 755 F.2d at 203. Objectors cite no authority for the astounding claim that the Commonwealth could act unconstitutionally but somehow *not* qualify under the *Reading* exception. Nor do they even attempt to explain why a *constitutional* claim should be given less weight than a *tort* claim. *See* FOMB Opp. 33.

Finally, the Board's attempts to draw a distinction between the wrongful conduct in *Reading* and *Charlesbank*—a negligently caused fire or a zoning violation coupled with disobeying a court order—and the wrongful conduct here are nonsensical. 755 F.2d at 203; 391 U.S. at 473; FOMB Opp. 33. Courts have straightforwardly applied *Reading* to constitutional violations. There is simply no basis for the assertion that Claimants' claims "should be rejected out of hand" because negligently causing a fire or deliberately violating a court order are somehow worse than the wrongdoing here. Indeed, intentionally, unconstitutionally, and tortiously causing billions of dollars of harm surpasses the wrongful conduct in *Reading* and *Charlesbank*.[9]

### d. Administrative Expenses Are Allowable in Title III Cases

The Retiree Committee alone argues that because PROMESA, like chapter 9, does not create a bankruptcy "estate," there can be no administrative expenses for "the actual and necessary costs of preserving the estate" under *Reading*. RC Opp. 19-21. The Retiree Committee treats *In re New York Off-Track Betting Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010), as if it were controlling precedent. But it is not, of course, and is only relevant to the extent it is persuasive. For the reasons given in Claimants' Motion, it is not persuasive and, in fact, threatens significant disruption to the Bankruptcy Code and the Oversight Board's approach to these cases. Mot. 26-

---

[9] The Retiree Committee also argues that § 552 bars Claimants' claims. RC Opp. 18. But the legal issues raised in the Motion do not turn on whether § 552 applies because, as discussed at length in Claimants' MTD Opposition, the collateral includes more than simply the post-petition employer contributions affected by that decision. Claimants' MTD Opp. at 13-18; *see also* Mot. 6 n.7.

30.  The Retiree Committee's attempt to rehabilitate *Off-Track Betting* fails for several reasons.

First, the Retiree Committee claims that *Off-Track Betting*'s approach "gives application *both* to chapter 9's wholesale incorporation of § 503 *and* its wholesale exclusion of § 541 by limiting administrative expenses to 'expenses incurred in or in connection with the case.'" RC Opp. 20.  As an initial matter, *Off-Track Betting* never discussed the argument that chapter 9 incorporates the entirety of § 503, including the administrative expense provision of § 503(b)(1)(A), so it is hardly authority on the matter.  In any event, the Retiree Committee's proposed solution does not work.  Limiting expenses to those incurred in connection "with the *case*" does not honor the statutory command that administrative expenses are allowed for the costs "of preserving the *estate*." 11 U.S.C. § 503(b)(1)(A) (emphasis added).  The Retiree Committee's interpretation does not respect chapter 9's wholesale incorporation of § 503, including § 503(b)(1)(A), but rather rewrites the phrase "the estate."

Second, the Retiree Committee claims that its interpretation will not cause any problems for the broader Bankruptcy Code. RC Opp. 20-21.  It acknowledges that "'property of the estate', when used in a section that is made applicable in a case under this chapter by section 103(e) or 901 of this title, means property of the debtor." 11 U.S.C. § 902; RC Opp. 21.  And it says that this definition *does not* apply to the term "estate" in § 503(b)(1)(A) but *does* apply to other uses of "estate" elsewhere in the code where the word "property" is used near "estate." RC Opp. 21.  That is "slicing the baloney mighty thin." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1215 (2018).  Certainly, it is difficult to understand why *some* phrases other than the defined one—"property of the estate"—might mean "property of the debtor" but others do not.  The phrase "the estate's interest in such property" is not the statutorily defined term "property of the estate" any more than the word "estate" alone.  Nor is there any meaningful distinction between "the estate's interest in

26

such property" and the "estate"; an "estate" of course is not a living, breathing thing, so a reference to "estate" necessarily refers to its "property." Accordingly, either the statutory definition applies only to "property of the estate"—in which case serious violence is done to the Bankruptcy Code, *see* Motion at 26-30—or it applies to analogous phrases including "estate" alone.

In any event, only *some* of the provisions Claimants cited in their Motion refer to "property" near "estate." Motion at 29. For example, 11 U.S.C. § 503(b)(1)(B)(i) refers to "any tax . . . incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, or both, except a tax of a kind specified in section 507(a)(8) of this title." 11 U.S.C. § 510(c)(2) states that a "court may … order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 552(b)(1) explains that certain security "interest[s] extend[] to such proceeds, products, offspring, or profits acquired by the estate." *See also id.* § 552(b)(2). And 11 U.S.C. § 365 talks about executory contracts and unexpired leases and uses the term "estate" several times without any reference to "property". So the Retiree Committee's proposed fix still results in serious damage to the Bankruptcy Code.

Third, the Retiree Committee wholly ignores another problem with its interpretation that Claimants pointed out in their Motion. Namely, that PROMESA § 301 specifically incorporates § 507(a)(2)—but not the rest of § 507—into Title III cases. Motion at 28. Section 507(a)(2) provides the priority of expenses described in § 503(b), so it is unlikely that Congress would have incorporated § 507(a)(2) if § 503(b)(1)(A) categorically did not apply in chapter 9 cases. *Id.*

### e. *Reading* Does Not Require a Showing that the Administrative Expenses Provided a Benefit to the Debtor's Property

Finally, the Retiree Committee claims that, to qualify for administrative expense priority, Claimants must show that the Objector provided a "benefit . . . to the Debtor's estates" that occurred only after the petition date. RC Opp. 22; *see also* FOMB Opp. 31. But *Reading* is an

27

"exception" to the normal requirement of showing a benefit to an estate. *In re Corbett*, 550 B.R. 170, 184 (D. Mass. 2016). "The First Circuit, relying on the underlying reasoning in *Reading*, has extended its rationale beyond the tort context and has held that other types of postpetition injuries and expenses are entitled to administrative priority, *despite no benefit having been conferred upon the debtor's estate*, when those injuries are caused or expenses incurred by the postpetition operation of the debtor's estate." *In re GT Advanced Techs., Inc.*, 547 B.R. 3, 12-13 (Bankr. D.N.H. 2016) (emphasis added and removed). After all, *Reading* itself involved a company which sustained injury from the negligence of the trustee—something which conferred no benefit on the estate at all. 391 U.S. at 473-77. It is no surprise, then, that the key First Circuit cases discussing *Reading* do not mention any requirement to show a benefit to the debtor's estate for the exception to apply. *See, e.g.*, *Hemingway*, 954 F.2d at 5-6; *In re Charlesbank Laundry, Inc.*, 755 F.2d at 201-03; *In re Mammoth Mart, Inc.*, 536 F.2d at 954.[10]

## B. The Claims Are Non-Dischargeable in this Proceeding

Finally, claims based upon the Post-Petition Legislation are non-dischargeable because they arose post-petition.[11] The Motion explained why the correct interpretation of § 944(b) forecloses the discharge of Claimants' post-petition claims by a plan of adjustment if they are not allowed as administrative expenses. Motion at 33-35. Objectors' contrary arguments fail.

The Oversight Board claims that the language of § 944(b) is unambiguous and discharges a debtor from "'all debts,' plainly and without qualification." FOMB Opp. 34. But § 944(b) is ambiguous—while it states "*when*" the discharge becomes effective—"as of the time when . . . the

---

[10] In any event, even if a benefit were required, ERS's evasion of its obligations to Claimants and the Commonwealth's confiscation of Claimants' collateral likely *did* benefit the debtors' property.

[11] Although beyond the scope of the Motion, Claimants' *constitutional* claims are nondischargeable for the additional reason that a plan of adjustment cannot discharge constitutional claims. *See In re City of Detroit*, 524 B.R. 147, 270 (Bankr. E.D. Mich. 2014).

plan is confirmed," 11 U.S.C. § 944(b) (emphasis added)—it does not address *what* debts are discharged, that is, "*whether* postpetition debts are discharged," Collier on Bankruptcy ¶ 901.04, n.110 (16th ed. 2020) (emphasis added); *see also id*. ¶ 944.03[2]. That is in stark contrast with chapter 11, which expressly identifies what debts are discharged—all pre-confirmation debts. Chapter 11 "discharges the debtor from any debt that arose before the date of [plan] confirmation." 11 U.S.C. § 1141(d)(1)(A). Congress thus knows how to speak clearly when it intends to discharge all pre-confirmation debts and it did not do so in PROMESA. As the Supreme Court has made clear, "differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017). Indeed, were the bare reference to "debts" in § 944(b) sufficient to trigger a discharge of all debts before the confirmation date, the additional language in § 1141(d)(1)(A) would be surplusage. Nor is the discharge provision in chapter 11 irrelevant to the proper understanding of § 944(b), as the Oversight Board argues. FOMB Opp. 34. Differences in language in closely related provisions is strong evidence of a difference in meaning, and that is true regardless of whether the provisions apply in PROMESA cases.

The Oversight Board also claims that the authority in Claimants' Motion does not support Claimants' position. *See* FOMB Opp. 34. Not so. The fact that the *In re City of Detroit, Michigan* court contemplated that "[c]laimants holding post-petition claims . . . may be entitled to pursue other remedies" supports Claimants' position even if the City was forced to limit its arguments to pre-petition claims. 548 B.R. 748, 761 n.48 (E.D. Mich. 2016). The Oversight Board also claims *Collier*'s statement that "claims incurred by the municipality" post-petition "will not be discharged, and will remain liabilities of the municipality after confirmation of a plan or dismissal of the case" is of limited help because it occurs in a section discussing general operating expenses. FOMB Opp. 34; Collier on Bankruptcy ¶ 901.04[13][b]. But *Collier*'s reasoning turns entirely on

29

*the text* of § 944, as its more fulsome discussion of § 944(b) confirms.  *See id.* ¶ 944.03[2].  In any event, *Collier's* treatment of the issue simply shows that while some authorities may conclude that post-petition claims are administrative expenses under *Reading*, and others may conclude that they are instead nondischargeable, no authorities would conclude that they are neither, as Objectors argue.  Such a result would not only be unfair to creditors, *see Reading*, 391 U.S. at 482, it would also license debtors to harm creditors with impunity prior to confirmation.

The Retiree Committee's argument on this score fares no better.  The Retiree Committee relies on *O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000), but that case addressed a different question: whether a claim based on a pre-discharge violation of the Americans With Disabilities Act arises "at the time of the events giving rise to the claim" or "at the time plaintiff is first able to file suit on the claim."  *Id.* at 874; RC Opp. 24.  Indeed, *O'Loghlin* was not a bankruptcy case at all; the confirmed plan's discharge of pre-confirmation debts was simply something the panel took as a given.  *Id.* at 873-74.  The other cases relied upon by the Retiree Committee, moreover, are of limited persuasive value because they do not meaningfully consider (or even cite) *Collier*'s reasoning.  *See* RC Opp. 24-25 (citing *Hayes v. City of Detroit Water & Sewerage Dep't*, 2015 WL 7567054 (E.D. Mich. Nov. 25, 2015); *V.W. ex rel. Barber v. City of Vallejo*, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013)).

## CONCLUSION

For the reasons above, Claimants respectfully request that the Court enter judgment as a matter of law foreclosing Objectors' objection that Claimants' recovery is limited to their collateral and holding that any post-petition claims are administrative expenses and nondischargeable.

In San Juan, Puerto Rico, today August 6, 2020.

/s/ Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3435
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

*Counsel for Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund L.P., Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd., and SV Credit, L.P.*

*/s/ Alicia I. Lavergne-Ramírez*

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@lsplawpr.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@lsplawpr.com

SÁNCHEZ & PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*

John K. Cunningham  (*pro hac vice*)
Glenn M. Kurtz (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund II, Inc., Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax- Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., and Tax-Free Puerto Rico Target Maturity Fund, Inc.*

/s/ Albéniz Couret-Fuentes
Albéniz Couret-Fuentes
USDC-PR Bar No. 222207
SEPULVADO, MALDONADO &
COURET
304 Ponce de León Ave. – Suite 990
San Juan, PR 00918
Telephone: (787) 765-5656
Facsimile: (787) 294-0073
Email: acouret@smclawpr.com

/s/ Luke A. Sizemore
Eric A. Schaffer (*pro hac vice*)
Luke A. Sizemore (*pro hac vice*)
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Email: eschaffer@reedsmith.com
Email: lsizemore@reedsmith.com

C. Neil Gray (*pro hac vice*)
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
Email: cgray@reedsmith.com

*Counsel for The Bank of New York Mellon, as fiscal agent*