# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

```
----------------------------------------------------------------- X
                                                                  :
In re:                                                            :
                                                                  :
THE FINANCIAL OVERSIGHT AND                                       :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                 :  Title III
                                                                  :
          as representative of                                    :  Case No. 17-BK-3283 (LTS)
                                                                  :
THE COMMONWEALTH OF PUERTO RICO et al.,                           :  (Jointly Administered)
                                                                  :
          Debtors.¹                                               :
----------------------------------------------------------------- X
                                                                  :
In re:                                                            :
                                                                  :
THE FINANCIAL OVERSIGHT AND                                       :  PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                                 :  Title III
                                                                  :
          as representative of                                    :  Case No. 17-BK-4780 (LTS)
                                                                  :
PUERTO RICO ELECTRIC POWER AUTHORITY                              :  This filing relates only to
                                                                  :  Case No. 17-BK-4780 (LTS)
                                                                  :
          Debtor.                                                 :
----------------------------------------------------------------- X
```

## LIMITED PRELIMINARY OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PREPA'S MOTION FOR ENTRY OF AN ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR COMPENSATION FOR FRONT-END TRANSITION SERVICES UNDER PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM OPERATION AND MAINTENANCE AGREEMENT WITH LUMA ENERGY

---

¹ The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

The Official Committee of Unsecured Creditors (the "Committee")[2] respectfully files this limited preliminary objection (the "Limited Objection") to *PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* [Docket No. 13583 in Case No. 17-BK-3283] (the "Motion").[3] In support of this Limited Objection, the Committee states as follows:

## OBJECTION

1.      The Committee does not oppose, as a general matter, PREPA's entry into the T&D Contract or the Government Parties' decision to enter into a concession agreement for PREPA's T&D System, as a way to improve its operations and maintenance services. Nevertheless, the Motion raises several serious issues that the Committee must bring to the Court's attention as part of its fiduciary obligations to PREPA's unsecured creditors.

2.      First, the supplemental agreement (the "Supplemental Agreement") executed in connection with the T&D Contract provides LUMA Energy with unreasonably broad control rights with respect to an eventual PREPA plan of adjustment, as well as the ability to receive a significant $115 million termination fee.  While the Government Parties have taken the position that the Supplemental Agreement is not before the Court at this time, the Court should not turn a blind eye to these concerning provisions given the gatekeeper role the Court has been asked to play in ruling on the Motion.

3.      Second, there are particular aspects of the Front-End Transition Obligations—specifically, a $60 million fixed fee payable in full even if no Front-End Transition Services are

---

[2]  The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

ever provided, as well as late fees (in the form of penalty interest for late payments)—that are not

"actual and necessary" for purposes of section 503(b)(1)(A) of the Bankruptcy Code.[4]

## I.   Supplemental Agreement Provides LUMA Energy with Objectionable Plan Consent Rights and Termination Fee

4.      The T&D Contract includes the Supplemental Agreement, designed to allow

LUMA Energy to take over operation of PREPA's T&D System even if—as is highly likely—

PREPA fails to emerge from Title III within the twelve months following the execution of the

T&D Contract.  While the Supplemental Agreement is not technically before the Court for

approval,[5] it contains certain concerning terms that the Court should be aware of now in

connection with its evaluation of the Motion, as those terms, by increasing LUMA Energy's

ability to terminate the T&D Contract, actually **increase** the likelihood that PREPA will

ultimately see only the short term benefits—but not the long-term benefits—that PREPA is

purportedly purchasing at the cost of approximately $136 million in estimated administrative

expenses.

5.      First, section 6.1 of the Supplemental Agreement creates a new condition to the

occurrence of the Service Commencement Date: that the Court shall have confirmed a Title III

Plan that is "reasonably acceptable to" LUMA Energy.  Relatedly, section 7.1(a) of the

Supplemental Agreement provides that both the Supplemental Agreement and the O&M

---

[4]  Further, the Committee has been obligated to respond to this Motion without having received adequate discovery from the Government Parties (who have produced only a small set of documents and essentially nothing related to the communications and emails requested by the Committee), and without the Court having issued a ruling on the parties' pending discovery dispute.  Therefore, the Committee reserves its rights to file supplemental briefing based on the additional discovery it may receive.

[5]  Section 2.3 of the Supplemental Agreement provides that one of the conditions precedent to the "Interim Period Service Commencement Date" (as defined therein) is that "the Title III Court shall have entered, on a final and non-appealable basis, an order or orders (i) to the extent required by Applicable Law, authorizing Owner's entry into and performance of this Supplemental Agreement, and (ii) granting administrative expense treatment for any amounts required to be paid by Owner under this Supplemental Agreement and the O&M Agreement during the Interim Period."

Agreement itself will terminate if the Service Commencement Date has not occurred within 18 months of the Supplemental Agreement Effective Date.

6.      Taken together, these provisions grant LUMA Energy potential control over PREPA's Title III case: not only must PREPA confirm a plan within a date certain or risk losing the entire T&D Contract, PREPA has agreed to grant LUMA Energy what is essentially a "reasonable" veto right over any such plan.  Even more troubling, the Supplemental Agreement sets no parameters for determining whether LUMA Energy's dissatisfaction with any proposed plan of adjustment is "reasonable" or not.  The Supplemental Agreement thus creates a scenario whereby LUMA Energy can throw PREPA's transformation process into turmoil for potentially any reason (even for reasons that do not directly impact the T&D Contract).

7.      Making matters worse, the Supplemental Agreement also provides a generous termination fee of $115 million to LUMA Energy should the T&D Contract terminate automatically if PREPA fails to obtain confirmation of a plan that is "reasonably acceptable to" LUMA Energy during the 18-month period.  *See* Suppl. Agreement § 7.2(c).  Should this occur, LUMA Energy will also keep all the other compensation that it will have received under the T&D Contract during that span of time.  *See id.* § 7.2(a)-(b).  In other words (and assuming the Court approves the Supplemental Agreement, including the approval of the termination fee and certain other fees as administrative expenses), not only can LUMA Energy abandon the transformation process at a crucial moment in the Title III case for vague and undefined reasons, but it can take with it hundreds of millions of dollars in the process.

8.      Therefore, the Committee believes that it is critical that LUMA Energy's consent rights to PREPA's eventual plan of adjustment be limited[6] and, further, that the $115 million termination fee, at least as currently structured, be denied.

9.      Finally, the Committee is well aware that the Government Parties are not currently seeking approval of the terms of the Supplemental Agreement; nonetheless, the issues outlined above should be considered in connection with the Motion.  The Motion requests that the Court approve PREPA's expenditure of up to approximately $136 million in Front-End Transition Obligations as "actual and necessary" administrative expenses based on commensurate benefits to PREPA both in the short term and in the long term (after hand-over of the T&D System), [7] and the Government Parties have represented that approval of the Motion is intended to pave the way for the Government Parties to implement the T&D Contract and Supplemental Agreement.  However, if LUMA Energy does not proceed with the T&D Contract in the event that (i) the Court declines to later approve the objectionable aspects of the Supplemental Agreement (i.e., the consent rights and termination fee) or (ii) LUMA Energy exercises its consent rights and the T&D Contract automatically terminates, it is likely that

---

[6]  Indeed, the Supplemental Agreement already contains such a concept, as it adds a defined term "Material Adverse Effect," which is defined to mean "a material adverse effect on (i) the ability of Operator or Owner, as applicable, to perform its obligation under the Supplemental Agreement or (ii) the rights of Operator or Owner, as applicable, under the Supplemental Agreement and/or this [Supplemental] Agreement."  Suppl. Agreement § 4.2(a).  The use of the vague term "reasonably acceptable," as opposed to a provision that would allow LUMA Energy to terminate its obligations under the T&D Contract if the Court confirmed a plan that created a Material Adverse Effect, raises important questions—which, in turn, highlights the importance of the Committee's requested discovery.

[7]  The Government Parties are quite clear that the benefits they believe PREPA will obtain from the payment of Front-End Transition Obligations extend to the entire benefits of the T&D Contract.  According to the Motion, the Front-End Transition Services are "an essential prerequisite to LUMA Energy's ability to assume full control over the operation and maintenance of the T&D System and PREPA gaining the full benefits the Government Parties expect to achieve under the T&D Contract." Mot. ¶ 31.  *See also id.* ¶ 6 ("By incurring the Front-End Transition Obligations, PREPA is able to obtain the substantial benefits of the T&D Contract."); *id.* ¶ 5.  ("Front-End Transition Services . . . are required to allow LUMA Energy to assume control over the operation and maintenance of the T&D System. Without these Front-End Transition Services, PREPA and its stakeholders cannot realize the benefits of the T&D Contract . . . .").

PREPA will not, in fact, receive the full measure of the promised benefits. Indeed, and ironically, the Supplemental Agreement's grant of broad termination rights to LUMA Energy, coupled with the $115 million termination fee, increases the risk that critical long-term benefits will be lost. Accordingly, the potential loss of some portion of the benefits allegedly obtained by entry into the T&D Contract should be considered by the Court prior to allowing substantial administrative expense claims as requested by the Motion.[8] In other words, the Court must resist the Oversight Board's invitation to put legal blinders on when considering the Motion.

## II. Fixed Fee and Late Fees Are Not Actual and Necessary Expenses

10. The Front-End Transition Obligations that the Government Parties argue should be allowed as "actual and necessary" administrative expenses under section 503(b)(1)(A) of the Bankruptcy Code contain two elements in particular that are not consistent with the "actual and necessary" standard: (i) a fixed $60 million portion of the Front-End Transition Service Fee (the "Fixed Fee") that is payable in full even if the T&D Contract is terminated immediately and (ii) a penalty interest rate on overdue obligations (the "Overdue Rate") of prime plus 2%.

11. Bankruptcy Code section 503(b)(1)(A) imposes strict standards on the allowance of administrative expense claims for the "actual, necessary costs and expenses of preserving the estate," and the "burden of proving entitlement to priority payment as an administrative expense . . . rests with the party requesting it." *In re La Electronica, Inc. v. Capo-Roman (In re La Electronica, Inc.),* 995 F.2d 320, 322 (1st Cir. 1993) (quoting *In re CIS Corp.,* 142 B.R. 640, 642 (S.D.N.Y. 1992)). As stated by the First Circuit's seminal pre-Code authority on the issue, a claimant is entitled to an administrative expense priority "**only to the extent** that the

---

[8] In addition, the Committee notes that (as discussed in the objection filed by UTIER and SREAEE [Docket No. 2128 in Case No. 17-BK-4780]) there exists the possibility that the T&D Contract may terminate based on the outcome of certain judicial and political processes in Puerto Rico, which could also result in the loss of the long-term benefits associated with the T&D Contract.

consideration supporting the claimant's right to payment **was both supplied to and beneficial to**
the debtor-in-possession in the operation of the business." *Cramer v. Mammoth Mart, Inc. (In re
Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976) (emphasis added). Hence the
requirement that the debtor receive "actual" value or benefit: a potential or speculative benefit is
not sufficient. *See, e.g.*, *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866–67 (4th Cir. 1994)
(section 503(b)(1)(A) contemplates "concrete, actual" benefit); *In re Drexel Burnham Lambert
Group*, 134 B.R. 482, 488 (Bankr. S.D.N.Y. 1991) ("The estate must have actually benefitted, as
opposed to potentially benefitted."); *In re Stevens*, 53 B.R. 783, 788 (Bankr. D. Me. 1985*), rev'd
on other grounds*, 68 B.R. 774 (D. Me. 1987 (a "claim can be characterized as an administrative
expense only if the expenses incurred 'did in fact confer *actual* value'" (quoting *In re O.P.M.
Leasing Services, Inc.,* 23 B.R. 104, 121 (Bankr. S.D.N.Y. 1982))); 4 Collier on Bankruptcy P
503.06[1] (16th 2020) ("'[A]ctual' and 'necessary' must be observed with scrupulous care.").

12.     To that end, courts have required that a debtor receive the benefits of a
transaction—and thus incur the related expense—**before** the allowance of administrative
priority, **not afterwards**. *See In re Globe Metallurgical, Inc.,* 312 B.R. 34, 40 (Bankr. S.D.N.Y.
2004) (fact that "there must be a strict construction of the terms 'actual' and 'necessary' . . .
require[s] that the estate actually receive[] 'a real benefit from the transaction, **before**
administrative priority will be granted on claims against the estate.'" (quoting *In re Drexel
Burnham Lambert Group,* 134 B.R. at 488) (emphasis added).[9]  As explained by one bankruptcy
court within the First Circuit:

---

[9]  *See also Nat'l Union Fire Ins. Co. of Pittsburgh v. VP Bldgs., Inc.*, No. 1:08 CV 196, 2008 WL 4445075, at *3
(N.D. Ohio Sept. 29, 2008), *aff'd sub nom. Nat'l Union Fire Ins. Co. v. VP Bldgs., Inc.*, 606 F.3d 835 (6th Cir.
2010) ("The estate must receive a real benefit from the transaction **before** administrative expense priority will be
assigned.") (emphasis added).  *See also In re Mammoth Mart, Inc.*, 536 F.2d at 954 (1st Cir. 1976) (administrative
claim allowable "only to the extent that the consideration supporting the claimant's right to payment **was** both
supplied to and beneficial to the debtor-in-possession in the operation of the business.") (emphasis added); *Kinnan
& Kinnan P'ship v. Agristor Leasing*, 116 B.R. 162, 166 (D. Neb. 1990) ("[A] creditor's right to payment will be

Bankruptcy Courts typically, at the end of a case, rule on and allow administrative expenses only after those expenses have been incurred.  To do otherwise would be tantamount to issuing an advisory opinion.  Section 503(b)(1)(A) of the Bankruptcy Code contains the rationale for this practice: administrative expenses must be both "actual" and "necessary."  If the Court were to rule on administrative expenses before they were incurred, the Court could not be certain that the claimant would actually incur the expenses for which it seeks advance payment, nor could it be certain that the expenses eventually incurred would be necessary.

*In re Microfab, Inc.,* 105 B.R. 161, 170 (Bankr. D. Mass. 1989).

13.    Here, the Government Parties have requested administrative expense priority for the $60 million Fixed Fee that, while payable in twelve monthly installments, will be "deemed to have been earned and shall be paid in full" in the event the T&D Contract is terminated (other than as a result of the acts, omissions, or breach of LUMA Energy) at any time prior to LUMA Energy commencing its operation of the T&D System.  *See* T&D Contract § 4.8(b)(vi).  In other words, upon termination, the Fixed Fee would accelerate and PREPA would be forced to pay a year's worth of the Fixed Fee even if it received only 3, 6, or 9 months' worth of Front-End Transition Services.  The allowance of an administrative claim for this Fixed Fee on a prospective, "deemed earned" basis is deeply inconsistent with the principle that section 503(b)(1)(A) be strictly construed, and that expenses must be determined to be "actual" and "necessary" in connection with benefits that have already been received by the Debtor prior to the allowance of administrative priority—not merely "deemed" to have been so.  Essentially, the Government Parties are requesting that LUMA Energy be guaranteed payment for services that PREPA may never receive.  Further, by granting an administrative expense claim for the entire Fixed Fee now, the Court will have foreclosed any possible subsequent challenge to such an administrative expense claim for unearned future Fixed Fees, even if the T&D Contract were to

afforded priority only to the extent the estate **was** benefited in fact from the consideration supporting the creditor's claim.") (emphasis added).

terminate the day after the entry of the Proposed Order.  Therefore, the Fixed Fee provisions of

the T&D Contract should be modified to ensure that LUMA Energy only receives an

administrative expense claim for services it actually provides.

14.     Similarly, allowance of the Overdue Rate as an administrative expense would be

inconsistent with section 503(b)(1)(A).  This is the case for multiple reasons.  First, it is not

appropriate to charge late fees in connection with administrative expenses, which by their nature

do not need to be paid until plan confirmation.  *See In re DVI, Inc*., 308 B.R. 703, 708 (Bankr. D.

Del. 2004) (refusing to allow late charges because "an administrative claim under section 503(b)

need not be paid immediately but can be paid as late as the confirmation").  In addition, late fees

do not provide any benefit to a debtor's estate.  *See In re Davenport Beverage Corp.,* 505 B.R.

374, 381 (Bankr. D. Mass. 2014) ("There is no basis upon which to rest a finding that late

charges provided any benefit to the estate.  Hence they are not allowable.").  Moreover, the

Overdue Rate, as is apparent by its incorporation of an additional 2% in excess of prime, does

more than compensate LUMA Energy for the use of money—in fact, it extracts a penalty from

PREPA for any failures to make payments on a timely basis.  Such a penalty is not actual and

necessary under section 503(b)(1)(A).  *See In re T.A. Brinkoetter & Sons, Inc.*, 467 B.R. 668,

670–71 (Bankr. C.D. Ill. 2012) (liquidated damages penalized debtor for failure to make timely

payments and therefore were "true penalty" and "not a form of compensation for a benefit to the

estate, and thus may not be accorded administrative priority status").

### III.     Committee Reserves Rights to File Supplemental Briefing

15.     As discussed in greater detail in the *Joint Status Report* [Docket No. 13954 in

Case No. 17-BK-3283] (the "Second Joint Status Report") filed on August 4, 2020, disputes

have arisen between the Committee and the Government Parties regarding the Government

Parties' refusal to produce certain requested documents as part of the discovery process in

connection with the Motion.  These disputes have not yet been resolved as of the deadline for the

filing of this Limited Objection and, therefore, the Committee has been obligated to file the

Limited Objection without having obtained adequate discovery.[10]  As the Committee explained

in the Second Joint Status Report, the Committee's document requests related to LUMA

Energy's consent rights and termination fee under the Supplemental Agreement are relevant to

the Motion because the Court's approval of such Motion paves the way for the Government

Parties to implement the T&D Contract, including the Supplemental Agreement.[11]  Given the

foregoing, the Committee therefore reserves all its rights with respect to filing supplemental

briefing based on information obtained in subsequent discovery prior to the date of the hearing

on the Motion.[12]  The Committee believes that there should be sufficient time for such

supplemental briefing given that the hearing on the Motion will not take place until September

16, 2020.

## **CONCLUSION**

16.     For the reasons stated above, the Committee requests that the relief granted by the

Court be modified to reflect the issues raised herein.

*[Remainder of page intentionally left blank.]*

---

[10] The Court's scheduling order for briefing and discovery in connection with the Motion instructed the parties in
their status report to "describe . . . all issues in dispute with full position statements on each such issue" and
provided that "[t]he Court will resolve any discovery disputes on the Status Report unless the Court deems a
hearing necessary."  Order Extending & Establishing Certain Deadlines Applicable to the Mot. ¶ 3 [Docket No.
13628 in Case No. 17-BK-3283].  The Second Joint Status Report described the issues in dispute, with full
position statements on each issue, but the Court has not yet made its ruling.

[11] Thus far, the Committee has obtained access to earlier drafts of the Supplemental Agreement that show how the
language of the Supplemental Agreement changed over time, and the Committee believes it is entitled to further
explore this issue.

[12] In addition, the Committee has received no indication from the Government Parties that the Government Parties
have completed producing those documents that they have agreed to produce.  Therefore, even setting aside the
parties' discovery disputes, the document production process in connection with the Motion does not seem to have
run its course.

WHEREFORE, the Committee respectfully requests that the relief granted by the Court

be modified to reflect the issues raised herein.

Dated:  August 12, 2020                   By: */s/ Luc A. Despins*

**PAUL HASTINGS LLP**
Luc. A. Despins, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

By: */s/ Juan J. Ayala*

**CASILLAS, SANTIAGO & TORRES LLC**
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*