# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>      as representative of<br><br>The Commonwealth of Puerto Rico, *et al.*,<br><br>      Debtors[1]. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS |
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>      as representative of<br><br>The Puerto Rico Electric Power Authority,<br><br>      Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 04780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## ORDER ON DISCOVERY

### I. INTRODUCTION

The Court has received and reviewed the *Joint Status Report* filed by the parties on July 29, 2020 (Dkt. No. 13895 in 17-BK-3283; Dkt. No. 2106 in 17-BK-4780) (the "First Status Report") and the *Joint Status Report* filed by the parties on August 4, 2020 (Dkt. No. 13954 in 17-BK-3283; Dkt. No. 2119 in 17-BK-4780[2]) (the "Second Status Report"). Therein, the parties report that they have been unable to resolve all of their discovery disputes in connection with the Administrative Expense Motion.[3] For the reasons detailed herein, this Court sustains the Government Parties'[4] objections to UTIER's discovery requests and Whitefish's discovery requests. This Court also sustains the Government Parties' objections to the UCC's written discovery requests and deposition notice. The UCC's deposition notice is hereby quashed. No additional discovery is warranted at this time.

### II. BACKGROUND

In the Administrative Expense Motion, the Government Parties seek an administrative expense priority for the Front-End Transition Obligations incurred by LUMA Energy pursuant to the Transmission and Distribution Contract (the "T&D Contract") during the Front-End Transition Period, expected to last one year. See Administrative Expense Motion, Dkt. No.

---

[2] Unless otherwise noted, all docket entry numbers will refer to Case No. 17-BK-4780.

[3] Capitalized terms not defined herein shall have the meanings given to them in the First Joint Status Report and the Second Joint Status Report.

[4] The Government Parties are PREPA, the Oversight Board, and AAFAF.

2053-1, ¶¶ 1-3, 35. As detailed in the Administrative Expense Motion, during the Front-End Transition Period, LUMA Energy will set the groundwork for modernization of the power grid and assume control over the operation and maintenance of the T&D System. See id. ¶ 4. LUMA Energy estimates that the Front-End Transition Obligations will amount to not more than $136,351,930.00. Id. ¶ 35. Per the terms of the T&D Contract, PREPA has already deposited $59,374,000.00 in a reserve account at PREPA from which the Front-End Transition Obligations will be paid and which will be replenished in the ordinary course of PREPA's business. PREPA represents that it intends to continue to replenish the reserve account on a timely basis and in the ordinary course, but the Motion is intended to give LUMA Energy assurances. Id. LUMA Energy can cancel the T&D Contract upon 30 days' notice if the Motion is not granted within 90 days after filing, subject to a 45-day extension by P3. Id. ¶ 36. Also relevant here, the T&D Contract contains a "supplemental agreement" (the "Supplemental Agreement") that contemplates, to the extent necessary, LUMA Energy assuming operation and maintenance services, for a limited duration, prior to PREPA's emergence from Title III, after the Front-End Transition Period. See Second Status Report ¶ 13. If PREPA has emerged from Title III prior to the end of the one-year Front-End Transition Phase, the Supplemental Agreement will not take effect. See id.

The UCC, UTIER/SREAEE and Whitefish[5] (collectively, with the Fuel Line Lenders, the "Anticipated Objectors") have each served discovery requests upon the Government Parties in

---

[5] The Fuel Line Lenders filed an objection to the Administrative Expense Motion, however, they did not serve discovery requests. Instead, the Fuel Line Lenders request that the Government Parties produce whatever documents are produced in connection with the other Anticipated Objectors' discovery requests to them as well. The Government Parties do not object to the Fuel Line Lenders' request. See First Status Report ¶¶ 31-32.

3

connection with the Administrative Expense Motion. On August 3, 2020, the Government Parties served their responses and objections to the Anticipated Objectors' discovery requests.[6] The Government Parties also produced 7,800 pages of documents on August 3rd, which included the following categories of documents: (1) request for proposals to operate the T&D System and addenda thereto; (2) communications and documents made available to and received from LUMA Energy via Power Advocate,[7] including messages and attachments thereto, various drafts of a term sheet and the T&D Contract, comments from LUMA Energy to the drafts of the term sheet, including issues lists summarizing the comments, and memoranda to LUMA Energy from P3 summarizing comments from LUMA that were accepted in the drafts of the term sheet and the LUMA contract; (3) certain project logs and other due diligence documents including requests for clarification and related responses; (4) minutes of Partnership Committee meetings; and (5) LUMA Energy's definitive proposal and certain updates and clarifications to the proposal. Id. ¶ 9.

The parties' positions concerning the remaining discovery disputes are detailed in the First Status Report and the Second Status Report.

---

[6] On July 31, 2020, P3 served its responses and objections to the UCC's subpoena. See Second Status Report ¶ 10.

[7] As explained in the First Joint Status Report, "PowerAdvocate is a digital platform specifically designed for competitive procurement in the energy industry" and "all communications between P3 and LUMA Energy during the RFP Process were through the Power Advocate platform." First Status Report ¶ 9 & n. 11.

### III. ANALYSIS

A. Legal Framework

PROMESA section 314(b)(4) provides that administrative expenses are required to be paid in full upon the effective date of a plan of adjustment unless the claimholder agrees to different treatment. The Administrative Expense Motion is brought pursuant to Bankruptcy Code section 503, which is made applicable to this case by PROMESA section 301. Section 503(b)(1)(A) provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). In the First Circuit, the allowance of such administrative expense claims is determined by a two-prong test. First, the transaction at issue must have arisen between the creditor and the bankruptcy estate post-petition. Second, the incurred expense must have benefitted the estate in some demonstrable way. See In re Jeans.com, 491 B.R. 16, 23 (D.P.R. 2013) (citing In re Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir. 1976)). [8]

B. UTIER Discovery Requests

With respect to UTIER's discovery requests, the Government Parties object to Document Request Numbers 1, 2, 3, and 4, and Interrogatory Numbers 1, 2, 3, 4, 5, 6, 7 and 9 on the grounds that they seek irrelevant information "regarding the impact of the Administrative Expense Motion on other stakeholders in PREPA's Title III case," and, with respect to Interrogatory Numbers 2, 3, 4, and 6 because "those requests seek information regarding the

---

[8] The Court acknowledges that, in briefing the merits of the motion, the parties have taken disparate positions as to whether section 503(b)(1)(A) applies in the Title III context. For the avoidance of doubt, through this Order, the Court makes no determination as to the applicability of section 503(b)(1)(A).

5

impact of the administrative expense claim on other creditors." Id. ¶¶ 29, 30. For example, UTIER Document Request No. 1 seeks "any and all non-confidential communications by and between P3, PREPA, Luma Energy and the FOMB regarding the impact of the Luma Contract on PREPA's Title III unsecured creditors, bondholders and pension obligations." The Government Parties argue that "[n]either the impact of the administrative expense claim on other creditors nor the impact of the LUMA Contract on other stakeholders in PREPA's Title III case are material to the narrow issue before the Court." Id. ¶ 30. In addition, in its Objections to UTIER's document requests, the Oversight Board contends that the entire T&D Contract is not before the Court for approval, but rather "only approval of an administrative expense priority claim for any accrued and unpaid Front-End Transition Obligations." FOMB Objection to UTIER Doc Request No. 1. UTIER responds that the standard for allowing an administrative expense claim is whether the expense constitutes a "benefit to the estate, which means benefit to the creditors who are the intended beneficiaries of a bankruptcy estate." Second Status Report ¶ 34.

If section 503(b)(1)(A) is to be applied in the Title III context, the question of benefit should, consistent with PROMESA's elimination of the concept of a bankruptcy estate, be one that recognizes that the purposes of the Title III proceeding are not narrowly focused on operation of the debtors for the benefit of creditors or any particular stakeholder constituency. The First Circuit has recognized that, "unlike the commercial focus of bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather continued provision of public services.'" In re Fin. Oversight & Mgmt. Bd. for P.R., 432 F. Supp. 3d 25, 30 (D.P.R. 2020) (citing In re Mount Carbon Metro. Dist., 242 B.R. 18,

34 (Bankr. D. Colo. 1999)); see also Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 954 F.3d 1, 7 (1st Cir. 2020) (recognizing distinction between governmental bankruptcies and commercial private party bankruptcies). Accordingly, the financial impact of the Front-End Transition Obligations on PREPA's creditors and stakeholders is not the principal focus of the evaluation of the Administrative Expense Motion. Targeted detailed discovery concerning such issues is thus disproportional to the scope of the relevant inquiry.

Moreover, the Government Parties have produced substantial information explaining the terms of the T&D Contract. To the extent that UTIER believes the impact of allowing the Administrative Expense Motion on PREPA's creditors is relevant to the Court's analysis, UTIER should have sufficient information to make that argument based on the material that has already been produced. Accordingly, the Government Parties' objections to UTIER's Document Request Numbers 1, 2, 3, and 4, and Interrogatory Numbers 1, 2, 3, 4, 5, 6, 7, and 9 are sustained.

C. Whitefish Discovery Requests[9]

Similarly, Whitefish seeks written discovery from the Oversight Board and PREPA concerning (1) consideration or analysis of the impact of the Administrative Expense Motion on existing and unpaid administrative claims and (ii) documentation of the status of FEMA's review and reimbursement of services provided to PREPA by Whitefish. First Status Report ¶¶ 26, 28.

---

[9] In the Second Status Report, the Government Parties represented that they would be holding a meet and confer with Whitefish on August 5, 2020. Second Status Report ¶ 38. Not having been advised otherwise, this Court assumes that there is still a live dispute between the Government Parties and Whitefish.

Whitefish, as an administrative creditor of PREPA, claims that it is "currently owed in excess of $136 million for work it performed in the immediate aftermath of Hurricanes Maria and Irma in 2017," and argues that the information sought in its requests is relevant to whether the Court should allow PREPA to take on another administrative claim. Id. ¶ 29. It argues that the Court should consider whether allowance of the Administrative Expense Motion will render PREPA administratively insolvent because in order to confirm a plan of adjustment, PREPA is required to pay all administrative claims in full. Id. Finally, Whitefish seeks discovery concerning the status of FEMA's review of Whitefish's invoices which FEMA may pay because, according to Whitefish, "to the extent such amounts are paid by FEMA, the amount of PREPA's outstanding administrative claims will be reduced dollar for dollar." Id. ¶ 30. The Government Parties object on similar grounds to those raised against UTIER. They agreed to produce to Whitefish only the documents that are produced in response to the UCC's and UTIER's discovery requests. Id. ¶ 26.

As the Government Parties note, "PROMESA does not refer to or incorporate a concept of administrative insolvency in connection with a Title III debtor's payment of administrative expenses or otherwise . . . ." *Order Overruling Cobra Acquisitions LLC's Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount*, Dkt. No. 1931, at 2. Accordingly, this Court finds that Whitefish's discovery related to the possibility of administrative insolvency is outside the scope of the inquiry presented by the Administrative Expense Motion. Furthermore, as explained above, the impact of allowing an administrative expense on PREPA's creditors, including Whitefish and other administrative creditors, is of minimal, if any, relevance to the allowance of an administrative expense motion under

PROMESA. Likewise, discovery concerning the status of FEMA's review of Whitefish's invoices for services provided by Whitefish is not relevant to the Administrative Expense motion. Accordingly, the Government Parties' objections to Whitefish's discovery requests are sustained. The Government Parties need only produce to Whitefish the documents that are produced in response to the UCC's and UTIER's discovery requests.

D. <u>UCC Discovery Requests</u>

The central dispute between the Government Parties and the UCC with respect to the UCC Discovery Requests is whether the Supplemental Agreement to the T&D Contract is an appropriate topic for discovery in connection with the Administrative Expense Motion, and whether discovery reflecting communications relating to the Supplemental Agreement is needed by the UCC. This Court concludes that it is not.

The UCC argues that its requests for communications and deposition testimony concerning the Supplemental Agreement, and in particular the requirement in Section 6.1 of the Supplemental Agreement that a Title III Plan and confirmation order be "reasonably acceptable to Operator" (UCC Document Request No. 1), and the "Operator Termination Fee" (UCC Document Request No. 2), are "relevant to the Administrative Expense Motion because the Court's approval of such motion paves the way for the Government Parties to implement the T&D Contract, including the Supplemental Agreement." Second Status Report at ¶ 21. According to the UCC, the drafts of the Supplemental Agreement being produced are not sufficient for its purposes. Rather, it "needs discovery of communications between the parties who negotiated the Supplemental Agreement to understand the nature and origin of the

9

provisions that give the Operator its consent right over any plan of adjustment and its right to receive the Operator Termination Fee." Id. ¶ 23.

As an initial matter, this Court questions the UCC's description of the scope of the relevant inquiry raised by the Administrative Expense Motion. It is apparently the UCC's position that, because the parties have conditioned the T&D Contract on approval of the Administrative Expense Motion, the Administrative Expense Motion opens any provision of the T&D Contract, including the Supplemental Agreement, to discovery. However, the provisions of the T&D Contract and its Supplemental Agreement as to which the UCC is seeking discovery are not before the Court on the Administrative Expense Motion. Moreover, the UCC has not cited support for its contention that, by seeking approval of an administrative expense, the Government Parties have opened the door to discovery on the entirety of the T&D Contract.

In addition, even assuming, *arguendo*, that the Supplemental Agreement is relevant to the issues raised by the Administrative Expense Motion, the UCC has not established a need for communications or deposition testimony specifically related to the Supplemental Agreement. The drafts of the Supplemental Agreement being produced should provide the UCC with sufficient understanding of the context in which the provisions at issue arose. This, combined with the information being produced about the negotiation and terms of the T&D Contract, should be sufficient for the UCC to understand (and challenge if it deems appropriate) the provision in Section 6.1 of the Supplemental Agreement requiring that a Title III Plan and confirmation order be "reasonably acceptable to Operator," and the "Operator Termination Fee" contained in the Supplemental Agreement. The UCC has not shown that the requested additional discovery concerning the Supplemental Agreement is relevant or proportional to the

narrow issue before the Court. Accordingly, the Government Parties' objections to the UCC's written discovery requests are sustained, and the UCC's deposition notice is hereby quashed.[10]

### IV. **CONCLUSION**

For the reasons detailed herein, this Court finds that no additional discovery needs to be provided in connection with the Administrative Expense Motion at this time. The Government Parties' objections to the discovery requests are sustained in their entirety, and the UCC deposition notice is quashed.

SO ORDERED.

Dated: August 13, 2020

/s/ Judith Gail Dein
HONORABLE JUDITH GAIL DEIN
UNITED STATES MAGISTRATE JUDGE

---

[10] Because this Court finds that the UCC's discovery requests concerning the Supplement Agreement are outside the scope of the Administrative Expense Motion, we need not address the UCC's argument that the Oversight Board failed its meet and confer obligations. See Second Status Report ¶¶ 25-26. Likewise, this Court need not address AAFAF's argument that the UCC's discovery requests to it are duplicative of those served on the other Government Parties. See id. ¶¶ 17-19.

11