**EXHIBIT C**

reorg®

2020-08-14 14:10:08

Puerto Rico

## Jaresko Says PREPA RSA Still Under Evaluation During Pause, Stresses Importance of 'Consensual' Move to Title III Exit to Curb Court Risks

Thu 07/16/2020 18:44 PM

PROMESA oversight board Executive Director Natalie Jaresko said this afternoon that the feasibility of the current Puerto Rico Electric Power Authority restructuring support agreement remains under evaluation during an ongoing pause in the proceedings due to the Covid-19 pandemic, but stressed the importance of moving the utility toward a consensual Title III exit for various reasons including litigation risks and the possibility that court could order a resumption of bond payments as the process drags on.

"I'm not saying that the RSA is feasible today. We're still evaluating," Jaresko said during the final interview today of the three-day Puerto Rico Grid Revitalization Forum, noting that the PREPA restructuring process remains on hold, with a second status report due in the Title III court on July 31. The oversight board, the authorized representative of the utility as debtor in the Title III case, has halted PREPA's debt restructuring proceedings as it and other parties analyze the impact of the Covid-19 pandemic on the RSA and future financial and economic projections. Jaresko said that prior to the Covid-19 pandemic, a series of postponements of a planned hearing on the Rule 9019 motion seeking approval of the settlements embodied in the PREPA RSA was driven by ongoing creditor negotiations at that time.

Jaresko also discussed other matters including ongoing efforts to transform the island's energy sector, pointing to the agreement with Luma Energy to run PREPA's grid as a big step in that process, and touched on the utility's proposed integrated resource plan, or IRP, as well as the Puerto Rico Energy Bureau, among others.

Jaresko outlined the oversight board's two mandates under PROMESA - achieving fiscal responsibility and restoring capital market access. Asked about the oversight board's gains over the past four years, she pointed to ending deficit spending and sustainable debt restructurings of Government Development Bank and COFINA bonds as well as the reprofiling of the Puerto Rico Aqueduct and Sewer Authority's federal debt.

While voicing frustration over the commonwealth government's lack of movement toward structural reforms that she said are key to the island's competitiveness and economic development, Jarekso pointed to energy reform as "one that is moving along quite well."

**PREPA RSA**

Jaresko defended the benefits of the current RSA and said studies critical of the proposed restructuring are "kind of missing the point" given that PREPA cannot stay in bankruptcy forever and will have to repay part of its legacy debt.

"Everyone is comparing a debt restructuring to what we do now, which is, we don't pay. But that's not an appropriate comparison. Since 2015 we have not been paying our debt, and that's a blessing," she said. "It's a gift from god, in essence, for an island with this financial duress and for an entity like PREPA that is in this much financial trouble."

Jarekso said that if PREPA was paying its bond debt it would represent 6 cents to 8 cents per kilowatt-hour on power bills, noting that current pension payments would add a further 2.4 cents, bringing legacy debt cost to nearly 10.5 cents per kWh.

"So we benefit from the stay, this moratorium, in order to restructure the debt. And we need to

restructure it, but we need to understand what kind of debt it is as well. I think we miss the point. The point is, can we convince the creditors and can we convince the court that 6 to 8 cents is too much, and do better than that," she said.

"Even the RSA that is on hold today improved that situation tremendously. "I'm not saying that the RSA is feasible today. We're still evaluating," she said. "What I'm saying is, even that was an incredible improvement compared to the existing legacy debt."

"You can't remain in bankruptcy forever. Let's be honest. At some point the courts, the creditors and others will get tired of this. And if this can't be resolved in a consensual fashion, then we move to expensive litigation over liens, over reintroducing receivers," Jaresko said. "All of that would disrupt any progress we have already seen and could potentially disrupt federal reconstruction monies."

Without weighing the odds of "winning or losing litigation on the liens or a receiver," Jaresko said: "God forbid the judge gets tired and says 'You know what, I'm done with this. You haven't been paying for five years. While you continue to negotiate why don't you guys start paying anyway.' That's not an option that any of us wants to see."

Jaresko said not reaching a consensual agreement has a cost, adding that PREPA pays a premium to suppliers because of the risks it represents as an entity in bankruptcy. She said critical studies do not really focus on the opportunity costs, risks and improvements. "Having a stay forever is not going to happen. It's just not going to happen," she reiterated.

Jaresko observed fuel represents PREPA's biggest cost, arguing that a focus on bringing that cost down "would gain us all more" than staying in bankruptcy and potentially going back to the full legacy debt. She stressed the importance of "pushing down" all the elements of cost including a PREPA pension system that is on track for insolvency in 2026. "Honestly, everyone else in the pension system is taking a cut," she said.

Jaresko also championed a fixed transition fee structure, as contemplated in the RSA, saying it avoids an "unfair" true up scenario in case of falling demand. She said a revenue bond structure "puts everyone on the island at risk of a true up," signaling that this was a key factor in the oversight board's rejection of an earlier RSA reached in 2016.

**Critics of RSA at Forum**

During a Wednesday forum at the event focused on PREPA's proposed restructuring support agreement, both panelists - Thomas King, managing partner of CrossRiver Capital LLC and founding director of energy nonprofit Fundación Borincana, and Fernando Agrait, legal advisor of the Puerto Rico Institute for Competitiveness and Sustainable Economy - said the proposal is no longer viable given the impact of the Covid-19 pandemic. They also said that progress on a new agreement is unlikely until the second half of 2021, given elections in Puerto Rico that could usher in a new administration in January. That outlook is in line with comments made by PREPA Executive Director José Ortiz and other PREPA officials, who also said that the Covid-19 pandemic will require modifications to the RSA, and they are unlikely to be undertaken until next year when its full economic impact is likely to be better understood.

Agrait said that the only economic analysis of the RSA has come from reports by economist Ramón Cao and the London School of Economics, both of which showed that the transaction would drive up electricity rates to unsustainable levels that would harm Puerto Rico's overall economy. He said that PREPA creditors have never presented other studies to counter those findings.

The attorney said the deal's proposed 30% haircut is definitely not viable given the economic impact of the pandemic, and also criticized that the proposed transition charge that would securitize the new debt issued under the RSA would act as a "solar tax," because it would be levied on small residential and business renewable generation systems. Agrait said such a mechanism may require legislative approval.

King acknowledged that small renewable generation systems still rely on Puerto Rico's electric grid,

so there is some justification to apply the transition charge, but he added that exemptions could be granted for residences and small businesses in order to fulfill commonwealth energy policy goals.

King said the current RSA "goes way too far" in dictating policy and regulation. The transition charge just increases under the current RSA, and King suggested that having a "dynamic" transition charge that can change in response to circumstances could be a potential solution for improving the RSA. For example, the transition charge could decrease in the aftermath of natural disasters or when electricity sales or revenue outpaces projections.

The panelists said there is little interest by local stakeholders in approving the current deal and held out the possibility that the terms of PREPA's exit from bankruptcy may wind up being set by the Title III court.

**Jaresko on Energy Transformation**

Jaresko noted that the transformation of the energy system, as embodied in the fiscal plan, has several parts including private operation of PREPA's transmission and distribution system and legacy generation assets, emerging from bankruptcy, reforming the utility's pension system and moving toward renewable energy.

She pointed to the T&D operation and maintenance agreement with Luma Energy as a vital step in "all of this," anticipating that it will prove to be a successful public-private partnership such as the airport and highway concessions. She said the oversight board played an important role in ensuring a fair and transparent P3 process and in determining that the contract followed sound procurement standards and is consistent with the fiscal plan.

Among the benefits of the deal, Jaresko cited the incentivizing of Luma Energy to boost the reliability of the grid and bringing stability in the utility's strategy and operations, among others. She also pointed to the importance of the role of IEM, a non-equity member of the consortium that is focused on "billions" in federal reconstruction funding, adding that number has "not been defined."

Jaresko also touted an alignment between Luma Energy and the government counterparties on the importance of getting PREPA out of Title III, noting that the agreement was crafted to protect the deal during the pendency of the utility's bankruptcy proceedings. "It's clear; it's transparent. They're aware; we're aware. But we are aligned to get out of bankruptcy," she said.

"I will admit that I had hoped we would have been out of bankruptcy, but we're not, and there are good reasons for not being out of bankruptcy. We are going to make every effort to exit bankruptcy," Jaresko said.

This publication has been prepared by Reorg Research, Inc. or one of its affiliates (collectively, "Reorg") and is being provided to the recipient in connection with a subscription to one or more Reorg products. Recipient's use of the Reorg platform is subject to Reorg's Terms of Use or the user agreement pursuant to which the recipient has access to the platform (the "Applicable Terms"). The recipient of this publication may not redistribute or republish any portion of the information contained herein other than with Reorg's express written consent or in accordance with the Applicable Terms. The information in this publication is for general informational purposes only and should not be construed as legal, investment, accounting or other professional advice on any subject matter or as a substitute for such advice. The recipient of this publication must comply with all applicable laws, including laws regarding the purchase and sale of securities. Reorg obtains information from a wide variety of sources, which it believes to be reliable, but Reorg does not make any representation, warranty, or certification as to the materiality or public availability of the information in this publication or that such information is accurate, complete, comprehensive or fit for a particular purpose. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg and its officers, directors, partners and employees expressly disclaim all liability relating to or arising from actions taken or not taken based on any or all of the information contained in this publication. © 2020 Reorg. All rights reserved. Reorg® is a registered trademark of Reorg Research, Inc.

© Copyright 2012 - 2020