# Exhibit I

GOBIERNO DE PUERTO RICO
DEPARTAMENTO DE AGRICULTURA
**OFICINA REGLAMENTACIÓN DE INDUSTRIA LECHERA**
APARTADO 10163
SAN JUAN, PUERTO RICO 00968-1163

**ORDEN ADMINISTRATIVA NÚM. 2020-22**

**RE:  Interpretación Oficial de la Definición de Leche Excedente.**

### I.  *Base legal:*

La Ley Núm. 34 de 11 de junio de 1957, según enmendada, (5 LPRA §1092, et seq.), en adelante "Ley Núm. 34", faculta a la Oficina de la Reglamentación de la Industria Lechera (en adelante, "ORIL"), a través de su Administrador, a investigar, fiscalizar y reglamentar la producción, elaboración y venta de leche en Puerto Rico y sus productos derivados. Esta facultad se extiende desde la fase inicial de producción de la leche, hasta las etapas posteriores de elaboración, esterilización, manufactura, almacenaje, transportación, distribución, compra y venta al público en general, de leche y de cualesquiera otros productos lácteos, de cualquier tipo, incluyendo la leche ultra pasteurizada y aséptica (en adelante, "UHT") y aquella leche cruda que será utilizada para la elaboración, entre otros productos, de queso, mantequilla, leche evaporada, leche en polvo, crema de leche, yogur y mantecados.

El Administrador tiene la facultad de ("[d]esarrollar y mantener condiciones satisfactorias de mercadeo tendientes a proteger la producción y distribución de la leche y los productos derivados de ésta"), *Id. §1096(b)(3)*; ("[e]stablecer sistemas o fórmulas de pago o liquidación a los productores…"), *Id. §1096(b)(12)*; ("[a]segurarse de implantar y hacer valer los precios máximos y mínimos fijados para la leche fluida y los precios máximos de sus productos derivados en todos los niveles de distribución"), *Id. §1096(b)(14)*; ("[e]n el ejercicio de los poderes concedidos en esta sección y en las otras disposiciones de las secs. 1092 a 1118 de este título, el Administrador queda expresamente autorizado para tomar todas las medidas pertinentes para hacer efectivas las disposiciones de las mismas."), *Id. §1096(c)*. El Administrador podrá reglamentar las diversas fases de la industria lechera sujeto a las disposiciones de [la Ley], y hasta donde sea necesario para poner en vigor la política pública y los fines de [la Ley]. En la determinación del límite de reglamentación de la industria, el Administrador tomará en cuenta las necesidades e intereses de los diferentes sectores dentro de la industria de manera que cualquier medida que adopte tienda a dar estabilidad y a estimular el progreso en la producción y mercadeo de leche y de los productos derivados de ésta, y por tanto prosperidad a la industria. *Id. §1107*.



Case:17-03283-LTS   Doc#:14076-1   Filed:08/21/20   Entered:08/21/20 10:44:28   Desc: Exhibit Administrative Order 2020-22 and Certified Translation   Page 3 of 29

*Orden Administrativa Núm. 2020-22*
*Página 2*

La Sección 1116 de la Ley Núm. 34 establece que las disposiciones de ésta se interpretarán liberalmente a favor de la autoridad del Administrador para reglamentar la industria de la leche y sus productos derivados a los efectos de poner en vigor la política y los fines de dichas secciones. A ese efecto, podrá el Administrador formular y adoptar los planes y medidas necesarias para hacer frente a las variaciones y condiciones cambiantes de la industria, todo ello a los efectos de proteger el interés general y la política pública.

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (Ley 38-2017) permite que las agencias sin estar sujetos al proceso de reglamentacion. 3 L.P.R.A. Sec. 9630(a). Una " 'interpretaci[ón] oficial[ ]' … indudablemente constituyen un mecanismo adicional para que las agencias hagan constar su posición formal sobre las leyes y reglamentos que administran. De hecho, se ha reconocido que las agencias emplean variedad de mecanismos para aclarar e interpretar dichos preceptos. 'Los formatos potenciales incluyen reglas legislativas, adjudicaciones, reglas interpretativas, declaraciones de política pública, manuales, guías, instrucciones de personal, opiniones y teorías legales…'" *Crespo Claudio v. O.E.G.*, 173 D.P.R. 804, 820 (2008) citando a Pierce, <u>Administrative Law Treatise</u>, Aspen Law and Business, New York, Vol., 2002, pág. 151.

## II.     *Trasfondo Fáctico y Legal:*

La Industria Lechera de Puerto Rico genera el primer producto agrícola del país siendo la leche un alimento esencial para la alimentación y salud de los puertorriqueños. Esta industria está revestida de un alto interés público, por lo que todas sus fases desde la producción hasta que llega a nuestros consumidores, están altamente reglamentadas.  Esto es así para asegurar el bienestar general y la salud de los consumidores ofreciendo en todo momento un producto de calidad óptima.

**A.     Las Definiciones Legales y Reglamentarias Pertinentes:**

1.     <u>Las Definiciones de la Ley 34 según enmendada.</u>

La Ley 34 de 11 de junio de 1957 (Ley 34) define "leche fresca" como "[l]eche en su estado natural, pasteurizada y homogenizada, que se expende para consumo directo al público." 5 L.P.R.A. Sec. 1092(h).  La Ley 34 define "excedente" como aquella "[l]eche producida en exceso de las necesidades del mercado de leche fresca, que se usa para manufacturar productos lácteos, o para enlatarla condensada, evaporada, pulverizada o en cualquier otra forma." 5 L.P.R.A. Sec. 1092(i).  Ambas definiciones fueron establecidas en la versión original del Artículo 1 de la Ley 34. Estas definiciones han permanecido casi inalteradas[1] por más de sies décadas, muy a pesar de



---

[1] Mediante enmienda del 2007, se suprimió "cruda" despues de natural.

los variados cambios experimentados através de los años en la industria lechera.  Por lo que a partir del 1957, el excedente es una función de la retención de leche cruda para fines de elaboración de leche fresca.  El destino principal de la leche cruda producida en Puerto Rico es la elaboración de leche fresca debido a una ficción legal.

La Ley 209 de 14 de diciembre de 2007 (Ley 209) enmendó la Ley 34.  La Ley 209 añadió, *inter alia*, la definición de "leche fluida."  Leche fluida es "[l]eche en su estado líquido ya sea cruda, pasteurizada y homogenizada, ultra pasteurizada y aséptica (leche "UHT" por sus siglas en inglés) o elaborada de tal manera que su producto final mantenga el estado líquido, que se expende en distintos tipos, formulaciones o categorías para consumo directo al público." 5 L.P.R.A. Sec. 1092(l).

En el Historial Legislativo de la Ley 209, el Legislador expuso el propósito de la enmienda a la Ley 34, especialmente las razones para añadir el concepto de leche fluida:

> La tradición en Puerto Rico, con este segmento de la Industria de Alimentos que a su vez es compartida con la Agricultura y Manufactura, ha sido la de mantener un modelo de oferta manejada donde mediante reglamentación se regula la leche a suplirse, tanto en cantidad como calidad.  De esta forma se aseguran los abastos necesarios para garantizar al consumidor puertorriqueño un suplido constante y confiable de leche a la vez que ayuda a fortalecer y a desarrollar una industria de la que dependen miles de empleos directos e indirectos.  Para que este modelo de oferta manejada funcione a cabalidad, requiere que se atempere el marco reglamentario de la Industria Lechera a las nuevas realidades y retos del mercado de la leche, muy en particular el vertiginoso aumento en costos operacionales en segmentos de la industria así como la llegada de nuevas variaciones del producto en su forma fluida.

> Esta Ley incorpora, por primera vez, una definición de uno de estos productos de leche fluída que ha alcanzado un por ciento significativo de ese mercado en Puerto Rico.  La leche ultra pasteurizada y aséptica o UHT (Ultra High Temperature) por sus siglas en inglés, necesita de una definición estatutaria y su incorporación al marco reglamentario del mercado de leche.

> Para que el Administrador de la Oficina para la Reglamentación de la Industria Lechera (ORIL) tenga disponibles los instrumentos necesarios para adecuar la reglamentación a los desarrollos del mercado, es necesario darle el poder para establecer precios no sólo máximos sino también mínimos e inclusive únicos para todo tipo de leche fluida.  En la actualidad, en Puerto Rico, la ORIL regula el precio de la Leche Fresca pero por falta de definiciones, la leche UHT no queda regulada.

> * * *
> Para cumplir con las garantías de seguridad alimentaria así como el continuo desarrollo del sector lechero en Puerto Rico, es indispensable mantener un equilibrio adecuado entre la demanda y la oferta para productos fluidos de la leche.  Por esa razón, se dispone que el Administrador de la Oficina Reglamentadora de la Industria Lechera deba asegurarse en todo momento que el precio de la leche UHT sea reglamentado como ocurre con el de la leche fresca y de ser necesario, con cualquier otro tipo, formulación o categoría de leche fluida.  Cabe señalar que la leche UHT se calcula mediante fórmula de retribución como parte de la cuota de producción de los ganaderos.  Se dispone, además, que la leche fluida en alguno de sus tipos, formulaciones o categorías,  podrá venderse, una vez reglamentado, en ningún nivel de distribución a un precio menor al precio mínimo fijado por el Administrador para ese nivel.  De igual manera, se amplia la facultad del Administrador para que en los casos en que la industria amerite establecer un precio único, igualmente lo pueda disponer.



Case:17-03283-LTS   Doc#:14076-1   Filed:08/21/20   Entered:08/21/20 10:44:28   Desc:
Exhibit Administrative Order 2020-22 and Certified Translation   Page 5 of 29

*Orden Administrativa Núm. 2020-22*
*Página 4*

Historial Legislativo y Declaración de Propósitos de la Ley 209 (Subrayado suplido).

El Informe de la Comisión de Comercio, Turismo, Urbanismo e Infraestructura del Senado sobre el Projecto del Senado 1425, precursor de la Ley 209, concluyó lo siguiente:

> La Ley Núm. 34 de 11 de junio de 1957, según enmendada, conocida como "Ley para Reglamentar la Industria Lechera", está cerca a cumplir 50 años y ha servido para colocar dicho sector en un alto sitial, aunque en estos momentos atraviesa situaciones que son preocupantes. Por esto, la medida legislativa objeto de este informe atiende el vacío de reglamentación que existe en el presente estado de derecho en cuanto a los productos cuya formulación conlleve el proceso de ultra pasteurización y los precios mínimos de la leche en forma fluida. Su aprobación es un asunto de alto interés, tanto para los sectores reglamentadores como para todos los componentes de la Industria Lechera y las enmiendas a esta Ley buscan asegurarles a los consumidores la calidad, cantidad y precios adecuados de este producto de primera necesidad y de gran consumo en Puerto Rico.

Informe, P. del S. 1425, 21 de marzo de 2007 (Subrayado suplido).

Con este pelucido propósito de reglamentar la leche fluida, el Legislador le añadió a la aljaba de poderes del Administrador los siguientes:

1.   Añadió al Artículo 5, inciso (b), el subinciso catorce[2] que dispone (Énfasis y Subrayado suplido):

> (14)   Asegurarse de implantar y hacer valer los precios máximos y mínimos fijados **para la leche fluida** y los precios máximos de sus productos derivados en todos los niveles de distribución.

2.   Enmendó el Artículo 16, el inciso (d)[3], para disponer (Énfasis y Subrayado suplido):

> El Administrador fijará precios máximos, mínimos o únicos **para la leche fluida, incluyendo el excedente, en sus distintas denominaciones, entiéndase tipos, formulaciones o categorías, en todos y cualquiera de los canales y niveles de distribución.** Cualquier determinación de precios deberá ser producto de un proceso de vistas públicas debidamente convocadas. En las vistas de fijación de precios máximos, mínimos o únicos para la leche fluida y/o de sus productos derivados, el Administrador citará al Secretario del Departamento de Asuntos del Consumidor y éste comparecerá en representación de los consumidores. Además, dicho Departamento deberá rendir un informe y recomendaciones sobre las referidas vistas al Administrador. El Administrador tomará en consideración las recomendaciones del Departamento de Asuntos del Consumidor al llevar a cabo su determinación sobre la fijación de precios máximos, mínimos o únicos.

3.   Enmendó el Artículo 16, el inciso (e)[4], para disponer (Énfasis y Subrayado suplido):

> En la fijación de precios máximos, mínimos o únicos a ser pagados por cada cuartillo de leche fluida o fracción de éste, el Administrador establecerá los precios que sean justos y razonables y que aseguren **un mercado adecuado de leche fluida** sin afectar desfavorablemente la producción ni las fuentes de producción u oferta. A este fin, el Administrador considerará todos los factores de costo envueltos en la producción, elaboración y esterilización de leche, incluyendo, pero no limitándose a, los costos de mano de obra, alimento, transportación y distribución de la leche fluida y de los productos derivados de esta, así como el cumplimiento de los requisitos sanitarios establecidos por Ley.



---

[2] 5 L.P.P.A. Sec. 1096(b)(14).
[3] 5 L.P.P.A. Sec. 1107(d).
[4] 5 L.P.P.A. Sec. 1107(e).


Case:17-03283-LTS Doc#:14076-1 Filed:08/21/20 Entered:08/21/20 10:44:28 Desc: Exhibit Administrative Order 2020-22 and Certified Translation Page 6 of 29

*Orden Administrativa Núm. 2020-22*
*Página 5*

4.      Enmendó el Artículo 20, el inciso (c)[5], para disponer (Énfasis y Subrayado suplido):

(c)-    **La leche fluida no podrá venderse** en ningún nivel de distribución **a un precio diferente al fijado por el Administrador para ese nivel**.

La intención legislativa es mover la industria lechera fuera del molde de un mercado de leche fresca como único producto fluido hacia un mercado de leche fluida con su variedad de productos. De ser así, la definición de excedente tiene que interpretarse para conformarla con la intención legislativa.

2.      Las Definiciones del Reglamento 5.

El Reglamento 5 de la Industria Lechera para Establecer las Normas que Regirán la Calidad de la Leche en Todas sus Fases de Producción, Elaboración, y Venta..." fue enmendado el 29 de diciembre de 2016 (con vigencia a partir del 27 de enero de 2017) y registrado como el Reglamento 8889 (en adelante el Reglamento 5). El Reglamento 5 tiene el propósito de reglamentar los asuntos de la calidad de la leche. El Reglamento 5 no contiene una definición de leche excedente. Define, sin embargo, "leche" como "la secreción láctea íntegra...que se obtiene mediante el ordeño de uno o más vacas saludables. La leche para consumo público contendrá no menos de [8.3%] de sólidos no grasos de leche y no menos de [3.25%] de grasa láctea [pero] [e]n aquellos casos que el mercado lo requiera, la planta o centro de pasteurización o elaboración podrá ajustar el porcineto de grasa láctea o sólidos no grasos." Regl. 8889, Sec. 4(N). Continua la sección disponiendo que "[l]a leche y productos de leche en su empaque final para consumo, estarán pasteurizados, ultra-pasteurizados o asépticamente procesados y podrán ser sometidos a un proceso de homogenización." *Id.* Esta porción de la definición de "leche" del Reglamento 5 se asemeja a la definición de "leche fluida" de la Ley 34.

El Reglamento 5 contiene nueve definiciones de formulaciones de leche fluida en la Sección 4. Estas son: leche acidificada (Sección 4(Ñ)); leche baja en grasa (Sección 4(P)); leche concentrada (Sección 4(Q)); leche con cultivo (Sección 4(R)); leche descremada (Sección 4(V)), desnatada o sin grasa; leche descremada o sin grasa (Sección 4(W)); leche evaporada (Sección 4(Y)); leche homogeneizada (Sección 4(Z)); y leche reducida en grasa (Sección 4(BB)). Define además los procesos de pasteurización (Sección 4(LL)), ultra-pasteurización (Sección 4(AAA)) y procesamiento aséptico (Sección 4(OO)).

2.      Las Definiciones del Reglamento 10.

---

[5] 5 L.P.P.A. Sec. 1111(c).

El Reglamento 10 de la Industria Lechera para Establecer Fórmulas para Canalizar el Excedente, Fijar Precios de la Leche en Todos sus Niveles y Estableciendo las Normas de Expansión en la Producción…" fue enmendado el 12 de noviembre de 2015 y registrado como el Reglamento 8657 (en adelante Reglamento 10). El propósito del Reglamento 10 es, entre otros, de delimitar el marco de discreción del poder exclusivo del Administrador de manejar el excedente de leche. *Véase* 5 L.P.R.A. Sec. 1096(b)(4) (El Administrador tiene el poder de "[f]ormular los planes necesarios para disponder de la leche excedente a los fines de proteger integralmente la industria.") El Reglamento 10 contiene definiciones de leche fresca, fluida y excedente. El Reglamento 10 define la "leche fresca" como "leche de vaquerías pasteurizada y homogenisada por un elaborador que se expende para consumo directo del público." Regl. 8657, Sec. 4(k). "Leche fluida" se define como "leche en su estado líquido ya sea cruda, pasteurizada y homogenizada, ultrapasteurizada y aséptica (leche "UHT" por sus siglas en inglés) o elaborada de tal manera que su producto final mantenga el estado líquido, que se expende en distintos tipos, formulaciones o categorías para consume directo al público." Regl. 8657, Sec. 4(j). Mientras que "excedente de leche" se define como "leche cruda que los elaboradores no procesan como leche fresca y que está disponible para la elaboración de otros productos lácteos." Regl. 8657, Sec. 4(g). El Reglamento 10 añade dos definiciones pertinentes. Define "leche cruda" como la "secreción láctea íntegra…que se obtiene mediante el ordeño de una o más vacas saludables en las vaquerías de los productores que no ha sido sometida a ningún proceso." Regl. 8657, Sec. 4(i). Define además la "leche retenida" como "la leche que retienen los elaboradores para procesarla como leche fresca."

Para fines de canalización, "la leche que se produce en Puerto Rico se utilizará, en orden de prioridad…para la elaboracion de leche fresca [y] [l]uego de agotada la demanda para leche fresca…se utilizará para la elaboracion de otros productos por dichas plantas elaboradoras de leche fresca y por Indulac, como planta de balance, y por elaboradoras de productos derivados." Regl. 8657, Sec. 8(b). "El orden de prioridad de los productos derivados elaborados con el excedente será determinado a base del rendimiento económico para el ganadero, comenzando con los de mayor rendimiento y continuando, en escala descendente, con los restantes." *Id.* Las elaboradoras "tendrá[n] acceso al excedente a un mismo precio conforme al uso al que se dará al excedente." Regl. 8657, Sec. 8(f). "Las decisiones del Administrador en cuanto a la canalización o disposición del excedente de leche, estarán basadas en las circunstancias particulares de la Industria en el momento en que se tomen. Entre ellas, tomará en consideración las circunstancias particulares de



cada elaborador que se proponga utilizar el excedente y el grado de necesidad que tenga del mismo para su operación normal." Regl. 8657, Sec. 8(g). Pues, "el Administrador calculará la cantidad de leche excedente que se producirá prospectivamente y adjudicará las porciones del mismo solicitadas por los elaboradores y la prioridad o preferencia de acceso a dicho excednete de cada uno de ellos." *Id.*

4.     <u>Las Definiciones del Acuerdo Transaccional.</u>

Otra autoridad que rige la industria lechera es el Acuerdo Transaccional en el caso de *Vaquería Tres Monjitas, Inc., v. Secretary of Agriculture*, 04-1840 (DRD). El Acuerdo Transaccional incluyó un borrador de Reglamento 12 cuyo propósito fue establecer metodologías mediante las cuales se determinan los precios de la leche en sus distintos niveles de venta, pero particularmente para con las elaboradoras de leche. Contiene por tanto algunas definiciones pertinentes. El Reglamento 12 anejado al Acuerdo Transaccional define leche cruda como "la secreción láctea íntegra…que se obtiene mediante el ordeño de una o más vacas saludables en las vaquerías de los productores que no ha sido sometida a ningún proceso." Dkt. 2322-1, Sec. 4(6) (Traducción nuestra). Leche es el "término genérico que se refiere a leche cruda retenida y procesada por las plantas elaboradoras, la cual es convertida a cualquier tipo de leche fluida para venta al consumidor con o sin la incorporación de ingredientes o sabores." Dkt. 2322-1, Sec. 4(10) (Traducción nuestra). Leche fresca se define como "leche cruda producida en las vaquerías que es posteriormente pasteurizada y homogenizada por las procesadoras y es clasificada dentro de la categoría de leche fluida." Dkt. 2322-1, Sec. 4(8) (Traducción nuestra). Leche ultra-pasteurizada se define como "leche cruda producida por las vaquerías, que ha sido sometida a un proceso de ultra-pasteurización por las procesadoras y es clasificada como un tipo de leche fluida." Dkt. 2322-1, Sec. 4(9) (Traducción nuestra). Leche fluida "se refiere a la leche cruda que las plantas procesadoras reciben y retienen para su homogeneización y pasteurización o procesamiento de ultra-pasteurización y homogeneización o procesamiento aseptico." Dkt. 2322-1, Sec. 4(7) (Traducción nuestra). Conforme al Reglamento 12 anejado al Acuderdo Transaccional, "[e]jemplos de leche fluida son leche fresca y UHT" y aquellos incluidos en la Sección 1000.15 del título 7 del Código de Reglamentos Federales. *Id* (Traducción nuestra.)

A pesar de estas definiciones, el poder sobre el manejo de excedente no fue alterado por el Acuerdo Transaccional[6]. Conforme al Reglamento 12 anejado al Acuerdo Transaccional, el

---

[6] El Tribunal de Distrito de los Estado Unidos para el Distrito de Puerto Rico reconoció que el Administrador tiene la potestad y discreción para establecer distintos precios para distintos usos pero no puede favorecer a un participante en el mercado a expensas de otro:

Administrador retuvo la autoridad de canalizar la leche cruda producida en Puerto Rico, en

"primera instancia en la producción de Leche Fresca y luego de agotada su demanda, el remanente

será utilizado por las Plantas Elaboradoras de Leche Fresca y por Indulac en la elaboración de

otros productos. El orden de prioridad de los productos adicionales elaborados con el remanente

será determinado a base del rendimiento económico de éstos, comenzando con los de mayor

rendimiento y continuando, en escala descendente, con los restantes." Dkt. 2322-1, Sec. 9

(traducción nuestra). El Acuerdo Transaccional, al párrafo 16, garantiza que "leche cruda estará

disponible a cualquier comprador al mismo precio para el mismo producto y/o el mismo propósito

de mercadeo." Dkt. 2322, para. 16. (traducción nuestra).

A pesar de que muchas de las definiciones de leche, leche fresca, leche fluida y excedente

son similares, no existe uniformidad entre las mismas, y pueden llevar a confusión, y error en la

aplicación de las mismas. Es por ello que el Administrador suscribiente interpretará la definición

de excedente con el fin de dar la uniformidad necesaria a la misma, pendiente el proceso de

reglamentación formal.

**B.      Las Reglas para Interpretar Textos Legales.**

1.     <u>Las Reglas de Interpretación que surgen del Código Civil.</u>

El Código Civil prescribe ciertas normas de hermenéutica (intepretación) legal. Estas

sirven como principios rectores en el análisis del significado de legislación. El Artículo 14 del

Código Civil dispone que: "[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no

debe ser menospreciada bajo el pretexto de cumplir su espíritu." 31 L.P.R.A. Sec. 14. Por igual,

se distingue aquel principio que establece que: "[e]l medio más eficaz y universal para descubrir

el verdadero sentido de una ley cuando sus expresiones son dudosas. es considerar la razón y

espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla." Art. 19 de

Código Civil, 31 L.P.R.A. sec. 19.

Toda ley requiere interpretación. aún la más clara de las leyes. cuando corresponde

aplicarla. *E.L.A. v. Frig. y Alm. del Turabo, Inc.*, 155 D.P.R. 27 (2001); *Nadal v. Depto. Rec. Nat.*,

150 D.P.R. 715 (2000); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 544 (1984); *Vives Vázquez v.*

*Tribunal Superior*, 101 D.P.R. 139, 145 (1973; *Pueblo v. Tribunal Superior*, 81 D.P.R. 763, 768

---



When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk. Under no circumstances will the fresh milk processors be required to pay more for their raw milk or carry additional costs for the purpose of allowing Indulac's access to raw milk for UHT or fluid milk manufacturing at a lower cost than the cost at which plaintiffs can acquire raw milk from fresh or fluid milk processing. **The Administrator may set at his discretion the prices for raw milk for non fluid milk use.**

*VTM v. Secretary of Agriculture*, 04-1840 (DRD); Amended Opinion and Order, July 13, 2007 (Dkt. 480).

(1960). Toda palabra tiene un valor, revela un significado, y/o transmite una idea, siempre es necesario conocer ese valor, ese significado, esa idea.  Por lo que la diferencia entre cada caso estriba en que cuando las palabras son claras, la interpretación es más fácil y resulta de manera más espontánea, pero cuando las palabras son obscuras o ambiguas, la interpretación es más difícil y se advierte su necesidad de manera más palpable. *Municipio v. Frenos, Com.*, 63 D.P.R. 978, 983 (1944).

Es de amplia aceptación el entendido de que sólo hay una regla de interpretación que es absolutamente invariable y ésta es que debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo. *Srio. del Trabajo v. P.R. Cereal Extracts Inc.*, 83 D.P.R. 267, 275-276 (1961); *Lange v. Pueblo*, 24 D.P.R. 854, 858 (1917).  La "regla de oro en materia de interpretación de leyes [es] que el objeto primordial de todas la reglas de hermenéutica no es conseguir un objetivo arbitrario preconcebido, sino <u>dar efecto al propósito del legislador</u>." *Mason v. White Star Bus Line*, 53 D.P.R. 337, 340 (1938).  Cuando los tribunales ejercen su función interpretativa de la ley, éstos consideran el propósito o intención de la Asamblea Legislativa al aprobar la misma con el fin de propiciar la obtención del resultado querido por el legislador originalmente.  *Piñero González v. A.A.A.*, 146 D.P.R. 890, 898 (1998); *García v. E.L.A.*, 146 D.P.R. 725, 733 (1998).

Otra regla de hermeneutica es la interpretación conjunta. La interpretación de los diferentes artículos o secciones de una ley y las leyes que se relacionen entre sí por su objetivo o propósito, debe hacerse en conjunto, refiriéndose las unas a las otras como un todo. *Ojeda v. El Vocero de P.R.*, 137 D.P.R. 315, 335 (1994); *Álvarez & Pascual, Inc. v. Secretario de Hacienda*, 84 D.P.R. 482, 489-490 (1962); *Pueblo v. Sucn. Junghanns*, 73 D.P.R. 648, 652-653 (1952).  "Téngase en cuenta, que la intención legislativa de una ley no debe buscarse en una frase aislada o en una de sus secciones; sino en el contexto de todo el estatuto, tomando en cuenta el propósito seguido por el legislador. Por eso, un artículo de una ley no debe interpretarse aisladamente, sino considerando la ley en su totalidad." Bernier y Cuevas Segarra, *supra*, a la pág. 245.



Finalmente, toda ejercicio interpretativo se debe ajustar al fundamento racional o fin esencial de la ley y la política pública que la inspiran. De forma tal que, en el proceso de interpretación, no es procedente desvincular el estatuto objeto del mismo del problema cuya solución se persigue. *P.R.T.C. v J. Reg. Tel. de P.R.*, 151 D.P.R. 269 (2000); *Industria Cortinera, Inc. v. Puerto Rico Telephone Co.*, 132 D.P.R. 654, 661 (1993); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772, 785 (1968); *Coll v. Picó*, 82 D.P.R. 27, 33 (1960); *Debién v. Junta de Contabilidad*,

76 D.P.R. 96, 105 (1954). Conforme al anterior principio. las leyes han de ser interpretadas y aplicadas en comunión con el propósito social que las inspira: sin desvincularlas de la realidad y del problema humano que persiguen resolver. La interpretación de un estatuto debe estar dirigida hacia aquella solución que mejor capte el impacto de éste en términos del bienestar general y que mejor perciba la intención legislativa al adoptar la norma enfilada a propiciar el interés público. *Goss v. Dycrex Construction Co.*, 141 D.P.R. 342, 356-357 (1996). A su vez, el clima socioeconómico que impulsa la adopción de un estatuto es un ingrediente de capital importancia para la interpretación del mismo. *Commonwealth Ins. Co. v. Casellas*, 103 D.P.R. 539, 542 (1975).

    2.    <u>Las Reglas de Interpretación que surgen de la Ley 34 y los Reglamentos de ORIL.</u>

El legislador le delegó el poder general al "Administrador [de] investigar y reglamentar todas las fases de la industria de la leche y los productos derivados de ésta, en el Estado Libre Asociado de Puerto Rico, incluyendo la producción, elaboración, esterilización, manufactura, almacenaje, compra y venta, transportación y distribución del producto principal y sus derivados." 5 L.P.R.A. Sec. 1096(a). Este poder reglamentario es amplio. El Legislador facultó al Administrador para "reglamentar las diversas fases de la industria lechera sujeto a las disposiciones de las secs. 1092 a 1118 de este título, y hasta donde [fuera] necesario para poner en vigor la política pública y los fines de dichas secciones." 5 L.P.R.A. Sec. 1107(a). "En la determinación del límite de reglamentación de la industria, el Administrador tomará en cuenta las necesidades e intereses de los diferentes sectores dentro de la industria de manera que cualquier medida que adopte tienda a dar estabilidad y a estimular el progreso en la producción y mercadeo de leche y de los productos derivados de ésta, y por tanto prosperidad a la industria." 5 L.P.R.A. Sec. 1107(b). Además del poder general de investigar y reglamentar todas las faces de la industria lechera, el legislador facultó al Administrador específicamente en una multitud de áreas. Pertinente aquí son las facultades de "[d]esarrollar y mantener condiciones satisfactorias de mercadeo tendientes a proteger la producción y distribución de la leche y los productos derivados de ésta," y de "[f]ormular los planes necesarios para disponer de la leche excedente a los fines de proteger integralmente la industria."



Además de las reglas generales de interpretación discutidas en la sección anterior de este orden administrativa, el legislador incluyó una regla de interpretación dentro del propio texto de la Ley 34. Pues "[l]as secciones 1092 a 1118…se <u>interpretarán liberalmente</u> a favor de la autoridad del Administrador para reglamentar la industria de la leche y sus productos derivados a los efectos de poner en vigor la política y los fines de dichas secciones." 5 L.P.R.A. Sec. 1116.

Case:17-03283-LTS   Doc#:14076-1   Filed:08/21/20   Entered:08/21/20 10:44:28   Desc:
Exhibit Administrative Order 2020-22 and Certified Translation   Page 12 of 29

*Orden Administrativa Núm. 2020-22*
*Página 11*

Similarmente, el Reglamento 10 "se interpretará liberalmente a favor de la autoridad del Administrador para reglamentar la industria de la leche y sus derivados a los efectos de poner en vigor la política y los fines de la [Ley 34]." "A ese efecto, podrá el Administrador formular y adoptar los planes y medidas necesarias para hacer frente a las variaciones y condiciones cambiantes de la industria, todo ello a los efectos de proteger el interés general y la política pública." Regl. 8657, Art. 15. El Reglamento 5 dispone de la misma manera en su Artículo 20. Regl. 8889, Art. 20. El Reglamento 12 anejado al Acuerdo Transaccional dispone de la misma manera en su Sección 10(5). Dkt. 2322-1, Sec. 10(5) (Traducción nuestra). "Las provisiones de[l] Reglamento [12 anejado al Acuerdo Transaccional] tiene que interpretarse en conjunto con otras normas, reglamentos, políticas y procedimientos emitidos por la Oficina de Reglamentación de la Industria Lechera." Dkt. 2322-1, Sec. 10(6) (Traducción nuestra).

Por otro lado, el legislador estaba consciente que la industria lechera era una dinámica y cambiante, por lo que facultó al Administrador a tomar medidas para hacer frente a los cambios. Por lo que "[a] ese efecto, podrá el Administrador formular y adoptar los planes y medidas necesarias <u>para hacer frente a las variaciones y condiciones cambiantes</u> de la industria, todo ello a los efectos de proteger el interés general y la política pública." *Id.* Todos los reglamentos citados reconocen este poder del Administrador. Regl. 8657, Art. 15; Regl. 8889, Art. 20; Dkt. 2322-1, Sec. 10(5).

El Legislador estableció la política pública de la Ley 34 como sigue:

> Todas las partes interesadas que concurrieron a las audiencias celebradas por la Comisión Especial Senatorial - - productores, elaboradores y consumidores - - solicitaron del Gobierno que creara un organismo regulador de las relaciones entre las partes a fin de <u>establecer las bases definitivas para el desarrollo y la estabilidad de la industria lechera</u>, y de buscar la manera de <u>distribuir y mercadear mejor el producto principal y sus derivados</u>.
>
> * * *
>
> La Asamblea Legislativa por medio de la presente ley aclara y ratifica su intención original respecto a la reglamentación de la industria lechera. De esta manera la Asamblea Legislativa quiere recalcar su intención de que el Estado, en el ejercicio de su poder policial y a los efectos de promover el bienestar general, <u>intervenga directamente con la industria lechera, para mediante la reglamentación adecuada lograr enderezar su rumbo para que el interés público esté adecuadamente servido a través de la mayor producción de leche y productos lácteos puros por una industria vigorosa, sana y progresista que opere eficientemente y que pueda ofrecer al consumidor leche y productos lácteos a precios justos y razonables</u>.



Historial Legislativo y Declaración de Propósitos de la Ley 34.

  3.  <u>Interpretación Oficial de Excedente</u>.

El texto la Ley 34 define "excedente" como toda la leche cruda que no se retiene para la elaboración de leche fresca. La definición resulta contraria a la intención legislativa de las



enmiendas a la Ley 34 del 2007 si la misma se toma aisladamente y fuera del contexto de la ley enmendada. La interpretación literal de "excedente" resulta contradictorio a la intención legislativa de tales enmiendas. Pero, si al contrario obedecemos la regla hermenéutica de interpretar leyes para dar efecto al propósito del legislador e interpretar sus artículos en conjunto, la definición de "excedente" es harmonizable con tal intención y propósito, y con las demás disposiciones. Tanto la intención legislativa, como el propio texto de las enmiendas a la Ley 34 realizadas por la Ley 209, indudablemente extienden a los poderes del Administrador y la oficina administrativa que dirige a todo el mercado de leche fluida. El Legislador no solo reconoció los cambios en el mercado de la leche, sino que también amplió los poderes del Administrador para reglamentar todo el mercado de leche fluida. En la actualidad, el mercado de leche fluida se compone por la leche fresca en variedad de formas y envaces, la leche ultra-pasteurizada acepticamente empacada (UHT) en variedad de formas, y la leche ultra-pasteurizada (UP) en variedad de formas y empaques. Por tanto, la cónsona interpretación de "excedente" con las enmiendas de la Ley 34 por la Ley 209 es "leche cruda en exceso de la demanda de leche fluida."

No obstante las enmiendas a la Ley 34 que ampliaron el poder reglamentario del Administrador a todo el mercado de leche fluida, la definición de excedente quedó rezagada. Es evidente que la tendencia en el consumo de leche fresca es decendente. Este fenómeno causa que el "excedente" continue aumentando en la medida que la producción no merme al mismo ritmo que el deterioro en el consumo de la leche fresca. Ha sido la responsabilidad del Administrador procurar canalizar leche excedente hacia productos de mejor rendimiento, pero sus muchos esfuerzos no han logrado detener el incremento de "excedente." Pues, la interpretación literal de "excedente" es impráctica y frena el desarrollo de la industria – resultados que serían contrario al texto de la Ley 34 y su intención legislativa. Es necesario que el Administrador actue de manera diferente a los esfuerzos de canalización bajo una definición de "excedente" contrario a la realidad de la Industria Lechera, y contraria a las enmiendas a la Ley 34. Por tanto, la cónsona interpretación de "excedente" con las enmiendas de la Ley 34 por la Ley 209 es "leche cruda en exceso de la demanda de leche fluida."



El Administrador tiene la facultad de reglamentar la Industria Lechera hasta donde sea necesario para poner en vigor la política pública subyacente de la Ley 34. Al reglamentar, las medidas que tome el Administrador tienen que tomar en cuenta las necesidades de los distintos sectores y dar estabilidad y estimular el progreso de la industria en tanto su producción como el mercadeo de los productos fluidos, según el texto enmendado de la Ley 34. El Administrador

tiene también el deber de desarrollar y mantener condiciones en el mercado satisfactorias para protejer la producción y la distribución de los productos de leche fluida.  Finalmente, la facultad de interpretar la Ley 34 le corresponde al Administrador para lo cual se interpreta liberalmente a favor del poder de reglamentar la industria haciendo frente a los cambios y variaciones de la industria.

Empleando estas facultades, deberes y responsabilidades administrativas delegadas, y siguiendo el texto de las enmiendas a la Ley 34 junto a la intención legislativa, el Administrador suscribiente interpreta la definición rezagada de excedente de tal forma que "leche excedente" sea en función de leche fluida, atemperando la misma a la realidad de la Industria Lechera, y al texto e intención de las enmiendas a la Ley 34. Tal interpretación se extiende, para dar uniformidad, a todo reglamento de ORIL.


Por lo cual, *se Ordena*:

### III.    *Orden:*

1.    *Se ORDENA,* la definición de "leche excedente" sea  "[l]eche producida en exceso de las necesidades del mercado de leche fluida, que se usa para manufacturar productos lácteos, o para enlatarla condensada, evaporada, pulverizada o en cualquier otra forma."

2.    *Se ORDENA,* la interpretación se extiende, para dar uniformidad, a todo reglamento de ORIL.

3.    *Se ORDENA,* que a partir del 23 de julio de 2020, Suiza Dairy, Corp., Vaquería Tres Monjitas, Inc., e Industria Lechera de Puerto Rico, Inc., recibirán un abasto de leche cruda para suplir la demanda de leche fluida de cada una de las plantas.  La leche cruda en exceso a la demanda de leche fluida se considerará excedente para todos los fines de la Ley 34 y los reglamentos de ORIL.

4.    *Se ORDENA,* como medida provisional, que mínimo dos rutas de Suiza Dairy, Corp., y una de Vaquería Tres Monjitas, Inc., de entrega diaria serán asignadas a Industria Lechera de Puerto Rico, Inc.  Las rutas entregadas a Industria Lechera de Puerto Rico, Inc. no contenderán menos de 22,000 cuartillos por termo.

5.    *Se ORDENA,* que todo precio establecido para los productos de leche fluida se mantienen inalterados.

#### *IV.* *Observancia:*

Esta Orden Administrativa es de estricto cumplimiento para Suiza Dairy, Corp., Vaquería Tres Monjitas, Inc., e Industria Lechera de Puerto Rico, Inc.

*Se apercibe*, que el incumplimiento de esta Orden Administrativa podría conllevar la imposición de las penalidades dispuestas en la Ley Núm. 34 del 11 de junio de 1957, *según enmendada*.

#### *V.* *Derogación:*

Se derogará cualquier norma o disposición que esté vigente o que entre en conflicto con lo aquí establecido.

#### *VI.* *Separabilidad:*

En caso que se declare nula o contraria a la ley cualquier parte de esta Orden Administrativa, no se afectará la validez de las restantes disposiciones.

#### *VII.* *Vigencia:*

Esta Orden Administrativa tiene vigencia inmediata.

En San Juan, Puerto Rico, hoy //de julio de 2020.

**NOTIFIQUESE**:

**AGRO. JORGE A. CAMPOS MERCED**
**ADMINISTRADOR**

CERTIFIED TRANSLATION

GOVERNMENT OF PUERTO RICO
DEPARTMENT OF AGRICULTURE
**OFFICE OF DAIRY INDUSTRY REGULATION**
P.O. BOX 10163
SAN JUAN, PUERTO RICO 00968-1163

**ADMINISTRATIVE ORDER NO. 2020-22**

**RE:    Official Interpretation of the Definition of Surplus Milk.**

*I. Legal Basis:*

Law 34 of June 11, 1957, as amended, (5 LPRA §1092, et seq.), hereinafter referred to as "Law 34," empowers the Office of Dairy Industry Regulation (hereinafter, "ORIL" [tr. note: Spanish acronym]), by and through its Administrator, to investigate, oversee, and regulate the production, processing, manufacturing, and sale of milk in Puerto Rico and its derived products. This power extends from the initial phase of milk production to the subsequent stages of manufacturing, sterilization, storage, transport, distribution, purchase, and sale to the general public of milk and any other dairy products, of any type, including ultra-pasteurized and aseptic milk (hereinafter, "UHT") and that raw milk that will be used for the manufacturing of, among other products, cheese, butter, evaporated milk, powdered milk, cream, yogurt, and ice cream.

The Administrator has the power to ("[d]evelop and maintain satisfactory marketing conditions aimed at protecting the production and distribution of milk and products derived from milk"), *Id. §1096(b)(3):* ("[e]stablish systems or formulas for payment or liquidation to producers…"), *Id. §1096(b)(12):* ("[m]ake sure to implement and enforce the fixed maximum and minimum prices for fluid milk and the maximum prices of its derived products at all levels of distribution.", *Id. §1096(b)(14):* ("[i]n the exercise of the powers granted in this section and in the other provisions of secs. 1092 to 1118 of this title, the Administrator is expressly authorized to take all pertinent measures to enforce the provisions of the same."), *Id. §1096(c)*. The Administrator shall be able to regulate the various phases of the dairy industry subject to the provisions of [the Law], and to the extent that such is necessary to enact the public policy and the purposes of [the Law]. In the determination of the limit of regulation of the industry, the Administrator shall take into account the needs and interests of the different sectors within the industry so that any measure that he adopts is aimed at providing stability and stimulating the progress of the production and marketing of milk and products derived from milk, and therefore the prosperity of the industry. *Id. §1107*.

[initials in left margin]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Section 1116 of Law 34 establishes that the provisions of this law shall be interpreted liberally in favor of the Administrator's authority to regulate the dairy industry and its derived products to the effect of enforcing the policy and the purposes of said sections. To that effect, the Administrator shall be able to formulate and adopt then necessary plans and measures to deal with the variations and changing conditions of the industry, all of this in order to protect the general interest and public policy.

The Government of Puerto Rico Uniform Administrative Procedure Act (Law 38-2017) allows agencies [*sic*] without being subject to the regulatory process. 3 L.P.R.A. Sec. 9630(a). An " 'official interpretation[]' …undoubtedly constitute an additional mechanism for the agencies to state for the record their formal position on the laws and regulations that they oversee. In fact, it has been recognized that the agencies employ a variety of mechanisms to clarify and interpret said precepts. 'The potential formats include legislative rules, adjudications, interpretative rules, statements of public policy, manuals, guidelines, employee instructions, opinions, and legal theories…'" *Crespo Claudio v. O.E.G.*, 173 D.P.R. 804, 820 (2008) citing Pierce, <u>Administrative Law Treatise</u>, Aspen Law and Business, New York, Vol., 2002, pg. 151.

## II. *<u>Factual and Legal Background</u>*

The Dairy Industry of Puerto Rico generates the top agricultural product of the country, with milk being an essential food for the nourishment and health of Puerto Ricans. This industry is of great public interest, wherefore all its phases from production until it reaches our consumers, are highly regulated. This serves to ensure the general welfare and health of consumers by providing them with a high-quality product at all times.

**A.     Pertinent Legal and Regulatory Definitions:**

1. <u>Definitions of Law 34, as amended</u>.

Law 34 of June 11, 1957 (Law 34) defines "fresh milk" as "[m]ilk in its natural state, pasteurized and homogenized, which is sold to the public for direct consumption." 5 L.P.R.A. Sec. 1092(h). Law 34 defines "surplus" as that "[m]ilk produced in excess of the needs of the market for fresh milk, that is used for manufacturing dairy products, or to be canned in its condensed, evaporated, powdered, or any other form." 5 L.P.R.A. Sec. 10929(i). Both definitions were established in the original version of Article 1 of Law 34. These definitions have remained unaltered[1] for over

---

[1] By way of amendment in 2007, "raw" was suppressed after natural.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[initials in left margin]

*Administrative Order No. 2020-22*
*Page 3*

six decades, despite the varied changes experienced throughout the years in the dairy industry. Therefore, as of 1957, the surplus is a function of the retention of raw milk for the purposes of manufacturing fresh milk. The principal use of raw milk produced in Puerto Rico is the production of fresh milk due to a legal fiction.

Law 209 of December 14, 2007 (Law 209) amended law 34. Law 209 added, *inter alia*, the definition of "fluid milk." Fluid milk is "[m]ilk in its liquid state, whether raw, pasteurized and homogenized, ultra-pasteurized and aseptic ("UHT" milk for its initials in English) or manufactured in such a way that the final product remains in liquid state, that is sold in different types, formulations, or categories to the public for direct consumption." 5 L.P.R.A. Sec. 1092(l).

In the Legislative History of Law 209, Lawmakers stated the purpose of the amendment to Law 34, especially the reasons for adding the concept of fluid milk:

> The tradition in Puerto Rico, with this segment of the Food Industry that is in turn shared with Agriculture and Manufacturing, has been to maintain a model of managed supply in which through regulation the milk to be supplied is regulated, both in terms of amount as well as quality. This way, the necessary provisions are ensured to guarantee a constant and reliable milk supply to Puerto Rican consumers while helping to strengthen and develop an industry that thousands of direct and indirect jobs depend on. In order for this model of managed supply to fully function, it requires for the regulatory framework of the Dairy Industry to be adjusted to the new realities and challenges of the dairy market, very particularly the dramatic increase in operating costs in segments of the industry as well as the arrival of new variations of the product in its fluid form.

> This Law incorporates, for the first time, a definition of one of these fluid-milk products that has reached a significant percentage of that market in Puerto Rico. Ultra-pasteurized and aseptic or UHT (Ultra High Temperature) milk, for its initials in English, needs a statutory definition and its incorporation into the regulatory framework of the market for milk.

> In order for the Administrator of the Office for Dairy Industry Regulation (ORIL) to have the necessary instruments available to it to adapt the regulation to the developments of the market, it is necessary to give it the power to establish not only maximum prices but also minimum prices and even flat prices for every type of fluid milk. At present, in Puerto Rico, ORIL regulates the price of Fresh Milk but due to a lack of definitions, UHT milk remains unregulated.

> \*\*\*

> In order to comply with the guarantees of food safety, as well as the ongoing development of the dairy industry in Puerto Rico, it is essential to maintain a proper balance between demand and supply for fluid milk products. For this reason, it is provided that the Administrator of the Office of Dairy Industry Regulation must at all times ensure that the price of UHT milk is regulated as occurs with fresh milk and, if necessary, with any other type, formulation, or category of fluid milk. It is worth pointing out that UHT milk is calculated through a retribution formula as part of dairy farmers' production quota. It is moreover provided that fluid milk in any of its types, formulations, or categories, may be sold, once regulated, at no level of distribution at a price lower than the minimum price set by the Administrator for that level. Likewise, the Administrator's power is broadened so that in cases in which the industry seeks to establish a flat price, he may likewise provide for such.

[initials in left margin]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Legislative History and Statement of Purposes of Law 209 (Underlining provided).

The Report of the Commerce, Tourism, Urban Development, and Infrastructure Commission of the Senate on Senate Bill 1425, the precursor to Law 209, concluded the following:

Law 34, of June 11, 1957, as amended, known as the "Dairy Industry Regulation Act," is about to turn 50 years old and has served to place said sector on a high seat of honor, although right now it is going through situations that are concerning. Therefore, <u>the legislative measure covered by this report attends to the regulatory gap existing in the current state of law with regard to products whose formulation entails the process of ultra-pasteurization and the minimum prices of milk in its fluid form</u>. Its passage is a matter of great interest, both for the regulatory sectors as well as for all the components of the Dairy Industry and the amendments to this Law seek to guarantee consumers proper quality, amounts, and prices of this highly consumed staple product in Puerto Rico.

<u>Report.</u> S.B. 1425, March 21, 2007 (Underlining provided).

With this clear purpose of regulating <u>fluid milk</u>, Lawmakers added the following powers to the Administrator's arsenal of powers:

1.    They added to Article 5, subsection (b), subparagraph fourteen[2], which provides (emphasis and underlining provided):

(14)  Make sure to <u>implement and enforce the maximum and minimum prices set **for fluid milk**</u> and the maximum prices of its derived products at all levels of distribution.

2.    They amended Article 16, subsection (d)[3], to provide (emphasis and underlining provided):

The Administrator <u>shall set maximum, minimum, or flat prices **for fluid milk, including surplus**, in its different denominations, meaning types, formulations, or categories, in any and all of the channels and levels of distribution</u>. Any determination of prices must be the product of a process of duly convened public hearings. At hearings regarding the setting of maximum, minimum, and flat prices for fluid milk and/or its derived products, the Administrator shall summon the Secretary of the Department of Consumer Affairs and he shall appear on behalf of consumers. Moreover, said Department must submit a report and recommendations on the aforesaid hearings to the Administrator. The Administrator shall take the recommendations of the Department of Consumer Affairs into consideration when making his determination on the setting of maximum, minimum, and flat prices.

3.    They amended Article 16, subsection (e)[4], to provide (emphasis and underlining provided):

In the setting of maximum, minimum, and flat prices to be paid for each quart of fluid milk or fraction of a quart of milk, <u>the Administrator shall establish the prices that are fair and reasonable and that ensure **an adequate fluid milk market**</u> without unfavorably affecting production or sources of production or supply. To this end, the Administrator shall consider all cost factors involved in the production, manufacturing, and sterilization of milk, including, but not limited to, the costs of labor, supply, transportation, and distribution of fluid milk and its derived products, as well as compliance with all legally established health requirements.

[initials in left margin]

---

[2] 5 L.P.R.A. Sec. 1096(b)(14).
[3] 5 L.P.R.A. Sec. 1107(d).
[4] 5 L.P.R.A. Sec. 1107(e).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

4.      They amended Article 20, subsection (c)[5], to provide (emphasis and underlining provided):

(c)-    **Fluid milk must not be sold** at any level of distribution at any **price other than that set by the Administrator for that level.**

The legislative intent is to move the dairy industry outside of the mold of a fresh milk market as the sole fluid product toward a market for fluid milk with a variety of products. As such, the definition of surplus must be interpreted to conform to the legislative intent.

2.      Definitions of Regulation 5.

Regulation 5 of the Dairy Industry to Establish the Rules Governing the Quality of Milk at all Phases of Production, Manufacturing, and Sale…" was amended on December 26, 2016 (taking effect January 27, 2017) and on record as Regulation 8889 (hereinafter Regulation 5). Regulation 5 is aimed at regulating matters of milk quality. Regulation 5 does not contain any definition of surplus milk. It does, however, define "milk" as "the whole lacteal secretion…that is obtained through the milking of one or more healthy cows. Milk for public consumption shall not contain less than [8.3%] nonfatty milk solids and no less than [3.25%] milk fat [but] [i]n those cases in which the market requires such, the pasteurization or manufacturing plant or center may adjust the percentage of milk fat or nonfatty solids." Reg. 8889, Sec. 4(N). The section continues by providing that "[m]ilk and milk products in their final packaging for consumption, shall be pasteurized, ultra-pasteurized, or aseptically processed and may undergo a process of homogenization." *Id.* This portion of the definition of "milk" of Regulation 5 is similar to the definition of "fluid milk" in Law 34.

Regulation 5 contains nine definitions of formulations of fluid milk in Section 4. These are: acidified milk (Section 4(Ñ)); lowfat milk (Section 4(P)); concentrated milk (Section 4(Q)); cultured milk (Section R)); skim, skimmed, or fat-free milk 4(V)); skim or fat-free milk (Section 4(W)); evaporated milk (Section 4(Y)); homogenized milk (Section 4(Z); and reduced-fat milk (Section 4(BB)). It furthermore defines the processes of pasteurization (Section 4(LL)), ultra-pasteurization (Section 4(AAA)), and aseptic processing (Section 4(OO)).

2.      Definitions of Regulation 10.

[initials in left margin]

---

[5] 5 L.P.R.A. Sec. 1111(c).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Regulation 10 of the Dairy Industry to Establish Formulas for Channeling Surplus, Set Prices of Milk at All Levels, and Establish the Rules for Expanded Production…" was amended on November 12, 2015 and recorded as Regulation 8657 (hereinafter Regulation 10). The purpose of Regulation 10 is, among other purposes, to limit the framework of discretion of the exclusive power of the Administrator to manage surplus milk. *See* 5 L.P.R.A. Sec. 1096(b)(4) (The Administrator has the power to "[f]ormulate the necessary plans to dispose of surplus milk in order to fully protect the industry.") Regulation 10 contains definitions of fresh, fluid, and surplus milk. Regulation 10 defines "fresh milk" as "milk from dairy farms that is pasteurized and homogenized by a processor that sells for direct consumption by the public." Reg. 8657, Sec. 4(k). "Fluid milk" is defined as "milk in its liquid state, whether it is raw, pasteurized and homogenized, ultra-pasteurized and aseptic ("UHT" milk for its English initials), or produced in such a way that the final product remains in the liquid state, which is sold in different types, formulations, or categories to the public for direct consumption." Reg. 8657, Sec. 4(j). While "surplus milk" is defined as "raw milk that producers do not process as fresh milk and that is available for the production of other dairy products." Reg. 8657, Sec. 4(g). Regulation 10 adds two pertinent definitions. It defines "raw milk" as the "whole lacteal secretion…that is obtained through the milking of one or more healthy cows at producers' dairy farms that has not undergone any process." Reg. 8657, Sec. 4(i). It moreover defines "retained milk" as "the milk that processors retain to process as fresh milk."

For the purposes of channeling, "milk that is produced in Puerto Rico shall be used, in order of priority…for the production of fresh milk [and] [o]nce the demand for fresh milk has been exhausted…it shall be used for the manufacturing of other products by said fresh milk processing plants and by Indulac, as the balance plant, and by manufacturers of derived products." Reg. 8657, Sec. 8(b). "The order of priority of the derived products processed with the surplus shall be determined based on the financial performance of the dairy farm, beginning with the greatest performance and continuing, on a descending scale, with the rest." *Id.* Processors "[s]hall have access to the surplus at one same price based on how the surplus will be used." Reg. 8657, Sec. 8(f). "The decisions of the Administrator with regard to the channeling or disposal of the surplus milk shall be based on the particular circumstances of the Industry at the time at which they are made. Among these, he shall take into consideration the particular circumstances

[initials in the left margin]



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

of each processor that seeks to use the surplus and the degree of need that they have of said surplus for their normal operation." Reg. 8657, Sec. 8(g). Hence, "the Administrator shall calculate the amount of surplus milk that will be prospectively produced and shall adjudicate the portions of such requested by the producers and the priority or preference of access to said surplus of each one of them." *Id.*

        4.      <u>Definitions of the Settlement Agreement</u>.

        The authority governing the dairy industry is the Settlement Agreement in the case of *Vaquería Tres Monjitas, Inc. v. Secretary of Agriculture*, 04-1840 (DRD). The Settlement Agreement included a draft of Regulation 12, the purpose of which was to establish methodologies through which the prices of milk at its different levels of sale, but particularly for milk processors. It therefore contains some pertinent definitions. Regulation 12, attached to the Settlement Agreement, defines raw milk as "the whole lacteal secretion…that is obtained through the milking of healthy cows on producers' dairy farms that has not undergone any process." Dkt. 2322-1, Sec. 4(6) (Translation ours). Milk is the "generic term that refers to raw milk retained and processed by processing plants, which is converted into any type of fluid milk for sale to consumers with or without the incorporation of ingredients or flavors." Dkt. 2322-1, Sec. 4(10) (Translation ours). Fresh milk is defined as "raw milk produced at dairy farms that is subsequently pasteurized and homogenized by the processors and is classified within the fluid milk category." Dkt. 2322-1, Sec. 4(8) (Translation ours). Ultra-pasteurized milk is defined as "raw milk produced by dairy farms, that has undergone a process of ultra-pasteurization by the processors and is classified as a type of fluid milk." Dkt. 2322-1, Sec. 4(9) (Translation ours). Fluid milk "refers to the raw milk that the processing plants receive and retain for homogenization and pasteurization or ultra-pasteurization and homogenization processing or aseptic processing." Dkt. 2322-1, Sec. 4(7) (Translation ours). Pursuant to Rule 12 attached to the Settlement Agreement, "[e]xamples of fluid milk are fresh milk and UHT milk" and those included in Section 1000.15 of title 7 of the Code of Federal Regulations. *Id.* (Translation ours.)

        Despite these definitions, the power over the management of the surplus was not altered by the Settlement Agreement[6]. Pursuant to Regulation 12 attached to the Settlement Agreement, the Administrator retained the authority

[initials in left margin]

---

[6] The United States District Court for the District of Puerto Rico recognized that the Administrator has the legal authority and discretion to establish different prices for different uses, but he cannot favor one participant in the market at the expense of another:

   I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Administrative Order 2020-22*
*Page 8*

to channel the raw milk produced in Puerto Rico, "first in the production of Fresh Milk and once its demand has been exhausted, the remainder shall be used by the Fresh Milk Processing Plants and by Indulac in the manufacturing of other products. The order of priority of the derived products processed with the surplus shall be determined based on the financial performance of the dairy farm, beginning with the greatest performance and continuing, on a descending scale, with the rest." Dkt. 2322-1, Sec. 9 (translation ours). The Settlement Agreement, in paragraph 16, guarantees that "raw milk shall be available to any buyer at the same prices for the same product and/or the same marketing purpose." Dkt. 2322, para. 16. (translation ours).

Despite the fact that many of the definitions of milk, fresh milk, fluid milk, and surplus are similar, no uniformity exists among them, and they may lead to confusion and error in their application. Therefore, the undersigning Administrator shall interpret the definition of surplus in order to provide the necessary uniformity of such, pending the formal regulation process.

**B.      Rules for Interpreting Legal Texts.**

1.      <u>Rules of Interpretation arising from the Civil Code.</u>

The Civil Code prescribes certain rules of legal hermeneutics (interpretation). These serve as guiding principles in the analysis of the meaning of legislation. Article 14 of the Civil Code provides that: "[w]henever the law is clear and free of all ambiguity, the letter of the law must not be undermined under the pretext of fulfilling its spirit." 31 L.P.R.A. Sec. 14. Likewise, that principle is distinguished that: "[t]he most efficient and universal means to discover the true sense of a law whenever its statements are uncertain, is to consider the reason and spirit of the law, or the cause or reasons that led the legislative branch to dictate it." Art. 19 Civil Code, 31 L.P.R.A. sec. 19.

Every law requires interpretation, even the clearest of laws, whenever it is to be applied. *Commonwealth v. Frig. y Alm. Del Turabo, Inc.*, 155 D.P.R. (2001); *Nadal v. Dept. Nat. Res.,* 150 D.P.R. 715 (2000); *Vélez v. Sec. of Justice*, 115 D.P.R. 533, 544 (1984); *Vives Vázquez v. Superior Court*, 101 D.P.R. 139, 145 (1973; *People v. Superior Court*, 81 D.P.R. 763, 768 (1960). Every word holds value, reveals a meaning, and/or transmits an idea, it is always [initials in left margin]

---

When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk. Under no circumstances will the fresh milk processors be require to pay more for their raw milk or carry additional costs for the purpose of allowing Indulac's access to raw milk for UHT or fluid milk manufacturing at a lower cost than the cost at which plaintiffs can acquire raw milk from fresh or fluid milk processing. **The Administrator may set at his discretion the prices for raw milk for nonfluid milk use.**

*VTM v. Secretary of Agriculture*, 04-1840 (DRD); Amended Opinion and Order, July 13, 2007 (Dkt. 480).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

necessary to know that value, that meaning, that idea. Therefore, the difference between each case derives from the fact that when the words are clear, the interpretation is easier and it is more spontaneous, but when the words are obscure or ambiguous, the interpretation is more difficult and the need for it is more palpably noticed. *Municipality v. Fresnos, Com.*, 63 D.P.R. 978, 983 (1944).

The understanding that there is only one rule of interpretation that is absolutely invariable and that this is that the true intention and desire of the legislative branch must be discovered and enforced is widely accepted. *Sec. of Labor v. P.R. Cereal Extracts, Inc.*, 83 D.P.R. 267, 275-276 (1961); *Lange v. People*, 24 D.P.R. 854, 858 (1917). The "golden rule in matters of the interpretation of laws [is] that the primordial objective of all the rules of hermeneutics is not to obtain a preconceived arbitrary objective, but rather to enforce the lawmakers' purpose." *Mason v. White Star Bus Line*, 53 D.P.R. 337, 340 (1938). When the courts exercise their interpretative role of the law, they consider the purpose or intent of the Legislative Assembly upon passing it in order to foster the obtention of the result originally desired by the lawmakers. *Piñero González v. PRASA,* 146 D.P.R. 890, 898 (1998); *García v. Commonwealth*, 146 D.P.R. 725, 733 (1998).

Another rule of hermeneutics is combined interpretation. The interpretation of the different articles or sections of a law and the laws that are related to one another due to their objective or purpose, should be performed as a whole, referring ones to the others as a whole. *Ojeda v. El Vocero de P.R.*, 137 D.P.R. 315, 335 (1994); *Álvarez & Pascual, Inc. v. Secretary of the Treasury*, 84 D.P.R. 482, 489-490 (1962); *People v. Junghanns Estate*, 73 D.P.R. 648, 652-653 (1952). "Keep in mind that the legislative intent of a law should not be sought in an isolated phrase or in one of its sections: but rather in the context of the entire statute, taking into account the purpose followed by the lawmakers. Therefore, one article of a law should not be interpreted in isolation, but rather through considering the law in its entirety." Bernier and Cuevas Segarra, *supra*, on pg. 245.

Lastly, every interpretative exercise must be adjusted to the rational foundation or essential purpose of the law and the public policy that inspire it. In such a way that, in the process of interpretation, it is not proper to sever the statute subject to this process from the problem for which a solution is sought. *P.R.T.C. v. Tel. Reg. Board of P.R.*, 151 D.P.R. 269 (2000); *Industria Cortinera, Inc. v. Puerto Rico Telephone Co.*, 132 D.P.R. 654, 661 (1993); *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R., 772, 785 (1968); *Coll v. Picó*, 82 D.P.R. 27, 33 (1960); *Debién v. Accounting*

[initials in left margin]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Board*, 76 D.P.R. 96, 105 (1954). Pursuant to the foregoing principle, laws must be interpreted and applied in communion with the social purpose that inspires them: without cutting them off from the reality and human problem that they seek to resolve. The interpretation of a statute must be aimed at that solution that best captures its impact in terms of the general welfare and that best observes the legislative intent when adopting the rule aimed at fostering the public interest. *Goss v. Dycrex Construction Co.*, 141 D.P.R. 342, 356-357 (1996). At the same time, the socioeconomic climate that drives the adoption of a statute is an extremely important ingredient for interpreting it. *Commonwealth Ins. Co. v. Casellas*, 103 D.P.R. 539, 542 (1975).

       2.    <u>Rules of Interpretation arising from Law 34 and the Regulations of ORIL.</u>

The lawmakers delegated the general power to the "Administrator [to] investigate and regulate all the phases of the dairy industry and milk-derived products, in the Commonwealth of Puerto Rico, including the production, processing, sterilization, manufacturing, storage, purchase and sale, transport, and distribution of the main product and its byproducts." 5 L.P.R.A. Sec. 1096(a). This regulatory power is broad. The lawmakers empowered to Administrator to "regulate the various phases of the dairy industry subject to the provisions of the public policy and the purposes of said sections." 5 L.P.R.A. Sec. 1107(a). "In the determination of the limit of regulation of the industry, the Administrator shall take into account the needs and interests of the different sectors within the industry so that any measure that he adopts is aimed at providing stability and stimulating the progress of the production and marketing of milk and products derived from milk, and therefore the prosperity of the industry." 5 L.P.R.A. Sec 1107(b). In addition to the general power to investigate and regulate all the phases of the dairy industry, the lawmakers specifically vested power in the Administrator in a multitude of areas. Of pertinence here are the powers to "[d]evelop and maintain satisfactory marketing conditions aimed at protecting the production and distribution of milk and products derived from milk," and to "[f]ormulate the necessary plans to dispose of surplus milk in order to fully protect the industry."

In addition to the general rules of interpretation discussed in the previous section of this administrative order, the lawmakers included a rule of interpretation within the very text of Law 34. Hence, "[s]ections 1092 to 1118…shall <u>be interpreted liberally</u> in favor of the Administrator's authority to regulate the dairy industry and its derived products in order to enforce the policy and the purposes of said sections." 5 L.P.R.A. Sec. 1116.


[initials in left margin]


  I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Administrative Order 2020-22*
*Page 11*

Similarly, Rule 10 "shall be interpreted liberally in favor of the Administrator's authority to regulate the dairy industry and its derived products to the effect of enforcing the policy and the purposes of [Law 34]." "To that effect, the Administrator shall be able to formulate and adopt then necessary plans and measures to deal with the variations and changing conditions of the industry, all of this in order to protect the general interest and public policy." Reg. 8657, Art. 15. Regulation 5 provides for the same in its Article 20. Reg. 8889, Art. 20. Regulation 12 attached to the Settlement Agreement provides for the same in its Section 10(5). Dkt. 2322-1, Sec. 10(5) (Translation ours). "The provisions of Regulation [12 attached to the Settlement Agreement] must be interpreted in conjunction with other rules, regulations, policies, and procedures issued by the Office of Dairy Industry Regulation." Dkt. 2322-1, Sec. 10(6) (Translation ours).

On the other hand, the lawmakers were conscious that the dairy industry was a dynamic and changing one, wherefore they empowered the Administrator to take measures to deal with changes. Therefore, "[t]o that effect, the Administrator shall be able to formulate and adopt then necessary plans and measures <u>to deal with the variations and changing conditions of the industry</u>, all of this in order to protect the general interest and public policy." *Id.* All the cited regulations recognized this power of the Administrator. Reg. 8657, Art. 15; Reg. 8889, Art. 20; Dkt. 2322-1, Sec. 10(5).

The lawmakers established the public policy of Law 34 as follows:

All the parties that attended the hearings held by the Special Senate Commission - - producers, processors, and consumers - - requested for the Government to create a regulatory body to oversee the relations among the parties in order to <u>establish the definitive bases for the development and stability of the dairy industry</u>, and to seek out the way to <u>better distribute and market the main product and its byproducts</u>.

***

The Legislative Assembly hereby clarifies and ratifies its original intent with regard to the regulation of the dairy industry. This way the Legislative Assembly wishes to underscore its intent for the State, in exercise of its policing power and to the effect of promoting the general welfare, <u>to directly intervene in the dairy industry, to by way of the proper legislation manage to set it on the right path so that the public interest is adequately served through greater production of milk and pure dairy products by a vigorous, sound, and progressive industry that operates efficiently and that can offer consumers milk and dairy products at fair and reasonable prices</u>.

Legislative History and Statement of Purposes of Law 34.

      3.    <u>Official Interpretation of Surplus</u>.

The text of Law 34 defines "surplus" as all the raw milk that is not retained for the processing of fresh milk.

The definition goes against the legislative intent of the amendments to Law 34 from 2007 if it is studied in isolation

[initials in left margin]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Administrative Order 2020-22*
*Page 12*

and outside of the context of the amended law. The literal interpretation of "surplus" is contradictory to the legislative intent of such amendments. But, if on the contrary we obey the hermeneutic rule of interpreting laws to enforce the purpose of the lawmakers and interpret their articles as a whole, the definition of "surplus" is reconcilable with such intent and purpose, and with all the other provisions. Both the legislative intent as well as the very text of the amendments to Law 34 made by Law 209, undoubtedly extend to the powers of the Administrator and the administrative office that oversees the entire fluid milk market. The lawmakers not only recognized the changes in the market for milk, but rather they also expanded the powers of the Administrator to regulate the entire fluid milk market. At present, the fluid milk market is made up of fresh milk in a variety of forms and containers, aseptically packaged ultra-pasteurized (UHT) milk in a variety of forms, and ultra-pasteurized (UP) milk in a variety of forms and packages. Therefore, the consonant interpretation of "surplus" with the amendments to Law 34 by Law 209 is "raw milk in excess of the demand for fluid milk."

Notwithstanding the amendments to Law 34 that expanded the regulatory power of the Administrator to the entire fluid milk market, the definition of surplus was left behind. It is evident that the trend in the consumption of fresh milk is a downward one. This phenomenon causes the "surplus" to continue to increase to the extent that production does not decrease at the same rate as the decline in the consumption of fresh milk. It has been the responsibility of the Administrator to seek to channel surplus milk toward higher-performing products, but his many efforts have not managed to stop the increase in "surplus." Hence, the literal interpretation of "surplus" is impractical and holds back the development of the industry—results that would go against the text of Law 34 and its legislative intent. It is necessary for the Administrator to act differently with regard to the channeling efforts under a definition of "surplus" that is contrary to the reality of the Dairy Industry, and contrary to the amendments to Law 34. Therefore, the consonant interpretation of "surplus" with the amendments to Law 34 by law 209 is "raw milk in excess of the demand for fluid milk."

The Administrator has the power to regulate the Dairy Industry to the extent that such is necessary to enforce the underlying public policy of Law 34. When regulating, the measures that the Administrator takes must take into account the needs of the different sectors and provide stability and stimulate the progress of the industry both in terms of its production as well as the marketing of fluid products, in accordance with the amended text of Law 34. The

[initials in left margin]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Administrative Order 2020-22*
*Page 13*

Administrator also has the duty to develop and maintain satisfactory market conditions to protect the production and distribution of fluid milk products. Lastly, the power to interpret Law 34 rests with the Administrator for which it is interpreted liberally in favor of the power to regulate the industry by dealing with the changes and variations in the industry.

Employing these delegated administrative powers, duties, and responsibilities, and following the text of the amendments to Law 34, along with the legislative intent, the undersigning Administrator interprets the excluded definition in such a way that "surplus milk" includes fluid milk, adapting it to the reality of the Dairy Industry, and to the text and intent of the amendments to Law 34. Such interpretation extends, in order to provide uniformity, to all regulations of ORIL.

Wherefore, ***it is hereby Ordered***:

### III.    Order:

1.      **It is ORDERED,** that the definition of "surplus milk" be "[m]ilk produced in excess of the needs of the fluid milk market, that is used to manufacture dairy products, or to can it in its condensed, evaporated, powder, or any other form."

2.      **It is ORDERED,** the interpretation is extended, in order to provide uniformity, to all regulations of ORIL.

3.      **It is ORDERED,** that as of July 23, 2020, Suiza Dairy, Corp., Vaquería Tres Monjitas, Inc., and Industria Lechera de Puerto Rico, Inc. shall receive a supply of raw milk to meet the demand for fluid milk of each one of the plants. The raw milk in excess of the demand for fluid milk shall be considered surplus for all the purposes of Law 34 and the regulations of ORIL.

4.      **It is ORDERED,** as a provisional measure, that a minimum of two daily delivery routes of Suiza Dairy Corp., and one of Vaquería Tres Monjitas, Inc., shall be assigned to Industria Lechera de Puerto Rico, Inc. The routes delivered to Industria Lechera de Puerto Rico, Inc. shall contain no less than 22,000 quarts per tank.

5.      **It is ORDERED,** that all prices established for fluid milk products remain unaltered.

[initials in left margin]

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Administrative Order 2020-22*
*Page 14*

### IV.   *Observance:*

This Administrative Order is compulsory for Suiza Dairy, Corp., Vaquería Tres Monjitas, Inc., and Industria Lechera de Puerto Rico, Inc.

*It is forewarned* that failure to comply with this Administrative Order may result in the imposition of the penalties provided for in Law 34 of June 11, 1957, *as amended.*

### V.   *Repeal:*

Any rule or provision currently in effect or that is found to be conflict with that established herein shall be repealed.

### VI.   *Severability:*

In the event that any part of this Administrative Order is declared null and void or against the law, the validity of the remaining provisions shall not be affected.

### VII.   *Validity:*

This Administrative Order shall take effect immediately.


In San Juan, Puerto Rico, today, July [hw:] *10*, 2020.

**LET IT BE SO NOTIFIED:**


[signature]

**JORGE A. CAMPOS MERCED**
**ADMINISTRATOR**



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.