**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>**This Motion relates to PREPA and shall be filed in Lead Case No. 17 BK 3283-LTS and Case No. 17 BK 4780-LTS.** |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY
("PREPA"),

      Movant,

v.

UNIÓN DE TRABAJADORES DE LA INDUSTRIA
ELÉCTRICA Y RIEGO *et al.*

      Respondents.

**OMNIBUS REPLY IN SUPPORT OF PREPA MOTION FOR ENTRY OF
ORDER ALLOWING ADMINISTRATIVE EXPENSE CLAIM FOR
COMPENSATION FOR FRONT-END TRANSITION SERVICES
UNDER PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM
<u>OPERATION AND MAINTENANCE AGREEMENT WITH LUMA ENERGY</u>**

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 2

ARGUMENT ........................................................................................................................ 6

   I.   The Motion Is Ripe for Review ................................................................................ 6

   II.   Administrative Expense Priority Treatment for the Front-End Transition Obligations Is
Available Under PROMESA in These Circumstances ............................................. 10

   III.   The Government Parties Have Demonstrated LUMA Energy's Entitlement to an
Administrative Expense Priority Claim for the Front-End Transition Obligations ................. 16

      A.   The Front-End Transition Services Benefit PREPA ................................. 16

      B.   Whether LUMA Has an Administrative Expense Claim Does Not Turn on Whether
Other Creditors Have That Priority ......................................................... 22

   IV.   Promesa Section 201(b)(1) Does Not Preclude the LUMA Administrative Expense
Claim ...................................................................................................................... 28

   V.   The Relief the UCC Requests Related to the Supplemental Agreement Is Outside the
Scope of the Motion ............................................................................................... 30

CONCLUSION .................................................................................................................... 32

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*American Petroleum Institute v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012) .................................................................................8

*Ambac Assur. Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight &*
   *Mgmt. Bd. for Puerto Rico)*,
   927 F.3d 597, 602 (1st Cir. 2019),
   *cert. denied*, 140 S. Ct. 856 (2020) ........................................................................29

*Assured Guaranty Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight*
   *& Mgmt. Bd. for Puerto Rico)*,
   582 B.R. 579 (D.P.R. 2018),
   *aff'd*, 919 F.3d 121 (1st Cir. 2019) ........................................................................13

*CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines*
   *Corp.)*,
   406 F.3d 229 (4th Cir. 2005) ..................................................................................22

*City of Central Falls, R.I. v. Central Falls Teachers' Union (In re Central Falls)*,
   468 B.R. 36 (Bankr. D.R.I. 2012) ...........................................................................13

*Colorado River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976).................................................................................................8

*First Liberty Ins. Corp. v. Budow*,
   No. 05-CV-88, 2007 WL 2071883 (E.D. Pa. July 17, 2007).................................31

*In re City of Stockton, Cal.*,
   486 B.R. 194 (Bankr. E.D. Cal. 2013) ....................................................................14

*In re Craig Cty. Hosp. Auth.*,
   572 B.R. 340 (Bankr. N.D. Okla. 2017) .................................................................23

*In re Fin. Oversight & Mgmt. Bd.*,
   432 F. Supp. 3d 25 (D.P.R. 2020),
   *aff'd*, 954 F.3d 1 (1st Cir. 2020) ........................................................................23, 24

*In re Jartran, Inc.*,
   732 F.2d 584, 588 (7th Cir. 1984) ..........................................................................11

*In re Jeans.com*,
   491 B.R. 16 (Bankr. D.P.R. 2013) ...........................................................................10

Hearing Date: September 16, 2020 at 9:30 a.m. (AST)

*In re Lake Lotawana Community Improvement Dist.*,
No. 10-44629-can9, 2017 WL 1968282 (Bankr. W.D. Mo. 2017)...........................................13

*In re Mount Carbon Metro. Dist.*,
242 B.R. 18 (Bankr. D. Colo. 1999) ..........................................................................................23

*In re New York City Off-Track Betting Corp.*,
434 B.R. 131 (Bankr. S.D.N.Y. 2010)................................................................................. 13-14

*In re SRT Solutions, Inc.*,
No. 15-35572-H3-11, 2016 WL 1530123 (Bankr. S.D. Tex. Apr. 13, 2016).........................22

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*,
844 F.3d 318 (1st Cir. 2016).......................................................................................................8

*Lawson v. Fleet Bank of Maine*,
807 F. Supp. 136 (D. Me. 1992),
*aff'd*, 3 F.3d 11 (1st Cir 1993) .................................................................................................31

*McCuin v. Sec'y of Health & Human Servs.*,
817 F.2d 161 (1st Cir. 1987)......................................................................................................13

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
330 F. Supp. 3d 685 (D.P.R. 2018),
*aff'd*, 945 F.3d 3 (1st Cir. 2019) ..............................................................................................28

*United States v. Bauzo-Santiago*,
867 F.3d 13 (1st Cir. 2017)........................................................................................................12

*Willson v. MLA, Inc. (In re Ascot Mortg., Inc.)*,
153 B.R. 1002 (Bankr. N.D. Ga. 1993) .....................................................................................22

**STATUTES**

11 U.S.C. § 365..............................................................................................................................12

11 U.S.C. § 502..............................................................................................................................12

11 U.S.C. § 507(a)(2).....................................................................................................................12

11 U.S.C. § 510..............................................................................................................................12

11 U.S.C. § 541(a) .........................................................................................................................12

11 U.S.C. § 546..............................................................................................................................12

11 U.S.C. § 557..............................................................................................................................12

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

11 U.S.C. § 901 ..................................................................................................................13

28 U.S.C. § 157(b) .............................................................................................................13

48 U.S.C. §§ 2101-2241 ......................................................................................................1

48 U.S.C. § 2126(e) ...........................................................................................................29

48 U.S.C. § 2161(a) ...........................................................................................4, 11, 12, 13

48 U.S.C. § 2161(c)(5) .................................................................................................11, 12

48 U.S.C. § 2174(b)(4) .......................................................................................................26

Bankruptcy Code § 507(a)(2) ...............................................................................2, 3, 11, 12

PROMESA § 301(c)(5) .......................................................................................................11

iv

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Electric Power Authority ("PREPA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as PREPA's sole Title III representative pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[2] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") (PREPA, the Oversight Board and AAFAF are referred to collectively as the "Government Parties"), respectfully submit this omnibus reply (the "Reply") in further support of the Administrative Expense Motion[3] and in response to (i) *UTIER and SREAEE's Objection to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy at Docket No. 2053* (ECF No. 2128) (the "UTIER/SREAEE Objection"), filed by Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER") and Sistema de Retiro de los Empleados de la Autoridad de Energía Eléctrica ("SREAEE"); (ii) *Limited Preliminary Objection of Official Committee of Unsecured Creditors to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* (ECF No. 2132) (the "UCC Objection"), filed by the Official Committee of Unsecured Creditors for all Title III Debtors, other than PBA and COFINA (the "UCC"); (iii); *Objection of the Fuel Line Lenders to*

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3]   Capitalized terms not defined herein have the definitions set forth in *PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy*, ECF No. 2053-1 in Case No. 17-4780 (the "Administrative Expense Motion" or "Motion"). Unless otherwise noted, docket entries refer to Case No. 17-4780.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

*LUMA Energy Administrative Expense Motion* (ECF No. 2133) (the "FLL Objection"), filed by Cortland Capital Market Services LLC, as successor administrative agent under a Credit Agreement, dated May 4, 2012, among PREPA, Scotiabank de Puerto Rico and certain lenders (collectively, the "Fuel Line Lenders"); (iv) *Cobra Acquisitions LLC's Objection to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* (ECF No. 2134) (the "Cobra Objection"), filed by Cobra Acquisitions LLC ("Cobra"); (v) *Limited Objection of Whitefish Energy Holdings, LLC to PREPA's Motion for Entry of an Order Allowing Administrative Expense Claim for Compensation for Front-End Transition Services Under Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement with LUMA Energy* (ECF No. 2138) (the "Whitefish Objection"), filed by Whitefish Energy Holdings, LLC ("Whitefish" and collectively with UTIER, SREAEE, the UCC, the Fuel Line Lenders and Cobra, the "Objectors").  In support of the Reply, the Government Parties respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Administrative Expense Motion seeks limited relief: an order allowing an administrative claim in favor of LUMA Energy LLC and LUMA Energy ServCo. LLC (collectively, "LUMA Energy") for any accrued and unpaid Front-End Transition Obligations that are due or become due from PREPA under the T&D Contract entered into by and among PREPA, the Puerto Rico Public-Private Partnership Authority (the "P3 Authority") and LUMA Energy. PROMESA section 301(a) renders Bankruptcy Code section 507(a)(2) applicable to PREPA's Title III case.  Section 507(a)(2) allows the Court to grant priority to administrative expenses allowed by section 503(b)(1)(A) for the actual and necessary costs and expenses of preserving the

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

estate (here, the debtor).  This is completely logical and essential because section 507(a)(2)

incentivizes parties to do business post-petition with a Title III debtor, particularly in a transaction

of this nature and magnitude.  The sole question before the Court is whether LUMA Energy's

Front-End Transition Obligations qualify under section 507(a)(2).

2.      Even if the Court were to accept Objectors' argument that administrative expenses

for preserving the estate are unavailable because there is no estate in Title III, the Court can and

should nonetheless grant the requested relief under section 503(b), not necessarily for preserving

the estate, but for entering into the T&D Contract.  As explained below, section 503(b) is a

nonexclusive list of administrative expense priorities, and the Court is free to add to them.

3.      Through the T&D Contract, PREPA, the P3 Authority and the Oversight Board

intend that the operation of PREPA's aging and outdated T&D System transitions to a qualified

and experienced private operator, LUMA Energy—a key step on the path toward transformation

and modernization of Puerto Rico's energy system, which the Government of Puerto Rico, the P3

Authority, and the Oversight Board years ago determined is essential to the economic recovery of

Puerto Rico and is now mandated by Puerto Rico law and PREPA's certified fiscal plan.

Moreover, denial of the Motion would significantly hamper the ability of the P3 Authority and the

Government Parties to carry out their mandates to transform Puerto Rico's energy system and

otherwise pursue public-private partnerships—not only in respect of the current T&D transaction,

but by severely limiting their ability to negotiate future contracts with respect to other aspects of

Puerto Rico's infrastructure, including the process currently underway for a similar transaction

with respect to PREPA's generation assets that is the other key pillar of PREPA's transformation.

4.      PREPA has not requested the Court review or approve these policy decisions, and

the Administrative Expense Motion does not seek approval of either the T&D Contract or the

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

judgment of the Government of Puerto Rico and the Oversight Board that PREPA's transformation
is critical for the island.  Moreover, as explained further below, the relevant standard for the
allowance of administrative expense claims pursuant to Bankruptcy Code section 503, which
applies in this case pursuant to section 301 of PROMESA (48 U.S.C. § 2161(a)),[4] looks to whether
the transaction is beneficial to the debtor and the debtor's property—not other constituents.  For
these reasons, Objectors' attempts to turn this Motion into a referendum on the wisdom of
PREPA's decision to pursue transformation in general or how it might affect PREPA's creditors,
to debate PREPA's fiscal plan and budget, or to quibble about the extent to which LUMA Energy
will have a say in PREPA's eventual Title III confirmation should be rejected because each is
immaterial and irrelevant to the narrow inquiry before the Court.  This Court has seen these tactics
before.  Just as this Court previously prohibited Objectors from disrupting adjudication of the 9019
Motion[5] with beyond-the-scope arguments, Objectors here should be precluded from litigating
issues not properly before the Court on the Administrative Expense Motion.

     5.     PREPA has carried its burden on the Administrative Expense Motion.  The Front-
End Transition Services are being provided under an actual post-petition transaction (the T&D
Contract), for preservation of PREPA.  It cannot seriously be disputed that the execution of the
T&D Contract and the services to be performed under it benefit, and will continue to benefit
PREPA, and indeed, already have benefitted PREPA in a demonstrable way.  As further described
in the Marrero Declaration submitted with the Motion, the Front-End Transition Services will
provide benefits that PREPA is already realizing and will continue to realize as operation of the

---

4   *See* Case No. 17-3283, ECF No. 14081 at 5.

5   The "9019 Motion" is the *Joint Motion of Puerto Rico Electric Power Authority and AAFAF Pursuant to Bankruptcy Code Sections 362, 502, 922, and 928, and Bankruptcy Rules 3012(a)(1) and 9019 for Order Approving Settlements Embodied in the Restructuring Support Agreement*, ECF No. 1235.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

T&D System transitions to LUMA Energy.  Because the T&D System will continue to be owned by PREPA, these benefits will be conferred not only on PREPA and its customers, who will enjoy safer and more reliable energy services, but it will also benefit PREPA's property, the T&D System itself.

6.      In asserting the Motion is not ripe, the Objectors have it backwards.  LUMA Energy is already working under a contract approved by PREB and wants allowance of its claim under that contract as an administrative expense.  It is the Objectors who want a hypothetical ruling as to whether LUMA Energy's claim should be allowed if they succeed in challenging PREB's Certificate of Energy Compliance.  UTIER already raised similar arguments in Puerto Rico Courts, but the arguments were rejected by the Puerto Rico Court of Appeals.  On July 2, 2020, the UTIER requested the stay of any effects of the Energy Compliance Certificate issued by PREB while the court evaluated the validity of the Certificate.  Specifically, UTIER sought to stay any actions designed to facilitate the transition and the execution of the T&D Contract, such as treating the Front-End Transition Obligations as an administrative expense priority in Title III.  They alleged that administrative expense priority would prevent UTIER members, other PREPA employees and unsecured creditors from receiving any payments under the Title III proceedings.  Nevertheless, the Puerto Rico Court of Appeals rejected UTIER's Emergency Motion.

7.      For these reasons, and as explained more fully below, the Government Parties respectfully request that this Court overrule the Objections and enter an order, substantially in the form of Exhibit A to the Administrative Expense Motion, allowing the requested administrative expense claim in favor of LUMA Energy.

Hearing Date: September 16, 2020 at 9:30 a.m. (AST)

## ARGUMENT

### I.    THE MOTION IS RIPE FOR REVIEW

8.     Contrary to the arguments advanced in the UTIER/SREAEE Objection, neither discovery disputes attendant to the Motion[6] nor pending legal challenges in other fora to the issuance of PREB's Certificate of Energy Compliance deprive this Court of jurisdiction to decide the Administrative Expense Motion.

9.     UTIER and SREAEE also cannot manufacture a jurisdictional deficiency by bringing legal challenges to PREB's issuance of the Certificate of Energy Compliance for the T&D Contract.[7] This Court is not being asked to review issuance of the Certificate or approve the T&D Contract itself, and this Motion is not contingent upon, nor should it have to wait for the exhaustion of challenges to the Certificate of Energy Compliance.  Regardless of UTIER's and SREAEE's attack on PREB's approval in the Commonwealth's courts, those proceedings do not change the fact that LUMA Energy is already performing its obligations and providing real benefits to PREPA.

---

[6]  Putting aside whether discovery disputes could affect the ripeness of this Motion, those disputes are no longer pending.  On August 13, 2020, the day after the Objections were filed, the Court resolved the pending discovery disputes in the Government Parties' favor, concluding that "no additional discovery needs to be provided in connection with the Administrative Expense Motion at this time." *Order on Discovery*, ECF No. 2140 at 11 (sustaining the Government Parties' objections to the discovery requests "in their entirety" and quashing deposition notice issued by the UCC).  As a result, UTIER's and SREAEE's discovery argument is now moot.

[7]  UTIER tried the same tactic in an effort to delay implementation of the contractual relationship PREB already approved with PREPA's LNG providers. *See Motion in Opposition to PREPA's Urgent Motion for Entry of an Order Authorizing PREPA to Assume Certain Contracts with EcoEléctrica, L.P. and Gas Natural Aprovisionamietos SDG. S.A.* (ECF No. 1974) at ¶¶ 48-55 (arguing the motion was not ripe because it was not final in light of a pending motion for reconsideration).  That effort failed. *Order Authorizing PREPA to Assume Certain Contracts with EcoEléctrica, L.P. and Gas Natural Aprovisionamientos SDG, S.A.* (ECF No. 2038).  This one should too.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

10.     UTIER and SREAEE argue (Obj. ¶ 12) that the T&D Contract has not been finally

approved, but this is wrong.  Under Puerto Rico law, per Law 29 and Act 120-2018, final approval

occurred when PREPA's Governing Board, P3 and the Governor approved the contract.  These

events occurred after PREB's issuance of the Certificate of Energy Compliance, and there is no

dispute that on June 17, 2020, PREB in fact issued the Certificate of Energy Compliance approving

the T&D Contract pursuant to the authority conferred upon it by Act 120-2018.  *See*

UTIER/SREAEE Obj. ¶ 23 (admitting "[i]n the present case, this Energy Compliance Certificate

was issued on June 17, 2020").  The Resolution and Order issuing the Certificate is reflected in

the PREB docket, which UTIER and SREAEE cite in their Objection.  *Id.* n.4.  That Resolution

was issued two months ago, and the Puerto Rico Court of Appeals has refused to stay its application

pending UTIER's challenge to PREB's Certificate of Energy Compliance.[8]

11.     LUMA Energy is already undertaking work for PREPA's benefit, and efforts by

UTIER and others to thwart the T&D Contract by filing motions for reconsideration before PREB[9]

and local court challenges do not convert this Motion into a "premature" dispute seeking an

"advisory opinion" regarding a "tentative" agency decision as UTIER and SREAEE contend.  *See*

UTIER/SREAEE Obj. ¶¶ 12, 15, 18.  The dispute is ripe for determination because the parties are

performing the contract, LUMA Energy is providing the Front-End Transition Services, and

---

[8]     *Unión de Trabajadores de la Industria Eléctrica y de Riego (UTIER) v. Autoridad de Alianzas Público-Privadas de Puerto Rico*, KLRA202000170 (PR Court of Appeals July 3, 2020) (Resolution), a copy of which is attached hereto as Exhibit A.  The Government Parties are contemporaneously filing a motion for leave to file the Spanish language version pending preparation of a translation.

[9]     Notably, none of the parties seeking reconsideration of PREB's issuance of the Certificate of Energy of Compliance has been granted intervenor status in that proceeding, which, as PREB has already explained in denying UTIER's motion to intervene, is because the proceeding is an *ex parte* administrative process.  *In re Certificate of Energy Compliance*, Case No.: NEPR-AP-2020-0002 (P.R. Pub. Serv. Reg. Bd.), June 18, 2020 Resolution.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

PREPA is obligated per the T&D Contract to ensure through the Administrative Expense Motion that any accrued, unpaid fees and expenses for such work are supported by an administrative claim. Motion ¶ 36. As the contract exists, is effective, and is being carried out, there is nothing advisory about determining that the carrying out of this post-petition contract generates administrative claims against PREPA. The T&D Contract is not a theoretical possibility—it is a functioning agreement. PREPA, and the people of Puerto Rico, would be injured if this Motion were denied because, among other things, LUMA Energy would have the right to walk away. *Id.*

12. Constitutional concerns are not implicated here because this Court's jurisdiction to determine the appropriateness of the administrative expense claim is not dependent upon the "finality" of the T&D Contract. This is not a case where the judicial process should be held in abeyance to "let[] the administrative process run its course before binding parties to a judicial decision" and avoid "'judicial interference' in an ongoing decision-making process." *American Petroleum Institute v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). Importantly, the Administrative Expense Motion also does not seek judicial review of PREB's determination to issue the Certificate of Energy Compliance.[10] Nor is this a case where two tribunals are being asked concurrently to adjudicate the same question.[11] For these reasons, none of the authority that UTIER and SREAEE rely upon has any bearing on whether this Court has jurisdiction to decide the Administrative Expense Motion.

---

[10] UTIER and SREAEE rely on cases such as the First Circuit's opinion in *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016), to argue this case is premature, but that case was a declaratory judgment action concerning the legality of a state sick time law that had yet to be enforced.

[11] UTIER and SREAEE cite *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) and its progeny (UTIER/SREAEE Obj. at 7) in support of their request that the Court abstain from determining the Motion, but those cases are inapposite here where the courts are not being asked to determine the same question and therefore there is no threat of inconsistent results nor judicial resources to be conserved.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

13.     This Court is not being asked to approve something contingent on conclusion of the legal or political processes; the Court is being asked to approve an administrative expense claim to support payment for work already being performed that will lead to the undeniable benefit of long-term private management of PREPA's updated and modernized power grid.  In the unlikely event PREB's determination is reversed or modified (either through the administrative appeals process, the state court challenge or otherwise), the parties to the T&D Contract would either address any deficiencies by amending the T&D Contract, or appropriate remedies would be implemented to address the failure to obtain final PREB approval.  UTIER's litigation tactics do not, however, deprive this Court of subject matter jurisdiction over the limited relief requested here.

14.     Prudential considerations also weigh in favor of granting the Motion.  PREPA and the public will be prejudiced by further delay if this Motion were dismissed or held in abeyance until the conclusion of the legal and political processes cited, which could take months or years. The modernization of PREPA's grid is a long-term process; further delay of the Administrative Expense Motion could jeopardize the anticipated Service Commencement Date.  The T&D Contract provides that LUMA Energy may terminate if the Motion is not approved within a certain time.  *See* Motion ¶ 36.  Absent assurance that fees for work performed, if unpaid by PREPA in the ordinary course, will be recoverable as an administrative expense, LUMA Energy will not have incentive to continue undertaking the critical Front-End Transition work.  The "wait and see" approach UTIER and SREAEE advocate will be costly and detrimental to the residents of Puerto Rico, as it threatens to delay delivery of safer and more reliable energy to the people and businesses of Puerto Rico.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

15.     Not only that, but delay of the Administrative Expense motion will jeopardize the P3 Authority's ability to negotiate future contracts with respect to other aspects of Puerto Rico's infrastructure, including but not limited to the electric sector.[12]  Taking an important potential tool and assurance of having an allowed administrative expense claim off of the table would not only affect the transformation of the T&D System, it would chill bidding and interest in public-private partnerships across the board in numerous different sectors of the economy of Puerto Rico if the P3 Authority is unable to, where required, negotiate for this term.

16.     Because there are no constitutional barriers to deciding the Administrative Expense Motion and because practical considerations weigh in favor of a swift determination, the Court can and should decide the Administrative Expense Motion.

## II.     ADMINISTRATIVE EXPENSE PRIORITY TREATMENT FOR THE FRONT-END TRANSITION OBLIGATIONS IS AVAILABLE UNDER PROMESA IN THESE CIRCUMSTANCES

17.     Although no First Circuit case articulates a PROMESA or chapter 9-specific standard for allowance of administrative expense claims under Bankruptcy Code section 503(b)(1)(A), in the commercial bankruptcy context, courts allow administrative expense claims if (1) the transaction arose post-petition and (2) the expense benefitted the estate in some demonstrable way.  *See* Administrative Expense Motion ¶ 38 (citing *In re Jeans.com*, 491 B.R. 16, 23 (Bankr. D.P.R. 2013)); *see also* Memorandum Order, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-03283, ECF No. 14081 (D.P.R. Aug. 21, 2020) (applying First Circuit standard for allowance of administrative expense claims under Bankruptcy Code section 503(b)(1)(A) to

---

[12] For example, the P3 Authority has issued a request for qualifications for an operations and maintenance transaction for its generation assets, which is another essential component or transforming and modernizing the utility as required by the certified fiscal plan and Puerto Rico law.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

disallow claim).  Moreover, incentivizing businesses, like LUMA Energy, to continue to work with post-petition debtors, such as PREPA, is exactly what Congress meant to achieve when enacting section 503(b)(1)(A).  *See, e.g.*, *In re Jartran, Inc*., 732 F.2d 584, 588 (7th Cir. 1984) ("[A]dministrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization.").  In Title III, as explained below, if the Government and Oversight Board explicitly consent to allowance of an administrative expense claim, administrative expenses may be allowed under subsection 503(b)(1)(A), so long as the transaction arose post-petition and the expense benefits the debtor, because PROMESA incorporates Bankruptcy Code sections 503 and 507(a)(2) and provides that property of the estate shall mean property of the debtor.  PROMESA § 301(c)(5).

18.     UTIER, SREAEE, and the Fuel Line Lenders argue that administrative expense priority pursuant to Bankruptcy Code section 503(b)(1)(A) is never available in Title III because section 503(b)(1)(A) allows claims for "actual, necessary costs and expenses of preserving the estate" and there is no "estate" in a Title III case.  UTIER/SREAEE Obj. ¶¶ 25-37; *see generally* FLL Obj.  While there is no "estate" in Title III, this argument ignores both the text and structure of PROMESA.  PROMESA section 301(a) explicitly incorporates Bankruptcy Code section 503. *See* 48 U.S.C. § 2161(a).  UTIER, SREAEE, and the Fuel Line Lenders essentially ask this Court to read subsection (b)(1)(A) out of Title III because it uses the word "estate."  But Title III of PROMESA does not disregard every incorporated provision that uses the word "estate."

19.     To the contrary, Congress specifically addressed the incongruent use of the term "estate" by specifying that "property of the estate" means "property of the debtor."  48 U.S.C. § 2161(c)(5).  Accepting Objectors' view that this substitution does not apply when a provision uses only the word "estate" but not the phrase "property of the estate" would make no sense as there is

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

no difference in the Bankruptcy Code between a debtor's estate and property of the debtor's estate.
*See* 11 U.S.C. § 541(a) (providing that the commencement of a bankruptcy case creates an estate
that is comprised of designated property).  There is no estate without property of the estate, and
services cannot preserve an estate without preserving its property.  Moreover, accepting this
argument would require the Court completely to ignore a host of Bankruptcy Code provisions
specifically incorporated into Title III.  *See*, *e.g.*, 11 U.S.C. § 365 (referencing circumstances where
entities do not have any "rights against the estate" and "reliev[ing] the trustee and the estate" from
liability under certain circumstances); 11 U.S.C. § 502 (disallowing certain claims to the extent
that "such creditor's claim against the estate is disallowed," and stating that reconsideration of a
claim does not affect the validity of a certain "payment or transfer from the estate made to a holder
of an allowed claim"); 11 U.S.C. § 507(a)(2) (providing the priority of "fees and charges assessed
against the estate under chapter 123 of title 28"); 11 U.S.C. § 510 (a court may order that certain
liens "be transferred to the estate"); 11 U.S.C. § 546 (discusses effect of court determination that
"a return is in the best interests of the estate"); 11 U.S.C. § 557 (court shall consider "the orderly
administration of the estate" in determining whether to shorten certain time periods).

20.     This is not what Congress intended.  Congress's express decision to incorporate
Bankruptcy Code section 503 into PROMESA must be given effect by construing it to allow
administrative expense claims of the "actual, necessary costs and expenses" of preserving the
debtor and the debtor's operations where the debtor and Oversight Board explicitly consent to
allowance.  *See* 48 U.S.C. § 2161(a) (incorporating specific Bankruptcy Code provisions by
reference into Title III); 48 U.S.C. § 2161(c) (5) (instructing that the term "property of the estate"
as used in the incorporated Bankruptcy Code provisions "means property of the debtor"); *see also*
*United States v. Bauzo-Santiago*, 867 F.3d 13, 18 (1st Cir. 2017) (citation omitted) ("In considering

the meaning of the text, we read a legislative enactment as a whole, 'since the meaning of statutory language, plain or not, depends on context.'"); *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 168 (1st Cir. 1987) ("In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions."); *Assured Guaranty Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 582 B.R. 579, 595 (D.P.R. 2018) (construing Bankruptcy Code section 922(d) narrowly to give full effect to PROMESA section 305, given the statutory canon that "statutes should be interpreted to give effect to all words and phrases"), *aff'd*, 919 F.3d 121 (1st Cir. 2019).[13] Where Congress intended to incorporate only certain subsections of Bankruptcy Code provisions into Title III, it did so expressly. *See*, *e.g.*, 48 U.S.C. § 2161(a) (specifying that, among others, "1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), [and] 1129(b)(2)(B) . . . of Title 11 apply in a case under this subchapter").[14]

21.     Both UTIER and the Fuel Line Lenders' arguments for reading subsection (b)(1)(A) out of Title III rely solely on *In re New York City Off-Track Betting Corp.*, 434 B.R. 131

---

[13] The cases relied upon by the Fuel Line Lenders (FLL Obj. ¶ 12) to support disregarding incorporated Bankruptcy Code provisions with the word "estate" are inapposite because they do not concern provisions directly incorporated by reference into Title III or chapter 9 and they do not involve an attempted distinction between estate and property of the estate.  In *City of Central Falls, R.I. v. Central Falls Teachers' Union (In re Central Falls)*, 468 B.R. 36, 50 (Bankr. D.R.I. 2012), the court ruled the provision of 28 U.S.C. § 157(b)(2) that defines "core proceedings" as including "matters concerning the administration of the estate" did not apply because there was no "estate" in chapter 9.  *In re Lake Lotawana Community Improvement Dist.*, No. 10-44629-can9, 2017 WL 1968282, at *2 (Bankr. W.D. Mo. 2017) rejected the argument to analogize "completion of administration in § 945(b) to the concept of 'substantial consummation' of a plan as defined in [11 U.S.C.] §1102(2) and used in § 1127(b) and (e)" because those provisions "are not applicable in Chapter 9."  It cites 11 U.S.C. § 901.  *Cf.* 48 U.S.C. 2161(a) (incorporating certain Bankruptcy Code provisions by reference).

[14] While there are some provisions of Bankruptcy Code section 503 that as a practical matter would not apply here, allowance of administrative claims under section 503(b)(1)(A) is not one of them.

Hearing Date: September 16, 2020 at 9:30 a.m. (AST)

(Bankr. S.D.N.Y. 2010) and treatises discussing that case.  There, the court reasoned that because there is no estate in chapter 9, there can be no administrative expense for preserving the estate.  *Id.* at 142.  Here, PROMESA provides property of the estate should be interpreted as property of the debtor, and Objectors have shown no difference between property of the estate and the estate.  Thus, under PROMESA, preservation of the debtor or its property is the equivalent of preservation of the estate.  This issue was not raised or addressed in *Off-Track Betting*.

22.     In any case, one of the concerns in *Off-Track Betting* was that the debtor (Off-Track Betting) could not consent to the court ordering the government to pay an administrative expense because such consent would be inconsistent with Bankruptcy Code section 903's prohibition on interference with the power of a State to control its municipalities.  *Id.* at 142-43.  Here, the Oversight Board is consenting for PREPA and the Commonwealth as the debtor's representative in Title III, and AAFAF is consenting on behalf of the Government and PREPA pursuant to its authority under Puerto Rico law.  Such consent eliminates *Off-Track Betting*'s concerns about Bankruptcy Code sections 903 and 904.  Moreover, unlike section 903 of the Bankruptcy Code, section 303 of PROMESA is expressly subject to the limitations of Title I and II.  In other words, *Off-Track Betting* did not address allowance of an administrative claim in a setting unique to this Title III case, where both the Debtor and the Government expressly consent to allowance of the claim.  While this Court's approval of the Front-End Transition Obligations is not required for PREPA to pay them, section 305 does not *preclude* the Oversight Board from consenting to and obtaining approval of administrative expenses at the request of a contract counterparty.  *See In re City of Stockton, Cal.*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) (in chapter 9 cases, the debtor need not consent to "judicial interference" with its property or revenues but may do so if "needed to accomplish the proposed transaction").  It would be wholly inconsistent with the principles

14

Hearing Date: September 16, 2020 at 9:30 a.m. (AST)

underlying PROMESA to allow UTIER, SREAEE, and the Fuel Line Lenders to use the reservation of powers to the Government Parties in PROMESA sections 303 and 305 as a sword against the Government Parties to preclude the requested relief.

23.   To the extent the Court determines it cannot grant LUMA Energy an administrative expense claim under section 503(b)(1)(A), the Court may still grant the relief requested in the Motion and in the Proposed Order allowing an administrative expense claim pursuant to section 503(b), but not specific to section 503(b)(1)(A), for LUMA Energy's Front-End Transition Obligations.  The  Court may issue that relief pursuant to Bankruptcy Code section 105(a), made applicable by PROMESA § 301(a), to carry out Title III, specifically to carry out Bankruptcy Code section 503(b), also made applicable by PROMESA § 301(a).[15]   Section 503(b)'s preamble expressly provides there shall be allowed administrative expenses "including" the expenses listed in section 503(b).[16]   Accordingly, the list is not exclusive, the Court may allow additional administrative expenses not expressly listed, and specifically is not confined to expenses incurred in preserving the estate under subsection (1)(A).  Here, to carry out the purposes of PROMESA Title III, it follows logically that the Court must have the power to provide entities doing business with the debtor with assurances of payment.  Therefore, the Court is empowered to grant LUMA Energy an administrative expense priority for its Front-End Transition Obligations.

---

[15]  11 U.S.C.  § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

[16]  *See* 11 U.S.C. § 503(b) ("After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, ***including***— . . . .") (emphasis added).

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

### III.   THE GOVERNMENT PARTIES HAVE DEMONSTRATED LUMA ENERGY'S ENTITLEMENT TO AN ADMINISTRATIVE EXPENSE PRIORITY CLAIM FOR THE FRONT-END TRANSITION OBLIGATIONS

#### A.   The Front-End Transition Services Benefit PREPA

24.      UTIER, SREAEE, and the UCC each object to the Front-End Transition Obligations on the basis that, either in whole or in part, those obligations will not benefit PREPA. They are wrong. Both the execution of the T&D Contract, which was incentivized by the assurance of administrative expense priority for the Front-End Transition Obligations, and the activities LUMA Energy is currently performing on the island under the T&D Contract, and is contractually obligated to continue performing over the course of the Front-End Transition Period, are unquestionably for PREPA's benefit. Carrying out a contract requested by PREPA and required by Government policy and PREPA's fiscal plan benefits PREPA.

25.      LUMA Energy's agreement to enter into the T&D Contract was the culmination of a comprehensive and transparent bidding and negotiation process, motivated by the recognition that a complete transformation of the T&D System was critically necessary to benefit Puerto Rico's people, its electric system, and its broader economy. *See* Marrero Decl. ¶ 10; PREPA 2020 Fiscal Plan § 3.1. Section 4.1(c)(i) of the T&D Contract, which requires the Government Parties to obtain an order confirming administrative expense priority for the Front-End Transition Obligations, was the end result of the bargain struck between PREPA and LUMA Energy. The inclusion of this term, and its assurance of administrative expense priority for the Front-End Transition Obligations, provided substantial benefit to PREPA by allowing it to enter into the T&D Contract and begin moving forward with the modernization of the T&D System. Absent the guarantee of administrative expense priority for unpaid Front-End Transition Obligations, PREPA may not have had any party willing to enter into an operation and maintenance contract or would

16

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

have been forced to accept a less favorable bid from a contractor less qualified than the consortium which makes up LUMA Energy. To deny administrative expense priority at this stage would deprive PREPA and the residents of Puerto Rico of the substantial benefit of an executed T&D Contract with a highly qualified contractor, a significant step in the overall transformation process.

26.     UTIER and SREAEE attack in their entirety the Front-End Transition Obligations, and the benefit LUMA Energy has provided to PREPA by undertaking those obligations. According to UTIER and SREAEE, those obligations cannot possibly benefit PREPA because they will be incurred in order to replace PREPA with a private operator, in effect "dismantl[ing] PREPA." This is wrong for at least two reasons: (1) the Front-End Transition Obligations indisputably benefit PREPA and the people of Puerto Rico by bringing experienced, qualified, professional management to PREPA's system as the Government and Oversight Board have determined is essential; and (2) in arguing that LUMA Energy will simply "dismantle" PREPA, UTIER and SREAEE misunderstand the planned transformation of PREPA—specifically, that PREPA will at all times remain the owner of the T&D System. Moreover, the transformation of the operation of the grid is not a discretionary action by any of the Government Parties—it is required by Puerto Rico law pursuant to Act 17-2019.

27.     As explained in the Administrative Expense Motion and the accompanying Marrero Declaration, LUMA Energy is providing a host of services during the Front-End Transition Period, including at least the following: (i) mobilization of the LUMA Energy transition team, (ii) transition of management, (iii) employee hiring and establishment of benefit plans for employees of LUMA Energy, (iv) information technology transition and development, (v) development of a system remediation plan and initial operating and capital budgets, (vi) preparation to take over customer services and billing and other financial management functions, (vii) preparation for

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

management of federal funding, (viii) increasing emergency response preparedness, and (ix) assessment of the chain of supply for fuel and power.  Marrero Decl. ¶ 20.  Each of these services provides PREPA and its customers with substantial benefits.

28.      The Front-End Transition Services described in the T&D Contract are necessary both to prepare for a smooth transition of the operation and management of PREPA's T&D System and to identify additional efficiencies and improvements upon PREPA's existing operations. Specifically:

- Mobilization of the LUMA Energy transition team, and transition of management to LUMA, will put in place the professional, qualified team leaders needed to familiarize LUMA with PREPA's operations, identify potential efficiencies, and supervise the transition of T&D System management to LUMA.  Marrero Decl. ¶¶ 12, 18, 20-22.

- Information technology transition and development enables identification of potential efficiencies in PREPA's operational systems, and enables LUMA to manage PREPA's information technology systems effectively and efficiently.  Marrero Decl. ¶¶ 18, 20-22.

- Development of a system remediation plan and initial operating and capital budgets is critical to effective management of the T&D System.  Development of operating and capital budgets enables LUMA to identify efficiencies and opportunities for cost-savings in PREPA's current operations.  Moreover, a system remediation plan will help LUMA identify steps that must be taken to further develop and improve PREPA's existing system.  Marrero Decl. ¶¶ 14, 18, 20-23.

- Preparation for management of PREPA's customer services, billing, and other financial management functions allows LUMA Energy to both identify potential improvements upon PREPA's existing operations, and to smoothly transition into this role on the Service Commencement Date.  Marrero Decl. ¶¶ 18, 20-23.

- Preparation for the management of federal funding, which is crucial to PREPA's overall funding, ensures LUMA Energy will be able to manage the complex process of procuring and managing federal funds for the preservation and improvement of the grid.  Marrero Decl. ¶¶ 18, 20-23.

- The need for increased emergency response preparedness to PREPA's future is not debatable.  PREPA provides electricity services in an area that is prone to natural disasters.  It is well-known that PREPA's emergency response preparedness is critical to its ability to provide reliable electrical service to its customers—and that, historically, it has not been capable of performing that service at the level its customers deserve.  Marrero Decl. ¶¶ 9, 18, 20-23.  For those reasons, the Government of Puerto

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

Rico identified emergency preparedness as a critical objective of its plan to transform PREPA. 2020 Fiscal Plan at 28.

- An improved chain of supply for fuel and power will also inevitably inure to PREPA's benefit. PREPA has long suffered from high fuel costs that have historically raised the overall costs of PREPA's electricity. 2020 Fiscal Plan at 13-14. Improved fuel and power supply chains will therefore also enable PREPA to provide cheaper, more reliable electricity to its consumers. Marrero Decl. ¶¶ 18, 20-22.

29.     These services are fundamental to the transition of management of PREPA's T&D System to LUMA Energy—a role that both the Oversight Board and the Government of Puerto Rico have long viewed as essential to successful transformation of PREPA into the efficient, modern utility Puerto Rico needs. *See* Act 120-2018 ("[T]o transform the Island's electric power system into a modern, sustainable, reliable, efficient, cost-effective, and resilient to the ravages of nature[,] . . . [Act 120 created] the legal framework . . . to transfer [PREPA's] assets" to private operators); 2020 Fiscal Plan at 10 (stating that "[a]chieving a comprehensive transformation of Puerto Rico's energy system . . . requires . . . [t]ransitioning the operation and management of PREPA's electricity grid and generation assets to private operators"). In other words, the services enumerated above enable PREPA to reap the benefits of LUMA Energy's professionalized management of the T&D System.

30.     Moreover, in performing the services outlined above, LUMA Energy has identified and will continue to identify efficiencies and opportunities for improvements to PREPA's existing operations, including in safety, fleet management, materials management, asset management, system operations, and disaster recovery. This means that LUMA Energy's work on the ground at PREPA *now* is already bringing immediate, substantial benefits to PREPA's operations. Marrero Decl. ¶ 23. The work LUMA Energy is performing now, and will continue to perform, will therefore benefit PREPA regardless of LUMA Energy's role in PREPA's future. LUMA's remediation plan and operating capital budgets, for example, will give PREPA visibility into

19

immediate steps it can take to improve its system for the greatest value relative to cost and to more efficiently allocate its budget.  *Id.*  Accordingly, even if the T&D Contract were terminated and the Service Commencement Date never occurred, LUMA Energy's Front-End Transition Services would provide PREPA with invaluable operational improvements.

31.     According to UTIER and SREAEE, however, these services do not benefit PREPA; they only benefit LUMA Energy.  This argument demonstrates a fundamental misconception about how the transformation will occur.  The Front-End Transition Services are an essential precondition to LUMA Energy's assumption of full control of the grid and the transition of PREPA through experienced, professional, and private management.  For LUMA Energy to manage the T&D System effectively, LUMA Energy must invest substantial up-front time installing its management team, familiarizing itself with PREPA's processes, and coordinating the turnover of essential functions, such as customer billing.  Moreover, as explained above, the benefits from LUMA Energy's efforts do not accrue solely to LUMA Energy, because LUMA Energy's expertise enables it to identify opportunities for cost savings and improvements to PREPA's overall operations.  Accordingly, as LUMA Energy prepares for its role as manager of the T&D System, it is already benefiting PREPA and its stakeholders by bringing a qualified, critical, professional eye to PREPA's operations.

32.     Nevertheless, UTIER and SREAEE contend that LUMA Energy's services cannot benefit PREPA because LUMA Energy is on the island for the sole purpose of "dismantling" PREPA and enabling LUMA Energy to "take over [PREPA's] business."  UTIER/SREAEE Obj. ¶ 53.  However, the T&D Contract specifies that *PREPA* will continue to own the entire T&D System: "[t]he T&D System is and shall be owned by [PREPA] throughout the [term of the T&D Contract], and [LUMA Energy] shall have no ownership interest therein."  T&D Contract, Section

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

3.1.   By contracting with LUMA Energy, PREPA is able to upgrade its T&D System with experienced, independent, professional management.   Rather than "dismantling" PREPA, the T&D Contract will *transform* PREPA into a more efficient, reliable provider of electric services.

33.   The UCC also takes issue with specific aspects of the Front-End Transition Obligations for which administrative expense treatment is sought, but those arguments fare no better.   The UCC objects to the allowance of an administrative expense claim for the Front-End Transition Obligations on two bases: (1) a fixed $60 million fee (the "Fixed Fee"), payable in full even if the T&D Contract is terminated, is not consistent with the requirements of section 503(b)(1)(a) because the fee compensates LUMA Energy even if PREPA has not realized any benefits from LUMA's services, and (2) the Overdue Rate is inappropriate because late fees are not eligible for administrative expense treatment, and because at a rate of 2% in excess of prime, the rate does not merely compensate LUMA Energy, it also penalizes PREPA for late payments. These arguments should be rejected for several reasons.

34.   *First*, the Fixed Fee is intended as payment for LUMA Energy's front-end investment of time and talent, including mobilization of resources to Puerto Rico, which already has occurred.   Moreover, the Administrative Expense Motion only seeks an allowed administrative expense claim for services LUMA Energy actually renders, which, as set forth above, will by their nature benefit PREPA and its customers.   In addition, to the extent the UCC is concerned about the fact that the T&D Contract does not cap the fees that LUMA Energy may charge, the agreement does impose substantial protections against overpayment or payment for services not provided. For example, LUMA Energy's invoices are subject to review by the P3 Authority pursuant to section 4.6(d) of the T&D Contract, and billing disputes the parties are not able to resolve must be submitted to an independent expert pursuant to Article 15 of the contract.   In light of these

Hearing Date: September 16, 2020 at 9:30 a.m. (AST)

substantial controls, there is no basis for concern that LUMA Energy's fees will be excessive. The Administrative Expense Motion does not seek prospective allowance of any specific dollar amount for fees to be billed, it simply seeks a ruling that the nature of these services, when provided and properly invoiced, will benefit and preserve PREPA's property, *i.e.*, the T&D System.

35.  *Second*, the UCC's assertion that late fees are impermissible as administrative expenses is incorrect. Indeed, late fees are routinely allowed as administrative expenses—even when they are charged at rates substantially higher than the prime rate. *See, e.g.*, *In re SRT Solutions, Inc.*, No. 15-35572-H3-11, 2016 WL 1530123, at *3 (Bankr. S.D. Tex. Apr. 13, 2016) ("the estate is liable for an administrative expense consisting of the rent and late fees" at a rate of 15%); *CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 236 (4th Cir. 2005); *Willson v. MLA, Inc. (In re Ascot Mortg., Inc.)*, 153 B.R. 1002, 1015 (Bankr. N.D. Ga. 1993) ("Defendant's claim for late fees . . . is entitled to administrative expense status . . . ."). Late fees are permissible where, as here, they compensate the claimant for assuming risks associated with a transaction. For the same reason—compensation of parties according to their expectations—court-approved break-up fees have also been found to be administrative expenses. *See In re Dana Corp.*, Case No. 06-10354-BRL, ECF No. 3441 (Bankr. S.D.N.Y. Aug. 2, 2010) (approving various payments pursuant to plan support agreement); *see also In re Delphi Corp.*, Case No. 15-44481-RDD, ECF No. 6589 (Bankr. S.D.N.Y. Jan. 12, 2007) (approving various fees and payments in connection with approval of plan framework support agreement).

### B.  Whether LUMA Has an Administrative Expense Claim Does Not Turn on Whether Other Creditors Have That Priority

36.  UTIER, SREAEE, Whitefish, and Cobra each wrongly assert the Front-End Transition Obligations do not "benefit the estate" because administrative expenses must "preserve[] the estate for the benefit of its creditors," UTIER/SREAEE Obj. ¶ 63, and the Front-

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

End Transition Obligations instead harm other creditors by imposing an additional, sizeable administrative expense claim, which may reduce or eliminate recoveries available to other creditors. Whitefish Obj. at 10-12; Cobra Obj. at 4-5. The impact of LUMA's administrative expense claim on other creditors is not relevant to the Court's determination of this Administrative Expense Motion. The proper standard for evaluating administrative expenses in a Title III proceeding is whether the expense preserves property of the *debtor*—and for the reasons articulated above, PREPA and its T&D System are preserved by the services LUMA Energy provides.

37.     As discussed above, in a municipal bankruptcy case such as this Title III case, an administrative expense claim is appropriate where (1) the services are necessary to preserve the operations of the debtor (*i.e.*, to provide services to the public and carry out its mission), and (2) the debtor consents to payment of the claim as an administrative expense. *In re Craig Cty. Hosp. Auth.*, 572 B.R. 340 (Bankr. N.D. Okla. 2017). Focusing this inquiry on whether the services are necessary to preserve the debtor's operations by enabling it to provide public services and carry out its mission is appropriate because, as the First Circuit has stated, "unlike the commercial focus of bankruptcy cases of private entities, the 'primary purpose' of governmental insolvency proceedings 'is not future profit, but rather continued provision of public services.'" *In re Fin. Oversight & Mgmt. Bd.*, 432 F. Supp. 3d 25, 30 (D.P.R. 2020) (quoting *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999)), *aff'd*, 954 F.3d 1 (1st Cir. 2020). Accordingly, as Magistrate Judge Dein observed, "the purposes of the Title III proceeding are not narrowly focused on operation of the debtors for the benefit of the creditors or any particular stakeholder constituency." *Order on Discovery*, ECF No. 2140, at 6.

23

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

38.     The impact of any administrative expense claim on other creditors—whether unsecured creditors such as UTIER and SREAEE, or other alleged administrative expense creditors, such as Whitefish and Cobra—is therefore not determined by impact on other creditors, because the impact on those creditors is not relevant to the analysis the Court must conduct with respect to the Motion.   Because the inquiry here must focus narrowly on whether the requested administrative expense claim preserves the debtor and its property by promoting the "continued provision of public services," there is no basis to consider the impact of the claim on other creditors when determining whether to grant this Motion and allow LUMA Energy's administrative expense claim. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 432 F. Supp. 3d at 30.[17]

39.     The limited scope of this inquiry is consistent with this Court's approach in considering the 9019 Motion.   There, this Court properly focused its inquiry on the facts and analysis relevant to the applicable standard.   Because determining whether to approve a settlement turned on the range of likely litigation outcomes, this Court focused its inquiry on that analysis, not on the potential impact of the settlement on other creditors. *See, e.g.*, July 11, 2019 Hrg. Tr. 11:18-24 (holding that "impact of full RSA implementation on [PREPA's] operations and PREPA's ability to address the costs thereof are [] ones whose logistical impact on these narrowly focused 9019 proceedings would outweigh substantially any probative value in connection with the decisions the Court must make"); *Memorandum Order Granting Motion for Protective Order*

---

[17]   Section 305 of PROMESA further confirms a narrow inquiry is appropriate here.   Pursuant to section 305, PREPA is entitled to pay all of LUMA Energy's fees, either upfront or on an ongoing basis.   Neither the creditors nor the Court could interfere with PREPA's decision to make such payments to LUMA Energy.   It would defy logic, then, for creditors to be able to preclude the incurrence of an administrative expense claim when a stronger form of obligation—payment in full, either upfront or in the ordinary course—is already available to PREPA.   Had PREPA been compelled to make all such payments upfront, however, its finances would have materially worsened, to the detriment of all its stakeholders.

Hearing Date: September 16, 2020 at 9:30 a.m. (AST)

*and Order in Limine Precluding Evidence in Connection with 9019 Motion*, ECF No. 1543 at 3

(holding that evidence regarding "the long-term impact of full implementation of the RSA is

outside the scope of the 9019 Motion" and excluding evidence regarding the potential impact of

the RSA on other creditors).  For the same reasons, the Administrative Expense Motion should not

turn on whether individual creditors or creditor constituencies will either benefit from or be harmed

by allowance of LUMA's administrative expense claim, because that is not the appropriate

standard here.  Rather, the Court should focus its inquiry on whether the Front-End Transition

Services benefit PREPA, as is required to meet the standard for an administrative expense claim

in the municipal bankruptcy context.  For the reasons set forth above, the Front-End Transition

Services plainly meet that test.

40.     Even if this Court were obligated to consider the potential impact on creditors (it is

not), the Administrative Expense Motion should still be granted.  As set forth above, LUMA

Energy's efforts have already begun to improve PREPA's T&D System.  As the Front-End

Transition Period progresses, LUMA Energy's efforts will continue to bring sustained operational

improvement to the T&D System.  Those improvements inure to the benefit of *all* of PREPA's

stakeholders—including PREPA's customers and creditors, who will benefit from a system that is

able to function in a more cost-effective, efficient manner.

41.     Whitefish and Cobra raise additional issues unique to other purported

administrative expense claimants, both of which are easily disposed of.  First, Whitefish contends

the Motion should be denied because allowing LUMA Energy's administrative expense claim

could imperil PREPA's ability to pay all of its administrative expense claims in full.  Whitefish

Obj. at 10-12.  According to Whitefish, "an additional $77 million of administrative claims" "may

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

result in PREPA's inability to pay all of these [administrative expense] claims in full," and accordingly, this Court should "craft relief that addresses" Whitefish's concerns. *Id.* at 11-12.

42.     Whitefish appears to contend that PREPA is or may become administratively insolvent as a result of the requirement that it pay all administrative claims in full. Whitefish is wrong as a matter of law. This Court has already determined that "PROMESA does not refer to or incorporate a concept of administrative insolvency," and accordingly, administrative insolvency is not possible in a Title III proceeding. *Order Overruling Cobra Acquisitions LLC's Omnibus Objection to Fee Applications Filed by Professionals and Request to Increase Holdback Amount*, ECF No. 1931 at 2. Given the policies and purposes behind Title III, as set forth above, it is not surprising that PROMESA does not incorporate such a concept: obviously, liquidation of either the Commonwealth, PREPA or any of the other Title III debtors in order to pay administrative creditors is simply not an option.

43.     PROMESA instead requires PREPA to pay all its administrative claims, in full, on the plan effective date. 48 U.S.C. § 2174(b)(4). To the extent Whitefish—or any other administrative expense creditor—has an allowed administrative expense claim that is unpaid as of the plan's effective date, PREPA has no choice but to pay it or reach an agreement regarding the resolution of any such outstanding claims. If PREPA cannot pay all its administrative expense claims, a plan of adjustment for PREPA cannot become effective. Whitefish therefore has no basis to suggest LUMA Energy's claim might preclude PREPA from paying Whitefish's alleged administrative expense claim. In light of the confirmation requirements imposed by PROMESA, PREPA's ability to pay all of its administrative claims in full is not material to the Court's determination of this Motion. The Government Parties were well aware of this confirmation requirement when they approved the T&D Contract, and PREPA will comply.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

44.　　Cobra objects on similar grounds, and asks this Court to "condition approval" of
LUMA Energy's administrative expense claim on "Cobra being permitted to proceed now to a
showing that its services to PREPA were 'actual and necessary' under section 503(b) of the
Bankruptcy Code." Cobra Obj. at 5. There is no basis to tie resolution of *Cobra's* motion for
allowance of its administrative expense claim (Case No. 17-3283, ECF No. 8789) (the "Cobra
Motion") to this Motion seeking allowance of *LUMA Energy's* administrative expense claim; as
explained above, it has no bearing on Cobra's claim. The standard governing this Administrative
Expense Motion does not require this Court to consider Cobra's claim, and in any event, to the
extent Cobra has an allowable administrative expense claim, PROMESA requires PREPA to pay
that claim in full at confirmation. The outcome of this Administrative Expense Motion therefore
has no impact on resolution of the Cobra Motion.

45.　　Moreover, Cobra ignores the Court's rationale in granting the Government Parties'
request to stay the Cobra Motion, which is predicated on both a pending criminal trial of certain
Cobra executives and the ongoing review of Cobra's contracts and invoices by FEMA and PREPA.
As this Court has already determined, resolution of the anticipated criminal trial in *United States
v. Tribble*, Case No. 19-cv-541-fab (D.P.R.) will facilitate resolution of the Cobra Motion because
"[t]he charges in that case relate to the same contracts between Cobra and PREPA that are at issue
in the [Cobra Motion], and thus concurrent litigation of both matters presents the potential for
duplication of effort by the parties and courts, inefficiencies in discovery, and inconsistent
rulings." ECF No. 1670, at 2. Further, this Court also held "FEMA's ongoing analysis of Cobra's
contracts with PREPA similarly weighs in favor of a stay." *Id.* The criminal trial remains pending,
and FEMA's review remains ongoing. Nothing in the Administrative Expense Motion alters this
Court's determination that the Cobra Motion should not be adjudicated until both the criminal trial

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

and FEMA's contract review have been resolved, and there is no basis for this Court to lift its stay of proceedings with respect to the Cobra Motion.

## IV. PROMESA SECTION 201(B)(1) DOES NOT PRECLUDE THE LUMA ADMINISTRATIVE EXPENSE CLAIM

46.     When Congress enacted PROMESA, it created the Oversight Board to provide a method for the Commonwealth "to achieve fiscal responsibility and access to the capital markets" and endowed the Oversight Board with the authority to control fiscal plans and budgets of "covered territorial instrumentalities" (such as PREPA[18]) to accomplish that goal.  PROMESA §§ 101(a), 201, 202.  As part of that delegation of authority, Congress granted the Oversight Board the "sole discretion" to determine whether to certify a fiscal plan or budget, *id*. §§ 201(c)(3), 202(e), and divested district courts of subject matter jurisdiction to review challenges to those certification determinations, *id.* § 106(e).  *See also Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 694, 698-700 (D.P.R. 2018), *aff'd*, 945 F.3d 3 (1st Cir. 2019).

47.     UTIER's and SREAEE's argument that granting the Administrative Expense Motion violates PROMESA section 201(b)(1) because allowing the administrative expense claim will preclude PREPA from meeting its funding obligations for essential public services and public pension systems as required by sections 201(b)(1)(C) and 201(b)(1)(D) constitutes a frontal attack on the Board's decision to certify both the PREPA 2020 Fiscal Plan and PREPA's budget for fiscal year 2021, certified on June 30, 2020 (the "PREPA 2020 Budget").  Because this Court does not have subject matter jurisdiction to review a challenge to those certification decisions, it cannot sustain the UTIER/SREAEE Objection on this basis.

---

[18]  The Oversight Board designated PREPA as a "covered territorial instrumentality" under PROMESA §101(d)(1)(A) on September 30, 2016.  ECF No. 1 at 6.

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

48.     Both the PREPA 2020 Fiscal Plan and PREPA 2020 Budget account for numerous expenditures and initiatives, including the T&D Contract.  In a different section of their brief, UTIER and SREAEE even cite the PREPA 2020 Fiscal Plan's discussion of the impact of the T&D Contract on the PREPA 2020 Budget.  UTIER/SREAEE Obj. ¶ 65.  Thus, UTIER's and SREAEE's challenge to the administrative expense claim on the ground that PREPA cannot afford it plainly challenges the PREPA 2020 Fiscal Plan and PREPA 2020 Budget, which includes specific line items for costs attendant to the T&D Contract.[19]  But UTIER and SREAEE are not the arbiters of whether the fiscal plan complies with PROMESA, or whether the budget complies with the fiscal plan—that role has been granted exclusively to the Oversight Board.  PROMESA's structure in this regard, which also eliminates judicial review of certification determinations (48 U.S.C. § 2126(e)), effectively insulates the Board's judgment from influence by any particular constituency.  This Court should deny UTIER's and SREAEE's bid to do exactly the opposite— interfere with the T&D Contract to elevate their interests over other PREPA constituencies.[20]

---

[19] The PREPA 2020 Budget is accessible online and at page 3 includes a line item for "T&D Operator                    Costs."                    *See* https://drive.google.com/file/d/1yIV664F009bi3UeE9WBHi3J6U6r42tFQ/view.

[20] This is not the first time stakeholders have attempted to invade the Oversight Board's exclusive judgment to certify a fiscal plan and budget.  Similar efforts to usurp the Board's discretion on this subject, including by UTIER, have repeatedly failed in these Title III cases.  *Ambac Assur. Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 927 F.3d 597, 602 (1st Cir. 2019) (request for relief that would "'invalidat[e] the Oversight Board's certification of the Fiscal Plan' . . . is plainly precluded as a result of [PROMESA] section 106 and our holding in *Méndez-Núñez* [*v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 112 (1st Cir. 2019)]") (citation omitted), *cert. denied*, 140 S. Ct. 856 (2020); *Memorandum Opinion and Order Granting Respondent Puerto Rico Electric Power Authority's Motion to Dismiss Plaintiff's Mandamus Petition Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)* Case No. 19-AP-298 (D.P.R.), ECF No. 19 at 15 (dismissing UTIER petition for lack of subject matter jurisdiction "insofar as it is premised on the assertion that PREPA's certified Budget fails to comply with PROMESA Section 201(b)(1) . . . .").

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

49.     Because this Court does not have subject matter jurisdiction to review the Oversight

Board's determination to certify the PREPA 2020 Fiscal Plan and PREPA 2020 Budget, as that

discretion lies exclusively with the Oversight Board, UTIER's and SREAEE's challenge to the

Front-End Transition Obligations already approved in connection with those certification

determinations must fail.

### V.   THE RELIEF THE UCC REQUESTS RELATED TO THE SUPPLEMENTAL AGREEMENT IS OUTSIDE THE SCOPE OF THE MOTION

50.     The UCC states no objection to allowance of the requested administrative expense

claim for LUMA Energy.  Instead, despite the UCC's admission that it is "well aware that the

Government Parties are not currently seeking approval of the terms of the Supplemental

Agreement" (UCC Obj. ¶ 9), it nonetheless asks this Court for relief related to two aspects of that

agreement.  Notably, the Supplemental Agreement has nothing to do with the Front-End Transition

Obligations for which administrative expense treatment is sought, and by its own terms the

Supplemental Agreement cannot go into effect until the Front-End Transition is complete.[21]  The

relief the UCC requests is thus not properly before the Court.  Because the UCC Objection is far

outside the scope of the Administrative Expense Motion[22] and there is no pending motion pursuant

to which the UCC would be entitled to the relief it seeks, its requests are procedurally defective

---

[21] *See* Marrero Decl., Ex. B, Supplemental Agreement, § 2.2.  By the time the Supplemental
Agreement becomes effective, the Front-End Transition Obligations that are the subject of this
Administrative Expense Motion will already have accrued and been paid.

[22] The UCC's argument (at 5) that its request falls within the scope of the motion makes no logical
sense.  Moreover, it is based on pure conjecture that LUMA Energy might one day terminate
the T&D Contract before providing the O&M Services.  This is not a sound basis on which to
deny the Motion.  Even if that unlikely event were to occur, PREPA would still realize
numerous benefits from LUMA Energy's engagement on the Front End Transition.  *See*
Marrero Decl. ¶ 22 (listing benefits PREPA expects to realize from the Front End Transition
Period even before assumption of O&M Services).

and a waste of the Court's and litigants' time and resources.  The UCC Objection should be overruled outright.

51.     Nevertheless, to the extent the Court is inclined to address the substance of the UCC Objection, it should be overruled because the Court has no authority to mark up the Supplemental Agreement to implement the UCC's requests to (1) limit a condition imposed on the Service Commencement Date that PREPA's Title III confirmation order be "reasonably acceptable to" LUMA Energy (Section 6.1), or (2) eliminate or restructure the $115 termination fee payable to LUMA Energy if PREPA does not achieve confirmation within eighteen months of the Supplemental Agreement Effective Date (Supplemental Agreement 7.1(a)).

52.     Both LUMA Energy's limited consent rights and the termination fee are economic terms that the parties extensively negotiated at arms' length and on which they agreed.  It is well-settled that courts should not rewrite parties' contracts because doing so would upset the parties' intentions in reaching their agreement.  *See*, *e.g.*, *Lawson v. Fleet Bank of Maine*, 807 F. Supp. 136, 141 (D. Me. 1992) ("The Court should not and will not rewrite the contract to effect a transfer desired by Plaintiffs but quite explicitly not intended by the parties to the contract."), *aff'd*, 3 F.3d 11 (1st Cir. 1993); *First Liberty Ins. Corp. v. Budow*, No. 05-cv-88, 2007 WL 2071883, at *9 (E.D. Pa. July 17, 2007).  That is particularly true where, as here, court approval of the contract is neither required nor sought.

53.     The UCC contends that the Supplemental Agreement gives LUMA Energy "unreasonably broad control rights" with respect to PREPA's future plan of adjustment because the Supplemental Agreement provides that any plan must be "reasonably acceptable to" LUMA Energy.  In so arguing, the UCC appears to contend that LUMA Energy can (and will) use this alleged "control right" to stand in the way of a plan for any reason it wants.  The Supplemental

Agreement does not confer such wide-ranging rights on LUMA Energy.  Standing in the way of confirmation of a Title III plan for any reason would be unreasonable and LUMA Energy is contractually prohibited from unreasonably withholding consent.   Marrero Decl., Ex. B., Supplemental Agreement § 6.1.   Read in context, the requirement that a plan be "reasonably acceptable to" LUMA Energy does not permit LUMA Energy to reject any plan at its whim; rather, it requires that a proposed plan not materially impair the parties' ability to fulfill their respective obligations under the T&D Contract.  Should LUMA Energy ever attempt to withhold acceptance of a plan for any reason outside the scope of the T&D Contract, the Government Parties have the right to declare such withholding unreasonable and proceed to confirmation.  This hypothetical is highly unlikely ever to occur; LUMA Energy has not invested years of time, manpower, and money to put itself in position to take over the power grid in Puerto Rico simply to walk away over plan provisions that do not concern its mission.  LUMA Energy is working tirelessly to provide are achieving tangible benefits and will effect a much-needed transformation of PREPA and Puerto Rico's energy system.   Accordingly, the limited relief sought in the Administrative Expense Motion should be granted.

## **CONCLUSION**

54.      WHEREFORE the Government Parties respectfully request the Court to enter the Proposed Order (a) overruling the Objections, (b) granting the Motion, and (c) granting PREPA such other relief as is just and proper.

*[Remainder of page left intentionally blank]*

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

Dated:  September 2, 2020                          Respectfully submitted,
     San Juan, Puerto Rico

**PROSKAUER ROSE LLP**                          **O'NEILL & BORGES LLC**

*/s/ Paul V. Possinger*                          */s/ Hermann D. Bauer*

Martin J. Bienenstock (*pro hac vice*)           Hermann D. Bauer
Ehud Barak (*pro hac vice*)                      USDC No. 215205
Margaret A. Dale (*pro hac vice*)                250 Muñoz Rivera Ave., Suite 800
Daniel S. Desatnik *(pro hac vice)*              San Juan, PR 00918-1813
Eleven Times Square                              Tel:   (787) 764-8181
New York, NY 10036                               Fax:  (787) 753-8944
Tel:  (212) 969-3000                             *Co-Attorney for the Financial Oversight and*
Fax:  (212) 969-2900                             *Management Board as representative of the*
                                             *Debtor*

Paul V. Possinger (*pro hac vice*)
70 W. Madison St., Suite 3800
Chicago, IL 60602
Tel: (312) 962-3550
Fax: (312) 962-3551
ppossinger@proskauer.com

Jennifer L. Jones (*pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Tel: (310) 284-4509
Fax: (310) 557-2193
jljones@proskauer.com

Laura E. Stafford (*pro hac vice*)
1 International Place
Boston, MA 02130
Tel: (617) 526-9714
Fax: (617) 526-9899
lstafford@proskauer.com

*Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Commonwealth of Puerto Rico and the Puerto*
*Rico Electric Power Authority*

33

**Hearing Date**: September 16, 2020 at 9:30 a.m. (AST)

**O'MELVENY & MYERS LLP**

*/s/ Elizabeth L. McKeen*

John J. Rapisardi
Nancy A. Mitchell
Maria J. DiConza
7 Times Square
New York, New York 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

-and-

Peter Friedman
1625 Eye Street, NW
Washington, D.C. 20006
Tel:  (202) 383-5300
Fax:  (202) 383-5414

-and-

Elizabeth L. McKeen
Ashley M. Pavel
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel:  (949) 823-6900
Fax:  (949) 823-6994

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority and Puerto
Rico Electric Power Authority*

**DÍAZ & VÁZQUEZ LAW FIRM, P.S.C**

*/s/ Katiuska Bolaños*
Katiuska Bolaños
USDC-PR No. 231812
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 1105
San Juan, PR 00918
Tel.:  (787) 395-7133
Fax:  (787) 497-9664

*Counsel for Puerto Rico Electric Power
Authority*

**MARINI PIETRANTONI MUÑIZ LLC**

*/s/ Luis Marini*
Luis C. Marini-Biaggi
USDC No. 222301
250 Ponce de León Ave., Suite 900
San Juan, Puerto Rico 00918
Tel:  (787) 705-2171
Fax:  (787) 936-7494

*Co-counsel for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*