**Hearing Date: October 28, 2020, at 9:30 AM (Atlantic Standard Time)**
**Response Deadline: October 14, 2020, at 4:00 PM (Atlantic Standard Time)**

<div style="border:1px solid black">

**PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO
TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

</div>

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                         Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the<br>Commonwealth.** |

## TWO HUNDRED FIFTY-EIGHTH OMNIBUS OBJECTION (SUBSTANTIVE) OF THE COMMONWEALTH OF PUERTO RICO TO NO LIABILITY AND DUPLICATE BONDHOLDER CLAIMS

To the Honorable United States District Court Judge Laura Taylor Swain:

     The Commonwealth of Puerto Rico (the "<u>Commonwealth</u>" or the "<u>Debtor</u>"), by and

through the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"),

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "<u>Debtors</u>") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

as the Commonwealth's representative pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] files this two hundred fifty-eighth omnibus objection (the "Two Hundred Fifty-Eighth Omnibus Objection") seeking to disallow in their entirety the proofs of claim listed on **Exhibit A** hereto, each of which purports to be based on indebtedness in whole or in part for which the Debtors are not liable because the claim asserts one or more of the following: (a) an ownership interest in bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"); (b) an ownership interest in bonds issued by the Government Development Bank of Puerto Rico ("GDB"); (c) an ownership interest in bonds issued by the Puerto Rico Industrial, Tourist, Educational, Medical & Environmental Control Facilities Financing Authority ("AFICA") which are not guaranteed by the Commonwealth; and/or (d) an ownership interest in bonds issued by the Puerto Rico Aqueducts and Sewers Authority ("PRASA") bonds which are not guaranteed by the Commonwealth.  Some of the claims listed on **Exhibit A** hereto should be disallowed for the additional reason that another part of the claim is duplicative in part of one or more master proofs of claim filed against the Commonwealth on behalf of the holders of certain bonds.  In support of the Two Hundred Fifty-Eighth Omnibus Objection, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA section 306(a).

2.      Venue is proper in this district pursuant to PROMESA section 307(a).

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

# BACKGROUND

### A. The Bar Date Orders

3.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case"). On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "COFINA Title III Case" and together with the Commonwealth Title III Case, the "Title III Cases"). On June 1, 2017, the Court entered an order granting the joint administration of the Commonwealth Title III Case and the COFINA Title III Case, for procedural purposes only. ECF No. 242.[3]

4.      On January 16, 2018, the Debtors filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2255] (the "Bar Date Motion"). Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Commonwealth Title III Case. Upon the informative motion of certain creditors, and the support of the Debtors, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160]

---

[3] Unless otherwise stated, all ECF numbers refers to Case No. 17-bk-3283-LTS.

(together with the Initial Bar Date Order the "Bar Date Orders"), extending these deadlines to June 29, 2018 at 4:00 pm (Atlantic Time).

**B. The COFINA Title III Case and Resolution of the Commonwealth-COFINA Dispute**

5.      COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth. Pursuant to that certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009, and pursuant to certain supplemental resolutions, COFINA issued a series of bonds in aggregate approximate amount of $17 billion, to, among other things, defray certain debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico Public Finance Corporation (the "COFINA Bonds"). Bank of New York Mellon serves as Trustee with respect to the COFINA Bonds.

6.      The Oversight Board filed that certain *Third Amended Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation* (the "Plan") [ECF No. 4652] on January 9, 2019. The Court considered confirmation of the Plan and any objections thereto at a hearing on January 16-17, 2019.

7.      On February 4, 2019, the Court confirmed the Plan, which incorporated the compromise and settlement of the dispute over whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law (the "Commonwealth-COFINA Dispute"). *See Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5048]. On the same day, the Court approved the compromise and

4

settlement of the Commonwealth-COFINA Dispute pursuant to the *Memorandum Opinion and Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 5045] (the "Settlement Order"). On February 5, 2019, the Court issued an *Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] (the "Amended Confirmation Order"). The Plan became effective on February 12, 2019 (the "Effective Date"), when the transactions contemplated therein were consummated. *See Notice of (A) Entry of Order Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [Case No. 17 BK 3284-LTS, ECF No. 587].

### C. The GDB Title VI Proceedings and Qualifying Modification

8.     GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by Legislative Assembly in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth. On April 28, 2017, the Oversight Board unanimously certified that certain February 2017 GDB Fiscal Plan, which contemplated an orderly wind-down of the operations of GDB based upon the determination that there was no clear path for the long-term viability of GDB based on its then-current financial condition.

9.     On July 12, 2017, the Oversight Board issued a resolution authorizing GDB, pursuant to Section 601(e) of PROMESA, to avail itself of Title VI of PROMESA. On August 10, 2018, GDB filed an application for approval of a qualifying modification, pursuant to

PROMESA section 601(m)(1)(D) (the "Qualifying Modification"), in the United States District
Court for the District of Puerto Rico.

10.    On November 7, 2018, the Court approved the Qualifying Modification pursuant
to PROMESA section 601(m)(1)(D).  *See* ECF No. 270 in *Government Development Bank for
Puerto Rico*, Case No. 18-1561 (D.P.R. Nov. 7, 2018).  The Qualifying Modification provided for,
among other things, (i) the issuance of new bonds by the newly-created GDB Debt Recovery
Authority in exchange for the cancellation of, among other things, certain participating bonds and
guaranteed bond claims (collectively, the "GDB Bonds"); (ii) the extinguishment of the
Commonwealth's guarantee of the guaranteed bonds upon the exchange and cancellation of the
guaranteed bonds; and (iii) the release of claims of the holders of GDB Bonds against GDB and
its affiliates relating to, among other things, any investment with GDB or the purchase, sale, or
transfer of any security or interest of GDB, and any action or omission with respect to any
indebtedness or loans to GDB (including any notes issued or deposits held by GDB) or from GDB.
Solicitation Statement, at 57-60, ECF No. 1-15 in *Government Development Bank for Puerto Rico*,
Case No. 18-1561 (D.P.R. Aug. 10, 2018).

11.    On November 29, 2018, GDB announced the consummation of the Qualifying
Modification for GDB.  Press Release, *Government of Puerto Rico Announces Consummation of
the GDB Qualifying Modification*, Governor of Puerto Rico (Nov. 29, 2018), *available at*
http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-
modification.pdf.

### D.  Bond Debt Issued by AFICA

12.    AFICA is a public corporation and government instrumentality of the
Commonwealth created by Act No. 121 of the Legislative Assembly of Puerto Rico, approved

June 27, 1977 (as amended and supplemented and codified as P.R. Laws Ann. tit. 12, § 1251 *et seq.*). P.R. Laws Ann. tit. 12, § 1254. AFICA facilitates project financing in order to promote the economic development of the Commonwealth, including through the development and construction of new industrial, commercial, tourist, agricultural, educational, medical and environmental control facilities.

13.    In 2000, AFICA issued $30,000,000 in Tourism Revenue Bonds, 2000 Series A (the "2000 Series A Palmas del Mar Bonds"), in the aggregate amount of $30,000,000.00, in order to finance, in part, improvements to the Palmas del Mar Country Club. The 2000 Series A Palmas del Mar Bonds are payable solely from repayment of a loan agreement entered into between AFICA and Palmas Country Club, Inc. The offering statement issued in connection with the 2000 Series A Palmas del Mar Bonds states that the bonds "shall not constitute an indebtedness of the [Commonwealth] or of any of its political subdivisions." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Tourism Revenue Bonds, 2000 Series A (Palmas del Mar Country Club Project), *available*                                                                 *at* https://emma.msrb.org/Security/Details/AD88773EB8772C017819AB0B921B2DAD5.

14.    In 2011, AFICA issued Industrial Revenue Refunding Bonds, 2011 Series A (the "2011 Series A Galeria Bonds," and together with the 2000 Series A Palmas del Mar Bonds, the "AFICA Bonds"), in the aggregate amount of $59,649,744.50, in order to finance, in part, the operation of certain office and commercial retail space owned and operated by Caparra Hills, Inc. The 2011 Series A Galeria Bonds are payable solely from repayment of a loan agreement entered into between AFICA and Caparra Hills, Inc. The offering statement issued in connection with the 2011 Series A Galeria Bonds states that the bonds "do not constitute an indebtedness of the

Commonwealth or of any of its political subdivisions, other than [AFICA], and neither the Commonwealth nor any of its political subdivisions, other than [AFICA], shall be liable thereon." *See, e.g.*, Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, Offering Statement, Industrial Refunding Bonds, 2011 Series A (Galeria Tower at San Patricio Project), *available at* https://emma.msrb.org/Security/Details/A95ABBB582ECE40E0D6ED039C687C3542.

### E. Bond Debt Issued by the Puerto Rico Aqueducts and Sewers Authority

15.     PRASA was established pursuant to Act Number 40 on May 1, 1945. PRASA is a government-owned corporation in Puerto Rico and was created for the purpose of providing water and sewer services on the island.  22 L.P.R.A. § 144.

16.     The PRASA Enabling Act authorizes PRASA to issue bonds.  22 L.P.R.A. § 144(g). Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution No. 1583"). In 2008, PRASA issued $1,316,204,456 principal amount of Series A revenue bonds (the "2008 Senior Series A Bonds"). Additionally, in 2012, PRASA concurrently issued $1,800,450,00 principal amount of Series 2012 A revenue bonds (the "2012 Senior Series A Bonds"), as well as $295,245,000 principal amount of Series 2012 B revenue bonds (the "2012 Senior Series B Bonds," together with the 2012 Senior Series A Bonds and the 2008 Senior Series A Bonds, the "PRASA Senior Lien Bonds").

17.     Holders of PRASA Senior Lien Bonds have received and continue to receive all payments owed to holders of the PRASA Bonds in full as they become due and owing.  The Commonwealth has not guaranteed repayment of the Senior Lien Bonds.

8

**F.  Bond Debt Master Proofs of Claim – Commonwealth Title III Case**

18.     Pursuant to the Initial Bar Date Order, indenture trustees, fiscal agents, or any similar agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents. Initial Bar Date Order, ¶ 5(a). As explained below, master proofs of claim (collectively, the "Master Claims") have been filed in the Commonwealth Title III Case on behalf of the holders of certain bonds or notes issued by Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), Puerto Rico Highways and Transportation Authority ("HTA"), Puerto Rico Public Buildings Authority ("PBA"), PRASA, and/or Puerto Rico Public Finance Corporation ("PRPFC").

19.     *ERS*—ERS is a trust established by the Commonwealth in 1951 for the economic well-being of public employees. ERS is an agency of the government, separate and apart from the Commonwealth government and its other instrumentalities.   *See* 3 L.P.R.A § 775.  Purportedly pursuant to that certain *Pension Funding Bond Resolution*, adopted on January 24, 2008, and certain supplemental resolutions, ERS issued senior and subordinate pension funding bonds (the "ERS Bonds") in the aggregate original principal amount of approximately $2.9 billion.[4]   BNYM

---

[4] On March 12, 2019, the Official Committee of Unsecured Creditors filed an *Omnibus Objection to Claims Asserted by Holders of Bonds Issued by ERS* [Case No. 17-3566, ECF No. 381], on the ground that the bond issuance exceeded ERS's statutory authority and was thus *ultra vires*, rendering the ERS Bonds null and void.  On April 23, 2019, the Official Committee of Retired Employees of the Commonwealth of Puerto Rico filed an *Omnibus Objection Of The Official Committee Of Retired Employees Of The Commonwealth Of Puerto Rico, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of ERS Bonds Against ERS And The Commonwealth* [ECF No. 6482], on the ground, among others, that the bond issuance was *ultra vires*.  ERS reserves its rights to challenge the bond issuance on any grounds whatsoever, including on the ground that the ERS Bonds were *ultra vires*, and any other grounds set forth in the foregoing objections.

serves as the fiscal agent with respect to the ERS Bonds.  On behalf of the holders of the ERS
Bonds, BNYM filed a master proof of claim in the Commonwealth Title III Case (the "ERS-CW
Master Proof of Claim"), asserting claims against ERS based on, among other things, the
enactment of Joint Resolution 188 and Law 106, which together created a "pay as you go"
retirement system whereby pensioners are paid from the general funds of the Commonwealth,
instead of Employers' Contributions, which is alleged to be collateral for the Bonds.  BNYM
initially filed one proof of claim that was logged by Prime Clerk, LLC ("Prime Clerk"), on May
24, 2018 as Proof of Claim No. 16775, and then filed an amended claim, on May 25, 2018, that
was logged by Prime Clerk as Proof of Claim No. 32004.[5]

20.   ___HTA___—HTA is a public corporation and instrumentality of the Commonwealth
constituting a corporate and political entity independent and separate from the Commonwealth,
created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA
Enabling Act").  HTA is responsible for the construction, operation, and maintenance of highways
and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A § 2002.  The HTA
Enabling Act authorizes HTA to issue bonds. *See* 9 L.P.R.A. §§ 2004(g), (h), (l).  Pursuant thereto,
HTA issued several series of bonds under two different resolutions (the "HTA Bonds"): (*i*)
Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution"), and (*ii*) Resolution No. 98-
06, adopted February 26, 1998 (the "1998 Resolution").  As of May 21, 2017, HTA's petition date,
approximately $830 million in principal amount of bonds issued under the 1968 Resolution remain

---

[5] On May 22, 2019, the Commonwealth filed an objection to the ERS Master Proof of Claim.  *See
Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section
502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the
Bank of New York Mellon, As Fiscal Agent* (Claim No. 16775) [ECF No. 7075].  For the
avoidance of doubt, this Two Hundred Fifty-Eighth Omnibus Objection is without prejudice to
the parties' rights with respect to such objection, including any rights to intervene, which are
reserved.

outstanding, and approximately $3.4 billion in principal amount of bonds issued under the 1998 Resolution remain outstanding. BNYM serves as fiscal agent with respect to the HTA Bonds. On behalf of the holders of HTA Bonds, BNYM filed three master proofs of claim in the Commonwealth Title III Case (the "HTA-CW Master Claims"), each asserting a "secured, contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have against the Commonwealth arising at law or in equity . . . ." *See* Addendum to Proof of Claim No. 121053, ¶ 15; Addendum to Proof of Claim No. 120982, ¶ 15; Addendum to Proof of Claim No. 115380, ¶ 15.[6]

21.     __*PBA*__—PBA purportedly issued bonds to finance office buildings and other facilities leased to various departments, public agencies and instrumentalities of the Commonwealth. U.S. Bank National Association ("US Bank") and US Bank National Trust Association ("US Bank Trust") serve as fiscal agents for certain revenue bonds issued by PBA, as identified in Footnote 3 of Proof of Claim No. 62833 (the "PBA Bonds"), and, on behalf of the holders of the PBA Bonds, filed a master proof of claim in the Commonwealth Title III Case for all outstanding amounts owed (the "PBA Master Proof of Claim"), which was logged by Prime Clerk as Proof of Claim No. 62833. The PBA Master Proof of Claim asserts liquidated claims for approximately $4 billion in allegedly unpaid principal, $160 million in allegedly unpaid interest, and reimbursement for fees and expenses of the fiscal agents, in addition to unliquidated and contingent claims for any and all amounts owed "on account of any and all claims the Fiscal Agent has or may have relating to the outstanding Bond obligations, whether known or unknown against

---

[6] While BNYM initially filed three proofs of claim logged by Prime Clerk as Proofs of Claim Nos. 21286, 26541, and 35277, these were superseded and amended by Proofs of Claim Nos. 121053, 120982, and 115380.

the Commonwealth and all those purporting to act on the Commonwealth's behalf . . . ." Rider to PBA Master Proof of Claim, ¶¶ 19-21.

22.     ***PRASA***—PRASA owns and operates the island-wide public water and wastewater systems in Puerto Rico.  PRASA issued certain revenue bonds (the "PRASA Bonds"), under the Puerto Rico Aqueduct and Sewer Authority Resolution No. 1583, *Authorizing and Securing Puerto Rico Aqueduct and Sewer Authority Bonds Guaranteed by the Commonwealth of Puerto Rico*, and certain supplemental resolutions.  Banco Popular de Puerto Rico ("Banco Popular") serves as trustee for the PRASA Bonds and filed a master proof of claim against the Commonwealth on behalf of the holders of the PRASA Bonds, which was logged by Prime Clerk as Proof of Claim No. 22620 (the "PRASA Master Claim").  The PRASA Master Claim asserts "a contingent claim against the Commonwealth on account of the Bonds in an amount not less than $284,755,000, together with all interest, and premium accruing on the Bonds from and after the Petition Date, and all fees, costs, expenses and other charges accrued, accruing or chargeable with respect thereto."  Addendum to PRASA Master Claim, ¶ 9.

23.     Certain PRASA bonds have been insured by one of several municipal bond insurers, either on the primary market or on the secondary market.  Municipal bond insurance is obtained on the primary market when the municipality issuing the bonds engages an insurance company to underwrite an insurance policy for that series of bonds.  In the event that a bond is not insured on the primary market, holders of such uninsured bonds may elect to obtain insurance via the secondary market. Holders of uninsured bonds who seek to obtain insurance in the secondary market contract directly with a municipal bond insurer and the original issuer is not part of this contract process.  When a holder of an uninsured bond obtains an insurance policy on the secondary market, a new CUSIP number is issued which corresponds to the original CUSIP

12

numbers assigned to the bonds at the time of issuance.  Certain bonds issued by PRASA have been

insured on the secondary market and, accordingly, have been issued new CUSIP numbers which

correspond to bonds issued by PRASA bearing original CUSIP numbers (the "PRASA Secondarily

Insured Bonds").

24.    *PRPFC*—PRPFC is a subsidiary corporation of GDB created pursuant to

Resolution No. 5044 of the Board of Directors of GDB, as amended ("Resolution No. 5044"),

adopted pursuant to the authority granted under Act No. 17 of the Legislature of Puerto Rico,

approved September 23, 1948, as amended.  It provides government agencies, instrumentalities,

municipalities and other subdivisions of the Commonwealth with alternative mechanisms to meet

their financing needs.  PRPFC has the capacity to borrow money and issue debt through the

issuance of bonds and other obligations.   U.S. Bank Trust serves as trustee for certain Series 2012A

and Series 2011A and B bonds issued by the PRPFC (the "PRPFC Bonds").  On behalf of the

holders of the PRPFC Bonds, US Bank Trust filed a proof of claim against the Commonwealth,

which was logged by Prime Clerk as Proof of Claim No. 13374.

### G.  Proofs of Claim Filed Against the Commonwealth, the Omnibus Objection Procedures, and Claim Objections

25.    To date, approximately 174,000 proofs of claim have been filed against the Debtors

and logged by Prime Clerk, LLC.  Such proofs of claim total approximately $43.6 trillion in

asserted claims against the Debtors, in addition to unliquidated amounts asserted.

26.    Of the proofs of claim filed, approximately 111,300 have been filed in relation to,

or reclassified to be asserted against, the Commonwealth.  In accordance with the terms of the Bar

Date Orders, many of these claims need not have been filed at all, or suffer from some other flaw,

such as being subsequently amended, not putting forth a claim for which the Debtors are liable,

being duplicative of other proofs of claim, or failing to provide information necessary for the Debtors to determine whether the claim is valid.

27.     In order to efficiently resolve as many of the unnecessary proofs of claim as possible, on October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (a) Approving Limited Omnibus Objection Procedures, (b) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (c) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures Motion"). The Court granted the relief requested in the Omnibus Procedures Motion by order dated November 14, 2018. *See Order (A) Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus Objection Procedures"). On November 29, 2018, the Court approved English and Spanish versions of the forms of notice for omnibus objections to be filed in accordance with the Initial Omnibus Objection Procedures. *See Order Approving the English and Spanish Versions of the Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

28.     In the continued interest of resolving any unnecessary proofs of claims in an efficient manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other things, to allow the Debtors to file omnibus objections on substantive bases, to further expand the number of claims that may be included on an objection, and to approve additional forms of notice. *Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091]. On June 14, 2019, the Court granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional*

14

*Forms of Notice, and (D) Granting Related Relief* [ECF No. 7440] (the "<u>Amended Omnibus</u>
<u>Objection Procedures</u>").

29.     Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus
Objection Procedures, the Court has held hearings related to one hundred twenty-three omnibus
objections filed by the Commonwealth, COFINA, HTA, and/or ERS, as well as thirty-three
individual objections. After hearings held on January 30, 2019, March 13, 2019, April 24, 2019,
June 12, 2019, July 24, 2019, September 11, 2019, and October 30, 2019, the Court sustained
seventy-four omnibus objections and thirty-two individual objections, resulting in thousands of
proofs of claim filed against the Commonwealth, HTA, ERS, and/or COFINA being disallowed
and expunged, and hundreds of other claims being reclassified to be asserted against another of
the Debtors. Twenty-two omnibus objections to claims filed against the Commonwealth, HTA
and ERS were heard and orally granted on December 11, 2019. Furthermore, twenty-seven
omnibus objections to claims filed against the Commonwealth, HTA and ERS were heard and
orally granted on January 29, 2020. Based upon rulings and orders of the Court to date,
approximately 56,000 claims, asserting approximately $43 trillion in liability against the
Commonwealth, HTA, COFINA, and ERS, have been disallowed and will be expunged from the
claims registry in the Title III proceedings upon entry of final orders.

30.     This Two Hundred Fifty-Eighth Omnibus Objection is filed in accordance with the
Court's Amended Omnibus Objection Procedures.

## <u>OBJECTIONS TO PROOFS OF CLAIM</u>

31.     Claims that are "unenforceable against the debtor and property of the debtor, under
any agreement or applicable law" should be disallowed. 11 U.S.C. § 502(b)(1). While a properly
executed and filed proof of claim constitutes *prima facie* evidence of the validity of the claim, *see*

Fed. R. Bankr. P. 3001(f), made applicable to this case by PROMESA section 310, the objecting

party may overcome this *prima facie* evidence with evidence which, if believed, would refute at

least one of the allegations essential to the claim. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.),

*aff'd*, 242 F.3d 367 (2d Cir. 2000); *see also Factors Funding Co. v. Fili (In re Fili)*, 257 B.R. 370,

372 (1st Cir. B.A.P. 2001) ("[A] claim is presumed valid until an objecting party has introduced

evidence sufficient to rebut the claimant's prima facie case." (citation omitted)).

32.      The Amended Omnibus Objection Procedures allow the Commonwealth to file an

omnibus objection to multiple proofs of claim on any basis provided for in Federal Rule of

Bankruptcy Procedure 3007(d)(1)-(7), as well as on other substantive bases set forth in the

Amended Omnibus Objection Procedures.

33.      The Two Hundred Fifty-Eighth Omnibus Objection seeks to disallow, in

accordance with the Amended Omnibus Objection Procedures, bondholder claims that seek

amounts for which the Commonwealth is not liable because the claim asserts liability based on (a)

an ownership interest in bonds issued by COFINA; (b) an ownership interest in bonds issued by

GDB; (c) an ownership interest in AFICA bonds, which are neither issued by nor guaranteed by

the Commonwealth; and/or (d) an ownership interest in PRASA bonds, which are neither issued

by nor guaranteed by the Commonwealth.  Some of the bondholders claims should also be

disallowed for the additional reason that another part of the claim is duplicative in part of one or

more master proofs of claim filed against the Commonwealth on behalf of the holders of certain

bonds.  **Exhibit A** hereto further specifies why each of the claims (collectively, the "Claims to Be

Disallowed") should be disallowed in their entirety.

## A. No Liability for COFINA Bondholder Claims

34.     As identified in **Exhibit A** hereto, some of the Claims to Be Disallowed purport to assert claims based, in part, on an alleged ownership interest in bonds issued by COFINA (collectively the "Partial COFINA Bondholder Claims").

35.     As explained above, the Settlement Order resolved the Commonwealth-COFINA Dispute, and, pursuant to Paragraph 55 of the Settlement Order, all claims against the Commonwealth arising from or relating to the relationship of the Commonwealth and COFINA have been released. Additionally, pursuant to Paragraph 3(c) of the *Settlement Agreement* [ECF No. 5045-1], dated October 19, 2018, and attached to the Settlement Order (the "Settlement Agreement"), Paragraph 7 of the Amended Confirmation Order, the adversary proceeding between the Commonwealth and COFINA concerning the Commonwealth-COFINA Dispute has been dismissed with prejudice following the approval of the compromise and settlement of the Commonwealth-COFINA Dispute. Furthermore, pursuant to Paragraph 29(f) of the Amended Confirmation Order, claims, such as the Partial COFINA Bondholder Claims, that arise from or relate to the relationship of the Commonwealth and COFINA were released. Amended Confirmation Order, ¶ 29(f).[7] Accordingly, the Partial COFINA Bondholder Claims should be disallowed because these claims based on an alleged ownership interest in COFINA Bonds have been satisfied, released, and/or discharged pursuant to the Settlement Order, Settlement

---

[7] Pursuant to the Plan, "Claim" is defined as "[a]ny right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise." Plan § 1.53.

Agreement, Amended Confirmation Order, and Plan.

### B. No Liability for GDB Bondholder Claims

36.     As identified in **Exhibit A** hereto, some of the Claims to Be Disallowed purport to assert claims based in part on the alleged ownership of bonds issued by GDB (collectively, the "Partial GDB Bondholder Claims").

37.     Each of the Partial GDB Bondholder Claims purport to be based in part on the ownership of GDB Bonds that were subject to the Qualifying Modification, which provided for the issuance of new securities in exchange for the cancellation of the GDB Bonds and the extinguishment of the Commonwealth's guarantee of certain GDB Bonds, and thus the Commonwealth is no longer liable for these claims. Accordingly, each of the Partial GDB Bondholder Claims has been released pursuant to the approval and consummation of the Qualifying Modification. As noted above, the Qualifying Modification provides, among other things, that holders of GDB Bonds shall release GDB and its affiliates from claims relating to the GDB Bonds and any action or omission of GDB and its affiliates with respect to any indebtedness of or loan to GDB. GDB is a public corporation and instrumentality of the Commonwealth. The Commonwealth, thus, is an affiliate of GDB within the scope of the release pursuant to the Qualifying Modification. Accordingly, the Partial GDB Bondholder Claims were released upon the consummation of the Qualifying Modification on November 29, 2018. Because the Partial GDB Bondholder Claims are unenforceable against the Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be disallowed because they seek recovery of amounts for which the Commonwealth is not liable.

### C. No Liability for Claims Based on AFICA Bonds

38.     As identified in **<u>Exhibit A</u>** hereto, some of the Claims to Be Disallowed purport to assert claims based, in part, on an alleged ownership interest in AFICA bonds which were neither issued by nor guaranteed by the Commonwealth (collectively, the "<u>Partial AFICA Bondholder Claims</u>").

39.     Each of the Partial AFICA Bondholder Claims purports to assert various liabilities against the Commonwealth associated with AFICA Bonds not guaranteed by the Commonwealth. AFICA, however, is not a Title III debtor, and is a separate, legally distinct entity from the Commonwealth.   Indeed, each of the offering statements issued in connection with the AFICA Bonds states that the AFICA Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than AFICA.  Moreover, each of the Partial AFICA Bondholder Claims fails to comply with the applicable rules does not assert a basis for asserting a claim against the Commonwealth for bonds issued by AFICA that are neither guaranteed by nor a debt of the Commonwealth.  Because of this failure to comply with the applicable rules, neither the Debtors nor the Court are able to determine the validity of the Partial AFICA Bondholder Claims.

### D. No Liability for PRASA Senior Lien Bonds

40.     As identified in **<u>Exhibit A</u>** hereto, some of the Claims to Be Disallowed purport to assert claims based, in part, on the alleged ownership of bonds issued by the PRASA (collectively, the "<u>Partial PRASA Senior Lien Bondholder Claims</u>").

41.     Each of the Partial PRASA Bondholder Claims asserts liabilities associated with PRASA Senior Lien Bonds issued by PRASA, which is not a Title III Debtor, and is a separate, legally distinct entity from the Commonwealth.   In addition, the Commonwealth has not guaranteed repayment for the Senior Lien Bonds.  The PRASA No Liability Claim does not assert

a basis for asserting a claim against the Commonwealth for bonds issued by PRASA that are not guaranteed by the Commonwealth. Because of this failure to comply with the applicable rules, neither the Debtors nor the Court are able to determine the validity of the PRASA No Liability Claim.

### E.  Duplicate Bond Claims

42.     In addition, certain of the Claims to Be Disallowed purport to assert liability, in part, on the basis of bonds issued by ERS, HTA, PBA, PRASA, and/or PRPFC (collectively, the "Duplicate Bond Claims").

43.     Each of the Duplicate Bond Claims purports to assert liability against the Commonwealth associated with one or more bonds that is duplicative of one or more Master Claims, which as described above were filed in the Commonwealth Title III Case on behalf of the holders of certain bonds and notes issued by ERS, HTA, PBA, PRASA, and PRPFC. Any failure to disallow the Duplicate Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Commonwealth, to the detriment of other stakeholders in the Commonwealth Title III Case. The holders of the Duplicate Bond Claims will not be prejudiced by the disallowance of their claims because the liabilities associated with the Duplicate Bond Claims are subsumed within one or more Master Claims.

### F.  Duplicate Secondarily Insured Bond Claims

44.     Finally, certain of the Claims to Be Disallowed purport to assert, in part, liabilities against the Commonwealth associated with one or more PRASA Secondarily Insured Bonds.

45.     The CUSIP numbers associated with such PRASA Secondarily Insured Bonds correspond to bonds issued by PRASA bearing original CUSIP numbers. Those original CUSIP numbers, which reflect bond issuances in which the claimants hold ownership interests, are listed

in one or more Master Claims.   Therefore, the Secondarily Insured Bonds assert liabilities
associated with bonds issued by PRASA that are duplicative of liabilities asserted by one or more
Master Claims.  Any failure to disallow the PRASA Secondarily Insured Bond Claims will result
in the applicable claimants potentially receiving an unwarranted double recovery against the
Commonwealth, to the detriment of other stakeholders in the Commonwealth Title III Case. The
holders of the PRASA Secondarily Insured Bond Claims will not be prejudiced by the partial
disallowance of their claims because the liabilities associated with the PRASA Secondarily Insured
Bond Claims are subsumed within one or more Master Claims.

46.     Because of one or more of the foregoing reasons, the Commonwealth respectfully
requests that the Claims to Be Disallowed be disallowed in their entirety.   In support of the
foregoing, the Commonwealth relies on the *Declaration of Jay Herriman in Support of the Two
Hundred Fifty-Eighth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to
No Liability and Duplicate Bondholder Claims*, dated September 11, 2020, attached hereto as
**Exhibit B**.

## NOTICE

47.     In accordance with the Amended Omnibus Objection Procedures, the
Commonwealth is providing notice of this Two Hundred Fifty-Eighth Omnibus Objection to (a)
the individual creditors subject to this Two Hundred Fifty-Eighth Omnibus Objection, (b) the U.S.
Trustee, and (c) the Master Service List (as defined by the *Thirteenth Amended Case Management
Procedures* [ECF No. 13512-1]), which is available on the Debtors' case website at
https://cases.primeclerk.com/puertorico.   The notice for this Two Hundred Fifty-Eighth Omnibus
Objection is attached hereto as **Exhibit C**.  Spanish translations are being filed and served with
this objection of the Two Hundred Fifty-Eighth Omnibus Objection and supporting exhibits

attached hereto.  The Commonwealth submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **RESERVATION OF RIGHTS**

48.    This Two Hundred Fifty-Eighth Omnibus Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors or the rights of any other party in interest in these Title III proceedings to object to the Claims to Be Disallowed or any other claims on any ground whatsoever.  The Debtors expressly reserve all further substantive or procedural objections.  Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the rights of the Debtors or any other party in interest in these Title III proceedings to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (e) a waiver of the rights of the Debtors or any other party in interest in these Title III proceedings under PROMESA, the Bankruptcy Code or any other applicable law.

## **NO PRIOR REQUEST**

49.    No prior request for the relief sought in this Two Hundred Fifty-Eighth Omnibus Objection has been made to this or any other court.

WHEREFORE the Commonwealth respectfully requests entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting the Commonwealth such other and further relief as is just.

Dated: September 11, 2020
San Juan, Puerto Rico

Respectfully submitted,

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Daniel J. Perez-Refojos
USDC No. 303909
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial*
*Oversight and Management Board*
*for Puerto Rico, as representative for*
*the Commonwealth of Puerto Rico*

**Fecha de la vista: 28 de octubre de 2020, a las 9:30 a.m. (AST)**
**Fecha límite para responder: 14 de octubre de 2020, a las 4:00 p.m. (AST)**

---

**REVISE DETENIDAMENTE LA PRESENTE OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS
## PARA EL DISTRITO DE PUERTO RICO

| | |
|---|---|
| *In re*: <br><br> JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO, <br><br> como representante del <br><br> ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al.*, <br><br> Deudores.[1] | PROMESA <br> Título III <br><br> Núm. 17 BK 3283-LTS <br><br> (Administrado Conjuntamente) <br><br> **La presente radicación guarda relación con el ELA.** |

**DUCENTÉSIMA QUINCUAGÉSIMA OCTAVA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO A RECLAMACIONES NO RELACIONADAS CON LA RESPONSABILIDAD Y RECLAMACIONES DUPLICADAS DE LOS BONISTAS**

A la Honorable Juez de Distrito de los Estados Unidos, Laura Taylor Swain:

---

[1] Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y denominados conjuntamente con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de Casos de Quiebra debido a ciertas limitaciones en el programa informático).

El Estado Libre Asociado de Puerto Rico (el "ELA" o el "Deudor"), a través de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como representante del ELA conforme a la sección 315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radica la presente ducentésima quincuagésima octava objeción global (la "Ducentésima quincuagésima octava objeción global") en la que se solicita que se rechacen en su totalidad las evidencias de reclamaciones mencionadas en el **Anexo A** de presente documento, cada una de las cuales se basa presuntamente en endeudamientos, en su totalidad o en parte, por los que los Deudores no tienen responsabilidad, puesto que en la reclamación se alegan uno o más de los siguientes motivos: a) una participación patrimonial en bonos emitidos por la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA"); b) una participación patrimonial en bonos emitidos por el Banco Gubernamental de Fomento para Puerto Rico (el "BGF"); c) una participación patrimonial en bonos emitidos por la Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental (la "AFICA"), que no están garantizados por el ELA; y/o d) una participación patrimonial en bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA"), bonos que no están garantizados por el ELA. Algunas reclamaciones que aparecen en el **Anexo A** del presente documento deben rechazarse por el motivo adicional de que otra parte de la reclamación está parcialmente duplicada en relación con una o más evidencias de reclamaciones principales radicadas contra el ELA en nombre de los tenedores de determinados bonos. En apoyo de la Ducentésima quincuagésima octava objeción global, los Deudores respetuosamente manifiestan lo siguiente:

---

[2]  PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101 a 2241.

## JURISDICCIÓN

1.       El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme a la sección 306(a) de PROMESA.

2.       La sede judicial de este distrito es la competente conforme a la sección 307(a) de PROMESA.

## ANTECEDENTES

### A.  Órdenes de Fecha Límite

3.       El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III del ELA"). El 5 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para COFINA conforme a la sección 304(a) de PROMESA, iniciando un caso de Título III de dicho cuerpo legal (el "Caso de Título III de COFINA", y junto con el Caso de Título III del ELA, los "Casos de Título III"). El 1 de junio de 2017, el Tribunal dictó una orden por la que concedió la administración conjunta del Caso de Título III del ELA y el Caso de Título III de COFINA únicamente con fines procesales. ECF núm. 242.[3]

4.       El 16 de enero de 2018, los Deudores radicaron su *Moción de una orden que A) fije fechas límite y procedimientos para radicar Evidencias de reclamaciones y B) apruebe la forma*

---

[3] Salvo disposición en contrario contenida en el presente documento, todas las citas ECF harán referencia al Caso núm. 17-BK-3283-LTS.

*y la manera de su notificación* [ECF núm. 2255] (la "Moción de Fecha Límite"). Conforme a la

*Orden que A) fija fechas límite y procedimientos para radicar Evidencias de reclamaciones y B)*

*aprueba la forma y la manera de su notificación* [núm. ECF. 2521] (la "Orden Inicial de Fecha

Límite"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite y fijó fechas

límite y procedimientos para radicar evidencias de reclamaciones en el marco del Caso de Título

III del ELA. Luego de la moción informativa de determinados acreedores, y del apoyo de los

Deudores, el Tribunal dictó a continuación la *Orden que A) extendió fechas límite para radicar*

*Evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF núm.

3160] (conjuntamente con la Orden Inicial de Fecha Límite, las "Órdenes de Fecha Límite"),

extendiendo dichas fechas límite hasta el 29 de junio de 2018, a las 04:00 p.m. (AST).

## B.  Caso de Título III de COFINA y resolución de la controversia entre el ELA y COFINA

5.       COFINA es una corporación pública y organismo del ELA, que constituye una

entidad corporativa y política independiente y separada del ELA, creada en virtud de la Ley núm.

91 de la Asamblea Legislativa del ELA. Conforme a la Resolución enmendada y modificada sobre

los bonos del fondo de interés apremiante, adoptada el 13 de julio de 2007, en su versión

enmendada del 19 de junio de 2009, y de conformidad con otras resoluciones complementarias,

COFINA emitió una serie de bonos por un monto total de aproximadamente $17,000 millones

para, entre otras cosas, sufragar determinadas obligaciones de deuda del Banco Gubernamental de

Fomento para Puerto Rico y de la Corporación para el Financiamiento Público de Puerto Rico (los

"Bonos COFINA"). El Bank of New York Mellon actúa como fiduciario con respecto a los Bonos

COFINA.

6.       La Junta de Supervisión radicó el *Tercer plan enmendado de ajuste de la*

*Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III*

(el "Plan") [ECF núm. 4652] el 9 de enero de 2019. El Tribunal examinó la confirmación del Plan y las objeciones formuladas a este en una vista celebrada los días 16 y 17 de enero de 2019.

7.       El 4 de febrero de 2019, el Tribunal confirmó el Plan que incorporaba el pacto y la conciliación de la controversia sobre si, luego de examinar todas las contestaciones y reconvenciones sustantivas y procesales, incluidas cuestiones constitucionales, los impuestos sobre la venta y uso supuestamente empeñados por COFINA para garantizar la deuda son propiedad del ELA o de COFINA conforme a la normativa legal aplicable (la "Controversia entre el ELA y COFINA"). *Véase la Orden y la Sentencia que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF núm. 5048]. Ese mismo día, el Tribunal aprobó el pacto y la conciliación de la Controversia entre el ELA y COFINA conforme al *Dictamen abreviado y orden que aprueba la conciliación entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF núm. 5045] (la "Orden de Conciliación"). El 5 de febrero de 2019, el Tribunal dictó una *Orden y Sentencia enmendadas que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF núm. 5055] (la "Orden de Confirmación Enmendada"). El Plan entró en vigor el 12 de febrero de 2019 (la "Fecha de Entrada en Vigor"), una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III, según el título III de PROMESA, y B) acontecimiento de la Fecha de Entrada en Vigor* [Caso núm. 17 BK 3284-LTS, ECF núm. 587].

**C. Procedimientos conforme al Título VI del BGF y modificación calificada**

8.     El BGF es una entidad pública y organismo gubernamental del ELA, creado por la Asamblea Legislativa en 1948 para ayudar al Gobierno del ELA (el "Gobierno") a llevar a cabo sus tareas fiscales y a desempeñar su responsabilidad con mayor eficacia en relación con el desarrollo de la economía del ELA. El 28 de abril de 2017, la Junta de Supervisión aprobó por unanimidad el Plan fiscal del BGF de febrero de 2017, que contemplaba una terminación ordenada de las actividades del BGF sobre la base de la determinación de que el BGF no era viable a largo plazo dadas sus condiciones financieras vigentes en ese momento.

9.     El 12 de julio de 2017, la Junta de Supervisión dictó una resolución por la que se autorizaba al BGF, conforme a la sección 601(e) de PROMESA, a ampararse en el Título VI de PROMESA. El 10 de agosto de 2018, el BGF radicó una solicitud de aprobación de una modificación calificada, conforme a la sección 601(m)(1)(D) de PROMESA (la "Modificación Calificada"), ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

10.     El 7 de noviembre de 2018, el Tribunal aprobó la Modificación calificada conforme al artículo 601(m)(1)(D) de PROMESA. *Véase* ECF núm. 270 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 7 de nov. de 2018). La Modificación Calificada disponía, entre otras cosas, i) la emisión de nuevos bonos por la Autoridad de Recuperación de Deuda del BGF (*GDB Debt Recovery Authority*) a cambio de la cancelación (entre otras cosas) i) de determinados bonos de participación y reclamaciones de bonos garantizados (conjuntamente, "Bonos del BGF"); ii) la extinción de la garantía del ELA de los bonos garantizados tras el intercambio y cancelación de los bonos garantizados; y iii) la liberación de reclamaciones de los tenedores de los Bonos del BGF contra el BGF y sus afiliados en relación con (entre otras cosas) cualquier inversión con el BGF o una compra, venta o transferencia de

cualquier garantía o derecho del BGF, y cualquier acción u omisión con respecto a un endeudamiento o préstamo al BGF (incluidos cualesquiera pagarés emitidos o depósitos poseídos por el BGF) o del BGF. Declaración de solicitación, en 57-60, núm. ECF. 1-15 en *Banco Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 10 de ago. de 2018).

11.      El 29 de noviembre de 2018, el BGF anunció la consumación de la Modificación Calificada relativa al BGF. Nota de prensa, *el Gobierno de Puerto Rico anuncia la consumación de la Modificación calificada relativa al BGF*, gobernador de Puerto Rico (29 de nov. de 2018), disponible en http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**D. Deuda de los bonos emitidos por la AFICA**

12.      La AFICA es una corporación pública y organismo gubernamental del ELA creada por la Ley núm. 121 de la Asamblea Legislativa de Puerto Rico, aprobada el 27 de junio de 1977 (en su versión enmendada, complementada y codificada en las Leyes de Puerto Rico, Título 12, § 1251 y siguientes.) Leyes de Puerto Rico, Título 12, § 1254. La AFICA facilita el financiamiento de los proyectos para fomentar el desarrollo económico del ELA, lo que incluye medidas para la promoción y construcción de nuevas infraestructuras industriales, comerciales, turísticas, agrícolas, educativas, médicas y de control medioambiental.

13.      En 2000, la AFICA emitió Bonos de Renta Turística, 2000 Serie A (los "Bonos Palma del Mar 2000 Serie A"), por un monto total de $30,000,000, para financiar, en parte, mejoras en Palmas del Mar Country Club. Los Bonos Palmas del Mar 2000, Serie A, son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Palmas Country Club, Inc. La declaración de oferta emitida en relación con los Bonos Palmas del Mar 2000 Serie A dispone que los bonos "no constituirán endeudamiento del [ELA] ni de ninguna de sus subdivisiones políticas". *Véase, por ejemplo*, Autoridad para el Financiamiento de Facilidades

7

Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta Turística, 2000 Serie A (Proyecto Palmas del Mar Country Club), *disponible en* https://emma.msrb.org/Security/Details/AD88773EB8772C017819AB0B921B2DAD5.

14.     En 2011, la AFICA emitió Bonos de Renta de Refinanciamiento Industrial, 2011 Serie A (los "Bonos Galería 2011 Serie A", y junto con los Bonos Palmas del Mar 2000 Serie A, los "Bonos AFICA") por un monto total de $59,649,744.50 para financiar, en parte, el funcionamiento de cierto espacio comercial minorista y de oficinas perteneciente y operada por Caparra Hills, Inc. Los Bonos Galería 2011 Serie A, son pagaderos únicamente a través del reembolso de un acuerdo de préstamo celebrado entre la AFICA y Caparra Hills, Inc. La declaración de oferta emitida en relación con los Bonos Galería 2011 Serie A dispone que los bonos "no constituyen endeudamiento del ELA ni de ninguna de sus subdivisiones políticas, salvo [la AFICA], y ni el ELA ni ninguna de sus subdivisiones políticas, salvo [la AFICA], será responsable de su pago". *Véase, por ejemplo,* Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental, Declaración de Oferta, Bonos de Renta Industrial 2011 Serie A (Proyecto Galería Tower en San Patricio), *disponible en* https://emma.msrb.org/Security/Details/A95ABBB582ECE40E0D6ED039C687C3542.

### E.  Deuda de los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico

15.     La AAA fue creada de conformidad con la Ley núm. 40 el 1 de mayo de 1945. La AAA es una corporación del Gobierno de Puerto Rico y fue creada para la prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 144.

16.     La Ley para crear la AAA autoriza a la AAA a emitir bonos. 22 L.P.R.A. § 144(g). Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA emitir bonos, lo que incluye la Resolución núm. 1583, en su versión enmendada y modificada el 7

de marzo de 2008 (la "Resolución núm. 1583"). En 2008, la AAA emitió unos bonos de renta, Serie A, por un monto del principal de $1,316,204,456 (los "Bonos Prioritarios Serie A 2008"). Además en 2012, la AAA emitió simultáneamente unos bonos de renta, Serie 2012 A, por un monto del principal de $1,800,450,00 (los "Bonos Prioritarios Serie A 2012") y unos bonos de renta, Serie 2012 B, por un monto del principal de $295,245,000 (los "Bonos Prioritarios Serie B 2012", y junto con los Bonos Prioritarios Serie A 2012 y los Bonos Prioritarios Serie A 2008, los "Bonos de Gravamen Prioritarios de la AAA").

17.     Los tenedores de los Bonos de Gravamen Prioritarios de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de la AAA, cuando tales bonos hayan sido pagaderos. El ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritarios.

### F. Evidencias de reclamaciones principal relativas a la deuda de los bonos: Caso de Título III del ELA

18.     Conforme a la Orden Inicial de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamaciones principal contra el deudor pertinente, en su propio nombre y en el de todos los tenedores de las reclamaciones por bonos relacionadas con la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos fiduciarios, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite, ¶ 5(a). Como se explica más adelante, las evidencias de reclamaciones principales (conjuntamente, las "Reclamaciones Principales") han sido radicadas en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos o pagarés emitidos por el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE"), la Autoridad de Carreteras y

9

Transportación de Puerto Rico (la "ACT"), la Autoridad de Edificios Públicos de Puerto Rico (la "AEP"), la AAA y/o la Corporación para el Financiamiento Público de Puerto Rico (la "CFP").

19.     **_SRE_**: el SRE es un _trust_ establecido por el ELA en 1951 para fomentar el bienestar económico de los empleados públicos. El SRE es un organismo gubernamental, separado e independiente del Gobierno del ELA y de otros de sus órganos. _Véase_ 3 L.P.R.A. § 775. Presuntamente, conforme a la _Resolución sobre bonos para el financiamiento de pensiones_, adoptada el 24 de enero de 2008, y las resoluciones complementarias, el SRE emitió unos bonos preferentes y subordinados relativos al financiamiento de pensiones (los "Bonos del SRE"), por un monto total del principal de aproximadamente $2900 millones.[4]   BNYM actúa como agente fiscal con respecto a los Bonos del SRE. En nombre de los tenedores de los Bonos del SRE, BNYM radicó una evidencia de reclamaciones principal en el marco del Caso de Título III del ELA (la "Evidencia de reclamaciones principal SRE-ELA"), alegando reclamaciones contra el SRE entre otras cosas sobre la base de la adopción de la Resolución conjunta 188 y la Ley 106, que juntas crearon un sistema de retiro "pay as you go" en virtud del cual los pensionados reciben pagos de los fondos generales del ELA, en lugar de las Contribuciones de los empleadores, que presuntamente constituye garantía de los Bonos. BNYM radicó inicialmente una evidencia de reclamaciones que fue registrada por Prime Clerk, LLC ("Prime Clerk"), el 24 de mayo de 2018,

---

[4]  El 12 de marzo de 2019, el Comité Oficial de Acreedores no Asegurados radicó una _Objeción global a reclamaciones radicadas por los tenedores de los bonos emitidos por el SRE_ [Caso núm. 17-3566, ECF núm. 381], sobre el motivo de que la emisión de los bonos supuso un exceso de la potestad legal del SRE, por lo que era _ultra vires_, lo cual convertía los Bonos del SRE en nulos de pleno derecho. El 23 de abril de 2019, el Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico radicó una _Objeción global del Comité Oficial de Retirados del Estado Libre Asociado de Puerto Rico, conforme al Código de Quiebras, artículo 502, y la regla 3007 de las Reglas de Quiebras, a reclamaciones radicadas o alegadas por los tenedores de los Bonos del SRE contra el SRE y el ELA_ [ECF núm. 6482], sobre el motivo, entre otros, de que la emisión de los bonos fue _ultra vires_. El SRE se reserva los derechos a impugnar la emisión de los bonos sobre cualquier motivo, también sobre el motivo de que los bonos del SRE eran _ultra vires_, y cualquier otro motivo recogido en las objeciones precedentes.

como Evidencia de reclamaciones núm. 16775, y posteriormente radicó una reclamación

enmendada, el 25 de mayo de 2018, que fue registrada por Prime Clerk como Evidencia de

reclamaciones núm. 32004.[5]

20.     _ACT_: la ACT es una corporación pública y organismo del ELA, que constituye una

entidad corporativa y política independiente y separada del ELA, creada en virtud de la Ley núm.

74-1965 de la Asamblea Legislativa del ELA ("Ley para crear la ACT"). La ACT se encarga de la

construcción, funcionamiento y mantenimiento de carreteras y otros sistemas de transportación en

el ELA. _Véase_ 9 L.P.R.A. § 2002. La Ley para crear la ACT autoriza a la ACT a emitir bonos.

_Véase_ 9 L.P.R.A. §§ 2004(g), (h), (l). Conforme a dicha normativa legal, la ACT emitió varias

series de bonos al amparo de dos resoluciones diferentes (los "Bonos de la ACT"): _i)_ Resolución

núm. 68-18, adoptada el 13 de junio de 1968 (la "Resolución 1968"), y _ii)_ Resolución núm. 98-06,

adoptada el 26 de febrero de 1998 (la "Resolución 1998"). Desde el 21 de mayo de 2017, la fecha

de petición de la ACT, aproximadamente $830 millones del monto principal de los bonos emitidos

conforme a la Resolución 1968 quedan pendientes de pago, y aproximadamente $3400 millones

del monto principal de los bonos emitidos conforme a la Resolución 1998 quedan igualmente

pendientes de pago. BNYM actúa como agente fiscal con respecto a los Bonos de la ACT. En

nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias de reclamaciones

principales en el marco del Caso de Título III del ELA (la "Reclamaciones principales ACT-

ELA"), cada una de las cuales alegaba "una reclamación garantizada, contingente y no liquidada

---

[5] El 22 de mayo de 2019, el ELA radicó una objeción a la Evidencia de reclamaciones principal del SRE.
Véase Objeción de la Junta de Supervisión y Administración Financiera, conforme al artículo 502 del
Código de Quiebras y la regla 3007 de las Reglas de Quiebras, a reclamaciones radicadas o alegadas
contra el ELA por el Bank of New York Mellon, como agente fiscal (Reclamación núm. 16775) [ECF
núm. 7075]. En aras de la claridad, la presente Ducentésima quincuagésima octava objeción global se
radica sin perjuicio de los derechos de las partes en relación con dicha objeción, lo que incluye
cualesquiera derechos a intervenir, que quedan reservados.

contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Agente Fiscal o los Propietarios puedan tener contra el ELA, en virtud de la ley o equidad. . . .” *Véase* Adenda de la Evidencia de reclamaciones núm. 121053, ¶ 15; Adenda de la Evidencia de reclamaciones núm. 120982, ¶ 15; Adenda de la Evidencia de reclamaciones núm. 115380, ¶ 15.[6]

21.    *AEP*: la AEP presuntamente emitió bonos para financiar edificios de oficinas y otras instalaciones arrendadas a varios departamentos, agencias públicas y organismos del ELA. U.S. Bank National Association ("US Bank") y US Bank National Trust Association ("US Bank Trust") actúan como agentes fiscales en relación con determinados bonos de renta emitidos por la AEP, conforme a lo explicado en la nota al pie 3 de la Evidencia de reclamaciones núm. 62833 (los "Bonos de la AEP"), y, en nombre de los tenedores de los Bonos de la AEP, radicó una evidencia de reclamaciones principal en el marco del Caso de Título III del ELA por todos los montos pendientes de pago adeudados (la "Evidencia de reclamaciones principal de la AEP"), que fue registrada por Prime Clerk como Evidencia de reclamaciones núm. 62833. La Evidencia de reclamaciones principal de la AEP reivindica reclamaciones liquidadas por aproximadamente $4000 millones en concepto de capital principal presuntamente impagado, $160 millones en concepto de intereses presuntamente impagados y por reembolso de comisiones y gastos de los agentes fiscales, además de reclamaciones no liquidadas y contingentes por la totalidad de los montos adeudados "en razón de la totalidad de las reclamaciones que el Agente Fiscal tenga o pueda tener en relación con las Obligaciones de bonos pendientes, conocidos o por conocer, contra

---

[6] Aunque BNYM radicó inicialmente tres evidencias de reclamaciones registradas por Prime Clerk como Evidencias de reclamaciones núms. 21286, 26541 y 35277, estas fueron sustituidas y enmendadas por las Evidencias de reclamaciones núms. 121053, 120982 y 115380.

el ELA y aquellos que pretendan actuar en nombre del ELA". . . ." Cláusula de la Evidencia de reclamaciones principal de la AEP, ¶¶ 19-21.

22.      *AAA*: la AAA es propietaria y se encarga de los sistemas de suministro público de agua y de aguas residuales en Puerto Rico. La AAA emitió determinados bonos de renta (los "Bonos de la AAA"), conforme a la Resolución de la Autoridad de Acueductos y Alcantarillados de Puerto Rico núm. 1583, *por la que se garantizan los bonos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico avalados por el Estado Libre Asociado de Puerto Rico*, y algunas resoluciones complementarias. El Banco Popular de Puerto Rico ("Banco Popular") actúa como fideicomisario en relación con los Bonos de la AAA, y radicó una evidencia de reclamaciones principal contra el ELA en nombre de los tenedores de los Bonos de la AAA, que fue registrada por Prime Clerk como Evidencia de reclamaciones núm. 22620 (la "Reclamación principal de la AAA"). La Reclamación principal de la AAA alega "una reclamación contingente contra el ELA en relación con los Bonos por un importe de al menos $284,755,000, además de todos los intereses y primas generados sobre los Bonos a partir de la Fecha de Petición, así como la totalidad de las tasas, costos y gastos u otros cargos acumulados que hayan devengado o sean cobrables en relación de tales Bonos". Adenda de la Evidencia de reclamaciones de la AAA, ¶ 9.

23.      Determinados bonos de la AAA han sido asegurados por una o más aseguradoras de bonos municipales en el mercado primario o en el secundario. El seguro de bonos municipales se obtiene en el mercado primario cuando el municipio emisor de los bonos contrata una compañía de seguros para suscribir una póliza de seguro en relación con dicha serie de bonos. En el caso de que un bono no se asegure en el mercado primario, los tenedores de tales bonos no asegurados podrían optar por obtener un seguro a través del mercado secundario. Los tenedores de los bonos no asegurados que pretendan obtener un seguro en el mercado secundario entran en una relación

13

contractual directamente con una aseguradora de bonos municipales, por lo que el emisor original no es parte en dicho proceso de contratación. Cuando un tenedor de un bono no asegurado obtiene una póliza de seguro en el mercado secundario, se emite un nuevo número CUSIP que corresponde a los números CUSIP originales asignados a los bonos en el momento de su emisión. Determinados bonos emitidos por la AAA han sido asegurados en el mercado secundario y, en consecuencia, se han emitido nuevos números CUSIP que corresponden a los bonos emitidos por la AAA que llevan números CUSIP originales (los "Bonos AAA asegurados en el mercado secundario").

24. **_CFP_**: la CFP es una corporación subsidiaria del BGF creada conforme a la Resolución núm. 5044 de la Junta Directiva del BGF, en su versión enmendada (la "Resolución núm. 5044"), adoptada de conformidad con la autoridad concedida en virtud de la Ley núm. 17 de la Asamblea Legislativa de Puerto Rico, aprobada el 23 de septiembre de 1948, en su versión enmendada. Proporciona a los organismos públicos, dependencias, municipios y a otras subdivisiones del ELA mecanismos alternativos para que puedan satisfacer sus necesidades de financiamiento. La CFP tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones. U.S. Bank Trust actúa como fiduciario en relación con unos bonos, serie 2012A y series 2011A y B, emitidos por la CFP (los "Bonos de la CFP"). En nombre de los tenedores de los Bonos de la CFP, US Bank Trust radicó una evidencia de reclamaciones contra el ELA, que fue registrada por Prime Clerk como Evidencia de reclamaciones núm. 13374.

## G. Evidencias de reclamaciones radicadas contra el ELA, los Procedimientos relativos a objeciones globales y las Objeciones a reclamaciones

25. Hasta la fecha, se han radicado aproximadamente 174,000 evidencias de reclamaciones contra los Deudores, que han sido registradas por Prime Clerk, LLC. Dichas evidencias de reclamaciones ascienden a un total de $43.6 billones en reclamaciones radicadas contra los Deudores, además de los montos no liquidados reclamados.

26. De las evidencias de reclamaciones radicadas, aproximadamente 111,300 han sido radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. De conformidad con las condiciones de las Órdenes de Fecha Límite, muchas de estas reclamaciones no tenían que haber sido radicadas en absoluto o adolecen de otro tipo de vicios; por ejemplo, haber sido enmendadas posteriormente, no alegar una reclamación por la que los Deudores sean responsables, estar duplicadas en relación con otras evidencias de reclamaciones o no aportar información necesaria para que los Deudores determinen si la reclamación es válida.

27. Para resolver eficazmente el mayor número posible de las evidencias de reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su *Moción para que se dicte una orden que a) apruebe procedimientos limitados relativos a objeciones globales, b) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y c) conceda el remedio relacionado* [ECF núm. 4052] (la "Moción de Procedimientos Globales"). El Tribunal concedió el remedio solicitado en la Moción de Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden A) que aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado* [ECF núm. 4230]; *Procedimientos relativos a Objeciones Globales* [ECF núm. 4230-1] (conjuntamente, los "Procedimientos Iniciales relativos a Objeciones Globales"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF núm. 4381] (la "Orden de Notificación").

28.     En aras del interés constante de resolver eficazmente cualesquiera evidencias de reclamaciones innecesarias, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden A) que apruebe Procedimientos Enmendados relativos a Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF núm. 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden A) que aprueba Procedimientos Enmendados relativos a Objeciones Globales, B) exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF núm. 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

29.     Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal celebró vistas vinculadas con 123 objeciones globales radicadas por el ELA, COFINA, la ACT y/o el SRE, así como con 33 objeciones individuales. Tras las vistas celebradas el 30 de enero de 2019, el 13 de marzo de 2019, el 24 de abril de 2019, el 12 de junio de 2019, el 24 de julio de 2019, el 11 de septiembre de 2019 y el 30 de octubre de 2019, el Tribunal concedió 74 objeciones globales y 32 objeciones individuales, lo cual resultó en que miles de las evidencias de reclamaciones radicadas contra el ELA, la ACT, el SRE y/o COFINA fueron rechazadas y suprimidas, y cientos de otras reclamaciones fueron reclasificadas como radicadas contra otros Deudores. Veintidós objeciones globales a reclamaciones radicadas contra el ELA, la ACT y el SRE fueron atendidas y concedidas

16

oralmente el 11 de diciembre de 2019. Además, 27 objeciones globales a reclamaciones radicadas

contra el ELA, la ACT y el SRE fueron atendidas y concedidas oralmente el 29 de enero de 2020.

Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, aproximadamente

56,000 reclamaciones que reivindicaban aproximadamente $43 billones en responsabilidad contra

el ELA, la ACT, COFINA y el SRE fueron rechazadas y serán retiradas del registro de

reclamaciones en el marco de los procedimientos radicados conforme al Título III una vez dictadas

las órdenes finales.

30.     Esta Ducentésima quincuagésima octava objeción global se radica de conformidad

con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

## OBJECIONES A EVIDENCIAS DE RECLAMACIONES

31.     Las reclamaciones que sean "inejecutables contra el deudor y los bienes de este, en

virtud de cualquier contrato o normativa legal aplicable" deben rechazarse. Título 11 U.S.C., §

502(b)(1). Aunque una evidencia de reclamaciones debidamente formalizada y radicada constituye

una prueba *prima facie* de validez de la reclamación, *véase* R. R. del Proc. de Quiebr. 3001(f),

aplicable al presente procedimiento en virtud de la sección 310 de PROMESA, la parte que radique

la objeción podrá superar dicha evidencia *prima facie* con pruebas que, según su criterio, refutarían

al menos una de las alegaciones esenciales para la reclamación. *In re Reilly*, 245 B.R. 768, 773

(B.A.P. 2d Cir.), *aff'd*, 242 F.3d 367 (2d Cir. 2000); *véase también Factors Funding Co. c. Fili (In*

*re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[S]e presume que una reclamación es válida

hasta que la parte que radique la objeción haya introducido evidencias suficientes para refutar el

caso *prima facie* de del reclamante". (se omite cita)).

32.     Los Procedimientos Enmendados relativos a Objeciones Globales permiten al ELA

radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las bases

recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de Quiebra

(*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas establecidas en
los Procedimientos Enmendados relativos a Objeciones Globales.

33.     La Ducentésima quincuagésima octava objeción global pretende que se rechacen,
de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales,
reclamaciones de los bonistas que reclaman montos por los que el ELA no tiene responsabilidad
porque en la reclamación se alega responsabilidad por a) una participación patrimonial en bonos
emitidos por COFINA; b) una participación patrimonial en bonos emitidos por el BGF; c) una
participación patrimonial en los bonos AFICA, que no son emitidos ni están garantizadas por el
ELA; y/o d) una participación patrimonial en los bonos AAA, que no son emitidos ni están
garantizadas por el ELA. Algunas de las reclamaciones de los bonistas también deben rechazarse
por el motivo adicional de que otra parte de la reclamación está parcialmente duplicada en relación
con una o más evidencias de reclamaciones principales radicadas contra el ELA en nombre de los
tenedores de determinados bonos. El **Anexo A** especifica además por qué cada una de las
reclamaciones (conjuntamente, "Reclamaciones que han de ser rechazadas") debe ser rechazada
en su totalidad.

**A. Ausencia de responsabilidad por reclamaciones relativas a los bonistas de COFINA**

34.     Conforme a lo identificado en el **Anexo A** del presente documento, algunas
Reclamaciones que han de ser rechazadas contienen presuntamente reclamaciones basadas
parcialmente en supuesta participación patrimonial en los bonos emitidos por COFINA
(conjuntamente, las "Reclamaciones parciales relativas a los bonistas de COFINA").

35.     Como se explicó anteriormente, la Orden de Conciliación resolvió la Controversia
relativa al ELA y a COFINA y, conforme al párrafo 55 de la Orden de Conciliación, la totalidad
de las reclamaciones contra el ELA, surgidas o vinculadas con la relación del ELA y COFINA,

han sido liberadas. Además, conforme al párrafo 3(c) del *Acuerdo de Conciliación* [ECF núm. 5045-1], de fecha 19 de octubre de 2018, que se adjunta a la Orden de Conciliación (el "Acuerdo de Conciliación"), y el párrafo 7 de la Orden de Confirmación Enmendada, el procedimiento contencioso entre el ELA y COFINA sobre la Controversia entre el ELA y COFINA ha sido rechazado de forma definitiva luego de la aprobación del pacto y la conciliación de la Controversia entre el ELA y COFINA. Además, conforme al párrafo 29(f) de la Orden de Confirmación Enmendada, este tipo de reclamaciones (por ejemplo, las Reclamaciones parciales relativas a los bonistas de COFINA) que surgen o están vinculadas con la relación entre el ELA y COFINA, fueron liberadas. Orden de Confirmación Enmendada, ¶ 29(f).[7] En consecuencia, las Reclamaciones parciales relativas a los bonistas de COFINA deben rechazarse porque dichas reclamaciones basadas en una presunta participación patrimonial en los Bonos COFINA han sido satisfechas, liberadas y/o liquidadas conforme a la Orden de Conciliación, el Acuerdo de Conciliación, la Orden de Confirmación Enmendada y el Plan.

### B. Ausencia de responsabilidad por reclamaciones relativas a los bonistas del BGF

36.   Conforme a lo identificado en el **Anexo A** del presente documento, algunas Reclamaciones que han de ser rechazadas contienen presuntamente reclamaciones basadas parcialmente en supuesta participación patrimonial en los bonos emitidos por el BGF (conjuntamente, las "Reclamaciones parciales relativas a los bonistas del BGF").

---

[7] Conforme al Plan, "Reclamación" se define como "[c]ualquier derecho a un pago o cumplimiento, independientemente de si tal derecho consta en una sentencia, es liquidado, no liquidado, fijo, accidental, vencido, no vencido, controvertido, no controvertido, legal, en equidad, garantizado o no garantizado, conocido o desconocido, reclamado o no reclamado; o cualquier derecho a un remedio en equidad por incumplimiento o ejecución de un cumplimiento, independientemente de si tal derecho a un remedio en equidad consta en una sentencia, es fijo, accidental, vencido, no vencido, controvertido, no controvertido, garantizado o no garantizado, y la totalidad de las deudas, procesos, indemnizaciones por daños y perjuicios, derechos, remedios, pérdidas, responsabilidades, obligaciones, sentencias, acciones, causas radicadas, procedimientos o reclamaciones de cualquier tipo o naturaleza, en derecho, equidad o de cualquier otra forma". Plan § 1.53.

37. La totalidad de las Reclamaciones relativas a los bonistas del BGF supuestamente se basan, en parte, en la participación patrimonial en los Bonos del BGF objeto de la Modificación Calificada, que dispuso la emisión de nuevos títulos de valores a cambio de la cancelación de los Bonos del BGF y la extinción de la garantía del ELA relativa a determinados Bonos del BGF, por lo que el ELA ya no tiene responsabilidad con respecto a dichas reclamaciones. En consecuencia, cada una de las Reclamaciones parciales relativas a los bonistas del BGF ha sido liberada conforme a la aprobación y la consumación de la Modificación Calificada. Como se señaló anteriormente, la Modificación Calificada dispone, entre otras cosas, que los tenedores de los Bonos del BGF liberarán al BGF y sus afiliados de las reclamaciones relacionadas con los Bonos del BGF, y de cualquier acción u omisión del BGF y sus afiliados con respecto a todo endeudamiento del BGF o préstamo al BGF. El BGF es una entidad y organismo público del ELA. En consecuencia, el ELA es un afiliado del BGF según el ámbito de la liberación conforme a la Modificación Calificada. Por tanto, las Reclamaciones parciales relativas a los bonistas del BGF fueron liberadas tras la consumación de la Modificación Calificada el 29 de noviembre de 2018. Puesto que las Reclamaciones parciales relativas a los bonistas del BGF son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de Quiebras, dichas reclamaciones deben rechazarse puesto que solicitan la recuperación de montos por los que el ELA no tiene responsabilidad.

**C. Ausencia de responsabilidad relativa a reclamaciones basadas en los Bonos AFICA**

38. Conforme a lo identificado en el **Anexo A** del presente documento, algunas Reclamaciones que han de ser rechazadas contienen presuntamente reclamaciones basadas parcialmente en supuesta participación patrimonial en los bonos AFICA que ni son emitidos ni están garantizados por el ELA (conjuntamente, las "Reclamaciones parciales relativas a los bonistas de la AFICA").

20

39.     Cada una de las Reclamaciones parciales relativas a los bonistas de la AFICA
pretende alegar varias responsabilidades contra el ELA vinculadas con los Bonos AFICA que no
están garantizados por el ELA. Sin embargo, la AFICA no es deudor de Título III y es una entidad
separada y jurídicamente independiente del ELA. En efecto, cada una de las declaraciones de oferta
emitidas en relación con los Bonos AFICA dispone que los Bonos AFICA no constituyen deuda
del ELA ni de ninguna de sus subdivisiones políticas, con la excepción de AFICA. Además,
ninguna de las Reclamaciones parciales relativas a los bonistas de la AFICA cumple con las
normas aplicables ni proporciona fundamento alguno para alegar una reclamación contra el ELA
por los bonos emitidos por la AFICA que no están garantizados por el ELA ni constituyen su
deuda. Como consecuencia de dicho incumplimiento de la normativa aplicable, ni los Deudores ni
el Tribunal pueden determinar la validez de las Reclamaciones parciales relativas a los bonistas de
la AFICA.

**D.  Ausencia de responsabilidad relativa a los Bonos AAA de gravamen prioritarios**

40.     Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, algunas
Reclamaciones que han de ser rechazadas contienen presuntamente reclamaciones basados
parcialmente en supuesta participación patrimonial en los bonos emitidos por la AAA
(conjuntamente, las "<u>Reclamaciones parciales de gravamen prioritario relativas a los bonistas de
la AAA</u>").

41.     Cada una de las Reclamaciones parciales relativas a los bonistas de la AAA alega
responsabilidades vinculadas con los Bonos AAA de gravamen prioritario emitidos por la AAA,
que no es Deudor de Título III, y es una entidad separada y jurídicamente independiente del ELA.
Además, el ELA no ha garantizado el reembolso de los Bonos de gravamen prioritario. La
Reclamación no relacionada con la responsabilidad de la AAA no proporciona fundamento alguno

para alegar una reclamación contra el ELA por los bonos emitidos por la AAA que no están garantizados por el ELA. Como consecuencia de dicho incumplimiento de la normativa aplicable, ni los Deudores ni el Tribunal pueden determinar la validez de la Reclamación no relacionada con la responsabilidad de la AAA.

**E. Reclamaciones duplicadas por bonos**

42.     Además, determinadas Reclamaciones que han de ser rechazadas pretenden alegar responsabilidad, en parte, sobre la base de los bonos emitidos por el SRE, la ACT, la AEP, la AAA y/o la CFP (conjuntamente, las "Reclamaciones duplicadas por bonos").

43.     Cada una de las Reclamaciones duplicadas por bonos pretende alegar responsabilidad contra el ELA vinculada con uno o más bonos que están duplicados en relación con una o más Reclamaciones Principales que, según se explicó anteriormente, fueron radicadas en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos y pagarés emitidos por el SRE, la ACT, la AEP, la AAA y la CFP. Si las Reclamaciones duplicadas por bonos no son rechazadas, ello resultaría en que las correspondientes reclamantes obtuvieran potencialmente una recuperación duplicada no justificada contra el ELA, en detrimento de otras partes interesadas en el Caso de Título III del ELA. Los autores de las Reclamaciones duplicadas por bonos no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones duplicadas por bonos figuran en una o más Reclamaciones Principales.

**F. Reclamaciones duplicadas de bonos asegurados en el mercado secundario**

44.     Por último, algunas de las Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidades contra el ELA vinculadas con uno o más Bonos AAA asegurados en el mercado secundario.

45.     Los números CUSIP vinculados con dichos Bonos AAA asegurados en el mercado secundario corresponden a bonos emitidos por la AAA que llevan los números CUSIP originales. Dichos números CUSIP originales, que reflejan las emisiones de los bonos en los que los reclamantes tienen participación patrimonial, se mencionan en una o más Reclamaciones Principales. En consecuencia, en los Bonos asegurados en el mercado secundario se alegan responsabilidades vinculadas con bonos emitidos por la AAA que constituyen duplicados en relación las responsabilidades alegadas en una o más Reclamaciones Principales. Si las Reclamaciones de Bonos AAA asegurados en el mercado secundario no son rechazadas, ello resultaría en que las correspondientes reclamantes obtuvieran potencialmente una recuperación duplicada no justificada contra el ELA, en detrimento de otras partes interesadas en el Caso de Título III del ELA. Los autores de las Reclamaciones de Bonos AAA asegurados en el mercado secundario no se verán perjudicados por el hecho de que se rechacen parcialmente sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones de Bonos AAA asegurados en el mercado secundario figuran en una o varias Reclamaciones Principales.

46.     Por uno o más de los motivos mencionados, el ELA solicita respetuosamente que las Reclamaciones que han de ser rechazadas sean rechazados en su totalidad. En apoyo de lo anterior, el ELA invoca la *Declaración de Jay Herriman en apoyo de la Ducentésima quincuagésima octava objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico a Reclamaciones no relacionadas con la responsabilidad y reclamaciones duplicadas de los bonistas*, de fecha 11 de septiembre de 2020, adjunta al presente como **Anexo B**.

### NOTIFICACIÓN

47.     De conformidad con los Procedimientos Enmendados relativos a Objeciones Globales, el ELA notifica la presente Ducentésima quincuagésima octava objeción global a) a los acreedores individuales objeto de esta Ducentésima quincuagésima octava objeción global, b) al

U.S. Trustee, y c) a la Lista maestra de notificaciones (según se define en los *Procedimientos de administración de casos enmendados núm. 13* [ECF núm. 13512-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.primeclerk.com/puertorico. La notificación relativa a la Ducentésima quincuagésima octava objeción global se adjunta al presente como **Anexo C**. Las traducciones al español de la Ducentésima quincuagésima octava objeción global y de la totalidad de los anexos justificativos que se adjuntan al presente se radican y envían con la presente objeción. El ELA sostiene que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

## RESERVA DE DERECHOS

48.     La presente Ducentésima quincuagésima octava objeción global se limita a los motivos expuestos en este documento. En consecuencia, esta se radica sin perjuicio de los derechos de los Deudores, o de los derechos de cualesquiera otras partes interesadas de dichos procedimientos radicados conforme al Título III, a objetar a las Reclamaciones que han de ser rechazadas o a cualesquiera otras reclamaciones que fuere. Los Deudores se reservan expresamente el derecho a radicar toda otra objeción sustantiva o procesal. Ninguna disposición contenida en el presente documento, ni ninguna acción adoptada conforme a tal remedio, tienen por objetivo, ni se interpretarán en el sentido de que: a) constituyan una admisión en cuanto a la validez de cualesquiera reclamaciones contra los Deudores; b) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas de dichos procedimientos radicados conforme Título III, a impugnar cualquier reclamación sobre la base de los motivos que fuere; c) constituyan una promesa o requisito para pagar cualquier reclamación; d) constituyan una solicitud o autorización a asumir cualquier acuerdo, contrato o arrendamiento anteriores a la petición conforme al artículo 365 del Código de Quiebras; o e) constituyan una renuncia a los

24

derechos que asisten a los Deudores, o a cualesquiera otras partes interesadas de estos procedimientos radicados conforme Título III, conforme a PROMESA, el Código de Quiebras o cualquier otra normativa legal aplicable.

## **AUSENCIA DE SOLICITUDES PREVIAS**

49.     No se ha radicado ninguna solicitud de remedio previa a la presente Ducentésima quincuagésima octava objeción global ni ante este Tribunal ni ante ningún otro órgano judicial.

POR LO QUE el ELA solicita respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda al ELA cualesquiera otros remedios que se consideren justos.

Fecha: 11 de septiembre de 2020
San Juan (Puerto Rico)

Respetuosamente sometida,

[*Firma en la versión en inglés*]
Hermann D. Bauer
USDC núm. 215205
Daniel J. Pérez-Refojos
USDC núm. 303909
Gabriel A. Miranda
USDC núm. 306704
**O'NEILL & BORGES LLC**
250 Avenida Muñoz Rivera, local 800
San Juan, PR 00918-1813
Tel.: (787) 764-8181
Fax: (787) 753-8944

[*Firma en la versión en inglés*]
Martín J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel.: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión
y Administración Financiera para
Puerto Rico como representante del
Estado Libre Asociado de Puerto
Rico*