UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

```
-----------------------------------------------------------------x
In re:                                            :
                                                  :
THE FINANCIAL OVERSIGHT AND                       :
MANAGEMENT BOARD FOR PUERTO RICO,                 :    PROMESA
                                                  :    Title III
        as representative of                      :
                                                  :    Case No. 17-BK-3283 (LTS)
THE COMMONWEALTH OF PUERTO RICO et al.,           :
                                                  :    (Jointly Administered)
                                                  :
        Debtors.¹                                 :
-----------------------------------------------------------------x
```

**REPLY OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF URGENT MOTION TO LIFT
<u>STAY TO ALLOW COMMITTEE TO PURSUE OBJECTION TO GO PRIORITY</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 3

    I.      Oversight Board's Indefinite Stay Severely Prejudices Committee .................................. 3

    II.     Granting Committee's Motion Will Not Cause Hardship to Commonwealth ................... 8

    III.    Continuing Stay Is Not Most Economical Use of Resources .......................................... 10

    IV.    Oversight Board's Characterizations of Committee's Motives Are Wrong and
           Unfair ................................................................................................................................ 11

CONCLUSION ............................................................................................................................ 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Armstrong v. Manzo*,
   380 U.S. 545 (1965)...................................................................................................................5

*Dionne v. Bouley*,
   757 F.2d 1344 (1st Cir. 1985).....................................................................................................5

*Richards v. Jefferson Cty.*,
   517 U.S. 793 (1996)...................................................................................................................5

**Statutes**

Bankr. Code
   § 502..........................................................................................................................................4
   § 1106(a) ...................................................................................................................................4

**Other Authorities**

Fed. R. Civ. P.
   R. 9019..............................................................................................................................2, 3, 10

PROMESA § 101(e)(2)(D)..............................................................................................................7

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors[1] (the "Committee") hereby submits this reply (the "Reply") in support of the *Urgent Motion of Official Committee of Unsecured Creditors to Lift Stay to Allow Committee to Pursue Objection to GO Priority* [Docket No. 13726] (the "Motion")[2] and in response to (a) the Oversight Board's objection to the Motion [Docket No. 14141] (the "Objection") and (b) its Status Report filed on September 9, 2020 [Doc. 14195] (the "September 2020 Status Report"). In support of this Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Oversight Board's Objection and September 2020 Status Report remove any doubt (to the extent there was any) that the fundamental premise for the current stay of the GO Priority Objection—*i.e.*, a global settlement with GO bondholders as reflected in a filed plan of adjustment—no longer exists. The Oversight Board now openly admits that it seeks to strike "a **new** global settlement"[3] or "**another** global settlement."[4] Similarly, the Oversight Board concedes that its renegotiations do not concern minor amendments, but are "**comprehensive**"[5] in nature. The Oversight Board cannot even claim that it is close to reaching a new settlement, noting that discussions are at a "**nascent stage**"[6] and that, although the "parties remain

---

[1] The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.
[2] Capitalized terms not defined herein shall have the meanings ascribed thereto in the Motion.
[3] Objection ¶ 21 (emphasis added).
[4] *Id.* ¶ 22 (emphasis added).
[5] *Id.* ¶ 19. (emphasis added). The Oversight Board's description of its current efforts as a "**comprehensive renegotiation**" of the settlement is a far cry from the language used by the Oversight Board's counsel at the June 4, 2020 hearing, who spoke instead of "the likelihood . . . that [the settlement] has to be **adjusted**" and likened future plan changes to the minor amendments typically made to filed plans of adjustment prior to confirmation in chapter 11 cases. June 4, 2020 Hr'g Tr. at 19:23, 19:24-20:2 (emphasis added).
[6] September 2020 Status Report ¶ 15 (emphasis added).

**hopeful**,"[7] "there can be **no assurance** that a revised agreement will be reached."[8] Indeed, with its settlement discussions subject to numerous "sources of disruption,"[9] including uncertain economic fundamentals, changing Oversight Board membership, and upcoming elections (which means that a new government will not be sworn in until January 2021), the Oversight Board cannot even say at this point "whether a modified plan of adjustment is **capable of being reached**."[10] Furthermore, the Oversight Board has discarded any pretense of concrete temporal limits to the stay, as it now admits that it is seeking, in effect, an open-ended stay that should remain in place as long as the Oversight Board makes "progress" in negotiations and provides status reports to the Court.

2.  Essentially, the Oversight Board takes the position that, even after the passage of over 4 years since its appointment without any resolution of the GO priority issue, as long as it "hopes" to reach a new plan settlement (which is far from certain at this time), the Court should bar the Committee from exercising its statutory rights to object to claims, because the Oversight Board believes that the exercise of such rights interferes with its chosen negotiation strategy.[11] The Oversight Board even asserts that the Committee's attempt to object to claims is an improper infringement upon the Oversight Board's exclusive right to propose a plan of adjustment. Obviously, the Motion is **not** an attempt to infringe upon the Oversight Board's plan exclusivity, nor is the Committee seeking to terminate exclusivity or proposing its own plan. In

---

[7] Objection ¶ 24. (emphasis added). *See also id.* ¶ 22 ("The Oversight Board needs more time to continue the mediation sessions and, **hopefully**, reach another global settlement with its major stakeholders") (emphasis added).
[8] *Id.* ¶ 3 (emphasis added).
[9] *Id.* ¶ 22.
[10] September 2020 Status Report ¶ 16.
[11] The posture adopted by the Oversight Board here is similar to the equally problematic posture adopted by the Oversight Board, PREPA, and AAFAF (collectively, the "Government Parties") in their objection to the Committee's motion to terminate the Government Parties' Rule 9019 motion [Doc. 14148] (the "Objection to Termination"). There, the Government Parties propose continual adjournments based on the filing of vague status reports while citing to "fluid" and "unprecedented" circumstances which they "continue to assess" and which are a "moving target," meaning that "no one has full visibility as to a sustainable debt load for PREPA" (*i.e.*, the information that is the *sine qua non* of successful negotiations). Objection to Termination ¶ 19.

fact, that would be impossible, given that the Oversight Board retains plan exclusivity for the duration of the Title III cases.

3. Nor should the Court be swayed by the Oversight Board's predictions that chaos will reign if the GO Priority Objection moves forward. To the contrary, allowing the GO Priority Objection to move forward now could motivate parties to reach a reasonable settlement. And, with respect to the Oversight Board's characterization of the Committee as selfish and litigious, the Committee submits that its interests with respect to the GO Priority Objection are completely aligned with the Commonwealth, and that, as the only fiduciary of the Commonwealth's general unsecured creditors, it is duty-bound to protect the interests of its constituents by seeking to litigate the GO priority issue in order to protect those interests.

4. For all these reasons, and as further detailed in the Motion and below, the Court-imposed stay should be lifted to allow the Committee to proceed with the GO Priority Objection.

## ARGUMENT

### I. Oversight Board's Indefinite Stay Severely Prejudices Committee

5. As noted, the Oversight Board's Objection and the September 2020 Status Report make abundantly clear that (a) the current settlement with GO bondholders is dead and (b) the Oversight Board seeks for the stay to remain in place indefinitely. Indeed, the Oversight Board admits—incredibly, only a few lines after protesting that it is "not seeking an unlimited stay"[12]—that it believes the stay should remain in place "[a]s long as meaningful progress continues to be made during the Court-appointed mediation process and the Oversight Board continues to be transparent about the status of negotiations."[13] This formulation is so vague as to be meaningless. Put plainly, the Oversight Board now takes the position that (subject to the empty

---

[12] Objection ¶ 25.
[13] *Id.*

-3-

condition that it show "progress" and provide "transparency") it can deprive the Committee indefinitely of its statutory right to object to claims on the grounds that the exercise of such rights would interfere with the Oversight Board's plan negotiation strategy.[14] The Court should reject this position.

6. The Oversight Board's position is directly contrary to Congress' decision to allow parties in interest to object to claims and **not** to limit that right to the Oversight Board. As detailed in the Motion, section 502 of the Bankruptcy Code allows the Committee to object to claims, and Congress chose to incorporate section 502 into PROMESA without incorporating other provisions, such as section 1106(a) of the Bankruptcy Code, that might be construed as limiting the right to object to claims to a debtor in possession or trustee.

7. The Court should also reject the Oversight Board's proposal that regular reports to the Court can be counted on to provide transparent disclosure regarding the progress of its plan negotiations, thereby justifying the continuation of the stay. As an initial matter, the Oversight Board has conducted (and is expected to continue to conduct) its plan negotiations in strict confidentiality—under the umbrella of mediation privilege—making it impossible for the Oversight Board to provide transparent reporting even if it wished to do so. In fact, the Oversight Board's status reports filed to date are largely devoid of any substance or specifics. For example:

- The May 1, 2020 Status Report [Docket No. 13018] disclosed only that discussions with creditors were expected to occur after the filing of the Commonwealth fiscal plan.

- The July 15, 2020 Status Report [Docket No. 13660], disclosed only that the Oversight Board would entertain discussions in the coming weeks with creditors

---

[14] To be clear, the issue here is **not** the ability of the Committee or another party to veto a settlement already negotiated by the Oversight Board, but the ability of the Oversight Board to foreclose litigation merely by engaging in discussions that might, at some indefinite point in the future, result in a settlement.

-4-

> who were parties to the PSA with guidance from the mediation team, and that those discussions would take into account certain recent case developments.
>
> - The September 2020 Status Report discloses only that the Oversight Board is in discussions with AAFAF, parties to the PSA, and certain individual creditors and parties in interest, that these discussions are at a "nascent" stage and subject to numerous uncertainties, and that more time is needed to "discern the possible direction of such discussions," including "whether a modified plan of adjustment is capable of being reached."

The Oversight Board's claim that it "has been fully transparent" to date and that it "will continue to be transparent by filing additional status reports"[15] bodes poorly for the future, foreshadowing that the Oversight Board likely will continue to provide minimal information while simultaneously arguing that the stay should be preserved. And to be clear, as far as the Committee is concerned, the plan negotiation process conducted to date has not involved the Committee and has not been transparent, other than to the extent the "end result" of plan negotiations was described to the Committee.

8. But even if the Oversight Board's proposed "progress and transparency" standard were workable (and it is not), that does not change the fact that absent a schedule for the Committee to raise its issues, the Committee is prejudiced by an indefinite stay.[16] This point is driven home by the Objection, which repeatedly suggests not only that the Oversight Board "needs more time,"[17] but that its negotiations are far from resolution. For example, the Objection emphasizes the depth and complexity of the issues the Oversight Board must work through to

---

[15] Objection ¶ 6.
[16] Indeed, the proposition that the Committee should be barred from pursuing the GO Priority Objection indefinitely implicates serious due process issues. *See Dionne v. Bouley*, 757 F.2d 1344, 1353 (1st Cir. 1985) ("As the Supreme Court has said, it is not enough to provide a party with an opportunity to be heard: the hearing must be provided 'at a meaningful time and in a meaningful manner.'" (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))), including by suggesting that the Committee should have no remedy to enforce its rights. *See, e.g., Richards v. Jefferson Cty.*, 517 U.S. 793, 804 (1996) (under due process of law "a state may not deprive a person of all existing remedies for the enforcement of a right" (quoting *Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*, 281 U.S. 673, 681–82 (1930))).
[17] *Id.* ¶ 22.

reach a new settlement,[18] including the impact of COVID-19, which the parties in interest have only "begun to better understand."[19] Further, the Oversight Board warns of "sources of disruption"[20] that may complicate its progress, as well as economic uncertainty "as to when a recovery will occur and what shape it will take."[21] Indeed, with so many unknown factors, it is unclear whether an effective negotiation is even possible now. Given this uncertainty, the Oversight Board proposes a formula to request an endless series of stay extensions based on complications and difficulties that are sure to arise in the future.

9. The Committee's concerns are further validated by the September 2020 Status Report, which, far from providing any definite time frame for a new settlement, raises a variety of issues suggesting that negotiations are likely to continue far into the future. For example, according to the Oversight Board:

- It is "premature" to propose a confirmation schedule because discussions are at a "**nascent**" stage and will be influenced by "material litigations" and the "political and electoral process on-Island."[22] Put simply, the negotiation process is just beginning, and it is unclear how long such discussions will take.

- Certain diligence must still be completed and the fiscal plan's assumptions must "continue to be tested in **the coming months**."[23] In other words, the Oversight Board currently lacks the economic information necessary to discuss what a workable settlement would look like, and will continue to lack such information for some time.

- The negotiations are also delayed by the "ongoing electoral process and the closure of the current legislative sessions"[24] and because it is currently unclear "whether the electoral process will need to be completed"[25] before a deal can be reached. But the outcome of elections will not be known until November, and **new officeholders, cabinet secretaries, and other key players will not be**

---

18 *See, e.g. id.* ("the Oversight Board and the Commonwealth are, once again, navigating uncharted waters"); *id.* (emphasizing "novelty and the severity" of Commonwealth's situation).
19 *Id.*
20 *Id.* (describing disruption of change in gubernatorial leadership following election).
21 *Id.*
22 September 2020 Status Report ¶ 15.
23 *Id.*
24 *Id.*
25 *Id.* ¶ 16.

-6-

      **seated until January 2021**. It therefore appears that the Oversight Board intends to seek to keep the stay in place for several months, at least.

- An undefined "brief respite" is needed, not to complete negotiations, but instead to "discern the possible direction"[26] of discussions and to "realize . . . **whether a modified plan of adjustment is capable of being reached**"[27] and "whether any remaining hurdles of such plan **can be overcome**."[28] Thus, not only does the Oversight Board lack a settlement or a clear time frame for reaching one, but it also has significant doubts about whether any settlement is possible at all.

- The Oversight Board's membership is in a state of flux, with the terms of two members having expired on August 31, 2020, and the term of José B. Carrión III, the current Chairman, to expire on October 5, 2020. Though the Oversight Board states that it "continues to carry out all functions and duties while awaiting appointment of a new Board, or additional or replacement members,"[29] the current situation raises questions about how membership changes (including the potential appointment of an entirely new slate of members) will impact negotiations with creditors.[30]

In sum, with the Oversight Board's negotiations just beginning, and the future clouded by uncertainty, the one thing that is clear is that continuing the stay of the GO Priority Objection on an indefinite basis will prejudice the rights of the Committee.

      10.    Furthermore, the Court should reject the Oversight Board's argument that the Committee is effectively seeking to terminate exclusivity, because the GO Claim Objection may impact a "material issue that the Oversight Board is **hopeful** of compromising and settling in connection with a plan of adjustment."[31] It should be obvious that the Committee's Motion has nothing to do with plan exclusivity. The Committee has clearly not sought to terminate exclusivity or file a separate plan—nor is that even possible. Nevertheless, the Oversight Board argues that the Court should bar any action that, in the Oversight Board's view, could impact

---

[26] *Id.*
[27] *Id.* (emphasis added).
[28] *Id.* (emphasis added).
[29] *Id.* ¶ 9.
[30] Another question that arises is what impact (if any) the departure of the Oversight Board's Chairman may have on the Oversight Board's ability to operate normally given that he is a special "Category A" member of the Oversight Board who is required to maintain a primary residence or have a primary place of business in Puerto Rico pursuant to section 101(e)(2)(D) of PROMESA.
[31] Objection ¶ 20 (emphasis added).

plan terms that the Oversight Board "hopes" to settle, on the grounds that allowing such action to go forward could infringe upon the Oversight Board's exclusive right to file a plan of adjustment. Indeed, under the Oversight Board's contorted understanding of plan exclusivity, it could designate issues as "off limits" to litigation by merely commencing negotiations to resolve such issues through a plan settlement. In the end, the Oversight Board's theory of plan exclusivity is just another pretense for it to improperly limit the Committee's statutory right to object to claims.

11. To repeat, the Stay Order was premised on a plan settlement and a definite time table for plan confirmation in which the Committee could raise its issues before the Court.[32] Now, there is no settlement and the Oversight Board proposes to transform the limited stay into one of indefinite duration. Thus, contrary to the Oversight Board's assertion that "none of the Court's findings has changed,"[33] in fact **everything has changed**.

## II. Granting Committee's Motion Will Not Cause Hardship to Commonwealth

12. Given that the Oversight Board's rationale for its original assertion of hardship (*i.e.*, the existence of a settlement that would be disrupted by litigation) has disappeared, the Oversight Board now asserts that the Committee's pursuit of the GO Priority Objection would be "beyond disruptive,"[34] leading to "disorder"[35] and the "inevitable break down of settlement discussions."[36]

13. The Oversight Board, however, provides no evidence for its conclusion that the "sky will fall," and, in any event, such predictions should not sway the Court. For one, there is

---

[32] *See* Omnibus Hr'g Tr. at 216:15-20, Mar. 4, 2020 ("The parties objecting to the stay have not demonstrated a countervailing risk of prejudice. They retain their rights to object to the Amended Plan of Adjustment, and they also have the opportunity to accept the proposed settlement, and if the Plan is confirmed, receive the distributions contemplated thereunder.").
[33] Objection ¶ 24.
[34] *Id.* ¶ 19.
[35] *Id.* ¶¶ 4 and 20.
[36] *Id.* ¶¶ 6 and 23.

no reason to believe that litigation affecting creditor recoveries must by its nature make a global settlement impossible. Indeed, allowing the GO Priority Objection merely to proceed forward at this time could provide much-needed pressure to help convince GO bondholders to make the concessions necessary to bring about a feasible deal consistent with the inherent risk they face from the GO Priority Objection. Moreover, to date, after more than 4 years since the Oversight Board's appointment, COFINA is the only Title III case with a confirmed plan. The COFINA plan came about because the Court held a hearing on summary judgment motions in the COFINA-Commonwealth litigation which lead the parties to realistically assess their litigation positions. Progress on the GO Priority Objection may provide similar assistance here, especially in light of the fact that, despite these cases having been filed more than three years ago, the GO priority issue still remains unresolved.

14. Further, the Oversight Board's concerns about possible disruption to its settlement negotiations are, like the rest of the Objection, based on the unstated and unsupported assumption that the Oversight Board has a right to engage in settlement negotiations free from interference from the exercise of other parties' statutory rights.[37] As discussed above, the Oversight Board cannot simply make a "wish list" of issues it hopes to settle with particular creditors under a plan and then suspend the statutory rights of other parties.

15. While the Committee understands the superficial attraction of the Oversight Board's "negotiation only" position, there has to be a limit: statutory rights cannot be sacrificed

---

[37] It is striking that the Oversight Board insists the Committee is not prejudiced by the indefinite suspension of its statutory objection rights while simultaneously arguing that it is a hardship for the Oversight Board to occupy the same position it held for most of the Title III cases—without a settlement in hand, in discussions with creditors, and not blocking the Committee's statutory rights. Here, the Oversight Board's indefinite stay clearly affects the Committee's legal rights, while the Oversight Board's legal rights will remain unaffected if the stay is lifted.

on the altar of negotiation based on the mere "hope" that a new deal may materialize at some unspecified point in the future.[38]

### III. Continuing Stay Is Not Most Economical Use of Resources

16. As discussed in the Motion, given that the plan settlement with the GO bondholders is dead, any potential savings of party and judicial resources from continuing the stay are entirely speculative, and cannot justify keeping the stay in place. This is especially the case for the GO Priority Objection, which presents purely legal issues that can be resolved without discovery. In this respect, the Oversight Board's predictions (based on alleged past examples that are never cited) of disorderly and time consuming litigation are not persuasive.[39] This Court undoubtedly has the ability to issue the procedural directives necessary to impose order and speed upon any litigation before it. Moreover, the expenditure of resources to judicially resolve the GO Priority Objection will result in savings later, as the GO priority issue will then be "off the table" in connection with any future confirmation litigation.[40] Thus, continuing the stay of the GO Priority Objection under the current circumstances is not the most economical use of party and judicial resources, and the GO Priority Objection should be allowed to move forward.

---

[38] The Committee also notes that the involvement of the mediation team in the Oversight Board's plan negotiations does not sanitize the Oversight Board's improper attempt to suppress the Committee's statutory rights. The Committee has not been included in current mediation discussions, and mediation is by its nature a voluntary, non-binding process. Nor does the existence of mediation mean that a settlement has been reached or even that the parties are close to a settlement, as the Objection and the September 2020 Status Report make clear.

[39] *See* Objection ¶ 26 ("The litigation disputes in this restructuring are anything but orderly, often drawing out for many months and acting as catalysts for unpredictable events.").

[40] It is also worth observing that litigation of the GO Priority Objection to a ruling now is likely to be less expensive than litigation regarding the propriety of a plan settlement of such issues later (*i.e.*, the procedure proposed by the Oversight Board), despite the relatively relaxed standard for approval of settlements under Rule 9019. This is so because litigating a Rule 9019 settlement will likely involve significant discovery regarding the Oversight Board's decision to settle the GO priority issue, while the GO Priority Objection can be litigated without any discovery or factual evidence. When considering the relative costs of these scenarios, one must also consider the expenses that will be incurred by the Oversight Board's advisors if they engage in lengthy open-ended negotiations subject to numerous complications and uncertainties, as they currently propose.

IV. **Oversight Board's Characterizations of Committee's Motives Are Wrong and Unfair**

17. Finally, the Court should disregard the Oversight Board's off-base characterizations of the Committee's motives. For one thing, the accusation that the Committee is motivated by "narrow self-interest to the detriment of the Commonwealth"[41] is simply wrong. The Committee's interest as fiduciary to all the Commonwealth's unsecured creditors—in fact, it is the only such fiduciary in these Title III cases—is **completely aligned** with the interests of the Commonwealth for the simple reason that more value retained by the Commonwealth means more potential value for unsecured creditors. Consequently, the Committee seeks (using the very same legal arguments made numerous times by the Oversight Board[42]) to challenge the asserted GO priority. If the Committee is successful in its challenge, that result would benefit the Commonwealth and give the Oversight Board more flexibility in negotiating a restructuring. Indeed, the real question here is why the Oversight Board, despite repeatedly arguing that no Commonwealth-law priorities are incorporated into Title III of PROMESA, has not only refused to take any action to challenge the GO priority but is opposing the prosecution of the GO Priority Objection by the Committee. Apparently, the Oversight Board is fearful that litigation of the GO Priority Objection at this time would force it to take the position it knows to be true because it is the position it has advocated in related matters—that Commonwealth-law priorities do not apply in Title III—because then its rationale for "peace at any price" through a settlement favorable to the GO bondholders would be destroyed.

---

[41] Objection ¶ 25. *See also id.* ¶ 19 ("The Committee entirely misses the broader picture in an effort to pursue its narrow self-interest"); ¶ 6 ("this is not the time for the Committee to pursue its narrow self-interest").
[42] Motion ¶ 26 (discussing Oversight Board's legal arguments against state-law priorities).

18. In addition, to accuse the Committee of opposing settlement discussions in favor of "massive litigation"[43] is deeply unfair. The Committee was never included in the relevant plan settlement negotiations, despite its repeated requests to be allowed to participate. It was only after a settlement had been reached in January 2020 that the Committee was informed of the terms of a lopsided plan structure that promised profound damage to the Committee's constituents: Wall Street hedge funds that bought GO bonds at steep discounts on the secondary market were to be granted rich recoveries (approximating 80% of the face value of the GO bonds), while general unsecured creditors were to be paid 3.9 cents on the dollar. It goes without saying that such a *de minimis* recovery would be a devastating outcome for many of the Committee's constituents, who include Puerto Rico-based small businesses, individual litigation plaintiffs, and other parties that cannot easily absorb a 96% haircut (especially after having waited years for payment). Under these circumstances, the Committee has sought to do what it can for its constituency, including by filing the GO Priority Objection.

## **CONCLUSION**

19. Based on the foregoing, the Committee requests that the Court grant the Motion and authorize the Committee to pursue the GO Priority Objection.

[*Remainder of page intentionally left blank.*]

---

[43] Objection ¶ 4.

WHEREFORE, the Committee respectfully requests that this Court grant the Motion and such other and further relief as this Court deems just and proper.

Dated: September 11, 2020

/s/ Luc. A. Despins
PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
Nicholas A. Bassett, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
nicholasbassett@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

- and -

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC - PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC - PR 306008)
PO Box 195075
San Juan, Puerto Rico 00919-5075
Telephone: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*