# Exhibit A
# Memorandum in Support

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO | ) | |
| | ) | Case No. 17-BK-03283 (LTS) |
| as representative of | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) | |
| | ) | |
| Debtors.[1] | ) | |
| | ) | |
| | ) | |
| In re: | ) | PROMESA |
| | ) | Title III |
| THE FINANCIAL OVERSIGHT AND | ) | |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | Case No. 17-BK-03566 (LTS) |
| | ) | |
| as representative of | ) | |
| | ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) | |
| GOVERNMENT OF THE COMMONWEALTH OF | ) | |
| PUERTO RICO, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | Adv. Proc. No. 19-00356 (LTS) |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK- 4780) (Last Four Digits of Federal Tax ID: 3747).

THE SPECIAL CLAIMS COMMITTEE OF THE )
FINANCIAL OVERSIGHT AND MANAGEMENT )
BOARD FOR PUERTO RICO, ACTING BY AND )
THROUGH ITS MEMBERS, )
)
    and )
)
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS )
(OTHER THAN COFINA), )
)
    as co-trustees of )
)
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO, )
)
    Plaintiff, )
)
v. )
)
DEFENDANT 1M, *et al.*, )
)
    Defendants. )
)
_____ )
)
THE SPECIAL CLAIMS COMMITTEE OF THE )   Adv. Proc. No. 19-00357 (LTS)
FINANCIAL OVERSIGHT AND MANAGEMENT )
BOARD FOR PUERTO RICO, ACTING BY AND )
THROUGH ITS MEMBERS, )
)
    and )
)
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF ALL TITLE III DEBTORS )
(OTHER THAN COFINA), )
)
    as co-trustees of )
)
THE EMPLOYEES RETIREMENT SYSTEM OF THE )
GOVERNMENT OF PUERTO RICO, )
)
    Plaintiff, )
)
v. )

STOEVER GLASS & CO., *et al.*,                        )
                                                     )
         Defendant.                                  )
                                                     )
                                                     )
_____             )
                                                     )        Adv. Proc. No. 19-00359 (LTS)
THE SPECIAL CLAIMS COMMITTEE OF THE                  )
FINANCIAL OVERSIGHT AND MANAGEMENT                   )
BOARD FOR PUERTO RICO, ACTING BY AND                 )
THROUGH ITS MEMBERS,                                 )
                                                     )
         and                                         )
                                                     )
THE OFFICIAL COMMITTEE OF UNSECURED                  )
CREDITORS OF ALL TITLE III DEBTORS                   )
(OTHER THAN COFINA),                                 )
                                                     )
         as co-trustees of                           )
                                                     )
THE EMPLOYEES RETIREMENT SYSTEM OF THE               )
GOVERNMENT OF PUERTO RICO,                           )
                                                     )
         Plaintiff,                                  )
                                                     )
v.                                                   )
                                                     )
DEFENDANT 1H-78H,                                    )
                                                     )
         Defendants.                                 )
                                                     )
                                                     )
_____             )
                                                     )        Adv. Proc. No. 19-00361 (LTS)
THE SPECIAL CLAIMS COMMITTEE OF THE                  )
FINANCIAL OVERSIGHT AND MANAGEMENT                   )
BOARD FOR PUERTO RICO, ACTING BY AND                 )
THROUGH ITS MEMBERS,                                 )
                                                     )
         and                                         )
                                                     )
THE OFFICIAL COMMITTEE OF UNSECURED                  )
CREDITORS OF ALL TITLE III DEBTORS                   )
(OTHER THAN COFINA),                                 )
                                                     )
                                                     )

|  |  |
|---|---|
| | ) |
| as co-trustees of | ) |
| | ) |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE | ) |
| GOVERNMENT OF PUERTO RICO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DEFENDANT 1G-50G, *et al.*, | ) |
| | ) |
| Defendants. | ) |

------------------------------------------------------------------- X


### MEMORANDUM IN SUPPORT OF THE ERS BONDHOLDERS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES AND PROCEEDINGS

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ v

TABLE OF AUTHORITIES ......................................................................................... vi

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

LEGAL STANDARD .................................................................................................... 4

ARGUMENT ................................................................................................................. 4

    I.   The ERS Bonds Are Valid and Binding Obligations of ERS ........................ 4

        A.   The ERS Enabling Act Authorized ERS to Borrow from Financial
Institutions and Through Direct Debt Placements .................................. 5

        B.   The ERS Enabling Act Authorized the ERS Bond Issuance ................. 9

        C.   Specific Statutory Reference to "Bonds" Is Not Needed ...................... 19

        D.   Precedent and Agency Interpretations Confirm ERS's Authority
to Issue the ERS Bonds ....................................................................... 26

    II.  The Bonds Are Enforceable Under UCC § 8-202 ....................................... 32

        A.   UCC § 8-202(b) is Applicable to the ERS Bonds ................................ 33

        B.   The Bondholders Are Purchasers for Value Without Notice
of the Particular Alleged Defect .......................................................... 34

    III. If the Bonds Are Invalid, the Bondholders Are Entitled to Recover in Equity ............. 42

CONCLUSION ............................................................................................................ 46

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................4

*Atl. Cleaners & Dyers, Inc. v. United States*,
286 U.S. 427 (1932) ..............................................................................................18

*Bd. of Cnty. Comm'rs of Tulsa v. Williamson*,
370 P.2d 837 (Okla. 1962) ....................................................................................10

*Berrios v. U.P.R.*,
116 D.P.R. 88, 16 P.R. Offic. Trans. 112 (1985) ..................................................43

*Black v. Cohen*,
52 Ga. 621 (1874) ..................................................................................................21

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ..............................................................................19, 20, 23

*Bowen v. Yuckert*,
482 U.S. 137 (1987) ..............................................................................................29

*Bunch's Ex'rs v. Fluvanna Cnty.*,
10 S.E. 532 (Va. 1890) ..........................................................................................11

*Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*,
564 F. Supp. 1425 (W.D. Va. 1983), *aff'd*, 740 F.2d 961 (4th Cir. 1984) ............45

*City of Brenham v. German Am. Bank*,
144 U.S. 549 (1892) ..............................................................................................25

*City of Brenham v. German-American Bank*,
144 U.S. 173 (1892) .................................................................................... *passim*

*City of Litchfield v. Ballou*,
114 U.S. 190 (1885) ..............................................................................................44

*Colegio de Ingenieros y Agrimensores de Puerto Rico v. Autoridad de Acueductos
    y Alcantarillados de Puerto Rico*,
    131 D.P.R. 735, 775 (1992) ...................................................................................29

*Comm'rs of Hendersonville v. C.A. Webb & Co.*,
    61 S.E. 670 (N.C. 1908) ........................................................................................11

*Commonwealth v. Cole*,
    164 D.P.R. 608 (2005) ...........................................................................................45

*Commonwealth ex rel. Hamilton v. Select & Common Councils of City of
    Pittsburgh*,
    34 Pa. 496 (1859) ...................................................................................................10

*Commonwealth v. SLG Negron-Rodriguez*,
    184 D.P.R. 464 (2012) ...........................................................................................46

*Commonwealth v. Town of Williamstown*,
    30 N.E. 472 (Mass. 1892) ...........................................................................10, 11, 22

*Dist. Twp. of Doon v. Cummins*,
    142 U.S. 366 (1892) ...............................................................................................44

*Dixon Cnty. v. Field*,
    111 U.S. 83 (1884) .................................................................................................44

*Doty v. Ellsbree*,
    11 Kan. 209 (1873) ................................................................................................11

*Dutton v. City of Aurora*,
    28 N.E. 461 (Ill. 1885) ......................................................................................11, 21

*Erie Railroad v. Tompkins*,
    304 U.S. 64 (1938) .................................................................................................20

*Faiella v. Fed. Nat'l Mortg. Ass'n*,
    928 F.3d 141 (1st Cir. 2019) ....................................................................................4

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ...............................................................................................19

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)....................................................................17

*Fid. Tr. & Safety Vault Co. v. Mayor of Morganfield*,
  29 S.W. 442 (Ky. 1895), *overruled in part on other grounds*, *Belknap v. City
  of Louisville*, 36 S.W. 1118 (Ky. 1896) ...................................................................11

*Forrest City v. Bank of Forrest City*,
  172 S.W. 1148 (Ark. 1915)...........................................................................................25

*Fullerton v. Cent. Lincoln People's Utility District*,
  201 P.2d 524 (Or. 1948) ...............................................................................................20

*Gonzalez Segarra v. Corporación del Fondo del Seguro del Estado*,
  188 D.P.R. 252 (2013) ...................................................................................................27

*Hatton v. Municipio de Ponce*,
  134 D.P.R. 1001 (1994) .................................................................................................44

*Holmes v. City of Shreveport*,
  31 F. 113 (C.C.W.D. La. 1887) .....................................................................................21

*In re Calore Express Co.*,
  288 F.3d 22 (1st Cir. 2002)............................................................................................45

*In re Fin. Oversight & Mgmt. Bd.*,
  914 F.3d 694 (1st Cir. 2019)............................................................................................6

*In re Oak Knoll Assoc., L.P*,
  835 F.3d 24 (1st Cir. 2016).............................................................................................4

*In re Plaza Resort at Palmas, Inc.*,
  741 F.3d 269 (1st Cir. 2014)....................................................................................9, 17

*In re Seacoast Anti-Pollution League*,
  490 A.2d 1329 (N.H. 1985) ...........................................................................................38

*Keel v. Pulte*,
  10 S.W.2d 694 (Tex. Comm'n App. 1928).....................................................................25

*Kruesel v. Collin*,
  17 P.2d 854 (Wash. 1933)..............................................................................................10

*Las Marias Reference Lab. Corp. v. Municipo of San Juan*,
  159 D.P.R. 868 (2003) ...................................................................................................44

*Loan Syndications & Trading Ass'n v. SEC*,
  882 F.3d 220 (D.C. Cir. 2018) ............................................................16

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
  486 U.S. 825 (1988) ..............................................................................30

*Mendoza Aldarondo v. Employees Association*,
  No. R-65-209, 1967 WL 17167 (P.R. May 19, 1967) ..........................46

*Merrill v. Town of Monticello*,
  138 U.S. 673 (1891)........................................................................ *passim*

*Merrill v. Town of Monticello*,
  72 F. 462 (7th Cir. 1896) ......................................................................25

*Mitchell v. City of Burlington*,
  71 U.S. 270 (1867)................................................................................21

*Morales v. Municipality of Toa Baja*,
  119 D.P.R. 682, 19 P.R. Offic. Trans. 724 (1987)................................44

*Muscatine Lighting Co. v. City of Muscatine*,
  217 N.W. 468 (Iowa 1928) ..................................................................20

*Office of Personnel Management v. Richmond*,
  496 U.S. 414 (1990)..............................................................................45

*Pac. Improvement Co. v. City of Clarksdale*,
  74 F. 528 (5th Cir. 1896) ......................................................................25

*Plan Bienestar Salud v. Alcalde Cabo Rojo*,
  114 D.P.R. 697, 14 P.R. Offic. Trans. 896 (1983)..........................2, 43

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
  91 F. Supp. 3d 267 (D.P.R. 2015)........................................................45

*Police Jury of Par. of Tensas v. Britton*,
  82 U.S. 566 (1873)..........................................................................21, 26

*Port of Palm Beach Dist. v. Goethals*,
  104 F.2d 706 (5th Cir. 1939) ................................................................25

*Ramette v. Al & Alma's Supper Club Corp.*,
  252 B.R. 148 (Bankr. D. Minn. 2000) ..................................................33

*Reed v. City of Cedar Rapids,*
    113 N.W. 773 (Iowa 1907) .......................................................................20

*Rivera Torres v. Junta de Retiro Para Maestros,*
    502 F. Supp. 2d 242 (D.P.R. 2007)......................................................26, 35

*Rogers v. City of Burlington,*
    70 U.S. 654 (1866)..................................................................................21

*Russell v. Middletown City Sch. Dist.,*
    125 A. 641 (Conn. 1924) ..............................................10, 21, 22, 24

*Russello v. United States,*
    464 U.S. 16 (1983)..................................................................................18

*Town of Belleair v. Olds,*
    127 F.2d 838 (5th Cir. 1942) ...................................................................45

*U.S.I. Props. Corp. v. M.D. Constr. Co.,*
    860 F.2d 1 (1st Cir. 1988)........................................................................27

*Vt. Dep't of Pub. Serv. v. Mass.s Mun. Wholesale Elec. Co.,*
    558 A.2d 215 (Vt. 1988) ..........................................................................46

**STATUTES**

Act No. 3-2013.................................................................................31, 32

Act No. 35-2007..................................................................................3, 29

Act No. 116-2011...............................................................................30, 31

3 L.P.R.A. § 779(b)(1)(C) (2008) .....................................................18

3 L.P.R.A. § 779(b)(1)(F) .................................................................18

3 L.P.R.A. § 779(b)(2)(A)(ii) (2008) ................................................18

3 L.P.R.A. § 779(b)(3) ......................................................................18

3 L.P.R.A. § 779(d) (2008) ......................................................*passim*

3 L.P.R.A. § 9004(q).........................................................................8

4 L.P.R.A. § 1437(g)..........................................................................8

5 L.P.R.A. § 1019(f) ................................................................................................8

7 L.P.R.A. § 552(A) ..............................................................................................28

7 L.P.R.A. § 607g ..................................................................................................8

7 L.P.R.A. § 779c ..................................................................................................8

10 L.P.R.A. § 691*o*(a)(2), (b)(2), (c) ....................................................................8

10 L.P.R.A. § 691(p)(1)(F)(iii), (p)(2)(F)(iii), (q) ................................................8

11 L.P.R.A. § 30c ..................................................................................................8

18 L.P.R.A. § 392h(7) (2008) .........................................................................8, 26

19 L.P.R.A. § 451(25) .....................................................................................37, 38

19 L.P.R.A. § 1752 ..............................................................................................32

19 L.P.R.A. § 1752(b)(1) ....................................................................................32

19 L.P.R.A. § 1752(b)(2) (2020) ....................................................................8, 33

19 L.P.R.A. § 1752(f) ..........................................................................................34

24 L.P.RA. § 7004a ..............................................................................................8

26 L.P.R.A. § 2930(4) ..........................................................................................8

26 L.P.R.A. § 8084(k) ..........................................................................................8

31 L.P.R.A. § 13 ....................................................................................................6

31 L.P.R.A. §§ 14–23 ..........................................................................................23

31 L.P.R.A. § 16 .............................................................................................9, 19

UCC § 8-202(b) ............................................................................................ *passim*

UCC § 8-202 cmt. 3 ......................................................................................24, 33

**OTHER AUTHORITIES**

7 Hawkland UCC Series § 8-202:6 .....................................................................33

15 McQuillin Municipal Corps. § 43:20 (3d ed. 2020) ..................................................................23

15 McQuillin Municipal Corps. § 43:22 (3d ed. 2020) .......................................................9, 19, 23

64A C.J.S. Municipal Corporations § 2119 ...............................................................................23

*Financial Institution*, *Black's Law Dictionary* (11th ed. 2019)..............................................13, 15

*Tomar Prestado*, *Cambridge Spanish-English Dictionary*,
    https://dictionary.cambridge.org/us/dictionary/spanish-english/tomar-prestado.....................8

*Tomar Prestado*, *WordReference.com*, https://wordreference.com/es/en/
    translation.asp?spen=tomar%20prestado ...................................................................7

## INTRODUCTION

More than a decade after ERS[2] issued $3 billion in bonds to reduce its unfunded pension liability and pay benefits, the Committees and Government Parties contend that ERS need not repay that obligation, because unbeknownst to everyone involved in that sophisticated transaction, ERS supposedly lacked any power to enter it.  Indeed, the Committees and Government Parties go even further to contend that ERS may recover from investors in ERS Bonds the interest payments that ERS has previously made on the debt.  This is no more than a desperate litigation gambit, dreamed up for the first time after these restructuring proceedings were underway.

ERS had full statutory authority to issue the ERS Bonds in 2008.  The plain text of the ERS Enabling Act authorized the issuance, both as borrowing from financial institutions—the syndicate of banks and broker-dealers to which all of the bonds were sold—and as a direct placement of debt. 3 L.P.R.A. § 779(d) (2008).  That is why the ERS Board of Trustees, ERS's General Counsel, the Government Development Bank's Board of Directors, the Secretary of Justice, and sophisticated lawyers involved in the transaction all concluded in writing at the time that the issuance was fully authorized.  It is why the legislature has repeatedly recognized that the ERS Bonds were existing, valid obligations.  It is why ERS paid interest on the debt without interruption for more than eight years and why even today ERS's financial statements reflect the bonds as an outstanding liability.  And it is why both ERS and the Oversight Board conceded in prior litigation that the Bonds were valid and enforceable.  The current contrary argument amounts to a magic-words requirement—that bonds may not be issued unless there is authorizing legislation that uses the word "bonds."  There is no support in Puerto Rico law for such a requirement, which numerous

---

[2] Capitalized terms not defined herein have the meanings given them in the Bondholders' Rule 56(b) Statement of Undisputed Facts in Support of Motion for Summary Judgment on *Ultra Vires* Issues and Proceedings, filed herewith.

states reject.  The Committees and Government Parties' own expert witness admitted that the sale

of bonds is both borrowing and a loan, and it is undisputed that ERS sold all of the ERS Bonds

directly to a syndicate made up of indisputable financial institutions.  The ERS Enabling Act

therefore expressly authorized ERS to issue the ERS Bonds, so the ERS Bonds are valid and

enforceable, requiring summary judgment for the Bondholders.

Moreover, the ERS Bonds would still be enforceable even if they were invalid—which

they are not—under UCC § 8-202(b).  That provision provides for the enforcement of otherwise

invalid government securities where, among other things, the government issuer had the authority

to borrow money for the stated purpose and received substantial consideration in exchange for the

security.  The ERS Bonds plainly qualify, and the Bondholders are purchasers for value without

notice who are entitled to UCC § 8-202(b)'s protection.  The ERS Bonds are also enforceable in

equity under Puerto Rico law, which precludes even a government institution like ERS from

accepting the benefits of a contract and then refusing to perform its reciprocal duties on grounds

of illegality.  *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 D.P.R. 697, 14 P.R. Offic. Trans.

896, 903–04 (1983).  For those reasons, as well, the Bondholders are entitled to summary

judgment.

## FACTUAL BACKGROUND

ERS borrowed nearly $3 billion in 2008, via a sale of three series of ERS Bonds to a

syndicate of underwriters.  BH UV 56(b) ¶¶ 39, 51.[3]  The transaction was authorized by ERS's

Board of Trustees and by the Government Development Bank.  BH UV 56(b) ¶¶ 41, 43–44.  The

Legislative Assembly had specifically directed ERS to raise money by issuing the ERS Bonds less

---

[3] Citations to "BH UV 56(b)" are to the corresponding paragraph of the Bondholders'
Rule 56(b) Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment
on *Ultra Vires* Issues and Proceedings, filed herewith

than a year earlier.  *See* Act 35-2007.  Virtually every Puerto Rico financial institution of any size

participated in the offering.  *See* BH UV 56(b) ¶¶ 53.1–53.3.  The validity of the resulting debt

was confirmed repeatedly by legal opinions from the Secretary of Justice, from ERS's general

counsel, and from the well-respected Puerto Rico law firm of Fiddler, Gonzalez, & Rodriguez.

BH UV 56(b) ¶¶ 46.1–46.13.  And all three nationally-recognized bond-rating firms rated the

bonds investment grade.  BH UV 56(b) ¶¶ 63.1–63.3.  At the time of the issuance, there was no

hint, from any quarter, that the bonds might not be valid.  BH UV 56(b) ¶ 79.

    The Committees and Government Parties now argue, more than a decade later, that the

ERS Bonds were void from the start and that ERS need not honor them.  Notably, ERS itself has

reached no such determination, for the question has never been presented to its governing board.

BH UV 56(b) ¶ 80.  As the Committees and Government Parties would have it, the invalidity of

the ERS Bonds flows directly from the Enabling Act and is facially obvious from that legislation.

But the validity of the ERS Bonds was thoroughly investigated in advance of the issuance, and the

unanimous conclusion was that the bonds would be valid and enforceable.  BH UV 56(b) ¶¶ 46.1–

46.13.  The reasoned legal opinion explaining why was leaked to the press and discussed publicly.

BH UV 56(b) ¶¶ 37.1–37.4.  Four years after the issuance, ERS then investigated the matter again

in 2012, when it received new advice of counsel about the validity of the bonds.  BH UV 56(b)

¶¶ 71–72.  According to minutes from an ERS board meeting that have been posted publicly on an

ERS website for years, that counsel gave the opinion "that the System has authority to incur debt,

pledge its assets and has authority to consider future contributions as part of its assets," and "added

that proof of this is that the Legislative Assembly amended Act No. 447 to limit these procedures."

BH UV 56(b) ¶ 72.  And after receiving this legal advice on the validity of the ERS Bonds in

February 2012, ERS made no determination that the bonds were invalid and undertook no effort

to stop paying them.  BH UV 56(b) ¶¶ 64–65.  Mr. Mayol Kaufmann, the ERS Administrator at

the time, even encouraged Puerto Rican investors in October 2012 to purchase the ERS Bonds,

stating "I urge everyone who wants to buy them to do so because it is a great investment."  BH

UV 56(b) ¶ 73.  And all of ERS's financial statements—even those issued about a month before

this filing—have *always* reflected the ERS Bonds as valid, outstanding obligations of ERS.  BH

UV 56(b) ¶ 66.

## LEGAL STANDARD

In bankruptcy proceedings, as in other cases, "summary judgment is proper 'if no genuine

issue of material fact exists and the moving party is entitled to judgment as a matter of law.'"  *In

re Oak Knoll Assoc., L.P*, 835 F.3d 24, 28–29 (1st Cir. 2016) (quoting *Soto-Rios v. Banco Popular

de P.R.*, 662 F.3d 112, 115 (1st Cir. 2011)).  "When the motion is premised upon the absence of

any genuine issue of material fact, the burden shifts to the nonmovant to identify, by means of

materials of evidentiary quality, an issue of fact that is 'more than merely colorable.'"  *Faiella v.

Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 145 (1st Cir. 2019) (quoting *Flovac, Inc. v. Airvac, Inc.*,

817 F.3d 849, 853 (1st Cir. 2016)).  "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a [factfinder] to return a verdict for that party."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  *Id.* at 249–50 (citations omitted).

## ARGUMENT

## I.  The ERS Bonds Are Valid and Binding Obligations of ERS

ERS had full legal authority in 2008 to borrow $3 billion by issuing the ERS Bonds.  The

ERS Bonds are therefore valid and binding obligations of ERS, and ERS's payments on those

bonds were payments of a lawful obligation, not avoidable transfers.  For that reason, the Court

should (a) grant summary judgment to the Bondholders[4] on Count I of the Clawback Actions,[5]

(b) grant summary judgment to the Bondholders on Counterclaim Counts I and III of the Clawback

Actions, (c) dismiss Counterclaim Counts II, IV, and V of the Clawback Actions as moot, and

(d) overrule the Committees and Government Parties' objections to the Bondholders' claims that

are based on the contention that the ERS Bonds are *ultra vires*.

## A. The ERS Enabling Act Authorized ERS to Borrow from Financial Institutions and Through Direct Debt Placements

When ERS borrowed $3 billion by issuing the ERS Bonds in 2008, it did so pursuant to

section 779(d) of the ERS Enabling Act.  In the original Spanish, section 779(d) provided:

> Autorización para incurrir en deudas.—La Junta de Síndicos podrá autorizar al Administrador para tomar prestado de cualquier institución financiera, del Gobierno del Estado Libre Asociado de Puerto Rico o del gobierno federal de los Estados Unidos de América, o mediante colocaciones directas de deuda, garantizando dicha deuda por los activos del Sistema. . . .

---

[4] The Bondholders are Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, SV Credit, L.P,, Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund.

[5] Counts II to VI of the Clawback Actions remain stayed pursuant to this Court's order. *See* ECF No. 866 in Case No. 17-bk-03566, ¶ 4 (April 17, 2020).  If the Court grants the Bondholders' Motion, however, it will moot the relief sought in those additional counts.

3 L.P.R.A. § 779(d) (2008).  Under Puerto Rico law, if there is any "discrepancy" between the

original Spanish text of a statute and the official English translation, the original Spanish controls.

31 L.P.R.A. § 13; *In re Fin. Oversight & Mgmt. Bd.*, 914 F.3d 694, 717 (1st Cir. 2019).  The

undisputed facts show multiple "discrepanc[ies]" between that Spanish text of section 779(d) and

the official English translation of that provision,[6] so it is the original Spanish text that governs.  31

L.P.R.A. § 13.  Properly translated into English from the original Spanish, section 779(d) as it

existed in 2008 provided:

> Authorization to incur debts.—The Board of Trustees may authorize
> the Administrator to borrow from any financial institution, from the
> Government of the Commonwealth of Puerto Rico or from the
> Federal Government of the United States of America, or through
> direct debt placements, securing said debt with the assets of the
> System. . . .

BH UV 56(b) ¶ 16.  That is the language that controls here.

The correct translation of section 779(d)'s Spanish text differs from the "official"

translation in three ways.  *First*, the official translation omits two commas from the original

Spanish text, BH UV 56(b) ¶ 13, which are bolded and bracketed here:  "The Board of Trustees

may authorize the Administrator to seek a loan from any financial institution**[,]** of the Government

of the Commonwealth of Puerto Rico or the Federal Government of the United States of America**[,]**

or through the direct placement of debts . . . ."  *Compare* 3 L.P.R.A. § 779(d) (2008) (Spanish

version) *with* 3 L.P.R.A. § 779(d) (2008) (English version).  The Retiree Committee conceded this

---

[6] The official English translation provides:

> Authorization to incur debts:  The Board of Trustees may authorize
> the Administrator to seek a loan from any financial institution of the
> Government of the Commonwealth of Puerto Rico or the Federal
> Government of the United States of America or through the direct
> placement of debts, securing said debt with the assets of the System.
> . . .

3 L.P.R.A. § 779(d) (2008) (English version).

error in the official translation of section 779(d) in its claim objection, although the Retiree Committee then made an error of its own in correcting it, misplacing the first omitted comma. *See* ECF No. 6482 in Case No. 17-bk-03283, at 5 & n.3. And the Oversight Board conceded the same by adopting the Retiree Committee's *ultra vires* claim objection. *See* ECF No. 9701 in Case No. 17-bk-03283 ¶¶ 7, 11.

*Second*, the official translation mistranslates certain instances of the Spanish word "del." BH UV 56(b) ¶ 14. The word "del" may mean either "of the" or "from the," depending on context. BH UV 56(b) ¶ 14.1. Here, with the commas from the original Spanish text properly in place, context and parallel structure show that two of the "del"s that were translated as "of the" should have been translated as "from the": "The Board of Trustees may authorize the Administrator to seek a loan from any financial institution[,] [**from**] the Government of the Commonwealth of Puerto Rico or [**from**] the Federal Government of the United States of America[,] or through the direct placement of debts." BH UV 56(b) ¶¶ 14, 14.2. The Retiree Committee and the Oversight Board conceded this translation error in their claim objections, too—although as a result of their error in placing the first omitted comma, they made one of their corrections to the wrong "del." ECF No. 6482 in Case No. 17-bk-03283 ¶¶ 10 & n.3, 67–68; ECF No. 9701 in Case No. 17-bk-03283 ¶¶ 7, 11.

*Third*, the official translation mistranslates the Spanish phrase "tomar prestado" as "seek a loan," when it should be translated as "borrow." BH UV 56(b) ¶ 15. The phrase "tomar prestado" is a more general term than "seek a loan," and "is not limited to loans specifically." BH UV 56(b) ¶ 15.1. Rather, "tomar prestado means to temporarily take something with the intention of returning it," and is properly translated into English as "borrow." *See, e.g.*, *Tomar Prestado*, *WordReference.com*, https://wordreference.com/es/en/translation.asp?spen=tomar%20prestado

(translating the phrase as "borrow" and giving, as an example of usage, "Juan borrowed his parents' car"); *Tomar Prestado, Cambridge Spanish-English Dictionary*, https://dictionary.cambridge.org/us/dictionary/spanish-english/tomar-prestado (translating the phrase as "borrow" and providing that it means "to take (something, often money) temporarily with the intention of returning it").

Unsurprisingly, the phrase "tomar prestado" appears thirteen other places in the Puerto Rico Statutes Annotated, and in nearly every other instance it is translated in the official translation as "borrow," "borrowed," or "borrowing," not "seek a loan."[7]  That includes official translations of nearly identical Spanish-language provisions in the enabling acts for the Teachers Retirement System and the Commonwealth of Puerto Rico Employees Association, each of which provide that the entity may "borrow from any financial institution . . . or through direct debt placements," 18 L.P.R.A. § 392h(7) (2008); *see also* 3 L.P.R.A. § 9004(q) (same except "direct placement of debt").

The expert opinion from the expert witness retained by certain Bondholders,[8] Dr. Laura Gonzalez, confirms that this is the proper translation of section 779(d). BH UV 56(b) ¶ 16.

---

[7] *See* 3 L.P.R.A. § 9004(q); 4 L.P.R.A. § 1437(g); 5 L.P.R.A. § 1019(f); 7 L.P.R.A. § 779c; *id.* § 607g; 10 L.P.R.A. § 691(p)(1)(F)(iii), (p)(2)(F)(iii), (q); *id.* § 691*o*(a)(2), (b)(2), (c); 18 L.P.R.A. § 392h(7) (2008); 19 L.P.R.A. § 1752(b)(2) (2020); 26 L.P.R.A. § 2930(4); *id.* § 8084(k).  *But see* 11 L.P.R.A. § 30c (similar translation error to that in the ERS Enabling Act); 24 L.P.R.A. § 7004a (translation does not reflect current Spanish text, including "tomar prestado").

[8] Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, and SV Credit, L.P.

Notably, the Committees and Government Parties have made no effort to engage an expert of their own to offer a competing translation or otherwise introduce competent evidence to the contrary.

**B.  The ERS Enabling Act Authorized the ERS Bond Issuance**

Whether the ERS Enabling Act authorized ERS to issue the ERS Bonds is a straightforward question of statutory construction.  "The rules relating to statutes generally are usually applied in construing enactments authorizing the issuance of bonds . . . ."  15 McQuillin Municipal Corps. § 43:22 (3d ed. 2020). "Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous." *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014).  "Technical terms and phrases used in the arts and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities in the science, art or profession to which they refer."  31 L.P.R.A. § 16. ERS's issuance of the ERS Bonds falls within the Enabling Act's debt authorization because ERS "borrowed" and "obtained a loan" from financial institutions when it issued the ERS Bonds in 2008, and because the issuance involved a "direct debt placement."

1.  <u>ERS Borrowed and Obtained a Loan by Issuing the ERS Bonds</u>

It is undisputed that ERS both "borrowed" and obtained a "loan" when it issued the ERS Bonds.  Tellingly, the parties' municipal finance experts agree that issuing bonds is a form of "borrowing," and that bonds are "loans."  BH UV 56(b) ¶¶ 21–23.  The Committees and Government Parties' municipal finance expert, Robert Doty, has written that "[m]unicipal securities issuers . . . *borrow* money in the municipal securities market" when they issue municipal securities, BH UV 56(b) ¶ 21 (emphasis added), and he testified at his deposition in this case that municipal securities "are *loans*" for which the "borrower is the governmental issuer" of the

9

securities.  BH UV 56(b) ¶ 23 (emphasis added).  The expert retained by certain Bondholders,[9] W.
Bartley Hildreth, Ph.D., agreed that a sale of municipal bonds is both "borrowing" and "a loan."
BH UV 56(b) ¶ 21, 23 ("A bond is a loan."); BH UV 56(b) ¶ 22 ("ERS borrowed directly from the
underwriters" when it issued the ERS Bonds).  This consensus that the issuance of bonds is both
"borrowing" and a "loan" should be dispositive on the question.

This is not a new discovery.  The Massachusetts Supreme Judicial Court explained more
than 125 years ago that it was "well known that as early as 1855, when money was to be raised on
loan, in considerable amounts, either by the commonwealth itself or by cities and towns or by
railroad corporations, a common method of doing it was by means of bonds." *Commonwealth v.
Town of Williamstown*, 30 N.E. 472, 482 (Mass. 1892).  When an issuer with authority to borrow
does so by issuing bonds, "[i]n substance, the money is borrowed from the purchasers of the bonds;
it is advanced on the faith of the [issuer's] obligations, for the very purpose for which the [issuer]
was authorized to raise it." *Commonwealth ex rel. Hamilton v. Select & Common Councils of City
of Pittsburgh*, 34 Pa. 496, 511 (1859).  Under such circumstances, a court "cannot be expected to
decide that the bonds are illegal, because the [authorizing legislation] did not specify what
securities might be given for the money borrowed." *Id.*  For this reason, courts across the country
have held for more than a century that municipalities with express statutory authority to borrow
money may carry out that authority by selling bonds.[10]

---

[9] *See supra* note 8.

[10] *See, e.g.*, *Bd. of Cnty. Comm'rs of Tulsa v. Williamson*, 370 P.2d 837, 838 (Okla. 1962)
("To our way of thinking, where the power to borrow is granted, the power to issue bonds is
implied."); *Kruesel v. Collin*, 17 P.2d 854, 855 (Wash. 1933) ("[W]here the power to borrow is
granted, the power to issue bonds is implied if the borrowing is to enable the county to perform a
duty or function imposed upon it by the state."); *Russell v. Middletown City Sch. Dist.*, 125 A. 641,
645 (Conn. 1924) ("[T]he power to issue bonds implied from the express power to borrow has
been recognized as legal in the majority of the older states, and especially in New England, and
that corporate securities have been issued and are now outstanding in large amounts, based upon

It makes no difference that the legal document pursuant to which the underwriting syndicate purchased the ERS Bonds is called a bond purchase and sale agreement, rather than a loan agreement.  BH UV 56(b) ¶¶ 24, 50.  This is because the very thing being purchased (or sold) is the set of bonds which are themselves "borrowings" or "loans."  The fact that a loan is sold by one financial institution to another does not change its essential character as a loan.  For the same reason, it is irrelevant that this class of loans does not resemble commercial bank loans, since not all loans are identical.  Nor does the purpose for which ERS issued the ERS Bonds matter, because the ERS Enabling Act authorized ERS to borrow without any restriction on purpose.

The remaining question is whether, when ERS issued the ERS Bonds, it borrowed (or obtained a loan) either *from a financial institution* or through *direct debt placements*.  The undisputed facts show that ERS did both.  ERS borrowed from a financial institution because it sold all of the ERS Bonds directly and solely to a syndicate of underwriters made up entirely of

---

this understanding of the law."); *Comm'rs of Hendersonville v. C.A. Webb & Co.*, 61 S.E. 670, 671 (N.C. 1908)  ("[W]hen the power to incur a debt for a necessary expense exists, there would seem to be no good reason or principle of law to prevent the governing authorities of a town from making provision for the present or ultimate payment of such a debt, by issuing bonds for the purpose . . . ."); *Town of Williamstown*, 30 N.E. at 473 ("We can have no doubt . . . that in this commonwealth the power given to these towns to raise these large or unusual sums of money by loan, no conditions or restrictions being imposed, carried with it the power to issue bonds,—a method which certainly enabled the towns to seek the best markets."); *Fid. Tr. & Safety Vault Co. v. Mayor of Morganfield*, 29 S.W. 442, 444 (Ky. 1895) ("The issuance of the bonds of said city in payment of said indebtedness was but an incident of same; some form of evidence of such indebtedness being necessary . . . .), *overruled in part on other grounds*, *Belknap v. City of Louisville*, 36 S.W. 1118 (Ky. 1896); *Bunch's Ex'rs v. Fluvanna Cnty.*, 10 S.E. 532, 533 (Va. 1890) ("[W]e do not doubt that it was competent for the county court, under the authority conferred by the act, to issue bonds for the money authorized to be borrowed. The power to do so was implied in the power to borrow."); *Dutton v. City of Aurora*, 28 N.E. 461, 462 (Ill. 1885) ("Having power to borrow money, the power to issue bonds therefor results as a necessary incident, and the circuit court properly refused to enjoin the issuing of the bonds."); *Doty v. Ellsbree*, 11 Kan. 209, 212 (1873) ("[P]ower to borrow money carries with it the power to issue the ordinary evidences and security of a loan, and among them are county bonds.").

investment banks, which are paradigmatic financial institutions.  And ERS borrowed through a direct debt placement because it issued the debt directly, rather than through a conduit entity.

    2.  <u>ERS Borrowed from a Financial Institution</u>

    It is undisputed that ERS sold each series of ERS Bonds exclusively and directly to a syndicate of underwriters.  BH UV 56(b) ¶ 52.  ERS did so via purchase contracts, one for each series, that provided that "the Underwriters jointly and severally hereby agree to purchase from the System and the System hereby agrees to sell and deliver to the Underwriters all (but not less than all)" of each series of ERS Bonds.  BH UV 56(b) ¶ 51.  Consistent with that agreement, at the closing of each issuance, the underwriters wired the purchase price of the ERS Bonds to ERS.  BH UV 56(b) ¶ 57.  When the sales to the underwriters were complete, ERS had received all of the money it would ever receive for issuing the ERS Bonds, and it received every penny of that money from the underwriters.  BH UV 56(b) ¶¶ 57–59.  That is standard practice in the issuance of bonds.  As the Committees and Government Parties' expert explained, "[t]he only legal relationship between the issuer and an underwriter is created by a Bond Purchase Agreement . . . wherein the issuer agrees to sell the bonds to the underwriter and the underwriter agrees to purchase the bonds from the issuer."  BH UV 56(b) ¶ 25.

    The underwriters who purchased the bonds were, indisputably, financial institutions.  Each was an SEC-registered securities broker-dealer or an FDIC-insured depository institution.  BH UV 56(b) ¶ 54.  They consisted of every, or nearly every, major financial institution doing business in the Commonwealth, plus some smaller brokers:  UBS Financial Services Incorporated of Puerto Rico; Popular Securities; Santander Securities; BBVAPR MSD; Merrill Lynch & Co.; Scotia Capital; Citigroup; Oriental Financial Services Corporation; TCM Capital; Lehman Brothers; Samuel A. Ramirez & Co., Inc.; Wachovia Capital Markets, LLC; Eurobank MSD; and Oriental Financial Services Corp.  BH UV 56(b) ¶¶ 53.1–53.3.  Each of those entities was, as a matter of

plain meaning, a "financial institution"—a "business, organization, or other entity that manages money, credit, or capital, such as *a bank*, credit union, savings-and-loan association, *securities broker or dealer*, pawnbroker, or investment company." *Financial Institution*, *Black's Law Dictionary* (11th ed. 2019) (emphases added). ERS's Rule 30(b)(6) designee, Luis Collazo, admitted to a similar definition of financial institution. BH UV 56(b) ¶ 55 ("an entity that works with financial instruments, financial transactions, and they are duly registered and authorized to carry out those types of transactions, from giving out loans to different types of financing"). Mr. Collazo further admitted on behalf of ERS that most of the underwriters involved in the issuances of ERS Bonds were financial institutions, and he was not sure about the rest only because he was not familiar with them. BH UV 56(b) ¶¶ 56–56.3.

The Committees and Government Parties' main argument is that ERS "borrowed" and obtained a "loan" not from the underwriters, but rather from third-party investors to whom the underwriters ultimately resold ownership interests[11] in the ERS Bonds. But none of those third-party investors transferred any money to ERS; only the underwriters did. BH UV 56(b) ¶¶ 57–58. And the underwriters were obligated to and did buy all of the ERS Bonds from ERS at a fixed price that did not change regardless of whether and at what price the underwriters were able to resell ownership interests in the bonds to other investors. BH UV 56(b) ¶ 59. As the Committees and Government Parties' expert admitted, the success or failure of the underwriters' efforts to

---

[11] The ERS Bonds themselves were never resold. Rather, as is commonly the case in modern financial markets, when ERS sold the ERS Bonds to the underwriters, ERS and the underwriters agreed that ERS would issue a single paper bond certificate for each maturity of each series of the ERS Bonds to the Depository Trust Company or DTC, via DTC's nominee, Cede & Co. 56(b) ¶ 61. Those paper bond certificates have never been resold; even today, Cede & Co. is the registered owner of all ERS Bonds ever issued. 56(b) ¶¶ 61–62. All subsequent transactions involving the ERS Bonds—like the vast majority of bond transactions today—have been sales of beneficial "ownership interests" in the ERS Bonds, not transfers of the ERS Bonds themselves. 56(b) ¶ 62.

resell ownership interests did not affect ERS's obligations one way or the other: it did not change the "rate of interest" ERS was obligated to pay, nor the bonds' "maturity," nor the "face amount" of ERS's obligations under the ERS Bonds. *Id.* While the success or failure of the underwriters' efforts to resell ownership interests in the ERS Bonds may have affected the *underwriters'* profits from the transaction, it had no economic effect whatsoever on ERS. *Id.* At the instant that ERS sold the bonds to the underwriters, ERS's borrowing was complete—ERS had received the borrowed funds from the underwriters and ERS was liable to the underwriters as holders of ownership interests in the bonds for the payment of interest and principal.

The Committees and Government Parties disregard the identities of the sole purchasers at the time of issuance—the underwriters themselves—and focus instead on the identities of subsequent purchasers. They do so even though they appear to be arguing that the bonds were invalid when ERS issued them, *see* ECF No. 19 in Case No. 19-bk-356, ¶ 3 ("[T]he ERS Bonds *were issued ultra vires*.") (emphasis added), not that they became invalid after the fact. They are wrong, and there would be no stopping place for this argument. The Committees and Government Parties argue that the underwriters' purchase of the ERS Bonds should be disregarded because the underwriters resold ownership interests in the bonds to other investors. But the underwriters are not unique in reselling ownership interests in the bonds, rather than holding them to maturity— many other investors do the same. In fact, most of the Bondholders purchased their ownership interests in ERS Bonds on the secondary market from investors who resold them after the bonds were issued, and some of the Bondholders have since resold some or all of their ownership interests in ERS Bonds to still other investors. BH UV 56(b) ¶¶ 81–82. Faced with this scenario, Mr. Doty opined that the lender is whoever happens to own the bonds at the time: "if Alice owns the bond . . . Alice is the lender," "if Alice sells the bond to Bob, then Bob becomes the lender," and "if Bob

sells to Carol, then Carol becomes the lender," so that "the identity of the lender can change over the life of the bond issue." BH UV 56(b) ¶ 27. Mr. Doty attempted to exclude underwriters from this rule by limiting it to "public investor[s]," but he provided no basis for that *ad hoc* limitation. *See id*. The underwriters are indistinguishable from Alice and Bob: they held the bonds, and then sold ownership interests in them to someone else. The underwriters were therefore the lenders at the time of the ERS Bond issuance, and so ERS borrowed from them by issuing the bonds, as section 779(d) authorized ERS to do.

Moreover, if the Committees and Government Parties were correct that a holder that resells its ownership interests in the bonds rather than holding them to maturity is not a lender, then it would be the identity of the *current* holder that mattered, because all previous holders have resold their ownership interests in the bonds rather than holding them and therefore cannot be lenders under the Committees and Government Parties' approach. Such an approach would do nothing to help the Committees and Government Parties. Under that analysis, the current Bondholders are the lenders, and like the underwriters, each of the Bondholders is indisputably a "financial institution"—a "business, organization, or other entity that manages money, credit, or capital." BH UV 56(b) ¶¶ 84–93; *Financial Institution*, *Black's Law Dictionary*.[12] Thus, if what matters is ownership by the last investor who has not (yet) resold its ownership interests in the bonds, then the ERS Bonds equally involve borrowing from financial institutions—the Bondholders themselves.

---

[12] The same, of course, may not be true for individual, on-island investors in the bonds who are not signatories to this motion. Treating those individual investors less favorably would be plainly inequitable and illustrates the problems that would follow from assessing the validity of the bonds based on post-issuance events like the underwriters' resale of the bonds, rather than at the time of the issuance.

The Committees and Government Parties seem to reject this approach, too, and argue that it is somehow specifically the *second* investor to hold an ownership interest in the bonds—the first investor after the underwriter—whose identity matters.  BH UV 56(b) ¶ 27.1 ("An issuer does not 'borrow' or take a 'loan' from an underwriter, but from the public investors who buy the bonds from the underwriters.")  Again, there is no basis for this *ad hoc* rule.  But even under that rule, the Bondholders would still be entitled to summary judgment.  As for the Bondholders who purchased ERS Bonds on the secondary market rather than from the underwriters, there is absolutely no record evidence concerning the identities of the investors to whom the underwriters first resold the ownership interests in those Bonds.  BH UV 56(b) ¶ 83.  Those investors, too, may very well have been financial institutions.  In the absence of any evidence on the question, the Committees and Government Parties cannot possibly show that the ownership interests in the Bonds currently held by the Bondholders were not sold by the underwriters to financial institutions at the time of the original issue.  And the Puerto Rico Funds that purchased their ownership interests of ERS Bonds directly from the underwriters are financial institutions, as well.  BH UV 56(b) ¶¶ 81.15, 93.

Finally, the underwriters' efforts to resell ownership interests in the ERS Bonds do not mean that ERS's sale of the ERS Bonds to the underwriters was not "borrowing" and a "loan." Traditional bank loans, too, are often resold by the initial lending institution.  As the D.C. Circuit has explained,

> [u]sually no single bank originates the entirety of a loan.  Rather, multiple banks "syndicate" under a lead arranger, each holding only a portion of the loan.  Syndicated loans are "actively traded amongst financial institutions in a secondary market place," and purchased on these markets by a range of investors.

*Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018) (quoting Wells Fargo & Company, Comment on Credit Risk Retention Proposed Rules 27 (July 28, 2011)).

Residential mortgages, too, are invariably resold by the initial lending institution, and ultimately securitized and funded by purchases of mortgage-backed securities.  *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 462–63 (S.D.N.Y. 2015).  No one would argue that the inevitability of such resale means that a borrower who obtains a bank loan or a mortgage has not thereby "borrowed" and obtained a "loan" from the lending bank.  The same is true here: ERS borrowed and obtained a loan from the underwriters, and what the underwriters did with the ERS Bonds after that does nothing to change that fact.

In sum, is undisputed that ERS both borrowed and obtained a loan by selling the bonds, that ERS sold the bonds directly and exclusively to the underwriters, and that the underwriters were financial institutions.  That should be the end of the matter: ERS borrowed and obtained a loan from financial institutions, as the statute unambiguously authorized it to do, when it sold the ERS Bonds to the underwriters.   Because the issuance of the bonds falls directly and unambiguously within "the text of the underlying statute," under Puerto Rico law, the statutory construction analysis "ends there."  *In re Plaza Resort at Palmas, Inc.*, 741 F.3d at 274.  This straightforward analysis resolves or moots all of the claims at issue in these proceedings.

3.  <u>ERS Borrowed Through Direct Debt Placements</u>

The Committees and Government Parties' *ultra vires* claims fail for yet another reason. The issuances of the ERS Bonds were also authorized as borrowing through "direct debt placements" under section 779(d).  *See* BH UV 56(b) ¶ 16.  Financial markets distinguish between direct borrowing, in which a borrower itself issues debt securities, and indirect or conduit borrowing, in which a borrower borrows money via a separate, conduit entity which then issues debt securities.  BH UV 56(b) ¶ 28.  The section of the ERS Enabling Act in which the debt-authorizing language appeared repeatedly uses the word "direct" (in Spanish, "directa") to refer to

that distinction between debt incurred directly and debt incurred through a conduit entity.[13]   The

"natural presumption [is] that identical words used in different parts of the same act are intended

to have the same meaning," *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932),

so the legislature's use of the term "directa" in other parts of section 779 to refer to direct

obligations of ERS confirms that the legislature was in fact authorizing ERS to issue debt for which

it was directly liable, instead of using a conduit to issue the bonds.   It is undisputed that ERS's

issuance of the ERS Bonds was "direct" rather than "indirect" in this sense, because ERS issued

the ERS Bonds itself, and was the direct obligor on those bonds.   BH UV 56(b) ¶ 37.   The issuance

of the ERS Bonds was therefore authorized as a "direct debt placement[]" under the statute.

The Committees and Government Parties argue that section 779(d)'s reference to "direct

debt placements" is instead a reference to "private placements," a type of bond issuance that the

Committees and Government Parties argue is distinct from an underwritten bond offering.   *See,*

*e.g.*, ECF No. 6482 in Case No. 17-bk-03283 ¶¶ 71–74.   But section 779 used a different term,

"private placings" (in Spanish, "colocaciones privadas"), when it prohibited ERS from investing

in private placements of debt.   3 L.P.R.A. § 779(b)(2)(A)(ii) (2008).   Courts presume that a

legislature "act[ed] intentionally and purposely" when "includ[ing] particular language in one

section of a statute but omit[ting] it in another."   *Russello v. United States*, 464 U.S. 16, 23 (1983)

---

[13]   Specifically, section 779(b)(1)(C) defined "fixed yield securities" to include "Bonds,
notes or evidence of indebtedness, whether exempted or taxable securities that represent direct
obligations or are secured by the good faith and credit of the government entities, instrumentalities,
enterprises or public corporations and any other government entities created under the laws of the
Government of the United States, any of its states, or of the Commonwealth of Puerto Rico."   3
L.P.R.A. § 779(b)(1)(C) (2008) (English).   Section 779(b)(1)(F) referred to "[f]inancial
instruments constituted directly or indirectly on financial obligations such as mortgage loans,
instruments secured by such loans, as well as automobile loans and lease contracts."   *Id.*
§ 779(b)(1)(F).   And section 779(b)(3) referred to "direct or indirect investments in income-
yielding real estate."   *Id.* § 779(b)(3).

(citation omitted).  Thus, the fact that the Puerto Rico legislature used the term "privadas" when indisputably addressing private debt placements shows that its use of the different term "directas" in the language at issue addresses a different subject.  Thus, "read in [its] context and with a view to [its] place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), it is clear that by using the term "colocaciones directas" rather than "colocaciones privadas," the legislature authorized ERS to issue direct obligation bonds like the ERS Bonds at issue here.  For this separate reason, too, ERS had the authority to issue the ERS Bonds.

## C.  Specific Statutory Reference to "Bonds" Is Not Needed

The Committees and Government Parties argue that the Enabling Act did not authorize the issuance of the ERS Bonds because the statute did not specifically refer to a public bond offering. For the reasons given in the previous section, the Enabling Act expressly authorized ERS to issue the ERS Bonds, because it authorized ERS to borrow from financial institutions and through direct debt placements, and the issuance of the ERS Bonds fell within both authorizations.  "The rules relating to statutes generally are usually applied in construing enactments authorizing the issuance of bonds."  15 McQuillin Municipal Corps. § 43:22.  And there is no "such thing as a 'canon of donut holes,' in which [a legislature's] failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception.  Instead, when [a legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020); *see also* 31 L.P.R.A. § 16 ann. 1 ("It is a basic rule of statutory construction [in Puerto Rico] that when the law grants power to do something, any lesser action included therein is also authorized implicitly.").  Here the "broad rule"—an authorization to borrow from financial institutions and through direct debt placements—expressly authorized the

19

ERS Bond issuance.  The fact that the Enabling Act did not specifically refer to a public bond offering is therefore beside the point.

In arguing otherwise, the Committees and Government Parties rely on two nineteenth-century decisions from the U.S. Supreme Court, *Merrill v. Town of Monticello*, 138 U.S. 673 (1891), and *City of Brenham v. German-American Bank*, 144 U.S. 173 (1892), which distinguish between authority to borrow in general and authority to sell bonds specifically.  *See* UCC Obj. ¶¶ 25–28.[14]  But *Merrill* and *City of Brenham* are not controlling.  They concern questions of Indiana and Texas law, respectively, and were decided nearly half a century before *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), when the Supreme Court still decided matters of state law for itself rather than looking to state court decisions.  *Merrill* and *City of Brenham* do not, of course, consider the law of Puerto Rico, which was still a Spanish colony when they were decided.  Still less do they consider the meaning of a provision the ERS Enabling Act—section 779(d)—that was enacted nearly a century later in 1988, or how that provision applies to a bond issuance that occurred in 2008.  Nor do they consider the governing modern, textual approaches to statutory interpretation, under which "when [a legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule."  *Bostock*, 140 S. Ct. at 1747.

---

[14] The UCC also cited *Fullerton v. Cent. Lincoln People's Utility District*, 201 P.2d 524, 528 (Or. 1948), *Muscatine Lighting Co. v. City of Muscatine*, 217 N.W. 468 (Iowa 1928), and *Reed v. City of Cedar Rapids*, 113 N.W. 773, 775 (Iowa 1907).   But *Fullerton* involved an explicit statutory *prohibition* on bond issuances without voter approval.  291 P.2d at 531 ("The prohibition against issuing either general obligation or revenue bonds without voter approval is so explicit that we believe that it cannot be overcome by anything short of a clear and positive implication to be found in the language of the statute.").  There is no similar prohibition under Puerto Rico law.  And *Reed* and *Muscatine Lighting* applied a rule of Iowa law that does not, of course, govern in Puerto Rico.  *See Muscatine*, 217 N.W. at 471 (applying the "settled law *of this jurisdiction*" (emphasis added)); *Reed*, 113 N.W. at 775 ("[W]e cannot without changing the rule for this state and overruling the cases hitherto cited approve the issuance" of bonds based on authority to borrow.).

20

Moreover, *Merrill* and *City of Brenham* were outliers even in the late 19th century.  Until they were decided, "the courts, federal and state, almost uniformly held that the power to borrow money carried with it the power to issue negotiable bonds."  *Russell*, 125 A. at 642; *see also* cases cited *supra* note 10.  As the Illinois Supreme Court put it, "[h]aving power to borrow money, the power to issue bonds therefor results as a necessary incident."  *Dutton*, 28 N.E. at 462; *see also, e.g.*, *Rogers v. City of Burlington*, 70 U.S. 654, 666 (1866) ("[T]he issuing of bonds by a municipal corporation as material aid in the construction of a railroad is merely a customary and convenient mode of borrowing money to accomplish the object," and allowed pursuant to authority to borrow); *Mitchell v. City of Burlington*, 71 U.S. 270, 273 (1867) ("[T]he power to borrow money for any public purpose" included the power to issue bonds.); *Holmes v. City of Shreveport*, 31 F. 113, 120 (C.C.W.D. La. 1887) ("[W]e are, after a very careful and general examination of authorities, unable to find a single case in which the power of the city's agents to execute negotiable or commercial instruments, or promissory notes, to evidence the credit price of a thing which they were authorized to secure, provide for, or purchase, was judicially denied."); *Black v. Cohen*, 52 Ga. 621, 624 (1874) (holding that the power to make contracts includes power to issue bonds, because "a bond is nothing more than a contract under seal.").

Beginning in 1873, however, the Supreme Court became concerned about fraudulent practices related to bond issuances—practices of which there is no evidence whatsoever in this case.  *See Police Jury of Par. of Tensas v. Britton*, 82 U.S. 566, 571 (1873).  After a series of cases "in one way or another narrow[ing] the scope of the doctrine" recognizing implied power to issue bonds, *Russell*, 125 A. at 643, the Court held in *Merrill*—a case in which a town official had absconded with most of the bond proceeds—that where a town had only implied authority to borrow, it did not have authority under Indiana law to issue negotiable bonds.  138 U.S. at 686.  In

*City of Brenham*, a majority then overruled precedent to hold that even express authority to borrow did not covey authority to issue negotiable bonds under Texas law.  144 U.S. at 182, 186.  This was a sea change, as both *Merrill* and the dissent in *City of Brenham* make clear.  *Merrill*, 138 U.S. at 692 ("It is true that there is a considerable number of cases . . . which hold a contrary doctrine."); *City of Brenham*, 144 U.S. at 196–97 (Harlan, J., dissenting) ("The aggregate amount of negotiable notes and bonds, executed by municipal corporations, for legitimate purposes, under express power to borrow money simply, and now outstanding in every part of the country, must be enormous.").

   *City of Brenham* was a closely divided decision on a question of state law, however, and most states did not follow it.  The Connecticut Supreme Court held in *Russell* that the power to issue bonds where borrowing was authorized was "so firmly established by usage and authority that it can only be taken away by legislative denial or limitation, and ought not to be negatived by judicial interpretation."  125 A. at 645.  The Massachusetts Supreme Judicial Court held that "[h]owever it may be elsewhere," in Massachusetts, towns' power to "raise these large or unusual sums of money by loan, no conditions or restrictions being imposed, carried with it the power to issue bonds." *Town of Williamstown*, 30 N.E. at 473).  Many other states did the same.  *See supra* note 10; *Russell*, 125 A. at 643 ("The [*Brenham* rule] obtains in Alabama, Illinois, Louisiana, New Jersey, and Texas, while the older rule is in force in Massachusetts, Arkansas, Georgia, Kentucky, Nevada, Ohio, New York, Rhode Island, Virginia, and Wisconsin.").[15]

---

[15] Treatises confirm that in most jurisdictions, authority to borrow and enter contracts implies authority to issue bonds.  The C.J.S. Municipal Corporations writes,

> It has been held that power conferred on a municipality to make contracts necessarily includes authority to issue bonds and that power to issue bonds may be implied from power given to a municipality to contract debts.  On the other hand, where the

There is no reason to conclude that Puerto Rico law applies a bond-specific rule of statutory construction akin to that adopted by *City of Brenham* and *Merrill*.  No court has ever so held.  Such a rule contradicts the modern, textual approach to statutory interpretation under which, "when [a legislature] chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 140 S. Ct. at 1747.  Moreover, Puerto Rico is a civil law jurisdiction, so its rules of statutory construction are set forth in the civil code.  *See* 31 L.P.R.A. §§ 14–23.  Nothing in the civil code provides for a special bond-specific rule of construction.  *See id.*  To the contrary, the civil code makes clear that the unambiguous text of a written statute *must control*, *id.* § 14, and that "[t]echnical terms and phrases used in the arts and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities . . . ," *id.* § 16.  And "[i]t is a basic rule of statutory construction [in Puerto Rico] that when the law grants power to do something, any lesser action included therein is also authorized implicitly." *id.* § 16 ann. 1.  As explained above, *supra* Part I.B.1, the experts on both sides agree that the issuance of bonds is both borrowing and a loan.  The issuance of the ERS Bonds therefore fell within the express authorization of section 779(d), as the civil code requires the Court to construe it.

---

corporation has no power to incur a particular indebtedness, it has no power to issue a bond therefor.

64A C.J.S. Municipal Corporations § 2119 (footnotes omitted).  Reflecting the split of authority discussed above, C.J.S. also writes that "[i]t has been both affirmed and denied that authority to issue bonds may be implied from power to borrow money." *Id.*

Similarly, the McQuillan Treatise explains that "[t]he rules relating to statutes generally are usually applied in construing enactments authorizing the issuance of bonds." 15 McQuillin Municipal Corps. § 43:22.  And while McQuillan states that "the general rule is that there is no authority to issue bonds unless it has been expressly conferred," *id.* § 43:20, the ERS Enabling Act *did* expressly confer authority to borrow from financial institutions or through direct debt placements, and thus to carry out the issuance of the ERS Bonds.

Even if the Court could construe a statute based on diffuse policy preferences in the face of unambiguous text and undisputed meaning of technical terms—and it cannot—a special rule that a statute authorizing borrowing does not thereby authorize bond issuance would serve no policy purpose today. As the Uniform Law Commission has explained, the problem of unauthorized bond issuances "has been alleviated by the present practice of requiring legal opinions as to the validity of the issue," so that "[t]he bulk of the case law on this point is nearly 100 years old and it may be assumed that the question now seldom arises." UCC § 8-202 cmt. 3. Yet the reasons for concluding that an authorization to borrow authorizes the issuance of bonds remain. Today as much as in 1892, "[t]hose who have money to lend will not lend it upon mere vouchers or certificates of indebtedness," but often demand "negotiable notes or bonds." *City of Brenham*, 144 U.S. at 196 (Harlan, J., dissenting). Today as in 1924,

> the power to borrow is practically ineffective where large loans are concerned, unless resort may be had to ordinary and well–recognized methods of issuing corporate securities, and any attempt to evidence indebtedness by instruments not fully negotiable would either fail, or, if carried out, could only be effected with inconvenience in debt administration, and the burden of higher interest charges which are uniformly imposed on any security which departs from the ordinary type prevailing in the investment market.

*Russell*, 125 A. at 645. The Legislative Assembly authorized ERS to borrow from financial institutions and through direct debt placements without further limiting the form of such borrowing. The issuance of the ERS Bonds complied with the express provisions of the Enabling Act, and that is all that is required.

Finally, even if the *City of Brenham* rule somehow applied in Puerto Rico and meant that the ERS Enabling Act did not authorize ERS to issue negotiable bonds, that conclusion would not render the ERS Bonds or the secured debt that they represent void or unenforceable, but merely non-negotiable. ERS indisputably had the power to borrow money, including by issuing securities,

and to "secur[e] said debt with the assets of the System." 3 L.P.R.A. § 779(d) (2008). Even states that require express authority for municipalities to issue negotiable paper generally provide that "where such authority is lacking, such a paper is not void, but merely not negotiable. It is still an evidence of debt." *Port of Palm Beach Dist. v. Goethals*, 104 F.2d 706, 709 (5th Cir. 1939); *see also, e.g.*, *Pac. Improvement Co. v. City of Clarksdale*, 74 F. 528, 534 (5th Cir. 1896) ("[W]hen negotiable securities, instead of nonnegotiable instruments, have been employed in settlement of lawful debts, the negotiable bonds so given have, when they were being sued upon, been treated, in a number of reported cases both in federal and state courts, as evidences of the debt, and on them, in the hands of third parties, recovery has been had against such defendant corporation," even though the issuer lacked the power to issue negotiable securities); *Keel v. Pulte*, 10 S.W.2d 694, 697–98 (Tex. Comm'n App. 1928) (warrants issued by city would be enforceable but nonnegotiable, "though couched in terms importing negotiability," because the city lacked authority to issue negotiable instruments); *Forrest City v. Bank of Forrest City*, 172 S.W. 1148, 1150 (Ark. 1915) (fact that city could not issue negotiable note did not render note unenforceable, only subject to personal defenses). It is a different matter, of course, where the municipality lacked the authority to borrow at all—but there is no contention here that ERS lacked such authority.

Indeed, in *City of Brenham* itself, the Supreme Court, after ruling that the city lacked authority to issue negotiable bonds, amended its judgment in response to a rehearing petition to allow the holders to sue the city on the underlying debt. *See City of Brenham v. German Am. Bank*, 144 U.S. 549, 549–50 (1892). Similarly, in *Merrill*, the bondholders' effort—after the Court's ruling that their bonds were issued without authority—to recover at least the principal cost of their bonds failed only on statute of limitations grounds. *See Merrill v. Town of Monticello*, 72 F. 462, 464 (7th Cir. 1896). Thus, a lack of authority to issue negotiable bonds would not preclude

recovery, but merely mean that the bonds themselves would not be treated as negotiable documents.

This makes sense.  The Supreme Court's concern, in narrowly construing municipal authority to issue negotiable paper under Texas and Indiana law, was with "burdens of a most fraudulent and iniquitous character" that would have been unenforceable "had not the obligations been such as to protect them from question in the hands of bona fide holders." *Police Jury*, 82 U.S. at 571.  That concern is fully remedied by recognizing that the underlying secured debt, which ERS indisputably had the authority to incur, is valid, but treating that debt as subject to any personal defenses that ERS may have against the initial purchasers.  The Committees and Government Parties have asserted no such defenses in their complaints, and thus the ERS Bonds are enforceable evidence of the underlying secured debt, which ERS had the undisputed authority to incur, even if ERS lacked authority to issue negotiable paper.

### D. Precedent and Agency Interpretations Confirm ERS's Authority to Issue the ERS Bonds

1. Precedent

In addition to following from the text of the Enabling Act, the conclusion that the ERS Enabling Act authorized the issuance of the ERS Bonds is consistent with precedent.  In 2007, Judge Gelpí ruled that the identically worded (in Spanish) provision in the Teachers Retirement System's enabling act, 18 L.P.R.A. § 392h(7), authorized TRS to "enter into contracts, make loans, *issue bonds*, and invest funds."  *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242, 254–55 (D.P.R. 2007) (emphasis added); *see also id.* at 258 (explaining that TRS "has the capacity to issue bonds").  Indeed, the Teachers Retirement System had conceded as much, even though it was seeking to minimize its independent authority in order to benefit from the Commonwealth's Eleventh Amendment immunity.  *Id.* at 257  And Judge Gelpí further held,

26

rejecting the TRS's contrary argument, that the enabling act did not "limit[] . . . [TRS's] ability to enter into contracts, make loans, issue bonds and invest funds." *Id.* at 255.  The same conclusion is appropriate here.

### 2.  Agency Interpretations

Moreover, "under Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act." *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 8 (1st Cir. 1988).  "[I]f the agency's interpretation of the statute is reasonable, even if it is not the only reasonable one, *the courts must defer to it*." *Gonzalez Segarra v. Corporación del Fondo del Seguro del Estado*, 188 D.P.R. 252 (2013) (quoting *Hernández v. Centro Unido de Detallistas*, 168 D.P.R. 592, 616 (2006)).  In *U.S.I. Properties*, the First Circuit, in upholding a Puerto Rico instrumentality's statutory authority to act as it had, emphasized that the instrumentality "had approval from its own counsel and from its finance committee" to take the challenged actions, and that the "Government Development Bank . . . approved [the instrumentality's] role. . . ." *U.S.I. Props. Corp.*, 860 F.2d at 8.  Given those contemporaneous approvals, the First Circuit remarked that "it may seem amazing that an ultra vires argument should arise at all," and upheld the instrumentality's authority "based on the statutory language and on the . . . agencies' reading of the statute." *Id.*

When ERS issued the ERS Bonds, they came accompanied by a slew of approvals and legal opinions affirming their validity.  These included (1) a Bond Resolution authorizing the bond issuance, which the ERS Board affirmed was "adopted pursuant to the provisions of the [ERS Enabling] Act," BH UV 56(b) ¶¶ 42–43; (2) a legal opinion from ERS's General Counsel opining that the "Bonds have been duly and validly authorized and issued" and "will constitute legally valid and binding obligations of [ERS]," that the Bond Resolution was a "legal, valid, and binding agreement[] of" ERS, and that "[a]ll legislation . . . necessary to fulfill in all material respects the

27

terms and conditions of the Bonds and to carry out the transactions contemplated by the" bond

issuance is "in full force and effect . . . and no further legislation . . . is required for such purposes,"

BH UV 56(b) ¶ 46.10; and (3) a legal opinion from outside counsel to ERS affirming that ERS

"has the right and power under [the ERS Enabling Act] to adopt the Resolution" and that "the

Bonds are valid and binding" obligations of ERS, BH UV 56(b) ¶ 46.6.   Moreover, the

Government Development Bank—the "fiscal agent and . . . a financial advisory and reporting

agency of the Commonwealth" and each of its agencies and instrumentalities, 7 L.P.R.A.

§ 552(A)—approved the ERS Bonds' issuance.   BH UV 56(b) ¶¶ 44–45.   Just as in *U.S.I.

Properties*, these approvals by ERS, its counsel, and the Government Development Bank reaffirm

that ERS had the power to issue the ERS Bonds, as a plain reading of the ERS Enabling Act's

original Spanish text shows.

Even more significantly, the issuance of the ERS Bonds was accompanied by a formal

opinion from the Puerto Rico Secretary of Justice.   BH UV 56(b) ¶ 46.11.   The Secretary of Justice

opined that "All legislation, authorizations consents and approvals necessary to fulfill in all

material respects the terms and conditions and to carry out the transactions contemplated by the

Letter of Representations and the [Master Continuing Disclosure Agreement] are in full force and

effect or have been obtained as applicable and no further legislation authorization consent or

approval is required for such purposes."   BH UV 56(b) ¶ 46.12.   The "transactions contemplated

by the Letter of Representations and the" Master Continuing Disclosure Agreement were, of

course, the issuances of the ERS Bonds:   the Letter of Representations specified that it was made

"in order to induce [the Underwriters] to enter into the Purchase Contract" for the ERS Bonds, and

the Master Continuing Disclosure Agreement was reached "in connection with the issuance of the

System's Senior Pension Funding Bonds."   BH UV 56(b) ¶¶ 46.12, 47.1, 49.   Opinions by the

Secretary of Justice are binding on Puerto Rico government officials unless withdrawn. *Colegio de Ingenieros y Agrimensores de Puerto Rico v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 131 D.P.R. 735, 775 (1992).  There is no evidence that the opinion in question has been withdrawn.  BH UV 56(b) ¶ 46.13.  This binding opinion further confirms the validity of the ERS Bonds.

3.  <u>Other Legislation</u>

Other enactments by the Puerto Rico legislature, both before and after the ERS Bonds were issued, further confirm that the legislature authorized ERS to issue the ERS Bonds in the ERS Enabling Act.  These enactments remove "any lingering doubt" about the scope of ERS's statutory authority.  *Bowen v. Yuckert*, 482 U.S. 137, 149–51 (1987).

*First*, in April 2007, before the ERS Bonds were issued, the legislature specifically anticipated their issuance when it provided that the "funds needed to cover the cost increase in the minimum amount of the pensions of the pensioners of the Central Government shall proceed from the resources obtained *through the issue of bonds* of the Employees of the Government and the Judicature Retirement Systems Administration." Act 35-2007 § 5 (emphasis added).  By that time, ERS was already considering the issuance of the ERS Bonds, and had already received a legal opinion that such an issuance would be legally valid.  BH UV 56(b) ¶ 37.1.  Act 35-2007 contains no independent authorization for ERS to issue bonds, but it confirms that the legislature was aware of the bond issuance, and understood ERS could authorize the transaction.  Otherwise, there could have been no "issue of bonds" to cover the cost of the pension increase provided for by Act 35-2007.

*Second*, the legislature acknowledged the ERS Bonds' validity in 2011 when it again amended the ERS Enabling Act in Act 116-2011.  Act 116 changed the ERS Enabling Act to prohibit future "Bond Issues . . . as part of the direct placement of debts secured with the assets of

the System," and to require legislation approved by two-thirds of the Legislative Assembly for any other future direct placements of debts secured by ERS assets.  Act No. 116-2011 § 7(d).  Self-evidently, the reference to "Bond Issues . . . as part of the direct placement of debts" is an acknowledgement that the phrase "direct placement of debts" always included the power to issue bonds.  The language would be superfluous if ERS never had the authority to issue bonds.  *See, e.g.*, *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) (courts are "hesitant to adopt an interpretation of a [legislative] enactment which renders superfluous another portion of that same law").

Moreover, Act 116-2011's operative text also included a statement that the issuance of the ERS Bonds had "encumber[ed] employer contributions . . . for up to fifty years" and that it had "significantly contributed to the financial crisis of" ERS, Act 116-2011 § 7(d)—effects that were possible only if the ERS Bonds were valid and enforceable in the first place.  And Act 116-2011 further provided that the "interest accrued on these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico"—a provision that makes sense only if the ERS Bonds were valid.  *Id.*  While the reference to tax exemption was holdover language from the prior law, it was re-enacted in Act 116 immediately following a discussion of the ERS Bonds.  In its new context after Act 116, the phrase "these obligations" plainly refers to the ERS Bonds, which are the subject of the previous three sentences.

The Committees and Government Parties largely ignore this portion of Act 116, and instead emphasize a lone statement in the Statement of Motives that: "The Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."  Act 116-2011 at 6.  The statement is factually inaccurate.  An issuance of bonds *by*

ERS was never "submitted to the Legislative Assembly," much less rejected by that body. BH UV 56(b) ¶ 37.5. Rather, this portion of the Statement of Motives seems to be referring to a different proposed transaction, in which it was proposed that the Commonwealth itself would issue general obligation bonds to help fund ERS. BH UV 56(b) ¶¶ 34–36. That different transaction, with the Commonwealth as the borrower, did require legislative authorization, and the required legislation was never passed. *Id.* But the issuance of bonds by ERS was a distinct transaction for which authorizing legislation was never sought, because all involved believed and opined that ERS's existing authority under the Enabling Act was sufficient. BH UV 56(b) ¶¶ 37–37.2, 46–46.13. In any event, whatever the Legislative Assembly meant by the factually inaccurate "illegally made" statement, Act 116 plainly recognized and provided for the continued enforceability of the ERS Bonds. Indeed, even the Statement of Motives went on to argue that "the Retirement System should not be allowed to issue debt, such as stock market bonds, to be secured with its assets." Act 116-2011 at 6. "Should not be allowed" is not, of course, the same as "was not allowed." And while Act 116 amended the ERS Enabling Act to prohibit bonds in the future, nothing the legislature said in that statute supports the conclusion that before the amendment, ERS lacked the authority to issue the bonds. Indeed, if ERS had always lacked that authority, there would have been no need for the legislature to prohibit future "Bond Issues."

*Third*, in 2013, the legislature again amended the ERS Enabling Act. *See* Act No. 3-2013. Yet again, when describing the obstacles facing ERS, the legislature directly referenced the ERS Bonds: "Although the bond issue enabled an injection of funds which extended 5 to 6 years the life of the System's assets, the [ERS] *is under the obligation to repay these bonds* from the employer contributions it receives." *Id.* at 6 (emphasis added). The legislation further provided that the 2008 "debt has a repayment term of almost 50 years, during which [ERS] shall pay

31

approximately $6 billion in interest, in addition to repaying its principal, which amount is equal to

approximately 4 years of benefit payments to retired persons." *Id.*  Thus, even after the legislature

had amended the ERS Enabling Act in 2011 to place limits on ERS's authority to issue bonds, the

legislature assumed and reaffirmed the validity and enforceability of the ERS Bonds that ERS had

already issued years before.

       4.  <u>Judicial Admissions</u>

Finally and unsurprisingly, ERS has itself repeatedly admitted that the ERS Bonds were

valid and enforceable.  Before Judge Besosa in 2016, ERS stipulated that the ERS Bonds were

"authorized" by ERS "[p]ursuant to the authority granted to it under the Enabling Act," Joint Stip.

of Movants, the Commonwealth Respondents, and ERS ¶ 6, No. 3:16-cv-02696, ECF No. 65

(D.P.R. Nov. 2, 2016), and that "[t]he ERS Bond Resolution adopted on January 24, 2008, is a

valid and binding contract between the ERS and holders of ERS Bonds," *id.* ¶ 11.  ERS also argued

in opposing adequate protection in that case that "under the clear terms of the Bond Resolution,

the [Bondholders] have *valid and enforceable liens* over hundreds of millions of dollars of ERS

revenue, which will continue to grow."  ERS Opp'n to Mot. to Lift Stay, No. 3:16-cv-2696, ECF

No. 52 (D.P.R. Oct. 26, 2016) (emphasis added).  These admissions further confirm ERS's

statutory authority to issue the ERS Bonds.

## II.  The Bonds Are Enforceable Under UCC § 8-202

Even if ERS lacked the authority to issue the ERS Bonds, the ERS Bonds would still be

enforceable under revised § 8-202 of the UCC,[16] 19 L.P.R.A. § 1752.  Under § 8-202, "[a] security

. . . , even though issued with a defect going to its validity, is valid in the hands of a purchaser for

value and without notice of the particular defect."   19 L.P.R.A. § 1752(b)(1).   Section 8-202

---

[16] All references to UCC § 8-202 herein are to revised § 8-202.

provides that it is the duty of the issuer, not of the purchaser, to ensure that the security complies

with the law governing its issue.  UCC § 8-202 cmt. 3; *see also Ramette v. Al & Alma's Supper

Club Corp.*, 252 B.R. 148, 156 (Bankr. D. Minn. 2000) ("[T]he unambiguous import of Article 8

is that the issuer of the certificated security bears the risk of improperly issued securities or other

defect.").

The undisputed facts show that this provision applies here and that the Bondholders are

"purchaser[s] for value and without notice" who are entitled to its protection.  Thus, even if the

Court does not conclude that section 779(d) authorized the issuance of the ERS Bonds, the Court

should rule that the ERS Bonds are fully enforceable in the hands of the Bondholders under § 8-

202(b), and therefore (a) grant summary judgment to the Bondholders on Count I of the Clawback

Actions, (b) grant summary judgment to the Bondholders on Counterclaim Counts II and III of the

Clawback Actions, (c) dismiss Counterclaim Counts I, IV, and V of the Clawback Actions as moot,

and (d) overrule the Committees and Government Parties' objections to the Bondholders' claims

that are based on the contention that the ERS Bonds are unenforceable because they are *ultra vires*.

### A.  UCC § 8-202(b) is Applicable to the ERS Bonds

Section 8-202 applies to government securities "only if [1] there has been substantial

compliance with the legal requirements governing the issue or [2] [a] the issuer has received a

substantial consideration for the issue as a whole or for that particular security and [b] a stated

purpose of the issue is one for which the issuer has power to borrow money or issue the security."

19 L.P.R.A. § 1752(b)(2); *see also* 7 Hawkland UCC Series § 8-202:6 ("Either there must have

been substantial compliance with the legal requirement concerning the issuance of the securities,

or the issuer must have received a substantial consideration for the securities and they must have

been issued for a purpose within the general power of the issuer.").  The undisputed facts show

that this requirement is met.

33

As for the first prong, ERS is in "substantial" compliance with the ERS Enabling Act because, as explained above, it was indisputably permitted to both borrow and issue debt—the Committees and Government Parties object, at most, to the form of the transaction. And regardless, both components of the second prong indisputably are satisfied as well. ERS received hundreds of millions of dollars for each series of ERS Bonds, BH UV 56(b) ¶ 39, and the ERS Enabling Act expressly authorized ERS to "borrow money" (or "seek a loan") without any restriction on purpose. Thus, § 8-202(b)(1) applies to the ERS Bonds even though they are government securities.

## B. The Bondholders Are Purchasers for Value Without Notice of the Particular Alleged Defect

There is no dispute that each Bondholder is a "purchaser[] for value" of the ERS Bonds as that term is used in § 8-202. Each Bondholder either (a) purchased its ERS Bond holdings in the open market, in exchange for a market price, (b) acquired its holdings in an exchange with an affiliate that purchased them in the open market, in exchange for a market price, or (c) purchased its ERS Bond holdings directly from the underwriting syndicate. BH UV 56(b) ¶¶ 81–81.15. And while the Bondholders hold securities entitlements, rather than the bonds themselves, which are held by DTC, *supra* note 11, § 8-202(f) provides that in such circumstances, "the issuer may not assert any defense that the issuer could not assert if the entitlement holder held the security directly." 19 L.P.R.A. § 1752(f).[17]

The undisputed facts also show that each Bondholder purchased its interest in ERS Bonds "without notice of the particular defect" that the Committees and Government Parties contend

---

[17] For the reasons given in the Fiscal Agent's Motion for Summary Judgment, to be filed contemporaneously herewith, § 8-202(b) *also* provides a defense with respect to the claims by the Fiscal Agent on behalf of Cede & Co. as nominee of The Depository Trust Company, the sole holder of the bonds themselves.

renders the ERS Bonds *ultra vires*—that is, without notice that the ERS Enabling Act did not authorize the issuance of the ERS Bonds.  To the contrary, from the issuance of the ERS Bonds to today, the evidence that the ERS Bonds were authorized by the Enabling Act was overwhelming. Arguments that the Bondholders had notice that the Enabling Act did not authorize the ERS Bonds must be considered in that context.

The ERS Bonds were issued pursuant to a resolution from the ERS Board of Trustees, which the ERS Board affirmed was "adopted pursuant to the provisions of the [ERS Enabling] Act." BH UV 56(b) ¶ 43.  They were offered via Official Statements that—despite listing many conceivable risks associated with the ERS Bonds—said nothing to suggest that the ERS Bonds might lack statutory authorization.  BH UV 56(b) ¶ 41.  To the contrary, the Official Statements were accompanied by a form legal opinion from Puerto Rico bond counsel confirming that "[t]he Bonds have been duly authorized by the System and constitute legal valid and binding limited obligations of the System." BH UV 56(b) ¶¶ 46.1–46.2.  Even before the offering, ERS had leaked to the press a more substantive legal opinion from bond counsel discussing, and confirming, ERS's authority to issue the ERS Bonds under the ERS Enabling Act.  BH UV 56(b) ¶¶ 37.1–37.4.  And as a prerequisite to the issuance, both ERS's General Counsel and the Commonwealth's Secretary of Justice offered legal opinions confirming the validity of the bonds.  BH UV 56(b) ¶¶ 46.9– 46.12.  By the time the ERS Bonds were issued, moreover, Judge Gelpí's had ruled in *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), that identical language authorized bond issuances, and the Legislative Assembly had expressly instructed ERS to use funds from the bond issuance to pay benefits in Act No. 35-2007 § 5.  In its exhaustive investigative report commissioned by the Oversight Board, Kobre & Kim found no evidence "that

any material concerns about [legislative] authorization were raised prior to issuance" of the ERS Bonds.  BH UV 56(b) ¶ 79.

Nor did matters change after issuance.  ERS paid the bonds in full and on time for nearly a decade.  BH UV 56(b) ¶¶ 64–65.  ERS's financial statements, from issuance up until today, have always recognized the ERS Bonds as a valid, outstanding liability of ERS.  BH UV 56(b) ¶ 66. ERS's Board, which authorized the issuance, has never rescinded its authorization or otherwise concluded that that the ERS Bonds are invalid.  BH UV 56(b) ¶ 80.  ERS obtained investment-grade ratings for the ERS Bonds, and argued against rating downgrades.  BH UV 56(b) ¶¶ 63, 76. In 2011, ERS's Administrator even told the press that he "urge[d] everyone who wants to buy [the ERS Bonds] to do so because it is a great investment."  BH UV 56(b) ¶ 73.  The Legislative Assembly recognized the validity of the ERS Bonds in subsequent legislation enacted in 2011 and 2013, including by specifically amending the ERS Enabling Act in 2011 to limit *future* bond issuances.  *Supra* at 29–32.  Even when ERS stopped making payments on the eve of these restructuring proceedings, ERS raised no argument that the bonds were invalid—to the contrary, it admitted their validity.  *Supra* Part I.D.4.

Moreover, the validity of the ERS Bonds did not sit unexamined after issuance.  ERS and the Government Development Bank commissioned Conway MacKenzie to investigate the issuance in 2010.  BH UV 56(b) ¶ 67. In its resulting report, Conway MacKenzie found much to criticize about the issuance, but made no suggestion that the ERS Bonds were not authorized by the Enabling Act.  BH UV 56(b) ¶ 69.  After reviewing the Conway MacKenzie report, ERS's Administrator and Board of Trustees then received legal advice from outside counsel in February 2012 addressing the subject of the validity or invalidity of the ERS Bonds under the ERS Enabling Act.  BH UV 56(b) ¶ 71.  According to minutes from an ERS board meeting that have been posted

publicly on an ERS website for years, that counsel told ERS's Board that the bonds had been validly issued: "Attorney Rivera believes that the System has authority to incur debt, pledge its assets and has authority to consider future contributions as part of its assets. Anthony Murray, Esq. added that proof of this is that the Legislative Assembly amended Act No. 447 to limit these procedures." [18] BH UV 56(b) ¶ 72. And it is undisputed that after receiving the February 2012 advice, ERS did not make any determination or contention that the ERS Bonds were invalid, commence any legal challenge to the ERS Bonds, or cease paying interest on the ERS Bonds. BH UV 56(b) ¶¶ 64–65, 77–78. Similarly, the Legislative Assembly held hearings on the ERS Bond issuance in 2011, yet then recognized the validity of the ERS Bonds and specifically amended the ERS Enabling Act in 2011 to limit *future* bond issuances. *Supra* at 29–31. Indeed, it is undisputed that ERS *itself* made no determination that the ERS Bonds were invalid before mid-2017—and even then, the supposed determination was made by outside counsel as a litigation position, and was never approved by the Board. BH UV 56(b) ¶¶ 77, 80.

Under the UCC, "a person has 'notice' of a fact when: (a) He has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." 19 L.P.R.A. § 451(25). For purposes of § 8-202(b), the question is whether the ERS Bondholders had notice under that definition of the "particular defect" rendering the ERS Bonds invalid—that is, notice that the ERS Enabling Act in fact did not authorize the issuance of the ERS Bonds. Notice that someone had *argued* that the ERS Bonds were invalid cannot be enough—notice of an affirmative determination of invalidity is required. That is because if the ERS Bonds are invalid, it is because the ERS

---

[18] As of the filing of this motion, these Board minutes are still publicly available on an ERS website: http://www.transicion.pr.gov/2012/026/juramentacion/ 01%20Minuta%20Reunion%20Ordinaria%2023%20de%20febrero%20de%202012.pdf.

Enabling Act *in fact* did not authorize them, and not because someone argued as much.  Allegations and arguments of all sorts are commonly made, and it cannot be the case that any such argument must be treated immediately as equivalent to a proven claim.  *See In re Seacoast Anti-Pollution League*, 490 A.2d 1329, 1339 (N.H. 1985) (holding that a pending appeal challenging the validity of bonds "does not amount to notice of a defect" under UCC § 8-202(b) because "[t]o hold otherwise would be to permit an appealing party to usurp the role allocated to this court" as "every appeal would create a 'defect' that would effectively suspend the operation of an issuing order by casting doubt on the subsequent validity of the securities issued, thereby making them unmarketable or substantially reducing their market value.").  There is no evidence in the record that any Bondholder, at the time of its purchases of ERS Bonds, "ha[d] actual knowledge" that the ERS Bonds were not authorized by the ERS Enabling Act.  19 L.P.R.A. § 451(25).  That should be obvious—no rational investor would purchase a security if it had actual knowledge that the security was invalid.

There is also no evidence in the record that any Bondholder had "received a notice or notification" that the ERS Enabling Act did not authorize the ERS Bonds.  No such notice or notification exists, even today, because there has been no determination by anyone with authority that the ERS Enabling Act did not authorize the issuance of the ERS Bonds.  A ruling from this Court would be the first.  To be sure, certain Bondholders purchased ERS Bonds after receiving litigation filings, such as those made by AAFAF and Commonwealth officials in November 2017 and those made by the Committees in March 2019, that the ERS Bonds were unlawful.  But while those filings made arguments, they could not provide notice that the ERS Enabling Act in fact had not authorized the issuance of the ERS Bonds, because that is a legal determination that those making the filings—AAFAF and creditors' committees—had no authority to make.  It is a question

for the Court.  Moreover, as explained above, ERS itself had previously rejected all of the very evidence on which the filings in question relied and concluded that the ERS Bonds were validly issued.  Nothing in the filings gave the Bondholders notice that ERS had been wrong to do so.

That leaves the third prong of the UCC's "notice" definition—whether, "from all the facts and circumstances known to" the Bondholders when they purchased their interests in ERS Bonds, the Bondholders had "reason to know that" the ERS Enabling Act in fact had not authorized the issuance of the ERS Bonds.  The Committees and Government Parties rely on three categories of "facts and circumstances" to argue that the Bondholders had "reason to know" that the ERS Enabling Act did not authorize the ERS Bonds.  None suffices.

*First*, the Committees and Government Parties have argued that the text of the ERS Enabling Act itself placed the Bondholders on notice that the ERS Bonds were unauthorized.   But there is no evidence that *anyone* has ever concluded from the text of the ERS Enabling Act alone that the ERS Bonds are unauthorized.  Indeed, ERS's general counsel concluded the opposite at the time of the issuance of the ERS Bonds, offering a legal opinion that they were valid.  BH UV 56(b) ¶ 46.10.  The Bond Counsel whose job it was to analyze and confirm validity reached the same conclusion.  BH UV 56(b) ¶¶ 46.1–46.8.  So did the Secretary of Justice.  BH UV 56(b) ¶¶ 46.11–46.12.  ERS's Board—obviously well aware of the Enabling Act—voted to authorize the issuance.  BH UV 56(b) ¶ 42.  If this Court rules that the ERS Bonds were not authorized by the Enabling Act, it will be the first body with any authority to say so.

Moreover, to hold that the Enabling Act itself placed investors on notice that the ERS Bonds were invalid in the face of so much contrary evidence would be to require investors to re-assess for themselves the validity of every security they purchase.  That is not how the municipal bond market works.  As the Bondholders' expert Dr. Hildreth explains,

> Making either the purchasers of securities entitlements or DTC
> responsible for reviewing legislation or conducting other diligence
> in connection with bond issues or secondary market purchases could
> impede issuer access to financial markets, with a resulting decrease
> in the efficiency of government operations. Imposing such risks
> could reduce demand, increase interest rates paid by issuers, limit
> negotiability of municipal bonds, and impair bond values.

BH UV 56(b) ¶ 31.  Dr. Hildreth further explains that "[a] reasonable investor cannot be expected

to uncover material facts that vary from what the professionals involved with the transaction state

in market-oriented certifications."  BH UV 56(b) ¶ 32.  There is no dispute of fact on these points.

The Committees and Government Parties' expert Mr. Doty similarly admitted that it is bond

counsel's obligation "to deliver an opinion stating that the bonds have been validly issued," and

that investors' analysis of the legality of bonds they are considering purchasing "centers on the

bond counsel's opinion."  BH UV 56(b) ¶ 29.  And Mr. Doty's book—which he intended to be "a

guide to investors in municipal securities," BH UV 56(b) ¶ 30—never once suggests that investors

should examine enabling legislation for themselves to assure themselves of validity before

purchasing municipal securities.  BH UV 56(b) ¶ 30.1.  Indeed, the chapter "Considerations When

Buying" says nothing about enabling legislation at all.  BH UV 56(b) ¶ 30.2.

*Second*, the Committees and Government Parties have argued that a statement from the

Legislative Assembly in the Statement of Motives for Act 116-2011 placed the Bondholders on

notice that the ERS Enabling Act did not authorize the ERS Bonds.[19]  That statement reads:  "The

Bond Issue was illegally made by the System's Administration even though such transaction was

submitted to the Legislative Assembly for approval and rejected by the House of Representatives

for deeming it detrimental to the System."  Act 116-2011 at 6.  The statement is factually

---

[19] This argument does not apply to Bondholders' holdings of ERS Bonds purchased before
the enactment of Act 116-2011.

inaccurate.  An issuance of bonds *by ERS* was never "submitted to the Legislative Assembly," much less rejected by that body.  BH UV 56(b) ¶¶ 37.5, 70.4–70.5.  Rather, the statement seems to be referring to a different proposed transaction, in which it was proposed that the Commonwealth itself would issue general obligation bonds to help fund ERS.  BH UV 56(b) ¶ 70.6.  That different transaction, with the Commonwealth as the borrower, did require legislative authorization, and the required legislation was never passed.  BH UV 56(b) ¶ 36–37.  But the issuance of bonds by ERS was a distinct transaction for which authorizing legislation was never sought, because all involved believed and opined that ERS's existing authority under the Enabling Act was sufficient.  BH UV 56(b) ¶¶ 37.1,–37.5, 46.1–46.12, 70.4–70.6.  The Legislative Assembly's factually inaccurate statement in Act 116's Statement of Motives cannot possibly have placed Bondholders on notice that the ERS Enabling Act did not authorize the issuance of the ERS Bonds.

Moreover, ERS itself was of course well aware of the statement in Act 116-2011.  Indeed, ERS received legal advice from outside counsel on the validity of the ERS Bonds in February 2012 that expressly considered the 2011 amendments to the Enabling Act.  BH UV 56(b) ¶ 71.  Public Board minutes reflect that outside counsel told ERS's Board in February 2012 that ERS's "authority to incur" the debt represented by the ERS Bonds was proven by the fact "that the Legislative Assembly amended" the Enabling Act in Act 116-2011 "to limit these procedures." BH UV 56(b) ¶ 72.  In the wake of Act 116-2011 and the receipt of this legal advice, ERS made no determination that the ERS Bonds were invalid and took no steps to have the ERS Bonds declared invalid, for more than eight years after Act 116 was passed.  BH UV 56(b) ¶¶ 77–78. Instead, ERS kept paying the ERS Bonds as before.  BH UV 56(b) ¶¶ 64–65. Thus, because Act 116-2011 did not lead ERS to conclude that the ERS Bonds were invalid—even when ERS

specifically looked into it through counsel—there is no basis for concluding that Act 116 should

have led anyone else to reach that conclusion, either.

*Third*, the Committees and Government Parties have argued that filings in the Title III

proceedings arguing that the ERS Bonds are invalid, including a filing by AAFAF and certain

Commonwealth officials in November 2017 and filings by certain of the Committees in March

2019, placed the Bondholders on notice that the ERS Enabling Act had not authorized the ERS

Bonds.  At the outset, this argument does not apply to the Bondholders' many holdings of ERS

Bonds that were purchased before November 2017.  But even as to later purchases, the filings in

question added nothing to the evidence already available to the ERS Bondholders.  The filings

argued for the first time that the ERS Bonds were invalid.  But the basis for those arguments was

just the Enabling Act and Act 116.  And as already explained, the Enabling Act and Act 116 did

not place the Bondholders on notice that the Enabling Act did not authorize the ERS Bonds.  *Supra*

at 40–41.  The fact that interested litigants were now arguing the opposite added no new factual

evidence, and did nothing to change that.

### III. If the Bonds Are Invalid, the Bondholders Are Entitled to Recover in Equity

Finally, even if ERS lacked authority to issue the ERS Bonds at the time of issuance, and

even if UCC § 8-202(b) did not render the ERS Bonds enforceable in the Bondholders' hands, the

Bondholders would still be entitled to recover in equity, under the doctrine of unjust enrichment.

Thus, if the Court does not grant the Bondholders summary judgment on the Committees and

Government Parties' counts and on Counterclaim Count I or II and III, it should grant the

Bondholders summary judgment on Count IV.

ERS received nearly $3 billion from the underwriters in exchange for the ERS Bonds.  BH

UV 56(b) ¶ 39.  If the Committees and Government Parties are correct that the ERS Bonds are

*ultra vires*, then ERS received that amount as a windfall for its own violation of the ERS Enabling

Act.  The purchasers of the ERS Bonds, and those (like the Bondholders) who acquired their claims

in the secondary market bear no responsibility for ERS's statutory violation.  To permit ERS to

retain billions of dollars it gained for violating its own governing statute at the expense of innocent

investors would surely offend "the elementary principles of equity."  *See Plan Bienestar Salud*,

114 D.P.R. 697, 14 P.R. Offic. Trans. at 903–04 (finding that where a government contract is void

"because the statutory formalities were not observed, the elementary principles of equity, in the

civil law sense of the word, are offended by a municipality's benefitting from an agreement in the

specific circumstances of this case, while at the same time evading all the responsibilities it freely

assumed").  And that is all the more so here, where the ERS Bonds are assertedly void not because

ERS could not borrow the money, but merely because ERS supposedly did so in the wrong way.

The Committees and Government Parties argue that unjust enrichment and estoppel

principles do not apply to *ultra vires* governmental acts.  But that is not the law in Puerto Rico.

To the contrary, Puerto Rico law is clear that "[t]he unjust enrichment doctrine is applicable, within

certain situations, to administrative bodies."  *Id.*  Similarly, Puerto Rico has "accepted the rule

that, in the proper circumstances, a plaintiff may invoke against the State the doctrines of one's

own acts, equitable estoppel, and good faith," and "reject[s] any rules or interpretations that could

lead to a result contrary to good faith."  *Berrios v. U.P.R.*, 116 D.P.R. 88, 16 P.R. Offic. Trans.

112, 125–26 (1985).  Here, ERS accepted the ERS Bonds for nearly $3 billion dollars in a public

process that occurred with the express approval of ERS, the Government Development Bank, and

the Secretary of Justice, and with the endorsement of the Legislative Assembly in Act 35-2007

before the issuance.  *Supra* at 27–29.

The cases that the Committees and Government Parties cite in opposition to these

principles are inapposite.  Many involve purchases that were made in excess of budgetary

appropriations,[20] or debt that was issued in excess of a constitutional limitation on total indebtedness.[21]  In such cases, the liability itself—in any form—exists in violation of a legal limitation on liabilities of any sort.  In *City of Litchfield*, for example, the constitution provided that a city could not "become *indebted in any manner, or for any purpose*" in excess of a certain amount.  114 U.S. at 192 (emphasis added).  As the Supreme Court explained, if such language limiting total indebtedness "is worth anything it is as effectual against the implied as the express promise, and is as binding in a court of chancery as a court of law."  *Id.* at 193.  Here, in contrast, it is undisputed that ERS was fully authorized to incur the $3 billion in debt represented by the ERS Bonds—the asserted problem is simply the form of the issuance—so enforcing the underlying debt in equity would not violate any express legal limitation.  Moreover, the Puerto Rico Supreme Court emphasized in *Morales* that "the contractor knew that the obligations assumed were illegal" at the time he entered into them.  19 P.R. Offic. Trans. at 736 n.7.  Here, there is no evidence that anyone involved in the issuance of the ERS Bonds had any doubt that the issuance was lawful.

Others of the Committees and Government Parties' cases involved government contracts entered in open defiance of legal requirements.  *See Hatton v. Municipio de Ponce*, 134 D.P.R. 1001 (1994) (contract was entered into in "*open violation of all the public policy rules concerning contracts*" with Commonwealth municipalities and plaintiff "argued that he and some municipal employees had for years been involved in a scheme to flout the law and avoid public bids"); *Las Marias Reference Lab. Corp. v. Municipo of San Juan*, 159 D.P.R. 868 (2003) ("Las Marías had done business with the Municipality before and, thus, should have known the rules that govern

---

[20] *Morales v. Municipality of Toa Baja*, 119 D.P.R. 682, 19 P.R. Offic. Trans. 724 (1987); *Humacao Lumber Co. v. Am. Surety Co. of N.Y.*, 59 D.P.R. 165, 168-69 (1941).

[21] *Dist. Twp. of Doon v. Cummins*, 142 U.S. 366 (1892); *Dixon Cnty. v. Field*, 111 U.S. 83 (1884); *City of Litchfield v. Ballou*, 114 U.S. 190 (1885).

contracts of this type. However, it relied on some letters to attempt to renew the contracts, even though it knew—or should have known—that said documents alone were insufficient to create obligations that could be demandable from the Municipality.").  In those cases, too, and again unlike here, the underlying liability itself violated public policy and never should have been created.  Moreover, those cases involved a net expenditure of public funds that never should have occurred.  Here, in contrast, ERS received nearly $3 billion in *private funds* that, according to the Committees and Government Parties, it never should have received.  Requiring ERS to repay those private funds does not contravene any limitation on the expenditure of public funds.[22]

Finally, in other cases on which the Committees and Government Parties rely there was no benefit to the government entity—just private benefit—and thus no question of an unjust enrichment remedy.  *See Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267 (D.P.R. 2015) (invalidating illegal contract that would have funneled tax money to a private shopping mall); *Town of Belleair v. Olds*, 127 F.2d 838, 839 (5th Cir. 1942) (no unjust enrichment because bond proceeds were used for private benefit in violation of the law, not for public benefit); *Commonwealth v. Cole*, 164 D.P.R. 608 (2005) (no enforcement of salary agreement that would have had government pay for work done for the private benefit of a political committee); *Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*, 564 F. Supp. 1425 (W.D. Va. 1983) (alleged breach of contract by government to provide sewer services on plaintiff's land; no evident enrichment of

---

[22] For this reason, the Committees and Government Parties' reliance on *Office of Personnel Management v. Richmond*, 496 U.S. 414, 419–24 (1990) is doubly misplaced.  Not only is there no indication that *Richmond*'s separation-of-powers–based limitations on the spending on non-appropriated federal funds even apply to Puerto Rico government entities, but there is no question here of non-appropriated funds, because ERS was enriched by private funds provided by the underwriters in exchange for the issuance of the ERS Bonds.  *See also In re Calore Express Co.*, 288 F.3d 22, 39 n.7 (1st Cir. 2002) (courts "never to require the government to pay public funds contrary to a statutory appropriation").

government), *aff'd*, 740 F.2d 961 (4th Cir. 1984); *Vt. Dep't of Pub. Serv. v. Mass.s Mun. Wholesale Elec. Co.*, 558 A.2d 215 (Vt. 1988) (breach of contract by government to buy electricity; no evident enrichment of government).[23]   Here, in contrast, it is undisputed that the nearly $3 billion proceeds of the ERS Bond issuance was used to directly benefit ERS, including by being invested to pay future pension benefits and by being used to pay current pension benefits.  BH UV 56(b) ¶ 39.1.

## CONCLUSION

For the foregoing reasons, the Court should (a) grant summary judgment to the Bondholders on Count I of the Clawback Actions, (b) grant summary judgment to the Bondholders on Counterclaim Count I or II and Count III, or Count IV of the Clawback Actions, (c) dismiss the remaining Counterclaim Counts of the Clawback Actions as moot, and (d) overrule the Committees and Government Parties' objections to the Bondholders' claims that are based on the contention that the ERS Bonds are *ultra vires*.

---

[23]   Similarly, *Commonwealth v. SLG Negron-Rodriguez*, 184 D.P.R. 464 (2012), and *Mendoza Aldarondo v. Employees Association* , No. R-65-209, 1967 WL 17167 (P.R. May 19, 1967), involved agreements that purported to illegally increase benefits for current employees. The employees were clearly enriched by these agreements, but there is no suggestion in those cases that the government entity was benefitted in any way.

In San Juan, Puerto Rico, today Friday September 11, 2020.

/s/Alfredo Fernández-Martínez
Alfredo Fernández-Martínez
DELGADO & FERNÁNDEZ, LLC
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750
Tel. (787) 274-1414
Fax: (787) 764-8241
afernandez@delgadofernandez.com
USDC-PR 210511


Sarah Podmaniczky McGonigle (*pro hac vice*)
David R. Fox (*pro hac vice*)
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
Tel. (617) 449-6943
Fax: (617) 449-6999
smcgonigle@jonesday.com
drfox@jonesday.com

/s/ Bruce Bennett
Bruce Bennett (*pro hac vice*)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel. (213) 489-3939
Fax: (213) 243-2539
bbennett@jonesday.com

Benjamin Rosenblum (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York 10281
Tel. (212) 326-3939
Fax: (212) 755-7306
brosenblum@jonesday.com

Geoffrey S. Stewart (*pro hac vice*)
Matthew E. Papez (*pro hac vice*)
Sparkle L. Sooknanan (*pro hac vice*)
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
Tel. (202) 879-3435
Fax: (202) 626-1700
gstewart@jonesday.com
mpapez@jonesday.com
ssooknanan@jonesday.com

*Counsel for Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global
Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW
SP, Glendon Opportunities Fund, L.P., LMA SPC for and on behalf of Map 98 Segregated
Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B),
Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P.,
Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II,
L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P.,
Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund
Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage
Master Fund Ltd., PWCM Master Fund Ltd., Redwood Master Fund, Ltd, and SV Credit,
L.P.*

*/s/ Alicia I. Lavergne-Ramírez*

José C. Sánchez-
Castro USDC-PR
213312
jsanchez@sanchezlrv.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@sanchezlrv.com

SÁNCHEZ/LRV LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*/s/ Jason N. Zakia*

Glenn M. Kurtz (*pro hac vice*)
John K. Cunningham (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
Cheryl T. Sloane (*pro hac vice*)
Jesse L. Green (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Defendants Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund*

# Addendum

# ADDENDUM
## TABLE OF CONTENTS

**Page**

**Puerto Rico Statutes and Related Materials**

1. 3 L.P.R.A. § 779 (2008) (Spanish)............................................... Add.1

2. 3 L.P.R.A. § 779 (2008) (English) ............................................. Add.3

3. 3 L.P.R.A. § 779 ..................................................................... Add.6

4. 3 L.P.R.A. § 9004(q) .............................................................. Add.8

5. 7 L.P.R.A. § 552.................................................................... Add.9

6. 18 L.P.R.A. § 392h................................................................ Add.9

7. 31 L.P.R.A. § 13.................................................................... Add.11

8. 31 L.P.R.A. § 14.................................................................... Add.11

9. 31 L.P.R.A. § 15.................................................................... Add.11

10. 31 L.P.R.A. § 16.................................................................... Add.12

11. 31 L.P.R.A. § 16 ann. 1.......................................................... Add.12

12. 31 L.P.R.A. § 17.................................................................... Add.12

13. 31 L.P.R.A. § 18.................................................................... Add.12

14. 31 L.P.R.A. § 19.................................................................... Add.12

15. 31 L.P.R.A. § 20.................................................................... Add.13

16. 31 L.P.R.A. § 21.................................................................... Add.13

17. 31 L.P.R.A. § 22.................................................................... Add.13

18. 31 L.P.R.A. § 23.................................................................... Add.13

19. 19 L.P.R.A. § 451(25) ............................................................ Add.13

20. 19 L.P.R.A. § 1752 (U.C.C. § 8-202) ....................................... Add.14

# ADDENDUM
# TABLE OF CONTENTS

**Page**

21.  UCC § 8-202 cmt. 3 ........................................................................  Add.15

22.  Act 35-2007 ....................................................................................  Add.17

23.  Act 116-2011 ..................................................................................  Add.23

24.  Act 3-2013 ......................................................................................  Add.46

**Puerto Rico Statutes and Related Materials**

**3 L.P.R.A. § 779 (2008)**

*§ 779 Beneficios de retiro de los empleados del Sistema—Inversiones y reinversión de reservas*

(a) Definiciones.—A los fines de esta sección y de las secs. 779a, 779b y 779c de este título, los siguientes términos tendrán el significado que se expresa a continuación:

> (1) Sistema.—Es el Sistema de Retiro de los Empleados del Gobierno y sus Instrumentalidades.
> (2) Junta.—Es la Junta de Síndicos del Sistema.
> (3) Administrador.—Es el Administrador del Sistema.
> (4) Agencias clasificadoras de crédito.—Son aquellas entidades reconocidas, de uso extenso dentro de los Estados Unidos, al efecto de establecer la calidad de crédito respecto a los valores a ser emitidos en el mercado.
> (5) Capital de riesgo.—Es la inversión de capital en empresas nacientes o en desarrollo, de alto riesgo donde existe un alto potencial de crecimiento.
> (6) Escalas más altas de crédito.—Son las primeras cuatro (4) categorías en la clasificación de valores en cuanto a calidad crediticia.
> (7) Instrumento del mercado de dinero.—Cubre valores de corto plazo (un año o menos), tales como papel comercial, certificados de depósitos, depósitos a términos y aceptaciones bancarias, entre otros.
> (8) Futuros.—Son contratos negociados en mercados establecidos que especifican una fecha futura de entrega o recibo de una cantidad definida de un producto tangible o intangible de carácter específico.
> (9) Opciones.—Son derechos a comprar o vender una cantidad fija de un instrumento financiero específico a un precio definido por un límite de tiempo.
> (10) Valores para futura entrega.—Son contratos negociables en mercados interbancarios o de corretaje que especifican una fecha futura de entrega o recibo de una cantidad definida de un producto tangible o intangible de carácter específico.

(b) Tipos de inversiones autorizadas.—El Sistema mantendrá invertidos todos los recursos disponibles que no se requieran para su operación corriente y podrá invertir en los siguientes valores:

> (1)(A) Valores de rendimiento fijo.—Bonos, pagarés y obligaciones del Gobierno de los Estados Unidos, sus agencias e instrumentalidades.
> (B) Instrumentos del mercado de dinero; éstos deberán ser reconocidos y tener la clasificación más alta para este tipo de instrumento de corto plazo de cualquiera de las agencias clasificadoras de crédito.
> (C) Bonos, pagarés o títulos de deudas, sean éstos valores exentos o tributables, que representen obligaciones directas o que estén garantizadas por la buena fe y el crédito de entidades gubernamentales, instrumentalidades, empresas o corporaciones públicas y cualesquiera otras entidades gubernamentales, creadas al amparo de las leyes del Gobierno

**Add.1**

de los Estados Unidos, cualquiera de sus estados o del Estado Libre Asociado de Puerto Rico.

(D) Bonos, pagarés y obligaciones corporativas.

(E) Bonos, pagarés y obligaciones emitidas y garantizadas por gobiernos centrales de países extranjeros.

(F) Instrumentos financieros constituidos directa o indirectamente sobre obligaciones financieras, tales como préstamos hipotecarios, instrumentos colaterizados [sic] por tales préstamos, así como préstamos de automóvil y contratos de arrendamiento.

Las inversiones autorizadas en los párrafos (C), (D), (E) y (F) deberán estar clasificadas por las agencias clasificadoras de crédito en cualquiera de las cuatro escalas más altas de crédito.

(2)(A) Acciones.—Se autoriza al Sistema a comprar, vender o cambiar acciones comunes o acciones preferidas de cualquier corporación creada bajo las leyes de cualquier estado de los Estados Unidos o del gobierno federal o el Estado Libre Asociado de Puerto Rico o por países extranjeros, sujeto a los siguientes criterios:

(i) Las acciones a ser adquiridas deben ser cotizadas abiertamente en uno o más mercados financieros o sistemas de cotización electrónico de carácter nacional o internacional.

(ii) No se podrán adquirir valores mediante colocaciones privadas.

(iii) El Sistema no podrá invertir más del sesenta por ciento (60%) del total de sus recursos en esta clase de valores.

(iv) No se podrá invertir en empresas cuya valorización de mercado sea menor de cien millones (100,000,000) de dólares (moneda americana).

(v) El sistema no podrá tener más del cinco por ciento (5%) de las acciones autorizadas y en circulación de una empresa.

(vi) El sistema no podrá tener más del veinte por ciento (20%) de sus fondos invertidos en un solo sector económico.

(3) Propiedades inmuebles.—El Sistema podrá invertir hasta un máximo del quince por ciento (15%) de sus recursos totales en inversiones directas o indirectas en propiedades inmuebles que generen ingresos. En dicha inversión tiene que haber una expectativa razonable de rendimiento igual o superior a otros tipos de inversiones y que no se podrá invertir en terrenos que no estén desarrollados.

(4) Capital de riesgo.—El Sistema podrá invertir en capital de riesgo, en empresas nacientes, en desarrollo, de alto crecimiento o de alto riesgo, donde exista un alto potencial de apreciación. En este caso el Sistema podrá controlar más de un cinco por ciento (5%) de las acciones autorizadas, sujeto a que los fondos dedicados a este tipo de inversión no excedan de un cinco por ciento (5%) del total de los recursos del Sistema.

(5) Instrumentos financieros.—La Junta de Síndicos podrá autorizar al Sistema, mediante reglamentación al efecto, a hacer uso de instrumentos financieros, tales como opciones, futuros, valores para entrega futura y transacciones relacionadas al intercambio de moneda extranjera con el único propósito de reducir riesgo.

(c)(1) Restricciones y autorizaciones misceláneas.—Las inversiones en países extranjeros no
excederán del treinta por ciento (30%) del total de los recursos del Sistema.

(2) No se invertirá en valores de ningún gobierno o empresa localizado en países
comunistas o totalitarios o que discriminen por razón de sexo, raza, religión o afiliación
política.

(3) Las inversiones del Sistema, tanto de rendimiento fijo como en acciones, podrán estar
denominadas en moneda de los Estados Unidos o en monedas extranjeras.

(4) A los fines de realizar las inversiones autorizadas en las secs. 779 et seq. de este título,
la Junta deberá contratar los servicios profesionales especializados que sean necesarios,
incluyendo los de consultores y administradores de fondos del Sistema, money managers.

(5) Cualesquiera inversiones efectuadas bajo las disposiciones de esta sección se llevarán
a cabo con la previsión, cuidado y bajo los criterios que los hombres prudentes, razonables
y de experiencia ejercen en el manejo de sus propios asuntos, con fines de inversión y no
especulativos, considerando el balance que debe existir entre expectativas de rendimiento
y riesgo.

(6) El Secretario de Hacienda, en función de agente cobrador y pagador del Sistema,
remesará a éste trimestralmente y dentro de los treinta (3) días siguientes al cierre de cada
trimestre calendario, cualquier sobrante que tenga bajo su custodia, que se produzca como
resultado del desempeño de dichas funciones.

(d) Autorización para incurrir en deudas.—La Junta de Síndicos podrá autorizar al Administrador
para tomar prestado de cualquier institución financiera, del Gobierno del Estado Libre Asociado
de Puerto Rico o del gobierno federal de los Estados Unidos de América, o mediante colocaciones
directas de deuda, garantizando dicha deuda por los activos del Sistema. Los intereses devengados
por dichas obligaciones estarán exentos de pago de contribuciones sobre ingresos al Estado Libre
Asociado de Puerto Rico.

## 3 L.P.R.A. § 779 (2008)

### § 779 Employees Retirement System— Investment and reinvestment of reserves

(a) Definitions.— For the purposes of this section and §§ 779a-779c of this title, the following
terms shall have the meaning stated below:

(1) System.— Is the Retirement System of the Employees of the Government and its
Instrumentalities.

(2) Board.— Is the Board of Trustees of the System.

(3) Administrator.— Is the Administrator of the System.

(4) Credit rating agencies.— Are those recognized agencies extensively used in the United
States to establish credit ratings with regard to securities to be issued in the market.

(5) Risk capital.— Is the investment of capital in new or developing high risk enterprises
in which there is a high growth potential.

(6) Higher credit scales.— Are the first four (4) categories in the rating of securities with
regard to their credit rating.

(7) Money market instrument.— Covers, among others, short-term securities (a year or less) such as commercial paper, certificates of deposit, time deposits and bankers acceptances, among others.

(8) Futures.— Are contracts negotiated in established markets that specify a future date of delivery or receipt of a stated amount of a tangible or an intangible product of a specific nature.

(9) Options.— Are rights to purchase or sell a fixed amount of a specific financial instrument at a stated price for a limited time.

(10) Future delivery securities.— Are negotiable contracts in interbank or brokerage markets that specify a future date of delivery or the receipt of a definite amount of a tangible or an intangible product of a specific nature.


(b) Types of investments authorized.— The System shall keep all the available resources which are not needed for its ordinary operation invested and may invest in the following securities:

(1) Fixed yield securities.—

(A) Bonds, notes and obligations of the Government of the United States, its agencies and instrumentalities.

(B) Money market instruments; these must be recognized and have the highest rating for this type of short-term instrument of any of the credit-rating agencies.

(C) Bonds, notes or evidence of indebtedness, whether exempted or taxable securities that represent direct obligations or are secured by the good faith and credit of the government entities, instrumentalities, enterprises or public corporations and any other government entities created under the laws of the Government of the United States, any of its states, or of the Commonwealth of Puerto Rico.

(D) Bonds, promissory notes and corporate obligations.

(E) Bonds, promissory notes and obligations issued and secured by the central government of foreign countries.

(F) Financial instruments constituted directly or indirectly on financial obligations such as mortgage loans, instruments secured by such loans, as well as automobile loans and lease contracts.

The investments authorized by paragraphs (C), (D), (E), and (F) of this clause must be rated by the credit-rating agencies in any one of the four highest credit classifications.

(2) Stock.—

(A) The System is hereby authorized to purchase, sell or barter common or preferred stock of any corporation created under the laws of any state of the United States or the Federal Government or the Commonwealth of Puerto Rico, or by foreign countries, subject to the following criteria:

(i) That the stock to be acquired must be openly quoted in one or more financial markets or electronic quotation system of a national or international nature.

(ii) Securities shall not be acquired through private placings.

(iii) The System shall not invest more than 60% of its total resources in this type of securities.

(iv) No investment shall be made in enterprises whose market value is less than one hundred million (100,000,000) dollars (United States currency).

**Add.4**

(v) The System shall not hold more than 5% of an enterprise's authorized shares outstanding.

(vi) The System shall not have more than 20% of its funds invested in one single economic sector.

(3) Real properties.— The System may invest up to a maximum of 15% of its total resources in direct or indirect investments in income-yielding real estate. In such investments there must be a reasonable expectation of a yield equal to or higher than other types of investments and no investment may be made in undeveloped land.

(4) Risk capital.— The System may invest in risk capital, new or developing high risk or high growth enterprises where there is a high appreciation potential. In this case, the System may control more than 5% of the authorized shares, provided the funds dedicated to this type of investment do not exceed 5% of the total resources of the System.

(5) Financial instruments.— The Board of Trustees may authorize the System, through regulations, to make use of financial instruments such as options, futures, future delivery securities and transactions related to the exchange of foreign currency for the sole purpose of reducing risks.

(c) Restrictions and miscellaneous authorizations.—

(1) Investments in foreign countries shall not exceed 30% of the total resources of the System.

(2) No investment shall be made in securities of any government or firm located in communist or totalitarian countries or that discriminate for reasons of sex, race, religion or political affiliation.

(3) The investments by the System, whether of fixed yield as well as in stock, may be denominated in United States currency or foreign currency.

(4) In order to carry out the investments authorized by §§ 779-779c of this title, the Board shall contract the necessary specialized professional services including consultants and managers of System funds money managers.

(5) Any investments whatsoever made under the provisions of this section shall be carried out with foresight and care and according to, the criteria that prudent, reasonable and experienced men exercise when handling their own affairs, for investment and nonspeculative purposes, taking into account the balance that must exist between yield expectation and risks.

(6) The Secretary of the Treasury, acting as collecting and paying agent of the System, shall remit to it any remainder under his custody that is produced as a result of exercising those duties, quarterly and within thirty (30) days following the close of each calendar quarter.

(d) Authorization to incur debts.— The Board of Trustees may authorize the Administrator to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the System. The interest accrued by these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico.

**3 L.P.R.A. § 779**

*§ 779 Employees Retirement System Investment and reinvestment of reserves*

(a) Definitions. For the purposes of this section and §§ 779a-779c of this title, the following terms shall have the meaning stated below:

> (1) System. Is the Retirement System of the Employees of the Government and its Instrumentalities.
> (2) Board. Is the Board of Trustees of the System.
> (3) Administrator. Is the Administrator of the System.
> (4) Credit rating agencies. Are those recognized agencies extensively used in the United States to establish credit ratings with regard to securities to be issued in the market.
> (5) Risk capital. Is the investment of capital in new or developing high risk enterprises in which there is a high growth potential.
> (6) Higher credit scales. Are the first four (4) categories in the rating of securities with regard to their credit rating.
> (7) Money market instrument. Covers, among others, short-term securities (a year or less) such as commercial paper, certificates of deposit, time deposits and bankers acceptances, among others.
> (8) Futures. Are contracts negotiated in established markets that specify a future date of delivery or receipt of a stated amount of a tangible or an intangible product of a specific nature.
> (9) Options. Are rights to purchase or sell a fixed amount of a specific financial instrument at a stated price for a limited time.
> (10) Future delivery securities. Are negotiable contracts in interbank or brokerage markets that specify a future date of delivery or the receipt of a definite amount of a tangible or an intangible product of a specific nature.

(b) Types of investments authorized. The System shall keep all the available resources which are not needed for its ordinary operation invested and may invest in the following securities:

> (1) Fixed yield securities.
>> (A) Bonds, notes and obligations of the Government of the United States, its agencies and instrumentalities.
>> (B) Money market instruments; these must be recognized and have the highest rating for this type of short-term instrument of any of the credit-rating agencies.
>> (C) Bonds, notes or evidence of indebtedness, whether exempted or taxable securities that represent direct obligations or are secured by the good faith and credit of the government entities, instrumentalities, enterprises or public corporations and any other government entities created under the laws of the Government of the United States, any of its states, or of the Commonwealth of Puerto Rico.
>> (D) Bonds, promissory notes and corporate obligations.
>> (E) Bonds, promissory notes and obligations issued and secured by the central government of foreign countries.

(F) Financial instruments constituted directly or indirectly on financial obligations such as mortgage loans, instruments secured by such loans, as well as automobile loans and lease contracts.

The investments authorized by paragraphs (C), (D), (E), and (F) of this clause must be rated by the credit-rating agencies in any one of the four highest credit classifications.

(2) Stock.

(A) The System is hereby authorized to purchase, sell or barter common or preferred stock of any corporation created under the laws of any state of the United States or the Federal Government or the Commonwealth of Puerto Rico, or by foreign countries, subject to the following criteria:

(i) That the stock to be acquired must be openly quoted in one or more financial markets or electronic quotation system of a national or international nature.

(ii) Securities shall not be acquired through private placings.

(iii) The System shall not invest more than 60% of its total resources in this type of securities.

(iv) No investment shall be made in enterprises whose market value is less than one hundred million (100,000,000) dollars (United States currency).

(v) The System shall not hold more than 5% of an enterprise's authorized shares outstanding.

(vi) The System shall not have more than 20% of its funds invested in one single economic sector.

(3) Real properties. The System may invest up to a maximum of 15% of its total resources in direct or indirect investments in income-yielding real estate. In such investments there must be a reasonable expectation of a yield equal to or higher than other types of investments and no investment may be made in undeveloped land.

(4) Risk capital. The System may invest in risk capital, new or developing high risk or high growth enterprises where there is a high appreciation potential. In this case, the System may control more than 5% of the authorized shares, provided the funds dedicated to this type of investment do not exceed 5% of the total resources of the System.

(5) Financial instruments. The Board of Trustees may authorize the System, through regulations, to make use of financial instruments such as options, futures, future delivery securities and transactions related to the exchange of foreign currency for the sole purpose of reducing risks.

(c) Restrictions and miscellaneous authorizations.

(1) Investments in foreign countries shall not exceed 30% of the total resources of the System.

(2) No investment shall be made in securities of any government or firm located in communist or totalitarian countries or that discriminate for reasons of sex, race, religion or political affiliation.

(3) The investments by the System, whether of fixed yield as well as in stock, may be denominated in United States currency or foreign currency.

(4) In order to carry out the investments authorized by §§ 779-779c of this title, the Board shall contract the necessary specialized professional services including consultants and managers of System funds money managers.

**Add.7**

(5) Any investments whatsoever made under the provisions of this section shall be carried out with foresight and care and according to, the criteria that prudent, reasonable and experienced men exercise when handling their own affairs, for investment and nonspeculative purposes, taking into account the balance that must exist between yield expectation and risks.

(6) The Secretary of the Treasury, acting as collecting and paying agent of the System, shall remit to it any remainder under his custody that is produced as a result of exercising those duties, quarterly and within thirty (30) days following the close of each calendar quarter.

(d) Authorization to incur debts. The Board of Trustees may authorize the Administrator to take on a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America. Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System. For the direct placement of debts secured with the assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary. This voting shall be detailed in the minutes of the Board by recording therein the number of votes in favor, against, and/or abstained. If the placement is made without such consent, it shall not be valid or binding on the System. In the event that an amendment is introduced in the Legislative Assembly to provide for the placement of direct debt secured with the assets of the System, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment. It is hereby clarified for future generations that the Retirement System made a bond issue amounting to three billion dollars, which bears between 6.25% to 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years. Such Bond Issue was made even though the System had been undergoing a cash flow deficit for several years. Such action has significantly contributed to the financial crisis of the System. The interest accrued on these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico.


### 3 L.P.R.A. § 9004(q)

#### *§ 9004 Powers and authorities of the Association*

The Association shall have all powers that are convenient and necessary to achieve its purposes including, but not limited to, the following:

…

(q) To borrow from any financial institution of the Commonwealth of Puerto Rico or the Federal government of the United States of America, or through the direct placement of debt, securing said debt with the assets of the Association. The interest accrued by said obligations shall be exempt from taxation in the Commonwealth of Puerto Rico.

…

**7 L.P.R.A. § 552**

*§ 552 Charter*

…

Third: The purposes for which the Bank is formed and the business or objects to be carried on and promoted by it are as follows:

(A) To act as fiscal agent and as paying agent and as a financial advisory and reporting agency of the Commonwealth Government and of the agencies, instrumentalities, commissions, authorities, municipalities and political subdivisions of Puerto Rico, the Governor of Puerto Rico, the Council of Secretaries of Puerto Rico and the Secretary of the Treasury of Puerto Rico.

…

**18 L.P.R.A. § 392h (2008)**

*§ 392h Investments— Types authorized*

The System shall invest all available resources that are not required for its regular operations and it is hereby authorized to invest said resources in the following securities:

(1) Fixed-income securities.—
(a) Bonds, notes and obligations of the Government of the United States, its agencies and instrumentalities.
(b) Bonds, notes or titles of debts, be they exempted or taxable securities that represent direct obligations or that are secured by the good faith and credit of government entities, instrumentalities, public enterprises or public corporations and any other government entities created under the laws of the Government of the United States, any of its states or of the Government of the Commonwealth of Puerto Rico.
(c) Bonds, notes and corporate obligations.
(d) Bonds, notes and obligations issued and secured by central governments of foreign countries.
(e) Financial instruments constituted directly or indirectly on financial obligations, such as mortgage loans, collateral instruments for said loans, as well as car loans and lease contracts.
(f) Money market instruments.— These must be recognized and hold the highest classification for this type of short-term instrument of any of the credit classifying agencies.
Those investments indicated in clauses (c), (d), (e) and (f) of this subsection must be classified by credit classifying agencies within any of the four (4) highest credit schedules.

(2) Stocks.—

(a) The System is hereby authorized to purchase, sell or exchange common and preferred stock of any corporation created under the laws of any state of the United States or the federal government or of the Commonwealth of Puerto Rico or of any foreign countries, subject to the following criteria:

(i) The stock to be acquired must be openly quoted in one or more financial markets or national or international electronic quotation systems.

(ii) Securities may not be acquired through private placements.

(iii) The System may not invest more than sixty percent (60%) of its total resources in these types of securities.

(iv) No investments may be made in enterprises whose market valorization is less than one hundred million dollars ($100,000,000) (U.S. currency).

(v) The System may not hold more than five percent (5%) of the authorized stock in circulation of a given enterprise.

(vi) The System may not have more than twenty percent (20%) of its funds invested in a single economic sector.

(3) Real property.— The System may invest up to a maximum of fifteen percent (15%) of its total resources in direct or indirect investments in real property that would generate revenues or for its own use. Said investments must have reasonable yield or savings expectations equal to or higher than other types of investments. No investments may be made in land which is not developed.

(4) Risk capital.— The System may invest in risk capital in newly created, developing, high growth or high risk enterprises with a high potential for appreciation. In this case the System may control over five percent (5%) of the authorized stock provided that the funds devoted to this type of investment do not exceed five percent (5%) of the total resources of the System and that they are executed through professional administrators of this type of investment.

(5) Financial instruments.— The Board of Trustees may authorize the System, through regulations to that effect, to make use of financial instruments such as options, futures, future delivery securities and transactions related to foreign currency exchange for the sole purpose of reducing the risk.

(6) The System investments, whether they are fixed yield or stock investments may be denominated in U.S. or foreign currency.

(7) Authorization to incur debts.— The Board of Trustees may authorize the Executive Director to borrow from any financial institution of the Government of the Commonwealth of Puerto Rico or the federal government of the United States, or through direct debt placements, securing said debt by the assets of the System. The interest said obligations accrue shall be exempted from the payment of income taxes to the Commonwealth of Puerto Rico.

Any investments made under the provisions of this chapter shall be executed with the foresight and care and under the criteria that prudent, reasonable and expert individuals exercise in conducting their own affairs for investment and not speculative purposes, also taking into consideration the balance that must exist between yield and risk expectations.

The Secretary of the Treasury, in the performance of his or her duties as collecting and paying agent of the System, shall remit to the latter any surplus under its custody generated as a result of said operations.

Furthermore, all investments that are not excluded by the Investment Regulations of the System or the investment guidelines promulgated by the Government Development Bank for Puerto Rico are hereby included.

## 31 L.P.R.A. § 13

### *§ 13 Discrepancy between Spanish and English texts*

In case of discrepancy between the English and Spanish texts of a statute passed by the Legislative Assembly of Puerto Rico, the text in which the same originated in either house, shall prevail in the construction of said statute, except in the following cases: (a) If the statute is a translation or adaptation of a statute of the United States or of any State or Territory thereof, the English text shall be given preference over the Spanish. (b) If the statute is of Spanish origin, the Spanish text shall be preferred to the English. (c) If the matter of preference cannot be decided under the foregoing rules, the Spanish text shall prevail.

## 31 L.P.R.A. § 14

### *§ 14 Letter of law observed if free from ambiguity*

When a law is clear and free from all ambiguity, the letter of the same shall not be disregarded, under the pretext of fulfilling the spirit thereof.

## 31 L.P.R.A. § 15

### *§ 15 General and popular use of words*

The words of a law shall generally be understood in their most usual signification, taking into consideration, not so much the exact grammatical rules governing the same, as their general and popular use. Nothing in the Teachers' Retirement Act shows an intention to give to the word 'widow' a meaning different from the usual one; since usually the word 'widow' does not include her, a mistress does not have a right to the benefits provided for the widow of a retired teacher.

**31 L.P.R.A. § 16**

*§ 16 Technical terms and phrases*

Technical terms and phrases used in the arts and sciences shall be interpreted according to their received meaning and acceptation with the experts and authorities in the science, art or profession to which they refer.

**31 L.P.R.A. § 16 ann. 1**

*§ 16 Technical terms and phrases*

It is a basic rule of statutory construction [in Puerto Rico] that when the law grants power to do something, any lesser action included therein is also authorized implicitly.

**31 L.P.R.A. § 17**

*§ 17 Dubious words*

When the words of a law are dubious, their meaning should be sought by examining and comparing the obscure expressions with other related words and sentences in an orderly manner, in order to ascertain their true meaning.

**31 L.P.R.A. § 18**

*§ 18 Laws referring to same matter*

Laws which refer to the same matter, or whose object is the same, shall be interpreted with reference to each other, in order that what is clear in one may be employed for the purpose of explaining what is doubtful in another.

**31 L.P.R.A. § 19**

*§ 19 Reason, spirit, and motives of law*

The most effectual and universal manner of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit thereof, or the cause or motives which induced its enactment.

## 31 L.P.R.A. § 20

### *§ 20 Laws declaring acts void*

When, in order to prevent fraud or from other motives of public utility, the law declares certain acts void, its provisions shall not be dispensed with or left unperformed on the ground that the particular act in question has been proved not to be fraudulent or contrary to the public good.

## 31 L.P.R.A. § 21

### *§ 21 Distinction of laws as odious or favorable*

The distinction of laws into odious or favorable with a view of limiting or extending their provisions, shall not be made by those whose duty it is to interpret them.

## 31 L.P.R.A. § 22

### *§ 22 Civil laws applied without distinction*

Civil laws are equally applied to all without distinction of person or sex, except in the cases otherwise specially provided in the law.

## 31 L.P.R.A. § 23

### *§ 23 Puerto Rico defined*

The expression 'Puerto Rico' shall be held to comprehend, for all civil purposes, the island of that name and the adjacent islands situated to the east of the seventy-fourth meridian of longitude west of Greenwich and which were ceded to the United States by the Government of Spain by virtue of the treaty made on the tenth day of December, eighteen hundred and ninety-eight, and ratified on the eleventh day of April, eighteen hundred and ninety-nine.

## 19 L.P.R.A. § 451(25)

### *§ 451 General definitions*

Subject to additional definitions contained in the subsequent chapters of this subtitle, which are applicable to specific chapters or subchapters thereof, and unless the context otherwise requires, in this subtitle:

…
(25) Notice. A person has 'notice' of a fact when:

**Add.13**

      (a) He has actual knowledge of it; or
      (b) he has received a notice or notification of it, or
      (c) from all the facts and circumstances known to him at the time in question he has reason
      to know that it exists.

A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar imp ort refers to knowledge rather than to sic reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by §§ 401 et seq. of this title.

…

## 19 L.P.R.A. § 1752 (U.C.C. § 8-202)

### *§ 1752 Issuer's responsibility and defenses; notice of defect or defense*

(a) Even against a purchaser for value and without notice, the terms of a certificated security include terms stated on the certificate and terms made part of the security by reference on the certificate to another instrument, indenture, or document or to a constitution, statute, ordinance, rule, regulation, order, or the like, to the extent the terms referred to do not conflict with terms stated on the certificate. A reference under this subsection does not of itself charge a purchaser for value with notice of a defect going to the validity of the security, even if the certificate expressly states that a person accepting it admits notice. The terms of an uncertificated security include those stated in any instrument, indenture, or document or in a constitution, statute, ordinance, rule, regulation, order, or the like, pursuant to which the security is issued.

(b) The following rules apply if an issuer asserts that a security is not valid:
      (1) A security other than one issued by a government or governmental subdivision, agency, or instrumentality, even though issued with a defect going to its validity, is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of a constitutional provision. In that case, the security is valid in the hands of a purchaser for value and without notice of the defect, other than one who takes by original issue.
      (2) Clause (1) of this subsection applies to an issuer that is a government or governmental subdivision, agency, or instrumentality only if there has been substantial compliance with the legal requirements governing the issue or the issuer has received a substantial consideration for the issue as a whole or for that particular security and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security.

(c) Except as otherwise provided in § 1755 of this title, lack of genuineness of a certificated security is a complete defense, even against a purchaser for value and without notice.

(d) All other defenses of the issuer of a security, including nondelivery and conditional delivery of a certificated security, are ineffective against a purchaser for value who has taken the certificated security without notice of the particular defense.

(e) This section does not affect the right of a party to cancel a contract for a security 'when, as and if issued' or 'when distributed' in the event of a material change in the character of the security that is the subject of the contract or in the plan or arrangement pursuant to which the security is to be issued or distributed.

(f) If a security is held by a securities intermediary against whom an entitlement holder has a security entitlement with respect to the security, the issuer may not assert any defense that the issuer could not assert if the entitlement holder had the security directly.


**UCC § 8-202 cmt. 3**

3. The penultimate sentence of subsection (a) and all of subsection (b) embody the concept that it is the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue. The penultimate sentence of subsection (a) makes clear that the issuer cannot, by incorporating a reference to a statute or other document, charge the purchaser with notice of the security's invalidity. Subsection (b) gives to a purchaser for value without notice of the defect the right to enforce the security against the issuer despite the presence of a defect that otherwise would render the security invalid. There are three circumstances in which a purchaser does not gain such rights: First, if the defect involves a violation of constitutional provisions, these rights accrue only to a subsequent purchaser, that is, one who takes other than by original issue. This Article leaves to the law of each particular State the rights of a purchaser on original issue of a security with a constitutional defect. No negative implication is intended by the explicit grant of rights to a subsequent purchaser.

Second, governmental issuers are distinguished in subsection (b) from other issuers as a matter of public policy, and additional safeguards are imposed before governmental issues are validated. Governmental issuers are estopped from asserting defenses only if there has been substantial compliance with the legal requirements governing the issue or if substantial consideration has been received and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security. The purpose of the substantial compliance requirement is to make certain that a mere technicality as, e.g., in the manner of publishing election notices, shall not be a ground for depriving an innocent purchaser of rights in the security. The policy is here adopted of such cases as Tommie v. City of Gadsden, 229 Ala. 521, 158 So. 763 (1935), in which minor discrepancies in the form of the election ballot used were overlooked and the bonds were declared valid since there had been substantial compliance with the statute.

A long and well established line of federal cases recognizes the principle of estoppel in favor of purchasers for value without notices where municipalities issue bonds containing recitals of compliance with governing constitutional and statutory provisions, made by the municipal authorities entrusted with determining such compliance. Chaffee County v. Potter, 142 U.S. 355 (1892); Town of Oregon v. Jennings, 119 U.S. 74 (1886); Gunnison County Commissioners v. Rollins, 173 U.S. 255 (1898). This rule has been qualified, however, by requiring that the municipality have power to issue the security. Anthony v. County of Jasper, 101 U.S. 693 (1879); Town of South Ottawa v. Perkins, 94 U.S. 260 (1876). This section follows the case law trend, simplifying the rule by setting up two conditions for an estoppel against a governmental issuer: (1)

**Add.15**

Substantial consideration given, and (2) power in the issuer to borrow money or issue the security for the stated purpose. As a practical matter the problem of policing governmental issuers has been alleviated by the present practice of requiring legal opinions as to the validity of the issue. The bulk of the case law on this point is nearly 100 years old and it may be assumed that the question now seldom arises.

Section 8-210, regarding overissue, provides the third exception to the rule that an innocent purchase for value takes a valid security despite the presence of a defect that would otherwise give rise to invalidity. See that section and its Comment for further explanation.

**April 24**                                           **Act No. 35**

### Government Retirement System—Amendments

(S.B. 1693)
(Conference)

### [No. 35]

### [*Approved* April 24, *2007*]

### AN ACT

To increase by three (3) percent all pensions granted effective the first (1st) of January 2004, or before, pursuant to the provisions of Act No. 10 of May 21, 1992; to grant a second increase of up to three (3) percent to pensions of less than one thousand two hundred and fifty (1,250) dollars per month, granted effective the first (1st) of January 2004 or before under the provisions of Act No. 447 of May 15, 1951, as amended; to amend subsection (A) of Section 2-101 and subsection (a) of Section 2-103 of Act No. 447 of May 15, 1951, as amended, in order to increase the minimum pension from three hundred (300) dollars to four hundred (400) dollars per month; to exclude from said increases the annuities granted under Act No. 305 of September 24, 1999; to provide the funds needed to cover the impact of said increases; [to] provide that the municipalities and the public corporations shall annually pay from their own resources the cost of these increases to the annuities of those who were employed there before being pensioned; and for other purposes.

STATEMENT OF MOTIVES

Act No. 447 of May 15, 1951, as amended, established a retirement and benefits system for all public employees. The Retirement System, according to the provisions of the law now in effect, is a trust of the public employees whose function is to invest and look after the periodic contributions made by the employees and their respective employers so as to be able to

**Act No. 35**                                                    **April 24**

make the corresponding employee retirement or disability pension payments in the future.

It is a known fact that with the passing of time the increase in the cost of living entails a relative decrease in the value of the annuities of the pensioners. For this reason, Act No. 10 of May 21, 1992, established that effective the first (1st) of January 1992, and subsequently every three years, all annuities to be paid by virtue of said Act because of age, years of service or disability that are in effect to that date and that had been received for the preceding three years would be increased by three (3) percent. Thus, the Government is faced with the moral obligation of helping to improve the quality of life of pensioners, those persons who gave the best years of their lives in the service of the People of Puerto Rico.

Therefore, in consideration of the obligation of the Government to attend to the needs of the pensioners through this Act, two (2) increases of three (3) percent are granted for those pensions provided by the aforementioned Act No. 447, and granted before the first (1st) of January 2004. The first increase shall be in effect the first (1st) of July 2007, retroactive to the first (1st) of January 2007, and the second increase, which is directed to increase for up to three (3) percent all pensions of less than one thousand two hundred and fifty (1,250) dollars without going over the established limit of one thousand two hundred and fifty (1,250) dollars per month, shall be effective the first (1st) of July 2008.

The funds needed to cover the cost of these two (2) increases, in reference to the pensioners of the Central Government, shall be charged to the General Fund and shall be consigned in the General Expenses Budget of the Government of the Commonwealth of Puerto Rico for each fiscal year as of Fiscal Years 2007-2008 and 2008-2009, respectively.

The retroactive cost of the first increase of three percent (3%) for the pensioners of the Central Government, the Public Corporations and the Municipalities shall proceed from

April 24                                                                    Act No. 35

appropriations of the General Fund of the Government of Puerto Rico.

On the other hand, the measure provides for an increase in the minimum pensions which at present amount to between three hundred (300) dollars and four hundred (400) dollars. All pensioners who receive less than the minimum monthly pension shall have their pension increase by an amount equal to the difference between the pension they receive and the minimum pension this measure provides. Said increase shall be effective to the first (1st) of July 2007, and shall be defrayed with the resources obtained from the bond issue of the Retirement Systems Administration for the Pensioners of the Central Government.

None of the increases granted shall apply to those persons who receive their annuities by virtue of Act No. 305 of September 24, 1999, which creates a Savings Account Program for the Retirement of the Employees of the Government of Puerto Rico.

The public corporations and the municipalities whose employees are covered under this Act, shall defray the cost represented by the increase in pensions, both the increase of three (3) percent and the increase in the minimum pension established by this Act for the pensioners of their corporations or municipalities.

*Be it enacted by the Legislature of Puerto Rico:*

Section 1.—Effective the first (1st) of July 2007, and retroactive to the first (1st) of January 2007, all annuities paid under Act No. 447 of May 15, 1951, as amended [3 L.P.R.A. § 766 nt], for merit, age and years of service or disability that are in effect to that date and which have been granted effective the first (1st) of January or before, pursuant to the provisions of Act No. 10 of May 21, 1992, shall be increased by three (3) percent. The appropriation of the resources needed to cover the cost of the increase in the pensions of the pensioners of the Central Government shall be charged to the General Fund and

shall be consigned in the General Expenses Budget of the Government of the Commonwealth of Puerto Rico for each fiscal year as of Fiscal Year 2007-2008.

The public corporations and the municipalities whose employees are covered under this Act, shall defray, from their own resources, the cost represented by the increase in pensions established by this Act for the pensioners of their corporations or municipalities as of Fiscal Year 2007-2008 and subsequent years.

The retroactive cost of the three percent (3%) increase for the pensioners of the Central Government, the Public Corporations and the Municipalities shall proceed from appropriations of the General Fund of the Government of Puerto Rico.

Section 2.—Effective the first (1st) of July 2008, a second increase shall be granted for the annuities that have been awarded effective to the first (1st) of January 2004, or before, of up to three (3) percent to those pensioners who receive a monthly pension of less than one thousand two hundred and fifty (1,250) dollars per month, without going over the established limit of one thousand two hundred and fifty (1,250) dollars per month. The appropriation of the resources needed to cover the cost of the increase in the pensions of pensioners of the Central Government shall be charged to the General Fund and be consigned in the General Expenses Budget of the Commonwealth of Puerto Rico for each fiscal year as of Fiscal Year 2008-2009.

The public corporations and the municipalities whose employees are covered under this Act shall defray, from their own resources, the cost represented by the increase in pensions established by this Act for the pensioners of their corporations or municipalities as of Fiscal Year 2008-2009.

Section 3.—Subsection (A) of Section 2-101 of Act No. 447 of May 15, 1951, as amended [3 L.P.R.A. § 766], is hereby amended to read as follows:

"Section 2-101.—Retirement Annuity

April 24                                                    **Act No. 35**

A.   Upon separation from service, on or after reaching the ages, and after completing the period of service indicated below, all participants who have not been reimbursed their accrued contributions shall be entitled to receive a retirement annuity. Said annuity shall commence on the date in which the participant files his/her application for retirement, but in no case before his/her separation from the service.

...

However, a minimum pension of four hundred (400) dollars per month is hereby fixed for those participants who retire in accordance with the provisions of this Act or of any of the pension plans superseded by it. Every pensioner who receives a pension of less than four hundred (400) dollars per month shall receive, effective the 1st of July 2007, an increase of one hundred (100) dollars or the difference between the pension he/she receives to June 30, 2007, and four hundred (400) dollars per month, whichever is less ..."

Section 4.—Subsection (a) of Section 2-103 of Act No. 447 of May 15, 1951, as amended [3 L.P.R.A. § 766d], is hereby amended to read as follows.

"Section 2-103.—Annuities for new participants

(a)  Annuity for years of service. Retirement shall be optional for new participants joining the System for the first time after April 1, 1990, as of the date in which they reach the age of sixty-five (65), have completed a minimum of ten (10) years of accredited services and have not requested or received the reimbursement from the accrued contributions. The amount of the annuity shall be one point five (1.5) percent of the average compensation multiplied by the years of accredited services. However, a minimum pension of four hundred (400) dollars per month, effective the 1st of July 2007, is hereby fixed for those participants who retire in accordance with the provisions of this Act. Every pensioner who receives a pension of less than four hundred (400) dollars per month shall receive, effective July 1, 2007, an increase of one hundred dollars ($100) or the

**Act No. 36**                                                    **April 24**

difference between the pension he/she receives up to June 30, 2007 and four hundred (400) dollars, whichever is less."

Section 5.—The funds needed to cover the cost the increase in the minimum amount of the pensions of the pensioners of the Central Government shall proceed from the resources obtained through the issue of bonds of the Employees of the Government and the Judicature Retirement Systems Administration. The public corporations and the municipalities whose employees are covered under this Act, shall defray, from their own resources, the cost represented by the increase in the minimum pension established by this Act for the pensioners of their corporations or municipalities.

Section 6.—The pensioners under the provisions of Act No. 305 of September 24, 1999 [3 L.P.R.A. § 766 nt], known as the Retirement Savings Accounts Program, shall be expressly excluded from the provisions of this Act.

Section 7.—This Act shall take effect immediately after its approval.

*Approved April 24, 2007.*

---

**Armed Forces Members Protection Act—Amendment**

(S.B. 398)

[No. 36]

*[Approved April 24, 2007]*

AN ACT

To add a Section 4 to Act No. 218 of August 28, 2003, known as the "United States Armed Forces Members Protection Act," in order that the surviving spouse and the dependent and permanently disabled minor children of those public employees who die as soldiers while in the performance of their duties or are declared missing in action or captured as

(H. B. 2855)
(Conference)

### (No. 116-2011)

(Approved July 6, 2011)

# AN ACT

To      amend **Section 1-105** in order to include temporary employees as members
of the System; amend **Section 2-116** to increase employer contributions;
amend **Section 3-105** to increase employer contributions and prevent them
from being assigned or pledged as collateral by the System to take on loans
as well as require the consent of two-thirds of the members of the Board of
Trustees of the System for such purposes; amend **Section 4-101** to increase
the members of the Board to nine, plus one participant and one pensioner of
the Employee Retirement System of the Government; amend **Section 4-104**
to provide that the Legal Division of the System shall represent the System
in any judicial proceeding; amend **Section 4-105** to require the consent of
two-thirds of the members of the Board of Trustees of the System through
their secrete vote, as well as the enactment of legislation by the Legislative
Assembly, in order to pledge the assets of the System as collateral for any
debt directly incurred, provided that, without such consent, no transaction
shall be valid or binding on the System; amend **Section 4-109** to provide that
a certificate of debt shall be issued and sent to the CRIM and the Secretary
of the Treasury in case that any municipality or municipal entity, agency,
public company, or any other body fails to remit to the System any
contribution and loan payment withheld from employees who participate in
the System, within thirty (30) days following such withholding; that such
debt shall not be cancelled by the Administrator or the Board of the System,
and shall have priority over any other debt under Act No. 447 of May 15,
1951, as amended, known as the "Employee Retirement System of the
Government of the Commonwealth of Puerto Rico"; and for other purposes.

### STATEMENT OF MOTIVES

Through this measure, this Legislative Assembly seeks to protect our public
employees by providing stability to a Retirement System that is undergoing a
serious crisis.

Act No 447 of May 15, 1951, as amended, established the "Employee Retirement System of the Government of the Commonwealth of Puerto Rico," which created a retirement and benefit system of public employees. According to the provisions of the law in effect, this Retirement System is a trust for public employees whose function is investing and keeping custody of the periodic contributions made by employees and their respective employers in order to be able to make the corresponding future employee pension payments for retirement or disability.

There are several Retirement Systems with defined benefit structures, to wit: the Commonwealth of Puerto Rico Teacher's Retirement System, created by Act No. 91 of March 29, 2004; the Retirement System of the University of Puerto Rico, created by Act No. 1 of January 20, 1966; the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, created by Act No. 12; and the Retirement System of the Puerto Rico Electric Power Authority, which was created through a collective bargaining agreement. The structures of these Systems are very similar to the System in question. However, these systems are not undergoing the same economic crisis as the Employee Retirement System of the Government of the Commonwealth of Puerto Rico.

Between June 30, 2007, and June 30, 2009, the System had a total of 160,053 active participants distributed as follows:

| Year* | Act No. 447 - 1951 | Act No. 1- 1990 | Act No. 305- 1999 | Total Participants |
|---|---|---|---|---|
| 30-6-09 | 38,249 | 56,991 | 64,813 | 160,053 |
| 30-6-07 | 46,062 | 58,337 | 66,704 | 171,103 |

**\*Data from the June 2007 and June 2009 Actuarial Reports of the Retirement System,** *Milliman, Wayne, PA*

On the other hand, as of June 30, 2009, the Retirement System had 104,971 pensioners, that is, 56,000 more participants than pensioners, which was good. It is evident that the gap between pensioners and participants is closing, which could seriously jeopardize the finances of the System.

**Incentivized Retirements** have contributed to a significant increase in the number of Pensioners who have entered the System, and their pensions, unlike those of **Retirement Windows**, are paid with the funds of the System. Until now, Incentivized Retirements for participants who have attained both the age and the time required to avail themselves of a pension based on merit have been a square deal for the Agencies of the Central Government, Public Corporations, and Municipalities, since thousands of employees are thus removed from their payrolls and 75% of their average salary is then paid by the Retirement System through a pension. This situation clearly accelerates and makes evident the Actuarial Deficit of the System, and also increases the Cash Flow deficit thereof. Although these employees are included in the actuarial studies, the truth is that the percentage of participants eligible to retire who actually do so is never 100%.

At this time, we can say that the Retirement System is undergoing the worst and most serious crisis since its creation. This crisis has been slowly draining the System to the extent that, by 2014, its capital assets will have been exhausted and its cash flow deficit will have reach nearly $500 million preventing it from meeting its obligations, namely, the pensions of our retirees. Only employer and individual contributions would be available to pay the System's obligations, which would not be enough. Consequently, an item would have to be included in the General Budget of the Government to defray such annual deficit of approximately $500 million. Therefore, we must find solutions that are proportionate to the problem and not merely superficial.

When compared to other Retirement Systems, this one is facing the worst financial crisis. We can conclude that the decisions made in connection with this System have been the least conservative and most devastating. The financial crisis of the System must be regarded as a very serious issue, because this is the Retirement System with the most participants and pensioners.

History has shown that this Retirement System has been managed differently *vis-á-vis* other Systems. Since System membership exceeds 100,000 pensioners, it is believed that providing benefits to such pensioners will translate into votes for the Government Administration that offers them. Hence, benefits are provided even though the System lacks the resources to pay for them. The following Table includes some of the laws that have provided benefits that have had to be paid with the System's funds:

| | | |
|---|---|---|
| **Act No. 15 of December 10, 1975** | $110 Million Loan To the General Budget | The System received $110 million without interests |
| **Act No. 221 of August 9, 1998** | 3%  Raise to Pensioners | Retirement System |
| **Act No. 22 of June 30, 2005** | Mandatory Retirement 58 years-old Police officers | Retirement System |
| **Act No. 35 of April 24, 2007** | Pension Raise from $300 to $400 | Retirement System Retirement System |
| **Executive Order No. 14 of May 24, 2006** | Incentivized Retirement | Retirement System |

Through **Act No. 110-1973** a $100 million dollar loan was granted to the government general budget. Such amount was repaid many years later, without the interests accrued thereon.

**Add.26**

**Act No. 221 of August 9, 1998** increased pensions granted under Act No. 447 of May 15, 1951, as amended, by three (3) percent, effective on or before January 1, 1995. Furthermore, it provided the necessary funds to cover the impact of such increase and established that, each year, municipalities and public corporations would defray the costs of the increase to the annuities of pensioners who were employees thereof. This Act had an estimated cost of $18 million which the System also had to cover.

**Act No. 22 of June 30, 2005,** proposed that members of the Puerto Rico Police and the Firefighters Corps may voluntarily retire after attaining the age of fifty-five (55) and thirty (30) years of service. Retirement will be mandatory as of the date on which participants have completed thirty (30) years of service and attained the age of fifty-eight (58). This Act, which also increased the number of pensioners in the System, and impose no cost whatsoever to be paid to such System, benefits the Central Government by eliminating hundreds of Police officers from its payroll and having the Retirement System pay 75% of their average salary.

**Act No. 35 of April 24, 2007,** set forth that pensioners receiving a monthly pension of less than four hundred dollars ($400) shall, effective on July 1, 2007, receive a one hundred-dollar ($100) raise or the difference between the pension they receive as of June 30, 2007, and four hundred dollars ($400) a month, whichever is less. This raise must have entailed a recurring expense of approximately $20 million which is defrayed by the System. In order to grant this raise, Act No. 35 proposed a **Bond Issue**. The System pledge its assets to make a three billion dollar Bond Issue to pay this raise among other things. This Bond Issue has accelerated the demise of the System, which is set to occur by 2014.

The System has been undergoing serious economic issues, which have not been given the importance they deserve.

**Three Billion-Dollar Bond Issue**

We must note that the System was involved in a Bond Issue transaction amounting to $3 billion. Such transaction was so badly structured that, rather than yielding profits, it resulted in tremendous losses that have accelerated the demise of Retirement System. The Bond Issue was illegally made by the System's Administration even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System. Such Bond Issue was made notwithstanding the fact that other Retirement Systems in the United States were facing difficulties after carrying out similar transactions. The System was led to believe that the return of the sale of such Bonds would make enough profits to pay bondholders and even defray the cash flow deficit. However, the results proved otherwise. Since day one, such investment did not yield any returns, but rather losses, and the payment to bondholders increased the cash flow deficit on the first year to more than one hundred and ten million dollars annually. At the beginning, the Bond Issue was expected to pay 6.6% interest to bondholders, since profits from the investment of the returns of this Bond Issue were estimated at 11%. When the bond issue was finally made, the expectation was down to 4.4%. This shows that, since the beginning, a loss of approximately 2% was expected. This Bond Issue was so terrible that, from $937,000,000 that were invested in February 2008 there were only $837,000,000 by December 2009. Currently, from a $3 billion Bond Issue, only about $1.3 billion remain.  According to the documents related thereto, such Issue was secured with the employee contributions to be collected in the next fifty years. For such reason, the Retirement System should not be allowed to issue debt, such as stock market bonds, to be secured with its assets.

**Actuarial Deficit and Cash Flow Deficit**

As stated above, the Retirement System has been facing not only an actuarial deficit, but also a cash flow deficit so severe that it is slowly draining the System to the extent that, by 2014, its capital assets will have been exhausted. It is necessary to start closing that gap, and there is no doubt that an increase in participant contributions is the solution to raise the funds of the System.

The Actuarial Deficit of this System has been increasing considerably to the point that, from 2001 to 2009, it has doubled, as shown in the Table below:

| Actuarial Deficit of the Retirement System | | | | | |
|---|---|---|---|---|---|
| | **2001** | **2003** | **2005** | **2007** | **2009** |
| **Net Assets** | $2,429,000 | $1,947,000 | $2,328,000 | $2,892,000 | $1,851,000 |
| **Actuarial Obligations** | ($9,882,000) | (11,191,000) | (12,284,000) | (16,770,000) | (18,944,000) |
| **Actuarial Deficit** | ($7,453,000) | ($9,244,000) | ($9,956,000) | ($13,878,000) | ($17,093,000) |

**\* Information supplied by the Employee Retirement System of the Government**

This large deficit should have warned past administrations about the System's situation and encourage them to find solutions to address this issue; however, it was not so.

The cash flow deficit has been increasing precisely due to all the laws that the System has had to finance, along with a $3 billion dollar Bond Issue. The table below shows the timeline of such deficit:

| CASH FLOW DEFICIT\* | |
|---|---|
| **1999-2000** | **17 MILLION** |
| **2000-2001** | **93 MILLION** |
| **2001-2002** | **45 MILLION** |
| **2002-2003** | **62 MILLION** |
| **2003-2004** | **58 MILLION** |

| 2004-2005 | 138 MILLION |
|-----------|-------------|
| 2005-2006 | 60 MILLION |
| 2006-2007 | 199 MILLION |
| 2007-2008 | 240 MILLION |
| 2008-2009 | 380 MILLION |

**\* Information supplied by the Employee Retirement System of the Government**

This cash flow deficit was defrayed as follows:

**2000-2001 - 93 Million** – This overdraft was subsequently paid to the Bank with the proceeds from the sale of some of the shares of the Puerto Rico Telephone Company which amounted to $172 million.

**2001-2002 -  45 Million** – Paid with the proceeds of the sale of some of the shares of the Puerto Rico Telephone Company.

**2002-2003 -  62  Million** – Assets were sold for the payment thereof.

**2003-2004 -  58  Million -**  Assets were sold for the payment thereof.

**2004-2005 - 138  Million** – A loan was taken for the payment thereof.

**2005-2006 -  60  Million -**  A loan was taken for the payment thereof.

**2006-2007 - 199 Million** –  The Remaining Shares of the Puerto Rico Telephone Company were sold for $529 million for the payment thereof.

**2007-2008 - 240 Million** – Paid with the proceeds from the Sale of the Bond Issue.

**2008-2009 - 380 Million** - Paid with the proceeds from the Sale of the Bond Issue.

**2009-2010 - 520 Million -** Paid with the proceeds from the Sale of the Bond Issue.

According to Act No. 447, *supra*, the Central Government has contributed to the Actuarial Deficit and the Cash Flow Deficit of the System, because its employer contributions have been less than what the law itself requires. The following table shows what the Government should have paid on account of employer contributions versus what it has actually paid:

| | | | | % | % |
|---|---|---|---|---|---|
| **Deficiency in the Required Employer Contribution Versus the Contribution Made** | | | | | |
| **Year** | **Required Employer Contribution\*** | **Employer Contribution** | **Contribution Discrepancy** | **% Employer Contribution Made** | **% Employer Contribution Not Made** |
| **2004** | $   578,387,000 | $330,336,000 | $248,051,000 | 57.11% | 46.89% |
| **2005** | $   578,387,000 | $374,823,000 | $203,504,000 | 64.80% | 37.20% |
| **2006** | $   816,472,000 | $559,198,000 | $257,274,000 | 68.49% | 31.51% |
| **2007** | $   816,472,000 | $566,524,000 | $249,948,000 | 69.39% | 30.61% |
| **2008** | $1,191,275,000 | $581,285,000 | $609,990,000 | 48.80% | 51.20% |
| **2009** | $1,258,695,000 | $594,509,000 | $664,186,000 | 47.23% | 52.77% |
| **2010** | $1,459,774,000 | $590,742,000 | $869,032,000 | 40.47% | 59.53% |

**\*Data from the June 2009 Actuarial Report of the Retirement System, *Milliman, Wayne, PA***

Looking at the actuarial deficit and the cash flow deficit we can conclude that there is an imbalance between the actual income of the System and what it needs order to pay its short- and long-term obligations. In Section 21 of Act No. 1, *supra*, a new formula was established to solve this situation by decreasing the deficit caused by a deficiency in contributions. This changed the financing formula of the System. The System's income on account of individual and employer contributions, as well as investments, were intended to provide financing to the System. Under this new formula, employers would assume the responsibility of contributing the difference between the total cost of the System and participant contributions, as well as administration costs. However, this formula has never been implemented by any subsequent administrations of the Retirement System. Today, this is one of the reasons why the actuarial deficit has increased to the point that the System already has its days numbered. The new formula was never implemented and the Act failed to fix a term to review the employer contributions thereunder. This formula was once applied to the Aqueduct and Sewers Authority

and, according to the Retirement System, the Authority owes it $833,219,000 on account of employer contributions. The State Insurance Fund also owes $984,943,000. Undoubtedly, a payment plan is necessary to collect this accrued debt; however, such payment plan should not extend beyond ten years given the economic crisis that the Retirement System is presently facing. After the approval of said Act, it was recommended that employer contributions be reviewed by the System every two years.

**Change in Employer and Individual Contributions**

The contributions schedule has been changing through different legislations. However, we must recognize that, since 1990, the contributions have not been increased. The Table below shows the different legislations that have introduced changes to individual and employer contribution schedules:

| Amendments to Act No. 447 of May 15, 1951 | Individual Contribution | Employer Contribution |
|---|---|---|
| Act No. 447 of May 15, 1951 | 5.5% | 4.5% |
| Act No. 162 of July 20, 1979 | 7% | 7% |
| Act No. July 1st, 1982 | 8% | 8% |
| Act No. 1 of February 16, 1990 | 8.275% | 9.275% |

The actuarial study conducted in 2003, recommended that employers should make a contribution of 16.915% in order for the System to remain balanced. This did not occur, and today we see the results.

**Contribution Remittance Debts**

Failure to implement Section 2-116 of Act No. 447, *supra*, now has make it necessary to increase contributions as a short-term solution to the cash flow problem. Thus, said Section is hereby amended to provide that such formula shall be reviewed every two (2) years.

Carelessness and delay are the order of the day in the Retirement System. Hence, it is necessary to amend the form and manner of sending remittances thereto. Even though previous laws have attempted to implement various remedies, such remedies have been neglected and, therefore, ineffective. The fastest and simplest solution is to enable the System to collect the debt of the municipalities directly from the CRIM, whenever a municipality fails to send their remittances within thirty days, or directly from the Department of the Treasury in the case of agencies that fail to pay within the term provided therefor. Nothing justifies an agency or mayor that withholds contributions and loan payments from the wages of participants and fails to remit such moneys to the Retirement System. We must put an end to this wrongful practice because it not only affects the finances of the System, but also participants themselves when they apply for loans and their applications are rejected because their accounts are past due. This also causes participants to be denied their rights to retire. Thus, we seek to provide that, if municipalities fail to send remittances to the System within 30 days, the System shall issue a Certification to the CRIM so that the latter pays such debt with the funds of the municipality. With regard to Government agencies, we further provide that the System shall issue a certification of debt to the Secretary of the Treasury and the latter shall issue a payment charged to the funds of such agency within 30 days. Debts owed by Government agencies, public corporations, and instrumentalities in connection with the remittance of individual and employer contributions and other payments to the retirement System shall have priority over any other debt. If there is any discrepancy between any Government agency, public corporation, and instrumentality and the System in connection with remittances, such discrepancy shall be notified to the Commission to Solve Controversies of Payments and Debts among Government Agencies. There is no justifiable reason

for a Government agency to owe excessive sums of money to the Retirement System.

**Retirement Savings Accounts**

This measure introduces changes to the Retirement Savings Account Program. Employer contributions are increased from 9.275% to 11.5% and, 20% of such amount shall be granted to the Participants of the Program. Even though this Act specifically provides that employer contributions shall be deposited in the System to increase its assets, reduce its actuarial deficit, and enable the System to meet its future obligations, it should be clarified that employer contributions shall not be used or pledged as collateral by the System to take on loans. In order to do so, the consent of two-thirds of the members of the Board of Trustees of the System through their secret vote, and the enactment of legislation approved by two-thirds of the members of the Legislative Assembly shall be necessary.

The changes made through the amendments being introduced may seem somewhat drastic, but we should bear in mind that in *Bayrón Toro v. Sierra* (119 DPR 605), our highest Court held, in a discussion about the constitutional bar against the impairment of contractual obligations, that a balance must be established when making reasonable and necessary changes to save the actuarial solvency of the Retirement System to safeguard the interests of the participants.

All contribution increases herein provided are established for the purposes of attaining an actuarial balance between the income of the System and the payment of its obligations and expenditures. For such reason, it is necessary to conduct an actuarial study as part of this measure. The flow of funds from contributions plus the yield of the System's assets must be sufficient to cover administrative costs and the payment of benefits.

This Retirement System must achieve financial stability, and the Government should protect it out of deference and respect to our pensioners who worked hard and contributed to build the Puerto Rico that we enjoy today.

With the approval of this measure, this Legislative Assembly seeks to strengthen the Employee Retirement System of the Government of the Commonwealth of Puerto Rico to ensure its financial stability and guarantee that both participants and pensioners can rest assured that their future will be financially stable, and that, at the end of their public service, the Retirement System shall provide them financial security in their retirement.

**_BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:_**

Section 1.- Section 1-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 1-105.- Membership.-

(a)     The membership of the system shall be constituted by every person who holds a regular position as a career or trust, or temporary employee or with probationary personnel status in any executive department, agency, administration, board, commission, office or instrumentality of the Executive Branch, by the Justices of the Peace, the regular employees and officials of the Judiciary Branch and the regular officials and employees of the Legislative Assembly of Puerto Rico, and by all regular officials and employees of the municipalities, including the mayors. Municipal temporary employees shall not be participants of the Retirement System.

(b)     Regular and temporary employees of those public enterprises and municipalities who are participating employers of the system shall also be participating members of the system, subject to what is established in Section 1-110 of this Act.

(i)      ………….……………………………………………………......

…………………………………………………………………………..”

Section 2.- Section 2-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 2-101.- Retirement Annuity**.-

(a)      Upon separation from service, on or after reaching the ages, and after completing the period of service indicated below, all participants who have not been reimbursed their accrued contributions shall be entitled to receive a retirement annuity.  Said annuity shall start on the date on which the participant files his/her application for retirement, but in no case before his/her separation from the service.

………………………………………………………………………

(b)      The preceding provisions of this Section shall not be applicable to officer participants of this System who have served as mayors for at least eight (8) years.

………………………………………………………………………

The maximum retirement annuity to be granted under this subsection shall be ninety percent (90%) of the highest salary that the mayor may have earned.

The payments of the retirement annuity shall begin as of the filing date of the retirement application, but never before the mayor has attained fifty (50) years of age.

…………………………………………………………………….

(f)      The deferred retirement annuity provided in this Section shall take effect at the participant's request."

Section 3.- Section 2-116 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 2-116.- Employer Contributions**.-

(a)     Employer's contributions shall cover the difference between the total cost of the benefits provided by the System and the costs of administration, reduced by the portion contributed by participants.

(b)     ……………………………………………………………..

(c)     ……………………………………………………………..

(d)     Starting on July 1st, 2011, the employer shall contribute to the appropriate System a minimum percentage equal to ten point two hundred seventy-five (10.275) of the compensation regularly received by the participants, and shall make such contributions concurrently with employee contributions, as provided by this Act. As of July 1st, 2011 and until June 30, 2016, the minimum employer contribution minimum of ten point two hundred seventy-five percent (10.275%) shall be increased annually each July 1st. Such increase shall be equal to one percent (1%) of the compensation that participants regularly receive.   As of July 1st, 2016 and until June 30, 2021, the minimum employer contribution rate in effect as of June 30 of each year shall be increased annually by one point twenty-five percent (1.25%) of the compensation that participants regularly receive.

                Provided, that the established increases applicable to Municipalities for Fiscal Years 2011-2012, 2012-2013, and 2013-2014 shall be included in the budget proposal submitted to the Legislative Assembly by the Office of Management and Budget.

(e)     Any difference between the contribution required by subsection (c)(3) of this Section and the minimum contribution established in subsection (d) of this Section shall constitute a deficiency in the employer contribution. The obligation accrued as a result of this deficiency shall constitute an actuarial deficit for the System and an obligation of the employer.

(f)   …………………………………………………………………..

(g)   ………………………………………………………………."

Section 4.- Section 3-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 3-105.- Retirement Savings Account Program – Employer Contributions**.-

Starting on July 1st, 2011, it shall be mandatory for every employer to contribute to the System a sum equal to ten point two hundred seventy-five (10.275%) of the compensation of each participant of the Program while such participant is an employee. These contributions shall be deposited in the System to increase the level of the assets of the System, reduce the actuarial deficit, and enable the System to meet its future obligations. As of July 1st, 2012 and until June 30, 2016, the minimum employer contribution rate of ten point two hundred seventy-five percent (10.275%) shall be increased annually each July 1st. Such increase shall be equal to one percent (1%) of the compensation that participants regularly receive. As of July 1st 2016 and until June 30, 2021, the minimum employer contribution rate in effect on June 30 of each year shall be increased annually by one point twenty-five percent (1.25%) of the compensation regularly received by participants. Provided, that the established increases applicable to Municipalities for Fiscal Years 2011-2012, 2012-2013, and 2013-2014 shall be included in the budget proposal submitted to the Legislative Assembly by the Office of Management and Budget. Said employer contributions may not be assigned or pledged as collateral by the System to take on loans. In order for such employer contributions to be assigned or pledged as collateral by the System to take on loans, the consent of two-thirds of the members of the Board of Trustees of the System through their secret vote and the enactment of legislation which shall be passed by the affirmative vote of two-thirds of the members of the Legislative

Assembly shall be necessary. In the event that an amendment is introduced in the Legislative Assembly to eliminate the provisions of this Act regarding the consent required to take on loans pledging employer contributions as collateral, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment."

Section 5.- Section 4-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 4-101.- Administration.-**

The system created by this Act shall be considered a trust. Any change in the benefit structure of the trust, which results in an increase in the amount of annuities or other benefits, shall be supported with prior actuarial studies to determine its cost, and the corresponding legislation shall provide for its financing.

A Board of Trustees is hereby created and established, which shall be responsible for the enforcement of the provisions of this Act. Said Board shall consist of eleven (11) members, four (4) of whom shall be ex-officio members, to wit: The Secretary of the Treasury, the Commissioner of Municipal Affairs, the President of the Government Development Bank for Puerto Rico, and the Director of the Director of the Human Resources Office. Three (3) members shall be appointed by the Governor of Puerto Rico for terms of three (3) years each, and shall perform their duties until a successor is appointed and takes office. Two (2) of these members shall be participants of the System created by this Act and the other one shall be a participant of the Retirement System of the Judiciary, both shall have at least ten (10) years of credited service on the date of their appointment. Of the remaining four (4) members, two (2) shall be pensioners of each system, appointed by the Governor for terms of three (3) years and shall perform their duties until a successor is appointed and takes office. The other two

(2) members shall be the Chairs of the Federation of Mayors and the Association of Mayors of Puerto Rico, respectively.

The ex-officio members may designate delegates to represent them at meetings of the Board and in any other activities within their duties as members of the Board, except when the Chair of the Board requires their attendance.

The System hereby created shall be organized as an agency of the Government of Puerto Rico, independent and separate from others. Neither the Board of Trustees nor the Administration shall be subject to provisions of the 'General Services Administration Act,' or of the Office of Management and Budget Organic Act'; they shall, however, be individual Administrators under the provisions of Act No. 184 of August 3, 2004, as amended, known as the 'Puerto Rico Public Service Personnel Act.'"

Section 6.- Section 4-104 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"**Section 4-104.- Treasurer and Legal Counsel of the System.-**

The Secretary of the Treasury shall be the Treasurer of the System and:

(a)     Act as the official custodian of the cash belonging to the System and hold said cash subject to the orders of the Board;

(b)     ……………………………………………………………

(c)     ……………………………………………………………

(d)     ……………………………………………………………

The System's Legal Division shall represent the System in any judicial proceedings including lawsuits, trials, actions, and proceedings related to the investments made by the Administrator as specified in Sections 4-106 and 4-108. The Department of Justice shall continue to handle any pending legal proceeding at the time of approval of this Act until its resolution, along with an attorney of the

Retirement System Legal Division, and both shall be equally responsible for the defense and processing thereof.

…………………………………………………………………………."

Section 7.- Section 4-105 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

(a) …………………………………………………………………………

(b) …………………………………………………………………………

(c) …………………………………………………………………………

(d) Authorization to Incur Debts.- The Board of Trustees may authorize the Administrator to take on a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America. Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System. For the direct placement of debts secured with the assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary. This voting shall be detailed in the minutes of the Board by recording therein the number of votes in favor, against, and/or abstained. If the placement is made without such consent, it shall not be valid or binding on the System. In the event that an amendment is introduced in the Legislative Assembly to provide for the placement of direct debt secured with the assets of the System, the consent of two-thirds of the members of the Legislative Assembly shall be necessary to pass such amendment. It is hereby clarified for future generations that the Retirement System made a Bond Issue amounting to three billion dollars, which bears between 6.25% to 6.35% interest to bondholders, thus encumbering employer contributions of the System for up to fifty years. Such Bond Issue was made even though the System had been undergoing a cash flow

deficit for several years. Such action has significantly contributed to the financial crisis of the System. The interest accrued on these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico."

Section 8.- Section 4-109 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

**"Section 4-109.- Penalties. -**

(a)      …

         …

(e)      If the director fails to meet the certification and notice requirement imposed by this Section, he/she shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for a term of six (6) months or by a fine of five thousand dollars ($5,000) or both, at the discretion of the Court. Such fine shall be paid from his/her own pocket.

(f)      In the event that the director of an agency, public corporation or municipality knowingly, willfully, and without just cause fails to remit the funds owed to the System after he/she has been notified by the Administrator, he/she shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for a fixed term of six (6) years or a fine of ten thousand dollars ($10,000) or both, at the discretion of the Court. Such fine shall be paid from his/her own pocket.

(g)      Municipal debts on account of individual or employer contributions, which are in arrears for more than thirty (30) days, shall have priority over any other debt of any municipality or municipal entity having participants in the Retirement System. If such municipality or municipal entity fails to remit to the Retirement System employer or individual contributions withheld from employees who participate in the Retirement System, within thirty (30) days following such withholding, the Administrator shall issue a Certificate of debt to the CRIM and

immediately remit such funds to the System in the amount owed. Such debt shall not be cancelled by the Administrator or the Board of the System.

(h)    Debts on account of individual or employer contributions owed to the Retirement System, which are in arrears for more than thirty (30) days, shall have priority over any other debt of any agency, public company, or any entity having participants in the Retirement System. If any agency, public company, or any entity having participants in the Retirement System fails to remit to the Retirement System the employer or individual contributions withheld from employees who participate in the Retirement System, within thirty (30) days following such withholding, the Administrator shall issue a Certificate of debt to the Secretary of the Treasury and immediately remit such funds to the System in the amount owed. Such debt shall not be cancelled by the Administrator or the Board of the System."

Section 9.- It is hereby provided that, after an actuarial analysis of this bill, if the sum of individual or employer contributions exceed the cash flow necessary to meet the obligation, the remainder thereof may not be used and shall be directly treated as capital to be invested every year.

Section 10.- The operating budget of the System may not exceed 20% of the employer contributions of the Retirement Systems administered by the Retirement System Administration.

Section 11.- Insofar as the System is not at least 75% funded, no Incentivized Retirement may be granted. However, if such retirements are granted, the cost of any pension that exceeds the normal retirement of such agency shall be paid to the System for a five-year period.

Section 12.- Within one hundred twenty (120) days as of the effective date of this Act, the Administrator may amend any Regulations so as to adjust them to this new Act, and approve the Personnel Regulations, and any other, as directed through this or any other Act providing therefor. If the Administrator is not able to

make such amendments within such term, he/she shall request the Legislative Assembly for additional time.

Section 13.- Severability Clause

If any section or part of this Act were ruled null or unconstitutional by any competent court, such ruling shall not affect, impair, or invalidate the remaining provisions thereof.  Any law or part thereof that is in conflict with any provisions of this Act is hereby repealed.

Section 14.- This Act shall take effect on July 1, 2011.

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 116-2011 (H. B. 2855)**

**(Conference)** of the **5th Session of the 16th Legislature** of Puerto Rico:

**AN ACT**  to amend **Section 1-105** in order to include temporary employees as members of the System; amend **Section 2-116** to increase employer contributions; amend **Section 3-105** to increase employer contributions and prevent them from being assigned or pledged as collateral by the System to take on loans as well as require the consent of two-thirds of the members of the Board of Trustees of the System for such purposes; amend **Section 4-101** to increase the members of the Board to nine, plus one participant and one pensioner of the Employee Retirement System of the Government; amend **Section 4-104** to provide that the Legal Division of the System shall represent the System in any judicial proceeding; amend **Section 4-105** to require the consent of two-thirds of the members of the Board of Trustees of the System through their secrete vote, as well as the enactment of legislation by the Legislative Assembly, in order to pledge the assets of the System as collateral for any debt directly incurred, provided that, without such consent, no transaction shall be valid or binding on the System; etc.

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on the 18th day of April, 2013.


Juan Luis Martínez Martínez
Acting Director

(H. B. 888)

## (No. 3-2013)

(Approved April 4, 2013)

# AN ACT

To amend Sections 1-101, 1-102, 1-104, 2-101, 2-103; repeal Sections 2-104, 2-115, and 2-116; renumber Section 2-104-A as Section 2-104; renumber Sections 2-117 to 2-120 as Sections 2-115 to 2-118; repeal Sections 3-104 and 3-105 and renumber Sections 3-106 to 3-112 as Sections 3-104 to 3-110; add new Sections 4-108 and 4-109 and renumber Sections 4-108 to 4-114 as Sections 4-110 to 4-116; create Chapter 5 entitled the "Defined Contribution Hybrid Program"; and add Sections 5-101, 5-102, 5-103, 5-104, 5-105, 5-106, 5-107, 5-108, 5-109, 5-110, 5-111, 5-112, 5-113, and 5-114 to Act No. 447 of May 15, 1951, as amended, in order to provide that the benefits of Chapter 5 of this Act shall not be coordinated with those of Title II of the Social Security Act, except as applicable under the provisions of Chapter 5, establish the definition of the Defined Contribution Hybrid Program, amend the definition of the normal retirement date, raise the minimum pension to $500, establish provisions that regulate pensioners who reenter public service, raise retirement age, establish the treatment for the accumulated benefits of pensioners and participants, establish the procedure for filing applications before June 30, 2013, create the Defined Contribution Hybrid Program, and for other purposes; amend Act No. 105 of June 28, 1969, as amended, to set forth that the benefits provided therein shall not apply to pensioners who retire under Chapter 5 of Act No. 447 of May 15, 1951, as amended; amend Section 1 of Act No. 37-2001, to eliminate the Summer Bonus for the participants of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico; amend Section 1 of Act No. 155-2003, to eliminate the Medications Bonus for the participants of the Retirement System for Employees of the Government of the Commonweal of Puerto Rico; amend Section 8 of Act No. 95 of June 29, 1963, as amended, to eliminate the Government's contribution to the health plan of the participants of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico; amend Section 1 of Act No. 98 of June 4, 1980, as amended, to eliminate the Christmas Bonus for the participants of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico; establish the Additional Benefit Program for the participants of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico; and add a new Section 5-115 to Chapter 5, in order to establish the transitory provisions and recognize cause for action to the System's participants and pensioners.

# STATEMENT OF MOTIVES

## INTRODUCTION

The Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "Public Employees System" or the "System") faces a resource deficiency that threatens to catastrophically worsen the economic crisis that the Island is already undergoing. For decades, the Government of the Commonwealth of Puerto Rico and government employees have not contributed the sums needed to defray the cost of pensions to be paid to public employees who retired and will retire in the future. Consequently, the Public Employees System has the lowest debt to asset ratio of all government employees' retirement systems in the United States and, in the near future, it shall not have the resources needed to pay their obligations to retired employees. It has been estimated that, as soon as fiscal year 2013-2014, the net assets of the System shall be negative, since the debt of the System as evidenced by pension obligation bonds shall exceed the assets of the System and, by fiscal year 2018-2019, the System shall not have sufficient funds to cover the payment of its obligations, among which is the payment of pensions to its own pensioners, because its total assets would have been depleted. Moreover, if changes are not made now, it is highly probable that the assets of the System will be depleted before that time.

At present, and according to reports provided by actuaries, as of June 30, 2011, the Public Employees System, along with the Teachers Retirement System (the "Teachers System" and the Public Employees System, the "Retirement Systems" or the "Systems"), are burdened with a combined actuarial deficit of $35.260 billion. The deficit of the Public Employees System alone is of approximately $25.491 billion. It is foreseen that this actuarial deficit will substantially increase by June 30, 2013. The magnitude of the actuarial deficit of both Retirement Systems is such that it is equivalent to more than four times the annual income of the General Fund and to more than half of the Gross National

Product of Puerto Rico, both for fiscal year 2011.[1] Projections show that in order to meet its obligations to pensioners for the next 26 years, the Government of the Commonwealth of Puerto Rico (central government, public corporations and municipalities) must make an annual injection of approximately $2.850[2] billion to the Systems, which would be equal to approximately one third of the revenues of the General Fund for fiscal year 2012.

It has been estimated that government pensions in the different United States jurisdictions carry over an aggregate deficit of $1.38 trillion.[3] States such as Rhode Island, California, and Illinois have made difficult yet necessary decisions in recent years to stabilize the finances of their retirement systems.[4] By June 30, 2011, the actuarial coverage (debt to net assets ratio) of the Public Employees System was scarcely 6%. In other words, as of that date, the Public Employees System had only 6 cents for each dollar needed to pay the pension of public employees. As a comparison, the actuarial coverage of Rhode Island, which was the lowest in the United States jurisdictions, was at 49%. There is no doubt that the challenge for Puerto Rico is greater than that of any other United States jurisdiction due to the wide gap between the Retirement Systems resources and obligations. Therefore, the measures to be taken must be attuned to the extent of the existing problem.

The crisis of the Retirement Systems is nothing new. In spite of this, past Administrations have failed to take the necessary actions to address the extent of the crisis, which is even worse today. The Island can no longer continue to wait or

---

[1]  The revenues of the General Fund for FY-2011 were $8.158 billion. The Gross National Product at the close of FY-2011 was $64.106 billion (at current prices).

[2]  Actuarial Recommended Contribution (ARC). According to actuarial reports as of June 30, 2011, the ARC for the Public Employees System is $2.153 billion and the ARC for the Teachers System is $700 million. The ARC calculation takes into consideration a stable annual return on investment rate of 6.4% for both Systems.

[3]   Source: "The Widening Gap Update," June 2012; The Pew Center on the States.

[4]  Rhode Island raised the minimum retirement age, eliminated cost of living allowances, and cancelled the defined benefit plan. The cities of San José and San Diego, CA eliminated bonuses for retired persons and discontinued automatic increases in pensions. Illinois raised the retirement age and established a cap in the salary to be used to calculate pensions.

entertain superficial or experimental solutions. At this juncture, Puerto Rico has no other option but to face the problem once and for all and carry out an encompassing system reform that is fair for all those persons affected.

This Legislative Assembly, aware of its historic duty towards pensioners, public employees, taxpayers, and future generations of Puerto Ricans, assumes said responsibility and decrees reasonable and necessary solutions to prevent the total erosion of the assets of the Public Employees System and thereby an unprecedented economic catastrophe for the Island, and to protect the retirement benefits of thousands of active and retired public employees to provide them with a fair and decent retirement in their old age.

**FISCAL CRISIS IN PUERTO RICO**

The Retirement Systems crisis arises at the same time as the most precarious fiscal situation ever in the Central Government, public corporations, and the municipalities. In spite of the approval by the past administration of Act No. 7-2009, known as the "Special Act to Declare a State of Fiscal Emergency and to Establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico" ("Act No. 7"), whereby certain taxes increases and cuts in public spending were implemented –including the dismissal of thousands of public employees– said effort did not eliminate the annual deficit of the General Fund and it has been estimated that the deficit of the General Fund shall exceed $2 billion by fiscal year 2012-2013. The situation of public corporations is not different, since it is estimated that the combined deficit of the three main public corporations shall be of approximately $800 million by fiscal year 2012-3013. The public debt of the government of the Commonwealth of Puerto Rico as of December 31, 2012, including the debt pertaining to the General Fund, the municipalities, public corporations, and agencies, amounted to $70.669 billion, having escalated from $56.455 billion to $70.669 billion in the last 5 years.

The Island's credit is also at an extremely difficult situation due to the downgrading of the public debt of the Central Government to one grade above "junk" by a credit rating agency on December 13, 2012. Along with said downgrading, the bonds of several instrumentalities of the Commonwealth and public corporations, including the bonds of the Public Employees System, the University of Puerto Rico, the Convention District, the Government Development Bank, the Municipal Financing Authority, and the Electric Power Authority were also downgraded. The bonds of the Aqueducts and Sewer Authority, the appropriation bonds of the Public Finance Corporation, and the subordinated bonds of the Highways Authority were downgraded by said credit rating agency to "junk" status. There is no doubt that, in view of the serious fiscal strait situation of the government apparatus, it does not have sufficient funds to inject the money needed to cover the actuarial deficit of the Systems.

**DESCRIPTION OF THE PUBLIC EMPLOYEES SYSTEM**

The Public Employees System administers two types of pension plans: a defined benefit plan and a defined contribution plan. The defined benefit plan is, in turn, divided into two benefits structures through Act No. 447 of May 15, 1951, as amended ("Act No. 447"), for participants who enrolled before April 1, 1990, and Act No. 1 of February 16, 1990, as amended ("Act No. 1"), for participants who enrolled after April 1, 1990 and before December 31, 1999. The defined contribution plan, better known as the "Reform 2000," is governed by Act No. 305-1999 ("Act No. 305"), and covers public employees who enrolled after January 1, 2000. In order to understand the causes of the present crisis, it is necessary to understand how those plans operate.

Public employees whose retirement plan is governed by the provisions of Act No. 447 are entitled to receive an annuity equal to 1.5% of their average compensation during the first twenty (20) years of service, and 2.0% of their average compensation during subsequent years. Said average compensation is

calculated on the basis of the highest compensation earned during any 3 years of creditable service. Under this plan, the minimum retirement age is 58 years (55 years if the person completed 25 years of service) with at least 10 years of service, and the minimum pension to be received by each participant amounts to $400 a month. Participants under Act No. 447 are entitled to receive the so-called "merit pension," which consists of an annuity equal to 75% of their average compensation, if they completed 30 or more years of service and are, at least, 55 years old, or an annuity equal to 65% of the average compensation with 30 years of service and no age requirement. The requirements that apply to police officers and firefighters are slightly different.

On the other hand, public employees whose retirement plan is governed by the provisions of Act No. 1 are entitled to receive an annuity equal to 1.5% of their average compensation during the last five (5) years of service. Under this system, the minimum retirement age is 65 years and the minimum pension to be received by every participant amounts to $400 monthly.

Lastly, in contrast with those public employees subject to Act No. 447 or to Act No. 1, public employees who are participants of the Reform 2000 (employees who entered public service on or before January 1, 2000) do not receive a defined benefit. They are only entitled to receive the money they have contributed throughout their years in public service, plus the return thereon. The minimum retirement age under Reform 2000 is 60 years.

**THE CAUSES OF THE CRISIS**

The serious problem faced by the System is due to several causes, including the original design of the System and the alterations that have been made thereto through amendments and special laws that have increased the benefits of retired persons who have availed themselves of Act No. 447 and Act No. 1, without the government having contributed the resources to defray the cost of said increases, thus bleeding dry the assets of the System.

The main causes of the crisis are the following:

**1)    Inadequate contributions:**

Since its beginning, the System did not receive adequate contributions to maintain a healthy solvency level. The System was designed as a defined benefits system whose pensions was fixed by law and did not depend on the amount of contributions made by the employer or the employees. The law that created the System established a contribution level that was not bound to the benefits to be paid by the System nor did it adjust to the economic or actuarial changes that affected the level of benefits. Although the law contemplated the fact that employers would have to make supplementary contributions as the benefits increased, these were never made. To worsen the deficiency of the original design of the System, a series of laws passed between 1960 and the present weakened the System's finances by increasing the benefits without receiving additional contributions. The government never paid the employer contribution recommended by actuaries to cover retirement benefits. To begin addressing the asset insufficiency, approximately $5 billion would have had to be contributed to the System during the last seven years. Neither the General Fund (nor many of the municipalities and public corporations) had –nor do they have at present– the resources needed to cover said amount.

**2)    Impact of special laws:**

The so-called "Special Laws" consist of a series of laws that grant additional benefits to those originally provided by Act No. 447 and Act No. 1. These Special Laws include:

- Summer bonus;
- Medication bonus;
- Christmas bonus;
- Contributions to health insurance plans;
- Other minimum pension benefits;

**Add.52**

- Other minimum death benefits;

- Cost of Living Allowances (COLA); and

- Additional death and disabilities benefits for specific reasons (for example, employees in high-risk positions that fall in the line of duty).

The annual cost of the benefits granted by the Special Laws is of approximately $212[5] million. The payment source of the benefits granted by the Special Laws comes almost in its entirety from the General Fund or the budget of other government entities. Therefore, the costs of these benefits should not be defrayed from the System's assets. However, at times, the General Fund, public corporations, and municipalities that have the responsibility to pay the benefits granted by these Special Laws simply do not pay them; causing the System to incur those expenses, thus worsening the deficit. The benefits established by Special Laws play an important role in the delicate fiscal situation faced by the General Fund and the System.

### 3) Early retirement programs:

The government began promoting early retirement programs in 1994 in order to reduce the size of its workforce. Although these measures reduced payroll expenses, an item which represents a substantial portion of the General Fund expenditure, early retirement reduced the System's income because it caused a proportional reduction in employer contributions. As soon as an employee ceases working, the government stops making the employer contributions for said person. However, the person receives a benefit that is usually equal to or greater than what he/she would have received had he/she remained employed until the original retirement date. If the government does not make the corresponding contributions to the System to cover the contribution deficit caused by early retirement, a debt

---

[5] According to actuarial reports for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico as of June 30, 2011. Does not include benefits granted under some Special Laws such as the cost of living allowance (COLA).

equal to or greater than that originally foreseen is produced with respect to the person who retired early, with less income to cover the same.

Since 1994, more than 20 early retirement windows have been implemented, being the most recent the one created by Act No. 70 of July 2, 2010.  In some of these windows, the pensions offered equaled 75% of the average compensation of an employee with only 24 years of service, regardless of the age of the participant. The basic problem of these early retirement windows was that they failed to achieve their objective to reduce the total deficit of the government because: (i) the positions left by these employees were taken by new employees; (ii) persons retired with a pension of 65% or 75% of their fixed average compensation, for which the government had contributed much less than what was recommended by actuaries; and (iii) payment plans were offered to government employers and some of these entities have not fully complied therewith.

**4)    Changes in the life expectancy of participants:**

The average life expectancy in Puerto Rico and the United States has increased to 78 years in the last 60 years. As a result, pensioners will receive benefits for a number of years that exceed what was originally foreseen. According to the last study of the Department of Health, in 1950, a year before the creation of the Public Employees System, the life expectancy of Puerto Ricans was 59.5 years for men, 62.4 for women, and 60.9 for both sexes. The most recent data of the Department of Health shows that by 2004, men had a life expectancy of 73.7 years, women of 80.9 years, and both sexes of 77.2 years, an increase of approximately 16 years in average life expectancy. The increase in life expectancy forces the System to defray pensions for longer periods than what was foreseen at the time of fixing retirement ages in the law, which has had a negative impact on the coffers of the System.

**5)    Personal loan programs:**

The Public Employees System offers and administers a personal, mortgage, and cultural trips loans program for the participants of the retirement plan. Participants may obtain up to a maximum of $5,000 in personal loans for any use. In 2007, the System raised that amount to $15,000, which resulted in a decrease in the System's cash flow of approximately $600 million between 2007 and 2010. This insufficiency has been covered with funds from the System itself and has required the liquidation of assets that would have otherwise been available for the payment of pensions.

Due to the number of personal loans originated in recent years, the investments portfolio of the System now holds a significant item pertaining to these loans that are liquid assets. In an effort to improve the situation, the Board of Trustees of the Public Employees System passed a resolution in 2011 to reduce the loan margin to $5,000, and in 2012, it approved the sale of some $313 million in loans. With a balance of $804 million in December 2012, personal loans represent about half of the net assets of the Public Employees System and are an obstacle for its solvency.

### 6)    Pension Obligation Bonds Issue:

In 2008, the Public Employees System issued nearly $3 billion in pension obligations bonds (POBs). The objective of the issue was to inject the proceeds thereof to the Public Employees System and increment its capitalization rate. This strategy has been undertaken by some jurisdictions in the United States, including California, Oregon, and Illinois. On issuing this type of debt, these jurisdictions assigned an external source to pay debt service. However, unlike these jurisdictions, the POBs were structured as a debt of the System itself, where the government employer's contributions are the bonds' repayment source. Although the bond issue enabled an injection of funds which extended 5 to 6 years the life of the System's assets, the Public Employees System is under the obligation to repay these bonds from the employer contributions it receives. This debt has a repayment

term of almost 50 years, during which the Public Employees System shall pay approximately $6 billion in interest, in addition to repaying its principal, which amount is equal to approximately 4 years of benefit payments to retired persons.

## THE MEASURES IMPLEMENTED TO DATE HAVE BEEN INSUFFICIENT; THE GENERAL FUND AND OTHER EMPLOYERS CANNOT CONTRIBUTE MORE TO THE PUBLIC EMPLOYEES SYSTEM

Through the years, the different Administrations have made experimental and fragmented efforts to resolve the crisis in the Public Employees System. Among others, Act No. 1 raised employers and employees contribution to 9.275% and to 8.275%, respectively. Subsequently, the Retirement Savings Account Program, known as the Reform 2000, was created under Act No. 305. It eliminated the defined benefits system for all employees who entered public service as of January 1, 2000, and substituted it for a defined benefit contribution plan, under which the benefit to be received by the public employee at the time of retirement is limited to the contributions made by the employee to the System (a personal savings account), throughout the years of service, plus the return on investment thereon. Lastly, and most recently, through Act No. 116-2011 the government of the Commonwealth of Puerto Rico raised employer contribution in a staggered manner beginning on July 1, 2011 to 10.275% and increased said percent annually to achieve a 21% employer contribution by 2021. However, and according to the System actuaries, the staggered increase in employer contributions is not enough to cover the System's cash flow needs or to eliminate or at least significantly reduce actuarial deficit thereof.

In fact, the difficulty in attempting to resolve the financial crisis of the Retirement System on the basis of solely increasing recurrent appropriations from

the General Fund and other government employers has been embossed by several credit rating agencies. The insufficiency of the increase of employer contribution to resolve the crisis faced by the Retirement System was one of the main reasons for one credit rating agency to downgrade the credit of Puerto Rico to one grade above "junk" during the past month of December 2012.

Moreover, recognizing the delicate fiscal situation of the General Fund and other employers, the increase in employer contribution to the Public Employees System imposes an enormous burden on the central government, public corporations, and the municipalities. Pursuant to the laws in effect at present, the employer contribution shall increase on an annual basis until it reaches 21% of the salaries of public employees by 2020. As for the General Fund, in order to pay these already approved employer contributions by 2020, approximately $1.747 billion would have to be set aside, that is, 20% of its income for fiscal year 2013[6] (proceeding from taxes paid by all Puerto Ricans). This commitment to increase employer contributions by itself entails an immense redistribution of the resources of the Commonwealth of Puerto Rico for the next decades, which shall affect the capacity of the government to invest in the education of our children, safety in our streets, and the construction of infrastructure. But it is even more alarming that, even when honoring the increase in employer contributions approved in Act No. 116, according to projections made by the actuaries of the System, if additional and drastic changes are not made, employer contributions, including the General Fund, to the Systems would have to be increased even more during the following 20 years in order to be able to pay the pensions. This would mean that by 2030, for each dollar of income that the government receives, 41 cents would be directed to the payment of pensions of public employees.

Definitely, the government lacks the resources to continue making more contributions to the System; therefore, it is necessary to consider new alternatives

---

[6] Budgeted income for fiscal year 2013: $8.750 billion.

that would allow for the total restructuring thereof. In order to achieve the financial stability of the System and guarantee the payment of benefits to every pensioner and public employee that will retire in the future, it is indispensable to reevaluate the benefits structure of the System.

## FAILURE TO ACT IS NOT AN OPTION

The Public Employees System is undergoing the greatest and most severe crisis in its history. In the first place, and as stated above, the magnitude of the System's actuarial deficit exceeds $25.491 billion. To correct this deficit, the contribution of the government to the Public Employees System for fiscal year 2011-2012 should have been of approximately $2.153 billion. However, the government only contributed $706 million (including employer contributions and payments under the Special Laws), or 33% of this amount. For the government to make a $2.153 billion contribution to the Employees System ($2.850 billion if the Teachers Retirement System is included), it would have to make drastic cuts in government safety, health, and education services, including additional reductions of personnel. Thus, the easy solution of the past, that is, of patching the System with an injection of non-recurrent cash sources or the appropriation of additional resources originating from the General Fund and other employers is no longer available to cover this wide gap due to the crisis the General Fund is undergoing and the weaknesses in the general finances of the Commonwealth of Puerto Rico, public corporations, and the municipalities. As it has been pointed out, if the government lacks sufficient resources in the General Fund to manage its own operations, much less does it have resources to address the deficiencies in the Public Employees System.

The welfare of all those of us who live in Puerto Rico would be seriously affected if more resources from the General Fund are encumbered for the payment of pensions to retired persons. The more money is appropriated from the General

Fund to cover contributions to the Retirement Systems, the less money would be available to address the needs of the rest of our society. More funds for the Retirement Systems would result in lesser funds to educate our children, protect our homes, healthcare, and to improve the infrastructure that we use on a daily basis.

Even more alarming are the estimates that suggest that as soon as fiscal year 2013-2014, the net assets of the System shall be negative, since the debt evidenced by pension obligation funds shall exceed the assets of the System, and that by fiscal year 2018-2019, the System shall not have sufficient funds to cover the payment of its obligation, among these, the payment to pensioners themselves, since its gross assets shall have been depleted. The crisis the System is undergoing is self-liquidating it rapidly; therefore, if prompt action is not taken, by fiscal year 2018-2019, the System would rely, almost exclusively, on employer and individual contributions for the payment of its obligations, which represents only about 59% of what is required to pay the obligations for said year. This means that the actuarial coverage of the Public Employees System will be 0% by June 30, 2014, and consequently the government would have to appropriate more money from the General Fund, in addition to those approved under Act No. 116, to inject them into the Public Employees System, funds that as we have indicated, are not available.

There is no doubt that the problem has reached a critical level. The Retirement Systems crisis is no longer the exclusive problem of a public employee that hopes to be able to enjoy his/her retirement; it is a systemic risk that threatens the Puerto Rican society and the daily lives of the people of the Island. The System deficit has the following implications:

**1)    The annual cost of the Systems is unsustainable for Puerto Ricans:**

According to projections provided by the actuaries of the System, if drastic changes are not made, the present contributions of the General Fund to the Systems

would have to be increased significantly during the next 20 years in order to be able to pay the pensions. This means that by 2030, for each dollar of income that the government receives, 41 cents would have to be directed to the payment of pensions for public employees, which would make it impossible to perform government work in countless aspects. The government simply does not have the resources to continue making more contributions to the Systems.

### 2)   The burden falls on the participants of the Reform 2000:

Participants who enrolled in the System after January 1, 2000 under the Reform 2000 are contributing the same or more than other active members, but shall receive at the time of their retirement, less benefits than participants under the previous laws. Moreover, if the necessary changes are not implemented, the assets of the Public Employees System could be depleted by the time the participants of the Reform 2000 are entitled to recover their contributions.

On the other hand, there are less active members at present in the System to support the increase for retired persons and beneficiaries. This reduction is due, in part, to the early retirement windows and to a substantial reduction in the number of government employees. At this rate, in the near future there will be more pensioners than participants, which shall intensify even more the financial pressure on the System.

### 3)   Essential public services shall be at risk:

As it has been explained, the burden posed by the contributions made by the Commonwealth to the pension fund is extremely onerous and shall continue to grow. This jeopardizes the viability of basic services that the government should provide to the people, such as public safety, health services, and education. For example, by 2022, the government shall have to set aside more than $2.7 billion to contribute to the Public Employees System and to the Teachers Retirement System. It is estimated that said sum will continue to grow throughout the years

and has already exceeded the annual budget of the Department of Education for fiscal year 2013.

    **4)    The moneys of the Retirement System will be depleted:**

With $1.724 billion in net assets as of June 30, 2011, it is estimated that the Public Employees System shall be left without net assets as soon as in 2014. As stated above, this means that when there are no net assets left, the Public Employees System shall have an actuarial coverage of 0%. Although the Public Employees System does, in fact, have the proceeds of a pension bonds issue, which is estimated to extend its life to 2019 or 2020, those funds are  payable from the employer contributions that the Public Employees System receives and, once exhausted, there shall not be enough money to pay the pensions of retired persons.

    **5)    If the Retirement Systems are not reformed, the credit of Puerto Rico shall be downgraded to "junk" unleashing countless disastrous consequences for the Island:**

As it has been reported by credit rating agencies, the credit of Puerto Rico shall be downgraded to "junk" if the Retirement Systems are not reformed. In fact, the fragility and actuarial deficit of the Public Employees System has been a recurrent finding of all credit rating agencies regarding the condition of the public finances and the rating of the obligations of the Commonwealth of Puerto Rico. So, if the problem of the Retirement Systems is not addressed now, there is a real and imminent risk that the credit of the Commonwealth of Puerto Rico shall be downgraded to "junk". As we all know, this downgrading would have an immediate effect on the people's wallets since it would unleash an unprecedented financial crisis in the Island. This would cause, among other things, the closing of financial markets to the government of Puerto Rico; a drastic devaluation ranging from 30% to 50% in the value of all government and public corporations obligations; a reduction in the short-term lines of credit granted by banks that the government uses to finance its operations; a significant increase in interest rates;

and the loss of millions of dollars invested in Individual Retirement Accounts (IRA), and in public and private retirement plans that have investments in government bonds.

The impact of such downgrading on government finances would be monumental. There would be an abrupt reduction in revenues and the impossibility of resorting to effective financing to cover budgetary insufficiencies and to manage government operations as usual. This would have disastrous consequences because the basic government services would be seriously affected. Given the government's need to be able to finance its operations and capital works through the financing obtained in financial markets and the fragility of our credit and its present rating, it is indispensable to promptly resolve this crisis. The longer we wait to solve this issue, the more the insolvency of the System will worsen, thus increasing the adverse social impact of any solution implemented. There is no doubt that the interest of this Legislative Assembly is to promptly resolve the crisis we face through the implementation of well-pondered, reasonable, fair, and permanent solutions.

## IN VIEW OF THE PRESENT CRISIS, IT IS NECESSARY TO ACT NOW

It is of utmost importance to implement a comprehensive reform plan to address the System's crisis. If the present structure does not undergo significant changes, all Puerto Ricans, including public employees, pensioners, and all other productive sectors of our society, will have to make great sacrifices in order to pay the obligations accumulated by the System.

The actuarial reality of the Public Employees System, as well as the experience of other jurisdictions, show that in the face of this type of crisis, it is necessary that all participants, beneficiaries, and contributors of the System help to restore its fiscal health, so that it can meet its present obligations to the more than 116,000 current pensioners and future obligations to the more than 130,000 active public employees. There are various alternatives; however, the extent of the crisis

prevents us from finding the solution that would make up once and for all the existing deficit. The increase of employer contribution, as provided in Act No. 116-2011, and the use of non-recurrent sources of income, as the POBs issue, or the sale of the System's assets, as it has been done in the past years, are not feasible and, in any case, could not solve the present actuarial crisis alone. To repeat the errors of the past would only perpetuate a problem that we have been dragging for the past 60 years and that today threatens to push us to an economic abyss that could ensue an unprecedented social crisis. On the contrary, comprehensive and encompassing solutions are required whereby all the constituents of the System and all of its contributors can work together on its recovery.

Therefore, in addition to honoring the previously approved increase in employer contribution (that is paid from taxes paid by taxpayers) the road to the fiscal reconstruction of the System requires reducing the actuarial deficit and the insufficiency of funds for the payment of benefits by means of a balance of measures that contemplate, among others: (1) freezing benefits accrued by active public employees under the defined benefits plan pursuant to Act No. 447 and Act No. 1, by eliminating the granting of new benefits under the present System, yet honoring all those accrued by said public employees to the present; (2) raising the retirement age, which shall be implemented in a staggered manner for those public employees that at present are close to attaining the retirement age required under the laws in effect; (3) increasing the contribution of employees to the System;      (4) transferring active public employees under Act No. 447 and Act No. 1 to a defined contribution plan similar to the Reform 2000; (5) modifying the benefits granted by the Special Laws, using all the savings in employer contribution thus generated to set aside more funds to the Public Employees System and ensure the payment of the benefits of pensioners and of those active public employees with benefits accrued under Act No. 447 and Act No. 1; and

(6) converting the lump sum payment made to public employees who retire under Reform 2000 into an annuity. Even after taking all these measures, the actuaries of the System estimate that the General Fund would also have to make additional contributions of approximately $100 million each year in up-coming decades. It is necessary to stress that this annual contribution to the System shall be in addition to the increase in employer contribution provided in Act No. 116, and that additional funds must be allocated to the General Fund to close this gap. The Commonwealth of Puerto Rico is evaluating the implementation of a recurring income source in order to be able to defray this additional contribution to the Retirement Systems.

**EXPLANATION OF THE AMENDMENTS**

Each one of the amendments included in this legislative piece is necessary so that all together, the actuarial deficit of the System, as well as the cash flow deficit that the same suffers and threatens to deplete the System's assets in the near future, is significantly reduced.

**1)      Freezing of benefits**

In the first place, salvaging the System requires freezing the accrual of benefits of active public employees that participate in the defined benefits plans under Act No. 447 and Act No. 1. The contributions that would have to be made by public employees and the government as employer to keep this benefit structure in the future are absolutely incongruent with the financial capacity of the public employee who currently works in the government and with the fiscal reality of the General Fund and of the other employers that have the obligation to make additional contributions to the Public Employees System as legislated under Act No. 116 (and which shall, in spite of all the changes contemplated herein, make additional appropriations of approximately $100 million annually to cover the System's cash flow deficit. However, it must be clear that the benefits accrued by active public employees under the laws that covered them up to the effective

day of this Act, shall subsist and shall be paid in accordance with the provisions of said laws. Therefore, at the time of their retirement, public employees participating in the programs established under Act No. 447 and Act No. 1 shall receive an annuity which shall combine: (i) the annuity resulting from the benefits they have accrued under the program in which they participated, as of the effective date of this Act, plus (ii) the annuity that they may acquire with what is accrued under the new defined contribution hybrid plan from the present to the time of their retirement. This Legislative Assembly deems that this measure is reasonable since it honors the benefits accrued by active public employees, while it significantly reduces the future annual deficit of the System. In view of the accelerated pace at which the System is exhausting its assets, if the reform of the System promulgated herein is not carried out, the accrued benefits of the active participants of the System could not be honored.

**2)   Raise in Retirement Age**

This Act raises the retirement age, implementing the same in a staggered manner so that those persons who, on this day, are close to attaining the required age under the laws in effect, may do so at a lesser age and will not be disproportionately affected by said modification.

**3)   Increase in employee contribution**

The current 8.275% employee contribution rate is hereby increased to a minimum of 10% of his/her compensation.

**4)   Special Laws**

The various special laws are hereby amended to eliminate the benefits granted under the same to future pensioners. As to current pensioners, said laws are amended in order to reduce some of the benefits provided by the same. However, every dollar of savings attained through the modifications of the special laws shall be paid to the System so that these funds are available to improve the retirement

benefits of those that receive less and to defray the System's actuarial deficit and thus contribute to the payment of the pensions to which retired persons are entitled.

### 5)    Annuity of Reform 2000

The conversion of the sum of the contributions made by every public employee participating in the Reform 2000 program to a life annuity offers all persons who retire under the Reform 2000, a continuous and accurate payment during their retirement years. Moreover, converting the payment of the contributions accumulated in the savings account contemplated by the Reform 2000 into an annuity guarantees that the System shall not have to disburse all at once a sum that, depending on the contributions made by the participant, could amount to tens of thousands of dollars, thus negatively affecting the flow of funds of the System.

These amendments go hand-in-hand with other changes implemented by this legislative piece, such as the elimination of recognition of uncredited services; the elimination of the power to reimburse and transfer contributions; the modification of death benefits; and the elimination of the occupational and non-occupational disability pension, which shall be substituted for the purchase of disability insurance and the acquisition of a disability annuity with the accumulated contributions.

This group of measures shall have the net effect of allowing the System to significantly reduce both, its annual cash flow deficit as well as its actuarial deficit, which, in turn, guarantee the extension of the life of the System in order to pay pensions to our pensioners and to thus eliminate the short- and long-term pressure on the General Fund, so that the ability of the government to provide basic services to the citizenry is not affected and our already delicate credit rating does not worsen. They are designed to impact on a fair and equal manner all the components of the System: the Commonwealth (through the increase in employer contributions already legislated by Act No. 116 and future appropriations from the

General Fund that these measures have not eliminated), pensioners (through the reduction or elimination of some of the benefits granted by the Special Laws), active public employees (through the modification of the benefits structure, the raise in the retirement age, and the increase in employee contribution), and taxpayers in general (through the injection of funds to the System by the General Fund from taxes paid by the people). Each one of these measures is an essential link to prevent the System's insolvency and thus guarantee a respectable retirement to public employees.

Even more importantly, this Reform honors and validates the accrued benefits of pensioners, whose accrued benefits shall not be affected, and those of active public employees that continue contributing to the System. In both cases it involves people who, making great financial sacrifices, have devoted the best years of their productive and professional lives to the common good of the Island. Although the easiest solution to this crisis would be to reduce said accrued benefits to temper them with the economic and fiscal reality we are undergoing, this Reform seeks to find the manner in which these benefits may be honored in view of the imminent insolvency of the System and the economic crisis prevailing in the Island.

It is also important to stress that even though the present legislative piece reforms the benefit structure and modifies the present retirement requirements, the Reform seeks to mitigate the impact of the measures on both, pensioners whose financial reality makes them more vulnerable to changes in the System and public employees who are close to their retirement age. Thus, the changes herein established increase the minimum pension benefit from $400 to $500 and grant more generous benefits under the Special Laws to those pensioners who receive less on a monthly basis from the System. On the other hand, by establishing a raise in the retirement age in a staggered manner, the impact of the Reform in effect on those that are close to the retirement age is mitigated. Lastly, the conversion of the

sum of the contributions made by the employees subject to the Reform 2000 to an annuity, assures them, in contrast with the Reform 2000, an accurate and lifetime income. In this manner, the Legislative Assembly seeks to strike a reasonable balance between the fiscal crisis of the System and the economic and social reality of our pensioners and our more disadvantaged public employees.

On the other hand, we must not lose from perspective that the measures herein adopted with respect to the Public Employees System, where all the components contribute to its solution, are part of a broader effort being made to correct the fiscal situation of the Island. The fiscal and economic challenges we are forced to endure are many, and require that all –individuals, domestic and foreign corporations and the government itself– contribute so that the Island may overcome the same.

This Legislative Assembly believes that these measures are necessary and reasonable to attack head-on the situation of the Public Employees System, within our legal and constitutional framework. They are the least onerous alternatives available to achieve the compelling public purpose to: (1) prevent that the Public Employees System is left without any money to pay the pensions of our retired persons; (2) honor the benefits accrued by retired public employees and by those that continue to work day to day for our well-being; (3) significantly reduce the projected impact of the actuarial deficit of the System on the General Fund through the appropriations of funds to the Public Employees System, which would otherwise affect the provision of essential public services to the citizenry; and (4) prevent the economic and fiscal catastrophe caused by the downgrading of the credit of Puerto Rico to "junk" status. We are aware that these measures, albeit significant, are reasonable and necessary for the attainment of the aforementioned purposes. After all, as it was very well stated by our Supreme Court in *Bayron Toro v. Serra*, 119 D.P.R. 605, 622-623 (1987):

We must bear in mind that at the basis of any public retirement system similar to the one under our consideration, lies the primal interest, both of the Government and of participating employees, to establish and preserve a monetary fund sound enough to guarantee the solvency of the system. For purposes of pension payments, this element is essential to the relationship between the Government as employer and the participating employee. Within the context of this relationship, the Government should have the capacity and flexibility to make such reasonable changes and amendments as may be necessary to further the interests of the Retirement System and to strengthen its foundations and structure. Changing conditions and requirements, such as years of service, contributions to the fund, and retirement age, are essential to preserve the solvency of the fund. This flexibility is vital to allow the Retirement System to face unforeseen situations and to keep abreast of developments in the field of actuarial sciences. Recognizing the Government's power to modify retirement systems within the parameters mentioned here is essential for the successful operation of these plans.

That is precisely the intention of the present measure, to reasonably modify the conditions and requirements of the Public Employees System in order to guarantee its subsistence and, therefore, the fiscal, economic, and social wellbeing of the Island.

***BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:***

Section 1.-  Section 1-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 1-101.- Employees Retirement System - Creation; Effective and Operative Dates; Coordination with Federal Social Security.-

A retirement and benefit system to be designated as the 'Retirement System for Employees of the Government of the Commonwealth of Puerto Rico,' which shall be considered a trust, is hereby created. The funds of the System herein created shall be used and applied, as provided in this Act, for the benefit of the participating members of its membership, their dependents and beneficiaries, for the payment of retirement and disability annuities, death benefits and annuities, and other benefits, upon meeting the requirements set forth hereinafter, in order to achieve economy and efficiency in the administration of the Government of the Commonwealth of Puerto Rico.

The system shall be established as of the effective date of this Act, and become operational on January 1, 1952, date on which the contributions and benefits shall become effective, as provided in this Act. The period from the effective date of this Act to January 1, 1952, shall constitute the period of organization of the System. January 1, 1952, shall be known as the 'operative date of the system.' In the case of public enterprises and municipalities, the operative date shall be the date on which their participation in the system begins. As of the effective date fixed in the modification of the Agreement entered into between the Agency in Charge, the Secretary of Health, and the Secretary of Education, pursuant to the provisions of Act No. 396 of May 12, 1952, as amended; the benefits of Chapter 2 of this Act shall be coordinated with the benefits of Title II of the United States Social Security Act. In no case shall the combined payments of annuities of the Social Security and the Retirement System to participants under Chapter 2 of this Act shall be less than the annuity that would have corresponded to the System participant under Chapter 2, in accordance with the provisions of this Act. Retirement benefits provided under Chapters 3 and 5 of this Act shall not be

coordinated with the benefits of Title II of the United States Social Security Act, except as it may apply under the provisions of Chapter 5."

Section 2.- Section 1-102 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 1-102.- Benefits for the Employees of the System.-

This Act shall consist of five chapters. Chapter 1 shall contain the provisions related to the creation of the System. Chapter 2 shall contain the provisions related to the retirement benefits program defined for the employees who enrolled in the System before January 1, 2000. Those employees who enrolled in the system before January 2000, shall only enjoy the benefits provided in Chapters 2, 4, and 5 and shall not be entitled to any other benefit provided by this Act, unless, pursuant to the provisions of Section 3-102, they choose to enroll in the Retirement Savings Account Program. Chapter 3 shall contain the provisions related to the Retirement Savings Account Program. Participants of the Retirement Savings Account Program shall only enjoy the benefits provided in Chapters 3, 4, and 5 of this Act, and shall not be entitled to any other benefit provided under this Act. Chapter 4 shall contain the provisions related to the administration of the System and the investment of the System's funds. Chapter 5 of this Act shall contain the provisions related to the Defined Contribution Hybrid Program which shall apply to all employees participating in the System as of July 1, 2013. The provisions of Chapters 4 and 5 shall only apply to employees participating in the Defined Contribution Hybrid Program, except as otherwise provided in this Act. The provisions of Chapters 1, 2, and 3 shall remain in effect to preserve the code of laws applicable to all transactions carried out or to be carried out on or before June 30, 2013, to preserve those sections whose provisions, along with Chapter 5, shall apply, as specifically provided herein, and to preserve the definitions of terms applicable to Chapter 5 of this Act."

Section 3.- Section 1-104 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 1-104.- Definitions.-

The following terms and phrases as used in this Act, unless a different meaning is plainly required by the context, shall have the following meanings:

(1)    Board.- Shall mean the Board of Trustees of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico.

…

(25)  Hybrid Program.- shall mean the Defined Contribution Hybrid Program established in Chapter 5 of this Act, under which participants make contributions that will later be used to pay a life annuity.

(26)   …

(27)   …

(28)   …

(29)   …

(30)   …

(31)   Normal Retirement Date.- Shall mean under Chapter 3 of this Act:

(a)    General Rule.- The first day of the month that falls on the same date or a subsequent date on which the Program participant reaches the age of sixty (60), except as otherwise provided in paragraph (b) of this subsection.

(b)    Public Employees in High-Risk Positions.- In the case of Public Employees in High-Risk Positions, it shall mean the first day of the month that falls on the same date or a subsequent date on which the Program participant reaches the age of fifty-five (55).

(c)    Effectiveness of these Provisions.- The normal retirement date established in paragraphs (a) and (b) of this definition shall be in effect until June 30, 2013.

(32)   New Retirement Age.- Shall mean the retirement age of participants as provided in Chapter 5 of this Act.

(33)   Transfer Option.-  …

(34)   Program Participant.- Shall mean, until June 30, 2013, any person for whom the Administrator maintains an account under the Retirement Savings Account Program pursuant to the provisions of Chapter 3 of this Act. Beginning on July 1, 2013, this term shall mean any person for whom the Administrator maintains an account under the Defined Contribution Hybrid Program in accordance with the provisions of Chapter 5 of this Act.

(35)   …

(36)   …

(37)   …

(38)   …

(39)   Code.- Shall mean the Internal Revenue Code for a New Puerto Rico, Act No. 1-2011, as amended.

(40)   Public Employees in High-Risk positions.- Shall mean the Puerto Rico Police Department, the Municipal Police Corps, the Puerto Rico Firefighters Corps, the Municipal Firefighters Corps, and the Custody Officers Corps.

(41)   Retirement Age for Participants who Enter Public Service after June 30, 2013.- Retirement age shall be sixty-seven (67) years, except for Public Employees in High-Risk positions, whose retirement age shall be fifty-eight (58) years.

The masculine gender of the pronoun, wherever it is used, shall encompass both genders."

Section 4.- Section 2-101 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 2-101.- Retirement Annuity.-

(a)    Upon separation from service, on or after reaching the age, and after completing the period of service indicated below, all participants who have not been reimbursed their accumulated contributions shall be entitled to receive a retirement annuity. Said annuity shall commence on the date on which the participant files his/her application for retirement, but in no case before his/her separation from the service.

…

However, a minimum pension of five hundred dollars ($500) per month is hereby fixed for those participants who retired in accordance with the provisions of this Chapter 2. Every pensioner receiving a pension of less than five hundred dollars ($500) per month shall receive, on July 1, 2013, the corresponding raise so that his/her pension amounts to five hundred dollars ($500).

The provisions on minimum pensions set forth in this Section shall not apply to persons who, having been participants of this System, retire under the jurisdiction of any other of the systems sponsored by the Government of the Commonwealth of Puerto Rico, in accordance with the provisions of this Act.

…

(c)    Notwithstanding that the annuity is payable for life upon reaching the retirement age, if any annuitant returns to the service, the payment of such annuity shall be suspended. After separation from service, the payment of said annuity shall be resumed and, in addition, the annuitant shall have the option to withdraw any contributions made from the date on which the pensioner returned to service to the date he/she separated from service if, upon returning to service, he/she worked less than five (5) years or accumulated contributions amounting to less than ten thousand dollars ($10,000). In the event that, upon returning to service, the pensioner worked five (5) years or more and accumulated ten thousand dollars ($10,000) or more, such pensioner, after he/she separates from service and reaches

**Add.74**

the age established in Section 5-110 of this Act, shall be entitled to a supplemental annuity computed in accordance with Section 5-110 of this Act, over the basis of the contributions made from the date on which such pensioner returned to service to the date he/she separated from service.

…"

Section 5.- Section 2-103 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 2-103.- Retirement Benefits for System Employees - Annuities for New Participants.-

(a)    Annuity for Years of Service.- Retirement shall be optional for new participants who have enrolled for the first time in the System after April 1, 1990, as of the date on which they reach the age of sixty-five (65), have completed a minimum of ten (10) years of credited service and have not requested or received the reimbursement from the accumulated contributions. The amount of the annuity shall be one point five percent (1.5%) of the average compensation multiplied by the years of credited services. However, a minimum pension of five hundred dollars ($500) per month, effective on July 1, 2013, is hereby fixed for those participants who retired in accordance with the provisions of Chapter 2. Every pensioner who receives a pension of less than five hundred dollars ($500) per month shall receive effective on July 1, 2013, the corresponding raise so that his/her pension amounts to five hundred dollars ($500).

…"

Section 6.- Section 2-104 of Act No. 447 of May 15, 1951, as amended, is hereby repealed.

Section 7.- Section 2-104a of Act No. 447 of May 15, 1951, as amended, is hereby renumbered as 2-104, to read as follows:

"Section 2-104.- Mandatory Retirement for Public Employees in High-Risk Positions.-

Public Employees in High-Risk positions may voluntarily choose to retire after reaching the age of fifty-five (55) and thirty (30) years of service. Retirement shall be mandatory on the date the participant reaches both thirty (30) years of service and the age of fifty-eight (58). Provided, that the Superintendent of the Puerto Rico Police and the Chief of the Firefighter Corps or the pertinent appointing authority may grant dispensations to authorize the members of their respective agencies to work for an additional maximum period of two (2) years performing the functions assigned to them; provided that the health and safety of Public Employees in High-Risk positions are not compromised. Such a request for dispensation shall be made by the official, not later than ninety (90) days before his/her retirement date.

It is hereby provided that the Superintendent of the Puerto Rico Police and the Chief of the Firefighter Corps or the pertinent appointing authority shall adopt regulations as necessary to comply with this Act."

Section 8.- Section 2-115 of Act No. 447 of May 15, 1951, as amended, is hereby repealed.

Section 9.- Section 2-116 of Act No. 447 of May 15, 1951, as amended, is hereby repealed.

Section 10.- Sections 2-117 to 2-120 of Act No. 447 of May 15, 1951, as amended, are hereby renumbered as Sections 2-115 to 2-118 in Act No. 447 of May 15, 1951, as amended.

Section 11.- Section 3-104 of Act No. 447 of May 15, 1951, as amended, is hereby repealed.

Section 12.- Section 3-105 of Act No. 447 of May 15, 1951, as amended, is hereby repealed.

Section 13.- Sections 3-106 to 3-112 of Act No. 447 of May 15, 1951, as amended, are hereby renumbered as Sections 3-104 to 3-110 in Act No. 447 of May 15, 1951, as amended.

Section 14.-  Chapter 5 of Act No. 447 of May 15, 1951, as amended, entitled 'Defined Contribution Hybrid Program,' is hereby created."

Section 15.- A new Section 5-101 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-101.- Defined Contribution Hybrid Program - Creation.-

(a)     Creation of the Program.- The Defined Contribution Hybrid Program is hereby created. This Program shall establish an individual contribution account for each person who enrolls in the System under the provisions of this Chapter. The individual contributions made by each participant to the Hybrid Program, as well as the return on investment thereon, shall be credited to such accounts, in accordance with Section 5-108 of this Chapter. The benefit to be provided to each participant upon separation from service, due to retirement or otherwise, shall depend on the total amount of contributions accumulated in his/her Hybrid Program account (including, in the case of those employees who entered the System for the first time on or after January 2000, the contributions accumulated in his/her savings account under the Retirement Savings Account Program which are transferred to the Hybrid Program in accordance with Section 5-103 of this Act), the return on investment of these contributions, and the life annuity granted on the basis thereof, in accordance with Section 5-110 of this Act.

(b)     Program Participants.- The following persons shall participate in the Hybrid Program:

(1)     Any employee participating in the System as of July 1, 2013.

(2)     Any new employee who enrolls for the first time in the System after July 1, 2013."

Section 16.- Section 5-102 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-102.- Transfer to the Program.-

(a)     As of July 1, 2013, any employee who is a System participant, including mayors, regardless of the date on which they were first appointed to the Government of the Commonwealth of Puerto Rico, its instrumentalities, municipalities, or employers participating in this System, shall become participants of the Defined Contribution Hybrid Program. The benefits to be received by these employees are those set forth in this Chapter.

Except as otherwise provided in this Chapter, the provisions of Chapters 1, 2, and 3, shall not apply to these employees."

Section 17.- Section 5-103 of Act No. 447 of May 15, 1951, as amended, is hereby amended to read as follows:

"Section 5-103.- Accumulated Benefits.-

(a)     On the effective date of this Act, employees participating in the System who entered public service before January 1, 2000 and who, as of June 30, 2013, are not participants of the Retirement Savings Account Program established under Chapter 3 of this Act shall keep their accumulated benefits as to credited years of service and the computation of the average compensation. Participants who, as of June 30, 2013, were entitled to retire and receive some sort of pension under this Act for having met the years of service and age requirements provided herein, shall retire on a subsequent date and shall be entitled to receive the corresponding annuity under Chapter 2 of this Act based on the compensation and years of service accrued as of June 30, 2013, as well as the annuity established in Section 5-110. In addition, the provisions of subsection (a) 7, 8, 9, 10, and 11 of this Section shall apply to these participants.

The following provisions shall apply to System participants who (i) entered service before January 1, 2000, (ii) as of June 20, 2013, are not participants of the Retirement Savings Account Program established under Chapter 3 of this Act, and (iii) as of June 30, 2013, do not meet the years of service and age requirements for retirement provided in Chapter 2 of this Act:

(1)    New retirement age for participants who enrolled for the first time in the System before April 1, 1990. In the case of participants who, as of June 20, 2013, have not reached the age of 58 and completed at least 10 years of service, or have not reached the age of 55 and completed 25 years of service, retirement shall be optional when they meet the following age and years of service requirements:

(i)    If, as of June 30, 2013, the participant is 57 years old, retirement shall be optional when he/she has reached the age of 59 and has completed at least 10 years of service.

(ii)    If, as of June 30, 2013, the participant is 56 years old, retirement shall be optional when he/she has reached the age of 60 and has completed at least 10 years of service.

(iii)    If, as of June 30, 2013, the participant is 55 years old or younger, retirement shall be optional when he/she has reached the age of 61 and has completed at least 10 years of service.

(2)    Retirement age for participants who have enrolled for the first time in the System between April 1, 1990 and December 31, 1999.- In the case of participants who, as of June 30, 2013, have not reached the age of 65 and completed at least 10 years of service, retirement shall be optional when such participants reach the age of 65 and have completed 10 years of service.

(3)    In the case of Public Employees in High-Risk positions who entered public service before April 1, 1990, and who, as of June 30, 2013, have not reached the age of 50 and completed at least 25 years of service, or have not

completed 30 years of service, regardless of their age, retirement shall be optional when they reach the age of 55 and have completed 30 years of service.

(4) In the case of Public Employees in High-Risk positions who entered public service between April 1, 1990 and December 31, 1999, and who, as of June 30, 2013, have not reached the age of 55 and have completed 25 years of service, or have not completed 30 years of service, regardless of their age, retirement shall be optional when they reach the age of 55 and have completed 30 years of service.

(5) Public Employees in High-Risk positions who separate from active duty before meeting the age and years of service requirements under subsection (a)(3) and (a)(4) of this Section shall only receive their pension when they meet the following age and service requirements:

(i) If the participant enrolled for the first time in the System before April 1, 1990, once he/she meets the age and service requirements set forth in subsection (a)1 of this Section.

(ii) If the participant enrolled for the first time in the System between April 1, 1990 and December 31, 1999, once he/she meets the age and service requirements set forth in subsection (a)2 of this Section.

(6) Computation of Pension.- When the participant meets the aforementioned age and service requirements, he/she shall be entitled to receive an annuity which shall be computed based on the years of service accumulated as of June 30, 2013, and pursuant to the following rules:

(i) The average compensation for employees who entered public service before April 1, 1990, shall be that established in definition 15 of Section 1-104 of this Act.

(ii) The average compensation for employees who entered public service between April 1, 1990 and December 31, 1999, shall be that established in Section 1-108 of this Act.

(iii)   The pension for employees who entered public service before April 1, 1990, shall be computed on the basis of one point five percent (1.5%) of the average compensation multiplied by the number of years of credited services up to twenty (20) years, plus two percent (2%) of the average compensation, multiplied by the number of years of credited services in excess of twenty (20) years, in each case, until June 30, 2013.

(iv)   The pension for employees who entered public service between April 1, 1990 and December 31, 1999, shall be computed on the basis of one point five percent (1.5%) of the average compensation, multiplied by the number of years of credited services up to June 30, 2013.

(v)   System participants who, as of June 30, 2013, have availed themselves of the plan coordinated with Social Security Benefits shall receive an annuity adjusted in accordance with the provisions of subsection (e) of Section 2-102 of this Act. Provided, that the participant shall receive an annuity in accordance with the provisions of Section 5-103 of this Act until he/she is eligible to receive Social Security benefits.

(vi)   A participant shall receive this pension together with the annuity accrued by him/her in accordance with Section 5-110 of this Act.

(7)   As of July 1, 2013, participants shall not accumulate additional years of service to determine the average compensation when computing a pension under Section 5-103(a)(4). Moreover, uncredited services, as well as transfers or contributions paid for periods worked prior to June 30, 2013, shall not be recognized, save for the exceptions expressly provided by this Act.

(8)   The provisions of Section 2-119 of this Act shall apply to the participant's contributions.

(9)   Reimbursement of Contributions.- As of July 1, 2013, upon permanent separation from service, participants shall be entitled to the annuity provided under this Section, but not to the reimbursement of contributions for

separation of service, whether voluntarily, involuntarily, or due to disability. The contributions made by System participants who entered public service before December 31, 1999, and who have not completed ten (10) years of service as of June 30, 2013, shall be transferred to the participant's account under the Hybrid Program.

(10)   Death of a Participant in Active Service.- Upon the death of any person who was rendering services and had accumulated contributions in the Hybrid Program, such contributions shall be reimbursed to the person or persons designated by the participant under a written order duly recognized and filed with the Administrator, or to his/her heirs, if such designation had not been made. The reimbursement shall be equal to the amount of the contributions made and the interests accrued thereon up to six (6) months after the date of death or the date on which such contributions were paid, whichever is earlier. The Administrator shall collect from such contributions any outstanding debt that the participant may have with the System.

(11)   Death of a Pensioner.- Unless, as provided in this Act, an annuity by transfer were payable upon the death of a participant who had been receiving a retirement annuity, a lump-sum cash payment in the form of death benefits shall be made to the person or persons designated by the participant under a written order duly recognized and filed with the Administrator, or to his/her heirs, if such designation had not been made. Such benefit shall consist of the excess, if any, of the contributions accumulated up to June 30, 2013, in favor of the participant until his/her retirement date, over the total amount of all retirement annuity payments that the participant received before his/her death. If a participant who is a pensioner dies within thirty (30) days after his/her retirement date, it shall be understood that, for purposes of any of the provisions of this Act, he/she died while in active service, notwithstanding any provision of this Act to the contrary.

(b)      Employees who entered public service on or after January 1, 2000, or those who were participating in the Retirement Savings Account Program and who, as of June 30, 2013, could separate from service for being sixty (60) years old, may retire on any subsequent date and be entitled to receive an annuity as the balance of the contributions made to the Retirement Savings Account Program may allow, as well as those accumulated under the Defined Contribution Hybrid Plan.

(1)      The account under the Retirement Savings Account Program of any employee who enrolled for the first time in the System on or after January 1, 2000, shall be transferred to the Defined Contribution Hybrid Plan. Provided, that if as of June 30 2013, such employee has not reached the age of sixty (60), he/she shall be entitled to the annuity established in Section 5-110 of this Act when the following age requirements are met:

(i)      If, as of June 30, 2013, the participant is 59 years old, retirement shall be optional when he/she reaches the age of 61.

(ii)      If, as of June 30, 2013, the participant is 58 years old, retirement shall be optional when he/she reaches the age of 62.

(iii)      If, as of June 30, 2013, the participant is 57 years old, retirement shall be optional when he/she reaches the age of 63.

(iv)      If, as of June 30, 2013, the participant is 56 years old, retirement shall be optional when he/she reaches the age of 64.

(v)      If, as of June 30, 2013, the participant is 55 years old, retirement shall be optional when he/she reaches the age of 65.

(2)      In the case of Public Employees in High-Risk positions who entered public service after December 31, 1999 and, as of June 30, 2013, have not reached the age of 55, retirement shall be optional when they reach the age of 55."

Section 18.- Section 5-104 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-104.- Establishment of Contributions Accounts for the Defined Contribution Hybrid Program.-

The Administrator shall establish and maintain in the System an account with the contributions of each participant of the Hybrid Program, which shall be credited and debited in accordance with Sections 5-108 and 5-109 of this Chapter.

(a)    In the case of employees participating in the System who entered public service before January 1, 2000, and, as of June 30, 2013, are not participating in the Retirement Savings Account Program, the amounts contributed by such employees after July 1, 2013, shall be allocated to such account. Individual contributions made before June 30, 2013 shall be used for the payment of the annuity provided in Section 5-103 of this Act.

(b)    In the case of employees participating in the System who entered public service on or after January 1, 2000, the balance as of June 30, 2013, in their savings account under the Retirement Savings Account Program and the amounts contributed by such employees after July 1, 2013, shall be allocated to their account, except as provided in Section 5-103(b).

The provisions of Section 2-119 of this Act shall apply to such contributions."

Section 19.- Section 5-105 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5.105.- Contributions of Hybrid Program Participants.-

(a)    Account Contributions.- Every Hybrid Program Participant shall contribute mandatorily ten percent (10%) of his/her compensation while he/she is an active employee.

(b)    Contributions under the Plan Coordinated with Social Security Benefits.- System participants who, as of June 30, 2013, are availing themselves of the Plan Coordinated with Social Security Benefits shall contribute to the Hybrid Program:

(1)    Effective on July 1, 2013, they shall contribute seven percent (7%) of their monthly compensation up to five hundred fifty dollars ($550) and ten percent (10%) of the monthly compensation in excess of said amount.

(2)    Effective on July 1, 2014, they shall contribute eight point five percent (8.5%) of their monthly compensation up to five hundred fifty dollars ($550) and ten percent (10%) of the monthly compensation in excess of said amount.

(3)    Effective on July 1, 2015, they shall contribute ten percent (10%) of the total monthly compensation.

Program participants under subsections (a) and (b) of this Section may voluntarily contribute to their accounts a sum in addition to that herein established. Said contributions shall be allocated to the contributions account of every Hybrid Program participant. The Administrator shall establish the manner in which participants may make additional contributions.

(c)    Mandatory Contribution to Obtain Disability Insurance.- Every Hybrid Program participant shall mandatorily contribute to the disability insurance provided in Section 5-112 of this Chapter, to which the participant shall contribute such sums, fixed in dollars or compensation percentage, that the Administrator, with the approval of the Board, may deem necessary to provide disability insurance, insofar as the contribution required by the Administrator is equal to or lower than point twenty-five percent (0.25%) of the participant's compensation. Contributions made in accordance with this subsection may be credited against and reduce the contributions that the Program participant is required to make to the Commonwealth of Puerto Rico Employee Association, as provided in Section 8 of

Act No. 133 of June 28, 1966, as amended. Contributions under this subsection shall not be allocated to the participant's account."

Section 20.- Section 5-106 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-106.- Employer Contributions.-

Beginning on July 1, 2013, every employer shall mandatorily contribute to the System a sum equal to twelve point two hundred and seventy-five percent (12.275%) of the contribution of every Program participant while the participant is an employee. These contributions shall be deposited in the System in order to increase its level of assets, reduce its actuarial deficit, and improve its capacity to meet future obligations. From July 1, 2014 to June 30, 2016, the minimum employer contribution rate of twelve point two hundred and seventy-five percent (12.275%) shall increase annually on every subsequent July 1 by one percent (1%) of the compensation regularly earned by participants. From July 1, 2016 to June 30, 2021, the minimum employer contribution rate as of June 30 of each year shall increase annually on every subsequent July 1 by one point twenty-five percent (1.25%) of the compensation regularly earned by participants. Provided, that the established increases applicable to municipalities for fiscal years 2012-2013 and 2013-2014 shall be included in the budget request submitted by the Office of Management and Budget to the Legislative Assembly for approval."

Section 21.- Section 5-107 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-107.- Obligation of the Employer, Penalties.-

Any employer that is required to deduct and withhold the contributions of Program Participants and make contributions to the System as provided in this Chapter shall have the following obligations:

(a)     Requirement to Deduct and Withhold the Contributions of Program Participants and to Remit the Contributions of the Program Participants and Employer to the System.- Every employer of a Program participant shall deduct and withhold the contributions provided in Section 5-505 from the participant's compensation. The Secretary of the Treasury or any paymaster of the employer is hereby authorized to make deductions, even if the compensation to be paid in cash to the participant as a result of such deductions is less than any minimum prescribed by law. Contributions of Program participants shall be remitted by the Employer along with the contributions such employer is required to make under Section 5-106 to the System on or before the fifteenth (15th) day of the month following the date on which the withholding was made. The Administrator shall establish the form and manner in which contributions shall be remitted.

(b)     Responsibility for Contributions.- Every employer required to deduct and withhold the contributions of Program participants and to remit the contributions of Program participants as well as those of  the employer as provided in this Chapter, shall be responsible to the System for the total payment of such contributions. If the employer fails to withhold or remit such contributions, the sums that such employer failed to withhold and the unpaid contributions shall be collected from the employer by the Administrator according to the procedure established in Section 4-111 of this Act.

(c)     Interests on Contributions Owed.- Every employer that fails to remit its contributions and those of the Program participants within the term provided therefor shall be responsible to the System for the payment of interests at a rate to be determined by the Board on the contribution owed, from the day the contribution should have been remitted to the System to the day on which the contribution is remitted. Interests owed by an employer shall be collected by the Administrator according to the procedure established in Section 4-111 of this Act.

(d)     Return on Investment - Credit.- If an employer fails to remit the contributions of Program participants within the term provided therefor, the Administrator shall credit the return on investment to the account of the affected Program participant, as provided in Section 5-108 of this Chapter, as of the Employer's deadline to remit such contributions."

Section 22.- Section 5-108 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-108.- Credits to the Contributions Account, Return on Investment, and Rights on the Contributions Account.-

(a)     Credit.- The Administrator shall credit to the account of every Hybrid Program participant the following items:

(1)     Initial Balance Transfer.- In the case of participants of the Retirement Savings Account Program, the balance of the savings account and income transferred to the Hybrid Program shall be credited.

(2)     Contributions of Hybrid Program Participants.- Contributions made by the Hybrid Program Participant as required under this Act shall be credited once they are remitted by the employer to the System.

(3)     Return on Investment.- The return on investment shall be credited at the close of each semester of each fiscal year. The return on investment shall be computed the last business day of each semester of the fiscal year on the average monthly balance of the contributions account of the Hybrid Program participant, during the semester in question.  The return on investment shall be determined by the Board and shall never be less than eighty percent (80%) of the System's portfolio net rate of return during each semester of each fiscal year, of the management fees such as, but not limited to, fees payable to portfolio managers, custody, and investment advice.

(b)     Rights on the Contributions Account.- Hybrid Program participants shall always have one hundred percent (100%) right over the initial balance transfer provided in paragraph (1) of subsection (a) of this Section and their contributions to the Hybrid Program accounts."

Section 23.- Section 5-109 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-109.- Contributions Account Debits.-

The Administrator shall debit from the Contributions account established for each Hybrid Program participant those amounts used to issue an annuity for the payment of benefits or pay a lump sum distribution in accordance with Sections 5-110 and 5-111 of this Chapter.  Once the annuity is issued or the total balance of the contributions account is paid in a lump sum distribution, the account shall cease to exist. Furthermore, the Administrator may debit the amount of the disability insurance premium from the account of the participant."

Section 24.- Section 5-110 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-110.- Benefits Upon Separation from Service.-

(a)     Retirement Benefit.- Upon permanent separation from service, when the separation is not due to death or total and permanent disability, the balance of the contributions account of the Hybrid Program participant shall be distributed to the participant by the Administrator, if such participant meets any of the following requirements: (i) has less than five (5) years of credited service or, (ii) has accumulated in the System an amount equal to or less than ten thousand dollars ($10,000).

(b)     Date of Issue of Annuity Contract and Commencement of Distributions.- In the case that the participant (i) permanently separates from service after completing five (5) years or more of credited service, and (ii) has accumulated in the System an amount equal to or higher than ten thousand dollars

($10,000), shall be entitled to a life annuity to be computed based on the balance of his/her contributions in accordance with subsection (c) of Section 5-110 of this Act. The age in which the participant may begin to receive such annuity, provided that he/she has permanently separated from service, shall be the following:

(1)     Participants who enrolled for the first time in the System before April 1, 1990, and are not participants of the Savings Account Program: at the age in which they would have been entitled to receive a pension in accordance with subsection (a)(1) of Section 5-103 of this Act.

(2)     Participants who enrolled for the first time in the System between April 1, 1990 and December 31, 1999, and are not participants of the Savings Account Program: at the age in which they would have been entitled to receive a pension in accordance with subsection (a)(2) of Section 5-103 of this Act.

(3)     In the case of Public Employees in High-Rick positions who entered public service on or before December 31, 1999: at the age in which they would have been entitled to receive a pension in accordance with subsection (a)(3), (a)(4), and (a)(5) of Section 5-103 of this Act.

(4)     Participants who enrolled for the first time in the System between January 1, 2000 and June 30, 2013: at the age in which they would have been entitled to receive a pension in accordance with subsection (b) of Section 5-103 of this Act.

(5)     Participants who entered public service after July 1, 2013: at the age of 67.

(6)     In the case of Public Employees in High-Risk positions who entered public service after July 1, 2013: at the age of 58.

(c)     The life annuity of each participant shall be computed upon retirement as follows: (i) the accumulated balance of his/her contributions to the account of the Hybrid Program participant on the date of retirement, divided by (ii) a factor,

established by the Board in consultation with its actuaries and to be determined on the basis of the actuarial life expectancy of the participant and a specific tax rate.

(d)    Annuity by Transfer: Hybrid Program participants may transfer a pension to a dependent as provided in Section 2-105 regarding annuities by transfer.

(e)    Annuities issued under this Chapter 5 shall be paid for life on a monthly basis and may not be increased, reduced, revoked, or repealed, unless it is issued by error, or as otherwise explicitly provided. The first annuity payment shall cover the fraction of the current month up to the end of the month; and the last payment shall cover up to the end of the month in which the participant dies.

Employers shall be bound to file with the Administration all documents required within sixty (60) days after the application for retirement benefits or lump sum distribution is filed. The Administration shall act on the application for retirement benefits or lump sum distribution within sixty (60) days after the filing date of such application and the documents required by the Retirement System.

If an employer fails to meet the obligation set forth in this Section, such employer shall be responsible to the participant for the payment of an amount equal to a month of his/her salary at the time the application for retirement benefits or lump sum distribution is filed."

Section 25.- Section 5-111 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-111.- Death, Disability, or Terminal Illness Benefits.-

(a)    Death of Participant on Active Duty.- If a person who was rendering services and had been making contributions to the Hybrid Program dies, such contributions shall be reimbursed to the person or persons designated by the participant by a written order duly recognized and filed with the Administrator, or to his/her heirs, if such designation had not been made. The reimbursement shall consist of the amount of the contributions made and the rate of return until the date

of the participant's death. The Administrator shall collect from such contributions any outstanding debt that the participant may have with the System.

(b)     Death of a Pensioner.- In a pensioner dies without receiving all the pension payments, his/her beneficiaries designated in the System or, in default thereof, his/her heirs, shall continue receiving the monthly pension payments until the contributions made by the participant are depleted.

(c)     Separation from Service Due to Disability or Terminal Illness.- The balance in the contributions account of every Hybrid Program participant who permanently separates from service due to total and permanent disability, or a disability in accordance with Act No. 127 of June 27, 1958, as amended, or due to terminal illness, as determined by the Administrator, shall be distributed by the Administrator, at the option of the participant, in a lump sum payment, or through an annuity contract, or any other optional form of payment pursuant to Section 5-110 of this Act.

After June 30, 2013 no disability pensions shall be issued as provided in Sections 2-107 to 2-111 of this Act."

Section 26.- Section 5-112 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-112.- Disability Insurance.-

The Administrator, with the approval of the Board, shall establish a disability benefit program, which shall provide a temporary annuity in the event of total and permanent disability. Disability benefits may be provided through one or more disability insurance contracts with one or more insurance companies authorized to do business in Puerto Rico by the Insurance Commissioner of Puerto Rico. The determination as to whether a person is totally and permanently disabled may be made by the insurance company that issues the insurance policy covering the person. All Program participants who are employees shall avail themselves of

the disability benefits program in the manner and form established by the Administrator."

Section 27.- Section 5-113 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-113.- Applicability of the Uniform Securities Act.-

The interest of any Program participant shall not constitute a security for the purposes of Act No. 60 of June 18, 1963, as amended, known as the 'Uniform Securities Act.'

Section 28.- Section 5-114 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-114.- Reciprocity between Retirement Systems; Uncredited Veteran Services; Voluntary Contribution to the Hybrid Program.-

(a)     After July 1, 2013, there shall be no reciprocity under Act No. 59 of June 10, 1953, as amended, between the Government Employees Retirement System and other retirement systems with respect to employees participating in other systems and are transferred to the Government Employees Retirement System.

(b)     The provisions of subsection E of Section 4 of Act No. 203-2007, as amended, known as the 'Bill of Rights of the Puerto Rican Veteran for the 21st Century,' shall continue to apply to System participants who are veterans, solely with regard to services rendered until June 30, 2013. However, there is no deadline for veterans to apply for service credit, for services rendered on or before June 30, 2013.

(c)     Any Hybrid Program participant who, on or after July 1, 2013, is on military leave for being on active duty in the United States Armed Forces and is not required to make mandatory contributions under Section 5-105(a) of this Act, may make voluntary contributions to his/her account in the Hybrid Program during the time he/she is on military leave. There is no deadline for veterans to make such

voluntary contributions. These contributions shall be credited to the contributions account of such Hybrid Program participant. The Administrator shall establish the manner in which these participants shall make such voluntary contributions to their accounts under the Hybrid Program."

Section 29.- A new Section 4-108 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 4-108.- Preservation of Benefits.-

(a)     Benefits of System Participants, under this Act, who retire on or before June 30, 2013 shall not be modified, including benefits received or to be received by their beneficiaries in the event of the participant's death.

(b)     The right of every participant who, as of June 30, 2013 was eligible to receive a deferred pension for meeting all the requirements thereof, to receive such pension regardless of whether he/she has applied therefor, is hereby preserved.

(c)     The right of every employee who has applied for a disability pension prior to the effective date of this Act and is pending evaluation by the System is hereby preserved.

(d)     In the case of a pensioner who had reentered public service before June 30, 2013, his/her contributions up to such date shall be preserved, in accordance with the option made under subsection (c) of Section 2-101 of Act No. 447 of May 15, 1951, as amended. Once he/she permanently separates from service, the benefit under the aforementioned subsection (c) of Section 2-101 shall be granted on the basis of the salaries earned and contributions made until June 30, 2013; provided, that after July 1, 2013, he/she shall be transferred to the Defined Contribution Hybrid Program established in Chapter 5 of Act No. 447 of May 15, 1951, as amended.

(e)     The provisions of subsection (c) of Section 2-101of Act No. 447 of May 15, 1951, as amended, shall apply to every pensioner who reenters public service after July 1, 2013."

Section 30.- A new Section 4-109 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 1-109.- Filing of Applications before June 30, 2013.-

Every System participant interested in applying for a retirement transaction before the benefits preservation date, that is, June 30, 2013, shall file such application with the Administration of the Employees Retirement System of the Government and the Judiciary. The Administrator shall establish the procedure to process such applications."

Section 31.- Former Sections 4-108 through 4-114 of Act No. 447 of May 15, 1951, as amended,  are hereby renumbered as Sections 4-110 through 4-116 of Act No. 447 of May 15, 1951, as amended.

Section 32.- Subsection (j) is hereby added to Act No. 105 of June 28, 1969, as amended, to read as follows:

"(j)   The benefits provided under this Act shall not apply to pensioners who retire pursuant to Chapter 5 of Act No. 447 of May 15, 1951, as amended."

Section 33.- Section 1 of Act No. 37 of June 13, 2001, is hereby amended to read as follows:

"Section 1.- Every person who is receiving a pension or benefit under Act No. 12 of October 19, 1954, as amended, shall be entitled to receive a Summer Bonus equal to one hundred dollars ($100), which shall be paid not later than July 15 of each year.

If there were more than one beneficiary entitled to a pension upon the death of the active or retired participant, the Bonus shall be distributed, pro rata, among all the beneficiaries."

Section 34.- Section 1 of Act No. 155 of June 27, 2003, is hereby amended to read as follows:

"Section 1.- Any person who is receiving a pension under Act No. 12 of October 19, 1954, as amended, shall be entitled to receive each year a Medications Bonus equal to one hundred dollars ($100), starting in 2003, which shall be paid not later than July 15 of each year."

Section 35.- Section 8 of Act No. 95 of June 29, 1963, as amended, is hereby amended to read as follows:

"(a)   The Government employer contribution for health benefits for employees covered by health benefit plans under this Act shall be fixed in the General Budget of Expenses and shall not be less than five dollars ($5) monthly in the case of the municipalities; or one hundred dollars ($100) monthly in the case of the employees of all other Government instrumentalities; and one hundred dollars ($100) in the case of the pensioners of the Teachers of Puerto Rico Retirement System; but it shall not exceed the total amount of the corresponding fee to be paid to any employee. Provided, that said employer contribution to the health plans of public employees not covered under Act No. 45 of February 25, 1998, as amended, and for those who are covered, but as of February 29, 2004, had not signed agreements with related financial clauses, the same shall take effect as of October 1, 2004. On the other hand, employees covered by the provisions of Act No. 45, *supra*, who have agreements signed up to February 29, 2004, that include clauses on employer contributions shall receive one hundred dollars ($100) as of July 1, 2004. Likewise, in the event that the agreement provides a lesser amount than the amount proposed through this legislation, employees shall receive the amount that is necessary to complete the proposed employer contribution of one hundred dollars ($100) monthly as of July 1, 2004. Provided, further, that those employees covered under clauses with an employer contribution greater than one hundred dollars ($100) monthly may receive the difference, if the agency contributes the additional costs thus entailed.

(b)      …

**Add.96**

(c)      …

(d)      Government employer contributions with respect to employees in active service shall be included in the General Budget of Expenses of the Commonwealth of Puerto Rico.

The employer contribution corresponding to pensioners of the Retirement System of the Judiciary and the Annuity and Pension System for the Teachers of Puerto Rico shall be consigned in the General Budget of Expenses of the Commonwealth of Puerto Rico as an additional contribution to said systems.

Provided, that the Office of Management and Budget shall be empowered to reimburse the cost of the increase in employer contributions, to be charged against the appropriations included for such purposes in the Joint Resolution for the General Government Budget. However, said reimbursement shall only cover the wages that are defrayed from the resources available in the General Fund. Provided, that those employees who, according to the dates established herein, are eligible to receive this increase, but whose salary is paid from other funds, shall receive the same raises chargeable to the special federal and state funds from which they receive their income. In order to obtain this reimbursement, each agency that defrays such increase from the General Fund shall file with the Office of Management and Budget a certified itemized list of the employees that are eligible for the increase, as provided by such Office. Said certification shall be received at the Office of Management and Budget not later than October 31, 2004."

Section 36.- Section 1 of Act No. 98 of June 4, 1980, as amended, is hereby amended to read as follows:

"Section 1.- All persons who are receiving a pension or benefit under Act No. 12 of October 19, 1954, as amended, shall be entitled to receive a Christmas Bonus equal to five hundred dollars ($500) beginning on December 2005; of five hundred fifty dollars ($550) beginning on December 2006;

**Add.97**

and of six hundred dollars ($600) beginning on December 2007, which shall be paid not later than December 20 of each year. Pensioners covered under Act No. 305 of September 24, 1999, known as the 'Retirement Savings Account Program,' and those persons who retire under Chapter 5 of Act No. 447 of May 15, 1951, as amended, are excluded from the benefits granted under this Act."

Section 37.- The creation of a Special Standing Committee is hereby directed. The purpose of such Committee shall be to guarantee the continuous solvency of the Retirement Systems. The composition of said Committee shall be established by means of special legislation.

Section 38.- The Additional Benefits Program for the Pensioners of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico is hereby established. Such benefits shall be separate from and shall not be part of any pension or annuity.

"Section 1.- Except for those persons who retire under Chapter 5 of  Act No. 447 of May 15, 1951, as amended, any person who has been receiving a pension or benefit under of Act No. 447 of May 15, 1951, as amended, or under the retirement plans superseded by this Act or any other Act administered by the Administrator of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico, excluding any person receiving a pension or benefit under Act No. 12 of October 19, 1954, as amended, shall be entitled to the following benefits:

(a)     A Medication Bonus equal to one hundred dollars ($100) to be paid not later than July 15 of each year.

(b)     A Christmas Bonus equal to two hundred dollars ($200) to be paid not later than December 20 of each year; and

(c)     A Government's contribution for health benefits for pensioners covered by the health benefit plans under Act No. 95 of June 29, 1963, as amended, of one hundred dollars ($100) every month for the pensioners of the

Retirement System for Employees of the Government of the Commonwealth of Puerto Rico, but shall not exceed the total rate corresponding to any pensioner.

Section 2.- In order to cover the Additional Benefit Program and the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico, beginning on fiscal year 2013-2014, and every subsequent fiscal year, the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico shall receive a contribution equal to two thousand dollars ($2,000) as of July 1 of each year for every pensioner of the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico who entered Public Service on or before December 31, 1999.

Section 3.- The Administration of the Employees Retirement System of the Government and the Judiciary shall determine the total amount of the special additional contribution provided in Section 2 and send a certification to the Director of the Office of Management and Budget and to each public corporation and municipality whose employees retired under the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico, stating the corresponding amount of the applicable special additional contribution.

Section 4.- The resources to cover the contribution described in Section 2 with respect to the pensioners of the Central Government shall be earmarked in the General Budget of the Commonwealth of Puerto Rico. Public corporations and municipalities whose employees are covered under this Act shall provide the funds to cover the contribution described in Section 2 with respect to pensioners of such corporation or municipality.

Section 5.- Persons who retired under the Act No. 305 of September 24, 1999, known as the 'Retirement Savings Account Program,' and under Chapter 5 of Act No. 447 of May 15, 1951, as amended, are excluded from the benefits granted under this Act."

Section 39.- Section 5-115 is hereby added to Act No. 447 of May 15, 1951, as amended, to read as follows:

"Section 5-115.- Transitory Provisions.-

(a)    Uncredited Creditable Service.-

(1)    Any participant who, on or before June 30, 2013, requests a payment plan to the Administrator, pursuant to subsection (b) of Section 1-107, to defray the cost of creditable service may choose to make such payments at a compound special interest rate of nine point five percent (9.5%).

(2)    Any participant who, on or before June 30, 2013, applies for a special personal loan to the Administrator to pay in full any uncredited creditable services, pursuant to subsection (c) of Section 1-107, may chose to make such payment at a compound special interest rate of nine point five percent (9.5%).

(3)    Any participant who avails him/herself of the special rate set forth in paragraphs (1) and (2) above and have entered public service on or before April 1, 1990, may only accumulate up to a maximum of sixty percent (60%) of the average compensation if he/she completes thirty (30) years of service.

(4)    For purposes of this paragraph (a), uncredited creditable services must have been rendered on or before June 30, 2013.

(b)    Any participant who entered public service on or before April 1, 1990, and would have been entitled to retire on or before December 31, 2013, after thirty (30) years of service pursuant to the provisions of Chapter 2, may do so under the following terms:

(1)    For those who have completed thirty (30) years or more of creditable service and have not reached the age of fifty-five (55) or more, fifty-five percent (55%) of their average compensation.

(2)    For those who have completed thirty (30) years or more of creditable service and have reached the age of fifty-five (55) or more, sixty percent (60%) of their average compensation.

(3)   Participants who avail themselves of the provisions of this subsection (b) shall make the mandatory contribution provided in Section 5-105 for benefit of the System, and such amount shall not be included in the contributions account of each Hybrid Program participant. Any excess mandatory contribution shall be credited to the Contributions Account of each participant.

Section 40.- Cause for action is hereby recognized to the participants and pensioners of the Employees Retirement System of the Government of Puerto Rico and the Judiciary to sue, *pro se*, nongovernment investment advisers and underwriters in any transaction in which pension obligation bonds have been issued by the Employees Retirement System of the Government of Puerto Rico and the Judiciary, for damages caused to the System or its beneficiaries.

Section 41.- Separability Clause.-

If any clause, paragraph, subparagraph, article, provision, section, subsection or part of this Act were held to be unconstitutional by a competent court, such holding shall not affect, impair, or invalidate the remaining provisions of this Act. The effect of such holding shall be limited to the clause, paragraph, subparagraph, article, provision, section, subsection, or part thereof thus held to be unconstitutional.

Section 42.- Effectiveness.-

This Act shall take effect on July 1, 2013. However, the provisions of subsection (c) of Section 4-108 and of the new Section 4-109 shall take effect immediately after its approval.

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 3-2013 (H. B. 888)** of the **1st Session of the 17th Legislature** of Puerto Rico:

**AN ACT**    to amend Sections 1-101, 1-102, 1-104, 2-101, 2-103; repeal Sections 2-104, 2-115, and 2-116; renumber Section 2-104-A as Section 2-104; renumber Sections 2-117 to 2-120 as Sections 2-115 to 2-118; repeal Sections 3-104 and 3-105 and renumber Sections 3-106 to 3-112 as Sections 3-104 to 3-110; add new Sections 4-108 and 4-109 and renumber Sections 4-108 to 4-114 as Sections 4-110 to 4-116; create Chapter 5 entitled the "Defined Contribution Hybrid Program"; etc.

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on this 28th day of February, 2014.

Juan Luis Martínez Martínez
Acting Director