# Exhibit 1



Bloomberg

Financial Series

ROBERT DOTY

EXHIBIT 12

08 - 11 - 2020

VISUAL GUIDE TO

# MUNICIPAL BONDS

ROBERT DOTY

# Bloomberg Visual Guide to
# Municipal Bonds

## Robert Doty

**BLOOMBERG PRESS**
An Imprint of
**WILEY**

# Bloomberg Visual Guide to
# Municipal Bonds

**Robert Doty**

**BLOOMBERG PRESS**
An Imprint of
**WILEY**

# Introduction

The municipal securities market is widely misunderstood by commentators, investors, issuers, regulators, legislators, and even many market professionals.

In reality, the market consists of two vastly different markets. One market is traditional municipal securities that are very sound and are secure, with extremely low default risks. The other is a market of readily identifiable, much riskier securities dependent primarily upon private performance (profit and nonprofit) or issued for start-up or rapidly expanding projects. That second municipal securities market deserves significantly greater attention from everyone.

Municipal securities are issued by state and local governments. Despite considerable negative publicity in the media and from certain pundits, traditional municipal securities are safe. That is, they have evidenced extremely low payment default rates historically. Further, despite unarguable fiscal stress resulting from the financial crisis and from pension and other employee benefit costs, a key feature of traditional municipal securities for essential purposes is

that the securities structures are strongly protective of investors. The net result is that those state and local government stresses will become burdens on the taxpayers long before they will harm investors. Indeed, it is highly unlikely that investors will suffer in the case of the traditional municipal securities. There are, however, certain municipal securities that warrant a closer look and greater rewards. This book seeks to identify many of those for you.

## What Are Municipal Securities?

Municipal securities are debt securities issued by state and local governments primarily to fund governmental projects and programs. Municipal securities are debt securities—effectively, loans—payable from taxes or governmental or other project revenues.

The following screen (Exhibit 1.1) from the Bloomberg Terminal illustrates the volume of municipal securities issued by certain states and nationally from January 1 through August 5, 2010.

**KEY POINT:**

The municipal securities market is widely misunderstood. The market actually is composed of two very different markets—traditional municipal securities, on one hand, and much riskier private obligations or securities for start-up projects, on the other.

**DEFINITION:**
Municipal securities

Municipal securities are debt securities issued by state and local governments primarily to fund governmental projects and programs. Municipal securities are debt securities—effectively, loans—payable from taxes or governmental or other project revenues.

1

CHAPTER

# Considerations When Buying

**Y**ou may have questions about selected technical topics when you make municipal securities investments. There are a number of important considerations beyond simply credit risks. Those include, for example, risks that the value of the securities may change due to market movements in prevailing interest rates, risks associated with optional redemptions (especially when investors pay a premium for the securities), and risks of illiquidity in a market that may be traded thinly.

This chapter is intended to highlight certain matters that you may wish to consider when buying municipal securities

## Where Should I Begin?

When you are considering buying municipal securities, the place to begin is to obtain and review available information. Based upon that information, you may wish to consider carefully whether the securities belong in your portfolio at all in light of their yields, your tax position, your investment horizon, and risks of the securities, including among them, risks identified below.

As discussed in Chapter 2, "Basic Information Resources," you should read the official statement for the offering and continuing disclosure documents filed by the issuer or borrower.

You can obtain the official statement from the broker or dealer who sold you the securities, as well as later from the Electronic Municipal Market Access (EMMA) platform maintained by the Municipal Securities Rulemaking Board (MSRB) at www.emma.msrb.org. If there is a preliminary official statement, as is usually the case, you should request it from the broker or dealer offering the securities to you. The broker or dealer then is obligated to provide it to you. The preliminary official statement will precede the official statement, which is the final version of the document containing pricing information for the offering. The continuing disclosure documents are available at EMMA. EMMA also can give you access to information as to how the issuer's or borrower's out-

SMART INVESTOR TIP

When you are considering buying municipal securities, the place to begin is to obtain and review available information. Based upon that information, you may wish to consider carefully whether the securities belong in your portfolio at all in light of their yields, your tax position, your investment horizon and the risks of the securities.

91

**STEP-BY-STEP**

The following are certain risks to consider when investing in municipal securities:

- Issuer/borrower credit risks
- Default risks
- Credit enhancer and liquidity provider credit risks
- Pricing and yield risks
- Duration risks
- Liquidity risks
- Redemption (prepayment or call) risks
- Tax risks

**SMART INVESTOR TIP**

The information available to you should be adequate for you to evaluate the securities intelligently. If adequate information is not available, then you may wish to consider other municipal securities.

**DEFINITION:**
**Redemption**

The term redemption is a message security is synonymous with the prepayment or call of the security

**DEFINITION:**
**Par**

The par amount of a municipal security is its principal amount

standing securities (if any) are trading, which will give you an insight into liquidity of those securities.

You also may wish to search on the Internet for the issuer's or borrower's website so that you can review other, perhaps more current, information regarding the issuer or borrower.

## What Are Some of the Factors I Should Consider?

When you purchase municipal securities, as a guide to appropriate investment you may wish to consider several risks associated with the securities. Those risks include, among others, issuer or borrower credit risks, default risks, credit enhancer and liquidity provider credit risks, pricing and yield risks, duration risks, liquidity risks, redemption (prepayment or call) risks, and tax risks.

The information available to you should be adequate for you to evaluate the securities intelligently. If adequate information is not available, then you may wish to consider other municipal securities.

When you buy municipal securities, you may wish to follow the practices of professional analysts and look closely at the credit-worthiness of the issuers and borrowers, even when the securities are insured, as well as at the terms of the securities.

By way of example, as discussed throughout this book, especially given the wide credit diversity within the municipal securities market, you should pay close attention to the source of payment and security for the municipal securities you are considering.

Therefore, among other things, you may wish to consider whether the municipal securities are secured by obligated taxes supported by a statutory lien or by dedicated revenues. In the cases of general fund securities or securities payable from an enterprise fund, you may wish to consider the financial condition of the fund and its results for the past several years.

You may wish to examine the essentiality of the project for the issuer and, in the case of revenue securities offerings, of the services that will generate revenues to pay you. You may wish to consider whether the community is diverse.

In addition, you may wish to consider whether factors such as are described in Chapter 6, "Greater Rewards and Greater Risks," may be present. If so, you may wish to consider what the implications of those factors may be in terms of rewards and risks for you.

Among other factors, there are securities terms that you may wish to consider. An example is the optional redemption feature of many municipal securities pursuant to which issuers or borrowers may redeem (prepay) the securities at the sole option of the issuers or borrowers. If the securities can be redeemed after a period of years, as is generally the case for long-term municipal securities, then you should be aware that any premium you pay for the securities could result in a loss if the redemption price is lower than the price you pay.

A similar outcome may occur when the securities are subject to mandatory redemption at their outstanding par (principal) amounts. See the section following

entitled "What Are Municipal Securities Premiums and Discounts?"

For example, if you pay 105% for a municipal security, you are paying 5% more than the principal amount of the security. If the security is subject to redemption (also called *prepayment* or *call*) at the option of the issuer at 101% of the principal amount of the security, you may lose up to 4% of the principal amount. (Technically, if the municipal securities are *priced correctly* (sometimes a significant assumption) to the lower of the yield to the applicable call date or to maturity, then you are compensated by the greater current yield, and during the period between your purchase and the redemption, there may be an *amortization* of all or a portion of the premium you paid when you purchased the securities. For purposes of simplicity, however, I am ignoring that, but the caution still applies.)

You should also be aware of where your securities fall on the yield curve, which is discussed later. You may wish to gain an understanding of where on the yield curve the remaining life of the securities falls and how that may affect the pricing and yield of the securities and their duration. Duration is a measure of their price responsiveness to changes in market conditions, as discussed in Chapter 12, "Investor Questions and Answers (Q&As)," in the section entitled "What Is 'Duration'?"

The Municipal Securities Rulemaking Board (MSRB) has published a fact sheet entitled "Seven Questions to Ask When Investing in Municipal Bonds."

The seven questions identified by the MSRB for municipal securities investors are:

1. What information is available about a municipal bond?
2. What should I know about credit quality?
3. What should I know about yield?
4. Is the price I am being offered fair?
5. How is my financial professional compensated?
6. Is the investment appropriate for my tax status?
7. Is the bond callable?

From the MSRB, "Seven Questions to Ask When Investing in Municipal Bonds" (2011). The complete document is contained on the MSRB's website through a link at a page with more extensive information for investors. The page is entitled "Preparing to Invest in Municipal Securities" at www.msrb.org/Municipal-Bond-Market/Investor-Resources/Preparing-to-Invest.aspx/.

There are, of course, many other factors that you may wish to consider. The Appendix directs you to resources to assist you in identifying them.

## What Is the Appropriate Role of Ratings?

When municipal securities are rated, as is usually the case, the ratings are one tool, but only one, to assist you. Long-term securities ratings of municipal securities that are regarded as safest are triple-A and double-A. Municipal securities that are A-rated, or BBB or Baa-rated also are considered to be investment grade. Long-term municipal securities at lower ratings, such

**SMART INVESTOR TIP**

You may wish to consider the creditworthiness of the product for the issuer and, in the case of revenue securities offerings, of the services that will generate revenues or revenue. You may want to consider whether the creditworthiness is diverse.

**DO IT YOURSELF**

If you pay 105% for a municipal security, you are paying 5% more than the principal amount of the security. If the security is subject to redemption (also called *prepayment* or *call*) at the option of the issuer at 101% of the principal amount of the security, you may lose up to 4% of the principal amount (less any amount of the premium you paid that amortizes.

**STEP-BY-STEP**

The seven questions identified by the MSRB for municipal securities investors are:
1. What information is available about a municipal bond?
2. What should I know about credit quality?
3. What should I know about yield?
4. Is the price I am being offered fair?
5. How is my financial professional compensated?
6. Is the investment appropriate for my tax status?
7. Is the bond callable?

SMART INVESTOR TIP

Ratings are not a substitute for gaining your own understanding of the securities

as BB or Ba, are not considered to be investment grade.

Rating agencies stress that their ratings are *not* recommendations that you buy, sell, or hold any security. Ratings agencies do not engage in substantial active due diligence. Instead, they rely largely upon information provided to the agencies by securities issuers or borrowers or by underwriters.

I recommend that you not regard ratings as a substitute for gaining your own understanding of the securities.

## What Are Rating Categories?

Rating categories are used by the rating agencies as a short-hand mechanism to express credit opinions regarding securities issues. The rating agencies often publish detailed analyses explaining their rationales for the ratings.

The major rating agencies are Standard and Poor's (S&P), Moody's Investors Service (Moody's), and Fitch Ratings (Fitch). The major rating agencies generally are paid by the issuers or borrowers. Other, less-well-known rating agencies also publish ratings. Some of them are paid differently, such as by investors. You may wish also to investigate those other rating agencies, their rating practices and records, and their rating scales.

The long-term rating categories of the major rating agencies include the following table.

**Certain Rating Categories**

| | |
|---|---|
| AAA/Aaa | |
| AA/Aa | Investment Grade |
| A/A | |
| BBB/Baa | |
| BB/Ba | Below Investment Grade |
| B/B | |

The ratings below those levels (such as C and D) indicate even more substantial risks of default and actual default status.

Each rating category contains other scaled indicators, such as + and –, or 1, 2, or 3 designations, such as A+ and A– or A1 and A3.

As one progresses down the rating scales, experience of the rating agencies demonstrates increasingly greater risks of default or late payment.

There also are short-term ratings for municipal securities. Standard and Poor's uses short-term ratings of A, B, C, and D, with 1, 2, and 3 designations within those categories. For notes, S&P uses SP-1, SP-2, and SP-3. Moody's Investors Service uses short-term ratings of MIG 1, MIG 2, and MIG 3, and for municipal securities with variable interest rates, VMIG-1, VMIG-2, and VMIG-3. Fitch Ratings uses F1, F2, and F3, with lower ratings for securities having, in Fitch's view, greater credit risks.

Municipal securities with credit enhancement—bond insurance, bank letters of credit, or occasionally, other forms of enhancement (such as guarantees)—are rated

generally with the ratings of the credit enhancers, unless that is lower than the rating, if any, of underlying securities. As discussed below, you also may wish to consider the credit and underlying ratings of the issuers or borrowers. If underlying ratings are not present, you may experience illiquidity in the event credit enhancers are downgraded.

As discussed in the Appendix, you are able to obtain the ratings for the securities from rating agencies (as well as EMMA and, upon initial issuance, official statements) and to review the rating criteria of various rating agencies for municipal market sectors.

## What Are Investment-Grade Ratings?

Investment grade ratings are ratings that span the credit quality ranges considered credit-worthy by various mutual funds, casualty insurance companies, banks, and other institutional investors, as well as by many retail investors.

As indicated in the table earlier, the long-term ratings of the major rating agencies that qualify generally as investment grade vary from AAA/Aaa at the highest rating level to BBB-/Baa3 at the lowest.

## To What Degree Are Investment Grade Ratings a Useful Guide?

Some investors will limit their investments only to the highest levels, such as triple-A, double-A, and perhaps single-A.

Ratings below BBB-/Baa3 are considered to be below investment grade and subject to risks that many inves-

tors (but not all) avoid. Securities at those levels deserve especially careful examination and higher yields.

As stated by Fitch Ratings, municipal securities that are not rated at investment-grade levels "are approximately 10 times more likely to default" than are investment grade municipal securities. (See "For Additional Information" at the end of the chapter.)

Having noted that investment grade ratings are a helpful factor for cautious investors, however, it bears restating that you should make your own review and analysis of the municipal securities you consider. There are numerous factors in addition to credit quality that you may wish to consider, some of which are discussed in this Chapter.

## How Do I Know When Ratings of My Securities Change?

You are able to monitor your securities for rating changes on the MSRB's EMMA at www.emma.msrb.org. That is one of the categories of event notices that issuers and borrowers are required to file on EMMA. S&P and Fitch also provide information to EMMA.

## What Are Underlying Ratings, and Why Do They Matter?

Municipal securities with credit enhancement—bond insurance, bank letters of credit, or occasionally, other forms of enhancement (such as guarantees)—are rated generally with the rating of the credit enhancers. In the past, that meant that insured municipal securities usually were rated

**90** ■ CHAPTER 7  Considerations When Buying

SMART INVESTOR TIP

When you buy credit-enhanced municipal securities, you may wish to follow the practices of professional analysts and also look at the underlying credit-worthiness of the issuers and borrowers, including but not limited to, their underlying ratings.

at triple-A levels (a few bond insurers, and other credit enhancers, had lower ratings such as double-A or single-A).

The issuers or borrowers in those securities transactions commonly were able to obtain ratings for their own securities, although they did not always do so. When those ratings were assigned to the securities, they were known as underlying ratings. The underlying ratings should be disclosed in official statements.

Many professional municipal securities analysts did not review the bond insurers' or other credit enhancers' ratings alone. Instead, the analysts also paid attention to the underlying ratings resulting from the issuers' or borrowers' participations in the transactions.

Further, many analysts rarely relied solely upon the credit enhancers' and underlying ratings. They also conducted their own internal review of information concerning both the credit enhancers and the underlying issuers or borrowers.

Those practices were due to a number of considerations. First, the credit enhancers were private corporations, and at the time, ironically given contrasting historical default experience, rating agencies rated corporate obligors more favorably overall than municipal obligors. That has changed somewhat, although not entirely.

In addition, professional analysts discounted the insured ratings and believed the credit-worthiness of the underlying issuers and borrowers mattered. This proved to be the case when all of the bond insurers' ratings were downgraded.

When you buy credit-enhanced municipal securities, you may wish to follow the practices of professional analysts and also look at the underlying credit-worthiness of the issuers and borrowers, including but not limited to, their underlying ratings.

In the long run, the underlying credit-worthiness of the issuer or borrower is your primary source of security, with the bond insurer or other credit enhancer standing in the background. If and when the credit enhancer's rating declines significantly, you may find that, like a broad universe of other municipal investors, the credit-worthiness of your investment will depend more upon the issuer and borrower than the insurer.

Another reason that underlying ratings matter is that the liquidity of the municipal securities may be affected without the underlying ratings, especially if the bond insurers or other credit enhancers are downgraded at some point. That illiquidity will affect adversely the price you can receive if you decide to sell the securities.

## What Is the Relevance of the Spread between Bid and Asked Prices?

A *bid price* is the price that a potential investor offers for a security. The *asked price* is the price for which a potential seller proposes to sell the security. In this context, the difference between the bid price and the asked price is the *spread* between them.

You may wish to consider the size of the spread between bid and asked prices for municipal securities.

A wider spread is viewed by some traders as indicating reduced liquidity for a municipal security. See the sections entitled "Why Does Liquidity Matter?"; "What Enhances Liquidity?"; and "How Does the Size of My Purchase Affect the Price?"

## What Is the Relationship between Interest Rates (Coupons) and Yields?

The stated interest rate or coupon of your municipal securities is an annual percentage applied to the principal amount of the securities. See Chapter 12, "Investor Questions and Answers (Q&As)," in the section entitled "What Is the Coupon of My Securities?"

When you buy municipal securities, whether in initial offerings or in trading transactions, you may pay a price that is different from the principal amount (par) of the securities. Similarly, when you sell municipal securities, the price you receive may be different from the principal amount.

When the price you pay or receive on municipal securities is different from the principal amount, the yields of the securities will be different from the interest rate (coupon) borne by the securities.

Pursuant to Municipal Securities Rulemaking Board (MSRB) rules, the yields are calculated to the lower of the yields to maturity of the securities or the yields to the first redemption date.

Exhibit 7.1 illustrates municipal yields as published in Bloomberg Brief: Municipal Market on July 20, 2011. The index is Bloomberg Valuation AAA Benchmark Municipal Yields (BVAL).

## What Is the Relationship between Yields and Prices?

Yields on and prices of municipal securities move in opposite (inverse) directions.

For fixed rate securities, as the price of a municipal security falls, the yield rises, and conversely, when the price rises, the yield falls.

## What Is a Basis Point?

Municipal securities interest rates and yields are expressed in basis points. A basis point is $1/1000$th of a percentage point, or .01%.

## What Are Total Return and Buy-and-Hold Strategies?

Purchasers of individual municipal securities, especially individual (retail) investors, commonly have a *buy-and-hold* approach to investing. Their ownerships, and their risks, may be concentrated in fewer securities issues than may be the case when investing in mutual funds. They may make their own investment choices or may invest upon advice of a broker-dealer or financial advisor.

SMART INVESTOR TIP

You may wish to consider the size of the spread between bid and asked prices for municipal securities.

A wider spread is viewed by some traders as indicating reduced liquidity for a municipal security.

DEFINITION:
**Stated interest rate or coupon**

The coupon is simply the interest rate borne by your securities pursuant to their terms.

KEY POINT:

Yields on and prices of municipal securities move in opposite (inverse) directions. For fixed rate securities, as prices fall, yields rise, and vice versa.

**Bloomberg Valuation AAA Benchmark Yields**

| Description | Current | Current Date | Previous | Previous Date | Net Change |
|---|---|---|---|---|---|
| BVAL 1Y | 0.19 | 07/19 | 0.18 | 07/18 | +0.01 |
| BVAL 2Y | 0.39 | 07/19 | 0.37 | 07/18 | +0.01 |
| BVAL 3Y | 0.67 | 07/19 | 0.64 | 07/18 | +0.02 |
| BVAL 4Y | 0.90 | 07/19 | 0.93 | 07/18 | −0.02 |
| BVAL 5Y | 1.22 | 07/19 | 1.21 | 07/18 | +0.01 |
| BVAL 6Y | 1.54 | 07/19 | 1.53 | 07/18 | 0 |
| BVAL 7Y | 1.94 | 07/19 | 1.97 | 07/18 | +0.03 |
| BVAL 8Y | 2.24 | 07/19 | 2.25 | 07/18 | −0.01 |
| BVAL 9Y | 2.50 | 07/19 | 2.49 | 07/18 | 0 |
| BVAL 10Y | 2.65 | 07/19 | 2.63 | 07/18 | +0.02 |
| BVAL 20Y | 3.82 | 07/19 | 3.82 | 07/18 | 0 |
| BVAL 30Y | 4.35 | 07/19 | 4.31 | 07/18 | +0.05 |

**Exhibit 7.1**

*Source: "Bloomberg Brief: Municipal Market" (July 20, 2011). Chart reprinted with permission. Copyright 2011 Bloomberg L.P. All rights reserved.*

For these investors, *total return* considerations associated with price volatility in the market may be viewed as largely irrelevant, as they do not intend to sell. As a result, they are less sensitive to liquidity and to changes in market values over time. They intend to look only to receipt of the interest they sought upon their original purchases.

Investors in mutual funds, on the other hand, may be concerned with total return considerations, meaning that they look not only to interest earnings, but also take into account changes in the value of securities in fund portfolios and the prices at which the funds can sell portfolio investments.

## What Are Municipal Securities Premiums and Discounts?

When municipal securities are sold or purchased at prices that are higher than the principal amount (par) of the securities, the price includes a premium that is represented by the difference between the principal amount and the higher price.

Because prices and yields move in opposite (inverse) directions, the premium has the effect of reducing the yield on fixed-rate securities below their stated interest rates. The greater the premium, the lower the yield.

Similarly, when the securities are sold at a price that is lower than the principal amount, the difference is a discount. The discount has the effect of raising the yield above the stated interest rates. The greater the discount, the higher the yield.

## What Is the Impact of Redemptions?

Redemption provisions are very important to municipal securities investors. A redemption means that you no longer will own the securities and that you may not be able to re-invest the funds at the same yield.

Most municipal securities are subject to redemption (also described as *prepayment* or *call*). The redemption price may be the principal amount of the securities or may include a small redemption premium.

Optional redemption occurs at the sole option of the issuer or borrower. You have no say in the matter. In general, you will receive your principal (plus any prescribed redemption premium, but no more), plus interest accrued to the redemption date.

Mandatory redemptions are a frequent facet of long-term municipal securities structures. For example, a term security maturing in 2030 may be subject to mandatory redemption in 2026, 2027, 2028, and 2029 in predetermined and fully-disclosed principal amounts. Most commonly, mandatory redemptions occur at the principal amount redeemed, plus interest accrued to the redemption date. Regarding *term securities*, see the descriptions above and in Chapter 12, "Investor Ques-

tions and Answers (Q&As)," in the section and subsection entitled "What Are Basic Provisions in Securities Structures?, What Are Term Securities?"

Depending upon the price you paid for the municipal securities, you may incur a capital gain or loss upon redemption. If you paid a premium for the securities, you may lose money upon a redemption at a lower redemption price. See the earlier discussion of "premiums" and the related example in the section entitled "What Are Some of the Factors I Should Consider?"

The trustee or paying agent for the securities generally is required to give prior notice of a redemption for a period, such as 30 days, which will give you an opportunity to plan for reinvesting the redemption payment.

## Why Does Liquidity Matter?

Many municipal securities are illiquid. Especially securities of smaller and less well-known issuers or borrowers may not have a ready market when and if you wish to resell them. Ernesto A. Lanza, deputy executive director and chief legal officer to the Municipal Securities Rulemaking Board (MSRB), testified that "On a typical trading day, there are about 40,000 trades in 14,000 different [municipal] securities. This means that over 99 percent of municipal securities do not trade on a given day. In fact, over 90 percent typically do not trade in a given month. The individual municipal securities that are traded each day change as new issues come to market, are traded, and eventually are purchased by investors that hold them as

SMART INVESTOR TIP

Optional redemption occurs at the sole option of the issuer or borrower. You have no say in the matter. In general, you will receive your principal (plus any prescribed redemption premium, but no more), plus interest accrued to the redemption date.

If you paid a premium for the securities, you may lose money upon a redemption.

**KEY POINT:**

Illiquidity can affect the price you may receive on resale of the securities.

**KEY POINT:**

Many retail investors are buy-and-hold investors who purchase municipal securities and hold them to maturity. Those investors generally are not highly concerned with liquidity issues most of the time. If, however, the investors find it necessary or desirable to sell their securities unexpectedly, liquidity can become a very serious pricing and sales issue for them.

**SMART INVESTOR TIP**

Municipal securities of larger, more frequent issuers that have more active trading patterns tend to be more liquid than securities of smaller, less frequent issuers. Other factors that may affect liquidity of your securities include the size of blocks you trade and the maturity of the securities. You may find that larger blocks (e.g., $100,000, $250,000 or more) and shorter maturities (e.g., 10 to 12 years or less) have more appeal (greater liquidity) in the market.

long-term investments, in many cases with the intention of retaining until maturity."

In turn, that illiquidity can affect the price you may receive on resale of the securities.

In other words, there is a higher price for liquid securities, in part due to the greater demand for the securities and in part because parties buying them have a higher level of confidence that they will be able themselves to resell the securities more readily and at a more favorable price.

As noted, many retail investors are buy-and-hold investors who purchase municipal securities and hold them to maturity. Those investors generally are not highly concerned with liquidity issues most of the time. If, however, the investors find it necessary or desirable to sell their securities unexpectedly, liquidity can become a very serious pricing and sales issue for them.

To illustrate contrasting liquidity in the secondary market, the next three pages contain screens (Exhibits 7.2, 7.3, and 7.4) from the Bloomberg Terminal showing (1) an example of a relatively high level of liquidity for a bond of a state issuer (California), reflecting numerous trades in larger blocks in the brief period from July 1, 2011, through July 20, 2011; (2) an example of a lower level of liquidity resulting from fewer trades for a security in smaller blocks in the longer period from February 20, 2011, through August 10, 2011; and (3) a security without any trades in the period from January 30, 2011 through July 20, 2011.

## What Enhances Liquidity?

If you are concerned about liquidity, you may wish to consider municipal securities of larger, more frequent issuers, such as states, state agencies, and larger cities, counties, school districts, airports and the like. The same is true of larger, better-known private borrowers. Those are likely to have more active trading patterns and tend to be more liquid than securities of smaller, less frequent issuers. Other factors that may affect liquidity of your securities include the size of blocks you trade and the maturity of the securities. You may find that larger blocks (e.g., $100,000, $250,000 or more) and shorter maturities (e.g., 10 to 12 years or less) have more appeal (greater liquidity) in the market. (See "For Additional Information" at the end of the chapter.)

If you are not a buy-and-hold municipal securities investor, or if you must sell your securities unexpectedly and suddenly, such considerations may impact you upon resale of your securities.

The MSRB's EMMA facility at www.emma.msrb.org is a recent enhancement in the market that is intended in part to improve liquidity by providing real-time trading and pricing data on municipal securities.

In addition, underwriters of securities upon initial issuance generally remain interested in those securities in the secondary market and may assist with trading, although they do not guarantee liquidity.

Bloomberg Visual Guide to Municipal Bonds ■ **101**



| | | | | | |
|---|---|---|---|---|---|
| **‹HELP› for explanation.** | | | | Muni | **TDHM** |
| **‹MENU› to Return** | | | | | |
| 1) Export | | Trade Disclosure History (As Reported by MSRB) | | | |
| Issuer | CALIFORNIA ST | | | Cusip | 13063A4Y7 |
| Issue | VAR PURP | | | | |
| Coupon | 6.00000 | Maturity  04/01/38 | Issued  04/01/09 | State | CA |
| Range | - | View | | Trade Size | |

| | Agg. Volume (M) | Agg. Trades | Trade Days | | High | Low |
|---|---|---|---|---|---|---|
| | 2,625 | 44 | 8 | | 110.784 | 105.210 |

| Date | Volume (M) | Trades # | High | Low | Average |
|---|---|---|---|---|---|
| 3) 07/18/11 | 400 | 5 | 109.510 | 106.330 | 107.649 |
| 4) 07/14/11 | 145 | 2 | 109.322 | 109.322 | 109.322 |
| 5) 07/12/11 | 620 | 8 | 110.784 | 107.123 | 109.339 |
| 6) 07/11/11 | 240 | 12 | 109.037 | 105.878 | 107.446 |
| 7) 07/08/11 | 450 | 8 | 107.546 | 105.210 | 106.696 |
| 8) 07/07/11 | 280 | 1 | 106.396 | 106.396 | 106.396 |
| 9) 07/06/11 | 265 | 4 | 106.875 | 106.470 | 106.571 |
| 10) 07/05/11 | 225 | 4 | 109.011 | 106.971 | 107.494 |

**Average Price calculated by Bloomberg. Volume may not include trades over 1 million**

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2011 Bloomberg Finance L P
GN 260301 CDT  GMT-5:00 G515-401-2 10-Aug-2011 10:30:10

**Exhibit 7.2**

Reprinted with permission from Bloomberg. Copyright 2011 Bloomberg L.P. All rights reserved.

**102** ■ CHAPTER 7 Considerations When Buying



**Exhibit 7.3**

Reprinted with permission from Bloomberg. Copyright 2011 Bloomberg L.P. All rights reserved.



**Exhibit 7.4**

Reprinted with permission from Bloomberg. Copyright 2011 Bloomberg L.P. All rights reserved.

**104**  ■  CHAPTER 7  Considerations When Buying

### KEY POINT:

The bond insurance industry has experienced significant decline. That has impacted directly and adversely large numbers of municipal securities investors.

This is, of course, quite different from the assertions by certain pundits and media sources regarding municipal securities. Bond insurance companies are private, not governmental, entities.

A number of bond insurers chose to step beyond their perceived monoline role of insuring municipal securities that would not default into insuring subprime mortgage pools and other risky securities. In doing so, various insurers conducted little real due diligence other than reliance upon underlying ratings, statistical analysis, and reliance upon issuer or underwriter representations. In other words, some insurers did not look far behind representations made to them and did not review directly the mortgages in pools even through sampling. A *monoline* insurer is one that insures only against securities defaults, not against any other risk.

### DEFINITION:
**Blocks**

The term *blocks* in the trading context refers to the principal amount of the securities sold or purchased, as in $25,000, $100,000, $250,000 or $1,000,000 *blocks*.

### How Does the Size of My Purchase Affect the Price?

In general, a broker or dealer must work disproportionately to sell $5,000 of securities, as opposed to selling $1 million or $10 million of securities. Thus, smaller purchases have higher execution costs per $1,000 of principal amount. In order to make a profit, the broker or dealer is likely to provide a less favorable price for the smaller sale, within regulatory limits.

In general, smaller principal amounts of securities (blocks) are less liquid than are larger **blocks** You may find that blocks of $100,000 or more are more liquid than are municipal securities in smaller blocks.

### When Should I Consider Mutual Funds and ETFs?

Due to the execution costs of smaller municipal securities sales, if you are interested in investing smaller amounts in municipal securities, you may wish to consider the alternative of investing in municipal bond funds or exchange-traded funds.

Those funds are discussed in Chapter 12, "Investor Questions and Answers (Q&As). What Is a Yield Curve? When considering specific municipal issues, the yield curve—a graphic depiction of yields expressed across periods—reflects relationships among different maturities of debt securities and interest rates. Under normal economic conditions, shorter-term debt securities gen-



**Exhibit 7.5**

Reprinted with permission from Bloomberg L.P. Copyright 2011 Bloomberg L.P. All rights reserved.

erally have lower yields than do longer-term securities for which there are greater inflation and other risks. The generally greater appeal and liquidity of securities with shorter maturities is reflected in the yield curve.

The upward slope of the normal yield curve, can be affected, however, by general investor (market) expectations for inflation or by general economic and political developments. In unusual conditions, the slope can become inverted, signaling possible future economic difficulties. The slope of the yield curve can tell you what the market expects yields may be in the future. You may wish to research yield curves and the significance of a variety of yield curve slopes in terms of how market professionals view them.

To illustrate, Exhibit 7.5 shows a yield curve based upon BVAL (the "Bloomberg Valuation AAA Benchmark Municipal Yields") on August 1, 2011.

## What Is the Significance to Me of the Bond Insurance Industry's Decline?

Bond insurers are private companies. You may wish to evaluate the presence of bond insurance in a municipal securities structure just as you would evaluate the presence of any other private credit.

Bond insurance has proved to be one of the greatest disappointments in the history of the municipal securities market. After participating in the municipal market significantly for decades, the bond insurance industry

experienced significant decline. That impacted directly and adversely large numbers of municipal securities investors.

This is, of course, quite different from the assertions by certain pundits and media sources regarding municipal securities. Bond insurance companies are not government entities.

Before the financial crisis, many investors relied upon bond insurance as an all-purpose homogeneous substitute for active review of their investments. Among other things, bond insurance homogenized municipal securities at triple-A levels. Many investors made the serious mistake of looking no further than an insurance company's triple-A rating.

Bond insurer practices and financial conditions led to rating downgrades of all of the formerly triple-A rated insurers, most of them substantially and even, in a few cases, to the point of insolvency and bankruptcy or close to it. Those occurrences impacted municipal securities prices, and led to large investor losses in terms of market prices. With only one exception, all the monoline insurers, have ceased active insurance underwriting, although some would like to re-enter the market.

For many years, half or more of municipal securities issues were insured as they were offered to the market. Today, the percentage is very low, even in single-digit percentages.

Exhibit 7.6 and Exhibit 7.7 present, based upon Bloomberg data, the volumes of insured long-term, fixed-rate municipal securities issued annually from 2003 through 2010.

**SMART INVESTOR TIP**

In general, smaller principal amounts of securities are less liquid than are larger blocks.

**SMART INVESTOR TIP**

With the emergence of bond insurer credit difficulties, the perception of homogeneity of municipal securities in today's market, it is even more important that you read and understand the information that is provided to you in official statements and issuer and borrower continuing disclosure documents. That will help you distinguish among issuers and borrowers.

**SMART INVESTOR TIP**

Bond insurers are private companies. You may wish to evaluate the presence of bond insurance in a municipal securities structure just as you would evaluate the presence of any other private credit.

**DEFINITION:**
**Monoline**

A monoline insurer is one that insures only against securities defaults.

**106** ■ CHAPTER 7  Considerations When Buying

| Year | Annual Bond Ins. % |
|------|---------------------|
| 2003 | 55 |
| 2004 | 56 |
| 2005 | 62 |
| 2006 | 52 |
| 2007 | 47 |
| 2008 | 21 |
| 2009 | 9 |
| 2010 | 6 |

**Exhibit 7.6**
*Reprinted with permission from Bloomberg L.P. Copyright 2011 Bloomberg L.P. All rights reserved.*





**Annual Bond Insurance Percent**

**Exhibit 7.7**
*Reprinted with permission from Bloomberg L.P. Copyright 2011 Bloomberg L.P. All rights reserved.*

**SMART INVESTOR TIP**

It is important for you to pay attention to the credits and ratings of municipal securities underlying bond insurance and other forms of credit enhancement.

To the extent that some investors relied solely upon the bond insurers and rating agencies to perform the investors' due diligence for them, it has been a bitter lesson. Although to date, most bond insurance companies have continued to pay claims, investors paid a significant price in terms of market valuations of their securities, sometimes leading to quite substantial losses.

With the emergence of bond insurer credit difficulties, the perception of homogeneity of municipal securities has disappeared. In today's market, it is even more important that you read and understand the information that is provided to you in official statements and issuer and borrower continuing disclosure documents. That will help you distinguish among issuers and borrowers.

The relevance to you of bond insurance in a municipal securities structure can be magnified even more when the issuer's debt service reserve fund consists solely of a surety bond issued by a bond insurer. Regarding the practice of some issuers or borrowers in structuring reserve funds consisting solely of bond insurer surety bonds, see also Chapter 6, "Greater Rewards and Greater Risks," in the section entitled "What About Reserve Funds Backed by Insurer Surety Bonds?" See also Chapter 12, "Investor Questions and Answers (Q&As)," in the section entitled "What Are Debt Service Reserve Funds?"

As discussed earlier, it is also important for you to pay attention to the credits and ratings of municipal securities underlying bond insurance and other forms of credit enhancement.

## How Can I Use CUSIP Numbers?

In researching information regarding municipal securities, issuer and borrower disclosure filings, pricing and trading data and other information, you are likely to find CUSIP numbers to be very useful.

### What Are CUSIP Numbers?

CUSIP numbers are important to securities investing. They are a widely-used means of identifying securities according to specific traits, such as differing maturities, and of gaining ready access to substantial information for specific securities issues. The Municipal Securities Rulemaking Board (MSRB) estimates that there are over 1.3 million CUSIP numbers.

As described by the SEC, "The CUSIP system—owned by the American Bankers Association (ABA) and operated by Standard and Poor's—facilitates the clearing and settlement process of securities." The term *CUSIP* refers to the ABA's Committee on Uniform Securities Identification Procedures.

CUSIP numbers are electronic identifiers for every municipal security (and virtually all other securities, including not only corporate debt obligations, but also stocks and debt securities of national governments). A separate CUSIP number is issued for each maturity in a municipal securities issue. If municipal securities have been refunded (refinanced), or if changes have been made to the credit (such as certain securities of an issue being insured, while others are not), the affected securities may be assigned distinct CUSIP numbers.

### How Can CUSIP Numbers Be Used?

CUSIP numbers make it possible to buy, sell, trade, and track every municipal security.

When you wish to identify municipal securities in specific terms, CUSIP numbers make that specific identification possible.

For example, the use of CUSIP numbers facilitates searches for data and documents on municipal securities on the MSRB's EMMA website.

The numbers also make it possible for investors and brokers or dealers to communicate the specific identities of securities.

### Where Can I Locate CUSIP Numbers?

You can locate CUSIP numbers on purchase and sale confirmations. In addition, most issuers or borrowers provide CUSIP numbers on the covers of official statements in tables showing the securities maturities offered, together with the interest rates and prices or yields.

On the EMMA website maintained by the Municipal Securities Rulemaking Board, you can search for information using issuer names. If you know the name of your securities, as well as the maturity, you can locate the CUSIP number.

Six-digit CUSIP numbers are associated with the issuers or borrowers. Three additional characters are attached for specific securities. For example, the format of a six-digit CUSIP number for a specific issuer or borrower is 000000. With the addition, the entire nine-digit CUSIP number may have a format of 000000 XX0.

**KEY POINT:**

As described by the SEC, "The CUSIP system … facilitates the clearing and settlement process of securities."

**KEY POINT:**

When you wish to identify municipal securities in specific terms, CUSIP numbers make that specific identification possible.

**SMART INVESTOR TIP**

You can locate CUSIP numbers on purchase and sale confirmations. In addition, most issuers or borrowers provide CUSIP numbers on the covers of official statements in tables showing the securities maturities offered, together with the interest rates and prices or yields.

## For Additional Information

- Fitch Ratings, "Default Risk and Recovery Rates on U.S. Municipal Bonds" at 2 (January 9, 2007).

- Ernesto A. Lanza, deputy executive director and general counsel to the Municipal Securities Rulemaking Board (MSRB), written testimony at the Securities and Exchange Commission's Field Hearing in Jefferson County, Alabama, on the State of the Municipal Securities Market, at 6 (July 29, 2011).

- Ernesto A. Lanza, deputy executive director and chief legal officer to the Municipal Securities Rulemaking Board (MSRB), in written testimony at the Securities and Exchange Commission's Field Hearing in Jefferson County, Alabama, on the State of the Municipal Securities Market, at 7 (July 29, 2011), testified: "In terms of trading, the small par value transaction—$100,000 or less—accounts for about 8.4 million or 81 percent of the transactions that occur each day. However, ... 78 percent of the par value traded each day is in transactions of $1 million or greater."

- The yield curve is also a general tool used in the market reflecting, as market barometers, yields for 10-year U.S. Treasury securities or other benchmark securities. See Chapter 8, "Municipal Securities and Trading," in the section entitled "What Is the Yield Spread?"

These securities are designed primarily for money market funds, corporate money management, and other institutional purchasers. Except when investing exceptionally large amounts for short-term purposes, you are not likely to see these securities.

A somewhat similar form of security, known as auction-rate securities, was issued in the past, but has fallen into disfavor due to remarketing difficulties after bond insurers enhancing the credits were downgraded. Dealers then stopped supporting the auctions. That froze the market for those securities and caused illiquidity and losses to many investors. Those securities are no longer issued, and you should not see them. If you do, you may wish to exercise considerable investigative care before buying them.

## Who Are the Principal Parties in Municipal Securities Offerings?

The principal parties in municipal securities offerings vary from transaction to transaction. The following are the most common parties, and their roles.

### Issuers

Municipal securities issuers are state and local governments and their agencies and instrumentalities that borrow money in the municipal securities market in order to obtain funding for their projects and programs.

In securities issues for governmental purposes, the issuers are considered by the Securities and Exchange Commission (SEC) to have primary disclosure responsibilities regarding important information they control.

### Private Borrowers

Private borrowers are profit-making and nonprofit entities that obtain tax-exempt funding through the issuance of municipal securities. These borrowers effectively borrow monies from municipal issuers in what are known as *conduit* transactions. In those transactions, the governmental issuers serve as conduits through which funds pass between investors and private borrowers. See the section entitled "What Are Conduit Financings?"

Essentially, however, the private borrowers are the substantive parties who make payments for application to the securities. The governmental issuers pay or assign those payments for the benefit of investors.

In conduit securities offerings, the private borrowers are considered by the SEC to be primarily responsible for disclosure of material information they control.

### Underwriters

Underwriters are securities dealers who purchase municipal securities from municipal issuers and resell the securities to investors.

In the municipal market, underwriters are expected to conduct sufficient investigations in order to form a reasonable basis for belief in key representations in official statements. They are also expected to disclose important information they know or should know.

KEY POINT:

Principal parties in municipal offerings include the following:

- Issuers/borrowers
- Underwriters
- Financial advisors to issuing borrowers
- Bond counsel
- Issuer disclosure counsel
- Issuer local counsel
- Underwriter counsel
- Trustees and paying agents
- Auditors and sometimes other experts
- Sometimes developers/other private parties

KEY POINT:

In securities issues for governmental purposes, the issuers are considered by the Securities and Exchange Commission (SEC) to have primary disclosure responsibilities regarding important information they control.

SMART INVESTOR TIP

# Exhibit 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
PROMESA TITLE III
CASE NO:  17-BK-03283 (LTS)

IN RE:  THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
        as representative of

THE COMMONWEALTH OF PUERTO RICO, et al.,
        Debtor(s).
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
PROMESA TITLE III
CASE NO:  17-BK-03566 (LTS)
IN RE:  THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
        as representative of
THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO
RICO,
        Debtor(s).
_____

CONFIDENTIAL

REMOTE VIDEOTAPED EXPERT DEPOSITION UNDER
ORAL EXAMINATION OF
ROBERT DOTY
DATE: August 11, 2020

REPORTED BY:  MICHAEL FRIEDMAN, CCR

CONFIDENTIAL
Robert Doty - August 11, 2020

Page 10

```
 1                I N D E X
 2  WITNESS NAME                        PAGE
 3  ROBERT DOTY
 4        By Mr. Stewart                 14
 5        By Mr. Bassett                178
 6
 7              * * * * * *
 8
 9              E X H I B I T S
10
11  EXHIBIT NO.    DESCRIPTION          PAGE
12  1-2            Tab 13, Tab 14         16
13  3              Tab 1                  26
14  4              Tab 2                  45
15  5              Tab 3                  45
16  6              Tab 6                  49
17  7              Tab 5                  58
18  8              Tab 7                  84
19  9              Tab 9                  97
20  10 - 11        Tab 23, Tab 24        103
21  12             Tab 15                108
22  13             Tab 16                166
23
24              * * * * * *
25
```

Page 11

```
 1              - - -
 2           Deposition Support Index
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  Page  Line      Page  Line      Page  Line
 7  None
 8
 9  Request for Production of Documents
10  Page  Line      Page  Line      Page  Line
11  None
12
13  Stipulations
14  Page  Line      Page  Line      Page  Line
15  None
16
17  Questions Marked
18  Page  Line      Page  Line      Page  Line
19  None
20
21
22
23
24
25
```

Page 12

```
 1        THE COURT REPORTER:  My name is
 2  Michael Friedman, a Certified Shorthand
 3  Reporter.  This deposition is being held
 4  via videoconferencing equipment.
 5        The witness and reporter are not in
 6  the same room.  The witness will be
 7  sworn in remotely, pursuant to agreement
 8  of all parties.  The parties stipulate
 9  that the testimony is being given as if
10  the witness was sworn in person.
11  ///
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
```

Page 13

```
 1        THE VIDEOGRAPHER:  This is the
 2  remote video recorded deposition of
 3  Robert Doty.
 4        Today is Tuesday, August 11, 2020.
 5  The time is now 9:35 a.m. in the Eastern
 6  time zone.
 7        We are here in the matter of In Re,
 8  The Financial Oversight and Management
 9  Board for Puerto Rico as Representative
10  of the Commonwealth of Puerto Rico
11  et al., Debtor.
12        All counsel have been noted on
13  record.  My name is Jose Rivera, remote
14  video technician on behalf of Gregory
15  Edwards, LLC.
16        At this time, will the reporter,
17  Michael Friedman, of Gregory Edwards,
18  LLC please swear in the witness.
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
```

CONFIDENTIAL
Robert Doty - August 11, 2020

5 (Pages 14 to 17)

Page 14

1  R O B E R T   D O T Y,
2           called as an expert witness, having been
3  first duly sworn according to law, testifies as
4  follows:
5
6  EXAMINATION BY MR. STEWART:
7       Q    Good morning, Mr. Doty.  I'm Geoff
8  Stewart of the firm of Jones Day.  We
9  represent the bondholders of certain bonds
10  issued by the Employees Retirement System of
11  Puerto Rico.
12           (Whereupon a discussion was held
13  off the record.)
14       Q    Mr. Doty, I will refer to the
15  retirement system as "ERS," if that's okay
16  with you?
17       A    Understood.
18       Q    And I'm going to keep my voice up,
19  so I apologize if it sounds like I'm shouting
20  at you.  I apologize in advance for that.
21           Could you share your full name and
22  your residential address?
23       A    Robert Walter Doty, 988 Placid
24  Court, Arnold, Maryland, 21012.
25       Q    And how long have you lived in

Page 15

1  Maryland?
2       A    I've lived in Maryland since 2013.
3       Q    And before that, where did you
4  live?
5       A    California.
6       Q    How long were you in California?
7       A    Twenty-three years.
8       Q    Do you have an office address
9  different from your residential address?
10       A    Would you ask that question again,
11  please?
12       Q    Sure.  Do you have an office
13  address different than your residential
14  address?
15       A    Not since last October.
16       Q    Okay.  You've been deposed any
17  number of times before?
18       A    I've been deposed before, yes.
19       Q    So this will be like those
20  depositions.  I usually take a break on the
21  hour.
22           If you want to take a break earlier
23  than that, just tell me.  We have all day.  I
24  break for five, ten minutes.
25           If you need a break longer than

Page 16

1  that, tell me that.  That will be fine, too.
2  If you don't, I will just break on the hour
3  anyway.
4           As with other depositions,
5  Mr. Doty, if you ask for a break, that's
6  fine.  I'd ask that you answer any pending
7  question before we break for obvious reasons.
8       A    Okay.
9       Q    I would like to mark as the first
10  two exhibits, the first report and rebuttal
11  report of Mr. Doty.  Those are respectively
12  Tabs 13 and 14.  I'm not going to use them
13  right away.  I shouldn't say that.
14           Tab 13 is the original report, the
15  first report.  And Tab 14 is the rebuttal
16  report.
17           We'll make that Exhibit 2.
18           (Whereupon the above mentioned was
19  marked for Identification.)
20       Q    Mr. Doty, let's turn, if we could,
21  to your curriculum vitae, which is about
22  halfway through Exhibit 1.
23           Can you turn to that, please?
24       A    That's Tab 13.
25       Q    It is Tab 13, yes.

Page 17

1       A    All right.  I'm doing it by these
2  tabs, of course.  What page -- about what
3  page number in there would it be?
4       Q    That's a good question.
5           MR. BASSETT:  Robert, it's page 36
6  of the PDF.
7           THE WITNESS:  Yes, I've got to
8  here.  Yes.
9       Q    Great.  And is that a current
10  summary of your background and credentials,
11  Mr. Doty?
12       A    Yes.
13       Q    And it points out here that you're
14  a lawyer.
15           Correct?
16       A    I am.
17       Q    Do you still practice law?
18       A    I haven't practiced law in a while.
19  So no, I don't practice law.
20       Q    When you say "a while," do you mean
21  a matter of under two years or a longer
22  period?
23       A    Not since 2013.  I was general
24  counsel for a while in the office of a
25  municipal advisor in California.

CONFIDENTIAL
Robert Doty - August 11, 2020

28 (Pages 106 to 109)

Page 106

1          MR. BASSETT:  Objection.  Calls for
2     a legal conclusion.
3       A     It says the underwriters may
4     terminate this purchase contract.  It sets
5     forth at great length circumstances where
6     that could occur.
7       Q     Now, is it the case in
8     underwritings -- that underwriters are not
9     necessarily able to sell all the bonds to the
10    investing public?
11      A     No.
12      Q     It's never happened, that they
13    can't sell all the bonds?
14      A     You know, I've been working in the
15    financial markets since the 1960s.  I've
16    never seen a situation where underwriters
17    could not sell the bonds to the investing
18    public.
19          I won't exclude the possibility
20    that, theoretically, it might occur in some
21    rare circumstance.  But it would -- it's not
22    occurred in my experience.
23      Q     Has it always been the case the
24    underwriters were able to sell all the bonds
25    at the stated IPO price or have they had to

Page 107

1     sell them at a discount?
2          MR. BASSETT:  Objection.
3       A     Oh, sometimes they have to sell
4     them at a discount.
5       Q     Why would they have to sell them at
6     a discount?
7       A     Because market conditions have
8     changed.
9       Q     Now, when they sell them at a
10    discount to investors, does the issuer have
11    to pay a different rate of interest than that
12    stated in the official statement?
13          MR. BASSETT:  Objection, form.
14      A     No.
15      Q     Does the maturity of the bond
16    change?
17      A     No.
18          MR. BASSETT:  Objection.
19      Q     Does the face amount of the bond
20    change?
21          MR. BASSETT:  Objection.
22      A     No.
23      Q     If the underwriters have to sell
24    the bonds at a discount to the investors, how
25    much additional money does the issuer owe the

Page 108

1     underwriters?
2          MR. BASSETT:  Objection.  Lack of
3     foundation, incomplete hypothetical.
4       A     I did not catch all your words at
5     the end.
6       Q     If the underwriters have to sell
7     the bonds at discount to investors, how much
8     additional money does the issuer owe the
9     underwriters?
10          MR. BASSETT:  Same objection.
11      A     None.
12      Q     How does the underwriter's discount
13    change?
14          MR. BASSETT:  Same objection.
15      A     The underwriter discount is the
16    price data based on the public offering
17    price, the initial public offering price.
18    The underwriter discount doesn't change, but
19    the underwriter's profit changes.
20      Q     Okay.  So let me -- let's open
21    another tab.  Tab 15 will be the next
22    exhibit.
23          MR. STEWART:  Mark this as
24    Exhibit 12.
25          (Whereupon the above mentioned was

Page 109

1     marked for Identification.)
2       A     Tab 15?
3       Q     Yes.
4       A     All right.  Oh, good.
5          You have good taste in books.
6       Q     Have you seen this before?
7       A     I have.
8       Q     You wrote this, did you not?
9       A     I did.
10      Q     And for the record, it's Robert
11    Doty's "Visual Guide to Municipal Bonds."
12      A     It's the Bloomberg Visual Guide.
13      Q     Well, I think it's your visual
14    guide.  But you're right, it's the Bloomberg
15    Visual Guide.
16          You wrote it, correct?
17      A     Yes.  But Bloomberg worked very
18    closely with me on this, and put the visuals
19    in.
20      Q     Okay.  And you wrote it around
21    2012?
22      A     I'd have to look, but I think
23    that's about right.
24      Q     Yeah, I'd represent to you that's
25    the copyright date, which may be of some

CONFIDENTIAL
Robert Doty - August 11, 2020

29 (Pages 110 to 113)

Page 110

1  help.
2         Was this accurate as of the date it
3  was written?
4      A    Yes.
5      Q    Is it still accurate today, to the
6  best of your knowledge?
7      A    Well, there have been a lot of
8  changes since then.  I would have to go back
9  through.
10        I'm sure I would rewrite portions
11  of it.
12     Q    Okay.  Well, let's start with the
13  "Introduction," which is page 1.
14        Are you open to page 1?
15     A    I'm trying to get there.  Okay.
16     Q    Okay.  Do you see there is a
17  heading, "What Are Municipal Securities?"
18     A    Yes.
19     Q    And --
20        MR. BASSETT:  Geoff, would you mind
21     pausing for one second?  I want to be
22     sure I'm on the right page.  Does
23     somebody have a page of the PDF?
24        MR. FOX:  It's page 13 of the PDF.
25        MR. BASSETT:  Thank you, David.

Page 111

1      Got it.
2      Q    Is everybody there?
3        MR. BASSETT:  Yes, thank you.
4      Q    Okay.  Do you see the heading,
5  "What are Municipal Securities?"
6      A    Yes.
7      Q    Okay.  And there, you write
8  "Municipal" -- and I'm going to just direct
9  your attention to the second sentence where
10  you say, "Municipal securities are debt
11  securities, effectively loans, payable from
12  taxes of governmental or other project
13  revenues."
14        Why do you call them "municipal
15  securities loans"?
16     A    Well, they are loans from the
17  investing public.
18     Q    Who is the borrower?
19     A    The borrower is the governmental
20  issuer.
21     Q    Okay.  Now, what's the evidence of
22  the loan?
23        MR. BASSETT:  Objection.
24     A    There is no paper evidence of it,
25  except in the DTC, the paper bonds.  There's

Page 112

1  a -- I guess there's a paper bond at DTC.
2        Maybe that's what you're referring
3  to as the "jumbo bond," but that would be it.
4      Q    Okay.  But there's a means of
5  determining who's the owner beneficially of
6  the bond?
7      A    On DTC's books, yes.
8      Q    And every bond has a beneficial
9  owner.
10        Correct?
11     A    I suppose so.
12     Q    So -- and the evidence of the
13  beneficial ownership is the chain of book
14  entries running through DTC down to the
15  retail account of the individual investor.
16        Correct?
17     A    Correct.
18     Q    Do you know how an issuer knows who
19  to send payments of interest to?
20     A    It's specified in the bond
21  resolution in this case.
22     Q    Okay.  And do you know how they --
23  how they -- the identity of the individual
24  investor is determined?
25     A    That flows through the DTC, from

Page 113

1  the trustee to DTC, to the individual
2  investors.
3      Q    Okay.  And so --
4      A    To the direct and indirect
5  participants, and from there, down to the
6  individual investors.
7      Q    So going back to this, is it fair
8  to say that the lender is the person who has
9  the beneficial rights to the bond?
10        MR. BASSETT:  Objection.
11     A    Yes.  Once you get to the investor
12  level, yes.
13     Q    Okay.  And that would be whoever it
14  is who happens to own those beneficial
15  rights.
16        Correct?
17        MR. BASSETT:  Objection, misstates
18     testimony.
19     A    Right.  But once the bonds are
20  placed through DTC and the bond issue is
21  completed, it's the individual investor.
22     Q    Okay.
23     A    By "individual," I don't mean
24  people.  I mean specific -- the specific
25  parties.

CONFIDENTIAL
Robert Doty - August 11, 2020

Page 114

1    Q    Fair to say it's the ultimate owner
2 of the beneficial interest?
3    A    Correct.
4    Q    Would it -- it would make the
5 examination easier if I simply called that
6 person a "bondholder."
7         Would that be acceptable to you or
8 do you think that would be inaccurate or
9 burdensome to you?
10   A    I don't object.
11   Q    Okay.  So I think you testified
12 that the borrower is the government entity
13 that issued the bonds.
14        And is the lender the bondholder?
15   A    Yes.
16   Q    And if the bond is sold, the lender
17 changes?
18   A    If the -- if the investors trade
19 the bonds, then new -- then, in effect, new
20 investors take their place.
21   Q    So if Alice owns the bond, Alice is
22 the lender?
23   A    If Alice owns the bond and Alice is
24 a public investor, the answer is yes.
25   Q    And if Alice sells the bond to Bob,

Page 115

1 then Bob becomes the lender?
2    A    At that point, yes.
3    Q    And if Bob sells to Carol, then
4 Carol becomes the lender?
5    A    Correct.
6    Q    And so on and so forth?
7    A    Correct.
8    Q    So the identity of the borrower
9 remains the same throughout the life of the
10 bond issue?
11   A    As a general rule.
12   Q    And the identity of the lender can
13 change over the life of the bond issue?
14   A    Correct.
15   Q    Also, in your book, you refer to
16 issuers of municipal securities as
17 "borrowers."  I can direct you to those
18 pages, but I was simply going to ask you why
19 you use that term.
20   A    I did not catch all your words.
21 I'm sorry.
22   Q    Let me start over again.
23        Elsewhere in your book, you refer
24 to municipal issuers as "borrowers."
25        Would you like me to direct you to

Page 116

1 those pages, or is it a usage that you're
2 comfortable talking about without looking at
3 particular parts of your book?
4         MR. BASSETT:  Geoff, if you're
5         going to ask him about particular
6         statements he's made in this book, I
7         think we should look at those
8         statements.  If you want to ask him
9         separate from that, questions about who
10        may or may not be a borrower or whatever
11        you're going to ask, that's fine.
12        But to the extent you're talking
13        about this book, I think he should look
14        at the language.
15        MR. STEWART:  Fine.
16   Q    Do you generally refer, Mr. Doty,
17 to issuers of municipal bonds as "borrowers?"
18   A    I don't know if I generally do it,
19 but I do do it.
20   Q    And is it an accurate description?
21   A    Generally, it is.
22   Q    So let's now go to your report.  If
23 I find your report.  We marked that, did we
24 not, as Exhibit 1, I think.
25        Do you have Exhibit 1 available to

Page 117

1 you?  It's Tab 13?
2    A    Thirteen.  All right.  Thank you.
3    Q    Okay.  So I'm going to direct your
4 attention to page 2 of your report.
5         And do you see at the top of page 2
6 where you say that counsel has asked you for
7 your expert opinion on two questions?
8    A    Correct.
9    Q    Okay.  At any point were you asked
10 to consider any opinions besides these two
11 opinions?
12   A    No.
13   Q    Let's go to page 5 of the report.
14        And do you see the first heading,
15 entitled the "ERS Enabling Act?"
16   A    Yes.
17   Q    And you quote two different -- do
18 you see, you have two different indented
19 quotations there.
20        Do you see that?
21   A    Yes.
22   Q    And those are two different
23 translations of the Spanish language from the
24 1988 amendments that we looked at earlier in
25 your deposition.

CONFIDENTIAL
Robert Doty - August 11, 2020

42 (Pages 162 to 165)

Page 162

1 you -- I was unclear about really what you
2 wanted me to say or talk about on B and C.
3       I thought you wanted -- I'm just --
4 I'm still confused about what you wanted
5 there.
6     Q    Well, what I was asking you about,
7 Mr. Doty, was this.  We were talking about
8 the -- I think it was the opinions and other
9 disclosures and commitments that were made in
10 the Series A transaction.
11       And the question was:  Were those
12 same opinions, commitments, and disclosures
13 made in the Series B and C transactions, to
14 the best of your knowledge?
15       And I asked you that first because
16 I think -- I have a good-faith basis to
17 believe that they're substantially identical
18 transactions.  And second, I wanted to save
19 all of us the time and trouble of going
20 through the enormous closing binders for the
21 other two series if we were all in agreement
22 that substantially they were structured the
23 same.
24     A    If the question is were they
25 structured substantially the same, you know,

Page 163

1 the bond structure, all that kind of thing, I
2 think I can say yes to that.
3       I don't -- you know, I can't answer
4 a lot of specific questions about what were
5 they -- but I've looked at all three of them,
6 and I think I can say that they were -- the
7 patterns were substantially the same.
8     Q    Okay.  And the patterns I was
9 asking about included whether they all had
10 the same kind of legal documentation such as
11 the bond purchase agreement and the official
12 statement and the basic documents that the
13 Series A bonds had?
14     A    For the most part, that's what I
15 saw.  I mean, keep in mind, they were
16 considerably different principal amounts, and
17 the syndicates were larger and smaller, and
18 that sort of thing.
19       But overall, I can -- I think I can
20 say that the bond structure, terms, and so on
21 were -- had similar patterns.
22     Q    Okay.  And that's what I was
23 getting at.  So I think we've covered it.
24     A    All right.
25     Q    Anything else you'd like to add?

Page 164

1     A    No.
2     Q    Okay.  Let me ask you about direct
3 placement versus negotiated underwritings.
4     A    Yes.
5     Q    And the Series A bonds were sold in
6 a negotiated underwriting?
7     A    That's correct.
8     Q    Do issuers sometimes select their
9 underwriters in direct negotiations?
10     A    Well, in direct negotiations they
11 would always select at least the lead
12 underwriter.  They may not select the entire
13 syndicate.
14       The lead underwriter might take
15 that responsibility on, or sometimes the
16 issuer would even select some or all of the
17 members of the syndicate.
18     Q    Okay.  I think I asked my question
19 poorly.  Let me just ask it a different way.
20       Are underwriters sometimes selected
21 in a competitive bidding process?
22     A    Yes.
23     Q    And sometimes by direct
24 negotiation?
25     A    Sometimes, yes.

Page 165

1     Q    And issuers may sell municipal
2 securities to underwriters, either through
3 competitive bidding or through direct
4 negotiation with one or more preselected
5 underwriters?
6     A    Correct.
7     Q    I'm going to ask you about bond
8 counsel.  I think I asked you previously
9 about bond counsel.
10       Is one of the obligations of bond
11 counsel to deliver an opinion stating that
12 the bonds have been validly issued?
13       MR. BASSETT:  Objection to the
14       extent it's outside the scope of the
15       opinions he's been asked to offer in
16       this case.
17     A    Right.  Yeah, again, that's an
18 accurate statement.
19       But the answer's yes.
20     Q    If bond counsel has reason to
21 believe that the issuer does not have the
22 legal authority to issue the bonds, is it
23 your opinion that the bond counsel should not
24 deliver his opinion at the closing?
25       MR. BASSETT:  Same objection.  He's

CONFIDENTIAL
Robert Doty - August 11, 2020

Page 170

1          Do you see that?
2      A   I do see that.
3      Q   Is that still your opinion today?
4      A   Yes, that -- I think as a general
5  rule, that is correct.
6      Q   Yeah.  Are there exceptions to the
7  general rule?
8      A   Yes.
9      Q   What would examples of those
10 exceptions be?
11     A   Where the investors themselves know
12 information or have access to public
13 information, I think they're responsible for
14 that, too.  But in general, I would agree
15 with the statement.
16     Q   Okay.  I'd like to go to
17 Paragraph 17.
18     A   All right.
19     Q   I'm going to read it into the
20 record just so we don't have any objections
21 about my paraphrasing.
22          It says, "As noted above, in
23 accordance with customs, practices, and
24 standards of care prevailing in the municipal
25 securities market in and before 2000, and

Page 171

1  today, municipal securities offering
2  documents were (and are) expected to be,
3  quote, four-corner, unquote, documents that
4  contain (and contain) all information
5  regarding the offered securities that a
6  reasonable investor would consider to be
7  important in making an investment decision."
8          Do you still subscribe to that
9  statement today?
10     A   Yes.
11     Q   What do you mean by a "four-corner
12 document?"
13     A   That the information is supposed to
14 be in the official statement.  That document
15 is supposed to contain that information.
16     Q   And so an investor could look at
17 just that one document for all of the
18 information that investor reasonably could
19 need?
20     A   As a general rule, I do agree with
21 that.  Again, subject to the same caveat that
22 we made a little while ago.
23     Q   That caveat is that if investors
24 happen to have additional knowledge of their
25 own, that also goes into the mix?

Page 172

1      A   Yes.  And they're also responsible
2  for other public information, information
3  that's available from the public market
4  sources.
5      Q   Okay.  So, let me ask this.  I
6  asked you earlier about ERS's disclosure
7  obligations, and we spoke about EMMA a little
8  bit.
9          Is it the case that if a board
10 member of ERS came to have a belief that
11 these bonds had been illegally issued, that
12 board member or ERS itself would be required
13 to make a disclosure of that fact?
14     MR. BASSETT:  Objection, lack of
15     foundation, outside of his opinions in
16     this case.
17     A   I don't know how many board members
18 ERS had.  If an individual trustee concluded
19 that the bonds were not validly issued, I
20 think that trustee had a responsibility to
21 speak up.
22          If -- from an ERS perspective, I
23 think it would depend upon what others
24 associated with ERS believed, that they
25 reached the same conclusion, that they should

Page 173

1  also speak up.
2      Q   Okay.  Let me check any notes.  The
3  good news about the lunch break is I was able
4  to get rid of a lot of things.
5          So do you know what obligations, if
6  any, bond counsel have to make disclosures if
7  and when they determine that an earlier
8  opinion is wrong?
9     MR. BASSETT:  Same objections.
10     A   I believe that most bond counsel
11 take the point of view, once their opinion is
12 issued, their role is done, and they don't
13 have any further disclosure responsibilities.
14 That's what I have heard them say.
15     Q   Okay.  What protections are
16 there -- let me back up.
17          The book you wrote is intended as a
18 guide to investors in municipal securities?
19     A   The Bloomberg guide?
20     Q   That's the one, yeah.
21     A   That was my intention, yes.
22     Q   Okay.  And fair to say that you
23 generally believe municipal securities are a
24 sound investment?
25     A   I do.

CONFIDENTIAL

Robert Doty - August 11, 2020

45 (Pages 174 to 177)

Page 174

```
1      Q    You own them yourself?
2      A    Actually, I refrain from buying
3  individual bonds, as -- because of the
4  pricing.  But I do own bonds through Bond
5  Fund.
6      Q    When we go off the record, I'm a
7  Maryland resident, too, so you're going to
8  have to give me advice on which funds to
9  invest in.  But not on the record.
10     A    Yeah, I have a strong opinion.
11     Q    Okay.  Well, I would ask you,
12 except Nick would object.  All right.
13          What type of disclosures are
14 individual investors entitled to expect when
15 it comes to the legality of the bonds they
16 have purchased?
17          MR. BASSETT:  Same objections as
18     before.
19     A    I believe that traditionally it
20 centers on the bond counsel opinion.
21     Q    Okay.  You're aware, in this case,
22 that certain parties have taken the view that
23 the bonds were never legally issued.  You're
24 aware of that position being taken.
25          Correct?
```

Page 175

```
1      A    It's my understanding.
2      Q    And that sometimes it's called in
3  argument that the bonds were issued
4  "ultra vires?"
5      A    I have seen that argument.
6      Q    You are not -- you were not asked
7  to and you have not reached an opinion about
8  whether the bonds were issued ultra vires.
9          Correct?
10     A    Correct.
11     Q    But the bonds were issued about a
12 dozen years ago?
13     A    That seems right.
14     Q    What expectation should investors
15 have of receiving disclosures if and when an
16 issuer determines that it has issued bonds
17 without proper legal authorization?
18          MR. BASSETT:  Objection.  Not
19     within the scope of his opinions in this
20     matter.
21     A    I think that depends on an
22 interpretation in one or two of the material
23 event notices that are in the Master of
24 Continuing Disclosures Agreement.  I think
25 people would argue over one or two of them,
```

Page 176

```
1  argue over what one or two of them may mean.
2      Q    But in any event, ERS has remained
3  subject to the Master of Continuing
4  Disclosures Agreement from 2008 until today?
5          MR. BASSETT:  Same objection, and
6     calls for a legal conclusion.
7      A    As far as I know.  I mean, I
8  haven't worked in that, obviously.
9      Q    Okay.  Mr. Doty, bear with me a
10 second.
11          Do you know one way or the other
12 whether the various opinions that were
13 delivered at the closing were delivered with
14 the expectation the investor would rely upon
15 them?
16          MR. BASSETT:  Objection.  Outside
17     of the scope of his opinions, lack of
18     foundation.
19     A    Apart from the bond counsel
20 opinion, I doubt that would be the case, and
21 in the case of the bond counsel opinion, I
22 have not done the analysis.  It is outside
23 the scope of my report.
24          I haven't looked at it in the
25 context of these particular transactions.
```

Page 177

```
1      Q    Okay.  So, let us go off the record
2  briefly.  I want to check with others to make
3  sure that they don't have anything that they
4  believe I should have covered.
5          MR. STEWART:  Take about a
6     five-minute break?
7          THE WITNESS:  Sure.
8          THE VIDEOGRAPHER:  Stand by.  The
9     time is 2:09 p.m. and we're going off
10    the record.
11         (Brief recess taken.)
12         THE VIDEOGRAPHER:  Stand by.  The
13    time is 2:20 p.m. and we're back on
14    record.
15     Q    And Mr. Doty, that is all the
16 questions I have of you.  Thank you very much
17 for your patience.
18     A    You're welcome.
19     Q    Others may have questions.  I will
20 ask the witness to -- pass the witness to
21 counsel.
22         MR. BASSETT:  Thank you.  Before
23    I -- I do have a few questions for
24    Mr. Doty.
25         But before I ask those, does anyone
```

# Exhibit 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
PROMESA TITLE III
CASE NO:  17-BK-03283 (LTS)

IN RE:  THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
          as representative of

THE COMMONWEALTH OF PUERTO RICO, et al.,
          Debtor(s).
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
PROMESA TITLE III
CASE NO:  17-BK-03566 (LTS)
IN RE:  THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
          as representative of
THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF PUERTO
RICO,
          Debtor(s).
_____

CONFIDENTIAL

REMOTE VIDEOTAPED EXPERT DEPOSITION UNDER
ORAL EXAMINATION OF
DR. WILLIAM HILDRETH
DATE: August 10, 2020

REPORTED BY:  MICHAEL FRIEDMAN, CCR

Case:17-03283-LTS   Doc#:14243-1   Filed:09/11/20   Entered:09/11/20 19:07:00   Desc:
Exhibit 1 to 7   Page 37 of 114
CONFIDENTIAL
Dr. William Hildreth – August 10, 2020

4 (Pages 10 to 13)

Page 10

```
1                  I N D E X
2  WITNESS NAME                          PAGE
3  DR. WILLIAM HILDRETH
4          By Mr. Dalsen                 14
5          By Mr. Fox                    256
6
7                  * * * * * *
8
9                  E X H I B I T S
10
11 EXHIBIT NO.    DESCRIPTION            PAGE
12 1 - 2          PX-001, PX-002         16
13 3             PX-013                  17
14 4             PX-005                  158
15
16                 * * * * * *
17
18
19
20
21
22
23
24
25
```

Page 11

```
1                  - - -
2                     Deposition Support Index
3
4
5  Direction to Witness Not to Answer
6  Page  Line     Page  Line     Page  Line
7  None
8
9  Request for Production of Documents
10 Page  Line     Page  Line     Page  Line
11 None
12
13 Stipulations
14 Page  Line     Page  Line     Page  Line
15 None
16
17 Questions Marked
18 Page  Line     Page  Line     Page  Line
19 None
20
21
22
23
24
25
```

Page 12

```
1          THE COURT REPORTER:  My name is
2  Michael Friedman, a Certified Shorthand
3  Reporter.  This deposition is being held
4  via videoconferencing equipment.
5          The witness and reporter are not in
6  the same room.  The witness will be
7  sworn in remotely, pursuant to agreement
8  of all parties.  The parties stipulate
9  that the testimony is being given as if
10 the witness was sworn in person.
11 ///
12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
```

Page 13

```
1          THE VIDEOGRAPHER:  This is the
2  remote video recorded deposition of
3  William Hildreth.
4          Today is Monday, August 10, 2020.
5  The time is now 9:34 a.m. in the Eastern
6  time zone.
7          We're here in the matter of In Re,
8  The Financial Oversight and Management
9  Board for Puerto Rico as Representatives
10 of the Commonwealth of Puerto Rico,
11 et al.
12         My name is Jose Rivera, remote
13 video technician on behalf of Gregory
14 Edwards, LLC.
15         At this time, will the reporter on
16 behalf of Gregory Edwards, LLC please
17 swear in the witness.
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
```

CONFIDENTIAL
Dr. William Hildreth – August 10, 2020

5 (Pages 14 to 17)

Page 14

1 D R. W I L L I A M   H I L D R E T H,
2        called as an expert witness, having been
3 first duly sworn according to law, testifies as
4 follows:
5
6 EXAMINATION BY MR. DALSEN:
7    Q    Good morning, Dr. Hildreth.  Would
8 you please state your full name for the
9 record?
10    A    Sure.  William Bartley Hildreth.
11    Q    And Dr. Hildreth, professionally,
12 you sometimes go by W. Bartley Hildreth.
13        Correct?
14    A    Yes.
15    Q    Okay.  Dr. Hildreth, you previously
16 testified in these Title III proceedings in
17 the Peaje Investments preliminary injunction
18 matter.
19        Correct?
20    A    I've previously testified, yes.
21 You read a lot of words there.  Some I'm not
22 sure about.
23        But I testified in the Puerto Rico
24 case, yes.
25    Q    Okay.  So you previously testified

Page 15

1 once in the Puerto Rico case.
2        Correct?
3    A    Yes.
4    Q    And do you recall whether that was
5 in the Peaje Investments case regarding a
6 preliminary injunction?
7    A    That was, yes.
8    Q    Okay.  And the court, Judge Swain,
9 denied Peaje's motion for a preliminary
10 injunction in part because she found your
11 testimony to be not credible.
12        Is that correct?
13    A    Yes.
14        MR. FOX:  Objection.
15    Q    And the court, Judge Swain, in
16 part, because she also found your testimony
17 to be not persuasive.
18        Is that correct?
19        MR. FOX:  Objection.
20    A    Yes.
21    Q    Okay.  Now, Dr. Hildreth, were you
22 given the PDFs that I sent to the Jones Day
23 law firm as exhibits, potential exhibits for
24 today's deposition?
25    A    Yes.

Page 16

1    Q    Okay.  So what I'm going to do now
2 is I would ask you to open up PX 001 and PX
3 002, which I will mark as Exhibits 1 and 2 to
4 your deposition today.
5        (Whereupon the above mentioned was
6    marked for Identification.)
7    Q    Okay., Dr. Hildreth, PX 001, is
8 that your opening report in these proceedings
9 that you're here to testify about today?
10    A    Yes.
11    Q    Okay.  Could you go to Paragraph 11
12 of your report, please, which is on page 3 of
13 Exhibit 1?
14    A    Yes.
15    Q    And in Paragraph 11, you refer to a
16 publication of yours entitled "State and
17 Local Government Debt Issuance and Management
18 Service."
19        Do you see that?
20    A    Yes.
21    Q    Okay.  So let's take a look at
22 that.  If you can open the document, please?
23 That's PX 013.
24        MR. DALSEN:  And Mike, I will mark
25    this as Exhibit 3, PX 013.

Page 17

1        (Whereupon the above mentioned was
2    marked for Identification.)
3    A    Yes.
4    Q    Okay.  Dr. Hildreth, these are
5 excerpts from Chapter 1, which I'll ask you
6 about it in a second.
7        MR. DALSEN:  But just for the
8    record, these are excerpts from Chapter
9    1 from "State and Local Government and
10    Debt Issuance" by W. Bartley Hildreth,
11    copyright 2009, as reflected on page 2
12    of what is now Exhibit 3 to this
13    deposition.
14    Q    Dr. Hildreth, do you recognize
15 Exhibit 3 and PX 013?
16    A    Yes.
17    Q    And is this -- does this appear to
18 be excerpts from the publication that you
19 refer to in Paragraph 11 of your opening
20 report?
21    A    Yes.
22    Q    Okay.  Now, this publication, you
23 last wrote additions to this publication in
24 December 2008.
25        Right?

Page 162

1 doesn't identify an interest rate that the --
2 that ERS would be paying to the underwriters
3 for making a loan to it.
4          Right?
5     A    Probably not, because that had not
6 been -- I'm just looking back through it to
7 be sure.
8          So this is talking about the
9 principal amount of the loan, of the amount
10 that the underwriters or underwriting
11 syndicate is paying to ERS.
12    Q    Do you see anywhere where this
13 refers -- this document, PX 005, which is
14 Exhibit 4 -- refers to the principal amount
15 of the loan?
16    A    It says "$1.588 billion, initial
17 principal amount."
18    Q    Okay. So you're looking at the
19 numbered Paragraph 1 on the second page of
20 this document where it says "Purchase and
21 Sale Details of Bond, Details of the Bonds,"
22 underlined?
23          That's the paragraph you're looking
24 at there?
25    A    Yes.

Page 163

1    Q    Okay. This paragraph does not
2 describe that $1.588 billion number as
3 principal of the loan, though.
4          Right?
5    A    It's a principal amount of the
6 bonds. And a bond is a loan.
7    Q    Does this document describe how the
8 underwriters were paid interest on extending
9 this principal amount that you say occurred
10 here?
11    A    It doesn't have to say that.
12    Q    Is the loan that the underwriters
13 made to ERS secured or unsecured?
14    A    You're using a legal term, I'd
15 suspect. And I would have to go back and
16 read to see what the actual wording is in the
17 document.
18    Q    And so the word -- the terms
19 "secured loan" and "unsecured loan" don't
20 have a meaning to you as a professor of
21 finance?
22    A    It does.
23    Q    Okay. So let's go with what you
24 understand it to mean, not a legal term.
25          Do you understand that the loan

Page 164

1 that the -- you say the underwriters made to
2 ERS was a secured or unsecured loan?
3          MR. FOX: Objection, vague.
4    A    There is a flow of money that was
5 scheduled through employee retirement
6 contributions, and that was pledged to repay
7 this debt obligation. So it's secured to the
8 extent that there is a pledge of revenue from
9 the ERS entity.
10    Q    Let's turn to page 4 of PX 005,
11 which is Exhibit 4 to your deposition today.
12 And I want to direct you to the numbered
13 Paragraph 4 about the middle of that page.
14          Just let me know when you're there.
15    A    Yes.
16    Q    So Dr. Hildreth, the underwriter's
17 underwriting syndicate, this Series A of ERS
18 bonds, purchased the bonds so they could make
19 a public offering of the bonds.
20          Is that right?
21    A    That's their intent, yes.
22    Q    Does the fact that they
23 purchased -- "they" being the underwriters --
24 purchased to make a public offering affect
25 your opinion at all that the underwriters

Page 165

1 made a loan to ERS?
2    A    No.
3    Q    Why not?
4    A    Because the -- the fundamental
5 financial transaction between the underwriter
6 and the ERS, the exchange of cash for future
7 debt obligation, constitutes the loan.
8          Now, what this is saying is that
9 the underwriter's intend to sell it. But as
10 I say in my rebuttal report, that may not
11 always hold.
12          They have to take into account that
13 they might not be able to offer the bonds to
14 someone outside of the underwriting
15 syndicate.
16    Q    So what actually happened in this
17 scenario with the Series A bonds? Did the
18 underwriters end up holding a bunch of ERS
19 bonds as unsold?
20    A    I don't know. My impression is
21 that they were able to sell those in the
22 market because there are bondholders that are
23 at risk.
24    Q    If the underwriting syndicate had
25 commitments to sell all of the ERS bonds that

# Exhibit 4

# EXPERT REPORT
## OF
# ROBERT W. DOTY

## JULY 1, 2020

## PREPARED AT THE REQUEST OF
# THE GOVERNMENT PARTIES
## AND COMMITTEES

*IN RE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, CASE NO. 17-3566 (D.P.R.)*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

SELECT BACKGROUND FACTS.....................................................................5

DISCUSSION OF KEY PRINCIPLES ............................................................8

ANALYSIS OF THE ERS BOND ISSUANCES....................................19

APPENDIX I—MATERIALS REVIEWED....................................................I-1

APPENDIX II—DEFINITIONS ................................................................ II-1

APPENDIX III—QUALIFICATIONS AND CURRICULUM VITAE ........................III-1

# EXPERT REPORT OF
# ROBERT W. DOTY

**Re:** *In re Financial Oversight and Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico*, Case No. 17-3566 (D.P.R.)

# INTRODUCTION

I have been retained by Brown Rudnick LLP ("Counsel"), as counsel to the Financial Oversight and Management Board for Puerto Rico (the "Board") acting through its Special Claims Committee ("SCC"), to prepare this Report in connection with certain litigation (the "Litigation") in the above-referenced case of the Employee Retirement System of the Commonwealth of Puerto Rico ("ERS") pending under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  As part of my engagement, I have also agreed to assist certain other parties who are aligned in interest with the SCC in the Litigation, including (i) the Official Committee of Unsecured Creditors of the Title III Debtors and its counsel, Paul Hastings LLP, Genovese Joblove & Battista PA, and Casillas Santiago Torres LLC; (ii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico and its counsel, Jenner & Block LLP; (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority and its counsel, O'Melveny & Myers LLP; and (iv) the Board and its counsel, Proskauer Rose LLP.  I have been retained as an independent testifying expert witness.  I am over the age of 18 years, and am competent to testify at trial. I have personal knowledge of the matters discussed herein. If called upon, unless stated otherwise, I am prepared to testify consistently with the analysis and opinions I express in this Report.

## A. Assignment

I have been engaged by Counsel in connection with the SCC and other parties' objections and related challenges (collectively, the "Objections") to claims filed in ERS' Title III case by beneficial holders of three series of senior pension funding bonds that ERS issued to the public in 2008 (the "Bonds"[1] or the "ERS Bonds").  My engagement relates to the meaning of certain municipal finance terms used in the ERS Enabling Act relevant to the issuance of the Bonds.

I understand from Counsel that, at all relevant times, the ERS Enabling Act authorized ERS to incur debt through certain means, including "seeking a loan from any financial institution" (or, depending upon the translation of the Act used, "borrowing" from a financial institution) and "direct placements of debt." I also understand that certain beneficial holders of the ERS Bonds ("the ERS Bondholders") have taken the position that the underwritten public

---

[1] *See* Appendix II for definitions of certain capitalized terms used in this Report.

**Report of Robert W. Doty**
**Page 2**

offerings through which the Bonds were issued in 2008 constituted "borrowing from a financial institution" by ERS or, alternatively, "direct placements of debt" by ERS, and thus were authorized by the ERS Enabling Act.

Counsel has asked for my expert opinion on the following questions:

1. Whether ERS' issuance of bonds through underwritten public offerings constituted a "borrowing" or "loan" "from a financial institution" according to the meaning of that terminology as used in municipal finance.

2. Whether ERS' issuance of bonds through underwritten public offerings constituted "direct placements of debt" according to the meaning of that terminology as used in municipal finance.

## B.  Qualifications

I have over 45 years of experience in the finance industry in a diversity of capacities relating to several billions of dollars of municipal and corporate finance transactions in approximately two dozen states.  Over the course of my career, I have participated in a substantial number of municipal securities issues on behalf of issuers, underwriters, investors, and other parties to the transactions.

My experience includes work as special consultant to underwriters, issuers and bond counsel and as financial advisor to bond issuers. In the course of those engagements, I have advised, among other entities, municipal bond issuers, issuer officials, underwriters, and investors in municipal securities offerings.  I have served as a municipal bond underwriter with three firms in three states, have worked with and for underwriters as underwriter counsel and worked with underwriters in numerous municipal bond issues.[2]

I am the author or co-author of numerous books, chapters, and articles on municipal bond transactions and roles and responsibilities of various parties in connection with, and customs, practices and standards of care relating to, municipal securities transactions. Those publications include seminal articles as to disclosure practices, due diligence and investigatory procedures, roles and responsibilities of parties, and fiduciary responsibilities in municipal securities transactions.

I have also held numerous directorship and other leadership positions with a variety of industry organizations, including the Government Finance Officers Association ("GFOA"), where I served as the General Counsel and as a key drafter of authoritative guidance on disclosure and bond offering procedures; the National Federation of Municipal Analysts

---

[2]  In addition, I have participated in a substantial number of corporate stock and bond transactions, both public offerings and private placements.

**Report of Robert W. Doty**
**Page 3**

("NFMA"), where I served on the Board of Governors and as a member and officer of NFMA committees; the National Association of Independent Public Finance Advisors ("NAIPFA"), where I served as Vice President and a member of the Board of Directors and as Chair of NAIPFA's Public Affairs Committee; and the Southern Municipal Finance Society, where I served as President and a Director.  Other examples of my participation in industry organizations include: (i) serving on the Municipal Securities Rulemaking Board's ("MSRB") Municipal Advisor Professional Qualifications Committee designing qualifications requirements for municipal advisors; (ii) serving on the Muni Council, formed initially through the auspices of the MSRB, including as Chair of the Security Committee of the Muni Council in connection with the development of a central post office for issuer and other obligor continuing disclosure filings; (iii) serving as a Subject Matter Expert for the MSRB's eLearning initiative; and (iv) serving as Vice Chair of Committees and Subcommittees of the National Association of Bond Lawyers and the American Bar Association.

The foregoing is a very brief synopsis of my industry experience.  Appendix III of this Report and the accompanying *curriculum vitae* contain a more detailed description of my qualifications and professional background.

## C.  Summary of Opinions

An underwritten public municipal bond offering, such as the 2008 ERS Bond issuances, is not a loan by or borrowing from a financial institution, nor is it a direct placement of debt.

When a municipal bond issuer sells bonds to an underwriting syndicate, the issuer is not regarded in the industry as "borrowing" or "taking a loan" from the underwriting syndicate, the members of which serve only as intermediaries for distributing the bonds to the public; rather, the issuer is regarded as borrowing from the public investors who buy the bonds from the underwriters.  ERS issued the Bonds through underwriting syndicates led by UBS, which marketed and sold the Bonds to public investors.  ERS thus borrowed from these public investors, not from UBS or any of the other member of the underwriting syndicate.

Neither are the ERS Bonds a "direct placement of debt."  In municipal finance and the municipal bond market, some commentators use the terms "direct placement" and "private placement" with differing emphases, and other commentators use the terms synonymously.  Based on my knowledge and experience in the municipal finance industry, the term "direct placement" is commonly understood in municipal finance to be a type of the larger universe of "private placements."  Both a direct placement and a private placement involve the sale of bonds directly to either a single investor or a small number of sophisticated investors.  Neither involves the sale of bonds to the general public through an underwritten public offering.  Because the ERS Bond issuances were underwritten public offerings, they were not "direct placements of debt."

**Report of Robert W. Doty**
**Page 4**

## D.  Documents and Information Considered

This Report takes into account the documentation and recognized and authoritative industry guidance I have reviewed to date, as well as my active participation in the financial markets for more than 45 years.  Appendix I hereto identifies the materials I considered in reaching my opinions.

I understand that I may be asked in the future to review additional documentation or to conduct additional research and analysis.  I also understand that I may be asked to form additional opinions as to other questions upon appropriate review. I reserve the right to modify or supplement this Report in any respect following my review of additional factual information or documents or additional research and analysis or to respond to additional questions.

This Report and the opinions I express herein are based upon my education, specialized training, skill, personal experience and knowledge of common and prevailing roles and responsibilities of parties involved in municipal bond transactions, and of industry customs, practices and standards of care prevailing in the municipal bond market in 1988 and 2008, and upon my consideration of materials discussed herein.

## E.  Compensation

I am an independent consultant, and have no present or contemplated future interest in this matter or personal bias with respect to the parties to the litigation.  My compensation for my work in this matter is $825 per hour, plus my out-of-pocket expenses. The payment of my fees and expenses is not contingent upon the outcome of this matter.

**Report of Robert W. Doty**
**Page 5**

# S<span style="font-variant:small-caps">ELECT</span> B<span style="font-variant:small-caps">ACKGROUND</span> F<span style="font-variant:small-caps">ACTS</span>

## A.  The ERS Enabling Act

I have been informed that the Bonds that are the subject of this Litigation were purportedly issued under the "ERS Enabling Act," which is Act No. 447 of the Legislative Assembly of Puerto Rico, approved May 15, 1951, as amended and supplemented, including as amended by Act 46-1988.

I have been informed by Counsel that the official English translation of the Act states as follows:

> The Board of Trustees may authorize the Administrator to seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the System.

I understand that a dispute exists concerning certain alleged errors in the official translation, and that ERS Bondholders argue the following, alternative English translation applies:[3]

> The Board of Trustees may authorize the Administrator to borrow from any financial institution, from the Government of the Commonwealth of Puerto Rico or from the Federal Government of the United States of America, or through the direct placement of debts, securing said debt with the assets of the System.

## B.  The 2008 ERS Bond Issuances

In 2008, ERS issued Bonds in three "series"—Series A Bonds, Series B Bonds and Series C Bonds—in the aggregate principal amount of approximately $3 billion.  The purpose of the Bond offerings as stated by ERS in its Series A Official Statement (the document used to market the Bonds to public investors) was "to increase the funds currently available to pay benefits under the System's largest benefit plan … and to reduce the unfunded accrued actuarial pension

---

[3] I do not opine in this report on the proper English translation of the ERS Enabling Act.  Instead, for the purposes of this Report, I consider both the official English translation and the ERS Bondholders' translation of the statute.  For the avoidance of doubt, my opinions expressed in this Report are no different whether the statute authorized the Administrator "to seek a loan" or "to borrow."

**Report of Robert W. Doty**
**Page 6**

liability of this benefit plan." [4]  The same statement appears in each of ERS' Series B and Series C Bond Official Statements. [5]

ERS had warnings that the Bond offerings were particularly complex and risky transactions. Prior to issuing the Bonds in 2008, the government of Puerto Rico, and subsequently ERS, investigated multiple sources of raising capital. [6]  In 2007, Merrill Lynch issued a formal proposal recommending a $7 billion bond issuance. [7]  Credit ratings agencies expressed multiple concerns about the proposal. [8]  Ultimately, Merrill Lynch was unable to find a sufficient market for the bonds at the desired terms. [9]  Thereafter, ERS then downsized the principal amount of the Bond offerings "due to a lackluster demand in the global market." [10]

ERS issued the Bonds in "bona fide public offerings," pursuant to which UBS, and the other members of the underwriting syndicates, as intermediaries, marketed and sold the Bonds to public investors. [11]  The Bonds, at the time of issuance, were rated by all three major rating agencies. [12]

The public offerings were subject to few restrictions on the investor universe to whom the underwriting syndicates could offer and sell the Bonds.  ERS did not require that investors in the Bonds be financial institutions or sophisticated investors or that they acquire the Bonds solely for investment without an intent to distribute in the public municipal bond market.  Finally, there was no requirement that the Bonds be sold in denominations of $100,000.00 or more, as is typical in direct placements and other private placements; instead, as is virtually uniform in a public offering, the Bonds were sold in the typical publicly-offered bond minimum denomination

---

[4]  ERS' Series A Official Statement at 2.

[5]  ERS' Series B Official Statement at 2 and ERS' Series C Official Statement at 2.

[6]  Kobre & Kim Report at 200-207.

[7]  Kobre & Kim Report at 206-208.

[8]  Kobre & Kim Report at 206-208.

[9] Kobre & Kim Report at 206-208.

[10]  Conway MacKenzie Report at 12.

[11]  ERS' Series A Bond Official Statement identifies on its cover twelve underwriters as members of the syndicate offering, the Series B Bond Official Statement identifies three underwriters, and the Series C Bond Official Statement identifies twelve underwriters.  While there were overlaps in syndicate memberships, and all were led by UBS, no two ERS Bond syndicates were exactly alike.

[12]  ERS' Series A Bond Official Statement at 4, Series B Bond Official Statement at 4, and Series C Bond Official Statement at 4-5.

**Report of Robert W. Doty**
**Page 7**

of $5,000.00 principal amount (or for capitalized interest Bonds, $5,000.00 maturity amount) and
integral multiples thereof. [13]

The terms of the Bonds for the benefit of the public investors are set forth in the ERS
Pension Funding Bond Resolution and the Supplemental Bond Resolutions for the respective
Bonds.  ERS did not engage in any direct negotiations with the public investors in setting
these terms or establishing Bond prices. Instead, ERS provided necessary documentation—
ERS' Official Statements, Bond Resolutions and other Bond documentation—to UBS and the
other underwriters in the respective underwriting syndicates for the underwriters to utilize in
their direct discussions and negotiations with public investors for the benefit of ERS.

## C.  The Claims and Litigations

As noted above, I understand that the ERS Bondholders have filed claims in ERS' case
under Title III of PROMESA for payment on the Bonds.  I further understand that (i) the SCC
and other parties have challenged the Bonds on the grounds that the ERS Enabling Act did not
permit ERS to issue bonds through public offerings in objections to claims and adversary
proceedings, among other avenues, and (ii) the ERS Bondholders have argued in response that
the Bond issuances constituted a "loan" or "borrowing" by ERS from a financial institution
(specifically, UBS, as underwriter) and/or a "direct placement of debt."

---

[13] Each Supplemental Resolution Section 2.3(d).

Report of Robert W. Doty
Page 8

# DISCUSSION OF KEY PRINCIPLES

 To provide context for my analysis, I first provide an overview of certain key principles in municipal finance, including (i) the roles, expectations, and objectives of underwriters in a public municipal bond issuance, and (ii) the meaning and nature of a "direct placement of debt" in municipal finance.

 This discussion is based on my decades of experience in the municipal bond industry from the mid-1970s into the 2010s.  I also draw upon recognized industry guidance, including guidance offered by the GFOA and by municipal bond underwriter representatives, notably the Securities Industry and Financial Markets Association ("SIFMA").  In addition, I rely upon key recognized municipal bond market legal and financial authorities, such as, among others cited herein, Robert Fippinger and Christopher Mier.

## A.  Industry Standards for Underwritten Bond Distributions

### 1.   The Role of Underwriters Generally

 Underwriters perform an important function by undertaking intensive efforts to identify and negotiate with potential public municipal bond investors who may ultimately purchase and hold municipal bonds.  This role of underwriters is critical because municipal bond issuers generally lack the capability, knowledge, sophistication, and investor contacts to be able to identify and negotiate with a broad range of investors for the issuer's bonds.

 To carry out a public offering of a municipal bond issuance, an issuer will engage in well-established practices to facilitate the offering and sale of the bonds by underwriters to public investors.  Such practices include the issuer's preparation of bond offering documents, known as "official statements," through which the issuer provides substantial detailed information regarding itself and the bond offering.  The underwriters will then use this information in their direct discussions and negotiations with public investors regarding the investors' potential purchases of the bonds.

 As stated in a "Best Practice" guide published by GFOA, "[t]he primary role of the underwriter in a negotiated sale is to market the issuer's bonds to investors."[14]

 GFOA strongly emphasizes the underwriter's ability to obtain the lowest borrowing cost from public investors:

> The issuers (sic) goal in a negotiated bond sale is to obtain the lowest possible borrowing cost for the bonds. To maximize the potential of this occurring, ***the***

---

[14] GFOA, "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014).

**Report of Robert W. Doty**
**Page 9**

> *issuers goal in the underwriter selection process is to select the underwriter(s)*
> *that has the best potential for obtaining the lowest borrowing cost*. Those
> underwriters are typically the ones that have demonstrated both experience
> underwriting the type of bonds being proposed and the strongest
> marketing/distribution capabilities. [15]

Importantly, in its Best Practice, describing "the only legal relationship" between the
municipal bond issuer and the underwriters, GFOA adds:

> The *only legal relationship* between the issuer and an underwriter is created by a
> Bond Purchase Agreement signed at the time of the pricing of the bonds,
> *wherein the issuer agrees to sell the bonds to the underwriter and the*
> *underwriter agrees to purchase the bonds from the issuer* at an agreed upon
> price. [16]

In 2012, the MSRB published *Interpretive Guidance Concerning the Application of
MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012), preceded by MSRB
Notice 2012-38 (July 18, 2012), [17] stating that municipal bond underwriters must disclose to
municipal bond issuers that the underwriters' *"primary role is to purchase securities with a view
to distribution in an arm's-length commercial transaction with the issuer* … ." [18]

The Securities and Exchange Commission ("SEC") has described the role of underwriters
in public bond issuances similarly. For example, in the definition of the term "underwriter" in

---

[15] *Id*. Emphasis added.

[16] *Id*. Emphasis added.

[17] These actions by the MSRB give important recognition to industry practices by municipal bond
underwriters. While the MSRB's guidance was issued in 2012, MSRB Notice 2012-38 states that the
principles underlying its guidance have been in place for some time: "Although many of the specific
elements identified in the Notice are fully articulated by the MSRB for the first time, all of them arise
from the same fundamental duty of fairness to the issuer that the MSRB has already required under
Rule G-17 for some time. This is particularly true with regard to those elements of the Notice relating to
representations made by dealers to issuers … ." MSRB Notice 2012-38 (July 18, 2012). Underwriters
are dealers.

[18] MSRB, *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of
Municipal Securities* (Aug. 2, 2012); MSRB Notice 2012-38 (July 18, 2012). Emphasis added.

Similarly, Robert Fippinger, a former Board Member of, and General Counsel to, the MSRB and
Senior Partner in the law firm of Orrick Herrington, states in his recognized and authoritative
treatise, THE SECURITIES LAW OF PUBLIC FINANCE, that "Ordinarily, issuers rely on their
underwriters to make a distribution."

R. . Fippinger, THE SECURITIES LAW OF PUBLIC FINANCE Ch. 10, §10:1.8 at 10-42 (Practising
Law Institute, rel. 9/18).

**Report of Robert W. Doty**
**Page 10**

SEC Rule 15c2-12, which governs the disclosure process in municipal bond offerings, the
Commission states:

> The term underwriter means any person who has purchased from an
> issuer of municipal securities *with a view to*, or offers or sells for an
> issuer of municipal securities in connection with, ***the offering of any***
> ***municipal security***, or participates or has a direct or indirect participation
> in any such undertaking, or participates or has a participation in the
> direct or indirect underwriting of any such undertaking … .[19]

The common thread across these authorities is that the role of underwriters is described
solely in terms of purchasing and reselling the issuers' bonds to investors in the public municipal
bond market. None of these respected authorities describe the relationship between municipal
bond issuers and intermediating municipal bond underwriting syndicates as involving
"borrowings" by the issuers from bond underwriting syndicates or a "loan" by the underwriting
syndicates to the issuer. I am not aware of any such authorities describing the relationship
between municipal bond issuers and intermediating municipal bond underwriting syndicates as
involving "borrowings" by the issuers from bond underwriting syndicates or a "loan" by the
underwriting syndicates to the issuer. This understanding and the consistent descriptions of the
roles of underwriters are consistent with my decades of experience.

### 2. Underwriting Syndicates

Underwriting syndicates, as contrasted with an individual underwriter, are formed in
certain public bond issuances both to share transactional risks among underwriters and to provide
enhanced municipal bond distribution capabilities. The underwriting syndicates focus on
conducting effective, successful bona fide public offerings of municipal bonds.

I have extensive experience working with underwriting syndicates for municipal bond
issuances, including working with front line investment bankers, the underwriting desks of
underwriting firms, heads of the sales teams, and individual brokers as they engaged in the
process of identifying potential investors, offering bonds to the investors, providing information
to the investors regarding the issuers and the bonds, receiving feedback from public investors,
and negotiating bond terms with the investors.

As obtaining widespread distribution capabilities for a bond offering is of paramount
concern to an issuer, many municipalities contract with underwriting syndicates, which provide
greater public bond distribution capabilities than using a single underwriter.[20]

---

[19] SEC Rule 15c2-12(f)(2), 17 C.F.R. §240.15c2-12(f)(2). Emphasis added.

[20] Mr. Fippinger states that "The purpose of a syndicate … is to promote the orderly formation of capital
and access to capital over a wide geographic area among a variety of investors."

**Report of Robert W. Doty**
**Page 11**

<div style="text-align:center">3.  <u>Underwriting Syndicate Distribution Activities and Objectives</u></div>

In my experience, before municipal bond underwriting syndicates are willing to execute and deliver bond purchase contracts on behalf of an issuer, they will engage in intensive marketing efforts to receive firm commitments from public investors for the issuers' bonds. Ultimately, an underwriting syndicate will seek to firm up as many commitments from public investors as possible, before entering into a bond purchase contract with the issuer.

This is consistent with industry guidance.  In THE FUNDAMENTALS OF MUNICIPAL BONDS, SIFMA describes how underwriting syndicates utilize sales personnel to make sales of the bonds to public investors and contact investors to learn the investors' level of interest in the offered bonds, specifically focusing on the issuers' credit strengths, the terms of the bonds and interest rates offered by the underwriting syndicates.[21]  According to SIFMA, in addition to proposing interest rates for offering the bonds, the underwriting desk of the underwriting syndicate members carefully tracks and maintains records of investor levels of interest and investor feedback about the offering. Once the bond purchase contract is executed, "[t]he syndicate desk then processes orders and allocates bonds [to investors]… ."[22] Thereafter, the underwriters send confirmations to the investors requiring payment by the bond closing date.

In "*The Role of the Underwriter*," a chapter in THE HANDBOOK OF MUNICIPAL BONDS, which is a recognized and respected resource in the municipal bond market, a recognized and highly-regarded municipal bond underwriter official, Christopher J. Mier, CFA, Managing Director, of Loop Capital Markets, echoes many of SIFMA's descriptions regarding the process

---

R. Fippinger, THE SECURITIES LAW OF PUBLIC FINANCE Ch. 10A, §10A:3.1 at 10A-39 (Practising Law Institute, rel. 9/18); *see also* Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 102 (6th ed. 2012) (describing reasons why a manager might consider particular entities in a syndicate); *see also* Patricia Tigue, A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS at 11-12 (Government Finance Officers Association, 1997) (describing the composition of underwriting syndicates as involving firms "chosen on the basis of their marketing strengths," with certain firms "better able to sell to institutional investors while others are known for their strength in the retail market.").

[21] SIFMA, THE FUNDAMENTALS OF MUNICIPAL BONDS at 104 (6th ed. 2012) (recognizing that "[t]he salespeople … work together with the public finance bankers in the early stages of a deal to develop a marketing plan for the bonds.").

[22] Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 97, 99, 104-05 (6th ed. 2012). Emphasis in original.

**Report of Robert W. Doty**
**Page 12**

by which underwriting syndicates enable municipal bond issuers to borrow from public investors.[23]

Mr. Mier describes the bond offering process from its initiation as "an idea" and "a gleam" in "a finance director's eye" until it is "transformed" through organization and activities of the finance team, including the underwriters. Mr. Mier concludes that "[t]he end result of this process is a bond issue that has been sold *to the investing public*—both retail and institutional" through which "the governmental issuer receives the financing that it needs."[24]

Mr. Mier describes the bond sale process in which "hundreds of clients will be contacted by the [underwriting] firm's sales force to determine their interest in the issue."[25]

Confirming industry practice, in 2008, SIFMA finalized its **MODEL BOND PURCHASE AGREEMENT** containing a provision stating "[t]he Underwriters intend to make a bona fide initial public offering of all the Securities at prices no higher than, or yields not lower than, those shown in the Official Statement. The Underwriters reserve the right to lower such initial offering prices as they deem necessary in connection with the marketing of the Securities."[26]

After an underwriting syndicate has marketed bonds to public investors, many of those investors may purchase bonds, while others may decline to make purchases. If there is insufficient interest in the bonds by public investors, the public offering may simply be terminated. I understand that this is what happened in 2007 when Merrill Lynch attempted, and failed, to find public investors to purchase $7 billion of ERS pension funding bonds.

Underwriters and underwriting syndicates are not interested in purchasing the issuer's bonds for investment because they are not in the business of investing in those bonds. That would tie up the firms' capital, which they need for underwriting bonds issued by other issuer clients. Their business is underwriting, not investing in municipal bonds or making loans. They make their profit from selling the bonds they purchase to the end investors (see discussion on

_____

[23] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 265-71 (John Wiley & Sons, Inc. 2008). Emphasis in original.

[24] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 265 (John Wiley & Sons, Inc. 2008). Emphasis added.

[25] S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 14, *The Role of the Underwriter* at 268 (John Wiley & Sons, Inc. 2008). Emphasis in original.

[26] Securities Industry and Financial Markets Association, **BOND PURCHASE AGREEMENT, GENERAL PROVISIONS AND CONDITIONS, GOVERNMENTAL TAX- OR REVENUE-SUPPORTED SECURITIES** at 2 (9/17/08).

**Report of Robert W. Doty**
**Page 13**

compensation below), not from earning interest.  An issuer does not "borrow" or take a "loan" from an underwriter, but from the public investors who buy the bonds from the underwriters.

4. Compensation of Underwriting Syndicates

In my experience, the compensation that an underwriting syndicate receives for selling municipal bonds to public investors is the difference ("spread" or "discount") between the price the syndicates pay the issuers for the bonds and the public offering prices the syndicates receive from the investors.

Reflecting this practice, SIFMA describes the fee as "the *gross spread*, [which] is the difference between the price the underwriter pays the issuer for the bonds and the price at which the bonds are reoffered to the investing public."[27] GFOA agrees in its Best Practice entitled "*Selecting and Managing Underwriters for Negotiated Bond Sales*," describing underwriters' compensation as "the sales commission in the transaction."[28]

In a typical borrowing scenario, by contrast, the lender is entitled to interest payments on the bonds, expects to be repaid the principal amount upon maturity, and is not entitled to any other fee or "spread."

**B.  Industry Standards for Direct Placements of Debt**

I have worked on both public offerings of municipal bonds and direct and private placements of municipal bonds at various times in my career, including in the 1980s and the 2000s.  In addition, prior to the 1980s, I worked on corporate public offerings of both stocks and debt securities and numerous direct placements of corporate stocks and debt.  Based on my experience, "direct placements" are types of "private placements," which are direct sales to either a single investor or to a small number of sophisticated investors.[29]  Private placements and

---

[27] Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** at 97 (6th ed. 2012). Emphasis in original.

[28] GFOA Best Practice: "*Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014) at *gfoa.org/selecting-and-managing-underwriters-negotiated-bond-sales*. *See also* Patricia Tigue, **A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS** at 26 (Government Finance Officers Association, 1997) (describing underwriters' compensation as "the underwriters' discount" or "gross spread"); R. Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Ch. 10A, §10A:3.2[A] at 10A-53 (Practising Law Institute, rel. 9/18) (describing underwriter compensation as "the gross spread, that is, the difference between the initial offering price and the amount paid to the issuer … .").

[29] R. Pope, **MAKING GOOD DISCLOSURE** at 53 (Government Finance Officers Association, 2001) ("Securities offerings are generally—but imprecisely—divided into two types—public offerings and private placements. … Private placements are sales of bonds or notes to either a single investor or a small number of sophisticated investors."); J.B. Kurish and Patricia Tigue, **AN ELECTED OFFICIALS**

**Report of Robert W. Doty**
**Page 14**

direct placements are vastly different from, and mutually exclusive of, underwritten public
offerings.

Although industry publications more commonly discuss the term "private placement," a
"direct placement" is a type of private placement and, as noted earlier, the two terms are
sometimes referred to synonymously.  For example, a 2012 article in Corporate Finance Review
states that "[t]he terms 'private placement' and 'direct placement' often refer to direct
placements of debt securities, as well as direct bank loans and other alternative financing
techniques."[30]  Other publications, including from the 1980s and earlier, are in accord.[31]

In the **DICTIONARY OF FINANCE AND INVESTMENT TERMS** (5th ed. 1998),[32] published by
Barron's, a respected and authoritative source in the financial markets, John Downes and Jordan
Elliott Goodman state:

> ***DIRECT PLACEMENT direct sale of securities to one or more
> professional investors***. … They may be bonds … . These investments
> typically require large minimum purchases, often in the millions of
> dollars. Direct placements offer higher potential returns ***than many
> publicly offered securities***. … Buyers of direct placements are large,
> sophisticated financial institutions including insurance companies, banks,

---

**GUIDE TO DEBT ISSUANCE** at 49 (Government Finance Officers Association, 2005 ("A private
placement is the sale of bonds by an issuer directly to investors without a public offering.").  *See also* R.
Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Ch. 10A, §10A:3.4[A] at 10A-57 (Practising
Law Institute, rel. 9/18) (describing "private placements of municipal securities" as including "direct
purchases by a single financial institution.")

[30] Fraser, Devlin and Lawrence, "*Direct Bank Loans to Municipalities by Banks May Be Treated as
Securities*" at 6, n. 5 (Corp. Fin. Rev. Sept./Oct. 2012).

[31] See Note, "*Reforming the Initial Sale Requirements of the Private Placement Exemption*," 86 Harv.
L. Rev. 403, 426 n. 1 (1972) ("The 'private placement' is alternatively described by courts and
commentators as a 'direct placement' or 'private offering.'"); *id*. at n 4 ("Generally, in a public
offering, unlike in a private placement, an underwriter takes title to the securities and then resells
them to the public."); Comment, "*Institutional Investment Through Private Placement of Corporate
Securities*," 53 Colum. L. Rev. 804 (June 1953) ("At different times and in different contexts the
phrases "private deal," "private sale," "private placement" and "direct placement" have been used to
describe the process by which capital is provided for the use of private or quasi-public corporations by
means of direct negotiations either between the suppliers and the recipients, or between the suppliers
and agents for the recipients."); Note, "*A Conduct-Oriented Approach to the Glass-Steagall Act*," 91
Yale L J. 102, 110 n. 68 (1981) ("A private placement, also known as a direct placement, is an
alternative to an open-market sale of securities.").

[32] J. Downes and J. Goodman, **DICTIONARY OF FINANCE AND INVESTMENT TERMS** at 151 (Barron's
Educational Series, Inc., 5th ed. 1998). Emphasis added.

**Report of Robert W. Doty**
**Page 15**

> mutual funds, foundations, and pension funds that are able to evaluate
> such offerings. **Also called *private placement***

DIRECT PLACEMENT OF CORPORATE SECURITIES,[33] by E. Raymond Corey, defines the term "direct placement" as follows:

> *Direct placement refers … to the procedure in which the corporate
> issuer and the institutional investor deal directly with each other, with or
> without the aid of an intermediary, in establishing the terms of a security
> issue, and in which title to the security, or securities, is taken directly by
> the final holder*. Securities negotiated and sold by this method are
> *directly* placed in the sense that they are not first sold to intermediate
> owners (*e.g.*, investment bankers) who have purchased with the intent of
> reselling.

In its book, THE FUNDAMENTALS OF MUNICIPAL BONDS, SIFMA describes private placements as occurring "when the investment banker offers securities to investors, ***without a public offering***."[34] SIFMA further notes that, in a private placement transaction, "the placement agent (the term for the underwriter in this type of transaction) contacts one or more institutional investors" and that such investors have the ability to negotiate directly with the issuer and influence the structure of the deal.[35]

Placement agents, by definition, are "agents." Given that agency role, the contracts between placement agents and municipal bond issuers are fundamentally different from bond purchase contracts with underwriters dealing with issuers at arms-length. Both the SEC and the MSRB have emphasized that placement agents may have fiduciary duties pursuant to state law.

The SEC stated: "a placement agent may have … a fiduciary duty to its client, that arise[s] as a matter of common law or another statutory or regulatory regime."[36]

The MSRB made clear that underwriters have vastly different roles from that of placement agents. In that vein, the MSRB requires underwriters to disclose to municipal issuers that: "The underwriter's primary role is to *purchase securities with a view to distribution* in an arms'-length commercial transaction with the issuer …" and "the underwriter does not have a fiduciary duty to the issuer under the federal securities laws and is, therefore, not required by

---

[33] E. Corey, DIRECT PLACEMENT OF CORPORATE SECURITIES at 3 (Harvard Univ., 1951). Emphasis in original.

[34] Securities Industry and Financial Markets Association, THE FUNDAMENTALS OF MUNICIPAL BONDS at 71 (6th ed. 2012). Emphasis added.

[35] *Id.*

[36] SEC Rel. No. 34-70462 at 172, n. 628 (Sept. 20, 2013).

federal law to act in the best interests of the issuer without regard to its own financial or other interests."[37]

Due to key distinctions between underwriters, which act in an arms'-length capacity, and placement agents, which do not, the MSRB exempted placement agents from the requirement of disclosing the absence of the fiduciary duty in relationships between placement agents and issuers because placement agents may in fact owe fiduciary duties to issuers.[38]

The market guidance document entitled *Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans* ("Considerations About Bank Loans"), which was created by nine authoritative national municipal bond market organizations,[39] is also instructive. The document describes the forms in which direct placements of municipal debt occur as: (i) "a direct purchase—by purchasing a bond directly," or (ii) "a direct loan—by entering into a loan agreement or other type of financing agreement with the issuer."[40] Notably, *Considerations About Bank Loans* states that "[t]he term 'bank loan,' . . . ***does not include*** purchases of bonds by banks in a primary public offering or in the secondary market."[41] The document further notes that "direct purchases" and "direct loans" generally occur without an official statement or other public offering document.[42]

In my experience, investors in direct placements typically agree to restrictions on transfers of the bonds into the public municipal bond market, thus protecting against retail purchases of the bonds without adequate information. The restrictions may take the form of "investment letters" in which the placement investors represent their investment intent or may be imposed by limiting the denominations of the bonds to $100,000 or more or as a single bond issue that cannot be broken into small participations. In a direct placement, an issuer provides confidential continuing information directly to the investors, rather than through a continuing

---

[37] MSRB Notice 2012-38 (July 18, 2012).

[38] MSRB Notice 2012-38 (July 18, 2012) ("in a private placement where a dealer acts as a true placement agent, the disclosure relating to fiduciary duty would be inapplicable and may be omitted due to the existence of similar state law obligations.").

[39] The organizations consist of American Bankers Association, Bond Dealers of America, Government Finance Officers Association, Government Finance Officers Association, Investment Company Institute, National Association of Bond Lawyers, National Association of Independent Public Finance Advisors, National Federation of Municipal Analysts, and Securities Industry and Financial Markets Association.

[40] Considerations About Bank Loans at 1.

[41] Considerations About Bank Loans at 1. Emphasis added.

[42] Considerations About Bank Loans at 2, 4.

**Report of Robert W. Doty**
**Page 17**

disclosure agreement providing for disclosures to the general public through the MSRB or national repositories.

The foregoing industry practices regarding direct placements of debt are echoed strongly in the regulatory actions of the SEC that govern disclosure requirements for municipal bond issuances. For example, SEC Rule 15c2-12,[43] which addresses disclosure by municipal bond issuers to the investing public in the municipal bond market, imposes procedural requirements for public offerings of municipal bonds, including that underwriters must obtain, review, and provide to investors official statements prepared by issuers in those public offerings. The Rule includes an explicit exemption from these requirements, however, for limited offerings that incorporate features of private placement transactions meeting all of the following conditions:[44]

1. The bonds must be issued in "denominations of $100,000 or more;"

2. The bonds must be sold to "no more than thirty-five persons each of whom" the underwriter "reasonably believes [h]as such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment;" and

3. No investor can be "purchasing for more than one account or with a view to distributing the securities"

Recently, the SEC issued a concept release proposing a potential rule to allow "direct placements of municipal securities" by municipal advisors to municipal bond issuers (as opposed to placements by underwriters). Once again, the SEC's proposal describes common characteristics of direct placements, requiring that the "entire issuance" be placed with a single "Qualified Provider," described as "(i) a bank, savings and loan association, insurance company, or registered investment company; or (ii) an investment adviser registered with the [SEC] or with a state; or (iii) any other institution with total assets of at least $50 million."[45]

In summary, in my substantial experience in the industry and based on industry guidance a "direct placement of debt" in the municipal bond industry is the opposite of a public offering: it does not involve (and has not in the past involved) an intermediating underwriting syndicate selling bonds to public investors using official statements. Instead, a direct placement involves direct contact and negotiations between municipal bond issuers and institutional or other sophisticated purchasers of the municipal bonds in limited distributions, without public official

---

[43] SEC Rule 15c21-2, 17 C.F.R. §240.15c2-12.

[44] SEC Rule 15c21-2(d), 17 C.F.R. §240.15c2-12(d).

[45] SEC Rel. No. 34-87204, Proposed Exemptive Order Granting a Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Registered Municipal Advisors at 11, 12 (Oct. 2, 2019).

**Report of Robert W. Doty**
**Page 18**

statements (although an issuer might assemble information in a limited offering memorandum). Such offering documents are unnecessary because the investors are able to obtain information directly from the municipal bond issuers and are better able to bear losses on their investments than are many public investors.[46]

---

[46] For this same reason, directly placed bonds are typically not rated because there is no need for ratings.

Report of Robert W. Doty
Page 19

# ANALYSIS OF THE ERS BOND ISSUANCES

### A. ERS Did Not "Borrow" or Take a "Loan" from UBS or Other Members of the Underwriting Syndicates As those Terms are Used in Municipal Finance

As discussed above, based on my decades of experience in the industry and relevant industry guidance, a municipal bond issuer in a public offering conducted through an underwriting syndicate does not "borrow" or take a "loan" from the members of the syndicate. The documents concerning the issuance of the ERS Bonds and the role that UBS, as representative of the underwriting syndicates, played confirm the following:

- The role of the underwriting syndicates with respect to the ERS Bonds was to facilitate the offering and sale of the ERS to public investors – a role typically held by underwriters;

- The transactions were solely purchase-sale transactions;

- The underwriting syndicates, led by UBS, purchased securities with a view to distribution to public investors in arms-length commercial transactions with ERS;

- The underwriting syndicates were compensated as typically expected of an underwriter: through discounts from the public offering price paid by public investors for the Bonds in the transactions;[47] and

- As expected, given the role of an underwriting syndicate, none of the documents governing the issuance of the ERS Bonds reference a borrowing from the underwriting syndicate.

From my review of the bond documents, it is clear the ERS Bond issuance contemplated that UBS and the other members of the underwriting syndicates were fulfilling an intermediating function by buying ERS' Bonds for resale to public investors. For example, in each of the ERS Series A, B and C Bond Letters of Representations to the Underwriters, ERS represented to UBS and the other members of the underwriting syndicates that it was providing the Letters "[i]n order to induce you to enter into the Purchase Contract … and to make the offering and sale of

---

[47] The discounts appear in Section 1 on page 1 of each of the Bond Purchase Contracts.

In addition, the "Underwriting" sections of each of ERS' Official Statements provide the underwriters' discounts "from the initial public offering prices of the … Bonds." Series A Bond Official Statement at 52; Series B Bond Official Statement at 49; and Series C Bond Official Statement at 54.

**Report of Robert W. Doty**
**Page 20**

the Bonds."  The Letters say nothing about inducing UBS and the underwriters to allow ERS to "borrow" or take a "loan" from them.

Based on my experience and knowledge of industry customs, practices and standards in the municipal bond market, the relationships between ERS and the intermediating underwriting syndicates would be set forth in a bond purchase contract.[48] Section 4 of the Series A Purchase Contract for the Series A Bond offering specifically describes the responsibilities of UBS and the other underwriters with respect to the ERS Bond issuances as "to make a bona fide public offering of all of the Bonds" and authorizes them to use ERS' Official Statements, Bond Resolutions and other documents in marketing the Bonds to public investors.[49] These provisions show that ERS used the underwriting syndicates not as lenders in a "borrowing" or a "loan," but as intermediaries who would distribute and offer the Bonds for sale to the public.

The Bond closing documentation does not indicate that ERS had a "borrowing" or "loan" relationship with the underwriters.  In fact, I could not find any mention of a "borrowing" by ERS from the underwriting syndicates anywhere in any of the Series A, B or C Bond documents I have reviewed. (See Appendix I, Materials Reviewed.)  None of the Bond Resolution or Supplemental Bond Resolutions describe the relationship between ERS and the underwriting syndicates as involving a "borrowing" by ERS from the syndicates.  And none of ERS' Official Statements, Bond Counsel Opinions, ERS General Counsel Opinions, or Secretary of Justice Opinions describe the relationships between ERS and the underwriting syndicates as involving a "borrowing" by ERS from the syndicates.

The Purchase Contracts between ERS and the underwriters are not borrowing or loan agreements; they are purchase and sale contracts in which the underwriters agree to make "bona fide" public distributions of ERS' Bonds to public investors.  The underwriters agree to purchase the Bonds and to re-sell them.  They do not agree to participate in a "borrowing" by ERS.  The underwriters do not agree to invest in the Bonds because that is not their business model. Indeed, such a practice would inhibit their ability to conduct future underwriting business with other issuer clients by tying up their net capital.[50]

---

[48] In "*The Role of Counsel to the Underwriters*," another chapter in **THE HANDBOOK OF MUNICIPAL BONDS**, Mary G. Wilson, a municipal bond underwriter counsel, states that "The bond purchase agreement sets forth the financial and business terms of the underwriting agreements between the issuer and the underwriter … . The bond purchase agreement provides for the sale of the bonds to the underwriter … ." S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 6, *The Role of Counsel to the Underwriters* at 86 (John Wiley & Sons, Inc. 2008).

[49] Series A Bond Purchase Contract §4 on page 3. The Series B Bond Purchase Contract §4 on page 3 and Series C Bond  Purchase Contract §4 on page 3 contain closely similar provisions.

[50] The SEC set forth net capital requirements in SEC Rule 15c3-1, 17 C.F.R. §240.15c3-1.

**Report of Robert W. Doty**
**Page 21**

A "borrowing" or "loan" agreement would set forth, among other things, the terms of the borrowing, including repayment terms, ERS financial and operational covenants, requirements that ERS provide information directly to the underwriting syndicates, interest rates, default provisions, and enforcement provisions. The Purchase Contracts do none of that. I have seen no such "borrowing" agreement with the underwriting syndicates in connection with the ERS Series A, B or C Bond offerings. The fact that the ERS Bond issuances were not borrowings from or loans by the underwriting syndicates is consistent with my 45 years of experience in the municipal bond market and my earlier experience in the corporate securities market.

As noted above, ERS sold the Bonds to the underwriters at a discount from the initial public offering price. The underwriters would have received their transactional compensation from selling the Bonds to public investors above the discounted price. The underwriters would not have been compensated through the receipt of interest payments, as would be the case if a true borrowing relationship existed between ERS and the underwriters.

In summary, in accordance with market standards, the underwriters were not investors in the ERS Bonds; they were bond underwriters that bought and sold the bonds. The transactions conform to the typical municipal bond market standard of purchase and sale transactions. Thus, ERS did not "borrow" or take a "loan" from the underwriting syndicates.

To view the underwriting relationship as a "borrowing" or "loan" from a "financial institution" would be an aberration and would be inconsistent with municipal bond industry standards and my decades of experience in the market.

### B. ERS Did Not Make a "Direct Placement of Debt" in its Bond Offerings

As discussed above, in municipal finance, a "direct placement of debt" involves the sale of municipal securities by an issuer directly to a single or small group of sophisticated investors. Here, the ERS Bonds were sold to the public at large through underwritten public bond offerings, and bond sales were not restricted to experienced or sophisticated investors or to financial institutions. As such, the ERS Bond issuances were not "direct placements of debt."

In my experience, if the ERS Bond offerings were "direct placements of debt," in addition to a small number of sophisticated investors, I would expect to see direct negotiation of Bond terms between ERS and each of the investors. That did not happen in connection with any of the Bond offerings. ERS did not itself identify the investors, market the Bonds directly to investors, or engage in negotiations with investors. Instead, the underwriting syndicates undertook those investor contacts in the process of offering and selling ERS' Bonds to public investors. ERS prepared its multi-hundred page Official Statements and provided those documents to the underwriting syndicates specifically for the syndicates to distribute public information regarding ERS broadly, not within a controlled confidential group. The investors did not negotiate terms directly with ERS as the issuer.

**Report of Robert W. Doty**
**Page 22**

Other aspects of the Bond issuances are also contrary to what I would expect to see in a direct placement transaction.  For example, I would not expect to see:

- Ratings for the Bonds by all three major rating agencies, which ratings typically do not exist for directly placed bonds because the sophisticated investors in such bonds can and do rely primarily upon their own credit research.

- A Master Continuing Disclosure Agreement [51] requiring ongoing public disclosures, as the issuer in a direct placement would typically provide information directly to the end purchasers.

- A complete lack of restrictions on the resale of the Bonds in the public market (including the use of minimum denominations of $5,000, rather than $100,000), which restrictions are a necessary component of a direct placement.

Based on all the foregoing, it is my opinion that ERS would not have been viewed in the industry as making a "direct placement of debt" in connection with the ERS Bond issuances.  In fact, because ERS Bonds were part of underwritten public bond offerings, they are in my opinion the direct opposite of a "direct placement of debt."

---

[51] Master Continuing Disclosure Agreement dated January 31, 2008, between ERS and the Commonwealth of Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

**IN WITNESS WHEREOF,** I have executed this Report in Annapolis, Maryland, as of
the date set forth below.

**EXECUTED ON:** July 1, 2020

_____

**Robert W. Doty**

# APPENDIX I—

# MATERIALS REVIEWED

# APPENDIX I–
## MATERIALS REVIEWED

In the preparation of this Report, I have considered the following materials (provisions cited in the Report):

**A.** Documents, authorities and other materials, or portions thereof, cited in the Report

**B.** Bond Resolution

**C.** First Supplemental Bond Resolution

**D.** Second Supplemental Bond Resolution

**E.** Third Supplemental Bond Resolution

**F.** Series A Purchase Contract

**G.** Series B Purchase Contract

**H.** Series C Purchase Contract

**I.** Series A Bond Counsel Opinion

**J.** Series B Bond Counsel Opinion

**K.** Series C Bond Counsel Opinion

**L.** Series A Official Statement

**M.** Series B Official Statement

**N.** Series C Official Statement

**O.** Specimen of the Series A Bonds

**P.** Specimen of the Series B Bonds

**Q.** Specimen of the Series C Bonds

**R.** Series A Bond ERS General Counsel Opinion

**S.** Series B Bond ERS General Counsel Opinion

**T.** Series C Bond ERS General Counsel Opinion

**U.** Series A Bond Secretary of Justice Opinion

**V.** Series B Bond Secretary of Justice Opinion

**Report of Robert W. Doty**
**Appendix I-2**

**W.** Series C Bond Secretary of Justice Opinion

**X.**  ERS Series A Bond Letter of Representations to the Underwriters

**Y.**  ERS Series B Bond Letter of Representations to the Underwriters

**Z.**  ERS Series C Bond Letter of Representations to the Underwriters

**AA.**  ERS Master Continuing Disclosure Agreement

**BB.**  Conway MacKenzie Report

**CC.**  Kobre & Kim Report

**DD.**  R. Fippinger, **THE SECURITIES LAW OF PUBLIC FINANCE** Chs. 5, 10, 10A (Practising Law Institute)

**EE.**  R. Pope, **MAKING GOOD DISCLOSURE** (Government Finance Officers Association, 2001)

**FF.**  Municipal Securities Rulemaking Board, *Interpretive Guidance Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities* (Aug. 2, 2012)

**GG.**  MSRB Notice 2012-38, *Guidance on Implementation of the Interpretive Notice* (July 18, 2012)

**HH.**  Securities Industry and Financial Markets Association, **BOND PURCHASE AGREEMENT, GENERAL PROVISIONS AND CONDITIONS, GOVERNMENTAL TAX- OR REVENUE-SUPPORTED SECURITIES** (9/17/08)

**II.**  Securities Industry and Financial Markets Association, **THE FUNDAMENTALS OF MUNICIPAL BONDS** (6th ed. 2012)

**JJ.**  S. Feldstein and F. Fabozzi, ed. **THE HANDBOOK OF MUNICIPAL BONDS** Ch. 6, *The Role of Counsel to the Underwriters* and Ch. 14, *The Role of the Underwriter* (John Wiley & Sons, Inc. 2008)

**KK.**  Government Finance Officers Association, "*Best Practice: Selecting and Managing Underwriters for Negotiated Bond Sales*" (2014)

**LL.**  Patricia Tigue, **A GUIDE FOR SELECTING FINANCIAL ADVISORS AND UNDERWRITERS, WRITING RFPS AND EVALUATING PROPOSALS** (Government Finance Officers Association, 1997)

**MM.**  J.B. Kurish and Patricia Tigue, **AN ELECTED OFFICIALS GUIDE TO DEBT ISSUANCE** (Government Finance Officers Association, 2005)

**Report of Robert W. Doty**
**Appendix I-3**

**NN.** *Considerations Regarding Voluntary Secondary Market Disclosure About Bank Loans* (May 2013)

**OO.** SEC Rule 15c2-12, 17 C.F.R. §240.15c2-12

**PP.** SEC Rule 144, 17 C.F.R. §230.144

**QQ.** SEC Rel. No. 34-87204, Proposed Exemptive Order Granting a Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Registered Municipal Advisors (Oct. 2, 2019)

**RR.** SEC Rel. No. 34-70462 at 172, n. 628 (Sept. 20, 2013)

**SS.** Note, "*Reforming the Initial Sale Requirements of the Private Placement Exemption*," 86 Harv. L. Rev. 403 (1972)

**TT.** Comment, "*Institutional Investment Through Private Placement of Corporate Securities*," 53 Colum. L. Rev. 804 (June 1953)

**UU.** Note, "*A Conduct-Oriented Approach to the Glass-Steagall Act*," 91 Yale L J. 102, 110 (1981)

**VV.** J. Downes and J. Goodman, **DICTIONARY OF FINANCE AND INVESTMENT TERMS** at 151 (Barron's Educational Series, Inc., 5th ed. 1998)

# APPENDIX II—

## <u>DEFINITIONS</u>

# APPENDIX II–
## DEFINITIONS

The following defined terms are used in this Report:

**A.** The term "*Bond Counsel Opinions*" means, collectively, the Series A Bond Counsel Opinion, the Series B Bond Counsel Opinion, and the Series C Bond Counsel Opinion.

    **1.** The term "*Series A Bond Counsel Opinion*" means the Bond Counsel Opinion dated January 31, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series A Bonds.

    **2.** The term "*Series B Bond Counsel Opinion*" means the Bond Counsel Opinion dated June 2, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series B Bonds.

    **3.** The term "*Series C Bond Counsel Opinion*" means the Bond Counsel Opinion dated June 30, 2008, of Fiddler Gonzalez & Rodriguez, P.S.C. relating to the Series C Bonds.

**B.** The term "*Bond Resolution*" means the Pension Funding Bond Resolution adopted on January 24, 2008, by ERS' Board of Trustees.

**C.** The term "*Supplemental Bond Resolutions*" means, collectively, the First Supplemental Bond Resolution, the Second Supplemental Bond Resolution, and the Third Supplemental Bond Resolution.

    **1.** The term "*First Supplemental Resolution*" means the First Supplemental Pension Funding Bond Resolution adopted on January 29, 2008, by ERS' Board of Trustees.

    **2.** The term "*Second Supplemental Resolution*" means the Second Supplemental Pension Funding Bond Resolution adopted on May 27, 2008, by ERS' Board of Trustees.

    **3.** The term "*Third Supplemental Resolution*" means the Third Supplemental Pension Funding Bond Resolution adopted on June 26, 2008, by ERS' Board of Trustees.

**D.** The term "*Bonds*" or "*ERS Bonds*" means, collectively, the Series A Bonds, the Series B Bonds, and the Series C Bonds.

    **1.** The term "*Series A Bonds*" means ERS' $1,588,810,799.60 Senior Pension Funding Bonds, Series A dated January 31, 2008.

    **2.** The term "*Series B Bonds*" means ERS' $1,058,634,613.05 Senior Pension Funding Bonds, Series B dated June 2, 2008.

**Report of Robert W. Doty**
**Appendix II-2**

  **3.** The term "*Series C Bonds*" means ERS' $303,202,930 Senior Pension Funding
  Bonds, Series C dated June 30, 2008.

**E.** The term "*Bond Purchase Contracts*" means, collectively, the Series A Bond Purchase
Contract, the Series B Bond Purchase Contract, and the Series C Bond Purchase Contract.

  **1.** The term "*Series A Bond Purchase Contract*" means the Amended and Restated
  Purchase Contract dated January 29, 2008, between ERS and UBS, as
  representative of the underwriting syndicate, relating to the marketing and sale for
  ERS of the Series A Bonds by the underwriting syndicate.

  **2.** The term "*Series B Bond Purchase Contract*" means the Purchase Contract dated
  May 28, 2008, between ERS and UBS, as representative of the underwriting
  syndicate, relating to the marketing and sale for ERS of the Series B Bonds by the
  underwriting syndicate.

  **3.** The term "*Series C Bond Purchase Contract*" means the Purchase Contract dated
  June 26, 2008, between ERS and UBS, as representative of the underwriting
  syndicate, relating to the marketing and sale for ERS of the Series C Bonds by the
  underwriting syndicate.

**E.** The term "*Conway MacKenzie Report*" means Review of the Events and Decisions That
Have Led to the Current Financial Crisis of the Employees Retirement System of the
Government of Puerto Rico Report prepared by Conway MacKenzie, Inc. for the Employees
Retirement System of Government of Puerto Rico and Government Development Bank for
Puerto Rico, as Fiscal Agent of the Government of Puerto Rico (Oct. 2010).

**D.** The term "*ERS*" means the Employees Retirement System of the Government of the
Commonwealth of Puerto Rico.

**E.** The term "*ERS Bondholders*" means certain beneficial holders of the ERS Bonds.

**F.** The term "*ERS Enabling Act*" means Act No. 447 of the Legislative Assembly of Puerto
Rico, approved May 15, 1951, as amended and supplemented, including amendment by Act
46-1988.

**G.** The term "*ERS General Counsel Opinions*" means, collectively, the Series A Bond ERS
Counsel Opinion, the Series B Bond ERS Counsel Opinion, and the Series C Bond ERS
Counsel Opinion.

  **1.** The term "*Series A Bond ERS General Counsel Opinion*" means the Opinion dated
  January 31, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series A
  Bonds.

**Report of Robert W. Doty**
**Appendix II-3**

    **2.** The term "*Series B Bond ERS General Counsel Opinion*" means the Opinion dated June 2, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series B Bonds.

    **3.** The term "*Series C Bond ERS Counsel Opinion*" means the Opinion dated June 30, 2008, of Marilyn Cuevas Silvagnoli, Esq. relating to the Series C Bonds.

**H.** The term "*ERS Letters of Representations to the Underwriters*" means, collectively, the ERS Series A Bond Letter of Representations to the Underwriters, ERS Series B Bond Letter of Representations to the Underwriters, and the ERS Series C Bond Letter of Representations to the Underwriters.

    **1.** The term "*ERS Series A Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated January 30, 2008, of ERS to UBS and the other underwriters of the Series A Bonds.

    **2.** The term "*ERS Series B Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated June 2, 2008, of ERS to UBS and the other underwriters of the Series B Bonds.

    **3.** The term "*ERS Series C Bond Letter of Representations to the Underwriters*" means the Letter of Representations dated June 26, 2008, of ERS to UBS and the other underwriters of the Series C Bonds.

**I.** The term "*GFOA*" means the Government Finance Officers Association of the United States and Canada.

**J.** The term "*Kobre & Kim Report*" means The Independent Investigator's Final Investigative Report prepared by Kobre & Kim LLP for The Financial Oversight & Management Board for Puerto Rico Special Investigation Committee (Aug. 20, 2018).

**K.** The term "*Master Continuing Disclosure Agreement*" means the Master Continuing Disclosure Agreements dated January 31, 2008, between ERS and the Commonwealth of Puerto Rico.

**L.** The term "*MSRB*" means the Municipal Securities Rulemaking Board.

**F.** The term "*Official Statements*" means, collectively, the Series A Bond Official Statement the Series B Bond Official Statement, and the Series C Bond Official Statement.

    **1.** The term "*Series A Bond Official Statement*" means ERS' Official Statement dated January 29, 2008, for the offering and sale of the Series A Bonds to investors.

    **2.** The term "*Series B Bond Official Statement*" means ERS' Official Statement dated May 28, 2008, for the offering and sale of the Series B Bonds to investors.

**Report of Robert W. Doty**
**Appendix II-4**

> **3.** The term "*Series C Bond Official Statement*" means ERS' Official Statement dated
> June 26, 2008, for the offering and sale of the Series C Bonds to investors.

**M.** The term "*SEC*" means the Securities and Exchange Commission.

**N.** The term "*Secretary of Justice Opinions*" means, collectively, the Series A Bond Secretary of
Justice Opinion, the Series B Bond Secretary of Justice Opinion, and the Series C Bond
Secretary of Justice Opinion.

> **1.** The term "*Series A Bond Secretary of Justice Opinion*" means the Opinion dated
> January 31, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series A Bonds.

> **2.** The term "*Series B Bond Secretary of Justice Opinion*" means the Opinion dated
> June 2, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series B Bonds.

> **3.** The term "*Series C Bond Secretary of Justice Opinion*" means the Opinion dated
> June 30, 2008, of Roberto J. Sanchez Ramos, Esq. relating to the Series C Bonds.

**G.** The term "*SIFMA*" means the Securities Industry and Financial Markets Association.

**H.** The term, "*UBS*" means UBS Financial Services Incorporated of Puerto Rico, as
representative of the underwriting syndicates distributing the respective ERS' Bonds.

# APPENDIX III—

## QUALIFICATIONS AND CURRICULUM VITAE

# APPENDIX III—
## QUALIFICATIONS AND CURRICULUM VITAE

1.  A current true and accurate copy of my *Curriculum Vitae* reflecting my qualifications and experience appears below.

2.  As described in my *Curriculum Vitae*, I have over 45 years of experience in the finance industry in a diversity of capacities relating to several billions of dollars of municipal and corporate finance transactions in approximately two dozen states.

3.  I have served as a municipal bond underwriter with three firms in three states, have represented underwriters as underwriter counsel, served as a consultant to underwriters, and worked with underwriters in numerous municipal bond issues.

4.  I have participated in numerous municipal securities issues as municipal bond counsel, issuer counsel, underwriter counsel, disclosure counsel, trustee counsel, promoter/developer counsel, and investor counsel.

5.  My experience includes work as special consultant to underwriters, issuers and bond counsel and as financial advisor to bond issuers. I have worked closely with numerous bond counsel, issuer counsel and underwriter counsel, and have advised municipal bond issuers, issuer officials, underwriters, and investors, among other things, in municipal securities offerings.

6.  I was a partner in the bond counsel firm known at the time as Squire, Sanders & Dempsey, now known as Squire Patton Boggs. The firm was, and still is, one of the leading bond and underwriter counsel firms in the United States.

7.  In the process of serving in various capacities in the municipal bond market, I have participated in the interview and selection processes for bond counsel and underwriters to work in municipal bond offerings, have negotiated on behalf of issuers with bond counsel, underwriters, and underwriter counsel, and have worked many times closely with, and observed the work of, bond counsel, issuer counsel, underwriters, and underwriter counsel.

8.  In the period from 1987 to 1990, I worked with state agencies that had acquired municipal bonds in direct placements of debt, and with their underwriters, in packaging for the secondary market sales of portfolios of such municipal debt. The transactions occurred separately from the acquisition transactions, often years later.

9.  Prior to the 1980s, I worked on both public offerings of corporate securities (stocks and bonds) and direct placements of corporate securities (stocks and bonds).

10. I have worked with and advised issuers, underwriters, private promoters/developers, and others in structuring complex financial transactions, and have assisted issuers in connection with financial planning and with workouts of numerous defaulted municipal securities issues.

**Report of Robert W. Doty**
**Appendix III-2**

11. In addition, I have discussed the roles and responsibilities of bond counsel, issuer counsel, issuers and issuer officials, underwriters, and underwriter counsel as a member of panels at numerous national and regional conferences, seminars and workshops sponsored by the National Association of Bond Lawyers, the International Municipal Lawyers Association, the California Debt and Investment Advisory Commission, the Practising Law Institute, and other recognized municipal bond market organizations. In those activities, I observed and learned more about the roles, responsibilities and prevailing practices of underwriter counsel, bond counsel, disclosure counsel, issuer counsel, issuers, issuer officials, underwriters, and other parties.

12. I served, and worked closely with many investors, underwriters and other market participants, as a member of the Board of Governors of the National Federation of Municipal Analysts ("NFMA"), and member and officer of NFMA committees, including as Chair of an NFMA disclosure committee and a member of the NFMA Industry Practices Committee. I have served as a member of NFMA committees preparing Best Practices and White Papers on expert work products (such as feasibility analyses, market and demand studies and appraisals), charter school finance, conflicts of interest, market practices and an advanced distressed debt conference.

13. I am a recipient of NFMA's Municipal Industry Contribution Award.

14. I have taught in law schools, among other things, municipal finance law, professional responsibility, securities law, advanced securities law, corporation law, advanced corporation law, corporate finance law, and agency and partnership law; have taught in-house courses for leading bond counsel law firms on securities law; have taught an in-house course for a leading financial consultant firm on roles and responsibilities of financial consultants; and am a recognized speaker on municipal finance at numerous institutes, conferences, seminars and other programs. One of the courses I structured and taught was an internal course at a major bond counsel firm on underwriter counseling.

15. I have been qualified in and testified as an expert witness on the finance industry in federal courts in Kentucky, Illinois and Iowa, and state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before a New Mexico special legislative investigative Subcommittee in an impeachment proceeding. My testimony as an expert witness has included testimony as an expert for the SEC's Division of Enforcement in proceedings brought by the SEC.

16. I am a member of the American Association of Individual Investors ("AAII") and have published in the AAII Journal.

**Report of Robert W. Doty**
**Appendix III-3**

17. I have attended investor conferences sponsored by NFMA, Morningstar and AAII and listened to and discussed concerns and interests of investors.

18. As a member of industry committees, I have participated with others in the preparation of a number of nationally- and regionally-recognized publications providing disclosure, investigatory (due diligence) and related guidance applicable to municipal securities transactions. Those publications include, without limitation, successive editions of the Government Finance Officers Association of the United States and Canada's ("GFOA") **DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES** over a period of almost two decades.

19. I am a former General Counsel to the GFOA.

20. I served as Editor and Coordinator of the 1987 edition of **DISCLOSURE ROLES OF COUNSEL**, sponsored by the National Association of Bond Lawyers and a Section and a Subcommittee of the American Bar Association. In that role, I coordinated, combined and edited the work products produced by national committees of attorneys experienced in municipal securities customs, practices and standards of care.

21. I was a principal drafter, together with a national committee of issuer counsel, of the Exposure Draft of the **FINANCING PROCEDURES CHECKLISTS** (Apr. 2007) of the International Municipal Lawyers Association ("IMLA") for attorneys representing local governmental securities issuers.

22. I served for many years as Chair and Co-Chair of IMLA's Section on Economic Development/Finance & Securities.

23. I received IMLA's award as its Most Outstanding Associate Member.

24. I am the author or co-author of numerous books, chapters, articles on municipal bond transactions and roles and responsibilities of various parties in connection with, and customs, practices and standards of care relating to, those transactions. Those publications include seminal articles as to disclosure practices, due diligence and investigatory procedures, roles and responsibilities of parties, and fiduciary responsibilities in municipal securities transactions.

25. I am the author of the **BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS** (John Wiley & Sons and Bloomberg Press, 2012), which discusses in plain English for investors and market participants the diversity and complexity of municipal finance.

26. I am the author of **EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS** (International Municipal Lawyers Association, 2016). The book discusses significant expansion from 2013 to 2016 in the enforcement

**Report of Robert W. Doty**
**Appendix III-4**

activities of the Securities and Exchange Commission relating to municipal bond issuers, issuer officials, underwriters and financial advisors.

27. I also am the author of MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE AND ENFORCEMENT, 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016 and 2017), which discusses the pattern of securities regulation in the municipal bond market and enforcement actions over the past 45 years.

28. My writings have been cited favorably in a number of judicial decisions and by the Financial Industry Regulatory Authority. The Securities and Exchange Commission also has cited my writings favorably in SEC Staff Reports, in connection with the SEC's proposal of SEC Rule 15c2-12 governing disclosure procedures in municipal finance transactions, and in the publication in 1988 and 1989 of the SEC's interpretation on underwriter investigatory responsibilities.

29. I served on the Muni Council, formed initially through the auspices of the Municipal Securities Rulemaking Board, consisting of approximately 20 professional associations representing the major municipal bond market participant sectors for the creation of a "central post office" for filings of issuer and obligor continuing disclosure documents. I served as Chair of the Security Committee of the Muni Council.

30. I served as President and a Director of the Southern Municipal Finance Society; member and officer of committees or subcommittees of the National Association of Bond Lawyers and Sections of Business Law and State and Local Government Law of the American Bar Association; and a member of GFOA's Disclosure Task Force.

31. I served as Vice President and a member of the Board of Directors of the National Association of Independent Public Finance Advisors ("NAIPFA") and as Chair of NAIPFA's Public Affairs Committee.

32. Among the consulting clients I have served are the counsel to the Division of Enforcement of the Securities and Exchange Commission, counsel to the Financial Industry Regulatory Authority, the Office of the California Attorney General, the California Department of Corporations, a United States Attorney, a County District Attorney, counsel to a special investigative subcommittee of the New Mexico House of Representatives in connection with impeachment proceedings relating to a State official, and counsel to investors, underwriters, issuers, issuer officials, bond counsel, financial consultants, developers/promoters, indenture trustees and others involved in finance transactions in a number of states.

33. I was selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China in Beijing, Shanghai and Hangzhou.

# ROBERT DOTY
## Curriculum Vitae

Robert Doty has been involved for decades in the finance industry as a municipal securities financial and municipal advisor, special consultant, investment banker (underwriter), and bond and securities lawyer and underwriter counsel. In the process, Mr. Doty participated in the successful completion of billions of dollars of municipal finance and corporate finance transactions, including representations benefiting more than 150 governmental entities in approximately two dozen states. He worked with a substantial diversity of credit types in the market for municipal bond and other municipal securities, as well as numerous corporate credits. Mr. Doty is President and proprietor of AGFS, his consulting firm.

Mr. Doty served as Chair and Co-Chair of the Section on Economic Development/Finance & Securities of the International Municipal Lawyers Association. He received IMLA's **Most Outstanding Associate Member Award**.



Mr. Doty served as a member of the Board of Governors and Executive Committee, as a member of the Industry Practices Committee, and as Chair of a disclosure committee of the National Federation of Municipal Analysts (NFMA). He is a recipient of NFMA's **Municipal Industry Contribution Award**. He also served as the President and a Director of the Southern Municipal Finance Society.

Mr. Doty served as a member of the Professional Qualifications Advisory Committee of the Municipal Securities Rulemaking Board and as a Subject Matter Expert for the MSRB's eLearning initiative. Mr. Doty also served for two years as Vice President of the National Association of Independent Public Finance Advisors (NAIPFA) (now, the National Association of Municipal Advisors), and served for several years as a member of NAIPFA's Board of Directors and Chair of its Public Affairs Committee. He represented NAIPFA on the Muni Council, a group of approximately 20 national associations from across the major municipal bond market sectors developing improvements in the municipal bond market's continuing disclosure practices.

Mr. Doty is a nationally and regionally recognized authority on public finance, and in particular, aspects of the municipal bond market relating to municipal securities law, municipal disclosure and due diligence, fiduciary duties, and roles and responsibilities of parties. He served for more than three decades in the development of disclosure guidelines and due diligence procedures respecting state and local government securities. Among other things, Mr. Doty served as General Counsel to, and a principal drafter, as a member of national industry committees, of the **Disclosure Guidelines for State and Local Government Securities** and other disclosure guidelines, of the Government Finance Officers Association. Mr. Doty was active for two decades on the Government Finance Officers Association's Disclosure Task Force, and served actively on committees and subcommittees of the American Bar Association and the National Association of Bond Lawyers. He served as Coordinator and Reporter, as a member of a national industry committee, of **Disclosure Roles of Counsel in State and Local Government Securities Offerings** (1st ed. 1987), sponsored by a subcommittee and a section of the American Bar Association and the National Association of Bond Lawyers. Mr. Doty served as a principal drafter, as a member of national industry

Robert W. Doty
Summary
Page 2

committees, of the NFMA's **WHITE PAPER ON EXPERT WORK PRODUCTS** (2011) and NFMA's **WHITE PAPER ON THE DISCLOSURE OF POTENTIAL CONFLICTS OF INTEREST IN MUNICIPAL FINANCE TRANSACTIONS** (2015) and the Exposure Draft of IMLA's **FINANCING PROCEDURES CHECKLISTS** (2007). He also served on the NFMA Task Force on pension disclosure, and served on NFMA's industry committee on charter school disclosure. He served as a member of the NFMA Industry Practices Committee, which prepared NFMA's **WHITE PAPER ON BEST MUNICIPAL BOND ISSUANCE PRACTICES** (2014).

Regionally, Mr. Doty served as a Principal Drafter and Coordinator of the Project Team, working with State agency staff, for the preparation of the California Debt and Investment Advisory Commission's **GUIDELINES FOR LEASES AND CERTIFICATES OF PARTICIPATION**, an important form of California public finance. He serve from 2012 to 2013 as an industry consultant to the Commission. He is also author of a series of papers and draft disclosure guidelines that foreshadowed the Commission's publication of its **DISCLOSURE GUIDELINES FOR LAND-BASED FINANCINGS**, such as for assessment districts and special tax districts.

Mr. Doty participated in a wide variety of activities related to municipal securities transactions, including the issuance of municipal bonds, notes, leases, certificates of participation and other municipal securities for many types of governmental issuers; workouts and forensic analysis of and litigation regarding defaulted municipal bonds and other troubled municipal securities issues; tender offers; and federal and state enforcement investigations. The governmental entities benefited by Mr. Doty include cities, multi-state interlocal agencies, water and wastewater agencies, counties, schools, assessment districts, special taxing districts, authorities, colleges, public utilities, state agencies, joint powers or joint action agencies, power authorities, and recreation and park, community service and other forms of special agencies and districts. He was instrumental in the development of sophisticated pooled and other financing structures.

Mr. Doty is the author and co-author of several books and chapters and over 80 articles on municipal bonds, corporate finance and related subjects. Mr. Doty's most recent book is **EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS** (International Municipal Lawyers Association, 2016). The book discusses the significant expansion from 2013 to 2016 in the enforcement activities of the Securities and Exchange Commission relating to municipal bond issuers and officials. Not only did the scope of securities law enforcement actions increased greatly in terms of number and subject matter, but penalties imposed were substantially more exacting for both municipal issuers and officials.

Mr. Doty's other recent books are **THE BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS** (John Wiley & Sons 2011) and **MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE AND ENFORCEMENT,** 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016, 2017). **THE BLOOMBERG VISUAL GUIDE**, which includes contributions from a number of market participants, is directed to explaining in plain English to retail investors, issuers, students and market professionals seeking to expand their knowledge of municipal finance, the complexity and diversity of municipal securities, a variety of municipal securities structures, and why traditional municipal securities are sound. The book also points out certain market sectors that offer greater rewards and greater risks, and considerations and sources of information for investors. **MUNICIPAL SECURITIES LAW & PRACTICE** discusses the pattern of

**Robert W. Doty**
**Summary**
**Page 3**

securities regulation in the municipal securities market and enforcement actions over the past 45 years. Mr. Doty's other writings include seminal works in the mid-1970s on municipal securities law and municipal securities disclosure and due diligence and later seminal publications on fiduciary duties and roles and responsibilities of parties in municipal bond offerings and other municipal securities transactions. Mr. Doty's writings have been cited favorably by the Securities and Exchange Commission and the Financial Industry Regulatory Authority and in judicial decisions on municipal securities law.

Mr. Doty frequently served as Chair and speaker at national and regional conferences regarding state and local government finance, including among them, from the late 1980s into this century, the **ANNUAL INSTITUTES ON MUNICIPAL FINANCE** sponsored by the Practising Law Institute in New York. Mr. Doty was selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China.

Mr. Doty has served as a consultant to lawyers in almost three dozen states on a variety of matters relating to the finance industry, municipal securities law, municipal disclosure, due diligence, roles and responsibilities of parties, and municipal finance, including counsel to municipal securities issuers, underwriters, bond counsel, trustees, investors and governmental agencies, such as counsel to the Division of Enforcement of the Securities and Exchange Commission (as well as in opposition to the Division), the Financial Industry Regulatory Authority, the California Department of Corporations, the Office of the California Attorney General, a United States Attorney, a District Attorney, and a special investigative subcommittee of the New Mexico House of Representatives. In such consultations, Mr. Doty may provide information regarding municipal finance to parties unfamiliar with the municipal market and may engage in forensic analysis of municipal securities transactions.

When appropriate, Mr. Doty has served as a municipal bonds expert witness. He has testified as an expert on the finance industry in federal courts in Kentucky, Illinois and Iowa, and in state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before the special investigative Subcommittee of the New Mexico House of Representatives.

Mr. Doty received his law degree from Harvard Law School. He is a member of numerous market associations representing issuers, investors, counsel and others.

**ROBERT W. DOTY**
**988 Placid Court**
**Arnold, MD 21012**
**Telephone: (916) 761-3432**
**Email: Robert.Doty@AGFS.com**

## CURRICULUM VITAE

**Degrees Earned:**

Harvard Law School, Ll.B, 1967
University of Houston, B.A., *cum laude,* 1964
*Phi Kappa Phi* Honor Society

**Professional Certifications**
**and Registrations:**

Bar examinations in California (retired), Texas (retired) and Maryland (Out of State Attorneys Exam)

Prior Professional Certifications: National Association of Securities Dealers, Inc.—Series 24 (Principal—twice), Series 7 (Registered Representative), Series 63 (State) (No longer in effect)

Certified Independent Public Finance Advisor examination (National Association of Independent Public Finance Advisors) (No longer in effect)

Municipal Advisor Registered with Securities and Exchange Commission and Municipal Securities Rulemaking Board (No longer in effect)

**Memberships and Offices:**

*Selected activities*—Member, Industry Practices Committee (2013), Board of Governors and Executive Committee (1990-92), Industry Practices Committee (1991), Certificate Committee (Chair, 1992-95), National Federation of Municipal Analysts (now inactive); International Municipal Lawyers Association (now inactive), Chair and Co-Chair, Section on Economic Development/Finance & Securities (2012-2019), Chair, Section on Economic Development, Taxation and Finance (2005-07), Vice Chair (2004-05) and Recorder (2003-04), Recorder, Associate Member Department (2002-03); Member, Professional Qualifications Advisory Committee, Municipal Securities Rulemaking Board (2011-12); Subject Matter Expert for the MSRB's eLearning initiative (2017); Muni Council (2002- 2005), Security Committee (Chair, 2004-2005); Vice President (2006-08), and member, Board of Directors and Chair, Public Affairs Committee, National Association of Independent Public Finance Advisors (2004-08); Director and President (1990-92), Southern Municipal Finance Society; Board of Editorial Advisors, Municipal Finance Journal (1990-2019); Disclosure Task Force, Government Finance Officers Association (1975-1991); Subcommittee

**Robert W. Doty**
*Curriculum Vitae*
**Page 2**

on Municipal and Governmental Obligations (Vice Chair 1980s), American Bar Association (1980s); Special Committee on Securities Law and Disclosure, National Association of Bond Lawyers (1980s)

*Professional memberships:*

Attorney bar regulatory associations and authorities in California (inactive); New York (inactive), Maryland, the District of Columbia, Texas (inactive), and Ohio (inactive). Past memberships through 2019: the National Federation of Municipal Analysts (now inactive), the Municipal Analysts Group of New York (now inactive), the Government Finance Officers Association (Associate Member) (now inactive), the International Municipal Lawyers Association (Associate Member) (now inactive), the American Bar Association (now inactive); the National Association of Bond Lawyers (Associate Member) (now inactive), and the Securities Experts' Roundtable (now inactive).

**Professional Recognition:**

Chair and Co-Chair, Section on Economic Development/Finance & Securities (2012-2019), Chair, Economic Development, Taxation and Finance Section (2005-07), International Municipal Lawyers Association

*Most Outstanding Associate Member Award,* International Municipal Lawyers Association

Member, Industry Practices Committee (2013), National Federation of Municipal Analysts (past Member of Board of Governors, Executive Committee and Chair, Certificate Committee)

*Municipal Industry Contribution Award,* National Federation of Municipal Analysts

Industry consultant, California Debt & Investment Advisory Commission (2012-2013)

Member, Professional Qualifications Advisory Committee, Municipal Securities Rulemaking Board (2011-2012)

Subject Matter Expert for the MSRB's eLearning initiative (2017)

Member, Organizing Committees, Brandeis Municipal Finance Conferences (2013-2015)

Cited favorably by the Securities and Exchange Commission in its Release No. 34-26100, 53 F.R. 37778 (Sept. 28, 1988), proposing Rule 15c2-12 effectively to regulate municipal disclosure in the issuance of municipal securities; the SEC Staff Report on the Municipal Securities Market at n. 93 (Sept. 1993); and the SEC Staff Report on the Municipal Securities Market at 7 n. 29, 24 n. 125, 34 n. 185 (July 2012)

**Robert W. Doty**
*Curriculum Vitae*
**Page 3**

Cited favorably by the Financial Industry Regulatory Authority (FINRA) in setting its 2013 "Business Conduct and Sales Practice Priorities (Jan. 11, 2013)

Cited favorably in the following judicial decisions: *In re New York City Municipal Securities Litigation,* 507 F.Supp. 169, 183 nn. 31 and 33, 184 n. 35 (S.D.N.Y. 1980) (co-authored article and congressional testimony); *In re Washington Public Power Supply System Securities Litigation,* 623 F.Supp. 1466, 1479 (W.D. Wash. 1985) (co-authored article); *Brown v. City of Covington,* 805 F.2d 1266, 1270 (6th Cir. 1986) (co-authored article); *Sonnenfeld v. City of Denver,* 100 F.3d 744, 746 (10th Cir. 1996) (co-authored article)

Testified as an expert in the finance industry in federal courts in Kentucky, Illinois and Iowa, and state courts in Arizona, California, Colorado, Connecticut, Florida, Nevada, New Jersey, and Virginia; before Administrative Law Judges of the Securities and Exchange Commission; before arbitration panels of the Financial Industry Regulatory Authority and the American Arbitration Association; and by video before a special investigative Subcommittee of the House Rules and Order of Business Committee of the New Mexico House of Representatives

Selected as one of a five-member United States delegation formed by the Smithsonian Institution's Woodrow Wilson International Center for Scholars and by the National Committee on United States-China Relations to consult with officials of the Peoples Republic of China and of the Cities of Beijing, Shanghai and Hangzhou, together with academicians and interested professionals in the PRC, as to the potential functioning of a municipal securities market in the PRC; role as a member of the delegation was to discuss legal and financial aspects of, and disclosure and due diligence mechanisms for, formation of a municipal securities market for financing environmental infrastructure in the PRC

Co-Chair, with The Honorable Gui Minjie, Vice Chairman of the China Securities Regulatory Commission, of the Securities Law Panel at the 22nd Biennial Congress of the World Jurist Association held in Beijing and Shanghai

**Professional Activities:**

AGFS, Arnold, Maryland (formerly, American Governmental Financial Services Company, Sacramento, California, and Doty Research & Development Company, Houston, Texas), President and proprietor, 1987-present; research, publications and consulting services regarding municipal securities law, municipal disclosure and due diligence, fiduciary duties, and roles and responsibilities of parties in municipal securities transactions (formerly, also a financial advisory firm providing advice to local governments)

**Robert W. Doty**
*Curriculum Vitae*
Page 4

Government Financial Strategies, Inc., Sacramento, California, Senior Advisor and Counsel to the Executive Team, 2012 to 2013, financial advisor to state and local governments respecting the conduct of their financings and other financial matters

George K. Baum & Company, Sacramento; Vice President, 1990-1991; origination of state and local government finance transactions; one of two senior bankers in the California office of the firm

University of Houston, School of Law; Visiting Professor and Adjunct Professor, 1987-1989; taught Business Organizations (emphasizing corporate and securities laws) and State and Local Government Finance (a course I developed)

Underwood, Neuhaus & Co. Incorporated, Houston; First Vice President, 1986-1987; public finance securities origination

Boettcher & Co., Inc., Denver; Vice President, 1984-1986; Rocky Mountain region public finance securities origination and financial institution securitization transactions

Squire, Sanders & Dempsey, Washington and Cleveland; Partner, 1979-1984; bond, underwriter, issuer, investor and trustee counsel; legal aspects of state and local government finance, tax-exempt industrial, commercial, real estate and hospital finance, and financial institution securitization transactions; member, Disclosure Committee; prepared firm forms of hospital financing documents; prepared an internal firm course on legal counseling of underwriters

Government Finance Officers Association, Washington; General Counsel and Director of Fiscal Policy, 1977-1979; a principal drafter with national industry committees of nationally-recognized disclosure guidelines for state and local government securities transactions; securities and tax law liaison with the federal government on behalf of state and local governments

Government Finance Officers Association, Washington, 1975, consultant under National Science Foundation grant regarding research and drafting of disclosure considerations for municipal securities offerings

Creighton University, School of Law, Omaha; Assistant Professor of Law and Associate Professor of Law, 1973-1976; taught Advanced Securities Law, Corporations, Advanced Corporations, Agency and Partnership, Professional Responsibility, and a Seminar on the Preparation of Registration Statements (a seminar I developed)

Kutak Rock, Omaha; Special Consultant, 1974-1975; reviewed the firm's securities law practices and taught an internal securities law course for the firm's attorneys

**Robert W. Doty**
*Curriculum Vitae*
**Page 5**

Fulbright & Jaworski, Houston; Associate, 1967-1973; securities and corporate law; preparation of registration statements, proxy statements, and merger and acquisition agreements, and general securities law and corporate advice

**Books and Database:**

EXPANDING MUNICIPAL SECURITIES ENFORCEMENT: PROFOUND CHANGES FOR ISSUERS AND OFFICIALS (International Municipal Lawyers Association, 2016)

MUNICIPAL SECURITIES LAW & PRACTICE: REGULATION, DISCLOSURE, DUE DILIGENCE AND ENFORCEMENT, 212 Securities Practice Series (Bloomberg BNA 2014, rev. 2015, 2016, 2017)

THE BLOOMBERG VISUAL GUIDE TO MUNICIPAL SECURITIES (John Wiley & Sons, Inc., print and electronic editions 2012)

MUNICIPAL ADVISOR RESOURCES (AGFS, 2011)

FROM TURMOIL TO TOMORROW--THE EMERGING NEW WORLD OF MUNICIPAL FINANCE (AGFS, 2010)

INFRASTRUCTURE FINANCE: TRENDS AND TECHNIQUES, Chapter on "*Funding Clean Water Systems in a Prosperous China*" (Euromoney Books, London, 2008)

STATE AND LOCAL GOVERNMENT DEBT ISSUANCE AND MANAGEMENT SERVICE (Sheshunoff Information Services, Inc., 1996 and subsequent revisions) (co-author of portions of book on securities law and disclosure)

SECURITIES LAW FOR MUNICIPAL FINANCE ADVISORS—A COMPILATION [sm] (AGFS, 2001)

SECURITIES LAW FOR THE MUNICIPAL MARKET [sm] (Goodman Publishing, 2002-03)

AGFS MUNICIPAL SECURITIES LAW AND DISCLOSURE DATABASE [sm] (online service through AGFS) (approximately 2001-02)

SIGNIFICANT BRIEFS FROM KEY MUNICIPAL SECURITIES ENFORCEMENT ACTIONS [sm] (AGFS, 2001)

LIFE AFTER WPPSS—ISSUER DISCLOSURE IN THE STATE AND LOCAL GOVERNMENT SECURITIES MARKET (Packard Press, Philadelphia, 1988-89)

**Robert W. Doty**
*Curriculum Vitae*
**Page 6**

THE FEDERAL LAW OF PUBLIC FINANCE, four volumes (Sorg Printing Company, Chicago, 1988) (co-author with John C. Bates, Jr.)

STATE AND LOCAL GOVERNMENT DEBT FINANCING (D. Gelfand, ed., Callaghan & Co., Deerfield, IL, 1986, 1988 revision and cum. supps. 1986, 1987, 1988, 1989, 1990, 1991 and 1992), "Chapter 2—*Traditional Bonds and Notes"* (co-author with Jeffrey S. Green), "Chapter 8— *Application of the Securities Laws & Market Standards to State & Local Government Securities Transactions,"* and "Chapter 8A—*Disclosure Process in State and Local Government Securities Transactions"*

**Market Guidance and Related Publications:**

RECOMMENDED BEST PRACTICES IN CHARTER SCHOOL FINANCINGS (2017, *National Federation of Municipal Analysts*) (member of national industry committee)

WHITE PAPER ON THE DISCLOSURE OF POTENTIAL CONFLICTS OF INTEREST IN MUNICIPAL FINANCE TRANSACTIONS (2015, *National Federation of Municipal Analysts*) (member of national industry committee)

WHITE PAPER ON BEST MUNICIPAL BOND ISSUANCE AND DISCLOSURE PRACTICES (2014, *National Federation of Municipal Analysts*) (member of NFMA's Industry Practices Committee)

WHITE PAPER ON EXPERT WORK PRODUCTS (*National Federation of Municipal Analysts*, 2011) (member of a national industry committee)

FINANCING PROCEDURES CHECKLISTS (*International Municipal Lawyers Association*, Exposure Draft 2007) (member of a national industry committee)

GUIDELINES FOR LEASES AND CERTIFICATES OF PARTICIPATION (California Debt Advisory Commission, 1993) (Coordinator and a principal drafter for the Project Team working with State agency staff)

DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES (Government Finance Officers Association, 1991 edition) (a principal drafter as a member of a national industry committee)

DISCLOSURE GUIDELINES FOR STATE AND LOCAL GOVERNMENT SECURITIES (Government Finance Officers Association, 1988 edition) (a principal drafter as a member of a national industry committee)

DISCLOSURE ROLES OF COUNSEL IN STATE AND LOCAL GOVERNMENT SECURITIES OFFERINGS (Section of Urban, State and Local Government Law of the American Bar Association, 1st ed. 1987), sponsored by Subcommittee on Municipal and Governmental Obligations, Committee on Federal Regulation of Securities, Section of

**Robert W. Doty**
*Curriculum Vitae*
**Page 7**

Corporation, Banking and Business Law, American Bar Association; Section of Urban, State and Local Government Law, American Bar Association; and Committee on Federal Securities Law, National Association of Bond Lawyers (Reporter and Coordinator as a member of a national industry committee)

**OFFICIAL STATEMENTS FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS—EXAMPLES AND GUIDELINES** (Government Finance Officers Association, 1981) (a principal drafter as a member of a national industry committee)

**DISCLOSURE GUIDELINES FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS** (Government Finance Officers Association, 1979 revision) (a principal drafter as a member of a national industry committee)

**DISCLOSURE GUIDELINES FOR OFFERINGS OF SECURITIES BY STATE AND LOCAL GOVERNMENTS** (Government Finance Officers Association, 1976 original version) (a principal drafter as a member of a national industry committee)

**GUIDELINES FOR USE BY STATE AND LOCAL GOVERNMENTS IN THE PREPARATION OF YEARLY INFORMATION STATEMENTS AND OTHER CURRENT INFORMATION** (Government Finance Officers Association, 1979) (a principal drafter as a member of a national industry committee)

**PROCEDURAL STATEMENTS IN CONNECTION WITH DISCLOSURE GUIDELINES** (Government Finance Officers Association, 1978) (a principal drafter as a member of a national industry committee)

**TENTATIVE DISCLOSURE GUIDELINES FOR DEVELOPERS,** a precursor for the California Debt Advisory Commission's 1996 Guidelines

**Selected Publications:**

"*The SEC Raises the Stakes: How the Recent Amendments to Rulen15c2-12 Will Affect Municipal Bond Issuers,*" 59 Mun. Law. No. 6 (Nov.-Dec. 2018) (Co-author with Randall Kulat)

"*Conflict of Interest Issues Are Pivotal for Municipal Advisors*" (The Bond Buyer Sept. 25, 2018)

"*Municipal Advisors' Fiduciary Duty of Care Is More Than Just 'Professional Standards'*" (The Bond Buyer Sept. 17, 2018)

"*Setting Standards of Practice for Consultants*" 38 Mun. Fin. J. 15 (Winter 2018) (Panelist)

"*Regulation and Your Consultants: Drawing the Line*" 38 Mun. Fin. J. 25 (Winter 2018) (Panelist)

**Robert W. Doty**
*Curriculum Vitae*
**Page 8**

 "*Duty of Care Enforcement for Municipal Advisors*" (The Bond Buyer Online Aug. 30, 2017)

"*What the SEC Has Achieved (So Far) Through Enforcement*" (The Bond Buyer Online, Aug. 30, 2016)

"*Expanding Municipal Securities Enforcement: Profound Changes For Issuers and Officials*" (The Bond Buyer Online, July 12, 2016)

"*The Past and Future of Municipal Securities--Fortieth Anniversary of the Municipal Securities Rulemaking Board,*" Mun. Fin. J. 1 (2016) (Panelist)

"*John Petersen: A Municipal Market Giant*" 33 Mun. Fin. J. 13 (Winter 2013)

"*Telling Myth from Reality in MuniLand,*" Govt. Fin. Rev. 17 (GFOA Feb. 2013)

"*Diversity & Risks of Municipal Bonds*" presented at the 2012 Municipal Finance Conference conducted by the Brandeis International Business School on August 3, 2012, and published in 34(2) Mun. Fin. J. 55 (Summer 2013)

*H.R. 2827—Potential Loss of Important Protections for Municipal Securities Issuers,"* Mun. Lawyers 18 (July/Aug. 2012)

"*The Readily-Identifiable Riskiest Municipal Securities: Due Diligence Does Make a Difference*" 32(2) Mun. Fin. J. 63 (2011)

"*Preliminary Observations on the Dodd-Frank Wall Street Reform and Consumer Protection Act as It Applies to the Municipal Securities Market*" 31(2) Mun. Fin, J. 99 (Summer 2010)

"*Bid-Rigging Investigations in the Municipal Markets: Current and Future*" 23 Journal of Taxation & Regulation of Financial Institutions 41 (July/Aug. 2010)

"*Pennsylvania School Districts v. JP Morgan—A Case Study for Issuers on Reading and Understanding Agreements Before Signing*" 30(4) Mun. Fin. J. 79 (Winter 2010)

"*Kentucky v. Davis—Protection for State Tax Exemptions for Bonds*" Mun. Law. 24 (Nov./Dec. 2008)

"*Securities Law Application to Municipal Finance Transactions— Continued Expansion & A Market in Flux, Part 2*" 29(1) Mun. Fin. J. 31 (Spring 2008)

**Robert W. Doty**
*Curriculum Vitae*
**Page 9**

"*Securities Law Application to Municipal Finance Transactions—Continued Expansion & a Market in Flux, Part I*" 28(4) Mun. Fin. J. 63 (Winter 2008)

**"***Municipal Securities Law and Disclosure Developments—Securities Law Application to Municipal Finance Transactions Is Coming of Age***,"** 27(4) Mun. Fin. J. 55 (Winter 2007)

"*Funding Clean Water Systems in a Prosperous China*," submitted to 2006 China International Conference in Finance, Xi'an, China, and subsequently revised and expanded under the title "*Funding Clean Drinking Water Systems in a Prosperous China*"

"*A Clean Water Funding Plan for a Prosperous China*," 790 Working Papers of the 22nd Congress on the Law of the World (World Jurist Association, Sept. 2005)

"*Lease-Purchase Financings in China—Financial Instruments for Environmental Infrastructure*," 25(4) Municipal Finance Journal 1 (Winter 2005)

"*Municipal Finance Advising, Part I: Fiduciary Relationships of Municipal Finance Advisors with Their Issuer Clients,*" 33 Urb. Law 225 (Spring 2001)

"*Municipal Finance Advising, Part II: Managing Relationships of Municipal Finance Advisors with Issuers*" 33 Urb. Law 259 (Spring 2001)

"*Special Disclosure Considerations for State and Local Government Securities Issuers*," 18 Mun. Fin J. 42 (Summer 1997)

"*Disclosure Responsibilities and Substance in Tax-Exempt Land-Based Financings,*" Mun. Fin J. (Winter 1996) [containing Tentative Disclosure Guidelines for Developers]

"*The Revolution in Municipal Securities Disclosure Practice,*" 2 Insights: Corp. & Sec. L. Advisor No. 11 at 3 (Nov. 1988) (co-author with John M. Gardner)

"*Searching for Standards: Disclosure in the Municipal Securities Market,*" 1976 Duke L.J. 1177 (1977) (co-author with Dr. John E. Petersen, Dr. Ronald W. Forbes and Donald D. Bourque)

"*The Federal Securities Laws and Transactions in Municipal Securities,*" 71 Nw. U.L. Rev. 283 (1976) (co-author with Dr. John E. Petersen)

"*Application of the Antifraud Provisions of the Federal Securities Laws in Exempt Offerings: Duties of Underwriters and Counsel,*" 16 B.C. Ind.

**Robert W. Doty**
*Curriculum Vitae*
**Page 10**

& Com. L. Rev. 393 (1975)

*"Analysis—Regulation of the Municipal Securities Market and Its Relationship to the Governmental Issuer"* (Municipal Finance Officers Association, 1975) (co-author with Dr. John E. Petersen)

**Speaking Since 2005:**

Mr. Doty has served actively as a speaker on municipal bonds, municipal securities law, disclosure, due diligence and roles and responsibilities of parties for more than the past four decades. Among other things, from the late 1980s into the 2000s, Mr. Doty served as Program Chair and Speaker for Practising Law Institute's *Annual Institutes on Municipal Finance Law* in New York.

The following are Mr. Doty's speaking engagements since 2005:

January 2006, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

April 2006, Moderator: "After *Kelo v. New London*: The Federal and State Response," International Municipal Lawyers Association, Joint Meeting of State League Counsel and Section on Economic Development, Taxation and Finance, *Mid-Year Conference,* Washington, DC

August 2006, Speaker: "Financing Public Water and Wastewater Systems," Smart Metering West Coast Conference, San Francisco, CA

September 2006, Speaker: "Potential Issuer Actions to Mitigate Securities Law Liability;" and Moderator: "Public Finance," International Municipal Lawyers Association, *Annual Conference,* Portland, OR

October 2006, Moderator: "Fiduciary Duties," Moderator: "Transactional Analyses for Clients," Moderator: "Broker-Dealer Requirements Applicable to Advisors," and Moderator: "The Role of Financial Advisors in School Finance: A Study," National Association of Independent Public Finance Advisors, *Annual Conference*, Boston, MA

November 2006, Speaker: "Municipal Bonds Fraud," California District Attorneys Association, San Francisco

January 2007, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

April 2007, Speaker: "IMLA's **FINANCING PROCEDURES CHECKLISTS**;" International Municipal Lawyers Association, *Mid-Year Conference,* Washington, DC

**Robert W. Doty**
*Curriculum Vitae*
Page 11

July 2007, Provided materials: "IMLA's **FINANCING PROCEDURES CHECKLISTS**;" *Annual Seminar*, Florida Municipal Attorneys Association, Amelia Island, FL

September 2007, Moderator and Speaker: "Establishing Issuer Due Diligence and Disclosure Programs;" *6th Annual Pre-Conference Seminar at The Bond Buyer's Annual California Public Finance Conference*, California Debt and Investment Advisory Commission and The Bond Buyer, San Diego, CA

October 2007, Moderator: Panels on "Current SEC, MSRB and IRS Issues," and "Credit Analysis in Municipal Finance," National Association of Independent Public Finance Advisors, *Annual Conference*, Indianapolis, IN

November 2007, Moderator and Speaker: "Hot Topics in Disclosure;" *CDIAC Disclosure Seminar*, California Debt and Investment Advisory Commission, San Mateo, CA

January 2008, Participant in the MSRB's Municipal Market Roundtable, representing National Association of Independent Public Finance Advisors, Washington, DC

September 2008, Speaker: "Emerging Issues in the Municipal Securities Market," International Municipal Lawyers Association, *2008 Annual Conference,* Las Vegas, NV

September 2008, Speaker: "Developments in Continuing Disclosure, " CDIAC Disclosure Seminar on "*Understanding Municipal Securities Regulations*," California Debt and Investment Advisory Commission, San Diego, CA

October 2008, Moderator, "Fundamentals of Financial Advising—What Newer Financial Advisors Need to Know;" Moderator, "Regulatory Activities Affecting Municipal Finance;" Moderator and Speaker: "Project Dynamics—Investigation; Private Parties; Experts;" Moderator, "Financing Public Infrastructure in China;" National Association of Independent Public Finance Advisors, *Annual Conference,* Seattle, WA

October 2008, Speaker: "Emerging Issues in the Municipal Securities Market, " *2008 California Controller's Conference with County Auditors*, Monterrey, CA

March 2009, Speaker, "Bond Financing for Environmental Infrastructure," *China Water Industry Net (CWIN) Seminar*, Beijing

April 2009, Prepared Materials for Presentation, "Recreation and Park District Financings, "California Association of Recreation and Park Districts, *Annual Conference,* Incline Village, NV

**Robert W. Doty**
*Curriculum Vitae*
**Page 12**

May 2009, Interview, DerivActive.com, "Regulation of Financial Advisors," online podcasts

February 2010, Panelist, "The DC Impact on (or Menace to) Municipal Credit," *National Federation of Municipal Analysts Advanced Seminar on Tax-Backed Bonds and Federal Intervention, Reform and Influence over the Municipal Market*, Palm Beach, FL

March 2010, Panelist, "Issuers' Roundtable: Developing and Implementing Financial Strategies for Adjusting to a New Normal," *Information Management Network*, Huntington Beach, CA

March 2010, Speaker, "From Turmoil to Tomorrow: The Emerging New World for Municipal Finance," *Bond Attorneys Spring Workshop*, Palm Beach, FL

May 2010, Panelist, "Expert Work Products White Paper," *National Federation of Municipal Analysts Annual Conference*, Santa Ana Pueblo, NM

October 2010, Panelist: "Rules of Engagement: Inside the SEC's Muni Market Project**,**" *Bond Buyer 20th Annual Public Finance Conference*, San Francisco

October 2010, Speaker: "The Substantial Municipal Market Changes During the Financial Crisis," *National Association of Independent Public Finance Advisors Annual Conference*, Detroit

November 2010, Chair, "Significant Municipal Securities Law & Market Developments for Local Governments," *International Municipal Lawyers Association Teleconference*

January 2011, Speaker, "Exploratory Teleconference on Municipal Advisor Regulation of Municipal Officials," *International Municipal Lawyers Association Teleconferences*

Feb./March/May 2011, Chair, "Municipal Finance Series," *International Municipal Lawyers Association Teleconferences*

Sept. 2011, Speaker, "Issuer Disclosure Procedures," International Municipal Lawyers Association, *2011 Annual Conference,* Chicago, IL

Sept. 2011, Speaker, "Steps for Pro-Active Issuers," *2011 Annual Bond Buyer Pre-Conference,* California Debt and Investment Advisory Commission, San Diego, CA

Feb. 2012, Speaker: "Stepping Forward: The Role of the Finance Officer in Today's Market," *2012 Annual California Society of Municipal*

**Robert W. Doty**
*Curriculum Vitae*
**Page 13**

*Finance Officers Pre-Conference,* California Debt and Investment
Advisory Commission, Anaheim, CA

March 2012, Speaker: "Looming Traps for Unsophisticated Issuers,"
*2012 Bond Attorneys Winter Workshop*, Palm Beach, FL

April 2012, Speaker and Moderator: "Recent Securities Law
Developments Affecting Municipal Issuers," *Teleconference Series,*
International Municipal Lawyers Association

April 2012, "Recent Securities Law Developments Affecting Municipal
Issuers," *2012 Mid-Year Conference*, International Municipal Lawyers
Association, Washington, DC

May 2012, Speaker and Moderator: "Municipal Securities Rulemaking
Board's Role for the Protection of Issuers," *Teleconference Series,*
International Municipal Lawyers Association

Written and oral testimony prepared at the request of the House
Committee on Financial Services, Subcommittee on Capital Markets and
Government Sponsored Enterprises, at a Hearing on the Impact of the
Dodd-Frank Act on Municipal Finance on July 20, 2012

Aug. 2012, "*Diversity & Risks of Municipal Bonds,*" selected for
presentation at the 2012 Municipal Finance Conference conducted by the
Brandeis International Business School

Sept. 2012, "Major SEC Pronouncements Affecting Municipal Issuer
Rights and Responsibilities," *Teleconference Series,* International
Municipal Lawyers Association

Oct. 2012, Speaker, "Credit Disclosure in General Obligation and
General Fund Securities," *Advanced Distressed Debt Conference,*
National Federation of Municipal Analysts

Oct. 2012, Speaker: "Municipal Finance & SEC Regulations," and
Speaker and Moderator: "Recent SEC & MSRB Developments on
Municipal Securities Law & Disclosure," International Municipal
Lawyers Association, *2012 Annual Conference,* Austin, TX

March 2013, Speaker: "What Are General Obligation Bonds & General
Fund Securities & What Disclosure Is Appropriate?" *2013 Bond
Attorneys Winter Workshop*, Palm Beach, FL

March 2013, Speaker: "Diversity & Risks of Municipal Bonds," Arizona
State University School of Public Affairs, *Municipal Finance Challenge
2013*, Phoenix

**Robert W. Doty**
*Curriculum Vitae*
Page 14

April 2013, "Responsibilities of Municipal Advisors" and "Diversity & Risks of Municipal Bonds," U.S. Bank Trust Administrators Teleconferences

April-May 2013, Panelist: "Charter School and Conflicts of Interest Disclosure," National Federation of Municipal Analysts, *30th Annual Conference*, San Diego

July 2013, Speaker: "Charter School and Conflicts of Interest Disclosure," Gates Foundation/LISC Bond Investor Conference, New York

Sept. 2013, Speaker: "Best Practices and Principles for Improving Disclosure to Issuers in California," *2013 Annual Bond Buyer Pre-Conference,* California Debt and Investment Advisory Commission, Los Angeles

Sept. 2013, Speaker: "Recent SEC & MSRB Developments on Municipal Securities Law & Disclosure," International Municipal Lawyers Association, *2013 Annual Conference,* San Francisco

Feb. 2014, Speaker: "General Obligation Bonds?" *2014 Bond Attorneys Winter Workshop*, Palm Beach, FL

April 2013, Panelist, "Municipal Advisor Regulation" Bond Buyer Webinar

June 2014, Moderator, "SEC Self-Reporting Initiative for Issuers and Other Recent Disclosure Actions: Decisions for Municipal Lawyers," International Municipal Lawyers Association Webinar

July/August 2014, Discussant, "Bankruptcy Premium in the Municipal Securities Market," 2014 Municipal Finance Conference conducted by the Brandeis International Business School

Feb. 2015, Speaker: "Regulation of Municipal Advisors" *2015 Bond Attorneys Winter Workshop*, Palm Beach, FL

Apr. 2015, Speaker: "Recent Developments in Municipal Securities Law: How Municipal Officials Can Be Barred for Life!!" *2015 Mid-Year Conference, International Municipal Lawyers Association*, Washington, DC

June 2015, Speaker: "*Navigating Municipal Bond Offerings Amid Increased SEC Scrutiny and Enforcement*," Strafford Webinars

Oct. 2015, Panelist: "*The Past and Future of Municipal Securities: 40th Anniversary of the Municipal Securities Rulemaking Board*," Association for Budgeting and Financial Management,

**Robert W. Doty**
*Curriculum Vitae*
Page 15

Washington, DC, remarks published in 37(1) Mun. Fin. J. 1 (Spring 2016)

Apr. 2016, Moderator: "Recent Developments in Municipal Securities Law," *2016 Mid-Year Seminar, International Municipal Lawyers Association*, Washington, DC

July 2016, Discussant: Paper on "*Municipal Borrowing Costs and State Policies for Distressed Municipalities*," 5th Annual Municipal Finance Conference, The Brookings Institution, Brandeis University and Washington University, Washington, DC

Sept. 2016, Panelist and Moderator, "*Expanding Municipal Securities Enforcement: Profound Changes for Issuers & Officials*," International Municipal Lawyers Association, Washington

Sept. 2016, Speaker, "*Expanding Municipal Securities Enforcement: Profound Changes for Issuers & Officials*," California Debt and Investment Advisory Commission, Los Angeles

Oct. 2016, Panelist, "*Hot Topics in Municipal Securities Law*," Bond Attorneys Workshop, Chicago

March 2017, Panelist: "*GFOA Disclosure Guidelines: A Retrospective and Reappraisal*" National Association of Bond Lawyers 2017 Tax and Securities Law Institute, Washington, DC

Apr. 2017, Moderator and Panelist: "*Municipal Securities Disclosure: Selected Key Issues for Issuers & Officials*," International Municipal Lawyers Association 2017 Mid-Year Seminar, Washington, DC

May 2017, Speaker: "*Navigating Municipal Bond Offerings,*" Strafford Webinars

August 2017, Moderator and Panelist: "*Recent Developments in Municipal Securities Law*," International Municipal Lawyers Association Webinar

Sept. 2017, Speaker, "*Setting Standards of Practice for Consultants*," and Facilitator: "*Regulation and Your Consultants: Drawing the Line*," California Debt and Investment Advisory Commission, Carlsbad, CA

Oct. 2017, Panelist: "*Current Municipal Securities Issues for Issuers & Officials*," International Municipal Lawyers Association 2017 Annual Conference, Niagara Falls

Apr. 2018, Panelist: "*Key Focal Points for Issuer Counsel Regarding Bond Issues and Securities Law Compliance*," International Municipal Lawyers Association 2018 Mid-Year Seminar, Washington

**Robert W. Doty**
*Curriculum Vitae*
**Page 16**

Oct. 2018, Panelist: "*SEC's 2018 Amendments to Rule 15c2-12*,"
International Municipal Lawyers Association 2018 Annual Conference,
Houston

Nov. 2019, Moderator: "*Coping with the New Disclosure Mandates of
SEC Rule 15c2-12*," International Municipal Lawyers Association

Nov. 2019, Moderator: "*Managing Your Municipal Advisors*," and
Speaker: "*Fiduciary Duties of Municipal Advisors (And Counsel)*,"
International Municipal Lawyers Association

# Exhibit 5



KOBRE & KIM | DISPUTES AND INVESTIGATIONS

# The Financial Oversight & Management Board for Puerto Rico

Independent Investigator

## FINAL INVESTIGATIVE REPORT

Kobre & Kim LLP | AUGUST 20, 2018

# THE INDEPENDENT INVESTIGATOR'S

# FINAL INVESTIGATIVE REPORT

# THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO

## SPECIAL INVESTIGATION COMMITTEE

## INDEPENDENT INVESTIGATOR'S

## FINAL INVESTIGATIVE REPORT

\*

### SUBMITTED BY:

### THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO

### SPECIAL INVESTIGATIVE COMMITTEE

### INDEPENDENT INVESTIGATOR

### KOBRE & KIM LLP

Pursuant to The Puerto Rico Oversight, Management and Economic Stability Act of 2016, Sections 101(b), 104(o)
and PROMESA Investigative Procedures Sections 1.3(10), 2.1(b)(1), 3.1(a).

When POBs are issued but a pension's long-term funding does not improve, understanding what happened requires investigation of several potential factors, including whether the issuer understood the risks involved or followed the advice of its advisors and experts, and whether reasonable projections at the time of the issuance ultimately were not met because of unforeseen events.  We investigated those issues and others in connection with the issuance of the ERS Bonds.  Our findings are discussed below.

## C.   Events Leading Up to the Issuance of the ERS Bonds in 2008

### 1.   A 2004 POB Proposal Stalled in the Legislature

In the early 2000s, a number of investment banks had pitched the idea of POBs to address the chronic underfunding of ERS.  According to several witnesses, following the election of Governor Acevedo Vilá in 2004, decision-makers at GDB were interested in pursuing POBs, and selected Citibank as lead underwriter to put a proposal together.  The proposal was structured like a typical POB:  Puerto Rico would issue $2 billion in bonds payable from the General Fund and secured by a pledge of Puerto Rico's full faith, credit and taxing power as well as ERS's pension fund assets.  ERS would receive the net proceeds from the bond sale and invest them to create arbitrage.[18]

Like other general obligation bonds, Citibank's proposed POBs would require legislative authorization.[19]  Ultimately, that authorization was never provided.  Acevedo Vilá's term in office was a divided government, with his administration and the majority of the Legislative Assembly hailing from rival political parties.  Legislation was proposed that would authorize the POB issuance and also increase the statutory levels of public employer and employee contributions to ERS. It was projected that the legislation, had it been approved, would have improved ERS's funding ratio from 19% to 35% and covered its obligations through 2021.  The legislation was approved by the Senate, but it ultimately stalled when the House of Representatives never brought it to a vote.[20]

### 2.   Merrill Lynch's November 2006 and Revised August 2007 POB Proposals Avoided the Need for Legislative Approval

In November 2006, another investment bank, Merrill Lynch, made a proposal to GDB for a POB issuance that was structured so as not to require the Legislative Assembly's approval.

---

[18] Commonwealth of P.R., *Official Statement for Tax Revenue Anticipation Notes, Series 2006,* I-40 (2005) (Commonwealth of P.R., *Financial Information and Operating Data Report for Year Ending June 30, 2005* (Dec. 1, 2005)) ("In addition, legislation has been submitted that, if enacted, will authorize the issuance of pension obligation bonds ("POBs"). The POBs will contribute approximately $2 billion in assets to the Employees Retirement System and will be payable solely from the Commonwealth's General Fund.").

[19] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, IV-27 (2008); (Commonwealth of P.R., *Financial Information and Operating Data Report* (Jan. 1, 2008)) ("Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case.").

[20] Goldman Sachs & Co. Investor Conference Call (May 16, 2006) ("The pension bonds have been approved by one of the houses and not the other.  The House of Representatives is still thinking about it.").

Merrill Lynch's initial proposal shared similarities to the COFINA structure that Puerto Rico had created earlier that year to issue bonds secured by a dedicated stream of SUT revenue. The proposal would have ERS assign its right to statutorily mandated Employer Contributions to a grantor trust. The trust would then issue POBs secured by its incoming stream of Employer Contributions and transmit the bond proceeds back to ERS.

The initial proposal contemplated the trust would issue an amount of POBs sufficient to provide $6.5 billion in net proceeds at an average interest cost of 6% with a final maturity of 2057. Merrill Lynch estimated this would keep ERS solvent for another ten to eighteen years.

An important feature of the structure Merrill Lynch proposed is that the POBs would only have recourse to the incoming stream of Employer Contributions, and not to ERS's assets. In other words, bondholders would not be able to seek payment from any of ERS's current assets or out of any funds payable to ERS in the future from employee contributions, government funding, and Employer Contributions in excess of the amount needed to make monthly payments on the bonds.

Perhaps most importantly under the circumstances, because the financing would be initiated by ERS and not Puerto Rico, the expectation was that the debt of the trust would not be consolidated with Puerto Rico's financial statements. As a result, Merrill Lynch believed ERS would not need to obtain legislative approval before proceeding. In fact, prior to delivering the proposal, a Puerto Rico law firm, Fiddler, reviewed the structure. Fiddler believed that the proposed structure did not require additional approval by the Legislative Assembly and that the transaction could be executed by ERS pursuant to existing law.

### (a)      ERS Authorized Merrill Lynch's Initial Proposal to Move Forward

Merrill Lynch's initial proposal was attractive to GDB decision-makers, who presented it to the ERS Board for preliminary authorization on February 27, 2007. The ERS Board considered, among other things, that: (i) ERS's payment obligations were exceeding its incoming contributions by an increasing amount each year with a projected 2007 deficit of $167 million; (ii) continued deficits would deplete its existing assets by 2015; and (iii) the Citibank proposal remained stalled in the Legislative Assembly. The Board also evaluated the size and structure of the Merrill Lynch proposal and its impact on ERS's funding ratio. Specifically, because bondholders would have no recourse to ERS assets, the view of Merrill Lynch's underwriting team—to which ERS and GDB agreed—was that the addition of $6.5 billion or more of bond proceeds to ERS's existing $2.3 billion of assets would raise the funding ratio from 19% to 72%. Finally, municipalities outside of Puerto Rico were using POBs, with reportedly more than $47 billion of POBs issued in the prior two decades. Members of the ERS Board considered the risks of the proposal, including the risk that, like all POBs, the market does not behave as expected resulting in an inability to invest the proceeds to make sufficient returns to cover the cost of the bonds. The ERS Board then authorized Merrill Lynch to go forward with preparing the transaction.[21]

---

[21] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, II-22 (2008) (Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Basic Financial Statements for the Years Ended June 30, 2007 and 2006* (Dec. 28, 2007)).

# Exhibit 6

FIDDLER GONZALEZ & RODRIGUEZ, P.S.C.

ATTORNEYS AND COUNSELORS AT LAW

PO BOX 363507

SAN JUAN, PR 00936-3507

TELEPHONE (787) 753-3113
FAX (787) 759-3123

254 MUÑOZ RIVERA AVENUE
CORNER CHARDÓN STREET
6TH FLOOR
HATO REY, PR 00918

March 9, 2007

Mr. Juan A. Cancel Alegría
Administrator
Employees Retirement System of
  the Government of the Commonwealth
  of Puerto Rico
437 Ponce de León Avenue
San Juan, Puerto Rico  00940

Dear Mr. Cancel:

At your request, we have examined Act No. 447 of May 15, 1951, as amended (the "Act 447")[1] to determine whether the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "System") may issue bonds secured by a pledge of employer contributions payable to the System pursuant to Act 447. For the reasons stated below, we believe that the System is able to issue such bonds and secure their payment with a pledge of such contributions.

***Facts and Assumption:***

The System was created pursuant to Act 447. The System is a public retirement system and is not subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended.

The System intends to enter into a transaction whereby it would issue "non-recourse" obligations in the form of bonds or notes payable from and secured by a pledge of future statutory employer contributions to the System (the "Transaction"). These obligations (the "Bonds") will be "non-recourse" to the System, which means that no other assets of the System will be pledged or encumbered for the benefit of the holders of the Bonds. Therefore, if the employer contributions pledged are not sufficient to pay the Bonds, neither the System nor any other entity (including the Commonwealth of Puerto Rico, its instrumentalities and political subdivisions) will be liable or responsible for the payment of such Bonds.

---

[1] 3 L.P.R.A. § 761 et. seq.

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -2-

**Questions:**

1.  Is the System authorized to issue the Bonds?
2.  If it may issue the Bonds, is the statutory right of the System to receive future employer contributions a legal asset[2] of the System that may be pledged to secure the payment of the Bonds?

**Discussion:**

Section 4-105(d) of Act 447 states:

"(d) Authorization to incur debts.-- ***The Board of Trustees may authorize the Administrator to seek a loan*** from any financial institution, the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or ***through the direct placement of debts, securing said debt with the assets of the System.*** The interest accrued by these obligations shall be exempt from the payment of income tax to the Commonwealth of Puerto Rico." 3 L.P.R.A. §779(d) (Emphasis added)

Therefore, Section 4-105(d) of Act 447 provides statutory authority for the System to issue debt that is secured with the assets of the System. The question then is whether the right of the System to receive future employer contributions is a legal asset of the System within the meaning of Section 4-105(d) of Act 447 that can be used to secure those debts issued by the System.

Section 2-116 of Act 447 establishes the obligation of employers[3] to make contributions to the System. The relevant subsections for this analysis are (a), (e) and (g) and read as follows:

"(a) The employer's contributions should cover the difference between the total cost of the benefits provided by the System as well as costs of administration, reduced by the portion contributed by participants.

---

[2] We make reference to "legal asset" because we are opining as to the treatment of certain rights and obligations under the law and we are not opining as to the accounting status of these obligations and rights under Generally Accepted Accounting Principles or any other accounting principles that may apply.

[3] "Employers" is defined under Act 447 to mean the Government of Puerto Rico, or any Public Enterprise, or municipality. In relevant part, Act 447 defines "Public Enterprise" as any government instrumentality of the Commonwealth of Puerto Rico heretofore or hereafter created. It does not, however, include those subsidiary enterprises of government instrumentalities whose employees, in the judgment of the Board of Trustees of the System, may not have a clear relationship of "employee and employer with regard to the Commonwealth of Puerto Rico." Therefore, our use of the term "employers" includes other entities separate from the Commonwealth of Puerto Rico.

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -3-

"(e) Any difference between the contribution required by subsection (c)(3) of this section and the minimum contribution of 9.275% mentioned above shall constitute a deficiency in the employer contribution. The *obligation accrued* as a result of this deficiency shall constitute an actuarial deficit for the System *and an obligation of the employer.*

"(g) The contributions of each employer shall be included in the budget and shall be appropriated annually together with appropriations for salaries or compensation of employees." 3 L.P.R.A. §781 (Emphasis added)

Section 3-105 of Act 447 also provides that in the case of participants of "Sistema 2000", employer contributions are also obligations of the employers.  Section 3-105 of Act 447 states that:

"Every employer *shall compulsorily contribute* to the System a sum equal to nine point two hundred and seventy-five percent (9.275%) of the salary of each participant of the Program as long as the participant is an employee. These contributions shall be deposited in the System to increase the level of the assets of the System, reduce the actuarial deficit, and enable the System to meet its future obligations. 3 L.P.R.A. §786-5 (Emphasis added)

Section 4-113 of Act 447 also provides that:

"It is the intent of this Act that the contributions required from the employer, as well as all annuities, benefits, reimbursements, and administration expenses, *shall constitute obligations of the employer.*" 3 L.P.R.A. §787 (Emphasis added)

Sections 2-116(e), 3-105 and 4-113 of Act 447 clearly establish that the obligations to make contributions by the employer are obligations of the subject employer to the System.

Article 1042 of the Puerto Rico Civil Code (the "Civil Code") establishes that:

"Obligations are created *by law*, by contracts, by quasi contracts, and by illicit acts and omissions or by those in which any kind of fault or negligence occurs." 31 L.P.R.A. § 2992 (Emphasis added).

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -4-

In addition, Article 1043 of the Civil Code establishes that:

"Obligations arising from law are not presumed. Those expressly determined in this Code or in special laws are the only demandable ones, and they shall be governed by the provisions of the laws which may have established them and by those of this subtitle in regard to what has not been prescribed by said laws." 31 L.P.R.A. §2993

Therefore, the obligation of employers to the System is demandable since it is an express obligation stated in Sections 2-116(e), 3-105 and 4-113 of Act 447. In addition, said obligation is governed by Act 447 as the special law that established the obligation and by the Civil Code in regard to what has not been prescribed by Act 447.

The obligations of the employers to make contributions to the System are obligations of the employers on one hand and a right of the System to receive those contributions on the other. In other words, a liability for the employers and an asset for the System. The Civil Code does not use the words "liabilities" or "assets" but uses equivalent terms such as "obligations" and "property" or "bienes" in Spanish, which the Supreme Court of Puerto Rico has equated to "assets." See, *Díaz v. Alcalá*, 140 D.P.R. 959 (1996).

Article 252 of the Civil Code states:

"The word *property* is applicable in general to anything of which riches or fortune may consist. This word is likewise relative to the word *things*, which is the second object of jurisprudence, the rules of which refer to persons, things and actions." 31 L.P.R.A. §1021 (Emphasis added)

Article 258 of the Civil Code states:

"Things are furthermore divided into corporeal and incorporeal. Corporeal things are such as are manifest to the senses, which may be touched or tasted, whether animate or inanimate. Of this kind are fruits, corn, gold, silver, clothes, furniture, lands, meadows, woods, houses and others.

*"Incorporeal things are such as are not manifest to the senses, and which are conceived only by the understanding, such as the rights of inheritance, servitudes and obligations."* 31 L.P.R.A. §1027 (Emphasis added)

In *Díaz v. Alcalá*, supra, the Supreme Court recognized the right of a future income flow as an asset. *Id.* at pages 972-973. This case discussed the right of lucrum cessans as "property." In the discussion the Supreme Court cited Civil Code

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -5-

commentators that offer bases for their analysis. For instance, Eduardo Vázquez Bote
points out:

> "[C]onsidering juridical evolution, there seem to be sufficient grounds to
> state, aside from the Civil Code's lack of rigor, that the word property is
> broader than the word things, as Planiol says. Although originally the
> word property referred fundamentally to corporeal objects, and
> specifically to immovables, the progress of juridical life and modifications
> made in the social conscience have greatly broadened its scope to
> encompass everything that constitutes an element of fortune and wealth
> that may be subject to appropriation. In this sense, property encompasses
> all kinds of things: houses, lands, movables, credits, rents, royalties,
> invention patents, etc. Thus, it includes, together with material things, a
> certain number of incorporeal assets: the rights." 7 Eduardo Vázquez Bote,
> Tratado teórico, práctico y crítico de derecho privado puertorriqueño:
> derechos reales 4-5, Oxford, Equity Pub. Co. (1991).[4]

Based on the above discussion, the obligation of the employers to make
contributions to the System pursuant to Act 447 is an incorporeal *thing* and *property*
owned by the System, and, therefore, a legal asset of the System. Section 4-105(d) of Act
447 does not suggest that assets of the System that may be used as security for its debts
are "accounting assets" and our opinion does not address whether any legal assets are
accounting assets. The context in which Section 4-105(d) of Act 447 uses the term
"asset" addresses the legal nature thereof, in other words, that such assets be legally
available to creditors of the System holding the subject debt secured by such assets and
not an "accounting asset" which is an asset for accounting purposes of the System.

Act 447 per Section 4-105(d) quoted above, expressly permits the System to issue
debt secured by its assets, and the Bonds will be such a debt of the System because each
Bond will be a promise by the System to repay the amount borrowed. The Bonds will be
"non-recourse" obligations, and the only asset of the System that the holders of the Bonds
may look to for payment is the future employer contributions and not the other assets of
the System, including the proceeds from the sale of the Bonds and the invested assets of
the System.

The total amount of debt that the System may incur pursuant to Section 4-105(d)
of Act 447 will depend upon the total legal assets of the System. As per our discussion
above, said legal assets include the right to receive future employer contributions from
employers. Given the fact that the Bonds are not secured by other assets of the System
other than the right to receive future employer contributions from employers, the amount

---

[4] As cited in English in the official translation of *Díaz* v. *Alcalá*, supra, by the Supreme Court on Footnote
4, 1996 WL 940337 (May 28, 1996).

Mr. Juan A. Cancel Alegría
Employees Retirement System of the Government of the Commonwealth of Puerto Rico
March 9, 2007
Page -6-

of the Bonds that the System may issue will depend upon the value of the legal asset
being pledged[5] and not the value of the other assets of the System.

### *Conclusions:*

Based on the foregoing, it is our opinion that:

1. The System is authorized pursuant to Section 4-105(d) of Act 447 to incur
   debt secured by the assets of the System, and the Bonds are such a debt.
2. The statutory right of the System to receive future employer contributions
   pursuant to Sections 2-116(e), 3-105 and 4-113 of Act 447 is an obligation
   of the employers and a legal asset of the System.
3. As a legal asset of the System, this right may be pledged to secure the
   Bonds.

This opinion is furnished to you and is not to be used, circulated, quoted or
otherwise referred to for any other purposes without our express written consent;
provided, however, that you may provide a copy to your external auditors and actuaries.
We hereby consent to their reliance on this opinion related to their audit and financial
accounting analyses of the System in connection with the Transaction. In authorizing
you to provide such a copy to your auditors and actuaries, we are not undertaking or
assuming any duty or obligation to or establishing any lawyer-client relationship with
them. Furthermore, we do not undertake or assume any responsibility with respect to
your financial statements, and we have no obligation to update this opinion.

Very truly yours,

Fiddler Gonzalez & Rodriguez, PSC

---

[5] In the case of future employer contributions payable to the System, this value could reasonably be the
present value or equivalent value of the expected future revenue flow.

# Exhibit 7

## FRONT PAGE

27

**CARIBBEAN BUSINESS** THURSDAY, AUGUST 16, 2007

# Can the ERS issue $7 billion in bonds without legislative approval?

BY CARLOS MÁRQUEZ
cmarquez@casiano.com

For at least the last two years $2 billion in bonds to address the unfunded liabilities of the ERS has been waiting for legislative approval of the House of Representatives.

The unfunded pension fund liability is the gap between what has been promised to retirees and what is likely to be available to meet those promises. To close this gap the ERS is planning to issue $7 billion in Pension Funding Bonds (PFB) starting in October.

So how come the ERS can now issue up to $7 billion in bonds without legislative approval when it couldn't issue $2 billion?



According to sources, the $2 billion issue contemplated in the bill would have carried the guarantee of the full faith and credit of the government of Puerto Rico, technically making the payment of the debt a constitutional commitment and increasing the commonwealth public debt, therefore requiring legislative approval. But the PFB expected to be issued by the ERS is different.

Fiddler, González & Rodríguez (Fiddler), at the request of Juan Cancel Alegría, administrator of the ERS, wrote an opinion March 9, 2007 that the ERS may issue bonds secured by a pledge of employer contributions payable to the ERS pursuant to Law No. 447.

"We believe the system is able to issue such bonds and secure their payment with a pledge of such contributions," states the opinion.

A copy of Fiddler's opinion obtained by CARIBBEAN BUSINESS addresses two fundamental questions: First, is the ERS authorized to issue the bonds? Second, if it may issue the bonds, is the statutory right of the ERS to receive future employer contributions a legal asset of the ERS that may be pledged to secure the payments of the bonds?

**FIDDLER'S OPINION CONCLUDES:**

"The System (ERS) is authorized pursuant to Section 4-105 (d) of Law No. 447 to incur debt secured by the assets of the ERS and the Bonds are such a debt. The statutory right of the system to receive future employer contributions pursuant to Section 2-116 (e), 3-105 and 4-113 of Law No. 447 is an obligation of the employers and a legal asset of the ERS. As a legal asset of the ERS, this right may be pledged to secure the Bond."

The proceeds are expected to help the ERS fund its pension liability. The hope is that the debt service on the bonds will be less than the

commonwealth employers (general fund, public corporations and municipalities) would otherwise have to pay in annual pension cost increases over the long term to cover the unfunded liabilities of the ERS.

The risk is that if the invested proceeds of the bonds do not realize a rate of return in excess of the cost of capital, new unfunded liabilities could arise. Similarly, if a plan is sought to achieve financial stability in the short term by virtue of the PFB issuance, there may be a temptation on the part of elected officials to sweeten pension benefits, which will increase liabilities. ■



WAY  BEYOND CHIC,
THERE'S EL SAN JUAN.

FROM
$179*
per room
per night

The most stunning hotel in Puerto Rico dazzles the senses once more with the coolest ambiance and a multimillion dollar, complete renovation that brings you San Juan's newest "in" nightspot, the Gold Bar; an *al fresco* zen landscaping sizzling with sensuous waterworks, the Encanto Beach Club & Grill; an alluring retro pool with ocean vistas; and completely reimagined, totally luxurious accommodations. So, are you in?


EL SAN JUAN HOTEL & CASINO

FOR RESERVATIONS PLEASE CALL 877-203-1365 OR VISIT WWW.ELSANJUANHOTEL.COM

LUXURY RESORTS
& HOTELS

*Rate valid through Nov. 21, 2007 for single or double occupancy, per room, per night, subject to availability. Rate may not be combined with other offers nor is it valid for groups, conventions or prior reservations. Does not include 11% government tax nor 14% hotel tariff. Minimum stay 2 nights, other restrictions apply.


JUAN CANCEL
ALEGRIA

**EXHIBIT 06**

06 - 05 - 2020

Copyright of Caribbean Business is the property of Casiano Communications and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.