# Exhibit 80



*Enviar Copi—
a la Comisión del
Trabajo y a la
Comisión de Gobiern*

## Secretaría

**MANUEL A. TORRES NIEVES**
SECRETARIO DEL SENADO

☐ Ver al dorso
☐ Para su información
☐ Notas
☐ Para mantenerle al día
☑ Expediente
☑ Dar Cuenta
☑ Registrar y Procesar



EL CAPITOLIO
PO Box 9023431
San Juan, Puerto Rico
00902-3431

T: 787.722.3460
   787.722.4012
F: 787.723.5413
E: mantorres@senadopr.us
W: www.senadopr.us

CONFIDENTIAL                                    ERS_0046058

## REFERIDO A:

## COMISIONES PERMANENTES

- [ ] Hacienda
- [ ] Gobierno
- [ ] Seguridad Pública y Judicatura
- [ ] Salud
- [ ] Educación y Asuntos de la Familia
- [ ] Desarrollo Eonómico y Planificación
- [ ] Urbanismo e Infraestructura
- [ ] Jurídico Penal
- [ ] Jurídico Civil
- [ ] Agricultura
- [ ] Recursos Naturales y Ambientales
- [ ] Comercio y Cooperativismo
- [ ] Turismo y Cultura
- [ ] Trabajo, Asuntos del Veterano y Recursos Humanos
- [ ] Bienestar Social
- [ ] Asuntos Municipales
- [ ] Recreación y Deportes
- [ ] Banca, Asuntos del Consumidor y Corporaciones Públicas
- [ ] Desarrollo de la Región del Oeste
- [ ] Asuntos de la Mujer
- [ ] Asuntos Internos
- [ ] Reglas y Calendario
- [ ] Asuntos Federales
- [ ] De la Montaña
- [ ] Ética

## COMISIONES ESPECIALES

- [ ] Puerto de las Américas
- [ ] Derecho de Autodeterminación del Pueblo de Puerto Ríc
- [ ] Sobre Reforma Gubernamental

## COMISIONES CONJUNTAS

- [ ] Informes Especiales del Contralor
- [ ] Donativos Legislativos de Puerto Rico
- [ ] Internado Córdova-Fernós
- [ ] Internado Pilar Barbosa
- [ ] Internado Ramos Comas
- [ ] Código Penal
- [ ] Revisión y Reforma del Código Civil
- [ ] Alianzas Público Privadas
- [ ] Auditoría Fiscal y Manejo Fondos Públicos
- [ ] Revisión Continua Código Penal y Reforma de las Leyes

CONFIDENTIAL

ERS_0046059



Iniciales

*Oficina del Presidente*

Katherine Erazo
CHIEF OF STAFF

Fecha _18 octube 2010_

Referido a _Manuel Torres_

Para su información
Evaluar y recomendar
Para trabajar y contestar directamente
Dar cuenta al cuerpo
Para otorgar contrato
Para nombramiento
Autorizado

CONFIDENTIAL                                    ERS_0046060



**Gobierno de Puerto Rico**
**ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO**
**DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA**
**PO BOX 42003 • SAN JUAN, PR 00940-2203**

18 de octubre de 2010

Hon. Tomas Rivera Schatz
Presidente
Senado de Puerto Rico

Estimado señor Presidente:

Adjunto para su conocimiento, copia del Informe Independiente sobre los eventos y decisiones que han causado la Crisis Financiera de los Sistemas de Retiro de los Empleados del Gobierno de Puerto Rico.

El mismo está siendo divulgado a la prensa el día de hoy y referido para la acción correspondiente al Departamento de Justicia así, como la Oficina de Ética Gubernamental y la Oficina del Contralor.

Estoy a su disposición para contestar cualquier pregunta al respecto.

Atentamente,

Héctor M. Mayol Kauffman
Administrador

Anejos

Informe de Conway Mackenzie
Comunicado de Prensa
Presentación a la Prensa
Cartas de referidos

CONFIDENTIAL

ERS_0046061

Anejo 1



# Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico

## *Report*

*Prepared for*

## Employees Retirement System of Government of Puerto Rico and Government Development Bank for Puerto Rico, as Fiscal Agent of the Government of Puerto Rico

*Submitted by*

## Conway MacKenzie, Inc.

October 2010

CONFIDENTIAL

# Table of Contents

| | | |
|---|---|---:|
| Section 1 | Scope of Assignment | 2 |
| Section 2 | Findings | 3 |
| Section 3 | Summary of Conclusions | 20 |
| | Exhibits | 22 |

CONFIDENTIAL

ERS_0046063

## Section 1 – Scope of Assignment

On June 30, 2010, Conway MacKenzie, Inc. ("Conway MacKenzie") was retained to prepare for the Employees Retirement System and the Government Development Bank for Puerto Rico, as fiscal agent, (the "GDB") this report and to provide professional services in connection with its review of the Employees Retirement System (hereafter referred to as the "ERS," or "System") of the Government of Puerto Rico (the "Government").

Conway MacKenzie was retained to identify, analyze, and summarize the key events and decisions that have created the current financial crisis of the ERS. Specifically, Conway MacKenzie was engaged to:

- Review historical decisions, transactions and other actions taken by the Board of Trustees of the ERS and the Board of Directors of the GDB, or any committees thereof, to evaluate the deterioration in the funding ratio, and other key indicators, of the ERS during the period of June 2004 to December 2008;

- Review financial projections, budgets, strategic plans and other information to assess the current financial situation of the ERS, including analysis and validation of key assumptions;

- Review the analyses supporting the issuance and utilization of funds related to the issuance of Senior Pension Funding Bonds by the ERS in fiscal year 2008; and

- Review compliance with certain laws and regulations applicable to the ERS, including the Fiscal Reform Law of 2006, by the Board of Trustees of the ERS and the Board of Directors, or any committees thereof, of GDB.

In undertaking this assignment, Conway MacKenzie made multiple site visits to both the ERS and GDB offices, located in Puerto Rico. Conway MacKenzie also interviewed, either telephonically or in-person, a number of key personnel from the ERS. Lastly, Conway MacKenzie reviewed and analyzed various documents including, but not limited to:

- Historical meeting minutes of the GDB Board of Directors (from 2005 through 2008)
- Historical meeting minutes of the ERS Board of Trustees (from 2004 through 2009)
- Actuarial valuation reports of the ERS
- Historical financial statements of the ERS
- Various financial analyses prepared by ERS personnel
- GDB transaction files related to the Pension Obligation Bonds ("POB") transaction of the ERS
- Various presentations prepared by the ERS or outside parties

A complete list of documents relied upon is included as **Exhibit 1**.

2

## Section 2 – Findings

The Employees Retirement System of the Government of Puerto Rico is a trust funded by the contributions of active participants, governmental employers and proceeds from its investment portfolio to pay pensions and other post-employment benefits of government retirees. The current System was created by Act 447 of May 15, 1951 and, since its inception, has lacked proper planning and contribution levels.

The ERS is divided into three benefit structures and administers two separate retirement plans: a defined benefit plan and a defined contribution plan. Contributions to the ERS are set by legislation, and not determined by actuarial calculations. This has negatively impacted funding of the System due to statutorily required contributions being less than actuarially determined required contribution levels for years. The responsibility for the proper operation and administration of the System is vested with the Board of Trustees. As currently structured, the System has inadequate contribution levels relative to benefit obligation requirements, resulting in negative cash flows, a deteriorating asset base and declining funding ratios. Historically, the System has largely ignored many warning signs and addressed and cured its cash flow issues in various temporary ways including the sale of investments, obtaining loans from financial institutions and using Pension Obligation Bond proceeds.

Actions taken by the ERS to improve its fiscal health and reverse the increasing actuarial liability and deteriorating funding ratio have not been successful. If these problems are not properly addressed and the System is not restructured immediately, annual cash shortfalls will render the ERS insolvent in the near future. While the structure of the System has been fundamentally broken for years, certain concrete actions and events from 2004 to 2008 have exacerbated its problems.

### Findings

Upon the conclusion of our work, we believe the following factors have been fundamental in the deterioration in the ERS's financial health throughout its nearly 60 year history, and particularly during our review period which primarily focused on years 2004 and beyond:

- Inadequate Funding Procedures;
- Special Laws;
- Early Retirement Programs;
- Personal Loans; and
- 2008 Pension Obligation Bond Transactions.

Our findings indicate that the System has essentially been underfunded since its inception in 1951. The underfunding is a direct result of statutory funding requirements that fall below actuarially determined contribution rates. In addition to deficient annual contributions, investment returns and other recurring income levels have been insufficient to cover the System's annual benefit payments and other operating obligations, resulting in negative cash flows. As a result, the System has been forced to liquidate nearly all of its net plan assets to address cash flow shortfalls. In order to bolster the System's prospects of long-term solvency, an increase in the statutorily required contribution rates will be

3

necessary, and only sufficient to reverse the ERS fiscal crisis if done in combination with other actions, some of which are mentioned throughout this report.

We also noted that Special Laws, which grant incremental retirement benefits to participants beyond those which are provided for under the Act 447 and Act 1 benefit structures, have exacerbated the System's fiscal situation through the years. In fact, many Special Laws that were passed appear to have failed in securing long-term, viable funding sources to compensate for their economic burden to the ERS. As a result, the System has shouldered the obligation of funding many Special Law benefits resulting in significant past-due receivables as many public corporations and municipalities simply could not afford to finance these incremental obligations. Since Special Law benefits are not an explicit component of the ERS, we believe the underlying legislation should be revisited and analyzed to determine whether much needed structural changes can be enacted, which would serve to reduce or eliminate unfunded Special Law payments, thereby strengthening the fiscal position of the Government, its various municipality and public corporation employers, and most importantly, the ERS.

Another factor which has aggravated the System's fiscal situation is early retirement programs. These programs were promoted by the Government of Puerto Rico in order to reduce the size of the public workforce, thereby decreasing payroll costs, which account for a substantial portion of the Government's general budget. Based on available information provided, it appears that early retirement programs did not accomplish their intended goals. In addition, since many of these programs were not funded up-front by the sponsoring employers, the ERS continues to remain exposed to collection problems, as well as future cash flow deficits, assuming the System funds additional early retirement benefits for which it is unable to collect reimbursement. It is therefore important that any additional early retirement programs enacted be funded in advance by the sponsoring employer in order to minimize the potential negative cash flow impact on the ERS.

Furthermore, the decision by the ERS to increase the maximum loan balance for personal loans from $5,000 to $15,000 in 2007 has resulted in a significant cash drain to the System amounting to nearly $600 million over the past four fiscal years. These negative cash flows have been funded by the System and necessitated the liquidation of plan assets. In addition, Conway MacKenzie did not come across any documented discussions or relevant documentation which indicated that the decision to increase the personal loan caps in 2007 was supported by a thorough analysis of its projected impacts on the System's financial health. As a result, we believe that both the System Administrator and Board of Trustees in office during 2007 may have failed to meet the requisite standards of due care and fiduciary duties in approving these changes.

Lastly, we believe that the POB transactions may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS. In fact, the strategy has not improved the funded position of the System and, due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future

4

CONFIDENTIAL

administrations of the ERS.   In addition, several warning signs, which suggested that the full implementation of the POB strategy would be difficult, if not impossible, were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008).  For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction.

There is a very strong possibility that without immediate, dramatic and encompassing changes to the structure of the System, the aforementioned dynamics will result in the full depletion of the System's net assets in the near future, potentially as early as 2014 as indicated in the ERS's 2009 actuarial valuation report prepared by ERS' actuarial Milliman without the POB available funds and 2018 if using POB available funds.

## Causes of Distress for the Employees Retirement System

The following section provides a more thorough summary of Conway MacKenzie's findings and conclusions as it pertains to the previously mentioned factors which have been fundamental in the deterioration of the ERS.

### Inadequate Funding Procedures

The current employee and employer contribution rates paid to the System are statutorily determined and have not changed since 1990, despite a precipitous drop in the System's funding status and the net assets of the ERS.  These contributions are significantly below both the Annual Required Contribution ("ARC"), as determined by the actuarial valuation reports, and the level required to meet benefit and other operating obligations of the System.  In fact, the amounts of the annual employee and employer contributions have historically been insufficient to cover even new actuarial liabilities incurred on an annual basis.  As a result, the funding ratio continues to deteriorate.  The following chart depicts the significant difference between historical employer contributions to the System and the ARC during our review period.[1]   As demonstrated below, during the 2004 – 2010 period, the ERS amassed an accumulated ARC deficit of nearly $3.1 billion.

---

[1] The data included in this graph was taken directly from the ERS's June  30, 2009 and 2005 Audited Financial Statements, as well as the ERS's June 30, 2009 Actuarial Valuation Report, as prepared by Milliman.  Actual Employer Contribution for the year ended June 30, 2010 is an estimate and assumes contributions of 9.275% of expected payroll for the basic system benefits, plus contributions of $149.9 million for special law pension benefits, plus contributions of $42.7 million for early retirement incentives.

5

Historical Employer Contribution versus Actuarial Required Contribution
for years ended June 30, 2004 to 2010



In addition, annual contributions and investment and other recurring income have not been sufficient to cover annual benefit payments and other operating obligations. As a result, the ERS is being forced to liquidate System assets in order to meet payment obligations. System assets are expected to continue to decline as negative cash flow (contributions less benefit payments) exceeds current and projected investment income. Simply put, the System is liquidating assets to meet its current obligations. The following chart highlights the anticipated cash flow shortfalls for plan years ended June 30, 2010 through 2020 under current laws, as well as the estimated declines in net plan assets through the same period.[2]

---

[2] The figures in this chart were obtained from the ERS's June 30, 2009 Actuarial Valuation Report, as prepared by Milliman. Certain key assumptions utilized in compiling this analysis are as follows:

- Estimated net plan assets at year-end assumes that the investment return assumption of 7.5% is met;
- Estimated payroll is assumed to grow 2.5% annually;
- Member and employer contributions were estimated to be 17.55% of estimated payroll for each plan year;
- The estimated benefit payments do not include amounts expected to be made to future participants, such as refund or contributions to terminated non-vested participants, disability benefits, death benefits, or retirement benefits due to service purchase, and thus are slightly understated;
- Administrative expenses are assumed to grow 2.5% annually,
- Contributions on behalf of and benefit payments to members of System 2000 are included in the table, and
- Estimated gross plan assets submitted by Milliman

6

CONFIDENTIAL

*($ millions)*

| Year Ended June 30 | Estimated Payroll | Estimated Member and Employer Contributions | Estimated Benefit Payments and Administrative Expense | Net Cash Flow | Estimated Net Plan Assets at Year-End | Estimated Gross Plan Assets at Year-End |
|---|---|---|---|---|---|---|
| 2010 | $4,293 | $753 | $1,181 | ($428) | $1,546 | $4,554 |
| 2011 | 4,400 | 772 | 1,191 | (419) | 1,228 | 4,284 |
| 2012 | 4,510 | 792 | 1,210 | (418) | 887 | 3,996 |
| 2013 | 4,623 | 811 | 1,231 | (420) | 518 | 3,684 |
| 2014 | 4,739 | 832 | 1,258 | (426) | 115 | 3,342 |
| 2015 | 4,857 | 852 | 1,292 | (440) | (333) | 2,961 |
| 2016 | 4,978 | 874 | 1,330 | (456) | (831) | 2,534 |
| 2917 | 5,102 | 895 | 1,370 | (475) | (1,385) | 2,055 |
| 2018 | 5,230 | 918 | 1,415 | (497) | (2,005) | 1,517 |
| 2019 | 5,361 | 941 | 1,464 | (523) | (2,697) | 913 |
| 2020 | 5,495 | 964 | 1,513 | (549) | (3,469) | 236 |

In order to bolster the prospects of the System's long-term solvency, an increase in the statutorily required contribution rates will be necessary, but that alone will most likely not be sufficient. Conversely, decreases in ERS benefits could also serve to bridge the gap between the statutorily required contributions and the ARCs, thereby enhancing the ERS's long-term solvency prospects. However, reductions in benefit obligations are considered long-term corrections and will not address the System's immediate cash flow issues. While such changes are both straightforward and logical, they remain long overdue as numerous actuarial recommendations stressing the need to implement these changes have been submitted to the ERS for decades. Unfortunately, failure to address the mismatch between benefits earned and contributions made has now resulted in the near total elimination of net plan assets and put the System at the brink of not being able to make current benefit payments.

## Special Laws

Special Laws, which are a series of post-employment benefits granted to ERS participants through enabling legislation passed by previous legislators and governors, provide incremental retirement benefits to participants beyond those which are provided for under the Act 447 and Act 1 benefit structures and include:

- Additional minimum pension benefits;
- Additional minimum death benefits;
- Ad-hoc cost-of-living adjustments (COLAS) provided in past years;
- Additional benefits due to death or disability for reasons specified in Act 127 (specified high-risk positions who died in line of work);
- Medical insurance plan contributions;
- Summer bonuses;
- Medication bonuses; and
- Christmas bonuses.

Many of the Special Laws appear to have been introduced and approved throughout the years by way of highly political processes, often with competing and conflicting goals relative to those which would serve to bolster the long-term viability of the ERS. Importantly, Special Law approvals also seem to have overlooked the importance of ensuring long-term, viable funding sources are available to

7

compensate for their economic burden. Ostensibly, these incremental benefits are funded on a pay-as-you-go basis from the General Fund or specific public employer entities of the Government and are therefore obligations which should not be funded by ERS assets. However, many public corporations and municipalities, which bear the responsibility of funding the Special Laws, simply cannot afford to finance these incremental obligations and as a result, have not paid the System the appropriations and have generated significant past-due receivables with the ERS. Specifically, as of June 30, 2010, ERS assets have been used to fund approximately $92.5 million of Special Law obligations, for which various municipalities and public corporations are yet to reimburse the ERS.[3]

As of June 30, 2009, Special Laws accounted for nearly $2.3 billion of the roughly $19 billion in actuarial liabilities.[4] A summary of the costs of Special Laws for plan years ended June 30th 2004 – 2010 is as follows:[5]

($ in millions)

| Special Laws | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Total Cost | $163.20 | $201.60 | $245.80 | $232.30 | $261.30 | $272.50 | $272.40 |

Please refer to **Exhibit 3** for a detailed analysis of the cost of each Special Law to the Government for fiscal years ended June 30, 2004 – 2010.[6]

Special Law benefits play a large role in the fiscal situation plaguing both the Government's General Fund and the ERS. Stated frankly, we question how these Special Laws could have ever been passed with what appears to be such little attention to confirming that long-term, viable funding sources would be available to cover their costs and minimize their potential negative impacts on the System's cash flows and funding ratio. Because the Special Law benefits are not an explicit component of the ERS, we believe the underlying legislation should be revisited and analyzed to determine whether much needed structural changes can be enacted, which would serve to reduce or eliminate unfunded Special Law payments, thereby strengthening the fiscal position of the Government, its various municipality and public corporation employers, and most importantly, the ERS. Conway MacKenzie's scope of work did not include determining whether the various participating employers had the ability to fund Special Laws.

Early Retirement Programs

The Government of Puerto Rico began to promote early retirement programs in 1994 in order to reduce the size of the public workforce, thereby decreasing payroll costs, which account for a substantial portion of the general budget. Since 1994, nearly 20 early retirement programs have been implemented, at a total cost of approximately $631 million.[7]

---

[3] Refer to Exhibit 2 for a summary of outstanding municipality and public corporation Special Law accounts receivable.

[4] Per ERS's June 30, 2009 Actuarial Valuation Report, as prepared by Milliman.

[5] This information was provided by Teresa Meaux Pereda, of the ERS.

[6] Ibid.

[7] This information was obtained from "Estudio Relacionado con los Programas de Retiro Temprano Aprobados desde el 2005 hasta el 2008, Propósito, Resultados y Recomendaciones, Volumen 2" published in March 2010.

CONFIDENTIAL

ERS_0046070

Conway MacKenzie was provided with two studies prepared by The Government of Puerto Rico's Permanent Special Committee on Retirement Systems, which both appeared to indicate that the early retirement programs did not accomplish their intended goals of shrinking the size of the government workforce.

Because many of these programs were not funded up-front by the sponsoring employers, the ERS continues to remain exposed to collection problems, as well as future cash flow deficits, assuming the System funds additional early retirement benefits for which it is unable to collect reimbursement. Specifically, as of July 31, 2010, the ERS was owed approximately $19.1 million[8] in past-due early retirement program costs by certain employers who did not remit their payments to the System in accordance with previously agreed upon payment plans. In total, the ERS currently has approximately $80.5 million[9] in outstanding accounts receivable pertaining to early retirement programs. To the extent additional employers don't comply with previously agreed upon payment plans, the ERS's exposure to early retirement program expenses could continue to grow. While opining on the overall success or failure of any particular early retirement plan (as defined by the costs saved from payroll reductions versus the costs spent on early retirement benefits) was outside of the scope of our engagement, it is clear to us that early retirement programs have indeed had, and could continue to have, a negative cash flow impact on the ERS.

To this end, it is important that any additional early retirement programs enacted be funded in advance or have specific funding plans by the sponsoring employer in order to minimize the potential negative cash flow impact on the ERS.

### Personal Loans

The ERS currently offers and administers a Personal Loan program to its plan members. Personal loans can be obtained by System participants for a variety of different reasons and can be taken for up to $15,000.

The decision by the ERS to increase the maximum loan balance for personal loans from $5,000 to $15,000 in 2007 has resulted in a significant cash drain to the System amounting to nearly $600 million over the past four fiscal years. These negative cash flows have been funded by the System and necessitated the liquidation of ERS assets. As a result, the ERS's investment portfolio is now heavily weighted in illiquid assets (i.e. personal loans) and includes a large amount in receivables from participants that have questionable short term cash recovery. This overconcentration of illiquid assets has also accelerated the System's forecasted insolvency date by nearly two years. The chart below illustrates the significant growth in the ERS's personal loan portfolio as a result of the System's decision to increase the loan caps in 2007.[10]

---

[8] This figure was obtained from the July 31, 2010 Early Retirement Accounts Receivable Schedule, provided by Cecile Tirado Soto, Controller of the ERS.

[9] Ibid.

[10] Figures referenced in this chart are in 000's and as of 6/30 for each respective year included. All figures were obtained from Luis Garcia Lopez, Director of Investment Officer at the ERS.

9



The potential impact of increasing the cap on personal loans from $5,000 to $15,000 on the System's liquidity profile and investment portfolio should have been thoroughly vetted before the ERS decided to amend the regulations pertaining to personal loans. Based on our review of the relevant documentation that was provided to us and interviews with various key employees of the ERS, it appears that appropriate due care was not exercised by the System's management and Board of Trustees in allowing this change in 2007. Specifically, we did not come across any documented discussions or other data which indicated that this change was supported by a thorough analysis of its projected impacts on the System's financial health. We were advised by ERS personnel that such analyses were, in fact, never prepared in connection with the decision to increase the personal loan caps in 2007.

Given the current liquidity crisis that the ERS is facing, we believe the System should immediately consider its options to reduce personal loan exposure, with the ultimate goal of reallocating these assets into more liquid and diversified investment options to ensure that funds will be available in the near-term to fund plan benefit expenses. While securitization of the personal loan portfolio could serve as one potential option of accomplishing this goal, the ERS may not be able to execute on a securitization due to legal implications.

<u>2008 Pension Obligation Bond Transactions</u>

In addition to identifying the above factors which have negatively impacted the financial condition of the ERS, Conway MacKenzie also reviewed the 2008 Pension Obligation Bond transactions. The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial liability and generate additional revenue to the System through speculative arbitrage. In evaluating the POB transactions, we focused our attention on the following three questions:

1. Was the Pension Obligation Bond strategy reasonable?
2. Was it prudent to issue the Pension Obligation Bonds?
3. Were Pension Obligation Bond proceeds utilized appropriately?

10

ERS_0046072

As discussed in greater detail below, the POB transaction was speculative and subject to significant risks which do not appear to have been fully understood or vetted by the Board of Trustee's prior to undertaking the bond issuance strategy in 2008. In addition, several early warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees. Therefore it is our opinion that given the risks inherent in the transactions, several of which appear to have increased significantly in probability prior to the issuance of these bonds, the decisions to pursue and enter into Series A, Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees. Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated.

## 1. Was the Pension Obligation Bond strategy reasonable?

In addressing this question, Conway MacKenzie evaluated the following:

a. If issued, would the POB transaction resolve the System's liquidity needs?
b. If issued, would the POB transaction increase the System's funded ratio?
c. Were the likelihood of success and potential risk factors properly vetted?

Would the POB transaction resolve the system's liquidity needs?

Based upon its financial analysis, in an August 7, 2007 presentation to the ERS, Merrill Lynch highlighted that $7.0 billion in bond proceeds were required to address the liquidity needs of the System.[11] The employer contributions, which solely secured the POB obligations, were forecasted to be sufficient to service the debt obligations related a $7.0 billion POB issuance. The POB transaction was essentially a pull ahead of future employer contributions to fund short term cash flow requirements. As the defined benefit plan matured and its benefit obligations declined, future employer contributions would continue to be used to fund POB debt service.

Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short term liquidity crisis and meet the System's long-term cash flow requirements but the ERS and GDB should have known the $3.0 billion of proceeds issued would not solve the long-term cash flow requirements.

Would the POB transaction increase the System's funded ratio?

As described in ERS Board of Trustee minutes and various presentations by the ERS, an underlying reason for the POB transaction was to increase the total assets of the System and therefore increase the funding ratio. Per ERS Board of Trustee minutes and various rating agency reports, the funding ratio of the System was expected to increase to approximately 70% with the issuance of $7.0 billion of pension obligation bonds. However, the current funding ratio calculated by Milliman in the June 30, 2009 actuarial report is 9.7%, significantly less than 70% as communicated and estimated by the ERS during the POB issuance process. A primary reason for this significant variance is treatment of the

---

[11] See Exhibit 4 for the complete Merrill Lynch Global Markets & Investment Banking Group presentation to the Employee Retirement System regarding Pension Funding Bonds: Debt Structure and Funding Analysis dated August 7, 2007.

CONFIDENTIAL                                                                                           ERS_0046073

bond debt liability in the funding calculation. The June 30, 2009 actuarial valuation report calculates the funding ratio based upon "net assets" in which the $2.961 billion of bond debt is netted or subtracted from the total market value of assets, consistent with how prior funding ratios were determined. However, in calculating the estimated 70% funding ratio, the proposed $7.0 billion of bond debt was not netted or subtracted from the total market value of assets to calculate net assets, essentially ignoring the liability.

Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this fundamental flaw in the forecasted funding ratio's computation methodology. Given the dramatic increase in the funding ratio presented to them, ERS management, the Board of Trustees and GDB Board of Directors had a responsibility to fully understand if the increase was reasonable and calculated consistently with prior period calculations. This lack of understanding falls short of what is expected from a director or a fiscal agent that is exercising prudence or acting within the general standards of reasonability.

### Were the likelihood of success and potential risk factors properly vetted?

Given the financial leverage that it imposed upon the System, the proposed POB transaction was a very risky and speculative transaction, such that if certain assumptions failed to materialize, the System could be forced to bear higher costs and/or face increased liquidity requirements. Potential risks that existed when the POB transaction was undertaken included, among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Both of these risks became realities as the POB transaction was not only undersubscribed, but it also failed to experience the planned investment returns, thereby resulting in negative arbitrage. It appears that numerous warning signs existed, foretelling difficulties with placing the bonds and realizing the returns required, yet action plans were not altered.

### Conclusion

Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, the transaction was subject to significant risks among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Based upon our review of supporting documents, it appears that these risks were not fully understood or vetted by the decision-makers prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care.

## 2. Was it prudent to issue the Pension Obligation Bonds?

The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB issuance during 2007 but Merrill Lynch was unable to consummate the transaction due to a lackluster demand in the global market. UBS then replaced Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds in the local Puerto Rico market. Given the System's significant current and projected annual

12

net cash flow shortfalls, the transaction was not large enough to create arbitrage opportunities since a significant portion of the proceeds have been (and will continue to be) utilized to address annual cash flow shortfalls, as opposed to being invested for the long term. This means that the transaction has also resulted in costly annual interest expense for the ERS.

In determining if it was prudent to proceed with the POB transaction, emphasis should be placed on whether or not the ERS ignored early warning signs prior to issuing the POBs. Based upon our review of the information, we believe that the following early warning signs existed related to the POB issuance:

a. It appears that Merrill Lynch's failed offering in the global marketplace during December 2007 should have been an indication that there was no viable market to raise the full $7.0 billion necessary to comprehensively address the ERS' objectives.

b. Series A, B and C of the POBs were all issued in the local Puerto Rican market by UBS after Merrill Lynch was unsuccessful in generating sufficient interest in the international market. A reasonable concern that should have been assessed thoroughly by the ERS management, Board of Trustees and GDB Board of Directors prior to moving forward on the POB transaction strategy with UBS was whether the local market was large enough to absorb a $7.0 billion bond offering.

c. In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing."[12]

d. By June 2008 there were also signs that the stock market was deteriorating, which should have signaled to the ERS that its arbitrage goals were jeopardized.

### Conclusion

Based upon advice and analysis from Merrill Lynch, the ERS believed that at least a $7.0 billion POB issuance was required to resolve the System's liquidity needs. Although POB proceeds of less than $7.0 billion would assist the System by improving liquidity in the short term and extending the date by which it would deplete its assets, they did not provide a permanent solution to the System's problems and actually harmed the System because negative arbitrage was realized. The parties responsible for the oversight and administration of the ERS had a fiduciary responsibility to ensure market conditions were supportive of issuing at least the full $7.0 billion transaction required to solve the System's financial crisis before proceeding with the transaction.

It is Conway MacKenzie's opinion that several warning signs existed concerning market conditions, principally Merrill Lynch's inability to issue the POBs in the global market, that should have given ERS management, Board of Trustees and GDB Board of Directors probable cause to either postpone the bond transaction or request additional due diligence be performed.

---

[12] Based on the ERS Board of Trustees meeting minutes dated May 27, 2008.

13

Additionally, we believe that by June 2008 it should have been apparent to the decision-makers and their advisors, that it was very unlikely that the incremental $5.5 billion in POB issuances required to reach the full $7.0 billion could be raised given deteriorating market conditions.

For these reasons, it is our opinion that the decisions made by the governing boards of the ERS and GDB to pursue and enter into Series A, Series B and Series C transactions were not prudent given the risks inherent in the transactions, several of which risks appear to have increased significantly in probability prior to the issuance of these bonds.

## 3. Were the Pension Obligation Bond proceeds utilized appropriately?

Two objectives of the POB issuance were to raise funds to cover the System's operating expenses (cash flow objective) and to generate a profit (arbitrage objective). In determining whether the POB proceeds were utilized in accordance with these objectives, we note following:

- Of the $1.6 billion raised from Series A, approximately $937 million was transferred to Citibank which was eventually invested in various stocks and bonds. The balance of $642 million in Series A proceeds were utilized to pay closing costs, fund debt service reserves and pay the Department of Treasury for overdrafts.

- Of the combined $1.4 billion raised from Series B and C, approximately $1.3 billion was transferred to a GDB account, where it was held in cash. Since 2008, $564 million of Series B and C proceeds have been used to cover the System's operating cash shortfalls and fund pension liabilities. As such, only approximately $737 million remains in the GDB cash account as of June 30, 2010.

### Conclusion

The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed based on the current liquidity needs of the System. In fact, the POB transaction has and will continue to cost the System money, as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees.

### Overall Conclusion on POB Transaction Review

In analyzing management's decision to enter into the POB transaction, we found no basis for the initial assumption made that such a strategy would improve the funded status of the ERS. The treatment of bond obligations in the calculation of the UAAL by the System's actuarial consultants appears to support the practical reality that the incurrence of additional debt to increase plan assets should have little

14

effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the ERS by ERS management, the Board of Trustees and GDB Board of Directors when they made the decision to enter into the POB transaction.

Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed, which suggested full implementation of the strategy would be difficult, if not impossible.

The successful execution of the POB transaction was dependent on certain risks not materializing, primarily the risk that the market would be unable to absorb the full $7.0 billion issuance. Consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary measure to address the System's liquidity issues, postponing for some period of time the date of the ERS's eventual insolvency. For this reason, the POB transaction resulted in the flawed execution of a failed strategy.

The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the $3.0 billion POB transaction merely provided a short-term temporary measure to address the System's liquidity needs, as it was not large enough to create arbitrage opportunities. It did nothing to improve the funded position of the System and due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System. The short-term liquidity fix is costly and these costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS.

Lastly, throughout the review process, it was clear to us that certain critical decisions, or lack thereof, made by those responsible for the ERS's oversight and management have negatively impacted the ERS and resulted in further deterioration of the System's liquidity profile and funding status. Furthermore, we believe that certain actions and omissions of the ERS Board of Trustees, GDB Board of Directors and ERS management during the POB decision making process were not reasonable and potentially flawed. As such, further investigation into the POB decision-making process should be pursued by the appropriate authorities.

**Evaluation of Past Management Practices of the ERS**

While the combination of Act 447 benefit arrangements, Special Laws, and historically inadequate funding procedures have resulted in significant deterioration of the ERS's funding ratio throughout its near 60 year history, certain recent decisions made by those responsible for the management and oversight of the ERS have exacerbated this issue.

In this section of the report, we focus on the evaluation of certain actions that were taken by the ERS's management during the 2004 – 2008 review periods, namely:

15

- The issuance of the Pension Obligation Bonds;
- Decisions to increase the ERS's personal loan portfolio; and
- Accounts receivable collection efforts.

### The Issuance of the Pension Obligation Bonds

In analyzing management's decision to enter into the POB transaction, we question the initial assumption made that such a strategy would improve the funded status of the System. The treatment of bond obligations in the calculation of the UAAL by the actuaries Milliman and Buck Consultants appear to support the practical reality that the incurrence of additional debt to increase assets should have little effect on the funded status of a pension plan in the short term. If the bond obligations could be excluded from the calculation of net assets or otherwise in the UAAL, we would have expected the ERS to oppose the calculation by Milliman in the System's June 30, 2009 actuarial valuation report. We did not come across any information to suggest there was a disagreement. This could imply a lack of understanding of the true impacts of the bond transaction on the System by the parties that made the decision to enter into the POB transaction.

Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the many warning signs that existed suggesting full implementation of the strategy would be difficult if not impossible. The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency.

Based on our review of the relevant ERS and GDB POB transaction working paper files, which include various meeting minutes of the ERS's Board of Trustees and the GDB's Board of Directors, it does not appear that this risk was properly considered or addressed by the various Boards. Specifically, in proceeding forward with the POB issuance just after Merrill Lynch's failed attempts to close the originally contemplated transaction, the decision-makers ignored a major warning sign which indicated that the requisite level of demand did not exist for the ERS's planed $7.0 billion POB issuance. Given a successful transaction required issuance of at least $7.0 billion, ERS management, ERS Board of Trustees and GDB Board of Directors had a duty to thoroughly understand the risks associated with not achieving at least $7.0B of POB proceeds.

The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the POB transaction merely provided a short-term temporary measure to address the System's liquidity needs. This short-term measure is pricey and its costs may be realized for decades to come. In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. We also believe that certain actions and omissions of the Board of Trustees, GDB Board of Directors and ERS management during the POB decision making process were not reasonable and potentially flawed. As such, Conway MacKenzie

16

recommends that further investigation into the POB decision-making process should be pursued by the appropriate authorities.

Decisions to Increase the ERS's Personal Loan Portfolio

As mentioned more thoroughly elsewhere in this report, the decision by the ERS to increase the maximum loan balance for personal loans from $5,000 to $15,000 in 2007 has resulted in a significant cash drain to the System amounting to nearly $600 million over the past four fiscal years. These negative cash flows have been funded by the System and necessitated the liquidation of ERS assets. As a result, the ERS's investment portfolio is now heavily weighted in illiquid assets (i.e. personal loans) and includes a large amount in receivables from participants that have questionable short term cash recovery. This overconcentration of illiquid assets has also accelerated the System's forecasted insolvency date by nearly two years.

The potential impact of increasing the cap on personal loans from $5,000 to $15,000 on the System's liquidity profile and investment portfolio should have been thoroughly vetted before the ERS decided to amend the regulations pertaining to personal loans. Based on our review of the relevant documentation that was provided to us, including the 2007 ERS Board of Trustee minutes, and interviews with various key employees of the ERS, it appears that such due care was not used by the System Administrator in supporting this change or by the Board of Trustees in approving this change. Specifically, we did not come across any documented discussions or other data which indicated that this change was supported by a thorough analysis of its projected impacts on the System's financial health and were advised by key ERS personnel that such analyses were, in fact, never prepared in connection with the decision to increase the personal loan caps in 2007. Approving such a decision without supporting analyses demonstrates lack of fiduciary responsibility by ERS management and the Board of Trustees.

Accounts Receivable Collection Efforts

Based on interviews conducted with current and former ERS personnel, Conway MacKenzie was informed that ERS invoices were not being issued on a timely basis, and in certain instances, were not being issued at all to certain employers who participated in the System prior to 2005. When this was discovered, the prior ERS Administration put forth significant extra effort in cleaning up, monitoring and managing the invoicing and collection process. Additionally, the ERS vigorously arranged payment plans for delinquent municipalities and corporations to further enhance the collections process during 2007. The lax management of account receivable balances by the Administration prior to 2005 is an area that that has negatively impacted the ERS. Conway MacKenzie was also informed that certain corporations and municipalities have not been remitting both employer and (withheld) employee contributions to the ERS. Upon further investigation by the System's accountants, it was determined that these contributions were used by certain participating employers to cover their own cash shortfalls or for other unspecified reasons. While investigating the use of these proceeds falls outside of the scope of Conway MacKenzie's assignment, this is still an area of concern, particularly as it relates to employee withholdings.

17

 ERS_0046079

**Lack of Proper and Accurate Record Keeping**

Mesirow Report

Conway MacKenzie learned through various interviews and by review of various POB documents that Mesirow Financial ("Mesirow") acted as the financial advisor to the GDB for the POB transaction. We were also advised by ERS personnel that Mesirow may have issued a report or correspondence expressing its concerns or an adverse position regarding the POB transaction. A physical or electronic copy of such report or position was not included in either ERS or GDB documents provided. Conway MacKenzie attempted to obtain a copy of Mesirow's report or position on the POB transaction through Luis Garcia (Director of Investments at the ERS), but was unsuccessful. When contacted by Luis Garcia, Mesirow responded that all information requests relating to the POB transaction should be channeled to Mesirow's legal department. The GDB sent a formal request for such information to Mesirow's Associate General Counsel on September 14, 2010. As of the date that this report was published, we had not obtained any of the requested information from Mesirow.

Given the potential implications which Mesirow's report or position on the feasibility of the POB transaction may have, we strongly encourage the GDB to review copies of both Mesirow's report and their working papers related to the POB transaction. If Mesirow did, in fact, raise concerns regarding the POB transaction that were communicated to its client, the GDB, reasons why the GDB Board of Directors and/or ERS Board of Trustees did not act on such concerns and advice from the advisor should be investigated to determine whether a lack of due care exists.

GDB Minutes

During Conway MacKenzie's review of GDB files related to the POB transaction, including Board of Director and Executive Committee meeting minutes, we noted that numerous GDB meeting minutes during the review period of 2004 – 2008 were either missing or incomplete. As such, we were unable to trace certain discussion threads or validate the timing of certain decisions made by the Board of Directors and/or Executive Committee which could have assisted us in verifying whether certain issues were identified or raised within the GDB organization, either prior to or during the issuance of Series B and C.

Section 107 of the GDB Board by-laws states that, "The Secretary of the Board shall issue calls for all regular meetings, shall keep minutes of all meetings, shall be custodian of the minute books and the Seal of the Bank and shall perform such other duties as are incident of his office or properly required of him by the Board of Directors who may also appoint one or more Assistant Secretaries to perform such duties as the Board my prescribe…"

Given the poor condition of the GDB Board of Director and Executive Committee meeting minutes, an investigation should be conducted to evaluate the process and determine who was responsible for the lack proper record keeping. In addition to the individuals responsible for record keeping, former Board of Directors and Executive Committee members should be questioned as to their knowledge of the situation. Current GDB management is aware and has taken remedial actions. Accordingly, we were informed by General Counsel of the GDB that the GDB has made referrals for further investigation to the

CONFIDENTIAL

Department of Justice, the Government Ethic's Office and the Office of the Comptroller regarding their findings with respect to poor record keeping by the former Secretary of the GDB Board of Directors. We strongly encourage the proper authorities to conduct further investigations as it relates to the state of record keeping by the former GDB Board of Directors.

19

CONFIDENTIAL

## Section 3 – Summary of Conclusions

The following table summarizes Conway MacKenzie findings, illustrates decision-makers, officers and directors responsible for the findings during the analyzed period and provides certain recommendations about the System:

| Factors that led to the Financial Crisis | Findings | Responsible Decision-Makers, Officers and Directors | Recommendations |
|---|---|---|---|
| Inadequate Funding Procedures | Failure to address at all from 2000-2008 funding status of the System after actions taken in year 1999 to close the defined benefit plans | ERS Board of Trustees and ERS management during relevant period | An increase in the statutory contribution rates and decrease in ERS benefit obligations is necessary |
| Special Laws | Enactment of special laws without long-terms viable funding sources introduced and approved by way of highly political process | Parties associated with the enactment of Special Laws, specifically Act. No. 524 of 2004, Act No. 144 of 2005 and Act No. 35 of 2007 and ERS management | Reduce or eliminate special law payments |
| Early Retirement Programs | Promotion of early retirement programs that were not funded up front by sponsoring employer | Parties associated with the enactment of early retirement programs and ERS management | Any additional early retirement program must be funded in advance or have specific funding plans by the sponsoring employer |
| Personal Loans | Increase in the maximum loan balance for personal loans resulted in a significant cash drain, as a result the ERS investment portfolio is heavily weighted in illiquid assets | Juan Cancel Alegria (ERS), Alfredo Salazar (GDB), Jorge Irizarry (GSB), Other select individuals from ERS management and ERS Board of Trustees as identified in Exhibit 4 | The ERS should immediately consider alternatives to reduce personal loan exposure |

20

ERS_0046082

| Factors that led to the Financial Crisis | Findings | Responsible Decision-Makers, Officers and Directors | Recommendations |
|---|---|---|---|
| **2008 Pension Obligation Bond Transactions** | The $3.0 billion POB transaction was inherently flawed, misconceived and speculative as a mechanism to improve the System's funded ratio. It merely provided a short-term temporary cash measure which blindly guided decision-makers despite many warning signs. The negative arbitrage and fees paid actually worsened the funding position | Alfredo Salazar (GDB), Jorge Irizarry (GDB), Juan Cancel Alegria (ERS), Harold Gonzalez (ERS), Minia Gonzalez (ERS), Other select individuals from ERS management, ERS Board of Trustees and GDB Board of Directors as identified in **Exhibit 4** | Due to lack of care demonstrated by the decision-makers, further investigation is warranted |

21

CONFIDENTIAL

## List of Exhibits

| | | |
|---|---|---|
| Exhibit 1 | - | List of Documents Relied Upon |
| Exhibit 2 | - | Summary of Outstanding Municipality and Public Corporation Special Law Accounts Receivable as of June 30, 2010 |
| Exhibit 3 | - | Detailed Cost Analysis by Special Law by Year (2004 – 2010) |
| Exhibit 4 | - | List of Decision-makers, Officers and Directors |

22

CONFIDENTIAL

ERS_0046084

# Exhibit 1

CONFIDENTIAL

## Exhibit 1

## Documents Relied Upon

1  2003-2004 to 2009-2010.xls
2  2007-08 Pension Funding Bonds Debt Structure and Funding Analysis.pdf
3  2010-02 ERS General Information.pdf
4  Act 11 Amendment-TRS-English.pdf
5  Act 34 Amendment-TRS-English.pdf
6  Act 35 of 2007.pdf
7  Act 447-ERS-English.pdf
8  Act 70 of 2010.pdf
9  Act 70 Regulation.pdf
10  Act 91-TRS-English.pdf
11  Actuarial Study in Respect to Active Members as of June 30, 1975 of the Retirement System of the Government of Puerto Rico and Its Instrumentalities, and Supplementary Comments (prepared by A. Estrella and C.J. Nesbitt) dated June 20, 1977
12  Actuarial Valuation 2005.pdf
13  Actuarial Valuation 2007.pdf
14  Actuarial Valuation 2009.pdf
15  Actuarial Valuation-ERS-2009-06-03.pdf
16  Actuarial Valuation-JRS-2009-06-03.pdf
17  Actuarial Valuation-TRS-2009-06-03.pdf
18  acuerdos11AGOSTO.xls
19  Alternate Allocation Scenario Comparison for Administrative Resolution Num. 2008-17
20  America's Prison Hell is a Little Slice of Heaven.pdf
21  approved laws.pdf
22  ASR-General Information-Actuarial Overview-ERS-JRS-TRS- 2009-09-21-English.pdf
23  ASR-Historical Presentation-JRS-2010-English.pdf
24  ASR-Retirement System Overview-2010-03-12-Spanish.pdf
25  Caribbean Business-2010-04-01-The Employee Retirement System is bankrupt-by Carlos Marquez.pdf
26  Cash Flows Statements.xls
27  Cashflow shortfall.pdf
28  cashflow2011proyeccion.xls
29  Chapter 7 - The Economy of Puerto Rico.pdf
30  Comision Reforma Retiro-Resource Library-v2010-05-25.xlsx
31  Comunicado de Prensa-2010-03-12-Spanish.pdf
32  Contact List-ASR-TRS.pdf
33  Contact List-ASR-TRS.xlsx
34  Contact List-Reform Commission Members-Español.doc
35  Employees Retirement System of the Government of the Commonwealth of Puerto Rico (ERS): Covered Payroll Outlook (2008-2059)
36  Enmiendas por decadas Sistema de Retiro.doc
37  EnnisKnupp-Asset Liability Study-Completion Ratio-2010-01-English.pdf
38  ERS 1989-2009.xls
39  ERS Board of Trustee By-Laws
40  ERS Board of Trustee meeting minutes (2004 - 2009) - various files
41  ERS Functional Organization Chart
42  ERS Position Papers for Laws 35, 144, and 524
43  ERS-JRS-TRS-Executive Summaries-English-2010.pdf
44  EST FIN ELA 2009-2010 (3).xls
45  Estudio Relacionado con los Programas de Retiro Temprano Aprobados desde el 2005 hasta el 2008, Proposito, Resultados y Recomendaciones Vol. 2.pdf
46  Financial Statements-ERS-2007-06-30.pdf
47  Financial Statements-ERS-2009-06-30.pdf
48  Fiscal Reform Law of 2006(A-0103-2006).pdf
49  FS 2007.pdf
50  FS 2008.pdf
51  FS 2009.pdf
52  GDB Board of Directors By-Laws
53  GDB Board of Directors Meetings, 2004 (Draft) files
54  GDB Board of Directors Meetings, 2005 (Final) files
55  GDB Board of Directors Meetings, 2006-2007 (Final) files
56  GDB Board of Directors Meetings, 2006-2008 (Draft) files

CONFIDENTIAL                                                                      ERS_0046086

## Exhibit 1
## Documents Relied Upon

57 GDB Board of Directors Meetings, 2007 (Final) files
58 GDB Board of Directors Meetings, 2008-2009 (Draft) files
59 GDB Bond Documents, Series A - File I (various files)
60 GDB Bond Documents, Series A - File II (various files)
61 GDB Bond Documents, Series A - File III (various files)
62 GDB Bond Documents, Series A - File IV - Cost of Issuance (various files)
63 GDB Bond Documents, Series B - Cost of Issuance (various files)
64 GDB Bond Documents, Series B - File I (various files)
65 GDB Bond Documents, Series B - File II (various files)
66 GDB Bond Documents, Series C - File I (various files)
67 GDB Bond Documents, Series C - File II - Cost of Issuance (various files)
68 GDB Exectuive Committee Meetings, 2006 (Final) files
69 GDB Exectuive Committee Meetings, 2006-2008 (Draft) files
70 GDB Org Chart.ppt
71 Historicos Flujos de Efectivo 2005 a 2009 eng.xls
72 Internal Financial Statements.xls
73 Investment Company Act of 1940.pdf
74 Investment Consultants.doc
75 June 30, 2010 Unaudited Financial Statements
76 June 30, 2010 Unaudited Financial Statements
77 KITJUNTAJUNIO2010.xls
78 Laws and Early Retirement Programs (8-23-10).doc
79 Letter address to the ERS" Board of Trustees from Wodward and Fondiller (a division of Martin E. Segal Co., Inc) dated June 29, 1971
80 Letter from John Thomas Enger of UBS Consulting Services of Puerto Rico to Jorge Irizarry Herrans dated June 4, 2008
81 LOAN OVERVIEW JUNE 2009.ppt
82 Memo to the Reform Commission General Overview-2010-English.pdf
83 Milliman Law 70 Analysis.pdf
84 Milliman-Review of Pension Funding and Solvency Issues-2010-04-06-English.pdf
85 Milliman-Review of Pension Funding and Solvency Issues-2010-05-11-English.ppt
86 NASRA-Public Fund Survey-Summary_of_Findings_FY08-by Keith Brainard-2009-10.pdf
87 NASRA-SustainabilityChanges-2010-05-24.pdf
88 NASRA-sustainabilitymeasures-2009-12-22.pdf
89 OE-2010-10 Orden Ejecutiva Sistema de Retiro-Spanish.pdf
90 Pew Center-Promises with a Price-Public Sector Retirement Benefits-2009-11-24.pdf
91 Pew Center-The trillion dollar gap-2010-02-18.pdf
92 Programas de Retiro Temprano Aprobados desde el 1994 hasta el 2005, Proposito, Resultados y Recomendaciones.pdf
93 Related to Series A, B and C Issues.xls
94 Related to Telefonica de PR Dividends and Sale of Shares.xls
95 Report to the Governor's Special Commission on Retirement System (submitted by Aon Consulting, Inc.) dated August 2010
96 Return Summary.pptx
97 S&P-Public Finance-US States OPEB Liabilities-2009-06-03.pdf
98 Santander Credit Line.xls
99 Senior Pension Funding Bond Series A - $1.59B.pdf
100 Senior Pension Funding Bond Series B - $1.06B.pdf
101 Senior Pension Funding Bond Series C - $300M.pdf
102 Sistema De Retiro De Los Empleados Del Gobierno: Origen, Deficit Actuarial y Recomendaciones (CEPSR report) dated March 2009
103 SistemaDeRetiroDeLosEmpleadosDelGobierno.doc
104 Social Secutiry Reform-National Commission-by Greenspan-1983-01.pdf
105 Special Commission on Retirement Systems Reform.pdf
106 The Puerto Rico Government Emplyees' and Judiciary Retirement Systems Statement of Investment Policy and Perfomance Objectives
    (dated April 6, 2010)
107 TIMEDEPOSTJUNTA.xls
108 UBS Consulting Services of Puerto Rico Presentation to the Puerto Rico Employee's Retirement System (various dates)
109 UBS in PR Pension_07-27-09 Bloomberg article.pdf
110 UBS in Puerto Rico Pension Gets Fee Bonanza Seen as Conlicted (Bloomberg article) dated February 27, 2009
111 Univ Minnesota Law School-Public Pension Plan Reform-The Legal Framework by Amy B. Monahan.pdf

CONFIDENTIAL

# Exhibit 2

CONFIDENTIAL

ERS_0046088

**Exhibit 2**
Summary of Outstanding Municipality Special Law Accounts Receivable
As of June 30, 2010

| Municipality | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| ADJUNTAS | 301 | $ - | $ - | $ - | $ 76,951 | $ - | $ 76,951 |
| AGUADA | 302 | - | - | - | - | - | - |
| AGUADILLA | 303 | - | - | - | - | - | - |
| AGUAS BUENAS | 304 | - | - | - | 3,576 | - | 3,576 |
| AIBONITO | 305 | - | - | - | 95,240 | - | 95,240 |
| AÑASCO | 306 | - | - | - | - | - | - |
| ARECIBO | 307 | - | - | - | - | - | - |
| ARROYO | 308 | - | - | - | - | - | - |
| BARCELONETA | 309 | - | | | 2,531 | - | 2,531 |
| BARRANQUITAS | 310 | - | | | 243,979 | - | 243,979 |
| BAYAMON | 311 | 122,866 | | - | - | - | 122,866 |
| CABO ROJO | 312 | - | | | 149,829 | - | 149,829 |
| CAGUAS | 313 | - | | | 562,324 | - | 562,324 |
| CAMUY | 314 | - | - | 4,227 | 136,300 | - | 140,527 |
| CANOVANAS | 378 | - | | | 3,211 | - | 3,211 |
| CAROLINA | 315 | - | - | | - | - | - |
| CATAÑO | 316 | - | - | 104,316 | 101,028 | - | 205,344 |
| CAYEY | 317 | - | - | - | 202,861 | - | 202,861 |
| CEIBA | 318 | - | - | - | 71,233 | - | 71,233 |
| CIALES | 319 | - | 5,779 | 59,665 | 67,572 | - | 133,015 |
| CIDRA | 320 | - | - | - | - | - | - |
| COAMO | 321 | - | - | 92,657 | 107,689 | - | 200,345 |
| COMERIO | 322 | - | - | - | 35,105 | - | 35,105 |
| COROZAL | 323 | - | - | - | 74,797 | - | 74,797 |
| CULEBRA | 324 | - | - | - | - | - | - |
| DORADO | 325 | - | - | - | 97,445 | - | 97,445 |
| FAJARDO | 326 | - | - | - | - | - | - |
| FLORIDA | 377 | - | | | 5,567 | - | 5,567 |
| GUANICA | 327 | - | | | 5,429 | - | 5,429 |
| GUAYAMA | 328 | - | | | 18,407 | - | 18,407 |
| GUAYANILLA | 329 | - | - | 80,848 | 104,573 | - | 185,421 |
| GUAYNABO | 330 | - | - | - | - | - | - |
| GURABO | 331 | - | - | - | - | - | - |
| HATILLO | 332 | - | - | - | 69,920 | - | 69,920 |
| HORMIGUEROS | 333 | - | - | - | - | - | - |
| HUMACAO | 334 | - | - | - | 226,540 | - | 226,540 |
| ISABELA | 335 | - | - | - | - | - | - |
| JAYUYA | 336 | - | - | - | - | - | - |
| JUANA DIAZ | 337 | - | - | - | - | - | - |
| JUNCOS | 338 | - | - | - | 97,928 | - | 97,928 |
| LAJAS | 339 | - | - | - | 91,456 | - | 91,456 |
| LARES | 340 | - | - | - | 101,115 | - | 101,115 |

Page 1 of 4

CONFIDENTIAL

ERS_0046089

Exhibit 2
Summary of Outstanding Municipality Special Law Accounts Receivable
As of June 30, 2010

| Municipality | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| LAS MARIAS | 341 | - | - | - | 68,331 | - | 68,331 |
| LAS PIEDRAS | 342 | - | - | - | 4,270 | - | 4,270 |
| LOIZA | 343 | - | - | - | 40,448 | - | 40,448 |
| LUQUILLO | 344 | - | - | - | - | - | - |
| MANATI | 345 | - | - | - | 6,119 | - | 6,119 |
| MARICAO | 346 | 98,326 | 53,033 | 60,261 | 66,703 | 3,906 | 282,229 |
| MAUNABO | 347 | 228,497 | 99,559 | 102,044 | 116,139 | - | 546,239 |
| MAYAGUEZ | 348 | 461,831 | 455,664 | 487,269 | 552,870 | - | 1,957,634 |
| MOCA | 349 | - | - | - | - | - | - |
| MOROVIS | 350 | 84,837 | 22,152 | - | 184,731 | - | 291,720 |
| NAGUABO | 351 | - | 2,324 | - | 10,588 | - | 12,913 |
| NARANJITO | 352 | - | - | - | 96,860 | - | 96,860 |
| OROCOVIS | 353 | - | - | - | 40,745 | - | 40,745 |
| PATILLAS | 354 | 88,378 | 72,487 | 79,882 | 86,464 | - | 327,210 |
| PEÑUELAS | 355 | - | - | - | 148,370 | - | 148,370 |
| PONCE | 356 | 518,438 | - | 725,509 | 779,971 | - | 2,023,919 |
| PONCE MUELLE | 379 | - | - | - | - | - | - |
| QUEBRADILLAS | 357 | - | - | - | - | - | - |
| RINCON | 358 | - | - | - | - | - | - |
| RIO GRANDE | 359 | 60,304 | 118,262 | 117,753 | 146,272 | - | 442,591 |
| SABANA GRANDE | 360 | - | 47,334 | - | 75,555 | - | 122,890 |
| SALINAS | 361 | 89,670 | 109,130 | 98,120 | 117,491 | - | 414,410 |
| SAN GERMAN | 362 | 0 | - | 149,962 | 168,999 | - | 318,961 |
| SAN JUAN | 363 | 1,922,228 | 4,796,915 | 5,232,328 | 5,411,655 | - | 17,363,126 |
| SAN LORENZO | 364 | - | - | - | - | - | - |
| SAN SEBASTIAN | 365 | 368,884 | 184,473 | 195,187 | 220,342 | - | 968,885 |
| SANTA ISABEL | 366 | 156,986 | 85,453 | 88,735 | 100,450 | - | 431,624 |
| TOA ALTA | 367 | - | 0 | 100,516 | 110,702 | - | 211,219 |
| TOA BAJA | 368 | - | - | - | - | - | - |
| TRUJILLO ALTO | 369 | - | - | - | - | - | - |
| UTUADO | 370 | - | 101,469 | - | 184,574 | - | 286,043 |
| VEGA ALTA | 371 | - | - | - | - | - | - |
| VEGA BAJA | 372 | 3,476 | - | 155,074 | 173,825 | - | 332,376 |
| VIEQUES | 373 | - | - | - | 81,454 | - | 81,454 |
| VILLALBA | 374 | - | - | - | 2,800 | - | 2,800 |
| YABUCOA | 375 | - | - | 87,809 | 105,972 | - | 193,781 |
| YAUCO | 376 | - | - | 71,960 | 168,170 | - | 240,130 |
| **Total Municipality** | | $ 4,204,720 | $ 6,154,034 | $ 8,094,121 | $ 12,023,471 | $ 3,906 | $ 30,480,253 |

CONFIDENTIAL

ERS_0046090

CONFIDENTIAL

Exhibit 2
Summary of Outstanding Public Corporation Special Law Accounts Receivable
As of June 30, 2010

| Corporations | ¶ | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| ADM. DE ASUNTOS FEDERALES | 112 | $ - | $ - | $ - | $ - | $ - | $ - |
| ASEM | 115 | 3,384,895 | 2,534,629 | 2,533,083 | 2,435,106 | 2,516,515 | 13,404,228 |
| JUNTA RETIRO PARA MAESTRO | 116 | - | - | - | - | 46,133 | 46,133 |
| COMISION SEGURIDAD EN EL TRANSITO | 123 | - | - | - | 13,033 | - | 13,033 |
| CORP. FOND. SEG. ESTADO | 163 | 1,027,073 | - | - | - | - | 1,027,073 |
| CIA. DE PARQUES NACIONALES DE PR | 174 | - | - | 332,777 | 454,349 | - | 787,126 |
| A.A.A. | 201 | - | 7,783,447 | 7,241,263 | 6,639,442 | - | 21,664,152 |
| AUT. EDIFICIO PUBLICOS | 203 | - | 360,890 | 1,197,217 | 1,156,694 | - | 2,714,801 |
| AEE | 204 | - | - | - | - | - | - |
| A.M.A. | 205 | - | 591,626 | 1,420,982 | 1,626,817 | - | 3,639,425 |
| AUT. PUERTOS | 206 | 953,936 | 1,623,449 | 1,540,172 | 1,597,859 | - | 5,715,416 |
| AUT. DE TIERRAS | 207 | - | - | - | 321,923 | - | 321,923 |
| AUT. CARRETERAS | 208 | - | - | 2,246,007 | 2,058,580 | - | 4,304,587 |
| AUT. NAVIERAS DE PR | 209 | - | - | - | - | - | - |
| AUT. DESP. SOLIDOS | 210 | 141,821 | 90,842 | 87,676 | 76,270 | - | 396,209 |
| ADM. TERRENOS | 211 | 60,040 | - | - | 124,428 | - | 184,469 |
| CORP. CENTRO DE BELLAS ARTES | 212 | - | - | - | 1,885 | - | 1,885 |
| A.D.T. | 213 | 254,956 | 83,621 | 454,207 | 202,368 | - | 995,152 |
| A.C.A.A. | 214 | 21,298 | - | - | 477,740 | - | 499,039 |
| CORP. ARTES MUSICALES | 217 | - | - | - | 1,589 | - | 1,589 |
| AEELA | 218 | - | - | - | 5,494 | - | 5,494 |
| BCO. GUB. FOMENTO | 219 | - | | | - | - | - |
| BANCO FINANCIAMIENTO VIVIENDA | 220 | | | | 26,245 | | 26,245 |
| CIA. COMERCIO Y EXPORTACION | 221 | - | - | - | 81,414 | - | 81,414 |
| CIA. DE FOMENTO INDUSTRIAL | 222 | - | - | - | 1,226,695 | - | 1,226,695 |
| CIA DE TURISMO | 224 | - | - | - | - | - | - |
| CENTRO CARDIOVASCULAR | 227 | - | - | - | 38,920 | - | 38,920 |
| COSSEC | 228 | - | 58,178 | 56,800 | 12,871 | 23,345 | 151,194 |
| CORP. AZUCARERA | 229 | 911,309 | 559,875 | 532,387 | 527,039 | 228,643 | 2,759,253 |
| NEGOCIADO SEG. EMPLEO | 232 | - | - | - | - | 83,381 | 83,381 |
| A.C.D. CULEBRA | 235 | - | - | - | - | - | - |
| SERV. EXT. AGRICOLA | 236 | - | - | - | - | 3,974 | 3,974 |
| FIDEIC. PARQ. NACIONALES | 238 | - | - | 10,261 | 14,850 | - | 25,111 |
| CENTRO DE ESTUDIO ESPECIALES GEN. GOBIERNO | 239 | | | - | - | - | - |
| ASD. AGROPECUARIO | 241 | 251,013 | - | 340,934 | 1,039,348 | - | 1,631,294 |
| OFICINA ETICA GUBERNAMENTAL | 242 | - | - | - | - | - | - |
| INSTITUTO MEDICINA FORENCE | 243 | - | - | - | 44,214 | - | 44,214 |
| BCO. DES. ECONOMICO | 245 | - | - | - | - | - | - |
| C. EMP. ADIESTRAMIENTO Y TRAB. | 248 | - | 14,082 | 28,325 | 33,176 | - | 75,583 |
| CORPORACION DIFUSION PUBLICA | 249 | - | - | - | 1,127 | - | 1,127 |
| PANEL. FIS. INDEP. | 250 | - | - | - | - | - | - |
| CONSEJO DE DESARROLLO OCUPACIONAL | 253 | - | - | - | 12,709 | - | 12,709 |

ERS_ 0046091

CONFIDENTIAL

**Exhibit 2**

Summary of Outstanding Public Corporation Special Law Accounts Receivable

As of June 30, 2010

| Corporations | # | 2002-2007 | 2007-2008 | 2008-2009 | 2009-2010 | COLA Cost Balance in Prior Years | Total |
|---|---|---|---|---|---|---|---|
| CORPORACION DE SEGUROS AGRICOLAS | 270 | - | - | 166,794 | - | - | 166,794 |
| FID.INST GUARDIA NACIONAL | 271 | - | 4,588 | 3,530 | - | - | 8,118 |
| ESCUELA ARTES PLASTICA | 272 | - | 1,410 | 1,767 | 8,014 | - | 11,192 |
| CENTRO RECAUDACIONES INGRESOS MUN. | 279 | | | - | - | | - |
| ADM. SEGUROS DE SALUD | 292 | - | - | | 400 | - | 400 |
| CONSEJO EDUCACION SUPERIOR | 293 | - | - | - | - | - | - |
| CONSERVATORIO DE MUSICA | 295 | - | - | - | 16,087 | - | 16,087 |
| JUNTA DE GOBIERNO 911 | 296 | - | - | - | - | - | - |
| SALUD CORRECCIONAL | 417 | - | - | - | - | - | - |
| AUTORIDAD TRANSPORTE MARITIMO | 502 | | | - | 2,000 | | 2,000 |
| **Total Corporations** | | **$ 7,006,140** | **$ 13,706,439** | **$ 18,194,183** | **$ 20,278,687** | **$ 2,901,991** | **$ 62,087,441** |

ERS_0046092

# Exhibit 3

CONFIDENTIAL

ERS_0046093

Exhibit 3

Employees Retirement System of Puerto Rico

Detailed Cost Analysis by Special Law (2003-2004)

| | Estimated OGP 2003 - 2004 | Estimated Corporations 2003 - 2004 | Estimated Municipalities 2003 - 2004 | Total Estimated Special Laws 2003 - 2004 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,070,000 | $ - | $ - | $ 4,070,000 |
| Act No. 207, Year 1995 | - | 1,531,885 | 407,777 | 1,939,662 |
| Act No. 40, Year 2001 | 20,625,000 | 2,649,257 | 766,032 | 24,040,289 |
| Act No. 157, Year 2003 | - | - | 441,240 | 441,240 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 372,000 | - | - | 372,000 |
| Act No. 134, Year 1996 | 401,000 | - | - | 401,000 |
| Act No. 221, Year 1998 | - | 2,307,682 | - | 2,307,682 |
| **Total COLA** | **25,468,000** | **6,488,824** | **1,615,049** | **33,571,872** |
| | | | | |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 19,528,000 | - | - | 19,528,000 |
| Act No. 159, Year 2003 | - | 1,412,300 | 965,600 | 2,377,900 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | - | - | - |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **19,942,000** | **1,412,300** | **965,600** | **22,319,900** |
| | | | | |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 6,431,500 | 928,703 | 347,496 | 7,707,700 |
| Act No. 169, Year 1968 | 5,019,000 | - | - | 5,019,000 |
| Act No. 2, Year 1985 | 75,000 | - | - | 75,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | | | | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | **11,569,500** | **928,703** | **347,496** | **12,845,700** |
| | | | | |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 45,347,968 | - | - | 45,347,968 |
| Act No. 155, Year 2003 | 6,030,000 | 1,412,700 | 965,500 | 8,408,200 |
| **Total Medical Plan** | **51,377,968** | **1,412,700** | **965,500** | **53,756,168** |
| | | | | |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 417,000 | | | 417,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,664,000 | | | 16,664,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,000,000 | | | 5,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,083,000 | | | 8,083,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | - | | | - |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 6,500,000 | 403,536 | 1,998,129 | 8,901,666 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 270,000 | | | 270,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 11,000 | | | 11,000 |
| **Total Others** | **38,384,000** | **403,536** | **1,998,129** | **40,785,666** |
| **Total Special Laws** | **$ 146,741,468** | **$ 10,646,063** | **$ 5,891,775** | **163,279,306** |

CONFIDENTIAL

ERS_0046094

Exhibit 3

**Employees Retirement System of Puerto Rico**
**Detailed Cost Analysis by Special Law (2004-2005)**

| | Estimated OGP 2004 - 2005 | Estimated Corporations 2004 - 2005 | Estimated Municipalities 2004 - 2005 | Total Estimated Special Laws 2004 - 2005 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $      4,212,000 | $          - | $          - | $      4,212,000 |
| Act No. 207, Year 1995 | - | 1,339,947 | 361,372 | 1,701,319 |
| Act No. 40, Year 2001 | 24,262,000 | 3,031,842 | 828,098 | 28,121,940 |
| Act No. 157, Year 2003 | - | 3,194,452 | 852,990 | 4,047,442 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 372,000 | - | - | 372,000 |
| Act No. 134, Year 1996 | 401,000 | - | - | 401,000 |
| Act No. 221, Year 1998 | - | 2,328,406 | - | 2,328,406 |
| **Total COLA** | **29,247,000** | **9,892,647** | **2,042,460** | **41,182,107** |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 19,549,000 | - | - | 19,549,000 |
| Act No. 159, Year 2003 | - | 1,434,100 | 985,300 | 2,419,400 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | - | - | - |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **19,963,000** | **1,434,100** | **985,300** | **22,382,400** |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 12,663,000 | 1,234,898 | 455,621 | 14,353,519 |
| Act No. 169, Year 1968 | 5,019,000 | - | - | 5,019,000 |
| Act No. 2, Year 1965 | 60,000 | - | - | 60,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | | | | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | **17,786,000** | **1,234,898** | **455,621** | **19,476,519** |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 60,000,000 | - | - | 60,000,000 |
| Act No. 155, Year 2003 | 6,030,000 | 1,433,800 | 985,500 | 8,449,300 |
| **Total Medical Plan** | **66,030,000** | **1,433,800** | **985,500** | **68,449,300** |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 426,000 | | | 426,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,664,000 | | | 16,664,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,000,000 | | | 5,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,083,000 | | | 8,083,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 398,750 | | | 398,750 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 155, Year 1941 – $300 minimum pension increase | 13,276,000 | 779,192 | 3,674,646 | 17,729,838 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 372,000 | | | 372,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 12,000 | | | 12,000 |
| **Total Others** | **45,670,750** | **779,192** | **3,674,646** | **50,124,588** |
| **Total Special Laws** | **$   178,696,750** | **$   14,774,637** | **$   8,143,526** | **201,614,913** |

CONFIDENTIAL

ERS_0046095

Exhibit 3

Employees Retirement System of Puerto Rico

Detailed Cost Analysis by Special Law (2005-2006)

| | Estimated OGP 2005 - 2006 | Estimated Corporations 2005 - 2006 | Estimated Municipalities 2005 - 2006 | Total Estimated Special Laws 2005 - 2006 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,212,000 | $ - | $ - | $ 4,212,000 |
| Act No. 207, Year 1995 | - | 1,313,605 | 351,995 | 1,665,599 |
| Act No. 40, Year 2001 | 24,262,000 | 3,032,595 | 813,040 | 28,107,635 |
| Act No. 157, Year 2003 | - | 3,123,329 | 837,477 | 3,960,806 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 372,000 | - | - | 372,000 |
| Act No. 134, Year 1996 | 401,000 | - | - | 401,000 |
| Act No. 221, Year 1998 | - | 2,034,484 | - | 2,034,484 |
| **Total COLA** | **29,247,000** | **9,504,013** | **2,002,511** | **40,753,524** |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 19,549,000 | - | - | 19,549,000 |
| Act No. 159, Year 2003 | - | 1,479,700 | 1,005,900 | 2,485,600 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,479,700 | 1,004,600 | 2,484,300 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **19,963,000** | **2,959,400** | **2,010,500** | **24,932,900** |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 12,663,000 | 1,038,666 | 415,298 | 14,116,964 |
| Act No. 169, Year 1968 | 4,600,000 | - | - | 4,600,000 |
| Act No. 2, Year 1965 | 60,000 | - | - | 60,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | | | | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | - | - | 20,000 |
| **Total Widows** | **17,367,000** | **1,038,666** | **415,298** | **18,820,964** |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 60,000,000 | - | - | 60,000,000 |
| Act No. 155, Year 2003 | 6,030,000 | 1,479,700 | 1,006,200 | 8,515,900 |
| **Total Medical Plan** | **66,030,000** | **1,479,700** | **1,006,200** | **68,515,900** |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 426,000 | | | 426,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,684,000 | | | 16,684,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,000,000 | | | 5,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,083,000 | | | 8,083,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 399,000 | | | 399,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 13,276,000 | 708,789 | 3,487,229 | 17,472,017 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 372,000 | | | 372,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 12,000 | | | 12,000 |
| Additional Asignment | 42,900,000 | | | 42,900,000 |
| **Total Others** | **88,591,000** | **708,789** | **3,487,229** | **92,787,017** |
| **Total Special Laws** | **$ 221,198,000** | **$ 15,690,567** | **$ 8,921,738** | **$ 245,810,305** |

Page 3 of 7

CONFIDENTIAL

Exhibit 3
Employees Retirement System of Puerto Rico
Detailed Cost Analysis by Special Law (2006-2007)

| | Estimated OGP 2006 - 2007 | Estimated Corporations 2006 - 2007 | Estimated Municipalities 2006 - 2007 | Total Estimated Special Laws 2006 - 2007 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,203,000 | $ - | $ - | $ 4,203,000 |
| Act No. 207, Year 1995 | - | 972,817 | 274,108 | 1,246,925 |
| Act No. 40, Year 2001 | 21,717,000 | 2,492,895 | 771,302 | 24,981,198 |
| Act No. 157, Year 2003 | - | 4,070,211 | 1,246,151 | 5,316,362 |
| Act No. 35, Year 2007 | - | - | - | - |
| Act No. 41, Year 2001 | 500,000 | - | - | 500,000 |
| Act No. 134, Year 1996 | 415,000 | - | - | 415,000 |
| Act No. 221, Year 1998 | - | 1,574,730 | - | 1,574,730 |
| **Total COLA** | 26,835,000 | 9,110,655 | 2,291,561 | 38,237,216 |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 28,200,000 | - | - | 28,200,000 |
| Act No. 159, Year 2003 | - | 1,448,400 | 981,200 | 2,429,600 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,448,400 | 982,500 | 2,430,900 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | 28,614,000 | 2,896,800 | 1,963,700 | 33,474,500 |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 9,513,000 | 1,038,666 | 414,213 | 10,965,878 |
| Act No. 169, Year 1968 | 4,600,000 | - | - | 4,600,000 |
| Act No. 2, Year 1965 | 60,000 | - | - | 60,000 |
| Act No. 82, Year 1941 | 24,000 | - | - | 24,000 |
| Act No. 135, Year 1975 | - | - | - | - |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefit | 20,000 | | | 20,000 |
| **Total Widows** | 14,217,000 | 1,038,666 | 414,213 | 15,669,878 |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 84,500,000 | - | - | 84,500,000 |
| Act No. 155, Year 2003 | 6,400,000 | 1,448,400 | 980,900 | 8,829,300 |
| **Total Medical Plan** | 90,900,000 | 1,448,400 | 980,900 | 93,329,300 |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 426,000 | | | 426,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 17,000,000 | | | 17,000,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 6,000,000 | | | 6,000,000 |
| Act No. 37, Year 1941 - Summer bonus | 8,880,000 | | | 8,880,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 3,000 | | | 3,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 300,000 | | | 300,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,436,000 | | | 1,436,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 12,760,000 | 700,112 | 3,433,883 | 16,893,995 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 650,000 | | | 650,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 12,000 | | | 12,000 |
| **Total Others** | 47,467,000 | 700,112 | 3,433,883 | 51,600,995 |
| **Total Special Laws** | $ 208,033,000 | $ 15,194,632 | $ 9,084,257 | $ 232,311,890 |

CONFIDENTIAL

ERS_0046097

Exhibit 3

**Employees Retirement System of Puerto Rico**

**Detailed Cost Analysis by Special Law (2007-2008)**

| | Estimated OGP 2007 - 2008 | Estimated Corporations 2007 - 2008 | Estimated Municipalities 2007 - 2008 | Total Estimated Special Laws 2007 - 2008 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 4,267,000 | $ - | $ - | $ 4,267,000 |
| Act No. 207, Year 1995 | - | 1,156,530 | 418,263 | 1,574,792 |
| Act No. 40, Year 2001 | 41,567,000 | 4,458,409 | 1,415,432 | 47,440,841 |
| Act No. 157, Year 2003 | - | 4,519,890 | 1,521,935 | 6,041,825 |
| Act No. 35, Year 2007 | - | 5,537,768 | 1,641,943 | 7,179,710 |
| Act No. 41, Year 2001 | 597,000 | - | - | 597,000 |
| Act No. 134, Year 1996 | 489,000 | - | - | 489,000 |
| Act No. 221, Year 1998 | - | 1,749,974 | - | 1,749,974 |
| **Total COLA** | **46,920,000** | **17,422,570** | **4,997,572** | **59,340,143** |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 28,200,000 | - | - | 28,200,000 |
| Act No. 159, Year 2003 | - | 1,717,700 | 1,097,500 | 2,815,200 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,717,700 | 1,097,500 | 2,815,200 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **28,614,000** | **3,435,400** | **2,195,000** | **34,244,400** |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 7,326,000 | 1,018,372 | 368,911 | 8,713,283 |
| Act No. 169, Year 1968 | 4,600,000 | - | - | 4,600,000 |
| Act No. 2, Year 1965 | 51,000 | - | - | 51,000 |
| Act No. 82, Year 1941 | 12,000 | - | - | 12,000 |
| Act No. 135, Year 1975 | - | - | - | |
| Act No. 33, Year 2002 -Jaime Benitez Widow Benefil | 20,000 | | | 20,000 |
| **Total Widows** | **12,009,000** | **1,018,372** | **368,911** | **13,396,283** |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 87,500,000 | - | - | 87,500,000 |
| Act No. 155, Year 2003 | 6,309,000 | 1,530,638 | 921,786 | 8,761,424 |
| **Total Medical Plan** | **93,809,000** | **1,530,638** | **921,786** | **96,261,424** |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 406,000 | | | 406,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 16,789,000 | | | 16,789,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,587,000 | | | 5,587,000 |
| Act No. 37, Year 1941 - Summer bonus | 9,483,000 | | | 9,483,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 1,000 | | | 1,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 236,000 | | | 236,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,399,000 | | | 1,399,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 12,401,000 | 300,873 | 1,070,404 | 13,772,277 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 403,000 | | | 403,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 3,000 | | | 3,000 |
| **Total Others** | **46,708,000** | **300,873** | **1,070,404** | **48,079,277** |
| **Total Special Laws** | **$ 228,060,000** | **$ 23,707,853** | **$ 9,553,673** | **$ 261,321,526** |

CONFIDENTIAL

ERS_0046098

Exhibit 3

**Employees Retirement System of Puerto Rico**
Detailed Cost Analysis by Special Law (2008-2009)

| | Estimated OGP 2008 - 2009 | Estimated Corporations 2008 - 2009 | Estimated Municipalities 2008 - 2009 | Total Estimated Special Laws 2008 - 2009 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 5,959,000 | $ - | $ - | $ 5,959,000 |
| Act No. 207, Year 1995 | - | 972,917 | 360,334 | 1,333,251 |
| Act No. 40, Year 2001 | 33,990,000 | 4,591,950 | 1,316,298 | 39,898,248 |
| Act No. 157, Year 2003 | - | 4,642,821 | 1,397,653 | 6,040,474 |
| Act No. 35, Year 2007 | - | 6,195,013 | 2,985,579 | 9,180,592 |
| Act No. 41, Year 2001 | 691,000 | - | - | 691,000 |
| Act No. 134, Year 1996 | 500,000 | - | - | 500,000 |
| Act No. 221, Year 1998 | - | 1,552,509 | - | 1,552,509 |
| **Total COLA** | **41,140,000** | **17,955,211** | **6,059,864** | **65,155,075** |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 37,650,000 | - | - | 37,650,000 |
| Act No. 159, Year 2003 | - | 1,191,100 | 1,810,414 | 3,001,514 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,777,205 | 1,192,500 | 2,969,705 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **38,064,000** | **2,968,305** | **3,002,914** | **44,035,219** |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 7,500,000 | 589,860 | 168,425 | 8,258,285 |
| Act No. 169, Year 1968 | 5,880,000 | - | - | 5,880,000 |
| Act No. 2, Year 1965 | 51,000 | - | - | 51,000 |
| Act No. 82, Year 1941 | 12,000 | - | - | 12,000 |
| Act No. 135, Year 1975 | - | - | - | - |
| **Total Widows** | **13,443,000** | **589,860** | **168,425** | **14,201,285** |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 90,000,000 | - | - | 90,000,000 |
| Act No. 155, Year 2003 | 7,552,000 | 2,062,867 | 1,206,200 | 10,821,067 |
| **Total Medical Plan** | **97,552,000** | **2,062,867** | **1,206,200** | **100,821,067** |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 400,000 | | | 400,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 17,000,000 | | | 17,000,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 5,500,000 | | | 5,500,000 |
| Act No. 37, Year 1941 - Summer bonus | 10,200,000 | | | 10,200,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) - Increase in death benefits | 1,000 | | | 1,000 |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 400,000 | | | 400,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,370,000 | | | 1,370,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 12,400,000 | 179,669 | 211,057 | 12,790,726 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 620,000 | | | 620,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 3,000 | | | 3,000 |
| **Total Others** | **47,894,000** | **179,669** | **211,057** | **48,284,726** |
| **Total Special Laws** | **$ 238,093,000** | **$ 23,755,911** | **$ 10,648,460** | **$ 272,497,371** |

CONFIDENTIAL

ERS_0046099

Exhibit 3

**Employees Retirement System of Puerto Rico**
Detailed Cost Analysis by Special Law (2009-2010)

| | Estimated OGP 2009 - 2010 | Estimated Corporations 2009 - 2010 | Estimated Municipalities 2009 - 2010 | Total Estimated Special Laws 2009 - 2010 |
|---|---|---|---|---|
| **COLA** | | | | |
| Act No. 10, Year 1992 | $ 7,066,000 | $ - | $ - | $ 7,066,000 |
| Act No. 207, Year 1995 | - | 1,354,292 | 425,209 | 1,779,501 |
| Act No. 40, Year 2001 | 33,786,000 | 2,748,362 | 761,427 | 37,295,789 |
| Act No. 157, Year 2003 | - | 3,693,387 | 914,145 | 4,607,532 |
| Act No. 35, Year 2007 | - | 5,570,044 | 2,268,385 | 7,838,429 |
| Act No. 41, Year 2001 | 629,000 | - | - | 629,000 |
| Act No. 134, Year 1996 | 462,000 | - | - | 462,000 |
| Act No. 221, Year 1998 | - | 1,552,448 | - | 1,552,448 |
| **Total COLA** | **41,943,000** | **14,918,533** | **4,369,166** | **61,230,699** |
| **Christmas Bonus** | | | | |
| Act No. 109, Year 1997 | 34,862,000 | - | - | 34,862,000 |
| Act No. 159, Year 2003 | - | 1,728,300 | 1,343,100 | 3,071,400 |
| Act No. 433, Year 2004 and Act No. 144, Year 2005 | - | 1,728,300 | 1,343,100 | 3,071,400 |
| Act No. 98, Year 1980 and Act No. 14, Year 1987 | 414,000 | - | - | 414,000 |
| **Total Christmas Bonus** | **35,276,000** | **3,456,600** | **2,686,200** | **41,418,800** |
| **Widows** | | | | |
| Act No. 158, Year 2003 | 9,553,000 | 3,334,631 | 1,293,359 | 14,180,991 |
| Act No. 189, Year 1968 | 8,481,000 | - | - | 8,481,000 |
| Act No. 2, Year 1965 | 51,000 | - | - | 51,000 |
| Act No. 82, Year 1941 | 12,000 | - | - | 12,000 |
| Act No. 135, Year 1975 | - | - | - | - |
| **Total Widows** | **18,097,000** | **3,334,631** | **1,293,359** | **22,724,991** |
| **Medical Plan** | | | | |
| Act No. 95, Year 1963 | 85,755,000 | - | - | 85,755,000 |
| Act No. 155, Year 2003 | 8,000,000 | 1,746,800 | 1,356,600 | 11,103,400 |
| **Total Medical Plan** | **93,755,000** | **1,746,800** | **1,356,600** | **96,858,400** |
| **Others** | | | | |
| Act No. 124, Year 1993 - Pension increase | 386,000 | | | 386,000 |
| Act No. 127, Year 1958 - Benefits for high-risk participants | 17,000,000 | | | 17,000,000 |
| Act No. 208, Year 2000 - Difference between $200 increase or $1,000, whichever is lower | 6,153,000 | | | 6,153,000 |
| Act No. 37, Year 1941 - Summer bonus | 10,400,000 | | | 10,400,000 |
| Act No. 27, Year 1955 (Amended by Act 11, Year 1986) – Increase in death benefits | - | | | - |
| Act No. 524, Year 2004 - $250 increase in death benefits and Act No. 548, Year | 473,000 | | | 473,000 |
| Act No. 23, Year 1983 - Pension increase < $3,600 | 1,328,000 | | | 1,328,000 |
| Act No. 156, Year 1941 - $300 minimum pension increase | 11,559,000 | 425,610 | 1,928,038 | 13,912,648 |
| Act No. 72, Year 1956 - Cultural travel loans (ASR) | 521,000 | | | 521,000 |
| Act No. 6 and 7, Year 1950 - Benefits for participants of mass migration | 2,000 | | | 2,000 |
| **Total Others** | **47,822,000** | **425,610** | **1,928,038** | **50,175,648** |
| **Total Special Laws** | **$ 236,893,000** | **$ 23,882,174** | **$ 11,633,363** | **$ 272,408,537** |

CONFIDENTIAL

ERS_0046100

# Exhibit 4

CONFIDENTIAL

Exhibit 4
Select List of ERS Personnel (2004 - 2008)

| Name | Title / Position | 2004 | 2005 | 2006 | 2007 | 2008 | Pension Obligation Bonds | Personal Loans | Accounts Receivable |
|---|---|---|---|---|---|---|---|---|---|
| **ERS Board of Trustees (BOT)** | | | | | | | | | |
| Alfredo Salazar Conde | Acting Chairman of the GDB; Vice President of the BOT | | x | x | x | | x | x | |
| Angel A. Ortiz Garcia | Secretary, Treasury Department | | | | | x | x | | |
| Angel M. Castillo Rodriguez | Commissioner of Municipal Affairs; Chairman of the BOT | x | | x | x | | x | x | |
| Angel M. Castillo Rodriguez | Commissioner of Municipal Affairs, Vice Chairman of the BOT | | | | | x | x | | |
| Angel M. Castillo Rodriguez | Commissioner of Municipal Affairs | | x | | | | x | | |
| Antonio Faria Soto | President of GDB; Vice Chairman of the BOT | x | | | | | | | |
| Barbara Sanfiorenzo Zaragoza | Commissioner for Municipal Affairs | x | | | | | | | |
| Carlos J. Rosa Jimenez | Director of Human Resources Office of the Commonwealth of Puerto Rico | | | x | | | | | |
| Debralee Corazanna | Acting director of Human Resources, Office of the Commonwealth of PR | | | x | | | | | |
| Emmaline Garcia Garcia | Administrator, Central Advisory Office for Education and Human Resources Administration; Secretary of the BOT | x - pre 6/04 | | | | | | | |
| Jorge Irizarry Herrans | Interim president, GDB; Vice Chairman of the BOT | | | | x - 9/29/07 | | x | x | |
| Jorge Irizarry Herrans | President, GDB; Chairman of the BOT | | | | | x | x | | |
| Jose G. Davila Matos | Secretary of Treasury | | | | | x | x | | |
| Juan A. Flores Galarza | Secretary of Treasury, Chairman of the Board of Trustees | x | | | | | | | |
| Juan C. Mendez Torres | Secretary of Treasury | | x | x | x | | x | x | |
| Luisa Herrera Jimenez | Special Assistant, Department of Transportation and Public Works; Secretary of BOT | x - post 6/04 | x | | | | | | |
| Luisa Herrera Jimenez | Special Assistant, Department of Transportation and Public Works | x | | | | | | | |
| Luz Nidad-Mainzer Colon | Acting Director of the Human Resources Office of the Commonwealth of PR | | | | x | | x | | |
| Marta Beltran Donas | Director of the Human Resources Office of the Commonwealth | | x | | | | | | |
| Maria Vera Ramirez | Director of the Human Resources Office of the Commonwealth | | | | x | x | x | x | |
| Maria Vera Ramirez | Executive Assistant, Secretary of Management and Development, Representative-participant | | | | x | | x | x | |
| Robert E. Aquino Garcia | Member Representative - Pensioners; President of the BOT | | x | x | | | x | | |
| Robert E. Aquino Garcia | Member Representative - Pensioners; President, Pensioner's Association | x | | | | | x | | |
| Robert E. Aquino Garcia | Member Representative - Pensioners | | | | | x | x | | |
| Roberto E. Aquire Garcia | President of the Association of Pensioners, Representative of Pensioners | | | | x | x | x | x | |
| Roberto Santiago Carrion | Assistant Secretary of General Affairs, Department of Labor; Representative - Participants | | x | x | | | x | | |
| Roberto Santiago Carrion | Associate Inspector, Office of Inspector Cooperative, Representative - Participants | | | x | x | x | x | x | |
| Rosa Castro Rivera | Executive Assistant, Administration of Housing Development and Improvements; Representative - participants | | | x | | | x | | |
| Rosa Castro Rivera | Secretary to the BOT | | | | x | | x | x | |
| Rosa Castro Rivera | Executive Assistant to the Secretary for Management and Development, Management of Developers and Home Improvement; Representative - Participants; Secretary of the BOT | | | | | x | x | | |
| William Lockwood Benet | President of the GDB; Vice Chairman of the BOT | | x | | | | x | | |
| **Representative from the Offices of the Board of Trustees** | | | | | | | | | |
| Marixsa Iorie Figueroa | General Counsel of the BOT | x | x | x | x | x | x | | |
| **Representative from the ERS Administration that participated in certain ERS BOD meetings** | | | | | | | | | |
| Harold Gonzalez Rosado | Administrator | | | | | x - July 2008 | x | | x |
| Jose L. Monroy Gonzalez | Deputy Administrator | | | x | x | x | x | | |
| Jose L. Villafañe Ramos | Assistant Manager | | | x | x | x | x | x | x |
| Jose O. Reyes Portalatin | Assistant Director for Finance and Investments | | | | | x | x | x | |
| Jose Sierra Morales | Deputy Administrator | x | | | | | x | x | |
| Juan Cancel Alegria | Administrator | | x | x | x | x | x | x | x |
| Luis Alvarez Miranda | Director, Office of Investment and Actuarial Studies | | | | x | | x | x | x |
| Luis Garcia Lopez | Director, Investment and Actuarial Studies Office | | | | | x | x | x | |
| Madiel Marchand Caspe | Administrator | x | | | | | | | x |
| Meily Gonzalez Alvarez | Acting Administrator | | | | | x | x | | x |
| Ramon Rodriguez Ortega | Deputy Administrator | x | | | | | | | |
| Roberto Rivera Cruz | Deputy Administrator | | x | x | | | | | |

Note:
2004 - 2008 information based on monthly meeting minutes of the Board of Trustees - ERS

Page 1 of 1

CONFIDENTIAL

Exhibit 4
Select List of GDB Personnel (2005 - 2008)

|  | Title / Position | 2005 | 2006 | 2007 | 2008 | Relevant Area of Responsibility Pension Obligation Bonds | Personal Loans | Accounts Receivable |
|---|---|---|---|---|---|---|---|---|
| **Board of Directors - GDB** | | | | | | | | |
| Alfredo Salazar-Conde | Chairman | x | x | x - until 12/4/07 | | x | | |
| Ana I. Vila-Davila | Member | | | | x | x | | |
| Armando Valdes Prieto | Member | | | | x | x | | |
| Ernesto A. Melendez-Perez | Member | x | x | x | x | x | | |
| Ileana I. Fas-Pacheco | Member | x | | | | x | | |
| Jorge P. Silva-Puras | Member | x | x | x | x | x | | |
| Jose F. Rodriguez-Perello | Vice Chairman | x | x | | | x | | |
| Jose G. Davila Matos | Member | | x - as of 8/08 | x | x | x | | |
| Juan C. Mendez-Torres | Member | x | x | x | | x | | |
| Luis A. Aviles-Pagan | Vice Chairman | | | x | x | x | | |
| Rafael F. Martinez-Margarida | Member | x | x | x | | x | | |
| Rafael F. Martinez-Margarida | Chairman | | | x - as of 12/07 | x | x | | |
| | | | | | | | | |
| **Officers of the Board - GDB** | | | | | | | | |
| Olga I. Ortiz-Guadalupe | Secretary | x | x | x | x | x | | |
| Minia Gozalez-Alvarez | Assistant Secretary | x | x | x | | x | | |
| | | | | | | | | |
| **Officers of the Bank - GDB** | | | | | | | | |
| Alfredo Salazar-Conde | Acting President | x | | | | x | | |
| Alfredo Salazar-Conde | President | | x | x - before 8/07 | | x | | |
| Ana E. Torres | Assistant Vice President | | | x | x | x | | |
| Hugo Diaz-Molini | Executive Vice President and Treasurer | x | x | x | | x | | |
| Jorge Irizarry-Herrans | Executive Vice President | x | x | | | x | | |
| Jorge Irizarry-Herrans | Acting President | | | x - as of 8/07 | | x | | |
| Jorge Irizarry-Herrans | President | | | x - as of 12/07 | x | x | | |
| Jose G. Davila | Executive Vice President | x | | | | | | |
| Luis Alfaro Martinez | Vice President | | | | x | x | | |
| Minia Gozalez-Alvarez | Senior Vice President | x | x | | | | | |
| Minia Gozalez-Alvarez | Acting General Counsel and SVP | | x - as of 8/08 | x | | | | |
| William Lockwood-Benet | President | x - resigned | | | | x | | |

Notes
(a) All 2005 designations based on M1010 - various resolutions
(b) All 2006 designations based on M1032 - various resolutions
(c) All 2007 designations based on M1049 - various resolutions
(d) 2008 designations based on ERS meeting minutes and M1076 GDB BOD meeting minutes.

CONFIDENTIAL

ERS_0046103

Exhibit 4
Select List of Other Parties of Interest (2007 - 2008)

| | Role | 2005 | 2006 | 2007 | 2008 | Pension Obligation Bonds | Personal Loans | Accounts Receivable |
|---|---|---|---|---|---|---|---|---|
| Merrill Lynch<br>4 World Financial Center<br>250 Vessey Street, 9th Floor<br>New York, NY 10080 | Lead Bookrunner & Senior Manager | | | X | X | X | | |
| UBS Financial Services Incorporated of PR<br>9th Floor American International Plaza<br>254 Muñoz Rivera Avenue<br>San Juan, PR 00918 | Lead Bookrunner & Senior Manager | | | | X | X | | |
| DEPFA Bank<br>623 Fifth Avenue<br>22nd Floor<br>New York, NY 10022 | Co-Senior Manager | | | X | X | X | | |
| First Albany Capital<br>One Penn Plaza, 42nd Floor<br>New York, NY 10119 | Co-Senior Manager | | | X | X | X | | |
| UBS Investment Consultants of Puerto Rico /<br>UBS PR Consulting | Investment Consultants | | | X | X | X | | |
| Meskow Financial<br>350 North Clark Street<br>Chicago, IL 60610 | Financial Advisor to GDB | | | X | X | X | | |
| Fiddler Gonzalez and Rodriguez<br>254 Muñoz Rivera Ave. 6th Floor<br>Hato Rey, Puerto Rico 00918 | Bond Counsel | | | X | X | X | | |
| O'Neill & Borges<br>American International Plaza<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, Puerto Rico 00918-1813 | Underwriter's Counsel | | | X | X | X | | |
| Sidley Austin LLP<br>787 Seventh Avenue<br>New York, NY 10019 | Underwriter's Counsel | | | X | X | X | | |

Relevant Area of Responsibility

Note:
2007 - 2008 Information based PO3 Tending and Action Plan included in working papers provided by the GDB

CONFIDENTIAL

ERS_0046104

 **Gobierno de Puerto Rico**
ADMINISTRACION DE LOS SISTEMAS DE RETIRO DE
LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA

18 de octubre de 2010
Contacto: Carlos Ramos Domenech
(787) 431-6847 / (787) 753-8757
cramosdomenech@yahoo.com; cramos@asr.gobierno.pr

# Comunicado de prensa

## Referido a Justicia, Ética y el Contralor por malos manejos en Sistemas de Retiro
*Informe independiente señala posibles violaciones de responsabilidad fiduciaria de parte de pasados
Administradores de Retiro y pasados presidentes del Banco Gubernamental de Fomento*

**San Juan, P.R. -**El administrador de los Sistemas de Retiro del Gobierno y la Judicatura, Héctor Mayol
Kauffmann, refirió en el día de hoy al Departamento de Justicia, a la Oficina de Ética Gubernamental, a la
Oficina del Contralor y a las comisiones correspondientes de Cámara y Senado, los hallazgos del Informe
Independiente Sobre los Eventos y Decisiones que Han Causado la Crisis Financiera de los Sistemas de Retiro
de Empleados del Gobierno de Puerto Rico.

En su conclusión, el informe nombra a varios funcionarios de la pasada administración del Gobernador Aníbal
Acevedo Vilá como los responsables de una serie de decisiones que han puesto en serio peligro la salud
financiera de los Sistemas de Retiro y, por lo tanto, su capacidad de pagarle los beneficios de retiro a los
pensionados en el futuro.

La firma independiente de consultores financieros especializados en evaluaciones y análisis forenses Conway
MacKenzie realizó un minucioso estudio sobre las causas que llevaron al Sistema de Retiro a la crisis que ahora
enfrenta y concluyó  que aunque una serie de factores han contribuido al deterioro de la solidez financiera del
sistema a través de su historia, las decisiones de los funcionarios que estuvieron a cargo entre el 2004 y el
2008 agravaron significativamente la situación.

"Aunque la combinación de los beneficios bajo la Ley 447, Leyes Especiales y procedimientos inadecuados de
capitalización han resultado en un deterioro significativo del nivel de capitalización del Sistema de Retiro a
través de sus 60 años de historia, ciertas decisiones recientes de parte de aquellos responsables por el manejo
y la supervisión del Sistema han exacerbado el problema", reza el informe.

En particular, el informe señala que del 2004 al 2008 ni la Junta de Síndicos ni la gerencia del Sistema de Retiro
atendieron su creciente insuficiencia actuarial, que quiere decir que el Sistema no tiene suficiente dinero para
pagar todos los beneficios que tendría que pagar en el futuro.

*Además, durante el mismo período se aprobaron una serie de Leyes Especiales que aumentaron los* beneficios
sin identificar fuentes de fondos de los cuales poder pagar dichos beneficios. El informe también critica la
implantación de una serie de ventanas de retiro temprano sin que las agencias concernidas tuvieran el dinero
para pagar los correspondientes beneficios de retiro.

CONFIDENTIAL                                                                    ERS_0046105

Pero las críticas más fuertes en el Informe Independiente están dirigidas a las decisiones de la gerencia del Sistema de Retiro—en particular de sus Administradores Juan Cancel Alegría, Minia González Álvarez y Harold González, así como de los pasados presidentes del Banco Gubernamental de Fomento ("BGF") Alfredo Salazar y Jorge Irizarry—en cuanto a subir el balance máximo de préstamos personales, así como la controvertible emisión de $3,000 millones en bonos de obligación de pensión ("POB", por sus siglas en inglés).

Según el informe, la decisión de subir de $5,000 a $15,000 el máximo que los miembros del Sistema pueden coger en préstamos personales ha erosionado significativamente la liquidez del Sistema de Retiro. Por otro lado, la controvertible transacción de los $3,000 millones en bonos de obligación de pensión, en lugar de reducir el déficit actuarial del Sistema, lo que ha hecho es empeorar la situación financiera del mismo.

"Este estudio que se acaba de recibir será referido a las autoridades correspondientes en el día de hoy, dado a que el mismo recomienda una investigación a profundidad que sólo pueden llevar a cabo las autoridades pertinentes. En particular, el mismo informe recomienda una investigación más profunda sobre el proceso de análisis llevado a cabo para apoyar la decisión de emitir $3,000 millones en bonos de obligación de pensión en el año 2008, ya que el informe señala que la transacción de $3,000 millones en POBs fue no solamente mal concebida y especulativa como mecanismo para mejorar el nivel de capitalización del Sistema, sino que la misma puede haber conllevado violación de las responsabilidades fiduciarias tanto de la gerencia del Sistema de Retiro como de su Junta de Síndicos, y eso es bien serio", afirmó Mayol.

Mayol explicó que según la documentación y los informes revisados, la firma Conway MacKenzie entiende que la gerencia de la Administración de los Sistemas de Retiro, el BGF como agente fiscal y sus respectivas Juntas de Directores, no analizaron ni entendían en su totalidad las posibles repercusiones que tenía esta emisión de bonos riesgosa y totalmente especulativa. Peor aún, el hallazgo más sorprendente fue la decisión del Gobierno de continuar con dicha emisión a pesar de las muchas señales existentes que evidenciaban que la implantación de esta estrategia sería dificultosa y hasta imposible.

El informe también pone al descubierto aparentes irregularidades en la documentación de dicha transacción toda vez que no aparecen las minutas de reuniones claves de la Junta de Directores del BGF así como de su Comité Ejecutivo en las cuales se habría discutido la transacción de los $3,000 millones en POBs. Así mismo, tampoco aparece un alegado informe que pudiera haber preparado la firma Mesirow Financial, asesor financiero al BGF para esta transacción.

Entre los oficiales y directores responsables de tomar estas decisiones fueron Alfredo Salazar Conde y Jorge Irizarry Herráns del Banco Gubernamental de Fomento, Juan Cancel Alegría, Minia González Álvarez y Harold González de los Sistemas de Retiro y José G. Dávila Matos y Juan C. Méndez Torres del Departamento de Hacienda.

### 

CONFIDENTIAL



*Gobierno de Puerto Rico*
**ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO
DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA
PO BOX 42003 • SAN JUAN, PR 00940-2203**

18 de octubre de 2010

Hon. Guillermo Somoza Colombani
Secretario
Departamento de Justicia
Apartado 90220192
San Juan, Puerto Rico 00902

Estimado señor Secretario:

El 30 de junio de 2010, la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura ("Administración") y el Banco Gubernamental de Fomento para Puerto Rico ("BGF") solicitaron los servicios de la firma de contabilidad forense Conway MacKenzie, Inc. ("Conway") con el propósito de investigar las causas que han agravado la crisis actuarial que afecta al Sistema de Retiro de los Empleados de Gobierno ("Sistema") en los últimos años.

Luego de un proceso de recopilación y análisis de la información suministrada por directivos de la Administración y el BGF sobre varios asuntos que pueden haber agravado la situación actuarial del Sistema, Conway presentó un informe detallando los hallazgos que obtuvieron de su investigación ("Informe de Hallazgos").

Del Informe de Hallazgos, se desprende que la gerencia de la Administración, la Junta de Síndicos del Sistema y la Junta de Directores del BGF, pudieron haber actuado de manera ilegal o antiética referente al manejo y toma de decisiones pertinentes a varias transacciones que afectaron a los activos del Sistema en contravención a los Artículos 4-102 (Facultades y Deberes de la Junta) y 4-103 (Facultades y Deberes del Administrador) de la Ley 447 de 15 de mayo de 1951, según enmendada; la Ley 113 de 25 de mayo de 2006, según enmendada (Ley para la Reforma Fiscal de 2006); y/o cualquier otra ley o reglamento aplicable. Por lo cual, es nuestra obligación referirles copia del Informe de Hallazgos para su análisis, estudio y acción correspondiente. (Véase Anejo)

El Exhibit Núm. 4 del Informe de Hallazgos presenta una relación de los miembros de la gerencia de la Administración, Junta de Síndicos del Sistema y Junta de Directores del BGF, con su participación en las transacciones o toma de decisiones detalladas en el Informe de Hallazgos.



Página 2
18 de octubre de 2010
Hon. Guillermo Somoza

A tono con lo anterior, recabamos su cooperación en este asunto que es de suma importancia para el Sistema.

Estamos a su disposición para proveerle cualquier información que le sea de utilidad en los trámites del presente caso.

Atentamente,

Hector M. Mayol Kauffmann
Administrador

Anejo

C  Hon. Luís G. Fortuño Burset, Gobernador
   Hon. Tomás Rivera Schatz, Presidente del Senado
   Hon. Jennifer González Colón, Presidenta de la Cámara de Representantes

CONFIDENTIAL



*Gobierno de Puerto Rico*
**ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO**
**DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA**
**PO BOX 42003 • SAN JUAN, PR 00940-2203**

18 de octubre de 2010

CPA Yesmín M. Valdivieso
Contralora
Oficina del Contralor
105 Ave. Ponce de León
San Juan, Puerto Rico 00917-1136

Estimada señora Contralora:

El 30 de junio de 2010, la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura ("Administración") y el Banco Gubernamental de Fomento para Puerto Rico ("BGF") solicitaron los servicios de la firma de contabilidad forense Conway MacKenzie, Inc. ("Conway") con el propósito de investigar las causas que han agravado la crisis actuarial que afecta al Sistema de Retiro de los Empleados del Gobierno ("Sistema") en los últimos años.

Luego de un proceso de recopilación y análisis de la información suministrada por directivos de la Administración y el BGF sobre varios asuntos que pueden haber agravado la situación actuarial del Sistema, Conway presentó un informe detallando los hallazgos que obtuvieron de su investigación ("Informe de Hallazgos").

Del Informe de Hallazgos, se desprende que la gerencia de la Administración, la Junta de Síndicos del Sistema y la Junta de Directores del BGF, pudieron haber actuado de manera ilegal o antiética referente al manejo y toma de decisiones pertinentes a varias transacciones que afectaron a los activos del Sistema en contravención a los Artículos 4-102 (Facultades y Deberes de la Junta) y 4-103 (Facultades y Deberes del Administrador) de la Ley 447 de 15 de mayo de 1951, según enmendada; la Ley 113 de 25 de mayo de 2006, según enmendada (Ley para la Reforma Fiscal de 2006); y/o cualquier otra ley o reglamento aplicable. Por lo cual, es nuestra obligación referirles copia del Informe de Hallazgos para su análisis, estudio y acción correspondiente. (Véase Anejo)

El Exhibit Núm. 4 del Informe de Hallazgos presenta una relación de los miembros de la gerencia de la Administración, Junta de Síndicos del Sistema y

CONFIDENTIAL



Página 2
18 de octubre de 2010
CPA Yesmin M. Valdivieso

Junta de Directores del BGF, con su participación en las transacciones o toma de decisiones detalladas en el Informe de Hallazgos.

A tono con lo anterior, recabamos su cooperación en este asunto que es de suma importancia para el Sistema.

Estamos a su disposición para proveerle cualquier información que le sea de utilidad en los trámites del presente caso.

Atentamente,

Héctor M. Mayol Kauffmann
Administrador

Anejo

C  Hon. Luís G. Fortuño Burset, Gobernador
   Hon. Tomás Rivera Schatz, Presidente del Senado
   Hon. Jennifer González Colón, Presidenta de la Cámara de Representantes

CONFIDENTIAL



*Gobierno de Puerto Rico*
**ADMINISTRACIÓN DE LOS SISTEMAS DE RETIRO
DE LOS EMPLEADOS DEL GOBIERNO Y LA JUDICATURA**
PO BOX 42003 • SAN JUAN, PR 00940-2203

18 de octubre de 2010

Lcda. Zulma R. Rosario
Directora Ejecutiva
Oficina de Ética Gubernamental
Urb. Industrial El Paraíso
108 Calle Ganges
San Juan, Puerto Rico 00926-2906

Estimada señora Directora:

El 30 de junio de 2010, la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura ("Administración") y el Banco Gubernamental de Fomento para Puerto Rico ("BGF") solicitaron los servicios de la firma de contabilidad forense Conway MacKenzie, Inc. ("Conway") con el propósito de investigar las causas que han agravado la crisis actuarial que afecta al Sistema de Retiro de los Empleados del Gobierno ("Sistema") en los últimos años.

Luego de un proceso de recopilación y análisis de la información suministrada por directivos de la Administración y el BGF sobre varios asuntos que pueden haber agravado la situación actuarial del Sistema, Conway presentó un informe detallando los hallazgos que obtuvieron de su investigación ("Informe de Hallazgos").

Del Informe de Hallazgos, se desprende que la gerencia de la Administración, la Junta de Síndicos del Sistema y la Junta de Directores del BGF, pudieron haber actuado de manera ilegal o antiética referente al manejo y toma de decisiones pertinentes a varias transacciones que afectaron a los activos del Sistema en contravención a los Artículos 4-102 (Facultades y Deberes de la Junta) y 4-103 (Facultades y Deberes del Administrador) de la Ley 447 de 15 de mayo de 1951, según enmendada; la Ley 113 de 25 de mayo de 2006, según enmendada (Ley para la Reforma Fiscal de 2006); y/o cualquier otra ley o reglamento aplicable. Por lo cual es nuestra obligación referirles copia del Informe de Hallazgos para su análisis, estudio y acción correspondiente. (Véase Anejo)

El Exhibit Núm. 4 del Informe de Hallazgos presenta una relación de los miembros de la gerencia de la Administración, Junta de Síndicos del Sistema y



Junta de Directores del BGF, con su participación en las transacciones o toma de decisiones detalladas en el Informe de Hallazgos.

A tono con lo anterior, recabamos su cooperación en este asunto que es de suma importancia para el Sistema.

Estamos a su disposición para proveerle cualquier información que le sea de utilidad en los trámites del presente caso.

Atentamente,

Héctor M. Mayol Kauffmann
Administrador

Anejo

C Hon. Luís G. Fortuño Burset, Gobernador
Hon. Tomás Rivera Schatz, Presidente del Senado
Hon. Jennifer González Colón, Presidenta de la Cámara de Representantes

CONFIDENTIAL

# Exhibit 81

CERTIFIED TRANSLATION

<u>RETIREMENT</u>
GOVERNMENT OF PUERTO RICO

MINUTES CORRESPONDING TO THE ORDINARY MEETING
HELD ON FEBRUARY 23, 2012

MEMBERS PRESENT:

| | |
|---|---|
| Mr. Juan Carlos Batlle | President of the Puerto Rico Government Development Bank and President of the Board of Trustees. |
| Mr. Esteban Morales | Representative of the Office of the Commissioner for Municipal Affairs and Vice President of the Board of Trustees. |
| Ms. Marilyn Cruz Vargas | Representative of the Secretary of the Treasury Department and the Secretary of the Board of Trustees. |
| Mr. Jose. L. Carrasquillo Santiago | Representative of the System Retirees. |
| Hon. Juan R. Hernandez | Representative of the System Participants. |
| Mr. Marcos Andrade Ravelo | Representative of the Director of Human Resources Administration and Labor Matters (OCALARH, acronym in Spanish) Training and Advisory. |
| Ms. Carmen Rosado | Representative of System Participants. |
| Mr. Reinaldo Paniagua | Representative of the President of the Federation of Mayors. |
| Mr. Jaime Garcia | Representative of the President of the Association of Mayors. |

PO Box 40316, San Juan, PR 00940-0316 • Tel. (787) 754-4545 Exts. 4296/4285/4284

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 2

NOT PRESENT:

| | |
|---|---|
| Mr. Luis Roberto Rivera Cruz | Municipal Affairs Commissioner, Vice President of the Board of Trustees. |
| Hon. Jesus F. Mendez Rodriguez | Secretary of the Treasury Department, Secretary of the Board of Trustees. |
| Hon. Hector O'Neill Garcia | President of the Federation of Mayors |
| Hon. Jose Santiago Rivera | President of the Association of Mayors |
| Mr. Richard Mendez Santiago | Representative of System Participants. |

REPRESENTATIVE OFFICE BOARD OF TRUSTEES

| | |
|---|---|
| Mr. Alexis J. Carlo Rios, Esq. | General Legal Advisor, Office of the Secretary of the Board of Trustees. |
| Juan Roman Serpa, CPA | General Auditor, Office of the Auditor for the Board of Trustees |

ASR REPRESENTATIVE

| | |
|---|---|
| Mr. Hector M. Mayol Kauffman | Administrator of the Retirement Systems of the Employees of the Government and the Judiciary |
| Mr. Carlos Ramos Fonseca | Assistant Administrator in the Area of Investments of Retirement Systems Administration. |
| Ms. Cecile Tirado | Director of the Comptroller's Area for Retirement System Administration |
| Ms. Daisy Torres | Director, Human Resources |

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 3

GUESTS:

| | |
|---|---|
| Mr. Rivera Vicente, Esq. | External Legal Advisor CNR&D |
| Mr. Arturo Diaz Abramo | External Legal Advisor CNR&|D |
| Mr. Anthony Murray | External Legal Advisor CNR&|D |

Having achieved quorum, the meeting commenced at 10:00 am, in the Conference Room for the Retirement System Administration for the Employees of the Government and the Judiciary (Administration), on the 15th Floor of the Agency. Mr. Esteban Morales initially presided the meeting, in representation of the Vice President of the Board, then the President, Juan Carlos Batlle joined him and directed the Board's work.  The General Legal Advisor gave each Trustee and the Administrator of the ASR, Mr. Hector M. Mayol Kauffman (Administrator) a work packet with the documents to be used during the meeting.

4183: I.      Approval of the Minutes of the Ordinary Meeting held on December 23, 2011

The General Legal Advisor submitted to the members of the Board for discussion and approval a draft of the minutes corresponding to the Ordinary Meeting held on December 23, 2011. Since there were no comments, Mr. Esteban Morales made a motion to approve the minutes. Mr. Jose Luis Carrasquillo seconded the motion, and as there were no objections, the motion was unanimously approved.

4184: II.     Election of Officers of the Board

The President mentioned that due to the fact that the Board has had several changes in the composition of its members, it should reevaluate what members should be officers of the Board. The President recommended that Mr. Jose

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 4

Luis Carrasquillo be the new President of the Board, that Treasury Secretary Mr. Jesus F. Mendez continue to be Secretary and that Mr. Juan Carlos Batlle continue to be an officer under the position of Vice President of the Board. He stated that the main reason for said recommendation was that as he participates in over 20 different boards where he presides several of them or has a position that cannot be delegated, he believes that it would be prudent for a person with a lighter schedule to preside so that the frequency of meetings may be increased. He added that this way the Board could be more active. The President made a motion for the President of the Board to be Mr. Jose Luis Carrasquillo, the Vice President to be the President of BGF (acronym in Spanish), Mr. Juan Carlos Batlle, and the Secretary to be the Treasury Secretary, Mr. Jesus F. Mendez. The motion was seconded by Mr. Esteban Morales. As there were no objections, it was unanimously approved. It was clarified that the new officers would commence their duties subsequent to the current meeting.

It was agreed that a calendar be circulated with dates proposed for the meetings that would be held during the year.

4185:   III.      Recommendation of the Case Evaluation Committee

The General Legal Advisor submitted to the Board the drafts of the resolution submitted by the administrative officers of the Board of Trustees. The drafts of the resolution were previously referred to the attention of the Members of the Case Evaluation Committee for the appropriate assessment and recommendation to the Board of Trustees. Mr. Samuel G. Davila Cid and Mr. Jose L. Carrasquillo Santiago recommend approval of the reports submitted by the administrative officers.

The drafts of the resolution submitted for approval are as follows:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 5

DECEMBER 2011

| NAME | CASE NO. |
|------|----------|

CONFIRM

| | | |
|---|---|---|
| 1. | Betty Alvarado Merced | 2008-0019 |
| 2. | Luis F. Nazario Sánchez | 2009-0258 |
| 3. | Héctor Correa Hernández | 2009-0335 |
| 4. | Mayra Jiménez Vázquez | 2010-0007 |
| 5. | Juan José Hernández Valentín | 2010-0121 |
| 6. | Blanca Candelaria Medina | 2010-0138 |
| 7. | Dionisia Ríos Martínez | 2010-0145 |

REVOKE

| | | |
|---|---|---|
| 1. | María de los A. Cabrera Rivera | 2008-0313 |
| 2. | Juan E. Hernández Arce | 2009-0204 |
| 3. | Maritza García Carrión | 2009-0206 |
| 4. | Félix Silva Reyes | 2010-0005 |
| 5. | María Rivera Vázquez | 2011-0075 |

RETURN

| | | |
|---|---|---|
| 1. | Sandra Rivera Marrero | 2010-0184 |
| 2. | Héctor L. Rivas Colón | 2010-0254 |
| 3. | Militza Emelina Medina Quiñones | 2010-0260 |
| 4. | José Antonio Carrión Betancourt | 2010-0275 |
| 5. | Delia Bauzó Calderón | 2010-0292 |
| 6. | Marisol Rosario Barbosa | 2010-0294 |
| 7. | Judith Ornara Ruíz Álvarez | 2011-0052 |
| 8. | Edgardo Marcucci Ramírez | 2011-0055 |
| 9. | Lilia Rivera de Jesús | 2011-0083 |
| 10. | Miguel A. Ferrer Irizarry | 2011-0094 |
| 11. | Luis Antonio Latorre Cardona | 2011-0095 |
| 12. | Ángel Nieves Soto | 2011-0099 |
| 13. | Nancy Merced del Valle | 2011-0105 |
| 14. | Edgardo Rodríguez Nieves | 2011-0132 |

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 6

JANUARY 2012

NAME                                                                    CASE NO.

CONFIRM

1.  Gladys Vélez Cruz                                    2009-0393
2.  Wilfredo de León Román                          2010-0103
3.  Marcial Fernando Santiago Román            2010-0140


REVOKE

1.  Grisel Alvarado Rivera                             2008-0277
2.  Luz Celenia Cordero Calero                      2009-0370
3.  Fernando L. Collazo González                   2009-0376

RETURN

1.   Carmelo Maldonado Rivera                      2010-0019
2.   Elizabeth Burgos Rodríguez                     2010-0154
3.   Domingo Cortés Rivera                            2010-0206
4.   Nereida Malavé Pagán                            2010-0225
5.   Juan A. Cortés Roldán                            2011-0003
6.   Radamés Benítez Fontánez                     2011-0009
         (Jelany Benítez Rodríguez, Idalia Rodríguez Cruz)
7.   María del Río Martínez                           2011-0062
8 .  Alexis García Velázquez                         2011-0073
9.   Evelyn Feliciano Cuevas                         2011-0082
10.  Rosa M. González River a                      2011-0123
11.  Ana Cruz Montoyo                               2011-0124
12.  Samuel Rivera Capetillo                         2011-0152
13.  Marta I. Rivera Ortíz                            2011-0165

FILE

1.  Sergio Pérez Nogueiro                            2009-0346
2.  Nayda Pagán Velázquez                          2011-0064
3.  Roberto Santos Escribano                        2011-0073
4.  Rolando Silva Iglecia                              2011-0102
5.  Virginia Valentín Vargas                         2011-0144
6.  Carlos Eligio Brito Burgos                       2011-0154


The Board took into account the recommendation of the members of the Case Evaluation Committee for the reports submitted during the months of December 2011 and January 2012. The President, Juan Carlos Batlle made

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 7

a motion approving the reports and Ms. Carmen Rosado seconded the motion. As there were no objections, the reports that were submitted were approved.

4186:  IV.      Matters of the Audit Office

The General Auditor delivered a follow-up report to the 2011-2012 Audit Plan. He mentioned that the report describes the areas that are being audited and their respective units. He mentioned that page 6 of the report describes the units and percentage of completed audits. He added that page 7 of the report describes the audits that are to be discussed with management and those that are in the process of final review. He mentioned the audit of the entire agency through 2010-2011 shall be completed by fiscal year 2012-2013. The President asked when he began to work with these audits, how delayed were they. The Auditor mentioned that there were areas that had not been audited and that under his supervision they are attempting to audit every area. Ms. Rosado asked what procedures can be seen as examples in the service area. The auditor mentioned that the entire operation in procedures is being audited. The President asked if there is any information that the Board should know which was not included in the report. The auditor stated that not at the moment.

Mr. Jose Luis Carrasquillo raised the concern as to inappropriate pension payments to deceased retirees, specifically as to how efficient the Administration has been in collecting said undue payments. The auditor mentioned that that is registered in the comptroller's area, and that this was an area where an audit was pending.

After the report was reviewed, the Board deemed the auditor's report submitted.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 8

4187:   V.       Report as to Conway MacKenzie study

Mr. Carlos Rivera Vicente delivered to the members of the Board a copy of the presentation as to his analysis regarding the report prepared by the forensic accounting firm, Conway Mackenzie. Mr. Rivera Vicente began by giving a background as to the matter; he mentioned that the administration of 2008 established a public policy of prioritizing the situation that the Retirement System had at the time. They had taken into account the concerns as to the continuity of the plan and the short-term payment of pensions and benefits. For 4 years, the Board at the time, the Administrator, the Board of the BGF and the BGF as fiscal agent, began to receive advice from world-renowned firms: Merrill Lynch, UBS and Global Insight; as well as legal advice from well-known firms, such as Fiddler Gonzalez and Oneill & Borges. In other words, the Board gathered all of the technical and legal information to proceed with 3 issuances totaling 3 billion dollars. With this background in mind, and the recent legal action from some participants for a derivative suit against a government trust, he examined the complaint that includes the reports prepared by Conway Mackenzie and the Retirement Affairs Commission. He indicated that said reports are inadmissible as evidence and do not comply with any guarantee of trustworthiness, legitimacy and veracity so as to be admissible in court. In his opinion, it is just a strategy of the attorneys to file a sensationalist document. He added that the complaint does not define the injuries and that they are speculative. Mr. Rivera mentioned that after the complaint is answered, a motion to dismiss or motion for summary judgment should be filed if it includes extrinsic evidence. He believes that the complaint does not raise

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 9

a justiciable dispute, therefore it should be dismissed. Furthermore, that plaintiffs do not have standing because they have not incurred any real and obvious harm that prevents them from continuing to receive their pensions. He mentioned that the main allegation against the Board is that it did not act as to said events, an allegation that can be defeated since the Board sent a letter reviewed by several firms for the members to cover their liability with the System. Mr. Rivera mentioned that he did not see any valid cause of action against defendants, meaning the members of former boards, external consultants and that the complaint has been answered accordingly.

Mr. Rivera mentioned that after reviewing minutes, offering statements, opinions and other documents, with the caveat that the opinion of [the] Justice [Department] that was analyzed did not include an "addendum" referenced in said opinion. He mentioned that he does not have the slightest doubt that the BGF as fiscal agent acted in accordance with its fiduciary duties and following the criteria included in the Business Judgment Rule defense. He mentioned that he would soon deliver to the members of the Board every reviewed document so that they would have the relevant information. He reiterated that the allegations of the complaint are inflammatory and that the allegation that they waived their rights is invalid because a letter was sent in order to have time to obtain an investigation and an opinion to see if there was any illegality in the transaction.

Mr. Rivera Vicente mentioned that courts review the circumstances as they were at the moment the event took place. He reiterated that this Board does not have any obligation to file a suit against prior Boards when the issuance took place. He also does not see any action against the people who participated as advisors.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 10

As to the allegation regarding future employer contributions being levied, Mr. Rivera believes that the System has the capacity to incur in debt, to pledge its assets and to consider that part of their assets are future contributions. Mr. Anthony Murray added that this is proven by the fact that the Legislative Assembly subsequently amended Law 447 to restrict those procedures.

He continued his statement mentioning that Law 447 establishes some principles similar to those established in the General Corporations Act that should be followed to allow for any decision as to administration: foresight, care, and attention that they would have had in dealing with their own matters.

The attorney continued by mentioning that the rule that is used is the "Prudent Man Rule" stemming from legislation, case law, and statutes of the U.S.A. whose language is identical to the language of the System. He mentioned that once all of the warnings in the documents that are incidental to the issuances are observed, there is no doubt that the Board's duties were complied with. He added that there is federal legislation: "Uniform Prudent Investor Act," whose requirements are practically identical to the System's. He added that the Law of Corporations mentions that the only way that they would be liable would be if gross negligence were proven and that that would mean a practically intentional situation. He added that that situation did not take place in this case, and that the commissions were actually extremely reasonable.

He mentioned that the defenses have already been included in the motion to answer that they prepared. The motion includes the answer and some conclusions. It was clarified that they are providing all of the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 11

information in order for each member to examine it in case they have to give a deposition. Mr. Rivera mentioned that the advice by experts was [exhaustive]; therefore, he has no doubt that they received all of the advice that they need. He added that according to what was talked about with the Administrator, the issuance allowed paying for pensioner obligations and that it is now resulting in a positive return.

Mr. Rivera mentioned that several opinions were submitted, in addition to the one that deals with the issuances. One of them deals with the measures for collecting employer contributions and the other one with the increase in borrowing parameters to address the matters noted in the report. He mentioned that the opinions detail all of the measures taken to deal with those obligations. The attorney concluded that he doesn't see any liability incurred by the previous Board in relation to collection of past late employer contributions.

As to the subject regarding increase of borrowing parameters, the attorney also concluded that previous Boards are not liable.

Lastly, the opinion includes whether any of the consultants were legally liable for the 2008 issuances. After analyzing the applicable case law and relevant documents, Mr. Rivera concluded that the BGF complied with its obligations, the underwriters also complied with their contractual duty, he did not see any conflict in relation to the function of UBS; in other words, each of those consultants acted prudently, did not deceive the System, and acted in good faith. The attorney mentioned that the complaint was answered with this whole analysis. As to the Conway report, it is inadmissible and has no veracity or credibility guarantee. Given said statement, Mr. Jaime García asked if it hadn't been the Retirement System Administration who had commissioned that report. The Administrator

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 12

mentioned that the BGF identified the signature and paid for the report; that the report was addressed to the Retirement System Administration and the BGF. He added that the report was referred to the [Office of Government] Ethics, the Department of Justice, and the Comptroller's Office for proper examination. He mentioned that the report has been used as a work tool to take corrective measures, such as reducing the borrowing parameters. The Administrator mentioned that with the benefit of hindsight we can now see that making that transaction was the correct decision, but if we go back to March of 2009 then the reaction is different. If the issuances had not been made, there would be no funds to pay for pensions.

Mr. Rivera mentioned that the answer would be used to enlighten the court and then a motion to dismiss would be filed.

The President of the Board asked why it hadn't been dismissed initially; Mr. Rivera stated that a motion to dismiss should include all possible arguments and since there are constitutional and jurisdictional arguments the court is deprived of authority. Mr. García stated that it would be advisable to send the letter in order to show that the Board was taking action in relation to this matter. Mr. Rivera stated that he'll be filing the motion to dismiss within the next 15-20 days. He added that he'll also be contacting the attorneys of UBS to collect information that may be included in the motion for dismissal or summary judgment.

Following a question by Ms. Marilyn Cruz regarding the ACE insurance company coverage, Mr. Rivera Vicente stated that a letter was received from ACE stating that they can deny coverage, and so a request for reconsideration

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 13

was prepared. Now we must wait for the insurance producer to notify about the result.

Following a question from Judge Hernández Sánchez, Mr. Rivera Vicente stated that the court gave until February 29th to submit documentation for parties who have already been summoned. Mr. Rivera Vicente stated that he will obtain copies of all reviewed documentation for the Board's information.

The President asked if an extension would be possible in order to be able to review the relevant documentation before the scheduled February 29th date to file pleadings. Mr. Murray stated that the Court would grant it. Immediately after that, the President thanked the attorneys of CNR&D and excused them from the meeting. The General Legal Advisor said that he would send meeting members the contact information of the external legal advisors to obtain the relevant legal documents.

**4188:         VI.      Actuarial Valuation and Investment Report**

The Administrator stated that in relation to the audited financial statements the actuary of the auditor still needs to finish an analysis that the same needs to do in this regard. Deputy Administrator Carlos Ramos Fonseca delivered a copy of the actuarial valuation drafts which are pending approval until the audited financial statements are submitted. The Administrator added that the only thing that can vary is for the external auditor to determine that the total assets are the ones mentioned in the valuation. Even if the valuation is not final, the Administrator invited members to review the actuarial valuation draft in order to see the situation in which the Systems are in and the different aggravating factors such as the purchase of uncredited services.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 14

     The Deputy Administrator, Carlos Ramos Fonseca, stated that after the disparity events in the markets, the performance has improved. He also stated that during the last trimester the portfolio performance was 2.6% against the "policy benchmark" which was 3%. As to the calendar year, the portfolio performance was 3.7% against the "policy benchmark" which was 2.7% even after a decrease in international investments of 11.5%. Mr. Ramos Fonseca stated that the new investment policy is still being applied in order to eliminate investment risk. The Administrator made reference to the manner in which the available cash has been used at BGF for payment of pensions and to the fact that if they had not had the money stemming from the issuance, there would only be enough money to pay for next year's pensions.

     The Administrator showed the Board two commitment letters from Banco Popular and Banco Cooperativo for purchase of loans. The Administrator stated that liquidity is needed and that it could be obtained by selling these loans and not having to liquidate assets. Mr. Calos Ramos stated that the main parameters include that the sale will be at 102% with 2% for "servicing". The Administrator stated that Banco Cooperativo had offered 101% so he suggests requiring 102% since that's the amount that would be paid by another competitor such as Banco Popular. The Administrator requested the authorization of the Board to sell $325 million in loans.

     To that end, Mr. Jaime García made a motion for the Board of Trustees to authorize the Administrator to sell an amount equal to $325 million in loans given by the Administration subject to the terms and conditions of the authorized transaction being substantially equal to the ones described in the letter of intention sent by Banco Popular de Puerto Rico and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 15

dated February 22, 2012 ("BPPR Letter"); and a copy of the BPPR Letter being part of this resolution. The motion was seconded by Mr. José Luís Carrasquillo. Since there was no objection, the motion was approved.

**4189:        VII.        Employer In Default Agreements and Report**

The Administrator made reference to a presentation detailing the debts with corporations, municipalities and the central government. The Administrator stated that this includes paying the 1% increase under Law 116-2011. Among the cases in the report, it mentioned that in relation to the AMA, the latter paid and their services were reopened. As to the Municipality of Toa Baja, their services have not been opened because they don't make their monthly payments. The Director of the Office of the Comptroller, Ms. Cecile Tirado, stated that as to ASEM, they are making the payments under their payment plan and their remittances but the only thing that's still pending in relation to ASEM are the special laws. The Administrator emphasized that the Board approved that, in cases where special law payments are not made, the Administration will stop making the special law payment if these employers do not become current.

The Director of the Office of the Comptroller submitted for approval by the Board a draft of a payment plan agreement with the Maritime Transportation Authority for payment of a special law debt amounting to $475,704.68 for a period of 6 months. After reviewing the agreement, Mr. Esteban Morales submitted a motion approving the proposed payment plan. Ms. Carmen Rosado seconded the motion. Since there was no objection, the requested payment plan was approved.

The Director of the Office of the Comptroller also submitted a payment plan with the Municipality of Yauco for payment of a special law debt amounting to $698,842.93 for a period of 36 months. After reviewing the agreement, the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 16

members thought that the period should not exceed 24 months and so Mr. José Luís Carrasquillo submitted a motion approving the proposed payment plan with a period of 24 months. Mr. Jaime García seconded the motion. Since there was no objection, the modified payment plan was approved.

As to the payments remitted by the CRIM, Mr. Carrasquillo stated that Law 116-20 should be amended to include the payment of loans with the payment of remittances which the CRIM makes to the System in advance.

**4190:        VIII.        Collaboration Agreement Invoicing**

The Administrator submitted the invoice for the Collaboration Agreement with the Teacher's Retirement System. The invoice total is a payment from SRM to ASR in the amount of $40,038.83. The report reveals that the total invoiced in favor of ASR amounts to $101,837.56 and the total invoiced in favor of SRM amounts to $61,798.73; resulting in the net invoice in favor of ASR for the $40,038.83 already mentioned. After reviewing the invoice, Ms. Carmen Rosado submitted a motion approving the submitted invoice. Mr. Esteban Morales seconded the motion. Since there was no objection, the submitted motion was approved.

**4191:        IX.        Approval of Similar Program under Law 70-2010**

The Administrator stated that following the public policy of the Governor to give Government employees the opportunity to participate under Law 70-2010, a Similar Program is submitted for consideration by the Board to be applied in the agency. He stated that 56 employees have shown interest in participating. The Administrator included a certification to the effect that the proposed Program would benefit the agency, a table including savings which indicates that the savings accrued for fiscal

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 17

years 2012-217 total approximately: $8,423,937.71. A draft of the Board resolution including the proposed Program was also circulated.

After reviewing the documents for the proposed Program, Mr. Jaime García submitted a motion for approval of the proposed Program. Ms. Carmen Rosado seconded the motion. Since there was no objection, the submitted motion was approved.

**4192:       X.      Other Matters**

The Administrator submitted a resolution draft deciding under WHEREFORE: "This Board of Trustees approves the Reorganization Plan of the Retirement System Administration, as well as the new Plans for Valuation of Positions and Compensation for Political Appointment, Managerial Career, and Union Career Services, as submitted and proposed by the Administrator."

The Director of Human Resources stated that during the December meeting only one report was submitted regarding the Plans for Valuation of Positions and Compensation for Political Appointment, Managerial Career, and Union Career Services, and so a statement by the Board is needed. The Administrator stated that Director of Human Resources Daisy Torres and Advisor Godwin Aldarondo discussed it and drafted the language in this regard for approval of what was submitted to OCALARH.

Mr. Jaime García submitted a motion approving the proposed resolution draft. The motion was seconded by Mr. Esteban Morales. Since there was no objection, the submitted motion was approved.

Lastly, as requested by the Deputy Administrator, Carlos Ramos Fonseca, two invoices were submitted for approval by the Board from the law offices of Cancio

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Ordinary Meeting Minutes
February 23, 2012
Page 18

Nadal Rivera & Díaz totaling $24,043.97 for the services to review the Conway report and other aspects of the filed complaint. After reviewing the invoices, Mr. José Luís Carrasquillo submitted a motion approving the submitted invoices. The motion was seconded by Mr. Jaime García. Since there was no objection, the submitted motion was approved.

Since there were no other matters to discuss, the meeting ended at 1:25 in the afternoon.

[signature]
Juan Carlos Batlle
President

By: Marilyn Cruz Vargas
Jesús F. Méndez Rodríguez
Secretary

[Board of Trustees Retirement Systems seal]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 82

CERTIFIED TRANSLATION

[*Letterhead:* Retirement System Administration
Government of Puerto Rico]

### MINUTES OF REGULAR MEETING
### FEBRUARY 23, 2012

## MEMBERS PRESENT:

| | |
|---|---|
| Mr.  Juan Carlos Batlle | *President of the Government Development Bank for Puerto Rico, Chairman of the Board of Trustees* |
| Mr. Esteban Morales | *Representative of the Commissioner of Municipal Affairs, Vice Chairman of the Board of Trustees.* |
| Marilyn Cruz Vargas, Esq. | *Representative of the Secretary of the Department of the Treasury and Secretary of the Board of Trustees.* |
| Mr. José L. Carrasquillo Santiago | *Representative of the Systems' Pensioners* |
| Hon. Juan R. Hernández | *Representative of the Systems' Participants* |
| Mr. Marcos Andrade Ravelo | *Representative of the Director of the Training and Labor Affairs Advisory and Human Resources Administration Office (OCALARH)* |
| Mrs. Carmen Rosado | *Representative of the Systems' Participants* |
| Mr. Reinaldo Paniagua | *Representative of the President of the Mayors Federation* |
| Mr. Jaime García | *Representative of the President of the Mayors Association* |

*PO Box 40316, San Juan, PR 00940-0316, Tel. (787) 754-4545 Exts. 4296/4285/4284*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 2

## EXCUSED MEMBERS:

| | |
|---|---|
| *Luis Roberto Rivera Cruz, Esq.* | *Commissioner of Municipal Affairs, Vice Chairman of the Board of Trustees.* |
| *Hon. Jesús F. Méndez Rodríguez* | *Secretary of the Department of the Treasury Secretary of the Board of Trustees.* |
| *Hon. Héctor O'Neill García* | *President of the Mayors Federation* |
| *Hon. José Santiago Rivera* | *President of the Mayors Association* |
| *Mr. Richard Méndez Santiago* | *Representative of the Systems' Participants.* |

## REPRESENTATIVE OF THE OFFICE OF THE BOARD OF TRUSTEES

| | |
|---|---|
| *Alexis J. Carlo Ríos, Esq.* | *General Legal Counsel of the Board of Trustees' Office and Secretary's Office* |
| *CPA Juan Román Serpa* | *General Auditor, Audit Office of the Board of Trustees* |

## RSA REPRESENTATIVE

| | |
|---|---|
| *Mr. Héctor M. Mayol Kauffmann* | *Administrator of the Retirement Systems Administration for Employees of the Government and the Judiciary.* |
| *Mr. Carlos Ramos Fonseca* | *Assistant Administrator, Investment Division of the Retirement Systems Administration* |
| *Mrs. Cecile Tirado* | *Director of the Comptroller's Division of the Retirement Systems Administration* |
| *Mrs. Daisy Torres* | *Director, Human Resources* |

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 3

### GUESTS

| | |
|---|---|
| *Rivera Vicente, Esq.* | *External Legal Advisor CNR&D* |
| *Arturo Díaz Abramo, Esq.* | *External Legal Advisor CNR&D* |
| *Anthony Murray, Esq.* | *External Legal Advisor CNR&D* |

*Having constituted a quorum, the meeting began at 10:00 a.m. at the Conference Room of the Retirement Systems Administration for Employees of the Government and the Judiciary (Administration), Floor 15 of the Agency. Initially, the meeting was presided by Mr. Esteban Morales, in representation of the Vice Chairman of the Board. Subsequently, the Chairman, Mr. Juan Carlos Batlle, joined the meeting and led the business of the Board. The General Legal Counsel distributed to each Trustee and the RSA's Administrator, Mr. Héctor M. Mayol Kauffmann (Administrator), a work package containing all the documents to be used during the meeting.*

**4183:     I.     *Approval of the Minutes of the Regular Meeting held on December 23, 2011***

*The General Legal Counsel presented to the Board Members for discussion and approval, the draft of the minutes of the Regular Meeting held on December 23, 2011. There being no comments, Mr. Esteban Morales introduced a motion to approve the presented minutes. Mr. José Luis Carrasquillo seconded the motion; there being no objections, the motion was passed unanimously.*

**4184:     II.     *Election of Officers of the Board***

*The Chairman stated that, since the composition of the Board has undergone several changes, the members who shall serve as officers of the Board should be reevaluated.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 4

The Chairman recommended Mr. José Luis Carrasquillo as the new Chairman of the Board of Trustees, and that the Secretary of the Treasury, Jesús F. Méndez, continue as Secretary, and that Mr. Juan Carlos Batlle continues as officer in the position of Vice Chairman of the Board. He stated that the main reason for said recommendation is that he is a member of over 20 different boards, in which he is either the chair or holds a nondelegable position, and that it would be prudent for someone with a less busy schedule to chair the board in order to increase the frequency of the meetings. He added that this will allow the Board to be more active. The Chairman introduced a motion to designate Mr. José Luis Carrasquillo as Chairman of the Board; GDB President, Mr. Juan Carlos Batlle, as Vice Chairman, and Treasury Secretary, the Hon. Jesús F. Méndez, as Secretary. The motion was seconded by Mr. Esteban Morales. There being no objections, the motion was passed unanimously. It was clarified that the new officers shall take office after the meeting being held.

It was agreed that a calendar with the proposed dates for the meetings to be held during the year would be distributed.

**4185:        III.        Recommendations of the Case Evaluation Committee**

The General Legal Counsel presented to the Board the draft resolutions filed by the hearing officers of the Board of Trustees. The draft resolutions were previously referred for consideration by the Members of the Case Evaluation Committee for evaluation and approval by the Board of Trustees. Mr. Samuel G. Dávila Cid and Mr. José L. Carrasquillo Santiago recommend the approval of the reports submitted by the hearing officers. The draft resolutions referred for approval are the following:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 5

## DECEMBER 2011

| NAME | CASE NO. |
|------|----------|

### CONFIRM

| | NAME | CASE NO. |
|---|------|----------|
| 1. | Betty Alvarado Merced | 2008-0019 |
| 2. | Luis F. Nazario Sánchez | 2009-0258 |
| 3. | Héctor Correa Hernández | 2009-0335 |
| 4. | Mayra Jiménez Vázquez | 2010-0007 |
| 5. | Juan José Hernández Valentín | 2010-0121 |
| 6. | Blanca Candelaria Medina | 2010-0138 |
| 7. | Dionisio Ríos Martínez | 2010-0145 |

### REVOKE

| | NAME | CASE NO. |
|---|------|----------|
| 1. | María de los A. Cabrera Rivera | 2008-0313 |
| 2. | Juan E. Hernández Arce | 2009-0204 |
| 3. | Maritza García Carrión | 2009-0206 |
| 4. | Felix Silva Reyes | 2010-0005 |
| 5. | María Rivera Vázquez | 2011-0075 |

### RETURN

| | NAME | CASE NO. |
|---|------|----------|
| 1. | Sandra Rivera Marrero | 2010-0184 |
| 2. | Héctor L. Rivas Colón | 2010-0254 |
| 3. | Militza Emelina Medina Quiñones | 2010-0260 |
| 4. | José Antonio Carrión Betancourt | 2010-0275 |
| 5. | Delia Bauzó Calderón | 2010-0292 |
| 6. | Marisol Rosario Barbosa | 2010-0294 |
| 7. | Judith Omara Ruíz Álvarez | 2011-0052 |
| 8. | Edgardo Marcucci Ramírez | 2011-0055 |
| 9. | Lilia Rivera de Jesús | 2011-0083 |
| 10. | Miguel A. Ferrer Irizarry | 2011-0094 |
| 11. | Luis Antonio Latorre Cardona | 2011-0095 |
| 12. | Ángel Nieves Soto | 2011-0099 |
| 13. | Nancy Merced del Valle | 2011-0105 |
| 14. | Edgardo Rodríguez Nieves | 2011-0132 |

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 6

## JANUARY 2012

| NAME | CASE NO. |
|------|----------|

### CONFIRM

| | | |
|---|---|---|
| 1. | Gladys Vélez Cruz | 2009-0393 |
| 2. | Wilfredo de León Román | 2010-0103 |
| 3. | Marcial Fernando Santiago Román | 2010-0140 |

### REVOKE

| | | |
|---|---|---|
| 1. | Grisel Alvarado Rivera | 2008-0277 |
| 2. | Luz Celenia Cordero Calero | 2009-0370 |
| 3. | Fernando L. Collazo González | 2009-0376 |

### RETURN

| | | |
|---|---|---|
| 1. | Carmelo Maldonado Rivera | 2010-0019 |
| 2. | Elizabeth Burgos Rodríguez | 2010-0154 |
| 3. | Domingo Cortés Rivera | 2010-0206 |
| 4. | Nereida Malavé Pagán | 2010-0225 |
| 5. | Juan A. Cortés Roldán | 2011-0003 |
| 6. | Radamés Benítez Fontánez | 2011-0009 |
| | (Jelany Benítez Rodríguez, Idalia Rodríguez Cruz) | |
| 7. | María del Río Martínez | 2011-0062 |
| 8. | Alexis García Velázquez | 2011-0073 |
| 9. | Evelyn Feliciano Cuevas | 2011-0082 |
| 10. | Rosa M. González Rivera | 2011-0123 |
| 11. | Ana Cruz Montoyo | 2011-0124 |
| 12. | Samuel Rivera Capetillo | 2011-0152 |
| 13. | Marta I. Rivera Ortiz | 2011-0165 |

### FILE AWAY

| | | |
|---|---|---|
| 1. | Sergio Pérez Nogueiro | 2009-0346 |
| 2. | Nayda Pagán Velázquez | 2011-0064 |
| 3. | Roberto Santos Escribano | 2011-0073 |
| 4. | Rolando Silva Iglecia | 2011-0102 |
| 5. | Virginia Valentín Vargas | 2011-0144 |
| 6. | Carlos Eligio Brito Burgos | 2011-0154 |

*The Board considered the recommendation of the members of the Case Evaluation*

*Committee for the reports submitted during December 2011 and January 2012. The Chairman,*



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 7

*Juan Carlos Batlle, introduced a motion to approve the reports and, Mrs. Carmen Rosado*

*seconded the same. There being no objections, the reports submitted were approved.*

**4186:          IV. Business of the Audit Office**

*The General Auditor distributed a follow-up report on the 2011-2012 Audit Plan. He said*

*that the report shows in detail the Divisions that are being audited and the respective units thereof.*

*He indicated that the units and the audit completion percentage are shown in detail on page 6 of*

*the report. He added that the audits pending discussion with management and those in the final*

*review stage are shown in detail on page 7 of the report. He said that for fiscal year 2012-2013*

*the entire Agency's audit through 2010-2011 will be completed. The Chairman asked when did*

*these audits begin and how delayed are them.  The Auditor mentioned that there are divisions that*

*have not been audited yet and that, under his lead, they are trying to audit all these divisions. Mrs.*

*Rosado asked what procedures are seen as an example in the service area. The Auditor said that*

*the entire operations are audited in procedures. The Chairman asked whether there is any other*

*information that should be shared with the Board that was not included in the report. The auditor*

*said, at this time, there is none.*

*Mr. José Luis Carrasquillo raised the concern about the undue pension payments made to*

*deceased pensioners, specifically as to how effective has been the Administration in collecting*

*these undue payments. The auditor said that it is recorded in the comptroller's division, and that*

*said division was soon to be audited.*

*After reviewing the report, the Board acknowledged receipt of the auditor's report.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 8

**4187:**          **V. Report on the Conway Mackenzie Study**

*Carlos Rivera Vicente, Esq. distributed to the Board members a copy of the presentation of his analysis of the report prepared by forensic accounting firm Conway Mackenzie. Atty. Rivera Vicente. began by discussing the background of the matter; he said that the 2008 administration's policy was to give priority to the Retirement System's situation at the time. Consideration was given to the concerns on the continuity of the plan and the payment of pensions and benefits in the short term.  For over 4 years, the Board at the time, the Administrator, the GDB's Board and the GDB as fiscal agent began receiving advice from internationally recognized firms, namely: Merrill Lynch, UBS, and Global Insight; as well as legal advice from reputable law firms such as Fiddler Gonzalez and Oneill & Borges. In other words, the Board availed itself with technical and legal information to authorize 3 bond issues that amount to three (3) billion dollars. With this background in mind and given the legal action recently brought by some participants for a derivative action against a government trust, we examined the complaint, which includes Conway Mackenzie's and the Committee on Retirement Affairs' reports. He stated that these reports constitute inadmissible evidence and fail to meet the guarantees of reliability, accuracy, and trustworthiness to be admitted in court. In his judgment, it is just a lawyers' strategy to present a sensationalistic document. He added that the complaint does not define the damages claimed and includes them as speculative damages. Attorney Rivera said that, after the complaint is answered, a motion to dismiss or a motion for summary judgment should be filed, provided it is accompanied by extrinsic evidence. He believes that the complaint does not present a justiciable controversy,*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 9

*therefore, it should not proceed. In addition, the plaintiffs have no standing because they have not suffered a real and imminent injury that prevents them from continuing to receive their pensions. He said that main allegation against this Board is that it failed to act on such events, which allegation is defeated because the Board sent a letter reviewed by several law firms to cover the members responsibility to the System.  Attorney Rivera said that he does not see any valid cause of action against the defendants, meaning the members of past boards, external consultants, and that the complaint has been answered accordingly.*

*Attorney Rivera stated that after reviewing the minutes, offering statements, opinions, and other documents, and clarifying that the evaluated opinion of the Department of Justice did not include an addendum mentioned in the opinion. He mentioned that he has no doubt that GDB, as fiscal agent, acted in accordance with its fiduciary duties and the Business Judgment Rule included in the defense.  He said that the Board members will soon receive all of the reviewed documents so that they have all the pertinent information. He stressed that the allegations of the complaint are inflammatory and that the allegation that they gave up their rights does not proceed because a letter was sent in order to buy some time to conduct an investigation and obtain an opinion to determine whether there the transaction was unlawful.*

*Atty. Rivera Vicente said that the courts review the circumstances at the time the event occurred. He stressed that this Board is under no obligation to bring an action against past Boards when the bond issue was made. He does not see either any action against those persons who participated in their capacity as advisors.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 10

*Regarding the allegation that future employer contributions were pledged, Attorney Rivera believes that the System has authority to incur debt, pledge its assets and has authority to consider future contributions as part of its assets. Anthony Murray, Esq. added that proof of this is that the Legislative Assembly amended Act No. 447 to limit these procedures.*

*The attorney continued his presentation and said that Act No. 447 establishes principles similar to those set forth in the General Corporations Act, which must be followed to make any management decision: the care, attention and diligence that they would use in the management of their own affairs.*

*The attorney mentioned that the prudent man rule is used, which stems from the Act itself, case law and other U.S. statutes with similar language to the System's Act. He said that once all the warnings in the bond issue documents are observed, there is no doubt that the Board complied with all of its duties. He added that the requirements of the federal legislation entitled "Uniform Prudent Investor Act" are practically identical to those of the System. He added that the Corporations Act provides that they only way they would be liable is by proving gross neglect and it would be practically intentional. He added that it was not the case in that scenario, and that even the commissions were extremely reasonable.*

*He mentioned that the defenses are already included in the draft of the answer that they have prepared.  In the draft, the allegations were answered and several conclusions were established. He clarified that this information has been provided to the Board members for them to examine it, should they be deposed. Attorney Rivera said that the expert advice was overwhelming, therefore, he has no doubt that they had all the necessary advice. He added*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 11

*that, as per his conversation with the Administrator, the bond issue allowed for the payment of the obligations to pensioners and now is yielding positive results.*

*Attorney Rivera mentioned that several opinions were submitted in addition to that of the bond issues. One of the opinions is related to the efforts made to collect employer contributions and another one is related to raise of lending standards to address the findings in the report. He said that the opinions state in detail all the measures taken to address said obligations. The attorney concluded that the past Board should not be liable for the collection of old past due employer contributions.*

*Regarding the raise of lending standards, the attorney also concluded that past Boards are not liable.*

*Finally, the opinion includes whether or not each of the consultants are liable for the 2008 bond issues. After analyzing the applicable case law and pertinent documents, Attorney Rivera concluded that GDB met its obligations, the underwriters also met their contractual duties, he does not see a conflict with UBS's function; that is, each of these consultants acted prudently and in good faith, and that they did not deceive the System. The attorney mentioned that the complaint was answered with all of this analysis. Regarding Conway's report, it is inadmissible and has no guarantees of trustworthiness or reliability. At said remark, Mr. Jaime García asked whether the report had been commissioned by the Retirement System Administration. The Administrator said that GBD identified the firm and paid for the report; that the report was addressed to the Retirement System Administration and to GDB. He added that the report was referred to the Ethics*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 12

*Office, the Department of Justice and to the Office of the Comptroller to be duly evaluated. He said that the report has been used as a work tool to take corrective actions such as decreasing the lending standards. The Administrator mentioned that even on a "hindsight" now, we can validate that the transaction was accurate, however, if you look back at March 2009, you would have reacted differently.  If said bond issues had not been made, there would be no funds available now to pay the pensions.*

*Attorney Rivera said that the answer would serve to inform the court and then a motion to dismiss would be filed.*

*The Chairman of the Board asked why a motion to dismiss was not filed initially; Attorney Rivera said that he likes to include as many arguments as possible in a motion to dismiss and since there are constitutional and jurisdictional arguments the court would be deprived of authority. Mr. García stated that it would be convenient to send the letter to let people know that the Board is taking action on the matter. Attorney Rivera said that the motion to dismiss will be filed within the next 15 to 20 days. He added that he will also contact UBS attorneys to obtain information that may be included in the motion to dismiss or for summary judgment.*

*At Marilyn Cruz, Esq.'s questions about the ACE Insurance's coverage, Atty. Rivera Vicente said that he received a letter from ACE stating that it may deny coverage; and that a reconsideration was prepared.  Now we must wait for the insurance producer's report on the results.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 13

At Judge Hernández Sánchez' question, Atty. Rivera Vicente mentioned that the court gave the summoned parties until February 29 to file documentation. Atty. Vicente Rivera said that he will obtain copies of all the documentation reviewed for the Board's information.

The Chairman asked whether it was possible to obtain an extension to review the pertinent documentation before the February 29, the deadline for filing allegations.  Attorney Murray said that the Court would grant it. Next, the Chairman thanked CNR&D attorneys and excused them from the meeting. The General Legal Counsel agreed to share the external legal advisors contacts with the Board members in order to process the pertinent legal documentation.

**4188:      VI.      Investment and Actuarial Valuation Report**

The Administrator mentioned that the audited financial statements are still pending for the auditor's actuary to complete his analysis on the same. Assistant Administrator Carlos Ramos Fonseca distributed a copy of the draft actuarial valuations that are pending approval until the audited financial statements are released. The Administrator added that the only thing that may vary is that the external auditor determines that the total assets are those stated in the valuation. Even though the valuation is not final, the Administrator encouraged the members to review the draft actuarial valuation so they know the status of the Systems and the different issues such as the acquisition services without quotation.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 14

Assistant Administrator, Carlos Ramos Fonseca, said that after the market disparity events, performance has improved. Furthermore, he said that for the last quarter, the portfolio performance was 2.6% against the policy benchmark of 3%. As for the natural year, the portfolio performance was 3.7% against the policy benchmark of 2.7%, even with an international investment decline of 11.5%. Mr. Ramos Fonseca stated that the new investment policy is being applied to eliminate investment risk. The Administrator described how the cash available in the GDB has been used to pay the pensions and that, if the money from the bond issued had not been available, there would only be money available to pay next year's pensions.

The Administrator presented to the Board two letters of commitment from Banco Popular and Banco Cooperativo for the purchase of loans. The Administrator says that they need liquidity and that it may be obtained by selling these loans and without having to liquidate assets. Mr. Carlos Ramos said that the main parameters include that the sale will be at 102% with 2% servicing. The Administrator said that Banco Cooperativo offered 101%, but that he suggests demanding 102%, which is the amount that the other competitor, Banco Popular, would paid. The Administrator requested the Board's authorization for the sale of $325 million in loans.

To such ends, Mr. Jaime García introduced a motion for the Board of Trustees to authorize the Administrator to sell an amount equal to $325 million in loans granted by the Administration, provided that the terms and conditions of the authorized transactions be substantially similar to those described in the letter of intent sent by Banco Popular of Puerto Rico, dated February 22,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Minutes of Regular Meeting
February 23, 2012
Page 6

2012 ("BPPR Letter"); and that a copy of the BPPR Letter be made part of this resolution. The motion was seconded by Mr. José Luis Carrasquillo. There being no objections, the motion was passed.

**4189:          VII.    Report and Agreements with Employers in Arrears**

The Administrator made reference to a presentation that shows in detail the debts of corporations, municipalities, and the central government. The Administrator said that it includes the payment of the 1% increase by virtue of Act No. 116-2011. Among the reported cases, he said that AMA paid and that services have been restored. Moreover, services have not been restored to the Municipality of Toa Baja because it has fail to make the monthly payments. The Comptroller's Division Director, Mrs. Cecile Tirado, mentioned that ASEM is complying with its payment plan and remittances, the only thing pending with ASEM are the special laws. The Administrator stressed that the Board approved that, in the case of nonpayment of special laws, the Administration would stop making the special laws payments, if employers fail to stay current.

The Comptroller's Division Director introduced for the Board's approval the draft of the payment plan agreement of the Maritime Transportation Authority for the payment of a special law debt that amounts to $475,704.68 for a term of six months. After reviewing the agreement, Mr. Esteban Morales introduced a motion to approve the proposed payment plan. Mrs. Carmen Rosado seconded the motion. There being no objections, the payment plan was approved.

The Comptroller's Division Director also presented the payment plan of the Municipality of Yauco, to pay a special law debt amounting to $698,842.93 for a term of 36 months. After reviewing the agreement, the members found that the term should not exceed 24 months, therefore,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Mr. José Luis Carrasquillo introduced a motion to approve the proposed payment plan with a term of 24 months. Mr. Jaime García seconded the motion. There being no objections, the modified payment plan was approved.*

*As for the payments remitted by CRIM, Mr. Carrasquillo said that Act No. 116-2011 should be amended to include the repayment of loans with the remittances advanced by CRIM to the System.*

**4190:      VIII. Collaboration Agreement Invoice**

*The Administrator presented the invoice of the Collaboration Agreement with the Teachers Retirement System. The invoice total is a payment from the TRS to the RSA in the amount of 440,038.83. The report shows that the invoice total payable to RSA is $101,837.56 and the invoice total payable to TRS is $61,798.73: resulting in a net invoice amount payable to RSA of the $40,038.83 mentioned above. After reviewing the invoice, Mrs. Carmen Rosado introduced a motion to approve the submitted invoice. Mr. Esteban Morales seconded the motion. There being no objections, the motion was passed.*

**4191:      IX. Approval of Similar Program to Act No. 70-2010.**

*The Administrator mentioned that following the Governor's policy of providing an opportunity to Government employees to avail themselves of Act No. 70-2010, a Similar Program is presented for the Board's consideration to be applied in the agency. He said that 56 employees have shown interest in participating. The Administrator included a certification that the proposed Program is beneficial for the agency, a savings table showing that the accumulated*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 17

*savings for fiscal years 2012-2017 amount to approximately $8,423,937.71. In addition, a draft of the Board's Resolution including the proposed Program was passed around.*

*After reviewing the proposed Program's documents, Mr. Jaime García introduced a motion to approve the proposed Program. Mrs. Carmen Rosado seconded the motion. There being no objections, the introduced motion was passed around the members.*

**4192:       X.       Other Businesses**

*The Administrator presented a draft resolution resolving in the WHEREAS: "This Board of Trustees approves the Retirement System Administration Reorganization Plan as well as the new Classification and Compensation Plans for Employees in positions of Trust, Managerial Employees in Regular Positions and Unionized Employees in Regular Positions, as submitted and proposed by the Administrator."*

*The Human Resources Director said that at December's meeting only one report of the Classification and Compensation Plans for Employees in positions of Trust, Managerial Employees in Regular Positions and Unionized Employees in Regular Positions was submitted, therefore, the Board's comments on the same are needed. The Administrator said that the Human Resources Director, Daisy Torres and Advisor Godwin Aldarondo discussed and included said language in order to approve that which was submitted to OCALARH.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Minutes of Regular Meeting
February 23, 2012
Page 18

    *Mr. Jaime García introduced a motion to approve the draft resolution presented. The motion was seconded by Mr. Esteban Morales. There being no objections, the introduced motion was passed.*

    *Lastly, as requested by Assistant Administrator, Carlos Ramos Fonseca, two invoices from Cancio Nadal Rivera & Díaz Law Firm amounting to $24,043.97 for services that include reviewing Conway's report and aspects of the filed complaint, were submitted for the Board's approval. After reviewing the invoices, Mr. José Luis Carrasquillo introduced a motion to approve the presented invoices. The motion was seconded by Mr. Jaime García. There being no objections, the introduced motion was passed.*

    *There being no further business to discuss, the meeting was adjourned at 1:25 p.m.*

    *[by: Marilyn Cruz Vargas]*              *[illegible signature]*
    *Jesús F. Méndez Rodríguez*          *Juan Carlos Batlle*
        *Secretary*                    *Chairman*

[*seal*: Retirement System. Government.
Judiciary.

Board of Trustees]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 83

CERTIFIED TRANSLATION

# NOTICEL

**Mayol urges people to invest in the practically bankrupt Retirement System**

**By:**

Ely Acevedo Denis
**Published:** Oct 07, 2012 01:30 PM AST
**Updated:** Oct 05, 2012 08:10 PM AST

The administrator of the Government Employees and Judiciary Retirement Systems Administration (ASR, acronym in Spanish), Héctor Mayol Kauffmann, guaranteed that the early retirement windows established by the current administration has helped to solve its deficit. As to other aspects, it admitted buying bonds from the three losing issuances carried out by the ASR in 2008 and refused to answer the representative from the New Progressive Party, Lourdes Ramos, who called him "problematic".

Mayol Kauffmann told NotiCel that this is the fifth opportunity to take advantage of Act 70 during the month of October, during which people can request the benefit through the web portal of the Office of Budget and Management (OGP, for its Spanish acronym). He pointed out that with this last window they expect that in total around 5,000 public employees were benefited.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

When asked how this helps the coffers of the Retirement System, he said that "number one the vast majority of the people who have decided to take advantage of it are people under Act 1, those people are going to receive immediately from now up to 50 percent of their salary, but it is not paid by the Retirement System, it is paid by their employer."

He reiterated that this represents savings in the Retirement System cash flow. However, he did say that only in public corporations will the employer continue to make both the employer contribution and the employee contribution.

He maintained that almost all Government workers can have access to this early retirement, including police officers who do administrative jobs or are under a sick leave.

As to other matters, he was asked whether it was true that he sold Retirement bonds, to which he answered that "that's public knowledge, my entire life people have known that. The firm for which I worked (Samuel A. Ramirez & Co., Inc.), I was the director in charge of that office in Puerto Rico. The firm was one of the 10 or 12 underwriters that participated in this issuance ….my work also included personally buying around 50 thousand of those bonds, which I still have in my portfolio and I urge everyone who wants to buy them to do so because it is a great investment."

And he seemed to change his mind regarding the adverse effect that the three bond issuances have had for the Retirement System by not having the expected yield. In relation to that, he said that if they had not been done, the ASR would not have had sufficient funds to pay for pensions during the last three years.

When asked to state his position regarding the statements made against him by representative Lourdes Ramos, who recently called him "problematic," he did not want to comment on the statements and only said that "well, she has her opinion, we have the freedom to express what we think. I feel that I must focus on doing my job and making sure that pensioners receive their check every two weeks."

The statements were made during the Pensioner Services Fair that was held on Friday at Pabellón de la Paz in Luis Muñoz Rivera Park, including exhibitions and presentations, and which was attended by dozens of pensioners.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 84

NOTICEL

# Mayol invita a invertir en el prácticamente quebrado sistema de Retiro

**Por:**

Ely Acevedo Denis
**Publicado:** Oct 07, 2012 01:30 PM AST
**Actualizado:** Oct 05, 2012 08:10 PM AST

El administrador de la Administración de los Sistemas de Retiro del Gobierno y la Judicatura (ASR), Héctor Mayol Kauffmann, aseguró que las ventanas de retiro temprano que ha establecido la administración en turno ha ayudado a sanear su déficit. En otros aspectos, admitió haber comprado bonos de las tres perdidosas emisiones efectuadas por la ASR en el 2008 y declinó contestarle a la representante penepé, Lourdes Ramos, quien lo clasificó de "problemático".

**Mayol Kauffmann señaló a NotiCel que esta es la** quinta oportunidad **para acogerse a la Ley 70 durante el mes de** octubre, durante el que las personas pueden solicitar el beneficio a través del portal de la Oficina de Gerencia y Presupuesto (OGP). Apuntó que con esta última ventana esperan que en total se hayan beneficiado alrededor de 5,000 empleados públicos.

Cuando se le cuestionó cómo esto ayuda a las arcas del Sistema de Retiro, dijo que "número uno la inmensa mayoría de las personas que se han acogido son personas de Ley 1, esas personas van a recibir desde ahora inmediatamente hasta el 50 por ciento de su salario, per no lo paga el Sistema de Retiro, lo paga su patrono".

Reiteró que esto representa un ahorro en el flujo de efectivo del Sistema de Retiro. Aunque hizo la salvedad de que únicamente en las corporaciones públicas el patrono seguirá haciendo tanto la aportación patronal como la del empleado.

Sostiene que casi todo los trabajadores del Gobierno pueden acceder a este retiro temprano, incluso los policía que hacen trabajo administrativos o están bajo alguna licencia de enfermedad.

Por otra línea se le preguntó si era cierto que vendió bonos de Retiro, a lo que contestó que "eso es materia pública, eso se ha sabido toda la vida. La firma para la cuál yo trabajé (Samuel A. Ramirez & Co., Inc.), yo era el director a cargo para esa oficina en Puerto Rico. La firma fue uno de los 10 o 12 underwriters que participaron en esta emisión….mi gestión incluyó también comprar personalmente como 50 mil de esos bonos, que los tengo todavía en mi cartera y exhorto a todos lo que lo quieran comprar que los compren porque es una magnifica inversión".

Y pareció echarse para atrás sobre el efecto adverso que han tenido las tres emisiones de bono para Retiro al no tener el rendimiento esperado. En ese sentido, dijo que si no se hubiesen hecho, la ASR no hubiera tenido los fondos suficientes para sufragar las pensiones de los últimos tres años.

Al pedírsele una postura sobre las expresiones que han hecho en su contra la <u>representante Lourdes Ramos</u>, quién recientemente lo catalogó como un "problemático", no quiso entrar a aquilatar las declaraciones y se limitó a decir que "bueno, ella tiene su opinión, tenemos la libertad de expresarnos como entendamos. Yo creo que yo tengo que estar enfocado en hacer mi trabajo y asegurarme que los pensionados cada quincena reciban su cheque".

Las expresiones se dieron durante la Feria de Servicios al Pensionado que se efectuó el viernes en el Pabellón de la Paz del Parque Luis Muñoz Rivera, donde habían exhibiciones y presentaciones, y decenas de jubilados se dieron cita.

---

# Exhibit 85

| | |
|---|---|
| **From:** | Francisco Del Castillo </o=HMC/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fdelcastillo> |
| **To:** | Coleman, Jose R. (GDB) (Jose.R.Coleman@bgfpr.com); Guzman Perez, Natalia (GDB) (Natalia.Guzman@bgfpr.com) |
| **Sent:** | 2/5/2014 10:44:24 PM |
| **Subject:** | POB's |

Buenas noches,

Como saben los POB's fueron degradados a "BB" por Standard & Poor's. En el comunicado del 4 de febrero de 2014,  Standard & Poor's indica que "We have lowered the appropriation and ERS-secured bond ratings further than the GO rating to reflect our view that liquidity and market access risk have been heightened following our downgrade of the Commonwealth, making it less likely that the Commonwealth would prioritize appropriation debt payments in order to preserve market access for GO debt."

Me parece que el tratamiento y la justificación para degradar los POB's es bastante superficial y no toma en cuenta disposiciones como la Ley 116-2011 que establece un aumento escalonado de las aportaciones patronales. Como cuestión de hecho hoy en día las cuentas de reserva para el pago de los bonistas se alimentan más rápido y tienen mayores garantías de repago que cuando fueron emitidos hace unos años atrás. En teoría el crédito de los POB's debe mejorar con el tiempo, en lugar de empeorar, proveyéndose que se reciban las aportaciones patronales (siendo esto último la única razón para degradarlos).

A esos efectos, quisiera conocer qué remedios tenemos en estos momentos, si alguno. Podemos trabajar en un memorando explicativo y proyecciones para asegurarnos que las casas acreditadoras entienden adecuadamente los POB's y las garantías que tienen.

```
Lcdo. Francisco del Castillo Orozco
Administrador Interino
Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura
(787) 754-4545 ext. 1129
(787) 777-1662 (directo)
```
fdelcastillo@retiro.pr.gov
```
P.O. Box 42003 San Juan, PR 00940-2203
Plaza Retiro 437 Ave. Ponce de León, Pda. 32½ San Juan, PR 00917-3711
```

CONFIDENTIAL

# Exhibit 86

CERTIFIED TRANSLATION

| | |
|---|---|
| From: | Francisco Del Castillo </o=HMC/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fedelcastillo> |
| To: | Coleman, Jose R. (GDB) (Jose.R.Coleman@bgfpr.com); Guzmán Pérez, Natalia (GDB) (Natalia.Guzman@bgfpr.gov) |
| Sent: | 2/5/2014 10:44:24 PM |
| Subject: | POB's |

Good evening,

As you know, POBs were downgraded to "BB" by Standard & Poor's. In its letter dated February 4, 2014, Standard & Poor's states "We have lowered the appropriation and ERS-secured bond ratings further than the GO rating to reflect our view that liquidity and market access risk have been heightened following our downgrade of the Commonwealth, making it less likely that the Commonwealth would prioritize appropriation debt payments in order to preserve market access for GO debt."

I believe that the treatment and justification for downgrading the POBs is superficial and fails to take into account provisions such as Act 116-2011, which provides for a staggered increase in employer contributions. As a matter of fact, currently, reserve accounts used for paying bondholders are filled faster and have greater repayment guarantees than when they were issued several years ago. In theory, the POBs credit should improve over time, rather than worsening; provided, that employer contributions are received (the foregoing is the only reason for the downgrading thereof).

Thus, I would like to known what remedies are available to us now, if any. We can work on a memorandum of understanding and projections to ensure that credit rating agencies properly understand the POBs and the guarantees thereof.

Francisco del Castillo Orozco, Esq.
Acting Administrator
Retirement System Administration for Employees of the Government and the Judiciary
(787) 754-4545 ext. 1129
(787) 777-1662 (direct)
fdelcastillo@retiro.pr.gov
P.O. Box 42003 San Juan, PR 00940-2203
Plaza Retiro 437 Ponce de León Ave., Stop 32 ½ San Juan, PR 00917-3711

CONFIDENTIAL                                                                                                            ERS _0040552

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit 87

| | |
|---|---|
| **From:** | Francisco Del Castillo </o=HMC/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fdelcastillo> |
| **To:** | Fernando J. Oronoz (foronoz@fortaleza.pr.gov); Alvaro Vazquez (alvazquez@fortaleza.pr.gov) |
| **Sent:** | 7/2/2014 5:58:16 PM |
| **Subject:** | Degradación de los Bonos del Sistema |

Buenas tardes,

Entre las degradaciones que realizó Moody's se encuentra la de los bonos emitidos por el Sistema de Retiro de los Empleados del Gobierno. La degradación fue de B3 a Ba2 con una expectativa negativa.

En el caso de estos bonos su única fuente de repago son las aportaciones patronales, que en la medida que se van recibiendo se pasan a unas cuentas en manos de un custodio para garantizar el pago. Lugo de que se cumplen con las reservas y por lo tanto el pago de intereses y principal (cuando aplique) para todo el año, las aportaciones restantes pasan al Sistema.  Cabe señalar que por legislación se han estado aumentando todos los años la aportación patronal en al menos 1%. Por lo tanto, la garantía de pago de los bonos ha mejorado con el tiempo, en lugar de empeorar.

Entiendo que como parte de la evaluación del pleito en contra de la casa acreditadora se debe examinar las degradaciones de los bonos del Sistema de Retiro y si también debemos ser parte del caso.


Cordialmente,


Lcdo. Francisco del Castillo Orozco
Administrador Interino
Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura
(787) 754-4545 ext. 1129
(787) 777-1662 (directo)
fdelcastillo@retiro.pr.gov
P.O. Box 42003 San Juan, PR 00940-2203
Plaza Retiro 437 Ave. Ponce de León, Pda. 32½ San Juan, PR 00917-3711

CONFIDENTIAL

# Exhibit 88

CERTIFIED TRANSLATION

| | |
|---|---|
| From: | Francisco Del Castillo </o=HMC/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fedelcastillo> |
| To: | Fermando J. Oronoz (foronoz@fortaleza.pr.gov); Alvaro Vazquez (alvazquez@fortaleza.pr.gov) |
| Sent: | 7/2/2014 5:58:16 PM |
| Subject: | Downgrading of the System's bonds. |

Good afternoon,

The bonds issued by the Retirement System for Government Employees are among those downgraded by Moody's. Said bonds were downgraded from B3 to Ba2 with negative outlook.

The only source of repayment for these bonds are employer contributions, which once received, are transferred to accounts held by a custodian to secure payment. Once the reserves are met, and therefore, the principal and interest are paid (as applicable) for the entire year, the remaining contributions are transferred to the System. It must be noted that, by law, employer contributions have been increasing by at least 1% annually. Therefore, the bonds' payment guarantee has improved over time rather than worsening.

I understand that as part of the evaluation of the action against the credit rating agency, we must evaluate the downgrading of the Retirement System's bond and also if we should join in the action.

Sincerely,

Francisco del Castillo Orozco, Esq.
Acting Administrator
Retirement System Administration for Employees of the Government and the Judiciary
(787) 754-4545 ext. 1129
(787) 777-1662 (direct)
fdelcastillo@retiro.pr.gov
P.O. Box 42003 San Juan, PR 00940-2203
Plaza Retiro 437 Ponce de León Ave., Stop 32 ½ San Juan, PR 00917-3711

CONFIDENTIAL                                                                ERS _0041347

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.