# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------- X

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

PROMESA
Title III

Case No. 17-BK-03283 (LTS)

---------------------------------------------------------------- X

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO,

     Debtor.

PROMESA
Title III

Case No. 17-BK-03566 (LTS)

---------------------------------------------------------------- X

THE SPECIAL CLAIMS COMMITTEE OF THE
FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, ACTING BY AND
THROUGH ITS MEMBERS,

     and

Adv. Proc. No. 19-00356 (LTS)

---

[1] The Debtors in these jointly-administered PROMESA title III cases (these "Title III"), along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric and Power Authority (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

|  | : |  |
| --- | --- | --- |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA AND PBA), | : : : : | |
| as co-trustees of | : : | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO, | : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| DEFENDANT 1M, *et al.*, | : : | |
| Defendants. | : : | |

------------------------------------------------------------------ X

|  | : |  |
| --- | --- | --- |
| THE SPECIAL CLAIMS COMMITTEE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, ACTING BY AND THROUGH ITS MEMBERS, | : : : : : | Adv. Proc. No. 19-00357 (LTS) |
| and | : : | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALL TITLE III DEBTORS (OTHER THAN COFINA AND PBA), | : : : : | |
| as co-trustees of | : : | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF PUERTO RICO, | : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| DEFENDANT 1R, *et al.*, | : : | |
| Defendant. | : : : | |

```
--------------------------------------------------------------------- X
                                                                      :
THE SPECIAL CLAIMS COMMITTEE OF THE                                   :
FINANCIAL OVERSIGHT AND MANAGEMENT                                    :
BOARD FOR PUERTO RICO, ACTING BY AND                                  :        Adv. Proc. No. 19-00359 (LTS)
THROUGH ITS MEMBERS,                                                  :
                                                                      :
          and                                                         :
                                                                      :
THE OFFICIAL COMMITTEE OF UNSECURED                                   :
CREDITORS OF ALL TITLE III DEBTORS                                    :
(OTHER THAN COFINA AND PBA),                                          :
                                                                      :
          as co-trustees of                                           :
                                                                      :
THE EMPLOYEES RETIREMENT SYSTEM OF THE :
GOVERNMENT OF PUERTO RICO,                                            :
                                                                      :
          Plaintiff,                                                  :
                                                                      :
v.                                                                    :
                                                                      :
DEFENDANT 1H-78H,                                                     :
                                                                      :
          Defendants.                                                 :
                                                                      :
--------------------------------------------------------------------- X
                                                                      :
THE SPECIAL CLAIMS COMMITTEE OF THE                                   :
FINANCIAL OVERSIGHT AND MANAGEMENT                                    :
BOARD FOR PUERTO RICO, ACTING BY AND                                  :
THROUGH ITS MEMBERS,                                                  :        Adv. Proc. No. 19-00361 (LTS)
                                                                      :
          and                                                         :
                                                                      :
THE OFFICIAL COMMITTEE OF UNSECURED                                   :
CREDITORS OF ALL TITLE III DEBTORS                                    :
(OTHER THAN COFINA AND PBA),                                          :
                                                                      :
          as co-trustees of                                           :
                                                                      :
                                                                      :
                                                                      :
                                                                      :
```

THE EMPLOYEES RETIREMENT SYSTEM OF THE :
GOVERNMENT OF PUERTO RICO,                 :
                                                                              :
      Plaintiff,                              :
v.                                                                            :
                                                                              :
DEFENDANT 1G-50G,                                         :
                                                                              :
      Defendant.                            :
                                                                              :
----------------------------------------------------------------------- X

**COMMITTEES' MOTION FOR
<u>SUMMARY JUDGMENT ON *ULTRA VIRES* ISSUES</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

PROCEDURAL BACKGROUND............................................................................ 3

FACTUAL BACKGROUND ................................................................................... 5

    A.    ERS Enabling Act and Debt Authorization Language ........................... 5

    B.    2008 Bond Issuance ............................................................................... 6

    C.    ERS Bonds Were Issued in Public Offerings ........................................ 7

    D.    2011 Amendment to Enabling Act ........................................................ 9

    E.    Government Parties Challenge Validity of ERS Bonds ......................... 9

    F.    ERS Bondholder Group and Its Acquisition of Bonds ....................... 11

LEGAL STANDARD............................................................................................ 13

ARGUMENT ........................................................................................................ 14

I.       ERS BONDS WERE ISSUED ULTRA VIRES .......................................... 14

    A.    Authority for Municipal Public Bond Offerings Must Be Expressly
Granted by Statute and Cannot Be Implied ........................................ 15

    B.    ERS Bond Issuances Were Not Borrowings From a Financial Institution ......... 19

    C.    ERS Bond Issuances Were Not "Direct Placements of Debts" ........................... 22

    D.    No Supposed Precedent, Agency Interpretations, Other Legislation, or
"Judicial Admissions" Can Confer Authority Not Granted in the ERS
Enabling Act ....................................................................................... 28

        1.    Rivera Torres Case Did Not Address the Question Presented Here ........ 28

        2.    Purported Interpretations of ERS's Authority Are Not Entitled to
Deference ................................................................................. 29

        3.    Other Legislation Does Not Confirm that ERS Enabling Act
Authorized ERS Bonds ............................................................ 30

        4.    ERS Has Made No "Judicial Admissions" that ERS Bonds Are
Valid......................................................................................... 33

        5.    ERS Bonds Cannot Be "Presumed" Valid................................. 34

II.      BECAUSE ERS BONDS WERE ISSUED ULTRA VIRES, THEY ARE NULL
AND VOID AND UNENFORCEABLE.......................................................... 34

III.     BONDHOLDERS HAVE NO UNJUST ENRICHMENT REMEDY ........................... 37

IV.     ERS BONDS ARE NOT VALIDATED BY UCC 8-202 ............................... 38

    A.    UCC 8-202 Is Inapplicable to the Committees' Objections. ............................ 39

    B.    Bondholders Had Notice of Potential Invalidity................................. 42

## TABLE OF CONTENTS
(continued)

**Page**

1. The Bondholders have admitted to being aware of the possibility
   that the ERS Bond Issuance was ultra vires prior to their final
   purchase of ERS Bonds ............................................................................ 43

2. The Bondholders had reason to know of the ERS Bonds' invalidity
   based on the offering documentation and the language of the ERS
   Enabling Act ............................................................................................. 44

3. The Bondholders had notice of the defect based on the passage of
   Act 116 in 2011, which clearly stated that the ERS Bond Issuances
   were "illegally made" ................................................................................ 46

4. Bondholders that had communications with counsel prior to final
   purchase had notice of the ultra vires issue of the ERS Bonds ................ 47

5. The Oversight Board and AAFAF provided notice to the
   Bondholders in November 2017 by raising the ultra vires issues
   with the Court ........................................................................................... 49

CONCLUSION ........................................................................................................... 51

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Wisc. Airlines Corp. v. Hoeper*,
    571 U.S. 237 (2014)..................................................................................................25

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................13

*Ayala v. Junta Cond. Bosque Sereno*,
    190 D.P.R. 547 (2014)..............................................................................................14

*Bd. of Cnty. Sup'rs of Prince William Cnty. v. United States*,
    48 F.3d 520 (Fed. Cir. 1995)....................................................................................14

*In re Blondheim Real Estate, Inc.*,
    91 B.R. 639 (Bankr. D.N.H. 1988) ..........................................................................38

*Botany Worsted Mills v. United States*,
    278 U.S. 282 (1929)..................................................................................................18

*Buchanan v. City of Litchfield*,
    102 U.S. 278 (1880)..................................................................................................35

*Central Transp. Co. v. Pullman's Palace Car Co.*,
    139 U.S. 24 (1891)....................................................................................................36

*City of Brenham v. German-American Bank*,
    144 U.S. 173 (1892)............................................................................................16, 32

*City of Litchfield v. Ballou*,
    114 U.S. 190 (1885)..................................................................................................35

*Dutton v. City of Aurora*,
    114 Ill. 138, 28 N.E. 461 (1885) ..............................................................................19

*In re Fin. Oversight & Mgmt. Bd.*,
    872 F.3d 57 (1st Cir. 2017)......................................................................................42

*Fullerton v. Cent. Lincoln People's Util. Dist.*,
    201 P.2d 524 (Or. 1948) .....................................................................................17, 19

*Harrington v. City of Nashua*,
    610 F.3d 24 (1st Cir. 2010)......................................................................................33

*Humacao Lumber Co. v. Am. Surety Co. of N.Y.*,
   59 D.P.R. 165 (1941) ..................................................................................35

*Int'l Salt Co. v. City of Boston*,
   590 F.3d 1 (1st Cir. 2009)............................................................................37

*Las Marias Reference Lab. Corp. v. Mun. San Juan*,
   159 D.P.R. 868 (2003) .................................................................................36

*LeBlanc v. Great Am. Ins. Co.*,
   6 F.3d 836 (1st Cir. 1993)............................................................................13

*Mandel v. Boston Phoenix, Inc.*,
   456 F.3d 198 (1st Cir. 2006)........................................................................13

*In re Mechanicsburg Fitness, Inc.*,
   592 B.R. 798 (Bankr. M.D. Pa. 2018) .........................................................41

*Merrill v. Town of Monticello*,
   138 U.S. 673 (1891)...............................................................................15, 16

*Morales v. Municipio de Toa Baja*,
   119 D.P.R. 682 (1987) .................................................................................37

*Moscato v. Tie Technologies, Inc.*,
   No. 04 Civ. 2487(GBD), 2005 WL 146806 (S.D.N.Y. Jan. 21, 2015)......................40

*Muscatine Lighting Co. v. City of Muscatine*,
   217 N.W. 468 (Iowa 1928) ..........................................................................17

*Norton v. McOsker*,
   407 F.3d 501 (1st Cir. 2005)........................................................................37

*In re. OneWeb Global Ltd.*,
   No. 20-22437-rdd (Bankr. S.D.N.Y.) ...........................................................41

*Petitti v. New England Telephone & Telegraph Co.*,
   909 F.2d 28 (1st Cir. 1990)..........................................................................13

*PHL Variable Ins. Co. v. Town of Oyster Bay*,
   16-CV-4013 (SJF)(AKT), 2017 WL 2371188 (E.D.N.Y. May 30, 2017) ..............35

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
   91 F. Supp. 3d 267 (D.P.R. 2015).........................................................36, 37

*Raimundi Melendez v. Productora de Agregados, Inc.*,
   162 D.P.R. 215, 224 (P.R. 2004) .................................................................14

*Rathbone v. Bd. of Comm'rs*,
    73 F. 395 (D. Kan. 1896), *rev'd on other grounds*, 83 F. 125 (8th Cir. 1897) ........................16

*Reed v. City of Cedar Rapids*,
    113 N.W. 773 (Iowa 1907) ..............................................................................................17

*Rivera Torres v. Junta de Retiro Para Maestros*,
    502 F. Supp. 2d 242 (D.P.R. 2007)..............................................................................28, 29

*Rodríguez Ramos v. ELA*,
    190 D.P.R.  448 (2014) ....................................................................................................36

*Russell v. Middletown City Sch. Dist.*,
    125 A. 641 (Conn. 1924) .................................................................................................19

*S.E.C. v. Platforms Wireless Int'l. Corp.*,
    617 F.3d 1072 (9th Cir. 2010) .........................................................................................20

*Sands v. Ridefilm Corp.*,
    212 F.3d 657 (1st Cir. 2000) ...........................................................................................13

*Torres Pagan v. Municipio Autónomo de Ponce*,
    191 D.P.R. 583 (2014) ....................................................................................................14

*Town of Bloomfield v. Charter Oak Nat. Bank*,
    121 U.S. 121 (1887)........................................................................................................14

*Traverse Bay Area Intermediate School Dist. v. Mich. Dept. of Educ.*,
    615 F.3d 622 (6th Cir. 2010) ...........................................................................................18

*U.S.I. Properties Corp. v. M.D. Construction Co.*,
    860 F.2d 1 (1st Cir. 1988)................................................................................................29

*Vázquez v. Morales*,
    114 D.P.R. 822 (1983) .................................................................................................31, 33

*Vineberg v. Bissonnette*,
    548 F.3d 50 (1st Cir. 2008)..............................................................................................13

*Waisman v.* Wagner, 278 N.W. 418 (Wis. 1938) ......................................................................35

*Wyoming State Treasurer v. Moody's Inv'rs Serv., Inc. (In re Lehman Bros.*
    *Mortage-Backed Sec. Lit.)*,
    650 F.3d 167 (2d Cir. 2011)............................................................................................21

*Zucht v. King*,
    260 U.S. 174 (1922)........................................................................................................15

**Statutes**

3 L.P.R.A.

§ 283h(a) ....................................................................................................36

§§ 761-788 ..................................................................................................5

§ 764 ............................................................................................................5, 6

§ 1906(l) .....................................................................................................18

19 L.P.R.A.

§ 451(25) ....................................................................................................42

§ 1714 .........................................................................................................39

§ 1751(a) ....................................................................................................40

§ 1752 .........................................................................................................38

22 L.P.R.A. § 906(a)(10) .................................................................................18

23 L.P.R.A.

§ 695(c)(14) ...............................................................................................18

§ 6412(h) ....................................................................................................18

31 L.P.R.A.

§ 3 ................................................................................................................31

§ 16 ..............................................................................................................25

11 U.S.C. § 1103(c)(5) ....................................................................................42

48 U.S.C.

§ 2101(b)(2) ...............................................................................................40

§ 2103 .........................................................................................................40

§§ 2231(a)(8), (a)(15), (a)(2), (e) ..............................................................40

11 U.S.C.

§ 502 ...........................................................................................................4

§ 502(b) ......................................................................................................42

§ 510(b) .......................................................................................................3, 38

§ 541 ...........................................................................................................41

UCC

§ 1-202(a)(3) ..............................................................................................50

§ 3-102(a) ...................................................................................................36

§ 8 ................................................................................................................36, 40, 41

§ 8-105 ........................................................................................................39

§ 8-114 ..........................................................................................................................39
§ 8-201 ...................................................................................................................39, 40, 41
§ 8-202 ..................................................................................................................... *passim*
§ 8-202(b)................................................................................................................38, 42
§ 8-202(b)(1) ......................................................................................................................42

17 C.F.R. § 240.15c2-12(f)(8) ...........................................................................................20

To the Honorable United States District Judge Laura Taylor Swain:

Pursuant to Federal Rules of Bankruptcy Procedure 7056 and 9014, the Official Committee of Unsecured Creditors (the "Committee")[2], the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee" and, together with the Committee, the "Committees")[3], and the Special Claims Committee (the "SCC") of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board") (and the SCC together with the Committees, "Movants") hereby submit this motion (the "Motion") for summary judgment in the *Ultra Vires* Litigation (as defined below). In support of this Motion, Movants respectfully state as follows.

## PRELIMINARY STATEMENT

1.      ERS, as an instrumentality and creation of the Commonwealth,[4] has no inherent or implicit authority to incur debt, and may only engage in such activities with the express authorization of the legislature. Nevertheless, in 2008, ERS issued approximately $3 billion of pension obligation bonds through an underwriting syndicate to public investors despite having no authority to do so under its Enabling Act (defined below)—the legislation that created ERS and demarcated its powers. Unlike numerous other Puerto Rico enabling statutes that have explicitly authorized the issuance of public bonds, the Enabling Act authorized ERS to borrow funds only (i) by taking a "loan" from a financial institution, from the government of Puerto Rico, or from the United States government, or (ii) through the "direct placement of debts." Because a public bond issuance is neither of these things, the ERS Bonds are void and unenforceable as a matter

---

[2] The Committee is the official committee of unsecured creditors for all Title III Debtors, other than PBA and COFINA.

[3] The Retiree Committee represents Puerto Rico's approximately 160,000 retirees who collectively hold the single largest claim in these title III cases.

[4] Capitalized terms used but not defined herein have the meanings ascribed to them in the Committee Objection (defined below).

1

of law. Consequently, all claims against ERS and the Commonwealth under the ERS Bonds must be disallowed in their entirety.

2.      The Bondholders' arguments to the contrary all fail as a matter of law. The Bondholders first argue that ERS did, in fact, have the authority to issue the bonds because: (1) the bonds are a "borrowing"[5] from the underwriters; and (2) because the bonds are a "direct placement of debt." There is not, however, any support for classifying a public bond issuance as a "borrowing" from underwriters. Instead, it is universally acknowledged that underwriters perform the role of a financial intermediary between the issuer of the bonds and the public investors (the true lenders) who ultimately hold the bonds. The Bondholders in this case appear to be the first to ignore this long-understood reality of the public bond markets and argue that publicly issued bonds are truly disguised loans made by the underwriters. Equally unavailing is the argument that the bond issuance is a "direct placement." Here too, decades of finance provide the answer because, in the context of public financing, the term "direct placement" is understood to apply to a bond issuance to a small number investors that is issued without the services of an underwriter. That, of course, is the exact opposite of what occurred here.

3.      Unable to fit the bonds within the framework of the Enabling Act, the Bondholders argue that, even if the bonds are invalid, the Bondholders are entitled to recover from ERS and the Commonwealth on a theory of unjust enrichment. The law is clear, however, that no party can obtain a remedy in equity, such as unjust enrichment, under an *ultra vires* contract. To hold otherwise would undermine the very purpose of the *ultra vires* doctrine, which serves to protect the public from potentially harmful actions by government agencies that

---

[5] According to its official translation, the ERS Enabling Act did not, as the Bondholders contend, authorize any type of "borrowing" from a financial institution; instead, it only authorized ERS to "seek a loan" from a financial institution. Regardless, the Bondholders' proposed translation does not help them because the ERS bonds were no more "borrowings" from the underwriters than they were "loans" by the underwriters.

conflict with legislative directives, including those designed to ensure fiscal responsibility. In any event, even if the Bondholders could pursue claims for unjust enrichment, such claims (i) cannot allow the Bondholders to receive more than they would receive under the terms of the Bonds, which limit the Bondholders' claims to certain collateral, and (ii) would be subordinated to the claims of all other unsecured creditors under section 510(b) of the Bankruptcy Code.

4.      Finally, the Bondholders argue that the Uniform Commercial Code allows a holder of a defective bond to enforce that bond so long as the bondholder was not on notice of the defect. This argument also fails as a matter of law because it is inapplicable to claims asserted by parties other than the issuer, such as the SCC and the Committees. What is more, the Bondholders are not the type of purchasers that would fall under the UCC's safe harbor even if it did apply here. The Bondholders all bought bonds with notice of their invalidity. In fact, many of the Bondholders continued to buy bonds even after engaging in litigation over the *ultra vires* nature of the bonds. Consequently, there is no basis to find the Bondholders were without notice of the bonds' defects.

5.      Because the ERS bonds are *ultra vires* and thus null and void, the Movants are entitled to summary judgment in their favor disallowing all of the Bondholders' claims against ERS and the Commonwealth.

## **PROCEDURAL BACKGROUND**

6.      On March 12, 2019, the Committee filed its *Omnibus Objection of the Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico* [Case No. 17-3283, Dkt. No. 5580] (the "Committee Objection"), objecting to all claims the ERS Bonds on the grounds that they were issued *ultra vires* and asked that all claims arising under the bonds be disallowed in full.

3

7.     On April 23, 2019, the Retiree Committee filed its *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007 to Claims Filed or Asserted by Holders of ERS Bonds* [Case No. 17-3283, Dkt. No. 6482] (the "Retiree Committee Objection" and, together with the Committee Objection, the "Objections"), raising additional arguments and seeking the same relief as the Committee Objection.

8.     On May 19, 2019, the SCC and the Committee, as co-plaintiffs, further filed adversary proceedings against Bondholders seeking to "claw back" interest and principal payments received by such holders on the grounds that the ERS Bonds are and always have been invalid based on the *Ultra Vires* issue [Adv. Proc. No. 17-219 and 17-220] (the "Clawback Actions" and, together with the Objections, the "*Ultra Vires* Litigation").[6]

9.     Pursuant to an order of the Court, the *Ultra Vires* Litigation was stayed for a period of time while the parties in the Title III cases engaged in mandatory mediation. On October 24, 2019, the Court lifted the stay and entered an initial scheduling order directing that the *Ultra Vires* Litigation move forward. *See Order Granting Urgent Joint Motion to Modify Order Regarding Stay and Mandatory Mediation with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* [Case No. 17-3566, Dkt. No. 687] (the "Scheduling Order").[7]

---

[6] The Clawback Actions are Adversary Proceeding Nos. 19-355, 19-356, 19-357, 19-358, 19-359, and 19-361.

[7] The Scheduling Order further provides, among other things, that the Clawback Actions are stayed in their entirety, except that Count One of the Clawback Actions is un-stayed as to "the groups of ERS bondholders represented by Jones Day and White & Case LLP (the 'ERS Bondholder Groups') that file appearances and answer the complaint(s)" in the Clawback Actions. Scheduling Order ¶ 2(e). Count One of the Clawback Actions is the request of the Committee and the SCC, as co-plaintiffs, for a declaration that the ERS bonds were issued ultra vires and are null and void, and the ERS Bondholder Groups have engaged in discovery and motion practice with respect to the ultra vires issue as pertaining to the Clawback Actions. This Motion is being filed contemporaneously and in

4

10. On October 25, 2019, the Bondholders filed their *Response of Certain Secured Creditors of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico to the Omnibus Claim Objections of the Official Committee of Unsecured Creditors and the Official Committee of Retired Employees of the Commonwealth of Puerto Rico* [Case No. 17-3283, Dkt. No. 9012] (the "Response").

11. After multiple amendments to the scheduling order, on August 25, 2020, the Court entered an *Order Modifying Discovery and Briefing Schedule with Respect to Certain Issues Raised in Certain Contested Matters and Adversary Proceedings Related to the Bonds Issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* establishing the discovery and briefing schedule in these proceedings. [Case No. 17-3283, Dkt. No. 14095.]  Among other things, the Court set a deadline of September 11, 2020 for filing motions for summary judgment. *Id.*

## FACTUAL BACKGROUND

12. The material facts necessary to decide the legality of the ERS Bonds are not dispute.

A. ERS Enabling Act and Debt Authorization Language

13. ERS is a retirement and benefit system created by Act 447-1951 of the Puerto Rico Legislative Assembly (as amended, the "ERS Enabling Act"). SUF ¶ 1 (Act No. 447-1951 (codified, as amended, at 3 L.P.R.A. §§ 761-788). ERS was created to provide pension and other benefits to retired employees of the Commonwealth and its instrumentalities and municipalities (collectively, the "Government Employers"). SUF ¶ 2 (3 L.P.R.A. § 764). These benefits were to

---

substantially identical form within the Clawback Actions, requesting summary judgment as to Count One of the complaints therein, solely as to the ERS Bondholder Groups.

be funded from, among other sources, contributions from the Government Employers as required

by the ERS Enabling Act ("Employer Contributions"). SUF ¶ 3 (3 L.P.R.A. § 764).

14.     When first created in 1951, ERS was not authorized to borrow money. SUF ¶ 4

(Compare Act No. 447-1951, §19 with Act No.46-1988 (the "1988 Amendment"), §19). In 1988,

the ERS Enabling Act was amended to permit ERS to incur two separate categories of debt, and

to secure that debt with ERS's assets. The Official English language translation of this

amendment states:

> The Board of Trustees may authorize the Administrator to ***seek a loan***
> from any financial institution of the Government of the Commonwealth of
> Puerto Rico or the Federal Government of the United States of America ***or***
> ***through the direct placement of debts***, securing said debt with the assets
> of the System.

SUF ¶ 5 (Act 46-1988, § 1 (emphasis added)).

15.     The ERS Bondholders argue that the official translation is incorrect, and that the

following, alternative translation applies:

> The Board of Trustees may authorize the Administrator to ***borrow*** from
> any financial institution, from the Government of the Commonwealth of
> Puerto Rico or from the Federal Government of the United States of
> America, ***or through the direct placement of debts***, securing said debt
> with the assets of the System.

B.      2008 Bond Issuance

16.     In 2006, the Commonwealth considered issuing general obligation ("GO") bonds

as an additional means to provide funding to ERS, but that legislation did not pass in the House

of Representatives and was never enacted. SUF ¶ 6 (Ex.[8] 1, Cancel-Alegria Dep. Tr. 59:5-61:10).

17.     In 2007, Merrill Lynch issued a formal proposal to ERS recommending that ERS

itself issue pension obligation bonds.[9] SUF ¶ 7. As originally conceived, ERS would issue a total

---

[8] All exhibit references are references to exhibits to the Declaration of Nicholas A. Bassett, filed contemporaneously
herewith

of $7 billion in ERS Bonds. SUF ¶ 8 (Ex. 3, Series A Official Statement at 17). On January 24,

2008, the ERS Board approved the ERS Bond Resolution, which authorized the issuance of the

ERS Bonds. SUF ¶ 9 (Ex. 13, Series A Bond Resolution Section 201). Pursuant to the Bond

Resolution, in 2008, ERS issued three series of ERS bonds (Series A, B and C) in an

underwritten public offerings to investors. The aggregate outstanding principal amount of the

ERS Bonds (including accretion on capital appreciation bonds) was approximately $3 billion,

instead of the originally planned $7 billion in bonds. SUF ¶ 10 (*See* Ex. 3, Series A Official

Statement; Ex. 4, Series B Official Statement; Ex. 5, Series C Official Statement).

        C.      <u>ERS Bonds Were Issued in Public Offerings</u>

      18.      The ERS Bonds were issued in a public offering. This is clear from the facts and

circumstances surrounding the issuances themselves. SUF ¶ 11. The ERS Bonds were rated by

all three major rating agencies. SUF ¶ 12 (*See,* Ex. 3, Series A Official Statement at 4; Ex. 4,

Series B Official Statement at 4; Ex. 5, Series C Official Statement at 4). There were few

restrictions on what type of investor could purchase the bonds; for example, there was no

requirement that bond purchasers be financial institutions or sophisticated investors, or that they

acquire the ERS Bonds solely for investment without an intent to distribute in the public

municipal bond market. SUF ¶ 13 (*See, e.g.,* Ex. 3, Series A Official Statement). Likewise, the

bonds were sold by the typical publicly-offered bond minimum denomination of $5,000 in

principal amount (or for capitalized interest Bonds, $5,000 maturity amount), SUF ¶ 14 (*see, e.g,*

Ex. 3, Series A Official Statement at 28; Ex. 4, Series B Official Statement at 30; Ex. 5, Series C

Official Statement at 30), instead of the $100,000 minimum denominations more common in

direct placements. SUF ¶ 14 (Ex. 6, Doty Report at 6).

---

[9] Ex. 2, Merrill Lynch August 7, 2007 PowerPoint, ERS_0047061-97.

19.     Moreover, the issuances were marketed and sold by underwriting syndicates, led by UBS.[10]  SUF ¶ 15. ERS did not engage in any direct negotiations with the public investors in setting these terms or establishing bond prices. Instead, ERS provided necessary documentation—ERS's Official Statements, Bond Resolutions and other bond documentation—to UBS and the other underwriters to use in their direct discussions and negotiations with public investors. SUF ¶ 16 (Ex. 6, Doty Report at 7).

20.     The ERS Bond issuances contemplated that UBS and the underwriting syndicates would fulfill an intermediary function by buying ERS Bonds for resale to public investors. SUF ¶ 17 (Ex. 6, Doty Report at 19). ERS did not borrow or take a loan from any of the underwriters. SUF ¶ 18. None of the relevant documents—including the Letters of Representation to the Underwriters, the Purchase Contracts, Bond Resolution or Supplemental Bond Resolutions, and the Official Statements, or other bond documents—say anything about ERS borrowing any money, or taking a loan from, UBS or any of the other underwriters. SUF ¶ 19 (*See* Ex. 3-5, 7-18).  Instead, they characterize the underwriter's role as "making the offering and sale of the bonds" (SUF ¶ 19 (*see* Ex. 7-9, ERS Series A, B and C Bond Letters of Representations to the Underwriters)) or as "to make a bona fide public offering of all of the Bonds."[11]  SUF ¶ 19.  ERS used the underwriting syndicates not as lenders in a "borrowing" or a "loan," but as intermediaries who would distribute and offer the ERS Bonds for sale to the public. SUF ¶ 20 (Ex. 6, Doty Report at 20).

---

[10] ERS's Series A Bond Official Statement identifies on its cover twelve underwriters as members of the syndicate offering, the Series B Bond Official Statement identifies three underwriters, and the Series C Bond Official Statement identifies twelve underwriters. While there were overlaps in syndicate memberships, and all were led by UBS, no two ERS Bond syndicates were exactly alike.

[11] Series A Bond Purchase Contract §4 on page 3. The Series B Bond Purchase Contract §4 on page 3 and Series C Bond Purchase Contract §4 on page 3 contain closely similar provisions.

D.     2011 Amendment to Enabling Act

21.     In 2011, the Puerto Rico legislature amended the ERS Enabling Act to ensure ERS would not engage in another public bond issuance. SUF ¶ 21 (*See* Ex. 38, Act 116-2011, § 7(d) ("Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System.")). In the statement of motives for the 2011 amendment, the Legislative Assembly recognized that the issuance of the ERS Bonds "was ***illegally made*** by [ERS] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System."[12] SUF ¶ 22.

22.     The Puerto Rico legislature amended the ERS Enabling Act to prohibit public bond issuances like the ERS Bonds as part of ERS's ability to engage in "direct placements of debt"—the purported basis for the ERS Bonds—thus clarifying the intent of the original language of the statute. SUF ¶ 23 (*See* Ex. 38, Act 116-2011). Notably, the legislature did not change ERS's ability to "take on a loan [or borrow] from any financial institution."  SUF ¶ 24 (*See* Ex. 38, Act 116-2011, § 7(d)).

E.     Government Parties Challenge Validity of ERS Bonds

23.     On May 21, 2017, the Oversight Board approved and certified the filing of a PROMESA Title III petition for ERS. SUF ¶ 25 (Case No. 17-3566, Dkt. No. 1). In the months following the filing of the petition, the Government Parties' advisors in these cases determined that the issuance of the ERS bonds had been *ultra vires* and decided to challenge them on that basis. SUF ¶ 26 (*See* Ex. 19, Rodriguez Dep. Tr. 280:12-20).

24.     On July 27, 2017, certain ERS bondholders filed parallel adversary proceedings in the Commonwealth and ERS Title III cases challenging the constitutionality of certain post-

---

[12] Ex. 38, Act 116-2011 at Statement of Motives (emphasis added).

petition legislation. SUF ¶ 27 (Adv. Proc. No. 17-219, Dkt. No. 1 (Commonwealth Title III complaint); Adv. Proc. No. 17-220, Dkt. No. 1 (ERS Title III complaint) (the "ERS Adversary Proceedings")).

25.     On November 3, 2017, the Oversight Board raised the *ultra vires* issue with the Court in a motion for summary judgment in connection with a dispute over whether the Bondholders had properly perfected their alleged liens. SUF ¶ 28 (Adv. Proc. No. 17-213, Dkt. 91).  On November 15, 2017, the Bondholder filed a response brief that acknowledged the *ultra vires* issue. SUF ¶ 29 ([Adv. Proc. No. 17-213,  Dkt. 120, ¶¶70-72]).

26.     On November 17, 2017, AAFAF filed a motion to dismiss the claims in another adversary proceeding on the basis that the ERS Bonds were issued *ultra vires* and are therefore invalid. SUF ¶ 30 (*See Government Defendants' Joinder and Supplemental Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Amended and Supplemented Complaint Pursuant to Fed. R. Civ. P. 12 (b)(6)*, at 11-14 [Adv. Proc. No. 17-219, Dkt. No. 44]). The bondholders opposed AAFAF's motion to dismiss. SUF ¶ 31 (*See Plaintiffs' Brief in Opposition to Defendants' Motions to Dismiss*, at 18-20 [Adv. Proc. No. 17-219, Dkt. No. 50]). All but two of the current members of the ERS Bondholder group were members of the group at the time of the opposition.[13] SUF ¶ 32. The Court never reached the *ultra vires* issue in the ERS Adversary Proceedings because it was mooted by other rulings. SUF ¶ 33.

---

[13] *Verified Statement of the ERS Secured Creditors Pursuant to Bankruptcy Rule 2019*, [Case No. 17-3566, Dkt. 194] (as of December 20, 2017,  reflecting current Bondholder group members Altair Global Credit Opportunities Fund (A), LLC, Andalusian Global Designated Activity Company, Glendon Opportunities Fund, L.P., Mason Capital Master Fund, L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oaktree Opportunities Fund IX Delaware, L.P., Oaktree Opportunities Fun IX (Parallel 2), L.P., Opps Culebra Holdings, L.P., Oaktree Opportunities Fund X Holdings (Delaware), L.P., Oaktree Opps X Holdo Ltd., Oaktree-Forrest Multi-Strategy, LLC (Series B), Ocher Rose, L.L.C., and SV Credit L.P.). Redwood Master Fund td. and the entities represented by Pentwater Merger Arbitrage Master Fund Ltd. (Crown Managed Accounts for an on behalf of Crown/PW SP, LMA SPC for and on behalf of Map 98 Segregated Portfolio, Oceana Master Fund Ltd.,  PWCM Master Fund Ltd.) are the only two ERS Bondholder group members absent in November 2017.

F.     ERS Bondholder Group and Its Acquisition of Bonds

27.    The Bondholders are comprised of sophisticated financial institutions with billions of dollars of investments under management. SUF ¶ 34 (*See, e.g.*, Redwood 13F ($8.5 billion[14]); Pentwater 13F ($5.7 billion[15])). Many of them have specialized experience in investing in distressed debt. SUF ¶ 35 (*See* Ex. 22, Centerbridge website ("The credit, distressed strategies & special situations platform currently totals over $12 billion in assets under management[.]"[16]); Ex. 23, 5-28-20 Engman Dep. Tr. 127:5-6 (for Mason, "we like restructuring and we like -- we like distress."); Ex. 24, Mikes Dep. Tr. 27:13-24 (discussing Oaktree's "distressed debt strategy"); Ex. 25, Corning Dep. Tr. 46:10-16 (noting that a "quarter" of Pentwater's "investment focus" is on "distressed debt situations")). They also have experience investing in municipal securities, and some have been involved in recent municipal bankruptcies. SUF ¶ 36 (*See* Ex. 26, Delaney Dep. Tr. 37:8-38:24 (Glendon/Altair, in Jefferson County); Ex. 27, Boyer Dep. Tr. 22:19-23:24; 38:9-39:15 (Redwood, in Jefferson County); Ex. 28, Dowd Dep. Tr. 24:17-25:8 (Ocher Rose, in Jefferson County and Detroit)).

28.    Each of the Bondholders has had, and continues to have, access to sophisticated counsel. A number of the Bondholders have been represented by Jones Day since at least May 2015 (SUF ¶ 37 (*see* Ex. 29, Delaney Dep., Ex. 5)), and Centerbridge received advice regarding the invalidity of the ERS bonds as early as February 2014. SUF ¶ 37 (*See* Ex. 30, Cao Dec. ¶ 3).

29.    From January 25, 2008 to June 17, 2019, the Bondholders purchased hundreds of millions of dollars in ERS Bonds. SUF ¶ 38 (*See* Ex. 31, PR Funds Supp. Response to Irog 17;

---

[14] Ex. 20, Redwood Capital Mgmt. LLC – Assets, Funds, Holdings, AUM 13F, https://aum13f.com/firm/redwood-capital-management-llc

[15] Ex. 21, Redwood Capital Mgmt. LLC – Assets, Funds, Holdings, AUM 13F, https://aum13f.com/firm/pentwater-capital-management-lp

[16] Ex. 22, Our Investment Approach: Credit, Distressed Strategies & Special Situations, Centerbridge, https://www.centerbridge.com/our-strategy/

Ex. 32, Jones Day Client Supp. Response to Irog 17; Ex. 29, Delaney Dep., Ex. 5 (for Jones Day

clients); *Second Supplemental Verified Statement of the Puerto Rico Funds Pursuant to*

*Bankruptcy Rule 2019* [Case No. 17-3298, Dkt. No. 13555] (for PR Funds)). The Bondholders

subsequently filed proofs of claim against both the Commonwealth and ERS for payment on the

bonds. SUF ¶ 39 (*See Order Granting Urgent Joint Motion for Entry of a Schedule for*

*Resolution of the ERS Bondholder Claims and Administrative Expense Motions*, at Appendix 2

[Dkt No. 12446]). In addition, the Bank of New York Mellon, as Fiscal Agent for the ERS

Bonds, for and on behalf of itself and all beneficial owners of ERS Bonds, filed proofs of claims

against both the Commonwealth and ERS. SUF ¶ 40 (*See* Claim Nos. 16775, 16777, and 32004).

30.     When they made their purchases, the Bondholders had actual knowledge of facts

that gave them reason to know that the ERS Bonds were issued *ultra vires*. SUF ¶ 41. As an

initial matter, each ERS Bondholder reviewed and relied upon the ERS Bonds' official

statements, which cited ERS's ability to borrow money "through the direct placement of debts"

as the sole basis for its authority to issue the ERS bonds.  SUF ¶ 42 (*See* Ex. 33, Engman Dep.,

Ex. 9, response to Irog 6; Ex. 5, Series C Official Statement, at 7). The official statements

contained no explanation of how a public bond issuance could be considered a "direct placement

of debt."  SUF ¶ 42 (*See id.*).

31.     In addition, as set forth in the Appendix attached hereto and incorporated herein

by reference, the Bondholders were aware of: (1) the specific debt authorization language in the

ERS Enabling Act (which, on its face, does not authorize public bond issuances); (2) the fact that

the Commonwealth initially planned (but failed) to fund ERS by issuing GO Bonds; (3) the

Legislative Assembly's statement in 2011 that the ERS bond issuances were "illegally made";

(4) advice from counsel that the ERS bonds may not have been issued with authority or legality

(*i.e.*, advice regarding the *ultra vires* issue); and (5) the November 2017 briefing raising the *ultra vires* argument. SUF ¶ 44 (*See* Appendix II (summarizing what the Bondholders had actual knowledge of regarding the invalidity of the ERS bonds, and when they had such knowledge)). This information gave each of the Bondholders' reason to know of the Bonds' invalidity.

## **LEGAL STANDARD**

32.     Summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir. 2000) (quoting *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1284 (1st Cir. 1996)). Material facts are those that "possess[] the capacity to sway the outcome of the litigation under the applicable law," and an issue is "genuine" if it "may reasonably be resolved in favor of either party." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks and citations omitted).

33.     When a properly supported motion for summary judgment is made, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). While the Court must "review the material presented in the light most favorable to the non-movant," *Petitti v. New England Telephone & Telegraph Co.*, 909 F.2d 28, 31 (1st Cir. 1990), the non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841-42 (1st Cir. 1993). Summary judgment should be granted "where further inquiry into the facts is not desirable to clarify the application of the law." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006) (internal quotation marks and citation omitted).

34.     The material facts necessary to resolve the claims at issue in this Motion are not in dispute. As shown above, the facts are undisputed because they arise out of the Bond Resolutions, Official Statements and related bond documentation and the Bondholders' admissions in uncontroverted deposition testimony and interrogatory responses.

## ARGUMENT

## I.     ERS BONDS WERE ISSUED ULTRA VIRES

35.     ERS, as a government instrumentality, only can exercise the powers that the legislature confers upon it. *See, e.g., Town of Bloomfield v. Charter Oak Nat. Bank*, 121 U.S. 121, 132 (1887) ("The borough and the town are confessedly inferior corporations. They act not by any inherent right of legislation, like the legislature of the state; but their authority is delegated, and their powers, therefore, must be strictly pursued"); *accord Bd. of Cnty. Sup'rs of Prince William Cnty. v. United States*, 48 F.3d 520, 523-24 (Fed. Cir. 1995).

36.     This bedrock principle applies with equal force in Puerto Rico. The Puerto Rico Supreme Court has held that an "administrative agenc[y] only ha[s] those powers which have been explicitly granted by its enabling act and those that are indispensable to carry out those which have been conferred." *Raimundi Melendez v. Productora de Agregados*, *Inc.*, 162 D.P.R. 215, 224 (P.R. 2004). "In other words, administrative agencies [in Puerto Rico] cannot act beyond what was delegated to them, such that any administrative action that does not obey the power conferred to it by way of legislation must be catalogued as *ultra vires*, and therefore void." *Ayala v. Junta Cond. Bosque Sereno*, 190 D.P.R. 547, 547-48 (2014). There are no exceptions to this rule. "Neither necessity nor utility nor convenience can replace the statute as a source of power of an agency. Given this, any doubt with respect of the existence of that power must be resolved ***against*** its exercise." *Torres Pagan v. Municipio Autónomo de Ponce*, 191 D.P.R. 583, 586 (2014) (emphasis added).

A.     Authority for Municipal Public Bond Offerings Must Be Expressly Granted by
Statute and Cannot Be Implied

37.     Under the traditional rule reflected in the weight of the case law, the authority of a

municipal entity to issue "negotiable bonds" for sale to the public must be expressly granted by

the legislature and cannot be implied from a general power to borrow money or incur debts.  As

a leading treatise on municipal finance explains, the "authority to issue bonds can be enforced

only by language which leaves no reasonable doubt of an intention to grant it, and . . . if the

intention of a statute to authorize the issuance of bonds is doubtful, the doubt will be resolved

against the authority to issue the bonds." 15 McQuillin Mun. Corp. § 43:20 (3d Ed.); *accord* 64A

C.J.S. Mun. Corp. § 2182 ("The power to issue negotiable bonds may not be implied from the

right to borrow money or to contract an indebtedness, but there is authority to the contrary.").

38.     This was the rule ultimately adopted by the United States Supreme Court in the

days when municipal bond cases came before the Court on a regular basis.[17] In *Merrill v. Town

of Monticello*, 138 U.S. 673 (1891), the Court addressed the question: "Does the implied power

to borrow money or contract a loan carry with it a farther implication of power to issue funding

negotiable bonds, for that amount, and sell them in open market, as commercial paper?" *Id.* at

686. The Court answered in the negative, holding that "[i]t [did] not follow that, because the

town of Monticello had the right to contract a loan, it had, therefore, the right to issue negotiable

---

[17] It is no surprise that the Supreme Court's case law on this subject dates from the late 19th century. At that time,
most of the Supreme Court's docket was comprised of diversity cases, and those cases turned on state, rather than
federal, law. *See generally* https://www.fjc.gov/history/courts/jurisdiction-appellate. Thereafter, a series of changes
to the Court's jurisdiction dramatically diminished the Court's state law docket: the congressional grant of federal
question jurisdiction in 1875 (which firmly established the Court's role in resolving questions regarding federal
statutes); the creation of the federal circuit courts in 1891 (which increased the number of federal-law direct appeals
to the Court); the Act of 1916, Ch. 448, 39 Stat. 726 (which expanded the Court's discretion to deny state law
cases); the so-called Judge's Bill of 1925, Act of Feb. 13, 1925, 43 Stat. 936 (which again expanded the Supreme
Court's certiorari, or discretionary, jurisdiction); and the Court's own decision in *Zucht v. King*, 260 U.S. 174
(1922), in which the Court declared that it would deny review by writ of error from state courts unless federal
constitutional questions "substantial in character" were presented. *See* J.W. Madden, *One Supreme Court and the
Writ of Certiorari*, 15 HASTINGS LAW J. 153, 155-57 (1963).

15

bonds and put them on the market as evidences of such loan." *Id.* at 691. Rather, "[t]o borrow money, and to give a bond or obligation therefor which may circulate in the market as a negotiable security, freed from any equities that may be set up by the maker of it, are, in their nature and in their legal effect, essentially different transactions." *Id.*

39.     The Court further explained that:

> the power to borrow money, or to incur indebtedness, carries with it the power to issue the usual evidences of indebtedness, by the corporation, to the lender or other creditor. Such evidences may be in the form of promissory notes, warrants and, perhaps, most generally, in that of a bond. ***But there is a marked legal difference between the power to give a note to a lender for the amount of money borrowed, or to a creditor for the amount due, and the power to issue for sale, in open market, a bond, as a commercial security, with immunity, in the hands of a bona fide holder for value, from equitable defenses***.

*Id.* at 687 (emphasis added).

40.     The following year, in *City of Brenham v. German-American Bank*, 144 U.S. 173 (1892), the Supreme Court held that a legislative grant authorizing a city to incur debt up to $15,000 on the credit of the city did not authorize the issuance of bonds, noting that it would have been "easy for the legislature to confer upon a municipality, when it is constitutional to do so, the power to issue negotiable bonds." *Id.* at 181-82 (emphasis added). The Court thus concluded that, "under the well-settled rule that any doubt as to the existence of such power ought to be determined against its existence, it ought not to be held to exist in the present case." *Id.*

41.     Having so held, the Court took the opportunity to expressly overrule certain of its prior decisions insofar as they stood for contrary principles. *Id.* at 187; *see also Rathbone v. Bd. of Comm'rs*, 73 F. 395, 399 (D. Kan. 1896) ("The rule of law in relation to the issue of negotiable bonds is that, whenever the power to issue is called in question, the authority to issue

must be clearly shown, and will not be deduced from uncertain inferences, and can only be conferred by language which leaves no reasonable doubt of an intention to confer it."), *rev'd on other grounds*, 83 F. 125 (8th Cir. 1897).

42.     The courts of various states have also adopted or endorsed the express authorization rule with respect to negotiable bonds. *See, e.g.*, *Fullerton v. Cent. Lincoln People's Util. Dist.*, 201 P.2d 524, 529-30 (Or. 1948) (holding that a municipal corporation's "general power to issue, sell and assume evidences of indebtedness" under the relevant statute did not imply the power to issue negotiable bonds); *Muscatine Lighting Co. v. City of Muscatine*, 217 N.W. 468, 471 (Iowa 1928) ("[A]uthority for the issuance of negotiable bonds by a municipality must be found in express language of [the] statute . . . [and thus the power to] borrow money for any object in [the city's] discretion . . . confer[red] no authority to issue negotiable bonds"); *Reed v. City of Cedar Rapids*, 113 N.W. 773, 775 (Iowa 1907) ("'May a municipal corporation issue negotiable bonds without express authority from the Legislature so to do?' That question seems to be foreclosed by our previous cases . . . [holding that] in the absence of express authority, a city has no power to issue long-time negotiable bonds . . . .").

43.     Against this municipal law backdrop, the ERS Enabling Act was amended in 1988 to provide that the ERS administrator may, upon authorization by the board of trustees, "seek a loan from any financial institution, from the Government of the Commonwealth of Puerto Rico, or from the Federal Government of the United States of America, or through the direct placement of debts, securing said debt with the assets of the System." Act 46-1988, § 1. Conspicuously absent from this provision is any reference to the issuance of bonds. This absence is especially conspicuous because history clearly shows that when the Puerto Rico Legislature wanted to grant its instrumentalities broad bond issuing powers, it did so explicitly.

17

In fact, Movants have located approximately fifty instances where the Puerto Rico Legislature explicitly granted an instrumentality the general authority to issue bonds.  A listing of these statutes and their relevant debt authorization language is attached hereto as Appendix I.

44.     Tellingly, these debt authorization statutes show that the Puerto Rico Legislature does not equate the general ability to borrow with the ability to issue bonds. For example, the Public Buildings Authority is authorized "[t]o borrow money, make and issue bonds…." 22 L.P.R.A. § 906(a)(10).   Likewise, the Infrastructure Financing Authority is authorized to "[b]orrow money and issue bonds…." 3 L.P.R.A. § 1906(l).   So too the Convention Center District, which was given the authority to "[m]ake loans in order to finance the costs of the Center. . . [and] make and issue negotiate bonds." 23 L.P.R.A. § 6412(h). Similarly, the Science, Technology and Research Trust has been given authority to "[o]btain money on loan" as well as "issue notes, bonds and any other evidence of debt….".  23 L.P.R.A. § 695(c)(14).   Additional examples of such grants of authority are listed on Appendix I. The unmistakable point is that when the Legislature wishes to give an instrumentality the general power to issue bonds, it does so explicitly.

45.     Finally, even if a grant of general borrowing authority could imply the authority to issue bonds in a public offering, the ERS Bonds would still be *ultra vires* because the ERS Enabling Act granted ERS no such general borrowing authority. On the contrary, as set forth above, the ERS Enabling Act authorized the incurrence of debt only through specifically enumerated means. *See supra* at ¶ 14. And as the Supreme Court has held, "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929) (citing *Raleigh & G. R.R. Co. v. Reid*, 80 U.S. 269 (1872)); *accord Traverse Bay Area Intermediate School Dist. v. Mich. Dept.*

18

*of Educ.*, 615 F.3d 622, 630 (6th Cir. 2010) ("Our analysis comports with the long-established canon of statutory construction, *expressio unius est exclusion alterius*, 'the mention of one thing implies the exclusion of another'" (internal quotation omitted).[18] The Bondholders' "implied authority" argument is therefore wholly unavailing.

B.    ERS Bond Issuances Were Not Borrowings From a Financial Institution

46.    Effectively acknowledging that ERS had no implied authority to issue the ERS Bonds, the Bondholders further argue that the Enabling Act **expressly** permitted the ERS Bond issuances because they involved a "borrowing from a financial institution"—namely, that ERS borrowed from financial institutions insofar as UBS and the other underwriters are "financial institutions." This argument fails for a host of reasons.[19]

47.    *First*, as the Movants' expert, Robert Doty, explains in his report, the role of UBS and the other underwriters (like the role of any underwriter in a public bond offering) was to market and facilitate the sale of the ERS Bonds to the general public, not to serve as an investor from which ERS would "borrow" funds. (Ex. 6, Doty Report at 8.) The notion that a public bond issuer "borrows" from the underwriter has no support in municipal finance and cannot be reconciled with the fundamental role of an underwriter in a public offering.[20] The issuer in a

---

[18] The ERS Enabling Act's narrowly circumscribed language stands in stark contrast to the general borrowing authority present in the cases cited by the Bondholders. *See, e.g., Russell v. Middletown City Sch. Dist.*, 125 A. 641, 642 (Conn. 1924)  (construing a statute that generally authorized school districts to "borrow money"); *Dutton v. City of Aurora,* 114 Ill. 138, 144, 28 N.E. 461 (1885) (same); *cf. Fullerton*, 201 P.2d at 529 (finding that even broad grant of authority "[t]o issue, sell and assume evidences of indebtedness" did not imply the authority to issue bonds to the public).

[19] As an initial matter, Movants dispute that the proper translation of "tomar prestado" in the Enabling Act is "to borrow" rather than "to seek a loan."  Ultimately, however, it does not matter which translation is correct, because the ERS Bond issuance involved neither a loan by nor a borrowing from a financial institution. Movants reserve the right to further respond to Movants arguments as to the correct translation of the Enabling Act, including in Movants' reply brief in support of summary judgment.

[20] Mr. Doty's expert qualifications are impeccable and directly on point. *See* Ex. 6, Doty Report at 2-3.  He has been intimately involved in the municipal finance industry since the 1970s in numerous capacities, including as a special consultant to underwriters, issuers, and bond counsel and as a financial advisor to bond issuers. He has also held several prominent industry leadership positions, including with the Government Finance Officers Association,

public offering borrows from the public investors who purchase bonds from the underwriter, not from the underwriter itself. (*Id*. at 3, 8.) The underwriter serves as an intermediary that markets and sell bonds to the public and has no interest in holding the bonds for its own account. (*Id*. at 8-9, 12.) Unlike a true lender, an underwriter is compensated through the "spread" between the price at which it acquires the bonds from the issuer and their public offering price, not through payments of interest and principal over time. (*Id*. at 13.)

48.     Mr. Doty's opinion is supported by countless industry authorities, which defeat the Bondholders' argument standing on their own.  These authorities include books and articles by prominent scholars and guidance from the Securities and Exchange Commission and the Municipal Securities Rulemaking Board describing the role of underwriters as intermediaries, not lenders. *See, e.g.*, 17 C.F.R. § 240.15c2-12(f)(8) (describing underwriter as "any person who has purchased from an issuer of municipal securities with a view to . . . the offering of any municipal security . . ."); MSRB Notice 2012-38 (July 18, 2012) (requiring that municipal bond underwriters disclose to issuers that the underwriters' "primary role is to purchase securities with a view to distribution in an arm's-length commercial transaction with the issuer"); Ex. 34, S. Feldstein and F. Fabozzi, ed., THE HANDBOOK OF MUNICIPAL BONDS, *Ch. 14, The Role of the Underwriter*, at 265-71 (John Wiley & Sons, Inc. 2008) ("[t]he end result . . . is a bond issue that has been **sold to the investing public**—both retail and institutional," through which "the governmental issuer receives the financing that it needs.") (emphasis added); *accord S.E.C. v. Platforms Wireless Int'l. Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) (describing an underwriter under the Securities Act of 1933 as "[a]ny intermediary between the issuer and the investor that

---

where he served as the General Counsel and as a key drafter of authoritative guidance on disclosure and bond offering procedures, and with the National Federation of Municipal Analysts ("NFMA"), where he served on the Board of Governors and as a member and officer of NFMA committees. He has also authored innumerable publications on issues relating to municipal bonds.

is an essential cog in the distribution process [of a security].") (internal quotations omitted);
*Wyoming State Treasurer v. Moody's Inv'rs Serv., Inc. (In re Lehman Bros. Mortage-Backed Sec. Lit.)*, 650 F.3d 167, 178 (2d Cir. 2011) ("[P]ersons playing roles essential in the actual distribution of securities qualify as underwriters.").

49.     By contrast, the Bondholders' expert, Bart Hildreth,[21] opines in essentially one sentence in his report that "ERS borrowed directly from the underwriters instead of retail or institutional investors since it was the underwriters whose money was transferred to ERS." (Ex. 35, Hildreth Report at ¶ 174.)   This opinion is wholly unsupported by any authority and demonstrably incorrect. As Mr. Doty explains, the "purchase contract," pursuant to which the underwriters acquired the ERS Bonds, says nothing about ERS "borrowing" from the underwriters. (Ex. 6, Doty Report at 20.)[22] Rather, it requires that the underwriters "make a bona fide public offering of all of the Bonds." (*Id*.; see, e.g., Series A Purchase Contract.) The fact that the underwriters initially purchased the ERS Bonds before selling them to the public (as in any committed underwriting) does not transform the underwriters into lenders. Indeed, in his more than 45 years in the industry, Mr. Doty has never seen or heard a public bond offering referred to as a borrowing from an underwriter. (Ex. 6, Doty Report at 21.)[23] Viewing the ERS Bond issuances this way is, as he explains, fundamentally inconsistent with how a public bond offering works.[24]

---

[21] Movants reserve the right to move to exclude or otherwise challenge Professor Hildreth's testimony for any reason.

[22] Unsurprisingly, none of the closing documentation for any of the Series A, B, or C Bonds mentions a "borrowing" by ERS from UBS or the other underwriters, either.

[23] Neither has the Bondholders' expert, Professor Hildreth. Hildreth was unable to identify any court decisions, Puerto Rican statutes, laws or regulations that state that underwriters are lenders. (Ex. 36, Hildreth Dep. Tr. 156:4-22; Ex. 37 Doty Rebuttal Report at 4)

[24] Moreover, the implications of Professors Hildreth's view are sweeping as it would turn every purchase transaction into a lending arrangement.

50.     *Second*, the Bondholders' argument cannot be reconciled with the statute's legislative history. In 2011, having determined that the ERS Bond issuances were "illegally made," the Legislative Assembly amended the Enabling Act to clarify that the "direct placements of debt" language (discussed below) does not authorize the issuance of public bonds. *See* Ex. 38 [Act 116-2011]. The Legislative Assembly did not, however, modify or clarify the Bondholders' purported "borrow from a financial institution" language, which remains the same today as when the ERS Bonds were issued in 2008. According to the Bondholders' argument that the authorization to "borrow from a financial institution" authorizes ERS to engage in public bond offerings, the amendment was pointless because ERS today remains authorized to do exactly what the amendment was intended to clarify ERS could not do. This, of course, makes no sense whatsoever. In reality, the "borrow from a financial institution" language was not modified or clarified in the amendment because no one had ever suggested, and no one would ever think, that such language authorized public bond offerings.

51.     *Third*, although the Bondholders rely heavily on the legal opinions blessing the ERS Bond issuances, those opinions are all completely conclusory on the issue of authorization, and none stated that the ERS Bond issuances were authorized as "borrowings [or loans] from a financial institution." Rather, they each concluded (albeit incorrectly and without any analysis, as discussed below) that the ERS Bond issuances were authorized as "direct placements of debt." Thus, the Bondholders' primary argument is, in fact, an entirely novel reading of the statute.

C.     ERS Bond Issuances Were Not "Direct Placements of Debts"

52.     The Bondholders argue in the alternative that the ERS Bond issuances were authorized because they were "direct placements of debt." This argument is also a non-starter. In municipal finance (and finance generally), a "direct placement" is a form of "private placement" and means a sale of securities directly to a small number of sophisticated purchasers. According

to this commonly understood meaning, a "direct placement of debts" is the opposite of an underwritten public bond offering. Indeed, the terms "direct placement" (or "private placement") and "public offering" are used in contradistinction.

53.     The meaning of "direct placement" in contradistinction to an underwritten public offering is reflected in dictionary definitions, finance and investment literature, court decisions, and regulatory pronouncements and guidance. For example, Black's Law Dictionary defines "direct placement" as "[t]he sale by a company, such as an industrial or utility company, of an entire issue of securities directly to a lender (such as an insurance company or group of investors), *instead of through an underwriter*." Black's Law Dictionary (10th ed. 2014) (emphasis added). Other dictionary definitions are in accord. *See, e.g.*, Dictionary of Finance and Investment Terms (10th Ed. 2018) (noting that "direct placements offer higher potential returns *than many publicly offered securities*" and that "the terms direct placement and private placement are interchangeably used") (emphasis added); The New York Times Dictionary of Money and Investing (2002) (defining direct placement as "selling a new issue *not by offering it for sale publicly*, but by placing it with one of several institutional investors. *Also known as a private placement*.") (emphasis added); David I. Scott, Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor (2003) (defining direct placement as "[t]he sale of a new security issue to a limited number of large buyers *rather than to the general public*.") (emphasis added).

54.     These definitions of "direct placement" reflect an understanding going back decades. In 1951, Professor E. Raymond Corey of Harvard explained that the term refers to transactions, alternatively referred to as "private placements," in which securities "are directly placed in the sense that they are *not first sold to intermediate owners (e.g., investment bankers)*

23

*who have purchased with the intent reselling*." Ex. 39, E. Raymond Corey, *Direct Placement of Corporate Securities* (Harvard University Printing Office, 1951) (emphasis added). Reviewing Professor Corey's work in 1952, Myer Feldman suggested that "['direct placement'] might, more meaningfully, be defined as the method of obtaining funds *without resorting to a public offering of securities*[,] [as] [s]uch a definition would place the direct placement in its proper perspective as *the other side of the coin from public offerings*." Ex. 40, Myer Feldman, "*Corey: Direct Placement of Corporate Securities*," 61 Yale L.J., Art. 11, Issue 3 (1952) (emphasis added). In his 1967 book *Trends in Corporate Bond Quality*, economist Thomas R. Atkinson explained (in a chapter entitled "*Direct Placements Versus Public Offerings*") that "[t]he National Bureau of Economic Research now uses the term 'direct placement' to indicate bonds *not marketed to the general public*." Ex. 41, Thomas R. Atkinson, *Trends in Corporate Bond Quality* 21 n.1 (1967) (emphasis added).

55.    This historical understanding of "direct placement" and "private placement" as describing transactions not involving a public offering of securities has never changed. For example, in its book "The Fundamentals of Municipal Bonds," SIFMA describes private placements as occurring "when the investment banker offers securities to investors, *without a public offering*." Ex. 42, Neil O'Hara, *The Fundamentals of Municipal Bonds*, SIFMA, 6th Ed. (2012). Likewise, in announcing the October 2018 amendments to its disclosure regulations for municipal securities, the SEC noted that, beginning in 2009, "issuers and obligated persons have increasingly used . . . *direct placements as an alternative to public offerings of municipal securities*." Ex. 43, Amendments to Municipal Securities Disclosure, Exchange Act Release No. 34-83885, 83 Fed. Reg. 44700, 44702 (Aug. 31, 2018) (emphasis added).

56.    Citing some of these same sources and many more, and based on his decades of
municipal finance experience, including direct placements as far back as the 1980s, Movants'
expert, Mr. Doty, opined that "ERS would not have been viewed in the industry as making a
'direct placement of debt' in connection with the ERS Bond issuances." *See* Ex. 6, Doty Report
at 22. In fact, "because ERS Bonds were part of underwritten public bond offerings, they are . . .
the direct opposite of a 'direct placement of debt.'" *Id*.

57.    Under Puerto Rico law, "[t]echnical terms and phrases used in the arts and
sciences shall be interpreted according to their received meaning and acceptation with the
experts and authorities in the science, art or profession to which they refer." 31 L.P.R.A. § 16.
Given this directive and the fact that, here, "direct placement" appears in a statute governing an
entity's ability to incur debt, the term only can be understood to refer to its use as a financial
term of art and must be interpreted accordingly. *See Air Wisc. Airlines Corp. v. Hoeper*, 571 U.S.
237, 248 (2014) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a
term of art, it presumably knows and adopts the cluster of ideas that were attached to each
borrowed word in the body of learning from which it is taken.") (change in original) (original
quotations omitted). Put simply, there is no reason to believe that the Puerto Rican legislature
intended "direct placement" to have a meaning other than its well-established meaning in
finance. This is particularly true because when the 1988 Amendment was passed, direct
placements were a popular form of debt financing and at the time even exceeded public bond
issuances.[25]

---

[25] *See* Ex. 44, Mark S. Carey, *Recent Developments in the Market for Privately Placed Debt*, Federal Reserve
Bulletin (Feb. 1993), available at https://fraser.stlouisfed.org/files/docs/publications/FRB/pages/1990-
1994/33100_1990-1994.pdf

58.     Unable to contest the well-understood meaning of "direct placement" in municipal finance, the Bondholders' interpretation is based entirely on a fatally flawed parsing of the statutory language. According to the Bondholders, the modifier "direct" in the term "direct placements" was not meant to refer to direct placements as opposed public offerings but rather to debt issued by "ERS itself" as opposed to debt issued by a "conduit entity." *See* Resp. ¶ 20. Bondholders claim to glean this intent from the use of the modifiers "direct" and "private" elsewhere in the ERS Enabling Act. *Id.*

59.     The Bondholders point to two specific examples of "direct" elsewhere in the statute. In the first example, the ERS Enabling Act authorizes ERS to invest in "obligaciones directas o que estén garantizadas por la buena fe y el crédito de entidades gubernamentales," which the Bondholders translate as "direct obligations or [bonds, notes, or evidence of indebtedness] that are secured by the good faith and credit of the government entities." *Id.* ¶ 20 n. 6 (quoting 3 L.P.R.A. § 779(b)(1)(C)). This provision is plainly not referring, as the Bondholders contend, to obligations issued by the government entity as opposed to obligations issued by a conduit entity; rather, it is distinguishing between obligations that an entity owes directly, as primary obligor, and those that it owes indirectly as a guarantor or provider of other security.  In other words, "direct" modifies the "obligation," not the manner of its placement. In contrast, the debt-authorization language of the ERS Enabling Act refers "direct placements of debt," not "placements of direct debt."

60.     In the second example, the ERS Enabling Act authorizes ERS to invest in "[i]nstrumentos financieros constituidos directa o indirectamente sobre obligaciones financieras," which the Bondholders translate as "[f]inancial instruments constituted directly or indirectly on financial obligations". *Id.* (quoting 3 L.P.R.A. §  779(b)(1)(F)). Thus, "directly"

and "indirectly" refer to the relationship of a financial instrument to an underlying financial obligation and are used to make to clear that the authorization covers derivative instruments. Whatever the meaning, it has nothing to do with distinguishing between debts issued by a government entity itself and debts issued by a conduit entity as the Bondholders claim.

61.     Regarding uses of "private" in the ERS Enabling Act, the Bondholders point to a provision prohibiting ERS from acquiring securities "through private placings" ("colocaciones privadas"). *Id*. ¶ 20 (quoting 3 L.P.R.A. § 779(b)(2)(A)(ii)). This proves nothing, as "direct placement" and "private placement" are used synonymously in contradistinction to an underwritten public offering. And herein lies a fundamental problem with the Bondholders' argument that "direct placement" distinguishes between bonds issued by "ERS itself" and bonds issued by some special purpose entity created by ERS as part of a "conduit" financing structure: the argument bears no relation to how those words have historically been used in municipal finance or to the historical distinction in municipal finance law between bonds issued privately to particular purchasers and negotiable bonds offered to the public, which terminological and legal history formed the backdrop against which the ERS Enabling Act was amended to authorize "direct placements of debt." Whereas the law on municipal bond authority had long recognized a fundamental distinction between bonds issued directly to particular purchasers and negotiable bonds offered to the public, the law had never distinguished between bonds issued by a municipality itself and bond issued by a conduit entity. In short, Bondholders ask this Court to interpret the ERS Enabling Act in a way that ignores the financing backdrop against which this language was drafted.

27

D.    No Supposed Precedent, Agency Interpretations, Other Legislation, or "Judicial
       Admissions" Can Confer Authority Not Granted in the ERS Enabling Act

62.    According to the Bondholders, "[a] mountain of evidence from before and after

ERS issued the ERS Bonds in 2008 confirms that the ERS Enabling Act has always been

understood to authorize underwritten bond issuances." Resp. ¶ 28. This supposed "mountain" is

not even a legal "mole hill." Not only is the "evidence" not as represented, but no amount of

such evidence can confer on ERS the authority to engage in public bond offerings when the ERS

Enabling Act plainly did not grant such authorization.

### 1.    *Rivera Torres Case Did Not Address the Question Presented Here*

63.    The Bondholders contend that "the one case to address the relevant text," *Rivera*

*Torres v. Junta de Retiro Para Maestros*, 502 F. Supp. 2d 242 (D.P.R. 2007), "holds that it does

not limit bond-issuing authority." Resp. at 18 (capitalization removed). In the Bondholders'

telling, the case stands for the proposition that, because the ERS Enabling Act did not expressly

prohibit the issuance of bonds, ERS has the authority to engage in public bond offerings. This is

not what the case stands for. Under the most fundamental principle of municipal law, ERS has

only the powers expressly granted to it by the Legislative Assembly. The question presented here

is whether an underwritten public bond offering is a "borrowing from a financial institution" or

"direct placement of debt," and that question was not even addressed, let alone analyzed, in

*Rivera Torres*.

64.    Instead, *Rivera Torres* involved a federal age discrimination claim against the

Puerto Rico Teacher's Retirement System ("TRS"), and the issue before the court was whether

TRS was an "arm of the Commonwealth" for Eleventh Amendment immunity purposes. *Rivera*

*Torres,* 502 F. Supp. 2d at 248. The court held that it was not. *Id.* at 259. One of the multiple

factors in the analysis was "[w]hether [TRS] has the power to sue, be sued, and enter contracts in

28

its own name and right." *Id*. at 253. TRS, which has the same authorization to incur debt as ERS (including through "direct placements of debt"), "concede[d] that it is allowed to enter into contracts, make loans, issue bonds, and invest its funds . . . ." *Id*. at 254-55. Another factor was "[w]hether the [Commonwealth of Puerto Rico] has legally or practically obligated itself to pay [TRS's] indebtedness." *Id*. at 249. In analyzing this factor, the court stated that "[o]n the one hand, [TRS] has the capacity to issue bonds; on the other hand, at least at first glance, it seems that the contributions of the Commonwealth to [TRS] are not a trivial amount." *Id*. at 258. Neither TRS's concession nor the court's statement was made in reference to the TRS Enabling Act's debt authorization provision, which was quoted for the unrelated proposition that interest on TRS's debt obligations is tax-exempt. *Id*. at 256. In any event, the court said nothing about TRS having the authority to engage in public bond offerings.

### 2. *Purported Interpretations of ERS's Authority Are Not Entitled to Deference*

65. Relying on the First Circuit's decision in *U.S.I. Properties Corp. v. M.D. Construction Co.*, 860 F.2d 1, 8 (1st Cir. 1988), the Bondholders argue that this Court "must" defer to ERS's own interpretation (at the time) that the ERS Enabling Act authorized the issuance of the ERS Bonds. In *U.S.I. Properties*, the First Circuit upheld a Commonwealth instrumentality's challenged acts, which had been approved by its counsel and finance committee, observing that "under Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act." *Id*. The circumstances of the case, however, were much different from those at issue here. In *U.S.I. Properties*, the court was asked to defer to a decision of the Cooperative Development Company of Puerto Rico to enter into certain contracts for the development of a housing project—an activity at the core of the company's original purpose. *Id*. Here, by contrast, the Bondholders ask the Court to defer to

29

ERS's exercise of its borrowing authority—authority which ERS did not obtain until more than 30 years after its formation and which is at best ancillary to its purpose.

66.     In any event, as the Bondholders acknowledge, however, agency deference is warranted only when the agency's interpretation of its own authority is "reasonable." Resp. ¶ 31 (citing *Gonzalez Segarra v. CFSE*, 188 D.P.R. 252 (2013)). Although, as the Bondholders are always eager to point out, the ERS Bonds "came accompanied by a slew of approvals and legal opinions affirming their validity," these approvals and opinions were all completely devoid of analysis. They simply asserted that the ERS Bond issuances were "direct placements of debt" without so much as acknowledging that, in the terminology of municipal finance, a "direct placement of debt" is the opposite of a public bond offering. Thus, contrary to the Bondholders' contentions, these legal opinions were far from consistent with a "plain reading" of the ERS Enabling Act, which, unlike the numerous other Puerto Rico enabling acts and statutes referenced above, did not expressly authorize ERS to "issue bonds in a public sale." If anything, the "plain reading" of the ERS Enabling Act was that it did ***not*** authorize underwritten public bond offerings.

### 3.     *Other Legislation Does Not Confirm that ERS Enabling Act Authorized ERS Bonds*

67.     The Bondholders also argue that "[o]ther enactments by the Puerto Rico legislature, both before and after the ERS Bonds were issued, further confirm that the legislature authorized ERS to issue the ERS Bonds in the ERS Enabling Act." Resp. ¶ 33. The three other enactments the Bondholders cite confirm no such thing and do not change the fact that an underwritten public bond offering is neither a "borrowing from a financial institution" nor a "direct placement of debts" as those terms have always been understood in municipal finance.

68.     The first "other enactment" cited by the Bondholders is Act 35-2007 (the "2007 Amendment"), passed in April 2007, which amended the ERS Enabling Act to increase certain ERS pension benefits. The 2007 Amendment included a statement that "funds needed to cover the cost increase in the minimum amount of the pensions of the pensioners of the Central Government shall proceed from the resources obtained through the issue of bonds of the Employees of the Government and the Judicature Retirement Systems Administration." Ex. 45, Act 35-2007. According to the Bondholders, the fact that the 2007 Amendment did not independently authorize the referenced "issue of bonds" confirms that "the legislature was aware of the bond issuance, and understood ERS to have the authority to authorize it." Resp. ¶ 34. Even if this were true, it is irrelevant. The fact remains ERS *did not* have the ability to publicly issue bonds and no amount of implied belief otherwise can change that fact. In any event, the 2007 Amendment said nothing about an issuance of bonds in a public offering.

69.     The other two legislative actions the Bondholders cite—the 2011 Amendment and Act 3-2013 (the "2013 Amendment")—postdate the ERS Bond issuances.  No matter how one views these actions, they cannot possibly amount to a legislative ratification or validation of the ERS Bonds.  Under Puerto Rico law, any such retroactive validation or ratification must be express. P.R. Civil Code, Art. 3, 31 L.P.R.A. § 3 (official translation) ("Laws shall not have a retroactive effect unless they expressly so decree."); *see also Vázquez v. Morales*, 114 D.P.R. 822 (1983) (holding that the intention for a law to have retroactive effect must be expressly stated or clearly emerge from the statute). Nor could any language in a legislative statement of motives retroactively validate or ratify the ERS Bonds, as such statements are not part of the statute itself and have no legal force or effect.  In any event, the cited enactments fail to support the Bondholders' arguments for other reasons.

31

70.    The 2011 Amendment, as discussed above, directly undermines the Bondholders'

position insofar as it declared the ERS Bonds to have been issued "illegally."   Ignoring this

crystal clear statement of how the Legislature viewed the ERS bonds issuances, the Bondholders

attempt to construct a hidden message of support for the ERS Bonds.   They claim that the

statement in the 2011 Amendment that "Bond Issues are hereby prohibited as part of the direct

placement of debts" is "an acknowledgement that the phrase 'direct placement of debts' always

included the power to issue bonds" because otherwise "[this] language would be superfluous if

ERS never had the authority to issue bonds." Resp. ¶ 36. Not true. When read in light of the

Legislative Assembly's statement that the ERS Bond issuances were "illegally made," the

evident purpose of this language was to clarify that the issuance of bonds (or at least publicly

offered bonds such as the ERS Bonds) was not, and had never been, part of "the direct placement

of debts." *See* Ex. 38, Act 116-2011, Statement of Motives.  The Bondholders also claim that the

statement in the 2011 Amendment that "interest accrued on these obligations shall be exempt

from the payment of income tax to the Commonwealth of Puerto Rico" makes sense "only if the

ERS Bonds were valid." Resp. ¶ 37; Ex. 38, Act 116-2011 § 7(d). This is simply not the case. As

the U.S. Supreme Court held in *City of Brenham v. German-American Bank*, 144 U.S. 173, 188

(1892), such a tax exemption provision "cannot [be] regard[ed] . . . as recognizing the validity of

the bonds in question," and "[w]hatever that provision may mean, it cannot include bonds

unlawfully issued."[26]

_____

[26] The Bondholders further claim that the 2011 Amendment acknowledges the validity of the ERS Bonds in stating
that their issuance had "encumber[ed] employer contributions . . . for up to fifty years" and had "significantly
contributed to the financial crisis of [ERS]"—"effects that were possible only if the ERS Bonds were valid and
enforceable." Resp. ¶ 37. The argument that this statement was meant to affirm the ERS Bonds' validity strains
credulity. Plainly, the purpose of the statement is to emphasize what the Legislature saw as the fiscal irresponsibility
and financial imprudence of the ERS administration at the time the bonds were issued.

71.     Finally, the Bondholders cite the 2013 Amendment, which amended the ERS
Enabling Act to decrease certain pension benefits in yet another attempt to address ERS's
underfunding. Resp. ¶ 39. Specifically, the Bondholders point to the Statement of Motives,
which provides, in part, that "[a]lthough the bond issue enabled an injection of funds which
extended 5 to 6 years the life of the System's assets, [ERS] is under the obligation to repay these
bonds from the employer contributions it receives." Ex. 46, Act 3-2013, Statement of Motives.
The Statement of Motives also includes a statement that the "debt has a repayment term of
almost 50 years, during which [ERS] shall pay approximately $6 billion in interest, in addition to
repaying its principal, which amount is equal to approximately 4 years of benefit payments to
retired persons." *Id*. According to the Bondholders, this shows that, "even after the Legislature
had amended the ERS Enabling Act in 2011 to reduce ERS's authority to issue bonds, the
legislature assumed and reaffirmed the validity and enforceability of the ERS Bonds that ERS
had already issued." Resp. ¶ 39.  These statements, however, do nothing to "reaffirm" the
validity or enforceability of the bonds; any such re-affirmance or ratification would have to be
express, *Vázquez v. Morales*, 114 D.P.R. 822, and the statute says nothing of the sort.  The
legislature's statements are nothing more than purported justifications for certain past actions and
are thus irrelevant here.

### 4.     *ERS Has Made No "Judicial Admissions" that ERS Bonds Are Valid*

72.     The Bondholders also argue that ERS has made a number of "admissions" that
"further confirm ERS's statutory authority to issue the ERS Bonds." Resp. ¶ 40. Despite the
reference to "judicial admissions" in their point heading I(B), the Bondholders do not actually
argue, because they cannot, that ERS has made any binding judicial admissions. Among other
things, the doctrine of judicial admissions applies to statements of evidentiary fact, not legal
conclusions. *Harrington v. City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010).

33

### 5.      *ERS Bonds Cannot Be "Presumed" Valid*

73.      The Bondholders argue that the ERS Bonds must be presumed valid because "ERS issued the ERS Bonds more than 10 years ago, and paid interest on those bonds continually until the beginning of restructuring proceedings[,] [n]ot once in that time period [doing] . . . anything to suggest that the ERS Bonds were not valid and enforceable." Resp. ¶ 41. There is, however, no conclusive presumption of validity for municipal bonds, no matter how long the issuer has paid the debt service or otherwise treated the bonds as valid. As the authorities cited by the Bondholders show, any "presumption" (a word not used in any of the cited authorities) is, at most, an interpretive approach that applies when the validity of a bond issuance is otherwise a very close call, *i.e.*, when the arguments in favor of and against validity leave substantial doubt as to the correct outcome. Here, there can be no doubt that the ERS Enabling Act did not authorize ERS to engage in underwritten public bond offerings. As demonstrated above, a public bond offering is simply not a "borrowing from a financial institution" or a "direct placement of debt." Indeed, in municipal finance, a "public offering" is the opposite of a "direct placement," and no "presumption" can overcome the overwhelming evidence on this point.

## II.    BECAUSE ERS BONDS WERE ISSUED ULTRA VIRES, THEY ARE NULL AND VOID AND UNENFORCEABLE

74.      The Bondholders have argued in response to the Committees' claim objections that, even if ERS had no authority to issue the ERS Bonds, the result is merely that the ERS Bonds are non-negotiable, not null and void, and therefore the Bondholders may still recover on the bonds.  As an initial matter, this argument is at odds with the fact that the Bondholders themselves acquired the Bonds only by virtue of their negotiability (*i.e.*, their transferability on the secondary market).  The argument is also fundamentally flawed because it ignores the rule

34

that a governmental entity may act, including when issuing bonds, only pursuant to the power

granted to it by the legislature.  If a governmental entity issues bonds outside its statutory

authority to do so, those bonds are *ultra vires* and void. *See, e.g.*, *Buchanan v. City of Litchfield*,

102 U.S. 278, 288 (1880) ("there would seem to be no escape from the conclusion that the bonds

are void for want of legal authority to issue them at the time they were issued"); *Humacao*

*Lumber Co. v. Am. Surety Co. of N.Y.*, 59 D.P.R. 165, 168-69 (1941) (holding that unauthorized

bond issuances are void and unenforceable); *accord* Geflan, *State and Local Government Debt*

*Financing* § 12:4 (2d ed. 2019) (noting that county, municipalities and other local political

subdivisions have "no inherent power to borrow" and rather "must receive that power form the

state.").

75.     And because *ultra vires* actions are void, they cannot give rise to a claim against

the acting party. As one commentator has summarized:

> If a contract is ultra vires, it is wholly void. Because the contract is void,
> (a) no recovery can be had against the municipality on it; (b) there can be
> no ratification, except by the legislature; (c) the municipality cannot be
> estopped to deny the validity of the contract; and (d) there can be no
> recovery on an implied contract, although it has been executed and the
> municipality has received the benefit of the contract.

*McQuillin: the Law of Municipal Corporations*, 10 McQuillin Mun. Corp. §29:15 (3d ed.);

*accord City of Litchfield v. Ballou*, 114 U.S. 190, 193 (1885) ("[i]f this prohibition is worth

anything it is as effectual against the implied as the express promise, and is as binding in a court

of chancery as a court of law."); *PHL Variable Ins. Co. v. Town of Oyster Bay*, 16-CV-4013

(SJF)(AKT), 2017 WL 2371188, at *14-16 (E.D.N.Y. May 30, 2017) (dismissing fraud claims

against municipality where alleged misstatements were misstatement of law and "plaintiff is

charged with knowledge" of law) (applying New York law); *Waisman v.* Wagner, 278 N.W. 418,

421 (Wis. 1938) (dismissing fraud based claims against municipality in connection with ultra

vires contract because "[a]greements that are beyond the power of a city to make are void")
(applying Wisconsin law).

76.     The law is the same in Puerto Rico. For example, a party cannot hold a breach of
contract cause of action if the underlying contract is *ultra vires*. *See Las Marias Reference Lab.
Corp. v. Mun. San Juan,* 159 D.P.R. 868, 874 (2003) (rejecting claim for breach of contract
against city which contracted *ultra vires* because the contract is "void"); *Plaza Carolina Mall,
L.P. v. Municipality of Barceloneta*, 91 F. Supp. 3d 267, 290-91 (D.P.R. 2015); *accord Central
Transp. Co. v. Pullman's Palace Car Co.*, 139 U.S. 24, 48 (1891) ("All contracts made by a
corporation beyond the scope of those powers are unlawful and void"). In fact, Puerto Rico law
provides that any contract by a government instrumentality that does not comply with statutory
requirements or follow the requisite formalities is unenforceable. *See, e.g.*, *Rodríguez Ramos v.
ELA*, 190 D.P.R.  448, 456 (2014) (holding that lawyer's verbal contract with Commonwealth
for legal services was null and void and unenforceable even though lawyer actually performed
the services, the failure to properly document the contract was the Commonwealth's fault, and
the parties subsequently executed a written contract); *see also* 3 L.P.R.A. § 283h(a) ("The
dependencies shall order obligations and disbursements from their public funds only to pay for
services . . . [or] claims or other items authorized by law.").

77.     Finally, although it is true that section 8-202 of the UCC (discussed below) can in
certain circumstances permit bondholders to recover on a defective bond issuance (which relief
is unavailable to the Bondholders here), Article 8 of the UCC contains no concept of partial
invalidity based on "negotiability"—a security is either valid or it is not.[27] Thus, the

---

[27] The concept of negotiability does apply in Article 3 which governs negotiable instruments like checks, not
securities. *See* UCC § 3-102(a) ("This Article applies to negotiable instruments. It does not apply to … securities
governed by Article 8.")

Bondholders' focus on the negotiability of the ERS Bonds has no applicability to this dispute and should be ignored.

## III.    BONDHOLDERS HAVE NO UNJUST ENRICHMENT REMEDY

78.    Neither can the Bondholders pursue an unjust enrichment claim against ERS or the Commonwealth, as no party can seek "any remedy in equity, such as unjust enrichment" under an *ultra vires* contract. *Las Marias,* 159 D.P.R at 875*; accord Norton v. McOsker*, 407 F.3d 501, 506 (1st Cir. 2005) ("'[T]he doctrine of estoppel … has no application to a contract … which is void because it violates … the dictates of public policy.'") (changes in original) (quoting *Doherty v. Bartlett*, 81 F.2d 920, 925 (1st Cir. 1936)); *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 693 (1987) (refusing to apply equitable principles to enforce ultra vires contract because "[t]o decide otherwise is to promote gross noncompliance by public officers of the laws and regulations that govern their actions"). In sum, an *ultra vires* finding is fatal to all claims. The Puerto Rico Supreme Court has explained that the purpose of the ultra vires doctrine is to "protect the interests and the money of the people that the government represents" and is therefore "applied inflexibl[y]" to protect the public from having to pay for ultra vires actions. *Las Marias*, 159 D.P.R. at 875.

79.    What is more, it is no defense for the counterparty to allege that it had no notice of the *ultra vires* nature of a governmental entity's action. The law is clear that when a private party contracts with a state or local governmental entity, the party is presumed to know the scope of the entity's authority to make contracts. *Plaza Carolina Mall,* 91 F. Supp. 3d at 290-91. "Parties that contract with a municipality are aware of the need to conduct themselves in accordance with" the municipality's contracting regulations. *Las Marias*, 159 D.P.R. at 875; *accord Int'l Salt Co. v. City of Boston*, 590 F.3d 1, 6 (1st Cir. 2009) (applying Massachusetts law); *Gelfand*, State and Local Government Debt Financing § 12.22(2) (stating that, as normal

municipal bond due diligence, purchasers should consider whether "the issuing entity [has] been delegated specific authority by state enabling legislation or constitutional provision for the type of financing contemplated"). In sum, the ERS Bonds are a nullity.

80.     Moreover, even if an *ultra vires* action could give rise to an equitable claim, such claim could not give the Bondholders a greater recovery than they would have the right to receive under the terms of the Bonds, which are non-recourse and secured solely by certain collateral.  In addition, any such claim would be subordinated under section 510(b) of the Bankruptcy Code, which provides that any "claim . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated" to all claims of equal or greater priority. 11 U.S.C. § 510(b).  Section 510(b) is meant to subordinate claims for "recovery **other than** the simple recovery of an unpaid debt upon an instrument."  *See In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988) (emphasis in original).  Here, any unjust enrichment claim by the Bondholders would necessarily be seeking a remedy other than the "simple recovery of an unpaid debt due upon an instrument," because the ERS Bonds are invalid and unenforceable.[28]

## IV.     ERS BONDS ARE NOT VALIDATED BY UCC 8-202

81.     The Bondholders contend that, even if the ERS Bonds were issued *ultra vires*, the bonds are valid in their hands under UCC 8-202,[29] which specifies "rules [that] apply if an issuer asserts that a security is not valid." UCC § 8-202(b). If certain conditions are satisfied, a government security issued with a defect going to its validity is valid in the hands of a purchaser

---

[28] The Bondholders contend that they are seeking no more than "recovery of an unpaid debt due upon an instrument" and therefore contend that *Blondheim* supports their position. They are wrong. In *Blondheim*, the court indicated that a **contract claim** seeking recovery on a valid security would, of course, not be subordinated to the claims of other unsecured creditors. *In re Blondheim*, 91 B.R. at 640.  But where, as here, the security is invalid and its holder seeks to recover for damages or harm resulting from such invalidity, section 510(b) plainly applies.

[29] *See* 19 L.P.R.A. § 1752.

for value "without notice" of the defect. The holder of an invalid security bears the burden of establishing eligibility for validation under UCC 8-202.[30]

82.     Here, the Bondholders cannot meet their burden for three independent reasons. As an initial matter, UCC 8-202 is inapplicable on its face because neither the SCC, the Committee, nor the Retiree Committee is an "issuer" of the ERS Bonds. Finally, the Bondholders—all hedge funds managed by highly sophisticated asset managers—cannot establish that they purchased their ERS Bonds "without notice" of the *ultra vires* issue.

A.     UCC 8-202 Is Inapplicable to the Committees' Objections.

83.     By its terms, UCC 8-202 applies only to assertions of invalidity by an "issuer" of the security in question. The SCC and the Committees are not "issuers" of the ERS Bonds within the meaning of the UCC, and thus UCC 8-202 is inapplicable.

84.     Section 8-201(a) of the UCC provides that, "[w]ith respect to an obligation on or a defense to a security, an 'issuer' includes a person that":

(1)     places or authorizes the placing of its name on a security certificate, other than as authenticating trustee, registrar, transfer agent, or the like, to evidence a share, participation, or other interest in its property or in an enterprise, or to evidence its duty to perform an obligation represented by the certificate;

(2)     creates a share, participation, or other interest in its property or in an enterprise, or undertakes an obligation, that is an uncertificated security;

(3)     directly or indirectly creates a fractional interest in its property, if the fractional interest is represented by a security certificate; or

---

[30] Section 8-114 of the UCC provides that "in an action on a certificated security against the issuer: . . . [i]f it is shown that a defense or defect exists, the plaintiff has the burden of establishing that the plaintiff or some person under whom the plaintiff claims is a person against whom the defense or defect cannot be asserted."  UCC § 8-114(4) (*see* 19 L.P.R.A. § 1714). Although the section refers to actions "against" an issuer, "section [8-114] should be read as requiring that any party claiming bona fide purchaser status has the burden of establishing such status, even where he is a defendant." 7 Hawkland UCC Series § 8-105:6 (discussing the relevant portion of old section 8-105, which is now in section 8-114).

(4)  becomes responsible for, or in place of, another person
described as an issuer in this section.

19 L.P.R.A. § 1751(a). The Committees are obviously not "issuers" under subsections (1), (2), or

(3), and thus the only question is whether they are "issuers" under subsection (4), *i.e.*, whether

the Committees have become "responsible for, or in the place of," ERS as an issuer of the ERS

Bonds. They indisputably have not.

85.  The paradigm example of an "issuer" under UCC 8-201(a)(4) is a person that has

become "responsible for the performance of the obligations represented by a security." *See*

*Moscato v. Tie Technologies, Inc.*, No. 04 Civ. 2487(GBD), 2005 WL 146806, at *4 (S.D.N.Y.

Jan. 21, 2015) (holding that a corporate director was not an "issuer"). Thus, as Anderson on the

UCC explains, a person becomes an "issuer" under subsection (4) if the person "assumes the

obligation of" an issuer, "whether by succession in interest or by novation." 8-201:11 [Rev]

Substituted obligor, 8 Anderson UCC § 8-201:11 [Rev] (3rd. ed.) (emphasis added). Likewise,

Hawkland on the UCC explains that, when one corporation takes control of another corporation,

it becomes the "issuer" of the other corporation's securities for UCC Article 8 purposes. 7A

Hawkland UCC Series § 8-201:3 [Rev]. The Committees plainly do not fall under this test.

86.  Neither does the Oversight Board.  The FOMB is not an "issuer" under UCC § 8-

201(a).  PROMESA itself defines "issuer" in an analogous context as the Government of Puerto

Rico. See 48 U.S.C. §§ 2231(a)(8), (a)(15), (a)(2), (e); *accord* 48 U.S.C. § 2101(b)(2).[31]  Thus, it

is the Government of Puerto Rico, not the Oversight Board, that Congress designated as the

"issuer" for purposes of resolving claims and debts under PROMESA. Additionally, the

Oversight Board has not "stepped into the shoes" of the Government of Puerto Rico in the same

---

[31] To the extent there is any inconsistency between UCC 8-201(a) and PROMESA, the terms of PROMESA govern.
48 U.S.C. § 2103.

capacity as if these Title III cases were brought under chapter 11 of the Bankruptcy Code, because section 541 of the Bankruptcy Code is not incorporated into PROMESA. Here, the Government of Puerto Rico continues to possess and maintain control, albeit with oversight by the Oversight Board, of the "enterprise" of Puerto Rico. Consistent with this analysis, commentators have emphasized that section 8-201(a)(4) is concerned with parties obligated to perform on an issuance. Hawkland on the UCC, a leading treatise, explains that section 8-201(a)(4) applies when Corporation A takes control of Corporation B and becomes (for purposes of Article 8) the issuer of securities issued by Corporation B. 7A Hawkland UCC Series § 8-201:3 [Rev]. Another leading treatise, Anderson on the UCC, similarly explains that a person is treated as an issuer under (a)(4) if such person "assumes the obligation of" an issuer, "whether by succession in interest or by novation." 8-201:11 [Rev] Substituted obligor, 8 Anderson UCC § 8-201:11 [Rev] (3rd. Ed.). As such, the Oversight Board is not the "enterprise" ultimately responsible for the ERS Bonds, and therefore cannot be the "issuer" of the ERS Bonds.

87. But even if the Oversight Board were deemed an "issuer," that would still not allow the Bondholders to invoke UCC 8-202 against the Committees. An official Committee "may object to the allowance of a secured or priority claim" in its own right. *See* 7 Collier on Bankruptcy ¶ 1103.05 (16th 2020) (citing *United States v. Unsecured Creditors Comm. of C-TOF Va., Inc. (In re C-T of Va., Inc.)*, 977 F.2d 137 (4th Cir. 1992)); *In re Mechanicsburg Fitness, Inc.*, 592 B.R. 798, 807 (Bankr. M.D. Pa. 2018) ("The language of section 502(a) is clear and unambiguous. It plainly authorizes a party in interest to object to any claim or interest, proof of which is filed under section 501 of the Code."); Ex. 47, July 28, 2020 Hr'g Tr. 91:14-20, *In re. OneWeb Global Ltd.*, No. 20-22437-rdd (Bankr. S.D.N.Y.) (holding that creditors' committee need not first obtain derivative standing or other court permission to object to a claim

under section 502(b) of the Bankruptcy Code, because "the authorities that I've located that deal with the standing issue under Section 502(b) have made it clear, and I agree with them, that there's no limitation on a parties-in-interest's standing, except a constitutional limitation . . . ."); *see also* 11 U.S.C. § 1103(c)(5); *see also In re Fin. Oversight & Mgmt. Bd.*, 872 F.3d 57, 63 (1st Cir. 2017) (holding that Committees have an unconditional right to intervene in adversary proceedings). As such, the Committees are not acting in a derivative capacity for ERS's constituents and their challenges to the Bondholders' claims are immune to any section 8-202 argument.[32]

B.   Bondholders Had Notice of Potential Invalidity

88.   When section 8-202(b) does apply it only allows an otherwise invalid bond to be deemed "valid in the hands of a purchaser for value and without notice of the particular defect…." UCC § 8-202(b)(1). Under the UCC, a person has "notice" of a fact when the person "has actual knowledge of it," "has received a notice or notification of it," or "from all the facts and circumstances known to [the person] at the time in question [the person] has reason to know that it exists." 19 L.P.R.A. § 451(25) (defining "notice"). Thus, even if section 8-202(b) did apply here (and it does not), for the ERS Bonds to be valid in the hands of the Bondholders, each Bondholder must prove with respect to each of its purchases that it had no actual knowledge of the *ultra vires* issue or of facts that would give it reason to know of the issue. No Bondholder can meet this burden.

---

[32] The SCC does not join in the arguments set forth in this paragraph 87.

1.      *The Bondholders have admitted to being aware of the possibility that the ERS Bond Issuance was ultra vires prior to their final purchase of ERS Bonds*

89.     As explained in more detail below, none of the Bondholders can avail themselves of UCC section 8-202 because they, at all relevant times, at least had reason to know of the *ultra vires* nature of the ERS Bond issuances based on their review of various materials. Although the Bondholders may contend that certain of these materials did not give them the requisite notice, they ultimately must concede that at least some of their holdings cannot be subject to 8-202 because they were acquired after the Bondholders admit they became aware of the *ultra vires* argument and/or sought legal counsel on the issue. The below chart summarizes when each applicable Bondholder **admits** it was on notice of the *ultra vires* issue and the purchases of ERS Bonds it made after that date.  *See also* SUF ¶ 49.

| Bondholder[33] | First Became Aware of Ultra Vires Issue or Sought Advice | Purchases Made After Seeking Legal Advice or Being Made Aware of the Ultra Vires Issue |
|---|---|---|
| Andalusian Global Designated Activity Company | November 4, 2017 | 8/20/2018; 2/19/2019; 3/5/2019 |
| Crown Managed Accounts for and on behalf of Crown/PW SP | November 15, 2017 | All purchases after November 15, 2017. |
| LMA SPC for and on behalf of Map 98 Segregated Portfolio | November 15, 2017 | All purchases after November 15, 2017. |
| Mason Capital Master Fund LP | November 2017 | 3/12/2018; 9/20/2018; 10/17/2018; 10/23/2018; 10/24/2018; 10/25/2018; 1/7/2019; 1/10/2019; 1/14/2019; 1/16/2019; 1/17/2019; 1/29/2019; 1/30/2019; 1/31/2019; 2/12/2019; |

---

[33] The information contained herein also is contained within Appendix II, which provides the relevant factual citations to the record, and Ex. 32.

| | | 6/17/2019 |
|---|---|---|
| Oceana Master Fund Ltd. | November 15, 2017 | All purchases after November 15, 2017. |
| Pentwater Merger Arbitrage Master Fund Ltd. | November 15, 2017 | All purchases after November 15, 2017. |
| PWCM Master Fund Ltd. | November 15, 2017 | All purchases after November 15, 2017. |
| Redwood Master Fund Ltd. | August 24, 2018 | 9/6/2018; 10/24/2018; 11/28/2018; 12/4/2018; 12/12/2018; 12/13/2018; 1/16/2019; 1/28/2019; 1/29/2019 |
| SV Credit, L.P. | February 2014 | All purchases after February 2014. |

Consequently, at a minimum, the bond purchases identified above cannot be protected under

UCC section 8-202.

### 2. *The Bondholders had reason to know of the ERS Bonds' invalidity based on the offering documentation and the language of the ERS Enabling Act*

90.     The Bondholders concede that they reviewed the Official Statements and Bond

Resolutions before purchasing ERS Bonds.[34]  SUF ¶ 43. These documents make clear that  ERS

was created by the ERS Enabling Act (Official Statement at 1) and that the Bond Resolutions

were adopted pursuant to the provisions of the ERS Enabling Act. (Ex. 13, Series A Bond

Resolution, Section 102). Specifically, the Official Statements cite to the language of the ERS

Enabling Act "authoriz[ing] the System to borrow money, including through **the direct**

**placement of debt**, and secure any such borrowing with its assets" (emphasis added). From these

statements, the Bondholders were on notice that the ERS Bonds were purportedly valid as "direct

---

[34] *See* Ex. 26, Delaney (Altair/Glendon) Dep. Tr. 87:14-88:11; Ex. 48, Bolin (Andalusian) Dep. Tr. 51:10-14; Ex. 49, 6-11-19 Engman (Mason) Dep. Tr. 33:18-25; Ex. 23, 5-28-20 Engman (Mason) Dep. Tr. 38:7-39:2; Ex. 24, Mikes (Oaktree) Dep. Tr. 133:8-19; Ex. 28, Dowd (Ocher Rose) Dep. Tr. 42:10-23; Ex. 25, Corning (Pentwater) Dep. Tr. 65:19-67:6; Ex. 50, Ramos (Puerto Rico Funds) Dep. Tr. 49:11-12; Ex. 27, Boyer (Redwood) Dep. Tr. 78:17-23; Ex. 51, Cao (SV Credit) Dep. Tr. 33:4-16.

placements of debt." But, given that it is well-understood in the industry (and has been for decades) that a "direct placement of debt" is a private placement, the Bondholders should have known that this language, on its face, did ***not*** authorize public bond issuances.

91.     In addition, the disclosures in connection with the ERS Bond offerings were highly unusual in ways that sophisticated municipal investors such as the Bondholders would have recognized as raising serious "red flags." For example, the "black box" summaries in the Official Statements for the ERS Bond issuances make no mention of ERS having statutory authority to issue bonds, let alone in a public offering. Instead, the summaries merely state that the "Bonds will be issued pursuant to [the bond resolution]."[35] This non-specific disclosure of purported bonding authority is highly unusual.

92.     In addition to having reviewed the Official Statements' references to the ERS Enabling Act's debt-authorization language, the Bondholders also had actual knowledge of the ERS Enabling Act itself. In fact, with the exception of Altair/Glendon and the PR Funds, each Bondholder has acknowledged that it was aware of the 1988 Amendment's debt authorization language either prior to the first purchase of ERS Bonds or no later than their final purchase of ERS Bonds.[36] Because this language said nothing about ERS's ability to issue public bonds, it gave the Bondholders reason to know that the ERS Bonds were issued *ultra vires*.

---

[35] *See, e.g.*, Ex. 5, ERS Series C Official Statement, at 4.

[36] *See* Ex. 52, Bolin (Andalusian) Dec. ¶ 4; Ex. 32, Supp. Response to Rog. 17 (aware no later than April 21, 2016 with last bond purchase made on March 5, 2019); Ex. 23, 5-28-20 Engman (Mason) Dep. Tr. 74:21-75:7; Ex. 32 Supp. Response to Rog. 17 (aware no later than August 2018 with last bond purchase made on June 17, 2019); Ex. 53, Mikes (Oaktree) Dec. ¶ 4; Ex. 32, Supp. Response to Rog. 17 (became aware no later than February 29, 2016 with last bond purchase made on May 24, 2017); Ex. 54, Dowd (Ocher Rose) Dec. ¶ 4; Ex. 32, Supp. Response to Rog. 17 (became aware no later than November 26, 2013 with last bond purchase made on July 26, 2017); Ex. 55, Corning (Pentwater) Dec. ¶ 4; Ex. 32, Supp. Response to Rog. 17 (became aware no later than November 3, 2017 with last bond purchase on June 17, 2019); Ex. 56, Boyer (Redwood) Dec. ¶ 4; Ex. 32, Supp. Response to Rog. 17 (became aware no later than August 24, 2018 with last bond purchase on January 29, 2019); Ex. 30, Cao (SV Credit) Dec. ¶ 4; Ex. 32, Supp. Response to Rog. 17 (became aware no later than February 10, 2015 with last bond purchase on January 25, 2017).

### 3. The Bondholders had notice of the defect based on the passage of Act 116 in 2011, which clearly stated that the ERS Bond Issuances were "illegally made"

93.     In 2011, the Puerto Rico Legislature put the world, including the Bondholders, on notice that the ERS Bond issuances were not legally valid when it amended the ERS Enabling Act in 2011 and declared that the "[ERS] Bond Issue was illegally made by the System's Administration" and clarified the debt authorization language of the ERS Enabling Act. (Ex. 38, Act 116-2011, Statement of Motives).

94.     Several of the Bondholders concede they had actual knowledge of Act 116 and its declaration regarding the invalidity of the ERS Bonds when they made their purchases. The Puerto Rico Funds, for example, were aware of Act 116 when it was passed and continued to make purchases of the ERS Bonds. (Ex. 50, Ramos Dep. Tr. 110:11-24; Ex. 31, Supp. Response to Rog. 17). Similarly, SV Credit received a copy of Act 116 on October 25, 2013, almost a year prior to their first purchase of the ERS Bonds. (Ex.30, Cao Dec. ¶ 5; Ex. 32, Supp. Response to Rog 17.) Altair/Glendon likewise was on notice of Act 116 prior to their first purchase of ERS Bonds in November 2013. (Ex. 26, Delaney Dep. Tr. 91:23-92:8.) Oaktree received Act 116 as an attachment to an email on September 18, 2014 and continued making purchases of ERS Bonds into 2017. (Ex. 53, Mikes Dec. ¶ 5.) Similarly, Ocher Rose received a memorandum on August 3, 2015 that quoted the "illegally made" language but continued making ERS Bond purchases into 2017. (Ex. 54, Dowd Dec. ¶ 5.)

95.     Contrary to the Bondholders' suggestion, the Legislative Assembly's 2011 statement that the ERS Bond issuances were "illegally made" cannot plausibly be interpreted as mere "complaining" about the "wisdom" of the ERS Bonds. Resp. ¶ 65. "Unwise" and "illegal" are fundamentally different concepts, and the Legislative Assembly certainly knows the difference. Further, the fact that the phrase "illegally made" does not include the words "*ultra*

*vires*" is simply irrelevant. The question is whether the Bondholders had reason to know of the *ultra vires* issue, not whether the issue had been identified for the Bondholders with magic words. An official statement by the Legislative Assembly in connection with amendments to the ERS Enabling Act that the ERS Bond issuances were "illegally made" is more than sufficient notice of the *ultra vires* issue, especially given that one of the amendments was to clarify that "direct placement of debts" does not include bond offerings. Indeed, it is difficult to image what such a statement could have meant other than that the ERS Bonds were issued without legal authorization.

### 4.    *Bondholders that had communications with counsel prior to final purchase had notice of the ultra vires issue of the ERS Bonds*

96.    At a minimum, the Bondholders represented by Jones Day (*i.e.*, each Bondholder other than the Puerto Rico Funds) had knowledge of the *ultra vires* issue of the ERS bonds when they retained Jones Day. It is black-letter law that "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties . . . ." *Restatement (Third) of Agency* § 5.03. "The elements of common-law agency are present in the relationship[] between . . . client and lawyer," and there can be no argument that counsel's knowledge of facts going to the *ultra vires* nature of the ERS Bonds is "material" to its duties in advising the client concerning the client's interest in the ERS Bonds. *Id.* at § 1.01.

97.    In February 2014, SV Credit received legal advice from Jones Day regarding the possibility that the ERS Bonds were issued *ultra vires*. SUF ¶ 45 (Ex.30, Cao Dec. ¶ 7; Ex. 57, SV Credit Suppl. Priv. Log. BH-ERS-F-PRIV000243). In May 2015, SV Credit and others formed the Bondholder group and retained Jones Day as their counsel. SUF ¶ 45 (*Fourth Supplemental Verified Statement of the ERS Secured Creditors Purusant to Bankruptcy Rule 2019*, ¶ 1 [Case No. 17-3566, Dkt. 652]). Consequently, each member of the Bondholder group,

including those who joined later, are imputed with the knowledge provided by counsel to other

members of the group, including knowledge of the *ultra vires* issue.

98.    The following chart shows when each Bondholder joined the Bondholder group

and the purchases made after that date. *See also* SUF ¶ 45. At a minimum, the Bondholders had

knowledge of the *ultra vires* defect for all purchases listed.

| Bondholder[37] | Date of Jones Day Representation or joined Bondholder Group | Dates of Purchases of Currently Held Bonds After Joining Jones Day Bondholder Group |
|---|---|---|
| Andalusian Global Designated Activity Company | Around May 2017 | 8/11/2017; 8/20/2018; 2/19/2019; 3/5/2019 |
| Crown Managed Accounts for and on behalf of Crown/PW SP | Prior to August 2018 | All Purchases Post Representation |
| LMA SPC on behalf of Map 98 Segregated Portfolio | Prior to August 2018 | All Purchases Post Representation |
| Mason Capital Master Fund LP | At some point between November 2, 2016 - May 26, 2017 | 12/16/2016; 12/19/2016; 12/20/2016; 1/30/2017; 1/31/2017; 2/13/2017; 2/14/2017; 2/15/2017; 2/17/2017; 2/21/2017; 2/28/2017; 3/3/2017; 3/8/2017; 4/12/2017; 4/17/2017; 4/24/2017; 7/10/2017; 7/12/2017; 8/31/2017; 10/4/2017; 10/13/2017; 10/16/2017; 10/25/2017; 3/12/2018; 9/20/2018; 10/17/2018; 10/23/2018; 10/24/2018; 10/25/2018; 10/30/2018; 1/7/2019; 1/10/2019; 1/14/2019; 1/16/2019; 1/17/2019; 1/29/2019; 1/30/2019; 1/31/2019; 2/12/2019; 6/17/2019 |
| Oaktree Funds[38] | 2014 or 2015 | Using the 2014 date, all purchases post representation. |

---

[37] The information contained herein also is contained within Appendix II, which provides the relevant factual citations to the record, and Ex. 32.

| Oceana Master Fund Ltd. | Prior to August 2018 | All Purchases Post Representation |
|---|---|---|
| Ocher Rose L.L.C. | Prior to May 26, 2017 | 6/1/2017; 6/8/2017; 6/14/2017; 7/20/2017; 7/21/2017; 7/26/2017 |
| Pentwater Merger Arbitrage Master Fund Ltd | Prior to August 2018 | All Purchases Post Representation |
| PWCM Master Fund Ltd. | Prior to August 2018 | All Purchases Post Representation |
| SV Credit, L.P. | Prior to July 2014 | All Purchases Post Representation |

**5.** ***The Oversight Board and AAFAF provided notice to the Bondholders in November 2017 by raising the ultra vires issues with the Court***

99.     The Bondholders also became indisputably aware of the *ultra vires* issue when it was first raised with the Court. Specifically, on November 3, 2017, the Oversight Board filed a motion for summary judgment in a dispute over whether the Bondholders had properly perfected their alleged liens. [Adv. Proc. No. 17-213, Dkt. 91]. In that filing, the Oversight Board stated that "[i]n addition to the perfection defenses that are the subject of this proceeding, ERS … [has] alternative and additional defenses to the Bondholders' claims … including … the defense that the bond issuance was not authorized under the ERS's Enabling Act and therefore was ultra vires." (*Id*. at 11 n.6). On November 15, 2017, the Bondholders filed a response brief that acknowledged the *ultra vires* issue. [Adv. Proc. No. 17-213,  Dkt. 120, ¶¶70-72]. Substantive briefing on the *ultra vires* issue thereafter commenced on November 17, 2017, when AAFAF

---

[38] The Oaktree Funds are: Oaktree-Forrest Multi-Strategy, LLC (Series B); Oaktree Opportunities Fund IX, L.P.; Oaktree Opportunities Fund IX (Parallel), L.P.; Oaktree Opportunities Fund IX (Parallel 2), L.P.; Oaktree Huntington Investment Fund II, L.P.; Oaktree Opportunities Fund X, L.P.; Oaktree Opportunities Fund X (Parallel), L.P.; Oaktree Opportunities Fund X (Parallel 2), L.P.; Oaktree Value Opportunities Fund Holdings, L.P.

filed a motion to dismiss the claims on that basis in another adversary proceeding. SUF ¶ 46 ([Adv. Pro. 17-219, Dkt. 44, at 10-18]).

100.     The Bondholders filed their first substantive filing on the *ultra vires* issue on December 20, 2017 in opposing AAFAF's motion to dismiss. SUF ¶ 46 ([Adv. Pro. 17-219, Dkt. 50]). This filing (and the November 15 filing that preceded it) were filed on behalf of the following Bondholders: the Puerto Rico Funds, Altair, Andalusian, Glendon Capital, Mason Capital, Oaktree, Ocher Rose, and SV Credit. Consequently, any ERS Bond purchases made by these Bondholders on or after November 2017 were plainly made with notice of the potential invalidity of the ERS Bond issuances.

101.     And even for those Bondholders who were not yet part of the Bondholder group in November 2017, these public filings in a well-publicized litigation suffice under UCC 1-202(a)(3) as giving them reason to know the issue existed. *See* Ex. 58, Reorg Research November 20, 2017 (summary noting *ultra vires* challenge to ERS Bonds). Indeed, Pentwater has acknowledged that although it was not yet formally a member of the Bondholder group in November 2017, it did receive notice of AAFAF's November 15, 2017 filing on November 17, 2017. (Ex. 55, Corning (Pentwater) Dec. ¶ 3 (received the November 3, 2017 filing on November 15, 2017)).

102.     Consequently, every Bondholder had notice sufficient to prevent any use of UCC section 8-202 no later than November 2017, and as summarized below, eight of the Bondholders made purchases of the ERS Bonds after this date with five of them making *all* their purchases after the Oversight Board and AAFAF's November 2017 filings.

| Bondholder[39] | Dates of Purchases of Currently Held Bonds After Filing |
|---|---|
| Andalusian Global Designated Activity Company | 8/20/2018; 2/19/2019; 3/5/2019 |
| Crown Managed Accounts for and on behalf of Crown/PW SP | All Purchases Post Filing |
| LMA SPC on behalf of Map 98 Segregated Portfolio | All Purchases Post Filing |
| Mason Capital Master Fund LP | 3/12/2018; 9/20/2018; 10/17/2018; 10/23/2018; 10/24/2018; 10/25/2018; 10/30/2018; 1/7/2019; 1/10/2019; 1/14/2019; 1/16/2019; 1/17/2019; 1/29/2019; 1/30/2019; 1/31/2019; 2/12/2019; 6/17/2019 |
| Oceana Master Fund Ltd. | All Purchases Post Filing |
| Pentwater Merger Arbitrage Master Fund Ltd | All Purchases Post Filing |
| PWCM Master Fund Ltd. | All Purchases Post Filing |
| Redwood Master Fund Ltd. | 8/20/2018; 8/21/2018; 8/22/2018; 9/6/2018; 10/24/2018; 11/28/2018; 12/4/2018; 12/12/2018; 12/13/2018; 1/16/2019; 1/28/2019; 1/29/2019 |

103.    Accordingly, UCC section 8-202 cannot serve to validate the ERS Bonds and the

ERS Bonds, are wholly unenforceable by the Bondholders.

## CONCLUSION

104.    For the forgoing reasons, the SCC and the Committees respectfully request that

the Court grant their summary judgment motion, sustain their objections, and disallow all ERS

Bondholder claims in their entirety.

---

[39] The information contained herein also is contained within Appendix II, which provides the relevant factual
citations to the record.

Dated:  September 11, 2020
         San Juan, Puerto Rico

*/s/ Luc A. Despins*

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss (*Pro Hac Vice*)
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
lucdespins@paulhastings.com

Nicholas A. Bassett, Esq. (*Pro Hac Vice*)
2050 M Street NW
Washington, D.C. 20036
Tel: (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors (other than COFINA
and PBA)*[40]

- and -

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq. (USDC - PR 218312)
Israel Fernández Rodríguez, Esq. (USDC -
PR 225004)
Juan C. Nieves González, Esq. (USDC - PR 231707)
Cristina B. Fernández Niggemann, Esq. (USDC -
PR 306008)
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434 Fax: (787) 523-3433
jcasillas@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors (other than COFINA
and PBA)*[41]

---

[40] As it relates to the Committee's omnibus claims objection at Docket No. 5580.

[41] As it relates to the Committee omnibus claims objections at Docket No. 5580 and 5586 and Adversary
Proceeding Nos. 19-356, 19-357, 19-359, 19-361.

- and –

*/s/ John Arrastia          .*
GENOVESE JOBLOVE & BATTISTA, P.A.
John Arrastia, Esq. (*Pro Hac Vice*)
John H. Genovese, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jarrastia@gjb-law.com
jgenovese@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Special Litigation Counsel to the Official Committee of Unsecured Creditors*[42]


*/s/ Catherine Steege   *
JENNER & BLOCK LLP
Robert Gordon (admitted pro hac vice)
Richard Levin (admitted pro hac vice)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted pro hac vice)
Melissa Root (admitted pro hac vice)
Landon Raiford (admitted pro hac vice)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
lraiford@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

---

[42] As it relates to Adversary Proceeding Nos. 19-356, 19-357, 19-359, 19-361.

*/s/ A.J. Bennazar-Zequeira*
BENNAZAR, GARCÍA & MILIÁN, C.S.P
A.J. Bennazar-Zequeira
Héctor M. Mayol Kauffmann
Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
hector.mayol@bennazar.com
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for the Official Committee of
Retired Employees of Puerto Rico*


*/s/ Sunni P. Beville*,
Sunni P. Beville, Esq. (*pro hac vice*)
Tristan G. Axelrod, Esq. (*pro hac vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial Oversight and
Management Board, acting through the
members of the Special Claims Committee*

and

*/s/ Alberto Estrella*,
ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Financial Oversight and
Management Board, acting through the members
of the Special Claims Committee*