**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>      Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered)<br><br>Related to ECF Nos. 5580, 6482,<br>and 9701 |
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>      Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>Related to ECF Nos. 381, 469, and<br>757<br><br>***This Pleading Relates to the<br>Commonwealth and ERS Only,<br>and Should Be Filed in Both<br>Dockets.*** |

**MOTION OF THE BANK OF NEW YORK MELLON,
AS FISCAL AGENT, FOR SUMMARY JUDGMENT PURSUANT TO
FED. R. CIV. P. 56 REGARDING *ULTRA VIRES* CHALLENGE**

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and
the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the
Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal
Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No.
17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and
Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of
Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the
Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits
of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case
No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public
Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal
Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software
limitations).

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 2

SUMMARY OF MATERIAL FACTS.............................................................................. 4

STANDARD OF REVIEW ............................................................................................... 6

     A.    Legal Standard For Summary Judgment Under Federal Rule 56. ....................... 6

     B.    Burdens of Proof Under The Bankruptcy Rules And The UCC............................ 7

ARGUMENT ..................................................................................................................... 9

I.      THE BONDS ARE VALID AND BINDING OBLIGATIONS OF ERS. ................. 9

II.     THE BONDS ARE VALID AND ENFORCEABLE UNDER UCC § 8-202(b). ........... 9

     A.    ARTICLE 8 AND THE INDIRECT HOLDING SYSTEM................................. 10

     B.    ALL REQUIREMENTS OF UCC § 8-202(b) ARE SATISFIED........................ 17

          1.    Cede & Co. Purchased The Bonds For Value............................................ 17

          2.    Cede & Co. Had No Notice Of The Alleged Defect................................. 20

          3.    ERS Was In Substantial Compliance With The Legal
Requirements Governing The Issue Or Received Substantial
Consideration For The Bonds And The Stated Purpose Of The
Bonds Is One For Which ERS Had Power To Borrow Money. ............... 24

     C.    THE POLICY AND PURPOSES OF THE UCC DICTATE
ENFORCEMENT OF § 8-202 IN ACCORDANCE WITH ITS TERMS. .......... 25

     D.    SECTION 8-202(b) APPLIES TO ULTRA VIRES BOND ISSUANCES. ........ 27

CONCLUSION.................................................................................................................. 32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................6, 7

*Apache Corp. v. Chevedden*,
696 F. Supp. 2d 723 (S.D. Tex. 2010) ........................................................................11

*Arcari v. Marder*,
225 B.R. 253 (D. Mass. 1998) ......................................................................................8

*Ayala-Gerena v. Bristol Myers-Squibb Co.*,
95 F.3d 86 (1st Cir. 1996) ............................................................................................7

*In re Beverages Int'l Ltd.*,
50 B.R. 273 (Bankr. D. Mass. 1985) ............................................................................8

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ......................................................................................................6

*Conward v. Cambridge Sch. Comm.*,
171 F.3d 12 (1st Cir. 1999) ..........................................................................................6

*In re Cty. of Orange*,
219 B.R 543 (Bankr. C.D. Cal. 1997) ....................................................................8, 13

*Daniel Goldreyer, Ltd. v. Van De Wetering*,
630 N.Y.S.2d 18 (N.Y. App. Div. 1995) ....................................................................19

*Delaware v. New York*,
507 U.S. 490 (1993) ....................................................................................................11

*Farmers Ins. Exch. v. RNK, Inc.*,
632 F.3d 777 (1st Cir. 2011) ........................................................................................7

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Activity Co.*,
385 F. Supp. 3d 138 (D.P.R. 2019), *aff'd* 948 F.3d 457 (1st Cir. 2020) ................25

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Vázquez*,
616 B.R. 238 (D.P.R. May 15, 2020) ..........................................................................6

*Garside v. Osco Drug., Inc.*,
895 F.2d 46 (1st Cir. 1990) ..........................................................................................7

*Gray v. Evercore Restructuring L.L.C.*,
    544 F.3d 320 (1st Cir. 2008)..........................................................................8

*Griggs-Ryan v. Smith*,
    904 F.2d 112 (1st Cir. 1990)..........................................................................7

*JOM, Inc. v. Adell Plastics, Inc.*,
    193 F.3d 47 (1st Cir. 1999).........................................................................12

*Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*,
    993 F.2d 915 (1st Cir. 1993)..........................................................................8

*Kemco Food Distribs., Inc. v. R.L. Schreiber, Inc.*,
    No. 15-1955, 2016 WL 814833 (D.P.R. Feb. 29, 2016).................................6

*Lou Levy & Sons Fashions, Inc. v. Romano*,
    988 F.2d 311 (2d Cir. 1992)..................................................................13, 26

*Marine Midland Bank-Rochester v. Vaeth*,
    388 N.Y.S.2d 548 (1976)..............................................................................31

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................7

*Mencher v. Weiss*,
    114 N.E.2d 177 (N.Y. 1953).........................................................................19

*In re Multiponics, Inc.*,
    622 F.2d 709 (5th Cir. 1980) .........................................................................8

*New Jersey Bank, N.A. v. Bradford Sec. Operations*,
    690 F.2d 339 (3d Cir. 1982)..........................................................................2

*Nieves-Romero v. United States*,
    715 F.3d 375 (1st Cir. 2013)..........................................................................7

*Oquendo-Lorenzo v. Hosp. San Antonio, Inc.*,
    256 F. Supp. 3d 103 (D.P.R. 2017)..............................................................31

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
    559 F.3d 773 (8th Cir. 2009) ...........................................................10, 11, 12

*Ramette v. Al & Alma's Supper Club Corp. (In re Bame)*,
    252 B.R. 148 (Bankr. D. Minn. 2000) .........................................................26

*Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*,
    532 F.3d 28 (1st Cir. 2008).............................................................................7

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust*,
   No. 14-4394 (AJN), 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ...........................................12

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
   324 F. Supp. 3d 387 (S.D.N.Y. 2018)...................................................................................13

*Santos-Santos* v. *Torres-Centeno*,
   842 F.3d 163 (1st Cir. 2016).................................................................................................28

*Seattle-First Nat. Bank v. Oregon Pac. Indus., Inc.*,
   500 P.2d 1033 (Or. 1972) .....................................................................................................30

*Trafalgar Capital Assocs. v. Cuomo*,
   159 F.3d 21 (1st Cir. 1998)...................................................................................................31

*Union St. Corridor-Cmty. Dev. Corp. v. Santander Bank, N.A*,
   191 F. Supp. 3d 147 (D. Mass. 2016) ..................................................................................30

*United States v. Ron Pair Enters., Inc.*,
   489 U.S. 235 (1989)..............................................................................................................25

**Statutes**

3 L.P.R.A. § 761 ...........................................................................................................................25

3 L.P.R.A. §§ 761-788 ....................................................................................................................2

3 L.P.R.A. § 779(d) ...................................................................................................................2, 25

19 L.P.R.A. § 401 ............................................................................................................................2

31 L.P.R.A. § 14 ...........................................................................................................................25

15 U.S.C. § 78g-1(a)(2)(A)(i) .......................................................................................................10

15 U.S.C. § 78g-1(e) .....................................................................................................................10

48 U.S.C. § 2170 .............................................................................................................................6

U.C.C. § 1-103 ..............................................................................................................................26

U.C.C. § 1-201(b) ....................................................................................................................18, 19

U.C.C. § 1-202(a) ..........................................................................................................................21

U.C.C. § 1-202(e) ..........................................................................................................................21

U.C.C. § 1-204 ..............................................................................................................................19

U.C.C. § 8-101 ........................................................................................................10

U.C.C. § 8-102(a) ...................................................................................12, 14, 15, 18

U.C.C. § 8-111 ........................................................................................................22

U.C.C. § 8-114(3) ......................................................................................................8

U.C.C. § 8-114(4) ......................................................................................................9

U.C.C. § 8-116 ....................................................................................................4, 18

U.C.C. § 8-202(b) ..............................................................................................*passim*

U.C.C. § 8-202(c) ....................................................................................................28

U.C.C. § 8-202 cmt. 2 .............................................................................................20

U.C.C. § 8-202 cmt. 3 ........................................................................................*passim*

U.C.C. § 8-202 cmt. 5 .........................................................................................19, 20

U.C.C. § 8-202(f) .....................................................................................................20

U.C.C. § 8-203 ........................................................................................................26

U.C.C. § 8-207 ........................................................................................................15

U.C.C. § 8-301(a) ....................................................................................................19

U.C.C. § 8-501 cmt. 1 .............................................................................................12

U.C.C. § 8-501 cmt. 4 .............................................................................................12

U.C.C. § 8-503 cmt. 1 .........................................................................................12, 14

U.C.C. § 8-505 cmt. 1 .............................................................................................13

**Rules**

Fed. R. Bankr. P. 3001(f) ..........................................................................................8

Fed. R. Civ. P. 56(a)-(c) ............................................................................................6

**Other Authorities**

1 Hawkland U.C.C. Series § 1-103:11 ..................................................................26, 30

1 Hawkland U.C.C. Series § 1-103:12 ........................................................................30

1 Hawkland U.C.C. Series § 1-103:6....................................................................................26

7 Hawkland U.C.C. Series § 8-114:1[Rev]......................................................................9

7 Hawkland U.C.C. Series § 8-202:7.........................................................................19, 20

7 Hawkland U.C.C. Series § 8-501...................................................................................20

7 Hawkland U.C.C. Series § 8-503...................................................................................20

7A Hawkland U.C.C. Series § 8-203:1 [Rev]...................................................................26

Anderson U.C.C. § 1-103:4 ..............................................................................................26

Anderson U.C.C. § 1-103:23 ............................................................................................30

David J. Fernandez *et al.*, *Demystifying DTC: The Depository Trust Company
    and the Municipal Bond* Market, NATIONAL ASSOCIATION OF BOND LAWYERS,
    March 2017, at 4,
    https://www.bradley.com/insights/publications/2017/03/demystifying-dtc-the-
    depository-trust-company-and-the-municipal-bond-market....................................13

*In re The Depository Trust Co.*, S.E.C. Release No. 34-47978, 2003 WL
    21288541, at *6 (June 4, 2003)...............................................................................11

ROBERT DOTY, BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS, 52
    (Bloomberg Press, John Wiley & Sons, Inc., 2012) ................................................22

Russell A. Hakes, *UCC Article 8: Will The Indirect Holding Of Securities Survive
    The Light Of Day?*, 35 Loy. L.A. L. Rev. 661, 708-09 (2002)................................20

*Transfer Agent Regulations*, S.E.C. Release 34-76743, File No. S7-27-15, at 38-
    39 (Dec. 22, 2015) ........................................................................................11, 12, 13

The Bank of New York Mellon ("BNYM" or the "Fiscal Agent"), as fiscal agent under the Pension Funding Bond Resolution (as supplemented, the "Resolution"),[1] adopted on January 24, 2008, by The Employee Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), files this motion (this "Motion"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment as to the *ultra vires* challenge (the "*Ultra Vires Challenge*") to the enforceability of ERS's pension funding bonds (the "Bonds"), as alleged in:[2]

(i)     the *Omnibus Objection of the Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico* [ECF No. 5580] (the "Official Committee Claim Objection");[3]

(ii)    Parts III, IV, and V of the *Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007 to Claims Filed or Asserted by Holders of ERS Bonds* [ECF No. 6482] (the "Retiree Committee Claim Objection"); and

(iii)   Part III of the *Objection of Financial Oversight and Management Board Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Proof of Claim Against ERS by The Bank of New York Mellon, as Fiscal Agent (Claim No. 16777)* [ECF No. 9701] (the "FOMB ERS Claim Objection").[4]

---

[1]   Capitalized terms used but not defined in this Motion have the meanings given in the Resolution.

[2]   Together with the ad hoc groups of beneficial owners of the Bonds (the "Bondholders") represented by Jones Day and White & Case LLP, the Fiscal Agent has filed contemporaneously herewith a separate motion for summary judgment concerning the scope of the Fiscal Agent's liens in connection with:  (i) Adversary Proceeding No. 19-366-LTS (D.P.R.); (ii) paragraphs 94-97 of Part VI of the Retiree Committee Claim Objection; and (iii) Part I.A.i. of the *Supplemental Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Proof of Claim Against the Commonwealth by The Bank of New York Mellon, as Fiscal Agent (Claim No. 16775)* [ECF No. 9700].

[3]   "ECF No." refers to the Electronic Case File No. in the Court's docket for the title III proceeding of the Commonwealth of Puerto Rico, Case No. 17 BK 3283-LTS (D.P.R.), or as otherwise specified.

[4]   The parties asserting the *Ultra Vires* Challenge consist of:  (i) The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"); (ii) the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico (the "Official Committee"); and (iii) the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee" and, together with the Official Committee, the "Committees").  The Oversight Board and the Committees are referred to in this Motion collectively as the "Objecting Parties."  The Official Committee Claim Objection, the Retiree Committee Claim Objection, and the FOMB ERS Claim Objection are referred to in this Motion collectively as the "Claim Objections".

## INTRODUCTION

The Fiscal Agent filed a proof of claim (*i.e.*, Claim No. 16777) against ERS in excess of $3 billion on account of the principal and interest due on the Bonds as of the commencement of ERS's Title III proceeding, plus all amounts due or becoming due to the Fiscal Agent and the Bondowners under the Resolution and the Bonds.  As a defense to the Fiscal Agent's claim, the Objecting Parties—ERS, as the issuer of the Bonds, and the Committees appointed in ERS's Title III proceeding, acting on ERS's behalf—assert through the Claim Objections that the Bonds are not valid and cannot be enforced as a result of a defect in the issuance of the Bonds.  Through this Motion, the Fiscal Agent seeks summary judgment overruling the Claim Objections and declaring that ERS had statutory authority to issue the Bonds or, alternatively, even if the Bonds were issued *ultra vires*, the Bonds are valid and enforceable pursuant to § 8-202(b) of the Uniform Commercial Code (the "UCC").[5]

ERS had statutory authority to issue the Bonds in 2008.  The plain text of Act No. 447-1951 (codified, as amended, at 3 L.P.R.A. §§ 761-788) (the "Enabling Act") authorized the Bonds as a borrowing from financial institutions and as a direct placement of debt.  3 L.P.R.A. § 779(d) (2008).  Because ERS had statutory authority to issue the Bonds, the Claim Objections should be overruled as they relate to the *Ultra Vires* Challenge.  However, even if ERS lacked

---

[5]   The Commonwealth of Puerto Rico enacted the Uniform Commercial Code (including Article 8) in 1995 and Revised Article 8 in 1998. 19 L.P.R.A. § 401 *et seq*.  The Resolution is governed by and construed in accordance with Puerto Rico law; provided, however, that the formalities leading to the creation of the trusts and, to the maximum extent permitted by applicable law, the rights and duties of the Fiscal Agent, are governed by New York law.  Resolution § 1311.  Section 8-110 of the UCC provides that validity of securities is determined under the law of the issuer's jurisdiction—here, Puerto Rico.  Because the UCC is the same in Puerto Rico and New York and the jurisdictions do not construe the UCC differently, choice of law is a non-issue for purposes of this case.  *See New Jersey Bank, N.A. v. Bradford Sec. Operations*, 690 F.2d 339, 343 n. 9 (3d Cir. 1982) (UCC enacted in issuer's and plaintiff's jurisdiction and states do not construe Article 8 differently).  For ease of reference, this Motion cites only the uniform statute.

statutory authority to issue the Bonds, UCC § 8-202(b) provides that such defect cannot be asserted to invalidate or prevent enforcement of the Bonds in the present circumstances.

A guiding theme of UCC Article 8 is that the issuer bears the risk of improperly issued securities. Official Comment 3 to UCC § 8-202 explains that "it is the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue." U.C.C. § 8-202 cmt. 3. To effectuate this policy, § 8-202(b) establishes clear and objective rules to protect purchasers for value against an issuer's assertion, as a defense to enforcement of a security, that the security is not valid. Even though a security may be issued by a governmental issuer with a defect going to its validity, the security nevertheless "is valid in the hands of a purchaser for value and without notice of the particular defect" if the issuer was in substantial compliance with the legal requirements governing the issue *or* the issuer has received "substantial consideration" and "a stated purpose of the issue is one for which the issuer has power to borrow money . . . ." *Id.* § 8-202(b). With respect to the Fiscal Agent's claim against ERS seeking to enforce the Bonds, each of these requirements is satisfied such that the Objecting Parties cannot assert a defect going to the validity of the Bonds as a defense.

The Fiscal Agent filed its claim against ERS on behalf of itself and the Bondowner. The sole Bondowner is, and always has been, Cede & Co., as nominee of The Depository Trust Company ("DTC"). Under UCC § 8-202(b), the Bonds are treated as valid and enforceable in the hands of Cede & Co., notwithstanding any defect going to their validity, because Cede & Co. purchased the Bonds for value at the time that they were issued in 2008 and, at that time, had no notice that ERS lacked statutory authority to issue the Bonds. Section 8-116 of the UCC confirms that securities intermediaries, like DTC and its nominee, Cede & Co., which receive a financial asset, such as the Bonds, are purchasers for value of the financial asset when they

- 3 -

establish security entitlements to the financial asset in favor of other investors, or entitlement

holders.  U.C.C. § 8-116.  As to lack of notice, all of the information that was made available to

Cede & Co. at the time of the issuance confirmed that the Bonds were valid, authorized, binding,

and enforceable.  As a market utility intended primarily to improve trading efficiency through

the immobilization of securities, Cede & Co. had no duty to perform due diligence regarding the

validity of the Bonds or otherwise to look beyond the opinions of ERS's bond counsel stating

that the Bonds are valid and enforceable.  Additionally, ERS received substantial consideration

in the form of hundreds of millions of dollars in exchange for each series of the Bonds, and the

Enabling Act empowers ERS to borrow money without restriction as to purpose.

Because Cede & Co. satisfies the clear and objective criteria of § 8-202(b), the Bonds are

valid and enforceable in its hands, and the Objecting Parties cannot assert that ERS lacked

statutory authority to issue the Bonds as a defense to the Fiscal Agent's claim.  As between ERS

and Cede & Co., ERS must bear the risks of any failure to comply with the Enabling Act.

Recognizing the effect of § 8-202(b), the Objecting Parties seek to circumvent, misapply,

or re-write the UCC.  They would have the Court interpose conditions beyond the clear terms of

the UCC or apply the UCC to persons other than Cede & Co. as the purchaser and owner of the

Bonds.  However, § 8-202(b) must be applied as written.  Applying the UCC as written on the

record before the Court, the Court should grant the Fiscal Agent summary judgment overruling

the Claim Objections to the extent they are premised upon the *Ultra Vires* Challenge and

confirming that the Bonds are valid and enforceable against ERS.

## SUMMARY OF MATERIAL FACTS

The relevant facts supporting this Motion are set forth in the *Statement of Undisputed*

*Material Facts in Support of the Motion of The Bank of New York Mellon, as Fiscal Agent, for*

*Summary Judgment Pursuant to Fed. R. Civ. P. 56 Regarding Ultra Vires Challenge* ("SUF")

filed contemporaneously herewith.  Record evidence that supports each fact is cited in the SUF,

and relevant portions of the record are included in the Appendix ("App.") to the SUF.  The

following paragraphs summarize the significant facts supporting this Motion.

In 2008, ERS issued three series of Bonds pursuant to the Resolution in the aggregate

amount of nearly $3 billion to decrease its unfunded pension liability.  SUF ¶ 5.  BNYM is the

Fiscal Agent for the Bonds and, in that capacity, is empowered to act to protect and enforce the

rights of the registered owners of the Bonds.  *Id.* ¶¶ 9-10.  The sole registered owner of the

Bonds is, and always has been, Cede & Co., as nominee of DTC.  *Id.* ¶ 13.  Upon issuance of the

Bonds, the physical security certificates were delivered to BNYM, as DTC's custodian.  *Id.* ¶ 29.

In exchange for receiving ownership and physical possession of the certificated

securities, DTC established security entitlements to the certificated Bonds in favor of various

securities brokers and dealers and certain other entities that are direct participants in DTC's

book-entry system.  *See* SUF ¶¶ 22-23, 25-27.  Thereafter, DTC facilitated post-trade settlements

among its direct participants of sales and other securities transactions relating to the Bonds,

through electronic computerized book-entry transfers and pledges between the direct

participants' accounts.  *Id.* ¶ 23.

As a market utility, DTC does not undertake, and does not have a responsibility, to

monitor or ascertain the compliance of any transactions in securities with any local, state,

federal, or foreign laws or regulations thereunder.  SUF ¶ 32.  Consistent with its ministerial role,

DTC received limited information concerning the Bonds only days before they were issued,

including copies of the official statement, the Resolution, the opinion of bond counsel, and

responses to a DTC eligibility questionnaire.  *Id.* ¶¶ 36-38.  None of the documents that DTC

received prior to issuance of the Bonds indicated that ERS lacked statutory authority to issue

them. *Id.* ¶¶ 39-46. To the contrary, each of the various official statements, the Resolution, and

the opinions of counsel that DTC received prior to issuance of the Bonds confirmed that the

Bonds were authorized, legal, valid, and binding obligations of ERS. *Id.* ¶¶ 39-43. DTC only

recently learned of the Objecting Parties' *ultra vires* argument. *Id.* ¶ 47. It had no notice of any

such argument, or any defect going to the validity of the Bonds, at the time of issuance. SUF

¶ 47.

## STANDARD OF REVIEW

### A.    Legal Standard For Summary Judgment Under Federal Rule 56.

The Fiscal Agent moves for summary judgment pursuant to Rule 56(a) of the Federal

Rules of Civil Procedure (the "<u>Federal Rules</u>"), as made applicable to these proceedings by Rule

7056 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").[6]

Any party may move for summary judgment regarding all or any part of the claims

asserted in a case. Fed. R. Civ. P. 56(a). The purpose of a summary judgment motion is "to see

whether there is [a] need for trial." *Kemco Food Distribs., Inc. v. R.L. Schreiber, Inc.*, No. 15-

1955, 2016 WL 814833, at *2 (D.P.R. Feb. 29, 2016). Summary judgment is appropriate where

there are no genuine issues of material fact and the movant is entitled to judgment as a matter of

law. *See* Fed. R. Civ. P. 56(a)-(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50

(1986); *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 18 (1st Cir. 1999); *Fin. Oversight &*

*Mgmt. Bd. for Puerto Rico v. Vázquez*, 616 B.R. 238, 245 (D.P.R. May 15, 2020).

The party moving for summary judgment bears the initial burden of showing the absence

of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The

---

[6]    The Bankruptcy Rules are made applicable to these proceedings pursuant to 48 U.S.C. § 2170.

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact." *Ayala-Gerena v. Bristol Myers-Squibb Co.,* 95 F.3d 86, 94 (1st Cir.

1996) (citations omitted).  A dispute concerning a material fact is genuine if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248.

A fact is "material if it has the potential of determining the outcome of the litigation." *Farmers*

*Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011) (quoting *Rodríguez-Rivera v. Federico*

*Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008)).

Once the movant carries this initial burden, "[t]he burden then shifts to the nonmovant to

establish the existence of at least one fact issue which is both 'genuine' and 'material.'" *Griggs-*

*Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990) (quoting *Garside v. Osco Drug., Inc.*, 895 F.2d

46, 48 (1st Cir. 1990)).  To defeat summary judgment, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  "Conclusory allegations,

empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than

significantly probative will not suffice to ward off a properly supported summary judgment

motion." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013) (quotations and

editing removed).

Regarding the application of UCC § 8-202(b), the material facts are not in genuine

dispute.  Rather, the parties disagree on the application of the law to undisputed facts.

Consequently, the issues addressed in this Motion are ripe for summary judgment.

### B.      Burdens of Proof Under The Bankruptcy Rules And The UCC.

The Claim Objections are governed by Bankruptcy Rule 3001.  Under Bankruptcy Rule

3001(f), the Fiscal Agent's proof of claim constitutes "prima facie evidence of the validity and

amount of the claim." Fed. R. Bankr. P. 3001(f); *see generally* Collier on Bankruptcy

¶ 3001.09[2] (16th ed. 2019). "The interposition of an objection does not deprive the proof of

claim of presumptive validity unless the objection is supported by *substantial evidence*."

*Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993)

(internal citations omitted). "A party objecting to [that] claim has the initial burden of presenting

a substantial factual basis to overcome [its] prima facie validity." *In re Beverages Int'l Ltd.*, 50

B.R. 273, 280 (Bankr. D. Mass. 1985) (citing *In re Multiponics, Inc.*, 622 F.2d 709, 714 (5th Cir.

1980)). Applying this standard to this Motion, and "[u]nlike typical summary judgment practice,

. . . the issue is whether the record before the [Court], viewed in a light most favorable to the

[Fiscal Agent], establishes 'substantial evidence' of a valid opposition to a claim of proof

sufficient to avoid a summary judgment," *Arcari v. Marder*, 225 B.R. 253, 255 (D. Mass. 1998)

(internal citations omitted), or that the Fiscal Agent's claim fails as a matter of law, *see Gray v.

Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008).

  Insofar as the Objecting Parties challenge the validity of the Bonds, the Objecting Parties

also must satisfy their burden under UCC § 8-114. Section 8-114 establishes a presumption that

a certificated security is authentic. In an action involving a certificated security, production of

the certificate entitles a holder to recover on it unless the objecting party "establishes a defense

or a defect going to the validity of the security." U.C.C. § 8-114(3); s*ee also In re Cty. of

Orange*, 219 B.R 543, 556 (Bankr. C.D. Cal. 1997) ("the burden of proof section presumes that

the person who possesses the security, on presentment, is the proper owner who is entitled to

payment unless the issuer can assert a defense or defect as to the validity of the security."). If the

objecting party shows that a defense or defect exists, the claimant has the burden of establishing

that it or some person under whom it claims "is a person against whom the defense or defect

cannot be asserted." U.C.C. § 8-114(4); 7 Hawkland UCC Series § 8-114:1[Rev]. The

Objecting Parties must satisfy their burdens under each of Bankruptcy Rule 3001 and § 8-114.

## ARGUMENT

**I.      THE BONDS ARE VALID AND BINDING OBLIGATIONS OF ERS.**

ERS was authorized by the Enabling Act to borrow approximately $3 billion by issuing

the Bonds in 2008. In support of ERS's statutory authority to issue the Bonds under the

Enabling Act, and to avoid duplicative briefing, the Fiscal Agent joins in, and incorporates by

reference as if specifically set forth herein, the arguments made in section I of the Bondholders'

motion for summary judgment (the "Bondholders' Motion") filed contemporaneously herewith.[7]

**II.      THE BONDS ARE VALID AND ENFORCEABLE UNDER UCC § 8-202(b).**

The Bonds are valid and enforceable under UCC § 8-202(b) notwithstanding any alleged

defect relating to their validity. Section 8-202(b)(1) creates a safe harbor for non-governmental

securities: "A security . . . even though issued with a defect going to its validity, is valid in the

hands of a purchaser for value and without notice of the particular defect unless the defect

involves a violation of a constitutional provision." U.C.C. § 8-202(b)(1).[8] Section 8-202(b)(2)

---

[7]      In section III of the Bondholders' Motion, the Bondholders seek summary judgment on Counterclaim
IV of the "clawback actions" on the basis that, even if ERS lacked authority to issue the Bonds and
UCC § 8-202(b) does not render the Bonds enforceable, the Bondholders still would be entitled to
recovery in equity under the doctrine of unjust enrichment. The Fiscal Agent is not a party to the
"clawback actions" and so does not join in the Bondholders' request for summary judgment in those
proceedings as set forth in section III of the Bondholders' Motion. However, to the extent that this
Court determines that ERS lacked authority to issue the Bonds and UCC § 8-202(b) does not render
the Bonds enforceable, the Fiscal Agent does not waive, and hereby reserves, its claim for unjust
enrichment against the Commonwealth of Puerto Rico and ERS as set forth in its proofs of claim.

[8]      Where the defect involves a violation of a constitutional provision, the security is valid in the hands
of a purchaser for value and without notice of the defect, other than one who takes by original
issue. *See* UCC § 8-202 cmt. 3 ("if the defect involves a violation of constitutional provisions, these
rights accrue only to a subsequent purchaser, that is, one who takes other than by original issue.").
The Objecting Parties have not alleged a defect involving the violation of a constitutional provision,
rather only that ERS lacked *statutory* authority to issue the Bonds.

extends the safe harbor to the holder of securities issued by a government if (i) "there has been

substantial compliance with the legal requirements governing the issue" *or* (ii) "the issuer has

received a substantial consideration for the issue as a whole or for the particular security and a

stated purpose of the issue is one for which the issuer has power to borrow money or issue the

security." *Id.* § 8-202(b)(2).  Stated differently, even if the Enabling Act did not authorize

issuance of the Bonds, the Objecting Parties may not assert that defect against a purchaser for

value without notice of the defect in the circumstances described in § 8-202(b)(2).  If § 8-202(b)

applies here, the *ultra vires* arguments are of no moment and the Bonds are valid and

enforceable.  Accordingly, the Fiscal Agent focuses on application of this section.

## A.    ARTICLE 8 AND THE INDIRECT HOLDING SYSTEM.

Application of Article 8 starts with defining the parties and their rights as they exist

within the indirect holding system.  The indirect holding or "book-entry" system was created in

the 1970s "to facilitate the establishment of a national system for the prompt and accurate

clearance and settlement of transactions in securities, and to eliminate the physical movement of

securities certificates among brokers and dealers."  *Pet Quarters, Inc. v. Depository Trust &

Clearing Corp.*, 559 F.3d 773, 776 (8th Cir. 2009) (quoting 15 U.S.C. §§ 78g-1(a)(2)(A)(i), (e))

(internal citations omitted); *see also* App. Ex. 13, Doty Dep. Tr. at 51:15-19 (book-entry system

"facilitate[s] electronic trading" and "eliminate[s] paperwork so that we no longer have paper

bonds.").  Following the establishment of this system, "securities may be held directly through

possession of a [security certificate] . . . or indirectly by acquisition of a 'security entitlement'

from an intermediary such as a clearing company, bank, or broker dealer."  *Pet Quarters*, 559

F.3d at 776 (citing U.C.C. § 8-101).  Instead of settling securities trades through the delivery of

certificates or registration of transfers on the issuer's books, the book-entry system contemplates

"netted settlement arrangements and accounting entries on the books of a multi-tiered pyramid of securities intermediaries."  U.C.C., Art. 8, Prefatory Note, § I.D.

At the top of this pyramid is DTC, which is a clearing corporation registered with the U.S. Securities and Exchange Commission and the nation's principal securities depository. *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 726 (S.D. Tex. 2010); *Pet Quarters*, 559 F.3d at 776; *see* SUF ¶ 20.  In that capacity, "DTC accepts deposits of securities from its participants (*i.e.*, broker-dealers and banks), credits those securities to the depositing participants' accounts, and effects book-entry movements of those securities."  *In re The Depository Trust Co.*, S.E.C. Release No. 34-47978, 2003 WL 21288541, at *6 (June 4, 2003); *see* Rules, By-Laws and Organization Certificate of DTC Rule 3, § 1; *see also* SUF ¶¶ 22-23, 25-27.  In effect, DTC "serves as a clearinghouse for its participants' securities transactions."  *Apache Corp.*, 696 F. Supp. 2d at 726 (quoting *Delaware v. New York*, 507 U.S. 490, 495 (1993)).  DTC's clearinghouse function was created for the primary purpose of "improv[ing] trading efficiency by 'immobilizing' securities, or retaining possession of securities certificates even as they are traded."  *Id.*

To immobilize the securities, DTC's nominee, Cede & Co., is the direct holder of all certificated securities deposited with DTC.  *Pet Quarters*, 559 F.3d at 776.  The securities are "legally owned by and registered in the name of" Cede & Co.  *Transfer Agent Regulations*, S.E.C. Release 34-76743, File No. S7-27-15, at 38-39 (Dec. 22, 2015) (footnotes omitted); *see* Doty Dep. Tr. at 53:12-13 (Cede & Co. is "legal owner").  As the legal and registered owner, Cede & Co.'s interest is the only ownership interest of which the issuer and the trustee/paying agent have direct knowledge.  *See* U.C.C., Art. 8, Prefatory Note, § I.D.

- 11 -

Contrasted with Cede & Co.'s ownership of the security, each of DTC's participants is an "entitlement holder" holding a "security entitlement" to a *pro rata* share of the security held by DTC, as the participant's "securities intermediary."[9]  *See Transfer Agent Regulations*, S.E.C. Release 34-76743, File No. S7-27-15, at 38-39 (Dec. 22, 2015) (footnotes omitted); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust*, No. 14-4394 (AJN), 2017 WL 1331288, *6 (S.D.N.Y. Apr. 4, 2017) ("Certificates are . . . legally held only in the name of a DTC nominee, on behalf of various participant banks and brokerage firms, whose own customers, in turn, are usually the ultimate beneficial owners of the securities.").  Transfers of these "indirect security entitlement positions among [DTC's] members" are tracked electronically through "DTC's automated system."  *Pet Quarters, Inc.*, 559 F.3d at 776.  As entitlement holders, DTC's participants do not have a "claim to a specific identifiable thing;" rather, the participants' security entitlements constitute "a package of rights and interests" that the participants have against DTC—the participants' securities intermediary—and the security held by DTC.  U.C.C. § 8-503 cmt. 1; *see Pet Quarters, Inc.*, 559 F.3d at 776 (investor's security entitlement represents "a property interest entitling the holder to exercise all of the rights attached to the security") (citing U.C.C. § 8-501 cmt. 1); *see also* U.C.C. § 8-501 cmt. 4 (persons holding securities through securities intermediaries have security entitlements governed by Part 5 of Article 8, and are not treated as direct holders of securities.).[10]

---

[9]   *See* UCC §§ 8-102(a)(14) (defining "securities intermediary" as "(i) a clearing corporation; or (ii) a person . . . that in the ordinary course of its business maintains securities accounts for others . . . ."); 8-102(a)(7) (defining "entitlement holder" as a "person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary"); 8-102(a)(17) (defining "security entitlements" as "the rights and property interest of an entitlement holder with respect to a financial asset").

[10]   The Official Comments to the UCC are cited throughout this Motion.  The Official Comments "do not have the force of law, but are nonetheless the most useful of several aids to interpretation and construction of the [UCC]."  *JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 57 n.6 (1st Cir. 1999) (internal quotation marks omitted).  They are "indispensable to an understanding of the objectives and

DTC's participants typically hold security entitlements, not for their own benefit, but for the benefit of their customers (typically brokers) or their customers' customers.  Each customer for whom a participant acts as securities intermediary owns not a security, but a security entitlement to a *pro rata* share of the participant's interest in each security.  *Transfer Agent Regulations*, S.E.C. Release 34-76743, File No. S7-27-15, at 38-39 (Dec. 22, 2015) (footnotes omitted); *see* David J. Fernandez *et al.*, *Demystifying DTC: The Depository Trust Company and the Municipal Bond* Market, NATIONAL ASSOCIATION OF BOND LAWYERS, March 2017, at 4, https://www.bradley.com/insights/publications/2017/03/demystifying-dtc-the-depository-trust-company-and-the-municipal-bond-market.  DTC has "no insight into" the relationship between each participant and its customers.  *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 391-92 (S.D.N.Y. 2018); *see also* U.C.C. § 8-505 cmt. 1.  As a consequence of the indirect holding system, "municipal securities are not owned any longer in a literal sense by the actual investors in those securities or even by the investors' brokers or dealers."  ROBERT DOTY, BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS, 166 (Bloomberg Press, John Wiley & Sons, Inc., 2012).

Consistent with the indirect holding system, Article 8 distinguishes between direct holders of securities (*e.g.*, Cede & Co.) and indirect holders of security entitlements (*e.g.*, participants and their customers) and affords them different rights and interests.  *See In re Cty. of Orange*, 219 B.R. at 553-56 (addressing distinctions between direct holders and entitlement holders under Article 8).  The Prefatory Note to Article 8 explains:

> The rules of Parts 2, 3, and 4 [of Article 8] deal only with the rights of persons who hold securities directly.  In typical securities holding arrangements in the modern depository system, only the clearing corporation would be a direct holder of the

---

purposes of the [UCC] and the substantive changes effected in the law."  *Lou Levy & Sons Fashions, Inc. v. Romano*, 988 F.2d 311, 314 n. 3 (2d Cir. 1992).

securities.  Thus, while the rules of Parts 2, 3, and 4 would apply to the relationship
between the issuer and the clearing corporation, they have no application to
relationships below the clearing corporation level.  Under Revised Article 8, a
person who holds a security through a broker or securities custodian has a security
entitlement governed by the Part 5 rules but is not the direct holder of the security.

U.C.C., Art. 8, Prefatory Note, § II.B.  The following example is given to further clarify these

relationships:

> Consider, for example, corporate stock which is held through a depository, such as
> DTC.  The clearing corporation, or its nominee [Cede & Co.], is the registered
> owner of all of the securities it holds on behalf of all of its participants.  Thus the
> rules of Parts 2, 3, and 4 of Revised Article 8 apply to the relationship between the
> issuer and the clearing corporation.  If, as is typically the case today, the securities
> are still represented by certificates, the clearing corporation will be the holder of
> the security certificate or certificates representing its total holdings.  So far as
> Article 8 is concerned, the relationship between the issuer and the clearing
> corporation is no different from the relationship between the issuer and any other
> registered owner.

*Id.* § III.C.  Accordingly, Part 2 of Article 8, including § 8-202(b), addresses the relationship

between the issuer and the clearing corporation and its nominee, the latter of which holds the

securities "directly," while the rights of entitlement holders are governed by Part 5 of Article 8.

Applying Article 8 in this case, each of the Bonds is a "security," *see* U.C.C. § 8-

102(a)(15), and each security was registered under DTC's book-entry only system.  SUF ¶ 24.

When ERS issued the Bonds, it registered ownership of the securities in the name of Cede & Co.,

as the nominee of DTC.  *Id.*  Cede & Co. received legal title to and became the owner of the

Bonds.  *See id.* ¶¶ 12-13; U.C.C. § 8-503 cmt. 1 ("A person's claim of ownership of a

certificated security is a right to a specific identifiable physical object . . . .").  ERS delivered the

physical security certificates to BNYM, as agent for DTC, to hold on behalf of Cede & Co.  *Id.*

¶ 29.  Because each of the Bonds is represented by a "security certificate" in "registered form,"

*see* U.C.C. § 8-102(a)(13), (16), each Bond is a "certificated security," *see id.* § 8-102(a)(4).

Cede & Co. remains the registered owner of the Bonds today.  SUF ¶ 13.

- 14 -

The Bonds and the Resolution confirm Cede & Co.'s ownership.  *First*, the applicable security certificates in the possession of BNYM, as DTC's agent, specify Cede & Co. as the person entitled to the security.  SUF ¶ 24.  *Second*, the Resolution defines the "Owner of the Bonds" and the "Bondowner" as the "registered owner."  *Id.* ¶ 11.  Registered ownership of the Bonds is proved by the registry books maintained by the Fiscal Agent, and the registry books identify Cede & Co. as the sole registered owner of the Bonds.  *Id.* ¶ 24.  For this reason, ERS and the Fiscal Agent deem and treat the registered owner as the absolute owner of the Bonds.  *Id.* ¶¶ 14, 16; *accord* U.C.C. § 8-207 (issuer or indenture trustee may treat registered owner as person exclusively entitled to exercise rights and power).  The Fiscal Agent makes payments and sends notices solely to DTC.  SUF ¶ 17.

DTC is the "clearing corporation" and a "securities intermediary" for the Bonds.  *See* U.C.C. § 8-102(a)(5), (14).  Each of DTC's participants whose accounts have been allocated a property interest in DTC's interest in a certificated Bond is an entitlement holder with a "security entitlement" against DTC.  In turn, each of the investors whose accounts have been allocated a property interest in a participant's security entitlement is itself an entitlement holder with a "security entitlement" against the participant.  The indirect holding system and its application to the Bonds is illustrated in the demonstrative below.

*[The remainder of this page was intentionally left blank]*



Considering the parties' roles and relationships with respect to each other and the Bonds, as they are defined by UCC Article 8, it becomes apparent that Part 2 of Article 8, including § 8-202(b), addresses the relationship between ERS, as the issuer, and DTC, as the clearing corporation, and its nominee Cede & Co., which owns and holds the certificated securities directly. The rights of DTC's participants, other securities intermediaries, and investors holding the ultimate beneficial interests in the Bonds are those of entitlement holders having security entitlements against their respective securities intermediaries. The entitlement holders' rights are governed by Part 5 of Article 8.

### B.     ALL REQUIREMENTS OF UCC § 8-202(b) ARE SATISFIED.

Section 8-202(b) mandates enforcement of the Bonds, notwithstanding any alleged

defect, (i) in the hands of a purchaser for value, (ii) without notice of the defect, (iii) if (a) there

has been substantial compliance with the legal requirements governing the issue *or* (b) the issuer

has received substantial consideration and the stated purpose of the issue is one for which the

issuer has power to borrow money.  *See* U.C.C. § 8-202(b).  Each of these requirements is

satisfied with respect to the Bonds.  Cede & Co. purchased the Bonds for value and lacked notice

of any defect.  ERS received substantial consideration of hundreds of millions of dollars for each

series of Bonds, and the Enabling Act authorized ERS expressly to borrow money without any

restriction on purpose.  Consequently, the Oversight Board, as the statutory representative of the

issuer, and the Committees, acting derivatively and "in place of" the issuer, may not assert any

defense or defect going to the validity of the Bonds to overcome the proofs of claim filed by the

Fiscal Agent for and on behalf of Cede & Co, as the registered owner of the Bonds.

### 1.     Cede & Co. Purchased The Bonds For Value.

Cede & Co. purchased the Bonds for value at the time of issuance and remains the sole

registered owner thereof, and the Fiscal Agent filed its proofs of claim to enforce its payment

rights on the Bonds for and on behalf of Cede & Co. (as it is authorized to do under the

Resolution), *see* SUF ¶¶ 12-13.  The clear and unambiguous text of Article 8 establishes Cede &

Co.'s status as the "purchaser for value."

Section 8-116 of the UCC, entitled "Securities Intermediary as Purchaser for Value,"

clearly states:  "A securities intermediary that receives a financial asset and establishes a security

entitlement to the financial asset in favor of an entitlement holder is a purchaser for value of the

financial asset." U.C.C. § 8-116.[11]  The Official Comments to § 8-116 explain:

> This section is intended to make explicit two points that, while implicit in other
> provisions, are of sufficient importance to the operation of the indirect holding
> system that they warrant explicit statement.  First, it makes clear that a securities
> intermediary that receives a financial asset and establishes a security entitlement in
> respect thereof in favor of an entitlement holder is a 'purchaser' of the financial
> asset that the securities intermediary received.  Second, it makes clear that by
> establishing a security entitlement in favor of an entitlement holder a securities
> intermediary gives value for any corresponding financial asset that the securities
> intermediary receives or acquires from another party, whether the intermediary
> holds directly or indirectly. . . . Even though the securities intermediary does not
> give value to the transferor, it does give value by incurring obligations to its own
> entitlement holder.

*Id.* cmt. 1.  As discussed above, DTC is the securities intermediary that received ownership and

physical possession of the certificated securities through its nominee, Cede & Co., and its agent,

BNYM.  *See* SUF ¶¶ 12-13, 29.  DTC also established security entitlements to the certificated

securities in favor of its participants, as entitlement holders.  *See id.* ¶¶ 22-23, 25-27.  Because

DTC and its nominee, Cede & Co., received the certificated securities and established security

entitlements in respect thereof in favor of entitlement holders, § 8-116 leaves no room for doubt

that Cede & Co. is the "purchaser for value" for purposes of § 8-202(b).

What is made explicit in § 8-116—that Cede & Co. is the "purchaser for value" of the

Bonds—is implicit elsewhere under Article 8.  "Purchaser" means "a person that takes by

purchase."  U.C.C. § 1-201(b)(30).  In turn, "purchase" means "taking by sale . . . or any other

voluntary transaction creating an interest in property."  *Id.* § 1-201(b)(29).  Cede & Co. is the

"purchaser" of the Bonds because ERS's issuance of the Bonds was a voluntary transaction that

---

[11]   The term "financial asset" is defined to include "a security."  UCC § 8-102(a)(9).

created an interest in property (*i.e.*, the certificated securities) and, as part of that transaction, Cede & Co. took legal title to and became the absolute owner of that property.

Cede & Co. also gave "value" for the Bonds. "Value" is given where a person acquires rights "by accepting delivery under a preexisting contract for purchase" or "in return for any consideration sufficient to support a simple contract." U.C.C. § 1-204. Cede & Co. did both. *First*, Cede & Co. accepted delivery of the certificated securities under the preexisting purchase contract executed between the issuer and the underwriters.[12] *See* SUF ¶ 29. *Second*, Cede & Co. gave consideration in exchange for delivery of the certificated securities by agreeing to act as securities intermediary and to provide security entitlements in the certificated securities to entitlement holders. *See id.* ¶¶ 22-23, 25-27; *see also* App. Ex. 13, Doty Dep. Tr. at 74:22-24 ("And when [the Bonds] go to DTC, they're going to the accounts for the participants at DTC."). Such consideration from Cede & Co. is sufficient to support a simple contract. *See Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953) ("[A] benefit flowing to a third person or legal entity constitutes a sufficient consideration for the promise of another."); *Daniel Goldreyer, Ltd. v. Van De Wetering*, 630 N.Y.S.2d 18, 24 (N.Y. App. Div. 1995) ("The value of the consideration is not crucial as long as it is acceptable to the parties . . . .") (citations omitted).[13]

---

[12]   The term "delivery" is defined in the UCC to mean the "voluntary transfer of possession."  UCC 1-201(b)(14).

[13]   Cede & Co.'s status as the "purchaser for value" also is confirmed by other provisions in Article 8. "[I]f a municipality issues a bond in book-entry only form, the only direct 'purchaser' of that bond would be the clearing corporation." UCC § 8-202 cmt. 5; *see also* 7 Hawkland UCC Series § 8-202:5 [Rev] (§ 8-202 applies to securities held by clearing houses in certificated form). Similarly, § 8-301(a) provides that "[d]elivery of a certificated security to a purchaser occurs when . . . the purchaser acquires possession of the security certificate . . . ." UCC § 8-301(a). Cede & Co. acquired possession of the applicable security certificates when they were physically delivered to BNYM, as agent for DTC and Cede & Co.

The Objecting Parties' assumption without discussion that holders of beneficial interests in the Bonds are "purchasers" for purposes of § 8-202(b) is flatly wrong. *See, e.g.*, Official Comm. Claim Obj. ¶ 56, 63-64. The beneficial holders have security entitlements—claims against their brokers, which have claims against DTC's participants, which have claims against DTC. The fact that entitlement holders purchased *security entitlements* is irrelevant to determining who purchased the *certificated securities* for purposes of § 8-202(b). *See* 7 Hawkland UCC Series §§ 8-501, 8-503 [Rev]; s*ee also id.* § 8-202:7 [Rev] (holders "through intermediaries are not described as purchasers of 'the security' but as [those] who have acquired security entitlements."). Because entitlement holders have not taken delivery of security certificates, they are not considered purchasers of those certificates.[14] *See* U.C.C. § 8-202 cmt. 2.

### 2.    Cede & Co. Had No Notice Of The Alleged Defect.

Assuming *arguendo* that ERS lacked statutory authority to issue the Bonds, neither DTC nor its nominee, Cede & Co, had notice of the defect when Cede & Co. purchased the Bonds in 2008. The UCC provides a functional definition of notice: "a person has 'notice' of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question, has reason to know

---

[14]   Entitlement holders have certain parallel protections under § 8-202(f). Subsection (f) provides that, "if a security is held by a securities intermediary against whom an entitlement holder has a security entitlement . . . , the issuer may not assert any defense that the issuer could not assert if the entitlement holder held the security directly." UCC § 8-202(f). This subsection is designed to ensure that, although only the clearing corporation is the direct holder and the "purchaser" of a certificated security, the defense preclusion rules also protect entitlement holders. *See* UCC § 8-202 cmt. 5; *see also* Russell A. Hakes, *UCC Article 8: Will The Indirect Holding Of Securities Survive The Light Of Day?*, 35 Loy. L.A. L. Rev. 661, 708-09 (2002) (protections afforded to purchasers for value under § 8-202(b) "are extended to entitlement holders in the indirect holding system by subsection 8-202(f)"). The extension of the defense preclusion rules to entitlement holders under subsection (f) does not affect Cede & Co.'s rights as "purchaser for value" under subsection (b); indeed, the sections complement each other to ensure broad protection of purchasers and entitlement holders in the indirect holding system.

that it exists." U.C.C. § 1-202(a). The Objecting Parties allege that purchasers of the Bonds had

"notice" that ERS lacked statutory authority to issue the Bonds because: (i) the Enabling Act did

not authorize public issuance of the Bonds; (ii) the Legislative Assembly said that the issuances

were "illegally made" in 2011; and (iii) disclosures made in connection with the issuances raised

"red flags" for any sophisticated investor. *See*, *e.g.*, Official Comm. Claim Obj. ¶¶ 63-70. Even

if true, none of these events would constitute notice to DTC and Cede & Co.

*First and foremost*, there is no evidence or even suggestion that DTC or Cede & Co. had

"actual knowledge" that ERS lacked statutory authority to issue the Bonds when Cede & Co.

purchased the Bonds in 2008. Additionally, there is no evidence to support the notion that DTC

or Cede & Co., prior to or contemporaneously with purchasing the Bonds, "received a notice or

notification" that ERS lacked statutory authority to issue the Bonds.[15] To the contrary, what the

record shows is that DTC had no "actual knowledge" and did not "receive" any "notice or

notification" that ERS lacked statutory authority to issue the Bonds. *See* SUF ¶¶ 39-46.

Additionally, if ERS had no knowledge of a defect in 2008, DTC and Cede & Co. certainly could

not. *See id.* ¶¶ 39, 43 (ERS's bond counsel opined that Bonds were authorized and valid).

*Second*, events subsequent to 2008, including statements made by the Legislative

Assembly in 2011, are irrelevant to whether Cede & Co. had notice of any defect when it

purchased the Bonds in 2008. *See* Official Comm. Claim Obj. ¶ 13. Assuming *arguendo* that

post-2008 events could put others on notice of a defect, they are not notice to Cede & Co., and

there is no basis to backdate the notice to 2008 when Cede & Co. purchased the Bonds. *See*

U.C.C. § 8-202(b) (notice is relevant at the time of purchase). Notice to, or the knowledge of,

---

[15]   For purposes of Article 8, "a person 'receives' a notice or notification when: (1) it comes to that
person's attention; or (2) it is duly delivered in a form reasonable under the circumstances . . . ."
UCC § 1-202(e).

entitlement holders who bought security entitlements in or after 2011 is doubly irrelevant because (i) § 8-202(b) makes no reference to notice to entitlement holders, let alone creates an exception based on their knowledge, and (ii) any notice to entitlement holders in 2011 could not constitute notice to Cede & Co. in 2008.

*Third*, the argument that sophisticated investors should have compared terms of the ERS offering documents with terms of unrelated bonds issued by different governmental entities has no relevance for Cede & Co.  As the nominee of a clearing agency, *see* U.C.C. § 8-111, Cede & Co. is not a "sophisticated investor," and it has no duty of due diligence.  *See* SUF ¶ 32.  And where securities are regular on their face and supported by multiple opinions as to their validity, Cede & Co. would have no reason to undertake any investigation or perform a detailed comparison of the terms of offering documents of *other* issuers concerning *unrelated* bonds. Nothing in the UCC requires Cede & Co. (or, indeed, any purchaser of securities) to undertake such an onerous process to validate the opinions of those that are charged with determining the validity of securities.[16]  A contrary rule, effectively establishing a presumption that securities are invalid until proven valid by a holder, would be contrary to logic, subvert governments' ability to perform public functions, and injure public interests—particularly in the context of a statutory scheme that makes it "the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue."  U.C.C. § 8-202 cmt. 3.

*Fourth*, in 2008, Cede & Co. had no "reason to know" that ERS lacked statutory authority to issue the Bonds.  ERS cannot charge Cede & Co. with notice of invalidity merely

---

[16]   "Bond counsel issue legal opinions assuring investors that municipal securities are legal, valid, and enforceable under state law . . . ."  ROBERT DOTY, BLOOMBERG VISUAL GUIDE TO MUNICIPAL BONDS, 52 (Bloomberg Press, John Wiley & Sons, Inc., 2012); *see also id.* at 46, 69, 123; *accord* App. Ex. 13, Doty Dep. Tr. 165:10-166:4 (confirming that bond counsel delivers opinion that bonds are validly issued and that such an opinion should not be delivered at closing if bond counsel has reason to believe that issuer lacks legal authority to issue bonds).

because the Bonds and related documents referenced the Enabling Act.  U.C.C. § 8-202(b) cmt. 3

("the issuer cannot, by incorporating a reference to a statute or other document, charge the

purchaser with notice of the security's invalidity.").  Rather, the Objecting Parties must provide

evidence demonstrating that Cede & Co. had reason to know of the Bonds' invalidity.  They

cannot do so.  DTC and Cede & Co. had no role in the decision to issue the Bonds; indeed, they

learned of the issuances only days in advance of each issue.  *See id.* ¶¶ 36-38, 45.  DTC had no

obligation to perform any diligence with regard to ERS's authority under the Enabling Act, and it

did not undertake to do so.  *Id.* ¶ 32.  Instead, DTC relied on those charged with a due diligence

obligation to determine compliance with the Enabling Act.  *See id.*  Far from giving DTC or

Cede & Co. any notice of a defect, the Resolution, supported by certifications and opinions from

ERS, its counsel, and the Puerto Rico Secretaries of Justice and Treasury, confirmed that the

Bonds were authorized and valid.  *See* Ex. 1 to Declaration of W. Bartley Hildreth ("Hildreth

Report") ¶¶ 169-72; *see also* U.C.C. § 8-202 cmt. 3 ("As a practical matter the problem of

policing governmental issuers has been alleviated by the present practice of requiring legal

opinions as to the validity of the issue.").

Even if Cede & Co. had some duty to investigate, the facts and circumstances available to

Cede & Co. at the time it purchased the Bonds all confirmed their validity.  Certainly, none of

the materials available gave Cede & Co. a "reason to know"—not hypothesize or speculate, but

*know*—that ERS lacked statutory authority to issue the Bonds.  To reach that conclusion, Cede &

Co. would have had to engage counsel to conduct an independent legal analysis on only a few

days' notice and substitute its judgment for that of ERS's bond counsel and general counsel, who

were charged with determining ERS's authority and who formally opined that the Bonds were

legal, valid, binding, and duly and validly authorized and issued.  *See* Hildreth Report ¶ 161.

- 23 -

Market utilities, such as DTC and its nominee, Cede & Co., "cannot be expected to repeat the
due diligence assignments of the officials and parties intimate to the transaction, much less
uncover basic information [that] those parties did not find." *Id.* ¶ 162; *see also* App. Ex. 13,
Doty Dep. Tr. 170:19-172:4 (investors may rely upon the official statement for due diligence).
Forcing DTC or Cede & Co. to question every issuer's authority and look beyond legal opinions
would be inimical to municipal issuers' ability to access debt markets by reducing demand,
increasing interest rates paid by issuers, limiting negotiability of securities, and impairing values.
*See* Hildreth Report ¶ 180.  The UCC avoids these results by placing the burden of ensuring the
validity of securities on the issuer.

### 3.  ERS Was In Substantial Compliance With The Legal Requirements Governing The Issue Or Received Substantial Consideration For The Bonds And The Stated Purpose Of The Bonds Is One For Which ERS Had Power To Borrow Money.

A purchaser for value without notice of any defect must satisfy the following additional
safeguards before the governmental securities are treated as valid and made enforceable under
§ 8-202(b):  (i) there must be substantial compliance with the legal requirements governing the
issue *or* (ii) (a) the issuer must have received substantial consideration for the issue and (b) the
stated purpose of the issue must be one for which the issuer has power to borrow money or issue
the security.  U.C.C. § 8-202(b).  Although the Bonds need only satisfy one of these tests, the
record here demonstrates that both are satisfied.

As to the first test, ERS was in substantial compliance with the Enabling Act because, as
explained in section I of the Bondholders' Motion, ERS was permitted to borrow money and
issue debt.  The Objecting Parties, at most, object to the form of the borrowing.  Even if the
Court determined that ERS were not in substantial compliance with the Enabling Act, there can
be no reasonable dispute that each prong of the second test is satisfied.  *First*, ERS received

substantial consideration, in the amount of nearly $3 billion, in exchange for issuing the Bonds.

SUF ¶ 5.  *Second*, the Enabling Act empowers ERS to borrow money or to incur debt without

any restriction as to purpose.  *See* 3 L.P.R.A. § 779(d) (2008); *see also Fin. Oversight & Mgmt.*

*Bd. for P.R. v. Andalusian Glob. Activity Co.*, 385 F. Supp. 3d 138, 144 (D.P.R. 2019) ("The

Enabling Act provides that ERS may both issue debt and secure such debt with the assets of

ERS."), *aff'd* 948 F.3d 457 (1st Cir. 2020).  Because there are no restrictions on the purpose for

which ERS may borrow money, ERS had the power to borrow money for the purpose of

decreasing ERS's unfunded pension liability.  SUF ¶¶ 3-4.  Indeed, facilitating retirees' pension

payments is the entire reason for ERS's existence.  *See* 3 L.P.R.A. § 761 ("The funds of [ERS]

shall be used and applied . . . for the benefit of the participating members of its membership,

their dependents and beneficiaries, for the payment of retirement and disability annuities. . . .").

## C.    THE POLICY AND PURPOSES OF THE UCC DICTATE ENFORCEMENT OF § 8-202 IN ACCORDANCE WITH ITS TERMS.

Section 8-202(b) establishes a clear standard to treat securities as valid and make them

enforceable in the hands of purchasers for value without knowledge of the defect.  If the

objective requirements for validation are satisfied, the Court's only role is to apply the statute as

written.  *See* 31 L.P.R.A. § 14 ("When a law is clear and free from all ambiguity, the letter of the

same shall not be disregarded . . . ."); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S.

235, 241 (1989) (where the statute's language is plain, "the sole function of the courts is to

enforce it according to its terms.") (citations omitted).  Applying the UCC as written, the Bonds

are valid and enforceable in the hands of Cede & Co.

Any doubt on this point is dispelled by reading the UCC as a whole—applying the policy and purpose of the UCC and the structure of Article 8.[17]  The UCC is a true code, stating its own aims, and not just a statute.  1 Hawkland UCC Series § 1-103:6.  As such, it provides legislative dictates as to its purposes and construction.  *Id.* § 1-103:11 [Rev].  The UCC mandates a liberal construction so as to:  (1) "simplify, clarify, and modernize the law governing commercial transactions;" (2) "permit the continued expansion of commercial practices through custom, usage, and agreement of the parties;" and (3) "make uniform the law among the various jurisdictions."  U.C.C. § 1-103(a).

Consistent with these stated purposes, Article 8 sets forth objective requirements that simplify and clarify the issuer-purchaser relationship, enhance negotiability of securities, and streamline issuance of debt.  A guiding theme is that, as between issuers and purchasers, risks should rest on the issuer as the party in the best position to avoid any loss.  *See* U.C.C. § 8-202 cmt. 3 ("it is the duty of the issuer, not of the purchaser, to make sure that the security complies with the law governing its issue."); *see also Ramette v. Al & Alma's Supper Club Corp. (In re Bame)*, 252 B.R. 148, 156 (Bankr. D. Minn. 2000) (stating that "the unambiguous import of Article 8 is that the issuer of the certificated security bears the risk of improperly issued securities or other defect"); *cf. Lou Levy & Sons Fashions, Inc.*, 988 F.2d at 314.  To implement this policy, "[s]ection 8-202 and various other provisions of Part 2 provide protection against issuer's defenses . . . to purchasers for value without notice."  7A Hawkland UCC Series § 8-203:1 [Rev].[18]  Stated differently, § 8-202(b) limits issuers' ability to escape their obligations or

---

[17]   "The UCC is to be read as a whole in order to obtain its full meaning."  1 Anderson U.C.C. § 1-103:4 (3d ed.).

[18]   *See, e.g.*, UCC §§ 8-203 (limiting an issuer's ability to assert staleness as notice of a defect or defense); 8-204 (providing that a restriction on transfer of a certificated security "imposed by the issuer, even if otherwise lawful, is ineffective against a person without knowledge of the restriction" unless "the restriction is noted conspicuously on the security certificate."); 8-205 (limiting an issuer's

to interfere with holders' rights and protects innocent holders.  Holding that the Bonds are valid

and enforceable in the hands of Cede & Co. is the result most consistent with the express

purposes and policies of Article 8 and the UCC as a whole.

For the reasons described above, each requirement for validation and enforcement of the

Bonds under § 8-202(b) is satisfied.  Consequently, even if the Bonds were issued with a defect

as to their validity, the Objecting Parties may not assert the invalidity of the Bonds as a defense

against the Fiscal Agent, which is authorized to seek to enforce the Bonds on behalf of Cede &

Co., as the purchaser for value without notice of the defect and the current registered owner.  On

this issue, there are no genuine issues of material fact, and the Fiscal Agent is entitled to

judgment as a matter of law.

### D.    SECTION 8-202(b) APPLIES TO ULTRA VIRES BOND ISSUANCES.

Recognizing that the Bonds are valid and enforceable in the hands of Cede & Co. under

§ 8-202(b), the Objecting Parties look to circumvent or alter the terms of this section by

incorporating pre-UCC case law and interjecting additional obstacles to validation.  The Retiree

Committee seeks to interpose a pre-Code "dichotomy between bond issuances where the issuer

lacked the power to issue the bonds at all (unsalvageable) and those where the issuer incorrectly

implemented its power to issue bonds (a problem that, in some instances, can be remedied)."

Retiree Comm. Claim Obj. ¶ 87.  Such a distinction, however, simply does not exist under

Article 8:  it does not appear in the text of § 8-202(b); it is not supported by the Official

Comments; and it is inconsistent with the established interplay between the UCC and pre-UCC

---

ability to escape liability based on an unauthorized signature); 8-209 (providing that a purchaser takes
free from a lien in favor of an issuer unless "the right of the issuer to the lien is noted conspicuously
on the security certificate."); 8-210 (providing that, where an issuer has over-issued securities, it must
make the purchaser whole by purchasing identical securities in the market or, if not available, by
paying an amount equal to the most recent price plus interest).

common law.  The Court should decline the Retiree Committee's invitation to re-write the
requirements of § 8-202(b).

  *First*, the text of § 8-202(b) does not provide for the Retiree Committee's claimed
distinction between securities issued *ultra vires* and securities issued through irregular exercise
of valid power.  The drafters knew how to draw clear distinctions:  § 8-202(b) recognizes
distinctions between governmental and non-governmental securities, *compare* U.C.C.
§ 8-202(b)(1) *with* (b)(2), and between constitutional and non-constitutional defects, *see id.*
§ 8-202(b)(1) (creating express exception for defects involving "a violation of a constitutional
provision").  The drafters also knew how to create exceptions expressly:  as an example,
§ 8-202(c) provides that "lack of genuineness of a certificated security is a complete defense,
even against a purchaser for value and without notice."  U.C.C. § 8-202(c).  Applying the rule
*expressio unius est exclusio alterius*, the existence of these express distinctions and exceptions,
far from providing a basis to imply others, precludes them.  *See, e.g., Santos-Santos* v. *Torres-
Centeno*, 842 F.3d 163, 169 (1st Cir. 2016) ("[D]esignating a completely separate and
independent order loudly proclaims [a] plaintiff's intention not to appeal from the former order. .
. . As an ancient maxim teaches, 'expressio unius est exclusio alterius.'") (internal citations
omitted).  The Retiree Committee cannot fabricate an exception that does not exist.

  *Second*, Official Comment 3 to § 8-202 does not, as the Retiree Committee claims,
codify an exception for securities issued *ultra vires*.  *See* Retiree Comm. Claim Obj. ¶ 87.
Acknowledging the pre-UCC distinction, the Official Comment explains that the drafters chose
to supplant the common law with a simplified two-part test for the validation of governmental
securities.  Official Comment 3 states the general proposition that "a purchaser for value without
notice of the defect [has] the right to enforce the security against the issuer despite the presence

- 28 -

of a defect that otherwise would render the security invalid," and explains that there are only

"three circumstances in which a purchaser does not gain such rights . . . ."  U.C.C. § 8-202 cmt.

3.[19]  The only circumstance relevant to the Retiree Committee's argument is that a purchaser

does not gain the protections of § 8-202(b) if the security was issued by a governmental issuer

and the purchaser cannot satisfy the "additional safeguards [that] are imposed before

governmental issues are validated" (*i.e.*, "substantial compliance with the legal requirements

governing the issue or if substantial consideration has been received and a stated purpose of the

issue is one for which the issuer has power to borrow money or issue the security.").  *Id.*

Explaining the rationale for the adoption of these safeguards, the Official Comment notes

that, prior to enactment of Article 8, federal case law recognized that "the principle of estoppel in

favor of purchasers for value without notices" was qualified "by requiring that the municipality

have power to issue the security."  U.C.C. § 8-202 cmt. 3.  Instead of creating a blanket

exception for securities that were issued *ultra vires*, however, the drafters "simplif[ied] the

[common law] rule by setting up two conditions for an estoppel against a governmental issuer:

(1) substantial consideration given; and (2) power in the issuer to borrow money or issue the

security for the stated purpose."  *Id.*  Far from implying *additional* pre-UCC common law

requirements, the Official Comment confirms that this simplified two-part test codified in

§ 8-202(b)(2) supplants pre-UCC common law.

*Third*, where the UCC is comprehensive as to a particular subject matter, as it is with

respect to application of government issuers' defenses to purchasers for value without notice

---

[19]    The first circumstance in which a purchaser does not gain the protections of § 8-202(b) is that, "if the
defect involves a violation of constitutional provisions, these rights accrue only to a subsequent
purchaser, that is, one who takes other than by original issue."  UCC § 8-202 cmt. 3.  This exception
is not applicable because the Objecting Parties have not alleged any constitutional defect.  The third
circumstance, relating to overissue under § 8-210, also is not relevant to the present facts.

under § 8-202(b), pre-UCC common law cannot be invoked to impose additional requirements

that do not exist in the UCC.  Hawkland explains:

> [T]he UCC is a general law and not a mere supplement to the common law.  It is preemptive in that it displaces the common law to the extent that it provides coverage for a particular matter, and currently, in relation to its fundamental objectives, and it is sufficiently comprehensive in providing such coverage that resort to exterior law for answers is held to a minimum.

1 Hawkland UCC Series § 1-103:12 [Rev] (footnotes omitted).  With this in mind, "the

paramount rule of construction is preemption of other law, and preemption extends to the

displacement of any law that is inconsistent with the [UCC's] express terms, or its purposes and

policies."  *Id.* § 1-103:11 [Rev].[20]  This rule of construction is necessary to support one of the

primary purposes of the UCC—"to create a statutory scheme incorporating within its provisions

the complete regulation of certain types of commercial dealings."  *Seattle-First Nat. Bank v.*

*Oregon Pac. Indus., Inc*., 500 P.2d 1033, 1034 (Or. 1972).  "This purpose would be blunted if

the rules created by some [pre-UCC] decisions and not expressly provided for in the statutory

scheme were nevertheless grafted onto the [UCC] by implication."  *Id.*  Consistent with the

foregoing analysis, the Court in *Union St. Corridor-Cmty. Dev. Corp. v. Santander Bank, N.A.*

affirmed that, "where a UCC provision specifically defines parties' rights and remedies, it

displaces analogous common-law theories of liability."  191 F. Supp. 3d 147, 150 (D. Mass.

2016) (internal citations omitted).  Accordingly, the Retiree Committee's pre-UCC case law is

irrelevant to the current analysis.

*Fourth*, the Enabling Act and the UCC can, and should be, read harmoniously.  The

Retiree Committee complains that the UCC cannot create a governmental power that does not

---

[20]   Displacement of pre-UCC common law does not require "unequivocal, explicit reference to the common law in each statutory section that effects a modification."  1 Anderson U.C.C. § 1-103:23 (3d ed.).

exist by retroactively empowering public actors to issue otherwise defective securities. *See*

Retiree Comm. Claim Obj. ¶ 88. This argument reflects a misunderstanding of the purpose and

effect of § 8-202(b). Section 8-202(b) does not empower municipalities to issue invalid

securities, retroactively or otherwise; rather, it determines the enforceability of securities, even if

invalidly issued, in the hands of purchasers for value without notice. The only question is who

bears the risk if ERS issued the Bonds without proper authority, and the UCC—not the Enabling

Act—answers that question. In adopting the UCC, the Puerto Rico Legislature made a policy

determination that "it is the duty of the issuer, not of the purchaser, to make sure that the security

complies with the law governing its issue." U.C.C. § 8-202 cmt. 3. If the issuer fails in that

duty, the security nevertheless will be considered valid and enforceable in the hands of

purchasers for value without notice of the defect so long as the "additional safeguards" discussed

above are satisfied. *See id.* § 8-202(b). Accordingly, the Enabling Act and the UCC are

consistent: the Enabling Act identifies the circumstances in which ERS may issue debt, and the

UCC determines that, as between ERS and a purchaser for value without knowledge of a defect,

ERS bears the risks of failing to comply with the Enabling Act.[21]

Prior to enactment of the UCC, some courts permitted governmental issuers to invoke the

equitable doctrine of *ultra vires* to avoid liability on bond obligations. Courts focused on the

particular facts relating to each issue, with mixed results. All this changed with the enactment of

---

[21]   Even if there were an inconsistency between the Enabling Act and the UCC, the latter would take
precedence as the more specific statute with respect to whether a purchaser for value or ERS should
bear the risk of loss for securities that are issued in violation of the Enabling Act. *See Marine
Midland Bank-Rochester v. Vaeth*, 388 N.Y.S.2d 548, 551 (1976) (as between inconsistent statutes,
the UCC, as the more specific statute, controls); *see also Trafalgar Capital Assocs. v. Cuomo*, 159
F.3d 21, 27 (1st Cir. 1998) (employing the canon *generalia specialibus non derogant* and finding that
the "specific limitation . . . trumps the general language"); *Oquendo-Lorenzo v. Hosp. San Antonio,
Inc.*, 256 F. Supp. 3d 103, 121-22 (D.P.R. 2017) (employing the "commonplace of statutory
construction that the specific governs the general" to "avoid rendering superfluous a specific
provision that is swallowed by the general one") (internal quotations omitted).

UCC Article 8.  In furtherance of the purposes of the UCC, including increased certainty in the public debt markets, the drafters established objective criteria for resolving challenges to the validity of securities.  Article 8 generally, and § 8-202 in particular, replaced the pre-UCC equitable doctrine of *ultra vires* with a statutory standard against which the courts measure the conduct of the issuer and the owner of the security.  The objective standards established in the UCC supplant the pre-Code common law.

## **CONCLUSION**

The testimony, documentary evidence, and pleadings in the record demonstrate that there are no material facts in controversy, and the Fiscal Agent is entitled to summary judgment as a matter of law.

WHEREFORE, the Fiscal Agent respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (i) granting this Motion, (ii) declaring that ERS had statutory authority to issue the Bonds or, alternatively, that the Bonds are valid and enforceable pursuant to UCC § 8-202(b), and (iii) overruling the Claim Objections to the extent they are premised upon the *Ultra Vires* Challenge.

*[The remainder of this page was left intentionally blank.]*

Dated:  September 11, 2020
        San Juan, Puerto Rico

Respectfully submitted,

**SEPULVADO, MALDONADO & COURET**

By:     _/s/ Albéniz Couret-Fuentes_
        Albéniz Couret-Fuentes
        USDC-PR Bar No. 222207
        304 Ponce de León Ave. – Suite 990
        San Juan, PR 00918
        Telephone: (787) 765-5656
        Facsimile:  (787) 294-0073
        Email:  acouret@smclawpr.com

**REED SMITH LLP**

Eric A. Schaffer (*Pro Hac Vice*)
Luke A. Sizemore (*Pro Hac Vice*)
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063
Email:  eschaffer@reedsmith.com
Email:  lsizemore@reedsmith.com

C. Neil Gray (*Pro Hac Vice*)
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
Email:  cgray@reedsmith.com

*Counsel to The Bank of New York Mellon,*
*as fiscal agent*

- 33 -

**EXHIBIT A**

<u>Proposed Order</u>

(Attached)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3566-LTS<br><br>***This Order Relates to the<br>Commonwealth and ERS Only,<br>and Should Be Filed in Both<br>Dockets.*** |

**[PROPOSED] ORDER GRANTING MOTION OF THE BANK OF NEW YORK
MELLON, AS FISCAL AGENT, FOR SUMMARY JUDGMENT PURSUANT
TO FED. R. CIV. P. 56 REGARDING *ULTRA VIRES* CHALLENGE**

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and
the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the
Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal
Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No.
17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and
Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of
Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the
Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits
of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case
No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public
Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal
Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software
limitations).

Upon the *Motion of The Bank of New York Mellon, as Fiscal Agent, for Summary Judgment Pursuant to Fed. R. Civ. P. 56 Regarding Ultra Vires Challenge* (the "<u>Motion</u>"); [2] and the Court having reviewed the Motion, section I of the Bondholders' Motion incorporated therein, and the *Statement of Undisputed Material Facts in Support of the Motion of The Bank of New York Mellon, as Fiscal Agent, for Summary Judgment Pursuant to Fed. R. Civ. P. 56*; and having considered any objection filed to the Motion; and the Court finding that the legal and factual bases set forth in the Motion establish that The Bank of New York Mellon is entitled to judgment as a matter of law; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      [ERS had statutory authority to issue the Bonds pursuant to the Enabling Act.] [The Bonds are valid and enforceable pursuant to § 8-202(b) of the UCC.]

3.      The Claim Objections are overruled to the extent they are premised upon the *Ultra Vires* Challenge.

4.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.


Dated:  _____ __, 2020
        San Juan, Puerto Rico


_____
HONORABLE LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

---

[2]     Capitalized terms used but not defined herein have the meanings given in the Motion.